## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| League of United Latin American Citizens, et al., | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Case No. 3:21-cv-259-DCG-JES-JVB |
| Greg Abbott, Governor of the State of Texas sued in his official capacity; and John Scott, Secretary of State of Texas of Texas sued in his official capacity, | § § § § § | |
| *Defendants.* | § § | |

## EXHIBIT E

## ORIGINAL COMPLAINT, *VOTO LATINO V. SCOTT*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| VOTO LATINO, ROSALINDA RAMOS ABUABARA, AKILAH BACY, ORLANDO FLORES, MARILENA GARZA, CECILIA GONZALES, AGUSTIN LOREDO, CINIA MONTOYA,  ANA RAMÓN, JANA LYNNE SANCHEZ, JERRY SHAFER, DEBBIE LYNN SOLIS, ANGEL ULLOA, and MARY URIBE; | Civil Action <br><br> Case No. 1:21-cv-00965 |
|                Plaintiffs, | |
|     v. | |
| JOHN SCOTT, in his official capacity as Texas Secretary of State, and GREGORY WAYNE ABBOTT, in his official capacity as the Governor of Texas; | |
|                Defendants. | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Voto Latino, Rosalinda Ramos Abuabara, Akilah Bacy, Orlando Flores, Marilena Garza, Cecilia Gonzales, Agustin Loredo, Cinia Montoya, Ana Ramón, Jana Lynne Sanchez, Jerry Schafer, Debbie Lynn Solis, Angel Ulloa, and Mary Uribe file this Complaint for Declaratory and Injunctive Relief against Defendant John Scott in his capacity as Texas Secretary of State and Gregory Wayne Abbott in his capacity as Governor of the State of Texas, and allege as follows:

1. Plaintiffs bring this voting rights action to challenge Texas Senate Bill 6, which establishes new congressional districts for Texas based on the 2020 census, on the grounds that it violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, because it strategically cracks and packs Texas communities of color. Senate Bill 6 particularly dilutes the voting power of Texas's Latino and Black communities to ensure that white Texans, who now make up less than 40 percent

of Texas's population, nevertheless form a majority of eligible voters in more than 60 percent of Texas's congressional districts.

2.      Ninety-five percent of Texas's population growth between 2010 and 2020 came from communities of color. Black, Latino, and Asian communities all grew far faster than Texas's white population, with the Latino community growing fastest of all. As a direct result of this growth, Texas was apportioned two additional congressional seats.

3.      Yet Senate Bill 6 appropriates those additional districts—and more—for white Texans. The plan actually *reduces* the number of districts in which Texas's communities of color have a reasonable opportunity to elect their preferred candidates, and it *increases* the number of districts in which a majority of voting-age residents are white. By doing so, Senate Bill 6 allows white Texans to choose representatives for congressional seats that exist only because of population growth in communities of color. Senate Bill 6 does so by packing and cracking communities of color along racial lines to ensure that those groups' growing populations will not translate to increased political influence.

4.      Section 2 of the Voting Rights Act prohibits this absurd result. There is widespread racially polarized voting in Texas. Latino and Black Voters across the state consistently and cohesively favor particular candidates for office, but those candidates are repeatedly defeated as a result of bloc voting by white Texans.

5.      Latino communities in south and west Texas, from the border region north to Bexar County and south to the Gulf of Mexico (hereinafter "South and West Texas"), are sufficiently numerous and geographically compact to form a majority of eligible voters in at least eight congressional districts in the region—two more than Senate Bill 6 provides in that region. And this may be done without reducing the number of other districts in the region or statewide in which

Latino communities are able to elect their representatives of choice. Senate Bill 6 also strategically draws at least one of the Latino-majority districts—CD23—to ensure that Latino Texans, despite their numerical majority, will rarely if ever succeed in electing their representatives of choice.

6.  Moreover, Senate Bill 6 improperly cracks and packs Latino and Black voters in convoluted districts in the Dallas–Fort Worth and Houston metropolitan areas, to avoid creating either an additional district in each metropolitan area in which a majority of eligible voters are Latino or an additional, more compact district in each metropolitan area in which coalitions of Latino and Black voters would have the opportunity to elect their representatives of choice.

7.  Latino and Black voters in Texas have suffered from a long history of marginalization and discrimination, including, as here, the dilution of their voting strength through redistricting. Latino Texans now make up almost as large a proportion of Texas's population as white Texans, yet they have been systematically denied an equal opportunity to elect representatives of their choice. The result is a persistent neglect of their needs and concerns. As evidenced by an array of factors, such as the history of racial discrimination in voting, the perpetuation of racial appeals in Texas elections, and the socio-economic effects of decades of discrimination against Latino and Black Texans that hinder their ability to participate effectively in the political process, Texas's failure to create at least eight performing majority-Latino congressional districts in South and West Texas, plus additional districts in Dallas–Fort Worth and Houston in which either a majority of eligible voters are Latino or coalitions of Latino and Black Texans would have a reasonable opportunity to elect their representatives of choice, has resulted in the dilution of Latino and Black voting strength in violation of Section 2.

8.  Accordingly, Plaintiffs seek an order (i) declaring that Senate Bill 6 violates Section 2 of the Voting Rights Act; (ii) enjoining Defendants from conducting future elections under

Senate Bill 6; (iii) ordering a congressional redistricting plan that includes eight majority-Latino congressional districts in South and West Texas in which Latino voters have a reasonable opportunity to elect their candidate of choice, without reducing the number of other districts in which Latino voters may already do so, plus additional districts in Dallas–Fort Worth and Houston either in which a majority of eligible voters are Latino or in which Latino and Black Texans together may elect their representatives of choice; and (iv) providing such additional relief as is appropriate.

## JURISDICTION AND VENUE

9.      Plaintiffs bring this action under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

10.      This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws of the United States and involve the assertion of deprivation, under color of state law, of rights under federal law.

11.      This Court has personal jurisdiction over Defendants, who reside in Texas and are sued in their official capacities, pursuant to Fed. R. Civ. P. 4(k)(1)(A).

12.      Venue is proper in this Court and this Division under 28 U.S.C. §§ 124(d)(1) and 1391(b) because a substantial part of the events that give rise to Plaintiffs' claims occurred in this judicial district.

13.      This Court has the authority to enter declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

14.      Plaintiff Voto Latino is a 501(c)(4) nonprofit, social welfare organization that engages, educates, and empowers Latinx communities across the United States, working to ensure

that Latinx voters are enfranchised and included in the democratic process. In furtherance of its mission, Voto Latino expends significant resources to register and mobilize thousands of Latinx voters each election cycle, including the nearly 5.6 million eligible Latinx voters in Texas. Voto Latino considers eligible Latinx voters in Texas to be the core of its constituency. Voto Latino mobilizes Latinx voters in Texas through statewide voter registration initiatives, as well as peer-to-peer and digital voter education and get-out-the-vote ("GOTV") campaigns. In 2020 alone, Voto Latino registered 184,465 voters in Texas. In future elections, Voto Latino anticipates making expenditures in the millions of dollars to educate, register, mobilize, and turn out Latinx voters across the United States, including in Texas.

15.     Plaintiff Voto Latino brings this action on behalf of its supporters and constituents, including the thousands of Latinx voters that Voto Latino has registered that reside in congressional districts that dilute the voting power of Latinx Texans. Voto Latino will now have to expend and divert additional funds and resources that it would otherwise spend on its efforts to accomplish its mission in other states or its own registration efforts in Texas to combat Senate Bill 6's effects on its core constituency, in particular to combat the dilution of the voting power of Latinx voters in Texas. Because of Senate Bill 6, Voto Latino and its constituents have suffered and will continue to suffer irreparable harm.

16.     Plaintiff Rosalinda Ramos Abuabara is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of San Antonio, in Bexar County. Under Senate Bill 6, she resides in Texas's 23rd congressional district ("CD23").

17.     Plaintiff Akilah Bacy is an African-American citizen of the United States and of the State of Texas, a registered voter, and a resident of Houston, in Harris County. Under Senate Bill 6, she resides in Texas's 38th congressional district ("CD38").

18.     Plaintiff Orlando Flores is a Latino citizen of the United States and of the State of Texas, a registered voter, and a resident of Fabens, in El Paso County. Under Senate Bill 6, he resides in CD23.

19.     Plaintiff Marilena Garza is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Corpus Christi, in Nueces County. Under Senate Bill 6, she resides in Texas's 27th congressional district ("CD27").

20.     Plaintiff Cecilia Gonzales is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Arlington, in Tarrant County. Under Senate Bill 6, she resides in Texas's 25th congressional district ("CD25").

21.     Plaintiff Agustin Loredo is a Latino citizen of the United States and of the State of Texas, a registered voter, and a resident of Baytown, in Harris County. Under Senate Bill 6, he resides in Texas's 36th congressional district ("CD36").

22.     Plaintiff Cinia Montoya is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Corpus Christi, in Nueces County. Under Senate Bill 6, she resides in CD27.

23.     Plaintiff Ana Ramón is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of San Antonio, in Bexar County. Under Senate Bill 6, she resides in Texas's 21st congressional district ("CD21").

24.     Plaintiff Jana Lynne Sanchez is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Fort Worth, in Tarrant County. Under Senate Bill 6, she resides in Texas's 12th congressional district ("CD12").

25.     Plaintiff Jerry Shafer is a Latino citizen of the United States and of the State of Texas, a registered voter, and a resident of Baytown, in Harris County. Under Senate Bill 6, he resides in CD36.

26.     Plaintiff Debbie Lynn Solis is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Dallas, in Dallas County. Under Senate Bill 6, she resides in Texas's 33rd congressional district ("CD33").

27.     Plaintiff Angel Ulloa is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of El Paso, in El Paso County. Under Senate Bill 6, she resides in Texas's 16th congressional district ("CD16").

28.     Plaintiff Mary Uribe is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Helotes, in Bexar County. Under Senate Bill 6, she resides in CD23.

29.     Defendant John Scott is sued in his official capacity as the Secretary of State of Texas. As Secretary of State, Mr. Scott serves as Texas's Chief Election Officer. Tex. Elec. Code § 31.001(a). As "the chief election officer of the state," *id.*, Mr. Scott is required to "obtain and maintain uniformity in the application, operation, and interpretation of" Texas's election laws, including by issuing directives and instructions to all state and local authorities having duties in the administration of these laws, *id.* § 31.003. Mr. Scott is further empowered to remedy voting rights violations by ordering any official to correct conduct that "impedes the free exercise of a citizen's voting rights." *Id.* § 31.005(b). Mr. Scott prescribes the form that individuals must complete for a place on a political party's general primary ballot, *see id.* §§ 141.031, 172.021-.024. And political parties who wish to hold a primary must deliver written notice to the Secretary of State noting their intent to hold a primary election, *id.* § 172.002, and the party chairs must certify

7

to the Secretary of State the name of each candidate who has qualified for placement on the general primary election ballot, *id.* § 172.028. The Secretary of State also serves as the filing authority for independent candidates for federal office, including members of Congress. *See id.* § 142.005. Finally, the adopted redistricting plans are filed with the Secretary of State to ensure that elections are conducted in accordance with those plans.

30.     Defendant Gregory Wayne Abbott is sued in his official capacity as the Governor of the State of Texas. Under Texas's election laws, Governor Abbott "shall order . . . each general election for . . . members of the United States Congress" by proclamation. Tex. Elec. Code § 3.003.

## LEGAL BACKGROUND

31.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" Thus, in addition to prohibiting practices that deny outright the exercise of the right to vote, Section 2 prohibits vote dilution. A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

32.     The dilution of voting strength "may be caused by the dispersal of [members of a racial or ethnic group] into districts in which they constitute an ineffective minority of voters or from the concentration of [members of that group] into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

33.     The United States Supreme Court, in *Thornburg v. Gingles*, identified three necessary preconditions ("the *Gingles* preconditions") for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically

compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51.

34.     Once all three preconditions are established, the statute directs courts to consider whether, under the totality of the circumstances, members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Senate Report on the 1982 amendments to the Voting Rights Act identifies several non-exclusive factors that courts should consider when determining if, under the totality of the circumstances in a jurisdiction, the operation of the electoral device being challenged results in a violation of Section 2.

35.     These Senate factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet-voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

36.     The Senate Report itself and the cases interpreting it have made clear that "there is no requirement that any particular number of factors be proved, or that a majority of them point

one way or the other." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see also id.* ("The statute explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

## FACTUAL ALLEGATIONS

### A. The 2020 Census

37.     On April 26, 2021, the U.S. Census Bureau announced that based on the 2020 decennial census, Texas would gain two additional seats in the United States House of Representatives. On August 12, the Census Bureau then released the detailed population and demographic data needed to draw new congressional districts. The Census Bureau's data revealed that Texas's population grew by nearly four million people between 2010 and 2020.

38.     Texas's growth came overwhelmingly from communities of color. Texas's white population grew by just 187,252 between 2010 and 2020. In contrast, Texas's Latino population grew by 1,980,796; Texas's Asian population grew by 613,092; and Texas's Black population grew by 557,887. The number of Texans identifying as members of multiple races also grew significantly. In all, non-white Texans accounted for 95 percent of Texas' population growth from 2010 to 2020, and Latinos accounted for more than half of that growth. Latino Texans now make up just under 40 percent of Texas's population—only half a percentage point less than white Texans. Had it not been for the growth in its communities of color, Texas likely would have lost congressional seats instead of gaining them.

39.     Communities of color also grew significantly in their share of Texas's voting-age population. More than 36 percent of voting-age Texans are now Latino—an increase of almost three percentage points since 2010. More than 12 percent of voting-age Texans are now Black and

more than 5 percent are Asian. Only 43 percent of Texas's voting age population is now white—a decrease of more than 6 percentage points since 2010.

40.     The 2020 census did not collect citizenship information. Based on the Census Bureau's 2019 American Community Survey ("ACS"), Texas's citizen voting age population was 30.9 percent Latino, 13.4 percent Black, 3.9 percent Asian, and 50.1 percent white.

## B.  The Redistricting Process

41.     Senate Bill 6 is the direct result of the Texas Legislature's failure to meaningfully engage with voters and abdication of its map-drawing responsibility to outside interests.

42.     After a lengthy delay due to the coronavirus pandemic, the Texas Legislature began collecting public input on the redistricting process in January 2021.

43.     From January to March 2021, the Senate Special Committee on Redistricting, led by Republican Senator Joan Huffman, heard public testimony during a series of hearings with a regional focus. Each hearing was held over the Zoom two-way video conferencing platform.

44.     Although taking testimony remotely might as a matter of first impression appear to open the opportunity to give testimony to a greater number of people, the process was entirely inaccessible to many Texans. Not only did all but one of the twelve hearings held in those three months take place on weekdays during regular work hours—precluding working Texans from testifying unless they took time off work to do so—only Texans with a computer or other device with an internet connection and video/audio capability, such as a smartphone or tablet, were able to participate in the hearings. Witnesses were required to have both audio and video capabilities in order to provide virtual testimony. And those who did not have access to such a device were advised—in the middle of a global pandemic that prohibited in-person regional hearings—to visit their local public library.

45.     The Senate held four additional virtual hearings in September 2021.

46.     On September 7, 2021, Governor Abbott announced a third special session of the Texas Legislature, commencing on September 20, for the purpose of redrawing legislative and congressional districts in accordance with the results of the 2020 census. One week later, on September 27, Senator Joan Huffman released congressional Plan 2101—the first proposed congressional district map, which later became Senate Bill 6, and scheduled a public hearing on it three days later.

47.     On September 30, 2021, Senate Bill 6 was considered by the Special Committee on Redistricting. The Committee considered invited and in-person public testimony.

48.     During the September 30 hearing, Senator Huffman admitted that Plan 2101, the base map for Senate Bill 6, was drawn not by any Texas legislator or their staff but by the State's Republican congressional delegation's lawyer, indicating that the public testimony was nothing more than a formality.

49.     When asked by Senator John Whitmire about the fact that Plan 2101 paired two Houston Democrats in Harris County in the same district, Senator Huffman admitted that this plan had been provided to her by the Texas Republican congressional delegation. After Senator Huffman received the plan, she made "some changes," and those changes were incorporated into Plan 2101 before she introduced it as Senate Bill 6.

50.     On October 4, 2021, the Senate Special Committee on Redistricting met to consider Senate Bill 6. After a public hearing in which witnesses were overwhelmingly opposed to the plan, the committee reported it favorably with minor amendments in the Dallas–Fort Worth Area.

51.     On October 8, 2021, the full Senate considered Senate Bill 6. Senate Bill 6 was amended to make minor changes to the border between CD6 and CD17 in East Texas. All other

amendments that were offered failed. Senate Bill 6 then passed out of the Senate on party lines by a vote of 18-13.

52. Senate Bill 6 then moved to the Texas House.

53. Like the Senate, prior to the consideration of Senate Bill 6, the House had held a series of virtual hearings for the purpose of considering public testimony on the redistricting process.

54. And, like the Senate, the process for providing public input during the map drawing process was held entirely online and almost entirely during the work week, all but ensuring the process was inaccessible for most Texans.

55. And, like the Senate, the individuals responsible for redrawing the congressional maps did not directly receive or respond to public comments and criticisms during these hearings.

56. On September 29, 2021, just after Plan 2101 became public, the Texas Tribune reported that Adam Foltz, a Republican lawyer and political operative who had previously played a key role in another state's redistricting process described by federal judges as "needlessly secret," had been hired by the House Redistricting Committee. Despite being paid by the non-partisan Texas Legislative Council, Foltz was reporting directly to the Chair of the House Redistricting Committee, Representative Todd Hunter.

57. Foltz's work was entirely separate from the House Redistricting Committee's public facing work and, until the Texas Tribune's story broke, at least one Democratic member of the Committee was unaware of Foltz's involvement in the process.

58. The House process for considering Senate Bill 6 allowed for only limited public testimony. Senate Bill 6 was received by the House on October 8, 2021, and referred to the House's

Redistricting Committee that same day. The Committee sat on the bill for five days until October 13, 2021, when they noticed a hearing for October 14, 2021—the very next day.

59.     Despite the less than 24 hours' notice that was provided for the hearing, 94 Texans testified before the House Redistricting Committee—93 of them opposed Senate Bill 6. Nonetheless, later that same day the House Redistricting Committee met again and passed Senate Bill 6 along a party line vote.

60.     On Saturday, October 16, the full House considered Senate Bill 6. The House considered a total of twenty-six amendments, of which five were adopted. Those amendments kept the general outline of Senate Bill 6 the same but made relatively minor changes in numerous counties and districts. The House rejected proposed amendments that would have created additional majority-minority districts. Early in the morning on Sunday, October 17, the House then voted 79 to 56 to pass Senate Bill 6 as amended.

61.     The Senate refused to concur in the House's amendments to Senate Bill 6, and a conference committee was immediately appointed. Less than 24 hours after the House version of Senate Bill 6 was adopted, on the evening of October 17, the conference committee issued a report. The conference committee report adopted some of the House's amendments, rejected others, and made several other changes.

62.     Representative Todd Hunter, the Chair of the House Redistricting Committee, described the conference committee as a "casual discussion," explaining that the House "showed deference to the Senate. They took the lead and I agreed."

63.     On October 18, 2021, both the House and Senate passed the conference committee report, sending Senate Bill 6 to the Governor.

64.     Governor Abbott signed Senate Bill 6 on October 25, 2021.

### C. Senate Bill 6

65.     Senate Bill 6 creates significant problems focused in three parts of the State: in the districts in South and West Texas and neighboring districts to the north, which systematically dilute Latino voting strength, and in the Dallas–Fort Worth and Houston metropolitan areas, where Senate Bill 6 packs and cracks non-white voters to reduce the number of districts in which they have an opportunity to elect their candidates of choice.

#### 1. South and West Texas

66.     The U.S.–Mexico Border stretches for 1,254 miles across south Texas, from El Paso to Brownsville. The majority of Texans living in the border region are Latino, and Latino Texans in the border region cohesively support political candidates affiliated with the Democratic Party. North of the border, however, are many predominantly white, rural counties whose white residents vote as a bloc to oppose Latino voters' favored candidates.

67.     In Senate Bill 6, this region is divided into nine districts: CD16, CD23, CD28, CD15, and CD34 along the U.S.–Mexico Border, and CD27, CD35, CD20, and CD21 just north of the border districts.

68.     As explained in more detail in the paragraphs that follow, Senate Bill 6 systematically combines predominantly Latino areas in the border region with white counties in the interior to dilute the votes of Latino Texans and limit the number of congressional districts in which they may elect their candidates of choice. It also carefully packs and cracks non-white voters in Bexar County, denying those communities the opportunity to collect their candidate of choice. But for this packing and cracking, Latino eligible voters could form a numerical majority in two additional districts in South and West Texas without compromising their ability to elect their candidates of choice in the existing districts.

### a. CD16

69.     CD16 is the western-most congressional district in Texas, centered in El Paso. It has long been an overwhelmingly Latino district. Under the previously enacted map, 76.5 percent of CD16's voting-eligible population—that is, of its U.S. Citizen population of voting age—was Latino. Senate Bill 6 packs CD16 still further with voting-eligible Latino Texans, so that 77.8 percent of CD16's eligible voters are now Latino. Senate Bill 6 does this by excising the comparatively white northeast portion of El Paso County from CD16, and replacing it with a more densely Latino area further south. The result is a less compact district that increases the packing of Latino voters in El Paso in CD16, further diluting their voting rights, including the voting rights of Plaintiff Angel Ulloa. By doing so, Senate Bill 6 also reduces the ability of Latino voters in neighboring districts, including Plaintiffs Orlando Flores, Rosalinda Ramos Abuabara, and Mary Uribe in CD23, to elect their candidates of choice.

### b. CD23

70.     Immediately east of CD16 is CD23, a large, predominantly rural district stretching along the U.S–Mexico Border from El Paso County to Maverick County. But CD23's vast geographic size is misleading, because the district includes many very sparsely populated counties in West Texas. In fact, the bulk of CD23's population is located in two pockets separated by more than 500 miles: in El Paso County at CD23's western extreme and in Bexar County at CD23's eastern extreme. Senate Bill 6 surgically alters CD23's boundaries in El Paso and Bexar Counties to reduce the district's population of voting-eligible Latinos from 63.1 percent under the previously enacted map to 58.1 percent under the new map.

71.     Latino voters in CD23 cohesively prefer candidates affiliated with the Democratic Party, but the higher turnout and bloc voting of CD23's white residents ensured that even under the prior map, Latino voters were often unable to elect their candidates of choice. And when Latino

voters have been able to do so, it was nearly always by a margin of fewer than five-percentage points.

72.     In previous litigation,  a federal court ultimately concluded that the prior version of CD23 was a highly competitive district that still allowed Latino voters an opportunity to elect their candidates of choice, even though more often than not such candidates were in fact defeated. But Senate Bill 6's five percentage-point reduction in CD23's Latino voting-eligible population transforms CD23 into a non-competitive district and will prevent Latino voters in CD23, including Plaintiffs Orlando Flores, Rosalinda Ramos Abuabara, and Mary Uribe, from electing their candidates of choice in the future. A more compact district or set of districts could readily be drawn that would enable Latino voters in these areas, including Plaintiffs Orlando Flores, Rosalinda Ramos Abuabara, and Mary Uribe, to elect their candidates of choice.

### c.  CD28

73.     South of CD23 along the U.S.–Mexico border is CD28, which stretches from the City of Laredo and Starr County in the south to Bexar County in the north. Senate Bill 6 leaves CD28 largely unchanged, with a Latino voting-eligible population that is just under 70 percent.

### d.  CD15

74.     Just east of CD28 is CD15, a skinny, more than 250-mile-long district running from McAllen to Guadalupe County. More than 70 percent of CD15's voting-eligible population is Latino, a percentage that is largely unchanged from the previous map. More compact districts could readily be drawn that would enable Latino voters to elect their candidates of choice.

### e.  CD34

75.     Southeast of CD15 is CD34, which includes the southernmost portion of Texas's gulf coast. Under the prior enacted map, nearly 79 percent of CD34's voting eligible population was Latino. Senate Bill 6 further packs Latino voters into CD34 by adding more of Hidalgo County

into CD34, and by eliminating a tail that previously stretched north through several rural counties. As a result, CD34's voting-eligible population is now nearly 87 percent Latino.

76. The packing of Latino voters into CD34 dilutes the votes of its Latino residents, and it reduces the ability of Latino voters in neighboring districts—in particular, Latino voters in CD27, including Plaintiffs Marilena Garza and Cinia Montoya—to elect their candidates of choice.

### f. CD27

77. North of CD34 is CD27, which combines predominantly Latino Nueces County with predominantly white counties to its north and west, creating a district with a voting eligible population that is just 48.65 percent Latino. Because of higher turnout and bloc voting among CD27's white voters, this configuration ensures that Latino voters in CD27, including Plaintiffs Marilena Garza and Cinia Montoya, will be unable to elect their candidates of choice. By adopting such a configuration, Senate Bill 6 dilutes the votes of Latino voters in CD27, including Latino voters in Nueces County. Alternative compact districts could readily be drawn that would enable Latino voters in CD27—particularly Latino voters in Nueces County, including Plaintiffs Marilena Garza and Cinia Montoya—to elect their candidates of choice.

### g. CD35

78. Northwest of CD27 is CD35, a narrow strip of a district that stretches along I-35 from Travis County to Bexar County, often covering an area little wider than I-35's median strip. The district combines separate Latino populations in Travis and Bexar County, for a voting-eligible population that is just under 48 percent Latino. While the Supreme Court ruled in 2018 that the existing CD35 was not necessarily an illegal racial gerrymander, the fact remains that there is no need for such contortions in this area. Unlike in other parts of Texas, Latino and white voters in Travis County frequently favor the same political candidates—those affiliated with the Democratic Party. Latino voters in Travis County may therefore elect their candidates of choice

18

even if they do not form a majority of eligible voters in their districts. And Bexar County is a majority-Latino county, so it is entirely possible to create compact districts which allow Latinos in Bexar County to elect their candidates of choice without resorting to the geographic gymnastics typified by CD35. By unnecessarily combining two, differently situated populations of Latino voters in an oddly-shaped, non-compact district in CD35, Senate Bill 6 dilutes their votes, and impairs the ability of Latino voters in neighboring districts, including Plaintiffs Marilena Garza and Cinia Montoya in CD27, Plaintiff Ana Ramón in CD21, and Plaintiffs Orlando Flores, Rosalinda Ramos Abuabara, and Mary Uribe in CD23, to elect their candidates of choice.

### h. CD20

79.     CD20 is a small district centered in San Antonio, strategically drawn to cover many of the most Latino portions of Bexar County, while excluding precincts—like those covering Lackland Air Force Base—that are less Latino. The result is a district with a voting-eligible population that is 69.94 percent Latino, an increase of four percentage points from the prior enacted map. By packing Latino voters into CD20, Senate Bill 6 dilutes the votes of its Latino residents, and it reduces the ability of Latino voters in neighboring districts, including Plaintiffs Orlando Flores, Rosalinda Ramos Abuabara, and Mary Uribe in CD23, to elect their candidates of choice.

### i. CD21

80.     North of CD20 is CD 21, which combines eight largely rural, predominantly white counties with more diverse slices of Bexar and Travis Counties to form a district that is 25.78 percent Latino. By cracking slices of Latino voters from Bexar and Travis Counties and placing those voters in a predominantly white, rural district, Senate Bill 6 dilutes the votes of CD21's Latino residents, including Plaintiff Ana Ramón, and impairs their ability to elect their candidates of choice.

### 2. Dallas–Fort Worth

81.     Senate Bill 6 carves up Dallas and Tarrant Counties, the core of the diverse Dallas–Fort Worth metropolitan area, among nine extraordinarily convoluted congressional districts. Non-white voters have a reasonable opportunity to elect their candidates of choice in just three of those districts: CD30, a predominantly Black district in southern Dallas County; CD32, a diverse coalition district in northwest Dallas County, and CD33, a bizarrely-shaped, predominantly Latino district that includes portions of Fort Worth and Downtown Dallas. Non-white voters elsewhere in the area are cracked among the other six districts, many of which combine diverse slices of the Dallas–Fort Worth metropolitan area with distant, predominantly-white rural counties.

82.     Latino and Black voters in Tarrant and Dallas Counties overwhelmingly and consistently join together in supporting candidates affiliated with the Democratic Party, and often favor the same candidates in primary elections, while white voters vote as a bloc to oppose such candidates in general elections.

83.     Alternative districts could readily be drawn in Tarrant and Dallas Counties that would either (a) create an additional district in which a majority of eligible voters, including Plaintiff Debbie Lynn Solis, are Latino, or (b) create an additional district in which Latino and Black voters have a reasonable opportunity to form coalitions to elect their candidates of choice, in each case without eliminating any districts in the area in which Latino and Black voters, already have a reasonable opportunity to elect their candidates of choice. Doing so would provide additional Latino voters in the region, including Plaintiffs Cecilia Gonzales and Jana Lynne Sanchez, with the opportunity to elect their candidates of choice.

### 3. Houston

84.     Harris County is the largest county in Texas and is home to more non-white residents than any other Texas county. In fact, there are more non-white residents in Harris County

than there are *total* residents in any other Texas county. Just under 30 percent of Harris County residents are white—20 percent of the county's residents are Black and nearly 45 percent are Latino.

85.    Senate Bill 6 separates highly diverse Harris County into eight congressional districts. In terms of voting eligible population, five of those congressional districts—CD7, CD8, CD9, CD18, and CD29—are majority non-white, while three—CD2, CD36, and CD38—are majority white. This configuration deprives Latino and Black voters in CD2, CD36, and CD38 of the opportunity to elect their candidates of choice.

86.    Latino and Black voters in Harris County overwhelmingly join together in supporting candidates affiliated with the Democratic Party, and often favor the same candidates in primary elections, while white voters vote as a bloc to oppose such candidates in general elections.

87.    Senate Bill 6 is able to draw three majority-white districts in the diverse Harris County area principally via its configuration of CD29, which both (a) cracks compact Latino communities in southeast Harris County between CD29 and the predominantly white and rural CD36, and then (b) captures a separate, dense triangle of Latino voters north of Houston and places it in CD29. Such a configuration is unnecessary and improper.

88.    A more compact version of CD29 in which a majority of the citizen voting age population is still Latino could be drawn entirely in the southeast Houston suburbs, by eliminating the cracking of a portion of that community into CD36. By doing so, Latino voters in eastern Harris County, including Plaintiffs Jerry Shafer and Agustin Loredo, would gain a reasonable opportunity to elect their candidates of choice. This change would also enable the creation of an additional district in Harris County either (a) in which a majority of eligible voters are Latino or (b) in which Latino and Black voters, including Plaintiff Akilah Bacy, have a reasonable opportunity to form

coalitions to elect their candidates of choice, in each case without eliminating the number of districts in the area in which Latino and Black voters already have a reasonable opportunity to elect their candidates of choice.

### D. Racial Polarization

89. As courts have long recognized, voting in nearly every region of Texas is severely racially polarized. *See Veasey v. Abbott*, 830 F.3d 216, 258 (5th Cir. 2016) (en banc) (noting State's failure to contest evidence that "racially polarized voting exists throughout Texas"); *Perez v. Abbott* ("*Perez I*"), 250 F. Supp. 3d 123, 180 (W.D. Tex. 2017) (three-judge panel) (noting "the existence of racially polarized voting throughout Texas").

90. Black and Latino voters across Texas cohesively vote for the same candidates. For example, ecological regression analysis suggests that in the 2020 presidential election, more than 70 percent of Latino voters and more than 95 percent of Black voters statewide supported President Biden, the Latino and Black candidate of choice. Similarly, in the 2018 governor's race, more than 70 percent of Latino voters and more than 95 percent of Black voters supported candidate Lupe Valdez, the Latino and Black candidate of choice. In contrast, non-Hispanic white voters in Texas consistently vote as a bloc to defeat those candidates, with just 15 percent of white Texas voters supporting President Biden and just 10 percent of white Texas voters supporting Lupe Valdez.

91. The racially polarized voting patterns in Texas are driven in significant part by attitudes about race and ethnicity. Members of Texas's two major political parties exhibit sharp disagreements over issues relating to race and ethnicity. Members of the Democratic Party—which Latino and Black voters in the state overwhelmingly prefer—are significantly more likely to view Texas's voting laws as racially discriminatory, support removing Confederate monuments from public spaces, oppose immediate deportation of undocumented immigrants, and support

comprehensive immigration reform with a pathway to citizenship than members of the Republican Party, which white voters overwhelmingly prefer.

92.     In 2008, the Cooperative Congressional Election Study found that *60 percent* of Texas Republicans supported re-imposing a literacy test for voting, compared to just 24 percent of the State's Democrats.

**E.  Texas's History of Discrimination**

93.     Texas's attempts to dilute the Latino vote through redistricting is nothing new. It is simply the latest iteration of centuries-long efforts by Texas officials to suppress non-white political participation.

94.     "Texas has a long, well-documented history of discrimination that has touched upon the rights of Blacks and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 682–83 (S.D. Tex. 2017) (quoting *League of United Latin Am. Citizens v. Perry* ("*LULAC*"), 548 U.S. 399, 439–40 (2006)); *see also Perez v. Abbott* ("*Perez II*"), 253 F. Supp. 3d 864, 888, 906 (W.D. Tex. 2017) (three-judge panel noting that "Texas's history of official discrimination touching on the right of Hispanics to register, vote, and otherwise to participate in the democratic process is well documented").

95.     Texas's ongoing history of voting discrimination against minorities has deep historical roots. In 1866, Texas prohibited freed slaves from voting and holding office. After Reconstruction-era policies expanded ballot access, Texas systematically fought to suppress minority voting rights.

96.     In the decades before white Texans coalesced around the Republican Party, white Texans dominated the Democratic Party—and stopped minority voters from participating in its primaries. This was particularly problematic because the historic Democratic Party so dominated the State's politics into the mid-twentieth century that no other party was even relevant. By 1923, Texas had passed a law explicitly providing that "in no event shall a negro participate in a Democratic primary in the State of Texas and declaring ballots cast by negroes as void." S.B. 44, 38th Leg., 2d Sess. (Tex. 1923). After the U.S. Supreme Court invalidated that law, Texas maneuvered around the ruling by allowing political parties to set their own qualifications, after which Black and Latino voters were immediately barred from political participation once again.

97.     Texas further engaged in systematic disenfranchisement of Latino voters by capitalizing on language barriers and literacy disparities, going so far as to prohibit anyone from assisting "illiterate" individuals or non-English speakers at the polls. These restrictions remained in place until federal court intervention in 1970.

98.     Texas also used a poll tax to disenfranchise Black and Latino voters, who were significantly more likely to be living in poverty. This significantly depressed Black and Latino registration and turnout throughout much of the twentieth century.

99.     After the Voting Rights Act of 1965 increased registration rates among Black and Latino Texans, the State quickly legislated counteractive measures. The following year, Texas enacted a law requiring that every voter reregister each year, a measure intended to mimic the poll tax's burden on minority voters. After a federal court found this annual-registration requirement unconstitutional, *see Beare v. Smith*, 321 F. Supp. 1100, 1101–02 (S.D. Tex. 1971) (three-judge panel), *aff'd sub nom. Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974), Texas purged minority voters from its rolls by requiring all voters in the State to reregister before voting in future

24

elections. These and other tactics against minority voters eventually led Congress to include Texas as a covered state under Section 5 of the Voting Rights Act in 1975.

100. While Texas's efforts to limit Black and Latino voters' access to the franchise have a long and shameful heritage, they are by no means a thing of the past. The State continues to lead the nation in efforts to suppress minority political participation.

101. A 2018 study by the U.S. Commission on Civil Rights found that Texas had "the highest number of recent [Voting Rights Act] violations in the nation." U.S. Comm'n on C.R., *An Assessment of Minority Voting Rights Access in the United States* 74 (2018). In every redistricting cycle since 1970, a federal court has ruled at least once that the State violated the Voting Rights Act or the U.S. Constitution during the redistricting process.

102. In 2006, the U.S. Supreme Court held that the State had enacted a congressional map that unlawfully diluted the voting strength of Latino voters in West Texas in direct response to those voters' growing political power. *See LULAC*, 548 U.S. at 436–42. These actions "b[ore] the mark of intentional discrimination that could give rise to an equal protection violation." *Id.* at 440.

103. During the 2010 redistricting cycle, federal courts found that Texas had intentionally diluted Black and Latino voting strength in crafting new congressional and state legislative maps. *See Perez II*, 253 F. Supp. 3d at 949–62; *Perez I*, 250 F. Supp. 3d at 145–80 (W.D. Tex. 2017); *Texas v. United States*, 887 F. Supp. 2d 133, 159–66, 177–78 (D.D.C. 2012) (three-judge panel), *vacated and remanded on other grounds*, 570 U.S. 928 (2013). A three-judge court "found that the Texas Legislature intentionally discriminated in 2011 in numerous and significant ways" during the last decennial redistricting, and the Supreme Court "never addressed or in any way called into question [that court's] findings as to the Legislature's discriminatory

purpose in enacting the 2011 plans." *Perez v. Abbott*, 390 F. Supp. 3d 803, 811–12 (W.D. Tex. 2019).

104.    In 2016, an en banc panel of the U.S. Court of Appeals for the Fifth Circuit concluded that there was evidence that Texas's 2011 law requiring photo identification for voters was motivated by a discriminatory purpose. *See Veasey*, 830 F.3d at 225, 234–43. The Fifth Circuit further "conclude[d] that the district court did not clearly err in determining that [the photo identification law] ha[d] a discriminatory effect on minorities' voting rights in violation of Section 2 of the Voting Rights Act." *Id.* at 265.

105.    Texas also uses the enormous power of its criminal justice system to suppress minority political participation. Since Attorney General Paxton took office in 2015, at least 72 percent of the prosecutions brought by his Election Integrity Unit have been against Black and Latino individuals—who make up just over 50 percent of the State's population.

106.    Because the rules governing voter registration and ballot casting can be confusing, the threat of criminal prosecution for violating such rules significantly deters eligible voters from participating in the political process. The severe racial and ethnic disparities in Texas's election-related prosecutions thus intimidate minority voters against participating in the State's elections.

107.    Attorney General Paxton has not been alone in intimidating minority voters. In 2019, former Acting Secretary of State David Whitley issued an advisory decision to county registrars claiming to have a list of 95,000 noncitizens who were unlawfully registered to vote. The list was rife with errors, particularly because it failed to account for noncitizens who had since become naturalized. A federal judge called Secretary Whitley's actions in this incident "ham-handed and threatening" and lamented that these actions stoked "fear and anxiety" among the State's minority population and "intimidate[d] the least powerful among us." *Tex. League of*

*United Latin Am. Citizens v. Whitley*, No. SA-19-CA-74-FB, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019).

108.    In addition to the threat of criminal prosecution, Black and Latino Texans routinely face intimidation and misinformation at the polls.

109.    Dallas County's former elections administrator stated in 2018 that the severity and intensity of voter harassment and intimidation had reached levels she had not seen in her 30 years of service. During that year's election, a white poll worker in North Houston yelled racial insults at a Black voter, stating, "Maybe if I'd worn my blackface makeup today you could comprehend what I'm saying to you," and, "If you call the police, they're going to take you to jail and do something to you, because I'm white."

110.    The 2020 election was no better. On the first day of early voting at a Dallas polling place, an older white man falsely told a long line of mostly Black and Latino voters that they would not be allowed to vote if they were not inside the building by the time the polls closed.

111.    At a different Dallas polling location, supporters of former president Trump blared messages aimed at Latino and Black voters while one of them told the voters that he sends people to the morgue.

112.    On October 29, cars and military-style trucks gathered in the parking lot of a Fort Bend polling place with loudspeakers, bullhorns, and a coffin.

113.    Incidents of Trump supporters engaging in similar intimidating behavior were reported in Tarrant, Montgomery, and Harris Counties.

114.    And just this year, the Texas Legislature re-doubled its efforts to make it more difficult of Black and Latino Texans to vote, enacting an omnibus voter suppression bill that burdens voters, restricts access to the franchise, and targets the very measures that communities of

color disproportionately relied on to increase voter turnout in 2020 and other recent elections. *See generally* SB 1, 87th Leg., 2d Called Sess. (Tex. 2021). Disturbingly, SB 1 even empowered partisan poll watchers to employ voter intimidation tactics by granting them increased freedom in the polling place while limiting the oversight powers of election workers.

### F. Use of Racial Appeals in Political Campaigns

115.    Political campaigns in Texas commonly resort to racial appeals that rely on stereotypes. During the 2018 campaign for the U.S. Senate, Senator Cruz ran ads capitalizing on fears founded on the stereotype that Latino immigrants are violent criminals and mocked his opponent's call for an investigation into the police shooting of an unarmed Black man in the man's own apartment.

116.    In support of former congressman Pete Olson, who was facing a challenge by Sri Preston Kulkarni in 2018, the Fort Bend County Republican Party circulated an advertisement depicting Ganesha, a Hindu deity, asking, "Would you worship a donkey or an elephant? The choice is yours."

117.    That same year, former congressman Pete Sessions claimed that his Black opponent, now-congressman Colin Allred, wanted to legalize crack cocaine, and ran a digital ad placing Congressman Allred's name over a picture of a dark-skinned hand clasping a white woman's mouth.

118.    Local campaigns have also included racial appeals. For example, Vic Cunningham, a white candidate for Dallas County Commissioner in 2018, explained to the *Dallas Morning News* that he believed it would be "Christian" only if his children married a person "that's Caucasian."

119.    Race played an enormous role in the 2020 election, fueled in significant part by police killings of Black Americans like George Floyd and Breonna Taylor. In Texas, Republican

officials publicly mocked the worldwide outrage and protests that these killings provoked. One county Republican chair posted a Martin Luther King Jr. quote on a background with a banana. Other county Republican chairs spread false conspiracy theories on social media suggesting that George Floyd's murder was staged in an effort to limit Black support for former president Trump and that the protesters demanding racial justice nationwide were being paid by George Soros. Taking these blatantly false assertions a step further, Republican Agriculture Commissioner Sid Miller publicly stated that Soros was starting a "race war."

120.    During the 2020 U.S. Senate race, Republican incumbent John Cornyn engaged in several racial appeals. He nicknamed potential opponent Royce West, who is Black, "Restful Royce"—a clear reference to a longstanding racist stereotype.

121.    Senator Cornyn also publicly blamed China's "culture" for the coronavirus outbreak, playing into the same racial appeals used by former president Trump and other Republicans, who, for example, referred to the pandemic as the "Kung-Flu." An Asian American studies expert called this language "textbook racist discourse."

122.    And, just a few months ago, a Republican candidate in the State's special congressional election for CD6 outright declared that she did not want Chinese immigrants in the United States.

### G.  Ongoing Effects of Texas's History of Discrimination

123.    The long history of discrimination against Black and Latino Texans has produced stark disparities between the everyday lives of minority and white Texans. Black and Latino Texans make up a disproportionate number of individuals living in poverty. According to the U.S. Census Bureau's 2019 American Community Survey ("ACS") 5-Year Estimate, 8.4 percent of

white Texans lived below the poverty line, compared to 19.3 percent of Black Texans and 20.7 percent of Latino Texans.

124.    Disparities also exist in the areas of employment and income. According to the 2019 5-year ACS Estimate, the median income among non-Latino white Texan households ($75,879) was significantly higher than that among Black Texan households ($46,572) and Latino Texan households ($49,260). And according to a 2018 study by the Economic Policy Institute, non-white Texans had a significantly lower unemployment rate (3.9 percent) than Black Texans (5.7 percent) and Latino Texans (4.5 percent).

125.    Low-income voters face a number of hurdles to voter participation including working multiple jobs, working during polling place hours, lack of access to childcare, lack of access to transportation, and higher rates of illness and disability. All of these hurdles make it more difficult for poor and low-income voters to participate effectively in the political process.

**H.  Extent to Which Latino and Black Texans Have Been Elected to Public Office**

126.    The ongoing disparities in minority political participation are also reflected by the fact that Latino and Black lawmakers are underrepresented in the State's elected offices. While Latino Texans constitute more than 36 percent of Texas's voting-age population and nearly 30 percent of its citizen voting-age population, and Black Texans constitute more than 12 percent of Texas's voting age population and more than 13 percent of its citizen voting age population, just two of Texas's twenty-seven statewide elected State officials are Latino, and none is Black. Less than 20 percent of the seats in Texas's delegation to the U.S. House of Representatives, and less than 25 percent of the seats in the Texas Senate and Texas House are held by Latino lawmakers. At the local level, many communities with large Latino populations lack any minority representation at all.

# CLAIMS FOR RELIEF

## COUNT I

## SECTION 2 OF THE VOTING RIGHTS ACT

127.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

128.    Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race, color, or membership in a language minority group. 52 U.S.C. § 10301(a).

129.    The district boundaries created by Senate Bill 6 combine to "crack" and "pack" Latino Texans, resulting in the dilution of the electoral strength of the state's Latino and Black residents, in violation of Section 2 of the Voting Rights Act.

130.    Latino Texans in South and West Texas are sufficiently numerous and geographically compact to constitute a majority of eligible voters in two additional congressional districts, for a total of eight such districts in that region.

131.    Additionally, Senate Bill 6's CD23, which contains a majority of Latino eligible voters, is drawn to ensure that Latino voters do not have a reasonable opportunity to elect their candidates of choice. Latino voters in South and West Texas are sufficiently numerous and geographically compact to permit CD23 to be drawn in ways that would give the Latino residents of that district a reasonable opportunity to elect their candidates of choice.

132.    In addition, Black and Latino voters in the Dallas–Fort Worth and Houston metropolitan areas are sufficiently numerous and geographically compact to either (a) allow for an additional district in each of the Dallas–Fort Worth and Houston areas in which a majority of eligible voters are Latino, or (b) allow for an additional district in each of the Dallas–Fort Worth

31

and Houston areas in which Black and Latino eligible voters are, together, a majority of eligible voters.

133.   In sum, under Section 2 of the Voting Rights Act, the Texas legislature was required (a) to create two additional majority-minority districts in which Latino Texans in South and West Texas have the opportunity to elect their candidates of choice, (b) to draw CD23 in a manner that would give Latino Texans in that district a reasonable opportunity to elect their candidates of choice, and (c) to create two additional districts—one each in the Dallas–Fort Worth and Houston areas—in which either Latino Texans or Black and Latino Texans together form a majority of eligible voters. Not one of these additional districts would reduce the number of minority opportunity districts in their respective regions or in the enacted map as a whole.

134.   Black and Latino voters in Dallas–Fort Worth and Houston, and Latino voters in South and West Texas, are politically cohesive, and elections in the state reveal a clear pattern of racially polarized voting that allows the bloc of white voters usually to defeat minority-preferred candidates.

135.   The totality of the circumstances establishes that the congressional map established by Senate Bill 6 has the effect of denying Black and Latino voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

136.   By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs' rights guaranteed to them by Section 2 of the Voting Rights Act. Defendants will continue to violate those rights absent relief granted by this Court.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a.  Declare that Senate Bill 6 violates Section 2 of the Voting Rights Act.

b. Order the adoption of a valid congressional redistricting plan that includes:

    i. Two additional majority-Latino districts in South and West Texas, from the border region north to Bexar County and south to the Gulf of Mexico, without reducing the number of majority-Latino districts currently in the region or elsewhere in the State;

    ii. A district that gives the Latino residents of TX-23 a reasonable opportunity to elect their candidates of choice;

    iii. An additional majority-Latino or majority–Black and Latino district in the Dallas–Fort Worth metropolitan area, without reducing the number of minority opportunity districts currently in the region; and

    iv. An additional majority-Latino or majority–Black and Latino district in the Houston metropolitan area, without reducing the number of minority opportunity districts currently in the region.

c. Enjoin Defendants, as well as their agents and successors in office, from enforcing or giving any effect to the boundaries of the congressional districts as drawn in Senate Bill 6, including an injunction barring Defendants from conducting any further congressional elections under the current map.

d. Hold hearings, consider briefing and evidence, and otherwise take actions necessary to determine and order a valid plan for new congressional districts in the State of Texas; and

e. Grant such other or further relief the Court deems to be appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Dated: October 25, 2021.

Respectfully submitted,

*/s/ Renea Hicks*
Renea Hicks
Attorney at Law
Texas Bar No. 09580400

Law Office of Max Renea Hicks
P.O. Box 303187
Austin, Texas 78703-0504
(512) 480-8231
rhicks@renea-hicks.com


Abha Khanna*
**ELIAS LAW GROUP LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
akhanna@elias.law


Aria C. Branch*
David R. Fox*
Kathryn E. Yukevich*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
abranch@elias.law
dfox@elias.law
kyukevich@elias.law

Kevin J. Hamilton*
**PERKINS COIE**
1201 Third Avenue
Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-8000
khamilton@perkinscoie.com

*Counsel for Plaintiffs*

*Pro Hac Vice* Application Forthcoming