IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SOUTHWEST VOTER REGISTRATION EDUCATION  PROJECT, MI FAMILIA VOTA, AMERICAN GI FORUM, LA UNION DEL PUEBLO ENTERO, MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS, TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION, WILLIAM C. VELASQUEZ INSTITUTE, FIEL HOUSTON INC., TEXAS ASSOCIATION OF LATINO ADMINISTRATORS AND SUPERINTENDENTS, EMELDA MENENDEZ, GILBERTO MENENDEZ, JOSE OLIVARES, FLORINDA CHAVEZ, AND JOEY CARDENAS, | § § § § § § § § § § § § § | Case No. 3:21-cv-00259 |
| *Plaintiffs,* | § § | |
| V. | § § § | |
| GREG ABBOTT, in his official capacity as Governor of Texas; JOHN SCOTT, in his official capacity as Secretary of State of Texas, | § § § § § § | |
| *Defendants.* | § § | |

DEFENDANTS' MOTION TO DISMISS,
FOR A MORE DEFINITE STATEMENT, OR TO STRIKE

## TABLE OF CONTENTS

Table of Contents .......................................................................................................................ii

Index of Authorities ..................................................................................................................iii

Introduction ................................................................................................................................1

Standard ......................................................................................................................................1

Argument ....................................................................................................................................2

I.      Plaintiffs Have Not Plausibly Alleged Standing ............................................................2

      A.  The Plaintiff Organizations Lack Associational Standing.........................................2

      B.  The Individual Plaintiffs Also Lack Standing ...........................................................5

II.     Each of Plaintiffs' Claims Fails as a Matter of Law ......................................................6

      A.  The Court Should Dismiss Plaintiffs' One-Person-One-Vote Claims.................................6

            1.     This Court Lacks Jurisdiction to Consider the Old Maps .................................7

            2.     Plaintiffs Have Not Plausibly Alleged that the New House Map Violates the One-Person-One-Vote Principle.............................................7

      B.  The Court Should Dismiss Plaintiffs' Section 2 Effects Claim............................................9

            1.     Plaintiffs' Section 2 Effects Claim Fails on the Merits......................................9

            2.     Section 2 Does Not Give Plaintiffs an Implied Private Cause of Action ................................................................................................16

      C.  The Court Should Dismiss Plaintiffs' Intentional-Discrimination Claims ......................19

            1.     Lack of Discriminatory Effect Precludes Intentional-Discrimination Claims ...........................................................................................20

            2.     Plaintiffs Have Not Plausibly Alleged Discriminatory Intent .........................20

Conclusion ................................................................................................................................23

## INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) (Thomas, J. concurring) ................................................................ 14, 22

*Ala. Legislative Black Caucus v. Alabama,*
575 U.S. 254 (2015) ........................................................................................................ 7, 14

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ................................................................................................ 18, 19, 20

*Allen v. State Bd. of Elections,*
393 U.S. 544 (1969) ................................................................................................................ 20

*Alsbrook v. City of Maumelle,*
184 F.3d 999 (8th Cir. 1999) (en banc) ............................................................................... 19

*Anne Harding v. County of Dallas,*
948 F.3d 302 (5th Cir. 2020) .................................................................................................. 12

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .................................................................................................. 2, 10, 12, 22

*Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Retardation Ctr. Bd. of Trs.,*
19 F.3d 241 (5th Cir. 1994) ................................................................................................... 4

*Baca v. Berry,*
806 F.3d 1262 (10th Cir. 2015) .............................................................................................. 9

*Bartlett v. Strickland,*
556 U.S. 1 (2009) ................................................................................................................ 12, 14

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .......................................................................................................... *passim*

*Benavidez v. Irving Indep. Sch. Dist.,*
690 F. Supp. 2d 451 (N.D. Tex. 2010) ................................................................................. 11

*Bethune-Hill v. Va. State Bd. of Elections,*
137 S. Ct. 788 (2017) .............................................................................................................. 7

*Brecht v. Abrahamson,*
507 U.S. 619 (1993) .............................................................................................................. 17

*Brnovich v. Democratic Nat'l Comm.,*
    141 S. Ct. 2321 (2021) (Gorsuch, J., concurring) ...............................................17

*California v. Sierra Club,*
    451 U.S. 287 (1981)...................................................................................................20

*Chisom v. Roemer,*
    501 U.S. 380 (1991) (Scalia, J., dissenting)...........................................................21

*City of Lockhart v. United States,*
    460 U.S. 125 (1983)...................................................................................................16

*City of Mobile v. Bolden,*
    446 U.S. 55 (1980).....................................................................................................17

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)................................................................................................7, 8

*Conley v. Gibson,*
    355 U.S. 41 (1957)................................................................................................2, 12

*Conservation Force v. Delta Air Lines, Inc.,*
    190 F. Supp. 3d 606 (N.D. Tex. 2016) ..........................................................19, 20

*Conservation Force v. Delta Air Lines, Inc.,*
    682 F. App'x 310 (5th Cir. 2017) ...................................................................19, 20

*Cooper Indus., Inc. v. Aviall Servs., Inc.,*
    543 U.S. 157 (2004)...................................................................................................17

*Ctr. for Biological Diversity v. EPA,*
    937 F.3d 533 (5th Cir. 2019)......................................................................................4

*Delancey v. City of Austin,*
    570 F.3d 590 (5th Cir. 2009).....................................................................................20

*DiMaio v. Democratic Nat'l Comm.,*
    520 F.3d 1299 (11th Cir. 2008) (per curiam).............................................................6

*Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors,*
    522 F.3d 796 (7th Cir. 2008)......................................................................................5

*Draper v. Healey,*
    827 F.3d 1 (1st Cir. 2016) (Souter, J.)......................................................................5

*Evenwel v. Abbott,*
    136 S. Ct. 1120 (2016) ..........................................................................................8, 9

*Faculty, Alumni, & Students Opposed to Racial Preferences v. New York Univ.*,
    11 F.4th 68 (2d Cir. 2021) .................................................................................................5

*Friends of the Earth, Inc. v. Chevron Chem. Co.*,
    129 F.3d 826 (5th Cir. 1997) ..............................................................................................4

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
    695 F.3d 330 (5th Cir. 2012) ..............................................................................................4

*Ga. Republican Party v. SEC*,
    888 F.3d 1198 (11th Cir. 2018) ..........................................................................................5

*Gallagher v. New York State Bd. of Elections*,
    496 F. Supp. 3d 842 (S.D.N.Y. 2020) ...............................................................................6

*Georgia v. Ashcroft*,
    539 U.S. 461 (2003) .........................................................................................................16

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ...............................................................................................4, 6, 7

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002) .........................................................................................................19

*Gonzalez v. Harris County*,
    601 F. App'x 255 (5th Cir. 2015) (per curiam) ...............................................................13

*Growe v. Emison*,
    507 U.S. 25 (1993) .....................................................................................................11, 13

*Hall v. Virginia*,
    385 F.3d 421 (4th Cir. 2004) ............................................................................................13

*Hancock Cty. Bd. of Supervisors v. Ruhr*,
    487 F. App'x 189 (5th Cir. 2012) .......................................................................................5

*Harris v. Ariz. Indep. Redistricting Comm'n*,
    578 U.S. 253 (2016) ...........................................................................................................9

*Holder v. Hall*,
    512 U.S. 874 (1994) (Thomas, J., concurring in the judgment) ................................14, 16

*Hunt v. Wash. St. Apple Adver. Comm'n*,
    432 U.S. 333 (1977) ...................................................................................................3, 4, 5

*J.I. Case Co. v. Borak*,
    377 U.S. 426 (1964) ...................................................................................................18, 20

*Johnson v. De Grandy,*
    512 U.S. 997 (1994) .................................................................................................. 12, 14

*League of United Latin Am. Citizens, Council No. 4434 v. Clements,*
    999 F.2d 831 (5th Cir. 1993) (en banc) ..................................................................... 14

*League of Women Voters of Michigan v. Johnson,*
    No. 2:17-cv-14148, 2018 WL 10483517 (E.D. Mich. May 16, 2018) ........................ 7

*Logan v. U.S. Bank Nat'l Ass'n,*
    722 F.3d 1163 (9th Cir. 2013) .................................................................................. 18

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................................................... 8

*LULAC v. Abbott,*
    369 F. Supp. 3d 768 (W.D. Tex. 2019) ..................................................................... 14

*LULAC v. Abbott,*
    951 F.3d 311 (5th Cir. 2020) (Smith, J.) .................................................................. 14

*LULAC v. Clements,*
    986 F.2d 728 (5th Cir. 1993) .................................................................................... 13

*LULAC v. NE Ind. Sch. Dist.,*
    903 F. Supp. 1071 (W.D. Tex. 1995) ....................................................................... 21

*Miller v. Johnson,*
    515 U.S. 900 (1995) .................................................................................................. 22

*Mo. Prot. & Advocacy Services, Inc. v. Carnahan,*
    499 F.3d 803 (8th Cir. 2007) ...................................................................................... 4

*Morse v. Republican Party of Va.,*
    517 U.S. 186 (1996) (minority opinion of Stevens, J.) ............................................ 19

*N.E. Ohio Coal. for Homeless v. Blackwell,*
    467 F.3d 999 (6th Cir. 2006) ...................................................................................... 3

*NAACP v. City of Kyle,*
    626 F.3d 233 (5th Cir. 2010) ................................................................................. 4, 6

*Nestle Ice Cream Co. v. NLRB,*
    46 F.3d 578 (6th Cir. 1995) ........................................................................................ 4

*NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760,*
    377 U.S. 58 (1964) .................................................................................................... 24

*Palmer v. Thompson,*
  403 U.S. 217 (1971) ...................................................................................................21

*Pers. Adm'r of Mass. v. Feeney,*
  442 U.S. 256 (1979) ........................................................................................ 22, 23, 24

*Rodriguez v. Harris County,*
  964 F. Supp. 2d 686 (S.D. Tex. 2013) ..................................................... 13, 21

*Rodriguez v. Popular Democratic Party,*
  457 U.S. 1 (1982) .......................................................................................................19

*Shaw v. Reno,*
  509 U.S. 630 (1993) ............................................................................................ 21, 24

*Shelby County v. Holder,*
  570 U.S. 529 (2013) ...................................................................................................16

*Sinkfield v. Kelley,*
  531 U.S. 28 (2000) (per curiam) ..........................................................................7

*Stokes v. Sw. Airlines,*
  887 F.3d 199 (5th Cir. 2018) .......................................................................... 18, 20

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ...................................................................................................4

*Tex. Indigenous Council v. Simpkins,*
  No. 5:11-cv-315, 2014 WL 252024 (W.D. Tex. Jan. 22, 2014) .......................4

*Thornburg v. Gingles,*
  478 U.S. 30 (1986) ..............................................................................................*passim*

*Touche Ross & Co. v. Redington,*
  442 U.S. 560 (1979) ...................................................................................................20

*Turner v. Arkansas,*
  504 U.S. 952 (1992) ...................................................................................................21

*Turner v. Arkansas,*
  784 F. Supp. 553 (E.D. Ark. 1991) ...................................................................21

*United States v. Hays,*
  515 U.S. 737 (1995) ..............................................................................................7, 24

*United States v. O'Brien,*
  391 U.S. 367 (1968) ...................................................................................................21

*Valdespino v. Alamo Heights Indep. Sch. Dist.*,
  168 F.3d 848 (5th Cir. 1999) ........................................................................... 11

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) .................................................................................. 22, 23

*Voinovich v. Quilter*,
  507 U.S. 146 (1993) ........................................................................................ 9

*Warth v. Seldin*,
  422 U.S. 490 (1975) ........................................................................................ 3

*White v. Regester*,
  412 U.S. 755 (1973) ........................................................................................ 9

*Yazzie v. Hobbs*,
  977 F.3d 964 (9th Cir. 2020) (per curiam) ........................................................ 6

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017) ............................................................................. 18, 20

**Statutes**

52 U.S.C.
    § 10301(a) ........................................................................................ 11, 18, 19
    § 10301(b) ............................................................................................. 11, 15
    § 10304 ........................................................................................................ 16
    § 10308 ........................................................................................................ 19

**Other Authorities**

Tex. Const. art. III, § 40 ..................................................................................... 22

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 13

Fed. R. Civ. P. 12(e) .......................................................................................... 10

Fed. R. Civ. P. 12(f) ........................................................................................... 16

Fed. R. Evid. 201(b)(2) ....................................................................................... 10

## INTRODUCTION

In this redistricting case, Plaintiffs have not alleged which districts they challenge. Their conclusory complaint does not even identify the voters whose rights supposedly support associational standing or disclose the districts in which those voters live. Plaintiffs have not given Defendants fair notice of their claims or the grounds upon which they rest.

These ambiguities and omissions infect every part of the case. Beginning with jurisdiction, Plaintiffs lack Article III standing because they have not identified any allegedly affected voters and because they have omitted the "district-by-district" allegations required by Supreme Court precedent. On the merits, Plaintiffs attempt to challenge unspecified districts by simply reciting the elements of their claims, often quoting or paraphrasing caselaw, without alleging any underlying facts.

If Plaintiffs are allowed to proceed on their current complaint, it will needlessly multiply proceedings and waste both the parties' and the Court's resources. Defendants respectfully move the Court to dismiss the current complaint and require any amended complaint to allege the facts necessary to efficiently litigate this case.

## STANDARD

A plaintiff must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

1

ARGUMENT

## I. Plaintiffs Have Not Plausibly Alleged Standing

This Court should dismiss for lack of subject-matter jurisdiction because Plaintiffs do not have Article III standing. The Entity Plaintiffs have not plausibly alleged facts supporting associational standing. They have not even identified the voters whose rights are at issue or alleged the districts in which those voters live. And the Individual Plaintiffs have not even alleged that they intend to vote. In any event, even if some plaintiff had standing, it would permit only district-specific challenges, not statewide challenges to each redistricting map as a whole.

### A. The Plaintiff Organizations Lack Associational Standing

The Entity Plaintiffs have not plausibly alleged associational standing. Although "an association may have standing solely as the representative of its members," this doctrine "does not eliminate or attenuate the constitutional requirement of a case or controversy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Accordingly, courts apply a three-part test: "(a) [the association's] members would otherwise have standing to sue in their own right; (b) the interests [the association] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

As a threshold matter, the Entity Plaintiffs have not established that they have members at all. SVREP, Mi Familia Vota, and WCVI do not claim to have members. *See* ECF 1 at ¶¶ 12–13, 18. Those organizations allegedly work with or serve certain voters, but the beneficiaries of a plaintiff's services do not qualify as "members" for purposes of associational standing. "[S]tanding on behalf of the group served by [an] organization" would be "a form of representational standing never recognized by any court." *N.E. Ohio Coal. for Homeless v. Blackwell*, 467 F.3d 999, 1010 n.4 (6th Cir. 2006).

The remaining Entity Plaintiffs—LULAC, American GI Forum, LUPE, MABA-TX, Texas

2

HOPE, FIEL, and TALAS—each claim to be a "membership organization," but they do not allege any facts supporting that conclusion. ECF 1 at ¶¶ 11, 14–17, 19–20. The question is not whether an entity describes itself as having members but whether those purported members "possess all of the indicia of membership in an organization." *Hunt*, 432 U.S. at 344. Under that inquiry, individuals may support associational standing only if they "elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 (5th Cir. 2012) (citing *Hunt*, 432 at 344-45; *see also Tex. Indigenous Council v. Simpkins*, No. 5:11-cv-315, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014).

Courts "apply the *Hunt* 'indicia of membership' test" when determining whether an organization has "members" whose interests it can represent in federal court. *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997); *see, e.g., Mo. Prot. & Advocacy Services, Inc. v. Carnahan*, 499 F.3d 803, 810 (8th Cir. 2007); *Nestle Ice Cream Co. v. NLRB*, 46 F.3d 578, 586 (6th Cir. 1995). The organization must "provide[] the means by which [its purported members] express their collective views and protect their collective interests." *Hunt*, 432 U.S. at 345. If the individuals it claims as members do not "participate in and guide the organization's efforts," then the plaintiff organization lacks associational standing. *Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994). None of the Entity Plaintiffs alleges facts establishing that their purported members meet these criteria.

Even if the Entity Plaintiffs did have members, they still could not establish associational standing unless one of those members independently had Article III standing. *See Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019); *Funeral Consumers All.*, 695 F.3d at 344 n.9.

"Foremost among [the Article III standing] requirements is injury in fact." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). But the Entity Plaintiffs have failed to "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see NAACP v. City of Kyle*,

3

626 F.3d 233, 237 (5th Cir. 2010) (requiring an injury to "a specific member"). When a complaint fails to identify members, associational-standing claims should be dismissed. *See, e.g.*, *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (dismissing claim where the only member identified failed to allege that he was injured by the challenged regulation); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J.) (dismissing claim where the plaintiff organization had only "submitted an affidavit asserting that many of its members asked it to take legal action" but did not identify any injured member with particularity); *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008) (dismissing claim where the plaintiff organization had failed to allege that its standing was derived from any identified individual that had suffered the requisite harm).

In this case, the Entity Plaintiffs have not identified any members at all, much less injured ones. Of course, the complaint identifies the Individual Plaintiffs, but it does not allege that they are members of any of the Entity Plaintiffs. *See* ECF 1 ¶¶ 21–25. Even if the Individual Plaintiffs were members of the Entity Plaintiffs, they could not support associational standing because the Individual Plaintiffs lack standing for the reasons explained below. *See infra* Part I.B.[1]

Some of the Entity Plaintiffs also have not satisfied *Hunt's* second requirement: that "the interests [they] seek[] to protect are germane to [their] purpose[s]." 432 U.S. at 343. The American GI Forum is "dedicated to addressing problems of discrimination and inequities endured by Hispanic veterans." ECF 1 ¶ 14. WCVI "conducts research" in order "to provide information relevant to the needs of its constituents to Latino community leaders." ECF 1 ¶ 18. TALAS's purpose is to "advocate[] for Latino learners' and leaders' growth and advancement in Texas." ECF 1 ¶ 20. But

---

[1] An unpublished Fifth Circuit opinion once noted that the panel was "aware of no precedent holding that an association must set forth the name of a particular member in its complaint," *Hancock Cty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 198 (5th Cir. 2012), but the precedent cited above holds exactly that. In any event, even if the Entity Plaintiffs did not have to "name names," they would at least have to include "more specific" allegations "identifying members who have suffered the requisite harm." *Faculty, Alumni, & Students Opposed to Racial Preferences v. New York Univ.*, 11 F.4th 68, 75–76 (2d Cir. 2021).

Plaintiffs do not allege that their interest in redistricting is germane to veteran status, conducting research, or education. The worthiness of those causes does not make the Entity Plaintiffs' claims "germane" to their purposes.[2]

**B.     The Individual Plaintiffs Also Lack Standing**

The Individual Plaintiffs also do not allege facts to establish standing. *See* ECF 1 ¶¶ 21–25. They rely on a vote-dilution theory of injury, *see id.* ¶ 26, but they do not allege that they intend to vote in 2022 (or any other future election). Vote dilution, by definition, injures only those who vote. It "arises from the particular composition of the voter's own district, which causes his vote . . . to carry less weight than it would carry in another, hypothetical district." *Gill*, 138 S. Ct. at 1931.

True, the Individual Plaintiffs allege that they are registered to vote, *see id.* ¶¶ 21–25, but a plaintiff's allegation that he is "a registered voter" does not suffice. *DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1302 (11th Cir. 2008) (per curiam). A "complaint undeniably fails the test for constitutional standing" when the plaintiff "never allege[s] that he actually voted, nor even so much as suggested that he intended to vote in," the election at issue. *Id.*; *see also Yazzie v. Hobbs*, 977 F.3d 964, 967 (9th Cir. 2020) (per curiam) (dismissing for lack of standing because "any allegation or showing as to, at a bare minimum, whether any of the plaintiffs intend to vote in this general election" was "missing"); *Gallagher v. New York State Bd. of Elections*, 496 F. Supp. 3d 842, 850 (S.D.N.Y. 2020) (holding the plaintiffs lacked standing to challenge a deadline for voting by mail when "none of them has alleged that he or she intends to cast an absentee ballot *by mail*").

Even if the Individual Plaintiffs had plausibly alleged an intent to vote, their claims of "statewide" harm would still fail to satisfy Article III. ECF 1 ¶ 26. Where, as here, "plaintiffs' alleged

---

[2] Because the Entity Plaintiffs rely exclusively on associational standing, Defendants do not address the barriers to organizational standing, including the fact that none of the Entity Plaintiffs are themselves injured. *See City of Kyle*, 626 F.3d at 236–37 (distinguishing associational and organizational standing).

harm is the dilution of their votes, that injury is district specific." *Gill*, 138 S. Ct. at 1930. Because any injury to a plaintiff "results from the boundaries of the particular district in which he resides," any remedy "lies in the revision of the boundaries of the individual's own district." *Id.*[3]

This is in keeping with Supreme Court precedent restricting standing to bring related redistricting claims. In a "racial gerrymandering" case, for example, a voter does not have Article III standing to challenge a map "in its entirety." *United States v. Hays*, 515 U.S. 737, 746 (1995). Establishing "individualized harm" requires showing that the "plaintiff resides in a racially gerrymandered district." *Id.* at 744–45. "On the other hand, where a plaintiff does not live in such a district, he or she does not" have standing, unless there is some other basis for concluding "that the plaintiff has personally been subjected to a racial classification." *Id.* at 745; *see also Sinkfield v. Kelley*, 531 U.S. 28, 30 (2000) (per curiam). Thus, "[a] racial gerrymandering claim" must proceed "district-by-district," and courts do not analyze the State "as an undifferentiated 'whole.'" *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015); *accord Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 800 (2017).

## II.     Each of Plaintiffs' Claims Fails as a Matter of Law

### A.     The Court Should Dismiss Plaintiffs' One-Person-One-Vote Claims

Count 2 contains two different one-person-one-vote claims, *see* ECF 1 ¶¶ 109–10, but neither should survive this motion to dismiss. First, Plaintiffs lack standing to challenge the old maps because they have not plausibly alleged that any implementation of the old maps is "*certainly impending.*" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Second, Plaintiffs challenge the population deviations in the new House map, but they have not alleged any facts sufficient to overcome the presumption of constitutionality for deviations smaller than 10%.

---

[3] Entity plaintiffs face the same restrictions. An entity plaintiff "may not step into the shoes of its members to bring a statewide claim because its members would lack standing as individual plaintiffs to challenge the apportionment plan on a statewide basis." *League of Women Voters of Michigan v. Johnson*, No. 2:17-cv-14148, 2018 WL 10483517, at *6 (E.D. Mich. May 16, 2018) (three-judge district court).

1.     **This Court Lacks Jurisdiction to Consider the Old Maps**

Plaintiffs first one-person-one-vote challenge is to the old maps drawn based on the 2010 census numbers. They contend that those maps are "unconstitutionally malapportioned" once the 2020 census numbers are applied. *See* ECF 1 ¶ 109. But Plaintiffs do not have standing to challenge the old maps.

The Supreme Court has "repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 565 n. 2 (1992)). Here, Plaintiffs do not allege that Defendants will implement the old maps in the 2022 election (or any subsequent election). Nor could they. Plaintiffs themselves concede that the Legislature has already passed new maps superseding the old maps. *See* ECF 1 ¶ 33. Plaintiffs cannot be injured by maps that will not be implemented, and they do not allege otherwise.

2.     **Plaintiffs Have Not Plausibly Alleged that the New House Map Violates the One-Person-One-Vote Principle**

Plaintiffs also challenge the new House map's "'top to bottom' deviation of 9.98%." ECF 1 ¶ 110. Instead of challenging specific districts, Plaintiffs attempt to challenge the new House map as a whole. As explained above, Plaintiffs do not have standing to bring statewide vote-dilution challenges. *See supra* Part I.B. The same rule limitation applies on the merits. As *Thornburg v. Gingles* explained in the Section 2 context, a "vote dilution" inquiry "is district specific." 478 U.S. 30, 59 n.28 (1986). Plaintiffs' failure to identify specific districts renders their complaint deficient.

Even if Plaintiffs could challenge the House map as a whole, that claim would fail as a matter of law. "[W]hen drawing state and local legislative districts, jurisdictions are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives, among them, preserving the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness." *Evenwel v. Abbott*, 136 S. Ct. 1120, 1124 (2016). "Where the

maximum population deviation between the largest and smallest district is less than 10%, the [Supreme] Court has held, a state or local legislative map presumptively complies with the one-person, one-vote rule." *Id.*

This rule of presumptive constitutionality means a plaintiff's claim of an unconstitutional deviation below 10% is "insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Voinovich v. Quilter*, 507 U.S. 146, 161 (1993). Plaintiffs cannot "establish a violation of the Equal Protection Clause from population variations [below 10%] alone." *White v. Regester*, 412 U.S. 755, 764 (1973). Because the Supreme Court "ha[s] refused to require States to justify deviations of 9.9%" or smaller, "attacks on deviations under 10% will succeed only rarely, in unusual cases." *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253 (2016). Claims necessarily fail when "they identify no facts or law supporting an argument that the presumption was rebutted (or even rebuttable)." *Baca v. Berry*, 806 F.3d 1262, 1276 (10th Cir. 2015).

In this case, Plaintiffs include just two sentences beyond their assertion of a 9.98% differential. Neither suffices, even at the pleading stage.

First, Plaintiffs claim that, in the House map, the Legislature "overpopulate[ed] Latino majority districts and underpopulated Anglo majority districts to avoid drawing new Latino majority districts and minimize Latino voters' opportunity to participate in the political process." ECF 1 ¶ 110. What Plaintiffs mean is far from clear. Defendants assume that Plaintiffs do not mean to assert that districts that contain a Latino majority are disproportionately overpopulated statewide. In fact, data from the Texas Legislative Council reflects that half the districts with majority Hispanic CVAP have less than the ideal number of voters.[4] The other half have more.[5] Defendants do not understand

---

[4] Plan Packet: H2316 at 33–37 of 63 (15 Districts: HDs 31, 34–42, 80–81, 104, 140, 145).

[5] *Id.* (15 Districts: HDs 43, 74–75, 77–79, 116–19, 123–25, 143–44).

8

Plaintiffs to be disputing the accuracy of these publicly available numbers, which Defendants assert are subject to judicial notice. *See* Fed. R. Evid. 201(b)(2). To the extent Plaintiffs dispute the numbers, they would nevertheless need to allege which districts they contend are underpopulated or overpopulated and which districts they contend are "Latino majority districts" or "Anglo majority districts." ECF 1 ¶ 110. To the extent Plaintiffs mean to suggest that districts in a particular geographic area were over- or under-populated based on race, they have not so alleged. Plaintiffs have not carried their burden of plausibly alleging a violation and should, at least, be required to provide "a more definite statement" because their allegation "is so vague or ambiguous that [Defendants] cannot reasonably prepare a response." Fed. R. Civ. P. 12(e).

Second, Plaintiffs assert that "[t]here is no legal justification for maintaining a deviation of 9.98% when it has such an adverse impact on Latino voting strength." ECF 1 ¶ 110. This is not a factual allegation taken as true at the pleading stage. It is a "conclusory" legal assertion "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. It adds nothing, except to suggest that Defendants bear the burden of "justif[ying]" the alleged deviation. But as explained above they don't. Instead, Plaintiffs bear the burden of overcoming the presumption of constitutionality for deviations smaller than 10%, and bald assertions, with nothing more, do not suffice.

**B.    The Court Should Dismiss Plaintiffs' Section 2 Effects Claim**

Plaintiffs' VRA claim fails as a matter of law. First, Plaintiffs have not plausibly alleged facts establishing a violation of Section 2. Second, Plaintiffs lack a private cause of action.

**1.    Plaintiffs' Section 2 Effects Claim Fails on the Merits**

Plaintiffs have not plausibly alleged facts establishing a violation of Section 2 on a district-by-district basis. They do not even identify each district they want to challenge. As a result, Plaintiffs cannot and do not allege facts necessary for *Gingles*' "district specific" analysis. 478 U.S. at 59 n.28. Instead of giving Defendants fair notice of the scope of their challenge, Plaintiffs include only a few

"example" districts. Even there, though, they do not allege facts supporting their claim.

> **a.** **The *Gingles* Test**

Section 2 prohibits a "standard, practice, or procedure" from being "imposed or applied . . . in a manner which results in a denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a). To establish a violation of that provision, a plaintiff must show, "based on the totality of circumstances," that:

> the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 10301(b). A court can consider "[t]he extent to which members of a protected class have been elected to office in the State," but "nothing in [Section 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.*

Under Supreme Court precedent interpreting this statute, plaintiffs must establish three "necessary preconditions":

> (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."

> (2) "the minority group must be able to show that it is politically cohesive."

> (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate."

*Gingles*, 478 U.S. at 50–51 (citation omitted); *see also Grove v. Emison*, 507 U.S. 25, 39–41 (1993) (requiring "the *Gingles* preconditions" in "a § 2 dilution challenge to a single-member districting scheme").

The Fifth Circuit "has interpreted the *Gingles* factors as a bright line test." *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852 (5th Cir. 1999); *accord Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 456 (N.D. Tex. 2010). "Failure to establish any one of these threshold requirements

is fatal." *Harding v. County of Dallas*, 948 F.3d 302, 308 (5th Cir. 2020) (quotation omitted). If a plaintiff can meet "the three prongs of *Gingles*," he "must establish that the 'totality of the circumstances' supports a finding of vote dilution." *Id.* at 308–09.

Under *Gingles*, the Section 2 inquiry must be "district specific." 478 U.S. at 59 n.28. That is in keeping with the requirement that plaintiffs establish standing on a district-specific basis. *See supra* Part I.B. In this case, Plaintiffs have not alleged any facts establishing the *Gingles* preconditions or vote dilution under a totality of the circumstances, either on a statewide or district-specific basis.

**b.      Plaintiffs Have Not Alleged Facts Required by *Gingles***

To meet the first *Gingles* precondition, a plaintiff must establish that the minority group at issue is "sufficiently large and geographically compact to constitute a majority in a single member district." *Gingles*, 478 U.S. at 50. This test "relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett v. Strickland*, 556 U.S. 1, 13, 18 (2009) (plurality op.); *see also Johnson v. De Grandy*, 512 U.S. 997, 1016 (1994) (refusing to "read[] the first *Gingles* condition in effect to define dilution as a failure to maximize" the "number of majority-minority districts").

Plaintiffs' complaint does not identify a single "relevant geographic area" where Hispanic voters are a majority of the citizen voting-age population. Plaintiffs assert—without elaboration—that "[t]he Latino population in Texas is sufficiently numerous and geographically compact to constitute the majority of the CVAP in more . . . districts." ECF 1 ¶ 87 (House); *accord id.* ¶ 94 (Senate); *id.* ¶ 97 (SBOE); *id.* ¶ 102 (Congress). That does not even disclose which geographic areas are at issue, much less give Defendants "fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (quoting *Conley*, 355 U.S. at 47). Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Plaintiffs have not stated a claim because they have not plausibly alleged that Latino voters could "form a

majority of the voters in some single-member district." *Hall v. Virginia*, 385 F.3d 421, 429–30 (4th Cir. 2004) (affirming dismissal under Rule 12(b)(6)).

The second *Gingles* precondition—political cohesion—"contemplates that a specified group of voters shares common beliefs, ideals, principles, agendas, concerns, and the like such that they generally unite behind or coalesce around particular candidates and issues." *LULAC v. Clements*, 986 F.2d 728, 744 (5th Cir. 1993). "In order to satisfy the political cohesiveness precondition, the plaintiff must show that a significant number of minority group members usually vote for the same candidate." *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 754 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris County*, 601 F. App'x 255 (5th Cir. 2015) (per curiam).

Plaintiffs do not allege any facts related to this requirement. Their cursory assertion that "Latinos in Texas—including the areas in which Latino-majority Texas House, Texas Senate, congressional and SBOE districts can be created—are politically cohesive" does not suffice. ECF 1 ¶ 81. "[A] court may not presume bloc voting within even a single minority group." *Growe*, 507 U.S. at 41. And Plaintiffs do not allege any facts that could form the basis for such an assertion. Perhaps more importantly, Plaintiffs fail to allege the geographic areas in which they intend to prove cohesion, effectively refusing to proceed in the "district specific" manner *Gingles* requires. 478 U.S. at 59 n.28.

The third *Gingles* precondition, whether white-bloc voting usually defeats Latino voters' candidate of choice, is also based on a "district specific" inquiry. *Id.* But the complaint in this case alleges no facts regarding white bloc voting. It contains a single conclusory assertion: "Anglos in Texas vote specifically as a bloc to enable them—in the absence of special circumstances, such as a Latino candidate running unopposed—usually to defeat the Latino voters' preferred candidates, including the areas in which Latino majority Texas House, Texas Senate, congressional and SBOE districts can be created." ECF 1 ¶ 82. That is almost a direct quote from *Gingles*, 478 U.S. at 51, and nothing more than "a formulaic recitation of the" third *Gingles* precondition. *Twombly*, 550 U.S. at 555. It also fails to

address whether the alleged "failure of minority-preferred candidates to receive support from a majority of whites on a regular basis" is due to "illegal vote dilution" or simple "political defeat." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc). Holding that such an allegation "without more" suffices to establish "legally significant racial bloc voting" would "loose[] § 2 from its racial tether." *Id.*

When Section 2 plaintiffs allege specific facts regarding relevant election results, the court can evaluate whether those allegations establish white block voting. *See, e.g.*, *LULAC v. Abbott*, 369 F. Supp. 3d 768, 785 (W.D. Tex. 2019) (granting a motion to dismiss based on the third *Gingles* precondition), *aff'd*, 951 F.3d 311 (5th Cir. 2020) (Smith, J.). Plaintiffs here should not be able to avoid the same fate by omitting factual allegations altogether.[6]

Finally, Plaintiffs do not allege any facts to establish that a totality-of-the-circumstances inquiry would find unlawful vote dilution here. Again, Plaintiffs include a formulaic recitation of the element, *see* ECF 1 ¶ 83, but they do not allege any relevant facts provide fair notice or make vote dilution plausible. That is independently fatal to their claim. Even if Plaintiffs had plausibly alleged the three *Gingles* preconditions, that would not be "sufficient"—courts still must evaluate "the totality of circumstances" before finding vote dilution. *De Grandy*, 512 U.S. at 1011. This requirement is especially important when a plaintiff's "challenge goes to a series of single-member districts" rather than a multi-member districting scheme. *Id.* at 1012.

> ### c. Plaintiffs' "Examples" Do Not Give Fair Notice and Fail on Their Own Terms

Implicitly acknowledging the insufficiency of their general statewide allegations, Plaintiffs

---

[6] In addition, Plaintiffs' Section 2 claim should be dismissed because that provision "does not apply to redistricting." *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018) (Thomas, J. concurring); *see also Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 294–98 (2015) (Thomas, J., dissenting); *Bartlett v. Strickland*, 556 U.S. 1, 26 (2009) (Thomas, J., concurring in the judgment); *Holder v. Hall*, 512 U.S. 874, 892–93 (1994) (Thomas, J., concurring in the judgment). Although this argument is currently foreclosed by precedent, Defendants preserve it for appeal.

include a few "examples" of areas in which they think additional Latino-majority districts should have been drawn. These examples, however, are not exhaustive, as would be required to give Defendants fair notice. *See, e.g.*, ECF 1 ¶¶ 88, 104. Regardless, Plaintiffs' examples do not include plausible allegations of Section 2 violations.

In the House map, Plaintiffs identify three geographic areas. First, Plaintiffs point to Harris County, where they say that the "Latino population has increased" but that "Plan H2316 fails to add any Latino majority House district." ECF 1 ¶ 88. That is facially insufficient. It provides no notice of where or how, according to Plaintiff, an additional "Latino majority House district" could have been drawn in Harris County. There are twenty-four House districts in Harris County, so leaving Defendants to guess as to which one(s) should have been altered is insufficient.[7]

Second, Plaintiffs allege that the new map "weakens" HD 76 by "mov[ing]" it from El Paso County to Fort Bend County. ECF 1 ¶ 90. But Section 2 does not ask whether a district with a particular number has the same demographic profile as a previous district with the same number. Section 2 focuses on the ability of identified voters "to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). Plaintiffs do not allege that any voter previously or currently within HD 76 has suffered vote dilution. In El Paso County, every voter lives in a district with a majority Hispanic CVAP, and Plaintiffs do not allege otherwise.[8] Nor do Plaintiffs assert that Fort Bend County could have had a district with majority Hispanic CVAP, much less plausibly allege facts establishing a Section 2 violation.

Third, Plaintiffs point to HD 118, where they contend "Latino voting strength" was

---

[7] Plan Packet: H2316 at 50 of 63, https://data.capitol.texas.gov/dataset/71af633c-21bf-42cf-ad48-4fe95593a897/resource/e8a63cb9-001b-4b1f-a7f8-9106cce80706/download/planh2316_map_report_package.pdf (map showing HDs 126–135 and HDs 137–150 in Harris County).

[8] Plan Packet: H2316 at 35 of 63, https://data.capitol.texas.gov/dataset/71af633c-21bf-42cf-ad48-4fe95593a897/resource/e8a63cb9-001b-4b1f-a7f8-9106cce80706/download/planh2316_map_report_package.pdf (HDs 74–75 and HDs 77–79 with rounded HCVAPs of 77%, 90%, 86%, 66%, and 75%).

"weaken[ed]" when the Legislature "increase[ed] Latino voting strength in nearby House Districts 117 and 124." ECF 1 ¶ 91. Again, Plaintiffs do not allege that HD 118 satisfies the *Gingles* requirements—with good reason. Under the new map, HD 118 still has a majority Hispanic CVAP: 56.4%.[9] Plaintiffs provide no reason to think that white voters, who constitute only 35.5% of HD 118, could or would vote as a bloc to defeat Latino voters' preferred candidates.

At best, Plaintiffs' theory about "weaken[ing] Latino voting strength in House District 118" is a retrogression claim. ECF 1 ¶ 91; *see City of Lockhart v. United States*, 460 U.S. 125, 135 (1983) (rejecting a retrogression claim when minority "voting strength" was unchanged). But "[r]etrogression is not the inquiry in § 2 dilution cases." *Holder v. Hall*, 512 U.S. 874, 884 (1994). Federal courts correctly "refuse to equate a § 2 vote dilution inquiry with the § 5 retrogression standard." *Georgia v. Ashcroft*, 539 U.S. 461, 478 (2003). Alleged retrogression therefore does not support Plaintiffs' Section 2 claim.[10]

Plaintiffs cannot bring a standalone retrogression claim under Section 5 either. *See Shelby County v. Holder*, 570 U.S. 529, 557 (2013). Plaintiffs nonetheless cite Section 5 in the portion of their complaint describing their Section 2 claim. *See* ECF 1 ¶ 112 (citing 52 U.S.C. § 10304). To the extent Plaintiffs bring a Section 5 claim, it should be dismissed. To the extent Plaintiffs do not bring a Section 5 claim, their allegation that Texas's maps are "in violation of 52 U.S.C. § . . . 10304" should be stricken as immaterial. ECF 1 ¶ 112; *see* Fed. R. Civ. P. 12(f) ("The court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter.").

For the Senate map, Plaintiffs do not allege any specific examples of vote dilution. *See* ECF 1 ¶¶ 93–95.

For the SBOE map, Plaintiffs point to only one district: ED 3 in South Texas. *See* ECF 1 ¶ 99.

---

[9] Plan Packet: H2316 at 36 of 63, https://data.capitol.texas.gov/dataset/71af633c-21bf-42cf-ad48-4fe95593a897/resource/e8a63cb9-001b-4b1f-a7f8-9106cce80706/download/planh2316_map_report_package.pdf.

[10] For the same reasons, Plaintiffs' other retrogression allegations are likewise irrelevant. *See* ECF 1 ¶¶ 89, 95, 98 ("lost voting strength"); *id.* ¶¶ 90, 99, 103–04 ("weakens").

But as with HD 118, Plaintiffs do not allege that ED 3 satisfies the *Gingles* requirements. That is because it continues to have a majority Hispanic CVAP: 57.8%.[11] Again, Plaintiffs provide no reason to think that white voters, who constitute only 31.8% of ED 3, could or would vote as a bloc to defeat Latino voters' preferred candidates.

For the congressional map, Plaintiffs point to two districts: CD 15 and CD 23. *See* ECF 1 ¶ 104. Again, however, both districts continue to have majority Hispanic CVAPs: 73.8% for CD 15 and 57.8% for CD 23.[12] Plaintiffs make no attempt to allege facts showing a violation under *Gingles*. They allege no reason to think white-bloc voting will be a problem in districts where the White CVAP is only 23% and 35.1%, respectively.

> ### 2.       Section 2 Does Not Give Plaintiffs an Implied Private Cause of Action

Plaintiffs' Section 2 claim fails for an independent reason: They do not have a private cause of action to enforce Section 2. Plaintiffs presumably believe that they have an implied cause of action, but under modern precedent, they cannot succeed.

The Supreme Court has never decided whether Section 2 contains an implied private cause of action. It has often "[a]ssum[ed], for present purposes, that there exists a private right of action to enforce" Section 2, but it has never so held. *City of Mobile v. Bolden*, 446 U.S. 55, 60 (1980) (plurality). Decisions that "never squarely addressed the issue," but "at most assumed" an answer, are not binding "by way of *stare decisis*." *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993); *see also Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004). Thus, whether "the Voting Rights Act furnishes an implied cause of action under § 2" is "an open question." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring).

---

[11] Plan Packet: E2106 at 13 of 25, https://data.capitol.texas.gov/dataset/ad1ae979-6df9-4322-98cf-6771cc67f02d/resource/335ecdc1-9fa5-47a9-8156-d8d4b6e75c60/download/plane2106_map_report_package.pdf.

[12] Plan Packet: C2193 at 16 of 48, https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/54155a32-537f-4425-a951-923457c5ffce/download/planc2193_map_report_package.pdf.

Answering that question requires analyzing whether Congress created a private cause of action in Section 2, despite its failure to say so in statutory text. "[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* Unless Congress expresses that intent, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286–87.

To be sure, there was a time when federal courts "assumed it to be a proper judicial function to 'provide such remedies as are necessary to make effective' a statute's purpose." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)). But that time has passed. Since jettisoning the "*ancien regime*," *id.* at 1855, the Supreme Court has "not returned to it." *Sandoval*, 532 U.S. at 287. As a result, courts no longer rely "on pre-*Sandoval* reasoning." *Stokes v. Sw. Airlines*, 887 F.3d 199, 205 (5th Cir. 2018).

Under *Sandoval*, Section 2 does not confer a private cause of action on Plaintiffs. It contains no indication of a congressional intent to create a private right, much less a private remedy.

"Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289 (quotation omitted). Section 2's text focuses on the governmental officials it regulates, not individual voters: "No voting qualification or prerequisite to voting or standard, practice, or procedure s*hall be imposed or applied by any State or political subdivision* in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a) (emphasis added). Because it "is framed in terms of the obligations imposed on the regulated party" (government officials)—while voters are "referenced only as an object of that obligation"—Section 2 does not create a private right. *Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163,

17

1171 (9th Cir. 2013). Language "framed as an instruction to the regulated entity, rather than to the person protected," does "not indicate a congressional intent to make a remedy available to private litigants." *Conservation Force v. Delta Air Lines, Inc.*, 190 F. Supp. 3d 606, 616 (N.D. Tex. 2016), *aff'd*, 682 F. App'x 310 (5th Cir. 2017).

Although Section 2 refers to "the right . . . to vote," 52 U.S.C. § 10301(a), it does not contain any "'rights-creating' language." *Sandoval*, 532 U.S. at 288. The underlying right to vote to which Section 2 refers is based on state law, *see Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982), and the Fifteenth Amendment. Because referring to a right is not the same as creating one, Section 2 does not create a federal right "in [the] clear and unambiguous terms" that precedent requires. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002).

In addition, other provisions of the VRA make clear that Section 2 does not create a private remedy. The statute authorizes civil and criminal enforcement actions by the federal government. *See* 52 U.S.C. § 10308. "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. "Courts should presume that Congress intended that the enforcement mechanism provided in the statute be exclusive." *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1011 (8th Cir. 1999) (en banc).

To be sure, fractured opinions have suggested, in *dicta*, that Section 2 impliedly creates a private cause of action. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 232–33 (1996) (minority opinion of Stevens, J.) (quoting legislative history and discussing "a right to vote"); *id.* at 240 (Breyer, J., concurring in the judgment) (similar). But those opinions are inconsistent with the later majority opinion in *Sandoval*, which limited its "search for Congress's intent [to] the text and structure of" the statute. 532 U.S. at 288. "[D]ecisions before *Sandoval* frequently implied private rights of action without rigorous analysis; they did so by making a somewhat cursory inspection of the statute and its legislative history." *Conservation Force*, 190 F. Supp. 3d at 616, *aff'd*, 682 F. App'x 310 (5th Cir. 2017). They "are

not binding nor persuasive." *Id.* Thus, courts in the Fifth Circuit refuse to rely "on pre-*Sandoval* reasoning." *Stokes*, 887 F.3d at 205 (quoting *Conservation Force*, 190 F. Supp. 3d at 616).

That other provisions of the VRA contain implied private causes of action is irrelevant. In *Allen v. State Bd. of Elections*, for example, the Supreme Court held that Section 5 of the Voting Rights Act created a private cause of action because that provision was "passed to protect a class of citizens," that is, voters. 393 U.S. 544, 557 (1969). But *Allen* did not consider Section 2, and in determining whether a statute creates implied causes of action, each provision must be considered separately. *See, e.g.*, *Touche Ross & Co. v. Redington*, 442 U.S. 560, 576–78 (1979) (rejecting an implied cause of action under Section 17(a) of the Securities Exchange Act of 1934 despite *Borak* earlier inferring one under Section 14(a) of the same act). In any event, the Supreme Court has rejected *Allen's* loose, legislative-history-based approach, *see Sandoval*, 532 U.S. at 287, even listing *Allen* as an example of the now-abandoned "*ancien regime*," *Abbasi*, 137 S. Ct. at 1855.

In the alternative, even if Section 2 implied a private cause of action, it would apply only to voters, not Plaintiffs here. An implied private cause of action is limited to "a particular class of persons." *Sandoval*, 532 U.S. at 289 (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). Neither artificial entities that cannot vote nor individuals who do not allege that they intend (or even want) to vote are included in "any particular class of beneficiaries whose welfare Congress intended to further" under Section 2. *California*, 451 U.S. at 294. They are not mentioned in the statute at all. Section 2 therefore does not confer rights on them "in clear and unambiguous terms." *Delancey v. City of Austin*, 570 F.3d 590, 593 (5th Cir. 2009) (quotation omitted).

### C. The Court Should Dismiss Plaintiffs' Intentional-Discrimination Claims

Plaintiffs also have not plausibly alleged their intentional-discrimination claims under the Equal Protection Clause and Section 2. *See* ECF 1 ¶¶ 106, 112.

1.    **Lack of Discriminatory Effect Precludes Intentional-Discrimination Claims**

Even if Plaintiffs had plausibly alleged discriminatory intent—they did not—that would not be enough. For the reasons explained above, Plaintiffs have failed to plausibly allege discriminatory effect. *See supra* Part II.B.2. Without a discriminatory effect, Plaintiffs cannot succeed on their intentional-discrimination claims.

That Plaintiffs must establish discriminatory effect follows from "a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). "[N]o case in [the Supreme] Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Courts routinely require discriminatory effect in intentional-discrimination redistricting cases. *See, e.g.*, *Shaw v. Reno*, 509 U.S. 630, 641 (1993) ("a discriminatory purpose and have the effect of diluting minority voting strength"); *Rodriguez*, 964 F. Supp. 2d at 800 ("purpose and operative effect"); *LULAC v. NE Ind. Sch. Dist.*, 903 F. Supp. 1071, 1093 (W.D. Tex. 1995) ("intentional discrimination" and "a resultant discriminatory effect").

The same is true under Section 2 of the VRA. "[T]he statute proscribes intentional discrimination only if it has a discriminatory effect, but proscribes practices with discriminatory effect whether or not intentional." *Chisom v. Roemer*, 501 U.S. 380, 406 (1991) (Scalia, J., dissenting); *accord Turner v. Arkansas*, 784 F. Supp. 553, 565 (E.D. Ark. 1991), *aff'd*, 504 U.S. 952 (1992).[13]

2.    **Plaintiffs Have Not Plausibly Alleged Discriminatory Intent**

Plaintiffs have not alleged facts that would allow the Court to infer a discriminatory purpose.

---

[13] Plaintiffs' Section 2 discriminatory-intent claim also fails because Section 2 does not create a private cause of action. *See supra* Part II.B.1.

In redistricting cases, "the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). It is "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). The required intent is not mere "volition" or "awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). It requires that the Legislature have passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

 Plaintiffs have not plausibly alleged discriminatory intent here. They claim that the new maps "discriminate against Plaintiffs on the basis of race and national origin" and that they "hav[e] the intent . . . of canceling out or minimizing [Latino] voting strength," ECF 1 ¶¶ 106, 112, but those "bare assertions . . . amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Iqbal*, 556 U.S. at 681. "As such, the allegations are conclusory and not entitled to be assumed true," even at the pleading stage. *Id.*

 At most, Plaintiffs allege three facts in an effort to show discriminatory intent, but none helps their case. First, Plaintiffs allege "departures from normal procedures" in the passing of the new maps. ECF 1 ¶ 62. Although "[d]epartures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role" in government decisionmaking, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977), they raise no inference of "invidious discrimination" when there is an "obvious alternative explanation." *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567). Here, Plaintiffs complain that the process was too rushed. *See* ECF 1 ¶¶ 63, 67–80. But the complaint itself offers a ready explanation for the complained-of exigencies: The federal census was delayed due to the pandemic, *see id.* ¶ 30, and results were not delivered until "more than ten weeks after the Texas Legislature's 87th Regular Session adjourned *sine die*." *Id.* ¶ 32. As a result, the Legislature had to redistrict during a special session, which is constitutionally limited to thirty days. *See* Tex. Const. art. III, § 40.

Second, Plaintiffs claim to have identified "departures from the normal and required substantive standards during the redistricting process." ECF 1 ¶ 64. "Substantive departures . . . may be relevant" to discriminatory intent, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." *Vill. of Arlington Heights*, 429 U.S. at 267. But not on the facts alleged here.

Plaintiffs complain that in responding to questions posed during a hearing a single senator described the maps as "drawn blind to race" and assert that a single representative looked at "voting age population" rather than "citizen voting age population." *Id.* ¶¶ 64–65. Plaintiffs' theory seems to be that those two statements are substantive departures because the Voting Rights Act requires consideration of race and CVAP. That fundamentally misunderstands the potential relevance of substantive departures to a discriminatory intent analysis.

As an initial matter, saying that a decisionmaker was "blind to race" cannot be evidence that the decisionmaker acted "'because of,' not merely 'in spite of,'" race. *Feeney*, 442 U.S. at 279. Moreover, even if Plaintiffs were right that two lawmakers misunderstood a federal statute, that would not support an inference of invidious discrimination. Substantive departures—doing something a decisionmaker would not normally do—are potentially relevant because they can reveal a hidden motive. For example, if a local government has consistently rezoned land in a particular area to allow higher density housing, but then inexplicably abandons that strategy when the proposed housing would serve racial minorities, that could certainly support an inference of racial discrimination. *See id.* at 279 n.17. But Plaintiffs do not allege any similar departure from previous practice for the two lawmakers in question. Plaintiffs cannot bootstrap what they claim is confusion about the VRA— which did not result in a violation of the VRA, *see supra* Part II.B.2—into an intentional-discrimination claim.

Third, Plaintiffs allege that opponents of the new maps "warned" the Legislature that they

22

"violated minority voting rights" but that "the Legislature did not cure the identified deficiencies." ECF 1 ¶ 66. Of course, legislators are not obligated to credit the opinions of a bill's opponents. As the Supreme Court has recognized, a bill's "legislative opponents," "[i]n their zeal to defeat a bill," "understandably tend to overstate its reach." *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 66 (1964). In any event, alleged "awareness of consequences" does not establish discriminatory intent. *Feeney*, 442 U.S. at 279. Mere awareness is "consistent with" invidious intent, but it is "just as much in line with" other motives. *Twombly*, 550 U.S. at 554. Because Plaintiffs' factual allegations are equally consistent with the Legislature acting "in spite of" rather than "because of" the alleged racial consequences of the redistricting maps, they have not plausibly alleged invidious discrimination. *Feeney*, 442 U.S. at 279; *see Twombly*, 550 U.S. at 557 (explaining "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with)" a legal violation).

In the redistricting context, mere awareness of racial consequences is especially insufficient. "[E]vidence tending to show that the legislature was aware of the racial composition of" a district "is inadequate to establish injury in fact," much less a violation on the merits. *Hays*, 515 U.S. at 745–46. "[T]he legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination." *Shaw v. Reno*, 509 U.S. 630, 646 (1993). Here, Plaintiffs have not alleged any facts suggesting invidious racial discrimination.

### CONCLUSION

Defendants respectfully request that the Court dismiss Plaintiffs' claims. In the alternative, Defendants move the Court to require a more definite statement in which Plaintiffs identify each district they intend to challenge under each of their legal theories.

Date: November 12, 2021                    Respectfully submitted.

KEN PAXTON                                 /s/ Patrick K. Sweeten
Attorney General of Texas                  PATRICK K. SWEETEN
                                           Deputy Attorney General for Special Litigation
BRENT WEBSTER                              Tex. State Bar No. 00798537
First Assistant Attorney General
                                           WILLIAM T. THOMPSON
                                           Deputy Chief, Special Litigation Unit
                                           Tex. State Bar No. 24088531

                                           OFFICE OF THE ATTORNEY GENERAL
                                           P.O. Box 12548 (MC-009)
                                           Austin, Texas 78711-2548
                                           Tel.: (512) 463-2100
                                           Fax: (512) 457-4410
                                           patrick.sweeten@oag.texas.gov
                                           will.thompson@oag.texas.gov

                                           **COUNSEL FOR DEFENDANTS**

                                   **CERTIFICATE OF SERVICE**

        I certify that a true and accurate copy of the foregoing document was filed electronically (via
CM/ECF) on November 12, 2021, and that all counsel of record were served by CM/ECF.

                                   /s/ Patrick K. Sweeten
                                   PATRICK K. SWEETEN