# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| LULAC, *et al.*,<br><br>      *Plaintiffs,*<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of Texas, *et al.*,<br><br>      *Defendants.* | Case No.: EP-21-CV-00259-DCG-JES-JVB<br>[Lead Case] |

## ***BROOKS* PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AS TO SENATE DISTRICT 10**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND ............................................................................... 2

   I.   Benchmark SD10 is an Effective Crossover District for Minority Voters. ...................... 2

   II.  SB4 Dismantles SD10 as a Performing Crossover District by Cracking Apart its Minority Populations and Submerging them in Three Anglo-Controlled Districts .......... 3

   IV.  The Legislature Repeals the 2011 SD10 Plan and Enacts the Benchmark Plan................. 7

   V.   The Pre-2020 Census Release Redistricting Meetings and Hearings ................................. 8

   VI.  Meeting to Unveil Plan Dismantling SD10 as Effective Crossover District .................... 11

   VII. Sen. Powell's Correspondence with Sen. Huffman and Full Senate ................................ 12

   VIII. Sen. Huffman Releases Proposed Senate Plan (S2101) ................................................... 14

   IX.  Sen. Huffman Releases Amendment (Plan S2108) on Eve of Public Hearing................. 14

   X.   Sen. Huffman Identifies Her Redistricting Criteria and Mapdrawers ............................. 14

   XI.  Voters and Minority Community Members Testify Against Dismantling SD10 ............. 16

   XII. Committee Rejects Amendment to Restore Benchmark SD10 ......................................... 17

   XIII. Senate Floor Proceedings ................................................................................................ 18

   XIV. The House Proceedings .................................................................................................... 22

ARGUMENT ..................................................................................................... 24

   I.   Plaintiffs are Likely to Succeed on their Intentional Discrimination Claims. .................. 24

      A.  SB4's Dismantling of Benchmark SD10 Bears More Heavily on Minority Voters. . 26

      B.  The Historical Background Supports a Finding of Intentional Discrimination.......... 27

      C.  The Specific Sequence of Events Leading to the Dismantling of SD10 and the Legislative History Suggests a Discriminatory Purpose. ........................................... 28

      D.  Procedural and Substantive Departures Demonstrate a Racially Discriminatory Purpose in the Dismantling of SD10. .......................................................................... 34

      E.  Race, Not Politics, Explains Why SD10's Minority Populations Were Cracked. ..... 36

      1.   Any Proffer of Partisan Motivation for SD10's Lines is Post Hoc, Pretextual Explanations Contradicted by Sen. Huffman's Own Statements .................................... 36

      2.   Plaintiffs' Alternative Maps Demonstrate that if Partisan Advantage Were the Legislature's Real Motivation, Not Race, the Legislature Would Have Achieved those Goals without Targeting Tarrant County Minorities. ........................................................ 37

   II.   Plaintiffs Are Likely to Succeed on their *Shaw*/Racial Gerrymandering Claim. .............. 41

   III.  Plaintiffs Will Be Irreparably Harmed if SD10 Is Not Enjoined....................................... 44

   IV.  The Balance of the Equities Weighs in Favor of Plaintiffs ................................................ 45

i

CONCLUSION ...................................................................................................... 46

CERTIFICATE OF SERVICE ............................................................................... 48

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) ........................................................................... 29

*Bartlett v. Strickland,*
    556 U.S. 1, 24 (2009) ............................................................................. 25

*Bethune-Hill v. Va. State Bd. of Elections,*
    137 S. Ct. 788 (2017) ......................................................................... 37, 41

*BST Holdings v. OSHA,*
    No. 21-60845 (5th Cir. Nov. 12, 2021) ............................................... 44, 45

*Bush v. Vera,*
    517 U.S. 952 (1996) .............................................................................. 43

*Charles H. Wesley Educ. Fdn., Inc. v. Cox,*
    408 F.3d 1349 (11th Cir. 2005) ............................................................. 46

*Cooper v. Harris,*
    137 S. Ct. 1455 (2017) .................................................................. *passim*

*Deerfield Med. Center v. City of Deerfield Beach,*
    661 F. 2d 328 (5th Cir. Unit B Nov. 1981) .......................................... 44, 45

*DeLeon v. Abbott,*
    791 F.3d 619 (5th Cir. 2015) ............................................................. 44, 45

*DeLeon v. Perry,*
    975 F. Supp. 2d 632 (W.D. Tex. 2014) ................................................ 47, 48

*Elrod v. Burns,*
    347 U.S. 373 (1976) .............................................................................. 44

*Foster v. Chatman,*
    578 U.S. 488 (2016) .............................................................................. 30

*G & V Lounge, Inc. v. Michigan Liquor Control Commission,*
    23 F.3d 1071 (6th Cir. 1994) ................................................................. 46

*Gomillion v. Lightfoot,*
    364 U.S. 339 (1960) .............................................................................. 44

*Ingebretsen on behalf of Ingebretsen v. Jackson Public School Dist.,*
    88 F.3d 274 (5th Cir. 1996) ................................................................... 45

*League of Women Voters of N. Carolina v. North Carolina,*
  769 F.3d 224 (4th Cir. 2014) ............................................................... 45

*McCleskey v. Kemp,*
  481 U.S. 279 (1987)............................................................................ 27

*Miller v. Johnson,*
  515 U.S. 900 (1995)............................................................................ 41

*Perez v. Abbott,*
  253 F. Supp. 3d 864 (W.D. Tex. 2017).......................................... *passim*

*Personnel Adm'r of Mass. v. Feeney,*
  442 U.S. 256 (1979).................................................................... 25, 34

*Planned Parenthood v. Sanchez,*
  403 F.3d 324 (5th Cir. 2005) ............................................................ 24

*Rogers v. Lodge,*
  458 U.S. 613 (1982)............................................................................ 25

*Texas v. United States,*
  887 F. Supp. 2d 133 (D.D.C. 2012) ........................................ 5, 27, 30

*Texas v. United States,*
  133 S. Ct. 2885 (2013).................................................................. 5, 27

*United States v. Brown,*
  561 F.3d 420 (5th Cir. 2009) ............................................................ 25

*Univ. of Tex. v. Camenisch,*
  451 U.S. 390 (1981)............................................................................ 46

*Veasey v. Abbott,*
  830 F.3d 216 (5th Cir. 2016) ...................................................... *passim*

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
  429 U.S. 252 (1977).................................................................... 26, 27

*Washington v. Davis,*
  426 U.S. 229 (1976)............................................................................ 26

*Wenner v. Texas Lottery Comm'n,*
  123 F.3d 321 (5th Cir. 1997) ............................................................ 46

**Constitutional Provisions**

U.S. Const. amend. XIV § 1 ...................................................................... 44

U.S. Const. amend. XV § 1 ............................................................................. 44

**Other Authorities**

Federal Practice Procedure § 2948 ............................................................... 46

## INTRODUCTION

Republican Senator Kel Seliger, Chair of the Senate Select Redistricting Committee in 2011 and 2013, testifies in his attached declaration:

> Given my experience on the Senate Redistricting Committee in 2011 and 2013, the federal court's order regarding SD10, the fact that the benchmark district was compact, wholly contained within Tarrant County, and had close to ideal population, I cannot accept the suggestion that any of the stated redistricting criteria, such as equalizing population, compactness, communities of interest, or incumbent protection compelled the substantial change to SD10's boundaries. *I believe this explanation is pretext.*

Ex. 1 ¶ 11 (emphasis added). Rather, as Sen. Seliger testifies, "[h]aving participated in the 2011 and 2013 Redistricting Committee proceedings, and having read the prior federal court order regarding SD10, *it was obvious to me that the renewed effort to dismantle SD10 violated the Voting Rights Act and U.S. Constitution*." *Id.* ¶ 12 (emphasis added).

Senator Seliger explains that "[t]he 2021 senate redistricting process saw untrue, pretextual explanations given for why the lines were drawn as they were," including explanations provided by Sen. Joan Huffman, who chaired this year's redistricting effort in the Senate. Ex. 1 ¶ 10. He testifies that Sen. Huffman, when a member of the 2011 and 2013 redistricting committees, "knew that it was necessary to restore SD10 to its benchmark configuration in order to comply with the Voting Rights Act and the U.S. Constitution, which prohibit racial discrimination." Ex. 1 ¶ 8. And she knew that "voting in Texas and Tarrant County is racially polarized." Ex. 1 ¶ 9.

A three-judge federal court in D.C. ruled in 2012 that the legislature engaged in intentional discrimination by dismantling SD10 and cracking apart its minority population. A nine-judge majority of the *en banc* Fifth Circuit cited and relied upon that decision in 2016, explaining that the invalidation of the preclearance regime did not undermine the factual findings of intentional discrimination in the dismantling of SD10. The three-judge San Antonio court ruled in 2017 that

the 2011 congressional plan's cracking of minority voters in Tarrant County was intentionally discriminatory. Judge Smith, who otherwise disagreed with the majority, agreed that the legislature's cracking apart of minority voters in Tarrant County, and submerging them in Anglo-controlled rural districts, was intentional vote dilution.

Fifteen federal judges in the past nine years have ruled, or relied upon rulings, that the cracking of Tarrant County minority voters was intentional racial discrimination. Yet that is the path the legislature has charted again. Federal court orders are due more respect than this.

Judge Smith's assessment of the cracking of Tarrant County minority voters in 2011 rings true in 2021: "[r]elatively little . . . passes the smell test as to DFW." *Perez v. Abbott*, 253 F. Supp. 3d 864, 986 (W.D. Tex. 2017) (Smith, J., dissenting). Plaintiffs respectfully request that the Court set an expedited hearing, extend the candidate filing deadline with respect to SD10, preliminarily enjoin enforcement of SB4 as it relates to SD10, and order remedial relief.[1]

## FACTUAL BACKGROUND

### I.   Benchmark SD10 is an Effective Crossover District for Minority Voters.

Benchmark SD10 is an effective crossover district for minority voters. The district is majority-minority by total population and voting age population ("VAP"), with non-Anglos constituting 56.1% of the district's VAP. Ex. 7 at 4. According the 2015-2019 American Community Survey ("ACS") estimates, the citizen voting age population ("CVAP") of the district is 53.9% Anglo and 46.1% non-Anglo. *Id*. This represents a steep decline in the district's Anglo CVAP, which was 62.7% a decade ago. Ex. 3E at 28. The map below shows the district's

---

[1] Plaintiffs are separately moving to set a hearing schedule and alter the candidate filing period for SD10 in order to permit the Court an opportunity to adjudicate their motion.

benchmark configuration, with pink shading identifying the location of the district's minority population.



Ex. 2C at 5.

Voting in SD10 is racially polarized but a portion of benchmark SD10's Anglo voters cross over and support minority-preferred candidates. Ex. 7 at 4. As a result, minority-preferred candidate Beverly Powell won election in SD10 in 2018 and minority-preferred candidates for statewide office and president have carried the district in 19 out of 23 recent elections. *Id.*

The 2020 Census showed that Benchmark SD10 was nearly perfectly populated—just 5,318 persons above ideal, for a population deviation of 0.57%. Ex. 7 at 8 The 2020 Census also showed that benchmark SD10's minority population has grown substantially, with its total population 39.5% Anglo, 32.2% Hispanic, 21.5% Black, and 5.7% Asian, and its voting age population ("VAP") 43.9% Anglo, 28.8% Hispanic, 20.3% Black, and 5.5% Asian. Ex. 7 at 4.

## II.   SB4 Dismantles SD10 as a Performing Crossover District by Cracking Apart its Minority Populations and Submerging them in Three Anglo-Controlled Districts

SB4 dismantles SD10 as a performing crossover district by cracking apart its minority populations and submerging them in three Anglo-controlled districts. The map below illustrates

the new district lines with red shading showing minority population and green shading showing
Anglo population.



Ex. 7 at 6; *see also* Exs. 28 & 28 (Hispanic VAP in benchmark and new DFW districts); Exs. 30
& 31 (Black VAP in benchmark and new DFW districts).

SB4 moved 387,161 people out of benchmark SD10, of whom 56.4% are minorities. Ex. 7
at 8. Of those exported from the district, 168,721 (43.6%) are Anglo, 122,446 (31.6%) are
Hispanic, 63,362 (16.4%) are Black, and 27,522 (7.1%) are Asian. *Id*.

By contrast, SB4 adds 377,534 new residents to SD10, of whom just 32.8% are minorities.
Of those imported into the district, 253,532 (67.2%) are Anglo, 81,604 (21.6%) are Hispanic,
25,138 (6.7%) are Black, and 5,734 (6.7%) are Asian. *Id*.

SB4 thus moves a total of ***764,695*** people to redraw SD10—a district that was just 5,318
people above ideal size—and in the process increases its Anglo share by nearly 10% and converts

SD10 from a majority-minority voting-age population district to a majority-Anglo voting-age population district. *Id*. The dismantling of SD10 lowers by one the overall number of majority-minority voting-age population districts in Texas compared to the benchmark plan, Ex. 7 at 3, despite the fact that minorities constituted 95% of the approximately 4-million-person population growth in Texas since 2010, Ex. 7 at 2.

The effect of SB4's export of minority voters from SD10 is magnified by the intense racially polarized voting of the Anglo voters it imported into the district. As Dr. Matthew Barreto explains, SB4's configuration of SD10 "demonstrate[s] one of the strongest patterns of [racially polarized voting] that I have ever measured across the more than 50 jurisdictions I have analyzed in my career." Ex. 7 at 10. The "super-majority Anglo" rural counties SB4 added to SD10 show "extremely cohesive" bloc voting against minority preferred candidates, with "less than 10%" of Anglo voters in these counties supporting minority preferred candidates. Ex. 7 at 23.

As a result of these changes, Dr. Barreto explains, under SB4, SD10 will no longer perform as an effective crossover district for minority voters. Ex. 7 at 5, 19.

III.   **The 2011 Plan's Dismantling of SD10 Was Ruled Intentionally Discriminatory**

SD10 has existed in its benchmark configuration since 2001. Ex. 6K at 43. In 2011, the legislature enacted a plan that dismantled SD10, cracking apart its substantial minority populations across three districts. At the time, Texas was subject to the preclearance requirements of Section 5 of the Voting Right Act, and a three-judge federal court denied preclearance as to SD10, concluding that not only had Texas failed to meet its burden, but affirmatively concluding that the legislature engaged in intentional racial discrimination in dismantling SD10. *See Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012), *vacated on other grounds*, 133 S. Ct. 2885 (2013) (Mem.). The court explained that benchmark SD10 was "a geographically compact district located

entirely within Tarrant County" with, at the time, a total population that was 53% minority and an Anglo CVAP of 62.7%. *Id.* at 224.[2] The district was "comprised of almost all the traditional and growing minority neighborhoods of Tarrant County in and around Fort Worth, including the historic northside Hispanic area, the growing Southside Hispanic area, and the predominantly Black areas of Southeast Fort Worth, Forest Hill, and Everman." *Id.* at 226 (citation omitted). The court noted that the benchmark district's population was "well within the population deviation accepted for redistricting . . . and there is no evidence [its 23,118 person] 'over-population' played any part in redrawing the district." *Id.*

The court concluded that the 2011 plan featured "cracking of the minority communities from SD10," *id.* at 227, with the "large Black community in Southeast Fort Worth," *id.* at 228, cracked apart from the "north side Latino community," *id.* and the south side Latino community, resulting in the minority communities being cracked into "three other districts that share few, if any, common interests with the existing District's minority coalition." *Id.* These facts, together with an examination of the *Arlington Heights* factors, led the court to reject Texas's partisanship defense and instead conclude that "the Senate Plan was enacted with discriminatory purpose as to SD 10." *Id.* at 166.

Federal courts also concluded last decade that Tarrant County was the site of intentional racial discrimination through the cracking of minority voters in the 2011 congressional plan. The D.C. court denied preclearance on this basis, citing in particular the "lightning bolt" from Denton County into Tarrant County, *Texas v. United States*, 887 S. Supp. 2d at 220-22. Likewise, the San Antonio three-judge court concluded that the cracking of minority voters across multiple districts

---

[2] According to the 2019 ACS estimates, SD10's Anglo CVAP has since fallen to 53.9%. Because ACS includes five years of survey results, however, it is outdated and benchmark SD10 is "almost certainly a majority minority district by CVAP today." Ex. 7 at 4.

6

in Tarrant County constituted intentional racial discrimination in violation of Section 2 and the Fourteenth Amendment. *Perez v. Abbott*, 253 F. Supp. 3d 864, 961 (W.D. Tex. 2017). Notably, while Judge Smith dissented on mootness grounds, and disagreed with the district court's rulings in other parts of the State, he agreed that the cracking of minority voters in Tarrant County was the product of intentional racial discrimination. *Id.* at 986 (Smith, J., dissenting) ("Relatively little about the 2011 Congressional redistricting passes the smell test as to DFW."); *id.* (noting the "unusual appendages added [in a Tarrant County district] from an adjoining, but demographically dissimilar, neighboring county").

## IV. The Legislature Repeals the 2011 SD10 Plan and Enacts the Benchmark Plan.

After the 2011 senate plan was ruled intentionally discriminatory as to SD10, then-Attorney General Abbott advised the members of the House and Senate redistricting committees that the legislature had a duty to remedy that discrimination by enacting the benchmark configuration of SD10 that the San Antonio court had already ordered in place on an interim basis:

> The Legislature has both the opportunity and the obligation to remove the specter of discrimination. That is why I have been counseling leadership that the best way to remedy the violations found by the D.C. court is to adopt the court-drawn interim plans as the State's permanent redistricting maps.

Ex. 6D.

As then-Chair of the Senate Select Redistricting Committee, Republican Sen. Kel Seliger, explains in his attached declaration, his committee—including Sen. Joan Huffman—received copies of the DC federal court's ruling regarding SD10. Ex. 1 ¶ 6. Moreover, the committee "discussed the federal court's ruling that the dismantling of SD10 was racially discriminatory," and enacted a new plan to "restore[] SD10 to its benchmark configuration" in order to "remedy this racial discrimination." Ex. 1 ¶ 7. Indeed, Sen. Seliger testifies that "[t]he committee members all knew that it was necessary to restore SD10 to its benchmark configuration in order to comply

with the Voting Rights Act and the U.S. Constitution, which prohibit racial discrimination." Ex. 1 ¶ 8. Likewise, Sen. Seliger explains that "[t]he committee members also knew that voting in Texas and Tarrant County is racially polarized." Ex. 1 ¶ 9.

In 2013 the Texas Legislature held a series of hearings. At an April 18, 2013 hearing, Chair Seliger explained that the proposed plans—those the San Antonio court had ordered on an interim basis—"deferred to the maps drawn by the 82nd Legislature, only making changes that were *necessary to comply with the Voting Rights Act and the United States Constitution.*" Ex. 6E at 13 (emphasis added). Sen. Seliger addressed SD10 specifically, explaining that "[t]he DC court denied preclearance because of the way in which Senate District 10 was drawn and the interim plans address the legal deficiency by restoring Senate District 10 to its benchmark configuration." *Id.* Sen. Seliger repeated these statements at the Committee's May 30, 2013 hearing. Ex. 6F at 14. Sen. Huffman attended both hearings at which Sen. Seliger spoke. Exs. 6E & 6F. During the Senate floor debate, Sen. Seliger explained that SD10 was being returned to its benchmark configuration in light of the federal court order. Ex. 6G at 1. The Senate unanimously passed SB2, which adopted the court-ordered benchmark configuration of SD10 as the permanent plan. Ex. 6H at 2.

## V.     The Pre-2020 Census Release Redistricting Meetings and Hearings

Senator Joan Huffman was the Chair of the Senate Select Committee on Redistricting for the 2021 redistricting cycle. As discussed above, Sen. Huffman had served on the Senate redistricting committee in 2011, which produced maps ruled intentionally discriminatory in violation of the Voting Rights Act and the Fourteenth Amendment by two three-judge federal courts. She also served on the redistricting committee in 2013, when the legislature remedied that discrimination by restoring SD10 to its benchmark configuration. Ex. 1 ¶ 4.

In anticipation of the 2021 redistricting process, Sen. Powell wrote two letters requesting a redistricting hearing be held in Tarrant County and noting the large, vibrant, and growing minority community in SD10. Exs. 2A & 2B. In 2020, Sen. Huffman or her staff met with Sen. Powell or her staff twice to discuss the redistricting of SD10. The first meeting was held on February 12, 2020, and was attended by Sen. Powell's Chief of Staff, Garry Jones, and her Deputy Chief of Staff, Rick Svatora, as well as Sen. Huffman's top Committee staffer, Sean Opperman, and another staffer Amy Befeld. Ex. 3 ¶ 3. Mr. Opperman spoke for the majority of the meeting, Ex. 3 ¶ 4, and Mr. Svatora took handwritten notes, Ex. 3 ¶ 5, Ex. 4 ¶ 5; Ex. 4A. Mr. Opperman discussed the process and noted that they were using estimates from the Census Bureau's 2014-2018 American Community Survey ("ACS") to assess the redistricting process. Ex. 3 ¶ 6. Large maps of the district were provided at the meeting. Ex. 3 ¶ 9. After stating that the Committee staff were being counseled by attorneys at the Office of the Attorney General, the Texas Legislative Council, and the National Conference of State Legislatures, Mr. Opperman noted that they anticipated that "most of [the] challenges" to the forthcoming redistricting plans would allege "cracking and packing" under Section 2 of the Voting Rights Act. Ex. 4 ¶ 7.

Mr. Opperman concluded the meeting by addressing how redistricting would affect SD10. Because of the importance of this aspect of the conversation, Mr. Svatora sought to transcribe Mr. Opperman's exact words. Ex. 4 ¶ 8. Mr. Opperman stated that "***very little change would be necessary for you all being you're close to ideal size. I wouldn't anticipate much movement for you, other than slightly tweaking your district***." Ex. 4A (emphasis added). Below are Mr. Svatora's handwritten notes reflecting Mr. Opperman's statement:



Ex. 4A.

The next meeting occurred on November 19, 2020, and was attended by Sen. Huffman, Sen. Powell, Mr. Opperman, and Mr. Jones. Ex. 3 ¶ 7. When Sen. Powell and Mr. Jones arrived, there were once again maps of SD10 on the table. *Id.* Mr. Jones recalls that either Sen. Huffman or Mr. Opperman verbally acknowledged that the district was majority-minority as Sen. Powell spoke about the district's minority populations. Ex. 3 ¶ 8.

The maps that Sen. Powell's office were provided during the 2020 meetings with the Redistricting Committee staff showed an image of the district's configuration on the left, with large boxes presenting the racial data for the district, including the percent change in each racial group's population in the district since the 2013. Ex. 3A.

Sen. Powell and her staff received little further communication regarding redistricting until August 2021. On August 19, 2021, Mr. Opperman sent an email to senate staffers with a link to the Redistricting Committee's Dropbox website, which he indicated included "[m]aps based on ACS estimates," "[m]aps of current plans," and "[m]aps based on the Texas Demographic Center projects." Ex. 3B. The Dropbox contained the same 2014-2018 ACS maps that Sen. Huffman and Mr. Opperman provided Senator Powell's office in the 2020 meetings as well as updated maps based on the 2015-2019 ACS estimates. Ex. 3C & 3D. Again, these maps prominently displayed

data showing the racial makeup of benchmark SD10, as well as the percent change among racial populations. The maps provided by the Committee showed that non-Anglos were 56.8% of the district as of the 2019 ACS release, compared to 52.9% in 2013. *Id*. Moreover, the maps showed that SD10's Anglo population grew by only 0.2% in that time period while its non-Anglo population grew by 17.1%. *Id*. The Committee's Dropbox account also provided a report of racial demographic changes for each district from the Texas Demographic Center. Ex. 3N.

## VI.    Meeting to Unveil Plan Dismantling SD10 as Effective Crossover District

On September 14, 2021, Sen. Huffman, Mr. Opperman, and Sen. Huffman's Special Counsel Anna Mackin—who was later revealed to be the primary mapdrawer for SB4—held a meeting with Sen. Powell and Mr. Jones to preview the draft plan for SD10. Ex. 2 ¶ 10.  When Sen. Powell and Mr. Jones were invited into the meeting room, Mr. Opperman and Ms. Mackin were seated at a computer with the map of the newly configured SD10 displayed on a projector screen. *Id*. The map showed the region containing benchmark SD10's minority community cleaved in half, with Parker and Johnson counties appended to the district instead. *Id*.

After looking at the map on the projector screen, Sen. Powell explained that SD10 was nearly perfectly populated and required no changes whatsoever, Sen. Powell began showing Sen. Huffman a series of maps that showed benchmark SD10 with racial shading to illustrate how the proposed plan discriminated against the district's Black, Latino, Asian, and Anglo populations by cracking them apart. Ex. 2 ¶¶ 11-12. As Sen. Powell handed Sen. Huffman each map, she read its header to indicate which minority population or group of minority populations were shown on the map. *Id*. ¶ 13. Sen. Huffman looked at each map she was given and asked that she and Sen. Powell initial and date each map, which they did, *id.*, and Sen. Huffman stated that she turned them over

to the Attorney General's office, Ex. 6K at 17. In the middle of the exchange of maps, Mr. Jones recalls Ms. Mackin saying that this was making her "uncomfortable." Ex. 3 ¶ 19.

During the subsequent floor debate, Sen. Huffman said that she only "glanced" at the first map "for less than a second" and once she "realized it had racial data" she "turned it over flat []" and said, I will not look at this." Ex. 6K at 17. But as Sen. Powell and Mr. Jones both testify. Sen. Huffman looked at each, and longer than "less than a second." Ex. 2 ¶ 14, Ex. 3 ¶ 17. Neither Sen. Powell nor Mr. Jones recall Sen. Huffman saying "I will not look at this"—indeed, she looked at each map. *Id*.

After Sen. Powell provided the final map showing the locations of benchmark SD10's minority populations, Sen. Powell then provided Sen. Huffman with excerpts from the federal court's 2012 ruling that the 2011 effort to dismantle SD10 was intentionally racially discriminatory. Ex. 2 ¶ 16. Sen. Huffman acknowledged she was aware of the decision, and the meeting ended thereafter. *Id*.

## VII.   Sen. Powell's Correspondence with Sen. Huffman and Full Senate

On September 16, 2021, Sen. Powell sent a letter to Sen. Huffman, via an email from Mr. Jones to Mr. Opperman and Ms. Mackin, expressing concerns about the proposed plan and outlining in more detail the information she relayed in her September 14 meeting, including more information about the federal court's prior ruling regarding SD10, the Supreme Court's warning that dismantling performing crossover districts may violate the Constitution, and additional demographic data about the district. Ex. 3E. The letter explained how the proposal shifted hundreds of thousands of voters around in order to increase SD10's Anglo population by 10%, converting it from a majority-minority VAP district to a majority-Anglo VAP district. *Id*. The letter also

included the following map of the benchmark plan, showing in circles the minority communities that the proposed plan cracked apart:



Mr. Opperman failed to address any of Sen. Powell's concerns. On September 17, 2021, he responded to Mr. Jones, saying that he had "briefly opened these documents and they appear to contain racial data, so I closed out of them right away." Ex. 3F. As Mr. Jones explains, "I found Mr. Opperman's email odd, given that the Committee staff had provided *us* with maps in prior meetings containing racial data, and had just a month earlier posted maps on the Senate Redistricting Committee's Dropbox, which [they] encouraged all senate staff to review, that prominently displayed the racial data for each senate district, along with the percentage increase or decrease in population by race." Ex. 3 ¶ 24. Indeed, racial data was among the most prominent of the information the Committee had made available prior to releasing the proposed plan. *See, e.g.*, Ex. 3C, 3D, 3N.

At 8:59 AM the next morning, September 17, 2021, Mr. Jones sent an email to all senators on Sen. Powell's behalf, attaching her letter to Sen. Huffman and the various maps and federal court decision excerpts. Ex. 3G. The body of the email contained the map shown above with blue

circles identifying the minority communities that Sen. Huffman's proposed map cleaved apart, and it explained why it was intentional racial discrimination to crack apart the SD10's minority population in this way. *Id*. Mr. Jones received a "read receipt" indicating that Sen. Huffman had read the email. Ex. 3H.

## VIII.   Sen. Huffman Releases Proposed Senate Plan (S2101)

Later than afternoon, after the senators had all already received Sen. Powell's email with the map identifying where Sen. Huffman proposed to crack apart SD10's minority communities, Mr. Opperman emailed all senate offices to announce that the proposed senate plan, S2101, had been publicly released on the Texas Legislative Council's website. Ex. 3I. The plan cracked the minority population as Sen. Powell had illustrated, and added Parker and Johnson County to SD10.

## IX.   Sen. Huffman Releases Amendment (Plan S2108) on Eve of Public Hearing.

On September 23, 2021—the evening before a 10 AM Redistricting Committee hearing designed for expert and public testimony on the senate plan—Sen. Huffman released a new version of the proposed map (Plan S2108) that substantially changed SD10 even further. Ex. 14 at 10. This version removed part of Parker County and added six additional rural counties, reaching near to Abilene, instead. *Id.* at 10-11.

## X.   Sen. Huffman Identifies Her Redistricting Criteria and Mapdrawers

At the September 24, 2021 hearing, and in the subsequent floor debate on SB4, Sen. Huffman revealed some information about the mapdrawing process in response to questions from Sen. Powell and others. Sen. Huffman began the hearing by reading aloud a written opening

statement. Ex. 14 at 5.[3] In her prepared remarks, Sen. Huffman identified the redistricting criteria

that purportedly guided the mapdrawing process:

> My goals and priorities in developing these proposed plans include, first and
> foremost, abiding by all applicable law, equalizing population across districts,
> preserving political subdivisions and communities of interest when possible,
> preserving the cores of previous districts to the extent possible, avoiding pairing
> incumbent members, achieving geographic compactness when possible, an
> accommodating incumbent priorities, also when possible.

Ex. 14 at 5; *see also* Ex. 6K at 1 (repeating nearly verbatim on senate floor). Sen. Huffman

explained that she, Mr. Opperman, and Ms. Mackin were in the room at all times the map was

being drawn, but that Ms. Mackin was the primary mapdrawer, with assistance from Mr.

Opperman and in Sen. Huffman's presence, and used the RedAppl[4] program to draw the district

lines. Ex. 6K at 7.

Ms. Mackin has significant experience with Texas redistricting. Prior to becoming Sen.

Huffman's special counsel and primary mapdrawer, Ms. Mackin was counsel at the Office of the

Attorney General and counsel of record for the State in *Perez v. Abbott* during the trial on the 2013

Texas congressional plans. Ex. 6 ¶ 4. Ms. Mackin, among other tasks, oversaw exhibits for

Defendants, and was Plaintiffs' counsels' primary point of contact on exhibit issues. *Id*. Ms.

Mackin created, and transmitted, a spreadsheet of exhibits noting those which the State objected

to and which it did not. *Id*. Given the significant focus on intentional discrimination and Section 2

claims in the Dallas/Fort-Worth ("DFW") area in that trial, a number of the exhibits Ms. Mackin

---

[3] Sen. Huffman acknowledged that she had "probably" read aloud pre-written remarks, Ex. 6K at 7; she can be seen doing so in the video of the hearing. *See* Senate Select Comm. on Redistricting, https://tlcsenate.granicus.com/MediaPlayer.php?clip_id=16596.

[4] RedAppl stands for "Redistricting Application" and it is a redistricting mapping program provided by the Texas Legislative Council.

reviewed (and objected to) were maps showing racial shading of the DFW area, with two examples shown below:



Ex. 6B. Much of the trial presentation and testimony in the *Perez* case focused on the minority areas of DFW, and racial shading maps were regularly displayed on the projector screen, and testified to, during trial and argument. The trial transcript appearances note that Ms. Mackin was present throughout trial. Ex. 6 ¶ 7. During the trial, Ms. Mackin emailed Plaintiffs' counsel a previously undisclosed exhibit, the 2013 letter from then-Attorney General Abbott to the redistricting committee members (including Sen. Huffman) advising them that it was their duty to remedy the intentional discrimination found by the DC court by enacting the court-ordered plans, including the return of SD10 to its benchmark configuration. Exs. 6C & 6D.

## XI.    Voters and Minority Community Members Testify Against Dismantling SD10

Despite the rushed process, a host of voters, community leaders, and elected officials testified against the dismantling of SD10. Their testimony was not vague—rather, it illustrated in explicit detail which minority neighborhood were cracked apart, and how many minorities' votes would be diluted by the plan. *See, e.g.*, Ex. 14 at 148-51 (Pastor Evans, testifying to the "jagged billy club portion of SD22" and identifying the numbers of Mansfield voters placed in rural-

dominated district); *id.* at 145-46 (Tarrant County Justice of the Peace Sergio De Leon testifying that "inner-city Fort Worth Hispanics do not tend to cattle. They don't cut hay or gather at the feed store. We work two to three jobs, met up at the Fiesta supermarket and Tacorias."); *id.* at 146 (Mr. De Leon identifying "over 76,000 of my constituents that were previously in SD10 [moved to] Anglo-controlled SD9" and "over 47,000 of my constituents" submerged into "80 percent white" rural counties); *id.* at 172-73 (testimony of Felipe Guitierrez identify neighborhood cracked between SD9 and SD10); *id.* at 176 (Mr. Guitierrez noting the shared community of interest and voting coalition of historic northside and southside Fort Worth Hispanic communities); *id.* at 168-69 (testimony of Fort Worth City Councilor Elizabeth Beck); Ex. 15 at 20 (Sen. Powell identifying "jagged gash from east to west just below Interstate 30" that splits "133,000 people who live north" of the divide in heavily Hispanic neighborhood); *id.* at 27-28 (Sen. Powell explaining that "[w]e have very little in common with folks to the west, with Brownwood, with Cleburne even anymore . . . we're driven by tourism and travel and entertainment. These are not the same issues that people in Brownwood or Abilene or the cities to the west would be concerned with); Ex. 15 at 65-69 (testimony of Tarrant County Commissioner Devan Allen regarding cracked neighborhoods and "king-cobra like" intrusion of SD22 in Tarrant County minority communities).

## XII.   Committee Rejects Amendment to Restore Benchmark SD10

Three days after the public hearings ended, the Senate committee convened on September 28, 2021 to consider amendments and vote out the bill. Ex. 17. Sen. Huffman "remind[ed]" the members—reading from scripted remarks—of her redistricting priories. *Id.* at 4-5. The list, however, included a new priority not previously announced: "partisan considerations." *Id.* at 5. Explaining her opposition to an amendment to restore SD10 to its benchmark configuration, Sen.

Huffman cited the overpopulation of other districts in DFW, SD8, SD12, and SD30, as the basis for reconfiguring SD10. *Id.* at 11-12.

## XIII.   Senate Floor Proceedings

The Senate convened on October 4, 2021, to consider the senate redistricting plan. Ex. 6K. By this point the plan had further changed, with SD10 picking up more of Parker County and losing Young County. In this iteration, SD10 was now overpopulated by over 21,000—four times greater than the benchmark district's deviation of just over 5,000 people. Ex. 6K at 12.

During the floor debate, Sen. Powell asked Sen. Huffman to confirm that her districting criteria were: (1) following the law, (2) equalizing population, (3) preserving political subdivisions and communities of interest when possible, (4) avoiding pairing incumbents, (5) geographic compactness when possible, and (6) accommodating incumbent priorities, when possible. Ex. 6K at 7. Sen. Powell asked: "[t]hese were the goals that you followed in drawing the districts. Is that correct?" Sen. Huffman responded, "[l]iterally speaking, yes." *Id.* Sen. Powell then walked through each criterion with respect to SD10.

First, Sen. Powell asked how she satisfied the first goal, asking: "Did you get legal advice about how to draw the lines from the Attorney General's Office before you undertook to draw the districts?" *Id.* Sen. Huffman responded, "[n]o." *Id.*[5] Rather, Sen. Huffman claimed she sent the maps to Chris Hilton at the Attorney General's office only after they were drawn. Ex. 14 at 15. Sen. Huffman acknowledged that she "probably ha[s] in the past" read the 2012 federal court order concluding that the dismantling of SD10 was unlawful. Ex. 6K at 9.

---

[5] Huffman's denial was contrary to what Mr. Opperman had told Mr. Jones and Mr. Svatora in February 2020, that legal counsel from the Attorney General's office, Texas Legislative Council, and the National Conference of State Legislature's had been counseling them regarding redistricting. Exs. 4 & 4A.

Second, Sen. Powell asked about the goal of equalizing population. She began by explaining that the benchmark district's deviation of 0.57% meant no changes were necessary, Ex. 6K at 10, to which Sen. Huffman responded "[n]ot necessarily because as you know we had to look at the state holistically, and just because one district may have been close to ideal doesn't mean that it wasn't going to be changed to accommodate a statewide plan." *Id*. Indeed, Sen. Huffman went so far as to say "[w]e believed you needed population"—even though the district was already slightly overpopulated. *Id*. at 15. Sen. Powell walked through each of the nearby districts that Sen. Huffman had proffered as the basis for needing to change SD10's configuration at the September 28th committee hearing—SD 8, 12, and 30. *Id.* at 10. Sen. Huffman acknowledged that SD8 was overpopulated by 57,995, SD12 by 146,201, and SD30 by 87,087. *Id*. Sen. Powell then noted that adjoining districts were underpopulated by nearly exactly the amount needed to correct the deviation in SD8, SD12, and SD30. *Id.* at 10-11. She noted that (1) SD8's overage (57,995) could have been resolved by remedying SD23's underage (~53,000), *id.*, and asked Sen. Huffman "[s]o, in reality, it was not necessary to alter SD10 in order to balance the population of SD8. Isn't that right?" Sen. Huffman responded, "I believed it was necessary to balance, looking at it holistically." *Id.* at 11. Sen. Powell then noted that while SD30 was overpopulated by about 87,000 and SD12 was overpopulated by about 146,000, those deviations could be resolved by shifting population from underpopulated adjoining SD28 (underpopulated by about 144,000) and SD31 (underpopulated by about 71,000). *Id.* at 11. The senators colloquy continued:

> **Sen. Powell**:       So, shifting population from the overpopulated districts, 12 and 30, into the underpopulated districts, 28 and 31, would've completely resolved the population imbalance in the districts 12 and 30 to well within permissible deviation. Correct?

| | |
|---|---|
| **Sen. Huffman**: | I disagree, well, I disagree with that conclusion. I mean, you could look at the numbers of all the districts and say if I just moved 10,000 here and 10,000 there it would work, but as you know it does not, it's not that simple. |

*Id.* at 11. But according to Sen. Huffman's chief aide, Mr. Opperman, it *was* that simple. Ex. 4A (stating that only "tweaks" were needed to SD10 because it was close to ideal population).

Third, the senators discussed preserving political subdivisions and communities of interest. *Id.* at 12. Sen. Huffman acknowledged that the plan splits the City of Arlington (population 394,000—less than half a senate district's size) into four different districts. *Id*. Then, when asked "[w]hat community of interest [] the City of Fort Worth and the City of Arlington  have with Brown County, Callahan County, Shackelford County, Stephens County, Palo Pinto County, Parker County, and Johnson  County," *id.*, Sen. Huffman had no answer, other than to note that Sen. Zaffirini had explained how *her* senate district (SD21) in south Texas had combined communities of interest some distance from each other, *id.* Despite hearing repeated testimony from SD10 voters and community leaders objecting to the splitting of the historic north- and south-sides of Fort Worth in the proposal just weeks earlier, *see supra*, Sen. Huffman denied any memory of that testimony, other than that Sen. Powell was well liked by her constituents, *id.* at 13, 23.

Fourth, Sen. Powell asked about the "preserving the core of previous districts" criterion. *Id.* at 14. The senators had the following exchange:

| | |
|---|---|
| **Sen. Powell:** | Brown, Callahan, Shackelford, Stephens, Palo Pinto, Parker, and Johnson counties are not part of the core of existing SD10. Is that correct? |
| **Sen. Huffman:** | The[s]e are new areas to Senate District 10, yes. |
| **Sen. Powell:** | And so, how does adding these seven rural counties serve your goal of preserving the core of Senate District 10? |
| **Sen. Huffman:** | The core is still there in Senate District 10. I believe your home is in Senate District 10. Is it not, Senator Powell? I'm |

|                | pretty sure you believe you lived in the heart and soul of Senate District 10. So, your, the, the core, in my belief, is still there. It is a Tarrant County-based Senate district. |
|----------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Sen. Powell:   | With seven rural counties added to that urban area. |
| Sen. Huffman:  | Correct. |

Ex. 6K at 14.

Fifth, Sen. Powell asked about compactness, and Sen. Huffman said no compactness metrics were used: "Basically, we just tried to look for population. We used all the considerations that I spoke of previously and drew the map along those lines. As I said, it's a big state and there's some big Senate districts out there." *Id.* at 15. Asked whether the proposed SD10—"that goes nearly to Abilene and all the way to Brownwood," was more compact than benchmark SD10, Sen. Huffman replied that "it [] depends how you define compactness" and explained (counterfactually) that "we believed you needed population" added to SD10. *Id.* at 15.

Finishing their discussion on the criteria, the senators had the following exchange:

| Sen. Powell:   | At the September 28th committee hearing, you said you were voting against my amendment, sponsored by Senator Alvarado, to restore SD10 in order to accommodate your redistricting criteria. So, which of the redistricting criteria that we just discussed were you referring to when you said that? |
|----------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Sen. Huffman:  | *All of them*. |
| . . .          | |
| Sen. Powell:   | All of them. Well, what is the main reason, then, that you changed SD10 from its current configuration where it's based solely in Tarrant County and largely in urban areas of Fort Worth and Arlington to one that includes now seven counties, seven additional counties. |
| Sen. Huffman:  | *All* of the redistricting priorities that I previously stated, that you have stated as well. |

*Id.* at 16 (emphasis added).

The Senate considered, and rejected, an amendment offered by Sen. Powell to restore SD10 to its benchmark configuration. Ex. 6I at 3. The amendment received bipartisan support, with Sen. Kel Seliger, the Chair of the Senate Redistricting Committees for the 2011 and 2013 cycles, voting in favor. *Id.* Despite bipartisan opposition, SB4 passed the Senate. *Id.* at 6.[6]

As Sen. Seliger testifies in his attached declaration, "[t]he 2021 senate redistricting process saw untrue, pretextual explanations given for why the lines were drawn the way they were." Ex. 1 ¶ 10. Regarding SD10, Sen. Seliger testifies that based on his considerable experience with redistricting in Texas, the explanation that the changes to SD10 were driven by the stated redistricting criteria is "pretext." *Id.* ¶ 11. Indeed, Sen. Seliger testifies that he voted in favor of the amendment to restore SD10 because "[h]aving participated in the 2011 and 2013 [redistricting] proceedings, and having read the prior federal court decision regarding SD10, ***it was obvious to me*** that the renewed effort to dismantle SD10 violated the Voting Rights Act and U.S. Constitution." *Id.* ¶ 12 (emphasis added).

## XIV.   The House Proceedings

On October 10, 2021, Mr. Jones sent an email on Sen. Powell's behalf to House Redistricting Committee Chair Todd Hunter and the Committee's members explaining why the dismantling of SD10 was unlawful, and providing maps showing how the plan cracked apart Tarrant County's minority population. Ex. 3L. The Committee scheduled a hearing on the senate proposal for October 11, 2021.

---

[6] Even three senators who voted in favor of SB4, Sens. Lucio, Zaffirini and Hinojosa signed a statement explaining that the dismantling of SD10 in the plan was racially discriminatory. Ex. 6J at 5-6.

The proceedings in the House Redistricting Committee featured several procedural departures from the normal legislative, and redistricting, process. As Rep. Chris Turner testifies, he and other committee members requested the ability to have invited testimony by expert witnesses—as is common in redistricting—to permit those witnesses to aid the committee without being subject to the three-minute rule that otherwise applies to testifying witnesses. Ex. 5 ¶ 7. Chair Hunter denied that request. *Id.* Rep. Turner and other committee members also requested that resource witnesses be made available from relevant agencies with expertise on redistricting, such as the offices of the Attorney General, the Secretary of State, the Texas Legislative Council, and the State Demographer. *Id.* ¶ 9. As Rep. Turner explains,

> [i]t is common practice for resource witnesses from relevant state agencies to be made available at committee hearings on nearly all bills, regardless of how minor. The refusal of the Chair to arrange for resource witnesses to be present was an extraordinary departure from normal procedures, especially on a matter as complicated and consequential as redistricting.

*Id*. Moreover, the committee process was unusually rushed. "In a departure from normal practice," the Chair "held the vote on the senate and congressional plans on the same day of their public hearings in the Committee. This is not normal; ordinarily a bill remains pending after it is first heard in the Committee." *Id.* ¶ 5. This is so, Rep. Turner explains, to "provide[] an opportunity for the Committee to actually listen to, and incorporate changes based upon, testimony from the public." *Id*. "Because Chair Hunter provided no opportunity for the Committee to actually synthesize or consider any of the public testimony, the hearings were essentially for show—they were never intended to actually obtain public input. The maps were fait accompli before the hearings ever occurred." *Id.* ¶ 6.

After the House committee voted out SB4, Mr. Jones sent an email on Sen. Powell's behalf to all members of the Texas House of Representatives illustrating how the proposed plan cracked

apart Tarrant County's minority communities, with a racial shading map in the body of the email showing the cracked populations. Ex. 3M. The email attached the earlier letter sent to Rep. Hunter and committee members explaining how the populations were cracked and why it was unlawful, excerpts from the 2012 federal court order regarding intentional discrimination in the dismantling of SD10, and the maps showing benchmark SD10's minority populations. Ex. 3 ¶ 31.

Prior to the House floor debate on SB4, Rep. Turner placed maps produced by the Texas Legislative Council on all 150 House members' desks; the maps showed the racial makeup of Tarrant County with SB4's lines displayed—illustrating how the plan cracked apart the minority community. Ex. 5 ¶ 11. Rep. Turner also displayed a large blown-up map which he referred to as he spoke on the House floor about the discriminatory cracking apart of Tarrant County's minority voters. *Id*. Nevertheless, SB4 passed and was signed into law by the Governor on October 25th, 2021.

## ARGUMENT

To succeed on a motion for a preliminary injunction, Plaintiffs must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiffs will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest." *Planned Parenthood v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005). Plaintiffs make that showing here.

## I.   Plaintiffs are Likely to Succeed on their Intentional Discrimination Claims.

Plaintiffs are likely to succeed on their claims that SB4's dismantling of SD10—cracking apart its minority voters across three Anglo-controlled districts—is the product of intentional race discrimination in violation of the Fourteenth and Fifteenth Amendments and Section 2 of the

Voting Rights Act. "[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (Kennedy, J., Roberts, C.J., Alito, J., lead op.). In assessing those serious questions, "'racial discrimination need only be one purpose, and not even a primary purpose,' of an official action for a violation to occur." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (*en banc*) (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)). "[D]iscriminatory intent need not be proved by direct evidence." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982). Rather, "direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of [the legislature's] actions may be considered." *Brown*, 561 F.3d at 433. As the *en banc* Fifth Circuit has explained,

> [i]n this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence. To require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions. This approach would ignore the reality that neutral reasons can and do mask racial intent, a fact we have recognized in other contexts that allow for circumstantial evidence.

*Veasey*, 830 F.3d at 230.

Although discriminatory purpose "implies more than intent as volition or intent as awareness of consequences," *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 379 (1979), the Supreme Court has explained that "the inevitability or foreseeability of consequences . . . bear[s] upon the existence of discriminatory intent," *id.* at 379 n.25. Where "the adverse consequences of a law upon an identifiable group" are clear, "a strong inference that the adverse effects were desired can reasonably be drawn." *Id.*

As the Supreme Court explained, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct

evidence as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). "The impact of the official action[,] whether it 'bears more heavily on one race than another," may provide an important starting point." *Id.* (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). From there, the Court "set out five non-exhaustive factors to determine whether a particular decision was made with a discriminatory purpose: (1) "the historical background of the decision," (2) "the specific sequence of events leading up to the decision," (3) "departures from the normal procedural sequence," (4) "substantive departures," and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Veasey*, 830 F.3d at 231 (quotation marks omitted); *Arlington Heights*, 429 U.S. at 267-68.

Plaintiffs claiming intentional discrimination "need not prove race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will toward minorities because of their race." *Perez v. Abbott*, 253 F. Supp. 3d 864, 948 (W.D. Tex. 2017).

A.  **SB4's Dismantling of Benchmark SD10 Bears More Heavily on Minority Voters.**

SB4's dismantling of SD10 bears more heavily on minority voters. Minorities accounted for 95% of the 4-million-person population growth in Texas since 2010, yet SB4 reduces the number of majority-minority VAP districts statewide, Ex. 7 at 2-3, and eliminates SD10 as a performing crossover district for minority voters, *id.* at 5-8. The majority of Tarrant County's 2.1 million people are minorities, yet SB4 reduces from one to zero the number of senate districts in which the County's minority voters can elect their preferred candidate (outside Dallas County-based SD23's small incursion into Tarrant County). *Id.* In violation of the senate's claimed redistricting criteria, SB4 disregards communities of interest in Tarrant County whose populations are largely minorities, as a number of community leaders and elected officials testified during the

hearings, including splitting the city of Arlington four ways, while providing Anglo voters an additional senate seat to control. *Id.*; *see supra* Factual Background Part XI. As the court concluded in 2012, "there is little question that dismantling SD 10 ha[s] a disparate impact on racial minority groups in the district." *Texas v. United States*, 887 F. Supp. 2d 133, 163 (D.D.C. 2012), *vacated on other grounds*, 133 S. Ct. 2885 (2013) (Mem.). Even the State's expert agreed. *Id.*

**B.      The Historical Background Supports a Finding of Intentional Discrimination.**

The Court does not need to search far into the past to find in the "historical background . . . a series of official actions taken for invidious purpose." *Arlington Heights*, 429 U.S. at 267; *see McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987) (noting that historical evidence should be "reasonably contemporaneous with the challenged decision). In 2012, the DC federal court ruled that the "Texas legislature redrew the boundaries of SD 10 with discriminatory intent." *Texas*, 887 F. Supp. 2d at 162. Indeed, the court found that then-Senator Wendy Davis, who represented SD10 at the time, had presented evidence that was "largely unrebutted" by the State and showed "clear on-the-ground evidence of 'cracking' minority communities of interest in SD 10." *Id.* The court explained that the benchmark district was "comprised of almost all the traditional and growing minority neighborhoods of Tarrant County in and around Fort Worth, including the historic Northside Hispanic area, the growing Southside Hispanic area, and the predominantly Black areas of Southeast Fort Worth, Forest Hill, and Everman." *Id.* at 226 (citation omitted). Although the district was only 23,118 people over ideal population—within the allowable deviation—the minority communities were "broken apart and placed into Anglo-controlled districts." *Id.* These facts, together with evidence from the legislative process—such as Sen. Davis being in the dark about the changes to her district while other senators were informed it was being "shredded," and conflicting testimony from the State's witnesses, *id.* at 164, led the court to conclude that "the

Senate Plan was enacted with discriminatory purpose as to SD 10," *id.* at 166. Then-Attorney General Abbott advised the legislature of its "obligation to remove the specter of discrimination" by adopting the benchmark configuration of SD10 as the permanent plan. Ex. 6D.

In *Veasey*, nine Fifth Circuit judges—a majority of the *en banc* Court—held that the DC court's intentional discrimination ruling with respect to SD10 was a "contemporary example of State-sponsored discrimination" in Texas, and specifically cited and relied upon the DC court's decision regarding SD10 (and the congressional districts). *See Veasey*, 830 F.3d at 240 (relying upon SD10 decision in *Arlington Heights* analysis); *id.* at 257 n.54 (explaining that DC court's merits ruling withstood *Shelby County*).

Moreover, the San Antonio federal court ruled in 2017 that the 2011 congressional plan was the result of intentional discrimination in the cracking and packing of minority voters in DFW. *See Perez*, 253 F. Supp. 3d at 961. Coupled with the other "contemporary examples of State-sponsored discrimination" credited by the *Veasey* court, 830 F.3d at 239, Texas's recent history of discrimination in redistricting in SD10 specifically and DFW generally creates a strong inference of discrimination in the legislature's renewed dismantling of SD10.

## C. The Specific Sequence of Events Leading to the Dismantling of SD10 and the Legislative History Suggests a Discriminatory Purpose.

The specific sequence of events leading to the dismantling of SD10 (factor two) and the legislative history (factor 5) support a finding of intentional discrimination. After the DC court issued its ruling, then-Attorney General Abbott counseled the legislature's redistricting committees, including Sen. Huffman, that "the Legislature has both the opportunity and the obligation to remove the specter of discrimination" and should thus "adopt the court-drawn interim plans as the State's permanent redistricting maps." Ex. 6D. As Sen. Seliger testifies, "[t]he

committee members all knew that it was necessary to restore SD10 to its benchmark configuration in order to comply with the Voting Rights Act and the U.S. Constitution." Ex. 1 ¶ 9.

As the Fifth Circuit explained in *Veasey*, "[c]ontext matters" in assessing discriminatory intent. 830 F.3d at 236. When the 2021 redistricting cycle began, the relevant context was that dismantling SD10 and cracking of Tarrant County minority voters constituted unlawful race discrimination. *See Perez*, 253 F. Supp. 3d at 961; *see also Abbott v. Perez*, 138 S. Ct. 2305, 2327 (2018) (noting that "the intent of the 2011 Legislature and the court's adoption of the interim plans are relevant to the extent that they naturally give rise to—or tend to refute—inferences regarding the intent of the [subsequent] Legislature. They must be weighed together with any other direct and circumstantial evidence of the Legislature's intent"). The events leading up to SB4's enactment and the legislative history confirm what Sen. Seliger testifies—that the explanations offered for changing SD10 were "pretext." Ex. 1 ¶ 11.

In February 2020, Sen. Huffman's top committee aide, Mr. Opperman told Sen. Powell's aides not to expect SD10 to change beyond "tweaks." Ex. 4A. Neither Mr. Opperman nor Sen. Huffman said otherwise at the November 2020 meeting, nor subsequently. Ex. 2 ¶ 17. Meanwhile, with Sen. Powell believing that her district would remain largely unchanged, Sen. Huffman was simultaneously telling other people the opposite:

| | |
|---|---|
| **Sen. Powell:** | Is there anyone else, other than you and Anna Mackin and Sean Opperman who suggested that the boundaries of SD 10 should be altered from its current configuration today, as I serve in SD 10? |
| **Sen. Huffman:** | I'm sure I've had conversations with people *over the months* but I do not recall a specific conversation where that specific discussion was had. |
| **Sen. Powell:** | Not one? |

29

| | |
|---|---|
| **Sen. Huffman:** | Not that I recall a specific discussion. As I said, I'm sure I've had discussion with Members in general about that SD 10 had changed or was changing, but I cannot recall a specific conversation. |

Ex. 6K at 4 (emphasis added). *See Texas*, 887 F. Supp. 2d at 164 (finding evidence of intentional discrimination when Sen. Davis was left uninformed as other members were told her district was being "shredded").

Sen. Huffman and her staff also provided shifting explanations for SD10's radical reconfiguration. *See Veasey*, 830 F.3d at 240-41 (noting that shifting explanation may give rise to finding of intentional discrimination); *Foster v. Chatman*, 578 U.S. 488, 507 (2016) (noting that the government's "principal reasons . . . shifted over time, suggesting that those reasons may be pretextual"). Sen. Huffman repeatedly focused on the fact that neighboring districts were overpopulated, Ex. 16 at 11, Ex. 6K at 10-11, but as Sen. Powell explained during the senate floor debate—and as is evident from the map below showing population deviations in the benchmark map, the deviations in North Texas could have all been resolved by shifting population among several neighboring districts where over- and under-populations nearly perfectly balanced one another. Indeed, SD10 can be retained while achieving a *lower* overall population deviation than SB4. *See infra* Part I.E.2.



Ex. 17 (blue arrows added). In fact, the notion that population needed to shift *south* from SD8, SD9, and SD12 is nonsensical: every district from SD10 south to San Antonio was either close to ideal population or substantially overpopulated. Ex. 17.

Sen. Huffman refused to acknowledge this obvious fact, even stating to Sen. Powell that "we believed you needed population," despite the slight overpopulation in the benchmark plan. Ex. 6K at 15. Moreover, Sen. Huffman's contention that SB4's cleaving of minority populations is explained by benign population balancing is contradicted by two key facts: (1) Mr. Opperman's *opposite* statement that "very little change would be necessary for you all being you're close to ideal size," Ex. 4A, and (2) Sen. Huffman's admission that she discussed with other people (whom she curiously could not identify) "over the months . . . that SD10 was changing." Ex. 6K at 3-4. The 2020 Census data was released in mid-August 2021, less than *one* month before Sen. Huffman unveiled her proposed redistricting plan. The ACS population estimates available during the "months" in which Sen. Huffman was telling people (other than Sen. Powell) that SD10 would change were the same that led Sen. Huffman's top aide to inform Sen. Powell's staff that SD10's

near-ideal population meant it would *not* be changing. The reliance on population deviations in surrounding districts is necessarily a pretextual post hoc explanation in light of Sen. Huffman's decision to change SD10 before the Census data was even released.

Beyond these contradictory and counterfactual population arguments, when asked directly Sen. Huffman did not identify population (or any other criteria) as the main justification for cracking SD10. Instead, she simply stated that "all" of her redistricting criteria necessitated the radical change. Ex. 6K at 16 ("All of them."). The fact that SD10 was radically reconfigured despite having population numbers close to ideal is yet another violation of Senator Huffman's claimed redistricting criteria, *i.e.,* preserving the core of the existing district.  Such a substantive departure strongly suggests discriminatory intent.

Sen. Huffman claims SD10 was drawn "blind to race" because "racial shading" was not displayed in RedAppl as the maps were drawn. Ex. 6K at 5, 22. But as Sen. Seliger testifies, the committee members—Sen. Huffman included—"all knew that voting in Texas and Tarrant County is racially polarized." Ex. 1 ¶ 9. Sen. Huffman has served on three redistricting committees, is a lawyer, and acknowledges reading redistricting decisions about Texas. *See* Ex. 6K at 37 ("I have read the law and I know the law . . ."). Nonetheless, she responded "I don't know that the courts said that" when asked by Sen. Powell whether "courts have repeatedly said that voting in Texas is racially polarized." Ex. 6K at 21. This type of feigned ignorance of race-related issues gives rise to an inference of discriminatory intent. *Veasey*, 830 F.3d at 237 (citing bill's sponsor's response of "I am not advised" when asked about the disparate impact of legislation as evidence that could support finding of intentional discrimination).

In any event, the absence of racial shading is not dispositive. This is particularly so in a state like Texas where voting is racially polarized such that politics and race are a "proxy" for one

another, *Cooper v. Harris*, 137 S. Ct. 1455, 1464 n.1 (2017), or where the "racial make-up of the county" is "fixed in [the mapdrawer's] head," *id.* at 1477. Here, as Sen. Seliger testifies, Sen. Huffman knew from her service on the prior redistricting committee that voting in Tarrant County was racially polarized, Ex. 1 ¶ 9, and the primary mapdrawer, Ms. Mackin, was particularly knowledgeable about Texas redistricting and Tarrant County demographics, *see supra* Factual Background Part X. And Sen. Huffman and her aides repeatedly provided Sen. Powell and her aides with racial data about SD10 in the lead up to the mapdrawing process. Ex. 3. Indeed, other than commenting that Sen. Powell's staff should not expect changes from benchmark SD10's configuration because of its near-ideal size, racial data about SD10 was the most prominent information Sen. Huffman and the Committee staff made available about SD10 for nearly two years. Ex. 3C, 3D, 3N. Finally, SD10 had been subject to years of litigation about the treatment of its minority populations; it is not credible to claim ignorance of its large minority population was centered in Fort Worth.

Every member of the legislature was aware of the racially discriminatory effect SB4's cracking of minority populations would have. First, they were aware because federal courts had repeatedly addressed the issue of SD10 and Tarrant County redistricting, and the legislature had to remedy the legal violations by returning to the benchmark plan. Second, they were aware because Sen. Powell emailed *all of them* with maps showing how the lines cracked apart Tarrant County's minority populations. Ex. 3G, 3M, Third, the redistricting committee heard hours of testimony on the topic. Exs. 14 & 15. Fourth, the issue was addressed at length on the senate floor. Ex. 6K. Fifth, Rep. Turner placed a map showing the cracking of Tarrant County's minority population on all 150 House members' desks during the House debate and addressed the issue in his remarks on the House floor. Ex. 5 ¶¶ 10-11. In *Veasey*, the record showed that far fewer

33

legislators were aware of the racial impact than were here, and yet the Fifth Circuit found that "[t]he record shows that drafters and proponents of SB 14 were aware of the likely disproportionate effect of the law on minorities." 830 F.3d at 236.

While awareness of discriminatory results alone is not proof of discriminatory intent, "[t]he inquiry is practical. What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid." *Feeney*, 442 U.S. at 279 n.24. And, "when the adverse consequences of a law upon an identifiable group are [] inevitable . . . .a strong inference that the adverse effects were desired can reasonably be drawn." *Id.* at 279 n.25. That inference only "fails to ripen into proof" when "the impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed legitimate, and when . . . the statutory history and *all of the available evidence* affirmatively demonstrate the [absence of discriminatory intent]." *Id.* (emphasis added). That is not the case here. *See, e.g.*, *infra* Part I.E (demonstrating that the cracking of SD10's minority population was not an "unavoidable consequence" of political goals.) And the statutory history and available evidence points toward discriminatory purpose.

### D. Procedural and Substantive Departures Demonstrate a Racially Discriminatory Purpose in the Dismantling of SD10.

The enactment of SB4 features procedural and substantive departures that indicate a racially discriminatory purpose. Sen. Huffman contended that she received no legal advice regarding compliance with voting rights laws prior to drawing the maps. Ex. 6K at 7. Even if this were true, numerous witnesses testified that the failure to conduct any analysis of VRA obligations prior to drawing the map was a sharp departure from the ordinary redistricting process in Texas. Ex. 14 at 68-76; *id.* at 110-17. Forsaking purposeful attention to VRA compliance while drawing

lines and disregarding federal court orders about intentional racial discrimination is not the procedural norm.

Moreover, the hearing process itself was rushed, with changes made on the eve of the hearing—including substantial changes to SD10. Ex. 2 ¶ 20. This left invited witnesses and the public unprepared to testify about the new configuration. Indeed, the blown-up map displayed at the hearing still showed the earlier re-configuration of the district. *Id.* p 21. The House's consideration of the Senate plan was also replete with procedural departures from the norm. For example, as Rep. Turner testifies, the House's consideration of the Senate plan was replete with procedural departures from the norm. *See supra* Factual Background, Part XIV.

The configuration of SD10 also reflects substantive departures. First, it departs from the view of the 2013 legislature and then-Attorney General Abbott that adopting the court-ordered senate plan was needed to remedy the intentional vote dilution in the 2011 plan. Second, it departs from the policy of preserving the community of interests in Fort Worth, including its large minority communities. In contrast, the State Board of Education plan and the Congressional plan both keep the minority areas of Fort Worth whole. Only the state senate plan cracks them apart.[7] Third, as Sen. Powell demonstrated in her exchange with Sen. Huffman during the floor debate, *see supra*, the new configuration of SD10 departs substantively from redistricting criteria that Sen. Huffman identified as purportedly guiding the process. Sen. Huffman could not identify how the new SD10

---

[7] *See* Tex. Legislative Council, https://redistricting.capitol.texas.gov/.

advances any of those interests, other than to assert that "all of them" led her to shift nearly *three-quarters of a million people* to rebalance a district that was 5,318 above ideal.

### E.    Race, Not Politics, Explains Why SD10's Minority Populations Were Cracked.

Race, not politics, explains why SD10's minority populations were cracked apart in SB4. This is apparent from the legislative process and from the alternative plan Plaintiffs discuss below that demonstrates that the legislature's purported political goals could have been achieved without dismantling SD10 and cracking apart its minority populations.

### 1.    Any Proffer of Partisan Motivation for SD10's Lines is Post Hoc, Pretextual Explanations Contradicted by Sen. Huffman's Own Statements.

First, any suggestion that politics, not race, explained SD10's lines would be *post hoc* pretext. At the September 24, 2021 hearing, Sen. Huffman read aloud from a scripted statement and identified her redistricting criteria. Ex. 14 at 5; Ex. 6K at 16. Seeking partisan advantage was not among them. *Id*. At the September 24 and 25 hearings, a host of community leaders, elected officials, and citizens from Tarrant County spoke eloquently in opposition to the dismantling of SD10 and cracking of its minority populations across three Anglo-dominated districts. Exs. 14 & 15; *see supra*.

It was only after hearing all this testimony about the racially discriminatory nature of the proposed plan, that Sen. Huffman then offered an additional consideration. On September 28, Sen. Huffman again read from prepared remarks. Ms. Mackin—her special counsel and the primary mapdrawer—sat next to her pointing at the scripted remarks as Sen. Huffman read from them.[8] Sen. Huffman explained that she wanted to "remind" senators of her redistricting criteria, which

---

[8] Video of hearing is available at https://tlcsenate.granicus.com/MediaPlayer.php?clip_id=16607. Sen. Huffman's discussion of the purported redistricting criteria can be seen at 5:53.

she read aloud from her paper. Ex. 16 at 4-5. She repeated each of the criteria previously identified on September 24, but added a new criterion to her script: "partisan considerations." *Id*.; *see also id.* at 16 (denying being told to add "partisan considerations" to the criteria *post hoc*). The addition of this new purported criterion in scripted remarks after the lines were drawn, after the criteria were already announced in earlier scripted remarks, and after days of testimony about the racially discriminatory cracking of SD10's minority populations, is strong evidence that it is pretextual. *See Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017) (holding that determination of whether race was motivation "concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not"); *see Veasey*, 830 F.3d at 237 (noting evidence that that a "race-neutral reason" offered by Legislature was "pretextual"). Indeed, Sen. Huffman reverted to her original script when the floor debate began, Ex. 6K at 1, and Sen. Powell later asked Sen. Huffman to specifically identify the criteria that motivated her redraw of SD10, and when asked if the criteria announced in the *first* set of scripted remarks constituted the list, Sen. Huffman responded "literally, yes." Ex. 6K at 7.

> **2.     Plaintiffs' Alternative Maps Demonstrate that if Partisan Advantage Were the Legislature's Real Motivation, Not Race, the Legislature Would Have Achieved those Goals without Targeting Tarrant County Minorities.**

Plaintiffs' alternative maps and analysis demonstrate that if the legislature's motive was truly to gain a Republican seat in the Senate, it could have—and would have—achieved that goal without cracking apart Tarrant County's minority populations.

In *Cooper*, the Supreme Court held that while evidence of an alternative districting plan is not required to demonstrate that race rather than politics explains line drawing decisions, such a plan is powerful evidence.

[A]n alternative districting plan . . . can serve as *key evidence* in a race-versus-politics dispute. One, often *highly persuasive* way to disprove a State's contention that politics drove a district's lines is to show that the legislature had the capacity to accomplish all its partisan goals without moving so many members of a minority group into the district. If you were *really* sorting by political behavior instead of skin color (so the argument goes) you would have done—or, at least, could just as well have done—*this.* Such would-have, could-have, and (to round out the set) should-have arguments are a familiar means of undermining a claim than an action was based on a permissible, rather than a prohibited, ground.

137 S. Ct. at 1479 (first and second emphasis added); *id.* at 1481 (noting that such an alternative map "could carry the day" even where other evidence was "meager").[9] In dissent, Justice Alito, Chief Justice Roberts, and Justice Kennedy would have held that a party *must* "come forward with an alternative redistricting map that served the legislature's political objective as well as the challenged version without producing the same racial effects" to show that race predominated.[10] *Id.* at 1486 (Alito, J., dissenting) (suggesting plaintiffs must provide alternative maps in states where "race and party affiliation . . . .[are] highly correlated") (internal quotation marks omitted). The dissenters characterized the proffer of an alternative map as "a logical response to the difficult problem of distinguishing between racial and political motivations when race and political party preference closely correlate." *Id.* at 1489-90. Moreover, the dissent explained that the proffer of an alternative map was a "sound" approach for plaintiffs to overcome their "burdens of production and persuasion," and the "presumption that the plan was drawn for constitutionally permissible

---

[9] Although *Cooper* involved a *Shaw* claim, the alternative maps' probative value is relevant to both intentional discrimination and *Shaw* claims, as the *Cooper* Court observed in noting that this type of evidence is common in cases alleging that a purported permissible purpose is pretext for prohibited motivations.

[10] Importantly, the dissent's conclusion that an alternative map should be a requirement is specific to the *Shaw* context where racial *predominance* must be established, rather than the vote dilution context where plaintiffs must show that racial discrimination was at least one factor, not the most important factor. *See id.* at 1491 (Alito, J., dissenting).

reasons." *Id.* at 141. The Supreme Court is thus unanimous about the powerful probative value of an alternative map in disentangling race from politics as the motivation for the drawing of lines.

Again, "[c]ontext matters" in weighing evidence of discriminatory intent. *Veasey*, 830 F.3d at 236. When the 2021 Texas redistricting process began, the legal landscape provided the legislature with (1) a warning about racial discrimination in Tarrant County and (2) a green light to engage in partisan gerrymandering in Travis County.[11]

As discussed *supra*, fifteen federal judges over the past nine years either ruled or relied on the rulings of intentional discrimination in SD10 and Tarrant County redistricting generally. *See supra*. And in the 2017 *Perez* decision on the 2011 plans, the majority explained that a partisan gerrymander of Austin Democrats was not unlawful: "[t]he Legislature could have simply divided Travis County and Austin Democrats among five Republican districts." *Id.* at 897 (majority op.). Judge Smith echoed that point, noting in his dissent that "fragmenting Travis County into relatively harmless parts" for Republican districts was, in his view, evidence of a permissible partisan motivation. This, Judge Smith explained, stood in "stark contrast" to the "packing and cracking" in DFW. As Judge Smith explained, "*[i]n terms of what redistricting law requires, the differences between DFW and Travis County[] are dramatic*." *Id.* (emphasis added).[12]

---

[11] To be clear, the only remedial plans offered by Plaintiffs consist of their alternative configurations of SD10, which would remedy the legal violations addressed in this motion. Plaintiffs do not offer or advocate any other illustrative plan as a potential remedy. The illustrative Austin-based partisan gerrymanders are offered only as evidentiary illustrations that the legislature's cracking of SD10's minority populations was for prohibited racial reasons, and are not proffered as an appropriate judicial remedy for the legal violation in SD10. Importantly, these plans do not address any other allegations of legal violations the Court may adjudicate.

[12] Ms. Mackin—the primary mapdrawer—was counsel of record in *Perez*, formally entering her appearance just two days after the amended decision on the 2011 plan was issued. No. 5:11-cv-00360 (W.D. Tex.), ECF No. 1392.

If gaining a Republican senate seat were truly the legislature's motivation, it would have followed the federal court's roadmap for permissibly obtaining partisan advantage. Instead, it followed the federal court's roadmap for intentional racial discrimination. Plaintiffs' attached alternative maps demonstrate this. Exs. 32 & 38. Both of Plaintiffs' demonstration plans split Austin-area Democrats (aside from those placed in Democratic SD21) among five Republican districts. *Id*. Alternative Plan 1 alters benchmark SD10 by swapping its Republican-dominated "arm" for SD9's Democratic-dominated "arm"—boosting SD9's Republican performance even higher. Ex. 32. Alternative Plan 2 maintains the benchmark configuration of SD10. Ex. 38.

In both of Plaintiffs' alternative maps—like in SB4—Republicans would safely hold nineteen seats by comfortable margins. Exs. 35-36; 41-42. Indeed, Plaintiffs' alternative maps are *better* for Republican performance.[13] Plaintiffs' alternative plans also have a lower overall population deviation (5.33%) than SB4 (6.14%). Exs. 19, 33, 39. Plaintiffs' alternative plans satisfy—indeed exceed—any purported partisan goals of the legislature, and do so "without moving so many members of a minority group" out of SD10. *Cooper*, 137 S. Ct. at 1479. The fact

---

[13] For example, in the 2020 presidential election, Trump received a lower vote share in two of SB4's Republican districts (SD8: 55.1%; SD12: 55.2%) than his lowest vote share in Plaintiffs' alternative plans' Republican districts (SD8: 55.3%). Exs. 24, 36, 42. Likewise, Biden received a higher voter share in one of SB4's Republican districts (SD12: 43.3%) than his highest vote share in Plaintiffs' alternative plan's Republican districts (SD7: 43.1%). *Id*. In the 2018 Senate race, Cruz received a lower vote share in SB4's SD9 (55.6%) than his lowest vote share in Plaintiffs' alternative plan's Republican districts (SD14 & SD24: 55.9%). Exs. 23, 35, 41. Likewise, O'Rourke received a higher voter share in SB4's SD9 (43.6%) than his highest vote share in Plaintiffs' alternative plan's Republican districts (SD11: 43.3%). *Id*.

Moreover, under SB4, recent Republican statewide candidates in 2018 and 2020 have a ceiling of nineteen seats. Exs. 23 & 24. But under Plaintiffs' Alternative Plan 2, Republicans narrowly carried SD10 in four of twenty races in 2018 and 2020. Exs. 41 & 42. Although benchmark SD10 is a performing district for minority voters in the vast majority of recent elections, Ex. 7, its contests are competitive.

that the legislature declined to pursue a more advantageous partisan gerrymander a federal court had recently green lighted and instead chose to crack apart Tarrant County's minority population, which it had been repeatedly told was unlawful, is "key[,] . . . highly persuasive" evidence that "disprove[s] [any] contention that politics drove [SD10's] lines." *Id.*

## II.   **Plaintiffs Are Likely to Succeed on their *Shaw*/Racial Gerrymandering Claim.**

Plaintiffs are likely to succeed on their *Shaw*/racial gerrymandering claim with respect to SD10. Regardless of whether the legislature acted with invidious intent (it did), "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without [SD10]." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). Such a racial gerrymander occurs when race predominates and "the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 797 (2017) (internal quotation marks omitted). The showing of racial predominance may be made "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose." *Id.* (internal quotation marks omitted). Once that showing is made, strict scrutiny applies and "[t]he burden shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 137 S. Ct. at 1463-64.

"A conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition" to demonstrate a racial gerrymander, though such a conflict "may be persuasive circumstantial evidence." *Bethune-Hill*, 137 S. Ct. at 799. A court adjudicating a racial gerrymandering claim "should not divorce any portion of the lines—whatever their relationship to traditional principles—from the rest of the district." *Id.* at 800. Nevertheless, evidence of areas "smaller or larger" than the district, including "statewide

evidence" and evidence from surrounding districts, is relevant. *Id.*; *see id.* ("Districts share borders, after all, and a legislature may pursue a common redistricting policy toward multiple districts.").

The evidence establishes that race was the predominant factor in the drawing of SD10's lines and traditional nonracial redistricting criteria were subordinated to race. Moreover, the State has no plausible compelling interest to justify its line drawing with respect to SD10.

First, there are "stark splits in the racial composition of the populations moved into an out of disparate parts of the district." *Id.* at 800. As Dr. Barreto explains, "[a]lthough benchmark SD10 was near ideal population . . . Plan S2168 moved 387,161 people out of the district," of whom "56.4% [were] minority," and "moved into SD10 377,534 new residents," of whom "67.2% are Anglo." Ex. 7 at 8. The result was a nearly 10% increase in the district's Anglo population. Ex. 7 at 6.

The decision to radically change SD10 in this manner—with this large increase in Anglo population share—must be analyzed in the context of the prior litigation. As Sen. Seliger, whom Sen. Huffman served under on the 2011 and 2013 redistricting committee, testifies, Ex. 1, Sen. Huffman knew of the previous racial discrimination finding (and thus knew there was a large minority population in SD10), and knew—despite her non-credible denial, Ex. 6K at 21—that voting in Tarrant County was racially polarized, Ex. 1 ¶ 9. Ms. Mackin was a lawyer for the State in a trial that focused heavily on the location of racial minorities in Tarrant County, *see supra*, and was familiar from her trial work with the location of Tarrant County's minority population. Indeed, in the nearly two-year lead up to the mapdrawing, aside from estimated population deviations, racial data about the districts was the most prominent data Sen. Huffman's committee made available to Sen. Powell and her aides. Exs. 3C, 3D, 3N. Ultimately, the decision to spread minority voters in Tarrant County into multiple districts is no less a racial gerrymander than if voters are

42

segregated into separate districts based upon race. *See Cooper*, 137 S. Ct. at 1464 n.1; *Bush v. Vera*, 517 U.S. 952, 970, 972 (1996) (plurality) (concluding that "spreading the Black population" in DFW to aid Democrats was a racial gerrymander, even if result was not "segregate[d]" voters by race).

Second, the alternative maps that Plaintiffs have proffered constitute "highly persuasive" evidence that race, not partisanship, informed the line drawing in SD10. *Cooper*, 137 S. Ct. at 1479; *see also supra.* A unanimous Supreme Court agrees on that point, and the maps Plaintiffs offer *exceed* SB4's partisan benefit for Republicans, without the stark racial effects of the enacted plan.

Third, a visual comparison of SB4's configuration to the benchmark configuration, along with Sen. Powell's colloquy with Sen. Huffman during the floor debate, show that neutral districting criteria were subordinated to race in the drawing of SD10. The district is visually non-compact. Sen. Huffman could not even articulate any meaning behind her purported compactness goal, saying "it depends" and involves "looking for population." Ex. 6K at 30.[14] The district combines rural areas near Abilene with urban areas in Fort Worth, two distant areas with no shared community of interest. *See supra* Factual Background, Part XI (testimony regarding reconfigured SD10). It combines territory from *four* senate districts in the benchmark map. Ex. 14 at 11. The latter point is noteworthy. When Sen. Huffman was presented with a proposed new Hispanic majority district, she cited the fact that it "combines communities that have not been jointly represented in the Senate in previous years" as a basis to reject it. Ex. 6K at 63. Yet, she contended it served "all" of her redistricting criteria to convert a majority minority VAP district (SD10) into

---

[14] One needs to look no further than SD17—the Rorschach district Sen. Huffman drew for herself—to see that compactness was not actually a redistricting criterion.

a majority Anglo VAP district by stitching together territory with no shared interests from *four* different districts.

The alternative maps plaintiffs have provided, together with the available evidence, demonstrates that race, not politics or any of neutral criteria, predominated in the drawing of SD10.

## III.     Plaintiffs Will Be Irreparably Harmed if SD10 Is Not Enjoined

SD10 was drawn intentionally to dismantle an effective crossover district and dilute the votes of Black and Latino voters in Tarrant County, and predominantly on the basis of race, in violation of Plaintiffs' constitutional right to be free from discrimination. As such, Plaintiffs will suffer irreparable harm absent this Court's intervention. *BST Holdings v. OSHA*, No. 21-60845 at *19 (5th Cir. Nov. 12, 2021) ("the loss of constitutional freedoms . . . 'unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns*, 347 U.S. 373 (1976)); *see also, e.g.*, *Deerfield Med. Center v. City of Deerfield Beach*, 661 F. 2d 328, 338 (5th Cir. Unit B Nov. 1981) (finding that violations of fundamental rights are always irreparable); *DeLeon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom. DeLeon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law.")

The right to be free from intentional racial discrimination in voting is a core constitutional right. *See* U.S. Const. amend. XIV § 1, amend. XV § 1; *see also Gomillion v. Lightfoot*, 364 U.S. 339, 346 (1960.) ("When a legislature thus singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the Fifteenth Amendment."). By intentionally dismantling SD10 as an effective crossover district for minority voters, and by using race as the predominant districting criteria to move a significant amount of voters within and without SD10, SB4, violates Plaintiffs' constitutional rights. This harm cannot be undone through

44

monetary relief. *See Deerfield*, 661 F.2d at 338 (holding that where a fundamental right is "either threatened or in fact being impaired . . . mandates a finding of irreparable injury."); *see also League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress."). As such, the harm to Plaintiffs is irreparable. *Deerfield*, 661 F.2d at 338.

## IV.    The Balance of the Equities Weighs in Favor of Plaintiffs

The balance of the equities weighs in favor of Plaintiffs. SB4 violates Plaintiffs' constitutional rights by intentionally diluting the voting power of Black and Latino voters in Tarrant County by cracking them into different districts, and by making race the predominant districting criterion. Thus, enjoining SB4 will serve the public interest. *See Ingebretsen v. Jackson Public School Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (holding that where an enactment is unconstitutional, "the public interest [is] not disserved by an injunction preventing its implementation."). Defendants lack any legitimate interest in enforcing a redistricting plan that violates Plaintiffs' constitutional rights to be free from discrimination. *See BST Holdings*, No. 21-60845 at *19 (finding that any interest that may be asserted in enforcing laws that infringe on constitutional freedoms is "illegitimate.").[15] And the public interest in protecting Plaintiffs' constitutional rights to be free from discrimination outweighs any minimal burden to Defendants. *See De Leon v. Perry*, 975 F. Supp. 2d 632, 665 (W.D. Tex. 2014), *aff'd sub nom. De Leon v.*

---

[15] To the extent Defendants assert an administrative burden in altering election deadlines, any such burden imposed by adopting a new filing deadline and election schedule to accommodate the use of a remedial configuration of SD10 in upcoming elections is minimal. Indeed, the legislature enacted a law with alternative election schedules to accommodate potential delays in redistricting. *See* Tex. Elec. Code § 41.0075. And any marginal burden imposed is far outweighed by the interest in ensuring Plaintiffs' right to vote is not intentionally infringed on the basis of race. *See, e.g.*, *BTS Holdings*, No. 21-60845 at *20. ("The public interest is [] served by maintaining our constitutional structure. . . even, or perhaps *particularly*, when those decisions frustrate government officials.").

*Abbott*, 791 F.3d 619 (5th Cir. 2015) ("a preliminary injunction preventing the enforcement of an unconstitutional law serves, rather than contradicts, the public interest."); *see also*, *e.g.*, *G & V Lounge, Inc. v. Michigan Liquor Control Commission*, 23 F.3d 1071 (6th Cir. 1994) ("it is always in the public interest to prevent the violation of a party's constitutional rights."); *Charles H. Wesley Educ. Fdn., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) ("the . . . cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest.").

Finally, prohibiting Defendants from implementing SB4 with respect to SD10 during the pendency of this litigation would do no more than "freeze[] the status quo," which is precisely the purpose of a preliminary injunction.[16] *Wenner v. Texas Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997) (analyzing injunction issued to preserve the status quo prior to the challenged law going into effect); *see also Univ. of Tex. v. Camenisch* , 451 U.S. 390, 395 (1981) (finding that the intent of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held.").

For the foregoing reasons, the balance of the equities clearly weighs in favor of the Plaintiffs.

## CONCLUSION

Plaintiffs respectfully request that the Court extend the filing period for SD10 while it adjudicates this motion, hold an evidentiary hearing, grant the motion for preliminary injunctive relief, and schedule remedial proceedings.

---

[16] Typically, the status quo is defined as "the 'last peaceable uncontested status' existing between the parties before the dispute developed." 11A Charles A. Wright, et al., Federal Practice Procedure § 2948; *see also Pendergest-Holt, Standford, Lopez v. Underwriters*, 681 F. Supp. 2d 816, 821 n.4 (S.D. Tex. 2010) (citing *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 n. 5 (10th Cir. 2006)).

November 24, 2021                             Respectfully submitted,

_/s/ Chad W. Dunn_
Chad W. Dunn (Tex. Bar No. 24036507)
Brazil & Dunn
4407 Bee Caves Road
Building 1, Ste. 111
Austin, TX 78746
(512) 717-9822
chad@brazilanddunn.com

Mark P. Gaber*
Mark P. Gaber PLLC
P.O. Box 34481
Washington, DC 20
(715) 482-4066
mark@markgaber.com

Jesse Gaines* (Tex. Bar. No. 07570800)
P.O. Box 50093
Fort Worth, TX 76105
817-714-9988
gainesjesse@ymail.com

*Admitted _pro hac vice_

_Counsel for Plaintiffs_

47

## CERTIFICATE OF SERVICE

I certify that all counsel of record were served a copy of the foregoing this 24th day of November, 2021, via the Court's CM/ECF system.

_/s/ Chad W. Dunn_
Chad W. Dunn