# EXHIBIT 3-J

SENATOR JOAN HUFFMAN
CHAIR

SENATOR JUAN "CHUY" HINOJOSA
VICE CHAIR



POST OFFICE BOX 12068
AUSTIN, TX 78711
(512) 463-0495
FAX: (512) 463-0175

## SENATE SPECIAL COMMITTEE ON REDISTRICTING

### Hearing Agenda

Friday, September 24, 2021  10:00 a.m.
Senate Chamber

**I.   Call to Order**

**II.   Roll Call**

**III.   Committee Business:**

   **A. Bills to be Considered**

   SB 4        Huffman
   *Relating to the composition of districts for the election of members of the Texas Senate.*

   SB 7        Huffman
   *Relating to the composition of districts for the election of members of the State Board of Education.*

**IV.   Invited Testimony:**

   1. Domingo Garcia, National President, League of United Latin American Citizens (LULAC)
   2. Michael Li, Senior Counsel, Democracy Program - Brennan Center for Justice
   3. Robert Notzon, Legal Redress Committee Chair, Texas National Association for the Advancement of Colored People (NAACP)
   4. Kathryn Oler, President, League of Woman Voters - Corpus Christi Area
   5. Nina Perales, Vice President of Litigation, Mexican American Legal Defense and Educational Fund, Inc. (MALDEF)

**V.   Public Testimony**

**VI.   Recess**

If submitting written testimony, please provide 20 copies to the committee clerk with your name and the bill number on each copy.



Testimony of

**Michael C. Li**
Senior Counsel
Brennan Center for Justice
At New York University School of Law

Meeting of
The Senate Select Committee on Redistricting
Austin, Texas
September 24, 2021
at 10:00 a.m.

SB 4 and SB 7

Chairwoman Huffman, Vice Chairman Hinojosa, and members of the Select
Committee:

Thank you for the invitation to testify before the Senate Select Committee on
Redistricting.

The Brennan Center for Justice at New York University School of Law is a
nonpartisan public policy and legal institute that works to reform, revitalize, and defend
our country's systems of democracy and justice. For more than two decades, the Brennan
Center has built up a large body of nationally respected research and work on these
issues, including in the fields of redistricting and election law. I am Senior Counsel in
the Center's Democracy Program, where my work focuses on redistricting and the
census.

My remarks today focus on North Texas, and, in particular, Tarrant County,
because Plan S2101 raises a number red flags with respect to treatment of minority
communities in the DFW Metroplex. However, the themes of my remarks are more
broadly applicable to the state as a whole, particularly its urban and suburban areas, and to
other maps in addition to state senate maps.



## FORT WORTH®

September 23, 2021

To:     The Honorable Joan Huffman
        P.O. Box 12068 Capitol Station
        Austin, TX 78711

Re:     Impacts of Senate District 10 Redistricting on Fort Worth, Texas Residents

Dear Chair Huffman,

As members of the Fort Worth City Council representing majority-minority districts, we write with grave concerns regarding the proposed Senate map which cracks Fort Worth's historic and growing minority communities and places our constituents within Senate districts where their votes will be diluted, and their voices stifled.

The City of Fort Worth is now the 13th largest city in the country and the fastest growing large city in America. The latest census data shows that Fort Worth is majority-minority, with only 37% of population identifying as Anglo. Together, Black, and Hispanic residents constitute nearly 500,000 of Fort Worth's 918,915 residents. Of Fort Worth's nine council seats, five are majority-minority where Black, Hispanic, and Asian American voters unite to elect a candidate of their choice.  Majority-minority representatives now make up the majority of members on Fort Worth's City Council.

Under the proposed State Senate map, our constituents would be gravely harmed and unable to elect candidates of their choice to the Texas Senate. Currently, most of our constituents reside in Senate District 10. District 10 is a prime example of an effective coalition crossover district—our varying minority communities have proven their ability to unite to elect candidates of their choice.

In the last two election cycles, our constituents in Senate District 10 have resoundingly come together to elect Beverly Powell for Texas Senate and supported candidates in races from President to Attorney General to Sheriff. The proposed map intentionally and effectively eliminates this ability by fracturing minority neighborhoods and placing our constituents in two Anglo dominated districts. One of these districts is reconfigured District 10 where current minority voters are diluted by being added to predominately White rural Parker and Johnson counties. The other is reconfigured District 9 where minority voters of Fort Worth are fractured from District 10 and attached to Anglo dominated suburban communities.

The proposed plan removes over 79,000 people from the historic Hispanic community in the greater Northside area from Senate District 10 and places them in Anglo controlled Senate District 9. This Citizen Voting Age Population (CVAP) that is 63% Hispanic.

**ELIZABETH M. BECK**
CITY COUNCIL · DISTRICT 9
THE CITY OF FORT WORTH ∗ 200 TEXAS STREET ∗ FORT WORTH, TEXAS 76102
817-392-8809 ∗ FAX 817-392-2409

♻ Printed on recycled paper.



## FORT WORTH®

Just east of downtown Fort Worth, the proposed map also removes 53,000 people from Senate District 10 along the urban Lancaster corridor which has a combined Black and Hispanic CVAP of 44.6 %. These residents are combined with predominately suburban Anglo SD9.

Finally, the proposed plan takes over 375,000 Fort Worth residents with a combined CVAP that is 55% Black and Hispanic and intentionally dilutes their vote by adding 328,192 people in Parker and Johnson Counties to SD10. These two counties alone have a combined CVAP that is 82.4% Anglo. The cracking of Fort Worth's African American and Hispanic populations is intentional and would have a discriminatory effect of the communities we are elected to serve.

We call on the committee and Chair to heed our concerns and, at a minimum, restore Senate District 10 to its current configuration. As it stands today, Senate District 10 allows our diverse constituents to unite and elect a candidate of their choice to represent our City's interests in Austin. Senate District 10 has a nearly ideal population and does not need to be changed. If the committee feels that changes must be made, Fort Worth's densely populated African American and Hispanic communities, such as the Como neighborhood, the greater Northside community, and the Lancaster corridor, which are currently drawn outside SD10 should be included in a newly drawn district.

Any attempt to dismantle majority-minority legislative districts in Fort Worth will be correctly seen as an attack on the communities we serve. The census has revealed that our city and county population growth is because of Hispanic, Black, Asian and other minority residents. This growth must be reflected in any map passed by the legislature. The current proposal falls far short of this requirement and would seriously harm the communities we proudly serve.

Respectfully,

Elizabeth M. Beck, District 9          Chris Nettles, District 8          Jared Williams, District 6

Gyna Bivens, District 5          Carlos Flores, District 2

CC: Members of Senate Redistricting Committee

**ELIZABETH M. BECK**
CITY COUNCIL · DISTRICT 9
THE CITY OF FORT WORTH  *  200 TEXAS STREET  *  FORT WORTH, TEXAS 76102
817-392-8809  *  FAX 817-392-2409

♻ Printed on recycled paper

I am happy to follow up with the Committee with additional information, either on the subject of my testimony today or on other topics or to offer other help and assistance as may be beneficial in ensuring that Texas has a robust, inclusive, and transparent redistricting process.

## The Need to Consider Race in Redistricting

*Overview*

This redistricting cycle, a number of states have publicly stated that they will not consider racial or ethnicity data when drawing maps. This approach is not tenable in a state as diverse and demographically complex as Texas.

Between 2010 and 2020, over 95 percent of Texas' population growth was attributable to communities of color, including people who reported two or more races on census forms. In Dallas County and Tarrant County, the percentage was even higher, with the Anglo population of both counties decreasing in both absolute and relative terms last decade.

### Dallas County Demographic Change 2010-2020

| | TOTAL POPULATION | ANGLO | BLACK | LATINO | ASIAN | MULTIRACIAL |
|---|---|---|---|---|---|---|
| 2020 Population | 2,613,539 | 724,987 | 564,741 | 1,057,835 | 181,314 | 66,754 |
| Absolute Change 2010-2020 | +245,400 | −59,706 | +46,009 | +151,895 | +63,517 | +37,327 |
| Group Share of County Population Growth 2010-2020 | N/A | 0% | 19% | 62% | 26% | 15% |

**Source:** U.S. Census Bureau

### Tarrant County Demographic Change 2010-2020

| | TOTAL POPULATION | ANGLO | BLACK | LATINO | ASIAN | MULTIRACIAL |
|---|---|---|---|---|---|---|
| 2020 Population | 2,110,640 | 904,884 | 358,645 | 620,907 | 127,783 | 78,920 |
| Absolute Change 2010-2020 | +301,606 | −32,251 | +96,123 | +137,930 | +44,405 | +48,364 |
| Group Share of County Population Growth 2010-2020 | N/A | 0% | 32% | 46% | 15% | 16% |

**Source:** U.S. Census Bureau

Much of the growth of communities of color last decade in Tarrant County was centered in the current Senate District 10. All told, the non-Anglo population of SD-10 increased last decade by 134,124 people, of whom 51 percent were Latino, 25 percent

2

were Black, and 11 percent were Asian. By contrast, the Anglo population of SD-10 *fell* by 22,893 people, a decrease of nearly 6 percent. Remarkably, almost half of the Latino population growth in Tarrant County was in SD-10, as was 36 percent of Tarrant County's Black population growth and 32 percent of its Asian population growth.

As currently configured, SD-10 is only 39.5 percent Anglo by total population and 53.9 percent Anglo by citizen voting age population estimates. In fact, estimates of the Anglo citizen voting age population may be overstated. Because CVAP estimates are calculated on a five-year rolling average, they tend to trail actual population, especially in fast-growing states like Texas. It is very likely, accordingly, that SD-10 is already majority non-Anglo both by total population *and* citizen voting age population.

*Texas' Obligations*

Given the growth of communities of color and their geographic concentration, Texas has an obligation to conduct a searching and nuanced analysis to ascertain and fully understand the extent of minority power before adopting a new plan.

Under Section 2 of the Voting Rights Act, Texas has a legal obligation to avoid drawing district lines in a way that dilutes the votes of minority voters and prevents them from electing preferred candidates.[1] Whether liability exists under Section 2 is not a simple back-of-the-envelope calculation. Rather, the U.S. Supreme Court has said that the inquiry is "intensely local," "fact-intensive," and "functional" in nature.[2] In diverse multi-racial, multi-ethnic regions such as North Texas, among the matters that must be investigated is whether two or more minority groups in a region are politically cohesive and could together form the majority of a district.[3] It is imperative that the state not only conduct this analysis but that it do so in a transparent fashion, making its analysis publicly available before any vote on a map.

But Texas' obligations do not end with creating Section 2 districts under the Voting Rights Act. Like all states, Texas has a constitutional obligation to avoid intentional discrimination against racial and ethnic minorities. The Supreme Court has made clear that liability for intentional discrimination can exist even where no liability exists under Section 2 of the Voting Rights Act, explaining that "if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious concerns under both the Fourteenth and Fifteenth Amendments."[4] Likewise, the Supreme Court has held that the "undermin[ing

---

[1] Thornburg v. Gingles, 478 U.S. 30 (1986).

[2] *Id.* at 62-63, 79.

[3] Campos v. City of Baytown, 840 F.2d 1240, 1244 (5th Cir. 1988).

[4] Bartlett v. Strickland, 556 U.S. 1, 24 (2009) (Kennedy, J.) (plurality opinion).

3

of] the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive" can "bear[] the mark of intentional discrimination that could give rise to an equal protection violation."[5]

In gauging whether there is discriminatory intent, a state's awareness that a state's action bears "more heavily on one race than another" is a key factor that courts will consider.[6] As the Supreme Court has explained, "Adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence . . . is one factor among many others which may be considered by a court" in evaluating whether a state's motive is discriminatory.[7] Drawing maps without racial or ethnicity data will not insulate a state from liability if a state becomes aware of the disparate impact or if a state ignores its obligation to carefully consider whether it is diluting minority voting power.

*Red Flags*

The proposed state senate map under consideration by the Select Committee (Plan S2101) raises a number of flags regarding the treatment of communities of color, particularly with regard to changes made to the benchmark configuration of SD-10. These changes suggest that Texas has not yet done the careful analysis required by both the Voting Rights Act and the Constitution.

To start, Plan S2101 makes wholesale changes to SD-10 despite the fact that there is no legal reason to do so. Although SD-10 became much more demographically diverse last decade, the overall population of the district reported by the census (945,496) is not far from the target population for Texas Senate districts (940,178). In fact, the exceedingly small population deviation of just 5,318 people (or 0.57 percent) is well within the ten percent top-to-bottom deviation generally permitted under case law for legislative districts.[8] In other words, if Texas wanted, it could leave SD-10 exactly as it is or make at most nominal changes. Instead, Plan S2101 removes over a third of the population from the district and, in the process, significantly fractures minority communities.

Altogether, Plan S2101 would remove 317,966 people in Tarrant County from SD-10 and replace them with 328,149 people from Johnson County and Parker County.

---

[5] League of United Latin American Citizens v. Perry, 548 U.S. 399, 439-40 (2006) (discussing Texas' dismantling the 23rd Congressional District in 2003 in response to increased Latino political effectiveness).

[6] U.S. v. Brown, 561 F.3d 420, 433 (5th Cir. 2009).

[7] Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 464-65 (1979).

[8] Brown v. Thomson, 462 U.S. 835, 842-43 (1983) (population deviations within a 10 percent top-to-bottom threshold are presumptively constitutional).

Brennan Center for Justice at New York University School of Law
120 Broadway, Suite 1750   New York, NY 10271

Of the people added to the district from Johnson County and Parker County, 72 percent are Anglo. By contrast, 55 percent of the Tarrant County people removed from the district are non-Anglo. Overall, Plan S2101 would remove 34 percent of the current SD-10's Latino population, 23 percent of its Black population, and 46 percent of its Asian population.

Minority neighborhoods that Plan S2101 would move from SD-10 to SD-9 include the North Side of Fort Worth, which is heavily Latino, and the Central Meadowbrook neighborhood, which is two-thirds Latino and Black. These neighborhoods are kept together with other heavily Latino and Black neighborhoods in a variety of other plans, including the benchmark congressional plan (Plan C2100) and both the benchmark State Board of Education plan (Plan E2100) and the state's proposed State Board of Education plan (Plan E2103).

It is noteworthy in this regard that the changes to SD-10 proposed by Plan S2101 in many ways mirror attempted changes to the district last decade that were found to be intentionally discriminatory by a three-judge panel in an action brought by Texas to obtain preclearance to use the plan. In denying preclearance, the panel held that "there is little question that dismantling SD 10 had a disparate impact on racial minority groups in the district . . . by submerging their votes within neighboring and predominately Anglo districts."[9] Even some of the same neighborhoods are involved. In the decade since, SD-10 has only gotten more non-Anglo. This should be a major red flag for this body as it proceeds.

The result of the surgical redrawing of SD-10 is a significant cracking of communities of color. While nearly half of Tarrant County's Latino population is in the benchmark SD-10, only 32 percent would be under Plan S2101. The percentage of the county's Black population in SD-10 would similarly fall from 57 percent to 43 percent, while the share of Tarrant County Asians in the district would go from 42 percent to just 22 percent. Similar changes take place when the district is viewed from the standpoint of citizen voting age population.

## A Note on Partisan Gerrymandering

The redistricting process in Texas is a partisan one, and there could be a temptation for lawmakers to try to use politics to justify line drawing choices, particularly in light of the Supreme Court's decision in *Rucho v. Common Cause* holding that partisan

---

[9] Texas v. U.S., 887 F.Supp.2d 133, 163 (D.D.C. 2012), vacated and remanded, Texas v. U.S., 133 S.Ct. 2885 (2013).

5

gerrymandering claims are non-justiciable political questions under the U.S. Constitution.[10]

However, Texas is among the most demographically diverse states in the country, and voting patterns in Texas are more politically polarized along racial and ethnic lines than in many states. This means that targeting voters because of partisanship will inevitably have a significant racial and ethnic valence. Although the Supreme Court has held that federal courts may not step in to police partisan gerrymandering, the use of race or ethnicity as a proxy for partisanship remains constitutionally suspect under the Supreme Court's racial gerrymandering line of cases and could subject the state to liability for racial, rather than partisan, gerrymandering.

Notably, unlike claims rooted in racial animus, the Supreme Court's racial gerrymandering jurisprudence does not require proof of discriminatory intent. Rather, the legal inquiry is whether race predominated in the drawing of district boundaries. The Supreme Court has made clear that a state's motive is irrelevant to this inquiry. Rather, strict scrutiny review is triggered whenever:

> [L]egislators have 'place[d] a significant number of voters within or without' a district predominately because of their race, regardless of their ultimate objective in taking that step . . . In other words, the sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics.[11]

This limitation is significant. Historically, in Texas, the engineering of partisan advantage for either Democrats or Republicans has relied heavily on underrepresenting communities of color in order to shore up electoral opportunities for white candidates of whatever party is in charge at the time. Indeed, given the high level of racially polarized voting in the state, it is difficult to successfully gerrymander in Texas without at least some targeting of racial and ethnic minorities.

The 2011 congressional map passed by the Texas Legislature, for example, had some of the highest rates of partisan bias of any congressional map this decade. However, the partisan bias was largely a product of the failure to preserve a Latino ability to elect district in West Texas and the failure to create additional electoral opportunities for Latinos in North Texas.[12] When a court subsequently modified the map to address the

---

[10] Rucho v. Common Cause, 139 S.Ct. 2484 (2019).

[11] Cooper v. Harris, 137 S.Ct. 1455, 1473-4 n.7 (2017) (emphasis added).

[12] Laura Royden, Michael Li, and Yurij Rudensky, *Extreme Gerrymandering and the 2018 Midterm*, Brennan Center for Justice, 2018, https://www.brennancenter.org/sites/default/files/2019-08/Report_Extreme_Gerrymandering_Midterm_2018.pdf.

Brennan Center for Justice at New York University School of Law
120 Broadway, Suite 1750   New York, NY 10271

treatment of minority communities, the map's bias fell significantly.[13] Maps proposed by Latino groups that were not adopted would have reduced the bias even further.[14]

## Conclusion

Texas has struggled for more than five decades to draw maps that treat its communities of color fairly. This was the case when Democrats were in control of map drawing, and, unfortunately, it has remained the case in the two decades since Republicans have been in control of the process. But after a decade in which communities of color powered the state's growth to an unprecedented extent, it is more important than ever to work to get it right.

At the nation's founding, John Adams wrote that legislative bodies should be an "exact portrait, a miniature" of the people as a whole. The idea was simple. Decisions should be made by legislative bodies that resemble the people being represented. Unfortunately, redistricting is too often used by map drawers to do the exact opposite – to exclude rather than include.

Plan S2101 contains worrying hints that communities of color will once again see their political power undermined. I urge this body to pause and look more closely at the maps, both because it will help the state avoid protracted litigation and legal liability and because it is what Texans deserve.

---

[13] *Id.*

[14] *Id.*

7



The Latino Legal Voice for Civil Rights in America

Invited Testimony of Nina Perales on Senate Redistricting Bills 4 and 7

The Senate Select Committee on Redistricting

Friday, September 24, 2021

Good morning. My name is Nina Perales. I am the Vice President of Litigation for MALDEF, the Mexican American Legal Defense and Educational Fund. MALDEF is a national civil rights organization that conducts community education, policy advocacy and, where necessary, litigation. MALDEF has a long history as a leader in the area of redistricting, particularly in Texas. Beginning with the first Texas redistricting after MALDEF's founding in 1968, MALDEF has worked throughout the state to inform Latinos about the redistricting process, assist them in creating and advocating for fair maps, educate redistricting officials about their legal obligations towards Latinos, and represent Latinos in the litigation that has been a regular feature of redistricting in Texas.

MALDEF is also counsel for the Texas Latino Redistricting Task Force[1], a group of organizations united in the desire to achieve equitable redistricting plans for Texas.

My testimony today is intended to assist the Committee in adopting redistricting maps that comply with the federal Voting Rights Act and the U.S. Constitution.

Latinos were the engine of the population growth in Texas from 2010 to 2020

The recently released 2020 Census data reveals that Latinos were the engine of population growth in Texas. From 2010 to 2020, Texas population increased by close to 4 million people

---

[1] As of September 24, 2021, the Texas Latino Redistricting Task Force consists of the following members: Southwest Voter Registration Education Project (SVREP), League of United Latin American Citizens (LULAC), La Union Del Pueblo Entero (LUPE), Texas Hispanics Organized for Political Education (HOPE), Mi Familia Vota, American GI Forum of Texas, Mexican American Bar Association (MABA) of Texas, National Organization of Mexican American Rights (NOMAR), William C. Velasquez Institute (WCVI), FIEL Houston, Voto Latino, JOLT Initiative, Texas Association of Mexican American Chambers of Commerce (TAMACC), Community Re-investing in Educational Opportunities (CREO) of West Texas, Unidos US, United We Dream, Southwest Workers Union, Texas Association of Latino Administrators and Superintendents (TALAS), Laredo Immigrant Alliance, ARISE Support Center, Proyecto Azteca, Proyecto Juan Diego, Reform Immigration for Texas Alliance (RITA) Coalition.

(3,999,994). About half of that increase (49.5%) was Latino. This demographic trend has been the same for the past three decades.

While the Latino population in Texas increased by almost 2 million (1,980,796) over the past decade, the Anglo population, which is the slowest growing demographic, increased by less than 200,000. The increase in Anglo population contributed to only 5% of Texas population growth.[2]

The Texas Demographic Center estimates that by next year the Latino population in Texas will be larger than the Anglo population.[3] Latinos are now the largest ethnic group in three of Texas's most populous counties: Harris, Dallas and Bexar.

The Latino population in Harris county grew by 363,169 over the last decade, and in Dallas and Tarrant counties it increased by 289,825. The Rio Grande Valley Latino population grew by 121,091 since the 2010 Census.

Latinos are also the most significant component of Texas's expanding electorate. Among those turning 18 in Texas last year, just under half were Latino. In 2018, Texas Latinos increased their vote share by about five percentage points -- from 14.4% to 19.1% of all votes cast (compared to 2014 midterm election).

The 2020 U.S. Census undercounted Latino communities in Texas

During the spring and summer of 2020, many local organizations reported that 2020 Census operations were undercounting Texas Latinos. Although trusted organizations such as The Pew Research Center projected that Texas would gain three congressional seats in the 2020 apportionment, Texas only gained two. These are not the only signs of an undercount in the 2020 Census.

The most recent U.S. Census American Community Survey (ACS) provided an estimate of the Texas population in 2019. Because the ACS estimate is based on a survey taken from 2015-2019, the ACS estimate "lags" behind the 2020 U.S. Census. Where the Latino population is growing in Texas, the 2020 U.S. Census numbers should be higher than the ACS estimate, but in many places the opposite is true.

Two-thirds of the South Texas counties have a 2020 Census count **below** the 2015-2019 ACS estimate. Similarly, eight of the 14 counties in Texas that touch the U.S. Mexico border have a population **below** the 2015-2019 ACS. In contrast, of the top 15 counties with 2020 Census counts **higher** than the ACS estimate, none were majority Latino.

The Proposed Senate Map S2108 Fails to Reflect Latino Population Growth

---

[2] Of total population growth in Texas from 2010 to 2020, 15% was Asian American, 14% was Black, 17% was non-Hispanic other race (including people who indicated multiple races).
[3] Texas Demographic Center, Texas Population Projections Program, available at
https://demographics.texas.gov/Data/TPEPP/Projections/

2

The proposed Senate districts in South Texas do not adequately reflect Latino voting strength. Proposed Senate District 19 sees a decrease in its Latino voter registration from 54.6% to 49.9%.

This reduction is not accompanied by increased Latino opportunity elsewhere in the region, such as in the creation of a new Latino opportunity Senate district.

Proposed Senate District 19 is also extremely non-compact without an apparent justification.

The Proposed State Board of Education Map Fails to Reflect Latino Population Growth Even as Measured by the 2020 U.S. Census

Similar to the proposed Senate map, MALDEF has several concerns with the proposed State Board of Education (SBOE) map. District 3 in the proposed map reduces Latino voting strength. It decreases the Spanish Surname Voter Registration from 60.2% to 49.7% and the Spanish Surname Voter Turnout for the 2020 General Election drops from 56% to 44.5%. The proposed District 3 also decreases the vote share of Latino candidates by an average of seven percentage points. For example, the vote share for Lupe Valdez in the 2018 Governor's race drops from 57.4% to only 50.8%.

The proposed SBOE map weakens District 3 by removing Latino-majority precincts in Hidalgo County and replacing those areas with north and northwest precincts of Bexar County, where Latinos are not as numerous. This proposed district also adds the entire counties of DeWitt and Goliad where the populations are predominantly Anglo.

Latinos and other people of color have led the effort for fair redistricting maps in Texas and will continue to do so in 2021

From MALDEF's first U.S. Supreme Court victory in Texas redistricting, in *White v. Regester* (1973), through our more recent U.S. Supreme Court victories in 2006 in *LULAC v. Perry* (2006) and 2018 in *Abbott v. Perez* (2018), MALDEF's litigation has increased Latino-majority electoral districts in statewide redistricting plans.  We know Texas redistricting well and offer you a deep perspective on the mistakes of the past.

In every redistricting cycle since the 1970's Texas redistricting plans have been found to have discriminated against Latino voters by either a federal court or the U.S. Department of Justice. In Texas, the addition of new Latino opportunity districts to statewide redistricting plans often happens as the result of litigation when it should happen during the legislative process.

In the most recent redistricting cycle, the Texas Latino Redistricting Task Force secured federal court rulings that the Texas Legislature intentionally racially gerrymandered congressional districts in South Texas and the DFW Metroplex, and racially gerrymandered and/or intentionally diluted the voting strength of Latinos in State House districts in El Paso and San Antonio. In this most recent Texas redistricting cycle, the Texas Mexican American Legislative Caucus, sometimes in combination with the Texas NAACP, won rulings that the Texas Legislature

3

intentionally diluted minority voting strength in Bexar County, Nueces County, the Rio Grande Valley, Harris County, the DFW Metroplex and Bell County.

The 2011 redistricting litigation continues today, and the court is about to take up multi-million dollar petitions for attorney's fees and costs from the prevailing plaintiffs, including the Texas Latino Redistricting Task Force.

Texas redistricting battles have always been led and won by voters and organizations of color. These groups and others representing minority voters are prepared to advocate for and secure fair maps in the 2021 redistricting cycle.

MALDEF has three recommendations:

1)      THE NEW REDISTRICTING PLANS SHOULD FAIRLY REFLECT LATINO POPULATION GROWTH

Latinos in Texas must have an equal opportunity to elect their candidate of choice. This is a requirement of federal law. As a result, the new redistricting plans that the Legislature draws must fairly reflect Latino population and voting strength.

Maintaining the same amount of Latino electoral opportunity in any of 3 statewide redistricting plans -- congressional, senate or state house -- is not an option under the Voting Rights Act. Such an approach will cause Latinos to lose ground when compared to the rapidly shifting demographics of the state.

2)      THE REDISTRICTING PROCESS SHOULD BE OPEN AND TRANSPARENT

MALDEF urges the committee to continue to hold additional hearings after making redistricting bills public and after receiving House redistricting bills so that the public has an opportunity to comment on proposed maps. Similarly, the committee should hold hearings on any committee substitutes so that the plans that ultimately move forward out of committee receive public analysis and comment. All hearings should provide sufficient notice to allow public participation and permit virtual testimony.

3)      REDISTRICTING PLANS SHOULD AVOID THE MISTAKES OF THE PAST

In order to avoid having redistricting plans struck down in court, and burdening Texas taxpayers with paying attorney's fees, this committee and the Legislature as a whole must perform a careful analysis of what the federal Voting Rights Act and the U.S. Constitution require. This is not difficult, and the Texas Latino Redistricting Task Force, along with other witnesses in the last redistricting cycle advised the Legislature to draw redistricting plans that complied with federal requirements. However, the Legislature went in a different direction, often elevating incumbency protection concerns, which by law must yield to federal requirements in redistricting. Because of this approach, as well as other departures from legal requirements, federal courts in Washington D.C. and in Texas concluded that the Legislature's 2011 and 2013 redistricting plans were illegal. We urge this committee not to repeat the mistakes of the past.

4

MALDEF looks forward to the opportunity to continue to review and comment on the committee's proposed redistricting plans.  Thank you for the opportunity to testify before the committee today, and I am available to answer any questions you may have.

To the Chair, Vice Chair and distinguished Committee Members—

I am Pam Durham and testified virtually before this Committee on September 11 before the maps were released this week and amended a little more than 36 hours ago. I have prepared written testimony which includes details. So, today I will summarize my concerns and let you know that I am not in favor of SB 4 or the newly minted amendment.

I am thunderstruck by these proposed maps. I listened to all the public testimony of the committee's previous hearing 2 weeks ago and yesterday. I just don't understand how these maps could be presented when the majority of the public testimony directed this committee to protect minority coalition interests, to adhere to the Voting Rights Act, and to protect our communities of interest with compact Districts.

I have lived in the inner city historic neighborhoods of the South Side of Fort Worth and SD 10 for 37 years. I also own two homes with my brothers in Tarrant County. One is in North Richland Hills where we grew up and graduated from Richland High School. The second home is on Lake Worth that has been in our family for nearly 75 years.

My great-grandparents, grandparents, and parents raised their families in the inner city, historic neighborhoods on the North Side and the South Side of Fort Worth. My mother graduated from North Side High and my father graduated from Paschal, the original high school of Ft Worth. Yet, when they started their family they moved to the newly formed suburbs of Richland and North Richland Hills as part of the early "white flight" to avoid integration of the Fort Worth public schools. When I was a Richland Rebel there were less than a dozen students of color in my class of 500. While the demographics have changed over the decades, Richland did not give up its Rebel mascot until this last year. Senator Hancock knows this history as well as I as he graduated with my brothers from Richland, raised his family in North Richland Hills and served on the School Board of Birdville ISD that includes Richland, Haltom and now Birdville High.

All of this to say, my inner city roots where I raised my son, do not have a common interest with the suburban neighborhoods that are primarily outside of Loop 820. Our issues are not the same and deserve representation that is familiar with the distinctions of urban vs suburban.

But, these proposed maps turns our historic inner city neighborhoods that are now majority minority communities into lonely voices in rural counties or insignificant voices in suburban city/school districts.

As you have been told many times yesterday and today, SD 10 is a minority coalition opportunity district that was court-ordered in 2011 when it was first attempted to be dismantled. The only thing that has changed is that 100% of the growth of Tarrant County has been driven by the non-Anglo population and has moved Tarrant County to a Minority Majority County in 2020 from an Anglo majority County in 2010. As you have also been told, the current SD 10 is near perfect ideal population and there is no need to change its District boundaries.

However, as I have told you before my ideal District stays within county boundaries, is compact, and protects historic neighborhoods and communities of interest, I have drawn an alternative map for Tarrant County that is included in my submitted written testimony.

Tarrant County has population that entitles it to 2.25 Senate Districts. Natural residential segregation allows for almost identical population for SD 10 and 9 that preserves and protects the Minority Coalition of SD 10 and protects the SD 9 suburban, primarily outside the Loop, Anglo Majority. Looking at the map, SD 9 takes in the northern portion of SD 10 that is north of

I 30 as well as taking in the western branch of SD 12.  SD 9 would cover primarily outside the loop up to the Denton County border and all of the western border with Parker County.

SD 10 would take in the Tarrant County portion of SD 22 which adds Minority Coalition population and extends its border southeast to the Dallas County border and stopping at the Johnson County line.

The eastern arm of Tarrant County SD 12 in this map configuration includes Grapevine, Colleyville, and Euless that border on DFW airport.  This small portion of NE Tarrant County would combine naturally either with Irving and Coppell in Dallas County encircling DFW airport or with southern suburban Denton County with Flower Mound and Lewisville close to its SD 12 Denton County boundaries.

Thus, Tarrant County would have 2 wholly contained fair and equal SDs of equal population that is approximately 5.1-5.4% deviation from the ideal population.  One, a definitive Minority Coalition Majority District and one, an Anglo Majority District.

Fair and legal redistricting of Tarrant County without wasting millions of dollars on litigation. Let's reset our compass to serving the voters instead of self interest.  Don't discriminate in the Lone Star State.  Service over Self.

Thank you for listening.

Pam Durham
2320 Lipscomb St
Fort Worth TX  76110
817-881-1011

To the Texas Senate Redistricting Committee (Written Testimony)   September 25, 2021

Thank you to the Chair and the Senate Redistricting Committee for this opportunity to hear our concerns on the maps presented this week.

My name is Pam Durham.  I am Precinct Chair for Tarrant County Precinct 1062 in the Ryan Place Neighborhood on the near SouthSide of Fort Worth and have served on the Tarrant County Elections Board as well as election judge, assistant election judge, and poll worker. I am representing myself.

For some background about me, I am a fourth generation Fort Worth Texan who grew up in North Richland Hills before leaving for college in Lubbock. After working in Child Protective Services in West Texas for 7 years I returned to the metroplex to live in Johnson County for 7 years before moving to the inner city of the South Side of Fort Worth for the last 37 years.

I currently live on the border of the National Historic Fairmount Neighborhood and Ryan Place. These two neighborhoods with historic significance in Ft Worth development  and now redevelopment and revitalization have in common issues of affordable housing, transportation and aged infrastructure as pressing needs. It is a diverse area spanning the full spectrum of social and economic factors.  Wendy Davis was my City Council representative before she became my Senator in Senate District 10.  I also own homes with my brothers in North Richland Hills where we grew up and on Lake Worth, a home that has been in our family for nearly 75 years.

I am also the Chair of Trustee Board and Treasurer of a fraternal organization known as SPJST Lodge 92 Fort Worth/National Hall that was formed in 1910 in Niles City by my maternal great grandparents who had immigrated from Prague two years before. My mother attended North Side High School as did the majority of the Czech and Eastern European community that made up our Lodge.  Lodge 92 is not for profit organization, 501 C 8, formed for the education of Czech culture.

My father lived in Fort Worth on the South Side and attended Paschal High School and eventually graduated from TCU which he attended on the GI bill.

My parents, grandparents, and great parents were all historic Fort Worth natives.  Yet, when my parents started their family, they moved to the newly established suburbs to avoid integration of the Fort Worth public schools.  They were part of the original "white flight" to the new suburban small towns and I graduated from Richland High School home of the Richland Rebels which only changed its mascot this last school year.  The same school that Senator Hancock graduated and was on the School Board for Birdville ISD for several years.  He and my brothers attended Richland at the same time.

All this to say that I am very familiar Tarrant County and its history as well as Senate District 9, 10 and 12.

My diverse background leads me to believe in preserving county lines for compactness as well as preserving school districts and historic neighborhoods as communities of interest.

To the Texas Senate Redistricting Committee (Written Testimony)   September 25, 2021

Fair and equitable representation in our respective communities is the order of the day in these 3rd generation of 21st century maps. . Fairness, simplicity and focus should prevail in the drawing of Congressional and Senate District boundaries in Tarrant County, North Texas as well as all of Texas.  Stop the gerrymandering for political interests and put the people of this great state first by:

1. Keeping historical neighborhoods and High school districts as well as colleges together as communities of interest.
2. Keeping Congressional and Senate Districts whole within their county and/or city.  If population requirements demand that counties or cities share boundaries, then, those shared districts should be with similar type such urban, suburban, rural.
3. Making the most compact district first by population and then, community of interest.
4. And, foremost following the Voting Rights Act and allow our fastest growing populations in the minority coalition communities to be given priority to allow representation as one voice.  No more cracking and packing for political interests.  Don't discriminate in the Lone Star State.

I have spent considerable time looking at Texas district maps and drawing my concept of ideal Congressional, Senate, and House  Districts within Tarrant County, North Texas and the entire state.  I have provided written testimony that has maps of the Tarrant County Senate Districts that I have drawn in Red Apple as examples of following the principles I just outlined.  I will present statewide maps in writing to the Committee members next week as soon as possible. Today I will share some highlights of the Tarrant Senate Districts that I have come up with.

Population math calculations entitle Tarrant County to 2.25 Senate Districts.  Currently, SD 10 is the only SD dedicated to Tarrant County.  Even with the population growth, SD 10 matches the population requirements within a few thousand voters.  For all practical purposes, there is no need to change the boundaries of SD 10.  The remainder of Tarrant County is currently parceled into 3 other districts that join our populations with suburban areas in Denton County, urban areas in Dallas County and suburban areas with rural counties that extend beyond Waco.

The proposed Tarrant County maps as amended 36 hours ago is parceled into 5 SDs which combine our urban neighborhoods with suburban or rural counties and towns diluting our interests as urban centers.  SD 10 has been shifted out of Tarrant County to make southern urban Fort Worth combined with 8 rural counties that do not share any common interests. And, further the current proposed amendment changes the minority opportunity district that is now SD 10 into a rural majority district of Anglos.  The minority coalition of the present SD 10 is divided into 2 different SDs silencing the coalitions opportunity to choose a Senator of their choice.

Although there is no need to change SD 10, I have prepared a map that would give Tarrant two wholly contained SDs with a small portion reserved to combine with either Denton County or Dallas County.  These districts would be compact, maintain communities of interest, preserve historic neighborhoods and school districts and let natural residential segregation give all the population of these two districts to choose the Senator of their choice.

In my map, SD 10 would lose the northern portion of its boundary down to I30.  The portion now assigned to SD 22 would be absorbed into SD 10.  By making these changes SD 10 becomes a definitive minority coalition SD.

SD 9 would take in the north of I30 portion of SD 10.  Plus SD 9 would extend to the western boundary of Tarrant County and take in the western arm of SD 12 and extend further south to include the entire western border of Tarrant County.

To the Texas Senate Redistricting Committee (Written Testimony)   September 25, 2021

SD 12's eastern arm in Tarrant County would include Grapevine, Colleyville, and Euless. These three cities could combine well with Irving and Coppell in Dallas County or with Flower Mound and Lewisville in Denton County to complete a full SD on the eastern or northern border with similar communities of interest and population demographics.

The incumbent and the east /west portion was divided into 3 other contiguous districts with similar communities of interest and historic neighborhoods and cities. By pulling in the majority of the southern portion of Tarrant County into SD 10 eliminating SD 22 in Tarrant and creating a minority coalition district. SD 9 would primarily be the northern portion of Tarrant County,

By focusing on population within contiguous, compact districts of communities of interest, my version of two wholly contained Tarrant County Senate districts more resembles the 2020 Census population that has moved from Majority Anglo in 2010 to Majority Minority in 2020. SD 10 would be the Minority Coalition Majority District and SD 9 the Anglo majority District.  It also consolidates suburban cities and school districts as well as historic inner city neighborhoods and school districts with like-minded Senators so they can speak with one voice for their common interests.

The first priority of this Committee, in my opinion, is to stop the partisan redistricting, also known as gerrymandering, so that the citizens/voters can choose their representatives rather than the representatives choosing their constituents. Of course, the utmost concern is to follow the Voting Rights Act in making fair maps that allow people to choose their representatives whether they are in the majority or minority.

I also ask that that the process of redistricting be transparent and open to public input. These public hearings are a great start. Most importantly the public needs hearings and presentation of recommended maps prior to the amended maps moving out of committee with at least 2 weeks to review and comment again publicly.

It is time for Texas to respect its people and their needs. And, that kind of respect means taking discriminatory partisanship out of the process. This last decade millions of unnecessary dollars and resources were spent to defend illegal maps with regard to the Voting Rights Act. Tarrant County was front and center in these legal battles and is one of the most gerrymandered counties in the state.

This time—in 2021— let us all, legislature and public, work together to draw fair and legal maps that will not require litigation.

First and foremost, follow the Voting Rights Act, maintain county line boundaries along with school district and neighborhood integrity. We, the people of Texas deserve no less and require our representatives to work together meet OUR needs, rather than the partisan needs of political groups and individual representatives.

Thank you for your time.


Sincerely,


Pam Durham
2320 Lipscomb St
Fort Worth, Texas 76110
817-881-1011

