# EXHIBIT 3-K
# Part 2



SD 10 Benchmark
Anglo Population 2020




SD 10 Benchmark
Partisan Performance - Senate Districts 2018

# SD 10 Benchmark
## Average Partisan Performance - Top of Ticket



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF TEXAS,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>and ERIC H. HOLDER, in his<br>official capacity as Attorney General<br>of the United States<br><br>Defendants, and<br><br>Wendy Davis, *et. al.*,<br><br>Intervenor-Defendants. | Civil Action No. 11-1303<br>(TBG-RMC-BAH) |

## MEMORANDUM OPINION

Before: GRIFFITH, *Circuit Judge*, COLLYER and HOWELL, *District Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH, in which *District Judge* HOWELL joins and *District Judge* COLLYER joins all except section III.A.3. Separate opinion for the Court with respect to retrogression in Congressional District 25 filed by *District Judge* HOWELL, in which *District Judge* COLLYER joins.

Dissenting opinion with respect to retrogression in Congressional District 25 filed by *Circuit Judge* GRIFFITH.

Appendix filed by *District Judges* COLLYER and HOWELL, in which *Circuit Judge* GRIFFITH joins.

## IV. State Senate Plan

Next we consider Texas's request to preclear its State Senate Plan. The United States has not objected to this plan, but the Davis Intervenors, the Texas State Conference of NAACP Branches, the League of United Latin America Citizens, and the Texas Legislative Black Caucus argue that the Senate Plan retrogresses and was enacted with discriminatory intent. Their arguments concern a single district, Senate District (SD) 10, which they contend is a coalition district in the benchmark plan, and which all parties agree is not an ability district in the enacted plan. These Intervenors also argue that discriminatory purpose motivated the legislature's decision to break up SD 10. We conclude that benchmark SD 10 is not a coalition district, and thus that the Senate Plan is not retrogressive. Nevertheless, we deny preclearance because Texas failed to carry its burden to show that it acted without discriminatory purpose in the face of largely unrebutted defense evidence and clear on-the-ground evidence of "cracking" minority communities of interest in SD 10. Thus, we conclude that the Texas legislature redrew the boundaries for SD 10 with discriminatory intent.

### A. Retrogression in the Senate Plan

Benchmark SD 10 is located entirely within Tarrant County, which includes Fort Worth. When the Texas legislature last drew the district in 2001, the population was 56.6% Anglo, 16.7% Black, and 22.9% Hispanic. Defs.' Ex. 126, 2001 State of Texas Submission for State Senate Preclearance app. I (Aug. 15, 2001). Urging the Department of Justice to preclear the 2001 State Senate Plan, Texas justified SD 10's configuration by arguing that "[t]he voting strength of these minority communities in the future will depend on the cohesion within and between Black and Hispanic voters and the ability of such voters to form coalitions with other

racial or ethnic groups in support of their preferred candidates." *Id.* at 18. In other words, Texas argued that SD 10 had the potential to become a coalition district.

The Department of Justice precleared the 2001 map, and, over the past decade, the minority population in SD 10 has continued to grow. According to the 2010 Census, 47.6% of the population in SD 10 was Anglo, 19.2% Black, and 28.9% Hispanic. Defs.' Ex. 151, at 5. Minorities made up a smaller portion of the 2010 CVAP, however: 62.7% were Anglo, 18.3% Black, and 15.1% Hispanic. Pl.'s Ex. 15, at 8. Republicans have won almost every election in SD 10 in the past ten years, including the district's endogenous State Senate elections from 2000-2008. No Democratic candidate running in a statewide or other exogenous election has ever won a majority of the vote in SD 10. *See* Alford Rep. 30.

The only Democrat to win an election in SD 10 is the district's current senator, Wendy Davis, who was elected to a four-year term in 2008. Davis's path to the State Senate began when Democratic candidate Terri Moore lost the 2006 election for Tarrant County District Attorney, yet received nearly half of the vote in SD 10. *See* Trial Tr. 30:10-25, 31:1-17, Jan. 18, 2012 PM. In light of these results, Democratic elected officials and community leaders in Tarrant County were of the view that if the Black and Hispanic communities "came together as a coalition to vote . . . they could win Senate District 10." *Id.* at 30:15-16. These and other leaders within the district's minority communities recruited Fort Worth City Council member Wendy Davis to run for State Senate. *Id.* at 32:3-25, 33:1-17; *see also id.* at 16:1-5, Jan. 20, 2012 AM (Senator Davis, testifying, "I was approached by leaders in our minority community in large part because of the work I'd done as a City Council person and asked if I would consider running for the Texas State Senate."). Senator Davis ran unopposed in the 2008 Democratic primary, *see* Pl.'s Ex. 135, at 3,

then won the general election with 49.9% of the vote, beating the incumbent by 2.4% — approximately 7,100 out of 288,000 votes cast.[33] Pl.'s Ex. 31, at 14.

According to Texas's expert, Davis received 99.6% of the Black vote, 85.3% of the Hispanic vote, and 25.8% of the Anglo vote. Trial Tr. 32:24-25, 33:1-16, Jan. 25, 2012 AM. Although this is strong evidence that the minority communities in SD 10 voted cohesively in the 2008 election, the argument that SD 10 is a coalition district runs into trouble when looking at evidence that the district's minority communities have been effective in electing their preferred candidates.

At summary judgment, we noted that "evidence that a coalition had historical success in electing its candidates of choice would demonstrate that the minority voters in that district had, and would continue to have, an ability to elect their preferred candidates." *Texas*, 831 F. Supp. 2d at 268. The case that SD 10 is an ability district turns on a single, razor-thin election victory, which is not "historical success." Indeed, SD 10's decade-long history of electing Republicans shows just the opposite. There is no doubt that the minority community came together to elect a preferred candidate in 2008, but a single victory is not the more exacting evidence needed for a coalition district. If it were, any single victory built upon the support of minority voters would create a claim for ability status.

### B. Discriminatory Intent in the Senate Plan

There is no direct evidence that the Texas legislature acted with a racially discriminatory purpose in its reconfiguration of SD 10, and so we must look to circumstantial evidence. Once again, we look to the *Arlington Heights* factors to determine whether Texas has met its burden of disproving discriminatory intent.

---

[33] Richard Cross, a libertarian candidate, received 2.6% of the vote (7,591 votes). Pl.'s Ex. 31, at 14.

Considering first the impact of the redistricting — "whether it 'bears more heavily on one race than another,'" *Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)), there is little question that dismantling SD 10 had a disparate impact on racial minority groups in the district. Even Dr. Alford agreed that the enacted plan "diminishes the voting strengths of Blacks and Latinos in [SD 10]," Trial Tr. 39:14, Jan. 25, 2012 AM. In a letter he sent to the Department of Justice objecting to the enacted Senate Plan, Texas State Senator Rodney Ellis explained in detail how the new boundaries eliminate the ability of minority citizens to elect their preferred candidates by submerging their votes within neighboring and predominantly Anglo districts:

> The demolition of District 10 was achieved by cracking the African American and Hispanic voters into three other districts that share few, if any, common interests with the existing District's minority coalition. The African American community in Fort Worth is "exported" into rural District 22 — an Anglo-controlled District that stretches over 120 miles south to Falls [County]. The Hispanic Ft. Worth North Side community is placed in Anglo suburban District 12, based in Denton County, while the growing South side Hispanic population remains in the reconfigured majority Anglo District 10.

Defs.' Ex. 375, at 3. We find that Senator Ellis's testimony is well supported by the record. *See also* Defs.' Ex. 134, Expert Witness Report of Dr. Allan J. Lichtman ¶ 12 [hereinafter Lichtman Rep.] ("The state legislature, in dismantling benchmark SD 10 cracked the politically cohesive and geographically concentrated Latino and African American communities and placed members of those communities in districts in which they have no opportunity to elect candidates of their choice or participate effectively in the political process.").

Texas does not deny this disparate impact, but responds that its decision to "crack" SD 10 is best explained by partisan, not racial, goals. Tex. Post-Trial Br. 25. While this is a potentially plausible rationale, *Arlington Heights* instructs that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such

circumstantial and direct evidence of intent as may be available," and so we must "look to the other evidence." 429 U.S. at 266.

These other factors do not support Texas's case. The second factor is Texas's history of discrimination, and as we discussed in our analysis of the Congressional Plan above, history is not on Texas's side. The third considers the "specific sequence of events leading up to the challenged decision." *Id.* at 267. The Senate's principal mapdrawer and staff director of the Senate Redistricting Committee, Doug Davis (no relation to Senator Davis), began discussing draft maps of new Senate districts prior to the February 2011 release of official Census data by using projected population increases. Defs.' Ex. 127, at 38-39. Once the 2011 general legislative session started in January, these maps were kept in an anteroom off the Senate floor, where many Republican members were taken individually by Chairman Seliger and Doug Davis to review the draft plans and provide input. *See, e.g.*, Trial Tr. 39:15-25, Jan. 20, 2012 AM; Defs.' Ex. 809, Dep. of Senator Judith Zaffirini 29:22-25, 30:1-19, Jan. 6, 2012. Senator Davis was consistently rebuffed when she asked to see the plans for SD 10, even as another senator told her that the proposed plan was "shredding" her district. Trial Tr. 38:2-8, 40:11-14, Jan. 20, 2012 AM. Senator Judith Zaffirini's uncontroverted testimony shows that this scenario was not unique to Senator Davis, but reflected a larger pattern: every senator who represented an ability district was excluded from this informal map-drawing process and was not allowed into the anteroom to preview the maps. *See* Defs.' Ex. 809, Dep. of Senator Judith Zaffirini 30:1-3. Indeed, none of the senators representing ability districts were shown their districts until forty-eight hours before the map was introduced in the Senate. *See* Defs.' Ex. 129.

Texas offered conflicting testimony in response. Doug Davis testified that "we were not printing maps and giving them to members," Trial Tr. 172:10-11, Jan. 17, 2012 PM, suggesting

that at least part of this informal process that gave Republican senators opportunities to provide input into the plans did not occur. But Chairman Seliger, Davis's boss, testified that he provided paper maps to at least three senators during this period, all of them Anglo. Trial Tr. 68:1-3, Jan. 24, 2012 AM. In any case, it is clear that senators who represented minority districts were left out of the process.[34]

Our skepticism about the legislative process that created enacted SD 10 is further fueled by an email sent between staff members on the eve of the Senate Redistricting Committee's markup of the proposed map. The ostensible purpose of the markup was to consider amendments to the proposed plan, but the email suggests a very different dynamic at work. David Hanna, a lawyer for the Texas Legislative Council, a nonpartisan agency that provides bill drafting and legislative research to the Texas legislature, sent an email to Doug Davis and Senate Parliamentarian Katrina Davis (Doug Davis's wife). Hanna's email responded to an earlier message Texas did not produce, but which concerned "precook[ing]" the committee report, *i.e.*, writing the report before the hearing had been held. Trial Tr. 71:23-25, 72:1-7, Jan. 24, 2012 AM. With a subject line titled, "pre-doing committee report," Hanna's email read:

> No bueno. RedAppl [the redistricting software Texas used] time stamps everything when it assigns a plan. Doing [the Committee Report on] Thursday [May 12] would create [a] paper trail that some amendments were not going to be considered at all. Don't think this is a good idea for preclearance. Best approach is to do it afterwards and we'll go as fast as possible.

Defs.' Ex. 359. Although the chairman of the redistricting committee, Kel Seliger, denied knowing of any advance decision to refuse to consider amendments, he acknowledged what is apparent from the email: the boundaries of the new Senate districts would be a *fait accompli* by

---

[34] We also note that Texas did not refute testimony indicating that the field hearings held prior to the start of the 2011 legislative session were "perfunctory," Trial Tr. 94:20-21, Jan. 20, 2012 AM, and "a sham," with low attendance, low participation, and little invited testimony or prepared materials. Defs.' Ex. 809, Dep. of Senator Judith Zaffirini 7:11-21.

Case 3:21-cv-00259-DCG-JES-JVB   Document 39-19   Filed 11/24/21   Page 12 of 14
Case 1:11-cv-01303-RMC-TBG-BAH   Document 230   Filed 08/28/12   Page 49 of 154

the time of the markup and the committee did not intend to consider any amendments to the plan. Trial Tr. 71:3-25, 72:1-16, Jan. 24, 2012 AM. We agree with Chairman Seliger that, at a minimum, this email shows that a plan was in place, at least at the staff level, such that no new proposals or amendments to the district map would be entertained at the markup.

*Arlington Heights* instructs that "departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." 429 U.S. at 267. This factor focuses on comparing past redistricting cycles to the present one for anomalous behavior. The State held no field hearings after Census data was released and proposed plans were drawn, unlike the hearings that were held after such data was available in the past. Defs.' Ex. 134, at 13. Additionally, Senator Zaffirini testified that she, a senator of a minority district, "had never had less input into the drawing of any [redistricting] map" in over thirty years of redistricting experience," Defs.' Ex. 370, at 1, and that the 2010 redistricting process was the "least collaborative and most exclusive" she had ever experienced. Lichtman Rep. app. 7, Decl. of Senator Judith Zaffirini ¶ 3. We find this unchallenged testimony sufficient to conclude that the 2010 redistricting process was markedly different from previous years.

Finally, *Arlington Heights* states that "the legislative or administrative history may be highly relevant especially where there are contemporary statements by members of the decisionmaking body." 429 U.S. at 268. Aside from the "No Bueno" email described above, we have no evidence of contemporary statements by the majority members or their staff "concerning the purpose of the official action," *id.* But that email indicates, at a minimum, that redistricting committee staff feared their actions might create the appearance of impropriety under section 5. We do, however, have a statement published in the Senate journal from the eleven senators representing majority-minority districts and Senator Davis. They alleged that the fact they were

shut out from the map-drawing process until just forty-eight hours before the map was introduced in the Senate showed that the Senate Plan had a "racially discriminatory purpose." Defs.' Ex. 129, at 3. Other senators also wrote directly to Chairman Seliger to express their "disappointment in the process used to develop the Senate redistricting plan" and the "exclu[sion] [of] elected representatives of minority citizens" from that process. Defs.' Ex. 132, at 1. Although statements from the senators aggrieved by the process do not necessarily show that it was racially discriminatory, instead of merely partisan, they do indicate that the majority was aware during redistricting that several members were upset by the irregular process, yet chose not to address their concerns.

We conclude that Texas has not shown that the Senate Plan was enacted without discriminatory intent. Senator Davis and other Intervenors provided credible circumstantial evidence of the type called for by the Supreme Court in *Arlington Heights*, which, as a whole, indicates that an improper motive may have played a role in the map-drawing process. Rather than directly rebut this evidence, Texas asserts only that the legislature's motivations were wholly partisan, untainted by considerations of race. We agree that a plan that impacts minority citizens more harshly than majority citizens is not necessarily at odds with section 5. But under the VRA and *Arlington Heights*, it is not enough for Texas to offer a plausible, nonracial explanation that is not grounded in the record. It must, at a minimum, respond to evidence that shows racial and ethnic motivation, which it has failed to do. *See Arlington Heights*, 429 U.S. at 266 ("Absent a [clear pattern of discrimination] . . . the Court must look to other [circumstantial] evidence."). Here, Texas has made no real attempt to engage with the *Arlington Heights* factors, even though it concedes that the Senate Plan has a disparate impact on minority voters in SD 10. We find it telling that the legislature deviated from typical redistricting procedures and excluded

minority voices from the process even as minority senators protested that section 5 was being run roughshod. One would expect a state that is as experienced with VRA litigation as Texas to have ensured that its redistricting process was beyond reproach. That Texas did not, and now fails to respond sufficiently to the parties' evidence of discriminatory intent, compels us to conclude that the Senate Plan was enacted with discriminatory purpose as to SD 10.

## V. State House Plan

### A. Retrogression in the State House Plan

The United States and the Intervenors argue that the enacted House Plan retrogresses minority voting power by eliminating eight ability districts (House Districts (HDs) 26, 33, 35, 41, 106, 117, 144, and 149) without creating any others. Texas acknowledges retrogression in HD 33, but argues the House Plan works no abridgement of minority voting rights in any of the other districts. Texas maintains that the loss of HD 33 is offset by the plan's provision for at least one and as many as three new ability districts. We conclude that the enacted plan will have the effect of abridging minority voting rights in four ability districts — HDs 33, 35, 117, and 149 — and that Texas did not create any new ability districts to offset those losses. Consequently, we conclude that the enacted plan cannot be precleared. We first analyze each of the eight alleged ability districts before turning to the three alleged offset districts.

#### 1. Alleged Retrogressive Districts

##### a. State House District 33

Nueces County in southeastern Texas includes three State House districts in the benchmark plan. HDs 33 and 34 are entirely within the county; HD 32 partially so. Benchmark HD 33 comprises the core of Corpus Christi. HD 34 includes the western part of the county, and HD 32 covers much of the eastern portion and extends into other counties immediately north of