# EXHIBIT 5

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

|  |  |
|---|---|
| LULAC, *et al.*, <br><br>         *Plaintiffs,* <br><br> v. <br><br> GREG ABBOTT, in his official capacity as Governor of Texas, *et al.*, <br><br>         *Defendants.* | Case No.: EP-21-CV-00259-JES-JVB <br> [Lead Case] |

## DECLARATION OF REPRESENTATIVE CHRIS TURNER

Pursuant to 28 U.S.C. § 1746, I, Chris Turner, declare that:

1.      I am over 18 years of age and competent to testify.

2.      I am the incumbent Democratic state house representative for District 101 in the Texas House of Representatives. I have represented District 101 since 2013.

3.      I am the Democratic Caucus Chair.

4.      I served on the House Redistricting Committee this redistricting cycle.

5.      In a departure from normal practice, Representative Todd Hunter, who was the Chair of the Redistricting Committee, held the votes on the senate and congressional plans on the same day of their public hearings in the Committee. This is not normal; ordinarily a bill remains pending after it is first heard in the Committee. Among other reasons, this practice provides an opportunity for the Committee to actually listen to, and incorporate changes based upon, testimony from the public.

6.      Because Chair Hunter provided no opportunity for the Committee to actually synthesize or consider any of the public testimony, the hearings were essentially for show—they

were never intended to actually obtain public input. The maps were fait accompli before the hearings ever occurred.

7.    I, and other Committee members, including minority Committee members, requested the opportunity to have live testimony from invited expert witnesses, as is common practice when redistricting maps are considered. We needed the opportunity to have invited testimony in order for the 3-minute time limit otherwise applicable to public testimony to not apply to experts. Expert testimony on redistricting and voting rights cannot plausibly be provided in 3 minutes. This was request was denied, and Chairman Hunter said that experts we wished to testify could do so pursuant to the 3-minute time limit. This is not the normal procedure for consideration of redistricting legislation.

8.    Robust expert testimony was especially important as this was the legislature's first redistricting cycle without the Voting Rights Act Section 5 preclearance process. While the legislature could previously rely upon the Department of Justice or the federal courts to advise whether its redistricting maps were lawful before they took effect, that is no longer the case. Expert testimony would have helped fill that gap, particularly in Texas's first cycle without the preclearance system, and it was unusual practice for our request for invited expert testimony to be rejected.

9.    I, along with other Committee members, requested that resource witnesses be present during the hearings, including from Texas Legislative Council, the Office of the Attorney General, the Office of the Secretary of State, and the State Demographer. It is common practice for resource witnesses from relevant state agencies to be available at committee hearings on nearly all bills, regardless of how minor. The refusal of the Chair to arrange for resource witnesses to be

present was an extraordinary departure from normal procedures, especially on a matter as complicated and consequential as redistricting.

10.   When SB4, the state senate redistricting legislation, was being debated on the House floor, I spoke about how the bill cracked apart Tarrant County's minority population and destroyed Senate District 10 ("SD10") as an effective crossover district in which minority voters had succeeded in electing their preferred candidates.

11.   Before the senate debate, I had obtained from the Texas Legislative Council maps of Tarrant County showing SB4's lines dividing SD9, SD10, and SD22, and shading showing where the Black and Latino populations in the county were located. I had 150 copies of these maps made, and I placed one on each representative's desk before the floor debate began. I also had large blown up maps made and placed them on an easel as I spoke so that all members could see, whether using the map on their desk, or the large map on the easel, how SB4 cracked apart Tarrant County's minority populations.

I declare under penalty of perjury that the foregoing is true and correct.

November 23, 2021

Chris Turner