# EXHIBIT 6-E

**MINUTES**

**SENATE COMMITTEE ON STATE AFFAIRS**
Thursday, April 18, 2013
2:00 PM or upon adjournment
E1.004 (Auditorium)

\*\*\*\*\*

Pursuant to a notice posted in accordance with Senate Rule 11.10 and 11.18, a public hearing of the Senate Committee on State Affairs was held on Thursday, April 18, 2013, in the E1.004 (Auditorium).

\*\*\*\*\*

**MEMBERS PRESENT:**                          **MEMBERS ABSENT:**
Senator Robert Duncan, Chair                   Senator Leticia Van de Putte
Senator Bob Deuell, Vice Chair
Senator Rodney Ellis
Senator Troy Fraser
Senator Joan Huffman
Senator Eddie Lucio, Jr.
Senator Robert Nichols
Senator Tommy Williams

\*\*\*\*\*

The chair called the meeting to order at 3:57 PM. There being a quorum present, the following business was transacted:

The chair laid out SB 1524 and recognized the author, Senator Seliger, to explain the bill.

Witnesses testifying and registering on the bill are shown on the attached list.

The chair moved that the public testimony be closed; without objection, it was so ordered.

Senator Ellis moved that SB 1524 be left pending; without objection, it was so ordered.

There being no further business, at 4:55 PM Senator Duncan moved that the Committee stand recessed subject to the call of the chair. Without objection, it was so ordered.

_____

Senator Robert Duncan, Chair


_____

Kayli Ragsdale, Clerk

TEXAS SENATE STAFF SERVICES
RJM:jfs/337/SA041813CD1SI/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION I

1

(Senator Duncan in the Chair)

| | |
|---|---|
| : | (Inaudible, background conversation) |
| : | (Laughter) |
| : | (Inaudible, background conversation) |
| : | (Background noise) |
| : | Thank you. |
| : | (Inaudible, background conversation) |
| : | Yeah, she's comin' right back. |
| : | Okay. |
| : | Are you-- |
| : | Yeah. |
| : | Uh, (inaudible) I put you down here? |
| : | Reason, be actually-- |
| : | (Inaudible, background conversation) |
| : | Yeah. |
| : | That's-- |
| : | Yeah. |
| : | (Inaudible, background conversation) |
| : | I mean, it is, it is an auditorium. |
| : | Yeah, I understand. |
| : | (Inaudible, background conversation) |
| : | Uh, I think that it's (inaudible, background conversation)-- |
| : | Tomorrow's my last day. |
| : | (Inaudible, background conversation) |
| : | Okay. |
| : | Where are you (inaudible, background conversation)-- |
| : | And, and you wanna 'em there. |
| : | Hi. |
| : | So, one on the front row, on the other side. |
| : | How are you? |
| : | Fine, how you doin'? |
| : | Good, how are you? |
| : | All right. |
| : | If someone passes you cards-- |
| : | I mean, I-- |
| : | Actually, wait, you two (inaudible, background conversation)-- |
| : | (Laughter) |
| : | (Phil.) |
| : | (Phil), can you be the guy that's |

TEXAS SENATE STAFF SERVICES
RJM:jfs/337/SA041813CD1SI/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION I

2

outside?

: (Who?)
: Right outside the front door here?
: (Inaudible, background conversation)
: Okay.
: Okay.
: Sure.
: (Inaudible, background conversation)
: Yeah, (it's like) (inaudible) (pass out.)
: Uh-hum. (Can you)--
: That guy will hand it to you to pass out.
: Yep.
: (Inaudible, background conversation)
: (Inaudible) this side (inaudible, background conversation)--
: Right.
: It's kind of (inaudible, background conversation)--
: Oh, yeah.
: (Inaudible, background conversation)
: Okay.
: You gonna need this one.
: That's fine.
: Yeah, (you can) (inaudible, background conversation)--
: Yeah.
: Okay, so who, what if someone hands me their written testimony?  Well, it's same, the same general thing with the card?
: Yeah, (inaudible, background conversation)--
: Okay, same, same as usual.  Okay, and, so that's, that's (inaudible, background conversation)--
: Yeah, if they ask if they have written testimony or would (like to make sure comment card) (inaudible, background conversation)--
: Oh, you want it right away?
: Yeah, they want it right away so that it can stay with the card.
: Okay.
: And, ah--
: Oh, thank God, because that would be (inaudible, background conversation)--
: --so, yeah, and then I (inaudible,

TEXAS SENATE STAFF SERVICES
RJM:jfs/337/SA041813CD1SI/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION I

3

background conversation)--

:    Any problems?
:    (Inaudible, background conversation)
:    I'll wave it around and I guess I'll
(inaudible, background conversation)--
:    (Laughter)
:    None, I watch some TV.
:    (Dallas.)
:    (Laughter)
:    Excellent.
:    (Inaudible, background conversation)
:    She's a good person to know.
:    (Inaudible, background conversation)
:    Yes, we--
:    (Laughter)
:    Please have a seat.
:    (Inaudible, background conversation)--
:    Yeah, well, that's good (inaudible,
background conversation)--
:    (Congress?)
:    Okay, yeah.
:    (Inaudible, background conversation)
:    'Kay, I, I, basically, only just
(inaudible, background conversation) and you're here having to work on it.
:    (Inaudible, background conversation)
:    Oh.
:    (That must not be a good deal.)
:    (Inaudible, background conversation)
:    (You're) not there.
:    Yeah.
:    That's right.
:    (Inaudible, background conversation)
:    (Just like coughing) (inaudible,
background conversation)--
:    That, that's--
:    (Laughter)
:    --that's something I'd like to see.
:    (Inaudible, background conversation)
:    No, I think (inaudible, background
conversation)--
:    Oh, really, that's great.
:    (Laughter)
:    (Inaudible, background conversation)
:    Yeah.
:    Yeah.

TEXAS SENATE STAFF SERVICES
RJM:jfs/337/SA041813CD1SI/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION I

4

:     (Inaudible, background conversation)
:     That's great.
:     (Inaudible, background conversation)
:     Congratulations.
:     Hopefully, not (inaudible, background
conversation)--
:     That'll be good.
:     Perfect.
:     Good for you.
:     (Inaudible, background conversation)
:     Oh,        (inaudible,        background
conversation)--
:     Listen to you.
:     Hey, (inaudible), great to see you
again.
:     It's good to see you, too, Senator.
:     You doin' all right?
:     You, too, Senator.
:     Yeah.
:     Well, good.  Oh, I just spent, had lunch
with your brother.
:     Oh, really.
:     Yeah.
:     They were nice enough to (recognize)
(inaudible, background conversation)--
:     How are you?  Kirk Watson.
:     (Inaudible, background conversation)
Good to see you, I know.
:     (Inaudible, background conversation)
:     So.
:     Hum.
:     You doin' okay?
:     (Inaudible, background conversation)
:     Yeah.
:     (Inaudible) a bit.
:     (Inaudible, background conversation)
:     No, but I'm gonna make some
appointments on behalf (inaudible, background conversation)--
:     Good.
:     (Laughter)
:     (Well), h--how is (he)?
:     Doin' very well here, (inaudible,
background conversation)--
:     Monday.
:     Yeah.

TEXAS SENATE STAFF SERVICES
RJM:jfs/337/SA041813CD1SI/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION I

5

:    (Inaudible, background conversation)
:    Sorry to inquire.
:    But        (inaudible,        background
conversation)--
:    Probably      (inaudible,      background
conversation)--
:    Proposition one.
:    I didn't have much time to (inaudible,
background conversation)--
:    (Laughter)
:    Right, right, right.
:    (Inaudible, background conversation)
:    (Crooks.)
:    Yeah,      very      nice      (inaudible,
background conversation)--
:    Yeah, yeah, great, great to see you.
:    Yeah.  Glad you're here.
:    Thank you for being here.
:    (Inaudible) say that.
:    (Inaudible, background conversation)
:    (Background noise)
:    Close the door.
:    (Laughter)
:    We'll      see      (inaudible,      background
conversation)--
:    (Laughter)
:    (Inaudible, background conversation)
:    Problem      (inaudible,      background
conversation)--
:    Yeah, in fact, I think (inaudible,
background conversation) is (inaudible) gonna be at the dinner tonight?
:    Yeah,      (this)      is      for      (inaudible,
background conversation)--
:    Oh, hi, Katie O'Brien.
:    Hi.
:    Katie O'Brien, (inaudible, background
conversation)--
:    Nice to meet you.
:    Hi.
:    (Inaudible, background conversation)
:    Nice to meet you.
:    We've known each other also for a
long, long, long time.
:    I, I sued the (inaudible) Mayor back--
:    Yes.

TEXAS SENATE STAFF SERVICES
RJM:jfs/337/SA041813CD1SI/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION I

6

:    Oh, okay.
:    When he was mayor, before he was
Senator.
:    When I, over--
:    Single-member          dis--(inaudible,
background conversation)--
:    --single-member          dis--(inaudible,
background conversation), uh.
:    Yeah.
:    Anyway.
:    Uh, yeah.
:    (Inaudible, background conversation)
:    I'm glad you're here.
:    It's all good.
:    (Inaudible, background conversation)
:    You doin' okay?
:    I'm good, it's good to see you?  How are
you doin'?
:    (Inaudible, background conversation)
:    Good enough to say hi to me.
:    Well, we'll see how it goes.
:    Yeah.
:    (Laughter)
:    That's how I feel about it too.
:    (Inaudible, background conversation)
:    (Inaudible) ran into each other.
:    (Inaudible, background conversation)
:    Hey, man--
:    Senator.
:    --how are you?
:    Pretty good man.
:    (Inaudible, background conversation)
:    Oh, yeah.    (Just got) (inaudible,
background conversation) Senator (inaudible, background conversation)--
:    Oh,  Senator,  yeah,  turn  right
(inaudible, background conversation)--
:    Sure.
:    Do I need to do anything, Senator?
:    He's comin' late.
:    Oh, (I'm sorry).
:    He's  not  sure  that  (inaudible,
background conversation)--
:    There's  a  portion  of  it  (inaudible,
background conversation)--
:    (Laughter)

TEXAS SENATE STAFF SERVICES
RJM:jfs/337/SA041813CD1SI/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION I

7

:  (Inaudible, background conversation)
:  Right.
:  We need to call (inaudible, background conversation)--

CHAIRMAN   :   Members, I'm gonna kinda give everybody about a three or four minute warning.  I know some other, there were other things goin' on and people were headed, hopefully headed this way.  I'd like for, when we open, to have as many people here as we can have, so, please, and, give us a little patience and we'll get goin' here in just a second.

:  (Inaudible, background conversation)
:  Uh.
:  (Inaudible, background conversation)
:  Yeah,   (inaudible,   background conversation)--
:  (Laughter)
:  (Inaudible) very important.
:  Oh,   yeah,   (inaudible,   background conversation)--
:  (Background noise)
:  (Inaudible, background conversation)
:  (Laughter)
:  My well wishes.
:  We  found  out  yesterday  (inaudible, background conversation)--
:  I thought it was eliminated.
:  (I   called)   (inaudible,   background conversation)--
:  Jose  Rodriguez  (inaudible,  background conversation)--
:  (Today)   (inaudible,   background conversation)--
:  (Laughter)
:  That's great.
:  Yeah.
:  I'm gonna use this.
:  (Laughter)
:  That was pretty funny.
:  (Inaudible, background conversation)
:  (Inaudible) (long time.)
:  (I mean, cheeseburgers and whatnot.)
:  (Inaudible, background conversation)
:  Did you want cheese or not?
:  Wait a minute.
:  (Inaudible, background conversation)

TEXAS SENATE STAFF SERVICES
RJM:jfs/337/SA041813CD1SI/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION I

8

: (He wants a resolution that he) (inaudible, background conversation)--

: (In fact, if people here think that) (inaudible, background conversation)--

: (You good to go on all this?)

: Yeah.

: 'Kay.

: We've looked over these (inaudible, background conversation)--

: I'm gonna be hiding up here, you may have to signal, shoot up a flare if you need (inaudible, background conversation)--

: Coward, coward.

: Yes.

: (Laughter)

: I'm sorry.

: Oh, no, no, (inaudible, background conversation)--

: No, you need (inaudible, background conversation)--

: It was, and it's funny.

: It's, it's over (inaudible, background conversation) built up (inaudible, background conversation)--

: Good point.

: Good reminder.

: (Inaudible, background conversation)

: That's easy. Take (inaudible, background conversation)--

: Yeah.

: Good (inaudible, background conversation)--

: Probably a lot of that (inaudible, background conversation)--

: I refer (inaudible, background conversation)--

: Stuck. (I'm goin' home, but) (inaudible, background conversation)--

: I'm alive now.

: (Inaudible, background conversation)

: It's just (inaudible, background conversation)--

: Yeah.

: (Inaudible, background conversation)

: What, when you get done, to come up, I just, since we, it's hard to see--

TEXAS SENATE STAFF SERVICES
RJM:jfs/337/SA041813CD1SI/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION I

9


:    Okay, just come up there (inaudible, background conversation)--

:    --yeah, when you get done, but lay it out here so we can all--

:    --'kay, that's perfect--

:    --um--

:    (Inaudible, background conversation)

:    (I don't think) (inaudible, background conversation)--

:    No, they don't.

:    (Inaudible, background conversation)

:    Oh.

:    (Inaudible, background conversation)

:    ('Kay, Senator Watson) (inaudible) tryin' to get him to draw me out of your district.

:    (Laughter)

:    You're the only constituent that knew me by name.

:    (Laughter)

:    (Figure, if we have this opportunity, I might as well be) (inaudible, background conversation)--

:    We Baylor people gotta stick together.

:    (Beeping in background)

:    You're right.

:    (Beeping in background)

:    We're--

:    Sorry, (inaudible, background conversation) (senior Senator from Travis County).

:    (Laughter) Oh, now, listen to you.

:    (Idn't) (sic) that cold.

:    (Inaudible, background conversation)

:    (Laughter)

:    (Two parts) (inaudible, background conversation)--

:    (Inaudible, background conversation)

:    Absolutely.

:    I thought that was in the, I thought that was (inaudible, background conversation)--

:    (It was probable.)

:    (Inaudible, background conversation)

:    (Now, where is that?)

:    (Inaudible, background conversation)

:    (Decision-making time.)

:    (Inaudible, background conversation)

:    (You were?)

TEXAS SENATE STAFF SERVICES
RJM:jfs/337/SA041813CD1SI/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION I

10

:      And that's when she said that.
:      (She said that) (inaudible, background
conversation)--
:      (That's very clever, but that has
nothing) (inaudible, background conversation) amendment (inaudible,
background conversation)--
:      (Oh, absolutely.)
:      (No.)
:      (Inaudible, background conversation)
:      (Gavel)
:      (Explain.)
:      (Inaudible, background conversation)

CHAIRMAN            :      The Senate Committee on State
Affairs will come to order.  The purpose of the, this hearing is the posted
Senate Bill 1524 by Seliger.  We will hear that bill.  That'll be all the business
that we take up today.  Just for the record, we have public notice of this
meeting via our normal committee posting on Tuesday afternoon, April the
16th.  We also sent notice to each Senator, via the Secretary of the Senate,
Patsy Spaw, on Tuesday afternoon, April the 16th.  Moreover, we sent notice
to the service list in the San Antonio lawsuit, Perez versus, Perez, et al.
versus Perry, et al., by the Committee Director E-mail, Tuesday afternoon on
April the 6th.  For those in the audience, or who may wish to have others
view the hearing, it may be viewed on-line by the Senate's Web site, both now
live and later archived.  Following the hearing, the Secretary of Senate will
prepare a transcript of the proceedings, and following the hearing, all written
testimony will be posted on the State Affairs Web page.

LUCIO               :      Mr. Chairman.
CHAIRMAN            :      Yes, Senator Lucio.
LUCIO               :      Mr. Chairman, obviously, our offices
have been contacted by those that we represent, and I would like very much,
if it's Chair's intent, to allow us to make any, any remarks in (sic) behalf of
those that we've heard from, from back in the district, as a matter of courtesy
to them, so these coul--comments could be entered into the record this
afternoon. Ah--

CHAIRMAN            :      Senator, it is the prerogative of each
Member of this Committee to make a statement and, and it will be, certainly,
part of the record, as well as any Member of the Legislature, or rather of the
Senate who is here, who wishes to make a statement as well.  We'll take up,
first, statements by Members of the Committee, and then also statements by
Members of the Le--of the Senate who are here to speak.  And then, of course,
any other person who would wish to give testimony.  I will announce that we
have in our (tipacolous) (sic), our typical standing rule in this Committee that
we limit public testimony to three minutes.  We don't do that to cut anybody
off, we do that to allow more people to be able to testify in the limited time
that we have in a legislative Session.  So, we would certainly, and we will

TEXAS SENATE STAFF SERVICES
RJM:jfs/337/SA041813CD1SI/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION I

11

strictly enforce that.  Our timer didn't make it, so Kay--Kayli here will be our
time--timer, and she's pretty keen about keeping up, so, those of you in the
audience who are behind, you'll be happy that we have a, a--a time limit, but
I think we can certainly hear, and we will pay attention to each and every
witness and understand the concerns ah--or the support that they have for
this legislation.  Senator Ellis, do you have--

| | | |
|---|---|---|
| ELLIS | : | Uh, I was just gonna-- |
| CHAIRMAN | : | --comment? |
| ELLIS | : | --if I might, Mr. Chairman, my |

opening statement, I'm just gonna submit to the record, is that all right?
Unless y'all, I mean, I know you all always enjoy hearin' from me, unless you
just wanna hear from me da--this evening?  You promise you'll read it?

| | | |
|---|---|---|
| | : | (Laughter) |
| ELLIS | : | I'll just submit my opening statement |

to the record.

| | | |
|---|---|---|
| CHAIRMAN | : | We will certainly read your statement, |

Senator Ellis.  Okay, let me call the roll--

| | | |
|---|---|---|
| | : | (Inaudible, background conversation) |
| CHAIRMAN | : | --while we're ready to do that. |
| | : | (Inaudible, background conversation) |
| CHAIRMAN | : | Clerk will call the roll, please. |
| CLERK | : | Senator Duncan. |
| CHAIRMAN | : | Present. |
| CLERK | : | Senator Deuell.  Senator Ellis. |
| ELLIS | : | Present. |
| CLERK | : | Senator Fraser.  Senator Huffman. |
| HUFFMAN | : | Present. |
| CLERK | : | Senator Lucio. |
| LUCIO | : | Here. |
| CLERK | : | Senator Nichols. |
| NICHOLS | : | Here. |
| CLERK | : | Senator Van de Putte.  Senator |

Williams.

| | | |
|---|---|---|
| WILLIAMS | : | Present. |
| | : | (Inaudible, background conversation) |
| CHAIRMAN | : | Quorum is present.  Okay, Members, |

are there any other comments that would, any of you would like to, Senator
Lucio.

| | | |
|---|---|---|
| LUCIO | : | Thank you, Mr. Chairman, and |

Members, and Ladies and Gentlemen, again, I find it, it is necessary and
incumbent on me to be able to share with the Members of this Committee and
those present, some overview points that have been shared with me by those
back in my district that w--would like for me to reflect on at this time.  A
three-judge federal panel consistin' of two judges appointed by Republican
Presidents and one by a Democratic President determine that, determine

TEXAS SENATE STAFF SERVICES
RJM:jfs/337/SA041813CD1SI/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION I

12

that the House, Senate and Congressional maps adopted by the Legislature
failed to comply with Section 5 of the Voting Rights Act. Further, the court
ruled that the Legislature drew the state Senate and Congressional plans
with a discriminatory purpose. The court stated flatly that there was more
evidence of intentional discrimination that, than they had room to print.
The, the findings of retrogression of minority voting strength and intentional
discrimination came after the San Antonio district court had already ordered
the interim plans into effect. The San Antonio court never had the
opportunity to hear the evidence and consider that state leaders intentionally
discriminated against minority Texans in a cynical effort to expand the
political power at the expense of Black and Latino voters. The citizens of
Texas, particularly African-Americans and Latinos have every reason to
question the intentions of this Committee, the Senate leadership and our
statewide leaders, given their most recent history of intentional
discrimination. Tragically, Texas is the only state in the entire country
whose political leaders adopted redistricting plans that were determined by a
federal court to intentionally discriminate against its minority citizens. They
have put a stain on Texas that is very difficult, if not impossible, to wash
away. Callin' a hearing on redistricting and providing the Members of the
Senate and the citizens of the State of Texas no more than 48 hour notice,
certainly does not show any desire to accommodate or even respect the views
or concerns of minority Texans, or any Texans for that matter. It is even
greater reason though, for Texans to doubt the intentions of the current state
and legislative leadership. As we speak, the Attorney General of Texas,
acting on behalf of Governor Perry, Lieutenant Governor Dewhurst and
Speaker Straus, is asking the US Supreme Court to repeal Section 5 of the
Voting Rights Act and to approve the State's request to go forward with the
very maps that were ruled, and had been, had been drawn with the purpose
of discriminating against minority citizens. The question becomes why
should Texans trust the intentions of this Committee, or any legislative
leadership while they continue to pursue a legal strategy to condone and
promote intentional discrimination. Mr. Chairman, Members, I've had the,
the pleasure of w--of working with many of you for many years, and I know
you personally, and I--I--(onna) (sic) agree completely on some of what I read
off right now, in terms of my personal relationship with each one of you, but I
do find it necessary to share with you, at this time, what those in my district
are reflecting on about this particular issue, which they really have great
concerns with. And I, once again, want you all to know that, that I continue
to do my best to find, always, in all issues, middle ground that we can all
work with and appreciate each one of you as, as Members of this body we call
the Senate, Texas Senate, that I've enjoyed wor--working with over the years,
and I hope that at the end of this particular Session, this particular issue, we
can find a, I wanna say happy ending, I don't think there's ever a happy
ending for everyone, but one that we can all live with. Thank you, Mr.
Chairman.

TEXAS SENATE STAFF SERVICES
RJM:jfs/337/SA041813CD1SI/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION I

13

  CHAIRMAN    : Members, any other comments from any Member of the Committee. All right, the Chair recognizes Senator Seliger to explain Senate Bill 1524. Senator Seliger.
  SELIGER    : Thank you, Mr. Chairman and Members. Senate Bill 1524 ratifies and adopts the three interim plans, S for Senate 172, H309 and C for Congressional 235, used for the 2012 election cycle. These maps were ordered by the three-judge panel from the United States District Court for the Western District of Texas in the Davis versus Perez lawsuits. The interim maps were necessary because the maps enacted by the Legislature had not and would not receive preclearance from a federal court in Washington, DC, in time for the 2012 elections. At the direction of the Supreme Court, the Court issued three plans, which (larg--ly) (sic) deferred to the maps drawn by the 82nd Legislature, only making changes that were necessary to comply with the Voting Rights Acts and the United States Constitution. Thus, the interim maps represent the District Court's best judgment as to those maps that would be fully legal, and constitutional redistricting plans. Subsequently, all three plans were denied preclearance and the District Court's interim plans were considered to be judicious ones. The interim plans remedied the legal flaws found by the federal court in Washington, DC. Enacting these lawful and constitutional interim plans will help bring to a close this chapter of redistricting. Enacting these plans will practically ensure that the ongoing litigation over Texas redistricting plans will be brought to a swift end and grant some surety for primary dates and elections ensuing. And because interim plans only alter the legislatively drawn lines were necessary to fix legal flaws, enacting interim plans will give effect to the will of the Legislature and the people of the State of Texas. In the Senate Plan 172, the Court retained 27 of the 31 districts as they passed to the State's enacted plan, S148. The remaining districts were changed with the agreement of the plaintiffs in the Davis versus Perry lawsuit, primarily related to Senate District 10. The DC Court denied preclearance because of the way in which Senate District 10 was drawn and the interim plans address this legal deficiency by restoring Senate District 10 to its benchmark configuration, and the Court redrew only three adjacent Senate districts as required to comply with one person, one vote principles. In a recently filed joint advisory to the Court, the Davis, Veasey, and LULAC plaintiffs all informed the Court that their, and I quote, there is no claim by plaintiffs that the interim plan for the State Senate violates the Voting Rights Act, or the United States Constitution. Indeed, both plaintiffs and defendants in the Senate case have previously filed advisory with this Court in which they agree that SC10, as drawn in the interim plan, does not vote--violate the Voting Rights Act and may become a final plan for purposes of the Senate case. In the state House plan, the DC District Court denied preclearance to the state House plan because it concluded that it eliminated four ability districts. The interim plan restores those four ability districts while configuring 122 of the 150 districts in the identical manner, as did the 82nd

TEXAS SENATE STAFF SERVICES
RJM:jfs/337/SA041813CD1SI/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION I

14

Legislature.  The interim plan also garnered support from plaintiffs and
defendants alike.  Indeed, the Texas Latino Redistricting Task Force, which
represents a statewide coalition of Texas Latino organizations in the State of
Texas worked together on a compromise plan that was largely adopted by the
Court.    In  the  congressional  plan,  the  interim  congressional  plan  also
addresses the legal flaws pound (sic), found by the District of Columbia
District  Court.    The  District  Court  denied  preclearance  because  the
congressional plan lacked an additional mi--minority district, excuse me.  The
interim plan remedies that legal problem.  The DC District Court also found
that  the  Legislature  impermissibly  excluded  district  offices,  residents  and
certain  economic  engines  from  certain  existing  minority  districts  around
Houston and Dallas.  The interim plan restored those landmarks to those
districts.    Like  the  other  interim  plans,  the  interim  congressional  plan
garnered significant support from some of the groups challenging Texas
redistricting maps like the Latino Redistricting Task Force.  The State of
Texas has undergone extensive litigation on this matter, this legislation puts
this state in the best possible position to move forward and provide the voters
of Texas certainty as they head into the 2014 election cycle.  I believe the
public and the Members have had ample time to review this bill.  As referred
to previously, the 48 hours notice given for this hearing is consistent with
notice given for hearings in the Texas Senate.  It's important to note this l--
les--legislation has been filed since March 8th.  The maps codified within the
bill have been publicly available since February 28th, 2012 and were fully
implemented in the 2012 election cycle.  They are the maps under which all
181 Members of the 83rd Legislature were elected.  Because my goal as the
author of this legis--legislation is to simply enact the maps that were created
by the three-judge panel, it is my intention not to accept any amendments to
the bill.  Any amendment would undercut the goal of simply adopting the
interim maps, which are known to comply with the Voting Rights Act and the
US Constitution, and accepting one amendment would open the flood gates
for more.  Thank you very much.

END OF SECTION I

TEXAS SENATE STAFF SERVICES
JGH:cb/338/SA041813CD1SII/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION II

1

(Senator Duncan in the Chair)

CHAIRMAN               :    Thank you.  Are there any questions of
Senator Seliger?  Le' me make one comment, I, I don't necessarily d--agree
with, yeah it is, it's just I have a soft voice, unfortun--I don't necessarily agree
with some of the statements made by Senator Lucio.  But I do agree that this
Committee, and this Legislature, and this Senate should discuss this issue.
All 31 of us in this body ha--should have the opportunity to discuss whether
or not these maps are fair, whether these maps will work for Texans in the
future.  So I appreciate you bringing this bill and I hope we have a (lively)
discussion about it and determine the merits o--of the issue.  Senator Ellis.
          ELLIS            :    Coup--coupla' questions.  Thank you,
Senator.
          SELIGER          :    Thank you.
          ELLIS            :    Do, do you know how, just off the top
again, how many times we have tag proofed the redistricting bill?  You
mentioned that the bill had been introduced some time ago.
          SELIGER          :    I'm--
          ELLIS            :    I noti--
          SELIGER          :    --sorry--
          ELLIS            :    --ced it was tag proofed.
          SELIGER          :    --I don't re--I don't even recall if we tag
proofed this one (inaudible, overlapping conversation)--
          ELLIS            :    We did.  This one was tag proofed.
          SELIGER          :    --did (I)?  Ah--
          ELLIS            :    So you didn't request that.
          SELIGER          :    --no, Sir.
          ELLIS            :    'Kay.  And I--I just raise that to make
a point that obviously there're a lot of bills, I saw our colleague down on the
end askin' why all, everybody was on one side.  I told him he'd been acting up
today, he wanted more time to look at amendments.  I just wanna make a
point that once it was posted, I had to make calls to people who advise me on
(these) subjects, on this subject, subjects meaning the maps for House,
Senate, and, and the congressional lines.  And, to be honest with you, some of
'em couldn't get here, being (there), just a few of the things they do,
particular when I'm not payin' 'em for their advice, I'm just askin' what they
think.  I'd, I must say that I do agree with the comments made by Senator
Lucio.  I didn't hear all of 'em, but I--I'm familiar with what he was planning
to say and I have some of those same concerns as well.  In, in your bill it is
your plan to move, you wanna move State House, State Senate, and
congressional lines, right?
          SELIGER          :    Those are in the, in the current map.
If, if I could, Senator Ellis, it is my intention not to ask the Chair t--or the
Committee to move these maps today, but to leave them out so people can call
and discuss them.  And, at a later date, take that input from Members of this

TEXAS SENATE STAFF SERVICES
JGH:cb/338/SA041813CD1SII/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION II

2

Committee and the public, and offer a committee substitute, if need be, and make what changes that we think will be effective in this map, but not on the lines in the map.

ELLIS : 'Kay, so you will not offer a committee substitute today?

SELIGER : No, Sir, not today.

ELLIS : (You) askin' that hearing be left open, or was it your plan that we would do all this on the Floor?

SELIGER : It will be at--

: (Inaudible, overlapping conversation)

SELIGER : --the discretion of the Chair.  It will be at the discretion of the Chair.  I will simply inform the Committee that I don't intend to try to move this map today, this bill today.

ELLIS : 'Kay.  But, so what I'm saying is, if the hearing is closed, it would have to be reopened, i--if there's input that you willing to accept, or we would have to do it on the Floor.  And, just based on experience, don't bring it up on a Thursday afternoon.

SELIGER : Ah, if--if I were asked to make a recommendation to the Chair, it would not be to bring it up at the Floor, at, at th--the Chair's desk, or anything--

ELLIS : (But) make the changes.

SELIGER : --like that.

CHAIRMAN : Would you like the Chair to weigh in?

: Yes.

: Yeah.

: (Laughter)

CHAIRMAN : Okay.

ELLIS : That was what you call a subtle himp---hint, you know, when you have a gavel I don't wanna rile you up.  People been--

: (Inaudible, overlapping conversation)

ELLIS : --tense--

CHAIRMAN : No, I'm--

ELLIS : --this week.

CHAIRMAN : --not tense today.  I, I, I wanna have a good conversation about this today and hear from people, and then, obviously, if we lay out a substitute, we need to have a hearing on the substitute.  So, I'm not willing to, ah--i--this needs to be a dialogue in this body, and that's why we're here today, and there's no intent here to do anything other than hear the bill.  And, so, there will be no committee substitute laid out today, and I'm certainly not gonna ask you to vote today.  So, we need to hear discussion about this and understand concerns that may be out there.  So, that's the purpose today.

ELLIS : On Page 2, Line 14, Section 4, Subsection 2, the bill says the districts, the district courts interim plans

TEXAS SENATE STAFF SERVICES
JGH:cb/338/SA041813CD1SII/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION II

3

comply with all federal, state, constitutional revisions and laws applicable,
blah, blah, blah, Voting Rights Act. Is that based on just your opinion or is
that based on what the Attorney General's office has told you or--
      SELIGER           :    It is based upon the input of the
Attorney General, based upon a map implemented by court order.
      ELLIS            :    --okay. As it relates to the Senate
lines, if you just had to give a rough estimate of the extent to which the Court
changed those lines, would it be a 10 percent change, 20 percent change, 30
percent change, I think it's about, I think the map's about 90 percent what
this Legislature approved.
      SELIGER           :    I believe that to be correct and the, the
lines changed were substantial but I don't know if they were as much as 30
percent in Senate District 10. And then I believe that it was in the
surrounding three districts just to balance things for one man, one vote.
      ELLIS            :    I think it's a--I think, I'm guessing, it
was about 10 percent statewide. So, what the court put in place was about 90
percent of what we put in place. Di--if you don't know, don't worry about it,
but do you know off top of (ya) head does--
      SELIGER           :    I would not--
      ELLIS            :    --that sound right?
      SELIGER           :    --assert it but I would defer to your
measurement.
      ELLIS            :    Okay. I--I, I'm not gonna go through
the testimony I submitted but I will state that I have the same concerns
about these maps that I had when I went to the Justice Department, when I
testified in, in court in, in the, in the opening statement that I won't read but
that I submitted. I was not willing to spend a good million dollars, probably
out of my campaign, in order to take those issues into the, the, the federal
courts. But if given the opportunity again, if I think I can raise the resources
to do that, I'd be willing to do that. And from my vantage point, in addition
to those concerns about Senator Davis' district, the one that she represents--
      SELIGER           :    Right.
      ELLIS            :    --I forget the numbers. I do remember
mine--
      SELIGER           :    10.
      ELLIS            :    --I think it's 10. But as it relates to
my district, in, in my opinion and based on th--people who advise me, I think
there's a legitimate concern that my dish--my district was packed. It's a
wonderful district. I love everybody in it, represent 'em all well. But I don't
think that Rodney Ellis, or his successor, would need a 92, 93 percent
minority district in order to continue to be elected to the, to the Legislature. I
know they don--they don't have to elect me but whoever it is, I don't think
those communities need 92 percent. I think we've reached a point in Texas in
which a, a coalition would elect someone that would represent them well. So,
in my opinion, I think it was intentional but, I think that my district was

TEXAS SENATE STAFF SERVICES
JGH:cb/338/SA041813CD1SII/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION II

4

packed in order to dilute the voting strength of minorities in other districts. So, I, I won't, I don't wanna argue it with you, I just wanted to lay that out and make sure it's in the record, it's in my statement. But I do wanna make the point that if given the opportunity to go back to court with the resources, or if I just had a halo vision one night and decided I'd spend a million dollars on legal fees, I think I'd have a strong case in federal court on that. (Inaudible)--

SELIGER     : Would that also be a, a good hundred, a good million or bad million?

ELLIS      : --it a--it'd be a, a million that would hurt--

            : (Laughter)

ELLIS      : --if it comes out of my campaign. Thank you.

CHAIRMAN    : All right, any other questions for Senator Seliger? All right, the Chair hears none. Let me show that Senator Fraser, he's here, he just stepped out for a moment, has checked in, and also Senator Deuell. 'Kay, Members, I think at this point and time, Senator Seliger, you're welcome to join us up here (inaudible, overlapping conversation)--

SELIGER     : Well, thank you Mr. Chairman and Members.

CHAIRMAN    : --taking testimony. Members, there are, we do have resource witnesses here for your, for your benefit and if you, I wi--identify them. If you have any questions, the resource witnesses, let me know. David R. Hanna with the Texas Legislative Council, and Keith Ingram with the Texas Secretary of State's, Election Division office. They will be here throughout the hearing and if e--if you have a need to clarify something technical, then they will be here for your, for your a--assistance. Okay, we're ready to do our public testimony. We'll start with a panel--

            : (Background noise)

CHAIRMAN    : --and I'll do, we don't have a panel table up here like we normally would in the, in the Chamber, so if you'll just come up to the front. Oh, that's right, I'm sorry--

            : (Inaudible, background conversation)

CHAIRMAN    : --I'm sorry, Senator. S--

            : (Inaudible, background conversation)

CHAIRMAN    : --excuse me.   Thank you, Senator Ellis.  I, I kinda got ahead of myself on that.

            : Okay.

CHAIRMAN    : I didn't intend to. I--

            : I know.

CHAIRMAN    : --recognize  Senator  Watson, (laughter), I'm sorry.

WATSON     : All right, I appreciate that very much

TEXAS SENATE STAFF SERVICES
JGH:cb/338/SA041813CD1SII/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION II

5

Mr. Chairman, and Members. I'm speak--my, for the record my name's Kirk
Watson and I'm Chair of the Senate Democratic Caucus in the Texas Senate--

|  |  |  |
|---|---|---|
|  | : | (Inaudible, background conversation) |
| WATSON | : | --and am here today speaking on-- |
|  | : | (Background noise) |
| WATSON | : | --behalf of the Senate Democratic |

Caucus. And of course, it's not lost on anybody on, on, that are Members of
this Committee, that redistricting is a famously divisive, partisan, and
contentious issue. We should consider it a blessing that, as legislators, we're
required to take it up just once a decade. And yet, since 2001, this is the
fourth serious legislative effort to redraw district lines in Texas. It comes
even as last Session's efforts continue to be litigated. It's disappointing to see
this Committee, along with those in control of the Senate and the Capital,
choosing to take up such a divisive issue when there's no need to. There are
many problems with redistricting in Texas, but one of the biggest, frankly, is
trust. And that's regrettable, since on other issues there's more than enough
trust in the Senate for us to work together on the business of Texans. But
redistricting, unfortunately, and as always, is different.   This process
necessarily creates winners and losers. And repeated efforts to deny certain
voters the ability to elect the candidates of their choice has resulted in
lawsuits and even broken quorums, all of which sought only to preserve the
voice and voting strength of all voters in this State. For good reason, neither
I nor my 11 colleagues who represent districts where minority voters have
demonstrated the ability to elect their candidates of choice, can trust the
redistricting process. We're less than a year since a three-judge panel in the
Washington, DC Federal Court, after hearing evidence of purposeful
discrimination, ruled that the House, Senate, and congressional maps
adopted by the Legislature in 2011 violate Section 5 of the United States
Voting Rights Act.    More damning, as has been pointed out, they
unanimously ruled that the Senate and the congressional plans were drawn
with a discriminatory purpose. Texas was the only state in the nation subject
to Section 5 of the Voting Rights Act that was found to have deliberately
discriminated against African-American and Latino citizens. And this is not
a distinction which Texas should be leading the country. And even now,
Texas is arguing before the United States Supreme Court that these
discriminatory maps should be reactivated. At the same time, Texas is
asking the Court to repeal Section 5, which would take away the key
protection that minority Texans have against the very type, this very type of
purposeful discrimination. So in light of all this, it's only natural that neither
I, nor my colleagues will support this or any legislative redistricting plan over
the final 39 days of this Session. The process initiated with last year's
discriminatory map should be given time to play out. Subjecting it to another
session of politics and division would be a disservice to Democrats,
Republicans, and all Texans. While Interim Senate Plan 172, which was
ordered by the San Antonio Federal Court, reu--reunited the minority

TEXAS SENATE STAFF SERVICES
JGH:cb/338/SA041813CD1SII/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION II

6

neighborhoods in Senate District 10, and removed the principle violations in
the Senate map, the same is not true for the interim House and congressional
maps. Those interim maps retain far too many of the features that rob
African-American and Latino voters their full and fair voting strength. So
my colleagues and I preemptively, and respectfully, will oppose even efforts
to separate the Senate map from the House and congressional ones, and to
move it as a stand-alone bill. Too much can go wrong and too much has gone
wrong for anyone to trust that good faith efforts won't be corrupted. It's far
too plausible that once the bill would clear the Senate, the House and
congressional maps would be amended onto it, with the bill then returned the
Senate for a simple majority vote. This, of course, would allow the House and
congressional maps to bypass our Two-Thirds Rule, the only real legislative
protection that African-Americans and Latino voters have in this process.
And as long as Texas continues to argue before the United States Supreme
Court that the State passed discriminatory maps, should be reinstated, and
that the Voting Rights Act should be repealed, at least as it applies to Section
5, there is no reason to trust the purpose of moving forward. Instead of
spending anymore time on this wrenching issue, we should work together, to
improve schools, bos--bolster healthcare, fund badly needed road and water
infrastructure, and address the host of other issues facing Texans. Voters are
not well served by another redistricting effort, especially one that is likely to
undermine minority voting rights. We need to restore trust, not take an
optional controversy that will only undermine it. Thank you, Mr. Chairman,
and thank you, Members. And I'd be happy to answer any questions if
anybody has any.

|  | : | (Yes, Sir.) |
| CHAIRMAN | : | Senator Ellis. |
| ELLIS | : | Quick question, Mr. Chairman. |

Senator, I, I, in addition to the concerns you raise, in terms of our procedures,
I also have a concern that if a bill were to come up, if, if there're not, two-
thirds should bring a bill up on the House Floor--

|  | : | (Coughing in the background) |
| ELLIS | : | --that there could be a scenario similar |

to what happened with the budget last go-around. If something were to come
out of the House there would be an attempt to do it on something called
House Bill Day. Do you have those concerns as well?

|  WATSON | : | Certainly. I, I think e--moving any bill |

forward or a bill coming over that would undermine the ability for us to
utilize the Two-Thirds Rule, which in this case would be the best mechanism
for protecting minority voting rights when we're dealing with redistricting.
Would it, not only would it undermine trust but it would undermine minority
voting rights.

| ELLIS | : | And it, is it your understanding that |

the federal Court paid close attention to the fact that in Texas they did
circumvent the two-thirds tradition in this body in order to get maps enacted.

TEXAS SENATE STAFF SERVICES
JGH:cb/338/SA041813CD1SII/041913
83RD LEGISLATIVE SESSION
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION II

7

And that's something that the Court focused on, on, as you know, shortly before you came here. That issue is something that led to a group of us breaking a quorum in the Senate and (it) leaving the state for a good period of time. And I guess the new, the new normal around here now is that in a Special Session you no longer recognize the two-thirds tradition, you just do it by a majority vote.

WATSON : I could see where a court, any court including any new court that might look at it, a--a--at what goes on, could look at the fact that a long-standing rule and tradition that protects and is built to protect the minority, when it is circumvented is some evidence and it would be my view some evidence of purposeful efforts to discriminate.

ELLIS : Thank you.
CHAIRMAN : Any other questions?
WATSON : Mr. Chairman, I appreciate your allowing me to address the Committee--
CHAIRMAN : Well, and I'm sorry I moved a little quickly there (inaudible, overlapping conversation)--
WATSON : --(inaudible) it's, no problem at all--
CHAIRMAN : --I'm just tryin' to get--
WATSON : --I don't, I, I, I don't take offense at all.
CHAIRMAN : --I know you don't.
WATSON : Thank y'all.

END OF SECTION II

TEXAS SENATE STAFF SERVICES
JCW:jh/334/SA041813CD1SIII/041913
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION III

1


(Senator Duncan in the Chair)

CHAIRMAN              :    Are there any other Members of the
Senate who would like to address the Committee today?  All right, we'll
certainly open it up if somebody comes in later on and would like to do that.
Okay, let's go ahead with our first panel and let's see if we can, let's call
everybody up here and just sit in the front row in the order that you're called.
Glen Maxey, the Texas Democratic Party.  Dana Frandsen, representing
himself.  Commissioner Roy C. Brooks, Tarrant County, Precinct 1.  Becky
Moeller, Texas AFL-CIO (sic).  Joe Garza, MALC.  Joe Burns, Council
Member, Constituents of Fort Worth District 9, and Stewart Snider, Common
Cause, that's just a group, if you can sit up on the front row, then--
                         :    (Inaudible, not speaking into the
microphone) accident, not (inaudible, not speaking into the microphone)--
            ELLIS         :    Oh, he does, (Maxey) (inaudible,
background conversation)--
            CHAIRMAN      :    Oh, Glen is not, Glen, you're not
testifying, is that right?  Okay.  Glen is registering a, a position against the
bill but does not wish to testify.  Dana Frand--Frandsen is rec--is, is not
testifying but registering against the bill.  Okay, the first then oral testimony
we'll have is Commissioner Roy C. Brooks.  Mr. Brooks, you wanna, and just
for the record state your name and who you're representing in your
testimony.
            BROOKS        :    Thank you, Chairman Duncan, and
my good friend, Senator Rodney Ellis, the Members of the State Affairs
Committee.  Good afternoon, my name is Roy C. Brooks.  I currently serve as
Tarrant County Commissioner in Precinct 1 and I am an African-American.  I
wholeheartedly agree with the remarks by Senators Lucio and Watson, but in
the interest of making a complete record on this issue I may end up touching
on some of the same things.  I have represented Commissioners Court in
Precinct 1 for over eight years and have been directly involved for many years
in the ongoing efforts to assure fair and legal Senate, congressional and State
House Redistricting plans that accurately reflect the population of our region
and our State.    Tarrant County contains the third largest confrin--
concentration of African-American residents in Texas and continues to grow
at a rapid pace.  The Latino population in Tarrant County is also large and
growing.   My precinct contains virtually every predominately African-
American neighborhood in the county and many Latino neighborhoods as
well.  I have scrambled and altered my schedule to be here today after
receiving barely 48 hours notice, it is not the first time.  In fact, it appears to
be the sad practice of the legislative leadership to avoid any opportunity for
the public to provide meaningful comment on redistrica--redistricting plans.
And, only when compelled to hold public hearings, does so, here in Austin, far
away from the people I represent and with the shortest possible notice.  I
know my duty to, however, is to be here and speak for the many citizens and
community leaders in my region whom you were not willing to provide a

TEXAS SENATE STAFF SERVICES
JCW:jh/334/SA041813CD1SIII/041913
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION III

2

realistic opportunity to speak for themselves. I must tell you that ca--the
current Texas legislative and statewide leaders have exhausted any reservoir
or trust that had existed prior to the 2011 Redistricting. The Texas House,
the Texas Senate adopted, Governor Perry signed and the Attorney General
Abbott is currently defending Senate, congressional and State House maps
that were intentionally drawn to discriminate against African-American and
Latino voters and have been found to be in violation of Section 5 of the Voting
Rights Act. The congressional and Senate plans passed and signed into law
by the Governor were determined by the unanimous ruling of three federal
judges, two appointed by a Republican president and one by a Democratic
president, to be drawn with a racially discriminatory purpose. In Texas we
have not come very far in terms of racial fairness and equality when
legislative leaders engage in purposeful dimas--dimeth--discrimination to
harm minority voters. Shamefully, only Texas has been found to be in that
position.

| | | |
|---|---|---|
| CHAIRMAN | : | Thank you, Mr. C--Commissioner, I, I |

don't, your time has expired, but if you need to wrap up or conclude, you're--

| | | |
|---|---|---|
| BROOKS | : | I will wrap up. |
| CHAIRMAN | : | --welcome to do that. |
| BROOKS | : | I will wrap up and thanks for the |

opportunity. I don't have an objection to the current configuration of Senate
District 10 and if you were to just pass on to the House a bill on Senate lines I
would be fine with that, except that we don't trust the House as Senate,
Senator Watson said the bill would probably come back to the Senate loaded
with the congressional lines, which are flawed, and the House lines, which
are also flawed. We, in Tarrant County, had been able to demonstrate that
District 10 is a coalition district that has allowed us to elect the candidate of
our choice. It's a shame that if Senator Davis was Black or La--Latino, there
never would've been an effort to tear apart that district in the first place.
But, the protections under the Voting Rights Act are for the voters not for the
office holders and race, the race of the office holder--

| | | |
|---|---|---|
| CHAIRMAN | : | Senator Ellis-- |
| BROOKS | : | --should not-- |
| CHAIRMAN | : | --had a question-- |
| BROOKS | : | --be-- |
| CHAIRMAN | : | --I believe. |
| BROOKS | : | --a factor. |
| CHAIRMAN | : | Commissioner, Senator Ellis had a-- |
| ELLIS | : | (Yeah), Commission-- |
| CHAIRMAN | : | --question. |
| ELLIS | : | --I, I wa--I, I wanna thank you for |

comin', I know all of us appreciate the work that you're doin', the time you
would come, you, you take away from your schedule to be here. I think the
Chairman will also permit you to submit your statement in its entirety for
the--

| | | |
|---|---|---|
| CHAIRMAN | : | (Inaudible)-- |

TEXAS SENATE STAFF SERVICES
JCW:jh/334/SA041813CD1SIII/041913
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION III

3

| | | |
|---|---|---|
| ELLIS | : | --record as well. |
| CHAIRMAN | : | --wo--we wish you would. |
| BROOKS | : | I will do that. |
| CHAIRMAN | : | And you can conclude, I'm not, we're |

not tryin' to rush you here.

BROOKS            :    Final, well, finally, if there is any
interest among legislative leaders to regain some of the trust lost by
intentionally discriminating against minority v--residents, y--you would
immediately and publicly insist that Attorney General Abbott withdraw his
appeal before the US Supreme Court to approve the discriminatory maps
adopted by the Legislature in 2011 and withdraw all arguments for repeal of
Section 5 of the Voting Rights Act. We are all proud Texans. Our State is
large, it is diverse, and we have enormous challenges that must be met if our
children are to inherit a state as strong and as good as they deserve. I
sincerely call on you to abandon the current strategy of open hostility to the
growing African-American and Latino population in Texas so that we can
work together constructively for the good of the next generation of Texans.

CHAIRMAN          :    Thank you--
BROOKS            :    Thank you for (inaudible, overlapping
conversation)--
CHAIRMAN          :    --very much, Commissioner.
BROOKS            :    --thank you.
CHAIRMAN          :    Members, any other questions?   All
right, the Chair hears none. If you would submit your written testimony for
the record we would appreciate it, Commissioner. We have Becky, Becky
Moeller has written testimony against the bill and I assume that's been
submitted to the, to the Members of the Committee. Jose Garza with MALC.

                   :    (Pause)
GARZA             :    Mr. Chairman, Members of the
Committee, first let me thank you for allowing me the opportunity to talk on
this very important issue. I'd like to address some of the things that
Senators (sic) Seliger talked about in terms of the technical aspects of the
interim plans that are being considered by this Committee and by this
Legislature. First, I'd like to start with reminding the Committee of two very
important thoughts that were issued by pol--politicians on different sides of
the political spectrum. First, Ronald Reagan's description of the Voting
Rights Act extension during his presidency. He called it the crown jewel of
American Civil Liberties laws. And, Ann Richards, who said, life's not fair
but government oughta be fair, and what we have today in these plans is not
fair. The Texas court did not attempt to implement a complete remedy, so I
disagree respectfully with Senator Seliger when he says that these plans
have addressed the issues before the Texas federal district court. The, the
plan as, as was a--a--a--announced earlier by Senator Lucio, the interim
plans were issued by the federal court before there was judgment issued and
a ruling made from the DC District Court, from the DDC. In the DDC, the
court found a violation of Section 5 in the Texas House plan. And, although it

TEXAS SENATE STAFF SERVICES
JCW:jh/334/SA041813CD1SIII/041913
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION III

4

didn't find a violation regarding intentional discrimination under Section 5, it
reserved that, it said although we need not reach this issue, at minimum, the
full record strongly suggest that the retrogressive affect we found may not
have been accidental. The evidence that was presented both to the district
court in DC and the district court in Texas was compelling on the issue of, of,
of intentional discrimination. The interim plan did not fully address the
retrogression aspects of it and didn't address, at all, the potential for
intentional discrimination. The interim plan, for instance, created no
replacement district for District 33, that the state has conceded was the
elimination of which was a retrogressive feature of that, of that plan.
Speaking here on behalf of the Mexican-American Legislative Caucus, we as--
we have focused on the Texas House plan and the congressional plan, and
similarly with, as, as I've discussed with the Texas House plan, the
congressional plan was not fully remedied by the interim plan. In fact, the
district court in, in, in Texas said that this was not a, a remedial plan, that
its intention was not to remedy all the violations but to simply address the,
within the constrained of the Supreme Court, a plan that could be used on an
interim basis. It felt constrained from going forward and reviewing plaintiff's
evidence o--on a number of issues under Section 2 and under the
Constitution.

CHAIRMAN          :     Mr. Garza, your time has expired, but
I, go ahead and, and, and--

GARZA             :     And I'll--

CHAIRMAN          :     --complete your testimony--

GARZA             :     --I'll end with two points--

CHAIRMAN          :     --just complete your testimony.

GARZA             :     --Mr.   Chair,   two,   Chair,   Mr.
Chairman, two points. One is, if the, if the Legislature is truly interested in
putting redistricting behind it, then it must adopt a plan that is remedial in
all aspects. And it can do that by engaging the minority members of the
Legislature, both in the Senate and in the House, to discuss ways that it can
fully address the violations that were found by the DDC and the evidence
that was presented to the district court in Texas. If the Texas Attorney
General is truly interested in reaching a conclusion to this, it can engage the
plaintiffs in an arm's length negotiation about addressing fully a remedial
plan that addresses both the DDC findings and the evidence presented to the,
to the district court in Texas. And I ask the Committee to, to seriously
consider these, these problems with the interim plan before it moves forward.

CHAIRMAN          :     All   right,   thank   you   very   much,
Senator Ellis.

ELLIS             :     J--J--Just, just quickly, I wanna make
sure that you're comfortable with your statement and if there's anything else
that you think you need to put into the record to make your case to go to
court, I can go through (Q and A), or I'm sure the Chair will be more than
happy to let you submit it, but I wanna make sure that you, you think you
developed an adequate record knowing that this issue will end up in

TEXAS SENATE STAFF SERVICES
JCW:jh/334/SA041813CD1SIII/041913
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION III

5

litigation.

GARZA                    :    I appreciate that, Senator, we did have an abbreviated time to prepare for today, but we'd be a--appreciative of an opportunity to submit written testimony and we'd be glad to do that.  To expand on the issues regarding each of the violations found by the DDC, the evidence presented by the plaintiffs and how the interim plan does or does not address those issues.

ELLIS                    :    What, I'd like to ask (you) (inaudible, not speaking into the microphone)--

                         :    Senator.

ELLIS                    :    --I'd like to ask you, Mr. Chairman, if, if you would permit that, you know, there some timetable, but just knowing it'll end up in court, I, I could keep us here all night goin' through ke--me tryin' to figure what all to ask (inaudible, not speaking into the microphone)--

CHAIRMAN                 :    Wh--I, I agree, and what, I think we should continue to, w--we're not--

ELLIS                    :    --okay.

CHAIRMAN                 :    --this is the first dialogue we've had publically about this bill, and so, obviously, we will permit persons to put (peak) things in the record and we don't have that many people here today so I'm, that's why I'm kind of not goin' through, time management is not necessarily a problem for anybody here today, I think if you, well, I'm letting people go past the time limit, which we don't normally do in this Committee--

ELLIS                    :    But so, you're saying you'd like to--

CHAIRMAN                 :    --(so)--

ELLIS                    :    --submit    something    later,    the Chairman and I, I guess most of us have missed our flights, so we're gonna be here anyway, but I just as soon go to dinner with the Chairman or some of you all, but so I guess you (sic) askin', can you submit testimony next week?

CHAIRMAN                 :    He certainly can, we, we're, we're not gonna take this up on Monday even, so, (pause), I'm, I'm advised that you didn't state your name for the record, so we oughta do that--

GARZA                    :    I apologize.

CHAIRMAN                 :    --but I did for you, but you need to do it at the, (inaudible) we close for--

GARZA                    :    I--I understand.

CHAIRMAN                 :    --want you say that, and then let me look at the calendar and before we close out today I will give a deadline for, you gotta draw a line at some point in time, and so, if you're like me I normally work all the way up until the deadline and then I get it, turn it in. So, why don't we, let's look at the calendar and give a deadline--

ELLIS                    :    Very good.

CHAIRMAN                 :    --and get a consensus among the Members of when that deadline should be and then I'll try to post it at the end of their, announce it at the end of the day.

GARZA                    :    All right.   And, my name is Jose

TEXAS SENATE STAFF SERVICES
JCW:jh/334/SA041813CD1SIII/041913
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION III

6


Garza-- 

                                  :     (Inaudible)
        GARZA                     :     --and I'm here on behalf of the
Mexican American Legislative Caucus.
        CHAIRMAN                  :     All right. Thank you, Jose, good to see
you. Okay. Joel Burns, Council Member Constituents of Fort Worth District
9. And, Joel, just, yeah, state your name and who you represent.
        BURNS                     :     Yes, Sir, thank you, Mr. Chairman
and Members of the Committee. My name is Joel Burns and I serve on the
Fort Worth City Council. I represent a minority, majority district that
includes downtown and TCU, about 90 percent of which is in Senate District
10, and a majority of my district is in Congressional District 33. I am proud
to have been the candidate of choice for my minority, majority district
constituency for the last four elections now. Today, I learned of this hearing
and this morning cleared my schedule at City Hall so that I could come down
here. It also looks increasingly likely that I'm going to miss my speaking
opportunity tonight at the Crowley First United Methodist Church where I'm
supposed to keynote a, a event, chaired by one (Jeanette) Burns, who
happens to be my mother and will not be happy about that. I say that
because I take seriously the need to be here at this hearing even with such
short notice. I am here representing the people who couldn't take off for the
day and be away from their families to be here to testify, those people are my
constituents and those people, at least 90 percent of them, are constituents in
Senate District 10. There is great reason for all of us, my constituents, I, and
other Texans to question the intentions of the current state and legislative
leadership. As mentioned by Senator Lucio, the Attorney General acting on
behalf of Governor Perry, Lieutenant Governor Dewhurst and Speaker
Straus is asking the US Supreme Court to repeal Section 5 of the Voting
Rights Act and to approve the State's request to go forward with the very
maps that were ruled by the DC courts to have been drawn with the purpose
of discriminatory r--with the purpose of discriminating against minority
citizens. And, as referenced by my county commissioner, Texas is the only
state with that sad distinction. Why should we Texans trust the institutions
of this body or any legislative leadership, while they continue to pursue a
legal strategy to condone and promote intentional discrimination? On the
issue of Senate District 10, it was retained as a district where minority voters
can elect the ca--their candidate of choice. It reso--resolves the Section 5
violations by returning to the same exact configuration as before the 2012
elections. Just like in 2018 (sic), in the 2012 elections African-Americans and
Hispanic voters in District 10 formed a committed coalition to elect State
Senator Wendy Davis, who is clearly their candidate of choice. Senate
District 10 is an effective minority ability to elect a district and is properly
retained as such in interim maps. It would appear by the placement of both
the House and the congressional maps, and by some of the testimony here
today, that the House and congressional maps will also be taken up with this
bill as it goes back and forth from the Senate to the House and back to the

TEXAS SENATE STAFF SERVICES
JCW:jh/334/SA041813CD1SIII/041913
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION III

7

Senate, so I'd also like to touch on a couple of congressional points. Make no mistake, the interim congressional plan retains much of the offensive, discriminatory features of the State's original plan. Interim Plan C235, while better than the intentionally discriminatory pan--plan, passed by the Legislature and signed by Governor Perry still does not fairly reflect the minority population growth in Texas over the past decade. Under the interim congressional plan, District 33 in North Texas was created as a minority opportunity district and in 2012 African-American voters elected th--their candidate of choice in Congressman Marc Veasey. Under the interim congressional plan North Texas now has two African-American districts, District 30 represented by Congresswoman Eddie Bernice Johnson, and 33 represented by Congressman Veasey, both these districts should be retained as districts in which Black voters clearly have shown the ability to elect the candidate of their choice. However, in Dallas and Tarrant counties there are nearly 2.3 million African-Americans and Latinos. There are over 1.2 million Latinos alone. Clearly, the Black, and Latino populations in Dallas and Tarrant County is large enough, compact enough and votes cohesively enough for there to be three minority ability to elect districts. Several plans accomplish this goal and they were presented to the Legislature and rejected in 2011. If this Legislature is truly interested in adopting a plan that fairly reflects the diverse population of Texas, it will pass a plan that retains District 30 and 33 congressional districts as Black ability to elect districts and then can figure a new Latino opportunity district in North Texas. I appreciate all of you taking the time to allow me to be here tonight.

|  |  |  |
|---|---|---|
| CHAIRMAN | : | Senator Deuell. |
| DEUELL | : | Mr. Burns, th--what's your ethnicity? |
| BURNS | : | I am Anglo. |
| DEUELL | : | Yeah, and you have a minority |

majority district?

|  |  |  |
|---|---|---|
| BURNS | : | That is correct. It's about 58 percent |

Hispanic, about 6 percent African-American, 6, 5 percent Asian and the remainder 30 percent is Anglo. So, I had to have a coalition of minorities in order for me to be able to serve on the floor of city council.

|  |  |  |
|---|---|---|
| DEUELL | : | You feel you represent them equability |

and fairly?

|  |  |  |
|---|---|---|
| BURNS | : | I do my very best. |
| DEUELL | : | Tha--do you think Senator Davis |

represents her district equability and fairly?

|  |  |  |
|---|---|---|
| BURNS | : | I believe she does. |
| DEUELL | : | Thank you. |
| CHAIRMAN | : | Senator Ellis. |
| ELLIS | : | I'm just curious. How large are your |

council districts? I was a council member (inaudible, not speaking into the microphone)--

|  |  |  |
|---|---|---|
| BURNS | : | City of Fort Worth is-- |
| ELLIS | : | --back when I was young and had hair |

TEXAS SENATE STAFF SERVICES
JCW:jh/334/SA041813CD1SIII/041913
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION III

8

like you.

BURNS                    :    --the City (laughter) of Fort Worth is almost 800,000 people and we have eight single-member districts, so we are representing just, just south of 100,000 people, about 93, 94,000 in my district.

ELLIS                    :    Good, well thank you for comin' in.

BURNS                    :    Happy to be here, thank you.

ELLIS                    :    Tell your mother we're sorry we pulled you away.

BURNS                    :    I'll let, I'll let you tell her that.
                         :    (Laughter)
                         :    Thank you.
                         :    (Inaudible, background conversation)

CHAIRMAN                 :    Stewart  Sni--Snider,  of  Common Cause, Stewart, please state your name and who you represent.

STEWART                  :    (Boy), you're tall.  My name is Stewart Snider, I'm representing Common Cause of Texas.  We're a 43-year-old organization, we've always believed that redistricting should level the playing field, not tilt it.  We've heard today, address the, the discriminatory issues about the, the interim plans, and I wanna touch on just the, the general feeling that Common Cause has about redistricting.  We're active in fair redistricting across the country in many states.  We, the, we believe the interim maps are not in the best interests of Texas.  We think that competitive districts are a good thing and not something that should be drawn in contrary to.  We were particularly disappointed last week when a bill that would have created a bipartisan independent redistricting commission was withdrawn.  We believe that the existing maps are not worthy of endorsement of this body and would urge you g--vote against SB 1524.  Thank you, that's all.

CHAIRMAN                 :    (Pretty good), are there any questions that anyone would have of Mr. Snider?  All right, thank you for your appearance here--

SNIDER                   :    Thank you.

CHAIRMAN                 :    --today.  All right, Chair calls Yannis Banks, Texas NAACP.

                         :    (Pause)

BANKS                    :    Good afternoon, Yannis Banks, Texas NAACP.  Of course, here on behalf NAACP and, and President Bledsoe (clears throat) excuse me, who wasn't able to make it due to a court case down in San Antonio, he had to do.  And, I find it interesting that on, this a gloomy day here in Austin, we're talking about redistricting, which is just so, so divisive and I think all of y'all have received a letter from us yesterday, and, so, I won't g--I won't be long, I won't go into it since y'all have it and we, we may update it, but I did wanna highlight, I guess, a few things and definitely, everything has pretty much been said that needs to be said as far as how the maps are not really intended to be used as a permanent fix, the

TEXAS SENATE STAFF SERVICES
JCW:jh/334/SA041813CD1SIII/041913
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION III

9

court said so when they drew the maps. I, an--and as a part of what we sent you last night, it says as to the current interim plans, they are established for use only in one election cycle for each map the court specified that the top general plan was for the districts that usually elect representatives in 2012. So the court never drew these to be a, a permanent remedy to say we'll go on and move on from it. And then, even when you look at the congressional maps, and I, I don't think I E-mailed this to you, but we can get this to you. It's a map that we had done by Richard, Dr. Richard Murray, who was our expert during the case, and it lays out all th--the issues with the congressional map, how there should be another minority influence district up in the Dallas-Fort Worth area. We know we have one now that's (reported) by Congressman Veasey, but we've shown that we implemented maps to show you can have three districts up in the area as, as been stated, and within the population shows as such. And I just wanted to update, there is a part in the letter I did wanna update, 'cause I did talk to President Bledsoe. And when, I think, in the letter it stated that we didn't have a problem with the, with the Senate map, but we do wanna make sure that we don't think they should go into effect, there are some packing issues. I, I think that Senator Ellis did mention down in Houston that, that's a concern of ours and the only thing we should just go forward with the Senate map, so, w--we would oppose doing that as well. Thank you.

CHAIRMAN         :   'Kay.  Very good.  Are there any questions for Mr. Banks? All right. Thank you, Mr. Banks. Sondra Haltom, Empower The Vote Texas. Oh, she is not testifying but wishes to register a position in opposition to Senate Bill 1524. Okay, if we have, jus--let me have just one second here, I don't have any other cards, so let me ask this, is there anyone else out there who would wish to testify for, against, or on Senate Bill 1524? What, I'm sorry, what I'll do is, did everyone hear that, I thought, I thought the mic was on. I, I'm gonna go ahead and for today close public testimony on Senate Bill 1524. However, when we open, reopen the testimony, or when we, if there is a substitute that's laid out, we will reopen the testimony on the subject too. I anticipate that th--the substitute would include only the Senate map, so, that would be the case. Now, let me offer to the Committee this deadline for written comments, would be on the bill, on s---1524 as laid out today, would be Wednesday, April the 24th at 5:00 p.m.. Is that acceptable to the Members of the Committee?

:   (Inaudible)

CHAIRMAN         :   All right, so, I will now announce a deadline for written comments on Senate Bill 1524, Wednesday, April 24th at 5:00 p.m. and those need to be addressed to the Senate State Affairs Committee and then we will distribute them to the Members of the Committee and any other Member of the Senate who wishes to have them or the media. Okay. So, I will ford--I will t--for the day, close the public testimony. Members, there bein' no further business to come before the Senate State Affairs Committee, we'll stand in recess subject to the call of the Chair. Thank you for bein' here. (Gavel)

TEXAS SENATE STAFF SERVICES
JCW:jh/334/SA041813CD1SIII/041913
SENATE STATE AFFAIRS COMMITTEE
APRIL 18, 2013
COMPACT DISC 1, SECTION III

10

:   On Monday morning--
:   Great.
:   --(do   we)   (inaudible,   background
conversation)--
:   Yeah.
:   (Inaudible, background conversation)
:   I think it has a statement (for you) to
read (inaudible, background conversation)--
CHAIRMAN        :   Okay. (Okay.)
:   (She   just   walked   in)   (inaudible,
background conversation)--
:   And   you   still   have   your   (phone),
tonight?  You (wanted) (inaudible, background conversation) I do have bills to
go through (inaudible, background conversation)--
:   We're good now.
:   (Laughter)
:   I'm   (wearing   down)   (inaudible,
background conversation)--
:   We   advise   no   such   (inaudible,
background conversation)--
:   I   tried   to   (inaudible,   background
conversation)--
:   Yeah.
:   (Inaudible, background conversation)
:   (Laughter)
:   Yeah, yeah, (inaudible, background
conversation)--
:   (Laughter)
:   Oh, do you, yes (inaudible, background
conversation)--
:   Right.
:   --(inaudible,              background
conversation)--


END OF MEETING