# EXHIBIT 6-F
# Part 2

TEXAS SENATE STAFF SERVICES
JGH:cb/338/RD053013CD1SI/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION I

30

be able to answer, having been in the courtroom, Senator West's question regarding the submission of updated Census data.

| WEST | : | That's exact w--Mr. Chairman. |
| CHAIRMAN | : | Senator West. |
| WEST | : | As I was gonna ask you that question. |
| PERALES | : | Yes, so, excuse me, the parties on the |

plaintiffs side of the courtroom asked the Court if it would reopen the record to take in certain new evidence, including updated Census data under the American Community Survey, which would update citizen voting age population. It would not update, obviously, the decennial 2010 Census. It was noted for the Court's information, that that data is already available in the Texas Legislative Council database. So, when anybody on the Committee or in the Legislature request reports, including the most updated CVAP data on any plan, that it would be included already. The Court said that it would like to take briefing on the question whether it should reopen the record to take that new information, as well as, information related to the results of the 2012 election. The Court did instruct us, however, to begin work on designating those portions of the Washington DC evidentiary record, that we would like to, essentially, roll into the record in front of the San Antonio Court.

WEST                    :    W--let me ask this question. Given that the Court has not made any decisions on use of the, of the ACS, or what parts of the DC opinion, can, that they're going to consider, is it advisable for us, as a policy body, to go forth and make decisions without knowing exactly how the San Antonio Court is going to rule, as, in terms of the use of the data and some of the findings and conclusions, findings that was made by the DC Court?

PERALES                :    Senator, I think that the Committee and the Legislature are best served by using all of the available data and the most recent and reliable data. The District Court cannot constrain the Legislature in terms of what it considers--

                            :    (Inaudible, background conversation)

PERALES                :    --when it, when it makes the plans or adopts the plans. The Court, I think, was concerned about whether to look at updated data when evaluating the problems in the 2011 Plans. Which under certain scenarios, our Court might still end up having to do. So, for example, if there, if the interim plans are not adopted by the Legislature, and we get certain kinds of spes--outcomes from the US Supreme Court in the Shelby Case, it is possible, there is a scenario under which the San Antonio Court would have to make final conclusions regarding the 2011 Plan.

WEST                    :    So, one way, the other, in all probability, if one of the objectives is to reduce the expense of litigation, the reality is, we're gonna still be back in court, on these issues.

PERALES                :    It seems from the way the hearing went yesterday that i--that folks are expecting to be back in court, and, and

TEXAS SENATE STAFF SERVICES
JGH:cb/338/RD053013CD1SI/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION I

31

the panel itself is trying to prepare for whatever next steps it might need to take.

WEST                    :    W--W--L--L--Two questions.    As it relates to, the Court's asked both sides to brief the issue as to whether or not we should be using updated data.  When is that due?  When is the--

PERALES                 :    Next Wednesday, Senator.

WEST                    :    --next Wednesday.  And, and I know how courts act sometime, h--h--how long do you think it's gonna be before the Court makes determination as to whether or not updated, that updated data should be, updated population data should be used?

PERALES                 :    I do not know, Senator.

WEST                    :    Yeah, I know it.  And, and so, as it relates to adopting a permanent plan, it seems as though it would be advisable to wait until we get some nod from the Court to determine whether or not updated population information should be used.  Unless, unless we're just gonna ratify, quote, unquote, ratify and adopt the interim plan.  What are your thoughts?

PERALES                 :    Well, Senator, my perspective is slightly different.  I think if you're going to be looking at amendments, and you're going to be looking at the interim plans, you should look at them using the most recent and reliable data available.   Which would include the updated ACS and the 2012 election analysis, which I believe is all going to be available to you.

WEST                    :    I'm sorry, I didn't, I, hear you.  Say that again.

PERALES                 :    I believe that if the Legislature is going to undertake this task, that it should rely on the most recent and reliable evidence available to it.  I don't think you have to worry about a scenario in which a, the court later on says that you are wrong to rely on updated ACS data, or 2012 elections, in considering any new enactment.

WEST                    :    So, that's a, that's advisable to do that, in other words?

PERALES                 :    Yes, I would.   I don't advise the Legislature, but if--

WEST                    :    I understand.

PERALES                 :    --if--

WEST                    :    I understand.

PERALES                 :    --if I were, then I would advise you to rely on the most updated data that you had.

WEST                    :    Okay, I just wanted to get your opinion on that.  Thank you, Mr. Chairman.

CHAIRMAN                :    Senator Duncan.

DUNCAN                  :    Just a coupla questions, and one is--
                        :    (Background noise)

DUNCAN                  :    --I've been around here a while and

TEXAS SENATE STAFF SERVICES
JGH:cb/338/RD053013CD1SI/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION I

32

I've never seen legislation come out of here that's perfect, unless it's mine of course, but--

                      :    (Laughter)

DUNCAN         :    --w--you, you would agree that that's, that's a pretty high bar to have a perfect map, because it just depends on who you are, or what you're, what you're position is, so.

PERALES        :    Yes, Senator.  Beauty is in the eye of the beholder, and, and--

DUNCAN         :    Correct.

PERALES        :    --I'm sure the Latino Task Force would assert that its maps were perfect, and other maps might not be perfect, but our observation on the interim plans is that we did not draw them and they are not perfect.

DUNCAN         :    The, a--and I just wanna just understand and ask you to expand a little bit on the Redistricting Task Force. That is a statewide coalition of different Latino advocacy organizations. When you say statewide, d--does that or--d--did your coalition represent Latinos from all across Texas?

PERALES        :    Yes, it does.  A, a number of the organizations in the coalition are membership organizations that have members that live in every part of the state, and they are Latino members living in every part of the state.

DUNCAN         :    'Kay.  Southwest Voter Registration Education Project, what, what organization is that?

PERALES        :    That is a non-profit, non-partisan organization that is dedicated to improving Latino civic engagement, through voter registration, primarily focused on the Latino community and Get Out The Vote drives.

DUNCAN         :    And the Mexican-American Bar Association of Texas?

PERALES        :    That is a membership organization of Mexican-Americans and non-Mexican-Americans in the legal field.

DUNCAN         :    And Texas HOPE?

PERALES        :    Texas HOPE is also a statewide membership organization.  Hispanics Organized for Political Education, I believe is what the acronym stands for, and is also focused on Latino civic engagement, as well as, issues involving education and other issues of concern to that organization.

DUNCAN         :    The William C. Velasquez Institute?

PERALES        :    The William C. Velasquez Institute is a nonprofit, nonpartisan research organization that disseminates information about voting patterns, including in the Latino community, in Texas and nationwide.  And I wanted to note that the Legislature, in the Regular Session, did enact a law, that I believe is waiting for the Governor's signature, or may have been signed by the Governor, establishing a William

TEXAS SENATE STAFF SERVICES
JGH:cb/338/RD053013CD1SI/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION I

33

C. Velasquez Day, in honor of his great work.
    DUNCAN             :    And then, NOMAR?
    PERALES         :    That is also a Latino membership organization that is primarily comprised, I believe, of Latino federal employees.
    DUNCAN          :    And then, Southwest Workers' Union?
    PERALES         :    Also, a Latino membership organization, a--advocates on behalf of issues of concern to the Latino community.
    DUNCAN          :    Is that a statewide organization?
    PERALES         :    You know, I am not sure if it is regional or statewide. I did wanna note that these organizations came together at the very beginning of the redistricting cycle, out of an awareness that Latinos have struggled in past redistricting cycles, to achieve fair plans. And, the coalition formed to advocate and then, hopefully not, but if they had to, to litigate these issues and to really be thoughtful about the process.
    DUNCAN          :    So, MALDEF then, I guess, represents and speaks for that coalition, is that correct?
    PERALES         :    Yes, Senator.
    DUNCAN          :    Thank you, very much.
    CHAIRMAN       :    Thank you. Any other questions of Ms. Perales?
                   :    (Inaudible, not speaking into the microphone)
                   :    (Background noise)
    CHAIRMAN       :    Zaffirini.
    ZAFFIRINI      :    Thank you. To follow up on Senator Duncan's questions, do all of these organizations have Texas offices?
    PERALES         :    Yes.
    ZAFFIRINI      :    Where is the Willie Velasquez Institute Texas office?
    PERALES         :    In San Antonio.
    ZAFFIRINI      :    Thank you. Where is the Southwest Voter Registration Education Project office?
    PERALES         :    In San Antonio.
    ZAFFIRINI      :    Where is the Mexican-American Bar Association office?
    PERALES         :    Probably, their headquarters are in Austin, if they don't move around with whoever is the president.
    ZAFFIRINI      :    But they don't have an official office, physical office?
    PERALES         :    I'm not sure, Senator, because when I communicate with them, I do that largely either in person, by phone, or an E-mail. And, I have to confess that I have not addressed a letter to them. That is done by staff at MALDEF.

TEXAS SENATE STAFF SERVICES
JGH:cb/338/RD053013CD1SI/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION I

34

ZAFFIRINI : Okay. Where is the HOPE Texas office?

PERALES : I believe it's based in either Austin, Texas or Edna, Texas.

ZAFFIRINI : And NOMAR?

PERALES : San Antonio.

ZAFFIRINI : And Southwest Workers' Union?

PERALES : San Antonio.

ZAFFIRINI : The, most of these offices, most of these organizations are headquartered in San Antonio?

PERALES : I would say or Austin, Senator, yes.

ZAFFIRINI : Thank you.

CHAIRMAN : Any other questions of this witness? Thank you very much.

END OF SECTION I

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

1

(Senator Uresti in the Chair)

CHAIRMAN : Corena White.
 : Thank you--
 : (Inaudible, background conversation)
WHITE : --Senators, thank you, Mr. Chairman.
I am representing no group. I am actually an instructor of government. I teach at one of the North Texas community colleges. I won't say which one. But let me just tell you one of the things that I try to instill in my students is how important it is to know who represents them in the Texas House and in the Texas Senate, along at the national level, because you are the ones who have their voices. Also, the maps have their voices. I currently disagree with the interim maps. If, if my word means anything to you as an instructor of government, I would just encourage you to reconsider these maps. While I talk about the Civil Rights Movement, I talk about how important the Voting Rights Act was, and although that's not your decision to make on the Voting Rights Act, that'll be up to the Supreme Court, it certainly plays a huge role in the matter of the maps. And the very fact that the DC Court ruled parts of, um, excuse me, ruled the maps as unconstitutional, that's very concerning to me because I tell my students just how important the Constitution is, as far as listing their rights, listing who is going to represent them, so, please, just consider redrawing the maps. As Ms. (Collier) said, you had to be a political junkie to know that the Legislature was going into Special Session. I'm a political junkie, my students would say that. I didn't know that the Legislature was going into Special Session. I would also encourage more field testimonies. I know, certainly, some of my students who are starting to get involved, some of them have, don't have the means to travel to Austin, certainly, don't have the means to travel outside of the central Fort Worth area, so, also, please, consider setting up some field offices. And, thank you for your time.
CHAIRMAN : Thank you for your patience. Any questions of Ms. White? Thank you for being here. Okay, so, I believe those are the only cards we have for witnesses wishing to testify on all four bills, Senate Bill 1, 2, 3, and 4, is there anyone else that wish to testify on all four bills? Okay, did you turn in your card, Ma'am?
 : I turned in four cards.
CHAIRMAN : Okay.
 : (Laughter)
 : (Inaudible)
CHAIRMAN : What is your name?
HALTOM : Sondra Haltom, Empower the Vote Texas.
CHAIRMAN : Sondra. Last name?
HALTOM : Haltom. H-A-L--
CHAIRMAN : Haltom.

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

2

| | | |
|---|---|---|
| HALTOM | : | --T-O-M. |
| CHAIRMAN | : | Okay. Anyone else that wants to |

testify on all four bills?  Go (ahead) (inaudible), have a seat.  Your name again?

| | | |
|---|---|---|
| | : | (I'm here.) |
| BANKS | : | (I sent in) four cards, Yannis Banks. |
| CHAIRMAN | : | Last name? |
| BANKS | : | Banks. |
| CHAIRMAN | : | Banks. |
| BANKS | : | Texas NAACP. |
| CHAIRMAN | : | Okay. |
| | : | (Inaudible) we get in trouble |

(inaudible, not speaking into the microphone) turn in one card.

| | | |
|---|---|---|
| CHAIRMAN | : | That's all right. |
| | : | (Laughter) |
| | : | (Inaudible, background conversation) |
| | : | (Background noise) |
| CHAIRMAN | : | Sir, did you turn in a card on all four? |
| PENA | : | Senator, my apologies, I should've w-- |

designated all four, instead of just one, my apology.

| | | |
|---|---|---|
| CHAIRMAN | : | Okay, that's fine. Last name again. |
| PENA | : | Pena. |
| CHAIRMAN | : | Pena. |
| | : | (Inaudible, background conversation) |
| CHAIRMAN | : | Very well. |
| SELIGER | : | (Let me get), call on her first. |
| CHAIRMAN | : | Yes, Sir. |
| SELIGER | : | Okay. |
| CHAIRMAN | : | Okay, come on down, and then, if |

there's anyone else, if you'd see one of the Sergeants over here.  Sondra Haltom, Haltom.  We're gonna start with you.

| | | |
|---|---|---|
| SELIGER | : | What organization do-- |
| CHAIRMAN | : | Senator Seliger. |
| SELIGER | : | --you represent, Ma'am? |
| HALTOM | : | My name is Sondra Haltom with |

Empower the Vote Texas.

| | | |
|---|---|---|
| | : | Okay. |
| CHAIRMAN | : | Okay. |
| HALTOM | : | Testifying against the adoption of the |

interim maps, so, essentially, on all four bills.

| | | |
|---|---|---|
| CHAIRMAN | : | And I'm gonna remind all our |

witnesses, you're limited to three minutes.  Go 'head.

| | | |
|---|---|---|
| HALTOM | : | Thank you. I don't wanna beat a dead |

horse, so I will say that a lot of the same points that I was planning to make have already been made by several other witnesses.  Yannis probably plans

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

3

to make some of the same exact points. Senator Uresti's statement covered a
lot of the same points that I want to make about the maps.

|  |  |  |
|---|---|---|
| WEST | : | Excuse me for one second-- |
| CHAIRMAN | : | Senator West. |
| WEST | : | --Mr. Chairman, Nina Perales, before |

y--before you get ready to leave, I, I've got one other question, but I know that
we have a witness right there, so, before you leave, I, I need to ha--have you
come back up.

|  |  |  |
|---|---|---|
| CHAIRMAN | : | Well, we'll call her up after this |

witness.

|  |  |  |
|---|---|---|
| WEST | : | Yes. |
|  | : | (Inaudible, background conversation) |
| CHAIRMAN | : | She's not leaving, okay.  Go ahead, |

Sandra (sic).

|  |  |  |
|---|---|---|
| HALTOM | : | Um-- |
|  | : | (Inaudible) |
| HALTOM | : | --just meshing that a lot of the other |

witnesses who have already testified and probably several others who will
testify, making the same points, that the interim maps were drawn before the
DC Court issued its opinion, finding the legislatively drawn maps as
intentionally discriminatory.   The intentional discrimination was not
something that the San Antonio Court had heard evidence on, or addressed
in the interim maps because the DC Court's findings came after the Court
had already ordered those interim plans into effect for the 2012 election, so
that we could have 2012 elections at all.  S--they were always meant to be a
temporary measure.  Before the San Antonio Court, because the San Antonio
Court did not have the benefit of the DC Court's findings, the interim maps
contain some of the discriminatory features of the State's original plans.
Most notably, as has already been mentioned, the lack of appropriate
representation for minority voters, who made up 89 percent of Texas'
population growth in the last decade.  And, of course, now we're here in a
Special Session and the Governor has issued a very specific call asking this
Legislature to meet and adopt the interim maps without correcting any of
their flaws.  Not only are the flaws in the maps still exist in, but this process
itself, so far, has already started off on the wrong foot.  E--initially there were
only going to be three hearings, I appreciate that there will now be some
additional hearings to give folks additional time and opportunity to come to
Austin and voice their opinions, however, I agree, that there should be field
hearings.  We should go to the people and give the people the opportunity to
make their voices heard when we're talking about drawing maps that fairly
represent the people of Texas.  Additionally, choosing in the Senate to not
have a blocker bill and basically not have the Two-Thirds Rule was
something that the DC Court found to be problematic as part of the process.
That that prevented minority legislators p--and those who represent minority
districts, from having their voice heard in the process.  And we have to

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

4

remember that it's not just the final product, it's also the process that courts take into account when determining whether or not this redistricting process was fair and legal. The Attorney General continues to put forward this idea that the Legislature should just adopt these interim maps as permanent under the auspices that will somehow make all the State's redistricting issues magically go away, that there's not gonna be anymore court cases, all of the litigation will disappear, and I like to refer to this as Greg Abbott's redistricting unicorn, because it simply doesn't exist. It's a fantasy, as was somewhat mentioned by Nina, but mentioned in the court hearings yesterday, there are other plaintiffs in this case who recognize that just, if we adopt the interim maps, there are still problems with the constitutionality--

| | | |
|---|---|---|
| | : | (Inaudible, background conversation) |
| HALTOM | : | --of those maps, and they will likely be |

challenged again in court.

CHAIRMAN : Okay. Thank you very much. Any questions of this witness? Great. Thank you very much for your testimony.

HALTOM : Thank you.

CHAIRMAN : Okay, we're gonna, Gentlemen, if y'all don't mind, if you'll indulge Senator West, Ms. Perales, could you come forward, please? And you'll have to reidentify yourself.

PERALES : Nina Perales, with the Mexican American--

CHAIRMAN : Senator--

PERALES : --Legal Defense--

CHAIRMAN : --West.

PERALES : --and Educational Fund.

WEST : M--Ms. Perales, as it relates to the Two-Thirds Rule in the DC opinion, was, did the Court mention anything about the Two-Thirds Rule, the lack thereof?

PERALES : I do remember that the Court extensively reviewed procedural deviations in its analysis of the facts surrounding the adoption of the 2011 Redistricting Plan. And I remember that we submitted quite a few of them in DC, but I actually don't remember the Court's discussion of the Two-Thirds Rule. I know there was quite a bit about the timing of hearings, the location of hearings, the availability of recording equipment, the treatment of amendments, I would not be surprised if there was discussion of the Two-Thirds Rule.

WEST : Could you review that and kinda provide the Committee what you believe to be the Court's discussion on that?

PERALES : I can do that. In fact, I have the decision with me. I'll do that immediately. To spare myself writing another letter, could I correct an earlier misstatement I did wanna correct for Senator Zaffirini, that the Mexican American BAR Association is headquartered in Houston, Texas, and I will provide a letter to the Committee excerpting the Court's discussion of the Two-Thirds Rule in the DDC.

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

5

WEST                    :    B--one other question.   How long
you've been involved in this type of litigation?
PERALES               :    This is my third round, if you count
2001 and 2003 as two separate rounds.
WEST                    :    Okay, and I--I'm, obviously, you're an
expert in this particular area.   Do you know of any other entity,
governmental entity, that has been placed on an interim plan that
subsequently considers and passed interim plan as the permanent plan?
PERALES               :    No, Senator West, I think we are
definitely in an unusual territory.  I did wanna note for the record, that Texas
is the only state that enacted redistricting plans in the 2011 cycle that were
found to be discri--
                          :    (Background noise)
PERALES               :    --minatory on a statewide basis?
                          :    (Background noise)
WEST                    :    Know, based on the many years you've
been involved in this type of litigation, you know of no other entity that is
under an interim plan, and then subsequently passed the interim plan as
their permanent plan.
PERALES               :    I know of no such other fact pattern in
other cases.
WEST                    :    All right, so this, this may be a Texas
first, also, right?
PERALES               :    Yeah, Senator.
WEST                    :    Be interestin'--
                          :    (Background noise)
WEST                    :    --s--see what the Supreme Court says
about it.
SELIGER               :    (Ask a)--
CHAIRMAN            :    Senator Seliger.
SELIGER               :    --Ms. Perales, as you review the, the
procedural elements, going forward, if it would not be too much of an
imposition, if redistricting was taken up in Special Session, d--in th--after the
Census in 1990 and 1980, would you check and see, specifically, the
procedural question of whether the blocker bill was used at that time in
Special Session regarding redistricting?
PERALES               :    I will include that in my letter--
SELIGER               :    Thank--
PERALES               :    --letter, Senator, yes.
SELIGER               :    --you very much.
WEST                    :    An--And can I add on that?  As you're
reviewing those areas--
                          :    (Laughter)
WEST                    :    --find out whether or not there was
any issue raised by any legislators concerning the use of the block (sic) bill

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

6

too.

|   |   |   |
|---|---|---|
| PERALES | : | I will, Senator. |
| CHAIRMAN | : | Anyone else have any requests of Ms. |

Perales?  Senator Duncan.

|   |   |   |
|---|---|---|
|   | : | It's getting bigger and bigger. |
| DUNCAN | : | In, in the past, when the Courts have |

redrawn the lines, didn't they do that in '91?

|   |   |   |
|---|---|---|
| PERALES | : | Our courts have redrawn Texas |

redistricting lines in every decade--

|   |   |   |
|---|---|---|
| DUNCAN | : | Yeah. |
| PERALES | : | --since Texs--Texas-- |
| DUNCAN | : | Congressional-- |
| PERALES | : | --was-- |
| DUNCAN | : | --and, and then in, and also House and |

Senate, is that, is that s--

|   |   |   |
|---|---|---|
| PERALES | : | --one or more, Senator, in each cycle, |

but not always all three, but since Texas was obliged to do the redistricting
since Reynolds versus Sims in the one-person, one-vote cases beginning with
1972 in White versus Regester, in each cycle, Texas has been forced to redraw
one or more plans as a result of discrimination against minority voters.

|   |   |   |
|---|---|---|
| DUNCAN | : | --'kay, then that's been with whether |

the, back in the '90s and '80s, the Democrats controlled the House and the
Senate, is that right?

|   |   |   |
|---|---|---|
| PERALES | : | That's right, Senator. |
| DUNCAN | : | Now, the question though, I have |

though, in follow up, in Sen--in Senator West's question, is the fact that once
those lines were drawn, Texas continued to operate under those lines without
redrawing them, correct?

|   |   |   |
|---|---|---|
| PERALES | : | Subject to appeals, in 2001, we had a |

court-drawn plan that was in subsequently legislatively redrawn in 2003, is
subject of an appeal that we finally won in 2006, which resulted in another
set of court-drawn plans.

|   |   |   |
|---|---|---|
| DUNCAN | : | 'Kay, but we, we continue t--to operate |

under those court-drawn plans?

|   |   |   |
|---|---|---|
| PERALES | : | Unless they are enjoined or redrawn |

by the Court (inaudible, overlapping conversation)--

|   |   |   |
|---|---|---|
| DUNCAN | : | Just tryin' to get a little history on |

that, (inaudible) understand.

|   |   |   |
|---|---|---|
| PERALES | : | --it's been very varied over the |

decades.

|   |   |   |
|---|---|---|
| DUNCAN | : | Thank you. |
| CHAIRMAN | : | Any other questions?  Senator |

Zaffirini.  This is round two for you--

|   |   |   |
|---|---|---|
| PERALES | : | Thank-- |
| CHAIRMAN | : | --Ms. Perales. |

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

7

PERALES          :   --you, Senator--
                 :   (Laughter)
PERALES          :   --I, I, it's a privilege to testify.
CHAIRMAN         :   Thank you.
ZAFFIRINI        :   We, didn't we also have several rounds
of maps drawing in the '90s, after the 1990 Session?
PERALES          :   Yes.
ZAFFIRINI        :   We had, the Legislature adopted a
map, and then the Court redrew it, and then we came back and the
Legislature drew another map.
PERALES          :   Yes, Senator.
ZAFFIRINI        :   There were three rounds.  Thank you.
CHAIRMAN         :   Any other questions this--
WEST             :   Uh--
CHAIRMAN         :   --witness?
WEST             :   --just (inaudible)--
CHAIRMAN         :   Senator West.
ZAFFIRINI        :   One for Senator--
CHAIRMAN         :   I'm sorry, Senator--
ZAFFIRINI        :   --West.
CHAIRMAN         :   --Zaffirini.
ZAFFIRINI        :   I have one for Senator West.  Senator
West, what was your original question?  I di--I heard the answer, but I didn't
hear the question.
WEST             :   Ah--
ZAFFIRINI        :   To--
WEST             :   --original--
ZAFFIRINI        :   --to Ms. Perales.
WEST             :   --question?
ZAFFIRINI        :   Your first question when Ms. Perales
came back.
PERALES          :   I believe it was related to the blocker
bill.
WEST             :   Oh, the blocker bill, yes.
ZAFFIRINI        :   That what it was, okay.
PERALES          :   And, and, specifically, for me to
provide and cite the Cour--the DDC Court opinion, discussion of the Two-
Thirds Rule in the, in the Session that resulted in the 2011 enacted plans.
ZAFFIRINI        :   Thank you, thank you, Mr. Chair.
CHAIRMAN         :   Senator West, do you have any more
questions?
WEST             :   No, I, I'll hold off at--
CHAIRMAN         :   All right--
WEST             :   --this point.
CHAIRMAN         :   --great.  Thank you again.

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

8

| | | |
|---|---|---|
| PERALES | : | Thank you. |
| CHAIRMAN | : | Members, we, just so you'll know, |

we're gonna break at 11:30, we go into Session at 12:00 and if we're not done, then we'll reconvene after--

| | | |
|---|---|---|
| | : | (Coughing in background) |
| CHAIRMAN | : | --that. Yannis Banks. Good morning. |
| BANKS | : | Good morning, Yannis Banks with the |

Texas NAACP. So, course, we're, we're against, I guess, all four of the bills. I know President Bledsoe had meant to be here today, but was unable to make it, so I do have some thoughts from him, as well as just various conversations we had. And, w--one of the reasons we allow, or many of the reasons we're against this bill, we, we had a expert testimony, Dr. Richard Murray, some of y'all may know him, professor down at, he's the professor down in Houston. He had looked over the court-drawn maps and he did, his report that said, this was what s--still wha--what was wrong with those maps. And when he looked at it, he said, CD 23 is unnecessarily marginal, Latino opportunity district that made too easily go against the wishes of the Latino population, now house there--therein. When he looked at the Dallas and Tarrant Coun-- County area, the Black and Latino populations combined, increased by 608,000 persons, while the Anglo population decreased by 156,000 persons over the last decade. One district, CD 30, involves packing of minorities in one district so they will have less influence elsewhere. Another new district, which is just, now held by Congressman Marc Veasey, but it has five Anglo districts in the area, CDs 5, 6, 12, 24 and 32, that snake in and out of the Dallas and Tarrant Counties. Durin' the, durin' the Court hearings and some of the maps we've drawn, we actually did draw two dis--two new--

| | | |
|---|---|---|
| | : | (Background noise) |
| BANKS | : | --sorry, two new additional districts in |

the Dallas-Fort Worth, two additional minority districts in the Dallas-Fort Worth area, one being in Tarrant and one being in Dallas County. We showed that you can draw two there and th--so you can increase the vo--the min--minority population as the data shows. CD 27, from Corpus, w--was an ability to elect district for Latinos, that was close to optimal size, but a new and completely different district was formed that dissected the minority population of Corpus, and connected it up with the--with the exurbs of Houston. The previous district was 69.2 percent Hispanic VAP. And, when he looked at the Section 5 (opinion), you will see that Blacks make up 12.9 percent of the Texas Citizen Voting Age Population and such a proportion to number of seats would be 4.6 percent, percent, which we do currently have with the e--election of Congressman Marc Veasey. Hispanics make up 26.4 percent of the State's Citizen Voting Age Population and as such, a proportion of number seats would be 9.5 percent. The total of Black and Hispanic combined would be 14 plus seats, excluding the influence districts formally held by Lloyd Doggett. CD 25, held by Doggett in the past, is a protected seat, in as such, should not been dismantled. The Court held that

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

9

there was intentional discrimination in the State's fashioning of the congressional map. They relied mostly on the treatment of African-American congressional districts in (conger--al) (sic) persons, congresspersons to reach this conclusion. The panel said that the Black congresspersons along with one Latino had their offices removed from their districts, but this did not happen to any White congressperson. They also concluded that when White congressperson had issues regarding their districts, the records show that they were accommodated. One wanted the grandkids' schools to be put in their district, another wanted a country club. The panel also concluded that the economic guts were removed from the African-American ability to elect districts. The Court also said that, in a way, that minority members of the Legislator (sic) were treated (didn't have) the desire for input, was not open, or as it had been in the past, that this supported this finding. I think that goes to some of the earlier conversations that you were having, I believe it's Senator Uresti and even Senator West had brought it up. In regards to the State House of Representatives, we can clearly, we can say clearly that the compromised plan does not correct all the problems and that the NAACP, TLBC, LULAC, MALC, and others, want it, but it also failed to correct problems that were identified in Section 5 opinion.

    CHAIRMAN        :    Mr. Banks, I need you to wrap up your--

    BANKS        :    Oh, yes, this is my last, I guess, sentence right here. Also, it is important to note that one of the findings of the panel was that the State House map-drawer, crack (VTDs) along with racial lines, to dilute minority voting power.

    CHAIRMAN        :    Very good.  Any questions of Mr. Banks? Thank you, Sir, for being here.

    BANKS        :    No problem.

    CHAIRMAN        :    Mr. Pena.

    PENA        :    Mr. Chair, Honorable Senators, my name is Gustavo Almaguer Pena, proud native East Austinite, proud United States Marine Corps Veteran, served in Vietnam, and Semper Fi to you, Senator Hinojosa, and also Senator Uresti.

            :    (Inaudible)

    PENA        :    I thank you for the help that you've given all the Veterans, Sir. You have been there for us. Honorable Senators, I testified before this elected body last Session and I still love you, Senator Zaffirini, you're still part of Austin, Travis County, but I will say this, an-- Senator West, and this young lady here to my right, I apologize, I don't remember your name, (said it), articulated the, the cause very, very clearly. How can I, as a military Veteran, come over here and allow discrimination to, to remain rampant? As Veterans fought for equality, the right of liberty, justice and to, to state our, our positions. This gentleman, young gentleman back here, failed to give the Chair, I ran for City Council and Justice of the Peace, was endorsed by all law enforcement o--associations. I'm also a

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

10

member, Senator Seliger, I spoke to you last Session, I'm also a former EEO
Discrimination Complaints Investigator, Department of Treasury and
Justice, and I wish the young man would've given you this, 'cause it's on
there.  So, I wanna tell you this ver--this much, that, I, as a trained in--
investigator, against discrimination, I find some of these things unacceptable,
these, these bills and the, the manner in which some of the state elected
officials are going to, and it is discriminatory.  I have kids.  I, I, I am a former
(ESO) instructor for the IRCA, the Immigration Reform and Control Act of
1986, the, the Amnesty Program.  And I have a lot of people that, I don't
represent anybody, although I have a lot of following of Veterans.  We have a
new group called, VETS, VETS, V-E-T-S, and we're not supportive of this.
And I, I, I stand by what Senator West said, we will see you at the Supreme
Court.  I told this elected body last Session that we'll take you to court.  I just
got out of the hospital myself.  I had spine and neck surgery, and I can't
speak very well, but I wanted to be here.  My wife said, no, you're not gonna
go anywhere.  Usually, I, I do what my wife tells me, 95 percent of the time.

                                            :     (Laughter)
            PENA               :     But this, (laughter) this time, I can't.
How can I allow this to go, as--forward as, it is discriminatory.  Senator
Duncan, I respect you.  I, I met your, your, your people in office, y'all, y'all
welcome me very, even though I'm a Democrat, you know, we're cool, y'all
cool, but th--I cannot le--allow this t--

                                            :     (Laughter)
            PENA               :     --(laughter) allow this, and I say
respectfully, allow this to continue to occur.  You know, it's discriminatory.  I
have a lot of people, and I had to bring my notes, because I came from
Brackenridge Hospital, they just did X-ray, but the issue is this, how can we
stand for this to continue?  You mentioned back in the '90s, I understand
that, but we're in 2013 and discrimination is rampant.  You know, I'm here,
and a native of East Austin, and I cannot allow this to occur.  I'm gonna keep
it short, because really, I'm not prepared, but I'm on heavy medications,
Dilaudid, I'm not supposed to be here.  But the issue is this, we will see you
in the Supreme Court.  It's still highly discriminatory.  That's why I'm here.
And to say all four of these, some of these are discriminatory and not
acceptable to us, your Honorable Senators.  Thank you very much for
allowing me the time--
            WEST               :     Mr.--
            CHAIRMAN          :     Thank you for your--
            WEST               :     --Mr. Chairman--
            CHAIRMAN          :     --testimony, Mr. Pena.  Senator West.
            WEST               :     --Mr. Pena, is discrimination by the
Democratic Party or the Republican Party any different?
            PENA               :     Uh--w--w--
            WEST               :     It's still discrimination, (right)?
            PENA               :     --it's still discrimination, the way you

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

11

describe it, I'll tell you what, and I mean no disrespect to any party, but, we, in the Democratic Party, we're tryin' to do more for the people, and in my opinion, that it's more appropriate, more acceptable, and I'll tel·-y·-a lot of immigrants are angry and they said, Mr. Pena, we represented, I said, no. And to answer your question wi·-along with the answer·-

| | | |
|---|---|---|
| WEST | : | Discrimination is discrimination? |
| PENA | : | ·-yes, Sir. |
| WEST | : | All right, thank·- |
| PENA | : | The D·- |
| WEST | : | ·-you. |
| PENA | : | ·-is a D and I hate the Ds.  Either way |

you look at it, discrimination an·-and it's not acceptable.

| | | |
|---|---|---|
| WEST | : | Thank you. |
| CHAIRMAN | : | Thank you for your testimony.  Thank |

you·-

| | | |
|---|---|---|
| PENA | : | Thank you·- |
| CHAIRMAN | : | ·-for your·- |
| PENA | : | ·-Sir. |
| CHAIRMAN | : | ·-service.  Any other questions of Mr. |

Pena?

| | | |
|---|---|---|
| | : | Thank you (inaudible, overlapping |

conversation)·-

| | | |
|---|---|---|
| | : | Thank you, Sir. |
| CHAIRMAN | : | 'Kay.  The following have turned in |

cards to testify on Senate Bill 1.  Marion Mlotok.

| | | |
|---|---|---|
| | : | Oh, that's fantastic.  You're the first |

one·-

| | | |
|---|---|---|
| CHAIRMAN | : | Well, you hear that, Mr. Chairman. |
| SELIGER | : | I, I heard that. |
| CHAIRMAN | : | Keith Ingram and Mike Dominguez. |

If y'all would come forward?

| | | |
|---|---|---|
| | : | (Inaudible, background conversation) |
| | : | You were filled in before the |

(inaudible, background conversation)·-

| | | |
|---|---|---|
| CHAIRMAN | : | M·-Ms. Mlotok, you can go ahead. |
| MLOTOK | : | Thank you for the opportunity to |

testify.  My name is Marion Mlotok and I live in Austin.  How do the words to that song go, there's a problem right here in River City?  I w·-w·-was just about going blind last night looking at the maps, and I'm talking particularly about the US Congressional map.  There's like these snakes on the warpath is how the maps look like for Austin.  Austin's and Travis Con·-County, Austin's divided into six districts.  We have enough population to be one compact district, plus, maybe another little bit, with some other compact area next to it, and we have one district that snakes all the way over to Houston. Another two different districts that snake down to San Antonio.  Another

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

12

district that snakes up to Fort Worth, and one that stops, I think, just short
of Laredo, and another one that's part of 31 in Williamson County.  What
that amounts to is that Austin, with a population of almost 800,000 and the
11th largest city in the country, does not have a representative in the US
Congress.  We've been divided into six different districts.  I have, I think,
Lamar Smith as my Representative, but I still tell Lloyd Doggett, whenever I
communicate, that he's really still my Representative, because, like Doggett,
is really the Representative for Austin.  You folks have been here often
enough and long enough to know that Austin is really different than the rest
of Texas, it's not the same.  We vote differently, we think differently, we
behave differently and we need our own representative.  When we talk about
a, a perfect map, we don't have a perfect map here.  We have, in relation to
Austin, and I'm not talking about the minority issues, which I find important,
but I haven't examined the map from that perspective.  Given that, we had
very short notice.  I'm a political junkie, as well, so I found out about this
hearing, but most people had no idea this hearing was happening, and I
found out about it because i--of House Democrats.  N--Nobody mentioned that
the Senate was also having a hearing, so I just accidentally sort of found out
that the Senate was also having a hearing, and then I start--stayed up until
about 3:30 last night, looking at all the maps, and looking at the bills, and
looking at what they said--

CHAIRMAN          :     Ms. Mlotok, I hate to cut off witnesses,
but your--you wanna wrap up your comments.

MLOTOK          :     --yes.   I would like to see field
hearings.  I would like to see the maps completely withdrawn.  I don't accept
any of these maps.  Thank you.

CHAIRMAN          :     Very well, thank you so much.  Are
there any questions of this witness?  Thank you.  Mike Dominguez.

                        :     Hi.

                        :     (Inaudible, background conversation)

DOMINGUEZ          :     Hi.  Mike Dominguez.  Travis County
Republican Party, Director of Special Projects.  Just thank you, Senators, for,
for having me here today.  Just wanted to say that I do believe that dis--
crimination is discrimination regardless of party.  Austin, being the 11th
largest city in the United States, the demographics have changed.  I am in
favor of SB 1, and just wanted to make my voice heard today.  So, thank you
for hearing.

CHAIRMAN          :     Thank  you,  Mr.  Dominguez.   I'm
gonna change your card to oral testimony.  I think you had checked not
testifying.  If that's okay with you?

DOMINGUEZ          :     Yes, Senator, thank you.

CHAIRMAN          :     Okay.   Is  there  anyone  that  h--
questions of Mr. Dominguez?

ZAFFIRINI          :     Mr. Chairman.

CHAIRMAN          :     Senator Zaffirini.

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

13

| ZAFFIRINI | : | You say you were for or against? |
| DOMINGUEZ | : | For. |
| ZAFFIRINI | : | For Senate Bill 1? |
| DOMINGUEZ | : | Yes, Ma'am. |
| ZAFFIRINI | : | Thank you. |
| CHAIRMAN | : | Any other questions?  Thank you, Mr. |

Dominguez.  Now, we have Keith Ingram, Director of Elections Division, on
the bill.  Are you gonna testify, Mr.--

|  | : | I'm available to answer any questions |

y'all have.  If I were to testify, I would, I would plead, plead, plead for y'all to
go quickly--

| CHAIRMAN | : | --I guess you-- |
|  | : | --have everything in place-- |
| CHAIRMAN | : | --just testified. |
|  | : | --(by) September 1st. |
|  | : | (Laughter) |
| CHAIRMAN | : | Before September 1st? |
|  | : | Yes, Sir. |
| CHAIRMAN | : | Okay. |
|  | : | Want (him) to just register (inaudible, |

background conversation)--

| CHAIRMAN | : | Any questions of Mr. Ingram with the |

Secretary of State's Office?  Great, thank you.  Dr. Rosemary Edwards, M--
shh--Ms., Dr. Edwards here?  Okay, I have the card.  She's for the b--bill,
Senate Bill 1.  She's registering the position not testifying.  She's the
Chairman of Travis County Republican Party.  She did not testify.  Is there
anyone else that wishes to testify on, for, or against Senate Bill 1?  Okay,
Ma'am, come on down.

|  | : | That's actually testimony for Senate |

Bill 1, 2, 3, 4.

| CHAIRMAN | : | Ma'am, did you fill out a card? |
| VASQUEZ | : | I did. |
| CHAIRMAN | : | Okay, and your name, please. |
| VASQUEZ | : | Celina Vasquez. |
| CHAIRMAN | : | Ms. Vasquez.  And are you testifying |

on Senate Bill 1--

| VASQUEZ | : | Um, yes-- |
| CHAIRMAN | : | --or all four? |
| VASQUEZ | : | --I, actually, the congressional and the |

Texas House Redistricting bills, please.  Good morning--

| CHAIRMAN | : | Hold on-- |
| VASQUEZ | : | --Mr. Chairman. |
| CHAIRMAN | : | --one second.  I'm sorry, if you don't |

mind.  Let me see if I have your card.

| SELIGER | : | Is he gonna testify too? |

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

14

| | | |
|---|---|---|
| CHAIRMAN | : | He says yes, okay. |
| | : | (Laughter) |
| CHAIRMAN | : | So, is it, it's Celina Vasquez. |
| VASQUEZ | : | Yes. |
| CHAIRMAN | : | Okay, you may proceed. |
| VASQUEZ | : | Thank you.   Good morning, Cha-- |

Chairman and Members of the Senate Select Committee on Redistricting. My name is Celina Vasquez. I am the mother of five-year-old (Diego Fernando) Vasquez. We drove this morning from Tarrant County and we're very excited to be here with you all. I am also a wife and a government teacher at th--a local community college in North Texas, and a community activist. I could no longer sit at home and follow the c--proceedings, and was compelled to weigh in on this important issue that is going to affect my son, Diego, through his educational development from (kinnegarden) (sic) through 8th grade. The following are the reasons why we oppose SB 1 and the congressional and the Texas House redistricting bills. Redistricting will determine the State's political boundaries for the next 10 years, and my son's interests on the most important issues related to his development. The interim maps discriminate and should not be adopted. As the mother of a bilingual, bicultural child, my son deserves advocates who are culturally competent and that reflect the demographic changes occurring in our community. The legacy of Latino political exclusion in Tarrant County is so pervasive that it has affected the way Latinos and Latino candidates are perceived by non-Latinos, but also by the way Latinos perceive their own ability to participate in the political process. As a government teacher, we talk about voting as the most fundamental right, and our Legislatures should never suppress our right, or limit the ability of any Texan, Latino, minority or not, to participate in the political process. Again, we believe, I believe, as a community activist, a mother, and a government teacher, that these interim maps discriminate and should not be adopted. I hope that the Committee strives for fair and legal redistricting maps that reflect the diversity of our growing state and of our region in North Texas. I thank you, Mr. Chairman, and thank you, Committee Members for all of your hard work this week. We know that it's a difficult task, but again, I'm here this morning, left at 4:00 o'clock in the morning from Fort Worth in Tarrant County with my son, because we believed this issue was important enough for us to be here. Thank you.

| | | |
|---|---|---|
| CHAIRMAN | : | Thank you, Ms. Vasquez. And, just to |

be clear, on your card, do you want me to list 1, 2, 3 and 4?

| | | |
|---|---|---|
| VASQUEZ | : | Yes, that's fine. Thank you. |
| CHAIRMAN | : | Are there any questions of Ms. |

Vasquez? And we appreciate you making the trip with Diego.

| | | |
|---|---|---|
| VASQUEZ | : | Thank you. |
| CHAIRMAN | : | Thank you. |
| VASQUEZ | : | Thank you for having us. |

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

15

     CHAIRMAN          :     Okay. As a resource witness, we have Keith Ingram, Director of Elections Division, Secretary of State. He says we need to hurry up. We have Dr. Rosemary Edwards for the bill, not testifying, the Chair of the Travis County Republican Party, that's for Senate Bill 2. An--Anyone else that wish t--to testify on, for, or against Senate Bill 2? And, if not, we'll move on to Senate Bill 3.

                               :     (Inaudible, background conversation)

     CHAIRMAN          :     Keith Ingram on the bill for Senate Bill 3, the resource witness, Director of E--Elections Division, Texas Secretary of State. Any questions of him? Dr. Rosemary Edwards, for the bill, not wishing to testify. She is the Chair of the Travis County Republican Party. Anyone else that wishes to testify on, for, or against Senate Bill 3? Chair sees none, we will move on to Senate Bill 4. We have Marion Mlotok.

                               :     I think I (inaudible, not speaking into the microphone)--

     CHAIRMAN          :     And I have a card then, that you are against the bill, not wishing to testify, that correct? John-Michael Cortez. Mr. Cortez, if you'd come forward. We have Deece Eckstein. Deek (sic), if you'd come forward, Deece, if you'd come forward. As they're coming down, we have Keith Ingram on Senate Bill 4 as a resource. He is the Director of Elections Division for the Texas Secretary of State. And, also, Dr. Rosemary Edwards, not wishing to testify on Senate Bill 4. She is for the bill, she is the Chair of the Travis County Republican Party. And if there's anyone else that wants to testify on Senate Bill 4, please, fill out a card and bring it forward. We will start Deece, next time, we'll start with you.

     ECKSTEIN          :     Thank you, Chairman Uresti. Chairman Seliger, Members of the Committee--

                               :     (Background noise)

     ECKSTEIN          :     --thank you very much for the opportunity to visit with you this morning. I--I'll be very brief, my remarks. There's a--

     CHAIRMAN          :     Can you--

     ECKSTEIN          :     --one--

     CHAIRMAN          :     --identify yourself one more time--

     ECKSTEIN          :     --right.

     CHAIRMAN          :     --and who you represent?

     ECKSTEIN          :     I'm Deece Eckstein. I'm the Intergovernmental Relations Officer for Travis County and I'm here testifying on behalf of the Travis County Commissioners Court. We have a handout that I passed out to you, and the Commissioners Court has adopted a position that we, that it supports redistricting plans that meet three criteria. One, it respects the one person, one vote Constitutional standard. Two, it respects the integrity of Travis County, as a community of interest, as much as possible. And, three, it preserves the right of Travis County minority voters to joining coalition with other like-minded voters to elect the

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

16

candidates of their choice.  Unfortunately, the Congressional Plan, Plan C235, as contained in Senate Bill 1 and Senate Bill 4, does not meet that test.  P--Plan C235 divides Travis County into five different congressional districts, and in none of those districts, do Travis County voters make up, have sufficient numbers to determine the outcome of an election. In fact, in none of those districts do Travis County voters become 35 percent or more of the population of that district.  So, the effect of that is that Travis County really cannot control the outcome of any congressional election.  Now, I've had people tell me, oh, my gosh, you're so lucky, you have five congresspeople to, to work for you.

                               :   Hum.

ECKSTEIN          :   And unfortunately, it just doesn't work that way.  I gi--Senate Estes, I know you agree with that, with that thought. We do have good congresspeople representin' Travis County, and we're glad of that, but none of them have Travis County as an anchor, or as a place that is really their base.  And what happens?  Well, uh--Senator, excuse me, Representative Bill Flores, who represents Waco, and parts of Central Texas, is a part of our congressional delegation.  He's on the Veterans Affairs Committee and when he's making decisions about placement of Veterans' clinics, or giving input about that, he's probably worried more about the people in McLennan County than he is about the people in Travis County, and so on down the line.

                               :   (Uh-hum.)

ECKSTEIN          :   S--S--Chairman Lamar Smith is Chairman of the Science and Technology Committee in the US Congress. Science and technology's (sic) a big part of what we do here in Travis County, but when he's making decisions about allocation of resources, funding grants and so forth, not, an--I--not just makin' decisions, but giving input, he's probably thinkin' about Bexar County more than he's thinkin' about Travis County, and so on down the line.  So, the point we wanna make to you is that we believe that the, th--the maps are defective in that take Travis County, which is one of the, the fifth largest county in Texas.  The City of Austin, which we now know is the 11th largest city in the country, and divide it up, and, and frankly, deprived of congressional representation.  We think that's unfair, we think that some--that we hope the Legislature will address in this process moving forward.  I'm happy to answer any questions you have.

CHAIRMAN          :   Thank you, Sir. Senator West.

WEST               :   S--thank you very much, Mr. Chairman.  And, maybe you can get back with me on this, Austin is now the 11th largest city in the country.

ECKSTEIN          :   Yes, Sir.

WEST               :   As it relates to the, the 10 that are ahead of Austin, do they have a congressional district that's 50 percent or more that's anchored in, in the main city of that county?

ECKSTEIN          :   I can't speak to the, to the other ones

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

17

that are outside of the State of Texas (inaudible, overlapping conversation)--

WEST                    :   I'm talkin' now--

ECKSTEIN               :   --(I know) (inaudible, overlapping conversation)--

WEST                    :   --I'm talkin' about in the State of Texas.

ECKSTEIN               :   --but the ones that are here in Houston, a--a--obviously, the City of Houston, the City of Dallas, and the City of San Antonio are all larger than the City of Austin here in the State of Texas.  And all of them, the counties that are in, at least, anchor at least one congressional district.   In the case of Harris County, it anchors five congressional districts.  Dallas County anchors three congressional districts, and Bexar County anchors two congressional districts.

WEST                    :   A--A--As it relates to previous elections, did Travis County have a congressperson that was anchored in Travis County?

ECKSTEIN               :   Yes, Sir.   Until this, until this redistricting go-round, tra--tr--the majority of the district that was previously represented by Congressman Lloyd Doggett was in Travis County, and, in fact, going back, you know, several generations we have a cong--all the way back to Congressman Lyndon Johnson, Austin and Travis County had been the anchor of a congressional district.

WEST                    :   And, as it relates to the three prongs that you talked about here, respect one person, one vote, respect integrity, Travis County preserves the right of Travis County minority voters--

                         :   (Inaudible, background conversation)

WEST                    :   --did that his--wer--were those three criterion--

                         :   Hum.

WEST                    :   --respected previous, prior to the 2011 maps?

ECKSTEIN               :   We believe they were, Senator.   And, we believe that in the current map, at least criterion two and three are not respected.

WEST                    :   Okay, thank you.

CHAIRMAN               :   Senator Estes.

ESTES                   :   Hi, Deece.

ECKSTEIN               :   Senator, good morning.

ESTES                   :   I've known you a long time, hadn't I?

ECKSTEIN               :   Yes, Sir.

ESTES                   :   Not followin' your logic, but you're saying, you think that anyone of these five congressmen (dudn't) (sic) care about Austin and Travis County, because it's not the majority of their people.  Do you have any empirical evidence that any congressman ever saying, I really don't care about Travis County, 'cause I live in Waco, or I live

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

18

wherever?

ECKSTEIN             :     No, I don't‑‑

ESTES                :     (What)‑‑

ECKSTEIN             :     ‑‑Senator.

ESTES                :     ‑‑you know, to me, you're, you're makin' a broad accusation there that dudn't have any fa‑‑have any facts behind it, in my opinion.

ECKSTEIN             :     Senator‑‑

ESTES                :     Uh‑‑

ECKSTEIN             :     ‑‑th‑‑le' me (sic), le' me, let me be clear, I'm not a‑‑

ESTES                :     ‑‑did I think (up)‑‑

ECKSTEIN             :     ‑‑I'm sorry (inaudible)‑‑

ESTES                :     ‑‑they probably don't care about us, 'cause, you know, they've got other people in other places. I just, I'm just not followin' your logic. I‑‑you know, we can have the debate about whether you should have five congressmen or just one all day long, a‑‑frankly, there's advantages and disadvantages on both sides, but just to sit there and say, categorically, they don't care about a part of their district, I think, is judging their motives in a most unfair way.

ECKSTEIN             :     ‑‑and I do not mean to suggest they don't care about a part of their district. I mean to suggest that like any smart politicians, they are aware of where their voters are, they're aware of what constituencies help get them into office, and help keep them in office, and they are bound to be influenced, a‑‑at some level, at least, Senator, by considerations of where the po‑‑populations concen‑‑concentrations are in their district.

ESTES                :     And you‑‑you see no benefit to having five individual voices in al‑‑in all different areas of the federal government, that have representation here? I mean, there's n‑‑there's no benefit to havin' five?

ECKSTEIN             :     I think there's more benefit in having one‑‑

ESTES                :     That's fair.

ECKSTEIN             :     ‑‑whose primary concern is the people of our community.

ESTES                :     But show me empirical evidence where any congressman, Republican or Democrat, has said, I don't really care that much about Travis County, 'cause they're not the largest part of my district, i‑‑‑it doesn't exist, I don't think.

ECKSTEIN             :     I don't think it exists.

ESTES                :     'Kay, thank you.

CHAIRMAN             :     Any other questions of this witness?

ZAFFIRINI            :     Mr. Chairman.

                     :     Couple of questions.

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

19

CHAIRMAN : Senator Zaffirini.
ZAFFIRINI : Thank you, Mr. Chairman. Mr. (Epstein) (sic), you testified about the congressional map--
ECKSTEIN : Yes.
ZAFFIRINI : --which divides Travis into five districts, but you didn't say anything about the Senate map, which divides Travis into four districts. Do you have an opinion about that?
ECKSTEIN : The Commissioners Court does not have an opinion about that. As with our congressional delegation, we're delighted to have some very strong members in our senatorial delegation here, including yourself, and Senator Fraser. But the Court does not have an opinion as to the con--as to the State Senate map as con--tr--contrasted with the congressional map.
ZAFFIRINI : But there you do have the anchor in one district.
ECKSTEIN : Yes, we do.
ZAFFIRINI : So that would be the main--
ECKSTEIN : And that--
ZAFFIRINI : --difference--
ECKSTEIN : --changes.
ZAFFIRINI : --perhaps?
ECKSTEIN : Right. That changes the calculus of the Court.
ZAFFIRINI : You have the anchor in one of the four senatorial districts, but not in the other three.
ECKSTEIN : That's correct.
ZAFFIRINI : Thank you. Thank you, Mr. Chairman.
CHAIRMAN : Senator Garcia.
GARCIA : Um, just to follow what I consider was, actually, part of the question I was gonna ask is, you, you, you talked about SB 1, which is really all, all of the maps in SB 4. But you really, the Commissioners Court only has taken a position on the congressional maps.
ECKSTEIN : Yes, Ma'am.
GARCIA : And has the Commissioners Court suggested an alternative map, or suggested any amendments to anybody?
ECKSTEIN : Travis County is a litigant in the litigation down in San Antonio, wi--with respect to the Section 2 preclearance of the maps. And our, our contributions, if any, with that, in that, in that respect, are being done in that venue.
GARCIA : So you--
ECKSTEIN : But I don't think we proposed a distinct Travis County map.
GARCIA : --there, is there a, a particular plan that you all favor of all the maps that have been, that are in the record,

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

20

'cause, as you know, we adopted all the record from the previous hearing, so is there a map that you all preferred?

ECKSTEIN             :    I don't have that in front of me, if, if there is one, Senator. I'd be happy to respond to you--

GARCIA               :    Well, if you would--

ECKSTEIN             :    --if          (inaudible,       overlapping conversation)--

GARCIA               :    --'cause I would be interested, 'cause if, obviously, you're not happy with SB 4--

ECKSTEIN             :    --right.

GARCIA               :    --I would like to see just what y'all would recommend, or what alternative you might propose.

ECKSTEIN             :    I'll be glad to get back with you on, with the Members of the Committee about that.

GARCIA               :    Right, but, but your, but your whol-- the whole point of your, your complaint is about Travis County itself, and it has, not with respect to minority representation, or any other community of interest?

ECKSTEIN             :    Our, our concern at this point is with the, the fracturing of Travis County into five different districts, and none of which Travis County voters have an opportunity to really decide the outcome of an election.

GARCIA               :    All right, thank you.

CHAIRMAN             :    Any other questions of this witness? Thank you, Deece. Mr. Cortez, I guess you gotta wrap it up. Identify yourself and who you're with.

CORTEZ               :    Many thanks, Senator.  Again, my name is John-Michael Cortez, and I'm here representing myself, but will draw upon my perspective as a resident here of Travis County, specifically of East Austin here, just on the other side of the highway.  And also, as a longtime community, and public servant, and a local elected official.  I would like to start by saying that I applaud Senator Seliger's statements earlier about his intent to ensure that this is an open and transparent process, that there will be more hearings.  I would also implore the Committee to ensure that there are some field hearings held, because th--the, the process, as it stands now, is, is far from ideal.  It concerned me greatly that this Senate hearing was called with less than 48-hours' notice and the House had not much more notice than that.  The timing seems to not be designed to really encourage public input, and even more concerning, of course, as has been mentioned, that the limited scope of the Governor's call to consider legislation, which ratifies and adopts the interim redistricting plans, does not appear to leave any room to entertain anybody else's point of view.  It seems to send a clear message that this game is fixed.  It does not suggest that there is meaningful or fair consideration of ideas to improve representation of all Texans, specifically minority Texans.  And, more pointedly, and for my own

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

21

part, it seems to be a process that is designed to accommodate, which has become a new Texas tradition of denying myself and my neighbors of all ethnicities, socioeconomic statuses, etcetera, the ability to come together and elect a representative of our choice. Hastily making the San Antonio Court's interim congressional plan the permanent plan should be rejected out of hand. The San Antonio interim plan was issued several months before the DC Court unanimously denied preclearance based on the extensive record of intentional discrimination and retrogression. The DC Court wrote that there was more evidence of (discriminory) (sic) intent than we have space or need to address here. When the San Antonio Court issued an interim map, it made clear that its order was not a final ruling on the merits of any claims asserted by the plaintiffs in this case, or any of the other cases consolidated with this case. It is highly likely that the San Antonio Court would not have drawn the interim plan at a consideration today, as it did, if it had the benefit of the unanimous DC Court ruling that rejected the State map, from which the interim map is largely drawn. The DC Court ruling denying preclearance found legal problems with specific aspects of the 2011 enacted plan that were incorporated into the 2012 interim plan. In other words, the interim congressional map retains many of the characteristics of the discriminatory map rejected by the DC Court. None of these legal flaws would be remedied by a legislative adoption of this interim plan for Congress, which really seems to be the intent of the Governor's call of this, for this Special Session. The DC Court found--

CHAIRMAN                 :     (Inaudible, overlapping conversation) I'm, I'm sorry, I need you to go 'head and wrap up your comments.

CORTEZ                   :     --the DC Court found that intentional racial discrimination in, in the process of enactment, the public, minority legislators and Members of Congress seem to be, have been entirely frozen out of the process of developing the map and left with no input. So, I, I would just wrap up by saying that rushing passage of this interim map is, certainly, not in, in our interest here in, in my local community, and I do not believe it's in the best interest of the State as well.

CHAIRMAN                 :     Any questions of Mr. Cortez?
SELIGER                  :     (I do.)
CHAIRMAN                 :     Senator Seliger.
SELIGER                  :     Mr. Cortez, you said that there was barely 48-hours' notice to this, for this hearing, correct?

CORTEZ                   :     Well, I, I certainly didn't have 48 hours' notice, but perhaps--

SELIGER                  :     Or, do you insist that you should be notified personally about a hearing?

CORTEZ                   :     --no, but the notification should be made in such a fashion, I think it's been expressed by others, in such a fashion that the average citizen would have sig--the significant, or adequate enough notice to be able to make arrangements. Fortunately, I have the

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

22

means and the wherewithal to be here this morning, but I know many of my neighbors (did not)--

SELIGER            :   But since your testimony was that there was barely 48 hours, and when the announcement was made at about 5:30 on Monday, and, and Thursday, at 9:00 is about 62 hours, your statement was false?

CORTEZ             :   I, I suppose it was, if that is, indeed, the case. It was a federal holiday, so I doubt many folks, including myself, were watching the postings. So, I would retract that if that is, is a, is a true statement.

CHAIRMAN           :   Senator--

CORTEZ             :   But I--

CHAIRMAN           :   --West.

CORTEZ             :   --I would stress that legal notice is not the same as adequate notice.

CHAIRMAN           :   Senator West.

WEST               :   A--a cup--a coupla questions.  The greatest increase in Texas population durin' the last census was ethnic minority, is that correct?

CORTEZ             :   That's my understanding, Sir.

WEST               :   (Right), an--an--and to the extent that you do not agree with what I'm about to say, obviously, I don't think you'll have a problem saying that you do not agree, but if you do agree, make, make it known by purposes of the record, okay.

CORTEZ             :   Yes, Sir.

WEST               :   You agree with me that the greatest increase in population in the State of Texas was the ethnic minorities in the State of Texas.

CORTEZ             :   Yes, Sir.

WEST               :   You agree with me that the greatest number of individuals that are in p--poverty pro rata would be ethnic minorities, would you--

CORTEZ             :   Yes--

WEST               :   --agree with that?

CORTEZ             :   --Sir.

WEST               :   Would you agree with me that the mo---that the greatest number of Texans that are transit dependent are ethnic minority, would you not?

CORTEZ             :   Yes, Sir.

WEST               :   Okay.  Would you agree with me that given the fact that if the greatest increase was in the ethnic minority population in the State of Texas, that ethnic minorities are transit dependent, then, in order for government to really be responsive to the, to the needs of those ethnic minorities, specifically, getting input to them, then y-- sh--you should take government to where those people are, is that correct?

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

23

CORTEZ : Absolutely.

WEST : You would agree with me that most of those individuals that I just mentioned are in urban centers and also in South Texas, is that correct?

CORTEZ : Many of them, yes, Sir.

WEST : You would agree with me that based on the postings that you've heard about, as it relates to where these hearings will be held, as of today, all of them are in Austin. Would you?

CORTEZ : That's what I heard earlier today (inaudible, not speaking into the microphone)--

WEST : Okay. Would you agree with me that by having all of the hearings in Austin, that it virtually makes it impossible, save and except, written testimony for those Texans that represent the great majority of the increase in the population in the State of Texas, will have an opportunity to participate in the dis--discussion that we're having about redistricting?

CORTEZ : I would agree with that.

WEST : Thank you.

CHAIRMAN : (Well), any other questions of Mr. Cortez?

GARCIA : Um--

CHAIRMAN : Senator--

GARCIA : --no, but--

CHAIRMAN : --Garcia.

GARCIA : --I have a couple of questions and point of clarification about the posting.

CHAIRMAN : Of Mr. Gar--of Mr. Cortez, or Senator Seliger?

GARCIA : Yea--of, of--

CHAIRMAN : Okay, will you hold on--

GARCIA : --the author.

CHAIRMAN : --one second.  Or let me, I wanna excuse the witness, (or), if there are no other questions of Mr. Cortez. Very well.  Thank you two, gentlemen, for being here. Senator Garcia.

GARCIA : Thank you.  Senator Seliger, when was the hearing posted and the time for the hearing on the Texas Legislative online Web site?

SELIGER : Um, I--I'm not advised.  The announcement was made at 5:30 on Monday.

GARCIA : Well, I know it was announced on the Senate Floor, so, unless somebody was watching us, they probably d--couldn't, they probably h--got no notice.  But, Mr. Chairman, I'd like to find out exactly when it was pos--es--posted for public notice on the Legislative Web site.

SELIGER : Are you interested, also, in knowing

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

24

when it was revealed by media in Travis County, and, and elsewhere, that there was going to be a hearing?

GARCIA : Absolutely.

SELIGER : Okay.

GARCIA : And, how was your community informed, in addition to post it on the Web site about the hearings for today, and how will they be notified of the two subsequent hearings that you have announced this morning?

SELIGER : I'm not advised on the ways that the public is advised.

GARCIA : Who is advised? Your staff, or, I mean, who--

SELIGER : Well, th--the--

GARCIA : --I--

SELIGER : --news media will do what they will do. The posting will be made by the, the Senate, as is required by law.

GARCIA : --but who actually does it? I, I just don't know. I'm asking, 'cause this is the first time I've been through a hearing, so--

SELIGER : I, I think you would be well-advised to ask the Senate office how they advise and form and post such a notice, and you can ask the media how they, how they intend to run it on the news.

GARCIA : --okay, are you advised as to where the meetings will be? Will they be here in this room at the same time as today or--

SELIGER : I, I cannot inform you as to where the meeting will be (clears throat) the hearing will be, th--where we are going to join the House on Saturday. I assume House Appropriations. Ah, the Senate meetings, unless there is a change, we'll have them in this room.

GARCIA : --both the one for the 6th and the 12th?

SELIGER : Th--That's the tentative plan right now.

GARCIA : All right. Thank you, Sir.

CHAIRMAN : The Chair would like to recognize the presence of Senator Williams, by the way, and we have a card from Linda Magid, who is against the bill. Is she still here?

: (Yes, Sir.)

CHAIRMAN : Okay, um, you didn't mention which bill number. Is there a particular bill number, or all bill--all four (of 'em).

: All four (inaudible, not speaking into the microphone)--

CHAIRMAN : All four bills?

: (Inaudible, background conversation)

CHAIRMAN : If you, (if) it's okay, I'm gonna put that

TEXAS SENATE STAFF SERVICES
RJM:jw:jfs/337/RD053013CD1SII/053013
83RD LEGISLATIVE SESSION, FIRST CALLED
SENATE SELECT COMMITTEE ON REDISTRICTING
MAY 30, 2013
COMPACT DISC 1, SECTION II

25

on your card.  Senate Bill 1, 2, 3, and 4.  She's rec··i··representing herself.
Now, is there anyone else that wishes to testify on, for, or against either
Senate Bill 1, Senate Bill 2, Senate Bill 3, Senate 4, or all (the) Senate bills?
Chair sees none, we're gonna close public (gavel) testimony and, Mem··
Senator, are there any··

| | | |
|---|---|---|
| WEST | : | Uh·· |
| CHAIRMAN | : | ··Senator West. |
| WEST | : | ··uh, I was wonderin' whether Ms. |

Perales had response to··

| | | |
|---|---|---|
| | : | Uh. |
| | : | (Senator.) |
| | : | (Laughter) |
| CHAIRMAN | : | Ms. Perales, if you'll come forward, |

please, for the third time.

PERALES                    :    Thank you for the opportunity.  Thank
you for the opportunity.  We are currently searching the DDC opinion, and
haven't found it yet.  I have a really smart intern from Harvard who's
working on it very hard.  Yes, Senator··

| | | |
|---|---|---|
| | : | (Inaudible, background conversation) |
| PERALES | : | ··you know the young man in question. |

We will find it if it's in there.

| | | |
|---|---|---|
| WEST | : | All right, thank you. |
| CHAIRMAN | : | Thank you.  Um, by the way, is |

anyone from the Attorney General's Office here to answer any questions?
Chair sees none.  Okay, I have four more cards from Cynthia F··Flint,
representing herself on Senate Bill 1, 2, 3, and 4, and she is against those
bills.  Members, with that, the S··Senate Select Committee on Redistricting
will stand in recess, pending the call of the Chair.  (Gavel)

| | | |
|---|---|---|
| | : | Thank you. |
| | : | (Wasn't) that funny? |
| | : | Yeah. |
| | : | (Enforce that.) |
| | : | Yeah. |
| | : | (Inaudible, background conversation) |
| | : | (Be sure.) |

END OF MEETING