# EXHIBIT 6-G

# SENATE JOURNAL

## EIGHTY-THIRD LEGISLATURE — FIRST CALLED SESSION

### AUSTIN, TEXAS

### PROCEEDINGS

### ADDENDUM
(SECOND DAY CONTINUED — Friday, June 14, 2013)

### REMARKS REGARDING SENATE BILL 2 AND SENATE BILL 4 ORDERED PRINTED

#### Remarks Regarding Senate Bill 2

The following remarks regarding **SB 2** were ordered reduced to writing and printed in the *Senate Journal:*

**Senator Seliger:** Thank you, Mr. President. Senate Bill 2 is the first of three redistricting bills. With the indulgence of the Senate, I would like to comment before I lay out the bill, that everyone on this floor has been very patient. The Members, the 15 Members of the Committee, Republicans and Democrats, really knocked themselves out to be active participants and to go on the road and to take the discussion of redistricting to the State of Texas, along with our colleagues in the House of Representatives, and I appreciate that very much. And the exchange has been a very good and valuable one. Senate Bill 2 ratifies and adopts the Senate plans, the map is S172, used for the 2012 election cycle that was ordered by the three-judge panel from the United States District Court for the Western District of Texas, in the Davis and Perez lawsuits. The court retained 27 of the 31 districts passed in the state's enacted plan, and the remaining districts were changed with the agreement of plaintiffs and defendants in the Davis versus Perry lawsuit, primarily related to District 10. In a recently filed joint advisory to the court in San Antonio, the Davis, Veasey, and LULAC plaintiffs all informed the court that there is no claim by plaintiffs that the interim plan for the State Senate violates the Voting Rights Act or the United States Constitution. I believe Senator Zaffirini has an amendment, but she's on phone a friend at the moment.

**President:** Members, I'm going to lay out an amendment by Senator Zaffirini. It's being passed out to you as we speak. The Chair lays out Floor Amendment Number 1 by Senator Zaffirini. The Secretary will read the amendment.

**Secretary of the Senate:** Floor Amendment Number 1 by Zaffirini, West, and Ellis.

**President:** Chair recognizes Senator Zaffirini to explain the resolution.

**Senator Zaffirini:** Thank you, Mr. President. Mr. President and Members, this amendment simply removes a section that would direct itself to legislative findings that the interim maps are in compliance with federal and state constitutional provisions and laws applicable to redistricting plans. It only removes the language and it does not change any part of the bill, and I believe it is acceptable to the author.

**President:** Chair recognizes Senator Seliger on the amendment.

**Senator Seliger:** Thank you, Mr. President. The amendment does just remove a statement on the bill, and a statement that was, probably be effectively replaced by discussion that we've been having on the floor, that would reflect the letter written by the Davis, Veasey, and Perez amendments, I'm sorry, plaintiffs, and it is acceptable to the author.

**President:** Chair recognizes Senator Zaffirini to close.

**Senator Zaffirini:** Thank you, Mr. President. I move adoption.

**President:** Members, you've heard the motion by Senator Zaffirini, is there objection from any Member? Hearing no objection from any Member, Floor Amendment Number 1 is adopted.

**Senator Zaffirini:** Thank you.

**President:** Chair recognizes Senator Seliger for a motion.

**Senator Seliger:** Mr. President, I move passage to engrossment of Senate Bill 2.

**President:** Senator Davis, for what purpose do you rise?

**Senator Davis:** I'd like to make a comment on the bill, if I may–

**President:** You're–

**Senator Davis:** –Mr. President.

**President:** –recognized.

**Senator Davis:** Thank you. Members, as you recall, we're here today having this conversation because the court denied preclearance to the last session's state-adopted Senate plan, having found intentional discrimination in the process used to adopt it. As a result, the 2012 election in District 10 was conducted with the current court-ordered boundaries to protect minority voting rights. It's important to note, however, that since the court's opinion was issued, minority voters in Senate District 10 have again demonstrated their ability to elect their candidate of choice, so that district has now established historical success by demonstration of successfully making that choice in two separate election cycles. The map for Senate District 10 in Senate Bill 2 contains none of the illegal retrogression or other violations of the Voting Rights Act or the U.S. Constitution of the original map as it pertains to the drawing of that district. There is broad agreement among all groups that this plan is fair and legal as it pertains to Senate District 10, and I'm calling on you to adopt the interim State Senate redistricting plan as the final plan. Thank you, Members. Thank you, Senator Seliger.

**President:** Thank you, Senator Davis. Senator Ellis, for what purpose do you rise?

**Senator Ellis:**  Just to make a brief statement, Mr. President, on the bill.

**President:**  You're recognized.

**Senator Ellis:**  Thank you, Mr. President and Senator Seliger.  As I mentioned to you briefly on the floor, I did submit a record to the statement, a statement to the record, but I know y'all haven't seen me in a few days, so, I'll just make a few brief points. And I made these when the initial redistricting came up on the Senate floor at the end of the last session at some point. I'm going to, I voted, I will vote for this plan today, primarily to protect the changes that the court made in Senator Wendy Davis' area. I did not file a lawsuit about my belief that there was retrogression in the Harris County area, particularly in Harris County, because I didn't want to spend a million-plus on legal fees, as Senator Davis did, to get us to where we are today. I think that if I had gotten lawyers to represent me and been willing to pay the legal expenses, that you all would've made some of the changes that I think should be made in Harris County area. As it relates to my district in particular, I think it was packed. And as I understand the Voting Rights Act, it has a negative impact on minority voting strength, both when you crack minorities up in such a way that you dilute their strength, but it is also possible to pack them into certain districts. And we've had such tremendous growth in Harris County, particular, over 1.8 million Latinos, 930,000 African Americans in Harris County and Fort Bend County combined. If you add our Asian Americans and other minority residents in the two counties, overall total is about 3.5 million minorities, compared to 1.5 million Anglos. Under the interim map configuration, which maintains all Senate boundaries as drawn by the Legislature in 2011, every part of the state except the DFW region, those minority residents are packed into three Senate districts and then cracked among several areas, several others. My Senate district has a Black plus Hispanic population of nearly 90 percent, and I'm proud to represent all of them, but I think that their views would be represented even if you didn't have someone representing a district with a 90 percent African American and Hispanic population. Senate District 6 has a non-Anglo population of 88 percent. Senate District 15 has a combined Black, Hispanic population of 72 percent. Obviously, all three districts are overwhelmingly Democratic. The other five Senate districts are very carefully constructed to absorb some minority population, but not too much, certainly not enough to protect the minority voters to elect their candidate of choice. In each of these districts, the combined population is always over 30 percent, but just under the barely 50 percent. In each one, minority voters are overwhelmed by Anglo voters who bloc vote against minority-preferred candidates by design. I'm not going to read all of my statement. I put it into the record, but just to sum it up, I just want to make the case, I think that those districts were in, my district was intentionally packed, so were the others, to dilute the minority voting strength and the power that they would've had in those other districts. I do appreciate the time that the Committee put into having these hearings around the state. I went to the hearing in Harris County. I didn't pack the hearing with a lot of my constituents on very short notice, to go in and make these points, but I can assure you, they are concerned about them. And I just wanted to make sure that I put this in the record. Thank you very much. I will vote for this bill. I do regret that I wouldn't have had the ability to have my voice heard even more if we'd been voting with the two-thirds tradition. But I will vote for this bill.

**Senator Seliger:**  Thank you.

**President:**  Senator Whitmire, for what purpose do you rise, Sir?

**Senator Whitmire:**  I'd like to speak on the issue before us.

**President:**  You're recognized.

**Senator Whitmire:**  Mr. President, Members, Senator Seliger, a lot of recognition for your hard work and transparency, and I think you've done the very best you could under the circumstances. Mr. President, I would like to vote "no" against the Senate plan that we are ratifying today, in protest of the change of the rules, which took place so we can even have this conversation today.  But for a change in the rules, it would be my opinion that we would not be having a special session. So, where I would like to vote "no" in protest, Senator Seliger, I had to place this matter in what I, in my life, I call the greater good test. Even though I'd like to protest us being here in special session for a very political matter that would've not been brought up in a regular session, we're here. So, then, I have to look at the greater good of protesting my vote with a "no," Senator Seliger, or voting for it, which I intend to do, out of respect for each of the 31 Members and the integrity of their districts and the voters that have sent them here for this process. Even though I often don't agree with some of these individual Members, in fact, I do disagree strongly with some Members' positions, I respect the process that got them here, the redistricting process which allowed us to represent over 800,000 people. Particularly, the greater good would be for me to vote to protect those districts and the integrity of the voters' decisions, as it relates to Senator Davis, who, I think, we'd all have to agree, got unusual attention in the redistricting process by this body and, ultimately, the federal courts. I respect the choice of her district and intend to vote to protect those lines, or certainly make that statement confirming those lines, out of respect for her voters in that process. But I have to make a statement that I still strongly disagree with taking up this issue, because, Members, hopefully each of you that have spent one day in this deliberative body knows how important the two-thirds vote is. Senator Patrick, whether it's your education issues, Senator Huffman, whether it's how you use the two-thirds to block some criminal justice issues that you strongly oppose, whether it's an outstanding transportation plan that Senator Nichols has designed, with Senator Williams' assistance in the great budget that represented the diverse views of this body, whether it's going to allow Texans to once and for all have a water plan, the two-thirds plan works and builds consensus on behalf of the people of Texas.  And each time we come into a special session, Mr. President, and we waive that two-thirds, we destroy that two-thirds, we're chipping away at a fundamental procedure that I, after 30 years, know works for the people of Texas. So, where I would like to vote "no" in protest for us being here on a very political, partisan matter, I can vote in good conscience for it because this Senate plan would've passed under a two-thirds rule in a regular session. It was only when we lump it with the congressional and the House that you got the resistance based on a two-thirds rule. So, yes, I'm going to vote for the plan under protest of doing away with the two-thirds because I think it's the greater good for this body and the people of Texas, and I respect the political process that sent each of these 31 Members here from their diverse districts. Thank you.

**Senator Seliger:** I appreciate and respect your views on all of the issues on the floor today, Dean Whitmire.

### Remarks Regarding Senate Bill 4

The following remarks regarding **SB 4** were ordered reduced to writing and printed in the *Senate Journal:*

**Senator Seliger:** Senate Bill 4 adopts the congressional map. The map is C235, used for the 2012 election cycle that was ordered by the three-judge panel for the United States District Court for the Western District of Texas in the Davis versus Perez lawsuits. Subsequently, all three plans were denied preclearance, and the district court's interim plans were proven to be judicious. The interim plans remedy, we believe, the legal flaws found in the federal court in D.C., and it is because of that, that they were implemented, and everyone currently serving Texas in the U.S. Congress was elected. Enacting those plans will help bring a close this chapter of redistricting. They will almost ensure that the ongoing litigation over the redistricting plans will be brought to a swift end and will ensure that the confusion and any delay associated with the 2012 election cycle will not repeat itself, at least, for this decade. And because interim plans only alter the legislatively drawn lines were necessary to fix legal flaws with the agreement of the litigants involved, enacting the interim plans will give effect to the will of the Legislature and the people of Texas. The interim congressional plan addresses the legal flaws found by the D.C. district court, and the D.C. district court denied preclearance because the congressional plan lacked an additional minority district. The interim plan also remedies that legal challenge. The District of Columbia district court also found that the Legislature impermissibly excluded district offices, residences, and certain economic engines from certain existing minority districts. It's important to note at this point that the most recent contact with our Legislative Council to Members of Congress for district offices and residences and things went largely unanswered, and so there's some information lacking because it was not offered. Like other interim plans, the interim congressional plan garnered significant support or lack of challenge from some groups challenging Texas redistricting maps. And it's interesting to note that the Latino Redistricting Task Force, which is made up of a number of Latino advocacy, election advocacy groups, like the GI Forum, like MALDEF, and others, have not contested and have not protested, to the best of my knowledge, this plan.

**President:** Senator West, for what purpose do you rise, Sir?

**Senator West:** Question of the author.

**President:** Will Senator Seliger yield?

**Senator Seliger:** I do.

**Senator West:** Senator Seliger, thank you, first of all, for taking the, realistically, we've gone all over the State of Texas, all except Dallas.

**Senator Seliger:** Yes, Sir.

**Senator West:** And I requested several times to have a hearing in the Dallas-Fort Worth area. Is that correct?

**Senator Seliger:**  Yes, Sir.

**Senator West:**  And you as Chairman, denied that, denied that request?

**Senator Seliger:**  Yes, Sir.

**Senator West:**  Okay. In terms of the San Antonio court, did the court basically say that it would be, this, the interim map was just basically a preliminary determination and it could be revised upon full analysis? Do you recall them saying that?

**Senator Seliger:**  I'm not aware of the court characterizing them as temporary, but as interim maps.

**Senator West:**  Okay, are you familiar with the language then, the court explicitly, does it tell you that its process was expedited and that it was, it was able to make only preliminary conclusions that may be revised upon full analysis? Did anyone inform you of that quote by the court?

**Senator Seliger:**  Not specifically of that quote, but the sentiment that they were, indeed, interim maps, yes, Sir.

**Senator West:**  Had you known that the court had made that statement, would you have looked, done further analysis of the interim maps to see whether or not they comply with the Voting Rights Act, specifically Section 5?

**Senator Seliger:**  That examination and opinion was done largely by the Texas Attorney General, who felt that the court approved these maps because they felt that they were compliant with the Constitution and with Section 2 of the Voting Rights Act.

**Senator West:**  That's the same Attorney General's office that took the congressional map to the D.C. court for preclearance, too.  Is that correct?

**Senator Seliger:**  Yes, Sir.

**Senator West:**  And that, so, and that's the same Attorney General that got the opinion back from the D.C. court that basically said that Texas had engaged in intentional discrimination.

**Senator Seliger:**  That is the same Attorney General's office.

**Senator West:**  Okay, so, we're relying upon that advice, and we've had some good advice from the Attorney General's office on other areas, but we're relying upon that advice that led us to the D.C. court, as opposed to the Justice Department, and we got this opinion back basically saying that Texas has engaged in intentional discrimination.

**Senator Seliger:**  In truth, it's the only Attorney General that we have. And if some of their opinions and decisions are not infallible, then so be it.  But I think that you would agree that's probably true of any attorney or group of attorneys in almost any sort of testimony.

**Senator West:**  I agree with you wholeheartedly.  I've been on both sides of an issue myself, sometimes. But the reality is that given that the San Antonio court made its decision prior to the D.C. court, it seems as though that would've given us pause to

look at exactly what the San Antonio court said about doing a full analysis of the preliminary plan, prior to us passing this partisan plan again. Would you agree with that?

**Senator Seliger:** I think possibly in principle, but I think as time goes by, and there has been further analysis and discussion, I think it's not unreasonable for me to assume that that opinion is better developed now than from the day when the court issued the statement to which you refer.

**Senator West:** Okay, now, just kind of, let's look at Texas' history, as it relates to elections. Okay. Voting rights, the voter ID bill, that's the same Attorney General that is taking on that challenge, right, and basically, the Supreme Court hadn't ruled on that, the same Attorney General that's trying to get Section 5 of the Voting Rights Act set aside.

**Senator Seliger:** Yes, Sir.

**Senator West:** Okay, these are the facts. Alright, now let me ask this. It's your intention, is it your intention on the floor today not to accept any amendments offered by anyone to this preliminary matter?

**Senator Seliger:** If the amendments are not compelled by the Constitution or the Voting Rights Act, it is my intention not to accept them.

**Senator West:** How do we make a determination as to whether or not it's compelled by that, by the Voting Rights Act or the Constitution?

**Senator Seliger:** I think all of the amendments that will be offered on the floor were offered by yesterday, subject to my request, which I appreciate very much, by the way, and have been reviewed by the Attorney General's office and by the Committee counsel and Legislative Council.

**Senator West:** And all of those individuals that have reviewed the proposed amendments have said what?

**Senator Seliger:** They have submitted notes to me based upon the assertions made by changes in the map, whether they are or are not compelled by Section 2, the same sort of advice–

**Senator West:** Section 2 or Section 5?

**Senator Seliger:** –in this case, Section 2, as it relates to the court. I don't have, there are some things related to Section 5 in this, but the primary focus has been the San Antonio court.

**Senator West:** Okay, so, help me understand this. So, the analysis that you have gone by is a Section 2 analysis, not a Section 5 analysis?

**Senator Seliger:** There are some notes here, and I will make some comments based upon Section 5 going forward, but the majority of the analysis has been accorded, has been about Section 2.

**Senator West:** So, if Section 5 is upheld, what impact would that have on your consideration of amendments to this particular map?

**Senator Seliger:**  If Section 5 is upheld by the Supreme Court and this bill passes, it is my understanding that it will have to then be submitted to the court for preclearance.

**Senator West:**  And so, given Section 5 analysis, you feel as though the amendments that would be offered would not be applicable because, that the map would satisfy the Constitution and also the Voting Rights Act, specifically Section 5?

**Senator Seliger:**  Would you say that again, please?

**Senator West:**  Yes, there're amendments that individuals have, frankly, they offered in the Committee and may offer on the floor, in order to make certain that the mandates of Section 5 and the Voting Rights Act are complied with. It's my understanding that what you, based on your previous statement, that you don't intend to accept any of those amendments because you believe that if, indeed, Section 5 is upheld, that the map that you're offering, the preliminary map, comports with the requirements of Section 5 in the Voting Rights Act.

**Senator Seliger:**  Well, that, I think, is what's going to be asserted by our attorneys. I make no such assertion on my own, but I think, right now, references to Section 5 are relevant, certainly, in some context because it is still the law of the land.

**Senator West:**  Okay, and so all of your work, so for purposes of this record, all of your work and stewardship of this particular bill has been done pursuant to current law?

**Senator Seliger:**  Keep in mind also that I don't practice law, and so, has my work been done to apply the law to these, as you would? No, Sir, I can't say that.

**Senator West:**  What would you say then?

**Senator Seliger:**  I would say that I've taken the information given me, as we analyzed each particular amendment and sought that professional advice. Am I compelled, or are we compelled by either Section 2 or Section 5 to allow certain amendments?  I make no legal judgments of my own.

**Senator West:**  Let me make certain I understand this then, that the advice that you've received has been based on making certain that whatever we pass out of this, out of this body, as we have done in other areas, comport with current law.

**Senator Seliger:**  You are asking me how both our Committee counsel and the Attorney General have reached the conclusions that worked our way through notes, I can't answer that. That's for them to answer.

**Senator West:**  Well, I'm asking you how would they have advised you as the Chair of the Committee? That's what I'm asking.

**Senator Seliger:**  I think a lot of that is covered by attorney-client privilege and wouldn't care to share it, only that I have sought their advice on all the amendments.

**Senator West:**  Okay, so this bill does or does not comport with current law, that's all I'm asking.

**Senator Seliger:**  You're asking for a legal decision, and I don't make those, Senator West. I'm not a lawyer.

**Senator West:** Okay, well, let me ask the question this way. In drafting the map and presenting it to this body, is it your intent that this particular map comport with current law?

**Senator Seliger:** I didn't draft this map. It was a product of the negotiation of the litigants, and I think largely the Davis lawsuit, and approved under which we could hold elections in 2012. I didn't draw these lines.

**Senator West:** In authoring this map, is it your intent that it comport with current law?

**Senator Seliger:** It is my intention that it should, yes, Sir.

**Senator West:** Okay. And so, any amendments that are offered, you have scrutinized those amendments through the process that you engaged in, in order to author this particular bill. Is that correct?

**Senator Seliger:** I think that's a reasonable assessment, and that being said, let me say that I think the amendments that have been offered, the ones that were offered in Committee, I think they, in largest part, were legal. Were they compelled, as I asked each offerer, by Section 2, or were they proscribed in different context by Section 5?

**Senator West:** Oh, okay, well, the analysis, the Section 2 analysis, I don't recall hearing that in Committee, and I think I was at all the meetings. You asked the authors of the amendments as whether or not they comply with Section 2?

**Senator Seliger:** Not whether they complied with Section 2–

**Senator West:** But whether–

**Senator Seliger:** –whether they were compelled by Section 2. And correct me if I'm wrong, because you and I have been to the same redistricting things. Section 2 makes certain, absolute requirements. And so, my questions of the people who offered those amendments were, is this required by Section 2, not necessarily are they legal under Section 2 or the Constitution, but are they compelled.

**Senator West:** What do you see the Section 2 requiring?

**Senator Seliger:** Here's the way I, here's a layperson's assessment–

**Senator West:** Okay, sure–

**Senator Seliger:** –and I think this is sort of a statement, and you grade the paper, that if a Legislature can create a district in which a historically underrepresented minority can elect a candidate of its choice, then the Legislature must do that.

**Senator West:** –okay, alright.

**Senator Seliger:** That is a layperson's understanding of Section 2.

**Senator West:** What about Section 5?

**Senator Seliger:** Section 2 requires preclearance–

**Senator West:** Section 5.

ase 3:21-cv-00259-DCG-JES-JVB   Document 39-37   Filed 11/24/21   Page 11 of

A-10                83rd Legislature — First Called Session    2nd Day (Cont.)

**Senator Seliger:** –Section 5, I'm sorry. Section 5, once again, as I understand it, one, requires preclearance, not only of maps and elections but the lines drawn for school districts and cities and things like that, and as I understand Section 5, it also proscribes retrogression in maps. And as I understand that, that is lessening the ability of a minority-represented candidate of choice where it existed previously.

**Senator West:** Okay, so, let me just make sure I understand. If, indeed, there was an amendment that allowed for minority underrepresented groups to elect a candidate of its choice, you would be supportive of that?

**Senator Seliger:** No, Sir, not necessarily. Not unless it is required by the law.

**Senator West:** Under what conditions would it be required by the law?

**Senator Seliger:** As I have pointed out, if, let's say, under Section 2, that it is required to draw a certain district to make the change in the existing map, then it's required.

**Senator West:** Do you find that in any instance in the map that you currently have before us that there's a requirement under Section 2 to draw such a district?

**Senator Seliger:** I don't make those judgments. I believe that the map that has been offered today does comply, and the reason I reach that conclusion is, it is the product of negotiation of litigants and approved for elections by not just a federal district court but by a three-judge panel.

**Senator West:** Of some litigants, not all litigants.

**Senator Seliger:** Not all–

**Senator West:** Right–

**Senator Seliger:** –litigants.

**Senator West:** –and so, again, based on that product by those litigants, you don't plan to offer or accept anything, I should say, from anyone else that would kind of make it a better product?

**Senator Seliger:** Better product is in the eye of the beholder, and I feel the persons who offered the amendments will feel certain that it improves the map. It's not a question of improve, it's that's, it's not art, it's whether they are required by law.

**Senator West:** No, I should say, under the language by the San Antonio court, that would assist them in a fuller analysis of compliance with Section 5 and Section 2 of the Voting Rights Act.

**Senator Seliger:** I'm sorry, I don't understand the significance of a–

**Senator West:** What I'm, what I'm saying is this. You said the litigants, some of the litigants signed off on this preliminary map, and you recognize that the decision by the D.C. court was subsequent to the San Antonio court drawing up this particular map, and there's language in that opinion basically saying that it's a preliminary map subject to further analysis. And so, the litigants signed off on a preliminary map that was subject to further analysis, and based on what I'm hearing you say, is that you are okay, you feel as though that there's no need for further analysis of this map by the Legislature.

**Senator Seliger:** I didn't say that.

**Senator West:** Is that correct?

**Senator Seliger:** I did not say that.

**Senator West:** Do you think that there should be further analysis by the Legislature of the preliminary map?

**Senator Seliger:** I think that analysis is inevitable. It doesn't matter whether I approve of it or not. I think it'll take place, quite often, and quite likely, in the context of further litigation. That's up to the discretion of the court.

**Senator West:** Maybe, and you missed my question on that. I said, do you believe that the Legislature, even given that the litigants, some of the litigants came up with an agreement for the preliminary map, whether the Legislature, independent of the litigants, still do further analysis compliant with what the Supreme, the San Antonio court said that it would do?

**Senator Seliger:** I'm sorry, would you say that again?

**Senator West:** The San Antonio court made a statement that it was a preliminary map subject to further analysis. We have not, we, as the legislative body, have not done further analysis. Would you agree with that?

**Senator Seliger:** This body has not done further analysis?

**Senator West:** Right.

**Senator Seliger:** Well, that's not quite true, because as we look at laying out these bills–

**Senator West:** I'm talking–

**Senator Seliger:** –and–

**Senator West:** –about this, uh, what's this–

**Senator Seliger:** –yes, I think–

**Senator West:** –court.

**Senator Seliger:** –that we have done some analysis with our lawyers in a discussion of these maps and are they compliant with the law, yes, that analysis has gone on. It's not really my analysis.

**Senator West:** Okay, so the only analysis that has been done, for purposes of this record, has been with the lawyers?

**Senator Seliger:** In largest part, yes.

**Senator West:** Has there been any further analysis done with the Members of this body?

**Senator Seliger:** Oh, I think a lot of the Members of the body have done analysis, yourself included–

**Senator West:** No.

ase 3:21-cv-00259-DCG-JES-JVB   Document 39-37   Filed 11/24/21   Page 13 of

A-12          83rd Legislature — First Called Session    2nd Day (Cont.)

**Senator Seliger:** –did all that analysis confirm that these ought to be the maps, no, but there're disagreement on maps all the time.

**Senator West:** Okay, let me ask this question. Has there been any further analysis done in conjunction with the Members of this body, of the Committee I should say, of the Committee and the lawyers?

**Senator Seliger:** I have spoken with lawyers at the Attorney General's office and the Committee counsel. What other consultation has gone on between other Members of the Committee and lawyers outside or with Committee counsel or Attorney General, I do not know.

**Senator West:** Okay, but you would agree with me, there has not been a meeting of the lawyers, a private meeting to do the analysis with the lawyers of the Committee, yourself, and Members of the Committee?

**Senator Seliger:** No, we have not had any group meetings.

**Senator West:** So then, for purposes of the record, the only real analysis that you're talking about is the analysis with the attorneys of the Committee, attorneys of the Committee. Is that correct?

**Senator Seliger:** I'm, I'm sorry, say that again.

**Senator West:** For purposes of this record, the analysis that you're referring to is the analysis that you did with the attorneys for the Committee?

**Senator Seliger:** Correct.

**Senator West:** Okay.

**Senator Seliger:** That's not entirely the entire case, though. If you will recall, I announced, I think, in a week and a half ago, that all of the advocacy groups that wanted to come by my office were more than welcome to come by and analyze, as you say, and talk about the maps and changes. We sent, we contacted, I think, 40 different entities, or some number thereby. One came by. One. And they were groups that absolutely have done analysis and things like that, and had the opportunity to come by my office and share that analysis. One did.

**Senator West:** And you contacted those advocacy groups, and which advocacy group came by?

**Senator Seliger:** The Hispanic redistricting task force.

**Senator West:** And that's the only group that came by.

**Senator Seliger:** That's the only one.

**Senator West:** Okay. Is the NAACP in support of this map?

**Senator Seliger:** I have no idea. They didn't come by my office. Did you ask them to?

**Senator West:** Is the, is LULAC supportive of this map?

**Senator Seliger:** I do not know. They didn't come by my office.

**Senator West:** So, again, thank you for your response on the full analysis, but I would ask that you look at the creation of another district in the Dallas-Fort Worth area. That was one of the reasons I wanted to have a hearing in the Dallas-Fort Worth area, so you could kind of look at whether or not it would be comport, and whether or not it would be legally required to have another congressional district in North Central Texas.

**Senator Seliger:** And I appreciate that. And you and I have had this discussion and disagree with our colleagues in the House, with the exact same map, went to Dallas, and their record is going to be available to us for analysis going forward, and it's going to be available to courts going forward, as we look at the Dallas-Fort Worth area.  But the subject of a hearing, whether it was House or Senate, is exactly the same because the maps are exactly the same.

**Senator West:** Okay, so, let's explore whether or not that's the normal procedure. Could you tell the Members and myself whether historically, during the regular process of redistricting or just the regular process of this body, that in passing a Senate bill, we relied on information received from the House?

**Senator Seliger:**  I would like to think that if we're to make informed decisions about almost any subject, and we make them about important subjects, that we use all the information, that we not take such a parochial or self-centered view, that only the information that we ourselves generate are valid to our discussion. I would say, again, because our colleagues in the House went to the Dallas-Fort Worth area with the exact same map that as we have here today, that I should imagine that testimony and its sentiment and the intensity of it is exactly the same.

**Senator West:** Okay, so, you answered my question, as we have done that in the past?

**Senator Seliger:**  I've been here through one redistricting cycle, Senator West, I can't tell you.

**Senator West:** Okay, so, if we haven't done that in the past, then that would be different from what you're doing now.

**Senator Seliger:** Are–

**Senator West:** That–

**Senator Seliger:** –you–

**Senator West:** –correct?

**Senator Seliger:** –saying the only acceptable or good ideas are those things that were done in the past?

**Senator West:** No, no, no, no, no, I'm talking about changes in the process, that's what I'm talking about. And so, what I'm saying and what I heard you say, is that you don't know whether or not in the past we have looked to the House for information in order to pass a Senate bill. That's what I just heard you say, correct me if I'm wrong.

**Senator Seliger:** Well, that may be what you thought you heard me say–

**Senator West:** That's what I'm trying–

**Senator Seliger:** –but it may–

**Senator West:** –to make sure–

**Senator Seliger:** –not be what I thought I said for you to hear me say.

**Senator West:** –okay, what did you say then?

**Senator Seliger:** I think all that information is perfectly relevant.

**Senator West:** Okay–

**Senator Seliger:** The fact that there may be some sort of departure in some context, and I'm not familiar with it, I don't necessarily, makes the process flawed.

**Senator West:** So, you don't know whether or not this is a departure or not?

**Senator Seliger:** I do not. Like I say, I've been here through, you've been here through more redistricting that I have.

**Senator West:** Let me suggest to you it is. Now, let me ask this. You're telling the Members of the body that in making your decision about what to do in North Central Texas, is based on your reading of a transcript from what, the hearing that took place by the House in the Dallas-Fort Worth area?

**Senator Seliger:** I have not seen such a transcript. I expect it.

**Senator West:** Okay, so, if you haven't seen the transcript, how in the world can we take into consideration, even if it's the normal practice, what the House town hall meeting or committee meeting offers for this particular map?

**Senator Seliger:** Because that reading of the transcript at the House hearing, while I think it is useful, is not an absolute requirement. I would point out that we had no hearing whatsoever in El Paso, in Amarillo, in Lubbock, in Tyler. Are all of them essential? You're asserting here that the lynchpin of this entire discussion is a transcript generated in Dallas, and I'm not sure that that's the case.

**Senator West:** Well, again, I'm talking about North Central Texas. I'm not talking about El Paso or Lubbock, any place like that, and you're saying that the House went there and that we should be able to use that in our consideration of this particular map. And what you're telling me now, is that you haven't even read the transcript or had a briefing of the transcript from the House, and you're not taking that into consideration in passage of this map and in determining whether or not an amendment that would offer another congressional district in North Central Texas should, in fact, be considered and supported by you as the author? That's what I'm hearing.

**Senator Seliger:** You're free to, however your hearing works, is fine–

**Senator West:** I'm free. Okay, thank you. Well, I plan on offering a map for North Central Texas, and I look forward to further debate concerning that particular amendment.

**Senator Seliger:** Thank you–

**Senator West:** Thank you–

**Senator Seliger:** –I look forward to–

**Senator West:** –Mr. President.

**Senator Seliger:** –it.

**President:** Senator Garcia, for what purpose do you rise?

**Senator Garcia:** Question of the author, please.

**President:** Will Senator Seliger yield?

**Senator Seliger:** I do.

**Senator Garcia:** Senator, thank you so much for coming to Houston. And, first, let me just also say that I concur with a lot of the comments that my colleague and also Member of the Committee, Senator West, has made. And I, too, am concerned about the court's, San Antonio court's comments that it was an interim preliminary map and also a need for full analysis. So, I wanted to just ask you, first of all, what, in your mind, is a full analysis?

**Senator Seliger:** Senator Garcia, I appreciate the question, but as I said, this is my first redistricting session, and I make no legal analyses because I'm not a lawyer. And so, the procedure that I follow, it's probably not so different than what you do, is look at a map, in this case the interim map, and sit down and talk with our attorneys, look at amendments, look at, look at exceptions to the map and say, what is illegal? What is legal? What is absolutely required? What is not a change made by, that is, is determined by Section 2 of the Voting Rights Act, in this case, but is simply a partisan change, designed to add a chair for partisan reasons, which is never required by law, at least that is my understanding.

**Senator Garcia:** Well, I don't think it's required by law to have partisan considerations interjected into this any more than incumbency is.

**Senator Seliger:** But I–

**Senator Garcia:** But–

**Senator Seliger:** –insist they have been, Senator Garcia, and that's the reality.

**Senator Garcia:** –right, well, but, I guess, I'm, do you think that the hearings were part of that analysis?

**Senator Seliger:** I think we can split hairs. Are they analytical or are they not? Are they partisan, in which case, to what role do they play in analysis? I think the hearings have some value. I think it's important to listen to the people in the State of Texas. It is impossible, I think, as Senator West asserts, to listen to all the people, or the ones that are selected, especially for that. But I think it's all part of the process.

**Senator Garcia:** But wouldn't you agree that the Houston hearing was probably the best attended, higher attendance and more people testifying than any other hearing that we held?

**Senator Seliger:** I thought it was very well attended. I also had the impression that a lot of the turnout was stimulated for partisan reasons. But that's part of the consideration, too. People are welcome to come and provide that testimony that they

se 3:21-cv-00259-DCG-JES-JVB   Document 39-37   Filed 11/24/21   Page 17 of

A-16                    83rd Legislature — First Called Session     2nd Day (Cont.)

think is valuable to them and their communities. I think it's all far, part of the process. Part of the, part of that process is analytical, or something else, I don't know that I can determine that, but I'm not sure anyone else can.

**Senator Garcia:**  Right, and by our count, there was about 73 out of 80 people there that testified that asked for an additional minority-opportunity district in Harris County. Did you hear that?

**Senator Seliger:**  I don't know what the number is, but what I heard just as often is people who asked for another or more districts represented by Democrats.

**Senator Garcia:**  Well, I was at the same hearing, and I didn't quite hear it that way, but the bottom line was that–

**Senator Seliger:**  Then we–

**Senator Garcia:**  –there was–

**Senator Seliger:**  –disagree–

**Senator Garcia:**  –about–

**Senator Seliger:**  –profoundly–

**Senator Garcia:**  –73 of those people who testified asked for an additional district. And do you think the interim map now accurately reflects the population growth of Latinos, in particular, in Harris County?

**Senator Seliger:**  Senator, population growth is one thing, and it's a consideration, obviously. And we know about the Latino growth in Harris County, but don't you agree, as you read through this, and you read it in a different context than I do, since you're an attorney–

**Senator Garcia:**  Oh, I thought maybe it was because I was Latina.

**Senator Seliger:**  –no, it's because you very well wear the colors of Senator Duncan's beloved Texas Tech, if we're going that far–

**Senator Garcia:**  Alright.

**Senator Seliger:**  –but what we often discuss, and as I read things that come down from the court, seldom, it seems to me, do we read things that are just raw population numbers, but we read things like Hispanic citizens of voting age population, Hispanic voting age population, Black citizens, generally it's Black voting age population, because there's a different context for Black citizens voting age population and Spanish surname voting age registration. And so, it's not just raw population numbers, it's about those people who can and do go vote.

**Senator Garcia:**  Oh, I totally agree with you, and if you would've looked at our, both the map that we presented in Committee, you would've noticed that we also were referring to CVAP numbers, not just population numbers. The population numbers just underscore the point. But I guess, my bigger concern is that, did you really seriously consider any other map or any other testimony that was given at any of the hearings because, quite frankly, we haven't changed anything.

**Senator Seliger:** We haven't changed anything, and in the context of other legislation, one could ask on every bill to be introduced, do you take into account everybody's viewpoint that impinges upon that legislation, and things like that. I believe that the map that we're looking at today is a fair and a legal one.

**Senator Garcia:** And you don't think that it was a deviation from our procedures to look at the amendments and adopt and vote on the amendments before we even heard people testify here in Austin this week?

**Senator Seliger:** I'm sorry, was it a departure? We vote in that order on amendments all the time. Normally, we amend the bill and then open the floor to public testimony, if that's what you mean.

**Senator Garcia:** Well, that's what I mean, but to me, if we were really trying to hear from the public, we would've heard from the public before we voted on the amendments.

**Senator Seliger:** But we did. Before there were any amendments offered–

**Senator Garcia:** Well, not after we–

**Senator Seliger:** –just a second–

**Senator Garcia:** –remember we–

**Senator Seliger:** –just a second, before any amendments were offered, we had two hearings in Austin, we had a hearing in Corpus Christi, and we had a hearing in Houston. So, most emphatically, we did take public testimony before any amendments were offered.

**Senator Garcia:** Well, that's the point. We had our amendments due by noon on Monday, and then we voted on Wednesday. I'm not sure that the public had a chance to really look at those amendments or speak to them, because, then, when we had the hearing on Wednesday, we voted on the amendments and then took testimony, that's the point that I'm trying to make. And it seems to me that that's not a process that's really looking for public input, and my biggest–

**Senator Seliger:** That–

**Senator Garcia:** –concern–

**Senator Seliger:** –is your–

**Senator Garcia:** –has been–

**Senator Seliger:** –opinion.

**Senator Garcia:** –from the beginning, if you'll remember in my opening remarks. I mean, what is the rush?

**Senator Seliger:** You sit in a lot of committees right now. Don't you normally take the amendments and then take public testimony in hearing?

**Senator Garcia:** Quite frankly, I think sometimes it depends on the Chair, but I, for this–

**Senator Seliger:** Oh–

Case 3:21-cv-00259-DCG-JES-JVB   Document 39-37   Filed 11/24/21   Page 19 of

A-18                        83rd Legislature — First Called Session    2nd Day (Cont.)

**Senator Garcia:** –type–

**Senator Seliger:** –then it's–

**Senator Garcia:** –well–

**Senator Seliger:** –not out of the–

**Senator Garcia:** –well–

**Senator Seliger:** –ordinary.

**Senator Garcia:** –because for this, it's not the ordinary course of business. I mean, this is about the maps that we will be using for a decade. I mean, this is about due process, this is about one person, one vote. I mean, to me, this kind of committee is, should be held to a higher standard, particularly, when you've got multiple court cases looking at our, everything that we're doing.

**Senator Seliger:** When you say that's not the usual process, how was it done in 2011 and 1991?

**Senator Garcia:** Now, I was not there. I have no idea, I–

**Senator Seliger:** Well then, so it may not be the usual process?

**Senator Garcia:** –I don't know.

**Senator Seliger:** Okay.

**Senator Garcia:** But I would've preferred a more robust process, and you're absolutely right, we didn't go to El Paso, we didn't go to Laredo, we didn't go to Harlingen, and I say, why not?

**Senator Seliger:** I asked for a quorum of Members to go to Harlingen, and I find no blame, people are very busy, and they've got a lot of things to do this time of year, but without a quorum going to Harlingen, I felt that there would be criticism, quite frankly, for going to Corpus Christi with a quorum and going to Houston with a quorum and not going to Harlingen with a quorum.  And those folks have every consideration everywhere else. This is, when you talk about what's the hurry, I think this bill was filed March the 8th.  It's had a hearing in the State Affairs Committee. There's nothing new here.

**Senator Garcia:** Well, that's kind of like, was going to be my last comment, that last time around there was four maps presented that would've created a new minority-opportunity district for Congress by Alvarado, my predecessor, Senator Gallegos, by MALDEF, and by Dukes.  My map was not really a new map, it was just a reintroduced map. And I'm really disappointed that, my impression is, that it was not seriously considered by the Chair nor the Committee, and it fails to really acknowledge the population growth, the voting age population growth of Latinos in a particularly minority congressional district where you can get the African American, Asian, and Latino voters who have historically worked together in Harris County.  So, that's my final statement, and I'm sure you have a response, and, but, thank you for giving me the opportunity to ask you a few questions.

**Senator Seliger:**  Senator, kind of what you're saying is that you had an amendment or a bill that didn't pass, and so your feeling is, it was not seriously considered. And I respect that view, but don't you think that on this floor, almost everybody here could say that we have had a bill, some of them important bills and significant bills that have not been approved, and then we, too, can say, well, the only reason it didn't pass, because it was not seriously considered?

**Senator Garcia:**  No, Sir, because I think this is totally different. This different situation, when I've had some Members of the Committee even indicate to me in private that they really were, they listened, but they were not open to making any changes–

**Senator Seliger:**  I–

**Senator Garcia:**  –because that–

**Senator Seliger:**  –I–

**Senator Garcia:**  –was not the–

**Senator Seliger:**  –I respect–

**Senator Garcia:**  –direction from the leadership, and I'm just telling you what I've been told.  So–

**Senator Seliger:**  –I respect that–

**Senator Garcia:**  –thank you so much.

**Senator Seliger:**  –opinion.

**Senator Garcia:**  Thank you, Mr. President.

**President:**  Thank you, Senator. Senator Rodríguez, for what purpose do you rise, Sir?

**Senator Rodríguez:**  To offer a few comments to the author and–

**President:**  You–

**Senator Rodríguez:**  –on Senate–

**President:**  –you're recognized.

**Senator Rodríguez:**  –Bill 4. Mr. President, thank you, and, Members, I rise to express my concerns with the proposed congressional map on Senate Bill 4. Members, we all know what happened during the last session, leading to the embarrassing spectacle of the Legislature's maps being redrawn by the courts. And now, we are spending taxpayers' money to fight the Voting Rights Act, the federal law that gives us the tools to ensure that minorities are not being deprived of their constitutional rights. Nonetheless, this Legislature appears bent on repeating history. We all know what happened to open this special session, where the majority decided not to adhere, as the Dean pointed out, to the Two-Thirds Rule, the traditional operating procedure that protects minorities, and not, by the way, based on racial or on ethnic purposes, a minority, whether Republican or Democrat alike, and has been the hallmark of the Texas Senate, the Senate's distinction as the most deliberative body on Earth, as some people like to say. I will restate this because it cannot be emphasized

enough, Senator Seliger, minorities and, in particular, Hispanics make up almost 90 percent of the state's population since 2000, and I don't think that's disputed. In this new Texas, and I emphasize, new Texas, that we are building together, we gained four congressional seats based on the increased population in the Latino community, but only two of those were majority-minority under this proposal. You cannot draw maps to exclude minorities from opportunity. This is what happened in 2011, and while the court stepped in with an interim solution, it was stated very clearly at the time that the court's maps did not fully address all the constitutional issues. These were just interim maps, temporary maps. I believe what has happened is that one side of this discussion has looked at the facts and realized that they could not do better for their side, but I think we can do better in Texas, and we must. For once, in redistricting, Members, Texas should do the right thing. We should allow everyone to fully participate in this process and pass maps that accurately reflect the demographics of this state.  And I'm afraid that this map does not do so because as it has been acknowledged, it pretty much remains the same as it was when the courts, at least the court up in Washington, D.C., the federal court in D.C., found purposeful discrimination.  And I think that, while I understand that that's on appeal, that is the current finding of the federal courts.  And I'm afraid that with today's passage of this particular Senate Bill 4, that there will be similar finding in the future. Thank you, Mr. President and Senator Seliger.

**Senator Seliger:**  Senator Rodríguez, when you say for once this body ought to do the right thing–

**Senator Rodríguez:**  Yes.

**Senator Seliger:**  –are you stating unequivocally that in the past, 2001, 1991, 1981, 1971, which was the first redistricting cycle after the Voting Rights Act, that everything the Legislature did was the right thing?

**Senator Rodríguez:**  I believe that every single time that Texas has done redistricting since the period that you're talking about, the courts have found problems with the maps. There have–

**Senator Seliger:**  So, then the–

**Senator Rodríguez:**  –been challenges.

**Senator Seliger:**  –Legislature didn't do the right thing, did they?

**Senator Rodríguez:**  Well, it did not.

**Senator Seliger:**  But you're saying that now, for the–

**Senator Rodríguez:**  I say for–

**Senator Seliger:**  –first–

**Senator Rodríguez:**  –once.

**Senator Seliger:**  –time–

**Senator Rodríguez:**  Yes, I'm–

**Senator Seliger:**  –the Legislature–

**Senator Rodríguez:** –saying–

**Senator Seliger:** –ought to do the right thing. Then you acknowledge that the Legislature's not been doing the right thing going back to 1971–

**Senator Rodríguez:** –no, I'm–

**Senator Seliger:** –which–

**Senator Rodríguez:** –I'm–

**Senator Seliger:** –is it?

**Senator Rodríguez:** –I'm saying, simply, the Legislature has not been doing the right thing on these maps and that for once, today, this time, we ought to draw maps that comport with the constitutional requirements. That's what I'm saying.

**Senator Seliger:** Thank you.

**Senator Rodríguez:** Thank you.

**President:** Senator Watson, for what purpose do you rise, Sir?

**Senator Watson:** Question of the author.

**President:** Will Senator Seliger yield?

**Senator Seliger:** Yes, I will.

**Senator Watson:** Thank you, Mr. President, and thank you, Senator. I want to follow up on a couple of things that, when Senator West was asking you questions, and make sure I understood. First of all, the counsel that you refer to, that you have met with and discussed these maps, is that the counsel that, is that Mr. Heath?

**Senator Seliger:** Yes, he is the Committee counsel.

**Senator Watson:** And when you say Committee counsel and you're asserting a privilege, is he your counsel as Chair of the Committee, or was he counsel to the entire Committee, so that the privilege would extend to people like Senator West and other Members of the Committee?

**Senator Seliger:** He is the counsel to the Committee, individually and collectively.

**Senator Watson:** Thank you. As I understood you in your answers to Senator West's questions, you indicated that you would be willing to take an amendment only if compelled by Section 2 of the Voting Rights Act. Did I understand that correctly?

**Senator Seliger:** No, I don't think so, completely, because I think when it comes to questions of retrogression, under current law, we can't ignore Section 5.

**Senator Watson:** Okay. So, but you're looking at it only from the standpoints of Section 5 and Section 2? Section–

**Senator Seliger:** No, Sir.

**Senator Watson:** –2 for, we, the, I'm trying, didn't help me with that. I'll go back to my original question. Are you going to take amendments only if compelled by Section 2 of the Voting Rights Act?

**Senator Seliger:** I don't think exclusively, no.

Case 3:21-cv-00259-DCG-JES-JVB   Document 39-37   Filed 11/24/21   Page 23 of

A-22                    83rd Legislature — First Called Session    2nd Day (Cont.)

**Senator Watson:** What would be the other situations where you would be willing to take an amendment to Senate Bill 4?

**Senator Seliger:** I think that if there were a compelling argument under Section 5 provisions of the Constitution, and I can't tell you what they are. Are there other requirements of the law? I can tell you that most of the review that I have looked at, primarily, are around those subjects.

**Senator Watson:** Alright. So, you would agree with me that in order for this body to do its legal duty and do right, we would need to make sure not only that there was compliance with the Voting Rights Act but also compliance with the United States Constitution.

**Senator Seliger:** I think in such other provisions or law that Members of this body think are relevant and wish to discuss or introduce, things absolutely that I'm not aware of, but the body's free to discuss whatever they want.

**Senator Watson:** But certainly one of those requirements would be that this body follow the United States Constitution.

**Senator Seliger:** I think that's probably a good guideline all the time.

**Senator Watson:** Well, fair enough. We'll talk a little more about that then. With that being the case, you agree with me, don't you, Mr. Chairman, that there can be situations where this map can violate provisions of the United States Constitution, even if it is not violative of Section 2 or Section 5 of the Voting Rights Act?

**Senator Seliger:** You're asking me for a legal judgment, Senator, and I make no such thing.

**Senator Watson:** Do you, as Chair, have a position on whether or not this map can be violative of the United States Constitution in some particular, even though it doesn't violate Section 2 or Section 5 of the Voting Rights Act?

**Senator Seliger:** You are asking me, can I make a judgment if this is violative of the Constitution even if it conforms with Section 2 and Section 5. Once again, you're asking me for legal judgment, and I don't make them.

**Senator Watson:** I'm not asking you for a judgment. I'm asking you for, as this map gets laid out, as you lay out this map, as the author of the map, and you ask Members to vote on it, are you considering whether there are aspects of the map that violate the Constitution independently of violating the Voting Rights Act?

**Senator Seliger:** I will, I'll accept any argument anybody wants to make, but as I said before that I believe this map is fair and legal.

**Senator Watson:** So, you won't answer my question on whether or not you believe that it must, that there could be violations of the Constitution even though it doesn't violate the Voting Rights Act.

**Senator Seliger:** I don't determine whether provisions are, or things are offered are violative of any part of the Constitution, that's a question for lawyers. And as it's made very clear that this bill is going to be seen by a lot of lawyers, I don't make those judgments.

**Senator Watson:** The amendment that I offered in Committee, you were not at that time willing to accept that amendment, and I take it you would not be willing to accept that amendment on the floor.

**Senator Seliger:** I am not.

**Senator Watson:** During the regular session that was just completed, you had filed a version, it was not SB 4, I don't remember what the number was, but it was the same bill as what we're seeing with this congressional bill. Is that right?

**Senator Seliger:** Yes.

**Senator Watson:** Alright, so–

**Senator Seliger:** It's exact same bill, exact same map.

**Senator Watson:** –and during the regular session of the Legislature, at that point in time, that bill was blocked from coming to the floor.

**Senator Seliger:** I'm not aware of a block or anything else. All I'm aware is, was, I was given a hearing in front of the State Affairs Committee, there was not a vote taken in the State Affairs Committee, and what went into that consideration I was not privy to.

**Senator Watson:** Oh, so you don't know whether there was a block on the congressional map during the regular session of the Legislature?

**Senator Seliger:** No, I suspect you'd be the authority on that, but nobody said anything to me about it.

**Senator Watson:** Okay. During this special session of the Legislature, we are not following the tradition that is typically followed of having a blocker bill and allowing of, or require, having a requirement that there be a motion to suspend, requiring a vote of two-thirds of the Members of the Senate. Is that correct?

**Senator Seliger:** True.

**Senator Watson:** And so, this bill, SB 4, is on the floor today without the necessity of there being a motion to suspend the regular order of business and have a two-thirds vote of the Members.

**Senator Seliger:** That's true.

**Senator Watson:** Mr. Chairman, you're aware that the Democratic Members of the Senate represent over 60 percent of the Hispanic population of the State of Texas under the map that we were elected under in the last election. Is that correct?

**Senator Seliger:** I believe that to be true. I don't have the figure sitting in front of me.

**Senator Watson:** You're also aware as Chair of the Senate Committee on, the Special Committee on Redistricting, that the Democratic Senators in the Texas Senate elected under the map that we were all elected under in the last cycle, we represent a majority of the Black and Hispanic citizens of the State of Texas.

**Senator Seliger:** I believe that to be true.

**Senator Watson:** You're also aware, I think, that the Democratic Members of the Senate make up at least one-third of this Senate. Is that correct?

**Senator Seliger:** I believe that's true and are still decidedly in the minority.

**Senator Watson:** That, while that may be true, if the regular rule that requires there to be, or tradition that requires there to be a motion to suspend the rules in order to take up a bill, what we typically and traditionally refer to as the Two-Thirds Rule, those that represent over 60 percent of the Hispanic population and a majority of the Black and Hispanic population would be in a position to prevent such a bill coming to the floor if that tradition were being followed. Is that correct?

**Senator Seliger:** I think that's true, but it brings up another issue that's particularly important. That unless I'm mistaken, in the past there have been Lieutenant Governors who are Democrats who have also presided over special sessions in which there is no blocker bill. Now, I'm sure they had a far better reason, but the fact remains is that the same situation has existed other times in this body under a different sort of leadership, at least party.

**Senator Watson:** My question, that's obviously not an answer to my question, so let me ask my question again. My question is, that if those who represent over 60 percent of the Hispanic population and represent over 50 percent of the Black and Hispanic population in the state believed that this bill improperly impacted the Voting Rights Act, the voting rights of those individuals, if we were following the tradition of the Two-Thirds Rule with a blocker bill, those representing those individuals would be in a position to block this bill.

**Senator Seliger:** As would it have been the capability of the Republican minority in years gone by when this body was presided over by a Democrat.

**Senator Watson:** So, the answer's yes, huh?

**Senator Seliger:** The answer is the one I gave.

**Senator Watson:** Alright. Do you know whether in the past, in the Republican minority you were just talking about, the Republican minority represented a majority of the protected racial class in this state?

**Senator Seliger:** I do not.

**Senator Watson:** Under Section 2, one of the things that needs to be addressed is avoiding the dilution of minority voting strength. Is that correct, Mr. Chairman?

**Senator Seliger:** That's the way I understand it, yes.

**Senator Watson:** What is your definition of packing minority voters, and how that has an impact under Section 2?

**Senator Seliger:** With the caveat that mine is a layman's definition, packing is to put so many members of a minority in a certain district that it lessens the ability to elect the candidate of their choice in another or adjacent district. And fracturing is to fracture such a population so it cannot come together and so it will not be a voting bloc that can elect the candidate of their choice. And I apologize for any inadequacies there in the legal description.

**Senator Watson:** Under the concept of fracturing, would you also include in that the same definition with regard to cracking or splitting a minority population?

**Senator Seliger:** I'm sorry, if there are any subtleties or differences in those definitions, I don't know them.

**Senator Watson:** But basically you would put it in the same category as fracturing.

**Senator Seliger:** Once again, I'm not going to make that judgment.

**Senator Watson:** Was there any analysis done during this special legislative session with regard to Senate Bill 4 on whether there was packing, cracking, fracturing, or splitting of the map that you're asking us to vote on?

**Senator Seliger:** As we discuss this, I believe, given the legal advice that I have been given, no, there's not.

**Senator Watson:** There's not been that analysis?

**Senator Seliger:** I don't know if anybody's done the analysis or not, I'm telling you about the information that I have received. I did not do such an analysis.

**Senator Watson:** And your Committee did not do such an analysis.

**Senator Seliger:** Members may very well have, because a lot of folks were represented by a lot of different lawyers. I assume people have addressed it.

**Senator Watson:** But let me ask the question specifically. The Committee itself did not do an analysis of whether there is packing, cracking, fracturing, or splitting of minority populations in Senate Bill 4?

**Senator Seliger:** I am aware of none.

**Senator Watson:** Thank you, Mr. President. Mr. President. Thank you, Mr. Chairman, too, Chairman Seliger.

**Senator Seliger:** Thank you.

**Senator Watson:** Mr. President, I would move that the dialogue between Chairman Seliger and Senators West, Garcia, Rodriguez, and myself be reduced to writing and placed in the Journal.

**President:** That's fine. Members, you've heard the motion by Senator Watson. Is there objection from any Member? Chair hears no objection, and the exchange between the different Senators and Senator Seliger will be inserted in the Journal. Chair lays out Floor Amendment Number 1 by Senator Zaffirini. The Secretary will read the amendment.

**Secretary of the Senate:** Floor Amendment Number 1 by Zaffirini.

**President:** The Chair recognizes Senator Zaffirini to explain Floor Amendment 1.

**Senator Zaffirini:** Thank you, Mr. President. Mr. President and Members, this is the identical amendment that I offered for Senate Bill 2, and that was adopted, I believe, unanimously by the Texas Senate. Basically it removes the section regarding legislative findings that the interim maps are in compliance with federal and state

constitutional provisions and laws applicable to redistricting plans. So, it's the identical amendment. It would simply strike the identical language that we just removed from Senate Bill 2, and I move adoption.

**President:** The Chair recognizes Senator Seliger on Floor Amendment 1.

**Senator Seliger:** Thank you, Mr. President. This amendment is different because it takes on a different context in this map. What the statement is on the bill is it simply says that this bill, these maps satisfy the requirements to be legal maps. Certainly there is disagreement. There will be a split vote on that, but the majority will determine what the sentiment is expressed in that bill. And so, while I will not ask to table the amendment, it is my intention to vote against the amendment and would ask the Members to do the same.

**President:** Chair recognizes Senator Zaffirini to close.

**Senator Zaffirini:** Thank you, Mr. President. Mr. President and Members, as we saw with the originally passed maps that were found to be in violation by the U.S. district court in D.C., this Legislature has a poor track record of accurately determining what is constitutionally and statutorily required of the redistricting process and of redistricting maps. Whether court decisions are properly applied or redistricting maps are in compliance with constitutional and statutory requirements is not in the purview of the Legislature but rather that of the judicial system, which currently's in the process of reviewing the most recent Texas redistricting actions and the resulting maps. What's more, even our own Legislative Council, at a House redistricting hearing in Houston on Wednesday, pointed out that by quoting the San Antonio court that the interim maps are, quote, not a final ruling. These are preliminary determinations on the merits of Section 2. We are only looking at claims that are not insubstantial. These are difficult and unsettled legal issues, unquote. The court made it explicitly clear that these were interim maps. The representative from the Legislative Council went on to say that when the court said there were unsettled legal issues, they meant that they didn't have time to look at all of them. Making these determinations requires a very extensive fact finding, region by region. While the two field hearings at the San Antonio, at the Senate Redistricting Committee held in Corpus Christi and Houston were welcome, they did not allow for testimony from anywhere on the Border, West Texas, East Texas, Central Texas, or the Dallas-Fort Worth Metroplex. And since the maps remain unchanged, it can be assumed that whatever information gathered at the two field hearings was not seriously considered. This limited and restrictive process during a special session designed only to rubber stamp the interim maps is not sufficient for a confident finding, underscore finding, that the maps meet constitutional and statutory muster. The provision in the bills could be interpreted to seek to undermine and cut off the judicial process inappropriately, ultimately would be ineffective, and could serve to complicate the ongoing court cases and increase the time and cost of the litigation. My amendment simply would remove this provision from the bill. It also would result in a revised bill analysis that would not erroneously state that the Legislature is confident that the maps adopted in 2011 are fair and legal and compliant with federal law. Mr. President, I move adoption of my amendment.

**President:** Members, the issue before us is the adoption of Floor Amendment Number 1, which is opposed by the bill sponsor. The Secretary will call the roll.

**Secretary of the Senate:** Birdwell–

**Senator Seliger:** Mr. President, I'm sorry. Is it customary for the author of the bill to close before the vote's taken on the amendment?

**President:** Yes, it is. Chair recognizes Senator Seliger.

**Senator Seliger:** Thank you. And what I would like to say is, Senator Zaffirini is absolutely right. The court said these are interim maps, and the reason they said they are interim maps are there are no permanent maps. This is to be that permanent map that takes into account some of the litigants and the defendants who agreed to this map, and it was put in place by a three-judge panel. And I think that from what I've been told, that is kind of a compelling way to put together a permanent map. When Senator Zaffirini says that on the surface of it the input of the public is not considered by that Committee, I think the only time that some people would be satisfied if what went into the bill is what they want. And it doesn't necessarily work that way, that it will be determined by not individual preferences but by a vote of this body.

**President:** The Secretary will call the roll.

**Secretary of the Senate:** Birdwell, Campbell, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Garcia, Hancock, Hegar, Hinojosa, Huffman, Lucio, Nelson, Nichols, Patrick, Paxton, Rodríguez, Schwertner, Seliger, Taylor, Uresti, Van de Putte, Watson, West, Whitmire, Williams, Zaffirini.

**President:** There being 15 nays and 11 ayes, the Floor Amendment 1 fails.

**Senator Zaffirini:** Mr. President.

**President:** Senator Zaffirini–

**Senator Zaffirini:** Mr. President–

**President:** –for what purpose?

**Senator Zaffirini:** –I would move that my statement be reduced to writing and entered into the Journal.

**President:** Members, you've heard the motion by Senator Zaffirini. Is there objection from any Member? Chair hears no objection, and the motion is adopted.

**Senator Zaffirini:** Thank you, Mr. President and Members.

**President:** The Chair lays out Floor Amendment Number 2 by Senator Watson. The Secretary will read the amendment.

**Secretary of the Senate:** Floor–

**President:** Think it's being passed out right now.

**Secretary of the Senate:** –Floor Amendment Number 2 by Watson.

**President:** Chair recognizes Senator Watson to explain Floor Amendment 2.

**Senator Watson:** Thank you, Mr. President. Members, today I have a floor amendment that affects only Central and South Texas. I've included the statewide map only as a way to show context, and I anticipate that other amendments that attempt to remedy other flaws in SB 4 would be offered by others. I simply put it in a statewide so that you can see the context. It only impacts Central and South Texas. The interim plan, as has been discussed on the floor already, was entered by the federal district court in San Antonio in February of 2012. As has also been noted, and I think everybody is aware, notably, the D.C. federal court issued its preclearance decision based on Section 5 of the Voting Rights Act in August of 2012. As a result, and despite claims that we've heard today and by others leading up to today, the interim plan, SB 4, does not address, quote, every legal flaw, close quote, that was identified by the D.C. court. This Legislature can remedy this problem given the time, if we're given the appropriate time and if we're given the opportunity. I don't believe that there has been sufficient analysis, in light of the D.C. court, to be saying that SB 4 is what we should be voting on today. I am laying this amendment out.  I will not, I will pull the amendment back down because I know in, as we had the dialogue with Senator Seliger, this amendment will not be accepted.  And I believe that the die is cast that when the original proclamation for this special session was called, we were going to, this Legislature and this Senate was only going to pass the interim maps. But I do want the opportunity to stress that the Senate and the Legislature can do better, in fact, in my opinion, can do it right. It was not done, in my mind, Senate Bill 4 has not been done with the further analysis that it should have. Members, this amendment is a least-change option. In other words, it's the least disruptive to the interim plan. It's not necessarily what I would write if I got to write it and made no changes. It doesn't necessarily reflect my political preferences, but it's the least disruptive to the interim plan. It also restores a constitutionally protected crossover district in Travis County. And at the same time it adds a new Latino opportunity district, which you will see as Congressional District 34, and it strengthens two existing opportunity districts in order to maintain the same number of opportunity districts in the region as I believe is prescribed by Section 2 of the Voting Rights Act. Members, this amendment fixes a core constitutional defect in the interim plan. This is something that I asked Chairman Seliger about because it's very important to note. This plan can violate the United States Constitution, even independently of whether it meets certain requirements or doesn't need to have certain things happen under the Voting Rights Act. This restores, this amendment restores a crossover district centered in Travis County that the interim plan, SB 4, by simply adopting the 2011 legislatively enacted map destroyed. In the 2009 United States Supreme Court case of Bartlett versus Strickland, Justice Anthony Kennedy, in a very lengthy discussion related to crossover districts, defined a crossover district and confirmed that if a state purposefully dismantled such a district, it would raise serious constitutional questions under the 14th and 15th amendments. And, Members, that's exactly what happened in Travis County. In August 2012, the D.C. court held that the 2011 enacted map, and therefore the interim map, and therefore SB 4, had destroyed an existing tri-ethnic crossover district. That district was the former Congressional District 25, anchored in Travis County. This map remedies that constitutional violation by reconstituting the tri-ethnic coalition as the centerpiece of a district centered in Travis County. And this district in the map is

numbered CD 35. There has been no argument placed forward at any point that I know of in this special session as to why this Legislature would not fix these constitutional concerns. In addition, this amendment adheres to Section 2 of Voting Rights Act. As the San Antonio court continues to consider the Section 2 case against the State of Texas, it's important that we also continue to pay attention to this critical component. This map adds a new Hispanic opportunity district in Central and South Texas which is shown as CD 34. The new CD 34 would run from Nueces County into Bexar. And the Hispanic voting age population, commonly referred to as HCVAP, is 58.3 percent, which is well above the threshold required by Section 2 and above the current CD 35. The map also reverses some of the intentional discrimination displayed in the drawing of Congressional District 20. Senator, Chairman Seliger noted when he laid out SB 4 that some of the findings of the federal court in D.C. were that iconic places and economic drivers had been moved out of some congressional districts. He pointed out that some of that had been corrected. In Congressional District 20, they have not been corrected. So, in San Antonio, the legislatively enacted map, which is, was adopted in the interim map and is now part of SB 4, removed historic landmarks and removed economic generators from CD 20. Landmarks like the Alamo, City Hall, the Henry B. Gonzalez Convention Center were taken out of the district previously represented by Congressman Gonzalez and now Congressman Castro. The D.C. court noted that the parties provided more evidence of discriminatory intent than we have space or need to address, and my proposal remedies this. Finally, Members, I would point out that this proposal supports Congressional District 23 as a Latino opportunity district. The interim map made modest improvements in the enacted map, but I believe Section 2 requires more. This proposal that I'm laying out slightly increases the Hispanic CVAP in CD 23 and improves upon the estimated election performance for candidates of choice in that district. Members, as I've indicated, the die has been cast. But what I want to lay out, the reason I want to lay out this amendment is I want to show a proposal that demonstrates that the Legislature does not, in fact, have a false choice between restoring a constitutionally protected district in Travis County and maintaining Latino opportunity districts to the south. Now, I know there are aspects of this that could be changed and could be tweaked or made to be better. If we were following a process that was to allow for that, I believe we could get to a point where we could have a restored district that was not unconstitutional in Travis County and do what we need to do under Section 2 of the Voting Rights Act. However, as I've indicated, from the time the Governor laid down his call by his proclamation, to where we are today, we knew what the result was going to be. We do not have to meet that false choice. This map shows how we do not have to meet this false choice. And I appreciate the fact that you've allowed me to lay this out. And at this time, Mr. President, I will pull down my Floor Amendment Number 2.

**President:** Thank you, Senator Watson. Senator Watson pulls down Floor Amendment 2. I'm going to–

**Senator Seliger:** May I simply say, Mr. President–

**President:** –the Chair recognizes–

**Senator Seliger:** –since the amendment is coming down, as we are custom to the work and scrutiny of this, put in by Senator Watson, is, as we've come to expect, both exhaustive and expert. I don't necessarily agree with it all, but I agree with the quality of the analysis and the exhaustiveness of that analysis.

**Senator Watson:** Thank you, Mr. Chairman.

**President:** –Senator Williams, for what purpose do you rise?

**Senator Williams:** I believe that once we've got the motion before us, it's, I've still got the right to ask a question about this before he pulls it down, don't I? It's customary.

**President:** It's customary. Yes, Sir.

**Senator Williams:** Okay. Well, that's the purpose that I'm rising is to ask the author of the amendment some questions.

**President:** Will Senator Watson yield?

**Senator Watson:** Be happy to.

**Senator Williams:** Senator Watson, is this the same amendment that you offered in the Redistricting Committee–

**Senator Watson:** It is.

**Senator Williams:** –a few days ago? And did we vote on that amendment in the Committee?

**Senator Watson:** No, at that time it was pulled down as well.

**Senator Williams:** And why did you pull it down at that time?

**Senator Watson:** Because, as I've indicated, I believe that the votes of the majority of the Committee would not be there.

**Senator Williams:** Is that what you said in Committee the other day?

**Senator Watson:** I don't think I even gave an explanation. If you remember, I'm not on the Committee.

**Senator Williams:** Yeah.

**Senator Watson:** Senator West pulled it down–

**Senator Williams:** Yeah.

**Senator Watson:** –but I was in agreement with that.

**Senator Williams:** Yeah. Well, I think I just want to make sure that it's a part of the record that, you know, we had a discussion about this, and you didn't attend the hearing in Corpus Christi, is that correct?

**Senator Watson:** Yeah, as I told you that day, I did not.

**Senator Williams:** Yeah. Well, what you've done is you've shifted and substituted your political judgment about what ought to happen in Travis County with what ought to happen in Nueces County. And this is, clearly, the testimony that we had from both Democrats and Republicans would have been opposed to anything like this. I'm not

sure that you even had all the Democratic support on the Committee for what you're trying to do here. So, I just think that's an important part of the record that needs to be made here is that this, we had extensive testimony from both Republicans and Democrats, Anglos and Hispanics and African Americans that they liked the arrangement of their congressional districts, and what you've done here is, really, you've split Nueces County up into three different congressional districts where they are the anchor of a congressional district, so that you could change the boundaries in Travis County. Isn't that what's really going on here?

**Senator Watson:**  No. Would you like for me to explain?

**Senator Williams:**  You can try, but I mean–

**Senator Watson:**  Well–

**Senator Williams:**  –it's prima facie–

**Senator Watson:**  –I know I'm not going to convince you, Mr. Chairman.  You've made that very clear with your constitutional analysis, but let me say what this bill does. What this amendment proposes to do is not only does it restore what I believe to be a constitutionally protected district, it creates, it makes sure that we have the same number of Latino opportunity districts. And with regard to Nueces County, I would say two things. One is that what it does is, right now in Nueces County there are over 200,000 Latino voters who are placed into a congressional district where their voice pretty much doesn't–let me, let me, let me finish.

**Senator Williams:**  We didn't hear that, though.

**Senator Watson:**  Well–

**Senator Williams:**  You're asserting something that was, that we received no testimony to that effect in Corpus Christi.

**Senator Watson:**  –well, what I, what I'm suggesting to you is that that's the case if you look at the voting patterns in Nueces County. The other thing that I would say about, so, one of the things I think is what this map would do is, it would create a greater opportunity for those voices to be heard. But what I've also said, and what I think in, is a problem with the current SB 4, is that I'm showing that we can make those changes in a way that would meet the Constitution and the Voting Rights Act. Sure, and I've always said, there may be changes that need to be made to the map to meet other needs, but I wanted to show a demonstration that it could be done. We're not engaged in a process that's really allowing for that sort of analysis to occur, where you and I and others might be able to get together and try to make some additional changes that would meet different needs in different parts of the state. Instead, what we're engaged in is a process outside the traditional rules of the Senate so that we can pass through a map that the Governor placed on the call exactly the way he wanted it to be passed. And that's what we're going to do here today. We're not engaged in the kind of thoughtful process that you seem to be suggesting we should.

**Senator Williams:**  Well, Senator Watson, you won't even give us an opportunity to vote on your amendment. You've pulled it down in Committee, and you've pulled it down here on the floor.  And I would say this is exactly the kind of debate that we're talking about, and you've preordained the outcome of that, not me and not Senator

Seliger and not anybody else on this floor. And what I would further point out is that the Parliamentarian has already ruled that any matter dealing with redistricting, there's no narrowness to the call. The Governor can't keep us from considering these amendments. That has nothing to do with whether or not this amendment is being considered or not. The simple fact of the matter is that you've run it up the flagpole and you've pulled it down. And I suspect from the, you know, what, the chat that I hear on the floor is you don't have the support from a lot of people in your own party about this.

**Senator Watson:** Well, I appreciate your political advice, and as always, you're always helpful in that regard, Mr. Chairman. And what I would suggest to you is when I say, when I say that the process is preordained, I don't think there's anybody on this floor that doesn't understand that the process is preordained as a practical matter. And I don't think there's anybody on this floor, that if they're candid, they're honest, and they're forthright, wouldn't say that they know what the outcome was going to be from the very beginning of this legislative session. And regardless of the Parliamentarian's statements, as a practical matter, what has not been occurring is something that didn't occur during the last legislative session. And that is that we actually came together and worked on different aspects of the map as a group, and instead SB 4 has worked its way all the way through the process. The bottom line is the courts will have an opportunity to determine whether or not this body is, in fact, failing in its constitutional obligation with regard to Travis County. And I believe that it will ultimately determine that it has failed.

**Senator Williams:** Well, and we clearly disagree about that. I don't believe that there's a constitutional problem with the maps in Travis County. But setting that issue aside, what I really take issue with, Senator Watson, is that you're saying that it's preordained when you won't even let your own amendment be voted on. And this is exactly the deliberative process that our body goes through. What you're concerned about is you're not going to get the outcome that you would like to have. It's not a matter of whether the issues are being considered or not, clearly they are.

**Senator Watson:** Well, we also disagreed during the last session of the Legislature when these maps were passed. I believed that they were a violation of Voting Rights Act, you believed they were not. I believe they were passed with discriminatory intent, you believed they were not. And the federal court, of course, found that they were passed with discriminatory purpose, and that's one of the reasons that we have had the lawsuits. So, you're right, we do disagree. And we will continue to disagree, like we did in the past, where the district court ruled that, in fact, there was discriminatory purpose. Thank you, Mr. President.

**President:** The Chair recognizes Senator Seliger for a motion.

**Senator Seliger:** I have no other comment here. I believe there are other amendments–

**President:** Excuse me.

**Senator Seliger:** –before I move–

**President:** Excuse–

**Senator Seliger:**  –passage.

**President:**  –me. I've been told that we were through with amendments. The Chair lays out Floor Amendment Number 3 by Senator West. The Secretary will read the amendment.

**Secretary of the Senate:**  Floor Amendment Number 3 by West.

**President:**  Chair recognizes Senator West to explain Floor Amendment 3.

**Senator West:**  Thank you very much, Mr. President and Members. We only get the opportunity to deliberate at this point, and we're going to get the opportunity to vote on this amendment to see exactly how it fares in this deliberative body. As, when you're looking at this particular map, we submitted it to Lege Council, and as it relates to the map, the underlying map, it actually works with the underlying map. This is not a statewide amendment. It's an amendment for North Central Texas. It was not considered by the Committee because it wasn't ready at that time. And we filed it, I believe it was yesterday. Members, what this particular map does, it creates a Hispanic congressional district in North Central Texas. Why is that important? Well, let me just talk to you about, briefly, about the increase in population in the State of Texas. All of us know that we have had about, what, about 5.2 million new residents, most of that being ethnic minority. When you begin to look at North Central Texas, what you begin to see, that the increase in North Central Texas, of the increase in Dallas and Tarrant County, which was about 700, about 668,000 persons, that the majority of that was, in fact, ethnic minorities.  Interestingly, when you begin to look at the, Senator Seliger, when you begin to do a further analysis of the population in North Central Texas, and you know that you have two African American congressional districts there that obviously are being retained in your map, but we also have room to develop an Hispanic district. And what is the rationale for that? When you begin to look at the population changes in Dallas County, we lost about 191,000 Anglo voters, citizens in Dallas County between 2000 and 2011. The population increase for Hispanic voters was some 277,000 and for African Americans some 78,000. When you look at Tarrant County, you had an increase of Anglo citizens of about 53,000, but you had an increase of Hispanic residents of some 220,000, African Americans about 86,000. So, you can see there's room for another congressional district that favors Latinos if we have the political will to do it as part of this deliberative process. I want you to come with me one moment and look at districts surrounding Dallas County and also Tarrant County. When you begin to look at some of those districts, first of all, CD 6, that's in the benchmark plan. In the benchmark plan that is anchored in heavily Anglo counties of Ellis and Navarro, and I hadn't looked at the statistics, but I will be willing to bet you that those districts have increased in Anglo populations. But what ends up happening, that the district reaches into Dallas County and Tarrant County to include heavily Hispanic neighborhoods in Dallas, in Dallas County and areas of Tarrant County with rapidly growing Hispanic and African American population. The benchmark has a combined Black and Hispanic citizen voting age population in CD 6, some 38.6 percent. You look at CD 12 and see kind of the same, you look at CD 30, you look at CD 26, it's anchored in Denton County, kind of the same. You look at the Congressional District 26, the statistics may be different, but they end up having odd shapes, and they take in consideration, Senator Seliger, higher minority populations

Case 3:21-cv-00259-DCG-JES-JVB   Document 39-37   Filed 11/24/21   Page 35 of

A-34                83rd Legislature — First Called Session    2nd Day (Cont.)

than are necessary. They kind of dart into the urban counties and take up that population. And when you begin to look at whether or not those representatives represent those citizens by their votes, and let me give you an example, the Affordable Care Act, as one example, which is a big example, those representatives were not supportive of the Affordable Care Act, which was important to many of the Hispanic and African American residents of those particular districts. And so, we have the ability to, under Section 2 and also under Section 5, to create a congressional district where Latinos have an opportunity of electing a candidate of their choice. And so, I would move adoption of the amendment.

### (Senator Eltife in Chair)

**Presiding Officer:**  Senator Seliger on Floor Amendment Number 3.

**Senator Seliger:**  Senator West, are you familiar with a rubber band score?

**Senator West:**  I'm sorry, say that again.

**Senator Seliger:**  A rubber band score that scores the compactness of a district?

**Senator West:**  I'm sorry, I didn't hear you.

**Senator Seliger:**  Are you familiar with what's considered a rubber band score that scores the compactness of a district?

**Senator West:**  A rubber band?

**Senator Seliger:**  A rubber band score.

**Senator West:**  No, I'm not.

**Senator Seliger:**  Okay.

**Senator West:**  What is–

**Senator Seliger:**  Because there's a–

**Senator West:**  –what does that mean?

**Senator Seliger:**  –well, there's some details about it I don't understand, and I was going to ask you the question, in Congressional District 33–

**Senator West:**  Okay.

**Senator Seliger:**  –under this map.

**Senator West:**  Yes.

**Senator Seliger:**  Are you saying that Congressional District 33 is going to elect an African American candidate of choice?

**Senator West:**  Yes. Because we increase, there were some stranded African Americans in one of the other contiguous districts, we're taking those in my map and putting in that particular district.

**Senator Seliger:**  Would you define a stranded population, please?

**Senator West:**  A, basically, they're in a district that does not represent their interests. I mean–

**Senator Seliger:**  So, you're saying–

**Senator West:** –hold on, hold on, let me finish, let me finish, let me finish. And when you begin to look at the voting record of that representative, it's inconsistent with the interest of those individuals.

**Senator Seliger:** –and so, you're saying that Africans Americans in a district are not represented by the representative who is elected in that district, unless that representative is an African American.

**Senator West:** What? Say that again.

**Senator Seliger:** Is that what you're saying?

**Senator West:** I didn't hear what you said.

**Senator Seliger:** Are you saying that, take an African American population, what you call a stranded population, that they cannot be adequately or well represented by a congressman–

**Senator West:** No, no, I'm–

**Senator Seliger:** –or congresswoman–

**Senator West:** –I'm, no–

**Senator Seliger:** –who's not of that race?

**Senator West:** –I would never say that. I think you have to look at the person's record that–

**Senator Seliger:** Then, how are they stranded?

**Senator West:** –let me, let me finish. I think you have to look at the person's record to make a determination. Whether they're Black, White, purple, or pink as to whether or not they have a similar interest for the constituents for that particular area.

**Senator Seliger:** And I'm afraid I don't understand that because what you're talking about is they have a voting record that is not consistent with that so-called stranded population in that district. How is that judgment made?

**Senator West:** Based on the voting record, you look at the voting record to determine whether or not they have used an objective criteria. The objective criteria is, in fact, what the citizens in that particular area, geographical area, what those citizens are interested in, politically, and then look at the voting record of the individuals that represent them to make a determination as to whether or not they're voting their interests has, in fact, been considered and voted upon favorably by the representative. Those, I mean, it's objective. Would you not agree?

**Senator Seliger:** I don't know whether I agree or not. It seems to be such a subjective matter, and in preparing here, I don't think anybody has ever told me that that consideration was part of Section 2 when it comes to demands that it makes on a district. But I have another question. Am I correct in assuming that if one has a Black voting age population, or a Black citizen voting age population, that if one were to reduce those populations in favor of something else, it's my understanding that that is the very definition of retrogression under Section 5.

Case 3:21-cv-00259-DCG-JES-JVB   Document 39-37   Filed 11/24/21   Page 37 of

A-36                83rd Legislature — First Called Session   2nd Day (Cont.)

**Senator West:** I think that what you have, if indeed there had not been a determination of intentional discrimination, you'd probably be right.

**Senator Seliger:** And that leads me to another question, I think, because in Plan C235, the one described in Senate Bill 4, the Black voting age population is 46.4 percent, and the Black citizen voting age population is 53.5 percent.

**Senator West:** What district are you referring to, 33?

**Senator Seliger:** Plan 235, which is the plan offered by Senate Bill 4.

**Senator West:** Right.

**Senator Seliger:** Well now, in Plan C248, in the amendment that you have just offered, the Black voting age population drops a full five points to 41.8 percent, and the Black voting citizens age population drops to 58 percent, to 48 percent, I'm sorry, from 53.5. If I drew that map–

**Senator West:** I would support you.

**Senator Seliger:** –well, I wonder if you–

**Senator West:** Would you–

**Senator Seliger:** –would because–

**Senator West:** –co-author, would you co-author this with me?

**Senator Seliger:** –because what–

**Senator West:** Would you co-author–

**Senator Seliger:** –no, because–

**Senator West:** –this with me?

**Senator Seliger:** –I believe that my basing–

**Senator West:** I would, I would work–

**Senator Seliger:** –I'm sorry, may I finish now?

**Senator West:** –yes, you, yes, you can.

**Senator Seliger:** This appears to me to be the sort of retrogression that we must avoid, and yet you put it in your map.

**Senator West:** May I respond?

**Senator Seliger:** Well, let me ask you a question, though. Is retrogression okay if it's proposed by you, but not okay if it's proposed by me?

**Senator West:** Let me respond to you. If you decide to co-author this particular amendment, it's not retrogressive, not whatsoever. If you decide to co-author this, or if you say, Senator West, I want to submit this amendment, I'd pull mine down and co-author yours. Because the reality is, is what we're doing is maintaining two African American districts up here, where Eddie Bernice Johnson in Congressional District 30, she's been elected 11 times. Marc Veasey's in 33, he would be elected under this particular map also. And on top of that, we take some of those funny looking districts that kind of, where the core of the district is in suburban counties,

where you have an increase in Anglo population, because again you've got to look at the totality of the circumstances. In Dallas County you lost, we lost 191,000 Anglo citizens in Dallas County. Tarrant County, you didn't have a substantial growth in Anglo population so the Anglo population is going somewhere, and so where are they going? They're going to counties outside of Tarrant and Dallas. What counties are contiguous with those counties, with Dallas and Tarrant? Denton, Ellis, that's where they're going. Where are the core of those congressional districts? CD 6, I believe, it's in Ellis or Navarro. And then you look at Denton, and so, and what those districts are doing that are contiguous to 33 and 30, they're darting in, taking ethnic minority population that would be of no political consequences to them because of the sheer numbers. It's the only thing I'm saying is that given that we've had sufficient population growth, we've had sufficient population growth in North Central Texas. This gives us an opportunity to create a Latino district that won't be retrogressive of minority districts. And I'm willing to pull this amendment down if you're willing to author the amendment yourself, and I would co-author it with you. Would you do that, Sir?

**Senator Seliger:** I will not support a district that I think is retrogressive. I think it's the wrong thing to do, but what I will do because I think it does just that, is move to table the amendment.

**Senator West:** Well, let me ask you this before you move to table the amendment.

**Senator Seliger:** No, I've already moved to table.

**Senator West:** Would you allow me to ask you a question before you do that?

**Senator Seliger:** Please.

**Senator West:** Okay. Why do you think it's retrogressive?

**Senator Seliger:** Because, as I've said, it reduces the, what did I say, the Black citizen voting age population in, from 46 point, I'm sorry, the Black voting age population from 46.4 to 41.8, and reduces the Black citizen voting age population from 53.5 to 48 percent.

**Senator West:** Do you agree with me in a Section 5 analysis that you must go beyond mere population data to include such factors as minority voter registration, minority voter turnout, election history, and majority, minority-majority voting behaviors?

**Senator Seliger:** Ah, I am, I'm sorry, I neither agree or disagree but certainly agree that it is your assertion. At the same time, I think that there could be accusation that it's retrogressive and, therefore, I must move to table the amendment.

**Senator West:** And as you're moving to table the amendment, I think that what Senator Watson said a few moments ago, this is, I won't say it was preordained, I'll say it's been predetermined. And so, I'd move to, that we do not amend, that we do not grant your motion to table. So, I'm against it.

**Presiding Officer:** Thank you, Senator West. Thank you, Senator Seliger. Before we take up the motion on the amendment, we have a Motion In Writing by Senator Whitmire to excuse Senator Van de Putte on matters of important business. Is there

se 3:21-cv-00259-DCG-JES-JVB   Document 39-37   Filed 11/24/21   Page 39 of

A-38                    83rd Legislature — First Called Session    2nd Day (Cont.)

objection? Hearing none, motion is adopted. Thank you, Members. The motion is now by Senator Seliger to table Floor Amendment Number 3. Members, you're voting to table Floor Amendment Number 3. Secretary, please call the roll.

**Secretary of the Senate:** Birdwell, Campbell, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Garcia, Hancock, Hegar, Hinojosa, Huffman, Lucio, Nelson, Nichols, Patrick, Paxton, Rodríguez, Schwertner, Seliger, Taylor, Uresti, Van de Putte, Watson, West, Whitmire, Williams, Zaffirini.

**Presiding Officer:** 16 ayes, 11 nays, the motion to table prevails. Thank you, Senator West. Thank you, Senator Seliger. Senator Seliger, you're recognized for a motion.

**Senator Seliger:** Mr. President, I move the passage to engrossment of Senate Bill 4.

**Presiding Officer:** Senator Seliger now moves passage to engrossment. Secretary, would you please call the roll.

**Secretary of the Senate:** Birdwell, Campbell, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Garcia, Hancock, Hegar, Hinojosa, Huffman, Lucio, Nelson, Nichols, Patrick, Paxton, Rodríguez, Schwertner, Seliger, Taylor, Uresti, Van de Putte, Watson, West, Whitmire, Williams, Zaffirini.

**Presiding Officer:** 16 ayes, 11 nays, SB 4 is passed to engrossment. Senator West, for what purpose? Thank you.

**Senator Seliger:** I assume that Senator West was going to ask unanimous consent to reduce these comments and debate to writing.

**Senator West:** That's exactly right, plus I want to make a motion before, I want to set something in the record before final passage.

**Senator Seliger:** I would also move that any pictures taken during that time be only of Senator West.

**Presiding Officer:** Well, at this point, we don't have a motion, we just have mind reading going on. Is there a motion on the floor?

**Senator West:** There's a motion to reduce all comments, my comments, Senator Watson's comments, Senator Seliger's comments for sure.

**Presiding Officer:** Now we have a motion. Members, you've heard the motion by Senator West to reduce the comments made to writing. Is there any objection? Chair hears none, motion adopted. Thanks, Senator West.

**Senator West:** Mr. Chairman. There's–

**Presiding Officer:** Senator West, you're recognized.

**Senator West:** I'd like to speak before final passage.

**Presiding Officer:** Yes, Sir. We're stopping here right now.

**Senator West:** Oh.

**Presiding Officer:** We're going to another bill at this point. Then, we'll come back to that later.

## THIRD DAY

(Friday, June 14, 2013)

**President:**  The Chair recognizes Senator Seliger for, no, the Chair lays out on third reading and final passage Senate Bill 4. The Secretary will read the caption.

**Secretary of the Senate:**  Senate Bill 4, relating to the composition of districts for the election of Members of the United States House of Representatives from Texas.

**President:**  Senator West, for what purpose do you rise, Sir?

**Senator West:**  I'd like to speak on final passage of the bill.

**President:**  Alright, I'll call on you in just a moment.

**Senator West:**  Yes, Sir.

**President:**  The Chair recognizes Senator Seliger for a motion.

**Senator Seliger:**  Members, this is Senate Bill 2, I'm sorry, Senate Bill 4 is the map for the Texas congressmen. It passed a little while ago, and with a split vote, and since it did pass then, now is a great opportunity to let "Kum Ba Yah" ring all over the State of Texas and all vote for Senate Bill 4. I move final passage, Mr. President.

**President:**  The Chair recognizes Senator West.

**Senator West:**  Thank you very much, Mr. President. And I'm, I will be voting against final passage of this particular bill, Members, and the reason I'm voting against final passage of this particular bill is because I firmly believe in my heart that there has not been a full discussion of the deliberative process that includes input from all of the Members of the Committee yet, Members of this particular body. I think that the San Antonio court indicated that the congressional map was a preliminary map and gave us the ability to do a little bit more so they could fully analyze it once it's sent back to them. In my estimation, based on the Committee meetings that I participated, the field hearings that I requested, and the field hearings that I've attended, I do not believe that once you look at the evidence in this particular record that there has been full consideration of it. The only thing we're doing is what the Governor asked us to do in the first place. That is to, what was that, Kirk, modify, no, ratify and adopt this particular map.

**President:**  Members, the issue before us is the adoption of Senate Bill 4. The Secretary will call the roll.

**Secretary of the Senate:**  Birdwell, Campbell, Carona, Davis, Deuell, Duncan, Ellis, Eltife, Estes, Fraser, Garcia, Hancock, Hegar, Hinojosa, Huffman, Lucio, Nelson, Nichols, Patrick, Paxton, Rodríguez, Schwertner, Seliger, Taylor, Uresti, Van de Putte, Watson, West, Whitmire, Williams, Zaffirini.

**President:**  Members, there being 16 ayes and 11 nays, Senate Bill 4 is finally passed.