# EXHIBIT 6-K

# SENATE JOURNAL

## EIGHTY-SEVENTH LEGISLATURE — THIRD CALLED SESSION

## AUSTIN, TEXAS

### PROCEEDINGS

---

### ADDENDUM

(FOURTH DAY — Monday, October 4, 2021)

The following remarks regarding **CSSB 4** were ordered reduced to writing and printed in the *Senate Journal*.

**Secretary of the Senate:** Committee Substitute Senate Bill 4 relating to the composition of districts for the election of Members of the Texas Senate.

**President:** Senator Huffman, you're recognized to explain the bill.

**Senator Huffman:** Thank you, Mr. President and Members. Members, this is the Senate bill which draws our new lines for the entire Senate. We're going to call this, it's officially called PLANS2130 if you're looking in DistrictViewer. This plan was developed after the committee heard many hours of public testimony and after I listened to each Member's priorities and input about their respective district. My goals and priorities in developing this proposed plan included first and foremost following all applicable law, equalizing population across districts, preserving political subdivisions and communities of interest when possible, preserving the cores of previous districts to the extent possible, avoiding pairing incumbent Members, achieving geographic compactness, and accommodating incumbent priorities to the extent that I could. I also looked at and considered public plans which were submitted through the portal process that has been open for several months now, and some Members of the public have submitted those plans as well as some of the different organizations and groups. In the plan before us today, PLANS2130, the total deviation between the smallest district and the largest district is 6.13 percent. I would also like to point out that this plan does not split one single voting tabulation district, also known as VTD, in the entire state. When developing the Senate proposal, I made every effort to accommodate Member requests, and I'm pleased that I was able to accept many of your requests in the plan before you today, not all but many. I know that every Member of this body, including myself, would prefer to make certain adjustments to the proposed plan. But unfortunately changing as little as one precinct sometimes has an impact upon at least one other district and typically has ripple effects that impact multiple districts or sometimes even the entire state. Before we get to individual amendments also want to inform this body about my thought process in assessing each amendment that was filed. First, the amendment, as it interacts with the statewide plan, must abide by all applicable law. I sought legal advice and reviewed relevant information with my committee staff to satisfy myself that whatever map we vote off of this floor today will be legal. Second, I prefer that an amendment does not

increase the plan's overall deviation as we have worked hard to keep district populations relatively similar and legal. Third, at this point in the process it's my goal that changes to districts involved in an amendment be agreed to deals between Members to as much as was possible. Finally, I've always kept in mind the redistricting objectives and priorities I've laid out above. Since filing this plan, I've done my best to work with Members involved in specific changes to districts they represent. Therefore, I don't think it's fair to this body to abandon that strategy now, also do not want to put this body in the position of having to choose between colleagues and friends when there is a disagreement. Therefore, if an amendment is not agreed upon by all Members involved I will be voting against the amendment and will leave it to the will of the body. And with that I lay out the Committee Substitute to Senate Bill 4 and happy to answer any questions.

**President:** Senator Powell, you're recognized. For what purpose?

**Senator Powell:** To ask questions of the author.

**President:** Do you yield?

**Senator Huffman:** Of course.

**Senator Powell:** Senator Huffman, I'd like to better understand the process by which the Senate map was drawn. At the September 24th hearing, you told me that the three people responsible for drawing the Senate plan were you and your aides, Anna Mackin and Sean Opperman. Is that right?

**Senator Huffman:** Correct.

**Senator Powell:** Who actually sat at the computer and physically constructed this map?

**Senator Huffman:** Anna Mackin, who's sitting here to my left and Sean Opperman were the people actually using the computer. I sat in the room with them at all times and directed them as they went through the mechanical process, so to speak.

**Senator Powell:** So, the three of you took turns.

**Senator Huffman:** I didn't touch the computer to be honest but I gave direction to them, yes.

**Senator Powell:** And so, roughly what percentage of the time was it Anna versus Sean?

**Senator Huffman:** Anna probably was doing it most, but we were always all three in the room, yeah.

**Senator Powell:** Okay, so you were all three always present when Anna and Sean were drawing the district lines.

**Senator Huffman:** Anna and Sean did not do anything without my direction.

**Senator Powell:** And so, you, did you ever draw any lines outside of their presence?

**Senator Huffman:** I, no. Actually don't know how to even log in to RedAppl, to be honest.

**Senator Powell:**  Okay. And so, did Anna or Sean discuss map ideas they generated outside of their meetings with you?

**Senator Huffman:**  With other people? Not to my knowledge.

**Senator Powell:**  And so, what computer or program did they use to generate this map?

**Senator Huffman:**  RedAppl, the–

**Senator Powell:**  Okay.

**Senator Huffman:**  –provided by Texas Legislative Council.

**Senator Powell:**  And up, how many hours did it take to construct this district plan?

**Senator Huffman:**  I wouldn't want to begin to guess but countless, many, many hours. Yeah.

**Senator Powell:**  And when did you begin to draw the map for this plan?

**Senator Huffman:**  After the numbers came out.

**Senator Powell:**  Okay.

**Senator Huffman:**  I don't remember that exact date, was August.

**Senator Powell:**  And so it–

**Senator Huffman:**  August.

**Senator Powell:**  –it was you and Anna and Sean who sat at the computer and physically drew the boundaries for SD 10, for my map?

**Senator Huffman:**  Yes.

**Senator Powell:**  And the three of you all were in the room together when that occurred.

**Senator Huffman:**  Yes, as I've said, yes, Ma'am.

**Senator Powell:**  Alright. Did anyone besides Anna Mackin and Sean Opperman and you provide input on the boundaries of SD 10?

**Senator Huffman:**  Occasionally the Lieutenant Governor would come in but very rarely. Came in once or maybe two or three times through, during the entire process, as I'm sure any Lieutenant Governor in the history of Texas would, took it, took a, take an interest in the redrawing of Senate redistricting maps.

**Senator Powell:**  So, did anyone other than you and Anna and Sean and the Lieutenant Governor suggest the boundaries of SD 10 should be altered from the current configuration today?

**Senator Huffman:**  Could you repeat the question? Want to make sure I understand specifically.

**Senator Powell:**  Is there anyone else, other than you and Anna Mackin or Sean Opperman who suggested that the boundaries of SD 10 should be altered from its current configuration today, as I serve in SD 10?

**Senator Huffman:**  I'm sure I've had conversations with people over the months but I do not recall a specific conversation where that specific discussion was had.

**Senator Powell:**  Not one?

**Senator Huffman:**  Not that I recall a specific discussion. As I said, I'm sure I've had discussion with Members in general about that SD 10 had changed or was changing, but I cannot recall a specific conversation.

**Senator Powell:**  Alright. A specific single person that you might have had a conversation with about redrawing the boundaries of Senate District 10.

**Senator Huffman:**  Not that I recall, no.

**Senator Powell:**  Did anyone ever suggest to you that SD 10 be expanded beyond Tarrant County?

**Senator Huffman:**  Not that I recall.

**Senator Powell:**  Was any other, anyone other than a legislator or legislative staff member ever present when you were working on drawing this Senate map?

**Senator Huffman:**  A legislator or legislative staff member, no.

**Senator Powell:**  Okay.

**Senator Huffman:**  Other than, I guess, is the Lieutenant Governor, he's a statewide elected official. So, he's not really a legislator, but.

**Senator Powell:**  Was, and so, what computer program again did you use to draw this map?

**Senator Huffman:**  RedAppl.

**Senator Powell:**  At any time was any other program consulted such as Maptitude or Dave's Redistricting App or Districtr or others?

**Senator Huffman:**  Not to my knowledge, no.

**Senator Powell:**  In January, on, on January 22nd, 2021, in an interview with Fox 26 out of Houston, you explained that American Community Survey estimates were available and they gave you an idea of where the growth was in Texas. At any point, prior to the census data release on August the 12th, did you use ACS estimates of total population to begin drafting potential district lines?

**Senator Huffman:**  Not that I recall.

**Senator Powell:**  Did Anna Mackin or Steve, or Sean Opperman create draft district lines using ACS estimates?

**Senator Huffman:**  I honestly don't know. I would assume that they were probably practicing how to use RedAppl but there were no instructions, there were no numbers, they may have been playing with the, with the system, I don't know, but there was nothing and, and we never used ACS because ACS was not in RedAppl I believe, yeah, we just didn't use it, yeah.

**Senator Powell:**  Anyone else involved in that process that might–

**Senator Huffman:**  In which process, I'm sorry.

**Senator Powell:**  In creating this, this draft of district lines–

**Senator Huffman:**  No, I've stated–

**Senator Powell:**  –using ACS.

**Senator Huffman:**  –who was involved.

**Senator Powell:**  Alright. Were you provided a map created by anyone else at all based on ACS estimates prior to the census data release in August?

**Senator Huffman:**  I never received anything, any kind of map on ACS data. If it came in from the public or something, I never saw it but I was never made aware or looked at anything. Sometimes things, you know, come into your office via mail or email that I never see, but to my knowledge, no.

**Senator Powell:**  Alright. Once the census data was released in August, did you use the draft plan based on population estimates as the starting point to draw the Senate plan?

**Senator Huffman:**  Once the numbers were loaded into RedAppl, that is when we began the process, yes.

**Senator Powell:**  Were the current Senate districts displayed on the screen or on another screen when the Senate plan was being drawn?

**Senator Huffman:**  I don't remember.

**Senator Powell:**  Were there any printed maps used to compare?

**Senator Huffman:**  I thing that we had many printed maps there in the redistricting office that had been prepared for the eventuality of having public hearings. In fact, we still have boxes full of printed maps but because the public hearings were not held, we had an excessive number of printed maps. So, yeah, there were printed maps around. Sometimes I keep one, even on my desk to look at as we go through the process because it's a quick reference. Some of them have population numbers by county, you know, and other useful information that is a quick reference while performing the job.

**Senator Powell:**  In terms of data that you consulted, RedAppl has a statistics tab that allows the user to choose which electoral and demographic data to display on the screen while the map is being drawn. Is that correct?

**Senator Huffman:**  Correct, yes.

**Senator Powell:**  Which fields were displayed while the Senate plan was being drawn?

**Senator Huffman:**  It, it changed. Sometimes we looked at county lines, sometimes precinct, actual the precincts highlighted. Sometimes we have it shaded for cities and sometimes we had it shaded for partisan numbers, sometimes they were Trump numbers, sometimes we had several political elections up from different years that we looked at and population numbers were almost always there. One thing we never had was racial shading.

**Senator Powell:**  So, did you have anything about total population on the screen?

**Senator Huffman:**  Yes.

**Senator Powell:** And any deviation percentages?

**Senator Huffman:** Yes. There was a, kind of a column in the left-hand side that as you proceeded, you could see what it did to the statewide deviation. I think they may have had to click on another button to see it, but it was there on the left-hand column.

**Senator Powell:** And how about demographic data?

**Senator Huffman:** There was no demographic data provided. Just, as I said, sometimes partisan numbers, total population, city shading, things like that.

**Senator Powell:** Okay. You, you mentioned that election data was displayed.

**Senator Huffman:** Sometimes, yeah.

**Senator Powell:** And so, let me ask you specifically about these particular election data. How about the 2020 presidential election?

**Senator Huffman:** Yes.

**Senator Powell:** How about the 2020 Senate election?

**Senator Huffman:** Sometimes, yes.

**Senator Powell:** The 2018 Senate election.

**Senator Huffman:** Is, was that the Cruz election? Is that the Cruz, Beto?

**Senator Powell:** Yes.

**Senator Huffman:** That was up there sometimes. Sometimes we took, looked at it as a reference but it wasn't always up there.

**Senator Powell:** How about the 2018 Governor election?

**Senator Huffman:** Abbott, yes.

**Senator Powell:** And the 2016 presidential election?

**Senator Huffman:** It was, I don't think we had that up there very often. Maybe occasionally but I don't recall, that was not one of the main elections that we looked at. I'd like to say we never looked at that, but it was not one of the main ones.

**Senator Powell:** Okay. Any other election that maybe I didn't think to ask you here?

**Senator Huffman:** No. I think, you know, the 2020 Trump, the Abbott election, Lieutenant Governor Patrick's election, and Cruz, Beto were really the main ones that we focused on, yeah.

**Senator Powell:** Okay. RedAppl has a shading tab that allows voter tabulation districts to be colored based on a selected type of statistic. Is that right?

**Senator Huffman:** I don't know which ones you're referring to. As I said, we looked at the partisan shading and that's the only shading we looked at other than the ones that would shade municipalities–

**Senator Powell:** Okay.

**Senator Huffman:** –or yeah. Just other parts of ci– annexation areas and so forth.

**Senator Powell:** So, going back to the election data that was displayed, were those displayed in shading?

**Senator Huffman:** Were those what?

**Senator Powell:** Were those displayed in shading maps?

**Senator Huffman:** Yes. We had it–

**Senator Powell:** And do you recall–

**Senator Huffman:** –colored, so teal was more Republican Trump and sort of a orangish color was Biden and they sort of would shade darker, lighter, depending upon the, the percentage and the heaviness of the, the height. The low percentage would be lighter and the higher would be darker, to my understanding. I mean it was sort of subjective when you look at it but generally that's how it works.

**Senator Powell:** Okay. At the September 24th hearing you introduced the Senate plan by reading aloud written and prepared remarks, kind of like you did here today. Is that correct?

**Senator Huffman:** Don't recall but I assumed I probably did, yes.

**Senator Powell:** Well, you said the following, and I'm going to quote this from your comments. Quote, my goals and priorities in developing these proposed plans include first and foremost abiding by all applicable law, equalizing population across districts, preserving political subdivisions and communities of interest when possible, preserving the cores of previous districts to the extent possible, avoiding pairing incumbent Members, achieving geographic compactness when possible, and accommodating incumbent priorities, also when possible, end quote. These were the goals that you followed in drawing the districts. Is that correct?

**Senator Huffman:** Literally speaking, yes.

**Senator Powell:** Well, in the, in the written statement that you read aloud on that September 24th hearing I believe that you did not say anything about partisan considerations. That those were parts of your goals and principles. Did it?

**Senator Huffman:** I did not recall if I stated that at that time. I don't.

**Senator Powell:** Well, and after the plan was written and after you heard all the public testimony, I believe you added a new dis– redistricting criteria. And I'd like to walk through some of these goals and how they were applied to the drawing of Senate District 10.

**Senator Huffman:** Okay.

**Senator Powell:** In terms of legal compliance, you said that ensuring legal compliance was the first and foremost goal. And I'd like to ask today how did you satisfy that goal? Did you get legal advice about how to draw the lines from the Attorney General's Office before you undertook to draw the districts?

**Senator Huffman:** No.

**Senator Powell:** And how did you transmit the draft maps to the Attorney General's Office? Did you do that by email? Did you do it by a link to RedAppl?

**Senator Huffman:** I don't remember specifically. I think it was via email but I don't recall specifically.

**Senator Powell:** And were those PDFs of the map or were they–

**Senator Huffman:** Are you talking about after we filed it or are you talking about during the process? I just want to make sure I understand your question.

**Senator Powell:** This was after the September 24th hearing.

**Senator Huffman:** Let, let us look. I don't remember specifically the filing versus the hearing. So, give us, give me a second. I want to make sure I give you correct information, because I, I really don't recall, to be honest.

**Senator Powell:** Okay. And I would ask you this, too. What reports or data accompanied those maps that you sent to the AG's office?

**Senator Huffman:** As I stated before, I received legal advice from counsel which I'm not going to comment on, but I did believe that the maps did, were legal and complied with the Voting Rights Act. Since then, since the maps have been drawn, amendments taken care of, and so forth, I have looked at some data to reassure myself of that as well.

**Senator Powell:** So, when you sent those maps over to the AG's office did you also send any American Community Survey CVAP data or any other demographic data?

**Senator Huffman:** No data whatsoever, just the map as the, as I had drawn the map.

**Senator Powell:** And do, do you recall or can you speak to today when you sent the draft map to the Attorney General's Office for review?

**Senator Huffman:** I don't recall the exact date, no.

**Senator Powell:** Did the Attorney General's Office advise you to make any changes to the map after they reviewed it for legal compliance?

**Senator Huffman:** I'm, I'm not going to comment on my discussions with my attorney.

**Senator Powell:** And so, I would take that to mean that you are not going to tell us in a public format today what changes they may have suggested that you make.

**Senator Huffman:** It's not, I'm not going to discuss any legal advice I received. I will say that I believe the maps before you are legally compliant with Section 2 under the Voting Rights Act.

**Senator Powell:** Did the Attorney General's Office advise you that the State Senate plan you drafted was not intentionally racially discriminatory?

**Senator Huffman:** Again, I'm not going to discuss specific discussions I had with my attorney. I will say that I believe, today, that these maps are legally compliant and lawful under the Voting Rights Act.

**Senator Powell:** And I will also further ask you, did the Attorney General's Office advise you that the State Senate plan you drafted complies with the Voting Rights Act? Or do you–

**Senator Huffman:** I believe the maps–

**Senator Powell:** –just believe–

**Senator Huffman:**  –before me–

**Senator Powell:**  –that it is?

**Senator Huffman:**  –today are legally compliant.

**Senator Powell:**  So, you've, you've said that the Attorney General's Office told you SD 10, as proposed in your plan, is lawful. So, is that a correct statement?

**Senator Huffman:**  My statement today is I'm not going to discuss what I talked about with my lawyer. I will tell you as I stand before you today I believe that the map before you is legally compliant and does not violate Section 2 of the Voting Rights Act.

**Senator Powell:**  Do you believe that you received quality legal services from the Attorney General's Office?

**Senator Huffman:**  I'm not going to discuss the quality or the content of my legal discussions with my lawyer.

**Senator Powell:**  Have you sought legal advice from the Attorney General's Office via email?

**Senator Huffman:**  Again, I'm not going to discuss the, the means by which I received legal advice. I will tell you that I believe the maps are legally compliant.

**Senator Powell:**  Did you discuss with the Attorney General's Office the fact that SD 10 exists in its current form today because a federal court ruled that the Legislature intentionally discriminated against minorities by attempting to dismantle the map in 2011?

**Senator Huffman:**  Again, I'm not going to discuss what I talked about with my lawyer.

**Senator Powell:**  And have you read the 2012 preclearance decision from the D.C. federal court in the Texas versus United States case?

**Senator Huffman:**  Have I read it? I probably have in the past. I don't want to say definitively because I don't recall if it's one I read.

**Senator Powell:**  Well, I would add here that I provided a copy of that decision to you when we met to preview our proposed map. Is that correct?

**Senator Huffman:**  I recall you handing me a legal document, yes.

**Senator Powell:**  And you were on the Redistricting Committee and voted to permanently adopt the court-ordered plan. Is that correct?

**Senator Huffman:**  Are you talking about back in 20– yes, I was on the Redistricting Committee last time it came before the Senate in that year. Yes.

**Senator Powell:**  And, and you voted to adopt the court-ordered plan. Is that correct?

**Senator Huffman:**  I did vote for the map. Yes, I did.

**Senator Powell:**  Alright. Have you read the San Antonio federal court's opinion in *Perez v. Abbott* regarding the 2011 congressional and statehouse plans?

**Senator Huffman:**  I've read the synopsis.

**Senator Powell:** Okay. Then the next criterion that you mention is equalizing population. The next priority you listed was that equalizing population. SD 10, as it is currently drawn, is just .57 percent above the ideal population as it currently exists. Is that correct?

**Senator Huffman:** I don't have the numbers in front of me but that sounds if, I'm sure you do, so I won't question you on that.

**Senator Powell:** Thank you. In the plan that we have before us today only three districts, SD 14, SD 18, and SD 22 have deviations that are below .57. Is that correct?

**Senator Huffman:** I don't know. Let me pull the chart out because I don't know that, have that, I don't have that memorized.

**Senator Powell:** Well, I will just go on then and say that if left unchanged from its current configuration, SD 10 is closer to the equal population than 27 other districts in the plan before us today. No changes, and I believe I suggested this to you at our meeting, no changes were needed in order for SD 10's to, to have a legally permissible total population. Would you agree that's right?

**Senator Huffman:** Not necessarily because as you know we had to look at the state holistically, and just because one district may have been close to ideal doesn't mean that it wasn't going to be changed to accommodate a statewide plan.

**Senator Powell:** Well, at the September 28th committee hearing, you said that SD 10 needed to be changed because of the nearby districts, because of SD 8, which is Senator Paxton's district, because of SD 12, Senator Nelson's district, and SD 30, Senator Springer's district, that they were overpopulated, is that correct?

**Senator Huffman:** I know that Senator Nelson's district was overpopulated and I believe, I don't think SD 30 was overpopulated but I could be wrong on that.

**Senator Powell:** Well, you cited that day that SD 8 is overpopulated by about–

**Senator Huffman:** It is overpopulated, I'm sorry, I stand corrected, yes.

**Senator Powell:** I'm, I'm sorry go ahead.

**Senator Huffman:** I just wanted to say, yes, SD 30 was overpopulated. I see Senator Springer shaking his head yes. And so, was, and so was 12. Twelve, I have the chart in front of me now, was 146,201 over. Senator Springer's district was 87,087. Senator Paxton's was 57,955.

**Senator Powell:** Alright. SD 8, Senator Paxton's district, is based in Collin and Dallas counties, and it actually borders SD 16, Senator Johnson's–

**Senator Huffman:** Yes.

**Senator Powell:** –district, which itself borders SD 23. Is that correct?

**Senator Huffman:** That is correct.

**Senator Powell:** Both SD 16 and SD 23 in Dallas County are under populated in the current plan and SD 23 is overpopulated by about 53,000 votes. Is that correct?

**Senator Huffman:** In the current plan?

**Senator Powell:** In the current plan.

**Senator Huffman:**  Correct. Yes. Not the proposed plan, the current plan, yes.

**Senator Powell:**  So, in reality it was not necessary to alter SD 10 in order to balance the population of SD 8. Isn't that right?

**Senator Huffman:**  I believed it was necessary to balance, looking at it holistically.

**Senator Powell:**  Well, you also stated the fact that SD 30, Springer, Senator Springer's district, is overpopulated by about 87,000 people.

**Senator Huffman:**  Correct.

**Senator Powell:**  And Senator Nelson's by 146,000 people, I think that's what you just said.

**Senator Huffman:**  Yes.

**Senator Powell:**  But SD 28, Senator Perry's district, which adjoins Senator Springer's district, SD 30, was underpopulated by 144,000.

**Senator Huffman:**  Correct.

**Senator Powell:**  And SD 31, Senator Seliger's district, which adjoins Senator Perry, was underpopulated by about 71,000. Isn't that correct?

**Senator Huffman:**  Correct, yes.

**Senator Powell:**  So, shifting population from the overpopulated districts, 12 and 30, into the underpopulated districts, 28 and 31, would've completely resolved the population imbalance in the districts 12 and 30 to well within permissible deviation. Correct?

**Senator Huffman:**  I disagree, well, I disagree with that conclusion. I mean, you could look at all the numbers of all the districts and say if I just move 10,000 here and 10,000, there it would work, but as you know it does not, it's not that simple.

**Senator Powell:**  Well, I believe it was not necessary to make a single change to the borders of SD 10 in order to balance the population of Senate District 12 or Senate District–

**Senator Huffman:**  And that would have been–

**Senator Powell:**  –30.

**Senator Huffman:**  –the only Senate district in the State of Texas that was not changed.

**Senator Powell:**  In fact, Senator Alvarado's sponsor– Alvarado sponsored a committee amendment for me that restored SD 10 to its current configuration and ensured that SD 8, Senator Paxton's district, SD 30, Springer's district, and SD 12, Senator Nelson's, had balanced populations. Is that correct?

**Senator Huffman:**  I don't recall if it balanced populations. I do recall that she did have an amendment, yes.

**Senator Powell:** So, I, it's not true that you needed to change the boundaries of SD 10 in order to balance the population of other DFW area districts. In fact, your Senate proposal, in your Senate proposal, SD 10 goes from being 53,018 people above the ideal population to now being over 21,000 people above ideal. Isn't that correct?

**Senator Huffman:** I don't know the exact numbers.

**Senator Powell:** So, you effectuated your goal of balancing the population by redrawing SD 10 so that its population deviation is now four times greater than it is today.

**Senator Huffman:** Again, we look at it statewide and that's the goal, is a statewide goal.

**Senator Powell:** Well, let's move on to preserving the political subdivision in communities of interest.

**Senator Huffman:** Okay.

**Senator Powell:** The proposed Senate plan splits the City of Arlington with a population of 394,000 into four Senate districts. Is that correct?

**Senator Huffman:** I don't recall but that sounds right. I'm not sure.

**Senator Powell:** What community of interest does the City of Fort Worth and the City of Arlington have with Brown County, Callahan County, Shackelford County, Stephens County, Palo Pinto County, Parker County, and Johnson County's that are all rural counties.

**Senator Huffman:** Well, Senator Powell, as you know we have a very large state with, with thousands, probably tens of thousands, if not hundreds of thousands of communities of interest. So, it's very normal for there to be many communities of interest within a Senate district. I'm sure if we sat here and talked to every Senator they could tell you about different communities of interest within their Senate district. And sometimes they're shared even if they are far away. Senator Zaffirini has spoken eloquently about her community of interest that goes down I-35 from Webb County all the way to Travis County. I'm sure you've heard her speak of that. She speaks quite eloquently on it. There are others that believe that it's a small town that very interested in a lake in their area, so there can be many communities of interest within a Senate district. Simply because a city is separated into separate Senate districts does not necessarily mean that these are not communities that can still work together to have their goals met by their elected representative.

**Senator Powell:** So, does Senator Hancock's SD 9 district have any rural counties associated with it?

**Senator Huffman:** No.

**Senator Powell:** It's a Tarrant County district.

**Senator Huffman:** No, Ma'am. It doesn't.

**Senator Powell:** Not one. This proposed plan splits the historic North Side from the historic Southside in Fort Worth. Is that correct?

**Senator Huffman:**  I don't know exactly how Fort Worth is divided through their historic areas.

**Senator Powell:**  Well, I would remind this body that we heard testimony that the Latino community in the historic North Side and the historic Southside of Fort Worth form a single community of interest and they're joined together in the current SD 10. But in this new plan they are cracked apart. Is that correct?

**Senator Huffman:**  I do not, if they, how they are separated in the plan, specifically as you're describing it.

**Senator Powell:**  Multiple witnesses told you and the committee that the Latino communities in the north and south sides of Fort Worth share a single community of interest. Is that correct?

**Senator Huffman:**  There was a lot of testimony. I don't recall with specificity what areas were testified to, standing here today because there was a lot of testimony. A lot of it virtual and some of it in person, so I couldn't look at a map and point out to you where a specific way they testified where they were living.

**Senator Powell:**  So, I believe what you're saying to us today is that if citizens or Members of this Senate inform you about neighborhoods that form a single cultural community of interest that you are unwilling to modify the map to accommodate that community of interest.

**Senator Huffman:**  That is not what I said.

**Senator Powell:**  I'm sorry, I didn't finish my question.

**Senator Huffman:**  Oh, I apologize.

**Senator Powell:**  If those citizens, I mean, let me say that again.

**Senator Huffman:**  Okay.

**Senator Powell:**  That you are unwilling to modify the map to accommodate that community of interest if those citizens explained that they share racial or cultural ties with one another.

**Senator Huffman:**  We listened to what everyone had to say who came before us or anything that was submitted through the portal. I think you could understand that we have heard a lot of testimony about what constitutes a community and people have different opinions about that. And many people come forward and, and have concerns about issues. We listen to what everyone has to say and then holistically we put it together and tried to draw a legal map which is what we did here but, yes, we do listen to everyone, listening to their concerns, but again, sometimes that's in conflict, but we do listen to that.

**Senator Powell:**  So, you're aware that the Supreme Court has ruled that absent a compelling reason, race cannot be the predominant consideration in drawing a district line. Is that correct?

**Senator Huffman:**  Repeat the beginning please. Abs–

**Senator Powell:**  The Supreme Court has ruled that absent a compelling reason, race cannot be the predominant consideration in drawing district lines. Is that correct?

**Senator Huffman:** I'm not sure that's exactly what the Supreme Court has said. I believe that to draw a district based on race, unless there is a strong basis and evidence to believe the districting decision is required under Section 2 of the Voting Rights Act, then it is a racial gerrymander to do otherwise.

**Senator Powell:** Alright. Can you point out for me then today where the Supreme Court has ever ruled or said that a state cannot accommodate the shared cultural or heritage and community interests of two particular neighborhoods within a 940,000-person district.

**Senator Huffman:** I do not believe the Supreme Court has ever said that.

**Senator Powell:** How would accommodating these two neighborhoods, as was asked over and over and over again during testimony, these two neighborhoods have shared Hispanic culture and heritage, make the predominant consideration in the drawing of Senate District 10?

**Senator Huffman:** As I said, we considered many factors in drawing these lines. Racial constituencies was not one of them.

**Senator Powell:** Well, wouldn't preserving the existing district be the predominant consideration if we did accommodate those requests?

**Senator Huffman:** Say the beginning again.

**Senator Powell:** If–

**Senator Huffman:** Wouldn't.

**Senator Powell:** –in fact, wouldn't preserving the existing district be the predominant consideration if these requests were accommodated? The request to keep Senate district intact.

**Senator Huffman:** Not necessarily, no.

**Senator Powell:** Alright then. I'm going to move on to your criterion of preserving the core of previous districts.

**Senator Huffman:** Okay.

**Senator Powell:** Brown, Callahan, Shackelford, Stephens, Palo Pinto, Parker, and Johnson counties are not part of the core of existing SD 10. Is that correct?

**Senator Huffman:** There are new areas to Senate District 10, yes.

**Senator Powell:** And so, how does adding these seven rural counties serve your goal of preserving the core of Senate District 10?

**Senator Huffman:** The core is still there in Senate District 10. I believe your home is in Senate District 10. Is it not, Senator Powell? I'm pretty sure you believe you lived in the heart and soul of Senate District 10. So, your, the, the core, in my belief, is still there. It is a Tarrant County-based Senate district.

**Senator Powell:** With seven rural counties added to that urban area.

**Senator Huffman:** Correct.

**Senator Powell:** So, talking then about geographic compactness. What metrics did you use to assess the geographic compactness of districts?

**Senator Huffman:** Basically, we just tried to look for population. We used all the considerations that I spoke of previously and drew the map along those lines. As I said, it's a big state and there's some big Senate districts out there.

**Senator Powell:** The Reock compactness score commonly used by courts to access compactness, for the proposed SD 10 is 25 percent lower than the score for the existing SD 10. Did you know that?

**Senator Huffman:** No.

**Senator Powell:** Well, now you do.

**Senator Huffman:** Yes.

**Senator Powell:** Well, then making SD 10 less compact does not advance your compactness criteria, does it?

**Senator Huffman:** I'm sorry, repeat that. I'm, I apologize. I was talking to Anna.

**Senator Powell:** So, then knowing that the Reock compactness score for proposed Senate District 10 is 25 percent lower–

**Senator Huffman:** Yes.

**Senator Powell:** –than the compactness score for the existing Senate District 10. Are you making Senate District 10 less compact in this new map? Does that advance your criteria for compactness?

**Senator Huffman:** I would say there are multiple compactness scores, and I'm not going to focus on one that, frankly, I've never heard of before. Maybe it's very reputable, I just, I don't know. So, I'm not going to comment on some organization's score. I learned not to do that a long time ago.

**Senator Powell:** So, just looking at the map, would you assess that SD 10, in its current configuration, is more compact than an SD 10 that goes nearly to Abilene and all the way to Brownwood, is that, is that more compact than SD 10 is today?

**Senator Huffman:** It again depends how you define compactness and what the goals of the redistricting process were, how much population you needed, where you could find the population, other incumbents surrounding you and their interests had to be taken to, into account as well. And–

**Senator Powell:** Even if you didn't need any population.

**Senator Huffman:** Pardon.

**Senator Powell:** Even if you didn't need any population.

**Senator Huffman:** Well, we believed you needed population.

**Senator Powell:** Well, let's move on.

**Senator Huffman:** Okay.

**Senator Powell:** At the September 28th committee hearing, you said you were voting against my amendment, sponsored by Senator Alvarado, to restore SD 10 in order to accommodate your redistricting criteria. So, which of the redistricting criteria that we just discussed were you referring to when you said that?

**Senator Huffman:** All of them.

**Senator Powell:** All of them. Which redistricting criteria do you think was served by voting against that district?

**Senator Huffman:** I'm sorry, which–

**Senator Powell:** Which, which redistricting criteria do you think was served by voting against my amendment–

**Senator Huffman:** All of them.

**Senator Powell:** –to keep SD 10 the same?

**Senator Huffman:** All of them were considered.

**Senator Powell:** All of them. Well, what is the main reason, then, that you changed SD 10 from its current configuration where it's based solely in Tarrant County and largely in urban areas of Fort Worth and Arlington to one that includes now seven counties, seven additional counties?

**Senator Huffman:** All of the redistricting priorities that I previously stated, that you have stated as well.

**Senator Powell:** Senator Huffman, at the seven, at the September 28th hearing you read aloud written prepared remarks in order to, quote, remind Senators of the redistricting criteria that you followed in drawing the map. Do you recall that?

**Senator Huffman:** I don't recall specifically the date, but, yes, I do recall having some remarks, yes.

**Senator Powell:** And your September 28th written scripted criteria were the same as your September 24th written, scripted criteria with one exception. On September 28th, after the maps were drawn and after the testimony had been received, you read aloud from a piece of paper that, quote, partisan considerations were also one of the redistricting criteria that you followed in the drawing of the map. Do you recall that?

**Senator Huffman:** I don't recall there being a difference but I do recall that being one of the considerations, yes.

**Senator Powell:** And did someone tell you to add that new criteria of partisan considerations–

**Senator Huffman:** No.

**Senator Powell:** –after you heard the public testimony?

**Senator Huffman:** No.

**Senator Powell:** Alright then. You've claimed that this map was drawn blind to race. Is that correct?

**Senator Huffman:** That is the, the absolute truth as God as my witness.

**Senator Powell:** So, in fact when, when we had our committee discussion on September 24th you told me, and I quote this today, to this day I have not looked at any racial data.

**Senator Huffman:** Correct.

**Senator Powell:** When we met before you released the proposed Senate plan, I showed you a map of SD 10 showing colored shading. In fact, I showed you a number of maps that were shading maps where the district's minority populations were located, and you initialed every single one of those maps with the date on it. Is that correct?

**Senator Huffman:** Senator Powell, now we're going to, we're going to, I'm going to take you to task on this because you and I both know I made it perfectly clear that I was not considering racial data. You sat down and you handed me a document. I glanced at it for less than a second, I did not know what it was. When I turned the page, I realized it had racial data. I turned it over flat and I said, I will not look at this. You had four others, no, I'm going to finish, and I had you initial it. I initialed it. I put it into a folder. My staff did not look at it. I did not look at it, and I turned that d– that folder over to the Attorney General's Office. Okay? You're the one who gave it to me.

**Senator Powell:** That is correct.

**Senator Huffman:** I did not look at it. I did not read it. And I did not glean one bit of information from it. So–

**Senator Powell:** Alright.

**Senator Huffman:** –I'm trying to be very transparent here, completely honest, but you need to be so, too.

**Senator Powell:** Oh, I am being honest.

**Senator Huffman:** Okay, well–

**Senator Powell:** I am being honest.

**Senator Huffman:** –just want to make it clear.

**Senator Powell:** I absolutely–

**Senator Huffman:** Thank you, Senator Powell.

**Senator Powell:** –laid those in front of you–

**Senator Huffman:** Absolutely.

**Senator Powell:** –and we–

**Senator Huffman:** Thank you.

**Senator Powell:** –dated them and initialed those, both of, both of us did.

**Senator Huffman:** Correctly, yes.

**Senator Powell:** Alright. You, you chaired a series of Redistricting Committee hearings in February of this year in which the Texas Demographer, Dr. Potter, gave a powerful presentation on the American Community Survey estimates and the census data for different regions of the state. Is that correct?

**Senator Huffman:**  He, he testified at many of the hearings, yes. The virtual hearings that we held, I guess it were, was it late January, February, yeah. I think he testified at all of them.

**Senator Powell:**  And you, do you recall chairing one of those hearings in the Dallas-Fort Worth area on February the 4th?

**Senator Huffman:**  The one held here at the Capitol but kind of regionally dedicated–

**Senator Powell:**  Umh hmm.

**Senator Huffman:**  –yes.

**Senator Powell:**  And Dr. Potter provided a verbal presentation at that hearing. Is that correct?

**Senator Huffman:**  Again, I think he did at all of them. I don't recall that specific testimony. His testimony tended to be pretty repetitive those, he did focus a little bit on the, the regional areas, yeah.

**Senator Powell:**  And a PowerPoint was provided as–

**Senator Huffman:**  Yes.

**Senator Powell:**  –well.

**Senator Huffman:**  Dr. Potter had that part of his Zoom presentation because he actually testified via, well I don't know if it was Zoom, but through the process, yeah.

**Senator Powell:**  And then, so you had testified here or you have answered my question here that that same similar demographic presentation was done for regions across the state.

**Senator Huffman:**  Yes.

**Senator Powell:**  In a similar way.

**Senator Huffman:**  It was.

**Senator Powell:**  That he–

**Senator Huffman:**  Umh hmm.

**Senator Powell:**  –testified and there was a PowerPoint presentation that was on the screen for everyone to see.

**Senator Huffman:**  Yes.

**Senator Powell:**  Alright. And Dr. Potter explained that the population growth in urban DFW Senate districts would require making the districts geographically smaller. Do you recall that?

**Senator Huffman:**  No.

**Senator Powell:**  Well, Dr. Potter's verbal and PowerPoint presentations also explored population changes by race in Texas. Isn't that correct?

**Senator Huffman:**  I don't recall the specifics of his testimony.

**Senator Powell:**  Well, and he explained in that testimony that the population growth in Texas, based on the American Community Survey data at the time, showed that over 83 percent of Texas population growth was driven by minority populations. Correct?

**Senator Huffman:**  I don't recall that specific testimony. I think the data now is all out there from the census and readily available to the public.

**Senator Powell:**  And Dr. Potter testified again at our September 25th hearing in response to questions from Senator Alvarado. Isn't that correct?

**Senator Huffman:**  I don't, I don't recall. Again, he was testify– we didn't have census data at that point so he was testifying from ACS data, I believe. I will point out the ACS data was not exactly accurate. For example, at the time we thought that Senator Nelson's district was the largest. They were off by quite a bit. It was actually Senator Campbell's district. So, yes, we had, there were, I guess that's why they call them estimates.

**Senator Powell:**  Well, Dr. Potter testified that Texas added nearly 4 million people between 2010 and 2020. Does that sound about right?

**Senator Huffman:**  I don't know what Dr. Potter testified. They were based on estimates. The actual census numbers have since been returned and those were the actual numbers that we worked with at this point.

**Senator Powell:**  Well, Dr. Potter also testified that a little over 95 percent of that 4 million number was attributable to minorities. Is that correct?

**Senator Huffman:**  I don't remember what Dr. Potter said. Again, there's been testimony since then from the hard census numbers that I would tend to think would be the most accurate for our purposes.

**Senator Powell:**  Well, and Dr. Potter also testified that fewer than 200,000 of the 4 million were non-Hispanic, white Texans. Does that sound about right to you?

**Senator Huffman:**  I think Dr. Potter said something similar to that when he was here in the Senate Chamber and Senator Alvarado was asking him some questions last week, I think. Yes.

**Senator Powell:**  Okay. Well, now in the current Senate map, 16 districts are a majority-minority by voting age population. Are you aware of that?

**Senator Huffman:**  No.

**Senator Powell:**  Well, I'm presenting that to you today, and I hope that you would assume that maybe I–

**Senator Huffman:**  I just, I don't agree with that analysis. You can present it. Just, I'll accept that you are presenting it.

**Senator Powell:**  Do you have any reason to think that I'm wrong about it?

**Senator Huffman:**  I don't think the numbers show that but maybe it's just terminology that's different.

**Senator Powell:** In the new Senate plan that you have proposed, the number of majority-minority districts by voting age population actually has decreased now from 16 to 15. Do you have any reason–

**Senator Huffman:** I don't think–

**Senator Powell:** –to believe–

**Senator Huffman:** –we're speaking–

**Senator Powell:** –that I'm wrong about that?

**Senator Huffman:** –I don't think we're speaking the same language. Are you talking about protected minority opportunity districts under the Voting Rights Act or you talking about something else?

**Senator Powell:** I'm just talking about our census data.

**Senator Huffman:** Well, then I don't know, I don't know.

**Senator Powell:** Okay. So, you said this plan was drawn blind to race and I'm trying to understand how the Texas minority population increased by 3.8 million and its Anglo population increased by only 200,000. Yet without looking at race, you somehow drew a map that ended up decreasing the number of majority-minority districts. How did that happen?

**Senator Huffman:** I don't believe that we have decreased. I know we haven't decreased the number of districts that are protected under the Voting Rights Act.

**Senator Powell:** Alright.

**Senator Huffman:** Name them for you if you'd like.

**Senator Powell:** So, would you, would you say here then that minority voters have less influence in your proposed plan despite accounting for 95 percent of the Texas population growth since 2010?

**Senator Huffman:** I'm not saying that.

**Senator Powell:** Senator Huffman, you have served on the Redistricting Committee the past two cycles. I believe you agree.

**Senator Huffman:** Correct. I served my first, no, would actually been my second session, yes.

**Senator Powell:** Okay. And you've read and you're aware of the various court decisions from the D.C. district court, the Texas district courts, and the United States Supreme Court about Texas redistricting. Correct?

**Senator Huffman:** I am familiar with some of the cases, not all of the cases. But I am familiar with some of them, yes.

**Senator Powell:** You've read the *Cooper v. Harris* decision from the Supreme Court. Is that correct?

**Senator Huffman:** No. I might have, I just don't know the names so I'm not going to say yes and pretend to be an expert because I don't know that specific case.

**Senator Powell:** So, are you aware, then, that, that the courts have repeatedly said that voting in Texas is racially polarized with Anglo voters mostly supporting Republicans and minority voters mostly supporting Democrats?

**Senator Huffman:** I don't know that the courts have said that.

**Senator Powell:** Okay. So, I hear you say that you didn't look at racial data, but you would agree that urban areas in Fort Worth and Dallas have large concentrations of minority voters. Wouldn't you?

**Senator Huffman:** I am not going to make assumptions based on race, period. Alright. I have followed the law and I'm, I'm not going to get into that racial discussion with you. I followed the law, I've done what it's required me to do and what I wanted to do, and I'm going to leave it at that.

**Senator Powell:** So, you're basically saying that despite serving on the Redistricting Committee for the past two cycles and chairing the committee this cycle, and listening to witnesses who have testified from both redistricting cycles that you came to the process completely unaware that minority voters are concentrated in urban areas of Dallas and Fort Worth.

**Senator Huffman:** Senator Powell, of course, I have an awareness that there are minorities that live all over this state. Alright? But I blinded myself to that as I drew these maps and did not make map decisions based on racial determinations, period, right.

**Senator Powell:** Well, let's take a look at where minority population's increased and decreased in your Senate proposal.

**Senator Huffman:** Okay.

**Senator Powell:** Five of the districts with the largest increases in their minority population were Districts 3, 18, 22, and then 24 and 30. All of which, that's really five districts, isn't it? All of which today are Anglo majority or super majority districts. And all of which have been won by Anglo Republican candidates by large margins. So, let me, let me just say that again.

**Senator Huffman:** I don't know the question. So, what's the question?

**Senator Powell:** Alright. Five of the districts with the largest increases in their minority population.

**Senator Huffman:** And what are you calling minority population? How do you define that? Talk about majority-minority, just–

**Senator Powell:** I would say–

**Senator Huffman:** –minorities.

**Senator Powell:** –Hispanic, Asian Americans, African Americans, those are minority populations.

**Senator Huffman:** Well, I do know what minority populations are, Senator. My question was when you call it a minority district, I was wondering what you're, were referring to so that I could answer the question legally, appropriately.

**Senator Powell:** What I, what I said was five of the districts with the largest increases in their minority populations and I would say a combined minority population.

**Senator Huffman:** In which districts did you name in?

**Senator Powell:** They are District 3 Senator Nichols, 18 Senator Kolkhorst, 22 Senator Birdwell, 24 Buckingham, and 30 Senator Springer's district.

**Senator Huffman:** None of those are protected districts under the VRA.

**Senator Powell:** Well, then I would ask you of these five districts how did it happen that these five districts, safe Republican districts, dominated by Anglo voters, under your proposal now see some of their largest increases in minority voters?

**Senator Huffman:** I told you, Senator Powell, I drew blind to race. I would suggest to you that there are, it's a very rich, diverse state and there are minorities that live throughout our state and we're blessed by that. I drew blind to race so naturally there were going to be differences–

**Senator Powell:** So, just–

**Senator Huffman:** – the state.

**Senator Powell:** –by chance or by coincidence that, that those Anglo dominated Senator, Senate districts now see increases of minority voters.

**Senator Huffman:** I told you how I drew the maps, Ma'am.

**Senator Powell:** Okay. By the proposed map a number of Senate districts saw their minority populations decrease even though minorities were responsible for almost 4 million people in growth in Texas. So, in the proposed map five seats saw their minority voting age population decrease by more than 5 percentage points. Those were districts like Senator Hancock's District 8, Senator Hanco– Senator Hancock's District 9. Let me say that again because I think I didn't say it right. Those districts were Senator Paxton's District 8, Senator Hancock's 9, 10, your district Senate 17, and Senator Campbell's District 25. District 9, Senator Hancock, has a 12 percentage point decrease. District 10 has roughly a 10 percentage point decrease and your district, Senator Huffman, has a 5.6 percentage point decrease in minority voters. Would you–

**Senator Huffman:** I have not looked at that number.

**Senator Powell:** Okay. Well, I've, I showed you maps that illustrated those, those shaded maps that in– illustrated voter population.

**Senator Huffman:** Did not look at the shaded maps, and you know I did not look at the shaded maps, so please do not corrupt the record by saying I looked at the shaded maps.

**Senator Powell:** Well, I can tell you that I was elected by the votes of minority voters in my district. Would you agree that that's correct?

**Senator Huffman:** I don't know who voted for you, Senator Powell.

**Senator Powell:** You heard quite a bit of testimony that I was the candidate of choice for minority voters in Tarrant County. Would you agree with that?

**Senator Huffman:** I did hear a county commissioner say that, yes.

**Senator Powell:** So, SD 10 is a district in which minority voters are currently succeeding in electing their candidate of choice. And I would assume that, that after hearing testimony that you would agree with that.

**Senator Huffman:** I don't know that. I do know that the county commissioner said he had come to you and asked you to run.

**Senator Powell:** That's right.

**Senator Huffman:** That they really liked you. I remember that, yes.

**Senator Powell:** Thank you.

**Senator Huffman:** Yeah. Had very nice things to say about you.

**Senator Powell:** And you would agree that Districts 8, 9, and 17 in the current map are among the districts where minority voters are on the verge of electing their preferred Senators? And, in fact, minority preferred candidates like President Biden carried those districts. That's 8, 9, and 17.

**Senator Huffman:** Know nothing about that. I have not looked at those numbers. I don't agree with you. Don't know those numbers.

**Senator Powell:** So, it's hard for me to understand and maybe you can explain it to me how it came to be that you didn't have any racial data before you, yet you somehow randomly came up with a district plan in which minority populations increased in districts where Anglo control is safely established and those same minority populations decreased in districts where minority voters either controlled or were close to controlling their electoral results.

**Senator Huffman:** I blew the, I drew the maps blind to race.

**Senator Powell:** So, again, is blind to race just by chance or coincidence that you have drawn a map that disenfranchises majority-minority voters?

**Senator Huffman:** Well, I disagree with your assessment of how I drew the map. I told you I drew blind to race and that is what I did.

**Senator Powell:** Alright. Does it concern you at all that minority voters constituted nearly all of the population increase in Texas over the past decade? And you heard from many of them during the process yet you've drawn a plan that reduces the number of districts in which minority voters can elect their preferred candidates.

**Senator Huffman:** I do not know that to be the case. I don't, I don't agree with that statement.

**Senator Powell:** Does it concern you, then, that Tarrant County is majority-minority, yet your plan provides zero Senate districts in which Tarrant County minority voters would ever elect their candidate of choice.

**Senator Huffman:** I have followed the law. I drew blind to race. I believe the maps I've drawn are compliant under the Voting Rights Act.

**Senator Powell:**  Would you agree that in Texas a voter's political party is a strong proxy for a race or vice versa?

**Senator Huffman:**  Not necessarily. I don't know that to be the case.

**Senator Powell:**  So, when you, you say you used politics not race to draw these district, districts but the result is less minority empowerment, are you okay with the fact that you, the plan you drew reduces the number of districts in which minority voters in Texas can elect their preferred candidates?

**Senator Huffman:**  I'm not agreeing with your statement. You are making a statement that assumes all minorities vote the same.

**Senator Powell:**  No, I don't believe–

**Senator Huffman:**  So–

**Senator Powell:**  –that's what I'm saying.

**Senator Huffman:**  –well that's what it sounds like–

**Senator Powell:**  There's a–

**Senator Huffman:**  –you're saying.

**Senator Powell:**  –I'm not saying that all.

**Senator Huffman:**  Okay.

**Senator Powell:**  Do you think that district lines should reflect the state's population growth?

**Senator Huffman:**  And they do, yes.

**Senator Powell:**  So, I along with other witnesses have repeatedly quoted for you the Supreme Court's warning in *Bartlett v. Strickland* that destroys, that destroying an effective crossover district raises serious constitutional concerns. Do you recall that?

**Senator Huffman:**  I recall your concerns. I do not share your concerns, nor do many legal scholars, but I do understand your concern that you have articulated previously. Yes, Ma'am.

**Senator Powell:**  Was that quote from *Bartlett v. Strickland* in the letter that I sent to you following our meeting to preview the lines?

**Senator Huffman:**  I don't recall.

**Senator Powell:**  And are you aware that the Supreme Court in *Bartlett* said that the Voting Rights Act doesn't require the creation of new crossover districts but that dismantling existing ones is suspicious and may be unlawful.

**Senator Huffman:**  I believe that the maps we have drawn are legal and are compliant under the Voting Rights Act and under *Bartlett v. Strickland.*

**Senator Powell:**  Are you aware that the *Bartlett* court decision expressly said it was, quote, was not deciding whether coalition districts are required under Section 2 of the Voting Rights Act?

**Senator Huffman:** I think we could, I just disagree with you and your lawyers on your analysis of *Bartlett v. Strickland.* I could also quote from them saying nothing in Section 2 grants special protection to a minority group's right to form political coalitions. So, again, we can interpret the law differently. I've been assured, I've studied it, that the maps are in compliance and that we have followed the requirements under *Bartlett v. Strickland.*

**Senator Powell:** And are you also then aware, just moving on away from that, that the Fifth Circuit, for example, in the *Campos v. City of Baytown* case, has held that coalition districts can be required under Section 2 of the Voting Rights Act?

**Senator Huffman:** What year was that case decided?

**Senator Powell:** You know, I don't have that.

**Senator Huffman:** Yeah, well, I believe it was previous to *Bartlett v. Strickland.*

**Senator Powell:** Okay. Do you think that ruling–

**Senator Huffman:** I'm–

**Senator Powell:** –is binding on Texas?

**Senator Huffman:** –I'm sorry. I think what?

**Senator Powell:** Do you think that ruling is binding on Texas?

**Senator Huffman:** *Bartlett v. Strickland* of the–

**Senator Powell:** Umh hmm.

**Senator Huffman:** –United States Supreme Court, yes, I do.

**Senator Powell:** Okay. And then my last question and then I am–

**Senator Huffman:** Yes, Ma'am.

**Senator Powell:** –I am done here.

**Senator Huffman:** Okay. Sure others have questions as well.

**Senator Powell:** What have you done to determine whether Section 2 requires the creation of a new Black and Hispanic coalition Senate district in Tarrant County?

**Senator Huffman:** We, as I said, the maps that we drew we submitted to the Attorney General and we were, as I said, advised that the maps were in compliance. We also ran checks on every proposed map that has come to us whether it be through another Senate Member or members of the public who posted it public on DistrictViewer. And I have said repeatedly in this process to please bring me anything, any maps that you believe is necessary to comply with the Voting Rights Act. We all got the numbers on the same day, we're all working on the same timeline. And I have always been very open to, to have any map analyzed to determine the requirements under the Voting Rights Act.

**Senator Powell:** Did the Attorney General's Office provide you with any opinion as to whether a new Black and Hispanic coalition district was required to be drawn in Tarrant County?

**Senator Huffman:** As I said, I'm not going to discuss any discussions I have other than to say that I have completely complied with the Voting Rights Act and have done everything in my power to make sure that the law is followed in the Constitution.

**Senator Powell:** Well, thank you, Senator Huffman, for answering my questions today.

**Senator Huffman:** My pleasure, Senator Powell. Thank you very much.

**President:** Thank you, Senator Powell. Senator Menéndez, for what purpose?

**Senator Menéndez:** Thank you, Mr. President. Would the Senator–

**President:** Do you yield?

**Senator Huffman:** Of course.

**Senator Menéndez:** –yield for questions? Thank you, Mr. President. Thank you, Senator Huffman. I, many of my questions have been addressed–

**Senator Huffman:** Okay.

**Senator Menéndez:** –by Senator Powell. But I do have a few. And so, Senator, I've heard you repeatedly say that you did not take race into consideration when drawing these maps. Correct?

**Senator Huffman:** That's correct, Senator Menéndez.

**Senator Menéndez:** I also recall that during the, I think it was 15 virtual hearings that we had where the State Demographer, Mr. Lloyd Potter, Dr. Potter, where he testified and then later the census data verified that 95 percent of our growth in the last 10 years has been from the minority populations. Is that not correct?

**Senator Huffman:** I believe that's what Mr. Potter said. Again, I'd rather rely on the census numbers because–

**Senator Menéndez:** Sure.

**Senator Huffman:** –the ACS numbers are different. But Dr. Potter has testified as an invited witness during some of the hearings. I believe it was the Congressional hearing actually, and Senator Alvarado asked him a series of questions that touched on that issue. I don't remember the exact specifics but certainly that sounds close to what he said. Yes.

**Senator Menéndez:** So, my understanding too that prior to this census, the prior census, 2000-2010, people of color accounted for 89 percent of the population growth in the State of Texas.

**Senator Huffman:** And I don't have that number, but if you have it in front of you–

**Senator Menéndez:** I do.

**Senator Huffman:** –correct. I'm sure it's correct.

**Senator Menéndez:** I do. And so, my concern, Senator, is that the maps that are being proposed are not an accurate reflection of the growth in the State of Texas. And so, I know you've said that you have drawn these without any race of, input of any kind of race. But if over the last 20 years, 89 to 95 percent of our growth has been

Case 3:21-cv-00259-DCG-JES-JVB   Document 39-41   Filed 11/24/21   Page 28 of 67

from the minority population, and we have not had a new minority opportunity Senate district drawn, how can we justify the lines that we have if over 90 percent of the growth in 20 years and yet we don't have a new minority opportunity district? How is that possible?

**Senator Huffman:** Well, Senator Menéndez, as, as you well know, I've stated several times I drew blind to race and we did preserve all the current, both Black opportunity districts and Hispanic or Latino opportunity districts in the existing plan. I have repeatedly said, and I think I just said this to Senator Powell, for any group to bring us something that we didn't see, something that we missed. We were more than willing to run a VRA analysis on that, which in fact we have done with everything submitted. And nothing submitted has indicated to us that another minority opportunity district is required to be drawn under the law. As you understand, of course, that it would be racial gerrymandering to just draw a map based on race unless there is a strong basis in evidence to believe the districting decision is required in order to comply with Section 2 of the Voting Rights Act.

**Senator Menéndez:** You mentioned earlier that you had several points that you took into consideration. I think I heard compactness, I heard preserving communities of interest, jurisdictional lines, political jurisdictions, et cetera, et cetera. Senator, so, you've also mentioned that you have been assured that the maps are compliant with case law and the Voting Rights Act. Was it the Attorney General's Office or some other outside counsel who helped assure you?

**Senator Huffman:** The Attorney General.

**Senator Menéndez:** The Attorney General's Office. And so, do you or the Attorney General, do you expect the redistricting process will come under the subject of litigation as it has in the past?

**Senator Huffman:** I would expect probably so. Yes, Senator Menéndez. Which, in fact, I think there's already a couple of Senators already filed something, so.

**Senator Menéndez:** Well, I think that there have been, but you're right. I think I'll yield the floor and I, and listen to more of the other questions that may come up. Thank you very much.

**Senator Huffman:** Thank you very much, Senator Menéndez. Happy to answer your questions.

**President:** Senator Gutierrez, for what purpose? Perfect timing.

**Senator Huffman:** He likes to make an entrance.

**Senator Gutierrez:** Thank you, Mr. President. And thank you, Senator.

**President:** Would you like to state your purpose just for the record?

**Senator Gutierrez:** Yes. Thank you, Mr. President. Just to ask a few questions of the author of the bill.

**President:** Do you yield?

**Senator Huffman:** Yes.

**President:** You're recognized.

**Senator Gutierrez:**  Thank you, Mr. President. Senator, first off, I know that this was tremendously, it's a hard exercise. And so, you and I have had our ups and downs on this, but you are, you rightly made some corrections because you very early on told us that changes would be made by neighbor to neighbor and there was some misunderstanding I think on our part. You owned up to that and I appreciate that. I just wanted to let you know that.

**Senator Huffman:**  Yes, I did. And I think I fixed my mistake.

**Senator Gutierrez:**  Yes, Ma'am. And I can tell you that, you know, I have learned a lot in the last few weeks, and you've been doing this for a few months now and so, you know, I understand that there is a lot to do here and certainly it is a hard process. So, I commend you on that. I do, obviously, we do have some differences on how some of these maps play out, and that's what we're going to talk about a little bit.

**Senator Huffman:**  Okay.

**Senator Gutierrez:**  My first question is, did you begin drawing in August or September?

**Senator Huffman:**  I started drawing after the data became, it was loaded into RedAppl, which I think took almost a week after we received the numbers, could have been a little less than a week.

**Senator Gutierrez:**  Okay. I–

**Senator Huffman:**  Late August, probably.

**Senator Gutierrez:**  Yeah. And for purposes of, for the group, I'm not going to get into any of the questions that have already been asked. So, we're going to eliminate that so we can kind of keep going here a little bit. So, I do have some questions just on process here. So–

**Senator Huffman:**  Sure.

**Senator Gutierrez:**  –are your thoughts, are counties political subdivisions? I guess more substance than process.

**Senator Huffman:**  Under the law?

**Senator Gutierrez:**  Yes, Ma'am.

**Senator Huffman:**  Yeah, I think they are a political subdivision. Yes.

**Senator Gutierrez:**  Very good. How many counties does SB 4 currently split up?

**Senator Huffman:**  I don't know the answer to that but there will be several. I've never counted to be honest.

**Senator Gutierrez:**  We went through the data. Would 23, would that be?

**Senator Huffman:**  Anna's going to look it up so I can confirm, but I, she's going to check. But if you've counted, then it's probably 23.

**Senator Gutierrez:**  Okay. And I'll submit to you that it's 23, and we did this by verifying and looking at RedAppl, and any county that is not 100 percent is cut. That's correct. Right?

**Senator Huffman:**  Yes.

**Senator Gutierrez:**  Very good. And the counties that are cut, just for your edification are Collin, Dallas, Ellis, Jefferson, Galveston, Harris, Montgomery, Williamson, Tarrant, Parker, Brazoria, Denton, Travis, Fort Bend, Waller, Atascosa, Guadalupe, Bexar, Hidalgo, Hays, Nueces, San Patricio, and Wichita. Just–

**Senator Huffman:**  That sounds about right.

**Senator Gutierrez:**  And I think there might be some amendments down the road that might–

**Senator Huffman:**  Yeah.

**Senator Gutierrez:**  –cut up a county or two. Alright. And so, if a plan split fewer than 23 counties, would that be better or worse?

**Senator Huffman:**  I don't have an opinion on that, it would depend upon the political makeup of the, looking at the whole map statewide, the numbers, the concerns of incumbents, constituencies, so I don't have a general answer for that.

**Senator Gutierrez:**  Okay. If that plan were to be, one could consider it, and at least, I guess, it's all in the eye of the beholder I suppose, but keeping counties whole would be a better proposition I would take.

**Senator Huffman:**  Well, as you know sometimes that's the case, sometimes it's not.

**Senator Gutierrez:**  Okay.

**Senator Huffman:**  Couldn't, couldn't agree with that across the board for you because it's such an impossibility in many situations that it's hard for me to agree with you on that.

**Senator Gutierrez:**  Alright. Are cities political subdivisions?

**Senator Huffman:**  I believe that they are. Yes.

**Senator Gutierrez:**  Alright. How many cities are split by SB 4?

**Senator Huffman:**  Oh, probably quite a few. We did go back and try to clean up some of the smaller municipalities, in fact I have an amendment that cleans up in your district–

**Senator Gutierrez:**  That's right.

**Senator Huffman:**  –Seguin and–

**Senator Gutierrez:**  Atascosa–

**Senator Huffman:**  –Jourdanton, forgot the name of the town.

**Senator Gutierrez:**  In Atacscosa County.

**Senator Huffman:**  Jourdanton, a city up there, what's the name of that city?

**Senator Gutierrez:**  I think McGregor possibly.

**Senator Huffman:**  Mansfield in Tarrant County.

**Senator Gutierrez:**  Mansfield, that's right.

**Senator Huffman:** And I think we cleaned up a couple in an earlier amendment on the committee. I think it was Kyle and another one. But there are still, of course especially the major cities like San Antonio, Fort Worth, Houston, Dallas, et cetera, which have multiple Senators because of the vast population.

**Senator Gutierrez:** That's right. Well, I'll submit to you that about 164 cities were actually cut–

**Senator Huffman:** Okay.

**Senator Gutierrez:** –and I'm definitely not going to read off 164 cities.

**Senator Huffman:** Good.

**Senator Gutierrez:** But that's just data that we've gotten from RedAppl. And I'm not doing this to, or saying this to be critical, just trying to point out that making a statewide map is difficult, and some large counties and cities need to be, needed to be split to comply with one person, one vote. And so, we do understand that. Some cities are split by making a policy choice not to split certain districts and some splits don't matter because they have zero population. And so, let's talk about geographic compactness. How do you measure geographic compactness?

**Senator Huffman:** I think it just depends on the circumstances of the district, the area, how big the Senate district is, how the population is dispersed, where you're looking for population, it really varies on specific circumstances.

**Senator Gutierrez:** And is it your opinion that the districts that you're offering in SB 4 are geographically compact?

**Senator Huffman:** I believe they are compact when you look at the map as a whole, yes. As a statewide whole, I should say.

**Senator Gutierrez:** Did you measure the geographic compactness of these districts using the Red-315 Report by the TLC?

**Senator Huffman:** No.

**Senator Gutierrez:** Was that a yes?

**Senator Huffman:** The staff may have looked at it, I didn't look at it. I'm checking now, I don't, I don't know. I don't think we looked at it, maybe someone looked at it. I don't know.

**Senator Gutierrez:** Okay. So, there are three measures on compactness, and they're, they measure different kinds of compactness. Correct?

**Senator Huffman:** What are you referring to specifically. Some, a program or a–

**Senator Gutierrez:** No. Just the measures within RedAppl itself and the law itself. There's area to rubber band compactness. Correct? This is in RedAppl.

**Senator Huffman:** Yeah. I didn't, I didn't look at that completely. No.

**Senator Gutierrez:** And, and that's fair.

**Senator Huffman:** Is that your question, did I look at it? The answer's no.

**Senator Gutierrez:** Well, that's fair.

**Senator Huffman:**  That's the honest answer.

**Senator Gutierrez:**  But your staff probably did.

**Senator Huffman:**  They probably did but I don't recall.

**Senator Gutierrez:**  Just for your edification and for the body's, area to rubber band is the ratio of the area of the district to the area of the smallest convex polygon in closing district. This is why I got to commend you because this is really boring.

**Senator Huffman:**  You can see why I didn't look at it. Yeah.

**Senator Gutierrez:**  Yeah. It's boring stuff, I get it. And then there's perimeter to area, it excites this guy.

**Senator Huffman:**  Yeah, yeah.

**Senator Gutierrez:**  It excites the young lady next to you.

**Senator Huffman:**  Probably, probably.

**Senator Gutierrez:**  They get very excited about this stuff. Perimeter to area is the ratio of the area of a circle with the same perimeter as a district to the area of the district.

**Senator Huffman:**  There's a reason why I became a lawyer, Senator Gutierrez.

**Senator Gutierrez:**  Yes. Yeah, there's a reason why you and I don't do redistricting on a daily basis. Population rubber band is the ratio of the population for all census blocks contained in the smallest convex polygon enclosing the district to the population of the district. Your staff probably saw that–

**Senator Huffman:**  They may have, I didn't look at it.

**Senator Gutierrez:**  –so those are the three different types of compactness. When they explained it to me, 20 times, I said, okay, that's jaggedness. And then we started kind of talking about those things. Just out of curiosity, last question I mentioned census block, I had a question that I thought of earlier. Did you utilize census block group data when you were shading?

**Senator Huffman:**  We only shaded for partisan, as I've explained, not racial. But, yes, it was, yeah, I wanted to, I want to make sure I understand the question. Did we do it by census block when we did a shading?

**Senator Gutierrez:**  Did you, yes, did you use census block group data when you were doing your shading?

**Senator Huffman:**  No, we didn't go down to the block level, we did precinct level.

**Senator Gutierrez:**  Okay. The block group level?

**Senator Huffman:**  The precinct level.

**Senator Gutierrez:**  Alright.

**Senator Huffman:**  The VTD, which can get confusing because my understanding is the way that that could be that in a few instances it's more than one precinct or part of another precinct.

**Senator Gutierrez:**  Right. Did you use partisan shading by municipality?

**Senator Huffman:** No, I don't even know if you can do that, but we didn't do it. Or we didn't know how to do it.

**Senator Gutierrez:** Okay. So, looking at the Red-315 Report, it looks under the area to rubber band measure, the least compact district in SB 4 is SD 24. Is that correct?

**Senator Huffman:** I don't know since I didn't look at that report. I'll just, you could just tell me that and then we'll verify. But I have no reason to doubt you, Sir.

**Senator Gutierrez:** I'll submit to you that SD 24's ratio is .473.

**Senator Huffman:** Okay.

**Senator Gutierrez:** In your opinion, SD 24 and SB 4, is it your opinion that it's compact according to the area rubber band measure?

**Senator Huffman:** It looks, are you talking about SD 24 or SD 4? Because you–

**Senator Gutierrez:** SD 24.

**Senator Huffman:** –24.

**Senator Gutierrez:** Senate District 24.

**Senator Huffman:** Yes. I think SD 24 is compact when you look at the constituencies that, the way we drew it and to get the population numbers that we needed, it was as compact as we could get it.

**Senator Gutierrez:** You bring up a good point. I'll refer to Senate Bill 4 so we don't get–

**Senator Huffman:** Okay, I'm sorry. I thought you were–

**Senator Gutierrez:** –confused. It was my bad.

**Senator Huffman:** –Senate District 4.

**Senator Gutierrez:** No, my bad. I did say Senate District 24, you're correct. If there was a district that was created that had an area to rubber band that was higher than a district in Senate Bill 4 then that district would be more compact, or at least according to that measure. Is that a fair statement?

**Senator Huffman:** I just can't agree because I, no. I don't know what you're saying, so I'm not going to agree to something I don't understand what you're saying.

**Senator Gutierrez:** Alright. If there was a district that was created that had an area to rubber band that was higher than a district in Senate Bill or–

**Senator Huffman:** I don't know what rubber band means.

**Senator Gutierrez:** –I got it. Okay. We can move on.

**Senator Huffman:** Okay.

**Senator Gutierrez:** Let's–

**Senator Huffman:** I know what rubber band means, I just don't know what it means in the context of–

**Senator Gutierrez:** That's fine. Let's move on to perimeter to area measure. It looks like Senate District 6 in Senate Bill 4 has a measure of .070. Is that correct?

**Senator Huffman:** You know, I didn't look at these reports, Senator Gutierrez. I'm not going to be able to agree or disagree. As you know, compactness is just one of the issues we look at as we draw these maps. So, if you want to state something that's in your opinion for the record, but I can't, I'm not going to agree because I'm just not familiar with what you are referring to or getting at.

**Senator Gutierrez:** I guess what I'm asking, and we can probably summarize many of these questions along those lines, is if we find, if there are plans out there where there is greater compactness, are those districts, would that plan be considered more fair if you have better compactness?

**Senator Huffman:** I would not say that is necessarily so. It would depend on all the facts and circumstances of the map or maps.

**Senator Gutierrez:** If there was a plan that had more districts that met or exceeded the compactness measures of SB 4, in other words, we have all these compactness measures that you and I, you know, we struggle with but we kind of get it some. Right? But if we had another plan that had more Senate districts that met or exceeded the compactness measures of Senate Bill 4, would that plan be more compact than Senate Bill 4? In other words, that's kind of an obvious statement. Right? If someone drew a plan that was more compact than the Senate Bill 4 plan, then that other plan would be more compact. Simple statement.

**Senator Huffman:** Well, compactness is not the only criteria. So, we would have to look at the map holistically to determine the benefits of that.

**Senator Gutierrez:** I understand that there's some other criteria.

**Senator Huffman:** Umh hmm.

**Senator Gutierrez:** But this hypothetical plan that I'm suggesting, if it's more compact than the Senate Bill 4 plan, would be more compact. I mean, that's kind of a, yeah.

**Senator Huffman:** Well, Senator Gutierrez, I'm really not going to engage in hypotheticals. We have a map before us that we need to get through here. So, I will say that, again, compactness is not the only criteria, it's something to be considered when looking holistically at the entire map.

**Senator Gutierrez:** Very good. And I'm almost done here.

**Senator Huffman:** Okay.

**Senator Gutierrez:** How many current elected Senators have announced retirement or plans to run for another office? Senator Nelson, correct?

**Senator Huffman:** Senator Nelson, yeah. Trying to think of any, I think Senator, oh–

**Senator Gutierrez:** Senator Buckingham.

**Senator Huffman:** –Senator Buckingham, of course. She's not retiring, though.

**Senator Gutierrez:** She's running for another office, that's right.

**Senator Huffman:** She's moving on.

**Senator Gutierrez:** I think she described her district as a giving tree earlier today. So, we have 29 Senators at this point who are incumbents. We should thank Senator Nelson and Senator Buckingham for coming and helping us out today. Assuming no one loses in a primary, how many of those incumbents would be returning under your proposed plan?

**Senator Huffman:** Well, I can't predict how voters will vote. I think that every Senator on this floor will have to get out and campaign and convince their constituents they are deserving of another chance to serve. So, I'm not going to speculate on who is going to come back and who's not.

**Senator Gutierrez:** Under your plan, I think that we've already determined that Senate District 10 would probably not be returning Senator Powell. Is that accurate?

**Senator Huffman:** I do not know who the voters of Senate District 10 will vote for.

**Senator Gutierrez:** If there was a plan that crea– that brought back every incumbent, all 29 that we've suggested earlier, I mean, I think you, I think the obvious answer to this is, yes, you're right. That plan would be better for incumbents than Senate Bill 4?

**Senator Huffman:** Say that again. I'm not sure. If, what now? If map–

**Senator Gutierrez:** If a plan was created that brought back all 29 incumbents–

**Senator Huffman:** Yes.

**Senator Gutierrez:** –that hypothetical plan would be better than SB 4 for all those 29 incumbents. Correct?

**Senator Huffman:** Again, I'm not going to engage in hypotheticals with you. If you want to ask me a direct question, I'll answer it.

**Senator Gutierrez:** No, I think that's, it's a hypothetical plan. I'm just saying if there was a plan that was created that brought back all the incumbents, would that plan be better for all the incumbents, 29?

**Senator Huffman:** No, I think it's better for us to have to get out there and work and earn the vote of our constituents.

**Senator Gutierrez:** Okay. Is it true that you made a concerted effort to reduce population deviation in the State Senate map? You didn't rely on the 10 percent safe harbor?

**Senator Huffman:** I tried to make it, I don't think it's a safe harbor, but I did try to, to be as consistently, as low as we could get and follow all the redistricting general priorities, objectives, I should say.

**Senator Gutierrez:** That's true. I'll represent to you that you sought a lower deviation, no doubt. Did you feel that a map with a lower deviation would be more fair?

**Senator Huffman:** I don't know if it necessarily would be more fair. It was something that we achieved, we tried to do to have legal compliance.

**Senator Gutierrez:** And your overall deviation of your plan as far as we know right now is about 6.14. Is that?

**Senator Huffman:** It's something like that, but there are a couple of amendments and they may change them slightly so I don't want to say that's exactly it. If it is, if it does change it, it would be, it would be slightly.

**Senator Gutierrez:** Okay. And I'm using more fair because these are words that you've used in previous hearings and what not.

**Senator Huffman:** Okay.

**Senator Gutierrez:** If there was a plan that had a lower deviation than the 6.14, would that plan be more fair, at least as to population deviation, than your plan?

**Senator Huffman:** Again, I can't say that. A lot of it has to do with, you know, the growth possibilities in certain districts and other issues. So, fair is kind of a tough word to just associate when you don't know the facts.

**Senator Gutierrez:** What was the name of the consultants that you used?

**Senator Huffman:** I have not used any consultants.

**Senator Gutierrez:** There is no law firm that you used, outside law firm?

**Senator Huffman:** There was one law firm, but they were used very minimally. They did not consult on the drawing of the maps, just on legal issues.

**Senator Gutierrez:** Thank you, Mr. President. Thank you, Senator.

**(Senator Birdwell in Chair)**

**Presiding Officer:** Senator Eckhardt, for what purpose?

**Senator Eckhardt:** To ask some brief questions of the author.

**Presiding Officer:** Do you yield, Senator Huffman?

**Senator Huffman:** Of course.

**Presiding Officer:** You're recognized, Senator Eckhardt.

**Senator Eckhardt:** Thank you so much, Senator Huffman. And I'm going to follow on pretty much where Senator Gutierrez left off.

**Senator Huffman:** Okay.

**Senator Eckhardt:** And perhaps it's just that I didn't hear it, you had mentioned that you had engaged a private law firm?

**Senator Huffman:** There was a private law firm who was engaged, they were used very, in a very limited manner. They did not draw the maps or assist in the drawing of the maps.

**Senator Eckhardt:** I'm sorry–

**Senator Huffman:** They did not assist in the drawing of the maps.

**Senator Eckhardt:** –I see. When did the map that you and staff drew, with the possible assistance of the Lieutenant Governor, at least input of the Lieutenant Governor, when was that map sent over to any legal counsel?

**Senator Huffman:** I don't remember.

**Senator Eckhardt:** Was it sent, you had mentioned it was sent to the Attorney General's Office, was it sent to this private law firm as well?

**Senator Huffman:** It was not.

**Senator Eckhardt:** What is the name of the private law firm?

**Senator Huffman:** Lehotsky Keller.

**Senator Eckhardt:** Lehotsky Keller. Now, I completely respect that I would not want to, and you wouldn't respond to the question in any case, get into what Lehotsky Keller–

**Senator Huffman:** Keller.

**Senator Eckhardt:** –had advised you. That's attorney-client privilege. But who paid Lehotsky Keller?

**Senator Huffman:** There is a, through Texas Legislative Council.

**Senator Eckhardt:** So, they were–

**Senator Huffman:** A fund, I think, I mean, or it's, I'm not sure exactly. I mean, the Legislature appropriates the funds and the Texas Legislative Council disperses the funds.

**Senator Eckhardt:** Did Texas Legislative Council manage that contract?

**Senator Huffman:** Yes.

**Senator Eckhardt:** Okay. Do you know who at Legislative Council managed that contract?

**Senator Huffman:** No.

**Senator Eckhardt:** And was Lege Council specifically the client, or was the committee the client?

**Senator Huffman:** Lege Council is not the client. I'm sorry, I'm just getting, Texas Lege Council is not the client, no. They just managed the contract, I think, as you stated. It's probably a fair way of saying it.

**Senator Eckhardt:** Do you know who the client was?

**Senator Huffman:** The client was both me and the Lieutenant Governor.

**Senator Eckhardt:** Did you ask Lehotsky and Keller to do the voting rights analysis of the map?

**Senator Huffman:** Again, I'm not going to get into any conversation that I had with my attorney. But again, they were not involved in the drawing of the maps.

**Senator Eckhardt:** And I wasn't asking about the drawing of the map, I was asking about the voting rights analysis.

**Senator Huffman:** No.

**Senator Eckhardt:** Did you receive a voting rights analysis from Lege Council?

**Senator Huffman:** No.

**Senator Eckhardt:** Did you receive a voting rights analysis from the Attorney General's Office?

**Senator Huffman:** I received legal advice from the Attorney General's Office.

**Senator Eckhardt:** When you received this legal advice from the Attorney General's Office, was it in written format or oral briefing?

**Senator Huffman:** It was all verbal.

**Senator Eckhardt:** All verbal?

**Senator Huffman:** Yes.

**Senator Eckhardt:** And who else received the briefing along with you?

**Senator Huffman:** Most of the time it was Anna Mackin, my two lawyers, and Sean Opperman.

**Senator Eckhardt:** Were any other Senators involved in the briefing?

**Senator Huffman:** No, I don't believe there was ever anyone else present.

**Senator Eckhardt:** Was the Lieutenant Governor involved in the briefing?

**Senator Huffman:** No.

**Senator Eckhardt:** You, you have mentioned and been very assiduous about this, that you are colorblind in your dealings with the map.

**Senator Huffman:** Yes, Ma'am.

**Senator Eckhardt:** Who advised you and your committee to never open the racial shading of RedAppl?

**Senator Huffman:** Again, I'm not going to discuss any, you know, specifics, discussions I have with attorneys. But I have read the law and I know the law, and I believe the law to require me to draw the maps blind to race unless, again, there is a strong basis in evidence to believe the districting decision is required to comply with the Voting Rights Act, Section 2. To do otherwise would be a racial gerrymander.

**Senator Eckhardt:** But you do know that counsel must have looked at the racial shading in order to determine its compliance with the Voting Rights Act and the laws related to redistricting. Correct?

**Senator Huffman:** I don't know what specifically they looked at nor will I go into that discussion. I received legal advice from the Attorney General's Office and proceeded based on legal advice.

**Senator Eckhardt:** Well, as a lawyer, how else would a law firm determine the legality of the map without looking at the racial shading of the map?

**Senator Huffman:** Again, I'm not going to comment on that. I told you how I proceeded, and that's how I'm going to answer the question.

**Senator Eckhardt:** Do you yourself believe that, given the current state of the law and the current facts with regard to growing minority populations in Texas, that the law would require preservation of our current minority opportunity districts?

**Senator Huffman:** Of current minority, yes, I believe the law requires that.

**Senator Eckhardt:** Do you believe that the current state of the law and the current facts with regard to growing minority opportunity districts requires drawing additional minority opportunity districts?

**Senator Huffman:** If the Section 2 factors are met under *Gingles* and the evidence is there as I stated before, then, yes.

**Senator Eckhardt:** Thank you so much.

**Senator Huffman:** Umh hmm.

**Presiding Officer:** Senator West, for what purpose?

**Senator West:** Questions of the author.

**Presiding Officer:** Do you yield, Senator Huffman?

**Senator Huffman:** Yes.

**Presiding Officer:** You're recognized, Senator West.

**Senator West:** And I'm not going to be repetitive, okay. In terms of the issue of consideration of race–

**Senator Huffman:** Yes.

**Senator West:** –you've said that you have not considered it–

**Senator Huffman:** Yes.

**Senator West:** –for any purposes. But it just seems ironic that going back to questions asked by Senator Powell that there were decreases and increases of minorities in districts where minority voters were electing voters of their choice, in Senate District 10, I'm talking, let me just talk Senate District 10. And then in other Republican districts there was an increase in minorities being placed in those particular districts. And all of this was done, race, there was, no one applied race to any of these things. It just seems kind of ironic that that ended up being the occurrence and outcome when race was never considered at all. It just seems ironic to me. Now, you mentioned a second ago that race should only be considered when there's a strong base that would require you to look at race. Were there any strong basis in your drafting of this map that you thought that race should be looked at?

**Senator Huffman:** There has been none. As I said, we drew the maps blind to race, then we asked the Attorney General for a legal analysis, whether we had followed the Voting Rights Act. We were assured that we did, and then I continued to say if someone has something to bring me that would lead us to believe there was a strong basis in evidence, then we would proceed accordingly. We also made sure that, oh, yes, and we also made sure that we looked at, once the maps were drawn, and I was assured that the, both the two Black opportunity districts in the existing plan and the seven Hispanic or Latino opportunity districts in existing plan, had been honored and was assured by legal counsel that we had complied with all laws.

**Senator West:** And again, I'm not going to go back over the analysis of 10. Did you consider Senate District 10 a crossover or a coalition district?

**Senator Huffman:** We did not consider race in the drawing of Senate District 10.

**Senator West:** Okay, so in terms of, what is a coalition district?

**Senator Huffman:** Well, you know, there's, believe it's when you, it's, again, not required I believe under the law, but I believe it has been defined previously as in different minority groups that band together to elect their candidate of choice. That's how it has been used in the past. Whereas a crossover district is when the majority in the district crosses over to vote with the minorities to help the minorities elect, yeah, to form a political coalition to elect their candidate of choice.

**Senator West:** So then, in terms of your drawing and your staff's drawing of this map, you didn't take into consideration at all whether or not they were coalition or crossover districts?

**Senator Huffman:** I did not look at that. No, Sir. Because that would have been considering racial data improperly and illegally.

**Senator West:** I'm sorry.

**Senator Huffman:** And illegally.

**Senator West:** Alright. And so, as it relates to the Voting Rights Act, race was never considered at all? I just want to make certain.

**Senator Huffman:** That's not what I said. I said–

**Senator West:** I, don't–

**Senator Huffman:** –we drew the maps blind and then I looked at some data myself after everything was done. In fact, that was I think yesterday, if not the day before, think it was yesterday. But I had been advised that I had complied with the Voting Rights Act as they apply to the minority opportunity districts that currently exist in the State of Texas, like your district, Senator West. And as you know, I worked with you when you came to me with some tweaks you wanted with precincts, I was very committed to working with you, with your, with your communities.

**Senator West:** So, race was never considered at all for Voting Rights Act compliance–

**Senator Huffman:** As I said, after–

**Senator West:** –Other than, other than as it relates to the existing districts?

**Senator Huffman:** –to verify that in fact that we had honored the Voting Rights Act under Section 2, to honor the existing minority opportunity districts in the State of Texas.

**Senator West:** And that's, that is all that was required. Correct?

**Senator Huffman:** I'm sorry?

**Senator West:** And that's all that was required of you?

**Senator Huffman:** We just wanted to get this straight, we were also advised whether or not additional districts needed to be drawn. And we have moved forward without drawing any, but we continue to look at all proposed plans to determine whether or not a draw is required under the Voting Rights Act, which would be, again, the strong basis in evidence to believe that the districting decision should be done.

**Senator West:** Did I hear you say that you were advised as to whether or not any additional districts, minority opportunity districts, were required?

**Senator Huffman:** Just ask the question again, one more time. Was I advised, what was the question?

**Senator West:** I thought I heard you say that you were advised as to whether any other additional minority opportunity districts were required.

**Senator Huffman:** We, again, I don't want to get into my discussions with the attorney, I will say that I was told that I have complied with the Voting Rights Act, Section 2, by the map that you have before you, this plan. So.

**Senator West:** So, I misunderstood you when you said that?

**Senator Huffman:** I don't know if you misunderstood me, I don't know. I'm just telling you that's what happened.

**Senator West:** Okay. So–

**Senator Huffman:** Yeah.

**Senator West:** –if you said that then it was some Freudian slip?

**Senator Huffman:** No.

**Senator West:** Okay, it was not. Alright, thank you.

**Senator Huffman:** And you're mumbling, I can't hear you, so.

**Senator West:** I said, excuse me–

**Senator Huffman:** I'm sorry.

**Senator West:** –if you said that, it was some Freudian slip then. Right?

**Senator Huffman:** I don't think it was a slip. It was just me trying to answer your question but not understanding your question perfectly.

**Senator West:** For purposes of Senate District 10, we know that there was a court decision back in 2012, as it relates to Senate District 12, Senate District 10. Did you take that court decision into consideration in drawing, or redrawing, Senate District 10?

**Senator Huffman:** No, Sir.

**Senator West:** Why is that?

**Senator Huffman:** I didn't think it was required for me to do so.

**Senator West:** Okay. You didn't think it was required?

**Senator Huffman:** Correct.

**Senator West:** Okay. Are you familiar with the concept of cracking a district?

**Senator Huffman:** Yes.

**Senator West:** Is that permissible under the Voting Rights Act?

**Senator Huffman:** I don't believe that it is.

**Senator West:** Are you familiar with the concept of packing?

**Senator Huffman:**  Yes.

**Senator West:**  Is that permissible under the Voting Rights Act?

**Senator Huffman:**  I don't think any of these are Voting Rights Act terms. They're just general terms sometimes used in redistricting.

**Senator West:**  That again–

**Senator Huffman:**  But I will say that I am familiar with what the terms mean, I just don't think they're, in relation to the Voting Rights Act are they applicable.

**Senator West:**  –or any other federal law or constitutional law? I mean, you, you would agree that–

**Senator Huffman:**  I'm aware of packing and cracking, yes.

**Senator West:**  –you've heard of packing and cracking has been used in litigation in order to try to get districts declared constitutional, unconstitutional. Correct?

**Senator Huffman:**  I have heard those terms. Yes, Senator. Yeah.

**Senator West:**  And packing and cracking did not occur in this particular map. Is that correct?

**Senator Huffman:**  I do not believe that neither of those occurred. Correct, Sir.

**Senator West:**  You do not believe?

**Senator Huffman:**  Yes.

**Senator West:**  Okay. If it did, if it did occur, and you said you do not believe it did occur, but if it occurred, it may raise a constitutional question. Correct?

**Senator Huffman:**  I'm sure that people will have issues that they bring before the courts. I believe that I followed the law and drew these maps blind to race.

**Senator West:**  Okay. Thank you very much.

**Senator Huffman:**  Thank you, Senator West.

**Presiding Officer:**  Senator Gutierrez, for what purpose?

**Senator Gutierrez:**  Three short questions, possibly four. Very short.

**Presiding Officer:**  Do you yield, Senator Huffman?

**Senator Huffman:**  Yes.

**Presiding Officer:**  You're recognized, Senator Gutierrez.

**Senator Gutierrez:**  Thank you, Senator. I'll be real brief. Todd Disher, Matthew Frederick, I imagine those are the attorneys at the Lehotsky and Keller that you're talking to. Is that accurate?

**Senator Huffman:**  I don't, I don't remember their names. I'm sorry. We really only talked to them once or twice to be honest.

**Senator Gutierrez:**  You don't remember the name of the lawyers that you spent time with?

**Senator Huffman:**  Didn't actually ever spend time with them to be honest.

**Senator Gutierrez:**  Or on the phone or on Zoom?

**Senator Huffman:**  I know one is named Scott, and one is named Todd. I don't remember–

**Senator Gutierrez:**  Todd Disher, Todd Disher is a hell of a lawyer, by the way.

**Senator Huffman:**  Yeah. I don't remember Matt, but maybe he was there.

**Senator Gutierrez:**  Good lawyer, you picked a good one. Let me ask you, with regards to when did you begin that representation, approximately what month did you begin talking to Mr. Disher?

**Senator Huffman:**  I don't remember. Maybe someone here–

**Senator Gutierrez:**  Was it the springtime?

**Senator Huffman:**  –they're going to look and see if we can come up with it. I don't remember the date, but they're looking.

**Senator Gutierrez:**  While they're looking, how many times did you have communications with Mr. Disher or the other lawyer, Scott?

**Senator Huffman:**  I met them one time in person just to have a very general kind of interview type, but we didn't talk about anything. And I believe I was in the room one time when Anna was talking to them on the phone, and I was talking to them on the phone. I believe that's the only contact that I had with them.

**Senator Gutierrez:**  Is it fair that, would you think that you met them in the springtime?

**Senator Huffman:**  I don't want to guess. I'd rather look up the date of the contract and tell you so that I give you a definitive answer. I think that's fair for everyone.

**Senator Gutierrez:**  That is more than fair and that would be my last question. Yes, Ma'am, as soon as we get an answer to that, I'm done.

**Senator Huffman:**  Okay. I think they're looking now.

**Senator Gutierrez:**  We're waiting on an answer, Sir.

**Senator Huffman:**  Contract was signed on April the 13th of 2021.

**Senator Gutierrez:**  April the 13th. And I guess that call happened thereafter. After the–

**Senator Huffman:**  The call that I had was, yeah, sometimes thereafter, probably sometimes in August or September. I don't recall.

**Senator Gutierrez:**  Okay.

**Senator Huffman:**  But we had very little contact with them.

**Senator Gutierrez:**  Thank you, Senator.

**Senator Huffman:**  Would be evidenced by their bill, if you wanted to look at it.

**Senator Gutierrez:**  Thank you, Senator, and–

**Senator Huffman:**  Okay.

**Senator Gutierrez:**  –thank you, Mr. President.

**Presiding Officer:**  Members, any other questions of Senator Huffman? Hearing and seeing none, there is an amendment. Secretary will read the amendment.

**Secretary of the Senate:**  Floor Amendment No. 1 by Huffman, Plan No. 2149.

**Presiding Officer:**  Senator Huffman, you're recognized on the amendment.

**Senator Huffman:**  Thank you, Members. Since this plan has been filed, we have listened to public testimony and reviewed some com– many comments submitted to the public input portal. There was some concern that we heard about splitting the smaller municipalities. I think Senator Gutierrez has referred to that a little. So, we've reviewed the plan for municipalities that are currently split to see if we could make them whole without having a significant impact on the districts involved. During the committee process, after hearing public testimony, I amended the map to make the cities of Magnolia and Kyle whole. The amendment before us today furthers this goal by making the cities of Mansfield, Seguin, and Jourdanton whole. I appreciate the Senators involved in these. All the Senators that are touched upon by this have agreed upon these changes. They're pretty minor for everyone. I'm happy to answer any questions, but I do move adoption of Floor Amendment No. 1.

**Presiding Officer:**  Members, the following amendment to the amendment. The Secretary will read the amendment to the amendment.

**Secretary of the Senate:**  Floor Amendment No. 2 by Powell, Plan No. 2132.

**Presiding Officer:**  Senator Powell, you're recognized on the amendment.

**Senator Powell:**  Thank you, Mr. President. Members, this amendment will restore Senate District 10 to its benchmark as passed by the Legislature in 2013. This amendment will change Districts 9, 10, 12, 22, 23, and 30, in Plan Number 2149 to configurations drawn under S2132. In 2011, the Legislature passed maps that federal courts found to be intentionally discriminatory against African American, Hispanic, and Asian American Texans within Senate District 10. The court-ordered map I am offering today is the same map passed by the Legislative Redistricting Board in 2001. In 2001, the LRB intentionally drew Senate District 10 to allow minority Texans the ability to unite and elect candidates of their choice. The LRB defended their 2001 drawing of Senate District 10 by telling the Department of Justice SD 10 had a chance to become a coalition district. Texas wrote, quote, the voting strength of these minority communities in the future will depend on the cohesion within and between Black and Hispanic voters and the ability of such voters to form coalitions with other racial or ethnic groups in support of their preferred candidates. At the same time the LRB drew Senate District 10, the Senate District 10 population was 56.6 percent Anglo, and today that number has decreased to 39.5 percent Anglo. According to the 2020 census, the population of SD 10 has increased, especially among African American, Latino, and Asian American Texans. At the same time, the Anglo population has decreased. As these population changes have occurred, the voting strength of minority Texans within Senate District 10 has become stronger, showing both the cohesion and the ability to form strong coalitions as envisioned by the Legislative Redistricting Board when the district was formed in 2001. Along with some crossover, Anglo voters, the coalition of minority voters in SD 10 has never been stronger. This amendment, proposal S2132, is drawn with respect to many of the

redistricting objections, objectives outlined by the Chairwoman at the Senate committee hearing on September 24. This plan restores most of the boundaries of the cities of Benbrook, Mansfield, Weatherford, which are split in half under Plan 2149. Plan 2132 also reunites communities of interest that are split under PLANS2149. This amendment reunites Fort Worth's North Side and Southside Hispanic neighborhoods and are drawn together in both the current and proposed State House plans. The City of Mansfield, which is a community of interest with southeast Fort Worth and other parts of Tarrant County, as described by the Mayor of Mansfield during committee testimony, is reunited under 2132, under a configuration that will not place the city in a rural district. Finally, the historic core of the City of Fort Worth will remain intact under this plan, instead of being split across the middle, from east to west, as is done under Plan 2149. Finally, S2132 recognizes both the 2011 federal court ruling and significant population changes in the DFW region by restoring SD 10 to its benchmark and making the necessary adjustments to surrounding districts to ensure they remain within a legal deviation. Members, this amendment respects the federal court order which made clear any attempts to dilute minority votes in Tarrant County with rural, Anglo voters is discriminatory, both in intent and in effect. To put it plainly, S2149 is a repeat of the same, illegal attempts to redraw Senate District 10 that we saw in 2011. S2149 tears apart a performing crossover district at odds with a Supreme Court ruling in *Bartlett v. Strickland*. That is why I am demonstrating with this amendment that restoring SD 10 to the benchmark plan as ordered by the federal court in 2011, is possible even with population, with the population growth across North Texas. I am open for any questions from Members on this.

**(President in Chair)**

**President:** Senator Menéndez, what purpose?

**Senator Menéndez:** Would the gentlelady yield for questions?

**President:** Do you yield, Senator Powell?

**Senator Powell:** Yes, thank you.

**Senator Menéndez:** Thank you, Mr. President. Senator Powell, I want to thank you for offering this amendment. As you know, I'm the Chair of the Senate Hispanic Caucus and I have expressed to you my concern on the lack of representation in the proposed map. And so, my question for you is that after listening to you and hearing testimony, I am well aware that there are many historic, Hispanic communities in your district. And in your layout you mentioned that they are split apart. Isn't another term for that is that they are being cracked? And so, because I've heard that that term has come up, it's something that's used often in redistricting. The communities are being cracked and therefore their influence is being divided. Is that not correct?

**Senator Powell:** Senator Menéndez, that is correct. The, the historic community of North Side Fort Worth has been voting predominantly Hispanic for many years now. They are being cracked apart from Southside area where there's a large settlement of the Hispanic population. In fact, I testified during committee that in the Southside there is a huge plaza that used to be a shopping center, as a matter of fact, I watched that shopping be, shopping center be constructed as I was a small child. And I've watched that major shopping center change from an Anglo consumer to a Hispanic

population over the course of my own lifetime. The North Side and the Southside communities share many of the same characteristics. Many of the interests, same interests in economic issues, in issues that certainly are related to education and to public education specifically, and a broad range of many other topics. Certainly on the Fort Worth ISD School Board, both of these communities have elected Latino representatives to the school board. The State House District 90, represented by Ramon Romero, represents these communities. So there, there is no doubt that the north and south sides of Fort Worth have an interest based on similar cultural and demographic similarities.

**Senator Menéndez:** Have you heard from Latino leaders in your district, if, are they concerned with the proposed map that's basically cracking their communities apart? Have you heard from any Latino leaders in your community?

**Senator Powell:** Absolutely. During testimony we heard from Justice of the Peace, Judge De Leon who came to testify. We received written testimony from many of the Hispanic community leaders across the district, to talk about the fact that they will no longer have a voice in either, in order to elect their representative of choice either in SD 10 or SD 9.

**Senator Menéndez:** They wouldn't have a voice because in the proposed map Tarrant County would be diluted by the rural counties are being added to that. Is that correct?

**Senator Powell:** That is correct.

**Senator Menéndez:** So, in essence the proposed map dilutes the Latino electoral community's power?

**Senator Powell:** It absolutely does. Under the Senate's proposal there is a jagged gash across the new proposed district, from east to west, along and just south of Interstate 30. North of that gash, voters are added to Senate District 9, which is served by Senator Hancock, and then the area to the south will be drawn into SD 10 and now put into the same district with seven rural counties. North of the gash, that population is over 130,000 people, 58.1 percent of that population is Hispanic. These are people who would previously have been in Senate District 10 but are now in Senate District 9.

**Senator Menéndez:** So, we heard earlier that these maps have been drawn blind to race, therefore if race is not being used and your amendment would restore these communities of interest, there shouldn't be a problem. Because you're just bringing back together communities of interest and you're doing it out of respect for the testimony that we've heard to restore the power, and in essence, stop the dilution of the Hispanic, Latino voters' influence in these elections. Is that not correct?

**Senator Powell:** That's absolutely correct, Senator Menéndez.

**Senator Menéndez:** Thank you for bringing this amendment forward. I look forward–

**Senator Powell:** Thank you.

**Senator Menéndez:** –to supporting it.

**Senator Powell:**  Thank you.

**President:**  Senator Miles, for what purpose?

**Senator Miles:**  Questions to my colleague from Tarrant County, Mr. President.

**President:**  Do you yield, Senator Powell?

**Senator Powell:**  I do. Thank you, Mr. President.

**Senator Miles:**  Thank you, Mr. President. Senator Powell, kind of along the same lines as Senator Menéndez went down, you mentioned issues that are issues that matter to Tarrant County portion of the district. How do they differ with the new added part of your district in context of what this amendment will do to change? Do you understand my question?

**Senator Powell:**  I think I do. The easiest way, maybe, is to compare communities of interest. To compare–

**Senator Miles:**  Communities of color, are you referring to communities of color, Ma'am?

**Senator Powell:**  Yes.

**Senator Miles:**  Okay. African American and Hispanic?

**Senator Powell:**  Pardon me?

**Senator Miles:**  African American and Hispanic?

**Senator Powell:**  African American and Hispanic voters. Yes, Sir. In the southern portion of SD 10, which is going to be placed into that, into the new district with seven other rural counties, the percentage of that population that's Black, that's Black and Hispanic, is over 60 percent. In the new counties being added to the district now, the white population is over 70 percent. So, now we are submerging our majority-minority district into Anglo counties which will completely dilute their ability to elect their representative of choice.

**Senator Miles:**  And if I could interrupt you here, as I look at the map, the proposed map, it appears that those urban, suburbia are going to be overtaken by rural–

**Senator Powell:**  That's exactly, that's exactly what happens.

**Senator Miles:**  –as I look at the map. Is that correct?

**Senator Powell:**  That's exactly what happens under this map.

**Senator Miles:**  Yeah, so if I'm correct then, we're going to get a conflict on community interest and what's important from a rural community to an urban community. Is that correct?

**Senator Powell:**  That's absolutely correct. Yes, Sir. And I think that is, there are a number of things there that I think we have to consider, that certainly those rural counties don't have the same issues that people in an urban county have, whether it's education or transportation or commerce. In Tarrant County our economic development is driven largely, in part, by entertainment, by the travel industry. In rural areas, their interests are more related to raising crops and cattle. The interest for how

we educate our children is different in urban areas. The needs are different for children who are being educated in rural areas than are being educated in urban areas. The, just the general interests in life are completely different.

**Senator Miles:** And my last question, and it's a direct question. How will your amendment bring communities of interest or restore the communities of interest that are involved in what, this is clearly, Royce, Senator West, I think you were trying to get a definition for cracking, I think what we're seeing here is definitely a definition of cracking. So, show me, tell me how your amendment will correct this.

**Senator Powell:**  This amendment restores the lines of the district to what the existing lines are today. I think it's important to note that the folks who came and testified with regard to Senate District 10 and talked about their fears of no longer having representation at the ballot box were largely from the African American community, from the Hispanic community, and a large segment of the people who testified were from the Asian American community, which we also serve in the Arlington portion of our district. So this puts those voters back into a position to be able to elect their candidate of choice. And as Senator Huffman stated earlier, one after another, members, people who live in Senate District 10 came to testify about the fact that they had elected me as their candidate of choice. In fact, I was recruited to run for the State Senate by an African American Commissioner for Tarrant County. And so, I'm convinced, as I hope that everyone here is, that by restoring the boundaries of Senate District 10 to the current configuration, it will once again allow our majority-minority population in Tarrant County to have the opportunity to elect a candidate of their choice.

**Senator Miles:** Sounds like you have a good amendment here, Senator Powell. Senate District 13 will be voting with you.

**Senator Powell:**  Thank you so much, Senator Miles.

**President:**  Senator Johnson, for what purpose?

**Senator Johnson:**  Questions of the author of the amendment.

**President:**  Do you yield?

**Senator Powell:**  Yes, I'm sorry. Yes, I do.

**Senator Johnson:**  Thank you, Mr. President. Thank you, Senator Powell. You've indicated that the, the benchmark of Senate District 10 is that it's a crossover district. What does that mean that the benchmark of Senate District 10 is that it's a crossover district?

**Senator Powell:**  A crossover district, Senator Johnson, as I know that you well know, is where a coalition of minority voters come together to elect their candidate of choice, with some Anglo voters as well who join that minority in support of a candidate of choice.

**Senator Johnson:**  And what does, what does crossover refer to?

**Senator Powell:**  It refers to those Anglo voters who cross over to join the minority-majority voters.

**Senator Johnson:** So generally, you have a, you're saying that in your existing district, Senate District 10, you had a number of Anglo voters who would vote in kind of an identifiable group with non-Anglo, Black, Hispanic, Asian voters in your district?

**Senator Powell:** Yes, that's true, Senator Johnson.

**Senator Johnson:** Thank you. And what difference in particular, you have white crossover and Anglo, white crossover voters in your district. What difference do they make in election outcomes in a district like yours?

**Senator Powell:** Well, I think it's interesting to note that, that all of the races came together to elect me. I couldn't have been elected in Senate District 10 without the combination of all those votes to give me the majority in that election.

**Senator Johnson:** If you lose any ethnic or identifiable demographic group in a tight race like Senate District 10, you lose. Right?

**Senator Powell:** That's right.

**Senator Johnson:** But with that coalition together, they represent a majority of voters in your district.

**Senator Powell:** That's exactly right.

**Senator Johnson:** And we're losing that under the proposed maps.

**Senator Powell:** We are losing that with the new maps.

**Senator Johnson:** But your amendment restores it?

**Senator Powell:** It does restore it to the existing boundaries that we see today.

**Senator Johnson:** Thank you, Senator Powell.

**Senator Powell:** Thank you, Mr. Johnson, Senator Johnson.

**President:** Senator West, for what purpose? Good to have you back, by the way.

**Senator West:** It's great to be back, Mr. President and Members. Questions of Senator Powell.

**President:** Do you yield?

**Senator Powell:** Yes. Thank you.

**Senator West:** Senator Powell, let me get this straight. Senate District 10 is a urban-suburban district. Correct?

**Senator Powell:** That's correct.

**Senator West:** Crossover district.

**Senator Powell:** That's right.

**Senator West:** We have seen a trend in your district of the persons there voting Democratic. Correct?

**Senator Powell:** That's correct. We have.

**Senator West:** And that's been over the last, how many elections? Since 2016, somewhere off in there.

**Senator Powell:**  I think that's true, since 2016.

**Senator West:**  We even seen even more African Americans elected in your district. Is that correct?

**Senator Powell:**  We absolutely have.

**Senator West:**  And Latinos. Correct?

**Senator Powell:**  We have seen–

**Senator West:**  I mean Devan Allen is now a County Commissioner.

**Senator Powell:**  –county commissioner.

**Senator West:**  And she was elected by that coalition of Blacks, whites, Hispanics, and Asians. Is that correct?

**Senator Powell:**  That is correct.

**Senator West:**  We've also seen an increase in ethnic minorities in your district. Correct?

**Senator Powell:**  That is correct.

**Senator West:**  Okay. We've seen decrease in Anglos in your district. Is that correct?

**Senator Powell:**  Yes, Sir. That's correct.

**Senator West:**  Okay. Hmm–

**Senator Powell:**  Hmm–

**Senator West:**  –we've seen an increase in the number of minorities that are being elected. We've seen an increase in the number, an increase in the minority population in your district, reduction in Anglo population. Do you think your district is being targeted? For elimination?

**Senator Powell:**  Well, one would suspect that–

**Senator West:**  No, no, no–

**Senator Powell:**  –you think.

**Senator West:**  –no, well, hold on for one second. This is going to be a part of the record. We know we're going to lose this particular vote. It's been said that Senate District 10 was going to flip. Okay?

**Senator Powell:**  That's exactly right.

**Senator West:**  So, let's get it on the record, do you believe that your district is being intentionally targeted for elimination as it being a Democratic trending district?

**Senator Powell:**  Absolutely. Absolutely, Senator West, and it goes back to a question that Chairman Huffman asked me the day that we had our meeting. When I sat down and she put the proposed map up onto the screen, she said do you have any questions for me, and I answered to her, no, I have no questions because I can clearly see by this map what you're attempting to do.

**Senator West:**  Do you know of any other urban-suburban trending districts in the State of Texas that have been, frankly, gerrymandered like yours has been?

**Senator Powell:** I know of no other district that has been gerrymandered in this fashion where we have cracked apart the minority voters in a district and submerged them into a highly Anglo rural population.

**Senator West:** Now, and let me say this, and I want to be real clear about this. Mr. President, I am not demeaning any of my Members, any of my fellow Members here in the Chamber, but I need to go here for purposes of the record. Now, your district, as it currently is constituted obviously you represent the interest of those persons there, provide casework services for those persons also. Is that correct?

**Senator Powell:** I absolutely do, yes, Sir.

**Senator West:** Alright. When we begin to look at the district as it would be constituted under this particular map, what other senatorial districts would now frankly have parts of your current district? Let me, let's, let–

**Senator Powell:** It would–

**Senator West:** –the question was wrong. The question was wrong. How far south does your district go?

**Senator Powell:** This district would go as far south as Brownwood. The proposed district would go as far south as Brownwood and as far to the west as very near Abilene.

**Senator West:** Okay, and do you know what Senators currently represent those areas? Not off the top of your head.

**Senator Powell:** Not off the top of my head. I know that Senator Perry may represent a portion of that. Senator Springer and Senator Birdwell.

**Senator West:** Okay, and so the reality is that there's persons already lining up in order to run in this particular district. Is that correct?

**Senator Powell:** Absolutely. There have been a number of candidates drawn in and drawn out.

**Senator West:** Drawn in and drawn out.

**Senator Powell:** That's right. Drawn in and drawn out who have expressed their interest in running, and I believe that, that the House member from Weatherford, Phil King, has announced his candidacy for SD 10 and has been endorsed already by the Lieutenant Governor.

**Senator West:** Okay. Do you know what his track record is as it relates to issues that are important to constituents in the current district?

**Senator Powell:** I do.

**Senator West:** What is that track record?

**Senator Powell:** It is not consistent with a representative, a representation that will impact the majority-minority members of Senate District 10 with consideration.

**Senator West:** Are you aware, I'm sorry, were you finished?

**Senator Powell:** No, go ahead.

**Senator West:**  Are you aware of any casework that Representative King, who I've been knowing for a long time, has done for minorities within his district.

**Senator Powell:**  I am not aware of any.

**Senator West:**  We're not saying that he has not–

**Senator Powell:**  No–

**Senator West:**  –but you're–

**Senator Powell:**  –I'm not–

**Senator West:**  –just not aware it.

**Senator Powell:**  –I'm not aware of any.

**Senator West:**  You think by having a person on your staff, is it indicia of being sensitive to issues of individuals from minority groups?

**Senator Powell:**  I do think that it's an indication.

**Senator West:**  Are you aware of whether or not he has any minorities currently on his staff?

**Senator Powell:**  I am not aware.

**Senator West:**  Not saying that he does, not saying that he doesn't. But, that would be an indication of a person's willingness to make certain that they represent the constituents of–

**Senator Powell:**  I would agree–

**Senator West:**  –their district.

**Senator Powell:**  –with that.

**Senator West:**  Okay, now do you think that that should in fact be something that's taken under consideration? Let me specific, that a person has the ability to represent the interest of persons in their district through casework and other methods such as that.

**Senator Powell:**  I absolutely do.

**Senator West:**  That's very important, isn't it?

**Senator Powell:**  It is. It's very important.

**Senator West:**  And that should, in fact, be something that we take into consideration in deciding what happens to Senate District 10.

**Senator Powell:**  It is, Senator West. I agree with you.

**Senator West:**  Let me, I'm getting ready to sit down. So, we've got an increase of minorities in your district. We have a district that's trending Democratic with individuals that of African and Hispanic descent that are being elected, but your district now is being terminated. Correct?

**Senator Powell:**  That's correct.

**Senator West:**  Intentionally, would you agree?

**Senator Powell:**  I would agree.

**Senator West:**  Thank you.

**Senator Powell:**  Thank you, Senator West.

**President:**  Senator Eckhardt, for what purpose?

**Senator Eckhardt:**  To ask brief questions of the author.

**President:**  Do you yield?

**Senator Powell:**  I do, thank you, Mr. President.

**Senator Eckhardt:**  Thank you, so much, Senator Powell. I believe that the map that was taken in committee was published on September 18th. Did you get an opportunity to see the full map before September 18th, or did–

**Senator Powell:**  I did not–

**Senator Eckhardt:**  –you only see it after that date?

**Senator Powell:**  –I did not. I saw it after that date.

**Senator Eckhardt:**  When you did see the map, did you use the racial shading as part of your analysis of the impact of the map on your communities of interest within your constituency?

**Senator Powell:**  I absolutely did, yes.

**Senator Eckhardt:**  Were you advised by counsel as you evaluated the map?

**Senator Powell:**  Yes.

**Senator Eckhardt:**  Did counsel at any time advise you that it was in any way illegal or imprudent to consider race in your analysis?

**Senator Powell:**  Ask that question again, please, Senator.

**Senator Eckhardt:**  Were you ever advised that it was illegal or in any way imprudent to consider race as part of your analysis of the impact of the map on your community and constituency?

**Senator Powell:**  No, no.

**Senator Eckhardt:**  Did you seek legal analysis under the Voting Rights Act from the Attorney General's Office?

**Senator Powell:**  No, I did not.

**Senator Eckhardt:**  Did you seek legal analysis under the Voting Rights Act from Legislative Council?

**Senator Powell:**  No, we did not.

**Senator Eckhardt:**  Did you seek or even know about a contract with Lehotsky Keller?

**Senator Powell:**  No, no.

**Senator Eckhardt:**  Thank you.

**Senator Powell:**  Thank you, Senator Eckhardt.

**President:**  Senator Seliger, for what purpose?

**Senator Seliger:**  A couple of questions of the author of the amendment, please.

**President:**  Do you yield?

**Senator Powell:**  Yes, thank you.

**Senator Seliger:**  Senator Powell, currently what is a percentage respectively in Senate District 10 of the percentage of African American population of voting age and Hispanic?

**Senator Powell:**  Let's see here. I think that's currently, the African American makes up 21.5 percent–

**Senator Seliger:**  It's the voting age population, specifically.

**Senator Powell:**  –oh, I'm sorry. Specifically, the voting age population is, I'm sorry, the African American is 20.3. Is that the question? I'm sorry.

**Senator Seliger:**  If that is the percentage of voting age population of African American, that's exactly.

**Senator Powell:**  Yes.

**Senator Seliger:**  And Latino.

**Senator Powell:**  The Latino voting age population is 28.8 percent.

**Senator Seliger:**  And in the new District 10 as written in this map respectively, what are those percentages?

**Senator Powell:**  The white voting age population is 53.3 percent. The African American voting age population goes down to 16.6 percent. The Hispanic voting age population goes to 24.7 percent and the Asian voting age population goes down to 3.3 percent.

**Senator Seliger:**  So, there is a substantial decrease in the district in the voter, the voting age population of Hispanic and African American voters.

**Senator Powell:**  That's absolutely true.

**Senator Seliger:**  Did you do any sort of regression analysis on this district? Not that you would normally be expected to, but I assume that attorneys suggested it.

**Senator Powell:**  No. No, Sir.

**Senator Seliger:**  Okay. Thank you.

**Senator Powell:**  Thank you.

**President:**  Chair recognizes Senator Huffman on the amendment.

**Senator Huffman:**  Members, and thank you very much Senator Powell for your presentation, but I will be respectfully voting against this amendment for several reasons. First, it proposes changes to multiple districts in the DFW area without the agreement of all impacted Members. In fact, it jeopardizes the ability of a Republican candidate to continue to be elected in Senate District No. 9. I do not believe Senator Hancock was consulted or spoken with about this amendment. Second, it maintains SD 10's current configuration which limits the adjustments we can make throughout

the DFW area to accommodate statewide growth over the past decade and other redistricting priorities and objectives. Third, PLANS2132 by Senator Powell overpopulates SD 9 at 983,861, which is more than 40,000 above the ideal district size and SD 30 at 971,291, which is more than 30,000 above the ideal district size. Finally, with all due respect to those who have argued in favor of selecting SD 10's configuration of the basis of race, I do not believe that we can or should make redistricting decisions based on race, unless we have a legally sufficient justification. In addition to seeking legal advice, the substance of which I cannot comment on, I undertook my own review of the facts and the data, and I find no basis in evidence to believe that Section 2 of the Voting Rights Act requires the configuration of SD 10 that is proposed in PLANS2132. This is because in this proposed SD 10, Asian voting age population is 5.5 percent, Black voting age population is 20.3 percent, and Hispanic voting age population is 28.8 percent. As no minority group forms a majority that could control the outcome of an election in the proposed district, the threshold requirement for a Section 2 required district is not met. I will also add, that because there has been some commentary about the number of people in Tarrant County, I want to make it clear that in this, in the Senate's proposed map, 627,530 of 961,525 do reside in Tarrant County. That is 65.3 percent of the population will be in Tarrant County. Because I do not believe the proposed changes are required by law and because I want to accommodate the objectives in redistricting I've discussed throughout this process, I am respectfully voting no on this amendment.

**President:** The secretary will call the roll.

**Secretary of the Senate:** Alvarado, Bettencourt, Birdwell, Blanco, Buckingham, Campbell, Creighton, Eckhardt, Gutierrez, Hall, Hancock, Hinojosa, Huffman, Hughes, Johnson, Kolkhorst, Lucio, Menéndez, Miles, Nelson, Nichols, Paxton, Perry, Powell, Schwertner, Seliger, Springer, Taylor, West, Whitmire, and Zaffirini.

**President:** There being 14 yes votes, 17 no votes, the amendment fails. The following amendment to the amendment. Secretary will read the amendment to the amendment.

**Secretary of the Senate:** Floor Amendment No. 3 by Powell, Plan No. 2134, amending Floor Amendment No. 1.

**President:** Senator Powell, you're recognized on your amendment to the amendment.

**Senator Powell:** Thank you, Mr. President. Members, this amendment, PLANS2134 amends the PLANS2149, by redrawing the lines of Senate District 10 while ensuring that minority voters in Tarrant can continue to come together to elect a candidate of their choice. It has been suggested that because of population growth in DFW area and surrounding districts, the boundaries of Senate District 10 must change. I object to this off– this argument because it's clearly possible to maintain SD 10's benchmark boundaries while making necessary changes to the surrounding districts as I have shown with plans S2132 and S2119, which can be seen on DistrictViewer. However, if you operate under the premise, with which I disagree, that SD 10's boundaries must change, this amendment shows how it's possible to change the boundaries while still maintaining a Tarrant County based district where African American, Latino, and Asian American voters can continue to unite and elect candidates of their choice. Plan

2134 reconfigures Senate District 10 to include communities of interest not currently in SD 10 under the benchmark plan, including River Oaks, which shares many of the same characteristics of Fort Worth's northside neighborhoods. S2134 brings the Woodhaven neighborhood into SD 10 to join similar communities located just across Interstate 30, such as Meadowbrook, such as the Meadowbrook neighborhood. The plan also unites the the Como neighborhood with historically Black communities in southeast Fort Worth. This request was noted in a letter to the committee by members of the Fort Worth City Council. S2134 not only allow minority communities to continue to elect their candidates of choice, it enhances this coalition by uniting historic, like-minded Tarrant County communities that are fractured under the benchmark proposal. After uniting these communities of interest, the plan results in further solidifying a coalition district where African American and Latino voters make up over 52 percent of the citizen voting age population. S2134 makes adjustments to surrounding districts with respect to many of the redistricting principles outlined by the Chair at the September 24th committee hearing. For example, the plan reunites subdivisions split in half or three ways even under Senate, under S2149, under, excuse me. For example, the plan reunites subdivisions split in half or three ways under S2149. Under S2134, the City of Mansfield is reunited and Bedford is no longer split into three districts, as was voiced as a concern during the committee process. If adjustments are truly necessary to Senate District 10, based on regional growth, this amendment demonstrates it is possible to make the necessary changes to SD 10 and surrounding districts without diluting the voices of African American, Latino, and Asian voters in Tarrant County who represent 100 percent of the growth of the county over the past 10 years, Members. Thank you.

**President:**  Senator Huffman, on– I'm sorry.

**Senator Huffman:**  Thank you.

**President:**  I'm sorry, I did not see Senator West's light.

**Senator West:**  Thank you.

**President:**  For what purpose?

**Senator West:**  A question of the author.

**President:**  Do you yield?

**Senator Powell:**  Yes, Sir.

**President:**  Senator Powell.

**Senator West:**  Senator Powell, the last amendment because of it's impact on other districts, surrounding districts, as part of the reason that there was a vote against it. As it relates to this particular amendment right here, how does it impact the surrounding districts? Do you know?

**Senator Powell:**  SD 9 takes in the Mid-Cities and then heads to the west. Takes in the fast growing northern Tarrant County suburbs, including Watauga, Saginaw, and the lake communities in the northwest portion of the county. Then, the district will head south to take in pieces of west Fort Worth, outside the Loop. It takes in, also, Parker County to meet those population requirements that you're talking about. Then

the changes in SD 12 brings into Tarrant County on the northeast boundary to take in Colleyville, Grapevine area. But it does not make any changes to the district in Denton, Dallas, or Wise County. SD 22 takes into Tarrant County from Johnson County to take in the Rendon, Kennedale, Dalworthington Gardens, Pantego, and parts of Arlington. The district will then come into the county to take in Crowley and traditional Benbrook communities. Other rural communities, other than adding Johnson, are unchanged.

**Senator West:** Okay, well, in, in terms of when we do this redistricting, we have a range of what, 10 percent, 5 one way and 5 the other. Is that correct?

**Senator Powell:** I'm sorry.

**Senator West:** We have a range, a deviation of 5 percent, 10 percent. Correct?

**Senator Powell:** Correct.

**Senator West:** Okay. Now would, would it surprise you that this particular map is well within that deviation? That, based on my analysis, that if this were adopted, that Senate District 12 would be like 3.4 percent. Senate District 9 would be a minus .5 percent. Senate District 30 would be 3.3 percent. Senate District 22 would be 2.4 percent, and your district would be .4 percent. Would that surprise you?

**Senator Powell:** No, it would not surprise me at all.

**Senator West:** That's well within the, that's well within the standard deviation.

**Senator Powell:** That's right. That's right.

**Senator West:** Alright. Thank you.

**Senator Powell:** Thank you, Senator West.

**President:** Senator Huffman, you're recognized on the amendment.

**Senator Huffman:** Thank you.

**President:** I'm sorry, I'm sorry. Lights are coming on late. Sorry. Members, if you could get your lights sooner, it's helpful. Senator Lucio, for what purpose?

**Senator Lucio:** Senator yield for a question?

**Senator Powell:** Certainly.

**President:** Do you yield?

**Senator Powell:** Certainly.

**Senator Lucio:** In this amendment, what other senatorial districts are impacted and how many, let's say, polling places or boxes are affected in those other senatorial districts?

**Senator Powell:** Well, I would say that Senate District 9 is impacted.

**Senator Lucio:** Who, who represents that one?

**Senator Powell:** Kelly Hancock. Senator Kelly Hancock.

**Senator Lucio:** Okay. And how many polling places in those areas that are impacted in Senator Hancock's district are impacted?

**Senator Powell:** I don't think I can speak to that authoritatively in, I can tell you that–

**Senator Lucio:** When you, when you draw up lines in districts, you know what areas you're bringing in and the population and also the voting boxes that you're bringing in. I'd like to, to find out how many senatorial districts you're impacting, whose districts you're impacting, and if those were not part of your original, your original district.

**Senator Powell:** –well, Senate District 9, which, Senate District 12 and Senate District 22–

**Senator Lucio:** Who's–

**Senator Powell:** –are–

**Senator Lucio:** –in 12?

**Senator Powell:** –impacted.

**Senator Lucio:** Who's Senator in 12?

**Senator Powell:** Senate District 12 is Senator Nelson. Senate District 9 is Senator Hancock and Senate District 22 are Senator Birdwell's districts.

**Senator Lucio:** Okay. And so, you're, you're impacting three different senatorial districts–

**Senator Powell:** That's right.

**Senator Lucio:** –and any of those areas, were they in your district originally? And this district. The present district you're–

**Senator Powell:** The current district–

**Senator Lucio:** –you're serving in now.

**Senator Powell:** –not, no. In, in the areas–

**Senator Lucio:** Those are–

**Senator Powell:** –that I talk–

**Senator Lucio:** –new areas–

**Senator Powell:** –about the impact–

**Senator Lucio:** –those are new areas.

**Senator Powell:** –this is a new. It is, this is a demonstration map which depicts how the, how the lines could be drawn and, yes, it takes in a portion of the area that I currently serve. It also takes some out and adds a little bit into it.

**Senator Lucio:** Okay, so you are embarking and taking in new areas that you presently don't have in your district right now.

**Senator Powell:** That's true. That's true.

**Senator Lucio:** From other, from other, that's all I needed to know. Thank you.

**Senator Powell:** Okay. Thank you.

**President:** Any more lights? Nope. Senator Huffman.

**Senator Huffman:** Thank you, Mr. President and Members. I will be respectfully voting no to this Plan 2134. It's very similar, like my reasons for voting no like in S2132. This map proposes changes to multiple districts in the DFW area without the agreement of all impacted Members. It overpopulates several districts, SD 12, plus 30 and proposes a race-based draw without a legally sufficient justification. Reviewing the data, we have determined there no minority group forms a majority that could control the outcome of an election in the proposed district. The threshold requirement for a Section 2 require district is not met. Thus, in order to accommodate redistricting objectives, I have discussed throughout the process for much of the same reasons I voted against PLANS2132, I will be respectfully voting against the amendment as well.

**President:** Secretary will call the roll.

**Secretary of the Senate:** Alvarado, Bettencourt, Birdwell, Blanco, Buckingham, Campbell, Creighton, Eckhardt, Gutierrez, Hall, Hancock, Hinojosa, Huffman, Hughes, Johnson, Kolkhorst, Lucio, Menéndez, Miles, Nelson, Nichols, Paxton, Perry, Powell, Schwertner, Seliger, Springer, Taylor, West, Whitmire, and Zaffirini.

**President:** Thirteen ayes, 18 nays. The amendment to the amendment fails. Members, the question now is on Floor Amendment No. 1. Is there objection? Hearing none. The following amendment, Secretary will read the amendment.

**Secretary of the Senate:** Floor amendment No. 4 by Creighton—

**President:** Senator—

**Secretary of the Senate:** —Plan 2137.

**President:** Alright. You're recognized on your amendment, Senator Creighton.

**Senator Creighton:** Members, this amendment ensures that all of Montgomery County would fall within Senate District 4. We've worked quite a bit through the process and certainly the people of Magnolia, The Woodlands, the Woodforest community, Montgomery, East Montgomery County, Conroe, Conroe ISD. You know they'd like to stay together. We go to church together. We watch ball games together. We built one of the fastest growing communities in the state and nation together. With that, I lack the votes necessary to pass the amendment, so I'll continue to work on my votes and respectfully at this time, I'll pull down my amendment until I'm successful in doing so and thank you, Members, for your indulgence. Thank you, Mr. President.

**President:** Members, Floor Amendment No. 4 is pulled down. The following amendment, Secretary will read the amendment.

**Secretary of the Senate:** Floor Amendment No. 5 by Zaffirini, Plan 2139.

**President:** Senator Zaffirini, on your amendment.

**Senator Zaffirini:** Thank you, Mr. President. Mr. President and Members. This amendment makes changes to Senate Districts 14, 19, 21, and 29 and is agreed on, upon by the Senators impacted. It would move Dimmit County from Senate District 19 back to Senate District 21, where it had been for 110 years before the last redistricting, reflecting its historical community of interest with the six other counties

that have been part of SD 21 for more than 100 years. To accommodate this shift in population, the amendment also moves two large precincts to Senate District 14 from Senate District 21, moves one small precinct to Senate District 21 from Senate District 14, which is necessary to balance the numbers. It also moves Terrell County and two precincts in Brewster County from Senate District 29 to Senate District 19. Because Senator Huffman's amendment to make cities whole throughout the state, there is an amendment to this amendment.

**President:** We're going to pass out the amendment to the amendment. The following amendment to the amendment. Oh, Secretary will read the amendment to the amendment.

**Secretary of the Senate:** Floor Amendment No. 6 by Zaffirini amending Floor Amendment No. 5, Plan No. 2164.

**President:** Senator Zaffirini.

**Senator Zaffirini:** Thank you, Mr. President. Mr. President and Members. This amendment to the amendment resolves a conflict in Senate District 19 with the amendment by Chair Huffman we adopted earlier. It would ensure that adopting the amendment does not nullify any aspects of her amendment. Mr. President, I move adoption of the amendment to the amendment.

**President:** Senator Huffman.

**Senator Huffman:** Mr. President and Members. I have no objection to the amendment to the amendment nor to the amendment.

**President:** Members, anyone else have an objection? I would think not. No objection to the amendment to the amendment. It is adopted. Now the motion is on the amendment. Any objections? Hearing none, Senator Zaffirini, two for two there.

**Senator Zaffirini:** Thank you, Mr. President and Members and the Members impacted by this amendment to Senator Huffman.

**President:** Members, we have two amendments that were submitted after the filing deadline. An amendment by Senator Seliger affects Senate Districts 28 and 31. An amendment by Huffman affects Senate 20 and 27. Are there any objections to the consideration of these amendments? Hearing none, the amendments are eligible for consideration. I'm going to give you a few moments to look at the amendments. The following amendment, Secretary will read the amendment.

**Secretary of the Senate:** Floor amendment No. 7 by Huffman. That's Plan 2167.

**President:** Senator Huffman, you're recognized.

**Senator Huffman:** Thank you, Mr. President and Members. Members, this amendment affects two Senate districts, Senate District 20 and Senate District 27. Senator Lucio and Senator Hinojosa, two very fine gentlemen and very fine Senators, and I'm pleased to offer this. SD 20 takes all the City of Pharr from SD 27. SD 27 takes all of Bee and San Patricio counties. SD 27 takes two BTDs from SD 20 in Nueces counties. Their population works, and I believe it is agreeable to the two Senators involved in this, so I would move adoption of Floor Amendment No. 7.

**President:** Senator Hinojosa.

**Senator Hinojosa:**  Just a couple of comments and questions, if I may, Mr. President.

**President:**  You're recognized. Do you yield?

**Senator Huffman:**  Of course.

**Senator Hinojosa:**  And you know, Senator Huffman, dis– redistricting is always a very difficult process and in the whole State of Texas, we gain additional 4 million increase in population. And as we try to move forward, I would rather see Nueces County stay whole–

**Senator Huffman:**  Yes.

**Senator Hinojosa:**  –but I know that as we went through the discussions and we looked at the Voting Rights Act, we looked at the one person, one vote, and we also looked at minority opportunity districts and the population increase. There's an increase of over 100,000 people in the Rio Grande Valley. I think Nueces County was only 13,000. We had to factor all that in to be able to make sure that we were in compliance. And I know that some of my constituents will be disappointed, but we'll deal with the reality of what the Voting Rights Acts requires and sometimes having to make very difficult decisions. But at the end of the day, this amendment goes on. It will allow for Nueces County to have two Senators and at the same time, I get to keep all the major institutions in Nueces County, such as the port, A&M, Corpus Christi, Del Mar, and the state aquarium. So, I'm okay with the amendment.

**Senator Huffman:**  Thank you, Senator Hinojosa. Thank you for working with me.

**President:**  Senator Lucio, what purpose?

**Senator Lucio:**  Does Chairman Huffman yield?

**President:**  Do you yield, Senator Huffman?

**Senator Huffman:**  Yes.

**Senator Lucio:**  I just, today I just want to make it clear that this is your amendment, we negotiated it between two Senators, and I agreed to go ahead and proceed and will be supporting this amendment and the changes made to both districts. I do want to say that I think Senator Hinojosa is going to be thrilled to be able to represent what I consider one of the most proactive communities in my district, one of the best mayors in the state, and an incredible, you know, city commission, and many, many people in that area that really care for their community. So, I wish him well. I, for one, have received a lot of wonderful phone calls from Nueces County and those areas that I will be going into, and they have indicated that they're very, very pleased that I am coming into their area. Many agree with all the policy making that is taking place and the votes that I've cast that affects those communities as well, so I feel confident that this is going to be good for both of us. But more importantly, it's going to be good for the people in those areas to be able to have two individuals represent them in this Chamber. I really feel that the areas that were affected are important areas, especially in the Mid-Valley or upper Mid-Valley where a tremendous population has grown and would be lopsided. Right now, Hidalgo County is the seventh largest county in the state and certainly there should be a Senator anchored there. Just like Cameron County, the 13th, maybe the 12th largest county in Texas now, and they should have a

Senator anchored there. This is my fourth redistricting effort that I've been involved with, and I can tell you a lot of things have changed, but one thing that will never change is the fact that we need to continue to do our best to set up districts that will bring opportunities for their voters to elect people that they feel represent their issues. So, I feel comfortable with this. I want to thank Governor Patrick, as always, championing each cause that comes before this Chamber. Every major issue, you've been at the forefront, and I appreciate you very, very much and the Members who were going to be supportive other, other amendments that I was looking at. Another amendment, but I pulled it down because I think this is the right way to go, and I think at the end of the day, we're going to be able to see a good redistricting plan in that area of the state. Thank you.

**President:**  Senator Lucio. Senator Huffman.

**Senator Huffman:**  I move adoption of Floor Amendment 7.

**President:**  Are there any objection? Hearing none, amendment is adopted. Thank you. The following amendment, Secretary will read the amendment.

**Secretary of the Senate:**  Floor Amendment No. 8 by Seliger, Plan 2135.

**President:**  Senator Seliger, you're recognized on your amendment.

**Senator Seliger:**  Thank you, Mr. President. This amendment only impacts Senate District 31 and the neighboring District 28. And I have discussed these changes with Senator Perry, and he will comment as he will, but they involve counties that he already represents and I already represent. In about the 527 town hall meetings that I have had, both virtually and in person, the people of Gray, Wheeler, Donley, and Collingsworth County have been enthusiastic participants and don't like this change, don't like being yanked out of the Panhandle where they exist and are located today and put in another district, though they would be very ably represented, but that's not the question. The discussion that we had earlier this afternoon about compactness, the importance of compactness, surely no one took that discussion seriously. When you take those four counties out of the Panhandle and you take this District 31 from Midland County and Howard County and go down to Schleicher County. From Dallam County to Schleicher County is about 400 miles. Not the least bit compact, so we can get past that discussion. The only reason verbalized to me in my meeting by the Chairman was a desire to provide distinct oil and gas districts and distinct agricultural districts, and I'm going to point out to you why this doesn't do that at all, and is not really intended to do that. And we'll discuss it, we'll discuss that, too. Clearly in District 31 is the Permian Basin, probably the third largest reservoir in the world after Saudi Arabia and Russia. It's a great area to represent and a great economic area to represent. But to say then, and there's a lot of oil and gas in the Panhandle field, but there's nothing like the Permian almost anywhere else in the world. But if you look at the oil and gas production in District 28, the State of Texas would not be in nearly the shape it's in with that production. That is not just an agricultural district, District 31 is not just an oil and gas district. If I was to ask you to guess where the highest count of cattle and calves are in feed, what would you guess? I hope Senate District 31. And does anybody think these are not agricultural pursuits? Not oil and gas, even though we won't discuss the production of methane. Where's

the largest production of milk and cheese in the State of Texas? Thirty-first District. Once again, an agricultural endeavor, not oil and gas. Hogs? Thirty-first District. Where would you guess the largest production of peanuts are in the State of Texas? Thirty-first District. I hope you remember that the next time you have a Snickers or a PayDay because they probably came from somewhere around Seminole. As much cotton is produced in the 28th District, what is the largest cotton producing county in the State of Texas? Gaines County in the 31st District, not oil and gas industry. I believe, Members, that really what this is about is to take counties out of the Panhandle and move them closer to Midland because a member of board of Texas Public Policy Foundation is running. This is about compactness. It's not about agricultural or oil and gas. I appreciate the, I appreciate your attention.

**President:** Senator Huffman on the amendment.

**Senator Huffman:** Yes, thank you, Mr. President and Members. I will say that this amendment is not acceptable to the other Senator who is affected by this amendment. I would point out to the Members that after the 2020 census, both SD 28 and SD 31 were underpopulated, so we were forced to add more counties to both districts. SD 28 needed 144,171 to reach ideal district size. SD 31 needed 70,909 to reach the ideal district size. There were also some changes that happened in Central Texas. Other areas of Senator Perry's district, like Wichita Falls, and affecting Senator Springer, so there are many issues that were involved, factors involved in formulating these districts. Senator Seliger, I still believe you have a very compact district, considering the population and the breadth of West Texas and the beauty of West Texas. You also still have the most Republican Senate District in the State of Texas. And with that I will respectfully oppose the amendment, Sir.

**President:** You don't have a chance to close.

**Senator Seliger:** No, I was going to say that rather then having the Members take a difficult vote on this, I will pull down the amendment at this time. Is this the appropriate time?

**President:** Yes, it is.

**Senator Seliger:** Okay. Thank you.

**President:** Thank you, Senator. Floor Amendment No. 8 is withdrawn. Following amendment, Secretary will read the amendment.

**Secretary of the Senate:** Floor Amendment No. 9 by Flores and Eckhardt, Plan No. 2129.

**President:** Senator Gutierrez, you're recognized.

**Senator Gutierrez:** Thank you, Mr. President. I appreciate that. Members, Senator Eckhardt and I have really gotten together over the course of the last few weeks, and we've tried to come up together with a plan with an aim whose end is that, to end to any possible litigation that might occur from adopting Senator Huffman's plan. I want to repeat to you, this amendment would put an end to any possible litigation that might occur. PLANS2139 is better at incumbent protection. I repeat to you, it's better at incumbent protection. It brings back all Senators who want to come back to the Texas Senate. With the two people retiring, we create one very Republican district and

one Latino opportunity district that is a majority HCVAP. My plan cuts fewer, I take it back, our plan, sorry Senator Eckhardt, cuts fewer counties than Senator Huffman's plan. Our plan cuts fewer cities than Huffman's plan. Be glad to answer those questions if you have any as to how many we do. My plan has a lower deviation than Senator Huffman's. Hers is currently a 6.1. Ours is at 2.45. The best way, if you want to avoid litigation is to adopt a plan that has a minority opportunity district in it, which we are able to do in the DFW area. The second best way to avoid liability is not to reject an amendment that enhances minority opportunity and accomplishes the stated legislative goals more effectively, more effectively than that proposed plan by Senator Huffman. And I yield to any questions. Thank you, Mr. President.

**President:** Senator Huffman.

**Senator Huffman:** Thank you, Mr. President and Members. I will be opposing this amendment. This plan impacts every district in the state except for SD 16, which remains the same as its configuration in PLANS2130. Unlike my Senate plan, where each Member had an opportunity to provide input, all Members did not have an opportunity to give input on this proposal. This plan also jeopardizes the ability of several incumbents to win reelection. Additionally, the proposed SD 24 is nothing like any of the districts in the benchmark or file plan. It is not compact and combines communities that have not been jointly represented in the Senate in previous years. This, along with what I have heard from Members about this plan, suggest that SD 24 is a racial gerrymander that attempts to create a new Hispanic opportunity district in the DFW area. You all know the top, my top priority throughout the process has been following the law, so in addition to seeking legal advice on this proposal, I performed my own factual inquiry into whether the proposed SD 24 is a legally required district. I observed that the Hispanic citizen voting age population, or the HCVAP and the proposed SD 24, is just above 50 to 50.1, to be exact. Additionally, Spanish surname voter registration, SSVR is only 43.6 in the proposed SD 24. This suggests that Hispanic voters could not control electoral outcomes in this district. Based on my discussions with counsel, which I can't comment on, and my review of the facts and data, I do not believe that Section 2 of the Voting Rights Acts require the creation of SD 24 as proposed in PLANS2129. Since Plan 2129 is a significant departure from the plan that I have been moving through the Senate with input from Members and because I do not believe we are legally required to adopt PLANS2129 and based on all of the other redistricting criteria that I have explained today and repeatedly throughout this process, I will respectfully be voting against the amendment.

**President:** Secretary will call the roll.

**Secretary of the Senate:** Alvarado, Bettencourt, Birdwell, Blanco, Buckingham, Campbell, Creighton, Eckhardt, Gutierrez, Hall, Hancock, Hinojosa, Huffman, Hughes, Johnson, Kolkhorst, Lucio, Menéndez, Miles, Nelson, Nichols, Paxton, Perry, Powell, Schwertner, Seliger, Springer, Taylor, West, Whitmire, and Zaffirini.

**President:** There being 10 yes votes and 19 no votes, the amendment fails. Following amendment, Secretary read the amendment.

**Secretary of the Senate:** Floor Amendment No. 10 by Menéndez, Plan 2142.

**President:** Senator Menéndez, you're recognized.

**Senator Menéndez:** Thank you, Mr. President. Mr. President and Members, and I want to thank Chairwoman Huffman for the opportunity to present this and the conversations we've had today around redistricting and all the time that she and her staff have put in. Members, as you know, I chair the Senate Hispanic Caucus, and therefore I take it very seriously that we as a body do everything that we can to ensure that the Latino community be accurately represented in this state. And as we've discussed are earlier, from 2000 to 2010, the census showed that people of color accounted for 89 percent of the growth in Texas, and Latinos made up 65 percent of that, 89 percent of the growth. From 2010 to 2020, the census data confirmed that Texas population growth, that minorities accounted for 95 percent of that growth with Hispanics making up 50 percent of that growth. The current proposed maps, as we have heard, by Chairwoman Huffman were race blind as she drew them. Therefore, they are not reflective of the growth, and instead they dilute the number of Hispanic opportunity districts. In spite of the growing number of Latinos without any changes to this current map, the State of Texas could potentially go 30 years, think about that, three decades, without having added an Hispanic or Latino opportunity district. The Texas Senate Hispanic Caucus has worked with civil rights groups, the staff of caucus Members, to create a map, which is before you, that would be a fair reflection of the 2020 census. As you might expect, when not accounting accurately for growth of minorities over the past 20 years and in our attempt to address this dilution, we are all directly affected by this proposal. Mr. President and Members, Section 2 of the Voting Rights Act, we've heard a lot about today. But it establishes protection against minority voters from being provided less opportunities to elect the candidates of their choice, primarily by prohibiting the cracking and the packing of these voters. Under the VRA to determine if a group of voters has a Section 2 right, the Supreme Court has established a three-part test known as a Gingles factor. First, a minority group must constitute a geographically compact population sufficient to constitute a majority in a single member district, for purpose of drawing legislative district. That means you have to show that the citizen voting age population of the minority group in a proposed district is greater than 50 percent. Second, the minority group in question must vote cohesively and third, and finally, the majority, or white voters must vote as a block to defeat the minority candidates of choice. This task requires that mapmakers do a thorough analysis of areas with significant minority populations in order to ensure that they're not being denied the opportunity to elect candidates of their choice. We did so in drawing this proposed map. We looked at the areas of the state that have both significant minority population, as well as growth among these populations that would demand an additional opportunity district to match this growth. And after performing this analysis, we determined that there was sufficient growth in the Texas Latino community that would require a new Hispanic opportunity district drawn under Section 2 of the Voting Rights Act. I'd like to quote Michael Li, Senior Counsel to Brennan Center. He was cited in his testimony, I quote him, Texas' obligation does not end with creating Section 2 districts under the Voting Rights Act. Like all states, Texas has a constitutional obligation to avoid intentional discrimination against racial and ethnic minorities. The Supreme Court has made it clear that the liability for intentional discrimination can exist even when no liability exists under Section 2 of the Voting Rights Act, explaining that if there were a showing that the state

intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious concerns under both the 14th and 15th Amendments, end quote. For these purposes, Members and Mr. President, I believe strongly that the map offers an accurate reflection of the state's growth in compliance with the Voting Rights Act. Additionally, we made every effort to ensure that current constituencies and districts remained as compact as possible. Mr. President and Members, it is my hope that this map would be reviewed as a reasonable alternative to the current proposed maps as I believe it will accurately account for the growing Latino community in our state. I sent every one of you a letter. In that letter, it detailed the exact impacts it made to every district in the state that it did, and we tried to be as cohesive and as respectful of communities of interest. Thank you, Mr. President and Members, for your attention and for allowing us to present amendment, Floor Amendment No. 10.

**President:** Senator Huffman.

**Senator Huffman:**   Thank you, Mr. President and Members. Members, this proposal impacts the entire state and reflects a dramatic restructuring of both the current map and my file proposal including by pairing incumbent Members, Senator Perry and Senator Seliger. This amendment would also place several incumbents at risk of losing reelection. This plan also proposes a new SD 24 in the DFW area, which is nearly identical to the proposed SD 24 in Plan 2129. For the same reasons that I could not support this change in PLANS2129, authored by Senator Gutierrez, I cannot support it in this amendment either. The dramatic restructuring the San Antonio area is also cause for concern. Particularly with respect to proposed Senate District 21, but also in many other areas of the state, this proposal is not compact and combines communities that have not been jointly represented in the Senate in previous years. While the proposed SD 19, 24, and 31 appear to be attempts to create new Hispanic opportunity districts, I have not seen evidence that these districts would consistently be controlled by Hispanic voters. In addition to my previous remarks regarding proposed SD 24, I note that as proposed in PLANS2142, SD 19 and 31 have an HCVAP below 51 percent and only have around 41 percent SSVR. The committee has not been provided with evidence that these proposed districts with these demographic characteristics would be consistently controlled by Hispanic voters, and I have not seen any such evidence. As a result, I do not believe we have a strong basis in evidence for the proposed race-based draw. I will be voting no on the Floor Amendment No. 10.

**President:**  Secretary will call the roll.

**Secretary of the Senate:**  Alvarado, Bettencourt, Birdwell, Blanco, Buckingham, Campbell, Creighton, Eckhardt, Gutierrez–

**President:**  There being 9 ayes, 20 noes, the amendment fails. Members there are no other amendments. You're recognized for a motion, Senator Huffman.

**Senator Huffman:**  I move passage to engrossment of the Committee Substitute Senate Bill 4.

**President:**  Secretary will call the roll.

**Secretary of the Senate:** Alvarado, Bettencourt, Birdwell, Blanco, Buckingham, Campbell, Creighton, Eckhardt, Gutierrez, Hall, Hancock, Hinojosa, Huffman, Hughes, Johnson, Kolkhorst, Lucio, Menéndez, Miles, Nelson, Nichols, Paxton, Perry, Powell, Schwertner, Seliger, Springer, Taylor, West, Whitmire, Zaffirini.

**President:**  There're 20 ayes, 11 nays. Bill passes to engrossment. We'll hold there.