# EXHIBIT 6-L

# HOUSE JOURNAL

EIGHTY-SEVENTH LEGISLATURE, THIRD CALLED SESSION

## **SUPPLEMENT**

### SIXTH DAY (CONTINUED) — FRIDAY, OCTOBER 15, 2021

### CSSB 1 DEBATE - SECOND READING
#### (Meyer - House Sponsor)

**CSSB 1**, A bill to be entitled An Act relating to the provision of direct relief from ad valorem taxes to certain property owners in this state through the distribution of certain federal economic assistance money received by the state and a study of the provision of additional ad valorem tax relief; making an appropriation.

REPRESENTATIVE MEYER: **CSSB 1** appropriates $3 billion of the American Rescue Plan Act funds to the comptroller to make equal payments to each residence homestead owner in the state. **CSSB 1** requires the comptroller to divide that $3 billion by the total number of residence homesteads, which will equal about $525 per resident. **CSSB 1** also establishes a joint interim committee on property tax relief. Members, this bill provides immediate property tax relief to households and works to identify long-term solutions to lower property taxes for all Texans. I do have one perfecting amendment.

[Amendment No. 1 by Meyer was laid before the house.]

MEYER: This is a perfecting amendment from the comptroller's office to help them administer the bill.

[Amendment No. 1 was adopted.]

[Amendment No. 2 by Wu was laid before the house.]

REPRESENTATIVE WU: The money that was sent down from Washington is meant to support and help Texans across the board with COVID-19, with the issues of the pandemic, with economic downturn, with people losing their jobs, with many other things. And what this amendment does is saying, look, if you're going to spend this money to provide tax relief to homeowners, let's provide that tax relief to the homeowners who are in the most need. Then, if that money doesn't get used up, let's send it to use it in other places because we still have five percent cuts across the state agencies. If the money can go back to the other homeowners, homeowners who own properties of less than $1 million, if your property is worth less than $1 million, maybe you should get a bigger relief.

But I'm just saying in this amendment, if you own property that you're paying on and that property is worth more than $1 million, you should not get additional help from the state, from the federal government. That money should either go back to the state or go back to the people who own homes of less than $1 million. Provide that money to the people who need it the most, who are the most likely to be negatively affected by COVID-19, who are the most likely to be

working hourly jobs, who are the most likely to have been laid off because businesses shut down. And that, I think, is a fair thing for this body to do. That is a righteous thing for this body to do—that if you're going to provide relief, provide relief to the people who need it the most and not people who own million-dollar houses or five-million-dollar houses or ten-million-dollar houses or fifty-million-dollar houses. Provide it to the people who need it the most.

REPRESENTATIVE LANDGRAF: What's so special about this $1 million threshold?

WU: I think it is an easy to understand threshold. It is an easy cap to grasp. It is a nice, clean, even number for most people to understand. I think it is a number for tax assessors to understand. And I think most people would say if you own a million-dollar-house—a $1 million-dollar-house—people would say you're doing all right.

LANDGRAF: What if somebody said that you own an $815,000 or $400,000 house?

WU: I think that should be addressed, too, but we don't have the capacity right now to deal with it. I'm just trying to do this one cutoff. If you want to modify these, I would think you should offer an amendment to say if you have between a $1 million and $850,000 property you should maybe get only 80 percent of this $500 relief. And if it's less than that, if your property is between $800,000 and $500,000, maybe you should only get 50 percent.

LANDGRAF: But Mr. Wu, it's your amendment. You set this threshold in your amendment at $1 million. I'm just curious. Would you with your homestead actually benefit from this? By decreasing the number of eligible homestead holders, would that increase the pot of money for the homestead that you have?

WU: Is the tax assessor listening or not?

LANDGRAF: I'm sorry?

WU: Is the Harris County tax assessor listening? I'm not sure.

LANDGRAF: Is the Harris County tax assessor?

WU: It's a joke.

LANDGRAF: Based on the Harris County appraisal district's records, your home would be considered to be eligible for this property tax assistance.

WU: It's possible.

LANDGRAF: Yes. I mean, under the amendment that you've crafted and setting the threshold where you have, it would be.

WU: It's possible, yes.

LANDGRAF: Is that intentional ? Is that deliberate?

WU: Absolutely.

LANDGRAF: Okay.

WU: Would your home be in it?

LANDGRAF: Yes, mine would, but I'm not offering the amendment.

WU: Would you be happier if I reduced this to $500,000?

LANDGRAF: You set it where you set it.

WU: Yes, absolutely. I set it where I've set it. If you're unhappy with where I've set it, I can make it lower.

LANDGRAF: I'm unhappy that we're picking winners and losers here. This is designed to be property tax assistance.

WU: Oh, winners and losers—that's a really good point. Because here's the thing. This money only goes to people who own their property, right? Here's the problem. One-third of Texans don't own their property. So none of this $3 billion would go to the one-third of Texans who rent, not a penny.

LANDGRAF: Let me ask it this way, Mr. Wu. Would you personally financially benefit from your amendment?

WU: Absolutely, as would anyone in here—well, except for a few.

LANDGRAF: **CSSB 1** is designed to provide property tax assistance for all homestead owners in the state. It's not designed to pick winners and losers. There's a reason why there's not a threshold amount in the bill, and that's why we don't need an amendment to set one where it's arbitrarily set and where certain members of the legislature would benefit and others wouldn't. Look, I would benefit from it. I'm still going to vote against this amendment because it's not the right thing for us to do to pick winners and losers and operate in our financial interest. This is designed to be equitable across the state for everybody who is eligible in that class, in that category, and that's why I'm going to urge all of you to oppose this amendment.

WU: This money, as it is stated in the caption of the bill, is about direct relief for economic assistance. And what I'm saying in this amendment is that if you own a $1 million property, your need for assistance, economic assistance, is not as great as those who own properties that are less than $1 million.

REPRESENTATIVE MURPHY: Representative Wu, you're looking at this amendment as a chance to take money away from these homeowners hoping to maybe provide more relief to the lower end of the scale.

WU: Correct.

MURPHY: In this program where it's a flat amount—it's not a percentage—the people on the upper end of home values are going to receive a far smaller percentage of their taxes paid as a result of the existing bill. Are you aware of that?

WU: Yes.

MURPHY: And so in the democrat world, you all call that progressive and tend to support those kinds of policies, correct?

WU: Absolutely, and what I'm saying is there should be a hard cutoff at $1 million.

MURPHY: I don't know that I agree with that. We'll leave it to the house to decide. But are you also aware that renters have already received direct funds from the federal government? And you mentioned it was about a third of people that rent?

WU: A third of Texans.

MURPHY: And they've received about a billion dollars, so it seems to me we're right at a pro rata share. That seems reasonable that the state's going to do something that the federal government has not for people who've also been hurt by the COVID epidemic. So I don't think there's any reason to cut anybody out or, as we heard, pick winners and losers. I think we have a bad amendment here.

WU: Again, the point is the people who own properties in the $50,000 range, in the $100,000 range. If somebody owns a $150,000 home, they're far more likely to not only need this but need additional support. And I'm just saying in this amendment, if you have a property that's over $1 million, you don't need the support as much as a person who has a $50,000 house, a $100,000 ranch house. Somebody who in my district is living in a $70,000 home built in the 1950s, they need that relief more than you or more than someone who is in a million-dollar, wealthy estate.

[Amendment No. 2 failed of adoption by Record No. 84.]

[Amendment No. 3 by Wu was laid before the house.]

[Representative Cain raised a point of order against further consideration of Amendment No. 3 under Rule 11, Section 2, of the House Rules on the grounds that the amendment is not germane. The point of order was withdrawn.]

[Amendment No. 3 was withdrawn.]

WU: Mr. Meyer, this is property tax relief, correct?

MEYER: We're providing relief to homestead owners in the State of Texas.

WU: By reducing their property tax load.

MEYER: By providing them assistance from the American Rescue Plan Act. Yes, sir.

WU: So the point of the COVID-19 funds is to provide assistance to Texans.

MEYER: Yes, correct.

WU: In general.

MEYER: Correct.

WU: The purpose of that relief is that COVID-19 has been a particularly burdensome crisis for the whole nation. Would that be fair?

MEYER: Yes, sir.

WU: And people from across socioeconomic spectrums have been affected by it. Would that be fair?

MEYER: Yes.

WU: Would it be fair to say that people who work hourly wages, people who are not owners of companies, people who are low salary, that they have been hit harder than people who maybe are owners of a company and who have lots of wealth saved up?

MEYER: I think everyone has been hit very hard, Mr. Wu, by the pandemic.

WU: But you don't think that, let's say, the waitress at Chili's or the usher who works at the movie theater or any number of people who live paycheck to paycheck have been hit proportionately harder than people with greater wealth, with personal assets in the millions. Would that be a fair statement?

MEYER: I think everyone has been hit hard by the pandemic, Mr. Wu—everyone.

WU: So you think they got hit equally hard.

MEYER: I think everyone has been hit hard by the pandemic, Mr. Wu—everyone.

WU: And this is an appropriation of $3 billion, correct?

MEYER: Yes, sir.

WU: Out of the 16 that the state received.

MEYER: Yes, sir.

WU: It's not an insignificant amount of money.

MEYER: Correct.

WU: Do you think that maybe there are better ways to directly support Texans in this difficult time?

MEYER: I think it's important to provide relief to our homestead owners in the State of Texas.

WU: And for example, we could've taken this money and put it into SNAP funds for people around your district and around my district who are on food stamps and who may need more support. We could've done that, correct?

MEYER: I think it's important to provide relief to our homestead owners in the State of Texas.

WU: I mean, we could've provided child care to all the millions of Texans who went on unemployment and who are now out looking for jobs but may not be able to because they're now taking care of their kids. We could've done that, correct?

MEYER: I think it's important to provide relief to our homestead owners in the State of Texas.

WU: And you know that right now we're still in an eviction moratorium. Did you know that?

MEYER: I do.

WU: And the funds that we appropriated to assist apartment renters—the one-third of Texans who rent, who survive from month to month—that money is long, long gone. Did you know that?

MEYER: I think it's important to provide assistance to both renters and those who own homes in the State of Texas.

WU: And this $3 billion could have gone in part at least to assist those same people who are still suffering again and provide them with just a little bit more support. We could've done that, right?

MEYER: We already have rental assistance programs, Mr. Wu, and this bill is designed to provide relief to homestead owners in the State of Texas.

WU: Do you know that the way this bill is structured, it says that a person who is "not an eligible property owner, including an eligible property owner's agent or mortgage servicer" who receives a payment—they have to forward it to the person who's supposed to get it, right?

MEYER: Yes, sir. I believe that's how the bill is written.

WU: Is there any way to enforce that?

MEYER: I'm not aware of an enforcement mechanism within the bill, Mr. Wu.

WU: Okay, so if someone gets the check and they're not really the property owner—or maybe like me, I just sold a house. I just sold a house a couple of weeks ago. Should I keep that check since I paid for most of the property taxes that year?

MEYER: I would suggest not committing a crime, Mr. Wu, and I believe that if someone were to cash a check that they were not entitled to, that would be a crime.

WU: Is there any support for that mechanism?

MEYER: I don't have the criminal statutes, but you yourself as a criminal lawyer should probably know those fairly well. But we could certainly go to the criminal statutes to see that cashing a check that is not intended for you is, in fact, theft. However, I'm not a criminal lawyer, but you are.

WU: And average people just know whether they're the rightful recipient of this check or not? And even if it's their name on it?

MEYER: I believe that people understand if their name is on a check and to what they're entitled, sir. I obviously have much higher belief in all Texans than maybe you do, but yes, I do believe they're very, very capable.

WU: Why does this not take effect immediately? Why does this only take effect in May of 2022?

MEYER: We actually amended it to move it up to March, and what happens then is it takes the comptroller time to be able to process the checks and see about the homestead exemption. And quite frankly, we wanted to be able to make sure that

those who have purchased their homes this year are included in this. Whereas if it was not pushed until the following year, sir, then they wouldn't be included. So we wanted to make sure they were included.

WU: So you're saying that it was impossible to carry it out in March?

MEYER: I didn't say that.

WU: I'm sorry. I didn't understand your explanation, then. So you're saying the comptroller told you they could not be able to take these funds out and issue these checks earlier in the year. It had to be in May.

MEYER: No. I said we moved it from May to March per my amendment. And I said the reason that we put it in March of the following year was to make sure that homeowners—people who purchase their homes this year—benefit from this program.

WU: Wait, I'm sorry. Does the bill currently say May of 2022 or March of 2022?

MEYER: It currently says May sir, but I filed an amendment to move it to March.

WU: Okay, fair. My apologies.

MEYER: No problem. No problem at all.

WU: It went very quickly, and I didn't see that's what it was.

MEYER: Yes, sir.

REPRESENTATIVE HOWARD: I'm just still trying to figure this out in terms of, for one thing, I understand that the federal funds cannot be used for pensions and tax cuts. So this is being framed as what?

MEYER: The ARPA allows the state to use the funds to respond to the public health emergency with respect to COVID or its negative economic impacts, including assistance to households, and that's what we're doing.

HOWARD: So it's assistance to households based on whether or not you're a homeowner but it's not considered a reduction in your property taxes.

MEYER: Yes, ma'am, based on the fact that you're a homeowner.

HOWARD: And you've already answered the question about you're not going to be waiting until the fall to disperse these. These could be a couple of months earlier because you're moving the May date for the comptroller to March, so these funds could get to the homeowners sooner. If they need them for relief, they need it as quickly as they can get it.

MEYER: Yes, ma'am.

HOWARD: Is the intention to restore funds to the relief fund, to No. 325, if you have returned, undeliverable checks that have been mailed out?

MEYER: I'm sorry, ma'am, can you please restate your question?

HOWARD: If you're having checks that have been mailed out to households where the homeowners are no longer there and so the checks are returned as undeliverable mail, would those funds be returned to the Coronavirus Relief Fund?

MEYER: They would be returned, I believe, to general revenue. Yes, ma'am.

HOWARD: Well, if they're being expended from the Coronavirus Relief Fund, they should be coming back to that, right?

MEYER: They will be returned to the source. So if it's the Coronavirus Relief Fund, yes, ma'am.

HOWARD: And just to clarify, too, what we're talking about because I know that Chairman Murphy brought this up. I believe y'all have said that there were five million homeowners that were benefitting from this. Is that correct?

MEYER: Yes, ma'am. I believe it's actually close to 5.6 million and maybe by the time this goes into effect, 5.7.

[**CSSB 1**, as amended, was passed to third reading.]

### SB 7 DEBATE - SECOND READING
### (Hunter - House Sponsor)

**SB 7**, A bill to be entitled An Act relating to the composition of districts for the election of members of the State Board of Education.

REPRESENTATIVE HUNTER: We're at this time laying out the State Board of Education redistricting, and I'm going to give you some layout information, and then I'll take questions as best I can. We're here today to lay out the State Board of Education plan. The plan I'm about to lay out was adopted by the state senate this month as **SB 7**. The House Committee on Redistricting held a hearing on this senate plan in October. At the hearing we heard from several witnesses. At that hearing I laid out what the senate said its priorities were in drawing this plan. The senate said its priorities were following all applicable law, equalizing population across districts, preserving political subdivisions and communities of interest when possible, preserving the cores of previous districts to the extent possible, and achieving geographic compactness. As you know, amendments to the plan were due last evening.

There are 15 SBOE—that's State Board of Education—districts. And members, in comparison to a state house map, the ideal district size of a State Board of Education is 1,943,043 people. The plan before you has a deviation of .86 percent. The senate plan, according to the senate, doesn't split the VTDs. The plan contains four majority-minority HVAP districts: 1, 2, 3, and 4. District 4 has an HCVAP below 50 percent but its political performance strongly elects a democrat. The map has one pairing in District 4 and an open seat in District 7. I've been asked to give you a history. I think if you check the bill out, I believe in the Senate Redistricting Committee, the bill was voted out 14-0, and on the senate vote, it was 21-10. So I'll be urging you to adopt this plan by the senate as the Texas House of Representatives.

REPRESENTATIVE ANCHIA: During the committee hearing on October 12, I asked you a couple of questions and you mentioned you were going to try to verify some of the answers. So I'd like to ask them before the body. You pointed out that Districts 1, 2, 3, and 4 were Hispanic majority VAP districts, is that right?

HUNTER: That is what the report from the senate gave us, yes.

ANCHIA: Thank you. So I wanted to ask specifically about District 3. Is it correct that the SBOE map that is proposed today would lower the Spanish Surname Voter Registration in District 3 by over 10 percent from 59 percent to 48.8 percent?

HUNTER: I cannot confirm that. No, sir.

ANCHIA: Okay. And would it lower the Spanish Surname Voter Registration in District 1 from 65 percent in the current plan down to 60 percent?

HUNTER: I cannot confirm that.

ANCHIA: Thank you, Mr. Chairman. Is it correct that it would also lower the non-Anglo population in District 6 by nearly 10 percent from 62 percent people of color down to 53.6 percent?

HUNTER: And I cannot confirm that, Mr. Anchia.

ANCHIA: Okay. And so just as District 6 is about to become a performing minority coalition district, this map would take it apart and move portions into predominantly Anglo Montgomery County. Is that your understanding as well?

HUNTER: I cannot confirm that as well either, sir.

ANCHIA: Thank you. In your analysis of this map, was it possible or indeed required by the Voting Rights Act to draw a majority Hispanic Citizen Voting Age Population district in Harris County while also drawing an African American opportunity district in Harris County?

HUNTER: I'm not able to specifically answer but I can only tell you, as I indicated before, I'm relying on the information from the senate. Thank you, sir.

[Amendment No. 1 by Anchia was laid before the house.]

ANCHIA: Here we are again considering an electoral map that fails to reflect the diversity of the great State of Texas. The State Board of Education has an important role to play in the lives and learning of all our children. Their duties are to set curriculum standards in our neighborhood classrooms, and they pick the textbooks our students need to be successful in school. In fact, decisions made by the State Board of Education often have ramifications far beyond Texas. Because we are such a big state—the 10th largest economy in the world—the textbooks that we adopt often inform the content of the textbooks across the country. While what the State Board of Education does impacts millions of Texas families, oftentimes Texans don't know it. But we do. We as policy makers do. That's why it's incumbent for us as policy makers to make sure that the diversity of the State Board of Education approximates, in some way, the diversity of not only the schoolchildren that are impacted by the decisions that that organization makes but also of the state at large.

You know, it took years. It took years and years and years of MALC members fighting alongside some SBOE members to adopt a curriculum that was historically accurate for the Mexican American Studies program. I'm really pleased to say my daughter is taking that class as a senior. And that's a really important step that's critical in allowing more children to learn and appreciate the cultural heritage and contributions of the Mexican American community to this state. And I say all this because with the Hispanic population now surpassing the Anglo population, according to our state demographer, there remains only three out of 15, or one-fifth, of the districts in the State Board of Education that are Latino opportunity districts. And there are eight Anglo majority districts and another two near-Anglo majority districts. And that's just not representative. That just fails the basic test of proportionality—doesn't even come close to proportionality.

So rather than reflecting our collective diversity, the map drawers clearly chose to shore up a partisan majority. It fails to create a new Latino opportunity district even though one can be drawn in Harris County. It fails to provide representative choices for heavily Latino areas in Central Texas. And it weakens District 3, the district that stretches from the Rio Grande Valley to San Antonio, by lowering the Spanish surname turnout and by pairing heavily Latino areas from Hidalgo County through parts of Bexar County with Anglo areas such as Lavaca, Goliad, and Wilson Counties. Similarly, District 2, which is another South Texas anchor district, is stretched all the way to Matagorda, Wharton, and Jackson Counties with what appears to be the intent to dilute the voting strength of the Latino population in that district.

While the rules in a special may allow a bare minimum of 24 hours of notice, they don't mandate it. We had this discussion in committee. This has certainly been a very fast process. And while we're meeting the minimum requirement of 24 hours' notice, the public, when testifying before our committee, asked for much longer on all the redistricting maps, including the State Board of Education map. Regardless of which body originated these lines and drafted this map, each chamber is independently responsible for what ultimately passes. We own it, essentially. And so if we rubber-stamp a discriminatory map, it's just as bad as drawing them.

With that, I ask you reject these maps and allow an opportunity to consider maps that truly represent that great diversity of our state—the 50 percent of Texas growth that was driven by the Latino community and that is not reflected in the current document. So members, this amendment strikes the enacting clause. It would send this bill back to the drawing board, and I ask for your favorable consideration.

HUNTER: As you've heard, it strikes the enacting clause, which basically ends the bill. I respectfully ask you to vote no on this amendment.

ANCHIA: We'll be asking for a record vote on this. With the student population in the State of Texas and the growth that the Latino community represents, the fact that it has allowed us to import congressional districts from other states because of that growth, the fact that 95 percent of all the growth in this state are people of color, and yet this map has three performing Latino majority districts

out of 15 and a fourth that is sort of janky and kind of on the edge, this just isn't proportional. It's not even close to being proportional given the composition of our state. And so I'd ask that we start again, that the house offer its approach and not simply take the senate's approach to this matter. I would ask that we reject the senate map that comes before us because it just doesn't reflect the diversity of this great state.

REPRESENTATIVE C. TURNER: Chairman Anchia, basically the premise behind your amendment is you think we could come up with a better product than what we have here today. Is that right?

ANCHIA: I think rubber-stamping this bill is just as bad as having drawn it originally. We can do better. We can achieve more fairness in this bill. I'll have subsequent amendments to do so. But this isn't the product—simply because the senate drew it, this isn't the product we should be adopting as the house. The house's should be a representative reflection and should express its own sense of what the SBOE districts should look like. It should express its own sense of how we honor the Latino growth in this state. Because this isn't the answer.

C. TURNER: Do you think this map fairly represents the fact that 95 percent of the growth in the last decade is minority growth—Hispanic, African American, Asian American?

ANCHIA: No, it doesn't even approximate it.

C. TURNER: When you think about what this bill is about, it's the State Board of Education, an important body that oversees many aspects of public education in our state. When you think about the ethnic makeup of Texas public school students, does this map fairly represent them and their interests?

ANCHIA: No, not even close. I mean, children of color are by far the majority in this state. Latino students alone became the majority of Texas public school children all the way back in 2011. I will point out that the composition of our school student population is not required to be reflected. It's not a requirement, certainly, but it's an interesting mile marker to measure representation generally. What is, I think, an even better mile marker are communities of interest, right? I mean, what the Voting Rights Act cares about are voters. Under this map, Latino voters and voters of color do not have the ability to elect a candidate of their choice in an overwhelming majority of these districts.

C. TURNER: Well, I think you have a good amendment. I agree with your premise. I think the house could come up with a better product if we spent a little more time on it than we've had to devote to this senate bill over the last four days or so. I hope the body will support your amendment.

[Amendment No. 1 failed of adoption by Record No. 85.]

[Amendment No. 2 by Anchia was laid before the house.]

ANCHIA: This amendment provides an option for remedying the underrepresentation of Latinos in the SBOE map and ameliorating the delusion of people of color's voting power in majority-minority SBOE districts that cover Central, South, and Southeast Texas. On the whole, the current and proposed

maps are among the least represented of maps in our state. Despite accounting for roughly half of eligible voting population, non-Anglo voters only make up majorities in five out of 15 State Board districts. Just think about that for a second. Ninety-five percent of the growth are people of color. It's a minority-majority state. Yet non-Anglo voters only make up majorities in five out of 15 of the districts. It's not even close to being representative. And **SB 7** takes that baseline and makes the underrepresentation even worse.

The State Board of Education is incredibly important, as I stated earlier. And not only does **SB 7** fail to account for the exponential growth in communities of color across the state, but it dilutes the voting strength of Latino residents in SBOE Districts 2 and 3, and importantly, it takes a minority coalition district in District 6 in Harris County and it slices and dices it up into Montgomery County to dilute that vote even further, Ms. T. A preliminary analysis demonstrates that there's still significant racially polarized voting in minority-majority SBOE districts with Latinos and African Americans consistently preferring democratic candidates, and **SB 7** would dilute the votes of those groups by pairing them with high-turnout Anglo areas with which they have little in common, such as Lavaca, Goliad, Jackson, and other counties. At a time when state legislators in Austin are doing all they can to control how students learn in classrooms—and we saw that during the regular session—it's more important than ever that we have representation on the State Board of Education, and my amendment allows for just that.

HUNTER: Based again on the information we provided in the layout, I respectfully ask you to vote no on this amendment.

ANCHIA: If you want more representation that reflects the diversity of our state, vote aye. If you don't, vote no.

[Amendment No. 2 failed of adoption by Record No. 86.]

[Amendment No. 3 by Bonnen was laid before the house.]

REPRESENTATIVE BONNEN: This amendment will move a portion of the city of Friendswood that is within Galveston County into the State Board of Education District 7, which currently includes the vast majority of Galveston County. This edit keeps the district within the standard deviation allowed for the SBOE districts.

[Amendment No. 3 was adopted by Record No. 87.]

HUNTER: I request you to vote yes on this bill.

[**SB 7**, as amended, was passed to third reading by Record No. 88.]

## SB 4 DEBATE - SECOND READING
### (Hunter - House Sponsor)

**SB 4**, A bill to be entitled An Act relating to the composition of districts for the election of the Texas Senate.

REPRESENTATIVE HUNTER: This time I'm laying out the senate bill and map. We are here today to lay out the plan for the Texas Senate. The plan I am about to lay out was adopted by the senate in October as **SB 4**. The House Committee on Redistricting held a hearing on this senate plan in October. At the hearing we heard testimony from many witnesses. At that hearing I laid out what we heard the senate's goals and priorities were, including following all applicable law, equalizing population across districts, preserving political subdivisions and communities of interest when possible, preserving the cores of previous districts to the extent possible, avoiding pairing incumbents, achieving geographic compactness, and accommodating incumbent priorities to the extent possible. Proposed amendments to the plan were due last evening.

There are 31 senate districts. The ideal size is 940,178. The plan before you has an overall deviation of 6.14 percent. Senator Huffman also pointed out in her layout of this plan that it avoids splitting the VTDs. The plan contains seven majority-minority HVAP districts which are also majority HCVAP districts: Districts 6, 19, 20, 21, 26, 27, and 29. The map has one pairing in District 25 that includes Dawn Buckingham, who is not seeking reelection. District 24 in the plan has no incumbent. In the Redistricting Committee in the senate, it indicates the vote was 12-2. In the senate, the voting was 20-11. I urge the house to adopt the plan by the senate.

REPRESENTATIVE ANCHIA: Is it correct that the proposed senate map creates no new Latino opportunity districts despite the fact that Latinos accounted for nearly half of the entire growth in the state last decade?

HUNTER: Based on the information I gave you, the understanding that I have is what Senator Huffman said. Whether it fits the exact definition or not, I can't confirm.

ANCHIA: Okay. When you listed the majority Hispanic Citizen Voting Age Populations, there were seven, so it does appear that a new one was created. Is it correct that the plan dismantles existing Senate District 10, which has been performing to elect the Latino or black candidate of choice in general elections?

HUNTER: As indicated before, I am not able to confirm that information.

ANCHIA: Okay. I would like to draw the members' attention to publicly submitted maps S2162, S2161, and S2125 submitted by the Latino Task Force and Ric Galvan. You can see these in District Viewer, members. These plans demonstrate that it's possible to draw a Latino opportunity district in Dallas and Tarrant County and to draw either one or two additional opportunity districts in the South Texas/Bexar County area. Did you or anybody on your staff analyze whether the Voting Rights Acts requires the drawing of these additional districts?

HUNTER: I can tell you that we've looked at some of the aspects but I can't confirm the specifics, Mr. Anchia.

ANCHIA: Would you agree that Hispanics and Anglos, based on our state demographer's reporting, it's suggested that they are equal portions in the plurality that is the Texas population, with Latinos at this point in time probably being slightly higher than the Anglo population? Do you recall that testimony?

HUNTER: Are you talking about statewide?

ANCHIA: Yes, statewide.

HUNTER: On the growth side I think the indication from the demographer said you are correct.

ANCHIA: So you correctly pointed out that there were seven Hispanic CVAP districts. Do you know how many of the districts are majority Anglo Citizen Voting Age Population in the plan?

HUNTER: I'm not able to confirm that specifically.

ANCHIA: There are 20. So even though we have equal population, roughly equal with Hispanics being a little bit more, there are seven Hispanic Citizen Voting Age Population districts and 20 Anglo Citizen Voting Age Population districts. So there are nearly three times as many districts that are majority white compared to majority Hispanic. Are you aware of that?

HUNTER: Not until you just told us the information.

ANCHIA: Do you recall that Senator Huffman said that these maps were drawn race blind? Do you remember that from her testimony?

HUNTER: I do not.

ANCHIA: And is it not true that under Section 2 of the Voting Rights Act, Texas has an affirmative legal obligation to avoid drawing district lines in a way that dilutes the votes of minority voters, thus making a race blind effort at drawing a map almost de facto in violation of Section 2?

HUNTER: Not able to tell in the specifics, but I do know the protections built in the section. Yes, sir.

ANCHIA: And you would agree that Texas has a constitutional obligation to avoid intentional discrimination against racial and ethnic minorities?

HUNTER: Yes, that's right.

ANCHIA: Are you aware of the Fifth Circuit precedent in *U.S. v. Brown* that informs us that in gauging whether there is discriminatory intent, a state's awareness that a state's action bears "more heavily on one race than another" is a key factor that courts will consider?

HUNTER: I cannot recall that particular case but would be glad to take a look. Thank you, sir.

ANCHIA: Thank you. Some quick questions just on kind of the conclusions related to this map and that is, do you know if this map was drawn without racial or ethnic data?

HUNTER: I am not aware of the specifics.

ANCHIA: If it was drawn without racial or ethnic data, given the requirements of Section 2 of the Voting Rights Act, or if it was blind to race, as Senator Huffman said in her layout, and the state later becomes aware of a disparate impact or if the

state ignores its obligation to carefully consider whether it is diluting minority voting power, then that would also be a violation of the Voting Rights Act. Are you aware of that?

HUNTER: I'm not able at this time to hear what you said.

[Amendment No. 1 by C. Turner was laid before the house.]

REPRESENTATIVE C. TURNER: The 2020 census revealed tremendous population growth among African American, Hispanic, and Asian American communities in both Dallas and Tarrant Counties. At the same time, the Anglo population of Dallas County decreased by 5.4 percent and in Tarrant County by 8.9 percent. This proposed senate plan creates zero additional minority opportunity districts in either Dallas or Tarrant Counties. In fact, it eliminates the only Tarrant County district in which African Americans and Hispanic Texans can come together to elect the candidates of their choice, and that district is Senate District 10. Overall, minority opportunity districts in the Dallas-Fort Worth metroplex go from three to two.

Now, if you feel like you've heard some of this before, it's because in 2011, just like today, the legislature proposed and ultimately passed a senate map that dismantled Senate District 10 and submerged Tarrant County minority voters into an Anglo-controlled rural district. A federal court found that the 2011 senate map was intentionally discriminatory. And in fact, not only was the district restored to allow voters of color to continue to have the opportunity to elect the candidate of their choice, but the State of Texas—the taxpayers—were forced to pay over a million dollars in attorney's fees to former Senator Wendy Davis' attorneys in that case.

But despite minority population growth in both Dallas and Tarrant Counties and a federal court ruling in 2011 making clear that submerging Tarrant County minority residents into an Anglo-controlled district violates the law, the senate again has sent us a map that does the same thing and is discriminatory in intent and effect. And what's worse is this time the legislature has the benefit of that 2011 court ruling saying we cannot do this. In 2011, they hadn't seen it before. But in 2011, they ruled you can't do this, and here we are in 2021 proposing to do the exact same thing—republicans are.

This senate map proposal puts Tarrant County minority residents in not one but two rural districts. District 22, anchored in rural counties that goes south of Waco, comes into the eastern side of Tarrant County by shoving a crooked billy club into the county to grab 359,560 Tarrant County residents with a black and Hispanic Voting Age Population of 51.6  percent. The plan then takes more than 600,000 people—601,874 people—in southern Tarrant County with a combined black and Hispanic Voting Age Population of 52.2 percent into a new rural-based SD 10 that winds as far west as Shackelford and Callahan Counties. It does this by drawing a jagged gash across Tarrant County south of Interstate 30. North of this jagged gash, the historic Hispanic Northside community in Fort Worth is then joined with Anglo voters in a suburban-based Tarrant County District 9.

Now, members, to help you in this geography lesson of Tarrant County, on your desks I have provided you maps showing the combined Hispanic and African American Voting Age Populations in the benchmark plan, the current plan, and in the proposed plan in **SB 4**. And if you look at the large map on the easel over here, you will see that the current boundary of SD 10 includes all of Southeast Fort Worth and South Fort Worth, predominately African American and Hispanic neighborhoods, and the north side of Fort Worth, predominately Hispanic neighborhoods—all of those communities are collectively represented by Representatives Collier and Romero—and a growing and emerging African American population in Southeast Tarrant County in the Mansfield area in South Arlington. That's in the current SD 10.

Now, if you'll turn your attention to the proposed SD 10, you see those communities are cracked apart. The new boundary of SD 10 cuts this jagged gash across the middle of Tarrant County on an east-west basis, severing Representative Romero's district in half, cutting across part of Chair Collier's district, and cutting out the growing African American population in Southeast Tarrant County in Mansfield. You can see how, with precision, the senate map drawers cracked the minority communities of Fort Worth, Arlington, and Mansfield. Additionally, all of you received an e-mail from Senator Beverly Powell of Senate District 10 last night that included her letter to the House Committee on Redistricting that contains additional maps with more detail and highlights additional areas of concern.

So my amendment respects the minority growth in North Texas by restoring SD 10, a third minority opportunity district in the region, and it also creates a new Hispanic opportunity district, one that has been called for by Hispanic leaders and should be created based on tremendous Hispanic population growth. We heard a lot of testimony about this in the Redistricting Committee, that the combined Latino population of Dallas and Tarrant Counties demands that a new district be created. Under this amendment, Senate District 23, held by Senator Royce West, is retained as a Dallas County district in which African Americans can continue to elect the candidate of their choice. In both Dallas and Tarrant Counties, a new District 12 is drawn that unites communities of interest and historic Hispanic communities to create a new Hispanic opportunity district. In Tarrant County, SD 10 is retained as a coalition district.

In **SB 4**, I should note, Senate District 23 is drawn into Tarrant County for the first time that I can ever recall, and I raised some issues about this in committee. The Tarrant County population of SD 23 is also overwhelmingly minority and the Texas Legislative Council reports that the combined black and Hispanic population there is over 66 percent. As drawn today in the benchmark plan, SD 23 performs solidly as a black opportunity district, and adding thousands of new residents from Tarrant County—predominately minority residents—is nothing more than old-fashioned packing. It's also worth noting that local elected officials in Southeast Tarrant County provided testimony and statements to the senate and house committees that they want to be in a Tarrant County-centered district where they continue to have the opportunity to elect

candidates of their choice. And despite this testimony, the senate scooped up African American and Hispanic voters and cracked them into multiple districts, then packs them into SD 23.

So this amendment will rectify all those problems and will address many of the concerns raised by community leaders. Most importantly, it will allow minority voters of Senate District 10 to continue to elect the candidates of their choice.

ANCHIA: I wanted to focus on Tarrant County real quick because when you hear it in committee and you hear it described like this on the floor and you look at the data, if you didn't know, now you know. Because it's so overwhelming. When you look at Tarrant County, much of the growth in Tarrant County was driven by communities of color, was it not?

C. TURNER: Absolutely. In fact, Tarrant County lost Anglo population last decade.

ANCHIA: In fact, the Anglo population shrunk by about three percent while the Asian population grew by 56 percent, the African American population grew by 40 percent, and the Latino population grew by 29 percent. Isn't that right?

C. TURNER: That's right, and that's why we've seen over and over again the minority voters in Tarrant County increasingly have the ability to coalesce and elect candidates of their choice.

ANCHIA: And they did previously in Senate District 10. In the redistricting of the last decade, they were split apart, and a court said no, you can't do that. And a court drew it back together—required it to be drawn back together. Is that correct?

C. TURNER: That's absolutely correct.

ANCHIA: And now, despite all of this growth during the last decade, Tarrant County is cracked between SD 9, SD 10, and SD 22 and then packed into SD 23, which comes in from Dallas County. Is that correct?

C. TURNER: That's exactly right. Three crackings and one packing—that's what we have here.

ANCHIA: And if we look at your backyard, the area that you represent in Arlington, the black population has been split into multiple senate districts. Isn't that correct?

C. TURNER: That's exactly right. The population is split between Senate Districts 10, 22, and 23.

ANCHIA: Right, right. And so while the non-Anglo population of Senate District 10 increased by exactly 134,124 people, of whom 51 percent were Latino, 25 percent were black, and 11 percent were Asian, and the Anglo population fell by 22,893 people, which is a decrease of nearly six percent—so what we're talking about is SD 10, not Tarrant County—this proposed map cracks it up. It

breaks it up. After all of that growth and a demonstration that SD 10 could elect the person of the minority community's choice, they are rewarded for this growth by being cracked into multiple districts and packed into the 23rd, right?

C. TURNER: That's exactly right.

HUNTER: I respectfully request that this amendment be voted no.

C. TURNER: I did not hear a reason why you should vote no. I've given you a lot of reasons why you should vote yes. This amendment undoes a great injustice and reverses a terrible mistake that the senate has made in this map by destroying a protected coalition district, Senate District 10. And again, this was done 10 years ago. It was done in 2011, and the federal courts ruled that it was unlawful. It was intentionally discriminatory. It was a violation of the Voting Rights Act and the Constitution, and they ordered the state to remedy it by restoring the boundaries to Senate District 10 as they had existed before. And that's what this map seeks to address, is to correct that, to restore Senate District 10 to an effective coalition district so that minority voters can continue to have the opportunity to elect the candidate of their choice.

ANCHIA: I wanted to get through just sort of an analysis of other parts of the Metroplex because we oftentimes talk about the Latino community and African American community, but we saw explosive growth in the Asian American population growth in North Texas. Is that not right?

C. TURNER: That's absolutely correct.

ANCHIA: In fact, 87 percent growth. Isn't that correct?

C. TURNER: That's correct.

ANCHIA: The interesting thing about the Asian American population in DFW is that it is geographically compact. It's close together. And so the AAPI community could be drawn into one district where they have the opportunity to exert their electoral power and elect the person of their choice. Why do you think that was not done?

C. TURNER: Well, Chairman Anchia, I can't say for certain, but clearly as a pattern with a lot of these redistricting plans that we've seen over the course of this week and certainly with this senate proposal is that minority communities are intentionally cracked to dilute their voting strength and dilute their ability to elect the candidate of their choice. And what's one of the great features of this amendment that I hope the house will adopt is if you look at how Tarrant County is drawn, we do have a thriving Asian American community that I have the privilege of representing a large part of in Southeast Tarrant County. They're largely consolidated into Senate District 10 where they can be part of this effective coalition district. In Dallas County, which you represent, Senate District 16 is drawn in a way that many of those voters will have the opportunity to be together in a district.

ANCHIA: And just to make it clear to the membership—in case they say, hey, well, I don't know—the Senate District 10 in the proposed map goes from Tarrant County and takes these voters of color and pairs them all the way down with residents in rural counties that ends in Brown County. Is that not right?

C. TURNER: That's correct. That's correct—all the way out to Brown County, nearly to Abilene.

ANCHIA: And Asian American population growth, it looks like, is aggressively cracked between Senate District 2, Senate District 8, Senate District 12, and Senate District 30 in North Texas. Is that your understanding of how the underlying map is? And your map would seek to remedy part of that, correct?

C. TURNER: Yes, I think that's an accurate characterization of what **SB 4** would do if we don't fix it. And my amendment would address many of those flaws in the map that you just pointed out.

ANCHIA: And just one final point about the Hispanic residents in Tarrant County. It's not a small number. It's about 600,000 people, right?

C. TURNER: Right. That's right.

ANCHIA: And what justification exists for eliminating the only district where those 600,000 people in Tarrant County can elect the candidate of their choice?

C. TURNER: There is zero justification for it and what's worse is we know it is intentionally discriminatory. The courts have found that to be the case before. The courts will find that to be the case again if we do not adopt this amendment.

ANCHIA: Thank you, Mr. Chairman.

C. TURNER: Thank you, Chairman Anchia. Members, lastly, I'll just say that I know that some of you are saying, well, it's tradition that the senate passes the house district map unchanged and the house passes the senate district map unchanged. What I would say to you is that tradition does not trump the Voting Rights Act. Tradition does not trump the Constitution. Tradition does not trump what's right and wrong. So I ask that you vote yes on this amendment.

[Amendment No. 1 failed of adoption by Record No. 89.]

[Amendment No. 2 by Romero was laid before the house.]

REPRESENTATIVE ROMERO: This amendment makes adjustments to Senate District 10 and the surrounding districts. We're all aware that minority communities in Tarrant County have been intentionally targeted under **SB 4** by cracking apart historic Hispanic and African American communities and submerging these communities into Anglo-controlled rural and suburban districts. This is most evident in the tearing apart of Senate District 10 and, very specifically, my district in District 90.

We heard about it through our house maps. You guys know that HD 90 is and has been 75 percent Latino. SD 10 splits it right in half, east to west. We're fortunate to have these maps. If you look at what's happened to the communities of color in Tarrant County, they're in 9, they're in 10, they're in 23, 22. And in Tarrant County—which is, just Latino alone, 25 percent Latino—40 percent of

Fort Worth is now Latino, and we're being split apart into four different senate maps. Make no mistake. By cracking 10 the way these proposed maps have done, in effect you will take away the opportunity for Latino representation—people of color's representation—in the senate for many years to come.

Senator Huffman argued that Senate District 10 was required to change due to population growth in the DFW area. This suggestion is incorrect. The district was only .57 percent over the ideal population. Even if changes were required to the district, adding seven—seven—rural counties was absolutely not necessary, seven rural counties that now stretch almost to Abilene, Texas. For those of you that are in Abilene, what do your rural roads and your oil and gas industry really have in common with the people of Southeast Fort Worth and Stop Six and Poly and Morningside? Are your issues our issues? Are your concerns our concerns? Are our concerns of mobility within an urban area the same as your issues of connectivity in your rural areas?

Even if changes were required in this district, the addition of seven rural counties is a repeat of the same illegal action you just heard from Chairman Turner. Intentionally discriminatory tactics used to dismantle SD 10 in 2011, federal courts, you already heard, found illegal. The state was forced to pay over $1 million in attorney's fees to Senator Davis and her attorneys. I'm sure that's fiscally responsible for all of those who like to use that term.

This amendment demonstrates that it's possible to change the boundaries of SD 10, as Senator Huffman suggested was required, without dismantling a performing majority-minorty district and diluting Tarrant County voters of color by submerging us into a rural-anchored district that stretches, again, over 100 miles away. This amendment redraws District 10 to include communities of interest not in this proposed SD 10 which you've heard me talk about: Como, Diamond Hill, Northside, Meadowbrook, and Woodhaven on the east side of town.

SD 10, like all of Tarrant County, saw incredible growth among Hispanic, African American, and Asian American residents during the last decade. District 10 saw the white population decline by over eight percent according to the 2020 census. In the house, we recognized this growth in Tarrant County by creating a new coalition district along the eastern boundary of the county, yet the senate is intentionally diluting the growth. This amendment enhances an already performing crossover and coalition district by strengthening the coalition even further by uniting communities of interest. After uniting communities of interest, District 10 Citizen Voting Age Population becomes over 52 percent African American and Hispanic. This amendment makes adjustments by surrounding districts, making the surrounding districts generally stronger for incumbents.

I've heard arguments that hey, it doesn't matter what you want to do, house members. They've got to get to 19 over there on the other side. There's a cost. When I came to the house it was 55-95. When I got back home I'd say, I don't think this is the way our democracy was intended, for it to be one-third–two-thirds. There's not a lot of debate between us anymore. Certainly in the eight years that I've been here, I've seen the debate decline more and more year over year. It's unfortunate, because in my 47 years of life, in the time that I

decided that I wanted to run for office, I never thought that this was what it would be like—when it's a matter of winning. Last night, that's all that we heard. It's about winning. And that's what this Senate District 10 map is. It's about winning. What's the margin of victory that you guys need that you would silence an entire community of Tarrant County?

ANCHIA: Representative Romero, thanks for walking us through that. You talked about debate. There are some facts that are not even up for debate, right? I'd like to walk through some of them with you. SD 10, after being cracked during the last redistricting cycle, was put back together by a court, was it not?

ROMERO: Correct.

ANCHIA: And that court drew it so that minority communities could elect the person of their choice. Correct?

ROMERO: That's correct.

ANCHIA: And since then, we took a census, did we not, that showed massive growth in communities of color in Tarrant County. Correct?

ROMERO: That's fact.

ANCHIA: And the facts are that Tarrant County is now a minority-majority county, is it not?

ROMERO: That is also correct.

ANCHIA: Is it also not fact that while the Anglo population shrunk during this last census by three percent, the Asian, African American, and Latino populations blew up by 29, 40, and 56 percent respectively. Is that not right?

ROMERO: That's also fact.

ANCHIA: And the response—well, let me offer up another fact. SD 10 was fine. SD 10 was right around the deviation, not even close to being as under- or overpopulated as many other districts around this state. Is that not correct?

ROMERO: .5 percent.

ANCHIA: .5 percent.

ROMERO: .57 percent.

ANCHIA: So you didn't even really need to touch it. You could just play with it around the edges and it would've been fine for the people of color to elect the candidate of choice, right?

ROMERO: It was within the deviation.

ANCHIA: Within the deviation, yet SD 10 residents are now placed in districts that extend all the way down to Falls County, 143 miles away. Is that not right?

ROMERO: That's correct, within blocks of Abilene.

ANCHIA: Say it again?

ROMERO: Within blocks of Abilene, Texas.

ANCHIA: That's right. And in Falls County, which is south along I-35, there's a town there called Rosebud. It's, well, over 1,000 people, but now the residents of SD 10 that you represent are included in the same district as they are. And you talked about communities of interest. What could be the justification for the people that you represent—same people who were in SD 10—to be placed in a district with the people in Rosebud in Falls County? Can you think of one?

ROMERO: That's the point that I was making. Those of us that have seen debates between rural and urban—and anyone that represents a rural community should understand this—it's hard to know the day-to-day lives of urban areas, and we've shown it here on the floor. And it's hard for us to understand what you're dealing with on your farm-to-market roads, what you deal with with oil and gas industry and their traffic, and with the farms and your cotton farmers, and all of the issues that those communities face—their schools where, occasionally, thank God that we occasionally get on the same page. But right now, how often are we going to come together? That's the benefit of being in an urban area like Tarrant County where two districts could've completely been drawn almost wholly within Tarrant County. We wouldn't have to drive 140 miles to get to our neighbors that live within that same senate district.

ANCHIA: And not only does it impact the voters, which is what the Voting Rights Act is focused on, but let's just talk about beyond that. What does it do to the business community? What does it do to representation of Tarrant County down here in Austin? What does it do to how Tarrant County performs in this building when you crack their representation that was anchored in Tarrant County?

ROMERO: It is hard for me to believe, Chairman Anchia, that Fort Worth, Texas—the county seat of Tarrant County—with this map will not have a representative that lives in Fort Worth and have a bond with its chambers of commerce and its Hispanic chambers and black chambers and understanding the needs—not the wants, but the needs—of Fort Worth and Tarrant County and its surrounding communities.

ANCHIA: It just kind of blows my mind. SD 10 required really no adjustment at all.

ROMERO: It did not.

ANCHIA: The people of Fort Worth wanted it that way. The people of color in Tarrant County wanted it that way. They testified as much. Yet it is cracked into four different districts. What do you think is the possible justification for that? And by the way, at the same time that we learn that Tarrant County just became minority-majority—coincidence?

ROMERO: I don't think so. You know, we hear it all the time, and that's why I said "winning," Chairman Anchia. This is a matter of winning. We've heard that these elections have consequences, but the only people that are suffering here are the people in my district and District 90 by being split in half, by not being able to vote for the same senator. The fact is Senate District 10 was a competitive seat. If republicans would've worked a little bit harder, they potentially would've won

that seat and Senator Powell wouldn't be our senator. Konni Burton was the senator in that map. It was a competitive seat. It could've remained a competitive seat. But we don't want a win—we want an easy win.

HUNTER: I respectfully request no on the amendment.

[Amendment No. 2 failed of adoption by Record No. 90.]

[Amendment No. 3 by Collier was laid before the house.]

REPRESENTATIVE COLLIER: Members, this amendment will restore Senate District 10 to its benchmark as passed by the legislature in 2013. In 2011, the state legislature passed a state senate map that federal courts found to be intentionally discriminatory against blacks, Hispanics, and Asian Americans. As you heard before, the state was ordered to pay over $1 million in attorney's fees to then Senator Wendy Davis' attorneys. Similar to what was done in 2011, the proposed Senate District 10 map under **SB 4** intentionally destroys a performing coalition and crossover district by submerging minority voters in southern Tarrant County into a rural district with seven rural counties over 100 miles away.

Now, there's one thing I want you to remember. This is the same configuration of SD 10 where the coalition of voters and crossover voters chose to elect republican Konni Burton and at the next election they chose to elect democrat Beverly Powell. But **SB 4** takes that choice away from them because that coalition, which also includes crossover voters, will no longer have a choice.

The voters in SD 10, which is currently wholly contained in Tarrant County, have worked to form coalitions based on shared interests and shared concerns. Tarrant County is considered to be an urban area, whereas the counties of Palo Pinto, Stephens, Shackelford, Callahan, and Brown are all considered to be rural. Some of the main economic engines for Tarrant County include aerospace, technology, and the automotive industries. The main economic engines for those rural counties are different. Tarrant County residents must contend with high traffic, environmental issues, and access to affordable housing, to name a few. However, the rural counties do not share the same challenges. In fact, the largest employer in Palo Pinto County is the general hospital—the 99-bed general hospital. Stephens County enjoys a large oil and gas presence as well as agriculture. In fact, many of these rural communities, beautiful as they are, focus on agriculture. So lumping Tarrant County in with these rural counties reduces the ability of achieving coalitions between voters who have traditionally formed communities of interest in the county since their interests are not aligned, their challenges are not the same, and some live over 100 miles away.

Why take that away from them? Don't we trust the coalition and crossover voters in SD 10 to make their own choice of who their candidate will be? The decision has already been made for them by this legislature because they will no longer have the collective power to elect a candidate of their choice like they have in the past. This is because voters to the north, who are overwhelmingly Hispanic, and the growing communities to the east where I live, which have growing African American and Asian American populations, are drawn into other rural and suburban Anglo-controlled districts in order to dilute our voices.

This amendment simply restores SD 10 to its current boundaries and makes necessary adjustments to surrounding districts. The currently drawn SD 10 is only .57 percent over deviation and requires no changes to the district to meet the legal population requirements. This amendment respects the federal court order which made it abundantly clear any attempts to dilute minority votes in Tarrant County with rural Anglo voters is discriminatory both in intent and effect. Lastly, this current configuration of SD 10 which is also the same as seen in this amendment received bipartisan support. In fact, the 2011 chair of the Senate Redistricting Committee voted for this amendment along with every elected minority candidate of choice in the Texas Senate. So with that, I'll answer questions.

C. TURNER: I want to just ask you a couple of questions about your amendment to make sure the body understands. Your amendment is different from the amendment that Representative Romero offered and then the other amendment that I offered, right?

COLLIER: That's correct.

C. TURNER: My amendment a few minutes ago would have created a new—in addition to restoring Senate District 10 as a minority coalition district—it would have also created a new Hispanic opportunity district between Dallas and Tarrant Counties. Your amendment simply seeks to restore the current boundaries of Senate District 10. Is that right?

COLLIER: Yes, but while I appreciate your amendment, which shows the possibilities that are available to the State of Texas to create minority opportunity districts, this amendment just restores it, puts it back to where it was before we started today.

C. TURNER: Right, absolutely. So at a bare minimum, if the legislature can't bring itself to create new minority opportunity districts even though 95 percent of our growth over the last decade has been minority, at a bare minimum you're saying we ought to preserve an effective performing coalition district in Senate District 10.

COLLIER: Absolutely, because there's no need to change it. The population numbers are there.

C. TURNER: Absolutely. I know in the map I left up there, I pointed out earlier how your district, your House District 95, in Senator Huffman's map, **SB 4**, actually the boundary between Senate Districts 10 and 9 really kind of cuts off the top of your district, does it not? Am I right about that?

COLLIER: That is correct, yes.

C. TURNER: So some portion of your constituents in House District 95 would be submerged in Senate District 9, primarily a suburban district, an Anglo majority district, while the majority of your constituents would be submerged in a rural-based district. Is that fair to say?

COLLIER: That is so fair, yes.

C. TURNER: In thinking about your district and the great communities you represent, thinking about Stop Six, Forest Hill, Everman, and Meadowbrook, do any of those neighborhoods and the good people who live there, do they share a lot of commonality with the good people of Shackelford County or Callahan County or Brown County?

COLLIER: No. In fact, when we talked to the constituents after this map was passed in the senate, I shared with them some of the economic engines in these rural communities, and while we try to create community gardens, we don't have a large agricultural presence in Tarrant County like they do in those rural communities, and our challenges are different. So they could not understand it. They were dismayed and disappointed that they would have to be thrust into areas that they have nothing to do with and no connection with.

C. TURNER: You mentioned, and I'm glad you brought this up, that this amendment, in fact, in the senate had bipartisan support, right? Senator Seliger voted in favor of it. Is that right?

COLLIER: That's correct.

C. TURNER: And as you said, Senator Seliger was the chair of the Senate Redistricting Committee 10 years ago in 2011, right?

COLLIER: That is correct.

C. TURNER: And it's my understanding that when the legislature in that session dismantled Senate District 10—again, to dilute the impact of minority voters—Senator Seliger testified in that trial and ultimately that court ruled that the legislature's action was unlawful. It was intentionally discriminatory. And I think sometimes the legislature and our colleagues don't necessarily understand this, but it is against the law. What they did was against the law. Is that right?

COLLIER: That's right. It is a violation of the law, absolutely.

C. TURNER: Thank you.

COLLIER: Members, if it was good then, it's good now.

HUNTER: Members, I respectfully request no on the amendment. Vote no.

   [Amendment No. 3 failed of adoption by Record No. 91.]

HUNTER: I respectfully request you vote yes.

   [**SB 4** was passed to third reading by Record No. 92.]