# EXHIBIT 14

Texas Senate Special Committee on Redistricting

September 24, 2021

Transcript Produced by Rebecca Farris

1          SENATOR HUFFMAN:  The Senate Special Committee

2     on Redistricting will come to order.  Clerk, please call

3     the roll.

4          THE CLERK:  Alvarado.  Bettencourt.  Birdwell.

5     Campbell.  Hancock.  Hughes.  Lucio.  Nichols.  Paxton.

6     Perry.  West.  Whitmire.  Zaffirini.  Hinojosa.  Huffman.

7          SENATOR HUFFMAN:  Thank you, members.

8     Senator Birdwell asked me to please announce that he is

9     not present today because he has been exposed to COVID,

10    and he's following protocols, so at his request I have

11    stated that.

12          I'd like to welcome everyone to today's

13    hearing where the committee will receive and consider

14    input on proposed plans for the Texas Senate and state

15    Board of Education districts.  We have invited witnesses

16    today that will appear before the committee.  They were

17    recommended directly by members of this committee, and I

18    was pleased to invite each witness that was recommended

19    by the members.  Public testimony will begin after

20    invited testimony concludes.  I want to highlight that

21    our hearing posted for tomorrow will provide another

22    opportunity for members of the public to provide

23    testimony on the proposed plans before us today.  I also

24    want to point out that the committee will not be taking

25    any action on the proposed plans before us today.  The

—2—

1    committee will not be voting on any potential amendments

2    or bills.  Today's hearing is intended to provide an

3    opportunity to hear input on the proposed plans.

4         Committee members and other senators will have the

5    opportunity to ask questions of witnesses, both public

6    and invited.  And in regards to the committee amendment

7    process, I first want the committee to hear directly from

8    invited witnesses and the public so that their input

9    may be considered prior to consideration of any potential

10   amendments.  Therefore, committee amendments, including

11   the corresponding reports from legislative counsel are

12   due to the committee by September the 26th, 2021, at

13   10:00 a.m.  Legislative counsel is asking that committee

14   amendments be substituted to them by 5:00 p.m. on

15   September 25th in order for them to have sufficient time

16   to process and produce the amendment packet.  They will,

17   however, do their best to process amendments submitted to

18   them after that time.

19        At next week's hearings, we will vote on each

20   amendment and the proposed plans before us today.  I also

21   want to make everyone aware that I published an amendment

22   reflecting our continued work with members since the plan

23   was filed.  That amendment was published last night and

24   was posted on District Viewer for all members and the

25   public to review.

1              Before we continue today, I want to review the

2       redistricting process thus far.  Since this committee was

3       created, we've done our best to remain open and

4       transparent about the process, and we have actively

5       collected input from Texans and interested parties across

6       the state through many different avenues.  The committee

7       established a public input portal on its website for any

8       interested party to submit written comments and

9       materials, which are shared with each committee member

10      and also publicly available on the committee's website.

11      This portal will remain open throughout the redistricting

12      process.  It's open as we speak.

13              In addition, though the pandemic prevented us

14      from traveling the state to hold in-person regional

15      hearings as the legislature has done in past

16      redistricting cycles, we still have heard from Texans in

17      all parts of the state about their communities and what

18      they belive the legislature should take into

19      consideration during redistricting.  These public input

20      hearings, both before and after the 2020 census release,

21      enabled Texans to provide input virtually via Zoom.

22      We've also offered individual meetings with senators to

23      discuss their parties and respective districts, and I

24      thank all the members for their participation and input

25      in this process and was happy to meet with members and

1    will be continued to be happy to meet with members who

2    have concerns, interests, or thoughts.

3              I have kept interested parties that have

4    contacted the committee and congressional and SBO members

5    apprised of the process as well.  Over the past year we

6    have sent letters and e-mails to these individuals and

7    groups keeping them informed of the committee's plan and

8    inviting their participation in the process.

9              Members, today there are two proposed plans

10   before the committee, the Senate and the state Board of

11   Education.  These plans were developed after the

12   committee heard many hours of public testimony and after

13   we've talked to members about their perspective district.

14   My goals and priorities in developing these proposed

15   plans include first and foremost abiding by all

16   applicable law, equalizing population across districts,

17   preserving political subdivisions and communities of

18   interest when possible, preserving the cores of previous

19   districts to the extent possible, avoiding pairing

20   incumbent members, achieving geographic compactness when

21   possible, and accommodating incumbent priorities also

22   when possible.

23             In the Senate Proposal, the total deviation

24   between the smallest district and the largest district is

25   5.5 percent.  The total deviation for the SBOE Proposal

1        is less than 1 percent at 0.91 percent.

2               When developing the Senate Proposal, I have

3        had made every effort to accommodate members' requests.

4        We were able to accommodate most of the requests in the

5        plan before you today, not all.  And we will continue to

6        work with members as we work through this process.  There

7        is a -- still a committee process as I explained

8        previously.  I look forward to continuing to work

9        collaboratively with each one of you during the process.

10       As we -- I know we all share the goal of passing fair and

11       legal maps that will allow Texas's upcoming election

12       cycle to proceed as smoothly as possible.  And I am going

13       to ask Senator Hinojosa to come preside so he can lay out

14       the bills for me and then we will get started.

15               SENATOR HINOJOSA:  Good morning, everyone.  At

16       this time the Chair will lay out Senate Bill 4, which

17       deals with Texas Senate redistricting and lay out

18       Senate Bill 7, which deals with the state Board of

19       Education and recognized its author, Senator Huffman.

20               SENATOR HUFFMAN:  Thank you, Mr. President,

21       and Mr. -- excuse me.  I'm used to talking to

22       Mr. President from here.  Mr. Chairman, thank you.

23       Members, I am not going to have a traditional layout

24       because these are clearly bills, but I do propose to you

25       the two senate bills that were just laid out.  One, being

1    the map for the State Senate, the other for the state

2    Board of Education.  The maps have been posted online to

3    the public and for you to see now.  And with that, I am

4    happy to answer any questions that members may have.

5              SENATOR HINOJOSA:  Senator Gutierrez?

6              SENATOR GUTIERREZ:  Thank you.  Thank you,

7    Madam Chairwoman.  I know you've been working hard on

8    this.  You suggested last night that there was an

9    amendment that was created; is that correct?

10             SENATOR HUFFMAN:  That there was a --

11             SENATOR GUTIERREZ:  On the Senate maps you

12   suggested that was --

13             SENATOR HUFFMAN:  That there was an amendment

14   published last night, yes, that is -- there was one, and

15   it is available to the public.  Yes.

16             SENATOR GUTIERREZ:  And that was available as

17   of, what, about 9:30 last night?

18             SENATOR HUFFMAN:  I think it was a little

19   earlier, but it could have been.  That's probably a good

20   estimation.

21             SENATOR GUTIERREZ:  As a matter of fact, this

22   larger map that we see up here doesn't incorporate those

23   changes, does it?

24             SENATOR HUFFMAN:  I do not -- I can't see it

25   from here, but I doubt if it does because I don't think

1      they would have had time to publish something.

2              SENATOR GUTIERREZ:  This larger map is

3      essentially your the previous map that still has

4      Maverick County in Senate District 19, correct?

5              SENATOR HUFFMAN:  It is -- if it is the old

6      version -- again, I can't see from here -- but it would

7      have Maverick County in it, that's correct.

8              SENATOR GUTIERREZ:  Senate District 19 has had

9      Maverick County in its core, I think that was one of your

10     ideal goals that you just mentioned earlier, it had it in

11     its core since 1992; is that correct?  Since 1994, I'm

12     sorry.

13             SENATOR HUFFMAN:  I don't know the answer to

14     that.

15             SENATOR GUTIERREZ:  I would submit to you that

16     since 1994 Maverick County has been in

17     Senate District 19, and that's probably without dispute,

18     so that's for 27 years Maverick County has had it in its

19     core.  Do you understand that?

20             SENATOR HUFFMAN:  I do not know that to be a

21     fact, sir.

22             SENATOR GUTIERREZ:  Okay.  Well, I'll

23     represent to you that that is the facts.

24             SENATOR HUFFMAN:  All right.

25             SENATOR GUTIERREZ:  Now, you've also suggested

1    to us that during this process, the changes during the

2    maps would be done neighbor to neighbor and would be done

3    communicated with one another, or we could send your

4    staff an e-mail and that would -- that would -- would

5    effectuate a change, correct?

6                SENATOR HUFFMAN:  That's what we attempted to

7    do.

8                SENATOR GUTIERREZ:  Did anybody call my office

9    about creating this change?

10                SENATOR HUFFMAN:  I don't know.

11                SENATOR GUTIERREZ:  Did your staff call my

12    office?

13                SENATOR HUFFMAN:  I don't know.  Senator

14    Gutierrez, it's my understanding that you're agreeable to

15    this amendment.  If you are not agreeable to the

16    amendment, we will talk to you and Senator Zaffirini and

17    work with both of you to reach a compromise.  Okay.  Just

18    like we've done with every other member.  I apologize to

19    you if you feel -- I misunderstood.  I thought you were

20    agreeable to the amendment, so take it -- that's --

21    that's the truth.  Take it for what it is.  And I am

22    telling you we'll keep working with you.

23                SENATOR GUTIERREZ:  Fair enough, but you and I

24    never spoke, right?

25                SENATOR HUFFMAN:  I have not spoken to you.

1          SENATOR GUTIERREZ:  Someone else -- someone

2     else suggested to you that I was agreeable.  That's all I

3     wanted to --

4          SENATOR HUFFMAN:  Another senator, yes.

5          SENATOR GUTIERREZ:  Fair enough.  I'm not

6     agreeable and neither are the people of Maverick County,

7     but, thank you, Senator.

8          SENATOR HUFFMAN:  And we will keep working on

9     it, sir.

10          SENATOR HINOJOSA:  Are there any other members

11     who wish to ask questions?  Senator Powell.

12          SENATOR POWELL:  Thank you, Chairman Hinojosa.

13     So as you might well guess, I'm a little whiplashed this

14     morning after having seen the proposal for the new maps

15     for Senate District 10 about 9:00 last night.  Could you

16     walk us through those changes to Senate District 10 that

17     dropped around 9:00 last night?

18          SENATOR HUFFMAN:  Let me just look at my notes

19     so that I can be specific with you.  Give me just a

20     second.  You're asking for the changes from the initial

21     proposed map, Senator?

22          SENATOR POWELL:  Yes, ma'am.

23          SENATOR HUFFMAN:  All right.  In the new

24     proposed amendment, you -- the Senate did District 10

25     loses 70 percent of Parker County.  As you know,

1      Parker County was added to Senate District 2 in the

2      original proposed map.  And so Senate District 10 would

3      now have 30 percent of Parker, which would be 44,027

4      people.  In Parker County, it adds the VTD 215, 230, 235,

5      loses VTD 305, 430 and SD10 picks up additional whole

6      counties of Palo Pinto, Young, Stephens, Shackelford,

7      Callahan and Brown counties.

8                    SENATOR POWELL:  Thank you, Madam Chairman.

9      And who -- can you tell -- tell me and those folks that

10     are here today from Senate District 10 --

11                   SENATOR HUFFMAN:  Yes, ma'am.

12                   SENATOR POWELL:  -- who represents those areas

13     now?

14                   SENATOR HUFFMAN:  I believe Senator Perry

15     represents some of them.  And I'd have to look at the

16     old -- let me look at the old map here.  It gets in that

17     area it gets a little close.  Parker, Senator Springer;

18     Palo Pinto was Senator Springer; Young was Senator

19     Springer; Stephens, Perry; Shackelford, Perry; Callahan,

20     Buckingham, Senator Buckingham is in District 24; and

21     Brown was Senate District 24 currently represented by

22     Senator Buckingham.

23                   SENATOR POWELL:  And did you communicate with

24     any of the representatives of those districts before you

25     merged that into Senate District 10?

—11—

1        SENATOR HUFFMAN:  Some of them.  I spoke to

2    Senator Perry, to Senator Springer.  I do not believe I

3    spoke to Senator Buckingham.

4        SENATOR POWELL:  And did you speak to me?

5        SENATOR HUFFMAN:  I did not speak to you.

6        SENATOR POWELL:  That's correct.  In fact, I

7    have a question for you.  Who -- who drew these maps?

8        SENATOR HUFFMAN:  I drew the map along with

9    my -- two attorneys and my -- who are members of my

10   staff.

11       SENATOR POWELL:  And who are those attorneys?

12       SENATOR HUFFMAN:  Anna Mackin, who's sitting

13   right next to me, and Sean Opperman, who is up at the

14   dais as the committee director with Senator Hinojosa

15   currently.

16       SENATOR POWELL:  And which of these lines for

17   Senate District 10 did you draw and which did they draw?

18       SENATOR HUFFMAN:  I was in the room when every

19   part of this map was drawn.

20       SENATOR POWELL:  Okay.  And which --

21       SENATOR HUFFMAN:  And they didn't do anything

22   without my direction.

23       SENATOR POWELL:  Okay.  And in which room or

24   where were those plans drawn?

25       SENATOR HUFFMAN:  In the redistricting room --

1    what's the name of that?  Sam Houston Building, Room 460
2    in the Capitol Complex.
3              SENATOR POWELL:  And the three of you, were
4    you the only people in the room when those maps were
5    drawn?
6              SENATOR HUFFMAN:  Most of the time.
7              SENATOR POWELL:  Okay.  Let me ask you this:
8    Has Peter Morrison been involved in the drawing of any of
9    these maps in any way?
10             SENATOR HUFFMAN:  I don't know anyone named
11   Peter Morrison.
12             SENATOR POWELL:  Okay.  All right.  And there
13   is no one else?  There are no other people who have
14   been -- been involved in drawing those maps?
15             SENATOR HUFFMAN:  Many people had input in the
16   drawing of these maps.  Many times there were senators in
17   the room while I was drawing the maps, yes.
18             SENATOR POWELL:  And which senators would
19   those be?
20             SENATOR HUFFMAN:  Many of the senators, yes.
21             SENATOR POWELL:  So can you be specific, a
22   little bit more specific to tell us which ones would have
23   been in the room?
24             SENATOR HUFFMAN:  They were not -- let me
25   rephrase that.  Senators were brought into the room to

1    see the map just as you were, Senator Powell.  And some

2    of the senators had specific requests to look at specific

3    precincts or specific communities of interest and wanted

4    us to bring things up on the map.  You did not request me

5    to do that when you were in the room.  Other senators

6    did, and I always work with them.  Many times what they

7    requested -- and there are senators here looking at me

8    right now and know I've told them we were unable to do

9    it.  Those include republicans and that was the process.

10                SENATOR POWELL:  And I am sure that you will

11   recall when you asked me that question that I can -- that

12   I said to you I can clearly see by looking at this map

13   what you are attempting to do.

14                SENATOR HUFFMAN:  I do recall you saying

15   something like that.  I can't put your words --

16                SENATOR POWELL:  And I also said that we

17   believe that Senate District 10 was within a standard

18   deviation and that we could leave my map exactly as it

19   is.  Do you recall that statement?

20                SENATOR HUFFMAN:  I recall you saying that

21   there is something very similar, I do.  Yes.

22                SENATOR POWELL:  Okay.  So our staff was told

23   that, quote, legal was reviewing the draft plans for

24   legal compliance of these maps.  So would you tell us

25   again who exactly constitutes that group of legal.

1    SENATOR HUFFMAN:  As I said, I drew the maps,

2    I presented them to the attorney general's office to

3    check for legal compliance under all laws in the

4    United States constitution.

5    SENATOR POWELL:  And the names of people that

6    you would have contacted in legal?

7    SENATOR HUFFMAN:  I didn't use the word legal,

8    ma'am, you did.  I told you I had used the Attorney

9    General's Office as my legal counsel.

10   SENATOR POWELL:  Okay.  So who in the attorney

11   general's office?  Just everyone in the attorney

12   general's office?

13   SENATOR HUFFMAN:  There were certain people in

14   the attorney general's office that I assume work on the

15   redistricting issues, yes.  You know, it's a very large

16   office, and I believe they have hundreds of attorneys.

17   Yes.

18   SENATOR POWELL:  Okay.  So let me shift gears

19   just a little bit.  In the minority populations, the

20   Blacks, Latinos, Asian Americans in my district and

21   across the state grew at a tremendous rate between 2010

22   and '21.  So based on that population change, what is

23   being done in this process to determine whether Section 2

24   of the Voting Rights Act requires new minority

25   opportunity districts to be drawn?

1          SENATOR HUFFMAN:  I consulted with my legal
2    counsel.
3          SENATOR POWELL:  Okay, then I'll ask you one
4    more time.  Who is legal counsel?
5          SENATOR HUFFMAN:  It's the attorney general's
6    office.  My point of contact was Chris Hilton.  Who else
7    he talks to, I can't tell you.
8          SENATOR POWELL:  Okay.  Thank you for that.
9          SENATOR HUFFMAN:  Yes.
10          SENATOR POWELL:  Who is attempting to draw any
11    new majority-minority districts that might be required
12    under Section 2 of the Voting Rights Act?
13          SENATOR HUFFMAN:  Could you repeat the
14    beginning of the question?  I'm sorry.
15          SENATOR POWELL:  Based on the growth of our
16    minority population, who would be attempting to draw any
17    new majority-minority districts that might be required
18    under Section 2 of the Voting Rights Act?
19          SENATOR HUFFMAN:  I believe that the maps that
20    are before you have been presented are currently in
21    compliance with the constitution of the Voting Rights Act
22    under Section 2.
23          SENATOR POWELL:  Okay.  Did -- did the lawyers
24    or anyone in legal review the draft of these maps or the
25    changes that popped up last night at 9:00?

—16—

1          SENATOR HUFFMAN:  I've answered that question.

2     The maps I believe are in -- based on the advice of my

3     legal counsel, I believe these maps are in compliance.

4          SENATOR POWELL:  So does the Texas attorney

5     general's office represent your committee or any

6     legislator on the committee?

7          SENATOR HUFFMAN:  Any member of the

8     legislature can ask the attorney general to represent

9     them and have a privileged relationship, legal

10    relationship with the attorney general's office.  Any

11    member of the legislature can do that.

12         SENATOR POWELL:  And is what you're saying

13    that you have is a privileged relationship with the

14    attorney general's office?

15         SENATOR HUFFMAN:  I have a privileged legal

16    relationship like any person has with their attorney.

17         SENATOR POWELL:  And that -- would that

18    preclude the public of the state of Texas from

19    understanding the details of this redistricting map?

20         SENATOR HUFFMAN:  All of the information that

21    the attorney general would have used to make their legal

22    conclusions are readily available to the public from all

23    legislative counsel.

24         SENATOR POWELL:  All right.  Senate District

25    10 is, I believe, the only majority-minority voting-age

1    population district that you have intentionally turned

2    into a majority Anglo voting-age population district.

3    It's also the only district that was nearly perfectly

4    populated until you so radically changed it.  So I'd like

5    to invite you to come to my Black and Latino constituents

6    before you dismantle their district.  Is the committee

7    willing to come to Tarrant County and maybe more

8    specifically to the areas of Fort Worth and Mansfield and

9    Arlington that are so dismantled with regard to their

10   representation to the representation of Black and Brown

11   and Asian populations?

12            SENATOR HUFFMAN:  Senator Powell, and I've

13   stated it, and I will state it again, we create these

14   maps race blind.  We have not looked at any racial data

15   as we drew these maps.  And to this date, I have not

16   looked at any racial data.  So the comments that you make

17   are your comments, but I have not drawn these maps on a

18   racial basis.  As you know, the committee has not been

19   able to do public -- going to other parts of the state

20   because of the COVID situation.  We wanted to do that

21   during the interim, and as we all know the pandemic that

22   we've been under.  We also find ourselves in a special

23   session drawing these maps which was not ideal because

24   the time is more compressed which does not provide some

25   of the flexibility that you may have in a regular session

—18—

1    for traveling the state.

2         SENATOR POWELL:  So you have a special rule,

3    the only group who cannot tell you about how

4    redistricting affects them are the minority voters in my

5    district.

6         SENATOR HUFFMAN:  No, that is not my special

7    rule.  So please do not put words in my mouth,

8    Senator Powell.

9         SENATOR POWELL:  But you're unwilling to

10   consider or to hear their concerns, the concerns of the

11   Black and Latino voters.

12        SENATOR HUFFMAN:  I welcome every citizen to

13   come and talk to us.  They also can put their concerns in

14   the portal, which we are all reading and looking at and

15   taking to heart, and they are welcome to come here today

16   or all day tomorrow to speak to us.

17        SENATOR POWELL:  Yet we're all looking and

18   reading about and hearing about at 9:00 at night on the

19   night before a 10:00 hearing.  So I am going to end my

20   remarks here --

21        SENATOR HUFFMAN:  Yes, ma'am.

22        SENATOR POWELL:  -- by inviting this

23   committee, by inviting you to come to Senate District 10,

24   the only district that you have concentrated on

25   dismantling, and hear from those populations, from the

1          Black and the Brown and the Asian communities --

2                    SENATOR HUFFMAN:  Yes, ma'am.

3                    SENATOR POWELL:  -- whose voices have been

4          diluted in this map and who are being dismantled in these

5          maps that are drawn in late hours of the evening in which

6          we have little to no input other than to tell you that

7          our district was in the standard deviation of continuing

8          to exist with its current boundaries.  And with that,

9          I'll say thank you.

10                   SENATOR HUFFMAN:  Thank you, Senator Powell.

11         I am going to answer to your comment.  Our approach to

12         this process was informed by the redistricting

13         jurisprudence from the United States Supreme Court as

14         well as other applicable precedent.  Several key cases

15         are worth highlighting, Abbott v. Perez, 2018 Supreme

16         Court case; Cooper v. Harris, a 2017 Supreme Court case.

17         They make clear that any redistricting decision is made

18         on the basis of race must be narrowly tailored to achieve

19         compliance with the Voting Rights Act.  In Cooper v.

20         Harris, Justice Kagan writing for the majority held when

21         a state invokes the VRA to justify race-based

22         districting, it must show to meet the narrow tailoring

23         requirement that it have a strong basis in evidence for

24         concluding that the statute requires its action.  That

25         was Cooper v. Harris, a 2017 Supreme Court case, quoting

1        Alabama Legislative Black Caucus v. Alabama, a 2015 case.

2             Based on this warning against race-based

3        districting, I drafted all of the proposed maps totally

4        blind to race.  Once I had drafted the maps, I ensured

5        that they underwent a legal compliance check to ensure

6        there were no inadvertent violations of any law,

7        including the Voting Rights Act.  Thank you.

8             SENATOR HINOJOSA:  Thank you, both of you.

9        Just a reminder that we have the attorney general's

10       office here as a resource witness for anybody that wishes

11       to call the attorney general's office.  So Alvarado.

12            SENATOR ALVARADO:  Thank you, Mr. Chairman.

13       Madam Chair, I want to ask you a few questions and --

14            SENATOR HUFFMAN:  Okay.

15            SENATOR ALVARADO:  And I know you have

16       witnesses that we still have to go through, and thank you

17       for inviting witnesses that I submitted a list for.

18            SENATOR HUFFMAN:  Yes, ma'am, my pleasure.

19            SENATOR ALVARADO:  Sure.  I'd like to ask some

20       questions to get a better sense of why districts in the

21       fastest growing regions were drawn in a certain way in

22       these maps.

23            SENATOR HUFFMAN:  Okay.

24            SENATOR ALVARADO:  And I know we're going to

25       have the demographer here tomorrow, so I'll probably ask

1    our demographer some of these questions as well.  Do you

2    know what communities drove population growth in Harris

3    and Fort Bend counties?  In comparison, can you tell us

4    how the White population grew in Harris and Fort Bend

5    counties?

6              SENATOR HUFFMAN:  I don't know.  I have not

7    looked at that data.

8              SENATOR ALVARADO:  Okay.

9              SENATOR HUFFMAN:  And, again, you can ask the

10   demographer those questions, but I do not have them.  I

11   do not know.

12             SENATOR ALVARADO:  Okay.  With your analysis,

13   can you tell me the voting-age population by race and

14   ethnicity of the districts that hold a portion of

15   Fort Bend County?

16             SENATOR HUFFMAN:  I can't because I have not

17   looked at that data in drawing the maps.

18             SENATOR ALVARADO:  Okay.  And what is the

19   percentage of -- maybe we have the same answer?

20             SENATOR HUFFMAN:  I can't answer that question

21   either.

22             SENATOR ALVARADO:  What is the --

23             SENATOR HUFFMAN:  I have not looked at that

24   data.

25             SENATOR ALVARADO:  Okay.  So then I guess you

1   would -- would you know the percentage of the voting-age

2   population by race and ethnicity in Fort Bend County?

3           SENATOR HUFFMAN:  I don't know.  Again, you

4   know, all that information I believe is readily available

5   online through Ledge Counsel, but I have not looked at

6   any of that data.

7           SENATOR ALVARADO:  Okay.  And -- and the

8   reason I ask is I am trying to understand why would, for

9   example, a county as diverse as Fort Bend, a place that's

10  been called the most diverse county in the country, be

11  classed into multiple districts and combined with distant

12  rural nondiverse communities?

13          SENATOR HUFFMAN:  Again, the maps were drawn

14  blind to race and using all the other principals that are

15  usually used in drawing the maps, and I think I stated

16  those in my opening remarks.  So that's how the maps were

17  drawn.

18          SENATOR ALVARADO:  Well, let's --

19          SENATOR HUFFMAN:  And then sent to the AG for

20  compliance under -- for their legal advice on compliance

21  of the Voting Rights Act.

22          SENATOR ALVARADO:  And speaking of the AG's

23  office, who is here from the AG's office?

24          SENATOR HUFFMAN:  I believe their general

25  counsel is here.  And --

1          SENATOR HINOJOSA:  That's correct.

2          SENATOR HUFFMAN:  I have not seen him this

3     morning.

4          SENATOR ALVARADO:  Okay.

5          SENATOR HUFFMAN:  I think Senator Hinojosa has

6     the cards.  I didn't see the cards, to be honest.

7          SENATOR HINOJOSA:  Senator Alvarado, we have

8     Austin Kinghorn as the general counsel for the attorney

9     general's office.

10         SENATOR ALVARADO:  Okay.  I may have questions

11    for that representative of the AG's office.  Let's move

12    to the DFW region.  What community's growth population

13    rose in the DFW metro area; and in comparison, can you

14    tell how the White population grew in the metroplex?

15         SENATOR HUFFMAN:  It's the same answer to you,

16    Senator Alvarado.  I haven't looked at that data, so I

17    cannot give you an answer.

18         SENATOR ALVARADO:  Okay.  So I -- from what I

19    am told, communities of color in Tarrant County are

20    primarily cracked between Senate District 9, 10, and

21    Senate District 22 in a county where the White population

22    shrunk by two percent while Asian, which is about

23    56 percent growth; African Americans 40 percent growth;

24    and Latinos 29 percent, communities all grew

25    significantly.  Looking at the Tarrant County, Arlington

1    specifically, why has the Black population been split

2    into multiple senate districts?

3            SENATOR HUFFMAN:  Again, Senator Alvarado, I

4    did not look at that data when I drew the maps.  I drew

5    blind to race, so I cannot answer that question.

6            SENATOR ALVARADO:  Okay.  From information

7    I've looked at, it appears that Black communities in

8    Dallas and southeastern Tarrant County are packed into

9    Senate District 23 while the remainder of the eastern

10   Tarrant County Black communities are cracked and paired

11   in a far away -- far away counties in Senate District 22.

12   In the DFW, the Asian American population has experienced

13   enormous growth, 87 percent over a decade.  This is a

14   community that's geographically close together, and just

15   curious why the Asian American Pacific Islander

16   community, why they aren't in one district?

17           SENATOR HUFFMAN:  The same answer,

18   Senator Alvarado.  I drew -- I drew the maps blind to

19   race.  So I could not answer your question.

20           SENATOR ALVARADO:  Okay.  From what I can

21   tell, the Asian American population in Dallas with

22   particular growth in the northern part of the county,

23   Collin and Denton counties grew by 87 percent from 2010

24   to 2020.  This growth is aggressively cracked between

25   Senate District 2, Senate District 12, and

1    Senate District 30.  What does Euless, Texas, which is a

2    diverse suburb of Dallas-Fort Worth, have in common with

3    Rosebud, Texas, in Falls County?

4         SENATOR HUFFMAN:  I am not familiar with those

5    two communities, Senator, so I couldn't comment.

6         SENATOR ALVARADO:  So from what I gathered,

7    Senate District 22, diverse suburban area of Euless,

8    Euless is a population of 61,032, is in the same district

9    as a small rural Rosebud which is a population of 1,349

10   in Falls County, 143 miles away.  Eight other senate

11   districts are wholly contained within that 140-mile

12   radius.  There are over 600,000 Latino residents in

13   Tarrant County.  What was the justification for

14   eliminating the only district where they could elect a

15   candidate of their choice?

16        SENATOR HUFFMAN:  Senator Alvarado, again, I

17   blue -- I drew these maps -- as I've told you, of course,

18   and Senator Powell, that they were drawn blind to race.

19   As you know, we have a growing state, one of the fastest

20   growing states in the nation.  We have a very large

21   state.  Okay.  I'm not sure what that is.  A very large

22   state and the population, of course, is not necessarily

23   growing equally throughout the state.  And when we drew

24   these maps, many times members contributed information

25   about communities of interest and so forth, but we did

1    our best to follow the redistricting guidelines drawing

2    blind to race.

3           SENATOR ALVARADO:  And I'm just going to cover

4    one more region, the Austin area.  Do you know what

5    communities drove population growth in Travis and

6    Williamson County, and in comparison, can you tell us how

7    the White population grew in central Texas?

8           SENATOR HUFFMAN:  I cannot, Senator Alvarado,

9    for the reasons I've stated.

10          SENATOR ALVARADO:  Austin democrats are packed

11   into Senate District 14 and 21.  From what I gather,

12   Williamson County grew by 44 percent in the last decade

13   and 77 percent of that growth came from diverse

14   communities including 26 percent from the Latino

15   community and 21 percent from the Asian community, but

16   Senate District 5 and 24 cracks these communities into

17   far off rural diverse districts.  I just wanted to point

18   that out.  I appreciate your indulgence with me as I move

19   through these different regions in our state.  Thank you.

20          SENATOR HUFFMAN:  Of course.  And thank you,

21   Senator Alvarado, for your questions.

22          SENATOR HINOJOSA:  Members, does anyone wish

23   to call the resource witness?  Okay.  Could we have the

24   resource witness, Austin Kinghorn from the attorney

25   general's office please come up as the resource witness.

1  Some of the members may have some questions.  Just

2  identify yourself, who you represent, and there will be

3  some questions asked of you.

4          MR. KINGHORN:  Good morning, Senators.  My

5  name is Austin Kinghorn.  I'm the general counsel at the

6  Texas AG's office.

7          SENATOR HINOJOSA:  Senator Whitmire.

8          SENATOR WHITMIRE:  Would you ask the witness

9  if I could get his background.  Could you give

10  us -- obviously, work experience, how long have you been

11  with the AG's office, hired on specifically for this

12  project, or would you go into detail starting today with

13  your background, probably going back to at least law

14  school.

15          MR. KINGHORN:  I'd be happy to do that.  So I

16  started at the AG's office in June of last year as an

17  assistant attorney general in the general counsel

18  division, was later promoted to general counsel.  Prior

19  to that, I worked as a staff attorney at the Texas

20  Supreme Court for about six and a half years and was a

21  litigator at the AG's office in private practice for a

22  few years before that.  Before that, I did a clerkship on

23  the 14th Court of Appeals in Houston and went to law

24  school at Baylor Law School.  To answer your question, I

25  was not hired directly related to any redistricting

1    project.

2              SENATOR WHITMIRE:  Have you been employed by a

3    campaign in your background?

4              MR. KINGHORN:  Absolutely not.

5              SENATOR WHITMIRE:  Fair to ask if you've

6    volunteered in a campaign in the past?

7              MR. KINGHORN:  I'm sorry.  Could you restate.

8              SENATOR WHITMIRE:  Have you volunteered in

9    previous campaigns in your young adulthood?

10             MR. KINGHORN:  I'm assuming that the context

11   of your question is would it be for General Paxton or any

12   political candidate?

13             SENATOR WHITMIRE:  No, anyone.  Are you -- I'm

14   just --

15             MR. KINGHORN:  Okay.

16             SENATOR WHITMIRE:  I think it's important for

17   us to know when we have in your position to know what you

18   bring to the table, both education and real-life

19   experience, work; and particularly this is so political,

20   have you been involved in campaigns that you can tell us

21   about?

22             MR. KINGHORN:  I have been very intermittently

23   involved in campaigns in a volunteer capacity a handful

24   of times in the last ten years.

25             SENATOR WHITMIRE:  So the answer is yes?  You

1    know it's not against the law.  I am not asking

2    you -- you don't have to take the Fifth Amendment.

3    I just think it's a fair question to know what work

4    experience and affiliations have been.  Thank you.

5            SENATOR HINOJOSA:  Senator Powell, you are

6    next.  Senator Zaffirini?

7            SENATOR ZAFFIRINI:  Thank you, Mr. Chairman.

8    Sir, what is the attorney general's staff process and

9    purpose when analyzing whether proposed maps comply with

10   the Voting Rights Act?

11           MR. KINGHORN:  Senator Zaffirini, the attorney

12   general's office has certain lawyers who are experienced

13   in these issues and are marked as this process begins to

14   field those questions.  There is not a formal division of

15   labor in that regard.  As you may know, the AG's office

16   has a lot of specific divisions.  We don't have a

17   specific division of attorneys that handles these

18   questions.  It's really more of a -- we take an

19   assessment of what resources we have.  Who is still

20   around that took part in the process last time, try to

21   get some folks up to speed, and then try to respond to

22   the demands of the inquiries we get.  Obviously,

23   depending on the numbers of those inquiries and conflicts

24   they present, we may have to bring in additional folks to

25   these teams.  But to answer your question as directly as

1      possible, there is no formalized process to this.  We

2      muster our internal resources on an as-needed basis to

3      respond to the inquiries that come in.

4                    SENATOR ZAFFIRINI:  But does your process, for

5      example, include looking at each district individually to

6      determine if each district complies with the Voting

7      Rights Act?

8                    MR. KINGHORN:  The process as I understand it,

9      and I have not served in capacity in which I have been

10     personally advising any individual legislator, is that

11     our attorneys answer the questions that are posed to them

12     by the legislators who have inquiries, and I am confident

13     that that often includes whether the proposed maps would

14     survive constitutional scrutiny or scrutiny of the Voting

15     Rights Act.  Whether -- exactly the nuts and bolts of

16     that process district by district, I can't speak with

17     individual knowledge as to exactly how that goes.

18                    SENATOR ZAFFIRINI:  Thank you.  What specific

19     aspects of proposed maps do you analyze to ensure the

20     redistricting process does not diminish minority voters'

21     ability to select a candidate of their choice?

22                    MR. KINGHORN:  The attorney general's office

23     in evaluating these maps always is going to render legal

24     advice to the requesting state legislator, concerning

25     whether in our opinion the maps survive scrutiny under

1    the 14th Amendment and additionally the

2    Voting Rights Act.  Exactly what that looks like is just

3    a case-by-case inquiry depending on the facts of the

4    inquiry and the nature of the question asked.

5         SENATOR ZAFFIRINI:  But do you look at

6    specific data such as the voting-age population or the

7    registered voters or population growth and how minorities

8    are impacted by all of these aspects?

9         MR. KINGHORN:  The same data that is used for

10   the redistricting process and is publicly available is

11   data that the attorney general's office would look at and

12   that our lawyers are trained to understand and interpret.

13        SENATOR ZAFFIRINI:  Thank you.  The Black

14   citizen voting-age population of the proposed

15   Senate District 23, for example, is only 45 percent.  In

16   your opinion, would this be permissible under the

17   Voting Rights Act and if so, why?

18        MR. KINGHORN:  Senator, to answer your

19   questions as best I can, I need to back up for a moment

20   and inform the entire body that, as you all know, there

21   is pending litigation already as a preemptive measure

22   against this redistricting process.  Unfortunately, this

23   severely limits my ability to comment publicly on any

24   factual questions regarding the current redistricting map

25   given the pending litigation.  And I -- unfortunately

1    because of that pending litigation, I cannot delve into

2    specifics -- on -- on the districts.

3             SENATOR ZAFFIRINI:  Can you answer privately?

4             MR. KINGHORN:  I'm sorry?

5             SENATOR ZAFFIRINI:  Could you answer

6    privately?

7             MR. KINGHORN:  So the attorney general's

8    office stands prepared to offer legal counsel to any

9    senator or representative that would ask for it.  In

10   terms of the discussions that are had with the drafter of

11   the maps, there is a privileged relationship there.  So

12   there is an aspect of attorney-client privilege that --

13   that flows to the drafter.  However, in terms of an

14   off-line conversation, should you request it, we can

15   absolutely have an attorney help you with the answers to

16   your question.  However, it may be a different attorney

17   than the attorney that is advising the drafter of the

18   map.

19            SENATOR ZAFFIRINI:  But could I get an answer

20   to that question privately?  And let me repeat the

21   question.  The Black citizen voting-age population of the

22   proposed Senate District 23, for example, is only

23   45 percent.  In your opinion, would this be permissible

24   under the Voting Rights Act and if so, why?  You said you

25   could not answer that publicly and my question again is:

1    Could I get a private -- or an answer to that privately?

2              MR. KINGHORN:  Senator Zaffirini, you and any

3    other senators are welcome to reach out to our office and

4    you can have an attorney assigned to answer any question

5    that we can help you with regarding compliance with the

6    Voting Rights Act and the United States Constitution.

7              SENATOR ZAFFIRINI:  Thank you.  I hope the

8    answer is yes.  Thank you.  What would you consider an

9    acceptable threshold for the percentage of a district's

10   voting-age population who are Black or Hispanic to

11   maintain a minority-majority opportunity district

12   protected under the Voting Rights Act?

13             MR. KINGHORN:  Senator Zaffirini, again, with

14   the caveat that I can't answer any questions specific to

15   the maps that have been drawn, generally speaking the

16   bare minimum threshold for a district to be considered a

17   majority-minority opportunity district would be

18   50 percent plus 1 of the voting-age population.

19             SENATOR ZAFFIRINI:  Thank you.  Can you

20   describe the AG's staff analysis for the proposed

21   configuration of Senate District 10?

22             MR. KINGHORN:  Senator Zaffirini, for the

23   reasons I aforestated, I cannot comment publicly on any

24   issues regarding the maps given the pending litigation.

25   Moreover, I am actually not personally privy to that

1    analysis as I am not the attorney who has been assigned

2    to provide this -- the drafters of these maps with legal

3    assistance.

4            SENATOR ZAFFIRINI:  Thank you.  Given the

5    census data indicate 95 percent of population growth in

6    Texas was in communities of color during the last decade,

7    what steps are you taking to determine whether the senate

8    must draw a new minority opportunity district to comply

9    with the Voting Rights Act?

10           MR. KINGHORN:  Senator Zaffirini, our role in

11   this process is twofold.  One, is on the back end to

12   defend the court -- the redistricting maps that are drawn

13   in a court of law.  And the other role is on the front

14   end is to advise the membership on drafting those maps

15   and drafting maps that are legally compliant.  So our

16   role in the process is to give the best legal advice we

17   can.  Ultimately, it is the legislators' responsibility

18   to draft maps as they see fit and according to the law.

19   And we will do our best to provide the best legal counsel

20   we can to ensure that those maps that are drawn are

21   compliant with the Voting Rights Act and are compliant

22   with the Equal Protection Clause in the United States

23   Constitution.

24           SENATOR ZAFFIRINI:  Thank you, sir.

25   Thank you, Mr. Chairman.

1          SENATOR HINOJOSA:  Thank you, Senator

2     Zaffirini.  Senator Powell.

3          SENATOR POWELL:  Thank you, Mr. Chairman.

4     Mr. Kinghorn, does your office represent any legislator

5     or did you represent the committee?

6          MR. KINGHORN:  Senator Powell, I believe that

7     the nature of the representation flows to members

8     individually, but do not quote me 100 percent on that.

9     If you don't mind, I'm happy to follow up to make sure

10    that is the 100 percent correct answer.

11         SENATOR POWELL:  So it would be every member

12    of the committee.  Is that what I understand you to say?

13         MR. KINGHORN:  I believe that that is the way

14    that we typically handle these is that the -- the advice

15    and the privilege that follows it will flow to an

16    individual.  I don't believe it's representation to the

17    committee at large, although -- although counsel would be

18    afforded to any member of the committee that might seek

19    it.  Again, I'd -- I'd be happy to follow up to make

20    100 percent sure that that is the arrangement, but I

21    believe that I am correct on that.

22         SENATOR POWELL:  I -- I would appreciate that.

23    And so do you have a letter of engagement or any written

24    retainer letter with any of the members of the committee?

25         MR. KINGHORN:  I believe it is customary for

1    our office to execute letters of representation with

2    members of legislature in the redistricting process.  As

3    I sit here today, I do not have or know an exhaustive

4    list of that representation.

5              SENATOR POWELL:  Could we get it?

6              MR. KINGHORN:  I'd be happy to help you out

7    with that.

8              SENATOR POWELL:  Thank you.  Who in your

9    office is determining whether new majority-minority

10    districts can be drawn to ensure compliance with the

11    Section 2 of the Voting Right -- of the

12    Voting Rights Act?

13              MR. KINGHORN:  Senator Powell, as I mentioned

14    before, the team of lawyers that handle these cases are

15    kind of a -- pulled from different areas of the agency

16    based on their expertise and their past history.  So to

17    try to answer your question as directly as possible,

18    there is no set process to who and how is assigned to

19    individual senators to advise them.

20              SENATOR POWELL:  Can you say how many

21    attorneys are on that team?

22              MR. KINGHORN:  I do not believe that there is

23    a fixed number of attorneys that are on the team.  As

24    I've said that we are kind of moving in an ad hoc basis

25    and bringing in attorneys as they're needed.  I'm not

1       100 percent sure even as I sit here today exactly how

2       many attorneys we have working on redistricting matters

3       as of today.

4                   SENATOR POWELL:  That would be -- it would be

5       nice for the public to know that, to understand the

6       answer to that question.  Did your office, and by your

7       office, I mean any staff member of your office or any

8       outside entity or law firm that you communicated with

9       about this map, did your -- did your office make any

10      changes to draft maps that were submitted to you by the

11      redistricting committee or any of its staff members.

12                  MR. KINGHORN:  So I think it -- a two-part

13      answer to that is -- is, first, obviously the

14      communications that our office has with the legislators

15      about the maps are privileged; and ultimately whatever

16      changes that are made to the maps, that's the members'

17      changes.  The attorney general's office serves to advise

18      on the legality of the maps proposed, but the drafting

19      and the process of drafting is ultimately -- that's an

20      ownership of the legislature.

21                  SENATOR POWELL:  Okay.  So when you say that

22      it's privileged, the general public doesn't have a right

23      to know that information.  Is that what you're saying?

24                  MR. KINGHORN:  So the -- the legal advice that

25      the Office of the Attorney General gives to legislators

—38—

1    that request it, not just on redistricting but on any

2    other issues, and this applies to any -- anyone in this

3    room and any other representative or senator, that is an

4    attorney-client communication and it is privileged.

5              SENATOR POWELL:  Good to know.  Do you happen

6    to know who in your office is involved in drawing

7    district lines?  Who -- who specifically might be

8    involved in it?

9              MR. KINGHORN:  So in -- in -- just to be clear

10   on the question, no one in our office is assigned to draw

11   district lines.  Just to reframe it, if I can, in terms

12   of although I'm providing legal advice, if you are

13   looking for specific names of who has been assigned to

14   that work, I'd be happy to provide that with you and get

15   with you.

16             SENATOR POWELL:  All right.  That would be

17   great.  Thank you so much.

18             SENATOR HINOJOSA:  Senator Alvarado?

19             SENATOR ALVARADO:  Thank you, Mr. Chairman.  I

20   believe Senator Zaffirini maybe touched on this, and I

21   wanted to just dig a little deeper.  How would you

22   analyze whether or not a district complies with the

23   Voting Rights Act?  Walk me through the process.

24             MR. KINGHORN:  So the core analysis of whether

25   a district is compliant with Section 2 of the

1    Voting Rights Act comes down to the tests that is laid

2    out in Gingles versus Thornburg.  It's a three-part test.

3    First, you look at whether the minority group is

4    sufficiently large and geographically compact to

5    constitute a majority in a single-member district.

6    Second, you look at whether the minority group is

7    politically cohesive.  And, third, you look at in absence

8    of special circumstances whether blocked voting by the

9    majority would otherwise defeat the -- the minority

10   preferred candidate.  Additionally, you look at a number

11   of other factors that come from a senate legislative

12   history report that is outlined in that case, and all of

13   these factors taken together is viewed by the courts as a

14   totality of the circumstances test.  Under this the

15   Gingles test, Gingles factors, you have to establish all

16   three to potentially have a minority opportunity

17   district, but there is no test that is conclusive one way

18   or the other.  At the end of the day, it's a highly

19   fact-specific inquiry that the courts take fresh each

20   time guided by these factors and, as you know, a lot of

21   other case law.  But that's a 30,000 foot view of the

22   baseline inquiry.

23            SENATOR ALVARADO:  And who's involved in that

24   process in your office?

25            MR. KINGHORN:  So the -- the -- as I've said

1    before, we have a sort of informal ad hoc group of

2    attorneys who between having experience with this process

3    in prior sessions and also just folks we're bringing on

4    and -- and learning them up to get up to speed on this,

5    we just -- we have an informal ad hoc group of attorneys

6    that are ready to step in and serve those needs when

7    they're presented to our office.

8              SENATOR ALVARADO:  And so what's the, I guess,

9    the hierarchy of this in looking to see whether or not

10   each district complies with the Voting Rights Act?  You

11   sign off on it and it goes to somebody else and then to

12   the attorney general?  How does that work?

13             MR. KINGHORN:  There is no formal hierarchy

14   and there is no processing through the agency.  What you

15   have is individual lawyers from the AG's office that are

16   assigned to give counsel to the requesting

17   representatives.  So that individual attorney will give

18   privileged communication -- privileged advice to that

19   lawyer, but there is no formal approval process to the

20   AG's office, that is a matter of one attorney's advice to

21   his or her client.

22             SENATOR ALVARADO:  Thank you.

23             SENATOR HINOJOSA:  Senator Whitmire.

24             SENATOR WHITMIRE:  Yeah.  I'm just sitting

25   here listening to these fine questions, but you haven't

1    named one extra lawyer.  Ad hoc team doesn't tell us much

2    if we want to pursue work product or the advice of

3    counsel from the AG staff, and so as part of the senate,

4    I'm sitting here listening, you're doing, I guess, a

5    great job of representing the attorney general's office,

6    but you're not doing much to assist us on who we should

7    call.  So can you name this ad hoc team that you quote,

8    call it, would you just name maybe one other lawyer.

9            MR. KINGHORN:  As was discussed earlier in

10    this hearing today, Chris Hilton is one of the lawyers

11    who has been helping out on this project.

12            SENATOR WHITMIRE:  Another one?

13            MR. KINGHORN:  Dean Whitmire, to -- to put

14    it -- it's not my attempt to obfuscate on this list.

15    Some of the names I know are people at the ready.  I

16    don't actually know if they have been deployed because I

17    don't have a full and comprehensive list of what all

18    members have reached out for assistance from our office.

19    So if I were to tell you certain -- certain members of

20    this office that are at the ready, I can't tell you for

21    sure whether they've been deployed.  So it's not my

22    attempt to obfuscate on this.  We can -- we can happily

23    circle it back with you and give you more direction on

24    what --

25            SENATOR WHITMIRE:  What about the sake

1    of -- and we'll be here tomorrow for sure.  Maybe a list

2    of your staff in this, quote, ad hoc team, that you put

3    together because I think it's important as to all whom

4    seek out advice and counsel.  For instance, that ad hoc

5    team, five people, three people?

6              MR. KINGHORN:  I would say based on my

7    conversations internally, I think at this point it may be

8    three to five people that we have on deck at the moment.

9              SENATOR WHITMIRE:  I think it would be

10   very -- Chairman, I'd ask the witness to furnish us that,

11   that list if you could, that have been involved.  We

12   might want to call and ask them their advice and counsel.

13             MR. KINGHORN:  I'd be happy to reach out to

14   you on that.

15             SENATOR HINOJOSA:  Senator Huffman.

16             SENATOR HUFFMAN:  Yes, Mr. President.  If I

17   could just clarify.  I want to make sure the record --

18   the record is crystal clear.  The only person who I have

19   had legal advice from from the AG's office while drawing

20   the maps is Chris Hilton, and I think I said that in my

21   presentation.  Chris Hilton.  Thank you.

22             SENATOR HINOJOSA:  Thank you, Senator Huffman.

23   Senator Whitmire.  Any other questions, members?

24             SENATOR WHITMIRE:  Mr. Chairman --

25             SENATOR HINOJOSA:  Mr. Whitmire, go ahead.

1        SENATOR WHITMIRE:  -- that's not consistent

2   with what the gentleman just testified to, and I don't

3   challenge your -- your opinion because that's

4   significant, but you're saying one person.  He's got a

5   team that he's relying upon.  And I was just saying it's

6   only fair for us to hear who the team is.

7        SENATOR HUFFMAN:  I just wanted to make it

8   clear for the record that the only person that I have had

9   contact with to receive legal advice was Chris Hilton

10  while drawing the maps.  I just want the record to be

11  clear.  I'm not trying to interrupt your question.

12       SENATOR HINOJOSA:  Okay.  Any other senators

13  who have any questions for Mr. Kinghorn?  If not,

14  thank you for your testimony, and please stand by because

15  you may be called back again.

16       MR. KINGHORN:  Thank you.

17       SENATOR HINOJOSA:  At this time, we will move

18  to public testimony -- I'm sorry, invited testimony.  I'm

19  sorry.  We will move to invited testimony, and just a

20  remainder that we are to testify on both bills at the

21  same time, Senate Bill 4 and Senate Bill 7.  And by the

22  testimony, we will have the Domingo Garcia, National

23  President, League of United Latin American Citizens

24  LULAC.  Mr. Garcia.  Identify yourself, who you represent

25  and then you may proceed.

1        MR. GARCIA:  Thank you.  My name is Domingo

2   Garcia.  I'm the national president of LULAC.  LULAC is

3   the League of United Latin American Citizens.  We are a

4   nonpartisan civil rights organization founded in 1929 in

5   Corpus Christi, Texas, to deal with the issues of

6   discrimination at that time here in the state of Texas.

7   My background just so some of you all may know is that I

8   have served on the Dallas City Council.  I was mayor

9   pro tem for the City of Dallas; served on the Dallas

10  County redistricting commission in 2010 and have been

11  reappointed to serve on the Dallas County redistricting

12  commission in 2020.  I also was -- don't hold this

13  against me, but I was also a state representative for

14  about six years and member of the chamber.  And I have

15  now been national president of LULAC for six years.

16       LULAC when it got started dealt, with a lot of

17  issues of intentional discrimination.  To give you an

18  example, there were separate schools in Texas for

19  Mexican Americans, African Americans and Anglos.  In the

20  case called Mendez vs. Westminster, LULAC challenged that

21  and that case went to the U.S. Supreme Court, and the

22  U.S. Supreme Court ruled that segregated schools were

23  illegal.  This was two years before Browns vs. Topeka,

24  which said that schools for African Americans were

25  illegal.  We challenged the poll tax.  Believe it or not,

1    people in this same chamber required you to pay $2.50

2    back in the 1960s to vote in the state of Texas.  That

3    was equivalent to about $20 today.  So people could vote

4    and that was done intentionally to keep African Americans

5    and Mexican Americans from voting at that time period.

6    After that, literacy tests were passed in this chamber.

7    Literacy tests said you have to be able to read and write

8    to be able to vote in Texas.  To give you an example,

9    Mexican Americans in the Valley and in West Texas were

10   asked to recite the Texas constitution verbatim to vote.

11   They were asked to recite the U.S. Constitution verbatim

12   to vote.  Eventually, those literacy tests were

13   overturned after a LULAC lawsuit.  Then we had at-large

14   voting, so, for example, in the past there was no

15   single-member districts because of the -- actually, LULAC

16   brought -- we were able to create single-member

17   districts, which is what we're facing that we have now

18   today in the Senate and the House.  Before it was all

19   at-large.

20        Last year we had to face the issue of voter purges

21   in the state of Texas.  LULAC brought a lawsuit

22   challenging the purge of 98,000 voters of whom 94 percent

23   were Mexican American.  Again, LULAC prevailed and won,

24   and if you recall, the secretary of state was not

25   confirmed because of his actions in that case.  A reason

1      I tell you that is because LULAC is the only organization

2      in the country that represents all Hispanics because we

3      have class-action status.  NAACP is the only organization

4      that represents all African Americans, and they have

5      class-action status.  Since 1970, 1980, 1990, 2020, 2010,

6      LULAC has filed a lawsuit against every redistricting

7      plan in Texas history.  In every case, LULAC has

8      prevailed.  In every case we were able to show

9      intentional discrimination.

10          And let me tell you why we will be able to show

11      intentional discrimination once again.  I have been privy

12      to see the maps that have been stood up, but I want to

13      just show you some examples because I'm from Dallas,

14      Texas.  I'm from the North Texas area, so that's the area

15      I know the best.  In the current 23rd Senatorial

16      District, the district is currently 45 percent Latino,

17      38 percent Black, 14 percent Anglo.  That's the way it is

18      now.  Under the proposed map, Hispanics will go down to

19      39 percent, African Americans will go up 1 percent to 39,

20      and Anglos will go up to 17.6 under this map.

21          Senate District 16 is currently 41 percent

22      Anglo -- excuse me, is currently -- yes, 41 percent

23      Anglo, 29 percent Hispanic, 13 percent Black.  Under the

24      plan -- and I haven't seen the map from last night

25      because I wasn't aware of it until this morning.  Under

1      the proposed plan that came out, the Anglo population

2      would go down 26.6 percent.  Hispanics would go up to

3      49.3 and Blacks would be 16.8.  But Hispanics are

4      40 percent of the population of Dallas County.  We are

5      the largest ethnic group in Dallas County.  And so to

6      give you an idea in Dallas County, right now there are

7      724,000 Anglos, 1,057,000 Hispanics, 564,000 Blacks and

8      181,000 Asians.  There is no Latino opportunity district

9      in Dallas County.  There is no Latino opportunity

10     district or minority opportunity district in

11     Tarrant County.  So to put that in perspective, the

12     largest group in North Texas has no representation; and

13     under the current map, would have no representation as

14     there would not be a voting-age population in either one

15     of those districts that would create such.

16          We believe -- if we have one person that went to

17     vote, that would mean Latinos are about 40 percent of the

18     state's population.  Anglos are about 40 percent of the

19     state's population.  There would be approximately 10 or

20     11 Mexican American state senators in this chamber.  But

21     because of intentional cracking and packing, that doesn't

22     occur.

23          Let me tell you why -- I heard the -- you state

24     that there was no racial data used in drawing these maps.

25     I beg to differ.  It's like if I went to first grade and

1    I got my box of crayons and the only color in the crayons

2    were white.  There were no browns crayons.  There were no

3    black crayons.  There were no yellow crayons.  Only white

4    crayons.  Why do I say that?  Because what you see is you

5    see these lines mainly White districts, rural areas that

6    have nothing to do with Dallas County come in, take out

7    Black and Brown populations and take them up where they

8    are effectively neutralized and neutered as a voting

9    block.

10          Interesting, the same thing happened in District 10

11   in Fort Worth where Black and Brown districts are put in

12   with White rural districts.  You never see the other --

13   the other happen.  It's only Anglo rural and suburban

14   areas coming in and scooping up Black and Brown voters in

15   10 or 20 percent increments so they are effectively

16   diluted and cracked.  What we've seen today is that that

17   doesn't occur in other areas, so I want to just make sure

18   I'm clear that unless there is a majority Latino

19   opportunity district in North Texas, there will be

20   intentional racial discrimination by this body as it

21   has -- the litany of things that I've just showed you.

22          And it's easy.  Under the Gingles test that the

23   assistant attorney general just mentioned, do we have a

24   cohesive block?  Yes, we do.  They all vote the same.

25   Pretty much, yes, they do.  Will the majority block deny

1  them the right to choose a candidate of their choice?

2  Yes, they will.  So that is very clear.  And to give you

3  an example, there are more Latinos in Dallas-Fort Worth

4  than there are in San Antonio or El Paso or the Valley,

5  yet they have majority Latinos in their districts.  So

6  there is a clear opportunity for this chamber and -- to

7  draw a majority Latino opportunity district and a

8  majority -- and keep an African American district --

9  opportunity district and also a majority-minority

10  opportunity district in Tarrant County, which I'll get to

11  now.

12      We also have problems in Tarrant County in

13  District 10.  They're African American, Latino districts

14  are a cohesive group, primarily concentrated in the city

15  of Forth Worth and the south side in Arlington.  Those

16  districts of the proposed map would be rural or

17  prominently White areas.  Ranchers and farmers have

18  nothing to do with the Texas stadium, Raider stadium or

19  downtown Fort Worth and the stockyards.  They just don't.

20  And if you are going to keep people of common interest

21  together, you should put them together.  Dallas and

22  Fort Worth could be merged.  They're 20 miles apart, not

23  a problem.  Similar interests.  Similar urban and

24  suburban areas.  Why put them with Wise County, Decatur,

25  Texas, where you have more cows than people.  Doesn't

1    make sense.  As opposed to what you have in Dallas and

2    Tarrant County.

3         The 27th District, we also have an issue.  That is

4    one where it appears that the lines have been drawn to

5    include elements of Nueces County and San Patricio County

6    where it used to only be South Texas.  Not sure why that

7    happened, but it appears to dilute the numbers of voting

8    age Latinos and effective voting-age populations in that

9    district.

10        Now, that's just an initial glance.  We haven't had

11   a chance to look and apply the red apple to the county

12   level, street level numbers, but those is what we've seen

13   initially.  So we would ask the chamber to draw maps that

14   would more fairly and accurately represent the growth.

15   The Latinos were almost the entire growth from 2010 to

16   2020 in the state of Texas, yet there are no additional

17   Latino districts in this plan that have been laid out at

18   this time.  Thank you, very much.

19             SENATOR HINOJOSA:  Thank you, Mr. Garcia.  We

20   have a couple of questions from senators.

21   Senator Zaffirini.

22             SENATOR ZAFFIRINI:  Thank you, Mr. Chairman.

23   Thank you, Mr. Garcia, for your leadership and for your

24   passion, especially your interest in redistricting.  You

25   talked about the population growth in general, and you

1    talked about the growth specifically of the Hispanic

2    population.  If you were drawing this map, specifically

3    where would you draw a minority opportunity district?

4            MR. GARCIA:  We have a county commissioner's

5    district in Dallas that is commissioner District 4 that

6    has a population of about 700,000.  Just about 150,000

7    short, that is 16 percent Latino.  So western Dallas

8    County along with certain elements in the middle,

9    Pleasant Grove, Oak Cliff, which is the largest Latino

10   neighborhood in Dallas County, could easily create a

11   majority opportunity Latino district or a minority

12   opportunity district and also for Texas Senator West's

13   district in the 23rd.

14           SENATOR ZAFFIRINI:  What impact would that

15   have on Senate District 23 and Senate District 10?

16           MR. GARCIA:  23 would have to go further east

17   where there is a large part of African Americans where

18   currently, I believe, in Council District -- I mean

19   Senate District 2.

20           SENATOR ZAFFIRINI:  10?

21           MR. GARCIA:  Hmm?

22           SENATOR ZAFFIRINI:  What impact on Senate

23   District 10?

24           MR. GARCIA:  None, on Senate District 10.

25           SENATOR ZAFFIRINI:  None as it is proposed or

1    none as it exists?

2              MR. GARCIA:  None as it is.  As is proposed,

3    of course, Senator District 10 gets -- we call it

4    cracking of the minority communities in District 10.

5    They're losing their effective voice to elect the

6    candidate of their choice.

7              SENATOR ZAFFIRINI:  In developing your

8    proposals and your strategy in addressing redistricting,

9    have you worked with other Hispanic organizations?

10             MR. GARCIA:  Yes, we have.  We work with

11   multiple organizations Voto Latino, Valdez, the Latino

12   Task Force.

13             SENATOR ZAFFIRINI:  Thank you.  You heard me

14   ask questions of the attorney general's representative?

15             MR. GARCIA:  Yes.

16             SENATOR ZAFFIRINI:  I'd like to ask you some

17   of those questions in the depth of perhaps for you.

18             MR. GARCIA:  Sure.

19             SENATOR ZAFFIRINI:  Because I didn't get very

20   many specific answers.

21             MR. GARCIA:  Okay.

22             SENATOR ZAFFIRINI:  First of all, what

23   specific aspects of proposed maps do you think should be

24   used to ensure the redistricting process does not

25   diminish minority voter's ability to elect the candidates

—53—

1    of their choice?

2              MR. GARCIA:  In order to comply with the

3    Voting Rights Act, you definitely need to use racial data

4    to make sure you are not cracking or packing a Latino and

5    African American voters in violation of the

6    Voting Rights Act, Section 2.  I believe the assistant

7    attorney general is being disingenuous with you, to be

8    honest with you.  You are his client.  You are the state

9    of Texas.  You have a right to that same information just

10   like every other senator here.  Now, maybe not in public

11   because it is an attorney/client privilege.  I'm an

12   attorney also, by the way, so -- but you do have a right

13   to that information and data.

14             SENATOR ZAFFIRINI:  Thank you.  The Black

15   citizen voting-age population of proposed

16   Senate District 23 is only 45 percent.  In your opinion,

17   would this permissible under the Voting Rights Act and if

18   so, why or why not?

19             MR. GARCIA:  It will not.  It's not sufficient

20   voting-age population of African American voter to

21   comply.

22             SENATOR ZAFFIRINI:  Thank you.  What would you

23   consider an acceptable threshold for the percentage of a

24   district's voting-age population who are Black or

25   Hispanic to maintain a minority-majority opportunity

1    district protected under the Voting Rights Act?

2           MR. GARCIA:  Over 60 percent and that is

3    currently the numbers that we are seeing in almost

4    every -- every minority state senator in the state of

5    Texas has districts over 60 percent minority right now.

6           SENATOR ZAFFIRINI:  And you disagree with the

7    AG representative's testimony that it's 50 percent

8    plus 1?

9           MR. GARCIA:  That's correct.

10           SENATOR ZAFFIRINI:  Yours is 60 percent.

11           MR. GARCIA:  60 percent plus 1.

12           SENATOR ZAFFIRINI:  60 percent plus 1.  Okay.

13    I asked the AG's staff what analysis they used to the

14    proposed configuration of Senate District 10.  Do you

15    have any comment about that, about how Senate District 10

16    should be analyzed in terms of its compliance or

17    noncompliance with the Voting Rights Act?

18           MR. GARCIA:  I'm not a mind reader, but I have

19    been around a lot of rodeos in my time, political rodeos,

20    and my guess is because senator of District 10 has a

21    majority White population right now at about 50 percent,

22    or I believe that's what it was before.  They believe she

23    is not protective of the Voting Rights Act, but we

24    believe there are because of the cohesiveness of the

25    Black and Brown populations in District 10.

1          SENATOR ZAFFIRINI:  Thank you.  Given that

2     census data indicate 95 percent population growth in

3     Texas was in communities of color during the last decade,

4     what steps do you believe should be taken to determine

5     whether the senate must draw a new minority opportunity

6     district to comply with the Voting Rights Act?

7          MR. GARCIA:  You would take the census data

8     and seen that the growth was majority Latino.  African

9     Americans stayed about the same.  Anglos declined.  Then

10    you would create a minority opportunity districts for

11    that increase in growth, and it hasn't happened in this

12    map that I have seen so far.

13         SENATOR ZAFFIRINI:  Thank you.  How can we

14    ensure that if a new minority opportunity district is

15    drawn that is does not impact existing minority districts

16    negatively, for example, reducing their minority

17    voting-age population significantly?

18         MR. GARCIA:  You're going to have to change

19    the lines of the state senators in the north in terms of

20    Dallas County and Tarrant County.  And that means you

21    would have to alter their districts somewhat.  And

22    take -- and -- but Dallas is a majority-minority county

23    by far.  The fact of the matter is you see just looking

24    at it.  In Dallas County now, Anglos constitute

25    27 percent of the population.  So a majority 40 percent

1     is -- excuse me, yeah, 40 percent is Latino.  So it can

2     easily be done.  You just have to go up north or west

3     into Tarrant County or north.

4               SENATOR ZAFFIRINI:  Visualize with me, if you

5     will, the 1,250 mile Texas-Mexican border, all of the

6     districts along the border.  It will be Senator Lucio's

7     District, I believe it's 27; 20, Senator Hinojosa's;

8     mine, 21; Senator Gutierrez's is 19, and Senator Blanco

9     from El Paso, I believe that's 29.  All of those are

10    Hispanic districts represented by Hispanics.

11              MR. GARCIA:  That's correct.

12              SENATOR ZAFFIRINI:  The position is a new

13    minority opportunity district in North Texas would not --

14    probably not impact those Hispanics districts --

15              MR. GARCIA:  Not at all.  The Latino

16    population alone is bigger than most of the counties all

17    across from El Paso to (indecipherable) County.  The

18    Latino populations of Dallas County are much larger.  I

19    can tell you there's 1,027,000 Latinos in Dallas County

20    alone.  I believe there's close to 6- or 700,000 in

21    Tarrant County.  And then the suburban counties of

22    Collin, Denton all have substantial Latino populations.

23              SENATOR ZAFFIRINI:  And would you agree that

24    the drawing of a new minority opportunity district should

25    not negatively impact the existing Hispanics districts?

1           MR. GARCIA:  Correct, would not.

2           SENATOR ZAFFIRINI:  Thank you.  Thank you,

3    Mr. Chairman.

4           SENATOR HINOJOSA:  Senator Alvarado.

5           SENATOR ALVARADO:  Thank you, Mr. Chairman.

6    Mr. Garcia, it's good to see you.  I appreciate you being

7    here and thanks for your leadership on the national level

8    as well.  I know that you have been in this -- in this

9    fight for a long time.  You mentioned the lawsuits, and

10   LULAC has been in the forefront of many of those.  Can

11   you talk about some of the findings from some of these

12   lawsuits in the past?

13           MR. GARCIA:  I'm just -- well, right now

14   everybody -- every senator is sitting because of a

15   court drawn map here in the Western District of Texas

16   because they failed in 2010 to create districts that were

17   fair to minorities.  We believe that, again, what I am

18   seeing again is again partisanship and the use of race as

19   a way to crack and pack districts, and we've been able

20   to show that -- the attorney general -- assistant

21   attorney general is correct, under the Gingles test when

22   those three factors have been met and they were still

23   violated by this chamber anyway in order to maintain

24   partisan majorities.

25           SENATOR ALVARADO:  Okay.  I think you may have

1    heard the question that I asked earlier about -- and I

2    don't know if you have the exact numbers -- but what

3    communities showed population growth in the DFW metro

4    area, and in comparison can you tell us about the White

5    population growth in the metroplex?

6            MR. GARCIA:  I can.  Just to give you an

7    example in Dallas County in 2010, Latinos were 38.3 and

8    were going up to 40.5.  Anglos were 33.  They went down

9    to 27 percent.  They lost 6 percent of their population.

10   African Americans in 2010 were 22.5 percent and in 2020

11   they're 21.6.  They stayed relatively steady.

12           SENATOR ALVARADO:  And then you may have also

13   heard a question I asked about Euless being a diverse

14   suburb of Dallas-Fort Worth and what it would have in

15   common with Rosebud, Texas, in Falls County?

16           MR. GARCIA:  You have a Muslim American mayor.

17   Let me repeat that.  Euless, Texas, has a Muslim American

18   mayor, has a large increase of Asian Americans in that

19   city.  It is very diverse, about a fourth Black, a fourth

20   Asian American, a fourth White and a fourth Black.  It

21   has zero in common with any rural area.  I forgot the

22   name of the county you mentioned.

23           SENATOR ALVARADO:  Falls County.

24           MR. GARCIA:  Falls County.  Up in the northern

25   regions, those are ranchers and farmers.  Their -- their

1      needs and their interests are much different from those

2      of a cosmopolitan suburb like Euless.

3                  SENATOR ALVARADO:  Thank you for your

4      testimony.

5                  MR. GARCIA:  Thank you.

6                  SENATOR HINOJOSA:  Senator Gutierrez.

7                  SENATOR GUTIERREZ:  Thank you, Mr. Chairman.

8      Mr. Garcia, thank you very much for coming today.  We

9      appreciate you very much.  You testified earlier that you

10     just -- you know that -- you're aware that there's an

11     amendment that occurred last night.  Have you had a

12     chance to review it at all?

13                 MR. GARCIA:  You know what, I was handed

14     what's purported to be the maps and the language, but I

15     noticed that Senate District 16 and 23rd were not

16     included in what I was handed.

17                 SENATOR GUTIERREZ:  At this time,

18     Mr. Chairman, may I hand him the map of the existing

19     amendment if that's okay?

20                 SENATOR HINOJOSA:  Yes, you may.

21                 SENATOR GUTIERREZ:  Thank you.

22                 MR. GARCIA:  Okay.

23                 SENATOR GUTIERREZ:  So, Mr. Garcia, if you

24     need some time to look at it, go ahead.

25                 MR. GARCIA:  Again, like for some reason this

1    also, it shows District 10, then it pops to 18 and leaves

2    off 16, and then it goes 19.  I'm looking for the

3    demographic data, and it drops 23rd.  They're not in

4    here.

5            SENATOR GUTIERREZ:  Okay.  Well, before we

6    look at demographic data, let me have you look at the map

7    itself and point your attention to Districts 19 and 21.

8    I'll submit to you those changed overnight last night

9    substantially, taking District 19 up into beyond

10    Guadalupe County into Hays County.

11            MR. GARCIA:  Yeah.

12            SENATOR GUTIERREZ:  You know, you're -- you're

13    a good Latino like myself.  Do you like to eat fajitas?

14            MR. GARCIA:  I do, especially in Eagle Pass

15    where my father is from.

16            SENATOR GUTIERREZ:  Yes, I love fajitas.

17            MR. GARCIA:  He's from Maverick County, so I

18    know where you're headed.

19            SENATOR GUTIERREZ:  I love fajitas too.  But

20    you know, we often see it in redistricting maps, we see

21    these little slivers that meander into communities to do

22    exactly the things that you testified earlier, to

23    diminish communities; is that not correct?

24            MR. GARCIA:  That is done intentionally and

25    always.  I never heard the fajitas.  I like that one,

1    though.

2              SENATOR GUTIERREZ:  You don't like that kind

3    of fajita, neither do I.  So you mentioned earlier that

4    there was a -- that there's -- in redistricting we look

5    at people of common interest.  What kind of common

6    interest do you think that the people of the Val Verde

7    County would have with the people of Hays County and

8    San Marcos?

9              MR. GARCIA:  None.  We're talking a border

10   community.  Hays County is basically a suburb now of

11   Austin.

12             SENATOR GUTIERREZ:  Does the map as amended

13   last night between Districts 19 and 21 -- and realizing

14   that you haven't looked at it for any great deal, does

15   the amendment create any new, new Hispanics opportunity

16   districts?

17             MR. GARCIA:  Again, just glancing at it, I

18   don't see that; but I would have to do an analysis of

19   that and look at the numbers in terms of voting-age

20   population and the voting effectiveness of the

21   population.

22             SENATOR GUTIERREZ:  You're a great lawyer and

23   usually when you're, you know, preparing for court, you

24   know, you go out there and which is your witnesses, you

25   prepare your witnesses as we all do.  And -- and you and

1      I hadn't had a chance to talk earlier.  We have not
2      talked --
3                MR. GARCIA:  We have not.
4                SENATOR GUTIERREZ:  -- in months.  And I think
5      the last time we talked over the phone.  But you --
6      you -- you just testified that it does not create a new
7      Hispanic opportunity district; that you don't believe it
8      does, and you're actually correct, it does not.  In your
9      opinion does the amendment prevent the creation of a new
10     Hispanic opportunity district in central Texas?  In other
11     words, if you are pitting two Latino democrats, senator
12     in District 19 and senator in District 21, is it a
13     possibility that you would diminish Hispanic populations
14     from San Antonio to Travis County, from Bexar County to
15     Travis County?
16               MR. GARCIA:  Again, I'd have to do further
17     analysis, but on the initial first glance, yes, it would.
18               SENATOR GUTIERREZ:  Okay.  And what metrics do
19     you use to measure Hispanic opportunity?  HCVAP, SSVR.
20               MR. GARCIA:  That's correct, voting-age
21     population, registration numbers, and then actually voter
22     turnout because you can have -- you can have a bunch of
23     apartments with a lot of Hispanics, but they don't vote
24     versus large neighborhoods of stable families that do
25     vote in large numbers.

1          SENATOR GUTIERREZ:  Very good.  If an existing

2     Hispanic opportunity districts, SSVR, was lowered below

3     50 percent, as it was in this amendment, would that

4     concern you?

5          MR. GARCIA:  Yes, it would.  That would affect

6     its impact, its ability to vote.

7          SENATOR GUTIERREZ:  And you would find that

8     intentionally discriminatory?

9          MR. GARCIA:  Yes, sir.

10         SENATOR GUTIERREZ:  Thank you.  I have no

11    further questions.

12         SENATOR HINOJOSA:  Senator Huffman.

13         SENATOR HUFFMAN:  Thank you.  Thank you for

14    being here, sir.  And you are the national president of

15    LULAC; is that correct?

16         MR. GARCIA:  Yes, ma'am.

17         SENATOR HUFFMAN:  Yeah.  Where are you from?

18         MR. GARCIA:  Dallas, Texas.

19         SENATOR HUFFMAN:  I want to thank you for

20    being here, and thank you for your input for the

21    committee.  I just have a few questions based on your

22    presentation.  And did I hear you say that the

23    Voting Rights Act requires a racial gerrymander in the

24    DFW area and if so, what is your basis for that

25    statement?

1          MR. GARCIA:  I actually said the opposite,

2     that this senate map is gerrymandering the Latino

3     population by splitting them up into multiple districts

4     and, therefore, diluting their ability to elect a

5     candidate of their choice.

6          SENATOR HUFFMAN:  All right.  Do you believe

7     there is a section to require district that does not

8     appear in the proposed plan?

9          MR. GARCIA:  Yes, ma'am.

10          SENATOR HUFFMAN:  Do you have a map to submit

11     to us?

12          MR. GARCIA:  I will be submitting written

13     testimony, a Power Point and a proposed map within the

14     next week.

15          SENATOR HUFFMAN:  All right.  So you will

16     submit.  I do want to, you know, make sure you -- the

17     process and the timeline is part of the senate resolution

18     that was enacted by the senate earlier.  So we are in a

19     very timeline, so I want to make sure everyone is very

20     aware of that.  We do want you to propose if you have

21     something you want us to look at because we will look at

22     what is proposed, so I would encourage you to do that.

23     You also said that 60.9 -- 60.1 is the standard for

24     Hispanic opportunity district, what is that based on?

25     Any case law?

1          MR. GARCIA:  It is based on real politics.

2    That's normally what it takes to be able to elect a

3    candidate of their choice because the -- of the number of

4    Latinos that are under the age of 18 and the number that

5    may be noncitizens that are ineligible to vote.

6          SENATOR HUFFMAN:  So that's not case law

7    what's been held by the Supreme Court.  Did you call it

8    real politics?

9          MR. GARCIA:  You know, you'd have to ask that

10   question to Ms. Perales.  She's more of a constitution --

11         SENATOR HUFFMAN:  Okay.

12         MR. GARCIA:  -- than I am.

13         SENATOR HUFFMAN:  I will do that.  Thank you.

14   But, again, I would encourage you to present a proposed

15   plan as soon as possible, if you have that to do so.

16   Thank you.  Thank you, Ms. Chairman -- I mean,

17   Mr. Chairman.

18         SENATOR HINOJOSA:  Okay.  I don't think there

19   -- Senator Powell.

20         SENATOR POWELL:  Mr. Garcia, thank you for

21   being here today.  And I know that you have spent a

22   considerable amount of time in Senate District 10 and in

23   our region.  We've been at breakfast together over the

24   years and I know you have great interest in -- in Senate

25   District 10.  I think you've been to La Gran Plaza in

1     Fort Worth, haven't you?

2              MR. GARCIA:  I have.

3              SENATOR POWELL:  The old seminary south.  Kids

4     like me remember very well.  Can I ask you to tell us

5     what you think the area around La Gran Plaza and the

6     plaza itself would have in common with Brown County?

7              MR. GARCIA:  So the La Gran Plaza for those of

8     you who are not from Fort Worth is an entirely Mexican

9     American themed shopping center mall.  I'm talking about

10    all the movie theaters are predominantly Spanish language

11    and probably 80 or 90 percent of the customers there are

12    Mexican American or Hispanic.  Brown County would be,

13    again, a rural, primarily ranching, farming area that

14    would have little to anything in common with an -- an

15    urban predominantly Hispanic neighborhood.

16             SENATOR POWELL:  And that is the county that

17    at 9:00 last night was moved into Senate District 10, is

18    it not?

19             MR. GARCIA:  Yeah.  I have been hunting in

20    Comanche County, and I've had a trial in Comanche County

21    which is right next door to Brown County.  I believe

22    that's probably San Saba, I'm not sure, but I am pretty

23    sure that's where it is.  And that's a very rural, again,

24    probably more cows and deer than people in there.

25             SENATOR POWELL:  Thank you.  I -- I appreciate

1    your comments.

2                SENATOR HINOJOSA:  Any other questions,

3    members?  If not, thank you, Mr. Garcia, for your

4    testimony.  And I would, again, urge you as

5    Senator Huffman did to submit any proposed plans that you

6    may have.

7                MR. GARCIA:  Thank you, Mr. Chairman.

8                SENATOR HINOJOSA:  Next we have Michael Li,

9    senior counsel for the Brennan Center for Justice.

10   Mr. Li, just come up and identify yourself, who you

11   represent and then you may proceed.

12               MR. LI:  Thank you, Mr. Chairman, and

13   thank you to the members of the committee.  I do have

14   some written testimony to submit.  I wasn't sure who I

15   should hand that off to, but I will leave that here.

16   All right.  Thank you.  So thank you again Mr. Chairman

17   and members of the committee.  It is good to be back in

18   Texas and all of the talk today about fajitas and all of

19   the food of Texas are making me -- and the hour is quite

20   making me quite hungry, so I will try to be speedy on

21   this.

22        So Texas has struggled for five decades to get it

23   right when it comes to redistricting in its large and

24   growing communities of color.  This was the case when

25   democrats controlled the process several decades ago,

1    and, unfortunately, it has remained the case in the two

2    decades and since republicans have been in control of the

3    process.  But after a decade in which communities of

4    color provided around 95 percent of the state's

5    population growth, it is more important than ever that

6    Texas try to get it right.  At the country's sounding

7    John Adams wrote in 1776 that legislative body should be

8    an exact portrait of a miniature of the people as a

9    whole.  The notion was simple.  If your interests are at

10   the table, then so should you be.  But, unfortunately,

11   redistricting gives map drawers a chance to fiddle with

12   the process and to exclude rather than include.

13        Today I want to focus my remarks on North Texas and

14   in particular Tarrant County because of the proposed --

15   the proposed State Senate plan makes a number of choices

16   that raise red flags.  My comments, however, are only

17   illustrative because similar issues do occur elsewhere on

18   the map and I am happy to follow up with additional

19   information.

20        As I stated, last decade over 95 percent of Texas's

21   population growth was non-Anglo.  In Dallas and

22   Tarrant County the percentage was even higher, a

23   hundred percent of the growth in those counties came from

24   non-Anglos.  And, in fact, the Anglo population in both

25   counties fell.  In Dallas County, the Anglo population

1    fell by about 60,000 people.  And in Tarrant County, the

2    Anglo population fell by just over 30,000.  And in

3    Tarrant County, much of the county's non-Anglo population

4    growth was centered in Senate District 10, half of all of

5    the Latino growth in Tarrant County was in Senate

6    District 10 as was 36 percent of its Black population

7    growth and 32 percent of its Asian population growth.  As

8    currently configured by total population,

9    Senate District 10 is only 39.5 percent Anglo, down from

10   almost 48 percent in 2010.  It is still majority White by

11   citizen voting-age population about 54 percent, but that

12   may, in fact, be overstated because estimates of citizen

13   voting-age population are estimates calculated on a

14   five-year basis, with the most recent five-year estimates

15   we have run from 2015 to 2019, and we see that estimates

16   tend to trail especially in fast-growing regions in

17   states like Texas.  But despite all of that, remarkably

18   very few changes needed to be made to the map for Senate

19   District 10 if it's just 53 -- 5,318 people short of the

20   target population for a district.  Despite this,

21   Plan S2101 makes wholesale changes to Senate District 10

22   moving out about 318,000 people, 55 percent of whom are

23   non-Anglo and replacing with them with 328,000 people

24   from Johnson and Parker County, 72 percent of whom are

25   Anglo.  And, again, you know, the state did not have to

1      make any changes at all to Senate District 10.  At most

2      it needed to perhaps adjust by about 5,000 or so people,

3      but instead it moves 300,000 people out and 300,000 --

4      328,000 people in.  Overall, 34 percent of Senate

5      District 10's Latino population is moved out of the

6      district.  23 percent of its Black population and a

7      remarkable 46 percent of its Asian population is moved

8      out of the district.  This raises a number of red flags.

9          And I want to start with a notion that you're

10     starting to hear around the country as maps are being

11     drawn that somehow you can avoid liability if you don't

12     consider race at all.  And we heard this in -- around the

13     country.  We've heard it -- at my Brennan Center has

14     heard it from people in New Hampshire that the lawmakers

15     aren't considering race, which, you know, maybe it's fine

16     in New Hampshire, which is one of the whitest states in

17     the country and does not have much ethnic diversity, but

18     that just doesn't work in a state as diverse as Texas,

19     especially where there is a lot of evidence that

20     communities of color are politically affected in places

21     like Tarrant County.

22          So given the growth of communities of color and

23     their geographic concentration, Texas has an obligation

24     to conduct a searching and nuanced analysis to ascertain

25     whether -- and to fully understand the extent of minority

1    power before adopting a new map.  Under Section 2 of the

2    Voting Rights Act, Texas has a legal obligation to avoid

3    drawing district lines in a way that dilutes the votes of

4    minority voters and prevents them from electing preferred

5    candidates.  Whether liability exists under Section 2 is

6    not a simple back-of-the-envelope calculation, rather the

7    Supreme Court has said the inquiry is intentionally

8    local, fact intensive, and functional in nature.  In

9    diverse multiracial and multiethnic regions such as

10   North Texas among the matters that must be investigated

11   are whether two or more minority groups in a region are

12   politically cohesive and could together form the majority

13   of a district.  It is imperative for the state not only

14   conduct this analysis, but that it do so in a transparent

15   fashion making its analysis publicly available before any

16   vote on a map.  And -- you know, we've heard a lot of

17   talk today about privilege from the representative from

18   the attorney general's office.  I will just note that

19   that privilege is the client's privilege, and it can be

20   waived by the client.

21        Texas's obligations to do not end with creating

22   Section 2 districts under the Voting Rights Act.  Like

23   all states, Texas has an obligation to avoid potential

24   discrimination against racial and ethnic minorities.  The

25   Supreme Court has made clear that liability for

1    intentional discrimination can exist even when no

2    liability exists under Section 2 of the

3    Voting Rights Act.  Explaining that if a state, quote, if

4    there were a showing that a state intentionally drew

5    district lines in order to destroy an otherwise effective

6    crossover district, that would raise serious concerns

7    under both the 14th and 15th Amendment.  Likewise, the

8    Supreme Court has held that, quote, undermining the

9    progress for a racial group that has been subject to

10   significant voting-related discrimination and that was

11   becoming political -- becoming increasingly politically

12   active and cohesive can bear the mark of intentional

13   discrimination that would give rise from equal protection

14   violation.  Engaging whether there is intentional

15   discrimination, a state's awareness of an action that an

16   action bears more heavily on one race or another is a key

17   factor the courts will consider.  As the Supreme Court

18   has explained, adherence to a particular policy or

19   practice with full knowledge of the applicable facts of

20   such appearances, one among many other factors that may

21   be considered by a court in investigating whether a

22   state's motive is discriminatory.

23        And here there are real questions about whether

24   Texas has met its obligations to conduct that searching

25   and nuance inquiry given some much of the choices it has

1     made.  Texas must carefully consider questions about
2     whether minorities groups are politically cohesive and
3     whether they have an ability to elect.  And in this
4     regard, politics is not an excuse, this may be the
5     defense but, you know, the reality is that in Texas
6     people are well aware that there is much racially
7     polarized voting that -- and that if you're targeting
8     heavily democratic areas, you're liking targeting in most
9     of the state's heavily minority areas.  So the idea that
10    somehow not considering race but only considering
11    politics is an excuse just does not fly.
12          And I will note with respect to Senate District 10
13    that Senate District 10 was found to have been
14    intentionally discriminatory last decade when the state
15    also tried to redraw the district in a way that cracked
16    minority communities and diluted their power.  In
17    addition, there's lots of evidence that Senate District
18    10 is an effective coalition district.  I am not here to
19    say whether it is or not, but there is lots of evidence
20    to suggest that the state needs to take a closer look.
21    Texas for many decades has struggled to get it right.  It
22    has ended up in court time and time again, and that
23    itself should be a cautionary signal to this body.
24          I will end simply by saying -- with a couple of
25    notes.  One is, you know, that there was discussion of

1       Cooper versus Harris, and there was -- I believe

2       Senator Huffman read from Cooper versus Harris.  I do

3       want to read one other part from Cooper versus Harris,

4       which says that, you know, even if you're doing

5       partisanship, if you use race as the crude tool for

6       partisanship that can itself result in a racial

7       gerrymandering that violates the constitution.

8       Legislators who have placed a significant number of a

9       voters within or without a district predominantly because

10      of their race regardless of their ultimate objective in

11      taking that step can violate the constitution.

12      I also want to clarify one thing that Mr. Kinghorn said,

13      which is that the Voting Rights Act requires that a

14      district be 50 percent plus 1 in order to be protected.

15      The actual inquiry that you need to do is figure out

16      whether you could draw a majority district in an region,

17      not whether a district as it is currently configured is

18      protected or not.  Likewise, when you ultimately draw

19      that -- the ability to draw 50 percent plus 1 district

20      creates liability.  The ultimate district that is drawn

21      need not be 50 percent plus 1 minority.  It can be under

22      that if it performs and there are other legitimate

23      reasons for doing so.  So a 50 percent plus 1 threshold

24      is a trigger for liability.  It's not a dictate for how

25      districts ultimately have to be shaped.

1        So with that, I'm happy to take any questions from

2   the committee.

3        SENATOR HINOJOSA:  I have a question.  In

4   light of the recent United States Supreme Court decision

5   that partisan gerrymandering is permissible and they will

6   have a hands-off approach, how does that impact -- or

7   does it impact Section 2 of Voting Rights Act, will we

8   still have a discrimination issue?

9        MR. LI:  That is a great question,

10  Mr. Chairman.  You know, the Supreme Court has said that

11  you cannot bring claims about partisanship under the

12  federal constitution in court and that is the law right

13  now, but states still have to comply with the

14  Voting Rights Act and other laws and, of course, the

15  constitution does prohibit intentional discrimination on

16  the basis of race.  And so in places like Texas and

17  elsewhere in the south where voting is very polarized

18  along racial lines there -- you know, the reality is that

19  you cannot really sort of do a partisan gerrymander

20  without targeting communities of color.  It just is not

21  possible except in places perhaps like Austin, but in

22  general, you know, in Texas, democrats get about

23  25 percent, 28 percent of the White vote.  There still

24  aren't that many White democrats in Texas.  Even, you

25  know, with the changes in recent years, and the problem

1    from a gerrymander standpoint is that White democrats

2    tend to live near White republicans, sometimes in the

3    same houses, and so unless you're able to draw a line

4    down somebody's bed, it can be really hard to sort of,

5    like, totally effectively get that much gain by targeting

6    just White democrats and instead because of residential

7    segregation, it's much easier to pack together or break

8    apart communities of color.  So even if you're doing it

9    for partisanship reasons, there is a -- a racial and

10   ethnic impact that has to be considered and, you know, it

11   can push right into being right into being intentionally

12   discriminatory or otherwise violating the

13   Voting Rights Act.

14            SENATOR HINOJOSA:  So you have -- what if

15   partisanship gerrymandering is allowed and it has an

16   impact of intentional discrimination, then there will be

17   a violation of Voting Rights Act, Section 2?

18            MR. LI:  The Voting Rights -- if there's

19   intentional discrimination, it would violate the

20   Voting Rights Act, Section 2, but it also would be itself

21   a violation of the Constitution because the Constitution

22   does not allow discrimination on the basis of race or

23   ethnicity.

24            SENATOR HINOJOSA:  So partisan gerrymandering

25   cannot be used as a cover or substitute to -- for

1    intentional discrimination?

2              MR. LI:  That is -- that is correct.  I mean,

3    there are places in the country where you can

4    discriminate on the basis of party and not sort of

5    like -- there isn't a racial dimension to it, but that is

6    not the case in Texas, and you almost certainly will trip

7    over lots of things if you're attempting at an aggressive

8    partisan gerrymandering, you have to target Black and

9    Latino and Asian voters.

10             SENATOR HINOJOSA:  Thank you.

11   Senator Zaffirini.

12             SENATOR ZAFFIRINI:  Thank you, Mr. Chairman.

13   Sir, could you provide us some examples of cases in which

14   courts held that coalition districts in which two

15   communities of color combined make up the majority of

16   voters?

17             MR. LI:  Well, that is certainly the --

18   currently the case law in the Fifth Circuit.  There are a

19   couple of cases.  You know, one is the City of Baytown,

20   Campos versus the City of Baytown.  And, in fact, the

21   allowance of coalition districts is the law in most of

22   the circuits that have decided the question with the

23   exception of the Sixth Circuit, which is Michigan, Ohio

24   and that region.  So, you know, the -- you know, it's not

25   an automatic that, you know, two -- two or more minority

1      groups would be a coalition district, but if they are

2      politically cohesive, the current law is that that could

3      trigger Section 2 liability.

4             SENATOR ZAFFIRINI:  Thank you.  Are there any

5      districts you believe federal law requires us to protect

6      because they are coalition districts?

7             MR. LI:  Well, as I said, the analysis of

8      whether a Voting Rights Act liability exists is searching

9      and nuanced, and I haven't sort of done or talked to

10     demographers to sort of fully assess this on the maps

11     that came out last week and certainly not the maps that

12     came out last night; but I think that there are good

13     arguments that Section 10 -- or not Section 10,

14     District 10, sorry, is a coalition district, you know,

15     based on some of the findings last decade when the

16     district was -- as I said, almost 48 percent White and

17     now it's only 39.5 percent White.  I think that there is

18     a really good argument that -- well, your question was

19     specific to coalition districts, so I think, you know,

20     there's a really good argument that's unique, like not

21     only protect Senate District 10 but also perhaps enhance

22     it some.  More generally on Section 2 -- or not

23     section -- I'm sorry.  Thinking is on the mind, I guess.

24     But, you know, more -- more generally with respect to --

25     to -- to Section 2 districts, I think, you know, there's

1    a good argument that there should be a Latino district in

2    the Dallas County region.

3         You know, there was a lot of talk about

4    how -- how -- the size of the Latino community in the

5    Dallas-Fort Worth area.  It's about 1.7 million.  In

6    fact, there are more Latinos in Dallas and

7    Tarrant counties alone than the entire state of Colorado

8    or New Mexico.  Right, and so, you know, it is just a

9    gigantic population that just right now does not have

10   representation, and I think, maybe at a tipping point,

11   but Ms. Perales probably is in a better position to

12   address that.

13        SENATOR ZAFFIRINI:  So specifically in what

14   county or area do you believe we should have a coalition

15   district or Latino opportunity district?

16        MR. LI:  I think Dallas is -- is one that many

17   people have flagged.  You know, there is not Latino

18   representation north of, I guess, your district here.

19   You know, and -- and so, you know, again, North Texas has

20   a very large Latino population and growing, and so that's

21   an area I think, you know, Senate District 10 looks a lot

22   like a coalition district, and I think that that's

23   something that I think will -- you know, needs to be

24   looked carefully into, you know, given the -- you know,

25   so I think that that's the case.  And then I'd also -- as

1    was mentioned, I'd look in the Fort Bend area, which has

2    become incredibly diverse.  You know, there -- you know,

3    I think that's an area that needs to be looked at very

4    closely.  I have not done that, but, you know, it's an

5    area just given the growth, you know, I don't think you

6    can go in and put blinders on and just pretend like, you

7    know, you're not considering race at all.  I think, you

8    know, that you have an obligation knowing what the growth

9    is to investigate.

10           SENATOR ZAFFIRINI:  Thank you.  Thank you,

11   Mr. Chairman.

12           SENATOR HINOJOSA:  Senator Huffman.

13           SENATOR HUFFMAN:  Thank you, Mr. President.

14   Thank you very much for being here, Mr. Li, and adding

15   your opinions to this process.  I have just a couple of

16   questions based on your testimony and your handout.

17   First of all, I see one of the highlighted areas of your

18   testimony says the need to consider race in

19   redistricting, and you testified to that today.  How do

20   you square that or is it your testimony that we should

21   disregard the Supreme Court races which prohibit

22   race-based districting unless we are shown a strong basis

23   and evidence to believe that a race-based redistricting

24   is required to comply with the Voting Rights Act,

25   Section 2?

1              MR. LI:  Well, you know, I'm not sure that the

2    Supreme Court has said that you can't consider race.  In

3    other words, I think you -- what I am saying is that, you

4    know, there are lots of places on the map where there

5    could be Section 2 liability.  It's important to

6    investigate that in a searching and nuanced way, and

7    ideally publicly and transparently.  Like, you're getting

8    a lot of advice from the attorney general's office about

9    your obligations.  It would be great if that were made

10   public because this is not an issue, of course, just of

11   concern to you, Senator Huffman, but of concern to the

12   people of the state, and so making that public, for

13   example, perhaps waiving the attorney-client privilege

14   and allowing the attorney general's office to come here

15   and tell you what they told you about Senator District 10

16   and liability under the Voting Rights Act would be a

17   great service to the state so --

18              SENATOR HUFFMAN:  Well, as I've stated very

19   clearly, these maps were drawn blind to race and then I

20   consulted with the attorney general's office, and they

21   gave me legal advice as to whether or not I had -- I

22   complied with the Voting Rights Section 2.  That's what

23   we've done.  We invite anyone because the data that they

24   used is completely open to the public.  We invite anyone

25   to submit alternative maps.  Do you have a map you'd

1    would like for us to consider here today?

2           MR. LI:  I do not.

3           SENATOR HUFFMAN:  Okay.  Well, anyone who

4    wants to submit one, we will certainly consider it, and

5    we'll also get a legal opinion on it as well.  Also, I'd

6    like to -- in your testimony you referred to a Fifth

7    Circuit 1988 case, Campos v. City of Baytown, correct?

8    Is that what you were referring to?

9           MR. LI:  Yes.

10          SENATOR HUFFMAN:  Yes.  How do you -- and you

11   suggested that it authorized or required crossover

12   coalition districts.  How do you square that with the

13   Bartlett case, which is the United States Supreme Court

14   2009 Bartlett v. Strickland, which made it clear that the

15   Voting Rights Act does not require the creation of

16   coalition or a crossover district?

17          MR. LI:  I think I would disagree with you

18   about what Bartlett was about.  Bartlett was about

19   crossover districts.  In other words, where voters are

20   able to elect with support from White voters.  That's a

21   crossover district.  A minority coalition district is

22   where two or more minority groups are politically

23   cohesive.  So in Texas, to give you -- for example, Black

24   and Latino voters, you know, or in Fort Bend County, it

25   might be Black, Latino, Asian voters might be politically

1    cohesive and so, you know, Bartlett is a case out of

2    North Carolina.  It did not involve other non-White

3    groups.  It was a case about --

4            SENATOR HUFFMAN:  Well, I believe that

5    Bartlett specifically states that nothing in Section 2

6    grants special protection to a minority group's rights to

7    form political coalition.  Do you agree with that?

8            MR. LI:  Again, I think that is talking about

9    White voters in this case.  It is not, you know --

10           SENATOR HUFFMAN:  And, of course, there are

11   many legal scholars that would disagree with you on that.

12   Would you agree?

13           MR. LI:  I don't think that that is really

14   where the law is currently, and it certainly not -- well,

15   I -- I don't think that that's where the law is.  If that

16   is the advice that you're getting from the attorney

17   general's office --

18           SENATOR HUFFMAN:  No, I am getting it from the

19   Supreme Court of the United States of America.  So I just

20   politely disagree.  Thank you very much for answering my

21   questions.  I appreciate it.

22           SENATOR HINOJOSA:  Senator Powell.

23           SENATOR POWELL:  Thank you, Mr. Chairman.

24   Mr. Li, did you have the opportunity to analyze the map

25   that was dropped at about 9:00 last night?  I would

1    assume maybe not since your testimony was really about

2    packing Johnson County and Parker counties into the

3    district.

4             MR. LI:  I, unfortunately, finished my

5    testimony before and was having a very nice dinner when

6    the maps dropped last night.  You know, so I've looked at

7    them a little bit, but not too much, so you know, I --

8    I -- I know that it does not make any changes to the

9    cracking of Latino and Asian and Black communities in

10   Tarrant County.  It doesn't make any changes at all to

11   the configuration of the district between Plan S2101 and

12   Plan S2108 in Tarrant County.  The district does become a

13   little bit more Anglo just by about like half a point or

14   so, but there are no changes to the cracking of minority

15   communities in Tarrant County.

16            SENATOR POWELL:  I would agree.  It puts us at

17   a little bit of a disadvantage to be able to talk about

18   it at length when we have had very little opportunity to

19   analyze it, but let's -- let's continue on.  I want to

20   continue this discussion about crossover districts.  And

21   also to continue this discussion under Bartlett versus

22   Strickland.  Would you agree that the court stated that

23   dismantling currently performing crossover districts

24   would raise serious questions under both the 14th and

25   15th Amendment.

1      MR. LI:  Yes.  And to Senator Huffman's point

2   about this, you know, there is a difference between the

3   obligation to create a crossover district, which Bartlett

4   says you don't have an obligation to create a crossover

5   district and intentionally dismantling one, right?

6   That -- that, as the Supreme Court said, would said raise

7   serious red flags.

8      SENATOR POWELL:  And I can see by your

9   testimony today that you are pretty familiar with

10   Senate District 10 as it stands today.

11      MR. LI:  Not as familiar as you are, but

12   familiar.

13      SENATOR POWELL:  So do you believe after your

14   analysis of it, do you think it's currently performing as

15   a crossover district?

16      MR. LI:  With the caveat that I have not done

17   sort of a full-on analysis, you know, I think there are

18   lots of signs that it is a performing -- either it's a

19   performing coalition district or a performing crossover

20   district, but, you know, that -- you know, so yes.

21      SENATOR POWELL:  And do you believe that the

22   proposed configuration, and I guess the most recent one

23   that we've seen in SD10, prevents our current minority

24   groups in SD10 from electing their candidate of choice?

25      MR. LI:  I think that almost certainly would

1    be the case for -- for minority voters in the current

2    version of SD10, who, again, mold a huge percentage of

3    the minority voters in Tarrant County are in SD10.  They

4    are fractured apart among, I think, three senate

5    districts, at least in the earlier version of the map.

6    It may be more in the new version.  And, you know, I

7    think, you know, there's almost -- there's almost no

8    question that they would lose the ability to elect.

9              SENATOR POWELL:  And do you think under

10   Bartlett that this would be a violation of the 14th and

11   15th Amendments?

12             MR. LI:  I think that there are serious

13   concerns about whether there would be intentional

14   discrimination in that, you know, even if you don't look

15   at race.  You know, just the way that the cuts are done,

16   you know, it raises, you know, a lot of signs that, you

17   know, people are targeting communities of color.

18             SENATOR POWELL:  Thank you.  And we've

19   mentioned it here already today, but in 2012 the

20   D.C. District Court ruled that dismantling SD10 was

21   intentional racial discrimination.  Texas abandoned this

22   legal case, and the courts ordered the state of Texas to

23   pay over a million dollars in attorney's fees.  Can you

24   explain what that means for the process here today?

25             MR. LI:  Well, the fact that Texas was ordered

1    to pay attorney's fees means that the plaintiffs in that

2    cases, Senator Davis, at the time and others were the

3    prevailing parties, in other words, that they sort of won

4    because you don't get attorney's fees unless you are the

5    prevailing party.  So it's a recognition of the courts

6    that they -- they won.

7              SENATOR POWELL:  All right.  Mr. Li, thank you

8    so much for your testimony today.

9              SENATOR HINOJOSA:  I just have a follow-up

10   question just a point of clarification.  I guess under

11   the Bartlett versus Strickland case, it was addressing

12   crossover districts and not dealing with minority

13   coalition districts?

14             MR. LI:  That is correct.  It was in

15   North Carolina where, you know, unlike Texas there isn't

16   sort of a large, you know, other (indecipherable).  It's

17   becoming more diverse, but, you know, the -- the -- the

18   primary ethnic breakdown there is between Black and White

19   voters.

20             SENATOR HINOJOSA:  I think there are no

21   further questions.  Thank you very much for your

22   testimony.

23             MR. LI:  Thank you.

24             SENATOR HINOJOSA:  Next we have

25   Mr. Robert Notzon, Legal Redress Committee chair for the

1    Texas National Association for Advancement of Colored

2    People and NAACP.  So please just identify yourself, who

3    you represent and then you may proceed.

4                MR. NOTZON:  Thank you, Chairman.  As you

5    stated, I'm Robert Notzon.  I'm an attorney.  I'm the

6    Legal Redress Committee chairman for the Texas NAACP.

7    Thank you for allowing me to be here.  Our president and

8    national board member, Mr. Gary Bledsoe, couldn't be here

9    because of his litigation schedule.  The opposing counsel

10   just wouldn't let him off.  So I got tapped to -- to show

11   up, and I'm happy to be here.  I've been involved in

12   redistricting representing the NAACP since 2001, and I've

13   been with the agency as a legal redress chair since the

14   '90s.

15               We are terribly -- of course, I don't want to

16   go too long because I want to be respectful of everyone's

17   time.  NAACP, just to put it bluntly, is the largest and

18   oldest civil rights organization in the United States

19   and -- and we have a long career and history fighting for

20   the rights of people of color, be it African American,

21   Latino, Asian.  We -- we don't discriminate on people of

22   color.  Of course, we were started because of the massive

23   number of lynchings that were happening in the

24   United States back in 1909 and onward and in Texas since

25   1919.

1      We are, to put it bluntly, horribly frustrated and

2    disappointed but not surprised in the way in which the

3    White dominant political power in Texas is trying to

4    retain and expand their political power at the expense of

5    minority voters and minority citizens in Texas.  When I

6    say again, I'm talking about not just decades but

7    generations of consistent illegal, racist, racially

8    biased behavior.  And the standard techniques are being

9    employed again in this round of redistricting, the

10   packing, the cracking, the lack of visibility, hidden

11   advice from the attorney general as Mr. Li had requested

12   not be the case, and it is up to the -- each individual

13   politician to -- to make that call and to make it a

14   matter of public knowledge.  But -- and, of course, the

15   maps just came out recently.  I am not here to talk about

16   the entire map of the state of Texas which we will be

17   prepared to talk about if and when -- I say when, because

18   it's never if.  We always have to sue the state of Texas

19   for the rights of minority voters in Texas and we expect

20   it's going to happen again just because Texas doesn't

21   seem to be able to help itself to stop that racial

22   discrimination.

23       So I -- let's -- let's talk about packing as one of

24   the techniques that's allowed to be shown with just

25   numbers without actually looking at a map so much.  But

1    if you look at the numbers of the citizen voting-age

2    population, and, of course, right now the proposed maps

3    have on the White majority political party has 21 of the

4    31 -- no, 20 of 31 districts and 11 for the racial

5    minority-majority party.  And of those 11, 4 have over

6    80 percent citizen voting-age population in those

7    districts, over 80.  There are zero of the White party,

8    the White dominant party.  On 70 -- over 70 percent,

9    there's 4 citizen voting-age populations with minority

10   voting age over 70 and only 3 on the White side.  When

11   you get to over 60 percent, it's 1 of the citizen

12   voting-age population of minorities have those districts,

13   whereas, it's 12 on the White majority party.  And then

14   the last is over 50 percent where there's 2 of the

15   districts that are over 50 percent minority and 5 on the

16   White majority party.  The vast difference in the way in

17   which those racial breakdowns go shows evidence

18   right -- just right there of packing.  There's just no

19   reason why when 80 percent of the increased population

20   comes from minority increases that you're going to pack 4

21   districts -- well, 8 districts with over 70 percent of

22   the population when it's not required to have a

23   performing district.  That's just critical.

24        On the cracking side, you can't really show that

25   with numbers.  You have to look at the map and in looking

1        at what happened there in Dallas and Tarrant counties

2        where those -- and this happens in Harris County and also

3        in Travis County and Bexar County, where the strong,

4        cohesive, racially minority communities are drawn and

5        taken out -- as it's already been stated by Mr. Garcia

6        and Mr. Li, taken out to the rural areas, the

7        predominantly White areas and they are cracked.

8             What's interesting is, of course, this -- this

9        effort by the White majority party to say we're not

10       looking at race.  We didn't look at race at all when we

11       drew the map.  That is what we refer to in the legal

12       parlance as circumstantial evidence of discrimination.

13       We don't think that the White majority is going to be

14       stupid and say, yes, we did this with an intent to

15       racially discriminate.  That's not going to happen, but

16       that's what happens every time that Texas redistricts.

17       They intentionally discriminate against the minority

18       population to maintain or expand power for the White

19       majority party.  And I keep saying White majority party,

20       just so everybody knows because it was the democrats that

21       were doing it several decades ago, right?  It's not just

22       republican or democrat and -- and we're a nonprofit

23       organization.  We do not have a political affiliation.

24       It's a shame that the republican party doesn't do more to

25       try to research out to racial minorities to -- to garner

1    their support.  It just doesn't happen, and they've drawn

2    those lines.

3         But when -- if the majority party says we didn't

4    look at race, as Mr. Li was saying, well, that's --

5    that's essentially meaningless in Texas when the

6    majority -- the vast majority of the voters are racial

7    minorities.  So you say I didn't look at it, but when you

8    know as a republican legislator and the majority White

9    party in power, you know that the majority of those

10   voters are racial minorities, and you reach in there even

11   if you don't know -- even if you claim to not know where

12   those racial minorities are living in Tarrant County and

13   Harris County and Dallas County.  You claim to not know

14   that and claim to not understand that or consider that

15   when you're drawing the map and all you have to do is

16   click a button, but you actually represent those areas or

17   the people that you work with represent those areas and

18   they know who lives there.  Even disregarding all of

19   that, just knowing that the majority of the people in

20   that party are racial minorities, to not consider their

21   race is to intentionally discriminate because you are

22   there -- therefore assuming that all democratic voters

23   have the same interest.  All democratic voters are voting

24   for a democrat because of that reason that they are a D

25   instead of an R, and that just simply isn't the case.

—93—

1     And that isn't the case that when it's considered in --

2     in lawsuits related to redistricting.  You have to look

3     at the people.  You have to look at their communities.

4     You have to look at whether or not they have the same

5     interests, whether or not they live near each other,

6     across the street from each other.  That's -- that's the

7     kind of things that are looked at, but when you -- when

8     you try to take this pretextual position that you didn't

9     look at race when you drew these lines, that is simply

10    hogwash and it won't hold.  And so we are here to say

11    stop discriminating.  Take account of people's interests.

12    Stop disregarding democracy for intentionally

13    discriminating against these citizens in Texas.  They

14    deserve equal -- equal participation.  They deserve an

15    equal vote.  They deserve to have their political power.

16    There is no reason why that with almost 50 percent of the

17    population, they only have 40 percent or less of the

18    political power just on this map.

19        And I am sorry, I'm only here talking about SB4.

20    That was all I was able to prepare for.  I wasn't able to

21    prepare for the State Board of Education map, and I

22    apologize for that.  But I would reserve the Texas NAACP

23    rights to talk about those other issues if and when we

24    are given the opportunity.

25        SENATOR HINOJOSA:  Thank you.

1   Senator Zaffirini.

2           SENATOR ZAFFIRINI:   Thank you, Mr. Chairman.

3   Thank you, sir, for being with us today.   What steps

4   would you recommend the AG to take when analyzing

5   proposed maps for compliance with the Voting Rights Act?

6           MR. NOTZON:   Look at where the population

7   growth happened.   Look at who deserves the additional

8   representation.   Look at where things are beforehand and

9   just because they existed before doesn't mean they're

10  right or that they're legal or that they're the best way

11  for the state of Texas to go forward.   What do the

12  people -- what do their voices ask for?   What is the

13  representation they're seeking.   That's what -- that's

14  what I think they should look at.   And, as Mr. Li had

15  suggested, do it out in the open and -- and let -- and

16  let us speak.   I mean, we're given an opportunity to

17  speak on this, but we're not given adequate time to

18  prepare.   We're doing our best given the information that

19  we had and the time that we have to prepare, but there

20  needs to be more inclusion in the public input in this

21  process.

22          SENATOR ZAFFIRINI:   Thank you.   Are there any

23  specific districts in the proposed map you believe need

24  to be amended to ensure Black Texans have adequate

25  representation in the senate?

1          MR. NOTZON:  I don't know that I'm prepared to

2      talk about all the districts that negatively impact Black

3      voters, but you remind me, Senator Zaffirini, of -- of

4      one more piece of evidence, circumstantial evidence of

5      why race is taken into account.  The White majority party

6      states circumstantially, protectionally that it didn't

7      include race as part of its map drawing, but they're very

8      good at attacking the White democrats.  That the --

9      the -- the elected official, not the -- not the voters.

10     And, of course, the important part, although the race of

11     the elected official has some role to play and some

12     information for the voter and for the courts to determine

13     whether or not discrimination is occurring, it's the

14     voter and the voter's interest and the voter's voice

15     that's important here.  So if -- and -- and SD10, you

16     know, to take away someone who won and -- and was the

17     candidate of choice of the minority voters in that

18     district as it currently exists and to eradicate it and

19     then also SD16 to change that district from what it was

20     to only retaining maybe 40 percent of the prior district,

21     you know, it's -- it's not okay that they're a White

22     elected official, therefore, it couldn't be racist, or

23     therefore it couldn't be racially based, when it's the

24     voters that are being harmed.  So, you know, I think

25     that's one more piece of evidence, circumstantial

1    evidence, that race, in fact, was taken into account

2    because they can studiously attack the White democratic

3    elected official but not the Hispanic or Black or Asian

4    elected official.

5          SENATOR ZAFFIRINI:   Thank you.   Currently we

6    have 11 Hispanic senators.   You heard President Domingo

7    Garcia of LULAC say that we should have 11 Hispanic

8    senators, most are all of whom probably would be Mexican

9    American, Hispanics.   Do you have a similar number for

10   African Americans and how many African American senators

11   we should have?   We currently have two, of course.

12         MR. NOTZON:   I don't have an answer for that,

13   Senator Zaffirini.   I think that there ought to be 15, 14

14   at least senators of -- that are selected by voters of

15   color in Texas because that's where the numbers are.   I

16   think it's -- it's inexcusable, especially when you are

17   packing so many districts with voters, to have it be 11

18   or less.

19         SENATOR ZAFFIRINI:   When you say 14 or 15 of

20   color, what minorities are you including?

21         MR. NOTZON:   I'm including Black, Hispanic,

22   and Asian and whether it be individually or in a

23   coalition.

24         SENATOR ZAFFIRINI:   Thank you very much.

25   Here's a softball for you.   If Senator Miles or

1    Senator West were here, what question would they ask you

2    that I have not asked?

3              MR. NOTZON:  I have not talked to them, so I

4    don't know, so that makes it easier for me to -- and,

5    actually, I haven't even talked to President Bledsoe.

6    That's how much he loves and trusts me.  So I don't know

7    the answer to that.  I would think it would be why -- you

8    know, what -- just the same question you asked me.  What

9    should the White party in power be doing to correct what

10   they're doing and what they have been doing for

11   generations.  And I think I answered that.

12             SENATOR ZAFFIRINI:  Thank you, sir.

13   Thank you, Mr. Chairman.

14             SENATOR HINOJOSA:  Thank you,

15   Senator Zaffirini.  Senator Paxton.

16             SENATOR PAXTON:  Thank you, Mr. Chairman.  And

17   I thank you for being here and for your testimony today.

18   I'm doing my best to quote, but I am sure it's a little

19   bit paraphrased, from your testimony a little earlier.

20   It's a shame that the republican party doesn't do more to

21   reach out to minority communities.  It just doesn't

22   happen.  What's your basis for that very black-and-white

23   statement, it just doesn't happen?

24             MR. NOTZON:  My experience.

25             SENATOR PAXTON:  Do you know me?

—98—

1          MR. NOTZON:  Do I know you?  No, I've never

2     met you.

3          SENATOR PAXTON:  I beg to differ.  And I think

4     it is quite an offensive statement to me and in my

5     district that has a large growing Asian community,

6     Indian community, Hispanic community, Black community to

7     hear you say it just doesn't happen when it does happen.

8     That's from my experience.

9          MR. NOTZON:  What percentage of those voters

10    of color get your -- vote for you?

11         SENATOR PAXTON:  That will be seen in the next

12    election.

13         MR. NOTZON:  Would it be a majority or less

14    than a majority?

15         SENATOR PAXTON:  I can say -- I can tell you

16    that in Plano we had an Asian candidate that is one of my

17    supporters that almost won the mayors race that has been

18    a city council person.  We have actually Hispanic

19    republican club, an Asian republican club, African

20    American republican club.  And this is a little bit off

21    topic, I realize.  I just -- you know, one of the things

22    I learned a long time ago is that it's a dangerous thing

23    to say always or never, sir, when you're testifying to

24    make a statement like it just doesn't happen, as if you

25    know.  I think it would be wise for you to reconsider

1       your belief in an area like that, to speak as if you

2       actually know something like that.  It just doesn't

3       happen.

4                   MR. NOTZON:  Well, I'd be happy to amend my

5       testimony if, in fact, you have been voting for issues of

6       voters of color in your district or in the state of Texas

7       to any great degree.  So we'll leave it there.

8                   SENATOR PAXTON:  All right.  So you stand by

9       it just doesn't happen?

10                  MR. NOTZON:  In terms of real reaching out, in

11      terms of real effort to obtain and understand and promote

12      and correct the problems of voters of color have in the

13      state of Texas, yes, I do.

14                  SENATOR PAXTON:  So I guess reconsidering that

15      you might not know everything is something that just

16      doesn't happen.

17                  MR. NOTZON:  I -- I surely don't know

18      everything.

19                  SENATOR PAXTON:  Thank you.

20                  SENATOR HINOJOSA:  Okay.  Thank you very much,

21      Mr. Notzon, for your testimony.

22                  MR. NOTZON:  Thank you, Chairman.

23                  SENATOR HINOJOSA:  Next, we have Kathryn Oler,

24      President, Legal Women Voters from the Corpus Christi

25      area.  Identify yourself, who you represent and then you

1     may proceed.

2          MS. OLER:  Thank you.  Good afternoon,

3     Chairwoman Huffman, Vice Chairman Hinojosa, and members

4     of the Texas Senate Special Committee on Redistricting.

5     My name is Kathryn Oler.  I live in Corpus Christi,

6     Texas, Senate District 20.  Today I'm speaking as the

7     president of the League of Women Voters Corpus Christi

8     area against SB4.  I thank you for this opportunity.  As

9     you may know, the League -- as the League, we are

10     nonpartisan, and we support issues, not parties or

11     candidates.

12          In 2016, the Flint, Michigan, water crisis

13     erupted and sent waves across the nation including

14     Corpus Christi.  Now, I know this topic is not what most

15     of the presenters at this time have talked about.  This

16     is something very local.  It's something very personal to

17     the citizens of District 20.  At the time, 2016,

18     Corpus Christi, too, had a history of water issues,

19     bacteria contamination, low disinfectant levels.  We

20     thought was it possible that our drinking water could

21     also have lead issues.  Our league is familiar with the

22     idea of issues.  They are the basis for all of our

23     advocacy.  So members voted to make this issue a focus of

24     a grassroot community study potential for lead

25     contamination in our community's drinking water.  Our

1       study was local, but now many other counties in Texas
2       have similar lead issues.  For several years, we gathered
3       information on lead poisoning, looking at all sources of
4       lead in homes, at water quality regulations and incidents
5       of lead poisoning.  What we discovered was that overall
6       our city's water system was in pretty good shape.
7       However, there are data gaps that impede further
8       investigation, analysis, and remediation of lead in
9       drinking water.
10              For instance, survey records for every water
11      service line particularly in older neighborhoods don't
12      exist.  This is, again, not unique to Nueces County.  We
13      also learned that the EPA threshold level of lead in
14      drinking water, which most water systems use, is three
15      times higher than the health-based FDA standard for
16      bottled drinking water.  Through open records request, we
17      discovered which zip codes in Nueces County had the
18      highest number of cases of lead poisoning in children and
19      focussed on those areas.  What we found is that over
20      50 children per year ages zero to six years were being
21      diagnosed with elevated blood levels.  Updated data after
22      we completed our study indicates that this trend
23      continues.  There is no safe level of lead in blood.  And
24      those most at risk are infants, young children, and women
25      of childbearing age.  Leads cognitive effects on infants

1    and children are devastating and irreversible.

2        Many of the identified zip codes have older

3    subdivisions built before lead was banned in drinking

4    water pipes and lines.  Many of these older neighborhoods

5    are home to people of color, lower economic status, and

6    the elderly, communities historically overlooked and

7    disenfranchised.  It is critical to keep these

8    communities most affected by lead contamination intact so

9    that their voices are heard and not brushed aside.  It is

10   vital for their health and well-being to advocate for

11   remediation.  It is critical that they receive

12   information about lead exposure and simple inexpensive

13   tips for lessening their risk of exposure.  It is

14   critical that existing water codes are enforced and new

15   ones implemented to protect children and women.  And it

16   is vital to seek government support in addressing this

17   issue.  The 87th legislative session here budgeted

18   7,100,000 for testing drinking waters in schools and

19   daycare centers.  This is a start.

20       Last month the United States Senate passed its

21   bipartisan infrastructure bill.  It includes a

22   $15 billion allocation to fund lead pipe removal, half of

23   what low estimates for the cost of this removal

24   nationwide are.  How this funding is spread out across

25   the nation is in the hands of the people we elected to

1  represent us.  The people who are now drawing our map.

2       The proposed map for District 20 splits

3  Nueces County in half, which we believe will dilute the

4  voices of the communities of interest most impacted by

5  lead contamination and water whether this is through

6  gerrymandered, socioeconomic, racial, or other priorities

7  between districts within the same county lines.  We need

8  our legislators to draw fair maps that keep our county

9  intact so that our efforts to address this issue locally

10  are not dealt a losing hand.  It is imperative that

11  communities of interest, of color, lower socioeconomic

12  status, and the elderly are not marginalized and not

13  diluted.  It is imperative that the voices of women and

14  children are heard.  The ones most affected, not muted,

15  not overlooked, not left on the table.  It is inhumane

16  that they could be on the wrong side of the street for

17  addressing this egregious issue in the same county, in

18  the same city because unfair and unjust districting drew

19  a line down the middle of their streets.

20       We appreciate this opportunity to share our story.

21  We will save our thanks for when you deliver fair maps

22  that address this issue.

23       SENATOR HINOJOSA:  Thank you very much for

24  your testimony.  And as you well know, in Corpus Christi

25  which I represent, you probably rather keep the

1     Corpus Christi, Nueces County area in intact?

2                    MS. OLER:  Yes, sir.

3                    SENATOR HINOJOSA:  And in the past trying to

4     address some of these issues from buried pipes, lead

5     contamination and, you know, refineries.  Who have

6     beautiful beaches, but at the same time it really takes a

7     joint effort from the community, not only the community

8     leadership but also the public officials from mayor,

9     county judge, or legislators and congressional folks.

10                    MS. OLER:  Indeed, it does, Senator.  It

11    takes -- you know, it takes a team working diligently to

12    see that things happen and that these -- these issues --

13    particularly lead and its damage, and there's 20 percent

14    of lead poisoning comes from water.  And for infants who

15    are nursing or bottle fed, that can be as high as 40 to

16    60 percent.

17                    SENATOR HINOJOSA:  And you don't want the

18    voices to speak on behalf of the community to be split to

19    other possible officials who may not be as familiar as we

20    are with some of the issues that are very challenging to

21    our families in the Corpus Christi area?

22                    MS. OLER:  Absolutely.  Absolutely.

23                    SENATOR HINOJOSA:  Senator Zaffirini would

24    like to ask you some questions.

25                    SENATOR ZAFFIRINI:  Yes.  Thank you,

1    Mr. Chairman.  Ma'am, don't you think it would be some

2    advantage to Nueces County being represented by two

3    senators?

4              MS. OLER:  I think, again, it's about

5    cooperation.  And what we have intact, we have, I think,

6    a person who can speak for us particularly in the senate

7    district.  This also means that they get undivided

8    attention because most of these -- or both, District 20

9    and I believe it's 27, Senator Lucio, that their primary

10   populations are further south in the Rio Grande Valley,

11   and so I don't -- I won't say that we are an afterthought

12   because that's not true, but I think that the divided

13   effort to get this initiative going to make sure that

14   whatever money is available that can address this really

15   important health factor in Nueces County.

16             SENATOR ZAFFIRINI:  Thank you.  My

17   understanding is that Nueces County has a very strong

18   community of interest with surrounding counties

19   including, for example, San Patricio, Bee, Live Oak, and

20   McMullen.  What others counties -- or do you agree with

21   that assessment, first of all?

22             MS. OLER:  It's a very close connection

23   simply, you know, because of the port that's there, the

24   fourth largest in tonnage in the United States and

25   because of the petrochemical industry that is there and

1    continues to grow.  And particularly with San Patricio, I

2    think it's very, very important, that connection, I mean,

3    we are next door neighbors.  There -- because of the

4    tremendous growth that has happened particularly in

5    San Patricio County, housing, you know, has really sprung

6    up, and so there is -- there is -- it's burgeoning there

7    in terms of the population, although that's not

8    necessarily reflected in the growth, 13 percent, I

9    believe, around 13 percent growth in population over the

10   last decade, which -- although I -- it makes me wonder if

11   that was undercounted because of all of that, the growth

12   in those industries that brought people in.

13            SENATOR ZAFFIRINI:  I see.  So if you were

14   drawing this map, with what counties would you link

15   Nueces County?

16            MS. OLER:  Those that have that -- that share

17   similar interests.

18            SENATOR ZAFFIRINI:  Specifically?

19            MS. OLER:  Specifically, primarily -- first

20   and foremost being a coastal community.  There are issue

21   that coastal communities experience that those further

22   inland don't, particularly those that are further afield.

23   We know -- you know, when we look at what is your

24   foundation?  What is your bedrock?  Well, in

25   Nueces County and other coastal communities, it's

1    certainly not something like limestone.  It's sand and

2    it's clay and, of course, water.  I mean, those are

3    defining factors of the environment that shapes those

4    communities -- those coastal communities.

5            SENATOR ZAFFIRINI:  But you don't have any

6    counties to name?

7            MS. OLER:  You know, if we were to go further

8    south, I think that's certainly not more inland.  It's

9    really -- in this current map, it has a small corner of

10   San Patricio, and that's it, that's included in

11   District 20.  That seems a very small snippet to -- to

12   remove from that relationship with the greater part of

13   San Patricio.  Keeping -- you know, keeping,

14   Nueces County intact, I guess we have to say we were

15   flabbergasted by having it broken apart because we felt

16   like it -- you know, it had good representation, and it

17   had commitment from city officials and county officials

18   to -- to work hard to make Nueces County -- make it and

19   guide it -- in -- in staying the very vibrant county that

20   it is, the very vibrant city that Corpus Christi is, with

21   Corpus Christi being the largest city in -- in the

22   South Texas region.

23           SENATOR ZAFFIRINI:  Thank you.  I know you

24   have a very excellent senator who represents you, very,

25   very aggressively and effectively.

—108—

1          MS. OLER:  We do.

2          SENATOR ZAFFIRINI:  Thank you, ma'am.

3    Thank you, Mr. Chairman.

4          MS. OLER:  Thank you.

5          SENATOR ZAFFIRINI:  Thank you.

6          SENATOR HINOJOSA:  Just a quick point.  The

7    county -- the map as proposed does not split

8    Nueces County in half.  It takes about 17 percent to

9    allow a sliver to go up north to San Patricio.  But we as

10   a committee appreciate you making time to travel from

11   Corpus Christi to come and testify before the committee,

12   and we appreciate your comments.

13         MS. OLER:  Thank you very much.  We do

14   appreciate the opportunity.  I know this was a little bit

15   different because it's about a specific issue, but one,

16   as I said, that applies to many, many other counties in

17   the state of Texas.  Thank you again.

18         SENATOR HINOJOSA:  Thank you.  Next we have

19   Nina Perales, vice president of litigation, Mexican

20   American Legal Defense and Educational Fund, known as

21   MALDEF.  Just identify yourself, who you represent and

22   then you may proceed.

23         MS. PERALES:  Thank you very much.  Before I

24   begin, I have written testimony for the committee that my

25   colleague Ms. Fatima Menendez is providing now.

1          SENATOR HINOJOSA:  It will be passed out by

2     the clerk.

3          MS. PERALES:  My name is Nina Perales.  I'm

4     the vice president of litigation for MALDEF, the Mexican

5     American Legal Defense and Educational Fund.  I'm not

6     going to spend a lot of time -- good morning to the

7     committee members.  I'm not going to spend a lot of time

8     going over what is in my written testimony, but I will

9     touch on those points briefly and then address three

10    issues that have come up during the discussion with

11    witnesses who preceded me.

12         My testimony today is intended to assist the

13    committee in adopting redistricting maps that comply with

14    the Federal Voting Rights Act and the U.S. Constitution.

15    The committee has already heard extensively regarding

16    Latino population growth in Texas over the past decade.

17    Texas population increased by just about 4 million

18    people.  Latino -- the Latino share of that was about

19    50 percent, so half of the growth in Texas is Latino.  By

20    contrast, this almost 2 million Latino growth was

21    accompanied by a growth in the Anglo population of less

22    than 200,000.  And the Anglo population contributed to

23    only 5 percent of Texas population growth over the past

24    decade.  Latinos are almost the most significant

25    component of Texas's expanding electorate.  Among those

1    turning age 18 last year in Texas, just under half were

2    Latino young individuals.

3           I'd like to make a point that wasn't made by other

4    witnesses today which is that some of what we are seeing

5    in our examination of census data suggests that there was

6    a significant undercount in the Latino community in

7    South Texas and in other places.  My written testimony

8    explains this a little bit more.  But the short version

9    is that when you look at the American Community Survey,

10   which is the U.S. Census Survey that provides estimates

11   of all population, we see that places where Latinos are

12   the most numerous have an unexpected 2020 census count

13   compared to the American Community Survey.  The American

14   Community Survey is older.  It's from earlier in time.

15   It should lag behind 2020 census results particularly in

16   places where Latinos are living.  And, unfortunately,

17   what we are noticing in the data is that in places, for

18   example, like South Texas, two-thirds of the counties in

19   South Texas population is lagging behind ACS.  So the

20   2020 census numbers are lagging behind the ACS instead of

21   the other way around.  That is also true for 8 of the

22   14 counties in Texas that touch the U.S. Mexico border.

23   If you look at the other end where the 2020 census is far

24   outstripping ACS, none of those top 15 counties are

25   Latino.

—111—

1          Why does this matter?  Why does an undercount

2     matter.  Obviously, it matters a lot for the communities.

3     It has a lot to do with receiving resources from the

4     government.  But particularly with respect to

5     redistricting, we believe that this evidence of an

6     undercount suggests that if you are drawing Latino

7     majority districts or Latino districts -- districts in

8     areas where Latinos are very numerous, it may make sense

9     to tolerate a greater degree of under population as to

10    the ideal than, for example, in another area.  So I

11    wanted to make that point for you.

12         Specifically with respect to the Senate Map S2108,

13    that is the senate map that was released last evening.

14    We spent a great deal of time last night and the wee

15    hours of the morning examining the map.  We don't have a

16    completed analysis, but we do want to note a concern

17    regarding Senate District 19.  Senate District 19 sees a

18    decrease in its Latino voter registration from

19    54.6 percent to 49.9 percent.  That is a concern when you

20    have a significant drop in Latino voter registration.

21    This reduction is not accompanied by an increased Latino

22    opportunity elsewhere in the region such as the creation

23    of a new Latino opportunity senate district in

24    South Texas.  So that makes it even more concerning that

25    there's this drop in Latino voter registration.

1          Finally, proposed Senate District 19 is also

2     extremely non-compact without an apparent justification.

3     I have a couple of points related to the State Board of

4     Education map, which I don't believe any previous

5     witnesses have addressed, and that is a concern regarding

6     District 3 in the proposed plan.  District 3 in the

7     proposed map reduces Latino voting strength.  It

8     decreases Spanish earning voter registration from

9     60 percent to less than 50 percent.  It also decreases

10    Latino voter turnout for the 2020 general election from

11    56 percent to 44 percent.  The proposed District 3 also

12    decreases the vote share of Latino candidates by an

13    average of 7 percentage points.  For example, the vote

14    share for candidate Lupe Valdez in the 2018 governor's

15    race dropped from 57.4 percent, which most incumbents

16    would acknowledge is a fairly healthy number, to only

17    50.8 percent for Lupe Valdez in that district.  I don't

18    believe a 50.8 percent win is something that anybody here

19    would be comfortable with for themselves.

20          Latinos and other people of color have lead the

21    effort for fair redistricting in Texas.  My client, the

22    Texas Latino Redistricting Task Force, won a number of

23    important rulings from the courts related to the 2011

24    redistricting plans; and prior to that in an earlier

25    decade, MALDEF'S clients also won a decision -- in both

1    of these cases, they were decisions of the U.S. Supreme

2    Court.  In 2006, a decision from the U.S. Supreme Court

3    that congressional District 23 violated the Voting Rights

4    Act; and in 2018, we secured a decision from the

5    U.S. Supreme Court that Texas had unconstitutionally

6    racially gerrymandering a district in Tarrant County.  We

7    urge you not to repeat the mistakes of the past.

8         I have three final points related to the discussion

9    of today.  First, creating so-called race-blind maps

10   cannot protect Texas from liability under the

11   Voting Rights Act.  There are a whole bunch of reasons

12   why, but I'll touch on two.  First, redistricting is

13   never really race blind.  Pretty much everybody here is

14   sophisticated enough to know where the Latino and

15   African American as well as Asian American population is

16   growing and concentrated.  And so it really isn't

17   possible to sort of un-know so many of the things that

18   people know when they're drawing maps about people's

19   color.

20        Second, and Michael Li made this point.  We are

21   seeing legislatures around the country consider not

22   turning on racial shading in GIS programs as creating a

23   type of safe harbor for them in terms of legal claims.

24   That may be something that they want to try to do with

25   respect to intentional discrimination claims, but it does

1    not protect you from claims of -- that affect vote

2    dilution under Section 2 of the Voting Rights Act.  So

3    you can draw without respect to race, but if you are

4    diluting minority voting strength, there is potential

5    liability under Section 2 effect test.  Even if there's

6    an effort to say, well, I can't have discriminated on the

7    basis of race intentionally because I could not see the

8    race of the people.

9          Second point is that incumbency protection plans

10   can still be illegal.  Just because members sign off on a

11   redistricting plan does not make it necessarily legal.  I

12   would like to point out to two rulings of the federal

13   court from the 2011 redistricting cycle secured by the

14   Texas Latino Redistricting Task Force.  First, that the

15   drawing of house -- state house lines in Nueces County,

16   which was done as a sort of mutual incumbency protection

17   plan was intentionally racially discriminatory in

18   violation of the Constitution and Section 2.  Similarly,

19   there were map lines drawn in Bexar County on the

20   San Antonio house districts that were also found to have

21   been intentionally racially discriminatory in violation

22   of the Constitution and Section 2 of the

23   Voting Rights Act.

24         Finally, only -- only to add a little bit of

25   clarification with respect to the case of Bartlett versus

—115—

1     Strickland, which is a U.S. Supreme Court case.
2     Michael Li was exactly right, and I have to say I had to
3     look it up, but Mr. Li knows it by heart.  Bartlett was a
4     case that dealt with what was called a crossover
5     district.  It was minority-minority, but it had White
6     voters in it who were crossing over and electing the
7     minority candidate of choice.  The U.S. Supreme Court did
8     not say in Bartlett versus Strickland that it is illegal
9     or improper in any way to draw majority-minority
10    coalition districts.  In fact, the court was really
11    distinguishing crossover districts from coalition
12    districts.  And the language here I'm going to cite for
13    the committee from Bartlett versus Strickland is at
14    556 U.S. 1 at pages 13 and 14.  And that's where the
15    Court says -- and it's talking about these crossover
16    districts.  These are White -- you know, White majority
17    districts.  And the Court says:  That term risks
18    confusion with coalition district plans in which two
19    minority groups form a coalition to elect a candidate of
20    that coalitions choice.  We do not address that type of
21    coalition here.  The U.S. Supreme Court does not say that
22    it is improper.  And, in fact, we have case law here in
23    the Fifth Circuit as Michael Li pointed out being that if
24    you have a cohesive two minority group in a district that
25    is in the majority, that certainly is getting you at

—116—

1    least part way down the road towards a protected

2    Section 2 district.

3         I'll conclude my remarks.  I'm happy to take any

4    questions from the committee.

5         SENATOR HINOJOSA:  Thank you.  I do have

6    several questions.  I know MALDEF has been a key leader

7    in litigating many of the Voting Rights Act violations,

8    but many of the decisions that -- the recent decisions by

9    the United States Supreme Court have seem to weaken the

10   Voting Rights Act to the point it seems to continue to

11   dismantle the Voting Rights Act by some of the decisions

12   that have been made.  And it now allows for

13   gerrymandering, partisan gerrymandering, and both parties

14   do it.  You know, democrats when they're in control do

15   it.  The republicans do it when they're in control.  But

16   how protected is the section dealing with intentional

17   discrimination against minorities?

18        MS. PERALES:  Well, certainly, I agree with

19   you that the U.S. Supreme Court has weakened some

20   protections under the Voting Rights Act and, of course,

21   the best example of that would be the decision in

22   Shelby County, Alabama versus Holder where the Supreme

23   Court struck down the coverage formula for Section 5 of

24   the Voting Rights Act, which means practically that Texas

25   does not have to preclear its new redistricting plans

1    under Section 5.  So there are places where U.S. Supreme

2    Court decisions have weakened the protections of the

3    Voting Rights Act.

4              I would say with respect to Section 2 and vote

5    dilution, whether that's intentional or not intentional,

6    but still happening in its effect, we still have very

7    strong protection under the Voting Rights Act.  And we've

8    been able to litigate those successfully as we did on

9    behalf of the Texas Latino Redistricting Task Force in

10   the 2011 cycle.  We are now in the attorney's fees phase

11   of the 2011 redistricting case.  I did not know that we

12   would be lapped by the next census but we have been.  And

13   although that might be considered humorous, what is not

14   humorous at all is the millions of dollars of attorney's

15   fees that are now being petitioned to the Court because

16   Texas enacted discriminatory maps.  So even -- even if

17   not for salvaging my quality of life in the next

18   redistricting cycle, I would say that for the taxpayer's

19   pocketbook, it would be very, very important to take

20   special care to apply the Voting Rights Act standards

21   correctly.

22             SENATOR HINOJOSA:  So would intentional be a

23   required element in a lawsuit under Section 2 of the

24   Voting Rights Act?

25             MS. PERALES:  It is absolutely not a required

1    element.  It is under the Constitution, but not under the

2    Voting Rights Act, no.  We still have a very viable, very

3    present claim for affect vote dilution of Section 2 of

4    the Voting Rights Act.

5            SENATOR HINOJOSA:  How would you establish

6    such a case?  Would it be based on the numbers, for

7    example, here in Texas where you have 95 percent of the

8    growth due by -- 95 percent, I guess, of the growth in

9    our state population were driven by minority growth.  Is

10   it just using the numbers to show intent?  Many -- many

11   times the actual graph proven, I'd say I don't intend and

12   I can't remember which of the Supreme Court justices

13   said, well, intention doesn't matter.  It is the result

14   that matters from the actions taken.  How does -- just

15   elaborate a little on that.

16           MS. PERALES:  Well, yes, I do agree with your

17   description.  And, certainly, you would start with

18   information like rapid and significant population growth

19   in the state, but you would also move through additional

20   factors.  Those factors are typically provided under a

21   case we refer to as Arlington Heights.  But there are

22   also cases that rely on direct evidence of intentional

23   racial discrimination, including in this last most recent

24   round of redistricting where we had evidence that Texas

25   mappers were intentionally using race to dilute Latino

1    voting strengths specifically in congressional

2    District 23.  And so you would start with all of those

3    factors, and it's a very holistic examination, and then

4    you would move through additional factors as well,

5    including a key point:  What is the effect of the plan.

6            SENATOR HINOJOSA:  Sometimes for those of us

7    who do take it very much an interest in what the

8    United States Supreme Court does and its decisions, it

9    seems to be set up a higher bar in terms of trying to

10   establish proof of violations of the Voting Rights Act.

11   Would you agree with that?

12           MS. PERALES:  I agree that it is a high bar,

13   but I also agree that it can be met and it has been met

14   with respect to Texas and redistricting in three of the

15   last five redistricting cycles.  We have decisions of the

16   U.S. Supreme Court finding discrimination by Texas in

17   redistricting.

18           SENATOR HINOJOSA:  I'll let other senators ask

19   questions.  But thank you very much for answering my

20   questions.  Senator Zaffirini.

21           SENATOR ZAFFIRINI:  Thank you, Mr. Chairman

22   Ms. Perales, thank you for your testimony as usual, very

23   excellent written testimony in particular.  I thank you

24   for that.  It's really very helpful.  My first question

25   is if the senate creates a new Hispanic opportunity

1    district, what risk is there that it would interfere with

2    minority voters' ability to elect the candidates of their

3    choice in other minority districts?

4          MS. PERALES:  Well, to add a Latino

5    opportunity district particularly in an area where there

6    are other Latino opportunity districts nearby or

7    adjacent, it's important to make sure that you are, in

8    fact, adding one and not simply swapping out one for

9    another.  And so there has to be a very careful analysis

10   about what the effects are for Latino voting opportunity

11   in the new district as well as what the affects are in

12   the remaining or preexisting district.

13         SENATOR ZAFFIRINI:  So if you were drawing a

14   Hispanic opportunity district, where would that be?

15         MS. PERALES:  I don't know yet.  And I think I

16   may be answering in advance of questions as well of the

17   bill sponsor, which is that we are still really carefully

18   moving through the analysis both of the original proposed

19   senate plan as well as the one that was released last

20   night.  I don't have a proposal for you of a map, but we

21   would provide it as soon as we have it.

22         SENATOR ZAFFIRINI:  You heard previous

23   testimony that it should be in North Texas.  Are you

24   prepared to agree with that or you'll answer later?

25         MS. PERALES:  I am not prepared to agree yet

1    as to the location of any additional Latino or coalition

2    district in Texas, but we are looking very carefully at

3    both districts that are Latino majority themselves as

4    well as districts in which Latino and other minority

5    voters may comprise the majority and vote cohesively to

6    elect their candidate of choice, which is protected under

7    the law.

8         SENATOR ZAFFIRINI:  And we have to be so

9    careful, do we not, in defining communities of interest?

10    For example, many of us were opposed ten years ago to the

11    district -- the Senate District 21 configuration that

12    links Laredo, for example, with southeast Travis County.

13    Do you remember that?

14         MS. PERALES:  I wasn't following the senate

15    redistricting as closely, Senator, so I -- I can't say

16    that I remember it.

17         SENATOR ZAFFIRINI:  Well, there were people

18    who testified against that configuration and many of us

19    were very, very concerned about it, yet ten years later

20    here we are supporting that and, in fact, prioritizing

21    that because what we found through experience now was a

22    very strong community of interest that stretches not only

23    along the border for that particular district,

24    Senate District 21, but also along IH35 as the strongest

25    and most effective community of interest that was defined

1    really through IH35 from the Tex-Mexico border all the

2    way to southeast Travis County.  And so people who

3    testified against it last time, testified in support of

4    it last time -- this time.  So we have to be very careful

5    in analyzing community of interest and really

6    understanding there is so many aspects of it we have to

7    consider.

8              MS. PERALES:  I agree, Senator.

9              SENATOR ZAFFIRINI:  Thank you.  In the

10   proposed map, the Hispanic voting population of

11   Senate District 19 is 59.6 percent.  According to data

12   from the Secretary of State, however, Spanish surname

13   voter turnout in 2020 was 45.4 percent of the electorate.

14   How can we ensure that we do not draw districts that

15   dilute minority voters' ability to participate in the

16   electoral process in communities with Hispanic voting-age

17   populations with low Hispanic voter turnout?

18             MS. PERALES:  I believe that it requires a

19   very careful analysis if you are reducing certain

20   measures that we use to look at it for Latino voter

21   opportunity, like Spanish surname voter registration or

22   Spanish surname turnout.  It's very, very important to

23   analyze all of the factors that go around that in order

24   to understand whether Latino voters continue to have an

25   opportunity to elect their candidate of choice or whether

—123—

1   it has, in fact, been undermined to the point where it's

2   a Section 2 violation.

3           SENATOR ZAFFIRINI:  Thank you.  What do you

4   believe are the best data to examine as we consider how

5   to maximize representation for the state's rapidly

6   growing Hispanic population?

7           MS. PERALES:  The courts have told us that it

8   is a very local and fact-intensive appraisal.  So we can

9   look at numbers like voter registration, turnout, but we

10  also should rely heavily on -- on information that are

11  coming from local community members themselves and

12  possibly also what we refer to in litigation as

13  re-aggravated election analysis.

14          SENATOR ZAFFIRINI:  Thank you.  You heard

15  testimony earlier from the witness who said that based on

16  the population growth that the Senate should really have

17  more minority senators, specifically I believe he said

18  11 Hispanic senators.  Do you have an opinion regarding

19  how many Hispanic senators, how many African American

20  senators that it should have based on population growth?

21          MS. PERALES:  I do not because the

22  Voting Rights Act protects the opportunity of minority

23  voters to elect their candidate of choice regardless of

24  the race of that ultimately elected person.  So what we

25  say at MALDEF is that if Latino voters want to elect

1    somebody who is Latino, that's great.  If they want to

2    elect somebody who's White, African American, Asian,

3    purple with green spots, it is the focus is on the voter

4    and the voter's ability to elect a candidate of choice as

5    opposed to the outcome or the person sitting in the seat.

6                 SENATOR ZAFFIRINI:  Can you give us an

7    example?

8                 MS. PERALES:  I -- you know, we haven't been

9    doing the litigation for long enough.  I think it's been

10   since -- our last trial was in 2017.  I don't have any

11   recent election analysis by race to show preferences that

12   I could point to a specific district and say here we have

13   voters of one race in an opportunity district electing

14   somebody of another race.

15                 SENATOR ZAFFIRINI:  Thank you.  Do you have an

16   opinion regarding the configuration of districts in

17   North Texas?

18                 MS. PERALES:  Under the new proposed plan?

19                 SENATOR ZAFFIRINI:  Yes.

20                 MS. PERALES:  I will note that the new

21   proposed 16 has a Spanish surname voter registration of

22   approximately 25 percent.  That number would be typically

23   considered far lower than the number associated with a

24   Latino opportunity district certainly under the

25   Voting Rights Act.  And we are examining carefully

1    changes to Senate District 10 because of the protection

2    of the Voting Rights Act of multiracial coalition

3    districts.

4              SENATOR ZAFFIRINI:   Thank you, ma'am.

5    Thank you, Mr. Chairman.

6              SENATOR HINOJOSA:   Senator Huffman.

7              SENATOR HUFFMAN:   Thank you, Ms. Perales.

8    Thank you very much for being here with us today and for

9    lending your considerable expertise to this process.  We

10   appreciate you being here.  I just want to ask you a

11   couple of questions on just follow up on your testimony

12   because I was -- actually, I didn't -- I wasn't sure I

13   followed you or I didn't hear you completely.  When you

14   were talking about the alleged undercount and then you

15   said something about we should be able to consider or

16   tolerate I think is the word you used, a lower number for

17   the ideal district.  I didn't follow that.  Would you

18   re-explain that to me to make sure I understand your

19   testimony.

20             MS. PERALES:   Thank you for the opportunity.

21   And I'm quite sure it was because I wasn't being as clear

22   as I could have been, and I was talking too fast.  But

23   generally re-districtors, persons in the legislature are

24   advised that the deviation on districts should be no

25   greater from top to bottom of 10 percent.

1          SENATOR HUFFMAN:  Correct.

2          MS. PERALES:  And there is often an effort to

3     try to get districts as close as possible to the exact

4     ideal population, which would be the total number of

5     Texans divided by 31.  However, we believe that there is

6     enough evidence of an undercount in South Texas that when

7     looking at deviation from the ideal, not beyond the

8     10 percent to top to bottom, but let's just say within

9     that 10 percent, that it should be okay.  It should be

10    tolerable to go, for example, below the ideal by

11    3 percent --

12         SENATOR HUFFMAN:  Okay.

13         MS. PERALES:  -- because we sincerely believe

14    as the residents do of these regions that there are more

15    people present on the ground than were captured by the

16    2020 census.

17         SENATOR HUFFMAN:  Okay.  Thank you for

18    clarifying that.  I do understand, you know, what you are

19    saying there.  My other question and I know you may have

20    addressed this in your written testimony, but I haven't

21    read it because I wanted to listen to what you have to

22    say.  I can't read and sit -- sometimes I have to, but I

23    don't do my best at that.  So it looks like you have some

24    concerns about Senate District 19.  Do you have a

25    proposal of how to fix what you are articulating as

1    concerns?

2          MS. PERALES:  We do not yet have a proposal to

3    fix Senate District 19, but if we conclude based on a

4    deeper analysis -- the initial numbers are concerning to

5    us and the shape is concerning, but we're not going to

6    say that just shape or one number is -- is definitive.

7          SENATOR HUFFMAN:  Okay.

8          MS. PERALES:  If as a result of our deeper

9    analysis we conclude that 19 has been, let's say,

10   retrogressed, even though we don't use that as a legal

11   standard anymore --

12         SENATOR HUFFMAN:  Right.

13         MS. PERALES:  -- we would propose an

14   alternative.

15         SENATOR HUFFMAN:  Okay.  And the same question

16   would go to SBOE District 3 that you had a concern.

17   Would your answer be the same that you would do a more

18   in-depth analysis and -- or is that in a different

19   situation?

20         MS. PERALES:  I think we might be closer on

21   SBOE District 3 to concluding that there has been a

22   rather significant undermining of Latino ability to elect

23   in that district.  And I believe that we are moving

24   towards making a proposal that we think would do a better

25   job.

1          SENATOR HUFFMAN:  Okay.  And you have talked

2     about it and I think you've mentioned, in fact, you said

3     that you're working on proposals and so forth, so I just

4     want to reiterate the process.  I know you heard me say

5     but we have drawn the maps completely blind to racial

6     data, that continues to this point.  I have not looked at

7     that, and then submitted that and then with the advice of

8     legal counsel been told that we were in compliance with

9     Section 2.  All right.  So at this point I am saying to

10    you if you disagree with that and you think that there is

11    a strong basis and evidence to show otherwise, I ask you

12    to present that to me and I will give it all the legal

13    opinion I -- I will get a legal opinion on that and move

14    forward from there.

15          MS. PERALES:  Thank you for the invitation,

16    and we will take you up on it.

17          SENATOR HUFFMAN:  Thank you very much,

18    Ms. Perales.

19          SENATOR HINOJOSA:  Well, I think there are no

20    other questions.  Thank you very much for, again, your

21    excellent testimony as always.  And that's -- those are

22    all the invited witnesses, invited testimony that we

23    have.  We'll now open public testimony.  Each witness

24    will have three minutes per person to testify on one or

25    both bills, that's Senate Bill 4 and Senate Bill 7.  I

1    will call groups of ten at a time to come down from the

2    gallery to the chamber.  After testifying, please exit

3    the chamber and head back to the gallery.  And as I said,

4    groups of 10.  Now, sometimes I have a problem with

5    trying to read the handwriting.  It reminds me of some my

6    doctors, I can never read the prescriptions.  So I will

7    call Mark J. Keough, Mark J. Keough, please come down.

8    We have a Karen Bryant, Karen Bryant.  We have a

9    Monica Bayarena, Monica Bayarena.  We have Annell Neale.

10   Annell Neale.  Sylvia Campos, Sylvia Campos.

11   David Douglas, David Douglas.  Sergio De Leon.

12   Michael Evans, Michael Evans.  Salman Bhojani,

13   Salman Bhojani.  And Cyrus Reed, Cyrus Reed.

14        Judge, I apologize I massacred or butchered your

15   name, but you have three minutes.  And please just

16   identify yourself and you may proceed.

17        MARK KEOUGH:  All right.  Thank you very much.

18   I appreciate you, Chairman, you allowing me to come and

19   speak and to the rest of the members, specifically to

20   Brandon Creighton, who is also my -- one of my senators

21   as well as Robert Nichols.  As you know, the

22   Texas Constitution Article 3 lays out the framework for

23   redistricting, what we haven't talked much about, but

24   what we have talked about minority issues quite a bit.

25   They've added to that redistricting Voter Rights Act of

1      '65 and also conclusions from the Supreme Court.

2              So what I've heard today as I sat and listened

3      from the beginning is so much about discrimination and

4      the issue of minorities and numbers associated with those

5      requirements.  But in the Texas Voter Rights Acts of

6      19 -- Texas Voter Rights Act of 1965, Article 3 of the

7      Texas Constitution and in the Supreme Court, you have a

8      number of other priorities as well in redistricting.  Of

9      course, the first one is population.  Certainly, you want

10     to address the issues of race, but you also have issues

11     of communities of interest and you also have county line

12     issues.  It doesn't matter to me truly what race they

13     are.  I represent Montgomery County, Texas, as the county

14     judge and the population census says that we are getting

15     very close to the maximum population that has been

16     required for our -- our county.  As a matter of fact, in

17     the last ten years we've had 36.1 percent increase and

18     that growth really happened in the last five years, and

19     in another five years we're going to be right up to that

20     947, 78 requirement.

21             But the other element of that is communities

22     of interests.  Effective representation of people, and

23     the Supreme Court said what is traditionally good

24     government criteria.  What we have done in this map that

25     you are proposing is we have divided Montgomery County

—131—

1     from two senate districts into three.  And in doing that

2     you have drawn two into our area of Magnolia 175, 180,000

3     in the total area surrounding Magnolia, which has a

4     distinct set of community interests as does the rest of

5     the county.  And where you're drawing those from is

6     coming up from an area south of us from Harris County,

7     which has a -- which is totally different than what

8     Montgomery County is.

9             Obviously, we don't have the time, but the

10    result of all of that is is that we would suggest that we

11    don't divide it into adding two into it, but turning it

12    into one.  In five years it will meet the one voice, one

13    vote rule, and Senator Creighton would be -- would be

14    perfect.  He now carries most of the county to cover the

15    total amount of that county, and once he does the total

16    amount of the county, draw a little bit more in to make a

17    conclusion.

18            SENATOR HINOJOSA:  I guess (indecipherable)

19    Montgomery County being divided into three senate

20    districts.

21            MARK KEOUGH:  We appreciate it so much.

22    Thank you for allowing me to speak.

23            SENATOR HINOJOSA:  Thank you very much for the

24    testimony, Judge, and we appreciate you coming down -- or

25    coming up to Austin from Montgomery County.

1          MARK KEOUGH:  Senator Nichols, Mark Keough is

2     my name, and I am the county judge in Montgomery County,

3     Texas.

4          SENATOR HINOJOSA:  I appreciate you being

5     here, and you have two great senators.

6          MARK KEOUGH:  Thank you.

7          SENATOR HINOJOSA:  Karen Bryant from

8     Corpus Christi, a retired school counselor.  Ms. Bryant,

9     just identify yourself for the record, who you represent

10    and then you may proceed.

11         KAREN BRYANT:  Thank you, Chairman Hinojosa.

12    My name is Karen Bryant of Corpus Christi.  We are in

13    Nueces County, and I'm representing myself.  I'm a

14    recently retired school counselor with 32 years

15    experience in Corpus Christi ISDs.  I have voted for both

16    republicans and democrats in past elections.  I'm here

17    today because I am concerned that the committee's

18    proposed map may racially gerrymander Districts 20 and

19    27.  Now, we love our Senator Hinojosa, but our concern

20    is that splitting the map up the way it does in

21    Nueces County may be a violation of the Federal

22    Voting Rights Act, Section 2.

23         Our county has a population of 353,000 people, so

24    there is certainly no need to divide it up to meet the

25    proportionate requirements.  And my big concern with it

1     is that it really chunks it into three pieces and so it

2     takes 16 precincts with the south side of affluent Whites

3     going to Senator Lucio.  The central part going to you,

4     Senator Hinojosa, and then the islanders, the more

5     affluent Whites in the island going to Lucio.  So it's

6     almost a three-way split for us.  It does also divide the

7     city of Corpus Christi, which is a big concern because

8     of, you know, all of our unique issues.  And you do a

9     great job of representing us, and I understand that

10    Senator Zaffirini's proposal that, well, maybe two

11    senators are better than one.  I'm not so sure about that

12    because I've seen the committee today.  But,

13    nevertheless, we are concerned that it would dilute

14    minority votes and here's why.  12 of those 16 precincts

15    are heavily republican.  That's fine, but they're also

16    disproportionally White, and so then we cut that central

17    hole out of Nueces and then take a chunk of San Patricio

18    to fill that hole, well, and that piece of San Patricio

19    is disproportionately White compared to the rest of their

20    county.  And they also two to one republican, which, like

21    I said, I vote republican as well.  But I'm just saying

22    when we're -- it looks like we are rigging a partisan

23    advantage and kind of trying to shift District 27 red,

24    and I get that, but in the process it looks to be

25    diluting minority votes, and it looks to be targeting

1    precincts that have a heavier White population to connect

2    to District 27.

3         And I guess Senator Lucio is not here today, but to

4    me it looks like the long game is to turn that district

5    red.  And, again, I mean, I know that the

6    Voting Rights Act may not specifically outlaw that, but

7    it does outlaw diluting minority votes.  And so as we're

8    designing these districts, I know you're trying to, you

9    know, meet your apportionment, but to carve these out

10   when they are so blatantly nonrepresentative of those

11   minorities, I do have a concern about that.

12        SENATOR HINOJOSA:  We appreciate your concern.

13   I think one of the challenges that we have is when you

14   compare the growth that's taken place on the southern

15   part of my senate district, Senator Lucio's district, has

16   been at a much faster rate than Nueces County, so trying

17   to not minimize the division in Nueces County, but at the

18   same time comply with the Voting Rights Act.  It's always

19   a challenge.  So we will continue to work to making sure

20   that we minimize any division of Nueces County any

21   further than it needs to be.

22        KAREN BRYANT:  And, Chairman, just a -- just a

23   couple other points.  My understanding of the

24   Voting Rights Act, and I'm no lawyer, is that even if you

25   didn't intentionally harm a minority, if the result is

1    harm to a minority, that's not acceptable and that's

2    illegal.  So even if the maps were drawn colorblind, you

3    still have to look at the outcome.

4          The second thing is -- and my final point really is

5    we hear so much about election integrity and voter fraud,

6    and I know Attorney General Paxton has been looking and

7    looking, spent millions of dollars, tens of thousands of

8    clock hours prosecuting a handful of cases.  So we all in

9    this room know that the real fraud or the real lack of

10   integrity is drawing rigged maps.  And so if we support

11   election integrity, then election integrity begins with

12   fair maps.

13         SENATOR HINOJOSA:  Unfortunately, every time

14   we do a redistricting every ten years, all maps we come

15   up with end up in the federal courts in litigation.  But

16   we really appreciate your testimony and we appreciate you

17   taking the time.

18         KAREN BRYANT:  Thank you, Chairman, and

19   thank you to all the committee members.

20         SENATOR HINOJOSA:  Next, we have Monica

21   Bayarena of Corpus Christi.

22         MONICA BAYARENA:  Thank you, Chairman Hinojosa

23   and committee members.  My name is Monica Bayarena of

24   Corpus Christi of Nueces County, and I am representing

25   myself.  I am a retired school principal, and I have

1    served the youth of the community for 31 years in

2    60 ISDs.  I've always cast my vote for the most qualified

3    person in past elections, whether they be republican or

4    democratic candidates.  I am here today because the

5    senate map that has been proposed divides my city, my

6    county, and my community.  Corpus Christi is the

7    South Texas region's economic center.  Nueces County with

8    the city of Corpus Christi at its heart is one of

9    economic focal points of the Texas Gulf Coast.  We have

10   the third largest port in the U.S., leveraging commerce

11   that drives prosperity for the entire costal bend.  The

12   map your committee is proposing actually divides

13   Corpus Christi by one road, carving out 16 precincts in

14   affluent areas with higher percentages of non-Hispanics

15   Whites.  These precincts were clearly selected for 27

16   based on past voting patterns since 12 of the 16

17   precincts are heavily republican.  The divided parts of

18   Nueces County do not represent our county's racial

19   breakdown as a whole and harm minority voters.  In your

20   map that deliberately divides us, the people on the other

21   side of the road share the same school districts,

22   hospitals, transit system, colleges, malls, churches,

23   grocery stores, concerns about windstorms and insurance,

24   costal ecology and our unique coastal industries.

25   Nueces County and Corpus Christi are cohesive communities

1    and should be kept in one voting district to address the

2    community needs.  Would your committee propose -- why

3    would your committee propose to break up Nueces County

4    and especially Corpus Christi?  Current map proposals for

5    Senate Districts 20 and 27 will diminish the political

6    power of the Corpus Christi community, minimize the votes

7    of minorities, and will intentionally and deliberately

8    change the path for future representation.

9         Senator Hinojosa, I ask that you explain to your

10    constituents why Nueces County and Corpus Christi are

11    divided in the proposed maps.  You and Senator Lucio

12    would have never allowed McAllen or Brownsville to be

13    split.  Your predecessor, Senator Carlos Truan, would

14    have never allowed Corpus Christi or Nueces County to be

15    split.  Chair Senator Hinojosa, Senator Lucio and

16    committee members, at this turning point in our history

17    in such a divisive time, you can define your legacy by

18    creating fair maps and restoring representative democracy

19    in Texas.  Thank you.

20         SENATOR HINOJOSA:  Thank you very much for

21    testimony.  Every redistricting ten years -- every

22    ten years when we do the redistricting, it's extremely

23    challenging to try to put a big puzzle together, and we

24    usually will work towards trying to keep communities of

25    interest together.  I really appreciate your testimony.

1          MONICA BAYARENA:  Thank you for your hard

2     work, Senator Hinojosa.

3          SENATOR HINOJOSA:  Annell Neale.  Another

4     witness from the League of Women Voters of

5     Corpus Christi.  As you can tell, they're very active in

6     our community and very active on issues that impact, but

7     not only in our community in the Corpus Christi area, but

8     the whole state.  And, again, thank you for being here,

9     all of you.  Identify yourself, who you represent -- who

10    you represent and please proceed.

11         ANNELL NEALE:  May I take just a moment to

12    request that your mic be turned up.  I am having a very,

13    very hard time hearing and understanding.

14         SENATOR HINOJOSA:  I will speak closer to it.

15    Okay?

16         ANNELL NEALE:  There you go.  Okay.  Thank you

17    very much.  Good afternoon, Senators, Mr. Chairperson,

18    and members of the gallery.  My name is Annell Neale and

19    I come to you today from Corpus Christi, Texas, Senate

20    District 20.  I am here to speak to you regarding SB4 as

21    a concerned individual.  I am a member of the League of

22    Women Voters of Corpus Christi, but I am here as an

23    individual speaking on behalf of my family, my friends,

24    and other members of my community.

25         Corpus Christi is a coastal bend community,

1     but the current proposed map not only splits

2     Corpus Christi, our community, but it separates areas

3     with common issues and priorities along the coastal bend.

4     It even splits the city of Corpus Christi along racial --

5     racial lines and areas of affluent socioeconomic members

6     of the community.  While SD27 represents the largest

7     balance of the coastal bend, why does Nueces County not

8     reside within SD27?  Instead it looks like an Italian

9     boot that drops down into the middle of No. 27.

10          Texas can be a leader in showing the country

11    how fair mapping can work to support and develop common

12    communities, not rip them apart.  I am pleading with you,

13    our elected representatives, to please put a more

14    concerted effort into drawing fair, transparent, and

15    balanced maps.  Having said this, I completely expect

16    gerrymandered districts to continue far into the future.

17    Thank you for your time and attention.

18          SENATOR HINOJOSA:  Thank you very much for

19    your testimony and we appreciate you all making time to

20    come up here to Austin to testify.

21          ANNELL NEALE:  Thank you.

22          SENATOR HINOJOSA:  Sylvia Campos also from

23    Corpus Christi.  Corpus Christi day today.  Just identify

24    yourself, who you represent and then you may proceed.

25          SYLVIA CAMPOS:  Thank you.  Thank you so much,

1    Senator Hinojosa.  Thank you.  And thank you committee

2    members.  My name is Sylvia Campos.  I am from

3    Corpus Christi.  I'm an activist, a member for the

4    Greater Good, board member of the League of Women Voters,

5    but today I am representing myself, my family, my

6    community.  I recently retired as a medical biller.  I've

7    been voting since I was 18 and I'm 64.  So I have been

8    voting for a long time.  I am served by Congressional

9    District 27, House District 34, and you, sir, Senate

10   District 20.

11        I am here to speak on SB4.  No -- not one

12   redistricting map has been in compliance of the

13   Voting Act since it was passed in 1965 by President

14   Lyndon B. Johnson.  I repeat, not one redistricting map

15   has been in compliance with the Voting Act since it was

16   passed in 1965.

17        The proposed map of Senate District 20 will

18   further break up my own city of Corpus Christi, which

19   resides in Nueces County.  I'm asking you to please stop,

20   stop breaking up the body of Christ, as you know

21   Corpus Christi, that is what it represents.  This

22   proposed map, as you told me, it's about -- goes

23   18 percent to District 27 to Senator Lucio.  It actually

24   splits up my family.  My family.  I have my older brother

25   and nephew that will be in Senate District 27.

1          I'm asking you how much more can Latino

2     families endure.  We, as you know, Senator, we were

3     stripped of our language when we entered school.  We were

4     robbed of our land.  Our history is being erased.  All

5     this under Texas law.  Now you want to strip more of our

6     voting power.

7          Democrats and republicans have both been guilty of

8     this.  You turn your backs now on the obvious and

9     documented racism of the past and refuse to rubber stamp

10     racist maps.  I'm just here to remind you that we're

11     people, real people with families with real problems.

12     We're the ones that have the highest uninsured.  Our area

13     has been taken over by heavy polluting industry.  It

14     needs to stop.  Okay.  It needs to stop.

15          In conclusion, I'm asking you, the body, to keep

16     Nueces County intact.  Find a way.  I know you can.  I

17     know you will.  I have faith.  I am grateful for your

18     time.  Please continue to have an open and transparent

19     process.  Thank you so much.

20          SENATOR HINOJOSA:  Thank you.  Thank you very

21     much.  We really appreciate your testimony and your

22     comments.  They are very important to us and we will

23     continue working on the maps.  Thank you.  Have a safe

24     trip back to Corpus Christi.

25          SYLVIA CAMPOS:  Thank you.  And may the League

1    continue to grow.

2              SENATOR HINOJOSA:  Next we have David Douglas.

3    Douglas.  Just identify yourself and then you may

4    proceed.  You have three minutes.

5              DAVID DOUGLAS:  Thank you.  I'm David Douglas.

6    I'm testifying on my own behalf.  I've lived in Austin

7    since the mid-1950s, to date myself, except for a couple

8    of years when I went up the road to Baylor Law School.

9    For the last 21 years, I've lived in Southwest Austin.

10   My Senate District is 25.  Except for my State

11   representative, all of my elected representatives live

12   away from here with the exception of one of our U.S.

13   senators.

14              Most of the population growth, as you've heard

15   since the last redistricting, has been with people of

16   color, centered in and around urban communities, many of

17   them.  Some areas of the map before you that I have read

18   indicate that there is significant major populations

19   around Fort Worth, Dallas, Harrison, Fort Bend, Travis

20   and Houston counties, Coastal Bend are minorities that

21   are negatively affected by the map.

22              What's the purpose of splitting up diverse

23   communities into multiple districts drawing them from

24   counties that far away, that are nondiverse, or rural?

25   The effect is dilution of minority votes.  The phrase

―143―

1    divide and conquer seems to fit here or cracking.

2    Districts should be shaped by communities of interest,

3    not by the party's chance of winning.  Why not use a

4    concept of fundamental fairness of the people's votes on

5    uniform, reflected interest of communities in which they

6    live.  I ask you to, when the time comes, please not

7    approve the maps as written.  I'm not an expert in

8    redistricting.  I'm here as a voter, a citizen and just

9    asking that you take that into mind.  And I thank you for

10    your time.

11           SENATOR HINOJOSA:  Thank you very much, and

12    we -- Mr. Douglas, we appreciate your testimony.  Next we

13    have Judge Sergio De Leon, Tarrant County.  Just identify

14    yourself, who you represent and then you may proceed,

15    sir.

16           SERGIO DE LEON:  Yes, sir.  Senator, it's

17    great to see you in person and not on a Zoom camera.  So

18    it's an honor to be here on the floor.  Good afternoon,

19    my name is Sergio De Leon, and I'm appearing on behalf of

20    myself.  I am justice of the peace for Precinct 5 in

21    Tarrant County where I have been elected since 2012.

22    Before serving as JP, I served as council for the same

23    precinct for 12 years.  I'm here in a strong opposition

24    to Senate Bill 4, the proposed senate map.

25           Precinct 5 is Tarrant County's Hispanic

1    opportunity precinct where voters have consistently

2    elected the Hispanic candidate of choice in both JP and

3    council elections.  Bot the council and myself are

4    Latino.  The precinct includes Fort Worth's historic

5    north side communities, downtown Fort Worth, parts of

6    west Fort Worth and Fort Worth south side neighborhoods.

7    Just days ago, I testified before this committee and

8    called on you to and other members to ensure Texas SD10

9    remain an effective district where Hispanic and African

10   American voters could come together to elect a candidate

11   of their choice.  I described to you the demographic

12   makeup of my district and the underlying legislative

13   district which includes SD10.  I said any adjustments

14   that need to be made to SD10 should maintain the core of

15   its current district and take into minority populations

16   that are in the far southeast portion of Tarrant County.

17   Clearly, this request and requests made by numerous

18   witnesses from Tarrant County were blatantly ignored.

19   The proposed senate map fractures my constituents who

20   mostly reside in SD10 and will place them in two separate

21   senate districts where they will be unable to elect

22   candidates of their choice.  And with respect to the

23   latest map that was proposed, there's no communities of

24   interest with Fort Worth in those rural communities; and

25   to put that into some context for you, Senator,

1          inner-city Fort Worth Hispanics do not tend to cattle.

2          They don't cut hay or gather at the feed store.  We work

3          two to three jobs, meet up at the Fiesta supermarket and

4          Tacorias.  To the north, the historic north side

5          community, the proposed map would take over 76,000 of my

6          constituents that were previously in SD10 and place them

7          in Anglo-controlled SD9 where Tarrant County's suburban

8          neighborhoods would elect the candidate to the Texas

9          senate.  This portion of my precinct has an -- Hispanic

10         voting-age population that is 56 percent.  To the south

11         and south side neighborhoods, the proposed map would take

12         over 47,000 of my constituents, 62 percent of which are

13         Hispanic according to the American Community Survey and

14         dilute their votes by combining this community with

15         Parker and Johnson counties which are over 80 percent

16         White.

17              I'll just conclude by saying the federal court

18         found similar efforts to dismantle SD10 in 2011 illegal

19         and intentionally discriminatory.  Cracking

20         Tarrant County's minority's populations and diluting our

21         vote with rural and suburban voters is a violation of the

22         Voting Rights Act and the U.S. Constitution.  And I ask

23         this committee and the Texas Senate to do the right thing

24         and kept -- keep SD10 intact.

25              SENATOR HINOJOSA:  Senator Zaffirini.

1          SENATOR ZAFFIRINI:  Judge, in your testimony,

2     you described how the area you represent as being

3     fractured and seems to be divided into two under the

4     proposed map.  Could you expand how the impacted area is

5     affected by this map?

6          SERGIO DE LEON:  Absolutely.  The north side

7     would be put into my -- my look at the map in SD9, which

8     would run out to -- to the inner city, and so you're

9     really taking out the core of the Hispanic population,

10    which makes up Fort Worth, which is used to voting in

11    conjunction with south side Fort Worth to elect a

12    candidate of their choice.

13         SENATOR ZAFFIRINI:  Are communities of

14    interest being divided in the process?

15         SERGIO DE LEON:  Absolutely.

16         SENATOR ZAFFIRINI:  Do you believe that this

17    map would give Tarrant County Hispanic residents the

18    opportunity to elect candidates of their choice?

19         SERGIO DE LEON:  Absolutely not.  It's just

20    the opposite.  Again, you're taking out what is

21    considered the entire Hispanic population of Fort Worth

22    in the south and north sides and dispersing them into

23    different districts, and in by doing so, putting them

24    into districts where they have nothing in common with

25    suburban or rural communities.

1          SENATOR ZAFFIRINI:  Do you believe that

2     Senate District 10, for example, could be redrawn by

3     impacting only the surrounding districts and not

4     necessarily the entire state?

5          SERGIO DE LEON:  Yes.

6          SENATOR ZAFFIRINI:  How would you do it?

7          SERGIO DE LEON:  Just keep it intact as it is.

8     It's to make sure that it's a minority coalition

9     district, which it has been for the past decade.

10          SENATOR ZAFFIRINI:  Thank you.  Thank you,

11     Mr. Chairman.

12          SENATOR HINOJOSA:  Thank you, Judge, for being

13     here and taking the time to come and testify.

14          SERGIO DE LEON:  Thank you.  Take care.

15          SENATOR HINOJOSA:  Next we have Michael Evans,

16     Mayor of Mansfield.  Mayor, just identify yourself, who

17     you represent and then you may proceed.

18          MICHAEL EVANS:  Thank you.  Mr. Chairman and

19     committee members, my name is Michael Evans, and I'm

20     testifying on behalf of myself and against Senate Bill 4,

21     the proposed senate map.  I come before you as the first

22     African American ever elected as mayor of the city of

23     Mansfield and as a pastor of the 151-year-old Bethlehem

24     Baptist Church, the oldest African American Church in

25     Tarrant County.

1          I'm here today to express my shock and extreme

2     displeasure after seeing the proposed state senate map.

3     For two decades now, Mansfield has been entirely

4     contained within Senate District 10 where our growing

5     minority population has increased in its ability to elect

6     our candidate of choice.  Our city line holding within

7     current Senate District 10 acknowledges a natural

8     community of interest with other nearby minority

9     neighborhoods, especially East Arlington and Southeast

10    Fort Worth.  In fact, many of my church congregants live

11    in Arlington and Fort Worth but worship in Mansfield.

12    These communities have shared interests, shared values

13    and common concerns and unite, organize, and mobilize to

14    elect our candidates of choice.  That's what we did in

15    Senate District 10 in 2018 to elect our Senator Beverly

16    Powell.  We've done it in time and time and time again in

17    other important races.

18          District 10 is firmly established as a

19    minority coalition, a crossover district where its

20    citizens are protected by the Voting Rights Act and the

21    U.S. Constitution.  The proposed map intentionally,

22    unnecessarily, and illegally destroys the voting strength

23    of minority citizens and the citizenry of Mansfield.

24    Your proposed map splits my beloved city into two senate

25    districts and intentionally dilutes the voting strength

1    of our city and in particular African American and

2    Hispanic residents by submerging each part into

3    Anglo-ruled dominated districts where minorities have

4    zero influence.

5              The current population of Mansfield in Tarrant

6    County is 72,607 people.  You took 41,551 of those people

7    and cracked them into that jagged billy club portion of

8    SD22 and that portion that jumps into Tarrant County from

9    the south, but is anchored in a district that runs south

10   of Waco.  The remaining 30,056 Mansfield residents are

11   cracked into new SD10, but submerged in a district

12   dominated my Anglo voters in Johnson, Parker and now

13   other rural counties of record of which our city shares

14   no interest.  The jagged billy club that cracks the Black

15   population of Mansfield is intentionally discriminatory.

16   New SD22 now contains 65 percent of Mansfield's Black

17   population, and the new SD10 contains 35 percent of the

18   total Black population.  It is, obviously, intentional.

19   It is discriminatory.  It is illegal.

20             And I pray that you fully understand the

21   geography and demographics of Tarrant County and that you

22   immediately reconsider your surgical decision to identify

23   and undermine minority voters.  Do not rob them of their

24   ability to elect candidates of their choice, and please

25   work diligently to unite the city of Mansfield once again

1     under the existing Senate 10 boundary and that boundary

2     alone.  Thank you very much, Mr Chairman, for giving me

3     this opportunity to speak before you.

4              SENATOR HINOJOSA:  Thank you very much for

5     your testimony.  I think Senator Zaffirini may have some

6     questions.

7              SENATOR ZAFFIRINI:  Thank you, Mr. Chairman.

8     Mayor, you mentioned a growing minority population in

9     your city.  Could you describe how Mansfield has changed

10    in terms of demographics over the last decade?

11             MICHAEL EVANS:  Without a doubt, ma'am.

12    The -- the minority -- the minority participation as well

13    as the minority population has all but doubled in the

14    city of Mansfield in the past decade as has the

15    population of our city, so we continue to grow.

16             SENATOR ZAFFIRINI:  Thank you very much.  You

17    said something interesting about shared interests with

18    communities in Southeast Fort Worth and Arlington.  Could

19    you expand upon how these interests and how these

20    communities work and vote together?

21             MICHAEL EVANS:  Yes, ma'am.  When we talk

22    about shared interests, we're talking about an interests

23    in housing.  We're talking about interests in

24    transportation and infracture.  We're talking about

25    interests in a public education and equity in our local

—151—

1   schools and school districts.  That's what we're talking

2   about.  And that's what we share as urban and suburban

3   communities of choice.

4            SENATOR ZAFFIRINI:  Thank you so much.  How

5   would Mansfield being divided into two districts with

6   clearly a rural influence impact your representation in

7   the Texas Senate?

8            MICHAEL EVANS:  As was mentioned in my

9   testimony, we're talking about at least 45,000, a little

10   more than 45,000 of those constituents would be actually

11   diluted by the influx of the rural communities, which

12   means to us that they would have zero influence in a

13   agrarian and rural communities, whereas, we are suburban

14   and urban.  And for SD22, that juts sharply into

15   District 10 on the proposed map, we would note that we

16   would have zero influence in that particular district.

17            SENATOR ZAFFIRINI:  So if you were looking at

18   the current proposed map, how would you change it for

19   District 10?

20            MICHAEL EVANS:  I would leave it just as it is

21   and watch it continue to grow so that the community can

22   come together and vote for and elect the candidate of

23   their choice.

24            SENATOR ZAFFIRINI:  Thank you, sir.

25   Thank you, Mr. Chairman.

1          MICHAEL EVANS:  Thank you, ma'am.  Thank you

2     again, Mr. Chair.

3          SENATOR HINOJOSA:  Thank you, Mayor, for your

4     testimony.  Next we have Salman Bhojani.  Just identify

5     yourself, who you represent and then you may proceed.

6          SALMAN BHOJANI:  Thank you, Senator Hinojosa

7     and respective members of this committee.  My name is

8     Salman Bhojani, and I'm a former city council member and

9     mayor pro tem of the city of Euless, but today I am

10    representing myself.

11         The 2020 census has shown us that Texas is

12    more diverse than it has ever been.  With 95 percent of

13    the growth in the populations of African American,

14    Latino, and AAPI communities.  And a fair map should

15    reflect the diversity of our great state.  The proposed

16    maps and most recent amendment do not allow a new

17    opportunity district.  In the Dallas-Fort Worth area,

18    specifically Tarrant County where I live, the proposed

19    maps fracture the vote by packing and cracking our

20    communities.  This committee should comply with the

21    Voting Rights Act by not allowing this inherently

22    discriminatory maps to proceed as they are.  The

23    communities of color should have the opportunity to

24    choose the candidates of their choice, not the other way

25    around.

—153—

1          Where I live, the Asian population in

2    Tarrant County grew by 56 percent.  Within my

3    Asian American communities of interest, we have shared

4    cultural characteristics, countries of origin, languages,

5    and socioeconomic status.  In short, we live, eat, shop,

6    play, learn, work, and worship together.  We deserve to

7    vote together because it's essential that we advocate

8    together.  I'm a former Euless city council member and

9    understands how an elected official can easily serve

10   their constituents in a geographically contiguous map

11   with similar needs.  So I can think of no good reason why

12   cities like Euless with only 60,000 residents should be

13   split between multiple districts.

14          I'm an immigrant, and in some ways my story is

15   an example of how when communities come together,

16   anything is possible.  I came to this country with almost

17   nothing except a belief that if I worked hard I could be

18   successful.  As a young adult, I made $6 an hour and

19   worked three jobs to make ends meet.  I found my

20   community in North Texas and in the DFW area.  Gradually

21   I saved enough to own my business, and I put myself

22   through college and law school, eventually working for a

23   large law firm and now owning my own law firm.  When I

24   ran for Euless city council, my campaign was considered a

25   long shot against extremist forces.  These groups tried

1    to label me as different, as an outsider, but we won.  We

2    had good ideas and practical solutions.  The community

3    came together to support me, and I made history by being

4    the first minority ever to be elected to the Euless City

5    Council.

6             Coming back to these maps, by breaking up the

7    these cities like Euless, these proposed maps serve to

8    further divide and dilute minority voices and votes.

9    Further, they cause cities like Euless to have to contact

10   different state representatives, state senators in order

11   to coordinate limited resources, which is an inefficient

12   use of taxpayer dollars and official's time.  I currently

13   reside in Euless in Senate District 9, which based on the

14   2020 census data has grown to 61 percent of the people of

15   color.  And these proposed maps have been redrawn to

16   include less than 50 percent of the people of color.

17   These proposed maps are splitting and erasing our voices

18   district by district, and I cannot sit and be fine with

19   our voices being marginalized.

20            I testified earlier this year about Euless

21   being split into two different senate districts.

22   Unfortunately, this committee completely ignored my

23   testimony and split Euless in three different senate

24   districts.  They intentional fracturing of --

25            SENATOR HINOJOSA:  Wrap it up, please.  Your

1    time is up.

2         SALMAN BHOJANI:  Thank you so much for your

3    time.  I really appreciate that you allowed me to say my

4    opinion.  Thank you.

5         SENATOR HINOJOSA:  Thank you very much.  We

6    appreciate your testimony.

7         SALMAN BHOJANI:  Thank you.

8         SENATOR HINOJOSA:  Before the next witness

9    comes up to testify, I will call the next group of ten

10   witnesses.  It will be Roselei Belos, Roselei Belos.  It

11   will be Christian Urbano.  And I apologize if I mess up

12   some of the names, some of this handwriting is very

13   difficult to read.  Christian Urbano.  Jose Opena,

14   Jose Opena.  Kelly Nguyen, Kelly Nguyen.  Elizabeth Beck,

15   Elizabeth Beck.  Felipe Gutierrez, Felipe Gutierrez.

16   Khanay Turner, Khanay Turner.  Adrian Kaiser, Adrian

17   Kaiser.  Steven Weintraub, Steven Weintraub.  And

18   Sarah Chen, Sarah Chen.  Mr. Reed, just identify

19   yourself.  You know the process and you may proceed.

20        CYRUS REED:  I do know the process.

21   Cyrus Reed here representing the Lone Star Chapter of the

22   Sierra Club for the very first time ever testifying on a

23   senate redistricting map.  We are opposed to the current

24   version of SB4.  We do appreciate the fact that the maps

25   were released with enough time to look at them.  That

1    being said, we were very disappointed to learn of the

2    amendment last night, which really didn't give the

3    public -- I know I haven't looked at it carefully -- a

4    chance to look at the map.  And I would urge

5    Senator Huffman to have an additional hearing to allow

6    people more time to look at that map.

7              You are probably wondering why Sierra Club is

8    talking about maps.  Well, it's because we have 30,000

9    members throughout Texas.  They tend to be very civically

10   involved.  They tend to vote in high numbers.  They tend

11   to vote democratic, but we do have independents and

12   republicans, but they are interested in communities of

13   interest.  They are interested because they care about

14   things like flooding and water quality and air quality,

15   climate change, and those tend to have geographic

16   focuses.  And so keeping communities of interest together

17   is -- is very important.

18             And so I do have written testimony I -- I put

19   in the portal and I have copies here, but I won't read

20   it.  I was going to concentrate on just a few areas of

21   the state, and I was going to specifically mention

22   Senate District 10 and Tarrant County.  And, again, I

23   haven't looked closely at the -- at the new proposed map,

24   but even looking at this proposal, the fact that we would

25   turn Senate District 10 and turn what's really an urban

1    district into one that becomes more rural, means that

2    community of interest doesn't really make sense.  And I

3    say that in regards to air quality plans.  I'm looking

4    over at Senator Hancock, I mean, those are -- those are

5    issues that are of interest to Tarrant County, but may

6    not be to Parker and Johnson, that's an example.  I'm

7    thinking about flooding.

8              So without going into race or party politics,

9    it -- it just doesn't make sense.  Similarly the idea of

10   putting all -- I'll call it tentacle or fajita of

11   Senator Birdwell -- You know, Senator Birdwell, I respect

12   very much, but it doesn't make sense to have his district

13   go up into Tarrant County.  So that's one area I'd point

14   out.  The other two areas I will mention very quickly is

15   Nueces County.  I do believe given hurricanes and

16   flooding, it doesn't make sense to split it up in the way

17   it's split up.  There's a reason to keep the City of

18   Corpus and the coastal areas together and not split them

19   up between several districts.  And I would have similar

20   comments on Fort Bend County.  And, again, I would urge

21   you to look at those environmental implications,

22   hurricanes, floodplains, and keep districts contiguous.

23             I do have written comments, but with

24   respect -- out of respect for your time, I will finish

25   there and I'm happy to answer any questions.

1          SENATOR HINOJOSA:  Thank you very much,

2      Mr. Reed, for your testimony.

3          CYRUS REED:  Thank you.

4          SENATOR HINOJOSA:  Next we have Roselei Belos.

5      Ms. Belos is testifying against Senate Bill 4.  Just

6      identify yourself and who you represent.

7          ROSELEI BELOS:  Hello.  My name is Roselei

8      Belos, and I'm here representing OCA Greater Houston.

9      First, I would like to express my gratitude to you all

10     for giving me the opportunity to speak today.  I hope

11     that this committee will continue to hold in-person and

12     virtual hearings to allow public input from the entire

13     state.  The census showed that 95 percent of all growth

14     in Texas occurred in the African American, Latino, and

15     AAPI communities.  As we know, Texas is rich in diversity

16     and any fair amount must reflect the diversity of our

17     state.  However, the current draft maps do not allow any

18     new opportunity districts.  This is based on census

19     number in metroplexes like Houston, Dallas, San Antonio,

20     and Austin.  Instead, our draft maps pack and crack our

21     communities and dilute our votes.  I urge this committee

22     to comply with the Voting Rights Acts and respect the

23     reality of the new census.  Allow people of color the

24     opportunity to choose the candidates of their choice.

25          As a Filipino American college student and

1    organization leader living in Houston, I am informed of
2    many of the new issues AAPI communities have faced in the
3    past year and a half.  Prior to the start of
4    COVID-19 -- of the COVID-19 pandemic, one of the
5    pre-health college organizations that I'm currently a
6    part of Alpha Eta Alpha based at the University of
7    Houston have partnered up with few Houston community
8    organizations and universities to provide basic medical
9    needs such as examinations and flu shots.  Through my
10   volunteer work, I've seen that many marginalized
11   communities are less informed and often are the ones who
12   do not go to special doctors due to worries such as cost.
13   This experience makes me understand that equal access to
14   health resources is a human right.  As someone who is
15   fortunate enough to have access to healthcare and will be
16   entering the health field, I want my community in the
17   future to have a fighting chance to get the resources
18   that we all deserve.  Access to resources comes to having
19   representatives in our government who know who we are and
20   what our needs are.  I urge this committee to reconsider
21   the proposed redistricting map that do not allow for a
22   new opportunity district for the AAPI community.  We
23   deserve to have equal representation in our state and
24   country.
25          Finally, I would like to thank each and every one

1    of you again for your time in allowing me the opportunity

2    to speak.  Thank you.

3              SENATOR HINOJOSA:  Thank you very much.  We

4    appreciate you making time to come and testify before the

5    committee.  I think Mr. Senator Hancock has a question.

6              SENATOR HANCOCK:  Actually, it is regarding

7    the previous testimony.  So she can go.  I just wanted to

8    comment on the testimony regarding opposition to the maps

9    regarding air quality.  So I quickly turned to the TCQ's

10   website, and just for the matter of this committee, I

11   think it's important that the 2015 ARO zone standard

12   designations for area containment include in the DFW

13   area, Collin, Dallas, Denton, Ellis, Johnson, Kaufman,

14   Parker, Tarrant, and Wise counties.  So if we are going

15   to use air quality as a rationale on the maps, then the

16   rationale would be that these counties all listed seem to

17   be part of that discussion, and I just want to make sure

18   I clarify that based on what was previously stated.

19             SENATOR HINOJOSA:  Thank you, Senator Hancock,

20   for the information.  Next we have Christian.  Christian,

21   you're going to have to help me pronounce your last name

22   when you come up here.  Okay.  Come on up.  Just identify

23   yourself, who you represent and then you may proceed.

24             CHRISTIAN URBANO:  Hello.  My name is

25   Christian Urbano representing on behalf of OCA Greater

1    Houston.  Thank you for the opportunity to speak today.

2              I hope that this committee will continue to

3    hold in-person and virtual hearings to allow public input

4    from the entire state of Texas.  The 2020 census showed

5    that 95 percent of all growth in Texas occurred in the

6    African American, Latino and AAPI communities.  Any fair

7    map must reflect the diversity of our state.  The current

8    draft maps do not allow any new opportunity districts in

9    the metroplexes like Houston, Dallas, San Antonio and

10   Austin.  Instead, they pack and crack our communities and

11   dilute our votes.  I searched this -- I urge this

12   committee to comply with the Voting Rights Act and

13   respect the reality of the new census by allowing people

14   of color the opportunity to choose the candidates of

15   their choice.

16             As an Asian American, the fastest growing

17   demographic in Texas, I want fair redistricting because

18   the quality amongst all eligible voters should be a

19   fundamental right.  We need better, more responsive

20   representation and more opportunity districts for our

21   communities, including in coalition with other people of

22   color and immigrant population with similar values and

23   needs.

24             Where I live, the Asian population in

25   Fort Bend County grew by an impressive 82 percent in the

—162—

1    last decade.  Based on 2020 census, the Fort Bend County

2    POC population has grown to 60.4 percent.  However, has

3    been we redrawn to contain only 55.1 percent POC.  The

4    data clearly shows my district is immensely diverse, but

5    redrawing has now made it ever larger and barely

6    contiguous in a clear attempt to dilute the power of

7    minority votes.

8              An issue that many people from the Asian

9    community have to deal with is racial discrimination.

10   Since the Corona Virus pandemic started, hate crimes and

11   violence against Asian Americans have drastically

12   increased due to fear and misinformation.  Social media

13   and selected government officials have publicly demonized

14   Asian Americans using the scapegoat -- using the

15   scapegoat approach.  Grouping people with similar traits

16   and concerns together in one district gives them a

17   stronger voice to have their issues addressed, issues

18   like the hate crimes, the violence, fear, and

19   misinformation that I discussed so far.

20             I urge this committee to hold

21   additional hearings and to create a new senate map that

22   reflects our community input and the census data as well

23   as create fair districts for U.S. Congress and Texas

24   House.  In addition, please continue to allow a fair and

25   open process by providing at least 14 days for the public

1    to review additional maps, 5 days to review any changes

2    to proposed maps, keeping a record of all documents,

3    written communications, e-mails, text messages, and draft

4    maps and providing analysis of how the new maps impact

5    historically disenfranchised communities of color.  There

6    are many and ongoing conflicts in our society and none of

7    them should be taken lightly.  Issues within the Asian

8    American communities are no exception.  Thank you.

9         SENATOR HINOJOSA:  Thank you, Mr. Urbano.  We

10   appreciate your testimony.  Next we have Jose Opena.

11   Just identify yourself, who you represent and help me

12   pronounce your last name.

13        JOSE OPENA:  So my name is Jose Opena.  So I

14   am a representative for OCA Greater Houston, and I'm

15   representative for myself and I'm a representative for my

16   family and for my friends that could not come today.

17        You know, I have this whole thing written out,

18   but I think I'm just going to speak from the heart.  So

19   as an Asian American, which is the fastest growing

20   demographic in Texas, I want fair districts because the

21   demographic shows that minorities are all located in one

22   specific area, which, in turn -- in turn disempowers our

23   votes and causes people of color to get unfair

24   representation.  We need better and more receptive

25   representation and more opportunity district for our

1    communities including the union within people of color

2    and immigrant populations with homogenous values and

3    needs.  My mother as -- was an immigrant from the

4    Philippines, and she has been working as a nurse here in

5    Texas for about 15 years.  And throughout her time as a

6    nurse, she has helped treat countless patients and work

7    hand-to-hand to support my family and community.  This

8    past year and a half, the COVID -- the COVID-19 pandemic

9    has shown that the dedication of nurses, like my mother,

10   are -- a disproportionate number of nurses contracted

11   COVID-19, are Filipinos, yet no one was advocating for

12   their safety.  The Filipino nurses continue to support

13   and treat our community, our struggles.  Creating

14   opportunity districts would give us the chance

15   representatives that would advocate for us.

16              I urge you to reconsider the redistricting map

17   and consider the growing AAPI community.  Thank you.

18              SENATOR HINOJOSA:  Thank you, Mr. Opena, for

19   your testimony.  We appreciate your time.

20              JOSE OPENA:  Thank you.

21              SENATOR HINOJOSA:  Kelly Nguyen.

22              KELLY NGUYEN:  Hello.  My name is Kelly

23   Nguyen, and I'm hearing representing OCA Asian Pacific

24   American Advocates of Greater Houston.

25              SENATOR HINOJOSA:  Let me ask you if you

1    consider removing your mask so I can hear you better.

2          KELLY NGUYEN:  Oh, sorry.

3          SENATOR HINOJOSA:  Just identify yourself, who

4    you represent and then you may proceed.

5          KELLY NGUYEN:  Hello.  My name is

6    Kelly Nguyen, and I'm here representing OCA Asian Pacific

7    American Advocates of Greater Houston.  First, I want to

8    say this is my first time testifying, so I am a bit

9    nervous but excited all the same.  I want to start by

10   expressing my gratitude for the opportunity to be here

11   today and speak to you all in person.  And I am also a

12   part of the organization Alpha Eta Alpha, a pre-health

13   org on the campus of UH, like mentioned by Rose earlier.

14   And much like her, I want to continue and support

15   in-person and virtual hearings because I cannot emphasize

16   enough how important it is for the public to voice their

17   concerns and worries throughout the state of Texas.

18          As we already know, Texas is a very diverse

19   state.  Looking at any census map of our state alone can

20   reflect this easily.  For example, just last year the

21   2020 census showed us that the AAPI population has grown

22   40 percent from 2010 to 2020.  Beyond that, the growth of

23   diverse communities much like the Latino, African

24   American, and AAPI, to name a few, have grown by

25   95 percent in Texas.  These numbers are significant

1   especially in light of how unfairly the districts are

2   being drawn to manage these communities.  These minority

3   communities much like my own are being packed and

4   crowded, which in turn reduces their power, the power of

5   their votes and subsequent voice within the government.

6   I urge the committee to take into account the revelations

7   of the new census and create better opportunities for

8   Texan minorities and make their vote count and elect

9   representatives of their choice.  As an Asian American, I

10  specifically want fair districts because I want my vote

11  to weigh and count just as much a nonminority vote.  I

12  want my parents' votes to count.  I want all my friends'

13  and family's votes that are people of color just like me

14  to count.  I want these elections to represent my

15  community well and accurately because we cannot even come

16  close to putting a price on representation, especially a

17  representation that is responsive to my specific

18  community's needs and communities like mine with

19  analogous needs and beliefs.

20          At my current residence, Fort Bend County, a

21  whopping 87 percent of substantial growth in the area has

22  been contributed to diverse communities.  I know growing

23  up, I was fortunate enough to be constantly surrounded by

24  many different cultures and communities.  And though the

25  cultures were rich, the opportunities were not.  We lived

1    on the less affluent side of the district.  The school I

2    attended did not receive a lot of funding.  Corners were

3    cut to make ends meet and thus created a far from perfect

4    environment for learning.  In short, the students were

5    never pushed to be academically successful.  We had no

6    opportunities to advance in learning or to participate in

7    enriching clubs and organizations.  School was simply a

8    mandate of the state instead of an opportunity to pursue

9    higher education and more successful futures.  This lack

10   of motivation and unfavorable learning environment was a

11   product of insufficient funding due to irresponsible and

12   unfair district mapping.  This is why real representation

13   matters to me.  Again, I want to urge this committee to

14   create a new senate map that more accurately portrays our

15   communities' input in state affairs.  Please reflect upon

16   the new census data and create fair districts.

17          Thank you again for the opportunity to be here

18   today and speak upon matters so important to my

19   community.  Thank you.

20          SENATOR HINOJOSA:  You testified like a pro.

21   Thank you for your testimony.  Elizabeth Beck.  Beck with

22   city council of Fort Worth.

23          ELIZABETH BECK:  Good afternoon, Chairman, and

24   I appreciate the opportunity to testify today.  My name

25   is Elizabeth Beck.  I am the Fort Worth City Councilwoman

1    for District 9.  I was elected along with five of my

2    colleagues earlier this year.  I am here in opposition of

3    Senate Bill 4.  I'm going to read to you a letter today

4    signed by myself and four other of my council colleagues,

5    which represents Fort Worth's majority-minority council

6    and make up a majority of our current nine-member

7    council, in opposition of the district's proposed changes

8    to Tarrant County senate map.  I will note that this

9    letter was signed before the committee's late night and

10   untimely amendment to Senate District 10's map.  While

11   some of the data may be different, our concerns remain

12   the same as to the impact to our constituents.

13        As members of the Fort Worth City Council

14   representing majority and minority districts, we write

15   with great concerns regarding the proposed senate map

16   which cracks Fort Worth's historic and growing minority

17   communities and places our constituents within senate

18   districts where their votes will be diluted and their

19   voices stifled.  The City of Fort Worth is now the 13th

20   largest city in the country and the fastest growing large

21   city in America.  The latest census data shows that

22   Fort Worth is a majority-minority city with only

23   37 percent of our population identifying as Anglo.

24   Together, Black, Hispanic -- Black and Hispanic residents

25   constitute nearly 500,000 of Fort Worth's 918,000

1    residents.  Of Fort Worth's nine council seats, five are

2    majority-minority where Black, Hispanic and Asian

3    American voters unite to elect a candidate of their

4    choice.  Majority-minority representatives now make up

5    the majority of the members of city council.  Under the

6    proposed state senate map, our constituents would be

7    greatly harmed and unable to elect candidates of their

8    choice to the Texas Senate.  Currently most of our

9    constituents reside in Senate District 10.  District 10

10   is a prime example of an effective coalition crossover

11   district where varying minority communities have proven

12   their ability to unite and elect candidates of their

13   choice.  The last election cycle, our constituents in

14   Senate District 10 have resoundingly come together to

15   elect Beverly Powell to the Texas Senate and supported

16   candidates in races from the president to attorney

17   general and their county sheriff.  The proposed map

18   intentionally and effectively eliminates this ability by

19   fracturing minority neighborhoods and placing our

20   constituents into Anglo-dominated districts.  One of

21   these districts, reconfigured District 10 where the

22   current minority voters are diluted by being added to

23   predominantly White rural Parker County and Johnson

24   County.  The other is reconfigured District 9 where the

25   minority voter of Fort Worth are fractured from

1   District 10 and attached to Anglo-dominated suburban

2   communities.

3            I ask that you amend this map and put Senate

4   District 10 back to where it is today.  Thank you.

5            SENATOR HINOJOSA:  Senator Zaffirini.

6            SENATOR ZAFFIRINI:  Thank you, Mr. Chairman.

7   Ms. Beck, in the areas of Fort Worth that are being

8   divided, could you please expand upon the demographics

9   and the unique community characteristics that you believe

10  this community should know about?

11           ELIZABETH BECK:  Sure.  Two of the biggest

12  divides that we see in this new map are between the

13  historic north side of Fort Worth, which has a large and

14  very vibrant Hispanic community, and the south side of

15  Fort Worth, which I have the pleasure of representing,

16  that also has a very large and vibrant Hispanic

17  community.  They will now be separated into two senate

18  districts.  Likewise, we have a very long-standing

19  historic tight-knit African American community in West

20  Fort Worth of Como, and that will now be separated from

21  our Black residents in the east side of Fort Worth in the

22  Lancaster corridor.

23           SENATOR ZAFFIRINI:  Thank you.  In your

24  opinion, could someone from Fort Worth be elected to

25  Senate District 10.

1          ELIZABETH BECK:  Absolutely not.

2          SENATOR ZAFFIRINI:  Thank you.  Thank you,

3     Mr. Chairman.

4          SENATOR HINOJOSA:  Thank you for your

5     testimony.  Felipe Gutierrez.

6          FELIPE GUTIERREZ:  Good afternoon.  I have

7     written testimony I'd like to submit as well.  Hello.  My

8     name is Felipe Gutierrez from Fort Worth, and I'm here in

9     opposition of Senate Bill 4.  I am representing myself.

10         I'm a long-time resident of Texas

11    Senate District 10 and have been actively engaged in

12    advocating for unique diverse -- for the unique and

13    diverse district that this is.  I have always advocated

14    that Senate District 10 remain intact so that Latino,

15    African American, Asian American voters can continue to

16    come together to elect our candidate of choice.

17         I drove to Austin in 2011 to testify against a

18    proposed senate map that would dismantle Senate

19    District 10, as the map that you've currently proposed

20    will do again.  Thankfully, a federal court ordered

21    Senate District 10 to be restored and our powerful

22    coalition has continued to unite to elect candidates of

23    our choice ever since.  Under the proposed map, I would

24    be drawn -- I would be drawn out of Senate District 10

25    and placed into an Anglo-controlled Senate District 9,

1     which would be dominated by White suburban areas in the

2     northern portion of Tarrant County.  My vote and the vote

3     of so many others Latino Texans who call Senate District

4     10 home will be silenced under this proposal.  As I look

5     at the map, the attempt to tear apart Tarrant County's

6     historic Latino communities that work together is

7     evident.  The entire north side is cracked and placed in

8     Senate District 9, and the south side Hispanic

9     communities are no longer able to unite with their

10    neighbors to the north and vote as a coalition to elect a

11    candidate of our choice to the Texas Senate.  The Latino

12    community in Tarrant County is not only -- is not the

13    only community of color that is fractured in this map.

14    Fort Worth's large and historic African American

15    communities will have their votes diluted by being drawn

16    into eight rural counties as of late last night, which

17    are predominantly White, and reject the minority

18    candidates of choice.  As a long -- as a strong believer

19    in building coalitions where communities of color can

20    come together to elect candidates who will represent our

21    shared values and interests, this map intentionally tears

22    apart this coalition by diluting our shared voices with

23    White rural voters.  This is discriminatory and

24    intentional.  I stand before you just like I did in 2011

25    with the warning this map violates the law.  The

1    committee and the Chair must immediately act to remedy

2    the same mistakes that you made in 2011.  Moving forward,

3    with this proposed map will be seen as a direct attack on

4    a growing voting strength of minority communities in

5    Tarrant County, which no longer is the minority.  In

6    fact, White population in Tarrant County has decreased

7    in -- since 2010, and the response was to eliminate the

8    only senate district where African American, Latino

9    communities could come together to elect our candidate of

10   choice.

11           So members of this committee,

12   Chairman Hinojosa, Senate District 10 must be restored

13   and our communities of color must have an opportunity to

14   continue to unite behind a candidate of our choice.

15           SENATOR HINOJOSA:  Senator Zaffirini.

16           SENATOR ZAFFIRINI:  Thank you, Mr. Chairman.

17   Mr. Gutierrez, you testified not only earlier this year

18   but also ten years ago and now again.  We thank you for

19   being so involved in the process and for your expertise.

20   You also referenced a coalition that comes together in

21   Senate District 10 to elect a candidate of choice.  Could

22   you expand upon that, please?

23           FELIPE GUTIERREZ:  Of course.  I'd like to say

24   thank you for the question, and you haven't asked me a

25   question in ten years because I haven't been here since.

1   Redistricting was the last time that I testified.  So

2   thank you.  I would say what I said ten years ago; is

3   that, as a Latino, we have neighbors that are African

4   American, that are Asian American that are next door to

5   each other.  My experience as a then technician for

6   Southwestern Bell Telephone Company got me in and out of

7   the door of all the residents in that 820 corridor, which

8   is the east side of Fort Worth, all the way down to the

9   south side, all the way to the north side where there was

10  Latino neighborhoods.  And I saw firsthand the commitment

11  of our communities including myself to elect an

12  individual of our choice, and back then it was Senator

13  Wendy Davis.  At this time it is Senator Beverly Powell.

14  So I think we've proven over the last decade that we are

15  a coalition district by electing a candidate of our

16  choice.

17          SENATOR ZAFFIRINI:  Thank you so much.  You

18  said you testified on a map in 2011 that makes similar

19  changes to the map that we are looking out today.  What

20  are some of the similar faults you see with this map?

21          FELIPE GUTIERREZ:  You fracture African

22  American votes on the east side of Fort Worth, and I

23  extend the invitation that Senator Beverly Powell made

24  today to the committee, to come to Fort Worth and see

25  those neighborhoods that you're fracturing.  I think

1    fracturing and diluting their votes, whether it's

2    political, whether -- I hate to use this word on the

3    floor, but if it's racial, regardless of how you look at

4    it, you are diluting the power of a group of individuals

5    to represent themselves and elect a person of their

6    choice.

7            SENATOR ZAFFIRINI:  Thank you.  In your

8    written testimony, you reference eliminating the only

9    senate district in which the African American and Latino

10    communities come together to elect a candidate of their

11    choice.  Could you expand on upon that, please?

12            FELIPE GUTIERREZ:  Sure.  You look at the

13    growing population and like what the mayor of Mansfield

14    testified today, there's a growing population in

15    Arlington, into Mansfield, into that south west corridor

16    of Tarrant -- of Arlington into the southeast part of

17    Fort Worth, and while there's separate cities, I think

18    they are also neighboring two Latino neighborhoods in

19    Fort Worth on the north side and south side of

20    Fort Worth.  All of that is a coalition and we come

21    together very directly not only to elect across county

22    seats, state house seats.  We elect JP's.  We elect

23    constables.  We elect city man- -- I mean, mayors, and we

24    elect Senate District 10 candidates of our choice.

25            SENATOR ZAFFIRINI:  Thank you.  Do you believe

1     it would be possible to redraw Senate District 10 with

2     impacting only the nearby districts and not necessarily

3     the entire statewide plan?

4           FELIPE GUTIERREZ:  I think the way the

5     plan -- or the maps are drawn now completely fractures

6     us.  I think we should keep the Senate District 10 map as

7     it is, as a coalition district as the courts put it to us

8     ten years ago, and the rest of the state can also do its

9     shifting around us.

10           SENATOR ZAFFIRINI:  Thank you, sir.

11     Thank you, Mr. Chairman.

12           FELIPE GUTIERREZ:  Thank you.

13           SENATOR HINOJOSA:  Thank you for your

14     testimony.  We appreciate you being here.

15           FELIPE GUTIERREZ:  Have a good afternoon.

16           SENATOR HINOJOSA:  Khanay Turner.

17           KHANAY TURNER:  Good afternoon.  I also have

18     written testimony as well as a proposed map.

19           SENATOR HINOJOSA:  Just identify yourself, who

20     you represent and then you may proceed.  If you have any

21     handouts, we'll have the clerk hand them out.

22           KHANAY TURNER:  Okay.  Thank you.  Hello Chair

23     houseman, Vice Chair Hinojosa and members of the senate

24     committee on redistricting.  Thank you for the

25     opportunity to speak today.  My name is Khanay Turner.  I

1    live in Fort Worth within Senate District 10.  I am an

2    attorney, voter rights advocate, and community grassroots

3    activist for Black America.  I am also a proud member of

4    the Delta Sigma Theta Sorority, Incorporated, and serve

5    on our Texas redistricting cohort.  Today I am speaking

6    on behalf of myself, my community, and the Texas

7    redistricting cohort of Delta Sigma Theta Sorority,

8    Incorporated.  I am against SB4 and demand this committee

9    to keep current communities of interest together who live

10    in Senate District 10, which is a protected crossover

11    minority opportunity seat.  In addition, I request that

12    this committee leave the current boundaries of SD10 in

13    place as shown in the map that is being passed out.

14                I am from the southwest community of

15    Fort Worth.  My neighborhood lies south of Interstate 20

16    and east of Chisholm Trail Parkway.  Over the course of

17    20 years, I have seen my community grow into a beautiful

18    racially diverse community of hard-working, middle class

19    Texans.  My neighbors and I have had the privilege to

20    elect candidates who represent us and our values in

21    20 -- 2008, in 2012, and once again in 2018.  We do not

22    want gerrymandering to dilute our voices and we call for

23    district maps that will not tear our community apart.

24    However, this proposed map in SB4 and the amended map

25    that was sent late last night does, in fact, tear our

1    community apart and dilutes our voices.

2              Currently, SD10 is the only crossover minority

3    opportunity senate district for Tarrant County, which

4    minds you it's the third largest county in the state.  By

5    dismantling this district, the committee has once again

6    violated the 14th and 15th Amendment to the U.S.

7    Constitution by placing political parties over the needs

8    of people especially the constituents of color living in

9    SD10.  Texans, particularly Black Texans, have already

10   suffered at the hands of previous gerrymandering in the

11   consistent attacks on our Voter Rights Acts, on our

12   voting rights along with other lists of negatively

13   impacted situations to the Black communities such as over

14   policing, food deserts and lack of healthcare resources.

15   My neighbors and I have had the benefits from just

16   representation of SD10 with senators who have fought

17   against marginalization of its Black constituents by the

18   Texas legislature.  Therefore, we request the current

19   boundaries of SD10 not to be changed.

20         In conclusion, remember, you must follow the 14th

21   and 15th Amendment to the U.S. Constitution and Section 2

22   of the Federal Voter Rights Act of 1965 who are creating

23   these maps.  We live in a representative democracy and

24   like all Texans, the constituents of Senate District 10

25   deserve to be represented by just, adequate, and most

1      importantly, equitable representation of our choice.

2      Once again, thank you for this opportunity and your time.

3             SENATOR HINOJOSA:  Thank you very much for

4      your testimony.  We appreciate you being here.

5             KHANAY TURNER:  Thank you.

6             SENATOR HINOJOSA:  Adrian Kaiser.  Identify

7      yourself, who you represent and then you may proceed.

8             ADRIAN KAISER:  Mr. Chairman, members of the

9      committee, thank you so much for allowing me to speak

10     today.  My name is Adrian Kaiser.  I am a precinct chair

11     out in Montgomery County representing Precinct 66, which

12     is just south touching the Harris County line.  I have

13     received multiple calls, e-mails, texts and concerned

14     names from people within my precinct that are not excited

15     or happy in any way that our district is being

16     incorporated into Senate District 7 when we are currently

17     represented in Senate District 4.  The problem that most

18     of them see is the fact that we are a rural community

19     mostly, suburban rural in that area, and we're going to

20     be overtaken and our votes and our interests are going to

21     be diluted by the votes coming out of Harris County.

22     Harris County is a mostly urban county and most parts of

23     that, and that is where people tend to congregate.  When

24     they flee Harris County, they come in and they settle in

25     Montgomery County.  They're not happy with that.  A lot

1      of them raised concerns with the fact that Harris County

2      was sued in 2020 by the State Representative Steve Toth

3      and by a conservative activist down in that area and feel

4      that if this was to happen again, that their votes would

5      be diluted even more by that.  When it comes to the

6      divisions within the community, it's splitting a small

7      rural town of Magnolia completely in half.  South and

8      north side completing going into two different senate

9      districts.  One of which doesn't represent them, one of

10     which is okay by some people that I've spoken to.  It's

11     just divided the communities of interest that we share,

12     especially those in these rural areas, and many of them

13     feel very strongly that Harris County and a

14     representative from Harris County or a state senator from

15     Harris County will not represent the interest of

16     Montgomery County.

17            Other than that, I have nothing else besides a

18     list of 300 -- over 300 signatures of people opposed to

19     this -- to the senate redistricting map.  I urge to the

20     committee to work with Senator Brandon Creighton and the

21     other senators, representatives within that area to draw

22     a more acceptable district for SB4.  Thank you so much

23     for hearing me out today.

24            SENATOR HINOJOSA:  Please make the list of 300

25     signatures of names available to the committee.  Make a

1      copy.  I think Senator Huffman has a question for you.

2              SENATOR HUFFMAN:  Hi.  Thanks for being here.

3      I just want to point out for your -- so you could look

4      online, the amendment that was filed last night does not

5      address all your concerns, frankly; but it does address

6      the concern that you had about the splitting of

7      Montgomery -- of Magnolia in Montgomery County.  So

8      actually the amendment loses -- Senate District 7 loses

9      (indecipherable) 29, which makes that part of Magnolia

10     you were talking about whole in one senate district.  So

11     just so that -- you can look it up and get your details

12     online.  I just wanted you to know that information.

13             ADRIAN KAISER:  Yes, ma'am.  Thank you for

14     pointing that out to me.  I'll look that up.

15             SENATOR HUFFMAN:  Thank you.  Okay.

16             SENATOR HINOJOSA:  Thank you for your

17     testimony.  First of all, identify yourself, who you

18     represent and then you may proceed.

19             STEVEN WEINTRAUB:  I'm Steven Weintraub, and

20     I'm speaking for myself.  I am considered by many to be

21     an expert on critical maps and data.  I want to thank

22     Chair Hinojosa and the committee for letting me speak

23     today.  I want to start my testimony with a minor nit.

24     In past testimony, I commented how different state

25     district maps don't agree on their lines and this leads

1    to small orphan precincts and proliferation of different

2    ballots, over 800 in Travis County, leaving behind

3    management costs and ballot errors.  The senate SBOE maps

4    in Travis County do a very good job of avoiding this

5    except for one instance and that's Precinct 245.  This

6    small precinct was orphaned from the last redistricting.

7    In this map the only precinct that votes for SBOE 5 and

8    SD25, unless it's orphaned again.  Please, for elections

9    cost savings split even with 245 into SBOE 10 or SD14,

10   there are many other such errors around the state, please

11   look for them.  Travis is my bailiwick, so I get to speak

12   about this one.

13           But I really wanted to point out is the big

14   problems with maps in Williamson, Tarrant, Dallas, and

15   Harris counties.  In Williamson, you have a long noodlely

16   arm of about one to two precincts width, racing along the

17   Travis County border merging these suburban districts of

18   the 11th largest city in the country with 12 rural

19   counties, which they have no shared community.  There are

20   more egregious examples, like SD22 in Tarrant County.

21   Here, a little arm of 341,448 suburban voters is merged

22   with 602,574 voters in 11 counties reaching down to Waco.

23   What makes this so bad is that the 341 voters in

24   Tarrant County under 124,000 or 36.24 percent are White.

25   While of the 602,000, the rest of the district, 435,000

1    or 72.2 percent are White.  This takes a

2    majority-minority section of Tarrant County and dilutes

3    them making it a 59 percent .21 percent White overall

4    district.  This is a clear violation of Section 2 of the

5    1965 Voting Rights Act, which bans practices which

6    removes the ability of minority groups to have a voice in

7    their representative.  As the Supreme Court said in

8    Thornburg v. Gingles, quote, the essence of a Section 2

9    claim is that a certain electoral law, practice, or

10   structure interacts with social and historical conditions

11   to cause an inequity in the opportunities enjoyed by

12   Black and White voters to elect their preferred

13   representatives.  Saying you did not look at racial data

14   does not immunize you.  The Supreme Court deliberated in

15   (indecipherable), proof of intent is not required, just

16   proof that protected groups and its members, quote, have

17   a less opportunity than other members of the electorate

18   state to participate in the political process and elect

19   representatives of their choice.  In fact, in the

20   currently racially aware environment, a purposeful

21   refusal to look at racial data can be inferred to be a

22   condonation of growing racially discriminatory maps.

23   Similar issues can be found in other districts in

24   Tarrant County like SD9 and 10.  I do not have time to

25   elaborate on them.  Thank you for hearing me today.

1    SENATOR HINOJOSA:  Thank you.  We appreciate

2    your testimony.  Before I call the next witness, I want

3    to name the next group of ten witnesses so you can come

4    down.  Anaami Pandit, Anaami Pandit.  We have Ashley

5    Cheng, Ashley Cheng.  Prerna Bhat, Prerna Bhat.  Wendy

6    Yockay, Wendy Yockay.  Brandon Vance, Brandon Vance.

7    Steven Abodaca, Steven Abodaca.  Lily Trieu, Lily Trieu.

8    Mythe Kirven, Mythe Kirven.  Dr. Susana Carranza,

9    Dr. Susana Carranza.  And Heather Buen, Heather Buen.

10   And I'll call Sarah Chen.  Just please come up, identify

11   yourself, who you represent and then you may proceed.

12          SARAH CHEN:  Hello.  My name is Sarah Xiyi

13   Chen, and I am representing myself and a part of the

14   Texas AAPI Redistricting Coalition.  Thank you for the

15   opportunity to speak today in opposition to SB4.  I live

16   in here Austin, and I previously lived briefly in

17   Fort Worth.  I also spend spent quite a bit of time in

18   Dallas, Plano, and Carlton where my husband is from and

19   where his side of the family still lives.

20          On a general note, I urge the committee to

21   reconsider this proposed map to reflect the diversity of

22   our state and the fact that 95 percent of all population

23   growth occurred in the Black, Hispanic, Latino and Asian

24   communities.  Any fair map must reflect this population

25   growth.  The current draft of senate district map does

1       not allow any new opportunity districts based on these

2       census numbers in our metroplexes.  So I urge the

3       committee to respect the reality of Texas's population,

4       the population you serve by drawing districts that allow

5       people of color more opportunities to choose the

6       candidates of our choice.  I am Chinese American and

7       Asian American, as you heard the fastest growing

8       demographic in Texas.  Although the umbrella Asian

9       American, Native Hawaiian, Pacific Islander is extremely

10      broad, many of us share similar values and face similar

11      needs, just as we share many common interests with many

12      Black and Hispanic communities.  Where I live SD14 had a

13      13.4 percent increase in the Black population.

14      30.75 percent increase in the Hispanic Latino population.

15      And a 66.86 percent increase in the Asian population in

16      the last ten years.  And this is compared to just a 13.5

17      percent increase in the Anglo population.  But Asians in

18      North Austin are cracked into four separate senate

19      districts.  Our maps are not reflecting the growth of

20      minority communities and instead are dividing us further.

21      Around my husband's home down of Plano, Asians now

22      comprise 19 percent of the population of Collin County,

23      10 percent in Denton County, and 7 to 8 percent of the

24      Dallas and Tarrant counties.  The growth, that was

25      87 percent growth in the last decade in Dallas, Collin,

1    and Denton Counties.  Yet, this growth despite the fact

2    that we live in communities close together, the fact that

3    we are shopping, eating, praying, attending school

4    together are -- is divided aggressively between four

5    different senate districts in the proposed map.  So under

6    this map, it looks like that all people of color in

7    North Texas will have their voting power diluted by

8    inclusion of more rural areas with whom we have very

9    little in common resulting in candidates elected that

10   don't understand us and are not responsive to our needs.

11   And when I say understand us, I mean literally understand

12   us in terms of language access.  According to

13   nonpartisan, nonprofit APIA Vote, 79 percent of Asian

14   Americans in Texas speak a language other than English at

15   home.

16          I will be brief to wrap up because I just want

17   to say on a personal note that for many immigrants, from

18   many chosen Americans democracy is sacred.  My parents

19   immigrated from China in 1988, and they sought a country

20   where they had the right to vote, where they had economic

21   opportunity, and where they have ability to have more

22   than one child.  What we see now in Texas is a

23   restriction of the right to vote, a restriction on a

24   failure to address the energy infrastructure and other

25   issues that create economic opportunities and limitation

1   of reproductive freedom.

2           SENATOR NICHOLS:  I let you go way over.

3           SARAH CHEN:  I appreciate that very much, so

4   thank you.  Please continue to hold hearings and to not

5   make last-minute amendments to the maps.  And please

6   provide public analyses of the impact on communities of

7   color in future maps.

8           SENATOR NICHOLS:  Thank you.  Thank you very

9   much.  I call up Anaami Pandit from Cedar Park.  Please

10  state your name and your testimony.

11          ANAAMI PANDIT:  Good afternoon.  My name is

12  Anaami Pandit representing the Austin Asian Community

13  Civic Coalition and myself.  I appreciate the opportunity

14  to speak today and that I hope that this committee will

15  continue to hold in-person and virtual hearings to allow

16  public input from the entire state.

17              As we know, the census shows that 95 percent

18  of all growth in Texas occurred in the African American,

19  Latino, and AAPI communities.  Any fair map must reflect

20  diversity of our state.  The current drawn maps do not

21  allow any new opportunity districts based on these census

22  numbers in metroplex regions such as Austin, Dallas,

23  San Antonio, and Houston.  Instead they actually pack and

24  crack our communities diluting our votes.  So I urge this

25  committee to comply with the Voting Rights Act and accept

1    the reality of the new census by allowing people of color

2    the opportunity to choose the candidates of their choice.

3    As a member of the Asian community, the fastest growing

4    demographic in Texas, we need better, more responsive

5    representation and more opportunity districts for our

6    communities including in coalition with other people of

7    color and immigrant population with similar values and

8    needs.  Where I live in Williamson County, the population

9    grew by 44 percent in the last decade.  77 -- 77 percent

10   of that growth coming from diverse communities.  However,

11   SD5 and SD24 cracked these communities into far-off rural

12   districts.  Now, the southwestern edge of the county

13   where I live, a rapidly growing diversified area that

14   includes parts of Cedar Park and Leander is primarily

15   suburban.  It has a large Asian population.  However, in

16   a somewhat illogical moment, this is being drawn out to

17   instead being included in a district that stretches up to

18   Coryell County and (indecipherable).  It's challenging to

19   not conclude that this is an attempt at diluting our

20   votes.  SD5 had an increase -- an 18.5 percent increase

21   in African Americans, 42 percent increase in Hispanic

22   Latino, and 126 percent increase in Asian populations.

23   So our maps need to fairly reflect the growth of our

24   communities and not strategically divide them.  I have

25   family members who have served in missions abroad to

1    defend, protect, and promote our country's ideal as a

2    representative democracy.  I have a husband who served in

3    Iraq, a brother-in-law who served as an officer, and a

4    father-in-law who tirelessly works with the VA.  All of

5    them are Asian Americans, who like the rest of our

6    community deserve representation.  Redistricting is

7    intimately tied to voting rights, to the type of

8    representation we get, to the type of resources coming

9    into our communities.  And as you know, the Asian

10   American community has experienced horrific

11   discrimination here even in Central Texas.  So it's even

12   more imperative that we're able to civically participate

13   together.  Our redistricting will set the foundation for

14   the next ten years and give our community a chance at

15   equal and fair representation.  That way our elected

16   officials will listen to us and fight for us.  I urge

17   this community to hold additional in-person and virtual

18   hearings that allow public input from the entire state.

19   And I implore this committee to create a new senate map

20   reflecting our community and the census data as well as

21   creating fair districts for U.S. Congress and the Texas

22   House.

23            SENATOR NICHOLS:  I need to ask you to find a

24   place to close.

25            ANAAMI PANDIT:  Thank you for the opportunity

1    to speak today.

2         SENATOR NICHOLS:  Thank you for being here.  I

3    call up Ashley Cheng from Austin.  Please state your name

4    and begin your testimony.

5         ASHLEY CHENG:  Hello.  My name is Ashley Cheng

6    representing the Texas AAPI Redistricting Coalition.

7    Communities of color are the driving force behind growth

8    in Texas.  95 percent of our population increase was due

9    to African Americans, Latinos, and Asian Americans and

10   Pacific Islanders.  We deserve to be fairly represented

11   in these maps because it's the right thing to do, but

12   it's also the law.  I urge this committee to comply with

13   the Voting Rights Act and respect communities of color's

14   protected right to choose the candidates of our choice.

15   The proposed maps do not allow any minority opportunity

16   districts based on increase census numbers in metroplexes

17   like Houston, Dallas, San Antonio and Austin.  Instead

18   they pack and crack our communities and dilute our votes

19   districts by district.  Fair maps must reflect the

20   diversity of our state.

21        I am an Asian American of Chinese descent.

22   And I've already testified on my Asian American

23   community's interest in northwest Austin, but I would

24   like to share how it's being impacted by your maps.  My

25   grandmother, who I call Nainai fled communist China in

1    1949 to Taiwan and eventually immigrated to Austin with

2    my father and his siblings.  And in 1970, she opened a

3    restaurant in her living room where my dad and aunt

4    worked as kids.  Today they each run their own

5    restaurants in Anderson Mill and Northwest Hills, and at

6    90 years old, Nainai still shuttles back and forth

7    between the two helping with their businesses today.  And

8    as she does so, she crosses from the newly proposed SD24

9    into SD14.  It's only a 15-minute drive.  As Nainai

10   drives back where she lives with my aunt less than

11   ten minutes away from her restaurant, she crosses back

12   through yet another new district in SD25.  And if Nainai

13   were to have a medical issue, she very likely would go to

14   one of the closest hospitals in her area, St. David's

15   Round Rock Medical Center, and Nainai would be standing

16   in a forth district, SD5.  Now, what is shameful about

17   these maps is not that you are not making this sweet old

18   Chinese woman drive from senate district to senate

19   district in the course of her daily life, but that the

20   Asian Americans in her community she interacts with

21   throughout that day are having their votes and their

22   voices taken away from them.  In this region of Travis

23   and Williamson counties where Asian Americans are highly

24   concentrated, we are the fastest growing at an increased

25   rate of 76.5 percent and 164 percent respectfully.

1    Compared to the overall population of these counties,

2    though, we're still a relatively small share at about

3    7.88 percent and 9 percent.  However, much like Nainai,

4    this community is small, but it's mighty.  And splitting

5    us when we share common values and needs is

6    disenfranchisement.  We have been cracked.  In the cases

7    of currently White majority districts SD5, SD24, and

8    SD25, we have been attached to large blocks of rural

9    areas that dilute our votes.  And I am just not sure how

10   much Nainai has in common in terms of political needs and

11   representation with these far-off areas.  But I do want

12   to speak to who she does have more in common with.

13          Earlier this year after the rise of Asian

14   American hate crimes caused by racist political rhetoric

15   from our former president and several of our own Texas

16   elected leaders, I helped organize a stop Asian hate

17   rally.  Our own state capitol was closed to us to come

18   together for this cause, but Huston-Tillotson, a

19   historically Black university here in town welcomed us

20   immediately.  And it was one of the largest stop Asian

21   hate rallies in the country.

22          SENATOR NICHOLS:  Ma'am, I'll have to ask you

23   to find a place to close.

24          ASHLEY CHENG:  Okay.  I will wrap up.

25   Thank you.  We had a reported 1,000 attendants and our

1    partners included not only Asian Americans group, but a

2    coalition -- and this is the end -- a coalition of

3    organizations led me by people of color like Interfaith

4    Action of Central Texas, Go Austin/Vamos Austin, Central

5    Texas Collective for Racial Equity --

6               SENATOR NICHOLS:  I have to ask you to close.

7               ASHLEY CHENG:  -- and the NAACP.  In closing,

8    I just want to say that when I was afraid for Nainai's

9    safety --

10              SENATOR NICHOLS:  You're way over.  You're way

11   over.

12              ASHLEY CHENG:  -- as she drove through her

13   daily routines through your four senate districts --

14              SENATOR NICHOLS:  I will have to ask you to

15   close.

16              ASHLEY CHENG:  I will.  -- communities of

17   color were the ones who were there to step up for her.

18   So I urge this committee, please, to respect our Asian

19   American community, keep them together, and do the same,

20   and make sure that people of color across Texas have fair

21   representation as well.  Thank you so much for your time

22   today.

23              SENATOR NICHOLS:  Thank you very much for your

24   testimony.  I'll call up, it looks like Prerna Bhat from

25   Leander.  R-e-r-n-a, the EAJP from Leander.  Then I'll

1    call up Wendy Yockay from Pinehurst.  Okay.  Okay.

2    Thank you very much.  You've got -- just for all the

3    witnesses, you have three minutes to testify.  When the

4    light turns yellow, you have 30 seconds to close.

5            WENDY YOCKAY:  Okay.

6            SENATOR NICHOLS:  We won't start until you are

7    ready.

8            WENDY YOCKAY:  Thank you.

9            SENATOR NICHOLS:  State your name and then

10   begin testimony.

11          WENDY YOCKAY:  All right.  I am Wendy Yockay.

12   I am just an American citizen.  I am just a Texan.  I am

13   here to represent District 4 in Montgomery County

14   regarding SB4 redistricting.  We would like to call your

15   attention to the devastation that this proposed

16   redistricting plan would cause to our community by

17   cutting off Magnolia, Stagecoach, Decker Prairie, and

18   Pinehurst out of Montgomery County District 4 and sending

19   them to Harris County District 7.  The plan -- this

20   proposal cuts the heart out of Montgomery County -- oh.

21   Oh.  I'd like to tell you about our community.  We too

22   are a community of interest.  Our community is about

23   70 percent Anglo, voted 83 percent for Trump, the

24   Chairman of the Republican Party of Montgomery County

25   lives in our community, which is proposed now to be in

1        Harris County -- in Harris County district.  We are very
2        loyal voters and we have great political participation
3        amongst our neighbors.  We even talk about politics at
4        the grocery store.  We're a tight-knit county that
5        successfully elects some of the absolute best
6        conservative representatives like Senator Brandon
7        Creighton and Representative Steve Toth.  After receiving
8        this proposed map, our community was so outraged over its
9        drastic changes that we started a petition and only in
10       48 hours we have hundreds of people who have signed on,
11       neighbors who have signed on.  We have spent decades
12       building a collaborative relationship to participate in
13       our government behind the scenes of the glory positions
14       that we will be devastate -- that will be devastatingly
15       severed.  This will weaken what's left of the Montgomery
16       district and silence the voices of those whose votes are
17       dropped in the Harris County bucket of votes.  Dividing
18       Montgomery County into three different districts so
19       completely dissects our network that the power base that
20       we built over decades will likely cease to function.
21       Those Montgomery County votes will account for 7 percent
22       of the district -- of the District 7 in Harris County.
23       Harris County will make up 92 percent of the district.
24       So Harris County voters will decide who gets elected and
25       Montgomery County will have very little to say.  The

1     previous witnesses would be glad to hear this part.

2     District 7 is a 13 percent minority-majority district and

3     Whites will be outnumbered by 126,320 residents.

4             SENATOR NICHOLS:  Ma'am, your time is up.

5             WENDY YOCKAY:  I'm so sorry.

6             SENATOR NICHOLS:  I'll have to ask you to

7     close.

8             WENDY YOCKAY:  Okay.  Which is way outside the

9     census which --

10            SENATOR NICHOLS:  Your time is up, ma'am.

11            WENDY YOCKAY:  Thank you.

12            SENATOR NICHOLS:  Thank you.

13            WENDY YOCKAY:  I just want you to please

14     remember us when you make your decision and please keep

15     Montgomery County whole.

16            SENATOR NICHOLS:  We are trying to be

17     respectful of your time as well as everyone else's.

18     Thank you very much.

19       I ask Brandon Vance from Dallas to please come up.

20     When you get ready, just state your name and begin

21     testimony.

22            BRANDON VANCE:  Thank you, Mr. Chair.  My name

23     is Brandon Vance.  I reside in Dallas, Texas,

24     Senate District 23.  In my work, I serve as the regional

25     advocacy manager for KIPP Public Charter Schools in

1    Dallas, and I am not here to testify on behalf of KIPP,

2    but I do want to say working in education that I am

3    pleased to have a senator who represents our kids with

4    great care, whether they are at traditionalized public,

5    charter, private school, or any school, Senator West is

6    always fighting for our kids.

7                   With that said, I am here to testify regarding

8    the map that has been proposed.  I am here testifying as

9    an ally to my friends in Senate District 10 and

10   Senate District 16.  What has been proposed is literally

11   a travesty.  As has been said multiple times, this body

12   has a duty to protect the interest of all citizens.

13   Packing and cracking is not just wrong legally, it is

14   morally wrong.  This body has been fighting and cajoling

15   behind Senate District 10 for well over a decade.  As the

16   Mansfield mayor said, the people of SD10 have made this a

17   minority coalition district.  This district to me is an

18   example that should be a model that should be followed

19   across the state and why this body wants to move forward

20   with cracking this district is -- makes no sense as has

21   been said multiple times today.  The proposed maps, the

22   amended maps violate the equal protection clause of the

23   United States Constitution.  The people of this community

24   should be free to elect officials of their choosing.

25   Cracking this district dilutes the voting power of those

1     communities like Mansfield that have grown significantly

2     over the last decade.  SD10 should be left as it is, a

3     coalition district that is diverse and represented by

4     officials chosen by the people.  This is still a country

5     for the people by the people.  It is not just a cliche to

6     say that voters should choose their representative, not

7     representatives choosing their voters.  Minority

8     populations have increased significantly across the state

9     over the last decade.  We've heard from a number of our

10    citizens today advocating for the AAPI community,

11    advocating for minority opportunity districts whether by

12    majority or polarity.  That should be heeded by this

13    body.  We've heard from citizens speaking to the

14    necessity for grouping together and keeping together

15    communities -- like communities.  These maps,

16    specifically SD10 and SD16 show little care for keeping

17    communities of folks together.  It just makes me wonder

18    what are folks afraid of?  What are our senators afraid

19    of when it comes to making competitive maps that

20    represent all people?  I ask that you keep in mind and

21    please produce fair maps going forward.  Thank you for

22    your time.

23              SENATOR NICHOLS:  Thank you very much for your

24    testimony.  I'll call up Steven Abodaca.  It looks like

25    A-R-O-B-U-A, from Austin, Texas.  Please state your name,

1    sir.

2          STEVEN ABODACA:  It's actually Steven Abodaca.

3    Thank you to the Chair and members of this committee.  My

4    name is Steven Abodaca.  I'm represent myself.  I live in

5    South Austin just off of I35.  I should also note that my

6    own state senator, Senator Zaffirini, I'm pleased to have

7    you sitting next to me.

8          As you all know, this is an area that has

9    grown significantly since redistricting last took place.

10   I myself am one of these folks who moved back to my home

11   state three years ago.  So with my limited time, I'd like

12   to give testimony today on just a couple key topics

13   related to redistricting.  First, the timing and

14   transparency of the redistricting process.  Once again,

15   there has been very little notice given to citizens

16   regarding testifying in the proposed maps.  Generally

17   there is very little awareness of the redistricting

18   process and whether the public even has the ability to

19   provide testimony.  As constituents, we've had less than

20   a week to review and provide testimony on senate

21   districts proposed.  Additionally, not having an option

22   to provide testimony virtually during a pandemic creates

23   and undo burden on those who live far away as well as

24   those individuals who have put themselves at risk by

25   appearing in person.  It's simply the right thing to do

1    to allow citizen input to understand the ways the maps

2    should be improved.  Secondly, I'd like to address the

3    districts themselves.  The creativity with which the

4    outlined senate districts is extremely concerning.  The

5    proposed maps, once again, have no interesting -- have no

6    interest in representing the people of our state.

7    Instead, their main concern is maintaining power, even if

8    can comes at the expense of our democracy.  The ultimate

9    outcome of the map is obviously designed to decrease

10   number of competitive seats, ignore the growth and

11   influence of the community's of color and gerrymander our

12   districts once again.  It's clear the community input

13   during the few redistricting hearings that did occur

14   including my own simply requesting fair and competitive

15   maps were not met.  I expect the same to be true for the

16   congressional maps as well.  As a result of packing and

17   cracking, no one group has been -- no groups have been

18   harmed more than Black and Latinx constituents like

19   myself whose voices are being minimizing in the halls of

20   the Texas Senate as well as in congress.  Texas has grown

21   and 95 percent of that growth came from communities of

22   color.  Any map you draw must create districts where

23   people of color can vote for politicians that share their

24   values and backgrounds.  Neither the senate nor the SBOE

25   maps has any competitive districts.  Hundreds of

1     thousands of African Americans, Latinx, and Asian Texans

2     will have their voice and their votes diluted.  So I

3     implore you, it's critical that additional hearings are

4     held and take into account public testimony to improve

5     the maps to most accurately reflect the state's growing

6     and diverse population and communities of interests.

7     Thank you.

8                 SENATOR HINOJOSA:  Thank you.  We appreciate

9     your testimony.  Lily Trieu.  Just identify yourself and

10    who you represent and then you may proceed.

11                 LILY TRIEU:  Thank you.  Hello.  My name is a

12    Lily Trieu, and I am representing myself as well as the

13    Texas AAPI Redistricting Coalition.  I am encouraged by

14    the opportunity to provide testimony before this

15    committee today, and I hope that you will continue to

16    allow for in-person and virtual testimony throughout the

17    entire process.  I won't repeat a lot of the statistics

18    you've already heard today regarding the growth in Texas

19    and where that's coming from.  I do want to reiterate one

20    comment that's made -- well, a comment that has been made

21    multiple times today, and that is to comply with the

22    Voting Rights Act and to ensure that our new maps do

23    respect the reality of the census and of the changes we

24    see here in Texas.  I grew up in Sugar Land, Texas, which

25    is located in Fort Bend County and in Senate District 17,

1    Chairman Huffman's district. As a matter of fact, my

2    parents and younger sisters still live in my childhood

3    home today. I am a proud 2004 Kempner High School

4    graduate of Fort Bend ISD. For those who are not

5    familiar with Fort Bend, there are many things that we

6    take pride in. According to the 2020 census, our total

7    population grew by over 40 percent. We are amongst the

8    top fastest growing counties in Texas. We take pride in

9    our diversity, often touting that we've been named most

10    ethically diverse county in America. It's estimated that

11    over 100 different languages are spoken in my home

12    county. As a result we have a vibrant community with

13    churches, temples, mosques all thriving among some of our

14    State's most amazing ethnic foods, grocery stores, and

15    community centers. The AAPI community in Fort Bend

16    County grew by over 82 percent in the last decade as

17    compared to 66 percent statewide. The AAPI communities

18    now make up 6.6 percent of Texas's population and 23.6

19    percent of Fort Bend County's. We are the fastest

20    growing racial group across Texas that have historically

21    been unfairly divided into multiple legislative

22    districts. Unfortunately as we review the draft map,

23    you'll find that the AAPI community in Fort Bend has

24    continued to be cracked and packed, denying our voices

25    and ability to elect candidates to represent our needs.

1    Language access is a major need in AAPI communities that

2    won't be addressed without fair maps and fair

3    representation.  This past May my father, who is a

4    Vietnamese refugee and a Texan of over 30 years turned

5    65.  Just two days after his birthday he was then

6    diagnosed with stage 4 lung cancer.  Because of an

7    administrative error, we weren't able to enroll him in

8    Medicare, which denied him any form of cancer treatment.

9    Getting an appointment with the Social Security

10   Administration with translation services would have taken

11   months.  For a man who just received a terminal

12   diagnosis, he did not have months to wait.  Thousands of

13   people like him live in Texas.  Luckily, my sister and I

14   were able to be his translator and advocates, but the

15   ability to receive care and services and healthcare

16   should not come down to luck.  So unless we're able to

17   draw maps in a fair way there will be detrimental,

18   potentially life and death consequences for thousands of

19   people in SD17, in Fort Bend County, in Sugar Land, and

20   all across the state.

21          So I urge the committee to continue to hold

22   in-person and virtual testimonies and hearings that allow

23   for public input.  Continue to allow us ample time to

24   review maps, so at least 14 days for us to review

25   additional maps, 5 days to review changes to proposed

1    maps, keeping a record and documenting all communication

2    as well as providing an analysis of --

3            SENATOR HINOJOSA:  Please stop.  Your time is

4    done.

5            LILY TRIEU:  Yes, thank you.  And providing an

6    analysis on how these new maps will impact communities of

7    color.  Thank you.

8            SENATOR HINOJOSA:  Thank you very much.  We

9    appreciate your testimony.  Mythe Kirven.  Ms. Kirven.

10   Just identify yourself, who you represent and then you

11   may proceed.

12           MYTHE KIRVEN:  Good afternoon, presiding

13   officer of the senate committee to the Chairperson of the

14   redistricting committee.  My name is Mythe Kirven, and I

15   am testifying as for myself.  However, I am a proud

16   member of Delta Sigma Theta Sorority.

17           I want to thank you for the opportunity to

18   speak in opposition to Senate Bill 4 and the proposed

19   redrawing of Senate District 10.  I urge this committee

20   to keep the current boundaries of SD10, which were court

21   ordered in 2012.  Currently Senate District 10 is the

22   only crossover minority opportunity senate district for

23   Tarrant County.  The third largest county in the state of

24   Texas.  Per the 2020 census, the district population is

25   39.5 percent Anglo, 21.5 percent Black, 22 --

1    32.2 percent Hispanic.  Dismantling SD10 is a direct

2    violation of the 14th and 15th Amendment of the

3    United States Constitution.  The U.S. Supreme Court has

4    previously explained that the destruction of a

5    functioning crossover district is in violation of the

6    U.S. Constitution.  In 2012 a federal court ruled

7    specifically on Senate District 10 and the intentional

8    discriminatory enactment of the 2011 senate map that

9    negatively impacted minority voters in District 10.  It

10   is clear that the Black and Hispanic voters control the

11   electoral outcome of SD10.  By passing and enacting the

12   proposed map in senate -- it will -- it will dilute the

13   vote of peoples of color.  Please, use the existing map

14   for SD10 without any changes to the existing boundaries.

15   Thank you all for the opportunity to present my comments

16   today.

17              SENATOR HINOJOSA:  Thank you, Ms. Kirven.  We

18   appreciate your testimony.  Dr. Susana Carranza on both

19   Senate Bill 7 and Senate Bill 4.

20              SUSANA CARRANZA:  Hello.  I'm Dr. Susana

21   Carranza.  I'm testifying on my own behalf.  I oppose

22   both bills and the only thing I'm here to say about

23   Senate Bill 7 is that --

24              SENATOR HINOJOSA:  Please identify yourself

25   just for the record.  Identify yourself.

1          SUSANA CARRANZA:  Yes, I thought I just did,

2     but I am Dr.  Susana Carranza, and I am testifying

3     against both Senate Bills 7 and 4, testifying on my own

4     behalf.  Regarding Senate Bill 7, I would just like to

5     state that the map just favors non-competitive districts

6     and because of that we should revise it.  It should serve

7     the population and not incumbency or non-competitiveness.

8     Regarding the map on -- the senate map proposed under

9     Senate Bill 4, one of the problems that we heard before

10    is that Texas has seen tremendous growth in the current

11    census cycle.  The population, over 95 percent has come

12    from minorities, the growth in the population has come

13    from minorities.  The proposed map does not reflect the

14    growth patterns and, in fact, goes to extreme levels of

15    gerrymandering to disenfranchise racial minorities, the

16    thriving communities a fair representation.  Note that a

17    failure to perform or publish a racial analyses saying

18    that the maps are colorblind does not make the maps fair.

19    Proof of intent is not required.  Just proof that a

20    protected group and all its members have fewer

21    opportunities and representation and authoring.

22    Furthermore, the failure to perform racial impacts after

23    countless citizens and organization, civil right

24    organizations have urged the senate to perform the

25    impact, that clearly shows the maps were drawn with

1    ill intent.

2         I live in Travis County and we experience some of

3    the worse disenfranchising at the U.S. House level.  Our

4    urban and racial diverse population is cracking multiple

5    districts robbing us of representation.  The senate map

6    takes this type of tactics in -- applies to the Texas

7    Senate, especially in Dallas-Fort Worth, in the Herring

8    and Fort Bend areas that was discussed, but also in

9    neighboring -- in our neighboring areas where we are

10   packed in Senate 14 and 21 for the -- Austin population,

11   but our neighboring Williamson County is mixed with a lot

12   of rural counties.  These tactics are appalling.  I urge

13   you to redraw this map to make it fair.  Thank you.

14              SENATOR HINOJOSA:  Thank you.  We appreciate

15   your testimony Dr. Carranza.  Before I call the last

16   witness, I am going to call the next group.  Stevan Ruiz,

17   Stevan Ruiz.  Randall Bryant, Randall Bryant.

18   Norman Wigington, Norman Wigington.  Cheryl Foster,

19   Cheryl Foster.  Megan Sham, Megan Sham.  Christina Fu,

20   Christina Fu.  Miguel Dacones, Miguel Dacones.  Wesley

21   You, Wesley You.  Deborah Chen, Deborah Chen, and

22   Julie Gilberg, Julie Gilberg.  Heather Buen, Buen.  Just

23   come up and identify yourself, who you represent and then

24   you may proceed.

25              HEATHER BUEN:  Thank you very much.  Hello.

1   My name is Heather Buen.  I'm representing myself as well

2   as the Texas AAPI Redistricting Coalition.  I currently

3   reside in Senator Hancock's district, Senate District 9.

4   And so I would like to start off by saying the most

5   important thing that we need to consider and respect is

6   federal and state law including the Voting Rights Act.

7            I am Filipino American, Native Hawaiian.  I am

8   part of the AAPI community.  Sometimes when you're

9   indigenous, you feel like a minority amongst minority

10  sometimes, but the AAPI community of interest that I want

11  to talk about today is the one that the school district

12  that my kids got to school.  It's the HEB school

13  district, not the grocery store, but the first

14  Euless-Bedford independent school district located in

15  Tarrant County.  Boundaries include the cities of Hurst,

16  Euless, Bedford, far east Fort Worth along Trinity

17  Boulevard and the Arabian community in North Arlington.

18  Currently the school district is divided into two senate

19  districts, Senate District 9 and Senate District 10.  In

20  Tarrant County, the AAPI community has seen growth of

21  56 percent since 2010.  My family we live in River

22  Trails.  My kids attend HEB schools.  They should be out

23  of school right because I know they should be walking

24  home.  67 percent of the student population in HEB

25  schools are minority.  It is one of the most diverse

1    school districts, not just in Texas but also in the

2    entire country.  10 percent of the student population

3    identify as AAPI.  A little known fact, the largest

4    number of Tongans outside of the country of Tonga live in

5    the school district.  There's also a large number of

6    South Asian communities including Indian, Nepalese,

7    Pakistanis, Bhutanese, and many more.  A lot of our AAPI

8    residents own small businesses in the area contributing

9    to local economy and employing a lot of people in the DFW

10   area and the close proximity to the DFW airport means

11   many of our AAPI residents and families work in the

12   airline industry.  The AAPI community in the HEB school

13   district inclusive of our Muslim community means

14   they will not be met in the currently proposed maps.  In

15   the proposed maps, they are fracturing a part of the HEB

16   school district, you know, going from two senate

17   districts into three senate districts affecting cities of

18   Euless, Bedford as well as the far east Fort Worth.  And

19   so for the proposed senate district maps, this makes no

20   geographic sense because fracturing AAPI minority

21   communities along with low-income community in Euless,

22   Fort Worth, within the school district all it does is

23   ensure that their voices and their votes will be diluted.

24   For far too long AAPI communities, the fastest growing in

25   Texas, have been unfairly divided.  And so we want to

1    make sure that we embrace Texas's diversity and consider

2    the contributions of our AAPI communities and their right

3    to fair representation.  Thank you so much for your time.

4              SENATOR HINOJOSA:  Thank you Ms. Buen for your

5    testimony.  Stevan Ruiz.  Identify yourself, who you

6    represent and then you may proceed, Mr. Ruiz.

7              STEVAN RUIZ:  Thank you.  Good afternoon.  My

8    name is Stevan Ruiz.  I'm Latino.  I am a member of the

9    IBEW, International Brotherhood of Electrical Workers,

10   and an executive board member for the AFL-CIO,

11   Tarrant County Central Labor Council.  I'm here

12   representing both the AFL-CIO, Tarrant County Labor

13   Council as well as a delegate for the IBEW.  I'm here to

14   testify on my -- on behalf of myself, my union brothers

15   and sisters, and the residents of Tarrant County in which

16   I represent.  The direct impact and harm to communities

17   of color and the inequitable representation that these

18   proposed senate maps create will affect various

19   communities for decades to come.  The census shows a

20   95 percent growth rate in Texas among African American,

21   Latino, and AAPI communities.  These numbers don't even

22   include the known undercounting of Latino and minority

23   populations in the census data.  So the current data

24   being used to draw these maps is understated.  The

25   proposed maps in the amendments submitted last night do

1     not create any new opportunity districts in

2     Tarrant County or the DFW metroplex.  Instead, these maps

3     crack and pack all of our communities in order to

4     purposefully dilute the votes.  I urge this committee to

5     comply with the Voting Rights Act respecting the reality

6     of the new census data by allowing people of color the

7     opportunity to fairly elect candidates of their choice.

8     Tarrant County includes five proposed senate districts,

9     adding one more than previous; and of those five, three

10    of them including SD10 extend way off into rural areas

11    that at times go into multiple counties that have all

12    experienced a decline in their population growth.

13    Tarrant County is 29.5 percent Latino.  Latino voters of

14    these proposed maps are being splintered off with the

15    southeast portion of SD9 currently in both Dallas and

16    Tarrant and a majority-minority area.  It's now being

17    packed into a neighborhood majority-minority districts

18    like SD16 and SD23.  Senate District 10 has been cut

19    entirely in half.  Currently, SD9 where I live has

20    61.1 percent of people of color based on the 2020 census,

21    and yet it's been redrawn to represent only 49.5 percent

22    of people of color.  That's a 12 point shift.  The new

23    map should reflect the growth of the communities of color

24    and not split up or erase our voices district by district

25    with these new maps.  What I wanted to point out is that

1     the Anglo population in that same district has

2     experienced a decrease of 8.38 percent.  When you combine

3     that with that 12 percent shift, you now have an absolute

4     value of 20 percent difference in representation of those

5     votes in those districts.  I appreciate taking that into

6     consideration and the time to hear me out today.

7              SENATOR HINOJOSA:  Thank you, Mr. Ruiz.  We

8     appreciate your testimony.  Bryant, Randall Bryant.

9     Identify yourself and who you represent and then you may

10    proceed.

11             RANDALL BRYANT:  Good afternoon, Mr. Chair,

12    members of the committee.  My name is Randall Bryant.  I

13    hale from Dallas, Texas in Senate District 23.  I'm here

14    on behalf of myself and those that share my sentiment,

15    but their voices could not be heard today.  I, like many

16    people you have heard from and will continue to hear

17    from, have traversed from across this state and assembled

18    here today to provide testimony in opposition of the

19    proposed senate redistricting maps.  I have and also want

20    to tell Texas congratulations.  We've done it again.

21    Mr. Chair, I sat on the census committee for the city of

22    Dallas in 2020.  And I recall the talking points on how

23    important it was to get an accurate count and the

24    potential funding loss to the state if we did not.  I

25    recall the work we did in the hard-to-reach census

1    tracks, despite a global pandemic, to reach the Latino

2    population despite the President threatened to inquire

3    the citizenship status, and to reach the Black population

4    despite the high transition rate between multifamily

5    units.   And in the end, what did minorities do for Texas.

6    Delivered to a census that accounts for almost 95 percent

7    of the population growth, a mere 4 million people, and

8    this map is the thanks that we get.   So what have we done

9    again you may ask?   Allow me to quote the late U.S.

10   Supreme Court Justice Ruth Bader Ginsburg.   She said,

11   quote, racial discrimination in elections in Texas is no

12   mere historical artifact.   To the contrary, Texas has

13   been found in violation of the Voting Rights Act in every

14   redistricting cycle from and after 1970, end quote.   A

15   perfect five of the past five redistricting cycles Texas

16   has been found in violation of the Voting Rights Act of

17   1965.   And this map right here, congratulations, will

18   make us six out of six.   In 1929 a songwriter by the name

19   of Lethal Ellis published a song that has seen many

20   gospel renditions over the years entitled, You Can't Do

21   Wrong and Get By.   In it, he says nothing hidden can

22   be -- can be everything he thought to see.   You can't do

23   wrong and get by.   Well, Mr. Chair, I come to remind you

24   today that we can't do wrong and get by.   You can't

25   gerrymander us and get by.   You can't crack us and pack

1    us and get by.  You can't dilute our voting strength and

2    get by.  You can't suppress us with hateful, spiteful,

3    and downright shameful voting rights bills and get by.

4    You can't do wrong and get by.

5            SENATOR HINOJOSA:  Thank you very much.  We

6    appreciate your testimony.  Norman Wigington.  Wigington.

7    Okay.  Cheryl Foster.  Cheryl Foster.  Identify yourself,

8    who you represent and then you may proceed.

9            CHERYL FOSTER:  Thank you.  My name is Cheryl

10   Foster.  I'm here to represent myself.  I'm a sixth

11   generation Texan.  My family settled in McLennan County

12   in the early 1800's.  I live in Waco, Texas, House

13   District 56, Senate District 22, and U.S. Congressional

14   District 17.  I know that we're here talking about senate

15   districts, but it's instructive to see how our house

16   district in McLennan County operate.  Currently, McLennan

17   County and Waco specifically is divided into two house

18   districts, 56 represented by Doc Anderson and District 12

19   represented by Kyle Kacal.  The break between the

20   districts runs down the Brazos River through Waco

21   essentially cutting off and disenfranchising the African

22   American community in East Waco.  They can walk across

23   the river to Doc Anderson's office, but to visit

24   Kyle Kacal's office, they have to drive for over an hour

25   diluted by rural east counties east of us.  It appears

1      that you are doing the same slice and dice, crack and

2      pack to our senate district now to dilute the African

3      American vote in Tarrant County.  The racial

4      gerrymandering is very disappointing.  In Waco, we do a

5      lot of works -- do a lot of work with folks in Marlin and

6      Mart to the east, Whitney to the north, and Gatesville to

7      the west and down south I35 to Bell County.  Drawing a

8      new senate district that includes McKinleyville, Coryell,

9      Limestone, and Falls County would create a district that

10     would be more fair and incorporate the neighbors that we

11     already work with.  It is our economic community of

12     interest.  You know, Austin is the example that we

13     usually talk about when we -- when we show partisan

14     gerrymandering, the congressional districts in Austin.  I

15     think this proposed map for the senate is going to make

16     that list a prime partisan gerrymandering example.

17     Personally, I get it.  Senate District 22 as proposed,

18     certainly rewards Brian Birdwell, gives him even more

19     constituents that he can safely ignore.  And a big shout

20     out to Senator Powell for becoming so dangerous that

21     she's earned the reputation that Chet Edwards has and

22     will be ousted the same way he was.  That's it.

23                 SENATOR HINOJOSA:  Thank you very much.  We

24     appreciate your testimony, Ms. Foster.  Megan Sham.

25     Identify yourself, who you represent and then you may

1    proceed.

2         MEGAN SHAM:  Good afternoon.  Thank you,

3    Mr. Chairman and committee members for giving me this

4    opportunity.  My name is Megan Sham, representing OCA

5    Greater Houston, a nonpartisan, nonprofit that aims to

6    empower and advocate for the Asian American and Pacific

7    Islander community.

8         I would like to start by reemphasizing the

9    importance of this committee's purpose, upholding the

10   values of our society through laws that guide, protect,

11   and empower of us including the Voting Rights Act.  Fair

12   maps should be drawn in consideration for all

13   communities.  Every person regardless of language,

14   ethnicity or any aspect of their identity deserve a

15   chance at fair and equal representation for the future.

16   The creation of new opportunity districts would allow for

17   stronger voices of minorities to permeate our local,

18   state, and national government.  I am a native Houstonian

19   who grew up in Fort Bend County in Congressional District

20   22.  I felt fortunate to grow up in such a diverse

21   community, attending schools where I met friends from

22   many different cultures, languages, and socioeconomic

23   backgrounds.  In a majority-minority school district, we

24   were given lots of opportunities to grow and learn, and

25   there was still disparity in our school's resource

1    distribution.  It was extremely competitive for funding

2    for the school district.  So while the students were in

3    afforded many opportunities, the schools boosted its

4    competitive STEM classes to boost our rankings.  While I

5    was luckily able to benefit from this, I also recognize

6    that the competition made the school's priority to boost

7    students who are already excelling.  Rather than making

8    sure all students of all backgrounds have the same

9    support, the school focused on boosting the upper margins

10   of test scores.  When the lines are being drawn and

11   finalized for our congressional districts, I ask that

12   this committee consider minority groups such as the

13   growing population of AAPI's in the Congressional 22.  We

14   deserve to have fair and equitable representation from

15   those who are a part of our communities themselves.

16   Gerrymandering has and will continue to let racial

17   minorities slip through the cracks in our legislative

18   system preventing us from having representatives that

19   live and work with the people directly in our community.

20   By having representatives directly from our communities,

21   we will be able to have a stronger voice in the

22   government and become a fuller part of the tapestry that

23   makes our state and country strong and beautiful.  We

24   will also be afforded opportunities to reach out to

25   others within our communities who may have misguided

1    beliefs and judges of others.  Prejudice is alive in and

2    well, but I believe it is rooted in fear and lack of

3    knowledge.  By having representatives that represent the

4    people who actually live and work in our neighborhoods,

5    we can actively work to educate each other and have

6    effective dialogues that overcome the gulf that divides

7    our communities and will help communities progress.  As

8    someone who may seem young to you and only have been

9    voting for a few years, I encourage this committee to

10   listen to young constituents who will be directly

11   affected by these new districts.  We come into the future

12   we receive from you all, and I hope you think of your

13   children, your grandchildren, and all the future

14   generations who deserve a more equitable future.

15   Thank you so much for your time.

16            SENATOR HINOJOSA:  Thank you.  We appreciate

17   your testimony.  Christina Fu.  Just identify yourself,

18   who you represent and then you may proceed.

19            CHRISTINA FU:  Hello.  My name is Christina

20   Fu.  I currently reside in Senate District 17, and I am

21   representing OCA Greater Houston, a nonpartisan,

22   nonprofit that aims to empower and advocate for the Asian

23   Americans and Pacific Islander community.  Thank you for

24   letting me speak with you today.  This is my first time,

25   so please bear with me.

1          The 2020 census showed that the AAPI community

2     is one of the fastest growing demographics in Texas.

3     This community is extremely diverse and widespread, yet

4     our representation within the local, state, and federal

5     government has been lacking.  The proposed maps do not

6     reflect this growth, and I encourage the community to

7     consider new opportunity districts to allow communities

8     of color the ability to choose candidates that represent

9     them.  Having grown up in the -- in the Houston area, I

10    have been lucky enough to experience the many diverse

11    cultures that make Houston unique.  However, in my

12    majority White neighborhood, I did not often see people

13    like myself in the media and my schools and in the

14    government.  I was financially privileged enough to have

15    classmates that had attentive stay-at-home mothers and

16    fathers.  But I always noticed that my parents had to

17    come in in their work clothes to parent-student meetings

18    where my peers' parents came in in leisure wear.  Because

19    of this, I tried my bests to fit in with those around me

20    by distancing myself from my heritage.  The lack of

21    representation made me believe that there were not enough

22    Asian Americans in Houston to be represented.  And even

23    worse, it made be believe that Asian Americans were not

24    qualified or not smart enough to be a representative.

25    But even now as our population has grown, we still lack

1   adequate representation.  Despite not being the majority

2   in my area, the AAPI community continues to boost

3   economic growth with new businesses and enriches the

4   community with cultures and perspectives -- with new

5   cultures and perspectives and deserves to be represented

6   by someone who understands the unique experiences and

7   pressures that we face today.  I ask the committee -- I

8   ask as the committee draws and finalizes the

9   congressional district, especially the proposed Senate

10   District 15 that they remember Black, Indigenous, people

11   of color are not a monolith.  We each have cultures and

12   values that deserve to be represented in the government.

13   It is my hope that one day I will see a representative

14   who understands the academic pressures we face,

15   understands the fear Asian American women feel of being

16   fetishized, work to address the growing (indecipherable)

17   between Asian Americans, understand the barriers we face

18   in getting mental health help -- mental health help and

19   feels the frustration of being constantly overlooked.

20   Thank you for your time.

21        SENATOR HINOJOSA:  Thank you very much.  We

22   appreciate your testimony.  Miguel Dacones.  Miguel

23   Dacones.  Wesley You, Wesley You.  Deborah Chen, Deborah

24   Chen.  Identify yourself, who you represent and then you

25   may proceed.

1          DEBORAH CHEN:  Good afternoon,

2     Chairman Hinojosa, and committee members and thank you

3     for having me here today.

4          SENATOR HINOJOSA:  May I suggest that you

5     maybe you remove your mask so we can -- thank you.

6          DEBORAH CHEN:  My name is Deborah Chen, and I

7     with OCA Great Houston, a social justice, civil rights

8     organization.  I'm here today because of the importance

9     of redistricting fair opportunity and coalition district

10    maps that reflect the diversity of Texas and the spirit

11    of this constitutional requirement as a significant

12    foundation of civic engagement in our democracy.  Texas

13    has had significant population growth of which 95 percent

14    were from people of color, communities of which Asian

15    Americans are the fastest growing communities; and

16    therefore, we ask for fair representation, a fair and

17    transparent process with a minimum of 14 days for public

18    input on any proposed maps, 5 days to review proposed

19    changes, the opportunity for in-person, virtual, and

20    written testimony, and keeping a record of all documents,

21    written communications, e-mails, text messages, and draft

22    maps, and providing an analysis of how the new maps

23    impact historically disenfranchised communities of color.

24    The current proposed maps pack and crack our communities

25    and dilute our voices -- dilute our votes.  Through our

1    civic engagement work helping the AAPI community to

2    understand their civic duty and right to vote, we have

3    seen firsthand how the Asian American community in the

4    Greater Houston area is engaging in their local

5    communities and becoming increasingly politically active.

6    There are AAPI communities of interest in the Greater

7    Houston area as well as in Dallas-Fort Worth and the

8    Greater Austin area.  We should not have our voting power

9    diluted to packing or cracking at any legislative level.

10   For example, we are concerned of what happened in 2011

11   where Texas House District 137 and 149, both of which are

12   opportunity coalition districts with communities of

13   interest, were packed together in a racially

14   discriminatory attempt to prevent Asian Americans from

15   having two state representatives and it took a lawsuit to

16   prevent this.  Asian Americans and immigrant communities

17   work hard, pay taxes, buy homes, and start jobs creating

18   businesses and want opportunities for fair

19   representation.  We have shared communities of interest

20   with similar values and needs.  We have shared cultural

21   characteristics.  Share religious worship, countries of

22   origin, languages, and/or socioeconomic status.  The

23   Asian American community is diverse with generations of

24   citizens, new citizens, immigrants, and limited English

25   proficient people.  We need fair access to resources,

223

1    multi-language access, affordable housing, living wages,

2    jobs, good schools like any other community and we should

3    not have to live in fear of anti-Asian hate,

4    representatives that spew racist and discriminatory

5    rhetoric that scapegoat the Asia American from

6    communities.  The anti-Asian hate and rhetoric our

7    communities suffered during the COVID pandemic and the

8    lack of resources for our community are prime examples of

9    the importance of having the opportunity for fair

10   representation and not diluting the vote of our

11   communities.  We should have representatives that will

12   take responsibility to fix the electrical grid and have

13   companies pay their fair share for it and require living

14   wages.  We should be able to vote and advocate together

15   for the candidates of our choice to improve our

16   communities.  In closing, AAPI communities of interest

17   should not be unfairly divided in any level of egregious

18   maps whether the U.S. Congressional, State Senate, State

19   House or City Council and school boards and State Board

20   of Education.  We echo the request of other communities

21   where inclusion and transparency are publicly displayed,

22   fair maps and opportunities for input.  Unfair

23   gerrymandered redistricting is the most effective way to

24   suppress the votes of citizens and has been utilized

25   historically in Texas for multiple redistricting cycles

1   every ten years.  We ask you to rise above partisanship

2   and break this cycle.  Thank you.

3           SENATOR HINOJOSA:  Thank you very much for

4   your testimony.  Julie Gilberg, Julie Gilberg.  Identify

5   yourself, who you represent and then you may proceed.

6           JULIE GILBERG:  Thank you, Mr. Chairman and

7   committee members.  My name is Julie Gilberg and I'm here

8   to represent myself.  And I am against SB4 and the

9   proposed senate maps.

10          I live in Aldridge Place in Austin, just north

11   of UT.  I live within five blocks of two different

12   congressional districts, CD 10 and 21, and my precinct

13   itself is the third congressional district, CD 25.  So I

14   obviously live in a community that has been cracked.  My

15   congressional district is 212 miles long and contains

16   13 counties all with vastly different needs and almost

17   45 percent of CD 25's registered voters are in

18   Travis County, but I've never met my congressman despite

19   asking to meet him over four years.  My congressional

20   district contains the east side of Austin, a community of

21   color along with three minority military precincts in

22   Bell County.  And although Travis County has grown a lot

23   in the last ten years, our leadership in congress and the

24   State Texas Senate is the same and it is not reflective

25   of the racial diversity of our community.  No one has

1      been harmed more by map manipulation and voter

2      suppression than Black and Latino communities whose

3      voices have been minimized at the ballot box and in

4      congress.  According to the 2020 census, Texas is an

5      urban and racially diverse state, yet the proposed senate

6      maps do not reflect the increasing racial diversity

7      within our state.  In looking at the proposed senate

8      maps, communities of color in Tarrant County are

9      primarily cracked between SD9, SD10 and SD22 in a county

10     where the White population has shrunk by 3 percent.  The

11     Asian population has had 56 percent growth.  The Black

12     population has had 40 percent growth.  And the Latino

13     population has had 29 percent growth.  These racially

14     diverse communities all grew significantly.  SD22

15     contains many counties that are currently a part of

16     CD 25.  In SD22, racially diverse suburban Euless with a

17     population of 61,032 is in the same district a small

18     rural Rosebud with a population of 1,349 in Falls County,

19     which is 143 miles away.  There are eight other senate

20     districts that are wholly contained within that 140 mile

21     radius.  And I have to wonder, what does a racially

22     diverse community like Euless have in common with

23     Rosebud, Texas, in Falls County or what does East Austin

24     have to do with Bosque County.  Cracking and packing

25     Black and Brown communities means the needs of those

1    racially diverse communities are not met in the Texas

2    legislature or Congress.  For example, Black East Austin

3    is dealing with a lack of affordable housing and high

4    property taxes while the Black and Brown minority

5    precincts in military Killeen do not have a VA Hospital,

6    and their nearby rural hospitals are closing and the

7    nearest VA clinic is in Temple, Texas, around 30 minutes

8    away from Killeen.  And I believe both communities would

9    benefit from expanding Medicare or winterizing our grid,

10   but neither issue has been addressed in the legislature.

11   The people in my district and across Texas --

12            SENATOR HINOJOSA:  Please wrap up your

13   testimony.  Your time is up.

14            JULIE GILBERG:  Yeah.  The people in my

15   district and across Texas want solutions and not more

16   division.  And I ask the committee to draw maps that are

17   fair, competitive, and represent all Texans.  Thank you

18   very much.

19            SENATOR HINOJOSA:  Thank you.  We appreciate

20   your testimony.  Before I bring the next witness up, I'm

21   going -- I will be calling the next group, which is the

22   last group that we have, witness cards.  Idona Griffith,

23   Idona Griffith.  Sophia Deloretto-Chudy.

24   Anusheh Siddique.  Amatullah Contractor.

25   Niloufar Hafizi.  Selena Xie.  Benjamin Chou,

1   Benjamin Chou.  Prerna Bhat, Prerna Bhat.  Please come

2   up.  Identify yourself, who you represent and you may

3   proceed.

4            PRERNA BHAT:  Hi.  My name is Prerna Bhat

5   representing the Texas AAPI Redistricting Coalition, Wise

6   Up Texas and myself.  Thanks for the opportunity to speak

7   today.  I hope that this community will continue to hold

8   in-person and virtual hearings to allow public input from

9   the entire state.  The census showed that 95 percent of

10  all growth in Texas occurred in the African American,

11  Latino, and AAPI communities.  Any fair maps must reflect

12  the diversity of the state.  But instead the new maps

13  crack -- pack and crack our communities and dilute our

14  vote.  I urge this committee to comply with the

15  Voting Rights Act and respect the reality in the census

16  by honoring people of color the opportunity to choose a

17  candidate of their choice.  As an Asian American, fastest

18  growing demographic in Texas, I want fair districts

19  because we need better, more representative, more

20  communication and more opportunities for our communities

21  including in coalition with other people of color and

22  immigrant populations with similar values and needs.

23  During the winter storm when our elected officials and

24  many of our systems failed us, our community showed up

25  for each other.  This is particularly impactful because

1    many folks in these immigrant communities don't have
2    adequate information to have access to services and aid
3    and most of our representatives don't put in sufficient
4    effort to get us that information and reach out to AAPI
5    communities, so we often have to organize and support
6    each other on our own.  During the storm and the grid
7    failure in February, the South Asian Pacific organization
8    that I am a part of used our personal networks to
9    identify elderly sections in the area that were without
10   water and/or electricity so that we can send aid or get
11   them somewhere safer.  Those who are lucky enough to not
12   be as effected, hopped on the phone banks and checked on
13   those who might be.  My mom put out a call for donations
14   of household items, groceries, and water among the South
15   Asian community in her current neighborhood of Travisso
16   and Leander as well as the neighborhood that I grew up
17   in, Canyon Creek and Round Rock, Austin.  Our friends in
18   Canyon Creek didn't even still have water for several
19   days.  So we went to pick up items that they had
20   collected for donation.  We also brought them gallons of
21   water in repurposed milk jugs.  Overall through the
22   generosity of these communities, we ended up collecting
23   several van fulls of donated items to help those in even
24   more need to get through a really tough time.  These two
25   neighborhoods still only 15 minutes apart and are part of

1   the same heavily AAPI community interest in northwest

2   Austin, Sierra Park and neighborhoods in Leander and

3   Randolph are split apart in the majority of the district

4   up and down the ballot.  At least Canyon Creek are in the

5   same Senate District, SD14, in these new maps.  My

6   neighborhood will be carved out from SD14 having

7   52.1 percent people of color and thrown in the new SD25,

8   just 41 percent of people of color.  So I went from being

9   in a state senate district that included my old

10  neighborhood 15 minutes away to being in a district that

11  is two hours away in San Antonio as well as in Blanco,

12  Comal, Hays, and Burnet County.  It's all very

13  demographically distinct from my community.  Furthermore,

14  the temple that my family goes to, 5 minutes away from

15  our house, the Sri Venkateswara Temple on New Hope Drive

16  is currently in SD5 but is now being included in the new

17  SD24 map, which goes all the way up to Coryell County and

18  all the way down south to Atascosa County, but does not

19  include the majority of folks who actually attend temple.

20  This is a primarily religious and cultural center for the

21  Hindu American community of North Greater Austin where

22  folks of SD5, 14 and 24 all gather.  Now we're

23  additionally being split between SD5, 14, 24, and 25.

24  South Asian grocery stores must fund Indian, Pakistani

25  and Randall groceries and Gandhi Bazar, both located

1     around the 183/620 intersection, are frequented by the

2     South Asian community of (indecipherable) district.

3     These areas are primarily in SD5 but would also be carved

4     out and included in SD24 under these new maps.  Again

5     SD24, very (indecipherable) high districts.  Williamson

6     County grew by 44 percent in the last decade and

7     77 percent of that growth came from diverse communities

8     including 21 percent from the Asian community.  The Asian

9     population in Travis County grew by 76.5 percent over the

10    last decade.  These new maps crack these communities in

11    far-off rural nondiverse districts.  Our community is

12    already divided as is and these maps are maintaining and

13    furthering erasing our voices district by district.  They

14    serve only to dilute our voice.

15                 SENATOR HINOJOSA:  Please wrap it up.  Your

16    time has expired.

17                 PRERNA BHAT:  Yep.  For far too long, AAPI

18    communities across Texas have been unfairly divided into

19    multiple legislative districts.  I urge this committee to

20    hold additional in-person and virtual hearings that allow

21    public input from the entire state to create a new senate

22    map that reflects our community and for anecdotal data as

23    well as fair districts for U.S. Congress and Texas House.

24    In addition, please continue to allow a fair and open

25    process --

1      SENATOR HINOJOSA:  Please wrap it up.

2      PRERNA BHAT:  Review additional maps and five

3  days to review any changes to proposed map.  Thank you

4  for your time.

5      SENATOR HINOJOSA:  Thank you for your

6  testimony.  Idona Griffith.  Idona Griffith.  Sophia

7  Deloretto-Chudy.  Just identify yourself, who you

8  represent and you may proceed.

9      SOPHIA DELORETTO-CHUDY:  Thank you,

10  Mr. Chairman and committee members.  My name is Sophia

11  Deloretto-Chudy.  I'm here as the campaign manager of

12  The Good Deed Corps.  It's a nonpartisan, nonprofit that

13  furthers the voter registration and turnout in the

14  Rio Grande Valley.  And I myself live in Austin.

15      I am here today to give testimony in

16  opposition of SB4.  I remember sitting in my college

17  classroom in 2015 and learning for the first time what

18  the term gerrymandering meant.  The following year I went

19  on to write my honor's thesis on why half of all eligible

20  young people, despite being the largest eligible block of

21  voters in the United States history, decided to stay home

22  instead of voting in one of the most critical elections

23  in our lifetime.  The answer I came to over and over in

24  my year of research was that young people were made to

25  believe that their votes did not count.  They didn't

—232—

1   matter.  They truly believed that the elections were

2   decided for them and their voice and their votes didn't

3   make a difference no matter what they had to say.  Young

4   people are not apolitical.  They are not apathetic.  They

5   are distrusting.  The lack of trust in our formal, quote,

6   unquote, institution, is one of the most well-documented

7   declines in American cloak of history, and is

8   legitimately one of biggest threats to our nation's and

9   our state's democracy.  This is the kind of partisan

10  election rigging that makes us young voters distrusting

11  of election, not the false and unfounded accusations of

12  voter fraud and illegal balloting.  The lines drawn on

13  this senate map proposed actually do make it so that

14  certain people, specifically the young people of color

15  who make up the growing Texas electorate, votes will not

16  count because of their district drawn in an uncompetitive

17  by nature.  The winner is predetermined.  The intentional

18  lack of competitiveness and total disregard for what is

19  clear and obvious in the census data is a blatant power

20  grab.  I've worried about how divided we are as a

21  country.  I worry about the lack of trust in government

22  and gerrymandering and map manipulation will only make

23  this problem worse.  Not only are these maps

24  discriminatory and undemocratic, they will intentionally

25  or not discourage a young electorate from participating

1      in the patriotic acts of voting.  As a Texan, I am

2      demanding a fair and transparent process that results in

3      maps that accurately represent them, not what is in front

4      of us today.  I ask that the committee draw maps that are

5      fair, competitive and represents all Texans.  Thank you

6      for your time.

7                  SENATOR HINOJOSA:  Thank you very much.  We

8      appreciate your testimony.  Please identify yourself and

9      who you represent and then you may proceed.

10                 ANUSHEH SIDDIQUE:  My name is Anusheh

11     Siddique.  I'm speaking on behalf of the Emgage Action.

12     I'm the coordinator of the Empowering Community

13     Initiative, collaborative that seeks to advocate for the

14     Asian community.  I live in Fort Bend County in

15     U.S. Congressional 22, Texas House District 27, Texas

16     Senate District 17.

17                 In 1965, the Voting Rights Act was passed to

18     counter the Jim Crow laws to place the safeguards against

19     voters suppression.  A critical part of this was Section

20     2, an effort to protect minority voters from having their

21     voices and votes diluted.  In the past ten years, I am

22     proud to say Texas has added almost 4 million people and

23     minority communities in Fort Bend have grown

24     substantially and exponentially.  I mention this because

25     the maps this body has authored do not reflect this

—234—

1    growth.  Unfortunately, your maps continue to neglect the

2    rapid growth of minority communities as they have faced

3    decades of closed-door decisions.  These decisions are

4    decided by the same lawmakers whose incumbency is

5    contingent on how the district boundaries are set up.

6    Voters should decide their politicians.  Politicians do

7    not need to be deciding their voters.  So ask yourself if

8    this is a conflict of interest.  My own district --

9    forgive me, Senators -- our district has an AAPI

10    population and prevents them from consolidating any power

11    as a voting block or having any future of electing a

12    representative with our own interest at heart.

13    Congressional District 22 has one of the highest AAPI

14    populations in the nation, yet it has been drawn in a way

15    that no AAPI could possibly win.  Texas ranks fourth in

16    AAPI hate crimes.  This means to say my father or my

17    mother or my neighbors or my fellow believers in faith

18    are congregated in their houses of worship praying for

19    our safety, our representatives are allowed to operate on

20    wildly unpopular decisions without any fear of

21    consequences.  My community is literally split down the

22    middle to ensure our votes are diluted.  That's not an

23    exaggeration.  If you see these maps, you will see quite

24    literally that it's intentional and it is racist.

25    Despite being in the Chairwoman's district and being your

1    constituents is not to go out of their way to exclude me

2    and people who look like me.  I've worked in nonprofit

3    communities organizing campaigns, and in each of these

4    industries, I have found communities of marginalized

5    folks that have been fractured for electoral benefit.  I

6    have been able to work in mapping areas of interest, and

7    those are coincidentally the points your cracking and

8    packing policies strike the most in these proposed maps.

9    I ask you instead of calculating the trajectory of your

10   political advance for the next decade at the expense of

11   democracy, try opening the doors to public and when we

12   rise, we rise together.

13              SENATOR HINOJOSA:  Thank you very much for

14   your testimony.  Next we have Amatullah Contractor.

15   Please identify yourself and who you represent and then

16   you may proceed.

17              AMATULLAH CONTRACTOR:  Good afternoon,

18   Chair Huffman and Vice Chair Hinojosa and committee

19   members.  My name is Amatullah Contractor, and I am

20   speaking on behalf of Emgage Action and myself.  I am

21   here to testify against Senate Bill 4 and urge you to

22   withdraw and reconsider these proposed maps.  Senate

23   Bill 4 displays a series of senate district maps

24   surgically carved out to solidify the arbitrary request

25   for power in the republican party.  These maps are a

1     direct contradiction of the growth seen in the Texas

2     population, contributed 95 percent by communities of

3     color.  Instead these maps have cut out populous counties

4     by extending them out to rural areas.  These communities

5     have little shared interest or concerns and can only be

6     justified as a secure seat for incumbents.  Particularly

7     the Asian American communities, the fastest growing

8     ethnic minority in the country, and yet every region

9     where there was significant AAPI growth such as

10    Fort Bend, Harris and Collin counties have been cracked

11    to deny us representation.  I have analyzed the census

12    data of the AAPI community from 2010 up until 2020, and

13    it confirmed what I always knew was true, a strong desire

14    for our communities to congregate, to be together, and I

15    thought that is what we would get when I advocated for

16    our communities to complete the census all the way from

17    speaking in training in 2020 and yet here we are.  We

18    were worried their data would be weaponized for other

19    reasons, and right now it is being weaponized as a way to

20    crack them in half so that they would not be represented

21    adequately.  We are entitled to our representation, to

22    have our needs addressed; and when they aren't, we are

23    entitled to hold our officials accountable by voting

24    against them.  We need districts where politicians must

25    earn votes through public service and community

1    solutions.  I work with the coalition known as Houston In

2    Action to create unity maps that offer solutions for

3    communities that are drowning.  And when I see these

4    maps, I see this as an attempt by a certain party to hold

5    our heads under the water.  I have been on the -- today,

6    I urge you to reconsider these proposed maps and ask

7    yourselves about the consequences these lines have on my

8    community.  Silencing voices of the very people that you

9    have taken an oath to serve, whose rights you have taken

10   an oath to preserve and protect is inherently immoral.

11   We will not be spectators as our voices are stripped

12   away.  We will show up to public hearings to tell our

13   stories.  We will show up in court to represent our

14   communities and advocate for the lives we deserve and we

15   will continue to mobilize our community to march on in

16   the fight for the equitable representation we are

17   entitled to.  Fair districting is our right, and we won't

18   back down from that.  Thank you.

19              SENATOR HINOJOSA:  Thank you for your

20   testimony.  Niloufar Hafizi.  Just identify yourself, who

21   you represent and then you may proceed.

22              NILOUFAR HAFIZI:  Thank you, Mr. Vice Chair,

23   and thank you, Senators and Madam Chairwoman.  My name is

24   Niloufar Hafizi.  I'm here on behalf of myself and the

25   organization Emgage Action.  A c(4) advocates on behalf

1      of AAPI voters, their communities, and the Muslim

2      communities.  I was born in Harris County, went to the

3      same law school as Senator Huffman did in Harris County,

4      worked there, and I've lived in Fort Bend County since

5      2014.  And the (indecipherable) in Fort Bend, Harris,

6      Matagorda and Wharton counties, and I am here to testify

7      in opposition of SB4.  My family is from Iran, a country

8      where all state (indecipherable) of democracy exists, but

9      there is no real democracy.  When my relatives and our

10     family, friends talk about America and that I am from

11     America, they tell me oh, you must live -- you must be so

12     thrilled to live in a representative democracy.  They may

13     not know the details of the Voting Rights Act and the

14     Civil Rights movement here, but they do know that this is

15     supposed to be a country where you are race doesn't

16     determine how much your vote counts.  They may have never

17     read or heard of even Randall versus Simms, but they

18     think that one person, one vote is the principle of this

19     country, that people who serve in the legislature is

20     honor.  When I look at these maps, that is not what I

21     see.  In the district I live in, SD18 has experienced

22     massive population growth mostly thanks to communities of

23     color.  In fact, the Asian American population of SD18

24     increased by 129 percent.  When I learned of this, I

25     thought maybe, just maybe there will be a rare

1    opportunity for someone like me to feel that my vote

2    counts because our community is so used to being ignored,

3    we show up and we vote anyway.  When these maps were

4    released, I realized, of course, this is what I should

5    have expected.  These maps are drawn to benefit

6    incumbents and that is dangerous, not only because of the

7    populations you've ignored, but because these maps were

8    made in time of peril for American democracy.  Public

9    trust in government's ability to represent people is at

10    an all time low in modern history.  The public believes

11    that legislators drawn these maps to benefit themselves,

12    and when they look at structures like these where a place

13    like Fort Bend County, which is large enough that it

14    could be its own compact district, is split apart into

15    three senate districts and lumped into SD18 with

16    communities and counties such as (indecipherable),

17    Fayette and Burleson that are rural counties with little

18    in common with Fort Bend.  And it's clear to see why the

19    public has little trust in this process.  And

20    furthermore, noncompetitive districts like these exist,

21    they corrupt the process by making sure that people feel

22    that their vote doesn't count.  They make sure that when

23    primaries happen, that's when the election happens, not

24    the actual election.  I ask you as representatives of

25    Texas who have the power to do this at a moment of

1   crucial importance in the American history to not

2   gerrymander against people's interest based on race and

3   partisanship.  Thank you.

4         SENATOR HINOJOSA:  Thank you for your

5   testimony.  Benjamin Chou.  Just -- we'll have a clerk

6   pick it up.  You can go ahead and testify.  Somebody will

7   pick it up.  Just leave it there on the desk.  Thank you.

8   Just identify yourself and who you represent and then you

9   may proceed.

10         BENJAMIN CHOU:  My name is Benjamin Chou, and

11   I represent myself.  I rise in opposition to

12   Senate Bill 4.  Chairman Hinojosa, Chairwoman Huffman,

13   thank you for holding this important hearing.  Two weeks

14   ago during a virtual hearing held by this committee, I

15   testified that Asian Americans in Texas outgrew every

16   other racial group except Hispanics this past decade.  In

17   greater Houston, however, Asian Americans were the

18   fastest growing racial group, and we now comprise over

19   five percent of the state.  As a result of this growth,

20   an Asian polarity senate district can be drawn in the

21   Greater Houston area.  In fact, I have a copy of it here

22   and I've distributed it to all of you -- thank you very

23   much, to senators today, which I will walk you through.

24   Texas has never had an Asian polarity senate district and

25   currently there is no senate district that is more than

1    21 percent Asian.  As you can see on page 2, the areas

2    that are darker are where Asian Americans live.  From

3    this map, you can tell that our community largely resides

4    in southwest Harris County and northeast Fort Bend

5    County.  In the current senate map, Asian Americans are

6    already split.  Senate District 17, your district,

7    Madam Chair, is where we have the largest concentration

8    of Asian Americans at just over 17 percent.  On page 3

9    you will see, however, that Senate Bill 4 does a

10   disservice to the Asian American community by splitting

11   us even further.  Instead of creating an Asian

12   opportunity district, it engages in what legal experts

13   call cracking of our Asian community.  In this map, there

14   are no districts in Houston where we constitute more than

15   13 percent.  Only 13 percent, Madam Chair.  How is it

16   that the fastest growing population in the Houston area

17   finds itself with less representation?  How is it we find

18   ourselves decreasing from 17 percent to 13 percent?  How

19   can we as Asian Americans expect you or any other senator

20   to effectively represent our interests when you further

21   divide us so that we cannot even live together in one

22   district?  I understand that you have repeatedly said

23   today that these maps were drawn, in quote, blind to

24   race.  But based on the evidence, I find that claim hard

25   to believe.  This map reeks of intentional discrimination

1    against Asian Americans, and I hope you do show the data

2    that I brought here today to the attorney general's

3    office so that General Paxton is aware that this map

4    cracks the Asian community.  Fortunately, I'm an optimist

5    and believe the committee will do the right thing and

6    respect our desire to be united in one district.  As such

7    on the last map, you will see that there is an

8    opportunity to draw an Asian polarity district of

9    30 percent in our district.  As such, I strongly

10   encourage the senate to redraw Senate Bill 4 and create a

11   polarity Asian opportunity district because it's possible

12   and the Asian population deserves the opportunity to

13   elect someone of our choice.  Thank you so much.

14           SENATOR HINOJOSA:  Thank you very much for

15   your testimony.  Selena Xie.  Selena Xie.  I'm going to

16   call some of the other witnesses which I called a while

17   ago and were not -- did not respond.  Idona Griffith,

18   Idona Griffith.  Wesley You, Wesley You.  Miguel Dacones,

19   Miguel Dacones.  Norman Wigington, Norman Wigington.

20   Selena Xie.  Those are all the cards we have for today's

21   witness list.  I will ask if anybody present would like

22   to testify for, on, or against Senate Bill 4 and

23   Senate Bill 7?  I'll ask again.  Is anybody present who

24   would like to testify for, on, or against Senate Bill 4

25   and Senate Bill 7?  If not, the public testimony is

1    closed for today.  I think tomorrow we will continue at

2    9:00 in the morning listening and hearing testimony on

3    Senate Bill 4 and Senate Bill 7.  Madam Chair Huffman.

4                SENATOR HUFFMAN:  Thank you, Senator Hinojosa,

5    very much for fulfilling your vice chair duty so well --

6    so well today.  Thank you, sir, for taking over.

7    Members, I just want to remind you again about the

8    amendment process.  As we have said, I want to repeat it

9    publicly again, committee amendments including the

10   corresponding reports from legislative council are due to

11   the committee by Sunday, September 26, 2021, at

12   10:00 a.m., Ledge Counsel is asking that committee

13   amendments be submitted to them by 5:00 p.m. Saturday on

14   September 25 in order for them to have sufficient time to

15   process and produce the amendment packet.  Members, I

16   would say that today there were some comments and some --

17   about an amendment being filed in the dark of night last

18   night.  I actually filed that as soon as it was prepared.

19   The amendments actually are not due until Sunday.  So I

20   filed it purposefully so that the public would have some

21   viewing of the amendment.  As we all know, the amendments

22   are part of this process.  We are doing it just that way.

23   There will not be a committee substitute.  We are putting

24   the amendments out there.  We urge members of the public

25   who have amendments that they want to, or maps that they

1    want to present and all members to get your amendments

2    in.  They will all be considered and presented to this

3    committee for a vote.  So with that, we will -- I think

4    that's all the business we have today.  So we will stand

5    in recess subject to the call of the Chair which will be

6    tomorrow morning at 10:00 a.m. where we will welcome more

7    public testimony on these important pieces of

8    legislation.  At 9:00 a.m.  I'm so sorry.  Today was

9    10:00.  Tomorrow is 9:00.  9:00 a.m.  9:00 a.m.  So sorry

10   about that.  Okay.  We'll be in recess.  Thank you.

1          I, REBECCA FARRIS, a competent court reporter and

2     disinterested person, transcribed the pre-recorded

3     video/audio proceedings.

4

5          Dated November 24, 2021.

6

7                    Electronically signed/Rebecca Farris

8                    Rebecca Farris
                     Stenographic Court Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25