**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | § § § | |
| *Plaintiffs,* | § | Case No. 3:21-cv-00259 |
| v. | § § | [Lead Case] |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § | |

| | | |
|---|---|---|
| ROY CHARLES BROOKS, *et al.* | § § | |
| *Plaintiffs,* | § | |
| v. | § § | Case No. 1:21-cv-00988 |
| | § | [Consolidated Case] |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § | |

**DEFENDANTS' MOTION TO DISMISS**
**THE BROOKS PLAINTIFFS' CLAIMS**

TABLE OF CONTENTS

Table of Contents ...............................................................................................................ii

Table of Authorities.........................................................................................................iii

Introduction......................................................................................................................1

Standard............................................................................................................................1

Argument ..........................................................................................................................2

I.      Plaintiffs Have Not Plausibly Alleged a Discriminatory-Effects Claim.....................2

        A.   Coalition Districts Fail the First *Gingles* Precondition...............................2

             1.   Supreme Court Precedent Forecloses Requiring Coalition Districts.......................3

             2.   Fifth Circuit Precedent to the Contrary Was Wrong and Has Been
                  Overruled ......................................................................................4

        B.   Plaintiffs Do Not Plausibly Allege that Black and Latino Voters in SD10 Are
             Politically Cohesive ...............................................................................8

        C.   Plaintiffs Do Not Allege Facts Supporting the Third *Gingles* Precondition .........9

II.     The Plaintiffs Have Not Alleged Facts Stating a Claim of Intentional Discrimination..........10

III.    Plaintiffs Have Not Plausibly Alleged Standing ........................................................13

IV.     Section 2 Does Not Give Plaintiffs an Implied Private Cause of Action................16

Conclusion ......................................................................................................................19

Certificate of Service........................................................................................................19

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
  138 S. Ct. 2305 (2018) ............................................................................................ 10, 12, 13

*Alexander v. Sandoval,*
  532 U.S. 275 (2001) .............................................................................................. 16, 17, 18, 19

*Allen v. State Board of Elections,*
  393 U.S. 544 (1969) ..................................................................................................... 18, 19

*Alsbrook v. City of Maumelle,*
  184 F.3d 999 (8th Cir. 1999) (en banc) ............................................................................ 18

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .......................................................................................................... 2, 8

*Bartlett v. Strickland,*
  556 U.S. 1 (2009) ............................................................................................... 3, 4, 5, 6, 7, 8

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) .......................................................................................... 1, 2, 8, 11, 12

*Brecht v. Abrahamson,*
  507 U.S. 619 (1993) ........................................................................................................... 16

*Brewer v. Ham,*
  876 F.2d 448 (5th Cir. 1989) ............................................................................................... 9

*Brnovich v. Democratic National Committee,*
  141 S. Ct. 2321 (2021) ....................................................................................... 11, 13, 16

*Campos v. City of Baytown,*
  840 F.2d 1240 (5th Cir. 1988) .................................................................................. 4, 5, 6, 9

*Campos v. City of Baytown,*
  849 F.2d 943 (5th Cir. 1988) ........................................................................................... 5, 6

*Campos v. City of Houston,*
  113 F.3d 544 (5th Cir. 1997) .............................................................................................. 2

*City of Mobile v. Bolden,*
  446 U.S. 55 (1980) ............................................................................................................ 16

*Conley v. Gibson,*
   355 U.S. 41 (1957) ........................................................................................................... 1

*Conservation Force v. Delta Air Lines, Inc.,*
   190 F. Supp. 3d 606 (N.D. Tex. 2016) ...................................................................... 17, 18

*Conservation Force v. Delta Air Lines, Inc.,*
   682 F. Appx. 310 (5th Cir. 2017) ................................................................................. 17

*Cooper Industries, Inc. v. Aviall Services, Inc.,*
   543 U.S. 157 (2004) ....................................................................................................... 16

*DiMaio v. Democratic National Committee,*
   520 F.3d 1299 (11th Cir. 2008) (per curiam) ........................................................... 13, 14

*Dippin' Dots, Inc. v. Mosey,*
   602 F. Supp. 2d 777 (N.D. Tex. 2009) ........................................................................... 6

*Dominguez v. District of Columbia,*
   536 F. Supp. 2d 18 (D.D.C. 2008) ................................................................................ 15

*Gahagan v. U.S. Citizenship & Immigration Services,*
   911 F.3d 298 (5th Cir. 2018) ........................................................................................... 6

*Gallagher v. N.Y. State Bd. of Elections,*
   496 F. Supp. 3d 842 (S.D.N.Y. 2020) ........................................................................... 14

*Gee, In re,*
   941 F.3d 153 (5th Cir. 2019) (per curiam) ................................................................... 15

*Gonzaga University v. Doe,*
   536 U.S. 273 (2002) ....................................................................................................... 17

*Green Party of Arkansas v. Daniels,*
   4:09-cv-695, 2010 WL 11646587 (E.D. Ark. Apr. 15, 2010) ....................................... 15

*Grove v. Emison,*
   507 U.S. 25 (1993) ....................................................................................................... 2, 9

*Hall v. Virginia,*
   385 F.3d 421 (4th Cir. 2004) ........................................................................................... 4

*Harding v. County of Dallas,*
   948 F.3d 302 (5th Cir. 2020) ........................................................................................... 9

*Hotze v. Hudspeth,*
   16 F.4th 1121 (5th Cir. 2021) ........................................................................................ 15

*J.I. Case Co. v. Borak,*
    377 U.S. 426 (1964) ............................................................................................ 16, 18

*Johnson v. De Grandy,*
    512 U.S. 997 (1994) .................................................................................................. 4

*Logan v. U.S. Bank National Assn.,*
    722 F.3d 1163 (9th Cir. 2013) ................................................................................ 17

*LULAC v. Clements,*
    999 F.2d 831 (5th Cir. 1993) (en banc) ................................................................ 8, 10

*LULAC v. Midland Independent School Dist.,*
    812 F.2d 1494 (5th Cir.1987) ................................................................................... 5

*Marks v. United States,*
    430 U.S. 188 (1977) .................................................................................................. 3

*Miller v. Gammie,*
    335 F.3d 889 (9th Cir. 2003) (en banc) .................................................................... 6

*Miller v. Johnson,*
    515 U.S. 900 (1995) ................................................................................................ 10

*Morse v. Republican Party of Virginia,*
    517 U.S. 186 (1996) ................................................................................................ 17

*Nixon v. Kent County,*
    76 F.3d 1381 (6th Cir. 1996) .................................................................................... 5

*NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760,*
    377 U.S. 58 (1964) .................................................................................................. 11

*Northeast Ohio Coalition for the Homeless v. Husted,*
    831 F.3d 686 (6th Cir. 2016) .................................................................................... 6

*Perry v. Perez,*
    565 U.S. 388 (2012) ...................................................................................3, 4, 7, 8, 12

*Personnel Administrator of Massachusetts v. Feeney,*
    442 U.S. 256 (1979) ........................................................................................... 10, 11

*Rodriguez v. Pataki,*
    308 F. Supp. 2d 346 (S.D.N.Y. 2004) (per curiam), *aff'd,* 543 U.S. 997 (2004) ................................. 9

*Rodriguez v. Popular Democratic Party,*
    457 U.S. 1 (1982) ................................................................................................... 17

*Rollins v. Fort Bend Independent School Dist.*,
 89 F.3d 1205 (5th Cir. 1996) ................................................................................9

*Shaw v. Reno*,
 509 U.S. 630 (1993) ............................................................................................11

*Stokes v. Southwest Airlines*,
 887 F.3d 199 (5th Cir. 2018) ..................................................................... 16, 18

*Texas v. United States*,
 887 F. Supp. 2d 133 (D.D.C. 2012), *vacated*, 570 U.S. 928 (2013) ....................13

*Thornburg v. Gingles*,
 478 U.S. 30 (1986) .............................................................................1, 2, 7, 8, 9

*Touche Ross & Co. v. Redington*,
 442 U.S. 560 (1979) ............................................................................................18

*Townley v. Miller*,
 722 F.3d 1128 (9th Cir. 2013) ............................................................................14

*Troy v. Samson Manufacturing Corp.*,
 758 F.3d 1322 (Fed. Cir. 2014) ............................................................................6

*United States v. Brown*,
 494 F. Supp. 2d 440 (S.D. Miss. 2007), *aff'd*, 561 F.3d 420 (5th Cir. 2009) .....................................7

*United States v. Hays*,
 515 U.S. 737 (1995) ..................................................................................... 11, 15

*Valdespino v. Alamo Heights Independent School Dist.*,
 168 F.3d 848 (5th Cir. 1999) ............................................................................3, 9

*White v. Estelle*,
 720 F.2d 415 (5th Cir. 1983) ................................................................................6

*Yazzie v. Hobbs*,
 977 F.3d 964 (9th Cir. 2020) (per curiam) .........................................................14

*Ziglar v. Abbasi*,
 137 S. Ct. 1843 (2017) ............................................................................... 16, 19

**Statutes**

13 U.S.C. § 141 ...........................................................................................................12

52 U.S.C.
  § 10301 ................................................................................................................. 4, 17, 18
  § 10304 .......................................................................................................................... 18
  § 10308 .......................................................................................................................... 18

Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ........................................... 18

Senate Bill 4, 87th Texas Leg., 3d C.S. (Oct. 15, 2021) .............................................. 14

**Constitutional Provisions**

Texas Constitution art. III, § 40 ................................................................................. 12

U.S. Constitution, art. III, § 2 ............................................................................... 14, 15

**Other Authorities**

*The Bluebook: A Uniform System of Citation* (21st ed. 2020) .......................................... 7

## INTRODUCTION

The Brooks Plaintiffs present their claims as a narrow challenge to a single Senate district, but their legal theories would have radical consequences that the Supreme Court has already rejected. The Court should dismiss their complaint for failure to state a claim or lack of subject-matter jurisdiction.

First, Plaintiffs contend that Section 2 of the Voting Rights Act required the Legislature to create a "coalition district," in which black and Hispanic voters would combine to constitute an electoral majority. But under *Thornburg v. Gingles*, Section 2 does not apply unless a single minority group would constitute a majority of the proposed district. 478 U.S. 30, 50 (1986). The Supreme Court has repeatedly rejected attempts to expand Section 2 beyond *Gingles*. Requiring States to create coalition districts would upend redistricting in a way the Supreme Court has never approved.

Second, despite the absence of factual support for their assertion, Plaintiffs contend that the Legislature altered SD10 for racially discriminatory reasons. But the facts they allege support an opposite conclusion: That the Legislature sought partisan advantage. And partisan motives are neither unexpected nor invidious, and they do not support claims of intentional racial discrimination.

In any event, jurisdictional and procedural problems prevent Plaintiffs from pursuing these claims without, at least, repleading. Plaintiffs lack standing because, among other reasons, they do not allege that they intend to vote in any future election. Plaintiffs also do not have a private cause of action for their statutory claims.

## STANDARD

A plaintiff must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

ARGUMENT

## I.   Plaintiffs Have Not Plausibly Alleged a Discriminatory-Effects Claim

Plaintiffs demand a "coalition district" in which "Black and Hispanic voters" together form a majority, ECF 1 ¶ 109; *see also id.* ¶ 6, but the Voting Rights Act never requires coalition districts.. Coalition districts, by definition, cannot satisfy the first *Gingles* precondition. Moreover, on this complaint, Plaintiffs have failed to plausibly allege that the remaining *Gingles* preconditions are satisfied or that the totality of the circumstances requires transforming SD10 into a coalition district.

"Failure to establish any one of these threshold requirements is fatal." *Campos v. City of Houston*, 113 F.3d 544, 547 (5th Cir. 1997). Plaintiffs' sole discriminatory-effects claim should be dismissed.

### A.   Coalition Districts Fail the First *Gingles* Precondition

In *Thornburg v. Gingles*, the Supreme Court established three "preconditions" for a Section 2 discriminatory-effects claim. 478 U.S. 30, 50 (1986); *see Grove v. Emison*, 507 U.S. 25, 40–41 (1993) (rejecting a challenge to single-member district under the *Gingles* preconditions). The first precondition is that "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. Plaintiffs' claim fails this requirement because no single group constitutes a majority of the proposed coalition district.

There is no fact dispute here. Plaintiffs do not allege that either black voters or Hispanic voters *standing alone* could "constitute a majority in a single-member district." *Id.* On the contrary: they allege only that "Black and Hispanic voters" *together* "constitute a majority in a single member senate district." ECF 1 ¶ 105. As a result, the Court faces a pure question of law: Can Plaintiffs satisfy the first *Gingles* precondition where no single group can form a majority in the proposed single-member district?

2

The answer is no. The Supreme Court has never found a violation of Section 2 based on a State's decision not to draw a coalition district when the plaintiff could not show that a single minority group would constitute a majority in the proposed district. In fact, in *Bartlett v. Strickland*, the Supreme Court rejected crossover districts (i.e., districts in which a subset of white voters join with a minority group to form an electoral majority). *See* 556 U.S. 1, 13 (2009) (plurality).[1] And in *Perry v. Perez*, the Supreme Court made clear that *Bartlett*'s reasoning applied to coalition districts as well. *See* 565 U.S. 388, 399 (2012).

### 1. Supreme Court Precedent Forecloses Requiring Coalition Districts

Under the first *Gingles* precondition, Plaintiffs must plausibly allege "that their minority group exceeds 50% of the relevant population in the demonstration district." *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852–53 (5th Cir. 1999); *see also Bartlett*, 556 U.S. at 13 (a district may be required where "a minority group composes a numerical, working majority of the voting-age population"). Because of this requirement, the Supreme Court has refused to require either "influence districts, in which a minority group can influence the outcome of an election even if its preferred candidate cannot be elected," or crossover districts, in which "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Bartlett*, 556 U.S. at 13. For similar reasons, Section 2 does not mandate the creation of coalition districts.

*Bartlett*'s reasoning rejecting crossover districts applies with equal force to coalition districts. A violation of the Voting Rights Act occurs where "members of a class of citizens protected" by

---

[1]   *Bartlett* was decided by a 5-4 vote. The five votes to reverse comprised a three-justice plurality (Justice Kennedy, joined by Chief Justice Roberts and Justice Alito) and a two-justice concurrence (Justice Thomas, joined by Justice Scalia). The concurrence would have reversed on the basis that Section 2 "does not authorize any vote dilution claim" and therefore would have refused to apply the *Gingles* framework. 556 U.S. at 26 (Thomas, J., concurring). Because the plurality states the narrowest ground on which the judgment was reached, it is the controlling opinion. *See Marks v. United States*, 430 U.S. 188, 193–94 (1977).

Section 2 "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). But coalition districts are, by definition, those "in which two minority groups form a coalition to elect the candidate of the *coalition's* choice." *Bartlett*, 556 U.S. at 13 (emphasis added). As the Court explained, "[t]here is a difference between a racial minority group's 'own choice' and the choice made by a coalition." *Id.* at 15. Plaintiffs' claim is thus "contrary to the mandate of § 2." *Id.* at 14.

Indeed, the Court specifically recognized that "[n]othing in § 2 grants special protection to a minority group's right to form political coalitions." *Id.* at 15. Where a minority group does not constitute a numerical majority in the proposed district, members of that group would merely possess "the opportunity to join other voters—including other racial minorities, or whites, or both—to reach a majority and elect their preferred candidate." *Id.* at 14. Recognition of a Section 2 claim where minority group members cannot elect their preferred candidate "based on their own votes and without assistance from others" would impermissibly "grant minority voters 'a right to preserve their strength for the purposes of forging an advantageous political alliance.'" *Id.* at 14–15 (quoting *Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004)). The Voting Rights Act contains no such right, as "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground." *Id.* at 15 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994)).

**2. Fifth Circuit Precedent to the Contrary Was Wrong and Has Been Overruled**

*Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988), does not require otherwise. True, the *Campos* court held that if the combination of black and Latino voters "are of such numbers residing geographically so as to constitute a majority in a single member district, they cross the *Gingles* threshold as potentially disadvantaged voters." *Id.* at 1244. This Court, however, should decline to follow *Campos*. Its flawed reasoning is not only inconsistent with the Supreme Court's later decisions in *Bartlett* and *Perez* but also not binding in this unusual procedural posture.

4

The flaws inherent in the *Campos* decision were recognized from the outset, including in Judge Higginbotham's dissent from the denial of rehearing en banc, which five of his colleagues joined. Judge Higginbotham found *Campos*'s assumption "that a group composed of both [Black and Hispanic] minorities is itself a protected minority" to be "an unwarranted extension of congressional intent." *Campos v. City of Baytown*, 849 F.2d 943, 945 (5th Cir. 1988) (Higginbotham, J., dissenting from denial of rehg. en banc). Coalition groups are outside the *Gingles* framework because that case's "three step inquiry assumes a group unified by race or national origin and asks if it is cohesive in its voting." *Id.* (quoting *LULAC v. Midland Indep. Sch. Dist.*, 812 F.2d 1494, 1504 (5th Cir.1987) (Higginbotham, J., dissenting)). Channeling the sentiments that would later animate the Supreme Court in *Bartlett*, Judge Higginbotham observed that "[a] group tied by overlapping political agendas but not tied by the same statutory disability is no more than a political alliance or coalition." *Id.*

Nor were Judge Higginbotham and his five colleagues the only ones to see how *Campos* contradicted *Gingles* and Section 2. Nearly a decade later, the Sixth Circuit announced that it "share[d] the concerns articulated by Judge Higginbotham in his dissent from the denial of rehearing." *Nixon v. Kent County*, 76 F.3d 1381, 1388 (6th Cir. 1996). Among those concerns were that coalition districts would "effectively eliminate" the first *Gingles* requirement. *Id.* at 1391. That requirement "necessarily recognizes that, in some cases, a minority will not be numerous enough to prove a violation of the Voting Rights Act because it fails to constitute a majority in a single member district." *Id.* (internal quotation marks and citation omitted). Coalition districts would present an exception to the first *Gingles* requirement that would swallow the rule. The Sixth Circuit thus rejected this misreading, holding that "[t]he language of the Voting Rights Act does not support a conclusion that coalition suits are part of Congress' remedial purpose and, as previously discussed, there are compelling reasons to believe that they are not." *Id.* at 1393.

Fortunately, *Campos* has been overruled. Even when a Fifth Circuit opinion is "squarely on point," it does not bind lower courts after "intervening and overriding Supreme Court decisions." *White v. Estelle*, 720 F.2d 415, 417 (5th Cir. 1983). In analyzing whether a later Supreme Court decision abrogated an earlier Fifth Circuit decision, "[t]he overriding consideration is the similarity of the issues decided." *Gahagan v. U.S. Citizenship & Immig. Servs.*, 911 F.3d 298, 303 (5th Cir. 2018). As a result, "intervening Supreme Court authority need not be precisely on point, if the legal reasoning is directly applicable." *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 720–21 (6th Cir. 2016); *see also Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014) ("issues decided by the higher court need not be identical to be controlling"). It is sufficient that the Supreme Court has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). "[A] district court or a three-judge panel is free to reexamine the holding of a prior panel in light of an inconsistent decision by a court of last resort on a closely related, but not identical issue." *Dippin' Dots, Inc. v. Mosey*, 602 F. Supp. 2d 777, 785 n.3 (N.D. Tex. 2009) (quoting *Miller*, 335 F.3d at 899).

As discussed in detail above, *Bartlett*'s treatment of crossover districts applies with equal force to coalition districts. That opinion analyzes in detail why Section 2 protects individual racial and language minority groups and does not protect political coalitions between groups. *See Bartlett*, 556 U.S. at 13–15. By contrast, *Campos* "cites no authority and offers no reasoning to support its fiat." *Campos*, 849 F.2d at 945 (Higginbotham, J., dissenting from denial of rehg. en banc).

The only "reasoning" in *Campos* was the truism that Section 2 "protects the right to vote of both racial and language minorities." *Campos*, 840 F.2d at 1244. But the extension of "voting rights protection to language minorities does not answer the question whether Congress intended to extend protection to a group consisting of two distinct minority groups." *Campos*, 849 F.2d at 945 (Higginbotham, J., dissenting from denial of rehg. en banc). And that reasoning is inconsistent with

*Bartlett*. No one doubts that "Section 2 broadly protects the voting rights of all voters, even those who are white." *United States v. Brown*, 494 F. Supp. 2d 440, 446 (S.D. Miss. 2007), *aff'd*, 561 F.3d 420 (5th Cir. 2009). *Bartlett* nonetheless rejected crossover districts that rely on white voters to form an electoral majority. 556 U.S. at 14.

If any doubt remained following *Bartlett*, the Supreme Court dispelled it in *Perry v. Perez*, 565 U.S. 388 (2012). There, the Court rejected a proposed coalition district, holding:

> The [district] court's order suggests that it may have intentionally drawn District 33 as a "minority coalition opportunity district" in which the court expected two different minority groups to band together to form an electoral majority. . . . If the District Court did set out to create a minority coalition district, rather than drawing a district that simply reflected population growth, it had no basis for doing so. *Cf. Bartlett v. Strickland*, 556 U.S. 1, 13–15 (2009) (plurality opinion).

565 U.S. at 399. Because it was "unclear whether the District Court . . . followed the appropriate standards in drawing interim maps," the Supreme Court vacated the district court's ruling. *Id.*

The Supreme Court recognized that the coalition-district issue in *Perez* was not identical to the crossover-district issue in *Bartlett*. That is why it employed a "cf." signal. That signal literally means "compare" and is used when the "[c]ited authority supports a proposition different from the main proposition but sufficiently analogous to lend support." *The Bluebook: A Uniform System of Citation* rule 1.2(a) (21st ed. 2020). At the same time, the Supreme Court thought that the issues were sufficiently analogous that there was no need for extensive discussion; citing the portion of *Bartlett* discussed above was sufficient.

\* \* \*

This Court should dismiss Plaintiffs' discriminatory-effects claim because they cannot satisfy the first *Gingles* precondition. A plaintiff who proposes a coalition district has necessarily failed to plausibly allege that "the minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50.

7

**B. Plaintiffs Do Not Plausibly Allege that Black and Latino Voters in SD10 Are Politically Cohesive**

Even if Plaintiffs could satisfy the first *Gingles* precondition, they would still fail the second precondition: "[T]he minority group must be able to show that it is politically cohesive." 478 U.S. at 51. Plaintiffs do not allege any facts to establish this requirement. Even their conclusory assertions are bare bones. Count V includes only one paragraph on political cohesion, which states, in its entirety: "Black and Hispanic voters in Tarrant County are politically cohesive." ECF 1 ¶ 106. The only other paragraph to address cohesion offers little more:

> Black and Hispanic voters in Tarrant County are politically cohesive. General elections are most probative, given the high voter participation and the political unity that exists within the choice of which party's primary to vote in. But both recent general and primary elections illustrate the strong cohesion between Tarrant County's Black and Hispanic voters.

*Id.* ¶ 80. That is nothing more than a "formulaic recitation" of the second *Gingles* element. *Twombly*, 550 U.S. at 555. Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Plaintiffs cannot satisfy their pleading burden by broadly referring to unspecified "recent general and primary elections." ECF 1 ¶ 80. That is especially true in light of the "obvious alternative explanation" for any similar voting patterns: partisanship. *Twombly*, 550 U.S. at 567. Indeed, it is Plaintiffs' burden to disprove "that partisan affiliation, not race, best explains" any alleged bloc voting. *LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc). By neglecting to even mention partisanship as an explanation, much less address the extent to which partisanship accounts for any similar voting behavior, Plaintiffs have failed to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Plaintiffs' allegations would not suffice in any Section 2 case, but they are particularly deficient here because Plaintiffs propose a coalition district. Even before it swept away that assumption in *Bartlett* and *Perry v. Perez*, when the Supreme Court "[a]ssum[ed] (without deciding) that it was

permissible for [a] District Court to combine distinct ethnic and language minority groups for purposes of assessing compliance with § 2," it found that there was "quite obviously a higher-than-usual need for the second of the *Gingles* showings." *Grove*, 507 U.S. at 41. Indeed, "when dilution of the power of such an agglomerated political bloc is the basis for an alleged violation, proof of minority political cohesion is all the more essential." *Id.* Accordingly, even when *Campos* erroneously required the Fifth Circuit to assume that coalition districts could satisfy the first *Gingles* precondition, that court did not hesitate to dismiss cases proposing coalition districts based on the plaintiff's failure to meet the second *Gingles* precondition. *See, e.g.*, *Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1205, 1216 n.21 (5th Cir. 1996) (affirming dismissal where statistical evidence did not establish cohesion and "[n]o concrete, reliable, or credible evidence was presented at trial that Hispanic and African-American communities work together to accomplish common goals"); *Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989) (affirming dismissal due to "lack of statistical evidence of inter-minority political cohesion").[2]

### C.  Plaintiffs Do Not Allege Facts Supporting the Third *Gingles* Precondition

In addition, Plaintiffs do not allege facts supporting the final *Gingles* precondition, namely, "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51 (citation omitted). Satisfying this requirement is a "bright-line test," *Valdespino*, 168 F.3d at 852, and Plaintiffs' failure to satisfy it "is fatal." *Harding v. Cnty. of Dallas*, 948 F.3d 302, 308 (5th Cir. 2020) (quotation omitted).

---

[2]    Plaintiffs are also wrong to suggest that "[g]eneral elections are most probative" when determining whether two minority groups are politically cohesive. ECF 1 ¶ 80. Quite the opposite is true. "Where, as here, the two minority groups are generally affiliated/registered with the same party (Democratic) and vote for that party's candidates at high rates, primary elections for that party's candidate are by far the most probative evidence of cohesion." *Rodriguez v. Pataki*, 308 F. Supp.2d 346, 421 (S.D.N.Y. 2004) (three-judge court) (per curiam), *aff'd*, 543 U.S. 997 (2004). But the Court need not confront that issue at this stage because Plaintiffs have not alleged facts regarding either primary or general election results in their proposed district.

As to bloc voting, Plaintiffs' conclusory allegation in Count V, which merely recites the *Gingles* requirement, cannot suffice. *See* ECF 1 ¶ 107. The closest Plaintiffs come is alleging that the newly constituted SD10 would have favored five Republican candidates in 2018 and 2020. *See id.* ¶ 47. But the complaint does not address whether the alleged "failure of minority-preferred candidates to receive support from a majority of whites on a regular basis" is due to "illegal vote dilution" or simple "political defeat." *LULAC v. Clements*, 999 F.2d at 850. Allowing allegations such as these to suffice to establish "legally significant racial bloc voting," would "loose[] § 2 from its racial tether." *Id.*

## II.     The Plaintiffs Have Not Alleged Facts Stating a Claim of Intentional Discrimination.

Plaintiffs also have not plausibly alleged their intentional-discrimination claims. *See* ECF 1 ¶¶ 94–99.

Plaintiffs have not alleged facts that would allow the Court to infer a discriminatory purpose. In redistricting cases, "the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). It is "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). The required intent is not mere "volition" or "awareness of consequences." *Personnel Admr. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). It requires that the Legislature have passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

Plaintiffs have not plausibly alleged discriminatory intent here. On the contrary, Plaintiffs allege facts suggesting the Legislature's motive was not racial, but merely partisan. According to Plaintiffs, SD10 previously supported Democratic candidates. *See* ECF 1 ¶ 37 (alleging Democrats won eight of eight races in the old SD10). In the newly redistricted SD10, on the other hand, Republican candidates stand a much better chance of winning. *See id.* ¶ 47 (alleging Republicans would have won five of five races in the new SD10). "[P]artisan motives are not the same as racial motives."

*Brnovich v. Democratic Natl. Cmte.*, 141 S. Ct. 2321, 2349 (2021). Plaintiffs cannot rebut the inference supported by their own allegations: A partisan legislature acted for partisan reasons.

*First*, Plaintiffs allege that the bill's opponents, especially Plaintiff Beverly Powell herself, tried to inject race into the Legislature's consideration of SD10. *See, e.g.*, ECF 1 ¶¶ 57–60. Of course, legislators are not obligated to credit the opinions of a bill's opponents. As the Supreme Court has recognized, a bill's "legislative opponents," "[i]n their zeal to defeat a bill," "understandably tend to overstate its reach." *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 66 (1964). The most that Plaintiffs' allegations establish is that other legislators were aware of Plaintiff Powell's allegations of discrimination. But there is no reason to think that they agreed with her assessments. In any event, alleged "awareness of consequences" does not establish discriminatory intent. *Feeney*, 442 U.S. at 279. Mere awareness is "consistent with" invidious intent, but it is "just as much in line with" other motives. *Twombly*, 550 U.S. at 554. Because Plaintiffs' factual allegations are equally consistent with the Legislature acting "in spite of" rather than "because of" the alleged racial consequences of the redistricting maps, they have not plausibly alleged invidious discrimination. *Feeney*, 442 U.S. at 279; *see Twombly*, 550 U.S. at 557 (explaining "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with)" a legal violation).

Mere awareness of racial consequences is especially insufficient in the redistricting context. "[E]vidence tending to show that the legislature was aware of the racial composition of" a district "is inadequate to establish injury in fact," much less a violation on the merits. *United States v. Hays*, 515 U.S. 737, 745–46 (1995). "[T]he legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination." *Shaw v. Reno*, 509 U.S. 630, 646 (1993).

*Second*, Plaintiffs claim to have identified "departures from the normal procedures and from the substantive considerations usually deemed important by the Legislature in redistricting." ECF 1 ¶ 68. Plaintiffs allege that legislators gave "little advance notice" regarding proposed maps and did not hold "field hearings." *Id.* ¶¶ 68–69. There is, however, an "obvious alternative explanation" for these alleged departures: the COIVD-19 pandemic. *Twombly*, 550 U.S. at 567. As Plaintiffs' complaint acknowledges, the federal government did not deliver the data necessary for redistricting until August 12, 2021. *See* ECF 1 ¶ 27. That was more than four months after the statutory deadline of April 1. *See* 13 U.S.C. § 141(a), (c). That forced the Legislature to redistrict during a special session, which is constitutionally limited to thirty days, rather than during its longer, regular session. *See* Tex. Const. art. III, § 40. With a compressed schedule due to pandemic-related delays, an allegedly rushed process would hardly be surprising, much less give a reason to infer intentional invidious discrimination. In *Perez*, the Supreme Court could "not see how the brevity of the legislative process can give rise to an inference of bad faith." 138 S. Ct. at 2328–29. The evidence there was insufficient; Plaintiffs' allegations here are even weaker.

Plaintiffs also point to an alleged failure to keep Plaintiff Powell "informed" about the redistricting process, *see* ECF 1 ¶ 71, but there is again an "obvious alternative explanation." *Twombly*, 550 U.S. at 567. Everyone knew that Plaintiff Powell would oppose the changes to her district because they negatively affect her chances of winning reelection. A bill's supporters have little reason to keep a sure opponent of that bill "informed" about its progress. The failure to inform one's legislative opponent is not a basis for inferring intentional invidious discrimination, much less intentional invidious discrimination against racial and ethnic groups to which that opponent does not belong.

*Third*, Plaintiffs claim that the "historical background" and "specific sequence of events" reveal a discriminatory purpose. ECF 1 ¶¶ 72–73. Yet the only "background" to which Plaintiffs point is a contested 2012 court ruling that was vacated after the underlying federal statute was ruled

unconstitutional. *See Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012), *vacated*, 570 U.S. 928 (2013); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2330 (2018) ("Before our decision in *Shelby County* mooted Texas's appeal . . . , Texas filed a jurisdictional statement claiming that the D.C. court made numerous errors. . . ."). In any event, even if one believed that the 2011 map was enacted with a discriminatory purpose—it was not—that would not be probative of the intent of a different group of legislators in enacting a different map at a different time. In the last round of Texas redistricting, the Supreme Court specifically faulted the district court for "requir[ing] the State to show that the 2013 Legislature somehow purged the 'taint' that the court attributed to the defunct and never-used plans enacted by a prior legislature in 2011." *Perez*, 138 S. Ct. at 2324. The two-year-old taint that was too attenuated to support a finding of fault in 2013 did not become less attenuated in the intervening eight years.

And the only "event" Plaintiffs identify is a single senator's answers to Plaintiff Powell's questions. Conclusory assertions that those answers were "pretextual" are not plausible allegations of fact. ECF 1 ¶ 73.

In the end, Plaintiffs' allegations are facially insufficient to rebut the presumption of good faith. They focus almost exclusively on a single senator, Joan Huffman, who chaired the Senate Redistricting Committee. The only other senators mentioned are Plaintiff Powell and Kel Seliger, two opponents of the new Senate map. But Plaintiffs' complaint does not include any allegations regarding those who voted in favor of the new map. That is fatal to their claims. "[L]egislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents" and cannot be presumed to have adopted the motives Plaintiffs erroneously attribute to Senator Huffman. *Brnovich*, 141 S. Ct. at 2350.

## III.  Plaintiffs Have Not Plausibly Alleged Standing

Plaintiffs do not allege facts to establish standing. *First*, allegations that Plaintiffs are "registered voters," ECF 1 ¶¶ 8–14, are insufficient. *DiMaio v. Democratic Natl. Cmte.*, 520 F.3d 1299,

1302 (11th Cir. 2008) (per curiam). Indeed, an individual's right to vote cannot be impaired if that person does not intend to cast a ballot in the first place. *Id.* Nor are purported injuries redressable if that individual does not vote in the election being challenged. *Id.* at 1303. Even allegations that an individual "may, at some point . . . choose to cast a ballot" are insufficient because they "epitomize[] speculative injury." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013). Plaintiffs here do not even allege that much.

A "complaint undeniably fails the test for constitutional standing" when the plaintiff "never allege[s] that he actually voted, nor even so much as suggested that he intended to vote in," the election at issue. *DiMaio*, 520 F.3d at 1302; *see also Yazzie v. Hobbs*, 977 F.3d 964, 967 (9th Cir. 2020) (per curiam) (dismissing for lack of standing because "any allegation or showing as to, at a bare minimum, whether any of the plaintiffs intend to vote in this general election" was "missing"); *Gallagher v. N.Y. State Bd. of Elections*, 496 F. Supp. 3d 842, 850 (S.D.N.Y. 2020) (plaintiffs lacked standing to challenge vote-by-mail deadline when none of them alleged an intention to cast an absentee ballot by mail). Because they fail to allege an intention to vote in any election that would be conducted under the challenged maps, Plaintiffs Roy Charles Brooks, Felipe Gutierrez, Phyllis Goines, Eva Bonilla, Clara Faulkner, and Deborah Spell all lack standing under Article III.

*Second*, the remaining Plaintiff, Beverly Powell, also fails to meet the requirements for constitutional standing. She does not claim to be a registered voter. Instead, she claims standing as "the incumbent state senator in SD10," ECF 1 ¶ 15, but even if that were otherwise sufficient for standing, Plaintiff Powell does not allege an intention to run for reelection. The challenged redistricting "does not affect the membership or districts of the Senate of the 87th Texas Legislature," including Plaintiff Powell's current status as an elected official.[3] A plaintiff who "does not allege that [she]

---

3   Senate Bill 4 § 4, 87th Leg., 3d C.S. (Oct. 15, 2021), https://capitol.texas.gov/tlodocs/873/billtext/pdf/SB00004F.pdf.

intends to run for election" has failed to demonstrate a particularized injury. *Dominguez v. District of Columbia*, 536 F. Supp. 2d 18, 25 (D.D.C. 2008); *see also Green Party of Ark. v. Daniels*, 4:09-cv-695, 2010 WL 11646587, at *3 (E.D. Ark. Apr. 15, 2010) ("whether [Plaintiff] intends to run for office" is an issue that "relates to whether she has standing to proceed as a plaintiff"). Accordingly, Plaintiff Powell also lacks Article III standing.

Even assuming Plaintiff Powell intends to run for reelection, she would still lack standing because she does not allege that she is a member of a minority group allegedly discriminated against. Each count in Plaintiffs' complaint rests on a theory of discrimination against black and Latino voters. *See* ECF 1 ¶¶ 94–109. But the complaint conspicuously omits Plaintiff Powell's race and ethnicity, *see id.* ¶ 15, though it includes such information for the other Plaintiffs, *see id.* ¶¶ 9–14.

*Third*, certain Plaintiffs lack standing to bring certain claims for independent reasons. Courts analyze standing "on a claim-by-claim basis." *Hotze v. Hudspeth*, 16 F.4th 1121, 1125 (5th Cir. 2021); *accord In re Gee*, 941 F.3d 153, 170 (5th Cir. 2019) (per curiam).

Counts 1–3 and 5 all rest on Plaintiffs' contention that the Legislature should have drawn SD10 to include more black and Hispanic voters. Plaintiffs' proposal would not benefit them—and the fact that the Legislature did not adopt it would not injure them—unless Plaintiffs would live in SD10 under their proposed map. But Plaintiffs do not allege that any of them, much less all of them, would live in SD10 if their proposed revisions were effective.

Count 4 is a racial gerrymandering claim, *see* ECF 1 ¶¶ 100–03, so it requires each Plaintiff bringing the claim to allege that "he or she, personally, has been injured by" a "racial classification." *Hays*, 515 U.S. at 744. But the complaint does not allege "why [any] particular [Plaintiff] was put in one district or another." *Id.* The Plaintiffs living outside SD10 cannot have standing unless they were excluded because of their races or ethnicities, but Plaintiffs do not allege that. And at the very least, the Plaintiffs living inside SD10 cannot bring Count IV because they already have what they want.

15

**IV.     Section 2 Does Not Give Plaintiffs an Implied Private Cause of Action**

Plaintiffs' Section 2 claims, ECF 1 ¶¶ 94–95, 104–109, fail for an independent reason: There

is no private cause of action to enforce Section 2.

The Supreme Court has never decided whether Section 2 contains an implied private cause of

action. It has often "[a]ssum[ed] . . . that there exists a private right of action to enforce" Section 2,

but it has never so held. *City of Mobile v. Bolden*, 446 U.S. 55, 60 (1980) (plurality). Decisions that "never

squarely addressed the issue," but "at most assumed" an answer, are not binding "by way of *stare

decisis*." *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993); *see also Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543

U.S. 157, 170 (2004). Thus, whether "the Voting Rights Act furnishes an implied cause of action under

§ 2" is "an open question." *Brnovich*, 141 S. Ct. at 2350 (Gorsuch, J., concurring).

"[P]rivate rights of action to enforce federal law must be created by Congress," *Alexander v.

Sandoval*, 532 U.S. 275, 286 (2001), so answering that open question requires analyzing whether

Congress created a private cause of action in Section 2, despite its failure to say so in statutory text.

"The judicial task is to interpret the statute Congress has passed to determine whether it displays an

intent to create not just a private right but also a private remedy." *Id.* Unless Congress expresses that

intent, "a cause of action does not exist and courts may not create one, no matter how desirable that

might be as a policy matter, or how compatible with the statute." *Id.* at 286–87.

There was once a time when federal courts "assumed it to be a proper judicial function to

'provide such remedies as are necessary to make effective' a statute's purpose." *Ziglar v. Abbasi*, 137

S. Ct. 1843, 1855 (2017) (quoting *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964)). But that time has

passed. Since jettisoning the "*ancien regime*," *id.*, the Supreme Court has "not returned to it." *Sandoval*,

532 U.S. at 287. As a result, courts no longer rely "on pre-*Sandoval* reasoning." *Stokes v. Sw. Airlines*,

887 F.3d 199, 205 (5th Cir. 2018).

Under *Sandoval*, Section 2 does not confer a private cause of action on Plaintiffs. It contains no indication of a congressional intent to create a private right, much less a private remedy.

"Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Sandoval*, 532 U.S. at 289 (quotation omitted). And Section 2's text focuses on the governmental officials it regulates, not individual voters: "No voting qualification or prerequisite to voting or standard, practice, or procedure s*hall be imposed or applied by any State or political subdivision* in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a) (emphasis added). Because it "is framed in terms of the obligations imposed on the regulated party" (government officials)—while voters are "referenced only as an object of that obligation"—Section 2 does not create a private right. *Logan v. U.S. Bank Natl. Assn.*, 722 F.3d 1163, 1171 (9th Cir. 2013). Language "framed as an instruction to the regulated entity, rather than to the person protected," does "not indicate a congressional intent to make a remedy available to private litigants." *Conservation Force v. Delta Air Lines, Inc.*, 190 F. Supp. 3d 606, 616 (N.D. Tex. 2016), *aff'd*, 682 F. Appx. 310 (5th Cir. 2017).

Although Section 2 does not contain any "'rights-creating' language[.]" *Sandoval*, 532 U.S. at 288. Though it refers to "the right . . . to vote," 52 U.S.C. § 10301(a), that right is based on state law, *see Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982), and the Fifteenth Amendment. Referring to a right is not the same as creating one, and Section 2 thus does not create a federal right "in [the] clear and unambiguous terms" that precedent requires. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002).

Fractured opinions have suggested in *dicta* that Section 2 impliedly creates a private cause of action. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 232–33 (1996) (minority opinion of Stevens, J.) (quoting legislative history and discussing "a right to vote"); *id.* at 240 (Breyer, J., concurring in the judgment) (similar). But those opinions are inconsistent with the later majority opinion in *Sandoval*,

which limited its "search for Congress's intent [to] the text and structure of" the statute. 532 U.S. at 288. "[D]ecisions before *Sandoval* frequently implied private rights of action without rigorous analysis; they did so by making a somewhat cursory inspection of the statute and its legislative history." *Conservation Force*, 190 F. Supp. 3d at 616. They "are not binding nor persuasive." *Id.* Thus, courts in the Fifth Circuit refuse to rely "on pre-*Sandoval* reasoning." *Stokes*, 887 F.3d at 205 (quoting *Conservation Force*, 190 F. Supp. 3d at 616).

In addition, other sections of the VRA make clear that Section 2 does not create a private remedy. The VRA authorizes civil and criminal enforcement actions by the federal government. *See* 52 U.S.C. § 10308. "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. "Courts should presume that Congress intended that the enforcement mechanism provided in the statute be exclusive." *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1011 (8th Cir. 1999) (en banc).

That other sections of the VRA contain implied private causes of action is irrelevant. In *Allen v. State Board of Elections*, for example, the Supreme Court held that Section 5 of the Voting Rights Act created a private cause of action because the language of that section—that "no person shall be denied the right to vote," 52 U.S.C. § 10304(a)—was "passed to protect a class of citizens," that is, voters. 393 U.S. 544, 557 (1969). But in determining whether a statute creates implied causes of action, each provision must be considered separately. *See, e.g.*, *Touche Ross & Co. v. Redington*, 442 U.S. 560, 576–78 (1979) (rejecting an implied cause of action under Section 17(a) of the Securities Exchange Act of 1934 despite *Borak*'s earlier inferring one under Section 14(a) of the same act). And *Allen* analyzed only Section 5; it did not consider Section 2's language—that no improper "voting qualification or prerequisite . . . shall be imposed or applied by any State or political subdivision," 52 U.S.C. § 10301(a)—which focuses on the duties of the regulated parties. In any event, the Supreme Court

has rejected *Allen*'s loose, legislative-history-based approach, *see Sandoval*, 532 U.S. at 287, even listing *Allen* as an example of the now-abandoned "*ancien regime*," *Abbasi*, 137 S. Ct. at 1855.

CONCLUSION

Defendants respectfully request that the Court dismiss the Brooks Plaintiffs' claims.

Date: November 29, 2021                     Respectfully submitted.

KEN PAXTON                                  */s/ Patrick K. Sweeten*
Attorney General of Texas                   PATRICK K. SWEETEN
                                            Deputy Attorney General for Special Litigation
BRENT WEBSTER                               Tex. State Bar No. 00798537
First Assistant Attorney General
                                            WILLIAM T. THOMPSON
                                            Deputy Chief, Special Litigation Unit
                                            Tex. State Bar No. 24088531

                                            OFFICE OF THE ATTORNEY GENERAL
                                            P.O. Box 12548 (MC-009)
                                            Austin, Texas 78711-2548
                                            Tel.: (512) 463-2100
                                            Fax: (512) 457-4410
                                            patrick.sweeten@oag.texas.gov
                                            will.thompson@oag.texas.gov

COUNSEL FOR DEFENDANTS

CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on November 29, 2021, and that all counsel of record were served by CM/ECF.

                                            */s/ Patrick K. Sweeten*
                                            PATRICK K. SWEETEN