# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br>        *Plaintiffs*, <br><br> v. <br><br> GREG ABBOTT, *in his official capacity as Governor of the State of Texas*, and JOHN SCOTT, *in his official capacity as Secretary of State of Texas*, <br>        *Defendants*. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | Case No. 3:21-cv-259-DCG-JES-JVB <br> [Lead Case] |
| DAMON JAMES WILSON, <br>        *Plaintiff*, <br><br> v. <br><br> THE STATE OF TEXAS, *et al.*, <br>        *Defendants*. | § <br> § <br> § <br> § <br> § <br> § <br> § | Case No. 1:21-cv-943-RP-JES-JVB <br> [Consolidated Case] |

## EXHIBIT C

### U.S. CENSUS BUREAU FINAL RULE

listed in the **ADDRESSES** section of this document. FAA Order 7400.11B lists Class A, B, C, D, and E airspace areas, air traffic service routes, and reporting points.

## Differences From the NPRM

Subsequent to publication of the NPRM, the FAA identified an error within a set of True (T) and Magnetic (M) coordinates along V–113. The intersection coordinates ''INT Modesto 208°(T) 19(M) and El Nido 277°(T) 262°(M) radials'' were misidentified as PATYY intersection in the NPRM; when in fact these coordinates are for WINDY intersection. The FAA is changing the coordinates to ''INT Modesto 208° (T) 191° (M) and El Nido 298° (T) 283° (M)'' as the correct coordinates for PATYY intersection.

## The Rule

The FAA is amending Title 14 Code of Federal Regulations (14 CFR) part 71 to amend VOR Federal Airways V–113 and V–244 in the western United States due to the scheduled decommissioning of the Manteca and Maxwell VOR facilities. The routes are outlined below.

*V–113:* V–113 currently extends between Morro Bay, CA (MQO) and Lewistown, MT (LWT) with a gap between Panoche, CA (PXN) and Linden, CA (LIN). The FAA is filling the gap between Panoche, CA (PXN) and Linden, CA (LIN). The unaffected portions of the existing route will remain as charted.

*V–244:* V–244 currently extends between Oakland, CA (OAK) and Salina, KS, (SLN). The FAA is relocating the segment of the route from Oakland, CA by rerouting the airway approximately 10 nautical miles north of the previous airway until tied back into the previous route at Coaldale, NV. The unaffected portion of the existing route will remain as charted.

All radials in the regulatory text route descriptions below are stated in True degrees.

VOR Federal airways are published in paragraph 6010(a), of FAA Order 7400.11B dated August 3, 2017, and effective September 15, 2017, which is incorporated by reference in 14 CFR 71.1. The VOR Federal airways listed in this document will be subsequently published in the Order.

## Regulatory Notices and Analyses

The FAA has determined that this regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current. It, therefore: (1) Is not a ''significant regulatory action'' under

Executive Order 12866; (2) is not a ''significant rule'' under Department of Transportation (DOT) Regulatory Policies and Procedures (44 FR 11034; February 26, 1979); and (3) does not warrant preparation of a regulatory evaluation as the anticipated impact is so minimal. Since this is a routine matter that only affects air traffic procedures and air navigation, it is certified that this rule, when promulgated, does not have a significant economic impact on a substantial number of small entities under the criteria of the Regulatory Flexibility Act.

## Environmental Review

The FAA has determined that this action modifying VOR Federal airways V–113 and V–244 qualifies for categorical exclusion under the National Environmental Policy Act and its agency-specific implementing regulations in FAA Order 1050.1F, ''Environmental Impacts: Policies and Procedures'' regarding categorical exclusions for procedural actions at paragraph 5–6.5a, which categorically excludes from full environmental impact review rulemaking actions that designate or modify classes of airspace areas, airways, routes, and reporting points. Therefore, this airspace action is not expected to result in any significant environmental impacts. In accordance with FAA Order 1050.1F, paragraph 5–2 regarding Extraordinary Circumstances, this action has been reviewed for factors and circumstances in which a normally categorically excluded action may have a significant environmental impact requiring further analysis, and it is determined that no extraordinary circumstances exist that warrant preparation of an environmental assessment.

## List of Subjects in 14 CFR Part 71

Airspace, Incorporation by reference, Navigation (air).

## The Amendment

In consideration of the foregoing, the Federal Aviation Administration amends 14 CFR part 71 as follows:

## PART 71—DESIGNATION OF CLASS A, B, C, D, AND E AIRSPACE AREAS; AIR TRAFFIC SERVICE ROUTES; AND REPORTING POINTS

■ 1. The authority citation for part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(f), 106(g); 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

### §71.1 [Amended]

■ 2. The incorporation by reference in 14 CFR 71.1 of FAA Order 7400.11B, Airspace Designations and Reporting Points, dated August 3, 2017 and effective September 15, 2017, is amended as follows:

### Paragraph 6010—Domestic VOR Federal Airways

*V–113 (Amended)*

From Morro Bay, CA; Paso Robles, CA; Priest, CA; Panoche, CA; INT Modesto 208° and El Nido 298° radials; Modesto, CA; Linden, CA; INT Linden 046° and Mustang, NV, 208° radials; Mustang; 42 miles, 24 miles, 115 MSL, 95 MSL, Sod House, NV; 67 miles, 95 MSL, 85 MSL, Rome, OR; 61 miles, 85 MSL, Boise, ID; Salmon, ID; Coppertown, MT; Helena, MT; to Lewistown, MT

\*　　\*　　\*　　\*　　\*

*V–244 (Amended)*

From Oakland, CA; INT Oakland 077° and Linden, CA, 246° radials; Linden; 30 miles, 153 MSL, INT Linden 094° and Hangtown, CA, 157° radials; 58 miles, 153 MSL, INT Coaldale, CA, 267° and Friant, CA, 022° radials; 23 miles, 153 MSL, INT Coaldale 267° and Bishop, CA, 337° radials; 43 miles, 125 MSL, Coaldale, NV; Tonopah, NV; 40 miles, 115 MSL, Wilson Creek, NV; 28 miles, 115 MSL, Milford, UT; Hanksville, UT; 63 miles, 13 miles, 140 MSL, 36 miles, 115 MSL, Montrose, CO; Blue Mesa, CO; 33 miles, 122 MSL, 27 miles, 155 MSL, Pueblo, CO; 18 miles, 48 miles, 60 MSL, Lamar, CO; 20 miles, 116 miles, 65 MSL, Hays, KS; to Salina, KS. The airspace within R–2531A and R–2531B is excluded.

Issued in Washington, DC, on January 29, 2018.

**Sean E. Hook,**

*Acting Manager, Airspace Policy Group.*

[FR Doc. 2018–02133 Filed 2–7–18; 8:45 am]

**BILLING CODE 4910–13–P**

## DEPARTMENT OF COMMERCE

### Bureau of the Census

### 15 CFR Chapter I

**[Docket Number 160526465–8033–03]**

**RIN 0607–XC026**

### Final 2020 Census Residence Criteria and Residence Situations

**AGENCY:** Bureau of the Census, Department of Commerce.

**ACTION:** Final criteria.

**SUMMARY:** The Bureau of the Census (U.S. Census Bureau) is providing notification of the Final 2020 Census Residence Criteria and Residence Situations. In addition, this document contains a summary of comments received in response to the June 30,

**5526** **Federal Register** / Vol. 83, No. 27 / Thursday, February 8, 2018 / Rules and Regulations

2016, **Federal Register** document, as well as the Census Bureau's responses to those comments. The residence criteria are used to determine where people are counted during each decennial census. Specific residence situations are included with the criteria to illustrate how the criteria are applied.

**DATES:** The final criteria in this document are effective on March 12, 2018.

**FOR FURTHER INFORMATION CONTACT:** Jason Devine, Population and Housing Programs Branch, U.S. Census Bureau, 6H173, Washington, DC 20233, telephone (301) 763–2381; or Email [*POP.2020.Residence.Rule@census.gov*].

**SUPPLEMENTARY INFORMATION:**

**A. Background**

The U.S. Census Bureau is committed to counting every person in the 2020 Census once, only once, and in the right place. The fundamental reason that the decennial census is conducted is to fulfill the Constitutional requirement (Article I, Section 2) to apportion the seats in the U.S. House of Representatives among the states.[1] For a fair and equitable apportionment, it is crucial that the Census Bureau counts everyone in the right place during the decennial census.

The residence criteria are used to determine where people are counted during each decennial census. Specific residence situations are included with the criteria to illustrate how the criteria are applied.

*1. The Concept of Usual Residence*

The Census Bureau's enumeration procedures are guided by the constitutional and statutory mandates to count all residents of the several states. [U.S. Const. Art. 1, Section 2, cl.3, Title 13, United States Code, Section 141.] The state in which a person resides and the specific location within that state is determined in accordance with the concept of "usual residence," which is defined by the Census Bureau as the place where a person lives and sleeps most of the time. This is not always the same as a person's legal residence, voting residence, or where they prefer to be counted. This concept of "usual residence" is grounded in the law providing for the first census, the Act of March 1, 1790, expressly specifying that persons be enumerated at their "usual place of abode."

Determining usual residence is straightforward for most people. However, given our nation's wide diversity in types of living arrangements, the concept of usual residence has a variety of applications. Some examples of these living arrangements include people experiencing homelessness, people with a seasonal/second residence, people in group facilities,[2] people in the process of moving, people in hospitals, children in shared custody arrangements, college students, live-in employees, military personnel, and people who live in workers' dormitories.

*2. Reviewing the 2020 Census Residence Criteria and Residence Situations*

Every decade, the Census Bureau undertakes a review of the Residence Criteria and Residence Situations to ensure that the concept of usual residence is interpreted and applied, consistent with the intent of the Census Act of 1790, which was authored by a Congress that included many of the framers of the U.S. Constitution and directed that people were to be counted at their usual residence. This review also serves as an opportunity to identify new or changing living situations resulting from societal change, and to address those situations in the guidance in a way that is consistent with the concept of usual residence.

This decade, as part of the review, the Census Bureau requested public comment on the "2010 Census Residence Rule and Residence Situations" through the **Federal Register** (80 FR 28950) on May 20, 2015, to allow the public to recommend any changes they would like to be considered for the 2020 Census. The Census Bureau received 252 comment submission letters or emails that contained 262 total comments. (Some comment submissions included comments or suggestions on more than one residence situation.)

On June 30, 2016, the Census Bureau published the "Proposed 2020 Census Residence Criteria and Residence Situations" in the **Federal Register** (81 FR 42577).[3] In that publication, the Census Bureau included a summary of comments on the May 2015 **Federal Register** document, as well as the Bureau's responses to those comments.

During the 60-day comment period that ended on September 1, 2016, the Census Bureau received 77,958 comment submissions[4] that contained 77,995 total comments in response to the proposed residence criteria and situations. A summary of these comments and the Census Bureau's responses are included in section B of this document.

Section C of this document provides the Final 2020 Census Residence Criteria and Residence Situations.[5]

**B. Summary of Comments Received in Response to the "Proposed 2020 Census Residence Criteria and Residence Situations"**

On June 30, 2016, the Census Bureau published a document in the **Federal Register** asking for public comment on the "Proposed 2020 Census Residence Criteria and Residence Situations." Of the 77,995 comments received, 77,887 pertained to prisoners,[6] and 44 pertained to overseas military personnel. There were four comments on health care facilities. There were three comments on each of the following residence situations: Foreign citizens in the United States, juvenile facilities, and people in shelters and/or experiencing homelessness. There were two comments on each of the following residence situations: Boarding school students, college students, group homes and residential treatment centers for adults, transitory locations, visitors on Census Day, people who live or stay in more than one place, merchant marine personnel, and religious group quarters. There was one comment on each of the rest of the residence situations [people away from their usual residence on Census Day (*e.g.*, on vacation or business trip); people living outside the United States; people moving into or out of a residence around Census Day; people who are born or who die around

---

[1] Apportionment is based on the resident population, plus a count of overseas federal employees, for each of the 50 states. Redistricting data include the resident population of the 50 states, District of Columbia, and Puerto Rico.

[2] In this document, "group facilities" (referred to also as "group quarters" (GQ)) are defined as places where people live or stay in group living arrangements, which are owned or managed by an entity or organization providing housing and/or services for the residents.

[3] The Proposed 2020 Census Residence Criteria and Residence Situations are the same as the Final 2020 Census Residence Criteria and Residence Situations that are provided in Section C.

[4] Of the 77,958 comment submissions, 2,958 contained unique content and 75,000 were duplicates.

[5] The Census Bureau used the term "Residence Rule and Residence Situations" when referring to the 2010 version of this documentation and in portions of previous publications in the **Federal Register** in 2015 and 2016 regarding this topic. However, in this document, and in the foreseeable future, the Census Bureau will use the term "Residence Criteria and Residence Situations."

[6] The majority of comments received on this topic used the terms 'prisoner,' 'incarcerated,' or 'inmate.' Although the terminology is not exactly what we use in the residence criteria documentation, we believe the context of the comments suggests the comments apply to people in Federal and State Prisons, Local Jails and Other Municipal Confinement Facilities, and possibly Federal Detention Centers and Correctional Facilities Intended for Juveniles. References in this document to "prisons," or "prisoners," should be interpreted as referring to all of these types of facilities.

Census Day; relatives and nonrelatives; residential schools for people with disabilities; housing for older adults; U.S. military personnel; and workers' residential facilities]. The Census Bureau also received one comment on the concept of usual residence, seven general comments on the overall residence criteria, and 18 comments on other issues not directly related to the residence criteria or any specific residence situation.

### 1. Comments on Prisoners

Of the 77,887 comments pertaining to prisoners, 77,863 suggested that prisoners should be counted at their home or pre-incarceration address. The rationales included in these comments were as follows.

• Almost all commenters either directly suggested, or alluded to the view, that counting prisoners at the prison inflates the political power of the area where the prison is located, and deflates the political power in the prisoners' home communities. These commenters stated that this distorts the redistricting process by allowing officials to count prisoners as "residents" of the districts where they are imprisoned, even though the prisoners are not allowed to vote during the time that they are confined in that district.

○ Similarly, many commenters suggested that counting prisoners away from their home address goes against the principle of equal representation. Some commenters more specifically suggested that the practice potentially violates the Voting Rights Act and/or the U.S. constitutional commitment to one person, one vote. A couple of commenters stated that the practice differs from certain international guidelines.

○ A few commenters stated that counting prisoners at the correctional facilities can also negatively impact the communities in which the prisons are located by distorting and/or complicating the redistricting process at the local level (*e.g.*, county commissions, city councils, and school boards).

○ Some commenters stated that the current residence criteria for prisoners are inconsistent with certain states' laws regarding residency for elections (*i.e.*, some state laws specifically say that a correctional facility is not a residence).

○ Some commenters stated that some states and many local governments already adjust their population data to remove prisoners when drawing their districts. However, these commenters also suggested that this "piecemeal" approach at the local level is inefficient

and cannot fully resolve the issues associated with where prisoners are counted.

• Most commenters suggested that counting prisoners at the prison inaccurately represents the population counts and demographic characteristics of prisoners' home communities, as well as the communities where the prisons are located. These commenters stated that prisoners typically come from urban, underserved communities whose populations are disproportionately African-American and Latino, while prisons are more likely to be located in largely White (non-Hispanic) rural communities, far from the actual homes of the prisoners. Therefore, most commenters also suggested that counting prisoners at the prisons disproportionally harms communities with high proportions of minorities, by preventing their home communities from receiving their fair share of representation and funding.

• Many commenters stated that the incarcerated population has increased significantly in recent decades. Some commenters also stated that, throughout the long history of the decennial census, the Census Bureau has previously evolved and reevaluated its residence criteria in response to other historical changes in demographics and normative living situations (*e.g.*, the 1950 change to how college students were counted). Therefore, they suggested that the changes in the prisoner population and patterns of prison locations during recent decades warrant a similar evolution of the residence criteria.

• Some commenters suggested that the Census Bureau should change its interpretation of the concept of "usual residence" (*i.e.*, as the place where a person lives and sleeps most of the time), as it relates to incarcerated people. To support this suggestion, commenters used various rationales.

○ Some commenters suggested that prisoners do not have enduring social ties or allegiance to the community where they are incarcerated. To explain this, some commenters more specifically stated that prisoners cannot interact with the community where they are incarcerated, are there involuntarily, and generally do not plan to remain in that community upon their release. A few commenters also stated that the governmental representatives of the community where the prison is located do not serve the prisoners, or they stated that prisoners are not constituents of the community where the prison is located. These commenters further stated that prisoners rely, instead, on the representative services of the legislators in their pre-incarceration communities.

○ Some commenters suggested that the correctional facility where a prisoner is located on Census Day is not where a prisoner spends most of their time.

■ Some supported this suggestion by stating that counting incarcerated people at the facility in which they are housed on Census Day ignores the transient and temporary nature of incarceration. These commenters stated that incarcerated people are typically transferred multiple times between various correctional facilities during the time between when they are arrested and when they are released.

■ Some supported this suggestion by focusing on local jails. They stated that, while the length of incarceration for prison inmates is typically more than one year, about a third of all inmates (in prisons and jails) are jail inmates, and the typical length of incarceration for jail inmates is much shorter than one year (*i.e.*, a few days to a few weeks). A few also stated that the majority of jail inmates have not been convicted of a crime, or stated that they are awaiting trial and presumed innocent until proven guilty.

■ A few supported this suggestion by stating that, if your measuring stick is the 10-year period for which the decennial census counts affect representation, funding, and policies, most prisoners are incarcerated for less than 10 years.

○ A few commenters suggested that multiple factors must be considered together when determining the correct place to count certain types of people, such as prisoners, who do not easily align with the standard definition of usual residence. Therefore, they stated that a one-size-fits-all approach of focusing solely on where people live and sleep most of the time is not appropriate for determining where to count prisoners.

○ A few commenters suggested that only prisoners who are serving long-term sentences, such as longer than six months or a year, should be counted at the facility, and that prisoners serving shorter terms should be counted at their usual residence outside of the facility.

• Some commenters suggested that the treatment of prisoners is inconsistent with the treatment of other residence situations in which people are temporarily living or staying away from their permanent address (*e.g.*, travelers and snowbirds). A few stated that the proposed residence criteria make it appear as if the Census Bureau plans to count boarding school students, deployed military personnel, truck drivers, members of Congress, and/or juveniles in residential treatment

facilities at their home address, even if they do not spend most of their time there.

• Some commenters suggested that the number/proportion of comments submitted on this issue indicates that there is an overwhelming consensus urging a change to how prisoners are counted in the census.

• A few commenters suggested that the Census Bureau has acknowledged the need to correct its own data by proposing to help states with post-census population adjustments.

○ Some of these commenters suggested that "this ad hoc approach is neither efficient nor universally implementable." Some also stated that many states have laws that would prevent them from using such alternative data to adjust their Census counts for redistricting, and that many states may not have the resources to gather the necessary data to provide to the Census Bureau. Some also expressed concerns about the states' inability to provide data on federal prisoners and prisoners who are incarcerated in another state.

○ Therefore, some of these commenters suggested that the only way to implement a consistent solution for the entire United States is for the Census Bureau to change the way it counts prisoners. A few also suggested that the Census Bureau would be best able to accomplish this change if all correctional facilities (local, state, and federal) and/or all state and federal corrections departments were required to collect and maintain accurate records on each prisoner's home/pre-incarceration address.

Four comments were in support of counting prisoners at the correctional facility. All of these commenters suggested that the correctional facility is the prisoner's usual residence, or where they live and sleep most of the time (*i.e.*, prisoners are usually in prison, or away from their pre-incarceration address, for relatively long periods of time, such as one year or more). One commenter further stated that, because people are usually sent to prison for more than one year, they are not considered to be only "temporary residents" of the prison under many government regulations (other than the Census Bureau's). One commenter suggested that it makes sense to count prisoners at the facility because the communities in which the facilities are located are responsible for providing emergency response and certain law enforcement services to those facilities, as well as providing road maintenance and hospitality services (*e.g.*, hotels and restaurants) for

the family and friends of the prisoners who travel to the facility for visitation.

One commenter suggested that counting prisoners at their "home address" would create unreasonable burden on the census process because of the considerable time and effort that would be necessary, both on the part of the facility administrators who would need to research and maintain the address records, and on the census enumerators who would need to collect and ensure the accuracy of the addresses. One commenter stated that any approach that would count prisoners somewhere other than the prison would likely result in a national undercount due to the difficulty in tracking inmates in transit. One commenter stated that it is not the Census Bureau's responsibility to facilitate states' redistricting activities beyond their currently proposed activities (*i.e.*, providing the redistricting data file, identifying the group quarters counts at the block level, and the proposed option to geocode prisoner addresses if they are provided by the state to the Census Bureau).

Twenty comments were neutral regarding where to count prisoners, in that they did not state whether they thought that prisoners should be counted at the facility or at some other address. Many of these commenters stated the importance of equal representation for all. Some stated that prisoners should have the right to vote. A few further clarified that prisoners should have the right to vote if they are going to be counted as residents (of any place) for redistricting purposes, or vice versa (*i.e.*, if prisoners do not have the right to vote, then they should not be counted). One specifically stated that incarcerated people should not be counted at all (either at the facility or elsewhere) because they committed a crime and are not legally eligible to vote. A few commenters stated concerns regarding the fairness or effectiveness of the criminal justice system.

*Census Bureau Response:* For the 2020 Census, the Census Bureau will retain the proposed residence situation guidance for correctional facilities (Sections C.13.e, C.15, and C.17.a). The practice of counting prisoners at the correctional facility is consistent with the concept of usual residence, as established by the Census Act of 1790. As noted in section A.1 of this document, "usual residence" is defined as the place where a person lives and sleeps most of the time, which is not always the same as their legal residence, voting residence, or where they prefer to be counted. Therefore, counting prisoners anywhere other than the

facility would be less consistent with the concept of usual residence, since the majority of people in prisons live and sleep most of the time at the prison.

States are responsible for legislative redistricting. The Census Bureau works closely with the states and recognizes that some states have decided, or may decide in the future, to 'move' their prisoner population back to the prisoners' pre-incarceration addresses for redistricting and other purposes. Therefore, following the 2020 Census, the Census Bureau plans to offer a product that states can request, in order to assist them in their goals of reallocating their own prisoner population counts. Any state that requests this product will be required to submit a data file (indicating where each prisoner was incarcerated on Census Day, as well as their pre-incarceration address) in a specified format. The Census Bureau will review the submitted file and, if it includes the necessary data, provide a product that contains supplemental information the state can use to construct alternative within-state tabulations for its own purposes. However, the Census Bureau will not use the state-provided data in this product to make any changes to the official decennial census counts.

The Census Bureau also plans to provide group quarters data after the 2020 Census sooner than it was provided after the 2010 Census. For the 2010 Census, the Census Bureau released the *Advance Group Quarters Summary File* showing the seven major types of group quarters, including correctional facilities for adults and juvenile facilities. This early [7] release of data on the group quarters population was beneficial to many data users, including those in the redistricting community who must consider whether to include or exclude certain populations when redrawing boundaries as a result of state legislation. The Census Bureau is planning to incorporate similar group quarters information in the standard *Redistricting Data (Public Law 94–171) Summary File* for 2020.

## 2. Comments on the Military Overseas

Of the 44 comments received pertaining to the military overseas, 40 supported the Census Bureau proposal

---

[7] The *Advance Group Quarters Summary File* was released on April 20, 2011, which was earlier than when that GQ data was originally planned to be released in the *Summary File 1* that was released on June 16–August 25, 2011. The earlier release made it easier to use these GQ data in conjunction with the *Redistricting Data (Public Law 94–171) Summary File*, which was released on February 3– March 24, 2011.

to treat military personnel who are temporarily *deployed* overseas on a short-term basis differently than military personnel who are *stationed* overseas on a more long-term basis. More specifically, most of these commenters suggested that military personnel who are deployed overseas should be counted at their usual residence in the United States where they were stationed at the time they were deployed, and included in the local community-level resident population counts.

Many commenters stated that counting deployed military personnel at their usual residence (where they are stationed) in the United States would more accurately reflect the social and economic impact that these personnel members have on the communities where they usually work, recreate, and reside. Many commenters similarly stated that deployed personnel should be counted at their usual residence in the United States in order to ensure that the communities surrounding military bases are able to obtain the necessary resources and funding to support the soldiers who serve our country and their families, as well as accurate data to inform community planning. These commenters stated that the aforementioned planning, funding, and other resources would support community services such as police and fire departments, schools, roads, parks, utilities, and other infrastructure and amenities.

Some commenters stated that deployments from specific military bases typically happen in surges to support specific events, such as combat missions or natural disasters. Therefore, these commenters suggested that, if an event like this happens around the time of the census enumeration, then the population of the community surrounding that military base would be grossly undercounted if the deployed personnel were not counted there. One commenter suggested that counting deployed personnel at their usual residence would produce more consistent results than counting them at their home of record because the Department of Defense records on military personnel members' home of record[8] were not well maintained prior to the 2010 Census.

Some commenters suggested that the military member's permanent duty station from which they were deployed is their usual residence (*i.e.,* where they live and sleep most of the time), and some commenters stated that counting deployed personnel at their usual residence in the United States would be consistent with how the Census Bureau counts other people who are temporarily away for work purposes. A few commenters stated that deployments are typically short in duration, and one commenter stated that the Army plans to further shorten the length of deployments in the future. A few commenters stated that deployed personnel must return to their permanent duty station in the United States after the deployment ends, and a few commenters stated that many deployed personnel have families that live with them at their permanent duty station and maintain their residence while the military member is deployed.

Some commenters stated that many of the family members of deployed military were confused during the 2010 Census about whether they should count themselves at their usual residence because they were instructed that their deployed family member would be counted through administrative records, and they assumed the same would be true for them as well. One of these commenters stated that proposed residence guidance for how deployed personnel would be counted in the 2020 Census should reduce some of this confusion. However, all of these commenters encouraged the Census Bureau to conduct a strong communication and outreach program to ensure that all family members of deployed personnel are made aware of the fact that they still need to complete the census questionnaire for themselves.

One commenter expressed concern about footnote 5 in the proposed residence criteria documentation, which said: ''The ability to successfully integrate the DOD data on deployed personnel into the resident population counts must be evaluated and confirmed prior to the 2020 Census.'' The commenter was worried that the proposed change for counting deployed military might not be implemented if the research and evaluations are not completed before final decisions must be made, and they suggested that such research is not necessary because the Census Bureau already uses data from the Defense Manpower Data Center when producing annual population estimates at the national, state, and county levels. This commenter also recommended that if the proposed

change for counting deployed military is implemented for the 2020 Census, then the Census Bureau should also ensure that the methodology used to produce the annual population estimates is revised accordingly.

One commenter expressed support for the proposal to include military and civilian employees of the U.S. government who are deployed or stationed/assigned overseas and are not U.S. citizens (but must be legal U.S. residents to meet the requirements for federal employment) in the Federally Affiliated Overseas Count, because these people have met the requirements to qualify for federal employment and have pledged to serve our country. They also stated that this proposal would be consistent with the fact that citizenship status is not a requirement for determining a person's residence.

Three comments opposed the proposal to count deployed military at their usual residence in the United States from which they were deployed. One commenter suggested that all overseas military personnel should be counted in the same way, and that there is not a good reason to treat deployed personnel as a separate category from personnel who are stationed overseas. One commenter suggested that the Census Bureau should continue to count all overseas military personnel, including those who are deployed, in the state where they lived when they enlisted (*i.e.,* their home of record) because military personnel are typically reassigned to a different permanent duty station every few years throughout their career, and their home of record is where they have the strongest ties. One commenter suggested that the Census Bureau should not implement the proposed change to how deployed military are counted because that change would weaken the argument for continuing to count prisoners at the correctional facility where they are incarcerated on Census Day. This commenter also recommended that the Census Bureau should make a stronger case for the distinction between these two large populations (*i.e.,* deployed military personnel versus prisoners).

One comment was neutral regarding where to count overseas military personnel, in that they did not state where they thought deployed personnel should be counted. They simply stated that it appeared that not all of the locally stationed military personnel and their dependents were being counted, and asked for more information on whether this was true and/or how to ensure they were counted in the future.

*Census Bureau Response:* For the 2020 Census, the Census Bureau will

---

[8] Home of record is generally the permanent home of the person at the time of entry or re-enlistment into the Armed Forces, as included on personnel files. For the 2010 Census, if home of record information was not available for a person, the Department of Defense used the person's ''legal residence'' (the residence a member declares for state income tax withholding purposes), or thirdly, ''last duty station,'' to assign a home state.

retain the proposed residence situation guidance for overseas military personnel (Sections C.4.a–b and C.13.f–g). This guidance makes a distinction between personnel who are *deployed* overseas and those who are *stationed* or *assigned* overseas. Deployments are typically short in duration, and the deployed personnel will be returning to their usual residence where they are stationed or assigned in the United States after their temporary deployment ends. Personnel stationed or assigned overseas generally remain overseas for longer periods of time and often do not return to the previous stateside location from which they left. Therefore, counting deployed personnel at their usual residence in the United States follows the standard interpretation of the residence criteria to count people at their usual residence if they are temporarily away for work purposes.

The Census Bureau will use administrative data from the Department of Defense to count deployed personnel at their usual residence in the United States for apportionment purposes and for inclusion in the resident population counts. The Census Bureau will count military and civilian employees of the U.S. government who are stationed or assigned outside the United States, and their dependents living with them, in their home state, for apportionment purposes only, using administrative data provided by the Department of Defense and the other federal agencies that employ them.

The Census Bureau has been communicating with stakeholders from various military communities and plans to work closely with military stakeholders to plan and carry out the enumeration of military personnel. As the planning process moves forward, there will be continued testing of our process for integrating DOD data on deployed personnel into the resident population counts.

### 3. Comments on Health Care Facilities

Four comments were related to health care facilities. One commenter simply stated that they agree with the Census Bureau's proposal regarding how to count people in health care facilities. One commenter suggested that the Census Bureau add residence guidance specifically regarding memory care centers as a separate category from nursing facilities because the nature of Alzheimer's disease and Dementia necessitates that these patients be enumerated through administrative records in order to ensure the accuracy of the data. One commenter suggested that people in psychiatric facilities

should be counted at the residence where they were living before they entered the facility because they will most likely return to their prior community, which is where they would normally vote. This commenter also stated that these people should be counted in their prior communities in order to ensure that those communities receive the proper allocation of representatives and resources.

One commenter similarly suggested that people living in psychiatric hospitals on Census Day should be counted at the residence where they sleep most of the time, and only counted at the facility if they do not have a usual home elsewhere. They stated that the Census Bureau misunderstands the functioning of state and private psychiatric hospitals, which today provide primarily acute and short term treatment (*e.g.*, less than two weeks, in most cases). They also stated that most patients in these facilities are likely to have a permanent residence elsewhere. The same commenter also stated that the Census Bureau's proposal for how to count people in nursing/skilled-nursing facilities does not best capture the experience of people with disabilities who are in the process of transitioning from group housing to more independent housing. Therefore, the commenter suggested that the Census Bureau should alter the proposed guidance in order to allow people in nursing/skilled-nursing facilities to be counted at a residence to which they are actively preparing to transition.

*Census Bureau Response:* For the 2020 Census, the Census Bureau will retain the proposed residence situation guidance for health care facilities (Section C.11). Separate residence guidance was not added for memory care centers because these types of facilities would be considered subcategories of assisted living facilities and nursing facilities/skilled nursing facilities (Section C.11), and the guidance provided for these types of facilities is sufficient. Patients in mental (psychiatric) hospitals and psychiatric units in other hospitals (where the primary function is for long-term non-acute care) will be counted at the facility because the facilities or units within the facilities are primarily serving long-term non-acute patients who live and sleep at the facility most of time. Because people must be counted at their current usual residence, rather than a future usual residence, the residence guidance for patients in nursing/skilled-nursing facilities will not be revised to allow some people to be counted at a residence to which they

are actively preparing to transition. Comments on health care facilities not addressed in this section were considered out of scope for this document.

### 4. Comments on Foreign Citizens in the United States

Three comments were related to foreign citizens in the United States. One commenter simply stated that they agree with the Census Bureau's proposal regarding how foreign citizens are counted. One commenter suggested that the Census Bureau should add wording to clarify whether foreign "snowbirds" (*i.e.,* foreign citizens who stay in a seasonal residence in the United States for multiple months) are considered to be "living" in the United States or only "visiting" the United States. In order to more accurately reflect the impact of foreign snowbirds on local jurisdictions in the United States, this commenter suggested defining those who are "living" in the United States as those who are "living or staying in the United States for an extended period of time exceeding ____ months." One commenter expressed concern about the impact of including undocumented people in the population counts for redistricting because these people cannot vote, and they stated that this practice encourages gerrymandering. This commenter suggested collecting data to identify the citizen voting age population (CVAP), so that the data could be used to prevent gerrymandering in gateway communities during the redistricting process.

*Census Bureau Response:* For the 2020 Census, the Census Bureau will retain the proposed residence situation guidance for foreign citizens in the United States (Section C.3). Foreign citizens are considered to be "living" in the United States if, at the time of the census, they are living and sleeping most of the time at a residence in the United States. Section C.3 provides sufficient guidance for foreign citizens either living in or visiting the United States. Section C.5 provides additional guidance regarding "snowbirds." Comments on foreign citizens in the United States not addressed in this section were considered out of scope for this document.

### 5. Comments on Juvenile Facilities

Three comments were related to juvenile facilities. One commenter simply stated that they agree with the Census Bureau's proposal regarding how to count juveniles in non-correctional residential treatment centers. One commenter stated that

juveniles in all three types of juvenile facilities (*i.e.,* correctional facilities, non-correctional group homes, and non-correctional residential treatment centers) should be counted at their usual residence. One commenter similarly stated that people in juvenile facilities should be counted at their usual residence outside the facility, but the context of the comment showed that this commenter was referring mostly to correctional facilities for juveniles (rather than non-correctional group homes and non-correctional residential treatment centers).

*Census Bureau Response:* For the 2020 Census, the Census Bureau will retain the proposed residence situation guidance for juvenile facilities (Section C.17). People in correctional facilities for juveniles and non-correctional group homes for juveniles will be counted at the facility because the majority of people in these types of facilities live and sleep there most of the time. People in non-correctional residential treatment centers for juveniles will be counted at the residence where they live and sleep most of the time (or at the facility if they do not have a usual home elsewhere) because these people typically stay at the facility temporarily and often have a usual home elsewhere to return to after treatment is completed.

*6. Comments on People in Shelters and People Experiencing Homelessness*

Three comments were related to people in shelters and people experiencing homelessness. One expressed agreement with the Census Bureau's proposal regarding how to count people in all of the subcategories of this residence situation except for the subcategory of people in domestic violence shelters. This commenter suggested that people in domestic violence shelters should be allowed to be counted at their last residence address prior to the shelter, due to the temporary nature of their stay and the confidentiality of that shelter's location. One commenter suggested that the Census Bureau add residence guidance specifically regarding "temporarily moved persons due to emergencies" (*e.g.,* displaced from their home by a hurricane or earthquake). This commenter stated that these people should be counted "in their normal prior residential locations" (if they state the intention to return to that prior location after their home is repaired/ rebuilt) so that accurate decisions can be made regarding funding for rebuilding and infrastructure restoration in those locations. One commenter requested that the Census Bureau publish national and/or state level population counts for

the subcategory of people in emergency and transitional shelters with sleeping facilities for people experiencing homelessness. This commenter stated that these data are important to both housing advocates trying to assess the housing needs of people with disabilities, and to legal advocates working to enforce the community integration mandates of the Americans with Disabilities Act.

*Census Bureau Response:* For the 2020 Census, the Census Bureau will retain the proposed residence situation guidance for people in shelters and people experiencing homelessness (Section C.21).

The proposed residence guidance already allows people who are temporarily displaced by natural disasters to be counted at their usual residence to which they intend to return. People in temporary group living quarters established for victims of natural disasters will be counted where they live and sleep most of the time (or at the facility if they do not report a usual home elsewhere). In addition, people who are temporarily displaced or experiencing homelessness, and are staying in a residence for a short or indefinite period of time, will be counted at the residence where they live and sleep most of the time. If they cannot determine a place where they live most of the time, they will be counted where they are staying on Census Day.

*7. Comments on College Students and Boarding School Students*

Two comments were related to boarding school students, and two comments were related to college students. One commenter simply stated that they agree with the Census Bureau's proposal regarding how to count boarding school students and college students. One commenter suggested that they agree with counting college students at their college residence because that would better ensure that all college students are counted in the census. One commenter suggested that boarding school students should be counted at the school because that is where they live and sleep most of the time, and they participate in (and consume the resources of) the community where the school is located. This commenter also stated that counting boarding school students at their parental home is inconsistent with the fact that college students are counted at their college residence, considering that college students are often just as dependent on their parents as boarding school students.

*Census Bureau Response:* For the 2020 Census, the Census Bureau will retain the proposed residence situation guidance for college students (Section C.10.a–e) and boarding school students (Section C.9.a). The Census Bureau has historically counted boarding school students at their parental home, and will continue doing so because of the students' age and dependency on their parents, and the likelihood that they will return to their parents' residence when they are not attending their boarding school (*e.g.,* weekends, summer/winter breaks, and when they stop attending the school).

*8. Comments on Non-Correctional Adult Group Homes and Residential Treatment Centers*

Two comments were related to adult group homes and residential treatment centers. One commenter suggested that all people in adult group homes and adult residential treatment centers should be counted at their usual residence other than the facility, because counting them at the facility is not consistent with their state's definition of residence. One commenter stated that the Census Bureau's proposal for how to count people in adult group homes does not best capture the experience of people with disabilities who are in the process of transitioning from group housing to more independent living. The commenter suggested that the Census Bureau should alter the proposed guidance in order to allow people in adult group homes to be counted at a residence to which they are actively preparing to transition. The same commenter also requested that the Census Bureau publish national and/or state level population counts for the subcategories of people in adult group homes and adult residential treatment centers. This commenter stated that these data are important to both housing advocates trying to assess the housing needs of people with disabilities, and to legal advocates working to enforce the community integration mandates of the Americans with Disabilities Act.

*Census Bureau Response:* For the 2020 Census, the Census Bureau will retain the proposed residence situation guidance for people in non-correctional adult group homes and residential treatment centers (Section C.16). People in non-correctional group homes for adults will be counted at the facility because the majority of people in these types of facilities live and sleep there most of the time. People in non-correctional residential treatment centers for adults will be counted at the residence where they live and sleep

most of the time (or at the facility if they do not have a usual home elsewhere) because these people typically stay at the facility temporarily and often have a usual home elsewhere to return to after treatment is completed.

The residence guidance for people in adult group homes will not be revised to allow some people to be counted at a residence to which they are actively preparing to transition because people must be counted at their current usual residence, rather than a future usual residence. Comments on non-correctional adult group homes and residential treatment centers not addressed in this section were considered out of scope for this document.

*9. Comments on Transitory Locations*

Two comments were related to transitory locations. One commenter simply stated that they agree with the Census Bureau's proposal regarding how to count people in transitory locations. One commenter stated that the proposed residence guidance for transitory locations is acceptable because it is consistent with the concept of usual residence. However, they were concerned that the procedures used in the 2010 Census may have caused certain types of people to not be counted in the census because these people typically move seasonally from one transitory location (*e.g.,* RV park) to another throughout the year, but the location where they are staying on Census Day may not be the location where they spend most of the year. This commenter stated that, during the 2010 Census, if the transitory location where a person was staying on Census Day was not where they stayed most of the time, then they were not enumerated at that location because the assumption was that they would be enumerated at their usual residence. Therefore, the commenter was concerned that people who stayed in one RV park for a few months around Census Day were not counted at that RV park if they indicated that they usually lived elsewhere (*e.g.,* another RV park), and they would also not have been counted at that other RV park when they are there later that year (after the census enumeration period ends). The commenter suggested that we add procedures to account for people who spend most of their time in a combination of multiple transitory locations.

*Census Bureau Response:* For the 2020 Census, the Census Bureau will retain the proposed residence situation guidance for people in transitory locations (Section C.18). Sufficient

guidance for people in transitory locations, including those living in recreational vehicles, is provided in Section C.18. Comments on transitory locations not addressed in this section were considered out of scope for this document.

*10. Comments on Visitors on Census Day*

Two comments were related to visitors on Census Day. One commenter simply stated that they agree with the Census Bureau's proposal regarding how to count visitors on Census Day. One commenter asked whether the Census Bureau would count all vacationers in a specific state as residents of that state.

*Census Bureau Response:* For the 2020 Census, the Census Bureau will retain the proposed residence situation guidance for visitors on Census Day (Section C.2). People who are temporarily visiting a location on Census Day will be counted where they live and sleep most of the time. If they do not have a usual residence to return to, they will be counted where they are staying on Census Day.

*11. Comments on People Who Live or Stay in More Than One Place*

Two comments were related to people who live or stay in more than one place. One commenter simply stated that they agree with the Census Bureau's proposal regarding how to count people who live or stay in more than one place. One commenter suggested that the Census Bureau add more clarification to the residence guidance regarding where ''snowbirds'' (*i.e.,* seasonal residents) are counted.

*Census Bureau Response:* For the 2020 Census, the Census Bureau will retain the proposed residence situation guidance for people who live or stay in more than one place (Section C.5). People who travel seasonally between residences (*e.g.,* snowbirds) will be counted at the residence where they live and sleep most of the time. If they cannot determine a place where they live most of the time, they will be counted where they are staying on Census Day.

*12. Comments on Merchant Marine Personnel*

Two comments were related to merchant marine personnel, and both commenters simply stated that they agree with the Census Bureau's proposal regarding how to count merchant marine personnel.

*Census Bureau Response:* For the 2020 Census, the Census Bureau will retain the proposed residence situation

guidance for merchant marine personnel (Section C.14).

*13. Comments on Religious Group Quarters*

Two comments were related to religious group quarters. One commenter simply stated that they agree with the Census Bureau's proposal regarding how to count people in religious group quarters. One commenter expressed agreement with the proposal because most religious group quarters are long-term residences that align with the concept of usual residence.

*Census Bureau Response:* For the 2020 Census, the Census Bureau will retain the proposed residence situation guidance for religious group quarters (Section C.20).

*14. Comments on Other Residence Situations*

There was one letter that included a comment on every residence situation, and each of those topic-specific comments was included as appropriate among the comments regarding the corresponding residence situations discussed above. However, for each of the other residence situations not already discussed above, the commenter stated that they agreed with how the Census Bureau proposed to count people in the following residence situations.

• People away from their usual residence on Census Day (*e.g.,* on vacation or business trip) (Section C.1).
• People living outside the United States (Section C.4).
• People moving into or out of a residence around Census Day (Section C.6).
• People who are born or who die around Census Day (Section C.7).
• Relatives and nonrelatives (Section C.8).
• Residential schools for people with disabilities (Section C.9.b–c).
• Housing for older adults (Section C.12).
• Stateside military personnel (Section C.13.a–e).
• Workers' residential facilities (Section C.19).

*Census Bureau Response:* For the 2020 Census, the Census Bureau will retain the proposed guidance for the residence situations listed in this section (B.14).

*15. Comments on the Concept of Usual Residence or the General Residence Criteria*

There was one comment on the concept of usual residence, in which the commenter expressed agreement with

the definition of "usual residence" as being the place where a person lives and sleeps most of the time.

There were seven comments on the general residence criteria. One commenter simply supported the entire residence criteria and residence situations documentation. Two commenters stated that they specifically agree with the three main principles of the residence criteria. One commenter disagreed with "this method of tallying the U.S. population," but did not refer to any specific residence situation. One commenter stated that every resident should be counted in the census. One commenter stated that every citizen should be counted in the census. One commenter suggested that the Census Bureau count people who are away from their home at the time of the census using a code to indicate the reason why they are away (*e.g.,* travel, work, incarceration, etc.).

*Census Bureau Response:* For the 2020 Census, the Census Bureau will retain the three main principles of the residence criteria (see introduction portion of section C). The goal of the decennial census is to count all people who are living in the United States on Census Day at their usual residence. Comments on the concept of usual residence or general residence criteria not addressed in this section were considered out of scope for this document.

### 16. Other Comments

There were 18 comments that did not directly address the residence criteria or any particular residence situation.

*Census Bureau Response:* Comments that did not directly address the residence criteria or any particular residence situation are out of scope for this document.

### C. The Final 2020 Census Residence Criteria and Residence Situations

The Residence Criteria are used to determine where people are counted during the 2020 Census. The Criteria say:

• Count people at their usual residence, which is the place where they live and sleep most of the time.

• People in certain types of group facilities on Census Day are counted at the group facility.

• People who do not have a usual residence, or who cannot determine a usual residence, are counted where they are on Census Day.

The following sections describe how the Residence Criteria apply to certain living situations for which people commonly request clarification.

### 1. People Away From Their Usual Residence on Census Day

*People away from their usual residence on Census Day, such as on a vacation or a business trip, visiting, traveling outside the United States, or working elsewhere without a usual residence there (for example, as a truck driver or traveling salesperson)*—Counted at the residence where they live and sleep most of the time.

### 2. Visitors on Census Day

*Visitors on Census Day*—Counted at the residence where they live and sleep most of the time. If they do not have a usual residence to return to, they are counted where they are staying on Census Day.

### 3. Foreign Citizens in the United States

(a) *Citizens of foreign countries living in the United States*—Counted at the U.S. residence where they live and sleep most of the time.

(b) *Citizens of foreign countries living in the United States who are members of the diplomatic community*—Counted at the embassy, consulate, United Nations' facility, or other residences where diplomats live.

(c) *Citizens of foreign countries visiting the United States, such as on a vacation or business trip*—Not counted in the census.

### 4. People Living Outside the United States

(a) People deployed outside the United States[9] on Census Day (while stationed or assigned in the United States) who are military or civilian employees of the U.S. government—Counted at the U.S. residence where they live and sleep most of the time, using administrative data provided by federal agencies.[10]

---

[9] In this document, "Outside the United States" and "foreign port" are defined as being anywhere outside the geographical area of the 50 United States and the District of Columbia. Therefore, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, the Pacific Island Areas (American Samoa, Guam, and the Commonwealth of the Northern Mariana Islands), and all foreign countries are considered to be "outside the United States." Conversely, "stateside," "U.S. homeport," and "U.S. port" are defined as being anywhere in the 50 United States and the District of Columbia.

[10] Military and civilian employees of the U.S. government who are deployed or stationed/assigned outside the United States (and their dependents living with them outside the United States) are counted using administrative data provided by the Department of Defense and the other federal agencies that employ them. If they are deployed outside the United States (while stationed/assigned in the United States), the administrative data are used to count them at their usual residence in the United States. Otherwise, if they are stationed/assigned outside the United States, the administrative data are used to count them (and

(b) *People stationed or assigned outside the United States on Census Day who are military or civilian employees of the U.S. government, as well as their dependents living with them outside the United States*—Counted as part of the U.S. federally affiliated overseas population, using administrative data provided by federal agencies.

(c) *People living outside the United States on Census Day who are not military or civilian employees of the U.S. government and are not dependents living with military or civilian employees of the U.S. government*—Not counted in the stateside census.

### 5. People Who Live or Stay in More Than One Place

(a) *People living away most of the time while working, such as people who live at a residence close to where they work and return regularly to another residence*—Counted at the residence where they live and sleep most of the time. If they cannot determine a place where they live most of the time, they are counted where they are staying on Census Day.

(b) *People who live or stay at two or more residences (during the week, month, or year), such as people who travel seasonally between residences (for example, snowbirds)*—Counted at the residence where they live and sleep most of the time. If they cannot determine a place where they live most of the time, they are counted where they are staying on Census Day.

(c) *Children in shared custody or other arrangements who live at more than one residence*—Counted at the residence where they live and sleep most of the time. If they cannot determine a place where they live most of the time, they are counted where they are staying on Census Day.

### 6. People Moving Into or Out of a Residence Around Census Day

(a) *People who move into a new residence on or before Census Day*—Counted at the new residence where they are living on Census Day.

(b) *People who move out of a residence on Census Day and do not move into a new residence until after Census Day*—Counted at the old residence where they were living on Census Day.

(c) *People who move out of a residence before Census Day and do not move into a new residence until after Census Day*—Counted at the residence where they are staying on Census Day.

---

their dependents living with them outside the United States) in their home state for apportionment purposes only.

*7. People Who Are Born or Who Die Around Census Day*

(a) *Babies born on or before Census Day*—Counted at the residence where they will live and sleep most of the time, even if they are still in a hospital on Census Day.

(b) *Babies born after Census Day*—Not counted in the census.

(c) *People who die before Census Day*—Not counted in the census.

(d) *People who die on or after Census Day*—Counted at the residence where they were living and sleeping most of the time as of Census Day.

*8. Relatives and Nonrelatives*

(a) *Babies and children of all ages, including biological, step, and adopted children, as well as grandchildren*—Counted at the residence where they live and sleep most of the time. If they cannot determine a place where they live most of the time, they are counted where they are staying on Census Day. (Only count babies born on or before Census Day.)

(b) *Foster children*—Counted at the residence where they live and sleep most of the time. If they cannot determine a place where they live most of the time, they are counted where they are staying on Census Day.

(c) *Spouses and close relatives, such as parents or siblings*—Counted at the residence where they live and sleep most of the time. If they cannot determine a place where they live most of the time, they are counted where they are staying on Census Day.

(d) *Extended relatives, such as grandparents, nieces/nephews, aunts/uncles, cousins, or in-laws*—Counted at the residence where they live and sleep most of the time. If they cannot determine a place where they live most of the time, they are counted where they are staying on Census Day.

(e) *Unmarried partners*—Counted at the residence where they live and sleep most of the time. If they cannot determine a place where they live most of the time, they are counted where they are staying on Census Day.

(f) *Housemates or roommates*—Counted at the residence where they live and sleep most of the time. If they cannot determine a place where they live most of the time, they are counted where they are staying on Census Day.

(g) *Roomers or boarders*—Counted at the residence where they live and sleep most of the time. If they cannot determine a place where they live most of the time, they are counted where they are staying on Census Day.

(h) *Live-in employees, such as caregivers or domestic workers*—

Counted at the residence where they live and sleep most of the time. If they cannot determine a place where they live most of the time, they are counted where they are staying on Census Day.

(i) *Other nonrelatives, such as friends*—Counted at the residence where they live and sleep most of the time. If they cannot determine a place where they live most of the time, they are counted where they are staying on Census Day.

*9. People in Residential School-Related Facilities*

(a) *Boarding school students living away from their parents' or guardians' home while attending boarding school below the college level, including Bureau of Indian Affairs boarding schools*—Counted at their parents' or guardians' home.

(b) *Students in residential schools for people with disabilities on Census Day*—Counted at the school.

(c) *Staff members living at boarding schools or residential schools for people with disabilities on Census Day*—Counted at the residence where they live and sleep most of the time. If they do not have a usual home elsewhere, they are counted at the school.

*10. College Students (and Staff Living in College Housing)*

(a) *College students living at their parents' or guardians' home while attending college in the United States*—Counted at their parents' or guardians' home.

(b) *College students living away from their parents' or guardians' home while attending college in the United States (living either on-campus or off-campus)*—Counted at the on-campus or off-campus residence where they live and sleep most of the time. If they are living in college/university student housing (such as dormitories or residence halls) on Census Day, they are counted at the college/university student housing.

(c) *College students living away from their parents' or guardians' home while attending college in the United States (living either on-campus or off-campus) but staying at their parents' or guardians' home while on break or vacation*—Counted at the on-campus or off-campus residence where they live and sleep most of the time. If they are living in college/university student housing (such as dormitories or residence halls) on Census Day, they are counted at the college/university student housing.

(d) *College students who are U.S. citizens living outside the United States while attending college outside the*

*United States*—Not counted in the stateside census.

(e) *College students who are foreign citizens living in the United States while attending college in the United States (living either on-campus or off-campus)*—Counted at the on-campus or off-campus U.S. residence where they live and sleep most of the time. If they are living in college/university student housing (such as dormitories or residence halls) on Census Day, they are counted at the college/university student housing.

(f) *Staff members living in college/university student housing (such as dormitories or residence halls) on Census Day*—Counted at the residence where they live and sleep most of the time. If they do not have a usual home elsewhere, they are counted at the college/university student housing.

*11. People in Health Care Facilities*

(a) *People in general or Veterans Affairs hospitals (except psychiatric units) on Census Day, including newborn babies still in the hospital on Census Day*—Counted at the residence where they live and sleep most of the time. Newborn babies are counted at the residence where they will live and sleep most of the time. If patients or staff members do not have a usual home elsewhere, they are counted at the hospital.

(b) *People in mental (psychiatric) hospitals and psychiatric units in other hospitals (where the primary function is for long-term non-acute care) on Census Day*—Patients are counted at the facility. Staff members are counted at the residence where they live and sleep most of the time. If staff members do not have a usual home elsewhere, they are counted at the facility.

(c) *People in assisted living facilities*[11] *where care is provided for individuals who need help with the activities of daily living but do not need the skilled medical care that is provided in a nursing home*—Residents and staff members are counted at the residence where they live and sleep most of the time.

(d) *People in nursing facilities/skilled-nursing facilities (which provide long-term non-acute care) on Census Day*—

---

[11] Nursing facilities/skilled-nursing facilities, in-patient hospice facilities, assisted living facilities, and housing intended for older adults may coexist within the same entity or organization in some cases. For example, an assisted living facility may have a skilled-nursing floor or wing that meets the nursing facility criteria, which means that specific floor or wing is counted according to the guidelines for nursing facilities/skilled-nursing facilities, while the rest of the living quarters in that facility are counted according to the guidelines for assisted living facilities.

Patients are counted at the facility. Staff members are counted at the residence where they live and sleep most of the time. If staff members do not have a usual home elsewhere, they are counted at the facility.

(e) *People staying at in-patient hospice facilities on Census Day*— Counted at the residence where they live and sleep most of the time. If patients or staff members do not have a usual home elsewhere, they are counted at the facility.

*12. People in Housing for Older Adults*

*People in housing intended for older adults, such as active adult communities, independent living, senior apartments, or retirement communities*—Residents and staff members are counted at the residence where they live and sleep most of the time.

*13. U.S. Military Personnel*

(a) *U.S. military personnel assigned to military barracks/dormitories in the United States on Census Day*—Counted at the military barracks/dormitories.

(b) *U.S. military personnel (and dependents living with them) living in the United States (living either on base or off base) who are not assigned to barracks/dormitories on Census Day*— Counted at the residence where they live and sleep most of the time.

(c) *U.S. military personnel assigned to U.S. military vessels with a U.S. homeport on Census Day*—Counted at the onshore U.S. residence where they live and sleep most of the time. If they have no onshore U.S. residence, they are counted at their vessel's homeport.

(d) *People who are active duty patients assigned to a military treatment facility in the United States on Census Day*—Patients are counted at the facility. Staff members are counted at the residence where they live and sleep most of the time. If staff members do not have a usual home elsewhere, they are counted at the facility.

(e) *People in military disciplinary barracks and jails in the United States on Census Day*—Prisoners are counted at the facility. Staff members are counted at the residence where they live and sleep most of the time. If staff members do not have a usual home elsewhere, they are counted at the facility.

(f) *U.S. military personnel who are deployed outside the United States (while stationed in the United States) and are living on or off a military installation outside the United States on Census Day*—Counted at the U.S. residence where they live and sleep most of the time, using administrative

data provided by the Department of Defense.

(g) *U.S. military personnel who are stationed outside the United States and are living on or off a military installation outside the United States on Census Day, as well as their dependents living with them outside the United States*—Counted as part of the U.S. federally affiliated overseas population, using administrative data provided by the Department of Defense.

(h) *U.S. military personnel assigned to U.S. military vessels with a homeport outside the United States on Census Day*—Counted as part of the U.S. federally affiliated overseas population, using administrative data provided by the Department of Defense.

*14. Merchant Marine Personnel on U.S. Flag Maritime/Merchant Vessels*

(a) *Crews of U.S. flag maritime/ merchant vessels docked in a U.S. port, sailing from one U.S. port to another U.S. port, sailing from a U.S. port to a foreign port, or sailing from a foreign port to a U.S. port on Census Day*— Counted at the onshore U.S. residence where they live and sleep most of the time. If they have no onshore U.S. residence, they are counted at their vessel. If the vessel is docked in a U.S. port, sailing from a U.S. port to a foreign port, or sailing from a foreign port to a U.S. port, crewmembers with no onshore U.S. residence are counted at the U.S. port. If the vessel is sailing from one U.S. port to another U.S. port, crewmembers with no onshore U.S. residence are counted at the port of departure.

(b) *Crews of U.S. flag maritime/ merchant vessels engaged in U.S. inland waterway transportation on Census Day*—Counted at the onshore U.S. residence where they live and sleep most of the time.

(c) *Crews of U.S. flag maritime/ merchant vessels docked in a foreign port or sailing from one foreign port to another foreign port on Census Day*— Not counted in the stateside census.

*15. People in Correctional Facilities for Adults*

(a) *People in federal and state prisons on Census Day*—Prisoners are counted at the facility. Staff members are counted at the residence where they live and sleep most of the time. If staff members do not have a usual home elsewhere, they are counted at the facility.

(b) *People in local jails and other municipal confinement facilities on Census Day*—Prisoners are counted at the facility. Staff members are counted at the residence where they live and

sleep most of the time. If staff members do not have a usual home elsewhere, they are counted at the facility.

(c) *People in federal detention centers on Census Day, such as Metropolitan Correctional Centers, Metropolitan Detention Centers, Bureau of Indian Affairs Detention Centers, Immigration and Customs Enforcement (ICE) Service Processing Centers, and ICE contract detention facilities*—Prisoners are counted at the facility. Staff members are counted at the residence where they live and sleep most of the time. If staff members do not have a usual home elsewhere, they are counted at the facility.

(d) *People in correctional residential facilities on Census Day, such as halfway houses, restitution centers, and prerelease, work release, and study centers*—Residents are counted at the facility. Staff members are counted at the residence where they live and sleep most of the time. If staff members do not have a usual home elsewhere, they are counted at the facility.

*16. People in Group Homes and Residential Treatment Centers for Adults*

(a) *People in group homes intended for adults (non-correctional) on Census Day*—Residents are counted at the facility. Staff members are counted at the residence where they live and sleep most of the time. If staff members do not have a usual home elsewhere, they are counted at the facility.

(b) *People in residential treatment centers for adults (non-correctional) on Census Day*—Counted at the residence where they live and sleep most of the time. If residents or staff members do not have a usual home elsewhere, they are counted at the facility.

*17. People in Juvenile Facilities*

(a) *People in correctional facilities intended for juveniles on Census Day*— Juvenile residents are counted at the facility. Staff members are counted at the residence where they live and sleep most of the time. If staff members do not have a usual home elsewhere, they are counted at the facility.

(b) *People in group homes for juveniles (non-correctional) on Census Day*—Juvenile residents are counted at the facility. Staff members are counted at the residence where they live and sleep most of the time. If staff members do not have a usual home elsewhere, they are counted at the facility.

(c) *People in residential treatment centers for juveniles (non-correctional) on Census Day*—Counted at the residence where they live and sleep most of the time. If juvenile residents or

staff members do not have a usual home elsewhere, they are counted at the facility.

### 18. People in Transitory Locations

*People at transitory locations such as recreational vehicle (RV) parks, campgrounds, hotels and motels, hostels, marinas, racetracks, circuses, or carnivals*—Anyone, including staff members, staying at the transitory location is counted at the residence where they live and sleep most of the time. If they do not have a usual home elsewhere, or they cannot determine a place where they live most of the time, they are counted at the transitory location.

### 19. People in Workers' Residential Facilities

*People in workers' group living quarters and Job Corps Centers on Census Day*—Counted at the residence where they live and sleep most of the time. If residents or staff members do not have a usual home elsewhere, they are counted at the facility.

### 20. People in Religious-Related Residential Facilities

*People in religious group quarters, such as convents and monasteries, on Census Day*—Counted at the facility.

### 21. People in Shelters and People Experiencing Homelessness

(a) *People in domestic violence shelters on Census Day*—People staying at the shelter (who are not staff) are counted at the shelter. Staff members are counted at the residence where they live and sleep most of the time. If staff members do not have a usual home elsewhere, they are counted at the shelter.

(b) *People who, on Census Day, are in temporary group living quarters established for victims of natural disasters*—Anyone, including staff members, staying at the facility is counted at the residence where they live and sleep most of the time. If they do not have a usual home elsewhere, they are counted at the facility.

(c) *People who, on Census Day, are in emergency and transitional shelters with sleeping facilities for people experiencing homelessness*—People staying at the shelter (who are not staff) are counted at the shelter. Staff members are counted at the residence where they live and sleep most of the time. If staff members do not have a usual home elsewhere, they are counted at the shelter.

(d) *People who, on Census Day, are at soup kitchens and regularly scheduled mobile food vans that provide food to people experiencing homelessness*—Counted at the residence where they live and sleep most of the time. If they do not have a usual home elsewhere, they are counted at the soup kitchen or mobile food van location where they are on Census Day.

(e) *People who, on Census Day, are at targeted non-sheltered outdoor locations where people experiencing homelessness stay without paying*—Counted at the outdoor location where they are on Census Day.

(f) *People who, on Census Day, are temporarily displaced or experiencing homelessness and are staying in a residence for a short or indefinite period of time*—Counted at the residence where they live and sleep most of the time. If they cannot determine a place where they live most of the time, they are counted where they are staying on Census Day.

Dated: February 1, 2018.

**Ron S. Jarmin,**

*Associate Director for Economic Programs, Performing the Non-Exclusive Functions and Duties of the Director, Bureau of the Census.*

[FR Doc. 2018–02370 Filed 2–7–18; 8:45 am]

**BILLING CODE 3510–07–P**

---

# DEPARTMENT OF DEFENSE

## Department of the Navy

### 32 CFR Part 706

### Certifications and Exemptions Under the International Regulations for Preventing Collisions at Sea, 1972

**AGENCY:** Department of the Navy, DoD.

**ACTION:** Final rule.

**SUMMARY:** The Department of the Navy (DoN) is amending its certifications and exemptions under the International Regulations for Preventing Collisions at Sea, 1972 (72 COLREGS), to reflect that the Deputy Assistant Judge Advocate General (DAJAG) (Admiralty and Maritime Law) has determined that USS THOMAS HUDNER (DDG 116) is a vessel of the Navy which, due to its special construction and purpose, cannot fully comply with certain provisions of the 72 COLREGS without interfering with its special function as a naval ship. The intended effect of this rule is to warn mariners in waters where 72 COLREGS apply.

**DATES:** This rule is effective February 8, 2018 and is applicable beginning January 25, 2018.

**FOR FURTHER INFORMATION CONTACT:** Lieutenant Commander Kyle Fralick, (Admiralty and Maritime Law), Office of the Judge Advocate General, Department of the Navy, 1322 Patterson Ave. SE, Suite 3000, Washington Navy Yard, DC 20374–5066, telephone 202–685–5040.

**SUPPLEMENTARY INFORMATION:** Pursuant to the authority granted in 33 U.S.C. 1605, the DoN amends 32 CFR part 706.

This amendment provides notice that the DAJAG (Admiralty and Maritime Law), under authority delegated by the secretary of the Navy, has certified that USS THOMAS HUDNER (DDG 116) is a vessel of the Navy which, due to its special construction and purpose, cannot fully comply with the following specific provisions of 72 COLREGS without interfering with its special function as a naval ship: Annex I, paragraph 2(f)(i), pertaining to the placement of the masthead light or lights above and clear of all other lights and obstructions; Annex I, paragraph 2(f) (ii), pertaining to the vertical placement of task lights; Rule 23(a), the requirement to display a forward and aft masthead light underway, and Annex I, paragraph 3(a), pertaining to the location of the forward masthead light in the forward quarter of the ship, and the horizontal distance between the forward and after masthead lights; and Annex I, paragraph 3(c), pertaining to placement of task lights not less than two meters from the fore and aft centerline of the ship in the athwartship direction. The DAJAG (Admiralty and Maritime Law) has also certified that the lights involved are located in closest possible compliance with the applicable 72 COLREGS requirements.

Moreover, it has been determined, in accordance with 32 CFR parts 296 and 701, that publication of this amendment for public comment prior to adoption is impracticable, unnecessary, and contrary to public interest since it is based on technical findings that the placement of lights on this vessel in a manner differently from that prescribed herein will adversely affect the vessel's ability to perform its military functions.

### List of Subjects in 32 CFR Part 706

Marine safety, Navigation (water), Vessels.

For the reasons set forth in the preamble, the DoN amends part 706 of title 32 of the Code of Federal Regulations as follows:

## PART 706—CERTIFICATIONS AND EXEMPTIONS UNDER THE INTERNATIONAL REGULATIONS FOR PREVENTING COLLISIONS AT SEA, 1972

■ 1. The authority citation for part 706 continues to read:

**Authority:** 33 U.S.C. 1605.