# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., | Civil Action |
| Plaintiffs | |
| v. | Lead Case No.: |
| | 21-CV-00259-DCG-JES-JVB |
| GREG ABBOTT, et al., | |
| Defendants. | |
| | |
| VOTO LATINO, et al., | |
| Plaintiffs | |
| v. | Consolidated Case No.: |
| | 1:21-CV-00965-RP-JES-JVB |
| JOHN SCOTT, et al., | |
| Defendants. | |

## <u>VOTO LATINO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES .......................................................................................... iii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.   Plaintiffs have standing............................................................................................ 2

   A.  The Individual Plaintiffs have standing. ........................................................... 3

     1.  The Individual Plaintiffs adequately allege that they intend to vote............................. 3

     2.  The Individual Plaintiffs are directly affected by the entirety of the challenged portions of Senate Bill 6. ........................................................... 6

   B.  Voto Latino has standing. ................................................................................. 12

II.  Section 2 of the Voting Rights Act confers a private right of action..................... 14

CONCLUSION............................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018)..............................................................................................15

*Alexander v. Sandoval*,
   532 U.S. 275 (2001)..................................................................................................15

*Allen v. State Board of Elections*,
   393 U.S. 544 (1969)..................................................................................................16

*Brnovich v. DNC*,
   141 S. Ct. 2321 (2021)..............................................................................................15

*DiMaio v. DNC*,
   520 F.3d 1299 (11th Cir. 2008) ..................................................................................5

*Gallagher v. N.Y. State Board of Elections*,
   496 F. Supp. 3d 842 (S.D.N.Y. 2020) .....................................................................5, 6

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018).......................................................................................*passim*

*Heinze v. Tesco Corp.*,
   971 F.3d 475 (5th Cir. 2020) .......................................................................................4

*Johnson v. De Grandy*,
   512 U.S. 997 (1994)....................................................................................................1

*La Union Del Pueblo Entero v. Abbott*,
   Case No: 5:21-CV-0844-XR (W.D. Tex. Nov. 16, 2021) .......................................16

*Lewis v. Hughs*,
   475 F. Supp. 3d 597 (W.D. Tex. 2020).................................................................12, 13

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) .......................................................................................3

*LULAC v. City of Boerne*,
   675 F.3d 433 (5th Cir. 2012) .....................................................................................15

*LULAC v. Perry*,
   548 U.S. 399 (2006)..............................................................................................15, 17

*Mi Familia Vota v. Abbott*,
   977 F.3d 461 (5th Cir. 2020) ...................................................................................17

*Miss. Republican Exec. Comm. v. Brooks*,
   469 U.S. 1002 (1984) ...............................................................................................16

*Morse v. Republican Party of Va.*,
   517 U.S. 186 (1996) ..............................................................................2, 14, 16, 17

*OCA-Greater Hous. v. Texas*,
   867 F.3d 604 (5th Cir. 2017) ......................................................................12, 13, 15

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
   490 U.S. 477 (1989) .................................................................................................15

*Seminole Tribe of Fla. v. Florida*,
   517 U.S. 44 (1996) ...............................................................................................2, 14

*Shelby Cnty, Ala. v. Holder*,
   570 U.S. 529 (2013) .................................................................................................15

*Tex. Alliance for Retired Ams. v. Hughs*,
   489 F. Supp. 3d 667 (S.D. Tex. 2020) ....................................................................17

*Town of Chester, N.Y. v. Laroe Ests., Inc.*,
   137 S. Ct. 1645 (2017) .............................................................................................14

*United States v. Blaine Cnty., Mont.*,
   363 F.3d 897 (9th Cir. 2004) ...................................................................................17

*United States v. Rodriguez*,
   602 F.3d 346 (5th Cir. 2010) ...................................................................................14

*Veasey v. Abbott*,
   13 F. 4th 362 (5th Cir. 2021) ...................................................................................17

*Vote.org v. Callanen*,
   No. 5:21-cv-00649-JKP-HJB (W.D. Tex. Oct. 27, 2021) .......................................12

*Warth v. Seldin*,
   422 U.S. 490 (1975) ...................................................................................................3

*Williamson v. Tucker*,
   645 F.2d 404 (5th Cir. 1981) .................................................................................3, 4

*Yazzie v. Hobbs*,
   977 F.3d 964 (9th Cir. 2020) .................................................................................5, 6

**Statutes**

52 U.S.C. § 10302..................................................................................................................16

52 U.S.C. § 10310...........................................................................................................16, 17

**Other Authorities**

Fed. R. Civ. P. 12..................................................................................................................3

S. Rep. No. 97-417 (1982).....................................................................................................16

Plaintiffs Voto Latino, Rosalinda Ramos Abuabara, Akilah Bacy, Orlando Flores, Marilena Garza, Cecilia Gonzales, Agustin Loredo, Cinia Montoya, Ana Ramón, Jana Lynne Sanchez, Jerry Shafer, Debbie Lynn Solis, Angel Ulloa, and Mary Uribe (the "Voto Latino Plaintiffs" or "Plaintiffs"), file this opposition to Defendants' Motion to Dismiss, ECF No. 22[1] ("Mot.").

## INTRODUCTION

Defendants' Motion to Dismiss does not deny that the Voto Latino Plaintiffs have properly alleged that the congressional districts enacted by Senate Bill 6 violate Section 2 of the Voting Rights Act. That is for good reason. Plaintiffs' complaint alleges in considerable detail how, in the context of widespread racially-polarized voting across most of Texas, Senate Bill 6 systematically packs and cracks Latino and Black voters in Texas to ensure that such voters are able to elect far fewer of their preferred congressional candidates than their share of the population would support, while at the same time drawing lines that ensure that white voters are able to elect far more. *See generally* Compl., *Voto Latino v. Scott*, No. 1:21-cv-00965, ECF No. 1 (Oct. 25, 2021) (hereinafter "Compl."). Alternative districts could readily be drawn that would allow Latino and Black Texans an equal opportunity to elect their preferred candidates. *See id.* The failure to do so in Senate Bill 6 is a plain violation of the Voting Rights Act. *E.g.*, *Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994).

Instead of addressing the substance of Plaintiffs' claims, Defendants attempt to convince the Court not to reach them. First, Defendants contend that Plaintiffs lack standing to sue. Defs.' Mot. 1–9. But among the Plaintiffs are thirteen Latino and Black registered Texas voters who live in or adjacent to each of the districts that Plaintiffs challenge, and whose own voting rights are

---

[1] All ECF No. citations are to the docket for *LULAC v. Abbott*, No. 3:21-cv-259, unless otherwise specified.

directly impaired by the cracking and packing of Latino and Black voters in those districts. That is precisely the sort of injury that the Supreme Court has held is adequate to confer standing in a vote dilution case like this one. *See Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018). And while Defendants also argue that Plaintiffs do not adequately allege that they intend to vote, Plaintiffs' allegations—including that they are registered voters whose voting rights are impaired by Senate Bill 6—plainly support the reasonable inference that they will do so. Moreover, Voto Latino independently has organizational standing because Senate Bill 6 forces it to divert resources toward helping voters overcome Senate Bill 6's dilution of the voting power of Latino voters in Texas, which directly interferes with its organizational mission.

Second, Defendants contend that there is no private right of action to enforce Section 2. But the Supreme Court has said otherwise, explaining that "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." *Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (Stevens, J.) (plurality opinion on behalf of two justices) (quoting S. Rep. No. 97-417 at 30 (1982)); *see also id.* at 240 (Breyer, J., concurring) (expressly agreeing with Justice Stevens on this point on behalf of three justices). This was an essential part of the reasoning for the Supreme Court's holding in *Morse* and accordingly not dictum. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996). No court has ever accepted Defendants' argument, and this Court should not be the first.

The Court should therefore deny Defendants' Motion.

## ARGUMENT

### I.      Plaintiffs have standing.

The Court should reject Defendants' argument that neither the thirteen Texas citizens and registered voters (the "Individual Plaintiffs") nor the organizational Plaintiff Voto Latino has pled an injury in fact in the Complaint sufficient to confer standing under Article III. At this stage in

the proceedings, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of" Plaintiffs—the same standard that applies to a motion to dismiss for failure to state a claim. *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see also, e.g.*, *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981) ("A motion to dismiss for lack of subject matter jurisdiction, Rule 12(b)(1), can be based on the lack of jurisdiction on the face of the complaint. If so, the plaintiff is left with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised—the court must consider the allegations in the plaintiff's complaint as true.").

### A.  The Individual Plaintiffs have standing.

All of the thirteen Individual Plaintiffs are Texas citizens and registered voters who allege that Senate Bill 6 harms them by diluting their votes: either by packing the districts in which they reside with an excessive number of non-white voters, or by cracking communities of non-white voters between multiple districts to prevent them from electing their representatives of choice. Compl. ¶¶ 16–28, 65–88. Defendants nevertheless contest their standing, arguing that the Individual Plaintiffs do not adequately allege that they intend to vote, and that they do not live in a sufficient number of congressional districts to support Plaintiffs' claims. Both arguments fail.

### 1.  The Individual Plaintiffs adequately allege that they intend to vote.

Defendants first urge the Court to ignore the requirement that it must "draw all reasonable plausible inferences from the complaint in favor of the plaintiff," *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 264 (5th Cir. 2009), and find that the Individual Plaintiffs lack standing because "they do not allege that they intend to vote in 2022 (or any other future election)." Mot. 7 (citing Compl. ¶¶ 16–28). Accepting Defendants' argument would turn the well-settled standard that the Court must apply to motions to dismiss—including those brought on standing grounds, *see Williamson*, 645 F.2d at 412—on its head.

3

The Complaint's allegations about the injuries suffered by the Individual Plaintiffs more than suffice to support the reasonable inference that they intend to vote in future elections that, absent action from this Court, will be held under the districts drawn by Senate Bill 6. The Individual Plaintiffs allege that they are U.S. citizens and registered voters. Compl. ¶¶ 16–28. They allege that Senate Bill 6 will dilute their voting rights and reduce their abilities to elect their candidates of choice. *See, e.g.*, *id.* ¶ 69 (explaining CD 16 "increases the packing of Latino voters in El Paso in CD16, *further diluting their voting rights, including the voting rights of Plaintiff Angel Ulloa*. By doing so, Senate Bill 6 also reduces the ability of Latino voters in neighboring districts, including Plaintiffs Orlando Flores, Rosalinda Ramos Abuabara, and Mary Uribe in CD23, to *elect their candidates of choice*" (emphases added)); *id.* ¶¶ 72, 76, 77–80, 83, 88. (similar). The Court must take these factual allegations as true. *Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020). But they can be true only if the Individual Plaintiffs intend to vote in future elections—otherwise their voting rights would not be diluted and their ability to elect their candidates of choice would be unaffected. That is the only reasonable inference that follows from the Complaint's allegations. Indeed, it would be bizarre for the Individual Plaintiffs to register to vote and then file suit to protect their voting rights if they did not intend to vote.

The cases Defendants cite are not to the contrary. Notably, none were redistricting cases, which uniquely challenge the very boundaries of the districts in which Americans are represented in state and federal legislative bodies.[2] Further, each involved broader and more pervasive pleading

---

[2] Plaintiffs' allegations that they are citizens and registered voters who reside in particular locations are standard in redistricting complaints, and Defendants cite no case finding such allegations inadequate. *See, e.g.*, Quesada Pls.' First Am. Compl. ¶¶ 9–18, *Quesada v. Perry*, No. 5:11-cv-360, ECF No. 105 (W.D. Tex. Aug. 2, 2011); Pl.-Intervenors' Am. Compl. ¶¶ 6–8, *Perez v. Perry*, No. 5:11-cv-360, ECF No. 69 (W.D. Tex. July 25, 2011); Pls.' Third Am. Compl. ¶¶ 1–8, *Perez v. Perry*, No. 5:11-cv-360, ECF No. 53 (W.D. Tex. July 19, 2011).

deficiencies that left the court doubtful that the plaintiffs had been injured at all and are otherwise distinguishable.

*DiMaio v. DNC*, 520 F.3d 1299, 1302 (11th Cir. 2008), involved a rule that applied to a single party convention that followed a primary where it was not clear the plaintiff had even voted. At no point did the plaintiff attempt to clarify his position, and in fact the complaint did not even firmly assert that *plaintiff* believed his rights had been violated; it alleged only that the defendant "may *or may not*" have violated plaintiff's constitutional rights, and sought only a finding as to whether such a violation occurred. *Id.* (emphasis added). And the *DiMaio* plaintiff did not request leave to amend to clarify his standing. *Id.* at 1303. All of this left the Eleventh Circuit understandably suspicious that the plaintiff sought "an exercise in purely advisory decision-making." *Id.* at 1303.

Here, in contrast, the Individual Plaintiffs allege that they are personally harmed by the district lines that Senate Bill 6 has drawn for use in all future elections for at least the next ten years, in which the Individual Plaintiffs' votes will be diluted and where those lines will prevent them from electing their candidates of choice. Compl. ¶¶ 69, 72, 76, 77–80, 83, 88. And while Plaintiffs believe no amendment is necessary, they are ready and able to amend their complaint to expressly state their intention to vote in future elections, and Plaintiffs request leave to do so should the Court find their current allegations inadequate.

*Yazzie v. Hobbs*, 977 F.3d 964 (9th Cir. 2020), and *Gallagher v. N.Y. State Board of Elections*, 496 F. Supp. 3d 842 (S.D.N.Y. 2020), are also entirely inapposite. Each case challenged a single particular voting procedure applicable solely to voters who voted by mail in the middle of the COVID-19 pandemic: in *Yazzie*, at issue was the requirement that mail-in ballots be received by election day, 977 F.3d at 965, and in *Gallagher*, it was the requirement that mail-in ballots be

postmarked, 496 F. Supp. 3d at 845. Thus, an inference that the plaintiffs in those cases would vote would not be enough—they had standing only if they intended to vote *by mail*, specifically, during the COVID-19 pandemic. Yet neither set of plaintiffs alleged that they intended to vote by mail in the upcoming election, or any future election. *See Yazzie*, 977 F.3d at 967; *Gallagher*, 496 F. Supp. 3d at 845–46. And, as in *DiMaio*, there was substantial reason to doubt that any of the plaintiffs intended to do so. In *Gallagher*, one plaintiff had said she would *not* vote by mail, another had said she was unsure, and there were numerous other ways to vote. 496 F. Supp. 3d at 845–46, 850–51. In *Yazzie*, there was no allegation that any of the reasons supposedly motivating voters to vote by mail applied to the plaintiffs in question. 977 F.3d at 967.

In contrast, Plaintiffs here do not challenge a particular method of voting that they may or may not use, but rather the drawing of the boundaries of congressional districts that will invariably and unavoidably affect their ability to elect their candidates of choice, no matter what means of voting they use. Moreover, *Yazzie* involved a preliminary injunction motion, not a motion to dismiss, and thus required plaintiffs to "make a clear showing of" standing—not mere allegations. *Yazzie*, 977 F.3d at 966. No such standard applies in the context of Defendants' motion here.

In sum, construing the complaint in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, the Individual Plaintiffs have more than adequately alleged that they intend to vote in the future, as that is the only way that their voting rights and abilities to elect their candidates of choice could be injured in the way that they allege. In the event that the Court disagrees, however, Plaintiffs request leave to amend their Complaint, because the Individual Plaintiffs could readily allege that they intend to vote in the future, as in fact they do.

### 2. The Individual Plaintiffs are directly affected by the entirety of the challenged portions of Senate Bill 6.

The Court should also reject Defendants' argument that the Individual Plaintiffs lack

standing to support the full extent of their claims because their challenge includes districts in which none of the Individual Plaintiffs reside. Mot. 7–9. As the Supreme Court has explained, in a vote dilution case such as this one, a voter's "harm arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Gill*, 138 S. Ct. at 1931. As discussed further below, the Individual Plaintiffs make specific factual allegations that demonstrate how they are directly harmed in their own districts by each of the districting choices that Plaintiffs challenge across the State: in South and West Texas, in Dallas–Fort Worth, and in Houston.

### a. South and West Texas

Plaintiffs challenge seven of Senate Bill 6's districts in South and West Texas, which together have the effect of reducing by two the number of reasonably compact districts in the region in which Latinos could form a numerical majority of the voting-eligible population, and of reducing by three the number of such districts in which a Latino majority could elect its candidates of choice. Compl. ¶¶ 68, 72.[3] In four of these districts—Texas's 16th, 21st, 23rd, and 27th congressional districts ("CD16," "CD21," "CD23," and "CD 27")—at least one Individual Plaintiff lives in the district. Thus, even under Defendants' own standard, Plaintiffs' allegations are sufficient. In the remaining three districts—congressional districts 20, 34, and 35 ("CD20," "CD34," and "CD35"), the Individual Plaintiffs specifically allege how decisions made in drawing

---

[3] Specifically, in South and West Texas, Plaintiffs challenge CD16, CD20, CD21, CD23, CD27, CD34, and CD35. Defendants' motion appears to misunderstand Plaintiffs to challenge the 15th and 28th congressional districts (CD15 and CD28), as well. Plaintiffs have no quarrel with those districts *per se*, *see id.* ¶¶ 73–74 (describing those districts without criticizing them), although addressing the issues with the districts in the region that Plaintiffs do challenge may, as a simple matter of geography and population, require some changes to CD15 and CD28 as well. *See Gill*, 138 S. Ct. at 1931 (recognizing that remedying vote dilution will "require[] revising . . . such districts as are necessary to reshape the voter's district—so that the voter may be unpacked or uncracked, as the case may be").

those districts directly injures them by diluting their voting rights in their adjoining home districts, thus satisfying the standing requirements that are applicable to their vote dilution claims. *Gill*, 138 S. Ct. at 1931.

First, Plaintiffs challenge the packing of CD16 with an excessive concentration of Latino voters. Compl. ¶ 69. Plaintiff Angel Ulloa is a Latina registered voter who resides in CD16. *Id.* ¶ 27. The packing of CD16 directly harms her by diluting her vote. *Id.* ¶ 69. It also directly harms Latino and Latina registered voters in Texas's adjacent CD23, including Plaintiffs Orlando Flores, Rosalinda Ramos Abuabara, and Mary Uribe, by reducing the Latino population of CD23 to prevent Latino voters in CD23 from electing their candidates of choice. *Id.* ¶¶ 69–72.

Second, and relatedly, Plaintiffs challenge the drawing of CD23 to crack Latino voters into neighboring districts and thereby reduce the Latino population of CD23 to a level that will not enable Latino voters in CD23 to elect their candidates of choice. *Id.* ¶¶ 70–72. Plaintiffs Flores, Ramos Abuabara, and Uribe are all Latino registered voters in CD23 who are directly harmed by this cracking. *Id.* ¶¶ 16, 18, 28, 72.

Third, Plaintiffs challenge the packing of CD34 with an excessive number of Latino voters. *Id.* ¶¶ 75–76. As detailed in the Complaint, this directly harms Latino residents of neighboring districts, including Plaintiffs Marilena Garza and Cinia Montoya, Latina voters who reside in CD27, which is located directly north of CD34, by reducing the Latino population of CD27 to prevent Latino voters in CD27 from electing their candidates of choice. *Id.* ¶¶ 19, 22, 75–77.

Fourth, and relatedly, Plaintiffs challenge the drawing of CD27 to crack Latino voters into neighboring districts and thereby reduce the Latino population of CD27 to a level that will not enable Latino voters in CD27 to elect their candidates of choice. *Id.* ¶ 77. Plaintiffs Garza and Montoya are both Latina registered voters in CD27 who are directly harmed. *Id.* ¶¶ 19, 22, 77.

Fifth, Plaintiffs challenge CD35 on the ground that the oddly shaped, non-compact district dilutes the votes of Latino voters in immediately adjoining districts—including Plaintiffs Garza and Montoya in CD27, Plaintiff Ana Ramón in CD21, and Plaintiffs Flores, Ramos Abuabara, and Uribe in CD23—by interfering with the drawing of alternative districts in which a majority of eligible voters would be Latino and have an opportunity to elect their candidates of choice. *Id.* ¶¶ 16, 18, 19, 22, 23, 28, 78. Plaintiffs Garza, Montoya, Ramón, Flores, Ramos Abuabara, and Uribe are therefore directly harmed in their own districts by the challenged aspects of CD35. *See id.*

Sixth, Plaintiffs challenge the packing of CD20 with an excessive number of Latino voters. *Id.* ¶ 79. As the Complaint alleges, this packing in CD20 directly harms Latino voters who reside in CD23, including Plaintiffs Flores, Ramos Abuabara, and Uribe, by reducing the Latino population of CD23 to a point that prevents Latino voters in CD23 from electing their preferred candidates. *Id.* ¶¶ 16, 18, 28, 79.

Finally, Plaintiffs challenge the cracking of Latino voters in Bexar and Travis Counties in CD21, a predominantly white district in which Latino voters are unable to elect their candidates of choice. *Id.* ¶ 80. This cracking directly harms Plaintiff Ramón, a Latina voter who lives in the portion of Bexar County that is cracked into CD21. *Id.* ¶ 23, 80.

For each of these reasons, Defendants' contention that Plaintiffs lack standing to challenge decisions made in drawing CD20, CD34, or CD35, because none of the Individual Plaintiffs lives within the boundaries that Senate Bill 6 draws for those districts, Mot. 9, should be rejected. For each of those districts—and all of the other districts in South and West Texas that Plaintiffs challenge—at least one Individual Plaintiff resides in an immediately neighboring district and has clearly and adequately alleged how they are personally and directly harmed in their own district

by the way that Senate Bill 6 draws the challenged district. *See* Compl. ¶¶ 75–76, 78–79.

### b. Dallas–Fort Worth

Plaintiffs also challenge Senate Bill 6's configuration of the Dallas–Fort Worth metropolitan area, which improperly cracks many non-white voters among six predominantly rural districts in which such voters are unable to elect their candidates of choice. *Id.* ¶ 81. These districts are CD5, CD6, CD12, CD24, CD25, and CD26. And, as with the districts that Plaintiffs challenge in South and West Texas, for these districts, too, the Complaint adequately alleges an injury to at least one Individual Plaintiff sufficient to satisfy standing at this stage in the proceedings.

Plaintiff Cecilia Gonzales, a Latina voter who resides in Arlington in Tarrant County but has been cracked into Texas's predominantly white and rural 25th congressional district ("CD25"), and Plaintiff Jana Lynn Sanchez, a Latina voter who lives in Fort Worth in Tarrant County but has been cracked into Texas's predominantly white and rural 12th congressional district ("CD12"), are directly harmed by this cracking, which prevents them from electing their candidates of choice. *Id.* ¶¶ 20, 24, 81–83. In addition, Plaintiffs allege that an additional district could be drawn in Dallas-Fort Worth—in the area carved up between CD6, CD12, CD24, CD25, and CD30—in which a numerical majority of eligible voters are Latino and would have the opportunity to elect their candidates of choice. *Id.* ¶ 83. Plaintiff Debbie Lynn Solis is a Latina voter who would be included in such a district and would benefit from such relief. *Id.*

Defendants complain that no Individual Plaintiff resides in other districts in the Dallas–Fort Worth region, including CD5, CD6, CD24, CD30, and CD32. Mot. 9. But this is, again, irrelevant. Plaintiffs Gonzales and Sanchez are directly injured in their own districts by the Texas Legislature's decision to crack their communities—including them—into multiple rural districts instead of drawing them into a district in which they would have a reasonable opportunity to elect their candidates of choice. *Id.* ¶¶ 20, 24, 81–83. Nothing further is needed to trigger the relief

Plaintiffs seek in the Dallas–Fort Worth area. Compl. at 33. They therefore have standing to challenge the dilution of their votes. *Gill*, 138 S. Ct. at 1931. The fact that remedying this dilution will invariably *also* affect other districts in which no individual plaintiff resides does nothing to change that. *See id.*

### c. Harris County

Finally, Plaintiffs challenge Senate Bill 6's cracking of Latino communities in Southeast Harris County between Texas's majority-Latino 29th congressional district ("CD29") and the predominantly white 36th congressional district ("CD36"), along as well as Senate Bill 6's failure to draw an additional minority-minority district in western Harris County in the area occupied by the 2nd, 8th, and 38th congressional districts ("CD2," "CD8," and "CD38"). *Id.* ¶¶ 87–88.

This configuration directly harms those Latino voters who are cracked into CD36 and thus deprived of an opportunity to elect their candidates of choice, including Plaintiffs Jerry Shafer and Agustin Loredo. *Id.* ¶¶ 21, 25, 88. Plaintiffs Jerry Shafer and Agustin Loredo reside in CD36 but could be drawn into an additional, more compact, majority Latino district in Southeast Houston.

Senate Bill 6's configuration of CD29 also directly harms other voters in western Harris County, including Plaintiff Akilah Bacy, an African-American voter who Senate Bill 6 places in predominantly-white CD38, but who could instead be placed in a district—in addition to the majority Latino district in Southeast Houston that would include Plaintiffs Jerry Shafer and Agustin Lordeo—in which African-American and Latino voters are together able to elect their shared candidates of choice. *Id.* ¶¶ 17, 88.

Defendants' complaint that no Individual Plaintiff resides in CD2 or CD29 is therefore again beside the point, because the Complaint includes individual plaintiffs who are directly harmed in their own districts by the aspects of Senate Bill 6's Harris County districts that Plaintiffs challenge. *See Gill*, 138 S. Ct. at 1931.

**B.  Voto Latino has standing.**

Defendants also argue that the remaining Plaintiff, the organization Voto Latino, lacks standing. Mot. 2–7. Defendants are wrong. Voto Latino has organizational standing to sue. Organizational standing "does not depend on the standing of the organization's members." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017)*.* An organizational plaintiff "can establish standing in its own name if it meets the same standing test that applies to individuals." *Id.* (citing *ACORN v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999)). One way to meet this test is "by alleging that [the organization] must divert resources from its usual activities in order to lessen the challenged restriction's harm to its mission." *Lewis v. Hughs*, 475 F. Supp. 3d 597, 612 (W.D. Tex. 2020) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

For instance, in *OCA-Greater Houston*, 867 F.3d at 610, the Fifth Circuit held that a plaintiff had organizational standing where it alleged that its mission of getting out the vote was harmed by the "additional time and effort spent explaining the [challenged] provisions at issue to limited English proficient voters," which "frustrate[d] and complicate[d] its routine community outreach activities." Another court in this district similarly held that organizations dedicated to protecting voting rights had standing to challenge voting restrictions based on the organizations' diversion of resources to ameliorate harm to voters from the restrictions. *See Lewis*, 475 F. Supp. 3d at 612; *see also Vote.org v. Callanen*, No. 5:21-cv-00649-JKP-HJB, slip op. at 2-4 (W.D. Tex. Oct. 27, 2021) (same).

Voto Latino has alleged exactly this type of injury. Voto Latino works to ensure "Latinx voters are enfranchised and included in the democratic process," and it "expends significant resources to register and mobilize thousands of Latinx voters each election cycle" in pursuit of that mission. Compl. ¶ 14. Because Senate Bill 6 "dilutes the voting power of Texas's *Latino* and Black

communities," *id.* ¶ 1 (emphasis added), it directly threatens Voto Latino's mission and undermines Voto Latino's work to empower and enfranchise Latino voters. Voters who are unable to elect their candidates of choice because Senate Bill 6 dilutes their votes will be less likely to participate in the democratic process, and Voto Latino will be forced to "expend and divert additional funds and resources" that it would have spent elsewhere in an effort to reduce the harm to its mission from this systematic cracking and packing of Latino voters. *Id.* ¶ 15.

Defendants argue that Voto Latino's diversion of resources is inadequate to support its standing based on Defendants' claim that it pursues this action based on nothing more than a general partisan preference. Mot. 6. But this fabrication ignores the actual allegations in the Complaint. Voto Latino clearly alleges that its mission is "to ensure that Latinx voters are enfranchised and included in the democratic process," and that Senate Bill 6's "dilution of the voting power of Latinx voters in Texas" will require Voto Latino "to expend and divert additional funds and resources that it would otherwise spend on its efforts to accomplish its mission in other states." Compl. ¶¶ 14–15. This makes sense: Senate Bill 6's dilution of Latino voting rights directly undermines Voto Latino's efforts to enfranchise Latino voters, requiring Voto Latino to expend additional funds to respond. That is precisely the sort of diversion of resources that suffices to support organizational standing. *E.g.*, *OCA-Greater Hous.*, 867 F.3d at 610; *Lewis*, 475 F. Supp. 3d at 612; *Vote.org*, No. 5:21-cv-00649-JKP-HJB, *supra*, at 2-4.

In any event, the Court need not address Voto Latino's standing. Article III requires only that "[*a*]*t least one plaintiff* must have standing to seek each form of relief requested in the complaint." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651 (2017) (emphasis added). Voto Latino seeks the same relief as the Individual Plaintiffs, and as explained, the

Individual Plaintiffs have standing sufficient to support the full extent of Plaintiffs' claims in this case. *Supra* Parts I.A.1, I.A.2.

## II.     Section 2 of the Voting Rights Act confers a private right of action.

Defendants also contend that Plaintiffs fail to state a claim because—Defendants claim—Section 2 does not confer a private right of action, Mot. 9–12. But this argument is contrary to binding Supreme Court precedent and has never been accepted by any court.

As a majority of the Supreme Court explained in *Morse v. Republican Party of Virginia*, "the existence of the private right of action under Section 2 . . . has been clearly intended by Congress since 1965." 517 U.S. at 232 (Stevens, J.) (plurality opinion on behalf of two justices) (quoting S. Rep. No. 97-417, pt. 1, p. 30 (1982)); *see also id.* at 240 (Breyer, J., concurring) (expressly agreeing with Justice Stevens on this point on behalf of three justices). Defendants dismiss this as "*dicta*," Mot. 11, but Defendants are wrong. The Court reached this conclusion as an essential part of its rationale for holding that another provision of the Voting Rights Act, Section 10, creates a private right of action, explaining that "[i]t would be anomalous, to say the least, *to hold that both § 2 and § 5 are enforceable by private action* but § 10 is not, when all lack the same express authorizing language." *Id.* at 232 (Stevens, J.) (emphasis added); *see also id.* at 240 (Breyer, J., concurring) (similar).

"When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which [lower courts] are bound." *Seminole Tribe of Fla.*, 517 U.S. at 67; *see also United States v. Rodriguez*, 602 F.3d 346, 358 (5th Cir. 2010) ("Our court is bound not only by the result of an opinion, but also by those portions of the opinion necessary to that result." (cleaned up)). *Morse*'s statement that there is a private right of action under Section 2 is binding. Defendants' attempt to avoid this obvious conclusion, by arguing that this Court should nevertheless disregard the clear dictate of the U.S. Supreme Court in *Morse* because—

Defendants claim—they are inconsistent with the methodology for assessing the existence of implied rights of action that the Supreme Court subsequently adopted in *Alexander v. Sandoval*, 532 U.S. 275 (2001). Mot. 10–11. But the Court may not do so.

Where "a precedent of [the Supreme] Court has direct application in a case," even if it "appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to th[e Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). And *Morse* has not been overruled. Indeed, the Supreme Court has given no indication that a majority of justices intends to revisit *Morse*'s conclusion that a private right of action is available under Section 2. The Court repeatedly heard private cases brought under Section 2 for twenty years after *Sandoval*, with nary an objection that no right of action might exist. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2331–32 (2018); *LULAC v. Perry*, 548 U.S. 399, 409 (2006) (Kennedy, J.) (plurality op.); *see also Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 537 (2013) ("Both the Federal Government and individuals have sued to enforce § 2."). The Fifth Circuit has done the same. *See, e.g.*, *OCA-Greater Hous.*, 867 F.3d at 604; *LULAC v. City of Boerne*, 675 F.3d 433 (5th Cir. 2012). And only Justice Thomas joined Justice Gorsuch's recent suggestion that no private right of action might exist—a suggestion that notably did not cite *Morse* or any post–*Morse* Section 2 case. *See Brnovich v. DNC*, 141 S. Ct. 2321, 2350 (2021) (Gorsuch, J., concurring).

Ultimately, Defendants cite no case rejecting a private right of action under Section 2 because there is none. In fact, a judge of the Western District of Texas rejected this same argument, by these same Defendants, just 2 weeks ago. *See* Tr. of Status Conf. at 23–24, *La Union Del Pueblo Entero v. Abbott*, Case No: 5:21-CV-0844-XR, (W.D. Tex. Nov. 16, 2021) (attached as Ex. A).

The conclusion that Section 2 provides for a private right of action is grounded not only in binding precedent but also the statutory text and legislative history. The Supreme Court held in *Allen v. State Board of Elections,* 393 U.S. 544, 556 (1969), that private plaintiffs could bring suit to enforce Section 5 of the Act, explaining that the Voting Rights Act "was drafted to make the guarantees of the Fifteenth Amendment finally a reality for all citizens" and that this "laudable goal could be severely hampered . . . if each citizen were required to depend solely on litigation instituted at the discretion of the Attorney General.". The Supreme Court then explained in *Morse* that "both § 2 and § 5 are enforceable by private action." *Morse*, 517 U.S. at 232. This is consistent with the legislative history to the 1982 amendments to Section 2, in which the Senate Judiciary Committee emphasized that "the private right of action under Section 2, . . . has been clearly intended by Congress since 1965." S. Rep. No. 97-417, at 208 (1982).

The interplay between Section 2 and other provisions of the Voting Rights Act confirm this conclusion. *See* 52 U.S.C. §§ 10302, 10310. Section 3 authorizes certain remedies "[w]henever the Attorney General *or an aggrieved person* institutes a proceeding under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment." *Id.* § 10302(a) (emphasis added); *see also id.* § 10302(b) (similar). This authorization makes sense only if "aggrieved person[s]" other than the Attorney General may indeed sue under "statute[s] to enforce the voting guarantees of the fourteenth or fifteenth amendment." *Id.* § 10302(a). And Section 2—even as amended in 1982—is just such a statute. *See Miss. Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984), *aff'g Jordan v. Winter*, 604 F. Supp. 807, 811 (N.D. Miss. 1984) (holding that the amended Section 2 is a valid exercise of "Congress's enforcement power under the fifteenth amendment"); *see also United States v. Blaine Cnty., Mont.*, 363 F.3d 897, 904–05 (9th Cir. 2004) (same). Section 3's recognition that private rights of action were available to enforce

16

such statutes confirms that "Congress must have intended [those statutes] to provide private remedies." *Morse*, 517 U.S. at 234 (Stevens, J.) (plurality op.); *see also id.* at 240 (Breyer, J., concurring). Similarly, Section 14 authorizes attorneys' fees for "the prevailing party, other than the United States," in "any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment," *id.* § 10310(e), an authorization that assumes private parties may sue under statutes enforcing such guarantees, including Section 2.

Defendants also argue that any private cause of action belongs "only to voters." But as explained above, the Individual Plaintiffs *are* voters, and they have standing over the full extent of Plaintiffs' claims in this case. *Supra* Part I.A. And regardless, Defendants cite no case limiting the Section 2 cause of action in that way, and they ignore the overwhelming Fifth Circuit authority recognizing Section 2 claims brought by organizational plaintiffs. *See, e.g.*, *Veasey v. Abbott*, 13 F. 4th 362 (5th Cir. 2021) (awarding attorneys' fees to organizational plaintiffs for prevailing on Section 2 claim); *Tex. Alliance for Retired Ams. v. Hughs*, 489 F. Supp. 3d 667 (S.D. Tex. 2020) (holding organizational plaintiffs were likely to succeed on Section 2 claim); *see also Mi Familia Vota v. Abbott*, 977 F.3d 461 (5th Cir. 2020); *LULAC v. Perry*, 548 U.S. 399.

## CONCLUSION

For these reasons, the Court should deny Defendants' Motion to Dismiss.

Dated: November 30, 2021.

Respectfully submitted,
*/s/ Renea Hicks*
Renea Hicks
Attorney at Law
Texas Bar No. 09580400
**Law Office of Max Renea Hicks**
P.O. Box 303187
Austin, Texas 78703-0504
(512) 480-8231
rhicks@renea-hicks.com

Abha Khanna*
**ELIAS LAW GROUP LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
akhanna@elias.law

David R. Fox*
Kathryn E. Yukevich*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
dfox@elias.law
kyukevich@elias.law

Kevin J. Hamilton*
**PERKINS COIE**
1201 Third Avenue
Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-8000
khamilton@perkinscoie.com

*Counsel for Plaintiffs*

*\*Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically

(via CM/ECF) on November 30, 2021, and that all counsel of record were served by CM/ECF.

/s/ Renea Hicks