UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

**LEAGUE OF UNITED LATIN AMERICAN
CITIZENS**, et al.,

|  |  |
|---|---|
| *Plaintiffs*, | No. EP:21-cv-259-DCG-JES-JVB<br>[Lead Case] |
| V. |  |
| **GREG ABBOTT,** in his Official Capacity as<br>Governor of the State Texas; et al., | No. 1:21-cv-00943-RP-JES-JVB<br>[Consolidated Case] |
| *Defendants* |  |

**PLAINTIFF WILSON'S VERIFIED MEMORANDUM OF LAW IN SUPPORT OF**

**MOTION FOR CERTIFICATION OF CLASS ACTION**

Richard Gladden
Texas Bar No. 07991330
1204 West University Dr., Suite 307
Denton, Texas 76201
940/323-9300 (voice)
940/539-0093 (facsimile)
richscot1@hotmail.com (email)
*Attorney-in-Charge for Plaintiff*
*Damon James Wilson*

November 24, 2021

## TABLE OF CONTENTS

Page

Table of Contents……………………………………………………………...   i

Index of Authorities……………………………………………………………...   ii

I.  Facts……………………………………………………............................   1

II.  Federal Constitutional Issue Presented:

Whether the Equal Protection Clause of the Fourteenth Amendment, by Virtue of the "Equality of Representation" Requirement Embodied in Article I, §2 of the U.S. Constitution, and §2 of the Fourteenth Amendment to the U.S. Constitution, is Violated by a State's Congressional Redistricting Plan that Designates the Domicile of a Prison Inmate to be the Location of the Inmate's Confinement, and Not the Location of the Inmate's Domicile Maintained Before and During Confinement?
          ………………………………………………………………   4

III. Summary of Plaintiff's Claims……………………………………………   5

IV. Argument:

    a)  Applicable Federal Constitutional Law…………………………………   6

    b)  The Framers' Understanding of the Term "Residence" for Purposes of "Equal Representation" in the U.S. House of Representatives.
          …………………………   8

    c)  The Civil Law Source of the Domicile Doctrine, and Evidence of the Framers Familiarity with the "*Animo Manendi*" Doctrine.
          …………………………   11

    d)  The "Equality of Representation" Requirement Embodied in Article I, §2 of the U.S. Constitution, and in §2 of the Fourteenth Amendment to the U.S. Constitution, Mandates that Total Population Form the Basis for Congressional Redistricting within a State.
          …………………………………   20

    e)  The Location of Where an Inmate "Lives or Sleeps Most of the Time," for Purposes of Determining Where the Inmate is an "Inhabitant," is Inconsistent with the Framers' Intent; and the Temporal Length of an Inmate's Absence from his Permanent Domicile does not Affect Where the Inmate is an Inhabitant.
          …………………………………………   23

**Page**

f) The "Representational Interests" Defined.
……………………………………….... 25

g) The Constitutional Standard that Applies for Determining Whether Defendants Have Violated Plaintiff's Representation Rights.
……………………………………… 27

h) The State of Texas is not Constitutionally Permitted to Reply upon Less Granular U.S. Census Bureau Data for Purposes of Designating the Location of an Inmate's Domicile, When More Reliable and Accurate Information Concerning Where the Inmate is Domiciled is in its Actual Possession.
………………………………… 28

Conclusion…………………………………………… 31

Prayer…………………………………………………............. 33

Certificate of Compliance………………………………… 33

Certificate of Service…………………………………......... 33

## INDEX OF AUTHORITIES

**Cases:**

*Bempde v. Johnstone*, 3 Vesey Junior 198; 30 Eng. Rep. 967 (1796)…………….. 19

*Bowsher v. Synar*, 478 U.S. 714 (1986)……………………………………… 8

*Burns v. Richardson*, 384 U.S. 73 (1966)………………………………….. 22, 27

*Burton v. Fisher*, Milward's Rep. 183 (1847), 2 Ir. Law Rec. 152 (1829)………… 19

*Evenwel v. Abbott*, 578 U.S. ---, 136 S. Ct. 720 (2016)…………………… 6, 7, 20-22, 26

*Fletcher v. Lamone*, 831 F.Supp.2d 887 (D. Md. 2011)…………………… 29

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)……………………………… 9, 14, 24

*Frontiero v. Richardson*, 411 U.S. 677 (1973)……………………………….. 31

*Gutierrez v. Abbott*, No. 1:21-cv-00769-RP-JES-JVB (W. D. Tex.)……………… 1

*Hardy v. De Leon*, 5 Tex. 211 (1849)……………………………………… 20

**Page**

*Karcher v. Daggett*, 462 U.S. 725 (1983)………………………………………..  27, 31

*Kentucky v. Graham*, 473 U.S. 159 (1985)…………………………………………  3

*Mahan v. Howell,* 410 U.S. 315 (1973)……………………………………………  22, 27

*Pennhurst State School Hosp. v. Halderman*, 465 U.S. 89 (1983)………………  19

*Perez v. Texas*, No. 5:11-cv-00360-OLG (W. D. Tex.)……………………………  21

*Picquet v. Swan*, 5 Mason 35, 19 Fed. Cas. 609, no. 11,134 (C.C.D. Mass. 1828)... 10, 11, 17

*Richardson v. Ramirez*, 418 U.S. 24 (1974)………………………………………  8

*United States Steel Corporation v. Multistate Tax Commission*, 434 U.S. 452 (1978).
………………………………………………………………………………  13

*Utah v. Evans*, 526 U.S. 452 (2002)………………………………………………  9

*Wesberry v. Sanders*, 376 U.S. 1 (1964)…………………………………………  27

*Williams v. North Carolina*, 417 U.S. 287 (1942)………………………………  20

*Williams v. North Carolina*, 325 U.S. 226 (1945)………………………………  9

**Statutes, Codes, Rules, and Constitutional Provisions:**

Act of September 24, 1789, 1 Stat. 79 ("The Judiciary Act of 1789")……………..  10

Act of March 1, 1790, 1 Stat. 103 ("The Census Act of 1790")…………………… 2, 5,
                                                                              9-12, 19, 24

Mass. Gen. Laws, Act of February 28, 1795, ch. 65, §1…………………………  11

Mass. Gen. Laws, Act of February 17, 1798, ch. 50, §1…………………………  11

Texas Act of May 18, 1967, 60th Leg., R.S., ch. 723, §21, 1967 Tex. Gen. Laws, 1858 (former V.A.T.S., Texas Elections Code, art. 508(l)).
………………………………………  20

13 U. S. C. § 141…………………………………………………………………  2

28 U.S.C. § 1367…………………………………………………………………  19

**Page**

28 U.S.C. § 2201……………………………………………………………… 1

28 U.S.C. § 2202……………………………………………………………… 1

28 U.S.C. § 2284……………………………………………………………… 1

42 U.S.C. § 1983……………………………………………………………… 1

Local Rule CV-7, Rules of the United States District Court for the Western District of Texas.
……………………………………………………………… 1, 33

Article I, § 2 of the U.S. Constitution………………………………………… *passim*

Section 2, Fourteenth Amendment to the U.S. Constitution……………………. *passim*

The Equal Protection Clause, Fourteenth Amendment to the U.S. Constitution…... *passim*

**Other Sources:**

Bur. of Census, Dept. of Commerce, *Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5525 (Feb. 8, 2018).
………………………………… 2, 30, 32

Bur. of Census, Dept. of Commerce, *Group Quarters Assistance* (Aug. 12, 2021).. 2

Bur. of Census, Dept. of Commerce, *Using the Census Geocoder for Redistricting* (Aug. 12, 2021).
……………………………………………………………… 2

Jean-Jacques Burlamaqui, *The Principles of Natural and Politic Law* (London, 1763, 2d ed.).
……………………………………………………………... 14, 18

*A Catalog of the Books Belonging to the Library Company of Philadelphia* (1789).
……………………………………………………………… 13

*The Charter, Laws, and Catalog of Books of the Library Company of Philadelphia* (Philadelphia 1770).
……………………………………………………… 13

iv

**Page**

Daniel L. Cork & Paul R. Voss, eds., *Once, Only Once, and in the Right Place: Residence Rules in the Decennial Census* (2006). ………………………………… 24, 28-30

Serge Dauchy, *et al*., eds, *The Formation and Transmission of Western Legal Culture* (Springer Int'l. Pub. Co., Switzerland 2016). ……………………………. 17

Jean-Baptiste Denisart, *Collection de Décisions Nouvelles et de Notions Relatives à la Jurisprudence Actuelle* (1777). ……………………………………………… 17

Jean Domat, *The Civil Law in its Natural Order: Together with the Publick Law* (London, 1722). …………………………………………………………………... 16, 18

Jonathan Elliot, ed., *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* (1845). ………………………………… 15, 25

Alexander Hamilton, James Madison, and John Jay, *The Federalist Papers* (1961, Clinton Rossiter and Charles R. Kessler, eds.). ………………………………… 7, 26

Ray Forrest Harvey*, Jean-Jacques Burlamaqui: A Liberal Tradition in American Constitutionalism* (1937). …………………………………………………… 14

Richard H. Hemholz, *Use of the Civil Law in Post-Revolutionary American Jurisprudence*, 66 Tulane Law Rev. 1649 (1992). …………………………….. 19

Dale E. Ho, *Captive Constituents: Prison-Based Gerrymandering and Current Redistricting Cycle*, 22 Stan. L. & Pol'y Rev. 355 (2011). …………………………………………………… 23

John C. Hogan, *Joseph Story's Essay on Domicil*, 35 B.U. L. Rev. 215 (1955).…. 18

Flavius Petrus Sabbatius Iustinianus, *The Digest of Justinian* (circa A.D. 529-534). …………………………………………………………………… 12, 16, 18

**Page**

Benjamin B. Kendrick, ed., *Journal of the Joint Committee of Fifteen on Reconstruction* (reprint, Negro Universities Press, 1969).
…………………………… 8

James Kent, *Commentaries on American Law* (1st ed., 1826)……………….... 15, 25

James Kent, *Commentaries on American Law* (2nd ed. 1832)……………….... 13, 15

Gregg L. Lint, *et al*., eds., *The Papers of John Adams* (2012)..…………………… 10

*The General Laws of Massachusetts from the Adoption of the Constitution, to February, 1822* (Boston: Wells & Lilly, *et al*., publishers 1823).
…………………….. 11

Philippe-Antione Merlin, *Repertiore Universel et Raisonne de Jurisprudence* (Brussels 1826).
…………………………………………………………. 17, 24

Fulmer Mood, *The Continental Congress and the Plan for a Library of Congress in 1782-1783*, 72 Penn. Mag. Hist. & Bio. 3 (1948).
…………………………………. 18

William Ossipow and Dominik Gerber, *The Reception of Vattel's Law of Nations in the American Colonies: From James Otis and John Adams to the Declaration of Independence* (American Journal of Legal History, 2017).
………………………. 15

Robert Phillamore, *The Law of Domicile* (Philadelphia, 1847)……………………. 17

Robert A. Rutland, *"Well Acquainted with Books": The Founding Framers of 1787* (Washington, D.C., Library of Congress, 1987).
…………………………. 18

Paul H. Smith, *et al*., eds., *Letters of Delegates to Congress, 1774-1789* (Washington, D.C.: Library of Congress (2000).
………………………………. 14

Joseph Story, *Commentaries on the Conflict of Laws* (Hilliard, Gray, and Company, Boston 1834).
………………………………………………………. 18, 19

Joseph Story, *Commentaries on the Constitution of the United States* (abr. ed. 1833).
…………………………………………………………………... 26

**Page**

Ulpianus*, On the Edict* (circa A.D. 211-222)……………………………………… 16

Emerich de Vattel, *The Law of Nations, or Principals of the Law of Nature* (London, J. Newbery, *et al*., 1760).
……………………………………….. 13, 14, 24

Emerich de Vattel, *The Law of Nations, or Principals of the Law of Nature* (1916 reprint of 1758 edition), in 3 *The Classics of International Law* (James Brown Scott, ed.).
…………………………………………………………… 13

Johannis Voet, *Commentarius Ad Pandectas* (1698)……………………………… 16

Alan Watson, ed., *The Digest of Justinian* (1998)………………………….…... 16

Francis Wharton, *United States Revolutionary Diplomatic Correspondence* (1889).
……………………………………………………………….. 13

Noah Webster, *American Dictionary of the English Language* (4th ed., New York 1830)(S. Converse, Publisher).
………………………………………………………... 23

\*\*\*\*\*

**PLAINTIFF WILSON'S VERIFIED MEMORANDUM OF LAW IN SUPPORT OF**

**MOTION FOR CERTIFICATION OF CLASS ACTION**

TO THE HONORABLE OF SAID COURT:

COMES NOW Damon James Wilson, Plaintiff in the above captioned and numbered cause and, pursuant to Article I, Section 2 of the U.S. Constitution; Section 2 of the Fourteenth Amendment to the U.S. Constitution; the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; 28 U.S.C. Sections 2201, 2202 and 2284; 42 U.S.C. Section 1983; Rule 23 of the Federal Rules of Civil Procedure; and, Local Rule CV-7 of the Rules of the United States District Court for the Western District of Texas; files this *Verified Memorandum of Law in Support of Motion for Certification of Class Action*, in support of his motion for certification of class action (as filed in *Wilson v. Texas*, No. 1:21-cv-00943-RP-JES-JVB [Consolidated Case](ECF No. 5), and in this connection would respectfully show unto the Court as follows:[1]

## I.

## FACTS

This memorandum is submitted in support of *Plaintiff's Motion for Certification of Class Action* (as filed in *Wilson v. Texas*, No. 1:21-cv-00943-RP-JES-JVB [Consolidated Case](ECF No. 5). On February 8, 2018, the U.S. Department of Commerce (through the U.S. Census Bureau) published a final rule whereby, for purposes of apportionment of U.S. Representatives among the several States, it determined it would classify inmates who are confined in correctional facilities to be "residents" of their respective correctional facilities. When reaching this decision the Department of Commerce expressly declined to classify these inmates as

---

[1] Although Defendants have not yet formally filed a responsive pleading in this cause, in a pleading filed by Defendants in a related case they have acknowledged their receipt of the Plaintiff's original complaint herein. *Gutierrez v. Abbott*, No. 1:21-cv-00769-RP-JES-JVB; *Defendants' Reply in Support of First Motion to Consolidate*, 1 (Dkt.#25)(filed Nov. 1, 2021)("[O]ver the weekend, Defendants were served with process in a fourth redistricting lawsuit, *Wilson v. Texas*, No. 1:21-cv-943, ECF 1 (W.D. Tex. Oct. 18, 2021)").

persons "inhabitants" of the locations where they had resided prior to their confinement and at which they continued to maintain their domiciles on "Census Day" (April 1, 2020).[2] As stated by the U.S. Census Bureau ("Bureau") when explaining this decision:

> "The practice of counting prisoners at the correctional facility is consistent with the concept of usual residence, as established by the Census Act of 1790…. '[U]sual residence' is defined as the place where a person lives and sleeps most of the time, which is not always the same as their legal residence, voting residence, or where they prefer to be counted. Therefore, counting prisoners anywhere other than the facility would be less consistent with the concept of usual residence, since the majority of people in prisons live and sleep most of the time at the prison."[3]

In January of 2021, the Bureau created a "Census Geocoder" computer program that allows "[o]fficial state redistricting liaisons and technical staff to use the Census Geocoder" to locate the census geography associated with a specific address, and to reallocate group quarters populations, including persons confined in prison, to support congressional redistricting.[4] Upon release of the final census for 2020 by the Bureau on August 12, 2021,[5] the Bureau confirmed the Census Geocoder enabled states to reallocate where prison inmates were deemed to be inhabitants on "Census Day" within a state for purposes of legislative redistricting.[6]

Upon arrival at a prison unit in Texas all inmates are required to provide the true location of where they resided before being convicted, and the Defendants, through their agents, have consistently followed this official practice before, on, and after, April 1, 2020. The Plaintiff provided this information to the State of Texas before and at the time of his institutional

---

[2] Under federal law, 13 U. S. C. § 141(a) defines "Census Day" as "the first day of April."

[3] Bur. of Census, Dept. of Commerce, *Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5525, 5528 (Feb. 8, 2018).

[4] Bur. of Census, Dept. of Commerce, *Using the Census Geocoder for Redistricting* (Aug. 12, 2021), available at: https://www.census.gov/programs-surveys/decennial-census/about/rdo/summary-files/2020/GQAssistance_CensusGeocoder.html (last visited Nov. 21, 2021).

[5] *Ibid*.; see also, Bur. of Census, Dept. of Commerce, *Group Quarters Assistance* (Aug. 12, 2021), available at: https://www.census.gov/programs-surveys/decennial-census/about/rdo/summary-files.html (last visited Nov. 21, 2021).

[6] *Ibid*.

2

confinement.[7] The Plaintiff was (and is) an inhabitant of a specific location other than where he is confined; and the location where he is domiciled, which is not the location where he is confined, remains and at all times relevant to this proceeding has remained his permanent residence and domicile.[8]

On October 18, 2021, the third called session of the 87th Texas Legislature adopted "Plan C2193" which, on the basis of population data provided by the Bureau, assigned Plaintiff the status of a person residing in, and an "inhabitant" of, Texas Congressional District 13 ("CD13"). As devised by Plan C2193, CD13 encompasses the location where Plaintiff was confined on Census Day (April 1, 2020), but it does not encompass the location of his permanent domicile where he is an inhabitant and was an inhabitant on April 1, 2020.[9]

The Plaintiff on "Census Day" (April 1, 2020) was an inmate confined by the Defendant State of Texas in the William P. Clements Unit of the Correctional Institutional Division of the Texas Department of Criminal Justice.[10] The Clements Unit is located at 9601 Spur 591, in the City of Amarillo, Potter County, Texas.[11] Prior to commencement of his involuntary confinement Plaintiff physically resided in the 1400 block of Independence Trail, in the City of Grand Prairie, Dallas County, Texas.[12] Since his institutional confinement by Defendants commenced, Plaintiff has continuously maintained an intention to return to that location, *i.e.*, his permanent residence in the City of Grand Prairie, Dallas County, Texas, for the purpose of continuing his domicile there unabated.[13] The Plaintiff has never had the intention of establishing

---

[7] *Plaintiff's Declaration in Lieu of Affidavit*, 2, appended hereto as "*Plaintiff's Exhibit A*."
[8] *Plaintiff's Exhibit A*, at 1-3.
[9] *Plaintiff's Exhibit A*, at 2.
[10] *Plaintiff's Exhibit A*, at 1. When referring to "Defendant State of Texas," Plaintiff means the individual defendants sued collectively in their "official" capacities, as "Official-capacity suits…generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165(1985).
[11] *Plaintiff's Exhibit A*, at 1.
[12] *Plaintiff's Exhibit A*, at 1-2.
[13] *Plaintiff's Exhibit A*, at 2.

his permanent residence or domicile at the prison unit wherein he is confined.[14] The Plaintiff will be discharged from his sentence to confinement by Defendants not later than February 1, 2031.[15]

Notwithstanding the ready accessibility of the "Census Geocoder" computer program provided to Defendant State of Texas by the Bureau, the Defendant State of Texas has deliberately allocated Plaintiff to a congressional district within which it knew Plaintiff does not (and did not on April 1, 2020) permanently reside or have a domicile. Application of this policy by the Defendant State of Texas, which operates as a "legal fiction" that Plaintiff permanently resides at a location other than where he is an "inhabitant" and has established and maintained his domicile, has adversely affected (and will adversely affect) the responsivity of the U.S. Representative who would otherwise serve as Plaintiff's duly elected Member of Congress. Furthermore, application of the State of Texas' legal fiction, as so described, has adversely affected (and will adversely affect) the federal representational interests held by Plaintiff and shared with him by the local community in which he is an actual inhabitant. Application of this policy by the Defendant State of Texas has thus caused (and will cause) "representational harm" to Plaintiff.

## II.

## FEDERAL CONSTITUTIONAL ISSUE PRESENTED

*Whether the Equal Protection Clause of the Fourteenth Amendment, by Virtue of the "Equality of Representation" Requirement Embodied in Article I, §2 of the U.S. Constitution, and §2 of the Fourteenth Amendment to the U.S. Constitution, is Violated by a State's Congressional Redistricting Plan that Designates the Domicile of a Prison Inmate to be the*

---

[14] *Plaintiff's Exhibit A*, at 2-3.
[15] *Plaintiff's Exhibit A*, at 3.

*Location of the Inmate's Confinement, and Not the Location of the Inmate's Domicile Maintained Before and During Confinement?*

## III.

## SUMMARY OF CLAIMS PRESENTED BY PLAINTIFF

The Plaintiff's original complaint will require the Court to consider essentially three issues, two of which are purely legal, and another that is factual as it pertains to Defendants' conduct. *First*, as a legal matter, Plaintiff contends the Framers of Article I, §2 of the U.S. Constitution; the Framers of § 2 of the Fourteenth Amendment to the U.S. Constitution; the Framers of the Equal Protection Clause of the Fourteenth Amendment; and the first Congress that enacted of the U.S. Census Act of 1790; all understood the words "inhabitant," "usual place of abode" and "usual residence" to be qualified by what has been known since antiquity as the "*animo manendi*" doctrine (which John Adams referred to as the "*animus habitandi*" doctrine). The Plaintiff, as an inmate in a state prison, concedes that he presently has no right to vote in federal elections. However, Plaintiff nonetheless contends his federal right to "equal representation" secured by each of the aforementioned federal constitutional provisions has been violated by Defendants' decision to assign him, for purposes of congressional redistricting, to a congressional district where he is not and "inhabitant," where he has no "usual place of abode," and where he has no "usual residence."

*Second*, Plaintiff recognizes his claims are distinguishable from the "one person, one vote" theory that has be applied to congressional redistricting in the past. However, he nonetheless contends the same "as nearly as practicable" and "good faith effort" requirements that would apply to measure Defendants' conduct under the "one person, one vote" theory must be applied to his "equal representation" claims. *Third*, as a factual matter, Plaintiff contends that

under the "as nearly as practicable" and "good faith effort" requirements which must serve as the

metric of Defendants' conduct, the undisputed facts in this case would entitle Plaintiff to relief.

## IV.

## ARGUMENT

**a) *Applicable Federal Constitutional Law*.**

As ratified in 1788, the third clause in Article I, §2 of the U.S. Constitution ("Article I,

§2") provides that:

> "Representatives…shall be apportioned among the several States…according to
> their respective Numbers, which shall be determined by adding to the whole
> Number of free Persons, including those bound to Service for a Term of Years,
> and excluding Indians not taxed, three fifths of all other Persons."

In 1868, during the Reconstruction Period that followed the American Civil War, the

U.S. Constitution was amended. Among other amendments adopted at that time, §2 of the

Fourteenth Amendment provided that:

> "Representatives shall be apportioned among the several States according to their
> respective numbers, counting the whole number of persons in each State,
> excluding Indians not taxed. But when the right to vote at any election for the
> choice of electors for President and Vice-President of the United States,
> Representatives in Congress, the Executive and Judicial officers of a State, or the
> members of the Legislature thereof, is denied to any of the male inhabitants of
> such State, being twenty-one years of age, and citizens of the United States, or in
> any way abridged, except for participation in rebellion, or other crime, the basis of
> representation therein shall be reduced in the proportion which the number of
> such male citizens shall bear to the whole number of male citizens twenty-one
> years of age in such State."

In *Evenwel v. Abbott*, 578 U.S. ---, 136 S. Ct. 720 (2016), the Supreme Court ruled

Article I, §2 and §2 of the Fourteenth Amendment share a common constitutional imperative that

requires "equality of representation" in the U.S. House of Representatives. By requiring a

decennial enumeration of the "whole number" of persons within each state, regardless of a

person's "legal status," the Framers of those provisions comprehended that U.S. Representatives "serve all residents, not just those eligible or registered to vote." *Evenwel v. Abbott*, *supra*, 136 S. Ct. at 1132.

The literal text of the U.S. Constitution confirms that eligibility to vote does not define the constitutional scope of the right to "equal representation." The first clause of Article I, §2 provides that "voters" qualified to participate in the selection of Members of the U.S. House of Representatives "shall have the qualifications requisite for electors of the most numerous branch of the state legislature." As explained by James Madison in *The Federalist* No. 52, the Framers of Article I, §2, consciously chose to defer to state discretion the necessary determination of "requisite qualifications" for voters who would cast ballots in federal elections. This was the result of the Framers' perception that a uniform, national regulation of this task was either infeasible or politically impractical at the time.[16] However, as discussed above, the Framers of Article I, §2, delegated no similar discretion to states concerning the enumeration required by Article I, §2, wherein the several states assume no role at all.

The second clause of §2 of the Fourteenth Amendment did not alter the equal representation guarantee contained in Article I, §2. Rather, it merely recognized the pre-existing right of states, under the U.S. Constitution, to deprive persons who have engaged in "rebellion," or who have been convicted of "other crimes," of the right to vote in federal elections. Section 2 of the Fourteenth Amendment imposed a duty upon states not to deprive persons of the right to vote in federal elections for reasons unrelated to "rebellion" or the commission of "other crimes"; and, as a potential consequence for the breach of that duty, §2 threatened an offending state with a reduction of apportionment of U.S. Representatives to the state. Thus, a reduction in

---

[16] Alexander Hamilton, James Madison, and John Jay, *The Federalist Papers*, 325-326 (1961, Clinton Rossiter and Charles R. Kessler, eds.).

federal representation, imposed by federal constitutional law, was authorized under the second clause of §2 of the Fourteenth Amendment in the event that a state otherwise denied or abridged the federal constitutional right to vote held by the state's "inhabitants." *See*, *Richardson v. Ramirez*, 418 U.S. 24 (1974).

The second clause of §2 of the Fourteenth Amendment had no effect on the federal constitutional right to "equal representation" held by women, children, persons who had engaged in "rebellion" or persons who had been committed of "other crimes," to the extent those persons were denominated "inhabitants" of a particular location, as previously recognized by Article I, §2. In fact, one of the principal aims of the Fourteenth Amendment was to officially restore "equal representation" to the confederate states, in Congress, and to the inhabitants of those states, even if that Amendment did not restore the right to vote in federal elections to those who had engaged in "rebellion" during the Civil War.[17]

**b)** ***The Framers' Understanding of the Term "Residence" for Purposes of "Equal Representation" in the U.S. House of Representatives.***

Because the first Congress included a substantial number of members who had been delegates to the Constitutional Convention of 1787, the Supreme Court has frequently examined legislative acts of the first Congress when seeking to divine the meaning of words or phrases that appear in the U.S. Constitution. Congressional decisions made during the first Congress thus provide "contemporaneous and weighty evidence" of the Constitution's meaning.[18] This tool for interpretation has been applied by the Supreme Court to determine what was intended by the

---

[17] Benjamin B. Kendrick, ed., *Journal of the Joint Committee of Fifteen on Reconstruction*, 343-344 (reprint, Negro Universities Press, 1969), *quoting* Committee-member John A. Bingham.

[18] *Bowsher v. Synar*, 478 U.S. 714, 723-724 (1986).

Framers when they required a decennial enumeration for the purpose of ensuring "representational equality" in the U.S. House of Representatives.[19]

On March 1, 1790, the first Congress adopted the Census Act.[20] The Census Act, which was officially entitled "*An Act providing for the enumeration of the Inhabitants of the United States*," required "that persons be allocated to their place of 'usual residence.'"[21] The first Census Act used the term "enumeration," as it had appeared in Article I, §2, "almost interchangeably" with the phrase "cause the number of the inhabitants ... to be taken."[22] As the Supreme Court has observed, the first draft of Article I, § 2, used the word "inhabitant," but the word "inhabitant" was omitted by the Committee of Style in a non-substantive change to the final draft of the constitutional provision.[23]

The first Census Act also used other words such as "usual place of abode," and "usual residence," to describe the sort of "tie" which the Framers intended a person to have before he or she qualified, as a constitutional matter, as a resident of a state.[24] In this connection, for purposes of establishing federal diversity jurisdiction, the U.S. Supreme Court has stated with regard to "domicile" that:

> "The framers of the Constitution were familiar with this jurisdictional prerequisite, and since 1789 neither this Court nor any other court in the English-speaking world has questioned it. Domicil implies a nexus between person and place of such permanence as to control the creation of legal relations and responsibilities of the utmost significance."[25]

---

[19] *Franklin v. Massachusetts*, 505 U.S. 788, 803-804 (1992).
[20] Act of March 1, 1790, 1 Stat. 103, § 5.
[21] *Franklin v. Massachusetts*, *supra,* 505 U.S. at 803.
[22] *Utah v. Evans*, 526 U.S. 452, 476 (2002).
[23] *Franklin v. Massachusetts*, *supra,* 505 U.S. at 805 and n. 3.
[24] *Franklin v. Massachusetts*, *supra,* 505 U.S. at 804-805.
[25] *Williams v. North Carolina*, 325 U.S. 226, 229 (1945)("*Williams II*").

When the Supreme Court concluded the Framers of the Constitution in 1789 were well-acquainted with the concept of "domicile" it was on solid ground. For example, in 1784, when John Adams was asked by Charles William Frédéric Dumas ("Dumas"), a chargé d'affaires acting on behalf of the United States in Europe, whether in the United States "a *Citizen* [has] greater claims to the protection of Congress than an *Inhabitant"* (emphases in original), Adams replied to Dumas as follows:

> "Both Citizens and Inhabitants have a Right to Protection. But every Stranger who has been in the United States, or who may be there at present is not an Inhabitant. [D]ifferent States have different Definitions of this Word. The Domicile and the *animus habitandi* is necessary in all."[26]

Contemporaneously with his reply to Dumas, Adams also notified Congress through Thomas Mifflin, then-President of the Congress, of his answer to Dumas wherein he, Adams, stated that to be an "inhabitant" in the United States a person must possess "*animus habitandi*" (having an intention to stay).[27] This exchange between Adams and Dumas provides perhaps the best contemporaneous evidence of what the first Congress intended when it later used the words "usual place of abode," "inhabitant" and "usual reside[nt]" in the first Census Act.

In *Picquet v. Swan*, 5 Mason 35, 19 Fed. Cas. 609, no. 11,134 (C.C.D. Mass. 1828) Justice Joseph Story, sitting as Circuit Justice, construed the word "inhabitant" as it appeared in the Judiciary Act of 1789. The Judiciary Act of 1789 had been enacted by the first Congress six months before the first Census Act, and in relevant part the Judiciary Act provided that "no civil suit shall be brought…against an inhabitant of the United States…in any other district than that whereof he is an inhabitant."[28]  When resolving the jurisdictional question presented, and when discerning congressional intent manifested by the literal terms of the Judiciary Act of 1789,

---

[26] 16 *Papers of John Adams*, 362 (Letter to the President of Congress, Nov. 3, 1784)(enclosure)(Gregg L. Lint, *et al.*, eds.)(2012).
[27] 16 Papers of John Adams, *supra*, at 360.
[28] Judiciary Act of 1789, 1 Stat. 79, § 11 (Sept. 24, 1789).

Justice Story ruled that "[a]lienage or citizenship is one thing; and inhabitancy, by which I understand local residence, *animo manendi*, quite another."[29] Thus, as did John Adams in 1784 when iterating American common law, Justice Story discerned the word "inhabitant," as used by the first Congress, to mean a person who had established a residence at which he had a "mind to remain" indefinitely, *animo manendi*.

With regard to the term "usual abode," Justice Story's opinion in *Picquet v. Swan*, *supra*, was no less unequivocal. Upon examination of the term "usual abode" as it appeared in an act of the Commonwealth of Massachusetts adopted in 1797,[30] Justice Story explained:

> "[T]he plain intent of the statute is to apply the words of the first clause ["last and usual abode"] exclusively to cases, where the defendant was at the time…an inhabitant…. Where a defendant has no such inhabitancy or residence… how can it be said, that he has a…usual bode?"[31]

c) *The Civil Law Source of the Domicile Doctrine, and Evidence of the Framers Familiarity with the "Animo Manendi" Doctrine.*

The understandings of the Framers and of the Members of the first Congress, concerning who would meet the definition of an "inhabitant" to be enumerated for purposes of providing "equal representation," were not developed in a vacuum. As discussed in greater detail below, since ancient times, and continuing through the adoption and ratification of Article I, §2 of the U.S. Constitution; and the adoption and ratification of § 2 of the Fourteenth Amendment to the U.S. Constitution; and the adoption and ratification of the Equal Protection Clause of the Fourteenth Amendment; and at the time of the enactment of the U.S. Census Act by the first Congress; the "*animo manendi*" doctrine, as it would apply to "prisoners," was settled law in the

---

[29] *Picquet v. Swan*, *supra*, 19 Fed. Cas. at 613.

[30] Mass. Gen. Laws, Act of February 17, 1798, ch. 50, §1, *reprinted in* 1 *The General Laws of Massachusetts from the Adoption of the Constitution, to February, 1822*, 554 (Boston: Wells & Lilly, *et al*., publishers 1823).

[31] *Id*., 19 Fed. Cas. at 616. The Massachusetts act of 1798 reenacted a Massachusetts statute adopted three years earlier, in 1795, which, like the act of 1798, likewise used the words "last and usual abode." Mass. Gen. Laws, Act of February 28, 1795, ch. 65, §1, *reprinted in* 1 *The General Laws of Massachusetts from the Adoption of the Constitution, to February, 1822, supra*, at 467.

United States. In other words, this doctrine has consistently provided since antiquity, as it does now, that a "prisoner" who is involuntarily confined for a term less than life is not deemed an "inhabitant" of the location where he is confined, but is instead an "inhabitant" of the location where he was domiciled prior to his confinement.

The "*animo manendi*" doctrine, as it would apply to "prisoners," expressed the consensus of all legal writers whose works were published prior to 1787. Furthermore, no legal authority published before or since 1787 conflicts with the "*animo manendi*" doctrine with regard to a determination of the residence, "habitation" or domicile of prisoners, and the same doctrine continued to be applied as settled law through adoption and ratification of the Fourteenth Amendment.

The consensus among all legal authorities, concerning the "*animo manendi*" doctrine and determination of the residence or domicile of prisoners, is illustrated by the writings of Domitius Ulpianus, Flavius Petrus Sabbatius Iustinianus, Johannis Voet, Jean Domat, Jean-Batiste Denisart, Jean-Jacques Burlamaqui, Emerich de Vattel, Philippe-Antione Merlin, Joseph Story and James Kent. With the exception of the latter two legal authorities (Joseph Story and James Kent), the Framers of Article I, §2 of the U.S. Constitution, and the Congress that enacted the U.S. Census Act of 1790, would have been (or actually were) personally familiar with some if not all of these legal authorities prior to 1787. Neither the Framers of the constitutional provisions cited above, nor the Members of the first Congress that enacted the U.S. Census Act of 1790, intended "prisoners" confined for a term less than life to be deemed "inhabitants" of the location where they are confined for purposes of enumeration and allocation of representation in the U.S. House of Representatives. Rather, they intended the words "usual place of abode," "inhabitant" and "usual residence" to be qualified by the "*animo manendi*" doctrine.

In the second edition of his treatise *Commentaries on American Law*, published in 1832, renowned jurist James Kent observed that with regard to American common law "[t]he definition of a domicil [sic], in the writings of the jurists generally, is taken from the civil law."[32] The Plaintiff respectfully submits several civil law jurists who published legal treatises prior to 1787 shed light on what the Framers intended by the word "inhabitant" in Article I, § 2.

The writings of Dutch natural law philosopher Emerich de Vattel, among others, had a profound influence on the Framers at the convention of 1787.  Benjamin Franklin, in his own correspondence with Dumas, reported on December 9, 1775, that Dumas' French edition of Vattel's treatise, *The Law of Nations, or Principals of the Law of Nature*, published earlier in 1775, had "been continually in the hands of the members of our Congress now sitting."[33] This edition of Vattel's treatise, a copy of which was donated by Franklin to the Library Company of Philadelphia, "undoubtedly was used… by the men who sat in the Convention of 1787 and drew up the Constitution of the United States."[34]

For members of Congress less proficient at reading French, the London edition of Vattel's *Law of Nations*, which was translated into English and published at London in 1760, was also accessible to the Framers at the Library Company of Philadelphia at least as early as 1770.[35] While Vattel's treatise did not specifically refer by name to the *animo manendi* doctrine mentioned by John Adams and Justice Story, the following passage did appear in the English edition of Vattel's work:

---

[32] 2 James Kent, *Commentaries on American Law*, 430-431 n. "e" (2nd ed. 1832).
[33] 2 Francis Wharton, *United States Revolutionary Diplomatic Correspondence*, 64 (1889), quoted *in United States Steel Corporation v. Multistate Tax Commission*, 434 U.S. 452, 485 n. 12 (1978).
[34] Albert De Lapradelle, Introduction to 1 Vattel, *The Law of Nations, or Principals of the Law of Nature*, xxx (1916 reprint of 1758 edition), in 3 *The Classics of International Law* (James Brown Scott, ed.).
[35] *The Charter, Laws, and Catalog of Books of the Library Company of Philadelphia*, 36 (Philadelphia 1770)(listing Vattel's *Law of Nations*); see also, *A Catalog of the Books Belonging to the Library Company of Philadelphia*, 228 (1789)(same).

"The domicil is the habitation fixed in any place with an intention of always staying there. A man does not then establish his domicil in any place unless he makes sufficiently known his intention of fixing there, either tacitly, or by express declaration. However, this declaration is no reason why, if he afterwards changes his mind, he may not remove his domicil elsewhere. In this sense, he who stops, even for a long time, in a place, for the management of his affairs, has only a simple habitation there, but has no domicil. Thus the envoy of a foreign prince has not his domicil at the route where he resides."[36]

Similarly, while not speaking directly to the question of domicile, Swiss jurist Jean-Jacques Burlamaqui, whose works were also well-known to the Framers,[37] and with whom Vattel studied natural law at Geneva, noted the differences between persons with residential ties to a community and persons without such ties. Thus, in *The Principles of Natural and Politic Law* Burmalaqui observed:

"The appellation of *civis* ought to be understood only of those who share in all the advantages and privileges of the association, and who are properly members of the state, either by birth, or in some other manner. *The rest are rather inmates*, strangers, or temporary inhabitants, than members."[38]

One cannot escape irony in the fact that Elbridge Gerry, whose name would later be associated with political "Gerrymandering," purchased a copy of these two works by Vattel and Burlamaqui in 1785.[39] Nor can the high esteem in which Vattel and Burmalaqui were held by the Framers be overlooked. For example, at the South Carolina ratification convention on January 16, 1788, Charles Pinckney, a delegate who had served for that state as a delegate to the Federal

---

[36] 1 Vattel, *The Law of Nations, or Principals of the Law of Nature*, 93 (London, J. Newbery, *et al.*, 1760).

[37] Burlamaqui's treatise, which was owned by several of the Framers and which is known to have been ubiquitous in America in 1787, was a particularly significant influence on the Founding generation. *See*, Ray Forrest Harvey, *Jean-Jacques Burlamaqui: A Liberal Tradition in American Constitutionalism*, 79-105 (1937).

[38] 2 Jean-Jacques Burlamaqui, *The Principles of Natural and Politic Law*, 35 (London, 1763, 2d ed.)(English translation by Thomas Nugent)(emphasis added). *Cf.*, *Franklin v. Massachusetts, supra,* 505 U.S. at 806 (noting the Secretary of Commerce's conclusion that "[m]any, if not most" military personnel stationed overseas "retain ties" to the[ir] states and "should be counted towards their States' representation in Congress"); and *id.*, at 805 (quoting statement of Representative Bailey wherein he argued, during a contested election debate in 1824, that if "the mere living in a place constituted inhabitancy" it would "exclude sitting members of this House").

[39] Letter of Elbridge Gerry to Timothy Pickering (Oct. 15, 1785), 22 Paul H. Smith, *et al.*, eds., *Letters of Delegates to Congress, 1774-1789*, pages 687-688 ("The Books wanted are Vattel's Law of Nations [and] Burlamaqui's principles of natural & political Law")(Washington, D.C.: Library of Congress, 1776-2000).

14

Convention, referred to Burlamaqui as a "great writer on political law."[40] As for Vattel, his influence on the labors of the Framers at the convention of 1787 cannot be questioned.[41]

Chancellor Kent, in the first edition of his *Commentaries*, which comprised a collection of lectures he had delivered while a law professor at Columbia College beginning in 1824,[42] defined domicile as follows:

> The *animus manendi* appears to have been the point to be settled… If there be no such intention [of "staying" indefinitely], and the residence be *involuntary or constrained*, then a residence, however long, does not change the original character of the party, or give him a new and hostile one."[43]

The relevance of "involuntary constraint" when determining the location of a person's true residence or "habitation" was not a new principle of law devised by Chancellor Kent in 1824. Rather, the emergence of the "involuntary restraint" principle was coincident to emergence of the *animo manendi* doctrine recognized by the "civil jurists" to which Chancellor Kent referred.[44] More importantly, with regard to the designation of a prisoner's "usual habitat" or "usual place of abode," the Framers of Article I, § 2, in 1787, would surely have been aware of this doctrine.

The origin of the "involuntary constraint" rule, as it pertains to determination of a prisoner's domicile, can be traced to antiquity and the application of Roman law to persons temporarily banished or exiled from the Roman Empire. Thus, during the third century Roman jurist Domitius Ulpianus (a/k/a "Ulpian") ruled that a person who was "relegated" could retain

---

[40] 4 Jonathan Elliot, ed., *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*, 279 (1845).

[41] *See generally*, William Ossipow and Dominik Gerber, *The Reception of Vattel's Law of Nations in the American Colonies: From James Otis and John Adams to the Declaration of Independence*, 57 American Journal of Legal History 521-555 (2017).

[42] 1 James Kent, *Commentaries on American Law*, 3-4 (1st ed., 1826).

[43] *Id.*, at 72.

[44] 2 James Kent, *Commentaries on American Law, supra*, at 430-431 n. "e" (2nd ed. 1832)("[t]he definition of a domicil, in the writings of the jurists generally, is taken from the civil law").

his domicile "at the place from whence he is confined."[45] Thereafter, in the sixth century, the same rule of law was republished verbatim by Roman Emperor Flavius Petrus Sabbatius Iustinianus (a/k/a "Justinian") in what is today commonly known as "Justinian's Digest."[46] Loosely translated into English by one modern scholar, Ulpian's rule stated that "even an exile can have a domicile in that place from which he is excluded."[47]

In 1698, carrying Ulpian's rule forward, Dutch juris Johannis Voet published the first edition of his encyclopedic treatise *Commentarius Ad Pandectas*, wherein he expounded on the meaning of Justinian's Digest. In a subsequent edition of that work, published in 1778, Voet concluded that "when one has been exiled, during the relegation in that place, he who has been exiled may be able to retain his domicile in the place from which he is expelled, to the extent that he has the intention of returning."[48]

Within an edition of *The Civil Law in its Natural Order: Together with the Publick Law*, written by French jurist Jean Domat and published in London in 1722, Ulpian's rule was extended to apply not merely to persons who had been exiled from their countries of origin, but also to persons who were involuntarily "confined" domestically. Thus, in his treatise Domat wrote that:

> "Those who are confined to a certain Place by Order of the Prince, do not change their Domicil [sic], and they retain that [Domicile] which they had before their Exile."[49]

---

[45] Ulpianus, *On the Edict*, Book II, §3 (circa A.D. 211-222)("*Domicilium autem habere potest et relegatus eo loci, unde arcetur, ut Marcellus scribit*").

[46] *The Digest of Justinian*, Book 1, title 50, §27.3 (circa A.D. 529-534).

[47] 4 *The Digest of Justinian*, 420, §27 (final sentence)(1998)(English translation by Alan Watson, ed.).

[48] 1 Johannis Voet, *Commentarius Ad Pandectas*, 268 (Lib 5, Tit. 1, §93)(1698)("quod relegatus habet durante relegatione in eo loco, ad quem relegates est, et licet & in eo loco, unde arcetur, domicilium retinere possit, in quantum habit revertendi propositum").

[49] 2 Jean Domat, *The Civil Law in its Natural Order: Together with the Publick Law*, 487 (London, 1722).

By the middle of the eighteenth century French jurist Jean-Baptiste Denisart (a/k/a "Denizart"), in his own legal treatise, *Collection de Décisions Nouvelles et de Notions Relatives à la Jurisprudence Actuelle* (1777), concurred with Domat's explicit expansion of the Ulpian rule to domestically confined inmates. He also provided a more detailed explanation for the rule as follows:

> "[O]ne may say that an exile is not considered to be domiciled in the place of his exile, and that if he died there, his succession ought not to be regulated by the laws of the country of such residence; because, in order to fix a domicil, it is necessary that there should be a choice manifested by an express intention, and the exile is not allowed that liberty. Hope and intention of return ought always to be presumed in a *relégué*, and consequently it may be said that, during his exile, he preserves the domicil which he had at the moment when he was banished. *It is necessary to say the same thing of prisoners*."[50]

In the fifth edition of a legal encyclopedia first published at Paris in 1775, entitled *Repertiore Universel et Raisonne de Jurisprudence* (Brussels 1826)(known as the "Belgium edition"), French jurist Philippe-Antione Merlin (byname "Merlin de Douai") observed that:

> "Regarding those who are detained prisoners OR [sic] relegated by a royal order, it is apparent that they do not lose their primary residence, however long their detention or exile has lasted."[51]

According to modern scholars, the *Repertiore Universel* "was one of the most famous law dictionaries of the 18th century." Serge Dauchy, *et al*., eds, *The Formation and Transmission of Western Legal Culture*, 335 (Springer Int'l. Pub. Co., Switzerland 2016).

A short two years after Justice Story rendered his decision in *Picquet v. Swan*, *supra* (in 1828), wherein he had concluded the word "inhabitant" was intended by the first Congress to depend on a person's *animus manendi*, he anonymously published a legal article in 1830 which

---

[50] 3 Denisart, *Collection de Décisions Nouvelles, supra, verb.* "Domicile," as translated in Robert Phillamore, *The Law of Domicile*, 62 (Philadelphia, 1847)(emphasis added).
[51] 8 *Repertiore Universel et Raisonne de Jurisprudence*, *supra*, at 341 ("A l'egatd de ceux qui sont 'detenus prisonniers relegues par' un ordre du roi, OU ii est sensible qu'ils ne perdent point leur premier Domicile, quelque temps qu' ait dure leur detention ou leur exil.").

addressed the American law of "domicile." In that article, following the rule originally pronounced by Ulpian, Story wrote that "[r]esidence in a place by constraint, or involuntarily, will not give the party a domicil there; but his antecedent domicil remains."[52] Approximately four years later, Justice Story reiterated this principle in his *Commentaries on the Conflict of Laws*, wherein he wrote:

> "[R]esidence, in a place, to produce a change of domicil, must be voluntary. If, therefore, it be by constraint or involuntarily, as by banishment, arrest, or *imprisonment*, the antecedent domicil of the party remains."[53]

While a comprehensive inventory of the personal libraries of all delegates who attended the Federal Convention in 1787 may never be possible, some additional direct evidence of the Framers' exposure to some of the foregoing works has survived. For example, apart from their accessibility at the Library Company of Philadelphia, Justinian's *Digest*, *supra* (which was encompassed within his larger work *Corpus Iuris Civilis*); Domat's *The Civil Law in its Natural Order, supra*; Vattel's *The Law of Nations, or Principals of the Law of Nature*, *supra*; and Burlamaqui's *The Principles of Natural and Politic Law, supra*; were all among the books specifically recommended by a committee of Congress, led by James Madison in 1783, for inclusion in the then-proposed Library of Congress.[54]

Roman, French, Swiss and other "civil law" legal sources were often cited by early American lawyers and jurists in the absence of an English counterpart on particular points of

---

[52] John C. Hogan, *Joseph Story's Essay on Domicil*, 35 B.U. L. Rev. 215, 221 (1955).

[53] Joseph Story, *Commentaries on the Conflict of Laws*, §47, page 46 (Hilliard, Gray, and Company, Boston 1834)(emphasis added), citing Domat and Merlin, *supra*.

[54] Fulmer Mood, *The Continental Congress and the Plan for a Library of Congress in 1782-1783*, 72 Penn. Mag. Hist. & Bio. 3, 20, 22 (1948); Robert A. Rutland, *"Well Acquainted with Books": The Founding Framers of 1787*, 33, 61-62 (entries 15, 182 and 184)(Washington, D.C., Library of Congress, 1987). Madison's error when including the word "Nations" in place of the words "Politic Law" in the title of Burlamaqui's treatise indicates he may have been relying on memory when making this entry. *Cf.*, *Rutland*, *supra*, at 29 (observing that other works listed by Madison may have been "so familiar and so obviously appropriate for inclusion in his list that he most probably jotted them down from memory").

law;[55] and with regard to the question of an inmate's domicile, the same legal conclusion had

been reached during the eighteenth century under English common law. Again, as noted by

Joseph Story,[56] the English High Court of Chancery, only six years after the first Census Act was

adopted by the U.S. Congress in 1790, confirmed that the "involuntary confinement" rule, as it

pertained to a prisoner's domicile, applied under English common law. Thus, in *Bempde v.*

*Johnstone*, 3 Vesey Junior 198, 203; 30 Eng. Rep. 967 (1796), which was among the authorities

cited by Justice Story, Lord Chancellor Loughborough, writing for the Court, ruled that:

> "The actual place where [a person] is, is *prima facie* to a great many given
> purposes, his domicile. [However,] [y]ou encounter that, *if you show it is* either
> *constrained*, or from the necessity of his affairs, or transitory, that he is a
> sojourner; and you take from it all the character of a permanency" (emphasis
> added).[57]

In 1828, the Irish Prerogative Court at Dublin, in *Burton v. Fisher*, Milward's Rep. 183

(1847), 2 Ir. Law Rec. 152 (1829), interpreted *Bempde v. Johnstone*, *supra,* to have been decided

"agreeably to the rule of the Roman law, in the passage referred to by Domat." *Id.*, Milward's

Rep. at 192; *see also*, *ibid.* (ruling it "could not be supposed that he acquired a domicile in

England by residence within the rules or the walls of the King's Bench prison").

Finally, while Texas decisional law, separately from the forgoing authorities, *alone* might

not persuasively resolve inquiries into the original intent of the Framers who adopted Article I, §

2 (and of course Texas statutory law is not enforceable against the State of Texas in a federal

court);[58] two additional things may nonetheless be worthy of notice. First, the Supreme Court of

Texas adopted the "involuntary confinement" rule discussed above less than five years after

---

[55] Richard H. Hemholz, *Use of the Civil Law in Post-Revolutionary American Jurisprudence*, 66 Tulane Law Rev. 1649, 1664 (1992).
[56] *Commentaries on the Conflict of Laws*, *supra*, page 46 n. 7.
[57] *Bempde v. Johnstone*, *supra*, 30 Eng. Rep. at 968-969.
[58] *Pennhurst State School Hosp. v. Halderman*, 465 U.S. 89, 106 (1983)(federal courts are without jurisdiction to grant relief against state officials "on the basis of state law, whether prospective or retroactive"), superseded by statute on other grounds, 28 U.S.C. §1367.

Texas acquired statehood,[59] and there can be little doubt this principle was understood by the Framers of the Fourteenth Amendment in 1866.[60] Second, since 1967 the Texas Elections Code has expressly provided that "[a] person who is an inmate in a penal institution… does not, while an inmate, acquire residence at the place where the institution is located."[61]

d) ***The "Equality of Representation" Requirement Embodied in Article I, §2 of the U.S. Constitution, and in §2 of the Fourteenth Amendment to the U.S. Constitution, Mandates that Total Population Form the Basis for Congressional Redistricting within a State.***

In *Evenwel v. Abbott*, *supra*, the parties, the United States as *amicus curiae*, and the Supreme Court, all proceeded on the assumption that the State of Texas, after the 2010 decennial census, had used "total population," including *ineligible* voters, as the basis for drawing its state legislative districts. Additionally, the parties, as well as the United States as *amicus curiae* and the Supreme Court, all proceeded on the assumption that the State of Texas had *lawfully determined where* the enumerated persons resided.[62] As discussed below, the latter assumption was factually and legally in error.

---

[59] *Hardy v. De Leon*, 5 Tex. 211, 235 (1849)("residence in a place, to produce a change of domicile, must be voluntary. If, therefore, it be by constraint or involuntary, as by banishment, arrest, or imprisonment, the antecedent domicile of the party remains"), *quoting* Joseph Stor*y, supra*.

[60] *See, Williams v. North Carolina*, 417 U.S. 287, 321-322 (1942)("*Williams I*")(Jackson, J., dissenting)("The concept of domicile…was well-known to the Framers of the Constitution….Domicile means a relationship between a person and a locality. It is the place, and the one place, where he has his roots and his real permanent home. The Fourteenth Amendment, in providing that one by residence in a state becomes a citizen hereof, probably used 'residence' as synonymous with domicile. It is the place, and place where one belongs in our federal system").

[61] Act of May 18, 1967, 60th Leg., R.S., ch. 723, §21, 1967 Tex. Gen. Laws, 1858, 1879-1880 (former V.A.T.S., Texas Elections Code, art. 508(l)). This provision is currently codified as §1.015(e) of the Texas Elections Code.

[62] *See, Evenwel v. Abbott*, No. 14-940 (U.S.); *Brief of Appellant Evenwel*, 2 (asserting the State of Texas had drawn state senate districts "with approximately equal total populations (*i.e.*, all persons counted in the decennial Census)"); *Brief of the State of Texas*, i (reframing Question Presented to inquire whether "the Equal Protection Clause allows States to use total population, and does not require States to use voter population, when apportioning state legislative districts"); *Brief of the United States as Amicus Curiae*, i (reframing Question Presented to inquire "Whether the Equal Protection Clause of the Fourteenth Amendment requires the State of Texas to equalize 'eligible voters' rather than total population when creating state legislative districts").

As disclosed by federal litigation commenced in Texas after the 2010 decennial census, the State of Texas in 2011 *did not allocate* "total population" to draw its electoral districts according to *the true residence locations* of the persons enumerated. Instead, as in the present case, the State of Texas moved the location of inmate-residences from where inmates were domiciled, to locations at which they were confined. As a result, and as was shown by uncontroverted evidence in the record of that prior litigation, under Texas' former congressional redistricting plan (Plan C185, enacted in 2011) the densely populated urban areas of Dallas and Harris Counties were *underrepresented* by the State of Texas' decision to draw electoral districts that did not recognize 49,437 inmates to be inhabitants of those two counties alone.[63] The primary beneficiary of that legislative adjustment of known population data by the State of Texas was former Congressional District 8 (under Plan C185). Former Congressional District 8, an otherwise rural district, was thus *overrepresented* after the 2010 decennial census as the result of the State of Texas' decision to draw electoral districts that recognized 49,437 inmates from Harris and Dallas counties to be "inhabitants" of a location where they did not live and had likely never resided.

Because the question presented in *Evenwel v. Abbott* involved a challenge to Texas' ostensible use of "total population" data to draw its electoral districts, the Supreme Court in *Evenwel* had no opportunity to consider the constitutional validity of the State of Texas' reliance on the legal fiction it had devised whereby inmates are deemed "inhabitants" of congressional districts where they admittedly *do not reside*. The Court did conclude, however, that the Framers of Article 1, §2, intended "the basis of representation in the House was to include all inhabitants—although slaves were counted as only three-fifths of a person—even though States

---

[63] *Perez v. Texas*, No. 5:11-cv-00360-OLG (W. D. Tex.), *Plaintiff's Response in Opposition to State's Motion to Dismiss*, 6-7, and Exhibits 7 and 8 (State's Written Admissions)(filed Aug. 23, 2011)(ECM Dkt.# 226, 226-7, and 226-8).

remained free to deny many of those inhabitants the right to participate in the selection of their representatives." *Id*., 136 S. Ct. at 1127. Upon separate review of legislative history, the Court further concluded the Framers of the Fourteenth Amendment intended the same representational principle to "appl[y] as well to the method of apportioning legislative seats within States." *Id*., 136 S. Ct. at 1128-1129.[64]

The Plaintiff in the present case contends the State of Texas' legal fiction, as so described and as applied to him after the 2020 decennial census, violates his constitutional right to "equal representation" as guaranteed by Article I, §2 of the U.S. Constitution and by §2 of the Fourteenth Amendment to the U.S. Constitution. The Plaintiff also contends the State of Texas' legal fiction violates his constitutional right to Equal Protection of the Law under the Fourteenth Amendment. The Plaintiff's legal theory, and the ground upon which Plan C2193 must be invalidated, is supported by prior precedent of the U.S. Supreme Court. *See*, *Mahan v. Howell*, 410 U.S. 315, 331-332 (1973)(sustaining District Court's invalidation of electoral redistricting plan where, notwithstanding a defendant city's reliance on population figures provided by the Bureau, the city had classified military personnel to be "inhabitants" of an electoral district "in which they admitted[ly] did not reside").

---

[64] These conclusions by the Court were necessary to resolve whether Texas' asserted use of total population data was unconstitutional. They therefore cannot be construed as *dicta*. Thus, the Court's decision in *Evenwel v. Abbott*, *supra*, partially modified the Court's prior statement in *Burns v. Richardson*, 384 U.S. 73, 92 (1966), wherein it observed that "[n]either in *Reynolds v. Sims* nor in any other decision has this Court suggested that the States are required to include aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of crime in the apportionment base by which their legislators are distributed and against which compliance with the Equal Protection Clause is to be measured"). Under *Evenwel*, the federal constitution would not necessarily require "transients" or "short-term temporary residents" who have a domicile out-of-state to be counted in a state's legislative allocation of persons for redistricting purposes, but it does require the counting of a state's "inhabitants" in that calculation.

e)   *The Location of Where an Inmate "Lives or Sleeps Most of the Time," for Purposes of Determining Where the Inmate is an "Inhabitant," is Inconsistent with the Framers' Intent; and the Temporal Length of an Inmate's Absence from his Permanent Domicile does not Affect Where the Inmate is an Inhabitant.*

The 1830 edition of Noah Webster's American dictionary defined the word "inhabitant" as "one who dwells or resides permanently in a place, or who has a fixed residence."[65] In the federal decennial census of 1900, enumerators were given these instructions:

"[M]any prisoners are incarcerated in a state or county of which they are not permanent residents. In every case, therefore, enter the name of the county and state in which the prisoner is known, or claims, to reside."[66]

Accompanying the foregoing instructions was an additional direction which stated:

"[A]ll inmates of . . . institutions are to be enumerated; but if they have some other permanent place of residence write it in the margin of the [population] schedule on the lefthand side of the page."[67]

Although these directions were omitted from the instructions given to enumerators during the federal decennial census of 1910; from 1920 to 1940 the word "residence" was officially defined as a person's "permanent home."[68] That regulation, however, was changed by the U.S. Census Bureau in 1950 to the current formulation whereby the location of a person's permanent residence depends on where he "lives or sleeps most of the time."[69]

The current regulatory formulation (concerning where a person "lives or sleeps most of the time") is not only applied inconsistently by the Bureau (as it is not followed with regard to military personnel and others), it also bears no relationship to the intent of the Framers' use of

---

[65] "Inhabitant," Noah Webster, *American Dictionary of the English Language*, 452 (4th ed., New York 1830)(S. Converse, Publisher).
[66] Dale E. Ho, *Captive Constituents: Prison-Based Gerrymandering and Current Redistricting Cycle*, 22 Stan. L. & Pol'y Rev. 355, 372 (2011).
[67] *Ibid.*
[68] *Ibid.*
[69] *Ibid.*

the word "inhabitant" or to the phrase "usual place of abode" contained in the first Census Act of 1790. Furthermore, the length of time that an inmate is physically away from his permanent domicile does not affect where he is an "inhabitant" for purposes of congressional representation.

The earliest methods used to determine where a person was an "inhabitant" for federal decennial census purposes provided that a census-taker would simply ask a person where he permanently resides. Thus, in 1820, when he prepared the list of census questions to be asked by enumerators, John Quincy Adams, while serving as U.S. Secretary of State, instructed census takers to "ask for information about each person's *settled* place of residence."[70]

Moreover, as observed by the U.S. Supreme Court, the first Census Act, which presumptively manifests the intention of the Framers of Article I, §2, "placed no limit on the duration" of an person's absence from his permanent domicile for purposes of ascertaining the location of where the person was an "inhabitant."[71] The earliest census-taking practices plainly did not resolve this question by determining merely where a person lived or slept "most of the time." Thus, as also noted by the Supreme Court:

> "[D]uring the 36-week enumeration period of the 1790 census, President George Washington spent 16 weeks traveling through the States, 15 weeks at the seat of Government, and only 10 weeks at his home in Mount Vernon. He was, however, counted as a resident of Virginia."[72]

Again, the practice of the earliest census protocols reflects adherence to the *animo manendi* doctrine as it was known to the Framers in 1787.  1 Vattel, *The Law of Nations, or Principals of the Law of Nature*, supra, at 93 (1760)("he who stops, even for a long time, in a place, for the management of his affairs, has only a simple habitation there, but has no domicil"); 8 Merlin, *Repertiore Universel et Raisonne de Jurisprudence*, *supra*, at 341 (1775)("it is

---

[70] Daniel L. Cork & Paul R. Voss, eds., *Once, Only Once, and in the Right Place: Residence Rules in the Decennial Census*, 28 n. 5 (2006)(emphasis added).
[71] *Franklin v. Massachusetts*, *supra,* 505 U.S. at 804.
[72] *Id.*, 505 U.S. at 804.

apparent that [persons] do not lose their primary residence, however long their detention or exile has lasted"); 1 Kent, *Commentaries on American Law*, *supra, at* 3-4 (1ˢᵗ ed., 1826)("a residence, however long, does not change the original character of the party, or give him a new and hostile one").

f)   *The "Representational Interests" Defined.*

At this juncture Plaintiff would specify the constitutionally protected "representational interests" that have been infringed by Defendants' conduct. The Plaintiff contends the manner in which the State of Texas has defined the location of his "habitation" for congressional redistricting purposes has caused him representational harm. More specifically, Plaintiff contends the way Texas has defined the location of his "habitation" will in various ways diminish the "responsiveness" of the U.S. Representative who is elected to represent him in the congressional district that actually encompasses his domicile.

At the constitutional convention of 1787 James Madison attributed the following statement to fellow-delegate George Mason of Virginia:

> "Mr. MASON argued strongly for an election of the larger branch by the people. It was to be the grand depository of the democratic principle of the government ....It ought to know and sympathize with every part of the community, and ought therefore to be taken, not only from different parts of the whole republic, but also from different districts of the larger members of it; which had in several instances, particularly in Virginia, different interest and views arising from difference of produce, of habits, &c. &c."[73]

Elaborating on this point, Mason argued further at the convention that:

> "The requisites in actual representation are, that the Representatives should sympathize with their constituents; should think as they think, and feel as they feel; and that for these purposes they should be residents among them."[74]

---

[73] 5 Jonathan Elliot, ed., *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*, 136 (1845).
[74] 5 Jonathan Elliot, ed., *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*, *supra*, at 161.

In his efforts to secure ratification of the Constitution, Madison later confirmed that Mason's concept of representation in the House of Representatives had been adopted by the Framers. Thus, in *The Federalist* No. 52, Madison stated:

> "As it is essential to liberty that the government in general should have a common interest in the people, so it is particularly essential that the branch of it under consideration should have an immediate dependence on, and an intimate sympathy with, the people."[75]

Echoing the same sentiments, Joseph Story concluded it was the Framers' belief, with respect to the House of Representatives, that the Constitution was designed to guarantee "the dependence of the representatives upon the people, and the responsibility to them."[76]

Non-voters such as Plaintiff retain a stake in the outcome of federal policy debates, and their individual interests in the outcome of those debates are of constitutional dimension. *See*, *Evenwel v. Abbott*, *supra,* 136 S. Ct. at 1132. The fatal constitutional defect with Texas' legal fiction does not arise solely from the lack of geographic "contiguity" between where Plaintiff is imprisoned and the locus of the congressional district to which he would be assigned but for the state's legal fiction (although "contiguity" was one concern raised by those who ratified the Constitution in 1788). Rather, the primary unconstitutionality of the state's legal fiction results from its displacement of Plaintiff from the community, and diminution of the community of interests, he shares with others who reside near his domicile. The state's legal fiction also deprives Plaintiff of his personal right to representation provided by a member of Congress who has "an immediate dependence on, and an intimate sympathy with" him and the people and communities of interest of his domicile.

---

[75] *The Federalist Papers*, *supra,* 327.
[76] Joseph Story, *Commentaries on the Constitution of the United States* § 292, at 212 (abr. ed. 1833).

g)  ***The Constitutional Standard that Applies for Determining Whether Defendants Have Violated Plaintiff's Representation Rights.***

The goal of Article I, §2 is not merely to ensure that "voting strength" between congressional districts is equal. Article I, §2 is also designed to ensure that each person counted in the federal decennial census, including Plaintiff, be granted "equal representation" as near as may be.

When describing the measure for assaying whether "representational harm" has occurred in the related context of the "one person, one vote" theory, the Supreme Court has ruled Article I, §2 requires that "as nearly as practical" states must ensure "one man's vote in a congressional election is to be worth as much as another's." *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964). The Court has also ruled "the 'as nearly as practicable' standard" requires a state to make "a good-faith effort to achieve precise mathematical equality," and that "[u]nless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small." *Karcher v. Daggett*, 462 U.S. 725, 730 (1983).

While the Supreme Court, upon such a "good faith" showing by a state, has previously given deference to legislative actions involving determinations of where persons reside for the purpose of drawing electoral districts, this deference has been limited to cases *wherein available population data leaves it objectively uncertain* where individuals, or a class of individuals, reside.[77] Although Plaintiff's claims are distinguishable from the "one person, one vote" theory recognized in *Wesberry v. Sanders* (as clarified in *Karcher v. Daggett*), Plaintiff contends the

---

[77] *E.g.*, *Burns v. Richardson*, 384 U.S. 73, 95 (1966)(implicitly finding legislative "good faith" justified population deviations between electoral districts, where "population figures" were "hard to obtain or extrapolate"); *see also*, *Mahan v. Howell*, 410 U.S. 315, 331 (1973)(affirming interim redistricting plan where District Court was "[l]acking survey data sufficiently precise to permit the creation" of equipopulous electoral districts).

27

same "as nearly as practicable" and "good faith effort" requirements apply to assay the claims he has presented.

h) ***The State of Texas is not Constitutionally Permitted to Rely upon Less Granular U.S. Census Bureau Data for Purposes of Designating the Location of an Inmate's Domicile, When More Reliable and Accurate Information Concerning Where the Inmate is Domiciled is in its Actual Possession***.

The Plaintiff submits the State of Texas cannot constitutionally justify application of its legal fiction, as described above, because it cannot satisfy the "as nearly as practicable" and "good faith effort" standards in the present case. Here, there is no uncertainty concerning where Plaintiff truly resided permanently on April 1, 2020 (or where he continues to reside permanently); and the State of Texas cannot persuasively assert it was "impractical" for it to use, or acquire, that information pertaining to Plaintiff or to other inmates it held in institutional confinement on April 1, 2020.

Since the federal decennial census in 1950, the U.S. Census Bureau has relied on two arguments to defend its decision to artificially count prison inmates as inhabitants of state prisons where they are confined rather than where they are permanent inhabts. *First*, the Bureau has asserted counting inmates at the location of where they permanently reside would "open a Pandora's box" because, other than criteria based on where inmates "liv[e] or slee[p] most of the time," there is no other manageable "principle for where people are counted."[78] This argument does not explain why the Bureau counts other persons to be "inhabitants" of places where they are domiciled, *regardless* of where they "liv[e] or slee[p] most of the time."

---

[78] Cork & Ross, *Once, Only Once, and in the Right Place*, *supra*, at 85.

*Second*, in the past the Bureau has relied on its conclusion that counting inmates where they have a permanent domicile would present insurmountable, practical difficulties. Thus, according to the Bureau, for purposes of apportioning U.S. Representatives among the several states, prisoners in the past have been counted where they are incarcerated for "pragmatic and administrative reasons, not legal ones." *Fletcher v. Lamone*, 831 F.Supp.2d 887, 895 (D. Md. 2011). The Bureau has further explained that counting prisoners at their home addresses would require "collecting information from each prisoner individually" and would necessitate "an extensive coordination procedure" with correctional facilities. *Id.*, 831 F. Supp. 2d at 895-896.

In 2006, pursuant to a contract between the National Academy of Sciences ("NAS") and the U.S. Census Bureau, an NAS committee of experts "chosen for their special competences and…regard for appropriate balance" published a report which addressed the Bureau's policy of counting prison inmates at locations other than where they permanently reside. Daniel L. Cork and Paul R. Voss, eds., *Once, Only Once, and in the Right Place: Residence Rules in the Decennial Census*, ii (2006). Principally based on its assumption that information concerning where prison inmates permanently resided prior to their confinement "d[id] not exist,"[79] the NAS committee conditionally endorsed the Bureau's policy of counting inmates at the locations where they are confined.[80] However, in "Recommendation 7.2" of its report, the committee further recommended that:

> "A research and testing program, including experimentation as part of the 2010 census, should be initiated by the Census Bureau to evaluate the feasibility and cost of assigning incarcerated and institutionalized individuals, who have another address, to the other location."[81]

---

[79] Cork & Ross, *Once, Only Once, and in the Right Place*, *supra*, at 10, and 243. Notwithstanding this conclusion, the NAS report nonetheless noted that "the claim of a legal tie to a preincarceration address can be said to exist." *Id.*, at 99.
[80] *Id.*, at 242-243.
[81] *Id.*, at 243.

Predictably, the 2010 federal decennial census came and went without the Bureau taking action on any "research and testing programs" recommended by the NAS committee. However, in its publication dated February 8, 2018, the Bureau expressed its intention, "following the 2020 census," to "offer a product that states can request, in order to assist them in their goals of reallocating their own prisoner population counts."[82] In this connection, the Bureau exceeded expectations. In January of 2021, at no cost to the State of Texas, the Bureau provided a tool that enables the state to geographically locate the specific block of an inmate's domicile within the Bureau's 2020 census data.[83]

Contrary to the Bureau's assertion that there is no manageable "principle" that would govern where prison inmates are counted,[84] the *animo manendi* doctrine has provided a principle, which was known to the Framers of the U.S. Constitution, that has been manageably applied to determine where a person is an inhabitant *for nearly two millennia*. There is no need to reinvent the wheel, or jettison a perfectly good wheel, and the Framers of the U.S. Constitution did not do so.

To the extent that following the protocol directed by John Quincy Adams in 1820 (or the directions contained in the census enumerations in 1900, 1920, 1930 and 1940) would present potential institutional problems at Texas prisons (occasioned by a state official visiting a prison and personally asking a prison inmate the location of his permanent residence), no significant administrative obstacle would prevent the State from acquiring that information by other means. Questionnaires necessary to establish an inmate's permanent domicile could easily be distributed to prison inmates. Notably, such questionnaires are commonly distributed to all other inhabitants

---

[82] Bur. of Census, Dept. of Commerce, *Final 2020 Census Residence Criteria and Residence Situations*, *supra,* 83 Fed. Reg. at 5528.
[83] *See*, https://geocoding.geo.census.gov/geocoder/locations/address?form (last visited Nov. 21, 2021).
[84] Cork & Ross, *Once, Only Once, and in the Right Place*, *supra*, at 85.

of the United States. These questionnaires could be distributed either personally by state officials, or through the U.S. mail, and they could thereafter be returned by inmates to state officials via the U.S. mail.

Furthermore, the information necessary to determine the permanent residences of Texas' prison inmates is already in possession of its state officials. Again, as previously stated, upon arrival at a prison unit in Texas all inmates are required to provide the true location of where they resided before being confined, and this practice was followed by Defendants before, on and after April 1, 2020. The Plaintiff provided that information to the State of Texas before and at the time of his institutional confinement.[85] The Plaintiff was an "inhabitant" of a specific location within a particular area before his confinement, and this location remains, and at all times relevant to this proceeding has remained, his true residence and domicile.[86]

In the present context there should be "no doubt that administrative convenience is not a shibboleth, the mere recitation of which dictates constitutionality." *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973). This is particularly true when the Constitution imposes upon states an "as nearly as practicable" requirement which commands, in an analogous context, that states engage in "a good-faith effort to achieve precise mathematical equality," such that any variance in equal representational responsiveness must be justified by the state, "no matter how small." *Karcher v. Daggett*, *supra,* 462 U.S. at 730.

**CONCLUSION**

The Plaintiff's *Motion for Certification of Class Action* (as filed in *Wilson v. Texas*, No. 1:21-cv-00943-RP-JES-JVB [Consolidated Case](ECF No. 5) has set out the relevant criteria for consideration of this case for class action certification, and that motion, together with this

---

[85] *Plaintiff's Exhibit A*, at 2.
[86] *Plaintiff's Exhibit A*, at 1-3.

memorandum, should permit the Court to make an informed decision on that question. The material facts in this case, as to Plaintiff's claims, and as they would pertain to the putative class, are not subject to genuine dispute. Rather, the questions to be resolved by the Court will be purely legal, and they depend on the intended meaning of the words "inhabitant," "usual place of abode" and "usual residence," as they appear in the federal constitutional provisions and statutory provision discussed above. The Director of the U.S. Census Bureau has expressed his admittedly "non-legal" opinion that "the place where a person lives and sleeps most of the time…is not always the same as their…voting residence."[87] While that factual determination may or may not be true both as it would apply to Plaintiff as well as numerous others who are not prison inmates, such an observation is  irrelevant in the present case and it certainly does not resolve, as a legal matter, Plaintiff's claims against the Defendants who are parties to this action.

Because the Framers of the U.S. Constitution understood the words "inhabitant," "usual place of abode" and "usual residence" to be qualified by what has been known since antiquity as the "*animo manendi*" doctrine, the Defendants have deprived Plaintiff of his federally protected right to equal representation in the U.S. House of Representatives. The Defendants, having had constructive if not actual knowledge of Plaintiff's permanent residence on April 1, 2020, at the time they adopted Plan C2193, cannot constitutionally justify application of their legal fiction, as described above, because they cannot satisfy the "as nearly as practicable" and "good faith effort" standards that apply to the present case.

---

[87] Bur. of Census, Dept. of Commerce, *Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5525, 5528 (Feb. 8, 2018).

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays his *Motion for Certification of Class Action* (as filed in *Wilson v. Texas*, No. 1:21-cv-00943-RP-JES-JVB [Consolidated Case](ECF No. 5) will in all things be granted.

Respectfully submitted,

*/s/ Richard Gladden*
Texas Bar No. 07991330
1204 W. University Dr. Suite 307
Denton, Texas 76201
940.323.9300 (voice)
940.539.0093 (fax)
richscot1@hotmail.com (email)
*Attorney-in-Charge for Plaintiff*

**CERTIFICATE OF COMPLIANCE**

This is to certify that this motion is approximately 32 pages in length (exclusive of the caption, index, signature block, any certificate, and accompanying documents) and that it therefore *does not comply* with the 20-page limitation provided by Local Rule CV-7(d)(3) of the Rules of the U.S. District Court for the Western District of Texas. However, by separate motion for leave, Plaintiff has sought, without opposition by Defendants, leave of Court to file this motion as tendered in accordance with Local Rule CV-7(b).

*/s/ Richard Gladden*

**CERTIFICATE OF SERVICE**

This is to certify that a true copy of this document was served on all Defendants using the electronic CM/ECF filing system, *via* their Attorney of Record, Patrick K. Sweeten, and by the same means on all Plaintiffs having cases consolidated with this case, on this 24th day of November, 2021.

*/s/Richard Gladden*

33

# PLAINTIFF WILSON'S EXHIBIT A

IN THE STATE OF TEXAS

COUNTY OF FORT BEND

<u>**DECLARATION IN LIEU OF**</u>

<u>**SWORN AFFIDAVIT**</u>

My name is Damon James Wilson and my date of birth is January 11, 1979. I am currently confined by the Correctional Institutions Division of the Texas Department of Criminal Justice in the Jeter III Unit located 3 Jeter Rd., in the City of Richmond, Fort Bend County, Texas. My TDCJ inmate identifying number is 01865939. I am the named Plaintiff in *Damon James Wilson v. The State of Texas*, *et al*., No. 1:21-cv-00943-RP-JES-JVB, which case is now pending in the United States District Court for the Western District of Texas, El Paso Division (consolidated). It is my intention that this declaration be filed with the Court on my behalf at the discretion of my attorney, Richard Gladden.

I have been advised that under Section 132.001(a) of the Texas Civil Practice and Remedies Code an unsworn declaration executed by an inmate who is confined in the Correctional Institutions Division of the Texas Department of Criminal Justice may be used in lieu of a sworn declaration, verification, certification, oath, or affidavit. Having been so informed, I hereby declare under penalty of perjury that the facts stated above, and the facts stated hereinafter, are all true and correct.

On "Census Day," April 1, 2020, I was confined by the State of Texas at the William P. Clements Unit of the Correctional Institutional Division of the Texas Department of Criminal Justice. The Clements Unit is located at 9601 Spur 591, in the City of Amarillo, Potter County, Texas. Prior to my current term of confinement by the State of Texas, I physically resided in the 1400 block of Independence Trail, in the City

1

of Grand Prairie, Dallas County, Texas. On April 1, 2020, it was my intention to resume my permanent residence in the City of Grand Prairie, Texas, upon my release from confinement. Prior to my arrival at the William P. Clements Unit, and at the time that I began serving my current sentence to confinement, I provided Texas officials with the true location of where I permanently resided. I believe that my permanent residence address in Grand Prairie, Texas, was also provided to Texas prison officials in the "pen packet" they received at the time I began my current sentence to confinement. On April 1, 2020, I was (as I continue to be now) an inhabitant of a location *other than Amarillo, Texas*, because I am now, as I was on April 1, 2020, *a permanent resident of the City of Grand Prairie, Texas*.

Under Texas Senate Bill 6 and "Plan C2193," which was adopted by the Texas Legislature on October 18, 2021, I have been wrongly designated as an "inhabitant" and resident of Amarillo, Texas, and of Texas Congressional District 13 ("CD13"). As established by Plan C2193, CD13 encompasses the location where I was confined on April 1, 2020. CD13 in Plan C2193 *does not* encompass the location of where I was then, and am now, an inhabitant and a permanent resident, that is, in the City of Grand Prairie, Texas.

Before and since my most recent term of confinement in the Texas prison system I have continuously maintained an intention to return to my permanent residence in the City of Grand Prairie, Dallas County, Texas, for the purpose of continuing my permanent residence and domicile there. I have never had any intention of establishing a permanent residence or domicile *at any prison unit*. I will be discharged from my present sentence to confinement not later February 1, 2031.

2

My attorney, Richard Gladden, has discussed and thoroughly explained to me the nature of a class action lawsuit and the potential advantages and disadvantages to me and my case by proceeding with a class action lawsuit rather than individually. After conferring with Mr. Gladden I fully understand what he has explained to me; he has answered all of my questions about this; and I consent to the filing of a motion for the purpose of causing my case to be certified as a class action. Should I be approved by the Court as the representative party for the class, I will fairly and adequately protect the interests of the class at all times.

I am currently 42 years old. Like most other people, throughout my life I have kept myself informed about current affairs, including political matters involving public policy debates at the local and national levels. Prior to my becoming ineligible to vote under Texas law as the result of a felony conviction, I not only expressed my opinions and support for political candidates who I thought should be elected to local, state and national offices, but I also expressed my opinions and support for governmental policies that I thought should be adopted, whether they involved local or national issues. The public policy issues I supported almost invariably concerned matters that could have potentially impacted the local community in which I lived. My interest in affecting public policy outcomes, including those occurring at the federal level, has remained unchanged since I have been confined and this remains true today even though I am not currently eligible to vote.

I have never voluntarily resided in Amarillo, which is where the congressional district to which I have been assigned is centered. I do not share any political or other public policy interests with the vast majority of persons who live in Amarillo and are

3

inhabitants of CD13. Among other things, the voting record of U.S. Representatives who have been or would be elected to Congress from what is now CD13, discloses nothing short of outright hostility to the public policy objectives that I share with the vast majority of the inhabitants who live near my permanent residence in Grand Prairie, Texas, and who live within the congressional district in which I truly have my permanent residence, CD30.

It angers me that partisan factions in the Texas legislature think it is appropriate, and legal, to declare that I live wherever they choose to say I live, regardless of the facts. They have done this merely to advance their own political ambitions wholly unrelated to the objective of providing fair and equal representation to all. It is my understanding that the U.S. Senate was supposed to represent *the states* in the federal government, and that the U.S. House of Representatives was intended to represent *the People*, not the states. The action taken by the State of Texas, about which I am complaining, is clearly designed by Texas to claim, for itself, an unconstitutional right to control representation *in both chambers* of the federal government, to the exclusion of *the People*.

I am entitled to representation by a member of the U.S. House of Representatives who resides in, or at least has an interest in, the local affairs of the community where I reside, Grand Prairie, Texas, not a person from far West Texas whom a faction within the Texas legislature prefers. Such a representative from West Texas would hardly give a flip about what either I think, or what the majority of the inhabitants think, in the area of Grand Prairie, Texas and in CD30. The same *would not be true* of a person elected to represent me in CD30, who would depend on the views of their constituents in CD30 for their election. Again, comparison of the voting records of those who would represent me

4

in CD13, in contrast to the voting records of those who have represented or would represent me in CD30, demonstrates a radical difference between the public policy views of the inhabitants of these two communities and their respective political interests.

The action taken by members of the Texas legislature when declaring that I permanently reside "wherever *their* hearts desire" plainly deprives me, and those with whom I share common public policy interests in CD30, of the right to fair and equal representation in the U.S. House of Representatives. This cannot have been intended by our Founding Fathers.

I hereby declare under penalty of perjury that the foregoing facts are all true and correct.

SIGNED AND EXECUTED by me on this ___23___ day of November, 2021.

Damon James Wilson