UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**LEAGUE OF UNITED LATIN AMERICAN
CITIZENS**, et al.,

                  *Plaintiffs,*

V.                                 No. EP:21-cv-259-DCG-JES-JVB
                                       [Lead Case]

**GREG ABBOTT,** in his Official Capacity as
Governor of the State Texas; et al.,

                   *Defendants;*

_____

**DAMON JAMES WILSON**, for himself
and on behalf of all others similarly situated,

                  *Plaintiff,*

V.                                 No. 1:21-cv-00943-RP-JES-JVB
                                      [Consolidated Case]

**THE STATE OF TEXAS**; et al.,

                  *Defendants*

### PLAINTIFF WILSON'S OBJECTION AND REQUEST FOR

### RECONSIDERATION OF ORDER OF DISMISSAL

### BASED ON LACK OF STANDING

                             Richard Gladden
                             Texas Bar No. 07991330
                             1204 West University Dr., Suite 307
                             Denton, Texas 76201
                             940/323-9300 (voice)
                             940/539-0093 (facsimile)
                             richscot1@hotmail.com (email)
                             *Attorney-in-Charge for Plaintiff*
                             *Damon James Wilson*

December 5, 2021

# TABLE OF CONTENTS

**Page**

Table of Contents…………………………………………………………………...  i

Index of Authorities…………………………………………………………………...  ii

I. Plaintiff's Objection under Local Rule CV-7(d)(2)...…………………………… 1

II.  Standards for Review………….……………………………………………. 2

    a)  Dismissal under Rule 12(b)(1)…………………………………………….. 2

    b)  Dismissal under Rule 12(b)(6)……………………………………….... 3

III. Argument……………………………………………………………  5

    a)  The Plaintiff has Standing Because He has "Plausibly" Alleged an "Injury in Fact." ……………………………………………………………. 5

        1)  The Court's Ruling that Prison Inmates, Who are Ineligible to Vote, Categorically Cannot Plausibly Allege or Prove they have Sustained "Injury-In-Fact" as the Result of a Denial of Equal Representation in the U.S. House of Representatives. …………………………….... 5

        2)  The Court's Factual "Explanation" Requirement……………………… 8

        3)  The Court's Finding that Plaintiff's Factual Allegations Asserting Representational Harm are "Too Speculative." …………………………… 9

        4)  The Plaintiff has Plausibly Alleged a "Cognizable" Injury-In-Fact. …………………………… 11

        5)  The Plaintiff's Standing is Not Foreclosed by the "Speculative" Nature of Decisions by Third-Parties. …………………………… 17

Prayer……………………………………………………………............ 17

Certificate of Compliance…………………………………………………. 18

Certificate of Service………………………………………………........ 18

## INDEX OF AUTHORITIES

**Cases:**                                                                                                    **Page**

*Ashcroft v. Iqbal*, 556 U.S. 652 (2009)……………………………………………… 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)………………………………… 4, 9

*Benton v. United States*, 960 F.2d 19 (5th Cir. 1992)………………………… 2, 3, 10

*Burns v. Richardson*, 384 U.S. 73 (1966)…………………………………………. 8

*Clapper v. Amnesty Int'l. USA*, 568 U.S. 398 (2013)………………………… 9-11

*Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496 (5th Cir. 2000)……………. 4

*Conley v. Gibson*, 355 U.S. 41 (1957)……………………………………………. 3, 8

*Dept. of Commerce v. New York*, --- U.S. ---, 139 S. Ct. 2551 (2019)……………. 12, 17

*Evenwel v. Abbott*, 578 U.S. ---, 136 S. Ct. 720 (2016)…………………………… 6-8

*Karcher v. Daggett*, 462 U.S. 725 (1983)………………………………………… 12

*Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993).
……………………………………………………………….. 3, 4

*LULAC v. Abbott*, No. 3:21-cv-259-DCG-JES-JVB (W.D.Tex.)…………………. 1

*Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169 (5th Cir. 1994)…………………. 3

*Paterson v. Weinberger*, 644 F.2d 521 (5th Cir. 1998)……………………………. 3, 8

*People's Nat'l Bank v. Office of the Comptroller of the Currency of the U.S.*, 362 F.3d 333 (5th Cir. 2004)
……………………………………………………………….. 3

*Ramming v. United States*, 281 F.3d 158 (5th Cir. 2001).

*Reynolds v. Sims*, 377 U.S. 533 (1964)…………………………………………… 3

*Tellabs v. Makor Issues & Rights*, 551 U.S. 308 (2007)…………………………. 4

*United States v. Brewster*, 408 U.S. 501(1971)…………………………………… 15

*Wesberry v. Sanders*, 376 U.S. 1 (1964)………………………………………… 11

**Page**

**Statutes, Codes, Rules, and Constitutional Provisions**:

Rule 12(b), Federal Rules of Civil Procedure……………………………………… 2-4, 10

Rule 56, Federal Rules of Civil Procedure………………………………………… 10

Local Rule CV-7, Rules of the United States District Court for the Western District of Texas.

……………………………………………………………… 1, 2, 17, 18

Article I, § 2, U.S. Constitution…………………………………………………… 6, 7, 11, 12

Article III, U.S. Constitution…………………………………………………….. 6, 10

Section 2, Fourteenth Amendment to the U.S. Constitution……………………….. 6-8

The Equal Protection Clause, Fourteenth Amendment to the U.S. Constitution…... *passim*

**Other Sources:**

Heinz Eulau and Paul D. Karps, *The Puzzle of Representation: Specifying Components of Responsiveness*, 2 Leg. Stud. Q. 233 (Aug. 1977).

…………………………………. 15

Alexander Hamilton, James Madison, and John Jay, *The Federalist Papers* (1961, Clinton Rossiter and Charles R. Kessler, eds.).

…………………………………. 7

Tim Hysom, *Communicating with Congress: Recommendations for Improving the Democratic Dialogue*)(Congressional Management Foundation 2008).

…………………………………. 16

Wright & Miller, *Federal Practice and Procedure* (3d ed. 2004)…………………. 4

**APPENDIX:**

Declaration of Plaintiff Damon James Wilson (Nov. 24, 2021)………………… (EXHIBIT A)

\*\*\*\*\*

**PLAINTIFF WILSON'S OBJECTION AND REQUEST FOR**

**RECONSIDERATION OF ORDER OF DISMISSAL BASED**

**ON LACK OF STANDING**

COME NOW Damon James Wilson, Plaintiff in the above-referenced consolidated case, and, pursuant to Rule 12 of the Federal Rules of Civil Procedure, and Local Rule CV- 7(d) of the U.S. District Court for the Western District of Texas, files this *Objection and Request for Reconsideration of Order of Dismissal Based on Lack of Standing* **(ECF No. 63)**, and in this connection would respectfully show unto the Court as follows:

## I.

### PLAINTIFF'S OBJECTION UNDER LOCAL RULE CV-7(d)(2)

On October 18, 2021, Plaintiff filed his original complaint in Cause No. 1:21-cv-00943-RP (ECF No 1)("original compliant"). The Plaintiff's original complaint was thereafter consolidated on November 19, 2021, together with several complaints filed by other parties challenging Defendants' electoral redistricting plans for the State of Texas, under the "lead case" of *LULAC v. Abbott*, No. 3:21-cv-259-DCG-JES-JVB (ECF No. 16)(W.D.Tex.).

On November 29, 2021, the Defendants filed a motion to dismiss Plaintiff's original complaint (ECF No. 44). Four days later, on December 3, 2021, without affording Plaintiff a reasonable opportunity to respond to Defendant's motion to dismiss, the Court granted Defendants' motion to dismiss without prejudice (ECF No. 63).

The Plaintiff would respectfully object to the Court's act of dismissing his complaint four days after the Defendants' motion to dismiss was filed, on the ground that the Court's action contravenes Local Rule CV-7(d)(2) of the Rules of the U.S. District Court for the Western District of Texas ("Local Rule")("A response to [a motion other than one pertaining to discovery

1

or case management] shall be filed not later than 14 days after the filing of the motion.").

Additionally, for purposes of remedying the foregoing procedural error, Plaintiff seeks the

Court's reconsideration of its order granting Defendants' motion to dismiss on the basis of other

errors which form the grounds for the Court's decision to dismiss his original complaint.[1]

## II.

### STANDARDS OF REVIEW

The Defendants in their motion sought dismissal of Plaintiff's original complaint on the

ground that the Court is without "subject matter jurisdiction,"[2] and on the ground that Plaintiff's

original complaint "fails to state a claim upon which relief can be granted."[3] While the Court's

ground for dismissal of Plaintiff's original complaint rested solely on its consideration of

whether Plaintiff had adequately pled "subject matter jurisdiction" under Rule 12(b)(1), Plaintiff

has set out below the standards that govern the disposition of both Rule 12(b)(1) and Rule

12(b)(6) motions. The Plaintiff has done so because, under Fifth Circuit precedent, the

sufficiency of a plaintiff's complaint under Rule 12(b)(1) is measured by the same standard that

would apply to a determine the sufficiency of a complaint under Rule 21(b)(6). *Benton v. United

States*, 960 F.2d 19, 21 (5th Cir. 1992).

**a)** ***Dismissal under Rule 12(b)(1).***

A motion to dismiss under Federal Rule 12(b)(1), including one that urges a plaintiff does

not have "standing" to bring a claim for relief, operates to test the jurisdiction of the court.

Dismissal should not be granted "unless it appears certain that the plaintiff cannot prove any set

---

[1] In accordance with Local Rule CV-15(b), Plaintiff intends to timely file a First Amended Complaint "not later than 21 days after the filing of" Defendants' motion to dismiss, in an effort to satisfy what he respectfully believes to be a "heightened pleading requirement" applied by the Court when dismissing his original complaint. Further, with leave of Court, Plaintiff intends to timely file, not later than December 13, 2021,  his response to Defendants' motion to dismiss, relating to the grounds of Defendants' motion to dismiss not reached by the Court's order of dismissal, as permitted by Local Rule CV-7(d)(2).
[2] Fed.R.Civ.P. 12(b)(1)(hereinafter "Rule 12(b)(1)").
[3] Fed.R.Civ.P. 12(b)(6)(hereinafter "Rule 12(b)(6)").

of facts in support of h[is] claim which would entitle h[im] to relief." *Benton v. United States*, *supra*, 960 F.2d at 21. Federal courts are courts of limited jurisdiction; that is, without jurisdiction conferred by statute, federal courts lack the power to adjudicate claims. *People's Nat'l Bank v. Office of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 336 (5th Cir. 2004). A motion to dismiss pursuant to Rule 12(b)(1) must be considered before any other challenge because a court must have jurisdiction before determining the validity of a claim. *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994).

When considering a motion to dismiss for lack of subject matter jurisdiction, the court may consider (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The plaintiff bears the burden of proof that jurisdiction does in fact exist when jurisdictional facts are controverted. *Id.* Where the motion to dismiss is based on the complaint alone, the court is required to merely decide whether the allegations in the complaint, presumed to be true, sufficiently state a basis for subject matter jurisdiction. *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1998).

**b)  *Dismissal under Rule 12(b)(6).***

Rule 8(a)(2) of the Federal Rules of Civil Procedure "requires that a complaint include only a short and plain statement of the claim showing that the pleader is entitled to relief." *Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993). A complaint meets this minimal "notice pleading" requirement under the federal rules if it "give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

Motions to dismiss for failure to state a claim under Rule 12(b)(6) are viewed with disfavor and are seldom granted. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). The District Court must "accept all factual allegations in the complaint as true," *Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination Unit*, *supra*, 507 U.S. at 164; and the Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs v. Makor Issues & Rights*, 551 U.S. 308, 323 (2007), *citing* 5B Wright & Miller, *Federal Practice and Procedure*, § 1357 (3d ed. 2004 and Supp. 2007).

Prior Fifth Circuit precedent applying a "heightened pleading requirement," whereby a plaintiff was once required to plead "specific" and "particularized" allegations of fact in an original complaint in order to avoid dismissal under Rule 12(b)(6), was unanimously condemned by the United States Supreme Court in *Leatherman v. Tarrant County Narcotics Coordination & Intelligence Unit*, *supra*. Nonetheless, factual allegations "must be enough to raise a right to relief above the speculation level, on the assumption that all allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also*, *id.*, 550 U.S. at 569 n. 14 (distinguishing *Leatherman*, *supra*). In other words, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 652, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.*

4

## III.

## ARGUMENT

**a)  *The Plaintiff has Standing Because He has "Plausibly" Alleged an "Injury in Fact."***

In its order granting Defendants' motion to dismiss the Court confined its analysis to whether Plaintiff's original complaint failed to sufficiently allege an "injury in fact."[4] In this connection the Court relied upon three grounds to reach this determination.  *First*, the Court ruled that "[b]ecause [Plaintiff] cannot vote, he has not shown that he suffers the injury-in-fact needed for standing."[5] *Second*, the Court concluded Plaintiff's original complaint fails to sufficiently allege facts that "explained why" his "ability to influence or benefit from federal policy is any less than it would be if he were considered a resident of the district where he is domiciled."[6] *Third*, turning to Plaintiff's factual allegation that the State's policy "has adversely affected . . . the responsivity of the U.S. Representative who would otherwise serve as Plaintiff's duly elected Member of Congress," the Court, "accepting this [factual allegation] as true" (as it must at the pleading stage), nonetheless deemed this allegation as "too speculative to support an injury-in-fact."[7] The Plaintiff contends the Court has fallen into error when reaching these conclusions.

**1)  *The Court's Ruling that Prison Inmates, Who are Ineligible to Vote, Categorically Cannot Plausibly Allege or Prove they have Sustained "Injury-In-Fact" as the Result of a Denial of Equal Representation in the U.S. House of Representatives.***

---

[4] *District Court's Order Granting Defendants' Motion to Dismiss*, 2 ("Because Wilson has shown no injury-in-fact, we do not reach the other elements [of standing]".).
[5] *District Court's Order Granting Defendants' Motion to Dismiss*, 2.
[6] *District Court's Order Granting Defendants' Motion to Dismiss*, 2.
[7] *District Court's Order Granting Defendants' Motion to Dismiss*, 2-3.

The Court erred, as a matter of law, when categorically concluding that "[b]ecause [Plaintiff] cannot vote, he has not shown that he suffers the injury-in-fact needed for standing."[8] In *Evenwel v. Abbott*, 578 U.S. ---, 136 S. Ct. 720 (2016), the Supreme Court ruled Article I, §2 of the U.S. Constitution and §2 of the Fourteenth Amendment share a common constitutional imperative that requires "equality of representation" in the U.S. House of Representatives. By requiring a decennial enumeration of the "whole number" of persons within each state, regardless of a person's "legal status," the Framers of those provisions comprehended that the U.S. Representatives would "serve all residents, not just those eligible or registered to vote." *Evenwel v. Abbott*, *supra*, 136 S. Ct. at 1132.

The federal constitutional provisions Plaintiff has invoked compel the conclusion that the Court has erred when concluding only persons eligible to vote are capable of plausibly alleging, or proving, they have been (or will be) subjected to "representational harm." A deprivation of a person's right to service from his duly elected member of the United States House of Representatives, unimpeded by arbitrary declarations of state officials that assert the person is a permanent "inhabitant" of a place where he has never resided, constitutes a cognizable "injury-in-fact" under Article III of the U.S. Constitution.

The literal text of the U.S. Constitution confirms that "eligibility to vote" does not define the constitutional scope of the right to "equal representation." The first clause of Article I, §2 provides that "voters" qualified to participate in the selection of Members of the U.S. House of Representatives "shall have the qualifications requisite for electors of the most numerous branch of the state legislature." This constitutional directive does not define the category of persons who are entitled to be "represented" in the U. S. House of Representatives. As explained by James Madison in *The Federalist* No. 52, the Framers of Article I, §2, consciously chose to defer to

---

[8] *District Court's Order Granting Defendants' Motion to Dismiss*, 2.

state discretion the necessary determination of "requisite qualifications" for voters who would cast ballots in federal elections. This was the result of the Framers' perception that a uniform, national regulation of this task was either infeasible or politically impractical at the time.[9] This provision only identifies who may vote in federal elections; it says nothing about who is constitutionally entitled to "representation" in the U.S. House of Representatives.

The Court has erred in failing to recognize that the federal concession to the several states to determine the "requisite qualifications" for voters did not include a federal delegation to (or a reservation by) the states of discretion concerning the "enumeration" required by Article I, §2, or discretion to determine that a person resides at a location other than where he is an "inhabitant." Then, as now, the several states assume no role at all in conducting the federal decennial census. Yet states must adhere to the concept of "equal representation," which the Supreme Court referred to as the "theory of the constitution" in *Evenwel*, because, according to the Supreme Court, that theory "underlies not just the method of allocating House seats to States; it applies as well to the method of apportioning legislative seats within States." *Id.*, 136 S. Ct. at 1128-1129.

The "one person, one vote" is merely one species of ensuring the "constitutional theory" that commands "equal representation"; and "eligibility to vote" is not a prerequisite to a person's constitutional entitlement to "equal representation" in Congress. The Framers of Article I, §2 did not vest even the slightest degree of discretion in the several states to diminish the level or degree of representation to which all "inhabitants" of the United States, including prison inmates, are entitled in the U.S. House of Representatives.  Moreover, the second clause of §2 of the Fourteenth Amendment did not alter the "equal representation" guarantee contained in Article I, §2. Rather, it merely recognized the pre-existing right of states, under the U.S. Constitution, to

---

[9] Alexander Hamilton, James Madison, and John Jay, *The Federalist Papers*, 325-326 (1961, Clinton Rossiter and Charles R. Kessler, eds.).

deprive persons who have engaged in "rebellion," or who have been convicted of "other crimes," of the right to vote in federal elections.

In short, because the second clause of §2 of the Fourteenth Amendment had no effect on the federal constitutional right to "equal representation" held by women, children, persons who had engaged in "rebellion" or persons who had been convicted of "other crimes" (to the extent those persons were fairly classified as "inhabitants" of a represented area), the Court's ruling that Plaintiff is categorically unable to allege or prove that he will "suffe[r] the injury-in-fact needed for standing" because "he cannot vote," flagrantly conflicts with the Supreme Court's rulings in *Evenwel, supra*. According to the Supreme Court, "the basis of representation in the House was [intended] to include all inhabitants…even though States remai[n] free to deny many of those inhabitants the right to participate in the selection of their representatives," *id*., 136 S. Ct. at 1127. And contrary to this Court's ruling in its order of dismissal, "it remains beyond doubt that the principle of representational equality figured prominently in the decision to count people, whether or not they qualify as voters." *Id*., 136 S. Ct. at 1129.[10]

### 2) *The Court's Factual "Explanation" Requirement*.

To the extent the Court limited its examination of the "injury-in-fact" question to Plaintiff's original complaint "alone," it was "required to merely decide whether the allegations in the complaint, presumed to be true, sufficiently state a basis for subject matter jurisdiction. *Paterson v. Weinberger*, *supra*, 644 F.2d at 523. Having provided Defendants with "fair notice of what the plaintiff's claim is and the grounds upon which it rests," *Conley v. Gibson*, *supra*,

---

[10] Thus, the Court's decision in *Evenwel v. Abbott*, *supra*, partially modified the Court's prior statement in *Burns v. Richardson*, 384 U.S. 73, 92 (1966), wherein it previously observed that "[n]either in *Reynolds v. Sims* nor in any other decision has this Court suggested that the States are required to include aliens, transients, short-term or temporary residents, or persons denied the vote for conviction of crime in the apportionment base by which their legislators are distributed and against which compliance with the Equal Protection Clause is to be measured." Under *Evenwel*, the federal constitution would not necessarily require "transients" or "short-term temporary residents" who have a domicile out-of-state to be counted in a state's legislative allocation of persons for redistricting purposes, but *Evenwel* plainly does require the counting of a state's "inhabitants" in that calculation.

355 U.S. at 47, Plaintiff was not required in his original complaint to more "particularly" or "specifically" allege facts that "explained why" his "ability to influence or benefit from federal policy [would be] any less than it would be if he were considered a resident of the district where he is domiciled,"[11] *so long as* his factual allegations were plausible "enough to raise a right to relief above the speculation level, on the assumption that all allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, *supra*, 550 U.S. at 555. As discussed hereinafter, the allegations of representational harm contained in Plaintiff's original complaint are "concrete" and more than "speculative."

### 3) *The Court's Finding that Plaintiff's Factual Allegations Asserting Representational Harm are "Too Speculative."*

The Court's order concluded that one of Plaintiff's factual allegations, *i.e.*, that the State's policy "has adversely affected . . . the responsivity of the U.S. Representative who would otherwise serve as Plaintiff's duly elected Member of Congress,"[12] is "too speculative to support an injury-in-fact."[13] As legal authority for this conclusion the Court's order cited *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 409 (2013). The Plaintiff contends the Supreme Court's decision in *Clapper* is inapposite to a determination of standing at the initial pleading stage of a litigation; and further, he contends that the decision in *Clapper* does not support the Court's conclusion that Plaintiff has not "plausibly" alleged he has sustained, and has not plausibly alleged he will sustain in the future, an "injury-in-fact," *i.e.*, representational harm, by application of the State's legal fiction.

---

[11] *District Court's Order Granting Defendants' Motion to Dismiss*, 2.
[12] *District Court's Order Granting Defendants' Motion to Dismiss*, 2, *quoting, in part, Plaintiff's Original Complaint*, 8 (omitting the words "and will adversely affect").
[13] *District Court's Order Granting Defendants' Motion to Dismiss*, 2-3.

*First*, Plaintiff suspects the Court has overlooked the fact that in *Clapper*, *supra*, the District Court *had not* disposed of the plaintiffs' claims on a motion to dismiss that alleged an absence of standing. Rather, in *Clapper* the District Court disposed of the plaintiff's claims on summary judgment; and it was the District Court's decision to grant summary judgment, after the parties had complied with the procedural requisites of Fed. R. Civ. P. 56, that the Supreme Court reviewed in *Clapper*. Suffice it to say, the burden imposed on a plaintiff to adequately plead allegations in a complaint sufficiently to defeat a motion to dismiss under Rule 12(b)(1) is distinguishable from the plaintiff's burden of production required by Rule 56. Again, when it comes to "facial plausibility" in the "standing" context, the sufficiency of a plaintiff's complaint is measured under Rule 12(b)(1) by the same standard that applies to measure a complaint under Rule 21(b)(6). *Benton v. United States*, *supra*, 960 F.2d at 21.

*Second*, Plaintiff also respectfully submits the Court has misconstrued the Supreme Court's ruling in *Clapper*, *supra*. In the passage from *Clapper* explicitly cited by the Court concerning "injury-in-fact," *id*., 568 U.S. at 409, the Supreme Court ruled that:

> "To establish Article III standing, an injury must be concrete, particularized, and actual or imminent… Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." (italics in original).

The foregoing passage of the Supreme Court from *Clapper*, cited by this Court in its order, was intended to identify, as a temporal matter, allegations of harm concerning future injuries that are too "speculative" to satisfy the standing requirement. In the present case, this passage from *Clapper* is inapposite because Plaintiff's original compliant has alleged the State's "policy" *is actually being directly applied to him* "currently." An undisputed "current application" of a policy, as in the present case, necessarily satisfies the "certainly imminent"

requirement described in *Clapper*. Thus, a more accurate description of the Court's decision to find Plaintiff lacks standing would be that the Court questions whether Plaintiff has plausibly alleged an injury-in-fact to a right that is "cognizable" for constitutional purposes. As explained above, in this regard Plaintiff has done so.

### 4)   *The Plaintiff has Plausibly Alleged a "Cognizable" Injury-In-Fact.*

In contrast to its "categorical" disqualification of ineligible voters from any entitlement to representation in the U.S. House of Representatives, the Court also seems to acknowledge (inconsistently) that Plaintiff *would have standing* if he plausibly alleged the State's policy operates to diminish his "ability to influence or benefit from federal policy," when compared to his ability to do so "if he were considered a resident of the district where he is domiciled."[14] The Plaintiff has alleged his "ability to influence or benefit from federal policy" has been (and will be) measurably diminished by the State's policy of knowingly and arbitrarily placing him in a congressional district in which he undisputedly has never been an inhabitant.[15]   Here, Plaintiff contends the Court's error stems from its underinclusive definition of what is "plausible," and from its overinclusive definition of what is "speculative." A brief examination of the degree to which the Supreme Court has required a showing of "injury-in-fact" in the "one person, one vote" context, and a few factual illustrations that pertain to Plaintiff "equal representation" claims, demonstrates this view.

When describing the measure for assaying whether "representational harm" has occurred in the related context of the "one person, one vote" theory, the Supreme Court has ruled Article I, §2 requires that "as nearly as practical" states must ensure "one man's vote in a congressional election is to be worth as much as another's." *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964). The

---

[14] *District Court's Order Granting Defendants' Motion to Dismiss*, 2.
[15] *Plaintiff's Original Complaint*, 6-7.

Court has also ruled "the 'as nearly as practicable' standard" requires a state to make "a good-faith effort to achieve precise mathematical equality," and that "[u]nless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small." *Karcher v. Daggett*, 462 U.S. 725, 730 (1983). Noticeably absent from the Supreme Court's rule for determining when a person has been deprived of "equal representation" in the "one person, one vote" context is any requirement that an aggrieved plaintiff allege or prove, for purposes of standing, a tangible "injury-in-fact" resulting from population deviations between congressional districts "no matter how small." For the reasons previously stated above, and contrary to the Court's legal conclusion that inmates who are ineligible to vote have no right to representation in the U.S. Congress, no discernible rationale exists for recognizing a different test to determine when a prison inmate has been subjected to representational harm, merely on the basis of whether he is "ineligible to vote." Ineligibility to vote is irrelevant in the standing equation. *Dept. of Commerce v. New York*, --- U.S. ---, 139 S. Ct. 2551, 2565 (2019)(alleged census undercount of noncitizens who are ineligible to vote establishes standing to support a challenge claiming "representational harm").

Furthermore, the Court's conclusion that it is purely "speculative" whether a state policy that arbitrarily displaces a prison inmate from his domicile for purposes of manipulating the person's congressional representation constitutes "injury-in-fact" is unsupported by either history or decisional law. The Court's ruling in this regard would certainly have been surprising (and indeed viewed as intolerable) to the Framers who adopted the federal "constitutional theory" of equal representation in the U.S. House of Representatives. As Plaintiff has previously discussed, the Framers of Article I, §2, manifestly intended that U.S. Representatives, in an intangible but constitutionally cognizable way, be "dependent on, and responsive to" the interests of their own

constituents' particular political interests.[16]   However, this Court's order of dismissal gives no weight whatsoever to this fact in the injury-in-fact calculus when considering Plaintiff's claim that the way Texas has defined the location of his "habitation" will diminish the "responsiveness" of the U.S. Representative who is elected to represent him at his domicile. For the purpose of still more vividly illustrating for the Court how Plaintiff's "ability to influence or benefit from federal policy" is "less than it would be if he were considered a resident of the district where he is domiciled," the Plaintiff would offer the following:

Before issuance of the Court's order of dismissal the Plaintiff executed a declaration, a true copy of which is attached hereto as Plaintiff's Exhibit A. In his declaration Plaintiff has captured the more than "plausible" way in which he will sustain "injury-in-fact" from the ongoing application by the State of its legal fiction. In this connection, the Plaintiff has stated in relevant part:

> "I am currently 42 years old. Like most other people, throughout my life I have kept myself informed about current affairs, including political matters involving public policy debates at the local and national levels. Prior to my becoming ineligible to vote under Texas law as the result of a felony conviction, I not only expressed my opinions and support for political candidates who I thought should be elected to local, state and national offices, but I also expressed my opinions and support for governmental policies that I thought should be adopted, whether they involved local or national issues. The public policy issues I supported almost invariably concerned matters that could have potentially impacted the local community in which I lived. My interest in affecting public policy outcomes, including those occurring at the federal level, has remained unchanged since I have been confined and this remains true today even though I am not currently eligible to vote.
>
> "I have never voluntarily resided in Amarillo, which is where the congressional district to which I have been assigned is centered. I do not share any political or other public policy interests with the vast majority of persons who live in Amarillo and are inhabitants of CD13. Among other things, the voting record of

---

[16] *Plaintiff's Verified Memorandum of Law in Support of Motion for Certification of Class Action*, 25-26 (ECF No. 55)(filed Nov. 24, 2021), *quoting*, *inter alia*, comments of George Mason at the Federal Constitutional Convention of 1787 (anticipating the U.S. House of Representatives would represent "different districts" having "different interest[s] and views arising from difference of produce, of habits, &c. &c.").

U.S. Representatives who have been or would be elected to Congress from what is now CD13, discloses nothing short of outright hostility to the public policy objectives that I share with the vast majority of the inhabitants who live near my permanent residence in Grand Prairie, Texas, and who live within the congressional district in which I truly have my permanent residence, CD30.

"It angers me that partisan factions in the Texas legislature think it is appropriate, and legal, to declare that I live wherever they choose to say I live, regardless of the facts. They have done this merely to advance their own political ambitions wholly unrelated to the objective of providing fair and equal representation to all. It is my understanding that the U.S. Senate was supposed to represent *the states* in the federal government, and that the U.S. House of Representatives was intended to represent *the People*, not the states. The action taken by the State of Texas, about which I am complaining, is clearly designed by Texas to claim, for itself, an unconstitutional right to control representation *in both chambers* of the federal government, to the exclusion of *the People*.

"I am entitled to representation by a member of the U.S. House of Representatives who resides in, or at least has an interest in, the local affairs of the community where I reside, Grand Prairie, Texas, not a person from far West Texas whom a faction within the Texas legislature prefers. Such a representative from West Texas would hardly give a flip about what either I think, or what the majority of the inhabitants think, in the area of Grand Prairie, Texas and in CD30. The same *would not be true* of a person elected to represent me in CD30, who would depend on the views of their constituents in CD30 for their election. Again, comparison of the voting records of those who would represent me in CD13, in contrast to the voting records of those who have represented or would represent me in CD30, demonstrates a radical difference between the public policy views of the inhabitants of these two communities and their respective political interests."[17]

The obligations of a member of the U.S. House of Representatives in the 21st century includes not only "purely legislative" tasks, such as voting, speaking on the floor or conducting a legislative hearing, but also official responsibilities incidentally related to the legislative process. When describing the distinctions between these functions the Supreme Court has observed:

"It is well known, of course, that Members of the Congress engage in many activities other than the purely legislative activities….. These include a wide range of legitimate errands performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called news letters to constituents, news releases, and speeches delivered outside the Congress. The range of these related activities has grown over the years. They are performed in part because they have come to be

---

[17] *Declaration of Plaintiff Damon James Wilson*, 3-5 (Nov. 24, 2021)(Exhibit A).

expected by constituents, and because they are a means of developing continuing support for future elections. Although these are entirely legitimate activities, they are political in nature rather than legislative, in the sense that term has been used by the Court in prior cases."[18]

When it comes to fulfillment of "purely legislative" as well as "related activities" that "have come to be expected by constituents," political scientists for many decades have differed over the best analytical model to measure a Representative's "responsiveness" to his or her constituents. For example, one team of political scientists has argued "[t[here are four possible components of responsiveness which, as a whole, constitute representation."[19] The components of "representational responsiveness," according to these political scientists, would weigh: 1) "policy responsiveness," 2) "service responsiveness," 3) "allocation responsiveness" (which is defined as "the representative's efforts to obtain benefits for his constituency through pork-barrel exchanges in the appropriations process or through administrative interventions"), and 4) "symbolic responsiveness" (which is defined to involve "public gestures of a sort that create a sense of trust and support in the relationship between representative and represented").[20] The present case, however, does not call upon the Court to endorse or apply any particular method to measure *the degree* to which the State's legal fiction affects Plaintiffs' rights to equal representation. Instead, the judicial inquiry in this case is whether the State's decision to arbitrarily assign Plaintiff to a congressional district wherein he has never been an inhabitant operates *in any meaningful way to diminish* his constitutional right to equal representation when compared to others who are not subjected to the State's legal fiction. The Plaintiff contends the State's legal fiction deprives him of equal representation in a constitutionally meaningful way. More specifically, Plaintiff contends the State's legal fiction significantly interferes with an

---

[18] *United States v. Brewster*, 408 U.S. 501, 512 (1971).
[19] Heinz Eulau and Paul D. Karps, *The Puzzle of Representation: Specifying Components of Responsiveness*, 2 Leg. Stud. Q. 233, 241 (Aug. 1977)(" Eulau and Karps").
[20] Eulau and Karps, *supra,* 2 Leg. Stud. Q. at 241-247.

ability he would otherwise have to communicate with and acquire federal assistance from the U.S. Representative elected to represent him in the district of his domicile.

The fact that representational harm may exist, and that it represents a plausible basis to find an alleged injury-in-fact, is identifiable as a matter of political science. With regard to meaningful communications from a person to a Representative, one highly esteemed organization, after conducting extensive research for nearly a decade (including interviews with more than 350 congressional staffers), has concluded the particular location of the person's domicile dramatically affects the responsiveness of a Representative to any communication received.[21] For example, according to this research, "[w]hen a congressional office receives a message" the "first thing most look for is whether it comes from a citizen who resides in their congressional district."[22] When a message is determined to be communicated by a person who is classified as residing "outside" a Representative's district, the message "as a matter of professional courtesy" is *sometimes* (but not always) referred to another office "without consideration" by the member of Congress to whom it has been sent. In other words:

> "Individual citizens…routinely attempt to send messages to Members who do not represent them….However, Congress is a representative body whose Members are beholden to their own constituents. As a courtesy, *some Members* forward messages to the appropriate Members, but few read or respond to messages not from their own constituents. In fact, in most cases…Representatives and their staffs never read 'out-of-district' or 'out-of-state' mail because the systems in their offices usually verify immediately whether a message originated from their district or state."[23]

Upon a congressional staff member's discovery that Texas has placed Plaintiff in an alien congressional district, the treatment given to Plaintiff's personal communications with

---

[21] Tim Hysom, *Communicating with Congress: Recommendations for Improving the Democratic Dialogue*, 2 (italics added)(Congressional Management Foundation 2008)("Hysom"), available online at: https://www.congressfoundation.org/storage/documents/CMF_Pubs/cwc_recommendationsreport.pdf (Last visited Dec. 5, 2021).
[22] *Hysom, supra*, at 20.
[23] *Id.*, at 27.

congressional staff members of the Representative of his own domicile, or communications transmitted to the same staff members by third-parties on Plaintiff's behalf, would likely be indistinguishable from the disparate official treatment described above.

5) ***The Plaintiff's Standing is Not Foreclosed by the "Speculative" Nature of Decisions by Third-Parties***.

Finally, although the Court's order of dismissal does not directly address one other aspect of standing, Plaintiff out of an abundance of caution would briefly observe that, contrary to the argument interposed by Defendants,[24] Plaintiff is not attempting to establish standing on the basis of pure "speculation" about the decisions of third-parties (with the "third-party" in this case being the U.S. Representative who would represent Plaintiff's domicile in the U.S. House of Representatives). For the same reason this argument was rejected by the Supreme Court in *Dept. of Commerce v. New York*, *supra*, Plaintiff's standing "does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties." *Id.*, 139 S. Ct. at 2566 (finding standing existed where federal census undercount was alleged to be "attributable at least in part to noncitizens' reluctance to answer a citizenship question").

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays the procedural objection stated in this pleading on the basis of Local Rule CV-7(d)(2) will be sustained by the Court, and that the Court will remedy this error on reconsideration by vacating its order granting Defendant's motion to dismiss Plaintiff's original complaint on the ground that Plaintiff lacks standing.

---

[24] *Defendants' Motion to Dismiss*, 4.

Respectfully submitted,

*/s/ Richard Gladden*
Texas Bar No. 07991330
1204 W. University Dr. Suite 307
Denton, Texas 76201
940.323.9300 (voice)
940.539.0093 (fax)
richscot1@hotmail.com (email)
*Attorney-in-Charge for Plaintiff*

## CERTIFICATE OF COMPLIANCE

This is to certify that this objection is approximately 17 pages in length (exclusive of the caption, index, signature block, any certificate, and accompanying documents) and that it therefore complies with the 20-page limitation provided by Local Rule CV-7(d)(3) of the Rules of the U.S. District Court for the Western District of Texas.

*/s/ Richard Gladden*

## CERTIFICATE OF SERVICE

This is to certify that a true copy of this document was served on all Defendants using the electronic CM/ECF filing system, *via* their Attorney of Record, Patrick K. Sweeten, and by the same means on all Plaintiffs having cases consolidated with this case, on this 5th day of December, 2021.

*/s/Richard Gladden*

18

# PLAINTIFF WILSON'S EXHIBIT A

IN THE STATE OF TEXAS

COUNTY OF FORT BEND

## **DECLARATION IN LIEU OF**

## **SWORN AFFIDAVIT**

My name is Damon James Wilson and my date of birth is January 11, 1979. I am currently confined by the Correctional Institutions Division of the Texas Department of Criminal Justice in the Jeter III Unit located 3 Jeter Rd., in the City of Richmond, Fort Bend County, Texas. My TDCJ inmate identifying number is 01865939. I am the named Plaintiff in *Damon James Wilson v. The State of Texas, et al.*, No. 1:21-cv-00943-RP-JES-JVB, which case is now pending in the United States District Court for the Western District of Texas, El Paso Division (consolidated). It is my intention that this declaration be filed with the Court on my behalf at the discretion of my attorney, Richard Gladden.

I have been advised that under Section 132.001(a) of the Texas Civil Practice and Remedies Code an unsworn declaration executed by an inmate who is confined in the Correctional Institutions Division of the Texas Department of Criminal Justice may be used in lieu of a sworn declaration, verification, certification, oath, or affidavit. Having been so informed, I hereby declare under penalty of perjury that the facts stated above, and the facts stated hereinafter, are all true and correct.

On "Census Day," April 1, 2020, I was confined by the State of Texas at the William P. Clements Unit of the Correctional Institutional Division of the Texas Department of Criminal Justice. The Clements Unit is located at 9601 Spur 591, in the City of Amarillo, Potter County, Texas. Prior to my current term of confinement by the State of Texas, I physically resided in the 1400 block of Independence Trail, in the City

1

of Grand Prairie, Dallas County, Texas. On April 1, 2020, it was my intention to resume my permanent residence in the City of Grand Prairie, Texas, upon my release from confinement. Prior to my arrival at the William P. Clements Unit, and at the time that I began serving my current sentence to confinement, I provided Texas officials with the true location of where I permanently resided. I believe that my permanent residence address in Grand Prairie, Texas, was also provided to Texas prison officials in the "pen packet" they received at the time I began my current sentence to confinement. On April 1, 2020, I was (as I continue to be now) an inhabitant of a location *other than Amarillo, Texas*, because I am now, as I was on April 1, 2020, *a permanent resident of the City of Grand Prairie, Texas*.

Under Texas Senate Bill 6 and "Plan C2193," which was adopted by the Texas Legislature on October 18, 2021, I have been wrongly designated as an "inhabitant" and resident of Amarillo, Texas, and of Texas Congressional District 13 ("CD13"). As established by Plan C2193, CD13 encompasses the location where I was confined on April 1, 2020. CD13 in Plan C2193 *does not* encompass the location of where I was then, and am now, an inhabitant and a permanent resident, that is, in the City of Grand Prairie, Texas.

Before and since my most recent term of confinement in the Texas prison system I have continuously maintained an intention to return to my permanent residence in the City of Grand Prairie, Dallas County, Texas, for the purpose of continuing my permanent residence and domicile there. I have never had any intention of establishing a permanent residence or domicile *at any prison unit*. I will be discharged from my present sentence to confinement not later February 1, 2031.

My attorney, Richard Gladden, has discussed and thoroughly explained to me the nature of a class action lawsuit and the potential advantages and disadvantages to me and my case by proceeding with a class action lawsuit rather than individually. After conferring with Mr. Gladden I fully understand what he has explained to me; he has answered all of my questions about this; and I consent to the filing of a motion for the purpose of causing my case to be certified as a class action. Should I be approved by the Court as the representative party for the class, I will fairly and adequately protect the interests of the class at all times.

I am currently 42 years old. Like most other people, throughout my life I have kept myself informed about current affairs, including political matters involving public policy debates at the local and national levels. Prior to my becoming ineligible to vote under Texas law as the result of a felony conviction, I not only expressed my opinions and support for political candidates who I thought should be elected to local, state and national offices, but I also expressed my opinions and support for governmental policies that I thought should be adopted, whether they involved local or national issues. The public policy issues I supported almost invariably concerned matters that could have potentially impacted the local community in which I lived. My interest in affecting public policy outcomes, including those occurring at the federal level, has remained unchanged since I have been confined and this remains true today even though I am not currently eligible to vote.

I have never voluntarily resided in Amarillo, which is where the congressional district to which I have been assigned is centered. I do not share any political or other public policy interests with the vast majority of persons who live in Amarillo and are

3

inhabitants of CD13. Among other things, the voting record of U.S. Representatives who have been or would be elected to Congress from what is now CD13, discloses nothing short of outright hostility to the public policy objectives that I share with the vast majority of the inhabitants who live near my permanent residence in Grand Prairie, Texas, and who live within the congressional district in which I truly have my permanent residence, CD30.

It angers me that partisan factions in the Texas legislature think it is appropriate, and legal, to declare that I live wherever they choose to say I live, regardless of the facts. They have done this merely to advance their own political ambitions wholly unrelated to the objective of providing fair and equal representation to all. It is my understanding that the U.S. Senate was supposed to represent *the states* in the federal government, and that the U.S. House of Representatives was intended to represent *the People*, not the states. The action taken by the State of Texas, about which I am complaining, is clearly designed by Texas to claim, for itself, an unconstitutional right to control representation *in both chambers* of the federal government, to the exclusion of *the People*.

I am entitled to representation by a member of the U.S. House of Representatives who resides in, or at least has an interest in, the local affairs of the community where I reside, Grand Prairie, Texas, not a person from far West Texas whom a faction within the Texas legislature prefers. Such a representative from West Texas would hardly give a flip about what either I think, or what the majority of the inhabitants think, in the area of Grand Prairie, Texas and in CD30. The same *would not be true* of a person elected to represent me in CD30, who would depend on the views of their constituents in CD30 for their election. Again, comparison of the voting records of those who would represent me

4

in CD13, in contrast to the voting records of those who have represented or would represent me in CD30, demonstrates a radical difference between the public policy views of the inhabitants of these two communities and their respective political interests.

The action taken by members of the Texas legislature when declaring that I permanently reside "wherever *their* hearts desire" plainly deprives me, and those with whom I share common public policy interests in CD30, of the right to fair and equal representation in the U.S. House of Representatives. This cannot have been intended by our Founding Fathers.

I hereby declare under penalty of perjury that the foregoing facts are all true and correct.

SIGNED AND EXECUTED by me on this ___23___ day of November, 2021.

Damon James Wilson