# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § § | |
| *Plaintiffs*, | § § | Case No. 3:21-cv-00259 |
| v. | § § | [Lead Case] |
| GREG ABBOTT, *et al.*, | § § § | |
| *Defendants*. | § § | |

| | | |
|---|---|---|
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, | § § | |
| *Plaintiff*, | § § | Case No. 1:21-cv-00988 |
| v. | § § | [Consolidated Case] |
| THE STATE OF TEXAS, *et al.*, | § § § | |
| *Defendants*. | § | |

# DEFENDANTS' MOTION TO DISMISS
# THE MEXICAN AMERICAN LEGISLATIVE CAUCUS'S COMPLAINT,
# FOR A MORE DEFINITE STATEMENT, OR TO STRIKE

# TABLE OF CONTENTS

Table of Contents ...................................................................................................................i

Table of Authorities...............................................................................................................i

Introduction...........................................................................................................................1

Standard.................................................................................................................................2

Argument ..............................................................................................................................2

I.   This Court Lacks Jurisdiction Over MALC's Claims ...............................................2

    A.   MALC Has Not Plausibly Alleged Standing...............................................2

        1.   MALC Lacks Organizational Standing...........................................3

        2.   MALC Also Lacks Associational Standing .....................................5

    B.   The State of Texas is Immune from MALC's Claims...................................8

II.   MALC's Claims Fail on the Merits............................................................................9

    A.   The Court Should Dismiss MALC's Section 2 Effects Claim ......................9

        1.   The *Gingles* Test............................................................................9

        2.   MALC Has Not Alleged Facts Required by *Gingles* .................11

        3.   MALC's Challenges Also Fail As Applied to Specific Districts .......15

    B.   The Court Should Dismiss MALC's Intentional Discrimination Claim ...........17

        1.   MALC Has Not Plausibly Alleged Discriminatory Effect ...................17

        2.   MALC Has Not Plausibly Alleged Discriminatory Intent...................17

    C.   The Court Should Dismiss MALC's Racial Gerrymandering Claim ...........21

    D.   The Court Should Dismiss MALC's Malapportionment Claim...................23

Conclusion ...........................................................................................................................25

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Perez*,
138 S. Ct. 2305 (2018) (Thomas, J. concurring) ...................................................................15, 18, 20

*ACORN v. Fowler*,
178 F.3d 350 (5th Cir. 1999)...............................................................................................................5, 6

*Ala. Legislative Black Caucus v. Alabama*,
575 U.S. 254 (2015)........................................................................................................8, 15, 21, 22

*Ala. State Conf. of NAACP v. Alabama*,
949 F.3d 647 (11th Cir. 2020) (Branch, J., dissenting)..........................................................3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................................*passim*

*Baca v. Berry*,
806 F.3d 1262 (10th Cir. 2015) .......................................................................................24

*Bartlett v. Strickland*,
556 U.S. 1 (2009).............................................................................................12, 15, 16, 17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................................2, 18, 22

*Benavidez v. Irving Indep. Sch. Dist.*,
690 F. Supp. 2d 451 (N.D. Tex. 2010)........................................................................10

*Bethune-Hill v. Va. State Bd. of Elections*,
137 S. Ct. 788 (2017)..............................................................................................................8

*Block v. Tex. Bd. of Law Examiners*,
952 F.3d 613 (5th Cir. 2020)..........................................................................................3

*Brnovich v. Democratic National Committee*,
141 S. Ct. 2321 (2021) .........................................................................................18, 22

*City of Austin v. Paxton*,
943 F.3d 993 (5th Cir. 2019)..............................................................................................2

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)..............................................................................................................4

*Conley v. Gibson,*
   355 U.S. 41 (1957) .................................................................................................... 2

*Corn v. Miss. Dep't of Pub. Safety,*
   954 F.3d 268 (5th Cir. 2020) .................................................................................... 3

*DiMaio v. Democratic Nat'l Comm.,*
   520 F.3d 1299 (11th Cir. 2008) (per curiam) .......................................................... 8

*Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors,*
   522 F.3d 796 (7th Cir. 2008) .................................................................................... 7

*Donald J. Trump for President Inc. v. Pennsylvania,*
   830 F. App'x 377 (3d Cir. 2020) (Bibas, J.) .......................................................... 12

*Draper v. Healey,*
   827 F.3d 1 (1st Cir. 2016) (Souter, J.) ..................................................................... 7

*Evenwel v. Abbott,*
   136 S. Ct. 1120 (2016) ............................................................................................ 23

*Fair Elections Ohio v. Husted,*
   770 F.3d 456 (6th Cir. 2014) .................................................................................... 5

*FW/PBS, Inc. v. City of Dallas,*
   493 U.S. 215 (1990) .................................................................................................. 3

*Georgia v. Ashcroft,*
   539 U.S. 461 (2003) ................................................................................................ 16

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ................................................................................. 5, 6, 7, 8

*Gonzalez v. Harris County,*
   601 F. App'x 255 (5th Cir. 2015) (per curiam) .................................................... 14

*Green Valley Special Util. Dist. v. City of Schertz,*
   969 F.3d 460 (5th Cir. 2020) (en banc) .................................................................. 3

*Grove v. Emison,*
   507 U.S. 25 (1993) .................................................................................................. 10

*Hall v. Virginia,*
   385 F.3d 421 (4th Cir. 2004) .................................................................................. 14

*Harding v. Dallas County,*
   948 F.3d 302 (5th Cir. 2020) ........................................................................... 10, 21

*Harris v. Ariz. Indep. Redistricting Comm'n,*
　　578 U.S. 253 (2016).................................................................................................24

*Havens Realty Corp. v. Coleman,*
　　455 U.S. 363 (1982)...................................................................................................5

*Holder v. Hall,*
　　512 U.S. 874 (1994) (Thomas, J., concurring in the judgment)................................. 15, 16

*Hunt v. Wash. St. Apple Adver. Comm'n,*
　　432 U.S. 333 (1977)...................................................................................................6

*Williams ex rel. J.E. v. Reeves,*
　　954 F.3d 729 (5th Cir. 2020)......................................................................................3

*Johnson v. De Grandy,*
　　512 U.S. 997 (1994)..................................................................................................13

*Johnson v. Johnson,*
　　385 F.3d 503 (5th Cir. 2004).....................................................................................12

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
　　624 F.3d 1083 (9th Cir. 2010) ....................................................................................6

*Ex parte Levitt,*
　　302 U.S. 633 (1937) (per curiam) ...............................................................................5

*Lujan v. Defs. of Wildlife,*
　　504 U.S. 555 (1992)................................................................................................3, 4

*LULAC v. Abbott,*
　　369 F. Supp. 3d 768 (W.D. Tex. 2019) .....................................................................14

*LULAC v. Abbott,*
　　951 F.3d 311 (5th Cir. 2020) (Smith, J.)...................................................................14

*LULAC v. Clements,*
　　986 F.2d 728 (5th Cir. 1993).....................................................................................14

*LULAC v. Clements,*
　　999 F.2d 831 (5th Cir. 1993) (en banc) ....................................................................11

*LULAC v. NE Ind. Sch. Dist.,*
　　903 F. Supp. 1071 (W.D. Tex. 1995).........................................................................17

*Mi Familia Vota v. Abbott,*
　　977 F.3d 461 (5th Cir. 2020)......................................................................................2

*Miller v. Johnson,*
   515 U.S. 900 (1995) ............................................................................ 17, 21, 23

*Mixon v. Ohio,*
   193 F.3d 389 (6th Cir. 1999) ........................................................................... 3

*NAACP v. City of Kyle,*
   626 F.3d 233 (5th Cir. 2010) ....................................................................... 6, 7

*Nat'l Taxpayers Union, Inc. v. United States,*
   68 F.3d 1428 (D.C. Cir. 1995) ........................................................................ 5

*Nat'l Treasury Emps. Union v. United States,*
   101 F.3d 1423 (D.C. Cir. 1996) ...................................................................... 5

*Nev. Dep't of Human Res. v. Hibbs,*
   538 U.S. 721 (2003) ......................................................................................... 3

*OCA-Greater Houston v. Texas,*
   867 F.3d 604 (5th Cir. 2017) ........................................................................... 3

*Palmer v. Thompson,*
   403 U.S. 217 (1971) ....................................................................................... 17

*Pennhurst State Sch. & Hosp. v. Halderman,*
   465 U.S. 89 (1984) ......................................................................................... 22

*Pers. Adm'r of Mass. v. Feeney,*
   442 U.S. 256 (1979) .................................................................................. 18, 21

*Planned Parenthood Gulf Coast, Inc. v. Phillips,*
   5 F.4th 568 (5th Cir. 2021) .............................................................................. 3

*Raj v. LSU,*
   714 F.3d 322 (5th Cir. 2013) ........................................................................... 3

*Rodriguez v. Harris County,*
   964 F. Supp. 2d 686 (S.D. Tex. 2013) ..................................................... 14, 17

*Salermo v. Hughes Watters & Askanase LLP,*
   516 F. Supp. 3d 696 (S.D. Tex. 2021) ..................................................... 12, 20

*Shaw v. Reno,*
   509 U.S. 630 (1993) .................................................................................. 17, 21

*Sinkfield v. Kelley,*
   531 U.S. 28 (2000) (per curiam) ..................................................................... 8

*Spokeo, Inc. v. Robbins,*
   578 U.S. 330 (2016)................................................................................3

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009)................................................................................7

*Tenth St. Residential Ass'n v. City of Dallas,*
   968 F.3d 492 (5th Cir. 2020)................................................................4

*Tex. Democratic Party v. Abbott,*
   961 F.3d 389 (5th Cir. 2020)................................................................2

*Tex. Democratic Party v. Abbott,*
   978 F.3d 168 (5th Cir. 2020)................................................................7

*Thornburg v. Gingles,*
   478 U.S. 30 (1986)........................................................................*passim*

*United States v. Hays,*
   515 U.S. 737 (1995)................................................................................8

*United States v. O'Brien,*
   391 U.S. 367 (1968)..............................................................................17

*Va. Office for Prot. & Advocacy v. Stewart,*
   563 U.S. 247 (2011)................................................................................3

*Valdespino v. Alamo Heights Indep. Sch. Dist.,*
   168 F.3d 848 (5th Cir. 1999)..............................................................10

*Veasey v. Abbott,*
   830 F.3d 216 (5th Cir. 2016) (en banc) ...........................................11

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977)..............................................................................18

*Voinovich v. Quilter,*
   507 U.S. 146 (1993)..............................................................................24

*Warth v. Seldin,*
   422 U.S. 490 (1975)................................................................................6

*White v. Regester,*
   412 U.S. 755 (1973)..............................................................................24

*Yazzie v. Hobbs,*
   977 F.3d 964 (9th Cir. 2020) (per curiam)........................................8

*Zimmerman v. City of Austin*,
     881 F.3d 378 (5th Cir. 2018) ............................................................................................6

**Statutes**

52 U.S.C.
     § 10301(a) ...................................................................................................................9, 11
     § 10301(b) ................................................................................................................ 10, 15
     § 10303(f)(2) .................................................................................................................11

**Other Authorities**

Tex. Const. art. III § 26...........................................................................................................22

Tex. Const. art. III, § 40..........................................................................................................18

Fed. R. Civ. P. 12(b)(6)...........................................................................................................14

Fed. R. Civ. P. 12(e)......................................................................................................... 14, 24

Fed. R. Civ. P. 12(f) ................................................................................................................12

Fed. R. Evid. 201(b)(2)............................................................................................................13

United States Census Bureau, *2020 Census Statistics* (Aug. 12, 2021), https://www.
     census.gov/newsroom/press-releases/2021/population-changes-nations-
     diversity.htm...................................................................................................................18

## INTRODUCTION

MALC's complaint is one of seven redistricting lawsuits consolidated before this three-judge panel. It is deficient from top to bottom. MALC challenges the House, Congressional, and State Board of Education ("SBOE") maps with four claims: vote dilution under Section 2 of the Voting Rights Act, intentional discrimination and racial gerrymandering under the Fourteenth Amendment, and malapportionment under one person, one vote. None of them plausibly raise a right to relief.

MALC's Section 2 pleadings are deficient because they do not include specific facts that, if proven, would satisfy the three *Gingles* preconditions for any of the districts MALC challenges. To the contrary, it must do so for *every* district it seeks to challenge.

The intentional vote dilution and racial gerrymandering claims fare no better. Nothing in the complaint suggests that the House, Congressional, and SBOE maps were passed *because of* ethnicity in violation of the Fourteenth Amendment. MALC effectively asks the Court to infer invidious racial discrimination, despite the strong presumption of legislative good faith, from two unremarkable facts: (1) a compressed legislative timeline due to the delay in receiving the census data, and (2) legislators' sensitivity to racial considerations mandated by the VRA. That is implausible.

And MALC's malapportionment claim is nothing more than an unadorned legal conclusion. MALC observes that the maximum population deviation in the House map is 9.98%, and concludes, without more, that the plan violates one person, one vote. To the contrary, deviations under 10% are presumed constitutional, and MALC's cursory assertions do not rebut that presumption.

Moreover, even if MALC had stated a claim for which relief could be granted, which it has not, its complaint contains several jurisdictional defects. As an initial matter, MALC sues the State of Texas, but no exception to state sovereign immunity applies. In addition, MALC fails to establish Article III standing. It lists members, but fails to allege that they are registered voters, let alone that they intend to vote in future elections. No other bases for standing apply.

### STANDARD

A plaintiff must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### ARGUMENT

### I.   This Court Lacks Jurisdiction Over MALC's Claims

### A.   MALC Has Not Plausibly Alleged Standing

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). At the pleading stage, Plaintiffs must "clearly . . . allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016) (quotation omitted). These elements are: (1) an actual or imminent, concrete and particularized injury-in-fact; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

MALC fails to demonstrate the basis of its standing to bring this lawsuit. An entity like MALC "can establish the first standing element, injury-in-fact, under two theories: 'associational standing' or 'organizational standing.'" *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020). MALC generally alleges organizational interests, ECF 1 ¶ 1, but never connects them to a concrete injury. Likewise, it lists association members, *id.* at ¶ 2, but never specifies facts demonstrating that they have concrete injuries. MALC's failure to specify the basis of its standing is sufficient by itself to

warrant dismissal. *Lujan*, 504 U.S. at 561 ("The party invoking federal jurisdiction bears the burden of establishing these elements."). But even if it were not, both standing arguments fail on the merits.

### 1.   MALC Lacks Organizational Standing

To establish organizational standing, a plaintiff must establish, in its own right, injury in fact, causation, and redressability. *See Tenth St. Residential Ass'n*, 968 F.3d at 500. MALC alleges several facts that appear to be designed to support organizational standing. Specifically, it alleges that its "mission includes maintaining and expanding Latino representation across elected offices in Texas" and raising "the level of Latino engagement in Texas government and politics through policy, education, outreach, organizing, and advocacy." ECF 1 ¶ 1. MALC says that, as a result of Texas's new electoral districts, its members will be less able to "successfully gain election," and will "face increased difficulty advocating for their legislative platforms." *Id.* It alleges that it will "have to expend resource, including paid staff time to counteract" the reduction in representation. *Id.*

As an initial matter, if MALC asserts organizational standing, its alleged injury is speculative. MALC expresses concern that its members will be less likely to be elected to public office under the new maps, but "subjective fear . . . does not give rise to standing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013). It alleges their members "ability" to win elections may be "hindered," ECF 1 ¶ 1, but that concern is neither "imminent" nor "certainly impending." *Clapper*, 568 U.S. at 409.

But even if MALC's organizational injury is impending, it still is not cognizable. MALC makes the mistake of confusing injury to its *activities*, which supports standing, and injury to its *objectives*, which does not. An entity-plaintiff has standing where it shows "concrete and demonstrable injury to the organization's activities." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Conflict between a challenged law and the plaintiff's mission or general disagreement with its objectives is not enough. *See ACORN v. Fowler*, 178 F.3d 350, 362 n.7 (5th Cir. 1999) ("[T]hat an organization's mission is in direct conflict with a defendant's conduct is insufficient, in and of itself, to confer standing on the

organization."). Restated: "Frustration of an organization's objectives is the type of abstract concern that does not impart standing." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)).

Here, MALC fails to identify any activities that are actually impaired by the implementation of the State's new electoral maps. Like before, it is free to reach out to members of the public, educate them of its views on various issues, advocate on behalf of those issues, and try to organize support for them. Nor do the new maps impose any burdens on running for elected office generally. MALC alleges no facts to contrary. Rather, its primary complaint is that its members might be less likely to *win* elections. Even assuming that concern is "actually impending," it goes to MALC's general political objectives, not its activities. That is an "abstract social interest" and therefore "cannot confer Article III standing." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014). Indeed, a general interest in the makeup of the legislature is a quintessential generalized grievance. *See Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (A "citizen's interest in the overall composition of the legislature is embodied in his right to vote for his representative. And the citizen's abstract interest in policies adopted by the legislature on the facts here is a nonjusticiable 'general interest common to all members of the public.'") (quoting *Ex parte Levitt*, 302 U.S. 633, 634 (1937) (per curiam)).

Moreover, it is unclear how MALC's organizational interests have any connection at all to the configuration of the Congressional and SBOE districts. MALC does not allege that its membership includes those bodies, or that it engages in any activities related to Congressional and SBOE elections. It necessarily lacks organization standing to challenge the latter two maps because it fails to allege any related organizational interest, let alone a cognizable interest that has been injured.

Nor can MALC salvage organizational standing with its claim that it will be forced to "expend resource" to "counteract" potential electoral losses. ECF 1 ¶ 1. Although the diversion of resources can constitute a requisite injury under certain circumstances, "[n]ot every diversion of resources to

counteract [a] defendant's conduct . . . establishes an injury in fact." *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010). Rather, the "change in plans must still be in response to a reasonably certain injury imposed by the challenged law." *Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018); *see also La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (explaining that a diversion of resources is cognizable only if the plaintiff "would have suffered some other injury if it had not diverted resources to counteracting the problem").

MALC cannot establish standing based on a diversion-of-resources theory because it does not have a cognizable underlying injury. It complains that it will be required to expend resources because its members may lose elections. But, as explained above, a candidate's electoral success is an objective, not an activity, and "is insufficient, in and of itself, to confer standing." *ACORN*, 178 F.3d at 362 n.7.

## 2.    MALC Also Lacks Associational Standing

MALC cannot establish associational standing in the alternative. Although "an association may have standing solely as the representative of its members," this doctrine "does not eliminate or attenuate the constitutional requirement of a case or controversy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Accordingly, courts apply a three-part test: "(a) [the association's] members would otherwise have standing to sue in their own right; (b) the interests [the association] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). At issue here is the first requirement, that individual members have an injury in fact.

"Foremost among [the Article III standing] requirements is injury in fact." *Gill*, 138 S. Ct. at 1929. But MALC has failed to "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see also City of Kyle*, 626 F.3d at 237 (requiring an injury to "a specific member"). When a plaintiff fails to identify specific members with concrete injuries, associational-standing claims must be dismissed. *See, e.g., Disability Rights Wis., Inc. v. Walworth Cnty. Bd.*

*of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008) (dismissing claim for lack of standing where entity plaintiff failed to identify a member who was affected by the disability policy); *see also Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J.).

MALC fails to identify specific members who have concrete injuries. Indeed, it is not even clear which injury its members purport to have. Two potential injuries are discernable. Neither is sufficiently pled.

### a.    MALC Fails to Plead a Voting Injury

First, MALC appears to allege a voting injury. That is, it appears to allege that some of its members reside in districts that are malapportioned, intentionally drawn according to race, or otherwise unlawfully composed, and that those members' right to vote is correspondingly injured. *See* ECF 1 ¶ 1 ("MALC has one or more members who reside in the challenged districts and who have had their ability to elect representatives of their choice injured on account of being Latino and/or being part of the Spanish-speaking community in the affected areas.").

There are several reasons why MALC fails to support this injury. Most prominently, it does not allege that any of its members are registered voters or even intend to vote in upcoming elections. *See* ECF 1 ¶ 2.a–q. Voting injuries, by definition, affect only those who vote. Such an injury "arises from the particular composition of the voter's own district, which causes his vote . . . to carry less weight than it would carry in another, hypothetical district." *Gill*, 138 S. Ct. at 1931. To demonstrate that a plaintiff could sustain a voting injury, he or she must both be a registered voter and intend to vote in the elections at issue. *See, e.g.*, *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 178 (5th Cir. 2020) (a plaintiff must be registered to vote); *Yazzie v. Hobbs*, 977 F.3d 964, 967 (9th Cir. 2020) (per curiam) (a plaintiff must intend to vote in future elections); *see also DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1302 (11th Cir. 2008) (per curiam).

Even if MALC had alleged that its members are voters, its complaint still would not satisfy

Article III. Where, as here, "plaintiffs' alleged harm is the dilution of their votes, that injury is district specific." *Gill*, 138 S. Ct. at 1930. Because any injury to a plaintiff "results from the boundaries of the particular district in which he resides," any remedy "lies in the revision of the boundaries of the individual's own district." *Id.* This is in keeping with Supreme Court precedent restricting standing to bring related redistricting claims. In a "racial gerrymandering" case, for example, a voter does not have Article III standing to challenge a map "in its entirety." *United States v. Hays*, 515 U.S. 737, 746 (1995). Establishing "individualized harm" requires showing that the "plaintiff resides in a racially gerrymandered district." *Id.* at 744–45. "On the other hand, where a plaintiff does not live in such a district, he or she does not" have standing, unless there is some other basis for concluding "that the plaintiff has personally been subjected to a racial classification." *Id.* at 745; *see also Sinkfield v. Kelley*, 531 U.S. 28, 30 (2000) (per curiam). For this reason, a "racial gerrymandering claim" proceeds "district-by-district," and not "as an undifferentiated 'whole.'" *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015); *accord Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 800 (2017).

MALC appears to challenge the State's House, Congressional, and SBOE maps as a whole. *See* ECF 1 ¶ 232 (alleging the "House Plan," "Congressional Plan," and "SBOE plan" discriminate against MALC); *id.* ¶¶ 235, 237 (similar). That is not permissible. Instead, even if MALC properly set forth the basis of its injury (and it didn't), any injury would be limited to the districts in which its members reside. *See id.* ¶ 2.a–q (listing districts).

### b.      MALC Fails to Plead a Candidate Injury

In line with MALC's attempt to assert a voting injury, its complaint is primarily concerned with the effect of the State's maps on individual voters. For instance, the causes of action are all framed as affecting *voters*, and not candidates. *E.g.*, *id.* ¶ 235 (alleging MALC members cannot "elect representatives of their choice"). But MALC also appears to allege a candidate injury on behalf of its members. That is, it appears to allege that the new House map places an unlawful burden on its

members' ability to win elections. ECF 1 ¶ 1 ("MALC members representing the challenged districts will have their ability to successfully gain election hindered if the Plans go into effect.").

However, the complaint mentions nothing about whether MALC's members intend to run for reelection at all. Assuming they *do* intend to run, the complaint fails to specify in which districts the members would run. These basic details are essential to determining if a plaintiff could actually be injured in a candidate capacity. And even if this injury existed, MALC would have standing only to challenge the House districts because its members do not seek election to Congress or the SBOE.

### B.     The State of Texas is Immune from MALC's Claims

State "sovereign immunity bars private suits against nonconsenting states in federal court." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). It also "prohibits suits against state officials or agencies that are effectively suits against a state." *Id.* For this reason, a court lacks jurisdiction over claims against such defendants unless sovereign immunity is "waived by the state, abrogated by Congress, or an exception applies." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 400–01 (5th Cir. 2020). MALC sues the State of Texas as "a political subdivision covered under the provisions of the Voting Rights Act and responsible for the actions of its officials with regard to state-wide redistricting." ECF 1 ¶ 3. But it fails to demonstrate an exception to state sovereign immunity.

MALC does not plead waiver or abrogation for its constitutional claims, Counts I, III, and IV. As such, the only exception to sovereign immunity that could apply here is *Ex parte Young*, which sometimes "allows injunctive or declaratory relief against a state official in her official capacity." *Mi Familia Vota v. Abbott*, 977 F.3d 461, 467 (5th Cir. 2020). However, *Ex parte Young* only applies where a plaintiff names "individual state officials as defendants in their official capacities." *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020) (en banc) (quoting *Raj v. LSU*, 714 F.3d 322, 328 (5th Cir. 2013)). In other words, "*Ex parte Young* applies to state officials but not to the states themselves." *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 5 F.4th 568, 577 (5th Cir. 2021). In fact, that

doctrine is expressly based on the "premise that a state official is 'not *the State* for sovereign-immunity purposes.'" *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 735 (5th Cir. 2020) (emphasis added) (quoting *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011)).

The *Ex parte Young* exception does not apply to the State of Texas. And MALC has not identified any other exception to sovereign immunity. As to Counts I, III, and IV, the State should be dismissed for lack of subject-matter jurisdiction. *See, e.g.*, *Corn v. Miss. Dep't of Pub. Safety*, 954 F.3d 268, 274 (5th Cir. 2020); *Block v. Tex. Bd. of Law Examiners*, 952 F.3d 613, 619 (5th Cir. 2020).[1]

## II.     MALC's Claims Fail on the Merits

Even assuming that the State of Texas is a proper defendant and that MALC has standing to bring its four claims, each claims fails on the merits. Each claim is addressed in turn.

### A.     The Court Should Dismiss MALC's Section 2 Effects Claim

MALC fails to allege facts satisfying the three preconditions for each of the districts it purports to challenge. Its Section 2 claim therefore fails on the merits.

#### 1.     The *Gingles* Test

Section 2 prohibits a "standard, practice, or procedure" from being "imposed or applied . . . in a manner which results in a denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a). To establish a violation of that provision, a plaintiff must show, "based on the totality of circumstances," that:

> [T]he political processes leading to nomination or election in the State or political
> subdivision are not equally open to participation by members of a class of citizens
> protected by subsection (a) in that its members have less opportunity than other
> members of the electorate to participate in the political process and to elect

---

[1] The State should also be dismissed as to Count II because the Voting Rights Act does not abrogate state sovereign immunity. The Fifth Circuit has held that it does, but that case was wrongly decided. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017) (citing *Mixon v. Ohio*, 193 F.3d 389, 398–99 (6th Cir. 1999)). Congress may abrogate state sovereign immunity only if it "makes its intention to abrogate unmistakably clear in the language of the statute." *Block*, 952 F.3d at 617 (quoting *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003)). But "Section 2 contains no express authorization enabling individuals to maintain such an action in federal court against a State." *Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 658 (11th Cir. 2020) (Branch, J., dissenting). Nothing in the statute's text or structure suggests otherwise. Although this argument is currently foreclosed by precedent, Defendants preserve it for appeal.

representatives of their choice.

*Id.* § 10301(b). A court can consider "[t]he extent to which members of a protected class have been elected to office in the State," but "nothing in [Section 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.* Under Supreme Court precedent interpreting this statute, plaintiffs must establish three "necessary preconditions":

> (1) The minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district;
>
> (2) The minority group must be able to show that it is politically cohesive; and
>
> (3) The minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 50–51; *see Growe v. Emison*, 507 U.S. 25, 39–41 (1993) (explaining that "the *Gingles* preconditions" are required in "a § 2 dilution challenge to a single-member districting scheme").

The Fifth Circuit "has interpreted the *Gingles* factors as a bright line test." *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852 (5th Cir. 1999); *accord Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 456 (N.D. Tex. 2010). "Failure to establish any one of these threshold requirements is fatal." *Harding v. Dallas County*, 948 F.3d 302, 308 (5th Cir. 2020) (quotation omitted). If a plaintiff can meet "the three prongs of *Gingles*," it must then "establish that the 'totality of the circumstances' supports a finding of vote dilution." *Id.* at 308–09.

Under *Gingles*, the Section 2 inquiry must be "district specific." 478 U.S. at 59 n.28. That is in keeping with the requirement that plaintiffs establish standing on a district-specific basis. *Supra* Part I.B.2.a. Those challenged districts appear to be as follows: House Districts (HD) 31, 32, 37, 38, 76, 77, 80, 90, 118, 145, and 148, Congressional Districts (CD) 6, 15, 23, 27, 29, and 33, and SBOE Districts 2, 3, and 4. *See* ECF 1 ¶¶ 87–169. However, those districts do not match up with the ones MALC alleges its members reside in or represent. *See* ECF 1 ¶ 2.a–q. Specifically, MALC attempts to challenge HD 32, 80, and 118, but does not allege that it has members who resides in those districts.

It therefore lacks standing to challenge those districts. MALC also alleges that it has members who reside in HD 34, 40, 74, 75, 78, 79, 103, 105, and 140, as well as CD 16 and 18, but it does not otherwise discuss them. Any purported claims as to those districts should be dismissed.

In any event, MALC must set forth specific facts for each of the challenged districts that, if proven, would satisfy the three *Gingles* preconditions. But, as explained below, it exclusively relies on generalizations and legal conclusions. These do not suffice.

### 2.     MALC Has Not Alleged Facts Required by *Gingles*

As an initial matter, at least some of MALC's allegations are irrelevant to the *Gingles* analysis. MALC goes to lengths to allege facts concerning the percentage of a district's CVAP that "speaks Spanish at home." *See* ECF 1 ¶¶ 98–100, 109, 114–16, 153–54, 157–59. Such figures do not support the Section 2 analysis. True, Section 2 applies to "language minority group[s]." 52 U.S.C. § 10303(f)(2); *see also id.* § 10301(a) (cross-referencing § 10303(f)(2)). But the VRA specifically defines that term to mean ethnicity. *See id.* § 10310(c)(3) ("The term 'language minorities' or 'language minority group' means persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage."). Courts have adhered to this definition. *See, e.g., LULAC v. Clements*, 999 F.2d 831, 863–64 (5th Cir. 1993) (en banc); *see also id.* at 894 (Jones, J., concurring) ("When [the VRA] was amended in 1975 to reach language minorities, the Act then identified four new covered groups: persons of Spanish heritage; all American Indians; 'Asian Americans,' including Chinese, Japanese, Korean and Filipino Americans; and Alaskan natives."). In keeping with this understanding, federal courts have consistently interpreted Section 2 as applying to Hispanics or Latinos, which of course is neither a race nor necessarily a language-speaking group, but rather an ethnicity. *See, e.g., Veasey v. Abbott*, 830 F.3d 216, 257–65 (5th Cir. 2016) (en banc) (applying Section 2 to Hispanic plaintiffs).

Much of MALC's complaint suggests that Section 2 applies to Spanish speakers *per se*. *See, e.g.*, ECF 1 at p. 25 (alleging that HD 31 "has been drawn to dilute the voting power of Latinos and *Spanish*

*language communities*") (emphasis added); *see also id.* ¶ 100 ("On information and belief, under Plan H2316, the most recent ACS data indicates that the percentage of the citizen voting age population that speaks Spanish at home in HD 31 would drop below a majority, to roughly 49% (-6).")." Those pleadings are immaterial because, according to its plain language, Section 2 does not apply on the basis of spoken language. They should therefore be stricken. Fed. R. Civ. P. 12(f) ("The court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter").

Another issue is MALC's general reliance on information-and-belief pleadings. Such "pleading form is recognized as little more than 'a lawyerly way of saying' that the plaintiff 'does not know that something is a fact but suspects it or has heard it.'" *Salermo v. Hughes Watters & Askanase LLP*, 516 F. Supp. 3d 696, 710 (S.D. Tex. 2021) (quoting *Donald J. Trump for President Inc. v. Pennsylvania*, 830 F. App'x 377, 387 (3d Cir. 2020) (Bibas, J.)) True, "information and belief pleadings are generally deemed permissible under the Federal Rules," but only if accompanied by specific factual support. *Johnson v. Johnson*, 385 F.3d 503, 531 n.19 (5th Cir. 2004). In other words, a plaintiff must support its information-and-belief pleadings with facts explaining the "basis upon which [the plaintiff] made [its] assertion." *Salermo*, 516 F. Supp. 3d at 710–11. MALC uses information-and-belief pleadings to try to establish several facts, including data related to the percentage of districts that speak Spanish at home. *See* ECF 1 ¶¶ 98, 100, 107, 109, 114, 116, 157–59. But MALC says nothing about the basis of its information and belief. Such allegations are purely speculative without the required factual support, and the Court should disregard them for purposes of the 12(b)(6) analysis.

On the merits, MALC fails to satisfy any of the *Gingles* preconditions, let alone all of them. To meet the first precondition, a plaintiff must establish that the minority group at issue is "sufficiently large and geographically compact to constitute a majority in a single member district." *Gingles*, 478 U.S. at 50. This test "relies on an objective, numerical test: Do minorities make up more than 50 percent of the voting-age population in the relevant geographic area?" *Bartlett v. Strickland*, 556 U.S. 1,

13, 18 (2009) (plurality op.); *see also Johnson v. De Grandy*, 512 U.S. 997, 1016 (1994) (refusing to equate vote "dilution" with "a failure to maximize" the "number of majority-minority districts").

MALC fails to identify the "relevant geographic area" where Hispanic voters constitute a majority of the citizen voting-age population. It generally alleges that "Latinos and Spanish speaking votes are sufficiently numerous and geographically compact" to form majorities in House, Congressional, and SBOE districts, but fails to specify where or how an additional or reconfigured district could be drawn. For instance, MALC alleges that an additional Latino House district could be drawn in Harris County, but it pleads no facts on the location of any compact Latino populations, and how an additional district could be drawn with a Latino majority. *See* ECF 1 ¶¶ 131–41. According to publicly available numbers subject to judicial notice, *see* Fed. R. Evid. 201(b)(2), there are twenty-four House districts in Harris County, so leaving Defendants to guess how the map should be altered is not enough.[2]

Instead, MALC falls back on the general growth of the Latino population. ECF 1 ¶ 133 ("Latinos accounted for 21.7% of the growth in Harris County over the last decade."). Population-growth statistics do not satisfy the first *Gingles* precondition, nor do they give Defendants the fair notice of the basis of MALC's claim. As to Harris County, MALC commits the same error with respect to the Congressional and SBOE districts. *Id.* ¶¶ 163–64 (Congressional); *id.* ¶¶ 167–69 (SBOE). Nor is this deficiency limited to Harris County. Rather, it is present throughout MALC's pleadings. *See, e.g.*, *id.* ¶¶ 142–45 (alleging that "additional Latino opportunity districts" can be "drawn in West Texas, Central Texas, and the Nueces County region," without specifying where or how).

MALC's pleadings are conclusory and thus insufficient to satisfy the first precondition. It is required to plead specific facts that, if proven, would demonstrate that Latino voters could "form a

---

[2] Plan Packet: H2316 at 50 of 63, https://data.capitol.texas.gov/dataset/71af633c-21bf-42cf-ad48 4fe95593a897/resource/e8a63cb9-001b-4b1f-a7f8-9106cce80706/download/planh2316_map_report_package.pdf (map showing HDs 126–135 and HDs 137–150 in Harris County).

majority of the voters in some single-member district." *Hall v. Virginia*, 385 F.3d 421, 429–30 (4th Cir. 2004) (affirming dismissal under Rule 12(b)(6)). It has not. This claim should be dismissed, or, at least, MALC should be required to provide "a more definite statement" because its allegation "is so vague or ambiguous that [Defendants] cannot reasonably prepare a response." Fed. R. Civ. P. 12(e).

The second *Gingles* precondition—political cohesion—"contemplates that a specified group of voters shares common beliefs, ideals, principles, agendas, concerns, and the like such that they generally unite behind or coalesce around particular candidates and issues." *LULAC v. Clements*, 986 F.2d 728, 744 (5th Cir. 1993). "In order to satisfy the political cohesiveness precondition, the plaintiff must show that a significant number of minority group members usually vote for the same candidate." *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 754 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris County*, 601 F. App'x 255 (5th Cir. 2015) (per curiam). And the third precondition, whether white-bloc voting usually defeats Latino voters' candidate of choice, is also based on a "district specific" inquiry. *Gingles*, 478 U.S. at 59 n.28. It requires the plaintiff to allege specific facts regarding relevant election results. *See LULAC v. Abbott*, 369 F. Supp. 3d 768, 785 (W.D. Tex. 2019) (granting a motion to dismiss based on the third precondition), *aff'd*, 951 F.3d 311 (5th Cir. 2020) (Smith, J.).

MALC's pleadings are even more conclusory with respect to the second and third *Gingles* preconditions. Rather than set forth district-specific allegations on Latino and Anglo voting patterns and electoral results, MALC addresses these subjects in gross. *See* ECF 1 ¶ 170 ("On information and belief, voting is polarized between Anglo and Latino voters at levels which are statistically significant in the regions described in paragraphs 86-169 above"); *id.* ¶ 172 ("Anglo bloc voting in the regions detailed in paragraphs 86-169 above is sufficient to prevent cohesive Latino and/or Spanish language voters from having an equal opportunity to elect the candidates of their choice in those regions under the adopted Plans."). Those are legal conclusions, not specific facts. Without the latter, MALC's claim

14

necessarily fails the second and third preconditions.[3]

### 3.    MALC's Challenges Also Fail As Applied to Specific Districts

The general failure to satisfy the *Gingles* preconditions aside, MALC's Section 2 claim fails as applied to the district-specific challenges. As to HD 76, MALC complains that the new plan "removes HD 76 from El Paso and moves it to Fort Bend County." ECF 1 ¶ 89. But Section 2 does not ask whether a district with a particular number has the same demographic profile as a previous district with the same number. Rather, it focuses on the ability of identified voters "to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). MALC does not allege that any voter previously or currently within HD 76 has suffered vote dilution. In El Paso County, every voter lives in a district with a majority Hispanic CVAP, and MALC does not allege otherwise.[4] Nor does MALC assert that Fort Bend County could have had a district with majority Hispanic CVAP, much less plausibly allege facts establishing a Section 2 violation.

As to HD 118, MALC complains that HCVAP percentage was reduced. ECF 1 ¶¶ 126–30. But again, MALC does not allege that HD 118 satisfies the *Gingles* requirements. Under the new map, HD 118 still has a majority Hispanic CVAP: 56.4%. MALC concedes as much. *Id.* ¶ 128. It provides no reason to think that white voters, who constitute only 35.5% of HD 118, could or would vote as a bloc to defeat Latino voters' preferred candidates. The same is true as to HD 31 and 37 (66.6% and 77.8% HCVAP), *id.* ¶¶ 96–102, 103–11, as well as CD 23 and 15 (73.8% and 57.8% HCVAP).[5]

---

[3] In addition, MALC's Section 2 claim should be dismissed because that provision "does not apply to redistricting." *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018) (Thomas, J. concurring); *see also Ala. Legislative Black Caucus*, 575 U.S. at 294–98 (Thomas, J., dissenting); *Bartlett v. Strickland*, 556 U.S. 1, 26 (2009) (Thomas, J., concurring in the judgment); *Holder v. Hall*, 512 U.S. 874, 892–93 (1994) (Thomas, J., concurring in the judgment). Although this argument is currently foreclosed by precedent, Defendants preserve it for appeal.

[4] Plan Packet: H2316 at 35 of 63, https://data.capitol.texas.gov/dataset/71af633c-21bf-42cf-ad48-4fe95593a8 97/resource/e8a63cb9-001b-4b1f-a7f8-9106cce80706/download/planh2316_map_report_package.pdf (HD 74–75 and HD 77–79 with rounded HCVAPs of 77%, 90%, 86%, 66%, and 75%).

[5] Plan Packet: C2193 at 16 of 48, https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/54155a32-537f-4425-a951-923457c5ffce/download/planc2193_map_report_package.pdf.

Nor can MALC state a clam by contending that the new districts "severely retrogress[] Latino and the Spanish language community's voting power" in HD 80 or other districts. *Id.* p. 27. That argument fails on its face because "[r]etrogression is not the inquiry in § 2 dilution cases." *Holder v. Hall*, 512 U.S. 874, 884 (1994). Indeed, federal courts correctly "refuse to equate a § 2 vote dilution inquiry with the § 5 retrogression standard." *Georgia v. Ashcroft*, 539 U.S. 461, 478 (2003). Alleged retrogression therefore does not support Plaintiffs' Section 2 claim. These and other similar allegations should be stricken as immaterial or disregarded. ECF 1 ¶¶ 54, 117–18 (retrogression); *id.* ¶¶ 122, 136 (weakened voting strength); *id.* ¶ 32 (diminished voting strength).

With respect to the challenged Harris County districts—HD 145 and 148, CD 29, and SBOE District 4—they fail for the simple reason that MALC fails to support its claim with sufficient facts. *See* ECF 1 ¶¶ 131–41 (House); *id.* ¶¶ 163–64 (Congressional); *id.* ¶¶ 167–69 (SBOE). MALC says that additional Latino opportunity districts can generally be drawn in Harris County, but includes no allegations that put Defendants on notice as to specifically where it claims those districts can be drawn. Harris County is a large, populous, and diverse area. Simply alleging that districts should be drawn in the county is insufficient. And insofar as MALC claims that an additional district can be drawn, it must allege facts demonstrating that the amended districts would still be sufficiently populous to perform as an opportunity districts.

Among other deficiencies, MALC necessarily fails to identify the "relevant geographic area" as required by the first *Gingles* precondition. *Bartlett*, 556 U.S. at 18. MALC's claims with respect to the Dallas/Fort Worth area, and to West and Central Texas generally fail for the same reason: MALC claims that additional Latino districts can be drawn in that area, but fails to specify where and how. *See* ECF 1 ¶¶ 142–45 (HD 32); *id.* ¶¶ 156–60 (CD 15 and CD 27); *id.* ¶¶ 161–62 (CD 6 and 33). These cursory allegations do not give Defendants the fair notice to which they are entitled.

With respect to SBOE Districts 2 and 3, MALC explains neither the basis of its claim nor the

relief it seeks. *See id.* ¶¶ 165–66. MALC generally alleges those districts are "severely diluted," but then undermines that claim by contending that they still perform as "existing Latino opportunity districts." As relief, MALC wants the districts to be reformed to make them "more geographically compact" and better able to "provid[e] representation for Latinos in Central Texas." *Id.* at p. 37. It is unclear how these allegations fit into the well-established Section 2 framework. Conspicuously absent are the basic facts required to satisfy the *Gingles* preconditions—minority population and location, minority voting cohesion, majority bloc voting. This claim should be dismissed. At the very least, MALC should be required to provide a more definite statement because this basis of this claim is unclear.

### B.   The Court Should Dismiss MALC's Intentional Discrimination Claim

#### 1.   MALC Has Not Plausibly Alleged Discriminatory Effect

As explained below, *see* Part II.B.2, MALC has not plausibly alleged discriminatory intent. But even if it had, its intentional discrimination claim would still need to be dismissed because MALC has not plausibly alleged discriminatory *effect*, as demonstrated above. *See* Part II.A.1. That MALC must establish discriminatory effect follows from "a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). "[N]o case in [the Supreme] Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Courts routinely require discriminatory effect in intentional-discrimination redistricting cases. *See, e.g.*, *Shaw*, 509 U.S. at 641 ("a discriminatory purpose and have the effect of diluting minority voting strength"); *Rodriguez*, 964 F. Supp. 2d at 800 ("purpose and operative effect"); *LULAC v. NE Ind. Sch. Dist.*, 903 F. Supp. 1071, 1093 (W.D. Tex. 1995) ("intentional discrimination" and "a resultant discriminatory effect").

#### 2.   MALC Has Not Plausibly Alleged Discriminatory Intent

In redistricting cases, "the good faith of a state legislature must be presumed." *Miller v. Johnson*,

515 U.S. 900, 915 (1995). It is "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). The required intent is not mere "volition" or "awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). It requires that the Legislature have passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* Nor is it sufficient that there is a loose correlative relationship between party affiliation and some racial minorities. *See Brnovich v. Democratic National Committee*, 141 S. Ct. 2321, 2349 (2021). (explaining that "partisan motives are not the same as racial motives").

MALC points to several circumstances of the Congressional map's passage. None plausibly allege discriminatory intent. First, MALC generally complains that the process was "truncated." ECF 1 p. 12; *see id.* ¶¶ 29–65. Although "[d]epartures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role" in government decisionmaking, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977), they raise no inference of "invidious discrimination" when there is an "obvious alternative explanation." *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567). Here, the obvious reason why the redistricting process was shorter than normal is that the Legislature had far less time than normal. Due to the pandemic, the Census Bureau did not publish its final data until more than ten weeks after the Legislature's regular session ended.[6]

This is not a regular phenomenon. Indeed, the Census has always been published either before the regular session immediately following the census year, or during the session. In other words, the census data has *never* been delayed as much as it was this redistricting cycle. As a result, the Legislature had to redistrict during a special session, which is constitutionally limited to thirty days. Tex. Const. art. III, § 40. This would naturally require the Legislature to alter standard legislative procedures, like

---

[6] The 87th Regular Session ended on May 31, 2021. The Census Bureau delivered redistricting data to the States on August 12, 2021. *See* United States Census Bureau, *2020 Census Statistics* (Aug. 12, 2021), https://www.census.gov/newsroom/press-releases/2021/population-changes-nations-diversity.html.

by conducting fewer hearings, ECF 1 ¶ 34, giving shorter notice for witness testimony, *id.* ¶ 45, considering less amendments, *id.* ¶ 50, and working late hours, *id.* ¶ 59. These are ordinary trademarks of a compressed legislative schedule, not evidence of discriminatory intent.

Relatedly, MALC protests that the Legislature held redistricting hearings before the census data was released. *Id.* ¶¶ 24–28. It's unclear how that fact supports MALC's theory that the redistricting process was rushed. To the contrary, it shows that the Legislature spent *more* time considering its actions, not less. MALC also complains that hearings without the census data are *per se* meaningless, but it undercuts itself by observing that there was robust public participation in the pre-data hearings, including hundreds of individuals who testified or submitted written statements. *Id.* ¶¶ 26–27.

MALC further alleges that the House granted the Senate's request for a conference committee while in recess, and that the conference committee exceeded the scope of its authority. *See id.* ¶¶ 59–65. As a preliminary matter, MALC concedes that the House acted lawfully in granting the conference-committee request, and that the House parliamentarian overruled the point of order with respect to the conference committee's authority. *Id.* ¶¶ 60, 64. Moreover, MALC pleads no facts that connect this perceived irregularity with discriminatory intent. And so even assuming the process at issue was irregular, it does not support MALC's claim because nothing discriminatory came of it.

MALC's complaints with respect to the passage of the House map are much the same. *See id.* ¶¶ 66–81. Its primary criticism is that the process was improperly "swift." *Id.* ¶ 66; *see also id.* ¶ 67 (shortened time for members to consider the plan); *id.* ¶ 73 (less hearings); *id.* ¶ 75 (limited debate). But again, the clear reason why the process had to be undertaken promptly is that the pandemic forced the Legislature into a compressed timeline.

In addition, MALC alleges "on information and belief," that legislators "representing minority opportunity districts" were coerced into voting for the plan on threat of their districts being affected. *Id.* ¶ 80. MALC includes similarly unsupported allegations that minority members were not allowed

19

to ask questions on the plan. *Id.* ¶ 75. As explained above, information-and-belief pleadings should not be credited unless they are supported with factual allegations that explain the basis of the belief. *See Salermo*, 516 F. Supp. 3d at 710–11. Without more, these are "unadorned" conclusions, *Iqbal*, 556 U.S. at 678, and the Court need not, and should not, accept them as true.

Further, even if members of the legislative majority *did* persuade minority members to support the new electoral districts, that still would not demonstrate invidious, discriminatory motive. On the contrary, it would demonstrate (1) that the legislative majority was motivated by a desire to pass what it understood to be an important bill, and (2) that the minority member was motivated by self-interest. That is quintessential legislative maneuvering, not evidence of intentional discrimination.

MALC's complaints as to the passage of the SBOE map are the "same" as those with respect to the other maps. ECF 1 p. 22. At a minimum, these complaints are unavailing for the same reasons as those explained above. In addition, MALC's failure to specifically address the passage of the SBOE maps further confirms this claim's insufficiency. The SBOE map is different than the Congressional and House maps, involves different interests, and its passage required independent legislative action. The fact that MALC thinks its allegations are uniformly applicable in the "same" way demonstrates that those allegations are not tied to the purpose behind *any* of the maps. On the contrary, to plead this type of claim, the plaintiff must allege specific facts as to each legislative act that rebut the strong "presumption of legislative good faith." *Abbott*, 138 S. Ct. at 2325. MALC has not done so.

*     *     *

In the end, MALC's intentional-discrimination allegations reduce to three complaints: that the legislative process was rushed, that there were some allegedly unusual but concededly legal procedural differences, and that minority members were mysteriously threatened by majority members. In short, the compressed schedule and procedural alterations are clearly explained by the accelerated deadlines caused by the Census Bureau's late delivery of the census data. And MALC's unsupported accusations

20

concerning minority members are just that: unsupported. These complaints fall well short of rebutting the presumption of good faith afforded to state legislatures. *Miller*, 515 U.S. at 915. Nothing in MALC's complaint would be sufficient to bear its burden to prove that the Legislature acted "because of" the "adverse effects" the plans would have on Latinos. *Pers. Adm'r of Mass.*, 442 U.S. at 279.

### C.     The Court Should Dismiss MALC's Racial Gerrymandering Claim

"A racial gerrymandering claim is 'analytically distinct' from an intentional vote dilution claim." *Harding v. Dallas County*, 948 F.3d 302, 312 (5th Cir. 2020) (quoting *Shaw v. Reno*, 509 U.S. 630, 652 (1993)). It seeks to establish that "that race was improperly used in the drawing of the boundaries of one or more specific electoral districts." *Ala. Legislative Black Caucus*, 575 U.S. at 263. For a defendant to be liable on this basis, "race must have been 'the predominant factor motivating' the redistricting process and 'subordinat[ing] traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests[.]'" *Harding*, 948 F.3d at 313 (quoting *Miller*, 515 U.S. at 911).

As with an intentional vote-dilution claim, the awareness and use of racial demographics and statistics do not by themselves show discriminatory purpose. *See Miller*, 515 U.S. at 916 ("Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process."). Instead, as before, the plaintiff is required to demonstrate that the Legislature, in designing the particular district at issue, "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group." *Id.* (quoting *Feeney*, 442 U.S. at 279).

This claim fails on its face because it addresses the House, Congressional, and SBOE maps in gross, failing to specify individual districts and plead facts that, if proven, would show that those districts are racial gerrymanders. MALC alleges this claim only in general terms. *See* ECF 1 ¶ 218 ("every Latino opportunity district" in West Texas is racially gerrymandered); *id.* ¶ 238 (the Legislature

acted on the basis of race "in numerous instances"). That is insufficient because, as explained above, a "racial gerrymandering claim" proceeds "district-by-district," and not "as an undifferentiated 'whole.'" *Ala. Legislative Black Caucus*, 575 U.S. at 262. MALC cannot bring a racial gerrymandering claims without specifying the districts it seeks to challenge.

Nor is any of MALC's purported evidence directed at specific districts. MALC complains that the House map violates the County Line Rule, *see* ECF 1 ¶ 216; Tex. Const. art. III § 26, but it cannot bring this claim because the *Ex parte Young* exception to sovereign immunity does not apply to state-law claims brought in federal court. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121–23 (1984). It also protests that the allocation of prisoners in the district where they are incarcerated is unlawful, ECF 1 ¶ 218, but Defendants have explained at length elsewhere why locating prisoners in the district where they are incarcerated for purposes of reapportionment is lawful, and in fact the method chosen by the vast majority of the States. *See* ECF 44 at 6–9.

MALC complains that proposed amendments were accepted for Anglo-majority districts, but not for Latino districts, alleging that "concerns about splitting minority communities were ignored." ECF 1 ¶ 216. But MALC does not allege that any of these circumstances actually resulted in a specific racial gerrymander. And even if it did, none of the above plausibly raises an inference of discrimination because it fail to rebut the "obvious alternative explanation" that the Legislature acted in partisan interest. *Twombly*, 550 U.S. at 567. At the very least, denying amendments offered by party opponents is equally consistent with partisan intent, but "partisan motives are not the same as racial motives." *Brnovich*, 141 S. Ct. at 2349. The Supreme Court stresses that it is improper to "infer . . . purposeful, invidious discrimination" in the face of likely alternatives. *See Iqbal*, 556 U.S. at 682.

MALC makes much of the fact that Chairman Hunter referred to race in several instances during discussion of the electoral maps. ECF 1 ¶¶ 222–24. As an initial matter, the Supreme Court is clear that mere awareness of racial considerations is not enough to infer invidious discrimination.

*Miller*, 515 U.S. at 916. But even if the comments MALC quotes are relevant, they cut *against* its claim. The only thing they demonstrate is that Chairman Hunter wanted to ensure the plans complied with the VRA and provided sufficient minority-opportunity districts. This does not rebut the presumption of legislative good faith, nor is it directed at any specific districts.

The closest MALC comes to specifying districts is to allege that "[t]he shapes and interplay of Congressional Districts 6 and 33 are also inexplicable except on the grounds of race." ECF 1 ¶ 229. That is a legal conclusion, not a factual allegation. It cannot support this claim.

### D.     The Court Should Dismiss MALC's Malapportionment Claim

After fifty-two pages with no mention of malapportionment, MALC tacks-on an abbreviated one person, one vote claim. *See* ECF 1 ¶¶ 239–41. It should also be dismissed.

MALC observes that the House map includes a total deviation of 9.98%, and concludes that the Defendants "achieved this deviation by dramatically over-populating Latino majority districts and dramatically under-populating surrounding Anglo majority districts." *Id.* ¶ 241. It contends that HDs 76 and 77 are examples, and concludes without elaboration that there "is no legal justification for maintaining a deviation of 9.98%." *Id.*

The Supreme Court recently explained that "when drawing state and local legislative districts, jurisdictions are permitted to deviate somewhat from perfect population equality to accommodate traditional districting objectives, among them, preserving the integrity of political subdivisions, maintaining communities of interest, and creating geographic compactness." *Evenwel v. Abbott*, 136 S. Ct. 1120, 1124 (2016). And "[w]here the maximum population deviation between the largest and smallest district is less than 10%, the [Supreme] Court has held, a state or local legislative map presumptively complies with the one-person, one-vote rule." *Id.*

This rule of presumptive constitutionality means a plaintiff's claim of an unconstitutional deviation below 10% is "insufficient to make out a prima facie case of invidious discrimination under

the Fourteenth Amendment so as to require justification by the State." *Voinovich v. Quilter*, 507 U.S. 146, 161 (1993). MALC cannot "establish a violation of the Equal Protection Clause from population variations [below 10%] alone." *White v. Regester*, 412 U.S. 755, 764 (1973). Because the Supreme Court "ha[s] refused to require States to justify deviations of 9.9%" or smaller, "attacks on deviations under 10% will succeed only rarely, in unusual cases." *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253 (2016). Claims necessarily fail when "they identify no facts or law supporting an argument that the presumption was rebutted (or even rebuttable)." *Baca v. Berry*, 806 F.3d 1262, 1276 (10th Cir. 2015).

What MALC means by its claim that the House districts are "dramatically" overpopulated and underpopulated is far from clear. Defendants assume that MALC does not mean to assert that districts that contain a Latino majority are disproportionately overpopulated statewide. In fact, data from the Texas Legislative Council reflects that half the districts with majority Hispanic CVAP have less than the ideal number of voters, and the other half have more.[7] Defendants do not understand MALC to be disputing the accuracy of these numbers. To the extent MALC disputes the numbers, it would still need to allege which districts they contend are underpopulated or overpopulated and which districts they contend are "Latino majority districts" or "Anglo majority districts." ECF 1 ¶ 241. Listing HDs 76 and 77 as "example[s]" does not suffice." *Id.* MALC has not carried its burden of plausibly alleging a violation and should, at least, be required to provide a more definite statement. Fed. R. Civ. P. 12(e).

MALC also asserts that "[t]here is no legal justification for maintaining a deviation of 9.98%." ECF 1 ¶ 241. This is not a factual allegation taken as true at the pleading stage. It is a "conclusory" legal assertion "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. It adds nothing, except to suggest that Defendants bear the burden of "justif[ying]" the alleged deviation, but as explained above, the burden is on Plaintiffs. Instead, MALC bears the burden of overcoming the presumption of

---

[7] Plan Packet: H2316 at 33–37 of 63 (15 Districts: HDs 31, 34–42, 80–81, 104, 140, 145). *Id.* (15 Districts: HDs 43, 74–75, 77–79, 116–19, 123–25, 143–44).

constitutionality for deviations smaller than 10%, and bald assertions, with nothing more, do not suffice.

<h3 align="center">CONCLUSION</h3>

Defendants respectfully request that the Court dismiss MALC's claims and strike any pleadings that are redundant, immaterial, impertinent, or scandalous. In the alternative, Defendants move the Court to require a more definite statement in which MALC specifically identifies each district it intends to challenge under each of their legal theories, and the specific bases of those challenges.

Date: December 7, 2021                    Respectfully submitted.

KEN PAXTON                                /s/ Patrick K. Sweeten
Attorney General of Texas                 PATRICK K. SWEETEN
                                          Deputy Attorney General for Special Litigation
BRENT WEBSTER                             patrick.sweeten@oag.texas.gov
First Assistant Attorney General          Tex. State Bar No. 00798537

                                          WILLIAM T. THOMPSON
OFFICE OF THE ATTORNEY GENERAL            Deputy Chief, Special Litigation Unit
P.O. Box 12548 (MC-009)                   will.thompson@oag.texas.gov
Austin, Texas 78711-2548                  Tex. State Bar No. 24088531
Tel.: (512) 463-2100
Fax: (512) 457-4410                       **COUNSEL FOR DEFENDANTS**

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on December 7, 2021, and that all counsel of record were served by CM/ECF.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN