**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | § § § | |
| *Plaintiffs,* | § | Case No. 3:21-cv-00259 |
| v. | § § | [Lead Case] |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § | |
| TEXAS STATE CONFERENCE OF THE NAACP, | § § § | |
| *Plaintiff,* | § | |
| v. | § § | Case No. 1:21-cv-01006 |
| | § | [Consolidated Case] |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § | |

**DEFENDANTS' MOTION TO DISMISS NAACP'S COMPLAINT**

### TABLE OF CONTENTS

Table of Contents ......................................................................................................................ii

Table of Authorities................................................................................................................iii

Introduction...............................................................................................................................1

Standard.......................................................................................................................................1

Argument ....................................................................................................................................2

    I.   The Court Does Not Have Jurisdiction to Hear NAACP's Claims ............................2

        A.  NAACP Lacks Associational Standing .........................................................2

        B.  NAACP Lacks Organizational Standing........................................................5

    II.  NAACP Has Not Plausibly Alleged a Discriminatory Effects Claim ......................7

        A.  The *Gingles* Test.................................................................................................7

        B.  Coalition Districts Fail the First *Gingles* Precondition................................8

        C.  NAACP Does Not Plausibly Allege That Black, Latino, and Asian Voters in the Challenged Districts Are Politically Cohesive ........................................13

        D.  NAACP Does Not Allege Facts Supporting the Third *Gingles* Precondition ...................14

        E.  Section 2 Does Not Give NAACP a Private Cause of Action............................15

    III. NAACP Has Not Alleged Facts Stating a Claim of Intentional Discrimination....................15

        A.  Lack of Discriminatory Effect Precludes Intentional-Discrimination Claims................15

        B.  NAACP Has Not Plausibly Alleged Discriminatory Intent................................16

        C.  NAACP Does Not Allege Facts Supporting a Racial Gerrymandering Claim ................18

Conclusion ...............................................................................................................................19

Certificate of Service..............................................................................................................20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) .................................................................................................. 16, 17

*Alabama Legislative Black Caucus v. Alabama,*
    575 U.S. 254 (2015) ....................................................................................................... 5, 18

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ......................................................................................... 1, 13, 15, 17

*Assn. for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation*
    *Ctr. Bd. of Trs.,*
    19 F.3d 241 (5th Cir. 1994) ................................................................................................. 6

*Assn. of Community Orgs. for Reform Now v. Fowler,*
    178 F.3d 350 (5th Cir. 1999) ............................................................................................... 6

*Bartlett v. Strickland,*
    556 U.S. 1 (2009) ...................................................................................................... *passim*

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ....................................................................................... 1, 13, 17, 18

*Benavidez v. Irving Independent Sch. Dist.,*
    690 F. Supp. 2d 451 (N.D. Tex. 2010) ............................................................................... 8

*Bethune-Hill v. Virginia State Bd. of Elections,*
    137 S. Ct. 788 (2017) ......................................................................................................... 5

*Brewer v. Ham,*
    876 F.2d 448 (5th Cir. 1989) ............................................................................................ 14

*Campos v. City of Baytown,*
    840 F.2d 1240 (5th Cir. 1988) ........................................................................ 10, 11, 12, 14

*Campos v. City of Baytown,*
    849 F.2d 943 (5th Cir. 1988) ............................................................................. 10, 11, 12

*Campos v. City of Houston,*
    113 F.3d 544 (5th Cir. 1997) .............................................................................................. 7

*Center for Biological Diversity v. EPA,*
    937 F.3d 533 (5th Cir. 2019) .............................................................................................. 2

*Chisom v. Roemer,*
    501 U.S. 380 (1991)................................................................................15

*City of Mobile v. Bolden,*
    446 U.S. 55 (1980)............................................................................ 16, 17

*Clapper v. Amnesty Intl. USA,*
    568 U.S. 398 (2013)..................................................................................6

*Conley v. Gibson,*
    355 U.S. 41 (1957)....................................................................................1

*DiMaio v. Democratic Natl. Cmte.,*
    520 F.3d 1299 (11th Cir. 2008) (per curiam)..........................................3

*Dippin' Dots, Inc. v. Mosey,*
    602 F. Supp. 2d 777 (N.D. Tex. 2009)...................................................12

*Disability Rights Wisconsin, Inc. v. Walworth County Bd. of Supervisors,*
    522 F.3d 796 (7th Cir. 2008)....................................................................3

*Draper v. Healey,*
    827 F.3d 1 (1st Cir. 2017).........................................................................3

*Faculty, Alumni, & Students Opposed to Racial Preferences v. New York Univ.,*
    11 F.4th 68 (2d Cir. 2021).........................................................................5

*FW/PBS, Inc. v. City of Dallas,*
    493 U.S. 215 (1990)..................................................................................2

*Gahagan v. U.S. Citizenship & Immig. Servs.,*
    911 F.3d 298 (5th Cir. 2018)...................................................................11

*Gallagher v. New York State Bd. of Elections,*
    496 F. Supp. 3d 842 (S.D.N.Y. 2020)......................................................3

*Galveston Open Govt. Project v. U.S. Dept. of Housing & Urban Development,*
    17 F. Supp. 3d 599 (S.D. Tex. 2014) .......................................................6

*Georgia Republican Party v. SEC,*
    888 F.3d 1198 (11th Cir. 2018) ................................................................3

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) ..................................................................2, 3, 4, 6

*Grove v. Emison,*
    507 U.S. 25 (1993)...............................................................................8, 14

*Hall v. Virginia,*
  385 F.3d 421 (4th Cir. 2004) ............................................................................................10

*Hancock County Bd. of Supervisors v. Ruhr,*
  487 F. Appx. 189 (5th Cir. 2012) .......................................................................................5

*Harding v. Dallas County,*
  948 F.3d 302 (5th Cir. 2020) ................................................................................. 8, 14, 18

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ...........................................................................................................6

*Hawkins v. Dept. of Housing & Urban Dev.,*
  16 F.4th 147 (5th Cir. 2021) .............................................................................................16

*Henderson v. Stalder,*
  287 F.3d 374 (5th Cir. 2002) .............................................................................................5

*Hunt v. Washington State Apple Advertising Commn.,*
  432 U.S. 333 (1977) ...........................................................................................................2

*Johnson v. De Grandy,*
  512 U.S. 997 (1994) .........................................................................................................10

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
  624 F.3d 1083 (9th Cir. 2010) ...........................................................................................5

*League of Women Voters of Michigan v. Johnson,*
  No. 2:17-cv-14148, 2018 WL 10483517 (E.D. Mich. May 16, 2018) ................................4

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ........................................................................................................2, 5

*LULAC v. Clements,*
  999 F.2d 831 (5th Cir. 1993) (en banc) ...........................................................................13

*LULAC v. Midland Independent Sch. Dist.,*
  812 F.2d 1494 (5th Cir.1987) ...........................................................................................10

*LULAC v. North East Independent Sch. Dist.,*
  903 F. Supp. 1071 (W.D. Tex. 1995) ...............................................................................15

*Marks v. United States,*
  430 U.S. 188 (1977) ...........................................................................................................9

*Miller v. Gammie,*
  335 F.3d 889 (9th Cir. 2003) (en banc) ..................................................................... 11, 12

*Miller v. Johnson,*
    515 U.S. 900 (1995) ............................................................................................ 16, 18

*NAACP v. City of Kyle,*
    626 F.3d 233 (5th Cir. 2010) ................................................................................ 2, 5

*Natl. Treasury Employees Union v. United States,*
    101 F.3d 1423 (D.C. Cir. 1996) .............................................................................. 6

*Nixon v. Kent County,*
    76 F.3d 1381 (6th Cir. 1996) ................................................................................ 11

*Northeast Ohio Coal. for the Homeless v. Husted,*
    831 F.3d 686 (6th Cir. 2016) ................................................................................ 11

*Palmer v. Thompson,*
    403 U.S. 217 (1971) ............................................................................................... 15

*Perry v. Perez,*
    565 U.S. 388 (2012) ............................................................................... 9, 12, 14, 17

*Personnel Admr. of Mass. v. Feeney,*
    442 U.S. 256 (1979) ........................................................................................ 16, 18

*Rodriguez v. Harris County,*
    964 F. Supp. 2d 686 (S.D. Tex. 2013) ................................................................. 15

*Rodriguez v. Pataki,*
    308 F. Supp. 2d 346 (S.D.N.Y. 2004), *aff'd*, 543 U.S. 997 (2004) ..................... 14

*Rollins v. Fort Bend Independent Sch. Dist.,*
    89 F.3d 1205 (5th Cir. 1996) ............................................................................... 14

*Shaw v. Reno,*
    509 U.S. 630 (1993) ........................................................................................ 15, 18

*Simon v. Eastern Kentucky Welfare Rights Org.,*
    426 U.S. 26 (1976) ................................................................................................. 6

*Sinkfield v. Kelley,*
    531 U.S. 28 (2000) (per curiam) ............................................................................ 4

*Spokeo, Inc. v. Robbins,*
    578 U.S. 330 (2016) ............................................................................................... 2

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ............................................................................................... 2

*Tenth St. Residential Assn. v. City of Dallas,*
  968 F.3d 492 (5th Cir. 2020) ............................................................................ 2

*Thornburg v. Gingles,*
  478 U.S. 30 (1986) ............................................................................ 7, 8, 13, 14

*Troy v. Samson Manufacturing Corp.,*
  758 F.3d 1322 (Fed. Cir. 2014) ...................................................................... 11

*Turner v. Arkansas,*
  784 F. Supp. 553 (E.D. Ark. 1991), *aff'd,* 504 U.S. 952 (1992) ...................... 15

*United States v. Brown,*
  494 F. Supp. 2d 440 (S.D. Miss. 2007), *aff'd,* 561 F.3d 420 (5th Cir. 2009) ...... 12

*United States v. Hays,*
  515 U.S. 737 (1995) ............................................................................................ 4

*United States v. O'Brien,*
  391 U.S. 367 (1968) .......................................................................................... 15

*Valdespino v. Alamo Heights Independent Sch. Dist.,*
  168 F.3d 848 (5th Cir. 1999) .................................................................... 8, 9, 14

*Veasey v. Abbott,*
  830 F.3d 216 (5th Cir. 2016) (en banc) ........................................................... 16

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,*
  429 U.S. 252 (1977) .......................................................................................... 17

*Warth v. Seldin,*
  422 U.S. 490 (1975) ............................................................................................ 2

*White v. Estelle,*
  720 F.2d 415 (5th Cir. 1983) ........................................................................... 11

*Yazzie v. Hobbs,*
  977 F.3d 964 (9th Cir. 2020) .............................................................................. 3

*Zimmerman v. City of Austin,*
  881 F.3d 378 (5th Cir. 2018) .............................................................................. 5

**Statutes**

13 U.S.C. § 141 .................................................................................................... 17

52 U.S.C. § 10301 .............................................................................................. 7, 9

**Constitutional authorities**

Texas Constitution art. III, § 40 ...............................................................................................17

**Other Authorities**

*The Bluebook: A Uniform System of Citation* (21st ed. 2020) ........................................................13

U.S. Census Bureau, *2020 Census Statistics* (Aug. 12, 2021),
     https://www.census.gov/newsroom/press-releases/2021/population-changes-
     nations-diversity.html ...........................................................................................................17

**INTRODUCTION**

At the core of NAACP's complaint is a novel legal theory: that a State is legally required to draw opportunity districts for "people of color," by which it means "all Texans other than white, non-Hispanic people[.]" ECF 1 ¶ 27. It creates an entirely new term to support its theory: people of color citizen voting age population, or "POC CVAP." This theory is inconsistent with the plain text of the Voting Rights Act and contrary to Supreme Court precedent. The Court should reject it.

NAACP's intentional-discrimination claims fail as well. NAACP has not plausibly alleged any facts rebutting the strong presumption of good faith, let alone supporting an inference of intentional discrimination. To the contrary, these facts, if proven, would merely demonstrate two unremarkable things. First, that the Legislature passed the new electoral maps under a compressed timeline due to the U.S. Census Bureau's delay in distributing the Census data. And second, that a partisan Legislature made decisions based on partisan preference.

But the Court need not confront those issues here because NAACP has not plausibly alleged standing. It has identified neither injured members nor a cognizable harm to the organization itself.

For each these reasons, the Court should dismiss NAACP's complaint.

**STANDARD**

A complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**ARGUMENT**

## I.      The Court Does Not Have Jurisdiction to Hear NAACP's Claims

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). At the pleading stage, plaintiffs must "clearly . . . allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016) (quotation omitted). These are: (1) an actual or imminent, concrete and particularized injury-in-fact; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

An entity like NAACP could establish injury-in-fact under two theories, associational standing or organizational standing. *Tenth St. Residential Assn. v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020). NAACP's allegations, however, support neither theory, and the complaint should be dismissed.

### A.  NAACP Lacks Associational Standing

NAACP has not plausibly alleged associational standing. Although "an association may have standing solely as the representative of its members," this doctrine "does not eliminate or attenuate the constitutional requirement of a case or controversy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Accordingly, courts apply a three-part test to determine if a plaintiff has associational standing: Would the association's members otherwise have standing to sue in their own right? If so, are the interests the association seeks to protect germane to its purpose? And, if so, do the claim asserted or the relief requested require an individual member's participation in the lawsuit? *Hunt v. Wash. St. Apple Adver. Commn.*, 432 U.S. 333, 343 (1977). NAACP's complaint fails the first and third questions.

First, NAACP does not allege that specific members of its organization have been injured such that they would independently have standing. *See Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019). "Foremost among [the Article III standing] requirements is injury in fact." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). But NAACP has failed to "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (requiring an injury to "a specific member"). Rather, it purports to sue in the name of its members generally: "Texas NAACP brings this action on behalf of its members,

2

including the thousands of Texas NAACP members who are registered voters who reside in state house, state senate, and congressional districts where their voting power will be reduced under the new plans." ECF 1 ¶ 21. That does not satisfy the basic requirement to notify the Defendants of whom the new electoral maps allegedly harmed.

When a complaint fails to identify specific members, associational-standing claims should be dismissed. *See, e.g.*, *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (dismissing claim where the only member identified failed to allege that he was injured by the challenged regulation); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2017) (Souter, J.) (dismissing claim of organization that did not specifically identify an injured member but "submitted an affidavit asserting that many of its members asked it to take legal action"); *Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008) (dismissing claim organization that did not allege that its standing was derived from any identified individual that had suffered the requisite harm).

Even if NAACP had identified specific members, it did not allege facts demonstrating that those members have been injured. Its claims rely on a vote-dilution theory, ECF 1 ¶ 21 ( "the voting power" of "its members" will be "reduced under the new plans"), but vote dilution, by definition, injures only those who vote. It "arises from the particular composition of the voter's own district, which causes his vote . . . to carry less weight than it would carry in another, hypothetical district." *Gill*, 138 S. Ct. at 1931.

NAACP alleges that these unnamed members are "registered voters," ECF 1 ¶ 21, but a plaintiff's allegation that he is "a registered voter" does not suffice. *DiMaio v. Democratic Natl. Cmte.*, 520 F.3d 1299, 1302 (11th Cir. 2008) (per curiam). Specifically, a "complaint undeniably fails the test for constitutional standing" when the plaintiff "never allege[s] that he actually voted, nor even so much as suggested that he intended to vote in," the election at issue. *Id.*; *see also Yazzie v. Hobbs*, 977 F.3d 964, 967 (9th Cir. 2020) (per curiam) (dismissing for lack of standing because "any allegation or showing as to, at a bare minimum, whether any of the plaintiffs intend to vote in this general election" was "missing"); *Gallagher v. N.Y. State Bd. of Elections*, 496 F. Supp. 3d 842, 850 (S.D.N.Y. 2020) (plaintiffs lacked standing to challenge a vote-by-mail deadline when none alleged an intent to vote by

mail). NAACP fails to establish that any of its members are injured because it fails to allege that they intend to vote in the coming elections.

Even if NAACP had plausibly alleged that its members intend to vote in the 2022 election, it would still lack standing because it does not specify where those members reside. Where, as here, "plaintiffs' alleged harm is the dilution of their votes, that injury is district specific." *Gill*, 138 S. Ct. at 1930. A plaintiff may assert a "right not to be placed in legislative districts deliberately designed to 'waste' their votes in elections where their chosen candidates will win in landslides (packing) or are destined to lose by closer margins (cracking)," but in either case, any injury to an individual voter "results from the boundaries of the particular district in which he resides." *Id.* Thus, any remedy "lies in the revision of the boundaries of the individual's own district." *Id.* NAACP itself faces the same restrictions. An entity plaintiff "may not step into the shoes of its members to bring a statewide claim because its members would lack standing as individual plaintiffs to challenge the apportionment plan on a statewide basis." *League of Women Voters of Mich. v. Johnson*, No. 2:17-cv-14148, 2018 WL 10483517, at *6 (E.D. Mich. May 16, 2018) (three-judge court). And a prohibited statewide challenge is exactly what NAACP mounts in Counts II and III of its complaint. *See* ECF 1 ¶ 218 (alleging dilution of voting power of "voters of color . . . in Texas as a whole" by drawing "maps that have an overall retrogressive effect"), ¶ 224 (alleging maps "were adopted, at least in part, for the purpose of disadvantaging voters of color . . . across the State").

This is in keeping with Supreme Court precedent restricting standing to bring related redistricting claims. In a "racial gerrymandering" case, for example, a voter does not have Article III standing to challenge a map "in its entirety." *United States v. Hays*, 515 U.S. 737, 746 (1995). Establishing "individualized harm" requires showing that the "plaintiff resides in a racially gerrymandered district." *Id.* at 744–45. A plaintiff who does not live in such a district does not have standing unless there is some other basis for concluding "that the plaintiff has personally been subjected to a racial classification." *Id.* at 745; *see also Sinkfield v. Kelley*, 531 U.S. 28, 30 (2000) (per curiam). "A racial gerrymandering claim" must proceed "district-by-district," and courts do not analyze the State "as an

undifferentiated 'whole.'" *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015); *accord Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 800 (2017). [1]

NAACP disregards this. It purports to challenge many districts for the House, Senate, and Congressional elections. *See* ECF 1 ¶¶ 140–81 (House); *id.* ¶¶ 106–39 (Senate); *id.* ¶¶ 182–204 (Congressional). But it does not allege that it has members who reside in and intend to vote in any of those districts. NAACP therefore lacks associational standing.

### B. NAACP Lacks Organizational Standing

NAACP also lacks organizational standing, in which a plaintiff organization brings suit "on its own behalf," *Henderson v. Stalder*, 287 F.3d 374, 381 (5th Cir. 2002). NAACP does not contend that it is "the object of the government action or inaction [it] challenges," so its standing is "substantially more difficult to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (quotation omitted).

The two conclusory sentences in the complaint that address organizational standing do not suffice to establish it. NAACP alleges that the new maps' effects on others force it "to allocate time and resources" away from "other programs that are core to its mission." ECF 1 ¶ 22. [2] Although the diversion of resources can constitute a sufficient injury in certain circumstances, "[n]ot every diversion of resources to counteract [a] defendant's conduct . . . establishes an injury in fact." *City of Kyle*, 626 F.3d at 238. An organization's decision to divert resources "must . . . be in response to a reasonably certain injury imposed by the challenged law." *Zimmerman v. City of Austin*, 881 F.3d 378, 390 (5th Cir. 2018). In other words, a diversion of resources is cognizable only if the plaintiff "would have suffered some other injury if it had not diverted resources to counteracting the problem." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). Courts do not

---

[1]   An unpublished Fifth Circuit opinion once noted that the panel was "aware of no precedent holding that an association must set forth the name of a particular member in its complaint," *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. Appx. 189, 198 (5th Cir. 2012), but the precedent cited above holds exactly that. Even if NAACP did not have to "name names," it would at least have to include "more specific" allegations "identifying members who have suffered the requisite harm." *Faculty, Alumni, & Students Opposed to Racial Preferences v. New York Univ.*, 11 F.4th 68, 75–76 (2d Cir. 2021).

[2]   Though NAACP says that "it brings this action on behalf of its members," ECF 1 ¶ 21, Defendants assume based on these allegations that it is seeking to invoke its own organizational standing.

allow a plaintiff to "bootstrap standing by expending its resources in response to actions of another." *Assn. for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994). Otherwise, plaintiffs could "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Intl. USA*, 568 U.S. 398, 402 (2013).

Here, NAACP claims it will divert resources to "combat[] the effects of these new maps on communities of color throughout the state." ECF 1 ¶ 22. The Supreme Court, however, has "long recognized that a person's right to vote is 'individual and personal in nature.'" *Gill*, 138 S. Ct. at 1929. A vote-dilution injury, as explained in Argument § I.A, therefore belongs to a voter—a thing that NAACP, as an organization, is not. NAACP may prefer that individuals' votes not be diluted, but "[f]rustration of an organization's objectives is the type of abstract concern that does not impart standing." *Natl. Treas. Emps. Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (quotation omitted). Rather, there must be "concrete and demonstrable injury to the organization's activities— with the consequent drain on the organization's resources—constitut[ing] far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). No matter how laudable an organization's goal, it cannot establish "standing simply on the basis of that goal." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). Thus, "a showing that an organization's mission is in direct conflict with a defendant's conduct is insufficient, in and of itself, to confer standing on the organization to sue on its own behalf." *Assn. of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 361 n.7 (5th Cir. 1999).

Moreover, NAACP does not allege "how the allegedly discriminatory . . . practice is going to impair [its] activities." *Galveston Open Govt. Project v. U.S. Dept. of Hous. & Urban Dev.*, 17 F. Supp. 3d 599, 613 (S.D. Tex. 2014) (Costa, J.). Indeed, a redistricting map cannot impair NAACP's activities. NAACP remains free to educate and register voters, ECF 1 ¶ 17, "share information on redistricting principles," *id.* ¶ 20, and advocate for its preferred policies. *Id.* Its claims must therefore be dismissed for lack of standing.

## II.     NAACP Has Not Plausibly Alleged a Discriminatory Effects Claim

NAACP's sole discriminatory-effects claim arises from its belief that Section 2 requires the Texas Legislature to draw opportunity districts for "majority-minority coalition districts" for "voters of color" generally, an assertion with which it opens its complaint. ECF 1 ¶ 1. *See also, e.g.*, *id.* at 57 (demanding declaration that Legislature's "failure to maintain the same number of or draw additional majority-minority coalition" districts violates Section 2). But the Voting Rights Act imposes no such requirement: A coalition district, by definition, does not feature a single "minority group" that "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). Nor has NAACP plausibly alleged that "Black, Hispanic, and Asian," voters, *e.g.*, ECF 1 ¶ 2, or other minority groups are "politically cohesive." *Gingles*, 478 U.S. at 51. "Failure to establish any one of these threshold requirements is fatal." *Campos v. City of Houston*, 113 F.3d 544, 547 (5th Cir. 1997). Because transforming districts as drawn into coalition districts fails under at least two of the three *Gingles* preconditions, NAACP's vote-dilution claim should be dismissed. And because NAACP fails to allege facts supporting the other *Gingles* factors, that claim should be dismissed nonetheless.

### A.  The *Gingles* Test

Section 2 prohibits a "standard, practice, or procedure" from being "imposed or applied . . . in a manner which results in a denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a). To establish a violation, a plaintiff must show that:

> [T]he political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 10301(b). A court can consider "[t]he extent to which members of a protected class have been elected to office in the State," but "nothing in [Section 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.* A plaintiff bringing such a suit must establish three "necessary preconditions":

(1) The minority group must be able to demonstrate it is sufficiently large and geographically compact to constitute a majority in a single-member district;

(2) The minority group must be able to show that it is politically cohesive; and

(3) The minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 50–51; *see Growe v. Emison*, 507 U.S. 25, 39–41 (1993) ("*Gingles* preconditions" are required in "a § 2 dilution challenge to a single-member districting scheme").

The *Gingles* preconditions are "a bright line test." *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852 (5th Cir. 1999); *accord Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 456 (N.D. Tex. 2010). "Failure to establish any one of these threshold requirements is fatal." *Harding v. Dallas Cnty.,* 948 F.3d 302, 308 (5th Cir. 2020) (quotation omitted). Meeting "the three prongs of *Gingles*" is not sufficient: to prevail, a plaintiff that does so  must then "establish that the 'totality of the circumstances' supports a finding of vote dilution." *Id.* at 308–09.

### B. Coalition Districts Fail the First *Gingles* Precondition

NAACP's coalition-district theory cannot satisfy the first precondition because no single racial or language group constitutes a majority of any of the proposed coalition districts.

There is no fact dispute here. NAACP does not allege that any minority group *standing alone* could "constitute a majority in a single-member district." *Id.* On the contrary: it alleges only that "Black, Hispanic, and Asian" voters *together* could form "coalition districts." ECF 1 ¶ 216. As a result, the Court faces a pure question of law: Can a plaintiff satisfy the first *Gingles* precondition where no single group can form a majority in the proposed single-member district?

The answer is no. The Supreme Court has never found a violation of Section 2 based on a State's decision not to draw a coalition district when no single minority group would constitute a majority in the proposed district. In fact, in *Bartlett v. Strickland*, the Supreme Court rejected crossover districts (districts in which a subset of white voters join with a minority group to form an electoral

majority). *See* 556 U.S. 1, 13 (2009) (plurality).[3] And in *Perry v. Perez*, the Court made clear that *Bartlett*'s reasoning applied to coalition districts as well. *See* 565 U.S. 388, 399 (2012).

### 1. Supreme Court Precedent Forecloses Requiring Coalition Districts

To plead the first *Gingles* precondition, NAACP must plausibly allege "that [its] minority group exceeds 50% of the relevant population in the demonstration district." *Valdespino*, 168 F.3d at 852–53; *see also Bartlett*, 556 U.S. at 13 (a district may be required where "a minority group composes a numerical, working majority of the voting-age population"). Because of this requirement, the Supreme Court has refused to require either "influence districts, in which a minority group can influence the outcome of an election even if its preferred candidate cannot be elected," or crossover districts, in which "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Bartlett*, 556 U.S. at 13. For similar reasons, Section 2 does not mandate the creation of coalition districts.

*Bartlett*'s reasoning rejecting crossover districts applies with equal force to coalition districts. A violation of the Voting Rights Act occurs when "members of a class of citizens protected" by Section 2 "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). But coalition districts are, by definition, those "in which two minority groups form a coalition to elect the candidate of the coalition's choice." *Bartlett*, 556 U.S. at 13. As the Court explained, "[t]here is a difference between a racial minority group's 'own choice' and the choice made by a coalition." *Id.* at 15. NAACP's claim is thus "contrary to the mandate of § 2." *Id.* at 14.

---

[3]   *Bartlett* was decided by a 5-4 vote. The five votes to reverse comprised a three-justice plurality (Justice Kennedy, joined by Chief Justice Roberts and Justice Alito) and a two-justice concurrence (Justice Thomas, joined by Justice Scalia). The concurrence would have reversed on the basis that Section 2 "does not authorize any vote dilution claim" and therefore would have refused to apply the *Gingles* framework. 556 U.S. at 26 (Thomas, J., concurring). Because the plurality states the narrowest ground on which the judgment was reached, it is the controlling opinion. *See Marks v. United States*, 430 U.S. 188, 193–94 (1977).

Indeed, the Court specifically recognized that "[n]othing in § 2 grants special protection to a minority group's right to form political coalitions." *Id.* at 15. When a minority group does not constitute a numerical majority in the proposed district, members of that group merely possess "the opportunity to join other voters—including other racial minorities, or whites, or both—to reach a majority and elect their preferred candidate." *Id.* at 14. Recognition of a Section 2 claim where minority group members cannot elect their preferred candidate "based on their own votes and without assistance from others" would impermissibly "grant minority voters 'a right to preserve their strength for the purposes of forging an advantageous political alliance.'" *Id.* at 14–15 (quoting *Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004)). The Voting Rights Act contains no such right, as "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground." *Id.* at 15 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994)).

### 2.  Contrary Fifth Circuit Precedent Was Wrong and Has Been Overruled

*Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988), does not require otherwise. That case's flawed reasoning is inconsistent with and has been overruled by the Supreme Court in its later decisions in *Bartlett* and *Perez*.

The flaws inherent in *Campos* were recognized from the outset, including in Judge Higginbotham's dissent from the denial of rehearing en banc, which five of his colleagues joined. The *Campos* panel held that if a combination of black and Latino voters "are of such numbers residing geographically so as to constitute a majority in a single member district, they cross the *Gingles* threshold as potentially disadvantaged voters." 840 F.2d at 1244. Judge Higginbotham, however, recognized that *Campos*'s assumption "that a group composed of both [black and Hispanic] minorities is itself a protected minority" to be "an unwarranted extension of congressional intent." *Campos v. City of Baytown*, 849 F.2d 943, 945 (5th Cir. 1988) (Higginbotham, J., dissenting from denial of rehg. en banc). Coalition groups are outside the *Gingles* framework because that case's "three step inquiry assumes a group unified by race or national origin and asks if it is cohesive in its voting." *Id.* (quoting *LULAC v. Midland Indep. Sch. Dist.*, 812 F.2d 1494, 1504 (5th Cir.1987) (Higginbotham, J., dissenting)).

Channeling the reasoning that would later animate the Supreme Court in *Bartlett*, Judge Higginbotham observed that "[a] group tied by overlapping political agendas but not tied by the same statutory disability is no more than a political alliance or coalition." *Id.*

Nor were Judge Higginbotham and his five colleagues the only ones to see how *Campos* contradicted *Gingles* and Section 2. Nearly a decade later, the Sixth Circuit announced that it "share[d] the concerns articulated by Judge Higginbotham in his dissent from the denial of rehearing." *Nixon v. Kent County*, 76 F.3d 1381, 1388 (6th Cir. 1996). Among those concerns were that coalition districts would "effectively eliminate" the first *Gingles* requirement. *Id.* at 1391. That requirement "necessarily recognizes that, in some cases, a minority will not be numerous enough to prove a violation of the Voting Rights Act because it fails to constitute a majority in a single member district." *Id.* (cleaned up). Coalition districts would present an exception to the first *Gingles* requirement that would swallow the rule. The Sixth Circuit thus rejected this misreading, holding that "[t]he language of the Voting Rights Act does not support a conclusion that coalition suits are part of Congress' remedial purpose and, as previously discussed, there are compelling reasons to believe that they are not." *Id.* at 1393.

Since then, *Campos* has been overruled. Even when a Fifth Circuit opinion is "squarely on point," it does not bind lower courts after "intervening and overriding Supreme Court decisions." *White v. Estelle*, 720 F.2d 415, 417 (5th Cir. 1983). In analyzing whether a later Supreme Court decision abrogated an earlier Fifth Circuit decision, "[t]he overriding consideration is the similarity of the issues decided." *Gahagan v. U.S. Citizenship & Immig. Servs.*, 911 F.3d 298, 303 (5th Cir. 2018). As a result, "intervening Supreme Court authority need not be precisely on point, if the legal reasoning is directly applicable." *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 720–21 (6th Cir. 2016); *see also Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014) ("issues decided by the higher court need not be identical to be controlling"). It is sufficient that the Supreme Court has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). "[A] district court or a three-judge panel is free to reexamine the holding of a prior panel in light of an inconsistent decision

by a court of last resort on a closely related, but not identical issue." *Dippin' Dots, Inc. v. Mosey*, 602 F. Supp. 2d 777, 785 n.3 (N.D. Tex. 2009) (quoting *Miller v. Gammie*, 335 F.3d at 899).

As discussed in detail in Argument § II.B.1, *Bartlett*'s treatment of crossover districts applies with equal force to coalition districts. It explains in detail why Section 2 protects individual racial and language minority groups and does not protect political coalitions between groups. *See Bartlett*, 556 U.S. at 13–15. By contrast, *Campos* "cites no authority and offers no reasoning to support its fiat." *Campos*, 849 F.2d at 945 (Higginbotham, J., dissenting from denial of rehg. en banc).

The reasoning in *Campos* was limited to the truism that Section 2 "protects the right to vote of both racial and language minorities." 840 F.2d at 1244. But no one doubts that "Section 2 broadly protects the voting rights of all voters, even those who are white." *United States v. Brown*, 494 F. Supp. 2d 440, 446 (S.D. Miss. 2007), *aff'd*, 561 F.3d 420 (5th Cir. 2009). The actual question in *Campos* was "whether Congress intended to extend [voting-rights] protection to a group consisting of two distinct minority groups." *Campos*, 849 F.2d at 945 (Higginbotham, J., dissenting from denial of rehg. en banc). That Congress did not so intend is the very holding of *Bartlett*, which rejected crossover districts that rely on white voters to form an electoral majority. 556 U.S. at 14.

The Supreme Court dispelled any post-*Bartlett* doubt it in *Perry v. Perez*. There, the Court rejected a proposed coalition district, holding:

> The [district] court's order suggests that it may have intentionally drawn District 33 as a "minority coalition opportunity district" in which the court expected two different minority groups to band together to form an electoral majority. . . . If the District Court did set out to create a minority coalition district, rather than drawing a district that simply reflected population growth, it had no basis for doing so. *Cf. Bartlett v. Strickland*, 556 U.S. 1, 13–15 (2009) (plurality opinion).

565 U.S. at 399. Because it was "unclear whether the District Court . . . followed the appropriate standards in drawing interim maps," the Supreme Court vacated the district court's ruling. *Id.*

The Supreme Court recognized that the coalition-district issue in *Perez* was not identical to the crossover-district issue in *Bartlett*. That is why it employed a "*cf.*" signal, which means "compare" and

is used when the "[c]ited authority supports a proposition different from the main proposition but sufficiently analogous to lend support." *The Bluebook: A Uniform System of Citation* rule 1.2(a) (21st ed. 2020). At the same time, the Supreme Court thought that the issues were sufficiently analogous that there was no need for extensive discussion; citing the portion of *Bartlett* discussed above was sufficient.

*       *       *

All of NAACP's discriminatory-effects claims depend on its underlying assumption that Section 2 can require a jurisdiction to draw coalition districts. That assumption is false: A plaintiff who proposes a coalition district has necessarily failed to plausibly allege that "the minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. NAACP's discriminatory-effects claims should therefore be dismissed.

## C. NAACP Does Not Plausibly Allege That Black, Latino, and Asian Voters in the Challenged Districts Are Politically Cohesive

Even if NAACP could satisfy the first *Gingles* precondition, it would still fail the second: "[T]he minority group must be able to show that it is politically cohesive." 478 U.S. at 51. It alleges no facts to establish this requirement. Each of its allegations as to the cohesiveness of the "POC CVAP" regard an alleged preference for Democrats over Republicans in general elections. *See, e.g.*, ECF 1 ¶¶ 87, 110, 120. That does not suffice for two reasons.

First, those allegations are nothing more than a "formulaic recitation" of the second *Gingles* element. *Twombly*, 550 U.S. at 555. Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Second, they do not even attempt to allege facts to overcome the "obvious alternative explanation" for these voting patterns: partisanship. *Twombly*, 550 U.S. at 567. It is NAACP's burden to plausibly allege that "race," not "partisan affiliation," "best explains" any alleged bloc voting. *LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc). By neglecting to even mention partisanship as an explanation, much less address the extent to which it accounts for bloc voting behavior, it has failed to "nudge[ its] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. The partisanship attending general elections robs them of probative value when determining whether two minority groups are

13

politically cohesive. Rather, when "two minority groups are generally affiliated/registered with the same party (Democratic) and vote for that party's candidates at high rates, primary elections for that party's candidate are by far the most probative evidence of cohesion." *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 421 (S.D.N.Y. 2004) (three-judge court) (per curiam), *aff'd*, 543 U.S. 997 (2004).

NAACP's allegations would not suffice in any Section 2 case, but they are particularly deficient here because NAACP proposes coalition districts. Before rejecting such districts altogether in *Bartlett* and *Perry v. Perez*, the Supreme Court considered how the second *Gingles* precondition would apply to coalition districts. "Assuming (without deciding) that it was permissible for [a] District Court to combine distinct ethnic and language minority groups for purposes of assessing compliance with § 2," the Court found that "there was quite obviously a higher-than-usual need for the second of the *Gingles* showings." *Growe*, 507 U.S. at 41. For "when dilution of the power of such an agglomerated political bloc is the basis for an alleged violation, proof of minority political cohesion is all the more essential." *Id.* Accordingly, even when *Campos* erroneously required it to assume that coalition districts could satisfy the first *Gingles* precondition, the Fifth Circuit did not hesitate to reject coalition-district cases based on the plaintiff's failure to meet the second *Gingles* precondition. *See, e.g.*, *Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1205, 1216 n.21 (5th Cir. 1996) (statistical evidence did not establish cohesion and "[n]o concrete, reliable, or credible evidence was presented at trial that Hispanic and African-American communities work together to accomplish common goals"); *Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989) (affirming dismissal due to "lack of statistical evidence of inter-minority political cohesion").

### D. NAACP Does Not Allege Facts Supporting the Third *Gingles* Precondition

In addition, NAACP does not allege facts supporting the final *Gingles* precondition, namely, "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51. Satisfying this requirement is a "bright-line test," *Valdespino*, 168 F.3d at 852, and NAACP's failure to satisfy it "is fatal." *Harding*, 948 F.3d at 308.

Rather than plausibly allege facts, NAACP simply asserts this precondition is met: "[W]hite voters usually vote to defeat the preferred candidates of voters of color." ECF 1 ¶ 217; *see also id.* ¶¶ 7,

97. That is not an allegation. It is a "[t]hreadbare recital[] of the elements of a cause of action" and does "not suffice." *Iqbal*, 556 U.S. at 678.

### E. Section 2 Does Not Give NAACP a Private Cause of Action

Finally, NAACP's Section 2 claims must be dismissed because Section 2 does not create a private right of action. Defendants will not burden the Court with further briefing on an issue it has already decided, *see* ECF 58, but they respectfully disagree with that ruling and raise this argument to preserve it for further review.

### III.   NAACP Has Not Alleged Facts Stating a Claim of Intentional Discrimination

### A. Lack of Discriminatory Effect Precludes Intentional-Discrimination Claims

Even if NAACP had plausibly alleged discriminatory intent—it did not; *see* Argument § III.B—that would not be enough. As explained in Argument § II, NAACP has not plausibly alleged a discriminatory effect, which is a necessary element of an intentional-discrimination claim. This follows from "a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). "[N]o case in [the Supreme] Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Courts routinely require discriminatory effect in intentional-discrimination redistricting cases. *See, e.g.*, *Shaw v. Reno*, 509 U.S. 630, 641 (1993) ("a discriminatory purpose and have the effect of diluting minority voting strength"); *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 800 (S.D. Tex. 2013) ("purpose and operative effect"); *LULAC v. N.E. Indep. Sch. Dist.*, 903 F. Supp. 1071, 1093 (W.D. Tex. 1995) ("intentional discrimination" and "a resultant discriminatory effect").

The same is true under Section 2. "[T]he statute proscribes intentional discrimination only if it has a discriminatory effect, but proscribes practices with discriminatory effect whether or not intentional." *Chisom v. Roemer*, 501 U.S. 380, 406 (1991) (Scalia, J., dissenting); *accord Turner v. Arkansas*, 784 F. Supp. 553, 565 (E.D. Ark. 1991), *aff'd*, 504 U.S. 952 (1992).

### B.  NAACP Has Not Plausibly Alleged Discriminatory Intent

NAACP has not alleged facts that would allow the Court to infer a discriminatory purpose. In redistricting cases, "the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). It is "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). The required intent is not mere "volition" or "awareness of consequences." *Personnel Admr. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). It requires that the Legislature have passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

NAACP claims to identify several "indicia of discriminatory purpose," ECF 1 ¶ 226, but none plausibly supports discriminatory intent here. First, NAACP claims there is "evidence of substantial disparate impact," *id.*, but that is neither factually true nor legally significant. Even if NAACP had plausibly alleged discriminatory effects, *cf.* Argument §§ II.B–II.D, discriminatory effects do not imply discriminatory intent. The Fifth Circuit has repeatedly stressed that disparate impact does not support an intentional-discrimination claim. *See Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016) (en banc) ("Legislators' awareness of a disparate impact on a protected group is not enough: the law must be passed *because of* that disparate impact.") (citing *Feeney*, 442 U.S. at 279); *see also Hawkins v. Dept. of Hous. & Urban Dev.*, 16 F.4th 147, 158–59 (5th Cir. 2021) (dismissing intentional discrimination claim; mere awareness of disparate impact "[i]n no way . . . support[s] an inference that [the defendant] made any decision 'because of, not merely in spite of,'" the disparate impact) (quoting *Feeney*, 442 U.S. at 279).

Second, NAACP offers "a history of discriminatory official actions," but its allegations simply amalgamate independent events with no direct connection to this specific legislative act. ECF 1 ¶ 226. It points to past voting practices, *id.* ¶¶ 35–44, and past redistricting cases, *id.* ¶¶ 45–49, and simply concludes, without more, than those circumstances support an inference that *these maps* are motivated by discriminatory purpose. That is not the law. To the contrary, the Supreme Court has recently reiterated that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott v. Perez*, 138 S. Ct. at 2324 (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality op.)). The "ultimate question remains whether a discriminatory intent has

been proven *in a given case.*" *Mobile*, 446 U.S. at 74 (emphasis added). NAACP errs by alleging only general historical facts. These do not raise an inference of discriminatory intent here.

Third, NAACP alleges "procedural and substantive departures from the norms generally followed by the decision-maker," ECF 1 ¶ 226, but these are clearly the result of pandemic concerns and partisan considerations, not discriminatory purpose. It is true that "[d]epartures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role" in government decisionmaking, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977), but they raise no inference of "invidious discrimination" when there is an "obvious alternative explanation." *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567). Here, there are multiple obvious reasons why the redistricting process was shorter than normal: The continuing COVID-19 pandemic forced numerous changes in the way the Legislature operated, both in and out of session. And the Census Bureau did not publish its final data until more than ten weeks after the Legislature's regular session ended.[4] That was more than four months after the statutory deadline of April 1. *See* 13 U.S.C. § 141(a), (c). That forced the Legislature to redistrict during a special session, which is constitutionally limited to thirty days, rather than during its longer, regular session. *See* Tex. Const. art. III, § 40. With a compressed schedule due to pandemic-related delays, an allegedly rushed process would hardly be surprising, much less give a reason to infer intentional invidious discrimination. In *Perez v. Abbott*, the Supreme Court could "not see how the brevity of the legislative process can give rise to an inference of bad faith." 138 S. Ct. at 2328–29. The evidence there was insufficient; the allegations here—which do not even attempt to address these consequential matters of public record—are even weaker.

Fourth, NAACP contends that the general "legislative and administrative history of the decision, including contemporaneous statements by decisionmakers," supports its claim, but none of its allegations rebut the presumption of legislative good faith, let alone affirmatively suggest discriminatory intent. ECF 1 ¶ 226. NAACP claims that it and other groups that participated in the

---

[4]   The 87th Regular Session ended on May 31, 2021. The Census Bureau delivered redistricting data to the States on August 12, 2021. *See* U.S. Census Bur., *2020 Census Statistics* (Aug. 12, 2021), https://www.census.gov/newsroom/press-releases/2021/population-changes-nations-diversity.html.

legislative process warned the Legislature of the "dilutive effect" of the new maps, *id.* ¶ 227, but that the Legislature proceeded anyway. Similarly, it claims that certain statements made by members "indicate that they were aware" of the "effect" the new maps would have on "minority voters." *Id.* ¶ 228. In any event, alleged "awareness of consequences" does not establish discriminatory intent. *Feeney*, 442 U.S. at 279. Mere awareness may be "consistent with" invidious intent, but it is "just as much in line with" other motives. *Twombly*, 550 U.S. at 554. NAACP's factual allegations are equally consistent with the Legislature's acting "in spite of" rather than "because of" the alleged racial consequences of the redistricting maps, it therefore has not plausibly alleged invidious discrimination. *Feeney*, 442 U.S. at 279; *see Twombly*, 550 U.S. at 557 (explaining "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with)" a legal violation).

### C. NAACP Does Not Allege Facts Supporting a Racial Gerrymandering Claim

"A racial gerrymandering claim is 'analytically distinct' from an intentional vote dilution claim." *Harding*, 948 F.3d at 312 (quoting *Shaw v. Reno*, 509 U.S. at 652). It seeks to establish that "that race was improperly used in the drawing of the boundaries of one or more specific electoral districts." *Ala. Legislative Black Caucus*, 575 U.S. at 263. For a defendant to be liable on this basis, "race must have been 'the predominant factor motivating' the redistricting process and 'subordinat[ing] traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests[.]'" *Harding*, 948 F.3d at 313 (quoting *Miller*, 515 U.S. at 911).

As with an intentional vote-dilution claim, the awareness and use of racial demographics and statistics do not by themselves show discriminatory purpose. *See Miller*, 515 U.S. at 916 (though legislatures are "almost always" aware of racial demographics, "it does not follow that race predominates in the redistricting process."). Instead, as before, a plaintiff is required to demonstrate that the Legislature, in designing the particular district at issue, "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group." *Id.* (quoting *Feeney*, 442 U.S. at 279). For the same reasons that NAACP failed to allege facts

plausibly suggesting that the Legislature drew the new maps with an intent to discriminate based on race, it has not alleged facts plausibly suggesting that race was the Legislature's predominant concern in drawing the new maps. Indeed, its only two allegations on that basis are that bare recitations that the Legislature "prioritized racial considerations above traditional redistricting principles," ECF 1 ¶ 99, and that it "flout[ed] traditional redistricting principles," *id.* ¶ 105. And even if that were otherwise sufficient, it could not overcome the presumption of legislative good faith, for NAACP immediately acknowledges the obvious, non-racial reason the Legislature would have paid less heed to "traditional redistricting principles:" a desire to enhance the electability of Republicans in "districts . . . won or lost by narrow margins in the last election," *id.* ¶ 100—that is, the same partisan considerations that have motivated gerrymandering since the days of Gerry himself.

## CONCLUSION

Defendants respectfully request that the Court dismiss NAACP's claims.

Date: December 9, 2021                    Respectfully submitted.

KEN PAXTON                                */s/ Patrick K. Sweeten*
Attorney General of Texas                 PATRICK K. SWEETEN
                                          Deputy Attorney General for Special Litigation
BRENT WEBSTER                             Tex. State Bar No. 00798537
First Assistant Attorney General

                                          WILLIAM T. THOMPSON
                                          Deputy Chief, Special Litigation Unit
                                          Tex. State Bar No. 24088531

                                          OFFICE OF THE ATTORNEY GENERAL
                                          P.O. Box 12548 (MC-009)
                                          Austin, Texas 78711-2548
                                          Tel.: (512) 463-2100
                                          Fax: (512) 457-4410
                                          patrick.sweeten@oag.texas.gov
                                          will.thompson@oag.texas.gov

                                          **COUNSEL FOR DEFENDANTS**


**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on December 9, 2021, and that all counsel of record were served by CM/ECF.

                                          */s/ Patrick K. Sweeten*
                                          PATRICK K. SWEETEN