UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**LEAGUE OF UNITED LATIN AMERICAN
CITIZENS**, et al.,

*Plaintiffs*,

V.                                                     No. EP:21-cv-259-DCG-JES-JVB
                                                                    [Lead Case]
**GREG ABBOTT,** in his Official Capacity as
Governor of the State Texas; et al.,

*Defendants;*

_____

**DAMON JAMES WILSON**, for himself
and on behalf of all others similarly situated,

*Plaintiff*,

V.                                                     No. 1:21-cv-00943-RP-JES-JVB
                                                                 [Consolidated Case]
**THE STATE OF TEXAS**; et al.,

*Defendants*

**PLAINTIFF WILSON'S FIRST AMENDED COMPLAINT FOR**

**DECLARATORY AND INJUNCTIVE RELIEF, AND REQUEST FOR**

**CERTIFICATION OF CLASS ACTION**

TO THE HONORABLE OF SAID COURT:

COMES NOW Damon James Wilson, Plaintiff in the above captioned and

numbered cause and, pursuant to Article I, Section 2 of the U.S. Constitution; Section 2

of the Fourteenth Amendment to the U.S. Constitution; the Equal Protection Clause of

the Fourteenth Amendment to the U.S. Constitution; 28 U.S.C. Sections 2201, 2202 and

2284; 42 U.S.C. Sections 1983 and 1988; and, Rule 23 of the Federal Rules of Civil

Procedure; files this *First Amended Complaint for Declaratory and Injunctive Relief, and Request for Certification of Class Action*, and in this connection would respectfully show unto the Court as follows:

## I.

## JURISDICTION

The Plaintiff's complaint raises questions arising under the United States Constitution and federal law, and this Court has "federal question" jurisdiction pursuant to 28 U.S.C. §1331. Additionally, the Plaintiff's complaint challenges the constitutionality of the apportionment of congressional districts enacted by the Third Called Session of the 87th Texas Legislature on October 18, 2021, which has been designated as Senate Bill 6 ("Plan C2193"), so this Court possesses jurisdiction on that basis as well pursuant to 42 U.S.C. §1983, 28 U.S.C. §1343(a) and §2284(a).

## II.

## PARTIES

## (1)

Plaintiff Damon James Wilson ("**Plaintiff Wilson**") permanently resides in the 1400 block of Independence Trail, in the City of Grand Prairie, Dallas County, Texas. On "Census Day" (as designated by federal law, April 1, 2020), Plaintiff was an inmate confined by the Defendant State of Texas in the William P. Clements Unit of the Correctional Institutional Division of the Texas Department of Criminal Justice, and Plaintiff has been assigned "TDCJ" No. 01865939 by the State of Texas. The Clements Unit is located at 9601 Spur 591, in the City of Amarillo, Potter County, Texas. The Plaintiff is currently being confined by Defendant State of Texas in the Jester III Unit of

the Correctional Institutional Division of the Texas Department of Criminal Justice which is located at 3 Jester Rd., in the City of Richmond, Fort Bend County, Texas. Since he commenced serving the current term of his institutional confinement, Plaintiff has continuously maintained an intention to return to his permanent residence in the City of Grand Prairie, Dallas County, Texas, for the purpose of continuing his domicile there unabated.

**(2)**

Defendant Greg Abbott ("**Defendant Abbott**") is the duly elected Governor of Texas, and is the Chief Executive Officer of the State of Texas under Article IV, Section 1, of the Constitution of the State of Texas. Defendant Abbott is sued solely in his official capacity and he has formally entered an appearance in this action.

**(3)**

Defendant Dade Phelan ("**Defendant Phelan**") is the duly elected Speaker and Presiding Officer of the Texas House of Representatives under Article III, Section 9 (b), of the Constitution of the State of Texas. Defendant Phelan is sued solely in his official capacity and he has formally entered an appearance in this action.

**(4)**

Defendant Dan Patrick ("**Defendant Patrick**") is the duly elected Lieutenant Governor of Texas, and is the Presiding Officer of the Texas Senate under Article IV, Section 16, of the Constitution of the State of Texas. Defendant Patrick is sued solely in his official capacity and he has formally entered an appearance in this action.

**(5)**

Defendant John Scott ("**Defendant Scott**") is the Secretary of State of the State of Texas, is an Executive Officer of the State of Texas under Article IV, Section 1, is appointed by the Governor of Texas by and with the advice of the Texas Senate under Article IV, Section 21, of the Constitution of the State of Texas, and is the Chief Election Officer for the State of Texas. Tex. Elec. Code §3.001(a). Tex. Defendant Scott, who has been substituted as a defendant in place of former acting Texas Secretary of State Jose Esparza, is sued solely in his official capacity and he has formally entered an appearance in this action.

### III.

### FACTS

**(1)**

On February 8, 2018, the U.S. Department of Commerce (through the U.S. Census Bureau) published a final rule whereby, for purposes of apportionment of U.S. Representatives among the several States, it concluded it would classify inmates who are confined in correctional facilities as "residents" and "inhabitants" of their respective correctional facilities. When reaching this decision the Department of Commerce expressly declined to classify these inmates as persons domiciled at locations where they had resided prior to their confinement and at which they continued to maintained their domiciles on "Census Day" (April 1, 2020). As stated by the U.S. Census Bureau ("Bureau") when explaining this decision:

> "The practice of counting prisoners at the correctional facility is consistent with the concept of usual residence, as established by the Census Act of 1790…. '[U]sual residence' is defined as the place where a person lives and sleeps most of the time, which is not always the same as their legal

residence, voting residence, or where they prefer to be counted. Therefore, counting prisoners anywhere other than the facility would be less consistent with the concept of usual residence, since the majority of people in prisons live and sleep most of the time at the prison."

**(2)**

In January of 2021, the Bureau created a "Census Geocoder" computer program designed for use with 2020 census data and intended for the expressed purpose of allowing "[o]fficial state redistricting liaisons and technical staff to use the Census Geocoder" to locate "the census geography associated with a specific address." The "Census Geocoder" program is designed to allow state officials to "reallocate group quarters populations" (including persons confined in prison) to support valid congressional redistricting. Upon release of the final census for 2020 by the Bureau on August 12, 2021, the Bureau confirmed the Census Geocoder enabled states to reallocate where prison inmates were deemed inhabitants within a state for purposes of congressional redistricting and the election of Texas' Representatives in the United States House of Representatives.

**(3)**

Upon arrival at a Texas prison unit all inmates are required to provide the true location of where they resided before being confined; and the Defendants, through their agents, have consistently followed this official practice before, on, and after, April 1, 2020. The Plaintiff provided to the State of Texas the true location of where he permanently resided before being confined, both before and at the time of the current term of his institutional confinement. The Plaintiff was (and is) an inhabitant and permanent resident of a location other than where he was confined on April 1, 2020; and the location where he is an inhabitant and permanent resident, which is not the location

where he was confined on April 1, 2020, remains and at all times relevant to this proceeding has remained his permanent residence and domicile.

**(4)**

In the Spring of 2020, official enumerators employed by the Bureau personally visited the Clements Unit where Plaintiff was confined, in Amarillo, Texas, for the purposes of enumerating inmates confined therein for the 2020 federal decennial census. At that time, while under the direct supervision of state prison guards, the Bureau's enumerators met personally with Plaintiff, and with numerous other inmates confined at the Clements Unit, and requested that Plaintiff and other prison inmates provide the address of their permanent residences. In response to this inquiry from the Bureau's enumerator, Plaintiff informed the enumerator verbally and in writing, in the presence of the State's prison guards, that he permanently resided in Grand Prairie, Texas. The Bureau's enumerator accepted and retained this written statement from Plaintiff for purposes of including Plaintiff in the 2020 federal decennial census.

**(5)**

On October 18, 2021, the Third Called Session of the 87th Texas Legislature adopted "Plan C2193" which, on the basis of population data provided by the Bureau, assigned Plaintiff the status of a person residing in, and an "inhabitant" of, Texas Congressional District 13 ("CD13"). As devised by Plan C2193, CD13 encompasses the location where Plaintiff was confined on Census Day (April 1, 2020), but it does not encompass the location of his permanent domicile where he is and was an inhabitant on April 1, 2020. Under applicable federal constitutional law Plaintiff is domiciled in, and is

an "inhabitant" and permanent resident of, Texas Congressional District 30 ("CD30") as devised by Plan C2193.

**(6)**

The Plaintiff presently intends, and did intend on April 1, 2020, to return to and permanently reside at the location where he was an inhabitant on April 1, 2020, and where he maintained a residence and domicile prior to his current term of confinement, in the City of Grand Prairie, Texas. The Plaintiff has never had the intention of establishing a permanent residence or domicile at the prison unit wherein he was confined on April 1, 2020, or at any other prison. The Plaintiff will be discharged from his current sentence to confinement by Defendants not later than February 1, 2031.

**(7)**

Notwithstanding the ready accessibility of the "Census Geocoder" program provided to Defendant State of Texas by the Bureau, the Defendant State of Texas has deliberately assigned Plaintiff to a congressional district within which it knew Plaintiff does not (and did not on April 1, 2020) permanently reside or have a domicile. Application of this policy by the Defendant State of Texas, which essentially operates as a "legal fiction" that Plaintiff permanently resides at a location other than where he is an "inhabitant" and has established and maintained his domicile, has adversely affected (and will adversely affect) the responsivity of the U.S. Representative who would otherwise serve as Plaintiff's duly elected Member of Congress. Furthermore, application of the State of Texas' legal fiction, as described above, has adversely affected (and will adversely affect) the federal representational interests shared by Plaintiff with the local community in which he is an actual inhabitant. Application of this policy by the

Defendant State of Texas has thus caused (and will cause) "representational harm" to Plaintiff without the Court's intervention.

**(8)**

The Framers of Article I, §2 of the U.S. Constitution; the Framers of § 2 of the Fourteenth Amendment to the U.S. Constitution; the Framers of the Equal Protection Clause of the Fourteenth Amendment; and the first Congress that enacted of the U.S. Census Act of 1790; all understood the words "usual place of abode," "inhabitant" and "usual residence" to be qualified by what has been known since antiquity as the "*animo manendi*" doctrine (which John Adams referred to as the "*animus habitandi*" doctrine in November of 1784).

**(9)**

Since ancient times, and continuing through the adoption and ratification of Article I, §2 of the U.S. Constitution; and the adoption and ratification of § 2 of the Fourteenth Amendment to the U.S. Constitution; and the adoption and ratification of the Equal Protection Clause of the Fourteenth Amendment; and at the time of the enactment of the U.S. Census Act by the first Congress in 1790; the "*animo manendi*" doctrine, as it would apply to "prisoners," was settled law in the United States. This doctrine has consistently provided since antiquity, as it does now, that a "prisoner" who is involuntarily confined for a term less than life is not deemed an "inhabitant" of the location where he is confined, but is instead an "inhabitant" of the location where he was domiciled prior to his confinement.

**(10)**

The "*animo manendi*" doctrine, as it would apply to "prisoners," expressed the consensus of all legal writers whose works were published prior to 1787. Furthermore, no legal authority published since 1787 has questioned application of the "*animo manendi*" doctrine with regard to a determination of the residence, "habitation" or domicile of prisoners; and this doctrine, as settled law, has continued to be consistently applied in the United States through adoption and ratification of the Fourteenth Amendment and thereafter.

**(11)**

The consensus among all legal authorities, concerning the "*animo manendi*" doctrine and determination of the residence or domicile of prisoners, is plainly illustrated by the writings of numerous highly regarded legal authorities. These legal authorities include Domitius Ulpianus, Flavius Petrus Sabbatius Iustinianus, Johannis Voet, Jean Domat, Jean-Batiste Denisart, Jean-Jacques Burlamaqui, Emerich de Vattel, Philippe-Antione Merlin, Joseph Story and James Kent. With the exception of the latter two legal authorities (Joseph Story and James Kent), the Framers of Article I, §2 of the U.S. Constitution, and the Congress that enacted the U.S. Census Act of 1790, would have been (or were) personally familiar with some if not all of these legal authorities in 1787. Neither the Framers of the constitutional provisions cited above, nor the Members of the first Congress that enacted the U.S. Census Act of 1790, intended "prisoners"  confined for a term less than life to be deemed "inhabitants" of the location where they were confined for purposes of enumeration and allocation of representation in the U.S. House

of Representatives. Rather, the Framers intended the words "usual place of abode," "inhabitant" and "usual residence" to be qualified by the "*animo manendi*" doctrine.

**(12)**

Although the Director of the U.S. Census Bureau seems to be unfamiliar with the "*animo manendi*" doctrine and the Framers' intentions related to that doctrine, in this suit Plaintiff brings no claim in this complaint against the United States, the U.S. Department of Commerce, or against any other federal agency of the United States government. However, Plaintiff does present claims against the State of Texas by his inclusion of the named Defendants (Abbott, Phelan, Patrick and Scott) as parties to this suit in their official capacities.

**IV.**

**PLAINTIFF' LEGAL CLAIMS**

**(1)**

The federal constitutional theory of equal representation in the U.S. House of Representatives underlies not just the method of allocating House seats to States. It applies as well to the method of apportioning congressional seats within States.

**(2)**

The basis of representation in the U.S. House of Representatives was intended by the Framers of the U.S. Constitution to include all inhabitants of the United States, even though States remained free to deny many of those inhabitants the right to participate in the selection of their representatives. The Plaintiff's status as a prison inmate who is ineligible to vote in federal elections due to applicable state law does not extinguish his federal constitutional right to equal representation in the U.S. House of Representatives.

**(3)**

Federal statutory law requires the State of Texas to enact new congressional districts each decennial following its receipt of the certified apportionment of U.S. Representative provided by the Clerk of the U.S. House of Representatives, along with its receipt of population data provided by the Bureau.

**(4)**

In the present case Plaintiff contends the Defendant State of Texas' "legal fiction," as described above and as applied to him for the purpose of congressional redistricting after the 2020 decennial census, violates his constitutional right to "equal representation" as guaranteed by Article I, §2 of the U.S. Constitution and §2 of the Fourteenth Amendment to the U.S. Constitution. The Plaintiff also contends the Defendant State of Texas' legal fiction violates his constitutional right to Equal Protection of the Law under the Fourteenth Amendment.

**(5)**

The Framers of Article I, §2 of the U.S. Constitution, the Framers of the U.S. Census Act of 1790, the Framers of § 2 of the Fourteenth Amendment to the U.S. Constitution, and the Framers of the Equal Protection Clause of the Fourteenth Amendment, all intended the words "usual place of abode," "inhabitant" and "usual residence" to be qualified by the "*animo manendi*" doctrine. In accordance with that doctrine, the Framers of those constitutional provisions, and the Congress that enacted the U.S. Census Act of 1790, did not intend a person confined in prison for a term of confinement less than life to be deemed, merely on the basis of the person's confinement

alone, to have established a "residence," an "abode" or a "domicile," at the location of the person's confinement for purposes of congressional representation.

**(6)**

The Plaintiff has previously provided the Defendants and the Court with detailed notice of the historical basis which supports his claim that, for purposes of equal representation in the U.S. House of Representatives, the U.S. Constitution requires that he be represented by a U. S. Representative elected from the congressional district wherein he is a permanent resident and domiciled. See *Plaintiff Wilson's Verified Memorandum of Law in Support of Motion for Certification of Class Action*, 6-25 (ECF No. 55)(filed Nov. 24, 2021). The Plaintiff incorporates by reference that pleading into the allegations contained in this amended complaint.

**(7)**

Article I, §2 of the U.S. Constitution, § 2 of the Fourteenth Amendment to the U.S. Constitution, and the Equal Protection Clause of the Fourteenth Amendment, each require states, including Defendant State of Texas, to make "a good-faith effort" to provide "as "nearly as practical" equal representation to all persons enumerated in a federal decennial census regardless of whether the persons are legally qualified to vote under state law. These constitutional requirements condemn state congressional redistricting plans that provide unequal representation in the U.S. House of Representatives unless departures from equal representation "as nearly as practical" are shown to have resulted despite such a "good faith effort" by a state, and the state must justify each variance from equal representation "no matter how small."

**(8)**

The Plaintiff contends the Defendant State of Texas cannot constitutionally justify application of its legal fiction, as described herein, because it cannot satisfy the "as nearly as practicable" and "good faith effort" requirements that are applicable to the Plaintiff' claims. Here, there is no uncertainty concerning where Plaintiff was an "inhabitant" on April 1, 2020, within the meaning of the aforementioned constitutional provisions; and the Defendant State of Texas cannot persuasively assert it was "impractical" for it to utilize that knowledge or acquire that information, if necessary, pertaining to Plaintiff's permanent residence or domicile on Census Day (April 1, 2020). In other words, due to the Defendant State of Texas' actual knowledge of where Plaintiff last permanently resided before his current term of incarceration, and due to Defendant State of Texas' ready access to the "Census Geocoder" program that would easily have allowed it to place Plaintiff within the congressional district of his permanent domicile and where he is was an "inhabitant" on Census Day (April 1, 2020), the State of Texas cannot satisfy the aforementioned constitutional test.

**(9)**

When treating Plaintiff differently from others by declaring him for federal representational purposes as an inhabitant of where he was confined on April 1, 2020, rather than recognizing him as an inhabitant of the location where he had established and continued to maintain a permanent residence in the City of Grand Prairie, Texas, both before, on and after April 1, 2020, Defendants have violated the Equal Protection Clause of the Fourteenth Amendment. In this regard, other persons, including military personnel, have not been subjected to this legal fiction which has been applied to Plaintiff by

Defendants, but they have instead been treated by Defendants as inhabitants and permanent residents in accordance with the *animo manendi* doctrine.

**(10)**

The Plaintiff has sustained, and without the Court's intervention will sustain, the type of "injury in fact" that is required to establish legal standing. The Defendants have assigned Plaintiff for purposes of representation in the U.S. House of Representatives to a congressional district where Defendants actually knew Plaintiff has never permanently resided. When doing so, Defendants diminished Plaintiff's constitutionally protected "ability to influence or benefit from federal policy" in relation to the way he would otherwise be able "to influence and benefit from federal policy" were he considered, as required by the U.S. Constitution, as a resident and "inhabitant" of the district where he is domiciled. In this connection, Plaintiff would show, *inter alia*, that the voting record of U.S. Representatives who have been or would be elected to Congress from what is now CD13, discloses nothing short of outright hostility to the public policy objectives that Plaintiff holds and shares with the vast majority of the inhabitants who live near his permanent residence in Grand Prairie, Texas, and who live within the congressional district in which Plaintiff has his permanent residence and domicile, CD30. This fact and other facts that describe the ways in which Defendants' legal fiction has diminished Plaintiff's constitutionally protected "ability to influence or benefit from federal policy," are provided in greater detail in a declaration executed by Plaintiff that is appended to this amended complaint and identified as "Plaintiff's Exhibit A." The Plaintiff incorporates by reference Exhibit A, as appended to this pleading, as if fully set out in the body of this amended complaint.

**(11)**

Additionally, Plaintiff has sustained and without the Court's intervention will sustain an "injury in fact" as the result of Defendants' legal fiction. The Defendants' legal fiction displaces him from the location where he is an "inhabitant," and instead assigns him for representational purposes as an inhabitant of a congressional district within which he has never been an "inhabitant." In this regard, Plaintiff contends Defendants' legal fiction deprives him of equal representation in at least additional two ways. First, Plaintiff contends Defendants' legal fiction significantly interferes with, if it does not entirely eliminate, his ability to meaningfully communicate with the U.S. Representative elected to represent him in the district of his domicile. Second, Plaintiff contends Defendants' legal fiction adversely affects the scope and efficacy of official communications *to Plaintiff*, *from the U.S. Representative* who would otherwise represent him, but for Defendant's legal fiction.

**(12)**

With regard to the first consideration (meaningful communications *from a person to a Representative*), the "injury in fact" claimed by Plaintiff is identifiable as a matter of political science. For example, one highly esteemed organization, after conducting extensive research for nearly a decade (including interviews with more than 350 congressional staffers), has concluded the particular location of the person's residence dramatically affects the responsiveness of a Representative to any communication received.[1] According to this research, "[w]hen a congressional office receives a message" the "first thing most look for is whether it comes from a citizen who resides in their

---

[1] Tim Hysom, *Communicating with Congress: Recommendations for Improving the Democratic Dialogue*, 2 (Congressional Management Foundation 2008)("Hysom").

congressional district."[2] When a message is determined to be communicated by a person who is classified as residing "outside" a Representative's district, the message "as a matter of professional courtesy" is *sometimes* (but not always) referred to another office "without consideration" by the member of Congress to whom it has been sent. In other words:

> "Individual citizens…routinely attempt to send messages to Members who do not represent them….However, Congress is a representative body whose Members are beholden to their own constituents. As a courtesy, *some Members* forward messages to the appropriate Members, but few read or respond to messages not from their own constituents. In fact, in most cases…Representatives and their staffs never read 'out-of-district' or 'out-of-state' mail because the systems in their offices usually verify immediately whether a message originated from their district or state."[3]

The foregoing description of the common and customarily followed policy of Members of the U.S. House of Representatives provides, at a minimum, a plausible basis to support a finding that Defendants' actions have diminished Plaintiff's constitutionally protected "ability to influence or benefit from federal policy." Specifically, Plaintiff's constitutionally protected "ability to influence or benefit from federal policy" is diminished in relation to the way he would otherwise be able "to influence and benefit from federal policy" were he considered, as required by the U.S. Constitution, as a permanent resident and "inhabitant" of the district where he is domiciled. The treatment that would be given by congressional staff members employed by a U.S. Representative elected to represent CD30, when processing Plaintiff's personal communications with the U.S. Representative of his domicile (CD30)(or to communications transmitted to the same staff members by third-parties on Plaintiff's behalf), would thus be cognizably inferior to the treatment given to Plaintiff's communications, due to CD30 staff

---

[2] *Hysom*, *supra*, at 20.
[3] *Id.*, at 27 (italics added).

members' discovery that Defendants have classified Plaintiff is an "inhabitant" and "permanent resident" of CD13. In other words, the discovery by congressional staff of CD30, that Defendants have classified Plaintiff as an inhabitant of CD13 rather than of CD30, would result in treatment indistinguishable from the disparate and unequal official treatment described above.

**(13)**

To the extent Plaintiff's legal standing involves an inquiry into Plaintiff's "injury in fact," Plaintiff's standing does not rest on mere speculation about the decisions of the congressional staff of U.S. Representative who would represent him in CD30, or on mere speculation about the decisions made by the actual U.S. Representative who would represent Plaintiff in CD30. Rather, as the U.S. Supreme Court has ruled in a similar context, Plaintiff's alleged "injury in fact" relies instead on the "predictable effect" of Defendants' action on the decisions made by those third parties.

**(14)**

With regard to the second consideration (the scope and efficacy of communications *from a Representative to a person* not classified as a resident of the Representative's district), federal statutory law requires that communications mailed by a U.S. Representative to a person not residing in the Representative's district be treated differently and "unequally." Since October 1992, Representatives have been prohibited from sending "mass mailings" outside their districts.[4] This is confirmed by the literal text of 39 U.S.C. §3210 ("§3210"), which provides that a Representative "may not send any mass mailing outside the congressional district from which [he or he] was elected."

---

[4] *Franking Privilege: Historical Development and Options for Change*, 18 (Congressional Research Service, 2016).

Furthermore, under §3210(d), a Representative or Representative-elect may send franked mail with a "simplified form of address" only "for delivery within that area constituting the congressional district from which [he or she] was elected." *Ibid*. The disparate and unequal treatment applied to communications from a U.S. Representative to a person (regardless of whether the person is eligible to vote in federal elections or not), depending on where the person has been designated as an "inhabitant" for representational purposes, provides, at a minimum, a plausible basis to support a finding that Defendants' actions have diminished Plaintiff's constitutionally protected "ability to influence or benefit from federal policy" in relation to the way he would otherwise be able "to influence and benefit from federal policy" were he considered, as required by the U.S. Constitution, as a resident and "inhabitant" of the district where he is domiciled.

**(15)**

This amended complaint alleges the State's "policy" is actually being directly applied to him "currently," and that the same policy will be applied to him by Defendants for the next decade. An undisputed "current application" of a policy, as in the present case, which is ongoing and which Defendants have manifestly expressed an intention to apply to Plaintiff in the future, necessarily satisfies the "certainly imminent" requirement for legal standing.

**(16)**

The representational harms Plaintiff has sustained and will sustain without the Court's intervention are "traceable" to acts of Defendants, insofar as that showing is required to establish Plaintiff's legal standing to challenge and seek equitable relief as a remedy for Defendants' actions.   Each of the Defendants directly participated in the

official decision to displace Plaintiff for representational purposes from the congressional district in which he is an "inhabitant" as defined by the U.S. Constitution. Furthermore, the prospective remedial relief requested by Plaintiff would properly be directed at each of the Defendants in order to prevent a recurrence of the constitutional violations to which Plaintiff has been and otherwise will be subjected. Defendant Abbott is the duly elected Governor of Texas, and is the Chief Executive Officer of the State of Texas under Article IV, Section 1, of the Constitution of the State of Texas. As such, the authority to call a special session of the Texas Legislature, for purposes of revising Plan C2193 to conform the Court's remedial order, would rest solely with Defendant Abbott. Defendant Phelan is the duly elected Speaker and Presiding Officer of the Texas House of Representatives under Article III, Section 9 (b), of the Constitution of the State of Texas. As such, Defendant Phelan would necessarily exercise authority to oversee any revision of Plan C2193 and would hold an official responsibility to assure legislative compliance with the Court's remedial order. Defendant Patrick is the duly elected Lieutenant Governor of Texas, and is the Presiding Officer of the Texas Senate under Article IV, Section 16, of the Constitution of the State of Texas. As such, Defendant Patrick would necessarily exercise authority to oversee any revision of Plan C2193 and would hold an official responsibility to assure legislative compliance with the Court's remedial order. Defendant Scott is the Secretary of State of the State of Texas, is an Executive Officer of the State of Texas under Article IV, Section 1, and is appointed by the Governor of Texas by and with the advice of the Texas Senate under Article IV, Section 21, of the Constitution of the State of Texas. Defendant Scott is also the Chief Election Officer for the State of Texas. As such, Defendant Scott would hold an official responsibility to

assure administrative compliance with a remedial order issued by the Court that either requires implementation of a judicially congressional redistricting plan that would be applied in the interim to the next congressional election in November of 2022, or that compels a legislative revision of Plan C2193, should Plaintiff prevail in this cause.

**(17)**

An order or judgment entered by this Court would be capable of "redressing" the harms about which Plaintiff complains. The Plaintiff's claims therefore satisfy the "redressability" requirement for legal standing.

**(18)**

The Plaintiff's claims seeking prospective remedial relief are not barred by the Eleventh Amendment to the U.S. Constitution or the doctrine of sovereign immunity. While states are generally immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity, the U.S. Supreme Court has recognized an exception to the Eleventh Amendment and the doctrine of sovereign immunity that allows an action that seeks, as in the present case, prospective equitable relief that would prevent state officials from applying or enforcing state laws that are contrary to federal law.

**(19)**

Neither the acts about which Plaintiff complains, nor the prospective remedial relief he seeks, are barred by the doctrine of "legislative immunity." The scope of legislative immunity has never encompassed all conduct that merely relates, in some way, to the legislative process. Legislative immunity is doctrinally limited to acts that are "clearly" a part of "the legislative process" and which involve "the due functioning of the

process." Thus, conduct to which the doctrine applies must be an "integral part" of the "deliberative and communicative process" by which legislators participate in the formulation and consideration of legislation. Because Plaintiff challenges the validity of a "legislative act" occurring after all legislative "speech," "debate" and "deliberations" had concluded, and he therefore does not challenge conduct of Defendants occurring during the "deliberative legislative process," the legislative immunity doctrine does not bar either Plaintiff's claims against any of the Defendants or the relief he seeks against them.

**(20)**

Defendant Governor Abbott has "enforcement" authority, as it would pertain to Plan C2193, under Texas law. Among other things, Defendant Abbott is vested with authority to "order . . . each general election for . . . members of the United States Congress." Tex. Elec. Code §3.003(a)(1). The Plaintiff has alleged an election under Plan C2193 would deprive him of "equal representation" under various provisions of the U.S. Constitution. Because Plaintiff seeks an injunction that would prohibit Defendant Abbott from exercising an "enforcement" authority that is a necessary predicate to conducting an allegedly unconstitutional election, "legislative immunity" does not bar the prospective equitable remedy Plaintiff seeks against Defendant Abbott.

**(21)**

Defendant Secretary of State Scott is the Chief Election Officer for the State of Texas. Tex. Elec. Code §3.001(a). When a person who performs "official functions in the administration of any part of the electoral processes" fails "to comply with an order from the secretary of state," the secretary may seek "enforcement" of the order. Tex. Elec. Code §3.005(c). Defendant Scott thus has "enforcement" authority, as it would pertain to

Plan C2193, under Texas law. The Plaintiff has alleged an election under Plan C2193 would deprive him of "equal representation" under various provisions of the U.S. Constitution. Because Plaintiff seeks an injunction that would prohibit Defendant Scott from exercising an "enforcement" authority in furtherance of an allegedly unconstitutional election under Plan C2193, "legislative immunity" does not bar the prospective equitable remedy Plaintiff seeks against Defendant Scott.

**(22)**

Finally, no assertion by Defendants that Plaintiff has failed to "exhaust" his "administrative remedies" before filing this suit would have merit. Under Texas law inmates confined in a state prison may seek "administrative remedies" through a "grievance" process. The substantive and procedural rules that govern Texas' inmate grievance process are contained in Texas' "Offender Grievance Operations Manuel" (last revised Jan. 2011)("OGOM").

**(23)**

While under the OGOM prison officials employed by the Defendant State of Texas are ethically bound to "[u]phold all federal, state and local laws, and adhere to the agency's policies, procedures, rules and regulations," the OGOM has repeatedly informed (and continues to inform) Texas' prison inmates that their challenges to "[s]tate and federal court decisions, laws, and regulations" are "Non-Grievable Issues." Thus, because Texas' congressional redistricting plan constitutes a "state law" that is "non-grievable," and because there is no "administrative remedy" that is "available" to Plaintiff on that basis within the meaning of 42 U.S.C. §1997e (a), no legal obstacle to the District Court's jurisdiction is presented in this case.

## V.

## REQUEST FOR CERTIFICATION OF CLASS ACTION

### (1)

This action is brought by Plaintiffs as a class action, on his own behalf and on behalf of all others similarly situated, under the provisions of Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"). The Plaintiff hereby moves the Court to certify this case as a class action pursuant to Rule 23.

### (2)

In this suit Plaintiff seeks a declaratory judgment and a permanent injunction predicated on claims that his federal constitutional right to equal representation in the U.S. House of Representatives has been violated by the Defendants' legal fiction that has unconstitutionally designated him as an "inhabitant" of a location at which he was confined on April 1, 2020, rather than where he was, as a constitutional matter, an "inhabitant" on that date. In this suit Plaintiff does not seek compensatory damages.

### (3)

The class to be represented by Plaintiff in this action, and of which Plaintiff is himself a member, consists of all inmates: a) who are involuntarily confined by the Defendant State of Texas in its prisons for  a term of confinement less than life; b) who have been designated by Defendants for purposes of federal representation in the U.S. House of Representatives as "inhabitants" of the location where they were confined on April 1, 2020; and, c) who have not been designated by Defendants as inhabitants, for congressional representational purposes, at the location of the domiciles that they

maintained immediately prior to their terms of confinement, to which they intend to return after release from confinement.

**(4)**

The exact number of members of the class, as identified and described, is not known, but it is estimated that there are not less than 50,000 members. The class is so numerous that joinder of individual members is impracticable.

**(5)**

As disclosed by federal litigation commenced in Texas after the 2010 decennial census, the State of Texas in 2011, as it has in the present case, unconstitutionally moved the location of inmate-residences from where they were domiciled, to locations at which they were confined on "Census Day" (April 1, 2020). As a result, and as was shown by uncontroverted evidence in the record of that litigation, under Texas' former congressional redistricting plan (Plan C185, as enacted in 2011) inmates domiciled in the densely populated urban areas of Dallas and Harris Counties were displaced by the State of Texas' decision to draw electoral districts that did not recognize 49,437 inmates to be "inhabitants" of those two counties alone. *Perez v. Texas*, No. 5:11-cv-00360-OLG (W. D. Tex.), *Plaintiff's Response in Opposition to State's Motion to Dismiss*, 6-7, and Exhibits 7 and 8 (State's Written Admissions)(filed Aug. 23, 2011)(ECM Dkt.# 226, 226-7, and 226-8 Although more than a decade has elapsed since the decennial census of 2010, these figures support Plaintiff's estimation that the class certified in the present case would consist of not less than 50,000 members.

**(6)**

There are common questions of law and fact in this action that relate to, and affect, the rights of each member of the class; and the relief sought by Plaintiff is common to the entire class. Namely, the common questions of law involve whether the federal constitutional rights of the class members to equal representation in the U.S. Congress have been violated by the Defendants' allocation of class members to a location at which they were confined on April 1, 2020, rather than where they are inhabitants.

**(7)**

The claims of Plaintiff, who is representative of the class, are typical of the claims of the class, in that the claims of all members of the class, including Plaintiff, depend on a showing of the acts and omissions of Defendants giving rise to the constitutional rights of Plaintiff to the relief sought. There is no conflict between Plaintiff and other members of the class with respect to this action, or with respect to the claims for relief set forth in this complaint.

**(8)**

This action should be certified as a class action, for the reason that the prosecution of separate actions by individual members of the class would create a risk of varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the Defendants, all of whom oppose the interests of the class.

**(9)**

This action would be properly maintained as a class action, in that the prosecution of separate actions by individual members of the class would create a risk of

adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications. Additionally, separate actions by individual members of the class would substantially impair or impede the ability of class members to protect their respective interests.

**(10)**

This action would be properly maintained as a class action inasmuch as the Defendants, all of whom oppose the class, have acted or refused to act, as more specifically alleged in this complaint on grounds which are applicable to the class, and have by reason of such conduct made appropriate final injunctive relief and corresponding declaratory relief with respect to the entire class, as sought in this action.

**(11)**

As stated in a declaration executed by Plaintiff that is in the record, see *Plaintiff Wilson's Verified Memorandum of Law in Support of Motion for Certification of Class Action*, [page 45 of 46"] (ECF No. 55)(filed Nov. 24, 2021), undersigned counsel for Plaintiff has discussed and thoroughly explained to Plaintiff the nature of a class action lawsuit and the potential advantages and disadvantages to him and his case by proceeding with a class action lawsuit rather than individually. After conferring with under signed counsel, Plaintiff  has consented to his case being certified as a class action, and has affirmed that should he be approved by the Court as the representative party for the class, he will fairly and adequately protect the interests of the class at all times.

**(12)**

The Plaintiff, as the representative party for the class, is able to, and will, fairly and adequately protect the interests of the class. The Attorney-in-Charge for the Plaintiff in the present case, Richard Gladden, is experienced with complex federal litigation and has shown himself capable of providing excellent representation in numerous cases before this Court, as well as before other federal courts including the U. S. Supreme Court, particularly in area of litigation arising under 42 U.S.C. §1983. With regard to litigation involving the right to federal representation in the U.S. Congress, Mr. Gladden served as Attorney-in-Charge for plaintiffs Walter Session, Frenchie Henderson, and others (the "Cherokee County Plaintiffs"), arising from the State of Texas' re-redistricting of its congressional districts in 2003. *Session v. Perry*, 298 F. Supp. 2d 451 (E.D. Tex. 2004), *on remand sub. nom.*, *Henderson v. Perry*, 399 F. Supp. 756 (E. D. Tex. 2005). The nature of the federal constitutional claim presented by Mr. Gladden on behalf of the plaintiffs in *Session v. Perry*, *supra,* was the subject of a subsequently published law review article, Gladden, *The Federal Constitutional Prohibition Against "Mid-Decade" Congressional Redistricting: Its State Constitutional Origins, Subsequent Development, and Tenuous Future*, 37 Rutgers L.J. 1133 (2005-2006). Should he be appointed as Attorney-in-Charge for the class in the present case, Mr. Gladden would actively conduct and be directly responsible for the litigation. For these reasons, Plaintiff moves the Court to appoint Mr. Gladden as class counsel pursuant to Rule 23(g).

## RELIEF REQUESTED

In light of the foregoing facts and claims, the Plaintiff moves the Court to:

a) Certify this case as a class action pursuant to Rule 23;

b)  Set a hearing on any pretrial motion for relief filed by Plaintiff, including but not limited to a motion for summary judgment;

c)  Set a date for a trial on the merits of this case, if a trial be necessary; and, after full consideration of the merits of Plaintiff's claims at trial,

d)  Issue a declaratory judgment, pursuant to 28 U.S.C. §2201, which declares Plan C2193, as applied to Plaintiff and to others similarly situated, to be in violation of Article I, §2 of the U.S. Constitution, § 2 of the Fourteenth Amendment to the U.S. Constitution, and the Equal Protection Clause of the Fourteenth Amendment;

e)  Issue a permanent injunction, pursuant to 28 U.S.C. §2202, prohibiting the Defendants, their agents, successors, assigns, or anyone acting in concert with them, from engaging in any actions for the purpose electing, at any primary or general election, any person to serve as a Member of the United States House of Representatives from the State of Texas under Plan C2193;

f)  Award the Plaintiff's counsel reasonable costs and reasonable attorney's fees pursuant to 42 U.S.C. §1988, which are shown to be necessary to the prosecution of this matter; and

g)  Grant such other and further relief to which the Plaintiff and others similarly situated may show themselves entitled.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that the Court will certify this case as a class action as requested herein; that the Court will grant the relief requested by Plaintiff for himself and on behalf of others similarly situated; and that the

Court will grant such further or additional relief to which Plaintiff and others similarly situated may show themselves entitled.

Respectfully submitted,

*/s/ Richard Gladden*
Texas Bar No. 07991330
1204 W. University Dr. Suite 307
Denton, Texas 76201
940.323.9300 (voice)
940.539.0093 (fax)
richscot1@hotmail.com (email)
*Attorney-in-Charge for Plaintiff*

## CERTIFICATE OF SERVICE

This is to certify that a true copy of this document was served on all Defendants using the electronic CM/ECF filing system, *via* their Attorney of Record, Patrick K. Sweeten, and by the same means on all Plaintiffs having cases consolidated with this case, on this 13th day of December, 2021.

*/s/Richard Gladden*

# PLAINTIFF WILSON'S EXHIBIT A

IN THE STATE OF TEXAS

COUNTY OF FORT BEND

## **DECLARATION IN LIEU OF**

## **SWORN AFFIDAVIT**

My name is Damon James Wilson and my date of birth is January 11, 1979. I am currently confined by the Correctional Institutions Division of the Texas Department of Criminal Justice in the Jeter III Unit located 3 Jeter Rd., in the City of Richmond, Fort Bend County, Texas. My TDCJ inmate identifying number is 01865939. I am the named Plaintiff in *Damon James Wilson v. The State of Texas, et al.*, No. 1:21-cv-00943-RP-JES-JVB, which case is now pending in the United States District Court for the Western District of Texas, El Paso Division (consolidated). It is my intention that this declaration be filed with the Court on my behalf at the discretion of my attorney, Richard Gladden.

I have been advised that under Section 132.001(a) of the Texas Civil Practice and Remedies Code an unsworn declaration executed by an inmate who is confined in the Correctional Institutions Division of the Texas Department of Criminal Justice may be used in lieu of a sworn declaration, verification, certification, oath, or affidavit. Having been so informed, I hereby declare under penalty of perjury that the facts stated above, and the facts stated hereinafter, are all true and correct.

On "Census Day," April 1, 2020, I was confined by the State of Texas at the William P. Clements Unit of the Correctional Institutional Division of the Texas Department of Criminal Justice. The Clements Unit is located at 9601 Spur 591, in the City of Amarillo, Potter County, Texas. Prior to my current term of confinement by the State of Texas, I physically resided in the 1400 block of Independence Trail, in the City

1

of Grand Prairie, Dallas County, Texas. On April 1, 2020, it was my intention to resume my permanent residence in the City of Grand Prairie, Texas, upon my release from confinement. Prior to my arrival at the William P. Clements Unit, and at the time that I began serving my current sentence to confinement, I provided Texas officials with the true location of where I permanently resided. I believe that my permanent residence address in Grand Prairie, Texas, was also provided to Texas prison officials in the "pen packet" they received at the time I began my current sentence to confinement. On April 1, 2020, I was (as I continue to be now) an inhabitant of a location *other than Amarillo, Texas,* because I am now, as I was on April 1, 2020, *a permanent resident of the City of Grand Prairie, Texas.*

Under Texas Senate Bill 6 and "Plan C2193," which was adopted by the Texas Legislature on October 18, 2021, I have been wrongly designated as an "inhabitant" and resident of Amarillo, Texas, and of Texas Congressional District 13 ("CD13"). As established by Plan C2193, CD13 encompasses the location where I was confined on April 1, 2020. CD13 in Plan C2193 *does not* encompass the location of where I was then, and am now, an inhabitant and a permanent resident, that is, in the City of Grand Prairie, Texas.

Before and since my most recent term of confinement in the Texas prison system I have continuously maintained an intention to return to my permanent residence in the City of Grand Prairie, Dallas County, Texas, for the purpose of continuing my permanent residence and domicile there. I have never had any intention of establishing a permanent residence or domicile *at any prison unit.* I will be discharged from my present sentence to confinement not later February 1, 2031.

My attorney, Richard Gladden, has discussed and thoroughly explained to me the nature of a class action lawsuit and the potential advantages and disadvantages to me and my case by proceeding with a class action lawsuit rather than individually. After conferring with Mr. Gladden I fully understand what he has explained to me; he has answered all of my questions about this; and I consent to the filing of a motion for the purpose of causing my case to be certified as a class action. Should I be approved by the Court as the representative party for the class, I will fairly and adequately protect the interests of the class at all times.

I am currently 42 years old. Like most other people, throughout my life I have kept myself informed about current affairs, including political matters involving public policy debates at the local and national levels. Prior to my becoming ineligible to vote under Texas law as the result of a felony conviction, I not only expressed my opinions and support for political candidates who I thought should be elected to local, state and national offices, but I also expressed my opinions and support for governmental policies that I thought should be adopted, whether they involved local or national issues. The public policy issues I supported almost invariably concerned matters that could have potentially impacted the local community in which I lived. My interest in affecting public policy outcomes, including those occurring at the federal level, has remained unchanged since I have been confined and this remains true today even though I am not currently eligible to vote.

I have never voluntarily resided in Amarillo, which is where the congressional district to which I have been assigned is centered. I do not share any political or other public policy interests with the vast majority of persons who live in Amarillo and are

3

inhabitants of CD13. Among other things, the voting record of U.S. Representatives who have been or would be elected to Congress from what is now CD13, discloses nothing short of outright hostility to the public policy objectives that I share with the vast majority of the inhabitants who live near my permanent residence in Grand Prairie, Texas, and who live within the congressional district in which I truly have my permanent residence, CD30.

It angers me that partisan factions in the Texas legislature think it is appropriate, and legal, to declare that I live wherever they choose to say I live, regardless of the facts. They have done this merely to advance their own political ambitions wholly unrelated to the objective of providing fair and equal representation to all. It is my understanding that the U.S. Senate was supposed to represent *the states* in the federal government, and that the U.S. House of Representatives was intended to represent *the People*, not the states. The action taken by the State of Texas, about which I am complaining, is clearly designed by Texas to claim, for itself, an unconstitutional right to control representation *in both chambers* of the federal government, to the exclusion of *the People*.

I am entitled to representation by a member of the U.S. House of Representatives who resides in, or at least has an interest in, the local affairs of the community where I reside, Grand Prairie, Texas, not a person from far West Texas whom a faction within the Texas legislature prefers. Such a representative from West Texas would hardly give a flip about what either I think, or what the majority of the inhabitants think, in the area of Grand Prairie, Texas and in CD30. The same *would not be true* of a person elected to represent me in CD30, who would depend on the views of their constituents in CD30 for their election. Again, comparison of the voting records of those who would represent me

4

in CD13, in contrast to the voting records of those who have represented or would represent me in CD30, demonstrates a radical difference between the public policy views of the inhabitants of these two communities and their respective political interests.

The action taken by members of the Texas legislature when declaring that I permanently reside "wherever *their* hearts desire" plainly deprives me, and those with whom I share common public policy interests in CD30, of the right to fair and equal representation in the U.S. House of Representatives. This cannot have been intended by our Founding Fathers.

I hereby declare under penalty of perjury that the foregoing facts are all true and correct.

SIGNED AND EXECUTED by me on this ___23___ day of November, 2021.

Damon James Wilson