CAUSE NO. EP-21-CV-00259-DCG-JES-JVB [Lead Case]

**The exhibits identified below as referenced in Plaintiff's Response are true and correct copies of documents produced in discovery in this case. The exhibits I am authenticating are:**

**Ex.A The Honorable Todd Hunter Chairman, House Committee on Redistricting**

**Ex.B joint letter from Congresspersons Jackson-Lee and Green to Legislators which is incorporated herein as if fully set forth.**

**Ex.C map proposed by Senator Crockett in CD2139 with accompanying citizenship data, which is attached hereto and incorporated for all purposes as if fully set forth herein.**

**Ex.D A true and correct copy of a proposed Complaint**

**My name is Gary Bledsoe, I declare under penalty of perjury that the foregoing is true and correct. Executed in Travis County, State of Texas, on December day of the 15, 2021.**

*/s/ Gary Bledsoe*

**GARY BLEDSOE**



*Eddie Bernice Johnson*
*Member of Congress*
*Thirtieth District, Texas*

October 13, 2021

The Honorable Todd Hunter
Chairman, House Committee on Redistricting
Texas House of Representatives
P.O. Box 2910
Austin, TX 78768

Re: Texas 30th Congressional District

Dear Honorable Hunter:

I am a member of the United States Congress, representing Texas' 30th Congressional
District. My district is about 16,000 above the mean number for Congressional Districts in
Texas. I want to keep it largely intact. There is no reason to change the district under current
circumstances, and any change should be one that comes from those with understanding of the
constituents and the needs that must be met and that includes me as the Congressperson for the
30th Congressional District. Last time my district was drawn without my input, and it was
cracked and packed in such a way to where courts in Texas and the District of Columbia
comprised mostly of Republicans said it was illegal vote dilution.

Please include me in making any decisions about the 30th Congressional District. The courts
have continually recognized it as a protected African-American opportunity seat and I would like
to keep it that way.

I helped establish CD30 from its infancy and though it has been reconfigured many times in the
past, in many different lines, I have worked to nourish and develop it through the years, making
me uniquely qualified to understand it.

It goes without saying that I know the communities of interest, local political system, the
district's economic engines, racial and ethnic groups, diverse businesses, and how they all fit
together in ways to uniquely advance the interests of the 30th Congressional District. It is my
intention to provide you with a map in the not too distant future, though I would appreciate you
letting me know of any existing time obligations to provide my recommendations to you.

I know incumbent protection and maintaining cores of districts together are two accepted redistricting principles in Texas and hoping they are applied to my district consistent with the requirements of the Voting Rights Act.

Thank you.

Sincerely,

*Eddie Bernice Johnson*

Eddie Bernice Johnson
Member of Congress

September 29, 2021

The Honorable Joan Huffman
Chair
Senate Special Committee on Redistricting
P.O Box 12068
Capitol Station
Austin, Texas 78711

The Honorable Todd Hunter
Chairman
House Committee on Redistricting
Texas House of Representatives
P.O. Box 2910
Austin, Texas 78768

RE:    Texas 9th and 18th Congressional Districts

Honorable Joan Huffman and Honorable Todd Hunter:

As long-serving members of Congress from the 9th and 18th Districts of Texas, we strongly object to the initial congressional map (C2101) released by the Texas Senate Committee on Redistricting on September 27, 2021.

We base our objection on the following facts:

- Both districts in their present configuration have afforded African American voters the opportunity to elect candidates of their choice for 50 years in the case of the 18th District and 30 years for the 9th District (being an African-American opportunity district for nearly twenty years).
- Both districts have more than sufficient populations to maintain existing boundaries. The 9th District is slightly over the 2020 mean (+3,811) for Texas and the 18th District is less than three percent (+29,921) over the average. Very minor adjustments can bring each to the required 766,987 population.
- That being the case, the proposed Senate map unnecessarily removes more than 200,000 residents from these districts, while adding a slightly smaller number of new constituents with no history of being included in a protected district under the 1965 Voting Rights Act as amended in 1975.
- Both existing districts have strong economic engines providing expanding job opportunities for local residents. Notable among these are the Downtown Business District (DBD) and Bush International Airport in the 18th District and the Texas Medical Center in the 9th District.
- The proposed map moves the aforementioned Downtown Business District from the 18th District to an adjacent proposed district with fewer than 12 percent Black residents. Other important assets in the 18th District, such as the campuses of Texas Southern University and the University of Houston, are moved by C2101.
- The proposed map radically alters the local congressional map by moving the historic Third Ward and MacGregor areas from the 18th District to the 9th. That shift that includes the residence and main district offices of Congresswoman Sheila Jackson Lee. No other member of the large Texas delegation is so severely impacted by the proposed map.

- We also note that for the first time since Barbara Jordan took the 18th District seat in January, 1973, the iconic Fifth Ward and Third Ward constituencies have been placed in separate districts with no input from these communities.
- The changes to the Ninth District remove some of the most diverse and fastest growing communities in Fort Bend County, communities with a proven record of supporting the candidates of choice of Black voters. The proposed plan would add a number of new precincts from the City of Pearland in Brazoria County – a community with a history of opposing candidates supported by Black voters.

Currently, Congressional District 9 is almost the optimum size, being a little under 5,000 above the target number. Congressional District 18 is presently slightly above the optimum number for Congressional Districts by a little over 30,000. Last decade, after the State declined to include us in the process, Courts overturned the drawing of both districts as they both were victims of unnecessary surgery. It is essential that we keep the core of our districts together, including its economic engines and communities of interest.

In sum, the C2101 map makes radical and unneeded changes to the two local congressional districts that include the majority of Black voters in Harris and Fort Bend Counties. These changes have been made with no input from the sitting members, nor their constituent populations.

We should note that the 3 Judge Panel that heard the Section 5 challenge to the proposed Congressional Plan adopted by the Texas Legislature in 2011 made it very clear that the 9th and 18th are both protected African-American opportunity seats, and that they are protected from unnecessary surgery and surgery that takes out important economic engines from these districts as is being done in the current proposed plan. The paring of the two occupants of these districts seems and the unnecessary surgery done on their districts is clearly an act of racial discrimination. We strongly urge the Texas Senate members to reconsider C2101 and restore the performing 9th and 18th districts that have well served voters of color for decades.

Respectfully,

Sheila Jackson Lee,
Member of Congress
Texas 18th Congressional District

Respectfully,

Alexander Green,
Member of Congress
Texas 9th Congressional District

Cc:    Senator Royce West, Member, Senate Committee on Redistricting
       Senator Borris Miles, Member, Texas Legislative Black Caucus
       Vice-Chairwoman Toni Rose, Texas House Redistricting Committee
       Representative Nicole Collier, Chair, Texas Legislative Black Caucus
       Representative Ron Reynolds, 1st Vice Chair, Texas Legislative Black Caucus
       Representative Rafael Anchia, Member, Texas House Redistricting Committee
       Representative Craig Goldman, Member, Texas House Redistricting Committee
       Representative Ryan Guillen, Member, Texas House Redistricting Committee
       Representative Jacey Jetton, Member, Texas House Redistricting Committee

Representative Brooks Landgraf, Member, Texas House Redistricting Committee
Representative Ina Minjarez, Member, Texas House Redistricting Committee
Representative Joe Moody, Member, Texas House Redistricting Committee
Representative Geanie Morrison, Member, Texas House Redistricting Committee
Representative Andrew Murr, Member, Texas House Redistricting Committee
Representative Mike Schofield, Member, Texas House Redistricting Committee
Representative Senfronia Thompson, Member, Texas House Redistricting Committee
Representative Chris Turner, Member, Texas House Redistricting Committee
Representative James White, Member, Texas House Redistricting Committee
Colleen Garcia, Committee Clerk, Texas House Redistricting Committee
Senator Royce West, Member, Senate Special Committee on Redistricting
Mr. Marc Hoskins, Executive Director, Texas Legislative Black Caucus
Vice-Chari Juan Hinojosa, Senate Special Committee on Redistricting
Senator Carol Alvarado, Member, Senate Special Committee on Redistricting
Senator Paul Bettencourt, Member, Senate Special Committee on Redistricting
Senator Brian Birdwell, Member, Senate Special Committee on Redistricting
Senator Donna Campbell, Member, Senate Special Committee on Redistricting
Senator Kelly Hancock, Member, Senate Special Committee on Redistricting
Senator Bryan Hughes, Member, Senate Special Committee on Redistricting
Senator Eddie Lucio, Jr., Member, Senate Special Committee on Redistricting
Senator Robert Nichols, Member, Senate Special Committee on Redistricting
Senator Angela Paxton, Member, Senate Special Committee on Redistricting
Senator Charles Perry, Member, Senate Special Committee on Redistricting
Senator Royce West, Member, Senate Special Committee on Redistricting
Senator John Whitmire, Member, Senate Special Committee on Redistricting
Senator Judith Zaffirini, Member, Senate Special Committee on Redistricting

Texas Legislative Council
10/13/21 7:59 AM
Page 1 of 1

Red-116
Plan 2015-2019 ACS: 2020 Census
PLANC2139  10/13/2021 7:08:11 AM

## American Community Survey Special Tabulation
## Using Census and American Community Survey Data
## CONGRESSIONAL DISTRICTS - PLANC2139

Special Tabulation of Citizen Voting Age Population (CVAP) from the 2015-2019 American Community Survey with Margins of Error

| District | 2020 Census Total | VAP | CVAP | Special Tabulation Hispanic CVAP % Hispanic | Not Hispanic or Latino Citizen Voting Age Population (CVAP) % Black Alone | % Black + White | % Black + American Indian | % White Alone | % American Indian Alone | % Asian Alone | % Native Hawaiian Alone | % American Indian + White | % Asian + White | % Remainder 2 or More Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | 766,777 | 569,978 | 470,560 (±6,121) | 16.7 (±0.6) | 15.3 (±0.6) | 0.4 (±0.1) | 0.1 (±0.1) | 62.6 (±0.6) | 0.5 (±0.1) | 3.5 (±0.3) | 0.0 (±0.1) | 0.5 (±0.1) | 0.2 (±0.1) | 0.2 (±0.1) |
| 6 | 767,103 | 569,507 | 474,015 (±6,117) | 19.0 (±0.7) | 17.6 (±0.7) | 0.4 (±0.1) | 0.1 (±0.1) | 58.3 (±0.5) | 0.4 (±0.1) | 3.1 (±0.3) | 0.1 (±0.1) | 0.5 (±0.1) | 0.3 (±0.1) | 0.2 (±0.1) |
| 24 | 766,629 | 579,452 | 496,030 (±5,931) | 13.5 (±0.6) | 7.1 (±0.5) | 0.3 (±0.1) | 0.1 (±0.1) | 69.9 (±0.4) | 0.2 (±0.1) | 7.0 (±0.4) | 0.2 (±0.1) | 0.6 (±0.1) | 0.5 (±0.1) | 0.2 (±0.1) |
| 25 | 767,217 | 582,952 | 528,025 (±6,224) | 14.2 (±0.5) | 12.5 (±0.6) | 0.4 (±0.1) | 0.1 (±0.1) | 69.3 (±0.5) | 0.3 (±0.1) | 2.1 (±0.2) | 0.1 (±0.1) | 0.5 (±0.1) | 0.2 (±0.1) | 0.2 (±0.1) |
| 30 | 766,905 | 574,390 | 464,235 (±6,559) | 21.7 (±0.7) | 51.8 (±0.9) | 0.4 (±0.1) | 0.2 (±0.1) | 22.9 (±0.5) | 0.4 (±0.1) | 2.1 (±0.1) | 0.0 (±0.1) | 0.2 (±0.1) | 0.2 (±0.1) | 0.2 (±0.1) |
| 32 | 767,245 | 605,562 | 475,840 (±5,651) | 16.2 (±0.6) | 16.0 (±0.6) | 0.4 (±0.1) | 0.3 (±0.1) | 58.2 (±0.4) | 0.3 (±0.1) | 7.1 (±0.4) | 0.0 (±0.1) | 0.7 (±0.1) | 0.3 (±0.1) | 0.3 (±0.1) |
| 33 | 767,033 | 559,071 | 372,515 (±5,445) | 44.3 (±0.9) | 23.5 (±0.7) | 0.3 (±0.1) | 0.1 (±0.1) | 27.4 (±0.5) | 0.3 (±0.1) | 3.2 (±0.3) | 0.1 (±0.1) | 0.3 (±0.1) | 0.2 (±0.1) | 0.2 (±0.1) |

The American Community Survey provided estimated citizen voting age population (CVAP) data at the block group level in a Special Tabulation.  Because the MOE can only be calculated using whole block groups, all block groups with more than 50% of the population in a district are included in the analysis.  The Red-116 report provides a summary of the block groups used in the analysis.
The percent for each CVAP population category is that group's CVAP divided by the CVAP total.
Numbers in parentheses are margins of error at 90% confidence level.

EXHIBIT C



## U.S. Congressional Districts
Proposed Plan
PLANC2139

COUNTIES
PLANC2139

EXHIBIT C



Harris County
U.S. Congressional Districts
SEN. MILES STATEWIDE AMEND PLANC2116 (CSSB6)
PLANC2131

County
District

EXHIBIT D

EXHIBIT E

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION



LULAC, et. al.,                                  )(
                                                 )(
    *Plaintiffs*                                  )(
                                                 )(
Eddie Bernice Johnson, Sheila Jackson-Lee        )(
    Alexander Green, and Jasmine                )(
        Crockett                             )(
                                                 )(
    *Plaintiff-Intervenors*                       ))
                                                 )(
v.                                               )(      Case No.: EP-21-CV-00259-DCG-
                                                 )(              JES-JVB [Lead Case]
GREG ABBOTT, in his official capacity            )(
    As Governor of Texas, et. al.              )(
                                                 )(
    *Defendants*                                  )(

## COMPLAINT OF PLAINTIFF-INTERVENORS EDDIE BERNICE JOHNSON, SHEILA JACKSON-LEE, ALEXANDER GREEN, AND JASMINE CROCKETT

### Background

1.    This is an action to enforce Plaintiff-Intervenors rights under the Fourteenth and Fifteenth Amendments to the United States Constitution and under Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 et seq. Plaintiff-Intervenors Johnson, Jackson-Lee and Green are current members of the United States Congress and Crockett is a voter who resides in Texas 30th Congressional District now represented by Congresswoman Johnson.  All of the applicant intervenors are not only voters but regularly vote and intend to vote in the 2022 Congressional elections and thereafter. Plaintiff-Intervenors bring this action requesting declaratory and permanent injunctive relief against the State of Texas to challenge the 2021

Congressional Plan C2193 adopted by the Texas State Legislature. The adopted Plan is retrogressive, dilutes the voting strength of African American and Latino voters because, and, under the totality of circumstances, African-American and Latino voters do not have an equal opportunity to elect candidates of their choice to the United States Congress. This is so both in the Harris County-Fort Bend Region and in the Dallas-Fort Worth Metroplex Area.

2.      The plan is also heavily infected with an intent to discriminate, on the basis of race and ethnicity, against African American and Latino voters, in violation of both the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution. The 9th, 18th, and 30th Congressional Districts were all close to the optimal size of 766,000 persons for districts after the 2020 census. The 9th District in particular was only 3,611 persons above the optimum number of persons for a Texas Congressional District. The drastic changes made by the Texas Legislature removed 266,000 voters from this optimum-sized district, then added 263,000 new voters to the district. These actions were taken in order to ensure that white voters would be able to control a majority of the voting districts in the area.

3.      Of the 10 Congressional Districts in the Houston area, white voters were drawn control of 7 of them, even though whites are only 33.6 percent of the area population. Instead of being drawn a new Congressional District that they could control, Latino voters were packed into existing African-American and Latino opportunity districts, or cracked into white- or Anglo-dominated districts. Latinos and African-Americans were sliced and diced to make the map of the region achieve its discriminatory purpose and objective. Congressional District 9, though in need of essentially no surgery, received 12 new precincts from Fort Bend County; 13 new precincts from Brazoria County; 10 new precincts from the 18th

2

Congressional District in Harris County; and lost 11 precincts in Fort Bend County.  Precincts in the Hobby Airport area were removed from Congressional District 29 and moved into Congressional District 9.  As a result, the already optimal-sized district became a completely new district. Performance figures show that the African-American voter percentages and the related performance of the 18th decreased. Thus, beyond losing historical precincts that had been in the historic precinct since the time of Barbara Jordan (during the 1970s) it retrogressed in terms of effectiveness.

4.    The 30th Congressional district lost voters to the 6th Congressional District.  The minority voters who were lost from that district were placed into the 6th in order to provide population to the 6th Congressional District under circumstances where the voters who were cracked out of the 30th would have no ability to elect the candidate of their choice.  Further, the 30th was reduced from an above 50 percent Black Citizen Voting Age Majority District to a below 50 percent Black Citizen Voting Age Majority District.  Besides being drawn to ensure that white voters would continue and dominate the majority of area districts in the Harris and Fort Bend Area as well as the Dallas Fort Worth Metroplex Area, the districts were designed to prevent the creation of either a new Latino opportunity district or a new Minority Coalition District with a plurality of Latino population from being drawn in either area.

5.    In the 6th Congressional District, a naturally occurring minority district was taking shape and growing. To stymie that rise in minority voters, the map drawers cut out voters from the 6th and placed them in the 30th Congressional District, thereby requiring displacement of existing voters in the nearly optimum sized district.

3

6.      A ruling by this Court is necessary to protect the voters of the 9th, 18th and 30th Congressional Districts. A ruling by this Court is also necessary to protect the voters in the Harris County and Fort Bend Area as well as the Dallas Fort Worth area.  Furthermore, absent corrective action from this Court, this new redistricting plan will continue to dilute the voting strength of Texas' African American and Latino citizens and deny them fair representation in the United States Congress. Plaintiff Intervenors Johnson, Jackson-Lee, Green and Crockett seek the implementation of a redistricting plans that will not dilute the voting strength of African-American voters in Texas, the areas of the State in which they are placed or that will be retrogressive.

## I. JURISDICTION

7      Plaintiff-Intervenor's complaint arises under the United States Constitution and federal statutes. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3)  and (4), and 42 U.S.C. § 1988.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

9.      Plaintiff-Intervenors seek declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 and 2202.

## II. PARTIES

10.     Plaintiff Congresswoman Eddie Bernice Johnson is an African-American who resides in Dallas Texas and represents Congressional District 30. She has served in Congress since 1993. Congresswoman Johnson was the first African-American female Chairperson of a Congressional Subcommittee. She is a former Chair of the Congressional Black Caucus and currently a member of the House Transportation and Infrastructure Committee, the Aviation,

Highways and Transit, and Water Resources and Environment Subcommittees. Congresswoman Johnson has worked zealously to represent her district where she ably represents African-American voters and a coalition of African-American and Latino voters.  She is also a registered voter.

11.    Congresswoman Sheila Jackson-Lee is in her fourteenth term in the United States Congress, representing the historic 18th Congressional District held previously by the late Barbara Jordan and Mickey Leland. She is a Member of the Judiciary and Homeland Security Committees and is the founder and co-chair of the Congressional Children's Caucus. She has been a true advocate for immigration reform during her tenure in Congress and has worked zealously to represent her district, Congressional District  18, where she ably represents African-American voters and a coalition of African-American and Latino voters.   She is also a registered voter.

12.    Congressman Alexander Green is in his ninth term in Congress. He is a member of the Financial Services and Homeland Security Committees. He is the Chair of the Financial Services Sub-Committee on Oversight and Investigations as well as the Chair of the Texas Democratic Congressional Delegation. As a former elected judge of a Harris County small claims justice court as well as a former president of the Houston Branch NAACP, he judiciously and zealously represents African American voters as well as a coalition of African American, Latino, and Asian American voters in Congressional District  9. He is also a registered voter.

13.    Jasmine Crockett is a voter who resides both in the current Congressional District 30 and in the newly adopted version of Congressional District 30.  She is involved in civic and

political affairs throughout the Congressional District. As a Representative in the Texas Legislature she took the lead in attempting to prevent retrogression and vote dilution of the voters in the 30th Congressional District.  She lives in Dallas and as a State Representative she tendered proposed changes to Congressional District 30 that would have permitted it to continue as a 50 percent African-American Citizen Voting Age population district, the amendment, however, failed to pass.  She is a constituent of Congresswoman Johnson and is a registered voter who intends to vote in future Congressional elections.

14.     Defendant the State of Texas is a political subdivision covered under the provisions of the Voting Rights Act and responsible for the actions of its officials with regard to state-wide redistricting.

15.     Defendant Greg Abbott is the duly elected and acting Governor of the State of Texas. Under Article IV, Section 1, of the Texas Constitution, he is the chief executive officer of the Defendant State of Texas. He is sued in his official capacity.

16.     Defendant Daniel Patrick is duly elected and acting Lieutenant Governor of Texas. Under Article IV, Section 16, of the Texas Constitution he is the President of the Texas Senate. He is sued in his official capacity.

17.     Defendant Dade Phelan is the duly elected and acting Speaker of the Texas House of Representatives and is the presiding officer over the Texas House of Representatives. He is sued in his official capacity.

18.     Defendant John B. Scott Hope is the duly appointed and acting Secretary State of the State of Texas.  He is sued in his official capacity.

6

**III. FACTS**

19.     The individual Congresspersons are all elected with substantial support from the African-American and Latino voters in the districts which they represent. The individual Congresspersons are concerned about the welfare of the individual districts that they represent and took an active role in attempting to ensure that appropriate districts were drawn that were not retrogressive districts as part of larger vote dilution schemes to improperly empower white voters.  Crockett has been an important member of Congressional District 30, being actively engaged in the affairs of the district and attempting to uplift the population even before being elected to office.  She was one of the primary legislators seeking to prevent retrogression in the 30th Congressional District. She is and intends to remain an active voter, including in the 2022 and later elections to fill the position of Congressperson for the 30th Congressional District.

20.     Section 2 of the Voting Rights Act of 1965, 42 U.S.C. 1973, applies nationwide and prohibits voting practices and procedures that result in the denial or abridgement of the right of any citizen to vote on account of race, color, or membership in a language minority group. Section 2 is a permanent provision of the federal Voting Rights Act.

21.     After the last decennial census, the Texas Congressional apportionment increased from 36 representatives to 38 representatives, due to an overall population increase of approximately 4 million persons.  Non-whites accounted for approximately 95 percent of the growth.  This is after the last decade when Texas' Congressional Representation increased from 32 seats to 36 seats on the basis of growth in Texas of which approximately 79 percent was attributable to African-Americans and Latinos alone.

22.    Proportionally, voters of color in Texas are underrepresented in the U.S. House of Representatives in the new map, with white voters being able to control at least 24 of the 38 seats, but more than likely, at least 26 seats.   The drafting scheme involved: (a) packing minority voters into districts that were already minority opportunity districts, and therefore, needed no additional minority voters;   (b) moving minority voters into districts where they would be /outvoted by white voters;   and (c) a new third feature that involves placing minority voters in districts where they would be outvoted by progressive white voters.

23.    During the 2021 redistricting process, Senator Borris Miles and Representative Senfronia Thompson attempted to present plans for the 9th and 18th Congressional Districts that did not involve the unnecessary surgery on the districts that occurred in the map similar to what had occurred in 2011.  Intervenor Crockett unsuccessfully submitted an amendment, C2139, to the proposed State Congressional plan that would have prevented retrogression of the 30th Congressional District. Senator Miles was not able to formally file the proposal that would provide a proper remedy to what the Senate had proposed. The Senate, thereafter, adopted a map that was even more retrogressive as to the 9th and 18th than is the current proposed map. One plan he put forth unsuccessfully to try and address the retrogression and unnecessary surgery to the 9th and 18th Congressional Districts was C2131.   In the hastily called House Committee hearing on redistricting, surprisingly called 48 hours before the scheduled hearing on the same day the hearing on the State House Map was to take place. Representative Thompson attempted to introduce an amendment tendering the same remedial map as Senator Miles attempted to present in the hastily called House Committee hearing to consider the Senate adopted map.

24.     The House used this adopted House Map even after House Chairman Hunter assured Congresswoman Jackson-Lee, Congressman Green, and Texas Black Caucus Vice-Chair Ron Reynolds that they would not use the Senate map as a basis for creating the Congressional Plan to be voted on by the House.  See Letter to Legislators from Congresspersons Jackson-Lee and Green which are attached hereto and incorporated for all purposes as if fully set forth herein. As were many of the members of the Legislative Black Caucus, Congresspersons Jackson-Lee and Green were surprised by the short notice of a hearing which came on the morning the House was scheduled to debate the new proposed State House Map.   The African-American Vice-Chair of the Redistricting Committee was also unaware that the hearing notice was to be sent out.    The hearing on the Senate Map was not only a surprise because of these representations but also because the hearing was set just 48 hours after the House was to debate its map. Chairwoman Senfronia Thompson, the Dean of the House, made a proposal which essentially took the limited territory from the 3 minority opportunity districts in Harris and Fort Bend Counties (now including Brazoria) and reconfigured them to lessen the retrogression and dilution as to those district. This was done specifically because a full fix that would have involved impacting 7 as opposed to 4 districts would not be permitted.

25.     A full remedy was not supported by the Texas Legislative Leadership necessary for it to be considered. A small exchange of voters was also made between the 7th and 18th Congressional Districts. Chairman Hunter supported this change.   A full remedy as provided for in C2131 or other maps available to the Legislature was not supported by the Texas Legislative Leadership  and this was necessary for it to be favorably considered.

26.     Congressional District 30 was unnecessarily reduced below a Citizen Voting Age population of 50 percent and voters were cracked out of the district to be placed in areas where their votes will essentially not count.  Voters from the 6th Congressional district were added to the 30th Congressional District to prevent a naturally occurring minority coalition district and ensure continued dominance of white voters in the 6th.  Movement of these voters required displacement of other voters already with Congressional District 30, so a number of African-American voters were cracked out of the district to make way for the new voters. Congressional District 30 was near the optimal size so such surgery was unnecessary. Intervenor Crockett introduced an amendment the retrogression but was not successful in achieving passage. The population increases in both the Harris County and Fort Bend Area as well as the Dallas Fort Worth Metroplex Area each justified the creation of a new Congressional minority opportunity districts in each region.  The 2021 plan did not create any additional minority opportunity or other Congressional districts in the Dallas Fort Worth Metroplex region, but it did create a new seat in the Harris County/Ford Bend County area. The new Harris County/For Bend seat will be dominated by white voters.

27.     As drawn in the congressional plan passed by the Texas Legislature, congressional districts in Harris, Fort Bend, Brazoria, Galveston and other area counties as well as in Dallas, Tarrant, Johnson and neighboring counties dilute the voting strength of African-American and Latino voters.

28.     In the congressional plan passed by the Texas Legislature in 2021, Congressional Districts 9, 18 and 30 were drawn in a way that causes retrogression of the minority voter strength and further undermines the ability of African-Americans and Latinos to effectively

participate in the political process in those areas, elect the candidates of their choice, and intentionally discriminates against voters in those districts. Clearly. map drawers diluted African-American and Latino voters voting strength. Communities of interest or neighborhoods were cracked or split and minorities were placed in districts for the purposes of enhancing white voter power. In the Houston area there was an area racial gerrymander where black voters were moved between different Congressional Districts so that white voters would dominate. Black and Brown voters that who represented political problems in Congressional Districts such as 7, 14, 22 and 36 were moved from those districts so that white voters would dominate.

29.     Black and Brown voters and voters who voted with them were moved into Congressional District 7 to strengthen that district on behalf of the white incumbent. Congressional District 7 was near the optimum size for districts in the 2021 round of redistricting, but the map drawers moved nearly a quarter of a million voters from the African-American Opportunity District in Congressional District 9 in order to strengthen Congressional District 7. This major transfer of voters then required the map drawers to crack out 10 precincts from allied communities of interest that had worked together in the 18th Congressional District and place them in the 9th. The Latino opportunity District CD29 was negatively impacted as well, losing an important community of interest that was placed in the 9th Congressional District

30.     Congressional Districts 18 and 30 are retrogressed in the adopted plan and they are retrogressed so that area vote dilution and/or a racial gerrymander of each area likely would take place. Both took on unnecessary new voters. Congressional Districts 9, 18 and 30 are all

minority opportunity districts.  The new plan reduced the Black Citizen Voting Age population of the 30th from 51 percent to 48 percent, and the Texas Legislature declined to adopt an amendment that would have cured this retrogression.  African-American voters were moved from Congressional District to Congressional District to ensure white voter dominance in the Metroplex.  Black and Brown voters were moved from the 6th to the 30th and from the 30th to the 32nd and from the 5th and 24th to the 32nd in order to accommodate this scheme. Congressional District 24 had become a majority non-white district but minority residents and voters were purged from the district so that it is now safely a predominately white district. With the infusion of many additional white voters into the seats in the metroplex held by white Congresspersons who were voted in by white voters, the 32nd Congressional District saw an incredible rise in its minority and Black and Hispanic population and voter percentages.  Its overall non-white population increased from 53.1 percent to 67.8.  At the same time one-third of the Blacks and Hispanics were removed from Congressional District 24.  The Legislature also rejected and/or spurned attempts to cure the retrogression in Congressional District 18. The Legislature was locked in on discrimination in both the 30th and the 18th, as well as the 9th, because their configuration in the proposed map was part of a greater area scheme to dilute minority voting strength and/or racially gerrymander the area to enhance white voter strength.

31.    The dilution included cracking and dispersing Black and Brown voters, failing to draw new Latino Districts, packing of minority voters, and destructing or failing to draw naturally occurring districts, which would provide greater influence to minority voters.  Furthermore, the Legislature failed to draw minority coalition districts between Black and Brown voters, who vote cohesively in areas where they are likely to constitute a majority of the citizen voting age

population, but where white voters have voted as a block statewide (such as in the Dallas/Fort Worth Metroplex and in the Harris/Fort Bend County Area). That is another way of denying Black and Brown voters an election in which they decided the candidates they prefer and choose. When they do get to choose, Black and Brown voters have voted cohesively in recent national, state and presidential elections, among others. Black and Brown voters have voted cohesively in recent United States Senate race in 2018, the Lieutenant Governor's race in 2018 and the 2016 and 2020 Presidential campaigns among many others. The African-American Congresspersons all have strong African-American and Latino support with Congresswoman Jackson Lee even prevailing recently in Latino precincts when opposed by opponents with Spanish surnames.

32.     The 2021 Congressional plans unnecessarily split communities of interest from the 9th, 18th and 30th Congressional Districts, removed important economic engines from the 9th and 18th, packed Latino voters unnecessarily into the 18th and 9th Congressional Districts, and were purposefully designed to undermine or frustrate effective and long-term voter coalitions in the area as well as effective minority voter participation. The new Congressional District in the Houston area will be dominated by white voters, even though Latinos were the group most responsible for the state's population increase. It's worth noting that Latino voters have not been hostile to candidates supported by white conservatives.

33.     Elections in Texas continue to be racially polarized. Statewide officials in Texas have become more anti-Black and anti-Brown in their public statements and overt actions particularly in 2021. Massive election revisions were adopted by the 2021 Legislature, many of which are intentionally discriminatory against and target African-Americans or Latinos.

13

Consider that the State adopted many other discriminatory laws such, as laws banning the utilization of critical race theory in public schools.  It's worth noting that critical race theory has never been taught or studied in Texas public schools so that now is being used to erase or diminish the teaching of legitimate history and facts regarding African Americans and their history and culture in Texas and the U.S.  Even the rhetoric was racially-charged: When Black, Brown and some white legislators left the State, some white public officials indicated that they should be arrested and "quartered" until the voting takes place.  Such language represents vestiges of Texas' Jim Crow past, and its return to the present. The irregularities during the session were overtly racial, and they include, but are not limited to:

    i. The refusal to permit participation by the Chairperson of the Legislative Black Caucus, Nicole Collier, in Election Committee Hearings;

    ii. the refusal of the Senate to put an African-American lawmaker on any election or redistricting conference committee;

    iii. the refusal of the Senate to put a Latino lawmaker on the Congressional redistricting bill conference committee;

    iv. the refusal of the Senate to hear virtual testimony on the redistricting bill even though the minority community in Texas was hugely impacted by the coronavirus pandemic;

    v. instead of drafting its own Congressional map, the House decided to use the Senate adopted map as a base map for its work, even though House leadership was aware of the discrimination that existed in the Senate plan;

    vi. instituting a rule that required before you could present an amendment to the proposed map for consideration in the Senate Committee, you must receive the consent of all Congresspersons who would be impacted;

    vii. the refusal to receive any map for consideration in the Senate Redistricting Committee unless it was plugged into the proposed statewide map drawn by the white Congresspersons;

14

viii. the refusal for transparency and appropriate notification. For example, on the day that the House Redistricting Map for the Texas House of Representatives was to be considered, the Chairman of the House Redistricting Committee made a surprise announcement that the House would have a hearing on a Congressional Plan in 48 hours and that the Senate Map would provide the base map for this process;

ix. the implementation of gate-keeping rules to prevent Black and Brown lawmakers from amending discriminatory or racial gerrymandering tactics, One example is that lawyers were brought in for the House debate on the Congressional bill, so that any amendments could no longer simply be authorized by the Redistricting Chair or the Speaker. This group of lawyers for the conservative white leadership were required to approve potential amendments before they were accepted for consideration on the floor; and

x. During the House debate on the Congressional Map Intervenor Applicant Crockett and others were required to deliver proposed Amendments to designated Representatives who would take them to a room in which they could not enter for the proposed Amendment to be reviewed by white lawyers before it could be offered.

34.    African-Americans in Texas generally vote as a group and are politically cohesive.

35.    Latinos in Texas vote as a group and are politically cohesive.

36.    Latinos and African-Americans in Texas vote as a group and are politically cohesive. Latinos and African-Americans in Congressional District 30, Congressional District 9 and Congressional District 18 vote as a group and are politically cohesive in ensuring the continued character of the districts.  Latinos and African-Americans in Dallas and Tarrant Counties vote as a group and are politically cohesive.  Latinos and African-Americans in Harris, Fort Bend, Galveston and Brazoria counties vote as a group and are politically cohesive.

37.    Anglos in Texas and in the counties included in the Houston/Fort Bend gerrymander and those in the Dallas/Fort Worth Metroplex gerrymander generally vote as a group, are politically cohesive and vote sufficiently as a block to defeat the preferred candidate of Latino and African-American voters absent fair and equitable majority-minority single member

districts. This has been documented by federal and state courts, the United States Commission on Civil Rights and by the United States Congress.

38.    The Senate Committee on Redistricting refused to accept any amendment for consideration that was not agreed to by any and every Congressperson affected by the change, and further any proposed change had to use the proposed map as a basis or beginning from which to draft them.  Empowering these white Congresspersons to have the authority to veto any changes to African-American opportunity districts was in effect a policy of granting them overseer status over minority opportunity districts such as Congressional Districts 9, 18 and 30. The Congressional map has been drawn up primarily by conservative white Congresspersons who have generally voted against the interests of the African-American community. One conservative white Congressman informed Congresswoman Jackson Lee that he was the principal draft person.  Despite attempts by Senator Borris Miles, Senator Royce West and Senator Carol Alvarado to stop the retrogression and vote dilution of the districts and the Harris Fort Bend and Dallas Fort Worth Metroplex areas, the Senate adopted an excessively discriminatory plan that changed the 18th from an African-American opportunity district to a democratic district.

39.    The State adopted a retrogressive version of Congressional Districts 9 and 30 as well. The House through the efforts of Representative Thompson cured some, but not all, of the retrogression and dilution in Congressional Districts 9 and 18. Through the efforts of Intervenor Crockett some of the retrogression and dilution in Congressional District 30 was modified.  The Congressional Plan was modified in the House but was passed in the House by an overwhelming vote from white members even though minority members overwhelmingly

opposed the map.  Because the House version was different than the Senate's, a Conference Committee with no Black or Latino senators from the Senate was appointed and it agreed to many of the House changes.   Thereafter the Conference Committee version was signed into law by the Governor and will become effective in 2022.

40.     Public opposition to this map was overwhelming in both the Senate and the House, but particularly from members of Texas' minority community.  Minority legislators and their allies spoke with great depth and clarity so it was clear that the legislature was aware of the discriminatory impact the bill would have.  The public registered overwhelming opposition to this plan and the public provided in-depth information regarding the plan and its discriminatory impact.  Whites in Congress drew up the bill for their advantage and were required to approve any changes to what they originally drew up.  The Legislature embraced and adopted this approach.  By so empowering white Congresspersons to become the overseers of minority opportunity districts.

41.     Further, the actions of the Legislature in reference to limiting testimony in the Senate, giving short notice for the House Committee hearing, not permitting amendments to be considered in the Committee, and the failure of the Senate to put a minority on the Conference Committee at a critical point when the bill was considered in the special-called session, (and the many other irregularities), all support the clear fact that the Legislature's action in adopting this map was infused with discrimination.   Many minority legislators and non-minority legislators who supported the interests of minority voters all voiced strong, lengthy and well-reasoned opposition to the proposed map. Nevertheless, the white lawmakers adopted the discriminatory plan to benefit conservative white votes and maintain and sustain white majority

rule and power, even as the state's population has reached a point in which the majority of its citizens are minority.

42.     It is revealing is how the white majority used population data in the treatment of Black and Latino voters. This is indicative of discriminatory intent.  In the case of African Americans, majority party leaders used voting age population data to justify actions in reference to Black districts. By contrast, they used different data that included citizenship to justify actions in reference to Latino voters.  In each instance they chose to justify the plan as to these two minority groups in specific ways that would empower and prefer white voters and disadvantage minority voters.

43.     During the 2021 legislative process, the Texas Legislature had before it or was aware of plans for the Congressional districts that did not dilute the voting strength of African-American and Latino voters. Despite that, the Legislature rejected those plans for plans that did not afford minority voters an equal opportunity to elect candidates of their choice. It also utilized rules and procedures to prevent the receipt of other plans that limited minority vote dilution.

44.     Numerous plaintiff groups filed suit in October and November of 2021 challenging the 2021 adopted Congressional plans as violating the Equal Protection Clause of the 14th Amendment and Section 2 of the Voting Rights Act.

45.     Because Texas was no longer a covered jurisdiction under Section 5 of the Voting Rights Act of 1965 as a result of the *Shelby County v. Holder* decision of the United States Supreme Court, it was not required to obtain federal preclearance before implementing its enacted redistricting plans.  With regards to the Congressional plan in 2011 when Texas was covered and when similar actions were taken as were taken this time, the D.C. Court noted that

the Department of Justice and Intervenors (many of whom are Plaintiffs in the instant action) presented more evidence of intentional discrimination than the court had room to discuss. *Texas v. United States*, 887 F. Supp. 2d 133, 162 n. 32 (D.D.C. 2012).  Specifically, the Court found that the way in which the State had carved apart the Congressional districts being represented by African-American members of Congress could be explained only by an intent to discriminate against minority voters in the districts.  *Id.* at 160-61.

46.     While the House this year adopted a plan that did make improvements on the Senate map, it did not come close to eliminating the retrogression, vote dilution, racial gerrymandering nor the unconstitutional intentional discrimination harm to African-Americans and Latinos.

47.     As urged by these Congresspersons throughout this process the minority population growth in the Dallas-Fort Worth Metroplex and the Harris County-Fort Bend-Brazoria Areas was more than sufficient to support an additional, reasonably-compact district in which minority voters, especially Latino voters, would have an opportunity to elect the candidate of their choice.

48.     There is sufficient Latino population in the Dallas-Fort Worth metroplex to construct a reasonably-compact district in which Latino voters or Latino voters in cooperation with Black voters have an opportunity to elect their candidate of choice.  This district can be drawn while still maintaining the ability of black voters to elect their candidates of choice in Congressional Districts 30, 32 and 33.

49.     There is sufficient Latino population in the Harris County-Fort Bend Area to construct a reasonably-compact district in which Latino voters have an opportunity to elect their candidate

of choice.  This district can be drawn while still maintaining the ability of black voters to elect their candidates of choice in Congressional Districts 9 and  18.

50.     During the special session, advocacy groups and elected officials representing minority communities pointed out the statutory and constitutional flaws still present in the Court's interim plan and urged that these flaws be corrected. The failure to create anew Latino opportunity district in the Dallas-Fort Worth region and/or the Harris County-Fort Bend County region is a remnant and perpetuation of the state's intent to discriminate against and dilute the voting strength of African-American and Latino voters. That resulted in the creation of 60 percent or greater of Texas Congressional districts that are white dominated and/or likely to elect white candidates.

51.     The failure to remedy the intentional cracking of a cohesive community of color in the congressional plan in Congressional Districts 9, 18, and 30 are remnants of and perpetuation of the state's intent to discriminate against voters of color.

52.     The failure to remedy the retrogression of Congressional Districts 9, 18 and 30, the removal of economic engines from the 9th and 18th and unnecessary surgery, including cracking of minority communities in each of the districts, is a remnant and perpetuation of the state's intent to discriminate against voters of color that persists in the 2021 adopted Congressional plan.  Those factors are compounded by the dilution of minority voting strength, including the unnecessary packing of Latino voters within the 9th, 18th and 30th Congressional Districts and in the Harris County/Fort Bend Area and the Dallas/Fort Worth Metroplex Area.

## CAUSES OF ACTION

**Count I**

53.     The allegations contained in paragraphs 1-52 are alleged as if fully set forth herein.

54.     The 2021 Congressional redistricting plan violates Section 2 of the Voting Rights Act, as amended, 42 U.S. § 1973.  The plan results in a denial or abridgement of the right to vote of individual plaintiffs and voters in the 9th, 18th and 30th Congressional Districts on account of their race, color, or ethnicity, by having the effect of canceling out or minimizing their voices individually and officially. The plaintiff intervenors were not afforded an equal opportunity to participate in the political process as citizens or elected officials nor to elect representatives of their choice, and deny individual plaintiffs the right to vote in elections without discrimination of race, color, or previous condition of servitude in violation of 42 U.S.C. § 1973.

**Count II**

54.     The allegations contained in paragraphs 1-52 are alleged as if fully set forth herein.

55.     The 2021 Congressional redistricting plan C293 violates Section 2 of the Voting Rights Act, as amended, 42 U.S. § 1973.  These plans result in a denial or abridgement of the right to vote of individual plaintiffs on account of their race, color, or ethnicity, by having the effect of canceling out or minimizing their individual voting strength as minorities in Texas. The redistricting plans passed by the Texas Legislature do not afford individual plaintiffs or voters in the 9th, 18th and 30th Congressional Districts an equal opportunity to participate in the political process and to elect representatives of their choice, and deny individual plaintiffs the right to vote in elections without discrimination of race, color, or previous condition of servitude in violation of 42 U.S.C. § 1973.

21

**Count III**

56.     The allegations contained in paragraphs 1-52 are alleged as if fully set forth herein.

57.     The 2011 redistricting plans adopted by the Texas Legislature were developed with the intent to disadvantage African-American and other minority voters including those in the 9th, 18th and 30th Congressional Districts.  That intentional discrimination is in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, the Fifteenth Amendment of the United States Constitution, and 42 U.S.C. § 1983.

**Count IV**

58.     The allegations contained in paragraphs 1-52 are alleged as if fully set forth herein.

59.     The 2021 redistricting plans adopted by the Texas Legislature were developed in such a way and with the intent to not provide any new opportunity districts to minority voters and to ensure that districts dominated by or electing white representatives would continue to elect the candidate of choice of white voters.  Further, the plan was drawn to maximize the voting power of white voters in the Harris County-Fort Bend County and Surrounding Area, and the Dallas-Fort Worth Metroplex to disadvantage African-American and other minority voters including those in the 9th, 18th and 30th Congressional Districts.  This redistricting plan contains clear elements of drafting which show the Legislature was undeniably motivated by unconstitutional desires to minimize and exclude the political voice of voters of color in the state and in the 9th, 18th and 30th Congressional Districts.  This intentional discrimination is in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, the Fifteenth Amendment of the United States Constitution, and 42 U.S.C. §

1983.   The 9th, 18th and 30th were drawn as part of a racial vote dilution or racially scheme that was designed and intended to prefer and empower white voters above minority voters.

**Count V**

60.   The allegations contained in paragraphs 1-52 are alleged as if fully set forth herein.

61.   The 2021 Congressional redistricting plan adopted by the Texas Legislature is so rife with an intent to discriminate against minority voters including those in the 9th, 18th and 30th Congressional Districts that Plaintiffs and all minority voters in Texas or those in the 9th, 18th and 30th Congressional Districts are entitled to equitable relief under Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973.

**Count VI**

62.   The allegations contained in paragraphs 1-52 are alleged as if fully set forth herein.

63.   Race was the predominant factor in the drawing of the Congressional Districts both in the Dallas/Fort Worth Metroplex and the Harris County/Fort Bend Area.  In the Dallas/Fort Worth Metroplex Area, the Congressional Districts impacted were white voter dominated Congressional Districts 6, 12, 24 and 25 whose drawing caused the encompassing of minority voter dominated Congressional Districts 30, 32 and 33.   In the Houston/Fort Bend County Area, the Congressional Districts impacted were conservative white voter dominated Congressional Districts 2, 14, 18 and 22, white voter controlled Congressional District 7 and minority voter controlled districts 9, 18 and 29 which were impacted by the racial gerrymander to enhance Congressional Districts 2, 7, 14, 18 and 22.

64.   Racial considerations were the legislature's dominant motivation of the legislature in adopting the Dallas/Fort Worth Metroplex Area Districts and the Harris County/Fort Bend

County Area Districts.   Latinos were responsible for approximately 52 percent of the State's growth and were responsible for 65 percent of the State's growth according to the 2010 Census but the Legislature chose to engage in this racial gerrymander to ensure that Latino voters would not be drawn a seat which they could control. That goes against population figures that show Latino growth was so substantial in each of these areas that such seats were naturally occurring and could have easily been drawn by the Legislature.  Minority opportunity districts which were close to the optimum size became the subject of cracking and dispersion in order to further this aim.  Latino voters and those who might align with them were placed in other districts when they could and should have been included in either a new Latino opportunity district in Harris/Fort Bend and also Dallas/Fort Worth Metroplex.  Minority voters were joined to the 30th, 32nd and 33rd that could have been used to create a new Latino opportunity district, and minority voters were moved from Congressional District 6 and 5 into Congressional Districts 30 and 32 in order to ensure continued white voter control of those districts.

65.     Traditional redistricting principles were thereby ignored and major surgery took place in the 9th, 18th and 30th Congressional Districts.  White voters of both parties were given stronger districts and each a new district.  Some of the districts were irregular in shape.  The Senate delegation on the Conference Committee on C2193 had no African-Americans or Latinos and the House Conference Committee had no Latinos. The Legislature adopted this map with a discriminatory intent and bad faith towards the African-American and/or Latino communities including those in the benchmark plan in Congressional Districts 9, 18 and 30 and as to those voters in the new map who are now included in Congressional Districts 9, 18 and 30.

66. Because racial considerations predominated in the map drawing, Defendants' justifications for the maps are subject to strict scrutiny.

67. By engaging in the acts and omissions alleged herein, Defendant acted and continue to act under color of law to deny the Plaintiff rights guaranteed to them by the Fourteenth and Fifteenth Amendments to the U.S. Constitution and will continue to violate those rights absent relief granted by this Court.

### BASIS FOR EQUITABLE RELIEF

68. Plaintiff-Intervenors have no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for declaratory judgment and injunctive relief is their only means of securing adequate redress from all of the Defendants' unlawful practices.

69. Plaintiff-Intervenors will continue to suffer irreparable injury from all of the Defendants' intentional acts, policies, and practices set forth herein unless enjoined by this Court.

### ATTORNEYS' FEES

70. In accordance with 42 U.S.C. Section 1973-1(e) and 1988, Plaintiffs are entitled to recover reasonable attorney's fees, expenses and costs.

### PRAYER

Plaintiff-Intervenors respectfully pray that this Court enter Judgment granting:

A. A declaratory judgment that State Defendants' actions violate the rights of Plaintiffs as protected by Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 et seq., and the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983; and

B.      Preliminary and permanent injunctive relief requiring State Defendants, their successors in office, agents, employees, attorneys, and those persons acting in concert with them and/or at their discretion – to develop redistricting plans that do not dilute African American and minority voting strength or racially gerrymander in the 9th, 18th and 30th Congressional Districts nor in the Harris-Fort Bend Area of the Dallas-Fort Worth Metroplex Area for the Texas United States House of Representatives, and enjoining and forbidding the use of the newly-enacted congressional plan after trial on the merits; and

C.      An order requiring the State of Texas to submit to this Court for preclearance, under Section 3(c) of the Voting Rights Act, any change to any voting practice or procedure, including but not limited to any new redistricting plan, for a period not less than 10 years; and

D      .If need be, adopt an interim electoral plan for the 2024 elections for United States Congress and Texas House of Representatives that remedy these statutory and constitutional flaws; and

E.      An order of this Court retaining jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

F.      An order requiring Defendants to pay all costs including reasonable attorneys' fees, and

G.      Such other and further relief as the Court may deem just and proper.


Dated: December 14, 2021.


                        Respectfully Submitted,

                         /s/ Gary Bledsoe
                        The Bledsoe Law Firm PLLC

State Bar No. 02476500
6633 Highway 290 East #208
Austin, Texas 78723-1157
Telephone: 512-322-9992
Fax: 512-322-0840
gbledsoe@thebledsoelawfirm.com
Garybledsoe@sbcglobal.net
Attorney for Plaintiff-Intervenors Eddie Bernice
Johnson, Sheila Jackson-Lee, Alexander Green
and Jasmine Crockett

27