**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | § § § | |
| *Plaintiffs,* | § § | Case No. 3:21-cv-00259 |
| v. | § § | [Lead Case] |
| GREG ABBOTT, *et al.,* | § § | |
| *Defendants.* | § | |
| ROY CHARLES BROOKS, *et al.* | § § | |
| *Plaintiffs,* | § § | Case No. 1:21-cv-00991 |
| v. | § § | [Consolidated Case] |
| GREG ABBOTT, *et al.,* | § § | |
| *Defendants.* | § | |

**DEFENDANTS' OPPOSITION TO**
**THE BROOKS PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Table of Contents ..................................................................................................................i

Table of Authorities ...........................................................................................................ii

Introduction .........................................................................................................................1

Background ...........................................................................................................................3

   I.   The 2021 Redistricting Operated Under a Historically Compressed Timeline............................3

   II.  The Senate Majority Altered SD10 to Improve Republican Electoral Prospects.......................5

   III. District Lines Were Not Based on Race ........................................................................12

   IV. Plaintiffs' Supposed Evidence of Pretext Reflects Partisan Motivation, not Racial Discrimination ..........................................................................................................14

       A.  Senator Seliger's Declaration is Not Credible ............................................................14

       B.  Partisan Intent Is the Best Explanation for Plaintiffs' Circumstantial Evidence..............16

   V.  Senator Powell—At Risk of Losing Her Senate Seat—Sought to Bolster an Anticipated Legal Challenge ......................................................................................................19

   VI. Plaintiffs Evidence Regarding *Previous* Redistricting Cycles Proves Nothing about *This* Cycle ..................................................................................................................21

       A.  Plaintiffs Try to Analogize to the Previous Iteration of SD10, But Their Cases Are Inapposite ...........................................................................................................21

       B.  Plaintiffs' Pre-2021 Evidence Is Irrelevant to This Redistricting Cycle ..........................23

Standard .............................................................................................................................25

Argument ............................................................................................................................26

   I.   Plaintiffs Are Not Likely to Succeed on the Merits ........................................................26

       A.  Plaintiffs' Intentional Vote-Dilution Claims Fail..........................................................26

           1.   Plaintiffs Have Not Made a Clear Showing of Discriminatory Intent ......................27

           2.   Plaintiffs Vote-Dilution Claims Fail for Lack of Discriminatory Effect....................38

           3.   Plaintiffs' Vote-Dilution Claim is Not Cognizable Under the Fifteenth Amendment or the Voting Rights Act ...............................................................42

       B.  Plaintiffs' Racial-Gerrymandering Claim Fails .............................................................43

   II.  Plaintiffs Do Not Face Irreparable Harm ....................................................................46

   III. The Public Interest and the Balance of the Equities Do Not Favor an Injunction................47

Conclusion ..........................................................................................................................50

Certificate of Service..........................................................................................................51

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
 138 S. Ct. 2305, 2324 (2018)................................................................................passim

*Ala. Legis. Black Caucus v. Alabama,*
 575 U.S. 254, 260 (2015) ...........................................................................................43

*Bartlett v. Strickland,*
 556 U.S. 1, 120 (2009) ....................................................................................27, 39, 42

*Benisek v. Lamone,*
 138 S. Ct. 1942, 1943 (2018) (per curium)................................................................46

*Brewer v. Ham,*
 876 F.2d 448, 453 (5th Cir. 1989) .............................................................................41

*Brnovich v. Democratic Nat'l Comm.,*
 141 S. Ct. 2321, 2349 (2021)...........................................................................25, 33, 34

*Burton v. City of Belle Glade,*
 178 F.3d 1175, 1201 (11th Cir. 1999)................................................................ 26, 38

*Bush v. Martin,*
 251 F. Supp. 484, 513–15 (S.D. Tex. 1966) (three-judge panel) ........................37

*Bush v. Vera,*
 517 U.S. 952, 968 (1996) ...............................................................................33, 34, 45

*Canal Auth. of State of Fla. v. Callaway,*
 489 F.2d 567, 573 (5th Cir. 1974) .............................................................................25

*Chisom v. Roemer,*
 501 U.S. 380, 392 (1991) ............................................................................................43

*Cooper v. Harris,*
 137 S. Ct. 1445, 1478–82 (2017) ............................................................. 29, 30, 32, 44

*DNC. v. Wis. State Leg.,*
 141 S. Ct. 28, 31 (2020) ..............................................................................................47

*Easley v. Cromartie,*
 532 U.S. 234, 258 (2001) .................................................................................29, 34, 44

*Fusilier v. Landry,*
 963 F.3d 447, 464 (5th Cir. 2020) ..............................................................................27

*Garza v. City of Los Angeles,*
 918 F.2d 763, 771 (9th Cir. 1990) ..............................................................................26

*Graves v. Barnes,*
 343 F. Supp. 704, 734 (W.D. Tex. 1972) (three-judge panel), *revd. in part on other grounds, White v. Register,* 412 U.S. 755 (1973)..........................................................37

*Grove v. Emison,*
 507 U.S. 25, 41 (1993) ................................................................................................41

*Harding v. Dallas County,*
 948 F.3d 302, 312 (5th Cir. 2020) ....................................................................26, 27, 29

*Henderson v. Perry,*
 399 F. Supp. 2d 756 (E.D. Tex. 2005) (three-judge panel), *rev'd on other grounds, LULAC v. Perry,* 548 U.S. 399 (2006)...........................................................................37

*Holder v. Hall,*
 512 U.S. 874, 946 (1994) ............................................................................................43

*Humana, Inc. v. Jacobson,*
 804 F.2d 1390, 1394 (5th Cir. 1986)...........................................................................46

*Johnson v. DeSoto County Board of Commissioners,*
 72 F.3d 1556, 1565 (11th Cir. 1996)...........................................................................26

*Kilgarlin v. Martin,*
 252 F. Supp. 404, 432–34 (S.D. Tex. 1966) (three-judge panel) .................................37

*Libertarian Party of Tex. v. Fainter,*
 741 F.2d 728, 729 (5th Cir. 1984) ..............................................................................25

*LULAC v. Clements,*
 999 F.2d 831, 850 (5th Cir. 1993) (en banc)...............................................................39

*Mazurek v. Armstrong,*
 520 U.S. 968, 972 (1997) (per curiam) .......................................................................25

*McCleskey v. Kemp,*
 481 U.S. 279, 298 n.20 (1987) ...................................................................................21

*Mi Familia Vota v. Abbott,*
 834 F. App'x 860, 863 (5th Cir. 2020) (per curiam).....................................................48

*Miller v. Johnson,*
 515 U.S. 900, 911 (1995) ...........................................................................26, 27, 43, 44

*Miner, Ltd. v. Anguiano,*
    383 F. Supp. 3d 682, 705 (W.D. Tex. 2019)............................................................46

*Miss. Freedom Democratic Party v. Democratic Party of State of Miss.,*
    362 F.2d 60, 62 (5th Cir. 1966) ..........................................................................49

*Nichols v. Alcatel USA, Inc.,*
    532 F.3d 364, 372 (5th Cir. 2008) ......................................................................25

*Nken v. Holder,*
    556 U.S. 418, 435 (2009) ...................................................................................47

*NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760,*
    377 U.S. 58, 66 (1964) .......................................................................................37

*Page v. Bartels,*
    248 F.3d 175, 195 (3d Cir. 2001) .......................................................................50

*Perez v. Abbott,*
    253 F. Supp. 3d 864 (W.D. Tex. 2017) ..............................................................22

*Perez v. Texas,*
    No. 5:11-CV-360, 2014 WL 12853571, at *2 (W.D. Tex. June 23, 2014) ............43

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256, 279 (1979) ............................................................................38, 44

*Prejean v. Foster,*
    227 F.3d 504, 509 (5th Cir. 2000) ......................................................................28

*Prejean v. Foster,*
    227 F.3d 504, 519 (5th Cir. 2000) ......................................................................43

*Purcell v. Gonzales,*
    549 U.S. 1 (2006)........................................................................................... 3, 47

*Reno v. Bossier Parish Sch. Bd.,*
    528 U.S. 320, 334 n.3 (2000).............................................................................42

*Reynolds v. Sims,*
    377 U.S. 533, 585 (1964) ...................................................................................48

*Richardson v. Tex. Sec'y of State,*
    978 F.3d 220, 244 (5th Cir. 2020) ......................................................................48

*RNC v. DNC,*
    140 S. Ct. 1205, 1207 (2020) (per curiam) ........................................................48

*Rodriguez v. Harris County,*
   964 F. Supp. 2d 686, 804 (S.D. Tex. 2013) ........................................................................ 34

*Rodriguez v. Pataki,*
   308 F. Supp. 2d 346, 421 (S.D.N.Y. 2004) (three-judge court), *aff'd*, 543 U.S. 997 (2004) ........... 39

*Rollins v. Fort Bend Indep. Sch. Dist.,*
   89 F.3d 1205, 1216 n.21 (5th Cir. 1996) ........................................................................... 41

*Rucho v. Common Cause,*
   139 S. Ct. 2484, 2509 (2019) ........................................................................................... 29

*Salazar v. Buono,*
   559 U.S. 700, 714 (2010) ................................................................................................. 47

*Shaw v. Reno,*
   509 U.S. 630, 646 (1993) ............................................................................................. 38, 43

*Shelby County v. Holder,*
   570 U.S. 529 (2013) ......................................................................................................... 22

*Terrazas v. Slagle,*
   821 F. Supp. 1162, 1166–1175 (W.D. Tex. 1993) (three-judge panel) ............................... 37

*Tex. Alliance for Retired Ams. v. Hughs,*
   976 F.3d 564, 566–67 (5th Cir. 2020) (per curiam) ......................................................... 48

*Tex. Democratic Party v. Abbott,*
   961 F.3d 389, 411–12 (5th Cir. 2020) .............................................................................. 48

*Texas v. United States,*
   887 F. Supp. 2d 133 (D.D.C. 2012) (three judge district court), *vacated and remanded*, 570 U.S. 928
   (2013) .............................................................................................................................. 21

*Thompson v. Kemp,*
   309 F. Supp. 3d 1360, 1366–67 (N.D. Ga. 2018) ............................................................. 26

*Thornburg v. Gingles,*
   478 U.S. 30 (1986) ................................................................................................... 2, 27, 39

*United States v. Hays,*
   515 U.S. 737, 745–46 (1995) ....................................................................................... 38, 46

*Veasey v. Abbott,*
   830 F.3d 216 (5th Cir. 2016) ...................................................................................... 22, 35

*Veasey v. Abbott,*
   870 F.3d 387, 391 (5th Cir. 2017) (per curiam) ............................................................... 47

*Veasey v. Abbott*,
  888 F.3d 792 (5th Cir. 2018) (en banc) ........................................................23

*Veasey v. Perry*,
  769 F.3d 890, 892–95 (5th Cir. 2014)...........................................................48

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
  429 U.S. 252 (1977)........................................................................................34

*Voinovich v. Quilter*,
  507 U.S. 146, 159 (1993) ...............................................................................42

*Whitaker v. Livingston*,
  732 F.3d 465, 466 (5th Cir. 2013) ................................................................46

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7, 22 (2008)................................................................................25, 46

**Statutes**

  13 U.S.C. § 141(a) .............................................................................................3

**Other Authorities**

  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012) .......11

**Constitutional Provisions**

  Tex. Const. art. III, § 40 ...............................................................................30

## INTRODUCTION

This case is about politics, not race. It concerns Senate Bill 4, which implements S2168, the new map for the State of Texas's Senatorial districts. S2168 is largely an uncontroversial plan. It fixes population deviations resulting from the last decade's changes, and leaves many districts essentially unchanged. Senator Joan Huffman, the chair of the Senate Redistricting Committee, sought comment from the members of the Senate, and often incorporated their input. The final product was a map that protected incumbents in many areas. It is unsurprising, then, that the final version of SB4 received bipartisan support. It passed the Senate 20-11, with three Democratic senators voting in favor.

There is, however, one clear exception to a plan that is otherwise light on partisan objectives. From the beginning, the Republican-controlled Senate majority set out to bolster Republican support in the highly contested Senate District 10. Senator Beverly Powell, a plaintiff in this case, is the SD10 incumbent and stands to lose the most from SB4 because it reconfigures her district to more likely elect a Republican. Everyone knew that the Senate majority was targeting SD10 for partisan gain—including Senator Powell herself. In an exchange on the Senate floor, she directly confirmed as much:

> **Senator West:** So, let's get it on the record, do you believe that your district is being intentionally targeted for elimination as it being a Democratic trending district?
>
> **Senator Powell:** Absolutely.

Senator Nathan Johnson, another Democrat who opposed SB4, understood the same: "The proposed maps under CSSB 4 do exactly what they were expected to do: they make districts more partisan, and—if not invalidated by a court challenge—they effectively eliminate a Democratic seat."

Plaintiffs' theory is that the Senate majority intentionally discriminated on the basis of race, but all evidence points to the contrary. Senator Huffman stated that she never drew maps using racial shading—granular, block-by-block demographic data that allows map drawers to see minority-population density—to draw S2168. On the Senate floor she explicitly stated she did not use race while drawing district lines, and consulted with legal counsel to ensure compliance with the

1

Constitution and the Voting Rights Act. Rather, she only used maps with partisan shading—similar to racial shading, but indicating areas of Republican or Democratic population density. And indeed, the evidence bears this out. A comparison of SD10 at its benchmark, or before redistricting, and SD10 as implemented in SB4 shows that S2168 reconfigured SD10 to add areas that generally support Republicans into SD10, and subtract areas that generally support Democrats.

Plaintiffs offer various forms of circumstantial evidence to try to show discriminatory intent, but none of it supports their case. Most prominently, they point to evidence Senator Powell introduced during the legislative process—maps with racial shading and allegations of racial discrimination—but these are just examples of Senator Powell injecting race into the discourse, maps that later made their way into her lawsuit filed just nine days after the Governor signed redistricting legislation. The remainder of Plaintiffs' evidence includes either (i) materials related to the 2011 redistricting litigation, which are not probative of whether the Legislature acted with discriminatory intent in *this* redistricting cycle, or (ii) circumstances concerning the legislative process, which demonstrate that the Legislature acted according to partisan motivations, not racial ones.

At this stage, Plaintiffs seek a preliminary injunction based on their intentional vote dilution and racial gerrymandering claims. Although these are analytically distinct, they both fail for the same core reason: the Legislature simply did not consider race for purposes of redrawing SD10 (except, of course, for compliance with applicable law). Plaintiffs' evidence neither proves that the Legislature intended to dilute minority votes for purposes of intentional vote dilution nor that race predominated in the legislative process for purposes of racial gerrymandering. And their vote-dilution claim fails for the additional reason that Plaintiffs cannot satisfy the three preconditions set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986), which are necessary to establish a vote-dilution injury. For these reasons, they are unlikely to succeed on the merits, and the Court should deny preliminary-injunctive relief.

The Court need go no further. But if it reaches the issue, the Court should deny Plaintiffs' motion for the additional reason that the balance of the equities and the public interest demonstrate that the State will face substantial and disproportionate burdens if the Court enjoins SB4, moves the elections, and implements new Senatorial districts. The election is already underway, candidate filing has closed, other deadlines are fast-approaching, and local election officials are hard at work designing precincts, writing ballots, conducting logic-and-accuracy tests, and preparing for the March primaries. Substantially altering the Senate districts and the election itself at this late stage would cause significant voter confusion and would impose great burdens on state and local election officials. Under *Purcell v. Gonzales*, 549 U.S. 1 (2006), courts should not change voting laws during or on the eve of an election.

## BACKGROUND

The legislative record concerning SB4 demonstrates that it was a traditional redistricting bill. It reapportioned the Senatorial districts, protected incumbents, and identified one discrete partisan objective: SD10. The pertinent events are set forth below, explaining where Plaintiffs misconstrue the record where relevant.

## I.   The 2021 Redistricting Operated Under a Historically Compressed Timeline

In a normal census year, the Legislature would have redistricted during its eighty-seventh regular session, which ran from January 12, 2021, to May 31, 2021. By federal statute, the U.S. Census Bureau had a legal obligation to publish redistricting data no later than April 1, 2021. *See* 13 U.S.C. § 141(a), (c). The Census Bureau, however, failed to meet this deadline because of disruptions caused by the COVID-19 pandemic. Instead, the Census Bureau did not release any redistricting data until mid-August, and it did not produce the remainder until the following month when the Legislature was in the midst of its second special session. According to the Census Bureau, it "provided redistricting

data as legacy format summary files for all states on August 12, 2021," and committed "to providing the full redistricting data toolkit on Sept. 16, 2021."[1]

The federal government's delay forced the Legislature to work on a highly compressed and modified timetable. Although the Legislature would ordinarily have had months to consider reapportionment, the delay necessitated that the maps be adopted in a thirty-day special session. Nevertheless, the State took great care to ensure a robust debate, open to public input. As soon as it had the necessary data, the Governor called a special session of the Legislature, beginning September 20, 2021, to address redistricting. *See* Ex. 25. In anticipation of the special session, legislators resumed the public consultation process, hosting hearings on September 8, 9, 13, 15, and 18.[2] This was in addition to the public hearings that were convened prior to the release of the census data. The Legislature also passed a bill extending election-related deadlines to accommodate the new redistricting schedule, which Governor Abbott signed on September 10.[3]

Just before the third special session began, Senator Joan Huffman, the Chair of the Senate Special Committee on Redistricting, filed Senate Bill 4 on September 18, 2021. The bill was referred to committee two days later. Public hearings were held on September 24 and 25, 2021, and again on September 28, 2021, when the proposed map was reported favorably as substituted. After SB4 passed the Senate with bipartisan support (20 Yeas to 11 Nays), it was referred to the House Committee on Redistricting. Again, the Legislature invited public comment, holding a public hearing on October 11, 2021. At the hearing, the House Redistricting Committee considered possible amendments but reported SB4 favorably without changes. The full House considered the map on October 15, 2021,

---

[1] U.S. Census Bureau, *Decennial Census P.L. 94-171 Redistricting Data* (Aug. 12, 2021), https://www.census.gov/programs-surveys/decennial-census/about/rdo/summary-files.html (Ex. 24).

[2] *See* Texas Legislature Online, *House Committee Meetings by Date* (accessed Sept. 23, 2021), available at https://capitol.texas.gov/Committees/MeetingsbyDate.aspx?Chamber=H.

[3] *See* An Act Relating to Dates of Certain Elections to be Held in 2022, 87th Leg., 2d C.S., S.B. 13 (2021).

where it received bipartisan support and passed with a vote 81 Yeas to 60 Nays. The two chambers then signed the legislation on October 18, 2021, and the Governor signed it into law on October 25.

## II.    The Senate Majority Altered SD10 to Improve Republican Electoral Prospects

During the November 2020 elections, voters gave the Republican party substantial political advantages in the Texas House, Senate, and congressional delegation. The voters elected 83 Republicans and 67 Democrats to the House of Representatives, 18 Republicans and 13 Democrats to the Texas Senate, and 23 Republicans and 13 Democrats to Congress.

The Republican-controlled Legislature attempted to preserve Republican strength when possible. Its efforts occasionally came at the expense of Democratic electoral prospects, although Democratic incumbents were also frequently protected. Indeed, the maps were often criticized in the press as being focused on incumbent protection rather than on expanding Republican-controlled districts. The *New York Times* explained that the "Senate map protects Republican incumbents,"[4] and the *Texas Tribune* reported that "Texas Republicans propose a new congressional map that aims to protect the party's incumbents."[5]

One of the areas where Republicans sought to achieve political advantage was Senate District 10. SD10, centered in Tarrant County, is one of the more competitive Senate districts in Texas. Over the last decade, two Democrats and one Republican won general elections held in 2012, 2014 and 2018. And of those three general elections, the average margin of victory was just 4.5%. In the prior decade, Republicans held the advantage. They won two general election races for SD10 in 2002 and

---

[4] Nick Corsantini & Reid J. Epstein, *Texas Republicans Propose a New Congressional Map that Aims to Protect the Party's Incumbents*, N.Y. TIMES (Sept. 27, 2021), https://www.nytimes.com/2021/09/27/us/politics/texas-congress-map-republicans.html (Ex. 18).

[5] Elvia Limón, *Senate Map Protects Republican Incumbents*, TEXAS TRIBUNE (Oct. 25, 2021) https://www.texastribune.org/2021/10/25/2021-texas-redistricting-explained/?utm_source=liveblogshare&utm_medium=social#c8d09cbe-d075-4a94-9d72-0fb10aa99b2f (Ex. 19).

2004, and Democrats won just one general election race in 2008. SD10 is highly sought-after, and the races are closely contested. *See* Ex. 3 at 2–3 (Initial Report of Dr. John Alford).

**Table 1. Senate District 10 Electoral History**

| Year | | Winner | Loser |
|------|---|--------|-------|
| 2002 | | Kim Brimer (R) | Hal Ray (D) |
| 2004 | | Kim Brimer (R) | Andrew Hill (D) |
| 2008 | | Wendy Davis (D) | Kim Brimer (R) |
| 2012 | | Wendy Davis (D) | Mark Shelton (R) |
| 2014 | | Konni Burton (R) | Libby Willis (D) |
| 2018 | | Beverly Powell (D) | Konni Burton (R) |

Against this backdrop, the Republican majority set out to bolster Republican electoral prospects in SD10. This was abundantly clear to everyone in the Senate—including Senator Powell. Indeed, she expressly confirmed her knowledge of this plan during a floor debate colloquy with Senator Royce West.

> **Senator West:** This is going to be part of the record. We know we're going to lose this particular vote. It's been said that Senate District 10 was going to flip, okay?
>
> **Senator Powell:** That's exactly right.
>
> **Senator West:** So, let's get it on the record, do you believe that your district is being intentionally targeted for elimination as it being a Democratic trending district?
>
> **Senator Powell:** Absolutely. Absolutely. . . .

ECF 39-41 (Pls.' Ex. 6K) at A-49. As Senators Powell and West recognized, it was clear that—as previously configured—Senate District 10 was trending toward the Democrats. Of course, Senator Powell won the 2018 State Senate election, and in 2020, 53.1% of SD10 voted for Joe Biden in the presidential election, as compared to 45.4% who voted for Donald Trump. *See* Ex 26; Ex. 5.

**Figure 1. Partisan Composition of SD10, Benchmark**



To accomplish their goal of returning a Republican to SD10, the Republican majority needed to identify Republican areas of the state that could be added to SD10 and Democratic areas that could be removed. This strategic condition coincided with the relative population loss in West-North Texas and the South panhandle. Those areas grew much more slowly than the rest of the State, and those districts needed additional population in to comply with the Supreme Court's one person, one vote command. Specifically, under the benchmark, Senate District 28 was 15.3% smaller than the ideal district size. *See* Ex. 29 at 8 (S2100 Map Analysis); ECF 39-54 (Pls.' Ex. 17).

**Figure 2. Population Deviation Map**



As it stood, a number of counties in North Texas and the panhandle needed population. Those counties vote predominately Republican. For instance, according to publicly-available RedAppl data, 75.9% of Johnson County voted for Donald Trump in 2020, as compared to 22.9% who voted for Joe Biden. The same is generally true of other counties in the area. *See* Palo Pinto County (81.5% Trump, 17.4% Biden); Stephens County (89.0% Trump, 10.4% Biden). *See* Ex. 8 (below).

**Figure 3. Partisan Composition of North Texas, Benchmark**



Given these circumstances, the Republican majority decided to add several Republican-leaning counties in North Texas and the panhandle to SD10, and remove several blue areas in and around Tarrant County. Their goal, as always, was to design SD10 to elect a Republican. And they succeeded, at least on paper. Under the benchmark plan, 53.1% of SD10 voted for Joe Biden in 2020, as compared to 45.4% who voted for Donald Trump. Ex. 26. By contrast, under S2168, 57.2% of SD10 voted for Donald Trump in 2020, as compared to 41.4% who voted for Joe Biden. Ex. 27.

**Table 2. SD10 Partisan Comparison: S2100 and S2168**

| Map | | Winner | Loser | Margin |
|---|---|---|---|---|
| S2100 | | Joe Biden | Donald Trump | D + 7.7% |
| S2168 | | Donald Trump | Joe Biden | R + 15.8% |

**Figure 4. Partisan Composition of SD10, Enacted**



These figures depict what everyone in the Legislature knew: the Senate majority substituted Democratic areas in SD10 for Republican areas in an attempt to configure it such that it would elect a Republican. Viewing the partisan shading, Senator Huffman added red areas to SD 10, and removed blue areas. It is that simple. Close consideration of the partisan demographics that entered and exited SD10 further confirms this uncontroversial fact.

**Figure 5. SD10 Partisan Changes Map**



As shown in Figure 5, the reconfiguration of SD10 moved a substantial number of Republican voters into SD10, and moved a substantial number of Democratic voters out. Based on the population in the areas indicated on the map, and the percentage of the areas that voted for Donald Trump in the 2020 general election, SD experienced a net gain of 108,752 Republican voters and a net loss of 116,554 Democratic voters. This was the partisan objective the Senate majority set out to accomplish.

Again, the Senate majority's partisan objective was widely-known. In fact, Plaintiffs concede Senator Huffman stated on the Senate floor that "partisan considerations" were one "of the criteria [she] used in proposing and considering new districts." ECF 39-53 (Pls.' Ex. 16) at 4–5; *see* ECF 39-41 at A-16 ("I do recall [partisan considerations] being one of the considerations, yes."); ECF 39 at 36–37. Plaintiffs contend, however, that Senator Huffman's statement must have been pretextual because she allegedly did not mention partisan enough times in her floor statements. ECF 39 at 36–

37. They point to the absence of that statement in Senator Huffman's remarks four days earlier, but that is immaterial. The earlier statement did not purport to exhaustively list all considerations. Senator Huffman merely noted that her "goals and priorities . . . include[d]" certain considerations. ECF 39-51 (Pls.' Ex. 14) at 5. In ordinary English, "[t]he verb *to include* introduces examples, not an exhaustive list." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012). Indeed, as explained above, Senator Powell had no doubt that she was being targeted for political reasons. Nor did Senator Nathan Johnson, who explained SB4 as it pertained to SD10 as follows: "The proposed maps under CSSB 4 do exactly what they were expected to do: they make districts more partisan, and—if not invalidated by a court challenge—they effectively eliminate a Democratic seat." ECF 39-40 (Pls.' Ex. 6J) at 65.

## III.  District Lines Were Not Based on Race

To accomplish their goal of flipping SD10, the map drawers constructed district lines using partisan data, not racial data. To understand the map-drawing process, it is important to understand the tools available to the map drawers. A crucial tool is the ability to apply "shading" to a map currently being drawn. Shading maps display partisan, demographic, or other data to show the map drawer which areas contain high or low concentrations of Republican voters, Democratic voters, African Americans, Latinos, Asian Americans, and other cross sections of the population. A map will not display a particular shading unless the map drawer elects to view it, or "turns on" that particular shading. As Plaintiffs rightly observe, the publicly-available redistricting software included a racial shading tool, allowing map drawers to view maps with racial shading, if they desired.

From the beginning, Senator Huffman was unequivocal that neither she nor her staff would use or consider racial shading when drawing the new Senate map. She explained on the Senate floor that her team used many of the redistricting tools, but never racial shading:

> Sometimes we looked at county lines, sometimes precinct, actual the precincts highlighted. Sometimes we have it shaded for cities and sometimes we had it shaded

> for partisan numbers, sometimes they were Trump numbers, sometimes we had several political elections up from different years that we looked at and population numbers were almost always there. One thing we never had on was racial shading.

ECF 39-41 (Pls.' Ex. 6K) at A-5; *see also id.* at A-31 ("We only shaded for partisan, as I've explained, not racial."). Assiduously endeavoring to *avoid* discriminating on the basis of race, Senator Huffman stated on numerous occasions that the Senate maps were drawn "blind to race." *See, e.g., id.* at A-38 ("We did not consider race in the drawing of Senate District 10. . . . I believe that I followed the law and drew these maps blind to race."). Indeed, she stressed this point in response to Senator Powell:

> **Senator Powell:** So, you're basically saying that despite serving on the Redistricting Committee for the past two cycles and chairing the committee this cycle, and listening to witnesses who have testified from both redistricting cycles that you came to the process completely unaware that minority voters are concentrated in urban areas of Dallas and Fort Worth.

> **Senator Huffman:** Senator Powell, of course, I have an awareness that there are minorities that live all over this state. Alright? But I blinded myself to that as I drew these maps and did not make map decisions based on racial determinations, period, right.

*Id.* at A-21. And it is evident from other public colloquies that senators were keenly aware Senator Huffman drew the maps without racial shading. Indeed, Democratic Senator Sarah Eckhardt recognized Senator Huffman's commitment to this principle:

> **Senator Eckhardt:** You, you have mentioned and been very assiduous about this, that you are colorblind in your dealings with the map.

> **Senator Huffman:** Yes, Ma'am.

*Id.* at A-37. Plaintiffs purport to seize on the *blind to race* language, and suggest it demonstrates that Senator Huffman did not consider race for purposes of ensuring compliance with the Voting Rights Act and other federal law. *See* ECF 39 at 18–19, 34–35. But fairly read, Senator Huffman's statements reflect that she did not use racial shading to draw the maps and otherwise obtained legal counsel to ensure the plans were compliant with federal law. And she publicly explained this on numerous occasions. *See, e.g.,* ECF 39-51 (Pls.' Ex. 14) at 82 ("Well, as I've stated very clearly, these maps were

drawn blind to race and then I consulted with the attorney general's office, and they gave me legal advice as to whether or not I had—I complied with the Voting Rights [Act] Section 2."); ECF 39-53 (Pls.' Ex. 16) at 12 ("As I have made clear, my proposed plans were drafted blind to racial data, and I obtained legal advice prior to filing to ensure there was no inadvertent violations of the Voting Rights Act during this race-blind drafting."). Plaintiffs concede as much in their motion. *See* ECF 39 at 32 ("Senator Huffman claims SD10 was drawn 'blind to race' because 'racial shading' was not displayed in RedAppl as the maps were drawn.").

At least before litigation was filed, Senate Democrats had no trouble believing that Senator Huffman did not draw district lines based on race. Indeed, they seemingly objected to color blindness in principle. Senator Eckhardt, for example, explained her vote against SB4 by complaining that "the Senate Special Redistricting Committee process itself evinces continuing *conscious indifference* to our changing demographics." ECF 39-40 (Pls.' Ex. 6J) at 64. Senator Eckhardt apparently opposed "*conscious indifference* to minority voting strength," but such indifference forecloses the possibility of any discriminatory intent to dilute minority voting strength. *Id.* (emphasis added).

## IV.   Plaintiffs' Supposed Evidence of Pretext Reflects Partisan Motivation, not Racial Discrimination

### A.   Senator Seliger's Declaration is Not Credible

Despite Senator Powell's express recognition that the Senate majority targeted her seat in order to gain partisan advantage, Plaintiffs insist that Senator Huffman's explanations of why she drew SD10 as she did are a pretext for racial discrimination. *See* ECF 39 at 18–22. Their argument essentially turns on the declaration of a disfavored, retiring Republican legislator: Senator Kel Seliger. *See* ECF 39-2 (Pls.' Ex. 1. Speaking in broad, nonspecific terms, he alleges the "2021 senate redistricting process saw untrue, pretextual explanations given for why the lines were drawn the way they were." *Id.* ¶ 10. Such claims are not credible coming from a political opponent of the Lieutenant Governor's who believes that the redistricting process hurt his electoral prospects.

As an initial matter, Senator Seliger has been losing favor in the Republican Party for several election cycles. Midland mayor Mike Canon—a conservative Republican—challenged Senator Seliger in the 2014 Republican primary and lost by just five percentage points. *See* Ex. 14 (2014 GOP Primary). In the next Republican primary, Senator Seliger avoided a runoff by just .40%, or 323 votes, with Canon again being the runner-up. *See* Ex. 15 (2018 GOP Primary). In addition, Senator Seliger has openly opposed Lieutenant Governor Dan Patrick's policy agenda on numerous occasions, and Patrick stripped Seliger of his post as chairman of the Senate Agriculture Committee during the 2019 regular session.[6]

In this light, Senator Seliger publicly expressed dissatisfaction with the 2021 redistricting process because it did not give him the district he felt he needed to ensure reelection. Indeed, he has specifically alleged the new map was drawn to push him out of office, leading to his ultimate decision to not seek reelection in 2022. The *Amarillo Pioneer* contextualized Seliger's decision as follows: "The announcement came after weeks of Seliger's claims that redistricting efforts had been made to make his re-election more difficult, despite offering no substantive proof for his claims."[7] And the *Texas Tribune* explained the reconfiguration in similar terms: "Seliger's district was redrawn by his Republican colleagues in the Senate in a way that he says is designed to hobble a potential reelection bid."[8]

Having fallen out of favor with Senate Republican leadership and dissatisfied with his own district's boundaries, Senator Seliger has plenty of reason to complain. But he is complaining about

---

[6] *See* Emma Platoff, *Lt. Gov. Dan Patrick Pulls Senator Kel Seliger's Chairmanship after Seliger Suggested Patrick Aide Kiss His "Back End,"* Texas Tribune (Jan. 22, 2019), https://www.texastribune.org/2019/01/22/lt-gov-dan-patrick-strips-kel-seliger-senate-committee-chairmanship/ (Ex. 21).

[7] Thomas Warren, *Seliger Calls it Quits: Republican Senator Not Seeking Re-Election,* Amarillo Pioneer (Oct. 20, 2021), https://www.amarillopioneer.com/blog/2021/10/20/seliger-calls-it-quits-republican-senator-not-seeking-re-election (Ex. 22).

[8] Patrick Svitek, *Weighing Reelection Bid, GOP Texas Senator Kel Seliger Confronts Redrawn District, Trump Endorsement of Primary Challenger,* Texas Tribune (Oct. 7, 2021), https://www.texastribune.org/2021/10/07/texas-senate-reelection-kel-seliger/ (Ex. 20).

redistricting decisions being driven by partisanship and politics, not race. Regarding his own district, for example, Senator Seliger claims he was given "pretextual explanations" when the "purpose" of changes to his district "was to benefit a potential Republican primary challenger from Midland preferred by the Lieutenant Governor." ECF 39-2 (Pls.' Ex. 1) ¶ 10. Regarding SD10, Senator Seliger similarly claims that "the stated redistricting criteria, such as equalizing population, compactness, communities of interest, or incumbent protection," were "pretext." *Id.* ¶ 11. Notably, he does not deny that the majority had a partisan purpose or claim it had a racial purpose. Nor could he. As an opponent of the bill, Senator Seliger was only tangentially involved in the redistricting process this cycle, and he does not claim to have personal knowledge of any other legislator's intent.

### B. Partisan Intent Is the Best Explanation for Plaintiffs' Circumstantial Evidence

Plaintiffs raise a number of perceived issues with the explanations given for redistricting decisions in the Senate, but none raises an inference of intent to discriminate on the basis of race. *First*, Plaintiffs contend that SD10 did not need to be reconfigured to address equal-protection concerns. *See* ECF 39 at 19–20. They acknowledge that SD 23 (-4.14%), SD 28 (-15.33%), and SD 31 (-7.54%) were all underpopulated, but argue that the deviations could be corrected by shifting population from other nearby overpopulated districts, SD 8 (+6.16%), SD 12 (+15.55%), and SD 30 (+9.26%). *See* Ex. 29 at 6–10 (S2100 Analysis). Even if a map could be drawn according to Plaintiffs' suggestion, that does not mean Senator Huffman ignored equal-population concerns in drawing SD10. To the contrary, all Plaintiffs show is that Senator Huffman elected to address apportionment issues by reconfiguring SD10 instead of by alternative methods. The failure to use the opposition party's preferred configuration is hardly evidence the Senate majority did not authentically consider equal-population concerns.

*Second*, Plaintiffs protest that the new SD10 separates traditional political subdivisions, alters the core of the previous district, and makes the new district less compact. As a preliminary matter, the

perceived separation-of-political-subdivisions issue is overstated. The practical necessities of redistricting often require urban environments like Arlington and Fort Worth to be combined with more rural communities as a means of ensuring that districts are roughly proportional. In this circumstance though, the urban centers of Tarrant County are intimately connected with the other counties included in new SD10. This is especially apparent with Parker County and Johnson County, which both have deep economic ties to Tarrant County. Ex. 1 ¶ 12.

Specifically, both the cities of Burleson and Crowley and their associated school districts reach into Johnson County and Tarrant County, while workers that reside in Johnson County commonly commute into Tarrant County via Interstate 35. *Id.* ¶¶ 11–12, 15. Similarly, the city of Fort Worth extends into Parker County, while Aledo ISD extends from Parker County back into Tarrant County. *Id.* ¶¶ 11, 15. Workers commonly use Interstate 20 to commute into Tarrant County from Parker County, and some even travel in from Palo Pinto County. *Id.* ¶ 12. Parker and Palo Pinto counties are also closely related to one another, with Santo ISD, Millsap ISD, and Mineral Wells ISD, along with the city of Mineral Wells, all being partially located in both counties. *Id.* ¶¶ 11, 15. Because of their many shared interests and commonalities, government agencies often group the counties of Tarrant, Johnson, Parker, and Palo Pinto together for administrative efficiency and convenience. *Id.* ¶ 13.

Even if SD10 does not wholly retain the core of the old district, and is less compact, those circumstances are evidence of population shifts elsewhere and partisan motivation, not racial discrimination. As explained above, it was clear to the Legislature that SD10 was trending toward the Democrats and needed to be reconfigured if a Republican was going to win that seat. It was also clear that less densely populated western counties would need to move east to pick up the requisite amounts of population. Given these partisan and population concerns, it was necessary to change the boundaries of SD10. But in making those changes, those that drafted SB4 chose to incorporate the western counties that had the most in common with SD10's Tarrant County residents.

*Third*, Plaintiffs assert that one of Senator Powell's amendments, which would implement the benchmark SD10, "received bipartisan support, with Senator Kel Seliger . . . voting in favor." Motion at 22. This is misleading. Floor Amendment No. 2—the amendment Plaintiffs reference—failed 14-17. This was an entirely party-line vote except for Senator Seliger. Apparently Plaintiffs use "bipartisan support" to mean that the Senate Democrats joined with one Republican senator who has fallen out of favor with his party. Plaintiffs' distortion is even more clear when viewed in light of Senator Powell's second offered amendment, Floor Amendment No. 3. This was a similar proposal respecting SD10, and it failed 13-18, on a strictly party-line vote, with Senator Seliger voting against. *See* Ex. 23 at 53–54 (Senate Journal). In reality, these votes were partisan, as would be expected given the partisan nature of the objective.

Plaintiffs also point to a statement by Senators Eddie Lucio, Judith Zaffirini, and Juan Hinojosa, alleging that they voted for SB4 despite opposing certain aspects of the bill. *See* ECF 39 at 22 n.6. First, it should be noted all three Hispanic incumbent Senators voted for SB4. But their description of SB4 as partially "discriminatory" was based on a misunderstanding of the relevant precedent. In their statement, not one of the three senators disputes that district lines were drawn without consideration of racial shading. Instead, Plaintiffs argue that "no senator can claim after multiple hearings and today's debate that they do not know the harmful effects this map will have on racial minorities across Texas." ECF 39-40 (Pls.' Ex. 6J) at 66–67. That statement does not show that any legislator voting for SB4 did so for a racially discriminatory purpose. It does, however, undermine Plaintiffs' claims of discriminatory intent for at least some of the legislators who voted for SB4.

In the end, none of these circumstances demonstrate that Senator Huffman or the Senate majority was secretly harboring racially discriminatory intent when it drew SD10. Rather, the record shows that the Senate largely followed traditional redistricting principles, and strategically reconfigured SD10 to bolster Republican support in that district.

V.     **Senator Powell—At Risk of Losing Her Senate Seat—Sought to Bolster an Anticipated Legal Challenge**

Senator Powell publicly acknowledged the Senate majority targeted her district for partisan reasons. ECF 39-41 (Pls.' Ex. 6K) at A-49. She and her party also knew they could not prevent the Senate Majority from enacting S2168. *See id.* ("We know we're going to lose this particular vote."). With her electoral prospects waning, Senator Powell did the only other thing she could think to do: she claimed—during the redistricting process and in a federal lawsuit filed just nine days after the session—that districting efforts were not based on partisanship, but instead upon racial motivations. To buttress her putative legal case, Senator Powell submitted materials to Senator Huffman during the legislative session, first in a meeting, and later through emails and attachments directed to Senator Huffman and other legislators, that asserted S2168 was discriminatory and unlawful. Plaintiffs make much of this in their motion, pointing to exhibits they insist evince that Senator Huffman considered maps with racial shading and that she and the other members of the Legislature knew S2168 violated the Constitution and the VRA. But it was Senator Powell who introduced that evidence during the legislative process, and roughly a month later in her federal redistricting lawsuit alleging intentional discrimination. Far from showing that the Senate majority acted with discriminatory intent, Senator Powell's efforts demonstrate a recognition that the proposed configuration of SD10 was likely to pass and a belief that advantage could be gained by introducing *racial* evidence during the legislative process.

First, Plaintiffs point to a meeting between Senators Huffman and Powell and their staff that occurred on September 14, 2021. *See* ECF 39 at 11–12. Senator Huffman allegedly showed Senator Powell the proposed reconfiguration of SD 10, which was not well received by the latter. But Senator Powell had come prepared. During the meeting she gave Senator Huffman and her staff maps with racial shading and other handouts, arguing that the proposed reconfiguration would discriminate on the basis of race. *See* ECF 39-6 (Pls.' Ex. 2C). Senator Huffman glanced at each map, and initialed

them to indicate receipt. Senator Huffman would later explain to the full Senate that she refused to consider the maps once she "realized it had racial data." ECF 39-41 (Pls.' Ex. 6K) at A-17.

Plaintiffs, in turn, use these maps and information Senator Powell provided to Senator Huffman to argue that Huffman considered maps with racial shading, and that she therefore made redistricting decisions based on that knowledge. But the proposed map of SD 10 had already been drawn and shown to Powell. And nothing about Plaintiffs description of that meeting suggests that Senator Huffman used racial shading to draw S2168. And while Plaintiffs insist that Senator Huffman "glanced" at the maps "for less than a second," *id.*, it hardly matters whether she looked at the maps for one second, three seconds, or ten. There is no evidence that Senator Huffman utilized race to construct the district lines of SD 10. Powell's self-serving attempts to inject race into the process, and later claim in a federal lawsuit that her district was drawn in an intentionally discriminatory manner, do not change the fact that by her own telling her district was "absolutely" targeted because it was a Democratic district.

Senator Powell also sent three mass emails, each time attaching exhibits, and alleging that S2168 violates the Constitution and the VRA. *See* ECF 39 at 12–13 (email to Senator Huffman); *id.* at 13–14 (email to full Senate); *id.* at 22–23 (email to full House). Plaintiffs assert these exhibits show that Senator Huffman and the members of the Senate and House generally "knew" that S2168 was unlawful, and conclude that because the map was passed anyway, the Legislature acted with discriminatory intent. As before, the Court should ignore this evidence. The maps were not unlawful. They were drawn based on partisan motivations. And after the fact assertions—during session or the federal lawsuit that followed shortly after—that the maps were based on discriminatory intent does not make it so.

VI.   **Plaintiffs Evidence Regarding *Previous* Redistricting Cycles Proves Nothing about *This* Cycle**

In Plaintiffs' recitation of the factual background, they point to several past circumstances and argue that they informed the Legislature's actions during this redistricting cycle. They did not. First, Plaintiffs cite three federal judicial opinions for the proposition that the previous iteration of SD10 was drawn with discriminatory intent, but those cases stand for no such thing. Second, Plaintiffs stress several perceived connections between the 2011 redistricting cycle and this cycle, finally concluding that S2168 must have been enacted with discriminatory intent. But Plaintiffs' would-be connections are really not connections at all, and have no bearing on the Legislature's recent actions.

A.    **Plaintiffs Try to Analogize to the Previous Iteration of SD10, But Their Cases Are Inapposite**

Plaintiffs make much of the fact that SD10 was the subject of litigation in the last redistricting cycle, but they fail to connect any of their evidence to *this* redistricting cycle. They cite three cases they contend show that the previous version of SD10 was drawn with discriminatory intent. Plaintiffs misapprehend and misapply each of those three cases.

As a preliminary matter, even if the following cases stood for propositions Plaintiffs say they stand for—which they do not—they would still not be probative of discriminatory intent with respect to this redistricting cycle. Those rulings addressed different maps passed by different legislators, drawn by different map drawers, and passed in different circumstances. But the Supreme Court admonishes that discriminatory intent must be connected to the present circumstances. *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987) (explaining that "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value"). Indeed, in the last round of Texas redistricting, the Supreme Court specifically faulted the district court for "requir[ing] the State to show that the 2013 Legislature somehow purged the 'taint' that the court attributed to the defunct and never-used plans enacted by a prior legislature in 2011." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). The two-

year-old taint was too attenuated to support a finding of fault in 2013; it became more attenuated, not
less, in the intervening eight years since.

*First*, Plaintiffs cite *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (three judge district
court), *vacated and remanded*, 570 U.S. 928 (2013). The D.C. District held that the 2011 version of SD10
violated the Voting Rights Act with respect to discriminatory effect and purpose. But that ruling is of
little probative value for at least two reasons. To begin, *Texas* was a preclearance proceeding under
Section 5 of the VRA, which has since been declared unconstitutional by the Supreme Court in *Shelby
County v. Holder*, 570 U.S. 529 (2013). In such a proceeding, the ordinary burdens of proof are reversed.
The three-judge panel's holding reflects this crucial substantive difference: "We conclude that Texas
*has not shown* that the Senate Plan was enacted without discriminatory intent." *Texas*, 887 F. Supp. 2d
at 166 (emphasis added). Moreover, *Texas* was expressly vacated by the Supreme Court after it
announced its decision in *Shelby County*. *See* 570 U.S. at 928. Indeed, the Supreme Court specifically
recognized its vacatur later in the same redistricting litigation. *See Perez*, 138 S. Ct. at 2330 ("Before
our decision in *Shelby County* mooted Texas's appeal . . . Texas filed a jurisdictional statement claiming
that the D.C. court made numerous errors. . . .").

*Second*, Plaintiffs cite *Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017) (three judge district
court). The most obvious reason *Perez* does not support Plaintiffs' argument as to SD10 is that it was
a case about *congressional districts*. Necessarily, then, *Perez* involves different issues, different legislators,
different map drawers, different circumstances, and above all, *different maps*. In addition, Plaintiffs cite
Judge Smith's dissent, ECF 39 at 13, in an attempt to support their position when in fact his dissent
cuts strongly against their case. Judge Smith explained in unequivocal terms that a state legislature may
lawfully target a state representative based on partisan motivation:

> An attempt to dislodge an incumbent political adversary should logically be viewed as
> a permissible redistricting principle, as is true for the traditional principle of protecting
> an incumbent. It only stands to reason that if a partisan political majority can exercise

its legislative weight to protect its friends, it can do that to punish its enemies for political, non-racial reasons.

*Perez*, 253 F. Supp. 3d at 985 (Smith, J., dissenting). That is precisely what happened here. By Senator Powell's own admission, the Legislature attempted to dislodge her for political reasons. Plaintiffs cite *Perez* because they believe it supports their argument that SD10 was passed with discriminatory intent, but that case does no such thing.

*Third*, and last, Plaintiffs cite *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc). If *Veasey* says anything about SD10, it is that the 2012 *Texas* decision was vacated by *Shelby County. See id.* at 227 n.7. Indeed, Judge Jones, joined by Judges Jolly, Smith, Clement, and Owen, explained that "the D.C. District's opinion in [*Texas*] was vacated by the Supreme Court. Vacated opinions have no precedential or persuasive value." *Id.* at 301 n.36 (Jones, J., concurring in part and dissenting in part) (internal citations omitted). Moreover, *Veasey* was not even a redistricting case. It involved a challenge to the State's voter identification law, which was ultimately upheld in *Veasey v. Abbott*, 888 F.3d 792 (5th Cir. 2018) (en banc).

To summarize, Plaintiffs cite *Texas*, *Perez*, and *Veasey* for the proposition that other courts have recognized that SD10 was previously enacted with discriminatory purpose, but that is a substantial misstatement of the law. Only one case actually addressed SD10—*Texas*—and it was vacated by the Supreme Court and therefore has no precedential or persuasive value. And again, even if these three cases meant what Plaintiffs say they mean, they would still not demonstrate that *this* iteration of SD10 was drawn with discriminatory intent. The legislators, map drawers, and surrounding circumstances are entirely different.

### B.   Plaintiffs' Pre-2021 Evidence Is Irrelevant to This Redistricting Cycle

Plaintiffs also purport to identify three circumstances that predate this redistricting cycle to show that the Legislature acted with discriminatory intent. None of them is relevant.

*First*, Plaintiffs observe that Senator Huffman was on the Senate Redistricting Committee in 2011 and 2013 when the committee was responding to the *Texas* litigation. *See* ECF 39 at 7–8. As an initial matter, and as explained above, the *Texas* decision was vacated and has no bearing on this case. But even if that were relevant, Senator Huffman's awareness of alleged racial-discrimination issues then hardly shows that she acted with discriminatory intent now. Such a claim is based on pure conjecture.

*Second*, Plaintiffs point to hearings that the Senate Redistricting Committee conducted before the 2020 Census. *See* ECF 39 at 8–11; *see also* ECF 39-8 to 39-11 (Pls.' Exs. 3A–3D). They note that the committee distributed materials that included maps with racial shading, but this only shows that the committee gathered those materials for those hearings. The fact that those maps exist does not at all prove or even suggest that Senator Huffman *used* them to draw S2168. To the contrary, she has emphatically denied doing so. *See, e.g.*, ECF 39-41 (Pls.' Ex. 6K) at A-5 ("One thing we never had on was racial shading").

*Third*, and last, Plaintiffs note that Anna Mackin, Senator Huffman's special counsel, worked for the Office of the Attorney General during the 2011 redistricting litigation. *See* ECF 39 at 15–16. They dig up plaintiffs' exhibits offered in that litigation, to which Mackin objected. Several of these exhibits are maps with racial shading. *See* ECF 39-28 to 39-32 (Pls.' Ex 6B, Part 1–5). Plaintiffs also note that *four years after the litigation* Mackin drew several proposed Senate maps, along with staffer Sean Opperman and Senator Huffman herself. From these two data points, Plaintiffs conclude that Mackin drew S2168 with discriminatory purpose. But again, this is pure conjecture. The fact that Mackin, as a lawyer defending her client, opposed discriminatory-intent claims during the 2011 redistricting litigation does not at all mean that she used race to draw the Senate maps during this redistricting cycle. Nor could evidence about Mackin as an individual support a conclusion about the Legislature as a whole.

\*       \*       \*

Although Plaintiffs would have the Court believe that the circumstances surrounding the redrawing of Senate District 10 were a complicated web of legislative pretexts in a coordinated effort to disguise racial discrimination, the truth is what happened is really very simple. Early on, the Republican majority identified the Democratic-controlled SD10 as a district it wanted to flip. In line with that goal, Senator Huffman and the other members of the majority reconfigured SD10 so it would elect a Republican. In doing so, Senator Huffman was meticulously careful to avoid using race to draw the partisan lines. Senator Powell, the casualty of this partisan strategy, clearly had reason to oppose the new map. She introduced evidence she knew she would use later in an attempt to build a case that the new SD10 violates the Constitution and the VRA. But her manufactured evidence is just that, manufactured. All the pertinent evidence demonstrates that the Legislature acted according to partisan motivations. And as the Supreme Court accentuated last term, "partisan motives are not the same as racial motives." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021).

### STANDARD

A motion for a preliminary injunction must satisfy four "prerequisites":

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Libertarian Party of Tex. v. Fainter*, 741 F.2d 728, 729 (5th Cir. 1984). "The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974). That burden is heavy. It requires "*a clear showing.*" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

"A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Nichols v. Alcatel*

*USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (quotation omitted). Still, it is "never awarded as of right" and is instead left to a district court's "sound discretion." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

**ARGUMENT**

## I.      Plaintiffs Are Not Likely to Succeed on the Merits

### A.      Plaintiffs' Intentional Vote-Dilution Claims Fail

A vote dilution claim alleges that a particular voting scheme was enacted with the purpose "to minimize or cancel out the voting potential of racial or ethnic minorities." *Miller v. Johnson*, 515 U.S. 900, 911 (1995). In their motion for preliminary injunction, Plaintiffs seem to pursue their claim of intentional vote-dilution under the Constitution and the VRA but not their claim of effects-based vote-dilution under Section 2. But alleging intentional discrimination does not relieve Plaintiffs of their obligation to prove discriminatory effect. *See Harding v. Dallas County*, 948 F.3d 302, 312 (5th Cir. 2020).

The Fifth Circuit recognizes that the "role that § 2 and *Gingles* play in intentional vote dilution claims as opposed to results-only claims is somewhat unsettled." *Id.* at 313. Defendants are aware of only two Circuits that have addressed vote-dilution standards as they pertain to the *Gingles* factors. Consistent with the nature of a vote-dilution injury, the Eleventh Circuit requires that plaintiffs who bring an intentional vote-dilution claim must demonstrate the three *Gingles* prerequisites. This is so because although discriminatory intent might be "circumstantial evidence of discriminatory results," *Johnson v. DeSoto County Board of Commissioners*, 72 F.3d 1556, 1565 (11th Cir. 1996), such intent in no way "lessens the amount of discriminatory results that must be shown," *id.* at 1564.

Accordingly, discriminatory effects must still be demonstrated through the application of the three threshold *Gingles* factors. See *Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999) (rejecting a vote-dilution claim on summary judgment despite evidence of "discriminatory intent" because the plaintiff did not "meet the requirements of the Gingles factors"). Recent district-court

decisions apply these principles. *See, e.g.*, *Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1366–67 (N.D. Ga. 2018) ("[A]ll three *Gingles* preconditions [must] be shown in order to make a viable discriminatory intent claim."). By contrast, the Ninth Circuit in *Garza v. City of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990) held that the first *Gingles* precondition, that the minority must be large enough to form a majority in a single member district, is relaxed where there has been a showing of discriminatory intent.

The Court should apply the Eleventh Circuit's standard because it is consistent with the Fifth Circuit's admonition that there must be both discriminatory effect and discriminatory intent in order to prove an intentional discrimination claim. *Harding*, 948 F.3d at 312. The three *Gingles* preconditions define what it means to have sustained a vote-dilution injury. Logically, then, a plaintiff must prove that he or she sustained such an injury before proving such injury was the product of discriminatory intent. But even if the Court applies the Ninth Circuit's standard, Plaintiffs must still prove the second and third *Gingles* preconditions.

But Plaintiffs cannot prove any of the *Gingles* preconditions here. It is undisputed that they will be unable to show "the minority population in the potential election district is greater than 50 percent." See *Bartlett v. Strickland*, 556 U.S. 1, 120 (2009); *see also* Ex. 3 at 4. Even if Plaintiffs could overcome the first *Gingles* factor, their claims would still fail because Hispanic voters and Black voters in SD10 are not "politically cohesive" and, by definition, Anglo voters in a would-be crossover district do not "vote[] sufficiently as a bloc" so as "usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51. Finally, even if Plaintiffs could somehow cross the *Gingles* threshold, their claims would still fail because there is no evidence that benchmark SD10 will perform as Plaintiffs claim.

### 1.   Plaintiffs Have Not Made a Clear Showing of Discriminatory Intent

#### a.   The Legislature's Good Faith Is Both Presumed and Supported by Evidence That It Acted for Partisan Reasons

In redistricting cases, "the good faith of a state legislature must be presumed." *Miller*, 515 U.S. at 915. Indeed, "the Supreme Court has long cautioned against the quick attribution of improper

motives, which would interfere with the legislature's rightful independence and ability to function." *Fusilier v. Landry*, 963 F.3d 447, 464 (5th Cir. 2020). It is therefore "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Perez*, 138 S. Ct. at 2325. Thus, "showing that a redistricting plan intentionally discriminates is not ordinarily an easy task." *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000). Rather than confront this task head on, Plaintiffs completely ignore the presumption of good faith.

The evidence in this demonstrates that the Legislature acted based on partisan motivations, not discriminatory intent. Near the end of their argument, ECF 39 at 36–41, Plaintiffs try to disprove this, but both of their arguments are unavailing.

### i. The Weight of Evidence Showing Partisan Motivations Is Not a Pretext for Racial Discrimination

*First,* Plaintiffs contend that the Legislature's partisan motivations are a "*post hoc* pretext" for racial discrimination. *Id.* at 36. But they fail to grapple with the weight of evidence demonstrating the opposite. As explained in detail in the Background, it was clear from the outset that the purpose of SB4 was to bolster Republican support in SD10. Indeed, Senator Powell herself admitted as much on the Senate floor. If that were not enough, one need look no further than the partisan shading maps for the benchmark SD10 and the newly-configured SD10. They explain that Senator Huffman and the Senate majority intentionally moved Republican-leaning areas into SD10 and removed Democratic-leaning areas. To reiterate, under the benchmark, 53.1% of SD10 voted for Joe Biden in the 2020 election, as compared to 45.4% who voted for Donald Trump. Under S2168, however, 57.2% of SD10 voted for Donald Trump, as compared to 41.4% who voted for Joe Biden. *Supra* Table 2.

Moreover, Plaintiffs rebut themselves with their own pleadings. For example, they allege that Democrats would have won nine of nine evaluated 2020 races in the pre-redistricting version of SD10 but that Republicans would have won five of five such races evaluated in the post-redistricting version of SD10. *See* ECF 1 ¶¶ 37, ¶ 47. Plaintiffs merely give another example of partisan objectives.

Nor can Plaintiffs overcome the clear evidence of partisan motivation by fixating on the fact that Senator Huffman did not publicly announce that partisan considerations were one of the factors she considered until four days after she announced her five initial criteria. As explained above, she never purported to have identified all of her criteria. And in any event, if Senator Huffman was disinclined to emphasize partisan considerations, that likely reflects the fact that such considerations are unpopular in some quarters. *E.g.*, *Rucho v. Common Cause*, 139 S. Ct. 2484, 2509 (2019) (complaining about "partisan gerrymanders").

### ii.   Plaintiffs' *Post Hoc* Alternative Maps Do Not Prove that the Enacted Map Was Drawn with Discriminatory Intent

*Second*, Plaintiffs argue that the Legislature's failure to enact their "alternative maps" proves that it was motivated by race, not party. They are wrong for five reasons. A map cannot support an inference of racial discrimination unless multiple conditions are met: (1) The Legislature must be aware of the alternative map. (2) The alternative map must have been an available option for the Legislature. (3) The alternative map must achieve the Legislature's partisan goals better than the map actually enacted. (4) The alternative map must not have the alleged adverse effects on a particular racial group that the enacted map has. (5) Legislators could prefer the enacted map only because of adverse effects on a particular racial group. *See generally Harding*, 948 F.3d at 309–12; *Cooper v. Harris*, 137 S. Ct. 1445, 1478–82 (2017); *Easley v. Cromartie*, 532 U.S. 234, 258 (2001). None of those factors is present here. *See also* Ex. 3 at 7–9 (Dr. Alford report).

*First*, Plaintiffs present no evidence that the Legislature was even aware of their demonstration maps. The time-and-date stamps on their demonstration plans show they were created well into this litigation and long after the Legislature had finished redistricting. *See* ECF 39-69 (Pls.' Ex. 32 dated Nov. 23, 2021); ECF 39-75 (Pls.' Ex. 38 dated Nov. 23, 2021). Plaintiffs do not claim to have presented them to the Legislature in some other form. Plaintiffs do not argue that the Legislature considered every possible strategy for achieving its partisan goals, nor could they credibly do so in light of the

timeline. As discussed above, The Legislature was operating on a severely compressed schedule. Pandemic-related delays prevented the Legislature from redistricting during its regular session. *Supra* Background I. As a result, it had to redistrict not only the Senate but also the House, Congress, and the State Board of Education during a special session constitutionally limited to thirty days. *See* Tex. Const. art. III, § 40. Plaintiffs' demonstration maps were never proposed to the Legislature, nor is there any evidence the time-pressed Legislature considered anything like them on its own.

Plaintiffs' response seems to be that the Legislature could have inferred that achieving its partisan goals in Travis County rather than Tarrant County from court opinions issued during the last round of redistricting. *See* ECF 39 at 39 (citing *Perez*). But those opinions did not purport to be guides to partisan gerrymandering, much less for the Texas Senate. And, as explained above, *Perez* was concerned with the Congressional maps, not the State Senate Maps. *Supra* Background VI.A. There is nothing suspicious about the Legislature not reading so much into old court opinions.

*Second*, Plaintiffs' demonstration maps prove nothing because Plaintiffs do not even argue that they were available options for the Legislature. The premise of an alternative-map argument is that the Legislature *could have* adopted an alternative map. Without that premise, the fact that the Legislature did not adopt the alternative map is not probative of anything. But Plaintiffs cannot even bring themselves to contend their demonstration maps are lawful. They specifically warn the Court that their demonstration maps would not make "an appropriate judicial remedy" because "these plans do not address any other allegations of legal violations the Court may adjudicate." ECF 39 at 39 n.11. If Plaintiffs' demonstration maps suffer from legal defects, as Plaintiffs seem to suggest, then they could not satisfy Senator Huffman's first criterion for any redistricting proposal. ECF 39-41 (Pls.' Ex. 6-I) at 2 ("My goals and priorities in developing this proposed plan included first and foremost following all applicable law. . . ."). If Plaintiffs are not sure that their own plans are lawful, they cannot blame the Legislature for failing to adopt them.

*Third*, Plaintiffs' proposed map does not achieve the Legislature's political goals nearly as well as the plan the Legislature actually adopted. *See Cooper*, 137 S. Ct. at 1489 n.4 (Alito, J., concurring) (alternative "maps [must] me[e]t the legislature's political goals" to be probative of a legal violation). For instance, Plaintiffs' alternative maps would have put Senator Eckhardt in SD24, where the Republican incumbent, Senator Dawn Buckingham, is running for Land Commissioner rather than reelection.[9] Allowing Senator Eckhart to essentially run as the incumbent would be a poor way for Republican legislators to advance their partisan goals. Moreover, unlike S2168, Plaintiffs' versions of SD24 do not include the residence of former Senator Pete Flores, who is running for SD24 and has been endorsed by the Lieutenant Governor as well as Senator Buckingham.[10] It is no surprise that the Legislature did not adopt a map that would harm the electoral prospects of a popular Republican former colleague.

*Fourth*, enacting the alternative maps would generate the same adverse-effects claims Plaintiffs bring here. True, Senator *Powell* would not have been able to complain because, perhaps unsurprisingly, her proposed map improves her electoral prospects. But the proposed map harms Senator *Eckhardt's* electoral prospects. Senator Eckhardt undoubtedly believes herself to be minority voters' candidate of choice. *See* ECF 39-40 (Pls.' Ex. 6J) at 6 (Eckhardt *et al.* statement of representing "districts in which minority citizens have . . . elect[ed] their candidates of choice"). If the Legislature had adopted one of Senator Powell's alternative maps, Senator Eckhardt could have claimed that the Legislature was intentionally "dismantling" a coalition or cross-over district, just as Senator Powell is now. ECF 39 at

---

[9] Patrick Sivtek, *Republican state Sen. Dawn Buckingham running for Texas land commissioner*, TEXAS TRIBUNE (June 4, 2021), https://www.texastribune.org/2021/06/03/dawn-buckingham-texas-land-commissioner. *See also* ECF 39-41 (Pls.' Exh. 6-I) (floor discussion that Sen. Buckingham would not be an incumbent in 2022) (Ex. 30).

[10] Patrick Svitek, *After Losing to a Democrat in 2020, Former GOP State Senator Pete Flores Seeks Election in Newly Drawn Republican District*, Texas Tribune (Sept. 21, 2021), https://www.texastribune.org/2021/09/21/texas-legislature-redistricting-pete-flores-senate/. (Ex. 31).

26. Adopting Plaintiffs' alternative maps would have just traded a lawsuit from Senator Powell for a lawsuit from Senator Eckhardt.

Even Plaintiffs do not suggest that the Legislature would have avoided alleged injuries to minority groups. The most they say is that the Legislature could have achieved "partisan goals . . . 'without moving so many members of a minority group' out of SD10." ECF 39 at 40 (quoting *Cooper*, 137 S. Ct. at 1479). That is irrelevant. Plaintiffs' proposed alternatives focus on achieving partisan gains in Travis County, so the fact that they do not move as many voters in Tarrant County is not probative. Plaintiffs are curiously silent on whether their alternative maps would harm the interests of minority voters in Travis County, but a fair application of Plaintiffs' expansive (and erroneous) liability theories suggests their alternative maps would be subject to the same legal objections that Plaintiffs raise for the enacted map.

*Fifth*, legislators had good reason to prefer the enacted map to Plaintiffs' alternative maps. Plaintiffs' alternative maps would disrupt elections all over the State by radically realigning Senate districts from nearly end-to-end. They would shift dozens of counties within and among almost a dozen Senate districts all the way to the Mexican border and the Gulf. *See* ECF 39-69 (Pls.' Ex. 32) & 39-75 (Pls.' Ex. 38) (moving Starr County from SD21 to SD20 and rearranging SD11 and SD17 lines in Brazoria County). Although Plaintiffs have limited their preliminary-injunction motion to SD10, the Legislature necessarily took a broader view during redistricting. Plaintiffs do not dispute that the Legislature had valid reasons for drawing other Senate districts as it did. The Legislature was not obligated to abandon those reasons and adopt one of Plaintiffs' alternative maps.

Ignoring these important factual circumstances, Plaintiffs argue "that the legislature's purported political goals could have been achieved without dismantling SD10 and cracking apart its minority populations." ECF 39 at 36. Even if that were true, it would be irrelevant because it attempts to improperly shift the burden of proof. As explained *supra*, this is one of the central reasons why the

*Texas* case is not probative to this analysis: it applied a burden of proof based on a statute the Supreme Court has since declared unconstitutional. *See* Background VI.A (explaining *Texas v. United States*).

The Legislature is permitted to pursue its partisan goals—which even Plaintiffs concede are lawful—in any non-racial way it sees fit. Provided compliance with applicable federal law, it has no obligation in the abstract to avoid the alleged "cracking" effects about which Plaintiffs complain. (Plaintiffs' preliminary-injunction motion does not argue that the alleged cracking in SD10 violates Section 2, for example.) Plaintiffs' theory that the Legislature "could have . . . achieved that goal without cracking apart Tarrant County's minority populations" is thus irrelevant. ECF 39 at 37. There is no least-restrictive-means requirement for pursuing partisan goals. Plaintiffs seem to assume that failing to minimize alleged "cracking" is tantamount to intentionally pursuing such cracking. It is not. It is equally consistent with indifference to cracking. Under Supreme Court precedent, indifference to racial effects is the precise opposite of intentional discrimination. *See Bush v. Vera*, 517 U.S. 952, 968 (1996) (plurality op.); *Brnovich*, 141 S. Ct. at 2349.

In the end, Plaintiffs' suggestion that the Texas Legislature in 2021 would sacrifice partisan advantage to discriminate against racial minorities is untenable. The Legislature strengthened the electoral positions of many minority representatives that belong to the Republican party. For instance, the new House maps increase the Republican composition for two minority representatives: Ryan Guillen (R+6%) and J.M. Lozano (R+2%). *Compare* Ex. 16 at 6, 9 *with* Ex. 17 at 6, 9. And the Senate redrew SD24 to allow former State Senator Pete Flores to run for that district. *See* Ex. 31. Again, this should not be surprising. These circumstances further confirm that the Legislature is acting based on partisan motivation, not racial discrimination.

It is equally untenable to suggest, as Plaintiffs do, that the Legislature's plan for discriminating against racial minorities was to target a white Democrat for political defeat. Texas has many minority elected officials, Representative James White (HD19), Representative Hubert Vo (HD149) Senator

Royce West (SD23), Senator César Blanco (SD29), Congressman Tony Gonzales (CD23), and Congresswoman Veronica Escobar (CD16), just to name a few, but Plaintiffs do not argue that the Legislature discriminated against any of them. Instead, their theory is that the supposedly racist Legislature set its sights on a white incumbent from the Fort Worth area. That makes no sense.

*      *      *

Courts have routinely held that evidence of such partisan considerations defeats a claim of intentional racial discrimination. *See., e.g., Easley*, 532 U.S. at 243 (reversing finding party was proxy for race; "Given the undisputed evidence that racial identification is highly correlated with political affiliation in North Carolina, these facts in and of themselves cannot, as a matter of law, support the District Court's judgment."); *Bush*, 517 U.S. at 968 (plurality op.) ("If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify. . . . If the State's goal is otherwise constitutional political gerrymandering, it is free to use . . . political data . . . to achieve that goal regardless of its awareness of its racial implications and regardless of the fact that it does so in the context of a majority-minority district."); *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 804 (S.D. Tex. 2013) (rejecting racial gerrymandering claim; fact that Latinos tend to vote for Democrats and Anglos for Republicans, "without more, cannot transform partisanship into race discrimination."). After all, "partisan motives are not the same as racial motives." *Brnovich*, 141 S. Ct. at 2349.

But even if Plaintiffs could show that Senator Huffman did not really attempt to pursue partisan ends, that would not establish "that the legislature as a whole was imbued with racial motives." *Id.* at 2350. It is not enough for plaintiffs to establish that a bill's sponsor acted with improper motives (they cannot do that here) because "the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents." *Id.* Plaintiffs' evidence focuses nearly exclusively on events concerning Senator Huffman, but that is insufficient as a matter of law to demonstrate discriminatory intent.

> b.  **Plaintiffs Have Not Established Discriminatory Intent under** *Arlington Heights*

Plaintiffs invoke the framework set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), but it does not support them here. The five inexhaustive factors are as follows: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Veasey*, 830 F.3d at 231 (quotation marks omitted); *see Arlington Heights*, 429 U.S. at 267–68.

*Historical Background*: The only "background" to which Plaintiffs point is a series of contested court rulings from previous redistricting cycles. *See* ECF 39 at 27–28. But those rulings addressed different maps passed by different legislators, and different map drawers, at different times. In any event, even if one believed that the 2011 map was enacted with a discriminatory purpose—it was not—that would not be probative of the intent of a different group of legislators in enacting a different map at a different time five legislative sessions ago. As explained in detail *supra*, Background VI.A, the three cases Plaintiffs cite simply do not apply here.

*Sequence of Events and Legislative History*: Combining these factors, Plaintiffs suggest that Senator Huffman informed other people that Senator Powell would lose her seat before Senator Huffman informed Senator Powell herself. *See* ECF 39 at 28–34. But Plaintiffs' evidence does not support that argument. They highlight the fact that Senator Huffman "had conversations with people over the months" about SD10, but that says nothing about when and whether anyone decided revisions to Senator Powell's district would be a good idea. ECF 39 at 29. There is nothing suspicious about not keeping Senator Powell informed about changes she was certain to oppose. And even if Plaintiffs had offered evidence of a delay by Senator Huffman in explaining the SD10 reconfiguration to Senator Powell, it would matter little because Senator Powell clearly understood her seat was being targeted.

*Procedural Departures*: Plaintiffs purport to identify two procedural irregularities in the passage of the House map, but neither is accurate. *First*, Plaintiffs claim that "Senator Huffman contended that she received no legal advice regarding compliance with voting rights laws prior to drawing the maps," ECF 39 at 34, but that is not what Senator Huffman said. When asked the question "Did you get legal advice about how to draw the lines from the Attorney Generals' Office before you undertook to draw the districts?," the answer is "no." ECF 39-41 (Pls.' Ex. 6K) at A-7. That Senator Huffman did not receive legal advice "about how to draw the lines" *id.*, does not suggest Sen. Huffman received no "legal advice" at all. Second, Plaintiffs argue that the process was rushed, but that is attributable to the pandemic and the federal government, not conscious delay by the Legislature. Background I.

Plaintiffs claim to have identified departures from the normal procedural sequence for passing redistricting legislation. *See, e.g.*, ECF 39 at 23–24, 34–36. For example, Plaintiffs complain that the House Redistricting Committee did not invite testimony from expert witnesses and that "the committee process was unusually rushed." ECF 39 at 23, 35. However, any alleged procedural irregularities are easily explained without resorting to allegations of discriminatory intent. *See supra* Background I (explaining the compressed timeline the Legislature was forced to operate under).

As Plaintiffs' complaint acknowledges, the federal government did not deliver the redistricting data until August 12, 2021, *see* ECF 1 ¶ 27, more than four months after the statutory deadline of April 1. *See* 13 U.S.C. § 141(a), (c). This, in turn, forced the Legislature to redistrict during a special session, which is constitutionally limited to thirty days, rather than during its longer, regular session. *See* Tex. Const. art. III, § 40. Since, with the release of census figures, prior redistricting legislation was rendered malapportioned, the need for the Legislature to immediately redistrict was even more acute. Thus, with a compressed schedule due to pandemic-related delays, an allegedly rushed process would hardly be surprising, much less give a reason to infer intentional invidious discrimination. In *Perez*, the Supreme Court could "not see how the brevity of the legislative process can give rise to an inference

of bad faith." 138 S. Ct. at 2328–29. The evidence there was insufficient; Plaintiffs' allegations here are even weaker.

*Substantive Departures*: First, Plaintiffs complain that the 2021 Legislature did not follow the 2011 court-ordered plan, as a letter from then-Attorney General Abbott had recommended to an earlier legislature. But that is not a departure at all. Following the approach contained in such an out-of-date letter that addressed a completely different set of circumstances would have been the substantive departure, not this. Second, Plaintiffs claim SD10 now splits communities of interests, but as explained *supra*, that concern is overstated. *Supra* Background IV.B (explaining the overlapping interests within SD10). Third, Plaintiffs argue that SD10 departs from other redistricting criteria, but partisanship is a very common redistricting consideration. A map that improves partisan performance, even at the expense of other considerations, cannot be considered a "substantive departure."[11]

In the end, Plaintiffs rest much of their argument for discriminatory intent on their speculative contention that members of the Texas Legislature were "aware of the racially discriminatory effect SB4's cracking of minority populations would have." ECF 39 at 33–34. As explained in detail *supra*, Background V, that awareness, in turn, stemmed in part from Plaintiff Beverly Powell's overt attempt to inject race into the Legislature's consideration of SD10. *See, e.g.*, ECF 39 at 12–14, 22–24. But legislators were free to disregard Plaintiff Powell's opinions given that a bill's "legislative opponents," "[i]n their zeal to defeat a bill," "understandably tend to overstate its reach." *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 66 (1964). While legislators may have been aware of

---

[11] Partisan considerations are in fact so much a usual part of the both the process and substance of redistricting that it was not until the Supreme Court ruled such disputes nonjusticiable in *Rucho* that members of the two major parties stopped challenging redistricting plans as not just excessively partisan, but unconstitutionally so. *See, e.g., Bush v. Martin*, 251 F. Supp. 484, 513–15 (S.D. Tex. 1966) (three-judge panel); *Kilgarlin v. Martin*, 252 F. Supp. 404, 432–34 (S.D. Tex. 1966) (three-judge panel); *Graves v. Barnes*, 343 F. Supp. 704, 734 (W.D. Tex. 1972) (three-judge panel), *revd. in part on other grounds, White v. Register*, 412 U.S. 755 (1973); *Terrazas v. Slagle*, 821 F. Supp. 1162, 1166–1175 (W.D. Tex. 1993) (three-judge panel); *Henderson v. Perry*, 399 F. Supp. 2d 756 (E.D. Tex. 2005) (three-judge panel), *rev'd on other grounds, LULAC v. Perry*, 548 U.S. 399 (2006).

Plaintiff Powell's allegations of discrimination, there is no reason to think that they agreed with her assessments, much less that they voted for the new map because of those assessments.

Such awareness is insufficient to establish an intent to discriminate. Proof of intent requires more than mere "volition" or "awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Plaintiffs must show that the Legislature passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* And that standard is only heightened in the redistricting context, where "evidence tending to show that the legislature was aware of the racial composition of" a district "is inadequate to establish injury in fact," much less a violation on the merits. *United States v. Hays*, 515 U.S. 737, 745–46 (1995). "[T]he legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination." *Shaw v. Reno*, 509 U.S. 630, 646 (1993). Here, Plaintiffs have failed to demonstrate that awareness of Plaintiff Powell's potentially self-interested allegations in any way shows that redistricting SD10 was done with a discriminatory purpose.

### 2. Plaintiffs Vote-Dilution Claims Fail for Lack of Discriminatory Effect

Plaintiffs do not move for preliminary injunctive relief on the Section 2 effects claim. But that does not mean their obligation to demonstrate a vote-dilution injury is dispensed. As explained above, Plaintiffs must prove the three *Gingles* preconditions in order to prove they are likely to succeed on the merits of their intentional vote dilution claim. *See Burton*, 178 F.3d at 1201 (rejecting a vote-dilution claim on summary judgment despite evidence of "discriminatory intent" because the plaintiff did not "meet the requirements of the *Gingles* factors").

But Plaintiffs cannot satisfy *Gingles* here. Their theory is that dismantling a crossover district dilutes their votes. This makes sense given the fact that minorities do not make up a large enough percent of the population to constitute a majority in a single-member district. *See* Ex. 3 at 4 (Dr. Alford

Initial Report). However, *Bartlett v. Strickland* rejected the argument that Section 2 requires the creation of crossover districts in which "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." 556 U.S. at 13.

Even if a crossover district otherwise satisfied *Gingles*—and it does not—Plaintiffs could not show that minority and white voters are "politically cohesive" and share "distinctive minority group interests." *Gingles*, 478 U.S. at 51. Indeed, Plaintiffs do not even attempt to establish the second *Gingles* factor in their preliminary-injunction motion, skipping that analysis entirely in their paragraph-long treatment of discriminatory effect. *See* ECF 39 at 26–27. Nor do the voluminous exhibits attached to Plaintiffs' motion evidence cohesive voting among Black and Hispanic voters in SD10.

Plaintiffs offer an (unsigned) expert declaration, but it focuses exclusively on general election results. ECF 39-44 at 10–23 (Pls.' Ex. 7). The lack of evidence regarding primary elections is striking, given that Plaintiffs' complaint asserts that "both recent general and primary elections illustrate the strong cohesion between Tarrant County's Black and Hispanic voters." ECF 1 ¶ 80. Indeed, the partisanship attending general elections robs them of any probative value when determining whether two minority groups are politically cohesive. When "two minority groups are generally affiliated [or] registered with the same party (Democratic) and vote for that party's candidates at high rates, primary elections for that party's candidate are by far the most probative evidence of cohesion." *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 421 (S.D.N.Y. 2004) (three-judge court), *aff'd*, 543 U.S. 997 (2004).

This overreliance on general election results is insufficient to meet their burden to disprove "that partisan affiliation, not race, best explains" any alleged bloc voting. *LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc). The reason for that overreliance is clear once data on Democratic primary elections is analyzed: That data shows that Hispanic voters and black voters do not vote

cohesively. *See* Ex. 3 at 5 (By Plaintiffs' expert's "own definition," Latinos and Blacks "do not qualify as a coalition").

Perhaps the most probative example came in 2014. The open race for the SD10 seat that Wendy Davis had vacated featured a Hispanic candidate, Mike Martinez and an Anglo candidate, Libby Willis. The "minority" candidate, however, was not the choice of the "minority-majority." Rather, the number of votes Martinez and Willis received from black and Hispanic voters were an almost exact mirror: 61.5% of Hispanic voters preferred Martinez, but 61.1% of black voters preferred Willis, the Anglo candidate. Ex. 28; *see also* Ex. 3 at 4.

The 2020 Democratic primaries are only the most recent example of this lack of cohesion. In SD10, Joe Biden won 54.4% of the district's black voters, but only 18% of Hispanic voters. Bernie Sanders, on the other hand, won only 25.5% of black voters, but captured 60.5% of Hispanic voters. In the crowded Senate primary, Spanish-surnamed Annie Garcia won 24.3% of Hispanic voters, but only 7.9% of black voters. ("All other candidates" received the rest of the votes.) And in the four-candidate Railroad Commissioner race, the Hispanic and Spanish-surnamed candidates combined for 66% of the Hispanic vote but only 41.8% of the black vote. Black voters instead gave 58.2% of their votes to the two Anglo candidates, who received only 34% of the Hispanic vote. Ex. 28 at 8.

Similar results obtain in earlier years. In 2018, Hispanic voters overwhelmingly preferred the Hispanic candidate in the primary for Land Commissioner, but a majority of black voters supported the Anglo candidate. *Id.* at 6. In that year's primary for Railroad Commissioner, black voters overwhelmingly preferred the black candidate, but a majority of Hispanic voters preferred the Anglo candidate. *Id.* In the 2016 primary for Railroad Commissioner, a near-majority of Hispanic voters preferred an Anglo candidate who did not make the run-off; a slightly smaller plurality of black voters preferred the black candidate, who did. *Id.* at 4. Even as both groups gave tremendous percentages of their votes to Hillary Clinton in the presidential primary, more than a quarter of Hispanic voters cast

ballots for Bernie Sanders, compared to only 11.6% of black voters. *Id.* And in 2012's runoff for the Democratic nomination for Senate, Hispanic voters preferred the Anglo candidate by 61.6% while Black voters preferred the black candidate by 55.3%. *Id.* at 2. *See also* Ex. 3 at 6 ("The failure of" Blacks and Latinos "to unite as a single cohesive political minority, outside of the partisan general election, is hardly unique to SD10").

Given these facts, Plaintiffs' argument is particularly unlikely to succeed on the merits. That conclusion gains even more support because the importance of cohesive voting is heightened in case such as this. Plaintiffs seek to maintain a minority coalition district that requires crossover from Anglo voters. But even before *Bartlett* and *Perez* clarified that Section 2 does not apply to either crossover or coalition districts, when the Supreme Court "[a]ssum[ed] (without deciding) that it was permissible for [a] District Court to combine distinct ethnic and language minority groups for purposes of assessing compliance with § 2," the Court found that there was "quite obviously a higher-than-usual need for the second of the *Gingles* showings." *Growe v. Emison*, 507 U.S. 25, 41 (1993). The Court reasoned that "when dilution of the power of such an agglomerated political bloc is the basis for an alleged violation, proof of minority political cohesion is all the more essential." *Id.* Accordingly, even when *Campos* erroneously required the Fifth Circuit to assume that coalition districts could satisfy the first *Gingles* precondition, that court did not hesitate to dismiss cases proposing coalition districts based on the plaintiff's failure to meet the second *Gingles* precondition. *See, e.g.*, *Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1205, 1216 n.21 (5th Cir. 1996) (affirming dismissal where statistical evidence did not establish cohesion and "[n]o concrete, reliable, or credible evidence was presented at trial that Hispanic and African-American communities work together to accomplish common goals"); *Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989) (affirming dismissal due to "lack of statistical evidence of inter-minority political cohesion"). Because Plaintiffs here have also failed to establish that precondition, their suit should be subject to the same fate.

Plaintiffs also cannot establish the third *Gingles* precondition. In *Bartlett*, the Supreme Court observed that "[m]andatory recognition of claims in which success for a minority depends upon crossover majority voters would create serious tension with the third *Gingles* requirement that the majority votes as a bloc to defeat minority-preferred candidates." 556 U.S. at 16. Far from fact-intensive, this tension is inherent in any such claim since "[i]t is difficult to see how the majority-bloc-voting requirement could be met in a district where, by definition, white voters join in sufficient numbers with minority voters to elect the minority's preferred candidate." *Id.* The Court later reemphasized that it would be "unlikely that the plaintiffs would be able to establish the third *Gingles* precondition" in cases involving "substantial crossover voting." *Id.* at 24. The only reason that this was not part of the holding in *Bartlett* was that "for some reason respondents conceded the third *Gingles* requirement in state court." *Id.* at 16. Defendants make no such concession here.

These recent results demonstrate that benchmark SD10 does not provide Black and Latino voters with a "real" opportunity to elect representatives of their choice. *See Perez*, 138 S. Ct. at 2333. Indeed, even if Plaintiffs could satisfy all three *Gingles* factors, they must still "additionally prove that the proposed district will in fact perform as plaintiffs hope." *Harding*, 948 F.3d at 316 (Ho, J., concurring in part and dissenting in part). This they have failed to do. And absent such proof, Plaintiffs' intentional vote dilution claims would impermissibly have this Court "find § 2 effects violations on the basis of *uncertainty*," which would "twist[] the burden of proof beyond recognition." *Perez*, 138 S. Ct. at 2333. Because benchmark SD10 was not a performing crossover district, redistricting has not harmed the collective power of minority voters to elect their candidate of choice

### 3. Plaintiffs' Vote-Dilution Claim is Not Cognizable Under the Fifteenth Amendment or the Voting Rights Act

Finally, to the extent that Plaintiffs bring their vote-dilution claims under the Fifteenth Amendment, they must be dismissed. The Supreme Court has "never held that vote dilution violates the Fifteenth Amendment," nor "even 'suggested' as much." *Reno v. Bossier Parish Sch. Bd.*, 528 U.S.

320, 334 n.3 (2000); *see also Voinovich v. Quilter*, 507 U.S. 146, 159 (1993). The Fifth Circuit has interpreted this language as having "rejected application of the Fifteenth Amendment to vote dilution causes of action." *Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000); *see also Perez v. Texas*, No. 5:11-CV-360, 2014 WL 12853571, at *2 (W.D. Tex. June 23, 2014) ("under current law, vote dilution claims are not cognizable under the Fifteenth Amendment"). Plaintiffs' claims should be rejected.

Nor can vote-dilution claims be brought under Section 2. This follows naturally from the recognition that "Section 2 was originally "viewed largely as a restatement of the Fifteenth Amendment." *Chisom v. Roemer*, 501 U.S. 380, 392 (1991). Although current precedent allows such a claim, Justice Thomas has persuasively explained why that precedent is wrong. *See Perez*, 138 S. Ct. at 2335 (Thomas, J., concurring); *Holder v. Hall*, 512 U.S. 874, 946 (1994) (Thomas, J., concurring in the judgment). Defendants preserve this issue for appeal. Moreover, Section 2 does not imply a private cause of action for Plaintiffs. *See* ECF 43 at 16–19. Although this Court rejected that argument, ECF 58, Defendants preserve the issue for appeal.

### B.    Plaintiffs' Racial-Gerrymandering Claim Fails

Plaintiffs claim SD10 is a racial gerrymander, but in reality, it is a partisan gerrymander. "A racial gerrymandering claim is 'analytically distinct' from an intentional vote dilution claim." *Harding*, 948 F.3d at 312 (quoting *Shaw*, 509 U.S. at 652). While intentional vote dilution claims allege that the government has "disadvantage[ed] a particular race" by "enact[ing] a particular voting scheme as a purposeful device to maintain or cancel out the voting potential of racial or ethnic minorities," racial gerrymandering claims allege that the government "has used race as a basis for separating voters into districts[.]" *Miller*, 515 U.S. at 911. Racial gerrymandering occurs only when race was the "predominant consideration in deciding to place a significant number of voters within or without a particular district." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 260 (2015) (internal quotation marks omitted). The burden of proof required for such claims is especially "demanding," *Easley*, 532 U.S. at

241, and courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Miller*, 515 U.S. at 916.

As explained above, the district lines were drawn without racial shading turned on, so it would have been impossible to draw the individual district lines to racially gerrymander. *See supra* Background II–III. A true racial gerrymander would have required much more detailed knowledge of housing patterns than Senator Huffman and her staff had for the Fort Worth area. In arguing to the contrary, Plaintiffs rely on a series of circumstances that the Background demonstrates are irrelevant. *First*, Plaintiffs point to Senator Huffman's and her staff's familiarity with redistricting and related litigation in the last cycle. *See, e.g.*, ECF 39 at 42. As explained above, the fact that Senator Huffman and some of her staff have familiarity with the redistricting process and *past iterations* of SD10 does not at all substantiate Plaintiffs' claim that they drew *this version* of SD10 based on racial considerations. In fact, powerful evidence proves the opposite. In any event, knowledge of racial consequences is not the same thing as intending those racial consequences. *Feeney*, 442 U.S. at 279.

*Second*, Plaintiffs again rely on their alternative maps, *see* ECF 39 at 43, but those do not help them anymore on this claim than they did on the other claims. *See supra* Argument I.A.1.a.ii.

*Third*, Plaintiffs argue that SD10 deviates from traditional redistricting criteria. *See* ECF 39 at 42–44. Again, even if this is true, it is probative of *partisan motivations*, not racial ones. *See* Background III–IV. Every circumstance Plaintiffs cite as evidence of racial gerrymandering, the lack of compactness, for example, is better explained by the desire to bring more Republican votes into the district. When partisanship is offered as a defense to allegations of racial gerrymandering, as it is here, evidence of "the challenged district's conformity to traditional districting principles" often "loses much of its value . . . because a bizarre shape . . . can arise from a 'political motivation' as well as a racial one." *Cooper*, 137 S. Ct. at 1473.

The Senate majority's motive is especially clear when contextualized by the composition of the population that entered and exited SD10. Recall that Senator Huffman utilized partisan shading when drawing the Senate maps. Wanting to make SD10 more Republican, she drew in areas that were shaded red, and subtracted areas that were shaded blue. This ultimately led to a net gain of 108,752 Republican voters and a net loss of 116,554 Democratic voters. *Supra* Background II, Figures 3, 4, and 5. Plaintiffs make much of similar demographic statistics. *See* ECF 39 at 4 (explaining the number of people moved into and out of SD10, and their applicable racial or ethnic status). But these numbers simply do not support Plaintiffs' claim unless they can prove that Senator Huffman and the other members of the Senate majority *used them*. Plaintiffs offer no such evidence. To the contrary, the weight of the evidence demonstrates that Senator Huffman consulted partisan data, but never racial data. Plaintiffs fail to tether their circumstantial arguments to a single shred of affirmative evidence.

Nor can Plaintiffs prevail by arguing, ECF 39 at 32–33, that was race "used as a proxy for political characteristics." See *Bush*, 517 U.S. at 968 (plurality op.). The facts of this case do not present any basis for concluding "that racially motivated gerrymandering had a qualitatively greater influence on the drawing of district lines than politically motivated gerrymandering, and that political gerrymandering was accomplished in large part by the use of race as a proxy." *Id.* at 969. Such a claim arises when the Legislature considers racial data, draws partisan conclusions from that data, and then uses the racial data to achieve political objectives. The circumstances here could not be more different. Senator Huffman and the Legislature can hardly be said to have used race as a proxy for political characteristics when the record demonstrates that they did not consider race at all (other than for compliance with applicable law). Rather, it has been Senator Powell that has consistently invoked race as a rationale for setting the district's boundaries as she would prefer. And even assuming there are sometimes overlap between race and partisan affiliation, mere *coincidence* is not enough. The legislature

45

must affirmatively and intentionally *apply* that overlap. There is simply no evidence that the Senate majority or Senator Huffman ever did anything of the sort.

## II.    Plaintiffs Do Not Face Irreparable Harm

Even if Plaintiffs could show a likelihood of success, "a preliminary injunction does not follow as a matter of course." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curium). Plaintiffs must also demonstrate "a substantial threat of irreparable injury if the injunction is not issued." *Whitaker v. Livingston*, 732 F.3d 465, 466 (5th Cir. 2013). That injury must be "likely;" it is not enough to be merely possible. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Likeliness, in turn, requires "a significant threat of injury from the impending action," which must be "imminent." *Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682, 705 (W.D. Tex. 2019) (quoting *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986)). Here, Plaintiffs cannot show that they face a substantial threat of imminent injury because they are unlikely to prevail on the merits of their claims. *See supra.*

Even if Plaintiffs could show a likelihood of success on the merits, they still have not demonstrated that SD10 harms them, much less irreparably so. Plaintiffs' claims for intentional vote dilution rest on their contention that the Legislature should have preserved benchmark SD10 as a combination minority-coalition and crossover district. However, as explained above, the evidence indicates that Latino voters and Black voters, either individually or collectively, were unable to elect preferred candidates under the benchmark configuration. Changing the boundaries of such a district does not dilute the power of Plaintiffs' votes.

Plaintiffs' racial gerrymandering claim fares no better. Indeed, none of the Plaintiffs allege that they were personally subjected to a racial classification. *Hays*, 515 U.S. at 746. Absent such a showing, the Plaintiffs living outside SD10 will not be injured because they were not excluded based on their races or ethnicities, while the Plaintiffs residing inside SD10 were similarly not included on that basis

and already possess the relief they claim to seek. Plaintiffs are neither injured nor likely to succeed on the merits, so they cannot satisfy the requirement that there be a substantial threat of irreparable injury.

## III. The Public Interest and the Balance of the Equities Do Not Favor an Injunction

The balance of the equities and the public interest weigh against an injunction here, particularly because an injunction would interfere with the orderly administration of Texas elections.

Challenges to the enforcement of state law always implicate these factors. "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). In such cases, the State's "interest and harm merge with that of the public." *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). As a result, "a court should be particularly cautious when contemplating relief" like that sought here. *Salazar v. Buono*, 559 U.S. 700, 714 (2010) (noting that "[e]quitable relief is not granted as a matter of course," especially when the requested relief "implicates public interests").

These factors apply with special force in election-law cases. Binding "precedents recognize a basic tenet of election law: When an election is close at hand, the rules of the road should be clear and settled." *DNC. v. Wis. State Leg.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring). Even well-intentioned injunctions often cause more problems than they solve. As the Supreme Court has recognized, "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4–5. These concerns apply to not only broad relief but also "seemingly innocuous late-in-the-day judicial alterations to state election laws" because even those "can interfere with administration of an election and cause unanticipated consequences." *DNC*, 141 S. Ct. at 31 (Kavanaugh, J., concurring).

To avoid these dangers, the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *RNC v. DNC*, 140 S.

Ct. 1205, 1207 (2020) (per curiam). The Fifth Circuit takes this precedent very seriously. In the 2020 election cycle, that Court repeatedly stayed injunctions that would have interfered with Texas elections. *See, e.g.*, *Mi Familia Vota v. Abbott*, 834 F. App'x 860, 863 (5th Cir. 2020) (per curiam) (staying injunction regarding masks in polling places); *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 244 (5th Cir. 2020) (Higginbotham, J., concurring) (staying injunction regarding signature verification of mail-in ballots); *Tex. Alliance for Retired Ams. v. Hughs*, 976 F.3d 564, 566–67 (5th Cir. 2020) (per curiam) (straight ticket voting); *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 411–12 (5th Cir. 2020) (Smith, J.) (vote by mail).

In recent years, courts have been particularly alert to the dangerous of last-minute injunctions in election cases, but these concerns are not new. In some ways, they are at least as old as federal redistricting litigation itself. "In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964); *see also Veasey v. Perry*, 769 F.3d 890, 892–95 (5th Cir. 2014).

In this case, injunctive relief would be particularly disruptive because the March 2022 primary is underway. As the Secretary of State's Director of Elections has explained, "[i]t would be incorrect to describe the March 2022 Primary Election as upcoming" because that election "has already started." Ex. 10 (Ingram Declaration) ¶ 7. The candidate filing period for the primary election has already closed. *Id.* ¶ 9; Ex. 11 (Sherbet Declaration) ¶ 6; *see also* Ex. 12 (Blackburn declaration). And several additional deadlines are fast approaching. Ex. 11 ¶ 5. For example, county chairs must conduct a drawing to determine the order that the candidates' names will appear on the ballot by December 23. *Id.* ¶ 13; Ex. 10 ¶ 8. Shortly thereafter, the ballots will have to be designed and proofed. *Id.* ¶ 14; Ex. 11 ¶ 9. By January 15, absentee ballots must be transmitted to military and overseas voters under the federal Military and Overseas Voter Empowerment Act. Ex. 10 ¶ 17; Ex. 11 ¶ 12. Failure to comply with this deadline could result in an enforcement action by the U.S. Department of Justice against

local election authorities. Ex. 10 ¶ 18. "Even a minor delay or alteration of the Election Calendar at this stage would cause serious disruptions for local election authorities and voters." *Id.* ¶ 12.

At the status conference, Plaintiffs suggested they could avoid some of these problems by delaying Election Day itself. That would be worse, not better. "It is no small disruption to the state or to a political party or to the public when an election is postponed at the last moment." *Miss. Freedom Democratic Party v. Democratic Party of State of Miss.*, 362 F.2d 60, 62 (5th Cir. 1966) (refusing to delay a primary election). "[D]elayed election dates historically result in diminished voter participation," which "is particularly onerous for minority voters and candidates who benefit from high rates of participation." *Seamon v. Upham*, 536 F. Supp. 1030, 1034 (E.D. Tex. 1982).

In this case, delaying Election Day would create significant inefficiencies and unnecessary duplication of effort, thereby undermining efficient election administration. It would require repeating much of the same preparatory work that has already been performed, Ex. 11 ¶¶ 14, 18, and might include being required to redraw precinct lines. Ex. 10 ¶ 23. Postponement also threatens to impose additional personnel costs on the counties. Ex. 11 ¶ 18. Small Texas counties would be especially hard hit financially. Ex. 10 ¶ 25. Nor would candidates themselves be spared, as some candidates who have already applied for one office would need to apply for a different office. *Id.* ¶ 10. There could even be a cascading effect that would potentially "compromise the efficient operation and administration of the November 2022 General Election." *Id.* ¶ 26.

Finally, postponement is likely to undermine the public's perception of election integrity. Enjoining the March 2022 Primary Election would not only produce confusion among voters, Ex. 11 ¶¶ 14, 19, but also among local election officials and many candidates, Ex. 10 ¶¶ 10, 11, 30. This confusion is particularly likely if local election officials are forced to issue corrected voter certificates. Ex. 11 ¶ 15. Furthermore, logic and accuracy tests of counties' voting machines could be rushed. Such testing is essential to ensure that the voting equipment and ballots are properly displayed, that they

accurately collect votes, and tabulate results. Ex. 10 ¶ 14; Ex. 11 ¶ 10. This combination of widespread confusion and potentially inaccurate ballots or tabulation would be disastrous to the public's perception of fair and honest elections.

In past redistricting cycles, court orders altering election deadlines were virtually unavoidable. That was because Texas was subject to the VRA's preclearance regime, which prevented laws that had not been precleared from taking effect. When preclearance was not forthcoming, the State had no new map to implement, and something had to give. Either the election deadlines had to be delayed, or a court would have to implement a map (or both).

Now, however, Texas is not subject to preclearance, so its laws can take effect in the normal course. Instead of being stuck with two disruptive options (delays or a court-drawn map), the State can implement its own map as State law provides. And federal courts can adjudicate claims on normal timeframes, rather than rushing to set election rules as elections become imminent.

This is the way courts have long proceeded when preclearance was not an issue. The Third Circuit, for example, refused to issue relief that "would likely delay or suspend the legislative elections" because, if New Jersey "desired to avoid also postponing the concurrent gubernatorial and local elections," it "would be required to hold two separate primaries and general elections for its state offices, at great expense to the taxpayers." *Page v. Bartels*, 248 F.3d 175, 195 (3d Cir. 2001). Although serious, the costs to New Jersey were far less significant than the harms to Texas here. Nonetheless, the Third Circuit characterized "[f]ederal court intervention" as creating "a disruption in the state electoral process [that] is not to be taken lightly." *Id.* at 195–96. The same is true here.

## CONCLUSION

Defendants respectfully request that the Court deny the *Brooks* Plaintiffs' motion.

Date: December 20, 2021

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Tex. State Bar No. 00798537

BRENT WEBSTER
First Assistant Attorney General

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on December 20, 2021, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN