# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | § § § | |
| *Plaintiffs,* | § | Case No. 3:21-cv-00259 |
| V. | § | [Lead Case] |
| | § | |
| GREG ABBOTT, *et al.,* | § | |
| *Defendants.* | § | |

| | | |
|---|---|---|
| ROY CHARLES BROOKS, *et al.* | § | |
| *Plaintiffs,* | § | |
| V. | § | Case No. 1:21-cv-00991 |
| | § | [Consolidated Case] |
| GREG ABBOTT, *et al.,* | § | |
| *Defendants.* | § | |

## INDEX OF EXHIBITS TO STATE DEFENDANTS' OPPOSITION TO BROOKS PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Exhibit 1: Declaration of Rep. Phil King ........................................................................... 3

Exhibit 2: Declaration of Dr. John Alford ......................................................................... 8

Exhibit 3: Initial Report of Dr. John Alford ..................................................................... 11

Exhibit 4: Declaration of Todd Giberson .......................................................................... 47

Exhibit 5: Partisan-shaded map of benchmark SD10 ........................................................ 51

Exhibit 6: Partisan-shaded map of benchmark SD10, zoomed out ................................... 53

Exhibit 7: Partisan-shaded map of current SD10 .............................................................. 55

Exhibit 8: Partisan-shaded map of benchmark SD28 ........................................................ 57

Exhibit 9: Map of partisan changes in SD10 ..................................................................... 59

Exhibit 10: Declaration of Keith Ingram ........................................................................... 61

Exhibit 11: Declaration of Bruce Sherbet ......................................................................... 69

Exhibit 12: Declaration of David Blackburn ..................................................................... 75

Exhibit 13: Declaration of Leif Olson ............................................................................... 81

Exhibit 14: 2014 Republican Primary Election, SD31 ...................................................... 85

Exhibit 15: 2018 Republican Primary Election, SD31 ...................................................... 88

Exhibit 16: Election Analysis, H2100, 2020 General Election .......................................... 91

Exhibit 17: Election Analysis, H2136, 2020 General Election ................................................100

Exhibit 18: *New York Times* article, Sept. 27, 2021 ................................................107

Exhibit 19: *Texas Tribune* article, Oct. 25, 2021 ................................................112

Exhibit 20: *Texas Tribune* article, Oct. 7, 2021 ................................................124

Exhibit 21: *Texas Tribune* article, Jan. 22, 2019 ................................................133

Exhibit 22: *Amarillo Pioneer* article, Oct. 20, 2021................................................138

Exhibit 23: Texas Senate Journal, Oct. 4, 2021 ................................................141

Exhibit 24: U.S. Census Bureau redistricting data ................................................151

Exhibit 25: Governor Abbott Proclamation,  Third Called Session ................................................156

Exhibit 26: 2020 General Election District Election Analysis, benchmark SD10................................160

Exhibit 27: 2020 General Election District Election Analysis, current SD10 ................................162

Exhibit 28: 2012–2020 EI Voting Analysis, benchmark SD10 ................................................164

Exhibit 29: District Population Analysis, benchmark SD10 ................................................176

Exhibit 30: *Texas Tribune* article, June 4, 2021 ................................................184

Exhibit 31: *Texas Tribune* article, Sept. 21, 2021 ................................................188

# Exhibit 1:
# Declaration of Rep. Phil King

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | § § § | |
| *Plaintiffs,* | § § | Case No. 3:21-cv-00259 |
| V. | § § | [Lead Case] |
| GREG ABBOTT, *et al.,* | § § | |
| *Defendants.* | § | |
| ROY CHARLES BROOKS, *et al.* | § § | |
| *Plaintiffs,* | § § | |
| V. | § § | Case No. 1:21-cv-00991 |
| GREG ABBOTT, *et al.,* | § § | [Consolidated Case] |
| *Defendants.* | § § | |

**DECLARATION OF PHILLIP STEPHEN KING**

Pursuant to 28 U.S.C., I, Phillip Stephen King, declare the following:

1.     My name is Phillip Stephen King. I am over the age of 18 and competent to make this declaration. I currently reside in Parker County, Texas.

2.     I have served as a State Representative since 1999. I have held leadership positions including as the former Committee Chair of the House Redistricting Committee. I currently represent District 61, which encompasses all of Parker County. This includes the sections of Fort Worth that extend into Parker County.

3.     My family moved to east Fort Worth when I was four years old. I lived there from 1960 until 1983. During that time, I attended Fort Worth public schools and graduated from Eastern Hills High School. Many of Fort Worth's African American neighborhoods were located in east Fort Worth when I resided there.

4.     Following my graduation, I began my undergraduate studies at Tarrant County College. In 1993, I received my law degree from Texas Wesleyan University School of Law in Fort Worth.

5.     My wedding was held at Sagamore Hill Baptist Church, which I started attending when I was five or six years old. During my tenure at this church, it was located in east Fort Worth at 4400 Panola.

The first home that my wife and I purchased was located in east Fort Worth. We had our first child while we still lived in east Fort Worth.

6.      I proudly served as a police officer in the Fort Worth Police Department from 1974 to 1989. At the time I departed from the force, I was serving as the Commander of the Fort Worth Police Department's East Division.

7.      In 1983, I moved from east Fort Worth to Parker County. I served as a Justice of the Peace for Parker County from 1991 to 1998. My Justice of the Peace district included the portion of Fort Worth that extends into Parker County.

8.      My family and I have also been active members of Trinity Bible Church since 1984. That church is located off Interstate 20 in Willow Park, which is a small community in Parker County situated between Weatherford and Fort Worth. I am also on the Board of Directors for the Weatherford College Education Foundation.

9.      Having spent my life and my career in public service in Fort Worth and Parker County, I am intimately familiar with the issues that are unique to the area. In particular, I am familiar with the region's economic development, workforce, education, transportation corridors, public safety, environmental, water, oil and gas, electricity distribution, and population growth trends.

10.     The portions of Tarrant County that are included in the new Senate District 10 have much in common with the rest of the district, especially Johnson County, Parker County, and Palo Pinto County. For example, the city of Burleson is partially located in both Tarrant County and Johnson County. As already mentioned, Fort Worth extends into Parker County. Moving west, the city of Mineral Wells is located in both Parker County and Palo Pinto County.

11.     The economies of both Parker County and Johnson County are directly tied to Tarrant County. Johnson County shares the Interstate 35 corridor with Tarrant County. Interstate 20 runs west from Tarrant County into Parker County, Palo Pinto County, and Callahan County. It is therefore not uncommon for people to commute into Tarrant County for work from Parker, Johnson, and sometimes even Palo Pinto County. In fact, for five or six years after I moved to Parker County, I was just such a commuter.

12.     Because of their many shared interests and commonalities, Tarrant, Johnson, Parker, and Palo Pinto counties are often grouped with one another for administrative efficiency and convenience. For example, all four counties are part of the Texas Department of Transportation's Fort Worth District. All four counties are part of the Texas Department of State Health Services' Health Region 3. The Texas Commission on Environmental Quality has placed all four counties in the same region, Region 4. All four counties fall within the regulations of the Barnett Shale under 30 Texas Administrative Code 106.352. All four counties are part of the same Texas Highway Patrol District. All four counties are included in the North Central Texas Council of Governments. All four counties are included in the same district, District 3, by the Department of Family and Protective Services. All four counties are part of the Texas Health and Human Services' North Central Texas Regional Advisory Council, which provides resources to local emergency managers in case of an emergency. All four counties are in Joint Disaster District 4A for the Texas Division of Emergency Management as well as the Department of Public Safety. Tarrant, Johnson, and Parker counties are all serviced by Tarrant Regional Water District.

13.     Like the new district's four easternmost counties, the counties of Stephens, Shackelford, Callahan, and Brown are also often grouped together for administrative efficiency and convenience. Those counties are all grouped together in the Texas Department of State Health Services' Health Region 2, the Texas Commission on Environmental Quality's Region 3, the same Texas Highway Patrol District, District 2 of the Department of Family and Protective Services, the Texas Health and Human Services' Regional Advisory Council, and Joint Disaster District 7 for the Texas Division of Emergency Management as well as the Department of Public Safety. Those four counties are also grouped with Parker and Palo Pinto counties in District 7B of the Railroad Commission Oil and Gas Division's boundaries, and they are all four grouped with Johnson and Palo Pinto counties into the same Regional Water Planning Area by the Texas Water Development Board. All of these connections among the counties of Senate District 10 reflect these communities common interests.

14.     Additionally, the counties included in the new Senate District 10 often share school districts. For example, Burleson ISD and Crowley ISD both cover parts of Tarrant and Johnson County. Aledo ISD extends from Parker County into Tarrant County. Santo ISD, Millsap ISD, and Mineral Wells ISD all include portions of both Parker County and Palo Pinto County. Moran ISD extends from Shackelford County into Callahan and Stephens counties. Clyde Consolidated ISD extends from Callahan County into Shackelford County. And Cross Plains ISD extends from Callahan County down into Brown County.

15.     Senate District 10 has never been a majority Black, majority Hispanic, or majority Asian-American district. In the last two decades, there have been four Senators elected to represent Senate District 10. Those four individuals were Republican Kim Brimer, who is a white male, followed by Democrat Wendy Davis, who is a white female, followed by Republican Konni Burton, who is a white female, and then most recently Democrat Beverly Powell, who is another white female. To the best of my recollection, no member of a racial or ethnic minority has ever been elected to Senate District 10.

16.     I would also note that as reflected in the publicly reported voting records, three Democratic senators voted in favor of the new Senate District 10. I also firmly believe that Republican senators would not have voted for a racially discriminatory plan. The fact that many Senators from both sides of the aisle voted in favor of a plan containing Senate District 10 also suggests the new configuration was not in any way motivated by race.

17.     I am a candidate for the Texas Senate in the newly configured Senate District 10. Although the primary elections are not until March, political campaigns have been underway for weeks if not months. I have extensively traveled and spent time with members of the public all across the district in preparation for the election. Donors and other supporters in the new Senate District 10 who have contributed their time, money, and energy to support my campaign have done so with the understanding that I am running for the district that the legislature enacted.

18.     Changing the map for Senate District 10 at this point in the election cycle would be a significant hardship for both my campaign and the public. Voters who are no longer in Senate District 10 would have to begin anew their efforts to educate themselves about the candidates they will be voting on. Limited campaign resources would have been effectively wasted if they were spent in areas no longer covered under the new map. And any delay in the primary election will necessarily entail greater expense for candidates and campaigns and could result in voter confusion.

I declare under penalty of perjury that the foregoing is true and correct.


Executed in Parker County, State of Texas, on the 20th day of December, 2021.

_____
Phillip Stephen King

# Exhibit 2:
# Declaration of Dr. John Alford

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | § § § | |
| *Plaintiffs,* | § § | Case No. 3:21-cv-00259 |
| V. | § § | [Lead Case] |
| GREG ABBOTT, *et al.,* | § § | |
| *Defendants.* | § § | |
| ROY CHARLES BROOKS, *et al.* | § § | |
| *Plaintiffs,* | § § | |
| V. | § § | Case No. 1:21-cv-00991 |
| GREG ABBOTT, *et al.,* | § § | [Consolidated Case] |
| *Defendants.* | § § | |

## <u>DECLARATION OF JOHN R. ALFORD</u>

Pursuant to 28 U.S.C. § 1746, I, John R. Alford, declare the following:

1.      My name is John R. Alford. I am over the age of 18 and competent to make this declaration. I currently reside in Harris County, Texas.

2.      I am a Professor in the Department of Political Science at Rice University. I have been retained by the Texas Attorney General to serve as an expert witness in connection with the above-captioned matter.

3.      Attached hereto is a true and correct copy of the document titled "Initial Expert Report of John R. Alford Ph.D." This document represents my limited, preliminary analysis of issues raised by the Brooks plaintiffs related to the redrawing of Texas State Senate District 10. I reserve the right to supplement this initial report as appropriate and to provide the full disclosures required by Federal Rule of Civil Procedure 26(a)(2)(B) under the schedule ordered by the Court.

4.      My Initial Expert Report references two exhibits: my curriculum vitae and an article by Rene R. Rocha. True and correct copies of those documents are also attached hereto.

5.      I declare under penalty of perjury that the foregoing is true and correct.

Executed in Harris County, State of Texas, on the 20th day of December, 2021.

John R. Alford

# Exhibit 3:
# Initial Report of Dr. John Alford

Initial Expert Report of John R. Alford Ph.D.

## 1. Scope of Inquiry

I have been retained by the Texas Attorney General as an expert to provide analysis of issues raised by the Brooks plaintiffs related to the redrawing of Texas State Senate District 10. My rate of compensation as an expert is $400 per hour. Given the very tight schedule my analysis below is both limited and preliminary and I reserve the right to supplement this initial report as appropriate.

## 2. Qualifications

I am a tenured full professor of political science at Rice University. In my over thirty-five years at Rice, I have taught courses on redistricting, elections, political representation, voting behavior, and statistical methods at both the undergraduate and graduate level. Over the last thirty-five years, I have worked with numerous local governments on districting plans and on Voting Rights Act issues. I have previously provided expert reports and/or testified as an expert witness in voting rights and statistical issues in a variety of court cases, working for the U.S. Attorney in Houston, the Texas Attorney General, a U.S. Congressman and various cities and school districts.

In the 2000 round of redistricting, I was retained as an expert to provide advice to the Texas Attorney General in his role as Chair of the Legislative Redistricting Board. I subsequently served as the expert for the State of Texas in the state and federal litigation involving the 2001 redistricting for U.S. Congress, the Texas Senate, the Texas House of Representatives, and the Texas State Board of Education.

1

In the 2010 round of redistricting in Texas, I was again retained as an expert by the State of Texas to assist in defending various state election maps and systems including the district maps for the U.S. Congress, the Texas Senate, the Texas House of Representatives, and the current at large system for electing Justices to the State Supreme Court and Court of Appeals, as well as the winner-take-all system for allocating Electoral College votes.

I have also worked as an expert on redistricting and voting rights cases at the state and/or local level in Michigan, Washington, Louisiana, New Mexico, Mississippi, Wisconsin, Florida, New York, Georgia, South Carolina and Alabama.

The details of my academic background and qualifications, including all publications in the last ten years, and work as an expert, including all cases in which I have testified by deposition or at trial in the last four years, are included in my curriculum vitae, which is attached to this report as Exhibit 1.

### 3. The History of Texas Senate District 10

In the 1962 Texas Senate District 10 was, like all 31 of the Senate districts, occupied by a Democrat, Don Kennedy.  In the 1972 election Democrat Bill Meier won election and was reelected throughout the decade.  In 1981, near the end of his last term, Meier switched parties and became a Republican.  In the 1982 election Republican Bob McFarland won SD 10, becoming the first Republican to be elected as a Republican to SD10.   This made SD 10 one of only a handful of Republican Senate districts in the state (the 68th Senate that met in 1983 had only five Republican Senators).  McFarland served for the entire decade of the 80s, and in 1992 Republican Chris Harris was elected to the seat with 61.4% of the vote, besting Democrat Bob Bass, and joining a rise tide of 12 other Republicans in the 73rd Senate in 1993. Harris was reelected without

a Democratic opponent in 1994, 1996, and 2000.  By his last term in the Senate Harris was part of a Republican majority of 16 Republicans to 15 Democrats in the Texas Senate.

In the 2000 round of redistricting Senate District 10 returned to being drawn entirely within Tarrant County (as it had been in the 50s through the 80s, and in 2002 Republican Kim Brimer was elected to the seat winning with 58.7% of the vote over Democrat Hal Ray.  Brimer was reelected in 2004 over Democrat Andrew Hill with a similar 59.2% of the vote.  In the 2008 election Brimer was weakened by several campaign finance questions as well as the questionable use of a loophole to funnel Austin rent money to his spouse.  State Democrats identified SD 10 as a key target that year, and with strong support from Matt Angle and The Lone Star Project, Brimer was narrowly defeated by rising Democratic star Wendy Davis by a margin of 49.9% to 47.5% of the vote.  Davis managed a narrow reelection win in 2012 with 51.1% to Republican Mark Shelton's 48.9%.  In 2014 the seat was open due to Davis' decision to run for governor, and Republican Konni Burton flipped the seat back to the Republicans, winning the election with 52.8% over Democrat Libby Willis 44.7%.  In 2018 the seat flipped again, with Democrat Beverly Powell winning election with 51.7% to incumbent Rep Konni Burton's 48.3%.

Senate District 10 was a securely Republican district throughout the 80s and 90s, in the two most recent decades the district has become more competitive, and in the six elections beginning with 2002 has been won by Republicans three time and Democrats three times.  The redraw of the district in the recently enacted plan shifts the district back toward what would likely be a more similar to its earlier status as a secure Republican district.

### 4.  Plaintiffs' Analysis

In line with *Bartlett*, plaintiffs raise no VRA Section 2 claim with regard to Senate District 10. The most recent American Community Survey (ACS) Citizen Voting Age Population (CVAP) data (2015-2019) has the district at 53.9% Anglo, 20.6% non-Hispanic Black, 20.4% Hispanic, 3.2% Asian, and the remaining 2.0% other.  Clearly the district does not meet the bright-line *Gingles* 1 50% plus 1 test for any single minority group.  Nor does it meet the test with Blacks and Hispanics combined (41.0%).  Even combining Blacks, Hispanics, Asians, and all others, the district falls short of the 50% line for minorities.  As such, the plaintiffs are seeking to combine two already murky legal concepts – crossover districts and coalition districts.

### 4.1 Dr. Barreto's Report

In his report, Dr. Barreto offers election analysis that attempts to demonstrate that Blacks and Hispanics can be treated as a single combined minority in District 10 solely on the basis of the fact that both groups vote Democratic by strong majorities in the general election in the district. As has been noted in multiple court cases in Texas, the fact that two distinct racial or ethnic groups both provide majority support to the Democratic Party in the general election is not sufficient to allow them to be treated as a single politically cohesive minority group for legal purposes.  As it happens there is an ethnically contested Democratic primary in Senate District 10 that illustrates this point.

The 2014 Democratic primary in SD 10 included an Anglo candidate, Libby Willis, against a Hispanic candidate, Mike Martinez.  Willis defeated Martinez in the primary 53.5% to 43.5%. An EI analysis, of the same sort provided for the general election by Dr. Barreto, shows that in that primary Anglo voters gave an estimated 69% of their vote to the Anglo candidate Libby Willis.

4

A similar, but reversed pattern appears for Hispanic voters, with Mike Martinez getting and estimated 62% of the Hispanic vote.  While this voting pattern is far from the strongly polarized partisan voting that Dr. Barreto reports in his tables (Anglos voting 85-90% Republican, Blacks voting 90%+ Democratic, and Hispanics voting 75%+ Democratic), it is nonetheless clear that a majority of Anglo voters preferred the Anglo candidate and a majority of Hispanic voters preferred the Hispanic candidate.  However, the same EI analysis shows that Black voters did not favor the Hispanic candidate, but instead favored Libby Willis, the Anglo candidate, by an estimated margin of 61% to 39%.

In other words, focusing in on the behavior of the two minority groups, one racial and one ethnic, which form the bulk of the minority coalition that plaintiffs argue exists and must be protected in SD10, shows that by Dr. Barreto's own definition they do not qualify as a coalition. In fact, assuming Barreto's definition is correct, by his definition they exhibit Racially Polarized Voting in this endogenous Democratic primary.  Dr. Barreto offers as a simple definition of Racially Polarized Voting (RPV) – "It means simply that voters of different groups are voting in polar opposite directions, rather than in a coalition."  That is exactly what Black and Hispanic voters are doing in this contested Democratic primary.  As a result, it is fair to say that the Anglo candidate, Libby Willis, was the preferred candidate of Anglos and Black voters, but the same is not true for Hispanic voters whose preferred candidate, Mike Martinez, was defeated by a coalition of Anglo and Black voters.

In sum, Senate District 10 is an adult citizen majority Anglo district that was historically safe for Republicans and has more recently become competitive.  In the last two decades in its configuration entirely within Tarrant County, the district has elected Anglo Democrats three times and Anglo Republicans three times.  In this same period, no minority has been elected to this seat,

and no minority has been nominated by a major party.  Aside from a common partisan preference for Democrats in the November general election, there is no evidence of a political coalition sufficient to justify treating Black and Hispanic voters as a single politically cohesive minority group.

## 4.2 Other Evidence on Black-Hispanic Voting Patterns

The failure of these two groups to unite as a single cohesive political minority, outside of the partisan general election, is hardly unique to SD10.  The potential for a VRA Section 2 Black plus Hispanic coalition district in the Dallas and Tarrant County area was raised by plaintiffs in the Perez v Abbott litigation and analysis of Democratic primaries in Tarrant County was included in the expert testimony.  The analysis indicated that Black and Hispanic voters almost always supported different candidates in these primaries.  The results in Tarrant County were not unusual, and in fact were very similar to the results in the other urban counties in Texas where the same pattern of Black voters preferring different candidates from those preferred by Hispanic voters in Democratic primaries was evident.  Similarly, in the recent DFW area Kumar v Frisco ISD case, see 476 F. Supp. 3d 439 (E.D. Tex. 2020), the judge rejected the claim of a Black, Hispanic, Asian coalition on the bases of clear election evidence that, despite the evidence of similar voting patterns in partisan November elections, the three distinct groups were not politically cohesive.

This same point is clear in the continuing history of conflict between Black and Hispanic voters in the Democratic primary in CD 33.  CD 33 is near a Hispanic majority in CVAP (48.6% Hispanic, 23.5% Anglo, and 24.2% Black).  In the first contest for the Democratic nomination in the newly created CD 33 a Black candidate, Marc Veasey (preferred by Black and Anglo voters), prevailed over multiple Hispanic candidates in the Democratic primary, and over Domingo Garcia (preferred by Hispanic voters) in the runoff primary.  This pattern has continued since, with Veasey

regularly challenged unsuccessfully by Hispanic candidates in the Democratic primary and by Hispanic Republicans in the general election.

This pattern is no surprise to political science. The research literature on minority representation in school board elections has long noted the lack of evidence for the formation of Black-Hispanic voting coalitions, sometimes termed "rainbow coalitions". As for example Dr. Rene Rocha concludes in a recent study (attached to this report as Exhibit 2) of fifteen hundred school board elections:

> *The dynamics of interminority relations are unquestionably complicated. Despite commonly held beliefs about the ideological similarity between racial and ethnic minorities, the development of long- lasting rainbow coalitions is considered to be unlikely in most local settings. Like many previous works (i.e., McClain 1993; McClain and Karnig 1990; Meier and Stewart 1991a; Kaufmann 2003, 2004), the evidence presented here does not support the contention that rainbow coalition routinely form in urban areas. However, the data point to different patterns of conflict than those suggested by earlier studies. Contrary to the predictions of Meier and Stewart's (1991a) power thesis, there is little support for the notion that Anglo-Latino coalitions are an expected substitute for interminority ones. Rather, Latino immigration may encourage the development of Anglo-black coalitions, as seen by the increased likelihood of African Americans to be elected to local boards in districts with a large Latino noncitizen population.*

## 4.4 Plaintiff's 'Alternative' District Plan

The district history discussed above suggests that SD 10 would be a likely target for a Republican legislature seeking to bolster Republican prospects without risking too much security in existing Republican districts. It had become an anomaly – a truly competitive district that could be won by either party - adjacent to substantial secure Republican territory in adjacent counties. The plaintiffs argue that the partisan motivation asserted by the legislature was clearly pretext. As they say:

> *Race, not politics, explains why SD10's minority populations were cracked apart in SB4. This is apparent from the legislative process and from the alternative plan Plaintiffs discuss*

7

*below that demonstrates that the legislature's purported political goals could have been achieved without dismantling SD10 and cracking apart its minority populations". ... First, any suggestion that politics, not race, explained SD10's lines would be post hoc pretext. At the September 24, 2021 hearing, Sen. Huffman read aloud from a scripted statement and identified her redistricting criteria. Ex. 14 at 5; Ex. 6K at 16. Seeking partisan advantage was not among them. ... She repeated each of the criteria previously identified on September 24, but added a new criterion to her script: "partisan considerations." Id.; see also id. at 16 (denying being told to add "partisan considerations" to the criteria post hoc). The addition of this new purported criterion in scripted remarks after the lines were drawn, after the criteria were already announced in earlier scripted remarks, and after days of testimony about the racially discriminatory cracking of SD10's minority populations, is strong evidence that it is pretextual.*

The notion that the Republican majority in the Texas Legislature, or any partisan majority in any state legislature in the United States, conducted an entire redraw of legislative lines without any partisan motivation or consideration, and only fabricated the notion of a partisan purpose later simply defies the stark reality of the overwhelming predominance of partisan gerrymandering, both in Texas and in the rest of the U.S.

Similarly, the attempt to suggest that there is, and was, an alternative to be found by dismantling a Democratic district in Travis County fails on several grounds. First, the desire to return a once secure Republican district to the fold involved a natural redistricting focus on that Senate district in Tarrant County, not a focus on a very different political reality in Travis County. The district in Travis County plaintiffs suggest as a more natural partisan focus is the 14th, a district that has been held by a Democrat since the end of reconstruction, and typically votes 60-80% Democratic. It is in fact a packed Democratic district, an arrangement all too familiar in partisan gerrymandering, and the sort of district that is challenging to unpack without substantial disturbance to the surrounding Republican districts and their Republican incumbents, as evident in the five Republican districts impacted in the plaintiffs' alternative proposal. In short, the responsibility of plaintiffs to offer a plausible alternative that would have achieved the legislature's

purpose without the challenged racial impact would need to be satisfied by an alternative plan that returned Senate District 10 to secure Republican performance numbers with the alleged racial impact, not by a redraw distinct in both character and geography like that offered here.

**Conclusion**

These are my initial impressions based on a preliminary review. I reserve the right to revise and extend based on more time as the schedule allows.

# John R. Alford
Curriculum Vitae
December, 2021

Dept. of Political Science
Rice University - MS-24
P.O. Box 1892
Houston, Texas 77251-1892
713-348-3364
jra@rice.edu

## Employment:
Full Professor, Rice University, 2015 to present.
Associate Professor, Rice University, 1985-2015.
Assistant Professor, University of Georgia, 1981-1985.
Instructor, Oakland University, 1980-1981.
Teaching-Research Fellow, University of Iowa, 1977-1980.
Research Associate, Institute for Urban Studies, Houston, Texas, 1976-1977.

## Education:
Ph.D., University of Iowa, Political Science, 1981.
M.A., University of Iowa, Political Science, 1980.
M.P.A., University of Houston, Public Administration, 1977.
B.S., University of Houston, Political Science, 1975.

## Books:
*Predisposed: Liberals, Conservatives, and the Biology of Political Differences.* New York: Routledge, 2013. Co-authors, John R. Hibbing and Kevin B. Smith.

## Articles:
"Political Orientations Vary with Detection of Androstenone," with Amanda Friesen, Michael Gruszczynski, and Kevin B. Smith.  **Politics and the Life Sciences**.  (Spring, 2020).

 "Intuitive ethics and political orientations:  Testing moral foundations as a theory of political ideology." with Kevin Smith, John Hibbing, Nicholas Martin, and Peter Hatemi.  **American Journal of Political Science**. (April, 2017).

"The Genetic and Environmental Foundations of Political, Psychological, Social, and Economic Behaviors: A Panel Study of Twins and Families." with Peter Hatemi, Kevin Smith, and John Hibbing.  **Twin Research and Human Genetics**.  (May, 2015.)

"Liberals and conservatives: Non-convertible currencies." with John R. Hibbing and Kevin B. Smith.  **Behavioral and Brain Sciences** (January, 2015).

"Non-Political Images Evoke Neural Predictors Of Political Ideology."  with Woo-Young Ahn, Kenneth T. Kishida, Xiaosi Gu, Terry Lohrenz, Ann Harvey, Kevin Smith, Gideon Yaffe, John Hibbing, Peter Dayan, P. Read Montague.  **Current Biology**.  (November, 2014).

Department of Political Science                John R. Alford                                **2** | P a g e

"Cortisol and Politics: Variance in Voting Behavior is Predicted by Baseline Cortisol Levels." with Jeffrey French, Kevin Smith, Adam Guck, Andrew Birnie, and John Hibbing. **Physiology & Behavior**. (June, 2014).

"Differences in Negativity Bias Underlie Variations in Political Ideology." with Kevin B. Smith and John R. Hibbing. **Behavioral and Brain Sciences**. (June, 2014).

"Negativity bias and political preferences: A response to commentators Response." with Kevin B. Smith and John R. Hibbing. **Behavioral and Brain Sciences**. (June, 2014).

"Genetic and Environmental Transmission of Political Orientations." with Carolyn L. Funk, Matthew Hibbing, Kevin B. Smith, Nicholas R. Eaton, Robert F. Krueger, Lindon J. Eaves, John R. Hibbing. **Political Psychology**, (December, 2013).

"Biology, Ideology, and Epistemology: How Do We Know Political Attitudes Are Inherited and Why Should We Care?" with Kevin Smith, Peter K. Hatemi, Lindon J. Eaves, Carolyn Funk, and John R. Hibbing. **American Journal of Political Science**. (January, 2012)

"Disgust Sensitivity and the Neurophysiology of Left-Right Political Orientations." with Kevin Smith, John Hibbing, Douglas Oxley, and Matthew Hibbing, **PlosONE**, (October, 2011).

"Linking Genetics and Political Attitudes:  Re-Conceptualizing Political Ideology." with Kevin Smith, John Hibbing, Douglas Oxley, and Matthew Hibbing, **Political Psychology**, (June, 2011).

"The Politics of Mate Choice." with Peter Hatemi, John R. Hibbing, Nicholas Martin and Lindon Eaves, **Journal of Politics**, (March, 2011).

"Not by Twins Alone:  Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" with Peter Hatemi, John Hibbing, Sarah Medland, Matthew Keller, Kevin Smith, Nicholas Martin, and Lindon Eaves, **American Journal of Political Science**, (July, 2010).

"The Ultimate Source of Political Opinions:  Genes and the Environment" with John R. Hibbing in **Understanding Public Opinion**, 3rd Edition eds. Barbara Norrander and Clyde Wilcox, Washington D.C.: CQ Press, (2010).

"Is There a 'Party' in your Genes" with Peter Hatemi, John R. Hibbing, Nicholas Martin and Lindon Eaves, **Political Research Quarterly**, (September, 2009).

"Twin Studies, Molecular Genetics, Politics, and Tolerance: A Response to Beckwith and Morris" with John R. Hibbing and Cary Funk, **Perspectives on Politics**, (December, 2008).  This is a solicited response to a critique of our 2005 APSR article "Are Political Orientations Genetically Transmitted?"

"Political Attitudes Vary with Physiological Traits" with Douglas R. Oxley, Kevin B. Smith, Matthew V. Hibbing, Jennifer L. Miller, Mario Scalora, Peter K. Hatemi, and John R. Hibbing, **Science**, (September 19, 2008).

"The New Empirical Biopolitics" with John R. Hibbing, **Annual Review of Political Science**, (June, 2008).

"Beyond Liberals and Conservatives to Political Genotypes and Phenotypes" with John R. Hibbing and Cary Funk, **Perspectives on Politics**, (June, 2008).  This is a solicited response to a critique of our 2005 APSR article "Are Political Orientations Genetically Transmitted?"

[2]

"Personal, Interpersonal, and Political Temperaments" with John R. Hibbing, **Annals of the American Academy of Political and Social Science**, (November, 2007).

"Is Politics in our Genes?" with John R. Hibbing, **Tidsskriftet Politik**, (February, 2007).

"Biology and Rational Choice" with John R. Hibbing, **The Political Economist**, (Fall, 2005)

"Are Political Orientations Genetically Transmitted?" with John R. Hibbing and Carolyn Funk, **American Political Science Review**, (May, 2005). (The main findings table from this article has been reprinted in two college level text books - Psychology, 9th ed. and Invitation to Psychology 4th ed. both by Wade and Tavris, Prentice Hall, 2007).

"The Origin of Politics: An Evolutionary Theory of Political Behavior" with John R. Hibbing, **Perspectives on Politics**, (December, 2004).

"Accepting Authoritative Decisions: Humans as Wary Cooperators" with John R. Hibbing, **American Journal of Political Science**, (January, 2004).

"Electoral Convergence of the Two Houses of Congress" with John R. Hibbing, in **The Exceptional Senate**, ed. Bruce Oppenheimer, Columbus: Ohio State University Press, (2002).

"We're All in this Together: The Decline of Trust in Government, 1958-1996." in **What is it About Government that Americans Dislike?**, eds. John Hibbing and Beth Theiss-Morse, Cambridge: Cambridge University Press, (2001).

"The 2000 Census and the New Redistricting," **Texas State Bar Association School Law Section Newsletter**, (July, 2000).

"Overdraft: The Political Cost of Congressional Malfeasance" with Holly Teeters, Dan Ward, and Rick Wilson, **Journal of Politics** (August, 1994).

"Personal and Partisan Advantage in U.S. Congressional Elections, 1846-1990" with David W. Brady, in **Congress Reconsidered** 5th edition, eds. Larry Dodd and Bruce Oppenheimer, CQ Press, (1993).

"The 1990 Congressional Election Results and the Fallacy that They Embodied an Anti-Incumbent Mood" with John R. Hibbing, **PS** 25 (June, 1992).

"Constituency Population and Representation in the United States Senate" with John R. Hibbing. **Legislative Studies Quarterly**, (November, 1990).

"Editors' Introduction: Electing the U.S. Senate" with Bruce I. Oppenheimer. **Legislative Studies Quarterly**, (November, 1990).

"Personal and Partisan Advantage in U.S. Congressional Elections, 1846-1990" with David W. Brady, in **Congress Reconsidered** 4th edition, eds. Larry Dodd and Bruce Oppenheimer, CQ Press, (1988). Reprinted in The Congress of the United States, 1789-1989, ed. Joel Silby, Carlson Publishing Inc., (1991), and in The Quest for Office, eds. Wayne and Wilcox, St. Martins Press, (1991).

"Can Government Regulate Fertility? An Assessment of Pro-natalist Policy in Eastern Europe" with Jerome Legge. **The Western Political Quarterly** (December, 1986).

"Partisanship and Voting" with James Campbell, Mary Munro, and Bruce Campbell, in **Research in Micropolitics. Volume 1 - Voting Behavior**. Samuel Long, ed. JAI Press, (1986).

"Economic Conditions and Individual Vote in the Federal Republic of Germany" with Jerome S. Legge. **Journal of Politics** (November, 1984).

"Television Markets and Congressional Elections" with James Campbell and Keith Henry. **Legislative Studies Quarterly** (November, 1984).

"Economic Conditions and the Forgotten Side of Congress:  A Foray into U.S. Senate Elections" with John R. Hibbing, **British Journal of Political Science** (October, 1982).

"Increased Incumbency Advantage in the House" with John R.  Hibbing, **Journal of Politics** (November, 1981).  Reprinted in The Congress of the United States, 1789-1989, Carlson Publishing Inc., (1991).

"The Electoral Impact of Economic Conditions:  Who is Held Responsible?" with John R. Hibbing, **American Journal of Political Science** (August, 1981).

"Comment on Increased Incumbency Advantage" with John R. Hibbing, Refereed communication: **American Political Science Review** (March, 1981).

"Can Government Regulate Safety?  The Coal Mine Example" with Michael Lewis-Beck, **American Political Science Review** (September, 1980).


## Awards and Honors:

CQ Press Award - 1988, honoring the outstanding paper in legislative politics presented at the 1987 Annual Meeting of the American Political Science Association.  Awarded for "The Demise of the Upper House and the Rise of the Senate: Electoral Responsiveness in the United States Senate" with John Hibbing.


## Research Grants:

National Science Foundation, 2009-2011, "Identifying the Biological Influences on Political Temperaments", with John Hibbing, Kevin Smith, Kim Espy, Nicolas Martin and Read Montague.  This is a collaborative project involving Rice, University of Nebraska, Baylor College of Medicine, and Queensland Institute for Medical Research.

National Science Foundation, 2007-2010, "Genes and Politics:  Providing the Necessary Data", with John Hibbing, Kevin Smith, and Lindon Eaves.  This is a collaborative project involving Rice, University of Nebraska, Virginia Commonwealth University, and the University of Minnesota.

National Science Foundation, 2007-2010, "Investigating the Genetic Basis of Economic Behavior", with John Hibbing and Kevin Smith.  This is a collaborative project involving Rice, University of Nebraska, Virginia Commonwealth University, and the Queensland Institute of Medical Research.

[4]

Rice University Faculty Initiatives Fund, 2007-2009, "The Biological Substrates of Political Behavior". This is in assistance of a collaborative project involving Rice, Baylor College of Medicine, Queensland Institute of Medical Research, University of Nebraska, Virginia Commonwealth University, and the University of Minnesota.

National Science Foundation, 2004-2006, "Decision-Making on Behalf of Others", with John Hibbing. This is a collaborative project involving Rice and the University of Nebraska.

National Science Foundation, 2001-2002, dissertation grant for Kevin Arceneaux, "Doctoral Dissertation Research in Political Science: Voting Behavior in the Context of U.S. Federalism."

National Science Foundation, 2000-2001, dissertation grant for Stacy Ulbig, "Doctoral Dissertation Research in Political Science: Sub-national Contextual Influences on Political Trust."

National Science Foundation, 1999-2000, dissertation grant for Richard Engstrom, "Doctoral Dissertation Research in Political Science: Electoral District Structure and Political Behavior."

Rice University Research Grant, 1985, Recent Trends in British Parliamentary Elections.

Faculty Research Grants Program, University of Georgia, Summer, 1982. Impact of Media Structure on Congressional Elections, with James Campbell.

## Papers Presented:

"The Physiological Basis of Political Temperaments" 6th European Consortium for Political Research General Conference, Reykjavik, Iceland (2011), with Kevin Smith, and John Hibbing.

"Identifying the Biological Influences on Political Temperaments" National Science Foundation Annual Human Social Dynamics Meeting (2010), with John Hibbing, Kimberly Espy, Nicholas Martin, Read Montague, and Kevin B. Smith.

"Political Orientations May Be Related to Detection of the Odor of Androstenone" Annual meeting of the Midwest Political Science Association, Chicago, IL (2010), with Kevin Smith, Amanda Balzer, Michael Gruszczynski, Carly M. Jacobs, and John Hibbing.

"Toward a Modern View of Political Man: Genetic and Environmental Transmission of Political Orientations from Attitude Intensity to Political Participation" Annual meeting of the American Political Science Association, Washington, DC (2010), with Carolyn Funk, Kevin Smith, and John Hibbing.

"Genetic and Environmental Transmission of Political Involvement from Attitude Intensity to Political Participation" Annual meeting of the International Society for Political Psychology, San Francisco, CA (2010), with Carolyn Funk, Kevin Smith, and John Hibbing.

"Are Violations of the EEA Relevant to Political Attitudes and Behaviors?" Annual meeting of the Midwest Political Science Association, Chicago, IL (2010), with Kevin Smith, and John Hibbing.

"The Neural Basis of Representation" Annual meeting of the American Political Science Association, Toronto, Canada (2009), with John Hibbing.

"Genetic and Environmental Transmission of Value Orientations" Annual meeting of the American Political Science Association, Toronto, Canada (2009), with Carolyn Funk, Kevin Smith, Matthew Hibbing, Pete Hatemi, Robert Krueger, Lindon Eaves, and John Hibbing.

"The Genetic Heritability of Political Orientations: A New Twin Study of Political Attitudes" Annual Meeting of the International Society for Political Psychology, Dublin, Ireland (2009), with John Hibbing, Cary Funk, Kevin Smith, and Peter K Hatemi.

"The Heritability of Value Orientations" Annual meeting of the Behavior Genetics Association, Minneapolis, MN (2009), with Kevin Smith, John Hibbing, Carolyn Funk, Robert Krueger, Peter Hatemi, and Lindon Eaves.

"The Ick Factor: Disgust Sensitivity as a Predictor of Political Attitudes" Annual meeting of the Midwest Political Science Association, Chicago, IL (2009), with Kevin Smith, Douglas Oxley Matthew Hibbing, and John Hibbing.

"The Ideological Animal: The Origins and Implications of Ideology" Annual meeting of the American Political Science Association, Boston, MA (2008), with Kevin Smith, Matthew Hibbing, Douglas Oxley, and John Hibbing.

"The Physiological Differences of Liberals and Conservatives" Annual meeting of the Midwest Political Science Association, Chicago, IL (2008), with Kevin Smith, Douglas Oxley, and John Hibbing.

"Looking for Political Genes: The Influence of Serotonin on Political and Social Values" Annual meeting of the Midwest Political Science Association, Chicago, IL (2008), with Peter Hatemi, Sarah Medland, John Hibbing, and Nicholas Martin.

"Not by Twins Alone: Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" Annual meeting of the American Political Science Association, Chicago, IL (2007), with Peter Hatemi, John Hibbing, Matthew Keller, Nicholas Martin, Sarah Medland, and Lindon Eaves.

"Factorial Association: A generalization of the Fulker between-within model to the multivariate case" Annual meeting of the Behavior Genetics Association, Amsterdam, The Netherlands (2007), with Sarah Medland, Peter Hatemi, John Hibbing, William Coventry, Nicholas Martin, and Michael Neale.

"Not by Twins Alone: Using the Extended Twin Family Design to Investigate the Genetic Basis of Political Beliefs" Annual meeting of the Midwest Political Science Association, Chicago, IL (2007), with Peter Hatemi, John Hibbing, Nicholas Martin, and Lindon Eaves.

"Getting from Genes to Politics: The Connecting Role of Emotion-Reading Capability" Annual Meeting of the International Society for Political Psychology, Portland, OR, (2007.), with John Hibbing.

"The Neurological Basis of Representative Democracy." Hendricks Conference on Political Behavior, Lincoln, NE (2006), with John Hibbing.

"The Neural Basis of Representative Democracy" Annual meeting of the American Political Science Association, Philadelphia, PA (2006), with John Hibbing.

"How are Political Orientations Genetically Transmitted? A Research Agenda" Annual meeting of the Midwest Political Science Association, Chicago Illinois (2006), with John Hibbing.

"The Politics of Mate Choice"   Annual meeting of the Southern Political Science Association, Atlanta, GA (2006), with John Hibbing.

"The Challenge Evolutionary Biology Poses for Rational Choice"   Annual meeting of the American Political Science Association, Washington, DC (2005), with John Hibbing and Kevin Smith.

"Decision Making on Behalf of Others"   Annual meeting of the American Political Science Association, Washington, DC (2005), with John Hibbing.

"The Source of Political Attitudes and Behavior: Assessing Genetic and Environmental Contributions"   Annual meeting of the Midwest Political Science Association, Chicago Illinois (2005), with John Hibbing and Carolyn Funk.

"The Source of Political Attitudes and Behavior: Assessing Genetic and Environmental Contributions" Annual meeting of the American Political Science Association, Chicago Illinois (2004), with John Hibbing and Carolyn Funk.

"Accepting Authoritative Decisions:  Humans as Wary Cooperators" Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (2002), with John Hibbing

"Can We Trust the NES Trust Measure?" Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (2001), with Stacy Ulbig.

"The Impact of Organizational Structure on the Production of Social Capital Among Group Members" Annual Meeting of the Southern Political Science Association, Atlanta, Georgia (2000), with Allison Rinden.

"Isolating the Origins of Incumbency Advantage:  An Analysis of House Primaries, 1956-1998" Annual Meeting of the Southern Political Science Association, Atlanta, Georgia (2000), with Kevin Arceneaux.

"The Electorally Indistinct Senate," Norman Thomas Conference on Senate Exceptionalism, Vanderbilt University; Nashville, Tennessee; October (1999), with John R. Hibbing.

"Interest Group Participation and Social Capital" Annual Meeting of the Midwest Political Science Association, Chicago, Illinois (1999), with Allison Rinden.

"We're All in this Together:  The Decline of Trust in Government, 1958-1996."  The Hendricks Symposium, University of Nebraska, Lincoln. (1998)

"Constituency Population and Representation in the United States Senate," Electing the Senate; Houston, Texas; December (1989), with John R. Hibbing.

"The Disparate Electoral Security of House and Senate Incumbents," American Political Science Association Annual Meetings; Atlanta, Georgia; September (1989), with John R. Hibbing.

"Partisan and Incumbent Advantage in House Elections," Annual Meeting of the Southern Political Science Association (1987), with David W. Brady.

"Personal and Party Advantage in U.S. House Elections, 1846-1986" with David W. Brady, 1987 Social Science History Association Meetings.

[7]

"The Demise of the Upper House and the Rise of the Senate: Electoral Responsiveness in the United States Senate" with John Hibbing, 1987 Annual Meeting of the American Political Science Association.

"A Comparative Analysis of Economic Voting" with Jerome Legge, 1985 Annual Meeting of the American Political Science Association.

"An Analysis of Economic Conditions and the Individual Vote in Great Britain, 1964-1979" with Jerome Legge, 1985 Annual Meeting of the Western Political Science Association.

"Can Government Regulate Fertility?  An Assessment of Pro-natalist Policy in Eastern Europe" with Jerome Legge, 1985 Annual Meeting of the Southwestern Social Science Association.

"Economic Conditions and the Individual Vote in the Federal Republic of Germany" with Jerome S. Legge, 1984 Annual Meeting of the Southern Political Science Association.

"The Conditions Required for Economic Issue Voting" with John R. Hibbing, 1984 Annual Meeting of the Midwest Political Science Association.

"Incumbency Advantage in Senate Elections," 1983 Annual Meeting of the Midwest Political Science Association.

"Television Markets and Congressional Elections:  The Impact of Market/District Congruence" with James Campbell and Keith Henry, 1982 Annual Meeting of the Southern Political Science Association.

"Economic Conditions and Senate Elections" with John R. Hibbing, 1982 Annual Meeting of the Midwest Political Science Association. "Pocketbook Voting:  Economic Conditions and Individual Level Voting," 1982 Annual Meeting of the American Political Science Association.

"Increased Incumbency Advantage in the House," with John R. Hibbing, 1981 Annual Meeting of the Midwest Political Science Association.


## Other Conference Participation:

Roundtable Participant – Closing Round-table on Biopolitics; 2016 UC Merced Conference on Bio-Politics and Political Psychology, Merced, CA.

Roundtable Participant "Genes, Brains, and Core Political Orientations" 2008 Annual Meeting of the Southwestern Political Science Association, Las Vegas.

Roundtable Participant "Politics in the Laboratory" 2007 Annual Meeting of the Southern Political Science Association, New Orleans.

Short Course Lecturer, "What Neuroscience has to Offer Political Science" 2006 Annual Meeting of the American Political Science Association.

Panel chair and discussant, "Neuro-scientific Advances in the Study of Political Science" 2006 Annual Meeting of the American Political Science Association.

Presentation, "The Twin Study Approach to Assessing Genetic Influences on Political Behavior" Rice Conference on New Methods for Understanding Political Behavior, 2005.

Panel discussant, "The Political Consequences of Redistricting," 2002 Annual Meeting of the American Political Science Association.

Panel discussant, "Race and Redistricting," 1999 Annual Meeting of the Midwest Political Science Association.

Invited participant, "Roundtable on Public Dissatisfaction with American Political Institutions", 1998 Annual Meeting of the Southwestern Social Science Association.

Presentation, "Redistricting in the '90s," Texas Economic and Demographic Association, 1997.

Panel chair, "Congressional Elections," 1992 Annual Meeting of the Southern Political Science Association.

Panel discussant, "Incumbency and Congressional Elections," 1992 Annual Meeting of the American Political Science Association.

Panel chair, "Issues in Legislative Elections," 1991 Annual Meeting of the Midwest Political Science Association.

Panel chair, "Economic Attitudes and Public Policy in Europe," 1990 Annual Meeting of the Southern Political Science Association

Panel discussant, "Retrospective Voting in U.S. Elections," 1990 Annual Meeting of the Midwest Political Science Association.

Co-convener, with Bruce Oppenheimer, of Electing the Senate, a national conference on the NES 1988 Senate Election Study. Funded by the Rice Institute for Policy Analysis, the University of Houston Center for Public Policy, and the National Science Foundation, Houston, Texas, December, 1989.

Invited participant, Understanding Congress: A Bicentennial Research Conference, Washington, D.C., February, 1989.

Invited participant--Hendricks Symposium on the United States Senate, University of Nebraska, Lincoln, Nebraska, October, 1988

Invited participant--Conference on the History of Congress, Stanford University, Stanford, California, June, 1988.

Invited participant, "Roundtable on Partisan Realignment in the 1980's", 1987 Annual Meeting of the Southern Political Science Association.

## Professional Activities:

### Other Universities:

Invited Speaker, Annual Lecture, Psi Kappa -the Psychology Club at Houston Community College, 2018.

Invited Speaker, Annual Allman Family Lecture, Dedman College Interdisciplinary Institute, Southern Methodist University, 2016.

Invited Speaker, Annual Lecture, Psi Sigma Alpha – Political Science Dept., Oklahoma State University, 2015.

Invited Lecturer, Department of Political Science, Vanderbilt University, 2014.

Invited Speaker, Annual Lecture, Psi Kappa -the Psychology Club at Houston Community College, 2014.

Invited Speaker, Graduate Student Colloquium, Department of Political Science, University of New Mexico, 2013.

Invited Keynote Speaker, Political Science Alumni Evening, University of Houston, 2013.

Invited Lecturer, Biology and Politics Masters Seminar (John Geer and David Bader), Department of Political Science and Biology Department, Vanderbilt University, 2010.

Invited Lecturer, Biology and Politics Senior Seminar (John Geer and David Bader), Department of Political Science and Biology Department, Vanderbilt University, 2008.

Visiting Fellow, the Hoover Institution, Stanford University, 2007.

Invited Speaker, Joint Political Psychology Graduate Seminar, University of Minnesota, 2007.

Invited Speaker, Department of Political Science, Vanderbilt University, 2006.


**Member:**

Editorial Board, Journal of Politics, 2007-2008.

Planning Committee for the National Election Studies' Senate Election Study, 1990-92.

Nominations Committee, Social Science History Association, 1988


**Reviewer for:**

American Journal of Political Science
American Political Science Review
American Politics Research
American Politics Quarterly
American Psychologist
American Sociological Review
Canadian Journal of Political Science
Comparative Politics
Electoral Studies
Evolution and Human Behavior
International Studies Quarterly

Department of Political Science            John R. Alford            11 | Page

Journal of Politics
Journal of Urban Affairs
Legislative Studies Quarterly
National Science Foundation
PLoS ONE
Policy Studies Review
Political Behavior
Political Communication
Political Psychology
Political Research Quarterly
Public Opinion Quarterly
Science
Security Studies
Social Forces
Social Science Quarterly
Western Political Quarterly

## University Service:

Member, University Senate, 2021-2023.

Member, University Parking Committee, 2016-2022.

Member, University Benefits Committee, 2013-2016.

Internship Director for the Department of Political Science, 2004-2018.

Member, University Council, 2012-2013.

Invited Speaker, Rice Classroom Connect, 2016.

Invited Speaker, Glasscock School, 2016.

Invited Speaker, Rice Alumni Association, Austin, 2016.

Invited Speaker, Rice Alumni Association, New York City, 2016.

Invited Speaker, Rice TEDxRiceU , 2013.

Invited Speaker, Rice Alumni Association, Atlanta, 2011.

Lecturer, Advanced Topics in AP Psychology, Rice University AP Summer Institute, 2009.

Scientia Lecture Series: "Politics in Our Genes: The Biology of Ideology" 2008

Invited Speaker, Rice Alumni Association, Seattle, San Francisco and Los Angeles, 2008.

Invited Speaker, Rice Alumni Association, Austin, Chicago and Washington, DC, 2006.

Invited Speaker, Rice Alumni Association, Dallas and New York, 2005.

[11]

Director: Rice University Behavioral Research Lab and Social Science Computing Lab, 2005-2006.

University Official Representative to the Inter-university Consortium for Political and Social Research, 1989-2012.

Director: Rice University Social Science Computing Lab, 1989-2004.

Member, Rice University Information Technology Access and Security Committee, 2001-2002

Rice University Committee on Computers, Member, 1988-1992, 1995-1996; Chair, 1996-1998, Co-chair, 1999.

Acting Chairman, Rice Institute for Policy Analysis, 1991-1992.

Divisional Member of the John W. Gardner Dissertation Award Selection Committee, 1998

Social Science Representative to the Educational Sub-committee of the Computer Planning Committee, 1989-1990.

Director of Graduate Admissions, Department of Political Science, Rice University, 1986-1988.

Co-director, Mellon Workshop: Southern Politics, May, 1988.

Guest Lecturer, Mellon Workshop: The U.S. Congress in Historical Perspective, May, 1987 and 1988.

Faculty Associate, Hanszen College, Rice University, 1987-1990.

Director, Political Data Analysis Center, University of Georgia, 1982-1985.


## External Consulting:

Consultant, Lancaster ISD – redrawing of all school board member election districts including demographic analysis and redrawing of election districts, 2021.

Consultant, City of Baytown – redrawing of all city council member election districts including demographic analysis and redrawing of election districts, 2021.

Consultant, Goose Creek ISD – redrawing of all board member election districts including demographic analysis and redrawing of election districts, 2021.

Expert Witness, Christian Ministerial Alliance et al v. Arkansas, racially polarized voting analysis, 2020.

Expert Witness, Bruni et al. v. State of Texas, straight ticket voting analysis, 2020.

Consulting Expert, Sarasota County, VRA challenge to district map, 2020.

Expert Witness, Kumar v. Frisco ISD, TX, racially polarized voting analysis, 2019.

Expert Witness, Vaughan v. Lewisville ISD, TX, racially polarized voting analysis, 2019.

Expert Witness, Johnson v. Ardoin, (Louisiana), racially polarized voting analysis, 2019.

Expert Witness, Flores et al. v. Town of Islip, NY, racially polarized voting analysis, 2018.

Expert Witness, Tyson v. Richardson ISD, racially polarized voting analysis, 2018.

Expert Witness, Dwight v. State of Georgia, racially polarized voting analysis, 2018.

Expert Witness, NAACP v. East Ramapo Central School District, racially polarized voting analysis, 2018.

Expert Witness, Georgia NAACP v. State of Georgia, racially polarized voting analysis, 2018.

Expert Witness, United States v. City of Eastpoint, racially polarized voting analysis, 2017.

Expert Witness, Georgia NAACP v. Gwinnett County, racially polarized voting analysis, 2017.

Expert Witness for the State of Texas, Lopez, et al v. Abbott, a challenge to the current system of statewide at-large elections for the Texas Supreme Court and the Texas Court of Criminal Appeals, including election analysis, and racially polarized voting analysis, 2017.

Expert witness for the State of Texas, Perez, et al v State of Texas (and consolidated cases), challenge to adopted Texas election districts for the US Congress and the Texas House of Representatives, 2011-2017.

Political Research Quarterly
Volume 60 Number 2
June 2007 315-327
© 2007 University of Utah
10.1177/1065912907301982
http://prq.sagepub.com
hosted at
http://online.sagepub.com

# Black-Brown Coalitions in Local School Board Elections

Rene R. Rocha
*University of Iowa, Iowa City*

As the racial composition of the United States becomes increasingly diverse, scholars have begun to examine whether interminority, or rainbow, coalitions are feasible. The power thesis suggests that lower levels of social distance between Anglos and Latinos will make the formation of Anglo-Latino coalitions more likely than black-Latino coalitions. This hypothesis is reexamined using fifteen hundred school board election results. The findings offer little evidence for the formation of Anglo-Latino coalitions. There are, however, indications that Anglo-black coalitions form when an area becomes populated by Latino noncitizens, possibly due to the increased social distance this causes between Latinos and other racial/ethnic communities.

**Keywords:** school boards; African Americans; Latinos; electoral coalitions

The issue of interracial conflict has grown more complex as the United States has become more diverse. The sheer number of minority groups (non-Anglos) has increased considerably in recent years. During this time, the composition of minorities has also grown increasingly diverse. This development is perhaps most pronounced in the Latino population. Latinos now constitute the largest minority group in the nation (according to the Census Bureau, Latinos made up 14 percent of the U.S. population in 2004, compared to 12.8 percent for African Americans). Moreover, the geographic isolation of minorities in general and Latinos in particular is less prevalent. It is clear that Latino political activity no longer occurs solely in the Southwest, but also in several states in the Northeast, Midwest, and Southeast.

Several of these regions, especially the Southeast, also have sizeable African American populations. These demographic patterns have renewed scholarly interest in how minority groups relate to one another and whether those relations are characterized by cooperation or conflict. One forum in which interminority relations have been characterized as tenuous is the educational policy-making process (de la Garza 1997; Hero and Clarke 2003; Meier and Stewart 1991a, 1991b; Meier et al. 2004; Sidney 2002; Vaca 2004). In other policy arenas, both Latinos and African Americans are likely to benefit from redistributive policies. However, within the educational system, redistributing resources to Latino-targeted programs, such as bilingual education, often limits the resources available to African Americans and other non-Latino students. Considering that education is a significant predictor of everything from future income (Cohen and Tyree 1986) to incarceration rates (Osher, Woodruff, and Sims 2002), the extent to which African American–Latino relations are characterized by cooperation or conflict holds considerable implications for the future of both groups. This article attempts to better understand the nature of interminority coalitions in the election of the chief policy makers within the U.S. education system, school board members. Specific attention is paid to the "power thesis," a hypothesis first proposed by Meier and Stewart (1991a) that predicts the failure of rainbow coalitions and the formation of Anglo-Latino coalitions. I also consider how Latino immigration has changed traditional expectations about the formation of interracial coalitions. Last, the influence of structural variables on the formation of interracial coalitions is reexamined, with the primary emphasis placed on the presence of partisan elections.

## The Logic behind Interracial Coalitions

Interminority relations are heavily influenced by a variety of factors. de la Garza (1997, 453) pointed to several conditions that he argues have contributed to the inability of Latinos and African Americans to form numerous and long-lasting rainbow coalitions. These include resentment among many African Americans

over Latino access to affirmative action programs, the perception that immigration results in job displacement and the reallocation of public resources to Latinos rather than to African Americans, battles over reapportionment and redistricting, and tensions resulting from Latino population growth that produces Latino majorities in schools that previously had African American majorities, administrators, and staff. Paula McClain's research has long noted the existence of socioeconomic and political competition between African Americans and Latinos (McClain and Karnig 1990; McClain 1993; McClain and Tauber 1998, 2001). Her work in this area suggests that representational gains on the part of African Americans are likely to affect Latinos negatively, although gains made by Latinos do not necessarily limit African American opportunities (McClain 1993).

## The "Rainbow" Coalition

Despite such findings, which seem to point to the presence of interminority competition in a number of localities within the United States, there remains an elegant and compelling logic as to why one would expect rainbow coalitions to form in a variety of circumstances. In *Protest Is Not Enough*, for example, Browning, Marshall, and Tabb (1984) argued that Latino representation is improved by the formation of coalitions with African Americans and liberal Anglos. Forming rainbow coalitions allows African Americans and Latinos to inflate their electoral strength, gain office, and promote policies in the interest of both groups. Refusing to form such coalitions carries with it the risk that conservative Anglos will dominate governing coalitions, resulting in policies hostile to the interests of minority groups.

## Explanations for Alternative Interracial Coalitions

Given that the literature on African American–Latino relations has noted a surprising absence of rainbow coalitions (see Vaca 2004), scholars have been left to wonder why alternate racial coalitions routinely form. One such explanation comes from the sociological concept of "perceived social distance." In its simplest form, social distance refers to the amount and nature of social relationships that members of two groups are willing to engage in and is often measured using survey questions similar to those first employed by Bogardus (1928).[1]

Work dealing with the concept of social distance indicates that African Americans and Latinos rarely possess attitudes conducive to interminority affability and social networks. Latinos are usually more likely to favor social association with Anglos, and Anglos typically reciprocate. This is especially true for more intimate forms of association, such as intermarriage (Dyer, Vedlitz, and Worchel 1989).

Of course, interracial attitudes, including those comprising measures of social distance, vary considerably in different social and economic contexts. For this reason, researchers argue that the influence of race on social distance can be either exacerbated or mitigated by socioeconomic conditions. When the Latino community is similar to the Anglo community in terms of socioeconomic status, the argument suggests that African Americans become less desirable coalition partners (Meier and Stewart 1991a; Kaufmann 2004). There are also some indications that the reverse is true. That is, when the Latino community does not possess ample socioeconomic resources, African Americans may benefit from a more collegial relationship with the local Anglo population (Randall and Delbridge 2005). In short, social distance is partially determined by a group's social status generally and is therefore heavily influenced by socioeconomic factors.

Utilizing arguments made in the social distance literature, Giles and Evans (1985, 1986) presented what they termed the "power thesis," which suggests that the amount of social distance between two individuals determines their willingness to engage in cooperative or competitive behavior. Meier and Stewart (1991a, 1991b; also see Feagin 1980) extended their logic and developed an aggregated version of this hypothesis. The Meier and Stewart (1991a, 1991b) hypothesis argues that the level of social distance between racial/ethnic groups determines whether groups will enter into a coalitional relationship or one in which they compete for electoral representation and beneficial public policies. Thus, Meier and Stewart argued that social distance not only explains social relationships between groups but also the *political* behavior of groups toward one another.

Viewed from the perspective of the power thesis, it is not unexpected that much of the literature has noted an absence of rainbow coalitions and only limited attitudinal support for their formation (Dyer, Vedlitz, and Worchel 1989; de la Garza 1997; Garcia 2000; Mindiola, Niemann, and Rodriguez 2002). As Meier and Stewart (1991b, 100) suggested, "If the dominant Anglo group is forced to choose between Hispanic and black groups for coalition purposes, the power thesis suggests that, all things being equal, they will seek a coalition with Hispanics." Similar

observations regarding Anglo preferences[2] for coalition partners continue to be made in more contemporary studies, such as Kaufmann's (2004) work on the interplay between racial conflict and mayoral voting in American cities. She wrote,

> For moderate whites, Latinos are simply more attractive coalition partners. For Latinos, these alliances have resulted in greater levels of political influence and incorporation than they might have otherwise had in black-led coalitions. . . . The big losers in these new political arrangements between Latinos and moderate whites have been urban blacks, who become quite dispensable to these governing regimes. (pp. 205-6)

## Hypotheses

Empirically, however, it is difficult to distinguish between each of the possible scenarios. For example, the presence of a rainbow coalition would imply that as the size of the African American population within an area grows, Latino representation would likewise increase (for the rainbow coalition should be wielding greater electoral strength). Yet the power thesis predicts a similar set of results, but for very different reasons. That is, as the size of the African American population increases, Anglos have a greater incentive to form coalitions with Latinos. Thus, once again, we would expect to see Latino representation increase as a result of an increase in the size of the African American population.

Fortunately, the two hypotheses do make substantially different predictions regarding the relationship between the size of the Latino population and African American representation. If a rainbow coalition is present, an increase in the Latino population should naturally increase the degree to which African Americans are represented (once again, the coalition's electoral strength is growing). Conversely, if the power thesis is correct, we would expect to see a negative relationship between Latino population size and African American representation. This occurs because Anglos will not be inclined to form coalitions with African Americans but will take advantage of the presence of a sizeable Latino population to limit African American opportunities.[3] This leads to the following hypotheses:

*Black-Latino (Rainbow) Coalition:*
African American population size is positively associated with Latino representation in elected office.

Latino population size is positively associated with African American representation in elected office.
*Anglo-Latino Coalition (Power Thesis):*
African American population size is positively associated with Latino representation in elected office.
Latino population size is negatively associated with African American representation in elected office.

Neither scenario predicts that African American population size will be *negatively* associated with Latino representation in elected office (that is, the formation of an Anglo-black coalition). However, drawing on the framework set up by the power thesis and evidence presented by scholars of Latino immigration, there might be reason to suspect that Anglo-black coalitions are possible. The power thesis's applicability to Anglo-Latino coalitions assumes conflict is a function of the level of social distance between groups and that Anglos will be most likely to seek a coalition with the group or groups which most resemble themselves (typically assumed to be Latinos). Yet how have these traditional relationships been changed by recent immigration trends? With the size of the foreign born population increasing by 43 percent between 1990 and 2000 (Jones-Correa 2001), scholars have begun to examine how coalitional relationships are altered by the infusion of a large Latino immigrant population.

## Latino Immigration and the Power Thesis

Based upon a series of interviews with Houston residents, Mindiola, Niemann, and Rodriguez (2002, 61) presented anecdotal evidence that Latino immigrants sometimes believe Anglo-black coalitions to be more likely than Anglo-Latino coalitions due to the cultural and linguistic differences between Anglos and Latino immigrants. This serves as an illustration of an alternative to the traditional predictions of the power thesis, suggesting that Anglo-Latino social distance may occasionally be greater than Anglo-black social distance, resulting in the occasional formation of Anglo-black political coalitions.

Several other studies have examined how immigration influences Anglo and African American attitudes toward new immigrant populations, especially Latinos. For example, Sears et al. (1999) found that African Americans are more likely to oppose liberal immigration policies if they sense economic competition with Latinos.[4] Regarding Anglo behavior, Kaufmann (2004) observed that Anglos who believe that local government pays too much attention to recent immigrants were more likely to vote for

Giuliani in the 1993 New York mayoral race. This finding remained when she split her sample to only examine the voting behavior of politically moderate Anglos, although she did not find a relationship between immigration attitudes and voting for Riordan in the Los Angeles mayoral race held that same year. Last, a recent survey of residents in a North Carolina county with a rapidly growing Latino immigrant population found that African Americans and Anglos express lower levels of social distance to each other than they do toward any other group (Randall and Delbridge 2005).[5]

Furthering the predictions of this alternative interpretation of the power thesis are the attitudes of Latino immigrants themselves. For example, Mindiola, Niemann, and Rodriguez (2002) found that Latino immigrants often express very negative feelings regarding black-Latino social association. When considered alongside other works that suggest that Latinos perceive a greater degree of commonality with African Americans at higher levels of acculturation (Kaufmann 2003) and that support for coalitional strategies increases with political integration (Garcia 2000), we have reason to suspect that Latino immigrants will often not be receptive to African American overtures, should they be made.

The following scenario can be generated from this alternative interpretation of Meier and Stewart's (1991a, 1991b) power thesis:

*Anglo-Black Coalition (Revised Power Thesis):*
African American population size will be *negatively* associated with Latino representation in elected office.
Latino population size is *positively* associated with African American representation in elected office.

More specifically, this revised version of the power thesis argues that

The size of the Latino *immigrant* population will be *positively* associated with African American representation in elected office.

This relationship occurs not because Latino immigrants are rallying behind African American candidates, but rather because Anglos, who perceive Latino immigrants to be socially distant from them, are more likely to incorporate African Americans into governing coalitions in districts with large Latino immigrant populations.

## School Board Elections as an Arena for Black-Brown Cooperation and Conflict

Referring specifically to the education policy-making process, Hero and Clarke (2003, 326) argued that "Latinos and blacks bring different experiences and preferences . . . so the prospects of multiethnic coalitions are tenuous." Similarly, de la Garza (1997) maintained that school reform is one of four prime causes of political tension between the African American and Latino communities within recent years. Despite such highly conflictual portrayals of the education policy-making process, it would be disingenuous to imply that the vast majority of school board decisions are contentious and divisive. Rather, most of the issues taken up by school boards, as with other forms of local government, are resolved by unanimous or near-unanimous votes (Polinard et al. 1994). Thus, while race may not shape every deliberation undertaken by local governing institutions, where issues (e.g., funding for bilingual education) are framed in racial/ethnic terms, contention and voting blocs are likely to form. Under such circumstances, race is likely to provide a useful heuristic for determining the preferences of constituencies and representatives.

Beyond dealing with specific policy proposals, minorities have a variety of incentives to ensure that they maximize their representation on local school boards. Descriptive representation has been found to result in an increase in the hiring of minority administrators (Meier, Stewart, and England 1989; Polinard, Wrinkle, and Longoria 1990; Wright, Hirlinger, and England 1998), similar to the way in which representation on city councils has been found to increase the percentage of minority municipal employees (Dye and Renick 1981; Kerr and Mladenka 1994; Mladenka 1989a, 1989b). Minority administrators, in turn, tend to hire more minority teachers. Drawing on insights from the literature of representative bureaucracy, which argues that descriptive representation within organizations leads to the active representation of a group's interests (Hindera 1993; Selden 1997; Selden, Brudney, and Kellough 1998), several scholars have demonstrated that diverse teaching facilities are associated with increased student performance and lower levels of discrimination against minority students (Barajas and Pierce 2001; Irvine 1989; Polinard, Wrinkle, and Longoria 1990; Polinard, Wrinkle, and Meier 1995; Weiher 2000; Wright, Hirlinger, and England 1998). Beyond this indirect

influence on student outcomes, Marschall (2005) showed that African Americans, and to some extent Latinos, make more favorable assessments of neighborhood schools if they live in a district in which they are descriptively represented on the school board.

## Modeling African American and Latino Representation

The data for this study are taken from the National Latino Education Study (NLES), a national sample of school districts conducted in 2001. The NLES contains information on the racial/ethnic composition of school boards as well as the electoral system used to elect members. The NLES surveyed every school district in the nation with a student enrollment larger than five thousand and yielded a response rate of 96 percent. These data are supplemented by demographic information gathered by the 2000 Census. This results in a total sample of 1,831 districts across forty-nine states, 1,672 of which elect their board members. The size and geographic diversity of this sample presents a substantial improvement over samples used in previous studies.[6]

As the power thesis focuses on the level of African American and Latino representation, the dependent variable examined here is the percentage of African American/Latino school board members.[7] The primary determinate of minority representation is the size of the minority population.[8] The percentage of African Americans within a district should be positively related to African American representation on the board. Similarly, Latino population size should determine the share of offices held by Latinos. In addition to controlling for population size, I also account for the percentage of African Americans/Latinos who hold a college degree, as electoral successes also depends upon the socioeconomic resources available to each community.

Rodriguez (1999) argued that the nature of interminority relations varies considerably in different geographic locations. With this in mind, I insert a series of regional control variables into each model. The economic status of the Anglo community should also influence the ability of minorities to achieve their desired level of representation. Minorities are thought to benefit from a high degree of Anglo poverty, as limited Anglo resources restrict the effectiveness of minority repression and place the groups on a more level playing field (Stewart, England, and Meier 1989).

A long stream of literature analyzes how electoral structure influences minority representation. Generally, these studies find that the presence of ward, or single-member district, systems facilitate minority representation (Arrington and Watts 1991; Engstrom and McDonald 1986; Leal, Martinez-Ebers, and Meier 2004; Meier et al. 2005; Robinson and Dye 1978; Robinson and England 1981). Wards boost levels of minority representation because districts are typically drawn along racial lines. This effectively guarantees the election of minorities from certain districts. Under at-large arrangements, prospective minority officials must face an electorate that is usually predominately Anglo.[9]

### The Problem of Partisanship

A second structural variable that must be considered is the presence of partisan elections. While in most circumstances the presence of partisanship is a given, the focus of this present study, school boards, usually has nonpartisan elections, making this structural variable a probable determinate of representation. On average, nonpartisan systems tend to benefit Anglo business-class candidates (Davidson and Fraga 1988). Robinson and Dye (1978) found that levels of African American representation on school boards are modestly increased under partisan systems. Karning and Welch (1980), however, found that partisan elections are associated with a lower number of African American candidates in city council elections, although it has little bearing on the actual level of African American representation. Previous work has also suggested that race-based voting is facilitated by nonpartisan elections (Pomper 1966; Gordon 1970). In the absence of partisanship, race may become an increasingly important cue in determining vote choice. Moreover, partisan identification often competes with racial sentiments, leading liberal Anglos, Latinos, and African Americans to vote for the same candidate, irrespective of the candidate's race or ethnicity. In this vein, Johnson, Farrell, and Guinn (1999) argued that nonpartisan elections and weak Democratic Party organization have contributed to interminority tensions in Los Angeles. In short, distinct processes likely underlie the dynamics of interminority electoral coalitions under these different arrangements. Therefore, I split the sample and perform separate analyses[10] for districts that elect their board members through partisan and nonpartisan elections in order to examine the following hypothesis:

*The Effect of Partisanship of Interracial Coalitions:*
Rainbow coalitions will be more likely to form under partisan electoral systems. This occurs because there is a structural incentive for liberal minorities to vote for the same candidate irrespective of the candidate's race or ethnicity. Meanwhile, interminority competition will be more likely to occur under nonpartisan electoral systems. This occurs because individuals are more likely to rely on racial cues which are easier to discern than ideological ones.

Last, I control for whether a district has a majority African American or Latino population, expecting that minority representation will generally be higher in such districts (Henig et al. 1999). I also separate out districts in which both the African American and Latino populations are numerical minorities—in which, however, were they to be combined, their population would constitute a numerical majority. These are the districts in which minority populations should have the greatest incentive to form rainbow coalitions. Therefore, I insert a dummy variable for such districts and interact it with the African American and Latino population measures in order to search for evidence of interminority coalitions in such districts.

## Findings

Descriptive statistics for all the variables used in the analysis are presented in Table 1. Table 2 presents a simple model of the determinants of African American and Latino representation on school boards under nonpartisan systems, and is, to some degree, analogous to Meier and Stewart's (1991a) treatment of this matter. Theoretically, there is reason to suspect correlation between the residuals in the two models presented in Table 2. Indeed, the Breusch-Pagan test shows this to be the case ($\chi^2 = 9.709$). Accordingly, Zellner's (1962) seemingly unrelated regression (SUR) technique is used for estimation.

Representation on school boards is primarily a function of group size. Here a coefficient of 1 represents equal representation (a one-unit increase in the size of a group's population is associated with a 1-percentage-point increase in that group's level of representation). We see that African Americans are nearly equally represented (coefficient = .915), while Latinos appear to be slightly underrepresented (coefficient = .671). Both African Americans and Latinos also benefit from increased levels of Anglo poverty,

### Table 1
### Descriptive Statistics

| Variable | Mean | Standard Deviation |
|---|---|---|
| African American population | 9.85 | 13.35 |
| Latino population | 12.99 | 18.40 |
| Latino citizen population | 9.49 | 13.65 |
| Latino noncitizen population | 3.49 | 5.64 |
| % African Americans who have graduated from college | 15.97 | 14.14 |
| % Latinos who have graduated from college | 14.29 | 11.94 |
| % Anglos living in poverty | 6.03 | 3.93 |
| Partisan system (0, 1) | 13.82 | 34.52 |
| Single-member district system (0, 1) | 27.53 | 44.68 |
| Majority African American population (0, 1) | 2.15 | 14.50 |
| Majority Latino population (0, 1) | 6.16 | 24.05 |
| Combined majority district (0, 1) | 3.39 | 18.10 |
| Northeast (0, 1) | 16.15 | 36.81 |
| Midwest (0, 1) | 21.17 | 40.87 |
| West (0, 1) | 27.39 | 44.61 |
| South (0, 1) | 35.29 | 47.80 |

although Latinos benefit from this more than African Americans. Latino representation is increased by a greater level of education within the Latino community, while ward systems appear to have no effect on the level of Latino or African American representation. The level of African American incorporation is generally higher outside of the South. Latinos generally do worse in the Midwest and Northeast. As one might expect, when African Americans constitute a majority of the residential population, their level of representation on the local school board is increased. The same holds true for Latinos.

The results presented in Table 2 do not support the contention that a larger African American population will positively influence Latino representation. Rather, the relationship appears to be negative, a result not predicted by either the rainbow coalition or the Meier and Stewart (1991a) hypotheses. The model for African American representation further challenges the traditional predictions of the power thesis, while seeming to provide some support for the rainbow coalition hypothesis. An increase in the size of the Latino population does modestly increase the level of African American representation (coefficient = .053). These findings stand in contrast to those of Meier and Stewart (1991a), who found that African American group size was positively related to Latino

**Table 2**
**Determinants of African American and Latino School Board Representation in**
**Nonpartisan Elections (Seemingly Unrelated Regression Estimates)**
**(Dependent Variable: Percentage of School Board Members Who Are Black or Latino)**

| Independent Variable | Black | SE | Latino | SE |
|---|---|---|---|---|
| African American population | .915*** | .028 | −.063** | .028 |
| Latino population | .053** | .026 | .671*** | .029 |
| % African Americans who have graduated from college | −.019 | .019 | | |
| % Latinos who have graduated from college | | | .119*** | .025 |
| % Anglos living in poverty | .217*** | .072 | .326*** | .074 |
| Single-member district system | .000 | .006 | .000 | .006 |
| Majority African American population | .096*** | .022 | .024 | .023 |
| Majority Latino population | −.011 | .018 | .103*** | .019 |
| Combined majority district | −.071 | .087 | −.022 | .091 |
| Combined Majority District × African American Population | .319* | .165 | .090 | .171 |
| Combined Majority District × Latino Population | .092 | .151 | −.117 | .157 |
| Northeast | .014* | .008 | −.019** | .009 |
| Midwest | .020*** | .007 | −.001 | .007 |
| West | .009 | .007 | −.036*** | .007 |
| Constant | −.023** | .009 | −.055*** | .010 |
| N | 1,354 | | 1,354 | |
| $R^2$ | .692 | | .685 | |

Note: Breusch-Pagan test of independence: $\chi^2$ (Probability), 9.709 (.002).
*$p < .10$. **$p < .05$. ***$p < .01$.

representation, while Latino group size was *negatively* related to African American representation.[11]

There is also some indication that African Americans are better able to translate their numbers into representation on local school boards in districts where African Americans and Latinos constitute a minority of the population but combined make up a majority. However, there is no evidence of interminority cooperation (as noted by the relationship between African American group size and the level of Latino representation and vice versa) in such districts.

As noted earlier, the dynamics of interminority relations are unlikely to be static. The considerable population growth in the Latino community over the past few years may be one of the factors underlying the inconsistency of these findings with previous research. As the alternative version of the power thesis presented earlier suggests, Latino immigration may alter the dynamics of coalitional relationships, reversing the assumption that Anglos and Latinos are more natural coalition partners than Anglos and African Americans. To examine this possibility, I replicate the findings presented in Table 2, replacing the variable that takes account of the percentage of Latinos within a district with two variables that measure the percentage of the school district population

that is composed of Latino citizens and Latino noncitizens.[12] The positive relationship between Latino population size and African American representation may be the result of either Latino support for African American candidates, or the increased likelihood of Anglos to support African American candidates in areas with large Latino populations (the former is the hypothesized relationship that lies at the heart of the rainbow coalition hypothesis). If the positive relationship between Latino group size and African American representation is the result of Latino attempts to form rainbow coalitions, then we would expect the relationship between Latino citizens and African American representation to remain positive. For obvious reasons, a positive relationship between the percentage of Latino noncitizens within a district and African American representation cannot be the result of electoral support for African American candidates on the part of Latino noncitizens. Rather, such a relationship would be indicative of Anglo support for African American candidates, possibly as a result of increased social distance between the Anglo and Latino communities.

The results presented in Table 3 indicate that there is no relationship between the size of the Latino citizen population and the level of African American representation (*p*-value = .868). However, in line with

322   Political Research Quarterly

**Table 3**

**Determinants of African American and Latino School Board Representation in Nonpartisan Elections: The Role of Latino Citizenship (Seemingly Unrelated Regression Estimates) (Dependent Variable: Percentage of School Board Members Who Are Black or Latino)**

| Independent Variable | Black | SE | Latino | SE |
|---|---|---|---|---|
| African American population | .910*** | .028 | −.041 | .028 |
| Latino citizen population | −.006 | .035 | .844*** | .037 |
| Latino noncitizen population | .233*** | .077 | −.118 | .079 |
| % African Americans who have graduated from college | −.017 | .019 | | |
| % Latinos who have graduated from college | | | .108*** | .025 |
| % Anglos living in poverty | .234*** | .071 | .288*** | .073 |
| Single-member district system | −.001 | .006 | −.003 | .006 |
| Majority African American population | .097*** | .022 | .019 | .022 |
| Majority Latino population | −.015 | .018 | .115*** | .019 |
| Combined majority district | −.198** | .096 | −.115 | .098 |
| Combined Majority District × African American Population | .565*** | .181 | .252 | .185 |
| Combined Majority District × Latino Citizen Population | .678*** | .226 | .103 | .232 |
| Combined Majority District × Latino Noncitizen Population | −.619*** | .237 | .014 | .243 |
| Northeast | .015* | .008 | −.019** | .009 |
| Midwest | .019*** | .007 | .002 | .007 |
| West | .008 | .007 | −.030*** | .007 |
| Constant | −.024*** | .009 | −.053*** | .010 |
| N | 1,354 | | 1,354 | |
| $R^2$ | .695 | | .698 | |

Note: Breusch-Pagan test of independence: $\chi^2$ (Probability), 8.351 (.004).

*p < .10. **p < .05. ***p < .01.

the alternative power thesis, the greater the percentage of Latino noncitizens within a district, the greater the level of African American representation. The coefficient (.233) is also substantively meaningful and considerably larger than the coefficient for the relationship between the size of the Latino population and African American representation presented in Table 2 (.053). As a side note, the underrepresentation of Latinos noted in Table 2 is lessened when controlling for citizenship.[13]

A considerably different portrait of interminority relations emerges in districts where one would expect to find rainbow coalitions (non-Anglo-majority districts). In such districts, the size of the Latino citizen population does inflate the level of African American representation on local boards. Moreover, the presence of a Latino noncitizen population does not increase African American representation as it does in other districts. Rather, the relationship here is negative, which is expected given that noncitizens cannot become members of an electoral coalition. Yet there is no evidence that Latinos systematically benefit from such cooperative behavior in this analysis.

Finally, I noted earlier that previous work has emphasized the role of partisanship on race-based voting, arguing that partisan elections make it more

difficult for individuals to make strictly race-based decisions. Tables 4 and 5 replicate the previous analysis for districts that elect their members through partisan elections. The Breusch-Pagan tests for both sets of equations indicate that correlated errors are not an issue; thus, ordinary least squares (OLS) is used in place of SUR. The models in Table 4 indicate that Latino representation is not affected by the presence of African Americans within a district. However, there remains a positive relationship between the size of the Latino population and the level of African American representation. Taking Latino citizenship into account does change this dynamic, but in a manner opposite to nonpartisan systems. That is, there is a significant and positive relationship between the size of the Latino citizen population and the level of African American representation, while the size of the Latino noncitizen population appears to have no effect in partisan systems. The effect of a 1-percentage-point increase in the Latino citizen population benefits African Americans only slightly less than a 1-point increase in the percentage of Anglos living in poverty. This finding would appear to provide some support for the hypothesis that cooperative electoral behavior between minorities is most likely to occur under partisan systems.

**Table 4**
**Determinants of African American and Latino School Board Representation**
**in Partisan Elections (Ordinary Least Squares Estimates)**
**(Dependent Variable: Percentage of School Board Members Who Are Black or Latino)**

| Independent Variable | Black | SE | Latino | SE |
|---|---|---|---|---|
| African American population | 1.049*** | .063 | −.071 | .049 |
| Latino population | .268*** | .082 | .878*** | .067 |
| % African Americans who have graduated from college | −.001 | .066 | | |
| % Latinos who have graduated from college | | | .115** | .046 |
| % Anglos living in poverty | .323* | .182 | .285** | .145 |
| Single-member district system | .003 | .014 | .017 | .011 |
| Majority African American population | −.062 | .049 | .037 | .039 |
| Majority Latino population | −.182*** | .064 | −.020 | .051 |
| Northeast | .049*** | .017 | −.013 | .013 |
| Midwest | .057** | .026 | .000 | .021 |
| West | −.013 | .032 | −.037 | .025 |
| Constant | −.076*** | .025 | −.060*** | .019 |
| $N$ | 221 | | 222 | |
| $R^2$ | .720 | | .750 | |

*$p < .10$. **$p < .05$. ***$p < .01$.

**Table 5**
**Determinants of African American and Latino School Board Representation**
**in Partisan Elections: The Role of Latino Citizenship (Ordinary Least Squares Estimates)**
**(Dependent Variable: Percentage of School Board Members Who Are Black or Latino)**

| Independent Variable | Black | SE | Latino | SE |
|---|---|---|---|---|
| African American population | 1.047*** | (.063) | −.039 | .039 |
| Latino Citizen population | .237** | (.096) | 1.212*** | .062 |
| Latino noncitizen population | .437 | (.286) | −1.036*** | .183 |
| % African Americans who have graduated from college | .003 | (.067) | | |
| % Latinos who have graduated from college | | | .073** | .037 |
| % Anglos living in poverty | .345* | (.186) | .034 | .118 |
| Single-member district system | .003 | (.014) | .014 | .009 |
| Majority African American population | −.061 | (.049) | .020 | .032 |
| Majority Latino population | −.196*** | (.068) | .141*** | .044 |
| Northeast | .051*** | (.017) | −.028*** | .010 |
| Midwest | .057** | (.026) | .001 | .017 |
| West | −.018 | (.033) | .019 | .021 |
| Constant | −.080*** | (.025) | −.023 | .016 |
| $N$ | 221 | | 222 | |
| $R^2$ | .720 | | .840 | |

*$p < .10$. **$p < .05$. ***$p < .01$.

Attempts were made to examine how coalitional relationships varied in districts where rainbow coalitions made the most strategic sense, but only three districts in the sample employ partisan election systems and meet the "individually a minority, combined a majority" criteria used to identify such districts. Nonetheless, the analysis does indicate that interminority competition (that is, the formation of either Anglo-Latino or Anglo-black coalitions) does not appear to materialize in partisan systems as it does in nonpartisan systems. This does not mean that rainbow coalitions routinely form in such circumstances. However, there is modest evidence for such coalitions in the analyses presented here. It seems that the presence of partisan

elections limits competition and may occasionally produce cooperation.

## Conclusion

The dynamics of interminority relations are unquestionably complicated. Despite commonly held beliefs about the ideological similarity between racial and ethnic minorities, the development of long-lasting rainbow coalitions is considered to be unlikely in most local settings. Like many previous works (i.e., McClain 1993; McClain and Karnig 1990; Meier and Stewart 1991a; Kaufmann 2003, 2004), the evidence presented here does not support the contention that rainbow coalitions routinely form in urban areas. However, the data point to different patterns of conflict than those suggested by earlier studies. Contrary to the predictions of Meier and Stewart's (1991a) power thesis, there is little support for the notion that Anglo-Latino coalitions are an expected substitute for interminority ones. Rather, Latino immigration may encourage the development of Anglo-black coalitions, as seen by the increased likelihood of African Americans to be elected to local boards in districts with a large Latino noncitizen population.

As with most studies that do not focus on individual attitudes or behavior, relationships between population size and representation are interpreted as being indicative of cooperation or conflict. Ultimately, such findings are best considered alongside other works that unveil the nuance of interminority relations by relying on individual-level data, focus groups, or in-depth case studies of select urban areas. Sidney (2002), for example, used discourse analysis to argue that African Americans and Latinos do not agree on the way in which issues related to race permeate the education policy-making process. "If alliances do emerge," she warned, "they may be fragile ones" (p. 276).

Despite such skepticism, this study does suggest one mechanism that can work to increase the likelihood that minorities will form cooperative electoral relationships, the adoption of a partisan electoral system. Nonpartisan systems originally gained popularity during the progressive movement as a way to depoliticize the education policy-making process. Instead, nonpartisan elections redistribute electoral advantages and incentives for coalition building away from some groups and toward others. Minority representation tends to be higher under partisan systems, with minorities, on average, being slightly *overrepresented* given their population size (although this is

only true for Latinos if one discounts the noncitizen population). Moreover, African American representation on local boards also increases with the size of the Latino *citizen* population under partisan systems. Such benefits, however, remain confined to the relatively small number of districts (approximately 14 percent) that use such systems.

This study also indicates that African Americans benefit from the presence of a large Latino population in districts where no individual racial/ethnic group comprises a majority of the population but the combined racial/ethnic minority population does. However, only 3 percent of all districts meet this demographic criterion, so that in the vast majority of school districts within the United States, competition, not cooperation, remains the norm.

The central findings here is that African Americans and Latinos do appear to form cooperative relationships when there are enough strategic incentives or the electoral structure in place promotes it, but such situations are rare. It is essential that future research pay attention to varying structural and demographic contexts to better understand what factors are responsible for the formation of different governing coalitions in urban areas across the United States.

Future researchers should also view these findings within the context of some recent works. Branton's (2007 [this issue]) study clearly demonstrates that Latino attitudes vary in accordance with levels of acculturation. As mentioned earlier, the extent to which Latino immigrants hold attitudes which diverge from those of native-born Latinos holds considerable implications for the formation of interracial coalitions. Preuhs's (2007 [this issue]) article demonstrates the importance of legislative incorporation for the substantive representation of minority groups. Without such incorporation, the increased presence of minorities in many political jurisdictions within the United States may actually come at a loss of substantive representation. Again, coalitional arrangements and electoral structures play a significant role in determining the degree of minority legislative incorporation.

## Notes

1. Bogardus's (1928) social distance scale asks respondents the following survey item: "Which best represents your comfort level in interacting with this social group 1) Close kinship by marriage 2) My Club as Personal Chums (often modified in contemporary surveys as "Close Friendship") 3) Neighbors on my street 4) Employment in my occupation 5) Citizenship in the country 6) Visitors only to my country 7) Would exclude from my country."

2. Readers may contest that Anglos are the pivotal actors in most districts. However, within the average school district examined in this study, Anglos remain numerically superior. This, coupled with the socioeconomic advantage Anglos possess in most districts, makes such an assumption less tenuous. In further accordance with previous research, Latinos tend to fair slightly better than African Americans on most socioeconomic indicators (such as poverty rates and home ownership). However, districts where the Latino population is predominately composed of noncitizens are characterized by lower socioeconomic indicators for Latinos, often falling below indicators for African American (author's analysis, based upon the 2001 National Latino Education Survey [NLES]).

3. These predictions are laid out by Meier and Stewart (1991a, 1128), who wrote, "The key test for choosing between the rainbow thesis and the power thesis is what happens to black representation when Latino numbers increase. The power thesis holds that an increase in Latino population would be unlikely to increase Anglo votes for blacks, because blacks are less similar to Anglos than are Latinos. The relationship between Latino population and black representation in this case should be negative. The rainbow thesis, on the other hand, contends that as Latino population increases, the potential for a rainbow coalition increases. The correlation between Latino population and Black representation, therefore, should be positive."

4. Work by Waldinger (2001) suggested that fears related to economic competition with Latinos are well founded. He noted that in many areas Latino immigrants are more likely to find "adequate" employment than African Americans, possibly due to higher levels of immigrant social capital and the selection bias of individuals inherent in the immigration process.

5. Previous research by political scientists has found trends similar to those noted by sociologists. For example, Jackson, Gerber, and Cain (1994) noted that African Americans are more likely to perceive themselves to be "close" to Anglos than they are to Latinos.

6. For example, Fraga, Meier, and England's (1986) sample size is 35 districts; Marschall's (2005) is 196; Meier and Stewart's (1991a) is 118; Polinard et al.'s (1994) is 64; Robinson and England's (1981) is 75; and Welch and Karnig's (1978) is 43.

7. An alternative way to account for the level of minority representation would be the parity (or proportional representation) measure used by, among others, Browning, Marshall, and Tabb (1984). There are several reasons, however, why operationalizing minority representation as the percentage of African American or Latino board members is preferable to this approach. The parity measure generates the same value for all districts in which there are no minority board members regardless of the size of the minority population (in this instance, all districts receive a score of zero). Thus, the parity measure treats a district in which Latinos hold no seats and constitute 5 percent of the population the same as a district in which Latinos hold no seats and constitute 50 percent of the population, even though the cases are qualitatively different from one another. For this reason, Engstrom and McDonald (1981) argued that studies of minority representation on local boards should use the percentage of minority board members as the dependent variable and control for the size of the minority population. They wrote, "Under this approach, proportionality is a relationship across a set of data points, each of which reflects the specific black proportions of the population and the council for a city. The fact that all cities without a black council member do not

have the same black population percentage is taken into account in estimating this relationship" (p. 346). Beyond this methodological criticism of the parity measure, there are theoretical reasons why the Engstrom and McDonald modeling approach is preferable. Several studies demonstrate that increases in the percentage of minority school board members, regardless of parity, result in a greater level of minority substantive representation (see Fraga, Meier, and England 1986; Marschall 2005; Meier and Stewart 1991a, 199b; Meier, Stewart, and England 1989; Polinard, Wrinkle, and Longoria 1990; Polinard et al. 1994; Wright, Hirlinger, and England 1998). In other words, Latinos should find their substantive interests better represented in a district in which they hold 28 percent of seats and constitute 27 percent of the population than in a district in which they hold 14 percent of seats and constitute 15 percent of the population (even though parity measure would suggest the opposite). Thus, minorities have an incentive to maximize their level of descriptive representation on the board without concern for their population size.

8. There are three possible measures of population size that could conceivably be used in this analysis, all of which correlate highly with one another (above .97). The first is the size of the African American and Latino voting-age population. While this is an accurate measure of the electorate, it ignores the fact that African Americans and Latinos are more likely than other groups to have school-aged children, and therefore underestimates the number of minorities who have a strong incentive to vote in school board elections. The second is the percentage of African American and Latino students within a district. One could argue that the school board should reflect the composition of the student body it serves; however, students, by and large, are excluded from the electoral process. Moreover, this measure would inflate the size of the minority population relative to the actual voting-age population. Therefore, I chose to use the percentage of African Americans and Latinos residing within a district. This measure, because it includes residents who are not yet eligible to vote, results in a number greater than the voting-age population, but smaller than student-based measures. Last, this measure also allows for greater comparability to past research, most of which has relied on residential population measures to predict levels of minority representation on local school boards (see Fraga, Meier, and England 1986; Marschall 2005; Meier and Stewart 1991a; Robinson and Dye 1978; Robinson and England 1981; Welch and Karning 1978; Wright, Hirlinger, and England 1998). Replicating the analysis with the other possible measures of population size produces similar results in terms of significance and direction. The coefficients for African American/Latino population size tend to be smaller when the student-based measure is used (which is expected as this measure inflates the size of the population relative to the residential measure) and larger when voting-age population is used in place of residential population (which is expected as this measure deflates the size of the population relative to the residential measure).

9. Increases in the population size of racial/ethnic minorities, as well as Anglo residential patterns, have resulted in creation of several "Majority-Minority" (MM) school districts. In MM districts, the influence of electoral structure on levels of minority representation may differ considerably from its influence in non-MM districts. Nonetheless, it is important to note that in the average district included in this sample both Latinos and African Americans remain a minority. The mean percentage of Latinos within a district is 13 percent, while the average for African

Americans is 10 percent. Latinos constitute a minority in 94 percent of all districts included in the sample, while African Americans constitute a minority in 97 percent of all districts. Nevertheless, dummy variables are used to control for the effect of majority African American or Latino districts.

10. Conducting a Chow test allows me to reject the null hypothesis that the difference between the coefficients in the partisan and nonpartisan models is equal to zero. This provides some empirical support for my theoretical contention that distinct processes underlie partisan and non-partisan elections.

11. A few differences are worth noting. First, Meier and Stewart's (1991a) sample was taken in 1986 and consists of 118 districts, while the sample here is of more than 1,576 districts. Also, Meier and Stewart used ordinary least squares (OLS) as their estimation technique, where seemingly unrelated regression (SUR) is more appropriate. More important, however, Meier and Stewart did not control for the presence of partisan elections. As Tables 3 and 4 demonstrate, partisanship substantially influences the nature of interminority coalition building.

12. It should be noted that these variables correlate at .78 in the NLES, as Latino immigrants tend to settle in areas that are already heavily populated by Latino citizens.

13. The coefficient for the relationship between the size of the Latino citizen population and Latino representation is .844, where a coefficient of 1 would indicate proportional representation.

# References

Arrington, Theodore S., and Thomas Gill Watts. 1991. The election of blacks to school boards in North Carolina. *Western Political Quarterly* 44:1099-1105.

Barajas, Heidi Lasley, and Jennifer L. Pierce. 2001. The significance of race and gender in school success among Latinas and Latinos in college. *Gender & Society* 15:859-78.

Bogardus, Emory S. 1928. *Immigration and race attitudes*. New York: D.C. Heath and Company.

Branton, Regina. 2007. Latino attitudes toward various areas of public policy: The importance of acculturation. *Political Research Quarterly* 60 (2): 293-303.

Browning, Rufus P., Dale Rodgers Marshall, and David H. Tabb. 1984. *Protest is not enough*. Berkeley: University of California Press.

Cohen, Yinon, and Andrea Tyree. 1986. Escape from poverty: Determinants of intergenerational mobility of sons and daughters of the poor. *Social Science Quarterly* 67:803-13.

Davidson, Chandler, and Luis Ricardo Fraga. 1988. Slating groups as parties in a "nonpartisan" setting. *Western Political Quarterly* 41:373-90.

de la Garza, Rodolfo O. 1997. Latino politics: A futuristic view. In *Latinos and the political system*, ed. F. Chris Garcia. Notre Dame, IN: Notre Dame University Press.

Dye, Thomas R., and James Renick. 1981. Political power and city jobs: Determinants of minority employment. *Social Science Quarterly* 62:475-86.

Dyer, James, Arnold Vedlitz, and Stephen Worchel. 1989. Social distance among racial and ethnic groups in Texas: Some demographic correlates. *Social Science Quarterly* 70:607-16.

Engstrom, Richard, and Michael McDonald. 1981. The effect of at-large versus district elections on racial representation in U.S. municipalities. In *Electoral laws and their political consequences*, ed. Bernard Grofman and Arend Lijphart. New York: Agathon.

Feagin, Joe R. 1980. School desegregation: A political-economic perspective. In *School desegregation*, ed. Walter G. Stephan and Joe R. Feagin. New York: Plenum.

Fraga, Luis Ricardo, Kenneth J. Meier, and Robert E. England. 1986. Hispanic Americans and educational policy: Limits to equal access. *Journal of Politics* 48:850-76.

Garcia, John A. 2000. The Latino and African American communities. In *Immigration and race*, ed. Gerald Jaynes. New Haven, CT: Yale University Press.

Giles, Micheal W., and Arthur S. Evans. 1985. External threat, perceived threat, and group identity. *Social Science Quarterly* 66:50-66.

———. 1986. The power approach to intergroup hostility. *Journal of Conflict Resolution* 30:469-86.

Gordon, Daniel. 1970. Immigrants and municipal voting turnout: Implications for the changing ethnic impact on urban politics. *American Sociological Review* 35:665-81.

Henig, Jeffery R., Richard C. Hula, Marion Orr, and Desiree S. Pedescleaux. 1999. *The color of school reform*. Princeton, NJ: Princeton University Press.

Hero, Rodney E., and Susan E. Clarke. 2003. Latinos, blacks, and multiethnic politics in Denver: Realigning power and influence in the struggle for equality. In *Racial politics in American cities*, 3rd ed., ed. Rufus P. Browning, Dale Rogers Marshall, and David H. Tabb. New York: Longman.

Hindera, John J. 1993. Representative bureaucracy: Imprimis evidence of active representation in the EEOC district offices. *Social Science Quarterly* 74:95-108.

Irvine, Jacqueline Jordan. 1989. Beyond role models: An examination of cultural influences on the pedagogical perspectives of black teachers. *Peabody Journal of Education* 66:51-63.

Jackson, Byran O., Elisabeth R. Gerber, and Bruce E. Cain. 1994. Coalitional prospects in a multi-racial society: African-American attitudes toward other minority groups. *Political Research Quarterly* 47:277-94.

Johnson, James H., Jr., Walter C. Farrell Jr., and Chandra Guinn. 1999. Immigration reform and the browning of America. In *The handbook of international migration*, ed. Charles Hirschman, Philip Kasinitz, and Josh DeWind. New York: Russell Sage Foundation.

Jones-Correa, Michael. 2001. Comparative approaches to changing interethnic relations in cities. In *Governing American cities*, ed. Michael Jones-Correa. New York: Russell Sage Foundation.

Karning, Albert, and Susan Welch. 1980. *Black representation and urban policy*. Chicago: University of Chicago Press.

Kaufmann, Karen M. 2003. Cracks in the rainbow: Group commonality as a basis for Latino and African-American political coalitions. *Political Research Quarterly* 56:199-210.

———. 2004. *The urban voter*. Ann Arbor: University of Michigan Press.

Kerr, Brinck, and Kenneth R. Mladenka. 1994. Does politics matter? A times series analysis of minority employment patterns. *American Journal of Political Science* 38:918-43.

Leal, David L., Valerie Martinez-Ebers, and Kenneth J. Meier. 2004. The politics of Latino education: The biases of at-large elections. *Journal of Politics* 66:1224-44.

Marschall, Melissa J. 2005. Minority incorporation and local school boards. In *Besieged*, ed. William G. Howell. Washington, DC: Brookings Institution Press.

McClain, Paula D. 1993. The changing dynamics of urban politics: Black and Hispanic municipal employment: Is there competition? *Journal of Politics* 55:399-414.

McClain, Paula D., and Albert Karnig. 1990. Black and Hispanic socioeconomic and political competition. *American Political Science Review* 84:535-45.

McClain, Paula D., and Steven C. Tauber. 1998. Black and Latino socioeconomic and political competition: Has a decade made a difference? *American Politics Quarterly* 26:101-16.

———. 2001. racial minority group relations in a multiracial society. In *Governing American cities*, ed. Michael Jones-Correa. New York: Russell Sage Foundation.

Meier, Kenneth J., Eric Gonzalez Juenke, Robert D. Wrinkle, and J. L. Polinard. 2005. Strucutual choices and representational biases: The post-election color of representation. *American Journal of Political Science* 49:758-68.

Meier, Kenneth J., Paula McClain, Robert D. Wrinkle, and J. L. Polinard. 2004. Divided or together? *Political Research Quarterly* 57:399-409.

Meier, Kenneth J., and Joseph Stewart Jr. 1991a. Cooperation and conflict in multiracial school districts. *Journal of Politics* 53:1123-33.

———. 1991b. *The politics of Hispanic education*. Albany: State University of New York Press.

Meier, Kenneth J., Joseph Stewart Jr., and Robert England. 1989. Black representation in urban school districts: From school board to office to classroom. *Western Political Quarterly* 42:287-306.

Mindiola, Tatcho, Yolanda Flores Niemann, and Nestor Rodriguez. 2002. *Black-brown: Relations and stereotypes*. Austin: University of Texas Press.

Mladenka, Kenneth R. 1989a. Barriers to Hispanic employment success in 1,200 cities. *Social Science Quarterly* 70:391-407.

———. 1989b. Blacks and Hispanics in urban politics. *American Political Science Review* 83:165-91.

Osher, David, Darren Woodruff, and Anthony E. Sims. 2002. Schools make a difference: The overrepresentation of African-American youth in special education and the juvenile justice system. In *Racial inequality in special education*, ed. Daniel J. Losen and Gary Orfield. Cambridge, MA: Harvard Education Press.

Polinard, J. L., Robert D. Wrinkle, and Thomas Longoria. 1990. Education and governance: Representational links to second generation discrimination. *Western Political Quarterly* 43:631-46.

Polinard, J. L., Robert D. Wrinkle, Tomas Longoria, and Norman Binder. 1994. *Electoral structure and urban policy*. New York: M. E. Sharpe.

Polinard, J. L., Robert D. Wrinkle, and Kenneth J. Meier. 1995. The influence of educational and political resources on minority students' success. *Journal of Negro Education* 64:463-74.

Pomper, Gerald. 1966. Ethnic group voting in nonpartisan municipal elections. *Public Opinion Quarterly* 30:79-97.

Preuhs, Robert R. 2007. Descriptive representation as a mechanism to mitigate policy backlash: Latino incorporation and welfare policy in the American states. *Political Research Quarterly* 60 (2): 277-92.

Randall, Nancy Horak, and Spencer Delbridge. 2005. Perceptions of social distance in an ethnically fluid community. *Sociological Spectrum* 25:103-23.

Robinson, Theodore P., and Thomas R. Dye. 1978. Reformism and black representation on city councils. *Social Science Quarterly* 59:133-41.

Robinson, Ted, and Robert E. England. 1981. Black representation and central city school boards revisited. *Social Science Quarterly* 62:495-502.

Rodriguez, Nestor. 1999. U.S. immigration and changing relations between African Americans and Latinos. In *The handbook of international migration*, ed. Charles Hirschman, Philip Kasinitz, and Josh DeWind. New York: Russell Sage Foundation.

Sears, David O., Jack Citrin, Sharmaine V. Cheleden, and Colette van Laar. 1999. Cultural diversity and multicultural politics: Is ethnic balkanization psychologically inevitable? In *Cultural divides: Understanding and overcoming group conflict*, ed. Deborah A. Prentice and Dale T. Miller. New York: Russell Sage Foundation.

Selden, Sally Coleman. 1997. *The promise of representative bureaucracy*. New York: M. E. Sharpe.

Selden, Sally Coleman, Jeffery L. Brudney, and J. Edward Kellough. 1998. Bureaucracy as a representative institution: Toward a reconciliation of bureaucratic government and democratic theory. *American Journal of Political Science* 42:717-44.

Sidney, Mara S. 2002. The role of ideas in education politics: Using discourse analysis to understand barriers to reform in multiethnic cities. *Urban Affairs Review* 38:253-79.

Stewart, Joseph, Robert England, and Kenneth J. Meier. 1989. Black representation in urban school districts: From school board to office to classroom. *Western Political Quarterly* 42 (2): 287-305.

Vaca, Nicolas C. 2004. *The presumed alliance*. New York: Rayo Press.

Waldinger, Roger. 2001. Up from poverty? "Race," immigration, and the fate of low-skilled workers. In *Strangers at the gate*, ed. Roger Waldinger. Berkeley: University of California Press.

Weiher, Gregory R. 2000. Minority student achievement: Passive representation and social context in schools. *Journal of Politics* 62:886-95.

Welch, Susan, and Albert Karnig. 1978. Representation and blacks and big city school boards. *Social Science Quarterly* 59:162-72.

Wright, David E., III, Michael W. Hirlinger, and Robert E. England. 1998. *The politics of second generation discrimination in American Indian education*, Westport, CT: Bergin and Garvey.

Zellner, Arnold. 1962. An efficient method of estimating seeming unrelated regressions and test for aggregation bias. *Journal of the American Statistical Association* 57:348-68.

# Exhibit 4:
# Declaration of Todd Giberson

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | § § § | |
| *Plaintiffs,* | § | |
| V. | § | Case No. 3:21-cv-00259 |
| | § | [Lead Case] |
| GREG ABBOTT, *et al.*, | § | |
| *Defendants.* | § | |

| | | |
|---|---|---|
| ROY CHARLES BROOKS, *et al.* | § | |
| *Plaintiffs,* | § | |
| V. | § | Case No. 1:21-cv-00991 |
| | § | [Consolidated Case] |
| GREG ABBOTT, *et al.*, | § | |
| *Defendants.* | § | |

**DECLARATION OF TODD GIBERSON**

1.   My name is Todd Giberson. I am over the age of 18 and competent to make this declaration.

2.   I am an employee of the Office of the Attorney General (OAG) Legal Technical Support Division (LTS). I have been employed at the OAG since 1994 as a systems analyst. Before that, I was employed by the Texas Legislative Council (TLC) as a programmer. I was on the team of programmers who wrote the original RedAppl computer application for drawing districts. I am not a lawyer.

3.   RedAppl contains data gathered from various sources, including the Texas Secretary of State. This data includes borders of municipalities and other local-government bodies and borders of electoral precincts (which the Census Bureau refers to as voter tabulation districts, or VTDs). The data also includes the number of registered voters in each electoral precinct and the election results for each electoral precinct from 2012–present as reported to the Secretary of State by each county.

4.   RedAppl also contains data received from the Census Bureau, including its American Community Survey, or ACS. The Census Bureau divides each county into, from largest to smallest, tracts, block groups, and blocks. The Census Bureau data includes information such as the declared race, ethnicity, and Spanish-surname status of the persons in a block. The smallest unit for which ACS

data is available, however, is a block group. Thus, information gathered by the ACS, such as citizenship, is not available at the block level.

5.   By combining this data, RedAppl is able to create maps and reports showing demographic and electoral information in units as small as the block level. By combining data from the block level, it can create maps and reports for any defined area. It is by assigning these blocks to defined areas that RedAppl can be used to create electoral maps.

6.   By default, RedAppl displays only county borders. To display other features, such as roads and bodies of water, the user must specify them. To display boundaries besides county lines, the user must specify the type of boundary to display. To display data for an area, either pre-defined within RedAppl (such as an existing House district, a city, or an electoral precinct) or user-generated (such as a proposed Senate district), the user must actively select which data to display. In particular, data regarding race, ethnicity, Spanish-surname status, voting-age population, and number of registered voters is not displayed unless the user actively chooses to display it. Because of this, a user who chose to do so could create a proposed redistricting map having seen only population and electoral results and having never seen information on the race, ethnicity, or Spanish-surname status of the residents of the proposed districts.

7.   Exhibits 5–8 to State Defendants' Opposition are partisan-shading maps I personally generated using data gathered from RedAppl. They show the relative percentages of votes cast in the 2020 general election for president in each pictured VTD. Exhibits 5 and 6 are zoomed-in and zoomed-out, respectively, maps of benchmark SD10. Exhibit 7 is a map of SD10. Exhibit 8 is a map of benchmark SD28.

8.   Exhibit 9 to the Opposition is a map I personally generated using statistics gathered from RedAppl. It overlays current SD10 on benchmark SD10. It is color-coded to show the areas that remain from, were removed from, and were added to benchmark SD10 to create current SD10. Each

color-coded area shows the population of that area and the percentage of votes cast for Donald Trump in the 2020 general election.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated December 20, 2021.                    *Todd Giberson*
                                            _____
                                            Todd Giberson

# Exhibit 5:

# Partisan-shaded map of benchmark SD10



# Senate Plan S2100
## Democrat/Republican Shading by VTD

Values based on two party vote split for
the 2020 General Election for President
between Joe Biden and Donald Trump

- 57% or more Democrat
- 52% to <57% Democrat
- >50% to <52% Democrat
- Tie
- >50% to <52% Republican
- 52% to <57% Republican
- 57% or more Republican

12

9

TARRANT

16

10

22

23

# Exhibit 6:
# Partisan-shaded map of benchmark SD10, zoomed out



**Senate Plan S2100**
**Democrat/Republican Shading by VTD**

Values based on two party vote split for
the 2020 General Election for President
between Joe Biden and Donald Trump

| | |
|---|---|
| ■ | 57% or more Democrat |
| ■ | 52% to <57% Democrat |
| ■ | >50% to <52% Democrat |
| ■ | Tie |
| ■ | >50% to <52% Republican |
| ■ | 52% to <57% Republican |
| ■ | 57% or more Republican |

# Exhibit 7:
# Partisan-shaded map of current SD10



# Senate Plan S2168
## Democrat/Republican Shading by VTD

Values based on two party vote split for
the 2020 General Election for President
between Joe Biden and Donald Trump

SHACKELFORD
10

STEPHENS

PALO PINTO

TARRANT
9

PARKER

30

12

16

23

CALLAHAN

EASTLAND

HOOD

JOHNSON

ERATH

SOMERVELL

22

COMANCHE

HILL

BOSQUE

BROWN

HAMILTON

MILLS

24

McLENNAN

### Legend
- 57% or more Democrat
- 52% to <57% Democrat
- >50% to <52% Democrat
- Tie
- >50% to <52% Republican
- 52% to <57% Republican
- 57% or more Republican

# Exhibit 8:

# Partisan-shaded map of benchmark SD28



# Senate Plan S2100
## Democrat/Republican Shading by VTD

Values based on two party vote split for
the 2020 General Election for President
between Joe Biden and Donald Trump

Legend:
- 57% or more Democrat
- 52% to <57% Democrat
- >50% to <52% Democrat
- Tie
- >50% to <52% Republican
- 52% to <57% Republican
- 57% or more Republican

# Exhibit 9:
# Map of partisan changes in SD10



# Areas in SD10 moved between the benchmark plan H2100 and the enacted plan H2168

SHACKELFORD

STEPHENS

PALO PINTO

PARKER

TARRANT

CALLAHAN

EASTLAND

ERATH

HOOD

SOMERVELL

JOHNSON

COMANCHE

COLEMAN

BROWN

MILLS

12,345
**50.1%**

Top number is total population

Second number is percent voting for Donald Trump in the 2020 Presidential contest

135,175
**31.5%**

114,124
**57.1%**

42,370
**42.7%**

1,169
**50.5%**

33,581
**64.3%**

558,335
**41.2%**

333,995
**80.2%**

104,281
**45.9%**

Benchmark SD10 retained in new SD10

Areas moved out of benchmark SD10

Areas move into the new SD10

SD10 in Benchmark Plan

SD10 in PLANS2168

# Exhibit 10:
# Declaration of Keith Ingram

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br>　　　*Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, *in his official capacity as Governor of the State of Texas*, and JOHN SCOTT, *in his official capacity as Secretary of State of Texas*,<br>　　　*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 3:21-cv-259-DCG-JES-JVB<br>[Lead Case] |
| DAMON JAMES WILSON,<br>　　　*Plaintiff*,<br><br>v.<br><br>THE STATE OF TEXAS, *et al.*,<br>　　　*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:21-cv-943-RP-JES-JVB<br>[Consolidated Case] |
| VOTO LATINO, *et al.*,<br>　　　*Plaintiffs*,<br><br>v.<br><br>JOHN SCOTT, *in his official capacity as Secretary of State of Texas*, and GREG ABBOTT, *in his official capacity as Governor of the State of Texas*,<br>　　　*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:21-cv-965-RP-JES-JVB<br>[Consolidated Case] |
| MEXICAN AMERICAN LEGISLATIVE CAUCUS,<br>　　　*Plaintiff*,<br><br>v.<br><br>THE STATE OF TEXAS, *et al.*,<br>　　　*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:21-cv-988-RP-JES-JVB<br>[Consolidated Case] |

| | | |
|---|---|---|
| ROY CHARLES BROOKS, *et al.*,<br>        *Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, *in his official capacity as*<br>*Governor of the State of Texas*, and<br>JOHN SCOTT, *in his official capacity as*<br>*Secretary of State of Texas*,<br>        *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:21-cv-991-LY-JES-JVB<br>[Consolidated Case] |
| TEXAS STATE CONFERENCE OF THE<br>NAACP,<br>        *Plaintiff*,<br><br>v.<br><br>GREG ABBOTT, *in his official capacity as*<br>*Governor of the State of Texas*, and<br>JOHN SCOTT, *in his official capacity as*<br>*Secretary of State of Texas*,<br>        *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:21-cv-1006-RP-JES-JVB<br>[Consolidated Case] |
| FAIR MAPS TEXAS ACTION COMMITTEE,<br>*et al.*,<br>        *Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, *in his official capacity as*<br>*Governor of the State of Texas*, and<br>JOHN SCOTT, *in his official capacity as*<br>*Secretary of State of Texas*,<br>        *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:21-cv-1038-RP-JES-JVB<br>[Consolidated Case] |

## DECLARATION OF BRIAN KEITH INGRAM

I, Brian Keith Ingram, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that

the following testimony is true and correct to the best of my knowledge and belief:

1. I am the Director of Elections for the Office of the Texas Secretary of State ("Texas SOS"). I have served in this capacity since 2012. The Texas Secretary of State is the chief election officer for Texas. As the State's chief election officer, the Secretary, through the Elections Division, prepares and distributes guidance to appropriate state and local authorities in the

administration of elections in Texas, and provides certain administrative support.

2. In my tenure as Director of Elections, I have become familiar with the administration and operations of Texas elections, including the tasks, practices, and responsibilities that local Texas election authorities must fulfill; the deadlines local election authorities must meet, along with a general idea of the time, money, and manpower it takes; and the laws and regulations with which local election authorities must comply to plan, coordinate, manage, and execute a successful election.

3. I am also familiar with Texas's redistricting process, specifically the duties and responsibilities the Texas Election Code imposes on counties to implement a redistricting plan. I was the Director of Elections in 2012, when Texas counties sought to implement the Legislature's reapportionment maps and conduct a primary election using the new maps.

4. The United States District Court for the Western District of Texas rescheduled the March 2012 Primary Election. As the Director of Elections, I witnessed firsthand the consequences that postponing a primary election had on the effective administration of Texas elections, including the costs incurred by counties and political subdivisions, the heightened levels of voter confusion caused by the shifting dates, and voters' increasing frustration with the changes being imposed. I also witnessed the efforts that the State and local election authorities took to comply with the court's orders, all while remaining in compliance with state and federal requirements.

5. Every election conducted in Texas takes months of preparation. The primary election scheduled for March 1, 2022 is no exception. Primary elections, in fact, can often involve a greater amount of effort to organize and conduct than non-primary elections because they are run by county chairs of a political party and entail additional deadlines to account for the unique characteristics of a primary, such as the candidate-filing period and the need to conduct a drawing to determine the order of candidate names on the ballot.

6. Texas SOS published Election Advisory No. 2021-18 on November 12, 2021, which contained the March 1, 2022 Primary Election Law Calendar ("Election Calendar"). As the name suggests, the Election Calendar provides local election authorities, candidates, and the public a timetable of events and deadlines that occur throughout the election. Although Election Day is not until March 1, 2022, multiple deadlines on the Election Calendar have already passed, while many others are fast approaching.

7. It would be incorrect to describe the March 2022 Primary Election as upcoming. The March 2022 Primary Election has already started.

8. Moving the March 2022 Primary Election this late in the process would cause significant administrative upheaval, which risks compromising the integrity and perceived integrity of Texas elections as well as imposing substantial burdens on local election authorities, Texas counties in particular.

3

9. To offer an example, the candidate filing period for the March 2022 Primary Election opened on November 13, 2021, and is scheduled to continue until December 13, 2021. *See* Election Advisory No. 2021-18. Multiple candidates have submitted their applications to the state or county chair of the political party, as applicable, for a place on the primary election ballot.

10. Were the court to postpone the primary election or change the district maps, a second filing period would need to be scheduled for candidates seeking public office. Candidates whose applications were accepted during the initial filing period may no longer be eligible for the office sought due to a change in district lines. In such an instance, the filing authority would subsequently reject the application as a result of the candidate's ineligibility, and the candidate could submit an application for a different office, if eligible, during the second filing period. Other candidates whose applications were accepted in the initial filing period and remain eligible for the office sought may attempt to refile due to confusion over the renewed deadline or revised districts. In addition, candidates who failed to timely submit an application in the first filing period, or whose initial applications were rejected due to a defect, may take advantage of the second filing period.

11. My deep concern about the catastrophic consequences of postponing any primary-election deadlines are based on my observations of the election changes that occurred during the 2012 redistricting cycle in addition to my experience as Director of Elections for almost a decade. In 2012, when the Western District postponed the primary, the court scheduled a second candidate filing period, which caused a great amount of confusion and discontent from candidates who saw the lines of their districts change. Additionally, at least one candidate attempted to correct the defects of her initial application using inaccurate information and was subsequently prosecuted. I anticipate similar occurrences if the court moves the March 2022 Primary date.

12. Even a minor delay or alteration of the Election Calendar at this stage would cause serious disruptions for local election authorities and voters.

13. Under the current schedule, within ten days after the candidate filing period closes—currently December 13, 2021—the county chair or the county chair's designee must conduct a drawing to determine the order that the candidates' names will appear on the general primary election ballot for each county. *See* Tex. Elec. Code § 172.082. Notice of the drawing must be posted for at least 24 consecutive hours beforehand. *See id.*

14. Once the county chair has certified the drawing, the relevant local election authority will design and proof the ballots, program the ballots into the voting machines, and conduct logic and accuracy testing to ensure that there are no errors. Logic and accuracy testing is a collection of pre-election procedures that help ensure that the voting equipment and ballots to be used in an upcoming election can properly display the ballot, collect votes, and accurately tabulate results. It also helps ensure that the candidates only appear in the districts for which they are running. As part of conducting logic and accuracy testing, the local election authority will test by hand every possible ballot combination.

15. As required by the Texas Election Code, each local election authority will conduct two logic and accuracy tests—one that is private and another that is public. Tex. Elec. Code § 129.023. For larger counties, whose election may involve hundreds, if not thousands, of ballot combinations, logic and accuracy testing can take a week or more to complete.

16. The Election Calendar does not give local election authorities much time to prepare, test, and ready the ballots between the deadline for the ballot order drawing—December 23, 2021—and the federal deadline for the mailing of ballots to voters—January 15, 2022.

17. According to the Military and Overseas Voter Empowerment ("MOVE") Act, Texas election authorities must transmit validly-requested absentee ballots to military and overseas voters no later than 45 days before a federal election, which includes the March 2022 Primary. It is my understanding that the Travis County Clerk Dana DeBeauvoir seeks to have ballots in the mail sixty days before the election day. Not all local election authorities, however, have the resources to ready their ballots in advance of the 45th-day deadline. In each election, there are multiple local election authorities that struggle to meet this deadline, only finishing their ballot preparation at the deadline.

18. If the court were to alter the Election Calendar, it would risk eliminating or reducing whatever leeway local election authorities have to ready their ballots before the 45th-day deadline. Not only could this delay impact when voters receive their mail-in ballot, but it could also cause local election authorities to violate the MOVE Act and be subject to an enforcement action. From my experience, the U.S. Department of Justice strictly enforces the MOVE Act. The Department of Justice typically contacts our office both in advance of the 45th-day deadline and after to verify compliance with the provisions of the Act.

19. Additionally, even if the local election authority were able to send out mail ballots promptly, the accelerated timetable increases the likelihood of errors by the local election authority when creating the ballot. To mitigate this risk, local election authorities would have to devote more money and resources, such as personnel, to ballot preparation.

20. The situation is further complicated by the delay in the release of Census data, which has forced the State to work on an accelerated redistricting schedule in 2021. This includes Texas counties, who have certain responsibilities under the Election Code to review and implement changes to county election precincts after the Legislature completes its redistricting work. Specifically, Election Code § 42.032 requires county commissioners courts to review county election precinct boundaries whenever Texas reapportions federal and state representative districts. If changes in county election precinct boundaries are necessary to give effect to a redistricting plan, commissioners courts must order those changes.

21. The process of drawing precinct lines can be time-consuming depending on the number of changes to district lines made in a given area by the Legislature. According to Election Code § 42.006, an election precinct must contain a set population of at least 100 but not more than 5,000 registered voters. The number may vary slightly if the county has a population under 100,000 or 50,000. In addition, the county commissioners court must

5

determine whether the county election precincts comply with the officer line rule, *see* § 42.005, the population rule, *see* § 42.006, and the ban on combining incorporated and unincorporated territory in a single precinct, *see* § 42.007.

22. Due to the delays in the release of Census data and the adoption of legislative redistricting plans, many Texas counties are still in the midst of drawing their election precinct lines, at the same time that they are preparing for the March 2022 Primary Election. This has increased the strain on county election administrator resources.

23. In addition, the counties have already sunk a significant amount of time, money, and manpower into drawing the new election precinct lines and preparing to send out voter registration certificates to voters, specifying their information, including their election precinct. Not only would Texas counties be unable to recoup these expenditures, but should the court order the State to adopt new district maps, the counties also would be forced to review and redraw the election precincts a second time. This would be expensive, especially because the counties would need to act on an expedited basis as the primary cannot be held until the election precincts are finalized.

24. Texas counties are less able to absorb the costs of redrawing election precincts in 2021 and 2022 than 2012. First, because the census data was not delayed during the last redistricting cycle, the courts ordered injunctive relief before counties began in earnest to coordinate the first primary election after reapportionment. Here, the March 2022 Primary Election has already started, meaning that local election authorities, including Texas counties, have assumed many of the expenditures associated with the election. Second, because of the COVID-19 pandemic, local election authorities, including Texas counties, have implemented social distancing protocols for their own operations and at polling places, which has increased the expense of conducting an election. Relatedly, the pandemic has also imposed substantial costs on Texas counties, which limits their ability to shoulder additional financial burdens.

25. There are over a hundred counties in Texas with a population of 15,000 or less. Many of those counties, and the subdivisions and political parties in those counties, do not have the means or budgets to absorb the cost of redrawing election precincts twice and organizing what would be effectively two primary elections.

26. Moving the March 2022 Primary Election could also compromise the efficient operation and administration of the November 2022 General Election.

27. Under the Election Code, "[i]f no candidate for nomination to a particular office receives the vote required for nomination in the general primary election, a runoff primary election shall be held to determine the nomination." § 172.004. In a normal election year, the runoff primary election date is the fourth Tuesday in May. *See* § 41.007. The state chair of each political party then certifies by posting on the Secretary of State's website the name and address of each primary candidate who is nominated for a statewide or district office. *See* § 172.122. And the Secretary of State, not later than the 68th day before general election day, delivers the certification to the authority responsible for having the official general

election ballot prepared in each county. *See* § 161.008.

28. For the November 8, 2022 general election, the deadline for the Secretary of State's ballot certification is September 1, 2022. This gives local election authorities about three weeks to design the ballots, program their polling machines, conduct logic and accuracy testing, and prepare ballots for delivery before the 45th-day deadline for mailing ballots to military and overseas voters. Texas local election authorities sometimes have difficulty meeting the federal deadline as is. The probability of a Texas county or other election authorities running afoul of this federal requirement would only increase if certification of the ballot was delayed for any reason.

29. The State therefore has an acute interest in ensuring that neither the primary nor the primary runoff is pushed back far enough in the calendar year that it would impede the state chair from certifying the candidates or Texas SOS from delivering the certification of the general election ballot to the local election authorities. In 2020, Governor Greg Abbott postponed the primary runoff by executive order to July 14, 2020 due to the COVID-19 pandemic. Although Texas election officials were able to meet their responsibilities under the Election Code, the overall consensus was that the mid-July runoff was about as late as the runoff could go without interfering with the efficient administration of the November election.

30. Based on my experience in 2012, changing the primary date will create considerable confusion and frustration among voters and local election officials, and may contribute to the growing lack of trust voters have in democratic institutions. Indeed, the 2012 primary election was the most chaotic and demanding primary during my tenure as Director of Elections, prior to the global pandemic. As Director of Elections in 2012, I received numerous phone calls from voters of both political parties, independents, county administrators, and elected officials who complained about the disruptions and challenges caused by moving election deadlines. Many of these voters expressed confusion about basic details concerning the election, such as when elections would be held, when voters would have to meet certain deadlines, where polling locations would be located, and who would appear on their ballot. Others called to communicate their anger and frustration that changes to the primary were being made behind closed doors without public scrutiny or accountability. Many callers expressed fear that the changes were being made to benefit one party or one candidate over another.

Executed on this ⎯⎯ day of December, 2021.

Brian Keith Ingram
Director of Elections

# Exhibit 11:
# Declaration of Bruce Sherbet

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § § | |
| *Plaintiffs,* | § § | Case No. 3:21-cv-259-DCG-JES-JVB |
| v. | § § | [Lead Case] |
| GREG ABBOTT, *in his official capacity as Governor of the State of Texas*, and JOHN SCOTT, *in his official capacity as Secretary of State of Texas,* | § § § § § § | |
| *Defendants.* | § | |

| | | |
|---|---|---|
| DAMON JAMES WILSON, | § § | |
| *Plaintiff,* | § § | Case No. 1:21-cv-943-RP-JES-JVB |
| v. | § § | [Consolidated Case] |
| THE STATE OF TEXAS, *et al.*, | § § | |
| *Defendants.* | § | |

| | | |
|---|---|---|
| VOTO LATINO, *et al.,* | § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Case No. 1:21-cv-965-RP-JES-JVB |
| JOHN SCOTT, *in his official capacity as Secretary of State of Texas*, and GREG ABBOTT, *in his official capacity as Governor of the State of Texas,* | § § § § § | [Consolidated Case] |
| *Defendants.* | § | |

| | | |
|---|---|---|
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, | § § | |
| *Plaintiff,* | § § | Case No. 1:21-cv-988-RP-JES-JVB |
| v. | § § | [Consolidated Case] |
| THE STATE OF TEXAS, *et al.*, | § § | |
| *Defendants.* | § | |

| | | |
|---|---|---|
| ROY CHARLES BROOKS, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | Case No. 1:21-cv-991-LY-JES-JVB |
| GREG ABBOTT, *in his official capacity as* | § | |
| *Governor of the State of Texas*, and | § | [Consolidated Case] |
| JOHN SCOTT, *in his official capacity as* | § | |
| *Secretary of State of Texas*, | § | |
| | § | |
| *Defendants*. | § | |

| | | |
|---|---|---|
| TEXAS STATE CONFERENCE OF THE NAACP, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 1:21-cv-1006-RP-JES-JVB |
| | § | |
| GREG ABBOTT, *in his official capacity as* | § | [Consolidated Case] |
| *Governor of the State of Texas*, and | § | |
| JOHN SCOTT, *in his official capacity as* | § | |
| *Secretary of State of Texas*, | § | |
| | § | |
| *Defendants*. | § | |

| | | |
|---|---|---|
| FAIR MAPS TEXAS ACTION COMMITTEE, *et al.*, | § | |
| | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Case No. 1:21-cv-1038-RP-JES-JVB |
| | § | |
| GREG ABBOTT, *in his official capacity as* | § | [Consolidated Case] |
| *Governor of the State of Texas*, and | § | |
| JOHN SCOTT, *in his official capacity as* | § | |
| *Secretary of State of Texas*, | § | |
| | § | |
| *Defendants*. | § | |

## DECLARATION OF BRUCE SHERBET

I, Bruce Sherbet, pursuant to 28 U.S.C. § 1746, testify that:

1.    My name is Bruce Sherbet, and I currently serve as the Elections Administrator in Collin County, Texas. I began my service in Collin County in December 2015. Prior to starting with Collin County, I served as the Dallas County Elections Administrator for 24 years and spent another two years doing the same work for Ellis County. I began working with

elections when I was 23, approximately 41 years ago.

2.  My experience gives me substantial insight into the procedures, administration, and the various complexities of conducting elections in Texas.

3.  I understand that redistricting legislation passed by the Texas Legislature consisting of redistricting plans for the State House, State Senate, Congress and State Board of Education have been challenged in this lawsuit. I do not have any opinion about the specifics of those bills.

4.  Instead, I am offering this declaration to provide the Court with information about the impending primary election schedule and the impact a change in the election process now or in the coming weeks could have on election and election procedures. My statements are based on my experience and subject matter expertise in this field and my nearly four decades of observing conditions as they actually exist in Texas elections.

5.  It takes months of preparation to conduct a primary election in Texas. Under the current calendar, the primary election scheduled for March 1, 2022. Although the actual election does not occur until that date, several other important deadlines have already passed, and several others are quickly approaching.

6.  For example, the candidate filing period for the March 2022 Primary Election opened on November 13, 2021 and is scheduled to continue until December 13, 2021. Multiple candidates have submitted their application to the state or county chair of the political party in which they wish to run.

7.  Primary elections are run by county chairs of a political party and there are multiple deadlines in place that account for the unique characteristics of a primary. These include the candidate filing period and the need to conduct a drawing to determine the order of candidate names on the ballot, which is not a task that has to be accomplished in the general election cycle.

8.  Under the current schedule, by December 23rd, within ten days after candidate filing closes on December 13th, the county chair must conduct a drawing to determine the order that the candidates' names will appear on the general primary election ballot for each county. In accordance with the Election Code, each candidate affected by a drawing is entitled to be present or have a representative present at the drawing. In addition to the drawing, the county chair is also required to post notice of the date, time and place of the drawing 24 hours in advance.

9.  Once the county chair has conducted and certified the drawing, my office will code and proof the ballots, and then send to the party chairs for their approval. After that, my office will program the ballots into the voting machines. Designing and proofing the ballot can take several days.

10. After we design and proof the ballots, we then conduct logic and accuracy testing to ensure that there are no errors. Logic and accuracy tests are protocols designed to confirm that the voting equipment and ballots are properly displayed, that they accurately collect votes, and

tabulate results. These tests also operate as a check to make sure the candidates only appear in the districts where they are running. Conducting logic and accuracy tests is a painstaking process, and takes more time for larger elections. In fact, a midterm primary election is the largest election for purposes of logic and accuracy tests because so many offices are up for election, especially local offices. Due to this fact, in Collin County, there are 248 precincts and at least 75 ballot variations, meaning there could be as many as 4,000–5,000 test ballot combinations. I estimate that it could take ten to fourteen days to conduct the logic and accuracy tests for these primary elections.

11.     For Collin County, after ballots satisfy the logic and accuracy tests, mail ballots must then be printed. For smaller elections, ballots are printed as applications are received. For larger elections, ballots may be printed in bulk. This process can take up to several days, and is an ongoing obligation. Some counties also print ballots for in-person voting, in addition to absentee voting.

12.     There is little time allocated in the election schedule for election officials to prepare, test, and ready the ballots between deadline for conducting and certifying the ballot order drawing and the federal deadline for when mail-in ballots must be sent to voters. Pursuant to the federal Military and Overseas Voter Empowerment Act (the "MOVE Act"), Texas election authorities must transmit absentee ballots to military and overseas voters no later than 45 days before a federal election. For the upcoming primary election, that date falls on January 15th. Like other county election officials in Texas, my goal is to set an earlier deadline to send those ballots to avoid rushing to meet the deadline, and to allow voters sufficient time to complete and return their ballots. In my experience, rushing to meet deadlines is when mistakes get made. Thus, I prefer to send absentee ballots to voters sooner than the actual deadline.

13.     As I noted, I have serious concerns about any effort make changes immediately before the election. If new electoral maps are imposed, local election officials will face substantial challenges to administering the election. Such a late change would risk eliminating or reducing the short period of time local election authorities have to ready their ballots before the 45-day deadline. Difficulty in meeting the 45-day deadline, in turn, could subject counties to potential liability by the Department of Justice under the MOVE Act, which is strictly enforced by DOJ. And even if get mail-in ballots out promptly, the accelerated timetable increases the likelihood of errors by the local election authority when creating the ballot.

14.     Moving the date of the primary elections would also impose substantial challenges. As an initial matter, due to the fact that the electoral process is already underway, moving the election would entail repeating many of the same preparatory work that has already been performed. This would impose costs on the counties in the form of increased personnel use. And the closer we get to election day, the greater those costs become. In addition, it is likely that voters would be confused by the election being moved.

15.     In addition to the already compressed schedule, the delayed release of census numbers by the Census Bureau has also caused an additional burden on my office. My office would ordinarily have begun preparing for the election much earlier than we did this year, but we

were unable to do so because of those delays. As an example, we would ordinarily send out voter certificates—explaining to voters their precinct number and for which elections they are eligible to vote—by December 5, 2021. But we have been unable to do so because of the delays, and presently plan to send out the certificates in early January. In the event the court orders the adoption of new district maps, we would be forced to review and redraw the election precincts a second time, including recoding and retesting the ballots. If we did this, we would be required to issue corrected certificates to affected voters, which would cause substantial confusion.

16.     As a result of this delay and the delay in the Texas Legislature generating redistricting legislation, we have been forced to work on a truncated schedule. Under the Election Code county commissioners' courts are tasked with reviewing county election precinct boundaries after apportionment. Because of Census population changes, precinct boundaries usually have to change as a result of growth or population movement. Pursuant to the Election Code, county commissioners court must determine whether the county election precincts comply with population and other rules set out by the Election Code.

17.     In Collin County, we ended up drawing election precinct lines much later than usual. We also had to do so during a time when we were preparing for the March 2022 Primary Election. This has increased the strain on our office's resources. Our office has already spent significant time, money, and manpower into drawing the new election precinct lines and sending out voter registration certificates to voters, specifying their information, including their election precinct. These difficulties are exacerbated in Collin County by the fact that we are also conducting two special elections for municipal offices in the cities of McKinney and Frisco.

18.     In addition, because the March 2022 Primary Election has already started, local election authorities, including Texas counties, have assumed many of the expenditures associated with the election, which eats into their budget. As I have said, these costs continue to grow as the election grows closer, and local officials continue to perform more preparatory work, much of which they would have to repeat if the election were moved.

19.     Based on my experience as an elections administrator, changing the primary date will both impose substantial challenges on local elections administrators and will confuse voters. Those burdens and that confusion will be greatly compounded if new electoral maps are imposed on the counties.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December **6**, 2021

Bruce Sherbet
Collin County Elections Administrator

# Exhibit 12:
# Declaration of David Blackburn

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br>　　　*Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, *in his official capacity as Governor of the State of Texas*, and JOHN SCOTT, *in his official capacity as Secretary of State of Texas*,<br>　　　*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 3:21-cv-259-DCG-JES-JVB<br>[Lead Case] |
| DAMON JAMES WILSON,<br>　　　*Plaintiff*,<br><br>v.<br><br>THE STATE OF TEXAS, *et al.*,<br>　　　*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:21-cv-943-RP-JES-JVB<br>[Consolidated Case] |
| VOTO LATINO, *et al.*,<br>　　　*Plaintiffs*,<br><br>v.<br><br>JOHN SCOTT, *in his official capacity as Secretary of State of Texas*, and GREG ABBOTT, *in his official capacity as Governor of the State of Texas*,<br>　　　*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:21-cv-965-RP-JES-JVB<br>[Consolidated Case] |
| MEXICAN AMERICAN LEGISLATIVE CAUCUS,<br>　　　*Plaintiff*,<br><br>v.<br><br>THE STATE OF TEXAS, *et al.*,<br>　　　*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:21-cv-988-RP-JES-JVB<br>[Consolidated Case] |

| | | |
|---|---|---|
| ROY CHARLES BROOKS, *et al.*,<br>    *Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, *in his official capacity as*<br>*Governor of the State of Texas*, and<br>JOHN SCOTT, *in his official capacity as*<br>*Secretary of State of Texas*,<br>    *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:21-cv-991-LY-JES-JVB<br>[Consolidated Case] |
| TEXAS STATE CONFERENCE OF THE<br>NAACP,<br>    *Plaintiff*,<br><br>v.<br><br>GREG ABBOTT, *in his official capacity as*<br>*Governor of the State of Texas*, and<br>JOHN SCOTT, *in his official capacity as*<br>*Secretary of State of Texas*,<br>    *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:21-cv-1006-RP-JES-JVB<br>[Consolidated Case] |
| FAIR MAPS TEXAS ACTION COMMITTEE,<br>*et al.*,<br>    *Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, *in his official capacity as*<br>*Governor of the State of Texas*, and<br>JOHN SCOTT, *in his official capacity as*<br>*Secretary of State of Texas*,<br>    *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:21-cv-1038-RP-JES-JVB<br>[Consolidated Case] |

## DECLARATION OF DAVID BLACKBURN

I, David Blackburn, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that

the following testimony is true and correct to the best of my knowledge and belief:

1. My name is David Blackburn. I am over the age of 18 and competent to make this declaration. I am the elected County Judge for Bell County—a position that I have occupied since January 2019. Prior to my election, I served as City Manager for both the City of Temple and the City of Killeen. I also spent over a decade as a City Attorney in multiple municipalities across Texas. All totaled, my career in local government has spanned nearly 30 years.

2. The County Judge is both the presiding officer of the Commissioners Court and the Judge of the County Court. *See* Tex. Const. Art. V, § 15, 18). The duties of the County Judge can vary depending on the population. In Bell County, the County Judge presides over the Commissioners Court, performs various judicial duties, and discharges specific statutory duties related to elections, finance, and general administration. The County Judge is often thought of as the chief executive officer of the county.

3. Texas counties have certain responsibilities under the Election Code to review and implement changes to county election precincts once the state has adopted new legislative maps following reapportionment. § 42.032. If changes in county election precinct boundaries are necessary to give effect to a redistricting plan, the Election Code tasks the Commissioners Courts with ordering those changes.

4. The Commissioners Court must abide by certain standards stipulated in the Election Code when fashioning the county's election precincts. For example, an election precinct must contain a set population of at least 100 but not more than 5,000 registered voters, with limited exceptions. TEX. ELEC. CODE § 42.006. In Bell County, the Commissioners Court typically draws election precincts in the middle of that range, usually between 2,500 and 3,000 registered voters, to give the precinct room for growth.

5. In addition, the county Commissioners Court must ensure that the election precincts: are compact and contiguous, *Id.* at § 42.001; comply with the officer line rule, which precludes election precinct that contain multiple districts of select state and federal races; *Id.* at § 42.005; do not combine incorporated and unincorporated territory, *Id.* at § 42.007; and that any combined precincts do not dilute the voting strength, representation, or motivation to vote of any group covered by the Voting Rights Act. *Id.* at § 42.0051. Because Bell County has a population greater than 175,000, the Commissioners Court also considers the availability of buildings to use as polling places. *Id.* at § 42.001.

6. On top of these statutory requirements, Bell County must consider prudential concerns when drawing election precincts, such as being cognizant of municipal lines, adhering to natural and manmade boundaries, keeping communities of interest intact, and retaining the character of election precincts from census to census. To facilitate these aims, Bell County entered into an interlocal agreement with the City of Killeen, the City of Temple, and the Temple Independent School District to better coordinate and collaborate each respective entities redistricting efforts.

7. Ordinarily, Bell County would have sought to confirm its election precinct boundaries by early Fall so that its review did not overlap with the county's preparation of the March 2022 Primary. But the U.S. Census Bureau's failure to publish the census numbers on time forced Bell County to operate on a compressed schedule. Therefore, Bell County did not even start its review of its election precincts until the day the U.S. Census Bureau released the finalized census figures in mid-September. It approved the new precinct lines just last week, at the December 6, 2021 meeting of the Commissioners Court.

8. In light of the amount of time it takes to confirm its election precincts, in the event of any change in district lines, Bell County would face extreme challenges in redrawing its

election precinct lines in time for the March 1, 2022, primary election if the State's redistricting maps were set aside. In fact, Bell County is not sure we would be able to do such.

9. Drawing election precincts is not a simple process. Not only does it require the county to examine the county's population at the census block level, but the county must then divide the territory into contiguous and compact districts that correspond with the legislative maps, comply with statutory standards, and advance the interests of voters and the ease of administration, all while remaining transparent and inviting public input. It's hard to see how meaningful public input would occur if the State's maps were set aside and the March 1 primary date remained in place. The entire process takes weeks, even when the county acts on an expedited basis like we did this fall.

10. The process of drawing election precincts is even more challenging for high growth areas, such as Bell County. According to the latest census, Bell County has added over 60,000 new residents in the last ten years, jumping from a population of 310,235 in 2010 to a population of 370,647 in 2020. Because of this growth, the Legislature made significant alterations to the state house lines in Bell County, which the Commissioners Court had to incorporate into its election precinct map.

11. Furthermore, Bell County's added population pushed a number of Bell County's election precincts over statutory limit. The county had to add 14 new election precincts to account for the change, bringing its total to 62. The addition of new election precincts has a rippling effect throughout the precinct map, meaning that the Commissioners Court had to conduct a countywide review rather than focusing on isolated areas.

12. Because of the complexity involved in creating election precincts, Bell County entered into a contract with Bickerstaff Heath Delgado Acosta LLP ("Bickerstaff LLP") to help oversee the county's efforts and ensure compliance with state and federal law. The county depends on Bickerstaff LLP not only for the firm's legal expertise but also to provide the software that enables map drawers to analyze the county's population and assign them to an appropriate precinct.

13. I am deeply concerned that if for any reason new electoral maps were adopted by the court or anyone else were set aside, that it would have serious repercussions for Bell County and, more crucially, Bell County residents and voters.

14. First, Bell County has already reviewed, revised, and adopted its election precincts and therefore has already assumed the expenditures associated with redrawing precinct lines, such as retaining outside counsel. Should this court impose new district maps, Bell County would have to start the process over and absorb any ensuing costs from its unallocated fund balance since the county did not allocate in its budget funds sufficient for the creation of two election precinct maps.

15. Second, as I explained above, designing county election precincts to conform with state legislative maps is a lengthy process that takes weeks to perform. There are few shortcuts, and what shortcuts do exist all have an adverse effect on the voter since they involve the county satisfying the legal minimum instead of effort taking all possible steps to mitigate

sources of voter confusion and inconvenience or invite public feedback.

16. To illustrate how this works in practice, Texas law bars counties from housing multiple districts of certain state and federal offices in a single election precinct, but it has no equivalent requirement for local races. Nevertheless, Bell County took special care this year to ensure that the county's election precincts aligned with municipal election districts. Thus, where previous maps cut single member districts, the map adopted on December 6 by the Commissioners Court keeps them intact.

17. Having election precincts conform to municipal single member district benefits voters greatly. It reduces the possibility of voter confusion, and it eases election administration as all voters in the election precinct will utilize the same ballot format for every election. The process of obtaining this benefit, however, adds to the time that it takes the county to complete its review. Should any changes in the new redistricting maps occur before the primary election date, the county would have to reconstruct the boundaries of its election precinct on a shorter timetable. It is unlikely that the county would be able to do the level of analysis necessary to align its election precincts with municipal districts. The same is true of the other prudential concerns that the Commissioners Court considers in its evaluation. *See supra* ¶ 5.

18. Furthermore, Bell County did its best to ensure that stakeholders had the opportunity to participate in the map drawing process, both before and after Bickerstaff LLP proposed its findings. To that end, the Commissioners Court held a special workshop on Tuesday, October 5, 2021. Members of the community were invited to offer public comment. The Commissioners Court then extended the invitation for public testimony whenever the election precinct map was on the Commissioners Court's agenda.

19. Because of the Open Meeting Act, Bell County would need between 45 to 60 days, at minimum, to organize similar opportunities for public comment on any new election precinct map. It is my understanding that if this court orders changes to the state legislative districts, the counties will likely not have that long to make the necessary changes to their election precincts on account of the election calendar. If that is the case, then imposition of new district maps would foreclose Bell County residents from participating in the creation of new election maps. Not only would this make the process far less democratic, but it deprives Bell County of the opportunity to make the election precinct map responsive to voters' needs.

Executed on this 20ᵗʰ day of December, 2021.

David Blackburn
Bell County Judge

# Exhibit 13:
# Declaration of Leif Olson

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | § § § | |
| *Plaintiffs,* | § | Case No. 3:21-cv-00259 |
| V. | § § | [Lead Case] |
| GREG ABBOTT, *et al.,* | § | |
| *Defendants.* | § | |

| | | |
|---|---|---|
| ROY CHARLES BROOKS, *et al.* | § | |
| *Plaintiffs,* | § | |
| V. | § § | Case No. 1:21-cv-00991 |
| GREG ABBOTT, *et al.,* | § | [Consolidated Case] |
| *Defendants.* | § | |

**DECLARATION OF LEIF OLSON**

1.     My name is Leif Olson. I am over the age of 18 and competent to make this declaration. I am Special Counsel in the Special Litigation Unit of the Office of the Attorney General and am one of the attorneys representing the State Defendants in this case. The exhibits I refer to in this declaration are exhibits to the State Defendants' Opposition to the Brooks Plaintiffs' Motion for Preliminary Injunction. Each statement in this declaration is within my personal knowledge.

2.     Exhibit 14 is a true and correct copy of an excerpt from the Secretary of State's race summary report for the 2014 Republican Primary Election.

3.     Exhibit 15 is a true and correct copy of an excerpt from the Secretary of State's race summary report for the 2018 Republican Primary Election.

4.     Exhibit 16 is a true and correct copy of excerpts from the 2020 Election Analysis of benchmark House districts (Plan H2100) from the data files associated with that map available on the Texas Legislative Council's redistricting website.

5.      Exhibit 17 is a true and correct copy of excerpts from the 2020 Election Analysis of current House districts (Plan H2316) from the data files associated with that map available on the Texas Legislative Council's redistricting website.

6.   Exhibit 18 is a true and correct copy of the September 27, 2021, *New York Times* article, "Texas Republicans propose a new congressional map that aims to protect the party's incumbents."

7.   Exhibit 19 is a true and correct copy of the October 25, 2021, *Texas Tribune* article, "Gov. Greg Abbott signs off on Texas' new political maps, which protect GOP majorities while diluting voices of voters of color".

8.   Exhibit 20 is a true and correct copy of the October 7, 2021, *Texas Tribune* article, "Weighing reelection bid, GOP Texas Sen. Kel Seliger confronts redrawn district, Trump endorsement of primary challenger".

9.   Exhibit 21 is a true and correct copy of the January 22, 2019, *Texas Tribune* article, "Lt. Gov. Dan Patrick pulls Sen. Kel Seliger's chairmanship after Seliger suggested Patrick aide kiss his 'back end'".

10.   Exhibit 22 is a true and correct copy of the October 20, 2021, *Amarillo Pioneer* article, "Seliger Calls It Quits: Republican Senator Not Seeking Re-election".

11.   Exhibit 23 is a true and correct copy of pages 51–59 of the Senate Journal for the Third Called Session of the 87th Texas Legislature.

12.   Exhibit 24 is a true and correct copy of the landing page for the Decennial Census Redistricting Data on the website of the U.S. Census Bureau.

13. Exhibit 25 is a true and correct copy of Governor Greg Abbott's September 7, 2021, proclamation of the Third Called Session of the 87th Texas Legislature.

14.   Exhibit 26 is a true and correct copy of the RedAppl District Election Analysis of benchmark SD10 for the 2020 general election.

15.   Exhibit 27 is a true and correct copy of the RedAppl District Election Analysis of current SD10 for the 2020 general election.

16.   Exhibit 28 is a true and correct copy of the RedAppl 2012–2020 Election Analysis of benchmark SD10.

17.   Exhibit 29 is a true and correct copy of excerpts of the RedAppl District Population Analysis  for benchmark SD10.

18. Exhibit 30 is a true and correct copy of the June 4, 2021, *Texas Tribune* article, "Republican state Sen. Dawn Buckingham running for Texas Land Commissioner".

19. Exhibit 31 is a true and correct copy of the September 21, 2021, *Texas Tribune* article, "After losing to a Democrat in 2020, former GOP state Sen. Pete Flores seeks election in newly drawn Republican district".

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated December 20, 2021.

_____
Leif Olson

# Exhibit 14:
# 2014 Republican Primary Election, SD31

# Office of the Secretary of State

### Race Summary Report

## 2014 Republican Party Primary Election

### 3/4/2014

| RACE NAME | PARTY | CANVASS VOTES | PERCENT |
|---|---|---|---|
| U. S. Senator | | | |
| Curt Cleaver | REP | 12,325 | 0.94% |
| Ken Cope | REP | 34,409 | 2.62% |
| John Cornyn(I) | REP | 781,259 | 59.43% |
| Chris Mapp | REP | 23,535 | 1.79% |
| Reid Reasor | REP | 20,600 | 1.57% |
| Steve Stockman | REP | 251,577 | 19.14% |
| Dwayne Stovall | REP | 140,794 | 10.71% |
| Linda Vega | REP | 50,057 | 3.81% |
| | | ----------- | |
| Race Total | | 1,314,556 | |

----------------------------------------

| | | | |
|---|---|---|---|
| U. S. Representative District 1 | | | |
| Louie Gohmert(I) | REP | 57,830 | 100.00% |
| | | ----------- | |
| Race Total | | 57,830 | |

----------------------------------------

| | | | |
|---|---|---|---|
| U. S. Representative District 2 | | | |
| Ted Poe(I) | REP | 34,863 | 100.00% |
| | | ----------- | |
| Race Total | | 34,863 | |

----------------------------------------

| | | | |
|---|---|---|---|
| U. S. Representative District 3 | | | |
| Cami Dean | REP | 2,435 | 6.29% |
| Sam Johnson(I) | REP | 31,178 | 80.56% |
| Josh Loveless | REP | 2,086 | 5.39% |
| Harry Pierce | REP | 3,004 | 7.76% |
| | | ----------- | |
| Race Total | | 38,703 | |

----------------------------------------

U. S. Representative District 4

---

State Senator, District 25

| | | | |
|---|---|---|---|
| Donna Campbell(I) | REP | 40,867 | 55.41% |
| Elisa Chan | REP | 17,916 | 24.29% |
| Mike Novak | REP | 14,973 | 20.30% |
| | | ----------- | |
| Race Total | | 73,756 | |

---

State Senator, District 30

| | | | |
|---|---|---|---|
| Craig Estes(I) | REP | 57,911 | 100.00% |
| | | ----------- | |
| Race Total | | 57,911 | |

---

State Senator, District 31

| | | | |
|---|---|---|---|
| Mike Canon | REP | 33,252 | 47.48% |
| Kel Seliger(I) | REP | 36,777 | 52.52% |
| | | ----------- | |
| Race Total | | 70,029 | |

---

State Representative District 1

| | | | |
|---|---|---|---|
| George Lavender(I) | REP | 7,903 | 45.66% |
| Gary VanDeaver | REP | 9,406 | 54.34% |
| | | ----------- | |
| Race Total | | 17,309 | |

---

State Representative District 2

| | | | |
|---|---|---|---|
| Dan Flynn(I) | REP | 13,903 | 100.00% |
| | | ----------- | |
| Race Total | | 13,903 | |

---

State Representative District 3

| | | | |
|---|---|---|---|
| Cecil Bell Jr.(I) | REP | 11,761 | 100.00% |
| | | ----------- | |
| Race Total | | 11,761 | |

---

State Representative District 4

| | | | |
|---|---|---|---|
| Lance Gooden(I) | REP | 8,089 | 48.96% |
| Stuart Spitzer | REP | 8,434 | 51.04% |
| | | ----------- | |
| Race Total | | 16,523 | |

---

State Representative District 5

| | | | |
|---|---|---|---|
| Bryan Hughes(I) | REP | 12,557 | 100.00% |
| | | ----------- | |

# Exhibit 15:
# 2018 Republican Primary Election, SD31

# Office of the Secretary of State

### Race Summary Report

## 2018 Republican Party Primary Election

### 3/6/2018

| RACE NAME | PARTY | CANVASS VOTES | PERCENT |
|---|---|---:|---:|
| U. S. Senator - | | | |
| Ted Cruz(I) | REP | 1,322,724 | 85.36% |
| Stefano de Stefano | REP | 44,456 | 2.87% |
| Bruce Jacobson, Jr. | REP | 64,791 | 4.18% |
| Mary Miller | REP | 94,715 | 6.11% |
| Geraldine Sam | REP | 22,887 | 1.48% |
| | | ----------- | |
| | Race Total | 1,549,573 | |
| ---------------------------------------- | | | |
| U. S. Representative District 1 - | | | |
| Anthony Culler | REP | 6,526 | 8.97% |
| Louie Gohmert(I) | REP | 64,241 | 88.33% |
| Roshin Rowjee | REP | 1,962 | 2.70% |
| | | ----------- | |
| | Race Total | 72,729 | |
| ---------------------------------------- | | | |
| U. S. Representative District 2 - | | | |
| David Balat | REP | 348 | 0.75% |
| Dan Crenshaw | REP | 12,679 | 27.42% |
| Jonny Havens | REP | 936 | 2.02% |
| Justin L. Lurie | REP | 425 | 0.92% |
| Kevin Roberts | REP | 15,273 | 33.03% |
| Jon Spiers | REP | 418 | 0.90% |
| Rick Walker | REP | 3,320 | 7.18% |
| Kathaleen Wall | REP | 12,524 | 27.08% |
| Malcolm Whittaker | REP | 322 | 0.70% |
| | | ----------- | |
| | Race Total | 46,245 | |
| ---------------------------------------- | | | |
| U. S. Representative District 3 - | | | |
| Alex Donkervoet | REP | 3,197 | 5.93% |

|  | George W. Hindman | REP | 24,168 | 100.00% |
|---|---|---|---|---|
|  |  |  | ----------- |  |
|  |  | Race Total | 24,168 |  |

---

State Senator, District 15 -

|  | Randy Orr | REP | 17,057 | 100.00% |
|---|---|---|---|---|
|  |  |  | ----------- |  |
|  |  | Race Total | 17,057 |  |

---

State Senator, District 16 -

|  | Don Huffines(I) | REP | 30,311 | 100.00% |
|---|---|---|---|---|
|  |  |  | ----------- |  |
|  |  | Race Total | 30,311 |  |

---

State Senator, District 17 -

|  | Joan Huffman(I) | REP | 36,830 | 72.67% |
|---|---|---|---|---|
|  | Kristin Tassin | REP | 13,849 | 27.33% |
|  |  |  | ----------- |  |
|  |  | Race Total | 50,679 |  |

---

State Senator, District 25 -

|  | Donna Campbell(I) | REP | 59,143 | 73.75% |
|---|---|---|---|---|
|  | Shannon K. McClendon | REP | 21,055 | 26.25% |
|  |  |  | ----------- |  |
|  |  | Race Total | 80,198 |  |

---

State Senator, District 30 -

|  | Craig Carter | REP | 13,371 | 15.39% |
|---|---|---|---|---|
|  | Craig Estes(I) | REP | 19,641 | 22.60% |
|  | Pat Fallon | REP | 53,881 | 62.01% |
|  |  |  | ----------- |  |
|  |  | Race Total | 86,893 |  |

---

State Senator, District 31 -

|  | Mike Canon | REP | 25,335 | 31.41% |
|---|---|---|---|---|
|  | Victor Leal | REP | 14,671 | 18.19% |
|  | Kel Seliger(I) | REP | 40,664 | 50.41% |
|  |  |  | ----------- |  |
|  |  | Race Total | 80,670 |  |

---

State Representative District 1 -

|  | Gary VanDeaver(I) | REP |  | 0.00% |
|---|---|---|---|---|
|  |  |  | ----------- |  |
|  |  | Race Total |  |  |

# Exhibit 16:
# Election Analysis, H2100, 2020 General Election

Red-206
Data: 2020 Census
PLANH2100  08/02/2021 4:29:39 PM

Texas Legislative Council
08/29/21 3:04 PM
Page 1 of 20

Election Analysis

## HOUSE DISTRICTS - PLANH2100
### 2020 General Election

| District | Total Voter Registration | | Turnout | |
| --- | --- | --- | --- | --- |
| | **Total** | **SSVR-T** | **Total** | **TO/VR** |
| **STATE** | **16,960,107** | **24.0 %** | **11,355,339** | **67.0 %** |
| 1 | 109,158 | 2.7 % | 70,562 | 64.6 % |
| 2 | 122,319 | 6.5 % | 80,790 | 66.0 % |
| 3 | 134,194 | 12.6 % | 93,664 | 69.8 % |
| 4 | 127,155 | 9.1 % | 87,552 | 68.9 % |
| 5 | 111,411 | 7.4 % | 75,728 | 68.0 % |
| 6 | 109,018 | 8.4 % | 74,993 | 68.8 % |
| 7 | 101,173 | 5.6 % | 66,960 | 66.2 % |
| 8 | 95,070 | 9.1 % | 62,114 | 65.3 % |
| 9 | 114,571 | 3.6 % | 75,880 | 66.2 % |
| 10 | 129,275 | 13.8 % | 91,829 | 71.0 % |
| 11 | 100,278 | 7.9 % | 67,749 | 67.6 % |
| 12 | 100,158 | 12.9 % | 65,664 | 65.6 % |
| 13 | 119,655 | 10.6 % | 86,397 | 72.2 % |
| 14 | 96,326 | 15.7 % | 65,753 | 68.3 % |
| 15 | 147,940 | 9.4 % | 110,754 | 74.9 % |
| 16 | 125,729 | 11.8 % | 89,810 | 71.4 % |
| 17 | 109,803 | 25.0 % | 73,000 | 66.5 % |
| 18 | 100,299 | 10.0 % | 65,633 | 65.4 % |
| 19 | 127,547 | 3.7 % | 83,389 | 65.4 % |
| 20 | 150,659 | 10.2 % | 115,364 | 76.6 % |
| 21 | 114,296 | 7.6 % | 77,193 | 67.5 % |
| 22 | 89,173 | 7.7 % | 54,355 | 61.0 % |
| 23 | 125,075 | 15.8 % | 80,655 | 64.5 % |
| 24 | 133,937 | 12.3 % | 96,740 | 72.2 % |
| 25 | 107,208 | 21.0 % | 69,887 | 65.2 % |
| 26 | 118,037 | 11.4 % | 89,320 | 75.7 % |
| 27 | 121,891 | 13.0 % | 87,515 | 71.8 % |
| 28 | 164,258 | 13.2 % | 126,298 | 76.9 % |
| 29 | 138,416 | 18.3 % | 98,898 | 71.4 % |
| 30 | 110,559 | 30.2 % | 69,957 | 63.3 % |
| 31 | 106,776 | 74.1 % | 59,735 | 55.9 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR-T = Total Spanish surname voter registration

56528

Red-206
Data: 2020 Census
PLANH2100  08/02/2021 4:29:39 PM

Election Analysis

**HOUSE DISTRICTS - PLANH2100**
**2020 General Election**

Texas Legislative Council
08/29/21 3:04 PM
Page 2 of 20

| District | Total Voter Registration Total | SSVR-T | Turnout Total | TO/VR |
|---|---|---|---|---|
| 32 | 111,529 | 39.3 % | 71,250 | 63.9 % |
| 33 | 163,045 | 8.5 % | 124,146 | 76.1 % |
| 34 | 99,855 | 61.9 % | 56,848 | 56.9 % |
| 35 | 82,293 | 78.5 % | 47,115 | 57.3 % |
| 36 | 85,586 | 83.4 % | 46,646 | 54.5 % |
| 37 | 86,277 | 78.9 % | 42,368 | 49.1 % |
| 38 | 94,356 | 79.8 % | 51,813 | 54.9 % |
| 39 | 86,107 | 83.7 % | 47,612 | 55.3 % |
| 40 | 81,984 | 85.2 % | 44,775 | 54.6 % |
| 41 | 93,189 | 72.3 % | 57,903 | 62.1 % |
| 42 | 92,354 | 86.3 % | 47,460 | 51.4 % |
| 43 | 104,406 | 57.6 % | 60,362 | 57.8 % |
| 44 | 145,992 | 25.5 % | 103,048 | 70.6 % |
| 45 | 162,587 | 22.8 % | 117,440 | 72.2 % |
| 46 | 117,464 | 19.8 % | 77,898 | 66.3 % |
| 47 | 180,244 | 8.9 % | 141,663 | 78.6 % |
| 48 | 146,471 | 14.4 % | 110,857 | 75.7 % |
| 49 | 155,452 | 11.6 % | 107,637 | 69.2 % |
| 50 | 138,011 | 16.1 % | 98,151 | 71.1 % |
| 51 | 122,106 | 31.7 % | 76,490 | 62.6 % |
| 52 | 141,055 | 18.0 % | 102,228 | 72.5 % |
| 53 | 123,444 | 21.2 % | 89,157 | 72.2 % |
| 54 | 125,441 | 12.7 % | 73,850 | 58.9 % |
| 55 | 105,921 | 13.5 % | 64,616 | 61.0 % |
| 56 | 110,202 | 12.9 % | 75,933 | 68.9 % |
| 57 | 103,612 | 8.3 % | 69,184 | 66.8 % |
| 58 | 118,934 | 10.9 % | 81,628 | 68.6 % |
| 59 | 99,810 | 11.0 % | 64,358 | 64.5 % |
| 60 | 123,277 | 8.5 % | 86,211 | 69.9 % |
| 61 | 149,417 | 7.0 % | 108,899 | 72.9 % |
| 62 | 112,874 | 5.1 % | 77,416 | 68.6 % |
| 63 | 147,714 | 7.8 % | 113,106 | 76.6 % |
| 64 | 127,284 | 11.2 % | 90,868 | 71.4 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR-T = Total Spanish surname voter registration

Election Analysis

**HOUSE DISTRICTS - PLANH2100**
**2020 General Election**

| District | Biden-D | | Trump-R | | PRESIDENT Jorgensen-L | | Hawkins-G | | Write-In-W | | Cornyn-R | | Hegar-D U.S. SEN | | McKennon-L | | Collins-G | | RR COMM 1 Castaneda-D | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATE** | 5,257,513 | 46.5 % | 5,889,022 | 52.0 % | 126,212 | 1.1 % | 33,378 | 0.3 % | 10,927 | 0.1 % | 5,961,643 | 53.5 % | 4,887,309 | 43.9 % | 209,623 | 1.9 % | 81,753 | 0.7 % | 4,791,167 | 43.6 % |
| 1 | 17,162 | 24.4 % | 52,429 | 74.5 % | 538 | 0.8 % | 132 | 0.2 % | 92 | 0.1 % | 51,831 | 74.5 % | 16,552 | 23.8 % | 868 | 1.2 % | 284 | 0.4 % | 15,871 | 23.0 % |
| 2 | 15,468 | 19.2 % | 64,152 | 79.7 % | 752 | 0.9 % | 135 | 0.2 % | 25 | 0.0 % | 63,395 | 79.8 % | 14,526 | 18.3 % | 1,146 | 1.4 % | 411 | 0.5 % | 14,018 | 17.9 % |
| 3 | 22,950 | 24.5 % | 69,479 | 74.2 % | 996 | 1.1 % | 225 | 0.2 % | 14 | 0.0 % | 69,032 | 74.5 % | 21,496 | 23.2 % | 1,692 | 1.8 % | 414 | 0.4 % | 20,808 | 22.7 % |
| 4 | 24,280 | 27.8 % | 61,896 | 71.0 % | 762 | 0.9 % | 205 | 0.2 % | 51 | 0.1 % | 61,816 | 71.3 % | 23,036 | 26.6 % | 1,391 | 1.6 % | 494 | 0.6 % | 22,563 | 26.1 % |
| 5 | 15,680 | 20.8 % | 59,068 | 78.2 % | 619 | 0.8 % | 151 | 0.2 % | 8 | 0.0 % | 58,375 | 78.1 % | 15,100 | 20.2 % | 988 | 1.3 % | 313 | 0.4 % | 14,408 | 19.4 % |
| 6 | 24,200 | 32.5 % | 49,253 | 66.1 % | 886 | 1.2 % | 192 | 0.3 % | 0 | 0.0 % | 49,766 | 66.9 % | 23,133 | 31.1 % | 1,158 | 1.6 % | 336 | 0.5 % | 22,216 | 30.0 % |
| 7 | 17,673 | 26.4 % | 48,302 | 72.2 % | 730 | 1.1 % | 135 | 0.2 % | 34 | 0.1 % | 47,937 | 72.5 % | 16,829 | 25.4 % | 1,107 | 1.7 % | 259 | 0.4 % | 16,076 | 24.5 % |
| 8 | 13,551 | 21.8 % | 47,827 | 77.1 % | 487 | 0.8 % | 119 | 0.2 % | 44 | 0.1 % | 47,327 | 77.1 % | 12,854 | 20.9 % | 876 | 1.4 % | 361 | 0.6 % | 12,467 | 20.0 % |
| 9 | 16,828 | 22.3 % | 58,043 | 76.9 % | 541 | 0.7 % | 89 | 0.1 % | 24 | 0.0 % | 57,088 | 76.6 % | 16,278 | 21.8 % | 908 | 1.2 % | 249 | 0.3 % | 15,360 | 20.8 % |
| 10 | 28,750 | 31.4 % | 61,356 | 67.0 % | 984 | 1.1 % | 236 | 0.3 % | 239 | 0.3 % | 61,628 | 67.8 % | 26,923 | 29.6 % | 1,685 | 1.9 % | 623 | 0.7 % | 26,233 | 29.1 % |
| 11 | 17,839 | 26.4 % | 49,013 | 72.4 % | 618 | 0.9 % | 169 | 0.2 % | 50 | 0.1 % | 48,682 | 72.7 % | 17,000 | 25.4 % | 1,022 | 1.5 % | 300 | 0.4 % | 15,965 | 24.1 % |
| 12 | 21,988 | 33.6 % | 42,483 | 65.0 % | 716 | 1.1 % | 166 | 0.2 % | 31 | 0.0 % | 42,329 | 65.8 % | 20,383 | 31.7 % | 1,190 | 1.9 % | 384 | 0.6 % | 19,524 | 30.8 % |
| 13 | 18,236 | 21.2 % | 67,019 | 77.8 % | 661 | 0.8 % | 151 | 0.2 % | 99 | 0.1 % | 66,389 | 77.8 % | 17,446 | 20.5 % | 1,133 | 1.3 % | 321 | 0.4 % | 17,080 | 20.2 % |
| 14 | 30,206 | 45.9 % | 33,705 | 51.3 % | 1,525 | 2.3 % | 205 | 0.3 % | 107 | 0.2 % | 35,293 | 54.3 % | 27,443 | 42.2 % | 1,843 | 2.8 % | 389 | 0.6 % | 25,862 | 40.6 % |
| 15 | 39,765 | 35.9 % | 69,264 | 62.5 % | 1,451 | 1.3 % | 226 | 0.2 % | 43 | 0.0 % | 71,421 | 64.9 % | 36,136 | 32.9 % | 1,948 | 1.8 % | 491 | 0.4 % | 34,465 | 31.9 % |
| 16 | 19,826 | 22.1 % | 68,872 | 76.7 % | 920 | 1.0 % | 157 | 0.2 % | 35 | 0.0 % | 68,264 | 77.0 % | 18,323 | 20.7 % | 1,598 | 1.8 % | 423 | 0.5 % | 17,629 | 20.2 % |
| 17 | 27,078 | 37.2 % | 44,397 | 61.0 % | 873 | 1.2 % | 223 | 0.3 % | 164 | 0.2 % | 44,173 | 61.3 % | 26,169 | 36.3 % | 1,272 | 1.8 % | 409 | 0.6 % | 25,686 | 36.0 % |
| 18 | 16,006 | 24.4 % | 48,838 | 74.4 % | 606 | 0.9 % | 131 | 0.2 % | 51 | 0.1 % | 48,031 | 74.1 % | 15,344 | 23.7 % | 1,150 | 1.8 % | 323 | 0.5 % | 15,060 | 23.4 % |
| 19 | 14,391 | 17.3 % | 68,049 | 81.8 % | 638 | 0.8 % | 100 | 0.1 % | 37 | 0.0 % | 66,263 | 81.0 % | 14,039 | 17.2 % | 1,200 | 1.5 % | 338 | 0.4 % | 12,770 | 15.7 % |
| 20 | 35,731 | 31.0 % | 77,463 | 67.3 % | 1,485 | 1.3 % | 222 | 0.2 % | 195 | 0.2 % | 77,590 | 68.5 % | 33,275 | 29.4 % | 1,990 | 1.8 % | 446 | 0.4 % | 31,308 | 28.0 % |
| 21 | 16,794 | 21.9 % | 59,080 | 76.9 % | 827 | 1.1 % | 122 | 0.2 % | 31 | 0.0 % | 57,820 | 76.5 % | 16,232 | 21.5 % | 1,244 | 1.6 % | 304 | 0.4 % | 15,426 | 20.6 % |
| 22 | 35,636 | 66.1 % | 17,676 | 32.8 % | 446 | 0.8 % | 128 | 0.2 % | 13 | 0.0 % | 17,828 | 33.6 % | 34,129 | 64.4 % | 746 | 1.4 % | 300 | 0.6 % | 33,412 | 63.9 % |
| 23 | 33,007 | 41.0 % | 46,252 | 57.5 % | 911 | 1.1 % | 212 | 0.3 % | 87 | 0.1 % | 45,740 | 57.7 % | 31,381 | 39.6 % | 1,544 | 1.9 % | 610 | 0.8 % | 30,816 | 39.3 % |
| 24 | 29,823 | 30.9 % | 65,012 | 67.4 % | 1,252 | 1.3 % | 231 | 0.2 % | 184 | 0.2 % | 65,614 | 68.7 % | 27,492 | 28.8 % | 1,878 | 2.0 % | 469 | 0.5 % | 26,430 | 28.1 % |
| 25 | 20,010 | 28.7 % | 48,784 | 69.9 % | 842 | 1.2 % | 165 | 0.2 % | 12 | 0.0 % | 48,060 | 69.8 % | 18,983 | 27.6 % | 1,473 | 2.1 % | 376 | 0.5 % | 18,693 | 27.4 % |
| 26 | 45,192 | 50.9 % | 42,349 | 47.7 % | 742 | 0.8 % | 278 | 0.3 % | 269 | 0.3 % | 43,650 | 50.8 % | 40,478 | 47.1 % | 1,264 | 1.5 % | 506 | 0.6 % | 39,238 | 46.6 % |
| 27 | 61,243 | 70.3 % | 24,802 | 28.5 % | 593 | 0.7 % | 307 | 0.4 % | 214 | 0.2 % | 25,286 | 29.9 % | 57,257 | 67.7 % | 1,319 | 1.6 % | 678 | 0.8 % | 57,031 | 68.2 % |
| 28 | 60,101 | 47.8 % | 63,906 | 50.8 % | 1,190 | 0.9 % | 309 | 0.2 % | 343 | 0.3 % | 65,387 | 53.4 % | 54,571 | 44.6 % | 1,827 | 1.5 % | 573 | 0.5 % | 53,363 | 44.3 % |
| 29 | 45,951 | 46.5 % | 51,494 | 52.1 % | 1,133 | 1.1 % | 285 | 0.3 % | 35 | 0.0 % | 52,292 | 53.4 % | 43,327 | 44.2 % | 1,768 | 1.8 % | 565 | 0.6 % | 42,256 | 43.8 % |
| 30 | 18,923 | 27.1 % | 50,100 | 71.7 % | 599 | 0.9 % | 174 | 0.2 % | 66 | 0.1 % | 49,336 | 72.0 % | 17,902 | 26.1 % | 981 | 1.4 % | 320 | 0.5 % | 17,629 | 26.0 % |
| 31 | 25,315 | 42.9 % | 33,101 | 56.1 % | 340 | 0.6 % | 171 | 0.3 % | 38 | 0.1 % | 28,980 | 53.4 % | 23,609 | 43.5 % | 958 | 1.4 % | 756 | 1.4 % | 24,700 | 46.5 % |
| 32 | 31,699 | 44.7 % | 38,011 | 53.6 % | 910 | 1.3 % | 213 | 0.3 % | 140 | 0.2 % | 38,322 | 54.8 % | 29,613 | 42.3 % | 1,483 | 2.1 % | 531 | 0.8 % | 28,939 | 42.2 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR-T = Total Spanish surname voter registration

Red-206
Data: 2020 Census
PLANH2100  08/02/2021 4:29:39 PM

Case 3:21-cv-00259-DCG-JES-JVB   Document 102-1   Filed 12/20/21   Page 95 of 195

Election Analysis

Texas Legislative Council
08/29/21 3:04 PM
Page 7 of 20

## HOUSE DISTRICTS - PLANH2100
## 2020 General Election

| District | RR COMM 1 | | | | | | SUP CT CHIEF | | | | | | SUP CT 6 | | | | | | SUP CT 7 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wright-R | | Sterett-L | | Gruene-G | | Hecht-R | | Meachum-D | | Ash-L | | Bland-R | | Cheng-D | | Boyd-R | | Strange-L | |
| STATE | 5,830,003 | 53.0 % | 247,568 | 2.3 % | 129,588 | 1.2 % | 5,825,773 | 53.0 % | 4,892,131 | 44.5 % | 277,432 | 2.5 % | 6,049,262 | 55.2 % | 4,902,218 | 44.8 % | 5,842,276 | 53.3 % | 256,665 | 2.3 % |
| 1 | 51,614 | 74.9 % | 1,071 | 1.6 % | 383 | 0.6 % | 51,006 | 74.1 % | 16,646 | 24.2 % | 1,136 | 1.7 % | 52,160 | 76.0 % | 16,478 | 24.0 % | 51,417 | 74.6 % | 994 | 1.4 % |
| 2 | 62,412 | 79.6 % | 1,486 | 1.9 % | 474 | 0.6 % | 62,479 | 79.8 % | 14,377 | 18.4 % | 1,479 | 1.9 % | 63,632 | 81.8 % | 14,184 | 18.2 % | 62,235 | 80.0 % | 1,439 | 1.8 % |
| 3 | 68,138 | 74.4 % | 1,991 | 2.2 % | 650 | 0.7 % | 68,474 | 74.7 % | 21,210 | 23.1 % | 2,030 | 2.2 % | 70,362 | 76.9 % | 21,101 | 23.1 % | 68,607 | 75.0 % | 1,827 | 2.0 % |
| 4 | 61,399 | 71.1 % | 1,784 | 2.1 % | 590 | 0.7 % | 61,397 | 71.0 % | 23,265 | 26.9 % | 1,772 | 2.1 % | 62,994 | 73.1 % | 23,138 | 26.9 % | 61,617 | 71.4 % | 1,612 | 1.9 % |
| 5 | 58,048 | 78.3 % | 1,317 | 1.8 % | 375 | 0.5 % | 57,739 | 77.9 % | 15,080 | 20.3 % | 1,297 | 1.7 % | 58,985 | 79.8 % | 14,955 | 20.2 % | 58,001 | 78.3 % | 1,191 | 1.6 % |
| 6 | 49,596 | 67.1 % | 1,624 | 2.2 % | 515 | 0.7 % | 49,355 | 66.6 % | 23,211 | 31.3 % | 1,530 | 2.1 % | 50,764 | 68.6 % | 23,198 | 31.4 % | 49,556 | 66.9 % | 1,561 | 2.1 % |
| 7 | 47,700 | 72.8 % | 1,354 | 2.1 % | 381 | 0.6 % | 47,205 | 72.0 % | 16,903 | 25.8 % | 1,435 | 2.2 % | 48,599 | 74.3 % | 16,836 | 25.7 % | 47,487 | 72.5 % | 1,373 | 2.1 % |
| 8 | 47,143 | 77.3 % | 1,080 | 1.8 % | 334 | 0.5 % | 46,865 | 77.0 % | 12,920 | 21.2 % | 1,078 | 1.8 % | 47,893 | 78.9 % | 12,802 | 21.1 % | 47,012 | 77.3 % | 998 | 1.6 % |
| 9 | 57,093 | 77.3 % | 1,103 | 1.5 % | 341 | 0.5 % | 56,414 | 76.3 % | 16,319 | 22.1 % | 1,163 | 1.6 % | 57,437 | 78.3 % | 15,947 | 21.7 % | 56,425 | 76.8 % | 1,037 | 1.4 % |
| 10 | 61,123 | 67.7 % | 2,178 | 2.4 % | 718 | 0.8 % | 61,058 | 67.6 % | 27,091 | 30.0 % | 2,189 | 2.4 % | 62,952 | 70.0 % | 27,042 | 30.0 % | 61,220 | 68.0 % | 2,062 | 2.3 % |
| 11 | 48,404 | 73.2 % | 1,287 | 1.9 % | 492 | 0.7 % | 47,903 | 72.3 % | 17,017 | 25.7 % | 1,329 | 2.0 % | 49,239 | 74.5 % | 16,872 | 25.5 % | 48,217 | 72.9 % | 1,201 | 1.8 % |
| 12 | 41,946 | 66.2 % | 1,337 | 2.1 % | 524 | 0.8 % | 41,524 | 65.4 % | 20,565 | 32.4 % | 1,359 | 2.1 % | 42,805 | 67.8 % | 20,353 | 32.2 % | 41,823 | 66.0 % | 1,273 | 2.0 % |
| 13 | 65,558 | 77.6 % | 1,320 | 1.6 % | 480 | 0.6 % | 65,543 | 77.8 % | 17,329 | 20.6 % | 1,353 | 1.6 % | 66,965 | 79.9 % | 16,886 | 20.1 % | 65,686 | 78.1 % | 1,298 | 1.5 % |
| 14 | 34,557 | 54.3 % | 2,287 | 3.6 % | 922 | 1.4 % | 34,254 | 53.6 % | 27,310 | 42.7 % | 2,397 | 3.7 % | 36,047 | 56.7 % | 27,539 | 43.3 % | 34,416 | 54.1 % | 2,395 | 3.8 % |
| 15 | 69,884 | 64.7 % | 2,708 | 2.5 % | 979 | 0.9 % | 70,452 | 65.0 % | 35,295 | 32.6 % | 2,617 | 2.4 % | 72,742 | 67.4 % | 35,170 | 32.6 % | 70,248 | 65.0 % | 2,509 | 2.3 % |
| 16 | 67,388 | 77.0 % | 1,844 | 2.1 % | 606 | 0.7 % | 67,668 | 77.2 % | 18,075 | 20.6 % | 1,895 | 2.2 % | 69,370 | 79.4 % | 17,983 | 20.6 % | 67,678 | 77.4 % | 1,768 | 2.0 % |
| 17 | 43,205 | 60.5 % | 1,679 | 2.4 % | 807 | 1.1 % | 42,962 | 60.2 % | 26,362 | 37.0 % | 2,000 | 2.8 % | 44,852 | 63.2 % | 26,075 | 36.8 % | 43,510 | 61.1 % | 1,783 | 2.5 % |
| 18 | 47,576 | 73.9 % | 1,265 | 2.0 % | 436 | 0.7 % | 47,611 | 74.0 % | 15,405 | 23.9 % | 1,339 | 2.1 % | 48,811 | 76.1 % | 15,324 | 23.9 % | 47,610 | 74.2 % | 1,235 | 1.9 % |
| 19 | 66,868 | 82.4 % | 1,185 | 1.5 % | 360 | 0.4 % | 65,753 | 81.3 % | 13,805 | 17.1 % | 1,295 | 1.6 % | 67,167 | 83.4 % | 13,390 | 16.6 % | 66,013 | 81.7 % | 1,195 | 1.5 % |
| 20 | 76,453 | 68.5 % | 2,845 | 2.5 % | 1,036 | 0.9 % | 74,883 | 68.3 % | 31,888 | 29.1 % | 2,799 | 2.6 % | 79,365 | 71.5 % | 31,635 | 28.5 % | 76,406 | 68.9 % | 2,677 | 2.4 % |
| 21 | 57,509 | 77.0 % | 1,354 | 1.8 % | 418 | 0.6 % | 56,724 | 75.8 % | 16,621 | 22.2 % | 1,449 | 1.9 % | 58,361 | 78.2 % | 16,256 | 21.8 % | 57,253 | 76.6 % | 1,289 | 1.7 % |
| 22 | 17,567 | 33.6 % | 877 | 1.7 % | 443 | 0.8 % | 17,100 | 32.6 % | 34,455 | 65.7 % | 914 | 1.7 % | 17,860 | 34.1 % | 34,508 | 65.9 % | 17,169 | 32.7 % | 814 | 1.6 % |
| 23 | 44,968 | 57.4 % | 1,689 | 2.2 % | 918 | 1.2 % | 44,897 | 57.2 % | 31,565 | 40.2 % | 2,042 | 2.6 % | 46,517 | 59.5 % | 31,703 | 40.5 % | 44,945 | 57.5 % | 1,961 | 2.5 % |
| 24 | 64,475 | 68.5 % | 2,380 | 2.5 % | 905 | 1.0 % | 64,657 | 68.5 % | 27,242 | 28.8 % | 2,529 | 2.7 % | 66,885 | 71.1 % | 27,174 | 28.9 % | 64,573 | 68.7 % | 2,489 | 2.6 % |
| 25 | 47,245 | 69.3 % | 1,708 | 2.5 % | 532 | 0.8 % | 47,486 | 69.7 % | 18,973 | 27.8 % | 1,692 | 2.5 % | 49,060 | 72.2 % | 18,910 | 27.8 % | 47,530 | 69.9 % | 1,718 | 2.5 % |
| 26 | 42,818 | 50.8 % | 1,375 | 1.6 % | 861 | 1.0 % | 42,803 | 50.7 % | 40,018 | 47.4 % | 1,547 | 1.8 % | 43,526 | 51.9 % | 40,326 | 48.1 % | 42,477 | 50.6 % | 1,448 | 1.7 % |
| 27 | 24,462 | 29.2 % | 1,290 | 1.5 % | 875 | 1.0 % | 24,451 | 29.2 % | 57,702 | 69.0 % | 1,516 | 1.8 % | 25,273 | 30.4 % | 57,863 | 69.6 % | 24,298 | 29.1 % | 1,263 | 1.5 % |
| 28 | 64,123 | 53.2 % | 2,084 | 1.7 % | 991 | 0.8 % | 63,940 | 52.9 % | 54,604 | 45.2 % | 2,221 | 1.8 % | 65,654 | 54.7 % | 54,295 | 45.3 % | 63,815 | 53.1 % | 2,130 | 1.8 % |
| 29 | 51,097 | 52.9 % | 2,165 | 2.2 % | 1,063 | 1.1 % | 51,431 | 53.1 % | 43,199 | 44.6 % | 2,311 | 2.4 % | 53,106 | 55.0 % | 43,538 | 45.0 % | 51,336 | 53.1 % | 2,242 | 2.3 % |
| 30 | 48,620 | 71.6 % | 1,118 | 1.6 % | 497 | 0.7 % | 48,099 | 71.0 % | 18,349 | 27.1 % | 1,263 | 1.9 % | 49,727 | 73.8 % | 17,669 | 26.2 % | 48,564 | 71.9 % | 1,160 | 1.7 % |
| 31 | 26,837 | 50.5 % | 920 | 1.7 % | 636 | 1.2 % | 26,318 | 50.3 % | 24,695 | 47.2 % | 1,359 | 2.6 % | 28,101 | 53.9 % | 23,992 | 46.1 % | 26,928 | 51.5 % | 1,193 | 2.3 % |
| 32 | 36,856 | 53.7 % | 1,771 | 2.6 % | 1,063 | 1.5 % | 36,792 | 53.5 % | 30,057 | 43.7 % | 1,968 | 2.9 % | 38,488 | 56.3 % | 29,920 | 43.7 % | 37,083 | 54.2 % | 1,891 | 2.8 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR-T = Total Spanish surname voter registration

56528

Red-206
Data: 2020 Census
PLANH2100  08/02/2021 4:29:39 PM

Case 3:21-cv-00259-DCG-JES-JVB   Document 102-1   Filed 12/20/21   Page 96 of 195

Election Analysis

Texas Legislative Council
08/29/21 3:04 PM
Page 8 of 20

## HOUSE DISTRICTS - PLANH2100
## 2020 General Election

| District | SUP CT 7 Williams-D | | SUP CT 8 Busby-R | | Triana-D | | Oxford-L | | CCA 3 Richardson-R | | Davis Frizell-D | | CCA 4 Yeary-R | | Clinton-D | | CCA 9 Newell-R | | Birmingham-D | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STATE** | **4,860,388** | **44.3 %** | **5,845,851** | **53.4 %** | **4,825,339** | **44.1 %** | **274,876** | **2.5 %** | **5,952,614** | **54.5 %** | **4,962,780** | **45.5 %** | **5,972,977** | **54.8 %** | **4,922,833** | **45.2 %** | **6,014,555** | **55.3 %** | **4,861,782** | **44.7 %** |
| 1 | 16,516 | 24.0 % | 51,306 | 74.9 % | 15,996 | 23.4 % | 1,189 | 1.7 % | 51,624 | 75.5 % | 16,784 | 24.5 % | 51,822 | 75.8 % | 16,567 | 24.2 % | 52,059 | 75.9 % | 16,546 | 24.1 % |
| 2 | 14,129 | 18.2 % | 62,513 | 80.4 % | 13,649 | 17.6 % | 1,600 | 2.1 % | 62,775 | 81.2 % | 14,533 | 18.8 % | 62,933 | 81.4 % | 14,346 | 18.6 % | 62,856 | 81.7 % | 14,054 | 18.3 % |
| 3 | 21,090 | 23.0 % | 68,867 | 75.3 % | 20,670 | 22.6 % | 1,971 | 2.2 % | 69,665 | 76.4 % | 21,540 | 23.6 % | 69,782 | 76.7 % | 21,235 | 23.3 % | 69,968 | 76.9 % | 21,026 | 23.1 % |
| 4 | 23,024 | 26.7 % | 61,884 | 71.8 % | 22,578 | 26.2 % | 1,739 | 2.0 % | 62,531 | 72.6 % | 23,628 | 27.4 % | 62,790 | 72.9 % | 23,314 | 27.1 % | 62,789 | 73.0 % | 23,177 | 27.0 % |
| 5 | 14,923 | 20.1 % | 58,069 | 78.5 % | 14,580 | 19.7 % | 1,304 | 1.8 % | 58,580 | 79.4 % | 15,239 | 20.6 % | 58,640 | 79.6 % | 15,041 | 20.4 % | 58,844 | 79.8 % | 14,907 | 20.2 % |
| 6 | 22,918 | 31.0 % | 49,689 | 67.2 % | 22,673 | 30.7 % | 1,574 | 2.1 % | 50,286 | 68.0 % | 23,646 | 32.0 % | 50,417 | 68.4 % | 23,297 | 31.6 % | 50,607 | 68.6 % | 23,186 | 31.4 % |
| 7 | 16,619 | 25.4 % | 47,491 | 72.8 % | 16,369 | 25.1 % | 1,413 | 2.2 % | 48,107 | 73.8 % | 17,114 | 26.2 % | 48,232 | 74.0 % | 16,922 | 26.0 % | 48,371 | 74.3 % | 16,717 | 25.7 % |
| 8 | 12,808 | 21.1 % | 47,209 | 77.6 % | 12,488 | 20.5 % | 1,130 | 1.9 % | 46,810 | 78.2 % | 13,049 | 21.8 % | 47,698 | 78.7 % | 12,917 | 21.3 % | 47,729 | 78.8 % | 12,807 | 21.2 % |
| 9 | 16,000 | 21.8 % | 56,797 | 77.1 % | 15,710 | 21.3 % | 1,123 | 1.5 % | 57,199 | 77.8 % | 16,309 | 22.2 % | 57,240 | 78.0 % | 16,152 | 22.0 % | 57,277 | 78.1 % | 16,031 | 21.9 % |
| 10 | 26,743 | 29.7 % | 61,380 | 68.3 % | 26,270 | 29.2 % | 2,230 | 2.5 % | 62,024 | 69.1 % | 27,750 | 30.9 % | 62,473 | 69.7 % | 27,135 | 30.3 % | 62,623 | 69.9 % | 26,968 | 30.1 % |
| 11 | 16,698 | 25.3 % | 48,252 | 73.1 % | 16,472 | 24.9 % | 1,324 | 2.0 % | 48,799 | 74.0 % | 17,142 | 26.0 % | 48,931 | 74.3 % | 16,936 | 25.7 % | 48,982 | 74.5 % | 16,755 | 25.5 % |
| 12 | 20,225 | 31.9 % | 41,951 | 66.4 % | 19,927 | 31.5 % | 1,346 | 2.1 % | 42,378 | 67.2 % | 20,704 | 32.8 % | 42,423 | 67.4 % | 20,477 | 32.6 % | 42,535 | 67.7 % | 20,261 | 32.3 % |
| 13 | 17,075 | 20.3 % | 66,010 | 78.5 % | 16,664 | 19.8 % | 1,373 | 1.6 % | 66,383 | 79.3 % | 17,376 | 20.7 % | 66,258 | 79.4 % | 17,157 | 20.6 % | 66,463 | 79.7 % | 16,937 | 20.3 % |
| 14 | 26,758 | 42.1 % | 34,309 | 54.2 % | 26,612 | 42.0 % | 2,438 | 3.8 % | 35,287 | 55.8 % | 27,955 | 44.2 % | 35,834 | 56.8 % | 27,202 | 43.2 % | 35,754 | 56.8 % | 27,152 | 43.2 % |
| 15 | 35,255 | 32.6 % | 70,954 | 65.7 % | 34,440 | 31.9 % | 2,627 | 2.4 % | 71,824 | 66.9 % | 35,527 | 33.1 % | 71,798 | 67.0 % | 35,316 | 33.0 % | 72,154 | 67.4 % | 34,915 | 32.6 % |
| 16 | 17,998 | 20.6 % | 68,043 | 77.8 % | 17,585 | 20.1 % | 1,832 | 2.1 % | 68,680 | 78.9 % | 18,335 | 21.1 % | 68,794 | 79.2 % | 18,091 | 20.8 % | 68,891 | 79.3 % | 17,990 | 20.7 % |
| 17 | 25,961 | 36.4 % | 43,361 | 61.0 % | 25,907 | 36.4 % | 1,828 | 2.6 % | 44,250 | 62.3 % | 26,828 | 37.7 % | 44,577 | 62.8 % | 26,420 | 37.2 % | 44,757 | 63.2 % | 26,079 | 36.8 % |
| 18 | 15,302 | 23.9 % | 47,860 | 74.6 % | 14,933 | 23.3 % | 1,343 | 2.1 % | 48,309 | 75.5 % | 15,699 | 24.5 % | 48,495 | 75.9 % | 15,375 | 24.1 % | 48,523 | 76.0 % | 15,360 | 24.0 % |
| 19 | 13,568 | 16.8 % | 66,295 | 82.0 % | 13,088 | 16.2 % | 1,453 | 1.8 % | 66,697 | 82.9 % | 13,773 | 17.1 % | 66,673 | 83.1 % | 13,525 | 16.9 % | 66,931 | 83.2 % | 13,530 | 16.8 % |
| 20 | 31,791 | 28.7 % | 76,660 | 69.3 % | 31,146 | 28.1 % | 2,894 | 2.6 % | 78,074 | 70.6 % | 32,539 | 29.4 % | 78,300 | 71.0 % | 31,943 | 29.0 % | 78,655 | 71.4 % | 31,519 | 28.6 % |
| 21 | 16,208 | 21.7 % | 57,289 | 76.6 % | 15,868 | 21.2 % | 1,627 | 2.2 % | 57,776 | 77.7 % | 16,582 | 22.3 % | 57,869 | 77.9 % | 16,438 | 22.1 % | 58,038 | 78.1 % | 16,279 | 21.9 % |
| 22 | 34,467 | 65.7 % | 17,204 | 32.8 % | 34,102 | 65.0 % | 1,123 | 2.1 % | 17,527 | 33.6 % | 34,702 | 66.4 % | 17,486 | 33.5 % | 34,640 | 66.5 % | 17,666 | 33.9 % | 34,436 | 66.1 % |
| 23 | 31,318 | 40.0 % | 45,151 | 57.8 % | 30,962 | 39.7 % | 1,971 | 2.5 % | 45,837 | 58.8 % | 32,127 | 41.2 % | 46,065 | 59.2 % | 31,716 | 40.8 % | 46,219 | 59.6 % | 31,364 | 40.4 % |
| 24 | 26,942 | 28.7 % | 64,841 | 69.1 % | 26,407 | 28.1 % | 2,621 | 2.8 % | 66,079 | 70.5 % | 27,587 | 29.5 % | 66,125 | 70.8 % | 27,313 | 29.2 % | 66,396 | 71.2 % | 26,899 | 28.8 % |
| 25 | 18,739 | 27.6 % | 47,657 | 70.2 % | 18,446 | 27.2 % | 1,743 | 2.6 % | 48,369 | 71.4 % | 19,366 | 28.6 % | 48,485 | 71.8 % | 19,068 | 28.2 % | 48,701 | 72.1 % | 18,805 | 27.9 % |
| 26 | 39,939 | 47.6 % | 42,998 | 51.3 % | 39,120 | 46.7 % | 1,682 | 2.0 % | 43,434 | 52.0 % | 40,106 | 48.0 % | 43,197 | 51.7 % | 40,291 | 48.3 % | 43,684 | 52.5 % | 39,461 | 47.5 % |
| 27 | 57,866 | 69.4 % | 24,490 | 29.4 % | 57,166 | 68.7 % | 1,599 | 1.9 % | 24,866 | 29.9 % | 58,249 | 70.1 % | 24,843 | 29.9 % | 58,282 | 70.1 % | 25,199 | 30.4 % | 57,561 | 69.6 % |
| 28 | 54,250 | 45.1 % | 64,169 | 53.4 % | 53,643 | 44.7 % | 2,314 | 1.9 % | 65,075 | 54.3 % | 54,768 | 45.7 % | 65,257 | 54.5 % | 54,528 | 45.5 % | 65,699 | 55.0 % | 53,697 | 45.0 % |
| 29 | 43,020 | 44.5 % | 51,593 | 53.5 % | 42,455 | 44.0 % | 2,354 | 2.4 % | 52,456 | 54.5 % | 43,833 | 45.5 % | 52,568 | 54.7 % | 43,466 | 45.3 % | 52,999 | 55.3 % | 42,860 | 44.7 % |
| 30 | 17,776 | 26.3 % | 48,642 | 72.2 % | 17,545 | 26.0 % | 1,219 | 1.8 % | 49,095 | 73.0 % | 18,197 | 27.0 % | 49,356 | 73.5 % | 17,817 | 26.5 % | 49,319 | 73.6 % | 17,705 | 26.4 % |
| 31 | 24,175 | 46.2 % | 26,359 | 50.2 % | 24,820 | 47.3 % | 1,318 | 2.5 % | 27,313 | 52.4 % | 24,808 | 47.6 % | 27,268 | 52.6 % | 24,540 | 47.4 % | 27,825 | 53.8 % | 23,895 | 46.2 % |
| 32 | 29,413 | 43.0 % | 36,924 | 54.2 % | 29,353 | 43.1 % | 1,896 | 2.8 % | 37,749 | 55.5 % | 30,288 | 44.5 % | 38,210 | 56.3 % | 29,657 | 43.7 % | 38,357 | 56.7 % | 29,259 | 43.3 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR-T = Total Spanish surname voter registration

Red-206
Data: 2020 Census
PLANH2100  08/02/2021 4:29:39 PM

Case 3:21-cv-00259-DCG-JES-JVB   Document 102-1   Filed 12/20/21   Page 97 of 195

Texas Legislative Council
08/29/21 3:04 PM
Page 9 of 20

Election Analysis

## HOUSE DISTRICTS - PLANH2100
## 2020 General Election

| | PRESIDENT | | | | | | U.S. SEN | | | | | RR COMM 1 | |
| District | Biden-D | | Trump-R | | Jorgensen-L | | Hawkins-G | | Write-In-W | | Cornyn-R | | Hegar-D | | McKennon-L | | Collins-G | | Castaneda-D | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 33 | 47,361 | 38.3 % | 74,327 | 60.1 % | 1,372 | 1.1 % | 281 | 0.2 % | 354 | 0.3 % | 76,278 | 62.6 % | 42,849 | 35.2 % | 2,101 | 1.7 % | 654 | 0.5 % | 41,473 | 34.4 % |
| 34 | 29,226 | 51.7 % | 26,606 | 47.0 % | 494 | 0.9 % | 155 | 0.3 % | 97 | 0.2 % | 26,236 | 47.4 % | 27,567 | 49.8 % | 1,081 | 2.0 % | 466 | 0.8 % | 27,816 | 51.0 % |
| 35 | 24,991 | 53.8 % | 21,049 | 45.3 % | 285 | 0.6 % | 133 | 0.3 % | 33 | 0.1 % | 18,926 | 43.8 % | 22,735 | 52.7 % | 930 | 2.2 % | 575 | 1.3 % | 23,684 | 56.2 % |
| 36 | 27,180 | 58.8 % | 18,559 | 40.1 % | 267 | 0.6 % | 247 | 0.5 % | 6 | 0.0 % | 17,184 | 39.2 % | 24,690 | 56.3 % | 1,177 | 2.7 % | 787 | 1.8 % | 26,399 | 61.4 % |
| 37 | 24,258 | 58.0 % | 17,079 | 40.9 % | 268 | 0.6 % | 142 | 0.3 % | 52 | 0.1 % | 15,883 | 39.1 % | 23,343 | 57.5 % | 712 | 1.8 % | 648 | 1.6 % | 24,198 | 60.6 % |
| 38 | 29,116 | 56.6 % | 21,573 | 42.1 % | 335 | 0.7 % | 153 | 0.3 % | 84 | 0.2 % | 20,464 | 41.0 % | 28,050 | 56.2 % | 774 | 1.6 % | 610 | 1.2 % | 29,097 | 59.2 % |
| 39 | 28,107 | 59.5 % | 18,626 | 39.4 % | 257 | 0.5 % | 248 | 0.5 % | 12 | 0.0 % | 17,246 | 38.4 % | 25,657 | 57.2 % | 1,138 | 2.5 % | 817 | 1.8 % | 26,979 | 61.5 % |
| 40 | 26,654 | 59.8 % | 17,486 | 39.3 % | 265 | 0.6 % | 125 | 0.3 % | 5 | 0.0 % | 16,266 | 38.4 % | 24,401 | 57.7 % | 1,045 | 2.5 % | 597 | 1.4 % | 25,335 | 61.1 % |
| 41 | 31,956 | 55.5 % | 25,187 | 43.7 % | 312 | 0.5 % | 153 | 0.3 % | 7 | 0.0 % | 24,797 | 44.3 % | 29,594 | 52.8 % | 1,093 | 2.0 % | 518 | 0.9 % | 30,611 | 55.5 % |
| 42 | 29,040 | 62.0 % | 17,265 | 36.9 % | 300 | 0.6 % | 145 | 0.3 % | 78 | 0.2 % | 15,616 | 34.4 % | 28,186 | 62.2 % | 818 | 1.8 % | 718 | 1.6 % | 29,153 | 65.0 % |
| 43 | 23,775 | 39.6 % | 35,550 | 59.2 % | 550 | 0.9 % | 177 | 0.3 % | 37 | 0.1 % | 34,282 | 58.6 % | 22,750 | 38.9 % | 1,015 | 1.7 % | 411 | 0.7 % | 23,163 | 40.1 % |
| 44 | 35,155 | 34.2 % | 66,016 | 64.2 % | 1,174 | 1.1 % | 250 | 0.2 % | 195 | 0.2 % | 66,635 | 65.5 % | 32,640 | 32.1 % | 1,854 | 1.8 % | 546 | 0.5 % | 32,325 | 32.2 % |
| 45 | 61,435 | 52.6 % | 53,123 | 45.5 % | 1,807 | 1.5 % | 433 | 0.4 % | 56 | 0.0 % | 54,996 | 47.4 % | 57,413 | 49.5 % | 2,700 | 2.3 % | 844 | 0.7 % | 54,943 | 48.2 % |
| 46 | 62,691 | 80.8 % | 13,272 | 17.1 % | 1,021 | 1.3 % | 343 | 0.4 % | 252 | 0.3 % | 14,088 | 18.5 % | 59,667 | 78.5 % | 1,576 | 2.1 % | 677 | 0.9 % | 57,503 | 77.0 % |
| 47 | 76,336 | 54.1 % | 61,983 | 43.9 % | 1,954 | 1.4 % | 322 | 0.2 % | 483 | 0.3 % | 66,452 | 47.7 % | 69,906 | 50.2 % | 2,291 | 1.6 % | 613 | 0.4 % | 66,419 | 48.7 % |
| 48 | 79,107 | 71.7 % | 28,771 | 26.1 % | 1,730 | 1.6 % | 324 | 0.3 % | 395 | 0.4 % | 32,760 | 30.0 % | 73,499 | 67.4 % | 2,093 | 1.9 % | 670 | 0.6 % | 70,188 | 66.1 % |
| 49 | 87,287 | 81.4 % | 17,606 | 16.4 % | 1,527 | 1.4 % | 416 | 0.4 % | 439 | 0.4 % | 20,666 | 19.5 % | 82,534 | 78.0 % | 1,956 | 1.8 % | 682 | 0.6 % | 78,407 | 76.0 % |
| 50 | 68,013 | 69.5 % | 27,627 | 28.2 % | 1,549 | 1.6 % | 353 | 0.4 % | 305 | 0.3 % | 28,964 | 30.2 % | 64,101 | 66.8 % | 2,168 | 2.3 % | 710 | 0.7 % | 61,452 | 65.3 % |
| 51 | 62,426 | 81.9 % | 12,078 | 15.8 % | 1,124 | 1.5 % | 336 | 0.4 % | 279 | 0.4 % | 12,930 | 17.4 % | 58,821 | 78.9 % | 1,922 | 2.6 % | 839 | 1.1 % | 56,883 | 77.9 % |
| 52 | 55,059 | 53.9 % | 44,665 | 43.7 % | 1,907 | 1.9 % | 304 | 0.3 % | 293 | 0.3 % | 45,370 | 45.5 % | 51,451 | 51.6 % | 2,306 | 2.3 % | 597 | 0.6 % | 48,689 | 49.7 % |
| 53 | 20,570 | 23.1 % | 67,376 | 75.8 % | 771 | 0.9 % | 162 | 0.2 % | 32 | 0.0 % | 67,086 | 76.5 % | 18,901 | 21.6 % | 1,301 | 1.5 % | 383 | 0.4 % | 18,717 | 21.6 % |
| 54 | 35,994 | 48.9 % | 36,091 | 49.0 % | 1,158 | 1.6 % | 263 | 0.4 % | 173 | 0.2 % | 36,550 | 49.9 % | 34,461 | 47.1 % | 1,705 | 2.3 % | 461 | 0.6 % | 33,036 | 45.4 % |
| 55 | 23,164 | 36.0 % | 39,888 | 61.9 % | 967 | 1.5 % | 201 | 0.3 % | 190 | 0.3 % | 40,486 | 63.3 % | 21,930 | 34.3 % | 1,209 | 1.9 % | 327 | 0.5 % | 20,509 | 32.4 % |
| 56 | 26,329 | 35.0 % | 47,493 | 63.2 % | 1,044 | 1.4 % | 178 | 0.2 % | 92 | 0.1 % | 48,159 | 65.1 % | 23,854 | 32.2 % | 1,541 | 2.1 % | 457 | 0.6 % | 22,307 | 30.8 % |
| 57 | 15,920 | 23.1 % | 52,414 | 76.0 % | 455 | 0.7 % | 119 | 0.2 % | 98 | 0.1 % | 51,828 | 76.0 % | 15,245 | 22.4 % | 834 | 1.2 % | 285 | 0.4 % | 14,642 | 21.6 % |
| 58 | 18,025 | 22.2 % | 62,097 | 76.5 % | 854 | 1.1 % | 155 | 0.2 % | 28 | 0.0 % | 61,770 | 76.7 % | 16,964 | 21.1 % | 1,338 | 1.7 % | 429 | 0.5 % | 16,186 | 20.3 % |
| 59 | 13,767 | 21.4 % | 49,364 | 76.8 % | 840 | 1.3 % | 173 | 0.3 % | 111 | 0.2 % | 48,850 | 77.0 % | 12,918 | 20.4 % | 1,269 | 2.0 % | 379 | 0.6 % | 12,111 | 19.3 % |
| 60 | 12,681 | 14.7 % | 72,308 | 84.1 % | 735 | 0.9 % | 166 | 0.2 % | 88 | 0.1 % | 71,186 | 84.0 % | 11,780 | 13.9 % | 1,312 | 1.5 % | 425 | 0.5 % | 11,178 | 13.3 % |
| 61 | 17,990 | 16.6 % | 89,077 | 82.1 % | 1,190 | 1.1 % | 205 | 0.2 % | 31 | 0.0 % | 88,335 | 82.2 % | 16,563 | 15.4 % | 2,131 | 2.0 % | 487 | 0.5 % | 15,251 | 14.3 % |
| 62 | 17,564 | 22.8 % | 58,496 | 75.8 % | 813 | 1.1 % | 162 | 0.2 % | 140 | 0.2 % | 57,682 | 75.6 % | 16,867 | 22.1 % | 1,312 | 1.7 % | 395 | 0.5 % | 15,695 | 20.7 % |
| 63 | 41,879 | 37.0 % | 69,500 | 61.5 % | 1,393 | 1.2 % | 238 | 0.2 % | 86 | 0.1 % | 72,278 | 64.5 % | 37,111 | 33.2 % | 2,083 | 1.9 % | 554 | 0.5 % | 35,047 | 31.9 % |
| 64 | 42,908 | 47.2 % | 46,093 | 50.7 % | 1,436 | 1.6 % | 355 | 0.4 % | 76 | 0.1 % | 47,395 | 52.8 % | 39,350 | 43.8 % | 2,201 | 2.5 % | 803 | 0.9 % | 37,396 | 42.5 % |
| 65 | 44,884 | 54.5 % | 36,126 | 43.9 % | 1,028 | 1.2 % | 229 | 0.3 % | 55 | 0.1 % | 38,039 | 46.9 % | 40,789 | 50.3 % | 1,752 | 2.2 % | 571 | 0.7 % | 39,040 | 49.2 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.

SSVR-T = Total Spanish surname voter registration

Red-206
Data: 2020 Census
PLANH2100  08/02/2021 4:29:39 PM

Case 3:21-cv-00259-DCG-JES-JVB   Document 102-1   Filed 12/20/21   Page 98 of 195
Election Analysis
**HOUSE DISTRICTS - PLANH2100**
**2020 General Election**

Texas Legislative Council
08/29/21 3:04 PM
Page 10 of 20

| District | RR COMM 1 | | | | | | SUP CT CHIEF | | | | | | SUP CT 6 | | | | | | SUP CT 7 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wright-R | | Sterett-L | | Gruene-G | | Hecht-R | | Meachum-D | | Ash-L | | Bland-R | | Cheng-D | | | Boyd-R | | Strange-L | |
| 33 | 75,368 | 62.6 % | 2,709 | 2.2 % | 909 | 0.8 % | 75,041 | 62.3 % | 42,684 | 35.4 % | 2,822 | 2.3 % | 77,026 | 64.5 % | 42,402 | 35.5 % | 75,382 | 62.7 % | 2,532 | 2.1 % |
| 34 | 24,985 | 45.8 % | 1,006 | 1.8 % | 717 | 1.3 % | 24,778 | 45.5 % | 28,310 | 51.9 % | 1,408 | 2.6 % | 26,014 | 48.0 % | 28,162 | 52.0 % | 25,097 | 46.3 % | 1,255 | 2.3 % |
| 35 | 17,094 | 40.5 % | 788 | 1.9 % | 593 | 1.4 % | 16,879 | 40.7 % | 23,564 | 56.8 % | 1,033 | 2.5 % | 18,328 | 43.9 % | 23,465 | 56.1 % | 17,220 | 41.7 % | 1,044 | 2.5 % |
| 36 | 15,020 | 34.9 % | 940 | 2.2 % | 656 | 1.5 % | 15,212 | 35.5 % | 26,443 | 61.7 % | 1,228 | 2.9 % | 16,632 | 38.8 % | 26,204 | 61.2 % | 15,445 | 36.2 % | 1,435 | 3.4 % |
| 37 | 14,401 | 36.1 % | 781 | 2.0 % | 561 | 1.4 % | 13,735 | 35.6 % | 23,643 | 61.2 % | 1,241 | 3.2 % | 15,492 | 39.3 % | 23,908 | 60.7 % | 14,173 | 36.9 % | 1,041 | 2.7 % |
| 38 | 18,502 | 37.7 % | 877 | 1.8 % | 653 | 1.3 % | 17,892 | 37.6 % | 28,330 | 59.6 % | 1,335 | 2.8 % | 19,819 | 40.9 % | 28,640 | 59.1 % | 18,429 | 38.9 % | 1,126 | 2.4 % |
| 39 | 15,314 | 34.9 % | 871 | 2.0 % | 711 | 1.6 % | 15,411 | 35.2 % | 27,072 | 61.8 % | 1,327 | 3.0 % | 16,967 | 38.8 % | 26,724 | 61.2 % | 15,749 | 36.1 % | 1,413 | 3.2 % |
| 40 | 14,612 | 35.3 % | 846 | 2.0 % | 646 | 1.6 % | 14,535 | 35.1 % | 25,689 | 62.1 % | 1,141 | 2.8 % | 15,835 | 38.3 % | 25,477 | 61.7 % | 14,893 | 36.2 % | 1,290 | 3.1 % |
| 41 | 22,881 | 41.5 % | 972 | 1.8 % | 674 | 1.2 % | 22,937 | 41.6 % | 30,967 | 56.2 % | 1,227 | 2.2 % | 24,330 | 44.3 % | 30,643 | 55.7 % | 23,292 | 42.4 % | 1,361 | 2.5 % |
| 42 | 14,222 | 31.7 % | 733 | 1.6 % | 721 | 1.6 % | 13,743 | 31.2 % | 28,958 | 65.7 % | 1,351 | 3.1 % | 15,334 | 34.5 % | 29,083 | 65.5 % | 14,315 | 32.1 % | 1,151 | 2.6 % |
| 43 | 33,094 | 57.2 % | 1,014 | 1.8 % | 554 | 1.0 % | 32,595 | 56.6 % | 23,614 | 41.0 % | 1,374 | 2.4 % | 34,050 | 59.5 % | 23,197 | 40.5 % | 33,064 | 57.7 % | 1,206 | 2.1 % |
| 44 | 64,617 | 64.3 % | 2,331 | 2.3 % | 1,148 | 1.1 % | 64,700 | 64.3 % | 33,190 | 33.0 % | 2,697 | 2.7 % | 67,129 | 66.9 % | 33,111 | 33.1 % | 65,161 | 65.0 % | 2,405 | 2.4 % |
| 45 | 53,725 | 47.1 % | 3,274 | 2.9 % | 2,095 | 1.8 % | 53,537 | 46.9 % | 56,871 | 49.8 % | 3,837 | 3.4 % | 56,457 | 49.6 % | 57,273 | 50.4 % | 53,995 | 47.4 % | 3,589 | 3.2 % |
| 46 | 13,271 | 17.8 % | 2,116 | 2.8 % | 1,766 | 2.4 % | 13,334 | 17.9 % | 58,895 | 79.0 % | 2,337 | 3.1 % | 14,679 | 19.8 % | 59,551 | 80.2 % | 13,441 | 18.1 % | 2,124 | 2.9 % |
| 47 | 64,426 | 47.3 % | 3,682 | 2.7 % | 1,721 | 1.3 % | 64,676 | 47.4 % | 68,003 | 49.8 % | 3,772 | 2.8 % | 67,932 | 50.1 % | 67,623 | 49.9 % | 64,624 | 47.8 % | 3,307 | 2.4 % |
| 48 | 30,978 | 29.2 % | 3,138 | 3.0 % | 1,950 | 1.8 % | 31,407 | 29.5 % | 71,860 | 67.4 % | 3,364 | 3.2 % | 33,785 | 32.0 % | 71,900 | 68.0 % | 31,295 | 29.7 % | 3,115 | 3.0 % |
| 49 | 19,628 | 19.0 % | 2,800 | 2.7 % | 2,319 | 2.2 % | 19,716 | 19.0 % | 80,709 | 77.9 % | 3,125 | 3.0 % | 21,465 | 20.9 % | 81,345 | 79.1 % | 19,490 | 19.0 % | 2,867 | 2.8 % |
| 50 | 27,643 | 29.4 % | 2,995 | 3.2 % | 2,002 | 2.1 % | 27,839 | 29.6 % | 62,833 | 66.9 % | 3,305 | 3.5 % | 29,918 | 32.0 % | 63,579 | 68.0 % | 28,071 | 30.1 % | 2,988 | 3.2 % |
| 51 | 12,030 | 16.5 % | 2,230 | 3.1 % | 1,921 | 2.6 % | 11,946 | 16.4 % | 58,175 | 79.7 % | 2,837 | 3.9 % | 13,330 | 18.4 % | 59,192 | 81.6 % | 12,203 | 16.8 % | 2,494 | 3.4 % |
| 52 | 44,404 | 45.3 % | 3,318 | 3.4 % | 1,552 | 1.6 % | 42,950 | 45.1 % | 48,925 | 51.3 % | 3,456 | 3.6 % | 47,131 | 48.4 % | 50,249 | 51.6 % | 44,413 | 45.7 % | 3,383 | 3.5 % |
| 53 | 65,472 | 75.6 % | 1,606 | 1.9 % | 751 | 0.9 % | 65,552 | 75.8 % | 19,186 | 22.2 % | 1,752 | 2.0 % | 67,287 | 78.3 % | 18,647 | 21.7 % | 65,733 | 76.3 % | 1,646 | 1.9 % |
| 54 | 36,747 | 50.6 % | 1,952 | 2.7 % | 957 | 1.3 % | 36,136 | 49.6 % | 34,434 | 47.3 % | 2,268 | 3.1 % | 37,802 | 52.0 % | 34,882 | 48.0 % | 36,281 | 49.9 % | 2,037 | 2.8 % |
| 55 | 40,639 | 64.1 % | 1,575 | 2.5 % | 665 | 1.0 % | 39,912 | 62.7 % | 21,871 | 34.4 % | 1,831 | 2.9 % | 41,630 | 65.6 % | 21,795 | 34.4 % | 40,188 | 63.3 % | 1,698 | 2.7 % |
| 56 | 47,493 | 65.5 % | 1,826 | 2.5 % | 842 | 1.2 % | 47,143 | 64.7 % | 23,851 | 32.7 % | 1,865 | 2.6 % | 49,023 | 67.6 % | 23,489 | 32.4 % | 47,710 | 65.7 % | 1,653 | 2.3 % |
| 57 | 51,784 | 76.5 % | 958 | 1.4 % | 325 | 0.5 % | 51,050 | 75.5 % | 15,394 | 22.8 % | 1,160 | 1.7 % | 52,368 | 77.6 % | 15,127 | 22.4 % | 51,755 | 76.5 % | 946 | 1.4 % |
| 58 | 61,132 | 76.7 % | 1,796 | 2.3 % | 608 | 0.8 % | 60,941 | 76.6 % | 16,844 | 21.2 % | 1,773 | 2.2 % | 62,551 | 79.0 % | 16,624 | 21.0 % | 60,985 | 76.9 % | 1,590 | 2.0 % |
| 59 | 48,655 | 77.5 % | 1,455 | 2.3 % | 565 | 0.9 % | 48,174 | 76.8 % | 12,990 | 20.7 % | 1,543 | 2.5 % | 49,567 | 79.4 % | 12,854 | 20.6 % | 48,359 | 77.3 % | 1,418 | 2.3 % |
| 60 | 70,811 | 84.4 % | 1,477 | 1.8 % | 444 | 0.5 % | 70,148 | 83.8 % | 11,965 | 14.3 % | 1,613 | 1.9 % | 71,833 | 86.1 % | 11,564 | 13.9 % | 70,461 | 84.4 % | 1,426 | 1.7 % |
| 61 | 88,028 | 82.7 % | 2,520 | 2.4 % | 696 | 0.7 % | 87,524 | 82.2 % | 16,322 | 15.3 % | 2,627 | 2.5 % | 89,847 | 84.7 % | 16,186 | 15.3 % | 87,727 | 82.7 % | 2,457 | 2.3 % |
| 62 | 57,877 | 76.5 % | 1,604 | 2.1 % | 469 | 0.6 % | 57,212 | 75.6 % | 16,959 | 22.4 % | 1,548 | 2.0 % | 59,025 | 78.1 % | 16,564 | 21.9 % | 57,641 | 76.2 % | 1,464 | 1.9 % |
| 63 | 70,657 | 64.4 % | 2,847 | 2.6 % | 1,222 | 1.1 % | 70,675 | 64.0 % | 37,137 | 33.6 % | 2,588 | 2.3 % | 72,829 | 66.7 % | 36,353 | 33.3 % | 70,514 | 64.4 % | 2,658 | 2.4 % |
| 64 | 46,264 | 52.6 % | 2,511 | 2.9 % | 1,814 | 2.1 % | 46,264 | 52.3 % | 39,532 | 44.7 % | 2,620 | 3.0 % | 47,913 | 54.9 % | 39,400 | 45.1 % | 46,000 | 52.5 % | 2,646 | 3.0 % |
| 65 | 36,949 | 46.6 % | 2,127 | 2.7 % | 1,185 | 1.5 % | 37,205 | 46.6 % | 40,564 | 50.9 % | 1,998 | 2.5 % | 38,478 | 48.7 % | 40,531 | 51.3 % | 36,850 | 46.7 % | 2,076 | 2.6 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR-T = Total Spanish surname voter registration

56528

Red-206
Data: 2020 Census
PLANH2100  08/02/2021 4:29:39 PM

Case 3:21-cv-00259-DCG-JES-JVB   Document 102-1   Filed 12/20/21   Page 99 of 195

Election Analysis

Texas Legislative Council
08/29/21 3:04 PM
Page 11 of 20

## HOUSE DISTRICTS - PLANH2100
## 2020 General Election

| District | SUP CT 7 | | | SUP CT 8 | | | CCA 3 | | | CCA 4 | | | CCA 9 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Williams-D | Busby-R | | Triana-D | Oxford-L | | Richardson-R | Davis Frizell-D | | Yeary-R | Clinton-D | | Newell-R | Birmingham-D |
| 33 | 42,241  35.2 % | 75,454  62.9 % | | 41,628  34.7 % | 2,896  2.4 % | | 76,359  63.9 % | 43,130  36.1 % | | 76,839  64.3 % | 42,674  35.7 % | | 77,159  64.6 % | 42,201  35.4 % |
| 34 | 27,807  51.3 % | 24,735  45.8 % | | 28,040  51.9 % | 1,243  2.3 % | | 25,404  47.1 % | 28,567  52.9 % | | 25,737  47.8 % | 28,121  52.2 % | | 25,842  48.2 % | 27,761  51.8 % |
| 35 | 23,022  55.8 % | 16,718  40.1 % | | 23,888  57.4 % | 1,040  2.5 % | | 17,683  42.3 % | 24,132  57.7 % | | 17,743  42.8 % | 23,671  57.2 % | | 18,207  44.0 % | 23,160  56.0 % |
| 36 | 25,837  60.5 % | 14,609  34.3 % | | 26,825  62.9 % | 1,203  2.8 % | | 15,664  36.6 % | 27,081  63.4 % | | 16,085  37.7 % | 26,548  62.3 % | | 16,516  39.0 % | 25,796  61.0 % |
| 37 | 23,244  60.4 % | 13,841  35.0 % | | 24,681  62.4 % | 1,054  2.7 % | | 15,020  37.8 % | 24,713  62.2 % | | 14,732  37.9 % | 24,158  62.1 % | | 15,454  39.5 % | 23,651  60.5 % |
| 38 | 27,784  58.7 % | 17,997  37.0 % | | 29,427  60.5 % | 1,184  2.4 % | | 19,278  39.5 % | 29,511  60.5 % | | 19,032  39.7 % | 28,881  60.3 % | | 19,801  41.2 % | 28,263  58.8 % |
| 39 | 26,452  60.7 % | 15,045  34.6 % | | 27,243  62.7 % | 1,163  2.7 % | | 15,999  36.7 % | 27,609  63.3 % | | 16,449  37.8 % | 27,027  62.2 % | | 16,687  38.6 % | 26,489  61.4 % |
| 40 | 24,976  60.7 % | 14,155  34.5 % | | 25,709  62.6 % | 1,185  2.9 % | | 15,144  36.8 % | 25,991  63.2 % | | 15,505  37.8 % | 25,522  62.2 % | | 15,695  38.5 % | 25,075  61.5 % |
| 41 | 30,246  55.1 % | 22,642  41.3 % | | 30,822  56.3 % | 1,313  2.4 % | | 23,642  43.1 % | 31,168  56.9 % | | 24,078  44.0 % | 30,594  56.0 % | | 24,357  44.7 % | 30,079  55.3 % |
| 42 | 29,183  65.4 % | 13,304  29.9 % | | 30,024  67.5 % | 1,166  2.6 % | | 14,436  33.3 % | 28,937  66.7 % | | 14,834  34.4 % | 28,256  65.6 % | | 15,304  34.9 % | 28,552  65.1 % |
| 43 | 23,025  40.2 % | 32,700  57.3 % | | 23,116  40.5 % | 1,299  2.3 % | | 33,481  58.6 % | 23,616  41.4 % | | 33,838  59.3 % | 23,214  40.7 % | | 33,797  59.5 % | 23,011  40.5 % |
| 44 | 32,686  32.6 % | 65,175  65.1 % | | 32,356  32.3 % | 2,597  2.6 % | | 66,340  66.4 % | 33,609  33.6 % | | 66,687  66.9 % | 33,036  33.1 % | | 66,937  67.2 % | 32,607  32.8 % |
| 45 | 56,211  49.4 % | 53,835  47.4 % | | 55,841  49.2 % | 3,867  3.4 % | | 55,193  48.7 % | 58,103  51.3 % | | 55,900  49.5 % | 57,071  50.5 % | | 56,125  49.8 % | 56,517  50.2 % |
| 46 | 58,663  79.0 % | 13,180  17.8 % | | 58,608  79.1 % | 2,315  3.1 % | | 13,835  18.9 % | 59,513  81.1 % | | 14,026  19.1 % | 59,398  80.9 % | | 14,383  19.6 % | 58,852  80.4 % |
| 47 | 67,207  49.7 % | 64,608  47.9 % | | 66,512  49.3 % | 3,795  2.8 % | | 65,927  49.2 % | 68,046  50.8 % | | 66,158  49.4 % | 67,647  50.6 % | | 66,695  50.0 % | 66,578  50.0 % |
| 48 | 71,026  67.4 % | 30,819  29.3 % | | 71,141  67.5 % | 3,373  3.2 % | | 32,319  30.9 % | 72,115  69.1 % | | 32,392  31.1 % | 71,920  68.9 % | | 32,874  31.6 % | 71,017  68.4 % |
| 49 | 80,022  78.2 % | 19,308  18.9 % | | 79,822  78.1 % | 3,108  3.0 % | | 20,271  20.0 % | 81,110  80.0 % | | 20,384  20.1 % | 80,930  79.9 % | | 20,853  20.7 % | 80,078  79.3 % |
| 50 | 62,312  66.7 % | 27,640  29.7 % | | 62,287  66.8 % | 3,267  3.5 % | | 28,936  31.3 % | 63,392  68.7 % | | 29,196  31.6 % | 63,191  68.4 % | | 29,650  32.2 % | 62,529  67.8 % |
| 51 | 57,795  79.7 % | 11,711  16.2 % | | 58,018  80.1 % | 2,668  3.7 % | | 12,655  17.6 % | 59,068  82.4 % | | 12,911  18.0 % | 58,825  82.0 % | | 13,218  18.5 % | 58,303  81.5 % |
| 52 | 49,328  50.8 % | 44,395  45.8 % | | 49,005  50.5 % | 3,620  3.7 % | | 45,954  47.4 % | 50,909  52.6 % | | 46,205  48.0 % | 50,128  52.0 % | | 46,891  48.7 % | 49,440  51.3 % |
| 53 | 18,768  21.8 % | 65,718  76.4 % | | 18,399  21.4 % | 1,849  2.2 % | | 66,597  77.6 % | 19,206  22.4 % | | 66,721  78.0 % | 18,860  22.0 % | | 66,906  78.3 % | 18,554  21.7 % |
| 54 | 34,403  47.3 % | 36,610  50.4 % | | 33,942  46.7 % | 2,101  2.9 % | | 37,333  51.5 % | 35,194  48.5 % | | 37,634  51.9 % | 34,873  48.1 % | | 37,769  52.1 % | 34,746  47.9 % |
| 55 | 21,574  34.0 % | 40,403  63.8 % | | 21,185  33.4 % | 1,783  2.8 % | | 41,046  64.9 % | 22,245  35.1 % | | 41,314  65.3 % | 21,945  34.7 % | | 41,402  65.4 % | 21,866  34.6 % |
| 56 | 23,272  32.0 % | 47,718  65.8 % | | 23,011  31.7 % | 1,766  2.4 % | | 48,235  66.7 % | 24,079  33.3 % | | 48,487  67.3 % | 23,608  32.7 % | | 48,710  67.7 % | 23,261  32.3 % |
| 57 | 14,949  22.1 % | 51,646  76.5 % | | 14,815  21.9 % | 1,070  1.6 % | | 52,015  77.1 % | 15,478  22.9 % | | 52,070  77.3 % | 15,263  22.7 % | | 52,140  77.5 % | 15,124  22.5 % |
| 58 | 16,706  21.1 % | 61,369  77.2 % | | 16,155  20.3 % | 1,928  2.4 % | | 61,939  78.2 % | 17,276  21.8 % | | 61,933  78.5 % | 16,915  21.5 % | | 62,247  78.9 % | 16,630  21.1 % |
| 59 | 12,745  20.4 % | 48,466  77.6 % | | 12,368  19.8 % | 1,602  2.6 % | | 49,131  78.8 % | 13,256  21.2 % | | 49,268  79.2 % | 12,910  20.8 % | | 49,293  79.3 % | 12,841  20.7 % |
| 60 | 11,601  13.9 % | 70,517  84.6 % | | 11,236  13.5 % | 1,640  2.0 % | | 71,271  85.6 % | 12,021  14.4 % | | 71,423  85.9 % | 11,722  14.1 % | | 71,383  86.0 % | 11,655  14.0 % |
| 61 | 15,874  15.0 % | 87,715  82.9 % | | 15,421  14.6 % | 2,634  2.5 % | | 89,045  84.3 % | 16,621  15.7 % | | 89,277  84.6 % | 16,214  15.4 % | | 89,386  84.8 % | 15,962  15.2 % |
| 62 | 16,503  21.8 % | 57,786  76.6 % | | 16,000  21.2 % | 1,640  2.2 % | | 58,478  77.5 % | 16,985  22.5 % | | 58,672  77.9 % | 16,660  22.1 % | | 58,742  77.9 % | 16,625  22.1 % |
| 63 | 36,269  33.1 % | 70,712  64.8 % | | 35,467  32.5 % | 2,998  2.7 % | | 71,701  65.9 % | 37,064  34.1 % | | 71,953  66.4 % | 36,380  33.6 % | | 72,580  67.0 % | 35,730  33.0 % |
| 64 | 38,901  44.4 % | 46,426  53.1 % | | 38,173  43.7 % | 2,816  3.2 % | | 46,934  53.9 % | 40,068  46.1 % | | 47,340  54.6 % | 39,363  45.4 % | | 47,596  55.0 % | 39,015  45.0 % |
| 65 | 40,036  50.7 % | 37,194  47.1 % | | 39,515  50.0 % | 2,261  2.9 % | | 37,658  47.9 % | 40,930  52.1 % | | 37,959  48.4 % | 40,474  51.6 % | | 38,271  48.9 % | 39,996  51.1 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR-T = Total Spanish surname voter registration

# Exhibit 17:
# Election Analysis, H2136, 2020 General Election

Red-206
Data: 2020 Census
PLANH2316  10/13/2021 3:55:04 AM

Texas Legislative Council
10/13/21 10:11 AM
Page 1 of 20

# Election Analysis

## HOUSE DISTRICTS - PLANH2316
## 2020 General Election

| District | Total Voter Registration Total | SSVR-T | Turnout Total | TO/VR |
|---|---|---|---|---|
| **STATE** | **16,960,107** | **24.0 %** | **11,355,339** | **67.0 %** |
| 1 | 131,576 | 2.5 % | 85,126 | 64.7 % |
| 2 | 122,319 | 6.5 % | 80,790 | 66.0 % |
| 3 | 117,388 | 12.1 % | 83,910 | 71.5 % |
| 4 | 113,981 | 9.8 % | 77,499 | 68.0 % |
| 5 | 122,962 | 7.0 % | 83,071 | 67.6 % |
| 6 | 117,434 | 8.0 % | 81,036 | 69.0 % |
| 7 | 125,981 | 5.5 % | 82,734 | 65.7 % |
| 8 | 110,504 | 8.2 % | 73,885 | 66.9 % |
| 9 | 139,074 | 7.0 % | 89,057 | 64.0 % |
| 10 | 120,084 | 14.5 % | 85,932 | 71.6 % |
| 11 | 120,934 | 6.0 % | 81,494 | 67.4 % |
| 12 | 115,572 | 9.8 % | 81,199 | 70.3 % |
| 13 | 114,882 | 11.3 % | 73,535 | 64.0 % |
| 14 | 102,062 | 15.0 % | 70,933 | 69.5 % |
| 15 | 129,714 | 9.5 % | 96,758 | 74.6 % |
| 16 | 111,243 | 11.0 % | 81,491 | 73.3 % |
| 17 | 117,084 | 19.7 % | 79,351 | 67.8 % |
| 18 | 119,847 | 8.3 % | 78,999 | 65.9 % |
| 19 | 151,539 | 8.9 % | 118,022 | 77.9 % |
| 20 | 138,160 | 11.6 % | 105,804 | 76.6 % |
| 21 | 123,927 | 5.1 % | 85,072 | 68.6 % |
| 22 | 102,895 | 9.7 % | 62,208 | 60.5 % |
| 23 | 124,279 | 16.0 % | 80,944 | 65.1 % |
| 24 | 134,733 | 12.1 % | 96,451 | 71.6 % |
| 25 | 107,972 | 17.8 % | 74,211 | 68.7 % |
| 26 | 113,901 | 13.9 % | 87,069 | 76.4 % |
| 27 | 121,175 | 13.5 % | 87,168 | 71.9 % |
| 28 | 111,708 | 17.2 % | 84,358 | 75.5 % |
| 29 | 115,702 | 19.8 % | 80,773 | 69.8 % |
| 30 | 119,289 | 27.6 % | 76,771 | 64.4 % |
| 31 | 116,203 | 63.9 % | 70,051 | 60.3 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR-T = Total Spanish surname voter registration

Red-206
Data: 2020 Census
PLANH2316   10/13/2021 3:55:04 AM

## Election Analysis

### HOUSE DISTRICTS - PLANH2316
### 2020 General Election

| District | Total Voter Registration | | Turnout | |
| | Total | SSVR-T | Total | TO/VR |
|---|---|---|---|---|
| 32 | 120,396 | 31.6 % | 80,929 | 67.2 % |
| 33 | 119,728 | 8.8 % | 90,967 | 76.0 % |
| 34 | 109,247 | 64.5 % | 59,459 | 54.4 % |
| 35 | 74,562 | 86.4 % | 40,158 | 53.9 % |
| 36 | 85,806 | 82.9 % | 47,113 | 54.9 % |
| 37 | 100,230 | 70.5 % | 55,298 | 55.2 % |
| 38 | 97,425 | 84.2 % | 48,385 | 49.7 % |
| 39 | 87,171 | 83.7 % | 47,379 | 54.4 % |
| 40 | 81,197 | 84.8 % | 45,725 | 56.3 % |
| 41 | 96,191 | 72.1 % | 59,789 | 62.2 % |
| 42 | 100,364 | 85.0 % | 53,651 | 53.5 % |
| 43 | 122,445 | 54.5 % | 71,668 | 58.5 % |
| 44 | 123,585 | 25.1 % | 85,713 | 69.4 % |
| 45 | 121,657 | 28.3 % | 84,114 | 69.1 % |
| 46 | 124,707 | 18.7 % | 87,522 | 70.2 % |
| 47 | 144,364 | 8.6 % | 111,686 | 77.4 % |
| 48 | 150,257 | 14.3 % | 114,959 | 76.5 % |
| 49 | 157,838 | 12.7 % | 109,391 | 69.3 % |
| 50 | 109,847 | 19.2 % | 72,340 | 65.9 % |
| 51 | 118,225 | 31.7 % | 73,606 | 62.3 % |
| 52 | 126,527 | 14.7 % | 96,211 | 76.0 % |
| 53 | 141,931 | 24.4 % | 100,186 | 70.6 % |
| 54 | 105,436 | 12.8 % | 59,449 | 56.4 % |
| 55 | 110,530 | 13.7 % | 68,586 | 62.1 % |
| 56 | 118,961 | 12.5 % | 82,194 | 69.1 % |
| 57 | 113,716 | 10.3 % | 85,437 | 75.1 % |
| 58 | 112,916 | 11.0 % | 77,407 | 68.6 % |
| 59 | 115,787 | 8.3 % | 77,680 | 67.1 % |
| 60 | 128,382 | 7.0 % | 92,736 | 72.2 % |
| 61 | 121,624 | 7.3 % | 96,130 | 79.0 % |
| 62 | 119,898 | 5.1 % | 82,446 | 68.8 % |
| 63 | 124,762 | 9.7 % | 91,229 | 73.1 % |
| 64 | 124,284 | 10.4 % | 87,259 | 70.2 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR-T = Total Spanish surname voter registration

Election Analysis

**HOUSE DISTRICTS - PLANH2316**
**2020 General Election**

| District | | PRESIDENT | | | | | | | | U.S. SEN | | | | | | | RR COMM 1 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Biden-D | | Trump-R | | Jorgensen-L | | Hawkins-G | | Write-In-W | | Cornyn-R | | Hegar-D | | McKennon-L | | Collins-G | | Castaneda-D | |
| STATE | 5,257,513 | 46.5 % | 5,889,022 | 52.0 % | 126,212 | 1.1 % | 33,378 | 0.3 % | 10,927 | 0.1 % | 5,961,643 | 53.5 % | 4,887,309 | 43.9 % | 209,623 | 1.9 % | 81,753 | 0.7 % | 4,791,167 | 43.6 % |
| 1 | 20,817 | 24.5 % | 63,142 | 74.4 % | 617 | 0.7 % | 151 | 0.2 % | 95 | 0.1 % | 62,240 | 74.3 % | 20,105 | 24.0 % | 1,024 | 1.2 % | 345 | 0.4 % | 19,269 | 23.2 % |
| 2 | 15,468 | 19.2 % | 64,152 | 79.7 % | 752 | 0.9 % | 135 | 0.2 % | 25 | 0.0 % | 63,395 | 79.8 % | 14,526 | 18.3 % | 1,146 | 1.4 % | 411 | 0.5 % | 14,018 | 17.9 % |
| 3 | 19,156 | 22.8 % | 63,628 | 75.8 % | 944 | 1.1 % | 167 | 0.2 % | 15 | 0.0 % | 63,470 | 76.4 % | 17,788 | 21.4 % | 1,485 | 1.8 % | 343 | 0.4 % | 17,087 | 20.8 % |
| 4 | 22,799 | 29.5 % | 53,449 | 69.3 % | 686 | 0.9 % | 193 | 0.3 % | 38 | 0.0 % | 53,342 | 69.5 % | 21,663 | 28.2 % | 1,295 | 1.7 % | 469 | 0.6 % | 21,276 | 27.8 % |
| 5 | 15,863 | 19.1 % | 66,126 | 79.8 % | 722 | 0.9 % | 150 | 0.2 % | 13 | 0.0 % | 65,219 | 79.6 % | 15,274 | 18.6 % | 1,173 | 1.4 % | 314 | 0.4 % | 14,509 | 17.9 % |
| 6 | 25,230 | 31.3 % | 54,163 | 67.3 % | 926 | 1.1 % | 205 | 0.3 % | 0 | 0.0 % | 54,665 | 68.0 % | 24,129 | 30.0 % | 1,227 | 1.5 % | 369 | 0.5 % | 23,164 | 29.0 % |
| 7 | 24,035 | 29.1 % | 57,418 | 69.6 % | 892 | 1.1 % | 163 | 0.2 % | 36 | 0.0 % | 57,068 | 69.9 % | 22,906 | 28.1 % | 1,312 | 1.6 % | 321 | 0.4 % | 21,888 | 27.1 % |
| 8 | 15,932 | 21.6 % | 57,097 | 77.4 % | 568 | 0.8 % | 139 | 0.2 % | 56 | 0.1 % | 56,613 | 77.4 % | 15,187 | 20.8 % | 1,025 | 1.4 % | 335 | 0.5 % | 14,624 | 20.1 % |
| 9 | 20,550 | 23.1 % | 67,489 | 75.9 % | 591 | 0.7 % | 156 | 0.2 % | 96 | 0.1 % | 65,940 | 75.4 % | 19,824 | 22.7 % | 1,251 | 1.4 % | 416 | 0.5 % | 18,593 | 21.4 % |
| 10 | 27,565 | 32.2 % | 56,717 | 66.2 % | 954 | 1.1 % | 220 | 0.3 % | 232 | 0.3 % | 57,078 | 67.1 % | 25,780 | 30.3 % | 1,589 | 1.9 % | 585 | 0.7 % | 25,142 | 29.8 % |
| 11 | 19,596 | 24.1 % | 60,879 | 74.9 % | 612 | 0.8 % | 160 | 0.2 % | 64 | 0.1 % | 60,212 | 74.9 % | 18,830 | 23.4 % | 1,030 | 1.3 % | 344 | 0.4 % | 17,658 | 22.2 % |
| 12 | 22,949 | 28.3 % | 56,961 | 70.3 % | 886 | 1.1 % | 172 | 0.2 % | 97 | 0.1 % | 57,024 | 71.1 % | 21,509 | 26.8 % | 1,363 | 1.7 % | 357 | 0.4 % | 20,996 | 26.4 % |
| 13 | 20,360 | 27.8 % | 52,010 | 71.0 % | 637 | 0.9 % | 165 | 0.2 % | 50 | 0.1 % | 51,331 | 71.3 % | 19,076 | 26.5 % | 1,107 | 1.5 % | 502 | 0.7 % | 18,339 | 25.7 % |
| 14 | 30,840 | 43.5 % | 38,146 | 53.8 % | 1,605 | 2.3 % | 217 | 0.3 % | 114 | 0.2 % | 39,832 | 56.8 % | 27,972 | 39.9 % | 1,930 | 2.8 % | 399 | 0.6 % | 26,284 | 38.3 % |
| 15 | 35,438 | 36.6 % | 59,767 | 61.8 % | 1,307 | 1.4 % | 201 | 0.2 % | 40 | 0.0 % | 61,696 | 64.2 % | 32,198 | 33.5 % | 1,737 | 1.8 % | 449 | 0.5 % | 30,715 | 32.6 % |
| 16 | 18,077 | 22.2 % | 62,411 | 76.6 % | 828 | 1.0 % | 138 | 0.2 % | 37 | 0.0 % | 61,946 | 77.0 % | 16,638 | 20.7 % | 1,462 | 1.8 % | 368 | 0.5 % | 16,014 | 20.2 % |
| 17 | 28,180 | 35.7 % | 49,529 | 62.7 % | 921 | 1.2 % | 230 | 0.3 % | 162 | 0.2 % | 49,078 | 62.7 % | 27,300 | 34.9 % | 1,403 | 1.8 % | 443 | 0.6 % | 26,532 | 34.2 % |
| 18 | 13,302 | 16.8 % | 64,897 | 82.2 % | 682 | 0.9 % | 115 | 0.1 % | 2 | 0.0 % | 63,483 | 81.4 % | 12,948 | 16.6 % | 1,254 | 1.6 % | 325 | 0.4 % | 12,357 | 16.0 % |
| 19 | 34,651 | 29.5 % | 81,151 | 69.0 % | 1,316 | 1.1 % | 195 | 0.2 % | 229 | 0.2 % | 82,451 | 70.7 % | 31,798 | 27.3 % | 1,860 | 1.6 % | 434 | 0.4 % | 30,501 | 26.5 % |
| 20 | 44,651 | 42.2 % | 58,876 | 55.6 % | 1,714 | 1.6 % | 266 | 0.2 % | 297 | 0.3 % | 59,522 | 57.4 % | 41,484 | 40.0 % | 2,162 | 2.1 % | 467 | 0.5 % | 39,011 | 38.3 % |
| 21 | 18,580 | 21.9 % | 65,051 | 76.8 % | 863 | 1.0 % | 109 | 0.1 % | 49 | 0.1 % | 64,134 | 76.7 % | 17,971 | 21.5 % | 1,227 | 1.5 % | 285 | 0.3 % | 16,923 | 20.5 % |
| 22 | 36,804 | 59.6 % | 24,247 | 39.3 % | 515 | 0.8 % | 148 | 0.2 % | 14 | 0.0 % | 23,826 | 39.5 % | 35,241 | 58.4 % | 943 | 1.6 % | 361 | 0.6 % | 34,574 | 58.1 % |
| 23 | 30,882 | 38.2 % | 48,614 | 60.2 % | 971 | 1.2 % | 202 | 0.3 % | 87 | 0.1 % | 48,179 | 60.5 % | 29,193 | 36.7 % | 1,600 | 2.0 % | 606 | 0.8 % | 28,574 | 36.3 % |
| 24 | 31,948 | 33.2 % | 62,650 | 65.1 % | 1,192 | 1.2 % | 241 | 0.3 % | 184 | 0.2 % | 63,175 | 66.4 % | 29,680 | 31.2 % | 1,822 | 1.9 % | 473 | 0.5 % | 28,672 | 30.5 % |
| 25 | 29,441 | 39.7 % | 43,675 | 58.9 % | 882 | 1.2 % | 191 | 0.3 % | 22 | 0.0 % | 43,475 | 59.2 % | 28,018 | 38.2 % | 1,520 | 2.1 % | 410 | 0.6 % | 27,360 | 37.7 % |
| 26 | 37,863 | 43.7 % | 47,532 | 54.8 % | 862 | 1.0 % | 217 | 0.3 % | 264 | 0.3 % | 49,033 | 57.9 % | 33,979 | 40.1 % | 1,290 | 1.5 % | 381 | 0.4 % | 32,864 | 39.5 % |
| 27 | 61,827 | 71.2 % | 23,922 | 27.6 % | 590 | 0.7 % | 292 | 0.3 % | 198 | 0.2 % | 24,434 | 29.0 % | 57,823 | 68.6 % | 1,301 | 1.5 % | 672 | 0.8 % | 57,621 | 69.1 % |
| 28 | 36,213 | 43.1 % | 46,580 | 55.4 % | 773 | 0.9 % | 226 | 0.3 % | 215 | 0.3 % | 47,572 | 58.2 % | 32,562 | 39.8 % | 1,274 | 1.6 % | 375 | 0.5 % | 31,805 | 39.3 % |
| 29 | 32,787 | 40.6 % | 46,758 | 57.9 % | 978 | 1.2 % | 226 | 0.3 % | 24 | 0.0 % | 47,230 | 59.1 % | 30,741 | 38.5 % | 1,499 | 1.9 % | 469 | 0.6 % | 29,994 | 38.1 % |
| 30 | 18,850 | 24.6 % | 56,890 | 74.2 % | 623 | 0.8 % | 180 | 0.2 % | 78 | 0.1 % | 55,956 | 74.3 % | 17,935 | 23.8 % | 1,063 | 1.4 % | 317 | 0.4 % | 17,802 | 23.9 % |
| 31 | 25,741 | 37.1 % | 43,085 | 62.1 % | 364 | 0.5 % | 159 | 0.2 % | 59 | 0.1 % | 38,505 | 59.9 % | 23,995 | 37.3 % | 1,032 | 1.6 % | 754 | 1.2 % | 24,814 | 39.5 % |
| 32 | 31,670 | 39.3 % | 47,624 | 59.0 % | 993 | 1.2 % | 229 | 0.3 % | 150 | 0.2 % | 48,001 | 60.3 % | 29,487 | 37.0 % | 1,584 | 2.0 % | 543 | 0.7 % | 28,560 | 36.6 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR-T = Total Spanish surname voter registration

Election Analysis

## HOUSE DISTRICTS - PLANH2316
## 2020 General Election

| District | RR COMM 1 | | | | | | SUP CT CHIEF | | | | | | SUP CT 6 | | | | | | SUP CT 7 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wright-R | | Sterett-L | | Gruene-G | | Hecht-R | | Meachum-D | | Ash-L | | Bland-R | | Cheng-D | | Boyd-R | | Strange-L | |
| STATE | 5,830,003 | 53.0 % | 247,568 | 2.3 % | 129,588 | 1.2 % | 5,825,773 | 53.0 % | 4,892,131 | 44.5 % | 277,432 | 2.5 % | 6,049,262 | 55.2 % | 4,902,218 | 44.8 % | 5,842,276 | 53.3 % | 256,665 | 2.3 % |
| 1 | 62,033 | 74.7 % | 1,266 | 1.5 % | 446 | 0.5 % | 61,327 | 74.0 % | 20,192 | 24.4 % | 1,345 | 1.6 % | 62,653 | 75.8 % | 20,017 | 24.2 % | 61,802 | 74.5 % | 1,168 | 1.4 % |
| 2 | 62,412 | 79.6 % | 1,486 | 1.9 % | 474 | 0.6 % | 62,479 | 79.8 % | 14,377 | 18.4 % | 1,479 | 1.9 % | 63,632 | 81.8 % | 14,184 | 18.2 % | 62,235 | 80.0 % | 1,439 | 1.8 % |
| 3 | 62,638 | 76.3 % | 1,815 | 2.2 % | 565 | 0.7 % | 62,985 | 76.6 % | 17,401 | 21.2 % | 1,837 | 2.2 % | 64,679 | 78.9 % | 17,292 | 21.1 % | 63,110 | 76.9 % | 1,675 | 2.0 % |
| 4 | 52,978 | 69.3 % | 1,619 | 2.1 % | 545 | 0.7 % | 52,973 | 69.2 % | 21,880 | 28.6 % | 1,659 | 2.2 % | 54,418 | 71.4 % | 21,798 | 28.6 % | 53,180 | 69.7 % | 1,494 | 2.0 % |
| 5 | 64,852 | 79.8 % | 1,490 | 1.8 % | 399 | 0.5 % | 64,540 | 79.4 % | 15,259 | 18.8 % | 1,473 | 1.8 % | 65,943 | 81.3 % | 15,138 | 18.7 % | 64,823 | 79.8 % | 1,364 | 1.7 % |
| 6 | 54,511 | 68.2 % | 1,719 | 2.2 % | 544 | 0.7 % | 54,236 | 67.7 % | 24,224 | 30.2 % | 1,620 | 2.0 % | 55,751 | 69.7 % | 24,192 | 30.3 % | 54,449 | 68.0 % | 1,657 | 2.1 % |
| 7 | 56,782 | 70.3 % | 1,641 | 2.0 % | 510 | 0.6 % | 56,138 | 69.4 % | 23,023 | 28.5 % | 1,734 | 2.1 % | 57,789 | 71.7 % | 22,838 | 28.3 % | 56,235 | 69.8 % | 1,640 | 2.0 % |
| 8 | 56,363 | 77.6 % | 1,316 | 1.8 % | 351 | 0.5 % | 55,996 | 77.2 % | 15,265 | 21.0 % | 1,286 | 1.8 % | 57,340 | 79.2 % | 15,075 | 20.8 % | 56,275 | 77.6 % | 1,156 | 1.6 % |
| 9 | 66,423 | 76.6 % | 1,260 | 1.5 % | 449 | 0.5 % | 65,446 | 75.6 % | 19,623 | 22.7 % | 1,496 | 1.7 % | 67,094 | 77.7 % | 19,272 | 22.3 % | 66,117 | 76.4 % | 1,301 | 1.5 % |
| 10 | 56,551 | 67.0 % | 2,064 | 2.4 % | 696 | 0.8 % | 56,519 | 66.9 % | 25,944 | 30.7 % | 2,069 | 2.4 % | 58,305 | 69.2 % | 25,911 | 30.8 % | 56,678 | 67.3 % | 1,950 | 2.3 % |
| 11 | 60,147 | 75.6 % | 1,295 | 1.6 % | 481 | 0.6 % | 59,405 | 74.7 % | 18,790 | 23.6 % | 1,378 | 1.7 % | 60,659 | 76.6 % | 18,498 | 23.4 % | 59,680 | 75.2 % | 1,220 | 1.5 % |
| 12 | 56,249 | 70.8 % | 1,591 | 2.0 % | 568 | 0.7 % | 56,134 | 70.7 % | 21,630 | 27.2 % | 1,646 | 2.1 % | 57,625 | 72.8 % | 21,513 | 27.2 % | 56,292 | 71.0 % | 1,569 | 2.0 % |
| 13 | 51,108 | 71.7 % | 1,276 | 1.8 % | 528 | 0.7 % | 50,626 | 71.1 % | 19,250 | 27.0 % | 1,309 | 1.8 % | 51,886 | 73.2 % | 19,022 | 26.8 % | 50,848 | 71.6 % | 1,151 | 1.6 % |
| 14 | 39,012 | 56.8 % | 2,416 | 3.5 % | 968 | 1.4 % | 38,729 | 56.1 % | 27,795 | 40.3 % | 2,511 | 3.6 % | 40,653 | 59.2 % | 27,973 | 40.8 % | 38,884 | 56.7 % | 2,528 | 3.7 % |
| 15 | 60,319 | 63.9 % | 2,397 | 2.5 % | 898 | 1.0 % | 60,850 | 64.3 % | 31,441 | 33.2 % | 2,332 | 2.5 % | 62,862 | 66.7 % | 31,361 | 33.3 % | 60,643 | 64.3 % | 2,232 | 2.4 % |
| 16 | 61,116 | 77.0 % | 1,709 | 2.2 % | 536 | 0.7 % | 61,384 | 77.2 % | 16,439 | 20.7 % | 1,716 | 2.2 % | 62,943 | 79.4 % | 16,342 | 20.6 % | 61,366 | 77.3 % | 1,604 | 2.0 % |
| 17 | 48,265 | 62.3 % | 1,840 | 2.4 % | 866 | 1.1 % | 47,914 | 61.9 % | 27,405 | 35.4 % | 2,135 | 2.8 % | 49,901 | 64.8 % | 27,116 | 35.2 % | 48,453 | 62.7 % | 1,921 | 2.5 % |
| 18 | 63,221 | 81.7 % | 1,354 | 1.8 % | 421 | 0.5 % | 62,927 | 81.4 % | 12,939 | 16.7 % | 1,454 | 1.9 % | 64,320 | 83.5 % | 12,667 | 16.5 % | 63,001 | 81.7 % | 1,350 | 1.8 % |
| 19 | 80,716 | 70.2 % | 2,754 | 2.4 % | 1,016 | 0.9 % | 81,094 | 70.6 % | 31,130 | 27.1 % | 2,715 | 2.4 % | 83,851 | 73.3 % | 30,589 | 26.7 % | 81,304 | 71.0 % | 2,549 | 2.2 % |
| 20 | 58,514 | 57.5 % | 3,079 | 3.0 % | 1,232 | 1.2 % | 56,754 | 57.2 % | 39,359 | 39.7 % | 3,104 | 3.1 % | 61,404 | 60.7 % | 39,800 | 39.3 % | 58,443 | 57.8 % | 2,975 | 2.9 % |
| 21 | 64,021 | 77.4 % | 1,386 | 1.7 % | 407 | 0.5 % | 62,933 | 76.2 % | 18,210 | 22.0 % | 1,477 | 1.8 % | 64,667 | 78.4 % | 17,813 | 21.6 % | 63,412 | 76.7 % | 1,339 | 1.6 % |
| 22 | 23,444 | 39.4 % | 1,031 | 1.7 % | 503 | 0.8 % | 22,920 | 38.4 % | 35,732 | 59.8 % | 1,092 | 1.8 % | 23,866 | 40.0 % | 35,725 | 60.0 % | 23,155 | 38.8 % | 935 | 1.6 % |
| 23 | 47,364 | 60.2 % | 1,773 | 2.3 % | 916 | 1.2 % | 47,329 | 60.1 % | 29,325 | 37.2 % | 2,103 | 2.7 % | 49,003 | 62.5 % | 29,454 | 37.5 % | 47,375 | 60.4 % | 2,040 | 2.6 % |
| 24 | 62,079 | 66.1 % | 2,296 | 2.4 % | 907 | 1.0 % | 62,225 | 66.1 % | 29,482 | 31.3 % | 2,468 | 2.6 % | 64,399 | 68.6 % | 29,423 | 31.4 % | 62,143 | 66.3 % | 2,410 | 2.6 % |
| 25 | 42,862 | 59.0 % | 1,763 | 2.4 % | 660 | 0.9 % | 42,957 | 59.1 % | 27,987 | 38.5 % | 1,778 | 2.4 % | 44,424 | 61.3 % | 28,082 | 38.7 % | 42,945 | 59.2 % | 1,801 | 2.5 % |
| 26 | 48,155 | 57.9 % | 1,517 | 1.8 % | 676 | 0.8 % | 48,032 | 57.6 % | 33,781 | 40.5 % | 1,600 | 1.9 % | 49,315 | 59.5 % | 33,526 | 40.5 % | 47,791 | 57.6 % | 1,533 | 1.8 % |
| 27 | 23,613 | 28.3 % | 1,274 | 1.5 % | 856 | 1.0 % | 23,591 | 28.3 % | 58,302 | 69.9 % | 1,480 | 1.8 % | 24,382 | 29.4 % | 58,441 | 70.6 % | 23,431 | 28.2 % | 1,246 | 1.5 % |
| 28 | 46,660 | 58.0 % | 1,357 | 1.7 % | 611 | 0.8 % | 46,752 | 58.1 % | 32,344 | 40.2 % | 1,432 | 1.8 % | 47,662 | 59.6 % | 32,298 | 40.4 % | 46,582 | 58.2 % | 1,370 | 1.7 % |
| 29 | 46,135 | 58.5 % | 1,837 | 2.3 % | 837 | 1.1 % | 46,474 | 58.8 % | 30,605 | 38.7 % | 1,982 | 2.5 % | 48,022 | 60.9 % | 30,795 | 39.1 % | 46,418 | 58.9 % | 1,897 | 2.4 % |
| 30 | 55,105 | 73.9 % | 1,199 | 1.6 % | 455 | 0.6 % | 54,764 | 73.6 % | 18,329 | 24.6 % | 1,273 | 1.7 % | 56,368 | 76.1 % | 17,667 | 23.9 % | 55,175 | 74.4 % | 1,212 | 1.6 % |
| 31 | 36,288 | 57.7 % | 1,084 | 1.7 % | 672 | 1.1 % | 35,936 | 57.8 % | 24,850 | 40.0 % | 1,406 | 2.3 % | 37,700 | 60.9 % | 24,167 | 39.1 % | 36,424 | 58.8 % | 1,257 | 2.0 % |
| 32 | 46,519 | 59.6 % | 1,917 | 2.5 % | 1,117 | 1.4 % | 46,421 | 59.2 % | 29,836 | 38.1 % | 2,100 | 2.7 % | 48,353 | 62.1 % | 29,550 | 37.9 % | 46,777 | 60.0 % | 1,987 | 2.6 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR-T = Total Spanish surname voter registration

63321

Red-206
Data: 2020 Census
PLANH2316  10/13/2021 3:55:04 AM

Texas Legislative Council
10/13/21 10:11 AM
Page 8 of 20

Election Analysis

## HOUSE DISTRICTS - PLANH2316
## 2020 General Election

| District | SUP CT 7 Williams-D | | SUP CT 8 Busby-R | | Triana-D | | Oxford-L | | CCA 3 Richardson-R | | Davis Frizell-D | | CCA 4 Yeary-R | | Clinton-D | | CCA 9 Newell-R | | Birmingham-D | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STATE | 4,860,388 | 44.3 % | 5,845,851 | 53.4 % | 4,825,339 | 44.1 % | 274,876 | 2.5 % | 5,952,614 | 54.5 % | 4,962,780 | 45.5 % | 5,972,977 | 54.8 % | 4,922,833 | 45.2 % | 6,014,555 | 55.3 % | 4,861,782 | 44.7 % |
| 1 | 20,001 | 24.1 % | 61,697 | 74.8 % | 19,428 | 23.5 % | 1,385 | 1.7 % | 62,099 | 75.3 % | 20,325 | 24.7 % | 62,281 | 75.6 % | 20,120 | 24.4 % | 62,509 | 75.7 % | 20,102 | 24.3 % |
| 2 | 14,129 | 18.2 % | 62,513 | 80.4 % | 13,649 | 17.6 % | 1,600 | 2.1 % | 62,775 | 81.2 % | 14,533 | 18.8 % | 62,933 | 81.4 % | 14,346 | 18.6 % | 62,856 | 81.7 % | 14,054 | 18.3 % |
| 3 | 17,257 | 21.0 % | 63,359 | 77.2 % | 16,941 | 20.6 % | 1,798 | 2.2 % | 64,081 | 78.5 % | 17,596 | 21.5 % | 64,148 | 78.7 % | 17,409 | 21.3 % | 64,265 | 78.8 % | 17,270 | 21.2 % |
| 4 | 21,649 | 28.4 % | 53,413 | 70.0 % | 21,248 | 27.9 % | 1,613 | 2.1 % | 53,984 | 70.8 % | 22,259 | 29.2 % | 54,242 | 71.2 % | 21,966 | 28.8 % | 54,246 | 71.3 % | 21,832 | 28.7 % |
| 5 | 15,082 | 18.6 % | 64,891 | 80.0 % | 14,732 | 18.2 % | 1,492 | 1.8 % | 65,540 | 81.0 % | 15,420 | 19.0 % | 65,612 | 81.2 % | 15,236 | 18.8 % | 65,809 | 81.4 % | 15,068 | 18.6 % |
| 6 | 23,913 | 29.9 % | 54,597 | 68.3 % | 23,650 | 29.6 % | 1,670 | 2.1 % | 55,223 | 69.1 % | 24,682 | 30.9 % | 55,374 | 69.5 % | 24,298 | 30.5 % | 55,561 | 69.7 % | 24,192 | 30.3 % |
| 7 | 22,638 | 28.1 % | 56,506 | 70.2 % | 22,300 | 27.7 % | 1,678 | 2.1 % | 57,190 | 71.1 % | 23,196 | 28.9 % | 57,345 | 71.4 % | 22,917 | 28.6 % | 57,492 | 71.7 % | 22,719 | 28.3 % |
| 8 | 15,044 | 20.8 % | 56,410 | 77.8 % | 14,756 | 20.4 % | 1,337 | 1.8 % | 56,912 | 78.6 % | 15,481 | 21.4 % | 57,053 | 79.0 % | 15,197 | 21.0 % | 57,111 | 79.1 % | 15,111 | 20.9 % |
| 9 | 19,121 | 22.1 % | 66,105 | 76.5 % | 18,832 | 21.8 % | 1,445 | 1.7 % | 66,542 | 77.2 % | 19,705 | 22.8 % | 66,610 | 77.5 % | 19,393 | 22.5 % | 66,725 | 77.6 % | 19,273 | 22.4 % |
| 10 | 25,616 | 30.4 % | 56,811 | 67.5 % | 25,191 | 30.0 % | 2,106 | 2.5 % | 57,436 | 68.4 % | 26,571 | 31.6 % | 57,852 | 69.0 % | 25,988 | 31.0 % | 58,005 | 69.2 % | 25,834 | 30.8 % |
| 11 | 18,468 | 23.2 % | 59,838 | 75.4 % | 18,162 | 22.9 % | 1,354 | 1.7 % | 60,291 | 76.1 % | 18,949 | 23.9 % | 60,348 | 76.3 % | 18,730 | 23.7 % | 60,402 | 76.6 % | 18,463 | 23.4 % |
| 12 | 21,441 | 27.0 % | 56,522 | 71.3 % | 21,094 | 26.6 % | 1,625 | 2.1 % | 57,114 | 72.2 % | 21,945 | 27.8 % | 57,108 | 72.6 % | 21,564 | 27.4 % | 57,239 | 72.8 % | 21,423 | 27.2 % |
| 13 | 19,052 | 26.8 % | 51,117 | 72.0 % | 18,598 | 26.2 % | 1,303 | 1.8 % | 50,687 | 72.4 % | 19,310 | 27.6 % | 51,449 | 72.8 % | 19,197 | 27.2 % | 51,557 | 73.0 % | 19,023 | 27.0 % |
| 14 | 27,205 | 39.6 % | 38,795 | 56.7 % | 27,010 | 39.5 % | 2,575 | 3.8 % | 39,859 | 58.4 % | 28,406 | 41.6 % | 40,388 | 59.4 % | 27,660 | 40.6 % | 40,320 | 59.4 % | 27,576 | 40.6 % |
| 15 | 31,445 | 33.3 % | 61,270 | 65.0 % | 30,711 | 32.6 % | 2,337 | 2.5 % | 62,044 | 66.2 % | 31,685 | 33.8 % | 62,028 | 66.3 % | 31,496 | 33.7 % | 62,354 | 66.7 % | 31,133 | 33.3 % |
| 16 | 16,385 | 20.6 % | 61,720 | 77.8 % | 15,968 | 20.1 % | 1,680 | 2.1 % | 62,308 | 78.9 % | 16,668 | 21.1 % | 62,404 | 79.1 % | 16,445 | 20.9 % | 62,529 | 79.3 % | 16,344 | 20.7 % |
| 17 | 26,963 | 34.9 % | 48,338 | 62.6 % | 26,829 | 34.8 % | 2,000 | 2.6 % | 49,260 | 63.9 % | 27,828 | 36.1 % | 49,593 | 64.4 % | 27,441 | 35.6 % | 49,717 | 64.7 % | 27,133 | 35.3 % |
| 18 | 12,719 | 16.5 % | 63,233 | 82.0 % | 12,305 | 16.0 % | 1,551 | 2.0 % | 63,831 | 83.0 % | 13,070 | 17.0 % | 63,938 | 83.3 % | 12,807 | 16.7 % | 64,055 | 83.4 % | 12,731 | 16.6 % |
| 19 | 30,649 | 26.8 % | 81,376 | 71.2 % | 30,083 | 26.3 % | 2,807 | 2.5 % | 82,534 | 72.5 % | 31,274 | 27.5 % | 83,005 | 72.9 % | 30,826 | 27.1 % | 83,217 | 73.3 % | 30,349 | 26.7 % |
| 20 | 39,628 | 39.2 % | 58,726 | 58.2 % | 39,047 | 38.7 % | 3,162 | 3.1 % | 60,139 | 59.7 % | 40,637 | 40.3 % | 60,275 | 60.1 % | 40,051 | 39.9 % | 60,866 | 60.7 % | 39,411 | 39.3 % |
| 21 | 17,884 | 21.6 % | 63,595 | 76.8 % | 17,413 | 21.0 % | 1,752 | 2.1 % | 64,053 | 77.9 % | 18,159 | 22.1 % | 64,080 | 78.1 % | 17,991 | 21.9 % | 64,412 | 78.3 % | 17,874 | 21.7 % |
| 22 | 35,641 | 59.7 % | 23,137 | 38.8 % | 35,334 | 59.2 % | 1,234 | 2.1 % | 23,474 | 39.5 % | 35,946 | 60.5 % | 23,436 | 39.5 % | 35,898 | 60.5 % | 23,599 | 39.8 % | 35,672 | 60.2 % |
| 23 | 29,053 | 37.0 % | 47,591 | 60.8 % | 28,689 | 36.6 % | 2,045 | 2.6 % | 48,322 | 61.8 % | 29,882 | 38.2 % | 48,517 | 62.2 % | 29,502 | 37.8 % | 48,711 | 62.6 % | 29,112 | 37.4 % |
| 24 | 29,207 | 31.2 % | 62,401 | 66.6 % | 28,680 | 30.6 % | 2,547 | 2.7 % | 63,594 | 68.1 % | 29,832 | 31.9 % | 63,673 | 68.3 % | 29,527 | 31.7 % | 63,904 | 68.7 % | 29,151 | 31.3 % |
| 25 | 27,804 | 38.3 % | 43,048 | 59.5 % | 27,475 | 38.0 % | 1,831 | 2.5 % | 43,855 | 60.7 % | 28,445 | 39.3 % | 43,966 | 61.0 % | 28,141 | 39.0 % | 44,270 | 61.5 % | 27,742 | 38.5 % |
| 26 | 33,630 | 40.5 % | 48,239 | 58.2 % | 33,017 | 39.8 % | 1,661 | 2.0 % | 48,906 | 59.1 % | 33,776 | 40.9 % | 48,941 | 59.2 % | 33,687 | 40.8 % | 49,338 | 59.9 % | 33,059 | 40.1 % |
| 27 | 58,433 | 70.3 % | 23,610 | 28.5 % | 57,770 | 69.6 % | 1,579 | 1.9 % | 23,980 | 29.0 % | 58,824 | 71.0 % | 23,988 | 29.0 % | 58,851 | 71.0 % | 24,333 | 29.5 % | 58,116 | 70.5 % |
| 28 | 32,131 | 40.1 % | 46,920 | 58.6 % | 31,586 | 39.5 % | 1,527 | 1.9 % | 47,374 | 59.4 % | 32,442 | 40.6 % | 47,342 | 59.4 % | 32,307 | 40.6 % | 47,581 | 60.0 % | 31,767 | 40.0 % |
| 29 | 30,439 | 38.7 % | 46,657 | 59.4 % | 29,943 | 38.1 % | 1,992 | 2.5 % | 47,385 | 60.4 % | 31,117 | 39.6 % | 47,517 | 60.7 % | 30,777 | 39.3 % | 47,794 | 61.1 % | 30,367 | 38.9 % |
| 30 | 17,747 | 23.9 % | 55,316 | 74.6 % | 17,538 | 23.7 % | 1,269 | 1.7 % | 55,728 | 75.4 % | 18,211 | 24.6 % | 55,907 | 75.8 % | 17,888 | 24.2 % | 55,867 | 75.8 % | 17,822 | 24.2 % |
| 31 | 24,295 | 39.2 % | 36,000 | 57.8 % | 24,828 | 39.9 % | 1,410 | 2.3 % | 36,832 | 59.8 % | 24,793 | 40.2 % | 36,782 | 59.9 % | 24,598 | 40.1 % | 37,292 | 61.0 % | 23,879 | 39.0 % |
| 32 | 29,135 | 37.4 % | 46,686 | 60.1 % | 28,906 | 37.2 % | 2,060 | 2.7 % | 47,488 | 61.3 % | 29,985 | 38.7 % | 47,985 | 62.1 % | 29,317 | 37.9 % | 48,182 | 62.6 % | 28,841 | 37.4 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR-T = Total Spanish surname voter registration

Election Analysis

**HOUSE DISTRICTS - PLANH2316**
**2020 General Election**

| | PRESIDENT | | | | | | | | | U.S. SEN | | | | | | | RR COMM 1 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| District | Biden-D | | Trump-R | | Jorgensen-L | | Hawkins-G | | Write-In-W | | Cornyn-R | | Hegar-D | | McKennon-L | | Collins-G | | Castaneda-D | |
| 33 | 35,618 | 39.3 % | 53,384 | 58.9 % | 1,051 | 1.2 % | 231 | 0.3 % | 302 | 0.3 % | 54,995 | 61.4 % | 32,444 | 36.3 % | 1,503 | 1.7 % | 557 | 0.6 % | 31,667 | 35.7 % |
| 34 | 32,171 | 54.4 % | 26,232 | 44.3 % | 514 | 0.9 % | 170 | 0.3 % | 88 | 0.1 % | 25,746 | 44.5 % | 30,422 | 52.6 % | 1,158 | 2.0 % | 522 | 0.9 % | 30,820 | 54.0 % |
| 35 | 22,629 | 57.3 % | 16,478 | 41.7 % | 238 | 0.6 % | 119 | 0.3 % | 27 | 0.1 % | 14,028 | 38.8 % | 20,694 | 57.3 % | 833 | 2.3 % | 583 | 1.6 % | 21,549 | 61.1 % |
| 36 | 26,905 | 57.6 % | 19,328 | 41.4 % | 267 | 0.6 % | 216 | 0.5 % | 6 | 0.0 % | 17,693 | 40.1 % | 24,437 | 55.4 % | 1,217 | 2.8 % | 798 | 1.8 % | 26,167 | 60.4 % |
| 37 | 27,740 | 50.6 % | 26,576 | 48.4 % | 323 | 0.6 % | 134 | 0.2 % | 86 | 0.2 % | 25,703 | 48.1 % | 26,491 | 49.6 % | 761 | 1.4 % | 468 | 0.9 % | 27,280 | 52.0 % |
| 38 | 29,558 | 61.9 % | 17,614 | 36.9 % | 330 | 0.7 % | 174 | 0.4 % | 57 | 0.1 % | 16,294 | 35.1 % | 28,489 | 61.4 % | 843 | 1.8 % | 803 | 1.7 % | 29,735 | 64.9 % |
| 39 | 27,861 | 59.2 % | 18,679 | 39.7 % | 254 | 0.5 % | 228 | 0.5 % | 11 | 0.0 % | 17,321 | 38.8 % | 25,390 | 56.8 % | 1,146 | 2.6 % | 821 | 1.8 % | 26,726 | 61.1 % |
| 40 | 27,292 | 60.1 % | 17,709 | 39.0 % | 270 | 0.6 % | 167 | 0.4 % | 6 | 0.0 % | 16,457 | 38.2 % | 25,083 | 58.1 % | 1,010 | 2.3 % | 585 | 1.4 % | 25,943 | 61.4 % |
| 41 | 33,385 | 56.1 % | 25,616 | 43.0 % | 332 | 0.6 % | 177 | 0.3 % | 6 | 0.0 % | 25,453 | 43.9 % | 30,854 | 53.2 % | 1,146 | 2.0 % | 542 | 0.9 % | 31,934 | 55.9 % |
| 42 | 32,242 | 60.8 % | 20,242 | 38.1 % | 346 | 0.7 % | 153 | 0.3 % | 82 | 0.2 % | 18,730 | 36.2 % | 31,419 | 60.7 % | 876 | 1.7 % | 726 | 1.4 % | 32,380 | 63.3 % |
| 43 | 27,031 | 37.9 % | 43,401 | 60.9 % | 637 | 0.9 % | 204 | 0.3 % | 50 | 0.1 % | 41,886 | 60.4 % | 25,865 | 37.3 % | 1,167 | 1.7 % | 457 | 0.7 % | 26,244 | 38.3 % |
| 44 | 30,753 | 36.0 % | 53,180 | 62.3 % | 1,080 | 1.3 % | 226 | 0.3 % | 166 | 0.2 % | 53,925 | 63.8 % | 28,479 | 33.7 % | 1,634 | 1.9 % | 470 | 0.6 % | 28,128 | 33.7 % |
| 45 | 48,915 | 58.4 % | 32,987 | 39.4 % | 1,398 | 1.7 % | 368 | 0.4 % | 33 | 0.0 % | 34,338 | 41.4 % | 45,705 | 55.1 % | 2,168 | 2.6 % | 720 | 0.9 % | 43,817 | 53.8 % |
| 46 | 65,231 | 74.8 % | 20,081 | 23.0 % | 1,320 | 1.5 % | 340 | 0.4 % | 269 | 0.3 % | 21,067 | 24.6 % | 61,880 | 72.3 % | 1,910 | 2.2 % | 686 | 0.8 % | 59,741 | 71.0 % |
| 47 | 68,416 | 61.5 % | 40,525 | 36.4 % | 1,628 | 1.5 % | 273 | 0.2 % | 394 | 0.4 % | 44,706 | 40.7 % | 62,863 | 57.2 % | 1,813 | 1.6 % | 500 | 0.5 % | 59,819 | 55.8 % |
| 48 | 80,654 | 70.5 % | 31,259 | 27.3 % | 1,760 | 1.5 % | 324 | 0.3 % | 412 | 0.4 % | 35,392 | 31.3 % | 74,913 | 66.3 % | 2,073 | 1.8 % | 677 | 0.6 % | 71,495 | 64.9 % |
| 49 | 89,120 | 81.8 % | 17,478 | 16.0 % | 1,555 | 1.4 % | 424 | 0.4 % | 431 | 0.4 % | 20,512 | 19.1 % | 84,307 | 78.4 % | 2,025 | 1.9 % | 717 | 0.7 % | 80,213 | 76.5 % |
| 50 | 54,299 | 75.3 % | 16,170 | 22.4 % | 1,029 | 1.4 % | 324 | 0.4 % | 265 | 0.4 % | 16,686 | 23.7 % | 51,490 | 73.1 % | 1,609 | 2.3 % | 630 | 0.9 % | 49,325 | 71.4 % |
| 51 | 60,236 | 82.1 % | 11,480 | 15.6 % | 1,066 | 1.5 % | 325 | 0.4 % | 262 | 0.4 % | 12,318 | 17.2 % | 56,747 | 79.1 % | 1,833 | 2.6 % | 807 | 1.1 % | 54,833 | 78.0 % |
| 52 | 44,974 | 46.7 % | 49,046 | 51.0 % | 1,686 | 1.8 % | 248 | 0.3 % | 257 | 0.3 % | 49,720 | 52.8 % | 41,964 | 44.6 % | 2,038 | 2.2 % | 459 | 0.5 % | 39,502 | 42.7 % |
| 53 | 22,852 | 22.9 % | 75,912 | 76.0 % | 880 | 0.9 % | 200 | 0.2 % | 41 | 0.0 % | 75,362 | 76.6 % | 21,125 | 21.5 % | 1,485 | 1.5 % | 458 | 0.5 % | 21,016 | 21.6 % |
| 54 | 26,960 | 45.5 % | 31,067 | 52.4 % | 899 | 1.5 % | 208 | 0.4 % | 156 | 0.3 % | 31,418 | 53.4 % | 25,767 | 43.8 % | 1,338 | 2.3 % | 356 | 0.6 % | 24,660 | 42.2 % |
| 55 | 30,054 | 43.9 % | 36,826 | 53.8 % | 1,081 | 1.6 % | 232 | 0.3 % | 207 | 0.3 % | 37,516 | 55.2 % | 28,646 | 42.2 % | 1,387 | 2.0 % | 371 | 0.5 % | 27,040 | 40.2 % |
| 56 | 27,568 | 33.9 % | 52,408 | 64.4 % | 1,096 | 1.3 % | 189 | 0.2 % | 92 | 0.1 % | 52,989 | 66.1 % | 25,021 | 31.2 % | 1,641 | 2.0 % | 479 | 0.6 % | 23,381 | 29.8 % |
| 57 | 36,387 | 42.6 % | 47,660 | 55.8 % | 1,143 | 1.3 % | 186 | 0.2 % | 61 | 0.1 % | 48,710 | 57.6 % | 33,420 | 39.5 % | 1,888 | 2.2 % | 501 | 0.6 % | 31,881 | 38.4 % |
| 58 | 17,232 | 22.4 % | 58,733 | 76.3 % | 827 | 1.1 % | 152 | 0.2 % | 32 | 0.0 % | 58,506 | 76.6 % | 16,186 | 21.2 % | 1,295 | 1.7 % | 396 | 0.5 % | 15,454 | 20.4 % |
| 59 | 16,799 | 21.7 % | 59,325 | 76.6 % | 996 | 1.3 % | 223 | 0.3 % | 154 | 0.2 % | 58,862 | 76.9 % | 15,675 | 20.5 % | 1,510 | 2.0 % | 480 | 0.6 % | 14,818 | 19.6 % |
| 60 | 15,592 | 16.9 % | 75,609 | 81.8 % | 997 | 1.1 % | 187 | 0.2 % | 41 | 0.0 % | 75,016 | 81.9 % | 14,321 | 15.6 % | 1,831 | 2.0 % | 412 | 0.4 % | 13,266 | 14.6 % |
| 61 | 43,274 | 45.2 % | 50,795 | 53.0 % | 1,202 | 1.3 % | 213 | 0.2 % | 305 | 0.3 % | 52,858 | 56.4 % | 38,729 | 41.3 % | 1,689 | 1.8 % | 474 | 0.5 % | 37,197 | 40.4 % |
| 62 | 18,368 | 22.3 % | 62,657 | 76.2 % | 849 | 1.0 % | 170 | 0.2 % | 140 | 0.2 % | 61,796 | 76.1 % | 17,620 | 21.7 % | 1,375 | 1.7 % | 407 | 0.5 % | 16,389 | 20.4 % |
| 63 | 42,303 | 46.4 % | 47,444 | 52.0 % | 1,164 | 1.3 % | 240 | 0.3 % | 77 | 0.1 % | 49,708 | 55.1 % | 38,075 | 42.2 % | 1,844 | 2.0 % | 547 | 0.6 % | 36,123 | 41.0 % |
| 64 | 33,266 | 38.2 % | 52,309 | 60.0 % | 1,208 | 1.4 % | 308 | 0.4 % | 56 | 0.1 % | 52,714 | 61.3 % | 30,654 | 35.6 % | 1,962 | 2.3 % | 728 | 0.8 % | 28,925 | 34.2 % |
| 65 | 43,265 | 45.1 % | 51,231 | 53.4 % | 1,161 | 1.2 % | 216 | 0.2 % | 55 | 0.1 % | 53,666 | 56.6 % | 38,803 | 40.9 % | 1,839 | 1.9 % | 547 | 0.6 % | 36,917 | 39.8 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR-T = Total Spanish surname voter registration

Election Analysis

**HOUSE DISTRICTS - PLANH2316**
**2020 General Election**

| District | RR COMM 1 | | | | | | SUP CT CHIEF | | | | | | SUP CT 6 | | | | | | SUP CT 7 | | | |
| | Wright-R | | Sterett-L | | Gruene-G | | Hecht-R | | Meacham-D | | Ash-L | | Bland-R | | Cheng-D | | Boyd-R | | Strange-L | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 33 | 54,182 | 61.2 % | 1,968 | 2.2 % | 771 | 0.9 % | 54,478 | 61.4 % | 32,101 | 36.2 % | 2,086 | 2.4 % | 55,928 | 63.6 % | 32,068 | 36.4 % | 54,686 | 61.9 % | 1,876 | 2.1 % |
| 34 | 24,395 | 42.7 % | 1,078 | 1.9 % | 775 | 1.4 % | 24,202 | 42.5 % | 31,288 | 54.9 % | 1,506 | 2.6 % | 25,491 | 45.0 % | 31,194 | 55.0 % | 24,534 | 43.3 % | 1,357 | 2.4 % |
| 35 | 12,497 | 35.4 % | 701 | 2.0 % | 528 | 1.5 % | 12,266 | 35.4 % | 21,437 | 61.8 % | 962 | 2.8 % | 13,563 | 38.8 % | 21,369 | 61.2 % | 12,530 | 36.4 % | 967 | 2.8 % |
| 36 | 15,508 | 35.8 % | 964 | 2.2 % | 654 | 1.5 % | 15,686 | 36.3 % | 26,238 | 60.8 % | 1,241 | 2.9 % | 17,146 | 39.8 % | 25,956 | 60.2 % | 15,893 | 37.0 % | 1,470 | 3.4 % |
| 37 | 23,649 | 45.1 % | 859 | 1.6 % | 634 | 1.2 % | 22,904 | 45.0 % | 26,659 | 52.4 % | 1,339 | 2.6 % | 25,040 | 48.4 % | 26,650 | 51.6 % | 23,486 | 46.3 % | 1,095 | 2.2 % |
| 38 | 14,460 | 31.6 % | 908 | 2.0 % | 681 | 1.5 % | 13,831 | 31.3 % | 28,995 | 65.5 % | 1,425 | 3.2 % | 15,730 | 34.8 % | 29,415 | 65.2 % | 14,327 | 32.5 % | 1,205 | 2.7 % |
| 39 | 15,414 | 35.3 % | 877 | 2.0 % | 696 | 1.6 % | 15,505 | 35.5 % | 26,816 | 61.4 % | 1,328 | 3.0 % | 17,050 | 39.2 % | 26,476 | 60.8 % | 15,866 | 36.5 % | 1,411 | 3.2 % |
| 40 | 14,789 | 35.0 % | 847 | 2.0 % | 655 | 1.6 % | 14,751 | 35.0 % | 26,279 | 62.3 % | 1,125 | 2.7 % | 16,014 | 38.0 % | 26,081 | 62.0 % | 15,123 | 36.0 % | 1,237 | 2.9 % |
| 41 | 23,431 | 41.0 % | 996 | 1.7 % | 732 | 1.3 % | 23,509 | 41.2 % | 32,283 | 56.5 % | 1,299 | 2.3 % | 24,959 | 43.8 % | 31,989 | 56.2 % | 23,885 | 42.0 % | 1,440 | 2.5 % |
| 42 | 17,195 | 33.6 % | 846 | 1.7 % | 769 | 1.5 % | 16,602 | 32.9 % | 32,316 | 64.1 % | 1,489 | 3.0 % | 18,401 | 36.2 % | 32,411 | 63.8 % | 17,273 | 33.8 % | 1,253 | 2.5 % |
| 43 | 40,538 | 59.1 % | 1,183 | 1.7 % | 637 | 0.9 % | 39,933 | 58.5 % | 26,797 | 39.2 % | 1,565 | 2.3 % | 41,631 | 61.3 % | 26,298 | 38.7 % | 40,453 | 59.5 % | 1,390 | 2.0 % |
| 44 | 52,370 | 62.7 % | 2,028 | 2.4 % | 986 | 1.2 % | 52,422 | 62.6 % | 28,906 | 34.5 % | 2,348 | 2.8 % | 54,522 | 65.3 % | 28,935 | 34.7 % | 52,897 | 63.4 % | 2,126 | 2.5 % |
| 45 | 33,504 | 41.1 % | 2,429 | 3.0 % | 1,715 | 2.1 % | 33,216 | 40.7 % | 45,408 | 55.6 % | 2,999 | 3.7 % | 35,324 | 43.5 % | 45,940 | 56.5 % | 33,669 | 41.4 % | 2,713 | 3.3 % |
| 46 | 20,095 | 23.9 % | 2,498 | 3.0 % | 1,803 | 2.1 % | 20,045 | 23.9 % | 61,278 | 72.9 % | 2,714 | 3.2 % | 21,848 | 26.1 % | 61,794 | 73.9 % | 20,298 | 24.3 % | 2,534 | 3.0 % |
| 47 | 42,941 | 40.0 % | 2,948 | 2.7 % | 1,553 | 1.4 % | 43,407 | 40.4 % | 61,063 | 56.8 % | 3,021 | 2.8 % | 45,901 | 43.0 % | 60,858 | 57.0 % | 43,340 | 40.7 % | 2,695 | 2.5 % |
| 48 | 33,622 | 30.5 % | 3,170 | 2.9 % | 1,921 | 1.7 % | 34,017 | 30.8 % | 73,231 | 66.2 % | 3,357 | 3.0 % | 36,436 | 33.2 % | 73,225 | 66.8 % | 33,893 | 31.0 % | 3,094 | 2.8 % |
| 49 | 19,425 | 18.5 % | 2,854 | 2.7 % | 2,375 | 2.3 % | 19,499 | 18.5 % | 82,477 | 78.4 % | 3,247 | 3.1 % | 21,260 | 20.4 % | 83,169 | 79.6 % | 19,271 | 18.5 % | 2,984 | 2.9 % |
| 50 | 15,851 | 22.9 % | 2,198 | 3.2 % | 1,715 | 2.5 % | 15,971 | 23.2 % | 50,456 | 73.2 % | 2,518 | 3.7 % | 17,249 | 25.1 % | 51,413 | 74.9 % | 16,150 | 23.5 % | 2,140 | 3.1 % |
| 51 | 11,456 | 16.3 % | 2,139 | 3.0 % | 1,857 | 2.6 % | 11,367 | 16.2 % | 56,096 | 79.9 % | 2,726 | 3.9 % | 12,708 | 18.2 % | 57,050 | 81.8 % | 11,590 | 16.6 % | 2,408 | 3.5 % |
| 52 | 48,853 | 52.8 % | 2,977 | 3.2 % | 1,206 | 1.3 % | 47,381 | 52.5 % | 39,867 | 44.2 % | 2,976 | 3.3 % | 51,596 | 56.1 % | 40,379 | 43.9 % | 48,855 | 53.2 % | 2,944 | 3.2 % |
| 53 | 73,575 | 75.7 % | 1,804 | 1.9 % | 819 | 0.8 % | 73,558 | 75.7 % | 21,589 | 22.2 % | 2,007 | 2.1 % | 75,595 | 78.3 % | 20,980 | 21.7 % | 73,866 | 76.3 % | 1,842 | 1.9 % |
| 54 | 31,562 | 54.0 % | 1,504 | 2.6 % | 722 | 1.2 % | 30,955 | 52.8 % | 25,823 | 44.1 % | 1,830 | 3.1 % | 32,367 | 55.4 % | 26,093 | 44.6 % | 31,105 | 53.2 % | 1,637 | 2.8 % |
| 55 | 37,699 | 56.0 % | 1,798 | 2.7 % | 807 | 1.2 % | 37,031 | 54.8 % | 28,496 | 42.2 % | 2,017 | 3.0 % | 38,771 | 57.5 % | 28,605 | 42.5 % | 37,293 | 55.3 % | 1,851 | 2.7 % |
| 56 | 52,306 | 66.6 % | 1,925 | 2.5 % | 879 | 1.1 % | 51,886 | 65.8 % | 25,033 | 31.7 % | 1,982 | 2.5 % | 53,894 | 68.6 % | 24,637 | 31.4 % | 52,501 | 66.7 % | 1,746 | 2.2 % |
| 57 | 47,702 | 57.5 % | 2,317 | 2.8 % | 1,090 | 1.3 % | 47,741 | 57.2 % | 33,471 | 40.1 % | 2,206 | 2.6 % | 49,288 | 59.7 % | 33,246 | 40.3 % | 47,526 | 57.5 % | 2,225 | 2.7 % |
| 58 | 57,851 | 76.5 % | 1,743 | 2.3 % | 582 | 0.8 % | 57,699 | 76.4 % | 16,108 | 21.3 % | 1,703 | 2.3 % | 59,244 | 78.8 % | 15,906 | 21.2 % | 57,741 | 76.7 % | 1,548 | 2.1 % |
| 59 | 58,467 | 77.2 % | 1,783 | 2.4 % | 653 | 0.9 % | 58,039 | 76.7 % | 15,788 | 20.9 % | 1,861 | 2.5 % | 59,708 | 79.3 % | 15,584 | 20.7 % | 58,227 | 77.2 % | 1,719 | 2.3 % |
| 60 | 74,810 | 82.4 % | 2,126 | 2.3 % | 551 | 0.6 % | 74,311 | 82.0 % | 14,133 | 15.6 % | 2,226 | 2.5 % | 76,356 | 84.5 % | 13,984 | 15.5 % | 74,522 | 82.4 % | 2,058 | 2.3 % |
| 61 | 51,967 | 56.5 % | 2,154 | 2.3 % | 736 | 0.8 % | 51,592 | 56.0 % | 38,470 | 41.7 % | 2,121 | 2.3 % | 52,985 | 58.3 % | 37,891 | 41.7 % | 51,803 | 56.5 % | 1,921 | 2.1 % |
| 62 | 61,972 | 77.0 % | 1,676 | 2.1 % | 489 | 0.6 % | 61,228 | 76.0 % | 17,720 | 22.0 % | 1,610 | 2.0 % | 63,133 | 78.5 % | 17,288 | 21.5 % | 61,709 | 76.7 % | 1,532 | 1.9 % |
| 63 | 48,365 | 54.9 % | 2,396 | 2.7 % | 1,198 | 1.4 % | 48,438 | 54.6 % | 37,997 | 42.9 % | 2,218 | 2.5 % | 50,088 | 57.1 % | 37,563 | 42.9 % | 48,208 | 54.9 % | 2,313 | 2.6 % |
| 64 | 51,968 | 61.4 % | 2,199 | 2.6 % | 1,550 | 1.8 % | 51,758 | 60.9 % | 30,779 | 36.2 % | 2,387 | 2.8 % | 53,357 | 63.4 % | 30,744 | 36.6 % | 51,699 | 61.4 % | 2,341 | 2.8 % |
| 65 | 52,349 | 56.4 % | 2,408 | 2.6 % | 1,165 | 1.3 % | 52,548 | 56.3 % | 38,604 | 41.3 % | 2,217 | 2.4 % | 54,210 | 58.6 % | 38,282 | 41.4 % | 52,284 | 56.5 % | 2,257 | 2.4 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR-T = Total Spanish surname voter registration

Election Analysis

**HOUSE DISTRICTS - PLANH2316**
**2020 General Election**

| | SUP CT 7 | | | SUP CT 8 | | | CCA 3 | | | CCA 4 | | | CCA 9 | |
| District | Williams-D | | Busby-R | | Triana-D | | Oxford-L | | Richardson-R | | Davis Frizell-D | | Yeary-R | | Clinton-D | | Newell-R | | Birmingham-D | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 33 | 31,851 | 36.0 % | 54,746 | 62.0 % | 31,424 | 35.6 % | 2,129 | 2.4 % | 55,466 | 63.0 % | 32,565 | 37.0 % | 55,664 | 63.3 % | 32,314 | 36.7 % | 55,901 | 63.6 % | 31,993 | 36.4 % |
| 34 | 30,764 | 54.3 % | 24,118 | 42.7 % | 31,084 | 55.0 % | 1,308 | 2.3 % | 24,846 | 44.0 % | 31,628 | 56.0 % | 25,205 | 44.7 % | 31,146 | 55.3 % | 25,309 | 45.1 % | 30,791 | 54.9 % |
| 35 | 20,948 | 60.8 % | 11,994 | 34.3 % | 21,977 | 63.1 % | 902 | 2.6 % | 12,884 | 36.8 % | 22,094 | 63.2 % | 12,940 | 37.4 % | 21,666 | 62.6 % | 13,393 | 38.8 % | 21,108 | 61.2 % |
| 36 | 25,623 | 59.6 % | 15,078 | 35.2 % | 26,586 | 62.0 % | 1,220 | 2.8 % | 16,159 | 37.6 % | 26,861 | 62.4 % | 16,550 | 38.6 % | 26,368 | 61.4 % | 17,039 | 40.0 % | 25,580 | 60.0 % |
| 37 | 26,097 | 51.5 % | 23,394 | 45.1 % | 27,217 | 52.5 % | 1,225 | 2.4 % | 24,457 | 47.1 % | 27,474 | 52.9 % | 24,227 | 47.4 % | 26,896 | 52.6 % | 24,925 | 48.6 % | 26,363 | 51.4 % |
| 38 | 28,551 | 64.8 % | 13,713 | 30.3 % | 30,376 | 67.0 % | 1,236 | 2.7 % | 15,160 | 33.3 % | 30,386 | 66.7 % | 14,839 | 33.3 % | 29,744 | 66.7 % | 15,719 | 35.1 % | 29,102 | 64.9 % |
| 39 | 26,159 | 60.2 % | 15,157 | 35.0 % | 26,953 | 62.3 % | 1,186 | 2.7 % | 16,076 | 37.0 % | 27,372 | 63.0 % | 16,585 | 38.3 % | 26,744 | 61.7 % | 16,822 | 39.1 % | 26,215 | 60.9 % |
| 40 | 25,621 | 61.0 % | 14,352 | 34.3 % | 26,337 | 62.9 % | 1,153 | 2.8 % | 15,386 | 36.7 % | 26,542 | 63.3 % | 15,708 | 37.6 % | 26,121 | 62.4 % | 15,876 | 38.2 % | 25,674 | 61.8 % |
| 41 | 31,527 | 55.5 % | 23,218 | 40.9 % | 32,148 | 56.7 % | 1,375 | 2.4 % | 24,248 | 42.7 % | 32,502 | 57.3 % | 24,698 | 43.7 % | 31,874 | 56.3 % | 24,918 | 44.2 % | 31,423 | 55.8 % |
| 42 | 32,509 | 63.7 % | 16,175 | 31.8 % | 33,374 | 65.6 % | 1,308 | 2.6 % | 17,386 | 35.1 % | 32,174 | 64.9 % | 17,784 | 36.1 % | 31,462 | 63.9 % | 18,375 | 36.6 % | 31,817 | 63.4 % |
| 43 | 26,146 | 38.5 % | 40,098 | 59.2 % | 26,200 | 38.7 % | 1,486 | 2.2 % | 40,973 | 60.5 % | 26,804 | 39.5 % | 41,338 | 61.1 % | 26,341 | 38.9 % | 41,308 | 61.3 % | 26,085 | 38.7 % |
| 44 | 28,455 | 34.1 % | 52,857 | 63.5 % | 28,197 | 33.9 % | 2,221 | 2.7 % | 53,907 | 64.7 % | 29,391 | 35.3 % | 54,201 | 65.3 % | 28,821 | 34.7 % | 54,464 | 65.6 % | 28,517 | 34.4 % |
| 45 | 44,924 | 55.3 % | 33,440 | 41.2 % | 44,715 | 55.1 % | 2,951 | 3.6 % | 34,424 | 42.5 % | 46,544 | 57.5 % | 34,982 | 43.4 % | 45,711 | 56.6 % | 35,187 | 43.7 % | 45,259 | 56.3 % |
| 46 | 60,796 | 72.7 % | 19,984 | 23.9 % | 60,796 | 72.8 % | 2,705 | 3.2 % | 20,963 | 25.4 % | 61,717 | 74.6 % | 21,150 | 25.6 % | 61,617 | 74.4 % | 21,510 | 26.1 % | 61,059 | 73.9 % |
| 47 | 60,374 | 56.7 % | 43,208 | 40.7 % | 59,945 | 56.4 % | 3,082 | 2.9 % | 44,350 | 42.1 % | 61,099 | 57.9 % | 44,491 | 42.2 % | 60,839 | 57.8 % | 44,976 | 42.9 % | 59,919 | 57.1 % |
| 48 | 72,381 | 66.2 % | 33,494 | 30.6 % | 72,427 | 66.3 % | 3,362 | 3.1 % | 34,888 | 32.2 % | 73,465 | 67.8 % | 34,962 | 32.3 % | 73,253 | 67.7 % | 35,528 | 33.0 % | 72,262 | 67.0 % |
| 49 | 81,790 | 78.6 % | 19,039 | 18.3 % | 81,662 | 78.6 % | 3,204 | 3.1 % | 20,095 | 19.5 % | 82,932 | 80.5 % | 20,209 | 19.6 % | 82,752 | 80.4 % | 20,662 | 20.1 % | 81,933 | 79.9 % |
| 50 | 50,340 | 73.3 % | 15,815 | 23.1 % | 50,244 | 73.4 % | 2,409 | 3.5 % | 16,547 | 24.4 % | 51,248 | 75.6 % | 16,816 | 24.8 % | 51,049 | 75.2 % | 17,155 | 25.3 % | 50,534 | 74.7 % |
| 51 | 55,731 | 79.9 % | 11,137 | 16.0 % | 55,926 | 80.3 % | 2,575 | 3.7 % | 12,054 | 17.5 % | 56,936 | 82.5 % | 12,303 | 17.8 % | 56,689 | 82.2 % | 12,588 | 18.3 % | 56,194 | 81.7 % |
| 52 | 39,952 | 43.5 % | 48,982 | 53.4 % | 39,587 | 43.2 % | 3,135 | 3.4 % | 50,403 | 55.0 % | 41,176 | 45.0 % | 50,672 | 55.6 % | 40,442 | 44.4 % | 51,188 | 56.2 % | 39,901 | 43.8 % |
| 53 | 21,093 | 21.8 % | 73,747 | 76.3 % | 20,776 | 21.5 % | 2,070 | 2.1 % | 74,820 | 77.6 % | 21,627 | 22.4 % | 74,970 | 77.9 % | 21,212 | 22.1 % | 75,159 | 78.3 % | 20,888 | 21.7 % |
| 54 | 25,743 | 44.0 % | 31,322 | 53.6 % | 25,434 | 43.5 % | 1,689 | 2.9 % | 31,937 | 54.7 % | 26,396 | 45.3 % | 32,142 | 55.1 % | 26,191 | 44.9 % | 32,251 | 55.3 % | 26,095 | 44.7 % |
| 55 | 28,273 | 41.9 % | 37,560 | 55.8 % | 27,805 | 41.3 % | 1,936 | 2.9 % | 38,230 | 56.9 % | 28,996 | 43.1 % | 38,526 | 57.3 % | 28,656 | 42.7 % | 38,657 | 57.5 % | 28,535 | 42.5 % |
| 56 | 24,419 | 31.0 % | 52,542 | 66.9 % | 24,110 | 30.7 % | 1,872 | 2.4 % | 53,074 | 67.7 % | 25,266 | 32.3 % | 53,330 | 68.3 % | 24,764 | 31.7 % | 53,563 | 68.7 % | 24,403 | 31.3 % |
| 57 | 32,971 | 39.9 % | 47,748 | 57.8 % | 32,380 | 39.2 % | 2,437 | 3.0 % | 48,473 | 58.9 % | 33,789 | 41.1 % | 48,780 | 59.5 % | 33,191 | 40.5 % | 49,120 | 60.0 % | 32,811 | 40.0 % |
| 58 | 15,973 | 21.2 % | 58,088 | 77.0 % | 15,461 | 20.5 % | 1,848 | 2.5 % | 58,675 | 78.0 % | 16,528 | 22.0 % | 58,792 | 78.4 % | 16,183 | 21.6 % | 58,998 | 78.7 % | 15,927 | 21.3 % |
| 59 | 15,463 | 20.5 % | 58,352 | 77.5 % | 14,998 | 19.9 % | 1,944 | 2.6 % | 59,115 | 78.6 % | 16,101 | 21.4 % | 59,349 | 79.1 % | 15,657 | 20.9 % | 59,401 | 79.3 % | 15,522 | 20.7 % |
| 60 | 13,812 | 15.3 % | 74,590 | 82.7 % | 13,378 | 14.8 % | 2,223 | 2.5 % | 75,724 | 84.1 % | 14,356 | 15.9 % | 75,838 | 84.4 % | 14,047 | 15.6 % | 75,951 | 84.6 % | 13,852 | 15.4 % |
| 61 | 37,914 | 41.4 % | 51,924 | 56.7 % | 37,437 | 40.9 % | 2,226 | 2.4 % | 52,549 | 57.6 % | 38,361 | 42.2 % | 52,863 | 58.1 % | 38,147 | 41.9 % | 53,080 | 58.5 % | 37,669 | 41.5 % |
| 62 | 17,250 | 21.4 % | 61,833 | 77.0 % | 16,714 | 20.8 % | 1,718 | 2.1 % | 62,535 | 77.9 % | 17,730 | 22.1 % | 62,738 | 78.3 % | 17,405 | 21.7 % | 62,864 | 78.4 % | 17,357 | 21.6 % |
| 63 | 37,308 | 42.5 % | 48,422 | 55.2 % | 36,671 | 41.8 % | 2,559 | 2.9 % | 49,181 | 56.4 % | 38,080 | 43.6 % | 49,385 | 56.8 % | 37,548 | 43.2 % | 49,835 | 57.4 % | 37,033 | 42.6 % |
| 64 | 30,208 | 35.9 % | 51,877 | 61.7 % | 29,693 | 35.3 % | 2,496 | 3.0 % | 52,500 | 62.7 % | 31,284 | 37.3 % | 52,863 | 63.3 % | 30,700 | 36.7 % | 52,984 | 63.5 % | 30,446 | 36.5 % |
| 65 | 37,953 | 41.0 % | 52,618 | 56.9 % | 37,312 | 40.4 % | 2,516 | 2.7 % | 53,194 | 57.8 % | 38,857 | 42.2 % | 53,562 | 58.3 % | 38,275 | 41.7 % | 54,019 | 58.9 % | 37,682 | 41.1 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR-T = Total Spanish surname voter registration

# Exhibit 18:
# *New York Times* article, Sept. 27, 2021

**The New York Times** | https://www.nytimes.com/2021/09/27/us/politics/texas-congress-map-republicans.html

Daily Political Briefing >

# Texas Republicans propose a new congressional map that aims to protect the party's incumbents.

 

**By Nick Corasaniti and Reid J. Epstein**
Sept. 27, 2021

Republicans in the Texas Legislature proposed a new congressional map on Monday that would preserve the party's advantage in the state's delegation to Washington amid booming population growth spurred by communities of color.

The new map was designed with an eye toward incumbency and protecting Republicans' current edge; the party now holds 23 of the state's 36 congressional seats. Rather than trying to make significant gains, the party appears to be bolstering incumbents who have faced increasingly tough contests against an ascendant Democratic Party in Texas.

Indeed, in the proposed map, there is only one congressional district in the state where the margin of the 2020 presidential election would have been less than five percentage points, an indication that the vast majority of the state's 38 districts will not be particularly competitive.

Texas was the only state in the country to be awarded two new congressional districts during this year's reapportionment, which is taking place after the 2020 census. The state's Hispanic population grew by two million people over the past 10 years, and is now just 0.4 percentage points behind that of the Anglo population.

But the map proposed by the Republican-controlled State Senate redistricting committee, led by State Senator Joan Huffman, would decrease the number of predominantly Hispanic districts in the state from eight to seven, and would increase the number of majority-white districts from 22 to 23.

---

### Redistricting at a Glance

Every 10 years, each state in the U.S is required to redraw the boundaries of their congressional and state legislative districts in a process known as redistricting.

- **Redistricting, Explained:** Answers to your most pressing questions about redistricting and gerrymandering.

- **Breaking Down Texas's Map:** How redistricting efforts in Texas are working to make Republican districts even more red.

- **G.O.P.'s Heavy Edge:** Republicans are poised to capture enough seats to take the House in 2022, thanks to gerrymandering alone.

- **Legal Options Dwindle:** Persuading judges to undo skewed political maps was never easy. A shifting judicial landscape is making it harder.

---

Though the map proposed on Monday was just a first draft and could undergo some changes, civil rights groups expressed alarm at the lack of new districts with a majority of voters of color.

"With Latinos accounting for nearly half of the total growth of the Texas population in the last decade, we would expect legally compliant redistricting maps to protect existing Latino-majority districts and potentially to expand the number of such districts," said Thomas Saenz, the president and general counsel of the Mexican American Legal Defense and Educational Fund.

---

**Sign Up for On Politics**  A guide to the political news cycle, cutting through the spin and delivering clarity from the chaos. Get it sent to your inbox.

Texas has a long history of running afoul of the redistricting parameters set by the Voting Rights Act, having faced a legal challenge to every map it has put forward since the law was passed in 1965. But in 2013, the Supreme Court gutted a key provision of the act that forced some states to obtain approval from the Justice Department before making changes to voting laws or to congressional districts.

This year is the first time that Texas legislators have been free to redraw the state's congressional map without following that requirement.

Across the country, each party is poised to press its advantage to create as many favorable congressional and state legislative seats as possible in states where its lawmakers control how maps are drawn.

---

**Understand How U.S. Redistricting Works**

**What is redistricting?** It's the redrawing of the boundaries of congressional and state legislative districts. It happens every 10 years, after the census, to reflect changes in population.

---

On Friday, the National Redistricting Action Fund, a Democratic organization run by former Attorney General Eric H. Holder Jr., sued Ohio over Republican-drawn state legislative maps that it argued had violated a 2015 state constitutional amendment.

In Nebraska this month, Democrats protested a proposed map from Republicans that split Douglas County, which includes Omaha, the state's largest city, into two congressional districts. The Democrats eventually forced a compromise that maintained a district in which President Biden won a majority of votes. On Friday, Nebraska legislators agreed to pass a congressional map that preserves Douglas County as a single district.

Fast-growing Oregon is one of the few states where Democrats have the potential to press a redistricting advantage. The state is adding a sixth congressional district to its delegation, which now has four Democrats and one Republican. But the new map, set to pass on Monday, will most likely create a Democratic district, adding to Democrats' advantage in the state.

# Exhibit 19:

*Texas Tribune* article, Oct. 25, 2021

 

**REDISTRICTING TEXAS**

# Gov. Greg Abbott signs off on Texas' new political maps, which protect GOP majorities while diluting voices of voters of color

Texas lawmakers drew new maps for the state House and Senate, congressional delegation and State Board of Education. Here's what Texans should know about the 2021 redistricting outcomes.

BY **ELVIA LIMÓN**     OCT. 25, 2021   3 PM CENTRAL

COPY LINK





Texas lawmakers redrew political districts for the state House, state Senate, U.S. House and State Board of Education during 2021's third special session. 📷 Michael Gonzalez/The Texas Tribune

Gov. Greg Abbott on Monday approved Texas' new political maps for the state's congressional, legislative and State Board of Education districts, according to Texas Legislature Online.

The maps were drawn to keep Texas Republicans in power for the next decade. They simultaneously diminish the power of voters of color — despite new census numbers pointing to Texans of color as the main force behind the state's population growth.

The new districts will be used for the first time in next year's primary and general elections, barring any court interventions.



**Texas has new political maps. See which districts your home is in.**

In 2021, Texas Republicans redrew political maps for the state's congressional, House, Senate and Board of Education districts. Enter your address to see your districts. (Don't worry, we won't store your information.)

**ENTER YOUR ADDRESS**

1010 Colorado St, Austin, TX, 78701

**SEE DISTRICT CHANGES**

The redistricting process, which happens every 10 years after new census data is released, is complicated and contentious. Legal battles have already begun, with one early lawsuit raising various claims that the new districts unfairly and

illegally discriminate against voters of color. More legal challenges are expected to pop up in the near future.

The Texas Tribune thanks its sponsors. **Become one**.

Here's what Texans should know about the 2021 redistricting outcomes.



# The Texas GOP fortified its power with all four maps

Texas lawmakers drew political maps that would protect the GOP's majorities in the Texas Legislature, on the State Board of Education and within the state's congressional delegation to Washington, D.C. Throughout the process, Texas Republicans — nearly all of whom are white — struggled against demographic tides to protect their grip on power.

In a bid to hold the political turf, Republicans zeroed in on some communities with high shares of potential voters of color — who are more likely to support Democrats — and grafted them onto massive districts dominated by white voters. To protect GOP incumbents, Republicans also made political districts less competitive, which could undermine many potential challengers' campaigns. Some experts believe this tactic might hurt civic engagement.

# Republicans drew new maps that dilute the power of voters of color

Census data shows that Texans of color accounted for 95% of the state's population growth, but the state's new political maps don't reflect this growth. With partisan fervor, Republicans drew new maps for Congress and the Texas Legislature that dilute the power of voters of color. That came despite Democratic efforts — and pleas from members of the public — to create additional opportunities for voters of color to meaningfully influence elections.

Since Congress passed the Voting Rights Act in 1965, Texas has been barred by law from discriminating against voters of color. Yet in every decade since then, federal judges have ruled at least once that the state violated federal protections for voters in redistricting.

## Texas' new political districts are not reflective of the state

People of color made up 95% of Texas' population growth, and the Hispanic and white populations are nearly equal in size. But white voters will have disproportionate control of elections under the state's new political maps.

### The breakdown of Texas' population in 2020

| White | Hispanic | Black | Asian | Other |
| --- | --- | --- | --- | --- |
| 40% | 39 | 12 | 5 | 1 |

Note: Percentages may not add up to 100. About 3% of people in Texas identify as having two or more races.

### Majority demographic group among eligible voters in new districts

| | White | Hispanic | Black | Asian | No majority |
| --- | --- | --- | --- | --- | --- |
| **Congressional** 38 districts | 23 districts | 7 | | | 8 |
| **State House** 150 districts | 89 districts | 30 | | 6 | 25 |
| **State Senate** 31 districts | 20 districts | | 7 | 1 | 3 |

Source: U.S. Census Bureau, Texas Legislative Council
Credit: Mandi Cai

State Sen. Joan Huffman, the Houston Republican who led the redistricting process in the Senate, said in a public meeting that lawmakers had drawn the maps "race blind" and they had "not looked at any racial data" throughout the process. But to the legion of civil rights activists, lawyers, local leaders and organizers who have labored for decades against Texas political structures that exclude their communities, Huffman's words translate as being politically invisible.

"Color blind has two meanings — one that decisions are made without racial bias. These maps have obviously been made with racial bias," Elisa Gonzalez, a retired educator from Corpus Christi, told lawmakers at one public hearing. "However,

this committee is also color blind in terms of being deliberately blind to citizens of color by making maps that silence their impact."

The Texas Tribune thanks its sponsors. **Become one**.



# New congressional map increases districts Donald Trump would have won

With the state's new congressional districts, Republicans designed a map that will tighten their hold on diversifying parts of the state, where the party's grip on power was waning. It will also lock in the GOP's majority in the 38-seat delegation for the U.S. House.

The state's delegation had consisted of 23 Republicans and 13 Democrats. Trump won 22 current U.S. House districts, but would have won 25 under the new maps. Biden won 14 current U.S. House districts, but would have won 13 under the new maps. That means while Trump won 52.1% of the statewide vote, he would have won in more than 65% of the new congressional districts.

By fortifying GOP districts, the congressional map often manipulates district lines around communities of color. In some instances, Republicans drew diverse suburban areas into sprawling rural districts dominated by white voters. They

reconfigured a district in the typically blue Rio Grande Valley to boost Republican performance even though the area's Hispanic voters usually don't prefer GOP candidates.

The new map also incorporates two additional U.S. House seats the state gained, the most of any state in this year's reapportionment. Though Texas received those districts because of explosive population growth — 95% of it attributable to

Future of Abortion Rights      2022 Elections      School Board Fights      Find Your Political Districts

The Texas Tribune thanks its sponsors. **Become one**.

Republicans reduced the number of districts in which Hispanics make up the majority of eligible voters from eight to seven. The number of districts with Black residents as the majority of eligible voters drops from one to zero. Meanwhile, the state would have 23 districts with a white majority among eligible voters — up from 22 in the current configuration.

The new 37th Congressional District in the Austin area captures Democratic-leaning voters that were endangering the prospects of Republican incumbents in nearby districts. The new 38th Congressional District offers Republicans safe territory in the Houston area.



# Senate map protects Republican incumbents

Texas' new Senate map draws safe seats for Republican incumbents who were facing competitive races as their districts diversified over the last 10 years. As of October 2021, the chamber's 31 seats were divided among 18 Republicans and 13 Democrats.

In the 2020 elections, Trump won 16 districts and Biden won 15 districts. Under the new maps, Trump would have won 19 and Biden would have won 12. That means while Trump won 52.1% of the statewide vote, he would have won more than 61% of the new Senate districts.

The new map still has seven districts where Hispanics make up the majority of eligible voters and one where Black residents are the majority of eligible voters. The number of districts where white residents make up the majority of eligible voters drops from 21 to 20. And districts where no racial group makes up more than half of eligible voters increases from two to three.

# New House districts decrease Hispanic and Black voters' influence

The state's new House map pulls back on Hispanic and Black voters' potential influence in electing their representatives.

The map brings the number of districts in which Hispanics make up the majority of eligible voters down from 33 to 30. The number of districts with Black residents as the majority of eligible voters would drop from seven to six. Meanwhile, the number of districts with a white majority among eligible voters would increase from 83 to 89.

The redraw will ultimately aid Republicans' ability to control the chamber for years to come.

As of October 2021, the partisan breakdown of the House was 83 Republicans and 66 Democrats. During the 2020 election, 76 districts voted for Trump while 74 voted for Biden.

The Texas Tribune thanks its sponsors. **Become one**.

The new House map creates 85 districts that would have favored Trump in 2020 and 65 that would have voted for Biden. So while Trump won 52.1% of the statewide vote, he would have won in 56.7% of new state House districts.



# State Board of Education map keeps Republicans in control

The State Board of Education is the 15-member body that dictates what millions of Texas public school students are taught in classrooms. It is currently made up of nine Republicans and six Democrats. The new map continues to give Republicans control. Seven of the districts went to Biden during the 2020 general election, but under the new maps, Biden would have won only six of the districts.

Under the new maps, there are 10 districts whose majority of eligible voters is white, three where the majority is Hispanic and two that have no majority. This did not change from the previous maps.

More than 5.3 million students were enrolled in Texas public schools for the 2020-21 school year, according to the Texas Education Agency. More than 52% are Hispanic, about 12.7% are Black, 4.7% are Asian American, and about 26.5% white.



# Legal challenges are expected — something to which Texas is accustomed

Before the special legislative session for redistricting was wrapped up, lawsuits had already been filed, and more are expected. It's not unusual for some redistricting plans to end up in state or federal court. For the past decade, the state dealt with the legal implications of the 2011 redistricting maps that ended up being rejected by the federal government. If those past lawsuits indicate anything it's that these types of court challenges could take years, if not the better part of a decade.



# This is the first time in decades Texas doesn't need federal approval to implement new maps

In every decade since the federal Voting Rights Act was passed, federal courts have found that Texas lawmakers disenfranchised voters in one way or another when drawing maps. Because of this long history of voter suppression, Texas was required for decades to run any changes to its elections, including changes to district boundaries, by the U.S. Department of Justice or a federal court.

But in 2013, the U.S. Supreme Court gutted the Voting Rights Act and ruled that the formula that kept states like Texas under federal oversight was outdated, freeing the state from the process known as preclearance. That means 2021 was the first time in nearly 50 years that Texas could implement new legislative and congressional districts without having to prove ahead of time that the maps don't

undermine the electoral power of voters of color. Voters of color and civil rights groups that have fought the state's political maps in the past now have fewer tools with which to challenge the discrimination that may tarnish the maps.

## Quality journalism doesn't come free

Perhaps it goes without saying — but producing quality journalism isn't cheap. At a time when newsroom resources and revenue across the country are declining, The Texas Tribune remains committed to sustaining our mission: creating a more engaged and informed Texas with every story we cover, every event we convene and every newsletter we send. As a nonprofit newsroom, we rely on members to help keep our stories free and our events open to the public. Do you value our journalism? Show us with your support.

**YES, I'LL DONATE TODAY**

The Texas Tribune thanks its sponsors. **Become one**.



**INFO**

About Us

Our Staff

Jobs

# Exhibit 20:
## *Texas Tribune* article, Oct. 7, 2021

 

Future of Abortion Rights    2022 Elections    School Board Fights    Find Your Political Districts

**REDISTRICTING TEXAS**

# Weighing reelection bid, GOP Texas Sen. Kel Seliger confronts redrawn district, Trump endorsement of primary challenger

After high-profile clashes with Lt. Gov. Dan Patrick, a fellow Republican, Seliger suspects members of his own party are trying to oust him.

BY **PATRICK SVITEK**    OCT. 7, 2021    5 AM CENTRAL

COPY LINK



State Sen. Kel Seliger, R-Amarillo, has represented Senate District 31 in the Panhandle since 2004. 📷 Juan Figueroa/The Texas Tribune

*Sign up for The Brief,* our daily newsletter that keeps readers up to speed on the most essential Texas news.

Heading into election season, Amarillo state Sen. Kel Seliger says he feels like members of his own party might be using redistricting to oust him after years of tension with Lt. Gov. Dan Patrick, a fellow Republican.

Seliger is deciding whether he will even run for reelection, but if he does, he is now staring down perhaps his toughest primary yet.

He has received two primary challengers, including Kevin Sparks, a Midland oilman who previously served on the board of the Texas Public Policy Foundation, the Austin-based conservative think tank. Meanwhile, Seliger's district was redrawn by his Republican colleagues in the Senate in a way that he says is designed to hobble a potential reelection bid.

The Texas Tribune thanks its sponsors. **Become one**.

And on Tuesday, former President Donald Trump, a close ally of Patrick, endorsed Sparks and bashed Seliger as a "RINO" — Republican in name only — in a rare intervention in a Texas legislative race by the former president.

Reached by phone on Wednesday, Seliger offered only five words in response to the endorsement: "It comes as no surprise."

But the senator has otherwise been outspoken about his proposed new district, alleging it was constructed to tilt the primary in favor of Sparks. While he is waiting until after the redistricting process is done to decide whether to seek reelection, Seliger said the perceived effort to draw him into a harder primary would backfire because the new counties are still rural — and local officials in those counties "hate TPPF because they are virulently anti-local control."

"This map doesn't serve the purpose that was sought because these are rural counties, and I almost always win all the rural counties," Seliger said.

The proposed new district removes four counties from the Panhandle and adds a dozen to the southern end of the district, closer to Midland. The Senate approved the map proposal Monday, with Seliger as the only Republican voting against it.

"I believe, members, that really what this is about is to take counties out of the Panhandle and move them closer to Midland because a member of the board of Texas Public Policy Foundation is running," Seliger said on the floor before the vote.

He confirmed after the vote that he was referring to Sparks, a former board member — and that he "absolutely" felt the district was being redrawn to advantage his opponent.

Sen. Joan Huffman, the Houston Republican who chairs the Senate Redistricting Committee, defended the proposed new configuration of Seliger's district, saying the additional counties were necessary to make up for lost population in the 2020 census.

The Texas Tribune thanks its sponsors. **Become one**.

Patrick's chief political strategist, Allen Blakemore, scoffed at Seliger's claims in a statement Wednesday.

"After spending 17 years working against the interests of conservatives, often being the only Republican to vote with Democrats on key issues and being ranked as the most liberal Member year after year, Senator Seliger now feels there is an elaborate scheme designed to thwart his election," Blakemore said. "The timing speaks for itself."

Patrick himself has not publicly commented on Seliger's primary. But during a trip to Midland last week, Patrick told the Permian Basin Petroleum Association that the Senate needs an oil and gas expert — which Sparks happens to be.

Trump's endorsement of Sparks arrived Tuesday evening, less than two hours after Seliger cast the lone Republican vote against a Patrick priority bill clearing the way for party officials to trigger election audits. Seliger reportedly said he opposed the legislation because it is an "unfunded mandate of the counties, and I'm opposed to big government."

The Texas Tribune thanks its sponsors. **Become one**.

Trump said in a statement that Seliger "is not helpful to our great [Make America Great Again] Movement and, in fact, seems like the Texas version of Mitt Romney (and that is not good!)."

Seliger has become known for bucking Patrick on the lieutenant governor's signature issues. In 2017, Seliger voted against two of Patrick's highest priorities, a bill restricting local governments' abilities to raise property tax revenues and another one providing private school vouchers. The next session, Patrick stripped Seliger of his chairmanship of the Higher Education Committee, prompting a back-and-forth with Patrick's office that escalated to Seliger issuing a recommendation that a top Patrick adviser kiss his "back end." (Seliger ultimately apologized, but only for directing the comment at the adviser and not at Patrick himself.)

A former Amarillo mayor, Seliger has represented Senate District 31 in the Panhandle since 2004. He has gone through competitive primaries before, including the last time he ran for reelection in 2018, when he faced two challengers: Amarillo restaurateur Victor Leal and former Midland Mayor Mike Canon. Seliger narrowly avoided a runoff against Canon, winning 50.4% of the vote.

Patrick publicly swore off involvement in that race, but his top political lieutenant, Blakemore, was involved in Leal's campaign. At the time, Patrick was running in his own primary for reelection — and Seliger had declined to join every other GOP senator in endorsing the lieutenant governor for another term.

The Texas Tribune thanks its sponsors. **Become one**.

Three years later, Patrick possesses no stronger ally against Seliger than Trump. Both of Trump's Texas campaigns were chaired by the lieutenant governor.

Trump is overwhelmingly popular in the Panhandle, where he has already reshaped GOP representation with his 2020 backing of his former White House doctor, Ronny Jackson, for the 13th Congressional District. Campaigning heavily on Trump's support, Jackson soundly defeated fellow Republican Josh Winegarner in a primary runoff in which Winegarner had much stronger local roots and the support of the retiring incumbent, Mac Thornberry, as well as Seliger.

Trump won Seliger's Senate District 31 with 78% of the vote last year. He performed better in only one other Senate district.

Sparks celebrated the Trump endorsement in a fundraising email Wednesday night, saying the former president "realizes that the people of Senate District 31 deserve more conservative representation."

The Texas Tribune thanks its sponsors. **Become one**.

Sparks is formally kicking off his campaign Monday in Midland, where he has already assembled a formidable list of endorsements. It includes Seliger's two 2018 primary challengers, Canon and Leal; several former Midland mayors; and heavy-hitting conservative donors from the area like Tim Dunn, Douglas Scharbauer and Dick Saulsbury.

Sparks' campaign says it also has a list of Amarillo endorsements that it will release soon.

Seliger's other primary rival is Big Spring businessperson Stormy Bradley. She is undeterred by recent developments, saying in a statement Wednesday that neither the proposed new district nor the Trump endorsement "affect my campaign strategy for Senate District 31."

"I myself resonate with Trump's message to 'Make America Great Again' as I also am passionate towards having a thriving and secure nation," Bradley said. "I appreciate his concern for our citizens; however, I feel the voters in District 31 are best suited to determine their next senator."

The Texas Tribune thanks its sponsors. **Become one**.

Seliger had close to a half a million dollars in his campaign account at the end of June, though he does not appear to have done much fundraising since then. He reported one $2,500 donation on a campaign finance report that was due after the first special session, covering July 7 through Aug. 6. Meanwhile, Sparks and Bradley have started modestly in the money race, disclosing $58,000 and $29,000 in donations, respectively, on reports that go through Sept. 2.

As for the proposed new district, Seliger did not mince words Tuesday. He said "the only reason verbalized to me" in a meeting with Huffman "was a desire to provide distinct oil-and-gas districts and distinct agriculture districts." He disputed that, saying the proposed map "doesn't do that at all," and also dismissed the idea the new 31st District would adhere to the redistricting

principle of compactness — keeping constituents as close together as possible — noting how far the north-south distance of the district would grow.

Huffman also noted that the partisan makeup of voters in the proposed new district is the most favorable one for GOP candidates.

"Sen. Seliger, I still believe you have a very compact district considering the population and the breadth of West Texas and the beauty of West Texas," Huffman said. "You also still have the most Republican Senate district in the state of Texas."

The Texas Tribune thanks its sponsors. **Become one**.

Seliger had offered an amendment to restore the four Panhandle counties and add different counties surrounding Midland but withdrew it, saying he wanted to spare colleagues a "difficult vote."

Sparks has no problem with the redrawn district.

"Everyone understands that rural Texas has lost population, so it's only natural that rural districts are larger under the proposed redistricting plan," he said in a statement. "Instead of lodging petty attacks, our rural communities must stand together to amplify our voice in Austin."

*Disclosure: Permian Basin Petroleum Association, Stand Together and Texas Public Policy Foundation have been financial supporters of The Texas Tribune, a nonprofit, nonpartisan news organization that is funded in part by donations from members,*

# Exhibit 21:
## *Texas Tribune* article, Jan. 22, 2019



≡ MENU

Future of Abortion Rights    2022 Elections    School Board Fights    Find Your Political Districts

**TEXAS LEGISLATURE 2019**

# Lt. Gov. Dan Patrick pulls Sen. Kel Seliger's chairmanship after Seliger suggested Patrick aide kiss his "back end"

Patrick cited a "lewd comment" by Seliger in explaining the move. The two have been tussling over committee assignments in recent days.

BY **EMMA PLATOFF**    JAN. 22, 2019    2 PM CENTRAL

COPY LINK



Sen. Kel Seliger has been removed from his post as chairman of the Senate Agriculture Committee. 📷 Laura Skelding for The Texas Tribune

## Texas Legislature 2019

*The 86th Legislature runs from Jan. 8 to May 27. From the state budget to health care to education policy — and the politics behind it all — we focus on what Texans need to know about the biennial legislative session.* **MORE IN THIS SERIES →**

State Sen. Kel Seliger has been stripped of his post as chairman of the Senate Agriculture Committee, in an escalation of a feud with Lt. Gov. Dan Patrick, who presides over the upper chamber.

Announced Tuesday afternoon, the demotion caps a weekend spat between Seliger, an Amarillo Republican first elected to the Senate in 2004, and Patrick. The two have found themselves at odds with one another after Seliger voted against two of the lieutenant governor's priorities in 2017.

Patrick said the demotion came after Seliger failed to apologize for a "lewd comment ... that has shocked everyone" — a remark made on a West Texas radio program suggesting that a senior Patrick aide kiss his "back end."

The tiff started Friday, when Patrick released committee assignments for the legislative session, stripping Seliger of his longtime post as chairman of the Senate Higher Education Committee and taking him off the committee entirely. Instead, Seliger was appointed chair of a newly created agriculture committee, which split off from a larger committee. Patrick said only that committee assignments were "based on a number of factors." Seliger called the snub "a very clear warning" that Republicans better toe the line, teeing up the battle.

The Texas Tribune thanks its sponsors. **Become one**.

In response, Sherry Sylvester, senior advisor to Patrick, said, "If Sen. Seliger believes serving as chair of the Agriculture Committee — a critical committee for West Texas and all of rural Texas — is beneath him, he should let us know and the lieutenant governor will appoint someone else."

In an interview over the weekend on the radio show the "Other Side of Texas," Seliger shot back one more time.

"It was extremely snide and really unbecoming for a member of the staff, the lieutenant governor's or my staff," Seliger told host Jay Leeson. "I didn't say anything of the sort, and that assertion is disingenuous and I have a recommendation for Miss Sylvester and her lips and my back end."

Patrick announced Tuesday that he removed Seliger from his leadership position after the veteran lawmaker declined to apologize for that remark.

"I met with Sen. Seliger earlier today and gave him an opportunity to apologize for a lewd comment he made on radio about a female staffer that has shocked everyone. He had 48 hours to apologize, but failed to do so," Patrick said in a news release. "To not be willing to apologize and suggest, somehow, that she had it coming is unimaginable."

"I will appoint a new Agriculture Committee chairman shortly," Patrick added.

The Texas Tribune thanks its sponsors. **Become one**.

In a statement later Tuesday afternoon, Seliger said he was "disappointed" to lose the chairmanship, and he apologized for directing his message to Sylvester, saying he "should have directed my response to the Lt. Governor."

"But let's be clear," Seliger said in a statement on Twitter. "The conflict between the Lt. Governor and me has nothing to do with recent statements I made on a radio talk show. It has to do with the fact that I have consistently stood up for rural Texas, local control, and public education rather than trumpeting the Lt. Governor's pet projects of bathroom regulation and private school vouchers."*

Seliger could prove a thorn in Patrick's side. After losing a Republican seat in the Senate in the 2018 midterms, Republicans hold a razor-thin supermajority; all 19 Republican senators must vote together to bring measures to the floor without Democratic support. A "no" vote from Seliger on partisan issues could jeopardize the lieutenant governor's agenda.

The demotion leaves Seliger as one of just three returning Republicans without a chairmanship. The others are Sen. Bob Hall, R-Edgewood, and Sen. Charles Schwertner, R-Georgetown, who voluntarily gave up his chairmanship after an inconclusive University of Texas at Austin Title IX investigation into whether he had sent lewd texts to a graduate student.

While Patrick explicitly attributed Seliger's demotion to the "lewd comment," the lieutenant governor's office wouldn't confirm whether Patrick asked Schwertner to give up his post over the sexual harassment allegation he faced. After first taking a wait-and-see approach to the investigation, Patrick's comments on Schwertner's request were limited to saying the move was "consistent" with his plans for chair assignments.

Hall and Schwertner are the other two Republicans on the agriculture committee.

*Alexa Ura contributed reporting.*

*Disclosure: Sherry Sylvester and the University of Texas at Austin have been financial supporters of The Texas Tribune, a nonprofit, nonpartisan news organization that is funded in part by donations from members, foundations and corporate sponsors.*

# Exhibit 22:
## *Amarillo Pioneer* article, Oct. 20, 2021

# The Amarillo Pioneer

Oct 20

# Seliger Calls It Quits: Republican Senator Not Seeking Re-election

Election Coverage (/blog/category/Election+Coverage), Local News
(/blog/category/Local+News)

State Sen. Kel Seliger has
announced his retirement
from the Texas Senate after
nearly two decades of
service, setting up an open
race for his seat in 2022.



Seliger (R-Amarillo)
announced on Twitter on



substantive proof for his claims.

In his last appearance on the ballot, Seliger faced his most difficult re-election campaign yet, narrowly avoiding a runoff in a three-way race that included former Midland mayor Mike Canon and former Muleshoe mayor Victor Leal. Four years earlier, Seliger also faced a narrow re-election against Canon.

During the final years of Seliger's tenure, he was frequently criticized for his liberal positions on several fiscal issues, voting against bans on taxpayer-funded lobbying and being one of the only Republicans in the Texas Legislature to actively oppose property tax reform. His positions earned him the reputation as the most liberal Republican in the Senate, as well as the criticism of former President Donald Trump, who called Seliger the "Texas version of Mitt Romney."

With Seliger's announcement, two candidates are already seeking the Republican nomination for his job in District 31, which stretches from Amarillo to south of the Midland and Odessa region. Midland businessman Kevin Sparks, who has received the endorsement of former President Trump, and Coahoma ISD Trustee Stormy Bradley are running for the seat.

After Seliger's announcement, Sparks issued a statement to the *Texas Scorecard* publication, thanking Seliger for his service and saying he is looking forward to the campaign ahead.

"I thank Sen. Seliger for his nearly 20 years of service in the Texas Senate," Sparks said. "I look forward to the opportunity to meet with and earn the votes of the hardworking families of Senate District 31."

Candidates who are interested in running for State Senate can begin filing to run for office in November. The Republican primary election for this seat is scheduled for March 1, 2022.

Thomas Warren (/?author=593f5908e58c62e16b847a40)

# Exhibit 23:
# Texas Senate Journal, Oct. 4, 2021

# SENATE JOURNAL

## EIGHTY-SEVENTH LEGISLATURE — THIRD CALLED SESSION

### AUSTIN, TEXAS

### PROCEEDINGS

### THIRD DAY
(Continued)
(Monday, October 4, 2021)

### AFTER RECESS

The Senate met at 1:36 p.m. and was called to order by the President.

Senator Paxton offered the invocation as follows:

Our Father in heaven, thank You for the opportunity to gather here together to do the work of representing our fellow Texans, to protect the rights that are not given by government, but are given by You, Father, among them life, liberty, and the pursuit of happiness. And as we deliberate today, would You not only give us wisdom, but give us the courage that comes from love to do what is good in Your sight. It's in the name of Jesus that I pray. Amen.

### MESSAGE FROM THE HOUSE

HOUSE CHAMBER
Austin, Texas
Monday, October 4, 2021 - 1

The Honorable President of the Senate
Senate Chamber
Austin, Texas

Mr. President:

I am directed by the house to inform the senate that the house has taken the following action:

THE HOUSE HAS PASSED THE FOLLOWING MEASURES:

**HCR 10**               Guerra
In memory of former state representative Roberto Gutierrez of McAllen.

Respectfully,

/s/Robert Haney, Chief Clerk
House of Representatives

## SENATE BILL ON FIRST READING

The following bill was introduced, read first time, and referred to the committee indicated:

**SB 10** by Hughes
Relating to increasing the criminal penalty for committing certain offenses relating to elections.
To Committee on State Affairs.

## SENATE RULE 2.02 SUSPENDED
## (Restrictions on Admission)
## (Motion In Writing)

Senator Hall offered the following Motion In Writing:

Mr. President:

I move suspension of the Senate's admission rules to grant floor privileges to a staff member from each Senator's office during the deliberations on C.S.S.B. 4 and S.B. 7.

HALL

The Motion In Writing was read and prevailed without objection.

## SENATE RULE 7.12(a) SUSPENDED
## (Printing of Bills)
## (Motion In Writing)

Senator Huffman offered the following Motion In Writing:

Mr. President,

Pursuant to Senate Rule 7.12(a), the Printing Rule, I move that the Senate order C.S.S.B. 4 and S.B. 7 not printed.

HUFFMAN

The Motion In Writing was read and prevailed without objection.

## AT EASE

The President at 1:41 p.m. announced the Senate would stand At Ease subject to the call of the Chair.

## IN LEGISLATIVE SESSION

The President at 3:51 p.m. called the Senate to order as In Legislative Session.

## (Senator Birdwell in Chair)

## COMMITTEE  SUBSTITUTE
## SENATE BILL 4 ON SECOND READING

The President laid before the Senate **CSSB 4** by Senator Huffman at this time on its second reading:

**CSSB 4**, Relating to the composition of districts for the election of members of the Texas Senate.

The bill was read second time.

Senator Huffman offered the following amendment to the bill:

**Floor Amendment No. 1**

PLAN NUMBER: PLANS2149

DISTRICTS AMENDED: 9, 10, 19, 22, 24, and 25

REGIONS AFFECTED: METROPLEX, CENTRAL TEXAS, and TEXAS-MEXICO BORDER

Amend **CSSB 4** (PLANS2130) by striking Districts 9, 10, 19, 22, 24, and 25 as established by PLANS2130 and substituting Districts 9, 10, 19, 22, 24, and 25 as established by PLANS2149.

The amendment to **CSSB 4** was read.

**(President in Chair)**

Senator Powell offered the following amendment to Floor Amendment No. 1:

**Floor Amendment No. 2**

PLAN NUMBER: PLANS2132

DISTRICTS AMENDED: 9, 10, 12, 22, 23, and 30

REGIONS AFFECTED: METROPLEX, NORTH TEXAS, and CENTRAL TEXAS

Amend Floor Amendment No. 1 by Huffman (PLANS2149) to **CSSB 4** (PLANS2130) as follows:

(1) Strike District 9, 10, and 22 as established by PLANS2149 and substitute District 9, 10, and 22 as established by PLANS2132.

(2) Strike Districts 12, 23, and 30 as established by PLANS2130 and substitute Districts 12, 23, and 30 as established by PLANS2132.

The amendment to Floor Amendment No. 1 to **CSSB 4** was read and failed of adoption by the following vote:  Yeas 14, Nays 17.

Yeas:  Alvarado, Blanco, Eckhardt, Gutierrez, Hinojosa, Johnson, Lucio, Menéndez, Miles, Powell, Seliger, West, Whitmire, Zaffirini.

Nays:  Bettencourt, Birdwell, Buckingham, Campbell, Creighton, Hall, Hancock, Huffman, Hughes, Kolkhorst, Nelson, Nichols, Paxton, Perry, Schwertner, Springer, Taylor.

Senator Powell offered the following amendment to Floor Amendment No. 1:

**Floor Amendment No. 3**

PLAN NUMBER: PLANS2134

DISTRICTS AMENDED: 9, 10, 12, 22, and 30

REGIONS AFFECTED: METROPLEX, NORTH TEXAS, and CENTRAL TEXAS

Amend Floor Amendment No. 1 by Huffman (PLANS2149) to **CSSB 4** (PLANS2130) as follows:

(1) Strike Districts 9, 10, and 22 as established by PLANS2149 and substitute District 9, 10, and 22 as established by PLANS2134.

(2) Strike Districts 12 and 30 as established by PLANS2130 and substitute Districts 12 and 30 as established by PLANS2134.

The amendment to Floor Amendment No. 1 to **CSSB 4** was read and failed of adoption by the following vote: Yeas 13, Nays 18.

Yeas: Alvarado, Blanco, Eckhardt, Gutierrez, Hinojosa, Johnson, Lucio, Menéndez, Miles, Powell, West, Whitmire, Zaffirini.

Nays: Bettencourt, Birdwell, Buckingham, Campbell, Creighton, Hall, Hancock, Huffman, Hughes, Kolkhorst, Nelson, Nichols, Paxton, Perry, Schwertner, Seliger, Springer, Taylor.

Question recurring on the adoption of Floor Amendment No. 1 to **CSSB 4**, the amendment as amended was adopted by a viva voce vote.

All Members are deemed to have voted "Yea" on the adoption of Floor Amendment No. 1 as amended except as follows:

Nays: Alvarado, Blanco, Eckhardt, Gutierrez, Johnson, Lucio, Menéndez, Miles, Powell, West, Whitmire, Zaffirini.

Present-not voting: Hinojosa.

Senator Creighton offered the following amendment to the bill:

### Floor Amendment No. 4

PLAN NUMBER: PLANS2137
DISTRICTS AMENDED: 4, 7, and 18
REGION AFFECTED: SOUTHEAST TEXAS

Amend **CSSB 4** (PLANS2130) by striking Districts 4, 7, and 18 as established by PLANS2130 and substituting Districts 4, 7, and 18 as established by PLANS2137.

The amendment to **CSSB 4** was read.

Senator Creighton withdrew Floor Amendment No. 4.

Senator Zaffirini offered the following amendment to the bill:

### Floor Amendment No. 5

PLAN NUMBER: PLANS2139
DISTRICTS AMENDED: 14, 19, 21, and 29
REGIONS AFFECTED: SOUTH, CENTRAL, and WEST TEXAS

Amend **CSSB 4** (PLANS2130) by striking Districts 14, 19, 21, and 29 as established by PLANS2130 and substituting Districts 14, 19, 21, and 29 as established by PLANS2139.

The amendment to **CSSB 4** was read.

Senator Zaffirini offered the following amendment to Floor Amendment No. 5:

### Floor Amendment No. 6

PLAN NUMBER: PLANS2164
DISTRICTS AMENDED: 19, 24, and 25
REGIONS AFFECTED: CENTRAL AND SOUTHWEST TEXAS

Amend Amendment No. 5 by Zaffirini (PLANS2139) to **CSSB 4** (PLANS2130) as follows:

(1)  Strike District 19 as established by PLANS2139 and substitute District 19 as established by PLANS2164.

(2)  Strike Districts 24 and 25 as established by PLANS2130 and substitute Districts 24 and 25 as established by PLANS2164.

The amendment to Floor Amendment No. 5 to **CSSB 4** was read and was adopted by a viva voce vote.

All Members are deemed to have voted "Yea" on the adoption of Floor Amendment No. 6.

Question recurring on the adoption of Floor Amendment No. 5 to **CSSB 4**, the amendment as amended was adopted by a viva voce vote.

All Members are deemed to have voted "Yea" on the adoption of Floor Amendment No. 5 as amended.

The President announced that Floor Amendment No. 7 by Senator Huffman and Floor Amendment No. 8 by Senator Seliger were submitted after the filing deadline. He then asked if there was objection to the consideration of these amendments.

There was no objection.

Senator Huffman offered the following amendment to the bill:

**Floor Amendment No. 7**

PLAN NUMBER: PLANS2167
DISTRICTS AMENDED: 20 and 27
REGIONS AFFECTED: SOUTH TEXAS

Amend **CSSB 4** (PLANS2130) by striking Districts 20 and 27 as established by PLANS2130 and substituting Districts 20 and 27 as established by PLANS2167.

The amendment to **CSSB 4** was read and was adopted by a viva voce vote.

All Members are deemed to have voted "Yea" on the adoption of Floor Amendment No. 7 except as follows:

Nays:  Eckhardt, Gutierrez.

Senator Seliger offered the following amendment to the bill:

**Floor Amendment No. 8**

PLAN NUMBER: PLANS2135
DISTRICTS AMENDED: 28 and 31
REGIONS AFFECTED: PANHANDLE AND NORTH WEST TEXAS

Amend **CSSB 4** (PLANS2130) by striking Districts 28 and 31 as established by PLANS2130 and substituting Districts 28 and 31 as established by PLANS2135.

The amendment to **CSSB 4** was read.

Senator Seliger withdrew Floor Amendment No. 8.

Senator Gutierrez offered the following amendment to the bill:

**Floor Amendment No. 9**

PLAN NUMBER: PLANS2129

DISTRICTS AMENDED: ALL – COMPLETE SUBSTITUTE
REGIONS AFFECTED: ALL – COMPLETE SUBSTITUTE

Amend **CSSB 4** (PLANS2130) by striking each district as established by
PLANS2130 and substituting each district as established by PLANS2129.

> GUTIERREZ
> ECKHARDT

The amendment to **CSSB 4** was read and failed of adoption by the following
vote:  Yeas 10, Nays 19, Present-not voting 2.

Yeas:  Alvarado, Blanco, Eckhardt, Gutierrez, Lucio, Menéndez, Miles, Powell,
West, Whitmire.

Nays:  Bettencourt, Birdwell, Buckingham, Campbell, Creighton, Hall,
Hancock, Huffman, Hughes, Kolkhorst, Nelson, Nichols, Paxton, Perry, Schwertner,
Seliger, Springer, Taylor, Zaffirini.

Present-not voting:  Hinojosa, Johnson.

Senator Menéndez offered the following amendment to the bill:

**Floor Amendment No. 10**

PLAN NUMBER: PLANS2142
DISTRICTS AMENDED: ALL – COMPLETE SUBSTITUTE
REGIONS AFFECTED: ALL – COMPLETE SUBSTITUTE

Amend **CSSB 4** (PLANS2130) by striking each district as established by
PLANS2130 and substituting each district as established by PLANS2142.

The amendment to **CSSB 4** was read and failed of adoption by the following
vote:  Yeas 9, Nays 20, Present-not voting 2.

Yeas:  Alvarado, Blanco, Eckhardt, Gutierrez, Hinojosa, Lucio, Menéndez,
Powell, Whitmire.

Nays:  Bettencourt, Birdwell, Buckingham, Campbell, Creighton, Hall,
Hancock, Huffman, Hughes, Kolkhorst, Nelson, Nichols, Paxton, Perry, Schwertner,
Seliger, Springer, Taylor, West, Zaffirini.

Present-not voting:  Johnson, Miles.

**CSSB 4** as amended was passed to engrossment by the following vote:  Yeas 20,
Nays 11.

Yeas:  Bettencourt, Birdwell, Buckingham, Campbell, Creighton, Hall, Hancock,
Hinojosa, Huffman, Hughes, Kolkhorst, Lucio, Nelson, Nichols, Paxton, Perry,
Schwertner, Springer, Taylor, Zaffirini.

Nays:  Alvarado, Blanco, Eckhardt, Gutierrez, Johnson, Menéndez, Miles,
Powell, Seliger, West, Whitmire.

## SENATE BILL 7 ON SECOND READING

The President laid before the Senate **SB 7** by Senator Huffman at this time on its
second reading:

**SB 7**, Relating to the composition of districts for the election of members of the State Board of Education.

The bill was read second time.

Senator Campbell offered the following amendment to the bill:

**Floor Amendment No. 1**

PLAN NUMBER: PLANE2105
DISTRICTS AMENDED: 5 and 10
REGIONS AFFECTED: CENTRAL TEXAS

Amend **SB 7** (PLANE2103) by striking Districts 5 and 10 as established by PLANE2103 and substituting Districts 5 and 10 as established by PLANE2105.

The amendment to **SB 7** was read and was adopted by a viva voce vote.

All Members are deemed to have voted "Yea" on the adoption of Floor Amendment No. 1 except as follows:

Present-not voting: Johnson.

Senator Gutierrez offered the following amendment to the bill:

**Floor Amendment No. 2**

PLAN NUMBER: PLANE2104
DISTRICTS AMENDED: ALL – COMPLETE SUBSTITUTE
REGIONS AFFECTED: ALL – COMPLETE SUBSTITUTE

Amend **SB 7** (PLANE2103) by striking each district as established by PLANE2103 and substituting each district as established by PLANE2104.

The amendment to **SB 7** was read and failed of adoption by the following vote: Yeas 13, Nays 18.

Yeas: Alvarado, Blanco, Eckhardt, Gutierrez, Hinojosa, Johnson, Lucio, Menéndez, Miles, Powell, West, Whitmire, Zaffirini.

Nays: Bettencourt, Birdwell, Buckingham, Campbell, Creighton, Hall, Hancock, Huffman, Hughes, Kolkhorst, Nelson, Nichols, Paxton, Perry, Schwertner, Seliger, Springer, Taylor.

**SB 7** as amended was passed to engrossment by the following vote: Yeas 21, Nays 10.

Yeas: Bettencourt, Birdwell, Buckingham, Campbell, Creighton, Hall, Hancock, Hinojosa, Huffman, Hughes, Kolkhorst, Lucio, Nelson, Nichols, Paxton, Perry, Schwertner, Seliger, Springer, Taylor, Zaffirini.

Nays: Alvarado, Blanco, Eckhardt, Gutierrez, Johnson, Menéndez, Miles, Powell, West, Whitmire.

### CO-AUTHOR OF SENATE BILL 1

On motion of Senator Bettencourt, Senator Hughes will be shown as Co-author of **SB 1**.

### CO-AUTHOR OF SENATE BILL 3

On motion of Senator Perry, Senator Hughes will be shown as Co-author of **SB 3**.

### CO-AUTHOR OF SENATE BILL 11

On motion of Senator Hall, Senator Springer will be shown as Co-author of **SB 11**.

### CO-AUTHOR OF SENATE BILL 20

On motion of Senator Hall, Senator Springer will be shown as Co-author of **SB 20**.

### CO-AUTHORS OF SENATE CONCURRENT RESOLUTION 1

On motion of Senator Hall, Senators Eckhardt and Johnson will be shown as Co-authors of **SCR 1**.

### CO-AUTHORS OF SENATE CONCURRENT RESOLUTION 3

On motion of Senator Nichols, Senators Birdwell and Blanco will be shown as Co-authors of **SCR 3**.

### RESOLUTIONS OF RECOGNITION

The following resolutions were adopted by the Senate:

### Memorial Resolution

**HCR 10** (Hinojosa), In memory of former state representative Roberto Gutierrez of McAllen.

### Congratulatory Resolutions

**SR 47** by West, Recognizing Tom Hart on the occasion of his retirement.

**SR 48** by Campbell, Recognizing the Guadalupe Valley Young Marines for their commitment to reducing drug usage and trafficking.

**SR 49** by Zaffirini, Creighton, Eckhardt, Huffman, Perry, and Springer, Recognizing David W. Slayton for his service to the Office of Court Administration.

### ADJOURNMENT

On motion of Senator Whitmire, the Senate at 7:13 p.m. adjourned until 7:14 p.m. today.

---

### APPENDIX

---

### COMMITTEE REPORTS

The following committee reports were received by the Secretary of the Senate in the order listed:

Monday, October 4, 2021 SENATE JOURNAL 59

October 4, 2021

REDISTRICTING — **CSSB 6**

TRANSPORTATION — **SCR 3**

## BILLS ENGROSSED

October 4, 2021

**SB 4**, **SB 7**

## RESOLUTIONS ENROLLED

October 4, 2021

**SR 47**, **SR 48**, **SR 49**

# Exhibit 24:

# U.S. Census Bureau redistricting data

🇺🇸 An official website of the United States government
Here's how you know

# Decennial Census P.L. 94-171 Redistricting Data

AUGUST 12, 2021

CRVRDO

## P.L. 94-171 Redistricting Data

Public Law (P.L.) 94-171, enacted by Congress in December 1975, requires the Census Bureau to provide states opportunity to identify the small area geography for which they need data in order to conduct legislative redistricting. The law also requires the U.S. Census Bureau to furnish tabulations of population to each state, including for those small areas the states have identified, within one year of Census day.

Since the first Census Redistricting Data Program, conducted as part of the 1980 census, the U.S. Census Bureau has included summaries for the major race groups specified by the Statistical Programs and Standards Office of the U.S. Office of Management and Budget (OMB) in Directive 15 (as issued in 1977 and revised in 1997). Originally, the tabulation groups included White, Black, American Indian/Alaska Native, and Asian/Pacific Islander, plus "some other race." These race data were also cross-tabulated by Hispanic/Non-Hispanic origin. At the request of the state legislatures and the Department of Justice, for the 1990 Census Redistricting Data Program, voting age (18 years old and over) was added to the cross-tabulation of race and Hispanic origin. For the 2000 Census, the categories were revised to the current categories used today.

## 2020

### In this section:

- 2020 Census Redistricting Data [#P1] (P.L 94-171) Summary Files [#P1]
- 2020 Census (P.L.-171) Geographic Support Products [#P2]
- Group Quarters Assistance [#P3]
- Explaining the 2020 Census Redistricting Data [#P4]
- Additional 2020 Census Resources [#P5]

## 2020 Census Redistricting Data (P.L. 94-171) Summary Files

The 2020 Census Redistricting Data (P.L. 94-171) Summary Files in the Legacy Format were posted for FTP download, by state, on August 12, 2021 and released on data.census.gov with the full redistricting toolkit on September 16, 2021. Both releases contained the same data, only the format was different.

The summary file tables include:

- P1. – Race
- P2. – Hispanic or Latino, and not Hispanic or Latino by Race
- P3. – Race for the Population 18 Years and Over
- P4. – Hispanic or Latino, and not Hispanic or Latino by Race for the Population 18 Years and Over
- P5. – Group Quarters Population by Major Group Quarters Type
- H1. – Occupancy Status (Housing)

The 2020 Census Redistricting Data (P.L. 94-171) Summary File data are available for all 50 states, the District of Columbia, and the Commonwealth of Puerto Rico through data.census.gov and FTP download (in the Legacy Format).

The 2020 Census State Redistricting Data (P.L. 94-171) Summary File Technical Documentation is available in English, and in Spanish specifically for Puerto Rico. The 2020 Census National Redistricting Data (P.L. 94-171) Summary File Technical Documentation is available in English only. Links to the Technical Documentation are provided below.

Legacy Format Support Materials are provided to help data users work with the legacy format summary files. These materials include header records for each of the data segments in the summary file, Microsoft Access shells, an instructional guide and video tutorial that provide step-by-step instructions on how to download the legacy format data and import the data into the Microsoft Access Shells, and SAS and R statistical software import scripts. Links to these support materials are provided below.

**DATA LINKS**

- Legacy Format Summary Files [https://www2.census.gov/programs-surveys/decennial/2020/data/01-Redistricting_File--PL_94-171/]
- Census Data Explorer (data.census.gov) [https://data.census.gov/cedsci/all?q=&y=2020&d=DEC%20Redistricting%20Data%20%28PL%2094-171%29]

**TECHNICAL DOCUMENTATION**

- 2020 Census State (P.L. 94-171) Redistricting Summary File Technical Documentation [1.1 MB] [https://www2.census.gov/programs-surveys/decennial/2020/technical-documentation/complete-tech-docs/summary-file/2020Census_PL94_171Redistricting_StatesTechDoc_English.pdf]
- 2020 Census State (P.L. 94-171) Redistricting Summary File Technical Documentation (Spanish) [1.1 MB] [https://www2.census.gov/programs-surveys/decennial/2020/technical-documentation/complete-tech-docs/summary-file/2020Census_PL94_171Redistricting_StatesTechDoc_Spanish.pdf]
- 2020 Census National (P.L. 94-171) Redistricting Summary File Technical Documentation [1.1 MB] [https://www2.census.gov/programs-surveys/decennial/2020/technical-documentation/complete-tech-docs/summary-file/2020Census_PL94_171Redistricting_NationalTechDoc.pdf]

The national documentation is only for the limited set of geographic entities which cross state boundaries.

**LEGACY FORMAT SUPPORT MATERIALS**

- Legacy Format Summary File Header Records [< 1 MB] [https://www2.census.gov/programs-surveys/decennial/rdo/about/2020-census-program/Phase3/SupportMaterials/2020_PLSummaryFile_FieldNames.xlsx]
- VIDEO: How to use the Microsoft Access Database Shell [https://youtu.be/dz9117G8BsU]
- GUIDE: How to use the Microsoft Access Database Shell [< 1 MB] [https://www2.census.gov/programs-surveys/decennial/rdo/about/2020-census-program/Phase3/SupportMaterials/HowToUse_2020Census_PL94-171_MSAccessShells.pdf]
- Microsoft Access Database Shell [< 1 MB] [https://www2.census.gov/programs-surveys/decennial/rdo/about/2020-census-program/Phase3/SupportMaterials/2020PL_SummaryFile_Shell.zip]
- SAS statistical software import scripts [< 1 MB] [https://www2.census.gov/programs-surveys/decennial/rdo/about/2020-census-program/Phase3/SupportMaterials/2020PL_SAS_import_scripts.zip]
- R statistical software import scripts [< 1 MB] [https://www2.census.gov/programs-surveys/decennial/rdo/about/2020-census-program/Phase3/SupportMaterials/2020PL_R_import_scripts.zip]
- Frequently used geographic summary level codes [< 1 MB] [https://www2.census.gov/programs-surveys/decennial/rdo/about/2020-census-program/Phase3/SupportMaterials/FrequentSummaryLevels.pdf]

Back to top [#top]

# 2020 Census (P.L. 94-171) Geographic Support Products

- TIGER\Line Shapefiles [https://www.census.gov/geographies/mapping-files/time-series/geo/tiger-line-file.html]

Use the 2020 Tab of the linked page.

- Maps (.pdf format) [https://www.census.gov/geographies/reference-maps/2020/geo/2020pl-maps.html]
- Block Assignment Files (BAFs) [https://www.census.gov/geographies/reference-files/time-series/geo/block-assignment-files.html]

Use the 2020 Tab of the linked page. BAFs are meant to be used in conjunction with the NLTs.

- Name Look-up Tables (NLTs) [https://www.census.gov/geographies/reference-files/time-series/geo/name-lookup-tables.html]

Use the 2020 Tab of the linked page. NLTs are meant to be used in conjunction with the BAFs.

- 2010 to 2020 Tabulation Block Crosswalk Tables [https://www.census.gov/geographies/reference-files/time-series/geo/relationship-files.html]

Use the 2020 Tab of the linked page. Select Block Relationship Files.

Back to top [#top]

# Group Quarters Assistance

The Census Bureau published a Federal Register Notice on the Final 2020 Census Residence Criteria and Residence Situations [https://www.federalregister.gov/documents/2018/02/08/2018-02370/final-2020-census-residence-criteria-and-residence-situations] on February 8, 2018. In the Notice, the Census Bureau stated we will continue the practice of counting prisoners at the correctional facility, to ensure that the concept of usual residence is interpreted and applied consistent with the intent of the Census Act of 1790. The Notice stated the Census Bureau recognizes that some states have decided, or may decide in the future, to 'move' their group quarters (GQ) population (e.g. student, military, and prisoner population) to an alternate address for the purpose of redistricting. To assist those states, the Census Bureau is offering the use of a geocoding service. The service was updated with 2020 Census geographic data in January 2021, to assist states with their goals of reallocating GQ population for legislative redistricting.

November 04, 2019 | CRVRDO

**Group Quarters Assistance - The Census Geocoder**

[/programs-surveys/decennial-census/about/rdo/summary-files/2020/GQAssistance_CensusGeocoder.html]

Back to top [#top]

# Explaining the 2020 Census Redistricting Data

**EXPAND ALL** | COLLAPSE ALL

| ⌄ **About the 2020 Redistricting Data Product** |
| --- |
| ⌄ **America Counts Stories** |
| ⌄ **Blog Posts** |
| ⌄ **Census Academy** |
| ⌄ **Data Tools** |
| ⌄ **Fact Sheets** |
| ⌄ **News** |
| ⌄ **Social Media Toolkit** |
| ⌄ **Videos** |
| ⌄ **Visualizations** |

Back to top [#top]

# Additional 2020 Census Resources

Declarations filed in the case of Ohio v. Raimondo

In declarations filed in the case of Ohio v. Raimondo, the U.S. Census Bureau made clear that we could provide a legacy format redistricting data summary file to all states by mid-to-late August 2021, now realized as August 12. We also met our commitment to provide the full redistricting data toolkit by Sept. 30, 2021, with delivery on Sept. 16, 2021.

📄 Declarations - Ohio v. Raimondo   [<1 MB]   [https://www2.census.gov/programs-surveys/decennial/rdo/technical-documentation/2020Census/Combined_Declarations_Document.pdf]

**Related Information**

Redistricting Data Program Management [/programs-surveys/decennial-census/about/rdo/program-management.html]

Redistricting Data Program [/rdo]

Decennial Census of Population and Housing Datasets [/programs-surveys/decennial-census/data/datasets.html]

*Last Revised: October 8, 2021*

# Exhibit 25:
# Governor Abbott Proclamation, Third Called Session



GOVERNOR  GREG  ABBOTT

September 7, 2021

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
_____ 5PM _ O'CLOCK
SEP 0 7 2021
Secretary of State

Mr. Joe A. Esparza
Deputy Secretary of State
State Capitol Room 1E.8
Austin, Texas  78701

Dear Mr. Deputy Secretary:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

A proclamation calling an extraordinary session of the 87th Legislature, to convene in the City of Austin, commencing at 10 a.m. on Monday, September 20, 2021.

The original proclamation is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

# PROCLAMATION

### BY THE

## Governor of the State of Texas

TO ALL TO WHOM THESE PRESENTS SHALL COME:

I, GREG ABBOTT, GOVERNOR OF THE STATE OF TEXAS, by the authority vested in me by Article III, Sections 5 and 40, and Article IV, Section 8 of the Texas Constitution, do hereby call an extraordinary session of the 87th Legislature, to convene in the City of Austin, commencing at 10:00 a.m. on Monday, September 20, 2021, for the following purposes:

To consider and act upon the following:

Legislation relating to the apportionment of the State of Texas into districts used to elect members of the Texas House of Representatives, the Texas Senate, the State Board of Education, and the United States House of Representatives.

Legislation providing appropriations from the American Rescue Plan Act of 2021 (ARPA), Pub. L. No. 117-2.

Legislation identical to Senate Bill 29 as passed by the Texas Senate in the 87th Legislature, Regular Session, disallowing a student from competing in University Interscholastic League athletic competitions designated for the sex opposite to the student's sex at birth.

Legislation regarding whether any state or local governmental entities in Texas can mandate that an individual receive a COVID-19 vaccine and, if so, what exemptions should apply to such mandate.

Legislation similar to Senate Bill 474 as passed by 87th Legislature, Regular Session, but that addresses the concerns expressed in the governor's veto statement.

Such other subjects as may be submitted by the Governor from time to time after the session convenes.

The Secretary of State will take notice of this action and will notify the members of the legislature of my action.



IN TESTIMONY WHEREOF, I have hereto signed my name and have officially caused the Seal of State to be affixed at my Office in the City of Austin, Texas, this the 7th day of September, 2021.

GREG ABBOTT
Governor of Texas

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
_5 PM_ O'CLOCK

SEP 0 7 2021

*Governor Greg Abbott*
September 7, 2021

*Proclamation*
Page 2


Attested by:

JOE A. ESPARZA
Deputy Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
_____5PM_____ O'CLOCK

SEP 0 7 2021

# Exhibit 26:
# 2020 General Election District Election Analysis, benchmark SD10

```
DEA                               REDISTRICTING REPORT SYSTEM                        09/21/21
DATA: PAR                          DISTRICT ELECTION ANALYSIS                        15:09:02
PLANID: PLANS2100                                                                   PAGE 038

                                        2020 General

                                        RACE/
--   DISTRICT 10  TOTALS --            ETHNI PARTY  ----DISTRICT----   ------STATE------
President/Vice-President            BIDEN,JOE              D     199,896  53.1%   5,257,513  46.5%
                                   HAWKINS,HOWIE                  1,180   0.3%      33,378   0.3%
                                   JORGENSEN,JO                   4,305   1.1%     126,212   1.1%
                                  *TRUMP,DONALD          R     170,688  45.4%   5,889,022  52.0%
                                   WRITE-IN,WRITE IN                192   0.1%      10,927   0.1%

U.S. Senator                       COLLINS,DAVID                  2,636   0.7%      81,753   0.7%
                                  *CORNYN,JOHN           R     177,999  47.7%   5,961,643  53.5%
                                   HEGAR,MARY            D     185,910  49.8%   4,887,309  43.9%
                                   MCKENNON,KERRY                 6,788   1.8%     209,623   1.9%

U.S. Representative District 6     BLACK,MELANIE                  5,441   3.2%      10,955   3.2%
                                   DANIEL,STEPHEN        D      78,666  46.3%     149,530  44.0%
                                  *WRIGHT,RON            R      85,795  50.5%     179,507  52.8%

U.S. Representative District 12   *GRANGER,KAY           R      50,979  52.9%     233,853  63.7%
                                   HOLCOMB,TREY                  2,818   2.9%      11,918   3.2%
                                   WELCH,LISA            D      42,648  44.2%     121,250  33.0%

U.S. Representative District 24    BAUER,MARK                      364   0.7%       2,909   0.8%
                                   HAMILTON,DARREN                 671   1.4%       5,647   1.6%
                                   KUZMICH,STEVE                   515   1.1%       4,229   1.2%
                                   VALENZUELA,CANDACE  HISP  D    16,505  34.0%     163,326  47.5%
                                   VAN DUYNE,BARBARA     R      30,524  62.8%     167,910  48.8%

U.S. Representative District 25    KELSEY,BILL                      83   2.3%       7,728   2.0%
                                   OLIVER,JULIE          D       1,157  31.8%     165,676  42.1%
                                  *WILLIAMS,ROGER        R       2,397  65.9%     220,009  55.9%

U.S. Representative District 26    BOLER,MARK                        0   0.0%       9,243   2.1%
                                  *BURGESS,MICHAEL       R           0   0.0%     261,963  60.6%
                                   IANNUZZI,CAROL        D           0   0.0%     161,009  37.3%

Railroad Commissioner 1            CASTANEDA,CHRYSTA     D     181,063  49.0%   4,791,167  43.6%
                                   GRUENE,KATIJA                 4,038   1.1%     129,588   1.2%
                                   STERETT,MATT                  8,140   2.2%     247,568   2.3%
                                   WRIGHT,JAMES          R     175,962  47.7%   5,830,003  53.0%

- CONTEST CONTINUED ON NEXT PAGE -
-----------------------------------------------------------------------------------------
```

# Exhibit 27:
# 2020 General Election District Election Analysis, current SD10

```
DEA                              REDISTRICTING REPORT SYSTEM                    10/19/21
DATA: PAR                        DISTRICT ELECTION ANALYSIS                     17:14:28
PLANID: PLANS2168                                                              PAGE 041

                                      2020 General

                                   RACE/
--    DISTRICT 10  TOTALS --       ETHNI PARTY  ----DISTRICT----  ------STATE------
President/Vice-President           BIDEN,JOE          D    155,339  41.4%   5,257,513  46.5%
                                   HAWKINS,HOWIE               993   0.3%      33,378   0.3%
                                   JORGENSEN,JO              4,107   1.1%     126,212   1.1%
                                  *TRUMP,DONALD       R    214,676  57.2%   5,889,022  52.0%
                                   WRITE-IN,WRITE IN          165   0.0%      10,927   0.1%

U.S. Senator                       COLLINS,DAVID            2,349   0.6%      81,753   0.7%
                                  *CORNYN,JOHN        R    217,653  58.5%   5,961,643  53.5%
                                   HEGAR,MARY         D    145,387  39.1%   4,887,309  43.9%
                                   MCKENNON,KERRY           6,720   1.8%     209,623   1.9%

U.S. Representative District 6     BLACK,MELANIE            3,575   3.2%      10,955   3.2%
                                   DANIEL,STEPHEN     D     49,800  45.0%     149,530  44.0%
                                  *WRIGHT,RON         R     57,193  51.7%     179,507  52.8%

U.S. Representative District 11    CODY,WACEY                611   1.6%       5,805   2.0%
                                   HOGG,JON           D      4,836  13.1%      53,400  18.3%
                                   PFLUGER,AUGUST     R     31,595  85.3%     232,661  79.7%

U.S. Representative District 12   *GRANGER,KAY        R     65,287  59.8%     233,853  63.7%
                                   HOLCOMB,TREY             3,387   3.1%      11,918   3.2%
                                   WELCH,LISA         D     40,546  37.1%     121,250  33.0%

U.S. Representative District 19   *ARRINGTON,JODEY    R      2,544  92.6%     198,193  74.8%
                                   BURNES,JOE                  22   0.8%       6,271   2.4%
                                   WATSON,TOM         D        182   6.6%      60,572  22.9%

U.S. Representative District 25    KELSEY,BILL              1,286   1.7%       7,728   2.0%
                                   OLIVER,JULIE       D     16,473  22.1%     165,676  42.1%
                                  *WILLIAMS,ROGER     R     56,736  76.2%     220,009  55.9%

Railroad Commissioner 1            CASTANEDA,CHRYSTA  D    141,228  38.3%   4,791,167  43.6%
                                   GRUENE,KATIJA            3,490   0.9%     129,588   1.2%
                                   STERETT,MATT             8,059   2.2%     247,568   2.3%
                                   WRIGHT,JAMES       R    215,524  58.5%   5,830,003  53.0%

Chief Justice, Supreme Court       ASH,MARK                 8,649   2.3%     277,432   2.5%

- CONTEST CONTINUED ON NEXT PAGE -
------------------------------------------------------------------------------------
```

# Exhibit 28:
# 2012–2020 EI Voting Analysis, benchmark SD10

```
                                    EI Voting Analysis
                Estimated Race/Ethnicity Turnout as a percent of Estimated Total Turnout
                             In Voter Tabulation Districts (VTDs)
                                       District  10
                                         PLANS2100
```

| VTD In | % VTD In | % VAP In | Estimated Turnout % for Anglo | Estimated Turnout % for Black | Estimated Turnout % for Hispanic | Estimated Turnout % in District | Actual Turnout % in District | Acutal Turnout % in Election |
|---|---|---|---|---|---|---|---|---|
| **2020 General** | | | | | | | | |
| 330 | 88.9% | 100% | 75.7% | 40.2% | 21.2% | 53.1% | 53.1% | 51.9% |
| **2012 Democratic Primary** | | | | | | | | |
| 331 | 89.2% | 100% | 1.1% | 6.1% | 3.8% | 2.9% | 2.9% | 2.8% |
| **2012 Democratic Runoff** | | | | | | | | |
| 331 | 89.2% | 100% | 0.6% | 4.7% | 3.4% | 2.2% | 2.2% | 1.2% |
| **2012 General** | | | | | | | | |
| 329 | 88.7% | 100% | 55.4% | 40.6% | 16.0% | 41.3% | 41.3% | 36.8% |
| **2014 Democratic Primary** | | | | | | | | |
| 331 | 89.2% | 100% | 1.8% | 5.4% | 5.9% | 3.7% | 3.7% | 2.7% |
| **2014 Democratic Runoff** | | | | | | | | |
| 331 | 89.2% | 100% | 0.5% | 1.4% | 1.4% | 0.9% | 0.9% | 1.0% |
| **2014 General** | | | | | | | | |
| 331 | 89.2% | 100% | 39.2% | 18.9% | 6.6% | 25.9% | 25.9% | 21.7% |
| **2016 Democratic Primary** | | | | | | | | |
| 331 | 89.2% | 100% | 6.2% | 11.3% | 9.1% | 8.1% | 8.0% | 6.7% |
| **2016 Democratic Runoff** | | | | | | | | |
| 331 | 89.2% | 100% | 0.4% | 0.9% | 0.7% | 0.6% | 0.6% | 1.0% |
| **2016 General** | | | | | | | | |
| 330 | 88.9% | 100% | 63.0% | 33.7% | 15.3% | 43.6% | 43.6% | 41.4% |

```
                                   EI Voting Analysis
              Estimated Race/Ethnicity Turnout as a percent of Estimated Total Turnout
                          In Voter Tabulation Districts (VTDs)
                                     District  10
                                       PLANS2100
                           Estimated Estimated Estimated Estimated Actual   Acutal
                           Turnout   Turnout   Turnout   Turnout   Turnout  Turnout
                           % for     % for     % for     % in      % in     % in
  VTD In    % VTD In   % VAP In      Anglo     Black     Hispanic  District  District Election
-----------------------------------------------------------------------------------------------

     2018 Democratic Primary
     331    89.2%      100%           6.3%      6.8%      3.7%      5.7%     5.7%     5.1%


     2018 Democratic Runoff
     331    89.2%      100%           1.5%      2.9%      2.1%      2.0%     2.0%     8.3%


     2018 General
     330    88.9%      100%          31.9%      9.3%      5.3%     19.8%    19.8%    41.2%


     2020 Democratic Primary
     331    89.2%      100%          11.9%      2.0%      1.5%      6.9%     6.9%     7.3%


     2020 Democratic Runoff
     331    89.2%      100%           5.6%     11.0%      3.1%      6.0%     6.0%     4.6%


-----------------------------------------------------------------------------------------------
   Office of the Attorney General-State of Texas              Page 002                 09/21/2021
```

```
                              EI Voting Analysis
                Estimated Percent Vote by Race/Ethnicity for Each Candidate
                        In Voter Tabulation Districts (VTDs)
                                 District  10
                                   PLANS2100
```

| | Ethnic Party | Estimated % Anglo Votes for Candidate | Estimated % Black Votes for Candidate | Estimated % Hispanic Votes for Candidate | Estimated % of Total Votes in District | Actual % of Total Votes in District | Actual % of Total Votes in Election |
|---|---|---|---|---|---|---|---|
| **2020 General** | | | President/Vice-President | | | | |
| BIDEN,JOE | A D | 39.2% | 93.1% | 89.3% | 53.0% | 53.1% | 46.5% |
| HAWKINS,HOWIE | A G | 0.2% | 0.6% | 1.4% | 0.4% | 0.3% | 0.3% |
| JORGENSEN,JO | A L | 0.9% | 1.7% | 2.4% | 1.2% | 1.1% | 1.1% |
| TRUMP,DONALD | A R | 59.7% | 4.4% | 6.5% | 45.3% | 45.4% | 52.0% |
| WRITE-IN,WRITE IN | O W | 0.1% | 0.2% | 0.4% | 0.1% | 0.1% | 0.1% |
| **2020 General** | | | U.S. Senator | | | | |
| COLLINS,DAVID | A G | 0.3% | 1.5% | 2.8% | 0.7% | 0.7% | 0.7% |
| CORNYN,JOHN | A R | 62.3% | 4.9% | 7.7% | 47.7% | 47.7% | 53.5% |
| HEGAR,MARY | A D | 36.3% | 90.2% | 84.6% | 49.7% | 49.8% | 43.9% |
| MCKENNON,KERRY | A L | 1.1% | 3.4% | 4.8% | 1.8% | 1.8% | 1.9% |
| **2020 General** | | | Justice of the Supreme Court, Place 7 | | | | |
| BOYD,JEFF | A R | 61.9% | 8.2% | 9.7% | 47.4% | 47.4% | 53.3% |
| STRANGE,WILLIAM | A L | 1.4% | 3.8% | 7.0% | 2.4% | 2.3% | 2.3% |
| WILLIAMS,STACI | B D | 36.6% | 88.0% | 83.3% | 50.2% | 50.3% | 44.3% |
| **2020 General** | | | Justice of the Supreme Court, Place 8 | | | | |
| BUSBY,BRETT | A R | 62.5% | 7.5% | 8.4% | 47.7% | 47.7% | 53.4% |
| OXFORD,TOM | A L | 1.6% | 3.7% | 6.4% | 2.5% | 2.4% | 2.5% |
| TRIANA,GISELA | H D | 35.9% | 88.8% | 85.2% | 49.8% | 49.8% | 44.1% |
| **2020 General** | | | Court of Criminal Appeals, Place 3 | | | | |
| DAVIS FRIZELL,ELIZABETH | B D | 37.6% | 90.5% | 88.7% | 51.6% | 51.6% | 45.5% |
| RICHARDSON,BERT | A R | 62.4% | 9.5% | 11.3% | 48.4% | 48.4% | 54.5% |
| **2012 Democratic Primary** | | | President/Vice-President | | | | |
| ELY,BOB | A D | 4.3% | 1.3% | 1.8% | 2.0% | 0.9% | 2.4% |

EI Voting Analysis
Estimated Percent Vote by Race/Ethnicity for Each Candidate
In Voter Tabulation Districts (VTDs)
District  10
PLANS2100

| | Ethnic Party | Estimated % Anglo Votes for Candidate | Estimated % Black Votes for Candidate | Estimated % Hispanic Votes for Candidate | Estimated % of Total Votes in District | Actual % of Total Votes in District | Actual % of Total Votes in Election |
|---|---|---|---|---|---|---|---|
| OBAMA,BARACK | B  D | 84.5% | 95.2% | 92.7% | 92.4% | 95.5% | 88.2% |
| RICHARDSON,DARCY | A  D | 5.8% | 1.7% | 3.0% | 2.9% | 2.0% | 4.3% |
| WOLFE,JOHN | A  D | 5.5% | 1.8% | 2.6% | 2.7% | 1.7% | 5.1% |
| | | | | | | | |
| 2012 Democratic Primary | | | U.S. Senator | | | | |
| ALLEN,ADDIE | B  D | 19.9% | 23.3% | 23.2% | 22.4% | 22.4% | 22.9% |
| HUBBARD,SEAN | A  D | 17.0% | 16.6% | 16.4% | 16.6% | 16.3% | 16.1% |
| SADLER,PAUL | A  D | 42.6% | 33.2% | 34.4% | 36.0% | 36.3% | 35.1% |
| YARBROUGH,GRADY | B  D | 20.5% | 27.0% | 25.9% | 25.0% | 25.1% | 25.9% |
| | | | | | | | |
| 2012 Democratic Runoff | | | U.S. Senator | | | | |
| SADLER,PAUL | A  D | 68.3% | 44.7% | 61.6% | 55.9% | 56.0% | 63.1% |
| YARBROUGH,GRADY | B  D | 31.7% | 55.3% | 38.4% | 44.1% | 44.0% | 36.9% |
| | | | | | | | |
| 2012 General | | | President/Vice-President | | | | |
| JOHNSON,GARY | A  L | 0.8% | 1.4% | 2.6% | 1.1% | 1.0% | 1.1% |
| OBAMA,BARACK | B  D | 25.2% | 94.2% | 90.8% | 45.3% | 45.4% | 41.4% |
| ROMNEY,MITT | A  R | 73.8% | 3.7% | 5.0% | 53.2% | 53.3% | 57.1% |
| STEIN,JILL | A  G | 0.2% | 0.5% | 1.2% | 0.4% | 0.3% | 0.3% |
| WRITE-IN,WRITE IN | O | 0.1% | 0.2% | 0.4% | 0.1% | 0.0% | 0.1% |
| | | | | | | | |
| 2012 General | | | U.S. Senator | | | | |
| COLLINS,DAVID | A  G | 0.4% | 1.1% | 2.7% | 0.8% | 0.7% | 0.9% |
| CRUZ,TED | H  R | 73.2% | 6.0% | 9.3% | 53.0% | 53.1% | 56.5% |
| MYERS,JOHN | A  L | 1.3% | 2.3% | 4.6% | 1.8% | 1.8% | 2.1% |
| SADLER,PAUL | A  D | 25.1% | 90.6% | 83.4% | 44.4% | 44.5% | 40.6% |
| | | | | | | | |
| 2014 Democratic Primary | | | Governor | | | | |
| DAVIS,WENDY | A  D | 93.6% | 96.0% | 90.1% | 93.4% | 94.1% | 79.3% |
| MADRIGAL,RAY | H  D | 6.4% | 4.0% | 9.9% | 6.6% | 5.9% | 20.7% |

```
                                    EI Voting Analysis
                    Estimated Percent Vote by Race/Ethnicity for Each Candidate
                              In Voter Tabulation Districts (VTDs)
                                       District  10
                                         PLANS2100
                          Estimated  Estimated  Estimated  Estimated  Actual     Actual
                          % Anglo    % Black    % Hispanic % of Total % of Total % of Total
                 Ethnic   Votes for  Votes for  Votes for  Votes in   Votes in   Votes in
                 Party    Candidate  Candidate  Candidate  District   District   Election
--------------------------------------------------------------------------------------------

2014 Democratic Primary              Railroad Commissioner 3
BROWN,STEVE        B  D    59.2%      65.9%      56.5%      60.4%      60.6%      63.9%
HENRY,DALE         A  D    40.8%      34.1%      43.5%      39.6%      39.4%      36.1%

2014 Democratic Runoff               U.S. Senator
ALAMEEL,DAVID      O  D    81.2%      73.4%      72.4%      75.7%      77.5%      72.1%
ROGERS,KESHA       B  D    18.8%      26.6%      27.6%      24.3%      22.5%      27.9%

2014 General                         U.S. Senator
ALAMEEL,DAVID      O  D    24.3%      91.0%      77.0%      40.4%      40.5%      34.4%
CORNYN,JOHN        A  R    73.1%       4.0%      10.4%      55.9%      56.0%      61.6%
PADDOCK,REBECCA    A  L     1.9%       3.2%       6.7%       2.5%       2.5%       2.9%
SANCHEZ,EMILY      H  G     0.6%       1.6%       5.2%       1.1%       1.0%       1.2%
TAHIRO,MOHAMMED    O  W     0.1%       0.2%       0.7%       0.2%       0.0%       0.0%

2014 General                         Lt. Governor
BUTLER,ROBERT      A  L     1.9%       3.0%       7.7%       2.5%       2.5%       2.6%
COURTNEY,CHANDRAKANTHA O G  0.4%       1.0%       3.2%       0.7%       0.6%       0.6%
PATRICK,DAN        A  R    69.5%       5.5%      11.8%      52.7%      52.7%      58.1%
VAN DE PUTTE,LETICIA H D   28.3%      90.5%      77.3%      44.1%      44.2%      38.7%

2014 General                         Land Commissioner
ALESSI,VALERIE     O  G     0.7%       1.6%       5.1%       1.2%       1.1%       1.3%
BUSH,GEORGE        H  R    73.1%       6.3%      11.7%      55.5%      55.6%      60.7%
COOK,JOHN          A  D    24.3%      89.1%      76.0%      40.8%      40.9%      35.3%
KNIGHT,JUSTIN      O  L     1.8%       3.0%       7.2%       2.5%       2.4%       2.7%

2014 General                         Railroad Commissioner 3
BROWN,STEVE        B  D    26.7%      88.0%      73.6%      42.2%      42.3%      36.5%
--------------------------------------------------------------------------------------------
```

```
                                    EI Voting Analysis
                        Estimated Percent Vote by Race/Ethnicity for Each Candidate
                              In Voter Tabulation Districts (VTDs)
                                       District  10
                                         PLANS2100
```

| | Ethnic Party | | Estimated % Anglo Votes for Candidate | Estimated % Black Votes for Candidate | Estimated % Hispanic Votes for Candidate | Estimated % of Total Votes in District | Actual % of Total Votes in District | Actual % of Total Votes in Election |
|---|---|---|---|---|---|---|---|---|
| MILLER,MARK | A | L | 2.1% | 3.4% | 8.0% | 2.8% | 2.8% | 3.2% |
| SALINAS,MARTINA | H | G | 1.0% | 2.3% | 6.6% | 1.7% | 1.6% | 2.0% |
| SITTON,RYAN | A | R | 70.3% | 6.3% | 11.8% | 53.3% | 53.3% | 58.3% |
| | | | | | | | | |
| 2014 General | | | Justice of the Supreme Court, Place 7 | | | | | |
| BENAVIDES,GINA | H | D | 26.9% | 89.5% | 79.5% | 42.9% | 42.9% | 37.6% |
| BOYD,JEFF | A | R | 70.7% | 6.2% | 10.1% | 53.8% | 53.8% | 58.9% |
| FULTON,DON | A | L | 2.0% | 3.0% | 6.7% | 2.5% | 2.5% | 2.8% |
| WATERBURY,CHARLES | A | G | 0.4% | 1.3% | 3.7% | 0.8% | 0.7% | 0.7% |
| | | | | | | | | |
| 2016 Democratic Primary | | | President/Vice-President | | | | | |
| CLINTON,HILLARY | A | D | 52.2% | 86.6% | 70.2% | 67.8% | 68.8% | 65.2% |
| COMBINED | O | | 0.7% | 0.7% | 1.1% | 0.8% | 0.4% | 0.8% |
| DE LA FUENTE,ROQUE | H | D | 0.5% | 0.6% | 0.9% | 0.6% | 0.2% | 0.6% |
| SANDERS,BERNIE | A | D | 46.1% | 11.6% | 27.0% | 30.3% | 30.6% | 33.2% |
| WILSON,WILLIE | B | D | 0.5% | 0.4% | 0.9% | 0.6% | 0.1% | 0.2% |
| | | | | | | | | |
| 2016 Democratic Primary | | | Railroad Commissioner 1 | | | | | |
| BURNAM,LON | A | D | 50.0% | 28.1% | 49.9% | 42.1% | 42.2% | 24.8% |
| GARRETT,ROBERT | A | D | 24.4% | 25.8% | 24.5% | 25.0% | 24.8% | 35.2% |
| YARBROUGH,GRADY | B | D | 25.6% | 46.1% | 25.6% | 33.0% | 33.0% | 39.9% |
| | | | | | | | | |
| 2016 Democratic Runoff | | | Railroad Commissioner 1 | | | | | |
| GARRETT,ROBERT | A | D | 45.8% | 35.8% | 37.9% | 39.6% | 38.5% | 46.3% |
| YARBROUGH,GRADY | B | D | 54.2% | 64.2% | 62.1% | 60.4% | 61.5% | 53.7% |
| | | | | | | | | |
| 2016 General | | | President/Vice-President | | | | | |
| CLINTON,HILLARY | A | D | 31.2% | 90.2% | 86.8% | 47.2% | 47.3% | 43.2% |
| JOHNSON,GARY | A | L | 3.3% | 3.3% | 3.9% | 3.4% | 3.4% | 3.2% |
| STEIN,JILL | A | G | 0.5% | 1.4% | 2.1% | 0.8% | 0.8% | 0.8% |

```
                                    EI Voting Analysis
                       Estimated Percent Vote by Race/Ethnicity for Each Candidate
                                 In Voter Tabulation Districts (VTDs)
                                           District  10
                                            PLANS2100
                          Estimated   Estimated   Estimated   Estimated   Actual      Actual
                          % Anglo     % Black     % Hispanic  % of Total  % of Total  % of Total
                 Ethnic   Votes for   Votes for   Votes for   Votes in    Votes in    Votes in
                 Party    Candidate   Candidate   Candidate   District    District    Election
-------------------------------------------------------------------------------------------------
TRUMP,DONALD       A  R    64.5%        3.8%        5.4%        47.8%       47.9%       52.2%
WRITE-IN,WRITE IN  O  W     0.5%        1.2%        1.8%         0.8%        0.7%        0.7%

2016 General                         Railroad Commissioner 1
CHRISTIAN,WAYNE    A  R    67.5%        4.9%        7.9%        50.1%       50.2%       53.1%
MILLER,MARK        A  L     4.7%        4.1%        6.5%         4.8%        4.8%        5.3%
SALINAS,MARTINA    H  G     1.6%        4.1%        7.2%         2.6%        2.6%        3.3%
YARBROUGH,GRADY    B  D    26.1%       86.9%       78.4%        42.4%       42.5%       38.4%

2016 General                         Justice of the Supreme Court, Place 3
GLASS,KATHIE       A  L     3.2%        4.4%        6.6%         3.8%        3.7%        4.0%
LEHRMANN,DEBRA     A  R    70.4%        5.4%        6.7%        51.9%       51.9%       54.8%
MUNOZ,RODOLFO      H  G     1.1%        2.9%        8.0%         2.1%        2.1%        2.7%
WESTERGREN,MIKE    A  D    25.3%       87.3%       78.7%        42.2%       42.3%       38.5%

2016 General                         Justice of the Supreme Court, Place 5
GARZA,DORI         H  D    28.0%       89.1%       83.5%        44.4%       44.5%       41.2%
GREEN,PAUL         A  R    68.7%        5.0%        6.9%        51.1%       51.2%       54.3%
OXFORD,TOM         A  L     2.6%        3.9%        5.9%         3.2%        3.2%        3.3%
WATERBURY,CHARLES  A  G     0.7%        2.0%        3.7%         1.3%        1.2%        1.2%

2016 General                         Justice of the Supreme Court, Place 9
CHISHOLM,JIM       O  G     0.7%        2.0%        4.3%         1.3%        1.2%        1.4%
FULTON,DON         A  L     2.9%        3.9%        5.5%         3.3%        3.3%        3.5%
GUZMAN,EVA         H  R    70.1%        4.6%        8.2%        52.1%       52.1%       55.8%
ROBINSON,SAVANNAH  A  D    26.4%       89.5%       82.0%        43.4%       43.4%       39.4%

2016 General                         Court of Criminal Appeals, Place 2
ASH,MARK           A  L     3.1%        3.8%        6.0%         3.5%        3.5%        3.7%
KEEL,MARY          A  R    69.6%        5.7%        7.2%        51.5%       51.5%       54.9%
-------------------------------------------------------------------------------------------------
```

```
                                    EI Voting Analysis
                    Estimated Percent Vote by Race/Ethnicity for Each Candidate
                            In Voter Tabulation Districts (VTDs)
                                      District  10
                                        PLANS2100
                        Estimated  Estimated  Estimated  Estimated  Actual     Actual
                        % Anglo    % Black    % Hispanic % of Total % of Total % of Total
               Ethnic   Votes for  Votes for  Votes for  Votes in   Votes in   Votes in
               Party    Candidate  Candidate  Candidate  District   District   Election
-------------------------------------------------------------------------------------------
MEYERS,LAWRENCE     A  D   26.6%      88.4%      83.1%      43.7%      43.8%      40.0%
REPOSA,ADAM         H  G    0.7%       2.1%       3.8%       1.3%       1.2%       1.4%

2018 Democratic Primary              U.S. Senator
HERNANDEZ,SEMA      H  D   12.9%      40.5%      34.8%      24.0%      23.9%      23.7%
KIMBROUGH,EDWARD    B  D    7.5%      30.4%      26.9%      16.9%      16.7%      14.5%
O'ROURKE,BETO       A  D   79.6%      29.1%      38.3%      59.2%      59.4%      61.8%

2018 Democratic Primary              Governor
COMBINED            O       42.1%      20.4%      17.7%      31.6%      31.8%      39.1%
DAVIS,CEDRIC        B  D     5.7%      21.0%      15.2%      11.6%      11.5%       8.2%
OCEGUEDA,ADRIAN     H  D     2.5%       3.7%       5.2%       3.4%       3.0%       4.4%
VALDEZ,LUPE         H  D    47.3%      49.3%      54.9%      49.3%      49.8%      42.9%
YARBROUGH,GRADY     B  D     2.5%       5.6%       6.9%       4.2%       3.8%       5.4%

2018 Democratic Primary              Lt. Governor
COLLIER,MIKE        A  D    53.8%      48.8%      41.2%      49.6%      49.6%      52.4%
COOPER,MICHAEL      B  D    46.2%      51.2%      58.8%      50.4%      50.4%      47.6%

2018 Democratic Primary              Comptroller
CHEVALIER,JOI       B  D    54.2%      39.7%      45.4%      48.3%      48.3%      51.9%
MAHONEY,TIM         A  D    45.8%      60.3%      54.6%      51.7%      51.7%      48.1%

2018 Democratic Primary              Land Commissioner
MORGAN,TEX          A  D    28.0%      50.3%      38.0%      35.4%      35.3%      29.8%
SUAZO,MIGUEL        H  D    72.0%      49.7%      62.0%      64.6%      64.7%      70.2%

2018 Democratic Primary              Railroad Commissioner 1
MCALLEN,ROMAN       A  D    58.0%      38.4%      56.6%      52.1%      52.1%      58.5%
SPELLMON,CHRIS      B  D    42.0%      61.6%      43.4%      47.9%      47.9%      41.5%
-------------------------------------------------------------------------------------------
```

```
                                        EI Voting Analysis
                        Estimated Percent Vote by Race/Ethnicity for Each Candidate
                                  In Voter Tabulation Districts (VTDs)
                                            District  10
                                             PLANS2100
                         Estimated   Estimated   Estimated   Estimated   Actual      Actual
                         % Anglo     % Black     % Hispanic  % of Total  % of Total  % of Total
              Ethnic     Votes for   Votes for   Votes for   Votes in    Votes in    Votes in
              Party      Candidate   Candidate   Candidate   District    District    Election
-----------------------------------------------------------------------------------------------------

2018 Democratic Runoff              Governor
VALDEZ,LUPE        H  D     56.5%       63.5%       62.3%       60.0%       60.3%       53.3%
WHITE,ANDREW       A  D     43.5%       36.5%       37.7%       40.0%       39.7%       46.7%


2018 General                        U.S. Senator
CRUZ,TED           H  R     59.4%        6.4%        7.6%       45.9%       45.9%       50.9%
DIKEMAN,NEAL       A  L      0.5%        1.7%        2.2%        0.8%        0.8%        0.8%
O'ROURKE,BETO      A  D     40.1%       91.8%       90.2%       53.2%       53.3%       48.3%

2018 General                        Governor
ABBOTT,GREG        A  R     66.0%        6.7%        9.5%       51.1%       51.1%       55.8%
TIPPETTS,MARK      A  L      1.2%        3.1%        4.3%        1.8%        1.8%        1.7%
VALDEZ,LUPE        H  D     32.8%       90.3%       86.2%       47.0%       47.1%       42.5%

2018 General                        Comptroller
CHEVALIER,JOI      B  D     35.1%       87.1%       84.3%       48.1%       48.1%       43.4%
HEGAR,GLENN        A  R     62.5%        6.9%        8.4%       48.5%       48.5%       53.2%
SANDERS,BEN        A  L      2.4%        5.9%        7.3%        3.4%        3.4%        3.4%

2018 General                        Land Commissioner
BUSH,GEORGE        H  R     64.1%        7.8%        8.8%       49.8%       49.8%       53.7%
PINA,MATT          H  L      1.9%        4.9%        6.6%        2.8%        2.8%        3.1%
SUAZO,MIGUEL       H  D     34.0%       87.4%       84.5%       47.4%       47.4%       43.2%

2018 General                        Court of Criminal Appeals, Presiding
JACKSON,MARIA      B  D     35.2%       90.0%       85.6%       49.7%       49.8%       45.5%
KELLER,SHARON      A  R     63.2%        6.8%        8.6%       48.0%       48.0%       52.2%
STRANGE,WILLIAM    A  L      1.6%        3.3%        5.8%        2.3%        2.3%        2.3%

2018 General                        Court of Criminal Appeals, Place 7
FRANKLIN,RAMONA    B  D     35.8%       90.8%       87.1%       50.6%       50.6%       45.8%
-----------------------------------------------------------------------------------------------------
```

```
                              EI Voting Analysis
              Estimated Percent Vote by Race/Ethnicity for Each Candidate
                      In Voter Tabulation Districts (VTDs)
                                District  10
                                  PLANS2100
```

| | Ethnic Party | Estimated % Anglo Votes for Candidate | Estimated % Black Votes for Candidate | Estimated % Hispanic Votes for Candidate | Estimated % of Total Votes in District | Actual % of Total Votes in District | Actual % of Total Votes in Election |
|---|---|---|---|---|---|---|---|
| HERVEY,BARBARA | A R | 64.2% | 9.2% | 12.9% | 49.4% | 49.4% | 54.2% |
| **2020 Democratic Primary** | | | | **President/Vice-President** | | | |
| BIDEN,JOE | A D | 37.4% | 54.4% | 18.0% | 39.6% | 39.7% | 34.6% |
| COMBINED | O | 38.0% | 18.9% | 18.2% | 30.2% | 0.8% | 35.5% |
| COMBINED | O | 0.6% | 1.2% | 3.3% | 1.1% | 30.2% | 35.5% |
| SANDERS,BERNIE | A D | 24.1% | 25.5% | 60.5% | 29.2% | 29.2% | 29.9% |
| **2020 Democratic Primary** | | | | **U.S. Senator** | | | |
| COMBINED | O | 42.9% | 10.5% | 21.9% | 29.7% | 59.7% | 89.7% |
| COMBINED | O | 47.9% | 81.6% | 53.8% | 59.6% | 29.7% | 89.7% |
| GARCIA,ANNIE | O D | 9.2% | 7.9% | 24.3% | 10.6% | 10.5% | 10.3% |
| **2020 Democratic Primary** | | | | **Railroad Commissioner 1** | | | |
| ALONZO,ROBERTO | H D | 20.7% | 30.4% | 47.6% | 28.3% | 28.3% | 28.6% |
| CASTANEDA,CHRYSTA | A D | 40.4% | 11.4% | 18.4% | 28.2% | 28.2% | 33.8% |
| STONE,KELLY | A D | 22.9% | 24.2% | 15.6% | 22.0% | 22.0% | 21.7% |
| WATSON,MARK | A D | 16.0% | 34.0% | 18.4% | 21.6% | 21.6% | 15.8% |
| **2020 Democratic Primary** | | | | **Justice of the Supreme Court, Place 7** | | | |
| VOSS,BRANDY | A D | 35.2% | 23.6% | 42.0% | 32.6% | 32.6% | 34.9% |
| WILLIAMS,STACI | B D | 64.8% | 76.4% | 58.0% | 67.4% | 67.4% | 65.1% |
| 2020 Democratic Primary | | | | Justice of the Supreme Court, Place 8 | | | |
| KELLY,PETER | A D | 24.1% | 43.6% | 44.6% | 32.8% | 32.7% | 28.0% |
| TRIANA,GISELA | H D | 75.9% | 56.4% | 55.4% | 67.2% | 67.3% | 72.0% |
| 2020 Democratic Primary | | | | Court of Criminal Appeals, Place 3 | | | |
| DAVIS FRIZELL,ELIZABETH | B D | 82.8% | 57.9% | 57.9% | 71.5% | 71.7% | 68.7% |
| DEMOND,WILLIAM | O D | 5.5% | 15.2% | 17.5% | 10.3% | 10.1% | 12.0% |

```
                              EI Voting Analysis
              Estimated Percent Vote by Race/Ethnicity for Each Candidate
                       In Voter Tabulation Districts (VTDs)
                                 District  10
                                  PLANS2100
```

| | Ethnic Party | Estimated % Anglo Votes for Candidate | Estimated % Black Votes for Candidate | Estimated % Hispanic Votes for Candidate | Estimated % of Total Votes in District | Actual % of Total Votes in District | Actual % of Total Votes in Election |
|---|---|---|---|---|---|---|---|
| WOOD,DAN | A  D | 11.8% | 26.9% | 24.6% | 18.2% | 18.2% | 19.2% |
| 2020 Democratic Runoff | | | Railroad Commissioner 1 | | | | |
| ALONZO,ROBERTO | H  D | 28.5% | 57.3% | 52.8% | 42.6% | 42.5% | 38.0% |
| CASTANEDA,CHRYSTA | A  D | 71.5% | 42.7% | 47.2% | 57.4% | 57.5% | 62.0% |

# Exhibit 29:
# District Population Analysis, benchmark SD10

Red-100T
Data: 2020 Census
PLANS2100  08/02/2021 4:30:06 PM

Texas Legislative Council
08/26/21 1:33 PM
Page 1 of 11

# District Population Analysis with County Subtotals
## SENATE DISTRICTS - PLANS2100

| | |
|---|---|
| Total State Population | 29,145,505 |
| Total Districts Required | 31 |
| Ideal District Population | 940,178 |
| Unassigned Population | 0 |
| Districts in Plan | 31 |
| Unassigned Geography | No |
| Districts Contiguous | Yes |

| | Population | --------Deviation-------- | |
|---|---|---|---|
| | | Total | Percent |
| Plan Overall Range | | 307,472 | 32.70% |
| Smallest District (28) | 796,007 | -144,171 | -15.33% |
| Largest District (25) | 1,103,479 | 163,301 | 17.37% |
| Average (mean) | 940,178 | 62,569 | 6.65% |

## PLANS2100

56432

Red-100T
Data: 2020 Census
PLANS2100  08/02/2021 4:30:06 PM

**District Population Analysis with County Subtotals**
**SENATE DISTRICTS - PLANS2100**

Texas Legislative Council
08/26/21 1:33 PM
Page 4 of 11

| | Deviation | | Total | Anglo | Non-Anglo | Asian | Black | Hispanic | B+H | %Anglo | %Non-Anglo | %Asian | %Black | %Hispanic | %B+H |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DISTRICT 7** | 69,190 | Total: | 1,009,368 | 400,979 | 608,389 | 108,606 | 178,105 | 314,396 | 482,266 | 39.7 | 60.3 | 10.8 | 17.6 | 31.1 | 47.8 |
| | 7.36 % | VAP: | 741,905 | 318,117 | 423,788 | 79,795 | 121,527 | 213,508 | 330,000 | 42.9 | 57.1 | 10.8 | 16.4 | 28.8 | 44.5 |
| Harris (21%) | | | 1,009,368 | 400,979 | 608,389 | 108,606 | 178,105 | 314,396 | 482,266 | 39.7 | 60.3 | 10.8 | 17.6 | 31.1 | 47.8 |
| **DISTRICT 8** | 57,955 | Total: | 998,133 | 471,726 | 526,407 | 213,052 | 132,796 | 164,666 | 292,219 | 47.3 | 52.7 | 21.3 | 13.3 | 16.5 | 29.3 |
| | 6.16 % | VAP: | 750,559 | 379,606 | 370,953 | 151,150 | 93,611 | 112,209 | 203,272 | 50.6 | 49.4 | 20.1 | 12.5 | 15.0 | 27.1 |
| Collin (80%) | | | 855,489 | 414,023 | 441,466 | 194,946 | 104,142 | 128,210 | 227,961 | 48.4 | 51.6 | 22.8 | 12.2 | 15.0 | 26.6 |
| Dallas (5%) | | | 142,644 | 57,703 | 84,941 | 18,106 | 28,654 | 36,456 | 64,258 | 40.5 | 59.5 | 12.7 | 20.1 | 25.6 | 45.0 |
| **DISTRICT 9** | -15,521 | Total: | 924,657 | 359,833 | 564,824 | 77,850 | 148,920 | 324,820 | 465,913 | 38.9 | 61.1 | 8.4 | 16.1 | 35.1 | 50.4 |
| | -1.65 % | VAP: | 684,713 | 292,419 | 392,294 | 57,586 | 103,578 | 218,171 | 317,934 | 42.7 | 57.3 | 8.4 | 15.1 | 31.9 | 46.4 |
| Dallas (8%) | | | 214,865 | 40,951 | 173,914 | 11,414 | 28,241 | 133,038 | 159,538 | 19.1 | 80.9 | 5.3 | 13.1 | 61.9 | 74.3 |
| Tarrant (34%) | | | 709,792 | 318,882 | 390,910 | 66,436 | 120,679 | 191,782 | 306,375 | 44.9 | 55.1 | 9.4 | 17.0 | 27.0 | 43.2 |
| **DISTRICT 10** | 5,318 | Total: | 945,496 | 373,902 | 571,594 | 53,541 | 203,632 | 304,689 | 500,464 | 39.5 | 60.5 | 5.7 | 21.5 | 32.2 | 52.9 |
| | 0.57 % | VAP: | 708,665 | 311,021 | 397,644 | 39,148 | 143,890 | 203,819 | 344,139 | 43.9 | 56.1 | 5.5 | 20.3 | 28.8 | 48.6 |
| Tarrant (45%) | | | 945,496 | 373,902 | 571,594 | 53,541 | 203,632 | 304,689 | 500,464 | 39.5 | 60.5 | 5.7 | 21.5 | 32.2 | 52.9 |
| **DISTRICT 11** | -6,922 | Total: | 933,256 | 441,837 | 491,419 | 69,631 | 126,520 | 283,159 | 402,305 | 47.3 | 52.7 | 7.5 | 13.6 | 30.3 | 43.1 |
| | -0.74 % | VAP: | 704,652 | 358,661 | 345,991 | 50,870 | 89,666 | 192,455 | 278,887 | 50.9 | 49.1 | 7.2 | 12.7 | 27.3 | 39.6 |
| Brazoria (74%) | | | 274,233 | 109,938 | 164,295 | 28,062 | 51,329 | 82,513 | 131,415 | 40.1 | 59.9 | 10.2 | 18.7 | 30.1 | 47.9 |
| Galveston (99%) | | | 347,912 | 189,069 | 158,843 | 15,598 | 49,137 | 88,315 | 134,914 | 54.3 | 45.7 | 4.5 | 14.1 | 25.4 | 38.8 |
| Harris (7%) | | | 311,111 | 142,830 | 168,281 | 25,971 | 26,054 | 112,331 | 135,976 | 45.9 | 54.1 | 8.3 | 8.4 | 36.1 | 43.7 |
| **DISTRICT 12** | 146,201 | Total: | 1,086,379 | 584,227 | 502,152 | 112,796 | 130,987 | 237,245 | 360,982 | 53.8 | 46.2 | 10.4 | 12.1 | 21.8 | 33.2 |
| | 15.55 % | VAP: | 809,228 | 463,844 | 345,384 | 79,199 | 89,823 | 157,794 | 244,165 | 57.3 | 42.7 | 9.8 | 11.1 | 19.5 | 30.2 |
| Denton (82%) | | | 747,584 | 397,439 | 350,145 | 97,774 | 92,723 | 145,266 | 233,269 | 53.2 | 46.8 | 13.1 | 12.4 | 19.4 | 31.2 |
| Tarrant (16%) | | | 338,795 | 186,788 | 152,007 | 15,022 | 38,264 | 91,979 | 127,713 | 55.1 | 44.9 | 4.4 | 11.3 | 27.1 | 37.7 |
| **DISTRICT 13** | -48,341 | Total: | 891,837 | 87,673 | 804,164 | 83,325 | 359,794 | 366,202 | 714,241 | 9.8 | 90.2 | 9.3 | 40.3 | 41.1 | 80.1 |
| | -5.14 % | VAP: | 672,728 | 77,764 | 594,964 | 68,800 | 274,320 | 253,519 | 520,963 | 11.6 | 88.4 | 10.2 | 40.8 | 37.7 | 77.4 |
| Fort Bend (16%) | | | 129,465 | 10,047 | 119,418 | 13,324 | 66,474 | 40,856 | 105,499 | 7.8 | 92.2 | 10.3 | 51.3 | 31.6 | 81.5 |
| Harris (16%) | | | 762,372 | 77,626 | 684,746 | 70,001 | 293,320 | 325,346 | 608,742 | 10.2 | 89.8 | 9.2 | 38.5 | 42.7 | 79.8 |
| **DISTRICT 14** | 104,129 | Total: | 1,044,307 | 500,168 | 544,139 | 100,712 | 104,059 | 327,880 | 423,128 | 47.9 | 52.1 | 9.6 | 10.0 | 31.4 | 40.5 |
| | 11.08 % | VAP: | 823,529 | 423,611 | 399,918 | 77,514 | 77,803 | 223,239 | 305,178 | 51.4 | 48.6 | 9.4 | 9.4 | 28.2 | 37.1 |
| Bastrop (100%) | | | 97,216 | 45,751 | 51,465 | 1,287 | 6,873 | 41,484 | 47,762 | 47.1 | 52.9 | 1.3 | 7.1 | 42.7 | 49.1 |
| Travis (73%) | | | 947,091 | 454,417 | 492,674 | 99,425 | 97,186 | 286,396 | 375,366 | 48.0 | 52.0 | 10.5 | 10.3 | 30.2 | 39.6 |
| **DISTRICT 15** | 3,390 | Total: | 943,568 | 226,738 | 716,830 | 58,385 | 231,324 | 426,052 | 647,386 | 24.0 | 76.0 | 6.2 | 24.5 | 45.2 | 68.6 |
| | 0.36 % | VAP: | 702,919 | 193,626 | 509,293 | 46,291 | 166,966 | 291,967 | 453,752 | 27.5 | 72.5 | 6.6 | 23.8 | 41.5 | 64.6 |
| Harris (20%) | | | 943,568 | 226,738 | 716,830 | 58,385 | 231,324 | 426,052 | 647,386 | 24.0 | 76.0 | 6.2 | 24.5 | 45.2 | 68.6 |

56432

Red-202T
Data: 2020 Census
PLANS2100  08/02/2021 4:30:06 PM

Texas Legislative Council
08/26/21 1:33 PM
Page 1 of 2

# Population and Voter Data
## with Voter Registration Comparison
### SENATE DISTRICTS - PLANS2100

| District | Deviation | | Total | %Anglo | %Non-Anglo | %Asian | %Black | %Hispanic | %B+H | General Election | Turnout | Total | SSVR | TO/VR | Total | SSVR | TO/VR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Population** | | | | | | **Total Voter Registration** | | | **Non-Suspense Voter Registration** | | |
| 1 | -94,391 | Total: | 845,787 | 61.9 | 38.1 | 1.5 | 18.0 | 16.1 | 33.6 | 2020 | 363,881 | 545,787 | 5.6 % | 66.7 % | 493,895 | 5.7 % | 73.7 % |
| | -10.04% | VAP: | 647,407 | 65.4 | 34.6 | 1.4 | 17.1 | 13.3 | 30.2 | 2018 | 276,374 | 519,484 | 5.2 % | 53.2 % | 469,416 | 5.2 % | 58.9 % |
| 2 | 4,398 | Total: | 944,576 | 47.4 | 52.6 | 3.1 | 14.9 | 32.8 | 47.0 | 2020 | 354,231 | 526,499 | 14.4 % | 67.3 % | 478,714 | 14.7 % | 74.0 % |
| | 0.47% | VAP: | 695,983 | 51.8 | 48.2 | 3.1 | 13.9 | 28.9 | 42.4 | 2018 | 263,192 | 490,342 | 13.4 % | 53.7 % | 443,129 | 13.7 % | 59.4 % |
| 3 | -63,008 | Total: | 877,170 | 66.9 | 33.1 | 1.1 | 12.2 | 17.3 | 29.2 | 2020 | 376,342 | 561,371 | 6.6 % | 67.0 % | 512,956 | 6.6 % | 73.4 % |
| | -6.70% | VAP: | 678,053 | 69.9 | 30.1 | 1.0 | 11.7 | 14.7 | 26.2 | 2018 | 280,147 | 535,185 | 6.1 % | 52.3 % | 484,839 | 6.1 % | 57.8 % |
| 4 | 78,972 | Total: | 1,019,150 | 53.6 | 46.4 | 4.6 | 14.4 | 25.5 | 39.4 | 2020 | 430,449 | 612,336 | 11.0 % | 70.3 % | 554,823 | 11.2 % | 77.6 % |
| | 8.40% | VAP: | 754,208 | 57.1 | 42.9 | 4.4 | 13.8 | 22.6 | 36.0 | 2018 | 312,833 | 565,684 | 10.2 % | 55.3 % | 504,817 | 10.4 % | 62.0 % |
| 5 | 120,622 | Total: | 1,060,800 | 55.2 | 44.8 | 7.9 | 11.1 | 24.3 | 34.6 | 2020 | 459,310 | 632,370 | 13.0 % | 72.6 % | 570,389 | 12.9 % | 80.5 % |
| | 12.83% | VAP: | 814,153 | 58.5 | 41.5 | 7.3 | 10.4 | 21.8 | 31.7 | 2018 | 339,136 | 567,650 | 12.6 % | 59.7 % | 507,259 | 12.6 % | 66.9 % |
| 6 | -106,189 | Total: | 833,989 | 9.8 | 90.2 | 2.7 | 13.5 | 74.4 | 86.9 | 2020 | 187,157 | 344,937 | 55.7 % | 54.3 % | 320,598 | 57.0 % | 58.4 % |
| | -11.29% | VAP: | 597,899 | 11.7 | 88.3 | 2.9 | 13.4 | 72.0 | 84.7 | 2018 | 136,184 | 329,003 | 55.1 % | 41.4 % | 301,546 | 56.7 % | 45.2 % |
| 7 | 69,190 | Total: | 1,009,368 | 39.7 | 60.3 | 10.8 | 17.6 | 31.1 | 47.8 | 2020 | 426,355 | 595,067 | 17.1 % | 71.6 % | 550,952 | 17.3 % | 77.4 % |
| | 7.36% | VAP: | 741,905 | 42.9 | 57.1 | 10.8 | 16.4 | 28.8 | 44.5 | 2018 | 309,991 | 550,965 | 16.2 % | 56.3 % | 500,948 | 16.6 % | 61.9 % |
| 8 | 57,955 | Total: | 998,133 | 47.3 | 52.7 | 21.3 | 13.3 | 16.5 | 29.3 | 2020 | 452,913 | 603,428 | 7.8 % | 75.1 % | 542,981 | 7.7 % | 83.4 % |
| | 6.16% | VAP: | 750,559 | 50.6 | 49.4 | 20.1 | 12.5 | 15.0 | 27.1 | 2018 | 341,629 | 552,615 | 7.5 % | 61.8 % | 490,057 | 7.5 % | 69.7 % |
| 9 | -15,521 | Total: | 924,651 | 38.9 | 61.1 | 8.4 | 16.1 | 35.1 | 50.4 | 2020 | 333,524 | 495,653 | 17.3 % | 67.3 % | 437,005 | 17.7 % | 76.3 % |
| | -1.65% | VAP: | 684,713 | 42.7 | 57.3 | 8.4 | 15.1 | 31.9 | 46.4 | 2018 | 250,040 | 463,827 | 16.6 % | 53.9 % | 397,962 | 17.1 % | 62.8 % |
| 10 | 5,318 | Total: | 945,496 | 39.5 | 60.5 | 5.7 | 21.5 | 32.2 | 52.9 | 2020 | 376,345 | 548,142 | 15.9 % | 68.7 % | 491,709 | 16.2 % | 76.5 % |
| | 0.57% | VAP: | 708,665 | 43.9 | 56.1 | 5.5 | 20.3 | 28.8 | 48.6 | 2018 | 291,940 | 515,137 | 15.1 % | 56.7 % | 451,996 | 15.6 % | 64.6 % |
| 11 | -6,922 | Total: | 933,256 | 47.3 | 52.7 | 7.5 | 13.6 | 30.3 | 43.1 | 2020 | 400,677 | 576,112 | 17.8 % | 69.5 % | 522,945 | 18.0 % | 76.6 % |
| | -0.74% | VAP: | 704,652 | 50.9 | 49.1 | 7.2 | 12.7 | 27.3 | 39.6 | 2018 | 292,834 | 536,056 | 17.1 % | 54.6 % | 480,189 | 17.3 % | 61.0 % |
| 12 | 146,201 | Total: | 1,086,379 | 53.8 | 46.2 | 10.4 | 12.1 | 21.8 | 33.2 | 2020 | 489,574 | 670,147 | 10.7 % | 73.1 % | 602,956 | 10.8 % | 81.2 % |
| | 15.55% | VAP: | 809,228 | 57.3 | 42.7 | 9.8 | 11.1 | 19.5 | 30.2 | 2018 | 347,516 | 607,787 | 10.3 % | 57.2 % | 532,763 | 10.4 % | 65.2 % |
| 13 | -48,341 | Total: | 891,837 | 9.8 | 90.2 | 9.3 | 40.3 | 41.1 | 80.1 | 2020 | 258,849 | 429,463 | 17.6 % | 60.3 % | 389,598 | 18.1 % | 66.4 % |
| | -5.14% | VAP: | 672,728 | 11.6 | 88.4 | 10.2 | 40.8 | 37.7 | 77.4 | 2018 | 193,994 | 412,649 | 16.6 % | 47.0 % | 368,996 | 17.2 % | 52.6 % |
| 14 | 104,129 | Total: | 1,044,307 | 47.9 | 52.1 | 9.6 | 10.0 | 31.4 | 40.5 | 2020 | 493,322 | 692,307 | 14.7 % | 71.3 % | 627,742 | 14.8 % | 78.6 % |
| | 11.08% | VAP: | 823,529 | 51.4 | 48.6 | 9.4 | 9.4 | 28.2 | 37.1 | 2018 | 392,361 | 635,991 | 14.5 % | 61.7 % | 551,288 | 14.6 % | 71.2 % |
| 15 | 3,390 | Total: | 943,568 | 24.0 | 76.0 | 6.2 | 24.5 | 45.2 | 68.6 | 2020 | 323,560 | 490,330 | 23.6 % | 66.0 % | 450,416 | 24.1 % | 71.8 % |
| | 0.36% | VAP: | 702,919 | 27.5 | 72.5 | 6.6 | 23.8 | 41.5 | 64.6 | 2018 | 237,678 | 459,316 | 22.6 % | 51.7 % | 414,921 | 23.3 % | 57.3 % |
| 16 | -13,360 | Total: | 926,818 | 41.3 | 58.7 | 14.6 | 13.7 | 29.4 | 42.4 | 2020 | 378,394 | 520,942 | 12.7 % | 72.6 % | 468,661 | 12.8 % | 80.7 % |
| | -1.42% | VAP: | 721,088 | 44.9 | 55.1 | 14.0 | 13.2 | 26.6 | 39.3 | 2018 | 301,162 | 492,052 | 12.2 % | 61.2 % | 433,403 | 12.4 % | 69.5 % |
| 17 | 17,351 | Total: | 957,529 | 39.6 | 60.4 | 17.5 | 17.0 | 25.4 | 41.5 | 2020 | 412,243 | 569,790 | 13.7 % | 72.3 % | 522,954 | 13.8 % | 78.8 % |
| | 1.85% | VAP: | 735,558 | 42.2 | 57.8 | 17.2 | 16.0 | 23.7 | 39.0 | 2018 | 312,707 | 532,482 | 13.3 % | 58.7 % | 480,692 | 13.5 % | 65.1 % |
| 18 | 96,015 | Total: | 1,036,193 | 42.9 | 57.1 | 11.8 | 13.9 | 30.5 | 43.6 | 2020 | 440,812 | 623,972 | 18.8 % | 70.6 % | 574,524 | 18.6 % | 76.7 % |
| | 10.21% | VAP: | 764,077 | 46.4 | 53.6 | 11.2 | 13.1 | 28.0 | 40.6 | 2018 | 315,715 | 568,373 | 18.7 % | 55.5 % | 518,218 | 18.6 % | 60.9 % |
| 19 | 12,036 | Total: | 952,214 | 21.8 | 78.2 | 3.0 | 8.7 | 66.8 | 74.3 | 2020 | 332,264 | 547,241 | 53.8 % | 60.7 % | 491,568 | 54.6 % | 67.6 % |
| | 1.28% | VAP: | 696,433 | 24.3 | 75.7 | 2.9 | 8.3 | 64.0 | 71.6 | 2018 | 226,564 | 505,535 | 54.1 % | 44.8 % | 450,382 | 55.2 % | 50.3 % |
| 20 | -32,504 | Total: | 907,674 | 15.9 | 84.1 | 2.2 | 2.6 | 79.1 | 81.1 | 2020 | 277,036 | 470,445 | 66.4 % | 58.9 % | 425,350 | 67.6 % | 65.1 % |
| | -3.46% | VAP: | 661,833 | 18.2 | 81.8 | 2.2 | 2.5 | 76.5 | 78.6 | 2018 | 197,570 | 445,114 | 66.5 % | 44.4 % | 399,738 | 68.1 % | 49.4 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR = Spanish surname voter registration

56432

Red-202T
Data: 2020 Census
PLANS2100  08/02/2021 4:30:06 PM

## Population and Voter Data
## with Voter Registration Comparison
### SENATE DISTRICTS - PLANS2100

Texas Legislative Council
08/26/21 1:33 PM
Page 2 of 2

| District | Deviation | | Total | %Anglo | %Non-Anglo | %Asian | %Black | %Hispanic | %B+H | General Election | Turnout | Total | SSVR | TO/VR | Total | SSVR | TO/VR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Population** | | | | | | **Total Voter Registration** | | | **Non-Suspense Voter Registration** | | |
| 21 | -38,924 | Total: | 901,254 | 22.6 | 77.4 | 1.6 | 4.1 | 71.2 | 74.6 | 2020 | 295,047 | 505,873 | 57.2 % | 58.3 % | 460,757 | 58.0 % | 64.0 % |
| | -4.14% | VAP: | 668,648 | 25.7 | 74.3 | 1.7 | 4.2 | 67.5 | 71.3 | 2018 | 212,875 | 473,899 | 58.2 % | 44.9 % | 427,579 | 59.4 % | 49.8 % |
| 22 | 3,844 | Total: | 944,022 | 55.2 | 44.8 | 3.3 | 14.3 | 25.1 | 38.6 | 2020 | 388,997 | 569,813 | 12.7 % | 68.3 % | 517,886 | 12.8 % | 75.1 % |
| | 0.41% | VAP: | 707,084 | 59.2 | 40.8 | 3.2 | 13.1 | 21.8 | 34.6 | 2018 | 288,330 | 525,924 | 12.1 % | 54.8 % | 474,494 | 12.2 % | 60.8 % |
| 23 | -53,073 | Total: | 887,105 | 14.2 | 85.8 | 2.2 | 38.2 | 45.3 | 82.7 | 2020 | 295,978 | 486,211 | 22.8 % | 60.9 % | 437,579 | 23.7 % | 67.6 % |
| | -5.64% | VAP: | 664,473 | 17.3 | 82.7 | 2.5 | 38.4 | 41.4 | 79.2 | 2018 | 229,575 | 462,812 | 21.7 % | 49.6 % | 411,325 | 22.8 % | 55.8 % |
| 24 | -13,388 | Total: | 926,790 | 58.1 | 41.9 | 3.9 | 14.5 | 21.8 | 35.0 | 2020 | 392,271 | 585,675 | 11.2 % | 67.0 % | 516,380 | 11.0 % | 76.0 % |
| | -1.42% | VAP: | 708,848 | 62.3 | 37.7 | 3.6 | 12.8 | 19.1 | 31.0 | 2018 | 286,629 | 537,541 | 10.9 % | 53.3 % | 463,672 | 10.7 % | 61.8 % |
| 25 | 163,301 | Total: | 1,103,479 | 53.1 | 46.9 | 5.4 | 6.7 | 33.8 | 39.5 | 2020 | 571,431 | 758,052 | 20.7 % | 75.4 % | 681,411 | 20.7 % | 83.9 % |
| | 17.37% | VAP: | 844,709 | 56.3 | 43.7 | 5.0 | 6.1 | 31.0 | 36.5 | 2018 | 418,940 | 683,429 | 20.1 % | 61.3 % | 606,850 | 20.0 % | 69.0 % |
| 26 | -99,613 | Total: | 840,565 | 19.3 | 80.7 | 4.3 | 9.2 | 67.7 | 75.6 | 2020 | 290,494 | 482,377 | 54.4 % | 60.2 % | 419,418 | 55.7 % | 69.3 % |
| | -10.60% | VAP: | 644,877 | 21.9 | 78.1 | 4.2 | 8.6 | 65.1 | 72.8 | 2018 | 211,203 | 461,672 | 54.4 % | 45.7 % | 397,764 | 56.0 % | 53.1 % |
| 27 | -108,504 | Total: | 831,674 | 7.9 | 92.1 | 0.8 | 0.9 | 90.4 | 90.9 | 2020 | 220,265 | 411,297 | 80.0 % | 53.6 % | 379,121 | 80.5 % | 58.1 % |
| | -11.54% | VAP: | 588,385 | 9.6 | 90.4 | 0.9 | 0.8 | 88.6 | 89.1 | 2018 | 152,571 | 387,475 | 80.5 % | 39.4 % | 356,966 | 81.2 % | 42.7 % |
| 28 | -144,171 | Total: | 796,007 | 51.2 | 48.8 | 2.3 | 7.4 | 37.9 | 44.4 | 2020 | 304,386 | 478,336 | 26.6 % | 63.6 % | 424,419 | 26.3 % | 71.7 % |
| | -15.33% | VAP: | 607,986 | 54.9 | 45.1 | 2.3 | 6.9 | 34.1 | 40.6 | 2018 | 231,687 | 464,208 | 26.3 % | 49.9 % | 408,199 | 26.2 % | 56.8 % |
| 29 | -61,004 | Total: | 879,174 | 11.6 | 88.4 | 2.1 | 4.4 | 82.4 | 85.7 | 2020 | 274,554 | 498,691 | 67.7 % | 55.1 % | 446,689 | 69.1 % | 61.5 % |
| | -6.49% | VAP: | 655,733 | 12.9 | 87.1 | 2.1 | 4.0 | 81.0 | 84.3 | 2018 | 208,261 | 467,178 | 68.6 % | 44.6 % | 424,087 | 70.0 % | 49.1 % |
| 30 | 87,087 | Total: | 1,027,265 | 67.4 | 32.6 | 3.1 | 7.7 | 18.6 | 25.8 | 2020 | 460,025 | 654,804 | 8.4 % | 70.3 % | 585,897 | 8.4 % | 78.5 % |
| | 9.26% | VAP: | 773,135 | 70.8 | 29.2 | 2.8 | 6.9 | 16.0 | 22.6 | 2018 | 325,058 | 590,211 | 7.9 % | 55.1 % | 522,934 | 7.9 % | 62.2 % |
| 31 | -70,909 | Total: | 869,269 | 46.5 | 53.5 | 2.5 | 6.0 | 43.4 | 48.8 | 2020 | 294,653 | 472,639 | 27.3 % | 62.3 % | 421,808 | 27.4 % | 69.9 % |
| | -7.54% | VAP: | 637,232 | 50.4 | 49.6 | 2.3 | 5.5 | 39.8 | 44.9 | 2018 | 217,034 | 449,448 | 26.4 % | 48.3 % | 400,801 | 26.6 % | 54.2 % |

For technical reasons, election results in Texas Legislative Council reports may vary slightly from the official election results. Complete official results for all elections are maintained by the Office of the Texas Secretary of State.
SSVR = Spanish surname voter registration

56432

Red-350
Data: 2020 Census
PLANS2100  08/02/2021 4:30:06 PM

Texas Legislative Council
08/31/21 5:30 PM
Page 1 of 1

Incumbents by District

## SENATE DISTRICTS - PLANS2100

| District | Incumbents |
|----------|------------|
| 1 | Hughes - R |
| 2 | Hall - R |
| 3 | Nichols - R |
| 4 | Creighton - R |
| 5 | Schwertner - R |
| 6 | Alvarado - D |
| 7 | Bettencourt - R |
| 8 | Paxton - R |
| 9 | Hancock - R |
| 10 | Powell - D |
| 11 | Taylor - R |
| 12 | Nelson - R |
| 13 | Miles - D |
| 14 | Eckhardt - D |
| 15 | Whitmire - D |
| 16 | Johnson - D |
| 17 | Huffman - R |
| 18 | Kolkhorst - R |
| 19 | Gutierrez - D |
| 20 | Hinojosa - D |
| 21 | Zaffirini - D |
| 22 | Birdwell - R |
| 23 | West - D |
| 24 | Buckingham - R |
| 25 | Campbell - R |
| 26 | Menéndez - D |
| 27 | Lucio, - D |
| 28 | Perry - R |
| 29 | Blanco - D |
| 30 | Springer - R |
| 31 | Seliger - R |

* Incumbents paired.



**State Senate Districts**
83rd–87th Legislatures (2013-2022)
**PLANS2100**

COUNTIES
PLANS2100

Map ID 5900
08/29/21 15:27:27

47356
2020 Census
PLANS2100   2021-08-02 16:30:06



TARRANT COUNTY

State Senate Districts
83rd–87th Legislatures (2013–2022)
PLANS2100

COUNTIES

PLANS2100

Map ID 5900
08/29/21 15:27:27

47356
2020 Census
PLANS2100    2021-08-02 16:30:06

# Exhibit 30:
*Texas Tribune* article, June 4, 2021



☰ MENU

Public Library Books     Omicron Variant     Future of Abortion Rights     Find Your Political Districts



**TEXAS 2022 ELECTIONS**

# Republican state Sen. Dawn Buckingham running for Texas land commissioner

The news of her decision comes two days after the current land commissioner, George P. Bush, announced he was running for attorney general next year, challenging fellow Republican Ken Paxton.

BY **PATRICK SVITEK**     JUNE 4, 2021    UPDATED: JUNE 7, 2021



COPY LINK



State Sen. Dawn Buckingham, R-Lakeway, is running to be the state's land commissioner. 📷 Kelly West for The Texas Tribune

*Sign up for The Brief, our daily newsletter that keeps readers up to speed on the most essential Texas news.*

State Sen. Dawn Buckingham, R-Lakeway, announced Monday she is running for land commissioner.

"I will be running for Land Commissioner with a strong conservative record defending the right to life, our Second Amendment, our invaluable oil and gas industry, and the low tax economy that has made Texas great. Conservatives know just how important the Texas General Land Office is," Buckingham said in a statement.

"It's my goal as your next Texas Land Commissioner to safeguard the heroes who served in our military, protect our exceptional natural resources, and protect our unique Texas heritage, especially the Alamo," she said.

The Texas Tribune thanks its sponsors. **Become one**.

The Texas Tribune first reported her intentions to run Friday, when Buckingham was making calls to potential supporters sharing her decision, according to sources.

On Friday afternoon, Buckingham launched several Facebook ads alluding to a land commissioner run, asking viewers, for example, if they are "ready to elect the first female Land Commissioner." Another ad billed her as a "staunch defender of the Trump agenda."

The news of her decision comes two days after the current land commissioner, George P. Bush, announced he was running for attorney general next year, challenging fellow Republican Ken Paxton.

Buckingham was first elected in 2016 to represent Senate District 24 in Central Texas. While she won a second term last year, all members of the Senate have to run for reelection in 2022 due to redistricting, so she will have to give up her seat if she runs for land commissioner.

Another Republican, Weston Martinez, announced Monday that he is running for land commissioner. Martinez is a San Antonio activist who has run twice for the Railroad Commission. Agriculture Commissioner Sid Miller endorsed Martinez's bid on Friday afternoon.

Buckingham may not be the only GOP state senator who vies for land commissioner. Sen. Brandon Creighton of Conroe has been discussed as a potential candidate, and asked for comment, a spokesperson provided a statement from him that indicated his focus was still on legislative issues.

"I am officially announcing that I am ready for the special session," Creighton said in the statement. "Let's get an election bill passed."

The General Land Office oversees investments that earn billions of dollars for public education. It is responsible for managing state lands, and it operates the Alamo, helps communities recovering from natural disasters and doles out benefits to Texas veterans.

# Exhibit 31:
*Texas Tribune* article, Sept. 21, 2021



≡ MENU

Public Library Books     Omicron Variant     Future of Abortion Rights     Find Your Political Districts     i

**REDISTRICTING TEXAS**

# After losing to a Democrat in 2020, former GOP state Sen. Pete Flores seeks election in newly drawn Republican district

Within hours, Flores got the endorsement of Sen. Dawn Buckingham, R-Lakeway, who is vacating the seat to run for land commissioner, and then Lt. Gov. Dan Patrick, who presides over the Senate.

BY **PATRICK SVITEK**     SEPT. 21, 2021     1 PM CENTRAL

COPY LINK



Former state Sen. Pete Flores, R-Pleasanton, announced Monday that he is running next year for Senate District 24, which was significantly redrawn in the first proposed map to include his hometown. 📷 Juan Figueroa/The Texas Tribune

*Sign up for The Brief, our daily newsletter that keeps readers up to speed on the most essential Texas news.*

Former state Sen. Pete Flores is mounting a comeback bid for the upper chamber — with significant support — in one of the first major examples of this year's redistricting process creating new opportunities for Republican candidates.

The Pleasanton Republican announced Monday that he is running next year for Senate District 24, which was significantly redrawn in the first proposed map to include his hometown and to be safer for a Republican than his old district where he lost to a Democrat. Within hours, Flores got the endorsement of the current SD-24 incumbent, Sen. Dawn Buckingham, R-Lakeway, who is vacating the seat to run for land commissioner, and then Lt. Gov. Dan Patrick, who presides over the Senate.

Flores lost reelection last year in Senate District 19 to San Antonio Democrat Roland Gutierrez after nabbing it from Democratic control in a 2018 special election upset that drew national attention.

The Texas Tribune thanks its sponsors. **Become one**.

"It's not the old District 19, but it still encompasses the heartland of Texas, the parts of Texas I most closely identify with," Flores said in a news release, referring to the draft SD-24. "I know the people and the ideas and values they hold dear."

## Proposed Texas Senate district 24

State Senate district 24 was drawn to include former senator Pete Flores' home in Pleasanton. Flores represented Senate district 19 for two years before he lost the seat in 2020 to a Democrat.

© OpenStreetMap contributors

Source: Texas Legislative Council

Things moved quickly after Flores' announcement, with Buckingham endorsing him Monday afternoon and Patrick backing him Tuesday morning. Patrick said in a statement he needs Flores "back in the Texas Senate to continue to advance our conservative agenda for Texas."

The newly proposed SD-24 is largely rural, jutting into Atascosa County to encompass almost all of Flores' hometown of Pleasanton. It then curves north

around the San Antonio area and farther up through the Hill Country and beyond Austin.

The draft of SD-24 went for for President Donald Trump by 18 percentage points last year, which would be a friendlier district for Flores than the one he previously held, SD-19. President Joe Biden carried that district by 8 points.

Under the proposed map, SD-19 would become more Democratic, morphing into a district that Biden won by 13 points.

Flores' return to the chamber would add a Hispanic Republican to its ranks at a time when the GOP is pushing to make fresh inroads in South Texas, where President Joe Biden underperformed last year.

## Current Texas Senate district 24

District 24 is currently represented by Sen. Dawn Buckingham, R-Lakeway, who is vacating the seat to run for land commissioner. Under the current plan, Pete Flores, a former state senator who lives in Pleasanton, doesn't live in the district.

© OpenStreetMap contributors

Source: Texas Legislative Council

Ellen Troxclair, a Republican and former member of the Austin City Council, has been campaigning for SD-24 for months, unopposed by any other serious candidates. She launched her bid shortly after Buckingham announced in June that she was vacating the seat to run for land commissioner.

The first proposed boundaries for SD-24, however, appear to pose problems for Troxclair. Her campaign paperwork lists an address in the Austin suburb of Bee Cave, which would fall outside SD-24 under the new map.

The Texas Tribune thanks its sponsors. **Become one**.

The map will have to be approved by both chambers of the Legislature and signed into law by Gov. Greg Abbott.

"This map is only the first draft of many and will be vetted and tweaked in the weeks to come," Troxclair said in a statement Monday. "The only certain thing about the current map is that it will change."

Flores and Troxclair traded endorsements Tuesday. After Flores rolled out Patrick's support, Troxclair announced the backing of U.S. Rep. Roger Williams of Austin. Flores than released the endorsement of former Gov. Rick Perry.

In a news release announcing Williams' endorsement, Troxclair's campaign alluded to the tension over the proposed 24th District, showing no sign of backing down.

The Texas Tribune thanks its sponsors. **Become one**.

"As political insiders wrestle for power over the evolving redistricting maps in Austin," the campaign said, "Troxclair continues to focus her attention on building grassroots support on the ground, fundraising, and earning endorsements.

The Legislature started its work in the third special session on Monday to redraw the district maps for the Texas House, Senate, State Board of Education and members of Congress. Lawmakers will craft those maps using the latest census data, which showed that people of color fueled 95% of the state's population growth over the past decade.

Republicans control both chambers and will have every advantage throughout the 30-day process to better position their party for the next decade.

This is the first time in decades federal law allows Texas to draw and use political maps without first getting federal approval to ensure that they're not disenfranchising the voting rights of people of color. That federal preclearance requirement in the Voting Rights Act was gutted by the Supreme Court in 2013.

The Texas Tribune thanks its sponsors. **Become one**.

Since the enactment of the Voting Rights Act in 1965, Texas has not made it through a single decade without a federal court admonishing it for violating federal protections for voters of color.

*If you appreciate reporting like this, you need to be at the all-virtual 2021 Texas Tribune Festival happening now through Sept. 25. Join as big names from politics, public policy and the media share what's next for Texas and beyond. Explore live and on-demand programming, including dozens of free events, at tribfest.org.*

## Quality journalism doesn't come free

Perhaps it goes without saying — but producing quality journalism isn't cheap. At a time when newsroom resources and revenue across the country are declining, The Texas Tribune remains committed to sustaining our mission: creating a more engaged and informed Texas with every story we cover, every event we convene and every newsletter we send. As a nonprofit newsroom, we rely on members to help keep our stories free and our events open to the public. Do you value our journalism? Show us with your support.

**YES, I'LL DONATE TODAY**

The Texas Tribune thanks its sponsors. Become one.