# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

|  |  |  |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | ) ) ) ) | |
| *Plaintiff*, | ) ) | Case No. 3:21-cv-00259 |
| v. | ) ) | [Lead Case] |
| GREG ABBOTT, *et al.*, | ) ) | |
| *Defendants* | ) ) | |
| TEXAS STATE CONFERENCE OF THE NAACP, | ) ) ) ) | |
| *Plaintiff*, | ) ) | Case No. 1:21-cv-01006 |
| v. | ) ) | [Consolidated Case] |
| GREG ABBOTT, *et al.*, | ) ) | |
| *Defendants* | ) ) | |

### **TEXAS NAACP'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ..................................................................................................... 1

I.      THE GOVERNING LEGAL STANDARDS ...................................................... 1

    A.      Rule 12(b)(6) ........................................................................... 1

    B.      Rule 12(b)(1) ........................................................................... 2

II.     THE COMPLAINT ADEQUATELY ESTABLISHES STANDING .................. 3

    A.      The Complaint adequately pleads the basis for associational
        standing. ................................................................................... 4

    B.      The Complaint adequately pleads the basis for organizational
        standing. ................................................................................... 8

III.    PLAINTIFF'S CLAIMS STATE VALID CAUSES OF ACTION. ................... 10

    A.      The Complaint states a valid racial gerrymandering claim in
        Count I. ................................................................................... 10

    B.      The Complaint states a valid Section 2 results claim in Count II. ........... 12

        1.      Legal standard under Section 2. ................................................ 12

        2.      Plaintiff satisfies Gingles 1 under binding Fifth Circuit
            precedent. ....................................................................... 13

        3.      Plaintiff satisfies Gingles 2 and 3 under binding Fifth
            Circuit precedent. ............................................................ 16

    C.      The Complaint states a valid intentional discrimination claim in
        Count III. ................................................................................. 18

CONCLUSION ....................................................................................................... 20

# <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018)................................................................................18

*Adarand Constructors, Inc. v. Pena,*
    515 U.S. 200 (1995)...................................................................................3

*Ala. Legis. Black Caucus v. Ala.,*
    575 U.S. 254 (2015)...........................................................................5, 8, 11

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).................................................................................1, 20

*Ass'n of Am. Physicians & Surgeons, Inc,*
    627 F. 3d 547 (5th Cir. 2021) .....................................................................4

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler,*
    178 F.3d 350 (5th Cir. 1999) ...........................................................3, 4, 10

*Badillo v. City of Stockton,*
    956 F.2d 884 (9th Cir. 1992) ....................................................................15

*Bartlett v. Strickland,*
    556 U.S. 1 (2009)..........................................................................15, 16, 20

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)..................................................................................1, 17

*Bethune-Hill v. Va. St. Bd. of Elections,*
    137 S. Ct. 788 (2017).................................................................................11

*Bowlby v. City of Aberdeen, Miss.,*
    681 F.3d 215 (5th Cir. 2012) ....................................................................1

*Brewer v. Ham,*
    876 F.2d 448 (5th Cir. 1989) ..............................................................15, 17

*Bridgeport Coal. for Fair Representation v. City of Bridgeport,*
    26 F.3d 271 (2d Cir. 1994)........................................................................15

*Campbell v. Wells Fargo Bank, N.A.,*
    781 F.2d 440 (5th Cir. 1986) ....................................................................9

*Campos v. City of Baytown*,
    840 F.2d 1240 (5th Cir. 1988) ........................................................................14

*Campos v. City of Baytown*,
    849 F.2d 943 (5th Cir. 1988) ..........................................................................15

*Ctr. for Biological Diversity v. EPA*,
    937 F. 3d 533 (5th Cir. 2019) ............................................................................6

*Concerned Citizens of Hardee Cty. v. Hardee Cty. Bd. of Comm'rs*,
    906 F.2d 524 (11th Cir. 1990) ........................................................................15

*Cooper v. Harris*,
    137 S. Ct. 1455..................................................................................................11

*DiMaio v. Democratic Nat'l Comm.*,
    520 F.3d 1299 (11th Cir. 2008) ........................................................................7

*Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*,
    522 F. 3d 796 (7th Cir. 2008) ............................................................................6

*Draper v. Healey*,
    827 F. 3d 1 (1st Cir. 2017)..................................................................................6

*Fla. St. Conf. of NAACP v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) ........................................................................3

*Fisher v. Bank of Am.*,
    2013 WL 12116508 (W.D. Tex. Jan. 3, 2013) ..................................................2

*Foman v. Davis*,
    371 U.S. 178 (1962)...........................................................................................8

*Ga. Repub. Party v. SEC*,
    888 F. 3d 1198 (11th Cir. 2018) ........................................................................6

*Gallagher v. N.Y. St. Bd. of Elections*,
    496 F. Supp. 3d 842 (S.D.N.Y. 2020)...............................................................7

*Garrett v. Commonwealth Mortg. Corp.*,
    938 F.2d 591 (5th Cir. 1991) ............................................................................2

*Growe v. Emison*,
    507 U.S. 25 (1993).............................................................................................13

*Harding v. Cty. of Dallas*,
    948 F.3d 302 (5th Cir. 2020) ..........................................................................10

*Harrington v. State Farm Fire & Cas. Co.*,
563 F.3d 141 (5th Cir. 2009) ................................................................................1

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982)......................................................................................8, 9

*Holder v. Hall*,
512 U.S. 874 (1994)........................................................................................13

*Hunt v. Cromartie*,
526 U.S. 541 (1999)........................................................................................11

*Hunt v. Wash. St. Apple Advert. Comm'n*,
432 U.S. 333 (1977).........................................................................................4

*Kaufman ex rel. Kaufman v. Robinson Prop. Grp. Ltd. P'ship*,
331 F. App'x 276 (5th Cir. 2008) .......................................................................2

*Kumar v. Frisco Indep. Sch. Dist.*,
476 F. Supp. 3d 439 (E.D. Tex. 2020) ..............................................................15

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).....................................................................................3, 9

*LULAC v. Clements*,
999 F.2d 831 (5th Cir. 1993) ............................................................14, 15, 17, 18

*LULAC v. N. E. Indep. Sch. Dist.*,
903 F. Supp. 1071 (W.D. Tex. 1995)..................................................................15

*LULAC v. Perry*,
548 U.S. 399 (2006).........................................................................................13

*Miller v. Johnson*,
515 U.S. 900 (1995)....................................................................................11, 12

*NAACP v. City of Kyle*,
626 F.3d 233 (5th Cir. 2010) ..............................................................................6

*Nat'l Council of La Raza v. Cegavske*,
800 F.3d 1032 (9th Cir. 2015) .........................................................................5, 6

*Nixon v. Kent Cty.*,
76 F.3d 1381 (6th Cir. 1996) .............................................................................15

*Overton v. City of Austin*,
871 F.2d 529 (5th Cir. 1989) .............................................................................15

*Paterson v. Weinberger*,
    644 F.2d 521 (5th Cir. 1981) .................................................................2, 3

*Perez v. Abbott*,
    250 F. Supp. 3d 123 (W.D. Tex. 2017)..........................................................15

*Perez v. Abbott*,
    253 F. Supp. 3d 864 (W.D. Tex. 2017)..........................................................10

*Perez v. Abbott*,
    267 F. Supp. 3d 750 (W.D. Tex. 2017), *aff'd in part, rev'd in part on other*
    *grounds, and remanded sub nom.*, 138 S. Ct. 2305 (2018................................8, 9

*Perry v. Perez*,
    565 U.S. 388 (2012)...................................................................................16

*Residents Against Flooding v. Reinvestment Zone No. Seventeen*,
    260 F. Supp. 3d 738 (S.D. Tex. 2017), *aff'd*, 734 F. App'x 916 (5th Cir. 2018) .....................2

*Rollins v. Fort Bend Indep. Sch. Dist.*,
    89 F.3d 1205 (1996)...................................................................................17

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)....................................................................................6

*Thornburg v. Gingles*,
    478 U.S. 30 (1986).................................................................13, 14, 15, 16

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977)...................................................................................18

*Vinmar Overseas, Ltd. v. OceanConnect, LLC*,
    2012 WL 3599486 (S.D. Tex. Aug. 20, 2012) ............................................3

*Williams v. City of Dallas*,
    734 F. Supp. 1317 (N.D. Tex. 1990) ............................................................15

*Yazzie v. Hobbs*,
    977 F.3d 964 (9th Cir. 2020) .......................................................................7

**Statutes/Rules**

52 U.S.C. § 10301(a) .........................................................................................12

52 U.S.C. § 10301(b) .........................................................................................13

Fed. R. Civ. P. 12(b)(1)......................................................................................2

Fed. R. Civ. P. 12(b)(6)...............................................................................1, 2, 11

## INTRODUCTION

Defendants' Motion to Dismiss pays only lip-service to the settled standards under Rule 12, under which the movant must prove the complete implausibility of the claims alleged and all inferences from the pleadings must be drawn in the plaintiff's favor. The 59-page Complaint—which details not only the demographic shifts in the specific challenged districts but also identifies each district or region of the State in which effective majority-minority coalitions were dismantled or could have been drawn but were not—easily meets the facial plausibility standard of Rule 8 to support claims of intentional discrimination in violation of the Fourteenth Amendment and Section 2 of the Voting Rights Act, vote dilution in violation of Section 2, and unconstitutional racial gerrymandering, and to support Plaintiff's standing to assert these claims. That Defendants dispute these assertions as a matter of fact is no basis for their Motion. And every one of Defendants' legal arguments—including whether coalition claims are legally cognizable under Section 2 and whether Section 2 affords a private right of action—has been rejected by courts in this Circuit. For these reasons and more, Defendants' Motion should be denied.

## I.    THE GOVERNING LEGAL STANDARDS

### A.    Rule 12(b)(6)

A motion to dismiss brought under Rule 12(b)(6) for failure to state a claim "[is] viewed with disfavor and [is] rarely granted." *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009) (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)). Such motions are governed by the facial plausibility standard articulated in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). To establish "facial plausibility," the complaint need plead only factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 219 (5th Cir. 2012) (quoting *Ashcroft*, 556 U.S. at 678). "In

1

considering a motion to dismiss for failure to state a claim, the court must accept as true the well-pleaded factual allegations and any reasonable inference to be drawn from them." *Fisher v. Bank of Am.*, 2013 WL 12116508, at *1 (W.D. Tex. Jan. 3, 2013). The district court may not dismiss a complaint under Rule 12(b)(6) unless it "seems beyond doubt that plaintiff cannot prove any set of facts entitling her to relief." *Kaufman ex rel. Kaufman v. Robinson Prop. Grp. Ltd. P'ship*, 331 F. App'x 276, 277 (5th Cir. 2008). The question therefore is "whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief." *Id.*

A court may dismiss a complaint as a matter of law only if the complaint (1) lacks a cognizable legal theory or (2) fails to contain sufficient facts to support a cognizable legal claim. *Garrett v. Commonwealth Mortg. Corp.*, 938 F.2d 591, 594 (5th Cir. 1991). "A complaint lacks an 'arguable basis in law' if it is based on an indisputably meritless legal theory or a violation of a legal interest that does not exist." *Residents Against Flooding v. Reinvestment Zone No. Seventeen*, 260 F. Supp. 3d 738, 756 (S.D. Tex. 2017), *aff'd*, 734 F. App'x 916 (5th Cir. 2018). But when a complaint contains "either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory," it is considered well-pled. *Fisher*, 2013 WL 12116508, at *1 (quoting *Twombly*, 550 U.S at 562).

### B.     Rule 12(b)(1)

When challenging subject matter jurisdiction under Rule 12(b)(1), a party can make a "facial attack" or a "factual attack." *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). If the party merely files its Rule 12(b)(1) motion, it is considered a facial attack, and the court looks only at the sufficiency of the allegations in the pleading and assumes them to be true. *Id.* If the allegations are sufficient to allege jurisdiction, the complaint stands, and the court must deny the motion. *Id.* This is akin to a Rule 12(b)(6) motion in that "[t]he pleading's allegations are

presumed to be true, and if those allegations sufficiently allege a claim for recovery the complaint stands and the federal court must entertain the suit." *Vinmar Overseas, Ltd. v. OceanConnect, LLC*, 2012 WL 3599486, at *4 (S.D. Tex. Aug. 20, 2012) (internal quotations and citation omitted). If, however, the defendant makes a factual attack on subject matter jurisdiction, then the defendant must offer up evidentiary materials outside the pleadings such as affidavits and testimony. *Id.* In the latter case, a plaintiff is also required to "submit facts through some evidentiary method." *Paterson,* 644 F.2d at 523. Here, Defendants do not reference matters outside the Complaint with respect to their jurisdictional challenge as to Article III standing. The Court, therefore, must evaluate Defendants' jurisdictional arguments as a facial challenge and must limit its analysis to facts alleged in the Complaint.

## II.    THE COMPLAINT ADEQUATELY ESTABLISHES STANDING.

Article III standing demands that the plaintiff suffer an "injury in fact" that is "concrete and particularized," "actual or imminent," and "fairly traceable" to the actions of the defendant, so that the injury will likely be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Ass'n of Cmty. Orgs. for Reform Now v. Fowler* ("*ACORN*"), 178 F.3d 350, 356, 358 (5th Cir. 1999).[1] Organizations, such as Plaintiff, may assert standing in two ways: (1) associational standing, i.e., bringing suit on behalf of its members; and (2) organizational standing, i.e., seeking relief for injury to itself. Plaintiff's standing in

---

[1] Although not raised by Defendants, Plaintiff alleges imminent harm. To allege that prospective harm is imminent "requires only that the anticipated injury occur within some fixed period of time in the future, not that it happens in the colloquial sense of soon or precisely within a certain number of days, weeks, or months." *Fla. St. Conf. of NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008); *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211–12 (1995). Here, the harm to Plaintiff as an organization is as immediate as the results of the next election in the challenged districts and the harm to Plaintiff's members is as immediate as the next time they attempt to vote.

this case rests easily on either—and, indeed, on both—of these grounds, as has been repeatedly established over the course of Texas NAACP's more than 20-year history of participating in state legislative and congressional redistricting litigation in Texas.

### A. The Complaint adequately pleads the basis for associational standing.

Plaintiff has adequately pled associational standing, specifically that: (1) its members live in challenged districts and in the geographical areas that are the subject of Plaintiff's intent, Section 2 results, and racial gerrymandering claims; (2) the interests that Plaintiff seeks to protect—namely, preventing vote dilution and ensuring that minorities have equal opportunity to elect candidates of choice—are central to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of each of its individual members in the lawsuit. *See Hunt v. Wash. St. Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977); *ACORN*, 178 F.3d at 356, 365.[2]

Defendants first argue that Plaintiff has not alleged that individual members of its organization have been injured, because it has failed to identify "specific" members who have suffered injury, but "purports to sue in the name of its members generally." Defendants' Motion to Dismiss NAACP's Complaint ("Mot.") (ECF No. 82) at 2. The Complaint clearly alleges that Plaintiff has more than 100 local branch units across the State with members in counties throughout Texas; that more than 10,000 of its members—consisting largely of Black people and other persons of color—are registered to vote in Texas, Compl. ¶ 18; that it has

---

[2] Defendants do not challenge Plaintiff's standing on the basis of compliance with the second and third prongs. In any event, the Complaint details the extraordinary efforts Texas NAACP has made to protect voting rights for voters of color in Texas and no individual member is a required party to this lawsuit. *See, e.g.*, *Ass'n of Am. Physicians & Surgeons, Inc.*, 627 F. 3d 547, 551–53 (5th Cir. 2021) (no need for participation of individual members in law suit seeking declaratory and injunctive relief based on allegations applicable to all members).

specifically worked for redistricting on behalf of its members across the state and specifically in Dallas-Fort Worth Metroplex, Harris, and Fort Bend Counties, *id.* ¶ 19; and, most important, that it is bringing this action on behalf of those members "who reside in state house, state senate, and congressional districts where their voting power will be reduced under the new plans," *id.* ¶ 21. The Complaint then proceeds to identify each of these districts with extraordinary detail, identifying with pin-point precision those districts and counties where majority-minority districts should have been created, and those districts and counties where populations of voters of color were the victims of racial gerrymanders. *Id.* ¶¶ 7, 128, 138, 164, 170, 177, 181, 192, 195–97, 203–04, 206. It is these specific districts and counties where, as alleged in the Complaint, the legislature and map drawers implemented a plan to deprive voters of color an opportunity to elect candidates of their preference. *Id.* ¶¶ 4–5, 7.

While these allegations are more than sufficient for purposes of withstanding a facial challenge to standing, as the Supreme Court has noted under analogous circumstances, even after *trial* and without more proof, "it seems highly likely that a 'statewide' organization with members in 'almost every county,' the purpose of which is to help 'blacks and other minorities and poor people,' will have members in each majority-minority district" sufficient to support associational standing in a redistricting case. *Ala. Legis. Black Caucus v. Ala.*, 575 U.S. 254, 270 (2015); *see also Nat'l Council of La Raza* v. *Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) ("Where it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury, we see no purpose to be served by requiring an organization to identify by name the member or members injured.").

In this context, Defendants' reliance on cases where associational standing was found lacking after an adjudication on the merits or upon consideration of affidavits are decidedly inapposite,[3] as is their reliance on cases dismissing petitions for review of administrative regulations by Circuit Courts of Appeal exercising their original jurisdiction based on an assessment of declarations and affidavits submitted to support standing are also inapposite at this stage of the proceedings.[4]

Next, Defendants argue that, even if the pleadings were otherwise adequate in its description of injury to its members, Plaintiff must allege that its members "actually voted" in the

---

[3] *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) (no associational standing because affidavits submitted during merits adjudication process failed to identify members who were injured); *NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (no evidence in record after trial showing injury to any person); *see also Draper v. Healey*, 827 F. 3d 1, 3 (1st Cir. 2017) (dismissing complaint for lack of associational standing, but not because of lack of identification of individual injured member in the complaint, but because the group submitted an affidavit asserting only "that many of its members asked it to take legal action challenging the regulation, but the Supreme Court has said that an *affidavit* provided by an association to establish standing is insufficient unless it names an injured individual") (emphasis added) (citing to *Summers*, 555 U.S. at 498). In fact, the court in *La Raza* declined to adopt Defendants' argument based on *Summers* here. *See La Raza*, 800 F.3d at 1041 ("We are not convinced that *Summers*, an environmental case brought under the National Environmental Policy Act, stands for the proposition that an injured member of an organization must always be specifically identified in order to establish Article III standing for the organization.").

[4] *See, e.g.*, *Ctr. for Biological Diversity v. EPA*, 937 F. 3d 533, 536 (5th Cir. 2019) (dismissing petition for review of regulation after entertaining submission of affidavits on issue of associational standing); *Ga. Repub. Party v. SEC*, 888 F. 3d 1198, 1203 (11th Cir. 2018) (dismissing petition for review of SEC regulation governing political contributions after affidavits revealed that members had no plans to make contributions and had not proffered allegations in affidavits of at least one member being hurt). The only case cited by Defendants that was not adjudicated on the basis of trial testimony or affidavits is *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F. 3d 796, 804 (7th Cir. 2008). But there the court conducted an intensive analysis of the plaintiff's complaint seeking to stop the construction of a new school to which plaintiff claimed children with disabilities would be assigned and found no associational standing—not because the members were not adequately identified, but because the injury to the members was inadequately described, to wit, among other things, "no disabled child will be placed" in the new school, and that, even were that not so, the proper remedy was a statutory challenge, not an injunction to stop construction of the new school. *Id.* at 802–03. Here, of course, the injury—the loss of opportunity to elect candidates of their choice—is amply and repeatedly described.

"election at issue." Mot. at 11. But the only authority cited by Defendants are cases brought by *individual* plaintiffs—not organizations—whose voting-related pleadings did not meet a bare minimum showing of concrete injury because, among other things, they failed to claim they intended to vote. *See*, *e.g.*, *DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1302 (11th Cir. 2008) (challenge by individual voter to failure of political party to seat delegates at national convention); *Yazzie v. Hobbs*, 977 F.3d 964, 967 (9th Cir. 2020) (challenge by individual voters to absentee ballot procedures, where they did not plead they intended to vote by absentee ballot); *Gallagher v. N.Y. St. Bd. of Elections*, 496 F. Supp. 3d 842, 850 (S.D.N.Y. 2020) (same).

Finally, grasping at straws, Defendants describe the Complaint as asserting only a "statewide" claim and that Plaintiffs' members lack standing to bring such a claim, because redistricting claims must be adjudicated on a district-by-district basis. Mot. at 12. Defendants misread the Complaint. There are three counts in the Complaint. Two of them are appropriately and solely district-specific, with the specific districts listed by number as to the racial gerrymander claim, Compl. ¶ 206, and by number or county as to the Section 2 claims, *id.* ¶¶ 214, 215. These paragraphs summarize the preceding 200 paragraphs of the Complaint, which spell out the specific districts which are the subject of those two claims. The third count is an intentional discrimination claim based on the specific districts and counties described throughout the Complaint, as well as a claim that the maps taken as a whole were adopted, at least in part, with the discriminatory intent of reducing the number of districts in which voters of color could elect candidates of choice. Compl. ¶¶ 224–26. As alleged, Plaintiff has branches throughout the state and 10,000 members, who are registered voters of color throughout the state, who live in areas that will be impacted by the redistricting and its discriminatory intent, both on a district-by-district basis, and as a result of

the manifestation of the discriminatory intent in the maps as a whole. Plaintiff has associational standing to bring all of its claims on behalf of these members.[5]

### B.    The Complaint adequately pleads the basis for organizational standing.

To establish organizational standing, a plaintiff must demonstrate a "concrete and demonstrable injury to the organization's activities," such as a "drain on the organization's resources" or "perceptibl[e] impair[ment]" of the organization's ability to fulfill its mission. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982). Organizational standing applies with equal strength to voting rights litigation and was expressly extended to redistricting litigation in *Perez v. Abbott*, 267 F. Supp. 3d 750, 757, 771–72 (W.D. Tex. 2017) ("Most importantly for present purposes, despite not dealing specifically with redistricting claims of the type asserted in this case, courts have consistently found standing under *Havens* for organizations to challenge alleged violations of § 2 of the VRA and the Fourteenth Amendment"), *aff'd in part, rev'd in part on other grounds, and remanded sub nom.*, 138 S. Ct. 2305 (2018).

Plaintiff has adequately pleaded injury to its organizational interests. As set forth in the Complaint, protecting the right to vote and ensuring that the new plans afford minority voters the opportunity to vote for their candidates of choice is an essential aspect of Plaintiff's organizational mission. Compl. ¶¶ 16–22. Over the course of the organization's history, Texas NAACP has undertaken advocacy projects, public testimony, and litigation related to statewide redistricting plans that harm Black, Hispanic, and Asian voters. *Id.* ¶¶ 19, 227. The Complaint alleges in detail that by reshaping certain districts to dilute the votes of Black, Hispanic and Asian voters and by

---

[5] Should the Court disagree with Plaintiff that standing has been adequately pled, Plaintiff requests an opportunity to either amend the Complaint or provide evidence by declaration or affidavit to support its standing. *See Foman v. Davis,* 371 U.S. 178, 182 (1962) (leave to amend should be "freely given" in absence of bad faith); *Ala. Legis. Black Caucus*, 575 U.S. at 256 (membership organization should have opportunity to bolster its claim of associational standing).

moving around populations in and out of districts based on race, *id.* ¶¶ 102, 105, 110, 165, 170, 185, 214, the State's redistricting plans are in direct conflict with Plaintiff's mission of achieving majority-minority coalition districts, *id.* at ¶¶ 20–21; *see, e.g., Havens Realty Corp.*, 455 U.S. at 378–79 (finding that organization had standing where there was "perceptibl[e] impair[ment]" of the organization's ability to fulfill its mission).

The Complaint further alleges that if the challenged redistricting plans stand, Plaintiff will have to divert limited resources to combatting the consequences of the loss of political power of the communities it represents, resources that the organization would have committed to other important programs. Compl. ¶ 22; *see, e.g., Perez*, 267 F. Supp. 3d at 757 ("An organization will have organizational standing if it 'prove[s] a drain on its resources resulting from counteracting the effects of the defendant's actions.'") (quoting *ACORN*, 178 F.3d at 356–62).

Nevertheless, Defendants argue that Plaintiff's diversion of resources is "manufacture[d]." Mot. at 6. But, Defendants' mere disbelief must be given short shrift on this Motion because "the complaint is to be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true." *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440, 442 (5th Cir. 1986). A diversion-of-resources injury is sufficient to establish organizational standing at the pleading stage, even when it is "broadly alleged." *Havens Realty Corp.*, 455 U.S. at 379 ("If, as broadly alleged, [defendants'] steering practices have perceptibly impaired [plaintiff organization's] ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact."); *see also Lujan*, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.").

Next, Defendants assert that Plaintiff does not have organizational standing because a "vote-dilution injury belongs to a voter," which Plaintiff is not. Mot. at 6. Under Defendants' theory, no organization would ever have standing to bring a suit asserting any violation under the Voting Rights Act, a conclusion belied by the very case upon which Defendants rely, where the Fifth Circuit found that a voter advocacy organization's core mission of increasing the political power of low- and moderate-income people was at odds with the state's alleged failure to facilitate voter registration, conferring standing on the organization. *ACORN*, 178 F.3d at 361–62. The Complaint adequately pleads Plaintiff's organizational standing.

## III.   PLAINTIFF'S CLAIMS STATE VALID CAUSES OF ACTION.

### A.   The Complaint states a valid racial gerrymandering claim in Count I.

Defendants recognize, Mot. at 18, that a properly pled racial gerrymandering claim need plead "that race was improperly used in the drawing of the boundaries of one or more specific electoral districts" such that the legislature "subordinat[ed] traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests." *Harding v. Cty. of Dallas*, 948 F.3d 302, 313 (5th Cir. 2020) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). And "[w]hile an intentional vote dilution and a *Shaw* claim are analytically distinct, meaning the Court must analyze them under different rubrics, they are not mutually exclusive, and the allegations are sufficient to support both types of claims." *Perez v. Abbott*, 253 F. Supp. 3d 864, 893 n.29 (W.D. Tex. 2017). The Complaint expressly pleads that. Compl. ¶¶ 206–09.

Oddly, Defendants claim that the Complaint makes "only two allegations" to support its racial gerrymander claim. Mot. at 19. Not so. The Complaint painstakingly identifies each state house, state senate, and congressional district where racial gerrymandering occurred and describes the Black, Latino, and Asian voters who were placed "within or without a particular district," *see*

*Miller*, 515 U.S. at 916, as well as the Anglo voters who were similarly shuffled into or out of districts, on the basis of race. Compl. ¶¶ 5, 7, 111–12, 117–23, 125–26, 131–37, 146–47, 148—62, 166–69, 184 –92, 200, 206–10. The Complaint includes tables indicating the percentages by which the map drawers decreased voters of color in certain districts, noting that the common thread between these districts was an emerging Black, Latino, and Asian electorate on the brink of electing candidates of choice that were not the favored candidates of Anglos. *Id.* ¶¶ 142, 146, 164. The Complaint describes in detail the irregular shapes and non-compactness of the challenged districts, even providing images of how the new districts compare visually with the old districts under the benchmark plan. *Id.* ¶¶ 116, 124, 130, 147, 150, 152–54, 156, 166, 174, 178, 193, 198. And, leaving no ambiguity, Count I of the Complaint specifically identifies the offending districts. *Id.* ¶¶ 206–09; *see Ala. Legis. Black Caucus*, 575 U.S. at 262 (as a general matter, racial gerrymandering claims proceed "district-by-district"); *Bethune-Hill v. Va. St. Bd. of Elections*, 137 S. Ct. 788, 800 (2017) ("[T]he basic unit of analysis for racial gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district.").

Defendants go on to suggest that because alternative justifications—such as partisanship and electoral politics—may explain the drawing of the challenged districts, Count I should be dismissed. Mot. at 19. The Supreme Court has repeatedly noted in redistricting cases that "the legislature's motivation is itself a factual question," *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999), and has made it abundantly clear that using race as a tool to achieve partisan ends is unconstitutional, *Cooper v. Harris*, 137 S. Ct. 1455, 1464 n.1, 1473 n.7 (2017) (Plaintiff succeeds on racial gerrymander claim even if legislature elevated race to predominant criterion in order to advance political goals). Adjudicating the fact-intensive issue of motivation on a Rule 12(b)(6) motion is not permitted.

Indeed, in pressing this Court to consider Plaintiff's pleadings against "the presumption of legislative good faith," Mot. at 19, Defendants also ignore that where, as pled in the Complaint, the evidence will show that the legislature subordinated traditional race-neutral redistricting principles to racial considerations in drawing a redistricting plan, any such presumption will evaporate and the plan "cannot be upheld unless it satisfies strict scrutiny, our most rigorous and exacting standard of constitutional review." *Miller*, 515 U.S. at 920.

Because Plaintiff's racial gerrymandering claim is well-pled and because Plaintiff has shown that it can prove some set of facts that would allow this Court to draw a reasonable inference that specific districts in the new plans were racially gerrymandered, Defendants' 12(b)(6) arguments as to Count I must be denied.

### B.     The Complaint states a valid Section 2 results claim in Count II.

Defendants aver that Plaintiff's Section 2 claim should be dismissed because Plaintiff has not met the *Gingles* preconditions and because Section 2 does not afford a private right of action. As to the first point, Plaintiff has adequately pled a Section 2 claim and expressly alleged facts sufficient to meet the *Gingles* preconditions. As to the latter point, Plaintiff relies on this Court's opinion explicitly rejecting that argument. *See* ECF No. 58.

### 1.     Legal standard under Section 2.

Section 2 of the Voting Rights Act provides:

> [n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . as provided in subsection (b) of this section.

52 U.S.C. § 10301(a).

> Subsection (b) provides that a violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State . . . are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its

members have less opportunity than other members of the electorate to participate
in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b).

"Vote dilution" claims are actionable results claims under the Voting Rights Act. *See Thornburg v. Gingles*, 478 U.S. 30 (1986). To prove a vote dilution claim, the plaintiff must first meet three preconditions: (1) that the minority population comprises a sufficiently large group that is sufficiently geographically compact to constitute a majority in the challenged district ("*Gingles* 1"); (2) that the minority group is "politically cohesive," in that members of the group vote similarly ("*Gingles* 2"); and (3) that the white majority votes as a bloc, allowing it to usually defeat the minority group's candidates of choice ("*Gingles* 3"). *Id.* at 48–51. Preconditions (2) and (3) taken together are commonly referred to as proof of "racially polarized voting." *See Growe v. Emison*, 507 U.S. 25, 40 (1993) ("[T]he 'minority political cohesion' and 'majority bloc voting' showings are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population."); *LULAC v. Perry*, 548 U.S. 399, 427 (2006); *Holder v. Hall*, 512 U.S. 874, 879 (1994). Once these preconditions are met, the plaintiff succeeds on the claim by proving that the totality of the circumstances demonstrates that the challenged election practice "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Id.* at 938.

## 2.    Plaintiff satisfies Gingles 1 under binding Fifth Circuit precedent.

The Complaint alleges facts sufficient to infer that Plaintiff can meet *Gingles* 1—that Black, Latino, and Asian voters together are sufficiently large enough to make up numerical majorities in different and specifically identified parts of the State. Compl. ¶¶ 25–34, 114, 145, 170–71, 177, 181, 192, 195–97, 203–04; *see, e.g.*, ¶ 122 ("Had map drawers attempted to provide voters of color in Tarrant County the opportunity to elect candidates of their choice to the state

senate, they could have created at least one compact coalition seat with a 40% white CVAP and a 60% POC CVAP.").

Despite these particularized averments, Defendants argue that as a matter of law the text of Section 2 categorically prohibits minority coalition districts (districts in which more than one minority group aggregate to bring a Section 2 claim). Recognizing that this Circuit's law is directly contrary to their position, Defendants posit that "Contrary Fifth Circuit Precedent Was Wrong and Has Been Overruled." Mot. at 10. But this Court is bound by the precedent of *Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988) and *LULAC v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (en banc), which, contrary to Defendants' argument, has not been overruled.

As Defendants themselves acknowledge, *Campos* is "squarely on point." Mot. at 11. In that case, the Fifth Circuit held that, as a matter of law, coalition districts in which Black and Latino voters together made up a numerical majority satisfied *Gingles* 1. 840 F.2d at 1244. In *Campos*, Black and Hispanic voters brought a Section 2 claim challenging an at-large city council electoral scheme as dilutive of their votes. *Id.* The city argued that Black and Hispanic voters together "were not compact and insular enough to meet" *Gingles* 1. *Id.* The Fifth Circuit disagreed, noting that *Gingles* 1 did not prohibit minority groups from forming coalitions that could form a numerical majority in the district. *Id.* ("There is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved minority to include both Blacks and Hispanics.").

More than a decade after the decision in *Campos*, the Fifth Circuit took up *Clements* en banc, and Judge Higginbotham, writing for the panel majority, acknowledged *Campos* as controlling precedent, dispelling any doubt:

> As we stated in *Campos,* "if the statistical evidence is that Blacks and Hispanics together vote for the Black or Hispanic candidate, then cohesion is shown." *Id.* at 1245 (footnote omitted). If blacks and Hispanics vote cohesively, ***they are legally***

> *a single minority group*, and elections with a candidate from this single minority
> group are elections with a viable minority candidate.

999 F.2d at 864 (emphasis added).[6] *See also Brewer v. Ham*, 876 F.2d 448, 449 (5th Cir. 1989)

(citing *Campos*) (coalition of Black, Hispanic, and Asian voters); *Overton v. City of Austin*, 871

F.2d 529, 535 (5th Cir. 1989) (citing *Campos*) (Black and Hispanic coalition). Numerous courts

within this Circuit have found minority coalition claims satisfy Section 2. *See*, *e.g.*, *Kumar v.*

*Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 494 (E.D. Tex. 2020) (Black, Hispanic, and Asian

coalition); *Perez v. Abbott*, 250 F. Supp. 3d 123, 135 (W.D. Tex. 2017) (various majority-minority

coalitions); *LULAC v. N. E. Indep. Sch. Dist.*, 903 F. Supp. 1071, 1092 (W.D. Tex. 1995) (Black

and Hispanic coalition); *Williams v. City of Dallas*, 734 F. Supp. 1317, 1332 (N.D. Tex. 1990)

(same). [7]

  Defendants' attempt to undercut the vitality of this precedent by reliance on *Bartlett v.*

*Strickland*, 556 U.S. 1 (2009), is misplaced. *Bartlett* dealt only with "crossover" districts, "in

which minority voters make up less than a majority of the voting-age population" and rely on

---

[6] In that case, Judge Higginbotham authored the en banc opinion in *Clements*, and Defendant's wholesale reliance on his dissent from the decision not to grant en banc review of *Campos* is curious at best. In his dissent, Judge Higginbotham did not conclusively opine that coalition districts could not be required under Section 2; rather, he simply explained why the issue was of sufficient importance so as to merit consideration by the court sitting en banc. *Campos v. City of Baytown,* 849 F.2d 943, 946 (5th Cir. 1988) (mem. opinion) (Higginbotham J., dissenting). Clearly, when that consideration occurred more than a decade later, Judge Higginbotham concluded that Section 2 may require coalition districts.

[7] Like the Fifth Circuit, the Eleventh Circuit has held similarly that "[t]wo minority groups (in this case Blacks and Hispanics) may be a single section 2 minority if they can establish that they behave in a politically cohesive manner." *Concerned Citizens of Hardee Cty. v. Hardee Cty. Bd. of Comm'rs*, 906 F.2d 524, 526 (11th Cir. 1990). The Ninth and Second Circuits have also implicitly endorsed coalition claims where the *Gingles* preconditions are satisfied. *See Badillo v. City of Stockton*, 956 F.2d 884, 889 (9th Cir. 1992); *Bridgeport Coal. for Fair Representation v. City of Bridgeport*, 26 F.3d 271 (2d Cir. 1994). The Sixth Circuit is the only federal circuit court to conclude that two different minority groups cannot join together to bring a vote dilution claim under the Voting Rights Act. *Nixon v. Kent Cty.*, 76 F.3d 1381, 1381 (6th Cir. 1996).

Anglo voters to cross over and help elect the candidate of choice of minority voters. *Id.* at 13. While the *Bartlett* Court held that Section 2 could not be construed to require crossover districts, it expressly left open the question of majority-minority coalition districts. *Id.* at 13–14: "But that term risks confusion with coalition-district claims in which two minority groups form a coalition to elect the candidate of the coalition's choice. We do not address that type of coalition district here." The Court has not since addressed the issue of minority coalition districts.

Defendants' contention that *Perry v. Perez*, 565 U.S. 388 (2012), unequivocally changed clear Fifth Circuit precedent addressing majority-minority coalition districts is untenable. In *Perry*, the Supreme Court simply expressed concern that the district court had "no basis" for "intentionally draw[ing] District 33 as a minority coalition opportunity district," (internal quotations and citation omitted) and supported this vague conclusion with an equally ambiguous "cf." reference to *Bartlett,* 556 U.S. at 13–14, precisely where the *Bartlett* Court stated "[w]e do not address that type of coalition district here." *Perry*, 565 U.S. at 398. It is impossible to discern from the single paragraph in the per curiam *Perry* decision whether the Court was referring to a lack of "basis" in law or in "fact"—although nowhere does the *Perry* Court state that it had found a legal, rather than a factual, deficiency. Suggesting that the per curiam *Perry* Court's "cf." reference to *Bartlett* brought closure to the issue of minority "coalition" districts expressly left open in *Bartlett* is baseless.

### 3. Plaintiff satisfies Gingles 2 and 3 under binding Fifth Circuit precedent.

The Complaint sufficiently alleges that racially polarized voting (*Gingles* 2 and 3) exists, wherein Black, Hispanic, and Asian voters vote behind the same candidates and Anglo voters vote as a bloc to defeat those candidates. Compl. ¶¶ 7, 96–97, 110, 122, 217. These allegations are not "threadbare." Mot. at 1. Rather, Plaintiff specifically alleges that the "vast majority" of Black,

Hispanic, and Asian voters vote cohesively for the same candidates. Compl. ¶ 97, and that "[i]n all parts of the state, Black voters vote cohesively for Democratic candidates and white voters usually vote as a bloc to defeat those candidates." *see id.* ¶ 97. The Complaint goes on to aver that "in most parts of the state, Black, Hispanic, and Asian voters vote cohesively for Democratic candidates and white voters usually vote as a bloc to defeat those candidates, too." *Id.* More specific allegations are spelled out as to the cohesion of voters of color as to particular districts, *id.* ¶¶ 110, 122, and the entire Complaint is replete with allegations specific to each challenged district as to how racial polarization affects the elections in each district. Indeed, the thrust of Section 2 is that voting is racially polarized in each of the districts described in the Complaint, *id.* ¶ 217. At the pleading stage, that is more than sufficient to "nudge[] [a claim] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 569.[8]

Defendants' real beef, however, is a dispute of facts. Defendants contend that the Complaint does not raise plausible allegations of racially polarized voting because, according to them, it fails to "meet the burden to plausibly allege that race, not partisan affiliation, best explains any alleged bloc voting." Mot. at 13. The Complaint need not explain away partisan influence. This issue, as the en banc court explained in *LULAC v. Clements*, is for trial. There, the court not only recognized that "even partisan affiliation may serve as a proxy for illegitimate racial considerations," but also noted that the *LULAC* plaintiffs were "entirely correct in maintaining that courts ***should not summarily dismiss*** vote dilution claims in cases where racially divergent voting patterns correspond with partisan affiliation as 'political defeats' not cognizable under § 2." 999

---

[8] None of the cases Defendants cite were decided by way of a motion to dismiss. *Clements*, 999 F.2d at 838 (full trial on the merits, appeal, and two en banc Fifth Circuit opinions); *Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1205, 1208 (1996) (four-day bench trial and appeal); *Brewer*, 876 F.2d at 450 (decided by way of an application for declaratory judgment and injunction).

F.2d at 860–61 (emphasis added). The Fifth Circuit left open the question as to the precise burdens at trial, concluding that it "need not resolve the debate today. Whether or not the burden of the plaintiffs to prove bloc voting includes the burden to explain partisan influence, the result is the same. This is so even if the partisan voting is viewed as a defensive parry." *Id.* at 860.

### C.  The Complaint states a valid intentional discrimination claim in Count III.

The *Arlington Heights* framework is the test that governs intentional vote dilution claims brought under the Fourteenth Amendment and under Section 2. *See Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266–68 (1977); *see also Abbott v. Perez*, 138 S. Ct. 2305, 2346 (2018). "[I]n determining whether racially discriminatory intent existed," courts typically consider "circumstantial and direct evidence" of: (1) the discriminatory "impact of the official action," (2) the "historical background," (3) the "specific sequence of events leading up to the challenged decision," (4) departures from procedures or substance, and (5) the "legislative or administrative history," including any "contemporary statements" of the lawmakers. *Perez*, 138 S. Ct. at 2346 (citing *Arlington Heights*, 429 U.S. at 266–68).

Rather than heeding the test set out in *Arlington Heights*, Defendants attempt to have it both ways, arguing, as a matter of law, that discriminatory effect "is a necessary element of an intentional-discrimination claim" *and* that discriminatory effect "does not support an intentional discrimination claim." Mot. at 15–16. That makes no sense. The Supreme Court disclaimed both in *Arlington Heights*, writing that courts should consider "[t]he impact of the official action" and "whether 'it bears more heavily on one race than another'" as "an important starting point" for the intentional discrimination inquiry. 429 U.S. at 266 (quoting *Davis*, 426 U.S. at 242).

As Defendants themselves concede, *see* Mot. at 16–18, Plaintiff has thoroughly addressed the *Arlington Heights* factors in the Complaint, raising facts sufficient to infer that the legislature acted with discriminatory intent in drawing and implementing the three redistricting plans. The

Complaint proffers ample facts to make a reasonable inference that the enacted plans will have a dilutive effect on the voting strength of people of color in the State. The Complaint explains the methods by which the new maps dilute the voting strength of voters of color, by highlighting how voters of color were shuffled into and out of districts, Compl. ¶¶ 32, 96–105, and by pointing to missed opportunities for drawing majority-minority coalition districts in the geographical regions that experienced the most growth in people of color, *id.* ¶¶ 122, 128, 138–39. It also enumerates the past and present realities that render the State's electoral scheme less open for voters of color. For example, the history of discrimination touching the right to vote helps to explain the continuing inequalities in voting opportunities for Black and Latino voters, in particular. *Id.* ¶¶ 35–49. And the exponential growth of minority voters in the past decade presents a glimpse of the current demographic realities in Texas and stands in stark contrast to the new maps, which inexplicably have fewer districts in which minorities make up a numerical majority. *Id.* ¶¶ 25–34, 114, 145, 170–71, 177, 181, 192, 195–97, 203–04.

The Complaint also details the specific sequence of events leading up to the passage of the maps, noting the lightning-quick speed with which all three maps were drawn, approved, and passed. *Id.* ¶¶ 59–60. It alleges multiple departures from procedure, including the suspension of the regular order of business; the specific discarding of regular procedures; middle-of-the-night votes; shortened time for public testimony; and cancelled public hearings as the legislature focused on passing other controversial pieces of legislation. *Id.* ¶¶ 61, 63–71, 73–81, 86–94.

Referencing in detail the demographic changes in Texas's electorate over the past decade, the Complaint alleges facts sufficient to infer that the legislature manipulated populations based on race in the very districts that experienced the most demographic changes and in which the incumbent, the preferred candidate of choice of the Anglo electorate, was on the verge of losing.

*Id.* ¶¶ 30–34. The Complaint identifies several districts, including but not limited to Senate District 10, in which effective coalitions of Black, Latino, and Asian voters were dismantled and drawn as majority-Anglo districts. *Id.* ¶¶ 121–23, 174–75, 188. The Supreme Court has held that discriminatory purpose can be inferred from a legislature's decision to dismantle an effective crossover district in which minority voters were becoming sufficiently numerous to be able to elect a candidate of choice. *See Bartlett*, 556 U.S. at 24 ("if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments").

That Defendants take issue with the probative value of these facts is unsurprising and inappropriate for resolution by way of a motion to dismiss. *See Iqbal*, 556 U.S. at 696 ("*Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true. We made it clear, on the contrary, that a court must take the allegations as true, no matter how skeptical the court may be."). Because Plaintiff's Complaint sets forth facts ample to infer a discriminatory purpose in the enactment of the plans, Count III must stand.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

Date: December 23, 2021                                    Respectfully submitted,

                                                          */s/ Lindsey B. Cohan*
                                                          Lindsey B. Cohan
                                                          Texas Bar No. 24083903
                                                          DECHERT LLP
                                                          515 Congress Avenue, Suite 1400
                                                          Austin, TX 78701
                                                          (512) 394-3000
                                                          lindsey.cohan@dechert.com
                                                          *Attorney for Texas State Conference of NAACP*

Jon Greenbaum*
Ezra D. Rosenberg*
Pooja Chaudhuri*
Sofia Fernandez Gold*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street, Suite 900
Washington, DC 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org
sfgold@lawyerscommittee.org
*Attorneys for Texas State Conference of NAACP*

Neil Steiner*
Brian Raphel*
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com
brian.raphel@dechert.com
*Attorneys for Texas State Conference of NAACP*

Robert Notzon
Texas Bar No. 00797934
THE LAW OFFICE OF ROBERT
NOTZON
1502 West Avenue
Austin, Texas 78701
(512) 474-7563
robert@notzonlaw.com
*Attorney for Texas State Conference of NAACP*

Gary Bledsoe
Texas Bar No. 02476500
THE BLEDSOE LAW FIRM, PLLC
6633 E Highway 290, Suite 208
Austin, TX 78723
(512) 322-9992
garybledsoe@sbcglobal.net

*Attorney for Texas State Conference of NAACP, only as to the challenged state legislative districts*

Janette M. Louard
Anthony P. Ashton
Anna Kathryn Barnes
NAACP OFFICE OF THE GENERAL
COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
jlouard@naacpnet.org
aashton@naacpnet.org
abarnes@naacpnet.org
*Attorneys appearing of counsel*


*\*Admitted pro hac vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2021, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

> */s/ Lindsey B. Cohan*
> Lindsey B. Cohan