# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | |
|---|---|
| LULAC, *et al.*, <br><br>    *Plaintiffs,* <br><br> v. <br><br> GREG ABBOTT, in his official capacity as Governor of Texas, *et al.*, <br><br>    *Defendants.* | Case No.: 3:21-CV-00259-DCG-JES-JVB <br> [Lead Case] |
| ROY CHARLES BROOKS, *et al.*, <br><br>    *Plaintiffs,* <br><br> v. <br><br> GREG ABBOTT, in his official capacity as Governor of Texas, *et al.*, <br><br>    *Defendants.* | Case No.1-21-CV-00991-DCG-JES-JVB <br> [Consolidated Case] |

## ***BROOKS*** **PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION AS TO SENATE DISTRICT 10**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

    I.   Plaintiffs Are Likely to Succeed on their Intentional Discrimination Claims. .................. 2

        A.   The *Arlington Heights* Factors Demonstrate a Racially Discriminatory Purpose. .......... 3

            1.   Defendants Concede that the Dismantling of SD10 Bears More Heavily on Minority Voters.................................................................................................... 3

            2.   The Historical Background Supports a Finding of Intentional Discrimination...... 4

            3.   The Sequence of Events and Legislative History Demonstrate a Discriminatory Intent. ................................................................................................................. 8

            4.   Procedural and Substantive Departures Demonstrate a Racially Discriminatory Purpose............................................................................................................. 12

        B.   Plaintiffs Have Shown a Discriminatory Effect............................................................. 13

        C.   Defendants' Partisanship Defense Fails to Overcome Plaintiffs' Showing that Racial Discrimination Was a Factor in the Dismantling of SD10. ........................................... 17

            1.   Defendants' *Post Hoc* Invocation of Partisanship is Pretextual. .......................... 17

            2.   Plaintiffs' Alternative Maps Demonstrate that if Partisan Advantage Were the Legislature's Real Sole Motivation, it Would Have Achieved that Goal without Targeting Tarrant County Minorities................................................................. 19

    II.   Plaintiffs Are Likely To Succeed on their Racial Gerrymandering Claim. ................... 26

    III.   Plaintiffs Will Be Irreparably Harmed if SD10 Is Not Enjoined. ............................... 26

    IV.   The Public Interest and Balance of the Equities Favor Enjoining SD10. ..................... 27

CONCLUSION .................................................................................................................. 30

CERTIFICATE OF SERVICE .......................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez,*
   138 S. Ct. 2305 (2018) ............................................................................................. *passim*

*Abbott v. Equity Group, Inc.*
   2 F.3d 613 (5th Cir. 1993) ................................................................................................. 18

*Bartlett v. Strickland,*
   556 U.S. 1 (2009) ..................................................................................................... *passim*

*BST Holdings v. OSHA,*
   17 F.4th 604 (5th Cir, Nov, 12, 2021) ........................................................................ 26, 27, 30

*Burton v. City of Belle Glade,*
   178 F.3d 1175 (11th Cir. 1999) ........................................................................................ 15

*Cooper v. Harris,*
   137 S. Ct. 1455 (2017) ............................................................................................... *passim*

*De Leon v. Abbott,*
   791 F.3d 619 (5th Cir. 2015) ............................................................................................. 28

*De Leon v. Perry,*
   975 F. Supp. 2d 632 (W.D. Tex. 2014) ............................................................................... 28

*Deerfield Medical Center v. City of Deerfield Beach,*
   661 F. 2d 328 (5th Cir. Unit B Nov. 1981) ....................................................................... 26, 27

*Easley v. Cromartie,*
   532 U.S. 234 (2001) ......................................................................................................... 25

*Elrod v. Burns,*
   347 U.S. 373 (1976) ......................................................................................................... 26

*In re MCP No. 165,*
   No. 21-7000, et al. (Dec. 17, 2021) ................................................................................... 26

*Ingebretsen v. Jackson Public School Dist.,*
   88 F.3d 274 (5th Cir. 1996) .............................................................................................. 28

*Mississippi Freedom Democratic Party v. Democratic Party of State of Mississippi*
   362 F.60 (5th Cir. 1966) ................................................................................................... 29

*NLRB v. Fruit & Vegetable Packers & Warehouseman, Local 760,*
   377 U.S. 58 (1964) ........................................................................................................... 11

*Page v. Bartels*
   248 F.3d 175 (2001) ......................................................................................................... 29

*Perez v. Abbott,*
   253 F. Supp. 3d 864 (W.D. Tex. 2017) ....................................................................... *passim*

*Personnel Administrator of Massachussetts v. Feeney,*
   442 U.S. 256 (1979) ......................................................................................................... 12

*Reynolds v. Sims,*
   377 U.S. 533 (1964) ................................................................ 28, 30

*RNC v. DNC,*
   140 S.Ct. 1205 (2020) ...................................................................... 28

*Seamon v. Upham*
   536 F.Supp. 130 (E.D. Tex. 1982) ..................................................... 29

*Shelby County v. Holder*,
   133 S. Ct. 2612 (2013) ..................................................................... 30

*Texas v. United States*,
   887 F. Supp. 2d 133 (D.D.C. 2012) ......................................... *passim*

*Texas v. United States,*
   133 S. Ct. 2885 (2013) ....................................................................... 3

*Thompson v. Kemp*,
   309 F. Supp. 3d 1360 (N.D. Ga. 2018) ............................................. 16

*United States v. Brown*,
   561 F.3d 420 (5th Cir. 2009) ............................................................ 17

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) .................................................... 4, 7, 17

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252 (1977) .............................................................. 2, 3, 4, 6

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
   471 U.S. 626 (1985) .................................................................... 2, 18

**Statutes and Codes**

Tex. Elec. Code § 41.0075 .................................................................... 29

**Other Authorities**

All About Redistricting, https://redistricting.lls.edu/ ............................ 30

Texas Legislature Online, *Bill: Senate Bill 4*, https://capitol.texas.gov/BillLookup/History.a
   spx?LegSess=873&Bill=SB4 ........................................................... 28

# INTRODUCTION

The Constitution prohibits intentional racial discrimination whether the information necessary to execute that discrimination is displayed on a computer screen or "fixed in [the mapdrawer's] head." *Cooper v. Harris*, 137 S. Ct. 1455, 1477 (2017). Plaintiffs have proffered substantial evidence that the density of Fort Worth's minority population was fixed in the mapdrawers' heads and that the decision to crack apart SD10's minority population was motivated at least in part by race. As Republican Sen. Kel Seliger testified, Sen. Huffman knew Tarrant County voting was racially polarized, her statements regarding her redistricting motivations were repeatedly untrue and pretextual, and it was obvious to him that the effort to repeat the 2011 discriminatory scheme to crack apart SD10's minority population was unlawful discrimination.

Defendants respond by attacking Sen. Seliger's credibility, contending that his sworn testimony is untrue because, *inter alia*, he "has openly opposed Lieutenant Governor Dan Patrick's policy agenda on numerous occasions," Def. Br. at 15, an apparently new credibility metric. Defendants offer no testimony of their own on the merits, other than a declaration of Rep. King stating his pleasure with the redrawn SD10. Rather, they repeat page-by-page, for fifty pages, their lawyers' assertion—unsupported by any evidentiary submission—that partisanship was the exclusive motivation behind dismantling SD10. Defendants' attorneys' words are not evidence.

Plaintiffs have shown—with substantial evidence—that they are likely to succeed on the merits, that they face irreparable harm, and that the balance of equities and public interest compel issuance of a preliminary injunction to prevent Tarrant County minority voters from being subjected to an intentionally discriminatory 2022 election.

## ARGUMENT

**I.      Plaintiffs Are Likely to Succeed on their Intentional Discrimination Claims.**

Plaintiffs are likely to succeed on their claims that the dismantling of benchmark SD10—an effective crossover district for minority voters—was the product of intentional racial discrimination. As the Supreme Court has explained, "if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (Kennedy, J., Roberts, C.J., Alito, J., lead op.). Plaintiffs have made that showing, proffering substantial evidence that, assessed under the Supreme Court's framework for ascertaining discriminatory intent, *see Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), shows a racially discriminatory purpose as at least one factor in the dismantling of SD10, *see* Opening Br. at 26-36. Defendants offer scant response. *See* Def. Br. at 35-38.

Instead, Defendants rest their defense on three primary contentions: (1) that the testimony of Republican Sen. Kel Seliger, the prior Chair of the Senate Redistricting Committee, is "not credible" because he has "openly opposed Lieutenant Governor Dan Patrick's policy agenda on numerous occasions," Def. Br. at 14-15, (2) that the mapdrawers purportedly did not view "racial shading" on the computer screen, and (3) that SD10 was dismantled for exclusively partisan purposes. The evidence does not support these defenses. Indeed, their primary defense, Defendants cite no evidence at all, resting on their lawyers' say-so in briefing. That is not enough. *See, e.g., Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 648 (1985) ("We are not convinced. The State's arguments amount to little more than unsupported assertions:

nowhere does the State cite any evidence or authority of any kind . . . ."). Plaintiffs have met their burden to show they are likely to succeed on the merits of their intentional discrimination claims.

### A. The *Arlington Heights* Factors Demonstrate a Racially Discriminatory Purpose.

The *Arlington Heights* factors demonstrate a racially discriminatory purpose. Defendants devote little attention to the Supreme Court's framework for assessing intent, but the arguments they do advance are without merit.

### 1. Defendants Concede that the Dismantling of SD10 Bears More Heavily on Minority Voters.

Defendants concede that the dismantling of SD10 bears more heavily on minority voters. This is "an important starting point" to the *Arlington Heights* framework. 426 U.S. at 242. Plaintiffs explained, with evidentiary citations, that benchmark SD10 was performing to elect minority voters' preferred candidates, that SB4 reduced from one to zero the number of senate districts in Tarrant County—a majority-minority county with a population of 2.1 million—in which minorities could elect their preferred senate candidate, and that Black and Hispanic residents of benchmark SD10 testified during the legislative process about the representational harm this would cause them. Opening Br. at 26-27. Defendants offer no response, omitting from their brief any discussion of this "important starting point," *Arlington Heights*, 426 U.S. at 242, of the analysis, *see* Def. Br. at 35-38. Undoubtedly, this is because there *is* no response; it is apparent from the demographic and election data that the dismantling of SD10 bears more heavily on minorities and benefits Anglos. *See Texas v. United States*, 887 F. Supp. 2d 133, 163 (D.D.C. 2012), *vacated on other grounds*, 133 S. Ct. 2885 (2013) (Mem.) (noting that Texas's expert agreed that "there is little question that dismantling SD10 had a disparate impact on racial minority groups in the district").

## 2. The Historical Background Supports a Finding of Intentional Discrimination.

The recent "historical background" of SB4's dismantling of SD10 demonstrates "a series of official actions taken for an invidious purpose." *Arlington Heights*, 429 U.S. at 267. As Plaintiffs explain, *see* Opening Br. at 27-28; the legislature undertook the same discriminatory scheme to crack apart SD10's minority population in the last redistricting cycle and was found by a three-judge federal court to have done so "with discriminatory purpose as to SD 10." *Texas*, 887 F. Supp. 2d at 166. A nine-judge majority of the *en banc* Fifth Circuit held that this was a "contemporary example of State-sponsored discrimination" that could support a conclusion that a *different law*— Texas's voter ID law—was intentionally discriminatory under the *Arlington Heights* analysis. *Veasey v. Abbott*, 830 F.3d 216, 240 (5th Cir. 2016); *id.* at 275 n.54. And in 2017, a three-judge federal court concluded that the legislature intentionally discriminated against Tarrant County minorities by cracking them across multiple congressional districts where their votes would be diluted by Anglo voters. *See Perez v. Abbott*, 253 F. Supp. 3d 864, 961 (W.D. Tex. 2017); *id.* at 986 (Smith, J., dissenting) (agreeing with majority that cracking of Tarrant County minorities was intentionally discriminatory). Defendants contend these cases are "[i]napposite, Def. Br. at 21, but that is plainly not so.

*First*, Defendants contend that the 2011 Legislature's discriminatory intent in dismantling SD10 is irrelevant because "in the last round of Texas redistricting, the Supreme Court specifically faulted the district court" for requiring the State to show that its 2013 enactment of the interim court-ordered plans had purged the discriminatory taint in the 2011 plans. Def. Br. at 21. But the Supreme Court did not say that a prior legislature's discriminatory intent is irrelevant, but rather that prior intentional discrimination does not "flip[] the evidentiary burden" of proving a subsequent legislature acted with discriminatory intent from plaintiffs to defendants. *Abbott v.*

4

*Perez*, 138 S. Ct. 2305, 2325 (2018). Indeed, the Court reaffirmed the *Arlington Heights* framework and explained that "the historical background" is "one evidentiary source relevant to the question of intent." *Id.* at 2326 (internal quotation marks omitted). The Court emphasized that "we do not suggest [ ] that the intent of the 2011 Legislature is irrelevant," but instead that it is "relevant to the extent [it] . . . naturally gives rise to—or tend[s] to refute—inferences regarding the intent of the 2013 Legislature." *Id.* at 2327. The discriminatory intent of the 2011 Legislature "must be weighed together with any other direct and circumstantial evidence of that Legislature's intent." *Id.*

In *Perez*, the Supreme Court explained that this assessment weighed against a finding that the 2013 Legislature acted with discriminatory intent because it "did not reenact the plan previously passed by its 2011 predecessor[,] [n]or did it use criteria that arguably carried forward the effects of any discriminatory intent on the part of the 2011 Legislature." *Id.* at 2325. Ultimately, the Court credited Texas's primary defense: "the Legislature adopted the court-approved interim plans," *id.* at 2328, and, given the *Perez* district court's "careful analysis" in imposing those plans, the Legislature had "good reason to believe that the court-approved plans were legally sound." *Id.* In reaching that conclusion, the Court specifically credited the explanation offered by Sen. Seliger, *id.* at 2317, 2329, whom the State now says is "not credible" because the Lieutenant Governor no longer likes him, Def. Br. at 14-15.

The Supreme Court's *Perez* decision hardly aids Defendants because this case presents the *precise inverse* facts. Here, the Legislature has dismantled benchmark SD10—the exact court-approved interim plan the 2013 Legislature had enacted to remedy the judicial finding of intentional discrimination—and reverted to the 2011 approach of cracking apart Tarrant County's minority population to dismantle SD10 as a performing crossover district for minority voters. In

doing so, the Legislature has *ignored*—rather than implemented—multiple federal court rulings regarding SD10 specifically and Tarrant County redistricting generally. If *adopting* a court-ordered plan aimed at remedying intentional discrimination suggests the absence of discriminatory intent, then surely *rejecting* that same plan in favor of the scheme held to be intentionally discriminatory in the first place "naturally gives rise to . . . .inferences regarding the [discriminatory] intent of the [2021] Legislature." *Id.* at 2327.

*Second*, Defendants contend that the three judicial decisions are irrelevant because they "addressed different maps passed by different legislators." Def. Br. at 21. But Sen. Huffman was a member of the redistricting committee in both 2011 and 2013, knew as a result about Fort Worth's substantial minority population and that voting in Tarrant County was racially polarized, Ex. 1 ¶ 9, and was the Chair of the redistricting committee this year. Her involvement in that process, and the knowledge she gained from it, is plainly relevant to her state of mind when she was placed in charge of the process this cycle. In any event, the *Arlington Heights* historical background inquiry is not so limited. Indeed, the *en banc* Fifth Circuit in *Veasey* cited actions from 1975 and discrimination in redistricting—including with respect to SD10—in noting that the historical background of the voter ID law (a different topic) could support a finding of intentional discrimination under *Arlington Heights*. 830 F.3d at 240.

*Third*, Defendants contend that the *Texas* decision was vacated and had reversed burdens of proof under Section 5. Def. Br. at 22. Similarly, they contend—quoting a dissenting opinion from *Veasey*, that if the case "says anything about SD10" it is that "[v]acated opinions have no precedential or persuasive value." Def. Br. at 23 (internal quotation marks omitted). But the *dissent* from *Veasey* is not law, the majority opinion is. And the *en banc* majority specifically rejected the dissent's view. The majority acknowledged the different burden of proof in the preclearance

context, 830 F.3d at 257 n.54, but nevertheless maintained that the decision was relevant to the *Arlington Heights* analysis, *id.* at 240.[1] And the majority explained that "[o]ne of the dissenting opinions seeks to discredit [*Texas*] because it was vacated after *Shelby County* was decided. However, the opinion was not vacated on the merits and remains factually relevant as a contemporary example of State-sponsored discrimination based on the finding of a three-judge federal court." *Id.* Defendants' contention that this Court should follow the rejected rationale of the dissent and not the binding majority opinion of the *en banc* Fifth Circuit is lawless. In any event, Defendants omit the dissent's ultimate conclusion: "The 2013 Texas Legislature subsequently repealed its original plan and adopted the court's interim plan in full. The remediation undertaken by the Texas Legislature undermines any inference of an intent to discriminate . . . ." *Id.* at 301 n.36 (Jones, J., dissenting). As the Supreme Court's *Perez* decision illustrates, *see supra*, the abandonment of that remediation raises the opposite inference here.

*Fourth*, Defendants contend that the 2017 *Perez* decision concluding that the Tarrant County congressional districts were intentionally discriminatory is irrelevant because it was about "*congressional districts.*" Def. Br. at 22 (emphasis in original). Other than italicizing the phrase, Defendants do not explain why intentionally cracking apart Tarrant County minority voters is unlawful if done in a congressional plan but lawful if done in a state senate plan. The difference is particularly irrelevant given that the person who redrew SD10 in 2021 was counsel of record in *Perez*, and thus fully aware of the court's rulings regarding intentional vote dilution in Tarrant County and aware, as a lawyer, that intentional discrimination is unlawful regardless of the type

---

[1] Perhaps this was in part because the three-judge *Texas* court unanimously concluded not only that the State had failed to meet *its* burden, but that the Davis Intervenors had proffered sufficient evidence to affirmatively conclude that the dismantling of SD10 was done with discriminatory intent. *Texas*, 887 F. Supp. 2d at 166.

of redistricting plan in which it occurs. Opening Br. at 39. Notably, the *Perez* plaintiffs bore, and met, the burden of proof to show that cracking apart Tarrant County's minority voters was intentionally discriminatory.

### 3. The Sequence of Events and Legislative History Demonstrate a Discriminatory Intent.

The sequence of events and legislative history of SB4 demonstrate a discriminatory intent. Plaintiffs addressed these factors at length, citing Sen. Seliger's testimony about the knowledge Sen. Huffman and other senators had about the 2012 court decisions regarding SD10, his testimony that Sen. Huffman's explanations regarding the motivations for changing SD10 were "pretext," the handwritten notes reflecting Sen. Huffman's aide, Mr. Opperman, stating in 2020 that SD10 would only be "tweaked" in light of its near-ideal population, the shifting explanations offered for SD10's reconfiguration, Sen. Huffman's reliance on demonstrably nonsensical population balancing justifications, and the fact that neither Sen. Huffman nor Ms. Mackin needed racial shading to know about Fort Worth's large minority population. Opening Br. at 28-34. Defendants ignore much of these facts; what arguments they do make are unfounded.

*First*, Defendants abandon Sen. Huffman's explanation for the population movement, and instead proffer—without evidentiary citation—a new explanation. During the legislative process, Sen. Huffman repeatedly insisted that SD10 (which was near ideal population) "needed population," Ex. 6K at 15, from overpopulated districts to the north and northeast, SD8, SD12, and SD30, but Sen. Powell eviscerated this rationale in her colloquy with Sen. Huffman during the floor debate. *See id.*; *see also* Opening Br. at 19-20. In their brief, Defendants offer a new explanation—one apparently created by counsel. Defendants explain that "a number of counties in North Texas and the panhandle needed population," Def. Br. at 8, citing SD28 in particular, which was "15.3% smaller than the ideal district size," Def. Br. at 7. "Given these circumstances,

8

the Republican majority decided to add several Republican-leaning counties in North Texas and the panhandle to SD10, and remove several blue areas in and around Tarrant County." Def. Br. at 9.

This *post hoc* assertion by Defendants' counsel does not add up. SD28's *underpopulation* did not create a reason to *remove* Shackelford and Stephens Counties and give them to SD10. SD28 needed to *add* counties, not *subtract* counties. Nor did SD28—or any district from which it gained population—take population from "several blue areas in and around Tarrant County." Def. Br. at 9. Rather, as the "Plan Overlap Report"—which shows how population shifted from the benchmark plan to SB4—shows, SD28 gained population from only SD24, SD30, and SD31. Ex. 45. SD30 gained population from SD8 and SD12, *id.* and SD12 in turn gained just 37,963 people from benchmark SD10, *id.* That population came from the Colleyville area—one of the most Republican parts of benchmark SD10. *Compare* Ex. 18 *with* Ex. 25. Defendants' latest population justification—a *post hoc* invention of counsel—makes no more sense than the first. In reality, the data show that the most significant population shift SB4 made was transferring nearly 180,000 people—the vast majority Anglo—from Johnson County in benchmark SD22 to SD10, in exchange for SD22 taking over 122,000 Tarrant County residents—the majority of whom are minorities—from benchmark SD10. Ex. 45; Ex. 7 at 7-9. The evidence shows both Sen. Huffman's and Defendants' counsels' explanations to be *post hoc* pretext.

*Second*, Defendants contend that Ms. Mackin's involvement as counsel for the State in the *Perez* case is irrelevant to whether SB4 was drawn with discriminatory intent because she was "a lawyer defending her client." Def. Br. at 24. This misses the point. Plaintiffs do not suggest there was something untoward about Ms. Mackin's legal work; rather Plaintiffs have proffered evidence—including exhibits with Tarrant County racial shading with which Ms. Mackin worked

closely—to show that her extensive knowledge of the location and density of minority populations from the *Perez* case severely undermines Defendants' contention it was "impossible" for race to have played a part in the line drawing because they contend "the district lines were drawn without racial shading turned on." Def. Br. at 44. *See Cooper v. Harris*, 137 S. Ct. 1455, 1477 (2017) ("Whether the racial make-up of the county was displayed on [the] computer screen or just fixed in [the mapdrawer's] head," the "denial of race-based districting 'r[ang] hollow'" (citation omitted; alteration in original)). The evidence Plaintiffs have proffered shows that neither Ms. Mackin nor Sen. Huffman required racial shading to know that cleaving SD10's portion of Fort Worth in half would crack apart its minority population.

*Third*, Defendants contend that the Redistricting Committee's repeated distribution of maps displaying racial data in the period leading up to the mapdrawing in August 2021 is irrelevant because Plaintiffs have not proved that "Sen. Huffman *used* them to draw S2168." Def. Br. at 24 (emphasis in original). But Sen. Huffman suggested she did just that. During the floor debate, Sen. Powell and Sen. Huffman had the following exchange:

**Sen. Powell:**      Were there any printed maps used to compare?

**Sen. Huffman:**      I thin[k] that we had many printed maps there in the redistricting office that had been prepared for the eventuality of having public hearings. In fact, we still have boxes full of printed maps but because the public hearings were not held, we had an excessive number of printed maps. So, yeah, there were printed maps around. *Sometimes I keep one, even on my desk to look at as we go through the process because it's a quick reference. Some of them have population numbers by county, you know, and other useful information that is a quick reference while performing the job.*

Ex. 6K at 5 (emphasis added). The only paper or electronically transmitted maps Sen. Powell or her staff were provided by Sen. Huffman and her staff—in person during meetings in the redistricting office and on the Committee's Dropbox—show the population deviation for each district and its surrounding districts, and the racial data for each district. Exs. 3 ¶¶ 9-13, 3A, 3C,

3D. In any event, Sen. Huffman and her staff *handed these maps out*. The suggestion that they were oblivious to their contents is not credible.

*Fourth*, Defendants contend that there was "nothing suspicious" about Sen. Huffman telling other people (none of whom she could remember) for months that SD10 was changing despite Mr. Opperman's statement that SD10 would *not* be meaningfully changing. Def. Br. at 35. But the *Texas* court found similar evidence indicative of discriminatory intent. 887 F. Supp. 2d at 164. In any event, the contradictory statements undermine Sen. Huffman's credibility. Not only was Sen. Powell directly misled, but Sen. Huffman's contention that she discussed the dismantling of SD10 "over the months" cannot be squared with her contention that the decision to reconfigure SD10 was motivated by the need to shed population for nearby districts—a fact that could only be known upon the release of Census data. Opening Br. at 31-32.

*Fifth*, Defendants concede that every member of the legislature received racial shade maps circling the minority populations that SB4 cleaved apart. Def. Br. at 37-38. But they contend that "the legislators were free to disregard" them because "legislative opponents . . . understandably tend to overstate [a bill's] reach." Def. Br. at 37 (quoting *NLRB v. Fruit & Vegetable Packers & Warehouseman, Local 760*, 377 U.S. 58, 66 (1964)). But neither Defendants—nor any legislator— disputed the veracity of the maps Sen. Powell distributed, nor her identification of where SB4 cracked the minority population.[2] Nor could they. And while Defendants emphasize that awareness of racially discriminatory consequences is not the same as unlawful intent, the Supreme Court has explained that "a strong inference that the adverse effects were desired can reasonably

---

[2] Defendants contend that Sen. Powell "attempt[ed] to inject race into the Legislature's consideration of SD10." Def. Br. at 37. No—she shined the light on the Legislature's race-based, and racially discriminatory, line-drawing.

be drawn." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 379 n.25 (1979). Defendants offer

no evidence that this strong inference should be ignored here.

### 4. Procedural and Substantive Departures Demonstrate a Racially Discriminatory Purpose.

The enactment of SB4 featured procedural and substantive departures that evidence a

discriminatory purpose. Defendants do not dispute that it departed from normal redistricting

procedures for Sen. Huffman to forego any legal advice about Voting Rights Act and constitutional

compliance during the line drawing process—or to make any intentional effort to *comply* with

these laws while drawing the map. Rather, they contend that Sen Huffman sought legal advice

afterwards and, apparently by luck and chance, the first draft was deemed compliant by the Office

of the Attorney General. Def. Br. at 36; Ex. 14 at 17, 21; Ex. 6K at 25.

Defendants contend that the House Committee's refusal to allow invited expert witness

testimony and to provide resources witnesses, which Rep. Turner testifies is a sharp departure from

the procedural norm, Ex. 5 ¶¶ 7, 9, is explained by the delay in Census data caused by the COVID-

19 pandemic. Def. Br. at 36-37. But Chair Hunter did not cite the pandemic or Census delay to

explain his refusal. Ex. 5 ¶¶ 7, 9. Moreover, Defendants cite the Supreme Court's conclusion that

the brevity of the 2013 redistricting process did not suggest a discriminatory intent, Def. Br. at 36-

37 (quoting *Perez*, 138 S. Ct. at 2328-29), but the Supreme Court said that was so because the

adoption of the court-approve plans "did not require a prolonged process." *Perez*, 138 S. Ct. at

2329. A rushed process to *repeal* the court-approved plan and replace it with one that mimics the

court-*disapproved* plan is something entirely different.

Defendants do not dispute that the senate plan reflects a substantive departure from the

congressional, state house, and state Board of Education plans, all of which maintain the Fort

Worth minority community in a single district. Opening Br. at 35. Nor do they deny that it was as

substantive departure to redraw SD10 to be an Anglo-majority district including territory from *seven* benchmark senate districts—the most of any district in SB4, *see* Ex. 45[3]—at the same time Sen. Huffman rejected a new Hispanic majority district because it "combines communities that have not been jointly represented in the senate in previous years." Ex. 6K at 63. Rather, Defendants contend that repeating their 2013 approach of adopting court-ordered plans—an approach that won the day in the Supreme Court—would somehow be the substantive departure. Def. Br. at 37. Finally, they cite the declaration of Rep. Phil King—the *only* fact witness declaration they proffer outside those related to election deadlines—to argue that SD10 is explainable by shared roads and some governmental boundaries that overlap between Tarrant and neighboring counties. Def. Br. at 37. But Rep. King did not draw the senate plan, and Sen. Huffman cited none of these explanations to justify the reconfigured district. *See* Ex. 6K at 12; Opening Br. at 20.

Plaintiffs have met their burden to show they are likely to succeed on their discriminatory intent claims under the *Arlington Heights* framework; Defendants have offered no contradictory evidence.

### B.    Plaintiffs Have Shown a Discriminatory Effect.

Plaintiffs have demonstrated that SB4 achieves its discriminatory purpose by having a discriminatory effect—Black and Latino voters will no longer have an opportunity to elect their preferred candidate in SD10. Defendants do not dispute that Sen. Powell received the overwhelming support of Black and Latino voters in the 2018 election, *see* Ex. 7 ¶ 10, that the benchmark district is one in which candidates preferred by minority voters in SD10 prevail in most recent elections, *id.*, that SB4 converts SD10 from a majority-minority voting age population district to a majority Anglo voting age population district, with a 10 percentage point increase in

---

[3] Plaintiffs mistakenly undercounted the number as four in their opening brief.

its Anglo population, *id.* ¶ 12, or that the SB4 will make it near impossible for minority-preferred candidates to be elected, *id.* at 20. Indeed, Defendants do not even mention—and therefore concede—that the redrawing of SD10 bears more heavily on minorities. *See supra* Part I.A.1.

Rather, Defendants contend that in addition to proving a racially discriminatory purpose, Defendants must also prove all the elements of a Section 2 effects claim, including the three *Gingles* preconditions and totality of the circumstances. Def. Br. at 26-27; 38-42. Defendants devote more pages of their brief to this argument than to their *Arlington Heights* discussion. Defendants' contention that Plaintiffs' must satisfy the elements of an entirely different statutory legal claim to prove their constitutional intentional discrimination claim—a statutory claim whose central feature is the *absence* of proof of intent—makes no sense.

The Supreme Court's *Bartlett* decision shows why. In *Bartlett*, the Supreme Court held, as a matter of statutory construction, that Section 2 did not require the *creation* of crossover districts—districts where minority voters form less than a majority but succeed in electing their preferred candidates with help from some Anglo crossover voters. 556 U.S. at 14-17. Crossover districts, the Court reasoned, do not satisfy the first *Gingles* precondition, and may not satisfy the third either depending upon the magnitude of white crossover voting in a region. *Id.* at 15-16. At the same time, the Supreme Court explained that "if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Id.* at 24.

The Supreme Court's warning that intentionally destroying a crossover district violates the Fourteenth and Fifteenth Amendments forecloses Defendants' contention that those same constitutional provisions only protect against the intentional destruction of *majority-minority* districts that satisfy the *Gingles* test. The definitional feature of a crossover district is that its

14

minority population is not a majority of the district's voting population. Defendants' contention that *Gingles* prong one must be established to show intentional racial discrimination in redistricting thus makes no sense. Likewise, as Defendants note, *see* Def. Br. at 42, the third *Gingles* prong— white bloc voting that is usually sufficient to defeat minority-preferred candidates—may not be present in a crossover district. Yet the Supreme Court explained that intentionally destroying such a district would violate the Constitution. That cannot be if a plaintiff must prove *Gingles* prong three.[4]

Likewise, Defendants' focus on whether Black and Latino voters choose the same candidates in the Democratic *primary* is misplaced. Def. Br. at 39-41. While that inquiry may be relevant to determining whether a coalition of minorities have a Section 2 statutory right to the creation of a *new* district, it has no bearing on whether the State has violated the Fourteenth and Fifteenth Amendments by "destroy[ing] [an] otherwise effective crossover district[]." *Bartlett*, 556 U.S. at 24. Whether a crossover district is "effective" is measured by whether minority preferred candidates are *elected* notwithstanding the minority group's sub-majority population status, not who votes for whom as a party's nominee in low turnout primary elections. Defendants do not dispute that Black and Latino candidates have joined in SD10 to *elect* their mutually preferred candidates. Nor could they.

Defendants rely upon an Eleventh Circuit case from 1999, *Burton v. City of Belle Glade*, 178 F.3d 1175 (11th Cir. 1999), to contend that a discriminatory intent claim regarding

---

[4] Defendants miss the point on *Gingles* prong three and crossover districts. Although Anglo voters *within* the crossover district may exhibit less bloc voting against minority-preferred candidates, white bloc voting *surrounding* the crossover district may be extreme. Such is the case here, as evidenced by SB4's dismantling of SD10 and replacing it with a district characterized by extreme white bloc voting, Ex. 7 ¶ 21 something Defendants do not deny—in fact celebrate—will usually result in the defeat of minority preferred candidates.

redistricting requires proof of a Section 2 statutory violation. Def. Br. at 26. But *Burton* involved only a statutory claim under Section 2, not constitutional claims. *Id.* at 1201. Likewise, Defendants highlight this quotation from a 2018 Georgia district court case: "All three *Gingles* preconditions [must] be shown in order to make a viable discriminatory intent claim." Def. Br. at 27 (quoting *Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1366-67 (N.D. Ga. 2018). But Defendants omit that the *Thompson* court cabined this conclusion to plaintiffs' *statutory* intent claim under Section 2, and dismissed the constitutional intent claims without prejudice because the plaintiffs' "declined [the Court's] invitation" to brief the issue of what type of discriminatory effect must be provided to accompany a constitutional claim. *Id.* at 1366.

     *Gingles* is not a constitutional test. It is a statutory one. Unconstitutional race discrimination is not defined by a statute. By definition, a statute cannot dictate the contours of a constitutional violation. In light of *Bartlett*'s explanation that the intentional destruction of the crossover district is what violates the Fourteenth and Fifteenth Amendments, the discriminatory effect that must accompany proof of discriminatory intent is proof that the Legislature *succeeded* in destroying the crossover district.  That *is* the requisite effect that makes the legal claim cognizable, and Defendants do not deny that SD10 has been dismantled as an effective crossover district. *See also Perez*, 253 F. Supp. 3d at 962 (ruling that sufficient discriminatory effect was established to accompany discriminatory intent where "minorities are kept at levels where they cannot elect representatives of their choice"). Defendants' long discussion of *Gingles* is wholly misplaced.[5]

---

[5] *Bartlett* also forecloses Defendants' contention that Plaintiffs' cannot advance a Fifteenth Amendment claim. Def. Br. at 42-43. The Supreme Court expressly stated that *both* the Fourteenth and Fifteenth Amendments would be violated by the intentional destruction of an effective crossover district. *Bartlett*, 556 U.S. at 24.

* * *

Defendants contend that Plaintiffs' "theory is that the supposedly racist Legislature set its sights on a white incumbent from the Fort Worth area. That makes no sense." Def. Br. at 34. Defendants misunderstand the facts and law. An intent claim does not turn on proving the Legislature, or any legislator, is "racist." *See Perez*, 253 F. Supp. 3d at 948. And Plaintiffs' claim is not that the Legislature discriminated against *Sen. Powell*, but rather that it discriminated against Tarrant County's minority voters by intentionally diluting their ability to elect their preferred candidate, whatever that person's race. *Cf. Thornburg v. Gingles*, 478 U.S. 30, 67 (1986) ("[I]t is the *status* of the candidate as the *chosen representative of a particular racial group*, not the race of the candidate, that is important.") (emphasis in original).

### C.   Defendants' Partisanship Defense Fails to Overcome Plaintiffs' Showing that Racial Discrimination Was a Factor in the Dismantling of SD10.

Defendants' partisanship defense—the central theme of their brief—does not overcome Plaintiffs' showing that race was a factor in the dismantling of SD10. "'[R]acial discrimination need only be one purpose, and not even a primary purpose,' of an official action for a violation to occur." *Veasey*, 830 F.3d at 230 (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)). So even if Defendants were correct that partisanship was *also* a motivating factor, that is insufficient to overcome Plaintiffs' showing that race was *a* motivating factor.

#### 1.   Defendants' *Post Hoc* Invocation of Partisanship is Pretextual.

Defendants proffer no actual *evidence* that partisanship drove the decision to dismantle SD10 to the exclusion of *any* racial motivation. Plaintiffs submitted sworn testimony and substantial direct and circumstantial evidence showing that race was *a* motivating factor in the destruction of SD10; Defendants sole evidentiary response is a declaration from Rep. King expressing his satisfaction with the redrawn SD10. No declaration from Sen. Huffman. No

declaration from Ms. Mackin, And no declaration from Mr. Opperman. *Nothing*. Rather, Defendants' lawyers offer the unsupported factual assertion that "[f]rom the beginning, the Republican-controlled Senate majority set out to bolster Republican support in the highly contested Senate District 10." Def. Br. at 1. They repeat that over and over, without citing any evidentiary submission, throughout their brief. *See, e.g.*, *id.* at 5, 6, 7, 9, 10, 11, 16, 17, 18, 20, 28, 29, 31, 33, 34, 37, 43, 45. But the assertions of Defendants' lawyers in a legal brief are not evidence, and their repetition does not change that. *See Zauderer*, 471 U.S. at 648 ("We are not convinced. The State's arguments amount to little more than unsupported assertions: nowhere does the State cite any evidence or authority of any kind . . . ."); *Cf. Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 619 (5th Cir. 1993) ("[U]nsupported assertions are not competent summary judgment evidence.").

The actual evidence contradicts Defendants' unsupported assertions. "From the beginning," contrary to Defendants' contention, Def. Br. at 1, Sen. Huffman's top aide, Mr. Opperman, said that "[v]ery little change would be necessary for your all being you're close to ideal size. I wouldn't anticipate much movement for you, other than slightly tweaking your district." Ex. 4A. As Plaintiffs explained, Sen. Huffman's scripted remarks only once mentioned "partisan considerations," and only after she heard hours of testimony after the maps were drawn that they were racially discriminatory. Opening Br. at 36-37. She later abandoned this script for the first one, and when Sen. Powell later read aloud the first list and asked whether "[t]hese were *the* goals that you followed," Sen. Huffman responded "[l]iterally speaking, yes." Ex. 6K at 7 (emphasis added). Moreover, Sen. Powell then specifically asked Sen. Huffman to identify "the main reason [ ] that you changed SD 10 from its current configuration," and she responded "[a]ll of the redistricting priorities that I previously stated, *that you have stated as well*." Ex. 6K at 16

(emphasis added). This was the list of criteria—not a single of which was "partisan gerrymander[ing]" as Defendants' counsel now contend, Def. Br. at 43—that the senators confirmed minutes earlier. Defendants' contention that "the weight of the evidence," Def. Br. at 28, shows that the reconfiguration of SD10 was motivated solely by a desire to engage in a partisan gerrymander—a contention they make *without citing evidence*—cannot withstand Sen. Huffman's own words to the contrary.

Defendants seize on Sen. Powell's and Sen. Johnson's acknowledgement that SB4 makes it impossible for a Democrat to win SD10. Def Br. at 1. This misses the point. Sen. Powell repeatedly explained that she was the candidate of choice of Tarrant County's minority voters, and that Tarrant County's minority voters preferred Democratic candidates. *See, e.g.*, Ex. 6K at 21, 23. Sen. Huffman herself explained that "a crossover district is when the majority in the district crosses over to vote with minorities to . . . elect their candidate of choice." Ex. 6K at 39. The fact that SB4 destroys minority voters' ability to elect their preferred candidates—who in SD10 happen to be Democrats—does not make it a partisan gerrymander devoid of racial motivations. Were it so, the Supreme Court's warning in *Bartlett* that intentionally destroying a crossover district would be unconstitutional race discrimination would be entirely empty. The loud invocation of partisanship by Defendants' lawyers is belied by the evidence.

### 2. Plaintiffs' Alternative Maps Demonstrate that if Partisan Advantage Were the Legislature's Real Sole Motivation, it Would Have Achieved that Goal without Targeting Tarrant County Minorities.

Plaintiffs' alternative maps demonstrate that if partisan advantage were the Legislature's real sole motivation, it would not achieve that goal without targeting Tarrant County minorities. As the Supreme Court has instructed, a map like those proffered by Plaintiffs is "key evidence in a race-versus-politics dispute" and is a "highly persuasive way to disprove [the] State's contention

that politics drove a district's lines" because "it shows that the legislature had the capacity to accomplish all its partisan goals without moving so many members of a minority group." *Cooper*, 137 S. Ct. at 1479. The dissenting justices who would have *required* the proffer of an alternative plan (in racial gerrymandering suits) expressed the view that an alternative plan would suffice to "distinguish[ ] between racial and political motivations" in states with racially polarized voting, and was a "sound" approach for a plaintiff to overcome the "burden[ ] of production and persuasion" as well as the "presumption that the plan was drawn for constitutionally permissible reasons." *Id.* at 141 (Alito, J., dissenting).

The "highly persuasive" character of the evidence is magnified here where the approach to partisan gain demonstrated by Plaintiffs' alternative plans was recently the subject of judicial approval—in a case where the Legislature's mapdrawer was counsel of record—while the Legislature's purported approach to partisan gain was judicially rejected as intentional racial discrimination. *See Perez*, 253 F. Supp. 3d at 897 ("The Legislature could have simply divided Travis County and Austin Democrats among five Republican districts."); *id.* at 985 (Smith, J., dissenting) (noting that "fragmenting Travis County into relatively harmless parts, rather than a unified political force" was lawful and that "in terms of what redistricting law requires, the differences between DFW and Travis County . . . are dramatic"). Moreover, the Supreme Court had just held—in the same case in which the Legislature's mapdrawer was counsel of record— that relying on federal court orders, and not reenacting the plans or criteria judicially rejected as discriminatory, had insulated the State from legal challenge. *See Perez*, 137 S. Ct. at 2325, 2328.

Defendants contend that "[a] map cannot support an inference of racial discrimination unless [five] conditions are met." Def. Br. at 29. They cite eight pages from two Supreme Court cases and one Fifth Circuit case (a Section 2 results case) to support this purported five-part test.

Def. Br. at 29. None of the cases require this five-part test—Defendants invented it. Their effort to overcome the force of Plaintiffs' alternative maps fails.

*First*, Defendants contend that the alternative map is irrelevant if it was not provided to, and rejected by, the Legislature. Def. Br. at 29. This misses the point of the exercise, which is to show what the Legislature would have done *on its own* while *drawing* the plan if its motivation were truly exclusively partisan, and not in part racial. It is "would-have, could-have" evidence, *Cooper*, 137 S. Ct. at 1479, about the mapdrawer's intent while drawing the map. Neither *Cooper*, nor the other cases Defendants cite, suggest the alternative map must have been presented and rejected in the legislative process. Indeed, Justice Alito discussed the alternative map as arising from litigation *after* the challenged plan is enacted. *See, e.g.*, *id.* at 1491 (noting that challengers "are almost always sophisticated litigants . . . with the assistance of experts" and that "if it is indeed possible to find a map . . . it should not be too hard for the challengers to do so"). Not only does Defendants' purported rule misunderstand the evidentiary purpose of the alternative map, it would also be bizarre. For example, Sen. Huffman never said her goal was to achieve a partisan gerrymander—the opposing party is not obligated to propose a detrimental partisan gerrymander on their own in order to later submit circumstantial intent evidence in court about the mapdrawer's state of mind while drawing the map.[6] Finally, Defendants' dismissal of *Perez*'s 2017 blessing of

---

[6] Defendants also cite the "severely compressed schedule," but that was all the more reason to follow the *Perez* court's lead on acceptable partisan gerrymandering in Travis County rather than unlawful intentional racial discrimination in Tarrant County if the motive were in fact truly exclusively partisan gain. *See Perez*, 138 S. Ct. at 2329. As Justice Alito explained, the State—just like Plaintiffs—is "sophisticated" and "can churn out redistricting maps that control for any number of specified criteria." *Cooper*, 137 S. Ct. at 1491 (Alito, J., dissenting). Moreover, Defendants cite the legislature's need to also draw the House, Congress, and SBOE maps, but the record reflects that Sen. Huffman, Ms. Mackin, and Mr. Opperman only drew the Senate and SBOE plans. *E.g.*, Ex. 14 at 5-6; Sept. 30, 2021 Senate Select Redistricting Comm. Hr'g at 31:55-32:40 (noting that congressional plan was provided by attorney Chris Gober).

a Travis County partisan gerrymander as an "old court opinion[]" is unpersuasive—it was Texas's most recent litigation about redistricting, the mapdrawer was an attorney in the case, and Texas won a 2018 Supreme Court decision by adopting judicially-sanctioned mapdrawing.

*Second*, Defendants seize on a footnote from Plaintiffs' motion, *see* Opening Br. at 39 n.11, to contend that the map could not have been adopted by the Legislature because "Plaintiffs cannot even bring themselves to contend their demonstration maps are lawful," Def. Br. at 30. Defendants miss the point. Plaintiffs' footnote merely explains that the sole focus of their alternative maps is to demonstrate that Travis County, not Tarrant County, would have been the target of a partisan gerrymander free of racial intent. Plaintiffs had to fit those changes into a statewide map, and their point is that they merely aimed to hew closely to SB4 in doing so.  If some *other* aspect of SB4 is later challenged or found unlawful, the *Brooks* Plaintiffs' sole point is that their alternative map did not consider or assess other aspect of SB4. Because the Legislature *did* enact those other aspects of SB4, Defendants' argument that it could *not* have—citing the *Brooks* Plaintiffs' footnote—is nonsensical.

*Third*, Defendants offer two reasons to contend that "Plaintiffs' proposed map does not achieve the Legislature's political goals nearly as well as the plan the Legislature actually adopted." Def. Br. at 31. They contend that "[a]llowing [Austin Democratic] Sen. Eckhardt to essentially run as an incumbent would be a poor way for Republican legislators to advance their partisan goals." Def. Br. at 31. This makes no sense—Plaintiffs could not draw Sen. Eckhardt *out of Texas*. In SB4, President Biden received 74.4% of the vote in SD14 (Sen Eckhardt's district). Ex. 24. In Plaintiffs' alternative plans, Sen. Eckhardt resides in SD24, where President Biden received 41.4% of the vote. Exs. 36, 42. The contention that Republicans would face the risk of Sen. Eckhardt winning that district is not credible. Indeed, SB4 likewise allows Sen. Powell to run

22

as an incumbent in SD10, a district where President Biden received the *precise same* share of the vote—41.4%. Ex. 24. In this regard, the plans are equally beneficial to Republicans.

Defendants' second contention is that "Plaintiffs' versions of SD24 do not include the residence of former Senator Pete Flores, who is running for SD24 and has been endorsed by the Lieutenant Governor as well as Sen. Buckingham." Def. Br. at 31. Former Sen. Flores lives just precincts away from the border of SD24 in Plaintiffs' alternative maps, Exs. 32, 38, and Plaintiffs have altered those maps to include former Sen. Flores's residence in the attached Alternative Map 3, *see* Ex. 46, and Alternative Map 4, *see* Ex. 54. The change has no material effect on the maps and eliminates Defendants' remaining contention that the maps do not satisfy the Legislature's political objectives.

Defendants do not contest that the election data show that Plaintiffs' alternative maps are *better* for Republicans than SB4—nor could they. In SB4, President Trump and Sen. Cruz fare worse in one or more Republican districts than they do in Plaintiffs' alternative maps. *See* Opening Br. at 40 n.13; Exs. 24, 35, 36, 41, 49, 50, 57, 58. Likewise, President Biden and Mr. O'Rourke fare better in at least one Republican district in SB4 than they do in any of the Republican districts in Plaintiffs' alternative maps. *Id.* Plaintiffs' alternative plans create 19 safe Republican seats— just as SB4 does. But those are the only l9 seats in which Republican candidates have prevailed in recent elections in SB4. *See* Ex. 24. By contrast, Republican candidates narrowly carried benchmark SD10—the configuration in Plaintiffs' Alternative Plans 2 and 4—in four of twenty statewide races since 2018. Defendants offer no explanation for how their version of SD14—which no Republican can win, ever (*e.g.*, President Trump received 23.4% of the vote, *see* Ex. 24)—is somehow more beneficial for Republicans than a plan that converts SD14 to a safe Republican

seat and maintains SD10 as a competitive seat (*e.g.*, President Trump received 45.4% of the vote, *see* Ex. 42, Ex. 58).

*Fourth*, Defendants contend that the Legislature would not have adopted the alternative plans because doing so might have risked a race-based claim from residents of SD14 in Austin, rather than in SD10. Def. Br. at 31. Here again, Defendants miss the point. If the mapdrawing were completely blind to racial data, as they contend, then this worry could not possibly have arisen when the lines were being drawn. That is especially so given that the mapdrawer had just been told by a three-judge federal court in a case in which she was counsel of record that "[t]he Legislature could . . . simply divide[] Travis County and Austin Democrats among five Republican districts," *Perez*, 253 F. Supp. 3d at 897, but that cracking apart Tarrant County minority voters was unlawful, *see id.* at 961; *id.* at 985 (Smith, J., dissenting) ("[T]he differences between DFW and Travis County[] are dramatic."); *Texas*, 887 F. Supp. 2d at 166 (concluding that dismantling of SD10 was intentionally discriminatory); *Veasey*, 830 F.3d at 240, 257 n.54 (*en banc* Fifth Circuit majority relying upon *Texas* decision regarding SD10 as contemporary example of "State-sponsored discrimination"). And the mapdrawer had just prevailed in the same case in the Supreme Court defending the Legislature as intending to follow court orders, not racially discriminate. *See Perez*, 138 S. Ct. at 2328. If Defendants' "exclusively partisanship" defense were true, the judicial permission to partisan gerrymander Travis County and the warning not to racially discriminate in Tarrant County would have been at the forefront in their minds, not the risk of being accused of racial discrimination in *Travis* County. Defendants' argument does not square with the premise of their defense in this case.

*Fifth*, Defendants contend that the Legislature would have had good reasons to prefer SB4 over Plaintiffs' alternative maps because "Plaintiffs' alternative maps would disrupt elections all

over the State by radically realigning Senate districts from nearly end-to-end." Def. Br. at 32. Despite this hyperbole, Defendants cite just two examples of this supposedly extreme disruption: "moving Starr County form SD21 to SD20 and rearranging SD11 and S17 lines in Brazoria County." *Id.* But SB4 *also* rearranged SD11 and SD17 lines in Brazoria County; the difference between SB4's reconfiguration of Brazoria County and Plaintiffs' alternative plans' is mere precincts. *Compare*, *e.g.*, Ex. 18 *with* 25 *with* 54. Moreover, SB4 likewise disrupts a number of counties with greater population than Starr County (the significance of which is not mentioned)— many that Plaintiffs' alternative plans do not. *Id.*

The data forecloses Defendants' contention. Defendants characterize SB4's changes to the benchmark plan as minimal, noting that it "leaves many districts essentially unchanged." Def. Br. at 1. The mean population overlap between SB4 and the benchmark plan—the average percentage of population that SB4 kept in the same benchmark district—is 75.3% for SB4. Ex. 45. The median district's population overlap in SB4 is 77.7% (SD15). *Id.* By contrast, the mean population overlap between Plaintiffs' Alternative Plan 4 and SB4 is 80.6% and the median district population overlap is 91.9% (SD15). If a 77.7% median overlap is a minor change in Defendants' view, then a 91.9% median overlap cannot plausibly be characterized as "radically realigning" the map "from nearly end-to-end." Def. Br. at 32. Rather, the data show that Plaintiffs' alternative plan is "comparably consistent with traditional districting principles" compared to SB4. *See Cooper*, 137 S. Ct. at 1480 (quoting *Easley v. Cromartie*, 532 U.S. 234, 258 (2001) ("*Cromartie II*")).[7]

---

[7] Likewise, Plaintiffs' Alternative Map 4 is comparably consistent with SB4 vis-à-vis the benchmark plan, with a mean population overlap of 70.1% and a median district population overlap of 72.8% with the benchmark plan. Ex. 61. By contrast, Sen. Huffman defended SD10's 59.7% population retention as demonstrating core preservation. Ex. 6K at 14; Ex. 45.

## II.     Plaintiffs Are Likely To Succeed on their Racial Gerrymandering Claim.

Plaintiffs are likely to succeed on their racial gerrymandering claim. Plaintiffs explained the "stark racial splits" in the voters moved out of SD10 (hundreds of thousands of minorities) and those moved into SD10 (hundreds of thousands of Anglos), how the location of minority and Anglo voters was known to Sen. Huffman and Ms. Mackin without needing to resort to racial shading, and how other districting criteria were subordinated to race. Opening Br. at 41-11. Defendants' sole response is their contention that partisanship was the sole motivation—a contention unsupported by any evidentiary submission and contrary to the evidence. *See supra* Part I.C.

## III.    Plaintiffs Will Be Irreparably Harmed if SD10 Is Not Enjoined.

Defendants do not dispute that subjecting Plaintiffs to intentional discrimination on the basis of race by diluting their fundamental right to vote constitutes irreparable harm. *Cf. BST Holdings v. OSHA*, 17 F.4th 604, 618 (5th Cir, Nov, 12, 2021) ("[T]he loss of constitutional freedoms . . . unquestionably constitutes irreparable injury.") (stay dissolved on other grounds, *In re MCP No. 165,* No. 21-7000, et al. (6th Cir. Dec. 17, 2021)) (internal quotations omitted); *see also Elrod v. Burns*, 347 U.S. 373 (1976); *Deerfield Med. Center v. City of Deerfield Beach*, 661 F. 2d 328, 338 (5th Cir. Unit B Nov. 1981) (finding that violations of fundamental rights are always irreparable). Instead, Defendants erroneously contend that Plaintiffs cannot show irreparable harm because they are unlikely to succeed on the merits of their intent claim and are unlikely to show their votes have been diluted. Opp. at 46. Defendants are wrong on both points. *See supra* Part I; *see also Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (Kennedy, J., Roberts, C.J., Alito, J., lead op.) ("[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth

and Fifteenth Amendments."). Because Plaintiffs have shown that their fundamental right to vote will be impaired as a result of Defendants' intentional discrimination, they have shown they will suffer irreparable harm. *See Deerfield*, 661 F.2d at 338 (holding that where a fundamental right is "either threatened or in fact being impaired . . . mandates a finding of irreparable injury.").

Next, Defendants assert that Plaintiffs have not shown any irreparable harm with respect to their *Shaw* claim because Plaintiffs failed to allege they were individually subjected to a racial classification. Opp. at 46. Not so. *See e.g*, Compl. ¶¶ 9-14, 38, 76 (alleging that Plaintiffs Brooks, Goines, Faulkner, and Spell are Black, that Plaintiffs Gutierrez and Bonilla are Latino, and that Plaintiffs were moved out of SD10 because of Defendants' intent to crack apart Tarrant County's Black and Latino populations). Further, the evidence in the record shows that Plaintiff Gutierrez testified during the redistricting process that S2168 subjected him to racial classifications by cracking apart SD10 based on race. *See* Sept. 24, 2021 Hrg Tr., ECF 39-51 at 172:23-174:10 (testimony of Plaintiff Gutierrez that S2168 drew him and other Latino voters out of SD10 as part of an intentional plan to crack apart the Black and Latino communities in Tarrant County). Finally, to the extent it is relevant, Plaintiffs are prepared to offer further testimony that they were subject to a racial classification in the drawing of district lines for SD10 at the upcoming hearing. As such, Plaintiffs have shown they face irreparable harm absent an injunction.

## IV.   The Public Interest and Balance of the Equities Favor Enjoining SD10.

The balance of the equities and the public interest weigh in favor of enjoining SD10. Defendants assert that the government's generic interest in the enforcement of its laws overrides Plaintiffs' constitutional right to be free from discrimination on the basis of race. Opp. at 47. But as the Fifth Circuit recently emphasized, the government has no legitimate interest in enforcing laws that infringe on constitutional freedoms. *BST Holdings*, 17 F.4th at 618. Indeed, "[t]he public

interest is [] served by maintaining our constitutional structure. . . even, or perhaps *particularly*, when those decisions frustrate government officials." *Id.* at 20; *see also Ingebretsen v. Jackson Public School Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *De Leon v. Perry*, 975 F. Supp. 2d 632, 665 (W.D. Tex. 2014), *aff'd sub nom. De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) ("a preliminary injunction preventing the enforcement of an unconstitutional law serves, rather than contradicts, the public interest."). As such, Defendants have no legitimate interest in enforcing SD10 as drawn.

Next, Defendants contend that the Court should allow SB4 to go into effect because "courts should ordinarily not alter the election rules on the eve of an election," Opp. at 47 (citing *RNC v. DNC*, 140 S. Ct. 1205, 1207 (2020). But only one of the cases cited by Defendants in support of this proposition involved a challenge to an unconstitutional redistricting plan, and it does not support Defendants' position. In *Reynolds v. Sims*, the Supreme Court found that the lower court acted with "proper judicial restraint" in adopting an interim plan for the immediately forthcoming primary and general elections, and that such an action was "an appropriate and well considered exercise of judicial power." 377 U.S. 533, 586-87 (1964). Notably, the Court approved this plan notwithstanding the fact that the lower court's implementation of an interim remedy required Alabama to hold *new* primary elections, which it did pursuant to a schedule adopted by the legislature in anticipation of delays in finalizing the electoral map. *Id*. at 552-53.

Here the situation is similar, but more favorable to an injunction. Notably, SB4 is not currently in effect and does not go into effect until January 18, 2022.[8] Plaintiffs simply ask this Court to preserve the status quo by preventing SB4 from going into effect with respect to SD10, allowing the benchmark configuration to remain in place, and ordering primary elections affected

---

[8] *See* Texas Legislature Online, *Bill: Senate Bill 4*, https://capitol.texas.gov/BillLookup/History.aspx?LegSess=873&Bill=SB4.

by this change to occur on the schedule approved by the Texas Legislature in anticipation of delays in finalizing the electoral map, or one that is substantially the same. *See* Tex. Elec. Code 41.0075 (setting schedule for primary on May 24, 2022 for state legislative redistricting plan that becomes law after December 28, 2021 and on or before February 7, 2021). Indeed, the administrative burdens Defendants assert will arise out of any delay have already been accounted for by the legislature, which worked closely with the Secretary of State's office and determined that the alternative schedule "allows adequate time to comply with MOVE Act requirements for mailing ballots to military and overseas voters and complete the other logistical work associated with the election." Testimony of Senator Huffman, Aug. 7, 2011 Senate Comm. on Jurisprudence Hr'g at 31:04-16. Because the legislature has already acted to protect the state and the public's interest in orderly elections should the primary be delayed,[9] that interest does not weigh against an injunction

---

[9] Defendants cite three additional cases for the proposition that courts should decline to delay elections in order to remedy unconstitutional redistricting plans, each of which is inapposite. *Mississippi Freedom Democratic Party v. Democratic Party of State of Mississippi* did not involve redistricting, but rather a request by the plaintiffs to move the primary election to a date less than a month before the general election for the sole purpose of extending the voter registration period through the summer. 362 F.60, 62-63 (5th Cir. 1966). In *Seamon v. Upham,* the parties agreed that the primary election should not be delayed, so the court declined to revert to the plan adopted by the legislature and instead allowed the primary to proceed under an interim map imposed by the Court. 536 F. Supp. 1030, 1034 (E.D. Tex. 1982). And in *Page v. Bartels*, the Third Circuit declined to issue interim relief because it lacked jurisdiction and instead remanded the case for consideration by a three-judge court. 248 F.3d 175, 181-82. Although the Court expressed concern about the potential for confusion, it explicitly held that an interim remedy was not foreclosed on remand. *Id.* at 198 ("Given the potentially disruptive effects that our actions could have on New Jersey's electoral process, it is incumbent upon us to articulate our disposition of this appeal with surgical accuracy. Our exact disposition is as follows: We will vacate the District Court's April 16, 2001 order, and remand the case to the District Court, so that a district court of three judges, as specified in 28 U.S.C. § 2284, can be convened to hear both the Voting Rights Act and the constitutional challenges brought by Plaintiffs. With respect to interim relief, the temporary stay issued on April 17, 2001 will expire at its scheduled time, April 24, 2001 at noon. We will grant no further interim relief in this matter. We note, however, that neither the District Court, acting as a single judge, nor the district court of three judges that will be convened, is foreclosed from acting (and issuing interim relief), provided that they comply with the limitations on their authority imposed by 28 U.S.C. § 2284.). None of these cases support Defendants' contention that federal

here. This is especially so considering that the ultimate deadline is the November election—one each state faces—and a host of states have not completed—or in several cases even *begun*—their redistricting process yet. *See, e.g.*, All About Redistricting, https://redistricting.lls.edu/ (last visited Dec. 23, 2021).

Finally, Defendants argue that because Texas is no longer subject to preclearance under the Voting Rights Act, it is entitled to have its laws "take effect in normal course" and to "implement its own map as state law provides," while federal courts adjudicate claims on "normal timeframes." Opp. at 50. But in striking down the preclearance regime, the Supreme Court specifically acknowledged that "injunctive relief is available in appropriate cases to block voting laws from going into effect." *Shelby County v. Holder*, 133 S. Ct. 2612, 2619 (2013). Indeed, the Fifth Circuit has held that such relief is not only available but appropriate to protect against constitutional harms "even, or perhaps *particularly*, when those decisions frustrate government officials." *BST Holdings*, 17 F.4th at 618-19. The right to vote and have one's vote counted on an equal basis is fundamental and protected by the constitution. *Reynolds*, 377 U.S. at 554-55, 562. Texas is not entitled to enact laws that violate that right by intentionally discriminating against voters on the basis of race, nor does it serve the public interest to simply allow such laws to take effect in the normal course.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be granted.

---

courts routinely allow unconstitutional redistricting plans to remain in place simply to avoid delaying primary elections.

December 23, 2021                          Respectfully submitted,

                                          */s/ Chad W. Dunn*
                                          Chad W. Dunn (Tex. Bar No. 24036507)
                                          Brazil & Dunn
                                          4407 Bee Caves Road
                                          Building 1, Ste. 111
                                          Austin, TX 78746
                                          (512) 717-9822
                                          chad@brazilanddunn.com

                                          Mark P. Gaber*
                                          Mark P. Gaber PLLC
                                          P.O. Box 34481
                                          Washington, DC 20043
                                          (715) 482-4066
                                          mark@markgaber.com

                                          Jesse Gaines* (Tex. Bar. No. 07570800)
                                          P.O. Box 50093
                                          Fort Worth, TX 76105
                                          817-714-9988
                                          gainesjesse@ymail.com

                                          *Admitted *pro hac vice*

                                          *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that all counsel of record were served a copy of the foregoing this 23rd day of December, 2021, via the Court's CM/ECF system.


*/s/ Chad W. Dunn*
Chad W. Dunn