# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Case No. 3:21-cv-00259 [Lead Case] |
| GREG ABBOTT, *et al.*, | § § § | |
| *Defendants*. | § § | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | |
| *Plaintiff*, | § § | |
| v. | § § | Case No. 3:21-cv-299 [Consolidated Case] |
| STATE OF TEXAS and JOHN SCOTT, in his official capacity as Texas Secretary of State, | § § § | |
| *Defendants*. | § § | |

## DEFENDANTS' MOTION TO DISMISS THE UNITED STATES' COMPLAINT OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT

# TABLE OF CONTENTS

Table of Contents ...............................................................................................................i

Table of Authorities..........................................................................................................ii

Introduction.......................................................................................................................1

Standard.............................................................................................................................1

Argument ...........................................................................................................................2

    I.   The Congressional Map Is Lawful..........................................................................2

        A.  CD 23 Is Valid .............................................................................................2

            1.   The United States Has Not Plausibly Alleged Discriminatory Results ................2

            2.   The United States Has Not Stated a Claim for Discriminatory Intent.................7

        B.  The DFW Districts Are Valid.....................................................................13

            1.   The United States Has Not Plausibly Alleged Discriminatory Results ..............13

            2.   The United States Has Not Stated a Claim for Discriminatory Intent.................13

        C.  The Harris County Districts Are Valid........................................................15

            1.   The United States Has Not Plausibly Alleged Discriminatory Results ..............15

            2.   The United States Has Not Stated a Claim for Discriminatory Intent.................18

    II.  The House Map Is Lawful ....................................................................................18

        A.  HD 118 Is Valid.........................................................................................19

        B.  HD 31 Is Valid...........................................................................................20

        C.  House Districts in El Paso and West Texas Are Valid ................................22

    III. Section 2 Does Not Apply to Redistricting.........................................................24

Conclusion .......................................................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez*,
138 S. Ct. 2305, 2325 (2018) ............................................................................ 11, 12, 14, 24

*Ala. Legislative Black Caucus v. Alabama*,
575 U.S. 254, 294–98 (2015) ........................................................................................24

*Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009) ..............................................................................................1

*Bartlett v. Strickland*,
556 U.S. 1, 18 (2009) ..............................................................................................4, 19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 545 (2007) ....................................................................................passim

*Benavidez v. Irving Indep. Sch. Dist.*,
690 F. Supp. 2d 451, 456 (N.D. Tex. 2010) ..................................................................3

*Bostock v. Clayton County*,
140 S. Ct. 1731, 1738 (2020) ........................................................................................9

*Brnovich v. Democratic Nat'l Comm.*,
141 S. Ct. 2321, 2337 (2021) ...............................................................................7, 9, 11

*Brown v. Thomson*,
462 U.S. 835, 842 (1983) ............................................................................................23

*Chisom v. Roemer*,
501 U.S. 380, 394 n.21 (1991) ....................................................................................10

*City of Mobile v. Bolden*,
446 U.S. 55, 61 (1980) ................................................................................................10

*Conley v. Gibson*,
355 U.S. 41, 47 (1957) ..................................................................................................1

*Fusilier v. Landry*,
963 F.3d 447, 462 (5th Cir. 2020) ..............................................................................18

*Georgia v. Ashcroft*,
539 U.S. 461, 478 (2003) ..............................................................................................6

*Grove v. Emison*,
    507 U.S. 25, 39–41 (1993) ................................................................................ passim

*Harding v. Dallas County*,
    948 F.3d 302, 308 (5th Cir. 2020) ................................................................................ 3

*Holder v. Hall*,
    512 U.S. 874, 884 (1994) ................................................................................ 6, 8, 24

*Jeffers v. Beebe*,
    895 F. Supp. 2d 920, 932 (E.D. Ark. 2012) ................................................................ 4

*Kumar v. Frisco Indep. Sch. Dist.*,
    476 F. Supp. 3d 439, 503 (E.D. Tex. 2020) ............................................................. 17

*Larios v. Cox*,
    300 F. Supp. 2d 1320, 1347 (N.D. Ga. 2004), *aff'd*, 542 U.S. 947 (2004)........................ 23

*LULAC v. Clements*,
    986 F.2d 728, 744 & n.5 (5th Cir. 1993) (*LULAC I*) ............................................... 18

*LULAC v. Clements*,
    999 F.2d 831, 850 (5th Cir. 1993) (*LULAC II*) (en banc) ....................................... 7, 22

*LULAC v. NE Ind. Sch. Dist.*,
    903 F. Supp. 1071, 1093 (W.D. Tex. 1995) ............................................................. 10

*McMillan v. Escambia County*,
    748 F.2d 1037, 1046 (5th Cir. 1984).......................................................................... 9

*Mendenhall v. Cedarapids, Inc.*,
    5 F.3d 1557, 1570 (Fed. Cir. 1993) ......................................................................... 17

*Miller v. Johnson*,
    515 U.S. 900, 915 (1995) ........................................................................................ 11

*Palmer v. Thompson*,
    403 U.S. 217, 224 (1971) ........................................................................................ 10

*Perez v. Perry*,
    No. 5:11-cv-360, 2017 WL 962686, at *17 (W.D. Tex. Mar. 10, 2017) ................... 11, 19

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256, 279 (1979) ........................................................................................ 11

*Rodriguez v. Harris County*,
    964 F. Supp. 2d 686, 800 (S.D. Tex. 2013).......................................................... 10, 17

*Rollins v. Fort Bend ISD*,
    89 F.3d 1205, 1221 (5th Cir. 1996) ........................................................................18

*Salas v. Sw. Tex. Jr. Coll. Dist.*,
    964 F.2d 1542, 1555 (5th Cir. 1992) ...........................................................5, 20, 21

*Shaw v. Reno*,
    509 U.S. 630, 641 (1993) .......................................................................................10

*Shelby County v. Holder*,
    570 U.S. 529, 550–57 (2013) ....................................................................................6

*Thornburg v. Gingles*,
    478 U.S. 30, 50 (1986) .....................................................................................passim

*United States v. City of Philadelphia*,
    644 F.2d 187, 201 (3d Cir. 1980) .............................................................................9

*United States v. Georgia*,
    No. 1:21-cv-2575, 2021 WL 5833000, at *4 (N.D. Ga. Dec. 9, 2021) ...........................10

*United States v. Madison Cnty. Bd. of Educ.*,
    326 F.2d 237, 239, 242 (5th Cir. 1964) ....................................................................9

*United States v. O'Brien*,
    391 U.S. 367, 383 (1968) .......................................................................................10

*Valdespino v. Alamo Heights Indep. Sch. Dist.*,
    168 F.3d 848, 852 (5th Cir. 1999) ...........................................................................3

*Veasey v. Abbott*,
    830 F.3d 216, 234 (5th Cir. 2016) (en banc)............................................................12

*Voinovich v. Quilter*,
    507 U.S. 146, 155–56 (1993)..............................................................................4, 8

**Statutes**

42 U.S.C. § 1983...........................................................................................................9

52 U.S.C.
    § 10301(a) .......................................................................................................2, 7
    § 10301(b) .......................................................................................................3, 8
    § 10304(a)–(b) ......................................................................................................8
    § 10308(d) .............................................................................................................9

## Other Authorities

John R. Lewis Voting Rights Advancement Act of 2021, H.R. 4, § 2(a)(1), 117th Cong., 1st Sess. .....8

**Rules**

Fed. R. Civ. P. 12(e)........................................................................................................13

**Constitutional Provisions**

U.S. Const. art. I, § 2....................................................................................................16

U.S. Const. art. I, § 7......................................................................................................8

## Introduction

Plaintiffs bear the burden of plausibly alleging three "necessary preconditions" in vote-dilution cases under Section 2 of the Voting Rights Act ("VRA"). *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). The United States challenges an assortment of congressional districts ("CDs") and house districts ("HDs") but does not allege facts establishing those preconditions. It challenges a number of districts in which Latinos already make up a majority of the citizen voting age population ("CVAP"). And it fails to allege or explain how Latino voting power is diluted by white bloc voting in those districts when Latinos form a majority that cannot be overwhelmed by white voters.

Nor has the United States stated a claim for intentional discrimination. Section 2 does not authorize the Attorney General to file civil suits for intentional vote dilution, but even if it did, the United States' claims would not succeed. Failing to distinguish partisan intent from racially discriminatory intent, the United States does not plausibly allege that the Texas Legislature as a whole was motivated by invidious racial discrimination.

## Standard

A plaintiff must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id. See* Fed. R. Civ. P. 12(b)(6).

ARGUMENT

I.      **The Congressional Map Is Lawful**

The United States challenges three portions of the congressional map, but each challenge fails as a matter of law. CD 23 as well as the districts in DFW and Harris County are fully consistent with Section 2 of the VRA.

A.      **CD 23 Is Valid**

The United States asserts that CD 23 will produce discriminatory results, but it concedes that the district is majority Latino. The United States does not plausibly allege any facts suggesting that the much smaller group of white voters could or would somehow prohibit a cohesive bloc of Latino voters from electing their candidates of choice. Nor can the United States bring a Section 2 discriminatory-intent claim, both because the statute does not authorize that claim and because the Legislature did not have a racially discriminatory intent.

1.      **The United States Has Not Plausibly Alleged Discriminatory Results**

Every discriminatory-results plaintiff must satisfy the three preconditions from *Gingles*, 478 U.S. at 50, as well as a totality-of-the-circumstances analysis. The United States has not plausibly alleged facts to satisfy those requirements.

a.      **The Discriminatory-Results Test**

Section 2 prohibits a "standard, practice, or procedure" from being "imposed or applied . . . in a manner which results in a denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a). To establish a violation of that provision, a plaintiff must show, "based on the totality of circumstances," that:

> [T]he political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

2

*Id.* § 10301(b). A court can consider "[t]he extent to which members of a protected class have been elected to office in the State," but "nothing in [Section 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.* Under Supreme Court precedent interpreting this statute, plaintiffs must establish three "necessary preconditions":

> (1) The minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district;
>
> (2) The minority group must be able to show that it is politically cohesive; and
>
> (3) The minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 50–51; *see Grove v. Emison*, 507 U.S. 25, 39–41 (1993) (explaining that "the *Gingles* preconditions" are required in "a § 2 dilution challenge to a single-member districting scheme").

The Fifth Circuit "has interpreted the *Gingles* factors as a bright line test." *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852 (5th Cir. 1999); *accord Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 456 (N.D. Tex. 2010). "Failure to establish any one of these threshold requirements is fatal." *Harding v. Dallas County*, 948 F.3d 302, 308 (5th Cir. 2020) (quotation omitted). If a plaintiff can meet "the three prongs of *Gingles*," it must then "establish that the 'totality of the circumstances' supports a finding of vote dilution." *Id.* at 308–09.

Under *Gingles*, the Section 2 inquiry must be "district specific." 478 U.S. at 59 n.28. Plaintiffs cannot challenge a map as a whole.

### b.    Latino Voters Have Significant Opportunities in CD 23

The United States argues that the Legislature "eliminat[ed] a Latino electoral opportunity" in CD 23, Compl. ¶ 39, but the district provides significant electoral opportunities to Latino voters. As a result, the United States has not and cannot plausibly allege facts satisfying *Gingles*.

The first *Gingles* precondition—the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district"—presupposes that the challenged map

does not already make the minority group "a majority in a single-member district." *Gingles*, 478 U.S. at 50. The first precondition is satisfied when "an election district could be drawn in which minority voters form a majority but such a district is not drawn." *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009). It addresses the "special wrong" that occurs "when a minority group has 50 percent or more of the voting population and could constitute a compact voting majority but, despite racially polarized bloc voting, that group is not put into a district." *Id.* at 19. But it does not apply here, where both sides agree that Latino voters already constitute a majority of CD 23. *See* Compl. ¶ 48. Thus, the United States has "not established a claim for vote dilution under § 2 because . . . the challenged district . . . is *already* a majority-minority district under *Bartlett*'s definition." *Jeffers v. Beebe*, 895 F. Supp. 2d 920, 932 (E.D. Ark. 2012) (three-judge district court).

The United States also has not plausibly alleged the second *Gingles* precondition: that the minority group in question "is politically cohesive." *Gingles*, 478 U.S. at 51. "[A] court may not presume bloc voting within even a single minority group." *Growe*, 507 U.S. at 41 (citing *Gingles*, 478 U.S. at 46). The burden of establishing cohesion is on the plaintiff. *See id.* at 42; *Voinovich v. Quilter*, 507 U.S. 146, 155–56 (1993). The complaint does not include facts relevant to cohesion. Instead, it includes "a formulaic recitation of" cohesion. *Twombly*, 550 U.S. at 555. The United States asserts that "Latino voters in District 23 are cohesive in the most relevant elections, including elections for District 23." Compl. ¶ 49; *accord id.* ¶ 46 ("A cohesive majority of Latino voters in current District 23 have preferred Latino Democrats in most primary and general elections."). The complaint omits all other relevant details, including the level or degree of alleged cohesion it claims is present. That is not enough to carry the United States' burden.

Moreover, on the United States' theory, Latino voters in CD 23 cannot be sufficiently cohesive for Section 2 liability. The United States claims that (1) Latinos have been and will be a majority in CD 23 and (2) Latinos cohesively support Democratic candidates. Compl. ¶¶ 46, 48. If both those

things were true, then CD 23 would elect Democratic candidates. But the United States alleges precisely the opposite. It says that "voters in District 23 last elected a Latino Democrat in 2012" and that "Latino voters' preferred candidates" will lose in CD 23 going forward. *Id.* ¶¶ 46, 50. In light of the fact that the population numbers and the election numbers are, at least at a high level, uncontroversial, the only explanation is that Latino voters in CD 23 do not uniformly support Democratic candidates. There is no dispute that Latino voters could control CD 23 if they voted together. Any lack of control, therefore, stems from a lack of cohesion.

In any event, the United States should be addressing cohesion among Latino voters in its proposed district —that is, whether "the minority has the potential to elect a representative of its own choice in some single-member district"—not whether Latino voters are cohesive in the new or old CD 23. *Growe*, 507 U.S. at 40. The United States has not alleged any facts regarding that inquiry.

Next, the United States has not satisfied the third *Gingles* precondition. White bloc voting cannot suffice to defeat Latino voters' choices because white CVAP is only 35.1%. *See* Ex. A at 17. As a matter of math, that is not enough to control a district. The United States does not allege any facts explaining how white voters could control the district despite being so outnumbered. The complaint includes nothing more than "a formulaic recitation of the" third precondition. *Twombly*, 550 U.S. at 555. The only on-point paragraph reads, in full: "In enacted 2021 District 23, bloc voting by Anglo voters will enable them to usually defeat Latino voters' preferred candidates." Compl. ¶ 50. That is a conclusory assertion, not a plausible factual allegation for how 35.1% of the district will outvote 57.8% of the district. Under current Fifth Circuit precedent, the United States is "not precluded, as a matter of law, from seeking to prove such a claim" but "a registered voter majority class faces an obvious, difficult burden in proving that their inability to elect results from white bloc voting." *Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992). The United States did not allege, for example, that the numbers showing a Latino majority are "illusory" or "soft" because people

have "moved away" or due to other inaccuracies. *Id.*

Although the United States thinks a 58% Latino CVAP is too low, many Latino Democrats in the Texas Legislature did not. Indeed, the configuration of CD 23 incorporated an amendment offered by Representatives Moody, Fierro, M. Gonzalez, Ortega, and Ordaz Perez, all Latino Democrats. The House *unanimously* adopted their amendment, which gave CD 23 a Hispanic CVAP of 57.8% and white CVAP of 35.1%. *See* Ex. B at 7; Ex. C at 268–69.

Other Latino Democrats offered plans with similar demographic breakdowns. Senator Menendez offered Plan C2127, which would have given CD 23 a Latino CVAP of 58.0% and a white CVAP of 35.0%. *See* Ex. D at 7. Senator Gutierrez similarly offered Plan C2124, which would have given CD 23 a Latino CVAP of 59.0% and a white CVAP of 34.4%, *see* Ex. E at 9, as well as Plan C2132, which would have given CD 23 a Latino CVAP of 59.4% and a white CVAP of 34.2%, *see* Ex. F at 7. Representative Ortega offered Plan C2110, which would have given CD 23 a Latino CVAP of 58.8% and a white CVAP of 34.6%. *See* Ex. G at 7. The same is true for other members of the Legislature. Sen. Thompson, a black Democrat, offered Plan C2131, which would have given CD 23 a Latino CVAP of 57.6% and a white CVAP of 35.2%. *See* Ex. H at 17.

The United States complains that Latino CVAP and related numbers are lower under Plan C2193 than they had been under the previous map. *See* Compl. ¶ 48. That sort of allegation might be relevant to a retrogression claim under Section 5, but the United States has not (and cannot) bring such a claim. *See Shelby County v. Holder*, 570 U.S. 529, 550–57 (2013). "Retrogression is not the inquiry in § 2 dilution cases." *Holder v. Hall*, 512 U.S. 874, 884 (1994). Federal courts correctly "refuse to equate a § 2 vote dilution inquiry with the § 5 retrogression standard." *Georgia v. Ashcroft*, 539 U.S. 461, 478 (2003).

\*     \*     \*

For decades, CD 23 has been represented by non-white congressmen. From 1985 to 2015 and

again starting in 2021, Latino congressmen have represented CD 23: Albert Bustamante (D), Henry Bonilla (R), Ciro Rodriguez (D), Quico Conseco (R), Pete Gallego (D), and Tony Gonzales (R). The only modern exception, Will Hurd (R), who is black, represented CD 23 from 2015 to 2021 despite the fact that the district's black voting age population was about fourteen times smaller than its Latino voting age population. *See* Ex. I at 10 (showing black VAP of ~28,500 compared to a Hispanic VAP of ~400,500).

No one, not even the United States, suggests that CD 23 is about to start shutting out minority candidates. Instead, the United States complains that CD 23 should be electing "Latino Democrats," rather than a "Latino Republican." Compl. ¶ 46. The United States thus attempts to "loose[] § 2 from its racial tether and fuse[] illegal vote dilution and political defeat." *LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (*LULAC II*) (en banc).

### 2.    The United States Has Not Stated a Claim for Discriminatory Intent

The United States also has not plausibly alleged that CD 23 violates Section 2 under the intent test. First, Section 2 does not include an intent test. Second, even if it did, the United States would still need to plausibly allege discriminatory results, which it has not done. Third, the Legislature did not intend to harm any racial group. It followed traditional redistricting principles, including advancing partisan goals.

### a.    Section 2 Addresses Results, Not Intent

The United States challenges the congressional map based on the Legislature's alleged "purpose" and "intent[]." No. 3:21-cv-299, ECF 1 ("Compl.") ¶¶ 39, 56, 164. But Section 2 liability does not turn on purpose or intent. It turns on "results." 52 U.S.C. § 10301(a).

To be sure, Section 2 previously included language—"to deny or abridge the right . . . to vote on account of race or color"—that the Supreme Court "interpreted to require proof of discriminatory intent." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2337 (2021). Because of a 1982 amendment,

however, Section 2 now "omits the phrase." *Id.* "In place of that language," Congress "substitute[d] the phrase 'in a manner which *results in* a denial or abridgement of the right . . . to vote on account of race or color.'" *Id.* (quoting 52 U.S.C. § 10301(a)).

By making this change, Congress "repudiated" the previous "intent test." *Gingles*, 478 U.S. at 44. Instead of supplementing the discriminatory-intent test, "the 1982 amendments . . . replaced that test with specific language in § 2(b) setting a standard based simply on discriminatory *results*." *Hall*, 512 U.S. at 921 n.22 (Thomas, J., concurring); *accord id.* at 923; *id.* at 962 (separate opinion of Stevens, J.) ("In the 1982 amendment to § 2 of the Voting Rights Act, Congress substituted a 'results' test for an intent requirement.").

The "only" way to establish a violation of Section 2 is explained in Section 2(b), *Brnovich*, 141 S. Ct. at 2337, which itself focuses on voters' "opportunity . . . to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). Section 2(b) does not say anything about purpose or intent. "Only if the apportionment scheme has the *effect* of denying a protected class the equal opportunity to elect its candidate of choice does it violate § 2; where such an effect has not been demonstrated, § 2 simply does not speak to the matter." *Voinovich*, 507 U.S. at 155.

When Congress wants to address both "the purpose" of a law and "the effect," it does so expressly, as it did in Section 5. *See* 52 U.S.C. § 10304(a)–(b). Congress is currently considering whether to add a "purpose" test to Section 2. The U.S. House of Representatives has passed H.R. 4, which would amend Section 2 so that plaintiffs could use an alternative "purpose" test "or" the current results test.[1] But H.R. 4, which has not passed the Senate or been signed by the President, is not the law. *See* U.S. Const. art. I, § 7. As it currently reads, Section 2 does not include a "purpose" prong.

There is precedent to the contrary, but it is neither persuasive nor consistent with the Supreme

---

[1] John R. Lewis Voting Rights Advancement Act of 2021, H.R. 4, § 2(a)(1), 117th Cong., 1st Sess., https://www.congress.gov/bill/117th-congress/house-bill/4/text (amending Section 2(a) of the VRA "by inserting after 'applied by any State or political subdivision' the following: 'for the purpose of, or'").

Court's more recent descriptions of Section 2. In 1984, for example, the Fifth Circuit analyzed Section 2's legislative history and concluded that "Congress intended that fulfilling either the more restrictive intent test or the results test would be sufficient to show a violation of section 2." *McMillan v. Escambia County*, 748 F.2d 1037, 1046 (5th Cir. 1984). But that conclusion—which ignored Section 2's text—was wrong. As the Supreme Court has held, Congress intended to "repudiate" and "reject" the intent test. But even if *McMillan*'s conclusion about congressional intent were correct, it would not establish the meaning of Section 2. "After all, only the words on the page constitute the law adopted by Congress and approved by the President." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1738 (2020). "Judges are not free to overlook plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork about expectations." *Id.* at 1754.

This issue rarely arises because private plaintiffs can bring constitutional claims for intentional discrimination. *See* 42 U.S.C. § 1983. In *Brnovich*, for example, the Court noted that the plaintiffs brought their "discriminatory intent" claim under "both § 2 of the VRA and the Fifteenth Amendment." 141 S. Ct. at 2334. The Court then analyzed whether the plaintiffs had proven discriminatory intent (they had not) without discussing which source of law prohibited intentional discrimination. *See id.* at 2348–50. Whether Section 2 addresses intentional discrimination is generally immaterial to private plaintiffs' claims because they can pursue the same theory under the Constitution.

The Attorney General, however, cannot bring civil actions for alleged violations of individuals' constitutional rights without statutory authorization. *See United States v. Madison Cnty. Bd. of Educ.*, 326 F.2d 237, 239, 242 (5th Cir. 1964); *United States v. City of Philadelphia*, 644 F.2d 187, 201 (3d Cir. 1980). In this context, Congress has authorized the Attorney General to bring civil suits for alleged statutory violations but not alleged constitutional violations. *See* 52 U.S.C. § 10308(d). As a result, the scope of Section 2 matters in this case. Congress's decision to replace, rather than supplement, the intent test

in Section 2 means that the Attorney General cannot bring its intent claim.

When the State of Georgia recently raised this argument, a district court rejected it based on a footnote in *Chisom v. Roemer. See United States v. Georgia*, No. 1:21-cv-2575, 2021 WL 5833000, at *4 (N.D. Ga. Dec. 9, 2021) (citing 501 U.S. 380, 394 n.21 (1991)). But that footnote merely quoted a Senate report for a proposition about the results test. *See Chisom*, 501 U.S. at 394. It did not endorse every aspect of the quoted legislative history, much less hold that Section 2 still incorporates the intent test. Regardless, an expansive reading of *Chisom*'s footnote would be inconsistent with the Supreme Court's later reasoning in *Brnovich* and its modern refusal to let legislative history trump text.

### b.      Intent, Standing Alone, Cannot Violate the Law

Even if Section 2 still incorporated a discriminatory-intent test, the United States would still need to plausibly allege discriminatory results. The discriminatory-intent test is drawn from constitutional precedent, *see City of Mobile v. Bolden*, 446 U.S. 55, 61 (1980) (plurality), and it is "a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). "[N]o case in [the Supreme] Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Courts routinely require discriminatory effect in intentional-discrimination redistricting cases. *See, e.g., Shaw v. Reno*, 509 U.S. 630, 641 (1993) ("a discriminatory purpose and have the effect of diluting minority voting strength"); *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 800 (S.D. Tex. 2013) ("purpose and operative effect"); *LULAC v. NE Ind. Sch. Dist.*, 903 F. Supp. 1071, 1093 (W.D. Tex. 1995) ("intentional discrimination" and "a resultant discriminatory effect").

As explained above, the United States has not plausibly alleged that CD 23 leads to discriminatory results. *See supra* Part I.A.1. Its intentional-discrimination claim fails for this additional reason.

### c.     The Legislature's Intent Was Lawful, Not Racial

In redistricting cases, "the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). It is "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). The required intent is not mere "volition" or "awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). It requires that the Legislature have passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* Nor is it sufficient that there is a loose correlative relationship between party affiliation and some racial minorities. *See Brnovich*, 141 S. Ct. at 2349.

Far from establishing that the Legislature had a racially discriminatory intent, the United States' complaint suggests that the Legislature was motivated by partisan interests. "After Governor Abbott signed the enacted Congressional plan into law, Adam Kincaid, the executive director of the National Republican Redistricting Trust, told the *New York Times* that the 'competitive Republican seats are off the board.'" Compl. ¶ 51. An effort to help Republicans at the expense of Democrats is not racially discriminatory, even when partisanship correlates with race. "[P]artisan motives are not the same as racial motives." *Brnovich*, 141 S. Ct. at 2349.

The United States points to a small number of split precincts, *see* Compl. ¶ 53, but that is not nefarious. "There are race-neutral reasons for splitting precincts, including: ensuring population equality; following city boundaries and roads; including financial supporters, a member's home, airports, and government buildings; and complying with the VRA and the Texas Election Code (which requires precincts to have 100 to 5000 residents)." *Perez v. Perry*, No. 5:11-cv-360, 2017 WL 962686, at *17 (W.D. Tex. Mar. 10, 2017). The United States does not allege that these race-neutral reasons are inapplicable. The 2013 map, which was drawn by a federal court and enacted in full by the Legislature, also included split precincts, as the United States concedes. *See id.* "[N]o one would claim

that the court acted with invidious intent when it did so." *Perez*, 138 S. Ct. at 2328 (2018).

The United States seems to treat the split precincts as suspicious for two reasons, but neither bears scrutiny. First, the United States thinks fifteen splits in the new map is too many, *see* Compl. ¶ 53, but it does not explain why more splits is worse than fewer. The question is *why* the Legislature split precincts, not how many times it did so. In any event, fifteen splits is significantly fewer than the thirty-nine splits in the 2011 map. *See Perez*, 2017 WL 962686, at *136. Second, the United States alleges "the borders of District 23 split precincts in a manner that removed approximately half of Latino CVAP from District 23 but removed only around one-third of Anglo CVAP from District 23." Compl. ¶ 53. The United States appears to be alleging that the voters living in the portions of precincts that were not included in CD 23 are about half Latino and one-third white. If so, that is consistent with the demographics for the district as a whole. The district's CVAP is more than half Latino and more than a third white. *See* Ex. A at 17. Excluding a group of voters with approximately the same demographic profile as the voters who are included in CD 23 would not be a rational way of pursuing any racially discriminatory goal. If that is not what the United States means to allege, the Court should order it to provide "a more definite statement" that would allow Defendants to "reasonably prepare a response." Fed. R. Civ. P. 12(e).

Finally, the United States points to opposition from certain "Latino legislators," Compl. ¶ 54, but it "err[s] in relying on conjecture by the opponents of SB [6] as to the motivations of those legislators supporting the law." *Veasey v. Abbott*, 830 F.3d 216, 234 (5th Cir. 2016) (en banc). In any event, other Latino legislators supported SB 6, including Representatives Guillen and Lozano. *See* Ex. J at 332–33; *see also Brnovich*, 141 S. Ct. at 2349 (rejecting a discriminatory-intent claim and noting that the challenged law "found support from a few minority officials"). And as discussed above, additional Latino legislators supported plans that would have given CD 23 a very similar demographic breakdown. *See supra* Part I.A.1.a.

**B.      The DFW Districts Are Valid**

The United States challenges the configuration of congressional districts in DFW, but it does not state a claim under either the results test or the intent test. The Legislature's pursuit of partisan interests is not unlawful.

**1.      The United States Has Not Plausibly Alleged Discriminatory Results**

The United States seemingly does not challenge the DFW districts under the discriminatory-results test. It concedes that multiple districts in DFW "provide minority voters with electoral opportunities." Compl. ¶ 59. The United States does not identify any other district that should have been drawn. It did not even include a conclusory assertion that a minority group "is sufficiently large and geographically compact to constitute a majority in an additional single-member district" in DFW, though it made analogous assertions for CD 23 and Harris County. *Id.* ¶ 55 (CD 23); *see also id.* ¶ 91 (Harris County). Under *Gingles*, that is fatal to any discriminatory-results claim. *See* 478 U.S. at 50.

To the extent the United States purports to bring a discriminatory-results claim regarding districts in DFW, the Court should order it to provide "a more definite statement" that would allow Defendants to "reasonably prepare a response." Fed. R. Civ. P. 12(e).

**2.      The United States Has Not Stated a Claim for Discriminatory Intent**

The United States has not plausibly alleged a discriminatory-intent claim regarding DFW for the same reasons it failed to do so regarding CD 23. First, Section 2 addresses results, not intent. *See supra* Part I.A.2.a. Second, even if Section 2 addressed intent, it would still require some showing of discriminatory results, *see supra* Part I.A.2.b, which the United States has not plausibly alleged for DFW, *see supra* Part I.B.1. Third, the United States has not plausibly alleged that the Legislature as a whole intended to invidiously discriminate on the basis of race.

The most significant problem with the United States' intentional-discrimination theory is that it fails to distinguish alleged racial effects resulting from racial intent and alleged racial effects resulting

from partisan intent. The complaint focuses on the demographic characteristics of different districts, *see* Compl. ¶¶ 57–59, 62–64, 66–71, but it does not allege any facts showing that the Legislature enacted this map "'because of,' not merely 'in spite of,'" those alleged demographic consequences. *Feeney*, 442 U.S. at 279. To be sure, the complaint uses racial terms to describe the consequences of redistricting, including moving some of the City of Irving out of CD 24. *See* Compl. ¶ 68. But the facts alleged—as opposed to the conclusory labels attached—are at least equally consistent with a legislature pursuing partisan goals.

According to the complaint, the "community" removed from CD 24 "had threatened the electoral prospects of" Representative Van Duyne, an incumbent Republican. *Id.* The United States alleges no facts suggesting a racial intent over a partisan one. And it gives no reason nor facts to think that the map drawer was working based on racial data rather than electoral data. The United States has not plausibly alleged that a map drawer drew lines based on race, much less met its "burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Perez*, 138 S. Ct. at 2325.

The United States points to a past district court decision considering the 2011 congressional map, *see* Compl. ¶¶ 60, 65, but that was a different map passed by different legislators in a different session. Defendants were not required "to show that the 2013 Legislature somehow purged the 'taint' that the court attributed to the defunct and never-used plans enacted by a prior legislature in 2011." *Perez*, 138 S. Ct. at 2324. A decision regarding the 2011 map is even less relevant to the intent of the 2021 Legislature.

In any event, there is no factual basis for the United States' assertion that the 2021 map "us[es] configurations similar to the 'lightning bolt' found to be intentionally discriminatory in the 2011 Congressional plan." Compl. ¶ 65. First, the two maps are based on different census data from different times. The United States itself emphasizes the changes between the 2010 and 2020 censuses.

*See* Compl. ¶ 58. Even similar-looking configurations have different consequences when applied to different census data. Second, the maps do not include similar-looking configurations. The 2021 map does not include anything like the "lightning bolt" from the 2011 version of CD 26 (shown in green below). *See* Ex. K at 27; Ex. L at 44.

| 2011 Map | 2021 Map |
|:---:|:---:|



Once those allegations are stripped away, all that remains are conclusory assertions that cannot support the United States' claim. The complaint declares that the congressional map "intentionally discriminates" and "deliberately prevents minority voters from impacting elections in District 24," Compl. ¶¶ 56, 72, but "these are merely legal conclusions resting on the [other] allegations." *Twombly*, 550 U.S. at 564. The other allegations do not suffice, and these legal conclusions do not change anything.

### C. The Harris County Districts Are Valid

The United States also challenges congressional districts in Harris County, but it does not plausibly allege that they produce discriminatory results. Its formulaic recitation of the *Gingles* preconditions does not suffice.

#### 1. The United States Has Not Plausibly Alleged Discriminatory Results

The complaint alleges only three facts potentially relevant to whether a hypothetical new

Latino-majority district in Harris County would satisfy the first *Gingles* precondition. First, the United States claims that the Legislature created a new congressional district in Harris County without making it a majority-Latino district despite the fact that "the population growth occurred primarily in the Latino community." Compl. ¶ 76; *see also id.* ¶ 77. That is not the relevant metric. Congressional seats are apportioned among the States based on total population, *see* U.S. Const. art. I, § 2, but Section 2 vote-dilution claims turn on the number of voters (*e.g.*, CVAP). So any population growth among non-voters, including children under eighteen years old and noncitizens, could not support a new Latino-majority district for purposes of this vote-dilution claim.

Moreover, even when the number of voters from a particular minority group grows, it does not necessarily strengthen the case for creating another district with that group in the majority. The location of voters matters as much as the number of voters. That is why the first *Gingles* precondition asks whether the minority group is "sufficiently large *and geographically compact* to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. Anecdotes about generalized statewide population growth are not relevant to the inquiry, if that growth does not lead to localized population growth that turns a minority group into a potential majority group in a particular district.

Second, the United States alleges that "[t]he creation of another Latino electoral opportunity Congressional district in Harris County was discussed during the legislative redistricting process" and that "minority legislators introduced alternative plans with the stated goal of creating a new Latino opportunity district in Harris County." Compl. ¶ 89. But the United States does not allege that these "alternative plans"—which it does not even identify—would have achieved that "stated goal" in accord with *Gingles*. This allegation is, at best, the equivalent of saying that "some other people thought there were plans that could satisfy *Gingles*." That is not enough to plausibly allege that such plans actually exist, especially when the United States also alleges that the chair of the Senate Redistricting Committee disagreed with those unidentified "minority legislators." *See* Compl. ¶ 90.

Finally, the United States asserts that "a second Latino opportunity district can be crafted in southeastern Harris County, composed of parts of current Districts 2, 29, and 36." Compl. ¶ 91. But it provides no other details about this district. It does not even allege that Latinos would form a CVAP (as opposed to total population) majority, much less whether that alleged majority would be bigger than the 58% that the United States considers insufficient in CD 23. *See* Compl. ¶ 48.

The United States also has not plausibly alleged the second *Gingles* precondition. The complaint includes "a formulaic recitation of" cohesion focused on CD 38, *Twombly*, 550 U.S. at 555; *see* Compl. ¶ 93. Such conclusory assertions never suffice, but this one is especially immaterial because it seems to focus on CD 38 rather than CDs 2, 29, and 36. The latter districts are the ones allegedly containing Latino voters who the United States says could be put in a new Latino opportunity district. Whether Latinos in one district are cohesive does not affect whether Latinos in other districts are cohesive enough to control a hypothetical new district. *See Growe*, 507 U.S. at 40.

The United States' only other allegation regarding the second precondition is that, "[i]n the past decade, multiple courts have found that voting is racially polarized in Harris County." Compl. ¶ 92 (citing *Rodriguez*, 964 F. Supp. 2d at 754–75). But judicial precedent is given "[d]eferential weight on a legal conclusion, not evidentiary weight on facts in dispute." *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1570 (Fed. Cir. 1993). Even if citing precedent could otherwise suffice as a plausible allegation of fact, it would not here, where the decision is more than eight years old (pre-dating, for example, electoral shifts related to Donald Trump's presidential campaign and the recent border crisis) and considered cohesion of only a subset of Latinos for claims regarding local elections rather than federal elections. *See Rodriguez*, 964 F. Supp. 2d at 756 (concluding "Latinos in Precinct 2 are politically cohesive" for challenge to county commissioner precincts).

And even if voting were racially polarized in CDs 2, 29, and 36, and the United States has not plausibly alleged it is, that would not of itself demonstrate cohesion. Courts recognize that "political

17

cohesiveness" is a "distinct concept" from racially polarized voting. *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 502 (E.D. Tex. 2020). To explain in more detail:

> [E]vidence of RPV does not "automatically establish minority political cohesiveness." An example is helpful. Imagine a town. In that town, White citizens only vote for candidates that are of type A. Minority citizens, on the other hand, split their support among candidates of types B, C, and D. In this hypothetical community, RPV clearly exists, but there is no evidence of minority political cohesiveness. This is because minorities do not coalesce around one particular type of candidate—they are split, not cohesive.

*Id.* at 503 (dismissing VRA claims with prejudice, finding minority groups were not cohesive) (quoting *LULAC v. Clements*, 986 F.2d 728, 744 & n.5 (5th Cir. 1993) (*LULAC I*).

The United States devotes only a single sentence to the third *Gingles* precondition. "In enacted 2021 District 38, bloc voting by Anglo voters will enable them usually to defeat Latino voters' preferred candidates." Compl. ¶ 94. Again, "a formulaic recitation of" the third precondition does not suffice. *Twombly*, 550 U.S. at 555. Also, allegations regarding CD 38 do not establish that Latino voters in CDs 2, 29, and 36 suffer under white bloc voting. It is worth noting, though, that allegations of white bloc voting sufficient to meet the *Gingles* preconditions in CD 36 would be impossible. The district's CVAP is 62.2% Hispanic and 15.1% white. *See* Ex. L at 17.

### 2.   The United States Has Not Stated a Claim for Discriminatory Intent

The United States seemingly does not bring an intentional-discrimination challenge to the congressional districts in Harris County. That portion of its complaint does not use variations of "intent" or "purpose." *See* Compl. ¶¶ 76–94. To the extent the United States purports to bring a discriminatory-intent claim regarding districts in Harris County, the Court should order it to provide "a more definite statement" that would allow Defendants to "reasonably prepare a response." Fed. R. Civ. P. 12(e).

## II.   The House Map Is Lawful

Omitting any discriminatory-intent claim, the United States challenges various house districts

under the discriminatory-results test only. Those challenges fail because the complaint does not plausibly allege the three *Gingles* preconditions.

### A.      HD 118 Is Valid

The United States challenges HD 118 under the results test, but it has not plausibly alleged a violation. Its chief complaint seems to be that HD 118 "no longer has a majority 2020 SSVR or SSTO." Compl. ¶ 104. It concedes, however, that HD 118's CVAP is majority Hispanic: either 57.5% or 56.4%, depending on the method of estimation used. *See* Compl. ¶ 111. *See* Ex. L at 37. The United States focuses on statistics derived from the number of voters who have "Spanish surnames" rather than statistics derived from self-identification as Hispanic on a census form, *see id.* ¶ 104, but "there are some problems with [the] accuracy of [such statistics] because some Hispanic people do not have Hispanic surnames, and some people who are not Hispanic do have Hispanic surnames." *Perez*, 2017 WL 962686, at *15. Spanish surname statistics "will be lower than HCVAP." *Id.*

Regardless of which number is used, the United States complains that there is "a reduction" from the previous plan, *id.*, but that retrogression allegation is irrelevant to the Section 2 claim at issue here. *See supra* Part I.A.1.b.

As with CD 23 discussed above, HD 118 does not violate Section 2 because Latino voters already have electoral opportunities under the map passed by the Legislature. The United States does not plausibly allege any of the *Gingles* preconditions. First, the United States cannot satisfy the first precondition because it cannot allege that "an election district could be drawn in which minority voters form a majority but such a district is not drawn." *Bartlett*, 556 U.S. at 18. The Legislature already drew such a district in HD 118.

For the second and third preconditions, the United States includes nothing more than "formulaic recitation[s] of" cohesion and white bloc voting. *Twombly*, 550 U.S. at 555; *see* Compl. ¶¶ 115–16. For the second precondition, the United States' assertion does not even address cohesion

for the right group of voters. The United States asserts that "Latino voters in District 118 under both the current 2013 House plan and the enacted 2021 House plan are cohesive," Compl. ¶ 115, but that is not the appropriate measure for the United States' claim. Instead, the relevant question is whether the voters in the plaintiff's proposed new HD 118 would be cohesive—that is, whether "the minority has the potential to elect a representative of its own choice in some single-member district"—not whether Latino voters are cohesive in the new or old HD 118. *Growe*, 507 U.S. at 40.

For the third precondition, the United States' assertion regarding white bloc voting ignores the uncontested fact that white voters make up only about one third of HD 118. HD 118's CVAP is only 35.5% white. *See* Ex. L at 37. The United States offers no factual allegations to explain its counter-intuitive position that 35% of voters will outvote 57% of voters. The complaint includes no factual allegations to meet the "obvious, difficult burden" of establishing that a Latino majority will be defeated by "white bloc voting" when white voters are a relatively small part of the district. *Salas*, 964 F.2d at 1555.

### B.    HD 31 Is Valid

Also challenging HD 31 under the results test, the United States claims that HD 31 "no longer provides an opportunity for Latino voters to elect representatives of their choice" despite the fact that the district's CVAP is *two-thirds* Latino. Compl. ¶ 124; *see id.* ¶ 123 (alleging Hispanic CVAP is 64.5% or 66.6%, depending on the method of estimation). As with districts discussed above, the United States has not plausibly alleged the *Gingles* preconditions in light of the already favorable conditions for Latino voters in HD 31. *See supra* Part I.A.1.b, II.A.

First, the United States cannot satisfy the first precondition because it cannot allege that "an election district could be drawn in which minority voters form a majority but such a district is not drawn." *Bartlett*, 556 U.S. at 18. The Legislature already drew such a district in HD 31.

For the second and third preconditions, the United States includes nothing more than

"formulaic recitation[s] of" cohesion and white bloc voting. *Twombly*, 550 U.S. at 555; *see* Compl. ¶¶ 128–29. For the second precondition, the United States' assertion does not even address cohesion for the right group of voters. The United States asserts that "Latino voters in District 31 are cohesive," Compl. ¶ 128, but that does not matter for the United States' claim. The relevant question is whether Latino voters who would be cohesive in the plaintiff's proposed HD 31—that is, whether "the minority has the potential to elect a representative of its own choice in some single-member district"— not whether Latino voters are cohesive in the new or old HD 31. *Growe*, 507 U.S. at 40.

For the third precondition, the United States' assertion regarding white bloc voting ignores the uncontested fact that white voters make up less than one third of HD 31. HD 31's CVAP is only 30.7% white. *See* Ex. L at 34. The United States offers no factual allegations to explain its counter-intuitive position that 31% of voters will outvote 67% of voters. The closest the complaint comes is the allegation that "Latino voters in South Texas bear the effects of discrimination to an even greater degree than do minority voters in some other parts of the State, which hinders their ability to participate effectively in the political process despite population majorities." Compl. ¶ 130. But the United States' own allegations establish that Latino voters in the new HD 31 will be able to control the district, if they so choose. According to the complaint, Spanish surname turnout—which, as discussed above, is lower than Hispanic turnout—would be 56.3%. *Id.* ¶ 123. The United States has not satisfied its "obvious, difficult burden" of plausibly alleging that "a registered voter majority class" is defeated by "white bloc voting." *Salas*, 964 F.2d at 1555.

At its core, the United States' complaint about HD 31 seems to be that Representative Guillen, the incumbent, recently left the Democratic Party and became a Republican. *See* Compl. ¶¶ 117, 125. The United States does not contest that Representative Guillen was the Hispanic candidate of choice in 2020, *see id.*, but it seems to assume without explanation that Representative Guillen will no longer be the Hispanic candidate of choice in 2022 and that he will defeat the Hispanic candidate of choice.

Such an assumption, if indulged by courts, would transform the Voting Rights Act from a statute focused on protecting the rights of racial minorities to one focused on protecting the interests of the Democratic Party. That is not the law. *See LULAC II*, 999 F.2d at 854 (explaining that "§ 2 is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats").

### C.   House Districts in El Paso and West Texas Are Valid

The United States also brings an improper Section 2 challenge to districts in the El Paso area. *See* Compl. ¶¶ 131–46. A Section 2 results claim does not make sense in that region because every voter in the area already lives in a Hispanic opportunity district. The 2021 house plan includes five districts in or near El Paso, and each one of them has large Latino majorities. *See* Compl. ¶ 143. The United States does not contend that any of those districts deprives Latino voters of electoral opportunities. It does not and could not plausibly allege that the *Gingles* preconditions are satisfied.

The United States does assert that certain Latino voters to the East, "most notably in Districts 53 and 81[,] will not be able to elect their preferred candidates due to Anglo bloc voting," Compl. ¶ 145, but it does not connect this assertion to its claim. The complaint does not allege, for example, that the relevant voters could be included in a Latino-majority district that would satisfy the first *Gingles* precondition. The United States' allegation that "El Paso and West Texas" could support "six districts with Latino CVAP majorities" does not help because it does not say anything about the particular voters at issue in HDs 53 and 81. Compl. ¶ 146. In any event, the United States seems to ignore the fact that HD 81 *already* has a majority-Hispanic CVAP: 51.9%. Another 4.8% of the CVAP is black. Only 41.5% of the CVAP is white. *See* Ex. L at 36.

The United States' core complaint seems to be that the El Paso area should have six house districts instead of five. *See* Compl. ¶¶ 131, 141, 146. The United States does not dispute that population changes meant that, under federal one-person-one-vote precedent, the 2021 Legislature

could not assign six districts to the same counties that the 2013 Legislature had. Nor does the United States dispute that the districts drawn by the 2021 Legislature are within the threshold established in the Supreme Court's one-person-one-vote cases. *See* Compl. ¶ 139 (describing the 2021 El Paso districts as "overpopulated" by less than 5%); *Brown v. Thomson*, 462 U.S. 835, 842 (1983) (describing precedent presumptively allowing "an apportionment plan with a maximum population deviation under 10%").

Instead, the United States relies on the controversial *Larios* principle: "[A] state legislative reapportionment plan that systematically and intentionally creates population deviations among districts in order to favor one geographic region of a state over another violates the one person, one vote principle firmly rooted in the Equal Protection Clause." *Larios v. Cox*, 300 F. Supp. 2d 1320, 1347 (N.D. Ga. 2004), *aff'd*, 542 U.S. 947 (2004). In this vein, the United States alleges that the El Paso districts "are uniformly overpopulated," Compl. ¶ 139, and that "heavily Anglo districts in West Texas and the Panhandle" are "uniformly underpopulate[d]," *id.* ¶ 140. As an initial matter, that is wrong on the merits. It ignores the impacts of differing relative population growth in El Paso and other regions of the State, the application of the county line rule, and the relatively even distribution statewide of over and underpopulated Hispanic majority districts.[2]

But regardless of the merits, the problem for the United States is that the Attorney General is not authorized to bring *Larios* claims, or any other constitutional claims, in this case. That is why the complaint attempts to awkwardly fit *Larios* allegations into a Section 2 claim. The Court should dismiss this claim and leave the *Larios* issues regarding the proper number of districts in the area to be litigated by the private plaintiffs, supplemented by any appropriate amicus briefing from the United States. *See*

---

[2] *See* Ex. L at 24–25 (showing HDs 36–41, districts in in Cameron, Hidalgo, and Willacy Counties, each of which is greater than 83% Hispanic by total population, as underpopulated by amounts ranging from -2.62% to -4.84%). *See also id.* at 34–38 (showing there are fifteen over-populated districts with a majority HVAP, and fifteen similar under-populated districts).

Plaintiff MALC's Original Complaint, *MALC v. Texas*, No. 1:21-cv-988, ECF 1 ¶ 240 (W.D. Tex. Nov. 3, 2021) (asserting a claim based on *Larios*).

## III.    Section 2 Does Not Apply to Redistricting

All of the United States' claims should fail because Section 2 "does not apply to redistricting." *Perez*, 138 S. Ct. at 2335 (Thomas, J. concurring); *see also Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 294–98 (2015) (Thomas, J., dissenting); *Bartlett*, 556 U.S. at 26 (Thomas, J., concurring in the judgment); *Hall*, 512 U.S. at 892–93 (Thomas, J., concurring in the judgment). Although this argument is currently foreclosed by precedent, Defendants preserve it for appeal.

### CONCLUSION

Defendants respectfully request that the Court dismiss the United States' claims.

Date: December 27, 2021                     Respectfully submitted.

KEN PAXTON                                  /s/ Patrick K. Sweeten
Attorney General of Texas                   PATRICK K. SWEETEN
                                            Deputy Attorney General for Special Litigation
BRENT WEBSTER                               patrick.sweeten@oag.texas.gov
First Assistant Attorney General            Tex. State Bar No. 00798537


                                            WILLIAM T. THOMPSON
OFFICE OF THE ATTORNEY GENERAL              Deputy Chief, Special Litigation Unit
P.O. Box 12548 (MC-009)                     will.thompson@oag.texas.gov
Austin, Texas 78711-2548                    Tex. State Bar No. 24088531
Tel.: (512) 463-2100
Fax: (512) 457-4410                         **COUNSEL FOR DEFENDANTS**


### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on December 27, 2021, and that all counsel of record were served by CM/ECF.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN