IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

|  |  |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), et al., <br><br> Plaintiffs, <br><br> v. <br><br> GREG ABBOTT, et al., <br><br> Defendants. | Civil Action No. 3:21-cv-259 (DCG-JES-JVB) (consolidated cases) |

**UNITED STATES' OPPOSITION TO TEXAS'S MOTION TO DISMISS**

# **Table of Contents**

Introduction.................................................................................................................. 1

Procedural Background............................................................................................... 1

Statutory Background ................................................................................................. 2

Legal Standard ........................................................................................................... 3

Argument ................................................................................................................... 4

   I.    Section 2 of the Voting Rights Act Applies to Redistricting................................. 4

   II.   The United States Has Plausibly Alleged that the Congressional and

       House Plans Have a Discriminatory Result and Violate Section 2. ................................... 4

     A.    A District with a Latino Population Majority Can Violate Section 2. ........................ 5

     B.    A Section 2 Complaint Need Not Provide Illustrative Maps or Statistical

          Estimates of Voting Behavior.................................................................................... 7

     C.    Analysis of Minority Cohesion Is Not Limited to an Illustrative Plan....................... 10

     D.    Section 2 Liability Does Not Require Absolute Cohesion. ......................................... 11

   III.   The United States Has Plausibly Alleged that the Congressional Plan Has

       A Racially Discriminatory Intent and Violates Section 2. ............................................. 14

     A.    Intentional Racial Discrimination in Redistricting Violates Section 2...................... 15

     B.    Section 2 Prohibits Intentional Discrimination Even Where the

          *Gingles* Preconditions Cannot Be Met. ................................................................... 17

     C.    A Potential Partisan Motive Does Not Negate Allegations of Racially

          Discriminatory Intent................................................................................................. 18

Conclusion ................................................................................................................. 20

## Table of Authorities

**Cases**

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ............................................................ 2, 3, 7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................ 3, 4, 8

*Barnett v. Daley*, 32 F.3d 1196 (7th Cir. 1994) ........................................................ 15

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ............................................................ 7, 18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ 8

*Benavidez v. City of Irving*, 638 F. Supp. 2d 709 (N.D. Tex. 2009).......................... 13

*Benavidez v. Irving ISD*, No. 3:13-cv-87, 2014 WL 4055366
  (N.D. Tex. Aug. 15, 2014) ............................................................................ 9

*Bradley v. Ind. State Elec. Bd.*, 797 F. Supp. 694 (D. Ind. 1992).............................. 9

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021).......................... 3, 15, 16

*Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988)...................................... 12

*Catañeda v. Partida*, 430 U.S. 482 (1977) ............................................................ 13

*Chestnut v. Merrill*, 377 F. Supp. 3d 1308 (N.D. Ala. 2019) .............................. 9, 11

*Chisom v. Roemer*, 501 U.S. 380 (1991) ........................................................ passim

*Cisneros v. Pasadena ISD*, No. 4:12-cv-2579, 2014 WL 1668500
  (S.D. Tex. Apr. 25, 2014) ............................................................................ 10

*Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496 (5th Cir. 1987)............ 12

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ........................................................ 18

*City of Mobile v. Bolden*, 446 U.S. 55 (1980)...................................................... 16, 17

*Clark v. Calhoun Cnty.*, 21 F.3d 92 (5th Cir. 1994) .............................................. 5, 10

*Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, 835 F. Supp.
  2d 563 (N.D. Ill. 2011) (three-judge court) .............................................. 18

*Contant v. Bank of Am. Corp.*, No. 1:17-cv-3139, 2018 WL 5292126
  (S.D.N.Y. Oct. 25, 2018) ............................................................................ 8

*Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278 (5th Cir. 2006) ................ 8

*Finch v. Miss. State Med. Ass'n*, 585 F.2d 765 (5th Cir. 1978)................................ 16

*Frank v. Walker*, 819 F.3d 384 (7th Cir. 2016) ...................................................... 17

*Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020) .................................................... 2

*Garza v. Cnty. of Los Angeles*, 918 F.2d 763 (9th Cir. 1990)........................ 17, 19, 20

*Gingles v. Edmisten*, 590 F. Supp. 345 (E.D.N.C. 1984) (three-judge court) ........ 10, 12

*Growe v. Emison*, 507 U.S. 25 (1993) ................................................................ 4, 11

*Harper v. City of Chicago Heights*, No. 87-cv-5112, 1994 WL 710782
  (N.D. Ill. Dec. 16, 1994) ............................................................................ 8

*Johnson v. Ardoin*, No. 18-625, 2019 WL 2329319 (M.D. La. May 31, 2019) ............ 9

*Johnson v. De Grandy*, 512 U.S. 997 (1994)...................................................... 3, 4, 14

*Johnson v. Governor of Fla.*, 405 F.3d 1214 (11th Cir. 2005) (en banc) .................... 16

*Jones v. City of Lubbock*, 727 F.2d 364 (5th Cir. 1984)........................................ 12

*Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446 (2015).................................... 4

*Kirksey v. Bd. of Supervisors*, 554 F.2d 139 (5th Cir. 1977) (en banc).................... 12

*Kumar v. Frisco ISD*¸ 476 F. Supp. 3d 439 (E.D. Tex. 2020)................................ 10

*Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga.) (three-judge court) ...................... 5

*LULAC v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc) ................................ 12

*LULAC v. Perry*, 548 U.S. 399 (2006) ............................................................................... passim

*Luna v. Cnty. of Kern*, No. 1:16-cv-568, 2016 WL 4679723 (E.D. Cal. Sept. 2, 2016).............. 9

*Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143 (5th Cir. 1993) ......................................................... 10

*McMillan v. Escambia Cnty.*, 748 F.2d 1037 (Former 5th Cir. 1984)............................ 16, 17, 18

*Metts v. Murphy*, 363 F.3d 8 (1st Cir. 2004) (en banc)................................................................ 9

*Miller v. Johnson*, 515 U.S. 900 (1995)................................................................................ 17, 19

*Monroe v. City of Woodville* (*Monroe I*), 881 F.2d 1327 (5th Cir. 1989) ............................... 6, 12

*Monroe v. City of Woodville* (*Monroe II*), 897 F.2d 763 (5th Cir. 1990)..................................... 11

*Moore v. Leflore Cnty. Bd. of Elec. Comm'rs*, 502 F.2d 621 (5th Cir. 1974) ........................... 6, 7

*N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) ................................ 19

*Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017) (three-judge court)............... 6, 9, 15, 18

*Pledger v. Lynch*, 5 F.4th 511 (4th Cir. 2021) .............................................................................. 8

*Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832 (N.D. Tex. 2018)........................................ 8

*Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686 (S.D. Tex. 2013)............................................... 9

*Rogers v. Lodge*, 458 U.S. 613 (1982)................................................................................... 3, 14

*Russell v. Hathaway*, 423 F. Supp. 833 (N.D. Tex. 1976) (three-judge court)........................... 16

*Rybicki v. State Bd. of Elections*, 574 F. Supp. 1082 (N.D. Ill. 1982)........................................ 20

*Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542 (5th Cir. 1992)................................................... 6

*Scanlan v. Tex. A&M Univ.*, 343 F.3d 533 (5th Cir. 2003) .......................................................... 3

*Seastrunk v. Burns*, 772 F.2d 143 (5th Cir. 1985) ...................................................................... 15

*Shaw v. Reno*, 509 U.S. 630 (1993) ........................................................................................... 19

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ............................................................................... 2

*Teague v. Attala Cnty.*, 92 F.3d 283 (5th Cir. 1996)................................................................... 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ........................................ 4, 13

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
   576 U.S. 519 (2015)................................................................................................................. 4

*Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (three-judge court) ....................... 10

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ........................................................................... passim

*United States v. Brown*, 561 F.3d 420 (5th Cir. 2009).................................................... 17, 18, 20

*United States v. Georgia*, No. 1:21-cv-2575, 2021 WL 5833000
   (N.D. Ga. Dec. 9, 2021) ......................................................................................................... 16

*United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546 (11th Cir. 1984) ................................ 12

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc)........................................... 2, 9, 15

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).......... 3, 14, 19, 20

*Voinovich v. Quilter*, 507 U.S. 146 (1993) ...................................................................... 6, 7, 12

*Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973).................................................................. 6

## Statutes

52 U.S.C. § 10301............................................................................................................... 2, 17

## Rules

Fed. R. Civ. P. 8(a)(2)................................................................................................................ 8

Fed. R. Civ. P. 9(b) .................................................................................................................... 8

**Legislative History**

S. Rep. No. 97-417 (1982) ................................................................................. 3, 12, 16

## INTRODUCTION

In 2021, Texas enacted redistricting plans that discriminate against minority voters, just as it had in every redistricting cycle since the 1970s.  Rather than embrace the emergence of a multiracial democracy, the State argues that Section 2 of the Voting Rights Act offers no protection from discriminatory redistricting plans, despite decades of Supreme Court precedent to the contrary.  Tex. Mot. 24, ECF No. 111.  This remarkable claim—along with Texas's other defenses—must be rejected.  Under the Section 2 discriminatory results framework, superficial population majorities do not shield districts from scrutiny, allegations need not offer the specificity of an expert report, and courts are not constrained to examine minority cohesion only in an illustrative or remedial district.  Moreover, intentionally discriminatory redistricting plans violate Section 2, and racial discrimination need only be one purpose, and not even the primary one, for a redistricting plan to violate the Act.  The State's motion to dismiss should be denied.

## PROCEDURAL BACKGROUND

The United States brought this litigation to enforce the Voting Rights Act of 1965.  U.S. Compl., *United States v. Texas*, No. 3:21-cv-299 (W.D. Tex. Dec. 6, 2021), ECF No. 1.  The Complaint alleges that Texas's 2021 Congressional Plan and 2021 House Plan violate Section 2 of the Act, 52 U.S.C. § 10301.  U.S. Compl. ¶¶ 164-166.  In the Congressional plan, the United States challenges District 23 in West Texas for its discriminatory purpose and discriminatory result, U.S. Compl. ¶¶ 39-55; the Dallas-Fort Worth (DFW) configuration of districts for its discriminatory purpose, U.S. Compl. ¶¶ 56-75; and the Harris County configuration of districts for its discriminatory result, U.S. Compl. ¶¶ 76-94.  In the House plan, the United States challenges District 118 in Bexar County, U.S. Compl. ¶¶ 104-116; District 31 in South Texas,

U.S. Compl. ¶¶ 117-130; and the West Texas configuration of districts, U.S. Compl. ¶¶ 131-146, all for discriminatory results.

The State of Texas and Secretary of State John Scott have moved to dismiss in full.  Tex. Mot., ECF No. 111.

<div align="center">

**STATUTORY BACKGROUND**

</div>

Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, imposes a "permanent, nationwide ban on racial discrimination in voting."  *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013).  A violation of Section 2 can "be established by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991); *see also, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc).  Section 2 therefore prohibits vote dilution, such as the use of redistricting plans that "minimize or cancel out the voting strength of racial [minorities in] the voting population."  *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (internal citations and quotation marks omitted).  Section 2 also prohibits voting laws adopted with discriminatory intent.  *See Chisom*, 501 U.S. at 394 n.21; *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020).

In *Gingles*, the Supreme Court set out three preconditions to a vote dilution claim.  *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2330-31 (2018).  "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."  *Gingles*, 478 U.S. at 50.  "Second, the minority group must be able to show that it is politically cohesive."  *Id.* at 51.  "Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate."  *Id.* (internal citations omitted).  If plaintiffs establish all three preconditions, consideration proceeds to the totality of the circumstances analysis, which

<div align="center">

2

</div>

incorporates factors enumerated in the Senate Report that accompanied the 1982 Voting Rights

Act Amendments, as well as other relevant evidence.  *See Perez*, 138 S. Ct. at 2331; *Gingles*,

478 U.S. at 36-37 (quoting S. Rep. No. 97-417, at 28-29 (1982)); *see also LULAC v. Perry*, 548

U.S. 399, 425-26, 436-41 (2006); *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994).

To prove discriminatory intent, plaintiffs must show that a discriminatory purpose was "a

motivating factor" for enacting the challenged law.  *Village of Arlington Heights v. Metro. Hous.*

*Dev. Corp.*, 429 U.S. 252, 265-66 (1977).  Determining whether a facially neutral law has a

discriminatory purpose "demands a sensitive inquiry into such circumstantial and direct evidence

of intent as may be available."  *Id.* at 266; *see also, e.g.*, *Brnovich v. Democratic Nat'l Comm.*,

141 S. Ct. 2321, 2349 (2021) (applying *Arlington Heights*).  Categories of relevant evidence

include (1) the impact of the decision; (2) the historical background of the decision, particularly

if it reveals a series of decisions undertaken with discriminatory intent; (3) the sequence of

events leading up to the decision; (4) whether the challenged decision departs, either

procedurally or substantively, from the normal practice; and (5) contemporaneous statements and

viewpoints held by decisionmakers.  *See Arlington Heights*, 429 U.S. at 266-68.  Senate Factor

evidence is also probative of discriminatory intent.  *See Rogers v. Lodge*, 458 U.S. 613, 620-21

(1982).

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (internal citation and quotation marks omitted); *see also Scanlan v. Tex.*

*A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (directing district courts to "accept all well-

pleaded facts as true, viewing those facts most favorably to the plaintiff").  Consideration of

information outside the complaint is limited to "documents incorporated into the complaint by reference[] and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The motion to dismiss must be denied so long as the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I.     Section 2 of the Voting Rights Act Applies to Redistricting.

As Texas acknowledges, binding precedent forecloses the State's assertion that Section 2 does not apply to redistricting.  *See LULAC v. Perry*, 548 U.S. at 425; *De Grandy*, 512 U.S. at 1006; *Growe v. Emison*, 507 U.S. 25, 40 (1993); *Gingles*, 478 U.S. at 34-38, 49-51 (establishing vote dilution test under Section 2 in a redistricting case); *see also* Tex. Mot. 30.  "Where, as here, the precedent interprets a statute, *stare decisis* carries enhanced force, since critics are free to take their objections to Congress."  *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 447 (2015). Section 2's application to redistricting is all the clearer here, since Congress left in place this long-accepted reading of Section 2 when it last amended the Voting Rights Act in 2006.  *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 536 (2015) ("When it amended the FHA, Congress was aware of this unanimous precedent.  And with that understanding, it made a considered judgment to retain the relevant statutory text.").

### II.    The United States Has Plausibly Alleged that the Congressional and House Plans Have a Discriminatory Result and Violate Section 2.

The United States has adequately pled that Congressional District 23, the Harris County Congressional configuration, House District 118, House District 31, and the West Texas House configuration violate the Section 2 results test.  The United States' Complaint plausibly alleges all three *Gingles* preconditions.  First, the Latino communities in these areas are each

"sufficiently large and geographically compact to constitute a majority in" additional districts that would provide them with an opportunity to elect representatives of their choice. *Gingles*, 478 U.S. at 50; *see* U.S. Compl. ¶¶ 55 (CD 23), 91 (Harris), 114 (HD 118), 127 (HD 31), 146 (West Texas). Latino voters in these regions are also politically cohesive because "a significant number of minority group members usually vote for the same candidates." *Gingles* 478 U.S. at 56; *see* U.S. Compl. ¶¶ 46 & 49 (CD 23), 93 (Harris), 115 (HD 118), 128 (HD 31), 144 (West Texas). And bloc voting by Anglo voters in the challenged districts will likely "defeat the combined strength of minority support plus white 'crossover' votes," yielding legally significant racial bloc voting. *Gingles*, 478 U.S. at 56; *see* U.S. Compl. ¶¶ 50 (CD 23), 94 (Harris), 116 (HD 118), 129 (HD 31), 145 (West Texas).

As the Fifth Circuit long ago declared, "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* [preconditions] but still have failed to establish a violation of § 2 under the totality of circumstances." *Clark v. Calhoun Cnty.*, 21 F.3d 92, 97 (5th Cir. 1994) (internal citation and quotation marks omitted). The United States has pled sufficient facts to establish the *Gingles* preconditions, as well as sufficient facts under the Senate Factors, U.S. Compl. ¶¶ 14-38, 95-103, 147-60, to establish a Section 2 violation.[1]

**A.     A District with a Latino Population Majority Can Violate Section 2.**

By Texas's own admission, "the United States is 'not precluded, as a matter of law, from seeking to prove'" that a redistricting plan dilutes the voting strength of Latino voters, even when Latinos make up more than 50% of the registered voters in a district. Tex. Mot. 5 (quoting *Salas*

---

[1] The United States has not alleged that the West Texas House configuration is unlawfully malapportioned, under the theory articulated in *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga.) (three-judge court), *aff'd*, 542 U.S. 947 (2004). Tex. Mot. 23-24. Instead, the United States has alleged that overpopulation of heavily Latino districts and underpopulation of Anglo-controlled districts contributed to the elimination of a Latino opportunity district in West Texas. U.S. Compl. ¶¶ 139-140, 146.

*v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992)).  This is because "it may be possible for a citizen voting-age majority to lack real electoral opportunity." *LULAC v. Perry*, 548 U.S. at 428.  Ignoring its own concession, the State nonetheless contends that a mere Latino population majority immunizes districts from Section 2 claims.  Tex. Mot. 3-4, 19-20, 22.  But this argument is foreclosed by precedent and runs counter to "the broad remedial purpose of ridding the country of racial discrimination in voting." *Chisom*, 501 U.S. at 403.

The effect of creating a majority-minority district "depends entirely on the facts and circumstances of each case." *Voinovich v. Quilter*, 507 U.S. 146, 154-55 (1993).  Thus, the Fifth Circuit "has rejected any *per se* rule that a racial minority that is a majority in a political subdivision cannot experience vote dilution." *Monroe v. City of Woodville* (*Monroe I*), 881 F.2d 1327, 1333 (5th Cir. 1989); *see also Salas*, 964 F.2d at 1550; *Moore v. Leflore Cnty. Bd. of Elec. Comm'rs*, 502 F.2d 621, 624 (5th Cir. 1974); *Zimmer v. McKeithen*, 485 F.2d 1297, 1303 (5th Cir. 1973).  "[D]emographics alone do not demonstrate opportunity." *Perez v. Abbott*, 253 F. Supp. 3d 864, 880 (W.D. Tex. 2017) (three-judge court).  Instead, "the degree of racially polarized voting and turnout will affect whether an HCVAP-majority district provides opportunity, such that a searching, practical inquiry is required." *Id.*  Such scrutiny is particularly warranted in a district such as Congressional District 23, which has been drawn to have a Latino citizen voting age population (CVAP) majority, based on 2015-2019 American Community Survey data, but nevertheless has a 2020 Spanish surname voter registration minority and a 2020 Spanish surname turnout share of only 42.9%.  U.S. Compl. ¶ 48.

Similarly, House District 118 has been drawn with a Latino CVAP majority but a 2020 Spanish surname turnout share of 43.9%.  U.S. Compl. ¶ 111.[2]

Contrary to Texas's argument, Tex. Mot. 4, 19-20, *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009), does not disturb this precedent or create a safe harbor for majority-minority districts that do not afford actual electoral opportunities.  *Bartlett* merely sets a floor for satisfying the first *Gingles* precondition: minority voters must "form a majority" in a potential district.  556 U.S. at 18-19 (distinguishing crossover districts, which craft a population majority from minority voters and likeminded Anglos); *cf.* Tex. Mot. 4 (omitting relevant text).  But not every majority-minority district yields an electoral opportunity.  *See Abbott v. Perez*, 138 S. Ct. at 2332-33; *see also Voinovich*, 507 U.S. at 154-55 (describing opportunity created when minority voters constitute "a sizeable and therefore 'safe' majority").  This Court should reject the proposed *per se* rule immunizing districts with a majority-minority population from Section 2 scrutiny.

**B.     A Section 2 Complaint Need Not Provide Illustrative Maps or Statistical Estimates of Voting Behavior.**

Texas also erroneously suggests that the United States must plead particularized allegations regarding illustrative maps and statistical estimates of the "level or degree" of minority cohesion.  Tex. Mot. 4, 17, 19-22.

---

[2] Texas is mistaken that the United States has alleged that Congressional District 23 and House District 118 are unlawful under Section 2 purely because they reduce minority population share, under a "retrogression" theory.  Tex. Mot. 6, 19.  Rather, the diminution of minority voting strength simply reinforces the key allegation that the newly drawn districts deny minority voters equal electoral opportunities.  *See Moore*, 502 F.2d at 624; U.S. Compl. ¶¶ 48, 51-52, 104, 111.  Similarly, Texas is wrong to characterize the United States' Complaint as alleging that Congressional District 23 has been drawn to "shut[] out minority candidates."  Tex. Mot. 6-7.  The Voting Rights Act protects voters.  Thus, the United States has alleged that Congressional District 23 will not allow Latino *voters* to elect their candidates of choice.  U.S. Compl. ¶¶ 50-51.

Detailed information about how the plaintiffs have satisfied the first or second *Gingles* precondition is the province of expert reports, often dependent on discovery, not complaints. *See, e.g.*, *Harper v. City of Chicago Heights*, No. 87-cv-5112, 1994 WL 710782, at *5 (N.D. Ill. Dec. 16, 1994).  Rule 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and Rule 9 requires a party to plead "with particularity" only when alleging fraud or mistake, Fed. R. Civ. P. 9(b).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for plausible grounds . . . simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [liability].").  Caselaw and prudence confirm that a complaint need not divulge expert analysis to state a claim under Section 2.

Fundamentally, "[p]laintiffs need not gather any expert evidence or serve it on defendants for a claim to be plausible." *Pledger v. Lynch*, 5 F.4th 511, 520 (4th Cir. 2021) (internal citation and quotation marks omitted); *see also, e.g.*, *Contant v. Bank of Am. Corp.*, No. 1:17-cv-3139, 2018 WL 5292126, at *6 (S.D.N.Y. Oct. 25, 2018).  Indeed, district courts may decline to rely on expert opinions incorporated in a complaint, which may raise "a myriad of complex evidentiary issues not generally capable of resolution at the pleading stage." *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006); *see also Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 839 (N.D. Tex. 2018) ("[I]t is inappropriate to consider expert opinions at the pleading stage.").  Imposing statistical pleading mandates and requiring expert evidence at "the pleading stage of litigation" would yield disputes not properly resolved on a motion to dismiss.

*Luna v. Cnty. of Kern*, No. 1:16-cv-568, 2016 WL 4679723, at *5 (E.D. Cal. Sept. 2, 2016). Resolving those disputes is the province of summary judgment or trial.

Section 2 complaints are no exception to this general rule. *See Chestnut v. Merrill*, 377 F. Supp. 3d 1308, 1313 (N.D. Ala. 2019) (distinguishing between expert evidence required at trial and what is "necessary at the pleading stage"). Thus, "[i]t is no accident that most cases under [S]ection 2 have been decided on summary judgment or after a verdict, and not on a motion to dismiss." *Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004) (en banc). "[A]t the motion to dismiss stage, the Court is bound to accept Plaintiffs' well-pleaded facts as true and does not require submitting as evidence hypothetical redistricting schemes" to establish the first *Gingles* precondition. *Johnson v. Ardoin*, No. 18-625, 2019 WL 2329319, at *4 (M.D. La. May 31, 2019) (internal quotation marks and citation omitted); *see also, e.g.*, *Chestnut*, 377 F. Supp. 3d at 1313; *Luna*, 2016 WL 4679723, at *4; *Bradley v. Ind. State Elec. Bd.*, 797 F. Supp. 694, 699 (D. Ind. 1992). Similarly, a Section 2 plaintiff need not allege "how vigorously" groups "vote as a bloc over time" to plead the second and third *Gingles* preconditions. *Metts*, 363 F.3d at 12; *see also, e.g.*, *Luna*, 2016 WL 4679723, at *5 (finding sufficient allegation that "Latino voters in Kern County express a preference for Latino candidates"). The State's request for fine-grained analysis at the pleading stage "puts the cart before the horse." *Luna*, 2016 WL 4679723, at *5.[3]

---

[3] Rapid Latino growth in Harris County—as well as alternative maps that created a new majority-Latino district there—buttress the first *Gingles* precondition. Compl. ¶¶ 76, 89; *see also Johnson v. Ardoin*, 2019 WL 2329319, at *3; *Luna*, 2016 WL 4679723, at *4; *cf.* Tex. Mot. at 15-16. Furthermore, repeat findings of polarized voting in Texas buttress the plausibility of allegations in this case concerning the second and third *Gingles* preconditions. *See, e.g.*, *LULAC v. Perry*, 548 U.S. at 427; *Veasey*, 830 F.3d at 258; *Benavidez v. Irving ISD*, No. 3:13-cv-87, 2014 WL 4055366, at *10-13 (N.D. Tex. Aug. 15, 2014); *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 754-55 (S.D. Tex. 2013), *aff'd*, 609 Fed. App'x 255 (5th Cir. 2015); *Perez v. Abbott*, 253 F. Supp. 3d at 946. Although the State suggests that racially polarized voting is distinct from political cohesion, Tex. Mot. 17-18 (quoting *Kumar v. Frisco ISD¸* 476 F. Supp. 3d

**C.      Analysis of Minority Cohesion Is Not Limited to an Illustrative Plan.**

Texas next wrongly argues that analysis of cohesion focuses solely on minority voters within a proposed illustrative district.  *See* Tex. Mot. at 5, 17-18, 19-20, 21.  But no court has ever confined analysis of the second *Gingles* precondition in this manner.  *Gingles* itself affirmed a liability finding based on cohesion "in the challenged multi-member districts" and "in the area covered by the challenged single-member Senate District."  *Gingles v. Edmisten*, 590 F. Supp. 345, 367-72 (E.D.N.C. 1984) (three-judge court), *aff'd in relevant part*, 478 U.S. 30 (1986).

Moreover, analysis outside of an illustrative district is necessary because "elections involving the particular office at issue will be more relevant than elections involving other offices" when assessing the *Gingles* preconditions.  *Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993); *see also, e.g.*, *Clark*, 21 F.3d at 97 (5th Cir. 1994); *Cisneros v. Pasadena ISD*, No. 4:12-cv-2579, 2014 WL 1668500, at *9 (S.D. Tex. Apr. 25, 2014).  Analysis of these "endogenous" elections is only possible in the actually existing districts in which they were conducted.  Almost by definition, it cannot be performed regarding newly drawn or proposed illustrative districts.  *Texas v. United States*, 887 F. Supp. 2d 133, 142-43 (D.D.C. 2012) (three-judge court), *vacated*, 570 U.S. 928 (2013).  Thus, courts have consistently analyzed minority cohesion in challenged districts, in earlier configurations, and across the jurisdiction at issue, not merely in proposed illustrative plans.  *See, e.g.*, *LULAC v. Perry*, 548 U.S. at 427 (addressing "cohesion among the minority group . . . in District 23"); *Teague v. Attala Cnty.*, 92 F.3d 283,

---

439, 502 (E.D. Tex. 2020)), the concepts are "similar" and "a showing of racially polarized voting will frequently demonstrate that minority voters are politically cohesive," *Kumar*, 476 F. Supp. 3d at 502-503.  *See also Gingles*, 478 U.S. at 56 ("[T]he purpose of inquiring into the existence of racially polarized voting is twofold: to ascertain whether minority group members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates.").  Moreover, the State's argument relies solely on a decision issued after trial.  *Kumar*, 476 F. Supp. 3d at 453.  At the pleading stage, any allegation of polarization must be construed to incorporate minority cohesion.

289 (5th Cir. 1996); *Monroe v. City of Woodville* (*Monroe II*), 897 F.2d 763, 764 (5th Cir. 1990)

(per curiam); *see also* Mem. Op. at 4, ECF No. 144 (finding "plausibly indicat[ion]" of cohesion

in preferred candidate success in "several recent elections").

Texas erroneously suggests that a fragment of *Growe v. Emison*, 507 U.S. 25, 40 (1990),

invalidates decades of subsequent caselaw.  Tex. Mot. 5, 17, 20-21.  Applying *Gingles*, *Growe*

merely explained that a plaintiff must prove that the minority group "is politically cohesive."

507 U.S. at 40 (quoting *Gingles*, 478 U.S. at 50-51).  Because liability turns on the

discriminatory result of the challenged district, *Growe* concluded that "the 'minority political

cohesion' and 'majority bloc voting' showings are needed to establish that the challenged

districting thwarts a distinctive minority vote."  *Id.*  *Growe* did not limit the analysis to an

illustrative district.  *See id.* at 37, 41 (holding that plaintiffs had not proven vote dilution "*in a*

*portion* of the city of Minneapolis" because they failed to present evidence "of minority political

cohesion . . . in Minneapolis" (emphasis added)).  Nor should this Court.[4]

> **D.     Section 2 Liability Does Not Require Absolute Cohesion.**

Texas also wrongly suggests that any challenge to a district with a majority-minority

population must fail because a minority group offering "uniform[] support" to the same

candidates would have an electoral opportunity in any such district.  Tex. Mot. 4-6, 20-21.[5]  This

is just another way to argue that a majority-minority district cannot violate Section 2, and many

of the same decisions that foreclose the State's arguments under the first *Gingles* precondition,

---

[4] The State's argument also fails because plaintiffs are not required to "present[] an alternative district map" at the pleading stage.  *Chestnut*, 377 F. Supp. 3d at 1314; *see also* Section II.B, *supra*.  Thus, it cannot be that plaintiffs must plead cohesion within such a map.

[5] This focus on cohesion within the challenged district—though correct—contradicts the State's argument that analysis of the second *Gingles* precondition is confined to a proposed illustrative district.  *See* Section II.C, *supra*.

*see* Section II.A, *supra*, undermine this argument as well.  *See, e.g.*, *LULAC v. Perry*, 548 U.S. at

428; *Voinovich*, 507 U.S. at 154-55; *Monroe I*, 881 F.2d at 1333.

Texas's argument mistakenly presupposes that satisfying *Gingles*' political cohesion

precondition requires that minority voters vote as a bloc with perfect uniformity.  It does not.

*Gingles* requires only that "a significant number of minority group members usually vote for the

same candidates," not that minority voters are a monolith.  478 U.S. at 56; *see also, e.g.*, *Campos*

*v. City of Baytown*, 840 F.2d 1240, 1246 (5th Cir. 1988) (upholding cohesion based on combined

minority support as low as 62%); *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496,

501-02 & n.12 (5th Cir. 1987) (upholding cohesion based on mere plurality support in a

multicandidate contest); *Gingles v. Edmisten*, 590 F. Supp. at 369 (finding cohesion

notwithstanding only 53% support for lesser performing minority-preferred candidates in

multimember districts).  Moreover, Texas's argument also ignores the fact that "conditions

arising from past discrimination tend to depress minority political participation."  *LULAC v.*

*Clements*, 999 F.2d 831, 866-67 (5th Cir. 1993) (en banc) (quoting S. Rep. No. 97-417, at 29

n.114).[6]  Taken together, this means that even when they constitute a majority of the citizens of

voting age in a challenged district, cohesive minority voters may lack a practical opportunity to

elect representatives of their choice, whatever abstract arithmetic might suggest.

Texas's arguments under the third *Gingles* precondition essentially restate its flawed

argument concerning the second precondition and share its erroneous premises.  Tex. Mot. 5-6.

The State does not deny that the United States has alleged that Anglo bloc voting will defeat the

---

[6] To the extent that the State attributes any gap between a population majority and an electoral opportunity to voter apathy, this defense has long been barred.  *See Jones v. City of Lubbock*, 727 F.2d 364, 383 (5th Cir. 1984); *Kirksey v. Bd. of Supervisors*, 554 F.2d 139, 145 (5th Cir. 1977) (en banc); *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1569 (11th Cir. 1984).

preferred candidates of most Latino voters in relevant districts; it merely argues that Anglo voters cannot "control" elections in majority-minority districts.  Tex. Mot. 5.  In fact, the United States alleges that only 42.9% of voters who cast a ballot within the new Congressional District 23 in 2020 had Spanish Surnames.  U.S. Compl. ¶ 48 & tbl.1.  In House District 118, the comparable figure is 43.9%.  U.S. Compl. ¶ 111 & tbl.4.  It is Latino voters who are outnumbered in the redrawn districts.[7]  And in House District 31, the United States alleges that "extreme bloc voting by Anglo voters will enable them usually to defeat Latino voters' preferred candidates, despite Latino voters making up a majority of the electorate."  Compl. ¶ 129.

The fact that Latino legislators offered amendments to some challenged districts does not signal acquiescence to those districts' broader configurations adopted by the Legislature, let alone agreement that bloc voting by Anglo voters cannot defeat a certain demographic concentration of Latino residents in a single-member district.  *Cf.* Tex. Mot. 6.  Texas would like this Court to focus only on CVAP, which paints an incomplete picture as to whether a district affords Latino voters an opportunity to elect a candidate of choice.[8]

Finally, and only with respect to the Harris County Congressional configuration, Texas wrongly argues that the existence of a minority electoral opportunity in one district in a region is

---

[7] To the extent that Texas suggests that its own Spanish surname data is inaccurate or a poor proxy for Latino turnout share, Tex. Mot. 19, a motion to dismiss is not the correct vehicle for this argument, which rests on facts and analysis outside of the pleadings.  In any case, "experts commonly use Spanish surname databases as the foundation for analysis," relying on the percentage of voters with Spanish surnames on a registration or turnout list as a substitute for self-reported race.  *Benavidez v. City of Irving*, 638 F. Supp. 2d 709, 717 & n.7 (N.D. Tex. 2009); *see also, e.g.*, *LULAC v. Perry*, 548 U.S. at 439 (using Spanish surname voter registration as a measure of Latino political strength); *cf. Cataneda v. Partida*, 430 U.S. 482, 486-87, 495 (1977) (relying on Spanish surname data to address jury poll discrimination).

[8] The rationales and motivations behind proposed amendments are outside the scope of the Complaint and have not been presented to the Court.  The State's insinuations regarding these issues cannot be considered in the pending motion to dismiss.  *See, e.g.*, *Tellabs*, 551 U.S. at 322.

relevant to the third *Gingles* precondition, even when an additional opportunity district might be drawn. Tex. Mot. 18. The fact that Congressional District 36 provides minority voters with an opportunity to elect a candidate of choice because Anglo voters comprise only 15.1 percent of the CVAP in that district says nothing about polarized voting and may itself evince vote dilution in other districts. *See De Grandy*, 512 U.S. at 1007 (describing dilution "by packing [minority voters] into one or a small number of districts to minimize their influence").

### III.   The United States Has Plausibly Alleged that the Congressional Plan Has A Racially Discriminatory Intent and Violates Section 2.

The United States has also adequately pled that Congressional District 23 and the DFW Congressional configuration are intentionally discriminatory, in violation of Section 2. The United States' Complaint contains allegations in each category of relevant evidence under *Arlington Heights*, which together establish plausible allegations of discriminatory intent. *See* 429 U.S. at 266-68; *see also* Mem. Op. at 4, ECF No. 144 (finding adequate pleading based on comparable allegations). Both District 23 and the DFW configuration have dilutive impacts on minority voting strength. *See Rogers*, 458 U.S. at 617; U.S. Compl. ¶¶ 47, 50-52, 68-75. The history of redistricting in Texas includes intentional discrimination in the same regions using the same techniques, such as creating the "facade of a Latino district" (*i.e.*, a majority-Latino district in which most voters are not Latino). *LULAC v. Perry*, 548 U.S. at 441; *see also* U.S. Compl. ¶¶ 5, 19-21, 39-41, 52-53, 60, 65, 69.[9] The sequence of events includes narrow victories by

---

[9] Although Texas asserts there may have been "race-neutral reasons" to split precincts around District 23, Tex. Mot. 11, this Court must construe the Complaint at the motion to dismiss stage in the light most favorable to the United States. Moreover, the State misunderstands the United States' relevant allegation. The increase in precinct splits provides additional opportunities for discrimination, and the splits did not merely remove a greater *number* of Latino voters than Anglo voters. Tex. Mot. 12. They removed a greater *share* of the Latino voters in these precincts. U.S. Compl. ¶ 53. Finally, Texas claims that the DFW configuration "does not include anything like the 'lightning bolt' from the 2011 version" based

candidates opposed by most minority voters, new census data establishing remarkable minority growth, and rejection of most alternatives proposed by Latino legislators. *See, e.g.*, *Barnett v. Daley*, 32 F.3d 1196, 1199 (7th Cir. 1994); *see also* U.S. Compl. ¶¶ 1, 3, 18, 46, 56, 64-70, 76, 82, 90.[10]  The redistricting process departed from past practice by reducing the number of hearings, excluding expert testimony, failing to provide adequate notice or transparency, and bypassing good faith discussion of the Voting Rights Act. *See Perez v. Abbott*, 253 F. Supp. 3d at 961-62; U.S. Compl. ¶¶ 22-38, 90, 97.  Finally, contemporaneous statements make clear that the Congressional plan protects incumbents who did not receive substantial minority support, taking away Latino voters' electoral opportunities for fear that they might exercise them. *See LULAC v. Perry*, 548 U.S. at 440; U.S. Compl. ¶ 51.

### A. Intentional Racial Discrimination in Redistricting Violates Section 2.

In arguing that the United States' claim of intentional discrimination against the 2021 Congressional Plan should be dismissed, Texas wrongly contends that "Section 2 does not include an intent test." Tex. Mot. 7, 13.

Once again, the State's argument contravenes decades of settled caselaw. *See, e.g.*, *Chisom*, 501 U.S. at 394 n.21 (plaintiff must prove discriminatory intent or result); *Seastrunk v. Burns*, 772 F.2d 143, 149 & n.15 (5th Cir. 1985) (discriminatory dilution of minority voting power can be proven by intent or result); *see also Brnovich*, 141 S. Ct. at 2334, 2348-49 (analyzing Section 2 intent claim); *Veasey*, 830 F.3d at 229-243 (same); *United States v.*

---

on illustrations of Tarrant County alone.  Tex. Mot. 14-15.  But the 2021 "seahorse" appendage extends into Dallas County as well, similarly submerging minority voters in Anglo-dominated rural districts.  U.S. Compl. ¶¶ 65, 71 & fig.4.

    [10] Rejected amendments evince the availability of non-discriminatory alternatives, awareness of discriminatory impacts, and a lack of responsiveness to minority communities. *See, e.g.*, *Veasey*, 830 F.3d at 237, 241.  *Contra* Tex. Mot. 12.  Such evidence bears no relation to mere "conjecture . . . as to the motivations of those legislators supporting the law." *Veasey*, 830 F.3d at 234.

*Georgia*, No. 1:21-cv-2575, 2021 WL 5833000, at *4 (N.D. Ga. Dec. 9, 2021).

Texas acknowledges, as it must, that the Fifth Circuit has "concluded that 'Congress intended that fulfilling either the more restrictive intent test or the results test would be sufficient to show a violation of [S]ection 2.'"  Tex. Mot. 9 (quoting *McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1046 (Former 5th Cir. 1984)).  It is not enough for the State to assert that this binding precedent "was wrong."  Tex. Mot. 9.  As a three-judge district court, this Court is "bound to follow the law of the circuit."  *Finch v. Miss. State Med. Ass'n*, 585 F.2d 765, 773 (5th Cir. 1978); *see also, e.g.*, *Russell v. Hathaway*, 423 F. Supp. 833, 835 (N.D. Tex. 1976) (three-judge court) (Higginbotham, J.).

Section 2 has always prohibited, and continues to prohibit, purposeful racial discrimination.  Prior to its amendment in 1982, Section 2 prohibited the use of any voting practice or procedure that was enacted (or maintained) for a discriminatory purpose.  *See City of Mobile v. Bolden*, 446 U.S. 55, 60-62 (1980) (plurality opinion).  The 1982 amendments to Section 2 responded to *City of Mobile* by expanding, not contracting, the methods of proving a violation.  *See Johnson v. Governor of Fla.*, 405 F.3d 1214, 1227 (11th Cir. 2005) (en banc). The Senate Report accompanying the 1982 Amendments explained:

> The amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose. . . . Plaintiffs must *either prove such intent, or, alternatively*, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process.

S. Rep. No. 97-417, at 27 (1982) (emphasis added).[11]  And in *Chisom*, the Supreme Court adopted this explanation.  *See* 501 U.S. at 394 n.21 (quoting S. Rep. No. 97-417, at 27); *see also,*

---

[11] The Supreme Court has consistently relied on the 1982 Senate Report to understand and apply this complex statute. *See, e.g.*, *Brnovich*, 141 S. Ct. at 2332; *Gingles*, 478 U.S. at 43 n.7 (recognizing the Senate Report as "the authoritative source for legislative intent").

*e.g.*, *United States v. Brown*, 561 F.3d 420, 432 (5th Cir. 2009) (same); *McMillan*, 748 F.2d at 1046 (same).

> ### B.   Section 2 Prohibits Intentional Discrimination Even Where the *Gingles* Preconditions Cannot Be Met.

Texas next argues that any Section 2 intent claim must also incorporate proof of discriminatory effect—which it defines to include proof of the *Gingles* preconditions—which would effectively permit intentional discrimination wherever minority voters are not sufficiently numerous and geographically compact to meet the first *Gingles* precondition.  Tex. Mot. 10, 13.  However, Section 2 bars "denial or abridgment of the right of *any* citizen of the United States to vote on account of race."  52 U.S.C. § 10301(a) (emphasis added).  Intentional vote dilution—the United States' intent claim here—occurs when "the State has enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities,' an action disadvantaging voters of a particular race."  *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (quoting *City of Mobile*, 446 U.S. at 66).  The manipulation of district lines to minimize minority voting strength is no less intentional or harmful to minority voters simply because those voters live in smaller communities or less segregated neighborhoods.  *Cf. Frank v. Walker*, 819 F.3d 384, 386 (7th Cir. 2016) ("The right to vote is personal and is not defeated by the fact that 99% of other people [are not impacted by a challenged law].").  Rather, "any abridgment of the opportunity of members of a protected class to participate in the political process inevitably impairs their ability to influence the outcome of an election."  *Chisom*, 501 U.S. at 397.  This is the only discriminatory effect that the United States must prove.  *See* U.S. Comp. ¶¶ 39, 50, 52, 56, 63-72, 75.

Thus, it is not necessary to prove the first *Gingles* precondition to state a Section 2 intent claim.  *See Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 769 (9th Cir. 1990) ("[T]o the extent

that *Gingles* does require a majority showing, it does so only in a case where there has been no proof of intentional dilution of minority voting strength."); *Perez v. Abbott*, 253 F. Supp. 3d at 944 ("This Court agrees that, when discriminatory purpose (intentional vote dilution) is shown, a plaintiff need not satisfy the first *Gingles* precondition to show discriminatory effects"); *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, 835 F. Supp. 2d 563, 581 (N.D. Ill. 2011) (three-judge court) ("Failing proof of the first *Gingles* factor, [plaintiffs] may show discriminatory effect through circumstantial evidence of discriminatory intent.")  This follows from the use of identical standards for Section 2 intent claims and constitutional discriminatory intent claims.  *See McMillan*, 748 F.2d at 1046; *cf. Bartlett*, 556 U.S. at 24 (holding, notwithstanding the first *Gingles* precondition, that "if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments.").  Although federal civil rights statutes may enforce constitutional requirements, they do not change the core requirements to prove a constitutional violation.  *See, e.g.*, *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997).  The United States has plausibly pled intentional discrimination that would violate the Constitution and thus Section 2, and this Court should reject the State's invitation to leave minority voters vulnerable to such discrimination.

## C.    A Potential Partisan Motive Does Not Negate Allegations of Racially Discriminatory Intent.

Finally, Texas erroneously contends that the United States' intentional discrimination claim should be dismissed because the Complaint "suggests that the Legislature was motivated by partisan interests."  Tex. Mot. 11-14.  That contention ignores the fact that intentional vote dilution occurs where "racial discrimination [is only] one purpose, and not even a primary purpose" underlying a redistricting plan.  *Brown*, 561 F.3d at 433; *see also Arlington Heights*,

429 U.S. at 265-66.  The presence of other permissible purposes, such as the desire to protect incumbents of a certain political party, does not immunize a plan that also intentionally diminishes minority electoral opportunities.  *See, e.g.*, *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 222 (4th Cir. 2016) (recognizing "that racially polarized voting may motivate politicians to entrench themselves through discriminatory election laws"); *Garza*, 918 F.2d at 771 ("The supervisors intended to create the very discriminatory result that occurred. That intent was coupled with the intent to preserve incumbencies, but the discrimination need not be the sole goal in order to be unlawful.").[12]

The Supreme Court's decision in *LULAC v. Perry*, 548 U.S. 399 (2006), illustrates this point well.  That case involved Texas's impermissible use of race in the service of its ultimate goal of protecting a vulnerable incumbent, and the Court struck down the 2003 modifications to Texas Congressional District 23 as violating Section 2.  *See id.* at 423-43.  As the Court explained, after the 2002 election, "it became apparent that District 23 as then drawn had an increasingly powerful Latino population that threatened to oust the incumbent Republican," *id.* at 423, and "[f]aced with this loss of voter support, the legislature acted to protect [the incumbent] by changing the lines—and hence the population mix—of the district," *id.* at 424.[13]  "In essence the State took away the Latinos' opportunity because Latinos were about to exercise it."  *Id.* at

_____

[12] The partisanship defense available in a racial gerrymandering claim under *Shaw v. Reno*, 509 U.S. 630 (1993), is not available here.  A *Shaw* claim requires proof that "race was the predominant factor motivating the legislature's decision."  *Miller*, 515 U.S. at 916; *see also Shaw*, 509 U.S. at 649.  Such claims are "analytically distinct" from Section 2 intentional discrimination claims.  *Shaw*, 509 U.S. at 652.

[13] *See also id.* at 424-25 (describing similar purpose findings by the district court); *id.* at 428 (noting that the "rise in Latino voting power in each successive election, the near-victory of the Latino candidate of choice in 2002, and the resulting threat to the [incumbent] were the very reasons that led the State to redraw the district lines"); *id.* at 435 ("[T]he Latino population of District 23 was split apart particularly because it was becoming so cohesive.").

440.  After concluding that Texas had violated Section 2 under the results test, the Court went further, commenting that Texas's use of race to protect a vulnerable incumbent "bears the mark of intentional discrimination that could give rise to an equal protection violation."  *Id.*[14]

Texas's "troubling blend of politics and race," *LULAC v. Perry*, 548 U.S. at 442, precludes the clean separation that the State wishes to impose between protection of Republican incumbents and the elimination of minority electoral opportunity.  "Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern," *Arlington Heights*, 429 U.S. at 265, and this case is no exception. On a motion to dismiss, this Court cannot reject the United States' allegation of racially discriminatory intent by crediting only the partisan motivations at issue.  Even if the facts alleged were "at least equally consistent with a legislature pursing partisan goals," Tex. Mot. 14—and they are not, U.S. Compl. ¶¶ 53, 65, 71 & fig. 4—this Court must construe the allegations in the light most favorable to the United States' claims.  This Court should not dismiss the United States' claims of intentional racial discrimination based on Texas's assertion of possible alternative partisan rationales.

## CONCLUSION

For the foregoing reasons, Texas's motion to dismiss should be denied.

---

[14] For examples of other courts finding violations of Section 2 under similar circumstances, *see, e.g.*, *Brown*, 561 F.3d at 433 (holding that the defendants violated Section 2 by manipulating various aspects of the electoral process for the purpose of diluting minority voting strength); *Garza*, 918 F.2d at 769 (holding that the fragmentation of Latino communities to perpetuate incumbencies amounted to intentional discrimination in violation of Section 2); and *Rybicki v. State Bd. of Elections*, 574 F. Supp. 1082, 1109 (N.D. Ill. 1982) (finding intentional discrimination where "requirements of incumbency are so closely intertwined with the need for racial dilution that an intent to maintain a safe, primarily white, district for [a particular incumbent] is virtually coterminous with a purpose to practice racial discrimination").

Date:  January 24, 2021

PAMELA S. KARLAN
Principal Deputy Assistant Attorney General
Civil Rights Division


*/s/ Daniel J. Freeman*
T. CHRISTIAN HERREN, JR.
TIMOTHY F. MELLETT
DANIEL J. FREEMAN
JANIE ALLISON (JAYE) SITTON
MICHELLE RUPP
JACKI L. ANDERSON
JASMIN LOTT
HOLLY F.B. BERLIN
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(800) 253-3931
daniel.freeman@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on January 24, 2021, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

<div style="margin-left:40%">

*/s/ Daniel J. Freeman*

Daniel J. Freeman
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530
(202) 305-4355
daniel.freeman@usdoj.gov

</div>