Transcript of the Testimony of

**Senator Kel Seliger**

**Date:**

January 19, 2022

**Case:**

LEAGUE OF UNITED LATIN vs GREG ABBOTT

```
 1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
 2                     EL PASO DIVISION

 3   LEAGUE OF UNITED LATIN        (
     AMERICAN CITIZENS, et al.,    (
 4                                 (
          Plaintiffs,              (
 5                                 (
     v.                            (  Case No. 3:21-cv-00259
 6                                 (
     GREG ABBOTT, et al.,          (
 7                                 (
          Defendants.              (
 8

 9        _____

10             VIDEOTAPED ORAL DEPOSITION OF

11                SENATOR KEL SELIGER

12                 JANUARY 19, 2022

13        _____

14        VIDEOTAPED ORAL DEPOSITION OF SENATOR KEL

15   SELIGER, a witness produced on behalf of the

16   Defendants, taken in the above styled and numbered

17   cause on the 19th day of January, 2021, before

18   Renea Seggern, CSR No. 7262, in and for the State

19   of Texas, taken in the offices of the Attorney

20   General, Price Daniel, Jr. Building, 209 West 14th

21   Street, Austin, Texas, in accordance with the

22   Federal Rules of Civil Procedure and any

23   stipulations hereinafter set forth.

24

25
```

**Senator Kel Seliger**

**January 19, 2022**
**Pages 2 to 5**

## Page 2

```
 1              A P P E A R A N C E S
 2   FOR THE LULAC PLAINTIFFS:
 3        MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL
          FUND (MALDEF):
 4           Ms. Nina Perales
             Ms. Samantha Serna Uribe
 5           Mr. Kenneth Parreno
             110 Broadway Street
 6           Suite 300
             San Antonio, Texas  78205-1910
 7           (210) 224-5476
             nperales@maldef.org
 8
 9   FOR THE BROOKS PLAINTIFFS:
          BRAZIL & DUNN
10           Mr. Chad W. Dunn
             4407 Bee Caves Road
11           Building 1, Suite 111
             Austin, Texas  78746
12           (512) 717-9822
             chad@brazilanddunn.com
13
14   FOR THE DEFENDANTS:
15        OFFICE OF THE ATTORNEY GENERAL
             Mr. Eric Hudson
16           Ms. Courtney Corbello
             P.O. Box 12548
17           Austin, Texas  78711-2548
             (512) 463-2100
18           eric.hudson@oag.texas.gov
19
20   FOR THE WITNESS:
21        ERIC OPIELA, PLLC
             Mr. Eric Opiela
22           9415 Old Lampasas Trail
             Austin, Texas  78750
23           (512) 791-6336
             eopiela@ericopiela.com
24
25
```

## Page 3

```
 1   FOR THE TEXAS NAACP:
 2        LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
             Ms. Pooja Chaudhuri
 3           1500 K Street NW
             Suite 900
 4           Washington, D.C.  20005
             (202) 662-8319
 5           pchaudhuri@lawyerscommittee.org
 6
     FOR THE SOUTHERN COALITION FOR SOCIAL JUSTICE:
 7
             Ms. Alexandra Wolfson
 8
 9   FOR THE DEPARTMENT OF JUSTICE:
10           Ms. Jasmine Lott
11
     FOR THE MEXICAN AMERICAN LEGISLATIVE CAUCUS (MALC):
12
             Mr. Sean McCaffity
13           Mr. Tex Quesada
14
     FOR TREY MARTINEZ FISCHER AND CONGRESSWOMAN
15   VERONICA ESCOBAR:
16           Mr. Martin Golando
17
18   ALSO PRESENT:
19           Mr. Brad Rosauer, Videographer
20
21
22
23
24
25
```

## Page 4

```
 1                 I N D E X
 2   SENATOR KEL SELIGER                       PAGE
 3   Appearances.................................2
 4        Examination by Mr. Hudson...............8
 5        Examination by Mr. Dunn................75
 6   Changes and Signature Page................141
 7   Reporter's Certification..................143
 8
 9            E X H I B I T   I N D E X
10
     NO.          DESCRIPTION                   PAGE
11
     Exhibit 1    Declaration of Senator         14
12                Kel Seliger
     Exhibit 2    Map of State Senate Districts SB4  23
13                Enrollment Plans 2168
14   Exhibit 3    Senate Journal - October 4, 2021  24
15   Exhibit 4    Redistricting Dates of Interest   36
16   Exhibit 5    Email Correspondence 1/14/2022   40
17   Exhibit 6    Declaration of Senator         50
                  Kel Seliger
18   Exhibit 7    Texas Tribune Article,         51
                  January 22, 2019
19
20   Exhibit 8    Race Summary Report -          54
                  2014 Republican Party Primary
21                Election
22   Exhibit 9    Race Summary Report -          56
                  2018 Republican Party Primary
23                Election
24   Exhibit 10   Austin-American Statesman Article  59
25   Exhibit 11   Texas Tribune Article,         60
                  October 7, 2021
```

## Page 5

```
 1            E X H I B I T   I N D E X
 2   NO.          DESCRIPTION                   PAGE
 3   Exhibit 12   The Back Mic Article           63
 4   Exhibit 13   Texas Tribune Article,         65
                  June 16, 2021
 5
     Exhibit 14   Amarillo Pioneer Article,      68
 6                October 20, 2021
 7   Exhibit 15   Senate Journal Addendum -      71
                  October 4, 2021
 8
     Exhibit 16   Letter dated April 18, 2013 from  135
 9                Attorney General Greg Abbott
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Senator Kel Seliger

January 19, 2022
Pages 6 to 9

Page 6

P R O C E E D I N G S

1    THE VIDEOGRAPHER:  Good morning.
2    Today's date is January 19th, 2022, at 9:14 a.m.
3    We are on the record.  We are located at the Office
4    of the Attorney General of Texas at 209 West 14th
5    Street, Austin, Texas.  This is the video
6    deposition of Senator Kel Seliger in the matter of
7    League of United Latin American Citizens, et al.,
8    versus Greg Abbott, et al., Case No. 3:21-cv-00259.
9        My name is Brad Rosauer, the legal
10   videographer, and our court reporter is Renea
11   Seggern and we are with Kim Tindall & Associates in
12   San Antonio, Texas.
13       Will counsel please introduce themselves
14   for the record after which the court reporter will
15   swear in the witness.
16       MR. DUNN:  This is Chad Dunn on behalf
17   of the Brooks plaintiffs.
18       MR. HUDSON:  Eric Hudson and Courtney
19   Corbello on behalf of the State defendants.
20       MR. OPIELA:  Eric Opiela representing
21   Senator Seliger.
22       MS. PERALES:  Can counsel who are
23   participating remotely also have the opportunity to
24   introduce themselves?
25

Page 7

1        MR. HUDSON:  I was just about to slow
2    things down so we can do that, Nina, thank you.  If
3    you want to go ahead and introduce yourself, please
4    do.
5        MS. PERALES:  Thank you so much.  Good
6    morning.  This is Nina Perales on behalf of the
7    LULAC plaintiffs and with me today from my firm are
8    Kenneth Parreno and Samantha Serna Uribe.
9        (Witness sworn.)
10       MS. PERALES:  We have more counsel if
11   it's possible for them to introduce themselves.
12       MR. HUDSON:  Go ahead.
13       MR. McCAFFITY:  This is Sean McCaffity
14   and Tex Quesada on behalf of the Mexican American
15   Legislative Caucus.  Good morning.
16       MR. GOLANDO:  This is Martin Golando
17   on behalf of Trey Martinez Fischer and
18   Congresswoman Veronica Escobar.
19       MS. WOLFSON:  This is Alexandra
20   Wolfson on behalf of the Southern Coalition for
21   Social Justice.
22       MS. LOTT:  Hi.  Good morning.  This is
23   Jasmine Lott on behalf of the Department of
24   Justice.
25       THE COURT REPORTER:  Is that everyone?

Page 8

1        MR. OPIELA:  It looks like everybody
2    from what I can see here.
3        MS. PERALES:  That's all the folks
4    that I see, yes.
5            SENATOR KEL SELIGER,
6    having been first duly sworn, testified as follows:
7            EXAMINATION
8    BY MR. HUDSON:
9    Q  Ready to go?
10   A  I'm ready to go.
11   Q  Senator Seliger, my name is Eric Hudson.
12   I'm with the Office of the Attorney General.  Have
13   we ever met before?
14   A  Not that I recall.
15   Q  Okay.  So you're here today for a
16   deposition.  Have you ever been deposed before?
17   A  I have.
18   Q  How recently?
19   A  2012, 2013, subsequent to the
20   redistricting sessions in that period of time.
21   Q  Well, it's been a few years then so let's
22   go over a few ground rules as we're doing the
23   deposition today.  The first one which is let's not
24   talk over each other so as you can see, we're
25   obviously on video, we have a court reporter.

Page 9

1    She's taking down everything we say.  It's very
2    difficult and I have yet to meet a court reporter
3    who can take down two voices at once so can we
4    agree today that if I'm speaking, you'll let me
5    finish and I'll extend the same courtesy?
6    A  Okay.
7    Q  And the second thing is if you need
8    breaks, let me know.  I don't expect that we're
9    going to go a full day today, but in the event that
10   we're in the middle of the deposition and you feel
11   like you need a break, just let me know.  The only
12   thing I ask is that during the course of the
13   questioning, if there's a question on the table, I
14   ask that you finish answering the question before
15   you ask for the break.  Can you agree to that
16   today?
17   A  Okay.  I agree.
18   Q  I also need you to answer verbally.  I
19   know right before we went on the record the court
20   reporter suggested she might be able to get head
21   nods so what I don't want to see in the transcript
22   is, you know, my question and then answer, head
23   nod.  There's really no way to interpret that.
24   A  Right.
25   Q  So can we agree today that when you

Senator Kel Seliger

January 19, 2022
Pages 10 to 13

Page 10

1  answer, you will answer verbally?
2     A  Yes, and if I forget, please remind me.
3     Q  Okay.  Lastly, you understand that if I
4  ask you a question, it's up to you to decide
5  whether you understand my question.  So if I ask
6  you a question and you don't understand it, but you
7  answer it anyway, I'm not going to know.
8     A  Right.
9     Q  You follow what I'm saying?
10    A  Sure.
11    Q  So if I ask you a question, I need you to
12  tell me because otherwise the record and me frankly
13  are going to leave the court with the impression
14  that you understood the question and answered the
15  question as posed.
16    A  I understand.
17    Q  Okay.  Now, you're here to testify in the
18  Brooks litigation, right?
19    A  Yes.
20    Q  You understand that there is a preliminary
21  injection hearing set for the week of January 24th,
22  2022?
23    A  Yes.
24    Q  Are you planning to attend that hearing?
25    A  I have not been.

Page 11

1     Q  All right.  Have you received a trial
2  subpoena for that hearing?
3     A  I have not.
4     Q  All right.  Do you understand what the
5  Brooks plaintiffs are suing over?
6     A  Broadly, just the redistricting maps.
7     Q  Well, the preliminary injunction is
8  challenging Senate District 10 and the Texas Senate
9  Map passed in the third called session of the 87th
10  Legislature.  Is that your understanding of what
11  the Brooks plaintiffs are challenging?
12    A  Yes.
13    Q  Okay.  I'll be referring to the date of
14  the senate map that was ultimately passed in the
15  third called special session of the 87th
16  Legislature and signed by the Governor.  I'll be
17  referring to that map as either SB4 or the Texas
18  Senate Map today.
19    A  Yes.
20    Q  Can we agree to use those terms today when
21  referring to the Texas Senate Map that includes
22  SD10, the district that's at issue in the Brooks
23  litigation?
24    A  Yes.
25    Q  All right.  Finally, your testimony today,

Page 12

1  we may play this in court.  Do you understand that?
2     A  Sure.
3     Q  And so do you understand that you're under
4  oath and you're required to testify completely and
5  truthfully, right?
6     A  Yes.
7     Q  And you agree to do that today, right?
8     A  Yes.
9     Q  Let's go over a little bit of your
10  background.  So could you introduce yourself to the
11  judge?
12    A  My name is Kel Seliger.  I live in
13  Amarillo, and since 2004 I've represented the 31st
14  Senatorial District which is the Panhandle, part of
15  the South Plains and the Permian Basin.  And then
16  in 2011, I chaired the Senate Committee on
17  redistricting.
18    Q  What do you do for a living when you're
19  not legislating?
20    A  I've been in the structural steel business
21  for 30 some-odd years and it was a family business
22  which we sold a few years ago.
23    Q  Are you currently retired?
24    A  No, I'm a member of the Senate.
25    Q  Let me ask it this way.

Page 13

1     A  From the industry, yes.
2     Q  From industry, okay.  I'm going to go over
3  briefly your educational background.  I understand
4  from your profile online you matriculated at
5  Dartmouth?
6     A  Correct.
7     Q  Got what degree from there?
8     A  Psychology and biology.
9     Q  Bachelor of psychology and biology,
10  science?
11    A  Bachelor of arts.  They're all bachelor of
12  arts.
13    Q  Gotcha.  You don't have any law degree,
14  right?
15    A  I do not.
16    Q  No advanced degree?
17    A  No.
18    Q  You don't have any -- you've never worked
19  as an attorney?
20    A  Never.
21    Q  Do you currently live in Amarillo?
22    A  I do.
23    Q  Whereabouts?
24    A  3810 Deann, D-E-A-N-N, Drive.
25    Q  Now, right now you're retired from the

Senator Kel Seliger

January 19, 2022
Pages 14 to 17

Page 14

1  industry, but your current position is you're the
2  senator for Senate District 31, right?
3     A  Correct.
4        (Exhibit Number 1 marked.)
5     Q  (BY MR. HUDSON)  I'm handing you what I am
6  marking as State Defendant's 1.  Go ahead and take
7  a look at that and let me know when you're
8  finished.
9     A  Pretty much finished because I submitted
10 it.
11    Q  Well, go ahead and take a look and let's
12 make sure.
13    A  Okay.  Okay.
14    Q  What is that document?
15    A  This is the declaration or affidavit that
16 I submitted as part of this lawsuit.
17    Q  And if you flip to the back page, Page 3,
18 there's a signature.  Are you familiar with that
19 signature?
20    A  It is mine.
21    Q  Okay.  So you submitted this declaration.
22 Did you write it yourself?
23    A  I'm sorry?
24    Q  Did you write the declaration yourself?
25    A  I did not.

Page 15

1     Q  Who wrote it?
2     A  I don't know who wrote it.  It was given
3  to me.  I asked what Senator Powell wanted me to
4  present and this is what she gave me.
5     Q  Well, let's talk about that for a second.
6  So you didn't have a hand in drafting this
7  declaration?
8     A  I did not draft it.
9     Q  You said you received it from Senator
10 Powell?
11    A  Yes.
12    Q  Do you know if Senator Powell wrote the
13 declaration?
14    A  I couldn't begin to tell you.
15    Q  How did you come about getting a
16 declaration from Senator Powell?
17    A  When she asked me if I would participate
18 in some fashion on this suit when we were in
19 special session on the floor and I told her I
20 wanted to read the lawsuit that was being filed and
21 I wanted to see what it was that she would like me
22 to present and this was it.
23    Q  Okay.  So someone wrote this and handed it
24 to you and you signed it?
25    A  Senator Powell handed it to me, yes.

Page 16

1     Q  All right.  How did she hand it to you?
2     A  That I don't recall.
3     Q  Now, if we go to Paragraph 10 of your
4  declaration.
5     A  Um-hum.
6     Q  See Paragraph 10?
7     A  I do.
8     Q  Follow along with me.  It says, the 2021
9  senate redistricting process saw untrue pretextual
10 explanations given for why the lines were drawn as
11 they were.  Did I read that correctly?
12    A  Yes.
13    Q  Again, you didn't write that line?
14    A  No.
15    Q  What lines do you believe were drawn with
16 untrue explanations?
17    A  Oh, the lines in Senate District 31.
18    Q  Are there any other senate districts that
19 you believe untrue explanations were given for why
20 the lines were drawn the way that they were drawn?
21    A  Untrue, no.
22    Q  What about pretextual explanations?  When
23 you refer to pretextual explanations, which
24 districts do you believe were drawn and pretextual
25 explanations were given?

Page 17

1        MR. OPIELA:  Objection, form.
2     A  Only Senate District 31 that I know of.
3     Q  (BY MR. HUDSON)  Okay.  The second line
4  reads, for example, I was told by Senator Huffman
5  that my district was being changed to add many new
6  counties around Midland and remove Panhandle
7  counties in order to create distinctive
8  agricultural versus oil and gas districts between
9  SD31 and SD28.  Did I read that correctly?
10    A  Yes.
11    Q  All right.  That's an example that you
12 give as an untrue explanation; is that right?
13    A  Yes.
14    Q  What is untrue about that explanation?
15    A  Because it doesn't do that as a matter of
16 fact.  It excises four counties in the Panhandle
17 and places four counties down in the southern part
18 of the district and it doesn't necessarily create
19 that division.  Gray County is one of the districts
20 that was excised from the district which has been a
21 large gas-producing county for a long time.  Why
22 take that out?  At the same time there's a good
23 deal of agriculture, primarily ranching in the
24 southern part of the district.  So those divisions,
25 it is a diverse economy and it's both agricultural

Senator Kel Seliger

January 19, 2022
Pages 18 to 21

Page 18

1  and oil and gas and these changes did not really
2  have that effect at all.
3     Q  Now, you go on to say in Paragraph 10, as
4  I explained on the senate floor, the plan does not
5  create distinctive agricultural and oil and gas
6  districts.  Did I read that correctly?
7     A  Yes, you did.
8     Q  And I think that that's what you're
9  explaining there?
10    A  Yes.
11    Q  All right.  Instead, it was obvious that
12  the purpose of these changes was to benefit a
13  potential Republican primary challenger from
14  Midland preferred by the Lieutenant Governor.  Did
15  I read that correctly?
16    A  Yes, you did.
17    Q  All right.  Tell me about that.
18        MR. OPIELA:  Objection, form.
19    A  I think that's why it was done and I think
20  there was a motivation it was clear that the
21  Lieutenant Governor wanted the candidate from
22  Midland to compete successfully and that's why this
23  was done.
24    Q  (BY MR. HUDSON)  The Republican primary
25  challenger?

Page 19

1     A  Yes.
2     Q  Why do you think that Senator Huffman was
3  trying to strengthen the Republican primary
4  challenger against you?
5     A  Probably because she was told to by the
6  Lieutenant Governor.
7     Q  Well, Senator Huffman didn't tell you that
8  she was told to do that by the Lieutenant Governor,
9  did she?
10    A  No, that's my surmise.
11    Q  All right.  The Lieutenant Governor didn't
12  tell you that that's why Senator Huffman did it,
13  did he?
14    A  That is my surmise.
15    Q  And when you say it's your surmise, you
16  didn't actually speak to Senator Huffman and hear
17  the words I'm doing this because the Lieutenant
18  Governor told me to?
19    A  No.
20    Q  Same is true of the Lieutenant Governor,
21  right?
22    A  True.
23    Q  Did you have any nonpublic conversations
24  with Senator Huffman about how the lines were drawn
25  during the third special session?

Page 20

1        MR. OPIELA:  I'm going to object to
2  that on legislative privilege.
3        MR. HUDSON:  Well, let me finish my
4  question.
5     Q  (BY MR. HUDSON)  I'm just asking, don't
6  tell me the substance of the conversation.
7        MR. HUDSON:  I guess let's do it this
8  way.
9     Q  (BY MR. HUDSON)  You're not waiving
10  legislative privilege by being here, right?
11    A  No.
12    Q  All right.  In fact, you intend to assert
13  legislative privilege over communications that are
14  subject to legislative privilege, right?
15    A  I do.
16    Q  Okay.  So here's what I'm trying to get at
17  then because I'm trying not to draw an objection
18  here from your counsel.  Without telling me the
19  substance of any of the communications, did you
20  have any nonpublic communications with Senator
21  Huffman about the redistricting process?
22    A  Yes.
23    Q  All right.  Did you have any public
24  conversations with Senator Huffman about the
25  redistricting process?

Page 21

1     A  No.
2     Q  Okay.  Did you have any nonpublic
3  conversations about the redistricting process with
4  any of the committees members for the Senate
5  Redistricting Committee in 2021?
6     A  Not that I recall.  There's a lot of them
7  and we have a lot of interaction, but not that I
8  recall.
9     Q  Well, I'll go through them in a minute,
10  but I'm just trying to figure out here what the
11  scope of your knowledge is on this.
12    A  Okay.
13    Q  So you did have discussions with Senator
14  Huffman, but again, you would object to talking
15  about those based on legislative privilege, right?
16    A  Um-hum.
17    Q  All right.  So you claim that Senator
18  Huffman's reasons for pretextual.  Is there any
19  public information that you can point to that
20  demonstrates that Senator Huffman drew Senate
21  District 31 based on pretextual reasons?
22    A  No.
23    Q  Is there any information in the public
24  record that demonstrates that Senator Huffman drew
25  Senate District 31 for untrue reasons?

Senator Kel Seliger

January 19, 2022
Pages 22 to 25

Page 22

1    A  I don't quite understand what you mean by
2  untrue.  I think they're specious.
3    Q  Well, so let's go back to your
4  declaration, Paragraph 10.  You said, the 2021
5  senate redistricting process saw untrue
6  explanations given for why the lines were drawn as
7  they were.  Did I read that correctly?
8    A  Yes, you did so yeah, I did say untrue.
9    Q  You did and so that's why I'm asking.
10    A  Okay.
11    Q  Did you find -- can you point to any
12  public information or public statements that would
13  demonstrate untrue reasons why Senate District 31
14  was drawn the way that it was drawn?
15    A  No.
16    Q  Can you point to anything in the public
17  record demonstrating untrue reasons for why Senate
18  District 10 was drawn the way that it was drawn?
19    A  No.
20    Q  Can you point to anything in the public
21  record demonstrating that pretextual explanations
22  were given for why Senate District 10 was drawn the
23  way that it was drawn?
24    A  Anything in the public record?
25    Q  Yes.

Page 23

1    A  No.
2      (Exhibit Number 2 marked.)
3    Q  (BY MR. HUDSON)  I'm going to show you
4  what I'm marking as Exhibit 2.  Have you ever seen
5  that document before?
6    A  I have.
7    Q  What is it?
8    A  It's the map under SB4.
9    Q  Okay.  Is that a true and accurate copy of
10  the map that was adopted through the enrolled and
11  signed SB4?
12    A  I believe it is.  I'll have to trust you
13  on this.
14    Q  Okay.  You don't have any reason to
15  dispute that this is a final copy?
16    A  No.
17    Q  Okay.  Now, you see up there in the top
18  left-hand corner of the State of Texas that Senate
19  District 31; is that correct?
20    A  Yes.
21    Q  All right.  And that is the district that
22  you're currently representing in the Texas Senate?
23    A  Correct.
24    Q  And then to the right of that is a gray
25  area that's demarcated as Senate District 28; is

Page 24

1  that right?
2    A  Right.
3    Q  And then within or adjacent to Senate
4  District 28 we have one, two, three, four, five,
5  six, seven, eight counties that comprise Senate
6  District 10; is that right?
7    A  Yes.
8    Q  All right.  And, again, looking at this
9  map, there's no way to look at this map and
10  determine that untrue reasons were given for why
11  this map was drawn this way, right?
12    A  Not by looking at the map.
13    Q  Okay.  There's no way to look at this map
14  and determine that pretextual reasons were given
15  for why the map was drawn this way; is that right?
16    A  No.
17      (Exhibit Number 3 marked.)
18    Q  (BY MR. HUDSON)  I'm going to hand you
19  what I'm marking as Defendant's 3.
20      MR. OPIELA:  Do you have an extra copy
21  of that?  If not, I can look over his shoulder.
22    Q  (BY MR. HUDSON)  Have you ever seen
23  Exhibit 3 before?
24    A  No.
25    Q  Well, I'll represent to you that it's a

Page 25

1  copy of the Senate Journal for the fourth day,
2  Monday, October 4th, 2021.  Do you have any reason
3  to dispute that?
4    A  Not at all.
5    Q  I'll represent to you that that came
6  directly from the Senate Journal so if there's any
7  dispute about that, you let me know.
8    A  Right.
9    Q  If you'll flip to Page 62 for me.
10  Actually, go back to the first page real quick.
11    A  Okay.
12    Q  Do you see there at the bottom it says,
13  Committee Substitute Senate Bill 4 on Third
14  Reading?
15    A  Yes.
16    Q  Can you explain to the judge what that
17  means?
18    A  Each bill must be read three times, once
19  when it's read and submitted to committee and then
20  once when it's submitted for passage on the senate
21  and then it must be passed a third time generally
22  after a day.
23    Q  So this represents the third and final
24  passage out of the senate?
25    A  It does.

Senator Kel Seliger

January 19, 2022
Pages 26 to 29

Page 26

1    Q   If you'll flip over to Page 62?
2    A   Okay.
3    Q   It says at the top, the bill was read
4  third time and was finally passed by the following
5  vote: Yeas 20, Nays 11.  Did I read that
6  correctly?
7    A   Yes.
8    Q   You were among the nays; is that correct?
9    A   Right.
10   Q   Now, some of your colleagues submitted a
11 reason for vote; is that right?
12   A   Yes.
13   Q   Could you explain to the judge what a
14 reason for vote is in senate nomenclature?
15   A   On any vote any member may submit comments
16 on why they voted for or against a bill.  It's not
17 part of the debate and everyone has that privilege.
18   Q   Now, there on Page 62 we see that reason
19 for vote was offered by Senator Eckhardt; is that
20 right?
21   A   Yes.
22   Q   And if we go to Page 63, the second full
23 paragraph that starts the author, do you see that?
24   A   Yes.
25   Q   Reads, the author of CSSB 4 (Plan 2130)

Page 27

1  has claimed color blindness to race; is that right?
2    A   Yes.
3    Q   So the authors of SB4 claim that they were
4  color blind in drawing the map lines; is that
5  right?
6    A   Yes.
7    Q   And there's nothing in the public record
8  to your knowledge that demonstrates anything but
9  color blindness, right?
10   A   Correct.
11   Q   In fact, you're not here to testify today
12 about any public record of intentional
13 discrimination in the map drawing, right?
14   A   No.
15   Q   Now, you did not sign on to Senator
16 Eckhardt's reason for vote; is that right?
17   A   Correct.
18   Q   If we flip over to Page 64, the third full
19 sentence starts specifically, do you see that?
20   A   The third full, 60-what now?
21   Q   We're on Page 64, the third full sentence.
22   A   Okay.  I apologize.  Where it says
23 specifically, okay.
24   Q   Now, Senator Eckhardt says, specifically
25 CSSB 4's author listed their goals and priorities

Page 28

1  in the following order:  Abiding by all applicable
2  law, equalizing population across districts,
3  preserving political subdivisions and communities
4  of interest wherever possible, preserving the cores
5  of previous districts to the extent possible,
6  avoiding pairing incumbent members, achieving
7  geographic compactness when possible, and
8  accommodating incumbent priorities when possible.
9  Did I read that correctly?
10   A   Yes.
11   Q   All right.  And you would agree that all
12 of those reasons were given in support of passage
13 of SB4, right?
14   A   Yes.
15   Q   And, again, to go through them, you agree
16 that the Republican members offered as a reason for
17 passing SB4 abiding by all applicable law, right?
18   A   Yes.
19   Q   And they offered equalizing population
20 across districts, right?
21   A   Yes.
22   Q   And they offered preserving political
23 subdivisions, right?
24   A   It says that.  I don't believe it.
25   Q   And they offered preserving communities of

Page 29

1  interest wherever possible, right?
2    A   It says that.  I don't believe it.
3    Q   And they offered preserving the cores of
4  previous districts, right?
5    A   It says that.  I don't believe it.
6    Q   And they offered to the extent possible
7  avoiding pairing incumbent members, right?
8    A   I believe that's true.
9    Q   And they offered achieving geographic
10 compactness when possible, right?
11   A   It says that.  I don't believe it.
12   Q   And they offered accommodating incumbent
13 parties when possible, right?
14   A   It says that and they did not.
15   Q   Now, you identified four of these that you
16 don't believe, but, again, you can't point to
17 anything in the public record suggesting that these
18 reasons were untrue, right?
19   A   No.
20   Q   And you can't point to anything in the
21 public record suggesting that these reasons were
22 pretextural, right?
23   A   No.
24   Q   Now, you also knew that partisanship was a
25 factor driving the new senate map, right?

Senator Kel Seliger

January 19, 2022
Pages 30 to 33

Page 30

1  A  Absolutely.
2  Q  What role did partisanship play in driving
3  -- well, I'll avoid stepping on legislative
4  privilege, so let me rephrase.
5  A  Please do.  Someone is kicking me under
6  the table.
7  Q  All right.  Let's go to the bottom of Page
8  64.
9  A  Okay.
10  Q  Do you see at the bottom it says reason
11  for vote.  This is for Senator Johnson?
12  A  Yes.
13  Q  Now, on the next page it reads, the
14  proposed maps under CSSB 4 which is SB4 do exactly
15  what they were expected to do; they make districts
16  more partisan, and -- if not invalidated by a court
17  challenge - they effectively eliminate a Democratic
18  seat.  Did I read that correctly?
19  A  Yes.
20  Q  Now, one of the goals of Republican
21  members was to benefit Republicans, right?
22  A  Correct.
23  Q  All right.  So losing a Democratic seat is
24  the result of partisanship in the map, right?
25  A  True.

Page 31

1  Q  If you go down that page on 65, it has
2  reason for vote and that includes Senator Alvarado,
3  Blanco, Eckhardt, Gutierrez, Hinojosa, Johnson,
4  Lucio, Menendez, Miles, Powell, West, Whitmire, and
5  Zaffirini; is that right?
6  A  Correct.
7  Q  Now, I'll represent to you that I didn't
8  see any other reason for vote in the Senate Journal
9  that named you as giving a reason for vote on SB?
10  A  Correct.
11  Q  All right.  So you didn't join in any of
12  the reasons given by any of the Democratic members
13  for voting against SB4, right?
14  A  I did not.
15  Q  So you disagree with them when, for
16  instance, they refer to intentional discrimination
17  as a basis for drawing SB4, right?
18  A  I don't necessarily disagree at all.  If
19  you'll ask the question again.
20  Q  Did you not understand the question?
21  A  Well, I thought I did, but now we've gone
22  so long I'm not sure.
23  Q  Let me ask it like this.
24  A  Okay.
25  Q  You didn't join in any reason for vote for

Page 32

1  any of the members who gave a reason for vote in
2  voting against SB4, right?
3        MR. DUNN:  Object to form.  You can
4  answer.
5  A  I did not.
6  Q  (BY MR. HUDSON)  You weren't on the
7  redistricting committee for the 2021 session,
8  right?
9  A  Correct.
10  Q  And when I refer to the 2021 session, you
11  understand I'm referring to the 87th Legislature?
12  A  Yes.
13  Q  So I'm not trying to be pedantic, I just
14  want to make sure that the judges understand we're
15  talking about the same thing?
16  A  We can be specific that it was the third
17  special session.
18  Q  Okay.  So Senator Joan Huffman was the
19  chair in the third called session of the
20  redistricting committee?
21  A  Yes.
22  Q  And Juan Chuy Hinojosa was the vice chair,
23  right?
24  A  Yes.
25  Q  All right.  Did you have any public

Page 33

1  conversations with Senator Hinojosa about the
2  reasons why SB4 was drawn the way it was?
3  A  Not that I recall, no.
4  Q  Same question but for Carol Alvarado?
5  A  Not that I recall, no.
6  Q  Same question but for Paul Bettencourt?
7  A  No.
8  Q  Did you have any public conversations with
9  Brian Birdwell that discussed the reasons why SB4
10  was drawn the way it was?
11  A  No.
12  Q  What about with Donna Campbell?
13  A  No.
14  Q  Did you have any with Kelly Hancock?
15  A  No.
16  Q  Did you have any conversations with Bryan
17  Hughes about why SB4 was drawn the way it was?
18  A  No.
19  Q  What about with Eddie Lucio, Junior?
20  A  No.
21  Q  What about Robert Nichols?
22  A  No.
23  Q  Same question but Angela Paxton?
24  A  No.
25  Q  Did you have any conversations with

Senator Kel Seliger

January 19, 2022
Pages 34 to 37

Page 34

1   Charles Perry about why SB4 was drawn the way it
2   was drawn?
3         MR. OPIELA:  Objection, form.  You
4   were asking -- I think it's potentially confusing.
5   Can you restate it?
6     Q   (BY MR. HUDSON)  Sure.  Did you have any
7   public conversations with Angela Paxton about why
8   SB4 was drawn the way it was drawn?
9     A   Would you define public conversations?
10    Q   Anything on the public record.
11    A   No.
12    Q   Did you have any public conversations with
13  Charles Perry about why SB4 was drawn the way it
14  was drawn?
15    A   No.
16    Q   Same question but for Royce West?
17    A   No.
18    Q   Same question but for John Whitmire?
19    A   No.
20    Q   Finally with Judith Zaffirini, did you
21  have any public conversations concerning why SB4
22  was drawn the way it was drawn?
23    A   No.
24    Q   In fact, any conversations you had would
25  be subject to legislative privilege; would you

Page 35

1   agree?
2     A   I would, yes.
3     Q   Did you have any -- do you know who
4   Senator Huffman's staff was?
5     A   Yes, Sean Opperman was the committee
6   director.
7     Q   All right.  Are you familiar with a person
8   by the name of Anna Mackin?
9     A   I might have met her as a member of staff,
10  but I don't recall.
11    Q   Okay.  As you sit here right now, you
12  don't recall having any specific conversations with
13  Anna Mackin about redistricting?
14    A   No.
15    Q   Same question but for Sean Opperman?
16    A   Yes.
17    Q   And yes, you do recall or no, you don't
18  recall?
19    A   Yes, I do recall.
20    Q   Okay.  Were you personally involved in any
21  of the map drawing with Senator Huffman?
22    A   Early on I submitted a map.
23    Q   All right.  Let's -- you can go ahead and
24  put that down for a second.
25    A   Okay.

Page 36

1     Q   I'm going to hand you what I'm going to
2   mark as Exhibit Defendant's 4.
3         (Exhibit Number 4 marked.)
4     Q   (BY MR. HUDSON)  Have you ever seen that
5   document before?
6     A   No.
7     Q   Well, I'll represent to you if you take a
8   look in the bottom right-hand corner of Exhibit 4
9   that I've just handed you, are you familiar with
10  that little capital inside the circle?
11    A   I've seen it before, yes.
12    Q   Okay.  Well, I'll represent to you that
13  that's the Texas Legislative Council's symbol
14  marked on the bottom right-hand corner.  Do you
15  have any reason to dispute that?
16    A   No.
17    Q   I'll also represent to you that I pulled
18  this from the Texas Legislative Council's website.
19  It concerns redistricting dates of interest.  Do
20  you see that there?
21    A   I do.
22    Q   Now, I understand that you've worked as a
23  committee member for redistricting in the past; is
24  that right?
25    A   I was a committee member and chair.

Page 37

1     Q   So take a look at these dates.  Do you
2   have any reason to disagree that this would have
3   been the normal course had these census data come
4   in timely to the Texas Legislature?
5     A   Yes, I believe it is.
6     Q   Believe it is what?
7     A   I believe it is the map that any normal
8   session with normal report by the Census Bureau,
9   this would be in the schedule.
10    Q   In fact, having been a former chair and a
11  member of the redistricting committee, you're aware
12  that the U.S. Census Bureau had an obligation to
13  publish redistricting data no later than April 1 of
14  2021, right?
15    A   That is my understanding.
16    Q   In fact, that didn't happen in 2021; is
17  that right?
18    A   Correct.
19    Q   Now, you're aware that in past
20  redistricting cycles and census data was released
21  in time for the Texas Legislature to take the
22  matter during the regular session, right?
23    A   Yes.
24    Q   And you're also aware that the U.S. Census
25  data had been published on time in '21, the Texas

Senator Kel Seliger

January 19, 2022
Pages 38 to 41

Page 38

1 Legislature would have been able to address
2 redistricting before the 87th regular session
3 adjourned, right?
4    A  Yes.
5        MR. HUDSON:  And my apologies to the
6 reporter.  I'll see if I can't slow down.  Talking
7 fast seems to be a bad habit of mine.
8    Q  (BY MR. HUDSON)  You'd also agree that the
9 U.S. Census Bureau did not release the census data
10 on time in 2021, right?
11   A  Yes.
12   Q  And the census data was instead delayed
13 due to the COVID-19 pandemic, right?
14   A  That's what they told us.
15   Q  Based on everything you know, is the only
16 reason that you're aware of why the census data was
17 not provided on time the COVID-19 pandemic?
18       MR. OPIELA:  Objection, form.
19   Q  (BY MR. HUDSON)  Okay.  Let me see if I
20 can ask it like this.
21   A  Okay.
22   Q  You don't have any reason to dispute the
23 Census Bureau's statement that the census data was
24 delayed due to the COVID-19 pandemic?
25   A  No.

Page 39

1    Q  All right.  The Census Bureau did not
2 release preliminary data until August 12th, 2021;
3 is that right?
4    A  That is my understanding.
5    Q  And, in fact, the Census Bureau did not
6 deliver the full redistricting tool kit until
7 September 16 of '21; is that right?
8    A  Once again, that's my understanding.
9    Q  That's roughly a five-month delay from
10 what's set out in the districting dates of interest
11 in Exhibit 4; is that right?
12   A  Right.
13   Q  And for this reason the legislature did
14 not have the opportunity to conduct redistricting
15 during the regular session; is that right?
16   A  That is correct.
17   Q  And the governor instead called a special
18 session, right?
19   A  Yes.
20   Q  In fact, he called three?
21   A  Yes.
22   Q  One of the purposes of the third special
23 session was to enact new legislative maps; is that
24 right?
25   A  Correct.

Page 40

1    Q  And a special session only convenes for 30
2 days; is that right?
3    A  Yes.
4    Q  Now, 30 days is if it was shorter than a
5 regular legislative session; is that right?
6    A  Yes.
7    Q  How much shorter?
8    A  Regular session is 140 days, special
9 session is 30 days, can be called only when a
10 legislature is not in a regular session.  The
11 Governor can call as many special sessions as he
12 would like.
13   Q  Okay.  Do you mind if I take a short
14 break?
15   A  That's fine.
16       THE VIDEOGRAPHER:  We are off the
17 record.  The time is 9:55 a.m.
18       (Off the record.)
19       THE VIDEOGRAPHER:  We are back on the
20 record.  The time is 10:04 a.m.
21   Q  (BY MR. HUDSON)  I'm going to hand you
22 what I'm going to mark as Defendant's 5.
23       (Exhibit Number 5 marked.)
24   Q  (BY MR. HUDSON)  Have you ever seen
25 Exhibit 5 before?

Page 41

1    A  Yes.
2    Q  What is Exhibit 5?
3    A  It's a text of -- I guess it was a text or
4 an email sent to me by Senator Powell.
5    Q  And there in the middle of the page it
6 says from Beverly Powell; is that right?
7    A  Yes.
8    Q  And the date was November 16th, 2021; is
9 that right?
10   A  Yes.
11   Q  And it says to KelSeliger@iCloud.com; is
12 that right?
13   A  Yes.
14   Q  And the subject is follow up, right?
15   A  Yes.
16   Q  It says, Kel, thank you for visiting with
17 me yesterday.  Attached is a draft document.
18 Looking forward to seeing you tomorrow evening in
19 Waco.
20   A  Right.
21   Q  Okay.  So first off I understand that that
22 email came with a draft declaration attached to it;
23 is that right?
24   A  That is my memory of it, yes.
25   Q  So the declaration that she sent you is

Senator Kel Seliger

January 19, 2022
Pages 42 to 45

Page 42

1  also the declaration that you signed, right?
2     A  Yes.
3     Q  And that's Defendant's 1; is that correct?
4     A  Correct.
5     Q  And it looks like if we look at Page 3 of
6  Exhibit 1 you signed it on November 17th of 2021;
7  is that right?
8     A  I'm having trouble finding the page.  I
9  believe that's correct.
10    Q  It should be the last page of Defendant's
11  1.
12    A  Let me go back and find Defendant's 1.
13    Q  Senator, if you lost that exhibit, the
14  court reporter is going to be mad at you, not me.
15    A  That's why I found it so promptly.  Yes,
16  November 17th.
17    Q  All right.  So the day after you received
18  the declaration you signed it, right?
19    A  Yes.
20    Q  What did you do with it?
21    A  I assume submitted it back to Senator
22  Powell, but I don't recall.
23    Q  Have you had any conversations with any of
24  the plaintiffs from the Brooks case?
25    A  No, only Senator Powell.

Page 43

1     Q  Only Senator Powell?
2     A  Yes.
3     Q  Have you had any conversations with
4  counsel for any of the Brooks plaintiffs?
5     A  No.
6     Q  Have you had any conversations with anyone
7  about the declaration aside from Senator Powell or
8  with me here today?
9     A  My chief of staff.
10    Q  Is your chief of staff an attorney?
11    A  No.
12    Q  Obviously he works in your senate office?
13    A  Yes.
14    Q  And what is your chief of staff's name?
15    A  Her name is Johanna Kim.
16    Q  Now, let's go over your declaration in a
17  little bit more detail.  I know we've already
18  covered Paragraph 10, but I want to go through the
19  declaration itself.
20    A  Okay.
21    Q  Now, again, you didn't write this
22  yourself, right?
23    A  No.
24    Q  This was handed to you by Beverly Powell
25  and the day after she handed it to you, you signed

Page 44

1  it, right?
2     A  Yes.
3     Q  And your testimony today for the judge is
4  you don't know what you did with this declaration
5  after you signed it?
6     A  No.
7     Q  Now, let's go ahead and go to Paragraph 2
8  of your declaration.  It says you're the incumbent
9  Republican state senator representing District 31
10  in the Texas State Senate.  I have held this
11  position since 2004; is that right?
12    A  Yes.
13    Q  Now, when Beverly Powell was talking to
14  you about signing a declaration for her or asking
15  you how you could help, do you know if she sent
16  declarations like this to anyone else?
17    A  I have no idea.
18    Q  Did she tell you that she was going to
19  send you a declaration?
20    A  Yes, or I asked for it, one of the two.
21    Q  And before we get much deeper in this, let
22  me go back because I forgot to ask on Defendant's
23  5?
24    A  Uh-huh.
25    Q  She wrote, looking forward to seeing you

Page 45

1  tomorrow evening in Waco.  What was happening in
2  Waco on November 17th?
3     A  I was a master of ceremonies at a dinner
4  that was partially sponsored by Texas Pastors for
5  Children and Senator Powell was receiving an award.
6     Q  Would it be fair to say that you're
7  friendly with Senator Powell?
8     A  Yes.
9     Q  And it sounds like you two are both
10  members of the same organization or at least they
11  were honoring -- your organization was honoring
12  her?
13    A  It's not my organization.  I just have
14  done some things in public education so I was asked
15  to be the MC and she was -- she was a longtime
16  school board member in Fort Worth and they were
17  honoring her.
18    Q  And you don't recall if you handed this
19  declaration back to her in Waco on the 17th, right?
20    A  No, I don't.
21    Q  All right.  Let's go back to Paragraph 3.
22  It says, I was the Chair of the Senate Select
23  Redistricting Committees in 2011 and 2013; is that
24  right?
25    A  Yes.

Page 46

1    Q   Do you have any idea why you weren't on
2   the redistricting committee in the 87th
3   Legislature?
4             MR. OPIELA:  Objection, form.
5    A   I have an opinion, but do I know, no.
6    Q   (BY MR. HUDSON)  What is your opinion?
7             THE WITNESS:  Can I answer that?
8    A   After 2019 I was named to no other
9   committees or interest areas or anything else.
10   Q   (BY MR. HUDSON)  Now, Paragraphs 5, 6, 7,
11  and 8 talk about litigation related to 2011 and
12  2013 redistricting; is that right?
13   A   Correct.
14   Q   I'm going to ask you this because this
15  case involves allegations of intentional
16  discrimination so please don't take it as an insult
17  that I'm asking you.  I kind of have to.
18   A   I understand.
19   Q   You're not a racist, right?
20   A   No.
21   Q   When you were on the redistricting
22  committee, you didn't draw maps because you
23  disliked black people, right?
24   A   Certainly not.
25   Q   You didn't draw maps because you disliked

Page 47

1   Hispanic people, right?
2    A   Certainly not.
3    Q   You weren't trying to disadvantage
4   minority groups, right?
5    A   Absolutely not.
6    Q   You're not aware as you sit here today of
7   any racial animus by the 87th Legislature's
8   redistricting committee, right?
9    A   No.
10   Q   Okay.  All right.  Let's go down to
11  Paragraph 10.  The 2021 senate redistricting
12  process saw untrue, pretextual explanations.  We
13  talked about that earlier, right?
14   A   Yes.
15   Q   You gave one example in here -- well, I
16  guess Ms. Powell gave one example in here, right?
17   A   Yeah.
18   Q   All right.  Are there any other examples
19  aside from the example that was given in Paragraph
20  10 that you would include in this?
21   A   No.
22   Q   Are there any other examples that you
23  think should have been included in this?
24   A   No.
25   Q   Paragraph 11 talks about your experience

Page 48

1   on the Senate Redistricting Committee and you write
2   that Senate District 10 was compact and wholly
3   contained within Tarrant County and had close to
4   ideal population; is that right?
5    A   To the best of my recollection, yes.
6    Q   As you were reading this declaration and
7   ultimately before you signed it, did you go back
8   and look at any of the data or maps from the 2011
9   or 2013 redistricting to refresh your recollection
10  about whether that was true?
11   A   I did not.
12   Q   So when you read that and signed it, you
13  were going based on your recollection just cold?
14   A   Yes.
15   Q   Okay.  Now, I want to clarify for the
16  record.  I know we touched on it a little bit
17  earlier, but with Senate District 31, you're
18  familiar with how that was drawn in SB4, right?
19   A   Yes.
20   Q   SD10, were you as intimately involved in
21  the drawing of SD10 as you were SD31?
22   A   Not at all in 2021.
23   Q   Okay.  So you don't have any information
24  about how SD10 was drawn in the 87th Legislature?
25   A   Ask that again.

Page 49

1    Q   Let me ask it like this.  Is there any
2   nonprivileged information that you can provide
3   about how SD10 was drawn during the 87th
4   Legislature in either the regular session or any of
5   the special sessions?
6    A   It was drawn very specifically to ensure
7   that it would be represented by a Republican.
8    Q   So partisan reasons?
9    A   Yes.
10   Q   Is there any information that is either
11  missing or that you believe should have been added
12  to this declaration before you signed it having now
13  read it and had it since November of 2021?
14   A   I don't think so.
15   Q   Aside from your chief of staff and Beverly
16  Powell and I might have asked this, but I'm going
17  to ask it again just to make sure I didn't miss it,
18  is there anybody else that you talked to about this
19  declaration before you signed it?
20   A   No.
21   Q   Is there anybody that you talked to other
22  than your chief of staff and Beverly Powell since
23  you signed it excluding your counsel?
24   A   No.
25   Q   Before I move off of your declaration, I'm

Page 50

1  going to hand you what I'm going to mark as
2  Defendant's 6.
3         (Exhibit Number 6 marked.)
4     Q  (BY MR. HUDSON)  So I'll just represent to
5  you that that's a printout of the declaration that
6  was attached as an exhibit that your counsel sent
7  me in response to the subpoena duces tecum.
8     A  Okay.
9     Q  Do you have any reason to dispute that?
10    A  I do not.
11    Q  As you look at that declaration that I
12 handed you, if you go back to Page 3, you'll see
13 that Page 3 has no signature and no date, right?
14    A  Correct.
15    Q  Did you have the opportunity if you wanted
16 to to make amendments to this declaration before
17 you signed it and dated it?
18    A  Yes.
19    Q  And you chose not to do so, right?
20    A  Correct.
21    Q  Now, I believe you mentioned earlier ago
22 -- and I didn't really discuss that, but I want to
23 go back to it.  You said you had been removed from
24 all your committee chairs in 2019; is that right?
25    A  Correct.

Page 51

1     Q  What's your opinion about why that
2  happened?
3     A  I was removed from -- as a chair and
4  member of the Higher Education Committee, removed
5  from the Public Education Committee and removed
6  from finance because I voted against two of the
7  Lieutenant Governor's 30 priorities.
8     Q  Well, you'd agree with me that you've been
9  losing favor in Republican circles in Texas since
10 at least 2019, right?
11    A  I don't know how much Republican circles.
12 I don't know exactly what that means.
13    Q  How about the Republican party in Texas?
14    A  I've had so little interaction with the
15 Republican party that I wouldn't know.  I assume
16 among some members, yeah.  Certainly losing favor
17 with the Lieutenant Governor, yes, but that's easy
18 to do.
19    Q  I'm going to hand you what I'm marking as
20 Defendant's 7.
21        (Exhibit Number 7 marked.)
22    Q  (BY MR. HUDSON)  Now, you'll see that the
23 cover page there references Exhibit 21.  I'll just
24 represent to you that I'm marking this as Exhibit 7
25 for purposes of your deposition, but this is

Page 52

1  actually Exhibit 21 from the response to the
2  preliminary injunction that's been filed by the
3  Brooks plaintiffs.
4     A  Okay.
5     Q  Take a look at that and let me know when
6  you're finished.
7     A  I'm very familiar with it.  I'm finished.
8     Q  Can you tell me what this is?
9     A  It is an article from the Texas Tribune.
10    Q  All right.  So in 2019, the Texas Tribune
11 put out this article that's titled Lieutenant
12 Governor Dan Patrick pulls Senator Kel Seliger's
13 chairmanship after Seliger suggested Patrick aide
14 kiss his, quote/unquote, back end.  Did I read that
15 correctly?
16    A  That is correct.
17    Q  All right.  What is the substance of this
18 article?
19    A  The subject of the article is the fact
20 that I had been removed from the committees
21 mentioned before and named chairman of the
22 Agriculture Committee.  In an interview I was asked
23 for my opinion and I said I did not get the
24 committees that I had asked for or desired, but I
25 thought the Agriculture Committee was a

Page 53

1  particularly important one particularly for my
2  district.  At that point, the --
3         THE WITNESS:  Are you --
4         MR. OPIELA:  No.
5     A  At that point, the Lieutenant Governor's
6  policy advisor said Senator Seliger doesn't like
7  his committee assignments or chairmanship, we can
8  put him somewhere else.  I didn't say anything
9  derogatory about that committee or that appointment
10 and that's at the point that I said she could
11 consider attaching her lips to my back end which a
12 phrase we don't use in West Texas because normally
13 it's usually she could kiss my ass.  The Lieutenant
14 Governor said then that it was lewd, called me up
15 after a few days and told me I was then removed as
16 chairman of the AG Committee saying those remarks
17 were lewd.  While they may have been somewhat
18 indelicate, they were not lewd.  Let's talk about
19 my back end, not hers, and I think that referring
20 to them as lewd I think shows a little bit of
21 hysteria and priggishness on part of the Lieutenant
22 Governor.
23    Q  Fair to say that you and the Lieutenant
24 Governor were not getting along around the time
25 this article came out and thereafter?

Senator Kel Seliger

January 19, 2022
Pages 54 to 57

Page 54

1    A  We're not close.
2    Q  Now, even before that happened in 2019,
3  you were drawing primary opponents out in West
4  Texas; is that right?
5    A  I was.
6    Q  Let me show you what I'm going to mark as
7  Defendant's 8.
8      (Exhibit Number 8 marked.)
9      MR. HUDSON:  Mr. Opiela, if you don't
10  mind, I'm actually going to hand that to Chad.  It
11  looks like I only have three copies of that.
12  Excuse me, I have four.
13    Q  (BY MR. HUDSON)  Now, if you flip over to
14  -- if you look at the top of that page and again
15  just for purposes of the record I'm marking this as
16  8, but this is also Exhibit 14 to the response to
17  the preliminary injunction.  If you look at the
18  cover page there just so you're clear on what it
19  is.
20    A  Okay, yeah.
21    Q  That's also in the record.
22    A  Okay.
23    Q  Have you ever seen this document before?
24    A  Oh, I'm sure I have in a newspaper or
25  something.

Page 55

1    Q  Well, on the top of the first page it says
2  Office of the Secretary of State; do you see that?
3    A  Yes.
4    Q  And below that it says Race Summary
5  Report; is that right?
6    A  Yes.
7    Q  And below that it reads 2014 Republican
8  Party Primary Election.  Did I read that correctly?
9    A  Correct.
10    Q  And the date is March 4th, 2014, right?
11    A  Yes.
12    Q  Now, if you flip over to the next page.
13    A  Hold on just one second.  Okay.
14    Q  On that page from the top going down to
15  the third election there it says State Senator
16  District 31.  Correct?  Do you see that?
17    A  Yes.
18    Q  Now, do you agree with me that Midland
19  Mayor Mike Canon, a conservative Republican,
20  challenged you 2014 in the Republican primary?
21    A  Yes.
22    Q  These numbers show that he came within
23  five points of beating you in the primary; is that
24  right?
25    A  He did.

Page 56

1    Q  So even in 2014 you were drawing
2  challenges and you would agree with me that within
3  five points of this is pretty close, right?
4    A  Yeah, it's pretty close.
5    Q  Fair to say that at least half the
6  district out there that voted in the primary wanted
7  Mike Canon, right?
8    A  More than half wanted me.
9    Q  I'm going to show you what I'm going to
10  mark as Defendant's 9.
11      (Exhibit Number 9 marked.)
12    Q  (BY MR. HUDSON)  And for purposes of
13  identification on the record I'm marking this for
14  the exhibit as Defendant's 9.  This is also Exhibit
15  15 in response to Brooks plaintiff's preliminary
16  injunction.  Take a look at that and let me when
17  you're finished.
18    A  I'm done.
19    Q  There at the top of the first page reads
20  Office of the Secretary of State.  Do you see that?
21    A  Yes.
22    Q  Again, this is a Race Summary Report for
23  this time from the 2018 Republican Party Primary
24  Election; is that right?
25    A  Correct.

Page 57

1    Q  And the date on this is March 6th, 2018;
2  is that correct?
3    A  Yes.
4    Q  Now, in the 2018 primary you avoided a
5  runoff by just .4%, or 323 votes, with again Mike
6  Canon being the runner-up; is that right?
7    A  Yes.
8    Q  Getting closer, right?
9    A  Yeah.  Not close enough.
10    Q  So 2014 you draw a primary challenge, 2018
11  you draw a primary challenge, 2019 you're stripped
12  of your committee seats, right?
13    A  Um-hum.
14    Q  Are you ready to agree with me that you're
15  falling out of favor as early as 2014 with the
16  Republican party in Texas?
17    A  With the Republican party, but most
18  pronouncedly with the Texas Public Policy
19  Foundation and the power Texans who financed a lot
20  of this opposition.
21      THE WITNESS:  I get lost in these.
22  I'm just glad you're having a little trouble.
23      MR. OPIELA:  I'm happy to share.
24    Q  (BY MR. HUDSON)  I believe go back to
25  Exhibit 7.

Senator Kel Seliger

January 19, 2022
Pages 58 to 61

Page 58

1    A  All right.
2    Q  Do it this way.  You would agree that
3  there were certain agenda items of Governor Patrick
4  that you opposed in the 2019 regular session; is
5  that right?
6    A  No, in the 2017 regular session.
7    Q  2017, and those would be property tax
8  reform, right?
9    A  Well, it was tax caps and public --
10  private school vouchers.
11    Q  And both of those you took a position
12  opposite the Lieutenant Governor, right?
13    A  I did and both measures passed the senate.
14    Q  And you also took a position opposite the
15  governor of that session on those pieces, right?
16    A  Yes.
17       MR. HUDSON:  Mind if we go off the
18  record for a few minutes?
19       MR. DUNN:  Fine.
20       THE VIDEOGRAPHER:  We are off the
21  record.  The time is 10:28 a.m.
22       (Off the record.)
23       THE VIDEOGRAPHER:  We are back on the
24  record.  The time is 10:40 a.m.
25    Q  (BY MR. HUDSON)  Hand you what I'm going

Page 59

1  to mark as Defendant's 10.
2       (Exhibit Number 10 marked.)
3    Q  (BY MR. HUDSON)  Have you ever seen that
4  document before?
5    A  Yes.
6    Q  What is that document?
7    A  It's an article from the Austin American
8  Statesman.
9    Q  Is that a true and accurate copy of the
10  article dated January 24th, 2019, titled Patrick
11  criticizes Seliger's attitude, lack of teamwork?
12    A  Yes.
13    Q  So in addition to the issues that you had
14  with Senator Patrick or excuse me, Lieutenant
15  Governor Patrick in 2019, he had also criticized
16  you for not being a team player; is that correct?
17    A  Yes.
18    Q  And that, again, was based on your 2017
19  votes against priorities, right?
20    A  Yes.
21    Q  So challenger in 2014, challenger in 2018,
22  you had a dispute over remarks made about
23  Lieutenant Governor Patrick's staffer in 2019,
24  Lieutenant Governor Patrick criticizes you as not
25  being a team player in 2019, right?

Page 60

1    A  Um-hum.
2       MR. DUNN:  Is that a yes?
3       THE WITNESS:  Yes, I'm sorry.
4    Q  (BY MR. HUDSON)  I'm going to hand you
5  what I'm going to mark as Defendant's 11.
6       (Exhibit Number 11 marked.)
7    Q  (BY MR. HUDSON)  Take a look at that and
8  tell me when you're finished.  For purposes of
9  identification, in addition to marking this as
10  Exhibit 11, this is also Exhibit 20 in the response
11  to plaintiff's preliminary injunction motion.  Have
12  you ever seen that document before?
13    A  Yes.
14    Q  What is it?
15    A  It is an article from Texas Tribune,
16  October 7th, 2021.
17    Q  To your knowledge, is that a true and
18  accurate copy of the article entitled Weighing
19  reelection bid, GOP Texas Senator Kel Seliger
20  confronts redrawn district, Trump endorsement of
21  primary challenger, dated October 7th, 2021?
22    A  Yes.
23    Q  Now, the first full paragraph on Page 2 of
24  this document -- follow along with me -- reads,
25  heading into election season, Amarillo State

Page 61

1  Senator Kel Seliger says he feels like members of
2  his own party might be using redistricting to oust
3  him after years of tension with Lieutenant Governor
4  Dan Patrick, a fellow Republican.  Did I read that
5  correctly?
6    A  Yes.
7    Q  So you thought politics was at play with
8  potentially being redrawn out of your district; is
9  that right?
10    A  No, not being redrawn out of my district,
11  no.  Being redrawn is such a factor to make it more
12  difficult for me to get reelected in that same
13  direct.
14    Q  Well, in fact, the article goes on to
15  read, Seliger is deciding whether he will even run
16  for reelection, but if he does, he is now staring
17  down perhaps his toughest primary yet; is that
18  right?
19    A  Yes.
20    Q  All right.  Do you agree that the district
21  was redrawn to be even more Republican making it
22  difficult for you to win a primary; is that right?
23    A  Being more Republican doesn't make it
24  difficult for me as a Republican to win a primary.
25    Q  So why were you concerned about being or

Senator Kel Seliger

Page 62

1 drawing a tougher race that year?
2    A  Because they were taking counties that I
3 had represented before and taking those counties
4 out of the district and putting counties in the
5 district that were closer to Midland thinking that
6 they would affect the vote in favor of the Midland
7 candidate.
8    Q  In fact, this article goes on to say that
9 on Tuesday, former President Donald Trump, a close
10 ally of Lieutenant Patrick, endorsed Sparks and
11 bashed Seliger as a, quote/unquote, RINO,
12 Republican in name only, in a rare intervention in
13 a Texas legislative race by the former president.
14 Did I read that correctly?
15    A  Yes.
16    Q  Do you consider yourself a RINO?
17    A  Of course not.
18    Q  What does RINO mean?
19    A  Republican in name only.
20    Q  What does that mean?
21    A  I'm not sure I know.  It's what people on
22 the far right call people who are not on the far
23 right.  What the president also said that I was a
24 RINO and I was like Mitt Romney, and next to
25 probably Ronald Reagan and John McCain there was

Page 63

1 probably no one I would rather be compared to than
2 Mitt Romney which goes to show just how really good
3 the opinions of the former president are.
4    Q  You would agree you're the most liberal
5 Republican in the Texas Senate, right?
6    A  I accept no part of liberal.  I am not a
7 liberal.  Do I have a less so-called conservative
8 voting record according to Rice University and
9 Texas Public Policy than the rest of my colleagues,
10 I do, but a lot of those are based on fallacious
11 measurements and assumptions so my voting record is
12 80 some-odd percent with the Republican majority of
13 the senate that is not a liberal voting record.
14    Q  I'm going to hand you what I'm going to
15 mark as Defendant's 12.
16       (Exhibit Number 12 marked.)
17    Q  (BY MR. HUDSON)  Have you ever seen that
18 article before?
19    A  I believe so.
20    Q  Go ahead and take a look and let me know
21 when you're finished.
22    A  Yeah, I've read it at the time.
23    Q  Is this a true and accurate copy of the
24 June 18th, 2021 article titled The Back Mic,
25 Analyzing the 2021 Texas Legislature's Conservative

Page 64

1 to Liberal Rankings?
2    A  I believe so.
3    Q  If you flip over to page -- I'll count
4 them here because the pages aren't numbered.
5 There's one full page, two full pages, three full
6 pages and on the fourth full page Number 1 it reads
7 Bryan Hughes.  Do you see that?
8    A  I'm not there yet.
9    Q  Okay.
10    A  No, now I have it.
11    Q  Now, do you see in the top left-hand
12 corner it says 2021 rank?
13    A  Yes.
14    Q  All right.  And above that there is a
15 discussion about the methodology, but the 2021 rank
16 is 1 through 18 Republicans?
17    A  Yes.
18    Q  You would agree that there are 18
19 Republicans in the Texas Senate, right?
20    A  I do.
21    Q  For the 87th Legislature?
22    A  Yes.
23    Q  All right.  Number 1 is Bryan Hughes,
24 right?
25    A  Right.

Page 65

1    Q  And you're 18th, right?
2    A  Right.
3    Q  So based on Rice University's Baker
4 Institute of Public Policy out of all the members
5 of the Republican party in the senate, you were the
6 least conservative amongst them?
7    A  Yes, and I would also say that the Baker
8 Institute at Rice University does terrible work.
9    Q  So you disagree with them finding that
10 you're the least conservative member of the Texas
11 Senate?
12    A  Yeah, I do.
13    Q  Who do you think you're more conservative
14 than with regard to Republicans in the Texas
15 Senate?
16    A  I would not necessarily make that claim of
17 anybody, but do I think I'm more liberal, no.  Am I
18 less conservative, probably not.
19    Q  So we don't like Rice University?
20    A  I love Rice University.  I think the Baker
21 Institute is poorly manned.
22    Q  Let's take a look at Defendant's 13.
23       (Exhibit Number 13 marked.)
24    Q  (BY MR. HUDSON)  Did I mark this one that
25 you have in your hand?

Senator Kel Seliger

January 19, 2022
Pages 66 to 69

Page 66

1    A   Yes, you did.
2    Q   Take a look and let me know when you're
3   finished.
4    A   Okay.  Okay.
5    Q   Now, this article also pulls from Rice
6   University and if we look at page -- it looks like
7   it didn't come through on the printout -- if you go
8   to Page 2 at the top, again it says Bryan Hughes.
9   I will have to print out a color copy for you.
10  Again, in the Texas Tribune citing this has you as
11   the least conservative member in the Texas
12   Legislature.
13        MR. OPIELA:  Is there a question?
14    Q   (BY MR. HUDSON)  Correct?
15    A   Are they using the Rice University
16   statistics here?
17    Q   That's my understanding.
18    A   I think -- I think Rice University is
19   academically irresponsible in this because what
20   they don't do is take the issues, make up those
21   votes and say are they truly conservative issues,
22   and for that I would draw your attention to the
23   Twitter bill and I think that has to do with big
24   government and is antibusiness and I think the
25   people who voted for that, that is not a good

Page 67

1   Republican or conservative vote.  I think people
2   who voted for the bill that regulates a city's
3   ability to regulate the number of goats in people's
4   yards is a big government bill and is not a
5   conservative Republican bill.  I don't concede that
6   I'm less conservative than those people.  So I
7   think that there -- I think the way that they
8   assess issues is really flawed and academically not
9   as competent as it should be for Rice University.
10    Q   If you flip over to Page 5 of 7, if you
11   look at the bottom right-hand corner it has the --
12   Texas Tribune was kind enough to put the page
13   numbers on their form.  Middle of the page it says
14   methodology, do you see that?
15    A   Yes.
16    Q   Follow along with me.  This article reads,
17   political scientists have for decades used
18   roll-call votes cast by members of U.S. Congress to
19   map the places on the Liberal-Conservative scale
20   along which most legislative politics now takes
21   place.
22    A   Yes.
23    Q   This ranking of the Texas Senate does the
24   same, by drawing on the 943 non-lopsided roll-call
25   votes taken during the 2021 regular session.  Did I

Page 68

1   read that correctly?
2    A   Yes.
3    Q   So that's part of the methodology.  Do you
4   disagree with that?
5    A   Yes.
6    Q   So you don't think that your roll-call
7   votes should be used to determine where you fall in
8   the spectrum between Conservative and Liberal?
9    A   Not under the guise of being empirical,
10   no.  Just because everybody votes some way --
11   Republican votes some way doesn't make the issue
12   itself or the bill itself a conservative bill.
13    Q   You would agree with me that at a minimum
14   these two articles demonstrate that at least one
15   prominent academic university, whether you agree
16   with them or not, has pegged you as the least
17   conservative member of the Texas Senate, right?
18    A   They have pegged me that way fallaciously
19   and I'm not sure altogether academically
20   competently.
21    Q   Let me show you what I'm going to mark as
22   Defendant's 14.
23        (Exhibit Number 14 marked.)
24    Q   (BY MR. HUDSON)  Have you ever seen that
25   document before?

Page 69

1    A   I have.
2    Q   Take a look and we will talk about it.
3    A   I've got it.
4    Q   Is this -- so you've seen this before?
5    A   I have.
6    Q   To your knowledge, is this a true and
7   accurate copy of the October 20th, 2021 article
8   from the Amarillo Pioneer?
9    A   It is.
10    Q   Called Seliger calls it quits.  Republican
11   Senator not seeking reelection?
12    A   Yes.
13    Q   Why did you decide not to run again?
14    A   Everybody leaves at some point and it
15   seemed like a good time after what will be 19 years
16   when I leave office.
17    Q   So you weren't concerned about your
18   district being more competitive in the Republican
19   primary?
20    A   It's always been a concern.  More so this
21   time, not necessarily.
22    Q   Is that because of the way that SD31 was
23   drawn?
24    A   Well, partly except for the fact that the
25   new counties that were added are rural counties.

Senator Kel Seliger

January 19, 2022
Pages 70 to 73

Page 70

1  As a general rule, locally elected officials in
2  those rural counties and educators do not care for
3  Texas Public Policy Foundation and their candidates
4  and that's why when everybody runs for Senate
5  District 31 they resign their positions from the
6  Texas Public Policy Foundation.  They are probably
7  the most antilocal control and antipublic education
8  organizations in the state of Texas.
9      Q   Was your decision based in any part on the
10 fact that President Trump declined to endorse you
11 in the primary?
12     A   No, not really.
13     Q   Was your decision not to run based in part
14 in any way on the fact that Lieutenant Governor Dan
15 Patrick had removed you from your committees making
16 you a less effective senator?
17     A   No.
18     Q   Was your decision not to run based in any
19 way on the fact that Rice University had pegged you
20 the least conservative member of the Texas Senate?
21     A   I wouldn't compose a grocery list based
22 upon what Rice University thinks.
23     Q   So the answer is no?
24     A   No, yeah, sorry.
25         MR. HUDSON:  Let's take ten minutes

Page 71

1  off the record.  I'll take a look at my notes.  Are
2  you good with that?
3         MR. DUNN:  That's fine.
4         MR. HUDSON:  Are you guys good with
5  that?
6         THE WITNESS:  Yeah.
7         THE VIDEOGRAPHER:  We are off the
8  record.  The time is 10:56 a.m.
9         (Off the record.)
10        THE VIDEOGRAPHER:  We are back on the
11 record.  The time is 11:18 a.m.
12        (Exhibit Number 15 marked.)
13     Q   (BY MR. HUDSON)  I'm going to hand you
14 what I have marked as Defendant's 15.  For purposes
15 of identification, I believe this is Exhibit 6-K to
16 the preliminary injunction motion filed by the
17 Brooks plaintiffs.
18     A   Um-hum.
19     Q   Go ahead and take a look at this document
20 and let me know when you're finished.
21     A   Okay.  I think I'm ready.  I have seen
22 this before.
23     Q   So I'll just represent to you I didn't
24 print out the entire Senate Journal from that day.
25 This is the relevant portion I believe, Page A-49,

Page 72

1  but I have the first page of the Senate Journal on
2  there and got the last on the back.
3      A   Right.
4      Q   So I want to turn your attention down to
5  about the last third of the page where it says
6  Senator West.  If you don't mind, I'll mark it for
7  you so you can find it real easy.
8      A   Okay.
9      Q   This is kind of an extensive document.  Do
10 you see the highlighted portion?
11     A   Yes, sir.
12     Q   So follow along with me as I read that.
13 It says, Senator West:  -- no, well, hold on for
14 one second.  This is going to be part of the
15 record.  We know we're going to lose this
16 particular vote.  It's been said that Senate
17 District 10 was going to flip.  Okay?  Did I read
18 that correctly?
19     A   Yes.
20     Q   Now, Senator West a Democrat?
21     A   Yes.
22     Q   Senator Powell responds, That's exactly
23 right.  Did I read that correctly?
24     A   Yes.
25     Q   Senator West then says, So, let's get it

Page 73

1  on the record, do you believe that your district is
2  being intentionally targeted for elimination as it
3  being a Democratic trending district?  Did I read
4  that correctly?
5      A   Yes.
6      Q   Senator Powell responds, Absolutely.  Did
7  I read that correctly?
8      A   Yes.
9      Q   Do you disagree with Senator Powell?
10     A   No.  I don't know that it's necessarily a
11 Democratic trending district.  I haven't seen any
12 of the statistics, but over the last few terms it's
13 been represented by Senator Kim Brimer and then
14 Senator Wendy Davis and then Senator Connie Burton,
15 a Republican, and now Senator Powell who is a
16 Democrat.  Now, statistically it may be Democratic
17 trending, but that's not the way I've seen it over
18 that period of time.
19        MR. HUDSON:  Objection, nonresponsive
20 to everything after yes.
21        THE WITNESS:  Okay.
22     Q   (BY MR. HUDSON)  Couple of -- few things
23 remaining, first of which is thank you for your
24 time today.  I'm going to turn you over to Chad
25 Dunn here in just a second.

Senator Kel Seliger                                    January 19, 2022
                                                        Pages 74 to 77

Page 74

1    A   Okay.
2    Q   Would you agree that I've been courteous
3  and at least appropriate in the questions that I've
4  asked today?
5    A   You have and I appreciate it.
6    Q   Okay.  I want to make sure that you're not
7  walking away thinking that I've done anything rude
8  to you.
9    A   I absolutely agree and I hope you get the
10  same impression about me.
11    Q   Absolutely, sir.  I appreciate it.  Any
12  questions I haven't asked you today that you think
13  I should have?
14    A   No, I don't think so.
15    Q   Okay.  I'll tender the witness and I may
16  have a few redirect after Mr. Dunn, but I'll turn
17  this over to him.
18    A   Okay.
19        MR. DUNN:  Let's go off the record.
20        THE VIDEOGRAPHER:  We are off the
21  record.  The time is 11:22 a.m.
22        (Off the record.)
23        THE VIDEOGRAPHER:  This marks the
24  start of Media 2.  We are back on the record.  The
25  time is 11:24 a.m.

Page 75

1            EXAMINATION
2  BY MR. DUNN:
3    Q   Please tell us your name.
4    A   Kel Seliger.
5    Q   Senator Seliger, my name is Chad Dunn.  I
6  represent the Brooks plaintiffs in this case.  Do
7  you understand that?
8    A   Yes.
9    Q   I believe that you and I might have met at
10  a courthouse a few years back in the earlier round
11  of redistricting.  Does that sound right to you?
12    A   I don't recall specifically, but yes, I
13  have in some.
14    Q   Okay.  I haven't had any contact with you
15  in years though; would you agree?
16    A   No.
17    Q   Also representing the Brooks plaintiffs is
18  a lawyer named Mark Gaber.  Another one named Molly
19  Danahy.  Do either of those names sound familiar?
20    A   No.
21    Q   People you've spoken with?
22    A   No.
23    Q   Have you spoken with any lawyers in this
24  case prior to today?
25    A   Not since 2012, 2013.

Page 76

1    Q   Okay.  Which were the lawyers there that
2  you recall?
3    A   Nina Perales.
4    Q   Okay.  You spoke with her today during the
5  deposition?
6    A   Yes.
7    Q   Have you spoken with her prior to the
8  deposition today?
9    A   No.
10    Q   Have you spoken with any lawyer about your
11  testimony today other than your own?
12    A   No.
13    Q   How about any lawyers for the state?
14    A   No.
15    Q   Okay.  You received a subpoena to be here
16  today; is that true?
17    A   I was not served.  I'm here voluntarily.
18    Q   Okay.  I can tell you that I was served
19  with a subpoena that was directed towards you, but
20  it sounds like your testimony is you've never seen
21  that; is that a fact?
22    A   It seems like either you or the state sent
23  me a copy of the subpoena or something like that,
24  but I didn't sign anything and I simply told them I
25  would be here voluntarily, just give me a time and

Page 77

1  place.
2    Q   Okay.  I can represent to you I've never
3  sent you anything.
4    A   No.
5    Q   Okay.  I'm not trying to trick you here
6  about the subpoena.  I guess the reason I bring up
7  the subpoena is it also had a request in there that
8  you bring in some documents.  Do you recall that?
9    A   Yes.
10    Q   I notice that the state asked you today
11  about an email that looks like it was forwarded
12  from you to Mr. Opiela.  I can find it here in the
13  records.
14    A   Yeah.
15    Q   You recall that email?
16    A   Yes, I recall that.
17    Q   Okay.  Do you know how the state would
18  have come in possession of that?
19    A   I assumed Mr. Opiela gave them to you.
20  They were the only things that I had that were
21  responsive to the subpoena and I sent them to
22  Mr. Opiela immediately.
23    Q   Okay.  Well, I haven't received any of
24  your documents yet and, again, I'm not fussing
25  about it.  I just want to make sure I understand

Senator Kel Seliger

January 19, 2022
Pages 78 to 81

Page 78

1   what they are.
2      A   Okay.
3      Q   So the subpoena asked you to bring the
4   documents today.  Are you saying there's none other
5   than that email that was discussed?
6      A   There was one other document I think.
7         MR. OPIELA:  Just to help.  Chad, I
8   sent them to the state.
9         MR. DUNN:  Okay.
10        MR. OPIELA:  I didn't know you were
11  going to be here today so otherwise I would have
12  sent them to you.  I would be happy to forward them
13  to you if you want to take a break and do that.
14        MR. DUNN:  In all honesty I'm not
15  fussing, but I do want to see them.
16        THE WITNESS:  I'm sorry.  I assumed
17  with my counsel that it was done.
18        MR. OPIELA:  Let me see if -- I think
19  I brought a good deal of them today.  If you want
20  to take a break.
21        MR. DUNN:  Let's go ahead and do that
22  then.
23        MR. OPIELA:  Because I want you to
24  be --
25        MR. DUNN:  Sure.

Page 79

1         THE VIDEOGRAPHER:  We are off the
2   record.  The time is 11:27 a.m.
3         (Off the record.)
4         THE VIDEOGRAPHER:  We are back on the
5   record.  The time is 11:31 a.m.
6      Q   (BY MR. DUNN)  Senator, on a break we
7   looked at some of the documents that you produced
8   through your counsel; is that true?
9      A   Yes.
10        MR. DUNN:  And, Mr. Opiela, you've
11  looked at the subpoena.  Can you tell us what
12  requests you've had documents responsive to and
13  which you didn't?
14        MR. OPIELA:  So Senator Seliger had
15  items responsive to request 1 and 4.  There were no
16  documents in his possession responsive to request 2
17  and 3.
18        MR. DUNN:  Okay.
19      Q   (BY MR. DUNN)  In the interest of clarity,
20  you ultimately produced four documents; is that
21  right?
22      A   I believe that's correct, yes.
23      Q   Two of them were emails related to your
24  declaration.  There was the Word document of your
25  declaration and then there is a PDF signed version

Page 80

1   of your declaration; is that right?
2      A   Yes.
3      Q   And that's everything you produced; is
4   that right?
5      A   Yes.
6      Q   Okay.  You've looked for anything else in
7   the subpoena and you have nothing else responsive?
8      A   No.
9      Q   Okay.  Now, I just want to take a step
10  back for a minute because the court may ultimately
11  watch this video to get your testimony.  So just a
12  little bit about yourself, okay, where you grew up,
13  where you're from, that sort of thing.  Can you do
14  that for us?
15      A   Yeah.  I grew up in the town of Borger,
16  Texas, and for the last lots of years, 40 some-odd
17  years have lived in Amarillo, Texas, where at one
18  time I was city councilman and mayor.  And I've
19  been a member of the state senate since 2004.
20      Q   How long have you been in public service?
21      A   Since 1989, when I was first elected to
22  city council.
23      Q   Have you ever lost an election contest?
24      A   No, I haven't.
25      Q   Okay.  Now, you mentioned earlier in your

Page 81

1   testimony that you've done some other, you know,
2   business work and I think you said steel
3   erection/fabrication?
4      A   No erection and fabrication, basically a
5   steel supplier, what's called a steel service
6   center.
7      Q   But you've sold that business now?
8      A   Yes.
9      Q   We also had a discussion I think while we
10  were waiting at the security stand about your plans
11  next week.  Do you recall that?
12      A   Yes.
13      Q   Okay.  It's my understanding you're going
14  to be in California next week?
15      A   Correct.
16      Q   Have you had any discussions with anybody
17  about your testimony in this case?  Earlier I asked
18  you if you had any discussion about your testimony
19  today in the deposition.  I'm asking have you had
20  any discussion with anybody about your testimony?
21      A   No.
22      Q   Related to this case?
23      A   No, no one.
24      Q   Okay.  I just want to be clear in light of
25  some of the State's question of you.  Has anybody

Senator Kel Seliger

January 19, 2022
Pages 82 to 85

Page 82

1  tried to influence you in terms of what your
2  recollections were today?
3      A   Well, no, but Senator Powell did ask me to
4  sign the affidavit, but that's the only person I've
5  talked to about the issue.
6      Q   When she asked you to sign the affidavit,
7  did she get into, you know, what you believe or
8  what you think or what you recall?
9      A   No.
10     Q   Did she try to plant any kind of seeds in
11  your memory about thoughts or events or facts that
12  you might testify to?
13     A   No.  I feel certain -- right after the map
14  came out, I went over to her desk and expressed my
15  sympathy for it and we talked about it briefly and
16  what she thought it did, but that's the only
17  discussion I've had with anybody, just with her.
18     Q   That was right there on the floor after
19  the plan had passed?
20     A   Yes.
21     Q   Was she trying to influence your
22  recollections then do you think?
23     A   No.
24     Q   Was that conversation anything other than
25  her confiding in somebody in the senate that she

Page 83

1  had confidence in?
2      A   No, that's all it was.
3      Q   So other than that discussion immediately
4  after the vote, have you ever had any discussion
5  with Senator Powell on the merits of the
6  redistricting plan or her opinions or your
7  opinions, anything of that sort?
8      A   Not at all.  I'm sorry.
9          MR. OPIELA:  Well, we were getting
10  close to this.  I want to be consistent here and
11  object to any privileged conversations.
12     Q   (BY MR. DUNN)  So if you have to -- it's
13  -- let me ask you this.  You're familiar with
14  legislative privilege, I assume?
15     A   Yes.
16     Q   I know you're not a lawyer.  I'm not
17  asking you -- I'm not trying to box you into lawyer
18  positions here, but you were on the Senate
19  Redistricting Committee back in 2011; is that
20  right?
21     A   Yes.
22     Q   And you have given lots of testimony in
23  various places about redistricting; would that be
24  fair to say?
25     A   Yes.

Page 84

1      Q   In the course of that you had opportunity
2  to talk about your legislative privilege?
3      A   Yes.
4      Q   At least what you understand is the scope?
5      A   Right.
6      Q   You realize that's your privilege?
7      A   Right.
8      Q   It's not somebody else's; is that true?
9      A   I think so.
10     Q   You can decide on your own whether or not
11  you want to disclose a conversation?
12     A   Right.
13     Q   Now, in the past you were represented by
14  the Attorney General's office?
15     A   Correct.
16     Q   In fact, some of the same lawyers in this
17  case today were your lawyers in the previous
18  decade; is that not true?
19     A   It may be.  I think you were still in high
20  school so.
21     Q   Looking at Mr. Hudson, I think the main
22  lawyer here is Mr. Sweeten?
23     A   I think I recall him, yes.
24     Q   And I assume in the course of meeting with
25  the lawyers at the Attorney General's office they

Page 85

1  talked to you about telling the truth and the
2  importance of doing that in a deposition; is that
3  correct?
4      A   Yes.
5      Q   And they obviously talked to you about
6  your legislative privilege and what your rights are
7  there?
8      A   Yes.
9      Q   Okay.  How would you describe the gist if
10  you would of the questioning of the Attorney
11  General's office of you today?
12         MR. OPIELA:  Objection, form.
13     A   I don't know what to say because I don't
14  know why some questions was asked.
15     Q   (BY MR. DUNN)  Sure.
16     A   But I thought it was incisive questions
17  and I assumed they were asked to get the
18  information that they needed to have.  Other than
19  that, I don't have any real impression.
20     Q   Did you get the sense that your
21  truthfulness as a witness was challenged?
22     A   No.
23     Q   Are you telling the truth today?
24     A   Yes.
25     Q   Okay.  I would like to take you to your

Senator Kel Seliger

January 19, 2022
Pages 86 to 89

Page 86

1  declaration which you should have there in front of
2  you.
3      A  I do.
4      Q  That's attached as Exhibit 1 today.  Do
5  you have that there, sir?
6      A  I do, and I have the copy I brought too.
7      Q  Now, this declaration was signed by you in
8  your hand; is that true?
9      A  Yes, sir.
10     Q  And on the last page of it, Page 3, that
11 contains your actual original signature?
12     A  It does.
13     Q  And it was signed on November the 17th; is
14 that a fact?
15     A  Correct.
16     Q  The -- you were given any opportunity you
17 wanted to make adjustments to this declaration; is
18 that true?
19     A  Yes.
20     Q  It's not the case that this was jammed
21 down your throat and this is the language you had
22 to adopt?
23     A  Absolutely not.
24     Q  I assume you read it carefully?
25     A  Yes.

Page 87

1      Q  And is there anything in it that you think
2  is, you know, worded incorrectly or slightly wrong
3  or that you would rephrase today?
4      A  I don't think so.
5      Q  Okay.  I'd just like to walk through, you
6  know, some of the declaration.  Go to Page 1.  It
7  says you're over the age of 18 and competent to
8  testify.  I assume that's true?
9      A  I hope so.
10     Q  Okay.  And you have already testified
11 you're the incumbent Senator in Senate District 31
12 and you were elected to that position in 2004; is
13 that right?
14     A  Yes.
15     Q  Okay.  And you were the chair of the
16 Senate Redistricting Committees in 2011 and '13?
17     A  Yes.
18     Q  When you were the chair of those --
19     A  Let me clarify, please.
20     Q  Sure.
21     A  There was no senate select committee on
22 redirecting in 2013 because we had no bill to
23 consider because that's when we were in the middle
24 of litigation so I was there representing the
25 committee and the senate.

Page 88

1      Q  Do you recall the legislature in 2013
2  adopting a remedy map for the senate?
3      A  I don't recall that well.
4      Q  Okay.  Do you recall the U.S. Federal
5  Court passing or issuing an opinion on the Senate
6  District 10 part of the senate map?  I think that
7  decision came out in 2012 in Paragraph 5 of your
8  declaration?
9      A  I did not remember that until I read
10 Paragraph 5 and do not recall the substance of that
11 discussion.
12     Q  Okay.  Do you recall back in 2012 being
13 briefed on that decision?
14     A  I'm sure I was, but I don't recall it.
15     Q  Okay.  In Paragraph 6 you say that members
16 of the committee received copies of the federal
17 decision?
18     A  I can only speak for myself.
19     Q  Did you receive it?
20     A  To the best of my recollection, yes, but I
21 don't recall it.
22     Q  Is it fair to say you relied on the
23 Attorney General's office in interpreting that
24 decision?
25     A  Yes.

Page 89

1      Q  Okay.  And in 2013 it says then Attorney
2  General Abbott advised the Senate Select
3  Redistricting Committee that it was our duty to
4  correct the racial discrimination that the federal
5  court had found in Senate District 10.  Is that
6  what you said, sir?
7      A  Yes.
8      Q  And is that what you recall?
9      A  Yes.
10     Q  The committee held a series of hearings
11 and discussed the federal court's ruling that the
12 dismantling of Senate District 10 was racially
13 discriminatory.
14     A  Yes.
15     Q  And you recall at least having those
16 hearings in response to the federal court's order?
17     A  I do.
18     Q  And you would have been the chair?
19     A  Yes.
20     Q  Okay.  The next sentence in your
21 declaration says, to remedy the racial
22 discrimination, the committee adopted Plan S172,
23 which restored Senate District 10 to its benchmark
24 configuration.  Do you recall that?
25     A  I do.

Senator Kel Seliger

January 19, 2022
Pages 90 to 93

Page 90

1    Q   And that's your testimony?
2    A   Yes.
3    Q   Do you recall in 2011 that Senate District
4  10 was not out of deviation?
5    A   I don't recall that specifically.
6    Q   Okay.  Do you know that to be the case
7  today with regard to this cycle of redistricting?
8    A   No, I don't know that.
9    Q   And ultimately you say, the plan was
10  passed by the legislature and signed by the
11  Governor; is that right?
12   A   Yes.
13   Q   Is it fair to say that then in 2013 you as
14  chairman of the committee and the senate and the
15  rest of the legislature passed a remedy plan for
16  Senate District 10 to address the federal court's
17  order that the district had been intentionally
18  dismantled in violation of the Voting Rights Act?
19   A   It was not done intentionally to do that.
20  The court found that it did, but it was not
21  intentional on our part.
22   Q   And I understand you testified to that,
23  right, for the state?
24   A   Yes.
25   Q   And you testified in San Antonio in that

Page 91

1  court; is that true?
2    A   Yes.
3    Q   And you testified in Washington, D.C.?
4    A   I did.
5    Q   And there were three federal judges there
6  as well, right?
7    A   There were.
8    Q   And it was your opinion that it was not
9  intentionally discriminatory?
10   A   Absolutely.
11   Q   But ultimately the court found that?
12   A   Right.
13   Q   And then you accepted it; is that true?
14   A   Well, yeah.
15   Q   Okay.  And so in response to it you led
16  the committee in passing a plan that the court
17  would approve?
18   A   Yes.
19   Q   You don't have any regret about that?
20   A   I'm sorry?
21   Q   You don't have any regret about that?
22   A   About drawing the first map?
23   Q   No, about drawing the remedy plan in
24  response to the court?
25   A   Yeah, I regret that we had to because I

Page 92

1  think we had drawn a good map, but the court said
2  we had to do it and I'm satisfied that we met the
3  requirements of the court.
4    Q   And the Attorney General at the time told
5  you that you had to; is that correct?
6    A   Yes.
7    Q   And in the next Paragraph Number 8 your
8  declaration says, the committee members all knew it
9  was necessary to restore Senate District 10 to its
10  benchmark configuration in order to comply with the
11  Voting Rights Act and the U.S. Constitution which
12  prohibits racial discrimination; is that your
13  testimony?
14   A   Yes, it is.
15   Q   Is that what you recall the plan did in
16  2010, restore?
17   A   Yes.
18   Q   And at the time of the drawing of the
19  remedy map in 2013, can you recall, you know, I
20  don't want to put you through a memory test, but
21  what are the members of the committee you can
22  recall, the other members?  I know you may not get
23  them all.
24   A   Oh, I won't get them all.  Senator West,
25  Senator Zaffirini, Senator Fraser, Senator

Page 93

1  Wentworth, Senator Huffman and I don't recall
2  exactly who else was on it.
3    Q   And, again, fair enough.  But Senator
4  Huffman now is the -- was the chair of the
5  committee in this most recent --
6    A   Yes.
7    Q   And as you just noted, she was on the
8  committee in 2013?
9    A   I believe that's right.
10   Q   I think it's also true that she was on the
11  committee in 2011; does that sound right?
12   A   I believe that's correct.
13   Q   In terms of what you've laid out here in
14  these prior paragraphs of your declaration and what
15  the committee was told by the Attorney General what
16  the federal court decision said, that information
17  was shared with Senator Huffman and the rest of the
18  committee; would you agree?
19   A   Yes.
20   Q   Okay.  Now, you are familiar with
21  redistricting with racially polarized voting?  I
22  understand you may not be an expert in it, but
23  you've heard that phrase?
24   A   I've certainly heard the phrase.
25   Q   Okay.  You know it's an important issue

Senator Kel Seliger

January 19, 2022
Pages 94 to 97

Page 94

1  that courts resolve in voting rights cases?
2      A  Yes.
3      Q  Okay.  And so you said here in Paragraph
4  9, the committee members also knew that voting in
5  Texas and Tarrant County is racially polarized; is
6  that right?
7      A  Yes.
8      Q  And that's something that you I'm assuming
9  saw hours of testimony on in the court proceedings?
10     A  As a witness I did not go -- couldn't go
11  in and see those court proceedings, but yeah, I
12  believe that was subject -- that was a big, big
13  subject in there because we talked about it in my
14  depositions prior to those court proceedings.
15     Q  Okay.  Setting aside the litigation then
16  for a moment, when you were chair of the committee,
17  were you briefed, you know, whether in public or
18  private by experts on racially polarized voting?
19     A  Yes.
20         MR. OPIELA:  I was going to -- well,
21  go ahead.
22     Q  (BY MR. DUNN)  Were those public briefings
23  or private or both?
24     A  Those were private briefings and all with
25  counsel.

Page 95

1      Q  Okay.  And the counsel you're referring to
2  there is the Attorney General's office?
3      A  Both the Attorney General's office and
4  Professors Guinn and Morrison of Baylor University.
5      Q  All right.  Those were two professors that
6  the state had hired to help advise your committee;
7  is that right?
8      A  Correct.
9      Q  But had you also received advice on racial
10  polarized voting from the Attorney General's
11  office?
12         MR. HUDSON:  I object based on
13  attorney-client privilege, attorney work product.
14         MR. DUNN:  Well, our position is since
15  the Attorney General's office is cross-examining
16  their former client that we are entitled to any of
17  that discussion.
18         MR. HUDSON:  Well, our position is we
19  are instructing you not to answer and we don't
20  think that you're waiving privilege by testifying
21  today so to the extent that they are encroaching on
22  attorney-client privilege or attorney work product,
23  the Attorney General's office position is you
24  should not answer that question.
25         THE WITNESS:  Okay.

Page 96

1         MR. OPIELA:  I don't have any
2  objection to that.  It's your privilege to waive or
3  not.
4         THE WITNESS:  I'm not going to waive.
5      Q  (BY MR. DUNN)  So you're going to take the
6  direction of the Attorney General's office and not
7  answer questions about any advice or discussions
8  they had with you?
9      A  I have to this point, but that's no
10  commitment to future input.
11     Q  I understand.  If you don't mind, let me
12  finish my questions so we have a record.
13     A  Okay.
14     Q  You're going to take the Attorney
15  General's office direction and not answer any
16  questions about the communications you had or
17  advice you received from the Attorney General's
18  office in the 2011 and '13 litigation; is that
19  right?
20     A  Depending upon the advice of my counsel.
21     Q  As your attorney noted today it's your
22  privilege to decide whether you want to invoke or
23  not.  I'm really not trying to be difficult with
24  you.
25         MR. HUDSON:  I'm going to object to

Page 97

1  that line of questioning.  You've suggested to the
2  witness a few times that he has the ability to
3  waive the privilege.  It's getting awful close to
4  suggesting that he should and his attorney for
5  purposes of 2011 or 2013 was the Attorney General's
6  office, not Eric Opiela.  And so to the extent that
7  you're trying to encroach on attorney-client
8  privilege and attorney work product from prior
9  cases, Mr. Opiela is not here today to advise him.
10  And so I would ask that you please stop suggesting
11  to the witness that, you know, he can and --
12  implying that he should waive his privilege to
13  attorney-client privilege and attorney work
14  product.
15     Q  (BY MR. DUNN)  All I'm trying to establish
16  is you're going to take Mr. Hudson's direction and
17  not answer any questions about your communications
18  with the Attorney General's office during the 2011
19  and 2013 litigation about redistricting?
20     A  Yes, I am, unless otherwise advised by my
21  attorney.
22     Q  Okay.  Now, in terms of going back to the
23  racially polarized voting?
24     A  Um-hum.
25     Q  Tell us and I understand you're not an

Senator Kel Seliger

Page 98

1  expert in it, but tell us what your kind of
2  understanding of racially polarized voting is?
3          MR. HUDSON:  I'm going to object based
4  on attorney-client privilege and attorney work
5  product.  If you can answer that question without
6  encroaching on either of those privileges from
7  prior instruction and prior cases you're free to
8  answer, but if you can't, I'm instructing you not
9  to answer.
10     A  I can't.  I can't really define it.
11     Q  (BY MR. DUNN)  Okay.
12     A  It's just been a long time.
13     Q  Sure.  No.  Fair enough.  So I will
14  represent to you that racially polarized voting
15  typically is offered as evidence to show that
16  certain racial groups prefer one type of candidate
17  and other racial groups prefer other types of
18  candidates?
19     A  Right.
20     Q  And it relies on election data to reach
21  these conclusions and there are appropriate experts
22  to testify about that.  You're aware of all that
23  generally?
24     A  Yes.
25     Q  Okay.  And that's testimony or evidence

Page 99

1  that you have seen over the course of your career
2  in the redistricting committee, I mean, would you
3  have ever seen a racially polarized voting
4  analysis?
5     A  Oh, I'm sure I saw analysis at some point.
6     Q  Okay.
7          MR. OPIELA:  Go ahead.
8     Q  (BY MR. DUNN)  So that's ultimately how
9  you know that in Tarrant County the voting is
10  racially polarized as you say in Paragraph 9 of
11  your declaration?
12     A  Um-hum.
13     Q  Is that a yes?
14     A  It's yes.  That was the decision of the
15  court.  I don't concede it.
16     Q  I see.  Okay.  But that's what the court
17  told in its opinion and that's what was shared with
18  you and the rest of the committee members?
19     A  Right.
20     Q  Now, you were asked quite a few questions
21  from Mr. Hudson on Paragraph 10 and there you say,
22  the 2021 senate redistricting process saw untrue,
23  pretextual explanations given for why the lines
24  were drawn as they were.  Do you see that?
25     A  Yes.

Page 100

1     Q  You gave some comments on the senate floor
2  about the map around the vote?
3     A  I did.
4     Q  And that information of course is
5  available to anyone to get a sense of what you
6  thought about the plan; is that true?
7     A  Yeah.
8     Q  I'm not asking you -- I know you don't
9  have it memorized, but what are some of the
10  comments you recall having made on the floor?
11     A  That the assertion --
12          MR. OPIELA:  Go ahead.
13     A  That the assertion that it was done to
14  sort of concentration of ag in District 28, in oil
15  and gas in District 31, that those arguments were
16  specious and untrue and I thought it was contrived.
17     Q  (BY MR. DUNN)  You said that then?
18     A  Yeah.
19     Q  Okay.  And so in that sense what you have
20  said today on that subject is consistent with what
21  you said then?
22     A  Yes.
23     Q  Have you had --
24     A  Malicious and malicious.
25     Q  Do you -- what makes you believe it was

Page 101

1  malicious?
2     A  I think because the strained relationship
3  with Lieutenant Governor and Senator Huffman.
4     Q  Was the -- you were asked a number of
5  questions today about your, you know, relationship
6  with the Republican party and support and things of
7  that.  Do you recall that generally?
8     A  Yes.
9     Q  Now, did you view what was done to your
10  district as a punishment?
11          THE WITNESS:  Whenever you clear your
12  throat or something, I think you're going to say
13  something.
14          MR. OPIELA:  No, I'm trying to process
15  what he's asking and the way he's asking.
16     A  Wasn't punishment so much as it was
17  designed to be adverse to me; more that way.
18     Q  (BY MR. DUNN)  Is that the -- I mean,
19  somebody that's been in the senate all these years,
20  is that the sense of how things sometimes go, you
21  fall out of line with leadership and there's a
22  reaction?
23     A  Absolutely.
24     Q  You were asked a number of questions about
25  how you vote and did you vote, you know,

Page 102

1  conservatively enough and do you recall those
2  questions generally?
3      A  Yes.
4      Q  Was that -- was it your experience that
5  when you didn't vote with the priorities of the
6  Lieutenant Governor there was a reaction and it was
7  swift?
8      A  I don't know what you call swift.  Was it
9  profound and vindictive, yes, it was.
10     Q  All right.  And would that have been true
11  in terms of voting against a redistricting bill?
12     A  There's not much else that the Lieutenant
13  Governor can take from me so not necessarily.  So
14  that's just the answer.
15     Q  I understand, but in terms of the other
16  members of the senate who still had their committee
17  assignments and other things that, you know, the
18  other kind of assignments that a senator usually
19  receives, based on your experience is it reasonable
20  to believe that voting against a redistricting bill
21  might concern another member of them losing some of
22  their emolument into office?
23     A  No question.
24         MR. OPIELA:  Object to form on that.
25         THE WITNESS:  Just to form?

Page 103

1          MR. OPIELA:  Yes, you have to answer.
2      A  Because in truth, yes, it did happen.  And
3  the 87th District just passed, Senator Hancock --
4  on the bills having to do with electrical grid,
5  Senator Hancock did a lot of research and work on
6  the issue.  And the Lieutenant Governor -- whoever
7  with the Lieutenant Governor, I assume Senator
8  Schwertner but I don't know that -- did a lot of
9  work on the thing and they had bills that were
10  substantially different.  When Senator Hancock --
11  this transpired on the floor so I can -- when
12  Senator Hancock voted in favor of his work product
13  -- and it should be noted that I voted against
14  Senator Hancock's position and with the Lieutenant
15  Governor's -- he was summarily discharged as the
16  chairman of the business and commerce committee and
17  I think taken off the committee altogether.  So
18  yeah, vote against leadership and it's going to be
19  swift and sure.
20     Q  (BY MR. DUNN)  So we've had an objection
21  so I have to go back and ask questions again when
22  we have objections so let me ask you this, what
23  examples do you recall of other senators being
24  punished by leadership for not voting for a
25  particular measure?

Page 104

1      A  In 20 -- I forget the year, but it was the
2  year the measure was before the caucus of the
3  senate to take our threshold from 21 votes to 19
4  votes required to bring a measure to the floor
5  after it came out of committee.  One Republican
6  voted against -- and this is a rules change, not a
7  piece of legislation -- Craig Estes of Wichita
8  Falls who voted against that rules change and his
9  next session was taken off as chairman I think of
10  the Agriculture Committee and was taken off the
11  Finance Committee.
12     Q  Do you recall any other examples?
13     A  No.
14     Q  Other than your own?
15     A  My own.
16     Q  So was it your impression that if you
17  didn't vote for the leadership's redistricting bill
18  that there would have been a reaction?
19     A  That's an absolute conviction, but like I
20  said, there's not much more they can take from me.
21     Q  Right, but there were other things that
22  other Republican members could have taken from them
23  at that time?
24     A  Chairmanships and I was the senior
25  Republican without a chair.

Page 105

1      Q  All the other senators, of course, saw the
2  treatment that you had suffered?
3      A  Yes.
4      Q  They had seen -- those who had been there
5  saw Senator Estes's treatment after his vote; is
6  that right?
7      A  Yes.
8      Q  Do you think observing that had a reaction
9  in the chamber in terms of how they saw things?
10         MR. OPIELA:  Objection, form.
11         MR. HUDSON:  Objection, form.
12     A  Yes, I do, and I'm told that there's a
13  term that goes around the Republic caucus of being
14  Seligered and that's when the recriminations come.
15     Q  (BY MR. DUNN)  Since there is an
16  objection, I'm going to ask you a different way.
17  What is being Seligered?
18     A  Not voting with leadership and losing
19  chairmanship or other committee assignments.
20     Q  Have you heard that used by others?
21     A  I have been told --
22         MR. OPIELA:  Objection, as to any
23  nonpublic communications.
24     A  Yeah, it's not a nonpublic communication.
25     Q  (BY MR. DUNN)  I see.  How would you

Page 106

1  describe the term being Seligered?
2      A   Voting against Lieutenant Governor's
3  position and losing a chairmanship or other
4  committee assignments.
5      Q   And the other example you can think of
6  that is the Senator Estes circumstance you
7  described earlier?
8      A   Senator Estes and the example of Senator
9  Hancock.
10     Q   What was the example of Senator Hancock?
11     A   Senator Hancock almost in the middle of
12  session lost his chairmanship of the Business and
13  Commerce Committee in which he was doing a very
14  nice job and I think that he was taken off the
15  Business and Commerce Committee altogether.  It's a
16  very important committee.  It's a very important
17  chairmanship.  And just right in session taken off.
18     Q   Was it your opinion as a member you didn't
19  have the freedom to vote your conscious?
20         MR. OPIELA:  I'm going to object as to
21  the contemplations that he has when he's voting on
22  bills under legislative privilege.
23         MR. DUNN:  Are you instructing him not
24  to answer?
25         MR. OPIELA:  I am.

Page 107

1          THE WITNESS:  Okay.
2      Q   (BY MR. DUNN)  Did you feel free to vote
3  your conscious as a senator?
4          MR. OPIELA:  I'll restore that
5  objection as well.
6          MR. DUNN:  Again, instruct him not to
7  answer.
8          MR. OPIELA:  Instruct him not to
9  answer because it's going to the substance of his
10  decision-making while he's a legislator.
11     Q   (BY MR. DUNN)  Are there any other sort of
12  reactions that you have observed that leadership
13  has had when it's been dissatisfied with a member's
14  vote?
15     A   Not just offhand because the reaction is
16  pretty swift and for sure it is unmistakable.
17     Q   Returning back to your declaration in
18  Paragraph 10, is it fair to say that Paragraph 10
19  largely summarizes the comments that you made on
20  the floor during the debate?
21     A   I think so.
22     Q   And you said in the next sentence, for
23  example, I was told by Senator Huffman that my
24  district was being changed to add many new counties
25  around Midland and remove Panhandle counties in

Page 108

1  order to create distinctive agriculture versus oil
2  and gas districts between SD31 and SD28; is that
3  your testimony?
4      A   That is.
5      Q   And I'm reading that way so that it's
6  easier for her to take it down.
7      A   Okay.
8      Q   Now, you were -- you had started to say a
9  bit during Mr. Hudson's question explaining that.
10  But can you explain what you meant by the
11  agriculture versus the oil and gas districts and
12  what you understood Senator Huffman's explanation
13  and what you thought was incorrect about it?
14     A   Senate District 28 has tremendous
15  concentration of agriculture primarily built around
16  the cotton industry around Lubbock.  There's also a
17  good deal of oil and gas inside of Senate District
18  28 because it goes way down south.  At the same
19  time, the District 31, the one that I represent has
20  a tremendous amount of agriculture, both beef and
21  corn and peanuts and all those things, it's very
22  agriculture.  It happens to be a diversified
23  economy and is there a lot of oil and gas, yes,
24  most of the oil and gas in the state of Texas
25  probably is in the Permian Basin, but a lot of the

Page 109

1  Panhandle.  Does that mean that oil and gas is not
2  important for Senate District 28, absolutely not.
3  The assertion was specious and untrue and it's just
4  the best that she could do.
5      Q   And you said that at the time?
6      A   Yes.
7      Q   Why do you think, if you have an opinion,
8  as to she was giving you a specious answer?
9      A   To try and take those four counties in the
10  Panhandle, those being Gray, Wheeler, Donley and
11  Collingsworth, out of the district and adding
12  counties that go almost all the way to the border
13  like Schleicher and Upton and Reagan.  Good
14  counties.  I have no objection to representing them
15  because clearly I was going to have to represent
16  more than the 37 counties, but it was designed to
17  concentrate the vote to the degree possible in the
18  area close to Midland to help Mr. Sparks.
19     Q   Is that where Mr. Sparks is from?
20     A   Yes.
21     Q   Why not just tell you that?
22     A   I don't know, because everybody insists
23  they are innocent of any suspect motive.
24     Q   I don't want to -- I know that your
25  lawyers are going to instruct you not to answer so

Senator Kel Seliger

January 19, 2022
Pages 110 to 113

Page 110

1  that's why I'm going to try to ask this carefully.
2      A   Okay.
3      Q   Have you had any private conversations
4  with Senator Huffman about her motivation for your
5  part of the plan?
6          MR. OPIELA:  Yeah, you can't just ask
7  the question another way.  I'm going to object
8  again.
9          MR. DUNN:  I'm entitled to know
10 whether the conversation existed, not what she said
11 under your objection.
12         MR. OPIELA:  Correct.
13         MR. DUNN:  I'm just asking whether the
14 conversation happened.  The court needs to know
15 that so they can rule on the issue.  If it didn't
16 happen, we're all going to spin our wheels.
17         MR. OPIELA:  Okay.
18     A   I don't mind answering if in your opinion
19 it does nothing to compromise privilege.
20         MR. OPIELA:  So can we take a little
21 break here?
22         MR. DUNN:  I'm happy to take a break.
23         THE VIDEOGRAPHER:  We are off the
24 record.  The time is 12:02 p.m.
25         (Off the record.)

Page 111

1          THE VIDEOGRAPHER:  We are back on the
2  record.  The time is 12:16 p.m.
3      Q   (BY MR. DUNN)  Okay, Senator, before the
4  break I had asked you I don't want to know the
5  context of the discussion or what was said, but was
6  there ever any discussions between you and Senator
7  Huffman about private discussions about the
8  motivation behind the senate map?
9      A   No, I did have a conversation with her.
10 It didn't get into motivation.
11     Q   Okay.  Was the conversation about the
12 senate map?
13     A   Yes.
14     Q   Okay.  Have you at any point had a
15 conversation with the Lieutenant Governor about the
16 senate map and how it was crafted?
17     A   No.
18     Q   Public or private?
19     A   Public or private.
20     Q   Okay.  All right.  The discussion you did
21 have with Senator Huffman was in advance of the
22 vote or afterwards?
23     A   In advance.
24     Q   And did -- again, I don't want to know the
25 context, well, I mean, I do, but ultimately it's

Page 112

1  going to be for the court to decide whether you can
2  testify about it so don't tell us the substance
3  now, but whatever you were told in substance, did
4  it inform your opinion as to whether you were
5  voting for the bill or not?
6          MR. OPIELA:  I'm going to object to
7  that one because that's going to go under the
8  legislative privilege.
9          MR. DUNN:  Okay.
10         THE WITNESS:  Okay.
11     Q   (BY MR. DUNN)  All right.  So did you have
12 any other discussions with, you know, what I would
13 call I guess senate leadership about the senate
14 district map in private?
15         MR. HUDSON:  Objection, form.
16         MR. OPIELA:  I'm confused.  What's the
17 question?
18     Q   (BY MR. DUNN)  Sure.  What other members
19 of the senate did you have private conversations
20 about the senate district map?
21     A   I can't remember, but there were probably
22 a few discussions like that.
23     Q   But none that you recall?
24     A   No.
25     Q   All right.  Going back to your declaration

Page 113

1  in Paragraph 11 you say -- well, actually let me
2  ask you just a little bit more about 10.
3      A   Okay.
4      Q   The final thing you say here is instead,
5  it was obvious that the purpose of these changes
6  was to benefit a potential Republican primary
7  challenger from Midland preferred by the Lieutenant
8  Governor.  How did you know about this Republican
9  primary challenger?  Was it in the newspaper?
10     A   He had already filed.
11     Q   Okay.  And had you ever had any contact
12 with the challenger at all?
13     A   Yes, because I represent Midland over the
14 years, not in a substantial amount.
15     Q   Okay.  And what was his name?
16     A   Kevin Sparks.
17     Q   What gave you the sense that Mr. Sparks
18 was -- in talking to the Lieutenant Governor or
19 Senator Huffman?
20         MR. OPIELA:  Objection, form.
21     A   I don't know that he had.
22     Q   (BY MR. DUNN)  Okay.  Let me ask you this.
23 Earlier when Mr. Hudson was asking you questions
24 that said that you thought Lieutenant Governor had
25 told Senator Huffman get rid of my district is what

Page 114

1  I wrote down?  Do you recall that testimony?
2      A  I didn't say get rid of my district, but
3  do I think the Lieutenant Governor played a role,
4  absolutely I do.
5      Q  Okay.  What makes you think that?
6      A  I think he was intimately involved in the
7  whole process.  I think the Trump endorsement
8  essentially was requested of the former president
9  by the Lieutenant Governor.  Donald Trump doesn't
10  sit around and worry a lot about local elected
11  officials in West Texas.
12      Q  So have you -- do you have any information
13  that Mr. Sparks had direct contact with Senator
14  Huffman?
15      A  No.
16      Q  Do you know whether he had any direct
17  contact with the Lieutenant Governor or Lieutenant
18  Governor's staff?
19      A  No.  I suspect that he did.
20      Q  Now, going to Paragraph 11 of the
21  declaration.  You say, given my experience on the
22  Senate Redistricting Committee in 2011 and 2013,
23  the federal court's order regarding Senate District
24  10, the fact that the benchmark district was
25  compact, wholly contained within Tarrant County,

Page 115

1  and had close to ideal population, I cannot accept
2  the suggestion that any of the stated redistricting
3  criteria, such as equalizing population,
4  compactness, communities of interest or incumbent
5  protection compelled the substantial change to
6  Senate District 10's boundaries.  Is that what your
7  testimony is?
8      A  Yes.
9      Q  And you say I believe this explanation is
10  pretext?
11      A  Yes.
12      Q  So with regard to Paragraph 10 and 11, you
13  have provided testimony today about two examples
14  that you think the public explanation that Senator
15  Huffman gave for the senate map were pretext at
16  least with respect to two districts?
17      A  Yes.
18      Q  Now, you testified -- at this point
19  sitting here today, I don't want to get into
20  subjects outside of our stipulation, everybody has
21  agreed we are going to talk today about the matters
22  relative to the preliminary injunction.
23      A  Okay.
24      Q  But I just want to make sure in response
25  to questions by Mr. Hudson that there's an

Page 116

1  understanding of what your recollection is so at
2  this point you have not examined whether there are
3  untrue reasons offered for other districts in the
4  senate plan?
5      A  No.
6      Q  And you're not testifying today whether
7  untrue reasons were or were not offered for other
8  districts in the senate plans?
9      A  I am not.
10      Q  Now, finally in Paragraph 12 of your
11  declaration you said, I voted in favor of an
12  amendment offered by Senator Powell to restore
13  Senate District 10 to its benchmark configuration.
14  Do you see that?
15      A  Yes.
16      Q  Does that match your testimony?
17      A  Yes, I'm sorry.
18      Q  And the record reflects that you voted for
19  Senator Powell's amendment?
20      A  I did.
21      Q  Do you recall and again, we are not
22  getting into the discussion, but do you recall
23  having any conversation with Senator Powell about
24  her amendment before she offered it?
25          MR. OPIELA:  Would you rephrase that

Page 117

1  to limit to public conversation?
2          MR. DUNN:  I'm just asking the
3  existence of a private conversation.
4      Q  (BY MR. DUNN)  Did you have a private
5  conversation with Senator Powell about her
6  amendment before she offered it?
7      A  Yes.
8      Q  Okay.  And I assume that you will invoke
9  legislative privilege over that?
10      A  I will.
11      Q  Did you have a public conversation with
12  Senator Powell over her amendment related to Senate
13  District 10?
14      A  Help me with the distinction between the
15  public and private conversation.  When I went and
16  talked to her on the floor?
17      Q  Yes.
18      A  Is that public or private?
19      Q  That's between you and your lawyer to
20  advise.
21          MR. OPIELA:  Public is something
22  that's part of the public record.
23      A  It's not part of the public record.  It
24  was a private conversation.
25      Q  (BY MR. DUNN)  Did you have a public

Senator Kel Seliger

Page 118

1  conversation with Senator Powell about it?
2      A  No.
3      Q  Okay.  Why did you vote for her amendment?
4          MR. OPIELA:  That I'm going to object
5  to that because that goes directly to his
6  legislative privilege.
7      A  I'm not going to go to it.
8      Q  (BY MR. DUNN)  So then returning to
9  Paragraph 12 of your declaration, it says, having
10  participated in the 2011 and 2013 Senate Select
11  Redistricting Committee proceedings, and having
12  read the prior federal court decision regarding
13  Senate District 10, it was obvious to me that the
14  renewed effort to dismantle Senate District 10
15  violated the Voting Rights Act and U.S.
16  Constitution and that's your testimony?
17      A  Yes, it is.
18      Q  And you draw on that from your
19  experiencing of having been redistricting chair?
20      A  I did.
21      Q  In the prior cycle?
22      A  I did.
23      Q  And testifying and reading the court
24  decisions?
25      A  Yes.

Page 119

1      Q  Okay.  Now, this declaration that we have
2  gone through here was provided to you I think from
3  your documents in a Word form; is that right?
4      A  Yes.
5      Q  And did you provide it to your staff at
6  any point, your senate staff?
7      A  This declaration?
8      Q  Yes, sir.
9      A  My chief of staff might have read it
10  because she reads almost everything that comes
11  across my desk, but no one else.
12      Q  Okay.  I guess I'm curious and you may not
13  remember, but whether you shared the Word version
14  with your staff before you signed the declaration?
15      A  No.  Other than her, but no.
16      Q  And you knew when you signed this was
17  going to be filed in the United States District
18  Court?
19      A  Yes.
20      Q  And that the judges and the lawyers were
21  going to rely on your testimony?
22      A  Yes.
23      Q  Did you take the time to be careful about
24  it?
25      A  I read it I thought fairly thoroughly.

Page 120

1      Q  And if you had saw anything at all that
2  you thought was incorrect, you would have changed
3  it or asked for it to be changed?
4      A  I believe I would.
5      Q  Okay.  And you said something earlier
6  about the -- well, we've had a little bit of
7  discussion about the deviation in the map.  And I'm
8  going to show you the map that's been previously
9  marked as Brooks preliminary injunction 17.
10          MR. DUNN:  I'll give you a copy,
11  Mr. Hudson.  I couldn't print it in color, but the
12  color is not going to matter for the question I'm
13  going to ask.
14      Q  (BY MR. DUNN)  I'm going to use the
15  computer version because we need to be able to zoom
16  in on some numbers.
17      A  Okay.
18      Q  And my computer printing skills weren't
19  good enough to get the numbers.
20          MR. OPIELA:  So just numbers-wise,
21  would it be 16 or what?
22          MR. DUNN:  I don't intent to attach
23  it.  It's plaintiff's preliminary injunction,
24  Exhibit 17, that's in the court record.
25          MR. OPIELA:  So procedurally how are

Page 121

1  we giving the court a record of what he's looking
2  at?
3          MR. DUNN:  This is already filed
4  before the court.
5          MR. OPIELA:  Okay.
6          MR. DUNN:  It was filed with the
7  preliminary injunction motion.
8          MR. OPIELA:  Okay.
9          MR. HUDSON:  I'm going to look over
10  your shoulder so I can actually see.
11      Q  (BY MR. DUNN)  I have zoomed into Tarrant
12  County there?
13      A  Okay.
14      Q  So you don't think I'm tricking you, I
15  will zoom out so you can see this whole thing.
16  This is the Texas legislative counsel developed a
17  map of the plan that passed or of the benchmark
18  plan, would you agree?
19      A  Yeah.
20      Q  It has the various districts in it and it
21  shows their population deviations; is that right?
22      A  Yes.
23      Q  And your district here that you have
24  discussed is Senate District 31.  Do you see that?
25      A  Yes.

Senator Kel Seliger

Page 122

1    Q   It was underpopulated by 7.5%?
2    A   Right.
3    Q   To the south of your district in the
4  Panhandle is Senate District 28 which was
5  underpopulated by 15.3%?
6    A   Right.
7    Q   Now going over to Tarrant County, the
8  district Senator Powell serves in was
9  underpopulated by .6%; is that right?
10   A   Yes.
11   Q   So based on this, there didn't have to be
12  at least for equalization purposes any changes to
13  Senate District 10?
14       MR. HUDSON:  Objection, form.
15   A   That's my impression.
16   Q   (BY MR. DUNN)  Now, to the north of the
17  Dallas-Fort Worth area, say the northwest, there is
18  Senate District 30 that was overpopulated by 9.3%?
19   A   Right.
20   Q   So from your standpoint and I guess so you
21  can see it all, Senate District 14 which is to the
22  south of Tarrant County was underpopulated by 1.4%?
23   A   Do you mean 24?
24   Q   I'm sorry, 24.  I misspoke.  Was
25  underpopulated by 1.4%; is that right?

Page 123

1    A   Right.
2    Q   And then Senate District 22, the other one
3  in the region was .4% oversized; is that right?
4    A   Yes.
5    Q   All right.  So from your standpoint, you
6  know, if you have an opinion, what was the logical
7  way to deal with the under population of your
8  district?
9        MR. HUDSON:  Objection, form, calls
10  for speculation; objection, form, improper
11  hypothetical; and objection, form, foundation.
12  Senator Seliger is not being offered as an expert.
13  You can answer if you can.
14       MR. OPIELA:  You can answer.
15   A   Ask again, please.
16   Q   (BY MR. DUNN)  Sure.  From your standpoint
17  as the incumbent Senator in Senate District 31,
18  what was the -- what was your preferred method for
19  balancing the population in your district?
20       MR. HUDSON:  Same objections.
21   A   To add counties in the area not -- that
22  are now in District 28.  Those were the only
23  options.  Adding things like Clarendon County to
24  the north --
25       THE COURT REPORTER:  I'm sorry, what

Page 124

1  county?
2        THE WITNESS:  Well, Donley County to
3  the north and some of the counties that were added
4  by Senator Huffman.
5    Q   (BY MR. DUNN)  And can you recall some of
6  those?
7    A   Yeah, Reeves, Crane, Winkler, Ward,
8  because they are all right by existing counties.
9  They are contiguous with the district.
10   Q   Okay.  So when you take those out of
11  Senate District 28, which is already also
12  underpopulated, then I assume Senate District 28
13  has to take on some space?
14   A   Yes.
15   Q   What was your thought on where that would
16  come from?
17   A   Taylor County specifically because in 2011
18  we put some of the population in north Taylor
19  County which is Abilene into that district.  That
20  leaves a bunch more people there in Taylor County
21  and Calhoun County, Shackelford County.
22   Q   And in equalizing those two districts, was
23  it necessary to go into Senate District 10 at all?
24       MR. HUDSON:  Objection, form.
25   A   Was it necessary to go?

Page 125

1    Q   (BY MR. DUNN)  In order to make the
2  Panhandle districts that were underpopulated within
3  deviation under the new census figures, was there
4  any need to mess with Senate District 10?
5        MR. HUDSON:  Objection, form, calls
6  for speculation; objection, form, improper
7  hypothetical; objection, foundation.  Senator
8  Seliger is not being offered as an expert.
9    A   My impression is District 10's composition
10  to District 10 had nothing whatsoever to do with
11  the Panhandle.
12   Q   (BY MR. DUNN)  Is this -- did you
13  essentially give such an opinion on the floor at
14  the time of the vote?
15   A   I made no comment on District 10.
16   Q   And in terms of the changes that you
17  thought could be made to West Texas, were those
18  things you talked about on the floor?
19   A   Not specifically, no.  I mentioned some of
20  the counties in the context of ag versus oil and
21  gas, that's all.
22   Q   And why did you mention those things?
23   A   To point out --
24       MR. OPIELA:  I'm going to object to
25  that in terms of his thought processes, how he goes

Senator Kel Seliger

January 19, 2022
Pages 126 to 129

Page 126

1  about making a decision as legislative privilege.
2      Q   (BY MR. DUNN)  Did you have any reasons
3  that -- I don't want you to disclose them at the
4  moment, I just want to know if they exist.
5      A   Okay.
6      Q   Did you have any reasons that you voted
7  against the senate plan other than what you said on
8  the floor publicly?
9      A   Yes.
10     Q   Okay.  Have you -- are those other reasons
11 that you have, have you ever expressed them
12 publicly elsewhere?
13     A   Publicly, no.
14     Q   To a newspaper or constituents or anything
15 of that sort?
16     A   No.
17     Q   So I assume you take legislative
18 privileges on your other basis for voting against
19 the senate plan?
20     A   Yeah.  I would like to tell you, but he
21 would not approve.
22     Q   Okay.  He is your lawyer.
23     A   He is.
24     Q   I say that for our record.  It doesn't
25 know who he is.

Page 127

1      A   Okay.
2      Q   Is it the case that in the Texas Senate
3  there's sometimes what's said in public about the
4  motivations behind legislative activity and there's
5  something different in private?
6      A   All the time.
7      Q   Would you say more often than not that's
8  the case?
9      A   Not necessarily, no.
10     Q   Would you say more often than not that's
11 the case on the big items?
12         MR. HUDSON:  Objection, form, calls
13 for speculation; objection, foundation.
14     A   I would say that's often the case.
15     Q   (BY MR. DUNN)  Do you think it's often the
16 case with regard to redistricting?
17         MR. HUDSON:  Same objections.
18     A   I think it's often the case on a lot of
19 issues particularly more controversial ones.
20     Q   (BY MR. DUNN)  Including redistricting?
21         MR. HUDSON:  Same objections.
22     A   Yes.
23     Q   (BY MR. DUNN)  You mentioned in response
24 to Mr. Hudson -- well, let me ask it this way.
25 There used to be a two-thirds rule as it was

Page 128

1  referred to in the senate; is that right?
2      A   Correct.
3      Q   And that has gone through some changes in
4  the last decade or so; is that right?
5      A   Correct.
6      Q   What were those changes?
7      A   In -- the rule was that it required
8  two-thirds vote of the senate or 21 votes for a
9  bill that has come out of committee to even go to
10 the floor for debate.  Several years ago that rule
11 came up and the Lieutenant Governor wanted it
12 changed to 19 because the Republican majority was
13 eroding in the senate.  And the rule was changed
14 and that was the instance I talked about when
15 Senator Estes voted against the rule change.  Then
16 I think it was the 87th or 86th session once again
17 as our majority eroded when Beverly Powell won
18 District 10, Pete Forest lost his election in his
19 district to Senator Gutierrez that the Lieutenant
20 Governor wanted the number changed to 18 and so it
21 was.  But even with that rule change, with 18 votes
22 to go, if the Lieutenant Governor doesn't want the
23 bill to come to the floor, it doesn't come to the
24 floor.
25     Q   Is that because the Lieutenant Governor

Page 129

1  has the authority to just pull a bill or is it
2  because he can get the votes he needs?
3      A   I would argue that there is no such
4  authority because the senate makes the rules and
5  the senate has not done that.  But he does it and
6  he's the one who recognizes senators on the floor.
7      Q   So it's been your experience that the
8  Lieutenant Governor will just decide a bill will
9  not be taken up?
10     A   Absolutely.
11     Q   Without a vote?
12     A   Absolutely.
13     Q   That's a tremendous power, would you
14 agree?
15     A   Yes, and it's also not in the rules of the
16 senate or the Constitution.
17     Q   And ultimately the Lieutenant Governor's
18 ability to withdraw or remove any bill affects
19 every senator being able to pursue their agenda,
20 would you agree?
21         MR. HUDSON:  Objection, form,
22 foundation; objection, form, calls for speculation.
23     A   Yes.  You do talk really fast.
24     Q   (BY MR. DUNN)  I want to go back and on
25 the first vote that you described Senator Estes

Senator Kel Seliger

January 19, 2022
Pages 130 to 133

Page 130

1   voting against the first vote to change the rules?
2       A   Yes.
3       Q   How did you vote?
4       A   I voted to change the rule.
5       Q   And what was the new number of senators
6   that were needed after the first rule change?
7       A   Nineteen.
8       Q   Okay.  And later the rule was changed
9   again, what was the new number?
10      A   Eighteen.
11      Q   And how did you vote on that?
12      A   I voted in favor.
13      Q   In terms of drawing a district that
14  intentionally would not elect a Democrat -- well,
15  let me strike that.
16          If Senate District 10 had continued to
17  elect a Democrat, then the rules still provided for
18  Republican control under the revised two-thirds
19  rules; is that right?
20      A   Yes.
21      Q   It wasn't necessary to draw Senate
22  District 10 to elect a Republican in order to get
23  bills before the floor?
24          MR. HUDSON:  Objection, form,
25  speculation, foundation.

Page 131

1       A   As I understand the question, no.
2       Q   (BY MR. DUNN)  Okay.  Earlier, Mr. Hudson
3   asked you some questions about your private
4   conversations with various senators and he asked
5   you about Angela Paxton.  It sounds to me like you
6   recalled something, but again, don't get into it.
7   Had you had a conversation with Angela Paxton?
8       A   Not private or public.
9       Q   Okay.  I couldn't tell for sure on how you
10  answered the question.
11      A   Sure.
12      Q   You also mentioned that you talked with
13  Sean Opperman, Senator Huffman's committee
14  director?
15      A   Yes.
16      Q   Did you talk to him about the senate plan?
17          MR. OPIELA:  That would be to the
18  substance of the conversation just the fact that --
19  I'm going to object on legislative privilege.
20          MR. DUNN:  You're not going to let him
21  say whether or not he spoke with Senator Opperman
22  about the plan, that's it?
23          MR. HUDSON:  I want to clarify on the
24  record Sean Opperman is not a senator.
25          THE WITNESS:  He's a committee

Page 132

1   director.
2           MR. OPIELA:  But he's a legislative
3   staff.
4       Q   (BY MR. DUNN)  So all I'm asking is was
5   there a conversation between you and Mr. Opperman
6   about the senate plan, without getting into the
7   details of it?
8           MR. OPIELA:  You can answer that.
9       A   Yes.
10      Q   (BY MR. DUNN)  Was there more than one?
11      A   I think only one that I recall.
12      Q   Was it in advance of the floor debate?
13      A   Yes.
14      Q   Was there any other witnesses to the
15  discussion?
16      A   No.
17      Q   Was it your sense that Mr. Opperman was
18  the, you know, lead staffer for Senator Huffman on
19  the plan?
20      A   He was the committee director, yes, and if
21  there was anybody else who was part of that, my
22  chief of staff might have been there.  Sean used to
23  work for her.
24      Q   I see.  So there may have been a witness
25  to this conversation and that person may have been

Page 133

1   your chief of staff?
2       A   May have been.  I don't think so, but may
3   have been.
4       Q   All right.
5           THE WITNESS:  She doesn't let me talk
6   to people unaccompanied.
7       Q   (BY MR. DUNN)  Did anybody at any point
8   tell you why your district was being drawn the way
9   it was?
10      A   No.
11      Q   Okay.  You said you submitted a map at
12  some point in response to Mr. Hudson's questions?
13      A   Yes.
14      Q   You had a proposal?
15      A   Yes.
16      Q   Okay.  Had you shopped that proposal to
17  any other members?
18      A   No.
19      Q   Who on your staff drew that proposal or
20  did you?
21      A   As best I recall because we all have
22  access to RedAppl which is our redistricting
23  software, I think my chief of staff and I sat
24  around and said how does this work and how does
25  this work and looked at all the statistics and

Senator Kel Seliger

January 19, 2022
Pages 134 to 137

Page 134

1  things like that.
2      Q   Okay.  Best you recall it was drawn on the
3  state's RedAppl system?
4      A   As best I recall.
5      Q   Was it made public at some point?
6      A   No.
7      Q   Okay.  In other words, it wasn't published
8  as an amendment?
9      A   It was not.
10     Q   Again, I'm not asking at this moment to
11  tell me what it is, but did you get any feedback on
12  your plan or you just sent it in and never heard
13  anything?
14     A   Well, that would have to do with my
15  discussions with Senator Huffman and maybe with
16  Mr. Opperman so I don't know that I want to
17  disclose that.
18     Q   You're going to invoke your legislative
19  privilege?
20     A   Yeah.
21     Q   All right.  Let me take a break and I
22  should be able to wrap up here pretty quick.
23     A   Okay.
24         THE VIDEOGRAPHER:  We are off the
25  record.  The time is 12:40 p.m.

Page 135

1          (Off the record.)
2          THE VIDEOGRAPHER:  We are back on the
3  record.  The time is 12:45 p.m.
4          (Exhibit Number 16 marked.)
5      Q   (BY MR. DUNN)  Senator, during a break
6  I've handed you what I've marked Exhibit 16; is
7  that true?
8      A   Yes.
9      Q   It's a letter from Attorney General Greg
10  Abbott to the house and senate chairs of the
11  redistricting committee on April 18, 2013; is that
12  right?
13     A   Yes.
14     Q   And it's copied if you can look on the
15  last page on the members of those committees; is
16  that true?
17     A   Correct.
18     Q   All right.  And so do you recall, having
19  looked at this, that this was a letter you received
20  back then as chair of the redistricting committee?
21     A   Vaguely, but not specifically, no.
22     Q   But you do recall the federal court
23  issuing its order and being made aware of it and
24  the need for the senate and the house to take
25  action?

Page 136

1      A   Yes.
2      Q   Okay.  Did you have some -- I don't want
3  to know what they are at this point.
4      A   Okay.
5      Q   I'm just asking if they exist.  Did you
6  have some discussions with lawyers in the Attorney
7  General's office about the effect of the order, the
8  federal order?
9          MR. HUDSON:  I object based on
10  attorney-client privilege and attorney work
11  product.  To the extent that your answer would
12  encroach on either of those privileges, I instruct
13  you not to answer.  If you can answer without
14  waiving attorney-client privilege or attorney work
15  product doctrines you're free to answer.
16         MR. OPIELA:  So to explain this to
17  you.
18         MR. HUDSON:  Before you explain it to
19  him, if you're going to give him a little advice,
20  do you want to go off the record?
21         MR. OPIELA:  Why don't we do that real
22  quick.
23         THE VIDEOGRAPHER:  We are off the
24  record.  The time is 12:46 p.m.
25         (Off the record.)

Page 137

1          THE VIDEOGRAPHER:  We are back on the
2  record.  The time is 12:49 p.m.
3          (Record read by Reporter.)
4          MR. HUDSON:  I will renew my objection
5  instruction based on attorney-client privilege,
6  attorney work product.  To the extent that you can
7  answer without waiving or encroaching upon either
8  of those privileges you can answer.  To the extent
9  that you can't, an additional legislative privilege
10  or any other applicable privilege you can answer,
11  otherwise I'm instructing you not to.
12     A   Okay.  Just as I don't remember
13  specifically getting this or receiving it, my
14  memory is that the Attorney General's office
15  expended a good deal of effort keeping me informed
16  of the things that we received and what they meant
17  in layman's terms and things like that.  Any
18  specific discussion, I'm sorry, I don't remember at
19  all.
20     Q   (BY MR. DUNN)  Okay.  And then have you
21  had -- do you have any understanding about the
22  effect and the requirements of the federal court's
23  order in 2012 that is not in your opinion protected
24  by attorney-client communication privilege or
25  legislative privilege?

Senator Kel Seliger

January 19, 2022
Pages 138 to 141

Page 138

1   A  No.
2   Q  Have I been courteous to you today?
3   A  Yes.
4   Q  Have you understood my questions except
5   where you asked me to rephrase?
6   A  Yes.
7   Q  All right.
8       MR. DUNN:  I will pass the witness.
9       MR. HUDSON:  Two minutes to take a
10  look at my notes.  Can we go off the record.
11      THE WITNESS:  All right.
12      THE VIDEOGRAPHER:  We are off the
13  record.  The time is 12:50 p.m.
14      (Off the record.)
15      THE VIDEOGRAPHER:  We are back on the
16  record.  The time is 12:51 p.m.
17      MR. HUDSON:  Senator Seliger, thank
18  you very much for your time today.  We will
19  reserve.  One other point I wanted to make on the
20  record though and this isn't necessarily for you,
21  but I wanted to put it on the record.  There is a
22  scheduling order in this case that requires the
23  parties to agree before the deposition can be used
24  for error in lieu of trial testimony.  We have not
25  entered such stipulation today.  We may come to

Page 139

1   agreement with opposing counsel, but as of yet you
2   may still be called live to El Paso.  I just want
3   to make that clear to you.
4       THE WITNESS:  Okay.
5       MR. HUDSON:  Nothing further.
6       MR. DUNN:  I have nothing further
7   today.  I would say in response to that is the
8   deposition notice served on the witness that was
9   provided to our office said that it would be used
10  -- could be used at trial.  So we were under the
11  understanding that the Attorney General's office
12  scheduled this for the purpose of having the
13  testimony available at the preliminary injunction
14  next week.  So ultimately we will discuss that with
15  the office and determine from there.  My
16  understanding -- I will just ask you a couple
17  follow-up questions in response to that.
18      THE WITNESS:  Okay.
19  Q  (BY MR. DUNN)  Earlier you said you're
20  going to be in California next week; is that true?
21  A  I am, and it's my understanding if called
22  by the court I'd show up to the court.  I will just
23  pout.
24  Q  Okay.  All right.
25      MR. DUNN:  I have nothing further.

Page 140

1       THE VIDEOGRAPHER:  This concludes
2   today's deposition.  We are off the record.  The
3   time is 12:53 p.m.  Number of medias used is two.
4       (Deposition concluded.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 141

1           CHANGES AND SIGNATURE
2   WITNESS NAME:  SENATOR KEL SELIGER
3   DATE OF DEPOSITION:  JANUARY 19, 2022
4   PAGE        LINE        CHANGEREASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

## Page 142

1     I, SENATOR KEL SELIGER, have read the
foregoing deposition and hereby affix my signature
2  that same is true and correct, except as noted
above.

3

4

5     _____
     SENATOR KEL SELIGER
6

7  THE STATE OF _____
  COUNTY OF _____
8

9  Before me, _____, on this day
  personally appeared SENATOR KEL SELIGER, known to
10  me (or proved to me under oath or through
  _____) to be the person whose name is
11  subscribed to the foregoing instrument and
  acknowledged to me that they executed the same for
12  the purposes and consideration therein expressed.

13

14

  Given under my hand and seal of office this _____
15  day of _____, 2022.

16

17

18  NOTARY PUBLIC IN AND FOR THE
  STATE OF _____
19

20

  MY COMMISSION EXPIRES:_____
21

22

23

24

25

## Page 143

1      REPORTER'S CERTIFICATION
2    IN THE UNITED STATES DISTRICT COURT
      WESTERN DISTRICT OF TEXAS
3       EL PASO DIVISION
4  LEAGUE OF UNITED LATIN   (
  AMERICAN CITIZENS, et al., (
5             (
    Plaintiffs,     (
6             (
  v.            ( Case No. 3:21-cv-00259
7             (
  GREG ABBOTT, et al.,  (
8             (
    Defendants.    (
9

    -----------------------------------
10

    DEPOSITION OF SENATOR KEL SELIGER
11       JANUARY 19, 2022
12    -----------------------------------
13     I, RENEA SEGGERN, Certified Shorthand
14  Reporter in and for the State of Texas, do hereby
15  certify to the following:
16     That the witness, SENATOR KEL SELIGER, was
17  by me duly sworn and that the transcript of the
18  oral deposition is a true record of the testimony
19  given by the witness.
20     I further certify that pursuant to Federal
21  Rules of Civil Procedure, Rule 30(e)(1)(A) and (B)
22  as well as Rule 30(e)(2), that review of the
23  transcript and signature of the deponent:
24    __X__ was requested by the deponent and/or a
25  party before completion of the deposition.

## Page 144

1  _____ was not requested by the deponent and/or
2  a party before the completion of the deposition.
3     I further certify that I am neither
4  attorney  nor counsel for, nor related to or
5  employed by any of the parties to the action in
6  which this deposition is taken and further that I
7  am not a relative or employee of any attorney of
8  record in this cause, nor am I financially or
9  otherwise interested in the outcome of the action.
10     The amount of time used by each party at
11  the deposition is as follows:
12     Mr. Eric Hudson - 1 hour, 24 minutes
13     Mr. Chad Dunn - 1 hour, 2 minutes
14     Subscribed and sworn to on this 21st day
15  of January, 2022.
16

17                  _____
     Renea Seggern, CSR #7262
18     Certificate Expires:  04-30-2023
     Magna Legal Services
19     Firm Registration No. 633
     16414 San Pedro Avenue
20     Suite 900
     San Antonio, Texas 78232
21

22

23

24

25

### Exhibits

**Defendant's 1**  4:10 14:4,6 42:3,6,
10,11,12 86:4

**Defendant's 2**  4:12 23:2,4

**Defendant's 3**  4:13 24:17,19,23

**Defendant's 4**  4:14 36:2,3,8 39:11

**Defendant's 5**  4:15 40:22,23,25
41:2 44:22,23

**Defendant's 6**  4:16 50:2,3

**Defendant's 7**  4:18 51:20,21,24
57:25

**Defendant's 8**  4:19 54:7,8

**Defendant's 9**  4:21 56:10,11,14

**Defendant's 10**  4:23 59:1,2

**Defendant's 11**  4:24 60:5,6,10

**Defendant's 12**  5:3 63:15,16

**Defendant's 13**  5:4 65:22,23

**Defendant's 14**  5:5 54:16 68:22,23

**Defendant's 15**  5:7 56:14,15
71:12,14

**Defendant's 16**  5:8 135:4,6

---

### 1

**1**  14:4,6 37:13 42:3,6,11,12 64:6,16,
23 79:15 86:4 87:6

**1.4%**  122:22,25

**10**  11:8 16:3,6 18:3 22:4,18,22 24:6
43:18 47:11,20 48:2 59:1,2 72:17
88:6 89:5,12,23 90:4,16 92:9 99:21
107:18 113:2 114:24 115:12 116:13
117:13 118:13,14 122:13 124:23
125:4,10,15 128:18 130:16,22

**10's**  115:6 125:9

**10:04**  40:20

**10:28**  58:21

**10:40**  58:24

**10:56**  71:8

**11**  26:5 47:25 60:5,6,10 113:1
114:20 115:12

**11:18**  71:11

**11:22**  74:21

**11:24**  74:25

**11:27**  79:2

**11:31**  79:5

**12**  63:15,16 116:10 118:9

**12:02**  110:24

**12:16**  111:2

**12:40**  134:25

**12:45**  135:3

**12:46**  136:24

**12:49**  137:2

**12:50**  138:13

**12:51**  138:16

**12:53**  140:3

**12th**  39:2

**13**  65:22,23 87:16 96:18

**14**  54:16 68:22,23 122:21

**140**  40:8

**14th**  6:5

**15**  56:15 71:12,14

**15.3%**  122:5

**16**  39:7 120:21 135:4,6

**16th**  41:8

**17**  120:9,24

**17th**  42:6,16 45:2,19 86:13

**18**  64:16,18 87:7 128:20,21 135:11

**18th**  63:24 65:1

**19**  69:15 104:3 128:12

**1989**  80:21

**19th**  6:3

---

### 2

**2**  23:2,4 44:7 60:23 66:8 74:24 79:16

**20**  26:5 60:10 104:1

**2004**  12:13 44:11 80:19 87:12

**2010**  92:16

**2011**  12:16 45:23 46:11 48:8 83:19
87:16 90:3 93:11 96:18 97:5,18
114:22 118:10 124:17

**2012**  8:19 75:25 88:7,12 137:23

**2013**  8:19 45:23 46:12 48:9 75:25
87:22 88:1 89:1 90:13 92:19 93:8
97:5,19 114:22 118:10 135:11

**2014**  55:7,10,20 56:1 57:10,15 59:21

**2017**  58:6,7 59:18

**2018**  56:23 57:1,4,10 59:21

**2019**  46:8 50:24 51:10 52:10 54:2
57:11 58:4 59:10,15,23,25

**2021**  16:8 21:5 22:4 25:2 32:7,10
37:14,16 38:10 39:2 41:8 42:6 47:11
48:22 49:13 60:16,21 63:24,25
64:12,15 67:25 69:7 99:22

**2022**  6:3 10:22

**209**  6:5

**20th**  69:7

**21**  37:25 39:7 51:23 52:1 104:3
128:8

**2130**  26:25

**22**  123:2

**24**  122:23,24

**24th**  10:21 59:10

**28**  23:25 24:4 100:14 108:14,18
109:2 122:4 123:22 124:11,12

---

### 3

**3**  14:17 24:17,19,23 42:5 45:21
50:12,13 79:17 86:10

**30**  12:21 40:1,4,9 51:7 122:18

**31**  14:2 16:17 17:2 21:21,25 22:13
23:19 44:9 48:17 55:16 70:5 87:11
100:15 108:19 121:24 123:17

**31st**  12:13

**323**  57:5

**37**  109:16

**3810**  13:24

**3:21-cv-00259**  6:9

**4**

**4** 25:13 26:25 30:14 36:2,3,8 39:11
79:15
**4%** 57:5 123:3
**4's** 27:25
**40** 80:16
**4th** 25:2 55:10

**5**

**5** 40:22,23,25 41:2 44:23 46:10 67:10
88:7,10

**6**

**6** 46:10 50:2,3 88:15
**6%** 122:9
**6-K** 71:15
**60-what** 27:20
**62** 25:9 26:1,18
**63** 26:22
**64** 27:18,21 30:8
**65** 31:1
**6th** 57:1

**7**

**7** 46:10 51:20,21,24 57:25 67:10
**7.5%** 122:1
**7th** 60:16,21

**8**

**8** 46:11 54:7,8,16 92:7
**80** 63:12
**86th** 128:16
**87th** 11:9,15 32:11 38:2 46:2 47:7
48:24 49:3 64:21 103:3 128:16

**9**

**9** 56:10,11,14 94:4 99:10
**9.3%** 122:18
**943** 67:24
**9:14** 6:3
**9:55** 40:17

**A**

**A-49** 71:25
**a.m.** 6:3 40:17,20 58:21,24 71:8,11
74:21,25 79:2,5
**Abbott** 6:9 89:2 135:10
**abiding** 28:1,17
**Abilene** 124:19
**ability** 67:3 97:2 129:18
**absolute** 104:19
**absolutely** 30:1 47:5 73:6 74:9,11
86:23 91:10 101:23 109:2 114:4
129:10,12
**academic** 68:15
**academically** 66:19 67:8 68:19
**accept** 63:6 115:1
**accepted** 91:13
**access** 133:22
**accommodating** 28:8 29:12
**accurate** 23:9 59:9 60:18 63:23
69:7
**achieving** 28:6 29:9
**Act** 90:18 92:11 118:15
**action** 135:25
**activity** 127:4
**actual** 86:11
**add** 17:5 107:24 123:21
**added** 49:11 69:25 124:3
**adding** 109:11 123:23
**addition** 59:13 60:9
**additional** 137:9

**address** 38:1 90:16
**adjacent** 24:3
**adjourned** 38:3
**adjustments** 86:17
**adopt** 86:22
**adopted** 23:10 89:22
**adopting** 88:2
**advance** 111:21,23 132:12
**advanced** 13:16
**adverse** 101:17
**advice** 95:9 96:7,17,20 136:19
**advise** 95:6 97:9 117:20
**advised** 89:2 97:20
**advisor** 53:6
**affect** 62:6
**affects** 129:18
**affidavit** 14:15 82:4,6
**ag** 53:16 100:14 125:20
**age** 87:7
**agenda** 58:3 129:19
**agree** 9:4,15,17,25 11:20 12:7
28:11,15 35:1 38:8 51:8 55:18 56:2
57:14 58:2 61:20 63:4 64:18 68:13,
15 74:2,9 75:15 93:18 121:18
129:14,20 138:23
**agreed** 115:21
**agreement** 139:1
**agricultural** 17:8,25 18:5
**agriculture** 17:23 52:22,25 104:10
108:1,11,15,20,22
**ahead** 7:3,12 14:6,11 35:23 44:7
63:20 71:19 78:21 94:21 99:7
100:12
**aide** 52:13
**Alexandra** 7:19
**allegations** 46:15
**ally** 62:10
**altogether** 68:19 103:17 106:15
**Alvarado** 31:2 33:4

**Amarillo** 12:13 13:21 60:25 69:8
80:17

**amendment** 116:12,19,24 117:6,12
118:3 134:8

**amendments** 50:16

**American** 6:8 7:14 59:7

**amount** 108:20 113:14

**analysis** 99:4,5

**Analyzing** 63:25

**Angela** 33:23 34:7 131:5,7

**animus** 47:7

**Anna** 35:8,13

**answering** 9:14 110:18

**antibusiness** 66:24

**antilocal** 70:7

**antipublic** 70:5

**Antonio** 6:13 90:25

**apologies** 38:5

**apologize** 27:22

**applicable** 28:1,17 137:10

**appointment** 53:9

**approve** 91:17 126:21

**April** 37:13 135:11

**area** 23:25 109:18 122:17 123:21

**areas** 46:9

**argue** 129:3

**arguments** 100:15

**article** 52:9,11,18,19 53:25 59:7,10
60:15,18 61:14 62:8 63:18,24 66:5
67:16 69:7

**articles** 68:14

**arts** 13:11,12

**ass** 53:13

**assert** 20:12

**assertion** 100:11,13 109:3

**assess** 67:8

**assignments** 53:7 102:17,18
105:19 106:4

**Associates** 6:12

**assume** 42:21 51:15 83:14 84:24
86:24 87:8 103:7 117:8 124:12
126:17

**assumed** 77:19 78:16 85:17

**assuming** 94:8

**assumptions** 63:11

**attach** 120:22

**attached** 41:17,22 50:6 86:4

**attaching** 53:11

**attend** 10:24

**attention** 66:22 72:4

**attitude** 59:11

**attorney** 6:5 8:12 13:19 43:10
84:14,25 85:10 88:23 89:1 92:4
93:15 95:2,3,10,13,15,22,23 96:6,
14,17,21 97:4,5,8,13,18,21 98:4
135:9 136:6,10,14 137:6,14 139:11

**attorney-client** 95:13,22 97:7,13
98:4 136:10,14 137:5,24

**August** 39:2

**Austin** 6:6 59:7

**author** 26:23,25 27:25

**authority** 129:1,4

**authors** 27:3

**avoid** 30:3

**avoided** 57:4

**avoiding** 28:6 29:7

**award** 45:5

**aware** 37:11,19,24 38:16 47:6 98:22
135:23

**awful** 97:3

B

**bachelor** 13:9,11

**back** 14:17 22:3 25:10 40:19 42:12,
21 44:22 45:19,21 48:7 50:12,23
52:14 53:11,19 57:24 58:23 63:24
71:10 72:2 74:24 75:10 79:4 80:10
83:19 88:12 97:22 103:21 107:17
111:1 112:25 129:24 135:2,20 137:1
138:15

**background** 12:10 13:3

**bad** 38:7

**Baker** 65:3,7,20

**balancing** 123:19

**based** 21:15,21 38:15 48:13 59:18
63:10 65:3 70:9,13,18,21 95:12 98:3
102:19 122:11 136:9 137:5

**bashed** 62:11

**basically** 81:4

**Basin** 12:15 108:25

**basis** 31:17 126:18

**Baylor** 95:4

**beating** 55:23

**beef** 108:20

**begin** 15:14

**behalf** 6:17,20 7:6,14,17,20,23

**benchmark** 89:23 92:10 114:24
116:13 121:17

**benefit** 18:12 30:21 113:6

**Bettencourt** 33:6

**Beverly** 41:6 43:24 44:13 49:15,22
128:17

**bid** 60:19

**big** 66:23 67:4 94:12 127:11

**bill** 25:13,18 26:3,16 66:23 67:2,4,5
68:12 87:22 102:11,20 104:17 112:5
128:9,23 129:1,8,18

**bills** 103:4,9 106:22 130:23

**biology** 13:8,9

**Birdwell** 33:9

**bit** 12:9 43:17 48:16 53:20 80:12
108:9 113:2 120:6

**black** 46:23

**Blanco** 31:3

**blind** 27:4

**blindness** 27:1,9

**board** 45:16

**border** 109:12

**Borger** 80:15

**bottom** 25:12 30:7,10 36:8,14 67:11

**boundaries** 115:6

**box** 83:17

**Brad** 6:10

**break** 9:11,15 40:14 78:13,20 79:6 110:21,22 111:4 134:21 135:5

**breaks** 9:8

**Brian** 33:9

**briefed** 88:13 94:17

**briefings** 94:22,24

**briefly** 13:3 82:15

**Brimer** 73:13

**bring** 77:6,8 78:3 104:4

**Broadly** 11:6

**Brooks** 6:18 10:18 11:5,11,22 42:24 43:4 52:3 56:15 71:17 75:6,17 120:9

**brought** 78:19 86:6

**Bryan** 33:16 64:7,23 66:8

**built** 108:15

**bunch** 124:20

**Bureau** 37:8,12 38:9 39:1,5

**Bureau's** 38:23

**Burton** 73:14

**business** 12:20,21 81:2,7 103:16 106:12,15

———————————————

**C**

**Calhoun** 124:21

**California** 81:14 139:20

**call** 40:11 62:22 102:8 112:13

**called** 11:9,15 32:19 39:17,20 40:9 53:14 69:10 81:5 139:2,21

**calls** 69:10 123:9 125:5 127:12 129:22

**Campbell** 33:12

**candidate** 18:21 62:7 98:16

**candidates** 70:3 98:18

**Canon** 55:19 56:7 57:6

**capital** 36:10

**caps** 58:9

**care** 70:2

**career** 99:1

**careful** 119:23

**carefully** 86:24 110:1

**Carol** 33:4

**case** 6:9 42:24 46:15 75:6,24 81:17, 22 84:17 86:20 90:6 127:2,8,11,14, 16,18 138:22

**cases** 94:1 97:9 98:7

**cast** 67:18

**caucus** 7:15 104:2 105:13

**census** 37:3,8,12,20,24 38:9,12,16, 23 39:1,5 125:3

**center** 81:6

**ceremonies** 45:3

**Chad** 6:17 54:10 73:24 75:5 78:7

**chair** 32:19,22 36:25 37:10 45:22 51:3 87:15,18 89:18 93:4 94:16 104:25 118:19 135:20

**chaired** 12:16

**chairman** 52:21 53:16 90:14 103:16 104:9

**chairmanship** 52:13 53:7 105:19 106:3,12,17

**Chairmanships** 104:24

**chairs** 50:24 135:10

**challenge** 30:17 57:10,11

**challenged** 55:20 85:21

**challenger** 18:13,25 19:4 59:21 60:21 113:7,9,12

**challenges** 56:2

**challenging** 11:8,11

**chamber** 105:9

**change** 104:6,8 115:5 128:15,21 130:1,4,6

**changed** 17:5 107:24 120:2,3 128:12,13,20 130:8

**Charles** 34:1,13

**chief** 43:9,10,14 49:15,22 119:9 132:22 133:1,23

**Children** 45:5

**chose** 50:19

**Chuy** 32:22

**circle** 36:10

**circles** 51:9,11

**circumstance** 106:6

**citing** 66:10

**Citizens** 6:8

**city** 80:18,22

**city's** 67:2

**claim** 21:17 27:3 65:16

**claimed** 27:1

**Clarendon** 123:23

**clarify** 48:15 87:19 131:23

**clarity** 79:19

**clear** 18:20 54:18 81:24 101:11 139:3

**client** 95:16

**close** 48:3 54:1 56:3,4 57:9 62:9 83:10 97:3 109:18 115:1

**closer** 57:8 62:5

**Coalition** 7:20

**cold** 48:13

**colleagues** 26:10 63:9

**Collingsworth** 109:11

**color** 27:1,4,9 66:9 120:11,12

**comment** 125:15

**comments** 26:15 100:1,10 107:19

**commerce** 103:16 106:13,15

**commitment** 96:10

**committee** 12:16 21:5 25:13,19 32:7,20 35:5 36:23,25 37:11 46:2,22 47:8 48:1 50:24 51:4,5 52:22,25 53:7,9,16 57:12 83:19 87:21,25 88:16 89:3,10,22 90:14 91:16 92:8, 21 93:5,8,11,15,18 94:4,16 95:6 99:2,18 102:16 103:16,17 104:5,10, 11 105:19 106:4,13,15,16 114:22 118:11 128:9 131:13,25 132:20

135:11,20

**committees** 21:4 45:23 46:9 52:20, 24 70:15 87:16 135:15

**communication** 105:24 137:24

**communications** 20:13,19,20 96:16 97:17 105:23

**communities** 28:3,25 115:4

**compact** 48:2 114:25

**compactness** 28:7 29:10 115:4

**compared** 63:1

**compelled** 115:5

**compete** 18:22

**competent** 67:9 87:7

**competently** 68:20

**competitive** 69:18

**completely** 12:4

**comply** 92:10

**compose** 70:21

**composition** 125:9

**comprise** 24:5

**compromise** 110:19

**computer** 120:15,18

**concede** 67:5 99:15

**concentrate** 109:17

**concentration** 100:14 108:15

**concern** 69:20 102:21

**concerned** 61:25 69:17

**concerns** 36:19

**concluded** 140:4

**concludes** 140:1

**conclusions** 98:21

**conduct** 39:14

**confidence** 83:1

**confiding** 82:25

**configuration** 89:24 92:10 116:13

**confronts** 60:20

**confused** 112:16

**confusing** 34:4

**Congress** 67:18

**Congresswoman** 7:18

**Connie** 73:14

**conscious** 106:19 107:3

**conservative** 55:19 63:7,25 65:6, 10,13,18 66:11,21 67:1,5,6 68:8,12, 17 70:20

**conservatively** 102:1

**consistent** 83:10 100:20

**constituents** 126:14

**Constitution** 92:11 118:16 129:16

**contact** 75:14 113:11 114:13,17

**contained** 48:3 114:25

**contemplations** 106:21

**contest** 80:23

**context** 111:5,25 125:20

**contiguous** 124:9

**continued** 130:16

**contrived** 100:16

**control** 70:7 130:18

**controversial** 127:19

**convenes** 40:1

**conversation** 20:6 82:24 84:11 110:10,14 111:9,11,15 116:23 117:1,3,5,11,15,24 118:1 131:7,18 132:5,25

**conversations** 19:23 20:24 21:3 33:1,8,16,25 34:7,9,12,21,24 35:12 42:23 43:3,6 83:11 110:3 112:19 131:4

**conviction** 104:19

**copied** 135:14

**copies** 54:11 88:16

**copy** 23:9,15 24:20 25:1 59:9 60:18 63:23 66:9 69:7 76:23 86:6 120:10

**Corbello** 6:20

**cores** 28:4 29:3

**corn** 108:21

**corner** 23:18 36:8,14 64:12 67:11

**correct** 13:6 14:3 23:19,23 26:8 27:10,17 30:22 31:6,10 32:9 37:18 39:16,25 42:3,4,9 46:13 50:14,20,25 52:16 55:9,16 56:25 57:2 59:16 66:14 79:22 81:15 84:15 85:3 86:15 89:4 92:5 93:12 95:8 110:12 128:2,5 135:17

**correctly** 16:11 17:9 18:6,15 22:7 26:6 28:9 30:18 52:15 55:8 61:5 62:14 68:1 72:18,23 73:4,7

**cotton** 108:16

**council** 80:22

**Council's** 36:13,18

**councilman** 80:18

**counsel** 6:14,23 7:10 20:18 43:4 49:23 50:6 78:17 79:8 94:25 95:1 96:20 121:16 139:1

**count** 64:3

**counties** 17:6,7,16,17 24:5 62:2,3,4 69:25 70:2 107:24,25 109:9,12,14, 16 123:21 124:3,8 125:20

**county** 17:19,21 48:3 94:5 99:9 114:25 121:12 122:7,22 123:23 124:1,2,17,19,20,21

**couple** 73:22 139:16

**court** 6:11,15 7:25 8:25 9:2,19 10:13 12:1 30:16 42:14 80:10 88:5 89:5 90:20 91:1,11,16,24 92:1,3 93:16 94:9,11,14 99:15,16 110:14 112:1 118:12,23 119:18 120:24 121:1,4 123:25 135:22 139:22

**court's** 89:11,16 90:16 114:23 137:22

**courteous** 74:2 138:2

**courtesy** 9:5

**courthouse** 75:10

**Courtney** 6:19

**courts** 94:1

**cover** 51:23 54:18

**covered** 43:18

**COVID-19** 38:13,17,24

**crafted** 111:16

**Craig** 104:7

Senator Kel Seliger

January 19, 2022
Index: Crane..district

**Crane** 124:7

**create** 17:7,18 18:5 108:1

**criteria** 115:3

**criticized** 59:15

**criticizes** 59:11,24

**cross-examining** 95:15

**CSSB** 26:25 27:25 30:14

**curious** 119:12

**current** 14:1

**cycle** 90:7 118:21

**cycles** 37:20

---

**D**

**D-E-A-N-N** 13:24

**D.C.** 91:3

**Dallas-fort** 122:17

**Dan** 52:12 61:4 70:14

**Danahy** 75:19

**Dartmouth** 13:5

**data** 37:3,13,20,25 38:9,12,16,23
39:2 48:8 98:20

**date** 6:3 11:13 41:8 50:13 55:10 57:1

**dated** 50:17 59:10 60:21

**dates** 36:19 37:1 39:10

**Davis** 73:14

**day** 9:9 25:1,22 42:17 43:25 71:24

**days** 40:2,4,8,9 53:15

**deal** 17:23 78:19 108:17 123:7
137:15

**Deann** 13:24

**debate** 26:17 107:20 128:10 132:12

**decade** 84:18 128:4

**decades** 67:17

**decide** 10:4 69:13 84:10 96:22
112:1 129:8

**deciding** 61:15

**decision** 70:9,13,18 88:7,13,17,24
93:16 99:14 118:12 126:1

**decision-making** 107:10

**decisions** 118:24

**declaration** 14:15,21,24 15:7,13,16
16:4 22:4 41:22,25 42:1,18 43:7,16,
19 44:4,8,14,19 45:19 48:6 49:12,
19,25 50:5,11,16 79:24,25 80:1
86:1,7,17 87:6 88:8 89:21 92:8
93:14 99:11 107:17 112:25 114:21
116:11 118:9 119:1,7,14

**declarations** 44:16

**declined** 70:10

**deeper** 44:21

**Defendant's** 14:6 24:19 36:2 40:22
42:3,10,12 44:22 50:2 51:20 54:7
56:10,14 59:1 60:5 63:15 65:22
68:22 71:14

**defendants** 6:20

**define** 34:9 98:10

**degree** 13:7,13,16 109:17

**delay** 39:9

**delayed** 38:12,24

**deliver** 39:6

**demarcated** 23:25

**Democrat** 72:20 73:16 130:14,17

**Democratic** 30:17,23 31:12 73:3,
11,16

**demonstrate** 22:13 68:14

**demonstrates** 21:20,24 27:8

**demonstrating** 22:17,21

**Department** 7:23

**Depending** 96:20

**deposed** 8:16

**deposition** 6:7 8:16,23 9:10 51:25
76:5,8 81:19 85:2 138:23 139:8
140:2,4

**depositions** 94:14

**derogatory** 53:9

**describe** 85:9 106:1

**designed** 101:17 109:16

**desired** 52:24

**desk** 82:14 119:11

**detail** 43:17

**details** 132:7

**determine** 24:10,14 68:7 139:15

**developed** 121:16

**deviation** 90:4 120:7 125:3

**deviations** 121:21

**difficult** 9:2 61:12,22,24 96:23

**dinner** 45:3

**direct** 61:13 114:13,16

**directed** 76:19

**direction** 96:6,15 97:16

**directly** 25:6 118:5

**director** 35:6 131:14 132:1,20

**disadvantage** 47:3

**disagree** 31:15,18 37:2 65:9 68:4
73:9

**discharged** 103:15

**disclose** 84:11 126:3 134:17

**discrimination** 27:13 31:16 46:16
89:4,22 92:12

**discriminatory** 89:13 91:9

**discuss** 50:22 139:14

**discussed** 33:9 78:5 89:11 121:24

**discussion** 64:15 81:9,18,20 82:17
83:3,4 88:11 95:17 111:5,20 116:22
120:7 132:15 137:18

**discussions** 21:13 81:16 96:7
111:6,7 112:12,22 134:15 136:6

**disliked** 46:23,25

**dismantle** 118:14

**dismantled** 90:18

**dismantling** 89:12

**dispute** 23:15 25:3,7 36:15 38:22
50:9 59:22

**dissatisfied** 107:13

**distinction** 117:14

**distinctive** 17:7 18:5 108:1

**district** 11:8,22 12:14 14:2 16:17
17:2,5,18,20,24 21:21,25 22:13,18,
22 23:19,21,25 24:4,6 44:9 48:2,17

53:2 55:16 56:6 60:20 61:8,10,20
62:4,5 69:18 70:5 72:17 73:1,3,11
87:11 88:6 89:5,12,23 90:3,16,17
92:9 100:14,15 101:10 103:3 107:24
108:14,17,19 109:2,11 112:14,20
113:25 114:2,23,24 115:6 116:13
117:13 118:13,14 119:17 121:23,24
122:3,4,8,13,18,21 123:2,8,17,19,22
124:9,11,12,19,23 125:4,9,10,15
128:18,19 130:13,16,22 133:8

**districting**  39:10

**districts**  16:18,24 17:8,19 18:6
28:2,5,20 29:4 30:15 108:2,11
115:16 116:3,8 121:20 124:22 125:2

**diverse**  17:25

**diversified**  108:22

**division**  17:19

**divisions**  17:24

**doctrines**  136:15

**document**  14:14 23:5 36:5 41:17
54:23 59:4,6 60:12,24 68:25 71:19
72:9 78:6 79:24

**documents**  77:8,24 78:4 79:7,12,
16,20 119:3

**Donald**  62:9 114:9

**Donley**  109:10 124:2

**Donna**  33:12

**draft**  15:8 41:17,22

**drafting**  15:6

**draw**  20:17 46:22,25 57:10,11 66:22
118:18 130:21

**drawing**  27:4,13 31:17 35:21 48:21
54:3 56:1 62:1 67:24 91:22,23 92:18
130:13

**drawn**  16:10,15,20,24 19:24 22:6,
14,18,22,23 24:11,15 33:2,10,17
34:1,2,8,13,14,22 48:18,24 49:3,6
69:23 92:1 99:24 133:8 134:2

**drew**  21:20,24 133:19

**Drive**  13:24

**driving**  29:25 30:2

**duces**  50:7

**due**  38:13,24

**duly**  8:6

**Dunn**  6:17 32:3 58:19 60:2 71:3
73:25 74:16,19 75:2,5 78:9,14,21,25
79:6,10,18,19 83:12 85:15 94:22
95:14 96:5 97:15 98:11 99:8 100:17
101:18 103:20 105:15,25 106:23
107:2,6,11 110:9,13,22 111:3 112:9,
11,18 113:22 117:2,4,25 118:8
120:10,14,22 121:3,6,11 122:16
123:16 124:5 125:1,12 126:2
127:15,20,23 129:24 131:2,20
132:4,10 133:7 135:5 137:20 138:8
139:6,19,25

**duty**  89:3

---

## E

**earlier**  47:13 48:17 50:21 75:10
80:25 81:17 106:7 113:23 120:5
131:2 139:19

**early**  35:22 57:15

**easier**  108:6

**easy**  51:17 72:7

**Eckhardt**  26:19 27:24 31:3

**Eckhardt's**  27:16

**economy**  17:25 108:23

**Eddie**  33:19

**education**  45:14 51:4,5 70:7

**educational**  13:3

**educators**  70:2

**effect**  18:2 136:7 137:22

**effective**  70:16

**effectively**  30:17

**effort**  118:14 137:15

**Eighteen**  130:10

**El**  139:2

**elect**  130:14,17,22

**elected**  70:1 80:21 87:12 114:10

**election**  55:8,15 56:24 60:25 80:23
98:20 128:18

**electrical**  103:4

**eliminate**  30:17

**elimination**  73:2

**else's**  84:8

**email**  41:4,22 77:11,15 78:5

**emails**  79:23

**emolument**  102:22

**empirical**  68:9

**enact**  39:23

**encroach**  97:7 136:12

**encroaching**  95:21 98:6 137:7

**end**  52:14 53:11,19

**endorse**  70:10

**endorsed**  62:10

**endorsement**  60:20 114:7

**enrolled**  23:10

**ensure**  49:6

**entered**  138:25

**entire**  71:24

**entitled**  60:18 95:16 110:9

**equalization**  122:12

**equalizing**  28:2,19 115:3 124:22

**erection**  81:4

**erection/fabrication**  81:3

**Eric**  6:19,21 8:11 97:6

**eroded**  128:17

**eroding**  128:13

**error**  138:24

**Escobar**  7:18

**essentially**  114:8 125:13

**establish**  97:15

**Estes**  104:7 106:6,8 128:15 129:25

**Estes's**  105:5

**et al**  6:8,9

**evening**  41:18 45:1

**event**  9:9

**events**  82:11

**evidence**  98:15,25

**EXAMINATION**  8:7 75:1

examined 116:2

examples 47:18,22 103:23 104:12 115:13

excised 17:20

excises 17:16

excluding 49:23

excuse 54:12 59:14

exhibit 14:4 23:2,4 24:17,23 36:2,3, 8 39:11 40:23,25 41:2 42:6,13 50:3, 6 51:21,23,24 52:1 54:8,16 56:11,14 57:25 59:2 60:6,10 63:16 65:23 68:23 71:12,15 86:4 120:24 135:4,6

exist 126:4 136:5

existed 110:10

existence 117:3

existing 124:8

expect 9:8

expected 30:15

expended 137:15

experience 47:25 102:4,19 114:21 129:7

experiencing 118:19

expert 93:22 98:1 123:12 125:8

experts 94:18 98:21

explain 25:16 26:13 108:10 136:16, 18

explained 18:4

explaining 18:9 108:9

explanation 17:12,14 108:12 115:9, 14

explanations 16:10,16,19,22,23,25 22:6,21 47:12 99:23

expressed 82:14 126:11

extend 9:5

extensive 72:9

extent 28:5 29:6 95:21 97:6 136:11 137:6,8

extra 24:20

**F**

fabrication 81:4

fact 17:16 20:12 27:11 34:24 37:10, 16 39:5,20 52:19 61:14 62:8 69:24 70:10,14,19 76:21 84:16 86:14 114:24 131:18

factor 29:25 61:11

facts 82:11

fair 45:6 53:23 56:5 83:24 88:22 90:13 93:3 98:13 107:18

fairly 119:25

fall 68:7 101:21

fallacious 63:10

fallaciously 68:18

falling 57:15

Falls 104:8

familiar 14:18 35:7 36:9 48:18 52:7 75:19 83:13 93:20

family 12:21

fashion 15:18

fast 38:7 129:23

favor 51:9,16 57:15 62:6 103:12 116:11 130:12

federal 88:4,16 89:4,11,16 90:16 91:5 93:16 114:23 118:12 135:22 136:8 137:22

feedback 134:11

feel 9:10 82:13 107:2

feels 61:1

fellow 61:4

figure 21:10

figures 125:3

filed 15:20 52:2 71:16 113:10 119:17 121:3,6

final 23:15 25:23 113:4

finally 11:25 26:4 34:20 116:10

finance 51:6 104:11

financed 57:19

find 22:11 42:12 72:7 77:12

finding 42:8 65:9

fine 40:15 58:19 71:3

finish 9:5,14 20:3 96:12

finished 14:8,9 52:6,7 56:17 60:8 63:21 66:3 71:20

firm 7:7

Fischer 7:17

five-month 39:9

flawed 67:8

flip 14:17 25:9 26:1 27:18 54:13 55:12 64:3 67:10 72:17

floor 15:19 18:4 82:18 100:1,10 103:11 104:4 107:20 117:16 125:13, 18 126:8 128:10,23,24 129:6 130:23 132:12

folks 8:3

follow 10:9 16:8 41:14 60:24 67:16 72:12

follow-up 139:17

Forest 128:18

forget 10:2 104:1

forgot 44:22

form 17:1 18:18 32:3 34:3 38:18 46:4 67:13 85:12 102:24,25 105:10, 11 112:15 113:20 119:3 122:14 123:9,10,11 124:24 125:5,6 127:12 129:21,22 130:24

Fort 45:16

forward 41:18 44:25 78:12

forwarded 77:11

found 42:15 89:5 90:20 91:11

foundation 57:19 70:3,6 123:11 125:7 127:13 129:22 130:25

fourth 25:1 64:6

frankly 10:12

Fraser 92:25

free 98:7 107:2 136:15

freedom 106:19

friendly 45:7

Senator Kel Seliger

January 19, 2022
Index: front..implying

front 86:1

full 9:9 26:22 27:18,20,21 39:6 60:23
64:5,6

fussing 77:24 78:15

future 96:10

---

**G**

Gaber 75:18

gas 17:8 18:1,5 100:15 108:2,11,17,
23,24 109:1 125:21

gas-producing 17:21

gave 15:4 32:1 47:15,16 77:19 100:1
113:17 115:15

general 6:5 8:12 70:1 89:2 92:4
93:15 135:9

General's 84:14,25 85:11 88:23
95:2,3,10,15,23 96:6,15,17 97:5,18
136:7 137:14 139:11

generally 25:21 98:23 101:7 102:2

geographic 28:7 29:9

gist 85:9

give 17:12 76:25 120:10 125:13
136:19

giving 31:9 109:8 121:1

glad 57:22

goals 27:25 30:20

goats 67:3

Golando 7:16

good 6:2 7:5,15,22 17:22 63:2 66:25
69:15 71:2,4 78:19 92:1 108:17
109:13 120:19 137:15

GOP 60:19

Gotcha 13:13

government 66:24 67:4

governor 11:16 18:14,21 19:6,8,11,
18,20 39:17 40:11 51:17 52:12
53:14,22,24 58:3,12,15 59:15,23,24
61:3 70:14 90:11 101:3 102:6,13
103:6,7 111:15 113:8,18,24 114:3,9,
17 128:11,20,22,25 129:8

Governor's 51:7 53:5 103:15 106:2
114:18 129:17

gray 17:19 23:24 109:10

Greg 6:9 135:9

grew 80:12,15

grid 103:4

grocery 70:21

ground 8:22

groups 47:4 98:16,17

guess 20:7 41:3 47:16 77:6 112:13
119:12 122:20

Guinn 95:4

guise 68:9

Gutierrez 31:3 128:19

guys 71:4

---

**H**

habit 38:7

half 56:5,8

Hancock 33:14 103:3,5,10,12
106:9,10,11

Hancock's 103:14

hand 15:6 16:1 24:18 36:1 40:21
50:1 51:19 54:10 58:25 60:4 63:14
65:25 71:13 86:8

handed 15:23,25 36:9 43:24,25
45:18 50:12 135:6

handing 14:5

happen 37:16 103:2 110:16

happened 51:2 54:2 110:14

happening 45:1

happy 57:23 78:12 110:22

head 9:20,22

heading 60:25

hear 19:16

heard 93:23,24 105:20 134:12

hearing 10:21,24 11:2

hearings 89:10,16

held 44:10 89:10

high 84:19

Higher 51:4

highlighted 72:10

Hinojosa 31:3 32:22 33:1

hired 95:6

Hispanic 47:1

hold 55:13 72:13

honesty 78:14

honoring 45:11,17

hope 74:9 87:9

hours 94:9

house 135:10,24

Hudson 6:19 7:1,12 8:8,11 14:5
17:3 18:24 20:3,5,7,9 23:3 24:18,22
32:6 34:6 36:4 38:5,8,19 40:21,24
46:6,10 50:4 51:22 54:9,13 56:12
57:24 58:17,25 59:3 60:4,7 63:17
65:24 66:14 68:24 70:25 71:4,13
73:19,22 84:21 95:12,18 96:25 98:3
99:21 105:11 112:15 113:23 115:25
120:11 121:9 122:14 123:9,20
124:24 125:5 127:12,17,21,24
129:21 130:24 131:2,23 136:9,18
137:4 138:9,17 139:5

Hudson's 97:16 108:9 133:12

Huffman 17:4 19:2,7,12,16,24
20:21,24 21:14,20,24 32:18 35:21
93:1,4,17 101:3 107:23 110:4 111:7,
21 113:19,25 114:14 115:15 124:4
132:18 134:15

Huffman's 21:18 35:4 108:12
131:13

Hughes 33:17 64:7,23 66:8

hypothetical 123:11 125:7

hysteria 53:21

---

**I**

idea 44:17 46:1

ideal 48:4 115:1

identification 56:13 60:9 71:15

identified 29:15

immediately 77:22 83:3

implying 97:12

---

Senator Kel Seliger

January 19, 2022
Index: importance..leadership

**importance** 85:2

**important** 53:1 93:25 106:16 109:2

**impression** 10:13 74:10 85:19 104:16 122:15 125:9

**improper** 123:10 125:6

**incisive** 85:16

**include** 47:20

**included** 47:23

**includes** 11:21 31:2

**Including** 127:20

**incorrect** 108:13 120:2

**incorrectly** 87:2

**incumbent** 28:6,8 29:7,12 44:8 87:11 115:4 123:17

**indelicate** 53:18

**industry** 13:1,2 14:1 108:16

**influence** 82:1,21

**inform** 112:4

**information** 21:19,23 22:12 48:23 49:2,10 85:18 93:16 100:4 114:12

**informed** 137:15

**injection** 10:21

**injunction** 11:7 52:2 54:17 56:16 60:11 71:16 115:22 120:9,23 121:7 139:13

**innocent** 109:23

**input** 96:10

**inside** 36:10 108:17

**insists** 109:22

**instance** 31:16 128:14

**Institute** 65:4,8,21

**instruct** 107:6,8 109:25 136:12

**instructing** 95:19 98:8 106:23 137:11

**instruction** 98:7 137:5

**insult** 46:16

**intend** 20:12

**intent** 120:22

**intentional** 27:12 31:16 46:15 90:21

**intentionally** 73:2 90:17,19 91:9 130:14

**interaction** 21:7 51:14

**interest** 28:4 29:1 36:19 39:10 46:9 79:19 115:4

**interpret** 9:23

**interpreting** 88:23

**intervention** 62:12

**interview** 52:22

**intimately** 48:20 114:6

**introduce** 6:14,25 7:3,11 12:10

**invalidated** 30:16

**invoke** 96:22 117:8 134:18

**involved** 35:20 48:20 114:6

**involves** 46:15

**irresponsible** 66:19

**issue** 11:22 68:11 82:5 93:25 103:6 110:15

**issues** 59:13 66:20,21 67:8 127:19

**issuing** 88:5 135:23

**items** 58:3 79:15 127:11

---

**J**

**jammed** 86:20

**January** 6:3 10:21 59:10

**Jasmine** 7:23

**Joan** 32:18

**job** 106:14

**Johanna** 43:15

**John** 34:18 62:25

**Johnson** 30:11 31:3

**join** 31:11,25

**Journal** 25:1,6 31:8 71:24 72:1

**Juan** 32:22

**judge** 12:11 25:16 26:13 44:3

**judges** 32:14 91:5 119:20

**Judith** 34:20

**June** 63:24

**Junior** 33:19

**Justice** 7:21,24

---

**K**

**keeping** 137:15

**Kel** 6:7 8:5 12:12 41:16 52:12 60:19 61:1 75:4

**Kelly** 33:14

**Kelseliger@icloud.com** 41:11

**Kenneth** 7:8

**Kevin** 113:16

**kicking** 30:5

**Kim** 6:12 43:15 73:13

**kind** 46:17 67:12 72:9 82:10 98:1 102:18

**kiss** 52:14 53:13

**kit** 39:6

**knew** 29:24 92:8 94:4 119:16

**knowledge** 21:11 27:8 60:17 69:6

---

**L**

**lack** 59:11

**laid** 93:13

**language** 86:21

**large** 17:21

**largely** 107:19

**Lastly** 10:3

**Latin** 6:8

**law** 13:13 28:2,17

**lawsuit** 14:16 15:20

**lawyer** 75:18 76:10 83:16,17 84:22 117:19 126:22

**lawyers** 75:23 76:1,13 84:16,17,25 109:25 119:20 136:6

**layman's** 137:17

**lead** 132:18

**leadership** 101:21 103:18,24

105:18 107:12 112:13

**leadership's** 104:17

**League** 6:8

**leave** 10:13 69:16

**leaves** 69:14 124:20

**led** 91:15

**left-hand** 23:18 64:11

**legal** 6:10

**legislating** 12:19

**legislation** 104:7

**legislative** 7:15 20:2,10,13,14
21:15 30:3 34:25 36:13,18 39:23
40:5 62:13 67:20 83:14 84:2 85:6
106:22 112:8 117:9 118:6 121:16
126:1,17 127:4 131:19 132:2 134:18
137:9,25

**legislator** 107:10

**legislature** 11:10,16 32:11 37:4,21
38:1 39:13 40:10 46:3 48:24 49:4
64:21 66:12 88:1 90:10,15

**Legislature's** 47:7 63:25

**letter** 135:9,19

**lewd** 53:14,17,18,20

**liberal** 63:4,6,7,13 64:1 65:17 68:8

**Liberal-conservative** 67:19

**lieu** 138:24

**Lieutenant** 18:14,21 19:6,8,11,17,
20 51:7,17 52:11 53:5,13,21,23
58:12 59:14,23,24 61:3 62:10 70:14
101:3 102:6,12 103:6,7,14 106:2
111:15 113:7,18,24 114:3,9,17
128:11,19,22,25 129:8,17

**light** 81:24

**limit** 117:1

**lines** 16:10,15,17,20 19:24 22:6 27:4
99:23

**lips** 53:11

**list** 70:21

**listed** 27:25

**litigation** 10:18 11:23 46:11 87:24
94:15 96:18 97:19

**live** 12:12 13:21 139:2

**lived** 80:17

**living** 12:18

**local** 114:10

**locally** 70:1

**located** 6:4

**logical** 123:6

**long** 17:21 31:22 80:20 98:12

**longtime** 45:15

**looked** 79:7,11 80:6 133:25 135:19

**lose** 72:15

**losing** 30:23 51:9,16 102:21 105:18
106:3

**lost** 42:13 57:21 80:23 106:12
128:18

**lot** 21:6,7 57:19 63:10 103:5,8
108:23,25 114:10 127:18

**lots** 80:16 83:22

**Lott** 7:22,23

**love** 65:20

**Lubbock** 108:16

**Lucio** 31:4 33:19

**LULAC** 7:7

---

**M**

**Mackin** 35:8,13

**mad** 42:14

**made** 59:22 100:10 107:19 125:15,
17 134:5 135:23

**main** 84:21

**majority** 63:12 128:12,17

**make** 14:12 30:15 32:14 49:17 50:16
61:11,23 65:16 66:20 68:11 74:6
77:25 86:17 115:24 125:1 138:19
139:3

**makes** 100:25 114:5 129:4

**making** 61:21 70:15 126:1

**malicious** 100:24 101:1

**manned** 65:21

**map** 11:9,14,17,18,21 23:8,10 24:9,
11,12,13,15 27:4,13 29:25 30:24
35:21,22 37:7 67:19 82:13 88:2,6
91:22 92:1,19 100:2 111:8,12,16
112:14,20 115:15 120:7,8 121:17
133:11

**maps** 11:6 30:14 39:23 46:22,25
48:8

**March** 55:10 57:1

**mark** 36:2 40:22 50:1 54:6 56:10
59:1 60:5 63:15 65:24 68:21 72:6
75:18

**marked** 14:4 23:2 24:17 36:3,14
40:23 50:3 51:21 54:8 56:11 59:2
60:6 63:16 65:23 68:23 71:12,14
120:9 135:4,6

**marking** 14:6 23:4 24:19 51:19,24
54:15 56:13 60:9

**marks** 74:23

**Martin** 7:16

**Martinez** 7:17

**master** 45:3

**match** 116:16

**matriculated** 13:4

**matter** 6:7 17:15 37:22 120:12

**matters** 115:21

**mayor** 55:19 80:18

**MC** 45:15

**Mccaffity** 7:13

**Mccain** 62:25

**means** 25:17 51:12

**meant** 108:10 137:16

**measure** 103:25 104:2,4

**measurements** 63:11

**measures** 58:13

**Media** 74:24

**medias** 140:3

**meet** 9:2

**meeting** 84:24

**member** 12:24 26:15 35:9 36:23,25
37:11 45:16 51:4 65:10 66:11 68:17
70:20 80:19 102:21 106:18

Senator Kel Seliger

January 19, 2022
Index: member's..Opiela

**member's** 107:13

**members** 21:4 28:6,16 29:7 30:21 31:12 32:1 45:10 51:16 61:1 65:4 67:18 88:15 92:8,21,22 94:4 99:18 102:16 104:22 112:18 133:17 135:15

**memorized** 100:9

**memory** 41:24 82:11 92:20 137:14

**Menendez** 31:4

**mention** 125:22

**mentioned** 50:21 52:21 80:25 125:19 127:23 131:12

**merits** 83:5

**mess** 125:4

**met** 8:13 35:9 75:9 92:2

**method** 123:18

**methodology** 64:15 67:14 68:3

**Mexican** 7:14

**Mic** 63:24

**middle** 9:10 41:5 67:13 87:23 106:11

**Midland** 17:6 18:14,22 55:18 62:5,6 107:25 109:18 113:7,13

**Mike** 55:19 56:7 57:5

**Miles** 31:4

**mind** 40:13 54:10 58:17 72:6 96:11 110:18

**mine** 14:20 38:7

**minimum** 68:13

**minority** 47:4

**minute** 21:9 80:10

**minutes** 58:18 70:25 138:9

**missing** 49:11

**misspoke** 122:24

**Mitt** 62:24 63:2

**Molly** 75:18

**moment** 94:16 126:4 134:10

**Monday** 25:2

**morning** 6:2 7:6,15,22

**Morrison** 95:4

**motion** 60:11 71:16 121:7

**motivation** 18:20 110:4 111:8,10

**motivations** 127:4

**motive** 109:23

**move** 49:25

**N**

**named** 31:9 46:8 52:21 75:18

**names** 75:19

**nays** 26:5,8

**necessarily** 17:18 31:18 65:16 69:21 73:10 102:13 127:9 138:20

**needed** 85:18 130:6

**newspaper** 54:24 113:9 126:14

**nice** 106:14

**Nichols** 33:21

**Nina** 7:2,6 76:3

**Nineteen** 130:7

**nod** 9:23

**nods** 9:21

**nomenclature** 26:14

**non-lopsided** 67:24

**nonprivileged** 49:2

**nonpublic** 19:23 20:20 21:2 105:23, 24

**nonresponsive** 73:19

**normal** 37:3,7,8

**north** 122:16 123:24 124:3,18

**northwest** 122:17

**noted** 93:7 96:21 103:13

**notes** 71:1 138:10

**notice** 77:10 139:8

**November** 41:8 42:6,16 45:2 49:13 86:13

**number** 14:4 23:2 24:17 36:3 40:23 50:3 51:21 54:8 56:11 59:2 60:6 63:16 64:6,23 65:23 67:3 68:23 71:12 92:7 101:4,24 128:20 130:5,9

135:4 140:3

**numbered** 64:4

**numbers** 55:22 67:13 120:16,19

**numbers-wise** 120:20

**O**

**oath** 12:4

**object** 20:1 21:14 32:3 83:11 95:12 96:25 98:3 102:24 106:20 110:7 112:6 118:4 125:24 131:19 136:9

**objection** 17:1 18:18 20:17 34:3 38:18 46:4 73:19 85:12 96:2 103:20 105:10,11,16,22 107:5 109:14 110:11 112:15 113:20 122:14 123:9, 10,11 124:24 125:5,6,7 127:12,13 129:21,22 130:24 137:4

**objections** 103:22 123:20 127:17, 21

**obligation** 37:12

**observed** 107:12

**observing** 105:8

**obvious** 18:11 113:5 118:13

**October** 25:2 60:16,21 69:7

**offered** 26:19 28:16,19,22,25 29:3, 6,9,12 98:15 116:3,7,12,24 117:6 123:12 125:8

**offhand** 107:15

**office** 6:4 8:12 43:12 55:2 56:20 69:16 84:14,25 85:11 88:23 95:2,3, 11,15,23 96:6,15,18 97:6,18 102:22 136:7 137:14 139:9,11,15

**officials** 70:1 114:11

**oil** 17:8 18:1,5 100:14 108:1,11,17, 23,24 109:1 125:20

**online** 13:4

**Opiela** 6:21 8:1 17:1 18:18 20:1 24:20 34:3 38:18 46:4 53:4 54:9 57:23 66:13 77:12,19,22 78:7,10,18, 23 79:10,14 83:9 85:12 94:20 96:1 97:6,9 99:7 100:12 101:14 102:24 103:1 105:10,22 106:20,25 107:4,8 110:6,12,17,20 112:6,16 113:20 116:25 117:21 118:4 120:20,25 121:5,8 123:14 125:24 131:17 132:2,8 136:16,21

Senator Kel Seliger

January 19, 2022
Index: opinion..potential

**opinion**  46:5,6 51:1 52:23 88:5 91:8 99:17 106:18 109:7 110:18 112:4 123:6 125:13 137:23

**opinions**  63:3 83:6,7

**Opperman**  35:5,15 131:13,21,24 132:5,17 134:16

**opponents**  54:3

**opportunity**  6:24 39:14 50:15 84:1 86:16

**opposed**  58:4

**opposing**  139:1

**opposite**  58:12,14

**opposition**  57:20

**options**  123:23

**order**  17:7 28:1 89:16 90:17 92:10 108:1 114:23 125:1 130:22 135:23 136:7,8 137:23 138:22

**organization**  45:10,11,13

**organizations**  70:8

**original**  86:11

**oust**  61:2

**overpopulated**  122:18

**oversized**  123:3

——————————————————

**P**

**p.m.**  110:24 111:2 134:25 135:3 136:24 137:2 138:13,16 140:3

**pages**  64:4,5,6

**pairing**  28:6 29:7

**pandemic**  38:13,17,24

**Panhandle**  12:14 17:6,16 107:25 109:1,10 122:4 125:2,11

**paragraph**  16:3,6 18:3 22:4 26:23 43:18 44:7 45:21 47:11,19,25 60:23 88:7,10,15 92:7 94:3 99:10,21 107:18 113:1 114:20 115:12 116:10 118:9

**paragraphs**  46:10 93:14

**Parreno**  7:8

**part**  12:14 14:16 17:17,24 26:17 53:21 63:6 68:3 70:9,13 72:14 88:6 90:21 110:5 117:22,23 132:21

**partially**  45:4

**participate**  15:17

**participated**  118:10

**participating**  6:24

**parties**  29:13 138:23

**partisan**  30:16 49:8

**partisanship**  29:24 30:2,24

**partly**  69:24

**party**  51:13,15 55:8 56:23 57:16,17 61:2 65:5 101:6

**Paso**  139:2

**pass**  138:8

**passage**  25:20,24 28:12

**passed**  11:9,14 25:21 26:4 58:13 82:19 90:10,15 103:3 121:17

**passing**  28:17 88:5 91:16

**past**  36:23 37:19 84:13

**Pastors**  45:4

**Patrick**  52:12,13 58:3 59:10,14,15, 24 61:4 62:10 70:15

**Patrick's**  59:23

**Paul**  33:6

**Paxton**  33:23 34:7 131:5,7

**PDF**  79:25

**peanuts**  108:21

**pedantic**  32:13

**pegged**  68:16,18 70:19

**people**  46:23 47:1 62:21,22 66:25 67:1,6 75:21 124:20 133:6

**people's**  67:3

**Perales**  6:23 7:5,6,10 8:3 76:3

**percent**  63:12

**period**  8:20 73:18

**Permian**  12:15 108:25

**Perry**  34:1,13

**person**  35:7 82:4 132:25

**personally**  35:20

**Pete**  128:18

**phrase**  53:12 93:23,24

**piece**  104:7

**pieces**  58:15

**Pioneer**  69:8

**place**  67:21 77:1

**places**  17:17 67:19 83:23

**Plains**  12:15

**plaintiff's**  56:15 60:11 120:23

**plaintiffs**  6:18 7:7 11:5,11 42:24 43:4 52:3 71:17 75:6,17

**plan**  18:4 26:25 82:19 83:6 89:22 90:9,15 91:16,23 92:15 100:6 110:5 116:4 121:17,18 126:7,19 131:16,22 132:6,19 134:12

**planning**  10:24

**plans**  81:10 116:8

**plant**  82:10

**play**  12:1 30:2 61:7

**played**  114:3

**player**  59:16,25

**point**  21:19 22:11,16,20 29:16,20 53:2,5,10 69:14 96:9 99:5 111:14 115:18 116:2 119:6 125:23 133:7,12 134:5 136:3 138:19

**points**  55:23 56:3

**polarized**  93:21 94:5,18 95:10 97:23 98:2,14 99:3,10

**policy**  53:6 57:18 63:9 65:4 70:3,6

**political**  28:3,22 67:17

**politics**  61:7 67:20

**poorly**  65:21

**population**  28:2,19 48:4 115:1,3 121:21 123:7,19 124:18

**portion**  71:25 72:10

**posed**  10:15

**position**  14:1 44:11 58:11,14 87:12 95:14,18,23 103:14 106:3

**positions**  70:5 83:18

**possession**  77:18 79:16

**potential**  18:13 113:6

potentially 34:4 61:8

pout 139:23

Powell 15:3,10,12,16,25 31:4 41:4,6
42:22,25 43:1,7,24 44:13 45:5,7
47:16 49:16,22 72:22 73:6,9,15 82:3
83:5 116:12,23 117:5,12 118:1
122:8 128:17

Powell's 116:19

power 57:19 129:13

prefer 98:16,17

preferred 18:14 113:7 123:18

preliminary 10:20 11:7 39:2 52:2
54:17 56:15 60:11 71:16 115:22
120:9,23 121:7 139:13

present 15:4,22

preserving 28:3,4,22,25 29:3

president 62:9,13,23 63:3 70:10
114:8

pretext 115:10,15

pretextual 16:9,22,23,24 21:18,21
22:21 24:14 47:12 99:23

pretextural 29:22

pretty 14:9 56:3,4 107:16 134:22

previous 28:5 29:4 84:17

previously 120:8

priggishness 53:21

primarily 17:23 108:15

primary 18:13,24 19:3 54:3 55:8,20,
23 56:6,23 57:4,10,11 60:21 61:17,
22,24 69:19 70:11 113:6,9

print 66:9 71:24 120:11

printing 120:18

printout 50:5 66:7

prior 75:24 76:7 93:14 94:14 97:8
98:7 118:12,21

priorities 27:25 28:8 51:7 59:19
102:5

private 58:10 94:18,23,24 110:3
111:7,18,19 112:14,19 117:3,4,15,
18,24 127:5 131:3,8

privilege 20:2,10,13,14 21:15 26:17
30:4 34:25 83:14 84:2,6 85:6 95:13,

20,22 96:2,22 97:3,8,12,13 98:4
106:22 110:19 112:8 117:9 118:6
126:1 131:19 134:19 136:10,14
137:5,9,10,24,25

privileged 83:11

privileges 98:6 126:18 136:12
137:8

procedurally 120:25

proceedings 94:9,11,14 118:11

process 16:9 20:21,25 21:3 22:5
47:12 99:22 101:14 114:7

processes 125:25

produced 79:7,20 80:3

product 95:13,22 97:8,14 98:5
103:12 136:11,15 137:6

professors 95:4,5

profile 13:4

profound 102:9

prohibits 92:12

prominent 68:15

promptly 42:15

pronouncedly 57:18

property 58:7

proposal 133:14,16,19

proposed 30:14

protected 137:23

protection 115:5

provide 49:2 119:5

provided 38:17 115:13 119:2
130:17 139:9

psychology 13:8,9

public 20:23 21:19,23 22:12,16,20,
24 27:7,12 29:17,21 32:25 33:8
34:7,9,10,12,21 45:14 51:5 57:18
58:9 63:9 65:4 70:3,6 80:20 94:17,
22 111:18,19 115:14 117:1,11,15,
18,21,22,23,25 127:3 131:8 134:5

publicly 126:8,12,13

publish 37:13

published 37:25 134:7

pull 129:1

pulled 36:17

pulls 52:12 66:5

punished 103:24

punishment 101:10,16

purpose 18:12 113:5 139:12

purposes 39:22 51:25 54:15 56:12
60:8 71:14 97:5 122:12

pursue 129:19

put 35:24 52:11 53:8 67:12 92:20
124:18 138:21

putting 62:4


Q

Quesada 7:14

question 9:13,14,22 10:4,5,6,11,14,
15 20:4 31:19,20 33:4,6,23 34:16,18
35:15 66:13 81:25 95:24 98:5
102:23 108:9 110:7 112:17 120:12
131:1,10

questioning 9:13 85:10 97:1

questions 74:3,12 85:14,16 96:7,
12,16 97:17 99:20 101:5,24 102:2
103:21 113:23 115:25 131:3 133:12
138:4 139:17

quick 25:10 134:22 136:22

quits 69:10

quote/unquote 52:14 62:11


R

race 27:1 55:4 56:22 62:1,13

racial 47:7 89:4,21 92:12 95:9
98:16,17

racially 89:12 93:21 94:5,18 97:23
98:2,14 99:3,10

racist 46:19

ranching 17:23

rank 64:12,15

ranking 67:23

Rankings 64:1

rare 62:12

Senator Kel Seliger

January 19, 2022
Index: reach..Republican

reach 98:20

reaction 101:22 102:6 104:18 105:8 107:15

reactions 107:12

read 15:20 16:11 17:9 18:6,15 22:7 25:18,19 26:3,5 28:9 30:18 48:12 49:13 52:14 55:8 61:4,15 62:14 63:22 68:1 72:12,17,23 73:3,7 86:24 88:9 118:12 119:9,25 137:3

reading 25:14 48:6 108:5 118:23

reads 17:4 26:25 30:13 55:7 56:19 60:24 64:6 67:16 119:10

ready 8:9,10 57:14 71:21

Reagan 62:25 109:13

real 25:10 72:7 85:19 136:21

realize 84:6

reason 23:14 25:2 26:11,14,18 27:16 28:16 30:10 31:2,8,9,25 32:1 36:15 37:2 38:16,22 39:13 50:9 77:6

reasonable 102:19

reasons 21:18,21,25 22:13,17 24:10,14 28:12 29:18,21 31:12 33:2, 9 49:8 116:3,7 126:2,6,10

recall 8:14 16:2 21:6,8 33:3,5 35:10, 12,17,18,19 42:22 45:18 75:12 76:2 77:8,15,16 81:11 82:8 84:23 88:1,3, 4,10,12,14,21 89:8,15,24 90:3,5 92:15,19,22 93:1 100:10 101:7 102:1 103:23 104:12 112:23 114:1 116:21,22 124:5 132:11 133:21 134:2,4 135:18,22

recalled 131:6

receive 88:19

received 11:1 15:9 42:17 76:15 77:23 88:16 95:9 96:17 135:19 137:16

receives 102:19

receiving 45:5 137:13

recent 93:5

recently 8:18

recognizes 129:6

recollection 48:5,9,13 88:20 116:1

recollections 82:2,22

record 6:4,15 9:19 10:12 21:24 22:17,21,24 27:7,12 29:17,21 34:10 40:17,18,20 48:16 54:15,21 56:13 58:18,21,22,24 63:8,11,13 71:1,8,9, 11 72:15 73:1 74:19,21,22,24 79:2, 3,5 96:12 110:24,25 111:2 116:18 117:22,23 120:24 121:1 126:24 131:24 134:25 135:1,3 136:20,24,25 137:2,3 138:10,13,14,16,20,21 140:2

records 77:13

recriminations 105:14

Redappl 133:22 134:3

redirect 74:16

redirecting 87:22

redistricting 8:20 11:6 12:17 16:9 20:21,25 21:3,5 22:5 32:7,20 35:13 36:19,23 37:11,13,20 38:2 39:6,14 45:23 46:2,12,21 47:8,11 48:1,9 61:2 75:11 83:6,19,23 87:16 89:3 90:7 93:21 97:19 99:2,22 102:11,20 104:17 114:22 115:2 118:11,19 127:16,20 133:22 135:11,20

redrawn 60:20 61:8,10,11,21

reelected 61:12

reelection 60:19 61:16 69:11

Reeves 124:7

refer 16:23 31:16 32:10

references 51:23

referred 128:1

referring 11:13,17,21 32:11 53:19 95:1

reflects 116:18

reform 58:8

refresh 48:9

regard 65:14 90:7 115:12 127:16

region 123:3

regret 91:19,21,25

regular 37:22 38:2 39:15 40:5,8,10 49:4 58:4,6 67:25

regulate 67:3

regulates 67:2

related 46:11 79:23 81:22 117:12

relationship 101:2,5

relative 115:22

release 38:9 39:2

released 37:20

relevant 71:25

relied 88:22

relies 98:20

rely 119:21

remaining 73:23

remarks 53:16 59:22

remedy 88:2 89:21 90:15 91:23 92:19

remember 88:9 112:21 119:13 137:12,18

remind 10:2

remotely 6:24

remove 17:6 107:25 129:18

removed 50:23 51:3,4,5 52:20 53:15 70:15

Renea 6:11

renew 137:4

renewed 118:14

rephrase 30:4 87:3 116:25 138:5

report 37:8 55:5 56:22

reporter 6:11,15 7:25 8:25 9:2,20 38:6 42:14 123:25 137:3

represent 24:25 25:5 31:7 36:7,12, 17 50:4 51:24 71:23 75:6 77:2 98:14 108:19 109:15 113:13

represented 12:13 49:7 62:3 73:13 84:13

representing 6:21 23:22 44:9 75:17 87:24 109:14

represents 25:23

Republic 105:13

Republican 18:13,24 19:3 28:16 30:20 44:9 49:7 51:9,11,13,15 55:7, 19,20 56:23 57:16,17 61:4,21,23,24 62:12,19 63:5,12 65:5 67:1,5 68:11 69:10,18 73:15 101:6 104:5,22,25 113:6,8 128:12 130:18,22

Senator Kel Seliger

**Republicans** 30:21 64:16,19 65:14

**request** 77:7 79:15,16

**requested** 114:8

**requests** 79:12

**required** 12:4 104:4 128:7

**requirements** 92:3 137:22

**requires** 138:22

**research** 103:5

**reserve** 138:19

**resign** 70:5

**resolve** 94:1

**respect** 115:16

**responds** 72:22 73:6

**response** 50:7 52:1 54:16 56:15 60:10 89:16 91:15,24 115:24 127:23 133:12 139:7,17

**responsive** 77:21 79:12,15,16 80:7

**rest** 63:9 90:15 93:17 99:18

**restate** 34:5

**restore** 92:9,16 107:4 116:12

**restored** 89:23

**result** 30:24

**retired** 12:23 13:25

**returning** 107:17 118:8

**revised** 130:18

**Rice** 63:8 65:3,8,19,20 66:5,15,18 67:9 70:19,22

**rid** 113:25 114:2

**right-hand** 36:8,14 67:11

**rights** 85:6 90:18 92:11 94:1 118:15

**RINO** 62:11,16,18,24

**Robert** 33:21

**role** 30:2 114:3

**roll-call** 67:18,24 68:6

**Romney** 62:24 63:2

**Ronald** 62:25

**Rosauer** 6:10

**roughly** 39:9

**round** 75:10

**Royce** 34:16

**rude** 74:7

**rule** 70:1 110:15 127:25 128:7,10, 13,15,21 130:4,6,8

**rules** 8:22 104:6,8 129:4,15 130:1, 17,19

**ruling** 89:11

**run** 61:15 69:13 70:13,18

**runner-up** 57:6

**runoff** 57:5

**runs** 70:4

**rural** 69:25 70:2

## S

**S172** 89:22

**Samantha** 7:8

**San** 6:13 90:25

**sat** 133:23

**satisfied** 92:2

**SB** 31:9

**SB4** 11:17 23:8,11 27:3 28:13,17 30:14 31:13,17 32:2 33:2,9,17 34:1, 8,13,21 48:18

**scale** 67:19

**schedule** 37:9

**scheduled** 139:12

**scheduling** 138:22

**Schleicher** 109:13

**school** 45:16 58:10 84:20

**Schwertner** 103:8

**science** 13:10

**scientists** 67:17

**scope** 21:11 84:4

**SD10** 11:22 48:20,21,24 49:3

**SD28** 17:9 108:2

**SD31** 17:9 48:21 69:22 108:2

**Sean** 7:13 35:5,15 131:13,24 132:22

**season** 60:25

**seat** 30:18,23

**seats** 57:12

**Secretary** 55:2 56:20

**security** 81:10

**seeds** 82:10

**seeking** 69:11

**Seggern** 6:12

**select** 45:22 87:21 89:2 118:10

**Seliger** 6:7,22 8:5,11 12:12 52:13 53:6 60:19 61:1,15 62:11 69:10 75:4,5 79:14 123:12 125:8 138:17

**Seliger's** 52:12 59:11

**Seligered** 105:14,17 106:1

**senate** 11:8,14,18,21 12:16,24 14:2 16:9,17,18 17:2 18:4 21:4,20,25 22:5,13,17,22 23:18,22,25 24:3,5 25:1,6,13,20,24 26:14 29:25 31:8 43:12 44:10 45:22 47:11 48:1,2,17 58:13 63:5,13 64:19 65:5,11,15 67:23 68:17 70:4,20 71:24 72:1,16 80:19 82:25 83:18 87:11,16,21,25 88:2,5,6 89:2,5,12,23 90:3,14,16 92:9 99:22 100:1 101:19 102:16 104:3 108:14,17 109:2 111:8,12,16 112:13,19,20 114:22,23 115:6,15 116:4,8,13 117:12 118:10,13,14 119:6 121:24 122:4,13,18,21 123:2, 17 124:11,12,23 125:4 126:7,19 127:2 128:1,8,13 129:4,5,16 130:16, 21 131:16 132:6 135:10,24

**senator** 6:7,22 8:5,11 14:2 15:3,9, 12,16,25 17:4 19:2,7,12,16,24 20:20,24 21:13,17,20,24 26:19 27:15,24 30:11 31:2 32:18 33:1 35:4,21 41:4 42:13,21,25 43:1,7 44:9 45:5,7 52:12 53:6 55:15 59:14 60:19 61:1 69:11 70:16 72:6,13,20, 22,25 73:6,9,13,14,15 75:5 79:6,14 82:3 83:5 87:11 92:24,25 93:1,3,17 101:3 102:18 103:3,5,7,10,12,14 105:5 106:6,8,10,11 107:3,23 108:12 110:4 111:3,6,21 113:19,25 114:13 115:14 116:12,19,23 117:5, 12 118:1 122:8 123:12,17 124:4 125:7 128:15,19 129:19,25 131:13, 21,24 132:18 134:15 135:5 138:17

**Senatorial** 12:14

**senators** 103:23 105:1 129:6 130:5 131:4

**send** 44:19

**senior** 104:24

**sense** 85:20 100:5,19 101:20 113:17 132:17

**sentence** 27:19,21 89:20 107:22

**September** 39:7

**series** 89:10

**Serna** 7:8

**served** 76:17,18 139:8

**serves** 122:8

**service** 80:20 81:5

**session** 11:9,15 15:19 19:25 32:7, 10,17,19 37:8,22 38:2 39:15,18,23 40:1,5,8,9,10 49:4 58:4,6,15 67:25 104:9 106:12,17 128:16

**sessions** 8:20 40:11 49:5

**set** 10:21 39:10

**Setting** 94:15

**Shackelford** 124:21

**share** 57:23

**shared** 93:17 99:17 119:13

**shopped** 133:16

**short** 40:13

**shorter** 40:4,7

**shoulder** 24:21 121:10

**show** 23:3 54:6 55:22 56:9 63:2 68:21 98:15 120:8 139:22

**shows** 53:20 121:21

**sign** 27:15 76:24 82:4,6

**signature** 14:18,19 50:13 86:11

**signed** 11:16 15:24 23:11 42:1,6,18 43:25 44:5 48:7,12 49:12,19,23 50:17 79:25 86:7,13 90:10 119:14, 16

**signing** 44:14

**simply** 76:24

**sir** 72:11 74:11 86:5,9 89:6 119:8

**sit** 35:11 47:6 114:10

**sitting** 115:19

**skills** 120:18

**slightly** 87:2

**slow** 7:1 38:6

**so-called** 63:7

**Social** 7:21

**software** 133:23

**sold** 12:22 81:7

**some-odd** 12:21 63:12 80:16

**sort** 80:13 83:7 100:14 107:11 126:15

**sound** 75:11,19 93:11

**sounds** 45:9 76:20 131:5

**south** 12:15 108:18 122:3,22

**southern** 7:20 17:17,24

**space** 124:13

**Sparks** 62:10 109:18,19 113:16,17 114:13

**speak** 19:16 88:18

**speaking** 9:4

**special** 11:15 15:19 19:25 32:17 39:17,22 40:1,8,11 49:5

**specific** 32:16 35:12 137:18

**specifically** 27:19,23,24 49:6 75:12 90:5 124:17 125:19 135:21 137:13

**specious** 22:2 100:16 109:3,8

**spectrum** 68:8

**speculation** 123:10 125:6 127:13 129:22 130:25

**spin** 110:16

**spoke** 76:4 131:21

**spoken** 75:21,23 76:7,10

**sponsored** 45:4

**staff** 35:4,9 43:9,10 49:15,22 114:18 119:5,6,9,14 132:3,22 133:1,19,23

**staff's** 43:14

**staffer** 59:23 132:18

**stand** 81:10

**standpoint** 122:20 123:5,16

**staring** 61:16

**start** 74:24

**started** 108:8

**starts** 26:23 27:19

**state** 6:20 14:6 23:18 44:9,10 55:2, 15 56:20 60:25 70:8 76:13,22 77:10, 17 78:8 80:19 90:23 95:6 108:24

**state's** 81:25 134:3

**stated** 115:2

**statement** 38:23

**statements** 22:12

**States** 119:17

**Statesman** 59:8

**statistically** 73:16

**statistics** 66:16 73:12 133:25

**steel** 12:20 81:2,5

**step** 80:9

**stepping** 30:3

**stipulation** 115:20 138:25

**stop** 97:10

**strained** 101:2

**Street** 6:6

**strengthen** 19:3

**strike** 130:15

**stripped** 57:11

**structural** 12:20

**subdivisions** 28:3,23

**subject** 20:14 34:25 41:14 52:19 94:12,13 100:20

**subjects** 115:20

**submit** 26:15

**submitted** 14:9,16,21 25:19,20 26:10 35:22 42:21 133:11

**subpoena** 11:2 50:7 76:15,19,23 77:6,7,21 78:3 79:11 80:7

**subsequent** 8:19

**substance** 20:6,19 52:17 88:10 107:9 112:2,3 131:18

**substantial** 113:14 115:5

Senator Kel Seliger

January 19, 2022
Index: substantially..trending

**substantially** 103:10

**Substitute** 25:13

**successfully** 18:22

**suffered** 105:2

**suggested** 9:20 52:13 97:1

**suggesting** 29:17,21 97:4,10

**suggestion** 115:2

**suing** 11:5

**suit** 15:18

**summarily** 103:15

**summarizes** 107:19

**Summary** 55:4 56:22

**supplier** 81:5

**support** 28:12 101:6

**surmise** 19:10,14,15

**suspect** 109:23 114:19

**swear** 6:16

**Sweeten** 84:22

**swift** 102:7,8 103:19 107:16

**sworn** 7:9 8:6

**symbol** 36:13

**sympathy** 82:15

**system** 134:3

---

T

**table** 9:13 30:6

**takes** 67:20

**taking** 9:1 62:2,3

**talk** 8:24 15:5 46:11 53:18 69:2 84:2
    115:21 129:23 131:16 133:5

**talked** 47:13 49:18,21 82:5,15 85:1,
    5 94:13 117:16 125:18 128:14
    131:12

**talking** 21:14 32:15 38:6 44:13
    113:18

**talks** 47:25

**targeted** 73:2

**Tarrant** 48:3 94:5 99:9 114:25

**tax** 58:7,9

**Taylor** 124:17,18,20

**team** 59:16,25

**teamwork** 59:11

**tecum** 50:7

**telling** 20:18 85:1,23

**ten** 70:25

**tender** 74:15

**tension** 61:3

**term** 105:13 106:1

**terms** 11:20 73:12 82:1 93:13 97:22
    102:11,15 105:9 125:16,25 130:13
    137:17

**terrible** 65:8

**test** 92:20

**testified** 8:6 87:10 90:22,25 91:3
    115:18

**testify** 10:17 12:4 27:11 82:12 87:8
    98:22 112:2

**testifying** 95:20 116:6 118:23

**testimony** 11:25 44:3 76:11,20
    80:11 81:1,17,18,20 83:22 90:1
    92:13 94:9 98:25 108:3 114:1 115:7,
    13 116:16 118:16 119:21 138:24
    139:13

**Tex** 7:14

**Texans** 57:19

**Texas** 6:5,6,13 11:8,17,21 23:18,22
    36:13,18 37:4,21,25 44:10 45:4
    51:9,13 52:9,10 53:12 54:4 57:16,18
    60:15,19 62:13 63:5,9,25 64:19
    65:10,14 66:10,11 67:12,23 68:17
    70:3,6,8,20 80:16,17 94:5 108:24
    114:11 121:16 125:17 127:2

**text** 41:3

**thing** 9:7,12 32:15 80:13 103:9
    113:4 121:15

**things** 7:2 45:14 73:22 77:20 101:6,
    20 102:17 104:21 105:9 108:21
    123:23 125:18,22 134:1 137:16,17

**thinking** 62:5 74:7

**thinks** 70:22

**thought** 31:21 52:25 61:7 82:16
    85:16 100:6,16 108:13 113:24
    119:25 120:2 124:15 125:17,25

**thoughts** 82:11

**threshold** 104:3

**throat** 86:21 101:12

**time** 8:20 17:21,22 25:21 26:4 37:21,
    25 38:10,17 40:17,20 53:24 56:23
    58:21,24 63:22 69:15,21 71:8,11
    73:18,24 74:21,25 76:25 79:2,5
    80:18 92:4,18 98:12 104:23 108:19
    109:5 110:24 111:2 119:23 125:14
    127:6 134:25 135:3 136:24 137:2
    138:13,16,18 140:3

**timely** 37:4

**times** 25:18 97:2

**Tindall** 6:12

**titled** 52:11 59:10 63:24

**today** 7:7 8:15,23 9:4,9,16,25 11:18,
    20,25 12:7 27:11 43:8 44:3 47:6
    73:24 74:4,12 75:24 76:4,8,11,16
    77:10 78:4,11,19 81:19 82:2 84:17
    85:11,23 86:4 87:3 90:7 95:21 96:21
    97:9 100:20 101:5 115:13,19,21
    116:6 138:2,18,25 139:7

**today's** 6:3 140:2

**told** 15:19 17:4 19:5,8,18 38:14
    53:15 76:24 92:4 93:15 99:17
    105:12,21 107:23 112:3 113:25

**tomorrow** 41:18 45:1

**tool** 39:6

**top** 23:17 26:3 54:14 55:1,14 56:19
    64:11 66:8

**touched** 48:16

**tougher** 62:1

**toughest** 61:17

**town** 80:15

**transcript** 9:21

**transpired** 103:11

**treatment** 105:2,5

**tremendous** 108:14,20 129:13

**trending** 73:3,11,17

Senator Kel Seliger

January 19, 2022
Index: Trey..won

**Trey** 7:17

**trial** 11:1 138:24 139:10

**Tribune** 52:9,10 60:15 66:10 67:12

**trick** 77:5

**tricking** 121:14

**trouble** 42:8 57:22

**true** 19:20,22 23:9 29:8 30:25 48:10
59:9 60:17 63:23 69:6 76:16 79:8
84:8,18 86:8,18 87:8 91:1,13 93:10
100:6 102:10 135:7,16 139:20

**Trump** 60:20 62:9 70:10 114:7,9

**trust** 23:12

**truth** 85:1,23 103:2

**truthfully** 12:5

**truthfulness** 85:21

**Tuesday** 62:9

**turn** 72:4 73:24 74:16

**Twitter** 66:23

**two-thirds** 127:25 128:8 130:18

**type** 98:16

**types** 98:17

**typically** 98:15

―――――――――――――――――――

**U**

**U.S.** 37:12,24 38:9 67:18 88:4 92:11
118:15

**Uh-huh** 44:24

**ultimately** 11:14 48:7 79:20 80:10
90:9 91:11 99:8 111:25 129:17
139:14

**Um-hum** 16:5 21:16 57:13 60:1
71:18 97:24 99:12

**unaccompanied** 133:6

**underpopulated** 122:1,5,9,22,25
124:12 125:2

**understand** 10:3,5,6,16,20 11:4
12:1,3 13:3 22:1 31:20 32:11,14
36:22 41:21 46:18 75:7 77:25 84:4
90:22 93:22 96:11 97:25 102:15
131:1

**understanding** 11:10 37:15 39:4,8

66:17 81:13 98:2 116:1 137:21
139:11,16,21

**understood** 10:14 108:12 138:4

**United** 6:8 119:17

**university** 63:8 65:8,19,20 66:6,15,
18 67:9 68:15 70:19,22 95:4

**University's** 65:3

**unmistakable** 107:16

**untrue** 16:9,16,19,21 17:12,14
21:25 22:2,5,8,13,17 24:10 29:18
47:12 99:22 100:16 109:3 116:3,7

**Upton** 109:13

**Uribe** 7:8

―――――――――――――――――――

**V**

**Vaguely** 135:21

**verbally** 9:18 10:1

**Veronica** 7:18

**version** 79:25 119:13 120:15

**versus** 6:9 17:8 108:1,11 125:20

**vice** 32:22

**video** 6:6 8:25 80:11

**view** 101:9

**vindictive** 102:9

**violated** 118:15

**violation** 90:18

**visiting** 41:16

**voices** 9:3

**voluntarily** 76:17,25

**vote** 26:5,11,14,15,19 27:16 30:11
31:2,8,9,25 32:1 62:6 67:1 72:16
83:4 100:2 101:25 102:5 103:18
104:17 105:5 106:19 107:2,14
109:17 111:22 118:3 125:14 128:8
129:11,25 130:1,3,11

**voted** 26:16 51:6 56:6 66:25 67:2
103:12,13 104:6,8 116:11,18 126:6
128:15 130:4,12

**votes** 57:5 59:19 66:21 67:18,25
68:7,10,11 104:3,4 128:8,21 129:2

**voting** 31:13 32:2 63:8,11,13 90:18

92:11 93:21 94:1,4,18 95:10 97:23
98:2,14 99:3,9 102:11,20 103:24
105:18 106:2,21 112:5 118:15
126:18 130:1

**vouchers** 58:10

―――――――――――――――――――

**W**

**Waco** 41:19 45:1,2,19

**waiting** 81:10

**waive** 96:2,4 97:3,12

**waiving** 20:9 95:20 136:14 137:7

**walk** 87:5

**walking** 74:7

**wanted** 15:3,20,21 18:21 50:15
56:6,8 86:17 128:11,20 138:19,21

**Ward** 124:7

**Washington** 91:3

**watch** 80:11

**website** 36:18

**week** 10:21 81:11,14 139:14,20

**Weighing** 60:18

**Wendy** 73:14

**Wentworth** 93:1

**West** 6:5 31:4 34:16 53:12 54:3
72:6,13,20,25 92:24 114:11 125:17

**whatsoever** 125:10

**Wheeler** 109:10

**wheels** 110:16

**Whereabouts** 13:23

**Whitmire** 31:4 34:18

**wholly** 48:2 114:25

**Wichita** 104:7

**win** 61:22,24

**Winkler** 124:7

**withdraw** 129:18

**witnesses** 132:14

**Wolfson** 7:19,20

**won** 128:17

**Word** 79:24 119:3,13

**worded** 87:2

**words** 19:17 134:7

**work** 65:8 81:2 95:13,22 97:8,13
98:4 103:5,9,12 132:23 133:24,25
136:10,14 137:6

**worked** 13:18 36:22

**works** 43:12

**worry** 114:10

**Worth** 45:16 122:17

**wrap** 134:22

**write** 14:22,24 16:13 43:21 48:1

**wrong** 87:2

**wrote** 15:1,2,12,23 44:25 114:1

---
Y
---

**yards** 67:4

**year** 62:1 104:1,2

**years** 8:21 12:21,22 61:3 69:15
75:10,15 80:16,17 101:19 113:14
128:10

**Yeas** 26:5

**yesterday** 41:17

---
Z
---

**Zaffirini** 31:5 34:20 92:25

**zoom** 120:15 121:15

**zoomed** 121:11