**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § | |
| *Plaintiffs,* | § § | Case No. 3:21-cv-00259 |
| v. | § § | [Lead Case] |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § § | |
| FAIR MAPS TEXAS ACTION COMMITTEE, *et al.*, | § § § | |
| *Plaintiffs,* | § § | Case No. 1:21-cv-01038 |
| v. | § § | [Consolidated Case] |
| GREG ABBOTT, *et al.*, | § § § | |
| *Defendants.* | § | |

**DEFENDANTS' MOTION TO DISMISS FAIR MAPS' COMPLAINT**

# TABLE OF CONTENTS

Table of Contents ...................................................................................................................ii

Introduction .........................................................................................................................1

Standard ...............................................................................................................................1

Argument .............................................................................................................................2

    I.   The Court Does Not Have Jurisdiction to Hear Plaintiffs' Claims ............................2

        A.  The Entity Plaintiffs Lack Standing.................................................................2

        B.  The Individual Plaintiffs Lack Standing to Challenge Certain Districts.............7

    II.  Plaintiffs Have Not Plausibly Alleged a Discriminatory Effects Claim .....................8

        A.  The *Gingles* Test...........................................................................................9

        B.  Coalition Districts Fail the First *Gingles* Precondition...................................10

        C.  Plaintiffs Do Not Plausibly Allege That Black, Latino, and AAPI Voters in the Challenged Districts are Politically Cohesive .................................................15

        D.  Plaintiffs Do Not Allege Facts Supporting the Third *Gingles* Precondition ......16

        E.  Section 2 Does Not Give Plaintiffs a Private Cause of Action ..........................17

    III. Plaintiffs Have Not Alleged Facts Stating a Claim of Intentional Discrimination.................17

        A.  Lack of Discriminatory Effect Precludes Intentional-Discrimination Claims .................17

        B.  Plaintiffs Have Not Plausibly Alleged Discriminatory Intent............................18

    IV. Plaintiffs Do Not Allege Facts Supporting a Racial Gerrymandering Claim ...........21

Conclusion .........................................................................................................................23

Certificate of Service...........................................................................................................24

# Table of Authorities

**Page(s)**

## Cases

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) ..................................................................................................19

*Alabama Legislative Black Caucus v. Alabama,*
575 U.S. 254 (2015) ........................................................................................................6

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........................................................................................1, 2, 15, 17

*Assn. of Community Orgs. for Reform Now v. Fowler,*
178 F.3d 350 (5th Cir. 1999) ..........................................................................................7

*Bartlett v. Strickland,*
556 U.S. 1 (2009) ..................................................................................................*passim*

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) .........................................................................................1, 2, 15, 16

*Benavidez v. Irving Independent Sch. Dist.,*
690 F. Supp. 2d 451 (N.D. Tex. 2010) ...........................................................................9

*Bethune-Hill v. Virginia State Bd. of Elections,*
137 S. Ct. 788 (2017) ......................................................................................................6

*Brewer v. Ham,*
876 F.2d 448 (5th Cir. 1989) ........................................................................................16

*Campos v. City of Baytown,*
840 F.2d 1240 (5th Cir. 1988) .................................................................12, 13, 14, 16

*Campos v. City of Baytown,*
849 F.2d 943 (5th Cir. 1988) ................................................................................12, 14

*Campos v. City of Houston,*
113 F.3d 544 (5th Cir. 1997) ..........................................................................................8

*Center for Biological Diversity v. EPA,*
937 F.3d 533 (5th Cir. 2019) ..........................................................................................3

*Chisom v. Roemer,*
501 U.S. 380 (1991) ......................................................................................................18

*City of Mobile v. Bolden,*
   446 U.S. 55 (1980) .......................................................................................... 18, 19

*Conley v. Gibson,*
   355 U.S. 41 (1957) .................................................................................................. 1

*Dippin' Dots, Inc. v. Mosey,*
   602 F. Supp. 2d 777 (N.D. Tex. 2009) ............................................................... 14

*Disability Rights Wisconsin, Inc. v. Walworth County Bd. of Supervisors,*
   522 F.3d 796 (7th Cir. 2008) ................................................................................. 4

*Draper v. Healey,*
   827 F.3d 1 (1st Cir. 2017) ...................................................................................... 4

*Faculty, Alumni, & Students Opposed to Racial Preferences v. New York Univ.,*
   11 F.4th 68 (2d Cir. 2021) ..................................................................................... 6

*FW/PBS, Inc. v. City of Dallas,*
   493 U.S. 215 (1990) ............................................................................................... 2

*Gahagan v. U.S. Citizenship & Immig. Servs.,*
   911 F.3d 298 (5th Cir. 2018) ............................................................................... 13

*Galveston Open Govt. Project v. U.S. Dept. of Housing & Urban Development,*
   17 F. Supp. 3d 599 (S.D. Tex. 2014) .................................................................... 7

*Georgia Republican Party v. SEC,*
   888 F.3d 1198 (11th Cir. 2018) ............................................................................. 3

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) .................................................................................... 3, 4, 5

*Grove v. Emison,*
   507 U.S. 25 (1993) ............................................................................................. 9, 16

*Hall v. Virginia,*
   385 F.3d 421 (4th Cir. 2004) ............................................................................... 12

*Hancock County Bd. of Supervisors v. Ruhr,*
   487 F. Appx. 189 (5th Cir. 2012) .......................................................................... 6

*Harding v. Dallas County,*
   948 F.3d 302 (5th Cir. 2020) ...................................................................... 9, 10, 16

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ............................................................................................... 7

*Henderson v. Stalder,*
    287 F.3d 374 (5th Cir. 2002) ................................................................................. 6

*Johnson v. De Grandy,*
    512 U.S. 997 (1994) ........................................................................................... 12

*League of Women Voters of Michigan v. Johnson,*
    No. 2:17-cv-14148, 2018 WL 10483517 (E.D. Mich. May 16, 2018) ................. 5

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ......................................................................................... 2, 6

*LULAC v. Clements,*
    999 F.2d 831 (5th Cir. 1993) (en banc) ............................................................. 15

*LULAC v. Midland Independent Sch. Dist.,*
    812 F.2d 1494 (5th Cir.1987) ........................................................................... 12

*LULAC v. North East Independent Sch. Dist.,*
    903 F. Supp. 1071 (W.D. Tex. 1995) ............................................................... 17

*Marks v. United States,*
    430 U.S. 188 (1977) ......................................................................................... 10

*Miller v. Gammie,*
    335 F.3d 889 (9th Cir. 2003) (en banc) ...................................................... 13, 14

*NAACP v. City of Kyle,*
    626 F.3d 233 (5th Cir. 2010) .............................................................................. 3

*Natl. Treasury Employees Union v. United States,*
    101 F.3d 1423 (D.C. Cir. 1996) .......................................................................... 6

*Nixon v. Kent County,*
    76 F.3d 1381 (6th Cir. 1996) ............................................................................ 13

*Northeast Ohio Coal. for the Homeless v. Husted,*
    831 F.3d 686 (6th Cir. 2016) ............................................................................ 13

*Palmer v. Thompson,*
    403 U.S. 217 (1971) ......................................................................................... 17

*Perry v. Perez,*
    565 U.S. 388 (2012) ..................................................................................*passim*

*Rodriguez v. Harris County,*
    964 F. Supp. 2d 686 (S.D. Tex. 2013) ............................................................. 17

*Rollins v. Fort Bend Independent Sch. Dist.*,
    89 F.3d 1205 (5th Cir. 1996) ..................................................................................16

*Shaw v. Reno*,
    509 U.S. 630 (1993) ..............................................................................................17

*Simon v. Eastern Kentucky Welfare Rights Org.*,
    426 U.S. 26 (1976) ..................................................................................................7

*Sinkfield v. Kelley*,
    531 U.S. 28 (2000) (per curiam) ............................................................................5

*Spokeo, Inc. v. Robbins*,
    578 U.S. 330 (2016) ................................................................................................2

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................................................3

*Tenth St. Residential Assn. v. City of Dallas*,
    968 F.3d 492 (5th Cir. 2020) ..................................................................................2

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ................................................................................8, 9, 15, 16

*Troy v. Samson Manufacturing Corp.*,
    758 F.3d 1322 (Fed. Cir. 2014) ............................................................................13

*Turner v. Arkansas*,
    784 F. Supp. 553 (E.D. Ark. 1991), *aff'd*, 504 U.S. 952 (1992) ........................18

*United States v. Brown*,
    494 F. Supp. 2d 440 (S.D. Miss. 2007), *aff'd*, 561 F.3d 420 (5th Cir. 2009) ....................................14

*United States v. Hays*,
    515 U.S. 737 (1995) ................................................................................................5

*United States v. O'Brien*,
    391 U.S. 367 (1968) ..............................................................................................17

*Valdespino v. Alamo Heights Independent Sch. Dist.*,
    168 F.3d 848 (5th Cir. 1999) ....................................................................9, 11, 16

*White v. Estelle*,
    720 F.2d 415 (5th Cir. 1983) ................................................................................13

**Statutes**

52 U.S.C.
    § 10301 ..............................................................................................................9, 11

**Other Authorities**

*The Bluebook: A Uniform System of Citation* (21st ed. 2020) .........................................................................15

U.S. Census Bureau, *2020 Census Statistics* (Aug. 12, 2021),
   https://www.census.gov/newsroom/press-releases/2021/population-changes-
   nations-diversity.html ...........................................................................................................................19

## INTRODUCTION

Plaintiffs' claims are based largely on the erroneous theory that a State is legally required to draw opportunity districts for alleged coalitions of different minority communities. This theory is inconsistent with the plain text of the Voting Rights Act and contrary to Supreme Court precedent. The Court should reject it.

Plaintiffs' intentional-discrimination claims fail as well. Plaintiffs have not plausibly alleged any facts rebutting the strong presumption of good faith, let alone supporting an inference of intentional discrimination. To the contrary, these facts, if proven, would merely demonstrate two unremarkable things. First, that the Texas Legislature passed the new electoral maps under a compressed timeline due to the U.S. Census Bureau's delay in distributing the Census data. And second, that a partisan Legislature made decisions based on partisan preference.

Plaintiffs' complaint suffers from additional threshold deficiencies as well. The vast majority of the Entity Plaintiffs fail to identify injured members, and none identify a cognizable harm to the organization itself. Moreover, while this case includes several Individual Plaintiffs, Plaintiffs challenge several districts in which none of these individuals reside.

For these reasons, the Court should dismiss Plaintiffs' complaint.

## STANDARD

A complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

ARGUMENT

## I.   The Court Does Not Have Jurisdiction to Hear Plaintiffs' Claims

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). At the pleading stage, plaintiffs must "clearly . . . allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016) (quotation omitted). These are: (1) an actual or imminent, concrete and particularized injury-in-fact; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

### A.   The Entity Plaintiffs Lack Standing

Entities, like Fair Maps Texas Action Committee, OCA-Greater Houston, North Texas Chapter of the Asian Pacific Islander Americans Public Affairs Association ("NT-APAPA"), and Emgage (collectively, the "Entity Plaintiffs"), can establish an injury-in-fact under two theories, associational standing or organizational standing. *Tenth St. Residential Assn. v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020). The Entity Plaintiffs' allegations, however, support neither theory, and their claims should be dismissed.

#### 1.   The Entity Plaintiffs Lack Associational Standing

The Entity Plaintiffs have not plausibly alleged associational standing. Although "an association may have standing solely as the representative of its members," this doctrine "does not eliminate or attenuate the constitutional requirement of a case or controversy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Courts apply a three-part test to determine if a plaintiff has associational standing. An entity has associational standing when:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither

2

the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). The Entity Plaintiffs fail the first and third parts of this test.

There are four Entity Plaintiffs in this case. One of these Entity Plaintiffs—Fair Maps—is, in its own words, "a committee of seven nonpartisan organizations," which are League of Women Voters of Texas, Clean Elections Texas, Texans Against Gerrymandering ("TAG"), Our Vote Texas, American Civil Liberties Union of Texas, National Council of Jewish Women-Greater Dallas Section ("National Council"), and Common Cause Texas. ECF 1 ¶¶ 7–8. The complaint, however, identifies only one member of any of these entities; Plaintiff Angela Rainey is identified as member of League of Women Voters. *Id.* ¶ 19. Accordingly, the rest of the entities have failed to allege that specific members have been injured such they would independently have standing, as required by the first part of the three-part test. *See Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019). "Foremost among [the Article III standing] requirements is injury in fact." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018). With the exception of the League of Women Voters, each entity involved in this case has failed to "identify members who have suffered the requisite harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009); *see NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (requiring an injury to "a specific member").

Several entities fail to allege that they have members at all. *See* ECF 1 ¶¶ 8(b), 8(c), 8(d), 8(f) (failing to allege that Clean Elections, TAG, Our Vote, and National Council have members). The entities that do allege that they have members do so generally. *See id.* ¶¶ 8(e), 8(g), 11–14, 16 (ACLU, Common Cause, OCA, NT-APAPA, and Emgage allege they have members in certain Texas counties). These allegations do not satisfy the basic requirement to notify the Defendants of whom the new electoral maps allegedly harmed. When a complaint fails to identify specific members, associational-standing claims should be dismissed. *See, e.g.*, *Ga. Republican Party v. SEC*, 888 F.3d 1198,

1203 (11th Cir. 2018) (dismissing claim where the only member identified failed to allege that he was injured by the challenged regulation); *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2017) (Souter, J.) (dismissing claim of organization that did not specifically identify an injured member but "submitted an affidavit asserting that many of its members asked it to take legal action"); *Disability Rights Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008) (dismissing claim organization that did not allege that its standing was derived from any identified individual that had suffered the requisite harm).

Even if Plaintiffs had identified specific members of these entities, they did not allege facts demonstrating that those members have been injured. Plaintiffs' claims rely on a vote-dilution theory. ECF 1 ¶¶ 9, 13, 15, 17 (alleging that the challenged redistricting plans prevent them "from electing their candidates of choice"). Vote dilution, by definition, injures only those who vote; it "arises from the particular composition of the voter's own district, which causes his vote . . . to carry less weight than it would carry in another, hypothetical district." *Gill*, 138 S. Ct. at 1931.

Plaintiffs allege that unnamed members of these entities will be harmed because they are prevented "from electing their candidates of choice," ECF ¶¶ 9, 13, 15, 17, but they fail to include any allegation that members have voted, or intend to vote, in the coming elections. This requires dismissal. *See DiMaio v. Democratic Natl. Cmte.*, 520 F.3d 1299, 1302 (11th Cir. 2008) (per curiam) (holding that the "complaint undeniably fails the test for constitutional standing" where the plaintiff "never alleged he actually voted, nor even so much as suggested that he intended to vote in" the election at issue); *see also Yazzie v. Hobbs*, 977 F.3d 964, 967 (9th Cir. 2020) (per curiam) (dismissing for lack of standing because "any allegation or showing as to, at a bare minimum, whether any of the plaintiffs intend to vote in this general election" was "missing"); *Gallagher v. N.Y. State Bd. of Elections*, 496 F. Supp. 3d 842, 850 (S.D.N.Y. 2020) (plaintiffs lacked standing to challenge a vote-by-mail deadline when none alleged an intent to vote by mail).

Even if Plaintiffs had plausibly alleged that members of these entities intend to vote in the 2022 election, they would still lack standing because they do not specify where those members reside. Where, as here, "plaintiffs' alleged harm is the dilution of their votes, that injury is district specific." *Gill*, 138 S. Ct. at 1930. A plaintiff may assert a "right not to be placed in legislative districts deliberately designed to 'waste' their votes in elections where their chosen candidates will win in landslides (packing) or are destined to lose by closer margins (cracking)," but in either case, any injury to an individual voter "results from the boundaries of the particular district in which he resides." *Id.* Thus, any remedy "lies in the revision of the boundaries of the individual's own district." *Id.* Entities face the same restrictions. An entity plaintiff "may not step into the shoes of its members to bring a statewide claim because its members would lack standing as individual plaintiffs to challenge the apportionment plan on a statewide basis." *League of Women Voters of Mich. v. Johnson*, No. 2:17-cv-14148, 2018 WL 10483517, at *6 (E.D. Mich. May 16, 2018) (three-judge court). And a prohibited statewide challenge is exactly what the Entity Plaintiffs mount in Counts I and II. *See* ECF 1 ¶ 152 (alleging dilution of "the votes of Texans of color . . . throughout Texas); ¶ 156 (alleging "the intent to discriminate statewide against Texans of color").

This is in keeping with Supreme Court precedent restricting standing to bring related redistricting claims. In a "racial gerrymandering" case, for example, a voter does not have Article III standing to challenge a map "in its entirety." *United States v. Hays*, 515 U.S. 737, 746 (1995). Establishing "individualized harm" requires showing that the "plaintiff resides in a racially gerrymandered district." *Id.* at 744–45. A plaintiff who does not live in such a district does not have standing unless there is some other basis for concluding "that the plaintiff has personally been subjected to a racial classification." *Id.* at 745; *see also Sinkfield v. Kelley*, 531 U.S. 28, 30 (2000) (per curiam). "A racial gerrymandering claim" must proceed "district-by-district," and courts do not analyze the State "as an

undifferentiated 'whole.'" *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015); *accord Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 800 (2017).[1]

The Entity Plaintiffs disregard this. They purport to challenge many districts for the House, Senate, and Congressional elections. *See* ECF 1 ¶¶ 87–109 (House); *id.* ¶¶ 114–27 (Senate); *id.* ¶¶ 131–42 (Congressional). But they do not adequately allege that they have members who reside in and intend to vote in most of those districts. Of the identified districts, the Entity Plaintiffs have identified only one member of only one entity (League of Women Voters), which is a constituent of Fair Maps, that resides in and intends to vote in any of the identified districts—Plaintiff Angela Rainey, who allegedly resides in Senate District 10. *Id.* ¶ 19. Accordingly, all of the Entity Plaintiffs lack associational standing except for Fair Maps, based on its constituent, solely in relation its claims relating to Senate District 10.

### 2. The Entity Plaintiffs Lack Organizational Standing

The Entity Plaintiffs also lacks organizational standing, by which a plaintiff organization brings suit "on its own behalf." *Henderson v. Stalder*, 287 F.3d 374, 381 (5th Cir. 2002). The Entity Plaintiffs do not contend that they are "the object of the government action or inaction [they] challenge[]," so their standing is "substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (quotation omitted).

The Entity Plaintiffs' allegations that "redistricting in Texas frustrates and impedes" their "core mission" is insufficient to establish organizational standing. *See* ECF 1 ¶¶ 9, 13, 15, 17. "Frustration of an organization's objectives 'is the type of abstract concern that does not impart standing." *Natl. Treas. Emps. Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (quoting *Natl.*

---

[1]   An unpublished Fifth Circuit opinion once noted that the panel was "aware of no precedent holding that an association must set forth the name of a particular member in its complaint," *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x. 189, 198 (5th Cir. 2012), but the precedent cited above holds exactly that. Even if the Entity Plaintiffs did not have to "name names," they would at least have to include "more specific" allegations "identifying members who have suffered the requisite harm." *Faculty, Alumni, & Students Opposed to Racial Preferences v. New York Univ.*, 11 F.4th 68, 75–76 (2d Cir. 2021).

*Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)). Rather, there must be "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitut[ing] far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). No matter how laudable an organization's goal, it cannot establish "standing simply on the basis of that goal." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). Thus, "a showing that an organization's mission is in direct conflict with a defendant's conduct is insufficient, in and of itself, to confer standing on the organization to sue on its own behalf." *Assn. of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 361 n.7 (5th Cir. 1999).

The Entity Plaintiffs do not state "how the allegedly discriminatory . . . practice is going to impair [their] activities." *Galveston Open Govt. Project v. U.S. Dept. of Hous. & Urban Dev.*, 17 F. Supp. 3d 599, 613 (S.D. Tex. 2014) (Costa, J.). Indeed, a redistricting map cannot impair the Entity Plaintiffs' activities. Each of the Entity Plaintiffs remain free to conduct the various activities that they allege to be the purpose of the particular organization. *See* ECF 1 ¶¶ 7–8, 11–12, 14, 16.

## B. The Individual Plaintiffs Lack Standing to Challenge Certain Districts

Plaintiffs seek to "prevent the implementation of 2021 redistricting plans for the Texas State House, State Senate, and Congressional districts." *Id.* ¶ 4. The Individual Plaintiffs' claims of statewide harm fail to satisfy Article III. Where, as here, the "plaintiffs' alleged harm is the dilution of their votes, that injury is district specific." *Gill*, 138 S. Ct. at 1930. Because any injury to a plaintiff "results from the boundaries of the particular district in which he resides," any remedy "lies in the revision of the boundaries of the individual's own district." *Id.*[2] As discussed above, this is consistent with

---

[2] The Entity Plaintiffs face the same restrictions. An entity "may not step into the shoes of its members to bring a statewide claim because its members would lack standing as individual plaintiffs to challenge the apportionment plan on a statewide basis." *League of Women Voters*, 2018 WL 10483517, at *6.

Supreme Court precedent. *See Hays*, 515 U.S. at 744–46; *Sinkfield*, 531 U.S. at 30; *Ala. Legislative Black Caucus*, 575 U.S. at 262; *Bethune-Hill*, 137 S. Ct. at 800. Moreover, it is consistent with this Court's dismissal of certain claims asserted by the *Brooks* Plaintiffs, which emphasized the importance of residence within the challenged district. *See* ECF 119 at 3–6 (citing *Hays*, 515 U.S. at 745 (holding that plaintiffs lacked standing where they did not live in the district)).

Plaintiffs allege that Individual Plaintiffs reside, or will reside, in the following districts: (a) house districts 26, 28, 54, 55, 67, 70, 85, 95, 97, 135, 137, 145, 148; (b) senate districts 6, 7, 8, 10, 13, 17, 18, 24; and (c) congressional districts 3, 7, 8, 12, 22, 25, 29, 31. The Plaintiffs' complaint identifies several districts: (a) house districts 26, 28, 33, 54, 55, 61, 66, 67, 70, 89; (b) senate districts 10, 13, 17, 18, 22; and (c) congressional districts 3, 4, 6, 7, 9, 22, 26, 29, 30, 33. ECF 1 ¶¶ 90–93, 96– 98, 106–07, 115–17, 120–22, 124, 132–34, 136, 138–39, 141. However, no Plaintiffs allege that they reside, or will reside, in (a) house districts 33, 61, 66, 89; (b) senate district 22; or (c) congressional districts 4, 6, 9, 26, 30, and 33. *See id.* ¶¶ 18–30. Plaintiffs therefore have no standing to challenge those districts, and the claims regarding those districts should be dismissed.

## II.    Plaintiffs Have Not Plausibly Alleged a Discriminatory Effects Claim

Plaintiffs allege that State Defendants violated the Voting Rights Act based on their belief that Section 2 requires the Texas Legislature to draw opportunity districts for "coalitions of minority voters." ECF 1 ¶¶ 152–53; *see also, e.g., id.* ¶¶ 90, 101, 109, 117, 121, 126, 135, 140 (alleging the existence of coalition districts). But the VRA imposes no such requirement: A coalition district, by definition, does not feature a single "minority group" that "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). Nor have Plaintiffs plausibly alleged that black, Latino, and AAPI voters are "politically cohesive." *Gingles*, 478 U.S. at 51. "Failure to establish any one of these threshold requirements is fatal." *Campos v. City of Houston*, 113 F.3d 544, 547 (5th Cir. 1997). Because transforming districts as drawn into coalition

districts fails under at least two of the three *Gingles* preconditions, Plaintiffs' vote-dilution claim should be dismissed. And because Plaintiffs fail to allege facts supporting the other *Gingles* factors, that claim should be dismissed nonetheless.

### A. The *Gingles* Test

Section 2 of the VRA prohibits a "standard, practice, or procedure" from being "imposed or applied . . . in a manner which results in a denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a). To establish a violation, a plaintiff must show that:

> [T]he political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 10301(b). A court can consider "[t]he extent to which members of a protected class have been elected to office in the State," but "nothing in [Section 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.* A plaintiff bringing such a suit must establish three "necessary preconditions":

> (1) The minority group must be able to demonstrate it is sufficiently large and geographically compact to constitute a majority in a single-member district;

> (2) The minority group must be able to show that it is politically cohesive; and

> (3) The minority [group] must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 50–51; *see Growe v. Emison*, 507 U.S. 25, 39–41 (1993) ("*Gingles* preconditions" are required in "a § 2 dilution challenge to a single-member districting scheme").

The *Gingles* preconditions are "a bright line test." *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852 (5th Cir. 1999); *accord Benavidez v. Irving Indep. Sch. Dist.*, 690 F. Supp. 2d 451, 456 (N.D. Tex. 2010). "Failure to establish any one of these threshold requirements is fatal." *Harding v.*

*Dallas Cnty.,* 948 F.3d 302, 308 (5th Cir. 2020) (quotation omitted). Meeting "the three prongs of *Gingles*" is not sufficient: to prevail, a plaintiff that does so must then "establish that the 'totality of the circumstances' supports a finding of vote dilution." *Id.* at 308–09.

### B. Coalition Districts Fail the First *Gingles* Precondition

Plaintiffs' coalition-district theory cannot satisfy the first precondition because no single racial or language group constitutes a majority of any of the proposed coalition districts.

Plaintiffs do not allege that any minority group *standing alone* could "constitute a majority in a single-member district," *Gingles*, 478 U.S. at 50, with only a few exceptions. *See* ECF 1 ¶¶ 90, 101, 108, 117, 121–22, 126, 135, 140 (relying on coalitions of black, Latino, and AAPI voters); *but see id.* ¶¶ 136, 140 (asserting that Latino majority districts were possible). The Court faces a pure question of law: Can a plaintiff satisfy the first *Gingles* precondition where no single group can form a majority in the proposed single-member district?

The answer is no. The Supreme Court has never found a violation of Section 2 based on a State's decision not to draw a coalition district when no single minority group would constitute a majority in the proposed district. In fact, in *Bartlett v. Strickland*, the Supreme Court rejected crossover districts (districts in which a subset of white voters join with a minority group to form an electoral majority). 556 U.S. 1, 13 (2009) (plurality).[3] And in *Perry v. Perez*, the Court made clear that *Bartlett*'s reasoning applied to coalition districts as well. 565 U.S. 388, 399 (2012).

---

[3]   *Bartlett* was decided by a 5-4 vote. The five votes to reverse comprised a three-justice plurality (Justice Kennedy, joined by Chief Justice Roberts and Justice Alito) and a two-justice concurrence (Justice Thomas, joined by Justice Scalia). The concurrence would have reversed on the basis that Section 2 "does not authorize any vote dilution claim" and therefore would have refused to apply the *Gingles* framework. 556 U.S. at 26 (Thomas, J., concurring). Because the plurality states the narrowest ground on which the judgment was reached, it is the controlling opinion. *See Marks v. United States*, 430 U.S. 188, 193–94 (1977).

### 1.   Supreme Court Precedent Forecloses Requiring Coalition Districts

To plead the first *Gingles* precondition, Plaintiffs must plausibly allege "that their minority group exceeds 50% of the relevant population in the demonstration district." *Valdespino*, 168 F.3d at 852–53; *see also Bartlett*, 556 U.S. at 13 (a district may be required where "a minority group composes a numerical, working majority of the voting-age population"). Because of this requirement, the Supreme Court has refused to require either "influence districts, in which a minority group can influence the outcome of an election even if its preferred candidate cannot be elected," or crossover districts, in which "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Bartlett*, 556 U.S. at 13. For similar reasons, Section 2 does not mandate the creation of coalition districts.

*Bartlett*'s reasoning rejecting crossover districts applies with equal force to coalition districts. A violation of the VRA occurs when "members of a class of citizens protected" by Section 2 "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). But coalition districts are, by definition, those "in which two minority groups form a coalition to elect the candidate of the coalition's choice." *Bartlett*, 556 U.S. at 13. As the Court explained, "[t]here is a difference between a racial minority group's 'own choice' and the choice made by a coalition." *Id.* at 15. Plaintiffs' claims based on coalition districts are thus "contrary to the mandate of § 2." *Id.* at 14.

Indeed, the Court specifically recognized that "[n]othing in § 2 grants special protection to a minority group's right to form political coalitions." *Id.* at 15. When a minority group does not constitute a numerical majority in the proposed district, members of that group merely possess "the opportunity to join other voters—including other racial minorities, or whites, or both—to reach a majority and elect their preferred candidate." *Id.* at 14. Recognition of a Section 2 claim where minority

group members cannot elect their preferred candidate "based on their own votes and without assistance from others" would impermissibly "grant minority voters 'a right to preserve their strength for the purposes of forging an advantageous political alliance.'" *Id.* at 14–15 (quoting *Hall v. Virginia*, 385 F.3d 421, 431 (4th Cir. 2004)). The VRA contains no such right, as "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground." *Id.* at 15 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994)).

### 2.   Contrary Fifth Circuit Precedent Was Wrong and Has Been Overruled

*Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988), does not require otherwise. That case's flawed reasoning is inconsistent with, and has been overruled by, the Supreme Court in its later decisions in *Bartlett* and *Perez*.

The flaws inherent in *Campos* were recognized from the outset, including in Judge Higginbotham's dissent from the denial of rehearing en banc, which five of his colleagues joined. The *Campos* panel held that if a combination of black and Latino voters "are of such numbers residing geographically so as to constitute a majority in a single member district, they cross the *Gingles* threshold as potentially disadvantaged voters." 840 F.2d at 1244. Judge Higginbotham, however, recognized that *Campos*'s assumption "that a group composed of both [black and Hispanic] minorities is itself a protected minority" to be "an unwarranted extension of congressional intent." *Campos v. City of Baytown*, 849 F.2d 943, 945 (5th Cir. 1988) (Higginbotham, J., dissenting from denial of rehg. en banc). Coalition groups are outside the *Gingles* framework because that case's "three step inquiry assumes a group unified by race or national origin and asks if it is cohesive in its voting." *Id.* (quoting *LULAC v. Midland Indep. Sch. Dist.*, 812 F.2d 1494, 1504 (5th Cir. 1987) (Higginbotham, J., dissenting)). Channeling the reasoning that would later animate the Supreme Court in *Bartlett*, Judge Higginbotham observed that "[a] group tied by overlapping political agendas but not tied by the same statutory disability is no more than a political alliance or coalition." *Id.*

Nor were Judge Higginbotham and his five colleagues the only ones to see how *Campos* contradicted *Gingles* and Section 2. Nearly a decade later, the Sixth Circuit announced that it "share[d] the concerns articulated by Judge Higginbotham in his dissent from the denial of rehearing." *Nixon v. Kent County*, 76 F.3d 1381, 1388 (6th Cir. 1996). Among those concerns were that coalition districts would "effectively eliminate" the first *Gingles* requirement. *Id.* at 1391. That requirement "necessarily recognizes that, in some cases, a minority will not be numerous enough to prove a violation of the Voting Rights Act because it fails to constitute a majority in a single member district." *Id.* (cleaned up). Coalition districts would present an exception to the first *Gingles* requirement that would swallow the rule. The Sixth Circuit thus rejected this misreading, holding that "[t]he language of the Voting Rights Act does not support a conclusion that coalition suits are part of Congress' remedial purpose and, as previously discussed, there are compelling reasons to believe that they are not." *Id.* at 1393.

Since then, *Campos* has been overruled. Even when a Fifth Circuit opinion is "squarely on point," it does not bind lower courts after "intervening and overriding Supreme Court decisions." *White v. Estelle*, 720 F.2d 415, 417 (5th Cir. 1983). In analyzing whether a later Supreme Court decision abrogated an earlier Fifth Circuit decision, "[t]he overriding consideration is the similarity of the issues decided." *Gahagan v. U.S. Citizenship & Immig. Servs.*, 911 F.3d 298, 303 (5th Cir. 2018). As a result, "intervening Supreme Court authority need not be precisely on point, if the legal reasoning is directly applicable." *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 720–21 (6th Cir. 2016); *see also Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014) ("issues decided by the higher court need not be identical to be controlling"). It is sufficient that the Supreme Court has "undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). "[A] district court or a three-judge panel is free to reexamine the holding of a prior panel in light of an inconsistent decision

by a court of last resort on a closely related, but not identical issue." *Dippin' Dots, Inc. v. Mosey*, 602 F. Supp. 2d 777, 785 n.3 (N.D. Tex. 2009) (quoting *Miller v. Gammie*, 335 F.3d at 899).

As discussed in detail in Argument § II.B.1, *Bartlett*'s treatment of crossover districts applies with equal force to coalition districts. It explains in detail why Section 2 protects individual racial and language minority groups and does not protect political coalitions between groups. *See Bartlett*, 556 U.S. at 13–15. By contrast, *Campos* "cites no authority and offers no reasoning to support its fiat." *Campos*, 849 F.2d at 945 (Higginbotham, J., dissenting from denial of rehg. en banc).

The reasoning in *Campos* was limited to the truism that Section 2 "protects the right to vote of both racial and language minorities." 840 F.2d at 1244. But no one doubts that "Section 2 broadly protects the voting rights of all voters, even those who are white." *United States v. Brown*, 494 F. Supp. 2d 440, 446 (S.D. Miss. 2007), *aff'd*, 561 F.3d 420 (5th Cir. 2009). The actual question in *Campos* was "whether Congress intended to extend [voting-rights] protection to a group consisting of two distinct minority groups." *Campos*, 849 F.2d at 945 (Higginbotham, J., dissenting from denial of rehg. en banc). That Congress did not so intend is the very holding of *Bartlett*, which rejected crossover districts that rely on white voters to form an electoral majority. 556 U.S. at 14.

The Supreme Court dispelled any post-*Bartlett* doubt it in *Perry v. Perez*. There, the Court rejected a proposed coalition district, holding:

> The [district] court's order suggests that it may have intentionally drawn District 33 as a "minority coalition opportunity district" in which the court expected two different minority groups to band together to form an electoral majority. . . . If the District Court did set out to create a minority coalition district, rather than drawing a district that simply reflected population growth, it had no basis for doing so. *Cf. Bartlett v. Strickland*, 556 U.S. 1, 13–15 (2009) (plurality opinion).

565 U.S. at 399. Because it was "unclear whether the District Court . . . followed the appropriate standards in drawing interim maps," the Supreme Court vacated the district court's ruling. *Id.*

14

The Supreme Court recognized that the coalition-district issue in *Perez* was not identical to the crossover-district issue in *Bartlett*. That is why it employed a "*cf.*" signal, which means "compare" and is used when the "[c]ited authority supports a proposition different from the main proposition but sufficiently analogous to lend support." *The Bluebook: A Uniform System of Citation* rule 1.2(a) (21st ed. 2020). At the same time, the Supreme Court thought that the issues were sufficiently analogous that there was no need for extensive discussion; citing the portion of *Bartlett* discussed above was sufficient.

*     *     *

Most of Plaintiffs' discriminatory-effects claims depend on their underlying assumption that Section 2 can require a jurisdiction to draw coalition districts. That assumption is false: A plaintiff who proposes a coalition district has necessarily failed to plausibly allege that "the minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. Those claims should, therefore, be dismissed.

## C. Plaintiffs Do Not Plausibly Allege That Black, Latino, and AAPI Voters in the Challenged Districts are Politically Cohesive

Even if Plaintiffs could satisfy the first *Gingles* precondition, they still fail the second: "[T]he minority group must be able to show that it is politically cohesive." 478 U.S. at 51. Plaintiffs allege no facts to establish this requirement.

First, each of their allegations as to the cohesiveness of black, Latino, and AAPI voters is nothing more than a "formulaic recitation" of the second *Gingles* element. *Twombly*, 550 U.S. at 555; *see* ECF 1 ¶¶ 3, 90, 102, 108, 117, 126, 145. Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Second, Plaintiffs do not even attempt to allege facts to overcome the "obvious alternative explanation" for these voting patterns: partisanship. *Twombly*, 550 U.S. at 567. It is Plaintiffs' burden to plausibly allege that "race," not "partisan affiliation," "best explains" any alleged bloc voting. *LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc). By neglecting to even mention

partisanship as an explanation, much less address the extent to which it accounts for bloc voting behavior, they have failed to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Plaintiffs' allegations would not suffice in any Section 2 case, but they are particularly deficient here because Plaintiffs propose coalition districts. Before rejecting such districts altogether in *Bartlett* and *Perry v. Perez*, the Supreme Court considered how the second *Gingles* precondition would apply to coalition districts. "Assuming (without deciding) that it was permissible for [a] District Court to combine distinct ethnic and language minority groups for purposes of assessing compliance with § 2," the Court found that "there was quite obviously a higher-than-usual need for the second of the *Gingles* showings." *Growe*, 507 U.S. at 41. For "when dilution of the power of such an agglomerated political bloc is the basis for an alleged violation, proof of minority political cohesion is all the more essential." *Id.* Accordingly, even when *Campos* erroneously required it to assume that coalition districts could satisfy the first *Gingles* precondition, the Fifth Circuit did not hesitate to reject coalition-district cases based on the plaintiff's failure to meet the second *Gingles* precondition. *See, e.g.*, *Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1205, 1216 n.21 (5th Cir. 1996) (statistical evidence did not establish cohesion and "[n]o concrete, reliable, or credible evidence was presented at trial that Hispanic and African-American communities work together to accomplish common goals"); *Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989) (affirming dismissal due to "lack of statistical evidence of inter-minority political cohesion").

### D. Plaintiffs Do Not Allege Facts Supporting the Third *Gingles* Precondition

In addition, Plaintiffs do not allege facts supporting the final *Gingles* precondition, namely, "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51. Satisfying this requirement is a "bright-line test," *Valdespino*, 168 F.3d at 852, and Plaintiffs' failure to satisfy it "is fatal." *Harding*, 948 F.3d at 308.

Rather than plausibly allege facts, Plaintiffs simply assert this precondition is met: "White voters usually vote as a bloc to defeat those candidates." ECF 1 ¶ 90; *see also id.* ¶¶ 3, 102, 108, 117, 126, 144. That is not an allegation. It is a "[t]hreadbare recital[]  of the elements of a cause of action" and does "not suffice." *Iqbal*, 556 U.S. at 678.

### E.  Section 2 Does Not Give Plaintiffs a Private Cause of Action

Finally, Plaintiffs' Section 2 claims must be dismissed because Section 2 does not create a private right of action. Defendants will not burden the Court with further briefing on an issue it has already decided, *see* ECF 58, but they respectfully disagree with that ruling and raise this argument to preserve it for further review.

### III.  Plaintiffs Have Not Alleged Facts Stating a Claim of Intentional Discrimination

### A.  Lack of Discriminatory Effect Precludes Intentional-Discrimination Claims

Even if Plaintiffs had plausibly alleged discriminatory intent—which they did not; *see* Argument § III.B—that would not be enough. As explained in Argument § II, Plaintiffs have not plausibly alleged a discriminatory effect, which is a necessary element of an intentional-discrimination claim. This follows from "a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). "[N]o case in [the Supreme] Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Courts routinely require discriminatory effect in intentional-discrimination redistricting cases. *See, e.g.*, *Shaw v. Reno*, 509 U.S. 630, 641 (1993) ("a discriminatory purpose and have the effect of diluting minority voting strength"); *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 800 (S.D. Tex. 2013) ("purpose and operative effect"); *LULAC v. N.E. Indep. Sch. Dist.*, 903 F. Supp. 1071, 1093 (W.D. Tex. 1995) ("intentional discrimination" and "a resultant discriminatory effect").

The same is true under Section 2. "[T]he statute proscribes intentional discrimination only if it has a discriminatory effect, but proscribes practices with discriminatory effect whether or not intentional." *Chisom v. Roemer*, 501 U.S. 380, 406 (1991) (Scalia, J., dissenting); *accord Turner v. Arkansas*, 784 F. Supp. 553, 565 (E.D. Ark. 1991), *aff'd*, 504 U.S. 952 (1992).

## B. Plaintiffs Have Not Plausibly Alleged Discriminatory Intent

Plaintiffs have not alleged facts that would allow the Court to infer a discriminatory purpose. In redistricting cases, "the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). It is "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). The required intent is not mere "volition" or "awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). It requires that the Legislature have passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

Plaintiffs largely rely on bare assertions that the Texas Legislature acted with discriminatory intent without factual support. *See, e.g.*, ECF 1 ¶¶ 1, 2, 83, 85, 90, 108, 112, 152, 156. These "bare assertions . . . amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Iqbal*, 556 U.S. at 681. "As such, the allegations are conclusory and not entitled to be assumed true," even at the pleading stage." *Id.*

Where they do make factual allegations, those allegations are insufficient. First, Plaintiffs attempt to rely on historical events to support an inference that the Texas Legislature acted with discriminatory intent in passing the present maps. *See, e.g.*, ECF 1 ¶¶ 1–3, 42–43, 48–50, 52, 125. However, the Supreme Court has recently reiterated that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Perez*, 138 S. Ct. at 2324 (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality op.)). The "ultimate question remains

whether a discriminatory intent has been proven *in a given case.*" *Mobile*, 446 U.S. at 74 (emphasis added). Plaintiffs' historical allegations do not raise an inference of discriminatory intent here.

Second, Plaintiffs allege that "[t]he legislative process . . . reflected explicit and implicit racial discrimination." ECF 1 ¶ 53. For example, they allege that "[t]he Legislature routinely departed from normal procedures." *See, e.g.*, *id.* ¶ 61; *see also, e.g.*, *id.* ¶¶ 58, 62. Although "[d]epartures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role" in government decisionmaking, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977), they raise no inference of "invidious discrimination" when there is an "obvious alternative explanation." *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567). Here, Plaintiffs complain that the process was too rushed. *See, e.g.*, ECF 1 ¶¶ 58–62. But the complaint itself offers a ready explanation for the complained-of exigencies: The federal census was delayed due to the pandemic, and, therefore, the results were not delivered until more than ten weeks after the Texas Legislature's 87th Regular Session ended.[4] *See id.* ¶ 34. That was more than four months after the statutory deadline of April 1. *See* 13 U.S.C. § 141(a), (c). As a result, the Texas Legislature had to redistrict during a special session, which is constitutionally limited to thirty days. *See* Tex. Const. art. III, § 40. With a compressed schedule due to pandemic-related delays, an allegedly rushed process would hardly be surprising, much less give a reason to infer intentional invidious discrimination. In *Perez v. Abbott*, the Supreme Court could "not see how the brevity of the legislative process can give rise to an inference of bad faith." 138 S. Ct. at 2328–29. The evidence there was insufficient; the allegations here are even weaker.

Third, Plaintiffs claim to have identified "legal and substantive errors" in the legislative process. *See* ECF 1 ¶ 63. None of Plaintiffs' allegations rebut the presumption of legislative good faith,

---

[4]   The 87th Regular Session ended on May 31, 2021. The Census Bureau delivered redistricting data to the States on August 12, 2021. *See* U.S. Census Bur., *2020 Census Statistics* (Aug. 12, 2021), https://www.census.gov/newsroom/press-releases/2021/population-changes-nations-diversity.html.

let alone affirmatively suggest discriminatory intent. Plaintiffs complain that, in responding to questions posed during a hearing, a single senator described the maps as drawn blind to race and a single representative looked at voting age population rather than citizen voting age population. *Id.* ¶¶ 64–66. Plaintiffs' theory seems to be that those two statements are substantive departures because the VRA requires consideration of race and CVAP. That fundamentally misunderstands the potential relevance of substantive departures to a discriminatory-intent analysis.

As an initial matter, saying that a decisionmaker was blind to race cannot be evidence that the decisionmaker acted "'because of,' not merely 'in spite of,'" race. *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Moreover, even if Plaintiffs were right that two lawmakers misunderstood a federal statute, that would not support an inference of invidious discrimination. Substantive departures—doing something a decisionmaker would not normally do—are potentially relevant because they can reveal a hidden motive. But Plaintiffs do not allege any departure from previous practice for the two lawmakers in question. Plaintiffs cannot bootstrap what they claim is confusion about the VRA into an intentional-discrimination claim.

Third, Plaintiffs allege that "warnings of racially discriminatory intention and effect were set aside and discarded." ECF 1 ¶ 58; *see also id.* ¶¶ 64, 134. Of course, legislators are not obligated to credit the opinions of a bill's opponents. As the Supreme Court has recognized, a bill's "legislative opponents," "[i]n their zeal to defeat a bill," "understandably tend to overstate its reach." *NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 66 (1964). In any event, alleged "awareness of consequences" does not establish discriminatory intent. *Feeney*, 442 U.S. at 279. Mere awareness is "consistent with" invidious intent, but it is "just as much in line with" other motives. *Twombly*, 550 U.S. at 554. Because Plaintiffs' factual allegations are equally consistent with the Legislature acting "in spite of" rather than "because of" the alleged racial consequences of the redistricting maps, they have not plausibly alleged invidious discrimination. *Feeney*, 442 U.S. at 279; *see*

*Twombly*, 550 U.S. at 557 (explaining "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with)" a legal violation).

In the redistricting context, mere awareness of racial consequences—assuming this has even been plausibly alleged—is especially insufficient. "[E]vidence tending to show that the legislature was aware of the racial composition of" a district "is inadequate to establish injury in fact," much less a violation on the merits. *Hays*, 515 U.S. at 745–46. "[T]he legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination." *Shaw*, 509 U.S. at 646. Here, Plaintiffs have not alleged any facts suggesting invidious racial discrimination.

## IV.   Plaintiffs Do Not Allege Facts Supporting a Racial Gerrymandering Claim

"A racial gerrymandering claim is 'analytically distinct' from an intentional vote dilution claim." *Harding v. Dallas Cnty.*, 948 F.3d 302, 312 (5th Cir. 2020) (quoting *Shaw*, 509 U.S. at 652). It seeks to establish that "that race was improperly used in the drawing of the boundaries of one or more specific electoral districts." *Ala. Legislative Black Caucus*, 575 U.S. at 263. For a defendant to be liable on this basis, "race must have been 'the predominant factor motivating' the redistricting process and 'subordinat[ing] traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests[.]'" *Harding*, 948 F.3d at 313 (quoting *Miller*, 515 U.S. at 911.)

As with an intentional vote-dilution claim, the awareness and use of racial demographics and statistics do not by themselves show discriminatory purpose. *See Miller*, 515 U.S. at 916 ("Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process."). Instead, as before, the plaintiff is required to demonstrate that the Legislature, in designing the particular district at issue, "selected or reaffirmed a

particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group." *Id.* (quoting *Feeney*, 442 U.S. at 279).

For the same reasons that Plaintiffs failed to allege facts plausibly suggesting that the Texas Legislature drew the new maps with an intent to discriminate based on race, they have not alleged facts plausibly suggesting that race was the Texas Legislature's predominant concern in drawing the new maps. Plaintiffs' only allegations on this point are bare recitations that (a) "race was the predominant factor in the cracking of the AAPI community in Collin County in Plans H2316 and C2193 and in Fort Bend County in Plan H2316"; (b) "[r]ace was also the predominant factor in cracking of minority communities in Tarrant County in Plan S2168, particularly in Senate Districts 10 and 22"; and (c) "[t]he Texas Legislature violated traditional redistricting principles . . . and subordinated these principles to racial considerations." ECF 1 ¶ 160. That is not enough to overcome the presumption of legislative good faith. This is simply a "formulaic recitation of the elements" of a racial gerrymandering claim with no facts pled in support. *Iqbal*, 556 U.S. at 681.

None of Plaintiffs' factual allegations support discriminatory intent in drawing the boundaries of the districts Plaintiffs challenge. Plaintiffs make no attempt to allege facts within their complaint that support the conclusion that any legislator "improperly used [racial data] in the drawing of the boundaries of" these districts. *Ala. Legislative Black Caucus*, 575 U.S. at 262–63. None of Plaintiffs' allegations plausibly raises an inference of discrimination because Plaintiffs fail to rebut the "obvious alternative explanation" that the Legislature acted in partisan interest. *See Twombly*, 550 U.S. at 567. At the very least, denying amendments offered by the opposing party is equally consistent with partisan intent, but "partisan motives are not the same as racial motives." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021). It is improper to "infer . . . purposeful, invidious discrimination" in the face of likely alternatives. *See Iqbal*, 556 U.S. at 682.

## CONCLUSION

Defendants respectfully request that the Court dismiss Plaintiffs' claims.

Date: February 4, 2022

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

/s/ Patrick K. Sweeten

PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Tex. State Bar No. 00798537

BRENT WEBSTER
First Assistant Attorney General

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on February 4, 2022, and that all counsel of record were served by CM/ECF.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN