UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN | § | 3:21-CV-00259-DCG-JES-JVB |
| AMERICAN CITIZENS, ET AL | § | |
| | § | |
| V. | § | 2:01 P.M. TO 5:43 P.M. |
| | § | |
| GREG ABBOTT, IN HIS | § | |
| OFFICIAL CAPACITY AS | § | |
| GOVERNOR OF THE STATE OF | § | |
| TEXAS, ET AL | § | JANUARY 26, 2022 |

HEARING ON MOTION FOR PRELIMINARY INJUNCTION
AS TO SENATE DISTRICT 10
BEFORE THE HONORABLE DAVID C. GUADERRAMA,
HONORABLE JERRY E. SMITH
AND HONORABLE JEFFREY V. BROWN
VOLUME 5 (PM SESSION) OF 9 VOLUMES

APPEARANCES:

FOR THE PLAINTIFFS ROY CHARLES BROOKS, FELIPE GUTIERREZ,
PHYLLIS GOINES, EVA BONILLA, CLARA FAULKNER, DEBORAH
SPELL, BEVERLY POWELL:
Mr. Chad W. Dunn
Brazil & Dunn
4407 Bee Caves Road
Building 1, Suite 111
Austin, Texas  78746
(512) 717-9822
    and
Mr. Mark P. Gaber
Mark P. Gaber, PLLC
P.O. Box 34481
Washington, DC  20043
(715) 482-4066
    and
Ms. Molly Elizabeth Danahy
Molly E. Danahy, Esq
P.O. Box 26277
Baltimore, Maryland  21210
(208) 301-1202

*Laura Wells, RPR, RMR, CRR, RDR*

1  **APPEARANCES (continued):**

2  **FOR THE PLAINTIFFS ROY CHARLES BROOKS, FELIPE GUTIERREZ, PHYLLIS GOINES, EVA BONILLA, CLARA FAULKNER, DEBORAH**

3  **SPELL, BEVERLY POWELL:**
   Ms. Sonni Waknin

4  Sonni Waknin, Esq
   10300 Venice Boulevard, Apartment 204

5  Culver City, California  90095
   (723) 610-1283

6      and
   Mr. Jesse Gaines

7  Jesse L. Gaines Attorney at Law
   P.O. Box 50093

8  Fort Worth, Texas  76103
   (817) 714-9988

9

10 **FOR THE DEFENDANTS GREG ABBOTT, JOHN SCOTT, JOSE A. ESPARZA, STATE OF TEXAS, TEXAS LIEUTENANT GOVERNOR DAN PATRICK AND TEXAS SPEAKER DADE PHELAN:**

11 Mr. Patrick K. Sweeten
   Mr. Christopher D. Hilton

12 Mr. Eric Hudson
   Mr. William Thomas Thompson

13 Ms. Kathleen Hunker
   Ms. Courtney Brooke Corbello

14 Mr. Jack Buckley DiSorbo
   Office of Texas Attorney General

15 P.O. Box 12548
   MC 009

16 Austin, Texas 78711
   (512) 463-4139

17

   **ALSO PRESENT:**
18 Mr. Brian Christopher

19 Court Reporter:
   Laura Wells, RPR, RMR, CRR

20 601 Rosenberg, Suite 615
   Galveston, Texas  77550

21
   Proceedings recorded by mechanical stenography.

22 Transcript produced by computer-assisted transcription.

23

24

25

*Laura Wells, RPR, RMR, CRR, RDR*

1                          **VOLUME 5**
                **(HEARING ON MOTION FOR PRELIMINARY INJUNCTION**
2                        **AS TO SENATE DISTRICT 10)**

3                                                                    **Page**

   **January 26, 2022**
4

5   Defendants' Exhibit Number 64 played............          6
    Defendants' Exhibit Number 64 interrupted.......          6
    Defendants' Exhibit Number 64 played............          6
6   Defendants' Exhibit Number 64 concluded.........          7
    Defendants' Exhibit Number 65 played............          8
7   Defendants' Exhibit Number 65 concluded.........          8
    Defendants' Exhibit Number 65 played............          9
8   Defendants' Exhibit Number 65 concluded.........          9
    Defendants' Exhibit Number 65 played............         10
9   Defendants' Exhibit Number 65 concluded.........         11
    Defendants' Exhibit Number 65 played............         12
10  Defendants' Exhibit Number 65 concluded.........         13
    Video played....................................         23
11  Video concluded.................................         23
    Defendants' Exhibit Number 65 played............         25
12  Defendants' Exhibit Number 65 concluded.........         28
    Defendants' Exhibit Number 67 played............         33
13  Defendants' Exhibit Number 67 concluded.........         34
    Defendants' Exhibit Number 67 played............         39
14  Defendants' Exhibit Number 67 concluded.........         40
    Defendants' Exhibit Number 69 played............         43
15  Defendants' Exhibit Number 69 concluded.........         44
    Defendants' Exhibit Number 69 played............         49
16  Defendants' Exhibit Number 69 concluded.........         50
    Motion in Limine regarding Senator Huffman's            147
17  testimony.......................................
    Plaintiffs Rest.................................        154
18  Reporter's Certificate..........................        158

19

20

21

22

23

24

25

1                          **ALPHABETICAL**

2    **WITNESSES**                                              **Page**

3    **JERONIMO CORTINA, Ph.D**
         Direct Examination By Mr. Gaber                          78
4        Cross-Examination By Mr. Thompson                       129
         Redirect Examination By Mr. Gaber                       144
5
     **SENATOR BEVERLY POWELL**
6        Cross-Examination By Mr. Sweeten                          5
         Redirect Examination By Mr. Dunn                         24
7        Recross-Examination By Mr. Sweeten                       29

8    **REPRESENTATIVE CHRISTOPHER GREGORY TURNER**
         Direct Examination By Mr. Gaber                          31
9        Cross-Examination By Mr. Hudson                          52
         Redirect Examination By Mr. Gaber                        68
10       Recross-Examination By Mr. Hudson                        73

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                       *Laura Wells, CRR, RDR*

1                    **PROCEEDINGS**

2           JUDGE GUADERRAMA:  Good afternoon, everyone.

3   Please be seated.

4        Mr. Sweeten, you were about to lead us into a

02:01:01   5   different area, right?

6             MR. SWEETEN:  Yes, sir.

7             JUDGE GUADERRAMA:  Senator Powell is still on the

8   witness stand.

9                **SENATOR BEVERLY POWELL,**

02:01:06   10   having been previously duly sworn, testified as follows:

11                    **CROSS-EXAMINATION**

12   BY MR. SWEETEN:

13   **Q.**   Welcome back from the break, Senator Powell.

14   **A.**   Thank you, Mr. Sweeten.

02:01:19   15   **Q.**   So I want to continue our discussion; and one of the

16   things I want to talk about is the October 4th, 2021,

17   hearing in the Senate when Senator Huffman first laid out

18   Senate Bill 4 to the Senate floor.  Okay?

19   **A.**   Okay.

02:01:39   20   **Q.**   All right.  So in laying out the bill, she first

21   offered up opening remarks, right?

22   **A.**   That's right.

23   **Q.**   Okay.  Those remarks explained the bill?

24   **A.**   Yes.

02:01:49   25   **Q.**   Okay.  She took questions from other senators about

1    SB-4, right?

2    **A.**   Yes.

3    **Q.**   And you had the opportunity to have a colloquy with

4    her and ask her lots of questions that day, didn't you?

02:02:07   5    **A.**   Yes, sir.

6    **Q.**   And you were, in fact, the first senator to ask her

7    questions, to engage her in questions, correct?

8    **A.**   I think that's correct, yes, sir.

9    **Q.**   Now, I want us to take a look at some of those

02:02:18   10   exchanges, Senator.

11   **A.**   Okay.

12   **Q.**   If we could play video clip -- so this is -- the hard

13   copy is Exhibit 64.  The video is Exhibit 65.  These are

14   both defendants' exhibits.  What I plan to play is video

02:02:33   15   clip 15:13 to 16:4.

16        Mr. Christopher.

17       (Defendants' Exhibit Number 64 played, as follows:)

18           "SENATOR HUFFMAN:  I consulted with my legal

19   counsel.

02:02:45   20           "SENATOR POWELL:  Okay.  Then I will ask you one

21   more time."

22       (Defendants' Exhibit Number 64 interrupted.)

23           MR. SWEETEN:  We're having technical difficulty.

24   We'll get back to it.

02:03:03   25       (Defendants' Exhibit Number 64 played, as follows:)

*Laura Wells, RPR, RMR, CRR, RDR*

1          "SENATOR POWELL:  In terms of data that you

2     consulted, RedAppl has a statistics tab that allows the

3     user to choose which electoral and demographic data to

4     display on the screen while the map is being drawn; is

02:03:28  5     that correct?

6          "SENATOR HUFFMAN:  Correct, yes.

7          "SENATOR POWELL:  Which fields were displayed

8     while the Senate plan was being drawn?

9          "SENATOR HUFFMAN:  It changed.  Sometimes we

02:03:36  10    looked at county lines, sometimes precincts, the actual

11    precincts highlighted.  Sometimes we had it shaded for

12    cities, and sometimes we had it shaded for partisan

13    numbers.  Sometimes they were Trump numbers.  Sometimes we

14    had several political elections up from different years

02:03:58  15    that we looked at.  But population numbers were almost

16    always there.  One thing we never had was racial shading."

17         (Defendants' Exhibit Number 64 concluded.)

18    BY MR. SWEETEN:

19    **Q.**  Is that accurate?  You recall that discussion you had

02:04:11  20    with Senator Huffman?

21    **A.**  Yes.  That's what happened.

22    **Q.**  Okay.  Let's play another clip, if we could.  By the

23    way, just so we're clear, that happened during the

24    October 4, 2021, session --

02:04:22  25    **A.**  I think that's correct.

1    **Q.**  -- on the Senate floor when she was laying out the

2    bill.

3        Let's play another clip, if we could, which is again

4    Exhibit 64, is the hard copy.  Exhibit 65 is the video.

02:04:35   5    If we could go to 16:5 to 16:20.

6        (Defendants' Exhibit Number 65 played, as follows:)

7            "SENATOR HUFFMAN:  One thing we never had was

8    racial shading.

9            "SENATOR POWELL:  So did you have anything about

02:04:43   10   total population on the screen?

11           "SENATOR HUFFMAN:  Yes.

12           "SENATOR POWELL:  And any deviation percentages?

13           "SENATOR HUFFMAN:  Yes.  There is a -- kind of a

14   column in the left-hand side that as you proceeded you

02:04:58   15   could see what it did to the statewide deviation.  I think

16   they may have had to click on another button to see it,

17   but it was there on the left-hand column.

18           "SENATOR POWELL:  And how about demographic data?

19           "SENATOR HUFFMAN:  There was no demographic data

02:05:10   20   provided just, as I said, sometimes partisan numbers,

21   total population, city shading, things like that.

22       (Defendants' Exhibit Number 65 concluded.)

23   BY MR. SWEETEN:

24   **Q.**   That was a correct and accurate depiction of your

02:05:26   25   discussion with her about the issue of demographic data,

1    correct?

2    **A.**   I think it is, yes.

3    **Q.**   I think you have said this; but you obviously weren't

4    in the room and had no -- you can't dispute that, correct?

02:05:35    5    **A.**   I can't dispute it.

6    **Q.**   All right.  Now, let's go to another.  If we could

7    play the video clip of the Senate debate.  This, again, is

8    Exhibit 65, if we could go to 42:11 to 42:15.  It's a

9    short clip.

02:05:49   10        (Defendants' Exhibit Number 65 played, as follows:)

11            "SENATOR POWELL:  -- partisan considerations

12    after you heard the public testimony?

13            "SENATOR HUFFMAN:  No.

14            "SENATOR POWELL:  All right, then.  You claim

02:05:57   15    that this map was drawn blind to race; is that correct?

16            "SENATOR HUFFMAN:  That is the -- the absolute

17    truth as God is my witness."

18        (Defendants' Exhibit Number 65 concluded.)

19    BY MR. SWEETEN:

02:06:06   20    **Q.**   End there.  That is a correct -- that happened?

21    **A.**   That's how she answered the question.

22    **Q.**   And that's how you asked it?

23    **A.**   That's how I asked it.

24    **Q.**   Okay.  Very good.  All right.  If we could look at

02:06:16   25    another clip, 51:12 to 52:9, where you continue the

1   discussion.

2       (Defendants' Exhibit Number 65 played, as follows:)

3           "SENATOR HUFFMAN:  I don't know that the courts

4   have said that.

02:06:25   5           "SENATOR POWELL:  Okay.  So I -- I hear you say

6   that you didn't look at racial data, but you would agree

7   that urban areas in Fort Worth and Dallas have large

8   concentrations of minority voters, wouldn't you?

9           "SENATOR HUFFMAN:  I am not going to make

02:06:38   10   assumptions based on race, period.  All right.  I have

11   followed the law, and I am not going to get into that -- a

12   racial discussion with you.

13       "I've followed the law.  I have done what it has

14   required me to do, what I wanted to do, and I'm going to

02:06:54   15   leave it at that.

16           "SENATOR POWELL:  So you are basically saying

17   that despite serving on the redistricting committee for

18   the past two cycles and chairing the committee this cycle

19   and listening to witnesses who have testified from both

02:07:10   20   redistricting cycles, that you came to the process

21   completely unaware that minority voters are concentrated

22   in urban areas of Dallas and Fort Worth?

23           "SENATOR HUFFMAN:  Senator Powell, of course I

24   have an awareness that there are minorities that live all

02:07:28   25   over this state.  All right.  But I blinded myself to that

1    as I drew these maps and did not make map decisions based

2    on racial determinations, period.  Right."

3        (Defendants' Exhibit Number 65 concluded.)

4    BY MR. SWEETEN:

02:07:44  5    **Q.**   Okay.  And that clip was what you and Senator Huffman

6    talked about, correct?

7    **A.**   Yes.

8    **Q.**   That accurately depicted it?

9    **A.**   It accurately depicts the exchange.

02:07:55  10   **Q.**   And, in short, she told you on the Senate floor she

11   didn't make decisions based on race while drawing the

12   lines of the Senate district?  That's what she said,

13   right?

14   **A.**   She did.

02:08:04  15   **Q.**   Okay.  You have no personal knowledge that she

16   utilized any sort of racial information when drawing

17   SD-10, correct?

18        THE REPORTER:  Excuse me.  Could you start over,

19   please.

02:08:13  20        MR. SWEETEN:  Yes, ma'am.

21   BY MR. SWEETEN:

22   **Q.**   You have no personal knowledge that she utilized any

23   sort of racial information when drawing SD-10, correct?

24   **A.**   I have no first-hand knowledge.

02:08:17  25   **Q.**   Now, while you were -- while the debate was ongoing,

1   you had a discussion with Senator Royce West on the floor;

2   is that correct?

3   **A.**   That's correct.

4   **Q.**   All right.  And if we could play that part of the

02:08:32   5   debate which starts at 123:9 to 124:1, please.

6          (Defendants' Exhibit Number 65 played, as follows:)

7                "SENATOR WEST:  -- for elimination?

8                "SENATOR POWELL:  Well, one would suspect that.

9                "SENATOR WEST:  No.  No.  No.  Wait.  Hold on one

02:08:50   10   second.  This is going to be a part of the record.  We

11   know we are going to lose this particular vote.  It's been

12   said that Senate District 10 was going to flip.  Okay.

13                "SENATOR POWELL:  That's exactly right.

14                "SENATOR WEST:  So let's get it on the record.

02:09:03   15   Do you believe that your district is being intentionally

16   targeted for elimination as being a Democratic-trending

17   district?

18                "SENATOR POWELL:  Absolutely.  Absolutely,

19   Senator West.  And it goes back to the question that

02:09:20   20   Chairman Huffman asked me the day that we had our meeting.

21          "When I sat down and she put the proposed map up onto

22   the screen, she said, 'Do you have any questions for me?'

23          "And I answered to her, 'No.  I have no questions

24   because I can clearly see by this map what you are

02:09:38   25   attempting to do.'"

         1      (Defendants' Exhibit Number 65 concluded.)

         2  BY MR. SWEETEN:

         3  **Q.**  Senator Powell, that's what you said in response to

         4  Senator West's questions of you, correct?

02:09:46  5  **A.**  That is correct.

         6  **Q.**  All right.  Now, we talked about this in your depo

         7  last week.

         8  **A.**  Yes.

         9  **Q.**  But let me just -- you try to tell the truth when you

02:09:54 10  are on the Senate floor, correct?

        11  **A.**  Of course I do.

        12  **Q.**  And your answer to Senator West, that was a true

        13  statement, wasn't it?

        14  **A.**  Yes.  It was a true statement.

02:10:01 15  **Q.**  Okay.  Now, Senator, I'm going to also bring up an

        16  exhibit that I think Mr. Dunn used with you, which is

        17  Defendants' Exhibit Number 27; and this is a copy of the

        18  *Senate Journal*, correct?

        19  **A.**  Yes, sir.

02:10:18 20  **Q.**  Okay.

        21  **A.**  Can you tell me where that is in the exhibits?

        22  **Q.**  Yes.  That should be Defendants' Exhibit Number 27.

        23  It should be a tab that says 27.

        24  **A.**  I'm sorry.  I'm having a hard time reading what is on

02:10:45 25  the screen.

1    **Q.**   Okay.  Yeah.  No problem.  We can do it with the

2    exhibits.  That's what they are there for.

3    **A.**   Thank you.

4            JUDGE SMITH:  Feel free to ask for clearer

02:10:58   5    versions at any time.

6            THE WITNESS:  Okay.  Thank you.

7    **A.**   Now, would you ask me the question again, Mr. Sweeten.

8    BY MR. SWEETEN:

9    **Q.**   Sure.  Yes.  Let me get my copy, too.  We'll both be

02:11:10  10    on hard copies.  Okay.  So you can see at the top of

11    Defendants' Exhibit Number 27 we -- let's see.  Let's go

12    to the second page.  It says "State PI-00283" on the

13    bottom right?

14    **A.**   Yes.

02:11:31  15    **Q.**   Okay.  You see those Bates numbers.  Okay.

16    **A.**   223?

17    **Q.**   Yeah.  283.  283.

18    **A.**   Oh, I'm sorry.  All right.  I have that page before

19    me.

02:11:58  20    **Q.**   Okay.  So if you look at the very bottom of that

21    Page 283 -- and by the way, just to orient us all, this is

22    the fourth day, Monday, October 4th, 2021, is the report

23    from the *Senate Journal*.

24            Do you see that at the top?

02:12:11  25    **A.**   I do see that.

1  **Q.**  All right.  If you go to the very bottom line on that

2  page, it says, "CSSB relating to the composition of

3  districts for the election of members of the Texas

4  Senate."

02:12:22  5       Do you see that?

6  **A.**  Yes, sir.

7  **Q.**  If we go to the next page, it says, "The bill was read

8  third time, was finally passed by the following votes.

9  Yeas, 20.  Nays, 11."

02:12:32  10      Did I read that right?

11 **A.**  Yes, you did.

12 **Q.**  Okay.  Now, you talked a little bit about reasons for

13 vote; and I want you to look down, if you would, now to

14 Page 286.

02:12:51  15 **A.**  All right.  I see that.

16 **Q.**  And you can see on the very bottom under Senator

17 Eckhardt's reason for vote we see that it says, "Senator

18 Johnson submitted the following reason for vote on

19 CSSB-4."

02:13:03  20      Do you see that?

21 **A.**  I do see it.

22 **Q.**  All right.  Let's read that.  Let's read that first

23 sentence on 287.

24      And by the way, actually, before we do that, Senator

02:13:13  25 Johnson is Senator Nathan Johnson; is that correct?

1   **A.**   That's correct.

2   **Q.**   Senator Nathan Johnson is a Democrat from the Dallas

3   area, right?

4   **A.**   He is.

02:13:22   5   **Q.**   Senator Nathan Johnson says, "The proposed maps under

6   CSSB do exactly what they were expected to do:  They make

7   districts more partisan and, if not invalidated by a court

8   challenge, they effectively eliminate a Democratic seat."

9       Did I read that first line correctly?

02:13:41   10   **A.**   Yes, you did.

11   **Q.**   Okay.  You can put that away.

12   **A.**   All right.  Am I through with this book?

13   **Q.**   You can put that big book away, yes, ma'am.

14       Now, there are a few follow-up questions I want to

02:14:12   15   have with you about the September 4th meeting you had in

16   Senator Huffman's office.  Do you remember that meeting?

17   **A.**   Okay.

18   **Q.**   That is the meeting where you went in and the map was

19   on the wall.

02:14:22   20   **A.**   Okay.

21   **Q.**   Okay.  Now, you brought the maps, you've already said,

22   and Senator Huffman showed you what the possible draw

23   looked like.  At that time you handed her those racial

24   shading maps; is that right?

02:14:36   25   **A.**   That's correct.

1   **Q.**   Now, I want to be clear.  You were not asked for those

2   maps, correct?

3   **A.**   That's correct.

4   **Q.**   All right.  And it's the case that you -- you are not

02:14:47   5   testifying that you provided those maps prior to the

6   September 4th meeting, correct?

7   **A.**   I am not testifying that I --

8   **Q.**   Okay.

9   **A.**   -- provided them prior to that meeting.

02:14:57   10   **Q.**   All right.  Now, you also -- oh, at the meeting you

11   expressed to Senator Huffman you were not happy with the

12   way Senate District 10 was drawn, correct?

13   **A.**   That's correct.

14   **Q.**   And neither Senator Huffman, Ms. Mackin or Opperman,

02:15:13   15   none of them said anything in that conversation that bears

16   on the question of intentional discrimination.  That's

17   what you've said, correct?

18   **A.**   I think that's correct.

19   **Q.**   Okay.  Now, you also told Mr. Dunn in his questioning

02:15:27   20   that you provided copies of those maps to all of the House

21   members, correct?

22   **A.**   That's correct.

23   **Q.**   All 150?

24   **A.**   Yes, sir.

02:15:36   25   **Q.**   And those were not asked for?  You sent them on your

1    own volition, correct?

2    **A.**   Yes, sir.  That's correct.

3    **Q.**   The same with the Senate?  You sent it to all the

4    senators, correct?

02:15:46   5    **A.**   That's correct.

6    **Q.**   Now, we talked a little bit about you had -- your

7    counsel had put up an exhibit, and let's go ahead and do

8    that so you can see it again.  This one is Plaintiffs'

9    Exhibit Number 4.

02:16:07   10          MR. SWEETEN:  If you'll put that up, please.

11   BY MR. SWEETEN:

12   **Q.**   Do you remember talking about this earlier?

13   **A.**   Yes.

14   **Q.**   Okay.  So let's look at it.  This is a letter that you

02:16:32   15   wrote dated February 18th, 2020 --

16   **A.**   Yes.

17   **Q.**   -- to Senator Huffman, and this is where you invited

18   her to -- you said, "Thank you for your invitation to

19   participate in the planning process of the upcoming

02:16:49   20   hearing for Senate Select Committee on Redistricting on

21   September 17th, 2020, in Denton/Tarrant Counties," right?

22   **A.**   That's correct.

23   **Q.**   So she had invited you, and you are thanking her for

24   inviting you to that committee, correct?

02:17:02   25   **A.**   I think she -- I think everyone in the Senate was

                1    invited to participate in the hearings.

                2    **Q.**   Including you?

                3    **A.**   Yes, including me.

                4    **Q.**   And you wrote her on this date, February 18th, and you

02:17:12        5    asked her to consider choosing Tarrant County to host the

                6    hearing, right?

                7    **A.**   Yes, I did.

                8    **Q.**   And you offered her a place and you said that it fit

                9    all the criteria and the venue would be free of charge?

02:17:30       10    Those are the things you told her, among others, right?

               11    **A.**   That's correct.

               12    **Q.**   All right.  Now, it's the case, isn't it, if you look

               13    at the date on this, we know that three weeks later we

               14    were starting to see shutdowns in the U.S. based on COVID,

02:17:42       15    correct?

               16    **A.**   Yes.  That is correct.

               17    **Q.**   Okay.  And you would agree with me it's a true

               18    statement, isn't it, that, in fact, that canceled an awful

               19    lot of interim hearings, the fact that COVID had come to

02:17:55       20    the U.S. and, in particular, Texas, right?

               21    **A.**   I think the hearings went to Zoom, didn't they?

               22    **Q.**   I think they did.

               23    **A.**   I don't think they canceled them totally.  It did

               24    change things.

02:18:07       25    **Q.**   It changed things that there had originally been a

1    plan for the Senate -- as your letter references, there

2    had been a plan for the Senate to travel to different

3    regional places in the state and take testimony and listen

4    to folks in those different regional areas, right?

02:18:25   5    **A.**   I'm not specifically aware of the plan because I

6    wasn't on redistricting.

7    **Q.**   Okay.

8    **A.**   I assume there was a plan for that.

9    **Q.**   Right.

02:18:32   10    **A.**   Yes.

11    **Q.**   But, I mean, that's in line with what you are

12    saying --

13    **A.**   Yeah.  I don't disagree.

14    **Q.**   -- "Why don't you come to Tarrant County"?

02:18:38   15    **A.**   I don't disagree.

16    **Q.**   You don't disagree?  That's logical, right?

17    **A.**   Uh-huh.

18    **Q.**   Okay.  So, now, you wouldn't disagree that those

19    regional hearings were not held, right?

02:18:46   20    **A.**   They were not.  That's correct.

21    **Q.**   They were held instead by Zoom, an alternative

22    platform, correct?

23    **A.**   That's correct.

24    **Q.**   The Senate committee couldn't go all over the state

02:18:57   25    and talk to folks in, you know, the various corners and

1   regions of the state, could they?

2   **A.**   They couldn't.

3   **Q.**   Are you aware that there were actually 12 virtual

4   hearings held for the 87th Regular Session?

02:19:10   5   **A.**   I am aware there were hearings.  I wasn't aware of the

6   number.

7   **Q.**   Okay.

8   **A.**   But, yes, I am aware.

9   **Q.**   Are you aware that there were five, let's see, after

02:19:22   10   the regular session but before the third special session?

11   **A.**   I am aware that there were, just not the specific

12   number.

13   **Q.**   Okay.  And then during the 87th Third Session, are you

14   aware that there were additional public input portals that

02:19:39   15   were set up?

16   **A.**   Yes.

17   **Q.**   Okay.  Now, something else happened in 2021, correct?

18   And that is that the House broke quorum, right?

19   **A.**   That's correct.

02:20:03   20   **Q.**   And the House broke quorum, and many of the members

21   went to Washington, D.C., correct?

22   **A.**   That's correct.

23   **Q.**   And you wouldn't disagree that that basically shut

24   down the House Committee's ability to hold hearings during

02:20:18   25   the time that they were in D.C., right?  Or do you know?

```
                1    A.   I believe that it did.
                2    Q.   Okay.  And so -- and the purpose of going to
                3    Washington, D.C., for these Democratic House members was
                4    literally to stop the legislative process from moving
02:20:33        5    forward, correct?
                6    A.   I couldn't speak to their discussions about that.  I'm
                7    sorry.
                8    Q.   Okay.  Do you have -- I mean, is there any other
                9    reason that you think that they left for four weeks?
02:20:45       10    A.   No.  No.
               11    Q.   Okay.  Now, one thing about the map configuration,
               12    that you would agree, that there were Anglos that were
               13    taken out of the configuration of SD-10, correct?
               14    A.   There were some.
02:21:11       15    Q.   Yeah.  And Anglos were -- and you would also agree
               16    that taking out 50 percent plus Anglo VTDs that vote
               17    Democratic is not evidence of intentional discrimination,
               18    correct?  You have said that?
               19    A.   Please say that again.
02:21:25       20    Q.   Taking out 50 percent or higher VTDs is not evidence
               21    of intentional discrimination, in your view, correct?
               22    That's what you have said?
               23    A.   I would agree with that.
               24    Q.   Okay.  Very good.  Now, I had talked to you earlier
02:21:39       25    about a clip about counsel, and we were -- specifically,
```

1  we were talking about the Senate Redistricting Committee

2  when the bills were laid out, and I had asked you if you

3  recall was counsel named in that meeting.  And I think you

4  said you didn't recall that one way or the other; is that

02:21:59  5  right?

6  **A.**  That's right.

7  **Q.**  Okay.  I'm going to go to that clip and just show you

8  a short clip.

9      (Video played, as follows:)

02:22:07  10      "SENATOR HUFFMAN:  I consulted with my legal

11  counsel.

12      "SENATOR POWELL:  Okay.  Then I will ask you one

13  more time, 'Who is legal counsel?'

14      "SENATOR HUFFMAN:  It's the Attorney General's

02:22:16  15  office.  My point of contact was Chris Hilton.  Who else

16  he talked to, I can't tell you.

17      "SENATOR POWELL:  Okay.  Thank you."

18      (Video concluded.)

19  BY MR. SWEETEN:

02:22:26  20  **Q.**  Okay.  So you were at the September 24th hearing in

21  the Senate Redistricting Committee when you were told who

22  had provided Senator Huffman with legal advice, correct?

23  **A.**  She answered the question in the way that we have seen

24  on the screen, yes, correct.

02:22:43  25  **Q.**  Okay.  And the way that we have seen on the screen is

1    that she said that, yes, she gave the name of the

2    individual that was --

3    **A.**   She gave the name of one individual.

4    **Q.**   Okay.  Very good.  Thank you.

02:22:52   5         MR. SWEETEN:  I have no further questions at this

6    time, Senator Powell.

7              THE WITNESS:  Thank you, Mr. Sweeten.

8              MR. SWEETEN:  Thank you.

9              JUDGE GUADERRAMA:  All right, Mr. Sweeten.

02:23:00   10        Mr. Dunn.

11                        **REDIRECT EXAMINATION**

12   BY MR. DUNN:

13   **Q.**   Picking up where we left off, Senator Powell, on the

14   question of who was advising Senator Huffman from the

02:23:20   15   Attorney General's office, the clip that you just saw, she

16   advised that she was being advised by Mr. Hilton at the

17   Attorney General's office.  Are we on the same page now?

18   **A.**   Yes.

19   **Q.**   Okay.  Do you recall earlier where we showed you the

02:23:33   20   video clip of you asking Senator Huffman for the lawyers

21   in the Attorney General's office that were available on

22   redistricting?

23   **A.**   Yes, I do.

24   **Q.**   And do you recall asking the resource witness, the

02:23:46   25   lawyer for the Attorney General's office, for a list?

1   **A.**   Yes.

2   **Q.**   And you were promised that?

3   **A.**   I was promised that.

4   **Q.**   Did you -- have you ever been given any name at all?

02:23:55  5   **A.**   No, sir.

6   **Q.**   Other than the lawyer that was advising Senator

7  Huffman?

8   **A.**   Other than the one that -- no.  No, sir.

9   **Q.**   So as we sit here in this United States District

02:24:04  10  Court, you have disclosed to the State who your lawyers

11  have been from start to finish; is that right?

12   **A.**   Yes, sir.

13   **Q.**   But you can't get the same information in return?

14   **A.**   That's correct.

02:24:11  15   **Q.**   You were also shown a video of a short exchange with

16  Senator West -- do you recall that -- moments ago?

17   **A.**   I do.

18   **Q.**   That wasn't the whole exchange, was it?

19   **A.**   No, it was not.

02:24:22  20   **Q.**   I'm going to call the Courts' attention to Defendants'

21  Exhibit Number 65, 2:10:02 to 2:13:00.

22     (Defendants' Exhibit Number 65 played, as follows:)

23       "SENATOR WEST:  Senate District 10 is an

24  urban/suburban district, correct?

02:24:57  25       "SENATOR POWELL:  That's correct.

1          "SENATOR WEST:  A crossover district?

2          "SENATOR POWELL:  That's right.

3          "SENATOR WEST:  We have seen a trend in your

4   district of the persons there voting Democratic, correct?

02:25:09   5          "SENATOR POWELL:  That's correct.  We have.

6          "SENATOR WEST:  And that's been over the last how

7   many elections?  Is it 2016, somewhere in there?

8          "SENATOR POWELL:  I think that's true, since

9   2016.

02:25:20  10          "SENATOR WEST:  We have been seeing more

11  African-Americans elected in your district; is that

12  correct?

13          "SENATOR POWELL:  We absolutely have.

14          "SENATOR WEST:  And Latinos, correct?

02:25:27  15          "SENATOR POWELL:  Yes, we have.

16          "SENATOR WEST:  Devan Allen is now a county

17  commissioner.

18          "SENATOR POWELL:  County commissioner.

19          "SENATOR WEST:  And she was elected by that

02:25:32  20  coalition of Blacks, Whites, Hispanics and Asians; is that

21  correct?

22          "SENATOR POWELL:  That is correct.

23          "SENATOR WEST:  We have also seen an increase in

24  ethnic minorities in your district, correct?

02:25:46  25          "SENATOR POWELL:  That is correct.

*Laura Wells, RPR, RMR, CRR, RDR*

1      "SENATOR WEST:  Okay.  We've seen a decrease in

2  Anglos in your district; is that correct?

3          "SENATOR POWELL:  Yes, sir.  That's correct.

4          "SENATOR WEST:  Okay.  We have seen an increase

02:25:58   5  in the number of minorities that's being elected.  We have

6  seen an increase in the number -- an increase in the

7  minority population in your district, a reduction in the

8  Anglo population.

9      "Do you think the district is being targeted for

02:26:17  10  elimination?

11          "SENATOR POWELL:  Well, one would suspect that.

12          "SENATOR WEST:  No.  No.  No.  Wait.  Hold on one

13  second.  This is going to be a part of the record.  We

14  know we're going to lose this particular vote.  It's been

02:26:29  15  said that Senate District 10 was going to flip.  Okay.

16          "SENATOR POWELL:  That's exactly right.

17          "SENATOR WEST:  So let's get it on the record.

18  Do you believe that your district is being intentionally

19  targeted for elimination as being a Democratic-trending

02:26:50  20  district?

21          "SENATOR POWELL:  Absolutely.  Absolutely,

22  Senator West.  And it goes back to the question that

23  Chairman Huffman asked me the day that we had our meeting.

24      "When I sat down and she put the proposed map up onto

02:27:04  25  the screen, she said, 'Do you have any questions for me?'

*Laura Wells, RPR, RMR, CRR, RDR*

1    "And I answered to her, 'No.  I have no questions

2    because I can clearly see by this map what you are

3    attempting to do.'

4         "SENATOR WEST:  Do you know of any other

02:27:20    5    urban/suburban-trending districts in the state of Texas

6    that have been, frankly, gerrymandered like yours has,

7    ma'am?

8         "SENATOR POWELL:  I know of no other district

9    that has been gerrymandered in this fashion where we have

02:27:35   10   cracked apart the minority voters in a district and

11   submerged them into a highly Anglo rural population.

12        "SENATOR WEST:  Now -- and let me say this --"

13   (Defendants' Exhibit Number 65 concluded.)

14   BY MR. DUNN:

02:27:51   15   Q.   So is it the case in the lead-up to Senator West's

16   question about targeting a Democratic district that you

17   and he had discussed the racial changes that had been

18   happening in Tarrant County in Senate District 10?

19   A.   Yes, sir.

02:28:03   20   Q.   Had you spent the rest of that debate prior to that

21   moment making it clear to all your colleagues that when

22   you draw lines on the basis of partisanship in Tarrant,

23   you are drawing them on the basis of race?

24   A.   Yes.  That's obvious, yes, sir.

02:28:17   25   Q.   And you recall the task for coming in here and having

*Laura Wells, RPR, RMR, CRR, RDR*

02:28:32

1  prepared back during the debates?  Do you recall those

2  questions, having some questions to ask of Senator

3  Huffman, being prepared in meetings with documents?  Do

4  you recall Mr. Sweeten's questions?

5  **A.**  Yes.

6  **Q.**  Why did you prepare for these things?

7  **A.**  Well, personally, I'm a prepared person.  I don't like

8  to go into -- onto the floor of the Senate or into a

9  committee hearing without preparing and understanding the

02:28:46  10  legislation that I am looking at.

11      And, certainly, I feel that same way about Senate

12  District 10.  I wanted to be prepared for the meeting, and

13  I wanted to be prepared to represent the citizens of

14  Senate District 10.

02:29:01  15      This is a redistricting gerrymander that impacts the

16  voting rights of citizens across Senate District 10, and

17  they elect me to represent them, and I am very serious in

18  my considerations.  I am very serious in trying to do my

19  homework, being well-informed, and to represent my

02:29:29  20  citizens in the way that they deserve.

21          MR. DUNN:  Pass the witness.

22          JUDGE GUADERRAMA:  Okay, Mr. Dunn.

23      Mr. Sweeten.

24          MR. SWEETEN:  Just a couple, Your Honor.

02:29:48  25                  **RECROSS-EXAMINATION**

*Laura Wells, RPR, RMR, CRR, RDR*

|     |     |
| --- | --- |
|            | 1 | BY MR. SWEETEN: |
|            | 2 | **Q.**   After the discussion about the Attorney General |
|            | 3 | that -- the individuals from the Attorney General's |
|            | 4 | office, did you reach out and ask a follow-up question for |
| 02:30:00   | 5 | additional information? |
|            | 6 | **A.**   I did not personally, and I am unaware of my staff. |
|            | 7 | **Q.**   Okay. |
|            | 8 |         MR. SWEETEN:  I have no further questions.  Thank |
|            | 9 | you. |
| 02:30:15   | 10 |        THE WITNESS:  Thank you, Mr. Sweeten. |
|            | 11 |        MR. DUNN:  Nothing further. |
|            | 12 |        JUDGE GUADERRAMA:  Senator, thank you so much. |
|            | 13 | You are free to go. |
|            | 14 |        THE WITNESS:  Thank you, Judge. |
| 02:30:26   | 15 |        JUDGE GUADERRAMA:  You won't be needing the |
|            | 16 | Senator in your case, will you? |
|            | 17 |        MR. SWEETEN:  No, Your Honor.  We will not. |
|            | 18 |        JUDGE GUADERRAMA:  Mr. Dunn. |
|            | 19 |        MR. DUNN:  Your Honor, at this time, we call |
| 02:30:36   | 20 | Representative Chris Turner.  Mr. Gaber will be handling |
|            | 21 | the examination. |
|            | 22 |        JUDGE GUADERRAMA:  Good afternoon, Representative |
|            | 23 | Turner.  If you'll raise your right hand, sir, and receive |
|            | 24 | the oath. |
| 02:31:48   | 25 |        REPRESENTATIVE TURNER:   (Complying.) |

Direct Examination of Rep. Chris Turner - Vol 5

```
           1              JUDGE GUADERRAMA:  Do you solemnly swear or
           2   affirm the testimony you give in this proceeding will be
           3   the truth, the whole truth and nothing but the truth, so
           4   help you God?
02:31:54   5              THE WITNESS:  Yes, I do.
           6              JUDGE GUADERRAMA:  Thank you, sir.  You can have
           7   a seat right here.
           8              THE WITNESS:  Thank you.
           9              JUDGE GUADERRAMA:  Mr. Gaber, whenever you are
02:32:03  10   ready.
          11        REPRESENTATIVE CHRISTOPHER GREGORY TURNER,
          12   having been first duly sworn, testified as follows:
          13                    DIRECT EXAMINATION
          14   BY MR. GABER:
02:32:05  15   Q.   Good afternoon, Representative Turner.  Could you
          16   please state your name for the record.
          17   A.   Chris Turner.  My full name is Christopher Gregory
          18   Turner.
          19   Q.   Are you an elected official?
02:32:13  20   A.   Yes.
          21   Q.   What office do you hold?
          22   A.   I'm a state representative representing District 101
          23   in Tarrant County.
          24   Q.   How long have you represented District 101?
02:32:21  25   A.   I have represented District 101 for just under ten
```

1   years.  My total service through the legislature is right

2   at 11 years.  I previously represented District 96 for one

3   term.

4   **Q.**   Do you hold any leadership roles in the House of

02:32:38   5   Representatives?

6   **A.**   Yes, I do.  I am the Chairman of the House Committee

7   on Business & Industry.  I also serve as Chairman of the

8   House Democratic Caucus.

9   **Q.**   Are you familiar with the demographic makeup and

02:32:51   10   communities in Tarrant County?

11   **A.**   Yes.  I would consider myself fairly familiar with

12   those.

13   **Q.**   Are you familiar with the process by which the House

14   passed SB-4 during the recent redistricting cycle?

02:33:06   15   **A.**   Yes.

16   **Q.**   You submitted a declaration in this case about that

17   process; is that right?

18   **A.**   Yes, I did.

19       MR. GABER:  And for the Courts' record, that's

02:33:13   20   Plaintiffs' Exhibit Number 24.

21   BY MR. GABER:

22   **Q.**   What is your general impression of the House

23   proceedings regarding the redistricting process?

24   **A.**   My general impression is that the House proceedings

02:33:27   25   overall, with respect to redistricting overall, is that

1   they were rushed.  And there was not due consideration

2   given to public testimony that we heard throughout the

3   redistricting process.  There was not due consideration

4   given to feedback from members of the legislature

02:33:55   5   representing majority-minority communities.

6   **Q.**   Do you serve on the House Redistricting Committee?

7   **A.**   Yes, I do.

8   **Q.**   And how many hearings were there on the State Senate

9   plan in the House Redistricting Committee?

02:34:09   10   **A.**   On the actual State Senate plan, the bill, there was

11   one hearing.

12   **Q.**   And you attended that hearing?

13   **A.**   Yes, I did.

14   **Q.**   Do you recall Chair Hunter making comments at the

02:34:21   15   beginning of the hearing about the process that had

16   happened in the Senate?

17   **A.**   Yes.  He -- in the bill layout, he described in

18   general terms what the Senate had done.

19   **Q.**   And we're going to play a clip.  This is Defendants'

02:34:41   20   Exhibit Number 67, minute 7:28 through 8:14.

21       (Defendants' Exhibit Number 67 played, as follows:)

22       "REPRESENTATIVE MURR:  And then for purposes of just

23   consideration in this map, traditional process has been

24   that the Senate works diligently to arrive at this map.

02:35:04   25   And so what we have here, and just to kind of clarify on

            Monday morning, has been a lot of work that's been put in

            by the Texas Senate and through the discussion and the

            public process on their side?

                "CHAIR HUNTER:  I'm going to always be positive, and

02:35:21    I'm going to always be constructive.  They've put in their

            work.  They have put in their analysis, and we have

            received their bill.  And I'm going to presume they

            followed their procedures and done everything they are

            supposed to do."

02:35:38         (Defendants' Exhibit Number 67 concluded.)

            BY MR. GABER:

            Q.   For the record, Representative Turner, could you

            identify the representative that asked the question in the

            beginning of that clip?

02:35:44    A.   That was Representative Andrew Murr.

            Q.   And was that Chair Hunter who responded?

            A.   Yes, that was Chairman Hunter.

            Q.   Now, before this meeting happened, had you and the

            other members of the House Redistricting Committee

02:35:59    received any correspondence from Senator Powell about the

            changes to Senate District 10?

            A.   Yes.

            Q.   Did that letter give you cause to believe that perhaps

            trusting the process in the Senate might not be the best

02:36:15    idea?

1    **A.**   Absolutely.   I think Senator Powell explained in

2    detail why the process had yielded a very bad result for

3    Senate District 10 and Tarrant County.

4    **Q.**   And what did you take from the statement there in that

02:36:32    5    video clip from Chair Hunter about trusting the process

6    and moving on?

7    **A.**   What I heard in that clip was, you know, a lot of

8    words that probably didn't really mean a whole lot.   There

9    are some broad generalities about process and procedure

02:36:53    10    and work and -- but there was very little to nothing about

11    the substance of what was actually in the bill that we had

12    before us that day.

13    **Q.**   How does that relate to other bills that are laid out

14    in committees that you've served on?   Is that sort of

02:37:12    15    verbiage, is that usually meaningful?

16    **A.**   I'd say that's atypical of what we would typically

17    hear on any given bill, irrespective of the subject

18    matter.   It's typically the bill author.   In this case,

19    the bill sponsor.   It's a Senate bill.   It's a House

02:37:35    20    sponsor.   It would describe what is in the bill and be

21    able to answer substantive questions about the legislation

22    from other members of the committee.

23    **Q.**   Given the letter that the committee had received from

24    Senator Powell, did you consider that to be an appropriate

02:37:54    25    course of action for how to treat this bill in the House

1   committee?

2   **A.**   No.   My belief was that, as we do on virtually any

3   other piece of legislation, you know, bills, by

4   definition, have to be passed by the House and the Senate.

02:38:13   5   And the legislative process, by definition, requires input

6   from both chambers.   And on a regular basis we receive

7   House bills, and we change them and try to make them

8   better.   And conversely, the Senate will do the same to

9   House bills on a regular basis.

02:38:36   10   So simply saying, well, this is what the Senate did

11   and we think that everything is fine is very atypical of

12   the legislative process.

13   **Q.**   Now, is it sometimes the case in the past that the

14   House tends to focus on its redistricting plan and the

02:38:52   15   Senate tends to focus on its redistricting plan?

16   **A.**   Yes.   That's true.

17   **Q.**   Are you aware of another instance where there has been

18   a specific Senate district that had a federal court order

19   about it and a similar approach was taken that was the

02:39:09   20   subject of that order?

21   **A.**   I can't think of another such instance, no.

22   **Q.**   Would you expect, among your colleagues, to have a

23   level of concern, then, for changes to a district that had

24   been subject to a federal court order that might cause

02:39:27   25   them to take a look at that Senate map, even though the

1  Senate was the one that adopted it?

2  **A.**   Yes.  Absolutely.  I thought that members of the House

3  would have concerns given that previous court order and

4  raise more questions about the map the Senate had passed.

02:39:47  5  **Q.**   The House had to adopt that court interim remedy back

6  in 2013, right?

7  **A.**   That's correct.

8  **Q.**   And so the House had actually passed Senate District

9  10 in its benchmark configuration following that court

02:40:01  10  order?

11  **A.**   That's right.

12  **Q.**   And is it your understanding that that was at the

13  advice of then Attorney General Abbott?

14  **A.**   Yes, it definitely was.  It was a special session

02:40:10  15  called for that purpose, and it was on the advice of

16  General Abbott.  That was the general understanding at the

17  time.

18  **Q.**   And is it your understanding that that was sort of a

19  similar approach that occurred with respect to

02:40:23  20  Congressional District 33, that that also had been the

21  subject of a court order?

22  **A.**   Yes.

23  **Q.**   And did that order put CD-33 together so that the

24  minority communities in the Fort Worth area were in one

02:40:40  25  Congressional district?

*Laura Wells, RPR, RMR, CRR, RDR*

1   **A.**   Yes.  It did do that.

2   **Q.**   The House also adopted a Congressional plan; is that

3   right?

4   **A.**   Yes.

02:40:49   5   **Q.**   And how was Congressional District 33 treated in the

6   Fort Worth area?

7   **A.**   In the Congressional plan in the House the legislature

8   adopted that Congressional District 33 maintains its core

9   populations in Tarrant County, largely unifying the

02:41:12   10   majority-minority communities in particular within the

11   City of Fort Worth.

12   **Q.**   And so in that instance the Congressional plan adhered

13   to the court order from 2012 and the interim plan that had

14   been put in place by the federal court?

02:41:32   15   **A.**   Yes.  The plan adopted did not deviate much from the

16   previous decade's plan that the legislature had adopted in

17   2012.

18   **Q.**   And to be clear, my question is about, you know,

19   specifically the treatment of the core Fort Worth area

02:41:48   20   with the Hispanic and African-American communities; is

21   that right?

22   **A.**   Yes.  Absolutely.  Specifically, southeast Fort Worth,

23   Forest Hill, River Bend, and the north side of Fort Worth.

24   **Q.**   Now, during that committee hearing that we showed the

02:42:04   25   clip from earlier, was there a question, from your

1  recollection, about the opportunity to ask questions of

2  the Senate and/or to make amendments during the committee

3  process?

4  **A.**   Yes.  I recall, you know, trying to ask some questions

02:42:25   5  of the bill's sponsor, who in this case is Chairman

6  Hunter; and he largely deferred to what the Senate had

7  done, their process, and wasn't able to answer specific

8  questions about the plan itself.

9      With respect to amendments, my recollection is he said

02:42:46   10  that amendments would be allowed in the committee; but we

11  would be doing this all in one day.  So the amendments had

12  to be offered in that same meeting; and, ultimately, we

13  would vote on the bill in that -- in that same meeting.

14  **Q.**   And we'll play a clip of that for you to take a look.

02:43:06   15  That's Defendants' Exhibit 67, 11:26 through 12:26.

16      (Defendants' Exhibit Number 67 played, as follows:)

17          "REPRESENTATIVE TURNER:  -- what her or the

18  Senate's criteria is for defining a minority coalition

19  district?

02:43:24   20          "CHAIR HUNTER:  I am not aware.

21          "REPRESENTATIVE TURNER:  Okay.  So we wouldn't

22  know why some districts are on that list and some

23  districts, such as Senate District 10, are not on that

24  list?

02:43:33   25          "CHAIR HUNTER:  And I'm sure those inquiries to

*Laura Wells, RPR, RMR, CRR, RDR*

Direct Examination of Rep. Chris Turner     Vol 5-8

```
 1  any of us could be made to the Senate and talk to them and
 2  we could have been doing that as well, too.  So that's
 3  still open to talking with them at any time.
 4          "REPRESENTATIVE TURNER:  Okay.  Thank you,
 5  Chairman.
 6          "CHAIR HUNTER:  Thank you.  Any other questions?
 7  Thank you, members.
 8          "REPRESENTATIVE ANCHIA:  Mr. Chairman, one last
 9  question.
10          "CHAIR HUNTER:  Oh, Chairman Anchia.
11          "REPRESENTATIVE ANCHIA:  Thank you, Mr. Chairman.
12  Will there be a process for amending the Senate map in
13  committee?
14          "CHAIR HUNTER:  If you have an amendment, please
15  let us know.  Yes, sir.
16          "REPRESENTATIVE ANCHIA:  Just on a rolling basis?
17          "CHAIR HUNTER:  Yes.
18          "REPRESENTATIVE ANCHIA:  Okay.  Very good.
19          "CHAIR HUNTER:  But we do plan to vote today.  So
20  if you are going to, I'll ask that you try to do that
21  today.
22          "REPRESENTATIVE ANCHIA:  Very good.  Thank you."
23      (Defendants' Exhibit Number 67 concluded.)
24  BY MR. GABER:
25  Q.  Now, Representative Turner, were you the person that
```

*Laura Wells, RPR, RMR, CRR, RDR*

```
 1  asked the initial question of Chair Hunter during that
 2  exchange?
 3  A.   Yes.
 4  Q.   Is the second representative Representative Anchia?
 5  A.   That's correct.
 6  Q.   And where is Representative Anchia's State House
 7  district?
 8  A.   In Dallas County.
 9  Q.   Now, in the beginning of that, Chair Hunter suggested
10  that if you had questions about the Senate process you
11  could, you know, from that committee hearing, take those
12  questions to the Senate; is that -- is that correct?
13  A.   That's what he seemed to be saying, yes.
14  Q.   And what did you take from that suggestion?
15  A.   Well, I thought it was atypical because, as I
16  mentioned earlier, typically when we have a Senate bill
17  before a House committee, the House sponsor of that Senate
18  bill typically tries to answer questions from the
19  committee members.
20  Q.   Would there have been time during the hearing for you
21  to take up Chair Hunter's suggestion to ask questions of
22  the Senate?
23  A.   No, I don't believe there was.  We -- my recollection
24  of this day is that shortly after this dialogue that we
25  just heard, we went into public testimony.  I certainly
```

02:44:28
02:44:40
02:45:00
02:45:20
02:45:37

Direct Examination of Rep. Chris Turner    Vol 5   42

1    wanted to be present to listen to the public testimony.

2        And then from there, we were going on to any

3    amendments and then voting on the bill.  So it wasn't

4    practical to go and track down senators to try to ask them

02:45:57  5  why they adopted the plan as they did.

6   **Q.**   Did Representative Hunter give the committee members

7    any prior notice before the hearing, the committee members

8    as a whole, that there would be a vote happening that day?

9   **A.**   No.  Not that I recall.

02:46:13  10  **Q.**   Did he give any notice that any amendments should be

11   provided to the committee during the committee hearing?

12  **A.**   Not that I recall.

13  **Q.**   Was there any opportunity to consider the public

14   testimony that you heard that day and make changes, for

02:46:36  15  example, to the plan based on that?

16  **A.**   No, there was not; and it's why the process was

17   unusual.  Because, typically, we hear a bill in committee

18   and the Chair typically leaves the bill pending to allow

19   the committee members to absorb the testimony they have

02:46:58  20  heard and consider whether they want to propose amendments

21   or a committee substitute bill.  But, obviously, the way

22   this proceeding unfolded, there was not a lot of time to

23   do that.

24  **Q.**   Were any changes made based on the public testimony?

02:47:14  25  **A.**   No.

Direct Examination of Rep. Chris Turner     Vol 5-B

1    **Q.**   What is your assessment, then, of the purpose of the
2    hearing that day?
3    **A.**   To go through the motions.
4    **Q.**   Was SB-4 voted out of the committee?
02:47:26  5    **A.**   Yes, it was.
6    **Q.**   And what happened after SB-4 was voted out of the
7    committee?
8    **A.**   Committee adjourned and we took it up on the floor a
9    few days later.
02:47:44  10   **Q.**   Do you recall Representative Hunter identifying
11   Senator Huffman's redistricting priorities when he laid
12   the bill out on the floor of the House?
13   **A.**   I recall a very broad and general bill layout that
14   spoke to the Senate's approach with respect to Senate
02:48:09  15   Bill 4.
16   **Q.**   And we'll play Defendants' Exhibit Number 69, 0:53
17   through 1:30.
18        (Defendants' Exhibit Number 69 played, as follows:)
19             "REPRESENTATIVE HUNTER:  At that hearing I laid
02:48:19  20   out what we heard the Senate's goals and priorities were,
21   which included following all applicable law, equalizing
22   population across districts, preserving political
23   subdivisions and communities of interest when possible,
24   preserving the cores of previous districts to extent
02:48:42  25   possible, avoiding pairing incumbents, achieving

Direct Examination of Rep. Chris Turner   Vol 5   8

1    geographic compactness, and accommodating incumbent

2    priorities to the extent possible.  Propose the --"

3         (Defendants' Exhibit Number 69 concluded.)

4    BY MR. GABER:

02:48:58   5    **Q.**   Did you hear Representative Hunter mention partisan

6    considerations as one of the redistricting committee's

7    priority on the Senate side?

8    **A.**   I did not.

9    **Q.**   Do you know how Representative Hunter came to know

02:49:11   10   those priorities?

11   **A.**   The priorities that he described that we just saw?

12   **Q.**   Right.

13   **A.**   My understanding was that he had been provided some

14   talking points from the Senate and that's what he was

02:49:26   15   reading from.

16   **Q.**   If the -- if the priorities didn't reflect what the

17   Senate thought the priorities were, do you think that they

18   could have communicated them?

19   **A.**   I would think.

02:49:40   20   **Q.**   Now, what was your assessment of Senate District 10's

21   proposed changes with respect to the priorities that were

22   listed?

23        Take equalizing population, for example.  Did it seem

24   to you that it was necessary to make the changes to SD-10

02:49:58   25   that SD-4 made in order to equalize population in the

*Laura Wells, RPR, RMR, CRR, RDR*

Direct Examination of Rep. Chris Turner      Vol 5   45

1    plan?

2    **A.**   While some districts certainly needed population

3    equalization, Senate District 10 actually was very close

4    to the ideal population in the benchmark plan.  So my

02:50:17   5    belief was it did not require major changes or really any

6    changes at all.

7    **Q.**   And did representatives offer amendments that, in

8    fact, equalized the population in the plan but didn't

9    change SD-10?

02:50:30   10   **A.**   Yes.

11   **Q.**   What about the compactness criteria?  What was your

12   assessment of whether or not SD-10 is compact in the new

13   Senate plan?

14   **A.**   I would say in this instance they did the opposite of

02:50:51   15   the stated principle.  They took a compact Senate District

16   10 that was wholly contained within Tarrant County and

17   stretched it out over, I think, a total of seven counties

18   going a couple of hundred miles to the west and then

19   taking in Johnson County to the south.  So they took a

02:51:09   20   compact district and made it very -- very much uncompact.

21   **Q.**   How about communities of interest?  How did the SB-4

22   treat the communities of interest in Tarrant County with

23   respect to SD-10?

24   **A.**   I think communities of interest in Tarrant County were

02:51:29   25   broken apart and disrespected in this process.  Fort Worth

1    was split up unnecessarily.  The southeast part of the

2    district in Arlington and Mansfield were broken up

3    unnecessarily.  And so I don't think communities of

4    interest were respected at all in this drawing of SD-10.

02:51:57   5    **Q.**   And how about any shared interests or traditionally

6    shared interests between sort of the core of Fort Worth

7    and the counties that were adjoined to SD-10?

8    **A.**   Yeah.  Again, I think that this map is a betrayal of

9    that stated principle because, obviously, the communities

02:52:26   10   within Tarrant County, within Fort Worth and surrounding

11   communities, obviously, do have a shared community of

12   interest.

13       It is -- it is hard for me to identify a shared

14   community of interest between Fort Worth and rural

02:52:42   15   counties out near Abilene or even counties like Johnson

16   County to the south of Tarrant County.  So I don't think

17   there are like communities of interest in this drawing of

18   SD-10.

19   **Q.**   Can you talk a little bit, as a representative and a

02:52:59   20   politician, about what is the importance of communities of

21   interest and keeping them whole?  Why does that matter in

22   redistricting?

23   **A.**   Well, I think it matters for a few different reasons.

24   One, so that voters who live in similar communities and

02:53:24   25   have similar interests are able to coalesce and elect

Direct Examination of Rep. Chris Turner     Vol 5-8

1  elected officials who will represent their interests.

2      And so -- and we see that, you know, throughout our

3  politics, I think.  You know, my House district, for

4  example, in southeast Tarrant County is a very urban and

02:53:48  5  suburban mix of people that my constituents' concerns are

6  very different from a fellow House member, say, in

7  Anderson County which is very rural.  They have a

8  different set of concerns.

9      And so I think it helps the voters to be able to elect

02:54:11  10  people who are from their community and understand their

11  interests and not have constituencies with divergent

12  interests at times.

13  **Q.**  And beyond just voting on legislation that might be in

14  the shared view of the constituents, are constituent

02:54:32  15  services affected by fracturing traditional communities of

16  interest?

17  **A.**  Yes, I think they are.  I think, you know, one, just

18  logistically, you know, one of the most important things

19  we do is constituent services; and you have district

02:54:51  20  offices or a district office that responds to constituent

21  needs.

22      And so having a district office in Tarrant County,

23  will constituents in, you know, a far-flung, outlying

24  county be able to readily access those services or, vice

02:55:12  25  versa, if the office was on the other end of the district,

1  would constituents of Fort Worth be able to access that

2  office, I think that's certainly a question.

3      And, again, there could be divergent interests.  You

4  might -- in a rural area you might need staff that's very

02:55:26  5  knowledgeable about issues specific to that area -- you

6  know, agricultural issues or rural water issues -- versus

7  a totally separate set of priorities in a more urban

8  setting.

9  **Q.**  You mentioned that your district has a large Black and

02:55:40  10  Latino population; is that right?

11  **A.**  It does, very.

12  **Q.**  And can you talk a little bit about some of the

13  specific constituent services that are unique to those

14  communities and your role as a representative that may not

02:55:51  15  be the same for rural White voters?

16  **A.**  Sure.  I would say that a lot of the constituent

17  services that my office is involved in pertain to

18  certainly unemployment insurance over the last couple of

19  years, in particular with the pandemic.

02:56:11  20      We deal with a lot of Medicaid issues.  We have a lot

21  of families with children on Medicaid or in the CHIP

22  program, and that requires us to have specialized skill

23  and experience working on those issues.

24      Child support issues are another we have spent a lot

02:56:28  25  of time on.  So those would be some examples that I think

Direct Examination of Rep. Chris Turner   Vol 5-8

1    are particularly relevant in an urban and suburban area

2    such as the one I represent.

3    **Q.**   Were you concerned in seeing how SD-10 had been

4    treated in the plan, that those types of unique needs of

02:56:50   5    its constituents, its Black and Latino constituents, may

6    not be met if they were a small part of the electorate in

7    the district?

8    **A.**   Yes.  That was absolutely one of my concerns.

9    **Q.**   Did you speak on the House floor regarding the Senate

02:57:16   10   Bill 4?

11   **A.**   Yes.

12   **Q.**   We'll pull up Defendants' Exhibit Number 69, 8:45

13   through 9:24.

14       (Defendants' Exhibit Number 69 played, as follows:)

02:57:29   15       "REPRESENTATIVE TURNER:  -- 2020 census revealed

16   tremendous population growth among African-American,

17   Hispanic, Asian-American communities in both Dallas and

18   Tarrant Counties.  At the same time, the Anglo population

19   of Dallas County decreased by 5.4 percent and in Tarrant

02:57:45   20   County by 8.9 percent.

21       "This proposed Senate plan creates zero additional

22   minority opportunity districts in either Dallas or Tarrant

23   Counties.  In fact, it eliminates the only Tarrant County

24   district in which African-Americans and Hispanics in Texas

02:58:03   25   can come together to elect the candidates of their choice.

1    And that district is Senate District 10."

2        (Defendants' Exhibit Number 69 concluded.)

3    BY MR. GABER:

4    **Q.**   Representative Turner, can you describe this large

02:58:13   5    posterboard that you have displayed in the well of the

6    House floor?  What does it show?

7    **A.**   Yes.  That's a map of Tarrant County with Senate

8    district boundaries and the shading on the map represents

9    combined Black and Hispanic population.

02:58:37   10   **Q.**   And did you do anything else to make your House

11   colleagues aware, besides your speech and besides having

12   this large placard of what the -- how SB-4 treated the

13   Black and Latino and Asian voters in Senate District 10?

14   **A.**   In addition to having this map on the easel up at the

02:59:06   15   front, I also had smaller versions of it printed and

16   distributed on each member's desk on the House floor.

17   **Q.**   And did you mention the fact that you had done that,

18   placed the 150 maps on each of the House members' desks,

19   during the course of your remarks?

02:59:23   20   **A.**   Yes, I did.  I brought the membership's attention to

21   that and encouraged them to look at the map before they

22   voted on the amendments.

23   **Q.**   And did you see in the House that the maps actually

24   were visible on the House members' desks?

02:59:37   25   **A.**   Yes, I did.

*Laura Wells, RPR, RMR, CRR, RDR*

1    Q.   Now, we talked a little bit about CD-33 and how that,

2    in the new plan, kept the Fort Worth minority community

3    together.  Are you familiar with the State Board of

4    Education plan that was adopted?

02:59:50   5    A.   Yes, I am.

6    Q.   How did that treat the Fort Worth minority community?

7    A.   Like CD-33, it largely keeps together the heavily

8    Black and Hispanic areas of Fort Worth within the same

9    State Board of Education district, similar to the existing

03:00:11   10   district boundaries.

11   Q.   Does the lines that are chosen and the communities

12   that are kept together, does that reflect sort of the

13   substantive policy of the legislature in adopting the

14   redistricting maps?

03:00:24   15   A.   I think it does, yes.

16   Q.   And would it seem to you to be a departure from that

17   consistent policy across the other maps for the State

18   Senate map and only the State Senate map to crack apart

19   those Fort Worth minority communities?

03:00:39   20   A.   Yes, absolutely.

21   Q.   Now, Representative Turner, you broke -- participated

22   in breaking quorum in the summer of 2021; is that right?

23   A.   Yes.  That's right.

24   Q.   And why did you do that?

03:00:57   25   A.   That was to delay the passage of what was then SB-1,

1   which was an omnibus anti-voting participation bill that

2   would have made it more difficult for many Texans to vote.

3   **Q.**   Was your participation in that event important to you?

4   **A.**   Yes.

03:01:26   5   **Q.**   Now, did that happen before or after the Census Bureau

6   released the redistricting data to the states?

7   **A.**   That was before.

8   **Q.**   So, in your view, did the quorum break activities last

9   summer, did that have any impact on the redistricting

03:01:41   10   process?

11   **A.**   No.

12         MR. GABER:  Thank you, Representative Turner.  I

13   have no further questions.

14      I pass the witness.

03:01:53   15         JUDGE GUADERRAMA:  Thank you, Mr. Gaber.

16                    **CROSS-EXAMINATION**

17   BY MR. HUDSON:

18   **Q.**   For the benefit of the court reporter, my name is Eric

19   Hudson.

03:02:19   20      Representative Turner, good afternoon.  How are you?

21   **A.**   Good afternoon.  Doing fine.  Thank you.

22   **Q.**   Are you able to hear me?

23   **A.**   Yes.  I can hear you fine.  Thank you.

24   **Q.**   Let's talk a little bit about your redistricting

03:02:28   25   experience in the state of Texas.  You would agree that

Cross-Examination of Rep. Chris Turner      Vol 3-B

1   generally the Texas Senate works on their own

2   redistricting map, right?

3   **A.**   Yes.

4   **Q.**   And, generally, the Texas House of Representatives

03:02:38   5   works on its own redistricting map, right?

6   **A.**   Yes.

7   **Q.**   All right.  And you know who Senator Joan Huffman is,

8   right?

9   **A.**   Yes.

03:02:46   10   **Q.**   Now, you don't know anybody on her staff, if anyone,

11   who may have worked on redistricting the Texas Senate map,

12   right?

13   **A.**   Do I know anyone on her staff?

14   **Q.**   No.  My question is:  You don't know anyone on her

03:02:58   15   staff who may have worked on redistricting with Senator

16   Joan Huffman, right?

17   **A.**   No.  No, I don't.

18   **Q.**   And you don't recall talking to Senator Joan Huffman

19   during the first special session of the 87th Special

03:03:11   20   Legislature about redistricting?

21   **A.**   No.

22   **Q.**   In fact, from January 2021 to this very day, you

23   haven't had a single conversation with Senator Huffman

24   about redistricting, right?

03:03:20   25   **A.**   Not about redistricting.

Cross-Examination of Rep. Chris Turner   Vol 5   54

| | |
|---|---|
| 1 | **Q.**   Okay.  The same question but for her staff.  You |
| 2 | haven't talked to any of her staff members about |
| 3 | redistricting from January 1, 2021, to the present, right? |
| 4 | **A.**   No. |
| 03:03:32   5 | **Q.**   And so that includes the regular session, right? |
| 6 | **A.**   Right. |
| 7 | **Q.**   The first special session? |
| 8 | **A.**   Right. |
| 9 | **Q.**   The second? |
| 03:03:38   10 | **A.**   Right. |
| 11 | **Q.**   And then ultimately the third, right? |
| 12 | **A.**   Right. |
| 13 | **Q.**   All right.  So Joan Huffman, who is the Chair of the |
| 14 | Senate Redistricting Committee, you have no knowledge |
| 03:03:46   15 | about how she conducted redistricting or how she operated, |
| 16 | right? |
| 17 | **A.**   No. |
| 18 | **Q.**   You are familiar with RedAppl? |
| 19 | **A.**   Yes. |
| 03:04:00   20 | **Q.**   What is RedAppl? |
| 21 | **A.**   It's a -- it's an abbreviation for a redistricting |
| 22 | application which is a Texas Legislative Council software |
| 23 | product that is available to legislators to help us in the |
| 24 | redistricting process. |
| 03:04:16   25 | **Q.**   You understand RedAppl has functions that allow users |

*Laura Wells, RPR, RMR, CRR, RDR*

Cross-Examination of Rep. Chris Turner   Vol 5   55

 1   to look at different features of maps based on available

 2   data, right?

 3          COURT REPORTER:  Hold on a second.  Can you

 4   repeat the question, please.

03:04:26      5          JUDGE GUADERRAMA:  If you could slow down a

 6   little bit because you are speaking pretty fast.

 7          MR. HUDSON:  Sure, Your Honor.  That's a common

 8   complaint with me.  My apologies.

 9   BY MR. HUDSON:

03:04:34     10   **Q.**   You understand that RedAppl has functions that allow

11   users to look at different features of maps based on the

12   available data, right?

13   **A.**   Yes.

14   **Q.**   For instance, partisan shading can be turned on?

03:04:45     15   **A.**   Yes.

16   **Q.**   But again, not having talked to Senator Huffman or

17   anybody on her staff, you have no idea whether Senator

18   Huffman looked at things like partisan shading, right?

19   **A.**   No.

03:04:54     20   **Q.**   You have no idea whether it showed things like racial

21   shading, right?

22   **A.**   No.

23   **Q.**   And so you are not here to testify to this Court today

24   that Senator Huffman did or did not use any particular

03:05:04     25   feature of RedAppl when she was conducting redistricting,

1    right?

2    **A.**   No, I am not.

3    **Q.**   Now, you would agree with me that the Senate is

4    majority Republican, right?

03:05:14    5    **A.**   Yes, it is.

6    **Q.**   And there are 18 Republicans on the Senate?

7    **A.**   Yes.  That's right.

8    **Q.**   Thirteen Democrats?

9    **A.**   Yes.

03:05:21    10   **Q.**   But you know that Senate Bill 4, which is the Senate

11   map, passed 20 to 11, right?

12   **A.**   Yes.

13   **Q.**   So it was a bipartisan vote?

14   **A.**   Yes.  By definition there were a couple of Democrats

03:05:36    15   that voted for it.

16   **Q.**   So at least a couple of Democrats thought the Senate

17   map was fine, right?

18   **A.**   I don't know what they thought about the map overall.

19   **Q.**   Well, they certainly voted for it, right?

03:05:45    20   **A.**   I would agree they voted for the map.

21   **Q.**   Now, you had -- let's talk a little bit about the rush

22   and the delay that you talked about with your counsel.

23       Now, before we get to that, you had counsel during

24   redistricting, didn't you?

03:05:57    25   **A.**   Yes.

1   **Q.**   Who did you hire as counsel?

2   **A.**   I hired a Chad Dunn as counsel -- to be counsel for

3   the House Democratic Caucus.

4   **Q.**   That's Chad Dunn right there, right?

03:06:10   5   **A.**   Yes, sir.

6   **Q.**   So he advised you through the entire redistricting

7   process?

8   **A.**   Yes, he did.

9   **Q.**   Who else?

03:06:15   10   **A.**   I also worked with Mr. Gaber and, more recently,

11   Mr. Gaines.

12   **Q.**   Okay.  These are some of the same lawyers who worked

13   with the other members of the Senate, for instance, in

14   helping them with their redistricting issues, right?

03:06:31   15   **A.**   I believe some of them did, yes, sir.

16   **Q.**   Okay.  It sounds like a lot of y'all had a lot of the

17   same representation, right?

18   **A.**   That seems likely, yes.

19   **Q.**   Well, let's talk a little bit about the census data

03:06:45   20   delay.  So you went into session in 2021 knowing that the

21   census data would not be released in time for the regular

22   session, right?

23   **A.**   Yes.

24   **Q.**   And, in fact, you knew in 2020, because of the COVID

03:06:59   25   pandemic, that the census data would be delayed?

*Laura Wells, RPR, RMR, CRR, RDR*

1   **A.**   Yes.  That's right.

2   **Q.**   Now, you are aware that the Census Bureau has an

3   obligation under federal law to provide the census data by

4   April 1 of 2021, right?

03:07:10   5   **A.**   Yes.

6   **Q.**   And you are aware that in past redistricting cycles

7   the census data was released in time for the legislature

8   to take the matter up during the regular session, right?

9   **A.**   Yes.

03:07:20   10   **Q.**   In fact, are you aware of any other time in Texas

11   history where the census data has been delayed such that

12   redistricting did not occur during the regular session?

13   **A.**   I am not, no.

14   **Q.**   Okay.  Now, you are also aware that in -- that the

03:07:39   15   U.S. Census data had been published -- had it been

16   published on time in 2021, the legislature would have been

17   able to address redistricting before the 87th --

18          COURT REPORTER:  Hold on a second.  Repeat that,

19   please.

03:07:44   20          MR. HUDSON:  Sure.

21   BY MR. HUDSON:

22   **Q.**   You are aware that had the U.S. Census Data been

23   published on time in 2021, the legislature would have been

24   able to address redistricting before the end of the 87th

03:08:00   25   Regular Session, right?

1   **A.**   We would have had the opportunity to, yes.

2   **Q.**   And the Census Bureau did not release the data on

3   time?

4   **A.**   Correct.

03:08:10   5   **Q.**   Instead, it was delayed due solely to the COVID-19

6   pandemic, right?

7   **A.**   That's right.

8   **Q.**   That wasn't some Republican plan to prevent or delay

9   redistricting, right?

03:08:20   10   **A.**   No.  It was the result of the pandemic.

11   **Q.**   It wasn't intentional discrimination that resulted in

12   the census data not being delivered on time, right?

13   **A.**   No.

14   **Q.**   Now, the Census Bureau did not release preliminary

03:08:32   15   data until August 12 of 2021; is that right?

16   **A.**   Right.

17   **Q.**   And it didn't deliver the full redistricting tool kit

18   until September 16 of '21, right?

19        THE REPORTER:  Okay.  Hold on a second.  Please

03:08:46   20   start over.

21   BY MR. HUDSON:

22   **Q.**   And it didn't deliver the full redistricting tool kit

23   until September 16 of '21, right?

24   **A.**   That sounds right, yes.

03:08:50   25   **Q.**   Now, it's about a five-month delay?

Cross-Examination of Rep. Chris Turner                    Vol 5-B

```
           1   A.   I'm sorry.  Could you repeat that?

           2   Q.   That's about a five-month delay from when it was

           3   supposed to be delivered in April, right?

           4   A.   Yes.

03:08:59   5   Q.   For that -- for that reason, no redistricting occurred

           6   in the regular session; is that fair?

           7   A.   That's fair.

           8   Q.   And the Governor and State called a special session?

           9   A.   Yes.

03:09:11  10   Q.   One of the purposes of the special session was to

          11   enact new legislative maps, right?

          12   A.   The third special session, yes.

          13   Q.   The third call?

          14   A.   Yes.

03:09:20  15   Q.   For the benefit of the Court, when we're talking about

          16   special session, I understand first special session, no

          17   census data, right?

          18   A.   That's right.

          19   Q.   Second special session, still no census data, right?

03:09:34  20   A.   Correct.

          21   Q.   So the third special session was the first time that

          22   the Texas Legislature had both the census data and the

          23   time to conduct the redistricting, right?

          24   A.   Yes.

03:09:45  25   Q.   All right.  So will you agree with me that when I
```

1    refer to the session or special session, I'm referring

2    only to the third during this testimony?  Is that okay?

3    **A.**   Yeah.  Absolutely.

4    **Q.**   Now, how long is a regular session?

03:09:59   5    **A.**   A regular session is 140 days.

6    **Q.**   How long is a special session?

7    **A.**   A maximum of 30 days.

8    **Q.**   So in this particular circumstance, the special

9    session that the redistricting was conducted in, you had

03:10:15   10   30 days to conduct the entire redistricting that would

11   have normally been done across 140, right?

12   **A.**   Well, I would say that in reality you would not --

13   even had the census data arrived by April 1st, it would

14   not have been 140 days to do redistricting.  There is

03:10:40   15   constitutional limitations on when bills can be introduced

16   and when bills can be heard on the House floor.  And so I

17   think that the available time, had we done it in a regular

18   session, would have been less than 140 days.

19   **Q.**   Certainly more than 30?

03:11:00   20   **A.**   Probably, yes.  I would guesstimate about two months.

21   **Q.**   Now, again, the 30-day special session limit, that's

22   set by statute, right?

23   **A.**   It's in the Constitution, yes.

24   **Q.**   Okay.  That wasn't a Republican plan to only give you

03:11:18   25   30 days for redistricting, right?

1   **A.**   No.

2   **Q.**   It wasn't intentional discrimination that there is

3   only 30 days to conduct a special session, right?

4   **A.**   No.

03:11:25   5   **Q.**   And, in fact, candidate filing was November 13 of

6   2021, right?

7   **A.**   That was the first day to file, yes.

8   **Q.**   So the special session that got called for

9   redistricting, that occurred on September 20?

03:11:38   10   **A.**   Yes.

11   **Q.**   And 30 days puts us at October 20, right?

12   **A.**   Yes.

13   **Q.**   All right.  Now, being a 30-day special session, there

14   wasn't time for another special session before the

03:11:50   15   November 13 candidate filing deadline, right?

16   **A.**   There would have been.  Maybe not a full 30 days, but

17   a session does not have to last the full 30 days.  We have

18   had special sessions that have lasted two or three days.

19        So, in fact, there was speculation that the Governor

03:12:06   20   would call a fourth special session to finish

21   redistricting at that point.

22   **Q.**   You would agree, Representative Turner, if you thought

23   30 days was compressed, surely you think less than 30 days

24   was really compressed, right?

03:12:17   25   **A.**   Of course.  I think the thinking was that some

```
 1   progress might have been made in the first 30-day special
 2   session and then the work would be complete in the fourth.
 3   Q.   Let's talk a little bit about Beverly Powell.  Now,
 4   you've known Beverly Powell a long time, right?
 5   A.   Yes.
 6   Q.   At least since 2005?
 7   A.   That's right.
 8   Q.   In fact, you are the one who encouraged her to run for
 9   the Senate in 2018?
10   A.   I did, yes.
11   Q.   In fact, you are also a Democrat?
12   A.   Yes, I am.
13   Q.   Okay.  You are also a board member of the House
14   Democratic Campaign Committee; is that right?
15   A.   That's right.
16   Q.   You are also a Democratic Caucus Chair for the Texas
17   House of Representatives?
18   A.   That's correct.
19   Q.   The proper title is Chair of the Texas House
20   Democratic Caucus; is that right?
21   A.   That's right.
22   Q.   Your roles include serving as a minority -- serving as
23   minority leader in the House?
24   A.   Yes.
25   Q.   And that includes facilitating caucus activities?
```

03:12:32   5
03:12:39  10
03:12:51  15
03:13:01  20
03:13:07  25

1   **A.**   Yes.

2   **Q.**   Also calls for coordinating caucus members' efforts in

3   the legislature?

4   **A.**   Yes.

03:13:16  5   **Q.**   And bottom, you move Democratic policies forward in

6   the Texas House, right?

7   **A.**   Yes.  That's correct.

8   **Q.**   And one of the goals of the Democratic Party in the

9   legislative session was to have more Democrats elected

03:13:29  10  than not, right?

11  **A.**   One of our -- you are talking about a legislative

12  priority or --

13  **Q.**   Well, redistricting is -- redistricting is about

14  getting people elected, isn't it?

03:13:42  15  **A.**   Well, I am -- I would say redistricting is about

16  drawing districts that are roughly equal in population to

17  reflect the census figures.

18  **Q.**   And if you can do that in a way that elects more

19  Democrats than Republicans, that would have been a

03:14:01  20  priority of yours, right?

21  **A.**   I don't think I ever looked at it that way.  As you

22  have stated, Democrats are the minority in the Texas

23  Legislature.  So enacting a map that would elect more

24  Democrats wasn't -- wasn't something that we were actively

03:14:26  25  working towards because that simply wouldn't be realistic

1   with Republican majorities.

2   **Q.**   So that this three-judge panel is clear, you had no

3   partisan interests whatsoever in how you handle

4   redistricting?  That's your testimony to this Court?

03:14:41  5   **A.**   I don't think that's the question you asked me.

6   **Q.**   Well, that is the question I asked you.  I guess let

7   me ask it a different way, since maybe you didn't

8   understand it the first time around.

9        You had partisan interests in how redistricting was

03:14:52  10   handled in this special session in 2021, right?

11   **A.**   My interests in redistricting were -- given the

12   circumstances that we were in with the, you know, solid

13   Republican majorities and a Republican governor, was

14   working -- first and foremost, working with members of my

03:15:14  15   caucus to see that their districts were drawn in a way

16   that fairly reflected their communities' interests and

17   seeing that the tremendous growth in minority population

18   in Texas would be more fairly reflected in the maps that

19   were enacted in the House and the Senate and Congress.

03:15:37  20   And so those were my driving motivations and focus of my

21   work throughout the redistricting process.

22   **Q.**   Yeah.  My question was a lot simpler than the one you

23   just answered.  I'm just asking:  You are partisan, right?

24   **A.**   I'm a Democrat, yes.

03:15:54  25   **Q.**   And so you want Democrats to win, and you want

Cross-Examination of Rep. Chris Turner   Vol 5-8

1   Republicans to lose, right?

2   **A.**   Sure.

3   **Q.**   Now, let's talk a little bit about how you go about

4   seeing that Republicans lose and Democrats win.  During

03:16:09   5   the first called special session, you were part of a group

6   that actually absconded from the legislature toward the

7   end of the first special session; and you flew with a

8   contingent out to Washington, D.C., to break quorum in the

9   Texas House; is that right?

03:16:24   10   **A.**   Yes.

11   **Q.**   All right.  And, in fact, you spent four weeks out in

12   Washington, D.C.; is that right?

13   **A.**   That's right.

14   **Q.**   And you were successful in stopping legislation from

03:16:34   15   being passed in the first special session; is that right?

16   **A.**   Yes.

17   **Q.**   In fact, you were so pleased, you sent out a tweet

18   about how you had stopped the legislation, right?

19   **A.**   I probably did, yeah.

03:16:45   20   **Q.**   Well, in fact, you sent a tweet out on August 6th,

21   2021, declaring victory by, quote/unquote, killing an

22   election integrity bill that was drafted during the first

23   called special session, right?

24   **A.**   I don't think I called it an election integrity bill.

03:17:02   25   **Q.**   Well, because you are partisan, right, you wouldn't

*Laura Wells, RPR, RMR, CRR, RDR*

1   call it that?

2   **A.**   No.   Because it wasn't an election integrity bill.   It

3   was an anti-voter bill, and we did kill it.   I probably

4   tweeted something to that effect.

03:17:13   5   **Q.**   Let me ask you this, Representative Turner:   You would

6   agree with me that you've never heard a Republican call

7   SB-1 an anti-voter bill, right?

8   **A.**   I have not.

9   **Q.**   Okay.   You have heard plenty of Democrats call it

03:17:26   10   that, right?

11   **A.**   Sure.

12   **Q.**   That's partisan, right?

13   **A.**   No, I don't.   I think it's factual.

14          MR. HUDSON:   May I approach, Your Honor?

03:17:35   15          JUDGE GUADERRAMA:   Yes.

16   BY MR. HUDSON:

17   **Q.**   Go ahead and take a look at that.   Representative

18   Turner, having looked at that tweet, does that refresh

19   your recollection of whether you sent out a tweet

03:18:07   20   declaring victory for killing SB-1?

21   **A.**   Yes.

22   **Q.**   All right.   And so you did, in fact, send out a tweet

23   on August 6, 2021, declaring victory for having killed

24   SB-1, right?

03:18:19   25   **A.**   Yes, I did.

*Laura Wells, RPR, RMR, CRR, RDR*

1  **Q.**  Now, three days later you sent out another tweet that,

2  quote, "Every day the House can't move forward with

3  Republican anti-voter legislation is a good day," end

4  quote.

03:18:30  5      Do you recall sending out that tweet?

6  **A.**  That sounds familiar, yes.

7  **Q.**  Again, your whole purpose was to delay voting to slow

8  down Republican legislation; is that right?

9  **A.**  Specific to that particular bill, yes.

03:18:44  10  **Q.**  Well, so if your goal is to slow everything down, I

11  mean, everything feels kind of rushed, right?

12  **A.**  I -- I don't think I understand the question.

13          MR. HUDSON:  If I could have just a moment, Your

14  Honor.

03:18:57  15          JUDGE GUADERRAMA:  Yes.

16      (Sotto voce discussion between defense counsel.)

17          MR. HUDSON:  Pass the witness, Your Honor.

18          JUDGE GUADERRAMA:  Thank you, Mr. Hudson.

19      Mr. Gaber.

03:19:23  20                  **REDIRECT EXAMINATION**

21  BY MR. GABER:

22  **Q.**  Representative Turner, was there a piece of

23  legislation passed by the legislature last year that

24  foresaw the potential that more than one special session

03:19:52  25  might be needed to conduct the redistricting process?

Redirect Examination of Rep. Chris Turner    Vol 5

1    **A.**  Yes, there was.

2    **Q.**  And did that set a series of deadlines that would

3    change depending on when the redistricting bill were

4    enacted?

03:20:07  5    **A.**  It did.  It provided, as I recall, several different

6    scenarios and adjusted the filing period and the primary

7    dates accordingly.

8    **Q.**  So the law of Texas was that December 13th might

9    actually not be the final day for candidate filing if

03:20:28  10    redistricting were not completed in time for that to

11    functionally happen?  Is that the case?

12    **A.**  That's right.  The legislature contemplated that it

13    could well be later and might necessitate a later filing.

14    **Q.**  Was there time in the 30-day special session to spend

03:20:51  15    more than one day in the House committee hearing on the

16    Senate plan and provide opportunity for the members to

17    think about amendments, consider the public input, and

18    make changes before the bill was voted out of the

19    committee?

03:21:09  20    **A.**  Yes.  There absolutely was.  We got a slow start in

21    the House committee process in that third special session

22    to where everything was backloaded at the end of that

23    session.

24    **Q.**  Did Chair Hunter suggest during the committee meeting

03:21:30  25    that the end of the special session posed some problem for

Redirect Examination of Rep. Chris Turner   Vol 5

1  why there couldn't be an additional day of consideration?

2  **A.**   No.  I don't recall him expressing that.

3  **Q.**   Was there any opportunity to have resource witnesses

4  during that committee hearing?

03:21:51  5  **A.**   No.  There was not.

6  **Q.**   Is that common in the House?

7  **A.**   No.  It's very unusual.  In fact, I really can't think

8  of another example of when that's not been -- resource

9  witnesses have not been made available to members of the

03:22:08  10  committee on any legislation.

11  **Q.**   Did you have the opportunity to hear from expert

12  witnesses in the House?

13  **A.**   We heard from some experts, such as the state

14  demographer and a couple of others, in the hearings that

03:22:36  15  were held in the regular session and at the beginning of

16  the first special session, but not any during the session

17  in which we actually had the redistricting data or the

18  census data available to us and there were actually maps

19  being proposed.

03:22:56  20  **Q.**   Did you inquire of Chair Hunter of the opportunity to

21  have expert testimony after the census data was released

22  and after the redistricting plans were put in place or

23  proposed, rather?

24  **A.**   Yes, I did.

03:23:11  25  **Q.**   And what was the response?

Redirect Examination of Rep. Chris Turner   Vol 5-B

1    A.   We first raised this in the House -- the House map

2    proceedings and subsequently raised it with respect to the

3    other bills.

4         And at first the Chairman had indicated to one of my

03:23:37  5    colleagues that we would -- he would allow for us to

6    invite experts to testify, but that seemingly just never

7    happened.  And when we got actually on the bills, we had

8    the bills before us in committee, he said that wasn't

9    going to be possible in those hearings.

03:24:00  10        And, similarly, when I asked about resource witnesses

11   from the Texas Legislative Council, for example, or the

12   Secretary of State or the Attorney General's office, he

13   said something to the effect of maybe at some point we'll

14   be able to have them but not right now.

03:24:22  15   Q.   Has that ever happened before in your tenure in the

16   House of Representatives?

17   A.   No.  Never that I can recall.

18   Q.   If you had wanted to have an expert witness on, say,

19   the Voting Rights Act or the constitutional requirements

03:24:39  20   for redistricting, how long would those experts have had

21   to testify to the House Redistricting Committee on the

22   Senate bill?

23   A.   So that's ultimately up to the Chair of the committee,

24   as the Chairman sets the rules.  But, generally speaking,

03:24:59  25   invited expert witnesses are afforded a lot of latitude

1   and given a generous amount of time to make their

2   presentation.  Certainly more time than was allotted to

3   members of the public who were limited to three minutes

4   for their testimony.

03:25:18  5   **Q.**   And in this instance, since the Chair wouldn't allow

6   the invited expert testimony, were expert witnesses --

7   would they have been limited to those three minutes?

8   **A.**   Yes.  And they were limited to those three minutes.

9   **Q.**   Have you ever seen that before in the House of

03:25:38  10   Representatives?

11   **A.**   I can't say that I have seen that before, particularly

12   on an issue this complex and an issue that we, by

13   definition, only deal with once a decade.  It was very,

14   very unusual.  It was something that I had not experienced

03:25:58  15   before myself.

16   **Q.**   The bill that I mentioned earlier that would have

17   changed the candidate filing deadlines and the other

18   election -- and the election dates, that the primary

19   election dates had an additional special session than

03:26:18  20   needed or desired, that was SB-13; is that right?

21   **A.**   That sounds right, yes.

22        MR. GABER:  No further questions.

23        JUDGE GUADERRAMA:  Thank you, Mr. Gaber.

24      Mr. Hudson, did you have anything else?

03:26:35  25        MR. HUDSON:  Just briefly, Your Honor.

**RECROSS-EXAMINATION**

BY MR. HUDSON:

**Q.**   Representative Turner, we talked just a moment ago about how there was a quorum break in the first special session, right?

**A.**   Yes.

**Q.**   And I presume that the Democratic caucus did not go share its political strategies with Republicans during any of the three special sessions, right?

**A.**   Well, what do you mean by "share our strategy"?

**Q.**   Let me see if I can ask it like this:  You didn't go around telling Republicans a month in advance that you planned to break quorum in the first special session, right?

**A.**   No.  Although, we didn't know in a month in advance we were going to do that.

**Q.**   So Republicans wouldn't have a way to know whether Democrats were or were not going to break quorum in the second special session, for instance?

**A.**   No.

**Q.**   Or the third, right?

**A.**   Yeah.

**Q.**   So if Republicans wanted to have a quorum to actually pass legislation, they needed to do it quickly because they just had no idea when you guys might skip town or

1   break quorum, right?  Hold that thought.

2          MR. HUDSON:  Can you pull up 3 for me.

3   **A.**   I'm happy to answer your question.  I'm just not sure

4   I understand the question.

03:27:50   5   BY MR. HUDSON:

6   **Q.**   You would agree with me -- if you'll take a look at

7   the screen, this was Exhibit 3 to your deposition.  This

8   was a notice of public hearing by the House of

9   Representatives.  Do you see that?

03:28:03   10   **A.**   Yes.

11   **Q.**   You would agree that a committee hearing was set for

12   10:00 a.m. on Wednesday, July 7 of 2021, right?

13   **A.**   Yes.

14   **Q.**   And the subject of that meeting was redistricting,

03:28:16   15   right?

16   **A.**   Yes.

17   **Q.**   And the place was the Capitol Extension with Chair

18   Representative Todd Hunter, right?

19   **A.**   Yes.

03:28:23   20   **Q.**   And read along with me.  It reads, "The committee will

21   meet to hear invited and public testimony from experts and

22   members of the public on the 2021 legislative

23   redistricting process.  This hearing will focus on the San

24   Antonio area, but the committee will hear testimony about

03:28:39   25   any region of the state."

Recross-Examination of Rep. Chris Turner - Vol 5    75

1          Did I read that correctly?

2     **A.**   Yes, sir.

3     **Q.**   You understood that that meeting was going to take

4     place, right?

03:28:45   5     **A.**   Yes.

6     **Q.**   You got the notice, right?

7     **A.**   Yes.

8     **Q.**   Now, it goes on to say that "The committee will hear

9     invited testimony from the state demographer regarding

03:28:57  10     population projections for the State with a focus on the

11     San Antonio area."

12          Did I read that correctly?

13     **A.**   Yes.

14     **Q.**   And "The committee invites testimony from the public.

03:29:04  15     Members of the public who cannot attend the hearing in

16     person may request to be invited to provide their

17     testimony virtually by videoconference."

18          Did I read that correctly?

19     **A.**   Yes.

03:29:12  20     **Q.**   So the meeting is set July 7 to hear from a

21     demographer, other experts, and invited public testimony,

22     right?

23     **A.**   Yes.

24          MR. HUDSON:   All right.   Go ahead and pull up 4

03:29:22  25     for me, would you.

*Laura Wells, RPR, RMR, CRR, RDR*

Recross-Examination of Rep. Chris Turner   Vol 5

BY MR. HUDSON:

**Q.**   Do you see that on your screen?

**A.**   Yes.

**Q.**   This is Exhibit 4 from your deposition.  This is a

03:29:36   revision to that notice of public hearing; is that right?

**A.**   I'm sorry.  I think this is a different public

hearing.  The previous one was for a hearing on Wednesday,

July 7th that I thought you showed me.

**Q.**   This one was set for July 13th, right?

03:29:55   **A.**   Yes.

**Q.**   And, again, the subject was redistricting?

**A.**   Yes.

**Q.**   And this, again, was going to be at the capitol

building with Representative Todd Hunter presiding, right?

03:30:04   **A.**   Yes.

**Q.**   And that meeting was canceled?

**A.**   Yes.

**Q.**   And below where it says the meeting is canceled it

reads, "Today's redistricting hearing has been canceled

03:30:12   due to a lack of quorum of the Texas House of

Representatives.  A call has been placed on the House to

secure the attendance of absent members; and until a

quorum of the House is secured, no committee hearings may

be conducted."

03:30:23   Did I read that correctly?

*Laura Wells, RPR, RMR, CRR, RDR*

1   **A.**   Yes.

2   **Q.**   So when the Democratic Party decided that they were

3   going to take enough members to break quorum and fly to

4   Washington, D.C., in a plane, you guys prevented any

03:30:35   5   further hearings from happening until you returned, right?

6   **A.**   Yes.

7   **Q.**   So, in effect, you are complaining about things and

8   problems that the Democratic Party actually caused, right?

9   **A.**   No.

03:30:47   10   **Q.**   Well, did any Republicans join you on the trip to

11   Washington, D.C., to break quorum?

12   **A.**   No.

13           MR. HUDSON:  Pass the witness.

14           JUDGE GUADERRAMA:  Mr. Gaber.

03:30:59   15           MR. GABER:  I have no further questions, Your

16   Honor.

17           JUDGE GUADERRAMA:  All right.  Representative

18   Turner, thank you so much for coming down.  You may step

19   down.

03:31:06   20       Will the Representative be free to go?

21           MR. GABER:  Yes, Your Honor.

22           JUDGE GUADERRAMA:  State?

23           MR. SWEETEN:  Yes, Your Honor.

24           JUDGE GUADERRAMA:  Thank you, sir.

03:31:13   25       Who is your next witness?

*Laura Wells, RPR, RMR, CRR, RDR*

Direct Examination of Dr. Cortina                    Vol 5

```
              1         MR. DUNN:  We call Dr. Jeronimo Cortina.  Again,

              2   Mr. Gaber is going to do the examination.

              3         JUDGE GUADERRAMA:  Good afternoon, Dr. Cortina.

              4   If you will raise your right hand, sir.

  03:32:19    5         DR. CORTINA:  (Complying.)

              6         JUDGE GUADERRAMA:  You do solemnly swear or

              7   affirm the testimony that you'll give in this proceeding

              8   will be the truth, the whole truth, and nothing but the

              9   truth so help you God?

  03:32:27   10         THE WITNESS:  I do.

             11         JUDGE GUADERRAMA:  Thank you, sir.  You can have

             12   a seat right there.

             13         THE WITNESS:  Thank you, Judge.

             14         JUDGE GUADERRAMA:  Mr. Gaber, whenever you are

  03:32:35   15   ready.

             16              JERONIMO CORTINA, Ph.D,

             17   having been first duly sworn, testified as follows:

             18              DIRECT EXAMINATION

             19   BY MR. GABER:

  03:32:37   20   Q.   Please state your name for the record.

             21   A.   I'm Jeronimo Cortina.

             22   Q.   And how are you employed?

             23   A.   I work for the University of Houston.

             24   Q.   Could you tell the Court a little bit about yourself,

  03:32:48   25   where you grew up, your background?
```

1  **A.**   Sure.  I was born in Mexico, Mexico City.  I was

2  raised over there.

3        After finishing high school in Mexico, I came to San

4  Antonio to finish high school again.  I did an extra year

03:33:03  5  here.

6        And after that, I came back to Mexico to do college.

7        And then I came back to the United States to do my

8  master's and my Ph.D at Columbia University in New York.

9  **Q.**   Now, backing up to your undergraduate education, where

03:33:20  10  did you complete those studies?

11  **A.**   I worked -- I studied my Bachelor's in Business

12  Administration in ITAM.

13  **Q.**   And could you spell that for the court reporter.

14  **A.**   It's I-T-A-M.

03:33:39  15  **Q.**   And did you give your focus, your major while you were

16  an undergraduate?

17  **A.**   It was business administration.

18  **Q.**   What year did you graduate from undergrad?

19  **A.**   I believe it was '97.

03:33:54  20  **Q.**   And then after undergraduate, where did your studies

21  take you?

22  **A.**   To study a master's in public administration at the

23  School of International Public Affairs at Columbia

24  University.

03:34:06  25        And after that, I did my Ph.D in political science at

1   Columbia University.

2   **Q.**   What year did you receive your master's degree?

3   **A.**   I have two masters' degrees.  One in 2003, I believe.

4   That's a master's in public administration.  And then I

03:34:26   5   have a master of philosophy that I think it was 2005.

6        And then my Ph.D was 2007.

7   **Q.**   And were all of those degrees from Columbia

8   University?

9   **A.**   That is correct.

03:34:45   10   **Q.**   What motivated you to pursue the areas that you did in

11   your education?

12   **A.**   Well, my passion, one, for doing research; and also my

13   passion to study politics and policies.

14   **Q.**   And I'm not sure we got it on the record.  What was

03:35:02   15   your Ph.D in?

16   **A.**   Political science.

17   **Q.**   Who was your advisor for your Ph.D program?

18   **A.**   Rodolfo de la Garza.

19   **Q.**   And could you spell that, as well, for the court

03:35:17   20   reporter.

21   **A.**   R-o-d-o-l-o-f-o, d-e, l-a, G-a-r-z-a.

22   **Q.**   And did he have a particular area of study?

23   **A.**   Yes.  He studied political behaviors, Latino politics,

24   elections.

03:35:35   25   **Q.**   And did his interests and his academic work influence

1  yours?

2  **A.**   Yes.

3  **Q.**   How so?

4  **A.**   Well, when you have a mentor like him, you work close

03:35:45  5  together with the faculty.  And so usually you choose the

6  faculty that you want to work with because you are

7  interested in such topics.

8  **Q.**   What were some of the academic areas that you pursued

9  during your Ph.D program?

03:36:01  10  **A.**   Well, I -- my major was in American politics and my

11  minor was in applied methodology or statistics.

12  **Q.**   And can you explain for the Court some of the

13  statistical methods that you studied and applied while you

14  were in both graduate school and then your Ph.D program,

03:36:23  15  in that order?

16  **A.**   Yes.  So while in grad school, I learned geographic

17  information systems, GIS, in particular using a software

18  called ArcMap.

19      I also specialized in causal inference.  Those are

03:36:40  20  quasi-experimental statistical methods, multi-varied

21  regression analysis and other, I would say, sophisticated

22  statistical techniques that are employed in academia.

23  **Q.**   Can you explain for the Court what "causal inference"

24  is?

03:36:58  25  **A.**   Yes.  "Causal inference" is a methodology using

1    observational data when you cannot implement a controlled

2    experiment to make inferences -- in this case, causal

3    inference -- of a cause and effect.

4         You use these quasi-experimental methods that mimic

03:37:17   5    random assignment, the gold standard in experimental

6    science, to achieve cause and effect of a particular

7    question that you are trying to answer.

8    **Q.**  Can you reduce that to an example, both for my benefit

9    and for the Courts?

03:37:36  10    **A.**  Yes.  For example, if you are trying to understand,

11    you know, if kids that are assigned to a special math

12    program, all right, you can have kids that you can either

13    design an experiment and, you know, randomly assign kids

14    to one treatment, in this case the new math program, and

03:38:02  15    assign kids to the regular classes.  There might be some

16    opposition because some kids might get better, you know,

17    techniques to learn math, or whatnot.

18         So you can use that example without going into that

19    detail by using observational data.  And observational

03:38:22  20    data, depending on the question that you want to answer,

21    there is going to be a lot of techniques.

22         Like, for example, you can use a method called

23    differences in differences, and that method allows you to

24    compare before-and-after data.

03:38:38  25         So you have an external shock, in this case a

Direct Examination of Dr. Cortina        Vol 5-a

1    treatment -- whether it's a new math program, whether it's

2    external shocking in an election cycle, sudden changing

3    policy, so on and so forth -- and compare before-and-after

4    data.

03:38:57    5        And using those differences, those differences between

6    the before and after, you can mimic to a certain extent a

7    randomized assignment and, therefore, conclude that the

8    relationship that you are observing is a causal

9    relationship or at least as close as it would be with an

03:39:16   10    experiment.

11    **Q.**   What sorts of coursework did you undertake to become

12    knowledgeable in this type of analysis?

13    **A.**   I took, well, the introduction to multi-varied

14    statistics, advanced statistics, logistic regression.

03:39:38   15    Then I took causal inference.  And then I took a course on

16    GIS.

17    **Q.**   And can you explain what analytical methods go into

18    multi-varied analysis?

19    **A.**   Yes.  Regression analysis, depending if you are using,

03:39:57   20    you know, linear regression analysis, logistic regression,

21    depending on the data-generation process.  Depending on

22    the variables that you are studying, you can also apply

23    other techniques in multi-varied regression analysis like

24    fixed effects, multilevel modeling, and so on.

03:40:22   25    **Q.**   Now, how do these sorts of statistical methodologies

1   relate to the study of political science?

2   **A.**   Well, it has to do with everything.  There is two --

3   basically, I would say, political science over the past

4   two decades or so has become more and more data-oriented.

03:40:45   5   There has been a boom in data.  So we scientists have

6   access now to a plethora of new data that allows to us

7   more interesting research questions.

8       So methodology in this case or applied statistics are

9   very important because that's going to allow us to have a

03:41:06   10   better way to approach and answer questions that are our

11   interest -- or that fall within our interest.

12   **Q.**   Now, after you completed your Ph.D studies, could you

13   walk us through your professional activities?

14   **A.**   Yes.  I have -- after that, after I graduated from my

03:41:30   15   Ph.D, I went to the University of Houston.  I did a

16   visiting scholar year at the Center for Mexican American

17   Studies.

18       And in 2008, I transitioned back to the department of

19   political science as an assistant professor.

03:41:49   20   **Q.**   And I forgot to ask.  What was your dissertation topic

21   for your Ph.D program?

22   **A.**   I did three papers.  It was not a dissertation.  Now

23   we do three papers, models.  One paper was on immigration.

24   The other one was on applied methodology, something called

03:42:08   25   Bayesian additive regression trees.  And then the other

Direct Examination of Dr. Cortina                           Vol 5-8

```
    1   paper was on public opinion towards immigration.
    2   Q.   Now, after you were -- how long were you an assistant
    3   professor?
    4   A.   Our probatory period is for seven years.  So it was
03:42:30  5   six years, and in the sixth year you go up for tenure.
    6   Q.   What year was that?
    7   A.   I went for tenure in 2014, I believe.
    8   Q.   And did you obtain tenure?
    9   A.   Yes, I did.
03:42:43  10  Q.   And what is your title today?
   11   A.   I am an associate professor.
   12   Q.   Do you have any leadership positions at the
   13   university?
   14   A.   I am the associate director at the Center for Mexican
03:43:03  15  American Studies, and before that I was the president of
   16   the faculty center.
   17   Q.   And how long were you the president of the faculty
   18   center?
   19   A.   Eighteen months.
03:43:12  20  Q.   Can you explain what the Center for Mexican -- was it
   21   Mexican American and Latino Studies?
   22   A.   Yes.
   23   Q.   What does that center do?
   24   A.   Well, the center has three big areas.  One is the
03:43:28  25  academic achievement program; and with the academic
```

Direct Examination of Dr. Cortina      Vol 5-8

1    achievement program we mentor, take and, I guess, figure

2    out how to graduate kids that enter the university with a

3    lower GPA.  Most of the times these are first-generation

4    college students.  We take students from -- it's a

03:43:51   5    means-tested program.  They have to have some need in

6    order to apply for the program.

7         We provide a $3,000 annual scholarship for the four

8    years they are in college.  We provide mentorship.  We

9    provide leadership courses.  We invite them to do

03:44:13  10    community work -- that's part of the scholarship --

11    community work, service to the community.  And, also, they

12    have to comply with weekly study hall hours and, also,

13    one-to-one mentoring sessions.

14         On the other hand, we have the research part of the

03:44:34  15    center.  The research part focuses on creating a number of

16    reports and briefs that are published in the -- in the

17    center's website.

18         And the third part is the academic side.  We have a

19    minor in Mexican American studies, and we have been

03:44:52  20    working on creating an applied minor in Mexican American

21    and Latino studies that is going to have -- provide

22    students with tools that the labor market needs.

23         For example, tools are going to be addressed towards

24    the business community, the policy community.  For

03:45:12  25    example, one of the minors that -- or the concentration

1    tracks of the major is an applied minor in quantitative

2    methods.  The other one is in conjunction with the

3    business school on business administration.  And we have

4    one in general that is just liberal arts.

03:45:31   5    **Q.**   Do you teach both the undergraduate and the graduate

6    level?

7    **A.**   I do.

8    **Q.**   Let's start with the undergraduate courses.  What

9    undergraduate courses do you teach?  And if it changes,

03:45:44  10    you need to let me know.

11    **A.**   Yes.  So I taught Intro to American Politics, Intro to

12    Texas Politics, Intro to Public Policy, Latino Policy,

13    Race -- Race, Ethnic and Gender Politics.  And I have

14    taught, also, Research Design.  And I think that's the --

03:46:14  15    yeah.  I cannot recall if I taught any other classes or

16    not, but that's it.

17         And on the graduate side, I have taught Political

18    Psychology.  I have taught a seminar on causal inference,

19    a seminar on immigration policy.

03:46:32  20    **Q.**   How long have you been teaching Intro to Texas

21    Politics?

22    **A.**   I think probably six or seven years.

23    **Q.**   And what course -- or, excuse me, what topics do you

24    cover in that course?

03:46:52  25    **A.**   Well, in the Texas Politics, all students that go to a

Direct Examination of Dr. Cortina                    Vol 5-B

1  public institution in the state of Texas have to take

2  these two courses:  Intro to American Government and Intro

3  to Texas Politics.

4      And the Texas Politics is just introduction to Texas

03:47:10  5  government particularly.  So we go through the executive

6  branch, the legislative branch, including some legislative

7  processes and, obviously, the judicial branch.

8  **Q.**  Do you cover redistricting in any of the courses that

9  you teach?

03:47:32  10  **A.**  Yes.  In the American Politics course and Texas

11  Politics I have covered redistricting when we talk about

12  the judiciary.

13  **Q.**  And give the Court a sense of what that lesson looks

14  like.

03:47:45  15  **A.**  Okay.  So we, basically, study a little bit about

16  Public Law 74.  We have -- we compare different

17  redistricting systems across the country -- for example,

18  comparatively, like the independent commissions that

19  exist, for example, in California versus the legislative

03:48:07  20  processes that happen in Texas and other states.

21      We cover a little bit of the VRA, what those entail,

22  the language prohibitions of 1975; and we also make

23  comparisons about, you know, how different processes can

24  have different outcomes.

03:48:30  25  **Q.**  Do you keep yourself informed about Texas politics to

 1    prepare yourself to teach that course?

 2    **A.**    Yes.  Yes.  100 percent.  I also have a weekly podcast

 3    on Houston Public Media, and the podcast is about -- is

 4    divided in two parts.  One is general national politics

03:48:56   5    and the rest -- the podcast is 30 minutes.  I would say

 6    ten minutes is about national politics, one or two topics;

 7    and the rest is a discussion of what is going on in Texas

 8    politics.

 9    **Q.**    In your class that you teach redistricting topics,

03:49:18   10   does that involve looking at redistricting maps and

11    comparing them to one another?

12    **A.**    Yes.  We look at maps, and the purpose of looking at

13    maps is to change how -- depending on the process, you are

14    going to get different maps.  So we compare maps.

03:49:34   15        We illustrate how some maps are gerrymandering.  Of

16    course, we go through the history of gerrymandering back

17    in the 1800s in Boston how those maps -- and how it came

18    to be named or named as gerrymandering.

19        So we go through that -- through that in the

03:49:55   20   redistricting.

21    **Q.**    In your academic work do you have the occasion to

22    analyze election data?

23    **A.**    Yes.

24    **Q.**    And can you talk a little bit about that?

03:50:04   25   **A.**    Yes.  So in my most recent published work, we have

1  used data from the Texas Legislative Council to analyze

2  elections and to analyze, for example, changes in

3  electoral administration rulings or rules, in particular

4  how transitioning from precinct-level voting to vote

03:50:31  5  centers increases or decreases turnout in particular

6  counties.

7       We also -- I also use electoral data from the Texas

8  Legislative Council any time that I give presentations

9  either before or after the elections.  And these

03:50:49  10  presentations are to members of the community that invite

11  me to speak to different places, like the League of Women

12  Voters or any other professional association that wants to

13  get a sense of what is going on.

14  **Q.**   And have you been invited by members of both major

03:51:08  15  parties in Texas to speak at events?

16  **A.**   Yes.

17  **Q.**   How frequently do you work with data from the --

18  election data from the Texas Legislative Council?

19  **A.**   Well, I would say pretty frequently.  I don't have --

03:51:24  20  you know, I cannot tell you, like, every day or anything

21  like that.  There are weeks that I work extensively with

22  it and, you know, I stop and then come back.  So -- but I

23  would say that is pretty regular.

24  **Q.**   Can you talk a little bit about your experience with

03:51:39  25  geographic information systems and your studies, you know,

Direct Examination of Dr. Cortina                  Vol 5

1     in your Ph.D program?  We'll start with that.

2     **A.**   Yes.  So part of my research agenda is to try to

3     understand how space -- and by that I mean the geographic

4     space, how the space molds political behavior.  So in

03:52:02   5     order to understand that, I have to use geographic

6     information systems in order to be able to geocode data

7     and to see, for example, where voters live and what are

8     the characteristics of the place in which they reside.

9          We have used that data, for example, to estimate

03:52:21  10     driving distance between a voter's place of residence to

11     the closest precinct-level voting booth or to the closest

12     vote center and have tried to estimate if driving distance

13     increases or decreases turnout.

14          So if you are a voter and you have, for example, your

03:52:42  15     precinct-level place where you used to vote, you know, one

16     block away, well, voting may be easier for that particular

17     voter.

18          In 2005, when the State legislator -- legislature

19     enacted a law that allowed counties to transition to vote

03:53:03  20     centers and not use precinct-level voting anymore, we --

21     counties can now or have the opportunity to locate vote

22     centers across the county in different places.

23          So we estimate the driving distance from that place of

24     residence of a voter to a vote center and compare that

03:53:27  25     with the driving or the difference of the actual distance

```
              1   between the precinct level and the vote center and try to

              2   use that as an independent variable to predict turnout.

              3   Q.   How frequently in your academic work do you work with

              4   GIS methods like you've described just now?

03:53:46      5   A.   Very often because, you know, creating a paper,

              6   writing a paper it's -- you know, it's months.  So

              7   working, for example, with data that we got from the

              8   Secretary of State that was perhaps, I would say, a year

              9   or more of -- these are big -- very big files.

03:54:13     10        So cleaning the data and understanding the data and

             11   saving the data in GIS, it's a process that takes years.

             12   So very often.  Very often.

             13   Q.   Dr. Cortina, I'm going to have you open Plaintiffs'

             14   Exhibit Number 45, and it -- we'll pull it up on the

03:54:28     15   screen so you'll be able to see it; but the screen can be

             16   a bit fuzzy, so you may want to look -- yeah.  It would be

             17   -- I think it would be in the Volume 1 binder.  So if you

             18   have that one there, I'll let you open up to that.

             19        And then I'm going to ask you to turn -- I want to get

03:55:08     20   to your CV.

             21   A.   It's empty.

             22             JUDGE GUADERRAMA:  Mr. Gaber.

             23             THE WITNESS:  It's empty.

             24             MR. GABER:  Oh, it's empty?

03:55:15     25             THE WITNESS:  Yes.  There is nothing here.
```

1          JUDGE BROWN:  So is mine.

2          MR. GABER:  I apologize.  Well, we will get the

3   Court Exhibit 45.  And for the moment, Dr. Cortina, I'll

4   ask if you could look at the screen, if you wouldn't mind.

03:55:28   5   If we have a paper copy, we'll give it to you.

6          JUDGE GUADERRAMA:  Mr. Gaber, we are right at

7   that point where we should be taking our afternoon break.

8   Why don't we do that, and you can get your copies together

9   for us.

03:55:39  10          MR. GABER:  Yes.

11          JUDGE GUADERRAMA:  All right.  We will take a

12   break for 15 minutes.  If we could all be back at 4:10,

13   and we will resume our proceedings at 4:10.

14      (Recess from 3:55 p.m. to 4:10 p.m.)

04:10:27  15          JUDGE GUADERRAMA:  Be seated, please.

16      All right.  Mr. Gaber, did you get us our copies, as

17   well?

18          MR. GABER:  Thank you to the Court's generous

19   staff.  We have printed copies.  We will bring color

04:10:39  20   versions that are hole-punched and replace them in your

21   binders.  But for now there should be copies up there for

22   the Court, and the witness has a copy as well.

23          JUDGE GUADERRAMA:  Thank you.

24   BY MR. GABER:

04:10:50  25   Q.  So, Dr. Cortina, if you could turn to the third page

*Laura Wells, RPR, RMR, CRR, RDR*

Direct Examination of Dr. Cortina          Vol 5-8

1   of Exhibit 4 [sic].  Do you see the first two pages are a

2   declaration attaching your report and your CV?  Do you see

3   that?

4   **A.**   Yes, sir.

04:11:02   5   **Q.**   And the CV starts on Page 3; is that right?

6   **A.**   That is correct.

7          JUDGE SMITH:  Mr. Gaber, you said Exhibit 4.

8   It's 45, isn't it?

9          MR. GABER:  Oh, I am sorry, Your Honor.  Yes.

04:11:14   10   Exhibit 45.

11          JUDGE SMITH:  The court reporter said 4.

12          MR. GABER:  I appreciate it.

13   BY MR. GABER:

14   **Q.**   Dr. Cortina, did you prepare your CV?

04:11:21   15   **A.**   Yes.

16   **Q.**   And where it describes your education, is that

17   information accurate?

18   **A.**   Yes.

19   **Q.**   Now, the CV that you provided, that appears to me to

04:11:40   20   be eight pages long; is that correct?

21   **A.**   That is correct.

22   **Q.**   And not going through everything, but on Page 2 of

23   your CV, could you describe what this page shows?

24   **A.**   It shows my peer-reviewed publications, books, and

04:12:07   25   peer-reviewed journal articles.

1    **Q.**   How many peer-reviewed journal articles have you

2    published?

3    **A.**   I believe 11.

4    **Q.**   Is it the case that I believe one was actually

04:12:23   5    accepted for publication this weekend; is that right?

6    **A.**   Yes.  Yes.  That's the first one, "The Quiet

7    Revolution."

8    **Q.**   And could you tell the Court a little bit about one or

9    two of these publications, the peer-reviewed publications

04:12:39   10   that bear on election analysis and some of the work that

11   you did in your report for this case?

12   **A.**   Right.  The "2009 Vote Centers and Turnout By Election

13   Type in Texas," that's the paper that I alluded to before;

14   and it's a paper in which we ask if voting turnout when

04:13:00   15   transitioning from vote centers, before and after.  This

16   is county-level data.  The data comes from the Texas

17   Legislative Council.

18        And what we investigate is if turnout changes due to,

19   on the one hand, the type of election under

04:13:19   20   investigation -- under analysis and whether vote center

21   turnout was higher or lower after a county transitioned

22   from precinct-level voting to vote centers.

23   **Q.**   And then can you explain a little bit about the rigor

24   involved in getting the works that you have had published,

04:13:39   25   peer-reviewed works you have had published accepted by

1   journals?

2   **A.**   Yes.  So once you finish the article, you send it to

3   an editor.  The editor, his or her job is to do a desk

4   review.  In the desk review process, the editor merits if

5   the article is good enough to be sent out for review.

6        The peer-reviewed process in the journals I publish is

7   at least three peer reviewers.  These three peer reviewers

8   have to analyze your paper to see if the data that you are

9   using is correct, if the methods that you are applying is

10   correct -- are correct, and if the research question that

11   you are posing is of interest enough for the discipline.

12        If the reviewers agree that it is a good article, they

13   will have three choices.  Those three choices are either

14   accept as it is.  In very rare situations that happens.

15        Accept and resubmit, that means they raised a number

16   of questions that need to be addressed before it's

17   published.

18        And the last one, if they don't think it's a good

19   article, they reject it.

20   **Q.**   And I see you have several or a few books that you

21   have authored.  Can you talk a bit about those?

22   **A.**   Yes.  For -- in the -- we have -- well, I have an

23   edited volume that is on the new perspectives on

24   international migration and development.  And it's

25   basically a collection of papers and different authors

04:13:56
04:14:17
04:14:41
04:15:11
04:15:31

1    that talk about how migration can help development in home

2    countries.

3        The other book that I have is an edited volume.

4    Again, it's a quantitative tour of the social sciences.

04:15:50    5    And what I did in that with my co-editor in that book was

6    gather a number of essays from different academics and

7    explain in, I would say, non-academic language how

8    quantitative sciences are used in social science to answer

9    questions.

04:16:09    10    In that book I have a chapter on how you use

11    propensity score matching -- that is a technique -- in

12    order to try to, once again, mimic randomized assignment;

13    and I explain how it, you know, can be implemented in

14    social sciences.

04:16:29    15    And then the last book that we have is a book that we

16    did on *Red State, Blue State, Rich State, Poor State:  Why*

17    *Americans Vote the Way They Do*.  And in that book, myself

18    and my co-authors, or my co-authors and myself, we

19    investigated different elections at the national level and

04:16:53    20    why we observed different patterns.

21        For example, in some cases when you look at election

22    data in some states, you see an opposite party; and when

23    you look, for example, at their relationship between

24    income and voting for the Republican candidate, in some

04:17:11    25    cases that relationship is positive and in some cases that

1    relationship is negative.

2         Geography has to do with a lot of that.  In that book

3    we apply a series of statistical methods called multilevel

4    regression and multilevel regression allows you to compare

04:17:31    5    not only within groups -- let's say, states or counties

6    within states -- but also between counties by allowing the

7    slopes and the intercepts to vary freely.

8         In normal regression you are fixing those intercepts

9    because you are mimicking or you are trying to obtain the

04:17:52    10   line between the datapoints.  And in these ones you allow

11   the data to speak for itself, to put it in colloquial

12   terms.

13   **Q.**   And is there -- across all of these different types of

14   statistical and political science methodologies you've

04:18:09    15   discussed, is there sort of a standard process, a

16   scientific process that is followed in working with data?

17   **A.**   Yes.  Absolutely.  So the first one is you follow the

18   scientific method.  And the scientific method is you have

19   a research question, and that research question is you are

04:18:27    20   trying to come up with a theory.  You can observe a

21   pattern, and you are trying to explain that pattern.

22        So either you gather data to explain that pattern

23   through survey research or any other data-gathering

24   process, or you can use observational data.  For example,

04:18:51    25   a survey that asks a number of questions, and you use that

Direct Examination of Dr. Cortina          Vol 5-8

1    survey in order to try to answer the question that you are

2    using.

3        You develop a few hypotheses and the hypotheses then

4    are tested with such data.  And after that, you either

04:19:12    5    reject or accept the hypotheses given the data that you

6    have and the methods that you have applied.

7        The data-generation process is very important in terms

8    of how your outcome variable or dependent variable is

9    going to be, the nature of the variable itself, whether it

04:19:31    10   is an ordinal variable, whether it's a dichotomous

11   variable.  Then you have to choose -- pardon me.  You have

12   to choose the right method in order to investigate that

13   relationship.

14   **Q.**   I'll let you get some water.

04:19:51    15   **A.**   Oh, thank you.

16   **Q.**   Now, Dr. Cortina, what would you characterize as your

17   areas of expertise as applied to the work that you have

18   been asked to do in this case?

19   **A.**   So I would say that it is political behavior, election

04:20:09    20   analysis, statistics probably defined.

21   **Q.**   Is it political behavior, election analysis, and

22   statistics?

23   **A.**   Uh-huh.  Yes, sir.

24   **Q.**   And have you testified in court before?

04:20:23    25   **A.**   No.  This is my first time.

1  **Q.**  Now, today I'm going to ask you a series of questions.

2  In asking you that, I would ask you to apply your

3  knowledge, experience and qualifications on those topics.

4  Does that work for you?

04:20:37  5  **A.**  Yes, sir.

6         MR. GABER:  And, Your Honors, at this time I

7  would tender the witness, Dr. Cortina, as an expert in

8  political behavior, election analysis, and statistics.

9         JUDGE GUADERRAMA:  Who is the State's attorney?

04:20:49  10        MR. THOMPSON:  Defendants are not raising a

11  *Daubert* objection for purposes of this hearing.

12        JUDGE GUADERRAMA:  All right.  So the Court will

13  recognize Dr. Cortina as an expert in those areas:

14  political behavior, election analysis, and statistics.

04:21:05  15        MR. GABER:  Thank you, Your Honor.

16  BY MR. GABER:

17  **Q.**  Okay, Dr. Cortina.  After that long discussion of your

18  background -- and I appreciate that -- I would like to

19  move on to your work in this case.

04:21:16  20        How did you get involved in this case?

21  **A.**  I got a call from Mr. Dunn on December 31st asking me

22  if I would like to be an expert witness on this matter.

23  **Q.**  And what were you retained to analyze?

24  **A.**  I was asked to do three things primarily.

04:21:36  25        One was to compare the election results of the

1   reconstituted maps of the Enacted Plan 2168.  This was

2   Plan Number 4, the plaintiffs' alternative plan.

3       I used the 2018 and 2020 elections for that matter and

4   see what would be the prospects of the two major political

04:22:03   5   parties under those two maps.

6   **Q.**   And what was the second item that you did?

7   **A.**   The second item was to analyze and compare different

8   enacted plans as they pertain and relate to Tarrant County

9   and to the City of Fort Worth.  And I compared Senate

04:22:25  10   District 10, the benchmark plan, the Enacted Plan 2168.  I

11   also compared Congressional District 33 and school board

12   of elections and -- I'm sorry -- School Board of Education

13   and House district maps.

14       And the third thing that I was asked to do was to

04:22:50  15   compare core retention population plans between Plan 2168

16   versus the Benchmark Plan 2100, Plan 4 versus the

17   Benchmark Plan 2100; and Plan 4 versus the Enacted Plan

18   2168.

19   **Q.**   And we'll start with the first area of analysis, the

04:23:18  20   election analysis; and I will find the page number where

21   we begin in your report.  So this is Plaintiffs' Exhibit

22   Number 45, and it is beginning on Page 3 of Dr. Cortina's

23   report.

24       Do you see that first page, Dr. Cortina?  I'm sorry.

04:23:44  25   The third page.

1   **A.**   Yes.

2   **Q.**   Now, I think you mentioned that you used the 2018 and

3   the 2020 statewide election results to conduct your

4   analysis.  Do I have that right?

04:23:58   5   **A.**   You have that right.

6   **Q.**   And what was the source of that data?

7   **A.**   That was the Texas Legislative Council.

8   **Q.**   I know that you mentioned that earlier that you have

9   worked with TLC data.  Do you generally find it to be

04:24:11   10   reliable?

11   **A.**   Absolutely.

12   **Q.**   And is it regularly relied upon by other social

13   scientists?

14   **A.**   One hundred percent.

04:24:19   15   **Q.**   Now -- and just to back up a bit -- is it your

16   understanding that Plan S-2168, that's the enacted plan

17   that passed for the State Senate and Senate Bill 4.  Is

18   that your understanding?

19   **A.**   Yes.

04:24:32   20   **Q.**   And this alternative plan, Plan 4, is it your

21   understanding that that is an alternative configuration

22   that looks to what could alternatively have happened if

23   partisan intent were the goal of the Senate?

24   **A.**   Correct.

04:24:47   25   **Q.**   Now, I think you mentioned that you did a

1  reconstituted election result analysis on the two plans.

2  Can you explain what "reconstituted election results" are?

3  **A.**   Yeah.  So given that these plans were just one enacted

4  by the state legislature and the other one is an

04:25:09  5  alternative, no elections have happened in those plans.

6       So what TLC, the Texas Legislative Council, does is it

7  transforms, given the new geographies and the new

8  boundaries of such districts, it conforms the electoral

9  results of past elections and races in those elections and

04:25:35  10  puts them into the new -- into both plans, into 2168 and

11  Plan 4.

12       So it's reconstituted because the election has not

13  happened *per se*.  It's just an exercise to see how well a

14  political party would perform under one plan or the other

04:25:56  15  plan.

16  **Q.**   And is it necessary to do this type of reconstituted

17  election analysis using only statewide election --

18  statewide races in an election?

19  **A.**   Given that you have new districts, it's important to

04:26:12  20  be able to compare races that have been across the state.

21  So, in my opinion, the right way to do it is to analyze

22  all statewide elections in order to be able to compare,

23  luckily, apples with apples in the new boundaries created

24  by such maps.

04:26:34  25  **Q.**   And would you be able to look at individual prior

 1   state Senate races in new state Senate districts where the
 2   lines didn't match up?
 3   **A.**   The problem with that is that if you attempt to do
 4   that, it's a completely different election.  If you only
 5   look at Senate district races, the boundaries are going to
 6   be different.  The context may have different
 7   implications, and the elections are going to be different.
 8        If you use statewide elections in this case, the
 9   importance is that you are going to be consistent across
10   your comparisons regardless of one -- regardless of the
11   new districts.
12        So what I'm trying to say is that you are going to be
13   able to compare all the elections and how well a political
14   party performs under the new maps across all these
15   different races.
16        And, also, statewide races, as you know, in Texas we
17   have a very long ballot every single election cycle.  And
18   statewide races provide a good test to see elections that
19   are going to be with very high turnout and elections that
20   may not have a significant turnout in some cases because
21   they are at the bottom of the ballot.
22   **Q.**   And just to close the loop on the statewide versus
23   state Senate races, a new state Senate district might have
24   covered two different or more than two different state
25   Senate districts in the previous plan; is that correct?

1  **A.**   Yes.

2  **Q.**   In your view, did the 2018 and 2020 elections provide

3  an accurate assessment of the current state of Texas

4  politics?

04:28:26  5  **A.**   Yes.

6  **Q.**   Do you see any value to your analysis in reviewing

7  older election results?

8  **A.**   No.  And the reason for that is that previous

9  elections are not going -- given that the task at hand was

04:28:45  10  to see how well Republican candidates would fare between

11  2168 and Plan 4, the two elections that you are referring,

12  2018 and 2020, constitute the elections in which party

13  competition has increased significantly in comparison to

14  other years.

04:29:10  15      So if you want to make that comparison, you have to

16  use the elections in which it constitutes a good, as the

17  bankers say, stress test for both maps.  So if you use

18  other elections before or primary elections, that is just

19  going to give you numbers that are not going to be

04:29:33  20  reliable and that are not going to represent the current

21  political reality of the state.

22  **Q.**   And you mentioned the current political reality.

23  Would using older election results also give you a

24  snapshot of the past rather than the current state of

04:29:46  25  affairs?

1  **A.**   That is correct.

2  **Q.**   Dr. Cortina, what methodology did you use to compare

3  the electoral performance for Republicans in the two maps

4  that you analyzed?

04:29:57  5  **A.**   Correct.  So given that we are using these

6  reconstituted elections and we are using statewide

7  elections and we have these new geographic boundaries of

8  these new districts, I use the margin of victory.

9        The margin of victory is a percentage difference of

04:30:17  10  the first-place percentage votes minus the percentage

11  votes of the second place.

12  **Q.**   And was that analysis done on a district-by-district

13  basis or on a sort of plan-wide basis?

14  **A.**   It was done on a district-by-district basis.

04:30:35  15  **Q.**   And why prefer or why did you prefer a

16  district-by-district basis?

17  **A.**   Because electoral competition happens in districts.

18  And electoral competition is geographically bounded,

19  right.  We vote in a district.  We are represented by a

04:30:53  20  particular House district.  So -- pardon me.  So

21  everything is geographically bounded.

22        So district by district represents the reality of what

23  it is.  And especially when you are estimating average

24  race, that would have implications; and it can be

04:31:19  25  misleading by showing the margin of victory at the state

1   level because it's not going to give you the whole

2   picture.

3        And I think that given that I was asked to compare

4   these results at the -- and compare how both political

04:31:36   5   parties would fare in one map or the other, my

6   responsibility was to show the whole picture; and the

7   whole picture is district by district.

8   **Q.**   If you need to take another drink.

9   **A.**   Thank you.

04:31:49   10   **Q.**   Now, you mentioned the average in your response there.

11   Did you analyze the average margin of victory for

12   Republicans?

13   **A.**   Yes, I did.

14   **Q.**   And I think you just mentioned that you did the margin

04:32:10   15   of victory within the district; is that right?

16   **A.**   Right.  Yeah.  The district level.

17   **Q.**   That was my fault.  The question was:  Did you analyze

18   the statewide average margin of victory for Republicans?

19   **A.**   Yes.  I provided it as a contextual variable, yes --

04:32:25   20   **Q.**   And did --

21   **A.**   -- for particular races.

22   **Q.**   For particular races within a particular district?

23   **A.**   Exactly.

24   **Q.**   Okay.  And is it possible you could -- if one were to

04:32:37   25   use the average margin of victory on a plan-wide basis for

1  the Republican candidates in a particular race, is it

2  possible that as the average margin of victory increases,

3  the chance of the Republican candidates winning more

4  districts might decrease?

04:32:56  5  **A.**   It is possible.  And this has to do with the -- with

6  the average, with the mean in this case.

7      Just to give you an example, you can have, you know, a

8  margin of victory of, I don't know, let's say 50 in this

9  hypothetical, right.  But that could be driven by a couple

04:33:19  10  of outliers in the data distribution.

11      In comparison, you can have a margin of victory of 20

12  or something else; but the data distribution tends to be

13  smoother.

14      So the mean is going to be very sensitive to outliers.

04:33:37  15  And given that you have new boundaries drawn in one map or

16  the other, you can have some sort of a misleading result

17  at the end; and I would not feel comfortable saying that

18  this is a good margin of victory if you don't look down at

19  the district level.

04:33:57  20  **Q.**   And in terms of redistricting, is it also possible

21  that the higher the margin of victory for one party, it

22  might mean that their voters are being more inefficiently

23  placed in fewer districts?

24  **A.**   That is correct.

04:34:12  25  **Q.**   What threshold of the margin of victory in a

Direct Examination of Dr. Cortina                    Vol 5   109

1    district-by-district basis did you select for assessing

2    Republican Party performance in the two plans that you

3    analyzed?

4    **A.**   So for both plans I used the threshold is the margin

04:34:29   5    of victory is more than ten percent.

6    **Q.**   And how did you come to that margin?

7    **A.**   It's just the difference between the percent vote of

8    the first place minus the percent vote of the second

9    place.

04:34:45   10   **Q.**   I meant to ask "why."

11   **A.**   Oh, I'm sorry.  I heard "how."

12   **Q.**   That's my fault.

13   **A.**   Why?  Because, once again, we are comparing elections

14   that have not happened, on the one hand, in districts that

04:34:59   15   have not happened or had an election so far.

16        And we are comparing different elections.  We are

17   comparing, for example, the presidential election versus

18   the Criminal Court of Appeals election.  The two elections

19   are completely different.

04:35:17   20        So in order to understand what 10 percent margin of

21   victory means, that allows you to have these comparisons.

22   So a margin of victory of 10 percent in one election or

23   the other means the same.  It means that the candidate

24   that got that winning by 10 percent or more, he or she is

04:35:38   25   in a district that could be considered safe for that

1    particular candidate, in my opinion.

2    **Q.**   So, in your view, that 10 percent threshold is sort of

3    where the seat moves from being possibly competitive to

4    more likely to be secured for that party in a given

04:35:59    5    district; is that correct?

6              MR. THOMPSON:  Objection.  Leading.

7              JUDGE GUADERRAMA:  Sustained.

8              THE WITNESS:  I say --

9              MR. GABER:  I'll rephrase the question.

04:36:06   10              JUDGE GUADERRAMA:  Sustained.

11              THE WITNESS:  Sorry.

12    BY MR. GABER:

13    **Q.**   Is the -- the 10 percent level, what is the

14    significance of that in terms of whether the district is

04:36:16   15    competitive or not?

16    **A.**   Well, the significance is that about 10 percent or

17    greater than 10 percent is very difficult for a candidate

18    -- or it's considered or what is considered here is that

19    that district cannot be considered as competitive.

04:36:37   20        "Competitive" means that a candidate, whether from one

21    party or the other party, has a chance to win a particular

22    race on their particular election.

23        Having the margin of victory greater than 10 percent

24    implies that that candidate won that particular election

04:36:57   25    very comfortably.

04:37:15

04:37:37

04:38:04

04:38:28

04:38:49

1  **Q.**  And just to put it as an example, is there a statewide

2  election, say from 2018, where the candidate won by

3  greater than 10 percent that you would view -- if

4  statewide won by greater than 10 percent that would seem

5  to be indicative of a secure election?

6  **A.**  Yes.  For example, if you look at the -- for the

7  governor's race, Governor Abbott won re-election with a

8  statewide margin of victory of 13.3 percent versus the

9  Democratic candidate.  And no one questioned the margin of

10  victory of Governor Abbott and how overwhelmingly he won

11  re-election back in 2018.

12  **Q.**  Okay.  I would like to turn to your election analysis

13  of the two plans and start with the 2018 election.  And

14  this analysis is on Page 3 of your report.

15  Can you tell the Court what the range from the low to

16  high of the statewide margin of victory was for the

17  Republican candidates in the races that you analyzed?

18  **A.**  Yes.  So in the case of the statewide election,

19  Senator Cruz won re-election with a 2.6 statewide margin

20  of victory; while Governor Abbott won his re-election with

21  13.3 percent over the Democratic candidate.

22  **Q.**  Do you know how many elections from 2018 did you

23  analyze?

24  **A.**  I believe I analyzed 14 races.

25  **Q.**  Now, in Plan S-2168, so the enacted plan, for the 2018

1   statewide elections, did the number of Senate districts in

2   which Republican candidates received a 10 percent margin

3   of victory or greater change across the races that you

4   analyzed on that ballot?

04:39:09   5   **A.**   No.  It was 19 central districts.

6   **Q.**   Was that the case in each of those races?

7   **A.**   Yes.

8   **Q.**   Under Plan S-2168 did the Republican candidates win

9   any districts by less than a ten percent margin of

04:39:26   10   victory?

11   **A.**   No.

12   **Q.**   So the 19 seats, that was just it?  That was the total

13   number in each of the races?

14   **A.**   Yes.

04:39:38   15   **Q.**   In the 2018 election for Plan S-2168, what is the

16   lowest statewide margin of victory -- I'm sorry.  Strike

17   that.

18      What was the lowest statewide margin of victory for

19   Senator Cruz in any of the districts that he carried?  I

04:39:58   20   said "statewide" again.  I'll strike that again and try it

21   the third time.

22      Dr. Cortina, what was the lowest district margin of

23   victory for Senator Cruz in one of the districts he

24   carried under Plan S-2168?

04:40:16   25   **A.**   It was 12 percent.

1   **Q.**   Now I would like to move -- and I apologize.  I am

2   going to take it out of sequence.  I would like to move to

3   Page 4 of your report, and we'll skip for now the 2020

4   election analysis under Plan S-2168 and come back to that.

04:40:31   5        I'll ask you to take a look now at the 2018 election

6   under plaintiffs' Alternative Plan 4.

7        So we're looking at the same statewide elections,

8   right?  So it's the 2.6 percent statewide margin of

9   victory for Cruz to 13.3 percent for Abbott, that remains

04:40:49   10   the same; is that right?

11   **A.**   Yes.  Yes, sir.

12   **Q.**   And under plaintiffs' Alternative Plan 4 is there any

13   change in the number of districts where the Republican

14   candidate wins by a margin of victory of greater than

04:41:12   15   10 percent?

16   **A.**   No.  It's still the same number:  19.

17   **Q.**   Nineteen.  In Alternative Plan 4, under the 2018

18   elections, are there any districts in which the Republican

19   candidates win by a margin of less than 10 percent?

04:41:30   20   **A.**   There are some races, in particular in Senate District

21   10, where Republicans won certain of those races.  The

22   Republicans won -- for example, Governor Abbott won by a 4

23   percent margin of victory in the plaintiffs' Plan 4 SD-10

24   plan; also the comptroller's race and the land

04:41:59   25   commissioner's race and the railroad commissioner's race

1   in which the Republican candidate prevailed in Senate

2   District 10.

3   **Q.**   So under plaintiffs' Alternative Plan 4, then, is it

4   the case that there are in four of the 14 elections --

04:42:16   5   four of the 14 races from the 2018 election the Republican

6   candidates carried 20 seats?

7   **A.**   That is correct.

8   **Q.**   And then for Senator Cruz's race was it just 19 seats?

9   **A.**   Yes.

04:42:35   10   **Q.**   And then for Governor Abbott's was it 20?

11   **A.**   Twenty.

12   **Q.**   And does that reflect -- along the spectrum of the

13   statewide margin of victory from 2.6 to 13.3, does that

14   reflect some additional growth possibility under

04:42:52   15   plaintiffs' Alternative Plan 4 for Republican candidates?

16   **A.**   What it reflects is just that there exists possibility

17   for growth for Republicans to perform better in this 20th

18   district, whereas in Plan 2168 that possibility does not

19   exist.

04:43:19   20   **Q.**   Turning to the 2020 elections under Plan S-2168 -- and

21   that, I believe, is the paragraph above where you are

22   right now -- and, first of all, what was the statewide

23   margin of victory range for candidates on the 2020

24   election for Republican candidates?

04:43:42   25   **A.**   So for President Trump, he won the 2020 presidential

1    race with a margin of victory of 5.5 percent and also in

2    the 19 senatorial districts.  And for the Senate race,

3    Senator Cornyn won the state with a margin of victory of

4    9.6 percent.

04:44:07    5    **Q.**   And how many races -- how many statewide races did you

6    analyze for the 2020 election?

7    **A.**   I believe it was nine elections.

8    **Q.**   And how many total, then, for 2018 plus 2020?

9    **A.**   Twenty-four elections.  However, one of the elections

04:44:24    10   I believe in 2018, if I'm not mistaken, the Criminal Court

11   of Appeals, Position 8, there was no Democrat running.  It

12   was a Republican versus a Libertarian.

13   **Q.**   So 23 races in which there were two-party competitions

14   for the major parties?

04:44:47    15   **A.**   That's correct.

16   **Q.**   So in the 2020 election under Plan S-2168, how many

17   districts do Republican candidates prevail by a margin of

18   victory of 10 percent or greater?

19   **A.**   Nineteen.

04:44:58    20   **Q.**   And are there any in Plan S-2168 where Republican

21   candidates prevailed by a margin of victory of less than

22   10 percent?

23   **A.**   No.

24   **Q.**   And then turning, if you would, to Page 5, the 2020

04:45:16    25   election under plaintiffs' Alternative Plan 4, again, we

1  have the same -- it's the same election.  So we have the

2  same statewide range of margin of victory; is that right?

3  **A.**   That is correct.

4  **Q.**   And in plaintiffs' Alternative Plan 4 for the 2020

04:45:33   5  elections, in how many districts did the Republican

6  candidate win by a margin of victory of 10 percent or

7  greater?

8  **A.**   Nineteen.

9  **Q.**   And are there any in which the Republican candidate

04:45:44  10  won by a margin of victory of less than 10 percent?

11  **A.**   No.

12  **Q.**   So across both the 2018 and 2020 elections is it the

13  case -- or I'll ask:  In how many races under plaintiffs'

14  Alternative Plan 4 was there a Republican candidate

04:46:01  15  winning the 20th seat?

16  **A.**   In a lot of the races in Senate District 27, in most

17  races, and there were also -- no.  Sorry.

18  **Q.**   That was the Democratic candidate, right?

19  **A.**   Right.  That was the Democratic candidate that won

04:46:28  20  those elections in 2020.  That's correct.

21  **Q.**   So the four races in 2018 for SD-10?

22  **A.**   For SD-10, that is correct.

23  **Q.**   And none in 2020?

24  **A.**   None in 2020.

04:46:38  25  **Q.**   But it's four of 23 in Alternative Plan 4 that the

          1   Republican candidate would have won SD-10?

          2   **A.**   Yes.

          3   **Q.**   And it was zero in Plan S-2168?

          4   **A.**   That is correct.

04:46:57  5   **Q.**   In turning back to the 2018 U.S. Senate race under

          6   plaintiffs' Alternative Plan 4, what was Senator Cruz's

          7   lowest margin of victory in one of the districts that he

          8   carried?

          9   **A.**   12.7.

04:47:19 10   **Q.**   And it was 12 percent in Plan S-2168?  Is that --

         11   **A.**   That is correct.

         12   **Q.**   Dr. Cortina, what was your overall opinion, based on

         13   your background and experience and education, in comparing

         14   the election results for these two statewide elections of

04:47:43 15   Plan S-2168 versus plaintiffs' Alternative Plan 4?

         16   **A.**   Yes.  When you compare both plans, you can conclude

         17   that -- or I concluded that Plan 4 under the plaintiffs'

         18   alternative plan performs equal or better than Plan 2168.

         19        And the reason for that is that both those plans carry

04:48:07 20   19 districts in which the Republican candidate wins with a

         21   margin of victory of 10 percent or greater.

         22        However, in Plan 4 the Republican candidate has a

         23   chance, a possibility of winning an extra district, a 20th

         24   district, in particular statewide races:  the governor's

04:48:30 25   race, the comptroller's race, land commissioner and

1   railroad commissioner.

2   **Q.**   Now, in your view does that -- well, strike that.

3        Turning to the second set of analyses that you did,

4   comparing the treatment of Tarrant County in Plan S-2168

04:48:56   5   versus the Congressional plan, the State Board of

6   Education plan, and the State House plan -- and this

7   starts on Page 6 of your report -- and at the moment, I

8   apologize.  We have the black and white copies of the maps

9   on this report.  But on the screen we can show you the

04:49:16   10   color maps.

11        What did you -- what did you undertake to do in this

12   part of your report?

13   **A.**   So in this report I was just asked to compare the --

14   these maps amongst themselves and see if there were any

04:49:34   15   significant differences in terms of how Tarrant County and

16   how -- how Tarrant County and Fort Worth were treated on

17   their different maps.

18   **Q.**   What did you conclude from that analysis?  Let's start

19   with the state -- well, we see on the screen we have the

04:49:58   20   State Senate plan, do you see, kind of in the middle

21   section of the screen, "Senate District 10 under Plan

22   S-2168"?

23   **A.**   So, basically, what I analyzed here was that Senate

24   District 10 under Plan 2168 cut across different counties

04:50:18   25   that goes from, I believe, if my memory serves me well,

1    from Johnson County all the way down to Brown County and

2    cutting across in the center of Tarrant County between --

3    in the City of Fort Worth separating or cutting across the

4    north and south parts of the city.

04:50:41  5    Q.   And turning to the Congressional -- sorry.  Let's do

6    the State House next.  That's the next page, Page 8.

7        What do you observe about the comparison between the

8    treatment of Senate District 10 in Tarrant County under

9    Plan S-2168 versus the State House plan?

04:51:03  10   A.   All right.  So when you compare the combined borders

11   of House Districts 90, 94, 95, 96 and 97, you can see a

12   rough outline of what would be Senate District 10 under

13   Plan 2100.

14   Q.   And that grouping of districts stayed constant in the

04:51:29  15   new State House plan; is that fair?

16   A.   I'm sorry?

17   Q.   That grouping of State House districts that forms that

18   outline, that rough outline of SD-10, that stayed constant

19   in the new State House plan?

04:51:40  20   A.   That is correct.

21          MR. THOMPSON:  Objection.  Leading.  Objection.

22   It misstates his testimony.

23          JUDGE GUADERRAMA:  Well, he has answered it.

24   We'll admit it and take your objection.

04:51:53  25   BY MR. GABER:

*Laura Wells, RPR, RMR, CRR, RDR*

1    **Q.**   And then, finally, on this section of your analysis,

2    Dr. Cortina, on Page 9, the U.S. Congressional Districts,

3    what was your assessment -- and that Page 10 is probably a

4    clearer image for you.  What was your assessment of how

04:52:09    5    the State Senate plan treated Tarrant County and Fort

6    Worth, in particular, versus how the Congressional plan

7    did?

8    **A.**   So when you look and compare Congressional District 33

9    and School Board of Education District 13, you can see, as

04:52:28    10    it's shown in the screen, that they keep the north and

11    south parts of Fort Worth whole.

12    **Q.**   I am told that the color versions of these exhibits

13    will arrive momentarily.  So it's just in time for us to

14    move past the section of the report that has color.

04:52:52    15         So, Dr. Cortina, what was your ultimate conclusion

16    when you -- with respect to comparing all of these plans

17    for Tarrant County and Fort Worth, in particular?

18    **A.**   My conclusion was that amongst these maps, when we

19    looked at Congressional District 33, when we looked at the

04:53:14    20    School Board of Education in District 13, they treat Fort

21    Worth, especially the northern and the southern part, as a

22    whole community in comparison to the Senate District Map

23    Number 10 in 2168 that clearly cuts across Tarrant County

24    in the middle of the City of Fort Worth.

04:53:40    25    **Q.**   I would like to move to the third and final section of

1   your report, which is the core population retention

2   analysis.  Can you explain for the Court what "core

3   retention" is?

4   **A.**   Yes.

04:53:57   5   **Q.**   And this starts, I'm sorry, on Page 11 of your report.

6   **A.**   Core retention is a measurement that is used to

7   examine or quantify the percentage of the population from

8   an old district, how many of that population forms part of

9   the new district.

04:54:22   10   **Q.**   And which plans did you compare the core retention

11   figures for?

12   **A.**   So I compared the Plan 2168 versus the benchmark plan.

13   I compared Plan 4 versus the Benchmark Plan 2100.  And I

14   compared Alternative Plan 4 versus Plan 2168.

04:54:49   15   **Q.**   And I know there is district-by-district core

16   retention figures.  Did you also provide the mean for each

17   of those three comparisons?

18   **A.**   That is correct.

19   **Q.**   And the median, as well; is that right?

04:55:02   20   **A.**   That is correct.

21   **Q.**   Now, for the comparison between Plan S-2168, so the

22   enacted plan, and the Benchmark Plan S-2100, what was the

23   mean core retention figure for that plan?

24   **A.**   So when we compared 2100 versus 2168, the mean

04:55:20   25   retention of overlap population between such plans was

1    75.3 percent.

2  **Q.**   What about the median?

3  **A.**   The median was 78.7 percent.

4  **Q.**   Okay.  For plaintiffs' Alternative Plan 4, again

04:55:36    5  compared against the benchmark plan, what were those mean

6  and median core retention figures?

7  **A.**   70.4 percent, and the median was 74.6 percent.

8  **Q.**   And then, finally, in comparing plaintiffs'

9  Alternative Plan 4 with Plan S-2168, what were the mean

04:55:56   10  and median core retention figures?

11  **A.**   81 percent and 91.9 percent, respectively.

12  **Q.**   Does that mean that 81 percent of the people who are

13  in a district in Plan S-2168 are in that same district in

14  plaintiffs' Alternative Plan 4, on average?

04:56:17   15  **A.**   That is correct.

16  **Q.**   And for the median district, that is the district in

17  the middle of the distribution, that means that

18  91.9 percent of folks who were in Plan S-2168 in a

19  district are in that same district in plaintiffs'

04:56:32   20  Alternative Plan 4?

21  **A.**   That is correct.

22  **Q.**   And what was your assessment of the comparison of

23  these population -- core retention population figures

24  across these two plans?

04:56:42   25  **A.**   Well, my conclusion was that the plaintiffs'

*Laura Wells, RPR, RMR, CRR, RDR*

Direct Examination of Dr. Cortina                    Vol 5   123

1    Alternative Plan 4 has a high population overlap and core

2    retention versus Plan 2168 and comparable population

3    overlap and core retention versus Plan 2100 versus Plan

4    2168.

04:57:04    5    **Q.**   Would you consider both 75 percent and 70 percent to

6    be high core retention figures plan-wide?  Sort of as an

7    average plan-wide?

8    **A.**   It's certainly one is greater than the other one; but

9    I think that both figures are, as I said here, comparable

04:57:22   10    populations.

11    **Q.**   Now, do you recall receiving a response report from

12    Dr. Alford?

13    **A.**   I do.

14    **Q.**   And did Dr. Alford have some criticisms of your

04:57:35   15    analysis?

16    **A.**   He did.

17    **Q.**   Did he have any criticisms with respect to your

18    conclusions regarding the electoral analysis, the first

19    part of your report?

04:57:47   20    **A.**   He did not have *per se* objections in terms of the

21    analysis or the conclusions of my report.

22    **Q.**   Did he take any issue with using the

23    district-by-district margin of victory as the

24    methodological approach of comparing election results?

04:58:09   25    **A.**   No, he did not.

1  **Q.**  Did he take any issue with using 10 percent as the

2  threshold for a quote/unquote safe seat?

3  **A.**  No, he did not.

4  **Q.**  With respect to the -- he didn't take any issue with

04:58:27  5  your actual reporting of the election results, did he?

6  **A.**  No.

7  **Q.**  With respect to the second topic, the comparison of

8  the plans in Tarrant County, how would you characterize

9  his criticisms?

04:58:37  10  **A.**  Well, his criticisms entailed that such plans have

11  different histories, different legal battles, different

12  constituencies, if I remember correctly and, thus, that my

13  analysis that they constitute state policy was just simple

14  speculation.

04:58:59  15  **Q.**  Did Dr. Alford identify anything about those topics

16  that he raised that he believed was wrong or would require

17  a different configuration of Senate District 10 or explain

18  it?

19  **A.**  No.  Dr. Alford did not provide any evidence as of why

04:59:17  20  such factors as historical factors, or whatnot,

21  constituted a different -- a different or explaining why

22  they are important in considering that.

23  **Q.**  And with respect to the third -- the third analysis,

24  the core population analysis, did Dr. Alford have

04:59:41  25  criticisms there?

04:59:51

1    **A.**   I believe so, but I was wondering if I could take a

2    look at that.  I don't have it.

3    **Q.**   It's actually not -- it's not an exhibit.

4    **A.**   Oh, okay.

5    **Q.**   So it is not, to my knowledge.

6    **A.**   Okay.

7    **Q.**   But perhaps I can refresh your recollection.  Did he

8    take issue with the number of districts that were below

9    50 percent core retention in plaintiffs' Alternative Plan

05:00:07   10   4 versus Plan S-2168?

11   **A.**   Yes.

12   **Q.**   And what was his general just sort of point about that

13   phenomenon?

14   **A.**   That according to Dr. Alford, some of these

05:00:21   15   differences in districts in particular, if I remember

16   correctly, Table 3, he was highlighting those districts

17   with a core retention -- with a core population retention

18   less than 50 percent and seems to suggest that that would

19   create significant disruption to the constituencies of

05:00:45   20   such candidates.

21   **Q.**   And Dr. Alford -- I'm sorry.  Dr. Cortina, I'm going

22   to have you turn to -- and we'll bring up on the screen --

23   Plaintiffs' Exhibit Number 101.  This is your rebuttal

24   report, and it might help orient you to the data table.

05:01:36   25        Now, on page -- do you have it there?

**A.**   Yes.

**Q.**   Going to Page 2 of your report, first, were there Senate districts in plaintiffs' Alternative Plan 4 that had higher core retention than the same district in Plan 2168?

05:01:55   **A.**   Yes.

**Q.**   You identify two, two in particular, on Page 2.  Which two districts is that?

**A.**   So I identify Senate Districts 9 and 22 that have a higher core retention rate in Plan 21 -- in Plan 05:02:08 Alternative 4 in comparison to Plan 2168.

**Q.**   What is the magnitude of those differences?

**A.**   So for Senate District 9 in Alternative Plan 4 is 64.2 percent versus 54.4 [sic] in Plan 2168.

05:02:33   **Q.**   Just to -- is it 50.4?

**A.**   50.4, yes.

**Q.**   And then for SD-22?

**A.**   The core retention rate for Senate District 22 in Alternative Plan 4 is 81.4 versus 59.9 percent in Plan 05:02:56 2168.

**Q.**   And then for Senate District 10 what is the difference?

**A.**   That is a 100 percent core retention rating in Alternative Plan 4 and 59.7 percent in core retention in Plan 2168.

```
           1            THE REPORTER:  I'm sorry.  Could you say the

           2   second number again.

           3            THE WITNESS:  59.7 percent.

           4            THE REPORTER:  Thank you.

05:03:16   5   BY MR. GABER:

           6   Q.   Dr. Cortina, was one of Dr. Alford's criticisms that

           7   Republican incumbents might prefer to have a larger core

           8   retention in their district as it's redrawn?

           9   A.   Yes.

05:03:29  10   Q.   Now, with respect to the specific districts that he

          11   identified, what is your -- what do you report here as to

          12   what the response is to Senate Districts 12 and 24?

          13   A.   Yes.  These are two seats in which the Republican

          14   incumbents are not running.

05:03:47  15   Q.   Is it the case, then, that the Republican incumbent

          16   wouldn't have, in your view, a concern over the core

          17   retention figure for the district?

          18   A.   By that, the constituency of that incumbent is no

          19   longer his or her consideration.

05:04:05  20   Q.   And with respect to Senate Districts 5 and 30, what

          21   did you find?

          22   A.   I found that in these particular cases the incumbents

          23   are running unopposed in the primary and general

          24   elections.  So they maintain their core constituency.

05:04:29  25            And in Senate 18 the Republican candidate is also
```

1    running unopposed in the primary election and will face a

2    challenge in the '22 general election for Democratic

3    challengers.

4         However, the average margin of victory in Senate

05:04:51   5    District 18 was 16 percent for 2018 and then 19 percent

6    for 2020, which seems to suggest that these are very

7    comfortable margin of victories for the Republican

8    candidate.

9    **Q.**   Now, in the next paragraph you talk about two more

05:05:14   10   districts.  What did you report with respect to SD-14

11   under plaintiffs' Alternative Plan 4?

12   **A.**   Senate District 14 has the lowest core retention rate

13   of any district in the Alternative Plan 4.  As I

14   understand, this would be an open seat, a new creation

05:05:33   15   seat; and, therefore, there would be no incumbents whose

16   interests would be or could be affected by these low core

17   retention rates.

18        And finally, Senate District 2 has a high core

19   retention percentage in Alternative Plan 4 versus

05:05:55   20   Alternative Plan 2168.

21   **Q.**   And I just want to clarify that last point.  So Senate

22   District 2 the core retention figure is actually higher --

23   **A.**   In Alternative Plan 4.

24   **Q.**   -- than it is in Plan S-2168?

05:06:06   25   **A.**   That's correct.

 1          MR. GABER:  I have no further questions at this

 2    time.  I pass the witness.

 3          JUDGE GUADERRAMA:  Yes.  Mr. Thompson.

 4          MR. GABER:  For the Court, I have -- would you

05:06:26  5    like to wait until we adjourn?

 6          JUDGE GUADERRAMA:  If you want to just hand them

 7    to my clerk, he will pass them to us.

 8          MR. GABER:  Dr. Cortina, would you like another

 9    bottle?

05:06:49  10          THE WITNESS:  Yes.  Thank you.

11          MR. GABER:  May I approach the witness, Your

12    Honor?

13          JUDGE GUADERRAMA:  Yes, sir.  Thank you.

14          THE WITNESS:  Thank you.

05:07:08  15          MR. THOMPSON:  May I, Your Honor?

16          JUDGE GUADERRAMA:  You may whenever you are

17    ready.

18          MR. THOMPSON:  Will Thompson for the State.

19                     **CROSS-EXAMINATION**

05:07:25  20    BY MR. THOMPSON:

21    **Q.**   Dr. Cortina, I'm going to walk you through the three

22    opinions that you have been discussing today, and I'm

23    happy to put up on the screen or to hand to you your

24    report whenever you think that's useful.  So just let me

05:07:38  25    know if you don't have it and you need it.

1          On Page 2 of your report, Plaintiffs' Exhibit

2    Number 45, you have a heading that says "Opinion on

3    Election Analysis under Plan S-2168 and Plan POWBS-2020."

4    Do you remember that?

05:08:02  5    **A.**   Yes, sir.

6    **Q.**   Is Plan POWBS-2020 Alternative Plan 4?

7    **A.**   That is correct.

8    **Q.**   Now, the election analysis that is referred to in that

9    opinion, that's an exogenous election analysis, not an

05:08:20  10   endogenous election analysis, right?

11   **A.**   What do you mean by "exogenous" and "endogenous"?

12   **Q.**   You are not familiar with those terms?

13   **A.**   I am familiar but people have different

14   interpretations and I want to be able to give you the best

05:08:31  15   answer that I can.

16   **Q.**   My understanding is that an endogenous election

17   analysis of SD-10 would be relying on underlying electoral

18   data votes cast in races for the Texas Senate,

19   specifically SD-10, where an exogenous election analysis

05:08:47  20   would depend on not SD-10 races like, say, statewide

21   races.

22   **A.**   I totally agree with your definition.

23   **Q.**   Okay.  So on that definition, is it fair to say that

24   your analysis is an exogenous analysis, not an endogenous

05:09:05  25   one?

*Laura Wells, RPR, RMR, CRR, RDR*

Cross Examination of Dr. Cortina                    Vol 5   131

1   **A.**   That is correct.

2   **Q.**   Your election analysis analyzes the votes cast in

3   statewide races within the boundaries of State Senate

4   districts; is that right?

05:09:15   5   **A.**   That's correct.

6   **Q.**   It does not consider election results from the State

7   Senate races *per se*, right?

8   **A.**   That is correct.

9   **Q.**   You didn't analyze the percentage of the vote the

05:09:23   10   candidate for the State Senate may get in a particular

11   district, right?

12   **A.**   No, I did not.

13   **Q.**   And it might be the case that the percentage of the

14   vote a statewide Republican candidate receives would be

05:09:35   15   different than a percentage of the vote a State Senatorial

16   Republican candidate receives; is that right?

17   **A.**   Uh-huh.   Correct.

18   **Q.**   Now, your report says that you analyzed reconstituted

19   election results for all 2018 and 2020 statewide races; is

05:09:51   20   that right?

21   **A.**   Yes, sir.

22   **Q.**   The 2018 and 2020 statewide election results were the

23   data provided to you by counsel for the plaintiffs, right?

24   **A.**   By the -- yeah.   The Texas Legislative Council and the

05:10:10   25   counsel gave me the PDFs, yes.

*Laura Wells, RPR, RMR, CRR, RDR*

1   **Q.**   I just want to make sure the record is clear on this.

2   So you are saying the underlying data was prepared by TLC,

3   right?

4   **A.**   The data comes from TLC.  That is correct.

05:10:21   5   **Q.**   And then the way the data got from TLC to you was

6   through the plaintiffs' lawyers, right?

7   **A.**   Yes.

8   **Q.**   And you didn't choose 2018 and 2020, right?

9   **A.**   I chose 2018 and 2020, and that was the data provided.

05:10:35   10   **Q.**   Do you remember giving a deposition in this case?

11   **A.**   Yes.

12   **Q.**   Now, do you remember what answer you gave to the

13   question --

14   **A.**   That was -- yes.

05:10:42   15   **Q.**   -- why did you choose 2018 and 2020?

16   **A.**   Yes.

17   **Q.**   And what answer was that?

18   **A.**   That was the data that was given, provided.

19   **Q.**   Could we put up Page 52 of Dr. Cortina's declaration

05:10:56   20   -- I'm sorry -- deposition testimony starting on Line 17

21   going to 21.

22       So, Dr. Cortina, you can see there that in response to

23   the question why did you choose 2018 and 2020 you answered

24   "I did not choose them"; is that correct?

05:11:17   25   **A.**   That is correct.

1    **Q.**  You are not abandoning that testimony today?

2    **A.**  No.

3            MR. THOMPSON:  We can take that down, Brian.

4    Thanks.

05:11:26    5    BY MR. THOMPSON:

6    **Q.**  For your election analysis you considered margin of

7    victory; is that right?

8    **A.**  Yes, sir.

9    **Q.**  You didn't consider anything besides margin of

05:11:34   10    victory, right?

11    **A.**  No.

12    **Q.**  And in your report "margin of victory" means the

13    percentage of the vote the winner had minus the percentage

14    of the vote that the runner-up had, right?

05:11:44   15    **A.**  Correct.

16    **Q.**  You did not analyze how many Republicans would have

17    won state senatorial elections in 2018 under Alternative

18    Plan 4, right?

19    **A.**  No.

05:11:58   20    **Q.**  And your analysis does not predict how State Senate

21    races will perform; is that right?

22    **A.**  No.

23            JUDGE GUADERRAMA:  Is that right?  He asked "is

24    that right?"

05:12:12   25        Can you ask it again.

*Laura Wells, RPR, RMR, CRR, RDR*

        1              MR. THOMPSON:  Right.

        2   BY MR. THOMPSON:

        3   **Q.**  Sorry, Dr. Cortina.  That was a poorly phrased

        4   question.  I'm going to ask you to clarify what you meant

05:12:21  5   there.

        6        Does your analysis predict how State Senate races will

        7   perform?  Yes or no?

        8   **A.**  No.

        9   **Q.**  And your analysis also doesn't include any prediction

05:12:33 10   whatsoever; is that correct?

       11   **A.**  That is correct.

       12              MR. THOMPSON:  Brian, can we pull up Plaintiffs'

       13   Exhibit Number 101, which is Dr. Cortina's rebuttal

       14   report.

05:12:50 15   BY MR. THOMPSON:

       16   **Q.**  Dr. Cortina, I believe you were just talking about

       17   this.  Do you remember that?

       18   **A.**  Yes, sir.

       19   **Q.**  Now, we have got to get past the two-page declaration

05:12:57 20   at the beginning to get to the three-page report.  So

       21   let's get to Page 2 of the report, which should be Page 4

       22   of the document.  And I would like to focus on the first

       23   full paragraph.  You are welcome to read the whole thing

       24   to yourself.  There is a part starting in the fourth line

05:13:15 25   that I'm focused on.

Cross Examination of Dr. Cortina          Vol 5  135

1     So if you can follow along with me, that part says,

2    "SB-2168 and Plan 4 are similar in the sense that both

3    plans provide 19 districts in which Republicans would be

4    expected to win with an MOV greater than 10 percent or

05:13:35  5    with 55 percent or more of the vote."

6        Do you see that?

7   **A.**   Yes, sir.

8   **Q.**   When you say, quote, "Both plans provide 19 districts

9    in which Republicans would be expected to win with an MOV

05:13:49  10   greater than 10 percent or with 55 percent or more of the

11   vote," end quote, you are not talking about the state

12   senatorial races, right?

13  **A.**   No.

14  **Q.**   So it's right that you are not talking about the state

05:14:01  15   senatorial races?

16  **A.**   I am not talking about the state senatorial races.

17  **Q.**   You are talking about the statewide races?

18  **A.**   I'm talking about, yes, the statewide races.

19  **Q.**   For these statewide elections that you analyzed in

05:14:12  20   your report, you decided to use 10 percent as a margin of

21   competitiveness; is that right?

22  **A.**   That is correct.

23  **Q.**   Were you in the courtroom yesterday?

24  **A.**   No.

05:14:22  25  **Q.**   Did you otherwise read or hear Dr. Barreto's

*Laura Wells, RPR, RMR, CRR, RDR*

1    testimony?

2    **A.**   No.

3    **Q.**   Well, if I tell you that he testified yesterday that a

4    district favoring the Democratic candidate 57 percent to

05:14:37   5    43 percent is not solidly Democratic, do you have any

6    reason to disagree with his testimony?

7    **A.**   Yes.

8    **Q.**   So you disagree with Dr. Barreto if he, in fact, said

9    that?

05:14:50   10   **A.**   Yes.

11   **Q.**   Because in your analysis a 57:43 district would not be

12   considered competitive; is that right?

13   **A.**   Well, I mean, it's -- it's -- thinking hard, it

14   depends.  It depends on the --

05:15:10   15   **Q.**   Doctor, I'm sure that in the abstract we could talk a

16   lot about what "competitive" means.  I just mean for the

17   definition you used in your report, 57:43 is not

18   competitive, right?

19   **A.**   We used different definitions.  That is correct.

05:15:24   20   **Q.**   Okay.  I'm going to transition topics slightly,

21   Dr. Cortina.  We have been talking about your election

22   analysis.  Now I want to ask you about some of the things

23   you said were not part of the election analysis, just to

24   get those confirmed on the record.

05:15:37   25         You were not asked to analyze any legislative motive,

Cross Examination of Dr. Cortina                     Vol 5   137

1  right?

2  **A.**   I was not asked to do so.

3  **Q.**   And you are also not offering an opinion on what

4  alternative to S-2168 the Texas Legislature may have

05:15:52  5  considered; is that correct?

6  **A.**   That is correct.

7  **Q.**   You don't know if the Texas Legislature considered

8  anything like Alternative Plan 4, do you?

9  **A.**   No.

05:16:00  10  **Q.**   And you don't know if Alternative Plan 4 even existed

11  at the time the legislature was considering redistricting,

12  do you?

13  **A.**   That is correct.  I do not know.

14  **Q.**   In fact, we can just pull up Alternative Plan 4.

05:16:15  15          MR. THOMPSON:  Brian, would you please bring up

16  Plaintiffs' Exhibit Number 92.

17  BY MR. THOMPSON:

18  **Q.**   Dr. Cortina, can you see that on your screen?

19  **A.**   More or less.

05:16:23  20  **Q.**   I think we have a paper copy, if you would like it.

21  It's not particularly important other than, for right now,

22  can you just recognize this as Alternative Plan 4?

23          Can you see in the top right-hand corner it's from

24  Texas Plan 4?

05:16:41  25  **A.**   Yes.  I can read that on the screen.

1  **Q.**   Okay.  And then if we zoom in on the bottom right-hand

2  corner, there is a date.  It says 12-21-2021.  Do you see

3  that?

4  **A.**   Yes.

05:16:52  5  **Q.**   Based on your understanding of TLC data, do you

6  understand that this was created on December 21, 2021?

7  **A.**   Yes.

8  **Q.**   And do you know that that was after the legislature

9  had finished redistricting?

05:17:05  10  **A.**   Yes.

11  **Q.**   Now, it may be the case that legislators have a

12  partisan motivation to disfavor or favor particular

13  colleagues; is that right?

14  **A.**   It may be the case.

05:17:20  15  **Q.**   Although the performance of districts is one partisan

16  motivation, there are other ones, aren't there?

17  **A.**   I assume so.

18  **Q.**   Do you remember in your deposition saying "yes"

19  instead of "I assume so"?

05:17:36  20  **A.**   Yes, I mean.

21  **Q.**   Okay.  And you weren't asked to consider other

22  partisan motivations behind S-2168, were you?

23  **A.**   No.  I was just asked to -- I did not consider any

24  partisan motivation.  I was just asked to analyze the

05:17:50  25  election results of Plan 2168 versus Plan 4.

Cross Examination of Dr. Cortina                    Vol 5 - 139

```
          1   Q.   Sure.  So you don't know if Alternative Plan 4 is
          2   consistent with any of the legislature's other partisan
          3   motivations, do you?
          4   A.   I don't know.
05:18:04  5   Q.   You didn't talk with any legislators about Alternative
          6   Plan 4, did you?
          7   A.   No.
          8   Q.   I'm going to try just one specific example, and then
          9   we'll move on.
05:18:14 10   A.   Yes, sir.
         11   Q.   Are you aware that former-Senator Pete Flores has
         12   announced his intent to run for the newly configured
         13   SD-24?
         14   A.   Yes.  I read in the news.
05:18:23 15   Q.   And you didn't consider whether Alternative Plan 4 is
         16   configured such that SD-24 is favorable to former-Senator
         17   Flores, did you?
         18   A.   No.  I did not.  I was not -- that was not part of my
         19   mission.
05:18:35 20   Q.   Understood.  You also didn't analyze whether
         21   Alternative Plan 4 would comply with the Voting Rights
         22   Act, did you?
         23   A.   No.  I was not asked to do so.
         24   Q.   And you didn't analyze whether Alternative Plan 4
05:18:49 25   complies with the one-person, one-vote principle, right?
```

*Laura Wells, RPR, RMR, CRR, RDR*

Cross Examination of Dr. Cortina          Vol 5   140

1   **A.**   No.  And I wouldn't have taken that.  I am not a

2   lawyer.  So I would say --

3   **Q.**   I understand.  The answer may seem obvious to some of

4   these questions.

05:18:57   5   **A.**   Yes, sir.

6   **Q.**   The last one on this topic:  You didn't analyze

7   whether Alternative Plan 4 complies with the 14th

8   Amendment, right?

9       THE REPORTER:  I'm sorry.  Say that one more

05:19:08   10   time, please.

11       MR. THOMPSON:  Sorry.

12   BY MR. THOMPSON:

13   **Q.**   You didn't analyze whether Alternative Plan 4 complies

14   with the 14th Amendment, right?

05:19:08   15   **A.**   No, sir.

16   **Q.**   I'm going to transition topics another time,

17   Dr. Cortina.  Moving away from your first opinion or

18   moving to your second opinion now, and that opinion was

19   about the comparison of the different maps.  Do you

05:19:25   20   remember that?

21   **A.**   Yes, sir.

22   **Q.**   And that -- we can put it up if you need it.  I

23   believe it appears under the bold heading in your report:

24   "Opinion on the comparison between Plan S-2168, Plan

05:19:42   25   H-2316, Plan C-2193, Plan E-2106 as related to SD-10 in

*Laura Wells, RPR, RMR, CRR, RDR*

 1   Tarrant County, Texas."

 2        Does that sound right to you?

 3   **A.**   Yes, sir.

 4   **Q.**   Now, to form that opinion, you compared the maps

05:19:55    5   visually; is that right?

 6   **A.**   That is correct.

 7   **Q.**   So your analysis was to look at the maps and determine

 8   if they are different; is that correct?

 9   **A.**   That is correct.

05:20:03   10   **Q.**   After looking at the maps, you assert in your report

11   that the legislature has a policy of keeping the areas

12   north and south of Fort Worth whole.  Is that what you

13   asserted?

14   **A.**   Yes.

05:20:15   15   **Q.**   And you derived that policy by comparing the

16   Congressional plan and the State Board of Education plan

17   to the Senate plan; is that right?

18   **A.**   That is correct.

19   **Q.**   You didn't talk to any legislators about whether they

05:20:25   20   intended this to be a state policy, right?

21   **A.**   No.

22   **Q.**   Now, finally, I'm going to transition to your third

23   opinion, Dr. Cortina.  This is the core retention opinion.

24   Do you remember that?

05:20:36   25   **A.**   Yes, sir.

Cross Examination of Dr. Cortina           Vol 5   142

1    **Q.**   On average, S-2168 retains more of the benchmark

2    population than Alternative Plan 4 does; is that correct?

3    **A.**   Can you refer me to the page, please.

4    **Q.**   The page of your report that has this opinion?

05:21:00    5    **A.**   Yes, sir.

6    **Q.**   Sure.  We're talking about Plaintiffs' Exhibit

7    Number 45, which is your report.  It's Page 11 of your

8    report is where the opinion begins.

9         MR. THOMPSON:   Brian, you may have it already.

05:21:07   10   BY MR. THOMPSON:

11   **Q.**   That's Page 21 of 26 in the combined PDF.

12   **A.**   Yes.  Perfect.

13   **Q.**   Okay.

14   **A.**   I'm there.

05:21:14   15   **Q.**   So you can see the bold, underlined heading that says

16   "Core population retention/overlap population between Plan

17   S-2168, Plan 2100 (benchmark) and Plan POWBS-2020."

18        Do you see that?

19   **A.**   Yes, sir.

05:21:33   20   **Q.**   And again, Plan POWBS-2020 is Alternative Plan 4,

21   correct?

22   **A.**   Correct.

23   **Q.**   So here is the question that relates to that opinion.

24   On average, S-2168, which is the enacted map for the

05:21:45   25   Senate, retains more of the benchmark population than

*Laura Wells, RPR, RMR, CRR, RDR*

1    Alternative Plan 4 does; is that correct?

2    **A.**    That is correct.

3    **Q.**    Thank you very much, Dr. Cortina.  Oh, you know, I

4    actually do have one more last question based on something

05:22:00    5    you said in your intro.

6         You mentioned that you are familiar with the origin of

7    the term "gerrymander"?

8    **A.**    Yes.

9    **Q.**    It comes from the Founding Father Eldridge Gerry; is

05:22:10   10    that right?

11    **A.**    That's right.

12    **Q.**    It's a combination of his name with salamander?

13    **A.**    With a salamander.  That is correct.

14    **Q.**    Because his political opponents thought that a

05:22:18   15    district he had approved as governor looked sort of like a

16    salamander and it was designed to help his fellow

17    partisans; is that correct?

18    **A.**    Right.  It's a fantastic story of District 8.

19    **Q.**    Have I gotten it close enough to accurate?

05:22:32   20    **A.**    Yes.

21    **Q.**    Okay.  So is it fair to say that partisan

22    gerrymandering is an American tradition?  Maybe one you

23    like; maybe one you don't.  Is it an American tradition?

24    **A.**    I don't think so.  It's an American tradition to

05:22:46   25    allow, as you said before, one vote, one person and to be

1   able to have the opportunity to exercise our rights in the

2   ballot box.  I think that it's -- it's one of the

3   traditions that have made this country great in terms of

4   standing by our democratic values.

05:23:09   5   **Q.**   I can understand that you like that tradition.  Do you

6   happen to know what year Gerry's salamander was drawn?

7   **A.**   I don't recall exactly.

8   **Q.**   Is it fair to say it was in the early 1800s?

9   **A.**   I think so, or about that.

05:23:20   10   **Q.**   Do you know what year the one-person, one-vote

11   principle was created?

12   **A.**   I don't have that date in my mind.

13   **Q.**   Is it fair to say it might have been during the 1960s?

14   **A.**   It might be, yes, sir.

05:23:31   15         MR. THOMPSON:  No further questions.  Thank you.

16         THE WITNESS:  Thank you very much.

17         JUDGE GUADERRAMA:  Mr. Gaber.

18                    **REDIRECT EXAMINATION**

19   BY MR. GABER:

05:23:46   20   **Q.**   Dr. Cortina, counsel just asked you about you

21   represented a comment that Dr. Barreto had made about a,

22   say, 58 percent district.  Do you recall that?

23   **A.**   Yes.

24   **Q.**   Now, you weren't in the courtroom for that testimony?

05:24:01   25   **A.**   I was not.

1   **Q.**  Were you in the courtroom earlier today when Senator

2   Powell was cross-examined by the State's attorneys?

3   **A.**  I was not.

4   **Q.**  Well, if I represent to you that counsel for the State

05:24:12   5   characterized a 58 percent victory as a sound victory,

6   would you agree with that characterization?

7   **A.**  I would.

8   **Q.**  And as between Dr. Barreto and the State's own

9   lawyers, who would you assume had a better sense of what

05:24:26  10   the State thought was an electoral victory?

11          MR. THOMPSON:  Objection.  Calls for speculation

12   and misstates the roles of lawyers in the Office of the

13   Attorney General.

14          JUDGE GUADERRAMA:  You are asking him if you

05:24:39  15   think they have a better idea of what a sound victory is

16   based on what they said?  That's what you are asking?

17          MR. GABER:  I'll withdraw that question, Your

18   Honor.

19          JUDGE GUADERRAMA:  I'm not sure I understood.

05:24:50  20   Ask it again.

21   BY MR. GABER:

22   **Q.**  Your task was to compare two plans, one that the State

23   enacted and one that was an alternative plan that might

24   show a better performance for Republican candidates if

05:25:10  25   they were -- if they were truly conducting a partisan

1  gerrymander; is that correct?

2  **A.**   That is correct.

3  **Q.**   And the question is:  If you were looking to a source

4  for what the State considered to be -- the Republican

05:25:26   5  Party and the State considered to be or the Republican

6  legislators and the State considered to be a sound victory

7  for Republican candidates, would you look to the lawyers

8  hired by or counsel of the chief map drawer or would you

9  look to Dr. Barreto's opinion?

05:25:44  10          MR. THOMPSON:  Objection.  Misstates between the

11  lawyers --

12          JUDGE GUADERRAMA:  Yeah.  I'm going to sustain

13  his objection.

14  BY MR. GABER:

05:25:55  15  **Q.**   Now, you were also asked about some of the other

16  partisan considerations that maybe were considered, and

17  one example was how the district that former-Senator

18  Flores was running in.  Do you recall that?

19  **A.**   Yes.

05:26:09  20  **Q.**   Did Dr. Alford in his response report identify any

21  issue with respect to the district that Senator Flores --

22  former-Senator Flores would run in?

23  **A.**   No.  He did not raise any issues.

24  **Q.**   Did he raise any examples of these other types of

05:26:27  25  partisan considerations that he identified as a flaw in

 1  your analysis?

 2  **A.**   No, he did not.

 3           MR. GABER:  Thank you.  I have no further

 4  questions.

05:26:34  5           JUDGE GUADERRAMA:  Mr. Thompson?

 6           MR. THOMPSON:  Nothing further, Your Honor.

 7  Thank you.

 8           JUDGE GUADERRAMA:  May Dr. Cortina be permanently

 9  excused?

05:26:43 10           MR. THOMPSON:  Yes, Your Honor.

11           JUDGE GUADERRAMA:  Mr. Gaber?

12           MR. GABER:  Yes.

13           JUDGE GUADERRAMA:  All right.  Doctor, thanks for

14  coming down.  You have a good afternoon.

05:26:50 15           THE WITNESS:  Thank you, Your Honor.  Thank you

16  very much.

17           JUDGE GUADERRAMA:  All right.  You have about

18  34 minutes left.

19           MR. DUNN:  Your Honor, the plaintiffs are

05:26:58 20  prepared to rest at this time.  We do need to raise an

21  issue that was filed this morning, a motion in limine

22  regarding Senator Huffman's testimony.  We didn't see any

23  point in lying behind the log on the issue.

24       The Court might be aware of a three-judge court

05:27:13 25  opinion earlier this week issued in Alabama where the

 1  Court concluded that when members of the legislature came

 2  and testified in defense of their plans, that served as a

 3  waiver of legislative privilege.

 4       And it's a bit of a catch-22, just to be frank, for

05:27:28  5  both sides.  We took Senator Huffman's deposition last

 6  Friday.  I think it's fair to say on all the subjects

 7  specific to the plan and the legislative process, she

 8  either didn't know, didn't recall, or invoked legislative

 9  privilege or at least on the vast majority of subjects.

05:27:43 10  We've provided that testimony to the Court.

11       So we have been given notice that the State intends to

12  call Senator Huffman tomorrow.  It will be our position

13  that the minute she takes the stand she has waived

14  legislative privilege.

05:27:56 15       In the alternative, if the Court disagrees with that

16  stance, then we would suggest that any inquiry of Senator

17  Huffman has to first be linked to a specific place in the

18  record where she has made this statement before by page or

19  line of the transcript or otherwise minutes and seconds to

05:28:13 20  the video.

21            JUDGE GUADERRAMA:  Well, if I were the only judge

22  up here, I could tell you what my opinion was; but I'm

23  not.  So we need to talk about it and see what that would

24  be.  I come from a long history of criminal defense, and

05:28:33 25  it suggests some things to me about privilege and taking

 1    the stand.  I don't know what my colleagues think.  I

 2    would need to figure that out.

 3              MR. HILTON:  Your Honor, may I respond?

 4              JUDGE GUADERRAMA:  Sure.

05:28:43   5              JUDGE SMITH:  Will we be getting a written

 6    response from the State?

 7              MR. HILTON:  If that would be helpful to Your

 8    Honors, I'm certain we could do that.  We didn't see the

 9    motion in limine that was filed this morning until after

05:28:54  10    we already began.

11              JUDGE SMITH:  I understand.  We didn't see it

12    either.  That's okay.

13              MR. HILTON:  And Mr. Dunn and I conferred

14    regarding this issue before he filed it.  I do understand

05:29:03  15    we have a disagreement regarding legislative privilege.

16         We can't agree to the motion and the relief that

17    Mr. Dunn is requesting, and I think he has grossly

18    mischaracterized that Alabama opinion.  But I --

19              JUDGE GUADERRAMA:  Come to the mic so we can hear

05:29:18  20    you better.

21              MR. HILTON:  Thank you.

22              JUDGE SMITH:  We don't mean to rush you.  You

23    haven't filed anything.  So give us your full response

24    now, if you would, to the extent that you can.

05:29:29  25              MR. HILTON:  Thank you, Your Honor.  So again,

1   having only just seen the motion this morning, we can't

2   agree to the relief that he is requesting.  We think it's

3   overbroad.  We think it's unduly burdensome and not

4   helpful to the Court.

05:29:42   5   That said, as I understand Mr. Dunn's complaint, he

6   doesn't want the State to use privilege as both a sword

7   and a shield and to selectively invoke it.  We have no

8   plans to use the privilege as both a sword and a shield.

9   Senator Huffman testified in her deposition that she

05:29:58  10   intends to invoke legislative privilege to the fullest

11   extent allowed by law.  She understands -- she intends to

12   do so tomorrow on the stand here.

13   She does not intend to waive her privilege.  We

14   strongly disagree with Mr. Dunn that just by testifying

05:30:12  15   she waives the privilege.

16   In that Alabama case that Mr. Dunn refers to, the

17   legislators at issue actually intervened into the case,

18   became parties to the case, asserted factual and legal

19   defenses and/or actually, in fact, the Court found, using

05:30:30  20   privilege as a sword and a shield.

21   Senator Huffman is not a party to this case.  She is a

22   third-party fact witness.  She has a number of public

23   statements that we can go through with the Court, and she

24   can confirm they were her public statements regarding

05:30:43  25   issues that are relevant to this case.  We will go through

*Laura Wells, RPR, RMR, CRR, RDR*

1    them on the video, just like we have done today.  And she

2    can also testify to non-privileged matters about the

3    redistricting process and anything else that would be

4    relevant to the Court.

05:30:56    5    So, you know, I'm happy to respond to any specific

6    questions but, you know, I guess the point here is that,

7    one, I don't think that the problem that Mr. Dunn is

8    concerned about, using privilege as a sword and a shield,

9    that's not what we intend to do.  And Senator Huffman

05:31:09   10    doesn't intend to waive her privilege.

11    That said, if the Court is going to entertain the

12    notion that she will waive her privilege by testifying,

13    certainly we would not put her on the stand if that's

14    going to be the case or, at the very least, we would need

05:31:21   15    to discuss that and Senator Huffman would have to agree to

16    waive her privilege.  But she does not intend to do that.

17    JUDGE GUADERRAMA:  All right.  So let us -- let

18    us take a short recess so we can talk amongst ourselves

19    and reach a consensus, and we'll come back out and let you

05:31:36   20    know.

21    MR. HILTON:  Thank you, Your Honor.

22    THE MARSHAL:  All rise.

23    (Recess from 5:31 p.m. to 5:36 p.m.)

24    JUDGE GUADERRAMA:  All right.  Thank you.  You

05:36:42   25    may be seated.  All right.

1     So, Mr. Hilton, we have huddled up and conferred.  And

2     so we've decided that Senator Huffman will be allowed to

3     testify to everything within the public record; and if she

4     goes outside the public record, she will waive her

05:37:03    5     privilege.

6          MR. HILTON:  Understood, Your Honor.  And I think

7     that's our intent.  I just wanted to be clear.  I

8     anticipate that she will testify as to some non-privileged

9     matters, facts that don't go to legislative acts, like

05:37:19    10     mental impressions and communications with other

11     legislators and communications with staff members.

12     So I understand the Court's direction to me that with

13     respect to matters that may potentially be privileged,

14     those need to be contained to only public statements.  For

05:37:37    15     non-privileged matters, I would assume that she can

16     testify freely as any other fact witness.

17          JUDGE GUADERRAMA:  All right.  So, Mr. Dunn, he

18     is saying that she can testify about all the

19     non-privileged matters.  That doesn't -- that doesn't

05:37:51    20     touch the privilege.  But if she talks about things that

21     are privileged that are not in the public record, then she

22     does.

23          MR. DUNN:  Well, that's going to be the rub, I'm

24     afraid, exactly where that line is; and I suspect what the

05:38:03    25     Court will see in the questioning tomorrow is a pushing of

1    that line.

2        So as, you know, a lawyer that's expected to

3    cross-examine this witness, you know, I'm just looking for

4    some notice.  You know, when I think it's crossing the

05:38:16    5    line, should I stand up and say that, that I see this as a

6    waiver?  I'm not trying to be disruptive to the

7    proceedings.  I'm also not trying to play gotcha.  I just

8    want to handle it the appropriate way.

9        JUDGE GUADERRAMA:  And so let me ask you,

05:38:29   10    Mr. Hilton.  Do you want him to signal to you when he

11    thinks that -- when she is testifying to things that you

12    feel are not privileged and, therefore, won't be waiving

13    her privilege, that he stands up and says, "Well, you

14    know, I don't agree that they are not privileged.  They

05:38:46   15    are privileged, and she will be waiving her privilege by

16    testifying to that because it's not in the public record"?

17        MR. HILTON:  I think that makes good sense.  I

18    appreciate the offer from Mr. Dunn.  I'll also add that

19    I'll go over all this with the Senator, you know, when she

05:39:00   20    is on the stand to confirm that she intends to preserve

21    the privilege and instruct her not to reveal anything that

22    would be privileged.  So we'll make sure to couch it

23    appropriately as we go throughout.

24        But to the extent Mr. Dunn believes I have made a

05:39:13   25    mistake in going outside the bounds and he wants to let us

 1   know, we would actually appreciate, you know, the

 2   opportunity and I appreciate that.

 3             JUDGE GUADERRAMA:  Mr. Dunn?

 4             MR. DUNN:  That sounds like a path forward.

05:39:24   5   Thank you, Your Honor.

 6             JUDGE GUADERRAMA:  We have an agreement, then.

 7             MR. DUNN:  So we have nothing further to offer

 8   the Court today.  We rest.

 9             JUDGE GUADERRAMA:  So should we just rest for the

05:39:31  10   evening and come back tomorrow at 9:00?

11             JUDGE SMITH:  Could we --

12             MR. SWEETEN:  Your Honors, we are prepared to

13   start tomorrow morning with the defense's case.

14             JUDGE SMITH:  I'm just going to try to get some

05:39:37  15   kind of a feel from you.  We have used two days out of the

16   week.  How are we doing in terms of --

17             MR. SWEETEN:  I think we are doing well.  I'm

18   actually surprised we're finished with the plaintiffs'

19   case already.  We have Dr. Alford tomorrow.  We have

05:39:51  20   Senator Huffman.  We have one witness that we are

21   considering.  We have Keith Ingram.  We have two videos

22   that are about 30 to 40 minutes.  That's -- so, you know,

23   I think we're looking right now -- and, of course, it's

24   very hard to say to predict what the crosses are, but

05:40:07  25   we're looking at completion maybe early afternoon on

*Laura Wells, RPR, RMR, CRR, RDR*

1  Friday, if not sooner.

2          JUDGE SMITH:  That would include rebuttal cases

3  on each side?

4          MR. SWEETEN:  I guess we would have to discuss

05:40:18   5  how extensive those are.

6          MR. DUNN:  It's hard to know about rebuttal at

7  this point, but my expectation would be an hour or two on

8  our side.  And it could be less.  It could be zero.

9          JUDGE GUADERRAMA:  Could we --

05:40:31  10          MR. SWEETEN:  We may be able to accommodate.  We

11  have got a couple of decisions to make on some witnesses.

12  We have exhibits to talk about with opposing counsel.  And

13  so we're working towards it, but I think at least I can

14  tell the Court that I think we're going to finish by

05:40:44  15  Friday afternoon as we had hoped because I know the Court

16  allocated four days.  We may even be able to move it up a

17  little bit, is my best guess right now.

18          JUDGE SMITH:  We've pretty much committed to go

19  all day Friday, even if we go late.  Nobody is trying to

05:41:14  20  cut out early on Friday, as I'm sure all of you would like

21  to.

22          MR. SWEETEN:  We all would.  I would say, Your

23  Honor, I think that at this point, because we have got two

24  days to get through -- and I think we'll have a better

05:41:26  25  idea tomorrow -- probably the best idea is to plan to be

*Laura Wells, RPR, RMR, CRR, RDR*

1    finished Friday at 5:00 p.m.  But I'm projecting a little

2    bit earlier, but we'll see.

3         JUDGE GUADERRAMA:  So at the end of the day

4    tomorrow, if we need to, maybe we can start at 8:30 on

05:41:41   5    Friday?

6         MR. SWEETEN:  Yes, Your Honor.

7         JUDGE GUADERRAMA:  If we need to go to 6:30 on

8    Friday and see if we can get your rebuttals in and

9    completed.

05:41:49   10        MR. DUNN:  One question about that, Your Honor,

11   and then one small issue Mr. Gaber reminded me of.  I'll

12   start with the small issue.

13        The defendants haven't moved in their exhibits yet.

14   I'm not quarreling about that.  But we have referenced a

05:41:59   15   number of them as part of the plaintiffs' case.  So I

16   would move exhibits of the Defendants' 58 through 69,

17   which are just the videos and transcripts of the

18   legislative proceedings.

19        JUDGE GUADERRAMA:  He is moving your exhibits

05:42:13   20   into evidence.

21        MR. SWEETEN:  He is moving my exhibits in.  We

22   want to object to those exhibits.

23        (Laughter)

24        MR. SWEETEN:  Let me also add that our plan was

05:42:21   25   to go ahead and move --

1          JUDGE GUADERRAMA:  When you open your case.  I

2    get it.

3          MR. SWEETEN:  -- at the beginning of the

4    defendants' case tomorrow morning.  We plan to do that

05:42:28   5    still, if that's all right.

6          JUDGE GUADERRAMA:  We'll do that tomorrow

7    morning, then, at 9:00.

8          JUDGE SMITH:  One other thing we can discuss.

9    Obviously, the Court will decide, once all the evidence

05:42:37  10    and exhibits are in, whether there is time for or whether

11    we want any closing statements or whether -- and the

12    Courts can decide -- we prefer some kind of a summary

13    brief from both sides or neither.  That's just something

14    that, you know, the two of you can be thinking about in

05:42:55  15    terms of whether you want to state your preferences.

16          MR. DUNN:  That was my next question, Your Honor.

17    So thank you for that.  We will confer and discuss with

18    counsel.  That is all I have.

19          JUDGE GUADERRAMA:  Well, see you tomorrow at

05:43:10  20    9:00.

21          MR. SWEETEN:  Have a good evening.

22          JUDGE GUADERRAMA:  All right.  We are adjourned

23    for today.

24          THE MARSHAL:  All rise.

25          *(Proceedings adjourned at 5:43 p.m. and continued in*

Proceedings                                    Vol 5

1   *Volume 6.)*

2   *Date:  February 7, 2022*

3                   **COURT REPORTER'S CERTIFICATE**

4        *I, Laura Wells, certify that the foregoing is a*

5   *correct transcript from the record of proceedings in the*

6   *above-entitled matter.*

7                       _____/s/_ L a u r a   W e l l s _____

8                       *Laura Wells, CRR, RMR*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25