1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
2                          EL PASO DIVISION

3

     LEAGUE OF UNITED LATIN        §    3:21-CV-00259-DCG-JES-JVB
4    AMERICAN CITIZENS, ET AL      §
                                   §
5    V.                            §    8:58 A.M. TO 12:30 P.M.
                                   §
6    GREG ABBOTT, IN HIS           §
     OFFICIAL CAPACITY AS          §
7    GOVERNOR OF THE STATE OF      §
     TEXAS, ET AL                  §    JANUARY 27, 2022
8

9          HEARING ON MOTION FOR PRELIMINARY INJUNCTION
                    AS TO SENATE DISTRICT 10
           BEFORE THE HONORABLE DAVID C. GUADERRAMA,
10                  HONORABLE JERRY E. SMITH
               AND HONORABLE JEFFREY V. BROWN
11          VOLUME 6 (AM SESSION) OF 9 VOLUMES

12   APPEARANCES:

13   FOR THE PLAINTIFFS ROY CHARLES BROOKS, FELIPE GUTIERREZ,
     PHYLLIS GOINES, EVA BONILLA, CLARA FAULKNER, DEBORAH
14   SPELL, BEVERLY POWELL:
     Mr. Chad W. Dunn
15   Brazil & Dunn
     4407 Bee Caves Road
16   Building 1, Suite 111
     Austin, Texas  78746
17   (512) 717-9822
          and
18   Mr. Mark P. Gaber
     Mark P. Gaber, PLLC
19   P.O. Box 34481
     Washington, DC  20043
20   (715) 482-4066
          and
21   Ms. Molly Elizabeth Danahy
     Molly E. Danahy, Esq
22   P.O. Box 26277
     Baltimore, Maryland  21210
23   (208) 301-1202

24

25

                     *Laura Wells, RPR, RMR, CRR, RDR*

**APPEARANCES (continued):**

**FOR THE PLAINTIFFS ROY CHARLES BROOKS, FELIPE GUTIERREZ, PHYLLIS GOINES, EVA BONILLA, CLARA FAULKNER, DEBORAH SPELL, BEVERLY POWELL:**
Ms. Sonni Waknin
Sonni Waknin, Esq
10300 Venice Boulevard, Apartment 204
Culver City, California  90095
(723) 610-1283
    and
Mr. Jesse Gaines
Jesse L. Gaines Attorney at Law
P.O. Box 50093
Fort Worth, Texas  76103
(817) 714-9988

**FOR THE DEFENDANTS GREG ABBOTT, JOHN SCOTT, JOSE A. ESPARZA, STATE OF TEXAS, TEXAS LIEUTENANT GOVERNOR DAN PATRICK AND TEXAS SPEAKER DADE PHELAN:**
Mr. Patrick K. Sweeten
Mr. Christopher D. Hilton
Mr. Eric Hudson
Mr. William Thomas Thompson
Ms. Kathleen Hunker
Ms. Courtney Brooke Corbello
Mr. Jack Buckley DiSorbo
Office of Texas Attorney General
P.O. Box 12548
MC 009
Austin, Texas 78711
(512) 463-4139

**ALSO PRESENT:**
Mr. Brian Christopher

Court Reporter:
Laura Wells, RPR, RMR, CRR
601 Rosenberg, Suite 615
Galveston, Texas  77550

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

1                          **VOLUME 6**
           **(HEARING ON MOTION FOR PRELIMINARY INJUNCTION**
2                  **AS TO SENATE DISTRICT 10 )**

                                                              **Page**
3   JANUARY 27, 2022

4   Opening Statement by Defendants..................        5
    Plaintiffs' Objection to Senator Huffman's              24
5   testimony.......................................
    Defendants' Exhibit Number 59 played............        62
6   Defendants' Exhibit Number 59 concluded.........        62
    Defendants' Exhibit Number 59 played............        64
7   Defendants' Exhibit Number 59 concluded.........        65
    Defendants' Exhibit Number 59 played............        66
8   Defendants' Exhibit Number 59 concluded.........        67
    Defendants' Exhibit Number 59 played............        67
9   Defendants' Exhibit Number 59 concluded.........        68
    Defendants' Exhibit Number 59 played............        72
10  Defendants' Exhibit Number 59 concluded.........        73
    Defendants' Exhibit Number 59 played............        75
11  Defendants' Exhibit Number 59 concluded.........        75
    Defendants' Exhibit Number 59 played............        77
12  Defendants' Exhibit Number 59 concluded.........        77
    Defendants' Exhibit Number 61 played............        79
13  Defendants' Exhibit Number 61 concluded.........        80
    Defendants' Exhibit Number 65 played............        90
14  Defendants' Exhibit Number 65 concluded.........        92
    Defendants' Exhibit Number 65 played............        94
15  Defendants' Exhibit Number 65 concluded.........        94
    Defendants' Exhibit Number 65 played............        95
16  Defendants' Exhibit Number 65 concluded.........        98
    Defendants' Exhibit Number 65 played............       101
17  Defendants' Exhibit Number 65 concluded.........       103
    Defendants' Exhibit Number 65 played............       103
18  Defendants' Exhibit Number 65 concluded.........       105
    Defendants' Exhibit Number 65 played............       106
19  Defendants' Exhibit Number 65 concluded.........       106
    Defendants' Exhibit Number 65 played............       107
20  Defendants' Exhibit Number 65 concluded.........       108
    Defendants' Exhibit Number 65 played............       109
21  Defendants' Exhibit Number 65 concluded.........       110
    Defendants' Exhibit Number 65 played............       112
22  Defendants' Exhibit Number 65 concluded.........       113
    Defendants' Exhibit Number 65 played............       117
23  Defendants' Exhibit Number 65 concluded.........       118
    Defendants' Exhibit Number 65 played............       119
24  Defendants' Exhibit Number 65 concluded.........       120
    Defendants' Exhibit Number 65 played............       120

25

1                                                          **Page**

   **JANUARY 27, 2022**
2
   Defendants' Exhibit Number 65 concluded......... 123
3  Defendants' Exhibit Number 65 played............ 124
   Defendants' Exhibit Number 65 concluded......... 126
4  Defendants' Exhibit Number 65 played............ 127
   Defendants' Exhibit Number 65 concluded......... 127
5  Defendants' Exhibit Number 65 played............ 127
   Defendants' Exhibit Number 65 concluded......... 128
6  Reporter's Certificate.......................... 156

7                          **ALPHABETICAL**

8  **WITNESSES**                                          **Page**

9  **SENATOR CECILIA JOAN HUFFMAN**
       Direct Examination By Mr. Hilton               25
10     Cross-Examination By Mr. Dunn                 129

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    *Laura Wells, RPR, RMR, CRR, RDR*

1                          **PROCEEDINGS**

2                  **(Call to order of the Court.)**

3          JUDGE GUADERRAMA:  Good morning, everyone.

4   Please be seated.

08:58:42    5      Mr. Sweeten, will you be making an opening statement?

6          MR. SWEETEN:  Yes, Your Honor.  I'll give a brief

7   opening.

8          Your Honors, before I get started, I wanted to go

9   ahead and offer Defendants' Exhibits 1 through 70.  And I

08:59:08   10   think counsel has some objections to some of those

11   exhibits.  But I think, as the Court did with the

12   plaintiffs, I think you conditionally admitted them

13   subject to deciding the disputed evidentiary issues; is

14   that correct?

08:59:20   15          JUDGE GUADERRAMA:  Mr. Dunn, let me hear from

16   you.

17          MR. DUNN:  I think handling the exhibits

18   consistently makes sense.  So admission subject to

19   objection is fine with us.

08:59:32   20          JUDGE GUADERRAMA:  All right.  That will be the

21   Court's ruling.  Thank you.

22          MR. SWEETEN:  Thank you.  May it please the

23   Court, I'm going to give a brief opening statement today.

24   I just want to outline the defense's case.  We're going to

08:59:43   25   be -- today we're going to have -- Senator Huffman will be

*Laura Wells, RPR, RMR, CRR, RDR*

1   up later.  We'll have Professor Alford to testify, as

2   well.  We'll have testimony from a county election

3   administrator on videotape, two of them, in fact, one for

4   30 minutes, one for 45.  And then the director of

09:00:00   5   elections Keith Ingram.  So that's what the day is going

6   to look like.

7        I wanted to start by just -- by looking at Slide 2, if

8   we could.  The plaintiffs' theory in this case is that the

9   Senate majority drew Senate District 10 within Plan S-2168

09:00:17   10   to intentionally discriminate against African-Americans

11   and Latinos.

12        So the question before the Court, as it's framed, is:

13   Did the legislature purposely discriminate when they drew

14   the Senate maps, in particular Senate District 10?

09:00:30   15   The Brooks' theory is false.  You will hear more about

16   the reasons for that today, but the Texas Legislature drew

17   Senate District 10 and the entire Senate map with the

18   intention of passing legal maps that advanced partisan

19   motives and other factors described on the floor.

09:00:47   20   The Senate map lines were drawn without regard to

21   race.  That is clearly articulated on the floor, and we'll

22   show the Court those transcripts today from the

23   legislative session.

24        We start with the proposition that -- on Slide 4, if

09:01:02   25   we would -- that the good faith of a State legislature

 1    must be presumed.  That's *Miller v. Johnson*.

 2        On the next, the *Abbott v. Perez* case, the Supreme

 3    Court said that in assessing the sufficiency of a

 4    challenge to a districting plan, a court must be sensitive

09:01:17   5    to the complex interplay of forces that enter a

 6    legislature's redistricting calculus, and the good faith

 7    of the State legislature must be presumed.

 8        Now, it's the case that partisan motives are not

 9    racial motives.  The Court very recently said that in

09:01:34  10    *Brnovich*.

11        And the Court has also said that alleged knowledge of

12    racial effects, that prior decisions have made clear that

13    a jurisdiction may engage in constitutional political

14    gerrymandering even if it so happens that the most loyal

09:01:48  15    Democrats happen to be Black Democrats and even if the

16    State were conscious of that fact.

17        Finally, one other standard -- and then I'll talk a

18    little bit about the legislative session -- is that under

19    *Personnel Administrators of Massachusetts*, the way that

09:02:04  20    discriminatory purpose has been framed -- and it's been

21    cited multiple times over the years -- but it implies more

22    than intent, as volition or intent as awareness of

23    consequences.  It implies that the decision-maker selected

24    or reaffirmed a particular course of action at least in

09:02:21  25    part because of, not merely in spite of, its adverse

          1   effects upon an identifiable group.

          2        So we started the 2021 legislative session -- if we

          3   could go to Slide 10 -- with the balance of power tilting

          4   the needle trending Republican.  As it has since the

09:02:44  5   mid-'90s, Republicans hold the statewide offices in this

          6   state, including the governorship, including the

          7   lieutenant governorship.

          8        In addition, the people elected a House majority of

          9   Republicans of 85 and 65 was the -- was the

09:03:00  10  Republican/Democratic split.

          11       And the Senate majority was 18:13 Republican.

          12       Now, I'm going to walk the Court through -- and the

          13  Court has heard some testimony already about -- some of

          14  the timelines that occurred in the Senate redistricting

09:03:13  15  process.

          16       First of all, as Mr. Turner said yesterday, the Census

          17  Bureau has never delivered the census data this late.  The

          18  Census Bureau was supposed to release the census data in

          19  April of 2021.  It did not until August 12th, 2021, when

09:03:33  20  an initial redistricting data was released.  And then,

          21  finally, the full redistricting tool kit was released on

          22  September 16th.

          23       If we could go to Slide 12.

          24       The third special session, in response to the

09:03:45  25  unprecedented delays in the census data, Governor Abbott

 1  called what was then a third special session on

 2  September 7th of this year -- of 2021.  And then on

 3  September 20th through October 19th, the third special

 4  session was held.

09:04:03  5      As the Court knows, a special session as a limited

 6  duration of 30 days; and the legislature had four maps to

 7  pass.

 8      Now, an overlay to all of this, this unprecedented

 9  delay in the census, was that without warning, without

09:04:19  10  informing the Republicans that they were going to do so,

11  the Democrats left during the legislative session in the

12  summer.  They went out of state.  They went to -- to the

13  D.C. -- they went to D.C. for four weeks, which -- and you

14  heard in the questioning that that basically stopped the

09:04:38  15  wheels of the legislative process.

16      Now, if you think about that, if you think about the

17  deadlines, the elections that are, you know, just weeks

18  away now and all the things that had to occur before the

19  election -- and there will be testimony on that that

09:04:54  20  you'll hear -- you can see that even -- I mean, with the

21  truncated deadline that we had, the legislature also was

22  dealing with the fact that the parachute, the rip cord

23  could be pulled at any time.

24      They could -- they could leave in the dead of night

09:05:08  25  again, leave the state; and because there wasn't a

Opening Statement by the State                    Vol 6

1  supermajority in the Republican legislature, the State

2  would then be left, because the census data had come out

3  in September, the State would then be left with few

4  options to deal with what would be then malapportionment

09:05:26  5  claims that were filed.

6      In fact, one, the Gutierrez plaintiffs, actually part

7  of their filing was a claim that the State maps were

8  malapportioned.  And, of course, based on ten years of

9  growth that had occurred over that period, you know, the

09:05:39  10  State needed to get maps in place because what would be

11  next in a malapportionment case, if the legislature were

12  not able to generate those four maps, is they would then

13  come and ask the federal court to draw those maps.

14      And, of course, there is a legion of cases that talks

09:05:55  15  about that redistricting is the province of the

16  legislature.  There is a strong -- there is a strong line

17  of cases that talk about that.

18      So, at any rate, with all of these factors going on,

19  I'm going to run through some of the timeline of the

09:06:09  20  session which occurred -- which again began on

21  September 20th.

22      So on Slide 14 you'll see that prior to the third

23  special session, the Special Senate Committee on

24  Redistricting held hearings that solicited public input.

09:06:23  25  And, in fact, one of the statements made in the

*Laura Wells, RPR, RMR, CRR, RDR*

1    Redistricting Committee on September 7th from Senator

2    Whitmire, he says, "And I have looked at our schedule for

3    this week.  You're certainly giving the public ample

4    opportunity to testify, including evening hours and

09:06:37    5    weekends.  It occurred to me that you are doing such a

6    fine job."

7         On September 20th, Senate Bill 4, which was

8    implemented, originated in the Senate and it's referred to

9    the Senate Special Committee on Redistricting.

09:06:49   10         Then from September 20th to October 4th the -- the

11    Senate Bill 4 was considered and passed out of the Senate

12    on the 4th.

13         Now -- so it passed out with a vote of more than just

14    an R/D split but at 20:11 was the vote for Senate Bill 4.

09:07:10   15         On October 15th, 2021, the House passed SB-4; and then

16    ultimately SB-4, along with many of the other

17    redistricting bills, was signed by Governor Abbott on

18    2021.

19         The Brooks plaintiffs then filed their initial

09:07:26   20    complaint just eight days after that.  And the -- and, of

21    course, another deadline that I think we have talked about

22    some was that November 12th was the candidate filing

23    window opened.

24         So redistricting lines needed to be drawn in order to

09:07:44   25    conduct the election so candidates would know where they

Opening Statement by the State                     Vol 6

1   were going to be or where they were going to be running.

2       Let's talk a little bit about Senate District 10.

3   I'll start with the -- with the statement that Tarrant

4   County is a Republican county.  Most of the major Tarrant

09:08:01   5   County-wide officeholders are Republican.  County Judge

6   Glen Whitley, the Sheriff Billy Wayborne, and DA Sharon

7   Wilson, Tarrant County clerk, all of them are Republicans.

8   And as Mr. Brooks said yesterday on the stand, Tarrant

9   County is predominantly Republican.

09:08:20   10      Now, there is an important exhibit here because this

11  is kind of -- this has kind of been a shifting -- these

12  allegations on this issue have been shifting.  But I think

13  it's very important that this Court know that Defendants'

14  Exhibit Number 22 has the CVAP numbers, the most updated

09:08:37   15  CVAP numbers for the benchmark District 10.  And those

16  numbers show that almost 54 percent of the population of

17  Senate District 10 was Anglo, 20.4 percent was Hispanic,

18  and 20.5 percent were African-American.

19      We have also talked some and you heard from some of

09:09:00   20  the witnesses and you'll -- and you'll see in Defendants'

21  Exhibit Number 17 that Senate District 10 is a very

22  competitive district.  Three of the last six Senate

23  district candidates were Republican -- or winners were

24  Republican.  And three of the last four elections in SD-10

09:09:22   25  had been decided by a spread of three percent or less.

Opening Statement by the State                    Vol 6

 1    The legislature wanted to maintain a Republican
 2  representative for a historically Republican Senate
 3  district.  Senator Powell was elected on a wave election
 4  during a time with one of the closest election spreads
 5  that we have seen in recent years with the Beto/Cruz --
 6  with the Beto O'Rourke and Ted Cruz race.  And many of the
 7  statewide races were very, very close.
 8    Now, we showed you the clip yesterday of the colloquy
 9  between Senator West and Senator Powell.  I think it bears
10  repeating, though.  And that is that Senator West asked
11  Senator Powell -- and this is in Exhibit 64, which is the
12  transcript of the Senate floor debate from October 4,
13  2021 -- he says, "Let's get this on the record.  Do you
14  believe that your district is intentionally targeted for
15  elimination as it being a trending Democratic district?"
16    "Absolutely.  Absolutely."  That's what she said.
17    She also says, "And it goes back to a question that
18  Chairman Huffman asked me the day that we had our meeting.
19  When I sat down and she put the proposed map up and onto
20  the screen, she said, 'Do you have any questions for me?'
21  And I answered to her, no, I have no questions because I
22  can clearly see by this map what you are attempting to
23  do."
24    It was clear to Senator Powell that she was being
25  redistricted and targeted because she was a Democrat, that

*Laura Wells, RPR, RMR, CRR, RDR*

1    that seat had been changed because it was a -- because she

2    was a Democratic freshman member and the Republicans, you

3    know, had the majority and were able to make that into a

4    Republican seat.

09:11:04   5        Other senators acknowledged the same thing.  You saw

6    yesterday in the examination of Senator Powell,

7    Defendants' Exhibit Number 27, where Senator Nathan

8    Johnson, a Democrat from the Dallas area, he says that,

9    "The proposed maps under CSSB do exactly what they were

09:11:21   10   intended to do.  They make districts more partisan and, if

11   not invalidated by a court challenge, they effectively

12   eliminate a Democratic seat."

13       So it was clear to Powell.  It was clear to Nathan

14   Johnson.  They were saying these things on the floor.

09:11:41   15   Other legislators acknowledged the same.  And in his

16   testimony yesterday, unsurprisingly, Representative Turner

17   explained that he wants Democrats to win and Republicans

18   to lose; not an earth-shattering proposition for any

19   member of a party involved in redistricting.

09:11:59   20       Now, I want to talk a little bit -- if we could go to

21   Slide Number 24.  This is Defendants' Exhibit Number 2.

22   And I want to just show the Court very briefly that --

23   this is in the binders that we have submitted to the

24   Court.  It's probably a better look because the TV screens

09:12:13   25   are not very big.  But this is a partisan shading map.

1    This is what SD-10 looked like in the benchmark plan.

2         What this shows is shading by partisanship, not by

3    race.  Okay.  This is how it looks.  So the blue-shaded

4    area stands for 57 percent or higher Democratic VTDs; and

09:12:32    5    as the Court knows, VTDs are voting tabulation districts.

6    And so to alter the district to increase Republican

7    performance, they needed to identify the location of

8    Democratic-leaning areas.

9         Now, this is also part of Defendants' Exhibit Number

09:12:47    10    3; and in these partisan shading maps the legislature saw

11    many of those blue areas with 57-plus Democrats and it

12    removed some of those areas.  It did not do so based on

13    race.  It did so based on partisanship, as Senator Huffman

14    testified to at length.  She was questioned extensively on

09:13:05    15    the floor, and she was very specific in her testimony that

16    she did not utilize racial data when drawing the lines of

17    the map.

18         Now there is another slide.  It's Defendants' Exhibit

19    Number 3, and this is Slide 26.  So the exhibit is 3.  The

09:13:22    20    slide is 26.  This is what the new SD-10 looks like from a

21    partisan standpoint.  You can see that other counties were

22    joined with the -- with the Tarrant County configuration.

23    These red areas represent Republican counties.  The

24    blackout line that you can see there is the new SD-10.

09:13:41    25    And so, as you can see, the number of Republican areas

1    were increased in order to make SD-10 a more Republican

2    district.

3          Again, that's just partisan shading.  That's just

4    partisan shading.  That's what you see when you are

09:13:53   5    looking at partisan shading.

6          So let's look now, if we could go to Slide 27, which

7    is Defendants' Exhibit Number 5 that the Court has.  This

8    shows which areas were added and which ones were taken

9    away.

09:14:06   10    Now, the areas that are in red, the ones that were

11    taken away, predominantly voted Democratic.  Green are the

12    areas that were added.  And yellow is what remained in the

13    district.

14          Now, as you can see, the percentages of green, areas

09:14:21   15    added, are much more Republican than the areas that were

16    taken out.  And the areas taken out are much more

17    Democratic.

18          And there is a compilation on this next slide, which

19    is Slide 28.  This is contained in Defendants' Exhibit

09:14:35   20    Number 5.  And it shows it -- what it does is it tallies

21    those numbers from the map before.  But as you can see,

22    they added 108,753 Republicans; and they subtracted

23    119,000 Democrats.

24          Now, if we could go to 29 -- and I have alluded to

09:14:57   25    this but -- and this is also part of some of the testimony

*Laura Wells, RPR, RMR, CRR, RDR*

Opening Statement by the State                              Vol 6

```
         1   yesterday.  But in Defendants' Exhibit Number 64, Senator
         2   Powell asked, "In terms of data that you consulted,
         3   RedAppl has a statistics tab that allows the user" --
         4   pardon me -- "to choose which electoral and demographic
09:15:15 5   data to display on the screen while the map is being
         6   drawn; is that correct?"
         7       Senator Huffman on the floor said several things.  She
         8   said, "Correct.  Yes."  And then she later, at the end she
         9   says, "One thing we've never had was racial shading."
09:15:29 10  Again, that's Defendants' Exhibit Number 64.
         11      When expressly asked, Senator Powell failed to
         12  identify a single senator who acted with discriminatory
         13  intent yesterday.  She was not able to do so.  She
         14  testified that she has no knowledge whether racial shading
09:15:46 15  was ever used.  She said that yesterday in her trial
         16  testimony.
         17      On Slide 32 we have got, from the affidavit of Todd
         18  Giberson, that "Data regarding race, ethnicity,
         19  Spanish-surname status, voting age population, and number
09:16:05 20  of registered voters is not displayed unless the user
         21  actively chooses to display it."  And that's consistent
         22  with some of the testimony that we have heard over the
         23  last two days.
         24      Now, there was also a colloquy between Senator Huffman
09:16:20 25  during the October 4th Senate floor debate.  Senator
```

Opening Statement by the State                    Vol 6

1    Eckhardt, who is the Austin Democratic senator, who is now

2    in Senator Watson's old seat, said, "You had mentioned and

3    have been very assiduous about this that you are

4    color-blind in your dealings with the map."

09:16:39  5        Senator Huffman, again, "Yes, ma'am."

6        So it's also the case that Senator Powell yesterday

7    testified that taking out Democratic Anglo VTDs is not

8    discriminatory.  She herself admitted that.

9        And I want to show the Court the next slide, which is

09:16:59  10   Slide 35; and this is in Defendants' Exhibit Number 1,

11   this map, except for the fact that we have drawn for

12   demonstrative purposes these circles.

13       But the areas that are shaded are areas that vote

14   Democratic.  So purple are the areas where a race of over

09:17:18  15   50 percent predominate -- or does not predominate.  Sorry.

16   And this shows that the drawer of the map had the primary

17   intention of removing Democratic voters.  As you can see

18   in those circles, those are -- those are Democratic

19   districts that were shaded Anglo.

09:17:35  20       So we went through testimony over the last several

21   days.  There is no direct knowledge of discriminatory

22   purpose.  You heard the witnesses testify about that.  And

23   they have admitted they have no personal knowledge of any

24   evidence of discriminatory intent.

09:17:51  25       The plaintiffs utilized an affidavit of Senator

*Laura Wells, RPR, RMR, CRR, RDR*

 1  Seliger.  We had the opportunity to take the deposition of

 2  Senator Seliger, and he testified that Senator Huffman

 3  gave a pretextual reason for the composition of one

 4  district, SD-31.  He did not say SD-10 in the testimony.

09:18:10   5      There is an important factor about this case.  You

 6  often hear attacks made against maps by saying, well, you

 7  split VTDs.  And that's important because if you split

 8  VTDs, you know, it has been argued by some that, well, you

 9  can't get partisanship data below the VTD level, at the

09:18:31  10  lowest level.

11      The Senate map splits no VTDs.  So there is not a

12  single one split.  So that argument which we heard a lot

13  ten years ago in the past redistricting, you know, falls

14  flat in this attack on the Senate map.

09:18:45  15      Now, neither Senator Powell nor Representative Turner

16  testified to knowledge of racially discriminatory

17  statements.  I think that's important.  I mean, there were

18  opportunities on the floor for, you know, the senators to

19  grill one another.  You know, the session, you know, was

09:19:03  20  contested on several issues.  But neither testified of any

21  statements made regarding racially discriminatory matters.

22      Let's go to Slide 40.  There is no direct evidence

23  that supports the proposition that the Senate majority had

24  knowledge of any adverse effects on African-Americans or

09:19:23  25  Latinos when the lines of the maps were drawn.  I'll show

1    you *Hunt* again.  We can -- we can move on from that.

2    That's duplicated.

3        If we could go now to Slide 42.  The *Fusilier* case

4    says, "Discriminatory intent requires that the

09:19:41  5    legislature, quote, selected or reaffirmed a particular

6    course of action, at least in part because of, not merely

7    in spite of, its adverse effects upon an identifiable

8    group."

9        It's a Fifth Circuit case.  It's one of the many cases

09:19:55  10   that quotes the *Personnel Administrator of Massachusetts*

11   *v. Feeney* standards for intentional discrimination.

12       I want to talk just briefly about Dr. Barreto's

13   testimony.  And Dr. Alford will be here today to testify

14   to this Court.  He purports to conclude that Latinos and

09:20:12  15   African-Americans in SD-10 have the same candidate of

16   choice, but he improperly disregarded primary elections as

17   totally irrelevant.

18       Professor Alford will be here to explain to this Court

19   the relevance of including primary elections and assessing

09:20:26  20   claims of cohesion, and primary elections evidence will

21   show that Latino and African-American voters support

22   different candidates.  There are multiple races that have

23   been run in the boundaries within SD-10 where you have

24   racially contested elections and where that data gives

09:20:44  25   insight as to where Latinos and African-Americans and how

Opening Statement by the State                    Vol 6

```
     1  they are voting in primary elections.  Dr. Alford will

     2  explain that at length and why that is important.

     3      Very briefly, on Dr. Cortina's testimony it's -- you

     4  know, Dr. Alford will testify and Cortina admits that he

09:21:01  5  didn't consider a single partisan objective or consult

     6  with a single member of the legislature.

     7      He purports to conclude that plaintiffs' alternative

     8  Map 4 is better for Republicans than the enacted Plan

     9  S-2168, but he admits his analysis is limited to the

09:21:19 10  margin of victory in statewide races.  And he gives no

    11  reason for his decision to use 10 percent as the metric.

    12      Dr. Alford will discuss those issues with

    13  Dr. Cortina's report; but I think it's important, you

    14  know, to couch I think Dr. Cortina's primary opinion given

09:21:31 15  to this Court is about an alternative map.  He clearly

    16  said that he had no -- that he was not asked to nor did he

    17  provide an opinion on discriminatory intent.

    18      On paragraph -- on Slide 45, even assuming that the

    19  Brooks plaintiffs could succeed on the merits, which they

09:21:50 20  cannot, injunctive relief would still be inappropriate

    21  because this election is underway.

    22      Now, the -- if we can go to Slide 46, we are going to

    23  have witnesses for you to testify about this point.  We

    24  have the videotaped deposition of a small county election

09:22:09 25  administrator, Staci Decker.  We have the opinion of an
```

1   over-million-population county here to testify by

2   videotape, also, Bruce Sherbet.  And then we have the

3   Texas Director of Elections Keith Ingram.

4       They will testify that changes to the election at this

09:22:29   5   late date would be catastrophic, cause massive voter

6   confusion, increase the likelihood of election errors and

7   impose substantial burdens on state administrators.

8       Plaintiffs have failed to offer in their direct case a

9   single witness to testify to this Court to address these

09:22:46   10   issues.  This is -- we have three witnesses that are going

11   to testify about the massive consequences.  Of course,

12   this relates to the multiple factors, but balance of

13   equities being one of those, and the massive consequences

14   that would be caused by any sort of delay or change in the

09:23:03   15   election schedule right now.  You'll hear from them today

16   and early tomorrow.

17       And the primary elections are underway.  The Supreme

18   Court in a recent opinion written by Justice Blacklock --

19   and it was, actually, I think three weeks ago.  It was

09:23:22   20   decided on January the 6th -- the Court's opinion

21   indicated that no amount of expedited briefing or judicial

22   expediency at this point can change the fact that the

23   primary election for 2022 is already in its early stages.

24       It's important to note that in that decision our -- we

09:23:43   25   had defended the State in a PI in state court in December.

1    And there is a -- in the opinion, the Court looks at those

2    very affidavits that -- some of them that we have provided

3    this Court -- and found those to be credible and a reason

4    why the Court couldn't decide at this late date to make

09:24:03    5    any change to the election.  That was a Texas Supreme

6    Court persuasive authority, a recent decision from three

7    weeks ago saying it would be too late.

8        Of course, the *Purcell* Principle was -- this is a case

9    that was decided in the Supreme Court in 2006.  "Court

09:24:19    10   orders affecting elections, especially conflicting orders,

11   can themselves result in voter confusion and consequent

12   incentive to remain away from the polls.  As an election

13   draws closer, that risk will increase," said the Supreme

14   Court.

09:24:33    15       And so there is this whole other doctrine which is,

16   you know, even if, you know, there were liability found in

17   a preliminary injunction, there is this whole other

18   calculus that we don't make changes, you know, prior to an

19   election because the -- because the risk of doing so, it

09:24:50    20   can have -- can cause way more harm than the actual --

21   than the harm.

22       And this is a principle that's been further elucidated

23   in *RNC v. DNC* just in 2020.  So we have the Texas Supreme

24   Court case.  We have *Purcell*.  We have *RNC v. DNC*.  But

09:25:11    25   more importantly, we have the evidence, the uncontested

1  evidence of the election administrators in statewide,

2  large county, small county, that will testify to this

3  Court that the -- that moving the election, making any

4  sort of alterations would be highly damaging.

09:25:29  5  I thank the Court for your time, and we'll go ahead

6  and call Senator Joan Huffman.

7  MR. DUNN:  Your Honor, while the witness appears,

8  I just want to restate for the record we understand the

9  Court's ruling on privilege yesterday but we don't want to

09:25:50  10  have been seen as waiving something.  So we renew our

11  objection.

12  Our position is by merely testifying here today she is

13  waiving her legislative privilege and that this -- that to

14  the extent that she can testify today only to public

09:26:03  15  statements, it's cumulative and duplicative testimony and

16  violates Federal Rule of Evidence 403.

17  But again, I understand the Court's ruling, and we're

18  prepared to proceed.

19  JUDGE GUADERRAMA:  Good morning, Senator.

09:26:35  20  SENATOR HUFFMAN:  Your Honors, good morning.

21  JUDGE GUADERRAMA:  If you will raise your hand to

22  be sworn.

23  SENATOR HUFFMAN:  (Complying.)

24  JUDGE GUADERRAMA:  Do you solemnly swear or

25  affirm the testimony you are about to give in this cause

| | |
|---|---|
| 1 | now on trial before the Court will be the truth, the whole |
| 2 | truth, and nothing but the truth so help you God? |
| 3 | THE WITNESS:  I do. |
| 4 | JUDGE GUADERRAMA:  Thank you, ma'am.  If you |
| 09:26:45  5 | would have a seat. |
| 6 | THE WITNESS:  Right here? |
| 7 | JUDGE GUADERRAMA:  Yes, ma'am. |
| 8 | THE WITNESS:  All right. |
| 9 | **SENATOR CECILIA JOAN HUFFMAN,** |
| 09:26:50  10 | having been first duly sworn, testified as follows: |
| 11 | **DIRECT EXAMINATION** |
| 12 | BY MR. HILTON: |
| 13 | **Q.**  Good morning, Senator.  How are you? |
| 14 | **A.**  Good morning.  Fine.  Thank you. |
| 09:26:56  15 | **Q.**  Can you please state your name for the record. |
| 16 | **A.**  My full name is Cecilia Joan Huffman, but I go by |
| 17 | Joan. |
| 18 | **Q.**  And I just want to start with some of your background |
| 19 | and have you introduce yourself to the Court and for the |
| 09:27:10  20 | record. |
| 21 | **A.**  Yes. |
| 22 | **Q.**  Could you start maybe by telling us where you were |
| 23 | born and where you grew up? |
| 24 | **A.**  Yes.  I was born in New Iberia, Louisiana.  I was |
| 09:27:19  25 | raised there.  We lived a short time in Venezuela and |

```
 1   South America.  I went to middle school and high school in

 2   Louisiana.  I graduated from Mount Carmel Academy, an

 3   all-girls Catholic school in New Iberia.

 4             JUDGE GUADERRAMA:  Mr. Hilton, will you just

 5   identify yourself for the record, please.

 6             MR. HILTON:  I apologize, Your Honor.  Chris

 7   Hilton for the State.

 8             JUDGE GUADERRAMA:  Thank you.

 9   BY MR. HILTON:

10   Q.   Thank you, Senator.  After high school, did you go to

11   college?

12   A.   I did.

13   Q.   Where did you go?

14   A.   I graduated from Louisiana State University, LSU, in

15   Baton Rouge.

16   Q.   And what did you study?

17   A.   I majored in history and football games.

18   Q.   Geaux Tigers.  What did you do after college?

19   A.   I went to law school at LSU for about a year, and then

20   I moved to Texas and got a job at the Harris County

21   District Attorney's office as a secretary.  I worked as a

22   secretary for about a year and then decided to go back to

23   law school, applied to South Texas College of Law and then

24   worked at -- continued to work at the district attorney's

25   office while going to night school at South Texas.  And
```

1   then once I graduated from law school at South Texas, I

2   took the bar and then was hired at the district attorney's

3   office in Harris County as a prosecutor.

4   **Q.**   What motivated you to go to law school in the first

09:28:42   5   place and then go back at night while working full-time?

6   **A.**   Well, when I first started at LSU, I, like many young

7   people, wasn't sure what I wanted to do.  After I started

8   law school, I realized I didn't want to stay in Louisiana.

9   I wanted to move to Texas.  And as we know, Louisiana law

09:28:58   10   is a bit different than the rest of the common law states.

11       And so when I went back to Texas, I didn't -- you

12   know, I got a job as a secretary.  I could type and, you

13   know, I had some legal qualifications; so they hired me at

14   the DA's office.

09:29:14   15       And then, as I watched the work of the prosecutors, I

16   decided that's what I really wanted to do.  So I was

17   motivated to go ahead and finish law school at that time.

18   **Q.**   And so tell the Court a little bit about your career

19   and your work as a prosecutor.

09:29:25   20   **A.**   Well, like all the prosecutors, I started out at the

21   misdemeanor level.  I worked myself up over the years to

22   chief felony prosecutor.  You know, we tried over 100 jury

23   trials from aggravated sexual assaults of children to

24   capital murders, several capital murder cases.

09:29:44   25       I served 18 months at the Organized Crime Narcotics

*Laura Wells, RPR, RMR, CRR, RDR*

Direct Examination of Senator Huffman          Vol 6   28

1    Task Force as their legal counsel where I worked, you

2    know, at the site of the task force with a bunch of

3    federal officers and state and local officers on organized

4    crime issues.

09:30:03   5    **Q.**   How long did you work as a prosecutor, approximately?

6    And then what was the next chapter of your career after

7    that?

8    **A.**   I think it was about 15 years.  And then I became

9    pregnant with my only child, when I was a little older, I

09:30:17   10   had when I was 41.  And so I wanted to take it a little

11   easy, and I ended up taking some time off.  And then I

12   decided to run for a criminal district court bench in

13   Harris County at that time.

14   **Q.**   And when did you first run for the -- you know, run

09:30:36   15   for the bench and how long did you serve as a judge?

16   **A.**   I think it was 1999.  And I served a term and a half,

17   resigned in the middle of my second term, again, because I

18   had obligations at home as a mother that I wanted to

19   attend to; and I did that.  So I served -- it was -- it

09:30:54   20   may have been seven years, but I want to say six or seven

21   years.

22   **Q.**   What was your docket like as a criminal district

23   judge?  I imagine similar to your docket as a prosecutor?

24   **A.**   Yes.  It was very heavy.  It was in Harris County.

09:31:06   25   There were quite a few cases daily that we dealt with,

          1   lots of jury trials, lots of hearings and every day pleas,

          2   pleas of guilty, and so forth.  So it was a very -- it was

          3   a very busy schedule.

          4   **Q.**   And so while you were a practicing attorney and while

09:31:19  5   you were a judge, did you ever work in any civil law

          6   fields?

          7   **A.**   I have never worked in the civil arena.

          8   **Q.**   After you retired from being a judge, you decided to

          9   pursue a career in a different branch of government?

09:31:33 10   **A.**   Correct.

         11   **Q.**   Tell the Court about your decision to run for the

         12   Senate.

         13   **A.**   Well, a Senate seat came open in Senate District 17.

         14   Many of you who follow politics know it's fairly rare for

09:31:47 15   a Senate seat -- for someone to resign in the middle of

         16   their term and for there to be an open seat.  And I became

         17   aware that that seat was open.

         18       I had never thought about, you know, running for that

         19   type of office.  But once I thought about it, I thought

09:32:03 20   about my qualifications and that I had a desire to serve;

         21   my son was a little older then; I had a very supportive

         22   husband.  And with a supportive family, it's easier to do

         23   that and I decided to make a run for it.  I was not the

         24   preferred candidate, but I was able to ultimately win that

09:32:21 25   election.

1    **Q.**   And what year were you first elected to the Senate?

2    **A.**   That would be in 2008.

3    **Q.**   And you have served continuously in the Senate since

4    then?

09:32:32  5    **A.**   Yes.

6    **Q.**   Can you please give the Court -- it doesn't need to be

7    an exhaustive list but a flavor for some of the committees

8    you have served on and any chairships that you have had?

9    **A.**   Yes.  I served -- and, again, this won't be

09:32:48  10   all-inclusive because I can't recall completely.  But I

11   served on the Health and Human Services Committee over the

12   years, the Administrative Committee, the Higher Education

13   Committee, State Affairs.  I have been Vice-Chair of

14   Criminal Justice for several sessions.  I served as Chair

09:33:04  15   of State Affairs for several sessions.  This last session

16   I was Chair of Jurisprudence, as well as Chair of

17   Redistricting -- the Redistricting Committee.  And now the

18   Chair of Finance.

19   **Q.**   And you mentioned Chair of the Senate Special

09:33:22  20   Committee on Redistricting --

21   **A.**   Yes.

22   **Q.**   -- in 2021.  Had you previously served on a

23   redistricting committee?

24   **A.**   I had back -- on the last redistricting cycle, I

09:33:31  25   served as a member of that committee when Lieutenant

1   Governor Dewhurst was then the Lieutenant Governor.

2   **Q.**   Was that in 2013?

3   **A.**   I think so, but it may have been 2011 as well.   I

4   can't really recall.

09:33:44   5   **Q.**   But you said you were just a member?   You weren't a

6   chair?

7   **A.**   Correct.   Yes.

8   **Q.**   When were you named as Chair of the Senate Special

9   Committee on Redistricting for 2021?

09:33:56   10   **A.**   I believe it would have been in the early summer of

11   2019 after the regular -- we concluded the regular session

12   in May of 2019.   So probably June or July of 2019.

13   **Q.**   And has that committee disbanded?

14   **A.**   It is not an active committee.   I don't know if

09:34:15   15   "disbanded" is the exact correct word, but it's not an

16   operational committee.

17   **Q.**   So maybe a better question is:   What is the current

18   status of that committee?

19   **A.**   It's -- I believe it's just not active.   It's not

09:34:28   20   meeting and -- yeah.

21   **Q.**   Well, thank you, Senator Huffman, for going through

22   your background with us.

23        Before we go into the substance of your testimony

24   today, as you may have heard when you were walking in,

09:34:42   25   there were some objections regarding legislative

*Laura Wells, RPR, RMR, CRR, RDR*

1    privilege.  We had some conversations with the Court last

2    night.  The Court made some determinations about how today

3    is going to go.

4         And so I just want to go over everything with you and

09:34:54    5    make sure you understand it and make sure opposing counsel

6    and the Court believes that I have correctly stated how we

7    are going to proceed today.

8         First, let's confirm, do you intend to assert your

9    legislative privilege today?

09:35:05    10   **A.**   Yes.

11   **Q.**   Okay.  Do you intend to assert it to the fullest

12   extent permitted by law regarding all your legislative

13   acts?

14   **A.**   Yes.

09:35:13    15   **Q.**   Do you intend to assert it regarding inquiry into your

16   mental impressions related to legislation, including your

17   motivations in drafting and considering legislation and

18   any materials you considered?  Do you intend to assert the

19   privilege with respect to that line of inquiry?

09:35:28    20   **A.**   Yes.

21   **Q.**   Do you intend to assert it regarding your

22   communications with other legislators?

23   **A.**   Yes.

24   **Q.**   Do you intend to assert it regarding your

09:35:35    25   communications with your staff and other legislative

1  staff?

2  **A.**  Yes.

3  **Q.**  Do you understand that your public statements,

4  including statements that you made in the Senate chamber

09:35:46  5  during committee or during floor debate, are part of the

6  public record and those statements themselves are not

7  protected by the legislative privilege?

8  **A.**  Yes.  I do understand.

9  **Q.**  Okay.  At no point today will I ask you a question

09:35:57  10  that is intended to get at any privileged material.  And

11  if I inadvertently ask you a question that you believe

12  does call for privileged information in the response,

13  please say so; and I'll withdraw or rephrase the question.

14  **A.**  All right.  Thank you.

09:36:10  15  **Q.**  Do you understand that?

16  **A.**  Yes, I do.

17  **Q.**  The Court has determined that you may testify as to

18  non-privileged matters and that you may testify in

19  reference to and affirm your public statements without

09:36:25  20  waiving your privilege.  Do you understand the Court's

21  ruling?

22  **A.**  Yes.

23  **Q.**  And if you go beyond your public statements or if you

24  reveal any privileged information, the Court may find that

09:36:33  25  you have waived your legislative privilege regarding that

1   privileged conversation or mental impression.  Do you

2   understand that?

3   **A.**   I do.

4   **Q.**   Now, Mr. Dunn may object to my questioning, and he may

09:36:45   5   alert the Court that he thinks a question I have asked

6   will result in an answer that constitutes a waiver of

7   legislative privilege.  So whenever I ask you a question,

8   I ask that you give time for Mr. Dunn to lodge an

9   objection if he feels like he needs to do that.

09:36:56   10   **A.**   Yes, I will.

11   **Q.**   And if that happens, it may be necessary for the Court

12   to make a ruling on the objection; and I may withdraw or

13   rephrase the question.  All right?

14   **A.**   Yes.

09:37:06   15   **Q.**   Finally, if you have a question about something --

16   whether something is protected by your legislative

17   privilege, please let me and the Court know.  I may be

18   able to rephrase or withdraw my question.  The Court may

19   allow you to consult with me for the limited issue of

09:37:21   20   whether something is privileged, it may review your

21   testimony in-camera, or it may make any other appropriate

22   determination.  Do you understand that?

23   **A.**   Yes.

24         MR. DUNN:  Pardon me.  I would just like to note

09:37:31   25   for the record that hasn't been agreed.  We object to the

1  witness being -- communicating with her lawyer in the

2  middle of the examination.

3        MR. HILTON:  Well, that was my next question, to

4  ask the Court and Mr. Dunn if I have misstated the

09:37:43  5  procedure that we agreed upon.  So I have misstated that.

6  That's fair.

7        MR. DUNN:  And since I have been presented with

8  that inquiry, I will just add if there is a waiver of

9  legislative privilege, it doesn't just apply to the

09:37:53  10  subject of the question asked, which I thought is what you

11  implied.

12        MR. HILTON:  We would disagree with Mr. Dunn on

13  that point, privilege asserted in response to specific

14  questions then would be waived with respect to specific

09:38:06  15  matters.  And I don't believe that Senator Huffman would

16  waive all legislative privilege for all purposes if she

17  were to choose to waive legislative privilege.  Again, she

18  has testified she doesn't intend to do that.

19        JUDGE GUADERRAMA:  All right.  And those are

09:38:19  20  determinations we'll make on each of those questions.  I'm

21  not sure that that's settled amongst the three of us

22  either.  So let's just move slowly.

23  BY MR. HILTON:

24  Q.  All right.  Senator Huffman, do you understand the

09:38:29  25  procedure for your testimony today?

1    **A.**   Yes.

2    **Q.**   Okay.  All right.  Now that we have got some

3    preliminary matters out of the way, let's go on to the

4    substance of the work of the Senate during the

09:38:45  5    redistricting cycle.

6         I want to begin by discussing rules regarding the

7    redistricting process; and as we discussed, I'm not asking

8    for your mental impressions, any privileged deliberations

9    or opinions about any legislation.  I am hoping you can

09:39:05  10   explain to the Court as a factual matter what were the

11   rules of the road for redistricting this cycle.  Is that

12   clear?

13   **A.**   Yes.

14   **Q.**   Okay.  So did the Senate pass a resolution adopting

09:39:15  15   the rules for redistricting?

16   **A.**   Yes.

17   **Q.**   And was that Senate Resolution 4?

18   **A.**   Yes.

19   **Q.**   And is that Senate resolution publicly available, like

09:39:24  20   all official acts of the legislature?

21   **A.**   Yes, it is.

22   **Q.**   I'm not offering Senate Resolution 4 as an exhibit;

23   but since it's a public act of the legislature, I would

24   like to just put the text of it on the screen.

09:39:38  25        MR. HILTON:  Could you put that up, Brian.

*Laura Wells, RPR, RMR, CRR, RDR*

Direct Examination of Senator Huffman                     Vol 6

BY MR. HILTON:

**Q.**   Senator Huffman, do you recognize this document?

**A.**   Yes, I do.

**Q.**   Okay.  And what is it?

**A.**   It is a copy of SR-4, which was passed in the first
regular session of the 87th Legislature in, I believe it
was, January of 2021.

**Q.**   And did it control the work of the Senate
Redistricting Committee during the third called session of
the 87th Legislature?  And again, just speaking in terms
of what does the law say and public information and not
asking you about your mental impressions.

**A.**   Yes.

**Q.**   And did the committee abide by those rules?

**A.**   Yes.

**Q.**   I want to zoom in, if we can, on Section 2 of Senate
Resolution 4.

        MR. HILTON:  Scroll up just a little bit, please,
Brian.  Right there.  Thank you.

BY MR. HILTON:

**Q.**   According to Senate Resolution 4, what does Section 2
relate to?

**A.**   Regional hearings and videoconference testimony.

**Q.**   Does Section 2 of Senate Resolution 4 provide the
committee will accept public testimony at regional

1    hearings?

2    **A.**   Yes.

3    **Q.**   And does it provide for that testimony to be done via

4    videoconference?

09:41:06    5    **A.**   Yes.

6    **Q.**   Of course, this was passed during the COVID pandemic,

7    correct?

8    **A.**   Correct.

9    **Q.**   And did the Senate Redistricting Committee, in fact,

09:41:18    10    receive public testimony via videoconference?

11    **A.**   We did.

12    **Q.**   Going now to Section 3.  Senator Huffman, what does

13    Section 3 of Senate Resolution 4 relate to?

14    **A.**   It related to the public notice required for the

09:41:39    15    meetings.

16    **Q.**   What is the public notice requirement as stated in

17    Section 3 of Senate Resolution 4?  Again, not asking for

18    any mental impressions.

19    **A.**   Just reading from the document, it stated that the

09:41:50    20    public notice required at least 72 hours in advance of the

21    meeting during the regular session and 48 hours in advance

22    during a special called session.

23    **Q.**   And were those notice -- did the Senate Redistricting

24    Committee abide by those notice requirements?

09:42:05    25    **A.**   Yes, we did.

Direct Examination of Senator Huffman          Vol 6

1   **Q.**   Does -- just as a factual matter, does the work of

2   redistricting typically get done during a regular session

3   as opposed to a called session?

4   **A.**   You know, I hesitate using the word "typically"

09:42:32   5   because --

6   **Q.**   Well, let me rephrase that.

7   **A.**   Yes.

8   **Q.**   Does it typically at least start during the regular

9   session?

09:42:38   10   **A.**   Yes.

11   **Q.**   And this year it didn't, correct?

12   **A.**   Correct.

13   **Q.**   Did the federal government make any or the U.S. Census

14   Bureau make any public representations about when it was

09:42:51   15   going to deliver census data to Texas?

16   **A.**   Public representations?  I believe there were some

17   public, but I can't recall specifically what the manner

18   was.

19   **Q.**   Are you aware that federal law provides a statutory

09:43:03   20   deadline --

21   **A.**   Yes.

22   **Q.**   -- for the Census Bureau to provide the census data to

23   the states?

24   **A.**   Yes.

09:43:08   25   **Q.**   And are you aware what that deadline is?

1    **A.**   Was it April?  That's a guess.  April 1, yes.  It was

2    sometime in the spring.  A lot earlier than we actually

3    received it this time.

4    **Q.**   Well, that was my question.  I believe the deadline

09:43:21    5    was April 1.  You may or may not recall.  Did the federal

6    government meet its deadline in the spring?

7    **A.**   It did not.

8    **Q.**   Okay.  Did the U.S. Census Bureau ever publicly state

9    the reasons that the census data was delayed?

09:43:34    10    **A.**   I believe they put out some public statements or

11    letters stating the COVID pandemic had delayed the

12    gathering of information, delayed the census final numbers

13    from being prepared, is my understanding.

14    **Q.**   And when was the census data finally delivered to

09:43:51    15    Texas?  And again, not asking for any privileged

16    conversations with legislators or staff.

17    **A.**   It was in August.

18    **Q.**   And who specifically did the U.S. Census Bureau

19    deliver that data to?  Which agency of the Texas

09:44:07    20    government?

21    **A.**   I believe it was the legislative council, yes.

22    **Q.**   That is the Texas Legislative Council?

23    **A.**   Yes.

24    **Q.**   When did the Texas Legislative Council make that --

09:44:17    25    make that data available to the public?

1  **A.**   I believe that it took the council -- the raw data was

2  available, I believe, almost immediately; but it took a

3  little time for them to load that into the RedAppl system

4  where it would be more easily digestible, you know, for

09:44:36  5  the public and others to understand the data.  But we all

6  received the data at the same time, whether it be the

7  public, being members of the legislature, or anyone at all

8  received the data all at the same time.

9  **Q.**   And you mentioned for the first time today RedAppl has

09:44:51  10  come up.  Can you just explain as a factual matter what

11  RedAppl is?

12  **A.**   Yes.

13  **Q.**   So what is it?

14  **A.**   Well, it's a software system that -- where all the

09:45:02  15  census data is downloaded; and it provides, you know, maps

16  and information that legislators and the public or

17  interest groups, and so forth, can use to actually draw

18  maps and look at data as we go through the redistricting

19  process.

09:45:17  20  **Q.**   And you mentioned members of the public.  Can members

21  of the public access RedAppl through the Texas Legislative

22  Council?

23  **A.**   It's my understanding that they can.

24  **Q.**   Did the 87th Legislature pass a bill in the second

09:45:32  25  called session regarding election dates?

1    **A.**   Yes.

2    **Q.**   And was that SB-13?

3    **A.**   I don't recall the number.  We had several, as you

4    know, several sessions.  We had a lot of legislation, and

09:45:46   5   I don't recall the specific number.

6    **Q.**   You've dealt with probably four SB-13s this year?

7    **A.**   At least, yes.

8    **Q.**   The bill that was passed regarding election dates, was

9    that signed by the Governor?

09:45:58   10   **A.**   Yes.

11   **Q.**   And I want to look at some provisions of that bill.

12   Again, not offering this as an exhibit.  It's publicly

13   available text of the law that was passed.

14        Senator Huffman, do you recognize this document that's

09:46:15   15   on your screen?

16   **A.**   Yes.

17   **Q.**   And what is it?

18   **A.**   It is SB-13, which dealt with temporary provisions for

19   how elections could be held in 2022, depending on when the

09:46:28   20   maps were final.

21   **Q.**   And so beginning with Section B of SB-13 -- again, not

22   asking for your mental impressions, not asking for any

23   communications with legislators or staff or anything else

24   that would be privileged; but what does Section B of SB-13

09:46:48   25   do?

*Laura Wells, RPR, RMR, CRR, RDR*

1   **A.**   It was attempting to define when the specific piece of

2   legislation would actually become law, and we set up the

3   dates by which that would happen.

4   **Q.**   And that becomes law for the limited purpose of this

09:47:05   5   bill?

6   **A.**   This bill for these specific provisions, yes.

7   **Q.**   And then going down to Subsection (c) -- Subsection

8   (c) and then there are several sub-subsections below that.

9   What does Subsection (c) here do?

09:47:24  10   **A.**   Again, it was trying to -- this specific Subsection

11   (c) was trying to --

12   **Q.**   I want to stop you there.  Again, I want to clarify

13   I'm asking for you to read from the document and testify

14   regarding what the law itself states.  I don't want you to

09:47:38  15   go into any mental impressions, any opinions, or any

16   conversation with the legislators or your intent in

17   considering legislation.

18   **A.**   Okay.  It was setting up for all three maps when the

19   election dates would be dependent upon when the maps

09:47:54  20   became final.

21   **Q.**   And Subsection (1) here in Section C, what date does

22   Subsection (1) give?

23   **A.**   November 15th, 2021.

24   **Q.**   And did the governor sign redistricting laws passed by

09:48:10  25   the 87th Legislature prior to November 15th, 2021?

```
 1   A.   Yes.

 2        MR. HILTON:  If we could go to the next page to

 3   Subsection (2), please.

 4   BY MR. HILTON:

 5   Q.   And in Subsection (c)(2), what is the date range of

 6   this section?

 7   A.   After November 15th, 2021 and on or before December

 8   the 28th, 2021.

 9   Q.   And did the Governor sign redistricting laws passed by

10   the 87th Legislature between those dates?

11   A.   I believe he signed it before that.

12   Q.   So --

13   A.   Yeah.

14   Q.   So not within the date range specified in

15   Subsection (2)?

16   A.   Correct.

17   Q.   And then finally, Subsection (3), what date range does

18   that describe?

19   A.   That was between December 28th, 2021, and February --

20   on or before February the 7th, 2022.

21   Q.   And the same question there.  On the face of SB-13,

22   did any redistricting legislation become law for purposes

23   of SB-13 within that date range?

24   A.   No.

25   Q.   All right.  Let's turn to the work of the Senate
```

09:48:24
09:48:39
09:48:49
09:48:58
09:49:21

Direct Examination of Senator Huffman        Vol 6

```
 1   Redistricting Committee.  I think we have already touched
 2   on this.  Did the committee hold public hearings?
 3   A.   Yes.
 4   Q.   How many total would you estimate?
 5   A.   I don't recall.
 6   Q.   Two or dozens or --
 7   A.   Well, maybe around ten, but that's an estimate.
 8   Q.   Let's pull up the Senate Redistricting Committee's
 9   website again.  This is a publicly available website, not
10   being offered as an exhibit.
11        Do you recognize this website, Senator?
12   A.   I do.
13   Q.   What does this website reflect?
14   A.   It's the redistricting committee's official online
15   website.
16   Q.   And this specific page, what does this specific page
17   display or show?
18   A.   It gives the notice of the date of the hearing, the
19   copy of the hearing notice, the minutes and the witness
20   list.
21   Q.   Okay.  And what is the earliest date depicted on this
22   website?
23        MR. HILTON:  Brian, would you scroll to that,
24   please.
25   A.   January 25th of 2021.
```

1  BY MR. HILTON:

2  **Q.**  And how many hearings did the Senate Redistricting

3  Committee hold in January of 2021?

4  **A.**  Five.

09:50:37  5  **Q.**  And were hearings held in February?

6  **A.**  Yes.

7  **Q.**  And in March?

8  **A.**  Yes.

9  **Q.**  And there are hearing dates in September and October,

09:50:49  10  correct?

11  **A.**  Correct.

12  **Q.**  And which session of the 87th Legislature were those

13  hearings held in?

14  **A.**  The -- which hearings?  I'm sorry.  The October ones?

09:50:59  15  **Q.**  The September and October hearings, were those in the

16  third called session?

17  **A.**  Yes.

18  **Q.**  And you mentioned --

19  **A.**  One second.

09:51:08  20  **Q.**  Oh, I'm sorry.

21  **A.**  September may have been the second called session.  It

22  was either the second or third.  Yeah, it was one of the

23  special sessions.

24  **Q.**  Thank you.  And you mentioned that in connection with

09:51:17  25  each hearing there are a number of documents that may be

1  available on this website?

2  **A.**   Yes.

3  **Q.**   And so, if you could, just explain what each of those

4  is, the hearing notice and the minutes and the witness

09:51:27  5  list.

6  **A.**   The hearing notice would give a copy of the actual

7  notice that was put out to let people in the public, other

8  legislators know the time and place and the substance of

9  what the hearing would be about.

09:51:40  10      The minutes would be what actually happened during the

11  hearing as prepared by the clerk of the committee.

12      And the witness list is, of course, the list of those

13  who testified and filled out cards online or at -- I think

14  we just did online.  We didn't do hard cards, I don't

09:51:58  15  think, you know, printed cards.  There may have been some

16  in the in-person, early-on hearings.

17  **Q.**   Thank you, Senator.

18          MR. HILTON:  That's it, Brian.

19  BY MR. HILTON:

09:52:09  20  **Q.**   Let's go to Defendants' Exhibit Number 30.  And as we

21  continue to explain to the Court, you know, the nuts and

22  bolts and how the Senate redistricting process went, we've

23  got Defendants' Exhibit Number 30 up on the screen.  You

24  also have hard copies in front of you that are available,

09:52:26  25  if that would be easier.

1   **A.**   Okay.

2   **Q.**   Do you recognize what this document is?

3   **A.**   Yes.

4   **Q.**   And what is this document?

09:52:33   5   **A.**   It's a notice of public hearing for a hearing that was

6   held at 10:00 a.m. Friday on September the 24th.  Again,

7   it lays out the bills that will be heard.

8   **Q.**   And I'll represent to you, Senator, that Defendants'

9   Exhibit Number 30 is a compilation of several different

09:52:52   10   documents.  We'll look at a couple of them just so that

11   the Court has at least seen one of these types of

12   documents, and perhaps you can identify them and explain

13   them.

14          MR. HILTON:  So if we could go to the next

09:53:04   15   minutes.

16   BY MR. HILTON:

17   **Q.**   What is this document, Senator?

18   **A.**   This is a copy of the minutes of a hearing, again, the

19   same hearing from Friday, September 24th, 2021.

09:53:26   20   **Q.**   What kind of information did the minutes contain?

21   **A.**   It tells you who was there, who wasn't -- when I say

22   "who," I meant senators were present -- when the meeting

23   began.  And just like, you know, the minutes of an

24   official proceeding, it sort of lays out the time and the

09:53:45   25   basic explanation of what occurred during the hearing.

Direct Examination of Senator Huffman          Vol 6

1    **Q.**   Is this part of the official legislative record?

2    **A.**   It is.

3    **Q.**   And is that contained in the *Senate Journal*?

4    **A.**   Yes.

09:53:56   5    **Q.**   Are those documents publically available on the

6    Senate's website?

7    **A.**   Yes.

8            MR. HILTON:  If we could go to the next page,

9    Brian.

09:54:05   10   BY MR. HILTON:

11   **Q.**   Senator Huffman, do you recognize this document?  Do

12   you know what this document is?

13   **A.**   Yes.  It's the witness list for that same hearing we

14   have been discussing.

09:54:18   15   **Q.**   And how is the information shown on here, and what

16   kind of information about the witnesses is available?

17   **A.**   Basically, we document if someone testified for or

18   against or on a piece of legislation that's being heard

19   and then basic information about the individual without,

09:54:36   20   you know, giving home addresses, and so forth.  It's just

21   basic information.  If they represented an organization,

22   that's usually listed; if they represented theirself, it's

23   listed; and then their hometown, basically.

24   **Q.**   Did the Senate Redistricting Committee provide other

09:54:59   25   opportunities, other than showing up at a hearing, in

1   order to provide their opinions and register their

2   thoughts about the bills?

3   **A.**   Yes.   The committee had a portal that was open to the

4   public that was open for more than a year where members of

09:55:14   5   the public could provide input, comments, documents, case

6   law, maps, you know, whatever they chose to bring to the

7   attention of the committee.   And that was gathered for

8   some time.   It's still open now, in fact.   And members of

9   the public could provide that information.

09:55:36   10   And that was then passed on -- eventually, it was

11   loaded so that the public has access to that, as well.

12   Again by -- but we would redact personal information, and

13   so forth.

14   We did share all the information with all the members

09:55:50   15   of the committee; and that was available to them, I

16   believe, like in a Dropbox.   But the private information

17   was then redacted by staff and placed upon the portal

18   public website for the public.   And individuals are

19   informed that it would be made public.

09:56:07   20   **Q.**   All right.   And so again, just to -- well, strike

21   that.

22   The comments that were submitted, were those available

23   on the Senate website, as well?

24   **A.**   Yes.   Yes.

09:56:20   25   **Q.**   Had the committee planned to conduct in-person

1   regional hearings around the state?

2   **A.**   Yes, we had.

3   **Q.**   Were those hearings canceled?

4   **A.**   They were.

09:56:33   5   **Q.**   And that was during the time the COVID pandemic was

6   raging and before any vaccines were available?

7   **A.**   Absolutely.  Yes.

8   **Q.**   All right.  Senator, I think that concludes what I

9   wanted to ask you about, about the process and the

09:56:55   10   structure of the calendar.

11        Let's start looking at some maps.  What -- before I

12   do, what is the term -- are you familiar with the term

13   "benchmark map"?

14   **A.**   Yes.

09:57:08   15   **Q.**   And again, without asking for any legislative

16   privilege information, attorney-client or anything like

17   that, what does the term "benchmark map" mean to you?

18   **A.**   I believe it means the map that you start with, the

19   current -- the map that is in use at the time you start

09:57:21   20   the process.

21   **Q.**   Okay.

22        MR. HILTON:  Could you pull up 21, please.

23        MR. DUNN:  Excuse me, Your Honors.  I apologize

24   to Court and counsel and the Senator for my brief

09:57:32   25   interruption here.  I have to excuse myself from the

1    courtroom for a minute or two.  May Mr. Gaber stand in my

2    stead for a moment?

3              JUDGE GUADERRAMA:  Yes, sir.

4              MR. HILTON:  Your Honor, I would be happy to

09:57:41  5    stand at ease and take a recess if that would be

6    preferable.

7              JUDGE GUADERRAMA:  Let's take a ten-minute

8    recess.  Be back at 10:07.

9        (Recess from 9:57 a.m. to 10:09 a.m.)

10:09:57  10              JUDGE GUADERRAMA:  All right.  Thank you.  Be

11    seated, please.

12        All right, Mr. Hilton.

13              MR. HILTON:  Thank you.

14              JUDGE SMITH:  Mr. Dunn, don't hesitate to let us

10:10:08  15    know if there is any other kind of difficulty.

16              MR. DUNN:  Thank you, Your Honor.

17    BY MR. HILTON:

18    **Q.**  Okay, Senator.  Let's turn, as I said, to some maps.

19    And we just discussed the term "benchmark map" or

10:10:30  20    "benchmark plan"?

21    **A.**  Yes.

22    **Q.**  Let's go ahead and pull up Plan S-2100.  This is from

23    the District Viewer website, publicly available.  Well,

24    Senator Huffman, can you explain to the Court what the

10:10:45  25    District Viewer website is?

 1   **A.**   I'm sorry.  What the what?

 2   **Q.**   I'm sorry.  The District Viewer website.

 3   **A.**   It is a website that gives you access to the maps that

 4   are drawn, the current ones, the proposed ones, ones that

 5   were passed in committee, the amendment process, and so

 6   forth.  It's a view of the maps.

 7   **Q.**   It's available to the public?

 8   **A.**   It is, yes.

 9   **Q.**   It's maintained -- is it maintained by the legislative

10   council?

11   **A.**   It is, yes.

12   **Q.**   Do you recognize this plan, this map?

13   **A.**   I can say I recognize by looking at the shapes of the

14   districts.  By the plan numbers, not so much, to be

15   honest, because there were so many different ones, yes.

16   **Q.**   Fair enough.

17   **A.**   Yeah.

18   **Q.**   What is this map?

19   **A.**   It looks like, to me, like the -- from what I can see,

20   without having access to blowing up the more -- the

21   smaller districts, it looks like the benchmark plan.

22   **Q.**   Well, let's zoom in to Tarrant County, Senate District

23   10.  The benchmark plan, is that the map that was drawn

24   and enacted following the release of the 2010 census data,

25   the last census round?

Direct Examination of Senator Huffman          Vol 6

 1  **A.**   I don't recall if that was the one from that cycle or

 2  the next redistricting cycle, which was 2013.

 3  **Q.**   Understood.

 4  **A.**   By looking at this, I really can't say.

10:12:17   5  **Q.**   Understood.  And I want to clarify.  My question was

 6  based on -- was:  Which census was this based on?  Was

 7  this based on the 2010 census?

 8  **A.**   Yes.

 9  **Q.**   Thank you.  All right.  Do you recognize this

10:12:31  10  configuration of SD-10?

11  **A.**   I do recognize it as one of the configurations of

12  SD-10, yes.

13  **Q.**   Do you know whether this is the configuration of SD-10

14  that Senator Powell currently represents?

10:12:46  15  **A.**   I believe that it is, yes.

16  **Q.**   Do you know whether that's the same configuration of

17  SD-10 that was in effect in 2013?

18  **A.**   I believe that it is, yes.

19  **Q.**   Okay.  Next, I would like to pull up Defendants'

10:13:08  20  Exhibit Number 22.  And as we go into this exhibit,

21  Senator, I want to just again reiterate, regarding your

22  legislative privilege, that I am not asking you to reveal

23  any mental impressions or any thought process or any

24  opinions.  When I'm questioning you about this exhibit or

10:13:25  25  any exhibit, I'm just asking for you to confirm the

*Laura Wells, RPR, RMR, CRR, RDR*

1  content of the exhibit.

2  **A.**   Okay.

3  **Q.**   Defendants' Exhibit Number 22, which is -- do you see

4  the title here?

10:13:41  5  **A.**   I do.

6           MR. HILTON:  And can we zoom in on Row 10,

7  please, Brian.

8  BY MR. HILTON:

9  **Q.**   Do you see at the top it says "Special Tabulation of

10:13:55  10  Citizen Voting Age Population"?

11  **A.**   I see that.

12  **Q.**   And you saw earlier it referenced Plan S-2100?

13  **A.**   Yes.

14  **Q.**   And that was the same plan that we were looking at on

10:14:06  15  District Viewer a moment ago?

16  **A.**   Yes.

17  **Q.**   What is the White alone CVAP number listed on

18  Defendants' Exhibit Number 22?

19  **A.**   53.9 percent, plus or minus 45.

10:14:27  20  **Q.**   And, Senator, do you have an understanding what "CVAP"

21  is?

22  **A.**   Yes.

23  **Q.**   And without asking you to reveal any legislative or

24  attorney-client privileged conversations or information,

10:14:38  25  what is your understanding of "CVAP"?

*Laura Wells, RPR, RMR, CRR, RDR*

1  **A.**   It's the citizen voting age population.

2  **Q.**   Do you have to be a citizen to vote in Texas?

3  **A.**   Yes.

4  **Q.**   Looking back to Defendants' Exhibit Number 22, what is

10:14:55  5  the CVAP number listed on this exhibit for -- under the

6  column Black alone for Senate District 10?

7  **A.**   20.5.

8  **Q.**   And what is the Hispanic CVAP number that's listed on

9  this exhibit for Senate District 10?

10:15:11  10  **A.**   20.4.

11  **Q.**   And if you combine those two numbers, the total of

12  those two combined would be roughly what, based on the

13  face of Defendants' Exhibit Number 22?

14  **A.**   40.9.

10:15:28  15  **Q.**   Let's go to Plan S-2101.  Again, we'll pull this up

16  from the District Viewer website.  Understanding that you

17  have looked at many, many, many maps and plans -- so if

18  the answer is no, that's an acceptable answer -- but do

19  you recognize this map?

10:15:54  20  **A.**   It is one of the maps that we submitted as a proposed

21  map.

22  **Q.**   Again, without asking you to go into any legislative

23  privileged information, just based solely on what is in

24  the public record, was this the -- if you recall, was this

10:16:15  25  map your initial statewide proposal for a new Senate map?

1   A.   Yes.  It appears, from what I'm looking at, at this

2   angle, yes.

3   Q.   Thank you, Senator.  Do you recall when this map, this

4   plan was released to the public?

10:16:32   5   A.   I cannot give you a specific date, no.

6   Q.   Do you remember -- and if you don't, that's okay.  Do

7   you remember approximately, you know, within the

8   redistricting calendar that we looked at, at what point in

9   the process it was released?

10:16:46   10   A.   It was, looking at the calendar, sometime before the

11   first committee hearing on the Senate map.  So this is

12   prior to that, yes.

13   Q.   And when these maps are released to the public and

14   made publicly available, where does the public go to

10:17:06   15   access them?

16   A.   I believe District Viewer, yes.

17   Q.   That's one place they can go?

18   A.   I believe that's one place they can go, yes.

19   Q.   And I'm not asking for the content of any

10:17:20   20   communications that you had with any legislators, but did

21   you meet with members of the Senate prior to releasing

22   this proposal to the public?

23   A.   I did.

24   Q.   Okay.  And again, not asking for the content of any

10:17:32   25   communication or anything that would be privileged, did

1    you meet with Senator Powell prior to releasing this

2    proposal?

3    **A.**   I did.

4    **Q.**   And let's zoom in on Tarrant County and SD-10.  Again,

10:17:59   5    just looking at the face of the plan -- I'm not asking for

6    any legislative privilege or information -- is SD-10

7    changed in this map compared to the benchmark map?

8    **A.**   Yes.

9    **Q.**   Does it add counties to Tarrant County?

10:18:16   10   **A.**   Yes.

11   **Q.**   Did you later offer a committee amendment to Plan

12   S-2101?

13   **A.**   Yes.

14        MR. HILTON:  Let's pull up Plan 2108, Brian.

10:18:25   15   BY MR. HILTON:

16   **Q.**   Again, understanding that the answer may be no because

17   of the number of maps you've looked at and without asking

18   for any legislative privilege information --

19        JUDGE SMITH:  Which defense exhibit is this?

10:18:45   20        MR. HILTON:  I apologize, Your Honor.  This is

21   not a defense exhibit.  This is from the publicly

22   available District Viewer website.

23        JUDGE SMITH:  Fair enough.  That's fine.

24        MR. HILTON:  And so I make it clear for the

10:18:55   25   record, the plan number, that's the way it can be accessed

1   on the District Viewer website.  And I believe we cite to

2   that in some of our papers.  If we don't, we certainly

3   can.

4   BY MR. HILTON:

10:19:05   5   **Q.**   Do you recognize -- subject to those caveats that I

6   just gave, do you recognize this map, Senator?

7   **A.**   Yes.

8   **Q.**   And what is this map?

9   **A.**   I believe this would be the map of the amendment

10:19:22   10   offered in the committee on the hearing dealing with the

11   Senate map, my amendment, yes.

12   **Q.**   That was my next question.  This was your amendment

13   that you offered as a committee amendment?

14   **A.**   Yes.

10:19:39   15   **Q.**   Do you recall when this was released to the public?

16   **A.**   It was released right before -- the evening before the

17   hearing which was -- it was within the rules that we had

18   adopted under SJR-4 and, in fact, was earlier than

19   required under the SJR-4, the SJR-4 that we had adapted as

10:20:01   20   the rules for the committee process.

21   **Q.**   You said it was released before the hearing.  Are you

22   referring to the first Senate Redistricting Committee

23   hearing?

24   **A.**   Yes.

10:20:08   25   **Q.**   And do you recall --

1   **A.**   Excuse me.  For the Senate map, just so that's clear.

2   **Q.**   Thank you for the clarification.  For the Senate map.

3        Do you recall under the rules established under SR-4

4   what the deadline for committee amendments was?

10:20:26   5   **A.**   I don't recall specifically; but I believe that it was

6   48 hours, you know, after we had had the hearing.  So this

7   was actually introduced prior to the hearing so that the

8   public, and so forth, would have an opportunity to at

9   least see it and comment on it.

10:20:46   10   **Q.**   And let's zoom in on Tarrant County and SD-10 and Plan

11   S-2108, as well.  And is SD-10 changed in this map

12   compared to the benchmark?

13   **A.**   Yes.

14   **Q.**   And is it changed compared to Plan S-2101?

10:21:10   15   **A.**   Yes.

16   **Q.**   Does it add additional counties to SD-10?

17   **A.**   Yes.

18   **Q.**   Okay.  You may have already said this; but I just want

19   to confirm, just to make sure it's clear in the record.

10:21:35   20   Did the Senate Redistricting Committee hold a committee

21   hearing on September 24th, 2021?

22   **A.**   I would have to look at the public record to determine

23   the specific date; but it sounds like, yes, we did because

24   we looked at the minutes.  Yes, I believe we did.

10:21:50   25   **Q.**   Well, I'll represent to you that was the date of the

1  first hearing.  And I think we have already seen documents

2  that confirm that but, if we haven't, we'll see more, I

3  think.

4      Was Plan S-2108 discussed in the Senate chamber during

5  that hearing?

6  **A.**  Yes.

7  **Q.**  Was Senator Powell at that hearing?

8  **A.**  Yes.

9  **Q.**  Did you speak at that hearing?

10  **A.**  I did.

11  **Q.**  And did Senator Powell question you at that hearing?

12  **A.**  Yes, she did.

13  **Q.**  And were members of the public present at that

14  hearing?

15  **A.**  Yes.

16  **Q.**  Okay.  I would like to go through some of the

17  statements that were made in the Senate chamber during

18  that hearing.

19       MR. HLITON:  I will be referring, Your Honors, to

20  Defendants' Exhibit Number 58 and Defendants' Exhibit

21  Number 59 for purposes of this hearing.  Defendants'

22  Exhibit Number 58 is the transcript.  Defendants' 59 is

23  the corresponding video.

24      And as -- just so you know, as we go forward, we're

25  going to be using a combination of both.  For the most

1    part, I am going to be referring to clips by where they

2    appear in the transcript; but they also are all available

3    in the video.

4    BY MR. HILTON:

10:23:02   5    **Q.**   All right.  Now I want to play a video clip from this

6    hearing.  This clip will be from the video that's

7    contained in Defendants' Exhibit Number 59; and the

8    portion that we will be playing is from Page 1 of the

9    corresponding transcript, which is Defendants' Exhibit

10:23:17   10   Number 58.

11         MR. HILTON:  Could we play that first clip,

12   please, Brian.

13        (Defendants' Exhibit Number 59 played, as follows:)

14         "SENATOR HUFFMAN:  Before we continue today, I

10:23:29   15   want to review the redistricting process thus far.  Since

16   this committee was created, we have done our best to

17   remain open and transparent about the process; and we have

18   actively collected input from Texans and interested

19   parties across the state through many different avenues."

10:23:49   20        (Defendants' Exhibit Number 59 concluded.)

21   BY MR. HILTON:

22   **Q.**   Again, I'm going to be asking you questions related to

23   these clips only about the public statements as they are

24   played or as they appear on the transcript.

10:23:58   25   **A.**   Okay.

1   Q.   I'm not asking you about any of your mental

2   impressions, any of your considerations or any other

3   privileged material that may be related to the statements.

4   I'm only asking about the public statements themselves.

10:24:08   5   A.   Okay.  Yes, sir.

6   Q.   All right.  Now, was that an accurate recording of

7   your statement during this hearing?

8   A.   Yes.

9   Q.   And is that clip from the official recording of

10:24:19   10   proceedings that's available to the public on the Senate

11   website?

12   A.   Yes.

13   Q.   And that transcript came from the -- the transcript in

14   Defendants' Exhibit Number 58 -- and it may be convenient

10:24:30   15   for you to have that in front of you in one of the exhibit

16   binders up there.  If you could turn to that transcript.

17        MR. HILTON:  Your Honor, may I approach to help

18   the witness find that?

19        JUDGE GUADERRAMA:  Yes, Mr. Hilton.

10:24:55   20   BY MR. HILTON:

21   Q.   Is the transcript that's in Defendants' Exhibit Number

22   58, did that transcript come from the *Senate Journal*

23   that's available to the public?

24   A.   Yes.

10:25:13   25   Q.   And can you confirm for me, looking at Defendants'

1   Exhibit Number 58, that this was the hearing that was on

2   September 24th, 2021?

3   **A.**   Yes.

4   **Q.**   Okay.  All right.  We're going to play two more clips

10:25:31   5   that are from portions of the transcript found on Page 2

6   of Defendants' Exhibit Number 58.

7        MR. HILTON:  If you could just play the two

8   clips.

9        (Defendants' Exhibit Number 59 played, as follows:)

10:25:44   10        "SENATOR HUFFMAN:  My goals and priorities in

11   developing these proposed plans include, first and

12   foremost, abiding by all applicable law, equalizing

13   population across districts, preserving political

14   subdivisions and communities of interest when possible,

10:25:59   15   preserving the cores of previous districts to the extent

16   possible, avoiding pairing incumbent members, achieving

17   geographic compactness when possible, and accommodating

18   incumbent priorities also when possible.

19        "In the Senate proposal, the total deviation between

10:26:21   20   the smallest district and the largest district is

21   5.5 percent.  The total deviation for the SBOE proposal is

22   less than one percent at 0.91 percent.

23        "Within the Senate proposal, I have made every effort

24   to accommodate members' requests.  We were able to

10:26:42   25   accommodate most of the requests in the plan before you

*Laura Wells, RPR, RMR, CRR, RDR*

1   today, not all; and we will continue to work with members

2   as we work through this process."

3        (Defendants' Exhibit Number 59 concluded.)

4   BY MR. HILTON:

10:26:55  5   **Q.**   Was that an accurate recording of your statements

6   during that hearing?

7   **A.**   Yes.

8   **Q.**   And they are accurately reflected in the transcript in

9   Defendants' Exhibit Number 58?

10:27:01  10  **A.**   Yes.

11  **Q.**   And again, not asking for any privileged information,

12  but, essentially, you describe some details about the

13  proposed Senate plan?

14  **A.**   Yes.

10:27:14  15  **Q.**   And this is a question not directly related to the

16  video clip but I just want to ask here:  Again, not asking

17  for any legislative privileged information, but to the

18  extent this is a publicly available and ascertainable, you

19  know, datapoint, are there any split VTDs in the Senate

10:27:33  20  map that you initially proposed?

21  **A.**   No.

22  **Q.**   And are there any split VTDs in the Senate map that

23  you offered as a committee amendment?

24  **A.**   No.

10:27:42  25  **Q.**   Are there any split VTDs in the Senate map that was

*Laura Wells, RPR, RMR, CRR, RDR*

 1  finally passed --

 2  **A.**   No.

 3  **Q.**   -- by the legislature?

 4  **A.**   No.

10:27:50    5  **Q.**   All right.  I'm going to play another clip.  This is a

 6  clip from Defendants' Exhibit Number 59.  The

 7  corresponding portion of the transcript is Defendants'

 8  Exhibit Number 58 at Page 4.

 9       (Defendants' Exhibit Number 59 played, as follows:)

10:28:15   10       "SENATOR POWELL:  Thank you, Chairman Hinojosa.

11  "So as you might well guess, I'm a little whiplashed

12  this morning after having seen the proposal for the new

13  maps for Senate District 10 about 9:00 last night.  Could

14  you walk us through those changes to Senate District 10

10:28:37   15  that dropped around 9:00 last night?

16       "SENATOR HUFFMAN:  Let me just look at my notes

17  so that I can be specific with you.  Give me just a

18  second.  You are asking for the changes from the initial

19  proposed map, Senator?

10:29:03   20       "SENATOR POWELL:  Yes, ma'am.

21       "SENATOR HUFFMAN:  All right.  In the new

22  proposed amendment the Senate District 10 loses 70 percent

23  of Parker County.  As you know, Parker County was added to

24  Senate District 2 in the original proposed map.  And so

10:29:20   25  Senate District 10 would now have 30 percent of Parker,

1   which would be 44,027 people.  In Parker County it adds a

2   VTD 215, 230, 235 and loses a VTD 305, 430.  And SD-10

3   picks up additional whole counties of Palo Pinto, Young,

4   Stephens, Shackelford, Callahan, and Brown Counties."

10:29:49   5       (Defendants' Exhibit Number 59 concluded.)

6   BY MR. HILTON:

7   **Q.**   Senator Huffman, was that an accurate recording of

8   your statements during that hearing?

9   **A.**   Yes.

10:29:54  10  **Q.**   And who was the person questioning you in that video?

11  **A.**   Senator Beverly Powell.

12  **Q.**   Was that an accurate recording of her questions during

13  that hearing?

14  **A.**   Yes.

10:30:05  15  **Q.**   And we're going to play the next clip from this

16  hearing contained in Defendants' Exhibit Number 59.  This

17  clip corresponds to Page 5 of the transcript, which is

18  Defendants' Exhibit Number 58.

19       (Defendants' Exhibit Number 59 played, as follows:)

10:30:18  20       "SENATOR POWELL:  In fact, I have a question for

21  you.  Who -- who drew these maps?

22       "SENATOR HUFFMAN:  I drew the map, along with my

23  two attorneys and my -- members of my staff.

24       "SENATOR POWELL:  And who are those attorneys?

10:30:36  25       "SENATOR HUFFMAN:  Anna Mackin, who is sitting

*Laura Wells, RPR, RMR, CRR, RDR*

Direct Examination of Senator Huffman     Vol 6     68

1   right next to me, and Sean Opperman, who is up at the dais

2   as the committee director with Senator Hinojosa currently.

3        "SENATOR POWELL:  And which of these lines for

4   Senate District 10 did you draw and which did they draw?

10:30:52   5        "SENATOR HUFFMAN:  I was in the room when every

6   part of this map was drawn.

7        "SENATOR POWELL:  Okay.  And --

8        "SENATOR HUFFMAN:  They didn't do anything

9   without my direction.

10:30:59   10        "SENATOR POWELL:  Okay."

11      (Defendants' Exhibit Number 59 concluded.)

12   BY MR. HILTON:

13   **Q.**   Was that an accurate recording of your statements

14   during this hearing, Senator?

10:31:07   15   **A.**   Yes.

16   **Q.**   I want you to turn, please, to Page 6 of the

17   transcript, which is Defendants' Exhibit Number 58.  I'm

18   going to ask you to read one of your statements from the

19   transcript, and it is going to be the -- this is Page 6 of

10:31:28   20   Defendants' Exhibit Number 58, Bates-numbered State

21   PI-001655.

22      And there is some questioning from Senator Powell

23   regarding senators who may have been in the room and

24   providing input into the maps.  And then there is a

10:31:44   25   statement that is attributed to you that says -- that

                1   begins "They were not in the -- let me rephrase that."

                2        Can you please read that statement into the record?

                3   **A.**   To make sure I'm clear, you want me to read my

                4   response?

10:31:56        5   **Q.**   Yes, please.

                6   **A.**   "They were not in the room"?

                7   **Q.**   Yes.

                8   **A.**   Okay.   "They were not in the -- let me rephrase that.

                9   Senators were not [sic] brought into the room to see the

10:32:04       10   map, just as you were, Senator Powell, and some of the

               11   senators had specific requests to look at specific

               12   precincts or specific communities of interest and wanted

               13   us to bring things up on the map.   You did not request me

               14   to do that when you were in the room.   Other senators did,

10:32:20       15   and I always worked with them.   Many times what they

               16   requested, as there are senators here looking at me right

               17   now know, I told them we were unable to do it.   Those

               18   include Republicans, and that was the process."

               19        MR. DUNN:   Excuse me.   If I may interject.   I'm

10:32:35       20   sure it was inadvertent, but the second sentence says "and

               21   some of the senators were" -- or excuse me, the second

               22   sentence is "Senators were brought into the room" and I

               23   believe the witness said "were not brought into the room."

               24        MR. HILTON:   Thank you, Mr. Dunn.   That was

10:32:50       25   exactly what I was going to ask as the next question.

BY MR. HILTON:

**Q.**   Was that an accurate -- subject to that one correction, potentially, is that an accurate transcription of your statement?

**A.**   Senators were brought into the room.  That is correct, yes.

**Q.**   That's what the transcript reads?

**A.**   Yes.  Yes.

**Q.**   All right.  I would like you to turn, please, to Page 9 of Defendants' Exhibit Number 58.  That's Bates-numbered State PI-001658.

**A.**   All right.

**Q.**   This is a portion of the transcript where Senator Powell is still questioning you.  You would agree?

**A.**   Yes.

**Q.**   And the very bottom of this page -- and it expands on to the next page -- you have an answer where you describe your approach to the process of redistricting.  And I would like you to read that for the Court so that they can understand your answer to Senator Powell's question.

**A.**   Thank you.  I said, "Thank you, Senator Powell.  And I'm going to answer to your comment.  Our approach to this process was informed by the redistricting jurisprudence from the United States Supreme Court as well as other applicable precedent.

*Laura Wells, RPR, RMR, CRR, RDR*

1  "Several key cases are worth highlighting:  *Abbott v.*

2  *Perez*, a 2018 Supreme Court case; *Cooper v. Harris,* a 2017

3  Supreme Court case.  They make clear that any

4  redistricting decisions made on the basis of race must be

10:34:17  5  narrowly tailored to achieve compliance with the Voting

6  Rights Act.

7      "In *Cooper v. Harris*, Justice Kagan, writing for the

8  majority, held when a state invokes the VRA to justify

9  race-based redistricting, it must show to meet the narrow

10:34:35  10  tailoring requirements that it had a strong basis in

11  evidence for concluding that the statute required its

12  action.  That was *Cooper v. Harris*, 2017 Supreme Court

13  case, quoting *Alabama Legislative Black Caucus v. Alabama,*

14  a 2015 case.

10:34:50  15      "Based on this warning against race-based

16  redistricting, I drafted all of the proposed maps totally

17  blind to race.  Once I had drafted the maps, I ensured

18  that they underwent a legal compliance check to ensure

19  there were no inadvertent violations of any law, including

10:35:10  20  the Voting Rights Act.  Thank you."

21  **Q.**  Thank you, Senator, for rereading for us your

22  statement from the floor.

23  **A.**  Yes.

24  **Q.**  Was that an accurate transcription of your statements

10:35:19  25  during that hearing?

1   **A.**   Yes.   They appear to be.

2   **Q.**   All right.   We're going to play, I believe, one more

3   clip from this hearing.   It's contained in Defendants'

4   Exhibit Number 59.   The relevant portion -- the

10:35:37   5   corresponding portion of the transcript is from

6   Defendants' Exhibit Number 58, Page 11.   I believe the

7   beginning of this is some questioning by Senator Alvarado,

8   but I'll let the clip speak for itself.   You can confirm

9   for us.

10:35:54   10       (Defendants' Exhibit Number 59 played, as follows:)

11           "SENATOR ALVARADO:   So let's move to the DFW

12   region.   What communities drove population growth in the

13   DFW Metro area?   And, in comparison, can you tell how the

14   White population grew in the Metroplex?

10:36:09   15           "SENATOR HUFFMAN:   It's the same answer to you,

16   Senator Alvarado.   I haven't looked at the data, so I

17   cannot give you an answer.

18           "SENATOR ALVARADO:   Okay.   So I -- from what I am

19   told, communities of color in Tarrant County are primarily

10:36:21   20   cracked between Senate Districts 9, 10 and Senate District

21   22 in a county where the White population shrunk by

22   2 percent, while Asian, which is about 56 percent in

23   growth, African-American 40 percent growth, and Latino

24   29 percent communities all grew significantly.

10:36:44   25           "Looking at Tarrant County, Arlington specifically,

*Laura Wells, RPR, RMR, CRR, RDR*

Direct Examination of Senator Huffman     Vol 6

1  why has the Black population been split into multiple

2  Senate districts?

3          "SENATOR HUFFMAN:  Again, Senator Alvarado, I did

4  not look at that data when I drew the maps.  I drew blind

10:36:59  5  to race.  So I could not answer that question.

6          "SENATOR ALVARADO:  Okay."

7      (Defendants' Exhibit Number 59 concluded.)

8  BY MR. HILTON:

9  **Q.**   Senator, was that an accurate recording of your

10:37:07  10  statements during that hearing?

11  **A.**   Yes.

12  **Q.**   And was that Senator Alvarado questioning you?

13  **A.**   Yes.

14  **Q.**   Was that an accurate recording of her statements

10:37:15  15  during that hearing?

16  **A.**   Yes.

17  **Q.**   And turning to Page 12 of Defendants' Exhibit Number

18  58, if you could, please, Senator, it appears to me that

19  Senator Alvarado asks you several other questions and you

10:37:29  20  provided similar answers.

21      Do you agree with that characterization of Defendants'

22  Exhibit Number 58?

23  **A.**   Yes.  That's fair.

24  **Q.**   And could you please read your last two comments from

10:37:42  25  the transcript on this page of Defendants' Exhibit Number

1   58, beginning "Senator Alvarado, again, I drew --"

2   **A.**   "Senator Alvarado, again, I drew these maps, as I've

3   told you, of course, and Senator Powell that they were

4   drawn blind to race.  As you know, we have a growing

10:37:59  5   state.  One of the fastest growing states in the nation.

6   We have a very large state."

7        She says, "Okay."

8        And I said, "Not sure what that is.  Very large state

9   and the population, of course, is not necessarily growing

10:38:11  10   equally throughout the state.  And when we drew these

11   maps, many times members contributed to information about

12   communities of interest, and so forth.  But we did our

13   best to follow the redistricting guidelines drawing blind

14   to race."

10:38:26  15   **Q.**   Thank you, Senator.  Was that an accurate

16   transcription of your statements during that hearing in

17   response to Senator Alvarado's question?

18   **A.**   Yes.  They appear to be.

19   **Q.**   I would like to play one more clip, I believe.  I

10:38:51  20   think I have said that maybe twice already.

21        MR. HILTON:  I apologize, Your Honor.  I

22   appreciate the patience as we go through this to preserve

23   the privilege.

24   BY MR. HILTON:

10:38:59  25   **Q.**   Play another clip from Defendants' Exhibit Number 59

*Laura Wells, RPR, RMR, CRR, RDR*

```
 1   that corresponds to Page 37 of Defendants' Exhibit Number

 2   58.

 3          MR. HILTON:  Brian, if you would play that.

 4          (Defendants' Exhibit Number 59 played, as follows:)

 5          "MR. LEE:  -- to the State, though.

 6          "SENATOR HUFFMAN:  Well, as I stated very

 7   clearly, these maps were drawn blind to race.  And then I

 8   consulted with the Attorney General's office, and they

 9   gave me legal advice as to whether or not I had -- I had

10   complied with the Voting Rights, Section 2; and that's

11   what we have done.

12          "We invite anyone -- because the data that they use is

13   completely open to the public, we invite anyone to submit

14   alternative maps.

15          "Do you have a map you would like for us to consider

16   here today?

17          "MR. LEE:  I do not.

18          "SENATOR HUFFMAN:  Okay."

19          (Defendants' Exhibit Number 59 concluded)

20   BY MR. HILTON:

21   Q.  Is that an accurate recording of your statements in

22   the Senate hearing that day?

23   A.  Yes.

24   Q.  And do you recall who the person you are addressing

25   is?
```

10:39:13 (line 5)
10:39:28 (line 10)
10:39:43 (line 15)
10:39:47 (line 20)
10:39:55 (line 25)

 1  **A.**  Mr. Lee, I believe is his name.

 2  **Q.**  And do you know what organization he is affiliated

 3  with?

 4  **A.**  No.

10:40:05  5  **Q.**  I'll represent to you that it was the Brennan Center

 6  for Justice.  Would you have any reason to disagree with

 7  that?

 8  **A.**  I would not, but your recall refreshes my memory.

 9  **Q.**  Thank you, Senator.  Was that an accurate recording of

10:40:20  10  yours and his statements that day?

11  **A.**  Yes.

12        MR. HILTON:  And this will be the fourth time now

13  that I've said one more, but this truly is the last one

14  from this hearing.  And, again, I appreciate the Courts'

10:40:28  15  patience as we get these statements into the record.

16  BY MR. HILTON:

17  **Q.**  One more statement from you, Senator Huffman, or you

18  can confirm whether it's from you, corresponds to

19  Defendants' Exhibit Number 58 at Page 57.

10:41:01  20        MR. HILTON:  I apologize, Your Honor.  There is a

21  slight technical difficulty.  I'll use the downtime just

22  to let the Court know where I intend to go from here and

23  how I intend to proceed.

24        This will be the last clip from this hearing.  There

10:41:27  25  are two more hearings that we'll go through with a much

1    smaller number of clips.

2        And then the final hearing is from the Senate floor

3    debate.  There is a significant amount of material from

4    that floor debate.

10:41:38   5        But then I think that will conclude the clips that we

6    are going to play for the Court.  And then we may look at

7    one more map.

8        (Defendants' Exhibit Number 59 played, as follows:)

9            "SENATOR HUFFMAN:  Okay.  And you have talked

10:41:52  10   about, I think you mentioned -- in fact, you said you are

11   working on proposals, and so forth.  So I just want to

12   reiterate the process.  I know you have heard me say that

13   we have drawn the maps completely blind to racial data.

14   That continues to this point.  I have not looked at that.

10:42:08  15   And then we submitted that and then, with the advice of

16   legal counsel, been told that we were in compliance with

17   Section 2.  All right.

18       "So at this point I'd say to you, if you disagree with

19   that and you think that there is a strong basis and

10:42:24  20   evidence to show otherwise, I ask you to present that to

21   me, and I will give it all the legal opinion -- I will get

22   a legal opinion on that and move forward from there."

23       (Defendants' Exhibit Number 59 concluded.)

24   BY MR. HILTON:

10:42:39  25   Q.  Is that an accurate recording of your statements

Direct Examination of Senator Huffman     Vol 6

1   during the hearing, Senator?

2   **A.**   Yes.

3   **Q.**   And referring to that page of the transcript in

4   Defendants' Exhibit Number 58, can you -- can you tell

10:42:50   5   from the transcript who it is that you were addressing in

6   those comments?  And again, I don't want to ask you to

7   reveal any nonpublic privileged information.  But can you

8   tell who you were addressing?

9   **A.**   Ms. Perales.

10:43:03   10   **Q.**   Is that Nina Perales?

11   **A.**   Yes.

12   **Q.**   All right.  Moving on from the September 24th hearing,

13   did -- do you recall how soon after the Senate

14   Redistricting Committee held its next hearing from this

10:43:23   15   first one?

16   **A.**   No.

17   **Q.**   If you could turn to Defendants' Exhibit Number 60.

18   That's the transcript we'll be looking at, and we'll be

19   using video clips from Defendants' Exhibit Number 61.

10:43:38   20       Do you recognize Defendants' Exhibit Number 60,

21   Senator?

22   **A.**   It's just blank here, to be honest.  There is nothing

23   in that tab.  So --

24          MR. HILTON:  May I approach?

10:43:50   25          JUDGE GUADERRAMA:  Yes, sir.

*Laura Wells, RPR, RMR, CRR, RDR*

1        MR. HILTON:  Let's do this.  Brian, can you bring

2   up the first page of Defendants' Exhibit Number 60

3   briefly.  You have done it.  Thank you.

4   BY MR. HILTON:

10:44:13  5   **Q.**   Do you recognize the documents on the screen, Senator?

6   **A.**   Yes.

7   **Q.**   And what is this document?

8   **A.**   It appears to be the transcript of the hearing on

9   September the 25th, 2021.

10:44:27  10  **Q.**   That was the day after the hearing we were just

11  discussing?

12  **A.**   Yes.

13  **Q.**   And this -- was this the next hearing that the Senate

14  Redistricting Committee held regarding Senate maps?

10:44:39  15  **A.**   It would have been, yes, the next day.

16  **Q.**   Okay.  And we're going to play a clip from Defendants'

17  Exhibit Number 61 that corresponds to the first page of

18  the transcript that's on Defendants' Exhibit Number 60.

19  **A.**   Okay.

10:44:51  20       (Defendants' Exhibit Number 61 played, as follows:)

21       "SENATOR HUFFMAN:  -- Board of Education

22  Districts.  Today is the second opportunity for the public

23  to provide input on Senate Bill 4 and Senate Bill 7.  I

24  again want to point out that the committee will not be

10:45:01  25  taking any action on the proposed plans before us today.

*Laura Wells, RPR, RMR, CRR, RDR*

1      "Today's hearing is intended to provide another

2   opportunity to hear and put on the proposed plans.

3   Committee members and other senators will have the

4   opportunity to ask questions of witnesses.

10:45:15    5      "As a reminder, committee amendments are due to the

6   committee by September 26th, that is Sunday, at 10:00 a.m.

7      "Legislative council is asking that committee

8   amendments be submitted to them by 5:00 p.m. on

9   September 25th in order for them to have sufficient time

10:45:32   10   to process and produce the amendment packet.  They will,

11   however, do their best to process amendments submitted to

12   them after that time.  So we will work with you to try to

13   get that done.

14      "At next week's hearing we will vote on each amendment

10:45:46   15   and the proposed plans before us today.

16      "So that's the process, and I will say we're here this

17   morning.  It is a Saturday morning.  We do want to

18   accommodate as many people."

19      (Defendants' Exhibit Number 61 concluded.)

10:45:59   20   BY MR. HILTON:

21   **Q.**   Were members of the public present at that hearing?

22   **A.**   Yes.

23   **Q.**   And was that an accurate recording of your statement

24   to that hearing?

10:46:07   25   **A.**   Yes.

Direct Examination of Senator Huffman          Vol 6

1  **Q.**  We'll move on now to the next -- the next set of

2  exhibits, the next hearing.  The transcript we're going to

3  be referring to is Defendants' Exhibit Number 62, which I

4  believe you do have in your binder -- and I apologize for

10:46:22  5  the mishap -- and the video that corresponds with this

6  transcript is in Defendants' Exhibit Number 63.

7      Senator, did the Senate Redistricting Committee hold a

8  committee hearing on September 28th, 2021?

9  **A.**  Yes.

10:46:38  10  **Q.**  And was Senator Powell at that hearing?  Do you

11  recall?

12  **A.**  I don't recall.

13  **Q.**  Did you speak at that hearing?

14  **A.**  Yes.  I would have spoken.

10:46:46  15  **Q.**  And were members of the public present at that

16  hearing?

17  **A.**  Yes.

18  **Q.**  All right.  And we'll go through some of your

19  statements here.  Senator Huffman, I would like you to

10:47:00  20  turn to Page 2 of the transcript that is Defendants'

21  Exhibit Number 62.

22  **A.**  Yes.

23  **Q.**  It's Bates Number State PI-001799, and there is -- I

24  would like you to read for the Court, so they can hear

10:47:17  25  what you said to the committee that day, your first

1   statement on Page 2.  It begins, "All right.  Members,

2   before discussing...."

3   **A.**   "All right.  Members, before discussing this specific

4   amendment, I would like to remind everyone of the criteria

10:47:32   5   I used in proposing and considering new districts.  We

6   focused on complying with all applicable law, including

7   the Constitution, the Voting Rights Act, and the

8   requirement to equalize district populations based on the

9   2020 census, focused on keeping political subdivisions

10:47:47  10   together, keeping communities of interest together,

11   preserving the core of existing districts, creating

12   geographically compact districts, addressing partisan

13   considerations, protecting incumbents, and when possible

14   honoring reasonable requests made by incumbent members.

10:48:05  15   These considerations have also guided my approach to what

16   proposed committee amendments I'm able to support.

17        "So the first amendment --"

18        Do you want me to go on?

19   **Q.**   That's fine, Senator.  Thank you.  Was that an

10:48:19  20   accurate transcription of your statements during that

21   hearing?

22   **A.**   Yes.

23   **Q.**   And you stated during that hearing -- again, only

24   referring to the content of the public statements -- that

10:48:31  25   addressing partisan considerations was one of your

 1  considerations, correct?

 2  **A.**   Correct.

 3  **Q.**   And you stated that that was a criteria that you used

 4  in proposing and considering new districts, is that

 5  correct, from the transcription in Defendants' Exhibit

 6  Number 62?

 7  **A.**   Yes.

 8  **Q.**   All right.  I'm going to ask you to turn to Page 5 of

 9  this transcript, Defendants' Exhibit Number 62, relating

10  to the September 28th hearing of the Senate Special

11  Committee on Redistricting; and that's Bates Number State

12  PI-001802.

13       Are you there, Senator?

14  **A.**   Yes, I am.

15  **Q.**   On this page of the transcript Senator Zaffirini is

16  discussing a committee amendment for Senator Powell as

17  sponsored by Senator Alvarado.  Have I read correctly from

18  Page 5, and do you see what I'm referring to on the

19  transcript?

20  **A.**   Yes.

21  **Q.**   At the bottom of the transcript there is a statement

22  attributed to you.  Do you see that?

23  **A.**   Yes.

24  **Q.**   And again, I just want -- again, I apologize.  This is

25  somewhat lengthy, but I would like for the Court to hear

*Laura Wells, RPR, RMR, CRR, RDR*

1   it in your voice your statements to the committee in

2   response to that amendment.

3   **A.**   "All right.  Members, this amendment proposes changes

4   to multiple districts in the DFW area.  In testimony

10:50:00   5   before this committee Senator Powell argued that we should

6   not make changes to the existing SD-10 because it has

7   close to ideal total population as currently configured;

8   but this does not account for the neighboring districts,

9   including, for instance, SD-8 which was overpopulated by

10:50:20   10   57,955; SD-12, which was overpopulated by 146,201; or

11   SD-30, which was overpopulated by 87,087 people.  Shifts

12   throughout the DFW area were needed to account for this

13   growth.  Based on this and the other redistricting

14   objectives I discussed earlier, I proposed changes to

10:50:44   15   SD-10.

16        "Senator Powell also urged the committee to adopt

17   boundaries to SD-10 based upon the race of the people

18   living in parts of Tarrant County.  As I have made clear,

19   my proposed plans were drafted blind to racial data and I

10:50:57   20   obtained legal advice prior to filing to ensure that there

21   were no inadvertent violations of the Voting Rights Act

22   during the race-blind drafting.  I also sought legal

23   advice on the configuration of SD-10 as proposed in this

24   Plan S-2119.

10:51:14   25        "After consultation with my legal counsel and my

1  committee staff, I respectfully disagree with this

2  suggestion that this configuration of SD-10 is required by

3  Section 2 of the Voting Rights Act.

4      "Because I do not believe that the proposed changes

10:51:29  5  are required by law, because I want to accommodate the

6  redistricting objectives I discussed earlier, and to

7  ensure that no voters are placed in or out of the district

8  based solely on their race, I will respectfully be voting

9  against this amendment."

10:51:45  10  Q.  Was that an accurate transcription of your

11  statements --

12  A.  Yes.

13  Q.  -- during that hearing?

14  A.  Yes.

10:51:50  15  Q.  And it referred to plan -- you refer to Plan S-2119?

16  A.  Yes, I did.

17      MR. HILTON:  Brian, could you please pull up

18  S-2119 on the District Viewer if you have it handy.

19  BY MR. HILTON:

10:52:15  20  Q.  If you don't recall or if you don't remember, no is a

21  perfectly acceptable answer.  I'm not asking for any

22  privileged information.  But do you recognize this map?

23  A.  I don't specifically remember the configurations, but

24  I can see that it's the plan that I referred to at the

10:52:31  25  time in my testimony -- in my answer, I mean.

 1   **Q.**   And this was a plan that was sponsored by Senator

 2   Alvarado at the request of Senator Powell, as reflected in

 3   the transcript from Defendants' Exhibit Number 62?

 4   **A.**   Yes, as reflected in the transcript.

10:52:45   5   **Q.**   Okay.

 6          MR. HILTON:  Thank you, Brian.

 7   BY MR. HILTON:

 8   **Q.**   And, Senator Huffman, was action taken by the

 9   committee on the Senate map at the September 28th, 2021,

10:52:57  10   hearing?

11   **A.**   I don't recall if it was on that hearing or not -- on

12   that date, I should say, I guess.

13   **Q.**   Understood.  Well, how many committee hearings were

14   there before the committee referred bills out to the full

10:53:12  15   body?

16   **A.**   On the Senate map?  I don't recall specifically.  I

17   think three, but that's the best of my recollection.

18   **Q.**   Fair enough, Senator.  Thank you.

19   **A.**   You are welcome.

10:53:24  20   **Q.**   Well, let's turn to the next set of transcript and

21   video and, mercifully, this will be the last one.  This

22   will be Defendants' Exhibit Number 64 and 65.  Defendants'

23   Exhibit Number 64 is the transcript, and 65 is the video.

24          And let me know when you have turned to that

10:53:43  25   transcript, please.

Direct Examination of Senator Huffman    Vol 6

```
              1  A.   I am in that area, yes.
              2  Q.   Okay.  And on October 4th, 2022 [sic], did the full
              3  Senate consider the maps that were referred by the
              4  committee?
   10:53:51   5  A.   Yes.
              6  Q.   Do you recall whether Senator Powell was at that
              7  hearing?
              8  A.   She was there.
              9  Q.   And did you speak at that hearing?
   10:53:58  10  A.   Yes.
             11  Q.   And did Senator Powell question you at that hearing?
             12  A.   She did.
             13  Q.   And did other senators question you at that hearing?
             14  A.   Yes.  Numerous.
   10:54:06  15       JUDGE SMITH:  The transcript says October 4th,
             16  2022.  Of course, it should be 2021.
             17       MR. HILTON:  Absolutely, Your Honor.  I
             18  apologize.  I think I said 2022, as well.
             19  BY MR. HILTON:
   10:54:16  20  Q.   The date is October 4th, 2021.  That's the correct
             21  date, right, Senator?
             22  A.   Correct.  Yes.
             23  Q.   And we will submit a corrected version of this
             24  transcript to make sure that the date is accurate.
   10:54:29  25       Looking at the transcript, Senator Huffman, I want to
```

1   ask you:  Is this an official transcript from the *Senate*

2   *Journal*?

3   **A.**   Well --

4   **Q.**   It looks different than the other transcripts you have

10:54:51   5   looked at.

6   **A.**   -- it looks different.  I'm not sure.  It looks like

7   it was done by Kim Tindall & Associates, if I'm looking at

8   the right place.

9   **Q.**   You can see on the third page of this exhibit it lists

10:55:04   10   a court reporting company and has a title page.  Do you

11   see that?

12   **A.**   Right.  I don't think there is a court reporting

13   company that officially does it for the Senate, if that's

14   the question.

10:55:12   15   **Q.**   Well, I'll represent to you that this transcript was

16   prepared by a court reporter.

17   **A.**   Okay.

18   **Q.**   And so, as we go through, again, I would ask you to

19   confirm the accuracy of their transcription; and we'll

10:55:23   20   look at some video clips, as well.

21   **A.**   Okay.

22   **Q.**   And so, as we do the clips, even if I don't ask you to

23   read them, if you could follow along so that we can

24   confirm the accuracy of the transcript as we do it.

10:55:33   25   **A.**   Yes.

*Laura Wells, RPR, RMR, CRR, RDR*

```
 1              MR. HILTON:  And, Your Honor, it appears to me,
 2   at least the version I have, has the correct date.  If the
 3   Court doesn't have that, we'll make sure the Court gets
 4   it.  I apologize if I misspoke.  It's October 4th, 2021.
```
10:55:44
```
 5              JUDGE GUADERRAMA:  That's the date on my
 6   Exhibit 64.
 7              MR. HILTON:  Okay.
 8              JUDGE GUADERRAMA:  There might be --
 9              MR. HILTON:  When we have time, Your Honor,
```
10:55:51
```
10   before we leave El Paso, we'll certainly check all the
11   binders that the Court would like us to check and make
12   sure everything is correct.
13              JUDGE SMITH:  When I was referring to the word
14   "transcript," I was talking about today's court reporter's
```
10:56:01
```
15   transcript which said 2022, which I assume was just
16   transcribing what you had said.
17              MR. HILTON:  Thank you, Your Honor.  That's
18   exactly right.
19              JUDGE SMITH:  I think these exhibits that we have
```
10:56:12
```
20   are right.
21              MR. HILTON:  Okay.  I'm glad that's all clear.
22   Thank you, Your Honor.
23   BY MR. HILTON:
24   Q.  All right.  We're going to play a clip from
```
10:56:25
```
25   Defendants' Exhibit Number 65.  This is going to
```

1  correspond to Defendants' Exhibit Number 64, which is the

2  transcript, and it begins on Page 4 at Line 22, and it

3  runs for several pages.  I think this is just a couple of

4  minutes.  So we'll begin with that clip.

10:56:45   5      (Defendants' Exhibit Number 65 played, as follows:)

6           "MR. PRESIDENT:  Senator Huffman, you are

7  recognized to explain the bill.

8           "SENATOR HUFFMAN:  Thank you, Mr. President and

9  members.  Members, this is the Senate bill which draws our

10:56:56  10  new lines for the entire Senate.  We're going to call this

11  -- it's officially called Plan S-2130 if you are looking

12  in District Viewer.

13      "This plan was developed after the committee heard

14  many hours of public testimony and after I listened to

10:57:11  15  each member's priorities and input about their respective

16  district.

17      "My goals and priorities in developing this proposed

18  plan included, first and foremost, following all

19  applicable law, equalizing populations across districts,

10:57:29  20  preserving political subdivisions and communities of

21  interest when possible, preserving the cores of previous

22  districts to the extent possible, avoiding pairing

23  incumbent members, achieving geographic compactness, and

24  accommodating incumbent priorities to the extent that I

10:57:48  25  could.

*Laura Wells, RPR, RMR, CRR, RDR*

1      "I also looked at and considered public plans, which

2   were submitted through the portal process that has been

3   opened for several months now; and some members of the

4   public have submitted those plans, as well as some of the

10:58:05   5   different organizations and groups.

6      "In the plan before us today, Plan S-2130, the total

7   deviation between the smallest district and the largest

8   district is 6.13 percent.  I would also like to point out

9   that this plan does not split one single voting tabulation

10:58:24  10   district, also known as VTD, in the entire state.

11      "When developing the Senate proposal, I made every

12   effort to accommodate member requests; and I am pleased

13   that I was able to accept many of your requests in the

14   plan before you today.  Not all, but many.

10:58:42  15      "I know that every member of this body, including

16   myself, would prefer to make certain adjustments to the

17   proposed plan.  But, unfortunately, changing as little as

18   one precinct sometimes has an impact upon at least one

19   other district and typically has ripple effects that

10:59:01  20   impact multiple districts or sometimes even the entire

21   state.

22      "Before we get to individual amendments, I also want

23   to inform this body about my thought process in assessing

24   each amendment that was filed.

10:59:12  25      "First, the amendment as it interacts with the

 1  statewide plan must abide by all applicable law.  I sought

 2  legal advice and reviewed relevant information with my

 3  committee staff to satisfy myself that whatever map we

 4  vote off of this floor today will be legal.

10:59:31   5      "Second, I prefer that an amendment does not increase

 6  the plan's overall deviation, as we have worked hard to

 7  keep district populations relatively similar and legal.

 8      "Third, at this point in the process, it's my goal

 9  that changes to districts involved in an amendment be

10:59:48  10  agreed-to deals between members to as much as was

11  possible.

12      "Finally, I have always kept in mind the redistricting

13  objectives and priorities I have laid out above.

14      "Since filing this plan, I have done my best to work

11:00:03  15  with members involved in specific changes to districts

16  they represent.  Therefore, I don't think it's fair of

17  this body to abandon that strategy now.  I also do not

18  want to put this body in the position of having to choose

19  between colleagues and friends when there is a

11:00:20  20  disagreement.

21      "Therefore, if an amendment is not agreed upon by all

22  members involved, I will be voting against the amendment

23  and will leave it to the will of the body."

24      (Defendants' Exhibit Number 65 concluded.)

11:00:30  25  BY MR. HILTON:

Direct Examination of Senator Huffman          Vol 6      93

1   **Q.**  Senator, was the video an accurate recording of your

2   statement at the beginning of the Senate floor debate?

3   **A.**  Yes.

4   **Q.**  And were there any -- you know, with the exception of

11:00:42   5   a word here and there, as sometimes can happen in a

6   transcript, was the substance of your statements

7   accurately reflected in the transcript?

8   **A.**  Except for a couple of words that were left out.

9   **Q.**  Were there any substantive omissions or corrections

11:00:56  10   that you would need to make to this transcript?

11   **A.**  Well, I think it's important that when I said I would

12   leave it to -- it needs to be clear that's to the will of

13   the body, not just, like, leave it.  So I think that's an

14   important distinction.

11:01:09  15   **Q.**  Understood.

16   **A.**  Yeah.

17   **Q.**  But the video recording itself, that's the official

18   recording from the legislature?

19   **A.**  Completely accurate, yes.

11:01:15  20   **Q.**  And the video recording is publicly available?

21   **A.**  Yes.

22   **Q.**  And the video recording at Defendants' Exhibit Number

23   65, that is an accurate recording of your statements?

24   **A.**  Yes.

11:01:23  25   **Q.**  Okay.  So we'll continue to refer to the transcript in

1    Defendants' Exhibit Number 64 for convenience.  If there

2    is any substantive corrections that needs to be made due

3    to a transcription error, please let us know.

4    **A.**   Okay.

11:01:48   5   **Q.**   All right.  I'm going to play a short clip from

6    Defendants' Exhibit Number 65 that refers to the -- that

7    corresponds to Page 9 of Defendants' Exhibit Number 64,

8    beginning at Line 18.

9        (Defendants' Exhibit Number 65 played, as follows:)

11:02:03  10          "SENATOR HUFFMAN:  -- provided by the Texas

11   Legislative Council.

12          "SENATOR POWELL:  And how many hours did it take

13   to construct this district plan?

14          "SENATOR HUFFMAN:  I wouldn't want to begin to

11:02:12  15   guess, but countless.  Many, many hours, yeah.

16          "SENATOR POWELL:  And when did you begin to draw

17   the maps of this plan?

18          "SENATOR HUFFMAN:  After the numbers came out."

19        (Defendants' Exhibit Number 65 concluded.)

11:02:24  20   BY MR. HILTON:

21   **Q.**   Was that an accurate recording of your statements in

22   the floor debate?

23   **A.**   Yes.

24   **Q.**   And is the transcription a substantively accurate

11:02:33  25   reflection of your statements?

*Laura Wells, RPR, RMR, CRR, RDR*

Direct Examination of Senator Huffman      Vol 6

1    **A.**   Yes.

2    **Q.**   We'll do the next clip.  It corresponds to Page 15 of

3    Defendants' Exhibit Number 64, beginning at Line 13 with a

4    question from Senator Powell.

11:02:48      5        (Defendants' Exhibit Number 65 played, as follows:)

6            "SENATOR HUFFMAN:  -- while performing the job.

7            "SENATOR POWELL:  In terms of data that you

8    consulted, RedAppl has a statistics tab that allows the

9    user to choose which electoral and demographic data to

11:03:05     10   display on the screen while the map is being drawn; is

11   that correct?

12           "SENATOR HUFFMAN:  Correct.  Yes.

13           "SENATOR POWELL:  Which fields were displayed

14   while the Senate plan was being drawn?

11:03:14     15          "SENATOR HUFFMAN:  It -- it changed.  Sometimes

16   we looked at county lines, sometimes precincts, the actual

17   precincts highlighted.  Sometimes we had it shaded for

18   cities, and sometimes we had it shaded for partisan

19   numbers.  Sometimes they were Trump numbers.  Sometimes we

11:03:34     20   had several political elections up from different years

21   that we looked at, but population numbers were almost

22   always there.  One thing we never had was racial shading.

23           "SENATOR POWELL:  So did you have anything about

24   total population on the screen?

11:03:53     25          "SENATOR HUFFMAN:  Yes.

1          "SENATOR POWELL:  And any deviation percentages?

2          "SENATOR HUFFMAN:  Yes.  There is a kind of a

3   column in the left-hand side that as you proceeded you

4   could see what it did to the statewide deviation.  I think

11:04:06  5   that they may have had to click on another button to see

6   it, but it was there on the left-hand column.

7          "SENATOR POWELL:  And how about demographic data?

8          "SENATOR HUFFMAN:  There was no demographic data

9   provided just, as I said, sometimes partisan numbers,

11:04:21  10  total population, city shading, things like that.

11         "SENATOR POWELL:  Okay.  You -- you mentioned

12  that election data was displayed.

13         "SENATOR HUFFMAN:  Sometimes.  Yeah.

14         "SENATOR POWELL:  And so let me ask you

11:04:35  15  specifically about these particular election data.  How

16  about the 2020 presidential election?

17         "SENATOR HUFFMAN:  Yes.

18         "SENATOR POWELL:  How about the 2020 Senate

19  election?

11:04:47  20         "SENATOR HUFFMAN:  Sometimes, yes.

21         "SENATOR POWELL:  The 2018 Senate election?

22         "SENATOR HUFFMAN:  Is -- was that the Cruz

23  election?  Is that the Cruz/Beto?

24         "SENATOR POWELL:  Yes.

11:05:00  25         "SENATOR HUFFMAN:  That was up there sometimes.

1    Sometimes we looked at it as a reference, but it wasn't

2    always up there.

3            "SENATOR POWELL:  How about the 2018 governor

4    election?

11:05:09  5            "SENATOR HUFFMAN:  Abbott, yes.

6            "SENATOR POWELL:  And the 2016 presidential

7    election?

8            "SENATOR HUFFMAN:  It was -- I don't think we had

9    that up there very often.  Maybe occasionally.  I don't

11:05:23  10   recall.  That was not one of the main elections that we

11   looked at.  Like I said, we never looked at that; but it

12   was not one of the main ones.

13           "SENATOR POWELL:  Okay.  Any other election that

14   maybe I didn't think to ask you here?

11:05:34  15           "SENATOR HUFFMAN:  No.  I think, you know, the

16   2020 Trump, the Abbott election, the Lieutenant Governor

17   Patrick's election, and Cruz/Beto were really the main

18   ones that we focused on.  Yeah.

19           "SENATOR POWELL:  Okay.  RedAppl has a shading

11:05:51  20   tab that allows voter tabulation districts to be colored

21   based on a selected type of statistic; is that right?

22           "SENATOR HUFFMAN:  I don't know which ones you

23   are referring to.  As I said, we looked at the partisan

24   shading; and that's the only shading we looked at, other

11:06:08  25   than the ones that would shade municipalities or -- yeah,

1    just other parts of the annexation areas, and so forth.

2             "SENATOR POWELL:  So going back to the election

3    data that was displayed, were those displayed in shading?

4             "SENATOR HUFFMAN:  Were those what?

11:06:27   5             "SENATOR POWELL:  Were those displayed in shading

6    maps?

7             "SENATOR HUFFMAN:  Yes.  I recall the teal was

8    the more Republican Trump and sort of an orangish color

9    was Biden, and they sort of would shade darker or lighter

11:06:42  10    depending upon the percentage and the heaviness of the

11    high -- the low percentage would be lighter and the higher

12    would be darker."

13        (Defendants' Exhibit Number 65 concluded.)

14    BY MR. HILTON:

11:06:55  15    Q.   Senator, was that an accurate recording of your

16    statements during that hearing?

17    A.   Yes.

18    Q.   And the transcript in Defendants' Exhibit Number 64,

19    was that a substantively correct transcription of your

11:07:04  20    statements?

21    A.   Yes.

22    Q.   And one question about your statements towards the end

23    there.  You were describing shading colors in those public

24    statements.  You agree that's what the public statements

11:07:18  25    reflect?

1    **A.**   Yes.

2    **Q.**   I want to ask you a question -- again, not asking

3    about any privileged information, not asking about your

4    mental impressions or any thought process or what you

11:07:27  5    considered regarding legislation -- about the

6    functionality of the RedAppl software.

7    **A.**   Okay.

8    **Q.**   In RedAppl, when you turn on shading of any kind, is

9    the shading always in the same color?

11:07:42  10   **A.**   No.

11   **Q.**   Can the user of the RedAppl software select the colors

12   for shading?

13   **A.**   Yes.

14   **Q.**   Okay.  So, for example, one could have Republicans

11:07:56  15   shaded as red and Democrats shaded as blue?

16   **A.**   You could, yes.

17   **Q.**   And in your public statements here you describe using

18   teal for Republican Trump and an orangish color for Biden.

19   Is that an accurate characterization of your public

11:08:10  20   statements here?

21   **A.**   That's the way we did it, yes.

22   **Q.**   All right.  Senator, I'm going to ask you to turn to

23   Page 27 of Defendants' Exhibit Number 64.  And beginning

24   on Page 26, Senator Powell asks you a question related to

11:08:43  25   population deviation for Senate District 10.

1    And she states, "No changes were needed in order for

2  SD-10 to have a legally permissible total population.

3  Would you agree that that is right?"

4    Did I read that correctly from the transcript?

11:09:00  5  **A.**   Yes.

6  **Q.**   All right.  And can you please read your response from

7  the transcript.

8  **A.**   "Not necessarily because, as you know, we had to look

9  at the state holistically; and just because one district

11:09:10  10  may have been close to ideal doesn't mean that it wasn't

11  going to be changed to accommodate a statewide plan."

12  **Q.**   Is that a substantively accurate transcription of your

13  statements during this hearing?

14  **A.**   Yes.

11:09:34  15  **Q.**   And then let's turn to Page 29 of Defendants' Exhibit

16  Number 64.  And, again, I'll ask you to read beginning on

17  Line 25 on this page and going on to the next page.  You

18  can read statements attributed to you, and I'll read the

19  statements attributed to Senator Powell.

11:09:52  20  **A.**   You would like me to start on Line 25?

21  **Q.**   Yes, please.

22  **A.**   "Well, I disagree with that conclusion.  I mean, you

23  could look at all the numbers of all the districts and say

24  if I just move 10,000 here and 10,000 there, it would

11:10:05  25  work; but as you know, it does not.  It's not that

*Laura Wells, RPR, RMR, CRR, RDR*

1    simple."

2    **Q.**   And this is Senator Powell:  "Well, I believe it was

3    not necessary to make a single change to the borders of

4    SD-10 in order to balance the population of Senate

11:10:18    5    District 12 or Senate District 30."

6    **A.**   "And that would have been the only Senate district in

7    the state of Texas that was not changed."

8    **Q.**   So is that a substantively accurate transcription of

9    your statements at the Senate floor?

11:10:31    10    **A.**   Yes.

11    **Q.**   And did I read the portions attributed to Senator

12    Powell correctly?

13    **A.**   Yes.

14    **Q.**   And is that an accurate substantively -- substantively

11:10:38    15    accurate transcription of her statements?

16    **A.**   Yes.

17    **Q.**   All right.  We're going to play a clip from

18    Defendants' Exhibit Number 65 that corresponds to Page 31

19    of the transcript that is Defendants' Exhibit Number 64;

11:10:55    20    and it begins Page 31, Line 21.

21        (Defendants' Exhibit Number 65 played, as follows:)

22            "SENATOR HUFFMAN:  I don't recall, but that

23    sounds right.  I'm not sure.

24            "SENATOR POWELL:  What community of interest does

11:11:08    25    the City of Fort Worth and the City of Arlington have with

 1  Brown County, Callahan County, Shackelford County,

 2  Stephens County, Palo Pinto County, Parker County, and

 3  Johnson County that are all rural counties?

 4        "SENATOR HUFFMAN:  Well, Senator Powell, as you

 5  know, we have a very large state with thousands, probably

 6  tens of thousands, if not hundreds of thousands of

 7  communities of interest.  So it's very normal for there to

 8  be many communities of interest within a Senate district.

 9  I am sure if we sat here and talked to every senator, they

10  could tell you about different communities of interest

11  within their Senate district.  And sometimes they are

12  shared, even if they are far away.

13    "Senator Zaffirini has spoken eloquently about her

14  community of interest that goes down to I-35 from Webb

15  County all the way to Travis County.  I am not sure you

16  have heard her speak of that.  She speaks quite eloquently

17  on it.

18    "There are others that believe that it's -- it's a

19  small town that is very interested in a lake in their

20  area.

21    "So there could be many communities of interest within

22  a Senate district.  Simply because a city is separated

23  into separate Senate districts does not necessarily mean

24  that these are not communities that could still work

25  together to have their goals met by their elected

Direct Examination of Senator Huffman                    Vol 6   103

 1     representative."

 2          (Defendants' Exhibit Number 65 concluded.)

 3     BY MR. HILTON:

 4     **Q.**   Senator, was that an accurate recording of your

11:12:32    5     statements during the hearing?

 6     **A.**   Yes.

 7     **Q.**   And is the transcript in Defendants' Exhibit Number 64

 8     substantively accurate with respect to your statements?

 9     **A.**   Yes.  Yes.

11:12:40   10     **Q.**   All right.  The next clip that we'll play is from

11     Defendants' Exhibit Number 65 and corresponds to Page 34

12     of the transcript beginning at Line 18, and it continues

13     on for another page or two -- or perhaps beginning at

14     Line 5.  Yeah, it begins at Line 5, Page 30.

11:13:10   15          (Defendants' Exhibit Number 65 played, as follows:)

16          "SENATOR POWELL:  So I believe what you are

17     saying to us today is that if citizens or members of this

18     Senate inform you about neighborhoods that form a single

19     cultural community of interest, that you are unwilling to

11:13:23   20     modify the map to accommodate that community of

21     interest --

22          "SENATOR HUFFMAN:  That is not what I said.

23          "SENATOR POWELL:  I'm sorry.  I didn't finish my

24     question.

11:13:33   25          "SENATOR HUFFMAN:  Oh, I apologize.

*Laura Wells, RPR, RMR, CRR, RDR*

1    "SENATOR POWELL:  If those citizens -- let me --

2    let me say that again.

3            "SENATOR HUFFMAN:  Okay.

4            "SENATOR POWELL:  That you are unwilling to

11:13:46    5    modify the map to accommodate that community of interest

6    if those citizens explain that they share racial or

7    cultural ties with one another?

8            "SENATOR HUFFMAN:  We listened to what everyone

9    had to say who came before us or anything that was

11:14:01   10    submitted through the portal.  I think you can understand

11    that we have heard a lot of testimony about what

12    constitutes a community, and people have different

13    opinions about that.  And many people come forward and

14    have concerns about issues.  We listen to what everyone

11:14:19   15    has to say.  And then, holistically, we put it together

16    and try to draw a legal map, which is what we did here.

17        "But, yes, we do listen to everyone, listen to their

18    concerns.  But again, sometimes that's in conflict; but we

19    do listen to that.

11:14:35   20            "SENATOR POWELL:  So you are aware that the

21    Supreme Court has ruled that absent a compelling reason,

22    race cannot be the predominant consideration in drawing a

23    district line; is that correct?

24            "SENATOR HUFFMAN:  Repeat the beginning, please.

11:14:49   25            "SENATOR POWELL:  The Supreme Court has ruled

*Laura Wells, RPR, RMR, CRR, RDR*

1    that absent a compelling reason, race cannot be the

2    predominant consideration in drawing district lines; is

3    that correct?

4        "SENATOR HUFFMAN:  I'm not sure that's exactly

11:15:01   5    what the Supreme Court has said.  I believe that to draw a

6    district based on race, unless there is a strong basis in

7    evidence to believe the districting decision is required

8    under Section 2 of the Voting Rights Act, then it is a

9    racial gerrymander to do otherwise.

11:15:19  10        "SENATOR POWELL:  All right."

11        (Defendants' Exhibit Number 65 concluded.)

12   BY MR. HILTON:

13   Q.   Senator, was that an accurate recording of your

14   statements and Senator Powell's questioning during that

11:15:26  15   hearing?

16   A.   Yes.

17   Q.   And, Senator, was the transcript at Defendants'

18   Exhibit Number 64 a substantively accurate transcription

19   of those statements?

11:15:32  20   A.   Yes.

21        MR. HILTON:  I appreciate the patience, Your

22   Honors.  The pauses mean that I'm skipping clips.  So I

23   appreciate the time.

24   BY MR. HILTON:

11:15:53  25   Q.   All right.  The next clip that we'll play from

 1    Defendants' Exhibit Number 65 corresponds to Page 40 of

 2    the transcript beginning at Line 8.

 3         (Defendants' Exhibit Number 65 played, as follows:)

 4              "SENATOR HUFFMAN:  -- needed population.

11:16:06  5              "SENATOR POWELL:  Well, let's move on.

 6              "SENATOR HUFFMAN:  Okay.

 7              "SENATOR POWELL:  At the September 28th committee

 8    hearing you said you were voting against my amendment

 9    sponsored by Senator Alvarado to restore SD-10 in order to

11:16:20  10    accommodate your redistricting criteria.

11         "So which of the redistricting criteria that we just

12    discussed were you referring to when you said that?

13              "SENATOR HUFFMAN:  All of them.

14              "SENATOR POWELL:  All of them.  Which

11:16:36  15    redistricting criteria do you think was served by voting

16    against that district?

17              "SENATOR HUFFMAN:  I'm sorry.  Which?

18              "SENATOR POWELL:  Which redistricting criteria do

19    you think was served by voting against my amendment --

11:16:49  20              "SENATOR HUFFMAN:  All of them.

21              "SENATOR POWELL:  -- to keep SD-10 the same?

22              "SENATOR HUFFMAN:  All of them were considered.

23              "SENATOR POWELL:  All of them."

24         (Defendants' Exhibit Number 65 concluded.)

11:16:56  25    BY MR. HILTON:

*Laura Wells, RPR, RMR, CRR, RDR*

1    **Q.**   Was that an accurate recording of your statements on

2    the floor of the Senate chamber?

3    **A.**   Yes.

4    **Q.**   And is the transcription in Defendants' Exhibit Number

11:17:05  5    64 a substantively accurate transcription -- recording --

6    transcription of those statements?

7    **A.**   Yes.

8    **Q.**   I apologize.  I'm getting a bit tongue-tied.

9         All right.  The next clip that we'll play corresponds

11:17:26  10   to Page 41, beginning at Line 18 of Defendants' Exhibit

11   Number 64.

12        (Defendants' Exhibit Number 65 played, as follows:)

13        "SENATOR HUFFMAN:  -- the date but, yes, I do

14   recall having some remarks, yes.

11:17:35  15        "SENATOR POWELL:  And your September 28th

16   written, scripted criteria were the same as your

17   September 24th written, scripted criteria with one

18   exception.  On September 28th, after the maps were drawn

19   and after the testimony had been received, you read aloud

11:17:54  20   from a piece of paper that, quote, partisan considerations

21   were also one of the redistricting criteria that you

22   followed in the drawing of the map.  Do you recall that?

23        "SENATOR HUFFMAN:  I don't recall there being a

24   difference; but I do recall that being one of the

11:18:11  25   considerations, yes.

1          "SENATOR POWELL:  And did someone tell you to add

2    that new criteria of partisan considerations --

3          "SENATOR HUFFMAN:  No.

4          "SENATOR POWELL:  -- after you heard the public

11:18:25   5    testimony?

6          "SENATOR HUFFMAN:  No."

7       (Defendants' Exhibit Number 65 concluded.)

8    BY MR. HILTON:

9    **Q.**   Senator, was that an accurate recording of your

11:18:30  10    statements during the hearing?

11   **A.**   Yes.

12   **Q.**   And was that an accurate recording of Senator Powell's

13   questioning?

14   **A.**   Yes.

11:18:35  15   **Q.**   And your statement on Page 42 of the transcript,

16   Lines 3 and 4, says, "I do recall that being one of the

17   considerations, yes."

18       Did I read that correctly?

19   **A.**   Yes.

11:18:54  20   **Q.**   Based solely on the transcript and the statements

21   here, I just want to confirm your understanding of this

22   exhibit.  I'm not asking for any privileged information or

23   any mental impressions or any information about your

24   considerations or motivations during the legislative

11:19:06  25   process.  I'm solely asking about your reading of this

1  document in front of you, which is your public statement.

2      Does the word "that" in that sentence there refer to

3  partisan considerations?

4  **A.**   Yes.

11:19:19  5  **Q.**   We'll resume playing another clip corresponding to

6  Page 42 of Defendants' Exhibit Number 64, beginning Line

7  11, or thereabouts.

8      (Defendants' Exhibit Number 65 played, as follows:)

9          "SENATOR POWELL:  -- partisan considerations,

11:19:35  10  though, after you heard the public testimony?

11          "SENATOR HUFFMAN:  No.

12          "SENATOR POWELL:  All right, then.  You claim

13  that this map was drawn blind to race; is that correct?

14          "SENATOR HUFFMAN:  That is the absolute truth as

11:19:48  15  God is my witness.

16          "SENATOR POWELL:  So, in fact, when -- when we

17  had our committee discussion on September 24th, you told

18  me, and I quote this today, 'To this day, I have not

19  looked at any racial data.'

11:20:04  20          "SENATOR HUFFMAN:  Correct.

21          "SENATOR POWELL:  When we met, before you

22  released the proposed Senate plan, I showed you a map of

23  SD-10 showing colored shading.  In fact, I showed you a

24  number of maps that were shading maps where the district's

11:20:22  25  minority populations were located; and you initialed every

1    single one of those maps with the date on it; is that

2    correct?

3              "SENATOR HUFFMAN:  Senator Powell, now we're

4    going to -- we're going to -- I'm going to take you to

11:20:32    5    task on this one because you and I both know I made it

6    perfectly clear that I was not considering racial data.

7         "You sat down, and you handed me a document.  I

8    glanced at it for less than a second.  I did not know what

9    it was.  When I turned the page, I realized it had racial

11:20:52   10   data.  I turned it over flat; and I said, 'I will not look

11   at this.'  You had four others.

12        "No.  I'm going to finish.

13        "And I had you initial it.  I initialed it.  I put it

14   into a folder.  My staff did not look at it.  I did not

11:21:08   15   look at it.  And I turned that folder over to the Attorney

16   General's office.  Okay.

17        "You are the one who gave it to me.

18              "SENATOR POWELL:  That is correct.

19              "SENATOR HUFFMAN:  I did not look at it, I did

11:21:21   20   not read it, and I did not glean one bit of information

21   from it.  So I am trying to be --

22              "SENATOR POWELL:  All right.

23              "SENATOR HUFFMAN:  -- very transparent here,

24   completely honest, but you need to be so, too."

11:21:35   25        (Defendants' Exhibit Number 65 concluded.)

BY MR. HILTON:

Q.   Senator, was that an accurate recording of your statements during the hearing?

A.   Yes.

11:21:40   Q.   And was that an accurate recording of Senator Powell's questioning and statements during that hearing?

A.   Yes.

Q.   And was the transcript in Defendants' Exhibit Number 64 a substantively correct transcription?

11:21:50   A.   Yes.

Q.   Okay.  And you stated earlier that you are invoking your legislative privilege with respect to conversations with other legislators, correct?

A.   Correct.

11:22:02   Q.   Okay.  And the Rule has been invoked.  Have you discussed the substance of any fact testimony with anyone?

A.   I have not.

Q.   Or anything that's happened in the courtroom?  Have you discussed the substance of the testimony that was

11:22:11   heard here?

A.   I have not.

Q.   I want to make you aware that Senator Powell has waived her legislative privilege and described this conversation here in court.

11:22:19   A.   All right.

1  **Q.**  Do you still wish to assert your legislative

2  privilege?

3  **A.**  I do.

4  **Q.**  Okay.  All right.  The next clip that we'll play from

11:22:39  5  Defendants' Exhibit Number 65 corresponds to Page 51 of

6  Defendants' Exhibit Number 64, beginning on or about

7  Line 5.

8      (Defendants' Exhibit Number 65 played, as follows:)

9      "SENATOR HUFFMAN:  I might have.  I just don't

11:22:52  10  know the name.  So I'm not going to say yes and pretend to

11  be an expert because I don't know that specific case.

12      "SENATOR POWELL:  So are you aware, then, that

13  the courts have repeatedly said that voting in Texas is

14  racially polarized with Anglo voters mostly supporting

11:23:11  15  Republicans and minority voters mostly supporting

16  Democrats?

17      "SENATOR HUFFMAN:  I don't know that the courts

18  have said that.

19      "SENATOR POWELL:  Okay.  So I -- I hear you say

11:23:21  20  that you didn't look at racial data; but you would agree

21  that urban areas in Fort Worth and Dallas have large

22  concentrations of minority voters, wouldn't you?

23      "SENATOR HUFFMAN:  I am not going to make

24  assumptions based on race, period.  All right.  I have

11:23:40  25  followed the law, and I'm not going to get into that -- a

*Laura Wells, RPR, RMR, CRR, RDR*

1  racial discussion with you.  I followed the law.  I have

2  done what it's required me to do, what I want it to do,

3  and I'm going to leave it at that.

4           "SENATOR POWELL:  So you are basically saying

11:23:54  5  that despite serving on the redistricting committee for

6  the past two cycles and chairing the committee this cycle

7  and listening to witnesses who have testified from both

8  redistricting cycles, that you came to the process

9  completely unaware that minority voters are concentrated

11:24:15  10  in urban areas of Dallas and Fort Worth?

11           "SENATOR HUFFMAN:  Senator Powell, of course I

12  have an awareness that there are minorities that live all

13  over this state.  All right.  But I blinded myself to that

14  as I drew these maps.  I did not make map decisions based

11:24:33  15  on racial determinations, period."

16      (Defendants' Exhibit Number 65 concluded.)

17  BY MR. HILTON:

18  **Q.**   Senator, was that an accurate recording of your

19  statements during this hearing?

11:24:42  20  **A.**   Yes.

21  **Q.**   And was that an accurate recording of Senator Powell's

22  questioning?

23  **A.**   Yes.

24  **Q.**   And was the transcript in Defendants' Exhibit Number

11:24:50  25  64 substantively accurate?

1 **A.**   Yes.

2 **Q.**   I would ask you to turn to Page 54 of the transcript

3 that is Defendants' Exhibit Number 64, and I'm just going

4 to ask you to read your first statement that appears on

11:25:08   5 this page of the transcript, Lines 7 to 14.

6 **A.**   "I told you, Senator Powell, I drew blind to race.  I

7 would suggest to you that there are -- it's a very rich,

8 diverse state and there are minorities that live

9 throughout our state and we are blessed by that.  I drew

11:25:29   10 blind to race.  So, naturally, there are going to be

11 differences in the state."

12 **Q.**   Thank you, Senator.  Is that a substantively accurate

13 transcription of your public statements on the floor that

14 day?

11:25:38   15 **A.**   Yes.

16 **Q.**   All right.  We're going to skip ahead to Page 60 of

17 the transcript.  This -- again, this is still in the

18 exchange between you and Senator Powell.  And the context

19 for the conversation is a discussion of the case *Bartlett*

11:26:05   20 *v. Strickland.*  And I'd ask that you read into the record

21 your statements beginning at Line 20 on Page 60 of

22 Defendants' Exhibit Number 64.

23 **A.**   "I think we could.  I just disagree with you and your

24 lawyers on your analysis of *Bartlett v. Strickland*.  I

11:26:21   25 could also quote from them saying nothing in Section 2

*Laura Wells, RPR, RMR, CRR, RDR*

1    grants special protection to a minority group's rights to

2    form political coalitions.  So, again, we can interpret

3    the law differently.  I have been assured, I have studied

4    it, that the maps are in compliance, and that we have

11:26:39   5    followed the requirements under *Bartlett v. Strickland*."

6    **Q.**   Thank you, Senator.  Is that a substantively accurate

7    transcription of your statements during that hearing?

8    **A.**   Yes.

9          MR. HILTON:  And again, Your Honors, the pause

11:27:04   10    means I'm skipping some clips and trying to conclude here.

11    I appreciate your indulgence.

12    BY MR. HILTON:

13    **Q.**   All right.  Senator Huffman, I'm going to ask you to

14    read another one of your statements beginning on Page 65

11:27:26   15    of the transcript --

16    **A.**   All right.

17    **Q.**   -- beginning at Line 22.  This is in response to a

18    question by Senator Menendez -- or at least that is what

19    is reflected on the transcript -- regarding growth of

11:27:43   20    minority population in the state.  That's the context for

21    what I'm asking you to read.

22    **A.**   "Well, Senator Menendez, as you well know, I stated

23    several times I drew blind to race; and we did preserve

24    all the current both Black opportunity districts and

11:27:58   25    Hispanic or Latino opportunity districts in the existing

1   plan.

2        "I have repeatedly said -- and I think I just said

3   this to Senator Powell -- for any group to bring us

4   something that we didn't see, anything -- excuse me,

11:28:11   5   something we missed.  We were more than willing to run a

6   VRA analysis on that, which, in fact, we have done with

7   everything submitted; and nothing submitted has indicated

8   to us that another minority opportunity district is

9   required to be drawn under the law.

11:28:28   10        "As you understand, of course, that it would be racial

11   gerrymandering to just draw a map based on race unless

12   there is a strong basis in evidence to believe the

13   districting decision is required in order to comply with

14   Section 2 of the Voting Rights Act."

11:28:46   15   Q.   Thank you, Senator.  Is that a substantively accurate

16   transcription of your response to Senator Menendez's

17   questioning during the floor debate?

18   A.   Yes.

19   Q.   Thank you.  I'm going to turn to Page 71 of the

11:29:07   20   transcript, a question from Senator Gutierrez beginning on

21   Line 14.  And I have just asked you to read a number of

22   lengthy quotes.  So I'll do this one.

23        "SENATOR GUTIERREZ:  All right.  And so if a plan

24   splits fewer than 23 counties, would that be better or

11:29:24   25   worse?

1        "SENATOR HUFFMAN:  I don't have an opinion on

2   that.  It would depend upon the political makeup of

3   looking at the whole map statewide, the numbers, the

4   concerns of incumbents, constituencies.  So I don't have a

5   general answer for that."

6        Did I read that correctly, Senator?

7   **A.**   Yes.

8   **Q.**   Is that an accurate -- substantively accurate

9   transcription of yours and Senator Gutierrez's statements

10  during the floor debate?

11  **A.**   Yes.

12  **Q.**   The next clip we're going to play -- again, still in

13  the exchange between you and Senator Gutierrez -- is from

14  Defendants' Exhibit Number 65; and it corresponds to

15  Page 84 of Defendants' Exhibit Number 64.

16          MR. CHRISTOPHER:  Repeat the designation.

17          MR. HILTON:  I'm sorry.  Page 84 of Defendants'

18  Exhibit Number 64.

19       (Defendants' Exhibit Number 65 played, as follows:)

20       "SENATOR GUTIERREZ:  Assuming no one loses in a

21  primary, how many of those incumbents would be returning

22  under your proposed plan?

23       "SENATOR HUFFMAN:  Well, I can't predict how

24  voters will vote.  I think that every senator on this

25  floor will have to get out and campaign and convince their

*Laura Wells, RPR, RMR, CRR, RDR*

```
         1   constituents they are deserving of another chance to

         2   serve.  So I'm not going to speculate on who is going to

         3   come back and who is not.

         4           "SENATOR GUTIERREZ:  Under your plan, I think

11:31:02 5   that we have already determined that Senate District 10

         6   would probably not be returning Senator Powell.  Is that

         7   accurate?

         8           "SENATOR HUFFMAN:  I do not know who the voters

         9   of Senate District 10 will vote for."

11:31:14 10       (Defendants' Exhibit Number 65 concluded.)

        11   BY MR. HILTON:

        12   Q.   Senator, was that an accurate recording of your

        13   statements during this hearing?

        14   A.   Yes.

11:31:19 15  Q.   And was that -- and Senator Gutierrez's, as well?

        16   A.   Yes.

        17   Q.   And is the transcription in Defendants' Exhibit Number

        18   -- excuse me, Defendants' Exhibit Number 64, was that

        19   substantively accurate?

11:31:32 20  A.   Yes.

        21   Q.   Now, on Page 85 of Defendants' Exhibit Number 64, I'm

        22   going to read Senator Gutierrez's question beginning at

        23   Line 10.  I'm going to ask you to read your response,

        24   Senator.

11:31:46 25          "SENATOR GUTIERREZ:  I think that is a
```

 1   hypothetical plan.  I'm just saying if there was a plan

 2   that was created that brought back all the incumbents,

 3   would that plan be better for all the incumbents?"

 4   **A.**  "No.  I think it's better for us to have to get out

11:31:59   5   there and work and earn the vote of our constituents."

 6   **Q.**  Is that a subsequently accurate transcription of your

 7   statements during the hearing?

 8   **A.**  Yes.

 9   **Q.**  And did I read my portion correctly?

11:32:09  10   **A.**  Yes.

11   **Q.**  All right.  Next, we're going to do one clip from an

12   exchange between you and Senator Eckhardt.  It corresponds

13   to Page 92 of Defendants' Exhibit Number 64, and the clip

14   itself is contained in Defendants' Exhibit Number 65.

11:32:35  15        (Defendants' Exhibit Number 65 played, as follows:)

16           "SENATOR ECKHARDT:  -- Lieutenant Governor

17   involved in the briefing?

18           "SENATOR HUFFMAN:  No.

19           "SENATOR ECKHARDT:  You -- you have mentioned and

11:32:48  20   have been very assiduous about this, that you were

21   color-blind in your dealings with the map.

22           "SENATOR HUFFMAN:  Yes, ma'am.

23           "SENATOR ECKHARDT:  Who advised you and your

24   committee to never open the racial shading of RedAppl?

11:33:03  25           "SENATOR HUFFMAN:  Again, I am not going to

1    discuss any, you know, specific discussions I had with

2    attorneys.  But I have read the law and I know the law and

3    I believe the law to require me to draw the maps blind to

4    race unless, again, there is a strong basis in evidence to

11:33:25    5    believe the districting decision is required to comply

6    with the Voting Rights Act, Section 2.  It otherwise would

7    be a racial gerrymander."

8        (Defendants' Exhibit Number 65 concluded.)

9    BY MR. HILTON:

11:33:37    10   Q.   Senator, was that an accurate recording of your

11   statements and Senator Eckhardt's questions?

12   A.   Yes.

13   Q.   And is the transcript that corresponds to that

14   recording substantively accurate, as well?

11:33:48    15   A.   Yes.

16   Q.   Okay.  Next, we're going to go to an exchange between

17   you and Senator West.  The clip that I would like to play

18   corresponds to Page 95 of the transcript that's in

19   Defendants' Exhibit Number 64, and the clip itself is a

11:34:02    20   portion of Defendants' Exhibit Number 65.

21   A.   Okay.

22       (Defendants' Exhibit Number 65 played, as follows:)

23           "SENATOR WEST:  -- that ended up being the

24   occurrence and outcome when race was never considered at

11:34:13    25   all.  It just -- it just seems ironic to me.

1    "Now, you mentioned a second ago that race should only

2    be considered when there is a strong basis that would

3    require you to look at race.  Were there any strong bases

4    in your drafting of this map that you thought that race

5    should be looked at?

6        "SENATOR HUFFMAN:  There has been none.  As I

7    said, we drew the maps blind to race.  Then we asked the

8    Attorney General for a legal analysis whether we had

9    followed the Voting Rights Act.  We were assured that we

10   did.

11   "And then I continued to say if someone has something

12   to bring me that would lead us to believe there was a

13   strong basis in evidence, then we would proceed

14   accordingly.  We also made sure that -- oh, yes.  And we

15   also made sure that we looked at, once the maps were drawn

16   and I was assured that the -- both the two Black

17   opportunity districts in the existing plan and the seven

18   Hispanic or Latino opportunity districts in the existing

19   plan have been honored, and was assured by legal counsel

20   that we had complied with all laws.

21       "SENATOR WEST:  And again, I'm not going to go

22   back over the analysis of 10.  Did you consider Senate

23   District 10 a crossover or a -- or a coalition district?

24       "SENATOR HUFFMAN:  We did not consider race in

25   the drawing of Senate District 10.

*Laura Wells, RPR, RMR, CRR, RDR*

1          "SENATOR WEST:  Okay.  So in terms -- what is a
2    coalition district?
3          "SENATOR HUFFMAN:  Well, you know, there is -- I
4    believe it's when you -- it's, again, not required, I
5    believe, under the law; but I believe it has been defined
6    previously as different minority groups that band together
7    to elect their candidate of choice.  That's how it has
8    been used in the past.  Whereas, a crossover district is
9    when the majority in the district crosses over to vote
10   with the minorities to help the minorities elect -- yeah,
11   to form a political coalition to elect their candidate of
12   choice.
13         "SENATOR WEST:  So then in terms of your drawing
14   and your staff's drawing of this map, you didn't take into
15   consideration at all whether or not there were coalition
16   or crossover districts?
17         "SENATOR HUFFMAN:  I did not look at that, no.
18   No, sir.  Because that would have been considering racial
19   data improperly and illegally.
20         "SENATOR WEST:  Okay.  Sorry.
21         "SENATOR HUFFMAN:  And illegally.
22         "SENATOR WEST:  So as in relation to the Voting
23   Rights Act, race was never considered at all?  I just want
24   to make certain.
25         "SENATOR HUFFMAN:  That's not what I said.

1       "SENATOR WEST:  No.  That is --

2       "SENATOR HUFFMAN:  I said that we drew the maps

3  blind.  And then I -- I looked at some data myself after

4  everything was done.  In fact, that was, I think,

11:37:04    5  yesterday, if not the day before.  I think it was

6  yesterday.  But I had been advised that I had complied

7  with the Voting Rights Act as they applied to the minority

8  opportunity districts that currently exist in the state of

9  Texas, like your district, Senator West.

11:37:17   10      "And as you know, I have worked with you when you came

11  to me with some tweaks you wanted with precincts.  I was

12  very committed to working with you with your -- with your

13  communities.

14       "SENATOR WEST:  So race was never considered at

11:37:31   15  all for Voting Rights Act compliance?

16       "SENATOR HUFFMAN:  As I said --

17       "SENATOR WEST:  Other than -- other than as

18  relates to the existing districts?

19       "SENATOR HUFFMAN:  To verify that, in fact, that

11:37:40   20  we had honored the Voting Rights Act under Section 2 to

21  honor the existing minority opportunity districts in the

22  state of Texas."

23      (Defendants' Exhibit Number 65 concluded.)

24  BY MR. HILTON:

11:37:50   25  Q.  Senator, was that an accurate recording of your

*Laura Wells, RPR, RMR, CRR, RDR*

1    statements during the hearing?

2    **A.**   Yes.

3    **Q.**   And was that an accurate recording of Senator West's

4    questions?

11:37:57   5    **A.**   Yes.

6    **Q.**   And was the transcript substantively accurate?

7    **A.**   Yes.

8    **Q.**   Senator, we have two more clips --

9    **A.**   Okay.

11:38:06   10   **Q.**   -- that we're going to play.  The first one

11   corresponds to Page 132 of Defendants' Exhibit Number 64.

12   I'm going to represent to you that this is in the -- your

13   statements here are in the context of an amendment

14   proposed by Senator Powell.  I would like you to review

11:38:24   15   the transcript and satisfy yourself that that is the

16   context for your statements as they appear in Defendants'

17   Exhibit Number 64.

18   **A.**   Yes, they do.

19   **Q.**   Okay.

11:38:33   20        MR. HILTON:  And so, Brian, could you pull that

21   up, please.

22        (Defendants' Exhibit Number 65 played, as follows:)

23        "CHAIRMAN:  Chair recognizes Senator Huffman on

24   the amendment.

11:38:45   25        "SENATOR HUFFMAN:  Members -- thank you very

*Laura Wells, RPR, RMR, CRR, RDR*

1    much, Senator Powell, for your presentation; but I will be

2    respectfully voting against this amendment for several

3    reasons.

4        "First, it proposes changes to multiple districts in

11:38:58   5    the DFW area without the agreement of all impacted

6    members.  In fact, it jeopardizes the ability of a

7    Republican candidate to continue to be elected in Senate

8    District Number 9.  I do not believe Senator Hancock was

9    consulted or spoken with about this amendment.

11:39:14   10    "Second, it maintains SD-10's current configuration,

11    which limits the adjustments we can make throughout the

12    DFW area to accommodate statewide growth over the past

13    decade and other redistricting priorities and objectives.

14        "Third, Plan S-132 by Senator Powell overpopulates

11:39:34   15    SD-9 at 983,861, which is more than 40,000 above the ideal

16    district size, and SD-30 at 971,291, which is more than

17    30,000 above the ideal district size.

18        "Finally, with all due respect to those who have

19    argued in favor of selecting SD-10's configuration on the

11:39:57   20    basis of race, I do not believe that we can or should make

21    redistricting decisions based on race unless we have a

22    legally sufficient justification.

23        "In addition to seeking legal advice, the substance of

24    which I cannot comment on, I undertook my own review of

11:40:13   25    the facts and the data; and I find no basis in evidence to

1    believe that Section 2 of the Voting Rights Act requires

2    the configuration of SD-10 that is proposed in Plan

3    S-2132.

4         "This is because in this proposed SD-10, Asian voting

11:40:32    5    age population is 5.5 percent, Black voting age population

6    is 20.3 percent, and Hispanic voting age population is

7    28.8 percent.

8         "As no minority group forms a majority that could

9    control the outcome of an election in the proposed

11:40:47   10    district, the threshold requirement for a Section 2

11    required district is not met.

12        "I will also add that because there has been some

13    commentary about the number of people in Tarrant County, I

14    want to make it clear that in this -- in this Senate's

11:41:05   15    proposed map 627,530 of 961,525 do reside in Tarrant

16    County.  That is 65.3 percent of the population will be in

17    Tarrant County.

18        "Because I do not believe the proposed changes are

19    required by law and because I want to accommodate the

11:41:26   20    objectives in redistricting I have discussed throughout

21    this process, I am respectfully voting no on this

22    amendment."

23        (Defendants' Exhibit Number 65 concluded.)

24    BY MR. HILTON:

11:41:34   25    Q.   Senator, was that an accurate recording of your

 1  statements on the floor?

 2  **A.**   Yes.

 3  **Q.**   And was the transcript in Defendants' Exhibit Number

 4  64 a substantively accurate transcription?

 5  **A.**   Yes.

 6  **Q.**   The last clip that we're going to play, Senator, is on

 7  Page 142 of this transcript.  I'll represent to you that

 8  your statements here are in the context of another

 9  amendment proposed by Senator Powell that I'd like for you

10  to satisfy yourself on the context of the transcript as it

11  appears in Defendants' Exhibit Number 64, that that is the

12  context for your statements.

13       (Defendants' Exhibit Number 65 played, as follows:)

14            "UNIDENTIFIED SPEAKER:  Any more lights?  No.

15  Senator Huffman.

16            "SENATOR HUFFMAN:  Thank you, Mr. President and

17  members."

18       (Defendants' Exhibit Number 65 concluded.)

19  BY MR. HILTON:

20  **Q.**   Senator, is that the correct context for your

21  statements?

22  **A.**   I'm checking the record.  It appears to be, yes.

23  **Q.**   Thank you, Senator.

24            MR. HILTON:  Go ahead, Brian.

25       (Defendants' Exhibit Number 65 played, as follows:)

*Laura Wells, RPR, RMR, CRR, RDR*

11:41:45 (line 5)
11:42:01 (line 10)
11:42:17 (line 15)
11:42:17 (line 20)
11:42:26 (line 25)

```
11:42:44
11:43:01
11:43:15
11:43:29
11:43:35
```

1     "SENATOR HUFFMAN:  I will be respectfully voting

2   no to this Plan 2134.  It's very similar.  Like my reasons

3   for voting no, like in S-2132, this map proposes changes

4   to multiple districts in the DFW area without the

5   agreement of all impacted members.  It overpopulates

6   several districts, SD-12, plus 30, and proposes a

7   race-based draw without a legally sufficient

8   justification.  Reviewing the data, we have determined

9   there is no minority group that forms a majority that

10   could control the outcome of an election in the proposed

11   district.  The threshold requirement for a Section 2

12   required district is not met.

13     "Thus, in order to accommodate redistricting

14   objectives I have discussed throughout the process for

15   much the same reasons I voted against Plan S-2132, I will

16   be respectfully voting against the amendment, as well."

17     (Defendants' Exhibit Number 65 concluded.)

18   BY MR. HILTON:

19   **Q.**   Senator, was that an accurate recording of your

20   statements on the floor?

21   **A.**   Yes.

22   **Q.**   And was the corresponding transcript in Defendants'

23   Exhibit Number 64 substantively accurate, as well?

24   **A.**   Yes.

25   **Q.**   And, Senator, I just -- that's the last clip I'm going

 1   to play, and that concludes my examination.  I just want

 2   to make clear for the record we're back to where we began

 3   with your legislative privilege.

 4        Did you maintain your legislative privilege at all

11:43:48   5   times today?

 6   **A.**   Yes.

 7   **Q.**   Did you disclose any legislative privileged

 8   information?

 9   **A.**   I did not.

11:43:54  10        MR. HILTON:  Pass the witness.  Thank you, Your

11   Honors.

12             JUDGE GUADERRAMA:  Thank you.

13        Mr. Dunn.

14             MR. DUNN:  Your Honor, I'm ready to proceed.

11:44:00  15   Could we have a short break?

16             JUDGE GUADERRAMA:  Sure.  Let's go ahead and

17   recess for 15.  We'll be back at noon and start up at

18   noon.

19        (Recess from 11:44 a.m. to 12:00 p.m.)

12:01:11  20             JUDGE GUADERRAMA:  Be seated, please.

21        Mr. Dunn.

22             MR. DUNN:  Thank you, Your Honor.

23                      **CROSS-EXAMINATION**

24   BY MR. DUNN:

12:01:17  25   **Q.**   Nice to see you again, Senator.  Chad Dunn.

```
       1   A.   Good to see you, sir.

       2   Q.   We met, I believe, for the first time last Friday at

       3   your deposition.  Does that sound right to you?

       4   A.   Yes, sir.

12:01:25  5   Q.   At your deposition you were subpoenaed; is that a

       6   fact?

       7   A.   Yes.

       8   Q.   Your lawyers accepted the subpoena and also asked you

       9   to bring some documents.  Does that all sound true to you?

12:01:37 10   A.   They did not ask me to bring documents; but, yes, they

      11   were subpoenaed for me.

      12   Q.   Did you ever actually lay your eyes on the subpoena?

      13   A.   No.

      14   Q.   Did anybody ever ask you to go search for some

12:01:47 15   documents?

      16   A.   Yes.

      17   Q.   And did you do so?

      18   A.   I did.

      19   Q.   And have you turned over all the documents that were

12:01:55 20   responsive to the subpoena?

      21   A.   I did not have anything in my possession, personal

      22   possession.

      23   Q.   So you had no items left regarding the redistricting

      24   process?

12:02:03 25   A.   It's all kept --
```

*Laura Wells, RPR, RMR, CRR, RDR*

1      MR. HILTON:  Objection, Your Honor.

2  Mischaracterizes the scope of the subpoena.  Mr. Dunn,

3  furthermore, hasn't objected to our production in response

4  to the subpoena.  So to the extent that he is suggesting

12:02:16    5  that there are documents that should have been turned over

6  and weren't, this is the first that I am hearing about it.

7  If he is going to characterize the scope of the subpoena,

8  I don't think it's appropriate for the witness to testify

9  about that because ultimately that's also going to get

12:02:28   10  into attorney-client privilege areas.

11      MR. DUNN:  I'll rephrase, Your Honor.

12      JUDGE GUADERRAMA:  All right.  Thank you,

13  Mr. Dunn.

14  BY MR. DUNN:

12:02:34   15  Q.  As far as you understand, everything you had or could

16  have that was responsive to the subpoena, you turned over?

17  A.  Yes.

18  Q.  But you had nothing?

19  A.  Personally in my personal possession, no.

12:02:43   20  Q.  Where else were documents found, if any?

21  A.  Everything was kept, to my knowledge, in the

22  redistricting office or in the offices of the Senate.

23  Q.  Was there a person assigned to collect those materials

24  and produce them?

12:02:55   25  A.  That would have been Sean Opperman.

1   **Q.**   And he did that recently?

2   **A.**   Yes.

3   **Q.**   And now, your testimony today, did you receive a

4   subpoena to be here?

12:03:07   5   **A.**   I did not personally receive it.

6   **Q.**   Are you aware of one?

7   **A.**   Yes.

8   **Q.**   Issued by whom?

9   **A.**   I really don't know.  My attorneys told me I needed to

12:03:17   10   be here, and I am here.

11   **Q.**   Well, under Rule 45, my understanding is that the

12   parties have to be served with a subpoena before it's

13   served on the witness.  I haven't received any such

14   subpoena.  Is it possible you are mistaken?

12:03:29   15   **A.**   My lawyers asked me to be here.  I don't know if it

16   was via subpoena.  I willingly came to engage in the

17   process; but I don't know about the subpoena, to be

18   perfectly honest.

19   **Q.**   You can't say whether you are here voluntarily or

12:03:44   20   required?

21   **A.**   I'm definitely here voluntarily, sir.

22   **Q.**   All right.  I see.  That's where we're getting.

23   **A.**   Okay.

24   **Q.**   You chose today to come testify before this Court

12:03:50   25   about what you have given in testimony to Mr. Hilton; is

|     |     |
|-----|-----|
| 1 | that true? |
| 2 | **A.** Yes. Yes. |
| 3 | **Q.** And you have an attorney Mr. Hilton; is that right? |
| 4 | **A.** Yes. |
| 12:03:57  5 | **Q.** That's who showed up at the deposition for you; is |
| 6 | that true? |
| 7 | **A.** Correct. |
| 8 | **Q.** And that was also the lawyer that you referenced |
| 9 | during the Senate debates was advising you; is that a |
| 12:04:07 10 | fact? |
| 11 | **A.** Yes. |
| 12 | **Q.** You also mentioned having some other lawyers, Anna |
| 13 | Mackin and Sean Opperman, on your staff; is that true? |
| 14 | **A.** Yes. |
| 12:04:12 15 | **Q.** They gave you legal advice along the way? |
| 16 | **A.** Yes. |
| 17 |         MR. HILTON:  I'm going to object to the extent it |
| 18 | could be construed to call for the content of any |
| 19 | communication.  I'm also going to -- |
| 12:04:21 20 |         JUDGE GUADERRAMA:  He asked if they gave legal |
| 21 | advice.  He is not asking about content.  So I'll overrule |
| 22 | the objection. |
| 23 |         MR. HILTON:  Understood, Your Honor.  I'd also |
| 24 | like to object it could be construed to go to legislative |
| 12:04:33 25 | privileged information.  I believe she has referred to all |

```
        1  of these things on the floor of the Senate and in public

        2  statements.  I just want to clarify to the extent there is

        3  any legislative privilege information that could be here

        4  that she is referring to her public statements.  Thank

12:04:45 5  you, Your Honor.

        6          JUDGE GUADERRAMA:  All right.

        7  BY MR. DUNN:

        8  Q.   We'll get to talking about legislative privilege here

        9  in a moment.  I'm just focused on your lawyers.  You had

12:04:52 10 Anna Mackin and Sean Opperman on your staff; is that

       11  right?

       12  A.   Yes.

       13  Q.   And then you had Mr. Hilton advising you in the

       14  process; is that true?

12:04:59 15 A.   Yes.

       16  Q.   And you mentioned at your deposition you had two other

       17  lawyers named Scott and Todd.  That's all you could

       18  remember of them; is that true?

       19  A.   Yes.

12:05:07 20 Q.   In your preparations to come in here and testify

       21  today, have you been able to recall the rest of Scott and

       22  Todd's names?

       23  A.   No.

       24  Q.   Do you know where they are from?

12:05:17 25 A.   I believe they now office in Austin, though I do know
```

1    they had worked in the D.C. area, as well.  And they may

2    still currently have an office there.

3    **Q.**  Can you recall anything else about them that might

4    identify them?

12:05:32    5    **A.**  The record -- on the record -- in the public record

6    their official law firm name was stated.  So it's there.

7    I just can't recall it right now, to be honest.  I'm not

8    going to make it up.

9        What else do I know about them?  They were well

12:05:49   10    schooled in redistricting.  I believe at least one of them

11    had clerked for a Supreme Court Justice.  They had worked

12    extensively in the redistricting area in the past.

13    **Q.**  So you have had excellent counsel throughout this

14    process?

12:06:05   15    **A.**  Yes.

16    **Q.**  And there is nothing wrong with that, right?

17    **A.**  I don't think so.

18    **Q.**  It's a complicated area of the law?

19    **A.**  Extremely, yes, sir.

12:06:13   20    **Q.**  And yourself, as a lawyer, I assume you had no

21    experience with it before you joined the legislature?

22    **A.**  Correct.  Yes, sir.

23    **Q.**  Based upon your testimony here, it sounds like you

24    have had an exemplary career as a prosecutor and then a

12:06:26   25    judge and now you are a state senator.

1    Does that sound about right?

2  **A.**  Yes, sir.

3  **Q.**  From what I hear, you were a formidable trial lawyer

4  at the time?

12:06:34   5  **A.**  I don't know about that; but I have worked hard, yes,

6  sir.

7  **Q.**  Well, you and I both attended the same law school.  It

8  turns out some trial lawyers; would you agree?

9  **A.**  Yes, it does.  Yes, sir.

12:06:43  10  **Q.**  And so, ultimately, you had those skills available to

11  you when you engaged in this redistricting process; is

12  that right?

13  **A.**  Yes.

14  **Q.**  You have read a bunch of cases and statutes over the

12:06:53  15  course of your career?

16      MR. HILTON:  Your Honor, I'm just going to object

17  to the extent that it calls for inquiry into what she

18  considered as part of the legislative process.  If he is

19  asking generally about her career, I don't have an

12:07:04  20  objection.  But the question was broad as stated, and I

21  don't want to encroach on legislative privilege.

22      MR. DUNN:  I'll rephrase, Your Honor.

23      JUDGE GUADERRAMA:  Yes, sir.

24  BY MR. DUNN:

12:07:12  25  **Q.**  You are experienced reading cases of any nature, legal

1    cases; is that true?

2    **A.**   Am I experienced?  I didn't hear you.

3    **Q.**   Are you experienced at reading legal cases on a

4    variety of subjects?

12:07:21   5    **A.**   I have in the past, yes, sir.

6    **Q.**   And I would imagine as a judge you had to read a

7    number of briefs, probably thousands of pages of them?

8    **A.**   Not so much as a district court judge, as a trial

9    judge, but occasionally there would be instances,

12:07:35  10    opportunities to do so.

11    **Q.**   And so, ultimately, when you read a court decision and

12    you have available to you appropriate counsel, you are

13    able to make an understanding of it?

14            MR. HILTON:  Objection to the extent it calls for

12:07:46  15    attorney-client privileged information.  I don't know what

16    "make an understanding of it" means.

17            JUDGE GUADERRAMA:  I'm not sure what exactly that

18    objection is.  I'm going to overrule it.

19    **A.**   Could you repeat the question, sir?

12:08:01  20    BY MR. DUNN:

21    **Q.**   Sure.  Can you make an understanding of cases, even

22    complicated ones, when you read them?

23    **A.**   Can I make an understanding?

24    **Q.**   Yes.

12:08:09  25    **A.**   I attempt to make an understanding, yes, sir.

1  **Q.**  Now, in the course of your work as a judge, did you

2  ever come across the Doctrine of Willful Blindness?

3  **A.**  No.

4  **Q.**  How about as a prosecutor?

12:08:18   5  **A.**  No.

6  **Q.**  You are aware that there are a number of areas of the

7  law where a person decides to be willfully blind to

8  something and then they're -- the courts determine that

9  they remain culpable?  This is news to you?

12:08:30  10  **A.**  I'm not familiar with the term or the thought process,

11  no, sir.

12  **Q.**  Have you ever met a person or spoke to a person named

13  Kevin Sparks?

14  **A.**  Have I ever -- please repeat.

12:08:51  15  **Q.**  Have you ever met or spoken to Kevin Sparks?

16  **A.**  No.

17  **Q.**  Do you know who he is?

18  **A.**  Yes.

19  **Q.**  Who is he?

12:08:57  20  **A.**  I believe he is a candidate for the State Senate in

21  the Republican primary for the Senate seat that is

22  currently held by Senator Kel Seliger.

23  **Q.**  Senator Seliger has testified here that Mr. Sparks and

24  the Lieutenant Governor were working together to get his

12:09:17  25  district drawn in such a way as to elect Mr. Sparks.  Do

Cross-Examination of Senator Huffman      Vol 6   139

1    you have any knowledge about that?

2    **A.**    No.

3    **Q.**    Have you had any discussion with the Lieutenant

4    Governor about that subject?

12:09:27    5         MR. HILTON:   I'm going to object to the extent

6    that it necessarily calls for inquiry into the subject

7    matter of a discussion with the Lieutenant Governor.   If

8    the question is has she had a discussion with the

9    Lieutenant Governor, I don't have an objection; but

12:09:41   10    embedded within the question is the question about the

11    content of conversations with the Lieutenant Governor.

12         JUDGE GUADERRAMA:   All right.   So the question is

13    just has she had a conversation?   You can ask her that.

14         MR. DUNN:   The question is:   Has she had a

12:09:53   15    conversation with the Lieutenant Governor about Kevin

16    Sparks?

17         MR. HILTON:   I don't object to that question.

18         JUDGE GUADERRAMA:   All right.   You can answer

19    that.

12:10:01   20    **A.**    Ever?

21    BY MR. DUNN:

22    **Q.**    Yes.

23    **A.**    Yes.

24    **Q.**    And what did you discuss?

12:10:04   25         MR. HILTON:   I object.   That goes squarely to

1    legislative privilege.  To the extent that the question

2    has to be asked, you know, with a high level of generality

3    description, that would appear on a privileged log.  That

4    was the first question.  But this is squarely directed to

12:10:22    5    the content of the communication, and so it goes to

6    legislative privileged information.

7         JUDGE GUADERRAMA:  If they were talking about

8    wild horses, that would go to legislative privilege?

9         MR. HILTON:  A conversation between the Senator

12:10:35   10    and Lieutenant Governor, if it's legislative privilege, if

11    it's about legislative acts would certainly be privileged.

12    So if this is a conversation here that's not about

13    legislative acts as relates to Kevin Sparks, that would

14    not be covered.

12:10:47   15         JUDGE GUADERRAMA:  All right.  So you can answer

16    that in relation to anything that was not regarding any

17    legislative acts.

18         THE WITNESS:  Your Honor, may I consult with my

19    attorney?

12:11:00   20         JUDGE GUADERRAMA:  Sure.  If it's regarding the

21    privilege, yes.

22         THE WITNESS:  Pardon?

23         JUDGE GUADERRAMA:  Are you her personal counsel?

24         MR. HILTON:  I do represent Senator Huffman here

12:11:11   25    today.  If the Court would permit me to consult her about

1    a privileged matter, I would like to do so.

2              JUDGE GUADERRAMA:  Okay.  Sure.

3              MR. HILTON:  And where should -- should I come up

4    to the witness stand, or what?

12:11:20   5              JUDGE GUADERRAMA:  If you need some privacy, you

6    can go around the back into that corridor.

7              MR. HILTON:  Thank you, Your Honor.  I appreciate

8    the opportunity to do that.

9              THE WITNESS:  Thank you, Your Honor.

12:12:04  10       (Sotto voce discussion between counsel and the

11   witness.)

12             MR. HILTON:  Thank you, Your Honors.

13             JUDGE GUADERRAMA:  All right.  Mr. Dunn, maybe

14   you can restate your question.

12:12:43  15             MR. DUNN:  I will do so, Your Honor.

16   BY MR. DUNN:

17   Q.   What was the discussion you had with the Lieutenant

18   Governor about Kevin Sparks?

19   A.   Very recently I informed the Lieutenant Governor that

12:12:53  20   this litigation was pending, that there would be this

21   hearing in El Paso, and that Mr. Sparks was on the witness

22   list, as I understood it.

23   Q.   Was that the first time you had a conversation with

24   the Lieutenant Governor about Sparks?

12:13:08  25   A.   I am trying -- I'm really trying to remember.  I

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
|          | 1  | believe so, but I'm not positive.                                  |
|          | 2  | **Q.**  Was that the first time you had a conversation with        |
|          | 3  | the Lieutenant Governor about a challenger to Senator              |
|          | 4  | Seliger?                                                           |
| 12:13:33 | 5  | **A.**  No.                                                        |
|          | 6  | **Q.**  When was the first of those?                              |
|          | 7  | **A.**  I don't recall.                                            |
|          | 8  | **Q.**  Would it have been before 2168 was passed?               |
|          | 9  | **A.**  Again, I'm thinking very carefully.  There was a lot     |
| 12:13:58 | 10 | going on at that time period.  I don't recall.                    |

**Q.**  Well, when you went out and went to work to draft the plans for the Senate, did you know the Lieutenant Governor was working to defeat Senator Seliger?

**A.**  No.

12:14:20   **Q.**  Did you know that the Lieutenant Governor wanted his district refashioned in such a way that would make it harder for Senator Seliger to gain re-election?

MR. HILTON:  Your Honor, I object to that question.  It goes to a legislative act.  The question 12:14:32 relates to legislative priorities about how legislation would be drafted, specifically Senator Seliger's district. So that's squarely within the legislative privilege.  It's both communications with other legislators, Lieutenant Governor, president of the Senate, and her mental 12:14:48 impressions.

1     JUDGE GUADERRAMA:  I'm going to sustain that

2     objection.

3     BY MR. DUNN:

4     **Q.**   Are you invoking your privilege, Senator?

12:14:54  5     **A.**   Yes.

6     **Q.**   At your deposition we talked, and you have an

7     understanding of who it is that can invoke legislative

8     privilege and who can waive it; is that true?

9     **A.**   Yes, sir.

12:15:01  10     **Q.**   And you understand it's your privilege to waive it?

11     **A.**   I do understand that.

12     **Q.**   You know that Senator Powell has waived hers?

13     **A.**   I believe that's been stated today, yes, sir.

14     **Q.**   And you are not invoking your legislative privilege

12:15:10  15     because the Attorney General's office is asking you to do

16     so, are you?

17     MR. HILTON:  I'm going to object to the extent

18     that's going into attorney-client privilege communication.

19     He just asked what the Attorney General asked her to do.

12:15:21  20     JUDGE GUADERRAMA:  Right.  Just so it's clear,

21     Senator -- I'm sure you understand -- it's your privilege,

22     not the Attorney General's or your counsel who is the

23     Attorney General.  It's your privilege to raise it.  If

24     you raise it, you raise it.  For whatever reasons you

12:15:40  25     raise it for, that's your reasons.

```
                        THE WITNESS:  Yes, sir.  I do understand.  Thank
 1

 2       you, sir.

 3                        JUDGE GUADERRAMA:  All right.

 4       BY MR. DUNN:

 5       Q.   All right.  I would like to call your attention to

 6       your district, Senate District 17; is that correct?

 7       A.   Yes, sir.

 8       Q.   It should come up here on your screen momentarily.

 9       I'm going to start with the -- I'm showing you here what

10       is a screenshot in District Viewer of Plan 2100.  Does

11       that -- do you recognize Senate District 17 as the

12       orientation of your district under the benchmark map?

13       A.   Yes, I do.

14       Q.   Can you tell us where the core of this district is?

15       A.   It's Harris County.

16       Q.   Around your residence?

17       A.   It stretches through -- Harris County is very large,

18       over 4 million people.  It stretches through parts of

19       Harris County out towards the western side but also near

20       my residence, as well.

21       Q.   But to the extent changes need to be made to your

22       district, as long as the Harris County portions of it

23       remain current, you would believe the core of your

24       district was preserved?

25                        MR. HILTON:  I'm going to object to that to the
```

12:15:45
12:16:19
12:16:32
12:16:51
12:17:02

1    extent it calls for legislative privileged information.

2    He is asking about changes to the district that

3    necessarily entails redistricting and legislative acts.

4         If he is asking a factual question about what she

12:17:14    5    considers to be a core of her district, I believe that's

6    not a legislative act; but the way the question was

7    phrased, I feel like I have to object.

8              JUDGE GUADERRAMA:  All right, Mr. Dunn.  You can

9    ask her what her definition is of what she believes the

12:17:26   10    core of her district is.

11    BY MR. DUNN:

12    **Q.**   What do you believe is the core of your district?

13    **A.**   I still believe that Harris County is the core of the

14    district.

12:17:33   15    **Q.**   Now, when this -- when this district was drawn, your

16    district had previous -- in the previous decade become

17    competitive, is that right, politically?

18    **A.**   Which decade are you referring to, sir?

19    **Q.**   The decade of 2000 to 2009.

12:17:47   20    **A.**   Yes.

21    **Q.**   And when this district was drawn, there was a

22    discussion then on the Senate floor.  In fact, Senator

23    Ellis raised the concern that his district had been

24    packed, Number 13, to accommodate your re-election in

12:18:00   25    Senate District 17.  Do you recall that?

1  **A.**   No.

2  **Q.**   In 2011 your district was redrawn significantly again.

3  Would you agree -- I mean, excuse me, 2021, last fall, it

4  was redrawn again; would you agree?

12:18:13  5  **A.**   Yes.

6          MR. HILTON:   Your Honor, I apologize.   I have to

7  object to this.   This is well beyond the scope of direct.

8  So to the extent that he is leading the witness, I believe

9  that's improper.   Also, it has really nothing to do with

12:18:23  10  issues before the Court today.

11         JUDGE GUADERRAMA:   Well, if it's beyond the scope

12  of the direct, then I'll ask you not to lead.

13         MR. DUNN:   She was asked a number of statements

14  that she read into the record about what she considered to

12:18:33  15  be the requirements of the district in terms of drawing

16  race-blind and following her principles, and we're testing

17  those principles with respect to Senate District 17.

18         JUDGE GUADERRAMA:   I don't think that particular

19  district was invoked when they directed her on that.   So

12:18:49  20  since it's outside the scope, you will have to -- you can

21  ask it, but you can't lead her.

22         MR. DUNN:   I'm sorry.   I didn't hear the last

23  thing.

24         JUDGE GUADERRAMA:   You can ask her, but you

12:18:57  25  cannot lead her under the rule.

1          MR. DUNN:  Understood.

2    BY MR. DUNN:

3    **Q.**   I have here, then, on the screen Senate District 17 in

4    2168.  Do you see that?

12:19:05   5    **A.**   Yes, I do.

6    **Q.**   What were the changes that were made to your district?

7    **A.**   There were some changes -- there were some changes

8    made in Harris County, some in Fort Bend County, some in

9    Brazoria County, and then additional counties -- parts of

12:19:26   10   Waller County were added and parts in all of Colorado,

11   Wharton, Jackson, Matagorda were added.

12   **Q.**   All right.  A substantial change to your district, you

13   would agree?

14   **A.**   The core of the district is still Harris County.

12:19:43   15   **Q.**   Can you identify in here in the Harris County portion

16   where, generally, your residence is?

17   **A.**   Well, I live very near the Galleria area.  So if you

18   look at where 610 and 59 begin to go south, it's slightly

19   north of that outside the 610 Loop.  So probably kind of a

12:20:06   20   little closer to 610.  Right in that area.  The Galleria

21   area, if you are familiar with The Galleria.

22   **Q.**   Right about where the cursor is on the screen?

23   **A.**   Yes.

24   **Q.**   Ultimately, the district squeezes between two others,

12:20:17   25   heads out towards west Harris County, and then heads down

1   to the counties you mentioned; is that right?

2   **A.**   Correct, sir.

3   **Q.**   Now, do you recall Mr. Potter, the state demographer?

4   **A.**   I recall him, yes, sir.

12:20:48   5   **Q.**   And I believe there is testimony from you earlier here

6   today that he attended at least one of the committee

7   hearings?

8   **A.**   He attended several, yes, sir.

9   **Q.**   And you have produced, or at least the government has

12:20:59   10   produced on your behalf, a number of files, including this

11   one here on the screen, which is a PowerPoint presentation

12   that's been admitted as Brooks Exhibit 104 that has a

13   number of racial shade charts.  You are aware of those?

14   **A.**   I see them before me, yes.

12:21:12   15   **Q.**   And you recall that Mr. Potter came before a number of

16   the redistricting committee's hearings in advance of the

17   release of the census and gave this presentation on

18   multiple occasions?

19   **A.**   With the ACS numbers, yeah.

12:21:25   20   **Q.**   And that's why, when we look at the top of this, it

21   has ACS numbers from 2013 to 2017.  Those were the most

22   current available at the time of the field hearings.  Is

23   that right?

24   **A.**   Yes.

12:21:36   25   **Q.**   Now, you'll note here in Harris County I have shown

1   the Harris County region with an Asian population shade

2   map.  Do you see that?

3   **A.**   I see a shaded map, yes.

4   **Q.**   Would you have any dispute that that is shading the

12:21:51   5   Asian population, if you look at the title?

6   **A.**   I can read it, yes, sir.  That's what it says.

7   **Q.**   And ultimately down here, where you can hardly read

8   Sugar Land, that's Fort Bend County; would you agree?

9   **A.**   Yes.

12:22:06   10   **Q.**   Fort Bend County has been trending Democratic; is that

11   true?

12   **A.**   Yes.

13   **Q.**   And it's recently elected an Asian-American county

14   judge; is that right?

12:22:15   15         MR. HILTON:  Your Honor, I'm going to object to

16   leading again.  This is well outside the scope of direct.

17         JUDGE GUADERRAMA:  Sustained.

18   BY MR. DUNN:

19   **Q.**   Who was the county judge elected in Fort Bend County?

12:22:23   20   **A.**   His name is K.P. George.

21   **Q.**   What is his race or ethnicity, if you know?

22   **A.**   I don't know.

23   **Q.**   Now, I have set beside this a map of your district,

24   Senate District 17, next to the Asian population shade map

12:22:39   25   on the left.  How would you describe the cut your district

1    makes through that portion of Fort Bend County?

2    **A.**   I don't understand the question.

3    **Q.**   Well, would you say that the area that cuts through

4    Fort Bend County bisects the significant Asian-American

12:23:00    5    neighborhoods there?

6    **A.**   I can't tell from this, sir.

7    **Q.**   Let me show you the Plan 2168 of Senate District 17

8    and a portion of it that goes through Fort Bend County.

9    Can you see that?

12:23:13   10    **A.**   Yes.

11    **Q.**   How would you describe the cut there to the rural

12    counties in comparison to the benchmark plan?

13    **A.**   I can't answer that either.  If you could repeat the

14    question, maybe I could understand it better.

12:23:30   15    **Q.**   Would you describe it as narrower?

16    **A.**   The cut that goes from Harris County through Fort --

17    into Fort Bend and then down to Brazoria?

18    **Q.**   Between the purple and pink areas.

19    **A.**   Do I think it's narrow?  Not necessarily.

12:23:49   20    **Q.**   Do you think it's narrower than the benchmark?

21    **A.**   I don't recall specifically what the benchmark looks

22    like, but I don't think it's much different.

23    **Q.**   I've placed it on the screen.  Does it look narrower

24    to you now?

12:24:08   25    **A.**   It looks slightly narrow.  There are some changes, but

1  I couldn't tell you specifically how many precincts there

2  are.  It doesn't look like a huge number.

3  **Q.**  Now, Senate District 10 in the recent presidential

4  election, Trump lost that Senate district, didn't he?

12:24:21  5  **A.**  Which Senate district?

6  **Q.**  Yours.

7  **A.**  17?

8  **Q.**  Yes, ma'am.

9  **A.**  Yes.

12:24:26  10  **Q.**  Lieutenant Governor Patrick lost your district; is

11  that right?

12  **A.**  I don't recall.

13          MR. HILTON:  Again, objection.  Leading.

14          JUDGE GUADERRAMA:  Sustained.

12:24:32  15  BY MR. DUNN:

16  **Q.**  Do you recall any other candidates that didn't

17  prevail, any other Republican statewide or national

18  Republicans that didn't prevail?

19  **A.**  No.

12:24:42  20  **Q.**  And you mentioned your lawyer had you read a statement

21  that you made on the floor that -- to the effect of you

22  couldn't accommodate every one of the senators.  And, in

23  fact, there were many changes that you still wanted to

24  make to your district; but you did the best you could.

12:24:59  25          Do you remember something to that effect?

*Laura Wells, RPR, RMR, CRR, RDR*

            1   **A.**   Yes.

            2   **Q.**   Is this the best you could do with your district?

            3          MR. HILTON:  Objection, Your Honor.  Goes to the

            4   core of legislative privilege.  It's asking about her

12:25:09    5   mental impressions and her opinion regarding legislation.

            6          JUDGE GUADERRAMA:  I'll sustain the objection.

            7   BY MR. DUNN:

            8   **Q.**   Let's look at the Panhandle.

            9   **A.**   At the what, sir?  I'm sorry.

12:25:32   10   **Q.**   At the Panhandle.

           11   **A.**   Yes, sir.

           12   **Q.**   You spent a lot of time working on the Panhandle

           13   orientation; would you agree?

           14          MR. HILTON:  Objection, Your Honor.  If he is

12:25:41   15   asking what Senator Huffman spent a lot of time working on

           16   as it relates to a legislative act, I believe that could

           17   fall within the privilege.  If he could restate the

           18   question, perhaps I wouldn't have an objection.

           19          JUDGE GUADERRAMA:  All right.  Mr. Dunn.

12:25:53   20   BY MR. DUNN:

           21   **Q.**   The Panhandle was a central concern of yours as the

           22   Chair of the Redistricting Committee, would you agree,

           23   because it was underpopulated?

           24          MR. HILTON:  Objection, Your Honor.  He is asking

12:26:02   25   about Senator Huffman's concerns as a legislator regarding

1    legislation that she had in her consideration.

2                MR. DUNN:  I'll rephrase, Your Honor.

3                JUDGE GUADERRAMA:  All right.  Yes, sir.

4    BY MR. DUNN:

12:26:12  5    **Q.**  What attention -- what degree of attention did you put

6    to the Panhandle in this redistricting project?

7                MR. HILTON:  Same objection, Your Honor.  He is

8    asking for her mental opinions, deliberations and her

9    considerations.

12:26:22  10                JUDGE GUADERRAMA:  Sustained.

11   BY MR. DUNN:

12   **Q.**  You received a number of pieces of public comment, is

13   that right, throughout the -- I'm sorry.  Go ahead.

14   **A.**  Yes.

12:26:35  15   **Q.**  Okay.  One of the things that, in fact, was discussed

16   here and the Court has heard, Senator Seliger gave a

17   speech on the floor about the reason he was given for the

18   restructuring of his district was to create an oil and gas

19   and agriculture district.  Do you remember that?

12:26:51  20   **A.**  Do I remember his speech?

21   **Q.**  Yes.

22   **A.**  That he gave a speech?  I do remember that he gave a

23   speech.  I do not remember the specifics of everything

24   that he said.

12:26:59  25   **Q.**  Do you recall that he said he was told that his

1    district was redesigned so that there would be an

2    agriculture and an oil and gas district?

3    **A.**    That is part of what he said, as I recall, yes.

4    **Q.**    Now, are you willing to waive your legislative

12:27:10    5    privilege and tell us what you did tell him?

6    **A.**    No, sir.

7            MR. DUNN:  I got disconnected from the Wi-Fi.

8    We're reconnecting.

9            JUDGE GUADERRAMA:  Okay.  Are you still having

12:28:22   10    problems connecting?

11            MR. DUNN:  I just did, Your Honor.  Thank you.  I

12    just decided to use my phone.

13            JUDGE GUADERRAMA:  Oh, you are on a hotspot now?

14            MR. DUNN:  Yes, sir.  It has got to load a map.

12:28:46   15    It's out here in the universe.  I'm trying to get it here.

16            JUDGE GUADERRAMA:  We are about 30 minutes away

17    from a break; but if it would help, I suppose we could

18    break early and have IT come up and help you log back in

19    to the system.

12:29:07   20            MR. DUNN:  That would be helpful, Your Honor.

21    For the Court's information, the Wi-Fi has started in the

22    last day and a half to mostly not work.

23            JUDGE GUADERRAMA:  Okay.  So let me have IT come

24    up.  Does the government have or is the State having the

12:29:20   25    same problem?

1        MR. HILTON:  Your Honor, most of us have been

2   using our laptops without a problem on the attorney Wi-Fi.

3   So -- oh, I stand corrected.  We have had a little trouble

4   with that.

12:29:32    5        JUDGE GUADERRAMA:  Okay.  All right.  So let me

6   have -- if it's okay with you, we'll take our lunch recess

7   now.  It's 12:30.  We'll be back at 1:30.  And I'll have

8   the IT people come up and see if they can figure out what

9   is going on.

12:29:47   10        MR. DUNN:  Thank you, Your Honor.

11        JUDGE GUADERRAMA:  All right.

12        MR. HILTON:  Your Honor, I apologize.  Just for a

13   matter of timing, we have two other witnesses we intended

14   to do this afternoon.  We think we can get them both done.

12:30:01   15   But to the extent we get to 6:00 and have another 10 or 15

16   minutes, does the Court have any scheduling conflict

17   today?

18        JUDGE GUADERRAMA:  I don't have a problem going

19   beyond 6:00.

12:30:12   20        JUDGE SMITH:  That's fine.  We will be here as

21   long as we need to, and I think I mentioned that

22   yesterday.  And that is also true of tomorrow.

23        MR. HILTON:  I appreciate that, Your Honors.  So

24   thank you.

25        JUDGE SMITH:  I am not leaving town until

```
 1    Saturday.  So --

 2              JUDGE GUADERRAMA:  All right.  We're in recess

 3    until 1:30.

 4         (Proceedings adjourned at 12:30 and continued in

 5    Volume 7.)

 6                   ************************

 7    Date:  February 7, 2022

 8                   COURT REPORTER'S CERTIFICATE

 9         I, Laura Wells, certify that the foregoing is a

10    correct transcript from the record of proceedings in the

11    above-entitled matter.

12                         _____/s/ Laura Wells_____

13                         Laura Wells, CRR, RMR

14

15

16

17

18

19

20

21

22

23

24

25
```