# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> GREG ABBOTT, *et al.*, <br><br> *Defendants.* | § § § § § § § § § § § | Case No. 3:21-cv-00259 <br> [Lead Case] |
| UNITED STATES OF AMERICA, <br><br> *Plaintiffs,* <br><br> v. <br><br> STATE OF TEXAS and JOHN SCOTT, in his official capacity as Texas Secretary of State, <br><br> *Defendants.* | § § § § § § § § § § § § § | Case No. 3:21-cv-299 <br> [Consolidated Case] |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION
DISMISS THE UNITED STATES' COMPLAINT**

# TABLE OF CONTENTS

Table of Contents ..................................................................................................................................ii

Table of Authorities ............................................................................................................................iii

Introduction ..........................................................................................................................................1

    I.    The Congressional Map Is Lawful ......................................................................................2

        A.    CD23 Is Valid ..................................................................................................................2

            1.    The United States Has Not Plausibly Alleged Discriminatory Results ..........................2

            2.    The United States Has Not Stated a Claim for Discriminatory Intent ..........................5

        B.    The DFW Districts Are Valid ......................................................................................8

        C.    The Harris County Districts Are Valid ......................................................................9

    II.    The House Map Is Lawful ...................................................................................................9

        A.    HDs 31 and 118 Are Valid ............................................................................................9

        B.    House Districts in El Paso and West Texas Are Valid ..........................................10

Conclusion ..........................................................................................................................................11

Certificate of Service ..........................................................................................................................12

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Perez,*
　138 S. Ct. 2305 (2018) ............................................................................................................. 7, 11

*Ashcroft v. Iqbal,*
　556 U.S. 662 (2009) .................................................................................................................. 3, 8

*Bartlett v. Strickland,*
　556 U.S. 1 (2009) ............................................................................................................................ 2

*Bell Atl. Corp. v. Twombly,*
　550 U.S. 544 (2007) .................................................................................................................. 3, 8

*Brecht v. Abrahamson,*
　507 U.S. 619 (1993) ....................................................................................................................... 6

*Brnovich v. DNC,*
　141 S. Ct. 2321 (2021) ................................................................................................................ 5, 8

*Burton v. City of Belle Glade,*
　178 F.3d 1175 (11th Cir. 1999) ..................................................................................................... 7

*Chisom v. Roemer*
　501 U.S. 380 (1991) ....................................................................................................................... 6

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,*
　140 S. Ct. 1009 (2020) .................................................................................................................. 4

*Conley v. Gibson,*
　355 U.S. 41 (1957) .......................................................................................................................... 3

*Cooper Indus., Inc. v. Aviall Services, Inc.,*
　543 U.S. 157 (2004) ....................................................................................................................... 6

*Cooper v. Harris,*
　137 S. Ct. 1455, 1473 (2017) ......................................................................................................... 8

*Garza v. County of Los Angeles,*
　918 F.2d 763 (9th Cir. 1990) ......................................................................................................... 6

*Growe v. Emison,*
　507 U.S. 25 (1993) ............................................................................................................. 2, 4, 10

*Harding v. Dallas County*,
　948 F.3d 302 (5th Cir. 2020) ............................................................................................... 6, 7

*Holder v. Hall*,
　512 U.S. 874 (1994) .................................................................................................................5

*Johnson v. DeSoto County Bd. of Com'rs*,
　72 F.3d 1556 (11th Cir. 1996) ..................................................................................................5

*Larios v. Cox*,
　300 F. Supp. 2d 1320 (N.D. Ga.) (three-judge court), *aff'd* 542 U.S. 947 (2004) (per curiam) ......11

*Perez v. Abbott*,
　250 F. Supp. 3d 123 (W.D. Tex. 2017) (three-judge court) ....................................................11

*Perez v. Perry*,
　No. 5:11-cv-360, 2017 WL 962686 (W.D. Tex. Mar. 10, 2017) ..............................................3

*Pers. Adm'r of Mass. v. Feeney*,
　442 U.S. 256 (1979) .................................................................................................................7

*Salas v. Sw. Tex. Jr. Coll. Dist.*,
　964 F.2d 1542 (5th Cir. 1992) .................................................................................................3

*Seastrunk v. Burns*
　772 F.2d 143 (5th Cir. 1985) ...................................................................................................6

*Thornburg v. Gingles*,
　478 U.S. 30 (1986) ........................................................................................................*passim*

*Uno v. City of Holyoke*,
　72 F.3d 973 (1st Cir. 1995) .....................................................................................................3

**Statutes**

13 U.S.C. § 141(a), (c) ...................................................................................................................8

**Other Authorities**

S. Rep. No. 97-417 (1982) .............................................................................................................6

**Constitutional Provisions**

Tex. Const. art. III, § 40 .................................................................................................................8

**INTRODUCTION**

The United States' claims fail because they do not plausibly allege discriminatory results or discriminatory intent. Regarding discriminatory effects, if the United States has a theory for how small groups of white voters are going to overwhelm much large groups of Latino voters in Latino-majority districts, it should plead that theory in its complaint. Conclusory assertions about voter cohesion and bloc voting—which formulaically recite the elements of a Section 2 claim—do not provide Defendants fair notice and do not plausibly suggest the United States is entitled to relief.

The United States' allegations of discriminatory intent fare no better. Each of its circumstantial allegations is fully consistent with a lawful legislative intent to redistrict for partisan advantage, and within the compressed timeline imposed by the delay of the census data's publication. The United States cannot claim that a rushed redistricting process suggests improper motive when the need to rush resulted from the federal government's failure to comply with federal law governing the time for distributing census data.

Finally, the United States cannot transform Section 2 into a vehicle for bringing constitutional malapportionment claims that Congress has not authorized it to bring. It complains about the El Paso and West Texas region, but every voter in that region lives in a district with a large Latino majority. Indeed, the United States does not dispute that Latino voters can elect their candidates of choice in that region. Instead, the United States complains there should be more districts in that area. But that is not a Section 2 issue. It is a malapportionment issue (albeit a meritless one) that Congress has left to private plaintiffs.

## I.   The Congressional Map Is Lawful

### A.   CD23 Is Valid

#### 1.   The United States Has Not Plausibly Alleged Discriminatory Results

The United States' conclusory assertions regarding the *Gingles* preconditions do not satisfy its burden to plausibly allege any facts establishing those requirements. *See* ECF 111 at 3–6. That CD 23's CVAP is majority Latino and only about a third white undermines the United States' challenge to CD23. *See id.* at 5.

The *Gingles* preconditions illuminate whether Latino voters in the challenged district "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b). Together and separately, the three preconditions address whether white votes will overwhelm Latino votes in the district the Legislature drew. The first precondition is satisfied "[w]here an election district could be drawn in which minority voters form a majority *but such a district is not drawn*." *Bartlett v. Strickland*, 556 U.S. 1, 18 (2009) (emphasis added). The second and third preconditions—"'minority political cohesion' and 'majority bloc voting'"—"are needed to establish that the challenged districting thwarts a distinctive minority vote *by submerging it in a larger white voting population*." *Growe v. Emison*, 507 U.S. 25, 40 (1993) (emphasis added).

The United States does not dispute that CD23 is a majority Latino district by CVAP and that the Latino voting population is larger than the white voting population. Instead, it insists that these facts do not automatically foreclose its claim. The United States argues that a Latino-majority district "[c]an [v]iolate Section 2," ECF 161 at 5, and that "not every majority-minority district yields an electoral opportunity," *id.* at 7.

That a Latino-majority district *could* violate Section 2 does nothing to suggest that this Latino-majority district *does* violate Section 2. Defendants acknowledged the possibility of a Section 2 violation in a Latino-majority district, for example if "the numbers showing a Latino majority are 'illusory' or

2

'soft.'" ECF 111 at 5–6 (quoting *Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992)). But the United States does not allege that CD 23 falls into that category.[1]

Nor does it allege any other reason to think that a minority of white voters will somehow overwhelm a comfortable majority of Latino voters. The United States' response brief mentions apathy as a possible explanation, though that explanation is absent from the complaint. Arguing that apathy "has long been barred" as a "defense," the United States wrongly suggests that Defendants are invoking apathy to defeat its claim. ECF 161 at 12 n.6. In any event, to the extent the United States argues that Latinos will fail to vote because of apathy, that cannot support a Section 2 claim, at least absent plausible allegations that the apathy results from discrimination. "[W]hether low minority voter turnout helps or hurts a claim of vote dilution . . . depend[s] on the facts and circumstances of the particular case," *Uno v. City of Holyoke*, 72 F.3d 973, 987 (1st Cir. 1995), but the United States does not allege any facts and circumstances explaining Latino turnout, much less its significance in this case.

Emphasizing the *possibility* of a Latino-majority district violating Section 2, the United States essentially argues that Defendants have not shown the "factual impossibility" of its claim "from the face of the pleadings," but that is not the modern pleading standard. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561 (2007) (abrogating *Conley v. Gibson*, 355 U.S. 41 (1957)). Alleging "facts that are 'merely consistent with' a defendant's liability" is not enough. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). The United States must allege facts that "plausibly suggest an entitlement to relief." *Id.* at 681. It has not done so.

---

[1] The United States' response brief suggests that Latino voters "are outnumbered" in CD23 because "only 42.9% of voters who cast a ballot within the new Congressional District 23 in 2020 had Spanish Surnames." ECF 161 at 13. But the United States' complaint does not allege that the number of people with Spanish surnames matches the number of Latinos in a district. Nor could it. As the court recognized in the last round of redistricting, experts agree that the number of Latinos in a district is higher than the corresponding number of people with Spanish surnames. *See, e.g.*, *Perez v. Perry*, No. 5:11-cv-360, 2017 WL 962686, at *15 (W.D. Tex. Mar. 10, 2017) ("Dr. Ansolabahere testified that there are 10-15% more people identifying themselves as Hispanics than have a Hispanic surname."). The United States' own numbers reflect this reality. *See, e.g.*, Compl. ¶ 143 (showing CVAP higher than SSVR for multiple districts).

Further misconstruing federal pleading standards, the United States argues that it need not include expert testimony in its complaint. *See* ECF 161 at 8–9. But Defendants did not argue otherwise. Rule 8 requires the United States to plausibly allege specific facts supporting its conclusory assertions. Assertions like "Latino voters in District 23 are cohesive in the most relevant elections, including elections for District 23," do not provide Defendants fair notice, nor do they plausibly suggest a violation of law. The United States could provide the facts that supposedly support its assertion without attaching an expert report.

That this case is at the pleading stage does not relieve the United States of its obligation to establish relevant facts. The only difference is that, at this stage, it can establish them through plausible allegations rather than evidence. As the Supreme Court recently explained, "to determine what the plaintiff must plausibly allege at the outset of a lawsuit, we usually ask what the plaintiff must prove in the trial at its end." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020). The substance of the requirement does not change; only the methods of proof.

Finally, the United States confuses two different ways cohesion is relevant. *See* ECF 161 at 10–11. First, as discussed above, "minority political cohesion" is "needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population." *Growe*, 507 U.S. at 40. Second, "minority political cohesion" is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Id.* Even if the United States' conclusory assertion of cohesion in the legislatively enacted CD23 sufficed for that first purpose (it does not, *see* ECF 111 at 4–5), that assertion does not address cohesion in the proposed district. *See id.* at 5.

In response, the United States argues that the cohesion analysis is not "focuse[d] solely on minority voters within a proposed illustrative district," ECF 161 at 10, but that is not responsive to Defendants' point. No one disputes that courts consider cohesion in both the legislatively enacted

4

district and the proposed district. That makes sense in light of *Growe*'s explanation for the two different roles that cohesion plays in a Section 2 analysis. It is the United States' failure to even mention cohesion in the proposed district that renders its complaint deficient.

### 2. The United States Has Not Stated a Claim for Discriminatory Intent

The United States' discriminatory-intent claim fails for three reasons. First, it relies on Section 2, but Section 2 focuses on results, not intent. Second, even if Section 2 could support a discriminatory-intent claim, it would still require plausible allegations of discriminatory results, which the United States has not made. Third, the United States' assertions of discriminatory intent are not supported by plausible factual allegations.

#### a. Section 2 Addresses Results, Not Intent

Section 2 addresses discriminatory "results," not intent. 52 U.S.C. § 10301(a). "That statutory language expressly requires a showing of discriminatory results, and it admits of no exception for situations in which there is discriminatory intent but no discriminatory results." *Johnson v. DeSoto County Bd. of Com'rs*, 72 F.3d 1556, 1563 (11th Cir. 1996).

That has been true since Congress amended the statute in 1982. *See* ECF 111 at 7–10. "The intent test was repudiated . . . ." *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986). When the intent test was "replaced," *Holder v. Hall*, 512 U.S. 874, 921 n.22 (1994) (Thomas, J., concurring in the judgment), the results test was "substituted," *id.* at 962 (separate opinion of Stevens, J.), as six justices concluded between those two opinions. The Supreme Court recently explained, "§ 2 is violated *only* where" the results test from Section 2(b) is satisfied. *Brnovich v. DNC*, 141 S. Ct. 2321, 2337 (2021) (emphasis added).

In response, the United States argues that following the statutory text would be inconsistent with legislative history, namely a Senate committee report, and cases relying on that legislative history. *See* ECF 161 at 15–17. The committee report says that plaintiffs can prevail under "either" an intent

5

test or "alternatively" a results test, *id.* at 16 (quoting S. Rep. No. 97-417, at 27 (1982)), and that is true for private plaintiffs, who bring constitutional claims subject to the intent test or statutory claims subject to the results test. The problem for the United States is that Congress has not authorized the Department of Justice to bring constitutional claims. *See* ECF 111 at 9–10.

The cases cited by the United States do not add anything to the analysis. *Chisom v. Roemer* did not consider the intent test and merely quoted the committee report for a different proposition about the results test. *See* 501 U.S. 380, 394 n.21 (1991). *Seastrunk v. Burns* establishes only that "discriminatory intent of itself will normally render a plan illegal," which is true because such a plan violates the Constitution. 772 F.2d 143, 149 n.15 (5th Cir. 1985). That other cases may have treated intent claims as violating Section 2 as well as the Constitution—when the issue was not presented by a party and would have made no difference to the case's outcome—does not bind this Court. *See, e.g.*, *Cooper Indus., Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (holding the Court was not "bound . . . by way of *stare decisis*" because its precedents "never squarely addressed the issue" and "at most assumed" an answer).

### b. Intent, Standing Alone, Cannot Violate the Law

Defendants previously explained that the United States cannot support its discriminatory-intent claims because it fails to allege a discriminatory effect with respect to CD23. *See* ECF 111 at 10. Even if Section 2 prohibits intentional vote dilution, it requires at least that there be actual vote dilution, not just attempted vote dilution. *See Harding v. Dallas County*, 948 F.3d 302, 312 (5th Cir. 2020) (requiring "discriminatory effect" "[t]o prove an intentional vote dilution claim").

Relying on *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990), the United States argues that it can state an intentional-discrimination claim "even where *Gingles* preconditions cannot be met."

6

ECF 161 at 17 (capitalization altered). As an initial matter, that is not what *Garza* says. Like the other cases the United States cites, *see* ECF 161 at 18, *Garza* stands for the proposition that the first *Gingles* precondition may be relaxed if a court finds that the legislature intentionally discriminated against a particular minority group. *See* 918 F.3d at 769–71. But even then, the United States would still need to satisfy the second and third preconditions. As explained above, it has not done so.

In any event, the Court should not rely on *Garza* at all. In this circuit, "[t]he role that § 2 and *Gingles* play in intentional vote dilution claims as opposed to results-only claims is somewhat unsettled," *Harding*, 948 F.3d at 313, but Eleventh Circuit precedent provides the most persuasive approach. Alleging "intent to discriminate" does not "lessen[] the amount of discriminatory results that must be shown." *Johnson*, 72 F.3d at 1564. Accordingly, discriminatory effects must still be demonstrated through the application of the three threshold *Gingles* factors. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999) (rejecting a vote-dilution claim on summary judgment despite evidence of "discriminatory intent" because the plaintiff did not "meet the requirements of the *Gingles* factors"). For the reasons explained above, the United States does not plausibly allege that any of the *Gingles* preconditions is met.

### c. The Legislature's Intent Was Lawful, Not Racial

The United States bears the burden "to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018)). As such, "volition," or "awareness of consequences," without more, is insufficient. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Instead, the Legislature must have passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

The United States has not carried its pleading burden because its allegations are equally consistent with (indeed, more consistent with) the Legislature having a benign intent, like partisanship untainted by race. *See* ECF 111 at 11–12. Alleging "facts that are 'merely consistent with' a defendant's

7

liability" is not enough. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). To survive a motion to dismiss, the United States' complaint must go further and by alleging facts that "plausibly *suggest* an entitlement to relief." *Id.* at 681 (emphasis added).

The United States points to a few allegations, but none of them makes its assertion of discriminatory intent plausible. First, the allegations regarding electoral effects, *see* ECF 161 at 14–15, are immaterial because, according to the United States' allegations, one would expect the same results regardless of whether the Legislature pursued a partisan or racial goal. *See Brnovich*, 141 S. Ct. at 2349 ("[T]he voting preferences of members of a racial group may make the [partisan motives] look like [racial motives]."); *Cooper v. Harris*, 137 S. Ct. 1455, 1473 (2017) ("[P]olitical and racial reasons are capable of yielding similar oddities in a district's boundaries."). Second, allegations regarding differences in "[t]he redistricting process" are equally consistent with the rushed timeline on which the Legislature had to redistrict. Unlike previous redistricting cycles, this cycle required the Legislature to act during a special session, *see* Compl. ¶ 22, which is constitutionally limited to only thirty days, *see* Tex. Const. art. III, § 40. As the Court is aware, that was because the United States violated its statutory duty to provide redistricting data by April 1, 2021. *See* 13 U.S.C. § 141(a), (c).

Acknowledging that "partisan motives are not the same as racial motives," *Brnovich*, 141 S. Ct. at 2349, the United States argues that a legislature *could* have both motives, or even impermissibly use race to advance partisan interests. *See* ECF 161 at 18–20. But that does nothing to plausibly suggest that the Texas Legislature actually did so in this case. Such theoretical possibilities cannot overcome the presumption of good faith, even at the pleading stage.

**B.     The DFW Districts Are Valid**

The United States has not plausibly alleged a discriminatory-intent claim regarding the DFW districts. *See* ECF 111 at 13–15. The United States does not offer DFW-specific responses.

8

Accordingly, Defendants rely on their arguments regarding the inadequacy of the United States' general responses in the context of CD 23. *See supra* Part I.A.2.

For purposes of the motion to dismiss, the main difference between CD23 and DFW is that the United States did not even attempt to state a discriminatory-results claim regarding DFW. As a result, even if the United States' conclusory *Gingles* allegations suggested a discriminatory result in CD23 (they do not), there are no similar allegations to even potentially suggest a discriminatory result in DFW. *Cf. supra* Part I.A.2.b.[2]

### C. The Harris County Districts Are Valid

The United States' conclusory allegations regarding the *Gingles* preconditions for Harris County do not suffice. *See* ECF 111 at 15–18. The United States does not offer Harris County–specific responses. Accordingly, Defendants rely on their arguments regarding the inadequacy of the United States' general responses in the context of CD 23. *See supra* Part I.A.1.[3]

## II. The House Map Is Lawful

### A. HDs 31 and 118 Are Valid

Defendants' motion to dismiss explained that the United States' conclusory assertions regarding HDs 31 and 118 did not satisfy its pleading burden. *See* ECF 111 at 18–22. Both districts have comfortable Latino majorities.

In HD31, the CVAP is about two-thirds Latino and less than one-third white. *See* ECF 111-12 at 34 of 64. According to the United States' complaint, HD31 also has an SSVR of almost 64% and an SSTO of more than 56%. *See* Compl. ¶ 123. The United States has not plausibly alleged any

---

[2] The United States agrees that it has not brought a discriminatory-results claim regarding the DFW districts. *Compare* ECF 111 at 13, *with* ECF 161 at 1. Accordingly, Defendants will not address the issue further.

[3] The United States agrees that it has not brought a discriminatory-intent claim regarding the Harris County districts. *Compare* ECF 111 at 18, *with* ECF 161 at 1. Accordingly, Defendants will not address the issue further.

facts suggesting that white votes will somehow improperly overwhelm the comfortable Latino majority.

Similarly, HD118's CVAP is more than 56% Latino and only 35.5% white. *See* ECF 111-12 at 37 of 64. (According to the United States' estimate, HD118 is actually slightly more Latino: 57.5%. *See* Compl. ¶ 111.) Again, the United States has not pleaded any facts explaining how the much-smaller white population would improperly overwhelm the votes of the larger Latino population.

The United States does not offer any responses specific to HD31 or HD118. Accordingly, Defendants rely on their arguments regarding the inadequacy of the United States' general responses in the context of CD 23. *See supra* Part I.A.1.

### B. House Districts in El Paso and West Texas Are Valid

Finally, the United States asks this Court to significantly expand the reach of Section 2. Recognizing that it cannot bring a constitutional malapportionment challenge, *see* ECF 161 at 5 n.1, the United States attempts to use Section 2 to address whether there should be more districts in a Latino-majority part of the State. But that is not the role Section 2 plays in redistricting litigation. The United States cites no authority to the contrary.

Under current precedent, Section 2 addresses situations in which a legislature "thwarts a distinctive minority vote *by submerging it in a larger white voting population*." *Growe*, 507 U.S. at 40 (emphasis added). The idea is to identify situations in which Latino voters should form a majority in a particular district but do not.

That concern does not apply in El Paso and West Texas, where every district has a comfortable Latino majority. *See* Compl. ¶ 143. The United States does not dispute that fact. On the contrary, it affirmatively alleges not only that Latinos form a CVAP majority in every district but also that the Spanish surname statistics are over 50% for every district as well. *See id.*

10

The United States' complaint seems to be that it wants there to be more districts in the area than there are. *See* Compl. ¶ 146. And it insists that it is not attempting to bring a malapportionment claim under *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga.) (three-judge court), *aff'd* 542 U.S. 947 (2004) (per curiam); *see* ECF 161 at 5 n.1. But complaints regarding the regional distribution of state legislative districts go to *Larios*, not Section 2, as the *Perez* court recognized in the last redistricting cycle. *See, e.g.*, *Perez v. Abbott*, 250 F. Supp. 3d 123, 201–09 (W.D. Tex. 2017) (three-judge court). In fact, one of the *Perez* plaintiffs' *Larios* claims was almost identical to the United States' claim here: that the State could have drawn an additional Latino-majority House districts in Nueces County, but failed to do so. *See id.* at 209.[4] Simply put, complaints about the number of districts are analyzed via the one-person-one-vote principle, not Section 2. The United States' inability to bring a one-person-one-vote claim under the Constitution is not a reason to expand the reach of Section 2.

## CONCLUSION

Defendants respectfully request that the Court grant their Motion to Dismiss and dismiss the United States' claims.

---

[4] Note that these claims were ultimately abandoned by the plaintiffs and rejected by the Supreme Court. *See Perez*, 138 S. Ct. at 2333 n.26.

| | |
|---|---|
| Date: February 14, 2022 | Respectfully submitted. |
| | |
| KEN PAXTON | *Patrick K. Sweeten* |
| Attorney General of Texas | PATRICK K. SWEETEN |
| | Deputy Attorney General for Special Litigation |
| BRENT WEBSTER | Tex. State Bar No. 00798537 |
| First Assistant Attorney General | |
| | WILLIAM T. THOMPSON |
| | Deputy Chief, Special Litigation Unit |
| | Tex. State Bar No. 24088531 |
| | |
| | JACK B. DISORBO |
| | Assistant Attorney General, Special Litigation Unit |
| | Tex. State Bar No. 24120804 |
| | |
| | OFFICE OF THE ATTORNEY GENERAL |
| | P.O. Box 12548 (MC-009) |
| | Austin, Texas 78711-2548 |
| | Tel.: (512) 463-2100 |
| | Fax: (512) 457-4410 |
| | patrick.sweeten@oag.texas.gov |
| | will.thompson@oag.texas.gov |

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on February 14, 2022, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN