**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> *Plaintiffs,* <br> v. <br><br> GREG ABBOTT, *et al.*, <br><br> *Defendants.* | § § § § § § § § § § | Case No. 3:21-cv-00259 <br> [Lead Case] |
| FAIR MAPS TEXAS ACTION COMMITTEE, *et al.*, <br><br> *Plaintiffs,* <br> v. <br><br> GREG ABBOTT, *et al.*, <br><br> *Defendants.* | § § § § § § § § § § § § | Case No. 1:21-cv-01038 <br> [Consolidated Case] |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO
DISMISS THE FAIR MAPS PLAINTIFFS' COMPLAINT**

# TABLE OF CONTENTS

Table of Contents………………………………………………………………………………..ii

Table of Authorities……………………………………………………………………………..iii

Introduction........................................................................................................................................1

Argument ...........................................................................................................................................1

    I.   Plaintiffs are Not Entitled to Associational Standing Because They Fail to Identify a Single Injured Member......................................................................................................................1

    II.  Plaintiffs are Not Entitled to Organizational Standing Based on Unidentified, Alleged Effects on Third Parties. ......................................................................................................2

    III. The Court Should Address Each Plaintiffs' Standing...................................................4

    IV. Plaintiffs' Section 2 Effects Claim Fails.......................................................................5

        A.  Plaintiffs Misapprehend the Law Concerning Coalition Districts .........................5

        B.  Plaintiffs Do Not Plausibly Allege Voter Cohesion.................................................6

        C.  Plaintiffs Do Not Plausibly Allege White-Bloc Voting ...........................................7

    V.  Plaintiffs' Intentional Discrimination Claim Fails ...........................................................8

Conclusion .......................................................................................................................................10

Certificate of Service ......................................................................................................................11

## TABLE OF AUTHORITIES

**Page(s)**

Cases

*Abbott v. Perez*,
  138 S. Ct. 2305 (2018) ..................................................................................................9
*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*,
  178 F.3d 350 (5th Cir. 1999)........................................................................................3
*Black Caucus v. Alabama*,
  575 U.S. 254 (2015).....................................................................................................8
*City of Mobile v. Bolden*,
  446 U.S. 55 (1980).......................................................................................................9
*Coates v. Brazoria Cty.*,
  919 F. Supp. 2d 863 (S.D. Tex. 2013).........................................................................5
*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*,
  140 S. Ct. 1009 (2020) ................................................................................................1
*Crankshaw v. City of Elgin*,
  2020 WL 1866884 (W.D. Tex. Apr. 14, 2020)............................................................5
*Gilkerson v. Chasewood Bank*,
  1 F. Supp. 3d 570 (S.D. Tex. 2014) .............................................................................3
*Gill v. Whitford*
  138 S. Ct. 1916, 201 L. Ed. 2d 313 (2018)..................................................................9
*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982).....................................................................................................2
*Hunt v. Washington State Apple Advertising Commission*,
  432 U.S. 333 (1977).....................................................................................................1
*Kumar v. Frisco Indep. Sch. Dist.*,
  476 F. Supp. 3d 439 (E.D. Tex. 2020) .........................................................................6
*La. ACORN Fair Hous. v. LeBlanc*,
  211 F.3d 298 (5th Cir. 2000)........................................................................................2
*LULAC v. Clements*,
  986 F.2d 728 (5th Cir. 1993)........................................................................................6
*LULAC v. Clements*,
  999 F.2d 831 (5th Cir. 1993)................................................................................. 7, 10
*Miller v. Johnson*,
  515 U.S. 900 (1995)................................................................................................ 7, 9
*NAACP v. City of Kyle*,
  626 F.3d 233 (5th Cir. 2010)........................................................................................2
*OCA-Greater Houston v. Texas*,
  867 F.3d 604 (5th Cir. 2017)........................................................................................3
*Personnel Admr. of Mass. v. Feeney*,
  442 U.S. 256 (1979)................................................................................................ 8, 9
*Shaw v. Reno*,
  509 U.S. 630 (1993).....................................................................................................7
*Simon v. Eastern Kentucky*
  426 U.S.(1976) ............................................................................................................3

*Summers v. Earth Island Institute,*
   555 U.S. (2009) .................................................................................................................. 1, 2
*Thiebaut v. Colo. Springs Utils.,*
   455 F. App'x 795 (10th Cir. 2011) ........................................................................................ 4
*Thornburg v. Gingles,*
   478 U.S. 30 (1986) ........................................................................................................ 5, 6, 7
*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................................. 9
*We Are Am./Somos Am., Coal. of Ariz. v. Maricopa Cnty. Bd. of Supervisors,*
   809 F. Supp. 2d 1084 (D. Ariz. 2011) .................................................................................. 4
*Women's Med. Ctr. of Providence, Inc. v. Roberts,*
   512 F. Supp. 316 (D.R.I. 1981) ............................................................................................ 5

Statutes

28 U.S.C.A. § 1292(b) ................................................................................................................... 5

**INTRODUCTION**

The Court should grant Defendants' Motion to Dismiss because Plaintiffs do not plausibly allege standing or any violation of federal law. In response, Plaintiffs stress that they should not be required to provide factual support at the pleading stage. That Plaintiffs need not provide evidence in a complaint does not relieve them of the obligation to "plausibly allege at the outset of a lawsuit" each fact they would need to "prove in a trial at its end." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020).

**ARGUMENT**

**I.    Plaintiffs are Not Entitled to Associational Standing Because They Fail to Identify a Single Injured Member.**

Plaintiffs do not dispute that their Complaint lacks facts that demonstrate "they have members in the challenged districts." ECF 191 at 8. But, far from the "red herring" Plaintiffs claim this to be, it is the very first prong they must demonstrate to establish associational standing. *Id.* It is not, as Plaintiffs claim, enough to make a general statement that an entity "has sufficient members within its constituent organizations to establish standing." *Id.* None of the cases Plaintiffs cite hold otherwise, nor, more importantly, do they absolve Plaintiffs of their burden to allege *facts* establishing that supposed members "possess all of the indicia of membership" required by *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977). ECF 191 at 9-11. By simply claiming they do not have to allege such facts, and that the mere existence of members is enough, Plaintiffs' Response necessarily fails to establish the first associational standing prong: that "its members would otherwise have standing to sue in their own right." *Hunt*, 432 U.S. at 343.

That Entity Plaintiffs must identify members who live in the districts they challenge is a logical necessity. After all, neither this Court nor Defendants can discern an injury in fact, as a result of map drawing, if they do not know where any individual resides. But despite have the opportunity to do so, Plaintiffs' Response fails to "identify members who have suffered the requisite harm." *Summers*, 555

1

U.S. at 499; *see NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (requiring an injury to "a specific member"). This Court cannot simply "accept[] the [Entity Plaintiffs'] self-descriptions of their membership," *Summer*, 555 U.S. at 499, and rest on conjecture that "there is a statistical probability that some of those members are threatened with concrete injury." *Id.* at 497. Federal jurisdiction "require[s] plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.* at 498. By failing to make those allegations, Entity Plaintiffs cannot avail themselves of associational jurisdiction.

## II. Plaintiffs are Not Entitled to Organizational Standing Based on Unidentified, Alleged Effects on Third Parties.

Plaintiffs' Response fails to identify how the Entity Plaintiffs' missions have been "perceptibly impaired" because they have "diverted significant resources to counteract the defendant's conduct." *NAACP*, 626 F.3d at 238 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Plaintiffs make the conclusory argument, without factual support, that "they will have to divert resources they could have spent elsewhere." ECF 191 at 14. But "[n]ot every diversion of resources to counteract the defendant's conduct . . . establishes an injury in fact." *Id.* The Fifth Circuit has "explained that '[t]he mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.'" *Id.* (quoting *La. ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000)). Rather, there must be "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitut[ing] far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp.*, 455 U.S. at 379.

Plaintiffs do not dispute that the Entity Plaintiffs "remain free to conduct the various activities that they allege to be the purpose of the particular organization," but instead, assert such a consideration "is not the relevant standard." ECF 191 at 15. Even assuming this concession is irrelevant—it is not—Plaintiffs' proposed standard fairs no better. Plaintiffs insist the Court should

only require them to generally allege Defendants' actions "impede the organization's purpose and force a 'draining' of its limited resources in response to the challenged practice." *Id.* But "a showing that an organization's mission is in direct conflict with a defendant's conduct is insufficient, in and of itself, to confer standing on the organization to sue on its own behalf." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 361 n.7 (5th Cir. 1999).

This rejection of Plaintiffs' proposed standard makes sense—if the Court decided organizational standing in this way, no group would ever be denied standing. For example, organizations "dedicated to promoting access of the poor to health services" could "establish their standing simply on the basis of that goal" by alleging that a new law makes it harder for the poor to access health services, necessitating a redoubling of the organizations' efforts, but the Supreme Court has rejected such standing. *Simon*, 426 U.S. at 39–40. Plaintiffs rely on cases in which the challenged law "complicate[d] the plaintiff's activities," *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017), but they are irrelevant to a case, like this one, in which the plaintiff complains about needing to "combat" the law's "effects on" third parties rather than any direct effect on its own activities. ECF 191 at 14; *see, e.g., Gilkerson v. Chasewood Bank*, 1 F. Supp. 3d 570, 585 (S.D. Tex. 2014) ("A statement that 'the organization's abstract social interests' were set back is insufficient" to confer organizational standing).

Moreover, that any of the Entity Plaintiffs are expending resources to pursue this litigation does not confer organizational standing because such injury is "self-inflicted." *Fowler*, 178 F.3d at 358. Fair Maps', and its members', challenge to the new redistricting maps not only falls with their "routine" activities, but it is the *main* activity. *About Us*, Fair Maps Texas, https://www.fairmapstexas.org/about-us. As their website reflects, Fair Maps is involved in legislative decision-making in numerous ways because it disapproves of "the partisan redistricting system in Texas." *Id.* Fair Maps makes very clear

3

that its "ultimate[ ]" goal is to "get reform passed in the state legislature."[1] *Id.* There is no basis to find Fair Maps or any of the Entity Plaintiffs have organizational standing on the grounds that they have brought this suit.

### III. The Court Should Address Each Plaintiffs' Standing

Plaintiffs appear to argue that they all have standing because "at least one" plaintiff has standing to make the challenges present in their Complaint. ECF 191 at 16. That contradicts the approach this Court took when ruling on the motion to dismiss the Brooks plaintiffs' claims. *See* ECF 119 (evaluating the standing for each individual plaintiff to bring each claim alleged). That approach made sense. Even assuming Article III permits the "collective standing" theory Plaintiffs posit, a plaintiff-specific standing analysis would remain appropriate for a district court in this situation. "[N]othing in the cases addressing this principle suggests that a court must permit a plaintiff that *lacks* standing to remain in a case whenever it determines that a co-plaintiff has standing." *Thiebaut v. Colo. Springs Utils.*, 455 F. App'x 795, 802 (10th Cir. 2011). Here, multiple factors weigh in favor of fully considering standing: (1) any other approach "would not fully address [this] motion," (2) failing to decide standing "would leave at least some of the plaintiffs in a state of legal limbo," (3) "if one group of plaintiffs lack[s] standing, defendants would at least be entitled to partial dismissal," and (4) "judicial economy" supports streamlining the case. *We Are Am./Somos Am., Coal. of Ariz. v. Maricopa Cnty. Bd. of Supervisors*, 809 F. Supp. 2d 1084, 1092–93 (D. Ariz. 2011).

The judicial-economy factor is crucial. When a case is on appeal after final judgment and one plaintiff has standing to support the judgment, an appellate court's refusal to address another plaintiff's

---

[1] So too with the other entities that are not members of Fair Maps. *See* Compl. ¶¶ 11–12 (OCA-Greater Houston, which solicits member testimony at redistricting hearings as part of its advocacy (https://bityl.co/B3p5)); *id.* ¶ 14 (North Texas Chapter of the APAPA, which engages in redistricting issues as part of its advocacy as evidenced by the recent "redistricting training" it provided to members alongside OCA-Greater Houston (https://fbook.cc/3o4N)); *id.* ¶ 16 (Emgage, which states "achiev[ing] fair representation for Muslims and other communities of color during the Redistricting process of 2021" is a "priority area[ ]." (https://bityl.co/B3pC)).

4

standing likely serves judicial economy. For a district court considering a motion to dismiss, however, the opposite is true. Allowing a plaintiff without standing to continue litigating will only waste the parties' and the court's resources. Having additional parties means scheduling additional depositions and serving additional written discovery. And the standing issue may arise later in the case anyway.[2] This Court should fully evaluate standing now to avoid such issues.

## IV. Plaintiffs' Section 2 Effects Claim Fails

Plaintiffs cannot defend their discriminatory-effects claim. Defendants previously explained that Plaintiffs fail to satisfy any of the three preconditions set forth by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30 (1986), and Plaintiffs' response does nothing to change this.

### A. Plaintiffs Misapprehend the Law Concerning Coalition Districts

The first *Gingles* precondition requires Plaintiffs to plead facts showing the applicable minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. Defendants explained that, under Supreme Court precedent, Plaintiffs cannot satisfy this precondition with a coalition theory. ECF 181 at 17-18. That is, Plaintiffs cannot allege that several minority groups taken together are large enough to support a single-member district. Defendants, however, understand this Court's recent ruling on this matter (ECF 144) and therefore preserve, but do not belabor, the argument further.

In that ruling, this Court noted that "[t]he question of coalition districts' viability under *Gingles* is subject to a circuit split and would doubtless benefit from clarification." ECF 144. Because coalition districts' viability under *Gingles* is a "controlling question of law" and this Court understands the question to invite "substantial ground for difference of opinion," Defendants ask that the matter be

---

[2] One ground for denying attorney's fees to a plaintiff who claims to be a "prevailing party" is that the plaintiff lacked standing. *See, e.g., Women's Med. Ctr. of Providence, Inc. v. Roberts*, 512 F. Supp. 316, 320 (D.R.I. 1981) ("[T]he potential availability of attorney's fees turns the standing question raised by defendants' motions to dismiss into a situation in which a great deal 'may be gained or lost (depending upon) the presence or absence of' multiple plaintiffs.").

certified for interlocutory appeal under 28 U.S.C.A. § 1292(b). Certification is appropriate because Plaintiffs' Section 2 claims largely rely on coalition districts, therefore, an interlocutory appeal of the issue "may materially advance the ultimate termination of the litigation."[3] 28 U.S.C.A. § 1292(b).

### B. Plaintiffs Do Not Plausibly Allege Voter Cohesion

The second *Gingles* precondition requires Plaintiffs to plead facts showing that the applicable minority group "is politically cohesive." 478 U.S. at 51. Even if Section 2 supported a coalition-district theory, Plaintiffs would still have to plausibly allege that black and Latino voters act based on the same underlying values: "The notion of political cohesiveness contemplates that a specified group of voters shares common beliefs, ideals, principles, agendas, concerns, and the like such that they generally unite behind or coalesce around particular candidates and issues." *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 502 (E.D. Tex. 2020) (quoting *LULAC v. Clements*, 986 F.2d 728, 744 (5th Cir. 1993) (*LULAC I*)). That showing, in turn, requires that Plaintiffs demonstrate "that a significant number of minority group members usually vote for the same candidates." *LULAC I*, 986 F.2d at 743.

As Defendants explained, *see* ECF 181 at 22-23, Plaintiffs plead *no facts* supporting cohesion. The Complaint does not allege that black voters, Latino voters and Asian have "common beliefs, ideals, principles, agendas, concerns, and the like." *Kumar*, 476 F. Supp. 3d at 502. Plaintiffs do not contend otherwise. Instead, they point to seven paragraphs in their complaint, which all parrot the same conclusory line: "Voters of color in [X] County vote cohesively to elect their preferred candidate of choice." *See* Compl. ¶¶ 3, 90, 102, 108, 117, 126, 145. In this Court's recent order, it noted that, at the very least, this *Gingles* factor could be met where a plaintiff "list[ed] the results of several recent elections in which, it says, minority-preferred candidates have succeeded." ECF 144 at 4. Plaintiffs,

---

[3] This Court has determined this factor of Section 1292 by "'examin[ing] whether an immediate appeal would (1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly.'" *Crankshaw v. City of Elgin*, No. 1:18-CV-75-RP, 2020 WL 1866884, at *3 (W.D. Tex. Apr. 14, 2020) (quoting *Coates v. Brazoria Cty.*, 919 F. Supp. 2d 863, 867 (S.D. Tex. 2013)). All three are clearly true in this instance, particularly when considering all consolidated cases herein.

here, do not do so, however. Voter cohesion is alleged using the broadest brush and without reference to a single specific election to support that allegation. *See* Compl. ¶¶ 3, 90, 102, 108, 117, 126, 145. This renders Plaintiffs' Complaint deficient in establishing voter cohesion.

### C. Plaintiffs Do Not Plausibly Allege White-Bloc Voting

The third and last *Gingles* precondition requires Plaintiffs to plead facts showing "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50–51 (citation omitted). As explained before, *see* ECF 181 at 23-24, Plaintiffs' Complaint offers only legal conclusions on this precondition. *See* Compl. ¶ 90 ("White voters usually vote as a bloc to defeat those candidates."); *see also id.* ¶¶ 3, 102, 108, 117, 126, 144. In response, Plaintiffs do not point to any part of their Complaint that contains facts supporting these legal conclusions but instead insist it is enough that they made these conclusory allegations against "each challenged district." ECF 191 at 19.

It is not. The *en banc* Fifth Circuit rejected a much stronger showing of white-bloc voting when it held "that the failure of minority-preferred candidates to receive support from a majority of whites on a regular basis, without more," did not "prove legally significant racial bloc voting." *LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc) (*LULAC II*). And while this Court has found another complaint sufficient on this point, Plaintiffs' complaint lacks the same characteristics. This Court determined that complaint sufficiently pleaded the third *Gingles* prong by "plac[ing] great weight on partisan election results" and considering the complaint's allegations that SD 10 was redrawn to allow non-Hispanic whites to vote in large margins for Republican candidates. ECF 144 at 5. The same result cannot render here because Plaintiffs' Complaint is completely silent on election results in SD 10, let alone results by race or partisanship. Instead, it simply states, with no argument provided, that "White voters usually vote as a bloc." *See* Compl. ¶¶ 90, 102, 108, 117, 126. In so doing, Plaintiffs fail to nudge their Complaint across the final *Gingles* line.

### V. Plaintiffs' Intentional Discrimination Claim Fails

Plaintiffs bring an intentional-vote-dilution claim as well as a racial-gerrymandering claim. *See* Compl. ¶¶ 154–61. Although those claims are "analytically distinct," *Shaw v. Reno*, 509 U.S. 630, 652 (1993), both require some level of discriminatory intent. Specifically, intentional-vote-dilution claims must allege that the State used redistricting "as a purposeful device" that was intended "to minimize or cancel out the voting potential of racial or ethnic minorities." *Miller v. Johnson*, 515 U.S. 900, 911 (1995). Racial-gerrymandering claims allege that race was the "predominant consideration in deciding to place a significant number of voters within or without a particular district." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 260 (2015).

Plaintiffs have failed to plausibly allege discriminatory intent under either standard. That is, rather than asserting specific facts that the 87th Legislature acted with discriminatory intent in enacting the redistricting maps, Plaintiffs ask this Court to infer discriminatory intent in three ways that cannot suffice alone or combined.

First, Plaintiffs insist "the effect of the enacted plans on these voters is well-documented in the Complaint," citing nine specific paragraphs. ECF 191 at 21. Notably, Plaintiffs point to no authority that suggests conclusory predictions of future effects of redistricting maps demonstrate discriminatory intent. *Id.* And this Court has not yet found such predictions compelling in denying other motions to dismiss. *See* ECF 144 at 6 (stating "Plaintiffs may point to recent history, departures from normal procedure, and legislative history to infer racially discriminatory intent."). But even if they were able to, none of those paragraphs Plaintiffs cite to purport to predict how the enacted plans will affect minority voters but only vaguely allege voter cohesion, white bloc voting and that coalition districts could have been drawn. Compl. ¶¶ 93, 102, 108, 110, 117, 126, 135–36, 140. These unsupported statements provide no basis for this Court to discern a concrete discriminatory effect of the enacted plans, much less that the 87th Legislature intentionally acted to cause such an effect. And,

8

in any event, alleged "awareness of consequences" does not establish discriminatory intent. *Personnel Admr. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Second, Plaintiffs ask this Court to supplant the 87th Legislature's intent with that of a different legislature that drew maps 11 years ago in Texas. While this Court sanctioned the use of "recent history" as circumstantial evidence to infer discriminatory intent – and to the extent 11 years ago is "recent" - Plaintiffs' Complaint does not provide the same allegations relied on in that instance. In detailing what they view as a "history of racial discrimination," Plaintiffs do not specify which Districts they are challenging and to what extent their "history" shows they were drawn discriminatorily. Compl. ¶¶ 42-52. The focus instead, is on the 2011 maps, as a whole, which should not suffice for a claim that is "district specific." *Gill*, 138 S. Ct. at 1930. It also should not suffice given the Supreme Court's warning that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality op.)). Plaintiffs' choice to heavily lean on irrelevant, broad interpretations of legislative history says nothing of the 87th Legislature and its intent to discriminate when drawing specific districts in the 2021 maps.

Third, Plaintiffs decry any requirement being placed upon them to plead facts sufficient to meet their burden of rebutting the "obvious alternative explanation" that the Legislature acted in good faith. *Twombly*, 550 U.S. at 567. Unlike prior plaintiffs whom the Court found to have pled facts sufficient to show an alternative explanation (ECF 144), Plaintiffs, here, simply do not want to do so. Instead, they insist it is a "fact" that Defendants must "establish[ ] at trial." ECF 191 at 22. But "the good faith of a state legislature *must* be presumed," *Miller*, 515 U.S. at 915, therefore, it is "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Perez*, 138 S. Ct. at 2325.

9

Plaintiffs' ask that this Court resolve the matter at trial does not overcome that presumption. And even to the extent Plaintiffs pled facts to show mere "volition" or "awareness of consequences," this should not suffice. *Feeney*, 442 U.S. at 279. The required intent necessitates that the Legislature has passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* But in pleading an intentional-discrimination claim, the plaintiff must plead facts that disprove the "obvious alternative explanation." 550 U.S. at 567. As previously explained, the 87th Legislature passed Plans H2316, S2168 and C2198 based on partisan motives, not racial ones. *See* ECF 181 at 29. That is the obvious alternative explanation here and one that Plaintiffs make no effort to try to rebut through factual support.[4] As a result, their claim is not plausible. *See LULAC II*, 999 F.2d at 880 (claim cannot succeed where "the facts demonstrate that partisan affiliation, not race, was responsible" for the actions at issue).

## CONCLUSION

Defendants respectfully request that the Court dismiss Plaintiffs' claims.

---

[4] Plaintiffs offer only a recitation of their allegations concerning SD 10 as an example of the "factual assertions" contained in their Complaint regarding intentional discrimination. ECF 191 at 22. But even by their own description, those allegations amount to merely stating "SD 10 was a functioning coalition district" and "it was dismantled" regardless. *Id.* This clearly cannot suffice. If a Plaintiff properly pled intentional discrimination merely by stating a district was redrawn despite being perceived by some as an effective coalition district, there would effectively be no pleading standard to be met.

| | |
|---|---|
| Date: February 25, 2022 | Respectfully submitted. |
| | |
| KEN PAXTON | /s/ Patrick K. Sweeten |
| Attorney General of Texas | PATRICK K. SWEETEN |
| | Deputy Attorney General for Special Litigation |
| BRENT WEBSTER | Tex. State Bar No. 00798537 |
| First Assistant Attorney General | |
| | WILLIAM T. THOMPSON |
| | Deputy Chief, Special Litigation Unit |
| | Tex. State Bar No. 24088531 |
| | |
| | OFFICE OF THE ATTORNEY GENERAL |
| | P.O. Box 12548 (MC-009) |
| | Austin, Texas 78711-2548 |
| | Tel.: (512) 463-2100 |
| | Fax: (512) 457-4410 |
| | patrick.sweeten@oag.texas.gov |
| | will.thompson@oag.texas.gov |

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on February 25, 2022, and that all counsel of record were served by CM/ECF.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN