```
 1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
 2                      EL PASO DIVISION
                        VOLUME 2 OF 9
 3

 4   LULAC, et al.,              )(    EP:21-CR-259-DCG-JES-JVB
                                 )(    (Lead Case)
 5        Plaintiffs,            )(
     _____ )(
 6   ROY CHARLES BROOKS, et al., )(    EP:21-CV-00991-DCG-JES-JVB
                                 )(
 7        Plaintiffs,            )(
                                 )(
 8   vs.                         )(    EL PASO, TEXAS
                                 )(
 9   GREG ABBOTT, in his official)(
      capacity as Governor of Texas,)(
10    et al.,                    )(
                                 )(    January 25th, 2022
11        Defendants.            )(    (9:02 a.m. to 12:57 p.m.)

12   _____

13    HEARING ON BROOKS PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
     _____

14

15              FIFTH CIRCUIT JUDGE JERRY EDWIN SMITH
                U.S. DISTRICT JUDGE DAVID C. GUADERRAMA
16              U.S. DISTRICT JUDGE JEFFREY V. BROWN

17
     APPEARANCES:
18
     For Brooks Plaintiffs:     Mr. Chad W. Dunn
19                              Brazil & Dunn
                                4407 Bee Caves Road
20                              Building 1, Ste. 111
                                Austin, TX 78746
21                              (512) 717-9822

22
                                Mr. Mark P. Gaber
23                              Mark P. Gaber PLLC
                                P.O. Box 34481
24                              Washington, DC 20043
                                (715) 482-4066
25                              Mark@markgaber.com
```

KATHLEEN A. SUPNET, CSR

```
 1   For Brooks Plaintiffs:        Mr. Jesse L. Gaines
                                   Attorney at Law
 2                                 P.O. Box 50093
                                   Fort Worth, TX 76105
 3                                 817-714-9988
                                   Gainesjesse@ymail.com
 4
                                   Ms. Molly E. Danahy
 5                                 P.O. Box 26277
                                   Baltimore, MD 21211
 6                                 (208) 301-1202
                                   Danahy.molly@gmail.com
 7
                                   Ms. Sonni Waknin
 8                                 10300 Venice Blvd. # 204
                                   Culver City, CA 90232
 9                                 732-610-1283
                                   Sonniwaknin@gmail.com
10

11   For Defendants:              Mr. Patrick K. Sweeten
                                   Mr. Christopher D. Hilton
12                                 Mr. Eric Hudson
                                   Mr. William Thomas Thompson
13                                 Ms. Kathleen Hunker
                                   Ms. Courtney Brooke Corbello
14                                 Mr. Jack Buckley DiSorbo
                                   Office of Texas Attorney General
15                                 P.O. Box 12548
                                   MC 009
16                                 Austin, Texas 78711
                                   (512) 463-4139
17
     ALSO PRESENT:                 Mr. Bryan Christopher
18
     Court Reporter:               Kathleen A. Supnet
19                                 El Paso, Texas
                                   (915)834-0573
20                                 kathi.supnet5303@gmail.com

21

22

23

24           Transcript produced by mechanical stenography, and

25   computer-aided software and computer.
```

KATHLEEN A. SUPNET, CSR

```
1                        CHRONOLOGICAL INDEX

2                          VOLUME 2 of 9

3    JANUARY 25, 2022 (9:02 a.m. to 12:57 p.m.)        PAGE VOL.

4    Announcements. . . . . . . . . . . . . . . . .    4     2

5    PLAINTIFF'S WITNESSES:      DIRECT    CROSS    VOIR DIRE   VOL.

6    RICK SVATORA               9         24       --          2

7    SERGIO DE LEON             41,59     52,61    --          2

8    ROY BROOKS                 62        75       --          2

9    DR. MATT BARRETO           97        --       --          2

10   Court Reporter's Certificate . . . . . . . . . . 144      2

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

KATHLEEN A. SUPNET, CSR

09:02:17  1          (Open court.)

09:02:17  2          THE COURTROOM DEPUTY:  EP:21-CV-259, LULAC, et al vs.

09:02:30  3  Greg Abbott, et al.

09:02:33  4          THE COURT:  And on the motion for preliminary

09:02:35  5  injunction as to Senate District 10, announcement please.

09:02:39  6          MR. DUNN:  Good morning, Your Honors.  This is Chad

09:02:46  7  Dunn on behalf of the Brooks plaintiffs.  Joining me at counsel

09:02:51  8  table is Gaber, Danahy, Waknin and Gaines.

09:02:55  9          JUDGE GUADERRAMA:  And will we be hearing from other

09:02:57 10  counsel?

09:03:00 11          MR. DUNN:  This should be all.

09:03:02 12          JUDGE GUADERRAMA:  Just make your announcements again

09:03:05 13  once you start to ask questions, so we have a record of who's

09:03:09 14  asking.

09:03:09 15          Thank you, Mr. Dunn.

09:03:15 16          MR. SWEETEN:  Patrick Sweeten on behalf of the State

09:03:21 17  defendants.  With me today are co-counsels, Will Thompson,

09:03:26 18  Christopher Hilton, De Sorbo, Hudson, Corbello and Kathleen

09:03:32 19  Hunker.  We also have technical assistance from Brian

09:03:38 20  Christopher.

09:03:39 21          Thank you, Mr. Sweeten.

09:03:39 22          JUDGE GUADERRAMA:  Mr. Dunn, do you care to make an

09:03:42 23  opening statement?

09:03:43 24          MR. DUNN:  Your Honor, the plaintiffs intend to waive

09:03:49 25  opening statement and get to the evidence.  We believe we've

KATHLEEN A. SUPNET, CSR

09:03:51  1    sort of laid out the best opening we can in the papers before

09:03:51  2    the Court.

09:03:51  3            Yes.  Apologies.

09:03:57  4            But there are a couple of housekeeping questions we

09:03:59  5    might pose to the Court if now is an appropriate time?

09:03:59  6            JUDGE GUADERRAMA:  Yes, sir.

09:04:05  7            MR. DUNN:  The first issue is the Court -- an order

09:04:06  8    that invoked the rule.  And we just want to be make sure that

09:04:12  9    our understanding of the rule was followed and that we follow

09:04:14  10   it.  We'll have clients and experts in the room, but other than

09:04:19  11   that, nobody else in the room, and we want to make sure that's

09:04:22  12   the Court's direction.

09:04:24  13           JUDGE SMITH:  By clients, you mean parties to the

09:04:27  14   case?

09:04:27  15           MR. DUNN:  Yes, sir, names and parties.

09:04:27  16           JUDGE GUADERRAMA:  All right.  Parties and experts are

09:04:31  17   exempted from the rule.

09:04:33  18           MR. DUNN:  All right.

09:04:33  19           The second piece is that parties have exchanged

09:04:35  20   objections to exhibits.  There are a number, unfortunately.  We

09:04:39  21   conferred by telephone a few times over the weekend.  We intend

09:04:43  22   to confer at lunch.  We expect this morning there'll only be one

09:04:48  23   exhibit and so we can deal with that.  But before we engage in

09:04:52  24   additional negotiations over the exhibits, I wanted to inquire

09:04:56  25   with the Court if it intended -- what I've experienced in a

09:04:59  1    bunch of bench trials is the Court admits the exhibits subject

09:05:02  2    to objections and then decides later if it's going to use the

09:05:03  3    exhibit to rule on the objection or if you want us to argue

09:05:06  4    those out or do it the old fashioned way and, you know, serve up

09:05:11  5    every exhibit with the witnesses.

09:05:13  6         JUDGE GUADERRAMA:  I think that we -- if you -- we

09:05:16  7    have your objections on paper.  We know what those are.  We'll

09:05:20  8    take those under advisement and make our rulings.  We have an

09:05:23  9    idea of how that will go from the paper, but once we see the

09:05:27  10   testimony that may change.

09:05:29  11        MR. DUNN:  Understand.

09:05:29  12        Then in that case, subject to the objections that

09:05:31  13   defendants have made that we would move admission of Plaintiff's

09:05:35  14   Exhibit 1 through 105.

09:05:37  15        JUDGE GUADERRAMA:  And subject to your objection,

09:05:39  16   Mr. Sweeten?

09:05:40  17        MR. SWEETEN:  Your Honor, we object to several of

09:05:43  18   their exhibits.  We have exchanged the basis for those

09:05:46  19   objections.  We can provide those specific objections to the

09:05:51  20   Court.

09:05:51  21        Do you have a copy now to give.

09:05:53  22        JUDGE GUADERRAMA:  I think you provided those, had you

09:05:55  23   not?

09:05:57  24        MR. HILTON:  Chris Hilton for the defendants, Your

09:05:59  25   Honor.  We have not filed our exhibits, yet.  Now we exchanged

09:06:02  1    them between counsel.  We can certainly file objections by the

09:06:05  2    end the day if this the procedure that the Court would want to

09:06:08  3    use.

09:06:08  4            JUDGE GUADERRAMA:  Okay.  It seems like I read some

09:06:11  5    objections from the defense.

09:06:14  6            MR. HILTON:  We did file objections -- additional

09:06:18  7    objections from additional exhibits.

09:06:19  8            JUDGE GUADERRAMA:  I understand.  So we'll take that

09:06:21  9    ruling under advisement.

09:06:25  10           MR. DUNN:  So 1 and 105 are not admitted at this point

09:06:28  11   or are they admitted subject to objection.

09:06:29  12           JUDGE GUADERRAMA:  We're going to consider them as if

09:06:30  13   they were admitted, but we'll make our rulings once we hear all

09:06:35  14   of the evidence.

09:06:35  15           MR. DUNN:  Understood, Your Honor.

09:06:36  16           I don't know if you want to proceed with potential

09:06:40  17   opening from the state or shall we call our first witness.

09:06:42  18           JUDGE GUADERRAMA:  Well, normally, if you don't make

09:06:43  19   an opening, the other side doesn't make the opening until they

09:06:46  20   put on the case, but if the government wants to open now, we can

09:06:50  21   certainly hear them.

09:06:51  22           MR. SWEETEN:  Your Honor, I think that we would

09:06:52  23   reserve our opening statement until the beginning of the State's

09:06:56  24   defense case.

09:06:56  25           JUDGE GUADERRAMA:  Right.

| | | |
|---|---|---|
| 09:06:57 | 1 | All right.  Mr. Dunn, who's your first witness? |
| 09:07:01 | 2 | MR. DUNN:  We're calling Mr. Rick Svatora, by |
| 09:07:01 | 3 | videotaped deposition.  Mr. Svatora -- in fact, each side had a |
| 09:07:01 | 4 | witness that contracted COVID in the last week, and so there |
| 09:07:23 | 5 | were to videotaped depositions and this is just one of them. |
| 09:07:23 | 6 | It's a videotaped deposition and I intend to announce |
| 09:07:25 | 7 | in between the cuts, the page and line in the transcript for |
| 09:07:27 | 8 | clarity of the record, but otherwise you'll see the transcript |
| 09:07:30 | 9 | and the witness image on the screen. |
| 09:07:33 | 10 | JUDGE GUADERRAMA:  All right.  Thank you, sir. |
| 09:07:34 | 11 | MR. SWEETEN:  Your Honor, with respect to the video |
| 09:07:37 | 12 | clips that Mr. Dunn's talked about on Mr.  Svatora, the way |
| 09:07:42 | 13 | we've done it his designation to his side will play those and |
| 09:07:47 | 14 | then the State has countered designations, we will play it in |
| 09:07:51 | 15 | place after Mr. Dunn -- |
| 09:07:52 | 16 | JUDGE GUADERRAMA:  Once he passes the witness, you'll |
| 09:07:54 | 17 | put on yours. |
| 09:07:56 | 18 | MR. SWEETEN:  Yes, Your Honor. |
| 09:07:57 | 19 | JUDGE GUADERRAMA:  Okay. |
| 09:07:57 | 20 | MR. DUNN:  Let me revise that.  Perhaps I was |
| 09:07:58 | 21 | mistaken.  I was putting your part in and ours. |
| 09:08:03 | 22 | MR. SWEETEN:  I think what we've done is separately |
| 09:08:05 | 23 | had ours, but we can talk about that if you've done it for this |
| 09:08:09 | 24 | and it has my designations, I don't have any objections to just |
| 09:08:11 | 25 | playing the whole thing. |

```
09:08:12   1              JUDGE GUADERRAMA:  All right.  So if -- and if there's
09:08:14   2    anything you are not satisfied, if you want to add to it if your
09:08:18   3    parts aren't in there, then you'll have an opportunity to put
09:08:20   4    those on when you have your opportunity.
09:08:22   5              MR. SWEETEN:  Thank you, the Court.
09:08:28   6              JUDGE GUADERRAMA:  All right.
09:09:00   7              MR. DUNN:  Your Honor, there'll be one exhibit,
09:09:04   8    Brooks's Exhibit Number 23.  If you'd like to locate it in your
09:09:09   9    binders.  It will also be shown in the testimony.
09:09:13   10             The first cut to this deposition is page 4 line 8, to
09:09:14   11   page 4 line 12.
09:09:14   12             (Videotaped deposition; Brook's Exhibit Number 23).
09:09:14   13                            RICK SVATORA,
09:09:14   14                  DIRECT EXAMINATION BY PLAINTIFF
09:09:14   15   BY MS. DANAHY:
09:09:25   16        Q.   Good morning.
09:09:27   17        A.   Erik Richard Svatora.
09:09:28   18        Q.   And do you go by a nickname, Mr. Svatora?
09:09:31   19        A.   I've gone by Rick all my life.
09:09:35   20             (Videotaped deposition stops).
09:09:35   21             MR. DUNN:  The next cut is page 5, line 22, to page 6,
09:09:39   22   line 6.
09:09:46   23             (Videotaped deposition resumes).
09:09:46   24   BY MS. DANAHY:
09:09:46   25        Q.   How are you currently employed?
```

09:09:48  1        A.    I work for the State Senate for Senator Beverly

09:09:53  2   Powell.

09:09:53  3        Q.    And what's your title?

09:09:54  4        A.    I am Deputy Chief of Staff.

09:09:56  5        Q.    How long have you worked in the Senate?

09:09:58  6        A.    In the Senate, since 1995.

09:10:01  7        Q.    And how long have you worked for Senator Powell?

09:10:06  8        A.    Since January 2019.

09:10:09  9        Q.    Um...

09:10:12  10             (Videotaped deposition stops).

09:10:12  11             MR. DUNN:  The next excerpt is page 6, line 13, to

09:10:15  12   page 21, line 22.

09:10:19  13             (Videotaped deposition resumes).

09:10:19  14   BY MS. DANAHY:

09:10:19  15        Q.    Um, how are you currently -- um, in your role as an

09:10:26  16   Senator Powell's Deputy Chief of Staff, did you ever meet with

09:10:29  17   staff of the Senate Redistricting Committee in the 2020 round of

09:10:34  18   redistricting?

09:10:35  19        A.    I did once.

09:10:36  20        Q.    And when was that?

09:10:37  21        A.    That was in February, 2020.

09:10:39  22        Q.    Who was at that meeting?

09:10:42  23        A.    Gary Jones, Senator Powell's Chief of Staff, myself,

09:10:47  24   Sean Oppermann, the Chief of Staff of redistricting and Chief of

09:10:54  25   State Affairs and another state affairs redistricting staff.

09:11:00  1          THE COURT REPORTER:  I'm sorry.  Another State

09:11:01  2   Affairs...

09:11:01  3          THE WITNESS:  It was in the State Affairs Office.

09:11:03  4   They had just started a redistricting committee at Senator

09:11:09  5   Oppermann's Chair of State Affairs.

09:11:09  6   BY MS. DANAHY

09:11:09  7      Q.    And you had said one other person in the room.  I

09:11:12  8   think the Court reporter missed up?

09:11:13  9      A.    A female staffer.  I don't recall her name.

09:11:16 10      Q.    Where was the -- the -- this meeting?

09:11:22 11      A.    It was in the Sam Houston building which was adjacent

09:11:26 12   to the Texas Capitol.

09:11:27 13      Q.    And where was everybody in the room?  What was the set

09:11:31 14   up?

09:11:31 15      A.    Like I side it was in the State Affairs offices, and

09:11:35 16   when you walk in the room, it was toward the back.  There was a

09:11:40 17   round table in the right corner.

09:11:43 18      Q.    And you-all sat around that table?

09:11:46 19      A.    The four of us did, correct.

09:11:47 20      Q.    Were there any documents or materials in the room?

09:11:51 21      A.    There were maps, colored maps that I think were

09:11:55 22   two-sided that were in the middle of the table, but they were

09:11:59 23   not the subject to conversation.

09:12:02 24      Q.    Who spoke at the meeting?

09:12:04 25      A.    The committee director, Sean Oppermann, spoke for

09:12:09  1    almost the entire meeting.  There were a couple of minor

09:12:12  2    questions that Gary and I had along the way, and the other

09:12:18  3    staffer maybe made one sentence -- phrase or sentence when we

09:12:23  4    first started, but that was it.

09:12:25  5        Q.    What did Mr. Oppermann say during this meeting?

09:12:29  6        A.    He more or less broad-brush went over the process, the

09:12:34  7    redistricting process.  This was early in.  We talked a little

09:12:39  8    bit about the preliminary data and the ACS data and how it would

09:12:45  9    affect Senator Powell's district and then talked about hearings

09:12:48 10    and resources on the statewide level and national level.

09:12:53 11        Q.    Were you given anything by Mr. Oppermann during the

09:12:56 12    meeting?

09:12:56 13        A.    We -- again we received some maps, which we did not

09:13:02 14    discuss and walked away with them after the meeting.

09:13:05 15        Q.    Did Mr. Oppermann say anything during the meeting

09:13:09 16    about resources that were available for the redistricting

09:13:12 17    process?

09:13:12 18        A.    He did.  He said, obviously, Jeff Archer with

09:13:17 19    legislative counsel.  He mentioned the Attorney General's

09:13:20 20    office.  And he also mentioned the NCSL, National Conference of

09:13:24 21    the State Legislature.

09:13:25 22        Q.    Was there anything specific about that conversation

09:13:27 23    that stood out to you?

09:13:28 24        A.    In terms of the population data?  I mean, the most

09:13:37 25    significant part of this, in addition to talking kind of about

09:13:41  1    the -- any kind of legal implications proceeding through the

09:13:46  2    redistricting process.

09:13:47  3        Q.    And what was your general takeaway from the meeting

09:13:50  4    itself?

09:13:53  5            MR. SWEETEN:   Objection form.

09:13:55  6    BY MS. DANAHY

09:13:56  7        Q.    Go ahead.

09:13:56  8            MR. SWEETEN:   You can answer.

09:13:57  9            THE WITNESS:   I'm sorry.

09:13:59  10       A.    Yeah, it was positive.   It was a typical Senate staff

09:14:04  11   meeting and we all kind of talked nuts and bolts.   Sean gave

09:14:09  12   every indication that it was going to be a pretty smooth

09:14:13  13   process, that things were not changed too much with the district

09:14:16  14   and we walked away feeling pretty good about it.

09:14:20  15   BY MS. DANAHY

09:14:20  16       Q.    What did Mr. Oppermann say about SD-10 during this

09:14:27  17   meeting?

09:14:29  18            MR. SWEETEN:   Objection.   Hearsay.

09:14:31  19       A.    He said that the populations changes in SD-10 is one

09:14:36  20   of the things we talked about on the ACS data, is that

09:14:36  21   population in SD-10 had tracked more or less the population

09:14:42  22   increases were today and were very close to ideal.   And Sean

09:14:44  23   indicated that there shouldn't be any movement at all in the

09:14:50  24   boundaries.

09:14:52  25            MS. DANAHY:   Can you tell me what the objection was?

09:14:54  1         MR. SWEETEN:  I said it was hearsay.

09:14:57  2         MS. DANAHY:  Hearsay?

09:15:02  3   BY MS. DANAHY:

09:15:06  4      Q.   Was there anything else that you discussed during that

09:15:09  5   meeting that you recall?

09:15:10  6      A.   Again, we talked a little bit about the --

09:15:13  7         MR. SWEETEN:  Same objection.

09:15:15  8         I'm sorry.  You can answer.

09:15:17  9      A.   We talked a little bit about the potential legal

09:15:20  10  ramifications from any court procedures driving out of the

09:15:25  11  legislative redistricting process.

09:15:28  12  BY MS. DANAHY:

09:15:28  13     Q.   Are you aware of any record that was kept of that

09:15:30  14  meeting?

09:15:31  15     A.   I am not.

09:15:31  16     Q.   Did you take any notes during that meeting?

09:15:36  17     A.   I did.

09:15:37  18     Q.   I'm going to go ahead and show you plaintiff's

09:15:43  19  Exhibit 23.

09:15:44  20         Do you see that there in the front of you?

09:15:55  21     A.   I do.

09:15:57  22     Q.   And do you see that that's labeled Plaintiff's

09:16:01  23  Exhibit 23?

09:16:02  24     A.   Yes, I do.

09:16:03  25     Q.   And I'll just represent that, for the record, this is

09:16:07  1    Brook's plaintiff's trial Exhibit 23 and it was attached to the

09:16:11  2    preliminary injunction motion as Exhibit 4-A.

09:16:16  3           Can you tell me what this document is?

09:16:18  4    A.    This is simply my notes from my meeting from my

09:16:23  5    notebook at the time.  I go through many notebooks as a Senate

09:16:27  6    staffer and this is the one that I was using.  And I just picked

09:16:30  7    up where I left off on the previous notes.

09:16:33  8    Q.    And if you turn to the final page, what's on this

09:16:38  9    page?

09:16:43  10          (Videotaped deposition blacked out at 9:16:43 a.m. and

09:16:48  11          resumed at 9:17:31 a.m.).

09:17:31  12   A.    It will be difficult to read.

09:17:33  13   BY MS. DANAHY:

09:17:33  14   Q.    And did you make this transcription?

09:17:36  15   A.    I did.

09:17:37  16   Q.    Is this an accurate representation of what was in the

09:17:41  17   handwritten notes?

09:17:42  18   A.    It is.

09:17:42  19   Q.    Can you give us a sense of the volume of the notes

09:17:46  20   that you took?

09:17:47  21   A.    Very brief.  It was a pretty short meeting so I picked

09:17:51  22   up -- like I said, I picked up where I left previous notes.  I

09:17:55  23   finished that page.  So there's a little bit at the bottom of

09:17:58  24   the page and then I went onto the top of the next page.

09:18:01  25   Q.    Now, you took a number of notes, but I want to focus

DIRECT - SVATORA VIDEOTAPED DEPOSITION EXCERPTS                16

09:18:09  1    on two.  I want to focus, first, your attention here just on the

09:18:16  2    right it says page two where you -- um -- there's this portion

09:18:18  3    with the word "privilege."  What is the exact note you took

09:18:21  4    here?

09:18:22  5        A.    Attorney/client privilege is less waived than

09:18:27  6    legislative -- ledge privilege; short for legislative.

09:18:30  7        Q.    What do you recall that you were recording there?

09:18:34  8        A.    This was a direct statement from Sean.  It wasn't

09:18:39  9    prompted.  We were listening to him and taking notes and taking

09:18:43  10   notes.  And he was talking in the context of challenges and what

09:18:48  11   he was going through, I believe -- I mean, I was just writing it

09:18:52  12   down, but he was saying that, you know, legislative privilege

09:18:56  13   and attorney privilege are not on the same plain as attorney

09:19:01  14   privilege, is not waived as often as say privilege as a

09:19:08  15   legislative staff.

09:19:09  16           MR. SWEETEN:  Objection to the form and objection to

09:19:11  17   hearsay, but go ahead.

09:19:14  18           MS. DANAHY:  Can you tell me what the form objection

09:19:17  19   was?

09:19:17  20           MR. SWEETEN:  You're asking him to translate the notes

09:19:20  21   that he took and then you're -- what you're having him state is

09:19:24  22   hearsay.

09:19:25  23           MS. DANAHY:  So it's a hearsay objection?

09:19:28  24           MR. SWEETEN:  Its both.

09:19:29  25           MS. DANAHY:  I'm sorry.  I don't understand what the

09:19:34   1    form objection is.

09:19:34   2         MR. SWEETEN:  You're basically asking him to translate

09:19:35   3    what -- attorney-client privilege is less waived than means at

09:19:39   4    vis-a-vis ledge privilege, and that goes with his -- that goes

09:19:45   5    with the objection of hearsay, so it's kind of one thing.

09:19:48   6         MS. DANAHY:  Okay.  So it's a hearsay objection?

09:19:51   7         MR. SWEETEN:  The objection is what I stated.

09:19:55   8    MS. DANAHY:

09:19:55   9    Q.    I'm going to go ahead and have you focus next on the

09:19:59   10   point in your notes that starts with the phrase Sect II.  What

09:20:04   11   does that say?  What does that say specifically there in your

09:20:08   12   notes?

09:20:08   13   A.    That was my shorthand for Section 2 of the Voting

09:20:12   14   Rights Act.  What Sean was doing is he was talking about

09:20:14   15   potential challenges with the redistricting process and maps,

09:20:20   16   and he said that he thought the most challenges would come under

09:20:24   17   the Section 2 clause of the Voting Rights Act, specifically

09:20:27   18   cracking and packing, and obviously I put a little arrow and I

09:20:31   19   said that would be where most of challenges would come from, and

09:20:34   20   this is again taking notes from what Sean was telling us.

09:20:38   21   Q.    Just for the record, can you tell us what that says

09:20:42   22   there Section 2?

09:20:44   23   A.    Same section?

09:20:46   24        THE COURT REPORTER:  And can you enlarge that just a

09:20:48   25   little bit?

DIRECT - SVATORA VIDEOTAPED DEPOSITION EXCERPTS                18

| | | |
|---|---|---|
| 09:20:50 | 1 | MS. DANAHY:  I can do my best. |
| 09:20:54 | 2 | Is that a little bit better? |
| 09:20:57 | 3 | A.   Okay.  So my notes say Section 2, cracking and packing |
| 09:21:03 | 4 | most of challenges. |
| 09:21:05 | 5 | Q.   Okay.  And again, what did you understand that note to |
| 09:21:10 | 6 | be recording? |
| 09:21:10 | 7 | A.   It was literally a transcription -- or not a |
| 09:21:14 | 8 | transcription.  That's wrong.  It was my notes, my recollections |
| 09:21:18 | 9 | of what Sean told us in terms of where the challenges would come |
| 09:21:23 | 10 | from. |
| 09:21:24 | 11 | Q.   And then finally if you go all the way to the bottom, |
| 09:21:28 | 12 | there's something in quotes.  Can you read that for us please? |
| 09:21:31 | 13 | A.   So in quotes:  Very little change would be necessary |
| 09:21:35 | 14 | for you-all being close to ideal size. |
| 09:21:39 | 15 | Q.   I'm going to stop you right there for a second. |
| 09:21:41 | 16 | What was your understanding of what you were recording |
| 09:21:45 | 17 | there? |
| 09:21:46 | 18 | MR. SWEETEN:  Same objection. |
| 09:21:46 | 19 | BY MS. DANAHY: |
| 09:21:50 | 20 | Q.   Go ahead and answer the question.  I can restate it, |
| 09:21:55 | 21 | if you need me to? |
| 09:21:58 | 22 | A.   Go ahead and the answer. |
| 09:22:01 | 23 | MR. SWEETEN:  Yeah. |
| 09:22:02 | 24 | A.   Okay.  So it was -- with the data that we had at the |
| 09:22:07 | 25 | time -- it was February 2020 -- was the ACS survey on |

09:22:11  1   population, which had color gradations based on ideal size per

09:22:18  2   Senate districts, so within that 5 percent.  So what he's saying

09:22:24  3   there is that we're within ideal size.  As I recall we were at

09:22:30  4   the time SD-10 was something like 1.5 percent above the ideal,

09:22:36  5   so there was -- there were plates inside of the range, and

09:22:39  6   that's what Sean was saying, very little change would be

09:22:42  7   necessary because of that population.

09:22:46  8   BY MS. DANAHY:

09:22:49  9       Q.    You can go ahead.  If you could please read the rest

09:22:51  10  of that note.

09:22:52  11      A.    Sure.  I would not anticipate much movement for you

09:22:57  12  other than slightly tweaking your district.  And then I drew and

09:23:01  13  arrow indicating that came from Sean.

09:23:06  14          THE COURT REPORTER:  I'm sorry.  Indicating...

09:23:07  15      A.    That quote came from Sean Oppermann.

09:23:10  16  BY MS. DANAHY:

09:23:10  17      Q.    What was your notes recording in that portion of it?

09:23:18  18          MR. SWEETEN:  Objection, asked and answered.

09:23:21  19  BY MS. DANAHY:

09:23:21  20      Q.    You can answer.

09:23:22  21      A.    Could you restate the question?  I didn't hear all of

09:23:29  22  that.

09:23:30  23      Q.    Sure.

09:23:30  24          You just read the quote that says I wouldn't

09:23:32  25  anticipate much movement for you other than slightly tweaking

```
09:23:34   1   your district, correct?
09:23:36   2       A.   Correct.
09:23:36   3       Q.   And what did you understand that note to be recorded?
09:23:40   4       A.   Exactly what it says, ma'am.  I'm sorry.  Because it
09:23:44   5   was within the ideal size, he was telling us that not much would
09:23:48   6   change in the district.
09:23:50   7       Q.   And if we go up -- oh, I'm sorry.  Before we do that,
09:23:56   8   I just want to mention -- and then you said there's this little
09:23:59   9   arrow pointing to Sean.  Can you tell me what that is recording?
09:24:03  10       A.   That's my shorthand for the derivation of the quote,
09:24:10  11   which Sean was the one who said it.
09:24:12  12       Q.   And I want to go up and look back at the handwritten
09:24:17  13   notes here in Exhibit 23.  Had -- were these taken with your own
09:24:21  14   hand?
09:24:21  15       A.   They were.
09:24:22  16       Q.   Were they taken right there in the room while the
09:24:25  17   meeting was happening?
09:24:25  18       A.   The notebook was in front of me.  I was sitting to the
09:24:29  19   left with Sean taking notes as he was speaking.
09:24:32  20       Q.   Do these notes accurately reflect your recollection of
09:24:36  21   the meeting with Mr. Oppermann?
09:24:38  22       A.   Absolutely.
09:24:39  23       Q.   And is this a true and correct copy of your notes and
09:24:42  24   transcription that you made of them?
09:24:44  25       A.   Yes, they are.
```

09:24:45  1        Q.    Do you regularly take notes at meetings in your role

09:24:48  2   as Deputy Chief of Staff?

09:24:50  3        A.    I do.

09:24:50  4        Q.    And then have you -- these notes been altered by you

09:24:54  5   in any way since the notes themselves were taken?

09:24:57  6        A.    No.  They stayed that way, you know, since

09:25:01  7   February 2020.

09:25:02  8        Q.    After this meeting, when you returned to your office,

09:25:07  9   what were you thinking about the fact of the upcoming

09:25:11  10  redistricting process on your constituents in SD-10?

09:25:16  11            MR. SWEETEN:  Objection.  Relevance.

09:25:17  12  BY MS. DANAHY:

09:25:18  13       Q.    Go ahead and answer.

09:25:19  14       A.    Again, we felt pretty optimistic about it based on the

09:25:24  15  way that we departed and closed the meeting and based on what

09:25:28  16  Sean had told us.

09:25:29  17       Q.    And were you optimistic?

09:25:33  18            MR. SWEETEN:  Same objection.

09:25:34  19  BY MS. DANAHY:

09:25:35  20       Q.    Go ahead and answer.

09:25:36  21       A.    We were 1 because I mean this is a district that I'd

09:25:41  22  had some experience with and I was encouraged that based on what

09:25:47  23  Sean told them that not much would change.

09:25:50  24       Q.    You just said you were familiar with district --  with

09:25:57  25  SD-10; is that right?

DIRECT - SVATORA VIDEOTAPED DEPOSITION EXCERPTS                22

09:25:59  1      A.    Correct.

09:25:59  2      Q.    At the end of the redistricting process, would you

09:26:02  3  describe the changes that were made to the district as, quote,

09:26:05  4  "slight tweaking," as you were told in that meeting?

09:26:09  5      A.    Under no circumstances would I think that that was

09:26:13  6  tweaking.

09:26:13  7      Q.    What ended up happening in the 2021 redistricting

09:26:18  8  process to SD-10?

09:26:20  9          MR. SWEETEN:  Objection to form.

09:26:22 10  BY MS. DANAHY:

09:26:23 11      Q.    Go ahead AND answer.

09:26:24 12          MR. SWEETEN:  Objection, vague.  Go ahead.

09:26:27 13      A.    That's -- there were several changes made.  Counties

09:26:30 14  were added outside of Tarrant County.  In the end, I think seven

09:26:35 15  other rural counties were added in addition to what was left of

09:26:40 16  SD-10 in the southern Tarrant County.

09:26:43 17          THE COURT REPORTER:  I am sorry.  You trailed off at

09:26:46 18  the end.  What was left of SD-10?

09:26:48 19          THE WITNESS:  What was left of SD-10 in southern

09:26:52 20  Tarrant County.

09:26:53 21          MS. DANAHY:  Patrick, I didn't hear.  Was that

09:26:56 22  objection that it was vague.

09:26:57 23          MR. SWEETEN:  Yeah.  The objection was form and vague.

09:26:59 24          MS. DANAHY:  What was the form objection, please?

09:27:01 25          MR. SWEETEN:  I mean where -- restate the question.

09:27:07  1          MS. DANAHY:  I'll go ahead and restate.

09:27:09  2   BY MS. DANAHY:

09:27:10  3      Q.   What changes were made to SD-10 during the 2021

09:27:14  4   redistricting process?

09:27:15  5      A.   Okay.  So now the questions is:  What changes were

09:27:19  6   made to SD-10; is that right?

09:27:22  7      Q.   I've restated the question, Mr. Svatora.  Can you

09:27:26  8   answer that question?

09:27:27  9      A.   What changes were made between the time of the meeting

09:27:30 10   and the time that the bill was passed in the Senate in October?

09:27:34 11      Q.   No.  What changes were made to the final district when

09:27:38 12   SD-10 was approved in the Legislature for the 2021

09:27:42 13   redistricting?

09:27:42 14      A.   In October of 2021?

09:27:44 15      Q.   Correct.

09:27:46 16      A.   Several rural counties were added going west and south

09:27:50 17   from Tarrant County and minority populations.  The northern part

09:27:54 18   of the district were put into other -- were put into other

09:27:59 19   districts, if that's what you're asking.

09:28:01 20      Q.   Sure.  How would you describe the changes that were

09:28:04 21   made to SD-10?

09:28:06 22      A.   They were dramatic.  I mean they -- they split apart

09:28:14 23   traditional communities, put them into -- into other Senate

09:28:20 24   districts and added counties in other communities that had been

09:28:26 25   part of several other rural kind-of-districts, and it was -- it

CROSS - SVATORA VIDEOTAPED DEPOSITION EXCERPTS                    24

09:28:33  1     was something I had never seen.

09:28:36  2         Q.    Were you told the truth in that meeting about what

09:28:40  3     would happen to SD-10 during the redistricting process?

09:28:44  4             MR. SWEETEN:  Objection to the form.  Objection to

09:28:46  5     speculation.  Objection hearsay.

09:28:49  6             Go ahead.

09:28:49  7     BY MS. DANAHY:

09:28:50  8         Q.    Go ahead and answer.

09:28:51  9         A.    If the truth is that the district would only be

09:28:56  10    tweaked, I was not told the truth.

09:28:59  11            MS. DANAHY:  What was the form objection, Patrick?

09:29:03  12            MR. SWEETEN:  The objection is you're asking was he

09:29:06  13    told the truth in the meeting.  I think that's your question,

09:29:09  14    right?  So I mean objection calls for speculation, objection

09:29:14  15    hearsay.  We'll leave it at that.

09:29:19  16            MS. DANAHY:  Okay.  I don't have any further

09:29:24  17    questions, so I'll pass the witness.

09:29:29  18            (Videotaped deposition stops).

09:29:29  19            MR. DUNN:  The next and final excerpt is page 22 to

09:29:33  20    line 1, to page 40, line 4.

09:29:33  21            (Videotaped deposition resumes).

09:29:33  22                     ERIK RICHARD SVATORA,

09:29:33  23               CROSS-EXAMINATION BY THE DEFENSE

09:29:33  24    BY MR. SWEETEN:

09:29:40  25        Q.    So Mr. Svatora, we introduced earlier today, and as I

09:29:46  1    understand it and we are taking this deposition today on a

09:29:48  2    Saturday afternoon right before trial.  As I understand it, you

09:29:53  3    had COVID-19 and so we've agreed to accommodate you on the

09:29:56  4    weekend; is that your understanding as well?

09:29:58  5        A.   It is and I appreciate it.  Thanks.

09:30:01  6        Q.   Oh, sure.  Of course.  And I hope you're feeling

09:30:04  7    better, by the way Mr. Svatora?

09:30:06  8        A.   Other than the Kleenex.

09:30:09  9        Q.   Okay.  Good.  Good.  Well, hang in there.

09:30:12  10        So I do have some questions based upon some of the

09:30:15  11   questions that counsel asked you today and I want to start with

09:30:18  12   the meeting itself.

09:30:20  13        Now you've only described this one meeting in the

09:30:23  14   affidavit, and that -- and the meeting that we're talking about

09:30:27  15   you dated as being in February of 2020; is that correct?

09:30:32  16        A.   That's correct.

09:30:32  17        Q.   So I want to kind of focus on that meeting.

09:30:36  18        I guess before we get too far into that, though, just

09:30:41  19   so the Court is clear, you are currently under the employ of

09:30:47  20   Senator Powell.  She is your current boss; is that correct,

09:30:51  21   Mr. Svatora?

09:30:51  22        A.   Yes.

09:30:51  23        Q.   Okay.  Very good.

09:30:52  24        And you have worked with her since January of 2019,

09:30:56  25   right?

KATHLEEN A. SUPNET, CSR

09:30:56   1        A.    Yes.

09:30:57   2        Q.    Okay.  So now let's focus on the one meeting that

09:31:01   3   we've talked about today, and that was February 2020.

09:31:05   4            Now, first of all, that meeting occurred -- I mean,

09:31:11   5   just to give it some context -- occurred before the COVID-19

09:31:15   6   pandemic even began in the U.S., correct?

09:31:19   7        A.    Depends on how you define it.  It was around us and it

09:31:24   8   was coming, but it hadn't impacted us, yet.

09:31:27   9        Q.    Right.  So we hadn't shut down in the country, et

09:31:30   10  cetera, so this is how far -- this is how long ago was February,

09:31:35   11  2020?

09:31:35   12       A.    Yeah.

09:31:36   13       Q.    Okay.  All right.  And so that one meeting you were

09:31:39   14  involved in, and you sat in, that there were two staffers that

09:31:44   15  you talked about as being Senator Huffman's office.  One of

09:31:48   16  those was Amy Befield, correct?

09:31:51   17       A.    As I said I don't recall the name.

09:31:54   18       Q.    Okay.  Your affidavit states it was Amy Befield.  You

09:31:58   19  would not have any reason to dispute that that's correct, right?

09:32:02   20       A.    I don't recall her name now.  Maybe it's COVID -- I

09:32:06   21  don't know --

09:32:07   22       Q.    And the other person in there was Mr. Oppermann who

09:32:10   23  was the Chief of Staff for Senator Huffman, correct?

09:32:14   24       A.    He was I think maybe the director at the time.

09:32:18   25       Q.    Okay.  But he also employed by Senator Huffman as

09:32:24   1   well, isn't he?

09:32:24   2        A.   Correct.

09:32:25   3        Q.   All right.  So to be clear, in the meeting, Senator

09:32:31   4   Huffman was not present in that meeting, correct?

09:32:33   5        A.   Correct.

09:32:34   6        Q.   And your Senator, Senator Powell, was not present

09:32:40   7   either, correct?

09:32:41   8        A.   Correct.

09:32:41   9        Q.   And you were getting information, I think you said,

09:32:47  10   about the district -- the potential district population

09:32:52  11   physician, correct?

09:32:54  12        A.   Correct.

09:32:55  13        Q.   And those population figures, you would agree, were

09:32:59  14   not based on census numbers, right?

09:33:04  15        A.   Sean said that there were American Community Survey,

09:33:08  16   that's correct.

09:33:08  17        Q.   Right.  So they're not based on the decennial Census

09:33:14  18   in place at that time that was going on in your 2020 from the

09:33:17  19   U.S. Census Bureau, right?

09:33:22  20        A.   Right.

09:33:22  21        Q.   Okay.  And in fact the actual official census data did

09:33:27  22   not get released -- was not sent to the State of Texas over a

09:33:30  23   year and a half later, sometime in August of 2021, correct?

09:33:35  24        A.   I don't know.

09:33:36  25        Q.   Okay.  Would you have any reason to dispute that the

09:33:41  1    Census figures were not released until legacy files were sent in

09:33:47  2    August of 2021 and the then the ultimate Census figures were

09:33:52  3    sent in September of '21, correct?

09:33:55  4        A.   Sir, I can tell you we didn't have the Census numbers

09:33:58  5    at the meeting.  We had the --

09:33:58  6            THE COURT REPORTER:  I'm sorry.  You kind of trailed

09:34:01  7    off there.  We didn't have the Census going into the meeting.

09:34:05  8            THE WITNESS:  I'm sorry to use acronyms.  The American

09:34:09  9    Community Survey, ACS numbers are what we were talking about.

09:34:10  10           THE COURT REPORTER:  I'm sorry.  You're cutting off.

09:34:12  11   I can't hear you.

09:34:13  12           THE WITNESS:  I'll move the laptop a little closer.

09:34:19  13           We had the ACS numbers as the subject of our meeting,

09:34:24  14   the American Community Survey numbers.

09:34:29  15   MR. SWEETEN:

09:34:30  16       Q.   And not the actual Census figures during that talk,

09:34:34  17   right?

09:34:35  18       A.   Correct.

09:34:35  19       Q.   Now, it's the case, isn't it that redistricting, when

09:34:42  20   it's conducted in the Senate is first conducted by the senators

09:34:48  21   in the redistricting committee, correct?

09:34:51  22       A.   Traditionally.

09:34:53  23       Q.   Okay.  And it is the senators on the redistricting

09:34:56  24   committees that make decisions about maps and vote things out of

09:35:00  25   committee, that sort of thing.  It's the senators themselves

09:35:04   1   voting on these things, right?

09:35:06   2       A.   The Senate -- well, correct, all of the senators have

09:35:10   3   a vote on it.

09:35:11   4       Q.   Right.  And it isn't the staffers, for example, that

09:35:14   5   would have the vote on redistricting, correct?

09:35:17   6       A.   Correct.

09:35:17   7       Q.   All right.  And it's the case, isn't it, that once it

09:35:22   8   gets out of the Senate committee, then the full Senate then has

09:35:26   9   the opportunity typically to vote on redistricting legislation,

09:35:30  10   correct?

09:35:30  11       A.   Correct.

09:35:31  12       Q.   Again, that isn't something that's conducted -- the

09:35:34  13   voting isn't conducted by the staffers that are discussing

09:35:39  14   issues.  It's by the senators themselves, right?

09:35:42  15       A.   The voting, right.

09:35:43  16       Q.   Right.  And would agree with me that the redistricting

09:35:47  17   session didn't even commence until a year and a half after that

09:35:50  18   meeting that you've talked about that was -- that was in

09:35:54  19   February of 2020, correct?

09:35:56  20       A.   I believe that there were -- that they had scheduled

09:36:04  21   regional meetings, which were by and large aborted, but I want

09:36:07  22   to say that they maybe got one or two COVID shutting down.

09:36:11  23       Q.   And do you know -- do you know if the meeting that you

09:36:17  24   had in February of 2020, if other meetings were held with other

09:36:22  25   staffs to kind of update them on the upcoming redistricting

09:36:27   1   process and other things?

09:36:29   2        A.   I did not discuss those with anyone else.

09:36:33   3        Q.   Okay.  So it could be, but you don't know one way or

09:36:38   4   the other whether Mr. Oppermann met with other Senate office,

09:36:42   5   correct?

09:36:42   6        A.   I do not know.

09:36:44   7        Q.   All right.  Now, we talked about the fact that the --

09:36:48   8   that the census data came out sometime in the fall of 2021, and

09:36:56   9   I want to just show you, very briefly, an exhibit, which is

09:37:03  10   Exhibit No. 21, the Defendant's Exhibit 21.  And I want to put

09:37:07  11   that up.  If we can do a share screen.  See if you can -- first,

09:37:17  12   can you see that, Mr. Svatora?

09:37:18  13        A.   I can.

09:37:18  14        Q.   And can you read that please?

09:37:20  15        A.   Defendant's Exhibit 21?

09:37:23  16        Q.   Right.  And it says Map Analysis S-2100?

09:37:29  17        A.   It does.

09:37:30  18        Q.   I'm going to show you the first page of it, which you

09:37:33  19   would recognize as the web 100 T produced by Texas Legislative

09:37:42  20   Council, right?

09:37:42  21        A.   Yes.  It says that in the upper right-hand corner.

09:37:44  22        Q.   I don't want to spend a whole lot of time on this

09:37:47  23   document, but I do want to show you one thing and that is that

09:37:50  24   you would agree with me that this says that the plan overall

09:37:54  25   range -- and I am going to try to mark it in yellow, so

09:37:59   1   everybody can see it, but if you follow me -- plan overall wage,

09:38:03   2   you go over to the right column on percentage, it says 32.70,

09:38:08   3   correct?

09:38:08   4        A.   Correct.

09:38:09   5        Q.   Okay.  And you agree that this list, the smallest

09:38:13   6   district is being negative 15.33 percent?

09:38:17   7        A.   Correct.

09:38:18   8        Q.   And the largest district being 17.37 percent, correct?

09:38:24   9        A.   Correct.

09:38:24   10       Q.   And if you add those numbers together, we've got a

09:38:27   11  spread of 32.70, right?

09:38:31   12       A.   I'm bad at math.

09:38:33   13       Q.   Okay.  Well, you would not dispute my math, would you?

09:38:37   14       A.   I think you're right.

09:38:38   15       Q.   Okay.  So you would agree with me that when we're

09:38:41   16  drawing the Senate maps, there are 31 districts to be drawn, and

09:38:46   17  that, you know, depending on what the population is, that some

09:38:50   18  can be overpopulated and others can be underpopulated, right?

09:38:55   19       A.   Correct.

09:38:55   20       Q.   And you would not disagree that overpopulation or

09:39:01   21  underpopulation in other districts can cascade and impact other

09:39:05   22  districts that may have similar pop -- or the same population,

09:39:10   23  similar to the ideal population, let's say?

09:39:13   24       A.   I'm not sure I understand what you just asked.

09:39:17   25       Q.   Okay.  Let me ask it again.

CROSS - SVATORA VIDEOTAPED DEPOSITION EXCERPTS                    32

09:39:19   1          So you would not disagree that the population -- if

09:39:24   2   one district is underpopulated and one is overpopulated, that

09:39:29   3   that could cause changes to other districts that are

09:39:34   4   neighboring, correct?

09:39:36   5          MS. DANAHY:  Objection.  Calls for speculation.

09:39:38   6          MR. SWEETEN:  Very good.

09:39:40   7   MR. SWEETEN:

09:39:40   8      Q.   That's all I wanted to ask you about that document, so

09:39:43   9   I'll take that down.

09:39:44  10          Let me ask you, you would agree that there were

09:39:52  11   additional maps or additional meetings that were held regarding

09:39:57  12   the issue of redistricting between your office and Senator

09:40:08  13   Huffman's office, correct?

09:40:09  14      A.   You know, I didn't track this.  I wasn't in charge of

09:40:12  15   redistricting.  In fact, I had nothing to do with that meeting.

09:40:16  16      Q.   So you're basically telling us about the one meeting,

09:40:19  17   that's what you know.  This is not an area that you focussed on,

09:40:22  18   correct?

09:40:22  19      A.   Correct.

09:40:23  20      Q.   All right.  Let's talk about -- a little bit about --

09:40:26  21   you mentioned something about SD-10 and I want to talk about

09:40:30  22   your history.  Now, this -- Senator Powell was a freshman

09:40:35  23   democrat and she was elected in 2018, correct?

09:40:40  24      A.   That's correct.

09:40:41  25      Q.   Okay.  And obviously you must have -- knowing SD-10

KATHLEEN A. SUPNET, CSR

09:40:46   1    and knowing she was a democratic member, you must have had a

09:40:50   2    concern as the redistricting session unfolded about potential

09:40:54   3    changes to her district?

09:40:58   4        A.    As do all Senate staffers.

09:41:01   5        Q.    Right.  And as far as tracking those, your tracking of

09:41:07   6    the redistricting issue seized in February 2020 after the

09:41:14   7    meeting, this wasn't the issue you were in charge of, correct?

09:41:15   8        A.    Correct.

09:41:15   9        Q.    And you understand that it's a, you know, hearings had

09:41:20  10    not yet been held in the 2020 session when you even had this

09:41:25  11    discussion in February, correct?

09:41:29  12        A.    Correct.

09:41:30  13        Q.    And you knew hearings were going to be held and

09:41:32  14    certainly meetings were going to be held, correct?

09:41:34  15        A.    Yes.

09:41:35  16        Q.    You knew that the redistricting committee was going to

09:41:39  17    convene and have discussions and various members, they have

09:41:43  18    thoughts of they're own, correct?

09:41:47  19        A.    I would assume.  I can't speak for them.

09:41:50  20        Q.    One thing you do know, being SD-10 and based on your

09:41:55  21    years and years of service in the Texas Senate as partnership

09:41:58  22    raises it's head in just about every single session of

09:42:02  23    redistricting, right?

09:42:06  24        A.    It tended to, correct.

09:42:27  25        Q.    And what was your role with Senator Davis when she

09:42:31   1   occupied SD-10?

09:42:32   2       A.   I was communications director.

09:42:34   3       Q.   Okay.  And how long were you communications director

09:42:39   4   for Senator Wendy Davis, sir?

09:42:41   5       A.   Not long; eight or nine months.

09:42:43   6       Q.   And how long did you work in her employment, just the

09:42:46   7   eight to nine months?

09:42:47   8       A.   Eight or nine months, through the 2013 session and a

09:42:51   9   little beyond.

09:42:52  10       Q.   Okay.  So -- and between that time, between Senator

09:42:59  11   Davis leaving Senate District 10, which would've been in about

09:43:04  12   2014, and 2018 there was another member that occupied SD-10, who

09:43:10  13   was the senator for SD-10, correct?

09:43:13  14       A.   That's correct.

09:43:13  15       Q.   And that senator was a Republican by the name of

09:43:18  16   Connie Burton, correct?

09:43:20  17       A.   Correct.

09:43:20  18       Q.   And you knew, Mr. Svatora, that that district -- I

09:43:25  19   mean your knowledge of SD-10, you know that's a very competitive

09:43:30  20   seat between Democrats and Republicans, right?

09:43:34  21       A.   It has been, yes.

09:43:36  22       Q.   All right.  Now, Mr. Svatora, I want to ask you a few

09:43:59  23   other questions.  I'm going to show you what I've marked as

09:44:07  24   Powell Number 9 and ask you to look at the characteristics of

09:44:07  25   the districts you are talking about today.

09:44:08  1          Let me do the share screen.  Here you go.  So this

09:44:18  2  is -- can you see this is?

09:44:18  3      A.    Yes.

09:44:18  4      Q.    Okay.  Very good.  And you can see that -- let's look

09:44:27  5  at the top of this.  This is a web 116 produced for legislative

09:44:30  6  counsel, correct?

09:44:31  7      A.    That's what it case on the upper right-hand corner.

09:44:34  8      Q.    Okay.  And you would agree that this shows the Senate

09:44:37  9  districts under the Benchmark plan, which is plans 2100, right?

09:44:42  10     A.    Correct.

09:44:43  11     Q.    And this up here lists this as being data from ACS

09:44:49  12  2015 through 2019, and it shows Citizen Voting Age Population or

09:44:57  13  CVAP, correct?

09:44:59  14     A.    Correct.

09:44:59  15     Q.    When we look at CVAP -- and this is under the old

09:45:05  16  map -- you agree with me the CVAP in that district is 20.4 for

09:45:10  17  Hispanic CVAP, right?

09:45:14  18     A.    20.4 percent?

09:45:18  19     Q.    Yes.

09:45:18  20     A.    Okay.

09:45:18  21     Q.    That says that, right?

09:45:19  22     A.    That's what is says.

09:45:23  23     Q.    Okay.  Then for black alone it says 25 percent, right?

09:45:26  24     A.    Correct.

09:45:26  25     Q.    And then for white alone, it says 53.9 percent,

09:45:32   1   correct?

09:45:32   2       A.    Correct.

09:45:32   3       Q.    You would agree with me that according to this chart

09:45:36   4   at Benchmark Senate District 10 is a majority Anglo district,

09:45:42   5   correct?

09:45:42   6       A.    It's majority white.  I was corrected once never to

09:45:46   7   say the "A" word --

09:45:46   8       Q.    Okay.

09:45:47   9       A.    -- since I'm Irish.

09:45:49   10      Q.    Can you say that in a redistricting context.  I have

09:45:52   11  been -- but white, Anglo, assuming those are synonyms, that

09:45:59   12  53.9 percent would make that a majority white district, correct?

09:46:03   13      A.    50 plus one is majority.

09:46:07   14      Q.    There you go.  Okay.  All right.

09:46:11   15            Now I want to pull up your notes and make sure that

09:46:16   16  I'm clear on what they say.  I've got my own copy, so I'm going

09:46:21   17  to just put it up here on the share screen.

09:46:28   18            Can you see that?

09:46:29   19      A.    I can.

09:46:30   20      Q.    And I'll go to the first page.  Just to orient you,

09:46:35   21  but this is shows on our end that this is Exhibit 4-A that the

09:46:40   22  plaintiffs utilized; do you see that?

09:46:40   23      A.    I do.

09:46:40   24      Q.    Let's go to the back page which is your translation of

09:46:43   25  this.

09:46:44  1              Now, here you say, and you talked about in your direct
09:46:47  2      testimony, you say attorney/client privilege is less weighed
09:46:53  3      than less privileged.  That's all it says, right?
09:46:56  4          A.   That's right.
09:46:58  5              MS. DANAHY:  Object to that as mischaracterizing
09:47:03  6      Mr. Svatora's testimony.
09:47:04  7              MR. SWEETEN:  I can add the six in there.  Let's do
09:47:07  8      that.
09:47:08  9      MR. SWEETEN:
09:47:08  10         Q.   This says A. T. T. Y, dash, client privilege [sic], is
09:47:12  11     less weighed than ledge privilege [sic].  Did I read that
09:47:17  12     correctly?
09:47:18  13         A.   You read that correctly.
09:47:20  14         Q.   All right.  And as far as -- this doesn't say who
09:47:24  15     might waive ledge privilege or when it's waived or it doesn't
09:47:30  16     give us any context as to what that means.  These notes don't do
09:47:34  17     that, do they?
09:47:35  18         A.   It's not a transcription.  It was just taking notes
09:47:38  19     through the meeting.
09:47:39  20         Q.   Right.  But as far as whether this means that commonly
09:47:42  21     representatives or senators waive their privilege less, waive
09:47:47  22     their ledge privilege more than attorney/client privilege, this
09:47:55  23     doesn't give us context of what that means, these notes alone,
09:47:58  24     do they?
09:47:58  25         A.   All I can tell you is that's what Sean said.  Why he

09:48:04  1    brought it up, I have no idea.

09:48:06  2        Q.   Here you say something, "Section II cracking-packing,

09:48:09  3    most-of-challenges."  Those are what your notes say?

09:48:14  4        A.   Correct.

09:48:14  5        Q.   Now to be clear, obviously we didn't get into the

09:48:18  6    third special session when redistricting even began until

09:48:23  7    September 20th of 2021, correct?

09:48:25  8        A.   Correct.

09:48:27  9        Q.   Okay.  So here, whatever this is, it's certainly

09:48:31 10    not -- you know, it doesn't tell us anything about the maps that

09:48:36 11    were to come a year and a half later.  This is some statement

09:48:39 12    about -- about the commonalty of challenges, how often

09:48:47 13    challenges are raised, right?

09:48:49 14        A.   Again, this was Sean's statement about where he

09:48:52 15    thought the challenges would come from.

09:48:55 16        Q.   But as far as you know, obviously he was -- if this

09:48:58 17    was his statement that you're saying he transcribed, we're a

09:49:03 18    year and a half away from a map being drawn, as far as you know,

09:49:07 19    correct?

09:49:08 20        A.   Correct, yeah.  I'm just telling you what I wrote down

09:49:11 21    from what he said.

09:49:12 22        Q.   Okay.  And I want to go over some -- some more of

09:49:16 23    this, but you talk about -- drop box will share with all Senate,

09:49:24 24    what that is supposed to be?

09:49:26 25        A.   What that means is not just members of the committee.

CROSS - SVATORA VIDEOTAPED DEPOSITION EXCERPTS          39

09:49:29  1    Committees generally have testimony, agendas, information that

09:49:34  2    was -- that was uploaded that wasn't even part of testimony.  In

09:49:39  3    general, committees all create drop boxes for committee staff to

09:49:46  4    access, so they can prepare their bosses.  What Sean is saying

09:49:50  5    there, not just the committee would have access to the drop box,

09:49:55  6    but all members of the Senate and redistricting staff would have

09:49:59  7    that access.

09:50:00  8        Q.    Okay.  Under and American Community Survey it says

09:50:03  9    last estimates.  That talks about estimates there, correct?

09:50:10  10        A.    Right.

09:50:11  11        Q.    All right.  Then we talked about the statement about

09:50:14  12    necessary.  So you wrote here "very little change would be

09:50:17  13    necessary."  Is that what your -- is that what you wrote, sir?

09:50:21  14        A.    That's his quote.

09:50:23  15        Q.    Right.  And certainly you didn't walk away from that

09:50:26  16    meeting thinking that, well, the whole SD-10 has been

09:50:31  17    redistricted now, right?  I mean you didn't look at any maps or

09:50:35  18    any sort of mockups of what the district was going to look like.

09:50:39  19    Nobody had taken pen to paper, right?

09:50:41  20        A.    No.  We saw -- we saw no maps of proposals.

09:50:47  21        Q.    Okay.  So -- and let's see.  And of course, all of

09:50:52  22    this is taking place a year and a half before the census data

09:50:57  23    was released, right?

09:50:59  24        A.    More or less.  Like I said, I don't recall when the

09:51:04  25    census data was released.  It was February 2020.

09:51:07  1        Q.    Well, assume you can tell me that you know that the

09:51:10  2    Census wasn't released until 2021, right?

09:51:14  3        A.    Correct.

09:51:14  4        Q.    Okay.  Now I want to ask you, were you ever involved

09:51:18  5    in communication with Ms. Powell and her attorneys, during

09:51:22  6    January or anytime during the year of 2021?  And that means

09:51:27  7    Mr. Hicks, Mr. Dunn, Mr. Gaber or Mr. Hiebert.  Were you

09:51:33  8    involved in those conversations?

09:51:35  9        A.    No.

09:51:36 10        Q.    Okay.  Very good.  All right.  One second.  Let me see

09:51:41 11    if I have any more questions.  I don't think I do.

09:51:46 12            Mr. Svatora, I'm going to let you get back to

09:51:48 13    rehabilitating.  I hope you feel much better and we appreciate

09:51:52 14    your time today.

09:51:53 15            THE WITNESS:  Thank you.

09:51:55 16            MS. DANAHY:  I also don't have any further questions,

09:51:59 17    so I think we're ready to wrap up.

09:52:03 18            (Videotaped deposition stops).

09:52:03 19            MR. DUNN:  That concludes the offer of the deposition

09:52:06 20    by video of Rick Svatora.

09:52:08 21            We're prepared to call our next witness.  Shall we do

09:52:10 22    so?

09:52:10 23            JUDGE GUADERRAMA:  Yes, sir.

09:52:12 24            MR. DUNN:  Justice of the Peace, Sergio de Leon.

09:52:16 25            And he will be examined by Ms. Danahy.

KATHLEEN A. SUPNET, CSR

| | | |
|---|---|---|
| 09:53:16 | 1 | (Witness sworn by Judge Guaderrama). |
| 09:53:16 | 2 | MS. DANAHY:  Good morning, Your Honor. |
| 09:53:16 | 3 | JUDGE GUADERRAMA:  Tell me your last name again? |
| 09:53:16 | 4 | MS. DANAHY:  Danahy. |
| 09:53:11 | 5 | JUDGE GUADERRAMA:  Danahy.  Thank you.  Yes, ma'am. |
| 09:53:11 | 6 | SERGIO DE LEON |
| 09:53:12 | 7 | DIRECT EXAMINATION BY THE PLAINTIFF |
| 09:53:12 | 8 | BY MS. DANAHY: |
| 09:54:11 | 9 | Q.   Will you please state your name for the record? |
| 09:54:13 | 10 | A.   Yes.  My name is Sergio Leon de Leon. |
| 09:54:15 | 11 | Q.   What is your race or ethnicity? |
| 09:54:19 | 12 | A.   I am Hispanic. |
| 09:54:21 | 13 | Q.   Are you a voter? |
| 09:54:22 | 14 | A.   Absolutely. |
| 09:54:23 | 15 | Q.   How often do you vote in Texas state elections? |
| 09:54:35 | 16 | A.   Every election cycle. |
| 09:54:38 | 17 | Q.   Do you intend to vote in the 2022 election? |
| 09:54:41 | 18 | A.   Yes, ma'am. |
| 09:54:41 | 19 | Q.   And do you intend to vote in subsequent elections? |
| 09:54:44 | 20 | A.   Yes, ma'am. |
| 09:54:45 | 21 | Q.   Where do you live, Judge de Leon? |
| 09:54:47 | 22 | A.   I live in the Alamo Heights, Fort Worth, Texas. |
| 09:54:51 | 23 | Q.   How long have you lived in Alamo Heights? |
| 09:54:54 | 24 | A.   Over 25-plus-years. |
| 09:54:56 | 25 | Q.   Now I understand that you have deep ties in the Fort |

DIRECT - DE LEON                                                42

09:54:59  1     Worth area.  Can you tell me about that?

09:55:01  2         A.    Absolutely.  I was born in Fort Worth.  My mother was

09:55:04  3     born in Fort Worth, north side Fort Worth.  My father emigrated

09:55:08  4     from Mexico, but settled in north side Fort Worth, and my

09:55:12  5     grandfather worked in north side Fort Worth.

09:55:15  6         Q.    How are you employed?

09:55:18  7         A.    With Tarrant County Justice Peace Precinct Number 5.

09:55:23  8         Q.    When were you first elected?

09:55:25  9         A.    Justice of the Peace, I was elected of November 2012.

09:55:30  10        Q.    What did you do prior to your election as Justice of

09:55:33  11    the Piece?

09:55:33  12        A.    Prior to serving in the Justice the Peace, I was the

09:55:37  13    elected constable for Precinct Number 5 elected in 2000 and

09:55:41  14    sworn in, in 2001.

09:55:43  15        Q.    What areas of Tarrant County do you represent in

09:55:47  16    Precinct 5?

09:55:48  17        A.    Precinct 5 before redistricting was essentially

09:55:52  18    half-pie shaped, which included the traditional Hispanic north

09:55:58  19    side areas.  Basically if you are familiar with Fort Worth, 820

09:56:01  20    and 35 on the north run completely south to 20 and 35 on the

09:56:07  21    south, everything that was west of I-35, which also included the

09:56:12  22    south side Hispanic neighborhoods as well.

09:56:15  23        Q.    And generally speaking, what is the demographic makeup

09:56:19  24    of your constituents?

09:56:21  25        A.    Hispanic, African-American and a small portion of

KATHLEEN A. SUPNET, CSR

09:56:26  1   Anglos.

09:56:26  2        Q.   And is it predominantly Hispanic?

09:56:30  3        A.   Yes.

09:56:31  4        Q.   Are Hispanic voters able to elect candidates in

09:56:34  5   Precinct 5?

09:56:36  6        A.   Yes, ma'am.

09:56:37  7        Q.   Now you must mentioned that you went through

09:56:38  8   redistricting for your precinct, right?

09:56:38  9        A.   Yes, ma'am.

09:56:38 10        Q.   What changes were made to your precinct, if any during

09:56:46 11   the redistricting process?

09:56:46 12        A.   My district was essentially expanded to dilate the

09:56:52 13   Hispanic voting strength, so now we go from the west side of

09:56:56 14   Bryant/Irving all the way to 820, and from the south I now go

09:57:01 15   into a -- Precinct 5 now goes into Crowley, another municipality

09:57:08 16   south of Fort Worth.

09:57:10 17        Q.   Based on your experience, what impact has this impact

09:57:14 18   has this had on voter ability to elect candidates in Precinct 5?

09:57:17 19             MR. SWEETEN:  Your Honor, I'm going to object.  What

09:57:19 20   Mr. De Leon is talking about, as I understand it, is the

09:57:22 21   redistricting that that occurred --

09:57:22 22             (Court reporter interrupts).

09:57:22 23             MR. SWEETEN:  I'm sorry.

09:57:29 24             It is the redistricting that occurred in constable

09:57:31 25   precinct in Fort Worth.  It's not -- I don't think he's

DIRECT - DE LEON                                                    44

09:57:34  1   addressing the redistricting issue, so I object as to relevance

09:57:38  2   of this line of questioning.

09:57:41  3        MS. DANAHY:  Your Honor, we're just laying some

09:57:43  4   foundation.

09:57:43  5        JUDGE GUADERRAMA:  All right.  I'll allow the question

09:57:46  6   and the answer.

09:57:46  7   BY MS. DANAHY:

09:57:49  8   Q.   I'm going to restate the question.

09:57:50  9        Based on your experience, what impact did the changes

09:57:53  10  made to your district have on Hispanic voter's ability to elect

09:57:58  11  candidates in Precinct 5?

09:58:01  12  A.   It was diluted and now it will be almost impossible

09:58:05  13  for Hispanics to elect a Latino or Latina to the Justice of the

09:58:11  14  Peace or constable.

09:58:12  15  Q.   Now prior to the current round of redistricting, was

09:58:15  16  Precinct 5 located within SD-10?

09:58:18  17  A.   That's correct, about 90 percent of it.

09:58:21  18  Q.   Under the newly enacted state Senate plan, is Precinct

09:58:26  19  5 still 90 percent within SD-10?

09:58:30  20  A.   No, ma'am.  Now my understanding is that the north

09:58:33  21  side is now in Senate District number 9, so that included the

09:58:37  22  neighborhoods of north side, the far-greater north side and

09:58:41  23  Diamond Hill area fall in District 9, and the south side

09:58:47  24  Hispanic neighborhoods now fall -- well remain in Senate

09:58:50  25  District 10, which has been expanded out to areas in Brownwood.

09:58:55  1       Q.    And those north side neighborhoods you mentioned, are

09:58:57  2    those predominately Hispanic neighborhoods?

09:59:01  3       A.    Yes, ma'am.

09:59:01  4       Q.    What impact north side community into in SD 9 have on

09:59:07  5    those voters ability to elect a candidate of their choice?

09:59:09  6       A.    Well, essentially -- whereas when north and south side

09:59:15  7    Fort Worth collectively spoke with one voice, now, they do not.

09:59:20  8    They're fractured.  Their voting strength is diluted and they'll

09:59:26  9    have zero impact in that state Senate district.

09:59:32  10      Q.    Now, what are the demographic of SD-9, if you know?

09:59:34  11      A.    I do not fully aware of the demographics for SD 9;

09:59:42  12   however, I do know that based on areas where that's located out

09:59:46  13   by the airport, certainly different communities of interest in

09:59:50  14   north side Fort Worth and neighborhoods out by Dallas-Fort Worth

09:59:55  15   international airport.

09:59:56  16      Q.    Is it a more suburban are in Tarrant country?

09:59:58  17      A.    It's more of an Anglo suburban area of Tarrant County.

10:00:03  18      Q.    In your experience is there any community of interest

10:00:06  19   between the historic north side Hispanic community and the Anglo

10:00:09  20   suburbs of northern Tarrant County?

10:00:11  21      A.    No, ma'am.

10:00:12  22      Q.    What are some of the differences between those two

10:00:14  23   communities?

10:00:15  24      A.    The difference is where people worship at.  I mean

10:00:20  25   people in north side; catholic church; different economic status

DIRECT - DE LEON                                                    46

10:00:28  1   between people that live in the north side, as opposed to areas

10:00:31  2   out further in Senate District 9, and where the children go to

10:00:36  3   school, all of the north side, Diamond Hill area fall within

10:00:42  4   Fort Worth ISD.  The further you go out in the SD-9 towards the

10:00:46  5   airport, there are multiple school districts.

10:00:49  6        Q.   Were there other changes to SD-10 in the newly enacted

10:00:53  7   redistricting plan that impacts your constituents in Precinct 5?

10:00:57  8        A.   Are you referring to the south side neighborhoods?

10:01:00  9        Q.   I believe you said those districts remained in SD-10?

10:01:04 10        A.   Correct.  Those remain in SD-10 and their voices have

10:01:09 11   now been drowned out by rule voters that go further west, and so

10:01:17 12   they also have a minimal impact in the elections.

10:01:21 13        Q.   And can you describe a little bit for the Court what

10:01:25 14   you me by the communities that were added further west?

10:01:28 15        A.   Well, what I -- and I will refer to the testimony that

10:01:31 16   I gave at the hearing in Austin, it's just that people in south

10:01:37 17   side Fort Worth and even north side Fort Worth, they don't tend

10:01:42 18   to cattle.  They don't meet up at the feed store and they don't

10:01:46 19   bale hay; two separate communities.

10:01:50 20        Q.   So in your experience, would there be a community of

10:01:54 21   interest between the communities living in the south and south

10:01:55 22   side neighborhoods of Fort worth and the rural white communities

10:01:59 23   living in the new county appended to SD-10.

10:01:59 24             (Court reporter interrupts).

10:02:05 25             MS. DANAHY:  In your experience, is there a community

DIRECT - DE LEON                                                        47

10:02:07  1    of interest between the communities LIVING in the south and

10:02:10  2    south side neighborhoods of Fort Worth and the rural white

10:02:14  3    communities living in the new counties that were appended to

10:02:17  4    SD-10?

10:02:18  5        A.   No, ma'am.

10:02:19  6        Q.   Based on your experience, are Hispanic voters in

10:02:26  7    Tarrant County able to elect a candidate of their choice in the

10:02:30  8    state Senate under the newly enacted SD-10?

10:02:32  9        A.   Under the new map, no.

10:02:35  10        Q.   Who represents SD-10?

10:02:37  11        A.   Senator Beverly Powell.

10:02:38  12        Q.   Is she a Democrat?

10:02:40  13        A.   Yes.

10:02:40  14        Q.   Based on your experience and observations, did black

10:02:43  15    and Hispanic voters in SD-10 support Senator Powell?

10:02:48  16            MR. SWEETEN:  Objection.  Calls for speculation.

10:02:51  17            MS. DANAHY:  I'm asking for experience.

10:02:54  18            MR. SWEETEN:  And compound.

10:02:56  19            JUDGE GUADERRAMA:  Well, if you an just lay a

10:02:56  20    foundation on how he might know that.

10:02:56  21            MR. DANAHY:  I'm sorry?

10:03:00  22            JUDGE GUADERRAMA:  How he would know that, just lay a

10:03:01  23    foundation how I can tell that he knows that and experience that

10:03:02  24    you're talking about.

10:03:02  25    BY MS. DANAHY:

10:03:04  1       Q.    You mentioned that your voters in Precinct 5

10:03:07  2   predominantly Hispanic, correct?

10:03:10  3       A.    That's correct.

10:03:11  4       Q.    You also mentioned that you have a substantial black

10:03:13  5   voter population in your precinct; is that correct?

10:03:16  6       A.    That's correct.

10:03:16  7       Q.    And do you have -- based on your experience, do you

10:03:21  8   understand a little bit, generally, about the voting patterns of

10:03:23  9   black and Latino voters in your precinct?

10:03:25 10       A.    With respect to Senate District 10 and looking at the

10:03:29 11   results of Senator Powell's election, I can tell you

10:03:33 12   unequivocally that Hispanic and African-Americans voted for

10:03:37 13   Senator Powell.

10:03:39 14       Q.    And based on those same observations and experiences,

10:03:44 15   do black and Hispanics in SD-10 vote for the same candidate in

10:03:49 16   general elections?

10:03:50 17       A.    Yes.

10:03:51 18       Q.    Do you have any personal experience with coalition

10:03:56 19   support from black and Hispanic voters in Tarrant County?

10:03:59 20       A.    Absolutely.  I have been fortunate to have

10:04:01 21   African-American, Anglo and Hispanic support.

10:04:12 22       Q.    During your time as Justice of the Peace and resident

10:04:15 23   of Tarrant County, have you had state senators who are elected

10:04:18 24   without the support of the Tarrant County minority community?

10:04:22 25       A.    Yes.

```
10:04:22  1        Q.    And have you ever experienced any differences in
10:04:25  2   therms of responsiveness when your state senator is elected by
10:04:28  3   the minority?
10:04:30  4             MR. SWEETEN:   Objection, compound.  Objection, calls
10:04:33  5   for speculation.
10:04:34  6             JUDGE GUADERRAMA:   It might be compound.  Let's break
10:04:37  7   that up.
10:04:39  8   BY MS. DANAHY:
10:04:39  9        Q.    Have you experienced any differences in the
10:04:41 10   responsiveness in terms of candidates for state Senate -- state
10:04:47 11   senator rep -- between your state senator when they're elected
10:04:50 12   by the minority community?
10:04:53 13             MR. SWEETEN:   Objection, Your Honor.  She's
10:04:55 14   characterizing state senators broadly.  Objection, compound.
10:05:04 15             JUDGE GUADERRAMA:   Ms. Danahy, we're talking about
10:05:05 16   this Senate District or what are we talking about?
10:05:07 17             MS. DANAHY:   In Senate District 10.
10:05:07 18             THE COURT:   You can go ahead and answer.
10:05:07 19             THE WITNESS:   Thank you.
10:05:12 20        A.    I have seen senators through my tenure both as
10:05:20 21   constable and justice of the peace, some of which I have seen in
10:05:22 22   minority communities and others I had not.
10:05:25 23   BY MS. DANAHY:
10:05:28 24        Q.    In your role as Justice of the Peace, do you attend a
10:05:33 25   lot of community events?
```

10:05:34  1        A.    Yes, ma'am.  Neighborhood associations, PTA, parades,

10:05:39  2    et cetera.

10:05:39  3        Q.    And do you see Senator Powell?

10:05:46  4        A.    Yes, ma'am.

10:05:46  5        Q.    What's the significance of any of your state senator

10:05:50  6    attending community events?

10:05:51  7        A.    It's very meaningful.  It gives the community a sense

10:05:56  8    of pride to see their elected official at their community event.

10:05:59  9    It is -- it shows a degree of responsiveness and it also permits

10:06:05 10    many citizens an opportunity to visit with their state senator

10:06:13 11    about an issue they may have.

10:06:16 12        Q.    Judge de Leon, were you active in speaking out about

10:06:20 13    SD-10 during the previous decade's redistricting cycle in 2011?

10:06:25 14        A.    I was.

10:06:26 15        Q.    Did you offer any court testimony or...

10:06:29 16        A.    Yes, ma'am.  I testified in the federal court in San

10:06:32 17    Antonio.

10:06:32 18        Q.    And are there any similarities that you can identify

10:06:36 19    for the Court between the 2011 redistricting plan for SD-10 and

10:06:39 20    the newly enacted plan?

10:06:41 21        A.    Sure.  Minority communities were being sliced up and

10:06:45 22    cracked up to dilute their minority voting strength.

10:06:50 23        Q.    Were you involved in speaking about proposed SD-10

10:06:54 24    during the current redistricting cycle?

10:06:57 25        A.    Yes, ma'am.

10:06:57  1      Q.    Did you testify at any of the legislative

10:07:00  2  redistricting hearings?

10:07:01  3      A.    Yes, ma'am.

10:07:02  4      Q.    Was one of those hearings in person in Austin?

10:07:04  5      A.    Yes, ma'am.

10:07:05  6           MS. DANAHY:  For the record, Judge de Leon's testimony

10:07:08  7  from that hearing is in the record at Plaintiff's Exhibit 52,

10:07:11  8  pages 144 to 146.

10:07:16  9  BY MS. DANAHY:

10:07:17 10      Q.    What did you tell the Legislature about how they

10:07:20 11  should treat SD-10?

10:07:22 12      A.    Leave it intact and make sure that minority

10:07:25 13  communities remained intact in one District to speak with one

10:07:29 14  collective vote and to make the biggest impact possible in an

10:07:33 15  election.

10:07:34 16      Q.    So did you tell the Legislature some of the same

10:07:38 17  things you've told the Court today?

10:07:40 18      A.    Yes, ma'am.

10:07:40 19      Q.    And do you stand by your previous testimony?

10:07:42 20      A.    Absolutely.

10:07:44 21      Q.    Thank you, Judge de Leon.

10:07:45 22           MS. DANAHY:  I have no further questions.

10:07:46 23           JUDGE GUADERRAMA:  Thank you, Ms. Danahy.

10:07:48 24           Mr. Sweeten?

10:07:49 25           MR. SWEETEN:  Thank you, Your Honor.

10:07:52   1                    SERGIO DE LEON,

10:07:52   2            CROSS-EXAMINATION BY THE DEFENSE

10:07:52   3   BY MR. SWEETEN:

10:08:05   4       Q.    I'm Patrick Sweeten and I'm here on behalf of the

10:08:07   5   State defendants.  I'm just going to ask you a few questions

10:08:09   6   today and follow up to what counsel asked you just now.  Okay?

10:08:13   7       A.    Wonderful.:

10:08:14   8       Q.    You understand, don't you, that this is a -- that the

10:08:17   9   claim here is intentional discrimination.  Do you understand

10:08:21  10   that?

10:08:22  11       A.    Yes, sir.

10:08:22  12       Q.    I want to be clear.  Ou went to Austin and you spoke

10:08:26  13   your peace along with other citizens that had a right to do that

10:08:31  14   during the legislative session?

10:08:33  15       A.    I did.

10:08:34  16       Q.    As part of your testimony, you indicated that you

10:08:38  17   supported Senator Powell?

10:08:41  18       A.    Yes.

10:08:42  19       Q.    And in fact, you have supported Senator Powell?

10:08:45  20       A.    Correct.

10:08:45  21       Q.    At no time did you speak with Senator Huffman other

10:08:49  22   than to address her in the citizen participation?

10:08:55  23       A.    Correct --

10:08:55  24       Q.    You have not spoken -- just let me finish up.

10:08:58  25            You have not spoken with Senator Huffman, correct?

10:09:01   1        A.    Yes, I have not.

10:09:02   2        Q.    You have not spoken with her staff, correct?

10:09:04   3        A.    That's correct.

10:09:05   4        Q.    You have not spoken with Ann Macken?

10:09:07   5        A.    I have not.

10:09:08   6        Q.    You have not spoke with Sean Oppermann?

10:09:10   7        A.    I have not.

10:09:11   8        Q.    Okay.  With respect to how the lines were drawn in

10:09:15   9    Tarrant County, you do not have any personal knowledge about

10:09:18  10    that, do you?

10:09:19  11        A.    How the lines were drawn?

10:09:20  12        Q.    Correct.  In other words, the method used to draw

10:09:24  13    those lines, you do not have personal knowledge of that,

10:09:27  14    correct?

10:09:27  15        A.    I do not.

10:09:29  16        Q.    Okay.  It's the case that if I asked you what system

10:09:31  17    was even utilized, whether it was a map system, RedAppl or

10:09:36  18    something else, you would not be able to tell us that, would

10:09:38  19    you?

10:09:38  20        A.    No, just the impact that it had.

10:09:40  21        Q.    With respect to the functions that were utilized by

10:09:44  22    whatever that software was, you don't know what was turned on or

10:09:48  23    what wasn't, do you?

10:09:49  24        A.    That's correct.

10:09:50  25        Q.    Now I want to talk about your history.  You are

10:09:52   1   from -- I think you lived in Arkansas for a little while?

10:09:56   2       A.   I was born in Fort Worth, but raised in Arkansas.

10:09:59   3       Q.   And you've lived a number of years in Fort Worth,

10:10:02   4   correct?

10:10:02   5       A.   That's correct.

10:10:03   6       Q.   And give us an estimate of how many.  I don't know if

10:10:06   7   I got that on direct.

10:10:07   8       A.   Well, on and off, you know, 30, 40 years, maybe if --

10:10:13   9       Q.   And so you would say that you know the ins and out of

10:10:20  10   Fort Worth based on the living there?

10:10:21  11       A.   Correct.

10:10:22  12       Q.   More so than someone that doesn't live there, correct?

10:10:25  13       A.   That's correct.

10:10:25  14       Q.   Now, back to your history.  So you are the Justice of

10:10:29  15   the Peace and before that you were a constable, correct?

10:10:31  16       A.   That is correct.

10:10:32  17       Q.   Have a long period of service there in Fort Worth?

10:10:36  18       A.   That's correct.

10:10:36  19       Q.   Now are you Democrat?  Let's put that on the table.

10:10:41  20       A.   Yes.

10:10:41  21       Q.   You have a long history involving yourself in

10:10:44  22   democratic elections?

10:10:46  23       A.   Yes.

10:10:46  24       Q.   You supported Senator Powell?

10:10:48  25       A.   I did.

10:10:48   1        Q.    Supported Senator Davis?

10:10:49   2        A.    I did.

10:10:50   3        Q.    Both occupants of SD-10?

10:10:52   4        A.    That is correct.

10:10:53   5        Q.    And you know based on your experience in politics in

10:10:56   6   SD-10, it's a very competitive district.  It has been in the

10:11:00   7   past, correct?

10:11:01   8        A.    Yes.

10:11:01   9        Q.    Okay.  The elections have gone back and forth.  If you

10:11:03  10   go back to 2002, sometimes it's a Democrat, sometimes it's a

10:11:08  11   Republican, correct?

10:11:09  12        A.    Yes.

10:11:10  13        Q.    Right?  Okay.

10:11:13  14              Back to your campaign history.  You worked on Bill

10:11:17  15   Clinton's presidential campaign?

10:11:18  16        A.    I did.

10:11:19  17        Q.    You worked on Hillary Clinton's 2008 campaign?

10:11:21  18        A.    I did.

10:11:22  19        Q.    Once he beat Hillary, you were on the Obama/Biden, he

10:11:24  20   beat -- once Obama beat Hillary, you were on the Obama/Biden?

10:11:28  21        A.    Yes, I was.  I didn't play an active role in that

10:11:32  22   campaign as I did with Hillary, but I was a supporter.

10:11:40  23        Q.    All right.  And you've worked, also -- let me check

10:11:41  24   through a few -- Chris Bell for Governor in '06?

10:11:45  25        A.    I did.

10:11:45  1        Q.    Rick Noriega, Senate in '08?

10:11:48  2        A.    I did.

10:11:48  3        Q.    Tom Shiffer in '10?

10:11:51  4        A.    Correct.  He wasn't there very long.

10:11:53  5        Q.    Okay.  And then we talked about this Wendy Davis for

10:11:57  6   governor in '14, right?

10:11:57  7        A.    Yes.

10:11:58  8        Q.    Those are the folks you supported, right?

10:12:02  9        A.    That's correct.

10:12:03 10        Q.    You haven't only been involved in the politics.

10:12:06 11   You've also been involved in litigation?

10:12:08 12        A.    Correct.

10:12:08 13        Q.    When did Mr. Dunn contact you about testifying in this

10:12:12 14   case?

10:12:13 15        A.    I don't think I heard from Mr. Dunn, directly.

10:12:16 16        Q.    Okay.  You understand that Mr. Dunn is the attorney

10:12:19 17   for the Brook's plaintiffs in this matter?

10:12:21 18        A.    Yes.

10:12:21 19        Q.    All right.  And you understand, sir, that Mr. Dunn

10:12:27 20   represented you in prior litigation, right?

10:12:29 21        A.    Correct.

10:12:30 22        Q.    Okay.  That would be both the Section 5 attack on

10:12:34 23   voter ID that occurred in 2012, Mr. Dunn was your attorney,

10:12:39 24   wasn't he.

10:12:39 25        A.    He was.

10:12:40   1      Q.   Mr. Dunn was your attorney in the voter ID case in

10:12:44   2   2013, the V. C. case, correct?

10:12:47   3      A.   That's correct.

10:12:48   4      Q.   All right.  You testified also in redistricting last

10:12:53   5   time, Perez vs. Perez.  You were witness a witness and you were

10:12:58   6   deposed by my colleague, Matthew Fredrick, correct?

10:13:01   7      A.   That's right.

10:13:02   8      Q.   All right.

10:13:08   9           Now, Mr. De Leon, are you familiar with what the CVAP

10:13:16  10   figures the voting population age were for SD-10 as we came into

10:13:24  11   the 2021 redistricting session?

10:13:26  12      A.   No.

10:13:26  13      Q.   Okay.

10:13:46  14           MR. DUNN:  Why don't we see if we can pull those up?

10:13:55  15           If we can blow up row SD-10, please?

10:13:55  16   BY MR. DUNN:

10:14:01  17      Q.   To make this easier, because I think you have to

10:14:12  18   focus, is there a way you can do --

10:14:47  19           (Counsel speaking to counsel table).

10:14:47  20   BY MR. DUNN:

10:14:47  21      Q.   Okay.  You -- you -- as far as the citizen voting

10:14:48  22   population in Senate District 10, you're not here to testify

10:14:52  23   about that?

10:14:53  24      A.   No.

10:14:53  25      Q.   All right.  Very good.

10:15:08  1          All right.  Now let me also ask you, you were part of

10:15:13  2  the D. N. C.'s Texas Victory Leaders Counsel, correct?  You were

10:15:17  3  named that sometime over the last decade; is that right?

10:15:22  4      A.    That, I'm not familiar with.  The DNC what?

10:15:27  5      Q.    The Democratic National Committee's Texas Victory

10:15:35  6  Leadership Council.  Are you aware of that?

10:15:36  7      A.    That doesn't ring a bell.

10:15:38  8      Q.    I want to ask you, in Fort Worth, you would agree that

10:15:42  9  you and Mr. Brooks had worked to support Wendy Davis in her

10:15:47  10  prior campaigns, right?

10:15:50  11      A.    That's correct.

10:15:51  12      Q.    All right.  Now it's also the case that -- have you

10:15:57  13  worked with matt Angle in the past in Fort Worth politics?

10:16:01  14      A.    Yes.

10:16:01  15      Q.    And what group is Mr. Angle with?

10:16:06  16      A.    He's with the Loan Star group.

10:16:08  17      Q.    Loan Star Democrats, is that the name of the

10:16:12  18  organization?

10:16:12  19      A.    I've always referred to Loan Star.  I don't know the

10:16:17  20  full name.

10:16:17  21      Q.    Let me ask you about representation of you.  You have

10:16:21  22  had representing from either -- outside of Mr. Dunn, with

10:16:27  23  Mr. Jerry Hiebert in the past?  Has he represented you?

10:16:29  24      A.    In the past I worked with Jerry.  He prepped me for

10:16:33  25  the redistricting for Wendy Davis.

10:16:43   1          MS. DANAHY:  I want to object.  Attorney/client

10:16:46   2   privilege.  You don't -- I'm going to instruct you not to

10:16:48   3   discuss your conversations with Mr. Hiebert.

10:16:48   4   BY MR. SWEETEN:

10:16:51   5      Q.   I do not want to know any of your conversations.  I

10:16:54   6   want to ask you, have you worked with Mr. Hiebert in the past?

10:16:57   7      A.   I had one conversation with him back whenever Wendy

10:17:02   8   Davis was having her child.

10:17:04   9      Q.   How about attorney Rene Hicks?  Have you work with him

10:17:08  10   in the past?

10:17:08  11      A.   That does not ring a bell.

10:17:11  12      Q.   How about Mr. Gaber here?

10:17:14  13      A.   Other than the appearance here today and yesterday.

10:17:17  14      Q.   Do you if know any of those four attorneys represented

10:17:20  15   Ms. Powell during the year proceeding redistricting in the year

10:17:25  16   2011?

10:17:25  17      A.   I mean, I don't know the extent of that relationship.

10:17:37  18      Q.   Thank you.

10:17:40  19                         SERGIO DE LEON,

10:17:40  20            REDIRECT EXAMINATION BY THE PLAINTIFF

10:17:42  21   BY MS. DANAHY:

10:17:42  22      Q.   I just have a couple of short questions for you.

10:17:48  23      A.   Uh-huh.

10:17:49  24      Q.   Mr. Sweeten had asked you if you had spoken to Senator

10:17:54  25   Huffman at all about redistricting SD-10; is that right?

REDIRECT - DE LEON                                                    60

10:17:55  1        A.    Yes.

10:17:55  2        Q.    And you testified that you had not?

10:17:57  3        A.    That's correct.

10:17:58  4        Q.    Did Senator Huffman provide any public opportunity to

10:18:03  5   meet with her personally about redistricting, that you were

10:18:06  6   aware of?

10:18:06  7        A.    No.

10:18:06  8        Q.    What about Anna Macken?

10:18:08  9        A.    No.

10:18:09  10       Q.    And Sean Oppermann?

10:18:10  11       A.    No.

10:18:11  12       Q.    To your knowledge, was the public testimony sessions

10:18:13  13  the only ability that you had to speak in front of Senator

10:18:18  14  Huffman as member of the public on redistricting?

10:18:19  15            MR. SWEETEN:   Objection, leading.

10:18:21  16            THE WITNESS:   I'll just say --

10:18:23  17            JUDGE GUADERRAMA:   Hold on a second.

10:18:25  18            Yeah, I'll sustain that objection.

10:18:29  19  BY MS. DANAHY:

10:18:29  20       Q.    What opportunity did you have to speak in front of

10:18:32  21  Senator Huffman as a member of the public on redistricting?

10:18:35  22       A.    The only time I saw the Senator is when I was speaking

10:18:41  23  on the Senate floor in the most recent testimony that I gave on

10:18:46  24  redistricting.

10:18:46  25       Q.    Are you aware of any other opportunity you had to

KATHLEEN A. SUPNET, CSR

10:18:49  1    speak with Senator Huffman with redistricting?

10:18:53  2        A.    No, ma'am.

10:18:53  3        Q.    Thank you.

10:18:54  4             MS. DANAHY:  Thank you.  That's all.

10:18:54  5             JUDGE GUADERRAMA:   Mr. Sweeten:

10:18:55  6             MR. SWEETEN:  Just a couple of questions, Your Honor.

10:18:55  7             JUDGE GUADERRAMA:  Yes, sir.

10:18:58  8                        SERGIO DE LEON,

10:18:58  9             RECROSS-EXAMINATION BY THE PLAINTIFF

10:19:00 10    BY MR. SWEETEN:

10:19:00 11        Q.    You have, in the past, when visiting the Capitol, gone

10:19:04 12    to talk to other members, senators or legislators; is that

10:19:08 13    correct?

10:19:08 14        A.    Lobbying on a lot of JP consul issues, yes.

10:19:13 15        Q.    Got it.  So you're active in that area.

10:19:16 16             You've been in their offices to talk -- you've sign

10:19:18 17    in, tried to talk with them, correct?

10:19:20 18        A.    Correct.

10:19:21 19        Q.    Okay.  During September or October of 2021, did you go

10:19:25 20    to Senator Huffman's office?

10:19:28 21        A.    I did not.

10:19:30 22             MR. SWEETEN:  No further questions.  Thank you.

10:19:32 23             MS. DANAHY:  Nothing further, Your Honor.

10:19:33 24             JUDGE GUADERRAMA:   All right.

10:19:35 25             May the Judge be permanently excused?

DIRECT - BROOKS                                                         62

10:19:37  1          MS. DUNN:  Yes, Your Honor.

10:19:52  2          JUDGE GUADERRAMA:  Mr. Sweeten, may the Judge be

10:19:52  3   permanently excused?

10:19:52  4          MR. SWEETEN:  Yes, sir.

10:19:52  5          THE COURT:  This is a good time to take our break for

10:19:55  6   10:30, so let's go ahead and recess for 15.  If you'd you all be

10:19:59  7   pack at 10:35, we'll resume our proceedings then.

10:20:11  8              (Break at 10:20 a.m. to 10:35 a.m.).

10:35:36  9          JUDGE GUADERRAMA:  Mr. Dunn, what exhibits did you

10:35:36 10   identify earlier that you were offering?

10:35:41 11          MR. DUNN:  Brooks Exhibits 1 through 105.

10:35:46 12          JUDGE GUADERRAMA:  So do you have an additional

10:35:49 13   exhibit list?  I have your first amended, it goes through 104.

10:36:05 14          MR. DUNN:  Oh, I beg your pardon.  Then 1 through 104.

10:36:05 15          JUDGE GUADERRAMA:   So we're going to -- subject to

10:36:08 16   objections, Plaintiff's Exhibit 1 through 104.

10:37:13 17          Mr. Gaines, you may begin, sir.

10:37:19 18          MR. GAINES:  Thank you.

10:37:19 19                        ROY BROOKS

10:37:20 20            DIRECT EXAMINATION BY THE PLAINTIFF

10:37:21 21   BY MR. GAINES:

10:37:21 22      Q.   Good morning, Commissioner Brooks?

10:37:24 23      A.   Good morning, Mr. Gaines.

10:37:25 24      Q.   Would you please state your name for the record?

10:37:27 25      A.   My name is Roy Charles Brooks.

| | | |
|---|---|---|
| 10:37:31 | 1 | Q.   And what is your race? |
| 10:37:34 | 2 | A.   African-American. |
| 10:37:37 | 3 | Q.   And are you a voter? |
| 10:37:38 | 4 | A.   Yes, sir. |
| 10:37:40 | 5 | Q.   And how often do you vote in Texas state elections? |
| 10:37:44 | 6 | A.   Every time they have one. |
| 10:37:46 | 7 | Q.   And do you intend to vote in the 2022 election? |
| 10:37:52 | 8 | A.   Yes, sir. |
| 10:37:53 | 9 | Q.   And do you intend to vote in all future elections? |
| 10:37:56 | 10 | A.   That would be my intention, yes. |
| 10:37:58 | 11 | Q.   And could you tell us, where do you love in Fort |
| 10:38:05 | 12 | Worth, Commissioner? |
| 10:38:07 | 13 | A.   Southwest Fort Worth in the Meadows West neighborhood. |
| 10:38:13 | 14 | Q.   And how long have you lived in Fort Worth? |
| 10:38:17 | 15 | A.   Oh, I've lived in Fort Worth most of my life, which is |
| 10:38:29 | 16 | 72 years long. |
| 10:38:32 | 17 | Q.   Thank you. |
| 10:38:32 | 18 |      How are you employed? |
| 10:38:36 | 19 | A.   I am employed by Tarrant County as the elected County |
| 10:38:47 | 20 | Commissioner Tarrant County Precinct 1. |
| 10:38:50 | 21 | Q.   And could you tell us when you were first elected? |
| 10:38:56 | 22 | A.   I was elected in 2004 and took office January 1, 2005. |
| 10:39:07 | 23 | Q.   Have you been elected to any other positions in the |
| 10:39:10 | 24 | past? |
| 10:39:11 | 25 | A.   I was elected as city council person in the city of |

10:39:18  1    Forest Hills, which is a suburb of Fort Worth.  I was elected

10:39:25  2    three times.

10:39:26  3        Q.    Are you a member of any state or county commissioners

10:39:33  4    organizations?

10:39:33  5        A.    Yes, sir.  I'm a member of the National Association of

10:39:40  6    Counties, which is that body which represents all 3,069 counties

10:39:52  7    in America.  I'm a former president of that organization.  And I

10:39:57  8    am the current chairman of the Board of the National

10:40:04  9    Organization of Black County officials, which is an affiliate of

10:40:10  10   the National Association of Counties.

10:40:16  11       Q.    Is this organization -- what kind of organization is

10:40:19  12   this?

10:40:19  13       A.    Which one.

10:40:21  14       Q.    The National Association of Counties?

10:40:29  15       A.    The National Association of Counties is a

10:40:37  16   non-partisan, but very political body, which represents local

10:40:46  17   counties in their dealings with the federal government, whatever

10:40:56  18   administration happens to be in power and both houses of

10:41:01  19   Congress and the executive agencies to craft policies that are

10:41:10  20   to the benefit of people who live in counties in America.

10:41:16  21       Q.    And what is a role of a county commissioner in Tarrant

10:41:24  22   County?

10:41:24  23       A.    The role of a Tarrant County commissioner is to make

10:41:33  24   policies regarding the implementation of laws passed by the

10:41:44  25   state Legislature from time to time and to implement the

10:41:55  1    statutory responsibilities of a county commissioner under the

10:42:01  2    state Constitution.

10:42:03  3        Q.    What policies do you focus on in your role as county

10:42:09  4    commissioner?

10:42:11  5        A.    Personally?

10:42:12  6        Q.    Yes.

10:42:13  7        A.    My personal focus is primarily on issues of health

10:42:22  8    care, but I focus on the entire social safety net, which

10:42:30  9    includes criminal justice issues, child protection, mental

10:42:38  10   health and emergency assistance.

10:42:43  11       Q.    And do you, sir, as a liaison from the commissioners

10:42:49  12   court to any health organizations?

10:42:51  13       A.    Yes, I do.  I am liaison to the John Pier Smith Health

10:42:58  14   Network, which is our county hospital, and it's 40 or so

10:43:05  15   community based clinics.  I'm liaison to the mental health

10:43:11  16   retardation agency and also to Tarrant County public health

10:43:17  17   department.

10:43:18  18       Q.    What percentage of time is spent on constituent

10:43:27  19   services?

10:43:27  20       A.    At least 50 percent.

10:43:29  21       Q.    Now, I had already asked you how long you lived in

10:43:35  22   Tarrant County and are you familiar with the neighborhoods and

10:43:38  23   in communities of Tarrant County?

10:43:39  24       A.    Yes, sir.

10:43:40  25       Q.    And what areas of the counties do you represent in the

10:43:46  1    commissioner's court?

10:43:48  2        A.    I represent at least 50 percent of the city of Fort

10:43:57  3    Worth.   In addition I represent the cities of Benbrook, Crowley,

10:44:04  4    the town of Edge Cliff Village, the city of Forest Hills, the

10:44:13  5    city of Everman and a portion of the City of Arlington.   Also a

10:44:19  6    portion of the city of Burleson.

10:44:22  7        Q.    What is a demographic make-up of your precinct?

10:44:31  8        A.    It's approximately 50 percent Anglo, perhaps

10:44:40  9    35 percent Hispanic and 25 percent African-American.

10:44:45  10       Q.    Now Commissioner, in your role as commissioner, do you

10:44:49  11   have occasion to work with the state Legislature who represent

10:44:55  12   Tarrant County?

10:44:55  13       A.    Yes, sir.

10:44:55  14       Q.    And what state Senate District overlaps with your

10:45:01  15   commissioner's court precinct?

10:45:04  16       A.    Senate District 10 primarily.

10:45:07  17       Q.    And is it important to your role as commissioner to

10:45:11  18   have a working relationship with state legislature?

10:45:16  19       A.    Yes, sir, it is.

10:45:17  20       Q.    And why is that, commissioner?

10:45:23  21       A.    Because the government, when it works best is a

10:45:31  22   partnership between all levels of the government.   We must work

10:45:36  23   collaboratively to get positive results for the people that we

10:45:41  24   refer.   And although the taxpayer may write checks to different

10:45:54  25   governmental institutions, essentially there's only one taxpayer

10:46:00  1   and their interests have to be represented everywhere.

10:46:06  2       Q.   And could you just give us a couple of examples of

10:46:10  3   matters decided by the state Legislature that affect your

10:46:16  4   constituents?

10:46:18  5       A.   Issues of health care, the funding of Medicaid and the

10:46:27  6   various indigent health care programs.  The county's response to

10:46:43  7   the COVID pandemic is pretty well controlled by policies that

10:46:53  8   the Governor has established.  There are issues of public safety

10:47:00  9   and criminal justice, mental health, all of these are areas of

10:47:08  10  concern to me.

10:47:09  11      Q.   And in your experience, are these issues important to

10:47:15  12  your black and Latino constituents?

10:47:19  13      A.   Absolutely.

10:47:20  14      Q.   Could you tell us why?

10:47:23  15      A.   Because when we get those issues correct, when we do

10:47:41  16  the right things regarding those issues, it adds to the quality

10:47:45  17  of life of the residence of Tarrant County when we get them

10:47:51  18  wrong it often causes pain.

10:47:56  19      Q.   And have you been able to convince members of the

10:48:02  20  state Senate from your commissioner precinct to support these

10:48:07  21  measures?

10:48:07  22      A.   Some more than others, yes.

10:48:13  23      Q.   And could you tell us who you've been able to issues

10:48:20  24  you dress?

10:48:20  25      A.   Well Senator Beverly Powell who represents state

10:48:25  1    Senate District 10 is always a reliable partner.

10:48:30  2         Q.    And the other members, what's your relationship with

10:48:36  3    the other members?

10:48:37  4         A.    I try to work with all members of the House and

10:48:46  5    Senate.  I find that some are easier to work with than others.

10:48:54  6         Q.    Now, Commissioner Brooks, I want to ask you a question

10:49:00  7    about the state Senate maps.

10:49:02  8               Are you familiar with the map for SD-10 that was in

10:49:08  9    effect at the 2018 election for SD-10?

10:49:13  10        A.    Yes.

10:49:13  11        Q.    And can you tell us when that map was enacted?

10:49:19  12        A.    In 2011, I believe.

10:49:27  13        Q.    The 2011 redistricting plan?

10:49:33  14        A.    Yes.

10:49:34  15        Q.    Were you involved at all during the 2011 redistricting

10:49:39  16    cycle?

10:49:39  17        A.    I was.

10:49:40  18        Q.    And how were you involved?

10:49:44  19        A.    I am always involved in trying to make sure that

10:49:55  20    African-American and Hispanic voters are able to maximize their

10:50:04  21    participation in the electoral process.

10:50:07  22        Q.    Did you did you submit a written test to the

10:50:12  23    department of Justice during that preclearance process?

10:50:15  24        A.    Yes, I did.

10:50:16  25        Q.    Have you read the opinion from that court case?

10:50:19   1        A.    Yes I have.

10:50:20   2        Q.    And did that court credit your testimony in that

10:50:25   3   opinion?

10:50:25   4        A.    Yes it did.

10:50:27   5        Q.    How what is your non-lawyer understanding of decision

10:50:30   6   with respect to SD-10?

10:50:34   7        A.    My non-lawyer understanding of the court's decision

10:50:42   8   was that the Legislature's efforts to dismantle Senate District

10:51:04   9   10 were intentionally discriminatory.

10:51:11  10        Q.    After the district was put back together in 2012, were

10:51:20  11   you relieved when that happened?

10:51:22  12        A.    Absolutely.

10:51:25  13        Q.    Now, let's talk about the recent round of

10:51:30  14   redistricting.  Was the 2012 court decision honored in your

10:51:36  15   opinion?

10:51:36  16        A.    It was honored until the 2021 redistricting cycle.

10:51:48  17        Q.    So what happened during this cycle?

10:51:54  18        A.    Once again, there wasn't --

10:51:54  19              MS. CORBELLO:  Objection.  Lacks foundation.

10:52:06  20              THE COURT:  I'm sorry.  What was your objection?

10:52:06  21              MS. CORBELLO:  Lacks foundation, Your Honor.

10:52:06  22              THE COURT:  Lacks foundation?

10:52:09  23              MS. CORBELLO:  Yes, Your Honor.  The witness has not

10:52:10  24   testified to any knowledge of what went on during the 87th

10:52:12  25   Legislative Session.

DIRECT - BROOKS                                                    70

10:52:13   1          JUDGE GUADERRAMA:   I thought he touched on this.

10:52:16   2          Mr. Gaines, if you would lay that foundation and ask

10:52:20   3    your question again, please.

10:52:23   4    BY MR. GAINES:

10:52:23   5      Q.   Did you have an opportunity to testify as you said

10:52:28   6    during the 2021 redistricting cycle; is that correct?

10:52:32   7      A.   Yes, I did.

10:52:33   8      Q.   And you know from your testimony that and you know

10:52:37   9    from your final result that the plan that was came up with took

10:52:46  10    Tarrant County African-American and Hispanic neighborhoods out

10:52:50  11    of senatorial 10 and merged white rural voters in six rural

10:52:58  12    counties; is that correct?

10:52:59  13      A.   That is correct.

10:52:59  14      Q.   Tell us what communities were taken out of SD-10?

10:53:04  15      A.   The Hispanic community on the north side of the city

10:53:10  16    of Fort Worth and the African-American and Hispanic communities

10:53:18  17    in Mansfield and Kendall and south of Harlan.

10:53:27  18      Q.   And just again so we're clear, what counties were

10:53:32  19    moved into SD-10 during the last redistricting cycle?  Just

10:53:39  20    describe the counties for us.

10:53:42  21      A.   The portion of Tarrant County that was left in Senate

10:54:01  22    District 10 was appended to six or seven rural Anglo counties to

10:54:17  23    the south and west of Tarrant County.

10:54:22  24      Q.   And would you say that the white rural Texans in these

10:54:29  25    seven counties share the same needs and concerns of your

DIRECT - BROOKS                                                      71

10:54:35  1    constituents?

10:54:42  2          MS. CORBELLO:  Objection, lacks foundation.

10:54:46  3          JUDGE GUADERRAMA:    Mr. Gaines, if you can show a

10:54:50  4    foundation for how he would know about those other counties.

10:54:54  5    BY MR. GAINES:

10:54:55  6      Q.    Have you had a chance to look at the map passed by the

10:54:59  7    Legislature and signed by the Governor have you had a chance to

10:55:04  8    look at that map?

10:55:08  9      A.    The new map for Senate District 10?

10:55:10  10     Q.    Yes.

10:55:11  11     A.    Yes, I have.

10:55:11  12     Q.    And you also had an opportunity to look at the present

10:55:16  13   counties that were placed into the new SD-10; is that correct?

10:55:21  14     A.    That's correct.

10:55:21  15     Q.    And you know that you have also had an opportunity to

10:55:25  16   know that these counties are rural?

10:55:28  17     A.    Yes.

10:55:29  18     Q.    And you also know that these counties are white?

10:55:36  19          MS. CORBELLO:  Objection, leading.

10:55:37  20          JUDGE GUADERRAMA:    Sustained.

10:55:43  21   BY MR. GAINES:

10:55:44  22     Q.    Who lives in these counties?

10:55:46  23     A.    They are primarily Anglo, rural people.

10:55:51  24     Q.    Thank you.  Do these, based on your knowledge, do they

10:55:57  25   share the same needs and concerns of your constituents?

10:56:03   1              MS. CORBELLO:  Objection, lacks foundation.

10:56:07   2              JUDGE GUADERRAMA:  Sustained.  If we could just show

10:56:09   3    his knowledge.

10:56:16   4    BY MR. GAINES:

10:56:17   5        Q.    Who represents SD-10?

10:56:20   6        A.    Senator Beverly Powell.

10:56:23   7        Q.    Is she Republican or Democrat?

10:56:27   8        A.    She's a Democrat.

10:56:30   9        Q.    And did you recruit Senator Powell to run in SD-10?

10:56:36  10        A.    Yes, I did.

10:56:37  11        Q.    Why?  Can you tell us why?

10:56:40  12        A.    Because I have known Senator Beverly Powell for many

10:56:51  13    many years and know her to share the values of African-Americans

10:57:01  14    and Hispanics in Senate District 10.

10:57:07  15        Q.    And in your experience, do black and Latino voters in

10:57:15  16    Tarrant County vote same county date in generally elections?

10:57:19  17        A.    Yes I have enjoyed the support of the black and

10:57:25  18    Hispanic community in my five elections to the commissions Court

10:57:36  19    to Tarrant County.

10:57:37  20        Q.    And based on your knowledge of voters in Tarrant

10:57:40  21    County, would you say Senator Powell is elected of choice in?

10:57:48  22        A.    Yes.

10:57:49  23        Q.    And based on Tarrant County politics, do you believe

10:57:53  24    that Senator Powell can win re-election in the newly drawn

10:57:59  25    Senate District 10?

10:58:03  1    A.    Probably not.

10:58:08  2    Q.    And based on your experience with knowledge in Tarrant

10:58:13  3    County politics, do you believe Black and Latino voters can

10:58:17  4    elect any candidate of choice in SD-10 as it is currently drawn?

10:58:22  5    A.    No.

10:58:23  6    Q.    Commissioner Brooks, are you familiar with the 2021

10:58:28  7    Congressional District Plan adopted by the State Legislature?

10:58:31  8    A.    Yes.

10:58:32  9    Q.    And how did that plan treat the Fort Worth minority

10:58:36  10   community?

10:58:37  11   A.    It kept the community intact in both congressional

10:58:53  12   Districts 33, and 30.

10:58:59  13   Q.    And are you familiar with the 2021 State Board of

10:59:04  14   Education Redistricting Plan adopted by the State Legislature?

10:59:08  15   A.    Yes.

10:59:08  16   Q.    And how did that plan treat the Fort Worth minority

10:59:12  17   community?

10:59:12  18   A.    It kept those communities of interest intact.

10:59:17  19   Q.    And Commissioner Brooks, were you active speaking out

10:59:22  20   in the 2021 redistricting process?

10:59:25  21   A.    Yes.

10:59:25  22   Q.    And did you attend any of the redistricting committee

10:59:30  23   hearings?

10:59:30  24   A.    Yes.

10:59:31  25   Q.    And did you express disapproval of the plan that was

10:59:37  1    passed to members of the committee before it was passed?

10:59:42  2        A.    Yes, I did.

10:59:43  3        Q.    And what was your testimony during that 2021 hearing?

10:59:50  4    Can you tell us a little about that?

10:59:53  5        A.    My testimony was that the plan that was proposed to be

11:00:06  6    adopted would keep African-American and Hispanic voters from

11:00:27  7    ever being able to elect a candidate of their choice.

11:00:35  8        Q.    Were there other people that also testified against

11:00:39  9    this plan in regard to SD-10?

11:00:41  10       A.    Yes.

11:00:41  11       Q.    I believe you testified on September 11, 2021; is that

11:00:50  12   correct?

11:00:50  13       A.    I did.

11:00:50  14       Q.    And what was your testimony during that hearing?

11:00:53  15       A.    I recognize the irony and importance of the fact that

11:01:06  16   that hearing was being held on September 11th, and the

11:01:12  17   significance of that date and the history of America, that

11:01:21  18   because of attacks outside parties against the United States it

11:01:30  19   brought people together, brought us together as a nation, and

11:01:38  20   that the actions that were being contemplated by the state

11:01:46  21   Legislature would have just the opposite effect.  It would

11:01:52  22   divide us rather than unite us.

11:01:55  23       Q.    And did you submit written testimony during that

11:01:59  24   hearing?

11:01:59  25       A.    I did.

11:02:00  1      Q.    What are some of the things you told the committee in

11:02:08  2    your written testimony?

11:02:10  3      A.    Essentially that they should leave Senate District 10

11:02:19  4    intact and should try to learn the lessons of history and not

11:02:28  5    repeat a mistakes of the past.

11:02:32  6      Q.    And Commissioner Brooks, what path forward for your

11:02:46  7    citizens, the persons that you represent, do you have any

11:02:50  8    opinion as to whether that your black and brown constituents to

11:02:58  9    be silenced in Senate District 10 elections if this plan remains

11:03:03  10   in effect?

11:03:04  11     A.    Their voices will be greatly diminished to the point

11:03:10  12   of not being heard and not being effective in their attempts to

11:03:28  13   get their points of view across.

11:03:32  14     Q.    Commissioner Brooks, do you standby your testimony at

11:03:39  15   the legislative process?

11:03:41  16     A.    I do.

11:03:46  17           MR. GAINES:   I pass the witness.

11:03:49  18           JUDGE GUADERRAMA:   Thank you, Mr. Gaines.

11:03:56  19                      ROY BROOKS,

11:03:56  20           CROSS-EXAMINATION BY THE DEFENSE

11:03:56  21   BY MS. CORBELLO:

11:04:28  22     Q.    It is safe to say from your testimony this morning you

11:04:31  23   know Tarrant County very well, right?

11:04:32  24     A.    Yes.

11:04:33  25     Q.    You've lived there you said most of your life?

11:04:37  1        A.    Yes.

11:04:37  2        Q.    You've served as county commissioner for about

11:04:43  3    17 years; is that right?

11:04:43  4        A.    That's correct.

11:04:44  5        Q.    So you have had a lot of time and a lot of job

11:04:47  6    experience to familiarize yourself with the demographics and

11:04:52  7    voter population of Tarrant County; is that right?

11:04:54  8        A.    That's correct.

11:04:55  9        Q.    Would you expect someone who's never lived in Tarrant

11:04:58  10   County to have the same level of knowledge that you do about

11:05:04  11   Tarrant County voters, Mr. Brooks?

11:05:06  12       A.    No.

11:05:06  13       Q.    Did you know where Senator Huffman is from?

11:05:09  14       A.    No, I did not.

11:05:11  15       Q.    Are you aware that she's never lived in Tarrant

11:05:15  16   County?

11:05:15  17       A.    No.

11:05:15  18       Q.    So based on your testimony, you would not expect

11:05:19  19   Senator Huffman to be aware of the racial demographics of voter

11:05:22  20   population within Tarrant County the same way that you've

11:05:24  21   testified to today; is that fair?

11:05:26  22       A.    That's fair.

11:05:28  23       Q.    You said you're currently the County Commissioner for

11:05:35  24   Tarrant County, Precinct 1, correct?

11:05:36  25       A.    Correct.

11:05:37   1        Q.    Precinct 1, what's the population of Democrats to

11:05:41   2   Republican within Precinct 1?

11:05:43   3        A.    Approaching 60 percent Democrat, 40 percent more or

11:05:56   4   less, Republican.

11:05:57   5        Q.    And you are a Democrat, right?

11:06:00   6        A.    I am.

11:06:00   7        Q.    And that 60/40 number, that's remained the same

11:06:05   8   throughout your tenure as Commissioner of Precinct 1, right?

11:06:10   9        A.    Yes.

11:06:11  10        Q.    One of your job duties, you said, was to participate

11:06:15  11   in reviewing precinct maps and helping to decide whether they

11:06:19  12   need to be withdrawn; is that right?

11:06:21  13        A.    Say that again, please?

11:06:23  14        Q.    Sure.  I'll break it down.

11:06:25  15              As Precinct 1 Commissioner, one of your job duties is

11:06:29  16   to review precinct maps from time to time, right?

11:06:35  17        A.    Yes --

11:06:35  18        Q.    And you --

11:06:36  19        A.    -- one of our responsibilities is redistricting

11:06:42  20   Tarrant County every 10 years.

11:06:43  21        Q.    So you are part of the decision-making process about

11:06:48  22   whether or not Precinct 1 needs to be withdrawn [sic]; is that

11:06:54  23   right?

11:06:54  24        A.    Yes.

11:06:54  25        Q.    You, along with the rest of the commissioner's court,

| | | |
|---|---|---|
| 11:06:58 | 1 | looked into redrawing precinct one back in 2021, right? |
| 11:07:05 | 2 | A.   Yes. |
| 11:07:05 | 3 | Q.   And you were against Precinct 1 being withdrawn [sic] |
| 11:07:10 | 4 | at that time, weren't you? |
| 11:07:11 | 5 | A.   Yes. |
| 11:07:11 | 6 | Q.   Tarrant County is predominantly a Republican county, |
| 11:07:17 | 7 | isn't it? |
| 11:07:17 | 8 | A.   Yes.  Tending toward purple. |
| 11:07:25 | 9 | Q.   But currently it predominantly Republican county? |
| 11:07:30 | 10 | A.   Probably. |
| 11:07:31 | 11 | Q.   Well do you remember giving a deposition with me |
| 11:07:35 | 12 | Mr. Brooks, just a few days ago? |
| 11:07:35 | 13 | A.   I do. |
| 11:07:36 | 14 | Q.   Do you remember answering any differently to that |
| 11:07:44 | 15 | question? |
| 11:07:45 | 16 | A.   I don't specifically remember what my answer was at |
| 11:07:49 | 17 | the time, but I will concede to you that it is a Republican |
| 11:08:01 | 18 | county. |
| 11:08:03 | 19 | Q.   Other than one run virtual attendance, each to the |
| 11:08:09 | 20 | Senate and to the House, you didn't attend any other Legislature |
| 11:08:13 | 21 | redistricting this last redistricting, did you? |
| 11:08:17 | 22 | A.   No, I did not. |
| 11:08:18 | 23 | Q.   You didn't watch any of the sessions over video other |
| 11:08:23 | 24 | than the two that you attended virtually? |
| 11:08:26 | 25 | A.   No, I did not. |

11:08:27  1        Q.    You didn't get any live updates as the sessions were

11:08:31  2   going forward, did you?

11:08:32  3        A.    Define for me live updates.

11:08:41  4        Q.    Well, you didn't get any text messages from Senator

11:08:45  5   Powell as the redistricting sessions were going forward, did

11:08:48  6   you?

11:08:48  7        A.    No, I did not.

11:08:48  8        Q.    You didn't look up anyone's account on Twitter to see

11:08:53  9   how they were doing, did you?

11:08:54  10       A.    No, I did not.

11:08:55  11       Q.    Any live updates like the ones you -- I just gave you

11:08:59  12  that you were following at the time?

11:09:00  13       A.    No.

11:09:01  14       Q.    And you didn't watch any sessions after-the-fact, did

11:09:04  15  you?

11:09:04  16       A.    No.

11:09:05  17       Q.    You don't have any personal knowledge of what was said

11:09:10  18  by any of the legislators during the 87th session regarding

11:09:15  19  redistricting other than the two brief periods you made an

11:09:17  20  appearance over virtual; is that right?

11:09:19  21       A.    No, I did not.

11:09:21  22       Q.    And you're not testifying to this Court about any

11:09:26  23  personal knowledge of motivations behind any of the senators

11:09:30  24  that provided maps that would've impacted SD-10 during the

11:09:34  25  legislative session, right?

CROSS - BROOKS                                                        80

11:09:36  1       A.    Right.

11:09:36  2       Q.    And you are not here today speaking about -- you

11:09:39  3   didn't speak to any legislator who supported a map to have the

11:09:45  4   Senate maps, right?

11:09:46  5       A.    Right.

11:09:47  6       Q.    You've never spoken to Senator Huffman --

11:09:53  7       A.    No.

11:09:54  8       Q.    -- correct?  You've never spoken to her in person?

11:09:57  9       A.    No, I have not.

11:09:58 10       Q.    Never spoken to her in any other way; e-mail?

11:10:01 11       A.    I do not know her.

11:10:04 12       Q.    You don't know anyone who works for Senator Huffman,

11:10:09 13   do you?

11:10:09 14       A.    No, I do not.

11:10:10 15       Q.    You don't know who Anna Macken is?

11:10:12 16       A.    No.

11:10:12 17       Q.    So it's safe to say you haven't spoken to Anna Macken?

11:10:16 18       A.    That's correct.

11:10:16 19       Q.    And you don't know who Sean Oppermann is?

11:10:19 20       A.    No, I don't.

11:10:20 21       Q.    Safe to say you haven't spoken to Sean Oppermann?

11:10:23 22       A.    Safe to say.

11:10:27 23       Q.    You know what the proposed map of SD-10 looks like

11:10:30 24   that you are hear challenging today?

11:10:33 25       A.    Yes.

KATHLEEN A. SUPNET, CSR

```
11:10:34   1        Q.    You talked about what it looks like with your counsel
11:10:37   2   a little bit?
11:10:38   3        A.    Yes.
11:10:38   4        Q.    You know Senator Huffman authored that map, right?
11:10:48   5        A.    I have no specific knowledge who authored that map.
11:10:54   6        Q.    You actually don't have any personal knowledge about
11:10:58   7   the author of the map that you are challenging here today,
11:11:00   8   right?
11:11:00   9        A.    I do not.
11:11:01  10        Q.    So in that case, you weren't involved in any kind of
11:11:04  11   creation of the map that you are challenging today?
11:11:07  12        A.    I was not.
11:11:11  13        Q.    You didn't provide any input at any time during the
11:11:17  14   legislative session that ultimately went into -- was voted
11:11:20  15   through the Senate, right?
11:11:21  16        A.    Other than the hearings at which I testified, no.
11:11:28  17        Q.    Other than the testimony you provided, which we'll get
11:11:32  18   to in a second, were you asked to provide any input on any map
11:11:37  19   proposed by any senator that involved SD-10?
11:11:40  20        A.    No.
11:11:41  21        Q.    Senator Huffman has never told you why she drew the
11:11:47  22   map the way she did?
11:11:48  23        A.    Correct.
11:11:48  24        Q.    You don't know what software was used in drawing the
11:11:53  25   map, do you?
```

11:11:53   1       A.   No.

11:11:54   2       Q.   Have you ever used RedAppl software?

11:11:57   3       A.   No.

11:11:57   4       Q.   You don't know what functionalities are capable on

11:12:01   5    RedAppl when a Senator is creating a map?

11:12:05   6       A.   No.

11:12:06   7       Q.   Let's talk about your testimony a little bit that you

11:12:09   8    gave you gave essentially the same testimony for the Senate and

11:12:12   9    House back in the 87th legislative session, right?

11:12:16  10       A.   I believe so.

11:12:18  11       Q.   It was written testimony, right?

11:12:19  12       A.   Right.

11:12:20  13       Q.   That you read to both the Senate and the House?

11:12:23  14       A.   That's correct.

11:12:24  15       Q.   And in that testimony you advocated for separate

11:12:27  16    congressional districts for Hispanics, right?

11:12:33  17       A.   A separate congressional district for the Senate?

11:12:41  18       Q.   For Hispanics.

11:12:43  19       A.   Yes, I did.

11:12:44  20       Q.   And you advocated separate congressional district for

11:12:50  21    African African-Americans?

11:12:56  22       A.   I did.

11:12:57  23       Q.   And your reason for advocating for that is time

11:12:58  24    because the best configuration to make sure that both of those

11:13:01  25    groups could elect the candidate of their choice; is that right?

11:13:06   1          A.    That's correct.

11:13:07   2          Q.    You told the Senate that Congressional District 33 was

11:13:09   3    an African-American district, right?

11:13:17   4          A.    I told the Senate that it performs as an

11:13:19   5    African-American district, yes.

11:13:22   6          Q.    Do you recall telling them that reconfiguring

11:13:24   7    Congressional District 33 into a Hispanic District would be an

11:13:29   8    assault on African-American votes?

11:13:36   9          A.    Yes.

11:13:36  10          Q.    Did yo also tell them that redistricting Congressional

11:13:38  11    District 33 into a Hispanic district would constitute actual

11:13:41  12    intentional discrimination against minority voters including

11:13:45  13    African-American voters?

11:13:55  14          A.    I advised them that it would be discrimination.  I

11:14:03  15    don't know that I used the worth intentional discrimination.

11:14:07  16          Q.    Do you remember talking about this testimony with me

11:14:09  17    at your deposition, Mr. Brooks?

11:14:12  18          A.    I do.

11:14:13  19          Q.    Do you recall me asking whether you had told the

11:14:20  20    Senate that reconfiguring congressional 33 into a Hispanic

11:14:26  21    district would constitute intentional discrimination against

11:14:30  22    African-American voters?

11:14:33  23          A.    I don't recall specifically whether you asked me about

11:14:55  24    intentional discrimination.

11:14:59  25          Q.    Well, let me ask it this way.  Is it your testimony to

11:15:01  1    this Court today that reconfiguring Congressional District 33

11:15:07  2    into a Hispanic district would not constitute intentional

11:15:12  3    discrimination against African-American voters?  Is it your

11:15:16  4    testimony that you did not testify to that to the Senate back on

11:15:20  5    September 11, 2021?

11:15:27  6        A.   I do not have my testimony from the Senate in front of

11:15:34  7    me, so I cannot say with certainty that I used the term

11:15:42  8    intentional discrimination in this context.

11:15:54  9             MS. CORBELLO:  Permission to approach the witness,

11:15:56  10   Your Honor.

11:15:56  11   BY MS. CORBELLO:

11:15:57  12       Q.   Flip to tab one in that binder for me and go to page

11:16:06  13   53.

11:16:23  14       A.   Okay.

11:16:23  15       Q.   Go down to lines 16 on page 53 for me.

11:16:31  16            JUDGE SMITH:  Are you going to identify what you just

11:16:35  17   handed to him?

11:16:37  18            MS. CORBELLO:  Yes, sir.

11:16:39  19   BY MS. CORBELLO:

11:16:39  20       Q.   Mr. Brooks, you're looking at deposition testimony

11:16:40  21   that you gave on January 20th, 2022nd; is that right?

11:16:45  22       A.   Yes.

11:16:45  23       Q.   You gave this testimony under penalty of perjury?

11:16:48  24       A.   Yes.

11:16:48  25       Q.   Do you recognize this deposition testimony that you

11:16:54  1   gave on page 53?

11:16:57  2       A.    Yes.

11:16:58  3       Q.    At line 16 you see it says:

11:17:04  4            "Question:  So you're advocating against reconfiguring

11:17:08  5            District 33, Congressional District 33, as a Hispanic

11:17:11  6            district; is that fair to say?"

11:17:13  7            Your answer was:  "Yes."

11:17:14  8            Is that right?

11:17:14  9       A.    Yes.

11:17:15  10      Q.    And then at line 20 it asks:

11:17:19  11           "In doing, so it was your opinion that that would be a

11:17:22  12           legal and intentional discrimination, correct?"

11:17:25  13           And you said:  Answer:  "Correct."

11:17:26  14           Is that right.

11:17:27  15      A.    Yes, that is correct.

11:17:29  16      Q.    And the last question there at line 23?

11:17:33  17           "And when you said intentional discrimination, did you

11:17:37  18           mean against minority residence, including black

11:17:41  19           residents?"

11:17:41  20           And at line -- page 54, line 1, you answered:

11:17:44  21           "Correct."

11:17:44  22           Right?

11:17:45  23      A.    That is correct.

11:17:45  24      Q.    So refreshing your recollection with your deposition

11:17:53  25   testimony, is it fair to say that it was your testimony to the

11:17:57   1      Senate that reconfiguring Congressional District 33 into a

11:18:03   2      Hispanic district would have caused intentional discrimination

11:18:06   3      against African-Americans?

11:18:10   4          A.    Yes.

11:18:11   5          Q.    Within that testimony you praised the work of five

11:18:19   6      democratic congresspersons, right?

11:18:22   7          A.    Five democratic.

11:18:25   8          Q.    Democratic, Senate or congress member, house of

11:18:31   9      representatives right?

11:18:32   10         A.    Yes.

11:18:33   11         Q.    In that testimony, did you praise any Republican

11:18:42   12     leadership?

11:18:42   13         A.    No.

11:18:42   14         Q.    And in that testimony, you didn't advocate for any

11:18:46   15     district to be created in a way that made them majority

11:18:48   16     Republican, right?

11:18:49   17         A.    I did not.

11:18:50   18         Q.    In fact, your preference when you were -- that you

11:18:54   19     were trying to convey with this testimony, was that democratic

11:18:59   20     districts be created, wasn't it?

11:19:05   21         A.    No.  I believe I specifically said in my testimony

11:19:11   22     that I was not asking them to create either democratic or

11:19:18   23     Republican majority districts.  I was asking them to create

11:19:21   24     districts that treated African-American and Hispanic voters

11:19:28   25     fairly.

11:19:28  1      Q.    Is it your testimony that in giving that testimony in

11:19:31  2   the Senate on September 11th, 2021, you were not advocating for

11:19:36  3   your personal preference of creating democratic majority

11:19:40  4   districts?

11:19:50  5      A.    I really don't understand the question.  I answered

11:19:56  6   the question before, which is essentially the same question.

11:20:03  7      Q.    Turn to page 62 of your deposition for me, Mr. Brooks.

11:20:03  8   The second sentence that starts there you say:

11:20:16  9           "As I did not ask them to create democratic

11:20:41 10            majorities.  It's not about party."

11:20:43 11            You're talking about the testimony you gave on

11:20:45 12            September 11th, correct?

11:20:46 13      A.    Correct.

11:20:47 14      Q.    Okay.  On line 3, the question I ask you is:

11:20:50 15            "Well, even though you weren't asking them to create

11:20:56 16            democratic majorities, would you just personally, Mr.

11:20:58 17            Brooks, prefer a democratic majorities over

11:21:00 18            Republican majorities to have been created when you

11:21:02 19            were giving this testimony?"

11:21:04 20            Answer:  "I'm a Democrat."

11:21:06 21            Question:  "So yes?"

11:21:07 22            Answer:  "I'm a democratic."

11:21:10 23            Question:  "So the answer is yes or no, Mr. Brooks?

11:21:13 24             For the record it needs to be clear."

11:21:15 25            Answer:  "The answer is yes."

11:21:17   1              Do you see that?

11:21:18   2       A.   Yes.  That's what it says.

11:21:25   3              MR. GAINES:  Your Honor.  I object.  This question has

11:21:27   4   already been asked and answered.  He's already answered the

11:21:31   5   question.  I object to that.

11:21:32   6              JUDGE GUADERRAMA:  All right.

11:21:33   7              Did you have anything further on this line?

11:21:36   8              MS. CORBELLO:  No, Your Honor.  Just simply for

11:21:37   9   purposes of impeachment.

11:21:44  10   BY MS. CORBELLO:

11:21:44  11       Q.   For the written testimony you gave to the House and

11:21:44  12   Senate, you had help in writing that testimony, right?

11:21:46  13       A.   That's correct.

11:21:47  14       Q.   You had help from Beverly Powell and her team in

11:21:51  15   preparing that testimony; is that correct?

11:21:53  16       A.   That's correct.

11:21:53  17       Q.   And you also had help from the Loan Star Democrats in

11:21:58  18   writing that testimony?

11:21:59  19       A.   That's correct.

11:22:00  20       Q.   Loan Star Democrats wrote a part of the testimony and

11:22:06  21   gives it to you, correct.

11:22:07  22       A.   They assisted me in writing it, yes.

11:22:10  23       Q.   They wrote portions of the testimony for you, didn't

11:22:13  24   they, Mr. Brooks?

11:22:15  25       A.   Yes.

11:22:15  1        Q.    And it was Matt Angle at Loan Star Democrats that

11:22:22  2   helped you write that portion of your testimony, right?

11:22:24  3        A.    Yes.

11:22:24  4        Q.    He's the founder and director of Loan Star, currently?

11:22:30  5        A.    Yes.

11:22:31  6        Q.    He works there closely with Beverly Powell as well,

11:22:37  7   correct?

11:22:37  8        A.    Yes.

11:22:38  9        Q.    In fact, are you aware that she's given a quote to be

11:22:44  10  prominently displayed on their website?

11:22:48  11       A.    No.

11:22:48  12       Q.    Are you aware that Beverly Powell has stated that Loan

11:22:49  13  Star Project was essential to having her get re-elected in 2018?

11:22:55  14       A.    No, I'm not.

11:22:56  15       Q.    Does it surprise you that Beverley Powell feels that

11:23:00  16  way?

11:23:01  17       A.    No, it does not.

11:23:02  18       Q.    You worked with Loan Star on other redistricting

11:23:06  19  matters, right?

11:23:06  20       A.    Yes.

11:23:07  21       Q.    You have meetings with them both pre and post

11:23:11  22  redistricting legislative sessions to discuss strategies about

11:23:17  23  redistricting?

11:23:17  24       A.    That is correct.

11:23:19  25       Q.    The Loan Star Project is a group whose mission it is

CROSS - BROOKS                                                    90

11:23:22   1        to increase Democrat leadership in Texas, right?

11:23:26   2            A.   Correct.

11:23:27   3            Q.   Are you aware that their website says, quote:

11:23:30   4        "Beating Republicans is our bottom line," unquote?

11:23:35   5            A.   I am not aware of what their website says.

11:23:40   6            Q.   Given your extensive work with them, does it surprise

11:23:43   7        you that that says that on their website?

11:23:47   8            A.   It would not surprise me, no.

11:23:50   9            Q.   Loan Star works with you because you were someone that

11:23:53  10        can help them beat Republicans and meet their bottom line,

11:23:58  11        right?

11:23:58  12            A.   I suppose.

11:24:00  13            Q.   And so if you succeed today on this preliminary

11:24:04  14        injunction hearing and get the relief that you are asking this

11:24:07  15        Court, is it fair to say that you and Loan Star Democrats will

11:24:11  16        see that as a win against Republicans?

11:24:27  17            A.   I would consider it a win for the African-American and

11:24:33  18        Hispanic voters in Senate District 10.

11:24:36  19            Q.   Would you consider it a loss for the Democrats if you

11:24:42  20        win your preliminary injunction relief that you are asking for?

11:24:43  21            A.   I would consider it a loss for the African-American

11:24:47  22        and Hispanic voters in Senate District 10.

11:24:51  23                 MS. CORBELLO:   Object as nonresponsive.

11:24:53  24        BY MS. CORBELLO:

11:24:53  25            Q.   Mr. Brooks, if you could just answer my question.

11:24:55  1          Would you consider it a loss for the Democrats if you

11:24:57  2   were to succeed in your preliminary injunction relief?

11:25:01  3       A.   I believe I answered your question.

11:25:03  4       Q.   Well, Mr. Brooks, I haven't heard you answer anything

11:25:06  5   about the Democrats, yet.  I'm going to have to ask you to

11:25:13  6   answer.

11:25:13  7          MR. GAINES:  This is his answer to the best of his

11:25:15  8   ability.

11:25:23  9          JUDGE GUADERRAMA:  I'm going to overrule that, Mr.

11:25:23 10   Gaines.

11:25:25 11          It's a long question, but if you listen carefully to

11:25:25 12   it, please give her the answer.

11:25:28 13          THE WITNESS:  All right.

11:25:29 14   BY MS. CORBELLO:

11:25:30 15       Q.   If you succeed in your preliminary junction hearing

11:25:33 16   today and get the relief you wanted, would you and Loan Star

11:25:37 17   Project consider that a loss for Democrats?

11:25:41 18       A.   It would be a loss of a senatorial district, yes.

11:25:46 19       Q.   A senatorial district that is at least under the

11:25:50 20   Benchmark plan more Democrat than Republican, right?

11:25:54 21       A.   Correct.

11:25:55 22       Q.   You told your counsel -- I'm sorry.  Scratch that.

11:26:00 23          You work with several other local groups other than

11:26:04 24   the statewide Loan Star Project?

11:26:06 25       A.   That is correct.

KATHLEEN A. SUPNET, CSR

| | | |
|---|---|---|
| 11:26:06 | 1 | Q.   You work with 820 Democratic Club? |
| 11:26:11 | 2 | A.   Yes. |
| 11:26:11 | 3 | Q.   Mid City Democratic Club? |
| 11:26:13 | 4 | A.   Yes. |
| 11:26:13 | 5 | Q.   Arlington Democratic Club? |
| 11:26:15 | 6 | A.   Yes. |
| 11:26:16 | 7 | Q.   Stonewall Democratic Club? |
| 11:26:17 | 8 | A.   Yes. |
| 11:26:18 | 9 | Q.   You're also a member of the State Democratic Party, |
| 11:26:22 | 10 | right? |
| 11:26:22 | 11 | A.   Correct. |
| 11:26:23 | 12 | Q.   And you work with other members of the State |
| 11:26:28 | 13 | Democratic Party on redistricting issues, right? |
| 11:26:30 | 14 | A.   Yes. |
| 11:26:31 | 15 | Q.   And as you told your counsel, this isn't your first |
| 11:26:34 | 16 | time to the contributing to the plaintiff's side of a |
| 11:26:37 | 17 | redistricting case in Texas, is it? |
| 11:26:39 | 18 | A.   No, it is not. |
| 11:26:42 | 19 | Q.   You have been involved in at least four other |
| 11:26:45 | 20 | redistricting cases as a plaintiff; is that right? |
| 11:26:49 | 21 | A.   Ask that again? |
| 11:26:50 | 22 | Q.   You've been involved in at least four other |
| 11:26:53 | 23 | redistricting cases as a plaintiff; is that right? |
| 11:26:57 | 24 | A.   I've been involved in at least four other |
| 11:27:07 | 25 | redistricting cases as either a plaintiff or a witness.  I'm not |

11:27:11   1   sure I was a plaintiff in all of the them.

11:27:15   2       Q.   Well -- so for all four of those redistricting cases,

11:27:18   3   whether you were plaintiff or a witness, you were never a

11:27:23   4   plaintiff or a witness advocating for maps to be drawn for

11:27:28   5   favorably to a Republican?

11:27:30   6       A.   That's correct.

11:27:31   7       Q.   Each time you participated in a redistricting case,

11:27:33   8   either as a plaintiff or a witness, the maps you were advocating

11:27:38   9   for would have created more favorable district for Democrats; is

11:27:41  10   that fair to say?

11:27:44  11       A.   Yes.

11:27:45  12       Q.   Do you remember your counsel asking you a little bit

11:27:55  13   about the new Senate District as it exists under the map that

11:28:03  14   has passed through the 87th Legislative Session?

11:28:06  15       A.   I do.

11:28:06  16       Q.   You said it has joined with several other counties,

11:28:08  17   right?

11:28:08  18       A.   Yes.

11:28:09  19       Q.   You don't know anything about these other counties, do

11:28:14  20   you?

11:28:14  21       A.   I know some things about those counties.

11:28:28  22       Q.   You've -- other than Johnson County, have you been in

11:28:34  23   any of those other counties that are now part of SD-10 in the

11:28:38  24   plan S2168?

11:28:42  25       A.   I had been in Parker.

CROSS - BROOKS                                                    94

11:28:47  1         Q.    Other than Parker and Johnson County, have you been in

11:28:51  2    any of the others?

11:28:52  3         A.    I have not.

11:28:53  4         Q.    Are you aware of how many counties were involved in

11:28:56  5    the new drawing of SD-10?

11:28:59  6         A.    I believe there was seven, but I cannot name them.

11:29:15  7         Q.    You haven't looked at any demographics of those other

11:29:19  8    counties, have you?

11:29:20  9         A.    No.

11:29:20  10        Q.    You haven't studied the voter population in any way

11:29:24  11   for any of those other counties, have you?

11:29:26  12        A.    No.

11:29:27  13        Q.    You speak with community leaders within Tarrant County

11:29:33  14   about voters in Tarrant County, right?

11:29:34  15        A.    Yes.

11:29:35  16        Q.    You don't speak with the community leaders with the

11:29:38  17   other counties, right?

11:29:39  18        A.    No, I don't.

11:29:40  19        Q.    You don't have any idea of the percentage of

11:29:45  20   Republican to Democrat in any of those counties that joined in

11:29:48  21   SD-10 new plan, do you?

11:29:51  22        A.    The specific percentages, no.

11:29:56  23        Q.    And you don't have any specific percentages of --

11:29:59  24   broken down by race for any of those -- any of those counties

11:30:03  25   that have been joined in the new SD-10?

11:30:09   1        A.    Not the specific percentages; however, I am aware --

11:30:15   2        Q.    Mr. Brooks --

11:30:17   3        A.    -- majority Republican, majority white counties.

11:30:25   4              MS. CORBELLO:  I'm going to object as non-responsive

11:30:27   5   to everything after however.

11:30:29   6              JUDGE GUADERRAMA:  Sustained.

11:30:35   7   BY MS. CORBELLO:

11:30:35   8        Q.    Mr. Brooks, is it fair to say that you are asking the

11:30:36   9   Court today to keep SD-10 drawn the same way it was before the

11:30:39  10   87th Legislative Session?

11:30:42  11        A.    That is correct.

11:30:43  12        Q.    And for the -- for the Benchmark SD-10, for now, do

11:30:49  13   you understand what I mean by that?

11:30:49  14        A.    Yes.

11:30:50  15        Q.    Benchmark SD-10 is what Beverly Powell was elected

11:30:55  16   under the last time, right?

11:30:56  17        A.    Yes.

11:30:56  18        Q.    So fair to say Benchmark SD-10 is a democratic

11:31:02  19   district?

11:31:02  20        A.    Yes.

11:31:03  21        Q.    Benchmark SD-10 does not have the percentage of

11:31:08  22   African-Americans and Hispanics that combine to make the

11:31:11  23   majority of the CVAP, does it?

11:31:14  24        A.    No.

11:31:14  25        Q.    Under Benchmark SD-10, the CVAP was majority Anglo,

11:31:21  1     correct?

11:31:21  2         A.   Correct.

11:31:22  3         Q.   You testified a moment ago with your counsel that in

11:31:29  4     this past 87th Legislative Session, the map for S. B. O. E.

11:31:37  5     Kept Tarrant County intact.  Is that what you said?

11:31:44  6              MR. GAINES:  Object.  I think what he said was the

11:31:46  7     minority community in Tarrant County was, in fact, not Tarrant

11:31:52  8     County.

11:31:52  9              MS. CORBELLO:  I'll rephrase.

11:31:54 10     BY MS. CORBELLO:

11:31:54 11         Q.   The minority communities within Tarrant County were

11:31:57 12     kept intact for the SBOE map, right?

11:32:01 13         A.   Yes.

11:32:02 14         Q.   So the same legislative body in involved in altering

11:32:06 15     SD-10, kept the minorities community together for the purposes

11:32:10 16     of SBOE is that your testimony?

11:32:17 17         A.   Yes.

11:32:17 18         Q.   The same legislative body that altered SD-10 did not

11:32:25 19     go through and crack the minority districts under the SBOE map?

11:32:31 20         A.   No.

11:32:32 21         Q.   You also testified with your counsel a moment ago that

11:32:35 22     for the congressional district maps, the legislative body, the

11:32:40 23     87th Legislative Session managed to keep the minority

11:32:43 24     communities in Tarrant County intact?

11:32:45 25         A.   Correct.

11:32:46 1      Q.    So the same legislative body that altered SD-10 kept

11:32:50 2   the communities together -- the minority communities together

11:32:51 3   for the purposes of the congressional district maps?

11:32:55 4      A.    Correct.

11:32:55 5      Q.    They did not go through and crack the minority

11:32:59 6   districts -- the same legislative body that altered SD-10 did

11:33:04 7   not go through and crack the minority community for purposes of

11:33:07 8   the congressional districts?

11:33:09 9      A.    They did not.

11:33:30 10           MS. CORBELLO:  Pass the witness, Your Honor.

11:33:32 11           JUDGE GUADERRAMA:  Mr. Gaines?

11:33:32 12           MR. GAINES:  No further questions.

11:33:35 13           JUDGE GUADERRAMA:  May Commissioner Brooks step down?

11:33:42 14           He's remaining in the courtroom.

11:33:54 15           Who is your next witness?

11:33:54 16           MR. DUNN:  Dr. Matt Barreto.

11:34:42 17           (Witness present and sworn.)

11:34:42 18                        DR. MATT BARRETO,

11:34:42 19               DIRECT EXAMINATION BY THE PLAINTIFF

11:34:42 20   BY MR. DUNN:

11:35:40 21      Q.    Please state your name?

11:35:40 22      A.    My name is Matthew A. Barreto.

11:35:45 23      Q.    And how are you employed?

11:35:46 24      A.    A Professor of Political Science in Chicano Studies

11:35:52 25   and --

| | | |
|---|---|---|
| 11:35:52 | 1 | (Court reporter asks for clarification). |
| 11:35:55 | 2 | BY MR. DUNN: |
| 11:35:55 | 3 | Q.   And I was just about to tell you.  We got to speak |
| 11:36:00 | 4 | loudly here in this room, given it's wonderful size and |
| 11:36:04 | 5 | decorations, so I may ask you occasionally to speak up.  Okay? |
| 11:36:05 | 6 | A.   Okay. |
| 11:36:06 | 7 | Q.   Excellent. |
| 11:36:06 | 8 | Tell us a little bit about yourself, where you grew up |
| 11:36:10 | 9 | and that sort of thing. |
| 11:36:12 | 10 | A.   Sure.  I was born to San Juan, Puerto Rico.  I only |
| 11:36:17 | 11 | lived there a short while, then my family moved to the Kansas |
| 11:36:22 | 12 | City, Missouri area.  I lived there for a few years and then was |
| 11:36:25 | 13 | primarily raised in Topeka, Kansas.  I graduated from high |
| 11:36:31 | 14 | school there.  And then attended college in New Mexico and then |
| 11:36:38 | 15 | pursued any Ph.D. in California. |
| 11:36:42 | 16 | Q.   We'll talk about that more, of course, but your |
| 11:36:45 | 17 | mother's got kind of a civil rights history; is that true? |
| 11:36:46 | 18 | A.   Yes, in Topeka. |
| 11:36:49 | 19 | Q.   Tell us. |
| 11:36:50 | 20 | A.   My mother was a kindergarten teacher Sumner |
| 11:36:56 | 21 | Elementary, which was the school that Linda Brown lived across |
| 11:37:00 | 22 | the street from and wanted to go to school at and was not |
| 11:37:04 | 23 | allowed to and was a part of the very famous *Brown v. The Board* |
| 11:37:11 | 24 | *of Education* case.  In fact, it was kindergarten that Linda |
| 11:37:18 | 25 | Brown was to be enrolled in the room that my mom taught in, of |

DIRECT - BARRETO                                                99

11:37:22  1   course much later.  But eventually, she, my mother, became very

11:37:31  2   friendly and acquainted from with the Brown family.  Every year

11:37:36  3   on the anniversary they would come to and participate in

11:37:38  4   teaching the history to the students of that important case.

11:37:42  5       Q.   Let's turn our attention to your education, sir.  Can

11:37:46  6   you tell us where you went to undergraduate?

11:37:49  7       A.   I have a bachelor's degree in political science at

11:37:54  8   Eastern New Mexico University.  It was in Portales, New Mexico.

11:37:59  9   And I was there from 1994 to 1998.

11:38:02 10       Q.   And then where did your studies take you?

11:38:05 11       A.   I then moved to southern California and I enrolled in

11:38:11 12   a master's program at Claremont Graduate University, which I did

11:38:17 13   for one year.  I met a handful of very influential researches

11:38:24 14   there who encouraged me to go on and pursue my Ph.D., which I

11:38:29 15   did, and applied for the next year and enrolled, and then

11:38:33 16   completed my Ph.D. at California of Irvine.

11:38:38 17       Q.   What is it that motivated you to continue with these

11:38:41 18   graduate studies?

11:38:45 19       A.   Well, I have always been interested in issues,

11:38:48 20   representation in the Latino community.  Both my parents were

11:38:54 21   involved in the local LULAC Chapter in Kansas where I grew up

11:39:00 22   and my dad actually ran -- was a director of a health systems

11:39:05 23   agency that had to do reporting to the state.  And I can recall

11:39:10 24   when I was young going with him sometimes when he had to present

11:39:15 25   reports to the Kansas State Legislature.  I thought that was

DIRECT - BARRETO                                                            100

11:39:20  1    really interesting and fascinating.  I was interested in

11:39:24  2    politics for a long time.

11:39:26  3            When I got to California, it gave me a great

11:39:30  4    opportunity to continue this interest, because there was such a

11:39:34  5    large Hispanic population there and there were many universities

11:39:40  6    where I could pursue working on these topics, and so I decided

11:39:45  7    to pursue my Ph.D.

11:39:48  8        Q.   What is it you decided to focus on in your education

11:39:51  9    in terms of methods?

11:39:53  10       A.   The subfield I concentrated on broadly was referred to

11:39:59  11   as American politics.  And within there is a subfield called

11:40:03  12   race ethnicity politics, often abbreviated by the letters today

11:40:11  13   REP, within those fields, American politics and race and

11:40:14  14   ethnicity politics.  I concentrated in on quantitative and

11:40:17  15   statistical methods for understanding public opinion in voting

11:40:23  16   patterns of different racial and ethnic groups in the United

11:40:27  17   States.

11:40:27  18       Q.   Who was your adviser in the Ph.D. studies?

11:40:31  19       A.   My principal adviser was Dr. Bernard Groffman.

11:40:35  20       Q.   And what has been his history and role in political

11:40:40  21   science?

11:40:40  22       A.   He studies a little bit of everything, but his main

11:40:44  23   concentration is might similar to mine in understanding manner

11:40:49  24   politics ration and ethnic politics.  And he has been one of the

11:40:54  25   best known voting rights expert witnesses in analyzing voting

11:41:03  1    patterns, but also pioneering methodologies for the proper study

11:41:10  2    of voting patterns.  And because I had similar interests, it was

11:41:14  3    a very good fit for me to study with Dr. Groffman at Irvine.

11:41:20  4         Q.   Have you and he published together?

11:41:22  5         A.   We have.

11:41:23  6         Q.   After you completed your studies, walk us through your

11:41:27  7    employment history, please.

11:41:28  8         A.   I completed my Ph.D. at U.C. Irvine in 2005.  I then

11:41:34  9    applied for different professor jobs.  I was very interested in

11:41:41  10   continuing my work as a researcher, but also as a professor and

11:41:47  11   a teacher.  And I accepted a job at University of Washington in

11:41:51  12   Seattle and I started that job in the fall of 2005.

11:41:57  13        Q.   And then where did you go?

11:42:00  14        A.   I was at the University of Washington for nine and a

11:42:03  15   half years.  I was promoted to tenure there and I was also

11:42:07  16   promoted to full professor in my time there.  In the end of

11:42:13  17   2014, beginning of 2015, right in the middle of the academic

11:42:19  18   calendar, I accepted a job and moved to the University of

11:42:24  19   California Los Angeles, which I started in January of 2015 at

11:42:28  20   the appointment level of full professor with tenure.

11:42:32  21        Q.   Is that where you are today?

11:42:33  22        A.   Yes, it is.

11:42:34  23        Q.   What are your positions there?

11:42:36  24        A.   Well, my academic facility position is split between

11:42:41  25   two departments; the Department of Political Science and the

11:42:44  1    Department of Chicano and Chicano in Central American Studies.

11:42:50  2    Both of those are in the school of social science.  I also have

11:42:56  3    appointment in the public policy department, which is in the

11:43:01  4    school of public affairs.

11:43:02  5        Q.    And you've done work aside from your academic work; is

11:43:07  6    that true?

11:43:07  7        A.    Yes, I have.

11:43:08  8        Q.    What is that?

11:43:09  9        A.    Well, I have been actively involved since finishing my

11:43:18  10   Ph.D., graduating in doing voter analysis that has assisted in

11:43:23  11   various voter rights cases.  Some of the early cases were

11:43:28  12   referred to me by Dr. Groffman when he was getting too busy and

11:43:33  13   he knew I had the capabilities to do this type of work.  So

11:43:38  14   really since I graduated in '05, and when I started as a Ph.D.

11:43:43  15   student still, I have done a lot of consulting as an expert

11:43:47  16   witness in voting rights cases as well as some other litigation,

11:43:52  17   but I would say broadly within the civil rights area.

11:43:56  18       Q.    Have you done work on behalf of candidates or

11:43:59  19   campaigns or officers?

11:44:00  20       A.    Yes, I have.  In addition to my work as an expert

11:44:05  21   witness, around 2007, 2008, I started a political consulting

11:44:13  22   venture with a very close friend of mine, Dr. Gary Segura, and

11:44:20  23   we provided public opinion and polling analysis primarily at the

11:44:26  24   start to Hispanic interest groups.

11:44:29  25       Q.    Did that transition into working for individual

11:44:35  1    candidates?

11:44:36  2        A.   Yes.   Eventually over the years as our consulting firm

11:44:41  3    got to be better known, especially in the nation's Capitol, we

11:44:47  4    started to attract the attention of political parties and

11:44:53  5    candidates themselves.

11:44:54  6        Q.   What are some of the candidates you worked with?

11:44:58  7        A.   I believe the first candidates we first decided to

11:45:02  8    work for -- we've been approached by others and decided that

11:45:04  9    they would not be the right time -- so the first was in the 2016

11:45:08  10   election cycle and we worked for the Hillary Clinton's campaign

11:45:15  11   as Hispanic research in polling.  We worked as well for Senator

11:45:24  12   Cortez Masso in her Senate campaign.  We worked for Senator

11:45:30  13   Michael Bennett in his Senate campaign.  If I'm getting the

11:45:36  14   years right, I believe those were in '16.

11:45:38  15       Q.   Were you involved in the recent Presidential election?

11:45:40  16       A.   Yes, I was.

11:45:41  17       Q.   How so?

11:45:42  18       A.   I was hired by the Biden Presidential Campaign at the

11:45:50  19   close of the democratic primary cycle to do Hispanic research

11:45:58  20   and polling and focus groups to give them advice and information

11:46:04  21   about Hispanic voters.

11:46:05  22       Q.   Do you advise the White House today?

11:46:08  23       A.   Yes, I do.

11:46:09  24       Q.   Does any of that work have to do with your testimony

11:46:12  25   here in this courtroom?

11:46:14  1       A.    Not at all.  I collect data as a social scientist.  I

11:46:20  2   try to collect it in the best objective way I can.  I firmly

11:46:23  3   believe that no matter who you're giving presentations to, you

11:46:26  4   need to be giving them good data and accurate data and that's

11:46:30  5   what I do regardless of who I'm advising.

11:46:35  6       Q.    Is it fair to describe you as a Democrat?

11:46:38  7       A.    I believe in California.  I am registered as a

11:46:44  8   Democrat.  I would have to check the voter roll, but yes.

11:46:45  9       Q.    Is that important of your analysis and opinion you are

11:46:49 10   going to offer today?

11:46:50 11       A.    No, not at all.

11:46:52 12       Q.    What informed data do you claim to offer today?

11:46:54 13       A.    Well, data and social science.  I have accomplished

11:46:58 14   many social science articles and I take that same approach to

11:47:04 15   any project that I start.  Do we have accurate data?  Are we

11:47:11 16   employing accurate methodologies?  And then looking at those

11:47:15 17   results, what are those conclusions?  I firmly believe that the

11:47:19 18   reason that any interest group or candidate work with me is

11:47:24 19   because I'm giving them accurate information and not just

11:47:27 20   spinning stories for them.  I take that approach to every

11:47:31 21   project I start and I've done so today.

11:47:34 22       Q.    Have you had occasions when the data doesn't reflect

11:47:37 23   what you had hoped to be the outcome?

11:47:39 24       A.    Well, I never hope for any sort of outcome.  I just

11:47:43 25   analyze the data and report what the results are.  There are

11:47:47  1   times where I analyze data that perhaps doesn't reflect the

11:47:53  2   hopes of the end client, and if that's the case, I tell them and

11:47:59  3   I give them that advice.

11:48:00  4        Q.    Now, returning back to your training, education and

11:48:05  5   experience, you should have on your screen before you,

11:48:08  6   Dr. Barreto, Brooks's Plaintiff's 105.  That's been marked and

11:48:13  7   not admitted.  Would you identify this document?

11:48:16  8        A.    What is on the screen in front of me is my academic

11:48:21  9   CV, my list of publications and accomplishments as a professor.

11:48:27  10       Q.    Has this been prepared by you?

11:48:29  11       A.    Yes.

11:48:29  12       Q.    Where it states your education, is that accurate?

11:48:33  13       A.    Yes, that is accurate.

11:48:35  14       Q.    The CV that you provided to the Court, you can see in

11:48:39  15   this left-hand column, is approximately 13 pages?

11:48:43  16       A.    Yes.

11:48:44  17       Q.    You have a paper copy there with you; is that true?

11:48:47  18       A.    That is true.

11:48:49  19       Q.    Now, we don't need to go through the whole thing.

11:48:52  20   Obviously can you give us a sense to page two.  Can you give us

11:48:56  21   a sense of what you are summarizing in most of these pages?

11:48:59  22       A.    Starting on page two is titled Publication Record.

11:49:05  23   And here I've listed the books that I have authored or

11:49:10  24   co-authored.  And then below the books, I've listed the peer

11:49:15  25   reviewed social science journal articles that I have authored in

11:49:21  1    reverse chronological order, so that the first one listed is

11:49:25  2    among the more recent, all the way down to number one, which

11:49:30  3    should be among the oldest articles that I have accomplished.

11:49:34  4         Q.    Looking at page two of Exhibit 105, it looks like you

11:49:39  5    are up to number 77 in terms of peer-review article; is that

11:49:43  6    true?

11:49:44  7         A.    Yes.

11:49:44  8         Q.    What does it mean to have a post peer-review article?

11:49:49  9    Can you write whatever you want?

11:49:50 10         A.    No, you can't.  It's a long process.  Starts with

11:49:53 11    developing the research question, then finding the most

11:49:57 12    appropriate data, then find the most appropriate data to analyze

11:50:03 13    that data.  Then there's a draft of the paper written, if there

11:50:08 14    are co-authors shared and provided comments and feedback.  Many

11:50:13 15    academics will present the polished drafts at academic

11:50:19 16    conferences to get more feedback from colleagues.  So there's a

11:50:23 17    process of refinement and improvement.  And ultimately you

11:50:29 18    submit your article to a journal and your name is taken off.

11:50:34 19    You don't know who's reading it.  It's what's called

11:50:37 20    double-blind review.  They don't know us.  We don't know them.

11:50:41 21    And they provide commentary, quite critical, to assess whether

11:50:46 22    or not the paper should be accomplished.  Through those rounds

11:50:50 23    there's typically a revision by the author, and then ultimately

11:50:55 24    resubmitted and the editor of the journal would have the final

11:51:00 25    say on what's being published, so it's a quite rigorous process.

DIRECT - BARRETO                                                   107

11:51:04  1   We think it's important to the scientific process that people go

11:51:09  2   through a review and so these articles I listed are peer

11:51:13  3   reviewed and have gone through that process.

11:51:16  4       Q.   How many years has it been since you've been

11:51:19  5   publishing in journals?

11:51:20  6       A.   I started as a graduate student, which is quite

11:51:24  7   common.  When you start graduate studies, you work with faculty

11:51:30  8   research as their research assistant as full co-authors on their

11:51:35  9   projects.  That was the case for me.  So sometime in the early

11:51:39  10  2000s, I would've started, so I'd say for approximately

11:51:44  11  20 years.

11:51:44  12      Q.   How would you describe the volume of publications

11:51:49  13  you've had at this stage compared to others?

11:51:53  14      A.   Well, as I've listed here, I think I have five books,

11:51:59  15  over 75 articles and book chapters that I have published.  It is

11:52:07  16  a fairly large amount.  I don't have others in front of me, but

11:52:13  17  I also list the number of times my papers have been cited by

11:52:19  18  others here, which is another metric of the sort of impact that

11:52:24  19  folks are having.  So I've been pleased with the papers I've

11:52:27  20  been able to publish, especially on the topic of racial and

11:52:32  21  ethnic voting patterns.  I'd say it's probably the most in

11:52:39  22  political science today.

11:52:40  23      Q.   You and I have published together?

11:52:45  24      A.   Yes.

11:52:46  25      Q.   Page 74 of your CV, do you see that?

DIRECT - BARRETO                                                    108

11:52:50  1      A.    Yes, I do.

11:52:50  2      Q.    What was the nature of that publication?

11:52:53  3      A.    That was an article that was in the California Law

11:52:55  4  Review that we collaborated with many of our law students and

11:53:05  5  other legal scholars to describe what was happening with the

11:53:16  6  vote-by-mail voting rights questions that were being brought up

11:53:20  7  during the 2020 election and pandemic.

11:53:24  8      Q.    One of the arguments is whether or not states that

11:53:27  9  allow vote-by-mail under the 26 Amendment to all voters of every

11:53:32 10  age; is that right?

11:53:33 11      A.    That's correct.

11:53:33 12      Q.    At least in the Fifth Circuit, we got that one wrong;

11:53:37 13  is that true?

11:53:37 14      A.    That's my recollection.

11:53:39 15      Q.    Was that one the peer-review articles of statistics

11:53:44 16  and methodologies?

11:53:45 17      A.    That was peer reviewed.  I remember it was a lot of

11:53:49 18  revisions and critical comments from the review team.  I don't

11:53:54 19  recall if that article itself had any statistical methodology

11:54:01 20  tables of summary data, but I'd have to look at the article.  I

11:54:06 21  don't believe it was a paper that included a lot of statistical

11:54:12 22  methodology.

11:54:12 23      Q.    Give us a sense of types of methodologies that you

11:54:13 24  train others on and that you've been published on that are

11:54:16 25  relevant to our work here today?

DIRECT - BARRETO                                                     109

11:54:18   1        A.   Well, probably the most relevant, I'll start there, is

11:54:21   2    the study of voting patterns by race and ethnicity through a

11:54:28   3    method that's called ecological inference.  This is a

11:54:34   4    methodology that I've been working very closely on since

11:54:39   5    graduate studies with Dr. Groffman.  In fact, Dr. Groffman and I

11:54:44   6    have published a paper methodologies while I was a graduate

11:54:49   7    student.  That is a method for accurately understanding the

11:54:55   8    voting patterns of different racial or ethnic groups when

11:55:00   9    something like an exit pole doesn't exist where we have to use

11:55:06   10   ecological data which is precincts to draw inferences.  That's a

11:55:11   11   methodology I use in my expert report in this case.  It's one

11:55:15   12   that I've been working on for over 20 years and one that I have

11:55:20   13   published numerous papers on, specifically.

11:55:23   14       Q.   Now have you given testimony in court before?

11:55:27   15       A.   Yes, I have.

11:55:28   16       Q.   Approximately how many times, if you can recall, have

11:55:32   17   you testified as an expert in a legal proceeding?

11:55:34   18       A.   I think in my report I suggest that I've been involved

11:55:38   19   in about 3-dozen cases.  Not all of those include trial

11:55:44   20   testimony.  I'd say probably about 2-dozen include them trial

11:55:50   21   testimony some instances we gave depositions during the pandemic

11:55:57   22   that were video recorded and used as trial testimony but so some

11:56:03   23   are probably in the range of 2-dozen times.

11:56:06   24       Q.   Have you been rejected by a court as a qualified

11:56:10   25   expert?

KATHLEEN A. SUPNET, CSR

DIRECT - BARRETO                                                110

11:56:10   1        A.   Once.

11:56:11   2        Q.   When was that?

11:56:12   3        A.   In the state of Pennsylvania in a state court.  I

11:56:18   4    believe they call it Common Wealth Court in Pennsylvania.  And

11:56:19   5    in the first district court decision, I was offering and opinion

11:56:26   6    using a public opinion survey on levels of access to voter

11:56:33   7    identification.  It was a voter identification challenge and the

11:56:39   8    district court judge dismissed my survey and my report along

11:56:45   9    with I believe three other experts.

11:56:47   10       Q.   What happened on appeal?

11:56:50   11       A.   Well, the case was appealed.  I don't remember if it

11:56:55   12   was the Pennsylvania Supreme Court or whatever the next level

11:57:00   13   was ordered, the judge to reconsider and I believe I went back

11:57:05   14   to the same judge and there was an additional expert that was

11:57:09   15   brought in that justly summarized my methodology and ultimately

11:57:16   16   the courts found in our favor accepted my methodology and report

11:57:22   17   and the Pennsylvania identification law was struck down by state

11:57:27   18   court.

11:57:27   19       Q.   Any other courts have you been accepted as an expert?

11:57:30   20       A.   Yes, I have.

11:57:31   21       Q.   Did you testify here in Texas in the Texas Voter ID

11:57:36   22   case, V. C. v. Abbott?

11:57:38   23       A.   Yes, I have.

11:57:39   24       Q.   Were you accepted by the Court?

11:57:42   25       A.   Yes, the judge in that case specifically referenced

KATHLEEN A. SUPNET, CSR

11:57:47  1    the methodology that I used with Dr. Sanchez and the report we

11:57:55  2    used providing that was relevant to her decision.

11:57:59  3         Q.    And have you testified in other federal Court matters

11:58:03  4    here in Texas in relation to voting patterns?

11:58:05  5         A.    Yes, I have.

11:58:06  6         Q.    Now, just a couple for things about your

11:58:10  7    qualifications and we'll turn to this case.

11:58:12  8              Have you prepared or developed a recent -- recent

11:58:18  9    methods that other social sciences are using and software

11:58:24 10    packages that are used such as this?

11:58:26 11         A.    Yes.  I think there's two important methodological

11:58:32 12    advancements that I have been a part of that are directly

11:58:36 13    related to ecological inference.

11:58:39 14         Q.    What is the first one?

11:58:40 15         A.    The first was to help settle a debate; which type is

11:58:50 16    more accurate or is the most valid, which one can we learn from?

11:58:57 17    Today there are lots of different approaches to methodology, but

11:59:01 18    there are two main strands of ecological inference, and there

11:59:05 19    are some debates of scholars saying this one is better, no,

11:59:10 20    version two is better.  And so with a team of social scientists,

11:59:13 21    there were four of us, we employed a very in depth statistical

11:59:19 22    review of the methodologies.  We then compared exactly how they

11:59:26 23    worked and what they're results were.  And we published two

11:59:31 24    peer-reviewed social science methods articles discussing that

11:59:38 25    and we crows and wrote and have distributed for free on a public

11:59:42  1   website, a software package which called E.I. Compare, which is

11:59:45  2   what it sounds like.  It's a software package to run different

11:59:51  3   E. I. analyses and compare with a lot of different metrics how

11:59:56  4   those have been produced.

11:59:58  5       Q.   And has that been prevalently used now by other people

12:00:04  6   in social science?

12:00:05  7       A.   Yes.  Our articles themselves have been downloaded and

12:00:10  8   cited numerous times and the software package is also gaining a

12:00:15  9   lot of use by other scholars in their peer-reviewed research, as

12:00:21  10  well as practitioners who e-mail us and ask us questions about

12:00:27  11  it or tell us that they're using it in their, you know, pretrial

12:00:32  12  research to try to determine voting patterns in different

12:00:35  13  jurisdiction s.

12:00:36  14      Q.   What was the other method that you mentioned that you

12:00:39  15  recently developed?

12:00:40  16      A.   The second method that we've recently pioneered,

12:00:46  17  understanding the rise ethnicity of voters, when that

12:00:49  18  information is not prevalent on the voter file.  In some states

12:00:56  19  that we often called, we often referred to as the old Section 5

12:01:02  20  states, predominantly in the south.  Many of those still record

12:01:07  21  race on the voter file when you sign up to register to vote.  It

12:01:11  22  was a federal requirement for a while.  So in those places we

12:01:15  23  actually know the self-reported race and ethnicity of voters at

12:01:23  24  the precinct level in any using census data for surname

12:01:31  25  analysis.  And about over 10 years ago, there was a

12:01:37  1    methodological innovation to combine surname analysis and census

12:01:44  2    data to say let's look at both of those.

12:01:47  3         In 2016 I believe it made its way into political

12:01:52  4    science with an article by scholars who were at Princeton who

12:01:58  5    are now at Harvard.  And myself and members of the same team

12:02:02  6    that developed the E.I. Compare have been working on ways to

12:02:07  7    further refine and bring directly into voter rights analysis but

12:02:12  8    also for use in social science research a methodology that

12:02:17  9    relies on both surname analysis and census data to give us the

12:02:24  10   most accurate portrait of voters to be used in these cases.

12:02:30  11   That's something that we have published and also devolved into a

12:02:35  12   software package and are continuing to work on that today.

12:02:38  13        Q.   What is the name of that?

12:02:40  14        A.   That is referred to by the acronym, B-I-S-G.  It

12:02:44  15   stands for Bayesian Improved Surname Geocoding.

12:02:50  16        Q.   Has that been accepted by a Court?

12:02:54  17        A.   Yes it has.

12:02:56  18        Q.   And where was that?

12:02:56  19        A.   I'll get the dates right, but about two years ago,

12:03:00  20   might have been two-and-a-half, there was a quite a long trial

12:03:05  21   in New York in N.A.A.C.P. v. East Ramapo School District.  I was

12:03:14  22   one of the expert witnesses and we used both the E.I. Compare

12:03:20  23   software as well as, because it was quite appropriate in that

12:03:25  24   local jurisdiction.  We used this method called B.I.S.G. to give

12:03:29  25   us a more accurate understanding of voters race and ethnicity

DIRECT - BARRETO                                                    114

12:03:36  1    and that was accepted by the district and appellate court both

12:03:42  2    in that case.

12:03:43  3        Q.    Now once that case had been accepted in court, did you

12:03:46  4    and I co-author a law review introducing the methods to lawyers

12:03:48  5    that engaged the voting rights?

12:03:50  6        A.    Yes, that's right.

12:03:52  7        Q.    Now turning to back to your CV for a second on the

12:03:56  8    final page, you identify a number of people.  We don't need to

12:04:02  9    go through a list, but who are these folks?

12:04:05  10       A.    Let me just turn to that page.

12:04:08  11       Q.    It should be on the screen in front of you.

12:04:19  12       A.    I believe you're on page 3, Mr. Dunn?

12:04:28  13       Q.    Yes.

12:04:28  14       A.    A listing of my Ph.D. students that I've either served

12:04:33  15   as the committee chairperson or one of the committee members in

12:04:36  16   the years I had been a professor at the University of Washington

12:04:42  17   and then today at U. C. L. A.

12:04:46  18            MR. DUNN:  Your Honor, at this point, I move for the

12:04:47  19   admission of Brooks' 105.

12:04:50  20            MR. HILTON:  Your Honor, I understand it's already

12:04:53  21   been accepted by the Court subject to objection.  If I am

12:04:56  22   mistaken about that, the same procedure -- (mumbling).

12:04:59  23            JUDGE GUADERRAMA:  All right.  We'll admit it subject

12:05:02  24   to objection.

12:05:03  25            MR. DUNN:  And Your Honor, just so we know, we've

DIRECT - BARRETO                                                  115

12:05:06   1    filed an updated exhibit list in CM/ECF in the interim.

12:05:11   2            JUDGE GUADERRAMA:  Okay.

12:05:11   3    BY MR. DUNN:

12:05:14   4        Q.   Now, let's turn to this case and turn your attention

12:05:18   5    to plaintiff's Exhibit 44 and I want to just ask you -- I'm

12:05:23   6    showing you paragraph 3, but what is it you were asked to do in

12:05:27   7    this case?

12:05:28   8        A.    In this case, I was approached by plaintiff's attorney

12:05:39   9    Mr. Gaber, I believe, to assess the Senate plan that was adopted

12:05:45   10   by the State of Texas to look at demographic and voting patterns

12:05:53   11   in particular as they related to areas in and around Tarrant

12:05:58   12   County, Senate Districts 9, 10 and 22, to understand voting

12:06:06   13   patterns by blacks and Hispanic as well as Anglos and to

12:06:11   14   understand demographic changes that have been made to the plans.

12:06:16   15       Q.   And how did you -- did you accept this assignment?

12:06:20   16       A.   I have.

12:06:21   17       Q.   How did you proceed to prepare your analysis?

12:06:24   18       A.    First I had to assess which data would be the most

12:06:33   19   relevant to my inquiry, which is always the starting point.

12:06:36   20   There was different types of census data and voting data that I

12:06:41   21   would need in order to complete this.  And so I obtained data

12:06:46   22   from these sources that included the Texas Legislative Council.

12:06:53   23   Believe it's called Capitol Data Project.  It's a website that

12:07:00   24   has a lot of maps, demographics, as well as precinct by precinct

12:07:07   25   voting results.  It also contains precinct by precinct and

DIRECT - BARRETO                                             116

12:07:11  1   racial demographics.  Those are called V. T. D.s.  I believe

12:07:17  2   that's voting districts, but I'm not certain.  I know we used

12:07:19  3   the phrased V. T. D.

12:07:21  4        I also then accessed and evaluated data from the

12:07:28  5   Census Bureau, in a couple of different manners, both going to

12:07:34  6   the Census website, which is data.census.gov., but also through

12:07:42  7   the academic portal called Social Explorer, which houses the

12:07:49  8   most up-to-date Census data.

12:07:50  9        Q.   The first source of data you mentioned was the TLC

12:07:53 10   data, the Capitol Project.  Have you had occasion to use that

12:07:57 11   data before?

12:07:57 12        A.   Yes, many times.

12:07:58 13        Q.   Have you found it reliable?

12:08:00 14        A.   I have.

12:08:01 15        Q.   Is it a reasonable source for data for you to analyze

12:08:05 16   and come to opinions you intend to offer today?

12:08:07 17        A.   Yes, it is.  It's not only frequently used by

12:08:12 18   practitioners, but many social scientists who are interested in

12:08:17 19   voting patterns in Texas, download TLC data and publish it in

12:08:22 20   peer-reviewed articles.

12:08:23 21        Q.   Social Explore, what is it?

12:08:26 22        A.   That is a software package, which is accessible via

12:08:33 23   the Internet, which houses census data, both current as well as

12:08:38 24   over time, census data.  It is used by many academic social

12:08:45 25   scientists to access tables.  Some people prefer the interface

DIRECT - BARRETO                                                        117

12:08:52  1   over itself, but also to evaluate maps.  You can look at census

12:08:59  2   data at different geographies such as an overall county or you

12:09:02  3   can zoom in inside of the county and look at little census block

12:09:07  4   groups.  It is a software portal that houses census data and be

12:09:11  5   used to create tables, maps or other features.

12:09:14  6       Q.   Have you found it to be accurate?

12:09:16  7       A.   Yes.

12:09:17  8       Q.   Is it regularly relied upon by you and other social

12:09:21  9   scientist in your field to give testimony in cases and to

12:09:25 10   publish works?

12:09:25 11       A.   Yes and most absolutely.  Most Universities across

12:09:31 12   country have subscriptions to Social Explorer.  It's usually

12:09:36 13   used as a research tool.  It's widely used and relied upon.

12:09:41 14       Q.   And the third source of data you mentioned was census

12:09:45 15   data.  How would you obtain it and what source?

12:09:46 16       A.   As I said the census data is loaded inside Social

12:09:52 17   Explorer.  A lot of people go there just because the prefer the

12:09:53 18   interphase.  But I also have been working with Census website

12:09:59 19   itself for over 20 years.  And so you can also obtain tables and

12:10:08 20   summary statistics by going to data.census.gov.  The government

12:10:16 21   tables setting specific county or to a specific Senate District,

12:10:20 22   and so some of the sources I am more familiar going directly to

12:10:26 23   the Census website.  I download it from there.

12:10:30 24       Q.   Business on training experiencing obtain from the

12:10:33 25   Census website reliable?

DIRECT - BARRETO                                              118

12:10:35    1         A.    Yes, it is.

12:10:36    2         Q.    And is it regularly relied upon by social scientists?

12:10:39    3         A.    Extensive.  Not only by social scientists, but by

12:10:44    4    industry and many others as being valid and objective source of

12:10:51    5    social racial demographic.

12:10:53    6         Q.    All right.  I'd like to get a glossary of terms here

12:10:56    7    if I can, with you.  We've used a number of acronyms and I

12:11:01    8    expect we will continue to do so in this case.  So I'd like to

12:11:03    9    get explanations.

12:11:05   10              What is ACS?

12:11:07   11         A.    The ACS is an abbreviation for a Census project or

12:11:13   12    product, I should say, called the American Community Survey.

12:11:18   13    This is an annual survey collected every year.  I believe it

12:11:24   14    started in 2005 as an effort to expand upon what had been called

12:11:32   15    the current population survey or CPS.  Today the ACS has grown.

12:11:40   16    It's a fairly large annual product from the Census and many

12:11:46   17    people refer to it as just an ACS, by those three letters, but

12:11:53   18    it is understood that's a Census annual survey.

12:11:57   19         Q.    How does the Census Bureau determine who will answer

12:12:02   20    the ACS survey?

12:12:03   21         A.    I've had to do a lot of research on this, because I

12:12:06   22    was involved in the Census litigation as well.  And so I've

12:12:11   23    looked very closely at this, not only in my academic work, but

12:12:15   24    as a part of a lawsuit.

12:12:19   25              The ACS does a household sample.  They start by

DIRECT - BARRETO                                                      119

12:12:25   1    selecting upwards about three and a half percent of households

12:12:30   2    randomly selected across the United States using an sampling

12:12:35   3    algorithm.  They ultimately get two to two-and-a-half at max,

12:12:41   4    but usually 2 percent of households participate.  And these

12:12:45   5    households are randomly selected across every geography in

12:12:53   6    America.  And so any year, your household could get a letter.

12:12:57   7    They're now expanding to do online data collection as well.  You

12:13:04   8    get selected.  You get an invitation that says you've been

12:13:08   9    selected to participate in the ACS.  They accepted.  You

12:13:13   10   follow-up to make sure they have a high response rate.  And so

12:13:16   11   somewhere on the order of about two percent of households across

12:13:18   12   the United States are selected on any given year to answer

12:13:22   13   questions about their household and the people that live in

12:13:25   14   their household.

12:13:26   15        Q.    Now what is it what at data points or some of the data

12:13:29   16   points that are collected in the ACS that's relevant to our

12:13:33   17   inquiry here?

12:13:34   18        A.    Well, in particular, the ACS asks about citizenship

12:13:42   19   status of household members something that the census does not

12:13:48   20   ask about.  The ACS asks a lot of other questions about your

12:13:52   21   household, your employment patterns, type of automobile, how you

12:13:57   22   get to work, but what concerns us here is they do ask a question

12:14:02   23   about the citizenship status of household members and that

12:14:08   24   allows social scientists and voting right scholars who are to be

12:14:15   25   able to isolate the citizen voting-age population.

DIRECT - BARRETO                                        120

12:14:18   1        Q.    What do we call that acronym?

12:14:21   2        A.    By the first letters of the words there, CVAP,

12:14:25   3   C-V-A-P.

12:14:25   4        Q.    Can you also obtain CVAP from ACS?

12:14:31   5        A.    So reserve to all adults over the age of 18 and that

12:14:36   6   also comes on an annual basis from the ACS.

12:14:40   7        Q.    And how about total population?

12:14:42   8        A.    Yes they also enumerate tables with total population

12:14:48   9   on an annual basis from the ACS.

12:14:51   10       Q.    Are there or what is different between the Decennial

12:14:57   11  Census and the ACS?

12:14:59   12       A.    Well the Decennial Census sets out to not be a sample,

12:15:03   13  number one.  It sets out to gather responses from every single

12:15:10   14  known household in the United States.  We know that not

12:15:13   15  100 percent of households do respond, but they make every effort

12:15:19   16  to try to maximize the response rate, and so the Census is

12:15:24   17  considered a count that is enumerating the total number of

12:15:28   18  people across the United States in different geographies.  That

12:15:33   19  is done only 10 years.  The ACS is done every single year.  And

12:15:40   20  the Census does not have a question about citizenship status, so

12:15:44   21  it can only tell us the total population and it can also tell us

12:15:49   22  the adult population, because it does have a question about age.

12:15:52   23       Q.    Now, are both of these Census products -- the

12:15:56   24  Decennial Census and American Community Survey reliable sources,

12:16:03   25  in your opinion?

KATHLEEN A. SUPNET, CSR

DIRECT - BARRETO                                                    121

12:16:04   1        A.    They are.  They both have different methodologies, as

12:16:08   2   I have just discussed.  And social scientists who use them

12:16:11   3   should be familiar with the methodologies so that they know what

12:16:17   4   the full extent of the limitations might be in either product.

12:16:21   5        Q.    One last question on the CVAP and ACS.  Are there

12:16:27   6   circumstances in a given voting jurisdiction where you have to

12:16:31   7   look more carefully in terms of having a concern that it might

12:16:35   8   not be accurate?

12:16:35   9        A.    Yes.  This is what I was just referring to in needing

12:16:41  10   to have a strong familiarity with the methodologies, especially

12:16:43  11   with the ACS because it is a sample.

12:16:46  12        Q.    Is there also the case that when the geography changes

12:16:51  13   when you get to smaller locations that ACS needs to have a clear

12:16:56  14   look?

12:16:56  15        A.    That's primarily the area that we do pay more

12:17:02  16   attention and oftentimes you'll hear people use what's called

12:17:06  17   the 5-year ACS, because each individual year only has 2 percent.

12:17:13  18   If you can pool together 5 years of data, now you've got about a

12:17:17  19   10 percent sample of the entire country which is pretty big.

12:17:22  20   Even then with 10 percent, when you get down to really small

12:17:27  21   levels of geography, there may not have been thousands and

12:17:33  22   thousands of interviews.  The ACS will report on all of its

12:17:37  23   products, a plus or minus margin of error on those estimates and

12:17:43  24   they advise scholars to take those into consideration.  When

12:17:48  25   making estimates of the smaller geography you analyze, there are

KATHLEEN A. SUPNET, CSR

12:17:54   1   competent interval questions around the population number.

12:17:57   2       Q.   So turning to this -- to the work you did with the

12:18:01   3   data on this case, what is it that it told you about the

12:18:07   4   circumstances in Tarrant County?

12:18:12   5            MR. HILTON:  Your Honor, before we get into

12:18:15   6   Dr. Barreto's expert opinion, observe the formality of the

12:18:18   7   formal tender.  I think he qualifies.  (Mumbling).

12:18:23   8            JUDGE GUADERRAMA:   All right.

12:18:23   9            Mr. Dunn, are you offering him as an expert.

12:18:27  10            MR. DUNN:  Yes, Your Honor, we're offering Dr. Barreto

12:18:29  11   as an expert.

12:18:29  12   BY MR. DUNN:

12:18:30  13       Q.   What do you consider yourself as an expert, Dr.

12:18:30  14   Barreto?

12:18:31  15       A.   Political science, voting analysis, demographic

12:18:37  16   analysis and I would the Voting Rights Act in redistricting.

12:18:43  17            MR. DUNN:  We offer Dr. Barreto for those purposes.

12:18:47  18            JUDGE GUADERRAMA:   Mr. Hilton, any objection?

12:18:50  19            MR. HILTON:  I think for the limited purpose of his

12:18:53  20   opinion with this hearing, no objection.  I think I would

12:18:55  21   quibble again with the characteristics of him being an expert in

12:18:59  22   the Voting Rights Act, certainly legal questions were the

12:19:05  23   (indiscernible).  Subject to that, no objection.

12:19:06  24            (Counsel inaudible).

12:19:06  25            JUDGE GUADERRAMA:  All right.  The Court will except

12:19:08   1    him in as expert in those feels, the social scientist and the

12:19:13   2    voting rights and redistricting.

12:19:13   3    BY MR. DUNN:

12:19:17   4        Q.   And to clarify that last question, is the portion of

12:19:17   5    the Voting Rights Act you consider yourself an expert in the

12:19:21   6    racially polarized voting that the cases require?

12:19:26   7        A.   I would say the history of it.  First of all, I've

12:19:27   8    taught classes specifically about the history of the passage and

12:19:32   9    implementation of the Voting Rights Act.  But in particular, the

12:19:36  10    social science analysis that goes into providing evidence to

12:19:42  11    meet different voting right standards, I do not have a J.D. and

12:19:47  12    I am not offering myself as a legal conclusion expert.

12:19:51  13        Q.   All right.  Turning our attention then back to

12:19:54  14    paragraph 5, what is it you observe about the data you collected

12:20:02  15    from Tarrant County?

12:20:03  16        A.   Before I looked specifically at Tarrant County, I

12:20:05  17    wanted to get a sense of the State of Texas as a whole.  Knowing

12:20:09  18    that these Senate districts in this part of the state there were

12:20:14  19    puzzle pieces in the entire map.  And so I often do this when

12:20:20  20    I'm evaluating redistricting proposals, whether it's for a state

12:20:25  21    or city council, is to say, let's look at the overall

12:20:30  22    jurisdiction in this case.  It was the state of Texas.  And

12:20:34  23    before I could understand what happened in Tarrant County was at

12:20:41  24    issue, I needed to know what was in the state and get the

12:20:45  25    overall state trends.

DIRECT - BARRETO                                                      124

12:20:46   1          And so I describe here in paragraph five what had

12:20:50   2   happened, and that is that the State of Texas as a whole,

12:20:54   3   experienced massive growth of nearly 4 million of non-white

12:21:00   4   population, and as a percentage, the Anglo-white population

12:21:09   5   actually experienced the 5 point decline over the last 10 years.

12:21:14   6   So that for me, sort of framed for me going in my understanding

12:21:18   7   that this was a massive growth in the non-white population that

12:21:23   8   we should be observing that, we should be observing growths,

12:21:26   9   when we honed in on any particular geographic region.  So

12:21:31  10   paragraph five as I said is a very broad overview of the whole

12:21:34  11   state.

12:21:35  12      Q.   Now going to page two of the exhibit, you provided

12:21:42  13   table one.  Can you see that, sir?

12:21:44  14      A.   Yes.  This table is the summary then of the data

12:21:51  15   points that I just described in paragraph five that contains the

12:21:56  16   population by race and ethnicity, in 2020, according to the

12:22:03  17   Census, and compares that to the population by race and

12:22:08  18   ethnicity in 2010.  It then lists the numeric change.  You can

12:22:14  19   see at the very top the entire State of Texas grew by

12:22:18  20   almost exactly -- just short of exactly 4-million persons, and

12:22:24  21   then the same corresponding change by the each of the different

12:22:26  22   racial or ethnic groups.

12:22:30  23      Q.   We don't need to go through each of these bits of

12:22:31  24   data.  Can you summarize the change and the various groups?

12:22:36  25      A.   So one of the things I am usually looking at how it

KATHLEEN A. SUPNET, CSR

DIRECT - BARRETO                                                    125

12:22:39  1    compares to the state-wide average.  The first is important.

12:22:42  2    Let's us know groups are growing at a faster or lower rate.

12:22:47  3         The State of Texas grew by 16 percent, which is a lot

12:22:50  4    of growth in 4 years.  It's a lot of demographic shifts that any

12:22:56  5    map, whether it's city council or congressional or a Senate map,

12:22:59  6    is going to have to deal with because there's changes from ten

12:23:04  7    years ago, 16 percent.

12:23:05  8         The Hispanics grew by 21 percent, numerically by 2

12:23:12  9    million.  The Anglo population grew the least.  They grew by

12:23:16 10    2 percent.  Almost unchanged over the 10 years.  The

12:23:22 11    African-American or black population grew by 19 percent.  Again,

12:23:30 12    faster than the state-wide average.  The Asian-American

12:23:31 13    population, among the four major identifiable racial and ethnic

12:23:34 14    groups, grew by the most; 65 percent across the state of Texas

12:23:39 15    by over 600,000.

12:23:42 16         And there is also been something that a lot of social

12:23:46 17    scientists have been studying the increase in the number of

12:23:51 18    American who identify as multi-racial or mixed-race.  That is

12:23:56 19    also a notable trend in the State of Texas.  So those non-white

12:24:00 20    populations grew by very large amounts over the past ten years.

12:24:03 21    Q.   The numbers we see in the multi-racial row, are they

12:24:08 22    included also in the rows above?

12:24:10 23    A.   No, they are not.  The rows above are often referred

12:24:14 24    to as that race or ethnicity alone, and then there are people

12:24:22 25    who identify with two races or they identify as multiracial and

KATHLEEN A. SUPNET, CSR

12:24:26  1    that is that last row.

12:24:28  2        Q.    Did you analyze this increase of population in terms

12:24:32  3    of what impact it could have on the State Senate map?

12:24:36  4        A.    We -- that's also -- again, this is something I have

12:24:40  5    been involved in, this redistricting cycle, in advising or as an

12:24:45  6    expert witness for different cities, different counties, other

12:24:49  7    states.  And I always start at a starting point of understanding

12:24:53  8    how big are your districts that you are trying to draw, how many

12:24:57  9    people do they have, and thinking about that through the lens of

12:25:01  10   the demographic changes in your jurisdiction, whatever that

12:25:04  11   jurisdiction is, again it gives you the ability before you hone

12:25:08  12   in to narrow in on a region to understand the entire playing

12:25:13  13   field that you're dealing with.

12:25:15  14            Here in paragraph six, what I identified was that over

12:25:17  15   the 10 years, there was a 3.8 million increase in non-white

12:25:25  16   residence, given an average Senate district size, about 940,000,

12:25:31  17   that by itself would account for four additional, because these

12:25:35  18   are new people who were not here in 2010, full additional full

12:25:40  19   Senate seats if they were all 100 percent non-white.  However,

12:25:47  20   most seats are not 100 percent of one racial group or another

12:25:52  21   and so I looked at it through the lens of majority-minority

12:26:00  22   districts.  I used the rate of 67 percent.  This is something

12:26:04  23   that would be very commonly understood as minority performing

12:26:09  24   districts where there's a large minority population.  And that

12:26:13  25   would quite easily give the ability to say given the 3.8-million

12:26:22  1    people who are new, that could've accounted for six

12:26:26  2    majority-minority Senate districts.

12:26:28  3        Q.    You stated here earlier you reviewed Senate Plan

12:26:33  4    S2168, which is the map at issue in thi court case here today,

12:26:37  5    how many additional majority-minority districts did it draw from

12:26:41  6    the Benchmark plan, the plan from 2010?

12:26:44  7        A.    None.

12:26:45  8        Q.    Now you state here in the last sentence in paragraph

12:26:48  9    6, it's possible -- I'm paraphrasing -- it's possible to draw

12:26:52 10    six additional full Senate districts that are greater than

12:26:56 11    60 percent non-white.

12:26:57 12            Did you sit down with the mapping software and try to

12:27:01 13    draw these maps?

12:27:02 14        A.    I reviewed mapping software.  It's often a starting

12:27:08 15    point, whether it's through Social Explorer or other mapping

12:27:15 16    software that I use to try to understand where these populations

12:27:18 17    are.  Are they so disparate and spread apart that they could

12:27:25 18    never be joined into a district.

12:27:25 19            So I recall before I honed in on Tarrant, the very

12:27:31 20    common, I would say most social scientists do this at the very

12:27:33 21    start, get their hands on the data and try to look at it,

12:27:38 22    evaluating different sort of configurations and seeing where

12:27:43 23    these growths of 3.8-million none-whites were.  And I was

12:27:50 24    extremely confident that six additional full Senate seats

12:27:56 25    could've been comprised that were at least 67 percent minority.

DIRECT - BARRETO                                              128

12:28:01   1      Q.    Turning to page three of your report, you hone in on

12:28:05   2   Tarrant County.  And what is the analysis conclusion you provide

12:28:10   3   there?

12:28:10   4      A.    This was the area of primary concern was the

12:28:14   5   population in and around Tarrant County.  And so after sort of

12:28:19   6   setting the table with the general state demographic, I

12:28:23   7   evaluated the same question:  How has Tarrant County changed

12:28:26   8   from the last 10 years from 2010 to 2020; which groups have

12:28:30   9   grown; which groups have stayed the same; and what does that

12:28:36   10  mean for how lines could theoretically be drawn?  That is

12:28:43   11  presented in table two, the summary data from the Census.

12:28:47   12     Q.    All right.  What did the data say with the changes of

12:28:51   13  Tarrant County?

12:28:52   14     A.    Well, Tarrant County had robust growth about on par

12:28:58   15  with the state as a whole, one point higher.  You recall the

12:29:02   16  State of Texas grew by 16 percent.  Tarrant County grew by

12:29:08   17  17 percent, but the same Tarrant County and the state as a

12:29:12   18  whole, that -- and I'll say not only the same pattern; slightly

12:29:16   19  stronger; that the majority population growth is, in this case,

12:29:22   20  entirely responsible for the changes in Tarrant County.  The

12:29:28   21  Anglo population, as you can see there listed in the middle,

12:29:32   22  actually had a decline as reported by the Census of about 32,000

12:29:38   23  persons or about 3 percent over the 10 years.  So while Tarrant

12:29:42   24  County as a whole grew by 300,000, this was entirely due to the

12:29:49   25  growth of the black, Hispanic, Asian and other multi-racial

DIRECT - BARRETO                                                              129

12:29:59   1    population.

12:30:00   2         Q.   On the Anglo reduction that you note here, 3 percent,

12:30:03   3    how does that compare to the state-wide Anglo data that you

12:30:08   4    reported earlier?

12:30:08   5         A.   The state as a whole grew by 2 percent.  I think most

12:30:16   6    demographers would consider that to be mostly flat.  It went

12:30:20   7    from 11 million to 11 million.  It changed from about 187,000,

12:30:26   8    so it wasn't really robust growth, but it was more staying the

12:30:30   9    same.

12:30:31   10        In Tarrant, it was actually decline of 32 thousand of

12:30:37   11   non-Hispanic, Anglo-white population.

12:30:40   12        Q.   In turning to page four of your report, you focus your

12:30:43   13   report now to Senate District 10.  What is it that you report

12:30:48   14   there?

12:30:48   15        A.   Well here is when I start to evaluate the performance

12:30:54   16   of Senate District 10, looking at it's population, and how it

12:31:01   17   has been performing for minority candidates of choice.

12:31:07   18        Q.   And what does the data show?

12:31:11   19        A.   Well, I start here by discussing the population

12:31:17   20   characteristics of Senate District 10.  It is currently a

12:31:21   21   majority-minority district, 61.5 percent non-white population.

12:31:28   22   The largest group of which is Hispanic at 32.2 percent black and

12:31:36   23   African American at 21.5 and Asian American at 5.7 and mixed

12:31:42   24   race or multiracial.  It is also a majority-minority adult

12:31:47   25   population voting age population for which it is only

DIRECT - BARRETO                                                    130

12:31:51   1   43.9 percent Anglo-white.

12:31:55   2        And then I turn to discussing the citizen voting age

12:31:59   3   population or CVAP as we discussed earlier in the testimony.

12:32:04   4        Q.   Now, I want to -- well, first your source for this

12:32:09   5   data you reported the Texas Legislative Council; is that true?

12:32:13   6        A.   Yes, I believe that's the case in this particular

12:32:16   7   paragraph.

12:32:17   8        Q.   And you provide a footnote to the URL for your source

12:32:21   9   for that data; is that right?

12:32:23   10       A.   Yes.

12:32:23   11       Q.   Now returning back to that paragraph, you focus in on

12:32:29   12   a particular setup, ACS CVAP data, which was that?

12:32:34   13       A.   Well the last one that the Texas Legislative Council

12:32:37   14   reported was the 5-year, 2015 to 2019, ACS CVAP data.

12:32:46   15       Q.   And why not use one more recent?

12:32:49   16       A.   Well, the 2020 ACS is actually going to be delayed and

12:32:58   17   will not be reported in the same manner as any other ACS.

12:33:04   18       Q.   Why was it delayed?

12:33:06   19       A.   Well, the statisticians and demographers at the Census

12:33:14   20   Bureau have indicated that numerous reports and press releases

12:33:17   21   that they were concerned about the low response rate of the 2020

12:33:22   22   ACS that was collected during the first waives of the COVID

12:33:27   23   pandemic.  They not only had a lower response rate, but they

12:33:32   24   report it was unequal response rate by socioeconomic status.

12:33:38   25       In particular, the Census has stated that lower

KATHLEEN A. SUPNET, CSR

12:33:42  1    socioeconomic status, individuals, people who are renters, may

12:33:48  2    have been moving around more and less accessible, and they have

12:33:53  3    not released the 2020 ACS, yet, neither as a part of the 5-year

12:33:59  4    package nor as an individual standalone data set.

12:34:03  5        Q.    Now absent those, the pandemic and the other

12:34:06  6    difficulties with the 2020 ACS, would you have expected the 2020

12:34:13  7    ACS 1-year and 5-year to have been released by now here in

12:34:17  8    January 25, 2022?

12:34:18  9        A.    Yes.  Certainly the Census has indicated that in

12:34:21 10    normal years it would've been released at the end of 2021.

12:34:26 11        Q.    All right.  Because you only had 25 -- or 2015 to

12:34:31 12    2019, 5-year average, that's what you relied on this state -- or

12:34:35 13    this paragraph?

12:34:35 14        A.    That's what TLC relied on.  That's what they're using.

12:34:39 15    And so I'm citing some tables that they made, but in also

12:34:45 16    visiting Social Explorer or data.census.gov, that is the most

12:34:53 17    ACS product that is currently available for us to evaluate.

12:34:58 18        Q.    Now, in focussing in on the 2015 to 2019 ACS data, how

12:35:03 19    would you describe the timeliness in terms of the number?

12:35:06 20        A.    Well single-year ACS can you used to tell us something

12:35:11 21    about that single year.  So there's also a product called the

12:35:16 22    2019, 1-year data.  That should be thought of as fairly accurate

12:35:19 23    for the year 2019, because it only includes those 2 percent of

12:35:24 24    households interviewed in 2019.

12:35:27 25              When we use 5-year data, five times bigger.  It has

12:35:33   1   data from 2015, 2016, 2017, 2018 and 2019.  The downside of that

12:35:41   2   is it has some older data in it.  It has data all the way back

12:35:45   3   in 2015.  So in particular, when you're analyzing rapid

12:35:50   4   population change, we tend to think of the 5-year data as

12:35:58   5   centered on the midpoint, that is it has 2 years before 2017,

12:36:03   6   '15 and '16, it has 2 years after 2017, '18 and '19, and so when

12:36:09   7   we compare it to 1-year data, that midpoint of 2017 has been

12:36:16   8   proven that that's really what it reflects.  So when I look at

12:36:21   9   '15 to '19 ACS, it sort of stands in for what was the true state

12:36:28   10  of demographics in the year 2017.

12:36:31   11      Q.   Now when the Legislature -- I believe the record

12:36:33   12  reflects the Legislature undertook redistricting with respect to

12:36:37   13  this plan in the fall of 2021, what ACS CVAP product would have

12:36:43   14  been available then?

12:36:44   15      A.   At that time it would've been the 2015 to 2019 data

12:36:52   16  that they were using if they were evaluating CVAP voting page

12:36:58   17  population.

12:36:59   18      Q.   Is it fair to look at the -- I think this is clear,

12:37:02   19  but just to make sure the record is clear -- is it fair to look

12:37:04   20  at 2015 to 2019 CVAP 5-year's data that is the percentage of

12:37:11   21  citizen voting age population or the whole number of citizenship

12:37:14   22  voting age population in a particular geography as of 2019?

12:37:19   23      A.   No, not as of 2019.  No.  As of 2017, as I said.

12:37:24   24      Q.   Now returning your attention back to paragraph nine in

12:37:28   25  the last sentence, what is the conclusion you express there?

12:37:30  1        A.    I was evaluating the citizen voting population as part

12:37:36  2   of the overrule evaluation of rapid demographic changes in

12:37:42  3   Tarrant County.  Given the steady decline in the Anglo

12:37:47  4   population that we'd been observing in other ACS data, and as I

12:37:51  5   mention here, what I just described, the lag that is built into

12:37:56  6   the 5-year data, the Benchmark SD-10 as it existed was almost

12:38:03  7   certainly a majority-minority CVAP district by 2020.  And that

12:38:09  8   is because we're observing very rapid changes in the Anglo and

12:38:15  9   non-white population.  The non-white population was increasing

12:38:21 10   very quickly, and looking at those 5-year ACS product every

12:38:27 11   year, so there's not just a '15 to '19.  There's a '14 to '18

12:38:32 12   and there is a '13 to '17.  So they just slide it, so you always

12:38:37 13   have 5 years, but it gets a year newer.  And so looking at that

12:38:42 14   over time you can see very strong trends just as in the 1-year

12:38:48 15   data.  And just like the rest of Tarrant County and the State of

12:38:52 16   Texas, there's very observable trends in a decline in the Anglo

12:39:00 17   population and the Anglo citizen adult population.  And so this

12:39:05 18   last sentence suggests that, in fact, this district is likely

12:39:10 19   majority-minority CVAP today.

12:39:14 20        Q.    Now, when you look -- when you get the 2020 Decennial

12:39:21 21   Census are there things you look at in terms of comparing it to

12:39:25 22   the recent ACS reports to see what it tells you about how

12:39:29 23   accurate the ACS surveys were?

12:39:32 24        A.    Yes.  Each ACS, each individual ACS is a 2-percent

12:39:40 25   sample and a lot of refinements and adjustments are made by the

DIRECT - BARRETO                                           134

12:39:46  1    statisticians and demographers each year to hope to accurately

12:39:52  2    reflect the true population.

12:39:55  3          What the Census Bureau would tell us that true

12:39:57  4    population is the count that comes from the Decennial Census.

12:40:03  5    And so using the 1-year ACS, we can create the single 1-year

12:40:09  6    data point by race and ethnicity for the total population and

12:40:15  7    then compare it to the 2020 Census.  And we can see whether or

12:40:18  8    not that linear pattern we're observing in the ACS continues?

12:40:25  9    Does the 2020 Census help us correct what we see in the

12:40:30  10   2-percent samples?  Because the ACS, while a very good product

12:40:32  11   is only a 2-percent sample.  So the 2020 Census we think of as

12:40:37  12   close to 100 percent, it allows us to correct or refine where

12:40:42  13   the ACS might have been a little too high or a little too low.

12:40:45  14          Q.   And have you done that work?

12:40:47  15          A.   Yes, that's a regular -- I would say probably every

12:40:50  16   demographer has done it, is doing that work.  It's a regular

12:40:54  17   part of understanding census data as it relates to districting

12:40:58  18   plans.

12:40:59  19          Q.   What are your conclusions there?

12:41:00  20          A.   Well what we found across the entire State of Texas,

12:41:04  21   what we found to Tarrant County and what we found in SD-10,

12:41:08  22   specifically, was that the Anglo population was actually

12:41:15  23   declining at a much faster rate than what the ACS suggested.

12:41:23  24          MR. HILTON:  Your Honor, I have to object here.  This

12:41:25  25   is going beyond anything that's described in the report.  It

12:41:28   1   does not describe in detail what he's attempting to do here.

12:41:32   2   Now the effect of this correction that he's done with ACS on

12:41:39   3   SD-10, it's not in nine -- (indiscernible).

12:41:41   4           JUDGE GUADERRAMA:  So your objection is it's not

12:41:43   5   included in the report?

12:41:46   6           MR. HILTON:  That's correct.

12:41:47   7           JUDGE GUADERRAMA:  Mr. Dunn?

12:41:47   8           MR. DUNN:  Your Honor, I'll read the last sentence of

12:41:51   9   paragraph 9.  It says given the steady decline in Anglo share of

12:41:55  10   the district CVAP and lag in -- inherent in the 5-year ACS

12:41:58  11   estimates, Benchmark SD-10 is almost certainly a

12:42:03  12   majority-minority district by CVAP today.  I believe that's the

12:42:07  13   opinion he's giving.

12:42:12  14           JUDGE GUADERRAMA:  Well, he's talking about the

12:42:14  15   decline in the Anglo population, being much faster than what is

12:42:21  16   reflect in the ACS.  I'm not sure all of that is reflected.

12:42:29  17           MR. DUNN:  Understood, Your Honor.

12:42:30  18           JUDGE GUADERRAMA:  So I'll sustain his objection and

12:42:32  19   limit it to what's in his report.

12:42:32  20   BY MR. DUNN:

12:42:38  21       Q.   Let's move to paragraph ten.  Paragraph ten you turn

12:42:44  22   to looking at some election data; is that right?

12:42:47  23       A.   Yes.

12:42:48  24       Q.   What do you observe there?

12:42:49  25       A.   Well, after reviewing the racial and ethnic

DIRECT - BARRETO                                                        136

12:42:54   1   demographics, the second question was whether or not SD-10 was

12:42:59   2   performing for minority candidates of choice.  And here it

12:43:05   3   paragraph 10 I reviewed the most recent election of 2018 to

12:43:11   4   determine that the minority preferred candidate, in this case

12:43:18   5   Senator Powell, won the district and was preferred by minority

12:43:22   6   voters.

12:43:23   7       Q.   On page 2 -- or excuse me -- page 5, you summarize

12:43:31   8   election results and data; is that right?

12:43:32   9       A.   Yes.  In this table, I summarize a number of elections

12:43:39  10   through the lens of SD-10.  The primary election which I

12:43:45  11   highlight the election of Senator Powell, but then in this table

12:43:50  12   I turn to evaluating other elections to examine how this

12:43:58  13   district is performing, is it performing for minority candidates

12:44:01  14   of choice.

12:44:02  15       Q.   And why select these elections?

12:44:05  16       A.   This I believe is either the totality or close to the

12:44:10  17   totality of elections for statewide and other office that we

12:44:14  18   could evaluate for the last 2 years through the SD-10

12:44:19  19   boundaries.  So I look at the 2018 and 2020 election for things

12:44:24  20   like President, U.S. Senate, Governor, but other statewide

12:44:33  21   elected offices tally which candidate got more votes and whether

12:44:38  22   they were minority preferred.

12:44:40  23       Q.   And based on this analysis, who does the data show is

12:44:43  24   the candidate or preference or Senate District 10 voters under

12:44:49  25   the Benchmark map for the state Senate race?

DIRECT - BARRETO                                                    137

12:44:52  1        A.    There's no question that Senate District 10 is

12:44:57  2    performing as for minority candidates of choice.

12:45:02  3              In 2020, in ten out of ten elections, the minority

12:45:08  4    candidate of choice carried Senate District 10.  In 2018, out of

12:45:16  5    13 additional elections, there were only four in which the

12:45:21  6    minority candidate of choice did not carry.  Those were

12:45:26  7    extremely narrow.

12:45:27  8              So my conclusion was that in these 23 elections in

12:45:29  9    very recent years, including the election of Senator Powell,

12:45:33  10   herself, minority preferred candidates won this district

12:45:40  11   essentially in 20 out of 24 contests.

12:45:42  12       Q.    Now if you're looking at older ACS data, for example

12:45:46  13   going back to 2015, why aren't you looking further back?

12:45:50  14       A.    Here I'm most interested in the recent election

12:45:54  15   results to tell me about the current electorate; is the

12:45:57  16   electorate as composed today performing for minority candidates

12:46:02  17   of choice.  This is particularly important because it has grown

12:46:07  18   no minority population, as we just reviewed.  So these from my

12:46:11  19   perspective are the most relevant election.

12:46:15  20       Q.    Now in the interest of clarity, what partisan

12:46:19  21   affiliation do candidates prefer from the minority population in

12:46:25  22   SD-10?  What party affiliation?

12:46:28  23       A.    According to the ecological inference analysis, which

12:46:30  24   I present later in this report, democratic candidates at the

12:46:35  25   local statewide as well as federal level are strongly preferred

12:46:41   1    by black and Hispanic votes.

12:46:43   2        Q.    Now let's turn your attention to page six of your

12:46:47   3    report here.  You take a look at plan S2168, the map that's

12:46:55   4    challenged in this proceeding, and what is it that you are

12:46:58   5    reporting in paragraph 11?

12:47:00   6        A.    So after establishing in Section 2 that the current

12:47:04   7    Senate District is performing well for minority candidates of

12:47:09   8    choice as effective crossover district, in section three I now

12:47:13   9    start looking at the new boundaries of S2168 to assess how it's

12:47:20  10    going to perform by using many of the same population and

12:47:25  11    election results.  And here the take away or conclusion is that

12:47:30  12    this new plan dilutes the minority votes.  I believe I used the

12:47:38  13    "it cracks" the minority population, and it limits their

12:47:41  14    influence and ability to elect minority preferred candidates.

12:47:47  15        Q.    On to paragraph 12, you report some similar Census

12:47:52  16    figures and ACS figures for the Benchmark Senate District 10 for

12:47:57  17    the new district.  Can you describe those?

12:47:59  18        A.    Yes.  Again, here I start with total population.  I

12:48:05  19    also review the adult voting population and then citizen voting

12:48:11  20    age population and contrasting with what we just reviewed above,

12:48:17  21    which was 61.5 percent minority, the new district as drawn is

12:48:25  22    49 percent Anglo, only 51 percent minority in total population,

12:48:29  23    so 10 point decline in the minority population.

12:48:35  24            The voting age population of the new district now

12:48:38  25    becomes majority Anglo whereas the old district had maintained

DIRECT - BARRETO                                                           139

12:48:43   1    majority-minority status.   The new district is 53.3 percent

12:48:49   2    Anglo adult population.

12:48:51   3          And then further looking at the citizen voting age

12:48:54   4    population, a see a stronger, large Anglo population voting

12:49:01   5    block at 62.2 contrasted with the existing district, which at

12:49:07   6    this point is majority-minority CVAP district.

12:49:10   7    Q.    All right.   Now turning to page seven, you provide

12:49:16   8    figure one.   What are you showing there?

12:49:29   9    A.    This is a map that I produced from Social Explorer.

12:49:37   10   It has Census block groups that are shaded in red or green based

12:49:45   11   on the percent white or percent non-white.   And I then overlaid

12:49:50   12   a little black line that you can see going through part of

12:49:54   13   Tarrant and some of the other counties, which is Senate District

12:50:00   14   10 boundary in the new map.   What this shows is that the

12:50:06   15   additional counties that were taken on are overwhelmingly Anglo

12:50:13   16   at the Census block group level.   In the countywide level, many

12:50:17   17   cases over 80 or 90 percent Anglo in direct contrast to what I

12:50:25   18   describe as the core of Senate District 10, including parts of

12:50:29   19   Fort Worth and parts of Tarrant, which have a very large

12:50:34   20   population.

12:50:35   21   Q.    Focussing in on Tarrant County, for clarity, making

12:50:39   22   sure everyone is with us, that's the upper right-hand county,

12:50:41   23   the colored portion of the map; is that true?

12:50:44   24   A.    That's right.   Where there's a large red shading

12:50:48   25   indicates a very small white population is predominantly there

DIRECT - BARRETO                                                    140

12:50:55  1   in Fort Worth and outlining areas.

12:50:58  2       Q.   What does it show in terms of the northern boundary of

12:51:00  3   the new District 10 in Tarrant County?

12:51:03  4       A.   What it shows, and I have a zoom in on Tarrant later

12:51:08  5   in my report, what it shows in Tarrant County is that the

12:51:14  6   boundary line was drawn directly through the middle, the heart

12:51:19  7   of an otherwise large minority population.  I mean, you can just

12:51:24  8   see a large red shading that is the minority population.  These

12:51:32  9   are places that are 60, 70, 80 percent minority.  They're all

12:51:38 10   near each other.  They're geographically compact.  And that

12:51:43 11   northern boundary of SD-10 draws a line through the middle,

12:51:48 12   which is what we refer to as cracking.

12:51:50 13       Q.   On the next page there's a similar figure.  What are

12:52:01 14   you showing here?

12:52:01 15       A.   This is the counties and boundary that are included in

12:52:07 16   SD-22, which is an adjacent Senate District.  Of course anytime

12:52:13 17   you change the boundaries of one, it's bound to change the next.

12:52:17 18   And what this shows is quite similar to SD-10, that there is

12:52:26 19   sometimes what we refer to as a finger that sticks up there in

12:52:31 20   Tarrant County on the eastern side of the county, just high

12:52:35 21   density minority populations shaded in red.  That is then

12:52:41 22   connected again with multiple counties to its south, which are

12:52:45 23   overwhelmingly Anglo.

12:52:51 24       Q.   Now in the following paragraphs on page eight, you

12:52:57 25   collect some specific information in regards to the changes --

DIRECT - BARRETO                                                    141

12:53:01   1   quantifying the changes, starting in paragraph 15, what did you

12:53:08   2   report about the VTD changes?

12:53:09   3       A.   Well here I'm discussing within Tarrant County how

12:53:15   4   many precincts or VTDs were moved and shifted and to which

12:53:20   5   following jurisdictions they were shifted.  And what this

12:53:24   6   analysis shows is that while there had been a community holding

12:53:30   7   contained within Tarrant County, the new map shifted precincts

12:53:35   8   that were part of SD-10, and instead shifted them into, in this

12:53:41   9   case, SD-9 or SD-22.  So shifting them out of what I have

12:53:47  10   identified as performing minority Senate map, Senate District

12:53:52  11   into others, so we see shifts.  We see people getting pushed out

12:53:57  12   and moved around.

12:53:58  13       Q.   In paragraph 16, you give some statistics on the

12:54:02  14   population changes.  What is that?  What are you reporting

12:54:05  15   there?

12:54:06  16       A.   First the SD-10 was not how the of deviation by a

12:54:12  17   substantial amount, less than 1 percent over ideal size.  It was

12:54:16  18   overpopulated, I believe, by just 5000 persons.  So it had one

12:54:23  19   of the smallest amounts of deviation in the entire state at less

12:54:28  20   an a percent, yet, despite this, nearly 400,000 people, I think

12:54:35  21   identify 387,000, people are moved out of the district.  So

12:54:41  22   that's a substantial portion of the people that are moved out of

12:54:44  23   the district.  And then I gave the racial and ethnic breakdown

12:54:48  24   of those people that were moved.

12:54:50  25       Q.   And then in paragraph 7, what was the racial breakdown

12:54:55   1    that you provided?

12:54:55   2        A.    Well, in this case the population that was removed

12:55:00   3    from the district was majority-minority.  It was 56 percent .4

12:55:07   4    [sic] minority, 43.6 percent Anglo with the largest group being

12:55:14   5    Hispanic at 31.6, black at 16.4 and Asian at 7.1.

12:55:22   6        Q.    What did you report was the racial characteristics of

12:55:24   7    the population moved into the new drawing of Senate District 10?

12:55:28   8        A.    Paragraph 17, I describe if they moved out 387,000

12:55:34   9    people, they had to move in, roughly, 387,000 people.  In this

12:55:38  10    case slightly fewer; 377,000 people were moved into the

12:55:44  11    district.  And this population was only 32.8 percent minority

12:55:50  12    and 67.2 percent Anglo.  And so in this case, well over

12:55:58  13    50 percent of the people taken out of the SD-10 were minority

12:56:02  14    and a super majority of the people moved in, 67 percent were

12:56:07  15    Anglo.

12:56:09  16        Q.    Assuming we're keeping our schedule, I think we're

12:56:13  17    going to break for lunch here, I'll just finish this section on

12:56:17  18    page nine.  You report some additional information about the

12:56:21  19    characteristics of the changes to Senate District 10.  What do

12:56:27  20    you report in paragraph 18?

12:56:28  21        A.    So here I'm looking at the total number of people

12:56:29  22    moved.  So as we said, 387,000 people were moved out; 377,000

12:56:35  23    were moved in.  And that gives us roughly 764,000 people that

12:56:39  24    were moved around in a district that was not out of deviation,

12:56:43  25    and that it changed the composition of this district.  It made

```
12:56:48   1   it 10 percent more Anglo and it converted it from a documented
12:56:53   2   majority-minority voting age population district to now a
12:56:57   3   majority Anglo voting age population district.
12:57:02   4          MR. DUNN:  Your Honor, I think this might be a good
12:57:04   5   breaking point.
12:57:06   6          JUDGE GUADERRAMA:  So we'll come back and start with
12:57:07   7   figure three and we'll have a new court reporter.  You are not
12:57:11   8   going to have any more questions about figure 2?
12:57:14   9          MR. DUNN:  No, sir.
12:57:14  10          JUDGE GUADERRAMA:  Let's recess for lunch, be back at
12:57:18  11   2 o'clock.  We'll resume our proceedings at 2 o'clock.
12:57:23  12          COURTROOM SECURITY OFFICER:  All rise.
          13          (Lunch break at 12:57 p.m.).
          14                          *  *  *
          15
          16
          17
          18
          19
          20
          21
          22
          23
          24
          25
```

1                         * * * * *

2          I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.  I

4    further certify that the transcript fees and format comply with

5    those prescribed by the Court and the Judicial Conference of the

6    United States.

7    Signature:/s/KATHLEEN ANN SUPNET        February 23, 2022
              Kathleen A. Supnet, CSR        Date
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25