```
 1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
 2                     EL PASO DIVISION
                       VOLUME 7 OF 9
 3

 4   LULAC, et al.,            )(    EP:21-CR-259-DCG-JES-JVB
                               )(    (Lead Case)
 5      Plaintiffs,            )(
     _____)(
 6   ROY CHARLES BROOKS, et al.,)(   EP:21-CV-00991-DCG-JES-JVB
                               )(
 7      Plaintiffs,            )(
                               )(
 8   vs.                       )(    EL PASO, TEXAS
                               )(
 9   GREG ABBOTT, in his official )(
      capacity as Governor of Texas,)(
10    et al.,                  )(
                               )(    January 27th, 2022
11      Defendants.            )(    (1:33 p.m. to 5:53 p.m.)

12   _____

13   HEARING ON BROOKS PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
     _____

14

15            FIFTH CIRCUIT JUDGE JERRY EDWIN SMITH
              U.S. DISTRICT JUDGE DAVID C. GUADERRAMA
16            U.S. DISTRICT JUDGE JEFFREY V. BROWN

17
     APPEARANCES:
18
     For Brooks Plaintiffs:    Mr. Chad W. Dunn
19                             Brazil & Dunn
                               4407 Bee Caves Road
20                             Building 1, Ste. 111
                               Austin, TX 78746
21                             (512) 717-9822

22
                               Mr. Mark P. Gaber
23                             Mark P. Gaber PLLC
                               P.O. Box 34481
24                             Washington, DC 20043
                               (715) 482-4066
25                             Mark@markgaber.com
```

KATHLEEN A. SUPNET, CSR

```
 1   For Brooks Plaintiffs:        Mr. Jesse L. Gaines
                                   Attorney at Law
 2                                 P.O. Box 50093
                                   Fort Worth, TX 76105
 3                                 817-714-9988
                                   Gainesjesse@ymail.com
 4
                                   Ms. Molly E. Danahy
 5                                 P.O. Box 26277
                                   Baltimore, MD 21211
 6                                 (208) 301-1202
                                   Danahy.molly@gmail.com
 7
                                   Ms. Sonni Waknin
 8                                 10300 Venice Blvd. # 204
                                   Culver City, CA 90232
 9                                 732-610-1283
                                   Sonniwaknin@gmail.com
10

11   For Defendants:              Mr. Patrick K. Sweeten
                                  Mr. Christopher D. Hilton
12                                Mr. Eric Hudson
                                  Mr. William Thomas Thompson
13                                Ms. Kathleen Hunker
                                  Ms. Courtney Brooke Corbello
14                                Mr. Jack Buckley DiSorbo
                                  Office of Texas Attorney General
15                                P.O. Box 12548
                                  MC 009
16                                Austin, Texas 78711
                                  (512) 463-4139
17
     ALSO PRESENT:                Mr. Bryan Christopher
18
     Court Reporter:              Kathleen A. Supnet
19                                El Paso, Texas
                                  (915)834-0573
20                                kathi.supnet5303@gmail.com

21

22

23

24          Transcript produced by mechanical stenography, and

25   computer-aided software and computer.
```

1                    CHRONOLOGICAL INDEX

2                     VOLUME 7 of 9

3  JANUARY 27, 2022, (1:33 p.m. to 5:53 p.m.)        PAGE VOL.

4  **DEFENDANTS' WITNESSES:**      **DIRECT**    **CROSS**    **VOIR DIRE**    **VOL.**

5  SENATOR CECELIA
     JOAN HUFFMAN           4          37           --            7
6
   DR. JOHN ALFORD        40,148       63           --            7
7
   KEITH INGRAM           151          --           --            7
8
   Court Reporter Certificate. . . . . . . . . . .  181           7
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|         |    |                                                                        |
|---------|----|------------------------------------------------------------------------|
|         | 1  | (Proceedings resume after lunch at 1:33 p.m.)                          |
|         | 2  | (Continued cross-examination).                                         |
| 13:33:03 | 3  | SENATOR CECELIA JOAN HUFFMAN,                                          |
| 13:33:03 | 4  | CROSS-EXAMINATION CONTINUED BY THE PLAINTIFFS                          |
| 13:33:03 | 5  | BY MR. DUNN:                                                           |

13:33:03   6      Q.   Senator, you should have a map in front of you of the
13:33:06   7   Panhandle area of Plan S2100.  Do you see that?
13:33:07   8      A.   Yes.
13:33:08   9      Q.   This is the benchmark arrangement of the two senate
13:33:13  10   districts in the Panhandle, would you agree?
13:33:15  11      A.   It appears to be so, yes, sir.
13:33:16  12      Q.   And I'm just, for your knowledge, it cut off the
13:33:20  13   shading there at the very top of Texas, where it gets to the
13:33:22  14   Oklahoma, but other than that, it's accurate.
13:33:24  15      A.   Right.  I can tell that.  Yes, sir.  Thank you.
13:33:26  16      Q.   How would you describe sort of the shape of Senate
13:33:31  17   District 31 here?  There's a letter, for example.
13:33:33  18      A.   It would be hard to describe it as a letter.
13:33:35  19      Q.   Look like a C., maybe, to you, the way it fits around
13:33:40  20   28?
13:33:41  21      A.   Yeah, sort of.
13:33:43  22      Q.   These districts were reconfigured in the latest plan,
13:33:46  23   is that right, 2168?
13:33:48  24      A.   Which districts are you referring to, sir?
13:33:49  25      Q.   The same, 31 and 28.

CROSS - HUFFMAN                                                    5

13:33:51   1      A.    Yes.

13:33:52   2      Q.    A little less than C. and a little more of a jagged

13:33:56   3   edge now between the two, would you agree?

13:33:56   4      A.    I'd have to look at it to specifically agree, but

13:34:00   5   there are some changes, yes, sir.

13:34:01   6      Q.    Do you recall our discussion before lunch where

13:34:06   7   Senator Seliger had given a speech on the floor, alleging that

13:34:08   8   he had been told that the reason for rewording his district was

13:34:13   9   for an oil and gas and a farm, to create an oil and gas farm

13:34:15  10   district, do you recall that?

13:34:16  11      A.    Do I recall his speech on the floor?  I said I recall

13:34:22  12   some part of it, yes.

13:34:23  13      Q.    Now, in the documents that you produced, you produced

13:34:28  14   a number of pages of public testimony and statements that were

13:34:31  15   sent to you and I want to show you one of those now.  It's been

13:34:33  16   admitted as exhibit Plaintiffs' Exhibit 103.

13:34:44  17            Best you can, can you tell us who this is from and to

13:34:46  18   and the date and time of its sending?

13:34:48  19      A.    It looks like it's from a Mr. James O'Shaw (phonetic).

13:34:53  20      Q.    And what is sen when in --

13:34:55  21      A.    It looks like September 23rd, in the morning, 11:20 --

13:34:58  22   excuse me -- evening, 11:20 p.m.

13:35:02  23      Q.    Do you see where his correspondence is discussing

13:35:03  24   Senate District 28 and 31?

13:35:05  25      A.    I see the first sentence, yes, sir.

13:35:07  1      Q.    If you can, if you could read the paragraph in the

13:35:13  2   middle of the page that begins the new districts?

13:35:15  3      A.    All right.   You'd like for me to read that allowed,

13:35:15  4   sir?

13:35:19  5      Q.    Please.

13:35:19  6      A.    "The new districts would also be more geared to

13:35:21  7   communities of interest.   The proposed alternative District 28

13:35:25  8   would constitute 44 percent of Texas severance tax generation

13:35:30  9   oil and gas production, providing the significant and common

13:35:34 10   community of interest.   The new District 28 would encompass much

13:35:39 11   of the central Permian Basin, which constitutes the largest oil

13:35:42 12   field in the world."

13:35:42 13      Q.    And if you could just continue.

13:35:44 14      A.    Sure.   "The alternative 31 would only constitute

13:35:48 15   roughly about five percent of the same energy severances;

13:35:52 16   however, it has the vast majority of cattle production in the

13:35:55 17   state providing a different community of interest unique to the

13:35:58 18   Texas Panhandle and also critical and important to the state.

13:36:00 19   It's Exhibit C, D and E."

13:36:04 20      Q.    And then finally?

13:36:05 21      A.    "The new District 28 would have a common community of

13:36:08 22   interest n that there are two Air Force bases, within a 100

13:36:12 23   miles to each other; Goodfellow, San Angelo and Dyess, Abilene.

13:36:17 24   In addition, it serves as home to a majority of the states

13:36:18 25   alternative energy generation capability."

13:36:21   1      Q.    Thank you.  I don't need you to read much more, but I
13:36:24   2  just -- if you'd like to see the rest of the letter, I can put
13:36:27   3  that on the screen for you there.
13:36:28   4      A.    Okay.  Do you want me to finish that?
13:36:30   5      Q.    No, ma'am.
13:36:30   6      A.    Okay.
13:36:31   7      Q.    I'm just offering it to you in case you'd like to see
13:36:31   8  it.
13:36:33   9            Now, this was sent with a proposal.  This is the
13:36:36  10  proposal that was sent.  It doesn't resemble the shape at all of
13:36:42  11  either the benchmark or 2168's outline of these two
13:36:47  12  senate districts, does it?
13:36:48  13      A.    No.
13:36:49  14      Q.    But it indicates on its face that it does draw Senate
13:36:52  15  District 28 and District 31 and keep them roughly the same
13:36:55  16  population.  Do you see that there in the left-hand side?
13:37:00  17            MR. HILTON:  Your Honor, I'm going to object to
13:37:02  18  leading again.  It's beyond the scope of direct.  More
13:37:03  19  importantly, though, this hearing --
13:37:04  20            THE COURT:  I'll sustain your objection.
13:37:06  21            MR. DUNN:  Thank you.
13:37:06  22  BY MR. DUNN:
13:37:07  23      Q.    Is this correspondence where you got -- let me ask it
13:37:09  24  this way.
13:37:09  25            Are you willing to waive your legislative privilege

13:37:13   1    and tell us this is where the idea came from for the oil and gas

13:37:14   2    versus agricultural explanation that was given to Senator

13:37:19   3    Seliger?

13:37:19   4        A.   I will not waive my privilege.

13:37:23   5        Q.   In any event, the way the map ended up, does not look

13:37:29   6    like the orientation you saw on your screen; is that true?

13:37:33   7        A.   Correct.

13:37:34   8        Q.   All right.  Let's -- you were asked by your lawyer,

13:37:39   9    during your direct examination about some cases, and you read

13:37:42   10   some of the excerpts of some cases that you cited in the floor

13:37:47   11   debate.  Do you recall that, generally?

13:37:48   12       A.   Generally, yes, sir.

13:37:48   13       Q.   There was some discussion about *Bartlett v.*

13:37:53   14   *Strickland, Cooper v. Harris*, *Abbott v. Perez*, do you remember

13:37:59   15   that?

13:37:59   16       A.   Yes.

13:38:00   17       Q.   Now, you understand that the U.S. Supreme Court has

13:38:05   18   had an opportunity on at least two -- two opportunities in the

13:38:07   19   last decade to rule on redistricting with respect to Texas?

13:38:11   20       A.   Yes.

13:38:11   21       Q.   But you don't recall reading any of those decisions at

13:38:14   22   any point?

13:38:15   23       A.   I do not, no, sir.

13:38:16   24       Q.   And you don't recall reading any of the decisions of

13:38:18   25   three-judge federal court in San Antonio?

CROSS - HUFFMAN                                                        9

13:38:20   1        A.    Correct.

13:38:21   2        Q.    And you don't recall reading any of the decisions of

13:38:23   3   the three-judge federal court in Washington D.C.; is that true?

13:38:27   4        A.    Correct.

13:38:27   5             MR. HILTON:  I just want to make it clear for the

13:38:29   6   record.  I'm not objecting that these are reference to public

13:38:30   7   statement to the extent that the question could be construed as

13:38:33   8   attacking legislative privileged information, such as what she

13:38:36   9   considered.  That would be improper.  But I understand the

13:38:39  10   question and I understand the witness's answer to be within her

13:38:43  11   public statement.

13:38:45  12   BY MR. DUNN:

13:38:46  13        Q.    If you gave an answer to the latter, I didn't hear it.

13:38:48  14   I apologize.

13:38:48  15        A.    Could you repeat the question?

13:38:49  16        Q.    Yes, ma'am.

13:38:50  17             You didn't -- you don't recall that whether you've

13:38:52  18   read any of the decisions of the three-judge federal Court in

13:38:55  19   Washington D.C.  Is that true?

13:38:57  20        A.    Right.  I guess you're speaking of full opinions,

13:38:59  21   correct.

13:38:59  22        Q.    And you haven't read the portion or you don't recall

13:39:03  23   reading the portion of the 2012 three-judge district court

13:39:07  24   opinion that talks about Senate District 10.  Is that your

13:39:11  25   testimony?

13:39:11  1        A.    I don't recall reading that.

13:39:14  2        Q.    Now in fairness, when you gave your comments that I'm

13:39:18  3    referencing here on the floor of the Senate and in Committee,

13:39:21  4    you were reading from outlines, would you agree?

13:39:24  5              MR. HILTON:  I'm going to object to the extent that

13:39:25  6    goes into the witness's legislative, mental impressions and

13:39:30  7    opinions and her process in conducting her legislative acts.

13:39:33  8              THE COURT:  Didn't we see a video of that?  Is that

13:39:36  9    what you're talking about?  I'm overruling that objection.

13:39:39 10    BY MR. DUNN:

13:39:40 11        Q.    When you would give your comments, especially with

13:39:42 12    respect to the law on the floor of the Senate and in Committee,

13:39:45 13    you were reading from a document.  Is that true?

13:39:48 14        A.    In some instances, that is true, yes, sir.

13:39:51 15        Q.    And in some instances, your counsel, Ms. Mackin, can

13:39:54 16    be seen on the screen instructing you when to -- where to start

13:39:57 17    reading and stop reading.  Isn't that true?

13:39:59 18        A.    I don't think she instructed me to start and stop.

13:40:03 19    She did, you know, have whispered comments to me occasionally,

13:40:07 20    yes.

13:40:07 21        Q.    And you understand that Ms. Mackin was one of the

13:40:09 22    counsels for the State of Texas in the prior round of

13:40:12 23    redistricting.  Is that true?

13:40:13 24        A.    I do know she played a role in the redistricting for

13:40:16 25    the Attorney General's office, yes, sir.

13:40:17  1        Q.    And do you know that she -- there's evidence before

13:40:20  2    the Court that she exchanged exhibits in that litigation that

13:40:24  3    had racial shade maps pertaining to Tarrant County?

13:40:28  4        A.    I have no knowledge of that.

13:40:29  5        Q.    You also, it's true, recall that in 2017, the U.S.

13:40:42  6    Supreme Court issued its opinion in an appeal of the San Antonio

13:40:45  7    court's case, as it relates to Texas redistricting plans.  You

13:40:48  8    recall that generally, at least?

13:40:49  9        A.    Generally, yes.

13:40:51  10       Q.    And in that decision, the U.S. Supreme Court affirmed

13:40:54  11   the finding that racial discrimination had occurred with respect

13:40:59  12   to the drawing of House District 90 in Tarrant County.  Are you

13:41:04  13   aware of that?

13:41:04  14       A.    Yes.

13:41:04  15       Q.    Now, obviously, that was key information that you were

13:41:06  16   aware of as you went into the redistricting process, is that

13:41:09  17   Tarrant County had already been a recent example of race

13:41:13  18   discrimination and redistricting in this state, would you agree?

13:41:17  19             MR. HILTON:  Your Honor, I'm going to object to the

13:41:18  20   extent it characterizes the information as to key.  That goes

13:41:21  21   into her mental impressions and what she considers as part of

13:41:23  22   her legislative acts.

13:41:25  23             THE COURT:  She can answer whether she was aware of it

13:41:28  24   or not.  I'll overrule the objection to that extent.

13:41:30  25       A.    Was your question:  Was I aware when I went in to draw

13:41:33  1    the maps?

13:41:34  2    BY MR. DUNN:

13:41:34  3        Q.    The Supreme Court had recently found intentional race

13:41:37  4    discrimination with respect to the drawing of House District 90

13:41:40  5    in Tarrant County.

13:41:41  6        A.    No.

13:41:43  7        Q.    All right.  I want to turn to the discussion that you

13:42:01  8    had with your lawyer about the various times you laid out the

13:42:05  9    principles that guided you and the attorneys working with you in

13:42:08  10   crafting these plans.  Do you recall that testimony, generally?

13:42:10  11       A.    I don't know what you are referring to, sir.

13:42:13  12       Q.    Well, let's start here.

13:42:13  13             When you laid out the bill, the Senate Bill 4 in

13:42:16  14   committee, one of the first things you did was state the

13:42:19  15   principles that guided you in crafting that map; is that true?

13:42:22  16       A.    Yes, sir.

13:42:23  17       Q.    And you -- in listing those principles on the first

13:42:28  18   day of the committee hearing, on the first day this bill was

13:42:31  19   considered, you didn't mention partisanship once, did you?

13:42:32  20       A.    I don't recall mentioning it, no, sir.

13:42:36  21       Q.    Then you took almost three -- excuse me --

13:42:39  22   two-days-worth of testimony, and that testimony included

13:42:42  23   one person after another from Tarrant County coming in and

13:42:47  24   explaining to you and the committee members, that this proposed

13:42:50  25   map would split communities on the basis of race Tarrant County.

13:42:54  1    Is that the testimony you received?

13:42:55  2        A.    I would not characterize it as just that.  No, sir.

13:42:58  3        Q.    And then the third day of the committee hearing, the

13:43:01  4    final day, you came in and again listed your priorities; is that

13:43:04  5    right?

13:43:04  6        A.    I believe that is correct, yes, sir.

13:43:05  7        Q.    And that is the first time and the only time that you

13:43:09  8    listed the priorities together and said partisanship; isn't that

13:43:14  9    true?

13:43:14  10        A.    I don't think it was the only time, sir.

13:43:17  11        Q.    You think there was another occasion in the Senate

13:43:21  12    Committee debate or on the Senate floor, where you mention

13:43:23  13    partisanship along with the other criteria you were following?

13:43:26  14        A.    I don't recall.

13:43:27  15        Q.    Now, when you read the priorities on that third day of

13:43:32  16    the hearing, was partisanship written on the page or did you

13:43:36  17    call inaudible?

13:43:39  18             MR. HILTON:  Objection, Your Honor.  That's asking

13:43:40  19    about the content of attorney-client communication and attorney

13:43:42  20    work product and legislative privilege information.  It's

13:43:45  21    talking about the content of a document that is not public and

13:43:48  22    is part of her private files and contains her mental

13:43:54  23    impressions.

13:43:54  24             THE COURT:  I'm going to overall the objection.  She

13:43:57  25    can answer whether she was on the paper or she just said it.

13:44:02   1          A.    I don't recall.

13:44:04   2     BY MR. DUNN:

13:44:05   3          Q.    I call your attention to this portion of the

13:44:10   4     recording.

13:44:10   5              MR. DUNN:  And for the Courts' reference, it's

13:44:13   6     Defendants' Exhibit 63.

13:44:15   7              It begins at 50 and 58.

13:44:15   8              (Video and audio played).

13:44:15   9          *SENATOR HUFFMAN:  Of the criteria I used in proposing*

13:44:21  10           *in considering these districts, we focussed on*

13:44:23  11           *complying with all applicable law, including the*

13:44:26  12           *Constitution, the Voting Rights Act, and the*

13:44:29  13           *requirement to equalize district populations based on*

13:44:32  14           *the 2020 Census, focussed on keeping political*

13:44:37  15           *subdivisions together, keeping communities of*

13:44:39  16           *interest together, preserving the cores of existing*

13:44:43  17           *districts, creating geographically compact districts,*

13:44:45  18           *addressing partisan considerations, protecting*

13:44:48  19           *incumbents, and when possible, honoring reasonable*

13:44:51  20           *requests made by incumbent members.  These*

13:44:54  21           *considerations have also guided my approach to what*

13:44:57  22           *proposed committee amendments I'm able to support.*

13:44:59  23             *So the first amendment -- okay.  This first...*

13:44:59  24           (Video and audio stop).

13:44:59  25     BY MR. DUNN:

13:45:05  1      Q.   You see Ms. Mackin directing you where to look for

13:45:08  2  comments?

13:45:10  3      A.   That is not what she was doing.

13:45:12  4      Q.   What is it that she was doing?

13:45:14  5           MR. HILTON:   I'm going to object to the extent that

13:45:15  6  this is asking about, you know, the conversations between the

13:45:19  7  Senator and her staff and her --

13:45:21  8           THE COURT:   Sustained.

13:45:22  9  BY MR. DUNN:

13:45:22  10     Q.   Does it appear to you that you were reading in the

13:45:25  11 course of this?

13:45:25  12     A.   It appears so, yes, sir.  I would agree.

13:45:27  13     Q.   And this is where you say partisanship; is that right?

13:45:30  14     A.   I do say partisanship, yes, sir.

13:45:32  15     Q.   Now, on the Senate floor, you did not say

13:45:36  16 partisanship, is that true, when you listed off the principle at

13:45:40  17 the outset?

13:45:41  18     A.   I don't recall if -- if at the beginning -- if I don't

13:45:43  19 believe I did at the beginning, if your question is, did I do

13:45:47  20 late later, I believe that I did.

13:45:47  21           (Video and audio played).

13:45:50  22           *SENATOR HUFFMAN:  Ms. President and members.*

13:45:50  23               *Members, this is the Senate bill which draws our*

13:45:56  24           *new lines for the entire Senate.  We're going to call*

13:46:00  25           *this -- it's officially called Plan S2130, if you're*

13:46:05   1          *looking in district viewer.  This plan was developed*

13:46:08   2          *after the committee heard many hours of public*

13:46:11   3          *testimony and after I listened to each members*

13:46:15   4          *priorities and input about their respect districts.*

13:46:18   5              *My goals and priorities in developing this*

13:46:20   6          *proposed plan included, first and foremost, following*

13:46:25   7          *all applicable law, equalizing population across*

13:46:29   8          *districts, preserving political subdivisions and*

13:46:33   9          *communities of interest when possible, preserving the*

13:46:36  10          *cores of previous districts to the extent possible,*

13:46:39  11          *avoiding paring incumbent members, achieving*

13:46:44  12          *geographic compactness and accommodating incumbent*

13:46:48  13          *priorities to the extent that I could.*

13:46:48  14              *I also...*

13:46:52  15          (Video and audio stop).

13:46:52  16    BY MR. DUNN:

13:46:53  17        Q.   Again you're reading from your notes there, is that

13:46:54  18    true?

13:46:54  19        A.   Yes, sir, I would agree.

13:46:56  20        Q.   And again no mention of partisanship, right?

13:46:59  21        A.   Correct.

13:47:11  22             THE COURT:  Was there an answer to that?

13:47:14  23             SENATOR HUFFMAN:  I said correct.  Yes, Your Honor.

13:47:15  24             THE COURT:  Thank you.

13:47:19  25    BY MR. DUNN:

13:47:19  1        Q.   I'm now going to call your attention to what's been

13:47:20  2    admitted as Plaintiffs' Exhibit 41, and it's the *Senate Journal*

13:47:24  3    you talked about with your lawyer, in part, earlier.  We're on

13:47:28  4    page A, as in apple, dash 7.

13:47:31  5             Now there's an exchange here in the middle of the

13:47:32  6    page.  I can make the type larger.  Can you make that out,

13:47:35  7    Senator?

13:47:35  8        A.   I can.  Thank you, sir.

13:47:36  9        Q.   Can you read just the part that Senator Powell says

13:47:39  10   beginning:  "Well, you said..."

13:47:39  11       A.   "Well, you said the following, and I am going to quote

13:47:42  12   this from your comments.  Quote, my goals and priorities in

13:47:45  13   developing these proposed plans, include first and foremost,

13:47:48  14   abiding by all applicable law, equalizing population across

13:47:52  15   districts, preserving political subdivisions and communities of

13:47:56  16   interests when possible, preserving the cores of previous

13:47:59  17   districts to the extent possible, avoiding paring incumbent

13:48:03  18   members, achieving geographic compactness when possible, and

13:48:07  19   accommodating incumbent priorities also when possible," end

13:48:07  20   quote.

13:48:12  21            "These were the goals that you followed in drawing the

13:48:14  22   districts; is that correct?"

13:48:15  23       Q.   And your answer?

13:48:16  24       A.   "Literally speaking, yes."

13:48:17  25       Q.   You don't interject and say, excuse me, you left out

13:48:20  1    partisanship; isn't that true?

13:48:22  2        A.   I did not.

13:48:28  3        Q.   Now ultimately, your bill went over to the House side

13:48:32  4    to pass, isn't that true?

13:48:33  5        A.   Ultimately, my bill in the House passed?

13:48:36  6        Q.   Ultimately, the redistricting bill went from the

13:48:38  7    Senate to the House and was passed there?

13:48:40  8        A.   Yes.

13:48:41  9        Q.   Did you provide or did you your staff provide the

13:48:45  10   talking points to the House about what guided the bill?

13:48:49  11            MR. HILTON:  Objection, Your Honor.  It goes to the

13:48:51  12   core of legislative privilege, communication between legislators

13:48:54  13   and staff.

13:48:54  14            THE COURT:  Sustained.

13:48:56  15   BY MR. DUNN:

13:48:57  16       Q.   Did you attend any in-house proceedings?

13:48:59  17       A.   I did not.

13:49:00  18       Q.   I'm going to show you at the beginning of Exhibit 69,

13:49:09  19   as soon as it loads.  Beginning at :48.

13:49:09  20            (Video and audio played).

13:50:06  21            *CHAIRMAN HUNTER:  At that hearing, I laid out what we*

13:50:08  22             *heard the Senate's goals and priorities were, which*

13:50:11  23             *including following all applicable law, equalizing*

13:50:16  24             *population across districts, preserving political*

13:50:21  25             *subdivisions and communities of interest when*

13:50:24   1              *possible, preserving the cores of previous districts*

13:50:27   2              *to extent possible, avoiding paring incumbents,*

13:50:33   3              *achieving geographic compactness, and accommodating*

13:50:38   4              *incumbent priorities to the extent possible.*

13:50:40   5                   *Proposed amendment...*

13:50:42   6              (Video and audio stopped).

13:50:42   7   BY MR. DUNN:

13:50:43   8        Q.   Again, no partisanship is mentioned in the House there

13:50:46   9   either, is it?

13:50:46   10       A.   At that point, I did not hear it -- (mumbling).

13:50:46   11            (Court reporter asks for clarification).

13:50:46   12            SENATOR HUFFMAN:  Yes.  I'm sorry.

13:50:52   13   BY MR. DUNN:

13:50:52   14       Q.   In fact, it's the case that nowhere in this

13:50:55   15   legislative record do you or Chairman Hunter say Senate District

13:51:02   16   10's lines were driven by partisanship?

13:51:04   17       A.   I don't know if it appears in the -- for sure, I don't

13:51:07   18   know what --

13:51:07   19       Q.   You know --

13:51:09   20       A.   -- Chairman Hunter said.

13:51:11   21       Q.   -- about it today, right?

13:51:11   22            THE COURT:  Hold on.  Don't speak over each other,

13:51:11   23   because she can't get it.

13:51:15   24            MR. DUNN:  I'm sorry.

13:51:16   25            SENATOR HUFFMAN:  You'll have to repeat the question.

13:51:18  1            MR. DUNN:  Okay.

13:51:18  2   BY MR. DUNN:

13:51:18  3       Q.    Nowhere in the Senate debate or in the House debate do

13:51:22  4   one of the bill authors say out loud, the lines for Senate

13:51:27  5   District 10 were based -- were drawn on the basis of

13:51:29  6   partisanship, do they?

13:51:30  7       A.    I don't know what Chairman Hunter said during his

13:51:36  8   presentation, no knowledge of that.  And I don't recall if there

13:51:38  9   was a specific word, partisanship, used during the SD-10,

13:51:43  10  itself, discussions.  I know partisanship was discussed during

13:51:47  11  the overall debate.

13:51:49  12      Q.    Your lawyer hadn't shown you one today.  You don't

13:51:53  13  recall it today, do you?

13:51:53  14      A.    I don't recall.

13:51:54  15      Q.    Now returning to Mr. Sparks for a brief second,

13:52:18  16  admitted before the Court is Plaintiffs' Exhibit 102.  I'll

13:52:26  17  bring it up on the screen here.

13:52:39  18            Do you see this letter addressed to my co-counsel,

13:52:42  19  Mr. Gaber?

13:52:44  20      A.    I do see a letter --

13:52:44  21      Q.    Do you see --

13:52:50  22      A.    -- addressing a Mr. Gaber, yes.

13:52:51  23      Q.    And it's sent on behalf of Chris Gober, do you see

13:52:51  24  that?

13:52:56  25      A.    I do see the signature Chris Gober.

13:52:56   1        Q.    And he identifies him as counsel for Kevin Sparks, is

13:52:59   2   that true?

13:53:00   3        A.    I see that, yes.

13:53:01   4        Q.    Included with this production are a number of text

13:53:05   5   messages, which are identified -- the first one on the top of

13:53:10   6   the page, what is the first date?

13:53:12   7        A.    I can barely see this, but it looks like October 5th,

13:53:17   8   2021.

13:53:17   9        Q.    Can you see who was exchanging the messages?

13:53:17  10        A.    No.

13:53:22  11              MR. SWEETEN:  Your Honor, may I address the issue?

13:53:24  12   Counsel right now is attempting --

13:53:29  13              JUDGE GUADERRAMA:  Wait a minute.  Wait a minute.

13:53:29  14              MR. SWEETEN:  Patrick Sweeten, Your Honor.

13:53:29  15              THE COURT:  Right.

13:53:29  16              But --

13:53:29  17              MR. SWEETEN:  Okay.

13:53:30  18              JUDGE GUADERRAMA:  -- hasn't the objections been

13:53:32  19   coming --

13:53:32  20              MR. SWEETEN:  He has.

13:53:32  21              JUDGE GUADERRAMA:  -- from Mr. Hilton?

13:53:34  22              MR. SWEETEN:  He can make the objection.  I was going

13:53:35  23   to discuss the exhibits.

13:53:36  24              THE COURT:  Let's have one lawyer making objections.

13:53:45  25              MR. SWEETEN:  Okay.

13:53:45  1          MR. HILTON:  Thank you, Your Honor.

13:53:47  2          We've objected to Exhibit 102, and we need to make a

13:53:52  3   point specifically now, because Mr. Dunn is going to ask the

13:53:56  4   witness about it.  These -- there is no witness on any witness

13:54:00  5   list, who is going to be here who can authenticate these.

13:54:04  6   There's no author on any of them.  There is no indicia in the

13:54:07  7   record beyond the cover letter that Mr. Dunn just showed that

13:54:10  8   these are authentic, and there's certainly no evidence that the

13:54:14  9   witness has any knowledge.  So the extent that Mr. Dunn is going

13:54:17 10   to have read a document -- have Senator Huffman read documents

13:54:22 11   that can't be authenticated, about which she has no knowledge

13:54:26 12   into the record, you know, quite frankly, I don't see the

13:54:28 13   relevance of that either, Your Honor.  So that's the thrust of

13:54:31 14   our objection, but to the extent that the Court is going to let

13:54:34 15   this questioning proceed, there is no indication here that

13:54:39 16   Senator Huffman has any knowledge about it, that it's

13:54:40 17   authenticate and object to its use.

13:54:43 18          THE COURT:  Well, we'll find out what Senator Huffman

13:54:46 19   knows, but your objection to this document is what,

13:54:49 20   authentication?

13:54:50 21          MR. HILTON:  We need to reiterate our objection to the

13:54:53 22   document based on authenticity.  It's hearsay.  It can't be

13:54:59 23   authenticate.  It's irrelevant and it's -- there's no evidence

13:55:01 24   and no foundation laid that Senator Huffman has any knowledge

13:55:04 25   about it.

13:55:06  1          THE COURT:  All of the those objections are overruled.

13:55:09  2          What about the authentication?

13:55:11  3          MR. DUNN:  So the witness is unavailable to us.  He's

13:55:12  4  greater than a 100 miles from this courthouse.  It's a

13:55:15  5  preliminary injunction hearing, which has loser federal evidence

13:55:16  6  rules, and it's authenticated by the cover letter that's

13:55:21  7  included with it.

13:55:22  8          We could get Mr. Gober's attention, as an officer of

13:55:25  9  the court, and get additional instruction from him, but

13:55:29 10  excluding this document at this point because of the location of

13:55:31 11  the hearing and the proximity to production for this trial, is

13:55:39 12  grossly unfair.

13:55:39 13          JUDGE GUADERRAMA:  All right.

13:55:44 14          MR. HILTON:  Your Honor, may I respond briefly?

13:55:45 15          JUDGE GUADERRAMA:  Yes, sir.

13:55:46 16          I think we've already admitted these subject to the

13:55:49 17  objections, and we'll take those up when we finally decide on

13:55:53 18  the case it is.  In a preliminary junction hearing, there is

13:55:57 19  evidence -- not evidence -- but the case law from the *Sierra*

13:56:00 20  *Club* that indicates that it's -- the evidentiary standards

13:56:05 21  aren't the same, and so we're going to consider it for that

13:56:09 22  purpose.

13:56:10 23          MR. HILTON:  Understood, Your Honor.

13:56:11 24          I just want to note for the record that Mr. Dunn had

13:56:14 25  the opportunity to take any depositions he wanted and ask for

13:56:15  1  any authenticated evidence that he wanted from Mr. Gober.  He

13:56:17  2  did not avail himself of that opportunity.  But I understand the

13:56:20  3  Court's ruling.

13:56:21  4          THE COURT:  All right.

13:56:22  5          Mr. Dunn?

13:56:23  6  BY MR. DUNN:

13:56:23  7     Q.   Senator, in those binders to your left, if you would a

13:56:27  8  cleaner version -- I don't intend to ask much -- but it's under

13:56:29  9  tab 102.

13:56:30  10    A.   Okay.  Give me a second.  It's at the bottom.

13:56:38  11    Q.   And I noticed your water bottle is empty.

13:56:44  12    A.   Yes, I have it before me now.

13:56:46  13    Q.   You see the date of this first text message is October

13:56:50  14  the 5th?

13:56:50  15    A.   Yes.

13:56:51  16    Q.   That's the day after the plan passed the Senate floor;

13:56:54  17  is that true?

13:56:55  18    A.   Correct.

13:56:55  19    Q.   The floor debate was on October the 4th?

13:56:59  20    A.   Correct.

13:56:59  21    Q.   Now prior to this moment, has anybody told you about

13:57:06  22  the existence of these text messages?

13:57:09  23    A.   No.

13:57:21  24    Q.   Fair enough.

13:57:21  25          Now you had a discussion with your lawyer earlier.

13:57:24   1    You read a portion of the Senate floor debate, where you

13:57:26   2    explained that it was necessary to make changes to Senator

13:57:30   3    Powell's district in order to equalize the population.  Do you

13:57:33   4    recall that, generally?

13:57:33   5        A.   That's one of the reasons, yes, sir.

13:57:35   6        Q.   It's not your testimony here today that the only way

13:57:37   7    this map could've been drawn for the Texas Senate was to make

13:57:41   8    changes for Senate District 10?

13:57:43   9             MR. HILTON:  Objection.  That's legislative privilege.

13:57:46   10            THE COURT:  Sustained.

13:57:47   11   BY MR. DUNN:

13:57:48   12       Q.   Are you aware of any proposals that had been offered,

13:57:50   13   during the Senate debate, in the public record that balanced by

13:57:53   14   population deviation, the state map, but didn't make changes to

13:57:57   15   Senate District 10?

13:57:58   16       A.   I don't recall.

13:58:00   17       Q.   Senator Powell offered an amendment.  You would recall

13:58:03   18   that one, is that true?

13:58:04   19       A.   Senator Powell did offer amendments, yes, sir.

13:58:08   20       Q.   And at least one of those amendments balanced the

13:58:10   21   entire map and kept Senate District 10 within deviation, along

13:58:14   22   with the rest of the map, and didn't change Senate District 10?

13:58:19   23       A.   I don't recall that.

13:58:20   24       Q.   In fact, you had a number of proposal before you on

13:58:23   25   the Senate, both in committee and on the floor, that balanced

13:58:26  1    the population in all 31 Senate districts and left Senate

13:58:29  2    District 10 alone?

13:58:30  3        A.   I don't recall that, sir.

13:58:32  4        Q.   It's been stated here in this courtroom by Senator

13:59:00  5    Powell, that on at least three occasions, she provided to you

13:59:03  6    the 2012 D.C. Court decision about Senate District 10.  Are you

13:59:09  7    willing to waive your legislative privilege and disagree with

13:59:13  8    her on that point?

13:59:14  9        A.   No, I will not waive my privilege.

13:59:16  10       Q.   Do you disagree with her --

13:59:19  11            MR. HILTON:  Objection.  The witness just said she

13:59:22  12   won't waive her privilege.

13:59:22  13            JUDGE GUADERRAMA:  She invoked the privilege on her

13:59:25  14   own.

13:59:26  15   BY MR. DUNN:

13:59:28  16       Q.   There's been testimony in this case from Senator

13:59:31  17   Seliger about changes made to the two-thirds rule in the Senate.

13:59:35  18   Do you know about those, generally?

13:59:36  19       A.   About his comments or the changes?

13:59:37  20       Q.   The changes?

13:59:38  21       A.   Yes, of course.

13:59:39  22       Q.   It wasn't necessary to do anything to Senate District,

13:59:44  23   10, for Republicans to maintain control over the chamber in

13:59:49  24   terms of passing bills, was it?

13:59:50  25            MR. HILTON:  Objection.  Goes to legislative

13:59:53  1    privilege, asking for her mental impressions and opinions about

13:59:55  2    what legislation is or is not necessary and at the core of the

14:00:02  3    legislative privilege.

14:00:04  4            THE COURT:  All right.  Okay.  Overruled.

14:00:08  5            Mr. Dunn, I don't know if you want to respond to that.

14:00:12  6    You're just asking about control of the Senate?

14:00:15  7            MR. DUNN:  That's right.

14:00:16  8            THE COURT:  Overruled.

14:00:17  9            THE WITNESS:  And your question is:  What's the number

14:00:19 10    required to pass legislation?

14:00:22 11    BY MR. DUNN:

14:00:23 12        Q.   Yes, we'll start there.  What is the number?

14:00:25 13        A.   It's 18.

14:00:26 14        Q.   And is there -- was there a higher number at some

14:00:29 15    point?

14:00:29 16        A.   Yes.

14:00:29 17        Q.   What was that?

14:00:30 18        A.   When I first started in the Senate, it was 21.  Later,

14:00:34 19    it lowered to 19.  And then another session lowered to 18, where

14:00:38 20    it currently is, so it's actually not two-thirds anymore.

14:00:42 21        Q.   Why was it lowered from 19 to 18, if you know?

14:00:46 22        A.   It was --

14:00:46 23            MR. HILTON:  Objection, Your Honor.  Asking about the

14:00:47 24    purpose of a legislation and it involved legislative privilege

14:00:52 25    information, including her mental impressions and opinions about

14:00:54   1   legislation, her legislative act, to the extent that she can

14:00:56   2   answer based on publically disclosed information, she can do so,

14:00:59   3   but she should not reveal any legislative privilege information.

14:00:59   4        JUDGE GUADERRAMA:  All right.

14:01:02   5        Senator, whatever is in the public domain about why it

14:01:08   6   was lowers from 19 to 18, can you tell me?

14:01:19   7        JUDGE BROWN:  And if I could interrupt for a second.

14:01:19   8   If we could abbreviate the legislative privilege objections and

14:01:19   9   take the speaking out of it, please?

14:01:19  10        MR. HILTON:  Of course, Your Honor.

14:01:22  11   BY MR. DUNN:

14:01:22  12        Q.   So my question is, it wasn't necessary in make changes

14:01:25  13   to Senate District 10 for Republicans to contain -- to continue

14:01:29  14   to have full control over the Texas Senate, was it?

14:01:33  15        A.   I would take issue with the way you characterized full

14:01:39  16   control, so --

14:01:40  17        MR. DUNN:  Apparently, we're pretty boring.

14:01:41  18        (Computer sound).

14:01:41  19        A.   -- I can't agree with you on that question, because it

14:01:44  20   has an assumption in it, yes.

14:01:45  21        Q.   Well, as a vote-counting matter, the votes were there

14:01:50  22   when Republicans were voting together to move any legislation

14:01:53  23   they wanted to?

14:01:54  24        A.   When Republicans all vote together, it took 18 votes

14:01:58  25   to bring a bill to the floor.

CROSS - HUFFMAN                                                    29

14:02:00  1        Q.    Now transitioning, you were asked by your lawyer today
14:02:04  2   to read some statements about how you would draw the map, as you
14:02:07  3   say race blind, and then you would send it for a Voting Rights
14:02:12  4   Act compliance review.  Do you remember that discussion today?
14:02:15  5        A.    Yes, sir.
14:02:16  6        Q.    How is it you would received this Voting Rights Act
14:02:18  7   compliance review?
14:02:19  8              MR. HILTON:  Objection to the attorney-client
14:02:22  9   privilege and legislative privilege, but no objection to the
14:02:25 10   extent she can answer based on public conversations.
14:02:29 11        A.    I believe, publicly, I've stated that I received the
14:02:34 12   advice verbally from Mr. Hilton.
14:02:36 13   BY MR. DUNN:
14:02:36 14        Q.    Was that orally or in writing?
14:02:38 15        A.    As I stated, without waiving my privilege that as I
14:02:41 16   have stated publically, verbally.
14:02:44 17        Q.    Did you receive any data along with it?
14:02:49 18              MR. HILTON:  Same objection, legislate privilege and
14:02:51 19   attorney-client.
14:02:52 20              JUDGE GUADERRAMA:  Sustained.
14:02:53 21   BY MR. DUNN:
14:02:53 22        Q.    Did you receive any data -- any actual maps that
14:02:56 23   analyzed it with the VRA analysis?
14:03:01 24              MR. HILTON:  Same objections.
14:03:02 25              THE COURT:  All right.  Sustained.

14:03:03  1          So you're making the legislative objection for the

14:03:03  2   Senator?

14:03:10  3          MR. HILTON:  Your Honor, to the extent it's asking

14:03:13  4   about information that she considered in connection with her

14:03:16  5   legislative acts regardless of its source, that would implicate

14:03:18  6   the legislative privilege, and to the extent it specifically

14:03:21  7   directed --

14:03:21  8          JUDGE GUADERRAMA:  Right.  I'm just wondering --

14:03:21  9          MR. HILTON -- that's communication between me and her.

14:03:23  10         JUDGE GUADERRAMA:  -- because it's just unusual that

14:03:25  11  you're making it and not her.  It's her privilege.

14:03:31  12         MR. HILTON:  Understand, and I can --

14:03:31  13         JUDGE GUADERRAMA:  And I understand that you're her

14:03:32  14  personal counsel, I guess, also, counsel for the government.

14:03:36  15  That all seems unusual to me, but that's why you're invoking the

14:03:41  16  privilege?

14:03:42  17         MR. HILTON:  If it's the Court's instruction to

14:03:44  18  withhold objecting on legislative privilege to Mr. Dunn's

14:03:47  19  questions, and if my client doesn't need to confer with me

14:03:51  20  regarding any privileged matter, I can do that, but I just want

14:03:53  21  to make sure I'm abiding by what the Court would like me to do.

14:03:56  22         JUDGE GUADERRAMA:  Sure, I think the process should be

14:03:58  23  she should invoke it.

14:04:00  24  BY MR. DUNN:

14:04:03  25     Q.   Are you invoking your legislative privilege to that

KATHLEEN A. SUPNET, CSR

14:04:06  1   question?

14:04:07  2       A.   Could you repeat the question, sir?  I want to make

14:04:09  3   sure I understand, specifically.

14:04:10  4       Q.   I might need the court reporter to do it, at this

14:04:13  5   point, after the speech.

14:04:13  6       A.   Trying to make sure --

14:04:13  7            MR. DUNN:  Could you?

14:04:13  8            THE COURT:  I don't have the feed, otherwise I would

14:04:14  9   do it.

14:04:14  10           THE COURT REPORTER:  "Did you receive any data -- any

14:02:55  11  actual maps that analyzed it with the VRA analysis."

14:04:41  12           THE WITNESS:  I will invoke my privilege.

14:04:44  13  BY MR. DUNN:

14:04:44  14      Q.   Now, you had a discussion on the floor about how you

14:04:47  15  had boxes of maps that you used throughout this process.  Do you

14:04:51  16  recall that?

14:04:51  17      A.   I don't recall, specifically, the speaking about that

14:04:56  18  on the floor, but, yes, there were boxes of maps around.

14:05:01  19      Q.   This is Defendants' Exhibit 65.

14:05:08  20      A.   Did you want me to refer to that, sir?

14:05:10  21      Q.   No, ma'am.  I'm going to show you a video.  I

14:05:13  22  apologize.

14:05:13  23      A.   Okay.

14:05:13  24           MR. DUNN:  It begins at 12:15.

14:05:13  25           (Video and audio played).

14:05:19  1          SENATOR POWELL:  Were there any printed maps used to

14:05:21  2          compare?

14:05:24  3          SENATOR HUFFMAN:  I think we had many printed maps

14:05:29  4          there in the redistricting office in preparing of the

14:05:31  5          eventuality of having public hearings.  In fact, we

14:05:33  6          still have boxes full of printed maps, but because

14:05:36  7          the public hearings were not held, we had an

14:05:39  8          excessive number of printed maps.

14:05:41  9              So, yeah, there were printed maps around.

14:05:43  10          Sometimes I keep one even on my desk to look, as we

14:05:47  11          go through the process, because it's a quick

14:05:49  12          reference among population numbers by county, you

14:05:51  13          know, and other useful information.  That is a quick

14:05:54  14          reference while performing the job.

14:06:01  15          (Video and audio stopped).

14:06:01  16   BY MR. DUNN:

14:06:01  17      Q.   So I represent to you in looking through you documents

14:06:04  18   you produced, there's not a single map.  Where is the box of

14:06:09  19   maps?

14:06:09  20      A.   I don't know where the boxes of -- the box of maps,

14:06:11  21   the maps were all of the benchmark map, so there was a -- one

14:06:17  22   for the State Board of Education, the congressional districts;

14:06:21  23   there was one for the Senate maps benchmark, and then one that

14:06:26  24   showed, for example, all of the counties with their population

14:06:30  25   on it.  So they were all documents that had been produced by the

14:06:34  1   legislative council, where we had made multiple copies, because

14:06:37  2   again, we were going to do the on-the-road public hearings, and

14:06:41  3   as a courtesy to the public, we were going to have those maps

14:06:44  4   available for participants, attorneys representing --

14:06:50  5   participating or groups and so forth.  So they were all of the

14:06:53  6   benchmark.  There was no maps printed, per see, as we -- unless

14:06:57  7   they were adopted, if that answers your question.

14:07:02  8        Q.   I'm afraid it doesn't.  I appreciate the description,

14:07:06  9   but where is the box of maps?

14:07:08  10       A.   I don't know.

14:07:10  11       Q.   It's Senator Powell's testimony, and her staff Gary

14:07:18  12  Jones's testimony in his declaration, that they saw maps you

14:07:20  13  were using prior to laying out the first Senate plan that

14:07:24  14  include racial data on it.  Are those maps in that box?

14:07:30  15            MR. HILTON:  Objection, Your Honor.  Legislative

14:07:33  16  privilege.  Sorry.

14:07:34  17            THE COURT:  She's answered she doesn't know where the

14:07:36  18  box is.

14:07:37  19  BY MR. DUNN:

14:07:38  20       Q.   Well, you recall your lawyer asked you earlier today

14:07:40  21  about an exchange between you and Senator Powell on the floor

14:07:44  22  were -- and you each disagreed, I think it's fair to say -- but

14:07:46  23  you both agreed on the notion that each of you initialed the

14:07:48  24  bottom of the page of some maps that had racial data on it.  Do

14:07:53  25  you recall that?

14:07:53   1        A.    I recall what was said on the floor of the Senate.  I

14:07:56   2   saw that today again.  And what I stated on the floor of the

14:07:59   3   Senate is exactly what happened that day.

14:08:04   4        Q.    Where are those initialed maps?

14:08:07   5        A.    I handed them over to the Attorney General -- to

14:08:12   6   Mr. Hilton.

14:08:18   7        Q.    Are you willing to ask to have them produced to this

14:08:21   8   litigation?

14:08:21   9        A.    Not if it waives any of my privileges.

14:08:25   10       Q.    Now, there was a discussion that you had with your

14:08:32   11   lawyer here today about a Senate floor exchange between you and

14:08:37   12   Senator West.  Senator West asked you what your understanding of

14:08:40   13   the coalition district was, do you recall that?

14:08:43   14       A.    I do recall, yes.

14:08:44   15       Q.    And when providing in your definition of coalition

14:08:48   16   district, you volunteered that the Voting Rights Act doesn't

14:08:53   17   require them.  Do you remember saying that?

14:08:54   18       A.    I don't specifically recall, but the record will speak

14:08:57   19   for itself, yes.

14:08:58   20       Q.    At any point in time, have you become familiar with a

14:08:59   21   case *Campos v. The City of Baytown*, a Fifth Circuit case?

14:09:07   22       A.    I've heard of the case.  I would not say I'm familiar

14:09:07   23   with it, and could not recite it to you, sir.

14:09:08   24       Q.    That case permits Section 2 of the Voting Rights Act

14:09:12   25   to require the creation of a coalition district?

14:09:17   1        A.    You're asking me if I believe the case says that?  I

14:09:20   2   don't know what the case says.

14:09:21   3        Q.    And one final exchange, generally, about the Senate

14:09:24   4   floor.  You had a discussion that you talked about with your

14:09:27   5   lawyer with Senator Gutierrez, and Senator Gutierrez asked you a

14:09:32   6   question about how the district would perform for Senator

14:09:35   7   Powell.  Do you remember that?

14:09:39   8        A.    Yes.

14:09:44   9              MR. DUNN:  We're on exhibit -- Defendants' 65,

14:09:47  10   beginning at 1:28.

14:09:47  11              (Video and audio played).

14:09:51  12              *SENATOR GONZALEZ:  Under your plan, I think that we've*

14:09:53  13              *already determined that Senate District 10 would*

14:09:56  14              *probably not be returning Senator Powell.  Was that*

14:09:56  15              *accurate?*

14:10:04  16              *SENATOR HUFFMAN:  I do not know who the voters of*

14:10:07  17              *Senate District 10 will vote for.*

14:10:09  18              (Video and audio stopped).

14:10:09  19   BY MR. DUNN:

14:10:09  20        Q.    Now, partisanship was guiding your decision-making.

14:10:13  21   Are you willing to waive your legislative privilege and tell us

14:10:16  22   why you couldn't just say, right then, we drew the map to defeat

14:10:21  23   Senator Powell?

14:10:21  24        A.    I'm not going to waive my legislative privilege, but I

14:10:26  25   have said publically an on the floor of the Senate that

14:10:27  1  partisanship was a consideration of the drawing of the maps.

14:10:30  2      Q.   And then finally, the same exhibit.

14:10:34  3           MR. DUNN:  Beginning at 41:07.

14:10:39  4           *SENATOR HUFFMAN:  Depends on how you define*

14:10:40  5            *compactness and what the goals of the redistricting*

14:10:42  6            *process were and how much population you needed,*

14:10:45  7            *where you could find the population, other incumbents*

14:10:49  8            *surrounding you and their interests had to be taken*

14:10:52  9            *into account as well.*

14:10:57  10          *SENATOR POWELL:  Even if you didn't need any*

14:10:59  11           *population.*

14:10:59  12          *SENATOR HUFFMAN:  Pardon?*

14:10:59  13          *SENATOR POWELL:  Even if you didn't believe you needed*

14:10:59  14           *population.*

14:11:00  15          *SENATOR HUFFMAN:  Well we believed you needed*

14:11:02  16           *population.*

14:11:06  17          (Video and audio stopped).

14:11:06  18  BY MR. DUNN:

14:11:06  19      Q.   Are you willing to waive your legislative privilege

14:11:09  20  and explain the grin on your face right there?

14:11:15  21      A.   I'm not going to waive legislative privilege, sir.

14:11:21  22      Q.   And is the reason you won't waive legislative

14:11:23  23  privilege and that you invoke it today is because the truth to

14:11:26  24  that inquiry is you weren't telling Senator Powell the truth?

14:11:31  25  Isn't that a fact?

14:11:31   1              MR. HILTON:  Objection.  Privileged, attorney-client,

14:11:33   2     legislative and calls for speculation.

14:11:35   3              JUDGE GUADERRAMA:  Sustained.

14:11:38   4              MR. DUNN:  Pass the witness.

14:11:53   5                   SENATOR CECELIA JOAN HUFFMAN,

14:11:53   6               REDIRECT EXAMINATION BY THE DEFENSE

14:11:53   7     BY MR. HILTON:

14:12:13   8        Q.   Senator Huffman, are you a Republican?

14:12:14   9        A.   Yes, I am.

14:12:15  10        Q.   Republican is a political party?

14:12:19  11        A.   Yes.

14:12:20  12        Q.   Do you have a partisan motivations?

14:12:23  13        A.   Yes.

14:12:24  14        Q.   Senator Huffman, can you predict the future?

14:12:29  15        A.   I cannot, sir.

14:12:30  16        Q.   Can you predict how people are going to vote in the

14:12:37  17     future?

14:12:37  18        A.   No, sir.

14:12:38  19        Q.   Earlier, do you recall Mr. Dunn asking you if you or

14:12:46  20     Chairman Hunter stated publicly that SD-10 was drawn according

14:12:51  21     to partisanship?  Do you recall him asking about that?

14:12:54  22        A.   Yes, sir, I recall.

14:12:55  23        Q.   Do you recall any Democratic legislators publicly

14:12:58  24     stating that SD-10 was drawn according to partisanship?

14:13:05  25        A.   I can't recall, sir.

14:13:30   1           MR. HILTON:  Your Honor, if I may have one moment to

14:13:30   2   locate a document.  I may have a follow-up question if I can get

14:13:30   3   my hands on it, and If not, I'll have no further questions.

14:13:45   4           JUDGE GUADERRAMA:  Yes, sir.

14:14:07   5           MR. HILTON:  I appreciate the indulgence, Your Honors,

14:14:11   6   and this will take one more minute, and then I have two more

14:14:18   7   questions and then I'll pass the witness.

14:14:18   8   BY MR. HILTON:

14:14:26   9       Q.   Senator Huffman, do you recall the deposition that

14:14:29  10   Mr. Dunn took of you in connection with this case?

14:14:32  11       A.   Yes, sir.

14:14:32  12       Q.   Okay.  Do you recall being asked the question:  Would

14:14:34  13   you describe the Senate map as a partisan gerrymander?

14:14:40  14       A.   Yes.

14:14:41  15       Q.   Do you recall my objection and instruction to you not

14:14:42  16   to reveal any legislative privileged information in response to

14:14:46  17   that question?

14:14:47  18       A.   Yes.

14:14:47  19       Q.   Do you recall what your answer to that question was?

14:14:58  20       A.   No.

14:14:59  21       Q.   Perhaps I can refresh your recollection?

14:15:01  22       A.   I wish you would.

14:15:46  23       Q.   I'm going to end that line of questioning prematurely.

14:15:57  24           Senator Huffman, have you revealed any legislative

14:16:00  25   privileged information today in your testimony?

14:16:01   1        A.    No.

14:16:01   2        Q.    And did you maintain your legislative privilege?

14:16:05   3        A.    Yes, sir.

14:16:07   4        Q.    Okay.

14:16:07   5              MR. HILTON:  Nothing further.

14:16:09   6              THE COURT:  All right.  Thank you.

14:16:11   7              Mr. Dunn?

14:16:13   8              MR. DUNN:  I have no further questions for this

14:16:15   9    witness, Your Honor.  I just have a small thing I'd like to make

14:16:16  10    sure I insert in the record here.  I don't intend to start

14:16:19  11    something.

14:16:19  12              THE COURT:  All right.  Let me just excuse the

14:16:22  13    Senator.

14:16:22  14              Are we done with the Senator?  Is she free to go?

14:16:28  15              MR. HILTON:  Nothing further from the state, Your

14:16:30  16    Honor.

14:16:30  17              MR. DUNN:  Nothing from the plaintiffs.

14:16:30  18              THE COURT:  Thank you, Senator.  You're free to go.

14:16:32  19              (Witness excused).

14:16:32  20              THE COURT:  Mr. Dunn?

14:16:33  21              MR. DUNN:  We just want the record to reflect that

14:16:34  22    we've viewed Mr. Hilton's -- who is, I'm sure, a fine and

14:16:38  23    excellent lawyer -- as a witness to this case, and we just don't

14:16:41  24    want to be seen having waived any right to pursue discovery on

14:16:45  25    that issue later, but there's no reason to address it today.

DIRECT - DR. ALFORD                                    40

14:16:52   1            THE COURT:  All right.  Who's your next witness?

14:16:57   2            MR. SWEETEN:  Your Honor, we had Mr. Hilton doing the

14:16:58   3    next witness, which is was Ingram.  We're going to go ahead and

14:17:02   4    make the decision to go ahead and put Dr. Alford on through

14:17:06   5    Mr. Thompson.  The one thing I would say is that Mr. Ingram has

14:17:09   6    a flight in the morning at 10:30.  We think we can get Alford on

14:17:14   7    and then we can get Mr. Ingram on -- (indiscernible).

           8            JUDGE GUADERRAMA:  Okay.

           9            MR. SWEETEN:  May I have a moment to speak with my

          10    client?

          11            JUDGE GUADERRAMA:  Yes, sir.

          12            (Witness present and sworn by the Court).

          13            MR. THOMPSON:  May I proceed?

14:17:55  14            JUDGE GUADERRAMA:  Yes, sir.

14:17:55  15                        DR. JOHN ALFORD,

14:17:56  16              DIRECT EXAMINATION BY THE DEFENSE

14:18:01  17    BY MR. THOMPSON:

14:18:06  18       Q.    Dr. Alford, thanks for being here.

14:18:09  19            Could you state your name for the record, please?

14:18:10  20       A.    John Alford.

14:18:12  21       Q.    And what do you do for a living?

14:18:13  22       A.    I'm a professor of political science at Rice

14:18:19  23    University in Houston, Texas.

14:18:19  24       Q.    And could you just briefly walk the Court through your

14:18:21  25    academic background?

DIRECT - DR. ALFORD                                                        41

14:18:23   1        A.    I have a bachelor's degree in -- actually, a

14:18:26   2    Bachelor's of Science in Political Science from the University

14:18:29   3    of Houston, Master's in Public Administration from University of

14:18:35   4    Houston, Master's in Political Science from the University of

14:18:36   5    Iowa, Ph.D. in Political Science, Speciality in the American

14:18:41   6    Politics Public Policy and Methods from the University of Iowa.

14:18:46   7        Q.    And then you work in academia.  Could you walk through

14:18:49   8    the academic jobs you've held, just briefly?

14:18:51   9        A.    I taught for one year at Oakland University, which I

14:18:56  10    mistakenly thought was in Oakland, California, but it was

14:18:57  11    actually in Oakland, Michigan; then was recruited to the

14:19:02  12    University of Georgia, where I taught for three, four years

14:19:06  13    before being recruited to come to Rice.  I've taught at Rice

14:19:10  14    since then.

14:19:10  15        Q.    And you publish in peer-reviewed journals?

14:19:14  16        A.    Yes.

14:19:15  17        Q.    A lot, a little?  Do you have any description to that?

14:19:16  18        A.    Enough to be a full professor.

14:19:18  19        Q.    Have you served as a reviewer for peer-review

14:19:22  20    journals?

14:19:23  21        A.    Yes, I have.

14:19:24  22        Q.    Have you testified as an expert witness in

14:19:25  23    redistricting cases?

14:19:26  24        A.    Yes, I have.

14:19:27  25        Q.    And kind of give the Court a sense of volume how often

KATHLEEN A. SUPNET, CSR

DIRECT - DR. ALFORD                                                    42

14:19:32   1    you do that?

14:19:32   2         A.   I think the first case I testified in was in Alabama

14:19:36   3    in the 1980s.  I testified and drew districts in the '90s,

14:19:41   4    testified and drew districts in 2000, and continued to testify

14:19:49   5    and draw districts.  So I draw districts mostly for localities,

14:19:52   6    but I testified for the State of Texas for several decades.  I

14:19:58   7    worked for the Attorney General of Texas separately before that.

14:20:05   8    I would say I'm a lot busier now than I used to be.  I got into

14:20:11   9    this because it was something I could do for a couple of years

14:20:15   10   and then have eight years off, but in Texas, you don't get many

14:20:18   11   years off.

14:20:18   12        Q.   So are these and other details about your credentials,

14:20:22   13   qualifications and experiences, available to the Court in a CV

14:20:25   14   that you attached to your report?

14:20:26   15        A.   Yes.

14:20:26   16             MR. THOMPSON:  Brian, if we could just bring up

14:20:33   17   Defendants' Exhibit 34.

14:20:34   18   BY MR. THOMPSON:

14:20:35   19        Q.   Doctor, I believe you have binders if you want them,

14:20:36   20   but we also have Defendants' Exhibit 34 on the screen here.

14:20:41   21             Can you see the exhibit all right?

14:21:08   22             I'll just tell you.  This exhibit contains a few

14:21:08   23   related documents.  It starts off with your declaration, then

14:21:16   24   has your report and then it has your CV.  So I'll let you find

14:21:20   25   that, and ask Brian to flip back to the page Bates stamp State

14:21:25  1    P.I. 1307 in Defendants' Exhibit 34.

14:21:29  2            Is that your CV?

14:21:49  3        A.   It is.

14:21:49  4        Q.   And is that CV accurate?

14:21:52  5        A.   I've got a couple more recent redistricting

14:21:57  6    engagements, but it's everything up into the time it was

14:22:01  7    produced, yes.

14:22:03  8        Q.   Thank you.

14:22:03  9            MR. THOMPSON:  Your Honor, at this time defendants

14:22:04 10    would offer Dr. Alford as an expert regarding topics addressed

14:22:07 11    in this court, including political science, redistricting and

14:22:10 12    racially polarized voter analysis.

14:22:12 13            JUDGE GUADERRAMA:  Mr. Gaber?

14:22:14 14            MR. GABER:  No objection, Your Honor.

14:22:16 15            JUDGE GUADERRAMA:  The Court will receive him as such.

14:22:19 16    BY MR. THOMPSON:

14:22:21 17        Q.   Dr. Alford, would you turn to page two of your report,

14:22:23 18    that's Bate stamped State's P.I. 1299?  You include a heading.

14:22:29 19    I believe it says The History of Texas Senate District 10; do

14:22:35 20    you see that?

14:22:35 21        A.   Yes.

14:22:36 22        Q.   What does the Court need to know from that section of

14:22:39 23    your report?

14:22:39 24        A.   I just thought it was useful to have context about how

14:22:43 25    the district had developed over time.  It was -- as all the

14:22:48  1   senate districts were, it was a Democratic district at some

14:22:52  2   point.  In the past, as the state began shifting Republican, it

14:22:56  3   was one of the early districts, I think one of the first three

14:23:02  4   districts to flip Republican, remained a Republican district

14:23:05  5   through some shade changes and other things over time, and then

14:23:12  6   with the difficulties that Senator Berman got into to, it

14:23:17  7   became, basically, a much more competitive district, and is in

14:23:22  8   that form as sort of been battled for, back and forth.  It's a

14:23:27  9   rare thing.  It's an actual competitive legislative district in

14:23:34  10  the United States, so it's been contentious for some time.

14:23:38  11      Q.   And as part of that analysis, did you ultimately learn

14:23:40  12  anything about whether the district had elected minority

14:23:43  13  candidates or White candidates?

14:23:45  14      A.   Over the history of the district, it's based on White

14:23:49  15  candidates.

14:23:49  16      Q.   So after that section on the history of SD-10, your

14:23:54  17  report includes section entitled Plaintiffs' Analysis.  Do you

14:23:56  18  see that on page four of your report, which is Bate stamped

14:24:01  19  State P.I. 1301?

14:24:05  20      A.   Yes.

14:24:05  21      Q.   That section mentions ACS data, American Community

14:24:09  22  Survey data, about Senate District 10 CVAP.  Is the ACS CVAP

14:24:13  23  data reliable?

14:24:15  24      A.   It is reliable.  It's the best data we have for the

14:24:21  25  issue of assessing voter-eligible population.

14:24:24   1          Q.    Is it something that political scientists routinely

14:24:27   2    use?

14:24:27   3          A.    Yes.

14:24:28   4          Q.    Could you briefly explain to the Court what data you

14:24:32   5    reported and why it matters?

14:24:34   6          A.    Sort of my first question here was it's a little

14:24:39   7    unclear to me initially whether this was -- whether there was an

14:24:43   8    attempt here to argue that this was, in fact, a

14:24:47   9    majority-minority district.  So it just looks at those

14:24:52   10   population percentages.  If you look at total population, you

14:24:55   11   might be able to argue it was a majority district, but when you

14:25:00   12   look at voter-eligible population, it's not a majority district

14:25:05   13   in the 50-percent-plus-one sense.  And in reading Dr. Barreto's

14:25:12   14   report, he focuses on Black and Hispanic voting patterns, and

14:25:17   15   Black and Hispanic eligible population combined doesn't come

14:25:22   16   anywhere close.  But I don't think he indicated that he thought

14:25:26   17   that the current Black and Hispanic vote combined would be

14:25:31   18   majority.  So again, this helps with the context that we're not

14:25:35   19   talking about a majority-minority district in the Section 2

14:25:39   20   sense.

14:25:40   21         Q.    Did the ACS CVAP data that you reviewed reveal

14:25:47   22   benchmark configuration was a majority White CVAP district?

14:25:52   23         A.    That's what it reveals, yes.

14:25:54   24         Q.    Did you review Dr. Barreto's report?

14:25:57   25         A.    Yes.

14:25:58  1      Q.    Does Dr. Barreto's report to analyze whether Black

14:26:01  2  voters and Latino voters are cohesive?

14:26:04  3      A.    Yes.

14:26:05  4      Q.    Do you identify any problems with that analysis?

14:26:07  5      A.    He confines his analysis solely to set of fairly

14:26:15  6  recent general election contests, in which he simply looks at

14:26:22  7  patterns of voting for Democratic and Republican candidates

14:26:25  8  statewide in Texas elections.  And that was the extent of his

14:26:33  9  analysis.

14:26:33  10     Q.    And what's wrong with doing that?

14:26:35  11     A.    It's difficult to glean much from those elections,

14:26:39  12  because the partisanship has always been a powerful force in

14:26:47  13  American politics and in voting, but I don't think it's any

14:26:51  14  surprise to any one that is substantially more powerful now than

14:26:55  15  it was even ten years ago or two decades ago.  But in terms of

14:27:00  16  voting behavior, it's officially powerful that it simply erases

14:27:05  17  the other factors in voting behavior.

14:27:07  18           So you can look at those results and you can say

14:27:10  19  something about how people voted, democrat or Republican, in a

14:27:18  20  general election, but you can't say much more beyond that.  In

14:27:21  21  particular, you can't say much this case, whether these two

14:27:25  22  groups are absent the shared characteristic of being --

14:27:30  23  preferring the Democratic Party, whether they're, in fact, form

14:27:34  24  single political group.

14:27:36  25     Q.    Thank you for that.

14:27:36  1          And I want to make sure that those of us who don't run

14:27:40  2   recently polarized anaylsis for living fully understand what you

14:27:43  3   just said.  Are you're suggesting that there's -- if one looks

14:27:51  4   at general elections, partisanship is at issue in a way that is

14:27:56  5   not true if one looks at primary elections?

14:27:59  6      A.    That's true.  So, primary elections are presumedly

14:28:05  7   distinctive in the sense that the things that voters of whatever

14:28:09  8   racial group can focus on, including policy preferences or a

14:28:13  9   preference for a reflective representation, are available in

14:28:16  10  nonpartisan elections and in party primaries, without being

14:28:22  11  overridden by the queue of partisanship.

14:28:23  12      Q.    So if the Court wanted to separate out results that

14:28:27  13  have been driven by partisanship and results that are being

14:28:31  14  driven by race, would the Court want to look at primary

14:28:34  15  election?

14:28:35  16      A.    I would not say that I would look only at primary

14:28:39  17  elections, because ultimately the general elections are informed

14:28:42  18  about what will happen to the racial groups preferred candidates

14:28:48  19  in the broader election setting.  But, yes, I think if you want

14:28:52  20  to understand why these disparate groups are in fact forming a

14:29:00  21  cohesive political force and, therefore, share in the election

14:29:04  22  of candidates of choice or agree in the election of the

14:29:08  23  candidates of choice, I think you have to get outside of the

14:29:12  24  partisan context to glean some information about that.

14:29:15  25      Q.    I think I'm following.  So to do a racially polarizing

14:29:20  1   voting analysis in this context, are you saying you should look

14:29:21  2   at both general election data and primary election data?

14:29:25  3        A.   I would, yes.  I would say not everybody -- I was

14:29:32  4   surprised to see that Dr. Barreto's colleague, Dr. Collingwood

14:29:36  5   recent case I was involved in, did the same analysis and used

14:29:40  6   only primary elections; excluded the analysis in the general

14:29:44  7   elections completely, so they just weren't informed.  So some

14:29:48  8   people do that, some do both.  I think it's better to have the

14:29:52  9   full picture.

14:29:53  10       Q.   So when you're saying that Dr. Barreto's colleague was

14:29:57  11  only primary, you're not suggesting that he looked only at

14:30:00  12  generally election data?

14:30:01  13       A.   Correct.

14:30:05  14       Q.   Did your report explain this issue by pointing in a

14:30:11  15  particular primary, for example?

14:30:14  16       A.   Yes, and intended just to be at a (indiscernible) of

14:30:16  17  an example.  I think we could just stop at that point and say

14:30:19  18  there's not sufficient evidence here to know about whether these

14:30:24  19  groups are, in fact, forming a single group.

14:30:28  20       Q.   Could you walk the Court through the example you gave

14:30:31  21  in your report?

14:30:31  22       A.   The example is an actual endogenous election, which is

14:30:34  23  also something that is not in Dr. Barreto's report.  So it's an

14:30:38  24  actual endogenous election.  It's a prime Democratic primary in

14:30:42  25  SD-10.

14:30:42  1      Q.   Sorry, just before you keep going, we went over this a
14:30:43  2   little bit yesterday I don't think you were here.  Could you
14:30:44  3   tell the Court what you mean by endogenous?
14:30:48  4      A.   So an endogenous election is what's sometime called
14:30:50  5   the election /TPHAL force.  So if the case is about a Senate
14:30:54  6   election, then a contest in a Texas Senate district is the
14:30:59  7   election at hand.  So a lot of times when we're look at things
14:31:03  8   like reconstituted election analysis, there're reasons why we
14:31:08  9   might want to use statewide elections to do that, but those
14:31:11  10  statewide elections are exogenous elections.  Governors election
14:31:16  11  is a different election.
14:31:18  12       Where I think you see this most dramatically is I've
14:31:20  13  been involved in a lot of school board cases, you get somebody
14:31:25  14  analyzing school board districts using the presidential contest.
14:31:29  15  Well, that's a very exogenous election.  It's very different to
14:31:34  16  run for president in a partisan setting than it is to run for
14:31:35  17  the school board and, you know, the supreme branch of Texas.  So
14:31:40  18  you always prefer elections that are -- ideally you prefer
14:31:45  19  elections that are the actual election at issue.
14:31:48  20     Q.   I'm sorry.  I'm sorry to have interrupted you.  I
14:31:51  21  think were you testifying about the example contained in your
14:31:54  22  report, and you just described it as an endogenous election.  Do
14:31:58  23  you want to just continue where you left off?
14:31:59  24     A.   So it's -- if it's a racially contested primary in
14:32:04  25  that district, there's a -- in a Democratic primary, there is an

14:32:10  1    Anglo candidate and a Hispanic candidate, in the primary it

14:32:13  2    appears that the preference of Hispanic voters is for the

14:32:17  3    Hispanic candidate, preference of Anglo voters is for the Anglo

14:32:21  4    candidate.  Neither of those strike me as very surprising.

14:32:24  5            And then I think the question at hand here is if this

14:32:26  6    is an actual political coalition, then Black voters should be

14:32:32  7    supporting the Hispanic candidate along with Hispanics voters,

14:32:34  8    but, in fact, the majority of Black voters are favoring the

14:32:37  9    White candidate, not the Hispanic candidate or -- I'm sorry --

14:32:39  10   the Anglo, not the Hispanic candidate.

14:32:43  11       Q.    Now was that analysis intended to conclusively

14:32:48  12   establish whether Black voters and Latino voters are cohesive in

14:32:54  13   SD-31 [sic]?

14:32:55  14       A.    No.

14:32:56  15       Q.    What was it intended to do?

14:32:58  16       A.    So there's a background on this issue.  There relates

14:33:02  17   not just to this part of Texas, but to all of Texas, to a long

14:33:10  18   literature in political science on the issue of coalitions

14:33:13  19   between Black and Hispanic voters in local elections, as well as

14:33:16  20   in other sorts of elections.  And it's pretty consistent in that

14:33:22  21   it shows that these kinds of coalitions rarely emerge.  If they

14:33:26  22   emerge, they rarely last.

14:33:27  23            So my point here was just that having done what he had

14:33:30  24   done with general elections, Professor Barreto had failed to

14:33:35  25   establish that something in SD-10 or Tarrant County made it

14:33:40  1   unique, relative to the normal pattern that we would see in

14:33:45  2   which these groups don't form a coalition.

14:33:48  3           So it's an example.  It's an endogenous example, but

14:33:55  4   I'm not trying to prove in this particular instance what's true

14:33:58  5   or isn't true.  I'm just pointing out there's not enough

14:34:01  6   evidence in Dr. Barreto's report to tell whether this is some

14:34:06  7   sort of an usual setting.

14:34:09  8           JUDGE SMITH:  Mr. Thompson, you asked a minute ago

14:34:11  9   about SD-31.  Is that what you meant to ask?

14:34:16 10           MR. THOMPSON:  I don't think so.  I apologize if I --

14:34:17 11           JUDGE SMITH:  Just to make clear that this was all

14:34:20 12   about SD-10 and not SD-31.

14:34:20 13           MR. THOMPSON:  Yes.  I'm sorry.

14:34:22 14           JUDGE SMITH:  It was a long answer to your short

14:34:25 15   question, but I'm sure you said SD-31.

14:34:30 16   BY MR. THOMPSON:

14:34:32 17   Q.   Dr. Alford, I don't know if I just said SD-31, but

14:34:34 18   your report wasn't analyzed -- I'm sorry -- was your report

14:34:35 19   analyzing SD-10 or SD-31?

14:34:38 20   A.   SD-10 and my comments were about SD-10.

14:34:45 21   Q.   Thank you very much.

14:34:45 22           In this analysis of SD-10, did your report cite the

14:34:49 23   endogenous primary election example alongside a discussion of

14:34:55 24   some academic literature and cases regarding Black and Latino

14:34:59 25   cohesion or coalitions?

DIRECT - DR. ALFORD                                                52

14:35:01  1       A.    Yes.

14:35:02  2       Q.    And I should have put this on the record earlier,

14:35:07  3   Dr. Alford.  What is the Texas Legislative Council?

14:35:11  4       A.    The Texas Legislative Council is a research service

14:35:15  5   body within the Texas government, established primarily to

14:35:19  6   provide expert data information to the Legislature, but also

14:35:24  7   more broadly to the Texas government and much of that

14:35:28  8   information is available publicly, as well.

14:35:29  9       Q.    It's a reliable source of data?

14:35:32 10       A.    Yes.

14:35:32 11       Q.    When Dr. Barreto testified, he had some complaints

14:35:42 12   about the information that accompanied your report.  Are you

14:35:47 13   familiar with that?  I don't know if you saw the testimony or

14:35:49 14   not.

14:35:49 15       A.    Yes, I saw that.

14:35:51 16       Q.    What information did you disclose with your report?

14:35:55 17       A.    Along with the sort of general of what I relied on

14:36:00 18   discussion, I disclosed the actual data set that was used to

14:36:04 19   produce this primary analysis for SD-10, that included the

14:36:12 20   actual votes by precinct, and in accompanying columns, the CVAP

14:36:20 21   information that was used to produce the EI analysis on that

14:36:23 22   data set.

14:36:24 23       Q.    Was that equivalent to the information or better than

14:36:27 24   the information that Dr. Barreto disclosed with his report to

14:36:31 25   you?

DIRECT - DR. ALFORD                                                 53

14:36:31  1         A.    He also produced data sets, although he did not

14:36:35  2    produce a single set.  He produced sort of multiple raw data

14:36:40  3    sets; one for the VAP data for the entire State of Texas,

14:36:47  4    another independent one for elections, he looked at.  So what he

14:36:51  5    discloses was maybe not as convenient, but certainly had I

14:36:54  6    wanted to rerun that, I could easily have worked that out,

14:36:57  7    figured out how the things matched up and run that.  My data set

14:37:02  8    was, you know, much more compact, much more useable form.

14:37:06  9         Q.    Was the information that you disclosed sufficient for

14:37:10  10   a competent expert to understand the analysis contained in your

14:37:13  11   report?

14:37:14  12        A.    Yes.

14:37:14  13        Q.    Now I want to walk through just a couple of things

14:37:17  14   that I understood Dr. Barreto to be complaining about

14:37:21  15   specifically.  I believe he referred to a spreadsheet that

14:37:26  16   listed candidates as candidate one and candidate two, rather

14:37:28  17   than by name.  Are you familiar with that spreadsheet that was

14:37:33  18   disclosed?

14:37:33  19        A.    While the votes for the two candidates are in there,

14:37:36  20   the headers, because of the way that these data sets are brought

14:37:40  21   into the EI program, the headers are generic; candidate one,

14:37:47  22   candidate two and candidate three, so that you don't have to

14:37:49  23   rewrite the program every time you pull in a set of data.

14:37:52  24             So the candidates were there with the votes, but it

14:37:59  25   probably wouldn't have been nice if I actually thought to say,

KATHLEEN A. SUPNET, CSR

14:38:02  1    by the way candidate one is, you know, Martinez, or candidate

14:38:06  2    two is Martinez.  But we know on the primary.  If I had gotten

14:38:11  3    data set, I'd have gone to the bottom, looked at who had the

14:38:14  4    most votes and I would have been off to the races or just

14:38:17  5    checked the precinct against the TLC date.

14:38:21  6              And so it didn't render it impossible to analyze and I

14:38:21  7    would say less effort to analyze than his data sets were that

14:38:26  8    came to me.

14:38:27  9    Q.    And if I recall correctly, this issue was raised, and

14:38:32  10   subsequent to that, you just provided a code book that explained

14:38:35  11   who candidate one and candidate two were?

14:38:37  12   A.    Yeah.  Dr. Barreto seemed to think it was very

14:38:39  13   important to have a code book, so I provided a code book that

14:38:43  14   had one line in it; candidate one is X and candidate two is in

14:38:46  15   the code book.

14:38:46  16   Q.    Did you think a competent expert could've figured that

14:38:51  17   out?

14:38:51  18   A.    I don't think you need to be an expert to figure that

14:38:56  19   out.

14:38:56  20   Q.    Now I just want to turn to a different complaint about

14:38:58  21   disclosure.  Do you recall Dr. Barreto complain about a table or

14:39:02  22   some table that he received and didn't understand?

14:39:04  23   A.    Yes.

14:39:05  24   Q.    Was that something you relied upon or relied on in

14:39:10  25   preparing your report?

DIRECT - DR. ALFORD                                                    55

14:39:11   1        A.   My understanding with the discussion of the table

14:39:14   2   involved a large number, substantially more than a single

14:39:17   3   contest with some sort of EI analysis and this is the only

14:39:22   4   contest I analyze for my report.  So it's not anything I relied

14:39:26   5   on the report or anything that he apparently couldn't make sense

14:39:30   6   of, but I don't know why he would need to make sense.

14:39:33   7        Q.   Is it fair to say that we may have accidentally sent

14:39:35   8   something that wasn't relevant to the opinions you put forward

14:39:39   9   in your report?

14:39:40   10       A.   That's possible.

14:39:41   11       Q.   So you're confident that anyone who needed

14:39:46   12   understanding actual opinions given in your report would not

14:39:48   13   need to analyze this table that he's talking about at all?

14:39:52   14       A.   No.

14:39:53   15       Q.   In your report, you also analyze an alternative plan

14:39:59   16   that the plaintiffs had put forward.  And I kind of want to get

14:40:02   17   the timeline correct.  I believe there was an alternative plan

14:40:07   18   that was mentioned in the P.I. motions before Dr. Cortina's

14:40:12   19   involvement.  Do you remember addressing that?

14:40:14   20       A.   Yes.

14:40:14   21       Q.   I believe the discussion begins on page seven of your

14:40:17   22   report which is Bate stamp State P.I. 1304, if you would like to

14:40:21   23   look at it?

14:40:30   24       A.   Yes.

14:40:31   25       Q.   What did you conclude in that section of your report?

14:40:33  1       A.    With here I'm just addressing just generally the

14:40:37  2   concept that there was -- as I understand the purpose of the

14:40:41  3   alternative plan was to show the state could've achieved its

14:40:45  4   objective in some other way that was less objectionable than

14:40:49  5   plaintiffs, but I thought the alternative just missed the mark.

14:40:53  6   It's a discussion about, kind of to me, a fairly similar

14:40:57  7   operation in Travis County to divide up a Democratic district.

14:41:03  8   It's a district that I think has always been Democratic, and is

14:41:08  9   securely Democratic, so it's, you know, undertaking that, it's

14:41:12 10   just a different -- something quite different in nature from

14:41:17 11   trying to improve a historically Republican district, in the

14:41:21 12   Republican sense and moving it back to its Republican status.

14:41:24 13       Q.    And just so it's clear on the record, the district

14:41:27 14   that you are describing is historically Democratic, is that the

14:41:32 15   Travis County District?

14:41:34 16       A.    Correct.

14:41:35 17       Q.    So are there reasons that Republican legislature is

14:41:38 18   looking for partisan advantage, might have focussed their

14:41:42 19   attention first on Tarrant County rather than Travis County?

14:41:47 20       A.    I'm not sure -- I have no, of course, insight into

14:41:50 21   what the Legislature might be doing, I would be surprised if

14:41:54 22   Travis County would ever come up much at all.

14:41:57 23       Q.    And I'm sorry.  I should clarify the question.  I

14:42:00 24   didn't mean to ask you, do you know what legislators are

14:42:03 25   thinking or anything like that.  What I meant to ask was from an

14:42:06  1    objective perspective, someone who is looking for partisan

14:42:10  2    advantage trying to create another Republican seat, is there

14:42:12  3    someone -- is there -- are there reasons that someone in that

14:42:15  4    position might look at Tarrant County versus Travis County?

14:42:21  5        A.   If you just take the senate districts and put them in

14:42:24  6    order based on their vote for Governor Abbott or Ted Cruz, look

14:42:30  7    at the most secured down to the most Republican to most

14:42:36  8    Democratic, what you'll see in the middle are the districts that

14:42:40  9    you normally would look and say, okay, we've got -- we got our

14:42:41  10   district and won there or we lost narrowly, if you're looking

14:42:45  11   for a seat, that's usually where you look.  You don't tend to

14:42:50  12   sort of look down at the strongest districts for the other side

14:42:53  13   and say why don't we try to -- just at a starting point as a

14:42:56  14   practical matter, you know, taking a district that you have won

14:43:02  15   recently and narrowly lost when you lost it, tweaking that

14:43:06  16   district to make the district perform better for your party is a

14:43:12  17   much similar matter than trying to -- so you're sort of --

14:43:17  18   you're fulling around on the margins with the district to try to

14:43:22  19   get it to perform a little bit better for you, whether you are

14:43:26  20   democrat or Republican.  You are not building a district at of

14:43:29  21   whole cloth.

14:43:30  22        Q.   If I understand you correctly, if we took a list of

14:43:33  23   state senate districts that the Republicans did not win, but

14:43:37  24   ranks them by the ones at the top being the closest the

14:43:41  25   Republicans came to winning, are you saying that the Tarrant

DIRECT - DR. ALFORD                                                    58

14:43:45  1    County district would be ranked higher or lower than the Travis

14:43:48  2    County district?

14:43:49  3        A.   The Travis County district would be, if I'm recalling

14:43:52  4    correct, the third most Democratic district in the state.   I

14:43:55  5    think for the margin of victory there was over 30 points.   And

14:44:02  6    SD-10 would be the first district on your list that was not won

14:44:08  7    by Republicans, so the next most Republican district about SD-10

14:44:13  8    is a district that was won by Republicans, not just in the

14:44:17  9    endogenous election, but also in things like the Tec Cruz race.

14:44:23 10        Q.   Now after you submitted your report, analyzing the

14:44:27 11    plaintiffs' alternative plan, did Dr. Cortina submit an expert

14:44:30 12    report analyzing a new alternative plan called Alternative Plan

14:44:35 13    4?

14:44:35 14        A.   Yes.

14:44:36 15        Q.   Did you review that report?

14:44:40 16        A.   I did.

14:44:41 17        Q.   I want to start at a high level and give you a chance

14:44:46 18    to address Dr. Cortina's individual opinion.

14:44:49 19             Are you aware of any reason to think that the Texas

14:44:51 20    Legislature considered Alternative Plan 4?

14:44:54 21        A.   No.

14:44:55 22        Q.   Was Dr. Cortina's first opinion based on an election

14:45:02 23    analysis?

14:45:05 24        A.   It's based on some election results.   I'm not sure

14:45:09 25    it's what you mean by analysis.

14:45:11  1          Q.   I don't mean to assert proper election analysis.  I

14:45:16  2     believe he labeled it an election analysis in his report?

14:45:20  3          A.   That's correct.

14:45:20  4          Q.   What was your reaction to Dr. Cortina's purported

14:45:25  5     election analysis?

14:45:25  6          A.   I did not find it particularly persuasive in terms of

14:45:30  7     the underlying argument that it would've been preferable for the

14:45:37  8     Republican Party to choose a plan like plan four over the plan

14:45:42  9     that was adopted.

14:45:44  10         Q.   Did Dr. Cortina demonstrate that the Alternative Plan

14:45:53  11    4 would better serve whatever goals the Legislature may have

14:45:57  12    had?

14:45:57  13         A.   I don't think so.  It's pretty narrowly -- it's pretty

14:46:03  14    narrow in addressing the aspects of that -- the electoral

14:46:05  15    aspects of the plan.  So he makes some assumptions about some

14:46:09  16    things that -- that -- some things that might be Republican

14:46:13  17    goals, relative to the election performance of districts, some

14:46:16  18    of which may have been goals of the party and some of which may

14:46:21  19    not.  They certainly -- in no sense of the exhaustive election

14:46:23  20    goals pursued by a party when they engage in partisan

14:46:33  21    gerrymandering.

14:46:33  22         Q.   We'll just keep moving here relatively quickly,

14:46:33  23    Doctor.

14:46:33  24              Dr. Cortina's opinion, I believe he testified

14:46:36  25    yesterday, was based on a visual analysis of the enacted maps.

DIRECT - DR. ALFORD                                                    60

14:46:39  1    Are you familiar with that opinion?

14:46:40  2        A.    Yes.

14:46:41  3        Q.    What was your reaction to Dr. Cortina's visual

14:46:46  4    analysis?

14:46:47  5        A.    Well, first of all, I'm not sure exactly what

14:46:50  6    expertise is involved in a visual analysis.  I mean, it's a

14:46:54  7    special kind of I know it when I see it expertise.  It would be

14:46:58  8    difficult to -- in a scientific sense, right, issues of

14:47:01  9    replicability and so forth.  But more generally, I just thought

14:47:07 10    the idea that a visual look at those plans would disclose, even

14:47:13 11    if he was an expert at visually analyzing map confirmations and

14:47:18 12    configurations, the idea that that would disclose somehow a

14:47:19 13    state policy, I mean, I don't think you have to know much about

14:47:25 14    differences between the State Board of Education, the United

14:47:28 15    States Congress, the State Senate and the State House.  I mean

14:47:31 16    if you know only the one simple fact that those plans are not

14:47:34 17    all drawn by the same people are in consultation with the same

14:47:38 18    people, you'd know that they might exhibit a variety of

14:47:41 19    different concerns, obviously.  The idea that they're shade in

14:47:46 20    one particular part of state could be fairly described as a

14:47:49 21    state policy, I just think is -- again -- I mean, that's

14:47:54 22    substantial overreach, but I don't think it's particularly

14:47:58 23    relevant to the issue here.

14:47:59 24        Q.    Is there some scholarly literature that makes state

14:48:03 25    policy a well defined term of art in political science that

KATHLEEN A. SUPNET, CSR

14:48:06  1    tells us an expert how to a visual analysis to find that?

14:48:11  2         A.   Not that I'm aware of.

14:48:14  3         Q.   I believe Dr. Cortina's last opinion he labeled about

14:48:19  4    being core retention.  Did you review that opinion as well?

14:48:23  5         A.   Yes.

14:48:23  6         Q.   And what was your reaction to that opinion?

14:48:28  7         A.   There are a lot of different ways to do core

14:48:31  8    retention, so I'll just say, you know, I don't think it merited

14:48:35  9    a redoing or debating the issues about the nature of core

14:48:39  10   retention, because there are different ways of coming at core

14:48:39  11   retention.

14:48:44  12        You come at it from the perspective of the drawn

14:48:47  13   district and looking what the it contains.  You can look it

14:48:50  14   coming from the perspective of the original districts and how

14:48:54  15   much of the original district.

14:48:56  16        So, for example, if a district needs to get bigger,

14:48:59  17   and when you make the district bigger, you keep everybody in the

14:49:04  18   district who was there originally.  One direction of core

14:49:07  19   retention is that's 100 percent retention, because everybody who

14:49:09  20   was in the old district is in the new district.  On the other

14:49:12  21   hand, the new district is not made up entirely of people from

14:49:16  22   District 10.  It also now includes people from District 22,

14:49:19  23   but -- so it's fractional in that sense.

14:49:22  24        So, there are different ways to go at it.  The way he

14:49:26  25   went at it is one fairly common way, and so I don't have any

14:49:29  1   objection to that or to the numbers he produced.  I think it's a

14:49:33  2   reasonable -- looks to be reasonably competent core analysis for

14:49:37  3   the two plans or the three plans.

14:49:39  4       Q.   And so taking, you know, his numbers and his analysis,

14:49:42  5   with which you're not fighting right now, did Dr. Cortina

14:49:46  6   demonstrate that the enacted map as 2168 or Alternative Plan 4

14:49:54  7   at a higher core of retention relative to the benchmark plan?

14:50:00  8       A.   The average core of retention was higher in the

14:50:03  9   adopted plan than it was in core retention relative to benchmark

14:50:08  10  than it was in Plan 4.

14:50:09  11      Q.   Have you ever used the RedAppl software?

14:50:12  12      A.   Yes.

14:50:13  13      Q.   Do you know whether RedAppl is used by non-expert

14:50:20  14  laymen like staffers?

14:50:23  15      A.   That's what it was developed for.  So it's an

14:50:26  16  alternative to something called ArcInfo, which is a very

14:50:28  17  complicated piece of GIS software that most mappers use, but

14:50:33  18  RedAppl is developed, I think, by the legislative council, to --

14:50:37  19  precisely to let laypeople or legislators access map drawing

14:50:43  20  software.

14:50:44  21      Q.   And do you know whether it's possible for someone

14:50:47  22  using RedAppl to just not turn on racial shading while drawing a

14:50:53  23  map?

14:50:54  24      A.   My recollection when I've used RedAppl --

14:50:58  25           MR. GABER:  Your Honor, this is not in Dr. Alford's

KATHLEEN A. SUPNET, CSR

14:51:07  1    report.

14:51:07  2             JUDGE GUADERRAMA:  Mr. Thompson?

14:51:08  3             MR. THOMPSON:  That's fair.  It's not in the report.

14:51:09  4    I think it goes to his credentials as an expert, but...

14:51:12  5             JUDGE GUADERRAMA:  We've already accepted him as an

14:51:18  6    expert.

14:51:18  7             MR. THOMPSON:  Thank you, Dr. Alford.

14:51:22  8             No further questions.  I'll pass the witness.

14:51:25  9             THE COURT:  Mr. Gaber?

14:51:30  10                        DR. JOHN ALFORD,

14:51:31  11              CROSS-EXAMINATION BY PLAINTIFFS

14:51:31  12   BY MR. GABER:

14:52:28  13        Q.   Mark Gaber for the Brooks plaintiffs?

14:52:32  14             Dr. Alford, good afternoon.  We met over the phone

14:52:34  15   once in a deposition.  I doubt you remember it.  It was in the

14:52:37  16   *Perez v. Abbott* case from 2017.  You had a long seven or

14:52:43  17   eight-hour deposition with nine lawyers asking you questions,

14:52:45  18   so...

14:52:45  19        A.   Nice to see you in person.

14:52:47  20        Q.   Thank you for indulging us.

14:52:50  21             You have served as a political science consultant in

14:52:53  22   many voting rights lawsuits; is that right?

14:52:56  23        A.   That's correct.

14:52:56  24        Q.   And you have had the occasion to run ecological

14:52:58  25   inference analysis and write about racially polarized voting in

14:53:03  1    those consulting jobs; is that fair?

14:53:05  2         A.    That's correct.

14:53:06  3         Q.    Have you ever published peer-reviewed journal articles

14:53:10  4    on racially polarized voting?

14:53:12  5         A.    No.

14:53:13  6         Q.    Have you ever published any peer-review academic

14:53:14  7    articles about ecological inference?

14:53:16  8         A.    No.

14:53:16  9         Q.    So are you more of a higher consultant who runs these

14:53:22  10   types of analysis, but you don't do any academic work for it; is

14:53:26  11   that fair?

14:53:27  12        A.    It's my original academic work, the early, perhaps,

14:53:30  13   two-thirds of my career was election voting behavior analysis.

14:53:36  14   I moved off on a different direction in my research work.  I

14:53:40  15   have had an interest in this area.  I've taught courses on

14:53:43  16   redistricting and so forth, but for a variety of reasons, it's

14:53:50  17   not an area that I made an active research area.

14:53:53  18        Q.    And your active research area relates more, from

14:53:57  19   looking at your CV, top genetics and politics?

14:54:04  20        A.    I would not say that.

14:54:05  21        Q.    How would you describe it?

14:54:06  22        A.    Again, most of my academic career has been doing

14:54:10  23   relatively boring things, like analyzing incumbency advantage

14:54:13  24   and voter behavior.  More recently, I'm interested or have

14:54:17  25   become interested in research on physiology of -- broadly the

14:54:22  1    physiology of political behavior, particularly ideology.  So a

14:54:27  2    part of that, obviously, because it's physiology, involves

14:54:32  3    genetics, but I would not say I don't actively work in that

14:54:36  4    area.  My work is mostly in the area of brain physiology and

14:54:41  5    ideology.

14:54:43  6        Q.   When you say, physiology, is your work about whether

14:54:48  7    people inherent -- inherit their political persuasion through

14:54:53  8    their genetic makeup, is that part of what you mean by that?

14:54:57  9        A.   No, that's -- so that's a very early piece in this

14:55:02  10   work that sort of established -- that established kind of a sort

14:55:09  11   of goalpost, the general, what's come to be called the standard

14:55:12  12   social science model, as the all abstract or high level human

14:55:21  13   behaviors environmentally caused and not in any sense

14:55:27  14   biologically determined.

14:55:27  15        So sort of our initial proof of concept was to borrow

14:55:32  16   on some work from long standing work from behavioral genetics

14:55:39  17   that shows that, in fact, characteristics like left-right

14:55:42  18   ideology or actually substantially inheritable.  Our only

14:55:47  19   purpose there was to demonstrate that was non-zero where in way

14:55:53  20   are we dismissing that environment has enormous impact on

14:55:54  21   people's ideology.

14:55:55  22        But there is clear, replicated evidence, at this

14:56:01  23   point, from I virtually every part of the world, that a portion

14:56:04  24   of your ideological -- adult ideological orientation is

14:56:10  25   influenced by genetics.  That's pretty the end of my work on

14:56:17  1   genetics.

14:56:19  2        I was very -- surprisingly, to me, was a very well

14:56:21  3   accepted article.  It was the first article in political science

14:56:24  4   ever covered by the science section of the *New York times*, so we

14:56:28  5   felt like we had achieved what we started out to do.

14:56:31  6        Q.   Well, turning to your work in this case, if you could

14:56:35  7   turn to -- this is Defendants' Exhibit 34.  And it is the first

14:56:40  8   page of your initial expert report.  And I think you should have

14:56:57  9   a copy in the black binder?

14:57:00  10       A.   I do.

14:57:01  11       Q.   The binders are very large.

14:57:01  12       A.   Okay.

14:57:06  13       Q.   Page one of the report.

14:57:10  14            Now, Dr. Alford, when did you submit this report?

14:57:14  15       A.   I don't actually know.  I would have to look back to

14:57:33  16   see.  It's a very busy time these days and I couldn't tell you

14:57:36  17   in certainty when I submitted the report.  Prior to today and

14:57:41  18   sometime after Christmas would be my recollection.

14:57:46  19       Q.   I first saw it on December 20th, I believe, which is

14:57:48  20   the day that the defendants' P.I. opposition brief was due.

14:57:54  21   Does that sound about right?

14:57:55  22       A.   Certainly, corrects my impression it was done after

14:58:00  23   Christmas.

14:58:00  24       Q.   Now, you say in the scope of inquiry, given the very

14:58:04  25   type schedule, my anaylsis below is both limited in preliminary

CROSS - DR. ALFORD                                              67

14:58:07  1   and I reserve the right to supplement this initial report as

14:58:09  2   appropriate.

14:58:09  3           Do you see that?

14:58:10  4       A.   Yes.

14:58:11  5       Q.   Did you ever provide any sort of supplement with

14:58:16  6   respect to your opinions regarding Dr. Barreto's report or is

14:58:21  7   this the only report on that topic?

14:58:25  8       A.   I think that's correct.  I mean, I did provide other

14:58:33  9   material, but I think it was confined to -- if I'm not mistaken,

14:58:37  10  to Dr. Cortina's report.

14:58:39  11      Q.   So the only opinions you have with respect to racial

14:58:43  12  polarized voting, or anything else in Dr. Barreto's report, are

14:58:47  13  contained here in Exhibit 34; is that right?

14:58:53  14      A.   I mean, I read Dr. Barreto's testimony here in court,

14:58:58  15  so I have opinions.

14:59:00  16      Q.   The only opinions that you've disclosed in the case?

14:59:03  17      A.   The opinions in this report are the only reports in

14:59:08  18  writing.

14:59:09  19      Q.   Did you have time, since December 20th, to make any --

14:59:12  20  or was time available to you, since December 20th, to make any

14:59:16  21  updates if you had them?

14:59:18  22      A.   I have not done any additional analysis on the Barreto

14:59:22  23  issues in that time period.

14:59:27  24      Q.   Now I want to skip forward to pages two to three of

14:59:32  25  your report, the history of Texas Senate District 10.  Do you

14:59:38  1    see that?

14:59:38  2        A.    Yes.

14:59:45  3        Q.    And at the bottom of page three, you state that,

14:59:47  4    quote, the redraw of the district and the recently enacted plan

14:59:52  5    shifts the district back toward what would likely be more

14:59:56  6    similar to its earlier status as a secure Republican district.

14:59:59  7              Did I read that correctly?

15:00:00  8        A.    Yes.

15:00:01  9        Q.    Now are you referring back to the 1980s and 1990s in

15:00:07  10   this statement?

15:00:08  11       A.    No.  I think more to its configuration in the 2000s.

15:00:13  12       Q.    Are you aware of what the -- and you go through and

15:00:18  13   say that it was previously more Republican; is that right?

15:00:23  14       A.    It was previously more Republican, yes.

15:00:26  15       Q.    But since 2008, it's been won three times by the

15:00:32  16   Democratic candidate; is that right?

15:00:34  17       A.    I think that's correct.

15:00:35  18       Q.    And in that period of time, once by the Republican

15:00:38  19   candidate?

15:00:39  20       A.    Correct.

15:00:39  21       Q.    And that change in the district's partisan performance

15:00:46  22   has corresponded with the rapid increase in the district's

15:00:50  23   minority population; is that fair?

15:00:53  24       A.    I've not looked at a timeline change in the district,

15:00:58  25   so, I presume the district, in terms of general trends, probably

15:01:05  1    has been trending that direction, but I don't know about the

15:01:08  2    timeline.

15:01:08  3        Q.    So you haven't studied the timeline of the demographic

15:01:14  4    makeup of SD-10, only the election results?

15:01:18  5        A.    The only thing I've looked at with a timeline was

15:01:22  6    looking at, with regard to Dr. Barreto's contention that the

15:01:25  7    district is today, certainly a majority-minority voter-eligible

15:01:31  8    district.  So I looked at the timeline with regard to that and I

15:01:34  9    disagree with that, but the terms of what you're talking about,

15:01:38  10   what was the shift from say the 90s up to today, I have not

15:01:42  11   looked at that.

15:01:47  12       Q.    Now, on page or section four of your report, which is

15:01:54  13   page four of your report, you have a paragraph at the top of the

15:02:02  14   page.  Do you see that under the header Plaintiffs' Analysis?

15:02:06  15       A.    Yes.

15:02:06  16       Q.    What is the purpose of this paragraph?

15:02:14  17       A.    I just found -- I was just trying to sort of anchor

15:02:19  18   what it was that was being discussed here in terms of what

15:02:23  19   mattered.  So -- and I was confused a little bit by

15:02:27  20   Dr. Barreto's stance, arguing that this was, in fact, a Section

15:02:33  21   2, *Gingles*' one district, but let's assume that's his assertion.

15:02:39  22   What he asserts the district is today is certainly a

15:02:41  23   majority-majority, Citizen Voting Age Population district.

15:02:45  24       Q.    Did Dr. Barreto say anything to that report?

15:02:50  25       A.    He certainly argued that, yes, along the lines of

15:02:53   1   the -- my recollection is he presented that data and basically

15:02:57   2   was trying to discount the fact that the CVAP data from the

15:03:02   3   2015, 2019 was dated.

15:03:04   4       Q.   My question was the about the section, that it was a

15:03:08   5   *Gingle*s' -- the benchmark district was a *Gingles*' prong-one

15:03:10   6   district.  Do you use those words?

15:03:10   7       A.   That's why I said I was confused about what he was at.

15:03:13   8   (Mumbling) analysis was about, if he wasn't trying to make the

15:03:18   9   case that it was a *Gingles*' one district.

15:03:20  10       Q.   Now, do you agree that the ACS data, that's a

15:03:25  11   two percent estimate, is that -- each year; is that right?

15:03:27  12       A.   Two percent estimate?

15:03:30  13       Q.   The two percent survey, rather, of the population and

15:03:34  14   then therefore generates estimates of the Citizen Voting Age

15:03:37  15   Population?

15:03:37  16       A.   Yes.  ACS actually serves two percent of the U.S.

15:03:42  17   population every year.

15:03:44  18       Q.   And the White CVAP number that you talk about in your

15:03:48  19   report comes from the five-year aggregation of those estimates,

15:03:53  20   right?

15:03:54  21       A.   That's correct.

15:03:54  22       Q.   And so the data has -- is in some sense stale,

15:04:00  23   correct, it goes back to 2015 in this instance?

15:04:06  24       A.   The proportions from the data are centered

15:04:11  25   approximately on 2017.

15:04:18   1      Q.    And so what it actually reflects then is the status of

15:04:21   2   the district as of 2017, a snapshot of time?

15:04:25   3      A.    That's not entirely true.

15:04:27   4      Q.    On average?

15:04:29   5      A.    That's -- this is complicated.  And I'm not trying to

15:04:34   6   be evasive here, but the Census cautions a lot about saying

15:04:39   7   exactly that about the ACS.  A lot of people say, well, the --

15:04:44   8   obviously, if it's 15 to 19, it centered on 17, so it's just

15:04:49   9   weird things were in 17 or it's the average based on 17.  It

15:04:53   10  isn't.  Technically, it isn't.  It's a distribution that's more

15:04:59   11  closely centered on the time period.

15:05:02   12          The ACS is not a -- unlike the Census, which is a

15:05:06   13  snapshot at a point in time, right, the Census is, although it's

15:05:12   14  a legal fiction, the legal fiction is the Census is a full count

15:05:15   15  of U.S. population on a given day every 10 years.  The ACS

15:05:21   16  sample runs continuously year round.  It's not tied to a

15:05:24   17  particular point in the spring.  It's a continuos survey, always

15:05:29   18  in the field and always updating and it is not a count.  It is

15:05:32   19  not intended to be a count of anything.

15:05:33   20     Q.    The count is the Census Bureau?

15:05:36   21     A.    The what?

15:05:37   22     Q.    The count is the decennial census data?  That's the

15:05:41   23  one count.

15:05:41   24     A.    Correct.  So while both ACS and decennial census come

15:05:45   25  from the Census Bureau, one is a count and the other is a

15:05:47   1    continuous survey of proportions.

15:05:51   2        Q.   So -- but just to be clear, in paragraph four of your

15:05:53   3    report here, you are discussing the legal standards for

15:05:57   4    crossover districts for coalition districts; is that fair?

15:06:04   5        A.   I want to say broadly the legal context that they're

15:06:04   6    usually evaluated in.

15:06:05   7        Q.   You're not a lawyer?

15:06:07   8        A.   No.

15:06:14   9        Q.   Have you accomplished any academic papers about the

15:06:17  10    legal theories of crossover vote districts?

15:06:19  11        A.   No, I don't publish in that area.

15:06:21  12        Q.   Or coalition districts?

15:06:25  13        A.   No.

15:06:25  14        Q.   Are you aware that a three-judge federal Court in 2012

15:06:30  15    invalidated the 2011 version of SD-10 as intentionally, racially

15:06:37  16    discriminatory?

15:06:42  17        A.   I'm not sure about the dates.  I have some

15:06:47  18    recollection.  Was it a case here in Texas or was it...

15:06:52  19        Q.   Well, you testified in the case.

15:06:53  20        A.   I know, that's why I'm trying to locate the case in

15:06:57  21    my...

15:06:57  22        Q.   It was in Washington D.C.

15:06:59  23        A.   Okay.  Yeah.  I thought it was in Washington.  I

15:07:02  24    couldn't figure out why -- was this the Section 5 case?

15:07:05  25        Q.   Yes, it was.  And you're familiar with that case?

CROSS - DR. ALFORD                                                      73

15:07:08  1        A.    Yeah, I remember that case.

15:07:12  2        Q.    Now in paragraph 4.1, where you discuss Dr. Barreto's

15:07:19  3   record, did you offer any analysis to Dr. Barreto's findings

15:07:24  4   that Black and Hispanic voters vote cohesively in general

15:07:29  5   elections as he reports?

15:07:30  6        A.    Well, I mean, I considered it, but I just thought -- I

15:07:37  7   mean, I don't think his figures are correct.  I'll just be frank

15:07:41  8   with you.  I don't believe his analysis is correct.

15:07:43  9        Q.    You didn't offer some sort of analysis on your own?

15:07:47  10       A.    That's correct.

15:07:47  11       Q.    Did you do any analysis?

15:07:49  12       A.    I have not done any analysis.

15:07:51  13       Q.    So your belief that his figures are incorrect is just

15:07:55  14  speculation?

15:07:57  15       A.    I would not say it was just speculation, but my

15:08:00  16  decision was that I don't believe they're substantively wrong.

15:08:05  17  I believe the majority of Hispanics, the majority of Blacks vote

15:08:09  18  for Democratic candidates in Tarrant County and in SD-10.  I

15:08:12  19  believe the majority of Whites vote for Republican candidates.

15:08:15  20            So, I don't think there's anything substantively -- it

15:08:20  21  doesn't matter, in terms of what my point is here, so it's a

15:08:24  22  distraction.  But I will say, I'm not going to go on record as

15:08:28  23  saying I didn't contest that, because I think his reports --

15:08:31  24            (Speaking over each other).

15:08:31  25       Q.    But you didn't actually contest it, right?

KATHLEEN A. SUPNET, CSR

15:08:34  1        A.    What?

15:08:35  2        Q.    You did not actually contest it in your report?

15:08:39  3        A.    I'm not contesting it.  I don't think that's the issue

15:08:42  4   at hand.

15:08:43  5        Q.    Did you receive Dr. Barreto's data?

15:08:45  6        A.    Yes.

15:08:46  7        Q.    Did you undertake any effort to replicate his

15:08:49  8   analysis?

15:08:49  9        A.    No.  That was the decision I was making at that time.

15:09:00 10        Q.    Your primary dispute is that -- with Dr. Barreto, is

15:09:05 11   that partisan primary elections should be analyzed as well; is

15:09:10 12   that correct?

15:09:10 13        A.    At a minimum, yes.

15:09:12 14        Q.    Are voters, who participate in partisan primary

15:09:19 15   elections, a random sample of the voters who eventually

15:09:24 16   participate in the November general election?

15:09:26 17        A.    There's not a random sample of that or anything else.

15:09:29 18        Q.    I missed the first part.

15:09:30 19        A.    There is not a random sample of that or anything else.

15:09:34 20        Q.    It's a different set of voters in the primary than in

15:09:38 21   the general, correct?

15:09:38 22        A.    I would say typically the voters in the general -- in

15:09:41 23   the -- sorry -- in the primary are a subset of the voters in the

15:09:44 24   general, so there are not a lot of primary specialists, which a

15:09:48 25   term -- so voters sometimes -- we have voters that we call

15:09:51  1    presidential specialists; every four years they come out and

15:09:55  2    vote for President.  And if you're a

15:09:57  3    straight-party-ticket-state, they might vote a straight ticket,

15:09:57  4    but they're really there to vote for President.

15:10:00  5            There are not a lot of voters that come out and vote

15:10:03  6    in primaries and then don't vote in general elections.  So in

15:10:05  7    that sense, you could think of it as a kind of a subset.  On the

15:10:09  8    other hand, if you're starting from the broader set of voters in

15:10:12  9    a November general election, the voters of the Democratic

15:10:17  10   primary are not only -- not a representative sample.  They're

15:10:21  11   not even representative.  They're Democrats.

15:10:25  12       Q.   And it's a much smaller sample in the primary than it

15:10:29  13   is in the general election?

15:10:30  14       A.   It is not a sample.  It is -- it is --

15:10:33  15       Q.   A much more substance --

15:10:35  16       A.   -- universe of voters in the use Democratic primary.

15:10:38  17       Q.   And that is a much smaller number of voters in any

15:10:42  18   primary election, than it is in the generally election?

15:10:44  19       A.   Typically, yes.

15:10:48  20       Q.   Does the political science literature have any finding

15:10:52  21   on the characteristics of voters who participate in primary

15:10:55  22   elections versus general elections?

15:10:57  23       A.   So again, most primary voters do participate in

15:11:02  24   general elections, but the general electorate is typically less

15:11:07  25   partisan, less efficacious, less politicly motivated, probably

15:11:19  1    some other things as well.  That's my recollection.

15:11:24  2        Q.    So if the general election electorate is less

15:11:28  3    politically motivated, that would provide a better sense of

15:11:32  4    voters who might be voting along racial lines?

15:11:39  5        A.    Not necessarily.

15:11:40  6        Q.    Why not?

15:11:40  7        A.    I don't think racial and political are separate terms,

15:11:45  8    otherwise we wouldn't be talking about racial groups as a

15:11:51  9    unified political force in politics, if people do vote on the

15:11:56 10    basis of race.  So race and politics are not separate.

15:12:07 11        Q.    Would you also agree that primary voters are usually

15:12:11 12    somewhat older?

15:12:12 13        A.    That's typically the case, yes.

15:12:14 14        Q.    And then if you only focus on one party's primary,

15:12:24 15    you're not getting a representative sample of voters in the

15:12:27 16    district as a whole; is that right?

15:12:30 17        A.    That's correct.

15:12:37 18        Q.    And Republican and Democratic primary in Texas, does

15:12:41 19    the ballot clearly mark the partisan label such as Democratic or

15:12:46 20    Republican at the top of the ballot?

15:12:48 21        A.    In the primary?

15:12:49 22        Q.    Right.

15:12:50 23        A.    Not that I'm aware of.

15:12:52 24        Q.    The voter typically knows which primary they're voting

15:13:00 25    in though, correct?

15:13:00   1        A.    I would hope so.

15:13:03   2        Q.    Okay.  I'd like to take a look at the primary that you

15:13:11   3   studied.

15:13:11   4              Now to begin, you looked at one Democratic primary in

15:13:18   5   SD-10; is that correct?

15:13:18   6        A.    As far as I know, it's the openly racially contested

15:13:22   7   primary in the modern history of SD-10.

15:13:24   8        Q.    And that's the 2014 Democratic primary for SD-10

15:13:32   9   between the Anglo candidate Libby Wilson [sic] and Hispanic

15:13:35  10   candidate Mike Martinez; is that right?

15:13:37  11        A.    That's correct.

15:13:39  12        Q.    Now, at the bottom of page four, you say in the last

15:13:47  13   sentence:  An EI analysis of the same sort provided for the

15:13:52  14   general election by Dr. Barreto -- do you see that sentence?

15:13:56  15        A.    Yes.

15:13:56  16        Q.    What are you referring to there, when you say:  An EI

15:14:00  17   analysis?

15:14:01  18        A.    I'm talking about King's EI, which is the standard,

15:14:07  19   sort of broad umbrella for EI analysis.  All EI analysis

15:14:11  20   originates from King's original EI model, sometimes called the

15:14:17  21   two-by-two.  That's been updated most recent analysis, including

15:14:21  22   the most recent analysis that I've seen from Dr. Barreto, uses a

15:14:27  23   more up-to-date technique.  It's sometimes called R by C for

15:14:27  24   Multinomial Direchlet Bayesian Analysis.

15:14:36  25              (Court reporter asks for clarification).

15:14:36   1        A.    Multinomial Direchlet Bayesian Analysis.  That's --

15:14:46   2   that is the -- I would say maybe the highlighted EI method in

15:14:51   3   what Dr. Barreto calls the eiCompare.

15:14:55   4        Q.    My question was actually a little more basic than

15:14:57   5   that.  I'm trying to figure out which EI analysis you are

15:15:01   6   referring to.  What document or what analysis or who -- you

15:15:06   7   know, which EI analysis are you referring to there?

15:15:09   8        A.    Which of Dr. Barreto's?

15:15:10   9        Q.    No, which of yours.  You referred to EI analysis,

15:15:15   10  similar to the same sort of Dr. Barreto, and then you give the

15:15:19   11  results.  I'm just curious, when you say (mumbling) and not the

15:15:22   12  EI analysis, which one is that?

15:15:23   13       A.    That's the EI analysis of the 2014 primary that I'm

15:15:29   14  reporting in the paragraph.

15:15:30   15       Q.    Okay.  Maybe we'll circle back to this.

15:15:33   16             So, you report that Mike Martinez got 62 percent of

15:15:37   17  the Hispanic vote.  Do you see that on page five?

15:15:42   18       A.    Yes.

15:15:42   19       Q.    And Libby Willis received 69 percent of the Anglo

15:15:51   20  vote; is that right?

15:15:52   21       A.    Yes -- or -- just let me look back here -- yes.

15:15:58   22       Q.    And then you go on to show or report that Black voters

15:16:06   23  voted for Libby Willis by a margin of 61 to 39.  Do you see

15:16:11   24  that?

15:16:12   25       A.    Correct.

15:16:12  1        Q.    Where did you get this data?

15:16:14  2        A.    That's the result of an EI analysis.

15:16:18  3        Q.    Who provided you the EI analysis?

15:16:20  4        A.    So the EI analysis was performed, as is true for all

15:16:26  5    of my EI analysis, under my direction, supervised by Dr. Randy

15:16:36  6    Stevenson.

15:16:37  7        Q.    I think I heard you say:  As is true for all of your

15:16:43  8    EI analysis.  Do you recall in the 2017 case that you received

15:16:49  9    an EI analysis from the Attorney General's office and that was

15:16:53 10    the EI analysis that you used, the Texas Attorney General's

15:16:59 11    office?

15:17:01 12        A.    Again, there are a lot of Texas cases, but I know that

15:17:06 13    there -- maybe it was 2017.  I know I received analysis in the

15:17:12 14    past from the Attorney General's office that I haven't relied

15:17:16 15    on, but I don't know if that was analysis I have relied on.

15:17:19 16            So at some point in the set of the Texas cases,

15:17:26 17    Dr. Stevenson, working with me, developed a methodology and a

15:17:29 18    set of programs for doing EI analysis that he shared with the

15:17:33 19    technicians at the Attorney General's office, so they have the

15:17:38 20    ability to run the EIs in the same form and fashion that we are

15:17:41 21    running them.  So, you know, I don't -- this -- whatever was

15:17:49 22    going on in 2017, what's going on now is that the technicians in

15:17:58 23    the Attorney General's office can run an EI in exactly the form

15:18:02 24    that I want it run, because that's been set up by Dr. Stevenson.

15:18:07 25    Dr. Stevenson can run it.

15:18:10  1        In this particular -- for this particular analysis, I

15:18:12  2   think at the time I wrote the report, I may have been using a

15:18:19  3   run that came from the Attorney General's office, that was set

15:18:24  4   up -- we are in the process of -- it's a very large data process

15:18:28  5   to get ready for the trials that are coming up here in Texas, so

15:18:32  6   if we -- for a while, have been involved in the process of

15:18:34  7   building the data and programming capacity to do that.  And we

15:18:39  8   did that.  We do that kind of a type of election at a time and

15:18:42  9   we were -- we were not at the stage, yet, where we had the full

15:18:46 10   Senate election data set.

15:18:49 11        And so my recollection is that it was just quicker to

15:18:54 12   have -- to have that -- I think what ended up happening was that

15:19:02 13   Dr. Stevenson had that run with -- where the data was at that

15:19:06 14   time, which was the TLC data that the Attorney General's Office

15:19:12 15   had, rather than the data Dr. Stevenson had.

15:19:16 16        Subsequent to that, Dr. Stevenson got that data, and

15:19:21 17   while this has been run again, produces the same results, so I

15:19:25 18   was confident then, because I knew it was Dr. Stevenson code

15:19:30 19   that was being used, the TLC data.  I'm confident now, because

15:19:34 20   I've seen the replication of it.  Directly, it's the same

15:19:38 21   result.

15:19:38 22   Q.   Okay.  Who is the technician at the Texas Attorney

15:19:43 23   General's Office?  Who ran the EI analysis?

15:19:45 24   A.   I know it's in the technical office.  I don't know the

15:19:49 25   actual person that runs the analysis.

CROSS - DR. ALFORD                                             81

15:19:51   1        Q.    Do you know any of the names of the people in the
15:19:54   2   Texas Attorney General Office's technical office, who do run
15:19:58   3   these types of EI analyses?
15:20:00   4        A.    I now Mr. Falk is sort of -- to my knowledge,
15:20:03   5   supervises that group.  And I know there's a redistricter or a
15:20:09   6   GS person there, but there are other technical people in the
15:20:13   7   technical staff as well.
15:20:15   8        Q.    Do you know if any of these technicians have Ph.D.s?
15:20:19   9        A.    No idea.
15:20:20  10        Q.    You've never inquired to see if they have a Ph.D.?
15:20:24  11        A.    You know, I have never inquired, because you don't
15:20:27  12   need to have a Ph.D. to initiate an R. Program.  That's why we
15:20:33  13   wrote the program.
15:20:34  14        Q.    Do you know if they have any experience or training in
15:20:35  15   running ecological inference analysis?
15:20:39  16        A.    Again, you don't need to have experience in doing
15:20:41  17   that.  You would have to have some experience to doing that, if
15:20:43  18   you're going to write the programs to do it, but if you're going
15:20:47  19   to execute the programs, you don't need that experience.  They
15:20:52  20   might have, but I don't know.
15:20:52  21        Q.    But you haven't inquired?
15:20:54  22        A.    A decade or so ago when -- 15 years ago, the first
15:20:59  23   time I met with any of the technical people, I know there was a
15:21:03  24   mathematician there, who seemed to know a great deal about EI in
15:21:08  25   his mathematical underpinnings, I thought quite sophisticated.

15:21:12  1    I have no idea if he's still there or if he's the one involved

15:21:14  2    in doing it, but it's a very sophisticated technical staff.

15:21:18  3         Q.   Did you talk to anyone in the Attorney General

15:21:21  4    office's technical office about this EI anaylsis that you report

15:21:24  5    about in your report?

15:21:26  6         A.   No.

15:21:26  7         Q.   How did you receive it?

15:21:28  8         A.   I don't recall if I received it from the attorneys or

15:21:34  9    if I received it from Professor Stevenson.  I wasn't in

15:21:42  10   communication with the technical office over this.  That was

15:21:46  11   communication between Dr. Stevenson and the technical office.

15:21:50  12        Q.   So you don't know whether Dr. Stevenson had had any

15:22:02  13   involvement in running this analysis either?

15:22:04  14        A.   I think I've discussed what my understanding is of

15:22:07  15   what his involvement was.

15:22:08  16        Q.   Did you talk to him about whether he was involved?

15:22:12  17        A.   I talked to him about getting the analysis.  I tell

15:22:16  18   him what I wanted.  I said I want a standard R by C EI run on

15:22:22  19   the 2014 Democratic primary in SD-10, and I want it done now.

15:22:27  20   Because I made the decision, you know, that since there was a

15:22:31  21   racially contested primary, it would be useful illustrative.  He

15:22:37  22   said he would do it immediately.  His --

15:22:40  23             He then contacted me shortly after that, and said, you

15:22:43  24   know, we don't actually have the set of primary data, yet.  So

15:22:48  25   that data hasn't actually been put into our system.  He said,

CROSS - DR. ALFORD                                                      83

15:22:52  1    you know, I'll talk to Falk and see about either having him send

15:22:59  2    me the data or if they would just run it up there, just run my

15:23:04  3    code up there.  And then eventually I got the sheet, which is on

15:23:06  4    the bottom.  It says something about the Attorney General's

15:23:09  5    office, so I'm assuming that that was the decision.

15:23:11  6          The next time I communicated with Dr. Stevenson, he

15:23:15  7    indicated that he had subsequently gotten the data, rerun the

15:23:20  8    analysis himself on our system and tried a bunch of different --

15:23:26  9    ran a bunch of stress tests on it and got the same result.

15:23:29  10         Actually, the result was slightly less favorable to

15:23:32  11   Dr. Barreto's position than the one here, but I'm fine with this

15:23:37  12   one.

15:23:37  13     Q.    So it sounds like if we wanted to know how this

15:23:41  14   analysis came about, we'd at least need to talk to

15:23:46  15   Dr. Stevenson; is that fair?

15:23:46  16     A.    I wouldn't think so.

15:23:48  17     Q.    But you didn't conduct the analysis.

15:23:50  18     A.    It was conducted by Dr. Stevens, under my supervision,

15:23:54  19   running programs that he and I developed together, using

15:23:58  20   parameters I specified, data I specified.

15:24:02  21         Is there something you want to know about the details

15:24:04  22   about how that was run?  You know --

15:24:04  23     Q.    (Indiscernible) --

15:24:08  24     A.    -- Dr. Barreto would just say I ran eiCompare, which

15:24:11  25   if you've ever looked at it, you'll recognize eiCompare involves

KATHLEEN A. SUPNET, CSR

15:24:16   1    some 30 different possible statements, none of which he's

15:24:19   2    discussed in any detail, but if you want to know how R by C EI

15:24:21   3    runs and how we ran this, I'm happy to discuss it with you.

15:24:24   4        Q.   So just to back up a little bit, the 61 to 39 percent

15:24:31   5    figure you report for Black voters in the 2014 SD-10 Democratic

15:24:39   6    primary in favor of Libby Willis, in your report this comes from

15:24:43   7    the Texas Attorney General Office, not from Dr. Stevenson.

15:24:46   8        A.   Those numbers came from a printout that came in from

15:24:50   9    the Texas Attorney General's office.

15:24:51   10       Q.   Okay.  Can I have you turn --

15:24:53   11            MR. GABER:  Or Mr. Dunn, if you can bring up

15:24:57   12   Defendants' Exhibit 36.

15:25:31   13   BY MR. GABER:

15:25:31   14       Q.   Do you see that, Dr. Alford?

15:25:33   15       A.   Yes.

15:25:34   16       Q.   Is this the EI analysis that was the source of the

15:25:38   17   information you report for the 2014 Democratic primary in SD-10

15:25:43   18   in your expert report?

15:25:45   19       A.   I think it is.

15:25:47   20       Q.   Okay.  So on direct examination, when counsel asked

15:25:51   21   you about whether your analysis had come from this report from

15:25:57   22   the Attorney General's office, that was actually incorrect on

15:26:02   23   direct; is that fair?

15:26:03   24       A.   I don't think this is the report they were

15:26:06   25   referencing.  If it -- if I answered incorrectly, if I said they

15:26:10  1    were referencing some other report from the Attorney General's

15:26:13  2    office, I know Dr. Barreto referred to some report with multiple

15:26:17  3    elections, across multiple periods of time.  I don't know

15:26:21  4    exactly what this is.  I did not use it on my report and that's

15:26:25  5    exactly what I said on direct and...

15:26:26  6        Q.    But you did use this report, exhibit -- Defendants'

15:26:33  7    Exhibit 36?

15:26:33  8        A.    Yes.

15:26:33  9        Q.    And I see that there.  I see the -- it's reported

15:26:38  10   Libby Willis 61.1 percent and Mike Martinez 38.9 percent; is

15:26:45  11   that right?

15:26:45  12       A.    Yes.

15:26:47  13       Q.    And we see the date on the bottom.  This was run on

15:26:51  14   December 16th, 2021; is that right?

15:26:53  15       A.    Correct.

15:26:54  16       Q.    Do you see that date on the bottom right?

15:27:00  17       A.    Yes, I do.

15:27:01  18       Q.    And then it has the Office of the Attorney General,

15:27:04  19   State of Texas, in the lower left corner; is that right?

15:27:08  20       A.    That's correct.

15:27:09  21       Q.    Is there any way for someone to -- from this chart to

15:27:16  22   seek to replicate this analysis, if this is all they had?

15:27:20  23       A.    Sure.

15:27:21  24       Q.    And how would they do that from this piece of paper?

15:27:25  25       A.    Actually, they're way ahead of where I was with

15:27:29  1    Dr. Barreto's result.  I didn't get a piece of paper like this

15:27:32  2    from Dr. Barreto, did I?

15:27:33  3         Q.    You got this expert report that had the chart?

15:27:36  4         A.    No, there's no piece of paper like this.

15:27:40  5               My expert report contains an extract from this actual

15:27:43  6    EI printout.  His report contains tables that are extracts from

15:27:46  7    his actual EI reports, except we have no EI reports in the

15:27:50  8    record from Dr. Barreto.  So I could do -- I could redo his

15:27:53  9    analysis, but he would have a head start on me, because it's

15:27:56 10    very clear from this exactly what the analysis is.  It's more

15:27:59 11    than everything you need.

15:28:01 12               I can redo his --

15:28:02 13         Q.    Thank you.

15:28:02 14         A.    -- anaylsis and I don't even have his printout.

15:28:04 15         Q.    And when you say that you're referring to the primary

15:28:08 16    election, you didn't have an analysis of the primary election.

15:28:11 17    You had the analysis of the general elections from Dr. Barreto.

15:28:15 18         A.    Dr. Barreto has not provided -- if you look at what

15:28:18 19    you're referring to here, your referring to the actual output of

15:28:21 20    running an EI program on an election, the actual output.  That's

15:28:25 21    why you know the date it was run.  That's why you know all the

15:28:28 22    estimates.  That's how you know it's EI analysis.  There is

15:28:32 23    nothing in Dr. Barreto's report like this.  There is nothing in

15:28:36 24    Dr. Barreto's zip file disclosure like this.

15:28:38 25         Q.    You didn't take any of these complaints in your expert

15:28:41  1    report, did you?

15:28:42  2        A.    As I said, I had the opportunity if I wanted.  As a

15:28:48  3    competent EI analyst, I have the opportunity to rerun and

15:28:52  4    validate Dr. Barreto's analysis.  I don't believe that it would

15:28:57  5    have been validated.  I don't think it's substantially wrong and

15:29:01  6    I don't want to be down that rabbit hole.

15:29:03  7            I resent Dr. Barreto suggesting that given that he was

15:29:07  8    far ahead of where I would be, that he is simply unable to do

15:29:11  9    that, that is either not true or he is completely incompetent.

15:29:16  10   This is just not an issue here.  Competent analysts can use a

15:29:21  11   data set to do an EI.  If they have EI printout, they're even

15:29:21  12   better off.

15:29:24  13           I would love -- intend to insist going forward in

15:29:28  14   this -- as these cases go forward, insist on getting

15:29:32  15   Dr. Barreto's EI printouts, because typically in cases involved

15:29:35  16   with Dr. Barreto, I have not been able to replicate his results.

15:29:39  17   I cannot say that about any other expert.

15:29:41  18       Q.    And, Dr. Alford, you didn't try here, correct?

15:29:44  19       A.    I explained --

15:29:45  20       Q.    Yes or no?

15:29:46  21       A.    I did not.

15:29:47  22       Q.    Does this chart from the Attorney General's office

15:29:51  23   contain any confidence intervals?

15:30:01  24       A.    It does not.

15:30:01  25       Q.    And a confidence interval would be important,

15:30:04   1   generally, to determine the range of possible percentages, given

15:30:08   2   the known error in the data; is that fair?

15:30:11   3      A.   Very useful.

15:30:13   4      Q.   Did you ask for the confidence intervals from this

15:30:17   5   chart from the Attorney General's office?

15:30:20   6      A.   I did not.

15:30:25   7      Q.   Just so the record is clear, Dr. Stevenson is a

15:30:28   8   professor at Rice University; is that right?

15:30:32   9      A.   That's correct.

15:30:33  10      Q.   Dr. Randy Stevenson; is that correct?

15:30:34  11      A.   He's a professor of comparative politics and

15:30:36  12   methodology.

15:30:37  13      Q.   And so that -- and so that I have the sequence of

15:30:40  14   events right, the Attorney General's office gave this analysis

15:30:45  15   to Dr. Stevenson.  Did he give it to you then?

15:30:48  16      A.   As I say, I'm not exactly sure -- obviously, it was

15:30:54  17   produced there.  Where it went after that, I was not in direct

15:30:59  18   contact with them, so I did not initiate that.  I might have

15:31:04  19   initiated the request with Dr. Stevenson, and whether that form

15:31:08  20   that you've got here, whether that came directly to me or came

15:31:12  21   to me through Dr. Stevenson, I don't recall.

15:31:15  22      Q.   Did Dr. Stevenson write the expert report?

15:31:18  23      A.   Not a single word of it.

15:31:20  24      Q.   Who did?

15:31:21  25      A.   I do.

CROSS - DR. ALFORD                                                    89

15:31:27  1          THE COURT:  Mr. Gaber, we've been at is for about

15:31:30  2   two hours.

15:31:31  3          MR. GABER:  Take a break?

15:31:33  4          THE COURT:  Yes, sir.  Let's take a 15-minute recess.

15:31:36  5   We'll come back at 3:45.

15:31:40  6          COURTROOM SECURITY OFFICER:  All rise.

15:46:26  7          (Break at 3:31 p.m. to 3:46 p.m.).

15:46:26  8   BY MR. GABER:

15:46:28  9      Q.   Dr. Alford, earlier you mentioned that you had run

15:46:32  10   stress tests on Dr. Barreto's analysis.  Do you recall that?

15:46:35  11      A.   (No response).

15:46:38  12      Q.   You mentioned that you had run stress tests on

15:46:43  13   Dr. Barreto's anaylsis?  Do you recall testifying to that

15:46:44  14   effect?

15:46:44  15      A.   No.

15:46:44  16      Q.   Did you run stress tests on Dr. Barreto's analysis?

15:46:50  17      A.   I have not run Dr. Barreto's analysis.

15:46:53  18      Q.   Did you run stress tests on the Attorney General's

15:46:59  19   analysis?

15:46:59  20      A.   Yes.

15:47:00  21      Q.   How many?

15:47:00  22      A.   One.

15:47:02  23      Q.   And where is that stress test?  Do you still have it?

15:47:06  24   Do you have the results of it?

15:47:07  25      A.   I don't have the results of it.

KATHLEEN A. SUPNET, CSR

15:47:08   1       Q.   What happened to it?

15:47:10   2       A.   I can probably retrieve the results of it, but a

15:47:15   3   couple of things that you look at in an EI analysis.

15:47:18   4        So the main thing that you would do to see what might

15:47:24   5   happen in that sort of analysis is if you have the time to do

15:47:27   6   it, is to raise the iterations, so that when we say we're stress

15:47:35   7   testing it, we mean changing the seed and increasing the

15:47:39   8   iterations.  And typically that would either show no change or

15:47:43   9   it will show that it's sort of wandering, indicating that it may

15:47:49   10  not be a very solid result.  So as I said, we replicated the

15:47:53   11  analysis.

15:47:54   12       In the stress test part, we substantially increased

15:47:59   13  the number of iterations and we got a result that was both more

15:48:04   14  solid and showed a larger divergence in terms of support --

15:48:10   15  minority support between Blacks and Hispanics on that election.

15:48:17   16       So that's why I'm confident in these numbers, because

15:48:20   17  while I was not a part of this original analysis, I have since

15:48:25   18  both retrieved the data, rerun the original form and rerun a

15:48:31   19  much more stressful rigorous form, and the results are, if

15:48:35   20  anything, stronger for my position than what's here.

15:48:39   21       Q.   And is that data and analysis that you can produce in

15:48:45   22  this case?

15:48:48   23       A.   I have not produced it in this case, because I didn't

15:48:51   24  rely on a report or any subsequent analysis for the case.

15:48:56   25       Q.   But as you testified here today, you testified that it

15:48:58  1   bolsters your opinion, correct?

15:49:00  2       A.   That's correct.

15:49:02  3       Q.   And we don't have that stress test analysis; is that

15:49:07  4   right?

15:49:07  5       A.   I assume you don't.

15:49:10  6       Q.   What did Dr. Stevenson set the RHO value at for the

15:49:14  7   analysis.

15:49:15  8            MR. GABER:   And that's RHO for the court reporter.

15:49:18  9       A.   I would have to look back and see what our -- there

15:49:21  10  are whole series of values that we set, so I'd have to go back

15:49:24  11  to see what we're running at currently.

15:49:26  12      Q.   Do you have any sense of what it was?

15:49:28  13      A.   I don't.

15:49:29  14      Q.   How many simulations did Dr. Stevenson set?

15:49:34  15      A.   So that's what I would call iterations, but you could

15:49:38  16  call them simulations.

15:49:41  17           So people run anywhere from 500 to -- to quite a lot.

15:49:48  18  These -- this analysis that is produced here, I think was run

15:49:54  19  with, if I'm remembering correctly, maybe 10,000 iterations and

15:49:59  20  maybe a 10,000 burn-in.  So we sort of -- we typically push that

15:50:04  21  a little bit harder, sometimes up to a million iterations.  I

15:50:09  22  think when stress testing it, we ran 200,000 iterations, as well

15:50:14  23  as tuning, which is not -- this is something else you can do to

15:50:18  24  make that.  So it's -- if you tune first, it's -- the iterations

15:50:22  25  are more efficient.  So what we did in rerunning it was we tuned

15:50:28  1   first, I think ran the iterations at 200,000.

15:50:32  2        Q.   And I want to back up a little bit topically, and then

15:50:37  3   I'll come back.  I apologize for that.  I didn't want to lose

15:50:41  4   track of it.

15:50:42  5             You mentioned earlier that Dr. Collingwood, in a case

15:50:46  6   that you worked in recently, had analyzed only primary

15:50:49  7   elections.  Do you recall that?

15:50:51  8        A.   That's correct.

15:50:51  9        Q.   Are you referring to the *Johnson v. Wisconsin* case?

15:50:57  10       A.   Yes.

15:50:58  11            MR. GABER:  For the Courts' record, that's number

15:50:59  12   2021-AP-1450-OA, in the Wisconsin Supreme Court regarding state

15:51:08  13   redistricting.

15:51:08  14   BY MR. GABER:

15:51:10  15       Q.   Dr. Alford, do you know why Dr. Collingwood only

15:51:14  16   analyzed primary election results?

15:51:15  17       A.   He said that he only analyzed them because thought

15:51:20  18   those were the only things what were probative.

15:51:21  19       Q.   And full disclosure, I'm counsel on that case, and

15:51:24  20   Dr. Collingwood is expert for my client.

15:51:26  21            And is it your understanding that the Section 2 claim

15:51:30  22   in that case is about the Democratic primary and White voters

15:51:37  23   blocking the candidates of choice of Black voters in that

15:51:39  24   primary?

15:51:40  25       A.   I -- I -- I'm -- I don't think that's really the

15:51:44  1   central issue there.  Certainly, it's not a coalition case.

15:51:48  2       Q.   No, I guess what I'm saying is, do you understand the

15:51:51  3   Section 2 claim to be in that case?

15:51:59  4       A.   I would have to -- I -- I haven't seen the filing in

15:52:01  5   the case since I submitted my report in the case, so I would

15:52:05  6   have to look back.

15:52:06  7       Q.   And so when you mentioned that Dr. Collingwood was

15:52:10  8   limiting it to only primary elections, you weren't aware that

15:52:15  9   primary elections were the elections at issue in the case?

15:52:18 10       A.   It may well be.

15:52:20 11       Q.   You were an expert witness in that case.

15:52:29 12       A.   I wrote a report.

15:52:30 13       Q.   But you weren't aware that the primary election was

15:52:33 14   the election that's at issue?

15:52:35 15       A.   I'm involved in quite a number of similar cases,

15:52:40 16   currently, so I hesitate to talk about a particular one.

15:52:43 17       Q.   Turning back to the ecological inference report that

15:52:50 18   the state Attorney General ran, which is Defendants' Exhibit 36,

15:52:57 19   do you know -- excuse me -- do you know if this EI analysis

15:53:05 20   accounted for varying degrees of voter turnout?

15:53:08 21       A.   This is R by C analysis, so, yes.

15:53:12 22       Q.   And I guess what I mean by that, is turnout within the

15:53:16 23   Democratic primary -- within each precinct, did it account for

15:53:20 24   turnout by race?

15:53:22 25       A.   I guess I'm not sure I understand what you mean by

15:53:26   1   within precinct.  Within each precinct, it counted for turnout

15:53:30   2   by race.

15:53:30   3        Q.   Well, let's -- I want to get back to this, but I want

15:53:37   4   to move a bit more linearly with you to do that.

15:53:41   5             So, the spreadsheet that was sent -- there was an

15:53:52   6   Excel spreadsheet that was sent and that was represented as your

15:53:55   7   underlying data, does that sound right to you?

15:53:58   8        A.   Spreadsheet is the underlying data, yes.

15:54:01   9        Q.   Not for the Attorney General analysis that's in your

15:54:04  10   report, but for your later effort that you did; is that right?

15:54:09  11        A.   It's the same data.

15:54:12  12        Q.   How do you know that?

15:54:13  13        A.   Because they provided us with the data, and then we

15:54:18  14   did subsequent analysis, and it's the same rows, columns and

15:54:25  15   data.

15:54:25  16        Q.   But it's not actually the data that you used.  It's

15:54:29  17   not the Excel spreadsheet that you use to come up with this

15:54:32  18   report in your report, because you just used the printout from

15:54:37  19   the AG's office, right?

15:54:40  20        A.   I always use the printout.

15:54:42  21        Q.   Okay.

15:54:45  22        A.   Everybody uses the printout.

15:54:47  23        Q.   Everybody uses the printout.  What does that mean?

15:54:50  24        A.   So Dr. Barreto didn't get the numbers in his report

15:54:54  25   from the spreadsheets he gave me.  He got the number in his

CROSS - DR. ALFORD                                               95

15:54:55  1    reports from the printouts he didn't give me.

15:54:58  2         Q.   But he ran that report.  You didn't run this report.

15:55:01  3         A.   I don't know if Dr. Barreto ran it or not.

15:55:05  4              MR. GABER:  Mr. Dunn, could you please pull up the

15:55:09  5    spreadsheet that was sent by the State -- actually, first, the

15:55:14  6    code name PDF.

15:55:21  7    BY MR. GABER:

15:55:22  8         Q.   Now, you talked about this in your cross-examination,

15:55:24  9    that Dr. Barreto had one of his complaints about it, it didn't

15:55:27  10   list the candidates who were associated with the candidate one

15:55:32  11   field and the candidate 2 field, is this the code, both, that

15:55:35  12   you then subsequently provided us?

15:55:37  13        A.   Yes.

15:55:37  14        Q.   And candidate one is Libby Willis, do you see that?

15:55:41  15        A.   Yes.

15:55:42  16        Q.   And candidate two is Mike Martinez?

15:55:45  17        A.   Correct.

15:55:45  18        Q.   Is this the code book that you used to subsequently

15:55:49  19   run analysis?

15:55:51  20        A.   No.  We created the code book subsequent to running

15:55:55  21   the analysis.

15:55:55  22        Q.   Was that because plaintiffs had requested the data?

15:56:01  23        A.   No because they requested the code book.  We don't

15:56:04  24   have a code book so we created one.

15:56:07  25        Q.   Now, who won more votes in that primary election?

KATHLEEN A. SUPNET, CSR

15:56:12  1    A.    Libby Willis ran the primary, so I assume she got more

15:56:18  2  votes.

15:56:20  3        MR. GABER:   Mr. Dunn, can you pull up the spreadsheet

15:56:25  4  that was produced, please?

15:56:28  5  BY MR. GABER:

15:56:40  6    Q.    Dr. Alford, do you recognize this document?

15:56:42  7    A.    It looks as though it's the spreadsheet we were

15:56:51  8  talking about.

15:56:59  9    Q.    Do you know when this spreadsheet was created?

15:57:02  10    A.    I'm not sure I do recognize this spreadsheet.

15:57:23  11    Q.    Well, I can represent to you that this is the

15:57:26  12  spreadsheet that we were sent by your counsel last Saturday,

15:57:34  13  Friday or Saturday, represented the data that outlined your

15:57:37  14  analysis.  Does that seem right to you?

15:57:39  15    A.    It does not look like the spreadsheet that I have that

15:57:45  16  represents that data.  So there may have been -- the wrong

15:57:49  17  spreadsheet may have been sent, but I don't recognize this

15:57:54  18  spreadsheet that was used to produce these results.

15:57:56  19    Q.    What was different in the spreadsheet that you do

15:57:59  20  recognize?  What's triggering to think this isn't the right

15:58:03  21  spreadsheet?

15:58:04  22    A.    Well, first of all, the spreadsheet that I -- well, my

15:58:08  23  recollection is that the first thing in the spreadsheet is two

15:58:12  24  candidate columns that's followed by some VAP data followed by

15:58:19  25  CVAP data.  What I'm seeing here is some identifier information,

CROSS - DR. ALFORD                                          97

15:58:23  1    VTD-key district, then some CVAP, followed by the candidates,

15:58:30  2    followed by some CVAP, followed by Black and Hispanic and other.

15:58:37  3    I don't even know what those are.

15:58:39  4        Q.    Can you see the file name at the top, Dr. Alford?

15:58:44  5        A.    The what?

15:58:45  6        Q.    The file name?

15:58:47  7        A.    Yes.

15:58:47  8        Q.    Can you read that for the record, please?

15:58:49  9        A.    SD-10, underscore; it looks like dem-something, and

15:59:00  10   2014, I guess, demo, like demographics, maybe, in 2014 dem

15:59:07  11   primary, paren., 2.XLSX.

15:59:15  12           MR. GABER:  Mr. Dunn, could you go to the file

15:59:19  13   properties of this spreadsheet?

15:59:21  14   BY MR. GABER:

15:59:22  15       Q.    Dr. Alford, do you see it says labs modified by Randy.

15:59:27  16   Do you understand that to be Randy Stevenson?

15:59:29  17       A.    I would assume so.

15:59:30  18       Q.    And the last modified date is January 20th, 2022.

15:59:34  19   Does that look right to you?

15:59:39  20       A.    Yes.

15:59:40  21       Q.    When was the analysis that you actually directed to be

15:59:47  22   run using not this data, I guess, but some other set of data,

15:59:51  23   when was that done?

15:59:52  24       A.    Prior to the report, so it would've been well prior to

15:59:56  25   1-20.

15:59:58  1       Q.    All right.  So, this appears to you not to be data

16:00:06  2    that relates to your analysis?

16:00:09  3       A.    It may be the data, but it -- at least in my

16:00:12  4    recollection, it's organized differently than the spreadsheet in

16:00:19  5    which I saw the data.

16:00:20  6       Q.    Okay.

16:00:22  7             MR. GABER:  Mr. Dunn, can you pull up the email that

16:00:26  8    transmitted this data?

16:00:27  9             And we'll offer this as -- the email as Plaintiffs'

16:00:36  10   Exhibit 106.

16:00:47  11   BY MR. GABER:

16:00:48  12      Q.    The original email was sent Friday January 1st, 2022,

16:00:54  13   from Mr. Sweeten.  And it says, Mark add Chad, please find data

16:00:58  14   relating to the EI analysis related to Dr. Alford.  Do you see

16:01:02  15   that?

16:01:02  16      A.    Correct.

16:01:02  17      Q.    Do you know when this doctor -- the expert disclosure

16:01:08  18   deadline was in this case?

16:01:09  19      A.    I don't.

16:01:11  20      Q.    And it's your testimony, now, that you don't think

16:01:17  21   this is the data.  You don't recognize it, at least.

16:01:20  22      A.    I -- it looks like -- I don't know if it's the data or

16:01:24  23   not.  I don't recognize the form of the spreadsheet.  It may be

16:01:27  24   exactly the same date.  I don't know.

16:01:31  25            MR. GABER:  Mr. Dunn, go back to the spreadsheet,

16:01:34  1    please.

16:01:35  2    BY MR. GABER:

16:01:36  3        Q.   And if you would please --

16:01:37  4             MR. GABER:   I'm going to ask Mr. Dunn to sort or -- to

16:01:43  5    sort --

16:01:43  6             JUDGE GUADERRAMA:   Give me a second.

16:01:43  7             Thank you.

16:02:05  8             MR. GABER:   If you could please sort column F, the VTD

16:02:10  9    Black CVAP column program from largest to smallest?

16:02:10  10   BY MR. GABER:

16:02:31  11       Q.   So what I've done, Dr. Alford, is have the Excel

16:02:38  12   spreadsheet sorted, so the precinct with the largest number of

16:02:42  13   Black population are shown at the top of the spreadsheet, so we

16:02:47  14   can take a look at what this data shows.  Do you understand

16:02:51  15   that?

16:02:51  16       A.   Yes.

16:02:51  17       Q.   Now, if you recall the code book identified candidate

16:02:56  18   one as Libby Willis and candidate two as Mike Martinez?

16:03:01  19       A.   Correct.

16:03:01  20       Q.   Does that seem right?

16:03:04  21             Now if you look -- and the data that you reported was

16:03:07  22   that Black voters supported Libby Willis by a margin of

16:03:15  23   61 percent to 39 percent?

16:03:17  24       A.   That's correct.

16:03:17  25       Q.   That's a 20-point margin, right?

CROSS - DR. ALFORD                                                      100

16:03:21   1        A.    Correct.

16:03:21   2        Q.    If you look at the precinct on here that's reported as

16:03:26   3   having the largest Black population, which is now in row two,

16:03:34   4   you see that that has a Black CVAP of 2,640, out of total CVAP

16:03:42   5   out of 3,480.  Do you see that?

16:03:44   6        A.    Yes.

16:03:45   7        Q.    And that's a majority Black precinct, right?

16:03:48   8        A.    Correct.

16:03:50   9        Q.    And candidate one, that you identified as Libby

16:03:54  10   Wilson [sic]; is that right?

16:03:56  11        A.    I think that's correct.

16:03:57  12        Q.    And you identified candidate two as Mike Martinez?

16:04:01  13        A.    Correct.

16:04:01  14        Q.    Who carried this precinct?

16:04:03  15        A.    That district was carried by candidate two.

16:04:06  16        Q.    Who is that?

16:04:07  17        A.    I don't know.  Based on the code book it would be --

16:04:12  18   suggest it might be Mike Martinez, but I -- again, this is not

16:04:16  19   the form I saw the data in.  Maybe the candidates are reversed

16:04:21  20   here.  I don't know.

16:04:22  21        Q.    So you're saying that the candidates are reversed?

16:04:24  22        A.    It's very possible.

16:04:26  23        Q.    In which case, it would not really be all that easy to

16:04:29  24   go and compare and look up to see which precinct is which and

16:04:34  25   what candidate is which?

16:04:35  1        A.    What do you mean?

16:04:36  2        Q.    Well, one of your criticisms of Dr. Alford [sic], was

16:04:39  3   that he didn't need the code book.  He could just look at this

16:04:44  4   spreadsheet and determine what this data was.

16:04:47  5        A.    Actually criticism with Dr. Barreto though.

16:04:50  6        Q.    Did I say Dr. Alford?

16:04:52  7        A.    I should be critical of myself, too.  It's only fair.

16:04:55  8              Yeah, this is not handled the way it should be

16:04:59  9   handled.  That should be unambiguous.  On the other hand, if you

16:05:03  10  get the candidates reversed and run the analysis, you'll get the

16:05:05  11  same exact same results, except they all would be flipped.  And

16:05:08  12  you look at them say, wait a minute.  That looks like the exact

16:05:11  13  same numbers out to ten decimal points, but reversed.  What

16:05:13  14  could that mean?  It can only mean one thing; the candidates are

16:05:16  15  reversed.

16:05:16  16       Q.    What is --

16:05:16  17       A.    You can't be mislead by any of this.

16:05:19  18       Q.    So, 61 percent of 39 percent is the margin that you

16:05:26  19  performed for Black voters for Willis versus Martinez?

16:05:33  20       A.    Correct.

16:05:34  21       Q.    Looking at the -- so let's assume that the candidate

16:05:39  22  one and candidate two, that that's flipped and that candidate

16:05:43  23  one is actually Martinez and candidate two is Willis.  Looking

16:05:48  24  at the precinct with the largest number of Black votes, what do

16:05:54  25  you -- do you happen to know what that margin of victory is?

16:05:58   1        A.    (No response).

16:06:11   2        Q.    Do you have a calculator or some device that --

16:06:14   3        A.    They do not allow me to bring --

16:06:16   4        Q.    Well, I'm not going to even ask that.  But I will

16:06:17   5   represent to that I've just calculated it and that's

16:06:20   6   54.9 percent, in the precinct with the largest number of voters,

16:06:24   7   victory for candidate two, which we don't know who that is?

16:06:29   8        A.    That's -- this is a good example why we run an

16:06:35   9   incredibly complicated EI program to do this analysis.  It tells

16:06:38  10   you exactly nothing.  I mean it is the largest number of Black

16:06:40  11   voters, but there 3,480 people in the precinct.  The rest of

16:06:44  12   those voters are not Black voters.  The election -- matching the

16:06:48  13   election result up with the percent Black, if that's all that

16:06:50  14   was, I would not have a job.

16:06:51  15        Q.    Well, I guess I'm just trying to get a sense of, you

16:06:54  16   know, how sure you are -- well, one we don't know that this is

16:06:58  17   the right spreadsheet, right?

16:07:02  18        A.    I -- I don't know if it's -- I can't, on the basis of

16:07:06  19   what we're doing here.  We could do it all day and I couldn't

16:07:09  20   tell you whether this is the right spreadsheet or whether the

16:07:11  21   candidates are labeled right.  I can tell you -- I can certainly

16:07:15  22   can check and see if this is the right data, just put in a

16:07:18  23   different order that I had see.  If it is, then I can tell you

16:07:21  24   that no matter which candidate you run as one and two, you'll

16:07:25  25   get identical results that are either these results or the

16:07:27   1   exactly flipped results.

16:07:28   2           And again, if you could tell by summing up the

16:07:30   3   candidates that the code book is wrong, then I guess you figured

16:07:34   4   it out.  I think Dr. Barreto could figure it out, too.

16:07:38   5           So, if it's confusion and I am responsible for it,

16:07:41   6   then that's self-criticism.  That shouldn't be the case.  On the

16:07:45   7   other hand, there's a lot being made out of nothing here.

16:07:50   8       Q.   That's your opinion.

16:07:52   9           Okay.  So --

16:07:59  10           MR. GABER:  Mr. Dunn, if you could open up the second

16:08:01  11   version of this spreadsheet.  And if we could reverse -- and

16:08:20  12   this is column...

16:08:36  13   BY MR. GABER:

16:08:37  14       Q.   Okay.  Dr. Alford -- and this gets back to the

16:08:41  15   question I was asking about you turnout in the primary.  I want

16:08:44  16   to get some clarification on this.  And so what we've done is we

16:08:49  17   have sorted column D of the spreadsheet.  That's the column that

16:08:55  18   reports the total CVAP in the precinct.  And we've sorted that

16:09:00  19   from largest to smallest.  Do you see that?

16:09:02  20       A.   Yes.

16:09:03  21       Q.   Now, and let's take the first one that's listed.

16:09:10  22           Do you see that the CVAP and this VTD, which is

16:09:17  23   VTD7616 in this key.  The total CVAP is 5,365.  Do I have that

16:09:24  24   right?

16:09:24  25       A.   Yes.

16:09:25  1      Q.    And the Anglo total CVAP is 3,110; is that right?

16:09:33  2      A.    That's correct.

16:09:33  3      Q.    Now, does it look to you that there were 60 votes for

16:09:41  4    candidate one in this precinct and 83 votes for candidate two?

16:09:45  5      A.    Yes.

16:09:45  6      Q.    Now this is a majority-Anglo precinct; is that right?

16:09:51  7      A.    That's correct.

16:09:52  8      Q.    And SD-10, is it your assessment that Anglo voters

16:10:03  9    prefer Republican candidates?

16:10:06  10      A.    I would think so, yes.

16:10:07  11      Q.    And so -- and this is a, you know, given 5,365 CVAP,

16:10:15  12    that's, what, 143 people voted in that primary in that precinct?

16:10:20  13      A.    Correct.

16:10:21  14      Q.    Would you expect that that 143 people to be

16:10:29  15    representative of the overall demographics of that precinct?

16:10:35  16      A.    No.

16:10:36  17      Q.    How would it be different?

16:10:37  18      A.    That's Democratic primary, so it will be the majority

16:10:40  19    of -- presumedly the majority of Whites in SD-10 won't be voting

16:10:44  20    in the Democratic primary.  They'll be voting in the Republican

16:10:48  21    primary.  So we learned something about how White Democrats

16:10:51  22    vote, but will learn very little about how Whites in general

16:10:55  23    vote.  On the other side of that, presumedly the majority of

16:11:00  24    Blacks that participate in a primary, will be participating in

16:11:05  25    the Democratic primary, so we'll get pretty good information

16:11:06  1   about how Blacks vote, probably fairly good, maybe not quite as

16:11:09  2   good about Hispanics, because Hispanics tend to split more

16:11:15  3   Republican than do Blacks.  So I would say the primaries -- it's

16:11:20  4   mostly useful to understanding behavior of Black and Hispanic

16:11:25  5   voters in the Democratic primary, less useful understanding

16:11:28  6   White voters in SD-10.

16:11:32  7       Q.   So even though this is a majority-Anglo precinct, it's

16:11:38  8   quite likely that the voters, who are voting in this precinct in

16:11:42  9   this election, are either majority-Black or majority-Hispanic or

16:11:46  10  some combination of both; is that fair?

16:11:50  11      A.   I don't know what you mean by quite likely.  If you

16:11:54  12  mean is it quite possible?  It's possible.

16:11:57  13      Q.   Well, if it's a majority-Anglo precinct and 5,360

16:12:04  14  people and 140 people show up in the primary, do you agree it's

16:12:11  15  likely that the primary demographic makeup in that precinct is

16:12:16  16  substantially more minority than the precinct itself?

16:12:21  17      A.   I would expect it to be substantially more minority.

16:12:24  18  But in terms of who these -- who this handful of voters are, as

16:12:28  19  you can see from those numbers, they could easily, even with

16:12:32  20  very low levels of turnout, they could easily be all Anglo, all

16:12:36  21  Black, all Hispanic or any combination in between.

16:12:39  22      Q.   Well, not quite easily, right?  I mean it's a

16:12:41  23  Democratic primary, as you just said.  The likelihood is that

16:12:45  24  the minority number overrepresents the minority number in the

16:12:50  25  precinct itself?

CROSS - DR. ALFORD                                                106

16:12:51    1        A.    That doesn't -- it's true in the aggregate, but isn't

16:12:55    2    necessarily true at the precinct level.  There are lots of --

16:12:57    3    there are lots of precincts where you -- I mean remember that if

16:13:01    4    you assume that 20 percent of eligible Whites are Democrats, our

16:13:08    5    Anglos CVAP is 3,110.  So 20 percent of that is a lot of people,

16:13:14    6    more than enough to make up this whole -- this whole turnout.

16:13:19    7        So, the question that would have -- a particular

16:13:21    8    precinct is like, is part of the reason why you have multiple

16:13:26    9    precincts analyzed.  In a particular precinct, it's not

16:13:30   10    inconceivable that this is, in fact, all Anglo or all Black or

16:13:35   11    all Hispanic.

16:13:36   12        Q.    Now if he we were to group all of the majority-Anglo

16:13:42   13    precincts, so we're not just looking at one, would it be the

16:13:45   14    case that it is substantially likely that the minority

16:13:50   15    population in those precincts exceeds the -- by quite a bit, the

16:13:57   16    minority total of population in the precinct itself.  And I

16:14:01   17    meant to say, the minority total participation in the primary

16:14:07   18    exceeds by a substantial amount the minority population in the

16:14:11   19    precinct.

16:14:12   20        A.    I think that's possible.  I guess I'm not

16:14:17   21    understanding.  So we're -- you're talking about turnout.

16:14:22   22    Turnout it built into the R by C models, where it's actively

16:14:28   23    estimating these differences, and looking at them not by lumping

16:14:33   24    together a few precincts, but by actually looking at the

16:14:36   25    curvilinear relationship to turnout by group across all of these

16:14:41  1    precincts and adjusting for that.

16:14:43  2              And we are starting with CVAP, so I would like to

16:14:46  3    point out that Dr. Barreto's analysis uses VAP, not CVAP, which

16:14:51  4    means, among other things, clearly, his Hispanic estimates are

16:14:55  5    wrong, in ways very similar to what you're talking about --

16:14:55  6         Q.   Okay.  But --

16:14:56  7         A.   -- but he's starting on an even further, even more

16:14:59  8    remote number.  He's got a bunch of people --

16:14:59  9         Q.   Dr. Alford?

16:15:00  10        A.   -- who aren't even eligible.

16:15:02  11        Q.   Did you -- do you know if the technician, who ran this

16:15:08  12   model, adjusted by race in the precinct for turnout?

16:15:13  13        A.   We don't adjust for turnout.  Okay?  So there's a much

16:15:21  14   older procedure that I -- maybe is what you're referring to,

16:15:24  15   which is Goodman's Double Regression, where you estimate

16:15:29  16   turnout, adjust for turnout, estimate vote direction and then

16:15:32  17   those estimates are mathematically combined.  It's not a

16:15:36  18   technique that's used anymore.

16:15:38  19             We don't adjust for turnout in that form.  We -- the

16:15:42  20   model incorporates turnout, because it's not just estimating

16:15:46  21   voting for the different candidates.  It's also estimating not

16:15:50  22   voting for any of the candidates.

16:15:53  23        Q.   So is it your testimony that the model incorporates

16:15:57  24   the turnout by race that's in the precinct?

16:16:02  25        A.   Because the analysis is trying to understand who

16:16:06   1   people voted for by race.

16:16:09   2          So if we do -- for example, if this is a two-way race,

16:16:15   3   if you wanted to, you could run two by two EI, something

16:16:20   4   Dr. Barreto might do, for example, that would be wrong.  And

16:16:24   5   that would be wrong.  Because if you look at the first table in

16:16:27   6   the very first book by Professor King about EI, he pointed out

16:16:32   7   exactly this problem.

16:16:32   8          If you don't know the actual race of the voters, like

16:16:36   9   in Georgia, when we do this analysis, we know the actual race of

16:16:39  10   the people who showed up in the Democratic primary, because

16:16:43  11   they're registered by race, party, and there's official record

16:16:46  12   of whether they came in and turned in a ballot.  So we don't

16:16:50  13   have this issue.

16:16:52  14          Everywhere else, like Texas, where we don't have

16:16:55  15   registration by race, we have to use some other eligible number

16:16:58  16   to get to that.  The eligible number closest to the real number

16:17:01  17   is the CVAP.  That's why we use CVAP not VAP.  So using that

16:17:05  18   CVAP number and putting it into the model, if you just put in

16:17:09  19   the two candidates, you'll have all of the issues you're talking

16:17:13  20   about.  But that's not what we're trying to understand.

16:17:16  21          What we're modeling is given the choice of these two

16:17:17  22   candidates or not voting, what did individuals do and how did

16:17:22  23   those decisions play out across all the racial categories.  That

16:17:26  24   means that the decision, when we model what happened in this

16:17:29  25   race with regard to the voters, who actually chose Libby

16:17:34  1   Wilson [sic] or Mark Martinez, we also have an option for those

16:17:39  2   citizens of voting age population to have voted for nobody, that

16:17:43  3   is to have not participate or to have rolled off.

16:17:46  4        So when that's being estimated, inherent in that

16:17:51  5   estimation is not just what is the racial groups favoritism

16:17:54  6   toward these two candidates, but sitting off to the side it's

16:17:58  7   estimating the proportion that don't favor either of the

16:18:01  8   candidates and don't participate, that's the appropriate way,

16:18:04  9   and the only way to incorporate that information and still have

16:18:08 10   valid statistical properties.  That's what we do here.

16:18:12 11        It's a complicated procedure.  It takes a lot of

16:18:17 12   computer horsepower.  It results in things that the -- it --

16:18:19 13   results like these printouts, that you can say are the best

16:18:21 14   estimates that can be made of what is an inherently unknown

16:18:24 15   property.

16:18:25 16        You can't get at it better by doing extreme precinct

16:18:30 17   analysis or sorting spreadsheets or we would be back where we

16:18:34 18   were 40 years ago.

16:18:35 19   Q.   I'm certainly not trained to do this.

16:18:37 20        Did -- and I noticed you said that it was complicated.

16:18:41 21   It's the case, right, that you don't know the training or

16:18:44 22   expertise of the folks who actually ran the EI analysis that is

16:18:49 23   in the report?

16:18:50 24   A.   But you claim you don't know how to do this?  Give me

16:18:54 25   five minutes and I can employ you to run the EI analysis.

CROSS - DR. ALFORD                                                    110

16:18:59   1   Because running the analysis in the sense of executing the R

16:19:03   2   program is not complicated.  That's part of the reason why

16:19:05   3   Barreto and Collingwood developed eiCompare, so people can do it

16:19:08   4   without understanding EI.

16:19:10   5           Trying to understand what is EI is doing is

16:19:13   6   complicated, but actually running it in our program is more

16:19:15   7   complicated than pointing it at the right data set.

16:19:19   8       Q.   In the primary model for 2014, did you account for the

16:19:23   9   race of the voters in the primary?

16:19:25  10       A.   Account for the race of the voters?

16:19:27  11       Q.   Uh-huh.

16:19:29  12       A.   I'm not sure what you mean.

16:19:30  13       Q.   Did you do a Spanish surname analysis?

16:19:34  14       A.   No.  There's no -- there is no Spanish surname

16:19:38  15   analysis here.  There's CVAP.

16:19:40  16       Q.   And did you account for the race of the people who

16:19:43  17   actually voted in a precinct in the primary?

16:19:47  18       A.   We are predicting, through the EI, just as we're

16:19:51  19   predicting a vote direction, we're predicting who votes by race,

16:19:54  20   by precinct.

16:19:56  21       Q.   And that prediction is based on the overall

16:20:00  22   demographics of that precinct?

16:20:03  23       A.   It's based upon the CVAP across the precincts, yes.

16:20:06  24       Q.   Right.  So -- and this is my point.  If you have a

16:20:10  25   precinct that overall is 55 percent Anglo, but the actual voter

16:20:17  1  participation in the precinct is, say, 60 percent Black, that --

16:20:22  2  did you account for that difference within a precinct in the

16:20:26  3  analysis?

16:20:30  4      A.   If -- if that is a precinct anomaly, in the sense that

16:20:35  5  it's not like the pattern of general pattern of the proportion

16:20:39  6  of Blacks turning out in a nonlinear fashion across the

16:20:44  7  precincts, then nothing can account for that.

16:20:47  8      Q.   What about in the case of a non-anomaly?  So, we know

16:20:51  9  that SD-10 and Anglo precincts is that that Anglo voters in

16:20:56  10  SD-10 prefer Anglo candidates, right?

16:20:59  11     A.   What do you mean we know that?

16:20:59  12     Q.   Well, is --

16:21:01  13     A.   Through the EI, yes, but again you want to talk about

16:21:03  14  what the EI tells you, compare the VAP to the proportion of

16:21:07  15  population in the general election.  In your sense, I can give

16:21:09  16  you the -- we can create the same precinct example, which is the

16:21:12  17  general election.  We don't know that at all.

16:21:14  18     Q.   Okay.  So my -- and maybe I was not precise enough.

16:21:16  19          It's your opinion that the Anglo voters in SD-10

16:21:21  20  prefer Republican candidates?

16:21:24  21     A.   Based on the EI analysis, yes.

16:21:25  22     Q.   Do you have any reason to doubt that's the case?

16:21:28  23     A.   I don't have any reason to doubt that it's the case.

16:21:32  24  But the analysis you're talking about doing right now might make

16:21:35  25  you doubt it, because VAP is a long way from eligible

16:21:39   1   population.  Many of this precincts, the VAP estimate for

16:21:44   2   Hispanics is more than -- was more -- well more than twice the

16:21:46   3   actual eligible population, both because Hispanics are younger

16:21:50   4   and because they're more likely to be citizens.

16:21:53   5           So in terms of what we're looking at here for the

16:21:56   6   general election analysis Dr. Barreto did, the problems you are

16:21:59   7   talking about here are inherent and ecological inference.  We

16:22:01   8   can't escape them, because we don't know about the individual

16:22:05   9   voters in Texas.  But they are as large or more large, larger

16:22:10  10   than Dr. Barreto's VAP analysis of the generals, as they are

16:22:14  11   here in the primary.  But in general --

16:22:19  12           (Speaking simultaneously).

16:22:19  13       Q.    Dr. Alford, this is CVAP, right?

16:22:22  14       A.    What?

16:22:22  15       Q.    This is CVAP that's in here, right?

16:22:23  16       A.    This is CVAP.

16:22:23  17       Q.    Okay.  So that addresses the VAP issue you're talking,

16:22:28  18   right, this based on eligible voters?

16:22:29  19       A.    This is eligible voters, right.

16:22:31  20           Dr. Barreto's analysis is based on VAP, not eligible

16:22:34  21   voters, and that among other reasons, that means his Hispanic

16:22:39  22   estimates in the general election are certainly an error.  I

16:22:43  23   don't -- but again, my belief, based on my confidence in EI, is

16:22:47  24   that with Dr. Barreto running it with VAP instead of CVAP, I

16:22:52  25   still believe that, substantively, those are producing the right

16:22:56   1   estimates.

16:22:56   2          What you're talking about here like within a

16:22:58   3   particular precinct what could be happening, what you're getting

16:23:02   4   to is what is -- is what is the bounds part of an EI analysis.

16:23:05   5   And the fact is that whether you're using VAP or CVAP, you

16:23:08   6   seldom get any legitimate bounds information out of EI in large

16:23:13   7   precincts, so that's what we're seeing here.

16:23:17   8       Q.   I'm not sure I quite got an answer to my question,

16:23:20   9   which is whether or not the model accounts for the possibility

16:23:23  10   that across the district, in Anglo-majority precincts, the

16:23:31  11   electorate in the primary is actually majority-minority?

16:23:33  12       A.   Oh, yes, certainly does.

16:23:34  13       Q.   And how so?

16:23:35  14       A.   Because if it's the case that across the board in

16:23:40  15   these precincts the majority of turnout is minority turnout,

16:23:44  16   then what you'll see is that -- I mean for that to be true, it

16:23:48  17   means that Anglo turnout must be very, very much lower than

16:23:52  18   minority turnout, right, given the eligible population.

16:23:55  19       Q.   Right.

16:23:56  20       A.   And then what you see as you go -- again, as you go

16:23:58  21   across from all Anglo precincts to all minority precincts is

16:24:02  22   what you'll see is turnout will be very high in the all-minority

16:24:05  23   precincts and it will be almost nonexistent in the all-Anglo

16:24:09  24   precincts.  That happens to not be true, but if it was true,

16:24:12  25   that's what we would be modeling.  It will take advantage of the

16:24:15   1    fact that if you're correct, that Anglos are turning out at

16:24:18   2    really, really low levels, then that'll be disclosed when you

16:24:20   3    go, for example, to the first all-Anglo precinct and compare

16:24:24   4    that to the most -- you know that would be the extreme precinct

16:24:27   5    analysis.  But again, that's an analog for what it's doing.

16:24:31   6         Q.   Now, this isn't something that you disclosed in your

16:24:33   7    report, right, that there was -- that you did some analysis that

16:24:34   8    had race level voter estimates in your model.

16:24:41   9         A.   Again, if you're talking about do I have the racial --

16:24:47   10   do I have the racial self-identification of the voters in a

16:24:49   11   primary in Texas, I don't.  Nobody does.  I have the CVAP data,

16:24:54   12   which is a better measure available than the VAP data.

16:24:58   13        And when I model that across a series of precincts, if

16:25:02   14   you're confident that when Dr. Barreto models it, he can show

16:25:06   15   that Anglos are more likely to vote Republican, then you also

16:25:08   16   need to be confident that with a better measure like CVAP, that

16:25:12   17   when we estimate it across these precincts, we can account for

16:25:15   18   the fact that there are turnout differences, just as there are

16:25:18   19   in the general.  Okay.  This is either you accept the EI is

16:25:21   20   doing something here or you just have to dismiss the whole

16:25:24   21   project.

16:25:27   22        This -- there are many questions about how well we're

16:25:30   23   answering ecological inference questions, but there's probably

16:25:32   24   not an area in the social sciences, where there's a more broad

16:25:36   25   agreement and broad acceptance that we're doing the best we can

16:25:40  1    do, and that the results we get, both because they replicate

16:25:43  2    from expert to expert and because they replicate.

16:25:46  3         This is not the first time somebody ran an EI on a

16:25:49  4    general election or primary in the State of Texas, and they

16:25:52  5    produce results that over time, over case, over geography,

16:25:56  6    reenforce our certainty that we are actually providing the Court

16:25:59  7    with some useful insight, despite all of the limitations of

16:26:03  8    ecological inference that you correctly are alluding to.

16:26:08  9         Q.   Now I want to move on beyond the -- or I guess -- so

16:26:12  10   after all of the this, after the data pickup, you're saying that

16:26:18  11   you think this is a good estimate, this 61 to 39 for the Black

16:26:22  12   vote for Libby Wilson [sic]?

16:26:24  13        A.   Yes.

16:26:24  14        Q.   And what is the confidence interval of that?

16:26:27  15        A.   Off the top of my head, I don't know what the

16:26:30  16   confidence interval is.

16:26:30  17        Q.   Have you ever known?

16:26:31  18        A.   I'm sure that I saw it, because it's in the -- in

16:26:34  19   the -- when we do the analysis, it kicks out 95 percent

16:26:38  20   confidence interval.

16:26:38  21        Q.   This is the analysis, the second analysis that

16:26:41  22   happened sometime in January?

16:26:44  23        A.   Correct.

16:26:47  24        Q.   Now, on page five of your report, you also talk

16:26:54  25   about -- well, let's see.  It's not page five.  I apologize.

16:26:59   1          Actually, I want to stay on the primaries for a

16:27:03   2   second.  Did you -- so this is the only primary you analyzed in

16:27:06   3   SD-10, correct?

16:27:06   4          A.   Correct.

16:27:07   5          Q.   Did you analyze any other primary elections in Tarrant

16:27:11   6   County?

16:27:11   7          A.   No.

16:27:12   8          Q.   Why not?

16:27:13   9          A.   I initially wasn't going to analyze this one.  It was

16:27:20  10   a last minute decision, because I thought -- even though I don't

16:27:22  11   think it needs to be addressed.  There's -- this is simply not

16:27:25  12   something that's in question on this particular issue, whether

16:27:28  13   in the State of Texas, in Tarrant County, in the Dallas area,

16:27:32  14   Blacks, Hispanics and Asians vote together in a coalition

16:27:36  15   sufficient to satisfy *Gingles*' one.  It's just simply not a

16:27:40  16   question anymore.

16:27:40  17          So the issue is whether SD-10 is some unicorn in which

16:27:44  18   that's true, and then it's up to you guys to show that's it

16:27:47  19   true.  And I see Dr. Barreto not even attempting to do that.  So

16:27:51  20   I'm not here to -- you know, it's just not -- at this stage in

16:27:54  21   this proceeding in the big trial, where we all get a year to do

16:27:58  22   our stuff, all of that's going to be done and done in detail.

16:28:00  23          But, no, I don't think it was necessary here.  I don't

16:28:03  24   think this primary is necessary.  I think you can erase this

16:28:06  25   entire primary from history and you'll have exactly the same

16:28:11  1   situation in Dallas/Fort Worth, which is the current situation.

16:28:14  2   The current situation in SD-33, which is a miniature of the 10

16:28:19  3   that you're talking about, is the situation where rather than

16:28:22  4   solving a problem, because it created a district that could

16:28:26  5   serve a unified, single minority group, it's created a problem,

16:28:30  6   because it's now a barrier to creating a genuine Hispanic

16:28:33  7   district, right, because it's now a Black district, and if

16:28:36  8   that's all it took to satisfy that unified minority, then Blacks

16:28:41  9   and Hispanics would be thrilled with it.

16:28:43  10          The city of Houston, who I'm working with on

16:28:44  11  redistricting, is being sued to get rid of their at-large seats,

16:28:48  12  because despite of the success, including electing two Black

16:28:50  13  mayors, the city has only elected one district with a Hispanic

16:28:54  14  representative, and so far from being happy that overall,

16:28:57  15  minorities are well represented in the city of Houston.  Quite

16:29:01  16  reasonably, I think, Hispanics argue that they are not

16:29:05  17  effectively represented, when a Black candidate, who is the

16:29:07  18  candidate of choice, or Black or White voters, gets elected,

16:29:10  19  they would like to have a system in which the candidates they

16:29:15  20  prefer get elected.  So this fiction is not helpful to anybody

16:29:18  21  and it is a fiction.

16:29:19  22      Q.   So this primary analysis for the 2014 Democratic

16:29:25  23  primary in SD-10, we can just ignore that?

16:29:27  24      A.   I didn't -- I did not need that analysis to offer my

16:29:32  25  criticism.  The analysis isn't necessary, because my -- the main

16:29:37   1    thing I'm trying to point out here is Dr. Barreto was provided

16:29:40   2    nothing to overcome the -- this considerable burden in Texas,

16:29:45   3    and particularly in the Dallas/Fort Worth area, to the

16:29:49   4    presumption that you can join these groups together.  And he's

16:29:52   5    arguing that -- he's also joining groups together that he didn't

16:29:55   6    even bother to analyze; he's not analyzing Asian voters, he's

16:30:01   7    not analyzing others.  It's deficient.

16:30:03   8         Q.   Dr. Alford, you mentioned -- I think you said SD-33.

16:30:07   9    I think you meant to say CD 33; is that right?

16:30:10   10        A.   Well, this is my trade off of your SD-31, right?

16:30:13   11        Q.   Yes.

16:30:13   12        A.   So, yes, I meant CD-33.

16:30:15   13        Q.   And you mentioned CD-33 on page six of your report; is

16:30:19   14   that right?

16:30:20   15        A.   Let me go back to the report.

16:30:24   16             I'm sorry.  What tab is that?

16:30:39   17        Q.   It is exhibit --

16:30:47   18        A.   Oh, 34?  I found it.  I'm sorry.

16:30:51   19        Q.   Did you find it, Exhibit 34?

16:30:53   20        A.   Yes, page six.

16:30:56   21        Q.   So on page six, you have one paragraph that goes from

16:31:07   22   page six to page seven, where you draw the conclusion that Black

16:31:12   23   and Hispanic voters in D-33 are not cohesive in Democratic

16:31:19   24   primaries; is that correct?

16:31:19   25        A.   Yes.

CROSS - DR. ALFORD                                                    119

16:31:20  1      Q.    Do you provide any data about that?

16:31:22  2      A.    No.  I was just referencing data that was provided in

16:31:28  3  the previous Texas case on the dispute over CD-33.

16:31:35  4      Q.    That was the data that came from the Attorney

16:31:38  5  General's office, right, the EI analysis from the 2017 case that

16:31:43  6  you used?

16:31:43  7      A.    I'm actually mostly referencing partly that and partly

16:31:47  8  data that came from Richard Engstrom, one of the plaintiffs'

16:31:51  9  experts in the case.

16:31:52  10      Q.    You didn't disclose any of that in this report, right?

16:31:56  11      A.    No, I'm just referencing, just generally that

16:31:59  12  discussion.  I'm not.  It's not something I did for this report

16:32:02  13  or that I looked at for this report.

16:32:06  14      Q.    And you haven't updated your analysis with respect to

16:32:11  15  CD-33 for the 2018 Democratic primary?

16:32:16  16      A.    No.

16:32:17  17      Q.    Are you aware that the candidate who ran against Mark

16:32:22  18  Veasey in the 2016 and 2018 Democratic primaries, ran against

16:32:28  19  him in the 2020 general election?

16:32:29  20      A.    I believe I'd heard that.

16:32:31  21      Q.    Carlos Quintanilla?

16:32:33  22      A.    Yes.

16:32:34  23      Q.    Do you know how he performed in the 2020 general

16:32:39  24  election?

16:32:40  25      A.    Am I correct in remembering that he's not running as a

KATHLEEN A. SUPNET, CSR

16:32:45  1    democrat or a Republican?

16:32:47  2        Q.    He ran as an independent.

16:32:49  3        A.    Yea, I think he didn't perform very well.  It's a

16:32:50  4    partisan general election.  If you want to keep making my point

16:32:54  5    for me, keep making my point.  Partisan general elections are

16:32:56  6    not about the names or reputations, et cetera, about the

16:32:59  7    candidates.  They're about the R and the D, and then after that,

16:33:02  8    you can put the -- however deeply in their heart they believe

16:33:04  9    that the libertarians and the greens and -- like someone can be

16:33:09  10   the top vote-getter as a Republican, lose the primary and run as

16:33:12  11   a libertarian, run as an independent, run as a write-in.

16:33:15  12       Q.    And the election that actually elected the candidate

16:33:19  13   in CD-33, mark Veasey won the Hispanic vote; is that right?

16:33:24  14       A.    He's running as a democrat, so again, I haven't

16:33:28  15   analyzed that, but if you ask for my prediction, I would predict

16:33:32  16   he won the Democratic vote.

16:33:35  17       Q.    Against Carlos Quintanilla?

16:33:38  18       A.    Running as independent or running as write- -- Carlos

16:33:40  19   would have done better as a Republican.

16:33:41  20       Q.    Well, the Republican candidate was a Latino, as well,

16:33:41  21   did you --

16:33:44  22       A.    Not surprising.  Did he get the Hispanic vote?

16:33:46  23       Q.    No.

16:33:47  24       A.    No.  Did Carlos get the Hispanic vote?  No.  Who got

16:33:50  25   the Hispanic vote?  The democrat, right, Mark Veasey, who stole

CROSS - DR. ALFORD                                              121

16:33:53   1   the district from the Hispanic voters.  It's a Hispanic-majority

16:33:58   2   district created by Domingo Garcia to elect the Hispanics and

16:34:01   3   it's not doing it.

16:34:01   4       Q.   Dr. Alford, I just want to close the loop on your

16:34:08   5   CD-33 discussion.

16:34:09   6            The analysis that you ran on CD-33 in your -- in a

16:34:13   7   previous case, not this case, that was an analysis of CD-33 as a

16:34:18   8   whole; is that right?

16:34:19   9       A.   I -- I think it is CD-33 as a whole, but I'm not

16:34:27  10   certain.  I did not go back to look at that analysis.  I

16:34:30  11   actually just looked at the court's discussion about the issue

16:34:33  12   of the coalitions.

16:34:34  13       Q.   Okay.  Well, I will represent to you this was actually

16:34:37  14   one of my questions to you, at the time, that it was an analysis

16:34:40  15   of CD-33 as a whole, because the district goes from Fort Worth

16:34:44  16   into Dallas County; is that right?

16:34:46  17       A.   Correct.

16:34:46  18       Q.   You haven't run any specific analysis on the Tarrant

16:34:50  19   County portion of the results from CD-33; is that right?

16:34:55  20       A.   I have not.

16:34:56  21       Q.   And SD-10 is entirely, or was entirely located, within

16:35:01  22   Tarrant County; is that right?

16:35:02  23       A.   The benchmark is entirely in Tarrant County.

16:35:04  24       Q.   And so the relevant population for determining whether

16:35:08  25   Black and Latino voters are cohesive in the primary, would be

KATHLEEN A. SUPNET, CSR

16:35:11   1    the precincts that are located in Tarrant County; is that fair?

16:35:15   2        A.    Ultimately, that would be correct.

16:35:26   3        Q.    Dr. Alford, page seven of your report, you sort of

16:35:29   4    summarize the discussion of primaries versus general elections

16:35:33   5    with a quote from long -- long-block quote from a report of

16:35:38   6    Dr. Rene Rocha.  Do you see that?

16:35:40   7        A.    Yes.

16:35:41   8        Q.    And you summarize that in most local settings, the

16:35:47   9    development of long-lasting rainbow coalitions is unlikely.  Is

16:35:50   10   that a fair assessment?

16:35:53   11       A.    Yes.

16:35:53   12       Q.    And you include Dr. Rocha's paper on the back of your

16:35:58   13   report; is that right?

16:35:58   14       A.    Yes.

16:35:59   15       Q.    When was this paper written?

16:36:01   16       A.    Oh...

16:36:02   17       Q.    It starts on State's PI, Bates number 001320?

16:36:13   18       A.    It looks like it was published in 2007.

16:36:16   19       Q.    Okay.  Can you turn to -- it's page 324 of the article

16:36:24   20   at the top.  It's Bates number state's PI number 001329?

16:36:36   21       A.    Yes.

16:36:37   22       Q.    And then on the last paragraph of the first column, do

16:36:37   23   you see that Dr. Rocha reports this study shouldn't be

16:36:40   24   interpreted to suggest that there's a lack of cohesion and

16:36:44   25   partisan elections?

CROSS - DR. ALFORD                                              123

16:36:46  1        A.    Yes.

16:36:46  2        Q.    You didn't include that in your report, right, other

16:36:52  3   than it being appended to your report?

16:36:55  4        A.    I mean would've happily done so, but -- except I

16:36:59  5   think, unless I'm mistaken, I'm even -- never suggested or

16:37:03  6   contested the conclusion that the groups spoke cohesively in the

16:37:09  7   general election.  That -- it just isn't the issue here.  I'm --

16:37:12  8   I'm -- without even redoing Dr. Barreto's analysis, I'm

16:37:15  9   conceding the majority of Blacks and Hispanics in Texas vote

16:37:20 10   Democratic.  To say that this coalition emerges in the general

16:37:22 11   election is to say this is a partisan coalition.  It's about

16:37:26 12   party behavior, not about racial or ethnicity -- ethnic behave.

16:37:33 13            Traditionally, in the south, Blacks and Whites both

16:37:35 14   voted Democratic, but it didn't mean that the general

16:37:38 15   election -- White victory in the general election meant that the

16:37:40 16   candidate of -- preferred by Blacks had been elected, but the --

16:37:44 17   most of the history of the Voting Rights Act has been about

16:37:48 18   righting exactly that wrong.

16:37:49 19        Q.    It's widely known in Texas, would you agree, that

16:37:53 20   Black and Latino voters prefer Democratic candidates and White

16:37:59 21   voters prefer Republican candidates?

16:38:01 22        A.    On average, statewide, correct.

16:38:04 23        Q.    Would you say that's widely known that that's the case

16:38:07 24   in the urban areas, too; Tarrant County, for example?

16:38:13 25        A.    Maybe -- I think it's probably true in Tarrant County,

CROSS - DR. ALFORD                                                      124

16:38:17  1    though less probably than it is in other, you know, I'll

16:38:20  2    hesitate, because Tarrant County is a little different than the

16:38:24  3    other urban counties, but it certainly -- the White -- tendency

16:38:29  4    of Whites to vote Republican is certainly, remarkably less, in

16:38:32  5    the large urban cities in Texas; Houston, Dallas, San Antonio,

16:38:37  6    Austin.

16:38:38  7        Q.    And it's widely known, would you agree, that rural

16:38:42  8    White voters vote overwhelmingly for Republican candidates?

16:38:47  9        A.    Pretty much everywhere that there's a Republican Party

16:38:51  10   in the world, that's true.

16:38:52  11       Q.    And your study of political science, that -- is that

16:38:56  12   something that you think most political or politicians are aware

16:39:02  13   of?

16:39:02  14       A.    Or the fact that cities are more liberal than...

16:39:05  15       Q.    No, that Black and Hispanic voter prefer Democratic

16:39:10  16   candidates and that White voters -- white rural voters prefer

16:39:15  17   Republican candidates?

16:39:16  18       A.    I would think so.

16:39:23  19       Q.    Do you know what the claim is that we're here to

16:39:27  20   adjudicate in this case for this P.I. hearing?

16:39:27  21           MR. THOMPSON:  (Indiscernible).

16:39:27  22           (Court reporter asks for clarification).

16:39:37  23           MR. THOMPSON:  Objection, in so far as it call for a

16:39:39  24   legal conclusion.

16:39:40  25           THE COURT:  I'll overrule that objection.

KATHLEEN A. SUPNET, CSR

16:39:41  1          You can tell us if you know, in your opinion, what

16:39:46  2   that is, not as a legal matter.

16:39:48  3       A.    I mean I would say as a non-lawyer, non-scholar of the

16:39:52  4   law, that in most cases it's pretty clear to me, roughly what

16:39:58  5   the parameters of the claim are.  Like, so, in a Section 2 case,

16:40:02  6   you know, I understand the way *Gingles'* one, two and three work;

16:40:06  7   I understand what totality of the circumstances is.  It doesn't

16:40:08  8   mean I'll always predict what the court is doing to do.

16:40:12  9          But I will say in this case, given the amount of

16:40:14  10  conflict between things like *Bartlett v. Strickland* and, you

16:40:20  11  know, the various rulings on crossover versus coalition, on too

16:40:25  12  much attention to race and too little, in the weird way in which

16:40:29  13  the claims seem to be understood by Dr. Barreto and Dr. Cortina,

16:40:36  14  I would hesitate to say I understand exactly that the legal

16:40:41  15  dilemma is here or what the solution to it is.

16:40:43  16  BY MR. GABER:

16:40:43  17      Q.    Have you read the complaint that the Brooks'

16:40:46  18  plaintiffs filed?

16:40:47  19      A.    Yes.

16:40:47  20      Q.    Okay.  So, do you understand that this is a case about

16:40:51  21  one claim is vote intentional discrimination, one claim is

16:40:54  22  racial gerrymander *Shaw* violation and another that's not being

16:40:59  23  adjudicated in this P.I. hearing is a Section 2 coalition claim?

16:41:04  24  Did you read those?

16:41:05  25      A.    I mean I know there's a discussion of all of that, and

16:41:08  1   that's exact -- I think was what I was trying inarticulately to

16:41:10  2   say, that there are a lot of moving parts here and how they

16:41:12  3   actually intersect legally, I don't understand.

16:41:14  4       Q.   Okay.  If the claim is that the Legislature

16:41:19  5   intentionally discriminated to prevent Black and Latino voters,

16:41:24  6   to -- prevent them from electing their preferred candidate in

16:41:29  7   the general election, what is the relevance in your academic

16:41:32  8   view of the primary election?

16:41:35  9            MR. THOMPSON:  Objection, calls for a legal

16:41:37  10  conclusion.  Objection, vague as to what the formal legal

16:41:41  11  definition of intentional discrimination in its preferred --

16:41:43  12            (Counsel speaking simultaneous with the Court).

16:41:43  13            THE COURT:  I'm going to overrule the objection.  I'd

16:41:45  14  like to hear what he says.

16:41:47  15            THE WITNESS:  Well, I would say first, if the claim is

16:41:51  16  being raised on behalf independently of Black, Hispanic and

16:41:55  17  Asian voters, then I think the -- those issues are issues that I

16:41:59  18  think benefit from understanding getting a better former precise

16:42:06  19  estimate of racial voting percentages, so I think the primaries

16:42:09  20  are useful, but I don't think they're as critical as they are

16:42:13  21  here, where -- where whatever this case is, it's a case, as I

16:42:16  22  read at least, about first saying these groups, Blacks,

16:42:20  23  Hispanic, Asians and others, can be combined for the purpose of

16:42:25  24  this case, because I don't see the analysis that talks about

16:42:27  25  anything except dividing minorities or minority opportunity, I

16:42:30   1   don't see Blacks, Hispanics, Asians.  So in that sense, you

16:42:35   2   know, if it's -- if it's -- if any of this is premised on

16:42:39   3   combining the minorities, then I think it's crucial to

16:42:42   4   understand, first, if you could combine the minorities.

16:42:45   5   BY MR. GABER:

16:42:46   6       Q.   So, if the claim is that the Legislature intentionally

16:42:51   7   discriminated against minorities in the district, to prevent

16:42:56   8   them as a group from being able to elect their preferred general

16:43:01   9   election candidate, then all of this discussion about the

16:43:06  10   Democratic primary where the candidate -- where no candidate is

16:43:09  11   elected, a candidate is nominated by one party, is largely

16:43:14  12   irrelevant from an academic standpoint even; is that right?

16:43:17  13       A.   I mean if your only question is, is the new version of

16:43:22  14   SD-10 more or less likely to elect a Democratic candidate, which

16:43:28  15   seems to be the question you're asking...

16:43:29  16       Q.   No, that's not the question I'm asking.  I'm trying to

16:43:33  17   understand why it is that you think the primary election is so

16:43:37  18   important, when the claim that we're adjudicating is not a

16:43:42  19   Section 2 coalition claim in this hearing.  It's an intentional

16:43:48  20   discrimination claim to prevent minority voters from electing

16:43:52  21   their candidate of choice in a general election.

16:43:54  22       A.   Well, first of all, I don't think you get a very clear

16:43:59  23   picture of the voting behavior of minorities by looking only at

16:44:02  24   general elections, which you see partisan outcome, and then

16:44:07  25   quite frankly, if that's what the case is about, then I don't

CROSS - DR. ALFORD                                                128

16:44:10   1   think you need Dr. Barreto or me, because the simple answer to

16:44:14   2   your question -- I've said this about SD-10 before, and I

16:44:18   3   hesitate to say it again -- but in any district, in which under

16:44:23   4   any election, it's possible for a democrat to be elected one

16:44:27   5   time out of ten, if you make that district less Democratic, you

16:44:34   6   will reduce the opportunity for minority voters to elect a

16:44:37   7   candidate of choice in that district.  And that doesn't matter

16:44:41   8   whether there are ten minorities or -- or it's 50 percent

16:44:44   9   minority.  Right?  So it's just axiomatic, given what you're --

16:44:48   10  given this -- this setup that -- there's no question -- if

16:44:51   11  that's what you're saying, like, for example, there's no

16:44:54   12  question that that applies equally -- with equal force to -- to

16:44:59   13  plan four, where it does exactly the same thing in Travis

16:45:05   14  County; it takes a district with substantial, but

16:45:06   15  sub-majority-minority population and divides it up into

16:45:10   16  whatever, six pieces.  Right?  So I mean that's just -- I mean

16:45:12   17  if that's your basic argument that the state should have

16:45:15   18  intentionally -- (indiscernible) -- somewhere else, I don't

16:45:18   19  know.  And if it's your argument --

16:45:18   20      Q.   Well -- well -- I -- we are going to move on to the

16:45:22   21  your response to Dr. Cortina, I think now, so we can talk about

16:45:29   22  that.

16:45:31   23           Now, you didn't, in your -- so you issued -- you gave

16:45:37   24  a response report to Dr. Cortina; is that right?

16:45:42   25      A.   That's correct.

16:45:44  1        Q.   And you discuss it somewhat in your initial report; is

16:45:50  2   that right?

16:45:50  3        A.   That's correct.

16:45:51  4        Q.   Is there anything in your initial report that you

16:45:55  5   don't dress in your subsequent report, with respect to the

16:46:01  6   alternative plan four issue?

16:46:04  7        A.   I guess -- I'm -- are they the -- I'm not sure they're

16:46:08  8   exactly the same plan, but I think the general outlines of my

16:46:11  9   criticism in the original report are sort of drawn out in more

16:46:15 10   detail in the response.  I'm -- without looking at the two

16:46:19 11   reports, I couldn't say if there was something I said in one and

16:46:23 12   I didn't say in the other.

16:46:24 13        Q.   Okay.  I'll have you turn to Defendants' Exhibit 70,

16:46:29 14   if you could?

16:46:46 15        A.   I'm there.

16:46:47 16        Q.   Okay.  And so --

16:46:47 17             MR. DUNN:  (Indiscernible).

16:46:47 18             MR. GABER:  Okay.  It sounds like we're having

16:46:47 19   computer problems.

16:46:47 20   BY MR. GABER:

16:46:56 21        Q.   Now, this is your response report to Dr. Cortina; is

16:47:00 22   that right, Dr. Alford?

16:47:02 23        A.   That's correct.

16:47:02 24        Q.   And you address the three areas of focus of

16:47:08 25   Dr. Cortina, right; you start with the election performance and

16:47:12  1   the comparison amounts in the core population retention section

16:47:16  2   is after that?

16:47:16  3       A.   That's correct.

16:47:17  4       Q.   Now you don't actually take any issue with Dr.

16:47:24  5   Cortina's election results analysis, in this first section of

16:47:28  6   your response report, correct?

16:47:30  7       A.   I -- right, I don't agree with his interpretation, but

16:47:35  8   I'm accepting that he has the right reconstitute election

16:47:39  9   numbers and I don't dispute that.

16:47:40 10       Q.   Okay.  And you don't take issue with the -- his

16:47:44 11   analytical approach of concluding that a 55 -- or a 10 percent

16:47:48 12   margin of victory for Republicans would generally be considered

16:47:51 13   a safe seat; is that right?

16:47:54 14       A.   I don't.  I'm sorry.  I'm -- I'm commenting on what he

16:48:00 15   did in the report.  It's -- that's obviously an arbitrary

16:48:04 16   number.  I don't -- I don't take it to be anything other than

16:48:06 17   just an arbitrary number he put in the report.

16:48:08 18       Q.   But you don't, anywhere in your response report, you

16:48:11 19   don't criticize that as a level at which Republican candidates

16:48:15 20   would generally be considered secure in their district?

16:48:21 21       A.   I -- I didn't pay much attention to it.  I just

16:48:24 22   thought he was putting in a number to allow him to look at sort

16:48:27 23   of the districts that are in the more competitive range.  I

16:48:30 24   didn't -- I don't -- I didn't -- if he's intending that to mean

16:48:33 25   something special in an election sense, I don't think it means

CROSS - DR. ALFORD                                                  131

16:48:36  1    anything special in an election sense.  I don't know where any

16:48:41  2    literature that suggests that that's true.

16:48:43  3        Q.   What level margin of victory do you think is necessary

16:48:46  4    for -- to be a safe seat?

16:48:49  5        A.   Well, obviously, it's not 10 percent, because that's

16:48:53  6    how Brimer lost his Senate seat and that's why were here.

16:48:56  7    Right?  I mean people get defeated when they are -- I mean he

16:48:58  8    won before that with, I think, 59 percent of the vote.  The next

16:49:02  9    thing you know, he's looking for another job.  So it's -- that's

16:49:05  10   not secure enough.

16:49:06  11        I worked for Jim Wright when was a speaker of the

16:49:10  12   House.  A group of colleagues and I worked on his re-election

16:49:12  13   campaign.  He was furious that he wasn't getting more attention

16:49:16  14   and more appreciation from the constituency, because he was,

16:49:21  15   after all, the most powerful person in the U.S. House of

16:49:25  16   Representatives.

16:49:25  17        Q.   You blamed the loss of -- is it Kal [sic] Brimer?

16:49:27  18        A.   What?

16:49:28  19        Q.   You had blamed, in your report, the loss of that

16:49:31  20   Republican candidate in SD-10 on ethical issues, right?

16:49:35  21        A.   Yes.

16:49:35  22        Q.   Okay.

16:49:37  23        A.   Yeah, he was -- you know, he didn't do a good job of

16:49:39  24   running and that's my point.  Maybe he thought that he could be

16:49:41  25   unethical because was he was in a safe seat, but I can tell you,

16:49:45   1    I think that's about the margin Jim Wright got in the election,

16:49:49   2    and we were fired and we never worked for him again.  He was

16:49:53   3    furious he didn't get above 60 percent.

16:49:56   4         So -- right -- it's -- you know, what's safe enough, I

16:49:59   5    don't know.  There -- in the current -- you have to remember

16:50:02   6    that Texas is trending, however slowly Democratic, and these

16:50:06   7    districts are going to be fixed for 10 years, or however long it

16:50:09   8    takes for the Court to overturn them.  And so politicians are

16:50:13   9    risk-aversive in their forward looking, then if...

16:50:15   10   Q.    You don't take any issue with the comparison or you

16:50:17   11   don't take issue with the comparison between the election

16:50:21   12   results and the alternative plan four, as being comparable to

16:50:26   13   the election results in the adoptive plan, right?  You don't

16:50:29   14   report on anything like that?

16:50:29   15   A.    I mean the table of numbers seems quite reasonable to

16:50:32   16   me, and I use that exact same number of tables to comment on why

16:50:37   17   the interpretation is why I disagree with the interpretation.

16:50:41   18   Q.    But that's the thing, you don't actually comment on

16:50:42   19   why you disagree with the interpretation on page one of your

16:50:46   20   report, do you?  Other than to say that SD-10, in the benchmark

16:50:51   21   district, is trending towards the Democrats; is that right?

16:50:57   22   A.    I guess I -- I mean wasn't aware that Dr. Cortina's

16:51:01   23   report hinged entirely on an arbitrary 10 percent number.  I

16:51:05   24   thought he was making a broader point and he using that just to

16:51:08   25   show some counts, so I...

16:51:09   1        Q.    And I'm not suggesting to you that it does.  I'm just

16:51:12   2   saying you don't take issue with that in your report.

16:51:15   3        A.    It's of no importance and I don't take issue with --

16:51:18   4   in my mind, it was of no importance, because it's a small enough

16:51:21   5   table that anybody could look it at.  When you've got a thousand

16:51:26   6   native points, you need to be careful about how you summarize

16:51:27   7   things.

16:51:28   8              And you can see the table...

16:51:28   9        Q.    And you didn't find anything between the electoral

16:51:31  10   comparison of Alternative Plan 4 and Plan S2168, that you found

16:51:38  11   reason to comment on; is that right?

16:51:39  12        A.    On the methodology?

16:51:41  13        Q.    No, no.  On the actual election results.

16:51:44  14        A.    I'm just -- because I'm commenting on Dr. Cortina's

16:51:48  15   report in this case, I'm just taking -- I'm -- I don't believe

16:51:51  16   that he interprets the data in an appropriate way, and so I'm

16:51:55  17   looking at what my interpretation of it is, but I am not

16:52:00  18   disputing his numbers.

16:52:01  19        Q.    Okay.  And you're not disputing that the electoral

16:52:04  20   performance, using the 2018 and 2020 general elections,

16:52:08  21   reconstituted in the districts in both plans, shows that they

16:52:11  22   perform at least as well for Republican candidates; is that

16:52:16  23   right?

16:52:16  24              MR. THOMPSON:  Objection.  Vague as to what perform as

16:52:18  25   well means, and to the extent -- I think he means he is

16:52:22  1     misstating Dr. Cortina's testimony.

16:52:25  2                 THE COURT:  Overruled.

16:52:26  3                 You can answer if you understand it.

16:52:28  4         A.    And maybe this is, you know, part of the what the

16:52:30  5     misunderstanding is on this particular set of points, but you

16:52:34  6     can just count up the number of districts that somebody won in

16:52:38  7     any particular election.  You can use a high mark, low mark.

16:52:42  8     They used to use the Hobby index in the old days and now they

16:52:44  9     use the Cruz index.  Right?  So you can use that and say, here's

16:52:47  10    how many seats we would've won or wouldn't won.  It's a way of

16:52:49  11    summarizing one metric about the performance of districts, which

16:52:53  12    is the metric of any given election, what ended up winning and

16:52:57  13    ended up losing, which is not even consequential, but there are

16:53:00  14    a lot of other metrics that have to do with electrical

16:53:04  15    performance of districts.  I mean...

16:53:05  16    BY MR. GABER:

16:53:05  17        Q.    You didn't conduct any of that analysis, right?

16:53:08  18        A.    No, I'm just commenting this is the analysis

16:53:10  19    Dr. Cortina provided.

16:53:10  20                If you want to focus on the one aspect, then I can

16:53:13  21    assure you that when people draw districts, as I do, you don't

16:53:17  22    just focus on that one aspect, but if you do...

16:53:19  23        Q.    Were you here for Senator Huffman's testimony today?

16:53:22  24        A.    Yes.

16:53:22  25        Q.    And did you hear her video of her testifying about the

KATHLEEN A. SUPNET, CSR

16:53:26  1   various elections that she looked at?

16:53:29  2        A.   I'm sure I did.

16:53:31  3        Q.   Did you hear her testify about looking at the 2020

16:53:34  4   Presidential Election, the 2018 Senate Election and Dan

16:53:39  5   Patrick -- Lieutenant Governor Dan Patrick elections?

16:53:42  6        A.   I think she mentioned Cruz, as well.

16:53:44  7        Q.   And Cruz.

16:53:45  8             So, if that is true, then Dr. Cortina would have been

16:53:50  9   using the same elections that the Legislature did or say -- said

16:53:55  10  they did?

16:53:55  11       A.   And, again, I think we're talking past each other.

16:53:58  12            I'm not saying that you shouldn't look at this, and

16:54:00  13  I'm not saying that it wouldn't be maybe the first thing you

16:54:03  14  look at.  But I'm just saying that when you talk about overall,

16:54:06  15  what's a preferred partisan plan, you can't assess that just by

16:54:12  16  talking about just the raw election reconstituted.

16:54:16  17            Parties have a lot of interests and a lot goes into

16:54:20  18  redistricting beyond -- obviously, top line for many incumbents

16:54:24  19  is my share of the vote.  But there are a lot of other things

16:54:28  20  that matter deeply, not only to the party, but to the

16:54:31  21  incumbents.

16:54:32  22       Q.   And you don't -- you don't identify those in the

16:54:33  23  electoral -- (mumbling)?

16:54:33  24       A.   No.  All I'm saying is this what I make of what Dr.

16:54:37  25  Cortina's provided.

16:54:37  1        Q.    And in terms of what information would be available to

16:54:41  2    someone creating this type of alternative plan, did you -- did

16:54:47  3    you hear the invocation of legislative privilege today?

16:54:51  4        A.    I heard a lot of discussion.

16:54:53  5        Q.    You are were here.  I'm sure you heard it.

16:54:54  6        A.    I heard just -- I heard -- well, most of what I heard

16:54:56  7    was about legislative privilege.

16:54:59  8        Q.    Okay.  So these other considerations, that you just

16:55:03  9    identified or have generally identified, if they are not

16:55:08  10   accessible to the public or a party putting into evidence plan

16:55:12  11   like this, then it can't be considered, right?

16:55:16  12       A.    Can't be considered by the Legislature?

16:55:16  13             (Counsel and witness speaking simultaneous).

16:55:20  14             (Court reporter asks for clarification).

16:55:20  15             MR. THOMPSON:  I'm sorry.

16:55:21  16             Objection, speculation.  Objection, vague as to can't

16:55:25  17   be considered by whom.

16:55:26  18             THE COURT:  He can answer if he knows.

16:55:30  19             And you consider those if you don't have access to

16:55:34  20   them.

16:55:34  21   BY MR. GABER:

16:55:35  22       Q.    Can you consider something you don't have access to?

16:55:37  23       A.    Dr. Cortina doesn't have access, so we can't

16:55:41  24   consider --

16:55:41  25       Q.    (Indiscernible).

16:55:41   1      A.    -- it.  The Legislature has access to it, so they can,

16:55:44   2   which means that Dr. Cortina's analysis may reflect what

16:55:47   3   superficially he thinks is a better plan for the Republicans,

16:55:51   4   but it's the Republicans in the Legislature who have to decide

16:55:54   5   what's a better plan.  And the idea that this sort of ends the

16:55:56   6   discussion, I think this may be -- is a rough beginning, but I'm

16:56:00   7   sure --

16:56:00   8         Well, I mean, Kel Seliger is primarily concerned about

16:56:03   9   his opponent in the primary, not about his margin in the --

16:56:07  10   right -- if you make his district more Republican, at the same

16:56:11  11   time open himself up.  I've drawn lines where people are the

16:56:12  12   only single thing they cared about, was they wanted to make sure

16:56:16  13   that the person, who they thought was going to oppose them in

16:56:18  14   the next primary, was not in their district.  So they might be

16:56:22  15   willing to accept a more -- take a bigger chance in the general

16:56:25  16   to avoid taking a chance in the primary.

16:56:28  17      Q.    There's no evidence that you've seen that any of that

16:56:31  18   is the case, right, because of, in part, the indication of

16:56:36  19   legislative privilege?

16:56:37  20      A.    In my experience in redistricting, there is a -- the

16:56:40  21   idea that a legislature would look at this table and say, well,

16:56:44  22   I guess that's it; this is a better plan; why didn't we think of

16:56:48  23   that; I mean, it just defies the notion -- this would make

16:56:51  24   redistricting awfully simple, not only for redistricters, but

16:56:54  25   for legislative bodies that have to adopt plans.

CROSS - DR. ALFORD                                              138

16:56:57   1        Q.    Dr. Alford, you're not aware of anything that the

16:57:00   2   Legislature did other than putting the House in the district to

16:57:04   3   accommodate former Senator Flores in SD-24?

16:57:08   4        A.    I have no knowledge of SD-24.  I have no idea.  All I

16:57:12   5   know is I've been involved in redistricting and there are a lot

16:57:17   6   of things about a plan that might make you prefer one to

16:57:19   7   another, are --

16:57:19   8        Q.    Were you involved in the redistricting of the State

16:57:22   9   Senate Plan in 2021?

16:57:23  10        A.    Not at all.

16:57:24  11        Q.    So you don't know anything about the -- whatever other

16:57:28  12   partisan priorities beyond electoral performance that might have

16:57:31  13   motivated it?

16:57:32  14        A.    Right.  I'm just saying in my experience there are --

16:57:35  15   there are partisan motivations that cannot be captured in a

16:57:39  16   single number about a reconstructed election about how your

16:57:43  17   party will do in a particular election.  There are larger

16:57:46  18   interests than that, that come under the umbrella of

16:57:50  19   partisanship, that can be summarized in a number.  And I'm not

16:57:51  20   saying Dr. Cortina should have added those in.  I'm just saying

16:57:56  21   that what did we learn from plan four.  We learned that there's

16:58:00  22   a plan out there, that on one indicator, in some narrow sense

16:58:04  23   might seem like it was unequal or preferable plan.  On the other

16:58:09  24   hand, on the face of it, I think that the notion, based on his

16:58:13  25   numbers, that that makes any sense at all, I think is, again,

KATHLEEN A. SUPNET, CSR

16:58:17  1   simply based on his numbers.  That notion to me makes no sense

16:58:20  2   at all.

16:58:22  3       Q.    Dr. Alford, did you consider any of the court cases

16:58:29  4   that talk about partisan gerrymandering in Texas when you opine

16:58:35  5   that it would make more sense to do a partisan gerrymandering in

16:58:44  6   Tarrant County versus Travis County?

16:58:44  7       A.    I'm not a lawyer, so I'm not offering -- and I

16:58:47  8   don't -- I -- maybe I misunderstood --

16:58:48  9       Q.    Is that a no?

16:58:48  10      A.    -- I didn't think Dr. Cortina was saying it legally

16:58:52  11  would make more sense.  I thought he was just talking about it

16:58:55  12  as redistricting plan.  I'm talking about it as a redistricting

16:58:57  13  plan.

16:58:58  14      Q.    So your opinion, am I right, your opinion is that if

16:59:02  15  the Legislature would think to do a partisan gerrymander in

16:59:08  16  Tarrant County before they would think to do a partisan

16:59:09  17  gerrymander Travis County; is that your testimony?

16:59:14  18      A.    I mean my -- I'll tell you, my frank belief --

16:59:16  19      Q.    That's a yes or no question, Dr. Alford.

16:59:19  20      A.    That they would think about Tarrant County before

16:59:23  21  Travis.

16:59:24  22      Q.    To do a partisan gerrymander.

16:59:27  23      A.    Yes.

16:59:28  24      Q.    Okay.  Dr. Alford, have -- you were an expert in the

16:59:31  25  *Perez v. Abbott* case, right?

16:59:32  1        A.    Yes.

16:59:32  2        Q.    Did you read the decision in that case?

16:59:34  3        A.    The what?

16:59:35  4        Q.    Did you read the decision in that case about the 2011

16:59:39  5   Congressional and the State House plans?

16:59:43  6        A.    I'm sure at some point I did.

16:59:45  7        Q.    Did you consider the Court statement, and I'm quoting

16:59:51  8   from 253 F. Supp. 3d 864 at 897, quote, "The Legislature could

17:00:05  9   have simply divided Travis County and Austin Democrats among

17:00:09 10   five Republican districts," end quote, if the Court had

17:00:15 11   announced to the Legislature that it could divide Travis County

17:00:22 12   into five Republican districts, don't you think that that's a

17:00:24 13   statement to the Legislature that that would be a pretty good

17:00:28 14   place if they wanted to do a partisan gerrymander that they

17:00:34 15   would do it?

17:00:35 16        A.    Well, (sound), first of all --

17:00:38 17        Q.    Dr. Cortina, is that -- sorry -- Dr. Alford --

17:00:38 18              (Counsel and witness speaking simultaneous).

17:00:38 19        A.    -- yeah --

17:00:40 20        Q.    -- yes or no question?

17:00:40 21        A.    -- I completely disagree with you.

17:00:43 22        Q.    Me or the Court?

17:00:44 23        A.    Well, the Court is not offering this to the State as

17:00:48 24   one more piece of friendly advice about what a great job you do

17:00:51 25   in redistricting, and then, in fact, if you want to go even

17:00:53   1    further, why don't you cut up Travis County.

17:00:56   2             The Court and the State are --

17:00:57   3       Q.   Dr. Alford, you -- you just said you're not a lawyer,

17:00:59   4    right?

17:00:59   5       A.   I'm not a lawyer --

17:00:59   6       Q.   Okay.  So, I --

17:01:00   7       A.   -- I'm just a human being.  And I'm telling you that

17:01:03   8    when the Court says that to the State, it doesn't mean the State

17:01:07   9    says, oh, thank you and, also, thank you for the things you said

17:01:08   10   about that we do so terrible everywhere else.  It's a core

17:01:12   11   decision.

17:01:12   12      Q.   Dr. Alford --

17:01:12   13           (Witness speaks over counsel).

17:01:12   14      A.   (Indiscernible).

17:01:12   15      Q.   -- you're aware that there's also a court decision

17:01:15   16   that says that dismantling SD-10 is intentionally, racially

17:01:22   17   discriminatory, right, from the same 2011 redistricting cycle?

17:01:25   18      A.   We're -- we were in both of those cases, so you'll --

17:01:28   19   you know, if -- do you want to talk of -- yeah, I was there --

17:01:28   20      Q.   (Indiscernible).

17:01:29   21      A.   -- yes, I know what that judge said on that, and a

17:01:33   22   whole lot of other things, and i know what happened in the

17:01:35   23   three-judge panel, and my point is, you're saying the

17:01:38   24   Legislature should have looked at that and said, okay, we have a

17:01:41   25   green light from the court to do whatever we want to do.

CROSS - DR. ALFORD                                                    142

17:01:44   1        Point number one -- I'm not a lawyer, but let me tell
17:01:46   2   you, because some three-judge panel somewhere said, why didn't
17:01:49   3   your just go ahead and paint the town blue, doesn't mean that
17:01:52   4   when you taint -- paint it blue, and you come back to the same
17:01:54   5   court, they're going to say it was legal.  Right?  So, that's --
17:01:56   6   I don't think that's particularly good advice to say do whatever
17:01:59   7   the court said.
           8        Point number two --
           9   Q.   Dr. Alford, are you aware --
          10        (Court reporter interjects).
          11        JUDGE GUADERRAMA:  Mr. Gaber, it's about 5 o'clock.
          12   Could we move on, please?
          13        MR. GABER:  I'm just about finished, Your Honor.
          14        JUDGE GUADERRAMA:  I hope so.
17:02:08  15   A.   My second point would be this:  If you look to that
17:02:11  16   advice, and the court said it's perfectly legal to divide up...
17:02:14  17   BY MR. GABER:
17:02:14  18   Q.   Dr. Alford, there actually isn't a question pending.
17:02:16  19        In the second section of your report in response to
17:02:23  20   Dr. Cortina, you -- you, in a paragraph or I think a couple of
17:02:30  21   sentences, criticize the map comparison in the Tarrant County
17:02:34  22   region, that's in pages two to three, do you see that?
17:02:37  23   A.   On what page?
17:02:38  24   Q.   Two to three of your report?
17:02:41  25   A.   Okay.  Comparison maps, got it.

KATHLEEN A. SUPNET, CSR

17:02:43   1       Q.   Now you say that there's legal battles that aren't

17:02:47   2   considered; the evolution of the map over time, the politics

17:02:49   3   incumbents, the history of the bodies, you don't actually

17:02:52   4   identify anything about these topics that you think are flawed

17:02:55   5   in Dr. Cortina's analysis, right?

17:02:57   6       A.   No, there's -- I'm not suggesting that they are flawed

17:03:02   7   in his analysis.

17:03:02   8       Q.   Okay.  Thank you.

17:03:03   9            In the third section, you take issue with the core

17:03:07  10   population analysis -- well, first, you agree that the

17:03:11  11   differences plan-wide are small.  Do you see that on the

17:03:14  12   paragraph on page three?

17:03:16  13       A.   Yes.

17:03:16  14       Q.   But what you do take issue with is that there are some

17:03:23  15   districts in Alternative Plan 4 where the core population

17:03:26  16   retention is below 50 percent; is that correct?

17:03:31  17       A.   I mean I -- well, first of all, I mean I say the

17:03:34  18   difference is small, but -- but he difference favors the

17:03:39  19   state-adopted plan.  There is less -- or there's more core

17:03:43  20   retention in state-adopted plan.  So that's the first point --

17:03:44  21       Q.   The difference is small, right?

17:03:45  22       A.   The difference is small --

17:03:45  23       Q.   Okay.

17:03:46  24       A.   -- but it's in the wrong direction for you.

17:03:48  25       Q.   Dr. Alford, are aware -- so you listed the districts

CROSS - DR. ALFORD                                            144

17:03:51  1   on page four, right?  You listed the districts in both plans

17:03:53  2   where its below 50 percent?

17:03:55  3       A.   Yes.

17:03:56  4       Q.   And the theme here, right, is that Republican

17:04:00  5   incumbents would prefer to have districts with higher core

17:04:08  6   retention; is that right?

17:04:21  7       A.   I think the theme is that that would matter to the

17:04:24  8   party --

17:04:24  9       Q.   Well, what you say here is it would matter to the

17:04:33  10  Republican incumbent --

17:04:33  11      A.   -- it would matter to the incumbents.

17:04:33  12           (Court reporter interjects).

17:04:33  13           MR. GABER:  Sorry.

17:04:33  14      A.   I say that core retention is a high priority,

17:04:37  15  typically of incumbents --

17:04:37  16      Q.   Thank you.

17:04:38  17      A.   -- but I also say that the level of disruption would

17:04:41  18  make this less palatable to the majority party.

17:04:46  19      Q.   Now, Dr. Alford, the lowest core retention in

17:04:49  20  Alternative Plan 4 is SD -- the reconfigured SD-14; is that

17:04:55  21  right?

17:04:55  22      A.   Correct.

17:04:55  23      Q.   That is that it would be created as a new open seat

17:04:59  24  for Republican candidates, correct?  There's no incumbent in

17:05:03  25  that seat?

KATHLEEN A. SUPNET, CSR

CROSS - DR. ALFORD                                          145

17:05:04  1      A.    Correct.

17:05:04  2      Q.    Are you aware that the current Republican incumbent in

17:05:08  3  SD-24 and SD-12 have announced their retirement?

17:05:14  4      A.    I'm not aware.

17:05:15  5      Q.    So you didn't consider that in your analysis?

17:05:18  6      A.    I don't think it figures into the analysis at all.

17:05:23  7      Q.    And another district, District 2, at the bottom of the

17:05:27  8  chart, you see that Plan 4 actually has a higher core retention

17:05:32  9  than does the plan S2168?

17:05:37  10     A.    I'm sorry?

17:05:39  11     Q.    The core retention in Alternative Plan 4 for District

17:05:43  12  2 is higher in Plan 4 than in S2168, slightly?

17:05:50  13     A.    Slightly.

17:05:53  14     Q.    Now at the end, you discuss how your kind of overall

17:05:58  15  summary, one of your points is that alternative -- there's no

17:06:02  16  evidence that Alternative Plan 4 or something like it, was ever

17:06:05  17  introduced or considered; is that what you say?

17:06:08  18     A.    Yes.

17:06:08  19     Q.    You don't know whether that's the case?

17:06:15  20     A.    I have no evidence of it, so, that's -- yes, I don't

17:06:18  21  see any -- just -- Dr. Cortina provides no evidence of it, so...

17:06:21  22     Q.    And you're not a lawyer, so you don't know if it's

17:06:25  23  legally relevant to the exercise, right?

17:06:29  24     A.    It's -- no, I'm just saying to the issue of whether

17:06:33  25  this is --

KATHLEEN A. SUPNET, CSR

CROSS - DR. ALFORD                                                146

17:06:34   1        Q.    Thank you, Dr. Alford.  Yes or no.  I'm trying to get

17:06:36   2   a sense --

17:06:36   3              THE COURT:  Let him finish his answer, Mr. Gaber.

17:06:40   4              MR. GABER:  I'm sorry, Your Honor?

17:06:40   5              THE COURT:  Let him finish his answer.

17:06:43   6              MR. GABER:  Yes.

17:06:43   7   BY MR. GABER:

17:06:44   8        Q.    Dr. Alford, please continue.

17:06:45   9        A.    Just to the issue that Dr. Cortina has raised, which

17:06:48  10   is that this is a plan that because the Legislature didn't

17:06:52  11   entertain it, somehow provides insight into whether they were

17:06:56  12   actually intending not to just divide up Democrats or help

17:07:03  13   Republicans, but were actively looking to divide a racial

17:07:06  14   minority in a particular area.

17:07:07  15        Q.    But you don't know whether they considered, right,

17:07:11  16   because, one, because of legislative privilege?

17:07:15  17        A.    Right, which I'm saying, I don't know evidence that

17:07:17  18   they considered this.

17:07:18  19        Q.    And you don't identify any other partisan goals or

17:07:21  20   guidelines that might not be followed in Alternative Plan 4?

17:07:28  21        A.    I think that's much of what the discussion is about.

17:07:31  22   It's about core retention.  It's about, you know, basically

17:07:35  23   working on districts that you can improve that are districts you

17:07:40  24   have won in the past and might win in the future.

17:07:42  25        Q.    Outside of the core retention, there's no other

KATHLEEN A. SUPNET, CSR

17:07:46  1    actual -- example of an alternative -- or additional partisan

17:07:50  2    consideration that you identify; is that right?

17:07:52  3        A.    I mean I think table -- my view of that is that's --

17:07:58  4    is that's summarized in the sorted table one.

17:08:00  5        Q.    And that's the core retention table?

17:08:03  6        A.    No.  That's Cruz election performance.

17:08:07  7        Q.    Oh.

17:08:07  8              So the election result was the only thing that you

17:08:12  9    point to?

17:08:14  10       A.    That's the -- in terms of what I'm providing evidence

17:08:17  11   in here, that evidence about where there are districts in which

17:08:23  12   Republican performance in the Cruz election in the existing plan

17:08:28  13   suggested these were districts that should be shored up.  Those

17:08:33  14   districts were all shored up and one of those districts was

17:08:35  15   SD-10.

17:08:35  16       Q.    And the same number of districts are shored up in

17:08:40  17   Alternative Plan 4, by roughly the same margin, right?

17:08:44  18       A.    The same districts are shored up.  And again, let's

17:08:49  19   shore up the districts that are in trouble; we're shoring them

17:08:52  20   up; and then we take one of them and say, but let's not shore

17:08:54  21   that one up.  Let's, instead, go to the bottom of the list and

17:08:58  22   carve up Travis County.  That seems like -- I would have to

17:09:02  23   wonder what the motivation for that was.

17:09:06  24       Q.    Dr. Alford, I don't have any further questions.

17:09:18  25             MR. GABER:  I pass the witness.

REDIRECT - DR. ALFORD                                          148

17:09:18   1              THE COURT:  Thank you, Mr. Gaber.

17:09:20   2              Mr. Thompson?

17:09:26   3              MR. THOMPSON:  If I may.

17:09:27   4                      DR. JOHN R. ALFORD

17:09:27   5              REDIRECT EXAMINATION BY THE DEFENSE

17:09:27   6    BY MR. THOMPSON:

17:09:36   7       Q.   Dr. Alford, I'm sorry for keeping you so long today.

17:09:42   8            Do you remember being asked whether you attempted to

17:09:43   9    replicate Dr. Barreto's data?

17:09:46  10       A.   Yes.

17:09:47  11       Q.   Was replicating Dr. Barreto's data important to your

17:09:51  12    point about whether an R.P.V.A. should include both general and

17:09:55  13    primary election data?

17:09:56  14       A.   No.

17:09:56  15       Q.   Regarding your data, do experts consider the ACS CVAP

17:10:01  16    data to be reliable?

17:10:02  17       A.   Yes.

17:10:03  18       Q.   Is it something -- or is something that courts, and

17:10:05  19    experts testifying in redistricting cases, routinely rely upon?

17:10:09  20       A.   Yes.

17:10:10  21       Q.   You've gotten a lot of questions about the way the EI

17:10:13  22    was run, which technicians were involved, confidence intervals,

17:10:17  23    et cetera.  Does any of that cause you to lose confidence in

17:10:20  24    your opinions?

17:10:20  25       A.   No.

REDIRECT - DR. ALFORD                                          149

17:10:21  1        Q.    By the way, if I told you that David Falk had a Ph.D.

17:10:24  2   from Princeton, would you have any reason to disagree with me?

17:10:28  3        A.    I know he's sharp.  I must say I'm not -- I didn't

17:10:30  4   know he was that sharp.  I wish I had a Ph.D. from Princeton.

17:10:37  5        Q.    Me too.

17:10:37  6              Let's put this in context.  The long discussion you

17:10:38  7   had with Mr. Gaber regarding the spreadsheet, relates to the

17:10:42  8   illustrative example that we discussed in your direct testimony,

17:10:47  9   right?

17:10:47  10       A.    Correct.

17:10:47  11       Q.    And did you testify earlier that Dr. Barreto's

17:10:51  12  analysis was basically insufficient, even if you had no data

17:10:55  13  about that illustrative example of the 2014 primary?

17:10:58  14       A.    That's correct.

17:10:58  15       Q.    Do you standby that testimony?

17:11:00  16       A.    I do.

17:11:02  17       Q.    Thank you very much.

17:11:03  18             MR. THOMPSON:  Nothing further questions.

17:11:04  19             JUDGE GUADERRAMA:  Thank you, Mr. Thompson.

17:11:07  20             Mr. Gaber?

17:11:11  21             MR. GABER:  Nothing further, Your Honor.

17:11:11  22             JUDGE GUADERRAMA:  Dr. Alford, thanks for coming down?

17:11:11  23  I assume you are free to go.

17:11:11  24             Is that correct?

17:11:16  25             MR. SWEETEN:  I'm sorry, Your Honor?

17:11:16  1           JUDGE GUADERRAMA:  Mr. Thompson, is the doctor --

17:11:17  2           MR. THOMPSON:  Oh, yes, he is.

17:11:18  3           JUDGE GUADERRAMA:  And Mr. Gaber?

17:11:20  4           MR. GABER:  Yes, Your Honor.

17:11:20  5           JUDGE GUADERRAMA:  All right.

17:11:21  6           Thank you, sir.

17:11:21  7           (Witness excused).

17:11:23  8           MR. SWEETEN:  Your Honor, so we've got Keith Ingram.

17:11:27  9  We had this direct and cross-examination back in December in the

17:11:32  10  Mount case.  It lasted about an hour and 15 minutes.

17:11:34  11           Mr. Hudson is going to try to speed up the direct, in

17:11:39  12  light of the length of the cross-examination that we just had,

17:11:41  13  but it looks like we could go over 6 o'clock, maybe to 6:15 or

17:11:45  14  6:30.

17:11:45  15           JUDGE GUADERRAMA:  Okay.

17:11:47  16           MR. SWEETEN:  We'll try to be...

17:11:47  17           JUDGE SMITH:  Which witness is it that has the 10:30

17:11:50  18  flight?

17:11:53  19           MR. SWEETEN:  This is Keith Ingram, the director of

17:11:53  20  the elections...

17:11:53  21           JUDGE SMITH:  So that's...

17:11:55  22           MR. SWEETEN:  It's a 10:30 flight in the morning.

17:11:58  23           JUDGE SMITH:  So that's who we're going to hear from

17:11:58  24  now.

17:12:01  25           MR. SWEETEN:  He's walking in now.

17:13:01  1            (Witness present and sworn by Judge Guaderrama).

17:13:01  2                         KEITH INGRAM,

17:13:04  3            DIRECT EXAMINATION BY THE DEFENSE

17:13:10  4   BY MR. HILTON:

17:13:10  5       Q.   Good evening, Mr. Ingram.  How are you?

17:13:12  6       A.   I'm fine.  How are you?

17:13:12  7       Q.   I'm okay.  I apologize that you've been waiting for so

17:13:15  8   long today, but we appreciate you being here.  I also understand

17:13:16  9   you have a flight out in the morning tomorrow.  We're going to

17:13:18  10  try to get through this as quickly as we can.

17:13:21  11           I want to briefly go through your background, just so

17:13:24  12  the Court has some understanding of who you are and what you

17:13:26  13  bring to the table.

17:13:27  14           Can you please tell the Court your current employer

17:13:30  15  and your job title and your educational background?

17:13:34  16       A.   I'm the director of the elections division at the

17:13:36  17  Texas Secretary of State, been there about 10 years, and worked

17:13:39  18  for the Governor in the appointments office.  Before that, I

17:13:43  19  graduated from Texas A & M University back in '89 and U.T. law

17:13:49  20  in 1993.

17:13:50  21       Q.   And you were director of elections in 2012, when

17:13:54  22  elections were delayed as a result of redistricting litigation?

17:13:55  23       A.   That's right.  I started January 5th, 2012.

17:13:58  24       Q.   And at a high level, what are some of your

17:14:02  25  responsibilities as director of elections?

DIRECT - INGRAM                                                        152

17:14:03  1        A.    The election code says that the Secretary of State is

17:14:08  2   Chief Election Officer for the State of Texas, and it creates a

17:14:11  3   division to help the secretary fulfill that responsibility, and

17:14:16  4   I direct that division.

17:14:17  5        Q.    Who are some of the other the government officials in

17:14:21  6   Texas that you communicate with regularly out of the state or

17:14:25  7   local level?

17:14:26  8        A.    We talk to county election officials on a very regular

17:14:31  9   basis.  I would say that they're out primary customers.  We also

17:14:35 10   talk to city election officials, as well as folks in the

17:14:40 11   Governor's office and Attorney General's office, if a question

17:14:40 12   of law comes up, that we can help on.

17:14:44 13        Q.    Do you regularly present on and explain the election

17:14:48 14   system in the election code in Texas?

17:14:50 15        A.    I do.  I make speeches, some more elementary than

17:14:56 16   others.

17:14:56 17        Q.    Do regularly attend conferences and have discussions

17:14:59 18   with election officials from all over the state and from other

17:15:01 19   states?

17:15:02 20        A.    We do.  We have a county election official seminar

17:15:05 21   every summer here in Texas.  We have another one in December for

17:15:08 22   our city schools and other election officials.  And then I'm a

17:15:11 23   member of the National Association of State Election Directors

17:15:15 24   and we get together twice a year.

17:15:17 25        Q.    You mentioned a minute ago that the Secretary of

17:15:22  1    State's role regarding elections was to -- I'm sorry -- could

17:15:24  2    you state that one more time?

17:15:25  3        A.   Chief Election Official for the State of Texas.

17:15:27  4        Q.   That's to -- I always forget the code in the election

17:15:31  5    code:  Obtain and maintain, something to that effect?

17:15:31  6        A.   Yes.  31003 says that our job is to obtain and

17:15:35  7    maintain uniformity in the interpretation, application and

17:15:38  8    operation of the election code and election laws outside of the

17:15:41  9    election code.

17:15:42  10       Q.   And what's the local government's role in

17:15:46  11   administering elections?

17:15:47  12       A.   So they actually put on the elections.  The elections

17:15:51  13   are held at the county level for a -- you know, a statewide

17:15:55  14   election will have actually 254 specific elections.  For a

17:15:58  15   primary, like we're about to have, it's 508 elections, because

17:16:03  16   each party in each county holds their own election.

17:16:06  17       Q.   Who has responsibility for redistricting in Texas?

17:16:09  18       A.   The Legislature.

17:16:11  19       Q.   Does the secretary of state do anything at all with

17:16:14  20   respect to drawing new districts for statewide offices or state

17:16:18  21   legislative seats?

17:16:19  22       A.   We do not.

17:16:20  23       Q.   What's the first day of in-person voting for the March

17:16:24  24   2021 primary?

17:16:26  25       A.   I believe early voting starts February 14th, I think.

DIRECT - INGRAM                                                        154

17:16:29   1   If I look at a calendar...

17:16:31   2       Q.   And Mr. Ingram, I apologize.  I'll ask you not to

17:16:34   3   refer to your phone.  You're going to have to refer to anything

17:16:36   4   separately and -- understood.  I appreciate you trying to be

17:16:39   5   helpful.  We'll get to some documents later that I think may

17:16:43   6   have the exact date and we can point the Court to those

17:16:46   7   documents.

17:16:46   8            How long does it take to prepare for this kind of

17:16:49   9   election, a primary election?

17:16:50  10       A.   Well, the preparation has been going on since last

17:16:54  11   summer, whenever the legislative session concluded, because we

17:16:58  12   have to make sure that all of the new laws that the Legislature

17:17:01  13   passes are implemented in training materials for this election.

17:17:04  14            It begins in earnest in November of '21.  When the

17:17:09  15   filing period started on November 13th, that's when the election

17:17:13  16   really kicked off.

17:17:14  17       Q.   When do the local the government officials begin their

17:17:21  18   work?

17:17:22  19       A.   They've been working on it since before November 13th,

17:17:26  20   but part of what we had this year that made it difficult is the

17:17:31  21   redistricting fell in, right on top of the November

17:17:35  22   constitutional amendment election, as well as preparing for

17:17:39  23   candidate filing and then the election in the primary.

17:17:42  24       Q.   And so the compressed schedule for redistricting

17:17:46  25   affected local governments' preparations?  Am I understanding

17:17:50   1    you correctly?

17:17:51   2        A.    That's correct.  Because you know it's hard to

17:17:54   3    explain, but a county like Harris County, they've got a G.I.S.

17:17:59   4    division that can do redistricting and the rest of the office is

17:18:02   5    not affected.  Lee County doesn't have that luxury.  They've got

17:18:05   6    one person, who's supposed to do all the redistricting, all the

17:18:08   7    candidate filing questions that come up and prepare for this

17:18:11   8    election.

17:18:11   9        Q.    And of course, when your referring to redistricting,

17:18:15  10    local governments have to do their own redistricting for local

17:18:18  11    offices?

17:18:18  12        A.    That's true, but the redistricting I'm talking about

17:18:21  13    that affects election officials directly is that last step,

17:18:24  14    after all of the officer lines are drawn, then they have to draw

17:18:28  15    voter registration precincts and tie each voter to a list of

17:18:31  16    offices for that precinct.

17:18:33  17        Q.    Very good.  And we'll talk about voter precincts in a

17:18:37  18    little bit.

17:18:38  19             For a large country like Harris County or like Tarrant

17:18:41  20    County, how many people are involved in the overall effort of

17:18:44  21    conducting an election?

17:18:46  22        A.    A lot.  I don't know the exact numbers, but, you know,

17:18:52  23    a place like Harris County is going to have 800-something

17:18:57  24    polling places on election day, with a minimum of three each in

17:18:59  25    each of those polling places, they're going to have 50 or 60

17:19:03   1   places in early voting, with anywhere from five to ten folks

17:19:06   2   working those places, plus all of the ones in the office.  They

17:19:09   3   hire a lot of temps to do a lot of data entry.  It's a lot.

17:19:13   4        Q.   Could it be thousands?

17:19:14   5        A.   It's a big operation, yes.

17:19:16   6        Q.   Same question, but for a smaller county like

17:19:20   7   Shackelford or Callahan or Brown County?

17:19:22   8        A.   It's not as big, because usually those folks only have

17:19:27   9   four election day polling places, so it's three each for them.

17:19:31  10   But, you know, proportionally speaking, it's just as big a

17:19:33  11   logistic for Shackelford County with their resources, as Harris

17:19:38  12   County with their resources.

17:19:40  13        Q.   Smaller county, smaller resources for administering

17:19:43  14   elections?

17:19:44  15        A.   They would have smaller resources, period, yes, sir.

17:19:47  16        Q.   Let's pull up Defendants' Exhibit 49.

17:20:06  17             So this is Defendants' Exhibit 49.  Do you recognize

17:20:10  18   this document?

17:20:11  19        A.   I do.

17:20:12  20        Q.   And what is this document?

17:20:13  21        A.   This is the election law calendar that our office

17:20:15  22   prepares for the primary election.

17:20:19  23        Q.   And what was the purpose of this election advisory and

17:20:22  24   what was the target audience?

17:20:25  25        A.   The purpose of this advisory is to make sure that all

DIRECT - INGRAM                                                157

17:20:26  1   of the events that have to happen to put an election on, a

17:20:29  2   primary election, are listed by dates, so that election

17:20:32  3   officials can refer to it, as they go through each of these

17:20:37  4   weeks, to see -- to make sure they don't miss anything,

17:20:41  5   basically, making sure they're hitting all of the milestones.

17:20:44  6       Q.   And the document begins with a number of notes.  As

17:20:47  7   you scroll through the first, I don't know, 15 or so pages,

17:20:49  8   there's a number of notes.  What are those notes intended to do

17:20:54  9   and who are they directed at?

17:20:54  10      A.   They're things that don't really have a specific date

17:20:57  11  in the calendar that they apply to, but that election officials

17:21:01  12  need to know in preparing for the election.

17:21:06  13           MR. HILTON:  And if we could skip ahead to State P.I.

17:21:09  14  1470 in the same exhibit.

17:21:14  15  BY MR. HILTON:

17:21:15  16      Q.   You see this page of the exhibit, Mr. Ingram?

17:21:18  17      A.   Yes.

17:21:19  18      Q.   And you see that heading calendar of events?

17:21:22  19      A.   I do.

17:21:23  20      Q.   And so just, generally, what does the rest of this

17:21:25  21  document describe and what information could the Court find

17:21:29  22  there?

17:21:29  23      A.   So the rest of the document is an explanation of what

17:21:34  24  goes on, particular dates in the calendar that, you know, are

17:21:39  25  hyperlinked in that first page.

KATHLEEN A. SUPNET, CSR

DIRECT - INGRAM                                                    158

17:21:44   1           MR. HILTON:   Let's go to Defendants' Exhibit 51.

17:21:44   2   BY MR. HILTON:

17:21:55   3       Q.   Mr. Ingram, to you recognize this document?

17:21:57   4       A.   I do.

17:21:58   5       Q.   What is it?

17:21:59   6       A.   This is a short calendar that we put together, much

17:22:02   7   earlier than the one we just referenced that just has the hot

17:22:06   8   points for each election that's coming up in the next calendar

17:22:09   9   year.

17:22:10  10       Q.   Does this document have a different intended audience

17:22:13  11   than the previous one?

17:22:14  12       A.   Not really.  They're both for election officials.

17:22:17  13   It's just this one is kind of an advance notice and it's an

17:22:19  14   easy -- it's an easy glance when four members of the public or

17:22:22  15   candidates for public office, if they're interested, just at a

17:22:25  16   high level about calendar events, you know, important things

17:22:29  17   like voter registration deadline.

17:22:33  18       Q.   Let's turn ahead a couple of pages to state P.I.

17:22:39  19   001574.  And there's a heading, that says, important 2022

17:22:43  20   election dates and then a heading, that says, March 1, 2022

17:22:51  21   primary election.  Do you see that, Mr. Ingram?

17:22:52  22       A.   I do.

17:22:53  23       Q.   Are the dates that are contained in this portion of

17:22:55  24   Exhibit 51, are those the same dates that are reflected in a

17:22:58  25   lengthier Defendants' Exhibit 49?

17:23:00  1      A.    They are.  These are just -- this is a very high level

17:23:02  2   calendar.

17:23:02  3      Q.    And so I'd like to talk about the dates on here.  So,

17:23:11  4   let's begin with this December 13th, 2021, date, filing deadline

17:23:18  5   for candidates.  Can you please explain the importance of that

17:23:20  6   date to the Court?

17:23:20  7      A.    That's the date by which anybody that wants to run for

17:23:24  8   a party office -- for the nomination of a party office, has to

17:23:31  9   file their application -- their candidacy application, with the

17:23:34  10  appropriate filing authority, in order to be considered for that

17:23:38  11  nomination.

17:23:39  12     Q.    For the up -- for this March 1st election, that filing

17:23:45  13  deadline has passed?

17:23:47  14     A.    It has.

17:23:48  15     Q.    And the offices that candidates were filing for, were

17:23:56  16  those based on the maps that the Legislature just passed in the

17:24:00  17  third call session of the 87th Legislature?

17:24:03  18     A.    That is correct.  They were filing for a place for the

17:24:07  19  maps that had just been drawn and signed by the Governor on

17:24:11  20  October 25th.

17:24:12  21     Q.    Let's go down to this -- well, there's one deadline I

17:24:17  22  wanted to ask you about that's not pictured on this version.  It

17:24:19  23  is in Defendants' Exhibit 49.  Are there any federal deadlines

17:24:25  24  with respect to balance and elections that come into play in

17:24:31  25  January?

17:24:31  1        A.    If a county has received any federal postcard

17:24:35  2    applications before January 15th, January 15th, 45 days before

17:24:39  3    the election is the deadline to mail those ballots or email

17:24:44  4    those ballots to overseas and military voters.  A similar

17:24:48  5    deadline for domestic ballot-by-mail is January 30th.

17:24:50  6        Q.    This is federal January 15th deadline, what has to

17:24:55  7    happen at the local level in order for local county

17:24:59  8    administrators to be able to meet that federal deadline?

17:25:02  9        A.    So the county -- or the candidates file.  Then the

17:25:06  10   party does the ballot order drawing by December 23rd, certifies

17:25:12  11   that their ballot to the county.  The county gets the ballots

17:25:16  12   programmed.  They get them back and they proof them.  They do a

17:25:18  13   logic inaccuracy test before the mail ballots go out, to make

17:25:22  14   sure that every vote will be counted the way that its cast.  And

17:25:26  15   so that logic inaccuracy test, you know, could take a day.  If

17:25:28  16   it's a small county, it could take a week and a half in a big

17:25:32  17   county.  And once all of that is done, then your ready to send

17:25:37  18   your mail ballots on January 15th.

17:25:40  19       Q.    If we had more time, I'd ask you to explain some more

17:25:43  20   details of that processed, I'd certainly invite the Courts'

17:25:45  21   question, if they have any, about what all of that entails.  But

17:25:49  22   is it fair to say that that's a tremendous amount of work?

17:25:52  23       A.    All of those steps require a lot of work, especially,

17:25:54  24   it's very important that the ballot proofing be done correctly

17:25:59  25   so that you don't have a ballot correction later.  So ballot

17:26:00   1   proofing means that you should have the eyes of the candidates

17:26:04   2   on the ballot, the eyes of the political parties locally on it,

17:26:07   3   as well as the election officials, to make sure that everybody

17:26:13   4   agrees this is what the ballot audit looks like.

17:26:16   5        Q.    In your view, is that important to the safety and

17:26:17   6   integrity of Texas elections?

17:26:21   7        A.    Absolutely.  Because any time you have a corrected

17:26:22   8   ballot situation, you've got a potential for voter confusion.

17:26:27   9        Q.    Again, so that deadline has passed?

17:26:31  10        A.    Agreed.

17:26:32  11        Q.    And there were some other upcoming deadlines here.

17:26:36  12             I also note in Defendants' Exhibit 51 that there other

17:26:39  13   elections listed.  For example, on the next page, it talks about

17:26:41  14   a May 7th, 2020 uniform election date, and there are a few more

17:26:46  15   listed in here as well.  Is that right?

17:26:48  16        A.    Agreed.

17:26:49  17        Q.    So, what does the calendar look like for a local

17:26:53  18   election administrator once the March primaries is concluded?

17:26:59  19   Is there time off before the next one?

17:27:01  20        A.    No.  They're immediately preparing for May and, of

17:27:06  21   course, the May runoff for the primary.

17:27:09  22        Q.    In general, this year for this primary election, has

17:27:13  23   there been any wiggle room?

17:27:16  24        A.    The schedule has been completely packed.  Like I

17:27:19  25   mentioned, the overlaying of redistricting on top of what's

17:27:21  1    already a packed calendar, pushed everybody to the limit this

17:27:25  2    time.

17:27:26  3         Q.    Are local election officials in Texas getting the job

17:27:29  4    done?  Are they doing what they need to do?

17:27:32  5         A.    They are.  They are indeed.  They always do.

17:27:36  6         Q.    Let's go briefly to Defendants' Exhibit 48.  Do you

17:27:46  7    recognize this exhibit, Mr. Ingram?

17:27:49  8         A.    I do.

17:27:49  9         Q.    And what is it?

17:27:50  10        A.    The main purpose of this advisory was to talk about

17:27:57  11   the special situation of precinct chairs this year and make sure

17:28:01  12   that everybody understood that they're filing period was going

17:28:03  13   to end at midnight, December 1st, and reopen again on

17:28:08  14   January 15th.

17:28:09  15        Q.    Why was it a specialist here?

17:28:11  16        A.    Because the precinct chairs -- you know, the voter

17:28:15  17   precincts are the last precincts to be drawn.  Once you got

17:28:19  18   officer lines in population, thresholds in place, then they draw

17:28:24  19   the precinct lines, and the precinct chairs run for the

17:28:26  20   chairmanship of that voter registration precinct, and so they

17:28:31  21   can't know what their office is going to be, until the voter

17:28:35  22   registration precincts are drawn.

17:28:37  23        Q.    The first page of this election advisory also mentions

17:28:41  24   SB13, and the Court has heard some testimony regarding SB13 and.

17:28:45  25   It says in here, SB13 authorizes Secretary of State to adjust

17:28:49  1    the schedules.  Am I reading that correctly?

17:28:53  2        A.    That's right.

17:28:54  3        Q.    Did the Secretary of State have to move any election

17:28:56  4    dates?

17:28:56  5        A.    Just the precinct chair filing period and to make sure

17:29:00  6    that there're elections on the runoff date.

17:29:02  7        Q.    Were any of the election dates in the previous

17:29:05  8    exhibits that we looked at, other than those, were those moved

17:29:09  9    as a result of SB13?

17:29:11  10       A.    There were not.

17:29:11  11       Q.    Because legislature got to redistricting on time under

17:29:15  12   Senate Bill 13?

17:29:16  13       A.    That is correct.

17:29:18  14       Q.    And I want to turn briefly to the next page, because

17:29:20  15   you had mentioned drawing precincts.  And there's a heading here

17:29:25  16   that says, effects of redistricting on county election

17:29:29  17   precincts.  Do you see that, Mr. Ingram?

17:29:35  18       A.    I do.

17:29:36  19       Q.    So can you just very -- again, very briefly, explain

17:29:40  20   what -- again, briefly, what a precinct is and some of the rules

17:29:43  21   that go into play when the local election officials have to do

17:29:48  22   the work of drawing?

17:29:48  23       A.    So the 42.005 of the Election Code says that precincts

17:29:53  24   boundaries can't cross more than one of a particular kind of

17:29:56  25   officer.  So each congressional district, you should have one

DIRECT - INGRAM                                                                164

17:29:59  1   congressional district in every voter registration precinct, one
17:30:03  2   commissioners court precinct in every voter registration
17:30:06  3   precinct.  So you've got to follow the officer lines when you're
17:30:09  4   drawing voter registration precincts so that you don't have a
17:30:12  5   split precinct with an office that you can't have a split
17:30:16  6   precinct up for.  And then you also have to follow the
17:30:17  7   population requirements, so it has to be fewer than 5,000 and
17:30:21  8   more than 250, so that you've got the right number of voters in
17:30:27  9   each precinct.  And so those are the two main rules that they
17:30:30  10  have to follow, but they can't do that until they get the
17:30:35  11  officer lines from other entities, including the county
17:30:38  12  commissioners court.
17:30:39  13      Q.   Ist hat a time -- consuming process to draw these
17:30:40  14  precincts?
17:30:40  15      A.   To draw the precincts is the most time-consuming part
17:30:43  16  of this process.
17:30:44  17      Q.   And very briefly, on the last page of this exhibit,
17:30:47  18  there's a heading that says, voter registration certificate.
17:30:50  19  What is a voter registration certificate?
17:30:53  20      A.   Every two years we do a mass mail-out of the different
17:30:55  21  colored voter registration certificate.  This year they're blue.
17:30:59  22  You might have been getting them in the mail last couple of
17:31:00  23  weeks.  But that shows what precinct -- what voter registration
17:31:05  24  precinct you're in and what offices are tied to that.
17:31:09  25      Q.   Have those certificates been mailed out across Texas?

17:31:12  1        A.    I think most counties have done it.  We probably have

17:31:15  2   a couple that haven't.  I would have to check.

17:31:17  3        Q.    The deadline described in this election advisory, it

17:31:20  4   says between January 1, 2022, and January 12, 2022, did I read

17:31:25  5   that correctly?

17:31:26  6        A.    That's correct.

17:31:26  7        Q.    So that deadline has passed?

17:31:29  8        A.    That deadline has passed.

17:31:30  9        Q.    Okay.  And then very briefly, I just want to turn to

17:31:31  10  Defendants' Exhibit 50.  And if you could just identify this for

17:31:39  11  the Court in case they need to refer to it.

17:31:39  12       A.    This is similar to the first exhibit we looked at.

17:31:42  13  This is the election law calendar for the May uniform date

17:31:47  14  election, our detailed position.

17:31:52  15       Q.    All right.  I next want to go to --

17:32:02  16             MR. HILTON:  Defendants' 52, please, first page of

17:32:15  17  text.

17:32:16  18  BY MR. HILTON:

17:32:16  19       Q.    Mr. Ingram, do you recognize Defendants' Exhibit 52?

17:32:20  20       A.    I do.

17:32:20  21       Q.    Is that a declaration that you've submitted in

17:32:23  22  connection with this case?

17:32:24  23       A.    I did.  I prepared it, I think, back in December.

17:32:26  24       Q.    At high level, can you just summarize what this

17:32:36  25  declaration explains.  I'm going to go through some detailed

17:32:39  1    questions, but for purposes of doing this, is so the Court knows

17:32:41  2    that this testimony is in here so that we can cut short some of

17:32:44  3    the other things that I want to -- (mumbling).

17:32:46  4         Just generally, what are you explaining in this

17:32:49  5    declaration?

17:32:49  6         A.   The purpose of this declaration was to make sure that

17:32:51  7    the Court would know that the election was already in motion and

17:32:55  8    that disturbing it at this point means it has a ripple effect

17:33:03  9    of -- in a lot of different areas, because elections are such

17:33:04  10   logistics-heavy operation that, you know, interfering with it,

17:33:09  11   and then trying to start the train again later, it just has

17:33:14  12   consequences that can be very problematic.

17:33:17  13        Q.   And so if an election date for this primary --

17:33:27  14   March 1, 2022 primary election, if that were to be delayed or

17:33:27  15   postponed, what would some of the effects be of that?

17:33:31  16        A.   Well, it's kind of inconceivable right now to even

17:33:36  17   think about, but we have, I don't know, maybe 100,000 voters, at

17:33:44  18   least 50,000 have already completed applications for ballot by

17:33:49  19   mail, and they have either been accepted or rejected; most of

17:33:54  20   them accepted; I think we have about a 12 percent rejection rate

17:33:57  21   statewide right now.  So if the election is delayed at this

17:34:03  22   point, do they have to file another application for ballot by

17:34:07  23   male or is this one good?  The voters who have ballots in hand,

17:34:12  24   more than 4,000 ballots have been mailed.  I know that Tarrant

17:34:16  25   County is mailing 3,000 yesterday and today, Harris County is

17:34:21  1    mailing 30,000 tomorrow.  So those voters that get a ballot in

17:34:23  2    their hand, do they go ahead and vote it?  Will it count?  Do

17:34:29  3    they have to wait for another one?  What do you do with this

17:34:30  4    ballot?  I mean it's just inconceivable at this point that we

17:34:33  5    would stop the election.  It's just -- I can't imagine -- I

17:34:37  6    don't know how we pick up the pieces at this point.

17:34:40  7        Q.   Is it possible for a voter to have already voted in

17:34:44  8    this election at this point?

17:34:45  9        A.   Absolutely.

17:34:46  10       Q.   And were you director of elections -- you were

17:34:50  11   director of elections in 2012, when there was a delay due to

17:34:54  12   redistricting litigation?

17:34:55  13       A.   That's right.

17:34:56  14       Q.   What were some of the -- what were some of the

17:34:59  15   negative consequences of delaying that election?

17:35:01  16       A.   So that election was delayed before it got started.  I

17:35:06  17   mean there had been a candidate filing period, so they had to do

17:35:09  18   that again, but basically everything else had to be done.  So

17:35:12  19   we're later in the process than then.

17:35:14  20            But the primary effect was on voters.  Voters.  I used

17:35:19  21   to say all summer of 2012, there's just not a lot of trust in

17:35:23  22   this world, because voters did not think that the moving of the

17:35:27  23   election was fair, right, and they inevitably thought that it

17:35:31  24   was a conspiracy on the part of the other team to jerk around

17:35:36  25   their particular candidate.  And so I know that's what it was

17:35:41  1   like in 2012.  We've now had 2016 and 20220 elections and voter

17:35:47  2   trust is much lower than it was when I got here in 2012.  And I

17:35:53  3   cannot imagine the consequences to voters and the potential just

17:35:56  4   saying -- throwing up their hands and saying I give up, if that

17:35:59  5   happens.

17:36:02  6        Q.    I want to turn next to a Supreme Court of Texas

17:36:08  7   decision *In re Khanoyan*.  We're not offering it as an exhibit,

17:36:14  8   but again it's a published decision -- or an issue decision I

17:36:15  9   think is awaiting official publication.

17:36:23  10             I have up here on the screen the slip copy.  The

17:36:24  11  Westlaw cite for this is *2022 WL 58537*.  And it was decided by

17:36:31  12  the Supreme Court of Texas on January 6th of 2022.

17:36:36  13             Mr. Ingram, have you read this case?

17:36:38  14        A.    I read it, yes, yesterday evening.

17:36:43  15        Q.    Not asking for legal opinion, but can you state just

17:36:48  16  generally, briefly, what this case is about?

17:36:51  17        A.    The case was about application *Purcell* principle, that

17:36:54  18  once an election is in motion, that the burden is really high to

17:36:59  19  stop that train and start it again later.

17:37:01  20        Q.    And you referred to the *Purcell* principle.  Does that

17:37:05  21  refer to *Purcell v. Gonzalez,* 549 U.S. 1, decided in 2006?

17:37:12  22        A.    Yes.  I'll take your word for it.

17:37:14  23        Q.    We'll see the citation on the next page, so...

17:37:24  24             MR. HILTON:  Let's go to page three, please, Brian,

17:37:27  25  and if you can zoom in on footnote one.

17:37:27  1   BY MR. HILTON:

17:37:31  2      Q.   Do you see that citation there, Mr. Ingram?  Did I

17:37:35  3   recite that correctly to you?

17:37:37  4      A.   You did.

17:37:39  5      Q.   All right.  Let's go to page six of this case,

17:37:44  6   *In re* -- I'm saying *Khanoyan*, and I don't know if that's the

17:37:49  7   correct pronunciation -- this first full paragraph here that

17:37:51  8   begins:  "But no amount of expedited briefing..."

17:37:56  9           Mr. Ingram, I want to go through a couple of the

17:37:59  10  statements here by the Supreme Court of Texas.  I want to find

17:38:02  11  out from you if you agree or disagree or what you think about

17:38:07  12  it.

17:38:07  13          In the second line of this paragraph, it says:  "The

17:38:09  14  primary election for 2022 is already in its early stages.  It

17:38:14  15  began on November 13 with the opening of the filing period for

17:38:20  16  candidates, based on the now-challenged map.  That filing period

17:38:21  17  ended on December 13.  The period for ballot access has closed."

17:38:25  18          Did I read that correctly?

17:38:27  19     A.   Agreed.

17:38:29  20     Q.   And do you agree that the primary election is already

17:38:33  21  in its early stages?

17:38:35  22     A.   Yes.

17:38:35  23     Q.   And this -- this case was issued on January 6th.  So

17:38:39  24  are we even further along?

17:38:40  25     A.   Yeah, I was about to say we're not in the early stages

DIRECT - INGRAM                                                    170

17:38:44   1    anymore.  We're midway, I would say.  Right now counties are

17:38:47   2    training poll workers to start working in a couple of weeks.

17:38:51   3        Q.    The next sentence on page six of the slip opinion:

17:38:55   4    "Ballots must be finalized very soon to comply with deadlines

17:38:59   5    for mailing ballots to military and oversees voters."

17:39:04   6             That deadline we discussed earlier, that's already

17:39:04   7    passed?

17:39:05   8        A.    That's right.  Ballots are finalized and mailed out to

17:39:10   9    voters.

17:39:17   10       Q.    First complete sentence on this page says:  "The

17:39:19   11   affidavits attached to Respondents' brief, including affidavits

17:39:22   12   from the Texas Secretary of State's office drawn from

17:39:25   13   contemporaneous litigation, all state that disruptions to the

17:39:28   14   election at this point would be 'catastrophic'."

17:39:31   15            Did I read that correctly?

17:39:32   16       A.    You did.

17:39:33   17            MR. HILTON:  And I'd like to zoom in on -- and there's

17:39:35   18   a footnote 4 there.  I'd like to zoom in on footnote four.

17:39:35   19   BY MR. HILTON:

17:39:40   20       Q.    And do you see your name in footnote 4?

17:39:43   21       A.    I do.

17:39:44   22       Q.    Did you submit that declaration in connection with

17:39:47   23   this case or with a different case?

17:39:49   24       A.    I think it was a different case.  I didn't -- it

17:39:52   25   didn't have anything to do with this one.

```
17:39:55   1        Q.    Okay.  Do you agree that disruptions to elections at
17:39:58   2   this point would be catastrophic?
17:40:01   3        A.    I do.
17:40:02   4        Q.    Did you say as much in the declaration that we have
17:40:04   5   before this Court, Defendants' Exhibit 52?
17:40:07   6        A.    I believe so, yes, sir.
17:40:08   7        Q.    In fact, wasn't your declaration in this case
17:40:12   8   substantially identical to the declaration that's being
17:40:15   9   referenced by the Supreme Court of Texas here?
17:40:16  10        A.    It was the same, yes.
17:40:21  11             MR. HILTON:  Scrolling back up.
17:40:21  12   BY MR. HILTON:
17:40:22  13        Q.    I'll read one more sentence from this page.
17:40:26  14             The Supreme Court of Texas said, "Requested relief
17:40:28  15   could prevent the election from going forward on time, and at
17:40:32  16   the very least, insert a great deal of confusion into this
17:40:35  17   election cycle."
17:40:36  18             Did I read that correctly, Mr. Ingram?
17:40:37  19        A.    I do.
17:40:41  20        Q.    Do you agree with that?
17:40:44  21        A.    I do.
17:40:44  22        Q.    And then one final sentence from this, that I'd like
17:40:51  23   to look at, and we'll look at one more document and we'll
17:40:55  24   wrap-up and we'll get you to the flight on time tomorrow
17:41:00  25   morning.
```

DIRECT - INGRAM                                                                    172

17:41:02  1          MR. HILTON:  Page 12.  And it's the last paragraph I'm

17:41:14  2   sorry, end of the paragraph.  I apologize.  Scroll up.

17:41:27  3   BY MR. HILTON:

17:41:28  4      Q.   On page 12, here, the end of that paragraph, Supreme

17:41:32  5   Court of Texas says:  "Any relief this Court could grant is

17:41:35  6   already likely to disrupt elections in Harris County, and with

17:41:37  7   every passing day the likely severity of that disruption grows."

17:41:41  8          Did I read that correctly?

17:41:42  9      A.   You did.

17:41:43  10     Q.   And this was issued on January 6th.  Will the

17:41:46  11  disruption by delaying an election be more severe today than it

17:41:49  12  would have been on January 6th?

17:41:51  13     A.   Much more.

17:41:55  14     Q.   Mr. Ingram, one last document.  This is a filing by

17:42:03  15  plaintiffs' counsel in this case by Brooks' plaintiffs, the

17:42:08  16  Brooks Plaintiffs' Supplemental Brief on Preliminary Injunction

17:42:11  17  Remedies.  And that's E.C.F. docket number 159.

17:42:16  18         Have you read this brief, Mr. Ingram?

17:42:19  19     A.   I did.

17:42:20  20     Q.   I want to start on page five of this document with the

17:42:24  21  plaintiffs' conclusion.

17:42:25  22         The plaintiffs conclude, in this supplemental brief,

17:42:31  23  the March 2020 primary does not pose a barrier to effective fair

17:42:35  24  and workable relief for the Brooks plaintiffs.

17:42:40  25         Did I read that correctly?

KATHLEEN A. SUPNET, CSR

DIRECT - INGRAM                                                     173

17:42:41   1          A.    You did.

17:42:42   2          Q.    What relief are they seeking as they describe in this

17:42:46   3     document?

17:42:46   4          A.    So, I wasn't entirely sure if it was statewide or just

17:42:50   5     a few districts, but what they're looking for is to delay at

17:42:55   6     least part of the primary election to either May 24th or

17:42:56   7     November of this year.

17:42:59   8          Q.    Do you believe that delay of a primary election -- I

17:43:05   9     understand the brief to be just in counties affected by

17:43:09  10     remediation of Senate District 10, but even if it were

17:43:13  11     statewide, would that cause voter confusion?

17:43:16  12          A.    Yes.

17:43:16  13          Q.    Would it have negative consequences?

17:43:18  14          A.    It would make voters wonder what the point is.  You

17:43:22  15     know, why did I go through that effort; why bother next time?

17:43:27  16     It's very corrosive to the authenticity and legitimacy of the

17:43:34  17     process whenever you change the rules in the middle of the game.

17:43:37  18          Q.    Would a delay of this primary also entail the other

17:43:42  19     negative consequences, that I've asked you about today, such as

17:43:45  20     a waste of resources at the local level and duplication of

17:43:49  21     effort?

17:43:49  22          A.    Absolutely.  And -- yes, absolutely.

17:43:51  23          Q.    And on pages one and two of this document, Mr. Ingram,

17:43:57  24     the plaintiffs described two potential remedial options; one is

17:44:01  25     to delay the primary to May 24, 2020, and one is for an open

17:44:08  1    primary, a jungle primary in November of 2022.

17:44:11  2         Do you recall that from reading the supplemental

17:44:13  3    brief?

17:44:14  4         A.   Yes.

17:44:14  5         Q.   And in your view, would each of these options present

17:44:22  6    barriers to administering fair -- or fair elections in Texas?

17:44:23  7         A.   So, the major objection is that the voting in this

17:44:29  8    election is already underway.

17:44:31  9         There was a situation back several years ago, whenever

17:44:36 10    I was newer in this job, where a school district had a

17:44:39 11    consolidation election with another school district, and they

17:44:42 12    posted a trustees meeting, with three-days notice posting

17:44:45 13    requirement like you're supposed to, that had on the agenda,

17:44:47 14    "cancellation of the election," and it was during early voting,

17:44:52 15    same as we're doing early voting right now.  And our office,

17:44:56 16    under its limited authority under 31.005 of the Election Code,

17:45:02 17    sent a very sharply worded letter to the school district that

17:45:06 18    said, no, no, no, that's an abuse of voters' rights stop an

17:45:10 19    election once it's already underway.  Those people who have

17:45:13 20    voted and are about to vote deserve to have their votes counted

17:45:18 21    as they've been cast.  You can talk about the legitimacy of the

17:45:20 22    election after it's held, but no way are you going to stop it or

17:45:24 23    we're going to get the Attorney General to file a mandamus.

17:45:27 24         It's the same kind of thing here.  This election is

17:45:29 25    underway.  People are voting.  We cannot abuse those voters by

17:45:33  1    saying their vote is a straw vote at this point.  It's just not

17:45:38  2    right.  So that's the biggest objection.

17:45:42  3        Q.    And let me ask you about that.  So that example that

17:45:46  4    you gave, that was in reference to a school board election?

17:45:48  5        A.    It was a consolidation of two school districts.

17:45:53  6        Q.    Safe to say that that's a much smaller election as far

17:45:57  7    as number of voted impact -- number of voters impacted than a

17:46:01  8    senate district or multiple senate districts?

17:46:05  9        A.    I would agree with that.  It was Coleman and Novice

17:46:05 10    ISD, so it's pretty small.

17:46:07 11        Q.    There's also reference here to some notion that the

17:46:11 12    Court could order the Secretary of State to direct that the

17:46:14 13    affected districts primary results not be tallied.

17:46:18 14            Do you recall reading that?

17:46:18 15        A.    I did.

17:46:19 16        Q.    Okay.  What did you think of that?

17:46:20 17        A.    That's impossible.  These races are on the ballot with

17:46:24 18    the rest of the races.  When you put a ballot in the scanner, it

17:46:28 19    tallies all the races.  There's no way not to do that.  No,

17:46:32 20    there is a way; it would require hand counting every other race

17:46:35 21    on the ballot.

17:46:38 22        Q.    In every affected election?

17:46:42 23        A.    In every affected election, every affected precinct.

17:46:47 24        Q.    And finally, Mr. Ingram, with respect to this

17:46:49 25    document, plaintiffs cite to a 1996 case, *Vera v. Bush*, as

DIRECT - INGRAM                                                    176

17:46:55  1    support for some of their proposals.  Have there been

17:47:00  2    any changes -- had there been any changes to the administration

17:47:04  3    of elections in Texas since 1996?

17:47:07  4         A.   Yes, quite a few.

17:47:08  5         Q.   All right.  Can you give a couple of examples?

17:47:11  6         A.   So the way the ballots are prepared is different now.

17:47:15  7    The way that voting systems -- you know, voting systems, period,

17:47:19  8    are different.  Back in 1996, there were a number of counties

17:47:22  9    that had punch cards and now we almost universally use ballot

17:47:27  10   marking devices.  And the equipment that we have now costs more

17:47:31  11   than what they had back then.  You could just use, you know,

17:47:34  12   optical scan ballots back then.  Now we've got ballot marking

17:47:38  13   devices and there's a discrete number of units that each county

17:47:41  14   has, and so if you have to program a separate election on

17:47:43  15   separate equipment, a lot of counties are not going to have

17:47:46  16   enough equipment to do -- to do that.  It's just practically

17:47:49  17   more difficult.

17:47:50  18        Q.   We talked about the 45-day federal deadline for

17:47:55  19   mailing out ballots.  Do you know whether that was implemented

17:48:00  20   after 1996?

17:48:01  21        A.   That was in 2010.

17:48:03  22        Q.   And the *Purcell* case that we looked at earlier, that

17:48:05  23   was decided in 2006?

17:48:08  24        A.   Agree.

17:48:09  25        Q.   Would you say it's harder to administrate --

17:48:11  1    administer elections since 1996 or at least more complicated?

17:48:17  2         A.    Elections administrators now have to be pretty good

17:48:20  3    lawyers and they have to be pretty good I.T. people, techs,

17:48:22  4    both.  So, yes, it's much more difficult.

17:48:28  5         Q.    Thank you, Mr. Ingram.

17:48:29  6              MR. HILTON:  I think I'm finished, Your Honor.  I just

17:48:32  7    want to check with my (mumbling).

17:48:38  8              MS. DANAHY:  Your Honor, plaintiffs don't have any

17:48:43  9    questions.

17:48:44  10             MR. HILTON:  Well, then I have no further questions

17:48:46  11   either.

17:48:46  12             Thank you.

17:48:46  13             JUDGE GUADERRAMA:  And may Mr. Ingram be excused?

17:48:52  14             MS. DANAHY:  Yes, Your Honor.

17:48:53  15             MR. HILTON:  Yes, Your Honor.

17:48:53  16             JUDGE GUADERRAMA:  Thanks for coming down.  You are

          17   free to go, sir.

          18             (Witness excused).

          19             MR. SWEETEN:  Well, we made it under 6 o'clock.

          20             THE COURT:  Yes, you did.

          21             MR. SWEETEN:  So, we have to videotaped depositions.

17:49:15  22   We can just start those in the morning.  We seem to be on

17:49:16  23   schedule.  I don't know and I haven't talked to Mr. Dunn about

17:49:17  24   rebuttal.  So maybe if you give us two minutes to talk, we can

17:49:20  25   maybe project to the Court about what tomorrow looks like.

17:49:23  1          JUDGE GUADERRAMA:  Sounds good.

17:49:23  2          (Sotto voce conversation between counsel).

17:50:26  3          MR. SWEETEN:  Your Honor, I think here's where we are.

17:50:28  4     And I forgot to mention Phil King will be on tomorrow, as well.

17:50:32  5     So we have Representative King.  We have a 45-minute video depo

17:50:38  6     with both sets of clips, a 30-minute video depo with both sets

17:50:42  7     of clips.  He's got a single rebuttal witness that he thinks

17:50:45  8     will take an hour.  I haven't added that up, but I think we're

17:50:50  9     talking about early afternoon, which is what we were hoping for.

17:50:54  10    We think we can work out a deal on the exhibits, which may

17:50:58  11    obviate the need for an additional projection and so I guess my

17:51:01  12    projection is 2 o'clock tomorrow we could be finished.

17:51:04  13          Now, there was one other idea that he just pitched and

17:51:08  14    it seems like it might be workable for us and that is that he

17:51:12  15    suggested that maybe rather than give close tomorrow, but if

17:51:15  16    there's a time over the next couple of weeks, that we would come

17:51:18  17    before the Court -- Houston, El Paso -- wherever you want us to

17:51:22  18    be, we can come in and give a full closing, if that's something

17:51:26  19    the Court would entertain.  If not, we can be ready to give

17:51:30  20    closing tomorrow, and we can also do written closing, whatever

17:51:35  21    the Court wishes.

17:51:37  22          JUDGE SMITH:  I'd' rather have closings tomorrow.

17:51:37  23          JUDGE GUADERRAMA:  You want to do it tomorrow?

17:51:40  24          JUDGE SMITH:  It seems to me, while it's fresh in

17:51:43  25    everybody.  We may still have some requests for additional

17:51:46  1   briefing or input.

17:51:47  2            I don't know.  That's just me.

17:51:57  3            JUDGE BROWN:  That's fine.

17:51:59  4            JUDGE GUADERRAMA:  What would be your preference?

17:51:59  5            MR. SWEETEN:  What would be what?  I'm sorry.

17:52:02  6            JUDGE GUADERRAMA:  Your preference?  What would be

17:52:04  7   your preference?

17:52:04  8            MR. SWEETEN:  Well --

17:52:04  9            JUDGE GUADERRAMA:  Or do you have one?

17:52:05  10           MR. SWEETEN:  Well, he had the idea.  I was fine with

17:52:07  11  that.  But if the Court prefers us to do it tomorrow, we're

17:52:11  12  absolutely willing to -- I mean we're happy to do it.

17:52:12  13           MR. DUNN:  My only suggestion is there's a lot of

17:52:14  14  exhibit information that the Court hasn't seen in this short

17:52:17  15  evidentiary hearing.  And so, you know, closing tomorrow will

17:52:20  16  mean it won't get talked about, because we won't have the

17:52:23  17  ability to put all of that together.  So that's what my

17:52:27  18  suggestion, but we also don't want any further delay, so...

17:52:30  19           THE COURT:  So Judge Smith indicated maybe we'll hear

17:52:33  20  you orally tomorrow and then we have a submission later in the

17:52:37  21  week that maybe can summarize those other exhibits you're

17:52:40  22  talking about.

17:52:40  23           JUDGE SMITH:  If for whatever reason, we can reconvene

17:52:45  24  at some other time when we -- the Judges indicate --

17:52:53  25           MR. SWEETEN:  The state is fine giving it tomorrow and

17:52:56   1   the state is fine giving the closing in two weeks.  We're really

17:52:59   2   here, you know, to do what the Court wants us to do.

17:53:03   3           MR. DUNN:  I'm here.  We'll do it tomorrow.

17:53:05   4           MR. SWEETEN:  We'll just do it tomorrow.

17:53:07   5           JUDGE GUADERRAMA:  All right.  Sounds good.  We'll see

17:53:08   6   you-all back -- we start at 9 o'clock again tomorrow.  You'll

17:53:12   7   have enough time if we start at 9:00?

           8           MR. SWEETEN:  I think we will.

           9           JUDGE GUADERRAMA:  All right.  Then we'll see you back

          10   at 9 o'clock.  We're in recess until then.

          11           (Proceeding concludes for the evening).

          12                          * * *

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

```
1                        * * * * *

2            I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.  I

4    further certify that the transcript fees and format comply with

5    those prescribed by the Court and the Judicial Conference of the

6    United States.

7    Signature:/s/KATHLEEN ANN SUPNET        February 23, 2022
                Kathleen A. Supnet, CSR          Date
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

KATHLEEN A. SUPNET, CSR