```
1                    IN THE UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF TEXAS
2                          EL PASO DIVISION
                           VOLUME 9 OF 9
3

4   LULAC, et al.,              )(    EP:21-CR-259-DCG-JES-JVB
                                )(    (Lead Case)
5       Plaintiffs,             )(
    _____)(
6   ROY CHARLES BROOKS, et al., )(    EP:21-CV-00991-DCG-JES-JVB
                                )(
7       Plaintiffs,             )(
                                )(
8   vs.                         )(    EL PASO, TEXAS
                                )(
9   GREG ABBOTT, in his official)(
     capacity as Governor of Texas,)(
10   et al.,                    )(
                                )(    January 28th, 2022
11      Defendants.             )(    (1:01 p.m. to 2:31 p.m.)

12  _____

13  HEARING ON BROOKS PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
    _____

14

15               FIFTH CIRCUIT JUDGE JERRY EDWIN SMITH
                 U.S. DISTRICT JUDGE DAVID C. GUADERRAMA
16               U.S. DISTRICT JUDGE JEFFREY V. BROWN

17
    APPEARANCES:
18
    For Brooks Plaintiffs:     Mr. Chad W. Dunn
19                             Brazil & Dunn
                               4407 Bee Caves Road
20                             Building 1, Ste. 111
                               Austin, TX 78746
21                             (512) 717-9822

22
                               Mr. Mark P. Gaber
23                             Mark P. Gaber PLLC
                               P.O. Box 34481
24                             Washington, DC 20043
                               (715) 482-4066
25                             Mark@markgaber.com
```

KATHLEEN A. SUPNET, CSR

```
 1   For Brooks Plaintiffs:      Mr. Jesse L. Gaines
                                 Attorney at Law
 2                               P.O. Box 50093
                                 Fort Worth, TX 76105
 3                               817-714-9988
                                 Gainesjesse@ymail.com
 4
                                 Ms. Molly E. Danahy
 5                               P.O. Box 26277
                                 Baltimore, MD 21211
 6                               (208) 301-1202
                                 Danahy.molly@gmail.com
 7
                                 Ms. Sonni Waknin
 8                               10300 Venice Blvd. # 204
                                 Culver City, CA 90232
 9                               732-610-1283
                                 Sonniwaknin@gmail.com
10

11   For Defendants:            Mr. Patrick K. Sweeten
                                 Mr. Christopher D. Hilton
12                               Mr. Eric Hudson
                                 Mr. William Thomas Thompson
13                               Ms. Kathleen Hunker
                                 Ms. Courtney Brooke Corbello
14                               Mr. Jack Buckley DiSorbo
                                 Office of Texas Attorney General
15                               P.O. Box 12548
                                 MC 009
16                               Austin, Texas 78711
                                 (512) 463-4139
17
     ALSO PRESENT:               Mr. Bryan Christopher
18
     Court Reporter:             Kathleen A. Supnet
19                               El Paso, Texas
                                 (915)834-0573
20                               kathi.supnet5303@gmail.com

21

22

23

24           Transcript produced by mechanical stenography, and

25   computer-aided software and computer.
```

1               CHRONOLOGICAL INDEX

2                VOLUME 9 of 9

3   JANUARY 28, 2022, (1:01 p.m. to 2:31 p.m.)        PAGE  VOL.

4   Closing Argument by Mr. Dunn. . . . . . . . . . .   5     9

5   Closing Argument by Mr. Gaber . . . . . . . . . .  23     9

6   Closing Argument by Mr. Thompson. . . . . . . . .  34     9

7   Closing Argument by Mr. Dunn. . . . . . . . . . .  60     9

8   Court Reporter Certificate. . . . . . . . . . . .  67     9

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|        |    |                                                                                 |
|--------|----|---------------------------------------------------------------------------------|
|        | 1  | (Proceedings resume after lunch at 1:01 p.m.)                                   |
| 13:01:14 | 2  | JUDGE GUADERRAMA:  We're going to admit Exhibit 1 of                           |
| 13:01:16 | 3  | 2.  I think that's one that had the objection over the hearsay                |
| 13:01:23 | 4  | and authentication objections and we'll each then give it the                 |
| 13:01:27 | 5  | weight that we think that the exhibit deserves.                                |
| 13:01:31 | 6  | And the last thing is, do you-all want to set time                            |
| 13:01:35 | 7  | limits for your closing or do you want to just go until you                   |
| 13:01:39 | 8  | think we've had enough or how do you want to do that?                         |
| 13:01:40 | 9  | MR. DUNN:  Mr. Gaber and I were intending to split the                        |
| 13:01:45 | 10 | closing with -- where I plan to focus on the record evidence and              |
| 13:01:47 | 11 | he intended to focus on the legal argument and I think we've                  |
| 13:01:50 | 12 | estimated that should take about an hour, if that sounds                      |
| 13:01:53 | 13 | reasonable to the Court.                                                       |
| 13:01:55 | 14 | JUDGE GUADERRAMA:  Hour is fine.                                               |
| 13:01:56 | 15 | The government, are you good with an hour?                                     |
| 13:01:57 | 16 | MR. THOMPSON:  That's fine, Your Honor.  Thank you.                            |
| 13:01:59 | 17 | JUDGE GUADERRAMA:  So do you-all need a warning at any                         |
| 13:02:03 | 18 | point or you and Mr. Gaber will divide it up how you want, you                |
| 13:02:07 | 19 | want a warning right before you end?                                           |
| 13:02:09 | 20 | MR. DUNN:  I'll take a warning at 30 minutes, Your                            |
| 13:02:09 | 21 | Honor.                                                                          |
| 13:02:12 | 22 | JUDGE GUADERRAMA:  Thirty-minute warning?  All right.                         |
| 13:02:12 | 23 | The government, any warning?                                                    |
| 13:02:14 | 24 | MR. THOMPSON:  Thank you.  That would be great.                               |
| 13:02:14 | 25 | JUDGE GUADERRAMA:  I'm sorry?                                                  |

13:02:18   1            MR. THOMPSON:  That'll be great.  Thank you.

13:02:18   2            JUDGE GUADERRAMA:  Okay.  A 30-minute warning as well

13:02:21   3   or 3-minute warning?

13:02:23   4            MR. THOMPSON:  Three would be great.

13:02:26   5            JUDGE GUADERRAMA:  All right.

13:02:27   6            Mr. Dunn, whenever you're ready.

13:02:30   7                 CLOSING ARGUMENT BY THE PLAINTIFFS

13:02:32   8            MR. DUNN:  May it please the Court.

13:02:34   9            Chad Dunn on behalf of the Brooks plaintiffs.

13:02:35  10            On behalf of my client and the citizens of Tarrant

13:02:38  11   County, I thank the Court and its staff for the time and effort

13:02:40  12   to consider this important matter today.  It's my honor to stand

13:02:44  13   with these gentlemen and ladies arguing such an important case.

13:02:48  14            And my thanks to the state for their professionalism

13:02:51  15   and their exceptional conduct throughout this trial.

13:02:54  16            The record evidence is clear that the government is no

13:02:57  17   longer entitled to a presumption of good faith.  In fact, the

13:03:01  18   record evidence is that the government has routinely, throughout

13:03:04  19   the process of developing the map for Senate District 10, engage

13:03:08  20   not just in willful blindness, but outright dishonesty to the

13:03:12  21   citizens of Tarrant County, to Senator Powell and to other

13:03:16  22   members of the Senate and the House, who were asked to vote on

13:03:19  23   this plan.

13:03:20  24            We started the beginning of the plan analysis, which

13:03:23  25   starts with population deviation.  On your screen is Plaintiffs'

CLOSING BY MR. DUNN                                                    6

13:03:26   1   Exhibit 55, which shows the total population deviation of the
13:03:30   2   state Senate districts as of the release of the new Census
13:03:34   3   figures.  One of the things that this Court heard through the
13:03:37   4   record evidence is that it was necessary to make changes to
13:03:40   5   Senate District 10 in order to balance the population, but that
13:03:44   6   is simply not true.
13:03:45   7           As the Court will note, Senator Seliger's district was
13:03:49   8   shown to be 7.5 percent negative deviation.  The adjacent Senate
13:03:55   9   district was shown to be 15.3 negative deviation, and there were
13:04:00   10  two districts to the north and west of Tarrant County; Senate
13:04:04   11  District 30, it was 9.3 percent positive deviation and Senate
13:04:08   12  District 12, that was 15.6 positive deviation.
13:04:11   13          Trades between those four districts alone would have
13:04:15   14  balanced the maps in the Panhandle, and all of the evidence that
13:04:19   15  the Court heard from Senator Powell and from Senator Huffman is
13:04:22   16  that there were a number of proposals before the Legislature
13:04:23   17  that accomplished the tasks of balancing those adjacent
13:04:27   18  districts without making any changes to Senate District 10.
13:04:31   19  And, of course, the evidence shows that Senate District 10,
13:04:35   20  after the release of the new Census figures was swell within
13:04:36   21  deviation less than 1 percent.
13:04:39   22          So if the question -- if the motivation behind the
13:04:41   23  plan was not to balance population, what was it?  The government
13:04:47   24  posits that it's a partisanship explanation, except the record
13:04:51   25  evidence from the legislative debates does not support such a

CLOSING BY MR. DUNN                                                7

13:04:55  1    conclusion nor does the evidence developed throughout this

13:04:58  2    litigation.  We'll track some of that here.

13:05:00  3          But we start at the beginning of the process with a --

13:05:03  4    and what kind of information the government actors here reviewed

13:05:06  5    in developing the plan.  At Plaintiffs' Exhibit 104 on your

13:05:11  6    screen, starting back in October 2019, the Texas Demographic

13:05:17  7    Center began to make presentations to both the House and Senate

13:05:17  8    redistricting committees.

13:05:18  9          You heard Senator Huffman testify yesterday that she

13:05:22 10    recalled having seen these presentations and, in fact, they were

13:05:24 11    routine presentations throughout the field hearings in that

13:05:28 12    following year.

13:05:29 13          As the Court will note on page 21 of the exhibit, it

13:05:32 14    contains detailed racial shading maps of the Dallas-Fort Worth

13:05:38 15    area.  It also includes Hispanic and Black population shading

13:05:43 16    maps, as well as the Asian population in Dallas-Fort Worth.

13:05:47 17          This information of course though wasn't new to the

13:05:49 18    key actors in this case.  On your screen is Plaintiffs'

13:05:53 19    Exhibit 29, which was the -- was an exhibit in the *Perez* case in

13:05:56 20    San Antonio in the last three-judge court, to handle Texas

13:05:59 21    redistricting.  And this is one of the exhibits Anne Mackin

13:06:03 22    herself personally handled in negotiations between plaintiffs'

13:06:06 23    and defendants' counsel when she was then serving in the

13:06:09 24    Attorney General's Office.  This map too shows the racial

13:06:13 25    shading of Tarrant County, much as the Texas Demographic Center

CLOSING BY MR. DUNN                                                8

13:06:17   1   had also shown.

13:06:18   2          And so with that year and a half of absorption of that

13:06:21   3   information, Mr. Svatora on behalf of his senator, Senator

13:06:27   4   Powell, and Senator Powell's Senator Powell's Chief of Staff,

13:06:30   5   Gary Jones, went to meet with the staff from Senator Huffman,

13:06:32   6   and you heard that testimony by videotape deposition.  And in

13:06:35   7   this contemporaneously taken note, Senator Powell, through her

13:06:38   8   staff, was told that there would be very -- likely to be very

13:06:41   9   little change to her district.  In fact, the phrase was, as you

13:06:44  10   see in the next to the last line, "slightly tweaking your

13:06:48  11   district."  That was either untrue at the time it was said or it

13:06:52  12   became untrue at some point later, but in the follow-up meeting

13:06:57  13   that includes Senator Huffman and her Chief of Staff Gary Jones,

13:06:59  14   which he always describes in his declaration before the Court.

13:07:03  15          Senator Powell and Mr. Jones were provided two maps,

13:07:08  16   Exhibit 7, that had been admitted into evidence; Brooks'

13:07:13  17   Exhibit 7.  This is a photograph of one of them.  And as the

13:07:16  18   Court will note, it contains racial data in the margin.  Now

13:07:20  19   that in and of itself is relevant, but what is also relevant

13:07:24  20   about this exhibit is if you carefully look, you'll see that it

13:07:26  21   shows the non-Anglo percentage of population for Senate District

13:07:32  22   10 is 56-something percent.  And so the information before

13:07:37  23   Senator Huffman and her staff was not the CVAP figures that we

13:07:42  24   hear as post hoc explanation.  Instead what they knew or at

13:07:45  25   least what they were telling others what the documents that they

KATHLEEN A. SUPNET, CSR

CLOSING BY MR. DUNN                                                 9

13:07:47  1    were providing, is that Senate District 10 was indeed a

13:07:49  2    majority-minority district.

13:07:51  3            On Exhibit 9 are some additional maps that were later

13:07:58  4    provided in a drop box and made available to all of the Senate

13:08:01  5    staff and Senators.  I'll show that email momentarily, but what

13:08:04  6    this map also shows is that the information provided to the

13:08:06  7    entire Senate, with respect to Senate District 10, both included

13:08:11  8    racial makeup and also indicated that the district was -- also

13:08:16  9    indicated the percentage of the district.  Now this information

13:08:19 10    comes out after the development of the plan begins.

13:08:26 11            Now here's the email, Plaintiffs' Exhibit 8, that was

13:08:29 12    admitted into evidence, where Mr. Opperman forwards to all of

13:08:34 13    the staffers for the senators a drop box that contains various

13:08:38 14    information, and included in there are a number of racial maps,

13:08:41 15    and indeed -- and Gary Jones' declaration in paragraph 11 on

13:08:46 16    page 2, he describes the types of racial maps that were

13:08:50 17    provided.  So up until this point, in approximately 2 years

13:08:53 18    worth of work, the data that the government was working with in

13:08:57 19    developing this map was plainly racial data.

13:09:00 20            But then somehow the strategy changed and

13:09:04 21    unfortunately this Court has been deprived of an explanation of

13:09:07 22    why that is so.  But it is true that on September 16th at 5:31

13:09:11 23    p.m., Mr. Jones, Senator Powell's Chief of Staff, forwarded a

13:09:16 24    letter to the staff for Senator Huffman explaining why she was

13:09:22 25    against this recent proposal she had seen projected on the wall

13:09:24   1   in Senator Huffman's office.  And in there she included

13:09:28   2   information about the racial discrimination that she thought

13:09:30   3   would result from adopting such a plan.

13:09:34   4        And then the next day, Mr. Opperman responds in what

13:09:37   5   has to be one of the oddest letters sent from -- emails sent

13:09:40   6   from a legislative staffer in the chair of a committee, that at

13:09:44   7   least I have seen, and he says, and I quote, "Gary, thank you

13:09:48   8   for reaching out.  I briefly opened these documents and they

13:09:51   9   appear to contain racial data, so I closed them right away."

13:09:56   10  Open paren, (Just a reminder, we are drafting all maps without

13:09:59   11  regard to racial data and sending the drafts out for legal

13:10:03   12  compliance check.)

13:10:04   13       In what other circumstance does the Legislature

13:10:08   14  consider an important matter a public policy and willfully close

13:10:10   15  its eyes to relevant data?  But what's more about this is what

13:10:14   16  changed in the last 2 years about the considering racial data in

13:10:18   17  adopting of a map and then all of a sudden deciding not to.

13:10:22   18       And then finally, what else doesn't make sense is that

13:10:25   19  a state like Texas, with such a sorted history of violations of

13:10:29   20  the Voting Rights Act in redistricting, deciding to simply

13:10:34   21  ignore racial data, can't be anything other than a pretext.

13:10:36   22       Senator Powell having been unsuccessful at convincing

13:10:43   23  Senator Huffman to change course, then sent an unprecedented

13:10:45   24  email to all of her colleagues, providing them the detailed

13:10:49   25  information they needed in order to observe the effect that this

CLOSING BY MR. DUNN                                              11

13:10:53  1   new proposal would have on Senate District 10.  In there she

13:10:57  2   included the Federal District Court decision from Washington

13:11:01  3   D.C. in 2012, as well as an explanatory letter and racially

13:11:05  4   shaded maps.  And, yet, another abnormality in the process, the

13:11:11  5   next day, from Senator Huffman comes a read receipt for this

13:11:15  6   document showing that in fact it had been received and according

13:11:18  7   to the record read.

13:11:20  8         So then the discussion on the Senate floor begins.

13:11:25  9   And the Court, I know, has seen each of the iterations of

13:11:28  10  Senator Huffman explaining her motivations behind the plan.  I

13:11:30  11  won't repeat that here, other than to say the government has not

13:11:34  12  provided you, at any point, a record evidence of Senator Huffman

13:11:38  13  describing, number one, that Senate District 10, itself, was

13:11:41  14  specifically part -- was developed as a partisanship motivation.

13:11:45  15  And in the only time that Senator Huffman lists each of the

13:11:49  16  principles that guided her in the plan that she mentioned

13:11:52  17  partisanship, was on the third committee hearing; each other

13:11:57  18  time she addressed her principles, such information was not

13:11:57  19  provided.

13:11:58  20        Well let's focus on the principles that were told to

13:12:03  21  both the Senate and House at the beginning of their

13:12:06  22  deliberations.

13:12:06  23        (Video with audio played).

13:12:06  24        *SENATOR HUFFMAN:  My goals and priorities in*

13:12:10  25         *developing these proposed plans include first and*

13:12:11   1          *foremost abiding by all applicable law, equalizing*
13:12:15   2          *population across districts, preserving political*
13:12:17   3          *subdivisions and communities of interest when*
13:12:20   4          *possible, preserving the cores of previous districts*
13:12:24   5          *to the extent possible, avoiding pairing incumbent*
13:12:28   6          *members achieving geographic compactness when*
13:12:31   7          *possible and accommodating incumbent priorities also*
13:12:34   8          *when possible.*
13:12:34   9          In the Senate...
13:12:37  10       (Video and audio stop).
13:12:37  11       MR. DUNN:  These list of priorities have not been
13:12:41  12    demonstrated in the record evidence to have been treated
13:12:44  13    faithfully.
13:12:44  14          First, the evidence that you heard from the citizens
13:12:46  15    of Tarrant County and Senator Powell, herself, is that there are
13:12:50  16    no communities of interest between these rural counties combined
13:12:52  17    with her portion of Tarrant County and the citizens and the
13:12:57  18    cities and the communities that she has represented in this last
13:12:59  19    term.
13:12:59  20          Furthermore, there has not been any evidence that
13:13:02  21    it's -- that the map is compact, and indeed it is not, and the
13:13:05  22    idea that somehow or another the core of the district has been
13:13:09  23    retained is simply laughable.
13:13:12  24          In short though, as an evidentiary standpoint, there
13:13:16  25    is no alternative evidence in the record to the testimony of the

13:13:17  1   plaintiffs on these issues, and what remains in the legislative

13:13:22  2   record are nothing more than bold assertions not supported by

13:13:25  3   rational argument.

13:13:27  4        Now in the Senate debate, Senator Seliger provided us

13:13:32  5   some context and I'd like to call the attention to -- the

13:13:34  6   Courts' attention to.

13:13:34  7        (Video and audio played).

13:13:37  8        *MR. DUNN:  -- state if you have an opinion as to when*

13:13:38  9         *she was giving you a specious answer.*

13:13:39  10       *SENATOR SELIGER:  To try and take those four counties*

13:13:41  11        *in the Panhandle, those being Gray, Wheeler, Donley*

13:13:50  12        *and Collingsworth out of the district and adding*

13:13:54  13        *counties that go almost all the way to the border,*

13:13:59  14        *like Schleicher and Upton and Reagen.  Good counties.*

13:14:02  15        *I have no objection representing them, because*

13:14:04  16        *clearly I was going have to represent more than 37*

13:14:08  17        *counties, but it was designed to concentrate the vote*

13:14:13  18        *to the degree possible in the area close to Midland*

13:14:17  19        *to help Mr. Sparks.*

13:14:20  20       *MR. DUNN:  Is that where Mr. Sparks is from?*

13:14:22  21       *SENATOR SELIGER:  Yes.*

13:14:23  22       *MR. DUNN:  So why not just tell you that?*

13:14:25  23       *SENATOR SELIGER:  I don't know.  Because everybody*

13:14:29  24        *insists they're innocent of any suspect motive.*

13:14:33  25        (Video and audio stopped).

13:14:33  1          MR. DUNN:  And in the same way they don't tell Senator

13:14:36  2     Seliger what they were up to with regard to him, they wouldn't

13:14:39  3     tell Senator Powell what they were up to with regard to her

13:14:42  4     district, and when we asked methodically, careful questioning of

13:14:45  5     the important facts, she never got clean and honest answers.

13:14:50  6          Ultimately, the fact that the legislatures involved

13:14:53  7     here couldn't come before the Senate and say, Senate Seliger, we

13:14:58  8     have decided we would like to target your district for

13:15:00  9     replacement or Senator Powell, we would like your district to

13:15:05  10    become a Republican district and/or we would like to ensure that

13:15:05  11    you don't gain election in the next cycle.  Had they come before

13:15:10  12    the Court with evidence such as that, then perhaps the Court

13:15:11  13    would be in a more difficult of a factual bind, but because the

13:15:16  14    legislatures involved here decided not to tell the truth, the

13:15:19  15    good faith presumption falls away.

13:15:24  16         Now Senator Seliger provided some other context with

13:15:28  17    regard to the operation of the Senate.

13:15:28  18          (Video and audio played).

13:15:32  19          MR. DUNN:  *Do you have any reasons that you -- and I*

13:15:32  20           *don't want you to disclose them at the moment --*

13:15:32  21          *SENATOR SELIGER:  Okay.*

13:15:33  22          MR. DUNN:  *I just want to know if they exist.*

13:15:34  23           *Did you have any reasons that you voted against the*

13:15:36  24           *Senate plan other than what you said on the floor*

13:15:40  25           *pubically.*

| | | |
|---|---|---|
| 13:15:40 | 1 | SENATOR SELIGER:  Yes. |
| 13:15:42 | 2 | MR. DUNN:  Okay. |
| 13:15:43 | 3 | Have you -- are those other reasons that you have, |
| 13:15:46 | 4 | you ever expressed them publically elsewhere? |
| 13:15:49 | 5 | SENATOR SELIGER:  Publically, no. |
| 13:15:50 | 6 | MR. DUNN:  Like to the newspaper or constituents or |
| 13:15:50 | 7 | anything of that sort? |
| 13:15:53 | 8 | SENATOR SELIGER:  No. |
| 13:15:53 | 9 | MR. DUNN:  And so I assume you take legislative |
| 13:15:57 | 10 | privileges on your other basis for voting against the |
| 13:16:01 | 11 | Senate plan. |
| 13:16:02 | 12 | SENATOR SELIGER:  Yeah. |
| 13:16:11 | 13 | I'd like to tell you, but he would not approve. |
| 13:16:15 | 14 | MR. DUNN:  Okay.  He is your lawyer. |
| 13:16:16 | 15 | SENATOR SELIGER:  Yes. |
| 13:16:17 | 16 | MR. DUNN:  Okay.  I say that for our record.  It |
| 13:16:23 | 17 | doesn't know who he is. |
| 13:16:24 | 18 | SENATOR SELIGER:  Oh, okay. |
| 13:16:26 | 19 | MR. DUNN:  Is it the case that in the Texas Senate |
| 13:16:29 | 20 | there's sometimes what's said in the public about the |
| 13:16:32 | 21 | motivations behind the legislative activity and |
| 13:16:33 | 22 | there's something different in private? |
| 13:16:36 | 23 | SENATOR SELIGER:  All the time. |
| 13:16:37 | 24 | MR. DUNN:  Would you say more often than not that's |
| 13:16:37 | 25 | the case? |

13:16:39   1              SENATOR SELIGER:  Not necessarily, no.

13:16:40   2              MR. DUNN:  Would you say more often than not that's

13:16:43   3               the case on the big items?

13:16:43   4              UNKNOWN SPEAKER:  Objection, form, calls for

13:16:47   5               speculation; objection, foundation.

13:16:47   6              SENATOR SELIGER:  I would say it's often the case.

13:16:51   7              MR. DUNN:  You think it's often the case with regard

13:16:53   8               to redistricting?

13:16:55   9              UNKNOWN SPEAKER:  Same objection.

13:16:55  10              SENATOR SELIGER:  I think it's often the case on a lot

13:16:56  11               of issues, particularly more controversial ones.

13:16:59  12              MR. DUNN:  Including redistricting?

13:16:59  13              UNKNOWN SPEAKER:  Same objection.

13:17:00  14              SENATOR SELIGER:  Yes.

13:17:04  15              (Video and audio stopped).

13:17:04  16              MR. DUNN:  Now Senator Seliger, obviously, had careful

13:17:09  17     opinions about his district's construction, and although not

13:17:13  18     relevant specifically to the relief requested from this Court,

13:17:15  19     it's relevant to show that not -- it wasn't just Senator Powell

13:17:20  20     who was not given accurate answers about her district, but it

13:17:23  21     was another senator as well.  That type of perturbing of the

13:17:29  22     deliberative process of the state Senate charged with making

13:17:35  23     laws in this state should not be tolerated and this is the case

13:17:38  24     to deal with it.

13:17:40  25              Another thing to note from Senator Seliger, what he

13:17:42  1    states here, is he had more to say to explain about his vote,

13:17:45  2    but just like Senator Huffman here, the government worked to

13:17:50  3    make them or request of them to impose their legislative

13:17:53  4    privilege, to seek legislative privilege and impose it on nearly

13:17:56  5    every question.  Even in the circumstance where Senator Seliger,

13:18:01  6    himself, said there, I would tell you, but my lawyer Mr. Opiela

13:18:05  7    would not allow me.

13:18:08  8            And one final excerpt from Senator Seliger.

13:18:08  9            (Video and audio played).

13:18:08  10           UNKNOWN SPEAKER:  -- point anything in the public

13:18:13  11            record demonstrating the protectoral explanations

13:18:15  12            were given for why Senate District 10 was drawn the

13:18:15  13            way that it was drawn?

13:18:19  14           SENATOR SELIGER:  Anything in the public record?

13:18:19  15           UNKNOWN SPEAKER:  Yes.

13:18:21  16           SENATOR SELIGER:  No.

13:18:21  17           (Video and audio stop).

13:18:23  18           MR. DUNN:  And so instead the way the government chose

13:18:25  19    to litigate the case was to address witnesses only asking about

13:18:29  20    the public record to ensure that they continued the process of

13:18:32  21    not disclosing what really had occurred in these legislative

13:18:38  22    debates.

13:18:39  23           Now continuing on with the timeline of the process

13:18:42  24    after the Senate passes the plan, Senator Powell then sends and

13:18:47  25    email to all of the members of the House Committee, and they are

13:18:50  1   then given the same information, including the 2012 court

13:18:54  2   decision, Senator Powell's letter and a number of racial shading

13:18:58  3   maps.  And in nowhere in the House record has the government

13:19:00  4   shown that partisanship was stated or suggested as part of the

13:19:04  5   motivation for the Senate plan.  At best, there's a mention of

13:19:07  6   it by Senator Huffman as an aside in discussions on the floor.

13:19:11  7   Nowhere does that discussion exist before the House.  The House

13:19:16  8   could not have known that the plan was adopted with a partisan

13:19:19  9   purpose with respect to Senate District 10, but it did know

13:19:22  10  about the racial consequences of such a purpose, because Senator

13:19:25  11  Powell saw to it that they were informed.

13:19:27  12        Plaintiffs' Exhibit 20 that I'm showing you on the

13:19:29  13  screen is Senator Powell's email to all of the members of the

13:19:33  14  House, again disclosing the 2012 decision, her letter and

13:19:35  15  racially shaded maps.

13:19:37  16        You heard from Chairman Turner that he gave a

13:19:40  17  presentation on the floor of the House, where he described all

13:19:43  18  of the this information, and he asked the messengers in the

13:19:47  19  House to print this information and lay it on each of the desks

13:19:50  20  for the House members.

13:19:51  21        So now we turn back to the testimony that was

13:19:56  22  developed in the course of this case.  This is the rough

13:19:59  23  transcript from Senator Huffman's testimony yesterday.  And I'll

13:20:03  24  do my best to paraphrase.  As the Court will see, it's not quite

13:20:05  25  finished, but I'll read it as best I recall and ultimately we'll

13:20:09  1   have the final record to consider.

13:20:10  2           JUDGE GUADERRAMA:  Is there any way you can blow it

13:20:13  3   up?

13:20:14  4           MR. DUNN:  Yes, sir.

13:20:14  5           (Paraphrasing from transcript).

13:20:19  6           *MR. HILTON:  Earlier do you recall Mr. Dunn asking you*

13:20:22  7            *whether Senate District 10 was drawn on the basis of*

13:20:25  8            *partisanship?  Do you recall him asking about that?*

13:20:27  9           *SENATOR HUFFMAN:  Yes, sir.*

13:20:27 10           *MR. HILTON:  Do you recall that stating that Senate*

13:20:32 11            *District 10 was related to partisanship?*

13:20:34 12           MR. DUNN:  And her answer here in the courtroom to her

13:20:37 13   own lawyer was:  *I cannot recall, sir.*

13:20:42 14           And then there was this additional exchange.

13:20:47 15           *MR. HILTON:  Do you recall being asked the question*

13:20:49 16            *whether you would describe the Senate map as*

13:20:51 17            *partisan?*

13:20:52 18           *SENATOR HUFFMAN:  Yes.*

13:20:52 19           *MR. HILTON:  Do you recall an objection to legislative*

13:20:55 20            *privilege in response to that question?*

13:20:57 21           *SENATOR HUFFMAN:  Yes.*

13:20:58 22           *MR. HILTON:  Do you recall what your answer to that*

13:20:59 23            *question was?*

13:21:00 24           *SENATOR HUFFMAN:  No.*

13:21:01 25           MR. DUNN:  And then the lawyer for the government

13:21:03  1    attempts to refresh her recollection on her own deposition.

13:21:07  2          It's worth doting to the Court, that deposition was

13:21:10  3    just taken last Friday.  So between last Friday and this week,

13:21:15  4    Senator Huffman could not keep clear in her testimony that

13:21:19  5    partisanship was the central concern behind Senate District 10.

13:21:23  6          Now this Court has had the opportunity to review the

13:21:28  7    government's response to the motion for preliminary injunction.

13:21:28  8    The tail weaved in there is simply completely unsupported by

13:21:33  9    Senator Huffman's testimony in the court and at the deposition.

13:21:35  10         And finally if the Court would like more context about

13:21:39  11   the discussion of the deposition, it's been filed as Exhibit 1

13:21:42  12   in the motion in limine, and we encourage the Court to give

13:21:46  13   careful attention to the exchange about partisanship, which is

13:21:49  14   contained at the very end of the deposition.

13:21:55  15         Now we turn our attention to the 2012 preclearance

13:22:03  16   decision.  Here at the *Senate Journal* for October 4th, 2021, on

13:22:08  17   page A-9, Senator Powell is asked this:

13:22:13  18         *UNKNOWN SPEAKER:  Have you read the 2012 preclearance*

13:22:16  19          *decision from the D.C. Federal Court in* Texas v. The

13:22:19  20          United States *case.*

13:22:21  21         *ANSWER:  Have I read it?  I probably have in the past.*

13:22:22  22          *I don't want to say definitively because I don't*

13:22:25  23          *recall if it's one I read.*

13:22:26  24         MR. DUNN:  That answer of the chair of the committee,

13:22:29  25   who is charged with redrawing a district that was most recently

13:22:32  1   found to have been intentionally dismantled, is itself

13:22:34  2   incredible, but this additional exchange with Senator West:

13:22:34  3          (Video and audio played).

13:22:44  4          *SENATOR WEST:  We know there was a court decision back*

13:22:46  5             *in 2012, as it relates to Senate District 12 --*

13:22:52  6             *Senate District 10, did you take that Court decision*

13:22:53  7             *into consideration in drawing or redrawing Senate*

13:22:53  8             *District 10?*

13:22:59  9          *SENATOR HUFFMAN:  No, sir.*

13:23:01 10          *SENATOR WEST:  Why is that?*

13:23:02 11          *SENATOR HUFFMAN:  I didn't think it was required for*

13:23:04 12             *me to do so.*

13:23:06 13          *SENATOR WEST:  Okay.  You didn't think it was*

13:23:07 14             *required?*

13:23:08 15          *SENATOR HUFFMAN:  Correct.*

13:23:08 16          *SENATOR WEST:  Okay.*

13:23:11 17          (Video and audio stopped).

13:23:11 18          MR. DUNN:  No explanation given.

13:23:14 19          Now it may be that some look back at the 2012 decision

13:23:16 20   and think the court got it wrong.  It was a diverse group of

13:23:21 21   judges from different backgrounds.  It was a well thought out

13:23:23 22   opinion.  It's appendix on the Senate in particular is

13:23:26 23   voluminous.  But the State of Texas, in its Legislature, in no

13:23:30 24   other circumstance can simply ignore a binding court decision;

13:23:34 25   one from the Fifth Circuit or from another.  It had options

13:23:36  1    here.  If it thought it was not required to give respect to the

13:23:40  2    2012 decision, it could have filed a declaratory judgment

13:23:42  3    action.  It could've been honest here on the floor said we've

13:23:44  4    read the opinion and for these various reasons, we think we no

13:23:48  5    longer have to follow its edicts.  It did none of those things.

13:23:50  6    Instead, the Legislature chose to tell a different tale about

13:23:53  7    the purposes behind their effort.

13:23:56  8         We have more than proven the elements required of us

13:24:01  9    here today.  Even though we've been deprived of the box of maps,

13:24:05  10   which almost certainly have various racial shading and

13:24:08  11   information on it, even though we've been derived of the maps

13:24:13  12   that were initialed by Senator Huffman and Senator Powell, at

13:24:17  13   the end of the day it's important what happens to Senator

13:24:22  14   Powell's senate district.  That ought to be enough.  It's

13:24:25  15   important what happens with the million-plus minority voters in

13:24:29  16   Tarrant County.  That ought be enough.  It's important whether

13:24:34  17   or not the state's deliberative body -- it's highest

13:24:35  18   deliberative body, the Senate, can continue to be permitted to

13:24:37  19   operate this way and that out to be enough.

13:24:41  20        But at the end of the day, what this case is

13:24:44  21   fundamentally about is the respect for the rule of law.  Senator

13:24:50  22   Huffman gave no respect for it, even though she has a

13:24:55  23   substantial experience as a fine trial lawyer, as an excellent

13:24:57  24   criminal judge, knew precisely what she was doing here.

13:25:00  25        This Court has the opportunity to vindicate the

13:25:02  1    decision-making of the United States District Court.  It has far

13:25:08  2    reaching consequences.  It should find liability and issue an

13:25:13  3    injunction.

13:25:14  4              JUDGE GUADERRAMA:  Thank you, Mr. Dunn.

13:25:45  5                    CLOSING ARGUMENT BY PLAINTIFFS

13:25:53  6              MR. GABER:  May it please the Court, Mark Gaber for

13:26:00  7    the Brooks plaintiffs.

13:26:00  8              Two-and-a-half years ago, Texas successfully defended

13:26:05  9    itself in the Supreme Court by arguing that the 2013 Legislature

13:26:09  10   had remedied the 2011 Legislature's intentionally, racially,

13:26:14  11   discriminatory actions by enacting court ordered plans.

13:26:17  12             The Supreme Court credited the testimony of Senator

13:26:21  13   Seliger, which the state offered to it, and expressly noted that

13:26:25  14   it was not as if the Legislature had reverted to what it had

13:26:29  15   done in 2011, and so therefore no inference of intentional

13:26:35  16   discrimination should arise from those actions.

13:26:36  17             This case turns *Abbott v. Perez* upside down in all

13:26:38  18   respects.  The state has gone back to, with respect to the

13:26:43  19   Senate District 10, the very plan, the very same type of plan

13:26:45  20   that was found to be intentionally discriminatory, and in the

13:26:50  21   process of doing that it has discredited the testimony that the

13:26:55  22   Supreme Court credited of the state senator who was in charge of

13:26:58  23   that redistricting process because he disagrees with the

13:27:03  24   Lieutenant Governor's policy preferences.

13:27:05  25             Now in *Bartlett v. Strickland*, the Supreme Court ruled

13:27:07  1    that if there was a showing that a state intentionally drew

13:27:10  2    district lines, in order to destroy otherwise effective

13:27:13  3    crossover districts, that would raise serious questions under

13:27:17  4    the 14th and 15th amendments.  That showing has been made here.

13:27:23  5         In looking -- just a background on the law of

13:27:26  6    intentional discrimination, it is true that in -- and this was

13:27:30  7    highlighted by the state in their opening -- part of this Court

13:27:33  8    decision was highlighted -- *Personal Administrator v. Finney*,

13:27:36  9    from the Supreme Court.  And the state is correct that that case

13:27:40  10   says that intentional discrimination is not merely volition or

13:27:46  11   awareness of discriminatory effects, but at the same time the

13:27:51  12   Supreme Court made clear that where the adverse consequences of

13:27:52  13   a law upon an identifiable group are clear that it can -- a

13:27:58  14   strong inference arises that those adverse effects were desired

13:28:02  15   and that that inference can reasonably be drawn.

13:28:04  16        And the Court says that it is only the case that that

13:28:08  17   inference should not be drawn where all of the evidence shows

13:28:10  18   that some other explanation was the reason for the action.  That

13:28:15  19   clearly is not the case here, and that inference clearly shows

13:28:21  20   the presence of racially, discriminatory intent in this case.

13:28:25  21        The framework that the Court is to use in assessing

13:28:28  22   that evidence is the Arlington Heights framework.  In beginning

13:28:33  23   with whether or not the decision of the Legislature has -- bears

13:28:38  24   more heavily on a racial-minority group than on white voters.

13:28:43  25   There's no dispute that that's the case here.  You can look at

13:28:46  1    the map and you can see that.

13:28:47  2          Hundreds of thousands of minority voters, who had been

13:28:51  3    electing their candidate of choice, after a three-judge federal

13:28:55  4    court ruled the last time that it was dismantled, that they had

13:28:59  5    the right to do so and to continue doing so, were moved out of

13:29:03  6    the district and cracked among several Anglo dominated districts

13:29:07  7    spanning across dozens of counties outside of the DFW metroplex.

13:29:15  8    That historical background in the D.D.C. decision speaks with

13:29:18  9    specificity about the various neighborhoods that were cracked

13:29:22 10    apart in 2011.  Those same neighborhoods are the ones that are

13:29:25 11    cracked apart in the 2020 enactment.

13:29:29 12          In 2016 the Fifth Circuit sitting en banc, ruled that

13:29:36 13    that decision was a contemporaneous example of state sponsored

13:29:38 14    discrimination.  And it did so rejecting the argument of the

13:29:43 15    state and of the decent that the vacatur of that decision in

13:29:45 16    light of Shelby County somehow got rid of all of the factual

13:29:50 17    evidence of discriminatory intent.  The Fifth Circuit majority

13:29:54 18    sitting en banc was clear that that remained a relevant factual

13:29:59 19    example of state sponsored discrimination.

13:30:02 20          The next factor is the specific sequence of events,

13:30:06 21    and Mr. Dunn went over those; I won't repeat them; but the

13:30:09 22    shifting explanation -- the specious population -- the

13:30:11 23    population arguments were the ones that were repeatedly used and

13:30:14 24    they changed.  In the state's brief, they had a different

13:30:17 25    population explanation.  They said in the brief that the

13:30:21  1    Panhandle districts were losing population and so, therefore,

13:30:26  2    SD-10 -- it provided a partisan opportunity for SD-10 to take

13:30:29  3    more population from those districts.  That has it exactly

13:30:32  4    backwards.  That makes no sense even logically as an argument.

13:30:38  5         The third factor is the departures from the normal

13:30:42  6    procedures.  You saw the resource witness that the Attorney

13:30:45  7    General's office sent to the Senate Committee.  Normally the --

13:30:49  8    as Senator Powell testified, the procedure for a resource

13:30:52  9    witness is to send a subject matter expert on the issue, and

13:30:55 10    instead, the expert would not testify largely about the

13:31:00 11    redistricting processes.

13:31:02 12         You saw the process in the House, where there was one

13:31:05 13    meeting held.  At the beginning of that meeting, after having

13:31:10 14    received a letter from Senator Powell, explaining what had

13:31:14 15    happened with the district and the racial effects of that

13:31:17 16    change, you saw that the Chair Hunter said that, you know, we're

13:31:23 17    just going to -- something along the lines of I'm going to trust

13:31:26 18    the process.  I'm going to be productive and I'm going to accept

13:31:30 19    what they did.  That is not the normal process as Representative

13:31:35 20    Turner testified, nor is it the process to deny the ability to

13:31:39 21    have resource witnesses or to have experts come and testimony in

13:31:42 22    more than 3-minute increments, nor is it the normal process to

13:31:47 23    vote on the bill on the same day.

13:31:50 24         You saw that Chair Hunter said that amendments could

13:31:53 25    be offered to the bill, but we're going to pass it today, so get

CLOSING MR. GABER                                                    27

13:31:57  1    them in in the next three hours.  That, as Representative Turner

13:32:01  2    testified, is not the normal process in the House and he has

13:32:03  3    never seen that happen before.

13:32:04  4         In terms of substantive departures, this is the only

13:32:09  5    map that was passed by the Legislature that cracks apart the

13:32:14  6    Fort Worth minority community and every other map it would seem

13:32:17  7    set to keep that community together, the minority community in

13:32:21  8    Fort Worth.  And the state's argument is that, well, that's

13:32:24  9    not -- our maps don't reflect our substantive policies.  That's

13:32:28 10    just not a credible argument.  It is the embodiment of the

13:32:33 11    substantive policy with regard to redistricting.

13:32:36 12         The state has argued that plaintiffs have to show that

13:32:40 13    all of the *Gingles* preconditions are satisfied to show that

13:32:45 14    there's a discriminatory effect to this discriminatory intent.

13:32:49 15    That is not the law.  *Bartlett* would not -- the quote that I

13:32:52 16    read to you from *Bartlett* could not exist if that were the law.

13:32:55 17    If intentionally destroying a crossover district required you to

13:32:59 18    show that you could have 50-percent-plus-1 district, then it's a

13:33:04 19    circle.  You can't have a violation of the 14th Amendment.

13:33:07 20    That's not the law.  The law is that the state -- the

13:33:10 21    Legislature needed to have succeeded in destroying that

13:33:14 22    crossover district.  So you can have a situation that's not

13:33:16 23    unlawful if they intend to, but don't do a good job and fail to

13:33:21 24    destroy it, that would perhaps not have a discriminatory effect.

13:33:24 25    There is no doubt here that that effect is present.

CLOSING MR. GABER                                                    28

13:33:28  1        Now finally, I want to turn to the alternative plan

13:33:32  2   that plaintiffs have offered.  The Supreme Court, though they

13:33:36  3   disagreed about whether or not such a showing were a requirement

13:33:40  4   in a *Shaw* claim to disentangle partisanship from race and states

13:33:45  5   that have racially polarized voting.  The Supreme Court made all

13:33:49  6   of the Justices agree that this would be key evidence, a strong

13:33:53  7   showing that could overcome the legislative presumption of good

13:33:57  8   faith and the burden of proof to show that if partisan

13:34:00  9   motivations were truly what the state were at -- what the

13:34:02  10  Legislature were intending to follow, that it would've done this

13:34:04  11  type of map, rather than the one they did that moves around so

13:34:09  12  many minority voters.  And that was the case.  The Supreme Court

13:34:12  13  said that that was key evidence in the ordinary case.

13:34:16  14       Here we have a situation where a three-judge court in

13:34:20  15  2017 said that a partisan gerrymander in the Travis County area

13:34:26  16  splitting apart that area into five Republican districts would

13:34:28  17  be perfectly lawful.  Judge Smith said in his dissenting opinion

13:34:35  18  said that there is dramatic differences between what's required

13:34:36  19  in DFW in redistricting law and what's required in Travis

13:34:41  20  County -- the map drawer was counsel of record in that case --

13:34:42  21  read that opinion, knew those facts.  We have the context here

13:34:47  22  that was not present in *Cooper*, was not present in *Cromartie*,

13:34:51  23  which comes together.  There's no evidence that the state

13:34:54  24  offered that the alternative plan, which follows the Court

13:34:58  25  order, the very thing that Texas defendant itself is doing in

CLOSING MR. GABER                                                    29

13:35:01  1   the *Abbott v. Perez* case, there's no evidence to suggest that it

13:35:05  2   would not perform as well or better for Republican candidates,

13:35:10  3   safe seats for 19 Republican candidates, no incumbents are

13:35:14  4   paired, all of the priorities that are publicly available at

13:35:20  5   least were followed.  You heard some questions that suggest

13:35:23  6   perhaps there were some other partisan reasons that might have

13:35:27  7   been followed.  There's no actual evidence of that.  So the

13:35:30  8   states main argument is that, well, there's no evidence that

13:35:31  9   this plan was before the Legislature.  That's not the point of

13:35:35  10  the exercise and the Supreme Court made that clear in *Cooper.*

13:35:40  11  It is evidence of what the map drawer would've done had they had

13:35:42  12  the intent that the state says they had.  And so with no

13:35:47  13  evidence to suggest, as was the case in the *Cromartie* case, that

13:35:50  14  there was some flaw in the alternative plan, there's no evidence

13:35:54  15  of that, the Court must give it the key evidence characteristic

13:35:59  16  that the Supreme Court, that all of the Justices at the Supreme

13:36:05  17  Court, said should be the case in *Cooper.*

13:36:08  18       With respect to the *Shaw* claim, the court on that

13:36:12  19  claim does not need to find a discriminatory purpose.  It

13:36:16  20  just -- it needs to find that race with a predominant

13:36:19  21  consideration in the drawing in the lines and that traditional

13:36:22  22  redistricting principles were subverted.  Well, traditional

13:36:25  23  redistricting principles were clearly subverted here.  The

13:36:27  24  district bears no relation to its prior districts.

13:36:30  25       You heard Senator Huffman turned down another district

CLOSING MR. GABER                                                    30

13:36:34  1   that would have created a majority Hispanic district in the DFW

13:36:36  2   metroplex.  She turned that down because she said it was not

13:36:40  3   compact and it combined areas that had not previously been

13:36:46  4   represented in the same senate district before.  SD-10 combined

13:36:50  5   seven prior senate districts, more than any other districts in

13:36:53  6   the state and yet that was not a problem for Senator Huffman's

13:36:56  7   explanation.  She said, Senator Powell, you live in the core of

13:37:00  8   your district.  You live in the heart and sole of it and so

13:37:03  9   therefore it's compact and it combines communities of interest.

13:37:06  10        Instead what happened is 764,695 people were moved to

13:37:14  11  create the new version of SD-10, a district that was 5,318

13:37:20  12  people over population.  Its population deviation in the

13:37:25  13  benchmark plan is closer to ideal than all the three districts

13:37:29  14  in the new plan.  And indeed the first three, I think,

13:37:33  15  iterations of SD-10, the new SD-10 that were released by the

13:37:37  16  Senate, increased the deviation of the district by five-fold to

13:37:42  17  23,000, 24,000.  It was only at the last minute when the

13:37:45  18  argument was made that this was a specious explanation.  Was

13:37:51  19  there an amendment that dropped it down back around 5,000 people

13:37:55  20  over deviation.

13:37:56  21        And so with this these types of cuts along racial

13:37:58  22  lines, this type of export and import of hundreds of thousands

13:38:03  23  of people radically altering the racial makeup of the district.

13:38:06  24  With shifting and inconsistent explanations and alternative map

13:38:12  25  evidence and all the inferences and all the direct and

13:38:15  1    circumstantial evidence that you've seen, the state has not

13:38:18  2    overcome the evidence to show that this was not a racial

13:38:24  3    gerrymandering.

13:38:24  4         With respect to the timing issue, the Supreme Court in

13:38:28  5    one of its first cases, *Marbury v. Madison*, said that every

13:38:34  6    wrong has a remedy, and so the suggestion that in January, there

13:38:36  7    is no ability for there to be relief in time for November is

13:38:40  8    just not credible.  There are states who have not begun

13:38:44  9    redistricting, yet, and here we are having completed

13:38:48 10    adjudication of a hearing on this case, and the state says,

13:38:52 11    well, we can't do it in March.  We can't do it in May.  We're

13:38:56 12    not going to be able to do it in November.  That is not

13:38:59 13    credible.  There are ten months between now and November.  This

13:39:03 14    very -- we have -- in our filing we have offered two alternative

13:39:08 15    options beyond using the -- beyond disrupting the March primary.

13:39:12 16         Courts in Texas have followed these approaches before.

13:39:17 17    Just last -- the governor followed this approach in the last

13:39:21 18    election cycle.  The primaries were moved.  The runoff was in

13:39:26 19    July.  This is the same schedule that we suggest in our brief.

13:39:30 20    There's already going to be a partisan election on May 24th, I

13:39:33 21    think.  The primary could be held that day.

13:39:35 22         In *Vera v. Bush*, the state held in a more complicated

13:39:39 23    situation where there was straight ticket voting, where most

13:39:43 24    people voted straight ticket, and had to be educated that they

13:39:45 25    needed to separately vote on this one race for Congress.  We

13:39:49  1    don't have that circumstance anymore.  There's no precinct

13:39:52  2    splits.  This isn't a congressional plan and so there's not the

13:39:55  3    requirement to have zero population deviation.  So all VTDs will

13:40:00  4    be kept whole.  There is no reason why there cannot be relief in

13:40:04  5    this case, at the very least, prior to November, following a

13:40:06  6    process that courts in Texas have before followed.

13:40:10  7          I want to make one additional aside about an argument

13:40:16  8    you heard from the state in questioning earlier about *LULAC v.*

13:40:22  9    *Clements*, that there's some requirement to show that

13:40:23  10   partisanship and not race was the reason that motivated the

13:40:27  11   voting behavior.

13:40:28  12         First, it's not -- this is an intent case, so that

13:40:32  13   argument is not very relevant.  What matters here is whether or

13:40:36  14   not -- and for the same reason, all of the discussion about

13:40:39  15   primary elections is wholly irrelevant.  What matters here is

13:40:43  16   that there was intentional effort to make it so that minority

13:40:48  17   voters could not elect their candidate in the general election.

13:40:53  18         And on the point about whether why people vote the way

13:40:57  19   they do, in *Gingles*, the Supreme Court expressly held that

13:41:02  20   causation is not relevant to the inquiry of racially polarized

13:41:06  21   voting.  What matters is whether or not it happened, not why it

13:41:12  22   happened.  And that's at 478 US at 27 73.  And so to the extent

13:41:14  23   there is -- you can read into *LULAC v. Clements* some other

13:41:19  24   understanding or a causation requirement --

13:41:20  25         JUDGE SMITH:  I think you got the page wrong.  Give us

13:41:24  1    that cite again.

13:41:24  2         MR. GABER:  I said -- I clearly did get the page

13:41:25  3    wrong.  I have typed it wrong.  So there is a title that says

13:41:29  4    causation is not a requirement -- or something like that.  And

13:41:32  5    it's towards the bottom of the decision.

13:41:35  6         And it could not more expressly say --

13:41:38  7         JUDGE SMITH:  You can get it and give it to us later.

13:41:40  8    I didn't mean to interrupt you.

13:41:43  9         MR. GABER:  No worries.  I'll get it while the state

13:41:45  10   is arguing.

13:41:46  11        The Supreme Court could not more clearly have rejected

13:41:51  12   that type of inquiry as having any importance, and in any event,

13:41:56  13   that is a Section 2 standard.

13:41:59  14        I'm going to reserve the rest of my time for rebuttal

13:42:03  15   and I don't know how much that is; 20 minutes it looks like or

13:42:03  16   18 minutes.  But I do want to say one thing, which is that given

13:42:07  17   the invocation of the legislative privilege in this case and the

13:42:13  18   inability for plaintiffs to obtain any meaningful discovery,

13:42:18  19   it's our view that the Court can, under Rule 42(b), sever

13:42:25  20   Counts One through Five of the Brooks plaintiffs' complaint,

13:42:29  21   which are the intentional discrimination and the *Shaw* claims

13:42:32  22   from the Sixth Count, which is the Section 2 coalition claim for

13:42:36  23   a new different district in Tarrant County, hold that last claim

13:42:40  24   for trial, and then under Rule 65(a)(2), consolidate the merits

13:42:47  25   with this preliminary injunction hearing and issue final

13:42:52  1    judgment.  We think that would be the most effective use of the

13:42:53  2    Court's time, of the parties' time, in light of the fullest

13:42:59  3    extent of the record that could be developed, given the

13:43:02  4    indication of the legislative privilege.  And so I wanted to

13:43:05  5    raise that now for the Court to consider as it considers the

13:43:08  6    path forward.

13:43:09  7            JUDGE GUADERRAMA:  All right.  Thank you, Mr. Gaber.

13:43:09  8            MR. SWEETEN:  Your Honor, Mr. Thomson will close for

13:43:09  9    the state.

13:43:28  10           JUDGE GUADERRAMA:  Yes, sir.

13:43:28  11           MR. THOMPSON:  If I could just get one moment to set

13:43:36  12   up technology, Your Honor.

13:43:26  13           JUDGE GUADERRAMA:  Yes, sir.

13:43:26  14                   CLOSING ARGUMENT BY THE DEFENSE

13:43:57  15           MR. THOMPSON:  Rule 65 consolidation I believe would

13:44:31  16   be a violation of Rule 65.  I have not had time to pull up the

13:44:33  17   Rule prior to stepping up here.  It does require notice to the

13:44:38  18   other party who has not requested consolidation, and I believe

13:44:42  19   that notice has to come before the close of evidence, for

13:44:45  20   example, because parties, including the state defendants here,

13:44:47  21   make decisions about what evidence to pursue in limited

13:44:52  22   preliminary injunction hearings compared to full trials on the

13:44:56  23   merit.  So we very much oppose Rule 65 consolidation.

13:45:08  24           I believe Your Honors should be able to see the

13:45:08  25   presentation that I intend to give on your screens.  I have some

CLOSING MR. THOMPSON                                    35

13:45:12  1    hard copies if Your Honors would prefer them, though they do not

13:45:17  2    include some edits made in light of the close we just heard.

13:45:36  3          Your Honors, the standard here is a high one.  A

13:45:39  4    preliminary junction may be awarded only upon a clear showing

13:45:43  5    that the plaintiff is entitled to relief.  It's a heavy burden

13:45:46  6    particularly in an intentional discrimination case.

13:45:49  7          Plaintiffs cannot win without clearly showing that the

13:45:52  8    Legislature as a whole was imbued with racial motives.  That's

13:45:56  9    from *Brnovich v. DNC*.  It's an important recent case that

13:46:03  10   involves VRA claims and intentional discrimination claims.

13:46:03  11   Plaintiffs in that case, like plaintiffs here and many others,

13:46:07  12   try to pursue this theory that they could say the Legislature

13:46:11  13   was acting with a discriminatory purpose because some key actor,

13:46:18  14   a bill sponsor, for example, had a discriminatory purpose.  The

13:46:22  15   Supreme Court rejected that.  It compared it to the cat's paw

13:46:24  16   theory, which is acceptable in Title 7 cases, for example, and

13:46:27  17   said it has no place in an intentional discrimination case like

13:46:32  18   this one.  So while the defendants believe that the plaintiffs

13:46:37  19   have not produced any real evidence of discriminatory purpose by

13:46:37  20   anyone, it certainly true that they haven't provided evidence of

13:46:42  21   discriminatory purpose for everyone.

13:46:44  22         The test here is whether plaintiffs have managed to

13:46:51  23   disentangle race from politics and prove that the former drove

13:46:56  24   the district's lines.  That's from *Cooper v. Harris,* which

13:46:56  25   Mr. Gaber was talking about.

KATHLEEN A. SUPNET, CSR

13:47:03  1          Cases involving partisan motivation are strikingly
13:47:04  2  different than other cases involving allegations of racial
13:47:09  3  discrimination, and the reason for that is that they are
13:47:13  4  absolutely distinct as a matter of law.  The Supreme Court has
13:47:16  5  confirmed that partisan motivations are not the same as racial
13:47:20  6  motivations.  But as a factual matter, as some of the witnesses
13:47:26  7  testified, racial motivations and partisan motivations can have
13:47:33  8  similar effects on a map.  So when you see these effects and the
13:47:37  9  plaintiffs say we're deeply concerned by these effects, they
13:47:41 10  could've come from racial motivations, but they also could have
13:47:45 11  come from partisan motivations, and so the facts that you see
13:47:48 12  the effects tells you nothing about whether they were racial
13:47:52 13  motivations or partisan motivations.  It doesn't move the needle
13:47:54 14  one way or the other.
13:47:56 15          Combine that with the presumption of good faith that
13:47:59 16  the Supreme Court has insisted time and time again, the state
13:48:02 17  legislatures are entitled to, including the redistricting cases
13:48:06 18  like *Abbott v. Perez*.  That is a case where the Supreme Court
13:48:11 19  reversed, because the District Court accepted the plaintiffs'
13:48:14 20  argument that the presumption of good faith fell away due to a
13:48:18 21  taint in a prior decision.
13:48:19 22          Here, we can just take the plaintiffs' words for it.
13:48:25 23  When Senator West on the floor asked Senator Powell, do you
13:48:29 24  believe that your district is being intentionally targeted for
13:48:32 25  elimination as it being a democratic trending district, Senator

CLOSING MR. THOMPSON                                          37

13:48:37  1   Powell said, absolutely, that's partisanship.  And she

13:48:41  2   confirmed, quote, in Texas, everything is partisan.

13:48:44  3        Mr. Sweeten was questioning her.  He said you

13:48:51  4   understood entering redistricting, your district might be

13:48:55  5   targeted for political purposes.  Yep, she says on the

13:48:59  6   transcript.  It says, because you were a Democrat.  She says,

13:49:03  7   yes.  When she was asked to please identify which of her

13:49:09  8   colleagues had racially discriminatory purpose, she said she

13:49:14  9   would not speculate on the motives of my colleagues.  It's quite

13:49:18  10  a thing for a plaintiff to say that she's unwilling to speculate

13:49:22  11  about the motives of the people she says act with discriminatory

13:49:27  12  intent and then ask the Court to do that.

13:49:29  13       When asked does she have any personal knowledge about

13:49:34  14  what Senator Huffman utilized, whether she utilized any sort of

13:49:37  15  racial information when drawing SD-10, Senator Powell said, I

13:49:42  16  have no firsthand knowledge.

13:49:44  17       Plaintiff Brooks similarly has no knowledge.  He

13:49:50  18  testified that he did not know.  You're not testifying to this

13:49:53  19  Court about any personal knowledge of motivations behind any of

13:49:56  20  the senators that provided maps that would've impacted SD-10

13:50:01  21  during legislative session, right; right, according to Brooks.

13:50:05  22       De Leon, we heard him testify.  He similarly says he

13:50:08  23  has no knowledge about this.

13:50:10  24       Senator Huffman mentions partisanship.  She answers on

13:50:14  25  the floor in the statements we've heard played many times.  She

CLOSING MR. THOMPSON                                                    38

13:50:18   1   says she's addressing partisan considerations.  The plaintiffs
13:50:20   2   say that's not mentioning it often enough.  Well, she mentions
13:50:23   3   it in other ways.  She talks on the floor, of course, with
13:50:27   4   Senator Powell, about how she has partisan shading turned on
13:50:33   5   during the map drawing process.  That is of course a statement
13:50:35   6   that she is considering partisan information in the drawing of
13:50:38   7   the maps.  There's no other reason to have the partisan shading
13:50:41   8   turned on.  All of the senators understood that and that's why
13:50:45   9   all of the senators talk on the floor about how Senator Powell
13:50:48  10   is being targeted for political reasons.  Senator Huffman one
13:50:52  11   thing we never had was racial shading.
13:50:56  12        On your screen you can see S-2100, which is the
13:51:01  13   benchmark plan shown with partisan shading.  You can see the
13:51:04  14   northern part of the boundary for SD-10 incorporating a lot of
13:51:09  15   those blue areas showing democratic voters.  And then you can
13:51:16  16   see S2168, the enacted map, bisects those democratic voters,
13:51:20  17   puts some of them into SD-9 and keeps some in SD-10.  It is
13:51:23  18   completely plausible that these senators, as they say they did,
13:51:27  19   drew this with partisan shading.  There's no reason that they
13:51:31  20   would have needed racial shading for anything they were trying
13:51:33  21   to do.  They have disclaimed racial intent and certainly racial
13:51:37  22   data was not necessary to achieve their partisan attempts.
13:51:40  23        In the last round of redistricting, plaintiffs made
13:51:43  24   much of split VTDs, and the reason for that, if Your Honors
13:51:50  25   haven't seen these before, that they say partisan information

KATHLEEN A. SUPNET, CSR

13:51:51   1    isn't available at certain low levels of generality below the

13:51:56   2    VTD's level, and so they say that if there are split VTDs then

13:52:02   3    that may raise some suspicion that they were doing something

13:52:04   4    other than partisanship.  That's not the case here.  We don't

13:52:07   5    have any split VTDs and the plaintiffs don't disagree.

13:52:13   6            Representative Turner says he has no knowledge about

13:52:19   7    any of this.

13:52:22   8            Senator Huffman continues to confirm throughout the

13:52:25   9    transcripts that she had did not want to have the racial data.

13:52:30   10   We heard her speak rather passionately on the floor of the

13:52:34   11   Senate when Senator Powell said, you had these maps, right; and

13:52:37   12   Senator Huffman essentially testified, I didn't want the maps.

13:52:41   13   You forced them upon me.  I got rid of them as soon as I could,

13:52:44   14   because I don't want to consider race.

13:52:48   15           Senator Johnson put in his V-senate journal, the

13:52:53   16   reason that he was voting against plan 2168, which was Senate

13:53:00   17   Bill 4, the proposed maps under C.S.S.B.4 do exactly what they

13:53:08   18   were expected to do.  They make districts more partisan, and if

13:53:10   19   not invalidated by a court challenge, they effectively eliminate

13:53:15   20   a democratic seat.

13:53:17   21           Senator Seliger confirmed the partisanship of his

13:53:20   22   colleagues.

13:53:21   23           *Question:  Now one of the goals of Republican members*

13:53:24   24            *was to benefit Republicans, right?*

13:53:26   25           *Answer:  Correct.*

CLOSING MR. THOMPSON                                              40

13:53:28  1          *Question:  All right.  So, losing a democratic seat is*
13:53:32  2            *the result of partisanship in the map, right?*
13:53:34  3          *Answer:  True.*
13:53:36  4          MR. THOMPSON:  Now, Senator Seliger, whose declaration
13:53:37  5   was Exhibit 1 to the plaintiffs' PI motion, their star witness
13:53:42  6   agrees partisanship is what's causing the loss of the democratic
13:53:46  7   seat here.
13:53:47  8          *Questioning goes on:*
13:53:48  9          *Question:  Let me ask it like this.  Is there any*
13:53:50  10           *non-privileged information you can provide about how*
13:53:54  11           *SD-10 was drawn?*
13:53:55  12          *Answer:  It was drawn very specifically to ensure it*
13:53:59  13           *would be represented by a Republican.*
13:54:02  14          *Question:  So partisan reasons?*
13:54:04  15          *Answer:  Yes.*
13:54:05  16          MR. THOMPSON:  And Senator Seliger further confirmed
13:54:09  17   that it was not race that was at issue.
13:54:11  18          *Question:  There's nothing in the public record to*
13:54:15  19           *your knowledge that demonstrates anything but color*
13:54:16  20           *blindness, right?*
13:54:17  21          *Answer:  Correct.*
13:54:18  22          MR. THOMPSON:  Going further down the page:
13:54:20  23          *Question:  Your not aware as you sit here today of any*
13:54:23  24           *racial animus by the 87th Legislature's redistricting*
13:54:27  25           *committee, right?*

13:54:29  1          *Answer:  No.*

13:54:30  2          MR. THOMPSON:  Now, it is true that Senator Seliger

13:54:33  3  thinks that some of his colleagues did not give him the full

13:54:35  4  story.  The plaintiff says this is evidence of pretext.  If so,

13:54:39  5  it's just evidence of more partisanship.  Recall call that his

13:54:43  6  testimony is that the Senators should have been admitting to

13:54:47  7  even more partisanship than they did.  Certainly they talked

13:54:51  8  about partisanship on the floor.  Senator Seliger says they

13:54:54  9  didn't mention it often enough.  They didn't admit to it in all

13:54:57  10  the circumstances, when they really were being partisan.  If the

13:55:00  11  plaintiffs theory is right, it just undermines their intentional

13:55:06  12  discrimination claims.  Open partisanship and alleged hidden

13:55:09  13  partisanship are equally partisanship and equally not race.

13:55:13  14          In some cases, including the last round of

13:55:17  15  redistricting, I believe, plaintiffs are expert witnesses to

13:55:21  16  evaluate intent.  I'm not sure that's the appropriate topic of

13:55:26  17  expert testimony, but it does happen.  It did not happen in this

13:55:28  18  case.

13:55:30  19          Dr. Cortina confirmed when asked:

13:55:30  20          *Question:  You were not asked to analyze any*

13:55:32  21           *legislative motive, right?*

13:55:34  22          *Answer:  I was not asked to do so.*

13:55:36  23          MR. THOMPSON:  Same thing for Dr. Barreto.

13:55:38  24          *Question:  Are you offering -- or excuse me -- and you*

13:55:41  25           *are not offering any testimony or opinions regarding*

CLOSING MR. THOMPSON                                                    42

13:55:44   1              *the Legislature's intent.  You were just looking at*
13:55:47   2              *the facts in the voting data, correct?*
13:55:49   3              *Answer:  That's correct.*
13:55:50   4         MR. THOMPSON:  Now, plaintiffs have made much of this
13:55:53   5    text message that the Court has just admitted.  I obviously
13:55:58   6    can't authenticate the text message or anything.  I don't know
13:56:02   7    much about it, but I understand that the plaintiffs' theory is
13:56:05   8    that the Lieutenant Governor is speaking to a potential
13:56:07   9    candidate and criticizing Senator Seliger.  What's important
13:56:13  10    about this, if the Court find it to be competent evidence, is
13:56:16  11    the way that the Lieutenant Governor is allegedly describing
13:56:21  12    SD-10 and the goings-on about it.
13:56:23  13         He says, according to plaintiffs, that Senator Seliger
13:56:27  14    just voted to preserve a D. district over a potential R.
13:56:31  15    District in Fort Worth area giving D.s more control.  This is a
13:56:37  16    putatively private text message exchange.  He's not saying
13:56:42  17    anything about race.  He's describing it in strictly partisan
13:56:43  18    terms and complaining about a Republican not voting for the
13:56:46  19    bill.
13:56:47  20         The plaintiffs lacking in direct evidence of any kind
13:56:51  21    shift their focus to effects.  We talked about this a little
13:56:55  22    bit, but they have two theorys, seemingly, of how the effects
13:56:58  23    could go to prove intent; one is just the mere distance of the
13:57:03  24    effects and the other is alleged awareness of those effects.
13:57:06  25              *Cooper v. Harris*, which again Mr. Gaber spoke about,

13:57:10  1    says, crucially, political and racial reasons are capable of

13:57:13  2    yielding similar oddities in the district's boundaries.  That is

13:57:17  3    because, of course, racial identification is highly correlated

13:57:20  4    with political affiliation.  So again, Your Honors, that if

13:57:25  5    there are effects that the plaintiffs say are consistent with a

13:57:28  6    racial motive, does nothing to prove a racial motive, because

13:57:32  7    they are equally, if not more consistent, with a partisan

13:57:37  8    motive.

13:57:37  9         The Supreme Court confirmed this again even more

13:57:43 10    recently in *Brnovich* saying, the voting preferences of members

13:57:47 11    of a racial group may make the former partisan motives look like

13:57:52 12    the latter racial motives.  This is why the district courts have

13:57:56 13    to engage in such careful fact-finding, because it is not enough

13:58:00 14    to have this disparate impact-style claim and thereby infer

13:58:04 15    intent related to race, when all of those same impacts can be

13:58:10 16    attributed to partisan motivations.

13:58:13 17         Plaintiffs say, even if the existence of the effects

13:58:19 18    isn't enough, there's this willful blindness theory that has

13:58:24 19    been put forward.  And I'm a little bit familiar with willful

13:58:27 20    blindness in other areas of law.  Certainly, an ordinary tort

13:58:31 21    plaintiff might try to prove that a tort defendant was reckless

13:58:35 22    and willfully blinded himself to some sort of risk.  That is

13:58:39 23    just not how it works in constitutional or VRA intentional

13:58:43 24    discrimination claims.  That is one of the leading complaints

13:58:46 25    that people who don't like those decisions have about those

13:58:49  1   decisions.  They say, the court abandoned a doctrine like

13:58:53  2   willful blindness that apply in ordinary torts.  They did.  They

13:58:57  3   don't apply that doctrine.

13:58:59  4        Now, to the extent there was awareness that these

13:59:03  5   effects might occur, it's worth noting, of course, that they're

13:59:07  6   attributable to the plaintiff.  It's Senator Powell, who

13:59:10  7   insisted upon attempting to provide this information to Senator

13:59:13  8   Huffman, saying, she acknowledged that she provided the maps,

13:59:17  9   that Senator Huffman did not ask her for those maps, and then

13:59:22  10  Senator Huffman then turned the maps over and didn't want them.

13:59:26  11  The Supreme Court has confirmed that awareness of these types of

13:59:31  12  effects is not sufficient for an intentional discrimination

13:59:34  13  claim.

13:59:34  14        In *Miller v. Johnson*, the Supreme Court explained,

13:59:37  15  redistricting legislatures will almost always be aware of racial

13:59:40  16  demographics; but it does not follow that race predominates in

13:59:45  17  the redistricting process.

13:59:46  18        Similar, *Feeney* says, more than intent as volition or

13:59:51  19  intent as awareness of consequences is required.  That's to show

13:59:56  20  that there was an intent to do something to lead to those

13:59:59  21  effects because of, not merely in spite of, the alleged adverse

14:00:04  22  effects.

14:00:05  23        *Hunt v. Cromartie* says much of the same thing from

14:00:12  24  1999.  Our prior decisions have made clear that the jurisdiction

14:00:15  25  may engage in constitutional political gerrymandering, even if

CLOSING MR. THOMPSON                                                45

14:00:20  1    it so happens that the most loyal Democrats happen to be Black

14:00:25  2    Democrats and even if the state were conscious of that fact.

14:00:26  3            Senator Huffman followed a color-blind policy,

14:00:33  4    according to her testimony.  Some people don't like that.

14:00:35  5    Understand.  Senator Powell didn't like it.  Mr. Dunn seems to

14:00:40  6    believe its inappropriate to blind oneself to racial effects

14:00:44  7    when making government decisions.  Everyone is entitled to their

14:00:47  8    own opinion about that, as a matter of policy, I suppose, but

14:00:49  9    certainly the Constitution does not require government officials

14:00:54  10   to look at race.  It barely tolerates it.

14:00:56  11           Justice Harlan famously noted that our Constitution is

14:01:00  12   color-blind and neither knows nor tolerates classes among

14:01:04  13   citizens.  It is the highest and best tradition we have for

14:01:07  14   government officials dealing with sensitive topics related to

14:01:07  15   race, which followed Justice Harlan's advice.

14:01:15  16           Now it is true that the Voting Rights Act sometimes

14:01:15  17   forces governments into uncomfortable positions and that to --

14:01:21  18   in an effort to ensure governments do not violate Section 2,

14:01:24  19   sometimes people have to look at racial information.  Senator

14:01:30  20   Huffman testified that she did this through a legal compliance

14:01:32  21   check and had lawyers check to see if Section 2 was met.  Seems

14:01:38  22   like quite a reasonable policy to me.  There's no reason to have

14:01:40  23   government officials unnecessarily giving themselves racial

14:01:46  24   information when the Constitution's policy is to insofar as

14:01:49  25   possible avoid making decisions based on race.  If she had made

KATHLEEN A. SUPNET, CSR

CLOSING MR. THOMPSON                                           46

14:01:53  1   any decisions based on race, she would've been sued and she

14:01:57  2   would have had to defend against a claim subject to strict

14:01:59  3   scrutiny.  That's not an enviable position to be in.

14:02:05  4        Now the plaintiffs also point to alleged

14:02:09  5   irregularities in the scheduling and procedures for the passage

14:02:12  6   of the maps.  It's worth noting that this comes from *Arlington*

14:02:16  7   *Heights* and *Arlington Heights* is not saying, here's a list

14:02:20  8   elements where we check off the boxes, and if each one is met,

14:02:23  9   then we can prove intentional discrimination.  *Arlington Heights*

14:02:26  10  lists a series of factual considerations that may be relevant in

14:02:30  11  any given case.  Certainly, sometimes procedurally

14:02:34  12  irregularities suggest something nefarious is afoot.

14:02:38  13       With regard to this legislation, however, the

14:02:40  14  allegedly unusual process suggests nothing nefarious.  It

14:02:45  15  suggests that there was a pandemic that caused a lot of

14:02:48  16  problems.  One could easily say these courts have been holding

14:02:51  17  Zoom hearings a lot recently.  That's very procedurally

14:02:54  18  irregular.  I wonder if there's something nefarious afoot.  Of

14:02:54  19  course not.  It's related to the pandemic.

14:03:00  20       The COVID-19 pandemic delayed the Census.  That caused

14:03:03  21  the Census Bureau to violate a federal statute that required it

14:03:06  22  to get us the data by April 1st, 2021, that had (indiscernible)

14:03:10  23  effects and, yet, we couldn't redistrict during the regular

14:03:14  24  session, we had to do it during a special session,

14:03:18  25  constitutionally limited to 30 days.  So in addition to the

14:03:21  1   process starting late, we're now stuck in a session that's much

14:03:25  2   shorter than regular session.

14:03:26  3          Representative Turner testified that he thinks in a

14:03:28  4   normal Census year, he could get at least twice that amount of

14:03:32  5   time, two months or so, to redistrict.  We only had one month.

14:03:37  6   We're also facing the threat of a broken quorum, so

14:03:40  7   Mr. Sweeten's questioning went through this.

14:03:42  8          The Democrats left the state of -- many of the

14:03:44  9   Democrats in the House had left the state to break quorum and

14:03:49  10  prevent legislation from moving forward in the House.   That

14:03:50  11  would also prevent redistricting maps prosecute moving forward.

14:03:53  12  States understandably prefer to redistrict themselves rather

14:03:57  13  than default on their constitutional obligations and have a

14:04:01  14  state or federal court draw the maps on their own.  So it made

14:04:05  15  good sense for members of the Legislature to say, let's get a

14:04:08  16  move on while we have a quorum.  The process had to both start

14:04:12  17  late and end quickly, both for those reasons and because of the

14:04:15  18  upcoming election deadlines.

14:04:17  19         Next the plaintiffs point to this -- these alleged

14:04:22  20  alternative plans.  There seems to be some legal disputes about

14:04:25  21  the burdens here.  They're analogizing to *Cooper*, which was a

14:04:29  22  *Shaw* claim out of intentional vote delusion claim.  One of the

14:04:33  23  reasons it's different is in that type of case, the defendant is

14:04:39  24  struck -- is stuck with strict scrutiny, because the defendant

14:04:42  25  had said we used race, had to use race, and under strict

14:04:46  1    scrutiny to say, did you really have to use race?  And if

14:04:49  2    there's an alternative plan that either doesn't use it or uses

14:04:52  3    it less, and the Court says, no, you didn't have to, here's an

14:04:54  4    alternative you could've done, that's not the situation we find

14:04:59  5    ourselves in here.  The defendants a denying any motivation, any

14:05:03  6    racial gerrymandering.  We didn't do any of it.  So the

14:05:06  7    alternative plan has to be used for a slightly different purpose

14:05:09  8    when it's used in a case like *Cooper*.

14:05:10  9         At best, the plaintiffs would have to show that this

14:05:15  10   plan was so obvious that the people making decisions in the

14:05:18  11   Texas Senate and the Texas House just would have happened upon

14:05:22  12   it themselves, that if they were -- the plaintiffs' theory is,

14:05:27  13   if these decision makers were truly partisan, then they would've

14:05:31  14   gone for alternative plan four, other than the enacted map.

14:05:36  15   Only a racist would have gone with the enacted map.  That's not

14:05:39  16   true.  There's no factual evidence supporting this.

14:05:43  17        There was expert testimony from Dr. Cortina about the

14:05:46  18   nature of the plan, I suppose, and what sorts of effects he

14:05:51  19   thought it might have, but it was deficient in every respect if

14:05:55  20   the point was to show that it's a factual matter.

14:05:56  21        The Legislature considered something like this and

14:05:58  22   would've adopted it if it were truly partisan.  He had no

14:06:03  23   evidence that anybody, during this rushed process about which

14:06:06  24   they complained, thought to try to create a Republican district

14:06:09  25   in Travis County, rather than in Tarrant County; a rather

CLOSING MR. THOMPSON                                          49

14:06:12  1    counterintuitive idea; and he had no evidence that the plan

14:06:16  2    actually would've been better for Republicans, recalled that

14:06:19  3    when he was questioned on cross-examination, he said, yes, I say

14:06:22  4    it's better for Republicans, but I mean in the statewide races.

14:06:27  5         SC -- you know, the various senate districts would've

14:06:30  6    been better in statewide races, but we don't run statewide races

14:06:35  7    on senate districts.  We run senate races in senate districts.

14:06:37  8    And when asked whether he had any predictions about how

14:06:39  9    alternative plan four would've worked out for actual senate

14:06:44  10   races, he said no for two reasons; one, he had no predictions at

14:06:48  11   all and, two, he didn't have any data about senate races.  He

14:06:52  12   was doing a reconstituted election analysis dependent on

14:06:56  13   statewide data, which he said didn't allow him to draw

14:07:00  14   conclusions about senate races.

14:07:02  15        Finally, the plaintiffs complain about legislative

14:07:06  16   privilege.  I mean, certainly, privilege is annoying for people

14:07:09  17   who are on the other side of it.  We certainly face it all the

14:07:13  18   time, the state defendants, but it is contemplated by precedent,

14:07:15  19   and all of the relevant legal rules have been written to account

14:07:19  20   for the existence of legislate privilege.

14:07:23  21        Fore example, the plaintiffs rely on the *Arlington

14:07:25  22   Heights* framework.  *Arlington Heights* itself discusses how

14:07:28  23   legislators will rarely testify in these types of cases about

14:07:32  24   privileged information.  They also seem to attribute the

14:07:35  25   assertion of privilege to the office of the Attorney General.

CLOSING MR. THOMPSON                                              50

14:07:39  1    It's just not true.  Neither the defendants nor the office of

14:07:44  2    the Attorney General is empowered to tell senators what to do

14:07:48  3    with regard to legislative privilege.  Everyone made clear,

14:07:52  4    including this Court and the witnesses, that privilege belongs

14:07:53  5    to the senators.  There's nothing I or anyone else can do to

14:07:57  6    force them to give up information that I think would be helpful.

14:07:59  7         Mr. Dunn made some comments about what happened at

14:08:05  8    Senator Seliger's deposition.  It's worth noting he was

14:08:08  9    represented by outside counsel, to the extent that's relevant at

14:08:11  10   all.  And Senator Powell asserted privilege, too.  I'm informed

14:08:17  11   that she decided to waive it as to SD-10, but said that if there

14:08:20  12   were any questions about anything else other than SD-10; the

14:08:24  13   rest of the maps; other than that, she would be asserting

14:08:26  14   privilege.  That's not particularly surprising.  This is what

14:08:30  15   senators do; they assert privilege.  It raises no inference of

14:08:33  16   anything.

14:08:34  17        Plaintiffs have also pointed to previous court

14:08:38  18   decisions here.  There was some district court opinions from the

14:08:41  19   last round of redistricting.  They considered different maps

14:08:45  20   passed by different legislators.  The D.C. court that they often

14:08:47  21   used even had a different legal standard.  It is under the now

14:08:50  22   defunct Section 5.  The burden was on the state to prove the

14:08:54  23   negative and that court didn't think we had, but that doesn't

14:08:57  24   tell us anything about what this -- what the plaintiffs have

14:09:00  25   proven under a different legal standard, 10 years later with

CLOSING MR. THOMPSON                                          51

14:09:04   1    different maps and decision makers.

14:09:06   2          There was also some discussion I think of *Abbott v.*

14:09:10   3    *Perez*, which was the -- one of the two times the Supreme Court

14:09:14   4    got to review the decisions from Texas redistricting last round.

14:09:20   5    There was only one instance of intentional discrimination

14:09:23   6    according to the Supreme Court of the United States.  It had to

14:09:26   7    do with HD90.  The thing about HD90 is that was intentional

14:09:33   8    discrimination by Democrats.  It was an intramural fight about

14:09:36   9    whether a district, HD90, would have more Latino voters and

14:09:41   10   fewer African American voters or more African American voters

14:09:44   11   and fewer Latino voters.  So as the Supreme Court majority

14:09:46   12   opinion put it, the Legislature adopted changes to HD90 at the

14:09:52   13   behest of minority groups, not out of a desire to discriminate.

14:09:56   14   That is Darby, the chairman at the time, was too solicitous of

14:09:59   15   changes with respect to HD90.  That was found to be

14:10:04   16   unconstitutional, but the Supreme Court explained even though

14:10:08   17   that was unlawful, it certainly didn't raise any inference of

14:10:12   18   intentional discrimination.  Efforts to accept too many changes

14:10:18   19   from minority groups that wind of up constituting racial

14:10:23   20   gerrymandering are no evidence at all of an intent to harm

14:10:26   21   minority groups in some separate way.

14:10:29   22          Now it is true that the standard here is very high and

14:10:33   23   the plaintiffs, perhaps not unreasonably complain that it's very

14:10:37   24   difficult to meet the standard that I believe applies and I've

14:10:41   25   laid out.

14:10:42   1      Congress had some sympathy for that position and they

14:10:45   2   provided an alternative way to handle it.  In 1982, Congress

14:10:50   3   amended Section 2 of the VRA, and according to the Supreme

14:10:54   4   Court, the intent there was to make it easier to bring a

14:10:56   5   discrimination claim by removing the intent requirement.  So all

14:10:59   6   of these things we've taking about; the difficulties of proving

14:11:01   7   intent, the ambiguities of effects in light of possible partisan

14:11:04   8   motivations, all of those fall by the wayside under modern

14:11:07   9   Section 2 precedent for an effects claim.

14:11:09   10      Now the plaintiffs have that claim.  They were just

14:11:12   11   talking about severing it off.  They have a Section 2 effects

14:11:16   12   claim, where they wouldn't have to prove intent according to

14:11:19   13   their theory.  And they consciously and strategically chose not

14:11:23   14   to press it at the PI stage.  So they should not be heard now to

14:11:25   15   complain, oh, it's just too difficult to prove intent.  They had

14:11:28   16   an alternative and they chose not to avail themselves of it.

14:11:32   17      Finally, Your Honors, I'll just turn to the *Purcell*

14:11:37   18   principle.  This is a veneral principle of election cases,

14:11:42   19   generally.  It has not come up in some of the Texas

14:11:46   20   redistricting cases in the past, because of the effect that

14:11:49   21   Section 5 used to have.  When Section 5 preclearance was in

14:11:55   22   effect, it meant that -- and according to legal fiction -- Texas

14:11:58   23   law didn't take affect until it was pre-cleared.  So there was

14:12:01   24   no map in place that an selection could be held on, so courts

14:12:05   25   had to do something until preclearance was overcome.  Now,

CLOSING MR. THOMPSON                                                    53

14:12:09  1   that's not the case.  Preclearance is gone.  And there is a map

14:12:13  2   in place, and we know that because local and state officials are

14:12:17  3   already running an election on it.

14:12:19  4        The Supreme Court pays close attention to these kinds

14:12:22  5   of things.  And in 2020, as in many previous years, repeatedly

14:12:27  6   emphasized that lower federal courts should ordinarily not alter

14:12:31  7   the election rules on the eve of an election.  That's *RNC v.*

14:12:35  8   *DNC.*  What goes for the eve of an election goes doubly for the

14:12:35  9   middle of an election where people are already voting.

14:12:40  10       The Fifth Circuit has also faithfully applied this

14:12:44  11  principle.  We have just four examples here for Your Honors'

14:12:48  12  reference, where the Fifth Circuit stayed injunctions in 2020

14:12:50  13  related to election law changes.  Judge Smith was involved in a

14:12:55  14  couple of these.  I was involved in a couple myself.

14:12:57  15       One that might be worth noting is the fifth one,

14:13:01  16  *Mi Familia Vota.*  And it mirrors this case in the presentation

14:13:07  17  of evidence.  In *Mi Familia Vota*, the defendants put on

14:13:11  18  declarations, I believe, from election officials saying that the

14:13:15  19  district court should not do this.  It would cause problems.  It

14:13:18  20  would cause voter confusion.  The administration of elections

14:13:21  21  would not work very well.  And the plaintiffs did not.  They had

14:13:26  22  one declaration that the Fifth Circuit discounted, because it

14:13:29  23  didn't address the question in hand, and then said the

14:13:31  24  plaintiffs raise no other evidence, nor does the district court

14:13:36  25  cite to any, to support the proposition that the disruption to

CLOSING MR. THOMPSON                                              54

14:13:38   1   Texas's election rules would be minimal.  You can see that the

14:13:41   2   Court put the burden on the plaintiffs, as part of the general

14:13:46   3   PI burden, to prove that it would be okay, that it wouldn't

14:13:49   4   cause problems for the election.  They couldn't do it without

14:13:53   5   evidence.  That's exactly what we're seeing here.

14:13:54   6            The plaintiffs had an opportunity to put on evidence

14:13:57   7   related to *Purcell.*  They knew who our witnesses were going to

14:14:00   8   be.  They chose not to do so.  They haven't designated a single

14:14:04   9   witness to talk about this.

14:14:05  10            When we put on witnesses, they didn't cross-examine a

14:14:05  11   single one of the.  I don't think Your Honors heard a single

14:14:09  12   cross-examination question during the testimony from the two

14:14:11  13   election administrators or from Director of Elections Keith

14:14:19  14   Ingram.

14:14:19  15            Now, I think, and I am sure the record will reflect

14:14:24  16   I'm wrong, the first time plaintiffs have addressed *Purcell* is

14:14:27  17   doing Mr. Gaber's closing statement that just happened.  I

14:14:30  18   didn't see it in their original motion.  I didn't see it in

14:14:33  19   their reply brief.  I haven't seen it in any of the evidence.  I

14:14:37  20   supposed they did submit -- excuse me -- they did submit a

14:14:40  21   remedies brief, I think, during the PI hearing this week, but

14:14:44  22   they did not put on any evidence with it.  They didn't have a

14:14:47  23   witness or declaration attached, I believe.  And Mr. Gaber is an

14:14:51  24   eloquent man, but he is not an election administrator and he is

14:14:55  25   certainly not a fact witness.

CLOSING MR. THOMPSON                                           55

14:14:56   1        Defendants' evidence regarding *Purcell* has already

14:15:01   2   been credited by the Supreme Court of Texas.  It cited

14:15:05   3   declarations from Ingram, Sherbet and Decker.  Now of course

14:15:05   4   they're different declarations.  They were offered in different

14:15:10   5   cases, but they're substantially the same, materially identical,

14:15:14   6   you might say.

14:15:15   7        We litigated a state court redistricting case, I think

14:15:19   8   last month, in state court, and we put on the same type of

14:15:23   9   evidence.  The court denied the temporary injunction.

14:15:28  10        Then there is the next case.  It's called -- I'm

14:15:32  11   probably going to mispronounce it -- *In re Khanoyan*.  This is

14:15:32  12   the case that went up to the Texas Supreme Court.  We weren't

14:15:39  13   the defendants there.  I wasn't a lawyer in that case, but the

14:15:42  14   lawyer is there actually relied on the same evidence we put in

14:15:45  15   in the state Court proceeding, just attached it to their briefs

14:15:48  16   as I understand it.  And that's why the Supreme Court came to

14:15:51  17   see our evidence and credit it.  They said, no amount of

14:15:56  18   expedited briefing or judicial expediency at this point can

14:16:02  19   change the fact that the primary election for 2022 is already in

14:16:06  20   its early stages.  The only thing we need to be updated about

14:16:08  21   that is that we're no longer in the early stages.  According to

14:16:09  22   Director of Elections Keith Ingram, I was about to say we're not

14:16:13  23   in the early stages; we're midway.

14:16:18  24        One interesting fact I learned yesterday about *In re*

14:16:22  25   *Khanoyan* is that the lawyer for the plaintiffs in this case,

CLOSING MR. THOMPSON                                          56

14:16:25  1    Mr. Dunn, was the lawyer helping the defendants in that case.

14:16:29  2    He relied on our evidence and he convinced the Supreme Court to

14:16:35  3    prevent those plaintiffs from getting relief to whatever extent

14:16:39  4    they were entitled to it in that case.  This goes to show that

14:16:43  5    sometimes *Purcell* stops Republican plaintiffs or plaintiffs

14:16:47  6    aligned with the Republican party from getting relief they

14:16:51  7    believe they're entitled to.  Other times it stops plaintiffs

14:16:53  8    aligned with the democratic party from getting relief they're

14:16:56  9    entitled to.  What's good for the goose is good for the gander,

14:17:01 10    Your Honors.

14:17:02 11         This is not some conspiracy to prevent people from

14:17:04 12    winning lawsuits they ought to win.  It is a well respective

14:17:08 13    rule established repeatedly by the Supreme Court and the Fifth

14:17:09 14    Circuit that we can't throw the baby out with the bath water.

14:17:13 15    We need elections in this country and in this state to run

14:17:17 16    smoothly and well.  It's crucial, both for having the election

14:17:20 17    results, for having voter confidence in the elections, from

14:17:22 18    preventing voter confusion and disenfranchise them.

14:17:26 19         Now is not the time to stop the train on the tracks,

14:17:30 20    as Mr. Sherbet put it.  It's far too late for that.  As

14:17:38 21    Mr. Sherbet put it, we've already started mailing out ballots.

14:17:42 22    We've already posted ballots on our website.  We've already

14:17:45 23    started securing equipment, preparing it for testing.  I don't

14:17:48 24    know how it could feasible, from the stance of the voting

14:17:51 25    equipment especially.  He goes on to say, I think it's going to

KATHLEEN A. SUPNET, CSR

CLOSING MR. THOMPSON                                           57

14:17:57  1    be a situation where there definitely will be confusion.  It's

14:18:00  2    referring to voter confusion.  That is the aminating principle

14:18:05  3    behind *Purcell*.  In *Purcell v. Gonzalez*, the Supreme Court says

14:18:07  4    the problem with these late orders in election cases is they

14:18:10  5    cause voter confusion.

14:18:11  6         Mr. Sherbet points out the things that the lawyers in

14:18:17  7    the room may not find confusing, do, just as a practical matter,

14:18:22  8    confuse some voters.  It's something we have to be especially

14:18:24  9    careful with regarding mail-in ballots, because who is eligible

14:18:28 10    to cast those, we need to be especially certain not to confuse

14:18:32 11    voters in that circumstance, and mail-in ballots are the ones

14:18:38 12    that are already going out.  So the people most vulnerable to

14:18:40 13    confusion are the ones who would me most affected by any kind of

14:18:42 14    injunction entered at this point.

14:18:45 15         Plaintiffs have pointed to the fact that sometimes

14:18:48 16    courts have granted the sort of relief they want in the past,

14:18:52 17    albeit in very different circumstances.  One of the different

14:18:56 18    circumstances being the Section 5 issues I already mentioned,

14:18:57 19    but beyond that, we shouldn't just blindly do whatever was done

14:19:01 20    in 2012.  We should ask, how did it go in 2012; did it cause

14:19:07 21    unnecessary voter confusion or did it not?  It's a factual

14:19:09 22    question that can only be resolved with evidence.  The only

14:19:11 23    evidence before this Court says that there were problems in

14:19:15 24    2012.

14:19:15 25         The Kendall County Elections Administrator, Ms.

14:19:19  1   Decker, talked about the strain on the office staff, talked

14:19:22  2   about the difficulty finding poll workers to work, the problems

14:19:27  3   with having the primary election during the Memorial Day

14:19:30  4   weekend.

14:19:31  5          Now these aren't -- one might say, surely they can

14:19:35  6   just work harder and things like that.  The problem is we have a

14:19:37  7   lot of counties in Texas, 254.  Some of them are fairly small.

14:19:41  8   Some of them are fairly understaffed, don't have the same

14:19:43  9   resources the larger counties have.  And I'm sure that they find

14:19:47  10  people that work in those offices are willing to put in as much

14:19:50  11  effort as they can and do whatever they need to do to make

14:19:53  12  things work.  The problems is, there's a limit how much they can

14:19:55  13  do.  They're already operating at capacity.  And when things

14:19:59  14  happen to them, when things fall down on their job, the people

14:20:04  15  harmed are voters, not defendants, not plaintiffs.  That's who

14:20:07  16  we have to watch out here for, the voters.

14:20:09  17         Decker testified that 2012 we had voter confusion with

14:20:15  18  in-person voting, too.  People would see our fliers for one

14:20:18  19  election with different locations in the election they were here

14:20:21  20  to vote on.

14:20:27  21         Director of Elections, Keith Ingram, testified that

14:20:31  22  the problems seen in 2012 would also manifest if the primary

14:20:35  23  election in 2022 were delayed.

14:20:39  24         *We asked:  Do you believe that delay of primary*

14:20:41  25         *election -- I understand the brief to be counties*

14:20:45  1           *affected by remediation of Senate District 10, but*

14:20:48  2           *even if it were statewide, would that cause voter*

14:20:52  3           *confusion?*

14:20:52  4           *Answer:  Yes.*

14:20:53  5           *Question:  Would it cause negative consequences?*

14:20:54  6           *Answer:  It would make voters wonder what the point*

14:20:56  7           *is, you know, why did I go through that effort; why*

14:21:00  8           *bother next time?*

14:21:00  9           MR. THOMPSON:  These are not the kind of problems that

14:21:03 10  we can long stand in a democracy.

14:21:07 11           Plaintiffs' brief on remediation -- on remedies --

14:21:10 12  excuse me -- offers two options; one, is delaying the primary.

14:21:14 13  Director of Elections Ingram explains the major objection to

14:21:19 14  that is the voting in this election is already underway.  The

14:21:23 15  second option was to order the SOS to direct the affected

14:21:28 16  district's primary results not be tallied.  He testified, quote,

14:21:30 17  that's impossible.  The problem is the votes -- the races are on

14:21:34 18  the same ballot.  So if they're put into a machine together, all

14:21:39 19  of the votes will be counted.  The alternative, he said, was to

14:21:41 20  count them by hand, but that's obviously not feasible given the

14:21:46 21  number of votes that would have to be counted in a time frame.

14:21:47 22  Also, just note that as matter of law, I do not believe the SOS

14:21:54 23  can direct the affected districts to not count the ballots.  I'm

14:21:58 24  not aware of any authority in the election code that would allow

14:22:02 25  that.  Seems very surprising to me.  I haven't seen anything

CLOSING MR. DUNN                                               60

14:22:04  1   cited by the plaintiffs.  And as the Fifth Circuit put it in

14:22:09  2   Paloby (phonetic), there's the elemental fact that a defendant

14:22:11  3   can only be enjoined to do something he's otherwise empowered to

14:22:18  4   do.

14:22:18  5        Your Honors, we think that the plaintiffs have not

14:22:20  6   carried their burden to show any kind of intentional

14:22:23  7   discrimination or racial gerrymandering.  We think that the

14:22:25  8   plaintiffs have not carried their burden to demonstrate that

14:22:28  9   relief ordered by this Court would do more good than harm.  It

14:22:33 10   would delay -- delaying elections, messing with election

14:22:36 11   deadlines, would cause voter confusion and administrative

14:22:40 12   turmoil to only ultimately threatens the election itself.

14:22:42 13        I thank the Court for its time, both today and going

14:22:47 14   back.  If the Court has any questions, I'm happy to answer them,

14:22:51 15   otherwise, I will leave the podium to Mr. Gaber.

14:22:55 16        JUDGE GUADERRAMA:  Thank you, Mr. Thompson.

14:23:12 17        Mr. Dunn, once you begin, you'll have 19 minutes.

14:23:17 18             CLOSING ARGUMENT BY THE PLAINTIFFS

14:23:17 19        MR. DUNN:  May it please the Court.

14:23:20 20        Thank you, Your Honor.  I will be yielding back the

14:23:22 21   vast majority of that time.

14:23:25 22        Judge Smith, a cite that we did not have for you

14:23:27 23   earlier was 478 U.S. 63 in the *Gingles* case.

14:23:32 24        I'm going to pick off in the end where my counsel --

14:23:35 25   my co- -- opposing counsel ended on the matter of *Purcell*.  And

KATHLEEN A. SUPNET, CSR

CLOSING MR. DUNN                                                    61

14:23:38  1    I'd like to just state for a moment to the logical conclusion of

14:23:41  2    the government's argument in this case.

14:23:44  3            The state could come into court and admit that it drew

14:23:48  4    a map on the base of intentional race discrimination and there

14:23:52  5    would be no remedy under the state's theory of *Purcell* as it

14:23:57  6    applies to redistricting.

14:23:58  7            And even the Texas Supreme Court didn't go that far in

14:24:02  8    the decision as it was represented to this Court.  I'm going to

14:24:06  9    show you the other part of the decision now.

14:24:08  10           Well, first, you were shown the cover page to the

14:24:11  11   brief that I filed.  And there's no question I've done so and I

14:24:12  12   encourage the Court to look at it.  One of the things that we

14:24:15  13   note in that brief is that the law, under state law with respect

14:24:18  14   to remedies for state election procedures, has been in place by

14:24:22  15   the Texas Supreme Court since at least the 1870s, that provides

14:24:26  16   that once the election machinery is underway, procedural matters

14:24:29  17   as it relates to ballot access and voting become moot; the

14:24:34  18   election rolls forward.  No question that's still state law.

14:24:37  19           What we also state in our brief is that that -- the

14:24:40  20   claim made in the *In re Khanoyan* case, was a novel

14:24:44  21   constitutional claim, not yet recognized by any state in the

14:24:48  22   country, that was not based on intentional race discrimination

14:24:51  23   and isn't more to any specific provision in any constitution.

14:24:55  24   For that reason, the Court said it's a novel claim.  The

14:24:58  25   plaintiffs in that case were dilatory in pursuing their claim.

CLOSING MR. DUNN                                                    62

14:25:03  1    The Supreme Court lays that out in paragraphs.  But even had

14:25:06  2    they had a case that was worth pursuing and that was ultimately

14:25:10  3    sustained on the merits, the Supreme Court said this on the

14:25:14  4    bottom of page 13:

14:25:16  5            "It remains possible, in fact, that this case may yet

14:25:20  6    provide such a vehicle for judicial consideration of the

14:25:23  7    questions presented here.  No party disputes that an

14:25:27  8    interlocutory appeal is permissible.  Such opinion -- an appeal

14:25:30  9    could not change the 2022 primary, which has already begun.  But

14:25:35  10   the new map, if it stands, will govern Harris County elections

14:25:40  11   for the rest of the decade.  If the Court concludes that the map

14:25:42  12   is in fact unconstitutional, the remedial options could, at

14:25:46  13   least in theory, include an election for all four precincts in

14:25:50  14   '24 -- 2024, or even again, at least in theory, for a special

14:25:54  15   election for the two precincts up in 2022."

14:25:58  16           And it cites to some federal authorities.

14:26:00  17           It is the law in federal court as it now is in the

14:26:04  18   Texas Supreme Court, that when there is a constitutional harm,

14:26:07  19   there is a remedy.  The reason that the plaintiffs don't contest

14:26:11  20   that it's too late now for the March election is because it

14:26:15  21   wouldn't be reasonable to do so.  But these plaintiffs have been

14:26:18  22   diligent.  They filed their claim within eight days.  We hear

14:26:24  23   daily we're criticized by counsel for having been diligent in

14:26:25  24   pursuing our case.  We filed a voluminous, extensive motion for

14:26:30  25   preliminary injunction the day before Thanksgiving that

14:26:32   1   contained numerous exhibits, declarations, pages.  In fact, I'll

14:26:36   2   venture to say in my 20-plus years of doing this, it's not just

14:26:39   3   the most comprehensive motion for preliminary junction I've

14:26:42   4   seen.  It's the volume of at least two or three others of

14:26:45   5   similar weight and circumstance combined.  And the plaintiffs

14:26:49   6   asked for a hearing.

14:26:50   7          Now I under other circumstances, other plaintiffs

14:26:54   8   arranging various venue, consolidation and other procedural

14:26:58   9   matters stood in the way, but these plaintiffs did everything

14:27:00  10   they could to get a remedy in time for March.  If there is no

14:27:04  11   remedy, then there is no Fourteenth and Fifteenth Amendment.

14:27:08  12          On the matter of consolidation, Rule 65 says -- and

14:27:11  13   I'll just have to disagree with the state -- it says

14:27:14  14   specifically, that notice consolidation can be before or after

14:27:17  15   the preliminary junction.

14:27:20  16          On a number of other things that we are plainly in

14:27:24  17   opposite to the record, for one, Senator Powell has not invoked

14:27:29  18   legislative privilege.  She did not do so here in front of the

14:27:30  19   Court.  She was asked at her deposition, would she ever or some

14:27:35  20   omnibus *Mother Hubbard* question about would she ever invoke

14:27:37  21   legislative privilege, and there was an objection that she

14:27:40  22   might, but at no point did she decline to answer a question on

14:27:42  23   that basis.

14:27:43  24          There was also a statement made here at this podium

14:27:47  25   that the lawyers for the state have not once instructed a

14:27:51   1   witness to invoke legislative privilege, but the Court heard

14:27:55   2   Senator Seliger's testimony where that occurred on a number of

14:27:57   3   occasions.  And it heard it right here in the courtroom with

14:27:59   4   Senator Huffman, who had to take a minute to go around the

14:28:02   5   corner to get advice from her state counsel as to whether and

14:28:05   6   how to take legislative privilege.

14:28:08   7         And then on the matter of HD90.  HD90 was a claim

14:28:13   8   among, as the state presents, Democrats who had adjusted a

14:28:18   9   district to make it easier -- make it harder to elect a Latino

14:28:22  10   candidate of choice, for which the Supreme Court rightly struck

14:28:25  11   it down.  The purpose -- the relation of HD90 to this case is it

14:28:29  12   was in 2017 that the U.S. Supreme Court found that there had

14:28:33  13   been race-based lines drawn with respect to a district in

14:28:37  14   Tarrant County.  Nevertheless, Senator Huffman, here or on the

14:28:42  15   floor in the Senate, couldn't concede to having read or

14:28:45  16   carefully considered that decision.

14:28:46  17         And on the matter of the alternative plan, Senator

14:28:49  18   Huffman says she used racial shading, and that the type of

14:28:54  19   racial shading she used in the excerpt you viewed, was statewide

14:28:55  20   election results, which are precisely the statewide election

14:28:59  21   results that Dr. Cortina used to evaluate his plan.

14:29:04  22         And then --

14:29:15  23         JUDGE BROWN:  I think you meant partisan shading.

14:29:16  24         MR. DUNN:  And I beg your pardon, Your Honor.  This

14:29:16  25   also appears on the record, page 118.

KATHLEEN A. SUPNET, CSR

CLOSING MR. DUNN                                                      65

14:29:24  1        Senator West, page 118 of the transcript of this

14:29:25  2   courts proceeding yesterday.  Senator West asks:  So in relation

14:29:25  3   to the Voting Rights Act, race was never considered at all.  I

14:29:29  4   just want to make that certain.

14:29:30  5        And Senator Huffman responds:  That's not what I said.

14:29:32  6   I said that we drew the maps blind.  And then I looked at some

14:29:37  7   data, myself, after everything was done and, in fact, I was, I

14:29:40  8   think, yesterday, if not before.

14:29:42  9        She goes on to say she received the Voting Rights Act

14:29:45 10   analysis.  This is on the floor of the Senate.

14:29:47 11        Prior to posting the map for consideration by Senate

14:29:50 12   floor and later all of the House proceeding, there is no doubt

14:29:53 13   in this record that Senator Huffman knew the consequence of her

14:29:57 14   map, and was no doubt in the record that the rest of the members

14:29:59 15   of the Senate and the rest of the members of the House knew

14:30:03 16   about it, because Senator Powell saw to it that they are aware

14:30:07 17   of the consequences of their action.

14:30:08 18        The plaintiffs have met their evidentiary burden and

14:30:10 19   they are entitled to the injunction for which they seek.

14:30:22 20        JUDGE GUADERRAMA:  All right.  Thank you, Mr. Dunn.

14:30:25 21        All right.  We will --

14:30:37 22        JUDGE BROWN:  One thing.  I don't need a hardcopy of

14:30:42 23   the exhibits.  Has there been an electronic -- a full electronic

14:30:43 24   copy would be welcomed for me.

14:30:47 25        JUDGE GUADERRAMA:  Greg?

1          JUDGE BROWN:  If we could get that.  Okay.

2          JUDGE GUADERRAMA:  So, we may present you with an

3    order for some sort of written submission prior to the entry of

4    our decision, and if we need to do that, we'll get that to you

5    promptly.

6          All right.  Thank you-all.  This was an interesting

7    four days.

8          We're adjourned.

9          (Proceeding concludes at 2:31 p.m.).

10                              *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    * * * * *

2          I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.  I

4    further certify that the transcript fees and format comply with

5    those prescribed by the Court and the Judicial Conference of the

6    United States.

7    Signature:/s/KATHLEEN ANN SUPNET        February 23, 2022
              Kathleen A. Supnet, CSR        Date
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

KATHLEEN A. SUPNET, CSR