```
 1                    IN THE UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF TEXAS
 2                             EL PASO DIVISION
                              VOLUME 4 OF 9
 3

 4    LULAC, et al.,              )(     EP:21-CR-259-DCG-JES-JVB
                                  )(     (Lead Case)
 5        Plaintiffs,             )(
      _____ )(
 6    ROY CHARLES BROOKS, et al., )(     EP:21-CV-00991-DCG-JES-JVB
                                  )(
 7        Plaintiffs,             )(
                                  )(
 8    vs.                         )(     EL PASO, TEXAS
                                  )(
 9    GREG ABBOTT, in his official)(
       capacity as Governor of Texas,)(
10     et al.,                    )(
                                  )(     January 26th, 2022
11        Defendants.             )(     (8:59 a.m. to 12:59 p.m.)

12    _____

13    HEARING ON BROOKS PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
      _____

14

15                 FIFTH CIRCUIT JUDGE JERRY EDWIN SMITH
                   U.S. DISTRICT JUDGE DAVID C. GUADERRAMA
16                 U.S. DISTRICT JUDGE JEFFREY V. BROWN

17
      APPEARANCES:
18

19    For Brooks Plaintiffs:      Mr. Chad W. Dunn
                                   Brazil & Dunn
20                                 4407 Bee Caves Road
                                   Building 1, Ste. 111
21                                 Austin, TX 78746
                                   (512) 717-9822

22
                                   Mr. Mark P. Gaber
23                                 Mark P. Gaber PLLC
                                   P.O. Box 34481
24                                 Washington, DC 20043
                                   (715) 482-4066
25                                 Mark@markgaber.com
```

```
 1   For Brooks Plaintiffs:        Mr. Jesse L. Gaines
                                   Attorney at Law
 2                                 P.O. Box 50093
                                   Fort Worth, TX 76105
 3                                 817-714-9988
                                   Gainesjesse@ymail.com
 4
                                   Ms. Molly E. Danahy
 5                                 P.O. Box 26277
                                   Baltimore, MD 21211
 6                                 (208) 301-1202
                                   Danahy.molly@gmail.com
 7
                                   Ms. Sonni Waknin
 8                                 10300 Venice Blvd. # 204
                                   Culver City, CA 90232
 9                                 732-610-1283
                                   Sonniwaknin@gmail.com
10

11   For Defendants:              Mr. Patrick K. Sweeten
                                   Mr. Christopher D. Hilton
12                                 Mr. Eric Hudson
                                   Mr. William Thomas Thompson
13                                 Ms. Kathleen Hunker
                                   Ms. Courtney Brooke Corbello
14                                 Mr. Jack Buckley DiSorbo
                                   Office of Texas Attorney General
15                                 P.O. Box 12548
                                   MC 009
16                                 Austin, Texas 78711
                                   (512) 463-4139
17
     ALSO PRESENT:                 Mr. Bryan Christopher
18
     Court Reporter:               Kathleen A. Supnet
19                                 El Paso, Texas
                                   (915)834-0573
20                                 kathi.supnet5303@gmail.com

21

22

23

24          Transcript produced by mechanical stenography, and

25   computer-aided software and computer.
```

```
1                        CHRONOLOGICAL INDEX

2                         VOLUME 4 of 9

3    JANUARY 26, 2022, (8:59 a.m. to 12:59 p.m.)        PAGE VOL.

4    PLAINTIFFS' WITNESSES:       DIRECT    CROSS    VOIR DIRE   VOL.

5    SENATOR KEL SELIGER          4         13       --          4
     (VIDEOTAPED DEPOSITION)
6
     SENATOR BEVERLY POWELL       67        142      --          4
7
     Court Reporter Certificate. . . . . . . . . . . .  183      4
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

08:59:28  1              (Open court.)

08:59:28  2              JUDGE GUADERRAMA:  All right.  Mr. Dunn, we were in

08:59:30  3   the middle of the deposition testimony of Senator Seliger.

08:59:35  4              MR. DUNN:  Shall I proceed?

08:59:37  5              THE COURT:  Yes, sir.

08:59:37  6              (Videotaped deposition starts).

08:59:37  7         VIDEOTAPED DEPOSITION OFFERED BY MR. DUNN

08:59:37  8                    SENATOR KEL SELIGER,

08:59:37  9              DIRECT EXAMINATION BY THE DEFENSE

09:00:04  10  BY MR. HUDSON:

09:00:04  11       Q.    -- Senate District 10, have you seen that document

09:00:04  12  before?

09:00:04  13       A.    Yes.

09:00:04  14       Q.    And what is that document?

09:00:04  15       A.    It's an article from the *Austin American Statesmen*.

09:00:06  16       Q.    Is that a true and accurate copy of the article dated

09:00:08  17  January 24th, 2019, titled "Patrick Criticizes Soldiers

09:00:12  18  Attitude, Lack of Teamwork"?

09:00:14  19       A.    Yes.

09:00:15  20       Q.    So in addition to the issues that you had with Senator

09:00:21  21  Patrick -- excuse me -- Lieutenant Governor Patrick in 2019,

09:00:27  22  he'd also criticized you for not being a team player; is that

09:00:30  23  right?

09:00:30  24       A.    Yes.

09:00:31  25       Q.    And that again was based on your 2017 votes against

DIRECT - SELIGER                                                    5

09:00:34  1   priorities, right?

09:00:35  2       A.   Yes.

09:00:35  3       Q.   So, challenger in 2014, challenger in 2018, you had a

09:00:44  4   dispute over remarks made about Lieutenant Governor Patrick's

09:00:48  5   staffer in 2019; Lieutenant Governor Patrick criticizes you as

09:00:54  6   not being a team player in 2019, right?

09:00:57  7       A.   Um, hum.

09:01:02  8            UNKNOWN SPEAKER:  Is that a yes?

09:01:02  9       A.   Yes, I'm sorry.

09:01:02 10   BY MR. HUDSON:

09:01:18 11       Q.   I'm going to hand you what I'm going to mark as

09:01:21 12   Defendant's 11.  Take a look at that and see -- tell me when

09:01:29 13   you're finished.

09:01:31 14            For purposes of identification and in addition to

09:01:33 15   marking this as Exhibit 11, this is also Exhibit 20 in the

09:01:37 16   response to plaintiff's preliminary injunction motion.

09:01:44 17            Have you ever seen that document before?

09:02:58 18       A.   Yes.

09:02:58 19       Q.   What is it?

09:02:59 20       A.   It is an article from *Texas Tribune,* October 7th,

09:03:03 21   2021.

09:03:04 22       Q.   To your knowledge, is that a true and accurate copy of

09:03:08 23   the article titled "Weighing Re-Election Bid, GOP Texas Senator

09:03:12 24   Kel Seliger Confronts Redrawn District, Trump Endorsement of

09:03:16 25   Primary Challenger," dated October 7th, 2021?

09:03:19   1      A.    Yes.

09:03:20   2      Q.    Now, the first full paragraph on page 2 of this

09:03:24   3   document -- follow along with me --

09:03:24   4      A.    Um-hum.

09:03:26   5      Q.    -- reads:   Heading into election season, Amarillo

09:03:29   6   State Senator Kel Seliger says he feels like members of his own

09:03:31   7   party might be using redistricting to oust him after years of

09:03:32   8   tension with Lieutenant Governor Dan Patrick, a fellow

09:03:37   9   Republican.

09:03:37   10       Did I read that correctly?

09:03:39   11      A.    Yes.

09:03:39   12      Q.    So you thought politics was at play with potentially

09:03:40   13   being redrawn out of your district; is that right?

09:03:43   14      A.    No, not being redrawn out of my district, no.

09:03:48   15      Q.    Okay.

09:03:49   16      A.    Being redrawn is such a factor to make it more

09:03:52   17   difficult for me to get re-elected in that same district.

09:03:56   18      Q.    Well, in fact, the article goes on to read:   Seliger's

09:04:00   19   deciding whether he will even run for re-election, but if he

09:04:02   20   does, he's not starting down perhaps his toughest primary, yet.

09:04:05   21   Is that right?

09:04:05   22      A.    Yes.

09:04:06   23      Q.    You would agree that the district was redrawn to be

09:04:09   24   even more Republican, making it difficult for you to win a

09:04:15   25   primary; is that right?

09:04:15  1      A.    Being more Republican doesn't make it difficult for me

09:04:21  2  to win a primary.

09:04:22  3      Q.    So why were you concerned about being or drawing a

09:04:23  4  tougher race that year?

09:04:25  5      A.    Because they were taking counties that I had

09:04:28  6  representative -- represented before, and taking those counties

09:04:30  7  out of the district and putting counties in the districts that

09:04:34  8  are closer to Midland, thinking that they would affect the vote

09:04:37  9  in favor of the Midland candidate.

09:04:40 10      Q.    In fact, this article goes on to say that:  On

09:04:45 11  Tuesday, former President Donald Trump, a close ally of

09:04:51 12  Lieutenant Patrick, endorsed Sparks and bashed Seliger as a

09:04:52 13  quote-unquote "RINO" -- Republican in the name only -- in a rare

09:04:59 14  intervention in the Texas legislative race by the former

09:05:00 15  President.

09:05:00 16      A.    Yes.

09:05:01 17      Q.    Did I read that correctly?

09:05:01 18      A.    Yes.

09:05:02 19      Q.    Do you consider yourself a RINO?

09:05:04 20      A.    Of course not.

09:05:05 21      Q.    What does a RINO mean?

09:05:08 22      A.    Republican in name only.

09:05:09 23      Q.    And what does that mean?

09:05:11 24      A.    I'm -- I'm not sure I know.  It's what if what people

09:05:14 25  call in the far right call people who are not on the -- the far

09:05:18  1    right.  What the President also said that I was a RINO when I

09:05:24  2    was like Mitt Romney.  And next to probably Ronald Reagan and

09:05:30  3    John McCain, there was probably no one I'd rather be compared to

09:05:36  4    than -- than Romney, which goes to show just how really good the

09:05:39  5    opinions of the former President are.

09:05:41  6         Q.   You would agree you're the most liberal Republican in

09:05:45  7    the Texas Senate, right?

09:05:46  8         A.   I accept no -- no part of liberal.  I am not a

09:05:52  9    liberal.  Do I have a less so-called conservative voting record?

09:05:59  10   According to Rice University and Texas Public Policy and the

09:06:05  11   rest of my colleagues, I do, but a lot of those are based on

09:06:09  12   fallacious measurements and assumptions.  So my voting record is

09:06:14  13   80-some-odd-percent with the Republican majority of the Senate,

09:06:20  14   that is not a liberal voting record.

09:06:22  15        Q.   I'm going to hand you what I'm going to mark as

09:06:25  16   Defendant's 12.

09:06:27  17             Have you ever seen that article before?

09:06:30  18        A.   I believe so.

09:06:31  19        Q.   Go ahead and take a look and let me know when you're

09:06:37  20   finished.

09:06:38  21        A.   Yeah, I've read it at the time.

09:06:40  22        Q.   Is this a true and accurate copy of the June 18, 2021,

09:06:48  23   article titled "The Back Mic:  Analyzing the 2021 Texas

09:06:52  24   Legislature's Conservative to Liberal Rankings"?

09:06:54  25        A.   I believe so.

09:06:55   1        Q.    And if you'll flip over to page -- and I'll count them

09:07:07   2   here, because the pages aren't numbered.  There's one full page,

09:07:11   3   two full pages -- three full pages, and on the fourth full page,

09:07:17   4   number 1, it reads Bryan Hughes; do you one that?

09:07:19   5        A.    I'm not there, yet.

09:07:20   6        Q.    Okay.

09:07:22   7        A.    Now I have it.

09:07:27   8        Q.    Okay.  Now, do you see in the top left-hand corner it

09:07:31   9   says "2021 Rank"?

09:07:32  10        A.    Yes.

09:07:33  11        Q.    All right.  And above that, there's discussion about

09:07:37  12   the methodology, but the 2021 rank is 1 through 18 Republicans?

09:07:46  13        A.    Yes.

09:07:47  14        Q.    Now you would agree that there are 18 Republicans in

09:07:50  15   the Texas Senate, right?

09:07:50  16        A.    I do.

09:07:52  17        Q.    For the 87th Legislature?

09:07:53  18        A.    Yes.

09:07:54  19        Q.    Now, number one is Bryan Hughes, right?

09:07:57  20        A.    Yes.

09:07:57  21        Q.    And you are 18th?

09:07:58  22        A.    Right.

09:07:59  23        Q.    So based on Rice University's Baker Institute of

09:08:02  24   Public Policy, out of the all of the members of the Republican

09:08:05  25   Party in the Senate, you are the least conservative amongst

09:08:09  1    them?

09:08:10  2        A.    Yes.  And I would also say that the Baker Institute

09:08:16  3    and Rice University does terrible work.

09:08:20  4        Q.    So you disagree with them finding that you're the

09:08:22  5    least conservative member of the Texas Senate?

09:08:24  6        A.    Yeah, I do.

09:08:25  7        Q.    Okay.  Who did you think you're more conservative than

09:08:28  8    with regard to Republicans in the Texas Senate?

09:08:30  9        A.    I would not necessarily make that claim of anybody.

09:08:32  10   But do I think I'm more liberal?  No.  Am I less conservative?

09:08:38  11   Probably not.

09:08:38  12       Q.    So we don't like Rice University.

09:08:42  13             Let's take a loot at --

09:08:42  14       A.    Love Rice University.  I think Baker Institute is

09:08:48  15   poorly manned.

09:08:56  16       Q.    I'm going to show you what I'm going to mark as

09:09:07  17   Defendant's 14.

09:09:14  18             Have you ever seen that document before?

09:09:15  19       A.    I have.

09:09:16  20       Q.    Go ahead and take a look and we'll talk about it.

09:09:19  21       A.    I've got it.

09:09:20  22       Q.    Okay.  Is this a -- have you seen this before?

09:09:25  23       A.    I have.

09:09:25  24       Q.    To your knowledge, this is a true and accurate copy of

09:09:28  25   the October 20, 2021, article from the *Amarillo Pioneer* --

09:09:32   1        A.    It is.

09:09:33   2        Q.    -- called "Seliger calls it quits.  Republican Senator

09:09:38   3   not seeking re-election."

09:09:39   4        A.    Yes.

09:09:39   5        Q.    Why did you decide not to run again?

09:09:43   6        A.    Everybody leaves at some point and it seemed like a

09:09:47   7   good time, after what would be 19 years when I leave office.

09:09:51   8        Q.    So you are concerned about your district being more

09:09:55   9   competitive in the Republican primary?

09:09:58  10        A.    It's always been a concern.  More so this time, not

09:10:06  11   necessarily.

09:10:09  12        Q.    I'm going to hand you what I'm marking as Defendant's

09:10:12  13   15.  And for purposes of identification, I believe this is

09:10:18  14   Exhibit 6-K to the preliminary injunction motion filed by the

09:10:24  15   Brooks Plaintiffs?

09:10:25  16        A.    Um-hum.

09:10:26  17        Q.    Go ahead and take look at this document and let me

09:10:30  18   know when you finish.

09:10:38  19        A.    Okay.  I think I'm -- I'm ready.  I've seen this

09:10:45  20   before.

09:10:45  21        Q.    So I'll just represent to you, I didn't print out the

09:10:48  22   entire *Senate Journal* from that day.  This is the relevant

09:10:52  23   portion, I believe page A-49, but I've got the first page of the

09:10:57  24   *Senate Journal* on there and got the last on the back.

09:11:00  25        A.    Right.

09:11:01   1        Q.    So, I want to turn your attention down to about

09:11:08   2    probably less third of the page where it says Senator West.  And

09:11:12   3    if you don't mind, I'll mark it for you so you can find it real

09:11:14   4    easy, because it's kind of a --

09:11:14   5        A.    Okay.

09:11:15   6        Q.    -- it's kind of an extensive document.

09:11:23   7              Do you see the highlighted portion?

09:11:25   8        A.    Yes, sir.

09:11:26   9        Q.    So follow along with me as I read that.  It says:

09:11:28  10    Senator West:  "Now, hold on for one second.  This is going to

09:11:31  11    be part of the record.  We know we're going to lose this

09:11:34  12    particular vote.  It's been said that Senate 10 -- District 10

09:11:37  13    is going to flip.  Okay?"  Question mark.

09:11:39  14              Did I read that correctly?

09:11:40  15        A.    Yes.

09:11:41  16        Q.    Now, is Senator West a Democrat?

09:11:44  17        A.    Yes.

09:11:44  18        Q.    Okay.  Senator Powell responds:  "That's exactly

09:11:49  19    right."

09:11:50  20              Did I read that correctly?

09:11:50  21        A.    Yes.

09:11:50  22        Q.    Senator West then says:  "So let's get it on the

09:11:52  23    record.  Do you believe that your district is being

09:11:55  24    intentionally targeted for elimination as it being a democratic

09:11:55  25    and trending district?"

09:11:59   1          Did I read that correctly?

09:12:00   2     A.   Yes.

09:12:00   3     Q.   Senator Powell responds:  "Absolutely."

09:12:03   4          Did I read that correctly?

09:12:04   5     A.   Yes.

09:12:04   6     Q.   Do you disagree with Senator Powell?

09:12:08   7     A.   No.  I -- I don't know this is necessarily a

09:12:12   8     democratic tending district.  I haven't seen any of the

09:12:18   9     statistics, but over the last few terms, it's been represented

09:12:21  10     by Senator Kim Brimer and then Senator Wendy Davis and then

09:12:28  11     Senator Connie Burton, a Republican, and now Senator Powell is

09:12:34  12     who's a Democrat.

09:12:35  13          Now, statistically, it may be democratic trending, but

09:12:40  14     that's not the way I've seen it over that period of time.

09:12:40  15                       SENATOR KEL SELIGER

09:12:40  16              CROSS-EXAMINATION BY THE PLAINTIFF

09:12:44  17     BY MR. DUNN:

09:12:44  18     Q.   Please tell us your name.

09:12:47  19     A.   Kel Seliger.

09:12:51  20     Q.   Senator Seliger, my name is Chad Dunn.  I represent

09:12:54  21     the Brooks plaintiff in this case.  Do you understand that?

09:12:54  22     A.   Yes.

09:12:55  23     Q.   I believe that you and I might have met at a

09:12:55  24     courthouse a few years back in the earlier round of

09:12:58  25     redistricting.  Does that sound right to you or...

09:13:00   1       A.    I don't recall it specifically, but, yes, that was --

09:13:02   2       Q.    Okay.  I haven't had any contact with you in years,

09:13:05   3   though, would you agree?

09:13:06   4       A.    No.

09:13:06   5       Q.    Also representing the Brooks plaintiffs is a lawyer

09:13:10   6   named Mark Gaber, another one named Molly Danahy.  Do either of

09:13:10   7   those names sound familiar to you?

09:13:10   8       A.    No.

09:13:14   9       Q.    People you've spoken with?

09:13:16  10       A.    No.

09:13:16  11       Q.    Have you spoken with any lawyers in this case, prior

09:13:19  12   to today?

09:13:20  13       A.    Not since 2012, 2013.

09:13:25  14       Q.    Okay.  Which were the lawyers there that you recall?

09:13:28  15       A.    Nina Perales.

09:13:29  16       Q.    Okay.  You spoke with her today during the deposition?

09:13:32  17       A.    Yes.

09:13:32  18       Q.    Have you spoken with her prior to the deposition

09:13:35  19   today?

09:13:35  20       A.    No.

09:13:35  21       Q.    Have you spoken with any lawyer about your testimony

09:13:38  22   today other than your own?

09:13:39  23       A.    No.

09:13:39  24       Q.    How about any lawyers for the state?

09:13:41  25       A.    No.

09:13:42    1        Q.    Okay.  You received a subpoena to be here today; is

09:13:45    2    that true?

09:13:46    3        A.    I was not served.  I'm here voluntarily.

09:13:52    4        Q.    Okay.  I can tell you that I was served with a

09:13:56    5    subpoena that was directed towards you, but it sounds like your

09:13:59    6    testimony is you've never seen that; is that a fact?

09:14:02    7        A.    It seems like either you or the state sent me a copy

09:14:07    8    of the subpoena or something like that, but I didn't sign

09:14:11    9    anything, and I simply told them I would be here voluntarily,

09:14:17   10    just give me a time and place.

09:14:19   11        Q.    Okay.  I can represent to you I've never sent you

09:14:22   12    anything.

09:14:22   13        A.    No.

09:14:23   14        Q.    Okay.  I'm not trying to trick you about the subpoena.

09:14:26   15    The reasons I bring up the subpoena is it also had a request in

09:14:29   16    there that you bring some documents.  Do you recall that?

09:14:31   17        A.    Yes.

09:14:32   18        Q.    I noticed that the state asked you today about an

09:14:35   19    email that was -- it looks like it was forwarded from you to

09:14:40   20    Mr. Opiela.  I can find it here in the record.

09:14:43   21        A.    Yes, I recall that.

09:14:44   22        Q.    Do you know how the state would've come in possession

09:14:46   23    of that?

09:14:47   24        A.    I assume Mr. Opiela gave them to you.  They were the

09:14:51   25    only things that I had that were responsive to a subpoena.  I

09:14:55  1    sent them to Mr. Opiela immediately.

09:14:58  2        Q.   Well, I haven't received any of your documents, yet.

09:15:00  3    And again I'm not fussing about it.  I just want to make sure I

09:15:02  4    understand what they are.

09:15:03  5        A.   Okay.

09:15:04  6        Q.   So the subpoena asked you to bring the documents

09:15:07  7    today.  Are you saying there's none other than that email that

09:15:11  8    was discussed?

09:15:12  9        A.   There was one other document, I think.

09:15:17  10            MR. OPIELA:  Just to help, Chad, I sent them to the

09:15:22  11   state.

09:15:24  12            MR. DUNN:  Okay.

09:15:26  13            MR. OPIELA:  And I didn't know you were going to be

09:15:27  14   here today, so otherwise I would have sent them to you, but I'd

09:15:27  15   be happy to forward them to you, if you want to take a break and

09:15:31  16   do that.

09:15:31  17            MR. DUNN:  In all honesty, I'm not fussing.  I do want

09:15:35  18   to see them, so...

09:15:36  19            THE WITNESS:  I'm sorry.  I just thought that with my

09:15:39  20   counsel that it was done.

09:15:44  21            MR. OPIELA:  If you want to take a break --

09:15:48  22            MR. DUNN:  Let's go ahead and do that then, yes.

09:15:48  23            MR. OPIELA:  I can do that, because I want you to

09:15:48  24   be...

09:15:48  25            MR. DUNN:  Sure.

09:15:52  1          THE VIDEOGRAPHER:  We are off the record.  The time is

09:15:54  2   11:27 a.m.

09:15:54  3          THE VIDEOGRAPHER:  We are back on the record.  The

09:16:12  4   time is 11:31 a.m.

09:16:12  5   BY MR. DUNN:

09:16:12  6      Q.   Okay.  Senator during the break, we looked at some of

09:16:13  7   the documents that you produced through counsel; is that true?

09:16:13  8      A.   Yes.

09:16:14  9          MR. DUNN:  And Mr. Opiela, you've looked at the

09:16:17 10   subpoena.  Can you tell us what document -- what requests you

09:16:20 11   had documents responsive to and what you didn't?

09:16:23 12          MR. OPIELA:  So Senator Seliger had document -- items

09:16:27 13   responsive to request 1 and 4.  There were no documents in his

09:16:31 14   possession responsive to request 2 and 3.

09:16:34 15          MR. DUNN:  Okay.

09:16:34 16   BY MR. DUNN:

09:16:34 17      Q.   In -- just, you know, in the interest of clarity, you

09:16:36 18   ultimately produced four documents; is that right?

09:16:38 19      A.   I believe that's correct, yes.

09:16:39 20      Q.   Two of them were emails related to your declaration.

09:16:43 21   There is the Word document of your declaration and then there's

09:16:46 22   the PDF signed version of your declaration; is that right?

09:16:49 23      A.   Yes.

09:16:49 24      Q.   And that's everything you produced?

09:16:51 25      A.   Yes.

09:16:51  1        Q.    Okay.  You've looked for anything else in the subpoena

09:16:53  2    and you have nothing else responsive?

09:16:55  3        A.    No.

09:16:56  4        Q.    Okay.  Now, I just want to take a step back for a

09:17:01  5    minute because, you know, the Court may ultimately watch this

09:17:04  6    video to get your testimony, so just a little bit about

09:17:07  7    yourself, okay, where you grew up, where you're from?

09:17:10  8        A.    Yeah, I grew up in the town of Borger, Texas, and for

09:17:16  9    the last -- oh, lots of years -- 40-something-odd years, I lived

09:17:22 10    in Amarillo, Texas, where one time I was city councilman, then

09:17:27 11    mayor, and I've been a member of the State Senate since 2004.

09:17:30 12        Q.    How long have you been in public service?

09:17:31 13        A.    Since 1989, when I was first elected to city council.

09:17:35 14        Q.    Have you ever lost an election contest?

09:17:38 15        A.    No.

09:17:39 16        Q.    Now you mentioned earlier in your testimony that you'd

09:17:41 17    done some other, you know, business work, and I think you said

09:17:46 18    steel erection fabrication?

09:17:47 19        A.    No, not erection or fabrication.  Basically a steel

09:17:50 20    service.

09:17:52 21        Q.    But you sold that business now?

09:17:53 22        A.    Yes.

09:17:54 23        Q.    We also had a discussion while we were waiting at the

09:17:59 24    security stand about your plans next week.  Do you recall that?

09:18:02 25        A.    Yes.

KATHLEEN A. SUPNET, CSR

CROSS - SELIGER                                                    19

09:18:03   1        Q.   It's my understanding you're going to be in California
09:18:06   2   next week?
09:18:06   3        A.   Correct.
09:18:07   4        Q.   Have you had any discussion with anybody about your
09:18:12   5   testimony in this case?  But earlier I asked you if you had any
09:18:14   6   discussion about your testimony today in the deposition.  I'm
09:18:16   7   asking have you had any discussion with anybody about your
09:18:19   8   testimony --
09:18:19   9        A.   No.
09:18:20  10        Q.   -- related to this case?
09:18:21  11        A.   No, no one.
09:18:22  12        Q.   I just want to be clear in light of some of the
09:18:25  13   state's questioning.  Has anybody tried to influence you in
09:18:29  14   terms of what your recollections were today?
09:18:32  15        A.   Well, no, but Senator Powell did ask me to sign the
09:18:36  16   affidavit, but that's the only person I talked to about this
09:18:39  17   issue.
09:18:39  18        Q.   When she asked you to sign the affidavit, did she get
09:18:42  19   into, you know, what you believe or what you think or what you
09:18:45  20   recall?
09:18:45  21        A.   No.
09:18:45  22        Q.   Did she try to plant any kind of seeds in your memory
09:18:52  23   about thoughts or events or facts that you might testify to?
09:18:54  24        A.    No, I feel certain, right after the map came out, i
09:19:02  25   went over to her desk and expressed my sympathy for it, and we

KATHLEEN A. SUPNET, CSR

09:19:10  1    talked about it briefly and what she thought it did, but that's

09:19:13  2    the only discussion I've had with anybody, just her.

09:19:17  3        Q.    That was right there on the floor?

09:19:19  4        A.    Yes.

09:19:19  5        Q.    It passed?

09:19:21  6        A.    Yes.

09:19:21  7        Q.    Was she trying to influence your recollections then?

09:19:25  8        A.    No.

09:19:25  9        Q.    Was that conversation anything other than her

09:19:27  10   confiding in somebody in the Senate that she had confidence in?

09:19:32  11       A.    No, that's all it was.

09:19:33  12       Q.    So, other than that discussion immediately after the

09:19:38  13   vote, have you ever had any discussion with Senator Powell on

09:19:42  14   the merits of the redistricting plan, or her opinions or your

09:19:45  15   opinions, anything of that sort?

09:19:46  16       A.    Not at all.

09:19:48  17             I'm sorry.

09:19:49  18             MR. OPIELA:  We were getting close to this.  You know,

09:19:51  19   I want to be consistent here and object to any privileged

09:19:56  20   conversation.

09:19:57  21   BY MR. DUNN:

09:19:58  22       Q.    So if you have to, you know in the course of -- well,

09:20:00  23   just let me ask you this.  You're familiar with legislative

09:20:04  24   privilege, I assume?

09:20:05  25       A.    Yes.

09:20:05  1      Q.    I know you're not a lawyer.  I'm not trying to box you

09:20:08  2  into a lawyer position here, but you -- you know, you were in

09:20:11  3  the Senate Redistricting Committee back n 2011?

09:20:14  4      A.    Yes.

09:20:15  5      Q.    And you've given lots of testimony in various places

09:20:18  6  about redistricting.  Would that be fair to say?

09:20:20  7      A.    Yes.

09:20:21  8      Q.    And in the course of that, you had opportunity to talk

09:20:24  9  about your legislative privilege and --

09:20:27  10     A.    Yes.

09:20:27  11     Q.    -- at least what you understand is the scope?

09:20:30  12     A.    Yes.

09:20:30  13     Q.    You realize that's your privilege?

09:20:33  14     A.    Right.

09:20:33  15     Q.    It's not somebody else's; is that true?

09:20:35  16     A.    I think so.

09:20:35  17     Q.    You can decide on your own whether you want to

09:20:39  18  disclose a conversation?

09:20:39  19     A.    Right.

09:20:41  20     Q.    Now in the past, you were represented by the Attorney

09:20:45  21  General's office?

09:20:45  22     A.    Correct.

09:20:46  23     Q.    In fact, some of the same lawyers in this case today

09:20:49  24  were your lawyers in the previous decade; is that not true?

09:20:54  25     A.    It may be.  I think you were still in high school,

CROSS - SELIGER                                                      22

09:20:59  1    so...

09:20:59  2        Q.    Looking at Mr. Hudson, I think the main lawyer here is

09:21:03  3    Mr. Sweeten?

09:21:04  4        A.    I think I recall him, yes.

09:21:06  5        Q.    And I assume in the course of meeting with the lawyers

09:21:10  6    here at the Attorney General's office, they talked to you about,

09:21:13  7    you know, telling the truth and the importance of doing that in

09:21:16  8    the deposition; is that correct?

09:21:17  9        A.    Yes.

09:21:17 10        Q.    And they obviously talked to you about your

09:21:21 11    legislative privilege and what your rights are there?

09:21:24 12        A.    Yes.

09:21:28 13        Q.    I would like to take you through your declaration,

09:21:30 14    which you should have there in front of you.

09:21:34 15        A.    I do.

09:21:35 16        Q.    It's attached as Exhibit 1.  Do you have that there?

09:21:48 17        A.    I do and I have a copy I brought, too.

09:21:51 18        Q.    Now this deliberation was signed by you?

09:21:55 19        A.    Yes, sir.

09:21:55 20        Q.    And on the last page of it, Page 3, that contains your

09:21:59 21    actual original signature?

09:22:00 22        A.    It does.

09:22:00 23        Q.    And it was signed on November the 17th; is that a

09:22:06 24    fact?

09:22:06 25        A.    Correct.

09:22:06   1        Q.    The -- you were given any opportunity you wanted to
09:22:09   2    make adjustments to this declaration; is that true?
09:22:11   3        A.    Yes.
09:22:11   4        Q.    It's not the case that, you know, this was jammed down
09:22:15   5    your throat and this is the language that you had to adopt?
09:22:17   6        A.    Absolutely not.
09:22:18   7        Q.    I assume you read it carefully?
09:22:21   8        A.    Yes.
09:22:21   9        Q.    And is there anything in it that you think is, you
09:22:24  10    know, worded incorrectly or slightly wrong or that you would
09:22:28  11    rephrase today?
09:22:30  12        A.    I don't think so.
09:22:33  13        Q.    Okay.  I'd just like to walk through, you know, some
09:22:38  14    of the declaration.  Go to page 1.  It says you're over the age
09:22:44  15    of 18 and competent to testify.  I assume that's true?
09:22:49  16        A.    I hope so.
09:22:50  17        Q.    Okay.  And you have already testified you're the
09:22:54  18    incumbent Senator in Senate District 31 and elected to that
09:22:59  19    position in 2004; is that right?
09:23:01  20        A.    Uh-huh.  Yes.
09:23:01  21        Q.    And you were the chair of the Senate Redistricting
09:23:04  22    Committee in 2012 and '13?
09:23:06  23        A.    Yes.
09:23:07  24        Q.    When you were the chair of those --
09:23:08  25        A.    Let me clarify, please.

09:23:10  1      Q.   Sure.

09:23:11  2      A.   There was no Senate Select Committee on redistricting

09:23:14  3   in 2013, because we had no bill to consider, but that's when we

09:23:20  4   were in the middle of litigation so I was representing the

09:23:24  5   committee and Senate?

09:23:25  6      Q.   Do you recall the Legislature in 2013 adopting a

09:23:28  7   remedy map for the Senate?

09:23:30  8      A.   I don't recall that well.

09:23:32  9      Q.   Okay.  Do you recall the U.S. Federal Court passing or

09:23:38 10   issuing an opinion on the Senate District 10 part of the Senate

09:23:43 11   map?  I think that decision came out in 2012 in paragraph 5 in

09:23:48 12   your declaration?

09:23:48 13      A.   I did not remember that until I read paragraph 5.

09:23:48 14      Q.   Okay.

09:23:52 15      A.   And do not recall the substance of that decision.

09:23:55 16      Q.   Do you recall back in 2012 being briefed on that

09:24:00 17   decision?

09:24:00 18      A.   I'm sure I was, but I don't recall it.

09:24:03 19      Q.   In paragraph 6, you say the members of the committee

09:24:05 20   received copies of the federal decision?

09:24:07 21      A.   I can only speak for myself.

09:24:12 22      Q.   Did you receive it?

09:24:13 23      A.   To the best of my recollection, yes, but I don't

09:24:15 24   recall it.

09:24:15 25      Q.   Is it fair to say you relied on the Attorney General's

```
09:24:19   1   office in interpreting that decision?
09:24:21   2       A.   Yes.
09:24:22   3       Q.   In 2013, it says then Attorney General Abbott advised
09:24:27   4   Senate Select Redistricting Committee that it was our duty to
09:24:30   5   correct the racially discrimination that the federal court had
09:24:35   6   found in Senate District 10.
09:24:36   7            Is that what you said, sir?
09:24:37   8       A.   Yes.
09:24:37   9       Q.   And is that what you recall?
09:24:38  10       A.   Yes.
09:24:39  11       Q.   The committee held a series of hearings and discussed
09:24:42  12   the federal court's ruling that the dismantling of Senate
09:24:48  13   District 10 was racist and discriminatory?
09:24:50  14       A.   Yes.
09:24:50  15       Q.   And you recall at least having those hearings in
09:24:53  16   response to the federal court's order?
09:24:55  17       A.   I do.
09:24:55  18       Q.   And you would have been the chair?
09:24:56  19       A.   Yes.
09:24:57  20       Q.   Okay.  And the next sentence in your declaration says,
09:25:00  21   to remedy this racially discrimination, the committee adopted
09:25:04  22   Plan S172, which restored Senate District 10 to its benchmark
09:25:11  23   configuration?
09:25:12  24            Do you recall that?
09:25:12  25       A.   I do.
```

09:25:13   1        Q.    And that's your testimony?

09:25:14   2        A.    Yes.

09:25:14   3        Q.    Now, do you recall in 2011 that Senate District 10 was

09:25:18   4   not out of deviation?

09:25:20   5        A.    I don't recall that, specifically.

09:25:22   6        Q.    Do you know that to be the case today --

09:25:22   7        A.    No.

09:25:26   8        Q.    -- regarding the cycle of redistricting?

09:25:28   9        A.    No, I don't know that.

09:25:29   10       Q.    And ultimately you say the plan was passed by the

09:25:34   11   Legislature and signed by the Governor; is that right?

09:25:35   12       A.    Yes.

09:25:36   13       Q.    Is it fair to say then in 2013, you as Chairman of the

09:25:41   14   committee and the Senate and the rest of the legislature, passed

09:25:42   15   a remedy plan for Senate District 10 to address the federal

09:25:47   16   Courts's order that the district had been intentionally

09:25:51   17   dismantled in violation of the Voting Rights Act?

09:25:54   18       A.    It was not done intentionally to do that.  The Court

09:25:57   19   found that it did, but it was not intentional on our part.

09:26:01   20       Q.    And I understand you testified for the state?

09:26:03   21       A.    Yes.

09:26:03   22       Q.    And you testified in San Antonio in that court; is

09:26:06   23   that true?

09:26:07   24       A.    Yes.

09:26:07   25       Q.    And you testified in Washington, D.C.?

09:26:09  1        A.    I did.

09:26:10  2        Q.    And there were three federal judges there as well,

09:26:13  3   right?

09:26:13  4        A.    There were.

09:26:13  5        Q.    And it was your opinion that it was not intentionally

09:26:18  6   discriminatory?

09:26:18  7        A.    Absolutely.

09:26:19  8        Q.    Now, ultimately, the Court found that?

09:26:22  9        A.    Right.

09:26:22  10       Q.    And then you accepted it; is that true?

09:26:25  11       A.    Well, yeah.  I --

09:26:26  12       Q.    Okay.  And so in response to it, you led the committee

09:26:31  13  in passing a plan that the court would approve?

09:26:34  14       A.    Yes.

09:26:35  15       Q.    Okay.  You don't have any regret about that?

09:26:39  16       A.    I'm sorry?

09:26:39  17       Q.    You don't have any regret about that?

09:26:41  18       A.    About drawing the first map?

09:26:44  19       Q.    No.  About drawing the remedy plan in response to the

09:26:47  20  court.

09:26:47  21       A.    Oh, yeah, I regret that we had to, because I thought

09:26:51  22  we had drawn a good map, but the Court said we had to do it and

09:26:55  23  I am satisfied that we met the requirements of the court.

09:26:58  24       Q.    And the Attorney General, at the time, told you that

09:27:01  25  you had to; is that right?

CROSS - SELIGER                                                          28

09:27:02  1       A.    Yes.

09:27:02  2       Q.    And the next paragraph, number 8, your declaration

09:27:05  3    says, the committee members all knew it was necessary to restore

09:27:09  4    Senate District 10 to its benchmark configuration in order to

09:27:13  5    comply with the Voting Rights Act and the U.S. Constitution,

09:27:16  6    which prohibits racially discrimination.

09:27:19  7            Is that your testimony?

09:27:19  8       A.    Yes, it is.

09:27:20  9       Q.    And is that what you recall the plan did in 2012,

09:27:24 10    restore?

09:27:24 11       A.    Yes.

09:27:27 12       Q.    And at the time of the drawing of the remedy map in

09:27:31 13    2013, can you recall -- you know, I don't want to put you

09:27:34 14    through a memory test, but what are the members of the committee

09:27:37 15    that you can recall, the other members?  I know you may not get

09:27:41 16    them all, but what --

09:27:41 17       A.    Oh, I won't get them all:  Senator West, Senator

09:27:47 18    Zaffrini, Senator Frazer, Senator Wentworth; I don't know;

09:27:53 19    Senator Huffman.  And I don't recall exactly who else was on it.

09:27:56 20       Q.    And again fair enough.  But Senator Huffman was the

09:28:00 21    chair of the committee in this most recent?

09:28:03 22       A.    Yes.

09:28:03 23       Q.    And as you just noted she was on the committee in

09:28:07 24    2013?

09:28:07 25       A.    I believe that's right.

KATHLEEN A. SUPNET, CSR

09:28:08   1        Q.   I think it's also true she was on the committee in

09:28:11   2   2011.  Does that sound --

09:28:13   3        A.   I believe that's correct.

09:28:14   4        Q.   Okay.  So in terms of what you laid out here in these

09:28:17   5   prior paragraphs in your declaration and what the committee was

09:28:20   6   told by the Attorney General what the Federal Court decision

09:28:23   7   said, that information was shared with Senator Huffman and the

09:28:26   8   rest of the committee, would you agree?

09:28:30   9        A.   Yes.

09:28:31  10        Q.   Now you are familiar with redistricting with racially

09:28:33  11   polarized voting?  I know you might not be an expert, but you've

09:28:36  12   heard that phrase?

09:28:36  13        A.   I've certainly heard the phrase.

09:28:37  14        Q.   You know it's an important issue that courts resolve

09:28:41  15   in voting rights cases?

09:28:43  16        A.   Yes.  Yes.

09:28:43  17        Q.   Okay.  And so you said here in paragraph 9, the

09:28:48  18   committee members also knew the voting in Texas in Tarrant

09:28:53  19   County is racially polarized?

09:28:55  20        A.   Yes.

09:28:55  21        Q.   That's something you -- I'm assuming it saw hours of

09:28:58  22   testimony on in the court proceedings?

09:29:00  23        A.   As a witness, I cannot go -- could go in and see those

09:29:07  24   court proceedings, but, yeah, I believe that was subject -- that

09:29:10  25   was a big, big subject in there.  Because we talked about it in

09:29:14   1    my depositions prior to those court proceedings.

09:29:17   2         Q.    Okay.

09:29:17   3         A.    Excuse me.

09:29:18   4         Q.    Setting aside the litigation then, for a moment

09:29:22   5    though, when you were chair of the committee, were you briefed,

09:29:25   6    you know, whether in public or private, by experts on racially

09:29:31   7    polarized voted?

09:29:33   8         A.    Yes.

09:29:33   9         UNKNOWN SPEAKER:   Yeah, I was going to -- well, yeah,

09:29:36  10    go ahead.

09:29:37  11    BY MR. DUNN:

09:29:37  12         Q.    Were those public briefings, private or both?

09:29:41  13         A.    Those were private briefings and all with counsel.

09:29:47  14         Q.    Okay.  And the counsel you were referring to there is

09:29:51  15    the Attorney General's office?

09:29:52  16         A.    Both the Attorney General's office and Professors Gwen

09:29:55  17    and Morrison of Baylor University.

09:29:58  18         Q.    Those are professors that the state had hired to help

09:30:01  19    the committee?

09:30:02  20         A.    Correct.

09:30:02  21         Q.    But had you also received advice on racially polarized

09:30:08  22    voting from the Attorney General's office?

09:30:08  23         MR. OPIELA:   So I'm going to object on --

09:30:14  24         MR. HUDSON:   Object on by privilege.  Object --

09:30:14  25         MR. DUNN:   Our position is that since it's the

09:30:15  1    Attorney's General's office is cross-examining their former

09:30:17  2    client that we're entitled to any of that discussion.

09:30:22  3        MR. HUDSON:  Well, our position is we are instructing

09:30:25  4    not to answer and we don't think that you're waiving privilege

09:30:29  5    by testifying today, so to the extent that they're encroaching

09:30:33  6    on attorney-client privilege or attorney work product, the

09:30:38  7    Attorney General's position is you should not answer that

09:30:41  8    question.

09:30:41  9        THE WITNESS:  Okay.

09:30:41  10       MR. OPIELA:  I don't have any objection to that.  It's

09:30:44  11   your privilege to waive or not, so...

09:30:46  12       THE WITNESS:  I'm not going to waive.

09:30:48  13   BY MR. DUNN:

09:30:48  14       Q.   So you're going to take the direction of the Attorney

09:30:51  15   General's office to not answer questions about any advice or

09:30:52  16   discussions they had with you?

09:30:52  17       A.   I have to this point, but it's no commitment to future

09:30:56  18   input.

09:30:57  19       Q.   I understand.  If you don't mind, let me finish my

09:31:01  20   question, so we have a record.

09:31:03  21       A.   Okay.

09:31:03  22       Q.   So you're going to take the Attorney General's office

09:31:06  23   direction and not answer any questions about the communications

09:31:10  24   you had or advice you received from the Attorney General's

09:31:13  25   office in 2011 and the '13 litigation; is that right?

09:31:16  1        A.    Depending upon the advice of my counsel.

09:31:19  2        Q.    As your attorney noted today, it's your privilege to

09:31:22  3   decide whether you want to invoke or not, and I'm really not

09:31:26  4   trying to be difficult with you, but...

09:31:28  5        MR. HUDSON:   Well, I'm going to object to that line of

09:31:31  6   questioning.  You've suggested to the witness a few times that

09:31:34  7   he has the ability to waive the privilege.  It's getting awfully

09:31:39  8   close to suggesting that he should.  And his attorney for

09:31:41  9   purposes of 2011 or 2013 was the Attorney General's office, not

09:31:45  10  Eric Opiela, and so to the extent you're trying to encroach on

09:31:49  11  attorney-client privilege and attorney work product from prior

09:31:52  12  cases, Mr. Opiela is not here today to advise him.  And so I

09:31:56  13  would ask that you please stop suggesting to the witness that,

09:32:00  14  you know, he can -- implying that he should waive his privilege

09:32:02  15  to attorney-client privilege and attorney-client work product.

09:32:06  16  BY MR. DUNN:

09:32:07  17       Q.    All right.  All I'm trying to establish is you're

09:32:09  18  going to take Mr. Hudson's direction and not answer any

09:32:11  19  questions about your communications with the Attorney General's

09:32:13  20  office during the 2011, 2013 litigation about redistricting?

09:32:17  21       A.    Yes, I am, unless otherwise advised by my attorney.

09:32:21  22       Q.    Okay.  Now, in terms of going back to the racially

09:32:28  23  polarized voting --

09:32:28  24       A.    Um-hum.

09:32:29  25       Q.    -- so, tell us -- you know, and I understand you're

09:32:32  1    not an expert in it, but tell us what your kind of understanding

09:32:39  2    of racially polarized voting is?

09:32:41  3            MR. HUDSON:  I am going to object based on

09:32:41  4    attorney-client privilege, attorney work product.

09:32:43  5            You can't answer that question without encroaching on

09:32:47  6    those other privileges from prior instruction in prior cases.

09:32:50  7    You're free to answer, but if you can't, I'm instructing you not

09:32:52  8    to answer.

09:32:53  9            THE WITNESS:  I can't.  I can't really define it.

09:32:55  10   It's just been a long time.

09:32:57  11   BY MR. DUNN:

09:32:57  12       Q.   Sure.  No.  Fair enough.

09:32:59  13            So I'll represent to you that racially polarized

09:33:02  14   voting typically is offered as evidence to show that certain

09:33:07  15   racial groups prefer one type of candidate and other racial

09:33:11  16   groups prefer other types of candidates?

09:33:11  17       A.   Right.

09:33:13  18       Q.   And it relies on election data to reach these

09:33:15  19   conclusions.  There are appropriate experts that testify about

09:33:18  20   that.  You're aware of all of that, generally?

09:33:20  21       A.   Yes.

09:33:21  22       Q.   And that's testimony or evidence that you've seen over

09:33:23  23   the course of your career on the redistricting committee.  I

09:33:26  24   mean, would you have ever seen a racially polarized voting

09:33:32  25   analysis?

09:33:33   1        A.    Oh, I'm sure I've seen analysis at some point.

09:33:37   2              MR. OPIELA:  Go ahead.

09:33:39   3    BY MR. DUNN:

09:33:39   4        Q.    And so that's ultimately how you know that in Tarrant

09:33:43   5    County that voting is racially polarized as you say in paragraph

09:33:43   6    nine in your declaration?

09:33:45   7        A.    Um-hum.

09:33:45   8        Q.    Is that a yes?

09:33:46   9        A.    Yeah, it's yes.  That was the decision of the court.

09:33:49  10    I don't concede it.

09:33:50  11        Q.    Oh, I see.  Okay.

09:33:52  12              But that's what the court told in its opinion and

09:33:54  13    that's what was shared to you and the rest of the committee

09:33:57  14    members?

09:33:57  15        A.    Right.

09:33:58  16        Q.    Okay.  Now, you were asked quite a few questions from

09:34:02  17    Mr. Hudson on paragraph 10, and there you say the 2021 Senate

09:34:09  18    redistricting process saw untrue, pretextual explanations given

09:34:14  19    for why the lines were drawn the way they were.

09:34:17  20              Do you see that?

09:34:17  21        A.    Yes.

09:34:18  22        Q.    And you gave some comments on the Senate floor about

09:34:21  23    the map around the vote?

09:34:22  24        A.    I did.

09:34:22  25        Q.    And that information, of course, is available to

09:34:26  1   anyone to get a sense of what you thought about the plan; is

09:34:30  2   that true?

09:34:30  3       A.   Yes.

09:34:30  4       Q.   I'm not asking you -- I know you don't have it

09:34:33  5   memorized, but what are some of the comments you made on the

09:34:39  6   floor?

09:34:40  7       A.   That the assertion --

09:34:42  8            MR. OPIELA:  Go ahead.

09:34:45  9       A.   That the assertion that was done to sort of

09:34:46 10   concentration of A. G. in District 31 -- in District 28, in oil

09:34:52 11   and gas in District 31, that those arguments were specious and

09:34:59 12   untrue and I thought it was contrived.

09:35:03 13   BY MR. DUNN:

09:35:03 14       Q.   You said that then?

09:35:04 15       A.   Yeah.

09:35:05 16       Q.   And so in that sense, what you have said today on that

09:35:10 17   subject is consistent with what you said then?

09:35:12 18       A.   Yes.  Malicious --

09:35:13 19       Q.   Okay.  Have you had --

09:35:15 20       A.   And malicious.

09:35:17 21       Q.   Do you -- what makes you believe it was malicious?

09:35:20 22       A.   I think because the strained relationship with

09:35:23 23   Lieutenant Governor and Senator Huffman.

09:35:26 24       Q.   Was the -- you were asked a number of, you know,

09:35:30 25   questions today about your, you know, relationship with the

CROSS - SELIGER                                                      36

09:35:33  1   Republican Party and support and things of that.  Do you recall
09:35:35  2   that generally?
09:35:36  3        A.   Yes.
09:35:36  4        Q.   Now did you view what was done to your district as a
09:35:40  5   punishment?
09:35:45  6             THE WITNESS:  Whenever you clear your throat or
09:35:47  7   something, I think you're going to say something.
09:35:49  8             MR. OPIELA:  No, no.  I'm trying to process what he
09:35:52  9   was asking and what he was saying.
09:35:52  10       A.   Was it punishment, so much as it was designed to be
09:36:01  11  adverse to me, more that way.
09:36:01  12  BY MR. DUNN:
09:35:58  13       Q.   Is that the -- I mean as somebody that's been in the
09:36:02  14  Senate all these years, is that the sense of how things
09:36:05  15  sometimes go, you fall out of line with leadership and there's a
09:36:08  16  reaction?
09:36:09  17       A.   Absolutely.
09:36:10  18       Q.   You know you were asked a number of questions about
09:36:13  19  how you vote and did you vote, you know, conservatively enough,
09:36:19  20  do you recall those questions?
09:36:19  21       A.   Yes.
09:36:20  22       Q.   Was that -- was it your experience that when you
09:36:22  23  didn't vote with the priorities with the Lieutenant Governor
09:36:26  24  there was a reaction and it was swift?
09:36:30  25       A.   I don't know what you call swift.  Was it -- was it

09:36:33  1    profound and vindictive, yes, it was.

09:36:36  2        Q.   Would that have been true in terms of voting against a

09:36:40  3    redistricting bill?

09:36:42  4        A.   There's not much else that the Lieutenant Governor can

09:36:45  5    take from me, sole not necessarily.  So that's just the answer.

09:36:54  6        Q.   I understand, but in terms of the other members of the

09:36:57  7    Senate, who still had their committee assignments and the other

09:37:01  8    things that, you know, that the other kind of assignments that a

09:37:05  9    senator usually receives, based on your experience, is it

09:37:10  10   reasonable to believe that voting against the redistricting bill

09:37:13  11   might concern another member of them losing some of their

09:37:17  12   emoluments of office?

09:37:17  13       A.   No question.

09:37:17  14            MR. HUDSON:  Objection --

09:37:24  15            DEPOSITION COURT REPORTER:  Hold on just a second.

09:37:24  16            MR. HUDSON:  Objection form.

09:37:26  17            DEPOSITION COURT REPORTER:  "Another member of

09:37:26  18   those..."?  I didn't hear it.

09:37:26  19            MR. DUNN:  Another member of the Senate might be

09:37:29  20   concerned that voting against the redistricting bill would cost

09:37:29  21   them an emolument in office?

09:37:32  22            UNKNOWN SPEAKER:  And I'll object to form on that one

09:37:34  23   as well.

09:37:34  24            THE WITNESS:  Just form --

09:37:37  25            MR. OPIELA:  Yeah.  No, you have to answer it.

CROSS - SELIGER                                                                    38

09:37:38  1           THE WITNESS:  -- because in truth, yes, it did happen,
09:37:39  2   and the 87th District just passed.
09:37:42  3           Senator Hancock on the bills having to do with
09:37:49  4   electrical grid -- Senator Hancock did a lot of research and
09:37:54  5   work on the issue, and the lieutenant governor, whoever was the
09:37:56  6   lieutenant governor, I assume Senator Schwertner, but I don't
09:38:02  7   know that -- did a lot of work on the other thing and they had
09:38:02  8   bills that were substantially different.  When Senator Hancock
09:38:07  9   -- so this transpired on the floor, so I can -- when Senator
09:38:12  10  Hancock voted in favor of his work product, and it should be
09:38:20  11  noted that I voted against Senator Hancock's position and with
09:38:25  12  the lieutenant governor's, he was summarily discharged as the
09:38:29  13  Chairman of the Business and Commerce Committee and I think
09:38:33  14  taken off the committee altogether.  So, yeah, vote against
09:38:37  15  leadership and it's going to be swift and sure.
09:38:42  16  BY MR. DUNN:
09:38:42  17      Q.    So we've had an objection, so I have to go back and
09:38:45  18  ask questions again without objections, so let me ask you this.
09:38:48  19           What examples do you recall of other Senators being
09:38:53  20  punished by leadership for not voting for a particular measure?
09:38:59  21      A.    In 20 -- I forget the year, but it was the year the
09:39:02  22  measure was before the caucus of the Senate to take our
09:39:08  23  threshold from 21 votes to 19 votes required to bring the
09:39:12  24  measure to the floor after it came out of committee.  One
09:39:16  25  Republican voted against -- and this is a rules change, not a

KATHLEEN A. SUPNET, CSR

CROSS - SELIGER                                                    39

09:39:20   1   piece of legislation -- Craig Estes of Wichita Falls voted

09:39:28   2   against that rules change, and his next session was taken off as

09:39:32   3   chairman, I think on the agriculture committee, and was taken

09:39:37   4   off the finance committee.

09:39:39   5       Q.   Do you recall any other examples?

09:39:41   6       A.   No.

09:39:41   7       Q.   Other than your own?

09:39:42   8       A.   My own.

09:39:43   9       Q.   And so was it your impression if you don't vote for

09:39:47  10   the leadership's redistricting bill, that there would have been

09:39:51  11   reaction?

09:39:52  12       A.   It's an absolute conviction, but like I said, there's

09:39:55  13   not much more they can take from me.

09:39:57  14       Q.   Right.

09:39:57  15            There were other things that other Republican members

09:40:00  16   could've take from them at that time?

09:40:01  17       A.   Chairmanships and I was the senior Republican without

09:40:04  18   a chair.

09:40:05  19       Q.   All the other senators, of course, saw the treatment

09:40:08  20   that you had suffered?

09:40:10  21       A.   Yes.

09:40:10  22       Q.   They had seen, those that had been there, saw Senator

09:40:15  23   Estes's treatment after his vote; is that right?

09:40:17  24       A.   Yes.

09:40:17  25       Q.   Do you think observing that had a reaction in the

KATHLEEN A. SUPNET, CSR

CROSS - SELIGER                                                                40

09:40:20  1    chamber in terms of how --

09:40:22  2         MR. HUDSON:  Objection form.  Objection form.

09:40:27  3         THE WITNESS:  Yes, I do.  And I'm told there's a term

09:40:29  4    that goes around the Republican Caucus of being Seligered and

09:40:35  5    that's when the recriminations come.

09:40:37  6    BY MR. DUNN:

09:40:37  7    Q.    Since there's an objection, I'm going to ask you a

09:40:38  8    different way.

09:40:39  9         What is being Seligered?

09:40:45  10   A.    Not voting for you ship and losing chairmanship or

09:40:45  11   other committee assignments.

09:40:46  12   Q.    Have you heard that used by others?

09:40:48  13   A.    Yeah, I have been told.

09:40:50  14        UNKNOWN SPEAKER:  Objection as to any non-public

09:40:53  15   communications.

09:40:54  16        THE WITNESS:  Yeah, it's a non-public communication.

09:40:54  17   BY MR. DUNN:

09:40:57  18   Q.    I see.

09:40:58  19        How would you describe the term of being Seligered?

09:41:06  20   A.    Voting against lieutenant governor's position and

09:41:09  21   losing a chairmanship or other committee assignments.

09:41:12  22   Q.    And the other example you can think of that is the

09:41:15  23   Senator Estes's you described earlier?

09:41:16  24   A.    Senator Estes and the example of Senator Hancock.

09:41:20  25   Q.    And what was the example of Senator Hancock?

CROSS - SELIGER                                                      41

09:41:23    1        A.    Senator Hancock, almost in the middle of the session,

09:41:26    2   lost his chairmanship of a business and commerce committee, in

09:41:30    3   which he was doing a very nice job, and I think that he was

09:41:34    4   taken off the business and commerce committee altogether.  It's

09:41:37    5   a very important committee.  It's an important chairmanship.

09:41:41    6   And just right in session taken off.

09:41:43    7        Q.    Was it your opinion as a member you didn't have the

09:41:46    8   freedom to vote your conscience?

09:41:50    9        MR. OPIELA:  And I'm going to object as to the

09:41:53   10   contemplations that he has when he's voting on bills under

09:41:57   11   legislative privilege.

09:42:00   12        MR. DUNN:  Are you instructing him not to answer?

09:42:02   13        MR. OPIELA:  I am.

09:42:04   14        THE WITNESS:  Okay.

09:42:04   15   BY MR. DUNN:

09:42:05   16        Q.    Did you feel free to vote your conscience as a

09:42:09   17   Senator?

09:42:10   18        MR. OPIELA:  And I'll restore that objection as well.

09:42:14   19        MR. DUNN:  And again instruct him not to answer.

09:42:14   20        MR. OPIELA:  And instruct him not to answer, because

09:42:17   21   it's going to the substance of his decision making while he's in

09:42:23   22   legislature.

09:42:24   23   BY MR. DUNN:

09:42:24   24        Q.    Are there any other sort of reactions that you have

09:42:27   25   observed that leadership has had when it's been dissatisfied

| | | |
|---|---|---|
| 09:42:32 | 1 | with a member's vote? |
| 09:42:33 | 2 | A. Not just offhand. |
| 09:42:33 | 3 | Q. Okay. |
| 09:42:36 | 4 | A. Because the reaction is pretty swift and sure, it's |
| 09:42:39 | 5 | unmistakable. |
| 09:42:41 | 6 | Q. Now returning back to declaration in paragraph 10 -- |
| 09:42:41 | 7 | A. Uh-huh. |
| 09:42:44 | 8 | Q. -- is it fair to say that paragraph 10 largely |
| 09:42:49 | 9 | summarizes the comments that you made on the floor during the |
| 09:42:52 | 10 | debate? |
| 09:42:53 | 11 | A. I think so. |
| 09:42:54 | 12 | Q. And you said in the next sentence, for example, I was |
| 09:42:58 | 13 | told by Senator Huffman that my district was being changed, |
| 09:43:00 | 14 | adding many new counties around Midland and were removed |
| 09:43:04 | 15 | Panhandle counties in order to create distinctive agricultural |
| 09:43:09 | 16 | versus oil and gas districts between SD-31 and SD-28; is that |
| 09:43:16 | 17 | your testimony? |
| 09:43:17 | 18 | A. That is. |
| 09:43:17 | 19 | Q. And I'm reading that way so it's easier for her to |
| 09:43:21 | 20 | take it down. |
| 09:43:22 | 21 | A. Okay. |
| 09:43:23 | 22 | Q. Now, you were -- you had started to say a bit during |
| 09:43:27 | 23 | Mr. Hudson's question, you know, explaining that, but can you |
| 09:43:31 | 24 | explain what you meant by the agriculture versus oil and gas |
| 09:43:34 | 25 | districts and what you understood of Senator Huffman's |

KATHLEEN A. SUPNET, CSR

09:43:37  1    explanation and what you thought was incorrect about it?

09:43:39  2        A.    Senate District 28 has tremendous concentration of

09:43:44  3    agriculture primarily built around the cotton industry around

09:43:47  4    Lubbock.  There's also a good deal of oil and gas inside Senate

09:43:54  5    District 28, because it goes way down south.  At the same time,

09:44:01  6    the district, District 31, the one that I represent, has a

09:44:06  7    tremendous amount of agriculture, both beef and corn, and

09:44:15  8    peanuts and all of those things.  It's very agriculture.  It

09:44:20  9    happens to be a diversified economy.  And -- is there a lot of

09:44:26 10    oil and gas?  Yeah, most of the oil and gas in the State of

09:44:31 11    Texas, probably, is in -- in -- well, the Permian Basin, but a

09:44:34 12    lot in the Panhandle.  Does that mean that oil ans gas is not

09:44:38 13    important to Senate District 28?  Absolutely not.  The assertion

09:44:41 14    was specious and untrue and it's just the best that she could

09:44:45 15    do.

09:44:45 16        Q.    And you said that at the time?

09:44:47 17        A.    Yes.

09:44:47 18        Q.    Why do you think, if you have an opinion, as to she

09:44:51 19    was giving you a specious answer?

09:44:52 20        A.    To try to take those four counties in the Panhandle,

09:44:57 21    those being Gray, Wheeler, Donley, and Collingsworth, out of the

09:45:07 22    district and adding counties that go almost all of the way to

09:45:11 23    the border, like Schleichler and Upton and Reagan.  Good

09:45:16 24    counties.  I have no objection representing them, because

09:45:19 25    clearly I was going to have to represent more than the 37

09:45:22  1    counties, but it was designed to concentrate the vote to the

09:45:28  2    degree possible in the area close to Midland to help Mr. Sparks.

09:45:33  3         Q.   Is that where Mr. Sparks is from?

09:45:35  4         A.   Yes.

09:45:35  5         Q.   Why not just tell you that?

09:45:37  6         A.   I don't know, because everybody insists they're

09:45:44  7    innocent of any suspect motive.

09:45:47  8         Q.   Now I don't want -- I know that your lawyers are going

09:45:50  9    to instruct you not to answer, so I'm going to try to ask this

09:45:54  10   carefully.

09:45:54  11        A.   Okay.

09:45:55  12        Q.   Have you had any private conversations with Senator

09:46:00  13   Huffman about her motivation for your part of the plan?

09:46:02  14             MR. OPIELA:  Yeah, and you're just going to have to

09:46:05  15   ask the question another way.  I'm going to object again.

09:46:06  16             MR. DUNN:  I want to know if the conversation existed,

09:46:06  17   not what she said --

09:46:09  18             MR. OPIELA:  Correct.

09:46:10  19             MR. DUNN:  -- under your objection.  I'm just asking

09:46:10  20   whether the conversation happened.  The Court needs to know that

09:46:14  21   so he can rule on the issue.  If it didn't happen, we're going

09:46:18  22   to spin our wheels.

09:46:19  23             MR. OPIELA:  Okay.

09:46:19  24             THE WITNESS:  I don't mind answering, if in your

09:46:22  25   opinion it does nothing to compromise privilege.

09:46:26   1        MR. OPIELA:  So, can we take a little break here?

09:46:31   2        MR. DUNN:  I'm happy to take a break.

09:46:37   3        VIDEOGRAPHER:  We're off the record.  The time is

09:46:41   4   12:20 p.m.

09:46:43   5        We're back on the record.  The time is 12:16 p.m.

09:46:48   6   BY MR. DUNN:

09:46:48   7        Q.   Okay.  Senator, before the break I had asked you -- I

09:46:51   8   don't want to know the context of the discussion or what was

09:46:55   9   said, but was there any discussions between you and Senator

09:46:59  10   Huffman, about -- private discussions, about the motivation

09:47:01  11   behind the Senate map?

09:47:04  12        A.   No.  I did have a conversation with her.  It didn't

09:47:08  13   get into motivation.

09:47:09  14        Q.   Was the conversation about the Senate map?

09:47:12  15        A.   Yes.

09:47:12  16        Q.   Okay.  Have you at any point had conversation with the

09:47:15  17   Lieutenant Governor about the Senate map and how it crafted?

09:47:19  18        A.   No.

09:47:19  19        Q.   Public or private?

09:47:21  20        A.   Public or private.

09:47:22  21        Q.   All right.  The discussion you did have with Senator

09:47:28  22   Huffman was in advance of the vote or after it?

09:47:28  23        A.   In advance.

09:47:28  24        UNKNOWN SPEAKER:  (Inaudible objection).

09:47:28  25   BY MR. DUNN:

09:47:36  1      Q.    Again, I don't want to know the context or I mean I
09:47:38  2  do, but ultimately the Court will decide whether you testify
09:47:41  3  about it, but -- so don't tell us the substance now, but
09:47:45  4  whatever you were told in substance, did it inform your opinions
09:47:48  5  whether you were voting for the bill or not?
09:47:51  6            UNKNOWN SPEAKER:  I'm going to object to that one,
09:47:53  7  because that one's going to go -- it's going under legislative
09:47:58  8  privilege.
09:47:58  9            THE WITNESS:  Okay.
09:47:59 10  BY MR. DUNN:
09:47:59 11      Q.    All right.  So, did you have any -- other discussions
09:48:02 12  with, you know, what I would call, I guess, senate leadership
09:48:06 13  about his senate district map in private?
09:48:09 14            MR. HUDSON:  Objection form.
09:48:10 15            MR. OPIELA:  I'm confused.  What's the question?
09:48:14 16            MR. DUNN:  All right.  I'll rephrase it.  Sure.
09:48:14 17  BY MR. DUNN:
09:48:15 18      Q.    What other members of the Senate did you have private
09:48:17 19  conversations about the Senate District map?
09:48:19 20      A.    I can't remember.
09:48:19 21      Q.    Okay.
09:48:20 22      A.    But there were probably a few discussions like that.
09:48:23 23      Q.    But none others that you recall?
09:48:25 24      A.    No.
09:48:25 25      Q.    Okay.  All right.  Now going back to your declaration

CROSS - SELIGER                                                    47

09:48:30   1    in paragraph 11, you say -- well, actually let me ask you just a

09:48:35   2    little bit more about 10.

09:48:37   3         A.    Okay.

09:48:37   4         Q.    The final thing you say here is instead it was obvious

09:48:41   5    that the purpose of these changes was to benefit a potential

09:48:44   6    Republican primary challenger from Midland preferred by the

09:48:47   7    Lieutenant Governor.

09:48:48   8              How did you know about this Republican primary

09:48:52   9    challenger?  Had -- I mean -- I don't know (mumbling) -- so was

09:48:53   10   it in the newspaper?

09:48:54   11        A.    He had already filed.

09:48:55   12        Q.    I see.  Okay.  Have you ever had any contact with the

09:49:00   13   challenger at all?

09:49:02   14        A.    Oh, yes, because I represent Midland over the years

09:49:07   15   of, not an substantial amount.

09:49:09   16        Q.    And what was his name?

09:49:11   17        A.    Kevin Sparks.

09:49:12   18        Q.    Now, what gave the sense that Mr. Sparks was you,

09:49:16   19   know, talking to the Lieutenant Governor or Senator Huffman?

09:49:21   20              UNKNOWN SPEAKER:  Objection form.

09:49:26   21        A.    I don't know that he had.

09:49:26   22        Q.    Okay.  Well, let me ask you this.

09:49:29   23              Earlier, when Mr. Hudson was asking you questions,

09:49:29   24   you -- you said that you thought Lieutenant Governor had told

09:49:32   25   Senator Huffman to get rid of my district, is what I wrote down.

KATHLEEN A. SUPNET, CSR

09:49:35   1   Do you recall that testimony?

09:49:35   2        A.   I didn't say get rid of my district, but do i think

09:49:39   3   Lieutenant governor played a role?  Absolutely, I do.

09:49:42   4        Q.   Okay.  And what makes you think that?

09:49:44   5        A.   I think he was intimately involved in the whole

09:49:48   6   process.  I think the Trump endorsement, essentially, was

09:49:53   7   requested of the former President by Lieutenant Governor.

09:49:57   8             Donald Trump doesn't sit around and worry a lot about

09:50:01   9   local elected officials in west Texas.

09:50:04  10        Q.   Did you -- so have you -- do you have any information

09:50:19  11   that Mr. Sparks had direct contact with Senator Huffman?

09:50:23  12        A.   No.

09:50:24  13        Q.   Do you know whether he had any direct contact with

09:50:27  14   Lieutenant Governor or Lieutenant Governor's staff?

09:50:32  15        A.   No.  I suspect that he did.

09:50:36  16        Q.   Now, going to paragraph 11 of the declaration.

09:50:36  17        A.   Okay.

09:50:41  18        Q.   You say, given my experience on the Senate the

09:50:43  19   Redistricting Committee in 2011 and 2013, the Federal Court's

09:50:47  20   order regarding Senate District 10, the fact that the benchmark

09:50:52  21   district was compact, wholly contained within Tarrant County,

09:50:56  22   and had close to ideal population, I cannot accept the

09:50:59  23   suggestion that any of the state of redistricting criteria, such

09:51:04  24   as equalizing population, compactness, communities and interests

09:51:10  25   or incumbent protection, compelled the substantial change to

09:51:14  1   Senate District 10's boundaries.

09:51:16  2        Is that what your testimony is?

09:51:17  3   A.   Yes.

09:51:18  4   Q.   And you say I believe this explanation is pretext?

09:51:21  5   A.   Yes.

09:51:21  6   Q.   And so with regards to paragraph 10 and 11, you have

09:51:27  7   provided testimony today about two examples that you think the

09:51:31  8   public explanation that Senator Huffman gave for the Senate map

09:51:36  9   were pretext at least with respect to two districts?

09:51:40  10  A.   Yes.

09:51:41  11  Q.   Now, you testified -- at this point just sitting here

09:51:50  12  today, I don't want to get into subjects outside of our

09:51:54  13  stipulation.  Everybody has agreed we're going to talk today

09:51:55  14  about matters relative to the preliminary injunction.

09:51:55  15  A.   Okay.

09:51:59  16  Q.   But I just want to make sure, in response to questions

09:52:01  17  by Mr. Hudson, that there's an understanding what your

09:52:05  18  recollection is.

09:52:06  19       So at this point you have not examined whether there

09:52:08  20  are untrue reasons offered for other districts in the Senate

09:52:13  21  plan?

09:52:13  22  A.   No.

09:52:13  23  Q.   Okay.  And you're not testifying today whether untrue

09:52:15  24  reasons were or were not offered for other districts in the

09:52:19  25  Senate plan?

09:52:19   1       A.   I am not.

09:52:20   2       Q.   Okay.  Now, finally, in paragraph 12 of your

09:52:26   3   declaration, you said, I voted in favor of an amendment, offered

09:52:29   4   by Senator Powell, to restore Senate District 10 to its

09:52:33   5   benchmark configuration.

09:52:35   6            Do you see that, sir?

09:52:36   7       A.   Yes.

09:52:37   8       Q.   Is that your testimony?

09:52:37   9       A.   (No response).

09:52:40  10       Q.   Is that a yes?

09:52:40  11       A.   Yes.  I'm sorry.

09:52:41  12       Q.   And you -- the record reflects that you voted for

09:52:44  13   Senator Powell's amendment?

09:52:45  14       A.   I did.

09:52:46  15       Q.   Do you recall, and again we're not getting into the

09:52:48  16   discussion, but do you recall having any discussion with Senator

09:52:51  17   Powell about her amendment before she offered it?

09:52:54  18            MR. OPIELA:  And would you rephrase that to limit the

09:52:59  19   public conversation.

09:53:00  20            MR. DUNN:  Okay.  Well, I'm just asking the existence

09:53:04  21   of a private conversation.

09:53:05  22            MR. OPIELA:  Okay.

09:53:05  23   BY MR. DUNN:

09:53:05  24       Q.   Did you have a private conversation with Senator

09:53:07  25   Powell --

CROSS - SELIGER                                                    51

09:53:07   1        A.    Yes.

09:53:08   2        Q.    -- about her amendment before she offered it?

09:53:10   3        A.    Yes.

09:53:11   4        Q.    And I assume you'll invoke privilege?

09:53:14   5        A.    I will.

09:53:15   6        Q.    Do you have a public conversation with Senator Powell

09:53:17   7    over her amendment related to Senate District 10?

09:53:20   8        A.    Help me with the distinction between the public and

09:53:23   9    private conversation.

09:53:25  10              When I went and talked to her on the floor.

09:53:27  11        Q.    Yes.

09:53:27  12        A.    Is that public or private?

09:53:29  13        Q.    Well, that's between you and your lawyer, I think, to

09:53:31  14    advise.

09:53:32  15              MR. OPIELA:  So, public is something that's part of

09:53:34  16    the public record.

09:53:35  17        A.    It is not part of the public record.  It was a private

09:53:39  18    conversation.

09:53:39  19    BY MR. DUNN:

09:53:39  20        Q.    And did you have a public conversation with Senator

09:53:42  21    Powell, rather?

09:53:43  22        A.    No.

09:53:43  23        Q.    Okay.  Why did you vote for her amendment?

09:53:46  24              MR. OPIELA:  That's -- I'm going to object to that.

09:53:48  25    That goes directly to his -- well, legislative privilege.

KATHLEEN A. SUPNET, CSR

09:53:53  1    BY MR. DUNN:

09:53:54  2        Q.    Okay.  So then returning to paragraph 12 of your

09:53:56  3    declaration, it says, having participated in the 2011 and 2013

09:54:00  4    Senate Select Redistricting Committee proceedings and having

09:54:04  5    read the prior federal court decision regarding Senate District

09:54:07  6    10, it was obvious to me that the renewed effort to dismantle

09:54:13  7    Senate District 10 violated the Vote Rights Act in the

09:54:17  8    Constitution.

09:54:18  9             And that's your testimony?

09:54:18  10       A.    Yes, it is.

09:54:18  11       Q.    And you're drawing that from your experience of having

09:54:22  12   been redistricting chair --

09:54:22  13       A.    I do.

09:54:23  14       Q.    -- in the prior cycle?

09:54:23  15       A.    I do.

09:54:23  16       Q.    -- and testifying and reading the court decisions?

09:54:26  17       A.    Yes.

09:54:26  18       Q.    Okay.  Now, this declaration that we've gone through

09:54:32  19   here was provided to you, I think, from your documents in a Word

09:54:37  20   form; is that right?

09:54:37  21       A.    Yeah.

09:54:38  22       Q.    And did you provide it to your staff at any point,

09:54:41  23   your senate staff?

09:54:43  24       A.    This declaration?

09:54:45  25       Q.    Yes, sir.

09:54:46  1        A.    My chief of staff might have read it, because she

09:54:49  2    reads almost everything that comes across my desk, but no one

09:54:52  3    else.

09:54:52  4        Q.    Okay.  I guess I'm curious and you may not remember,

09:54:55  5    but whether you shared the Word version with your staff before

09:54:58  6    you signed the declaration?

09:55:00  7        A.    No.  Other than her, but no.

09:55:04  8        Q.    And you knew when you signed this was going to be

09:55:06  9    filed in the United States District Court?

09:55:08  10       A.    Yes.

09:55:09  11       Q.    And the that the judges and the lawyers were going to

09:55:11  12   rely on your testimony?

09:55:12  13       A.    Yes.

09:55:14  14       Q.    Did you take the time to be careful about it?

09:55:15  15       A.    I read it, I thought fairly thoroughly.

09:55:19  16       Q.    And if you had saw anything at all that you thought

09:55:21  17   was incorrect, you would've changed it or asked for it to be

09:55:25  18   changed?

09:55:25  19       A.    I believe I would.

09:55:26  20       Q.    Okay.  All right.  And you said something earlier

09:55:33  21   about the -- well, we've had a little bit of discussion about

09:55:37  22   the deviation in the map.  And I am going to show you the map

09:55:43  23   that's been previously marked as Brooks' Preliminary Injunction

09:55:49  24   Exhibit 17.

09:55:51  25            MR. DUNN:  I did give you a copy, Mr. Hudson.  I

09:55:52   1    couldn't get it printed in color, but the color is not going to

09:55:55   2    matter for the question I'm going to ask.  I'm going to use a

09:55:59   3    computer version, because we need to zoom in on the numbers.

09:55:59   4            THE WITNESS:  Okay.

09:56:01   5            MR. DUNN:  And my computer printing skills weren't

09:56:04   6    good enough to get the numbers, but...

09:56:04   7            MR. OPIELA:  So just numbers wise or it would be 16 or

09:56:08   8    what are we...

09:56:08   9            MR. DUNN:  I don't intend to, I mean, attach it.  It's

09:56:11   10   Plaintiffs' Preliminary Injunction Exhibit 17.  It's in the

09:56:15   11   court record.

09:56:17   12           MR. OPIELA:  Okay.  So, procedurally, how are we --

09:56:20   13   how are we giving the Court a record of what he is looking at.

09:56:24   14           MR. DUNN:  So this is already filed before the Court.

09:56:27   15           MR. OPIELA:  Okay.

09:56:28   16           MR. DUNN:  It was filed with the preliminary

09:56:29   17   injunction motion --

09:56:30   18           MR. OPIELA:  Okay.

09:56:30   19           MR. DUNN:  -- and it's Exhibit 17.

09:56:30   20           MR. OPIELA:  And that's what -- how your referencing

09:56:30   21   it.

09:56:34   22           MR. DUNN:  I try not to --

09:56:34   23           MR. HUDSON:  I'm looking over your shoulder so I can

09:56:39   24   actually see.

09:56:39   25           MR. OPIELA:  Yeah.

09:56:39   1              MR. DUNN:  Sure.

09:56:39   2      BY MR. DUNN:

09:56:40   3          Q.   I have zoomed in to Tarrant County there?

09:56:40   4          A.   Okay.

09:56:40   5               (Indiscernible conversation amongst counsel).

09:56:40   6               MR. DUNN:  Just so you don't think I'm tricking you,

09:56:59   7      I'm going to zoom out so you see this whole thing.

09:56:59   8               UNKNOWN SPEAKER:  Right.

09:56:59   9      BY MR. DUNN:

09:57:01  10          Q.   This is the Texas Legislative Council developed a map

09:57:05  11      of the plan that passed -- of the benchmark plan, would you

09:57:10  12      agree?

09:57:10  13          A.   Yes.

09:57:10  14          Q.   Okay.  Now, it has the various was districts and

09:57:12  15      shows the population and deviations; is that right?

09:57:13  16          A.   Yes.

09:57:14  17          Q.   And your district here that you've discussed is Senate

09:57:18  18      District 31.  Do you see that?

09:57:18  19          A.   Yes.

09:57:19  20          Q.   It was underpopulated by seven-and-a-half percent?

09:57:22  21          A.   Right.

09:57:22  22          Q.   And to the south of your district, in the Panhandle,

09:57:25  23      is Senate District 28, which was under populated by

09:57:29  24      15.3 percent?

09:57:30  25          A.   Right.

CROSS - SELIGER                                                    56

09:57:31  1      Q.    Now going over to Tarrant County, the district Senator

09:57:35  2   Powell serves in, was underpopulated by .6 percent; is that

09:57:39  3   right?

09:57:39  4      A.    Yes.

09:57:39  5      Q.    So based on this, it didn't have to be, for at least

09:57:42  6   equalization purposes, any changes to Senate District 10?

09:57:46  7            MR. HUDSON:   Objection, form.

09:57:53  8      A.    That's my impression.

09:57:53  9   BY MR. DUNN:

09:57:53 10      Q.    Now to the north of the Dallas-Fort Worth area, say

09:57:56 11   the northwest, there was Senate District 30 that was

09:57:58 12   overpopulated by 9.3 percent?

09:58:01 13      A.    Right.

09:58:02 14      Q.    So from your standpoint, and I guess just so you can

09:58:06 15   see it all, Senate District 14, which is to the south of Tarrant

09:58:10 16   County was underpopulated by 1.4 percent?

09:58:13 17      A.    Do you mean 24.

09:58:15 18      Q.    Oh, I'm sorry, 24.

09:58:16 19      A.    Uh-huh.

09:58:17 20      Q.    Was underpopulated by 1.4 percent; is that right?

09:58:20 21      A.    Right.

09:58:20 22      Q.    And then Senate District 22, the other one in the

09:58:23 23   region, was .4 percent over size; is that right?

09:58:27 24      A.    Yes.

09:58:27 25      Q.    All right.  So from your standpoint, you know, if you

09:58:31  1   have an opinion, what was the logical way to deal with the

09:58:35  2   underpopulation of your district?

09:58:37  3         MR. HUDSON:  Objection, form, calls for speculation;

09:58:40  4   objection, form, improper hypothetical; objection, form,

09:58:44  5   foundation; Senator Seliger is not being offered as an expert.

09:58:49  6         MR. OPIELA:  You go ahead an answer.

09:58:52  7         THE WITNESS:  Okay.

09:58:53  8         Ask me again.

09:58:53  9         MR. DUNN:  Sure.

09:58:53  10  BY MR. DUNN:

09:58:54  11       Q.   From your standpoint as the incumbent senator in

09:58:57  12  Senate District 31, what was the -- what was your preferred

09:59:03  13  method for balancing the population in your district?

09:59:06  14        MR. HUDSON:  Same objections.

09:59:08  15       A.   To add counties in that area not -- that are now in

09:59:12  16  District 28.  Those were the only options.  Adding things like

09:59:17  17  Clarendon County to the north.

09:59:19  18        THE COURT REPORTER:  I'm sorry.  What county?

09:59:21  19       A.   Clare- -- well, Donley County, D-O-N-L-E-Y -- to the

09:59:24  20  north and some of the counties that were added by Senator

09:59:31  21  Huffman.

09:59:31  22  BY MR. DUNN:

09:59:31  23       Q.   And can you recall some of those?

09:59:33  24       A.   Yeah, Reaves, Crane, Winkler, Ward, because they're

09:59:54  25  all right by existing counties.  They are contiguous with the

09:59:58  1    district.

09:59:58  2         Q.    Okay.  So when you take those out of Senate District

10:00:02  3    28, which is already also underpopulated, and I assume Senate

10:00:08  4    District 28 is going to take on some space?

10:00:09  5         A.    Yes.

10:00:09  6         Q.    What was your thought where that would come from?

10:00:12  7         A.    Taylor County, specifically, because in 2011, we put

10:00:18  8    some of the population in northern Taylor County, which is

10:00:21  9    Abilene, into that district, that leaves a bunch more people

10:00:25 10    there in Taylor County and Callahan County, Shackelford County.

10:00:37 11         Q.    And in equalizing those two districts, was it

10:00:40 12    necessary to go into Senate District 10 at all?

10:00:44 13               MR. HUDSON:  Objection, form.

10:00:46 14         A.    Was it necessary to go --

10:00:48 15    BY MR. DUNN:

10:00:48 16         Q.    In order to make the Panhandle Districts that were

10:00:52 17    underpopulated within deviation under the new Census figures,

10:00:57 18    was there any need no mess with Senate District 10?

10:00:57 19         A.    District --

10:01:01 20               MR. HUDSON:  Objection, form, calls for speculation;

10:01:02 21    objection, form, improper hypothetical; objection, foundation,

10:01:05 22    Senator Seliger is not being offered as an expert.

10:01:08 23         A.    My impression is District 10's composition is District

10:01:13 24    10 had nothing to do whatsoever to do with the Panhandle.

10:01:21 25         Q.    Did you essentially give an opinion on the floor at

10:01:24  1    the time of the vote?

10:01:24  2         A.    I made no comment on District 10.

10:01:27  3         Q.    In terms of the changes that you thought could be made

10:01:31  4    to West Texas, were those things you talked about on the floor?

10:01:35  5         A.    Not, specifically, no.

10:01:35  6         Q.    Okay.

10:01:39  7         A.    I mentioned some of the counties in the context of ag

10:01:44  8    versus oil and gas, that's all.

10:01:47  9         Q.    And why did you mention those things?

10:01:50  10        A.    To point out how --

10:01:52  11             MR. OPIELA:   I'm going to object to that as -- in

10:01:53  12   terms of his thought processes, how he goes about making

10:01:57  13   decisions as legislative privilege.

10:02:13  14   BY MR. DUNN:

10:02:14  15        Q.    Did you have any reasons that you, and I don't want

10:02:18  16   you to disclose them at the moment --

10:02:20  17        A.    Okay.

10:02:20  18        Q.    -- I just want to know if they exist.

10:02:20  19             Did you have any reasons that you voted against the

10:02:23  20   Senate plan other than what you said on the floor publically?

10:02:28  21        A.    Yes.

10:02:28  22        Q.    Have you -- are those other reasons that you have,

10:02:32  23   have you ever expressed them publically elsewhere?

10:02:35  24        A.    Publically, no.

10:02:37  25        Q.    Like to a newspaper, constituents or any sort of --

CROSS - SELIGER                                                      60

10:02:40    1         A.    No.

10:02:40    2         Q.    And so I assume you take legislative privileges on

10:02:44    3    your other basis for voting against the Senate plan?

10:02:46    4         A.    Yeah.

10:02:56    5               I'd like to tell you, but he would not approve.

10:03:00    6         Q.    Okay.  He is your lawyer.

10:03:01    7         A.    He is.

10:03:02    8         Q.    Okay.  I say that for our record.  It doesn't know who

10:03:06    9    he is.

10:03:07   10         A.    Okay.

10:03:08   11         Q.    Is it the case that in the Texas Senate there's

10:03:14   12    sometimes what's said in public about the motivations behind the

10:03:17   13    legislative activity and there's something different in private?

10:03:21   14         A.    All the time.

10:03:23   15         Q.    Would you say more often than not that's the case?

10:03:25   16         A.    Not necessarily, no.

10:03:26   17         Q.    Would you say more often than not that's the case on

10:03:30   18    the big items?

10:03:31   19               MR. HUDSON:  Objection, form, calls for speculation;

10:03:33   20    objection, foundation --

10:03:34   21         A.    I would say it's often the case.

10:03:34   22    BY MR. DUNN:

10:03:34   23         Q.    Do you think it's often the case with regard to

10:03:38   24    redistricting?

10:03:38   25               MR. HUDSON:  Same objections.

CROSS - SELIGER                                                          61

10:03:38  1        A.    I think it's often the case on a lot of issues,

10:03:43  2   particularly more controversial ones.

10:03:43  3   BY MR. DUNN:

10:03:46  4        Q.    Including redistricting?

10:03:46  5              MR. HUDSON:   Same objections.

10:03:48  6        A.    Yes.

10:03:50  7   BY MR. DUNN:

10:03:50  8        Q.    You mentioned in response to Mr. -- well, let me ask

10:03:56  9   it this way.   The -- you -- there used to be a Two-Thirds Rule

10:03:59 10   as it was referred to in the Senate; is that right?

10:04:02 11        A.    Correct.

10:04:02 12        Q.    And that has gone through some changes in the last

10:04:06 13   decade or so; is that right?

10:04:07 14        A.    Correct.

10:04:07 15        Q.    What were those changes?

10:04:10 16        A.    In -- the rule was that it required two-thirds vote of

10:04:16 17   the Senate or 21 votes, for a bill that has come out of

10:04:21 18   committee to even go to the floor for debate.   Several years

10:04:28 19   ago, that rule came up and the Lieutenant Governor wanted it

10:04:33 20   changed to 19, because the Republican majority was eroding in

10:04:41 21   the Senate.   And the rule was changed and that was the instance

10:04:46 22   I talked about when Senator Estes voted against the rule change.

10:04:51 23              Then I think it was the 87th or 86th session, once

10:04:55 24   again as our majority eroded, when Beverly Powell won District

10:05:03 25   10, Pete forest lost his election in his district to Senator

10:05:09  1    Gutierrez, that the Lieutenant governor wanted the number

10:05:12  2    changed to 18 and so it was.  But even with that rule change,

10:05:22  3    with 18 votes to go, if the Lieutenant Governor doesn't want the

10:05:29  4    bill to come to the floor, it doesn't come to floor.

10:05:32  5        Q.    Is that because the Lieutenant Governor has the

10:05:35  6    authority to just pull a bill or is it because he can get the

10:05:38  7    votes he needs?

10:05:39  8        A.    I would argue that there is no such authority because

10:05:42  9    the Senate makes the rules and the Senate has not done that, but

10:05:47  10   he does it and he's the one who recognizes senators on the

10:05:51  11   floor.

10:05:51  12       Q.    And so it's been your experience that the Lieutenant

10:05:55  13   Governor would just decide a bill would not bet taken --

10:05:57  14       A.    Absolutely.

10:05:58  15       Q.    -- without a vote?

10:05:59  16       A.    Absolutely.

10:06:00  17       Q.    That's a tremendous power, would you agree?

10:06:04  18       A.    Yes, and it is even in the Rules of the Senate or the

10:06:07  19   Constitution.

10:06:07  20             DEPOSITION COURT REPORTER:  I'm sorry.  Say that

10:06:07  21   again, "and it..."

10:06:07  22       A.    And it is also not in the Rules of the Senate or the

10:06:07  23   Constitution.

10:06:14  24   BY MR. DUNN:

10:06:14  25       Q.    And ultimately, the Lieutenant Governor's ability to

CROSS - SELIGER                                                                    63

10:06:17  1    withdraw or remove any bill affects every Senator being able to

10:06:23  2    pursue their agenda, would you agree?

10:06:26  3         MR. HUDSON:  Objection, form, foundation; objection,

10:06:29  4    form, calls for speculation.

10:06:32  5         A.    Yes.

10:06:33  6         THE WITNESS:  You talk really fast.

10:06:35  7    BY MR. DUNN:

10:06:36  8         Q.    Now, I wanted to go back and -- on the first vote that

10:06:38  9    you described Senator Estes voting against, the first vote to

10:06:43 10    change the rules --

10:06:44 11         A.    Yes.

10:06:44 12         Q.    -- how did you vote?

10:06:45 13         A.    I voted to change the rule.

10:06:47 14         Q.    And what was the new number of senators that were

10:06:50 15    needed after the first rule change?

10:06:51 16         A.    19.

10:06:52 17         Q.    And later, the rule was changed again.  What was the

10:06:55 18    new number?

10:06:55 19         A.    To 18.

10:06:56 20         Q.    And how did you vote on that?

10:06:57 21         A.    I voted in favor.

10:06:59 22         Q.    So in terms of drawing a district that intentionally

10:07:04 23    would not elect a Democrat -- well, let me strike this.

10:07:12 24         If Senate District 10 had continued to select a

10:07:16 25    Democrat, then the rules still provided for Republican control

KATHLEEN A. SUPNET, CSR

CROSS - SELIGER                                                        64

10:07:20  1    under the revised two-thirds rule; is that true?

10:07:23  2         A.    Yes.

10:07:24  3         Q.    In other words, it wasn't necessary to draw Senate

10:07:27  4    District 10 to elect a Republican, in order to get bills before

10:07:31  5    the floor?

10:07:32  6              MR. HUDSON:  Objection, form, speculation, foundation.

10:07:35  7         A.    As I understand the question, no.

10:07:37  8    BY MR. DUNN:

10:07:38  9         Q.    Okay.  Earlier, Mr. Hudson asked you some questions

10:07:46 10    about your private conversations with various senators, and he

10:07:49 11    asked you about Angela Paxton.  And it sounded to me like you

10:07:53 12    had recalled something -- and again, don't get into it -- but

10:07:56 13    had you had a conversation with Angela Paxton?

10:07:57 14         A.    Not private or public.

10:07:59 15         Q.    Okay.  I just couldn't --

10:07:59 16         A.    Right.

10:08:01 17         Q.    -- tell for sure how you would answer.

10:08:03 18         A.    Sure.

10:08:04 19         Q.    You also mention that you talked with Sean Opperman,

10:08:09 20    Senator Huffman's committee director?

10:08:11 21         A.    Yes.

10:08:12 22         Q.    Did you talk to him about the Senate plan?

10:08:15 23              MR. OPIELA:  That would be to the substance of the

10:08:18 24    conversation.  Just the fact that he -- I'm going to object on

10:08:18 25    legislative privilege.

10:08:20  1        MR. DUNN:  He can't -- you're not even going to let

10:08:21  2   him say whether or not he spoke with Senator Opperman about the

10:08:24  3   plan?  That's it?

10:08:25  4        MR. HUDSON:  I just want to clarify on the record,

10:08:28  5   Sean Opperman is not a senator.

10:08:28  6        MR. DUNN:  Excuse me.

10:08:31  7        THE WITNESS:  He's a committee director.

10:08:31  8        MR. OPIELA:  But he's legislative staff, nonetheless.

10:08:35  9   BY MR. DUNN:

10:08:35  10       Q.   So all I'm asking is, was there a conversation about

10:08:39  11  between you and Mr. Opperman about the Senate plan without

10:08:42  12  getting into that?

10:08:44  13       MR. OPIELA:  You can answer that.

10:08:46  14       A.   Yes.

10:08:46  15  BY MR. DUNN:

10:08:46  16       Q.   Was there more than one?

10:08:47  17       A.   I think only one, that I recall.

10:08:48  18       Q.   Was it in advance of the floor debate?

10:08:52  19       A.   Yes.

10:08:53  20       Q.   Was there any other witnesses to the discussion?

10:08:56  21       A.   No.

10:08:57  22       Q.   Was it your sense that Mr. Opperman was the, you know,

10:09:05  23  lead staffer for Senator Huffman on the plan?

10:09:07  24       A.   He was committee director, yes.  And if there was

10:09:11  25  anybody else that was part of that, my chief of staff might have

CROSS - SELIGER                                                    66

10:09:14  1   been there.  Sean used to work for her, so...

10:09:17  2       Q.    I see.

10:09:18  3       A.    Yeah.

10:09:18  4       Q.    So there may have been a witness in this conversation

10:09:21  5   and that person may have been your chief of staff?

10:09:24  6       A.    May have been.  I don't think so, but may have been.

10:09:29  7             (Videotaped deposition concludes).

10:09:29  8             MR. DUNN:  That includes the offer of this deposition,

10:09:32  9   and so the Court knows and for the reporter's benefit, the page

10:09:36  10  and line designations have now been filed in E.C.F. 165, along

10:09:41  11  with the transcript to (mumbling), transcribed in the reporter's

10:09:46  12  record.

10:09:47  13            We're prepared to call our first witness.

10:09:47  14            JUDGE GUADERRAMA:  All right.

10:09:49  15            MR. DUNN:  But there will be a little bit of

10:09:50  16  technology change I'll need to make a little bit into the

10:09:53  17  examination.  I'm hoping we can do that at the morning break.

10:09:56  18            JUDGE GUADERRAMA:  Okay.

10:10:11  19            Who will be your first witness?

10:10:14  20            MR. DUNN:  I call Senator Beverly Powell.

10:11:04  21            MR. SWEETEN:  Take a break?  In other words, start the

10:11:06  22  direct now?

10:11:07  23            Is there a morning break you want to take?

10:11:09  24            THE COURT:  I thought we would go for two hours, since

10:11:12  25  we're going to do four-hour half, do two hours and take a break,

KATHLEEN A. SUPNET, CSR

10:11:15  1   but if anybody needs a break now, we've been at it an hour and

10:11:19  2   ten minutes, we can take a break now.  I'm not sure if that's

10:11:19  3   what you're getting at.

10:11:23  4            MR. SWEETEN:  I'm just trying to get a tally of

10:11:23  5   when -- (indiscernible).

10:11:32  6            MR. DUNN:  And so as I mentioned, I'm going to have to

10:11:32  7   transition some technology here and that'll take about

10:11:35  8   five minutes.  And...

10:11:35  9            JUDGE GUADERRAMA:  So, do you want to take a break

10:11:37 10   now?  Is that what you're suggesting to me?

10:11:42 11            MR. DUNN:  What I was -- I thought we could do the

10:11:42 12   introductory items and get sort of into the legislative history

10:11:45 13   and then we can take a break.

10:11:47 14            JUDGE GUADERRAMA:  All right.  So you let me know when

10:11:48 15   you want to do that.

10:11:49 16            MR. DUNN:  I beg your pardon, sir?

10:11:51 17            THE COURT:  You'll let me know when you want...

10:11:52 18            MR. DUNN:  Please, yes.

10:11:52 19            THE COURT:  All right.  All right.

10:11:54 20            Senator Powell, come on up.

10:12:14 21                      SENATOR BEVERLY POWELL,

10:12:24 22              DIRECT EXAMINATION BY THE PLAINTIFFS

10:12:26 23   BY MR. DUNN:

10:12:26 24       Q.   Please tell us your name.

10:12:28 25       A.   I'm Beverly Powell.

DIRECT - POWELL                                                68

10:12:29    1        Q.    Senator, we're going to need you to bring that

10:12:33    2   microphone as close as you can.  The cavern in here absorbs the

10:12:37    3   voices and our court reporter will need to hear you.

10:12:41    4              Can you tell us how are you employed?

10:12:42    5        A.    I am a state Senator for District 10, State of Texas.

10:12:45    6        Q.    For how long?

10:12:47    7        A.    This is my -- I'm at the end of my third year,

10:12:54    8   beginning of fourth.

10:12:54    9        Q.    Could you tell us your race or ethnicity?

10:12:55   10        A.    I'm a Caucasian.

10:12:55   11        Q.    Can you start by just giving us a little bit of your

10:12:59   12   background, where you grew up, that sort of thing?

10:13:01   13        A.    I have was born in Fort Worth and my parents moved to

10:13:06   14   Burleson when I was four.  And I went through the public school

10:13:10   15   system in Burleson, graduated from Burleson High School.  And,

10:13:15   16   you know, we had a very normal, healthy family life, lots of

10:13:21   17   activity and support from our parents.

10:13:24   18        Q.    Where did you go to college?

10:13:26   19        A.    I went to Texas Wesleyan University.

10:13:28   20        Q.    That's in Fort Worth?

10:13:29   21        A.    Yes, it is.

10:13:30   22        Q.    Di you graduate from there?

10:13:33   23        A.    I did.  I graduated in 1992 with a Bachelor of Science

10:13:40   24   degree in psychology and I have a Master's in Business

10:13:43   25   Administration from Texas Wesleyan in 1999.

DIRECT - POWELL                                                    69

10:13:45   1       Q.    And then what did you do?

10:13:47   2       A.    Well, in my career, I am real estate professional.

10:13:55   3    I've had my brokers license, with the exception of about a

10:13:59   4    10-year period, since about 1975.  And I was in partnership with

10:14:04   5    my family in land development, home building, and investment in

10:14:09   6    real estate projects.

10:14:10   7       Q.    At some point, did you get into public service?

10:14:13   8       A.    Yes, I did.

10:14:14   9       Q.    Tell us about that?

10:14:15   10      A.    In -- well, I preface my remarks by saying that in the

10:14:22   11   early 2000s, I became a member of the Board of Trustees for

10:14:28   12   Texas Wesleyan University.  And I loved that service.  I love

10:14:32   13   education and I believe strongly in education.

10:14:36   14            In 2007, a member of the Burleson Independent School

10:14:43   15   District Board of Trustees retired from being a trustee, and I

10:14:47   16   was invited to apply to fill his term.  And so I was appointed

10:14:54   17   as a member of the Burleson Independent School District.  I

10:14:58   18   think that was like in February in 2007, and then during the May

10:15:04   19   election cycle, I had to run for office, and I ran for office

10:15:10   20   and won that seat.

10:15:12   21            I was a School Board Trustee for Burleson ISD?

10:15:18   22      Q.    Did you pursue other service after that?

10:15:20   23      A.    Yes.  I actually resigned my role as School Board

10:15:26   24   Trustee to run for the Texas State Senate in District 10.

10:15:30   25      Q.    What year was this?

KATHLEEN A. SUPNET, CSR

| | | |
|---|---|---|
| 10:15:32 | 1 | A.    2017, I believe. |
| 10:15:34 | 2 | Q.    And which party did you seek the nomination? |
| 10:15:36 | 3 | A.    The Democratic Party. |
| 10:15:38 | 4 | Q.    Are you a Democrat? |
| 10:15:39 | 5 | A.    I am a Democrat. |
| 10:15:40 | 6 | Q.    Do you have any apologies about that? |
| 10:15:43 | 7 | A.    I have none. |
| 10:15:43 | 8 | Q.    Now what is -- were you ultimately successful in your |
| 10:15:48 | 9 | election contest? |
| 10:15:48 | 10 | A.    I ultimately was successful. |
| 10:15:50 | 11 | Q.    Who was the opponent that you ran against in that |
| 10:15:53 | 12 | election? |
| 10:15:53 | 13 | A.    Well, I ran against Connie Burton in the general |
| 10:15:58 | 14 | election for Senate District 10. |
| 10:16:00 | 15 | Q.    Was she the Republican nominee? |
| 10:16:02 | 16 | A.    Yes, she was. |
| 10:16:03 | 17 | Q.    And is her race or ethnicity also Caucasian? |
| 10:16:08 | 18 | A.    Yes. |
| 10:16:08 | 19 | Q.    Tell us about the campaign.  How did you decide to |
| 10:16:12 | 20 | run, were you recruited, that sort of background? |
| 10:16:15 | 21 | A.    I had a conversation one day at a Board of Trustee's |
| 10:16:19 | 22 | meeting at Texas Wesleyan University.  And we were talking about |
| 10:16:23 | 23 | education, public ed and higher education, and I think |
| 10:16:28 | 24 | Commissioner Brooks said something to me like, well, it sounds |
| 10:16:31 | 25 | like you should run for higher office, and I said maybe I will. |

KATHLEEN A. SUPNET, CSR

10:16:35  1    And that started the thought process, that was the seed that led

10:16:43  2    me, ultimately, to think that through.  And by, I think, May, I

10:16:51  3    had made the decision that I actually should run for Senate.

10:16:57  4        Q.    Before making that decision, did you talk with other

10:17:00  5    state leaders in the community?

10:17:02  6        A.    I talked with lots and lots of people, yes.

10:17:05  7        Q.    The Court heard yesterday from Commissioner Brooks and

10:17:13  8    Justice of the Peace de Leon.  Were you here for any of that

10:17:13  9    testimony?

10:17:13  10       A.    Yes.

10:17:13  11       Q.    Did you have contact with Judge de Leon before you

10:17:16  12   ran?

10:17:16  13       A.    I did.  I had lunch with him on one occasion.  We had

10:17:22  14   a conversation about the possibility that I might run.

10:17:24  15       Q.    At the time that you decided to run, were there any

10:17:28  16   other candidates that were seeking the Democratic nomination?

10:17:34  17       A.    There was a Democratic candidate, Allison Campolo, who

10:17:38  18   actually entered her campaign sometime around March.

10:17:43  19       Q.    What was her race or ethnicity?

10:17:45  20       A.    She was also Caucasian.

10:17:47  21       Q.    And ultimately, did you and she face off in the

10:17:51  22   primary election?

10:17:51  23       A.    We did.

10:17:52  24       Q.    Do you recall roughly what the outcome was?

10:17:53  25       A.    Yes.  I won, roughly.

DIRECT - POWELL                                                    72

10:17:58  1      Q.    Do you recall roughly what the decision of the vote

10:18:01  2  was?

10:18:01  3      A.    I think I won pretty soundly, maybe by ten points.

10:18:09  4      Q.    And how would you describe the general election

10:18:11  5  contest after the nominations had been settled and you worked

10:18:15  6  towards November?

10:18:16  7      A.    Well, we worked really hard, I'll just say that.  I

10:18:19  8  know from my perspective, that's about as hard as I have ever

10:18:25  9  worked in my life.  I put over 20,000 miles in my vehicle.

10:18:29 10  Traveled from South Lake to Benbrook and everywhere in between.

10:18:34 11  We attended every meeting that we were invited to.  We attended

10:18:42 12  forums.  And, you know, I became more and more confident it was

10:18:46 13  a race I could win.

10:18:49 14      Q.    What were the neighborhoods -- I assume it's all of

10:18:51 15  them, but can you give us the main neighborhoods in Senate

10:18:53 16  District 10 that you were seeking votes from?

10:18:55 17      A.    Well, I spent a lot of time in Poly, for instance, in

10:19:02 18  Southeast Tarrant County and Southeast Fort Worth, actually,

10:19:07 19  around the Texas Wesleyan University area.  I've been really

10:19:12 20  instrumental in some development initiatives through my on the

10:19:17 21  Texas Wesleyan Board there, so we started sort of with that.

10:19:21 22          I visited African-American churches.  We campaigned in

10:19:31 23  Fort Worth.  We campaigned in North Fort Worth and northern

10:19:36 24  Tarrant County and the arm that goes up North Side, Fort Worth.

10:19:40 25  We campaigned in South Lake and Colleyville.  And Mansfield is

10:19:48   1   an area that we spent a lot of time.

10:19:53   2       Q.   And how would you describe these doors in southside

10:19:58   3   areas in terms of the predominate race or ethnicity of the

10:20:04   4   citizens there?

10:20:04   5       A.   Well, the areas of SD-10 in north of downtown Fort

10:20:09   6   Worth are predominantly Hispanic.  That is a large are of

10:20:13   7   Hispanic settlement.

10:20:14   8            Then in the southern portion of Fort Worth, down

10:20:20   9   around -- I guess down around Seminary South.  My grandparents

10:20:23  10   lived on the old Seminary Drive, so I had been raised in that

10:20:27  11   area as well.  Those areas around Seminary Drive and down toward

10:20:34  12   Loop 820 in south Fort Worth, are also an area of high

10:20:39  13   population of Hispanic neighborhoods.

10:20:42  14            African-American community is located predominantly in

10:20:49  15   that east Fort Worth, southeast Fort Worth area, from say

10:20:57  16   I-30 -- for Senate District 10, anyway -- from Interstate 30,

10:21:03  17   down through the Rosedale quarter down to Berry Street and even

10:21:08  18   further south towards Seminary Drive and beyond.

10:21:12  19       Q.   Are there neighborhoods with significant Asian

10:21:16  20   population?

10:21:16  21       A.   There are some significant Asian population, one over

10:21:22  22   in Arlington, probably in that 157 corridor in Arlington, and

10:21:29  23   then also along the Sylvania drive and (indiscernible) in

10:21:34  24   Fort Worth.

10:21:35  25       Q.   And were you ultimately successful in the election?

DIRECT - POWELL                                                    74

10:21:37   1       A.    Yes, I was.

10:21:38   2       Q.    How would you describe the result in terms of

10:21:40   3   landslide, close, squeaker?

10:21:44   4       A.    I don't think you'd call it a landslide, but I won by

10:21:49   5   10,000 votes.  It was significant enough that I felt really good

10:21:54   6   about our victory.

10:21:55   7       Q.    When did you take the oath of office?

10:21:58   8       A.    I took the oath of office -- I believe it was January

10:22:02   9   the 8th of 2019.

10:22:03  10       Q.    And you've been serving regularly in Senate District

10:22:08  11   10 since then?

10:22:08  12       A.    Yes, sir, I have.

10:22:09  13       Q.    Now, before we turn to the subject matter in this

10:22:12  14   case, tell us a little bit about what the duties and

10:22:14  15   responsibilities of a Senator are?

10:22:16  16       A.    Well, certainly there are legislative responsibilities

10:22:20  17   every other year.  In this last year, we had our regular session

10:22:26  18   and three special sessions, which is extremely time consuming

10:22:34  19   and sort of all consuming.  And so I'm very proud of our

10:22:38  20   legislative efforts and our -- the legislation that we've gotten

10:22:43  21   across the finish line, but I think I'm more proud even of the

10:22:47  22   constituent service work that we do.

10:22:49  23       Q.    What does that involve?

10:22:51  24       A.    Well, our staff members certainly answer every single

10:22:57  25   email that comes across our desk and we try to help with

10:23:01  1   resources for our constituents.  We've done everything we -- I

10:23:07  2   think one of the first things we did so amazing, we had a body

10:23:13  3   exhumed from a pauper's grave and exported to family members in

10:23:17  4   a state up north.  And that was my first surprise at the

10:23:25  5   enormity of constituent work.  We have united families with

10:23:31  6   adopted babies at the hospital, during the COVID crisis.  We've

10:23:36  7   helped children in Child Protective Services get the medical

10:23:40  8   care that they need.  We helped one baby get adopted by his

10:23:46  9   foster parents, in an effort to make sure that the child

10:23:51  10  received a kidney transplant.

10:23:57  11          During the COVID crisis, we did everything we could to

10:24:01  12  provide P.P.E. for hospitals and doctors, to make sure that when

10:24:07  13  vaccines became available, that those were disseminated

10:24:11  14  throughout Senate District 10 that met the needs of our

10:24:16  15  citizens.

10:24:16  16          On one occasion, you know, we even contracted for

10:24:23  17  P.P.E., so that we could get gloves and masks for doctors'

10:24:29  18  offices, because smaller doctors' offices didn't have the P.P.E.

10:24:33  19  supplies that they needed.

10:24:34  20      Q.    Was it the case with when you took office and you

10:24:38  21  began to do this constituent work, you were the front door

10:24:42  22  access to state government?

10:24:44  23      A.    Absolutely.

10:24:46  24      Q.    Was it the sense that some of that work hadn't been

10:24:49  25  done prior to your election?

DIRECT - POWELL                                                          76

10:24:51  1        A.   Yes, sir.

10:24:52  2        Q.   Now, I'd like to fast-forward to the 2021

10:24:57  3   redistricting process, and starting in sort of 2019, do you

10:25:02  4   recall sending a letter to Senator Huffman then?

10:25:05  5        A.   Yes, sir.

10:25:05  6        Q.   Let me turn this on.  So this should come on the

10:25:10  7   screen in front of you.  And there should be three binders up

10:25:12  8   there.

10:25:12  9             MR. DUNN:  And for the record, this is Brooks'

10:25:16 10   Exhibit 3.

10:25:35 11             JUDGE GUADERRAMA:  This is the letter from Senator

10:25:36 12   Powell?

10:25:37 13             MR. DUNN:  Yes, sir.

10:26:19 14   BY MR. DUNN:

10:26:19 15        Q.   All right.  Senator, you have there before you this

10:26:22 16   letter; is that true?

10:26:23 17        A.   The letter dated October 30th?

10:26:25 18        Q.   Yes.  Can you give (indiscernible), please?

10:26:29 19        A.   Yes, sir.

10:26:29 20        Q.   2019?

10:26:30 21        A.   Yes, sir.

10:26:31 22        Q.   What was your purpose of sending this letter?

10:26:35 23        A.   We wanted to be sure that the redistricting committee

10:26:39 24   understood Senate District 10 and that they understood that we

10:26:44 25   were a majority-minority coalition district and a crossover

DIRECT - POWELL                                                     77

10:26:51  1    district.

10:26:52  2         Q.   Did you receive a response to the letter?

10:26:54  3         A.   No, we did not.

10:26:57  4         Q.   Now you make a request of Senator Huffman in the

10:27:00  5    letter.  What was that?

10:27:01  6         A.   We told her that we would be happy to help facilitate

10:27:08  7    a redistricting committee meeting in Tarrant County.

10:27:11  8         Q.   Was your invitation accepted?

10:27:14  9         A.   No, it was not.

10:27:15  10        Q.   Did you receive any feedback at all from Senator

10:27:18  11   Huffman to this request?

10:27:20  12        A.   Not to my knowledge, no.

10:27:22  13        Q.   And you sent second letter; is that true?

10:27:24  14        A.   That's true.

10:27:26  15        Q.   I'll take you to Exhibit 4, now, in your binder.

10:27:28  16   That's also on the screen.

10:27:30  17             When is this letter dated?

10:27:34  18        A.   This letter is dated February the 18th, 2020.

10:27:37  19        Q.   Why did you send a second letter?

10:27:40  20        A.   Well, we still had the same belief that it was

10:27:43  21   important for the redistricting committee to understand Senate

10:27:49  22   District 10 and to understand Tarrant County, so we made

10:27:55  23   advanced -- an advanced effort to be sure that there was a place

10:28:00  24   where the meeting could be held and we wanted to offer that as

10:28:04  25   our suggestion.

DIRECT - POWELL                                                    78

10:28:05  1       Q.    Did you receive any response to this letter?

10:28:07  2       A.    Not to my knowledge, no, sir.

10:28:09  3       Q.    Was your invitation here accepted?

10:28:12  4       A.    No.

10:28:13  5       Q.    Now the Court heard testimony about a staff meeting

10:28:18  6    held between your staff and Senator Huffman's staff, I think the

10:28:21  7    record reflects on February the 12th, were you at that meeting?

10:28:24  8       A.    No, sir.

10:28:25  9       Q.    Did you receive any report about the meeting?

10:28:27  10      A.    Just that they had had a meeting and they came out of

10:28:31  11   that meeting with a sense that our population was within

10:28:38  12   reasonable deviation and that they -- that I believe it was

10:28:44  13   Mr. Opperman had said to them that he didn't think that we would

10:28:47  14   see any changes necessary for our district.

10:28:51  15      Q.    Having that information, did that cause you to reach

10:28:55  16   any conclusion about maybe why neither of your letters were

10:28:59  17   responded to?

10:29:01  18      A.    No, sir.

10:29:01  19      Q.    Now you ultimately attended a meeting yourself; is

10:29:07  20   that true?

10:29:07  21      A.    Yes, it is true.

10:29:08  22      Q.    With Senator Huffman?

10:29:10  23      A.    Yes, sir.

10:29:10  24      Q.    Does November 19th sound about right, 2020?

10:29:14  25      A.    Yes, sir.

10:29:15  1        Q.    Tell us who was at that meeting?

10:29:17  2        A.    That first meeting that was Gary Jones and me, and

10:29:25  3    Senator Huffman and Sean Opperman.

10:29:29  4        Q.    Who is Gary Jones?

10:29:31  5        A.    Gary Jones is my Chief of Staff.

10:29:33  6        Q.    The Court has heard that Mr. Opperman was the

10:29:38  7    committee Director for Senator Huffman.  Does that sound right

10:29:40  8    to you?

10:29:40  9        A.    Yes, sir.

10:29:40 10        Q.    What do you recall about that meeting?

10:29:44 11        A.    It was not very substantive.  There was not a lot of

10:29:51 12    conversation in that meeting.  We were cautious with one

10:30:00 13    another, I think.

10:30:00 14        Q.    Can you remember anything that was said?

10:30:07 15        A.    No.  It was -- there was very little said in that

10:30:12 16    meeting.  It was a short meeting.  Other than the fact that we

10:30:16 17    expressed again that Senate District 10 was within a normal

10:30:21 18    deviation, that was within 5 percent of being perfect

10:30:25 19    population, and that it functions as a majority-minority

10:30:33 20    coalition district and a crossover district, and that we felt

10:30:39 21    like that Senate District 10 could retain its current boundaries

10:30:47 22    as had been ruled in the 2012 redistricting signing by the

10:30:56 23    federal court.

10:30:56 24        Q.    Do you recall if there were any maps in that meeting?

10:30:59 25        A.    Yes, there was a map of SD-10.

DIRECT - POWELL                                               80

10:31:04  1           MR. DUNN:  Excuse me, Your Honor.  May we stand at

10:31:08  2   ease one second?

10:31:16  3           THE COURT:  Yes, sir.

10:31:22  4   BY MR. DUNN:

10:31:22  5       Q.    You should have there on your screen Exhibit 7?

10:31:25  6       A.    Yes, that's the map.

10:31:26  7       Q.    This map was provided to you at a meeting with Senator

10:31:31  8   Huffman?

10:31:31  9       A.    Yes, it was.

10:31:31 10       Q.    And can you note for me -- it's sort of hard to read,

10:31:36 11   but what types of population statistics are in the right-hand

10:31:40 12   margin?

10:31:41 13       A.    In the right-hand margin, there is some data about the

10:31:50 14   Black population of the district.

10:31:52 15       Q.    Does it also list non-Anglo, Hispanic and Asian?

10:31:58 16       A.    It does.  It does.

10:32:00 17       Q.    Now, I note that this -- I'll zoom back out.

10:32:04 18       A.    I'm having just a little bit of trouble reading that

10:32:10 19   box.

10:32:11 20       Q.    This looks like a photograph taken on a table?

10:32:13 21       A.    That's right.

10:32:14 22       Q.    Do you recall who made that photograph?

10:32:16 23       A.    I think that Gary Jones did that.

10:32:19 24       Q.    There was a second map, as well.  I'm showing that to

10:32:22 25   you.  It's page two of Exhibit 7.

                        KATHLEEN A. SUPNET, CSR

DIRECT - POWELL                                                    81

10:32:24   1        A.    All right.

10:32:25   2        Q.    Does this map also contain racial data in the

10:32:30   3   right-hand column?

10:32:32   4        A.    It does.

10:32:32   5              MR. DUNN:  For the Court's record, there are better

10:32:35   6   versions in Brooks' Exhibit 9.

10:32:44   7   BY MR. DUNN:

10:32:44   8        Q.    Did you ultimately then have another meeting with

10:32:50   9   Senator Huffman?

10:32:50   10       A.    Yes, we did.

10:32:51   11       Q.    September 24th, 2021, sound about right for the date

10:32:51   12   on that?

10:32:55   13       A.    Yes, sir.

10:32:55   14       Q.    Who was at that meeting?

10:32:57   15       A.    I believe at that meeting was my Chief of Staff Gary

10:33:02   16   Jones and I, and Sean Opperman, Senator Huffman and Anne Mackin.

10:33:14   17       Q.    Do you recall what was said?

10:33:16   18       A.    We -- we again made our contention that the population

10:33:26   19   of Senate District 10 was within the standard deviation of being

10:33:32   20   the right size.  As a matter of fact, I believe we were number

10:33:37   21   four out of 31 districts of being closest to the ideal size and

10:33:43   22   that Senate District 10 functions.  Again, I make this statement

10:33:48   23   many times, that Senate District 10 functions as a

10:33:51   24   majority-minority coalition district, African-American and

10:33:59   25   Hispanic coalition district and a crossover district.

KATHLEEN A. SUPNET, CSR

DIRECT - POWELL                                                    82

10:34:01   1        Q.    Did you receive specific responses to those articles

10:34:04   2   that you made to Senator Huffman or Mr. Opperman?

10:34:11   3        A.    I don't recall that we did.

10:34:15   4        Q.    And did they ultimately give you a sense of where they

10:34:19   5   were headed with your map?

10:34:20   6        A.    In that meeting, I don't believe so.

10:34:23   7        Q.    Now did you provide some information to them?

10:34:26   8        A.    We did.

10:34:27   9        Q.    If you could look at Brooks' Exhibit 5.

10:34:56  10              All right.   Are these the items -- since you have them

10:35:02  11   there in your binder, you can thumb through them -- are these

10:35:02  12   the items that you provided to Mr. Opperman and Senator Huffman

10:35:08  13   in that meeting?

10:35:09  14        A.    Yes, they are.

10:35:10  15        Q.    Just to show one example here, I'm on page five, what

10:35:12  16   does it depict?

10:35:15  17        A.    This portrays the minority population in 2020.

10:35:32  18        Q.    And this map, does it show the current District 10

10:35:36  19   lines?

10:35:37  20        A.    Yes, it shows the current lines of Senate District 10.

10:35:42  21        Q.    And do you recall there being a projector there?

10:35:45  22        A.    Yes, I do.

10:35:47  23        Q.    What was on the projector?

10:35:49  24        A.    It was the -- I believe it was the new lines for

10:35:54  25   Senate District 10 --

DIRECT - POWELL                                                      83

10:35:54  1        Q.   And --

10:35:56  2        A.   -- on that day -- I'm sorry -- on that day, the new

10:35:58  3   lines for Senate District 10 were portrayed on the screen.

10:36:03  4        Q.   All right.  I'm showing you on the screen -- I'm going

10:36:05  5   to Texas District Viewer.

10:36:08  6        MR. DUNN:  For the Courts' reference, all of the plans

10:36:10  7   that are considered by the Legislature are available publicly on

10:36:13  8   Texas District Viewer, which you can find by Googling those

10:36:16  9   words.

10:36:16  10  BY MR. DUNN:

10:36:17  11       Q.   I have Plan 2101 on the screen here?  Does that look

10:36:21  12  like the plan that you saw on the projector?

10:36:21  13       A.   That's the plan we saw on the screen that day.  It

10:36:25  14  showed the Tarrant County portion of Senate District 10,

10:36:32  15  basically cut down across the middle below Interstate 30.  It

10:36:38  16  actually took out a portion all the way down to Rosedale street,

10:36:42  17  to Senate District 10, to Tarrant County, took out the

10:36:46  18  northern -- north end of downtown Hispanic population, and it

10:36:49  19  took out the arm that goes up through South Lake and

10:36:53  20  Colleyville.

10:36:54  21       Q.   What did it add?

10:36:55  22       A.   And it submerged those remaining portions of Tarrant

10:37:01  23  County into rural Johnson and Parker counties.  It included

10:37:05  24  100 percent of those counties, which are largely Anglo, largely

10:37:12  25  Republican population.

KATHLEEN A. SUPNET, CSR

10:37:13  1     Q.    And did you say something to the Senator about this
10:37:18  2   when you saw the map, Senator Huffman?
10:37:21  3     A.    I did.
10:37:21  4     Q.    What did you say?
10:37:23  5     A.    I said -- she asked me if I had any questions about
10:37:26  6   the map, and I said I can clearly see what you're attempting to
10:37:30  7   do here.
10:37:31  8     Q.    Did you receive any response?
10:37:33  9     A.    No.
10:37:35 10     Q.    Now when you were talking about the -- going back to
10:37:39 11   Exhibit 5 -- those -- the packet of materials that you provided
10:37:42 12   to Senator Huffman, do you recall if Anne Mackin was in the
10:37:46 13   room?
10:37:46 14     A.    I do.
10:37:47 15     Q.    Do you recall if she had any reaction to those maps?
10:37:51 16     A.    I believe Anne may have said I'm uncomfortable with
10:37:56 17   this.
10:37:56 18     Q.    Uncomfortable about what?  Do you know?
10:37:59 19     A.    I don't know.
10:38:00 20     Q.    Anything else about that meeting that you call --
10:38:04 21   excuse knee -- that you recall about the meeting?
10:38:06 22     A.    I will say this, that I handed each one of those maps
10:38:10 23   to Senator Huffman, individually, and as I handed her each map I
10:38:16 24   read the title of the map.  In other words, I would hand her one
10:38:19 25   and I would say this map of Senate District 10 highlights the

10:38:25  1    Black population.  This map it shows you where the Hispanic

10:38:29  2    population is located in Senate District 10 and so forth.  And I

10:38:34  3    handed her -- I believe, it was seven different maps.

10:38:38  4         Q.   And did you do anything with those?

10:38:42  5         A.   I handed them to her.  She took the maps and then she

10:38:46  6    said let's initial these maps, and I said, okay.  And one by one

10:38:53  7    she initialled each map and handed the map back to me and I

10:38:58  8    initialled each map.

10:38:59  9         Q.   So to be clear, who's idea was it to initial the maps?

10:39:02  10        A.   Senator Huffman.

10:39:03  11        Q.   What happened, if you know, with those maps

10:39:06  12   afterwards?

10:39:06  13        A.   I don't know.

10:39:07  14        Q.   When you left the meeting, were they left behind?

10:39:11  15        A.   When we left the meeting they were on the table.

10:39:14  16        Q.   Now turning your attention to Exhibit 11.  You want to

10:39:27  17   pull that up in your binder and let us know when you're there?

10:39:31  18        A.   All right.

10:39:32  19        Q.   What is this?

10:39:34  20        A.   This is an email from Gary Jones to John Opperman.

10:39:41  21        Q.   What is it dated?

10:39:43  22        A.   It is dated September the 16th, 2021.

10:39:49  23        Q.   Did you direct Mr. Jones to send this email?

10:39:53  24        A.   Yes, I did.

10:39:54  25        Q.   Who were the recipients?

10:39:57  1       A.    Sean Opperman and Anne Mackin.

10:40:00  2       Q.    All right.  And you included a number of attachments;

10:40:04  3  is that right?

10:40:05  4       A.    That's right.

10:40:05  5       Q.    And what were those?

10:40:07  6       A.    One of attachments was a letter that I had written to

10:40:11  7  Senator Huffman regarding our September 14th meeting and draft

10:40:19  8  proposed plan.  And then there were maps attached to that email

10:40:32  9  that included maps of the minority population of Senate District

10:40:41 10  10 in 2020 and the Anglo population in 2020.

10:40:46 11       Q.    Did you provide any court opinions?

10:40:49 12       A.    Yes, sir, I did.  I also included the 2012 Federal

10:41:00 13  Court decision regarding the redistricting of Senate District

10:41:04 14  10.

10:41:04 15       Q.    In here Mr. Jones says, please confirm receipt.  Do

10:41:09 16  you see that?

10:41:10 17       A.    Yes, I do.

10:41:11 18       Q.    Let me show you what is Brooks' Exhibit 12.

10:41:17 19             What is this?

10:41:19 20       A.    It is an email from Sean Opperman back to Gary Jones.

10:41:27 21       Q.    What does it say?

10:41:28 22       A.    Thank you for reaching out.  I briefly opened this

10:41:32 23  document.  They appear to contain racial data, so I closed them

10:41:36 24  out right away.  Just a reminder, we're drafting all maps

10:41:43 25  without regard to racial data and sending the drafts out for

DIRECT - POWELL                                                           87

10:41:47   1    legal compliance check.

10:41:48   2         Q.    In the last part that you just read with "just a

10:41:51   3    reminder," was that the first you heard of this information when

10:41:53   4    you received this email?

10:41:58   5         A.    I'm not sure about the answer to that.

10:42:02   6         Q.    What did you make of the fact that they briefly and

10:42:05   7    immediately closed the documents, Mr. Opperman says?

10:42:08   8         A.    Well --

10:42:12   9               MR. SWEETEN:   Objection, Your Honor, what she --

10:42:16   10              JUDGE GUADERRAMA:   She's not speculating what she made

10:42:18   11   of it, so I'll overrule that objection.

10:42:21   12        A.    I thought that was a ridiculous response.

10:42:24   13   BY MR. DUNN:

10:42:24   14        Q.    Why is that?

10:42:26   15        A.    Well, our job is to do the write thing for the

10:42:32   16   citizens of Senate District 10 and all over the State of Texas,

10:42:35   17   and to disregard -- to say that you're disregarding information,

10:42:39   18   that's obvious it's ridiculous on its face.

10:42:42   19        Q.    Now I'll call your attention to Brooks' Exhibit 13.

10:42:50   20              Let us know when you're there?

10:42:53   21        A.    I'm there.

10:42:54   22        Q.    What is this?

10:42:55   23        A.    This is an email that I sent to all of the members of

10:43:02   24   the Senate.

10:43:02   25        Q.    And why did you send this letter or email?

DIRECT - POWELL                                                88

10:43:04  1      A.    I sent this email, because I wanted to reinforce the

10:43:08  2  information that we had provided throughout the redistricting

10:43:12  3  process.  I wanted to be sure that my colleagues had the

10:43:18  4  opportunity to see these maps, once again, the minority

10:43:22  5  population, and I wanted to be sure that everybody had all of

10:43:28  6  the information.

10:43:28  7      Q.    And what is the date and time of this email?

10:43:33  8      A.    The date is September 18, 2021.

10:43:37  9      Q.    Was included in -- with this email, the same racial

10:43:41 10  shaded maps that you'd previously provided to Senator Huffman?

10:43:46 11      A.    Yes, sir.

10:43:46 12      Q.    As well as your letter?

10:43:48 13      A.    As well as my letter to her.

10:43:50 14      Q.    As well as the 2012 decision?

10:43:51 15      A.    As well as the 2012 decision.

10:43:53 16      Q.    And then you placed a map in the email; is that right?

10:43:55 17      A.    I did.

10:43:56 18      Q.    Why did you do that?

10:43:57 19      A.    Why did I place the map in the email?

10:44:01 20      Q.    Yes, ma'am.

10:44:02 21      A.    Because I wanted to be certain that I had provided

10:44:05 22  that to every member of the Senate.

10:44:07 23      Q.    And I notice here on your screen there's four blue

10:44:12 24  circles on the pink-shaded background.  What were you showing

10:44:16 25  there?

DIRECT - POWELL                                          89

10:44:17   1      A.    Those are the areas that were cracked out.  Those are

10:44:22   2   the minority district areas that were cracked out of Senate

10:44:25   3   District 10.

10:44:25   4      Q.    Even under the old map?

10:44:27   5      A.    Yes, sir.

10:44:28   6      Q.    All right.  Now I'll call your attention to Brooks'

10:44:33   7   Exhibit 14.

10:44:33   8            What is this?

10:44:37   9      A.    This is an email from Joan Huffman to me.

10:44:52  10      Q.    And what does it reflect?

10:45:05  11      A.    Is this a read receipt?  Is that what this is?  I'm

10:45:12  12   sorry, I...

10:45:17  13      Q.    This is the conversation you got back from the read

10:45:20  14   receipt to the email?

10:45:22  15      A.    Right.

10:45:22  16      Q.    Is that a yes?

10:45:23  17      A.    Yes.  I'm seeing that, yes.

10:45:26  18      Q.    All right.

10:45:28  19      A.    I'm sorry.  It was -- it says that my email to her was

10:45:32  20   read on Saturday, September the 18th, 2021.

10:45:36  21      Q.    It's hard to see on the screen.

10:45:38  22      A.    It's hard to see on the screen and it's hard for these

10:45:41  23   eyes to see it on tiny print.

10:45:43  24      Q.    Now, do you recall that the Senate began to have

10:45:47  25   committee meetings around September 24th, about the Senate

10:45:50  1   redistricting plan?

10:45:51  2       A.   I do.

10:45:52  3       Q.   Did a different version of the plan come out than the

10:45:55  4   one you'd seen on the projector that day?

10:45:58  5       A.   Yes, sir.

10:45:59  6       Q.   Let me go back to District Viewer and show you Plan

10:46:05  7   2108 is that on your screen?

10:46:07  8       A.   It is.

10:46:07  9       Q.   Is that the plan that came out before the committee

10:46:11  10  debate?

10:46:12  11      A.   Yes, it did.

10:46:13  12      Q.   And how was it different than the earlier plan you had

10:46:16  13  seen?

10:46:16  14      A.   Well, this district actually dissects Parker County.

10:46:25  15  It takes a portion of Parker County out of their first map and

10:46:31  16  then it adds in Palo Pinto, Young, Stephens, Shackelford,

10:46:45  17  Callahan, and Brown counties.  As far to the west nearly as

10:46:53  18  Abilene and as further south and west to Brownwood.

10:46:58  19      Q.   Does this version of the proposed Senate Bill 4 have

10:47:04  20  the same orientation within Tarrant County?

10:47:07  21      A.   No, it does not.  It cracks Senate District 10 at, you

10:47:16  22  know, just below I-30.

10:47:19  23      Q.   Were you given any notice that this plan would be

10:47:22  24  released?

10:47:22  25      A.   No.

10:47:23   1        Q.    How did you first learn of it?

10:47:25   2        A.    I believe this is the map that came out somewhere at

10:47:29   3   9:30 in the evening, before the meeting schedule for the next

10:47:34   4   morning, and I think I had got a call from my Chief of Staff

10:47:41   5   about it.

10:47:42   6        Q.    And the committee meeting was scheduled to be the next

10:47:45   7   morning?

10:47:45   8        A.    Yes, sir.

10:47:45   9        Q.    On your screen is Brooks' Exhibit 15.

10:47:50  10              Is this the email forwarding the plan?

10:47:59  11        A.    Yes, it is.

10:48:00  12        Q.    And it references S22101?

10:48:06  13        A.    It is.

10:48:06  14        Q.    Now it was sent -- the email was sent about 1:20 p.m.

10:48:11  15   Do you see that?

10:48:12  16        A.    I do see it.

10:48:13  17        Q.    And was it the case you learned of it later that

10:48:16  18   evening from your staff?

10:48:17  19        A.    That's correct.

10:48:18  20        Q.    All right.

10:48:19  21              MR. DUNN:  Your Honor, now I think is the appropriate

10:48:20  22   time to do this technology transition.

10:48:24  23              JUDGE GUADERRAMA:  So it is 10:48.  Let's go ahead and

10:48:28  24   recess until 11:00.  That'll give us 12 minutes.

11:04:44  25              (Break 10:48 a.m. to 11:04 a.m.)

KATHLEEN A. SUPNET, CSR

DIRECT - POWELL                                                        92

11:04:44   1    BY MR. DUNN:

11:04:45   2        Q.    All right.  Senator, before the break, we were going

11:04:48   3    to transition and talk about the first committee -- senate

11:04:51   4    committee debate on September 24th.  Before we do that -- and

11:04:55   5    tell us kind of, as you have experienced it with the typical

11:04:59   6    standard practices for passage of a bill in a committee meeting,

11:05:04   7    you know, what the hearing process looks like in the Texas

11:05:08   8    Senate?

11:05:08   9        A.    Well, a typical committee process would be that the

11:05:11   10   senator ringing the bill lays it out in the beginning, and

11:05:16   11   they'll typically have a resource witness or an expert witness

11:05:20   12   that comes to elaborate on the bill that is being considered and

11:05:26   13   then they will open it for public testimony and you'll hear, you

11:05:33   14   know, sometimes a few minutes of public testimony and sometimes

11:05:36   15   hours and hours of public testimony.

11:05:38   16       Q.    The senator offering the measure, they typically very

11:05:42   17   well informed of the problem the bill's intending to address and

11:05:47   18   the solutions they were proposing?

11:05:50   19       A.    Yes.

11:05:51   20       Q.    Are you typically able to get details?

11:05:53   21       A.    Yes, sir.

11:05:53   22       Q.    Are you able to determine, in a typical circumstance,

11:05:56   23   where the bill came from, what the complaint was they brought

11:05:59   24   the bill for, that sort of thing?

11:06:01   25       A.    Yes, sir.

DIRECT - POWELL                                                    93

11:06:02   1      Q.   In terms of resource witnesses, are the resource
11:06:06   2   witnesses typically knowledgeable on the bill?
11:06:08   3      A.   They are.
11:06:09   4      Q.   And is it the case that bills are held over before
11:06:13   5   they're voted on or how does that work?
11:06:15   6      A.   Explain to me what you mean by held over.
11:06:18   7      Q.   Sure.  When the bill is laid out in committee, do they
11:06:21   8   typically vote right there that day or is it typically held over
11:06:23   9   a different day to vote?
11:06:23  10      A.   It depends.  It depends on the time of day that it is.
11:06:28  11   Sometimes you vote right away.  But if there's not a quorum
11:06:34  12   present and you can't, then it will be held over to the next
11:06:36  13   day.
11:06:37  14      Q.   And in controversial bills or that bills that get a
11:06:42  15   lot of attention, do you expect a lot of hearings on those?
11:06:46  16      A.   Yes, you do.
11:06:47  17      Q.   Now, the September 24th meeting of the Senate
11:06:52  18   Redistricting Committee, are you on that committee, were you on
11:06:54  19   the committee?
11:06:54  20      A.   I am not on redistricting.
11:06:56  21      Q.   Did you attend that committee meeting?
11:06:59  22      A.   Yes, I did.
11:06:59  23      Q.   Do you recall at the beginning of the meeting that
11:07:02  24   Senator Huffman laid out a list of priorities that she had
11:07:05  25   alleged to have followed in drafting the map?

KATHLEEN A. SUPNET, CSR

DIRECT - POWELL                                                    94

11:07:08   1          MR. SWEETEN:  Your Honor, I've not been objecting, but

11:07:11   2   I object to leading, leading form of the direct examination

11:07:14   3   that's being utilized.

11:07:16   4          JUDGE GUADERRAMA:  All right.

11:07:17   5          Mr. Dunn, let's not -- rephrase:

11:07:21   6          MR. DUNN:  We're trying to get to the spot, I'll do

11:07:24   7   better.

11:07:24   8          JUDGE GUADERRAMA:  Appreciate that.

11:07:25   9   BY MR. DUNN:

11:07:26  10      Q.   Let me show you on the screen what was previously

11:07:30  11   admitted as Defendants' Exhibit 59.  I'm going to play 4:54 to

11:07:35  12   5:23.

11:07:40  13          (Video and audio played).

11:07:51  14          *SENATOR HUFFMAN:  My goals and priorities in*

11:07:52  15            *developing these proposed plans, include first and*

11:07:54  16            *foremost abiding by all applicable law, equalizing*

11:07:58  17            *population across districts, reserving political*

11:08:01  18            *subdivisions and communities of interest, when*

11:08:03  19            *possible, preserving the cores of previous districts*

11:08:05  20            *to the extent possible, avoiding pairing incumbent*

11:08:11  21            *members, achieving geographic compactness when*

11:08:15  22            *possible and accommodating incumbent priorities also*

11:08:17  23            *when possible.*

11:08:17  24            *In the Senate pro- --*

11:08:18  25          (Video and audio stopped).

KATHLEEN A. SUPNET, CSR

DIRECT - POWELL                                                    95

```
11:08:18   1    BY MR. DUNN:
11:08:19   2        Q.   Was there any mention there by Senator Huffman a
11:08:22   3    partisanship?
11:08:22   4        A.   No, there isn't.
11:08:23   5        Q.   With regard to the factors that she listed, how do
11:08:28   6    they apply to the latest version of the bill that you had seen
11:08:32   7    the night before on Senate District 10?
11:08:40   8        A.   Well, I don't see where they applied at all to the new
11:08:42   9    version to Senate District 10, certainly not in terms of
11:08:47  10    communities of interest, not in terms of compactness and -- nor
11:08:54  11    any of the priorities that she had listed for how she was going
11:08:58  12    to develop these new districts.
11:09:01  13        Q.   At the onset of the meeting, were there maps available
11:09:07  14    to the public?
11:09:07  15        A.   There were.  If you'll notice in this picture that
11:09:10  16    there's a big giant map on an easel at the front of the Senate
11:09:16  17    chambers, and on the day that we considered the very -- for the
11:09:21  18    first time that map, that included those seven counties, it
11:09:26  19    still had the old map that had just Johnson and Parker counties,
11:09:30  20    because that whole transition happened so quickly, they didn't
11:09:34  21    prepare a new map.
11:09:35  22        Q.   For clarity of the record, was there any map blown up
11:09:39  23    and available on an easel that reflected the map that had just
11:09:43  24    come out?
11:09:43  25        A.   No.
```

KATHLEEN A. SUPNET, CSR

DIRECT - POWELL                                                    96

11:09:44  1        Q.   Do you recall there was a discussion during the

11:09:48  2   committee hearing about who Senator Powell [sic] talked to about

11:09:51  3   the changes to Senate District 10, which are the senators she

11:09:55  4   spoke with?

11:09:55  5        A.   Senator Powell or Senator Huffman?

11:09:57  6        Q.   Senator Huffman.

11:09:59  7        A.   I do you recall that discussion.

11:10:03  8        Q.   Again, showing Exhibit 59, 13:48 to 13:14.

11:10:03  9             (Video and audio played).

11:10:17 10             *SENATOR POWELL:  And did you communicate with any of*

11:10:18 11              *the representatives of those districts before you*

11:10:19 12              *merged that into Senate District 10?*

11:10:27 13             *SENATOR HUFFMAN:  Uh, some of the work.  I spoke to*

11:10:28 14              *Senator Perry, to Senator Springer.  I do not believe*

11:10:32 15              *I spoke to Senator Buckingham.*

11:10:35 16             *SENATOR POWELL:  And did you speak to me?*

11:10:36 17             *SENATOR HUFFMAN:  I did not speak to you.*

11:10:37 18             (Video and audio stopped).

11:10:37 19   BY MR. DUNN:

11:10:38 20        Q.   What would you say the circumstances of Senator

11:10:41 21   Buckingham were at that point?

11:10:44 22        A.   Are you talking about in terms of her district?

11:10:47 23        Q.   Yes.

11:10:48 24        A.   Senator Buckingham had made the decision to run for a

11:10:51 25   statewide race.

DIRECT - POWELL                                                    97

11:10:53  1       Q.    And why is it you asked about who Senator Huffman had

11:10:57  2   talked to about the changes to Senate District 10?

11:11:00  3       A.    Well, I wanted to know how you would make a decision

11:11:04  4   to change that map in that fashion.  It was so drastic to cut

11:11:11  5   Parker County in half, now, and submerge those minority

11:11:17  6   communities into all those outlying, rural-Anglo counties.  I

11:11:23  7   wanted to know how she came to that decision, because she

11:11:26  8   certainly never, during the process, ever talked to me.

11:11:29  9       Q.    What do you make of that decision not to talk to you

11:11:32  10  about it?

11:11:32  11      A.    Well, the only decision, the only conclusion you could

11:11:37  12  come to, she didn't care what I thought.

11:11:41  13      Q.    Now, do you recall also a discussion where Senator

11:11:45  14  Huffman laid out Supreme Court and other court decisions that

11:11:48  15  she was following?

11:11:49  16      A.    Yes, I do.

11:11:50  17      Q.    Again, Defendants' Exhibit 59, 24:51 to 26:13.

11:11:50  18            (Video and audio played).

11:12:01  19            *SENATOR POWELL:  In fact, I have a question for you.*

11:12:02  20             *Who drew these maps?*

11:12:05  21            *SENATOR HUFFMAN:  I drew the map of all -- with my two*

11:12:08  22             *attorneys and my -- who are members of my staff.*

11:12:12  23            *SENATOR POWELL:  And who are those attorneys?*

11:12:14  24            *SENATOR HUFFMAN:  Anne Mackin, who's sitting right*

11:12:16  25             *next to me, and Sean Opperman, who is up at the dais*

KATHLEEN A. SUPNET, CSR

| | | |
|---|---|---|
| 11:12:20 | 1 | as the committee director with Senator Hinojoza, |
| 11:12:24 | 2 | currently. |
| 11:12:25 | 3 | SENATOR POWELL:  And which of these lines for Senate |
| 11:12:28 | 4 | District 10 did you draw and which did they draw? |
| 11:12:30 | 5 | SENATOR HUFFMAN:  I was in the room when every part of |
| 11:12:33 | 6 | this map was drawn. |
| 11:12:34 | 7 | POWELL:  Okay.  And which -- |
| 11:12:35 | 8 | SENATOR HUFFMAN:  I didn't do anything without my |
| 11:12:37 | 9 | direction. |
| 11:12:40 | 10 | POWELL:  Okay.  And -- |
| 11:12:40 | 11 | (Video and audio stopped). |
| 11:12:40 | 12 | BY MR. DUNN: |
| 11:12:41 | 13 | Q.   Now you mentioned -- I think Senator Huffman just |
| 11:12:42 | 14 | mentioned that seated to her left, or our right looking at the |
| 11:12:45 | 15 | screen, is Anne Mackin? |
| 11:12:49 | 16 | A.   Yes, sir. |
| 11:12:49 | 17 | Q.   Is that the same Anne Mackin you had provided the |
| 11:12:52 | 18 | racial shaded data -- map to? |
| 11:12:55 | 19 | A.   Yes, sir. |
| 11:12:55 | 20 | Q.   Now, was there a resource witness available at this |
| 11:13:00 | 21 | hearing? |
| 11:13:00 | 22 | A.   Yes, there was. |
| 11:13:01 | 23 | Q.   And can you recall where he was from? |
| 11:13:03 | 24 | A.   I'm sorry, I don't. |
| 11:13:05 | 25 | Q.   Let me show you what is Defendants' Exhibit 59, 35:42 |

11:13:11  1    to 36:42?

11:13:11  2              (Video and audio played).

11:13:14  3              SENATOR HUFFMAN:  However, I am going to answer to

11:13:14  4          your comment.

11:13:18  5              Our approach to this process was informed by the

11:13:18  6          redistricting juris prudence.

11:13:21  7          (Video and audio stopped).

11:13:21  8          MR. DUNN:  Excuse me.  This is the...

11:13:21  9          SENATOR HUFFMAN:  -- from the United States Supreme

11:13:23 10          Court, as well as other applicable -- applicable

11:13:27 11          precedent.

11:13:27 12              Several key cases are worth highlighting.  _Abbott_

11:13:32 13          _v. Perez_, 2018 Supreme Court case; _Cooper v. Harris_,

11:13:36 14          a 2017 Supreme Court case.  They make clear that any

11:13:40 15          redistricting decisions made on the basis of race

11:13:44 16          must be narrowly tailored to achieve compliance with

11:13:48 17          the Voting Rights Act.

11:13:48 18              In _Cooper v. Harris_, Justice Kagan writing for

11:13:52 19          the majority hails, when a state invokes the VRA to

11:13:54 20          justify race-based districting, it must show to meet

11:13:58 21          the narrow tailoring requirement that it had a strong

11:14:03 22          basis in evidence for concluding that the statute

11:14:06 23          required its actions.  That was _Cooper v. Harris_, a

11:14:10 24          2017 Supreme Court case quoting _a.m. Legislative_

11:14:13 25          _Black Caucus v. Alabama_, a 2015 case.

DIRECT - POWELL                                                    100

```
11:14:19   1              Based on this warning against race-based
11:14:20   2         districting, I drafted all of the proposed maps
11:14:24   3         totally blind to race.  Once I had drafted the maps,
11:14:28   4         I ensured that they underwent a legal compliance
11:14:29   5         check to insure there were no inadvertent violations
11:14:33   6         of any law, including the Voting Rights Act.
11:14:36   7              Thank you.
11:14:37   8         (Video and audio stopped).
11:14:37   9   BY MR. DUNN:
11:14:37  10      Q.   And you what did you make of Senator Huffman listing
11:14:43  11   off those cases?
11:14:44  12      A.   The only thing that I could conclude from her comments
11:14:49  13   there was that it was clear and intentional to add Anglo voters
11:14:55  14   to Senate District 10.
11:14:57  15      Q.   Did it appear that Senator Huffman had read some case
11:15:00  16   law or at least she was making that representation?
11:15:01  17      A.   It did.
11:15:03  18          MR. DUNN:  Now, I need to correct the record.  The
11:15:06  19   previous and just played excerpt is at Defendants' 59, 24:51 to
11:15:12  20   26:13.
11:15:12  21   BY MR. DUNN:
11:15:14  22      Q.   Now, returning to the resource witness.
11:15:16  23          MR. DUNN:  That's at Defendants' Exhibit 59, 35:42 to
11:15:21  24   36:42.
11:15:21  25          (Video and audio start).
```

KATHLEEN A. SUPNET, CSR

11:15:31   1              *MALE SPEAKER 1:  Honestly, the work experience, how*

11:15:33   2              *long you have been with the AG's office, items*

11:15:37   3              *specifically for this project, would you go in*

11:15:40   4              *detail, starting today with your background, probably*

11:15:44   5              *going back to at least law school?*

11:15:48   6         *MALE SPEAKER 2:  I'd be happy to do that.*

11:15:50   7              *So, I started at the AG's office in June of last*

11:15:52   8              *year as an Assistant Attorney General, in the General*

11:15:55   9              *Counsel Division, was later promoted to General*

11:15:59  10              *Counsel.  Prior to that I worked as a staff attorney*

11:16:01  11              *at the Texas Supreme Court for about six and a half*

11:16:04  12              *years, and was a litigator at the AG's office in*

11:16:08  13              *private practice for few years before that.  Before*

11:16:11  14              *that, I did a clerkship on the 14th Court of Appeals*

11:16:15  15              *in Houston, and went to school law school at Baylor*

11:16:18  16              *Law School:*

11:16:18  17              *To answer your question, I was not hired*

11:16:21  18              *directly, really, to any redistricting projects.*

11:16:21  19         (Video and audio stop).

11:16:21  20    BY MR. DUNN:

11:16:26  21    Q.   What did you make of the qualifications and background

11:16:28  22    that the Attorney General lawyer stated at the committee

11:16:32  23    hearing?

11:16:32  24    A.   Well, I'm sure that he is a very fine lawyer, but it

11:16:37  25    seemed to me that he was coming to testify on a matter that he

| | | |
|---|---|---|
| 11:16:43 | 1 | didn't have a lot of experience in. |
| 11:16:46 | 2 |     Q.   Do you recall there was a discussion where the lawyer |
| 11:16:48 | 3 | was asked what kind of political or campaign experience he had? |
| 11:16:52 | 4 |     A.   Yes, I do. |
| 11:16:54 | 5 |     MR. DUNN:  For the record, that's Defendants' 59, |
| 11:16:58 | 6 | 36:42 to 38:00. |
| 11:16:58 | 7 |     (Video and audio start). |
| 11:17:02 | 8 |     SENATOR WHITMIRE:  Have you been employed by a |
| 11:17:04 | 9 |     campaign in your background? |
| 11:17:05 | 10 |     MALE SPEAKER:  Absolutely not. |
| 11:17:09 | 11 |     SENATOR WHITMIRE:  Fair to ask if you've volunteered |
| 11:17:12 | 12 |     in a campaign in the past? |
| 11:17:12 | 13 |     MALE SPEAKER:  I'm sorry.  Could you -- |
| 11:17:14 | 14 |     SENATOR WHITMIRE:  Have you volunteered in previous |
| 11:17:16 | 15 |     campaigns in your young adulthood? |
| 11:17:16 | 16 |     MALE SPEAKER:  I assume that the context of your |
| 11:17:24 | 17 |     questions is would be for General Paxton or any |
| 11:17:24 | 18 |     political candidate? |
| 11:17:27 | 19 |     SENATOR WHITMIRE:  No, anyone.  Are you -- I'm just -- |
| 11:17:27 | 20 |     MALE SPEAKER:  Okay. |
| 11:17:28 | 21 |     SENATOR WHITMIRE:  I think it's important for us to |
| 11:17:29 | 22 |     know when we have -- when in your position to know |
| 11:17:33 | 23 |     what you bring to the table, so education in real |
| 11:17:40 | 24 |     life experience work, in particular, this is so |
| 11:17:43 | 25 |     political, have you been involved in campaigns that |

DIRECT - POWELL                                          103

11:17:48    1           you can tell us about?

11:17:51    2           MALE SPEAKER:  I have been very intermittently

11:17:53    3           involved in campaigns in a volunteer capacity a

11:17:57    4           handful of times in the last ten.

11:18:01    5           SENATOR WHITMIRE:  So your answer is yes?

11:18:04    6              You know, it's not against the law.  I'm not

11:18:06    7           asking -- you don't have to take the Fifth Amendment.

11:18:09    8           I just 'think it's a fair question to know what your

11:18:12    9           work experience affiliations have been.

11:18:18   10              Thank you.

11:18:18   11           (Video and audio stop).

11:18:18   12    BY MR. DUNN:

11:18:18   13       Q.    What, if anything, worried you about this exchange?

11:18:24   14       A.    Well, it was clear that he had personal political

11:18:30   15    needs.

11:18:30   16       Q.    And we all do, is that your experience?

11:18:32   17       A.    It is my experience.

11:18:35   18       Q.    For our record, who was the Senator asking those

11:18:38   19    questions?

11:18:38   20       A.    That was Senator John Whitmire.

11:18:41   21       Q.    Have you been in committee -- I'm sorry -- have you

11:18:46   22    been in meetings where the Attorney General's office has sent a

11:18:48   23    resource lawyer?

11:18:49   24       A.    I have.

11:18:50   25       Q.    When that has happened, how would you describe some of

11:18:54  1    the experience and knowledge of the resource it sent?

11:18:58  2         A.   I would say, usually, that they had knowledge of the

11:19:03  3    subject matter and experience in that field.

11:19:06  4         Q.   Later, was there a discussion about who were the

11:19:12  5    lawyers in the Attorney General's office doing the legal

11:19:15  6    compliance check and working on redistricting?

11:19:17  7         A.   Yes, I did.

11:19:18  8              MR DUNN:  Defendants' Exhibit 59, 49:45 to 50:22?

11:19:18  9              (Video and audio played).

11:19:27  10             SENATOR *POWELL:  Um, do you happen to know who in your*

11:19:29  11             *office is involved in drawing district lines?  Who*

11:19:32  12             *specifically might be involved in it?*

11:19:37  13             *MALE SPEAKER:  So just to be clear on the question, no*

11:19:41  14             *one in our office is assigned to draw district lines.*

11:19:45  15             *Just to reframe it, if I can, in terms of our role in*

11:19:49  16             *providing legal advice, if you're looking for*

11:19:52  17             *specific names of who has been assigned to that work,*

11:19:56  18             *I'd be happy to provide that with you and get with*

11:19:59  19             *you.*

11:20:01  20             *SENATOR POWELL:  That would be great.  Thank you so*

11:20:01  21             *much.*

11:20:02  22             (Video and audio stopped).

11:20:02  23    BY MR. DUNN:

11:20:04  24         Q.   Were you ever provided the information you were

11:20:06  25    promised there?

DIRECT - POWELL                                                    105

11:20:06   1        A.   No, sir.

11:20:07   2        Q.   Now were there any other resource witnesses offered at

11:20:12   3   this hearing with respect to the Senate plan?

11:20:14   4        A.   I believe it was the demographer.

11:20:19   5        Q.   Was that the following day, the demographer came in?

11:20:20   6        A.   It might have been.

11:20:22   7        Q.   There were other outside experts that testified, do

11:20:26   8   you recall that?

11:20:26   9        A.   Yes.

11:20:29  10             MR. DUNN:  At Defendants' 59, 104 to -- 104:16 to

11:20:34  11   104:41.

11:20:34  12             (Video and audio played).

11:20:37  13             *LULAC PRESIDENT GARCIA:  You just -- the same thing*

11:20:39  14              *happened in District 10 in Fort Worth, where Black*

11:20:42  15              *and Brown districts are put in with White rural*

11:20:46  16              *districts.  You never see the other happen.  It's*

11:20:49  17              *only Anglo rural and suburban areas coming in and*

11:20:53  18              *scooping up Black and Brown voters in 10 or 20*

11:20:56  19              *percent increments, so they are effectively diluted*

11:20:56  20              *and cracked.*

11:21:01  21                  *What we've seen today --*

11:21:03  22             (Video and audio stop).

11:21:03  23   BY MR. DUNN:

11:21:04  24        Q.   Was that Domingo Garcia the LULAC National President?

11:21:08  25        A.   Yes, it is.

                        KATHLEEN A. SUPNET, CSR

11:21:09  1        Q.    Had you asked him to do that, show up at that meeting?

11:21:12  2        A.    No, I did not.

11:21:13  3        Q.    And was that statement he just made, made to all of

11:21:18  4   the senators present?

11:21:18  5        A.    Yes, it was.

11:21:19  6        Q.    Did he make other statements about Senate District 10?

11:21:23  7        A.    Yes, he did.

11:21:25  8              MR. DUNN:  At Defendants' 59, 105:52 to 106:41.

11:21:25  9              (Video and audio start).

11:21:36  10             *LULAC PRESIDENT GARCIA:  -- problems with Tarrant*

11:21:36  11             *County in District 10, there are African-American,*

11:21:39  12             *Latino districts are a cohesive group, primarily*

11:21:41  13             *concentrated on the -- in the City of Fort Worth and*

11:21:44  14             *on south side in Arlington.  Those districts on the*

11:21:47  15             *proposed map would be within rural, predominantly*

11:21:49  16             *White areas.*

11:21:51  17                 *Ranchers and farmers have nothing to do with*

11:21:54  18             *Texas Stadium, Ranger Stadium or Downtown Fort Worth*

11:21:58  19             *and the Stockyards.  They just don't.  And if you're*

11:22:00  20             *going to keep people of common interest together, you*

11:22:03  21             *should put them together.  Dallas and Fort Worth*

11:22:06  22             *could be merged; they're 20 miles apart, not a*

11:22:09  23             *problem, similar interest, similar urban and suburban*

11:22:12  24             *areas.  Why put them with Wise County, Decatur,*

11:22:16  25             *Texas, where you have more cows than people?  It*

DIRECT - POWELL                                                    107

11:22:20   1            *doesn't make sense, as opposed to what you have in*
11:22:22   2            *Dallas and Tarrant County.*
11:22:24   3            (Video and audio stop).
11:22:24   4   BY MR. DUNN:
11:22:24   5       Q.   And again, was that statement by Mr. Garcia made to
11:22:28   6   the senators present at the committee?
11:22:30   7       A.   Yes, sir.
11:22:30   8       Q.   Was there another outside legal expert, a Mr. Lee, who
11:22:34   9   came and spoke?
11:22:35  10       A.   Yes, he did.
11:22:38  11            MR. DUNN:  Defendants' Exhibit 59, 135:34 to 136:08.
11:22:44  12            And for the Courts' reference, Mr. Lee had a handout,
11:22:45  13             which has been admitted as Brooks' Exhibit 16.
11:22:45  14            (Video and audio played).
11:22:50  15            *SPEAKER LEE:  And I will note with respect to Senate*
11:22:53  16            *District 10, that Senate District 10 was found to*
11:22:54  17            *have been intentionally discriminatory last decade,*
11:23:00  18            *when the State also tried to redraw the district in a*
11:23:02  19            *way that cracked minority communities and diluted*
11:23:07  20            *their power.  In addition there's lots of evidence*
11:23:09  21            *that Senate District 10 is an effective coalition*
11:23:15  22            *district I am not here to say it is or not but*
11:23:18  23            *there's lots of evidence to suggest the state needs*
11:23:20  24            *to take a closer look.*
11:23:23  25            (Video and audio stopped).

KATHLEEN A. SUPNET, CSR

11:23:23   1   BY MR. DUNN:

11:23:23   2       Q.   And was that statement, again, by Mr. Lee, made to all

11:23:27   3   of the members of the Senate Redistricting Committee?

11:23:29   4       A.   Yes, it was.

11:23:30   5       Q.   And then was there a discussion or an exchange between

11:23:34   6   Senator Huffman and Mr. Lee about coalition districts?

11:23:38   7       A.   Yes, sir.

11:23:39   8            MR. DUNN:  That begins at Defendants' Exhibit 59,

11:23:43   9   147:19 and concludes at 149:07.

11:23:43  10            (Video and audio played).

11:23:43  11            *SENATOR HUFFMAN:  I'd like to -- in your testimony,*

11:23:51  12             *you referred to a Fifth Circuit 1998 case, Campos v.*

11:23:54  13             *City of Baytown, correct --*

11:23:56  14            *SPEAKER LEE:  That is correct.*

11:23:56  15            *SENATOR HUFFMAN:  -- is that what are you referring*

11:23:58  16             *to?*

11:23:58  17            *SPEAKER LEE:  Yes.*

11:23:58  18            *SENATOR HUFFMAN:  Yes.*

11:23:59  19                *How do you -- and you suggested it authorized or*

11:24:06  20             *required crossover coalition districts, how do you*

11:24:11  21             *square that with the Bartlett case, which is The*

11:24:14  22             *United States Supreme Court, 2009, Bartlett v.*

11:24:18  23             *Strickland, which made it clear that the Voting*

11:24:22  24             *Rights Act does not require the creation of coalition*

11:24:25  25             *of crossover districts?*

11:24:27  1          SPEAKER LEE:  Well, I think I would disagree with you

11:24:27  2      about what _Bartlett_ was about.  _Bartlett_ what about

11:24:31  3      crossover districts, in other words, where voters are

11:24:33  4      able to elect with support from White voters.  That's

11:24:37  5      a crossover district.  A minority coalition district

11:24:40  6      is where two or more minority groups are politically

11:24:43  7      cohesive.

11:24:44  8          So, in Texas, for example, Black and Latino

11:24:48  9      voters, you know, or in Fort Bend County, like Latino

11:24:51 10      Asian voters, might be politically cohesive, and so,

11:24:55 11      you know, _Bartlett_ is a case out of North Carolina,

11:24:57 12      it did not involve other non-White groups.  It was a

11:24:57 13      case about...

11:25:03 14          SENATOR HUFFMAN:  Well, I believe that _Bartlett_

11:25:04 15      specifically states that nothing in Section 2 grants

11:25:07 16      special protection to a minority group's right to

11:25:10 17      form political coalitions.  Do you agree...

11:25:13 18          SPEAKER LEE:  And I again I think that's talking about

11:25:15 19      White voters in this case.  It is not, you know

11:25:15 20      the...

11:25:21 21          SENATOR HUFFMAN:  And of course, there are many legal

11:25:23 22      scholars that would disagree with you on that.

11:25:26 23          SPEAKER LEE:  I don't think that that is really where

11:25:28 24      the law is currently.  And it's certainly not the --

11:25:32 25      well, I don't -- I don't think that that's where the

11:25:34  1              *law is.  If that is the advice that you're getting*

11:25:36  2              *from the Attorney General's office...*

11:25:39  3              SENATOR HUFFMAN:  *No, I'm getting if from the Supreme*

11:25:41  4              *Court of the United States of America, I just*

11:25:43  5              *politely disagree.  Thank you very much for answering*

11:25:46  6              *my question.  Appreciate it.*

11:25:47  7              (Video and audio stop).

11:25:47  8   BY MR. DUNN:

11:25:48  9        Q.   Now, Senator Powell, are you a lawyer?

11:25:51  10       A.   No, I'm not.

11:25:51  11       Q.   Was it clear to you that there was at least a

11:25:54  12  disagreement here over what the law said in this area?

11:25:56  13       A.   There is a disagreement there.

11:25:58  14       Q.   All right.  Now the hearing was held over the

11:26:01  15  following day, September 25th?

11:26:02  16       A.   Yes.

11:26:02  17       Q.   Did you attend that hearing?

11:26:04  18       A.   Yes.

11:26:04  19       Q.   You mentioned earlier a demographer was present at

11:26:09  20  part of the hearing.  Do you recall that?

11:26:10  21       A.   Yes.

11:26:11  22            MR. DUNN:  Defendants' Exhibit 61, 1:25:13 to 1:26:18.

11:26:11  23            (Video and audio start).

11:26:19  24            SENATOR ALVARADO:  *Start with the statewide numbers.*

11:26:21  25            *How did Texas' population change according to the*

11:26:24  1              *2020 Census?*

11:26:27  2              *SPEAKER POTTER:  Texas added more people than any*

11:26:29  3              *other state, just under 4 million, 3,999,944.  And*

11:26:39  4              *that's also a rapid increase.  We grew at a rate of*

11:26:44  5              *15.9 percent of the decade.  That's faster than any*

11:26:48  6              *other state, except for Idaho and Utah.*

11:26:53  7              *SENATOR ALVARADO:  What percentage of this growth does*

11:26:56  8              *Texans of color represent?*

11:26:59  9              *SPEAKER POTTER:  A little more than 95 percent of the*

11:27:01  10             *growth can be contributed to people who identify as*

11:27:06  11             *racial or ethnic minorities.*

11:27:08  12             *SENATOR ALVARADO:  Okay.  Of the nearly 4 million new*

11:27:11  13             *Texans, how many were non-Hispanic-White?*

11:27:16  14             *SPEAKER POTTER:  Of the almost 4,187,252 were*

11:27:21  15             *non-Hispanic-White.*

11:27:23  16             (Video and audio stop).

11:27:23  17  BY MR. DUNN:

11:27:24  18      Q.    And for clarity of the record, who's the Senator

11:27:26  19  asking the questions here?

11:27:27  20      A.    That's Senator Alvarado.

11:27:30  21      Q.    And was it the case then, the demographer, Mr. Potter,

11:27:34  22  provided this racial data, on at least growth information, to

11:27:38  23  all of the members of the committee?

11:27:39  24      A.    Yes, sir.

11:27:40  25      Q.    Then did the committee -- other events happened that

DIRECT - POWELL                                                     112

| | | |
|---|---|---|
| 11:27:43 | 1 | day, of course, but did the committee again meet again on |
| 11:27:46 | 2 | September 28th? |
| 11:27:47 | 3 | A.   Yes. |
| 11:27:49 | 4 | Q.   And at the beginning of that committee, do you recall |
| 11:27:51 | 5 | Senator Huffman again listing her priorities for the map? |
| 11:27:55 | 6 | A.   I do. |
| 11:27:58 | 7 | MR. DUNN:  This is at Defendants' Exhibit 63, 5:59 to |
| 11:28:03 | 8 | 6:45. |
| 11:28:09 | 9 | *SENATOR HUFFMAN:  We focussed on complying with all* |
| 11:28:11 | 10 | *applicable law, including the Constitution, the* |
| 11:28:14 | 11 | *Voting Rights Act and the requirements to equalize* |
| 11:28:17 | 12 | *district populations based on the 2020 Census,* |
| 11:28:20 | 13 | *focussed on keeping political subdivisions together,* |
| 11:28:24 | 14 | *keeping communities of interests together, preserving* |
| 11:28:26 | 15 | *the cores of existing districts, creating* |
| 11:28:31 | 16 | *geographically compact districts, addressing partisan* |
| 11:28:33 | 17 | *considerations, protecting incumbents, and when* |
| 11:28:35 | 18 | *possible, honoring reasonable requests made by* |
| 11:28:38 | 19 | *incumbent members.  These considerations have also* |
| 11:28:41 | 20 | *guided my approach to what proposed committee* |
| 11:28:43 | 21 | *amendments I'm able to support.* |
| 11:28:45 | 22 | *So the first amendment -- this first...* |
| 11:28:51 | 23 | (Video and audio stop). |
| 11:28:51 | 24 | BY MR. DUNN: |
| 11:28:51 | 25 | Q.   Was that the first time that you had heard |

KATHLEEN A. SUPNET, CSR

DIRECT - POWELL                                                      113

11:28:53   1    partisanship mentioned from Senator Huffman as a basis for her

11:28:57   2    plan?

11:28:58   3         A.   Yes, it was.

11:28:59   4         Q.   What had happened between the first time she had

11:29:01   5    mentioned her priorities into this time?

11:29:04   6         A.   Well, our map had dropped.  The changes in to Senate

11:29:11   7    District 10 continued to occur.

11:29:12   8         Q.   Had Senator Huffman heard from a number witnesses

11:29:15   9    during the committee?

11:29:15   10        A.   She heard hours of testimony from people in Senate

11:29:19   11   District 10.

11:29:19   12        Q.   And we've heard a bit of that in terms of these

11:29:22   13   experts that came, but describe generally what the other

11:29:24   14   testimony was like?

11:29:25   15        A.   Well, it was largely people who were expressing

11:29:38   16   they're thought that minority votes were being diluted, that

11:29:44   17   African-American and Hispanic and Asian voters were being

11:29:49   18   disenfranchised by the changes of this map, that we were

11:29:53   19   cracking apart areas of minority concentration, and half of

11:29:58   20   those were being submerged into -- or a portion of those were

11:30:03   21   being submerged into Senate District 9, Senator Kelly Hancock's

11:30:09   22   district, and the southern portion of Tarrant County was being

11:30:13   23   submerged into those seven rural, highly Republican, highly

11:30:18   24   Anglo populations, which to the voters of Tarrant County, to the

11:30:24   25   Hispanic and African-American and Asian voters of Tarrant

11:30:28   1    County, would leave them with no voice at the ballot box.

11:30:32   2        Q.   Were there a number of witnesses who came forward and

11:30:34   3    made comments similar to those that you've just described --

11:30:34   4        A.   Yes, sir.

11:30:38   5        Q.   -- with regards to Senate District 10?

11:30:39   6        A.   Yes, sir.

11:30:39   7        Q.   Now do you recall you had a discussion with Senator

11:30:42   8    Huffman in this committee meeting about why you got changes

11:30:46   9    because you were within deviation?

11:30:48  10        A.   Yes, sir.

11:30:49  11             MR. DUNN:  This is Defendants' 63, 20:14 to 21:05.

11:30:49  12             (Video and audio start).

11:31:00  13             *SENATOR HUFFMAN:  Under the fifth amendment proposes*

11:31:01  14              *changes to multiple districts in the DFW area.  In*

11:31:04  15              *testimony before this committee, Senator Powell*

11:31:06  16              *argued that we should not make changes to the*

11:31:11  17              *existing SD-10 because it has close to ideal total*

11:31:12  18              *population as currently configured, but this does not*

11:31:16  19              *account for the neighboring districts, including, for*

11:31:20  20              *instance, SD-8, which was overpopulated by 57,955;*

11:31:27  21              *SD-12, which was overpopulated by 146,201 or SD-30,*

11:31:33  22              *which was overpopulated by 87,087 people.  Shifts*

11:31:38  23              *throughout the DFW area needed to account for this*

11:31:40  24              *growth.  Based on this and other redistricting*

11:31:44  25              *objectives I discussed earlier, I proposed changes to*

DIRECT - POWELL                                                115

11:31:48   1            *SD-10.*

11:31:49   2            (Video and audio stop).

11:31:49   3    BY MR. DUNN:

11:31:49   4       Q.   Now what is your response to Senator Huffman's claim

11:31:52   5    that changes needed to be made to Senate District 10 to balance

11:31:56   6    population?

11:31:56   7       A.   Well, actually, I don't believe that's true.

11:31:58   8       Q.   Why not?

11:31:59   9       A.   Those changes could have occurred within -- within the

11:32:02  10    senate districts that were overpopulated and underpopulated.

11:32:06  11    They could have been absorbed by adjoining districts that were

11:32:13  12    underpopulated or overpopulated, and it didn't need to crack

11:32:18  13    apart those minority populations, in order to draw in a map in

11:32:30  14    which Senate District 10 continues to, in effect, act as a

11:32:38  15    coalition crossover district.  Those changes could've been made

11:32:43  16    easily.

11:32:43  17       Q.   Were there plans proposed during the debates that

11:32:47  18    balanced the population out in West Texas and the Panhandle and

11:32:51  19    left Senate District 10 alone?

11:32:53  20       A.   Yes.

11:32:53  21       Q.   Now, after -- the committee voted on the plan, I

11:32:57  22    assume?

11:32:57  23       A.   Yes.

11:32:58  24       Q.   And did it pass?

11:32:59  25       A.   Yes, it did.

DIRECT - POWELL                                        116

11:33:00  1        Q.    And then the Senate floor debate started on October

11:33:06  2    the 4th.  Does that sound right to you?

11:33:07  3        A.    Yes.

11:33:07  4        Q.    And were you there for that?

11:33:09  5        A.    Yes, I was.

11:33:10  6        Q.    At the beginning of the Senate floor debate, did

11:33:12  7    Senator Huffman again lay out her priorities that she alleged to

11:33:16  8    follow for the bill?

11:33:17  9        A.    She did.

11:33:18  10            MR. DUNN:  Defendants' Exhibit 65, :48 to 1:50.

11:33:18  11            (Video and audio start).

11:33:26  12       SENATOR HUFFMAN:  Ms. President and Members:

11:33:28  13            *Members, this is the Senate Bill, which draws our*

11:33:34  14            *new lines for the entire Senate.  We're going to call*

11:33:37  15            *this -- it's officially called Plan S2130, if you're*

11:33:43  16            *looking in District Viewer.  This Plan was developed*

11:33:45  17            *after the committee heard many hours of public*

11:33:47  18            *testimony and after I listened to each members*

11:33:51  19            *priorities and input about their respective*

11:33:54  20            *districts.*

11:33:55  21            *My goals and priorities in developing this*

11:33:58  22            *proposed Plan, included, first and foremost,*

11:34:01  23            *following all applicable law, equalizing population*

11:34:04  24            *across districts, preserving political subdivisions*

11:34:09  25            *and communities of interest, when possible,*

11:34:11  1              *preserving the cores of previous districts to the*

11:34:14  2              *extent possible, avoiding pairing incumbent members,*

11:34:19  3              *achieving geographic compactness and accommodating*

11:34:24  4              *incumbent priorities to the extent that I could.*

11:34:24  5                  *I also...*

11:34:28  6          (Video and audio stop).

11:34:28  7  BY MR. DUNN:

11:34:28  8      Q.    In that list of priorities, did Senator Huffman

11:34:33  9  mention partnership?

11:34:35 10      A.    She, did not.

11:34:36 11      Q.    Was there a discussion where you learned the

11:34:39 12  Lieutenant Governor was involved in drawing lines?

11:34:41 13      A.    Yes.

11:34:43 14          MR. DUNN:  This is Defendants' Exhibit 65, 7:31

11:34:48 15  through 7:57.

11:34:48 16          (Video and audio start).

11:34:52 17          *SENATOR POWELL:  Anyone besides Anne Mackin and Sean*

11:34:55 18          *Opperman and you provide input on the boundaries of*

11:34:58 19          *Senate District 10?*

11:35:00 20          *SENATOR HUFFMAN:  Occasionally, the Lieutenant*

11:35:02 21          *Governor would come in, but very rarely came in once*

11:35:04 22          *or maybe two or three times during the entire*

11:35:06 23          *process, as I'm sure any lieutenant governor in the*

11:35:09 24          *history of Texas would took -- take an interest in*

11:35:12 25          *the redrawing of Senate redistricting maps.*

DIRECT - POWELL                                                        118

11:35:16  1              (Video and audio stop).

11:35:16  2     BY MR. DUNN:

11:35:16  3        Q.    And your question there, were you specifically asking

11:35:18  4     about Senate District 10 lines?

11:35:21  5        A.    Yes.

11:35:21  6        Q.    And was the name that came to Senator Huffman's memory

11:35:27  7     and that she spoke was that the Lieutenant Governor would come

11:35:28  8     in and out of the room occasionally?

11:35:31  9        A.    Yes, it was.

11:35:31  10       Q.    Now did you have a discussion with Senator Huffman

11:35:34  11    about where the idea came from to make changes to Senate

11:35:38  12    District 10?

11:35:38  13       A.    I did.

11:35:40  14             MR. DUNN:  Defendants' Exhibit 65, 9:02 to 9:12.

11:35:40  15             (Video and audio start).

11:35:50  16             *SENATOR POWELL:  Did anyone ever suggest to you that*

11:35:53  17              *SD-10 be expanded beyond Tarrant County?*

11:35:57  18             *SENATOR HUFFMAN:  Not that I recall.*

11:35:59  19             (Video and audio stop).

11:35:59  20    BY MR. DUNN:

11:35:59  21       Q.    What did you make of Senator Huffman's statement

11:36:03  22    there?

11:36:04  23       A.    Well, I thought it was incredulous.

11:36:08  24       Q.    Why?

11:36:10  25       A.    That no one ever suggested that she expand Senate

KATHLEEN A. SUPNET, CSR

11:36:16  1    District 10 beyond the boundaries of Tarrant County, yet, she

11:36:20  2    cracked it in half and submerged the minority populations with

11:36:26  3    heavily rural districts to the south and a highly Anglo area to

11:36:33  4    the north.

11:36:34  5       Q.   Does the Texas Legislature typically pass legislation

11:36:39  6    without any interest group or citizen asking for it?

11:36:42  7       A.   No.

11:36:42  8       Q.   Do you recall a discussion on the floor about what

11:36:47  9    printed maps were available?

11:36:49  10      A.   Yes, I do.

11:36:50  11           MR. DUNN:  This is Defendants' Exhibit 65, 12:15 to

11:36:56  12   12:58.

11:36:56  13           (Video and audio start).

11:37:01  14           *SENATOR POWELL:  At the September 24th hearing, you*

11:37:03  15            *introduced the Senate Plan by reading allowed this*

11:37:06  16            *written and prepared remark, kind of like you did*

11:37:07  17            *here today; is that correct?*

11:37:10  18           *SENATOR HUFFMAN:  I don't recall, but I assume I*

11:37:12  19            *probably did, yes.*

11:37:14  20           *SENATOR POWELL:  Well, you said the following, and I*

11:37:15  21            *am going to quote this from your comments.*

11:37:18  22               *Quote:  My goals and priorities in developing*

11:37:21  23            *these proposed plans include first and foremost*

11:37:25  24            *abiding by of all applicable law, equalizing*

11:37:29  25            *population across districts, preserving political*

DIRECT - POWELL                                                    120

```
11:37:33   1              subdivisions and communities of interest, when
11:37:36   2              possible, preserving the cores of previous districts
11:37:40   3              to the extent possible, avoiding pairing incumbent
11:37:47   4              members, achieving geographic compactness, when
11:37:50   5              possible, and accommodating incumbent priorities,
11:37:55   6              also, when possible.  End quote.
11:37:58   7                  These were the goals that you followed in drawing
11:38:01   8              the districts; is that correct?
11:38:03   9              SENATOR HUFFMAN:  Legally speaking, yes.
11:38:03  10          (Video and audio stop).
11:38:05  11              MR. DUNN:  So, to correct the record, I must have
11:38:06  12     accidently deleted the maps portion and instead we played
11:38:10  13     Defendants' Exhibit 65, 17:02 to 18:09.
11:38:10  14     BY MR. DUNN:
11:38:15  15          Q.   You asked Senator Huffman again about her priorities
11:38:18  16     for the map; is that right?
11:38:18  17          A.   That's right.
11:38:19  18          Q.   Was there any mention in that exchange in her response
11:38:21  19     about partnership?
11:38:22  20          A.   No, there was not.
11:38:26  21          Q.   Okay.
11:38:26  22              MR. SWEETEN:  Your Honor, that misstates the record.
11:38:29  23     She just said partisanship.  Objection.
11:38:33  24              THE COURT:  Mr. Dunn?
11:38:35  25              MR. DUNN:  The record will reflect what it reflects.
```

KATHLEEN A. SUPNET, CSR

DIRECT - POWELL                                                    121

```
11:38:38   1    BY MR. DUNN:
11:38:39   2        Q.    There was a discussion also had about the 2012 court
11:38:42   3    decision; is that right?
11:38:42   4        A.    I'm sorry.  Could you please ask the question again.
11:38:49   5        Q.    Sure.  There was a discussion about the 2012 court
11:38:51   6    decision about Senate District 10?
11:38:52   7        A.    Yes.
11:38:52   8              MR. DUNN:  Oops.
11:39:01   9              This is 23:37 to 24:36 of Defendants' Exhibit 65.
11:39:01  10              (Video and audio start).
11:39:11  11              SENATOR POWELL:  And you have you read the 2012
11:39:13  12               preclearance decision from the D.C. Federal Court in
11:39:15  13               the Texas v. United States case?
11:39:19  14              SENATOR HUFFMAN:  Have I read it?  I probably have in
11:39:22  15               the past.  I don't want to say definitively, because
11:39:25  16               I don't recall if it's one I read it.
11:39:34  17              SENATOR POWELL:  Well, I would adhere that I provided
11:39:36  18               a copy of that decision to you when we met to preview
11:39:39  19               or proposed map; is that correct?
11:39:43  20              SENATOR HUFFMAN:  I recall you handing me a legal
11:39:46  21               document, yes.
11:39:47  22              SENATOR POWELL:  And you were on the Redistricting
11:39:49  23               Committee and voted to permanently adopt the
11:39:52  24               Court-ordered Plan; is that correct?
11:39:55  25              SENATOR HUFFMAN:  Are you talking back in 20- -- yes,
```

KATHLEEN A. SUPNET, CSR

11:39:56   1          *I was on the Redistricting Committee last time it*
11:40:00   2          *came before the Senate that year, yes.*
11:40:02   3          *SENATOR HUFFMAN:  And you voted to adopt the*
11:40:02   4          *Court-ordered Plan?*
11:40:05   5          *SENATOR HUFFMAN:  I did vote for the map, yes, I did.*
11:40:09   6          (Video and audio stop).
11:40:09   7   BY MR. DUNN:
11:40:10   8      Q.    What did you make of Senator Huffman not recalling the
11:40:14   9   2012 decision you provided?
11:40:15  10      A.    Well, I think that's an incredible statement.  I
11:40:19  11   don't -- having served on the 2011 Restricting Committee, and we
11:40:29  12   had provided that document to her.  I believe, we handed it to
11:40:34  13   her in person and again by email.  It had been discussed at
11:40:42  14   length during the entire redistricting process.  And I believe
11:40:48  15   that a prudent committee chairman of redistricting would want to
11:40:55  16   know all the facts.  I believe that because of the course of her
11:41:00  17   service, she would have read that.
11:41:02  18      Q.    Do you recall a discussion with Senator Huffman about
11:41:05  19   whether or not the core of districts had been preserved?
11:41:08  20      A.    That's right.
11:41:09  21          MR. DUNN:  This is Defendants' Exhibit 65, 37:52 to
11:41:13  22   38:49.
11:41:13  23          (Video and audio start).
11:41:18  24          *SENATOR POWELL:  All right.  Then I'm going to move on*
11:41:20  25          *to your criteria in preserving the core of previous*

KATHLEEN A. SUPNET, CSR

DIRECT - POWELL                                                123

11:41:24   1               districts.

11:41:26   2               SENATOR HUFFMAN:  Okay.

11:41:27   3               SENATOR POWELL:  Brown, Callahan, Shackelford,

11:41:29   4                Stephens, Palo Pinto, Parker and Johnson counties are

11:41:32   5                not part of core of the existing Senate District 10;

11:41:37   6                is that correct?

11:41:37   7               SENATOR HUFFMAN:  They're new areas to Senate District

11:41:40   8                10, yes.

11:41:41   9               SENATOR POWELL:  And so how does adding these seven

11:41:44  10                rural counties serve your goal of preserving the core

11:41:49  11                of Senate District 10?

11:41:49  12               SENATOR HUFFMAN:  The core is still there in Senate

11:41:52  13                District 10.  I believe your home is in Senate

11:41:55  14                District 10, is it not, Senator Powell?  I'm pretty

11:41:58  15                sure you believe you lived in the heart and soul of

11:42:00  16                Senate District 10, so your -- the core in my belief

11:42:02  17                is still there.  It is a Tarrant County based Senate

11:42:02  18                District.

11:42:11  19               SENATOR POWELL:  With seven rural counties added to

11:42:14  20                that urban area?

11:42:14  21               SENATOR HUFFMAN:  Correct.

11:42:14  22               (Video and audio stop).

11:42:14  23   BY MR. DUNN:

11:42:15  24      Q.    What is your response to Senator Huffman's claim that

11:42:16  25   the core had been retained in your district?

11:42:19  1        A.     Well, it absolutely had not.  The heart of the

11:42:25  2    district, the populations to the north of downtown Fort Worth

11:42:34  3    had been cracked out of the district and submerged in Senate

11:42:40  4    District 9, and the southern portion into those counties out to

11:42:44  5    the west and to the south.  And I think it's inconsequential

11:42:47  6    where I live in the district.  That doesn't make it the heart of

11:42:53  7    Senate District 10.  The heart of Senate District 10 are the

11:42:56  8    voters who reside in that district.

11:43:02  9        Q.     Did you also have a conversation with Senator Huffman

11:43:06 10    about the compactness and how compactness was or wasn't met?

11:43:08 11        A.     I did.

11:43:09 12               MR. DUNN:  Defendants' Exhibit 65, 40:45 to 41:32.

11:43:09 13               (Video and audio start).

11:43:18 14               SENATOR POWELL:  Looking at the map, would you assess

11:43:21 15                 that Senate District 10 in its current configuration

11:43:25 16                 is more compact than an SD-10 that goes nearly to

11:43:31 17                 Abilene and all the way to Brownwood, is that more

11:43:35 18                 compact than SD-10 is today?

11:43:38 19               SENATOR HUFFMAN:  It depends on how you define

11:43:41 20                 compactness and what the goals of the redistricting

11:43:43 21                 process were, how much population you needed, where

11:43:46 22                 you could find the population, other incumbents

11:43:50 23                 surrounding you and their interests had to be taken

11:43:54 24                 into account as well.

11:43:56 25               SENATOR POWELL:  Even if you didn't need any

11:43:58  1            *population?*

11:43:58  2            *SENATOR HUFFMAN:  Pardon?*

11:43:58  3            *SENATOR POWELL:  Even if you didn't need any*

11:43:58  4             *population?*

11:44:00  5            *SENATOR HUFFMAN:  Well, we believed you needed*

11:44:01  6             *population.*

11:44:02  7            *SENATOR POWELL:  Well, let's move on.*

11:44:04  8            *SENATOR HUFFMAN:  Okay.*

11:44:07  9            (Video and audio stop).

11:44:07  10  BY MR. DUNN:

11:44:08  11       Q.    Based on the information you had been provided by TLC,

11:44:12  12  did your district need population at that point?

11:44:14  13       A.    It did not.

11:44:30  14       Q.    And did you have again have a discussion with Senator

11:44:33  15  Huffman about the criteria she was following with regard to the

11:44:36  16  map?

11:44:36  17       A.    Yes, we did.

11:44:37  18            MR. DUNN:  Defendants' Exhibit 65, 41:33 to 42:45.

11:44:46  19            *SENATOR POWELL:  At the September 28th Committee*

11:44:48  20             *hearing, you said you were voting against my*

11:44:50  21             *amendment, sponsored by Senate Alvardo, to restore*

11:44:56  22             *SD-10 in order to accommodate your redistricting*

11:44:59  23             *criteria.  So which of the redistricting criteria,*

11:45:03  24             *that we just discussed, were you referring to when he*

11:45:07  25             *said that?*

DIRECT - POWELL                                                    126

11:45:10  1          *SENATOR HUFFMAN:  All of them.*

11:45:10  2          *SENATOR POWELL:  All of them.*

11:45:13  3              *Which redistricting criteria do you think would*

11:45:17  4           *serve that voting against that district.*

11:45:20  5          *SENATOR HUFFMAN:  I am sorry?  Which --*

11:45:21  6          *SENATOR POWELL:  Which redistricting criteria did you*

11:45:23  7           *think was served by voting against my amendment --*

11:45:26  8          *SENATOR HUFFMAN:  All of them.*

11:45:27  9          *SENATOR POWELL:  -- to keep SD-10 the same?*

11:45:31 10          *SENATOR HUFFMAN:  All of them were considered.*

11:45:33 11          *SENATOR POWELL:  All of them.*

11:45:33 12              *Well, what is the main reason then that you*

11:45:35 13           *changed SD-10 from its current configuration, where*

11:45:38 14           *it's based solely in Tarrant County and largely in*

11:45:41 15           *urban areas of Fort Worth and Arlington, to one that*

11:45:45 16           *includes now seven counties -- seven additional*

11:45:48 17           *counties?*

11:45:49 18          *SENATOR HUFFMAN:  All of the redistricting priorities*

11:45:50 19     *that I have previously stated, that you have stated as well.*

11:45:50 20          (Video and audio stop).

11:45:58 21     MR. DUNN:

11:45:58 22        Q.   Now Senator Huffman mentions all of them and you make

11:46:05 23     a face.  What is your response to that claim of hers?

11:46:06 24        A.   Well, I fundamentally disagree with that on its face.

11:46:12 25     Look at the map.  Look at the populations that are cracked out

DIRECT - POWELL                                              127

11:46:16   1   of the map and the populations in which they're submerged.

11:46:22   2          Would they be talking about communities of interest or

11:46:25   3   whether you're talking about incumbent issues, whether you're

11:46:30   4   talking about compactness, it is clear that this is not a

11:46:34   5   compact map, you know, to go from serving members of a district

11:46:43   6   that are in one county to now driving nearly to Abilene or

11:46:50   7   nearly to Brownwood in trying to connect those communities of

11:46:55   8   interest is complicated, as we've heard on here.  Those are more

11:47:02   9   agrarian societies that are now merged with a very urban

11:47:07  10   district that -- I said this before -- Fort Worth has over

11:47:14  11   85,000 students in their district, Mansfield some 55,000, I

11:47:17  12   believe, Arlington even larger than that, so we're talking about

11:47:23  13   going from serving a district that has very large urban

11:47:29  14   populations, very large school districts, highly related to

11:47:36  15   transportation and entertainment and to areas that are more

11:47:43  16   agrarian society.  They're not communities of interest.

11:47:48  17       Q.   Do you recall Senator Huffman on the floor discussing

11:47:52  18   what use she made of the racial shade maps?

11:47:56  19       A.   Yes.

11:47:58  20            MR. DUNN:  This is Defendants' Exhibit 65, 44:28 to

11:48:03  21   46:07.

11:48:03  22            (Video and audio start).

11:48:09  23            *SENATOR POWELL:  When we met, before you were released*

11:48:11  24             *the proposed Senate Plan, I showed you a map of SD-10*

11:48:17  25             *showing colored shading.  In fact, I showed you a*

11:48:20  1        *number of maps that were shading maps, where the*

11:48:23  2        *district minority populations were located, and you*

11:48:28  3        *initialed every single one of those maps with the*

11:48:31  4        *date on that, correct?*

11:48:33  5        *SENATOR HUFFMAN:  Senator Powell, we're going to --*

11:48:36  6        *we're going to -- I'm going to take you to task on*

11:48:37  7        *this one, because you and I both know I made it*

11:48:39  8        *perfectly clear that I was not considering racially*

11:48:43  9        *data.  You sat down and you handed me a document.  I*

11:48:47  10       *glanced at it for less than a second.  I did not know*

11:48:51  11       *what it was.  When I turned the page, I realized it*

11:48:54  12       *had racially data.  I turned it over flat, and I*

11:48:58  13       *said, I will not look at this.  You had four*

11:49:01  14       *others -- no, I'm going to finish -- and I had you*

11:49:04  15       *initial it, I initialled it.  I put it into a folder.*

11:49:09  16       *My staff did not look at it.  I did not look at it.*

11:49:13  17       *And I turned back -- that folder over to the Attorney*

11:49:16  18       *General's office okay.  Okay?*

11:49:18  19           *You're the one who gave it to me.*

11:49:18  20       *SENATOR POWELL:  That is correct.*

11:49:21  21       *SENATOR HUFFMAN:  I did not look at it.  I did not*

11:49:24  22       *read it and I did not glean one bit of information*

11:49:27  23       *from it.*

11:49:27  24       *SENATOR POWELL:  All right.*

11:49:28  25       *SENATOR HUFFMAN: So I'm trying to be very transparent*

| | | |
|---|---|---|
| 11:49:33 | 1 | *here, completely honest, but you need to be so, too.* |
| 11:49:37 | 2 | *SENATOR POWELL:  Oh, I am being honest.* |
| 11:49:38 | 3 | *SENATOR HUFFMAN:  Okay.  Well --* |
| 11:49:38 | 4 | *SENATOR POWELL:  I am being honest --* |
| 11:49:39 | 5 | *SENATOR HUFFMAN:  -- I just want to make it clear.* |
| 11:49:40 | 6 | *Thank you, Ms. Powell.* |
| 11:49:40 | 7 | *SENATOR POWELL:  -- I absolutely did lay that in front* |
| 11:49:40 | 8 | *of you --* |
| 11:49:40 | 9 | *SENATOR HUFFMAN:  Absolutely.  Thank you.* |
| 11:49:43 | 10 | *SENATOR POWELL:  -- and we dated them and initialed* |
| 11:49:44 | 11 | *them, both of them -- both of us did.* |
| 11:49:47 | 12 | *SENATOR HUFFMAN:  Correctly, yes.* |
| 11:49:47 | 13 | *SENATOR POWELL:  All right.* |
| 11:49:48 | 14 | (Video and audio stop). |
| 11:49:48 | 15 | BY MR. DUNN: |
| 11:49:49 | 16 | Q.   Do you recall that exchange of maps that Senator |
| 11:49:53 | 17 | Huffman has described it? |
| 11:49:54 | 18 | A.   Certainly, yes. |
| 11:49:55 | 19 | Q.   Do you recall the flipping over the pages quickly the |
| 11:49:59 | 20 | initialing, the not looking at it as she described it? |
| 11:50:03 | 21 | A.   What I recall of that event is that I handed her each |
| 11:50:08 | 22 | map individually.  I read the title of the map.  I told her what |
| 11:50:13 | 23 | the shading contained in each map.  Then she took -- she had all |
| 11:50:19 | 24 | of the maps together, and then she said, let's each initial |
| 11:50:23 | 25 | these maps, and she initialed them and handed that back to me |

DIRECT - POWELL                                                130

11:50:28  1   and I initialed them.  That entire transaction was far more than

11:50:34  2   one second.

11:50:36  3      Q.   Was it clear to you that she.

11:50:38  4           MR. SWEETEN:  Can you give the range of the clip you

11:50:43  5   just played?

11:50:43  6           MR. DUNN:  Sure.  Defendants' Exhibit 65, 44:28 to

11:50:49  7   46:07.

11:50:54  8           MR. SWEETEN:  Okay.

11:50:55  9   BY MR. DUNN:

11:50:56  10     Q.   Was it clear to you that Senator Huffman had time to

11:50:57  11  see and visualize and understand each of those maps?

11:51:02  12     A.   Yes.

11:51:04  13     Q.   Now there was another discussion about case law with

11:51:08  14  Senator Huffman on the Senate floor about the cases she was

11:51:13  15  relying on.  Do you recall that?

11:51:14  16     A.   Yes.

11:51:14  17          MR. DUNN:  This is Defendants' Exhibit 65, 52:43, to

11:51:23  18  52:58.

11:51:23  19          (Video and audio start).

11:51:26  20          *SENATOR POWELL:  Powell.  You've read the Cooper v.*

11:51:29  21          *Harris decision from the Supreme Court; is that*

11:51:29  22          *correct?*

11:51:31  23          *SENATOR HUFFMAN:  No.  I might have, I just don't know*

11:51:33  24          *the names, so I'm not going to say, yes, and pretend*

11:51:37  25          *to be an expert, because I don't know that specific*

DIRECT - POWELL                                                        131

| | |
|---|---|
| 11:51:40 | 1 |
| 11:51:40 | 2 |
| 11:51:41 | 3 |
| 11:51:41 | 4 |
| 11:51:45 | 5 |

11:51:40   1          *case.*

11:51:40   2               (Video and audio stop).

11:51:41   3   BY MR. DUNN:

11:51:41   4       Q.    Was *Cooper v. Harris* one of the cases she listed in

11:51:45   5   the committee hearing?

11:51:46   6       A.    Yes.

11:51:47   7       Q.    What did you make of the fact she wasn't sure if she

11:51:50   8   read them?

11:51:50   9       A.    I thought it was disingenuous.

11:51:53   10      Q.    Was there a discussion on the floor about whether or

11:51:56   11   not there's the existence of racially polarized voting or RPV in

11:52:02   12   Texas?

11:52:02   13      A.    Yes.

11:52:03   14           MR. DUNN:  Defendants' Exhibit 65, 52:9 to 53:19.

11:52:03   15           (Video and audio start).

11:52:11   16           *SENATOR POWELL:  Are you aware, then, that the courts*

11:52:13   17            *have repeatedly said that voting in Texas is racially*

11:52:17   18            *polarized with Anglo voters mostly supporting*

11:52:22   19            *Republicans and minority voters mostly supporting*

11:52:27   20            *Democrats?*

11:52:27   21           *SENATOR HUFFMAN:  I don't know that the courts have*

11:52:30   22            *said that.*

11:52:30   23           (Video and audio stop).

11:52:30   24   BY MR. DUNN:

11:52:34   25      Q.    Do you recall when the courts have said that as a

DIRECT - POWELL                                                    132

11:52:37  1    nonlawyer?

11:52:38  2        A.    Yes.

11:52:38  3        Q.    And have they?

11:52:39  4        A.    Yes.

11:52:39  5        Q.    What did you make about the fact that Senator Huffman

11:52:42  6    was unaware?

11:52:46  7        A.    Again, she's the Chairman of Redistricting.  She

11:52:51  8    should be aware of all of that and I believe that she is.

11:52:55  9        Q.    And then was there a discussion as to whether or not

11:52:58 10    the newly configured Senate District 10 would elect in your

11:53:02 11    election defeat?

11:53:03 12        A.    Yes.

11:53:04 13              MR. DUNN:  This is Defendants' Exhibit 65, 1:28:11 to

11:53:11 14    1:28:27.

11:53:11 15              (Video and audio start).

11:53:11 16              *MALE SPEAKER:  Your plan, I think that we've already*

11:53:19 17               *determined that Senate District 10 would probably not*

11:53:21 18               *be returning Senator Powell; is that accurate?*

11:53:25 19              *SENATOR HUFFMAN:  I do not know who the voters of*

11:53:28 20               *Senate District 10 will vote for.*

11:53:28 21              (Video and audio stop)

11:53:32 22    BY MR. DUNN:

11:53:32 23        Q.    Now did that make sense to you?

11:53:35 24        A.    No.

11:53:37 25        Q.    If partisanship was the goal, would you think Senator

11:53:44   1   Huffman would have known or had an expectation of how the

11:53:45   2   district was going to perform?

11:53:46   3        A.    I certainly think she would have an idea of what would

11:53:49   4   happen.

11:53:51   5        Q.    Now, ultimately, there was a number of amendments

11:54:05   6   processed and then voted on by the Senate; is that right?

11:54:07   7        A.    That's right.

11:54:08   8        Q.    Those are reflected in the record, but was there a

11:54:11   9   discussion Senator Huffman has about an amendment where she

11:54:14  10   describes the problems with it that related to what you thought

11:54:17  11   were the problems of Senate District 10?

11:54:20  12        A.    Yes.

11:54:21  13              MR. DUNN:   This is Defendants' Exhibit 69, 3:10 to

11:54:29  14   3:11.

11:54:29  15              (Video and audio start).

11:54:37  16              SENATOR *HUFFMAN:*  *Similarly, with respect to Senate*

11:54:37  17              *District 21, but also in many other areas of the*

11:54:40  18              *state, this proposal is not compact and combines*

11:54:44  19              *communities that have not been jointly represented in*

11:54:47  20              *the Senate in previous years.  While...*

11:54:51  21              (Video and audio stop).

11:54:51  22   BY MR. DUNN:

11:54:51  23        Q.    Now the explanation that Senator Huffman gives for

11:54:54  24   rejecting this amendment, what did you make of that?

11:54:57  25        A.    Well, compared to the new Senate District 10, the map

11:55:06  1    in question was far more compact than SD-10 is it is drawn

11:55:12  2    today.

11:55:13  3         Q.    Now, ultimately, the Senate voted on the bill; is that

11:55:17  4    right?

11:55:17  5         A.    That's right.

11:55:17  6         Q.    And did it pass?

11:55:18  7         A.    It did.

11:55:19  8         Q.    And did some Democrats vote for the bill?

11:55:26  9         A.    They did.

11:55:27  10        Q.    Some Democrats put a statement in the record

11:55:28  11   explaining their vote?

11:55:29  12        A.    They did.

11:55:29  13        Q.    And did anyone else vote against the bill?

11:55:33  14        A.    Yes.

11:55:34  15        Q.    Who was that?

11:55:34  16        A.    Senator Seliger.

11:55:37  17        Q.    Did you have anything to do with inducing him to make

11:55:40  18   that vote?

11:55:40  19        A.    I did not.

11:55:44  20        Q.    Take to you Exhibit 40, Brooks' Exhibit 40.

11:56:03  21              I've zoomed in to a list of senators names that made

11:56:06  22   this statement.  Let me know, take as much time as you need

11:56:10  23   there.  We can get you a copy.

11:56:23  24        A.    All right.  Just a list of senators.

11:56:25  25        Q.    Does that include the senators -- the democratic

11:56:29  1    senators who voted in favor of the plan?

11:56:31  2        A.    Yes, it does.

11:56:32  3        Q.    And then if you could just read the last sentence

11:56:45  4    here:  To the contrary?

11:56:47  5        A.    "To the contrary, we unanimously oppose specific

11:56:51  6    aspects of the plan, most notably, the defamation of Senate

11:56:59  7    District 10.

11:57:01  8        Q.    All right.  After the Senate passage of the bill moved

11:57:03  9    over to the House for consideration?

11:57:05  10       A.    Yes, it did.

11:57:06  11       Q.    And did you attend any of the House proceedings?

11:57:08  12       A.    I did not.

11:57:09  13       Q.    Did you provide some information to the House

11:57:11  14   Committee with respect to the Senate District 10 portion of the

11:57:15  15   plan?

11:57:15  16       A.    I did.

11:57:16  17       Q.    I'm going to show you what is marked as Exhibit 19?

11:57:53  18             All right.  Senator what is Exhibit 19?

11:57:59  19       A.    It is the packet of information on Senate District 10.

11:58:04  20       Q.    Does it appear to be addressed to all of the House

11:58:07  21   members that members of the House Redistricting Committee?

11:58:10  22       A.    Yes, it is.

11:58:11  23       Q.    And what were the informations you enclosed?

11:58:13  24       A.    I included the maps, the population map for Senate

11:58:22  25   District 10, a copy of the 2012 ruling, a copy of -- I believe a

DIRECT - POWELL                                                                136

11:58:33   1    copy of -- and a letter to Chairman Hunter.

11:58:54   2        Q.    And then do you also include, in the body of the email

11:58:58   3    itself, the same racial shaded map that you had shared with

11:59:04   4    Senator Huffman?

11:59:04   5        A.    Yes, I did.

11:59:05   6        Q.    Why did you do this?

11:59:06   7        A.    I felt that it was really important for the members of

11:59:12   8    the committee to have all of the data available on Senate

11:59:17   9    District 10, to understand the impact of cracking apart those

11:59:22  10    minority populations and submerging them into rural and

11:59:30  11    Republican counties.

11:59:31  12        Q.    Did you receive any response back to this email from

11:59:34  13    the Chair of the committee, Mr. Hunter -- Representative Hunter

11:59:39  14    or any of the other Republicans on the committee?

11:59:42  15        A.    No.

11:59:42  16        Q.    And when the bill went to the House floor, did you

11:59:46  17    send another correspondence?

11:59:48  18        A.    I did.

11:59:51  19        Q.    I'm showing you what has been admitted as Brooks'

11:59:54  20    Exhibit 20.

11:59:57  21              Is this the email you sent?

11:59:59  22        A.    It is.

11:59:59  23        Q.    And it's dated October 14th, 2021?

12:00:04  24        A.    Yes, it is.

12:00:05  25        Q.    And is it dated -- is it addressed to all of the

KATHLEEN A. SUPNET, CSR

12:00:08  1   members of the House?

12:00:09  2       A.   It is addressed to all of the members of the House.

12:00:14  3       Q.   Are you attaching the same information here that you

12:00:17  4   attached and provided to the House Committee members?

12:00:19  5       A.   I did.

12:00:20  6       Q.   And again, in the body of the email, do you include

12:00:24  7   the racial shade map?

12:00:26  8       A.   Yes, we did.

12:00:28  9       Q.   Did you receive any response from the Speaker or

12:00:31  10  Republican members of the House to this communication?

12:00:33  11      A.   Not -- not a word.

12:00:34  12      Q.   Why did you send this to all of the members of the

12:00:37  13  House?

12:00:37  14      A.   Again, I think that it is incumbent on members of the

12:00:42  15  Legislature to be well informed and to have the full knowledge

12:00:46  16  of the impact of a redistricting map like this on minority

12:00:52  17  populations.

12:00:52  18      Q.   Had you ever before sent a letter to every member of

12:00:59  19  the Texas House?

12:01:01  20      A.   No.

12:01:02  21      Q.   Now, transitioning to a different subject, before we

12:01:06  22  went on our break earlier, I showed you an email about enclosing

12:01:11  23  a plan for Mr. Opperman?

12:01:12  24      A.   Yes, sir.

12:01:13  25      Q.   And that email was dated September 18, 2021, and it

DIRECT - POWELL                                            138

12:01:17  1    showed Senator Opperman announcing a release of the proposed

12:01:20  2    Senate plan.  Do you remember that?

12:01:20  3        A.   Yes.

12:01:21  4             MR. DUNN:  For the record, that was Exhibit 15.

12:01:21  5    BY MR. DUNN:

12:01:24  6        Q.   We also discussed the release of the second version of

12:01:26  7    the plan, the night of the September 23rd, before the hearing.

12:01:29  8    Do you recall that?

12:01:30  9        A.   I do recall that.

12:01:31  10       Q.   I accidently gave you the wrong date on that email, so

12:01:34  11   I apologize for that.  Is it the case that the email we reviewed

12:01:36  12   in Exhibit 15 was the original plan that was emailed not the

12:01:40  13   version that came out the night of the committee hearing?

12:01:43  14       A.   Yes.

12:01:43  15       Q.   Did you have any -- you or your staff have any advance

12:01:46  16   notice of the plan that came out the night of the committee

12:01:50  17   hearing?

12:01:50  18       A.   Not a bit.

12:01:51  19       Q.   Now, the Court has heard some testimony about a

12:01:56  20   declaration that Senate Seliger has filed.  Are you aware of

12:02:00  21   this?

12:02:01  22       A.   I am aware of it.

12:02:02  23       Q.   Tell us how that declaration -- you know, how it is

12:02:03  24   that it came signed in your possession?

12:02:05  25       A.   My staff asked me if I would give Senator Seliger a

KATHLEEN A. SUPNET, CSR

12:02:16  1    call and ask him if he would consider, since he voted against

12:02:19  2    the map, if he would consider signing a declaration.  And so I

12:02:25  3    called him and he said, send it to me.  And so we sent him a

12:02:34  4    Word document of the declaration.  And that was the end of that

12:02:44  5    discussion.  Um...

12:02:44  6        Q.    Let me pause you there before you get to the rest of

12:02:47  7    it.

12:02:47  8              When you talked to him on the telephone that time, did

12:02:50  9    you have any substantive discussion of what he might say or want

12:02:54 10    him to say?

12:02:55 11        A.    I did not.

12:02:55 12        Q.    And so was it the sense from your side of the phone

12:02:59 13    call he didn't know, you know, what would be in the proposed

12:03:03 14    declaration?

12:03:03 15        A.    No, he didn't.

12:03:04 16        Q.    All right.  Now what happens next after that?

12:03:06 17        A.    And so I emailed him.  We emailed him a copy of a Word

12:03:12 18    document that was a declaration about just what had -- what

12:03:18 19    transpired when he voted against the bill.

12:03:20 20        Q.    Did you receive any response from him in terms of

12:03:23 21    email?

12:03:23 22        A.    No.

12:03:25 23        Q.    When did you --

12:03:25 24        A.    Not at that time.

12:03:26 25        Q.    When did you hear from him, if you did?

DIRECT - POWELL                                                    140

12:03:30   1        A.    He and I attended a friend's public education banquet.

12:03:40   2   I was receiving an award and he was the M.C. at the banquet.

12:03:45   3   And they seated us next to one another at the banquet.  I knew

12:03:52   4   he was going to be there, so I took a Word document with me to

12:03:55   5   the banquet, and I when I walked up to him, he said, I'm going

12:04:00   6   to sign your declaration; I'm going to sign your declaration.

12:04:06   7             MR. SWEETEN:  Objection, hearsay.

12:04:09   8             THE COURT:  All right.  We'll admit it subject to your

12:04:11   9   objection.

12:04:12  10   BY MR. DUNN:

12:04:15  11        Q.    What is the significance of having sent him the Word

12:04:15  12   document?  Why did you do that?  Why did you send him the Word

12:04:19  13   document, originally?

12:04:19  14        A.    I sent a Word document in case there was anything in

12:04:23  15   it that he didn't agree with, that he thought was untrue or

12:04:29  16   didn't represent the facts, so he could change it if he wanted

12:04:33  17   to.

12:04:34  18        Q.    So returning to the meeting in Waco, when he made

12:04:38  19   those statements you've already described, how is it that you

12:04:41  20   came into a possession of a signed version of the declaration?

12:04:44  21        A.    He said, I'm going to sign your declaration, and I

12:04:48  22   said, well, I brought a copy of the one that I emailed you, and

12:04:53  23   he said, great.  And so when dinner was over, I pulled that file

12:04:58  24   out of my bag and he signed it and we were done.

12:05:03  25        Q.    Now, one final area of inquiry.  At your deposition,

KATHLEEN A. SUPNET, CSR

12:05:08  1    you were shown a list of the senators that had voted for Senate

12:05:12  2    Bill 4.  Do you recall that?

12:05:13  3        A.   Yes.

12:05:14  4        Q.   And what were you asked to do with that list?

12:05:20  5        A.   Ask that again?  I am not understanding exactly what

12:05:24  6    I'm answering here.

12:05:25  7        Q.   What were you asked to do with the list of Senators?

12:05:28  8    What did the lawyer of the State can you to do when they gave

12:05:32  9    you that list of Senators?

12:05:34 10        A.   Oh, they asked me to circle names on that list that I

12:05:43 11    thought had discriminatory intent, I believe.

12:05:43 12        Q.   And what did you do in response to that request?

12:05:46 13        A.   I think I said that I would not speculate on the

12:05:52 14    motives of my colleagues.

12:05:54 15        Q.   Now, as part of -- you're a party to this lawsuit, do

12:05:58 16    you understand that?

12:05:58 17        A.   Yes, I do.

12:05:59 18        Q.   As part of your request to this Court, are you asking

12:06:02 19    it to find that Senate Bill 4 was adopted with a discriminatory

12:06:05 20    intent?

12:06:06 21        A.   I am asking that.

12:06:07 22        Q.   Why could you not circle some names on that list?

12:06:14 23        A.   As senators, we spend a lot of time together

12:06:18 24    throughout the year, and we develop personal relationships, and

12:06:23 25    that question felt really uncomfortable and kind of ugly to me.

| | | |
|---|---|---|
| 12:06:32 | 1 | It's not my nature to say, to someone, you're a racist, but |
| 12:06:42 | 2 | clearly, throughout the process, the Senate had the benefit of |
| 12:06:49 | 3 | all of the testimony and hearing folks from Senate District 10 |
| 12:06:54 | 4 | talk about how this map discriminated against them.  And I -- |
| 12:07:05 | 5 | its clear that this is discriminatory in its intent and its |
| 12:07:11 | 6 | effect. |
| 12:07:11 | 7 |     Q.    Senator, one last question.  Were you told the truth |
| 12:07:15 | 8 | about the reasons for changes to Senate District 10 at any point |
| 12:07:19 | 9 | in this process? |
| 12:07:20 | 10 |     A.    No. |
| 12:07:22 | 11 |         MR. DUNN:  Pass the witness. |
| 12:07:24 | 12 |         THE COURT:  Mr. Sweeten? |
| 12:07:28 | 13 |                 SENATOR BEVERLY POWELL, |
| 12:07:28 | 14 |             CROSS-EXAMINATION BY THE DEFENSE |
| 12:07:30 | 15 | BY MR. SWEETEN: |
| 12:08:01 | 16 |     Q.    Good morning, Senator Powell. |
| 12:08:03 | 17 |     A.    Good morning. |
| 12:08:03 | 18 |     Q.    I'm Patrick Sweeten.  We met last week -- |
| 12:08:06 | 19 |     A.    We did. |
| 12:08:07 | 20 |     Q.    -- at your deposition. |
| 12:08:09 | 21 |     A.    We did. |
| 12:08:10 | 22 |     Q.    I'm going to ask you some questions based on the |
| 12:08:13 | 23 | questions you were asked by counsel. |
| 12:08:15 | 24 |         Now, the first thing I want to ask you is the issue of |
| 12:08:22 | 25 | partisanship.  Let me get to the right page there. |

CROSS - POWELL                                                    143

12:08:28  1          You understood entering the redistricting session that

12:08:34  2     your district might be targeted for political purposes, correct?

12:08:40  3          A.   Well, according to Mr. Opperman --

12:08:43  4          Q.   It's a yes or no.

12:08:45  5          The question was, you understood entering

12:08:49  6     redistricting that your district might be targeted for political

12:08:53  7     purposes; that's what I asked you.

12:08:56  8          A.   Yes.

12:08:56  9          Q.   You did know that?

12:08:58  10         A.   That it made it, yes.

12:09:00  11         Q.   You understood that your district, SD-10, would be

12:09:06  12    targeted because you were a Democrat, correct?

12:09:08  13         A.   Yes.

12:09:08  14         Q.   You understood that the Texas Senate had Republican

12:09:13  15    majority, correct?

12:09:14  16         A.   Yes.

12:09:14  17         Q.   You understood and, in fact, that majority is 18/13

12:09:20  18    Republican, correct?

12:09:21  19         A.   Yes.

12:09:21  20         Q.   You understood that the Texas House had a Republican

12:09:25  21    majority also?

12:09:25  22         A.   Yes.

12:09:26  23         Q.   And that majority is 85/65 Republican, correct?

12:09:31  24         A.   Yes, I think so.

12:09:32  25         Q.   You understand that the statewide office holders, the

12:09:36  1    Lieutenant Governor is a Republican, correct?

12:09:38  2        A.    Yes.

12:09:39  3        Q.    You understood that the governor, Governor Greg

12:09:44  4    Abbott, Republican, correct?

12:09:45  5        A.    Yes, sir.

12:09:46  6        Q.    Now, I want to ask you about your attorneys in this

12:09:52  7    case.  Okay?

12:09:54  8              Now, you are a freshman Senator and we'll go over that

12:09:59  9    for a bit.  That's what you are?

12:10:00 10        A.    That's what I am.

12:10:02 11        Q.    And you would agree with me that you retained voting

12:10:07 12    rights attorneys, in January of 2021, to provide you

12:10:13 13    redistricting advice, correct?

12:10:16 14        A.    Yes.

12:10:17 15        Q.    Okay.  And those attorneys include the following

12:10:24 16    individuals:  Jerry Hiebert, correct?

12:10:27 17        A.    Not in -- not in January --

12:10:29 18        Q.    Okay.

12:10:30 19        A.    -- no.

12:10:30 20        Q.    Well, let's talk about it.

12:10:32 21              From January throughout the redistricting process, you

12:10:36 22    had redistricting attorneys that worked for you, correct?

12:10:39 23        A.    Yes.

12:10:39 24        Q.    That advised you, correct?

12:10:41 25        A.    Yes.

| | | |
|---|---|---|
| 12:10:42 | 1 | Q.   And those include Max Rene Hicks, a long time |
| 12:10:47 | 2 | redistricting attorney? |
| 12:10:48 | 3 | A.   Yes. |
| 12:10:48 | 4 | Q.   He provided you legal advice? |
| 12:10:50 | 5 | A.   We -- we retained him around January of 2021. |
| 12:10:54 | 6 | Q.   That includes Jerry Hiebert, who also is a voting |
| 12:10:58 | 7 | rights attorney, correct? |
| 12:10:59 | 8 | A.   Not to my knowledge, in January. |
| 12:11:01 | 9 | Q.   My question -- |
| 12:11:02 | 10 | A.   -- later on, yes. |
| 12:11:03 | 11 | Q.   My question was, from January to October of 2021 -- |
| 12:11:08 | 12 | A.   Oh, okay. |
| 12:11:09 | 13 | Q.   -- did you obtain legal advice from Jerry Hiebert? |
| 12:11:13 | 14 | A.   Yes. |
| 12:11:13 | 15 | Q.   Okay.  During that same time period, did you obtain |
| 12:11:17 | 16 | legal advice from Mr. Gaber, sitting at the table? |
| 12:11:20 | 17 | A.   Yes. |
| 12:11:20 | 18 | Q.   During that time period, did you obtain legal advice |
| 12:11:24 | 19 | from Mr. Dunn sitting at the table? |
| 12:11:26 | 20 | A.   Yes. |
| 12:11:26 | 21 | Q.   And that's through the session? |
| 12:11:27 | 22 | A.   Yes. |
| 12:11:28 | 23 | Q.   That's when you're planning this cross-examination of |
| 12:11:32 | 24 | Senator Huffman on floor? |
| 12:11:34 | 25 | A.   Yes. |

CROSS - POWELL                                                      146

12:11:35   1        Q.    It's throughout this lawsuit?

12:11:36   2        A.    Throughout the lawsuit.

12:11:38   3        Q.    A lawsuit you filed eight days after the Governor

12:11:43   4   signed SB4, correct?

12:11:49   5        A.    Yes.

12:11:49   6        Q.    Now, I want to ask you, who is paying for your

12:11:54   7   attorneys in this litigation?

12:11:55   8        A.    I am.

12:11:56   9        Q.    Is anyone else?

12:11:59   10       A.    Not so far.

12:12:00   11       Q.    Okay.  Have you asked someone else to pay those fees

12:12:04   12   or assist you with that?

12:12:05   13       A.    No.  I've raised funds in my campaign account, but I

12:12:11   14   have not.

12:12:12   15       Q.    Have you been given donations in your campaign account

12:12:15   16   for that purpose?

12:12:16   17       A.    There are some, yes.

12:12:17   18       Q.    And who gave you those?

12:12:19   19       A.    Senator Johnson gave us a donation and I am not aware

12:12:30   20   of exactly who else that I'm --

12:12:32   21       Q.    That's all you can tell the Court?

12:12:34   22       A.    That's right.  I'm not aware of who else.

12:12:36   23       Q.    How long did you prepare for the committee

12:12:47   24   examinations that you did of Senator Huffman?

12:12:54   25       A.    Maybe parts of day or so.

CROSS - POWELL                                                  147

12:13:00  1       Q.    And which attorneys assisted you with that?

12:13:04  2       A.    My chief of staff assisted me with that.

12:13:07  3       Q.    And which attorneys in addition to your chief of

12:13:10  4    staff?

12:13:10  5       A.    Just my chief of staff.

12:13:13  6       Q.    Do you know if your chief of staff liaised with

12:13:17  7    your -- the four attorneys -- with any of the four attorneys

12:13:21  8    that we discussed earlier?

12:13:25  9       A.    I'm not aware.

12:13:26 10       Q.    Okay.

12:13:26 11       A.    I assume so.

12:13:26 12       Q.    You assume so, that's yes?

12:13:29 13       A.    I know personally my chief of staff provided me with

12:13:32 14    that.

12:13:32 15       Q.    And you assume that your chief of staff liaised with

12:13:37 16    your attorneys that were advising you on redistricting, correct?

12:13:41 17       A.    Yes.

12:13:42 18       Q.    Okay.  So I want to talk to you about the Kel Seliger

12:13:56 19    affidavit.

12:13:58 20       A.    Okay.

12:13:58 21       Q.    First of all, Mr. Seliger -- it sounds like you

12:14:05 22    provided Mr. Seliger an affidavit, that was used in this case as

12:14:12 23    Defendants' Exhibit 1, at a function in Waco, correct?

12:14:15 24       A.    No, I emailed it to him.

12:14:17 25       Q.    Okay.  First you emailed it to him and then to obtain

KATHLEEN A. SUPNET, CSR

12:14:21  1    the signature, you show up at the event, correct?

12:14:25  2        A.   Yes.

12:14:26  3        Q.   Who drafted the affidavit?

12:14:28  4        A.   My chief of staff.

12:14:29  5        Q.   And with whose assistance?

12:14:34  6        A.   My chief of staff.

12:14:36  7        Q.   Senator Powell, the function that occurred, what we're

12:14:39  8    talking about, was in Waco on November 18th, is that what your

12:14:43  9    testimony was?

12:14:44 10        A.   I think so.

12:14:45 11        Q.   Now, I remember this date, and maybe you don't, but on

12:14:49 12    November 23rd, the night before Thanksgiving, was the night that

12:14:52 13    the preliminary injunction that you filed in this case was

12:14:55 14    filed.  Do you know that?

12:14:57 15        A.   I don't have the exact date, no.

12:15:00 16        Q.   Okay.  And you're saying that your chief of staff, by

12:15:04 17    himself, crafted the affidavit that was then -- you obtained a

12:15:09 18    signature for, and then it was utilized in a filing with this

12:15:13 19    Court, that's your testimony?

12:15:13 20        A.   It is.

12:15:14 21        Q.   Did he have assistance?

12:15:17 22        A.   He may have.  I don't know.

12:15:19 23        Q.   Mr. Seliger -- now, it's also the case, isn't it, that

12:15:28 24    in your deposition I asked you if you had received the e-mails

12:15:34 25    from Mr. Seliger?  Do you recall that question?

KATHLEEN A. SUPNET, CSR

CROSS - POWELL                                                    149

12:15:37  1        A.    Yes.

12:15:37  2        Q.    Your initial answer in sworn testimony in that

12:15:41  3   deposition was no?

12:15:42  4        A.    I do recall that.

12:15:43  5        Q.    And you recall the next thing was we pulled the email

12:15:47  6   out from Mr. Seliger with the affidavit sent to you, right?

12:15:50  7        A.    Yes, you did.

12:15:51  8        Q.    And you remembered it, didn't you?

12:15:53  9        A.    I did.

12:15:54  10        Q.    Okay.  Now, I want to pull up --

12:15:57  11             MR. SWEETEN:  If we could, page 65, line 18 of the

12:16:01  12   deposition, of Senator Powell.

12:16:17  13             And if you could zero in page 65, line 18, to page 66,

12:16:24  14   line 4.  Let's start here.

12:16:24  15   BY MR. SWEETEN:

12:16:27  16        Q.    Now, this is what Mr. Dunn was speaking with you

12:16:31  17   about, Senator Powell, on his last set of questions, correct?

12:16:38  18   And I handed you a list of those senators that voted for the

12:16:43  19   bill, correct?

12:16:43  20        A.    That's correct.

12:16:44  21        Q.    And you recall in the deposition that at one of the

12:16:47  22   first instructions that I gave you was that you are under oath?

12:16:51  23        A.    Yes.

12:16:51  24        Q.    Another of the instructions that I gave you was that

12:16:55  25   this could be played to the Court, right?

CROSS - POWELL                                                           150

12:16:57  1         A.    Yes.

12:16:58  2         Q.    Okay.  Told you both of those things, all right,

12:17:01  3    handed you the list of the 20 senators that voted for the bill,

12:17:06  4    and then when you --

12:17:07  5              And so I say:  "Is there a person on the yeas list,

12:17:12  6    and I'm going to give you a pen, and if you want to circle, is

12:17:16  7    there any person here that you believe acted with a purpose of

12:17:19  8    intentionally --

12:17:19  9              MR. SWEETEN:  And can we go on to the next page?

12:17:19 10    BY MR. SWEETEN:

12:17:24 11         Q.    -- discriminating in passing SB4?"

12:17:27 12              Answer:  "I would not speculate as to the motivations

12:17:29 13    of my colleagues."

12:17:30 14              That was your sworn testimony, wasn't it?

12:17:32 15         A.    Yes, sir.

12:17:33 16         Q.    All right.  Now I want to talk to you a little bit

12:17:45 17    about some meetings that you indicated that you had with Senator

12:17:53 18    Huffman's office.  Okay.

12:17:55 19              Now, first of all, we had testimony, and I think you

12:17:58 20    mentioned the testimony, that there was an initial meeting

12:18:03 21    with -- not with Senator -- not with Senator Huffman and not

12:18:07 22    with you in the room, but between one of your staffers

12:18:13 23    Mr. Svatora, correct?

12:18:14 24         A.    Yes.

12:18:14 25         Q.    Okay.  That is something that you've mentioned, and

KATHLEEN A. SUPNET, CSR

12:18:18  1    you would agree with me that that occurred a year and a half

12:18:22  2    before the session -- the redistricting session, the third

12:18:28  3    called session, correct?

12:18:28  4         A.   Yes.

12:18:29  5         Q.   You weren't there?

12:18:30  6         A.   No, I was not.

12:18:32  7         Q.   All right.  You then recounted a second meeting with

12:18:38  8    Senator Huffman, and I think at that time you indicated you had

12:18:41  9    a picture of a map that you showed this Court.  Do you remember

12:18:45  10   that?

12:18:45  11        A.   Yes.

12:18:45  12        Q.   Okay.  And you would agree with me that that picture

12:18:49  13   was simply -- that wasn't racial data or anything else -- it was

12:18:56  14   simply a map that showed the over-underpopulation of existing

12:19:01  15   Senate District 10, correct?

12:19:02  16        A.    It had statistics about the racial makeup of Senate

12:19:09  17   District 10 on it.  I don't recall specifically what you're

12:19:12  18   asking about it.

12:19:13  19        Q.   Okay.  Well --

12:19:14  20        A.    But I've seen the statistics in the box and the map.

12:19:20  21        Q.   All right.  So let's see if we can find that.

12:19:30  22             MR. DUNN:  It's Brooks' Exhibit 7.

12:19:30  23             MR. SWEETEN:  Okay.

12:19:37  24             MR. DUNN:  The clearer version is 9.  I don't know if

12:19:40  25   you'd like that, Mr. Sweeten.

12:19:40   1              MR. SWEETEN:  Thank you.  I'll use 7.

12:19:43   2              If we can pull up 7.  There we go.

12:19:45   3      BY MR. SWEETEN:

12:19:46   4         Q.   Now, look down.  I know it's a little hard to see.

12:19:48   5      It's a picture that you took in that meeting, correct?

12:19:51   6         A.   It's a picture that Mr. Jones took.

12:19:54   7         Q.   Your chief of staff took in the meeting?

12:19:56   8         A.   Yes.

12:19:56   9         Q.   And what this shows is the adjacent population,

12:20:02  10      whether they're over or under it -- one over or one under, north

12:20:04  11      of SD-10, correct?

12:20:10  12         A.   Could I -- where is this in here, because I can't see

12:20:16  13      that on my screen?

12:20:20  14         Q.   It's plaintiff's Exhibit 7.  It should be in one of

12:20:26  15      those books.

12:20:49  16         A.   I can see it now.

12:20:51  17         Q.   You can see those better now?

12:20:52  18         A.   This is better.

12:20:53  19         Q.   So let's take a look.  So the maps you said that you

12:20:57  20      were shown at that first meeting -- and let's get a date on that

12:21:01  21      first meeting that you attended.  Okay.  And as I understand it,

12:21:06  22      that was November 19th, 2020; is that right?

12:21:10  23         A.   Okay.

12:21:12  24         Q.   That's correct?

12:21:12  25         A.   I'll agree to that.

KATHLEEN A. SUPNET, CSR

12:21:14  1        Q.   All right.  And it was the meeting that you testified

12:21:18  2   you attended with Mr. Jones?

12:21:21  3        A.   Right.

12:21:22  4        Q.   Okay.  And you were shown these two maps?

12:21:25  5        A.   That is correct.

12:21:25  6        Q.   Now, these maps have a fairly limited purpose, right?

12:21:29  7   They're ACS 2014 to 2018, the 5-year estimates, that show the

12:21:36  8   existing populations of those districts based on population

12:21:39  9   growth or decrease, right?

12:21:41 10        A.   Right.

12:21:41 11        Q.   Okay.  So that's what you were shown in that second --

12:21:45 12   in that first meeting you attended, but the second one that

12:21:47 13   we've talked about today, you got it?

12:21:49 14        A.   Yes.

12:21:49 15        Q.   Very good.

12:21:51 16             Now, I want to talk about what was then the third and

12:21:55 17   final meeting that you had with Senator Huffman and that was on

12:21:59 18   September 14th, 2021, correct?

12:22:03 19        A.   Correct.

12:22:03 20        Q.   Now you would agree with me that that was six days

12:22:07 21   before the third special session began, that meeting?

12:22:11 22        A.   Yes.

12:22:11 23        Q.   Okay.  And would you agree with me that when you

12:22:17 24   walked in the room, displayed on the board, was the map that had

12:22:20 25   already been drawn?

CROSS - POWELL                                                    154

12:22:21  1        A.    Yes, sir.

12:22:21  2        Q.    All right.  And you looked at it and it had a

12:22:26  3   configuration of Tarrant County and it had also added two

12:22:31  4   additional counties to it, correct?

12:22:32  5        A.    That's correct.

12:22:32  6        Q.    And that I think you testified was -- ended up as Map

12:22:36  7   2101, correct?

12:22:38  8        A.    That's correct.

12:22:39  9        Q.    Now, you then indicated that at that time, you handed

12:22:46 10   over seven or eight maps that showed racial shading of Tarrant

12:22:53 11   County; you had Asian population, White population, Black

12:22:56 12   population, Hispanic population, right?

12:22:58 13        A.    That's correct.

12:22:58 14        Q.    All right.  Handed those over, after the map had been

12:23:02 15   constructed, though, the one that you're looking at on the wall?

12:23:06 16        A.    That's right.

12:23:07 17        Q.    All right.  Now, in that meeting with Senator Huffman

12:23:10 18   was Anne Mackin and Sean Opperman, correct?

12:23:13 19        A.    That's correct.

12:23:13 20        Q.    And I think you testified that Ms. Mackin said, I feel

12:23:17 21   uncomfortable?

12:23:18 22        A.    I think she did.

12:23:19 23        Q.    And that was when you handed over the map showing all

12:23:24 24   of the racial shading?

12:23:25 25        A.    I handed those maps over one by one --

KATHLEEN A. SUPNET, CSR

12:23:25  1        Q.     Okay.

12:23:27  2        A.     -- and cited the heading on each map as I handed them

12:23:32  3   to Senator Huffman.

12:23:34  4        Q.     Okay.  Very good.  And at that time, Senator Huffman,

12:23:36  5   being a judge, initialled those maps and had you initial them

12:23:42  6   and you-all both did that, correct?

12:23:43  7        A.     That's correct.  She would initial one map and handed

12:23:46  8   it to me and I would initial it.

12:23:46  9        Q.     Okay.

12:23:49 10        A.     And then she would take the second map, initial it and

12:23:52 11   hand it to me and I would initial it, and I gave them back to

12:23:57 12   her.

12:23:57 13        Q.     And you gave them back to her and she had those?

12:23:57 14        A.     Yes, sir.

12:23:58 15        Q.     Okay.  Again after the configuration that you already

12:24:02 16   were objecting to was shown to you, right?

12:24:05 17        A.     Yes.

12:24:05 18        Q.     Were you instructed to do that?

12:24:09 19        A.     No.  My chief of staff just said, I have these maps,

12:24:13 20   and that's what we did.

12:24:14 21        Q.     Okay.  Now, there was some conflicting testimony

12:24:18 22   earlier that I want to make sure that we're clear on.

12:24:21 23               The day before the Senate Committee hearing, there was

12:24:26 24   another map that was introduced, correct?

12:24:29 25        A.     Yep.

CROSS - POWELL                                                    156

12:24:30  1      Q.   And that map had additional drawings on it, correct,

12:24:37  2   additional changes to it, right?

12:24:38  3      A.   It did.

12:24:38  4      Q.   Now, one of the things that had not changed, however,

12:24:42  5   between your meeting on September 14th, 2021, and September 23,

12:24:50  6   2021, was the configuration of the district in Tarrant County?

12:24:56  7      A.   I believe that's correct.

12:24:57  8      Q.   Okay.  And, in fact, I think we can show you that,

12:25:00  9   just to confirm --

12:25:02  10     A.   I believe that's correct.

12:25:03  11     Q.   -- if we can look on the TLC website and do an overlay

12:25:08  12   of Plan S2101 and Plan S2108.

12:25:40  13          Okay.  Now, you're looking at the overlay between plan

12:25:45  14   2101 and 2108.  See that, in Tarrant County, that's what you are

12:25:53  15   focussing on?

12:25:54  16     A.   Okay.

12:25:55  17     Q.   It's an identical match, right?

12:25:57  18     A.   For Tarrant County --

12:25:57  19     Q.   For Tarrant County?

12:26:01  20     A.   -- for that portion of it?

12:26:02  21     Q.   Right.

12:26:02  22     A.   I think so.

12:26:03  23     Q.   Okay.  So, the original map that she showed you in her

12:26:07  24   office was the same map that was introduced just before the

12:26:14  25   first Committee hearing on this issue, correct?

KATHLEEN A. SUPNET, CSR

CROSS - POWELL                                                    157

12:26:14   1        A.    (No response).

12:26:20   2        Q.    In Tarrant County?

12:26:21   3        A.    In Tarrant County, thank you.

12:26:23   4        Q.    Okay.  Very good.

12:26:25   5              Now, you said that you drafted a letter that was then

12:26:50   6   sent to Senator Huffman sometime after that, correct?

12:26:54   7        A.    Yes.

12:26:54   8        Q.    And enclosed with that letter, you said that you had a

12:26:59   9   case, correct, that you utilized a case that was attached to

12:27:04  10   that letter.  Am I getting that right?

12:27:05  11        A.    I utilized a case.

12:27:07  12        Q.    There was a reported case that you attached?

12:27:10  13        A.    Oh, a legal case.

12:27:13  14        Q.    That's right.

12:27:14  15        A.    Yes.

12:27:14  16        Q.    Okay.  And I understand you're not a lawyer, correct?

12:27:17  17        A.    I am not.

12:27:18  18        Q.    Okay.  All right.  But you were also -- I mean, I

12:27:22  19   assume you don't know, one way or the other, how complicated

12:27:27  20   voting rights jurisprudence is.  Do you know how complicated it

12:27:32  21   is?

12:27:32  22        A.    I do now.

12:27:33  23        Q.    Okay.  And you had ample counsel to assist you now,

12:27:37  24   haven't you?

12:27:37  25        A.    I do.

12:27:39  1      Q.    Okay.  All right.  Now, you were -- and we'll go back

12:27:47  2   to that -- but you were critical of the Office of the Attorney

12:27:53  3   General, on some of that Committee -- some of the committee

12:27:58  4   questioning, in particular, one of the resource witnesses you

12:28:01  5   had some criticism about and then you also have some criticism

12:28:05  6   about the fact that you were not told directly who, from the

12:28:09  7   Office of Attorney General, assisted in counseling the Senator,

12:28:15  8   right?

12:28:15  9      A.    Right.

12:28:15 10      Q.    Those were your two primary criticisms of my office,

12:28:21 11   right?

12:28:21 12      A.    Right.

12:28:21 13      Q.    Now, you would agree with me in the Office of the

12:28:26 14   Attorney General, we constitutionally, we represent state

12:28:28 15   officers when they request assistance, right?

12:28:31 16      A.    Yes.

12:28:31 17      Q.    You understand that goes both ways.  Cases that

12:28:35 18   involve democratic members will often ask our office to assist

12:28:39 19   them, and then other -- and sometimes leadership and other

12:28:43 20   people will ask for our assistance, that's not uncommon.  We are

12:28:46 21   the law firm for the State, right?

12:28:48 22      A.    Right.

12:28:49 23      Q.    And you were given the name of the individual who, at

12:28:55 24   that hearing, an individual that provided consultation to

12:28:58 25   Senator Huffman, that was given publicly in that hearing, wasn't

12:29:01  1    it --

12:29:01  2         A.    The one gentleman --

12:29:01  3         Q.    Yeah.

12:29:03  4         A.    -- who testified as an expert witness.

12:29:05  5         Q.    No.  I'm talking about the person -- are you saying

12:29:09  6    that you were never given the name, in a public forum --

12:29:13  7         A.    Oh, I see.

12:29:14  8         Q.    -- of an attorney that provided advice to the Senate?

12:29:20  9         A.    I'm -- I certainly was witness to his testimony, yes.

12:29:27  10        Q.    Okay.  Sorry.  We're not -- we're talking past each

12:29:27  11   other.

12:29:27  12        A.    I (indiscernible) --

12:29:31  13        Q.    I'm not talking about the resource witness now.  I'm

12:29:34  14   talking about you asked a question and Mr. Dunn showed a

12:29:37  15   videotape of it, you asked a question about who provided legal

12:29:42  16   counsel from the Office of Attorney General --

12:29:44  17        A.    Yes, I did ask that question, yes, sir.

12:29:45  18        Q.    And you got the answer in that hearing, didn't you?

12:29:48  19        A.    No, I didn't think I did.

12:29:50  20        Q.    Okay.  We'll look at that, then, in a minute.

12:29:52  21              So you don't think you got that answer?

12:29:54  22        A.    I didn't think I got the answer to that.

12:29:54  23        Q.    Okay.

12:29:56  24        A.    I thought she said that's privileged.

12:30:00  25        Q.    Now, you understand that the Office of the Attorney

CROSS - POWELL                                                  160

12:30:04  1    General did provide a resource witness at that hearing?

12:30:08  2        A.   That hearing, yes.

12:30:09  3        Q.   In addition, at that hearing, was a state demographer,

12:30:14  4    participated, correct?

12:30:15  5        A.   Yes.

12:30:15  6        Q.   One of the Brennen center experts, that works for the

12:30:23  7    Brennan Center, Michael Lee, came in and testified about his

12:30:27  8    view of this?

12:30:27  9        A.   He did.

12:30:28  10       Q.   Okay.  Domingo Garcia, former Congressional candidate,

12:30:37  11   came in and testified about his views?

12:30:39  12       A.   Yes, he did.

12:30:39  13       Q.   Okay.  Senator Whitmire, you, others had the

12:30:43  14   opportunity to ask lots of questions of any of the members that

12:30:46  15   you wanted to, correct?

12:30:47  16       A.   Correct.

12:30:48  17       Q.   You weren't limited in time to do that.  You asked all

12:30:53  18   of the questions you wanted to ask; is that --

12:30:54  19       A.   I did.

12:30:55  20       Q.   Now, with respect -- I think you were critical of

12:31:24  21   Senator Huffman for not having read a decision.  You and

12:31:30  22   Mr. Dunn talked about that and you made much of that?

12:31:36  23       A.   I answered his question, yes.

12:31:38  24       Q.   Okay.  You were critical of it, weren't you?

12:31:39  25       A.   I am critical of it.

KATHLEEN A. SUPNET, CSR

CROSS - POWELL                                                    161

12:31:41  1      Q.   And you -- and you've had now a year-long campaign on

12:31:47  2  the Senate District 10 to forward your view, are you familiar

12:31:53  3  with some of the seminal cases in this area?

12:31:57  4      A.   I am aware of the 2012 case, but I am not aware of

12:32:02  5  other cases.  I'm aware they exist.  I have not read them nor

12:32:07  6  have I formed an opinion about them.

12:32:09  7      Q.   Have you read *Brnovich v. Democratic National*

12:32:13  8  *Committee*, which says:  Partisan motives are not the same as

12:32:16  9  racial motives?

12:32:17 10      A.   No, I haven't.

12:32:18 11      Q.   *Miller v. Johnson*:  The good faith of the State

12:32:21 12  Legislature must be presumed.

12:32:23 13           Have you read that one?

12:32:24 14      A.   No, I haven't.

12:32:25 15      Q.   *Personnel Administrator of Massachusetts v. Feeney*,

12:32:28 16  that says:  Discriminatory purpose implies more than intent as

12:32:31 17  volition or intent as awareness of consequences.  It implies the

12:32:35 18  decision-maker selected or reaffirmed a particular course of

12:32:37 19  action, at least in part because of, not merely in spite of, its

12:32:42 20  adverse effects on an identifiable group.

12:32:46 21           Are you familiar with that holding?

12:32:48 22      A.   I have not read that.

12:32:49 23      Q.   *Hunt v. Cromartie*, have you heard of that?

12:32:53 24      A.   No, sir.

12:32:55 25      Q.   Now, you made much of the court decision, that the

12:33:02  1    *Davis* opinion from 2012 -- right --

12:33:06  2        A.   Yes, sir.

12:33:06  3        Q.   -- you said that had been decided and intentional

12:33:09  4    discrimination had been found, right?

12:33:11  5        A.   Yes, sir.

12:33:11  6        Q.   Okay.  Let's talk about that case for a minute and a

12:33:14  7    few differences or a few issues with that case.

12:33:18  8             First of all, that was decided, don't you agree, of

12:33:21  9    Section 5 of the Voting Rights Act?

12:33:23  10       A.   Yes.

12:33:24  11       Q.   Section 5 has been held by the Supreme Court,

12:33:28  12   particularly, the coverage in section 4 that applied to it, to

12:33:31  13   being unconstitutional, correct?

12:33:33  14       A.   Sir, I'm, not a constitutional expert.  I can't speak

12:33:37  15   to that.

12:33:38  16       Q.   Okay.  Well, that's fair enough, but let me ask you

12:33:41  17   just a couple of more questions, see what you know about it,

12:33:43  18   because you've certainly talked about it on direct.  Okay?

12:33:45  19       A.   Okay.

12:33:45  20       Q.   And one of these questions is this.  Do you know what

12:33:47  21   the standard of proof is or was under the now and constitutional

12:33:51  22   Section 5?

12:33:52  23       A.   I do not.

12:33:53  24       Q.   Do you know that Texas had the burden of proof to

12:33:55  25   prove nondiscrimination.  If it's facts and intent, they had the

12:34:01  1   burden to prove that, did you know that?

12:34:02  2       A.   I do not.

12:34:03  3       Q.   Do you know the venue of that was in D.C.?

12:34:07  4       A.   I do not.

12:34:09  5       Q.   Do you know that that court found there was not --

12:34:11  6   that Senate District 10 was not a coalition district?

12:34:14  7       A.   I did not.

12:34:15  8       Q.   Now, it's the -- I know you're a freshman Senator, but

12:34:26  9   I it's the case and you know this, that typically the way

12:34:32 10   redistricting works is that the Senate primarily works on the

12:34:37 11   crafting the lines of the Senate map and House primarily works

12:34:41 12   on the crafting the lines of the House, correct?

12:34:44 13       A.   Correct.

12:34:44 14       Q.   Okay.  That's the way it works typically, right.

12:34:48 15   Okay.

12:34:48 16            Now, the Seliger affidavit, are you familiar with the

12:35:03 17   fact that it was entered as Exhibit 1, in your case, and it was

12:35:08 18   cited in bold on the first page of the response to the PI?

12:35:13 19       A.   I am.

12:35:13 20       Q.   Okay.  And are you familiar -- have you had the

12:35:16 21   opportunity to review his testimony in this case?

12:35:20 22       A.   Yes, I have.

12:35:20 23       Q.   Okay.

12:35:22 24       A.   Oh, I'm sorry.  His testimony...

12:35:23 25       Q.   In this case.

CROSS - POWELL                                          164

12:35:24  1        A.   No, I have not.  I'm sorry.  I have not.

12:35:27  2        Q.   Fair enough.

12:35:27  3        A.   I have not.

12:35:28  4        Q.   Now, I want to go through some additional questions

12:35:31  5   with you.  So it's clear on the record, you were the Democratic

12:35:47  6   Representative for SD-10 Fort Worth?

12:35:50  7        A.   That's correct.

12:35:50  8        Q.   And you're not African-American and you're not Latino?

12:35:55  9        A.   I'm not any one of those.

12:35:56  10       Q.   You're not Asian?

12:35:58  11       A.   I'm not Asian.

12:36:00  12       Q.   You were first elected in 2017?

12:36:03  13       A.   That's correct.

12:36:03  14       Q.   And you took office in January and you're closing out

12:36:07  15   the end of your first term, correct?

12:36:10  16       A.   I am.

12:36:11  17       Q.   Are you campaigning now?

12:36:13  18       A.   No, I'm not.

12:36:14  19       Q.   Have you filed for re-election --

12:36:17  20       A.   Yes, I have.

12:36:18  21       Q.   -- for Senate District 10?

12:36:21  22            Now, when you ran for the first time -- excuse me --

12:36:26  23   was in 2018, against Konni Burton, correct?

12:36:31  24       A.   Correct.

12:36:32  25       Q.   And she was the incumbent Republican?

CROSS - POWELL                                                    165

12:36:35  1        A.    She was.

12:36:36  2        Q.    And it was a fairly close race?

12:36:39  3        A.    It was.

12:36:40  4        Q.    And it happened to be a very good year for Democrats,

12:36:45  5   2018?

12:36:46  6        A.    It was a good year.

12:36:47  7        Q.    Some have called it a blue wave?

12:36:50  8        A.    Some have.

12:36:51  9        Q.    Some have called it a blue tsunami?

12:36:56 10        A.    Some have.

12:36:57 11        Q.    That was the year that Senator Cruz and Senator

12:37:02 12   O'Rourke had a very close race within two percentage points were

12:37:08 13   statewide -- for a statewide election, you would agree with me,

12:37:11 14   that was pretty close, that was pretty unusual?

12:37:14 15        A.    Yes, I think so.

12:37:17 16        Q.    And your seat during that election, was not the only

12:37:22 17   game that Texas Democrats made in State Senate that year, right?

12:37:26 18        A.    That's right.

12:37:27 19        Q.    Nathan Johnson defeated the Republican incumbent Don

12:37:31 20   Huffines, didn't he?

12:37:32 21        A.    That's correct.

12:37:33 22        Q.    Now, you'd agree that Tarrant County is primarily a

12:37:53 23   Republican county?

12:37:54 24        A.    I don't think that's true anymore.

12:37:56 25        Q.    Okay.  Who is the County Judge of Tarrant County?

KATHLEEN A. SUPNET, CSR

CROSS - POWELL                                                    166

```
12:38:01   1        A.    Judge Glenn Whitley.

12:38:03   2        Q.    And Mr. Whitley, he's been elected since 2007, hasn't

12:38:07   3   he?

12:38:07   4        A.    I think that's right.

12:38:09   5        Q.    He's a Republican?

12:38:10   6        A.    He is a Republican.

12:38:11   7        Q.    If Mr. Brooks, now I assume you defer a little bit to

12:38:19   8   Mr. Brooks, but if he believes it's a Republican, would you

12:38:24   9   disagree with that?

12:38:25  10        A.    I do disagree with that.

12:38:26  11        Q.    Now, in SD-10, you would agree with me that the last

12:38:31  12   six contests for SD-10, Republicans one half of those and

12:38:35  13   Democrats won half of those?

12:38:38  14        A.    I think that's a fair analogy.

12:38:40  15        Q.    I'm going to take a quick look at those contests.

12:38:44  16              And I'm going to put up Defendants' Exhibit Number 18

12:38:48  17   at 1, please.  All right.

12:38:53  18              I'm going to show you, these are documents from the

12:38:55  19   Secretary of State's office, and this is 2002, general election

12:39:00  20   11-5, 2002, do you see that on top?

12:39:04  21        A.    I do.

12:39:04  22        Q.    If we can turn to Senate District 10 in that race.

12:39:16  23              All right.  Would you agree that those election

12:39:20  24   results show that in 2002, Kim Brimer beat Hal Ray, the

12:39:32  25   Democrat --
```

CROSS - POWELL                                                       167

12:39:32   1        A.   I see that.

12:39:33   2        Q.   -- 58.71 39.93 percent?

12:39:33   3        A.   I see that.

12:39:34   4        Q.   Sound beating there by almost 20 percent points,

12:39:36   5   right?

12:39:37   6        A.   Yes.

12:39:38   7        Q.   Well, that's a sound beating, isn't it?

12:39:40   8        A.   Yes, it is.  I'm just doing your math.

12:39:54   9             MR. SWEETEN:  Let's go to the next page.  If we could,

12:39:56  10   the next race.

12:40:07  11   BY MR. SWEETEN:

12:40:08  12        Q.   You can see where it says Race Summary Report 2004

12:40:10  13   General Election, correct?

12:40:11  14        A.   Yes.

12:40:12  15        Q.   And if we move to the bottom of the next page, it says

12:40:14  16   Senate District 10, right?

12:40:15  17        A.   Right.

12:40:16  18        Q.   In that race, the Republican incumbent Kim Brimer

12:40:21  19   defeated Democratic candidate Andrew Hill, right?

12:40:23  20        A.   That's correct.

12:40:24  21        Q.   Brimer won the seat 59.25 percent to 40.75, right?

12:40:29  22        A.   That's right.

12:40:29  23        Q.   About a 19 point spread?

12:40:32  24        A.   About.

12:40:32  25        Q.   Let's move to the '08 election.  We turn to page five.

KATHLEEN A. SUPNET, CSR

CROSS - POWELL                                                                    168

12:40:36  1    We can see it says Race Summary Report '08 General Election.

12:40:41  2        A.   That's correct.

12:40:42  3        Q.   Going to the next page, you see where it says Senate

12:40:46  4    District 10, right?

12:40:46  5        A.   I do.

12:40:47  6        Q.   And here we have long-term Republican incumbent Kim

12:40:53  7    Brimer against Democrat Wendy Davis; is that right?

12:40:55  8        A.   Yes.

12:40:55  9        Q.   And in upset victory, Davis beats Kim Brimer, correct?

12:41:01  10       A.   That's correct.

12:41:02  11       Q.   All right.  And it was a 2.4 percent margin in that

12:41:06  12   win, right?

12:41:07  13       A.   Right.

12:41:07  14       Q.   Let's go to the 2012 election now.  And the race

12:41:12  15   summary report for '12 general election, you can see where it

12:41:16  16   says State Senate District 10, right?

12:41:19  17       A.   I see it.

12:41:20  18       Q.   And you would agree that the Democrat incumbent Davis

12:41:23  19   ran against Republican Mark Shelton, right?

12:41:25  20       A.   Right.

12:41:25  21       Q.   And she beat him 51.12 percent to Mr. Shelton's 48.88

12:41:33  22   right?

12:41:34  23       A.   That's correct.

12:41:34  24       Q.   All right.  I believe the margin is 2.24 percent,

12:41:37  25   right?

CROSS - POWELL                                                    169

12:41:37   1        A.    Right.

12:41:38   2        Q.    And then we can go one more, which is the '14

12:41:42   3   election.  You can see where it says Race Summary Report for the

12:41:45   4   '14 general?

12:41:46   5        A.    Correct.

12:41:46   6        Q.    And you would agree that it says that Konni Burton,

12:41:51   7   Republican, ran against the Democratic Candidate Libby Willis?

12:41:54   8        A.    Yes.

12:41:55   9        Q.    And Ms. Burton won that election contest 52.83 percent

12:42:03  10   of the vote compared to Willis's 44.72, right?

12:42:05  11        A.    I see that.

12:42:07  12        Q.    And then I think we've talked about your election, but

12:42:09  13   you wouldn't not disagree that Konni Burton, that you defeated

12:42:14  14   her 51.73 to 48.27, correct?

12:42:20  15        A.    I wouldn't disagree with that.

12:42:24  16        Q.    Okay.  Very good.

12:42:25  17              Now, I want to go back to your declaration, which I

12:42:28  18   think was talked about.

12:42:31  19              MR. SWEETEN:  If we could pull, Mr. Christopher,

12:42:33  20   plaintiff's Exhibit 2, paragraph number 8.

12:42:45  21   BY MR. SWEETEN:

12:42:46  22        Q.    Now, here you say and here you're describing the

12:42:51  23   November 19th, 2020, meeting that you had with Ms. Huffman,

12:42:55  24   correct?

12:42:55  25        A.    That's correct.

KATHLEEN A. SUPNET, CSR

```
12:42:56  1        Q.    All right.  And you asserted at that meeting that you
12:42:59  2   explained to Senator Huffman that SD-10's population was
12:43:04  3   majority-minority, correct?
12:43:05  4        A.    That's correct.
12:43:06  5        Q.    Now we talked about that very issue at your
12:43:09  6   deposition, correct?
12:43:10  7        A.    We did.
12:43:10  8        Q.    And we pulled out at that time the actual Citizen
12:43:15  9   Voting Age Population figures, correct?
12:43:17 10        A.    Yes, you did.
12:43:18 11        Q.    And you would agree with me, and I can pull them up
12:43:21 12   and we can do it again or you can just answer my question.  You
12:43:25 13   would agree with me that Hispanic CVAP in the Senate District 10
12:43:32 14   is 24 percent, that Black CVAP is 20.5 percent and that White
12:43:37 15   CVAP is listed in that exhibit, which is Exhibit 22, was
12:43:42 16   53.9 percent?
12:43:43 17        A.    I don't disagree with the CVAP.
12:43:46 18        Q.    And I believe Asian CVAP was 3.2 percent.  Does that
12:43:52 19   sound right?
12:43:52 20        A.    Yes, it is.
12:43:53 21        Q.    So even if you add it, assuming they all voted
12:43:57 22   together -- let's put that aside -- even if you added the
12:44:01 23   Citizenship Voting Age Population for Asian, Hispanic and the
12:44:04 24   Black population, you're not even cresting over 50 percent,
12:44:08 25   right?
```

KATHLEEN A. SUPNET, CSR

CROSS - POWELL                                                       171

12:44:11   1        A.    Near 50 percent.

12:44:12   2        Q.    My question was different.  My question is, you don't

12:44:16   3   get over 50 percent?

12:44:18   4        A.    In the voting age population.

12:44:20   5        Q.    Under the citizen age population?

12:44:22   6        A.    I will agree to that.

12:44:24   7        Q.    Okay.  Now, it's obvious you would agree with me that

12:44:57   8   Anglo votes are necessary to win Senate District 10 under

12:45:01   9   (indiscernible), correct?

12:45:01   10       A.    Under its current configuration, yes.

12:45:04   11       Q.    Right.  And you have actually said, haven't you, that

12:45:09   12   Republicans voted for you in Senate District 10?

12:45:11   13       A.    I believe that I received a small percentage of

12:45:15   14   crossover votes.

12:45:16   15       Q.    And you believe Democrats -- White Democrats voted for

12:45:19   16   you?

12:45:19   17       A.    I believe what?

12:45:20   18       Q.    You believe White Democrats voted for you?

12:45:23   19       A.    Oh, yes.

12:45:24   20       Q.    Okay.  I think you testified to this, but I want to

12:45:38   21   make sure it's on the record.  You were not on the Senate's

12:45:43   22   special committee on redistricting during the third called

12:45:46   23   Senate?

12:45:46   24       A.    I was not on the redistricting committee.

12:45:48   25       Q.    Now prior to the redistricting cycle, you had not

CROSS - POWELL                                               172

12:45:53  1    personally used the RedAppl program, correct?

12:45:57  2        A.   I did not personally use the RedAppl program.

12:46:01  3        Q.   And this is your first session, correct?

12:46:03  4        A.   That's correct.

12:46:03  5        Q.   So you're saying that at no point did you get on the

12:46:06  6    RedAppl, even during the session or after?

12:46:10  7        A.   That's correct.

12:46:11  8        Q.   Now, you understand that RedAppl was developed by the

12:46:18  9    Texas Legislative Council to assist map drawers in creating

12:46:24 10    districts, correct?

12:46:25 11        A.   Yes, I do.

12:46:26 12        Q.   And you're only vaguely familiar with how it works,

12:46:31 13    correct?

12:46:31 14        A.   I agree.

12:46:32 15        Q.   You don't know how its shading tools work?

12:46:36 16        A.   I have a vague understanding of it.

12:46:38 17        Q.   So you know that you can turn them on or keep them

12:46:42 18    turned off, right?

12:46:45 19        A.   (No response).

12:46:49 20        Q.   You do know that if a person wants to utilize racial

12:46:54 21    shading in map drawing, the user of RedAppl has to specifically

12:46:59 22    select that option to turn that on.  Do you know that?

12:47:01 23        A.   I do not know that, personally.

12:47:03 24        Q.   Okay.  Let's show your deposition.  Let's see if you

12:47:06 25    did last week.

CROSS - POWELL                                                          173

12:47:07   1          MR. SWEETEN:  If we can pull up Ms. Powell's

12:47:09   2   deposition, page 49, 16 through 22 are the lines.

12:47:34   3          Okay.  I don't think that's the quote we're looking

12:47:37   4   for.  Can you pull that down?

12:47:48   5          JUDGE SMITH:  I was watching the transcript here from

12:47:51   6   the court reporter and it didn't show an answer from the witness

12:47:53   7   on your answer of whether she knew that you could turn it on or

12:47:58   8   turn it off.  You want to make sure there's an answer to that

12:48:02   9   one way or the other?

12:48:04  10   BY MR. SWEETEN:

12:48:04  11      Q.   Let me ask you this.

12:48:05  12          Do you know if you can turn on or turn off shading in

12:48:09  13   RedAppl?

12:48:11  14      A.   I have no personal knowledge of how to operate

12:48:15  15   RedAppl.  I don't know the answer to that question,

12:48:19  16   definitively.  I don't know.

12:48:20  17      Q.   Understood.  So if there's testimony to that effect

12:48:23  18   that you have to specifically put on racial shading to utilize

12:48:28  19   it, that there's a feature that you click or don't click, you

12:48:32  20   would not have any reason to dispute that?

12:48:33  21      A.   No, I don't dispute it.

12:48:35  22      Q.   And, in fact, it's the case that there was a colloquy

12:48:39  23   between you and Senator Huffman where she told you that very

12:48:43  24   thing, and said that racial shading was never turned on.  You

12:48:46  25   remember that discussion, right?

KATHLEEN A. SUPNET, CSR

CROSS - POWELL                                                      174

12:48:47   1        A.    I do.

12:48:47   2        Q.    And you have no basis to contest that, do you?

12:48:51   3        A.    No, I don't.

12:48:53   4        Q.    Now, it's also the case that you were not in the room

12:48:57   5   when Mr. Opperman, Ms. Mackin or Senator Huffman drew the lines

12:49:04   6   of your district?

12:49:05   7        A.    I was not in the room.

12:49:09   8        Q.    And it stands to reason you have no personal knowledge

12:49:13   9   as to how that was drawn on the RedAppl?

12:49:17  10        A.    That's true, I have no personal knowledge.

12:49:19  11        Q.    In fact, you couldn't even tell me, as you're sitting

12:49:21  12   here today, whether another map program was used or red apple,

12:49:25  13   right?

12:49:25  14        A.    I couldn't tell you.

12:49:27  15        Q.    That's right, you don't know, right?

12:49:28  16        A.    I don't know.

12:49:29  17        Q.    Okay.  I just want to get that clear on the record.

12:49:43  18              Now, throughout the redistricting process, Senator

12:49:47  19   Huffman would -- well, she would often articulate the criteria

12:49:51  20   she followed when drafting district lines; she said that

12:49:54  21   publicly, correct?

12:49:55  22        A.    That's correct.

12:49:56  23              MR. SWEETEN:  Let's pull up, if we could, the clip of

12:50:01  24   the Redistricting Committee, the first one.

12:50:05  25              And this is -- I believe this to be --

KATHLEEN A. SUPNET, CSR

CROSS - POWELL                                                          175

12:50:10   1                    (Video and audio start).

12:50:10   2                    *UNKNOWN SPEAKER:  Committee amendment number 1...*

12:50:16   3    BY MR. SWEETEN:

12:50:17   4        Q.    Okay.  So I believe this to be Defendants' Exhibit 62

12:50:21   5    at 2, and I think it's line --

12:50:28   6                    MR. SWEETEN:  Do we've the lines on there?

12:50:39   7                    One second.

12:50:39   8    BY MR. SWEETEN:

12:50:56   9        Q.    I'm told there's no delineation numbers on what we're

12:51:00   10   about to play you, so there's no way to specifically cite, but I

12:51:04   11   will tell you it is on Defendants' Exhibit 62 at 2.

12:51:08   12                   And if for some reason you want to read along with any

12:51:11   13   of those, just ask and we'll bring Defendants' binders.

12:51:11   14                   (Video and audio start).

12:51:47   15                   *MALE SPEAKER:   -- Chair, based on Committee Amendment*

12:51:51   16                   *Number 1, I recognize the Senator Huffman to explain*

12:51:58   17                   *the committee amendment.*

12:51:58   18                   *SENATOR HUFFMAN:  Right.*

12:52:02   19                   *Members, before discussing this specific*

12:52:05   20                   *amendment, I'd like to remind everyone of the*

12:52:08   21                   *criteria I used in proposing and considering the new*

12:52:10   22                   *districts.  We focussed on complying with all*

12:52:13   23                   *applicable law, including the Constitution, the*

12:52:16   24                   *Voting Rights Act, as district populations based on*

12:52:21   25                   *the 2020 Census focussed on keeping political*

CROSS - POWELL                                              176

12:52:25   1            *subdivisions together, keeping communities of*
12:52:28   2            *interest together, preserving the cores of the*
12:52:30   3            *existing districts, creating geographically compact*
12:52:33   4            *districts, addressing partisan considerations,*
12:52:36   5            *protecting incumbents, and when possible, honoring*
12:52:40   6            *reasonable requests made by incumbent members.  These*
12:52:43   7            *considerations have also guided my approach to what*
12:52:45   8            *proposed Committee amendments I'm able to support.*
12:52:45   9            *So the first...*
12:52:45  10            (Video and audio stop).
12:52:45  11   BY MR. SWEETEN:
12:52:50  12       Q.    So, we'll just stop there.  You would agree with me
12:52:53  13   that Senator Huffman articulated what she believed were the
12:52:58  14   criteria she used for redistricting?  That's what she was doing
12:53:01  15   there, correct?
12:53:01  16       A.    In this clip, yes.
12:53:03  17       Q.    That's what she said.  And one of the things that she
12:53:06  18   said in there was partisan considerations, correct?
12:53:09  19       A.    That is correct.
12:53:10  20       Q.    No surprise, right?
12:53:11  21       A.    That's not what she had said prior to this.
12:53:13  22       Q.    Okay.  Well, let's talk about that, because much has
12:53:16  23   been made of that.
12:53:17  24            But you would agree that she did give a statement a
12:53:20  25   few days before where she said it included that the -- that it

KATHLEEN A. SUPNET, CSR

12:53:23  1    included this criteria, correct?

12:53:26  2        A.    I didn't hear that statement prior to this day.

12:53:29  3        Q.    Okay.  So if she said the word it "included," that

12:53:33  4    doesn't necessarily means that's everything at that certain time

12:53:39  5    that she said it, right?

12:53:41  6        A.    I have no idea of that.

12:53:42  7        Q.    Okay.  Well, you would agree that if in- -- that you

12:53:44  8    could say, "included," but that doesn't necessarily -- that

12:53:47  9    doesn't mean I'm about to provide a list, does it?

12:53:53 10        A.    I would assume if she provides a list, that that's the

12:53:55 11    list she intends to go by.

12:53:57 12        Q.    And she just provided a list here, where she was

12:54:00 13    talking to the Senate Redistricting Committee and said

12:54:06 14    partisanship, correct?

12:54:06 15        A.    Correct.

12:54:06 16        Q.    Okay.

12:54:07 17        A.    In this one instance.

12:54:08 18        Q.    But all of this aside, whatever she said, you've

12:54:10 19    already testified that you knew this was a partisan

12:54:14 20    redistricting, right, you knew that?

12:54:18 21        A.    In Texas, everything is partisan.

12:54:21 22        Q.    And you knew that you were vulnerable as a Democrat --

12:54:25 23    as a freshman Democrat?

12:54:26 24        A.    I did not know I was vulnerable, because Sean Opperman

12:54:32 25    had told my staff that they didn't think there was any need for

KATHLEEN A. SUPNET, CSR

CROSS - POWELL                                                    178

12:54:32   1    the district to change.

12:54:32   2        Q.   And you were --

12:54:36   3        A.   It was likely going to stay the same.

12:54:38   4        Q.   Ma'am, you weren't even in that conversation.

12:54:40   5        A.   I wasn't, but --

12:54:40   6        Q.   And you weren't --

12:54:41   7        A.   -- my staff was.

12:54:42   8        Q.   You understand that that conference occurred a year

12:54:44   9    and a half before actual Census figures were out, correct?

12:54:48  10        A.   I do.

12:54:50  11        Q.   You understand that there wasn't even a senator in the

12:54:52  12    room when that conversation took place, right?

12:54:55  13        A.   Right.

12:54:56  14        Q.   Okay.  You understand it is senators who make the

12:54:59  15    decisions on what -- what is going to be -- how things are going

12:55:01  16    to be redistricted, right?

12:55:04  17        A.   I'll accept that.

12:55:05  18        Q.   Okay.  They make the decisions in committee?

12:55:08  19        A.   They do make decision.

12:55:10  20        Q.   They make decisions on the floor?

12:55:13  21        A.   (No response).

12:55:13  22        Q.   A lot can happen, also, in a year and a half?

12:55:16  23        A.   Certainly.

12:55:17  24        Q.   Particularly, when the official population numbers

12:55:20  25    come out and redistricting actually starts in earnest, right?

KATHLEEN A. SUPNET, CSR

CROSS - POWELL                                                        179

12:55:24    1        A.    Right.

12:55:25    2        Q.    And there's something else, too, right?  And that is

12:55:28    3    that Census data came out very late in 2021, correct?

12:55:33    4        A.    It did come late.

12:55:35    5        Q.    It came out late, because the federal government,

12:55:38    6    although statutorily bound to provide the information by

12:55:42    7    April 1st, did not get it out, the official data, until

12:55:48    8    September 16th, 2021?

12:55:48    9        A.    I'll accept it, if you say it is.

12:55:50   10        Q.    You don't disagree with it, right?

12:55:52   11        A.    I'm not disagreeing.

12:55:53   12        Q.    Now, you would agree with me that the State of Texas

12:55:55   13    had already been sued at the time that -- that the Census data

12:55:59   14    came out, by the Gutierrez plaintiffs, for it -- for having a

12:56:04   15    map -- one of the things they argued is that the maps were, you

12:56:08   16    know, malapportioned, right?  So there was already litigation

12:56:14   17    starting in September and October about the fact that the

12:56:17   18    redistricting maps had not been completed, right?

12:56:19   19        A.    I'll accept that, if you say so.

12:56:21   20        Q.    You would agree that this was a historically

12:56:24   21    compressed time period for redistricting to be conducted, wasn't

12:56:28   22    it?

12:56:28   23        A.    I think it is a compressed time period.

12:56:31   24        Q.    And that's because of COVID-19, the unprecedented

12:56:34   25    pandemic that we -- you know, a 100-year pandemic came along and

KATHLEEN A. SUPNET, CSR

12:56:37  1    moved things, including Census data getting to states, right?

12:56:41  2        A.    Yes.

12:56:42  3        Q.    What day is candidate filing period, Senator Powell?

12:56:48  4        A.    December the 8th; is that right?

12:56:51  5        Q.    That's the last day.  The first day is November 13th,

12:56:51  6    isn't it?

12:56:56  7        A.    I wouldn't disagree with that.

12:56:57  8        Q.    Okay.  There's about a month window and to have

12:57:00  9    candidates filing, you have to have districts figured out,

12:57:04  10   right?

12:57:05  11       A.    Right.

12:57:07  12       Q.    So this Legislature was under intense pressure, being

12:57:12  13   sued in some quarters, in trying to get a map, trying to get

12:57:16  14   maps out, so an election could be run, right?

12:57:22  15       A.    I'm not going to agree to intense pressure.  The time

12:57:27  16   frame is what it is.

12:57:28  17       Q.    Okay.  Well, you would agree with me that in that

12:57:32  18   30-day period, between September 20th and October 19th, that

12:57:38  19   the -- which is a 30-day special session -- let me ask it a

12:57:42  20   better way.

12:57:42  21             Special sessions last 30 days, right?

12:57:44  22       A.    Right.

12:57:45  23       Q.    The Governor called a special session back in early

12:57:48  24   September, saying we're going to have a 30-day session, and part

12:57:50  25   of what we were -- are going to consider is redistricting,

CROSS - POWELL                                                      181

12:57:52  1   right?

12:57:53  2       A.    Right.

12:57:53  3       Q.    And you would agree with me that in that 30-day

12:57:56  4   period, the Legislature, both Houses, got four maps passed; the

12:58:03  5   SBOE, Congress, House and Senate, right?

12:58:06  6       A.    That is right.

12:58:06  7       Q.    Now, I know you're a freshman, but are you -- I

12:58:10  8   mean -- well, I'll ask a different question.

12:58:12  9             But they were all signed by the Governor, right?

12:58:18 10       A.    Yes.

12:58:18 11       Q.    October 25th, they were signed by the Governor, right?

12:58:23 12       A.    Right.

12:58:23 13       Q.    Just in time for candidate filing, right?

12:58:28 14       A.    Yes.

12:58:31 15       Q.    Okay.  Let's go, if we could, let's look at -- I

12:58:36 16   believe this is Exhibit 64.  There's a video clip of the Senate

12:58:41 17   debate at 15:13 to 16:4.

12:58:45 18             MR. SWEETEN:  Could you play it?

12:58:45 19             JUDGE GUADERRAMA:  Mr. Sweeten, it is almost

12:58:49 20   1 o'clock.

12:58:49 21             MR. SWEETEN:  Okay.

12:58:49 22             JUDGE GUADERRAMA:  Should we take a lunch break now or

12:58:49 23   wait till your done?

12:58:54 24             MR. SWEETEN:  I probably have 20 more minutes, just do

12:58:58 25   at the other end.  That sounds great, Judge Guaderrama.

KATHLEEN A. SUPNET, CSR

| | | |
|---|---|---|
| 12:58:59 | 1 | THE COURT:  All right.  We're going to go ahead and |
| 12:59:00 | 2 | take our lunch recess.  If you-all be back at 2 o'clock, we'll |
| 12:59:05 | 3 | resume our proceedings then. |
| 12:59:07 | 4 | Ms. Powell, if you would be back at 2:00, thank you. |
| 12:59:13 | 5 | COURTROOM SECURITY OFFICER:  All rise. |
| | 6 | (Lunch break at 12:59 p.m.) |
| | 7 | * * * |
| | 8 | |
| | 9 | |
| | 10 | |
| | 11 | |
| | 12 | |
| | 13 | |
| | 14 | |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

KATHLEEN A. SUPNET, CSR

```
1                        * * * * *

2          I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.  I

4    further certify that the transcript fees and format comply with

5    those prescribed by the Court and the Judicial Conference of the

6    United States.

7    Signature:/s/KATHLEEN ANN SUPNET          February 23, 2022
               Kathleen A. Supnet, CSR          Date
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

KATHLEEN A. SUPNET, CSR