**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIVIL ACTION NO. 21-CV-00259-DCG-JES-JVB |
| GREG ABBOTT, et al., | § § | [lead case] |
| *Defendants*. | § § § | |

| | | |
|---|---|---|
| TREY MARTINEZ FISCHER, Texas State Representative (HD 116), | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CIVIL ACTION NO. 3:21-CV-00306 |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas; JOHN SCOTT, in his official capacity as Secretary of the State of Texas, | § § § § § | [consolidated case] |
| *Defendants*. | § § | |

PLAINTIFF'S FIRST AMENDED COMPLAINT

## I.  Introduction

1.  In 1968, San Antonio celebrated its 250th birthday on the global stage with the World's

Fair. Among the many local leaders who contributed to the success of HemisFair '68 was the late

U.S. Rep. Henry B. González, who represented downtown San Antonio. Today, that park is no longer represented by a San Antonian. Like many other downtown assets, it has been drawn into a congressional district anchored in Austin.

2.   On October 25, 2021, Governor Abbott signed SB 6 into law, which apportioned Texas 38 congressional districts in relation to U.S. Census. CD 35 was created 10 years ago as a result of rapid population growth in central Texas. It grew into a majority Hispanic Citizen Voting Age Population (HCVAP) congressional district. According to the Texas Legislative Council, CD 35 in the benchmark map was a 52.6% HCVAP majority. Under SB 6, CD 35 is no longer a majority HCVAP district. SB 6 dilutes the voting strength of Latino voters in central Texas.

3.   Worse yet, SB 6 harms San Antonio, specifically. Under the maps created by SB 6, San Antonio's central business district, downtown university, the River Walk, and the John H. Wood Jr. U.S. courthouse have been drawn into a congressional district anchored by a majority of its population in Austin. The Alamo, a famed historical landmark and one of the most popular tourist attractions in the State, has been drawn into a district anchored in Laredo. These dangerous divisions of San Antonio ensure that the largest Latino majority city in the United States will not have its full voice in the United States House of Representatives.

4.   SB 6 must be enjoined, at least as to CD 35.


## II.  Jurisdiction & Venue


5.   Jurisdiction is based upon 28 U.S.C. § 1343(3) & (4) and upon 28 U.S.C. § 1331 for causes of action arising from 52 U.S.C. §§ 10301 and 10304. Jurisdiction for Plaintiff's claim for declaratory relief is based upon 28 U.S.C. §§ 2201 and 2202. Jurisdiction for Plaintiff's claims under the Fourteenth Amendment to the U.S. Constitution is based upon 42 U.S.C. § 1983 and 28

U.S.C. § 1331. Jurisdiction for Plaintiff's claim for costs and attorney's fees is based upon 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e). Venue is proper in this Court under 28 U.S.C. 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims in this case occurred in the Western District of Texas. Plaintiff requests a three-judge panel pursuant to 28 U.S.C. § 2284.

### III. Parties

6.   Plaintiff Trey Martinez Fischer is the current Texas State Representative for House District 116 (HD 116). He is a registered voter in HD 116 and CD 35 and will vote in future state and federal elections, including the swiftly approaching 2022 Democratic primary election. He is injured by SB 6, because of the intentionally discriminatory choice to dilute the strength of Latino voters in CD 35. He is Latino. He may be served by and through his counsel in this matter. The Plaintiff is **not** suing in his official capacity.

7.   Defendant Gregory W. ("Greg") Abbott is the Governor of Texas and, pursuant to Article IV, Section I of the Texas Constitution, is the chief executive officer of the State of Texas. He is sued in his official capacity.

8.   Defendant John Scott is the Secretary of State of Texas. He is the chief election officer of the State of Texas and is currently responsible for administering and implementing the election laws in Texas, including SB 6. He is sued in his official capacity.

### IV. Facts

9.  Trey Martinez Fischer is the current Texas State Representative for HD 116. He is the former Chairman of the Mexican American Legislative Caucus (MALC) and the Texas House Committee on Business & Industry. He has served 10 terms in the Texas House. He has been named one of the Ten Best Legislators in the Texas House according to Texas Monthly on multiple occasions. He is a U.S. Citizen. He resides and is registered to vote in CD 35 and will vote in future elections.

10. As a result of the pandemic, the U.S. Census Bureau provided redistricting data as "legacy format summary files" for all states on August 12, 2021. Then, on September 16, 2021, the U.S. Census Bureau released the 2020 Census Redistricting Data (Public Law 94-171) Summary Files and the full redistricting data toolkit.

11. In response to the publication of the Census, Governor Abbott issued a proclamation ordering the third called special session of the 87th Legislative Session to consider the apportionment of Texas' congressional districts.

12. SB 6, a bill relating to the composition of the districts for the election of members of the United States House of Representatives from the State of Texas, was filed on September 27, 2021. It was passed by both chambers of the legislature on October 18, 2021. SB 6 was signed into law on October 25, 2021. It becomes effective on January 18, 2022.

13. In the benchmark map, PLAN C 2100, CD 35 is a central Texas congressional district that spans from downtown San Antonio north to Austin. It took in parts of Bexar, Comal, Guadalupe, Caldwell, Hays, and Travis Counties. By the end of the decade, CD 35 was 52.6% Hispanic Citizen Voting Age District. According to the Texas Legislative Council, CD 35 in the benchmark had 344,030 in population in Bexar County and 263,480 population in Travis County.

## CD 35 in PLAN C 2100 (Benchmark)



14. In SB 6, CD 35 has radically shifted its population to Travis County. In SB 6, there are more than 40,000 fewer Bexar County voters in CD 35. The number of Travis County voters has been increased by 37,000 voters. As a consequence, CD 35's Spanish Surname Vote Registration has decreased by 6% points.

### CD 35 in PLAN C 2193 (SB 6)



15. CD 35 in SB 6 is no longer a Latino opportunity district.

16. There has been rampant population growth in Texas, specifically central Texas. In the last decade, Travis County increased its population by 265,922 people. Bexar increased its population by 294,551.

17. Over the same period, Hays County become one of the fastest growing counties in the Nation.

18. Since 2010, Texas has increased its population by 3,999,944 people. Fully, 95% of that growth was non-Anglo and 49.5% of that growth was Latino.

19. Despite this growth, SB 6 has no new Latino opportunity districts.

20. In fact, despite this growth, SB 6 has fewer Latino opportunity districts than the benchmark plan.

21. The failure to create new Hispanic opportunity districts and the elimination of an emerging Latino majority district like CD 35 was motivated by intentional, racial discrimination.

22. The failure to create a new Hispanic opportunity district and the elimination of an emerging Latino majority district like CD 35 is minority vote dilution for the Latino voters in that district.

23. The plaintiff, and other Latino voters in CD 35, are injured by the Defendants' failure to create a new Latino opportunity district in central Texas. Those voters and the plaintiff would benefit by the inclusion of more Latino voters in CD 35 or the creation of a new Latino opportunity district in central Texas.

24. It is possible to create more Hispanic majority congressional districts. In fact, several ameliorative amendments that would have provided more Hispanic opportunity were rejected by both chambers of the Texas Legislature.

25. This failure to consider or accept ameliorative amendments that would enhance minority opportunity is strong evidence of intentional discrimination or an otherwise impermissible motive.

26. Elections in CD 35 are racially polarized.

27. In fact, elections in Texas are racially polarized.

28. Latinos are politically cohesive in CD 35 and vote as a bloc for the Latino-preferred candidate.

29.  In Texas and in CD 35, Anglos (White Non-Hispanics) vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g. single-member districts), to defeat the minority voters' preferred candidates of choice. In CD 35 and throughout Texas as a whole, Anglos vote as a politically cohesive bloc against minority-preferred candidates and, specifically, Latino-preferred candidates.

30. Texas has a despicable and regrettable history of racism. Congressional elections and the creation of congressional districts have also had a troubling history of segregation and racial conflict.

31. Throughout Texas, federal courts have found that the elections in Texas bear the taint of racial polarization. "Regardless of methodology …experts [have] found that general election and primary election voting in Texas is highly polarized along racial-ethnic lines." *Perez, et al v. Abbott, et al.,* No. 5:11-cv-00360-OLG-JES-XR at ¶ 690 (W.D. Texas March 10, 2017) (Fact Findings General and Plan C185).

32. In the past decade, the State of Texas has instituted several barriers to minority participation that enhance minority vote dilution.

33. In 2011, Texas enacted one of the most stringent voter qualification laws of the United States. Voter ID was the law of the land until enjoined because of violations of Section 2 of the Voting Rights Act and the 14th Amendment. Initially, Texas was found to have intentionally racially discriminated against minority voters by enacting and in the enforcement of its Voter ID law.

34. Also in 2011, Texas enacted several redistricting plans many of which violated the 14th Amendment and Section 2 of the Voting Rights Act. In addition, in the adoption of those plans, a three-judge panel found that Texas had intentionally discriminated against minority voters.

35. In the recent past, Texas instituted a voter purge of its voting rolls supposedly targeting non-citizen voters. However, Texas was enjoined before enacting its purge because Texas had in actuality haphazardly removed more citizens than non-citizens. Texas settled these claims before a court could make a determination of Texas' intent in these matters.

36. In a special session in the August of 2021, Texas enacted yet another voter disfranchisement bill, SB 1, which is currently being challenged in federal court.

37. In Texas, there is a strong and consistent correlation between socio-economic welfare and race, such that Latinos and African Americans are more likely to be economically disadvantaged than their Anglo peers.

38. Anglos have a mean per capita income of $45,278, which is almost three times the $14,511 mean per capita income for Latinos. Moreover, median income for Anglo households is more than twice that of Latino households, with median income of Anglos totaling $75,124, compared to the $38,916 median household income of Latinos.

39. The American Community Survey (ACS), a data project of the U.S. Census Bureau, indicates that Latinos have a higher incidence of poverty than do Anglos. According to the ACS, 9.2% of Anglos earn less than 150% below the poverty level, but 34.5% of Latinos earn less than 150% of the poverty level.

40. Latinos in Texas are substantially more likely to have received less education than Anglos: the ACS indicated that 28.3% of Latinos over the age of 25 had completed nine or fewer years of education, whereas only 1.8% of Anglos over the age of 25 had completed nine or fewer years.

41. There is a strong correlation between the inability to elect minority-preferred candidates and the socio-economic disparities experienced by Texas minorities.

42. Texas elections are typified by subtle and overt racial appeals.

43. In Texas, Latino-preferred candidates for state office are rarely, if ever, successful. Absent single-member districts the Latino-preferred candidates are more likely than not to fail.

44. There is no policy rationale that would justify the dilution of Latino voting strength in CD 35.

45. The policy choice to decrease CD 35 as a Latino opportunity district will have a disparate impact on the Latino community in central Texas, generally, and in CD 35, specifically.

46. The adoption of SB 6 was fueled by a discriminatory purpose as to CD 35, specifically.

47. The sequence of events leading up to the adoption of SB 6 was fueled by a racially discriminatory purpose, including deviations from normal procedure, lack of transparency and public input, and a rushed, inconsistent process leading to enactment.

**Section 2 – Latino Vote Dilution in Central Texas**

48. Latinos in the geographic area of CD 35 are sufficiently large and geographically compact as to constitute a majority in a putative single-member district.

49. The plaintiff resides in those putative single-member districts.

50. In truth, it is fairly easy to create a version of CD 35 or a central Texas congressional district regardless of its district number that has a citizen-voting age majority of Latinos. The following are a few examples.

**PLAN C 2129 (SB 6) – Central Texas Configuration**



51. PLAN C 2129 is a statewide amendment that was considered and rejected by the Texas Senate on October 8, 2021.

52. PLAN C 2129 proposed the creation of 10 Latino Opportunity districts with majority Hispanic Citizen Voting Age Population (HCVAP) of fifty percent or more.

53. The enacted version of SB 6, PLAN C 2193, has only 7 majority HCVAP population.

54. The plaintiff resides in CD 37 of proposed PLAN C 2129.

55. According to RED-116 report for PLAN C 2129, CD 37 has a 50.0% majority HCVAP. RED -116 report is based on the ACS data from 2015-2019 and created by the Texas Legislative Council.

56. The 2016-2020 ACS data was published by the U.S. Census bureau on March 17, 2022.

57. This data is being fashioned by the Texas Legislative Council for use with RedApl, the State's proprietary redistricting software.

58. The 2016-2020 ACS data will show that CD 37 has an even larger majority of Latino citizen voters than previous ACS reports, constituting a sound majority of voters.

59. CD 37 has geographic compactness scores that meet or exceed geometric compactness standards for redistricting purposes.

60. Latinos in proposed CD 37 are sufficiently large and geographically compact to constitute a majority in a single-member district.

61. Latinos in proposed CD 37 of PLAN C 2129 are politically cohesive.  They work and vote together to elect candidates of their choice to school boards, city councils, to the state legislature, and federal offices.

62. The Anglos in Texas and in central Texas vote sufficiently as a bloc to enable them – in the absence of special circumstances, to usually defeat the Latino's preferred candidate.

**XGOL C 20001 – Minimal Change Map**



63. PLAN C 2129 is a statewide plan that alters most of the congressional districts of the state. The plaintiff only seeks remedies to CD 35. XGOL C 2001 is a putative single-member district plan that makes changes necessary to create a 50% HCVAP majority district in CD 35.

64. XGOL C 2001 makes changes to only 4 congressional districts in the enacted plan (PLAN C 219#). Those changes are CDs 10, 21, 28, 35. Specifically, according to the Plan Overlap Analysis, RA-340, CD 10 and CD 21 are 88.2% similar to their respective versions in the enacted plan. CD 28 is 82.7% unchanged from the enacted plan. Finally, CD 35 is 70.9% unchanged.

65. CD 35 in XGOL C 2001 has HCVAP of 51.8%.

66. The HCVAP percentage of CD 28, an existing Latino Opportunity district, is 65% and still performs as a minority opportunity district.

67. The plaintiff resides in CD 35 in proposed plan XGOL C 2001.

68. The districts changed in XGOL C 2001 (CDs 10, 21, 28, 35) have similar or better geographic compactness than those districts in the enacted plan.

69. Latinos in proposed CD 35 in XGOL C 2001 are sufficiently large and geographically compact to constitute a majority in a single-member district.

70. Latinos in proposed CD 35 of XGOL C 2001 are politically cohesive. They work and vote together to elect candidates of their choice to school boards, city councils, to the state legislature, and federal offices.

71. The Anglos in Texas and in central Texas vote sufficiently as a bloc to enable them – in the absence of special circumstances, to usually defeat the Latino's preferred candidate.

72. There are other configurations of CD 35 possible that would create another majority Latino congressional district.

**Racially Polarized Voting in CD 35**

73. Latinos in CD 35 are politically cohesive in most, if not all elections, including non-partisan elections for school board or municipal office. And, this is true in primary elections, as well. Partisanship plays little to no role in Latino political cohesion in these elections.

74. Anglos in CD 35 are also politically cohesive to the extent that they vote sufficiently as a bloc to defeat the preferred candidate of choice of the Latino community in CD 35. This is true in primary elections and in non-partisan elections, in which partisanship plays little to no role in electoral choice.

75. When Latinos are politically cohesive in their support specific candidates, and the Anglos are sufficiently cohesive around opposing candidates, then that is called racially polarized voting.

76. CD 35 has about 255 Voter Tabulation Districts (VTDs). The State uses VTDs in some measurements rather than precinct data, because some election precincts do not hew to Census geography. However, 99.9% of VTDs are the same geography as the election precincts utilized for election returns. The same is true in CD 35 in Plan C 2193.

77. Of these 255 VTDs in CD 35 in PLAN C 2193, there are 27 that have no population. 9 VTDs that have fewer than 10 people of voting age.

78. Of the remaining 229 VTDs in CD 35, there are 27 VTDs that have a majority Anglo VAP. There are 109 VTDs that have a majority Latino VAP population.

79. The Anglo VTDs support different and opposing candidates than the Latino precincts. This is true in partisan general elections, primary elections, and non-partisan elections.

80. The HVAP majority VTDs are strongly politically cohesive and support different and opposing candidates from the Anglo precincts in some partisan general elections, primary elections, and non-partisan elections.

81. Mathematically, this can be measured using Ordinary Least Squares (OLS), which is a version of ecological regression.

82. The OLS measurement of CD 35's racially polarized voting is statistically significant. OLS has determined that Latinos are strongly cohesive in enacted CD 35 support the same candidates in non-partisan, partisan, and primary elections.

83. OLS can also be used to determine the sufficiency of Anglo bloc voting to determine if there is an Anglo candidate of choice and the degree of cohesion around that candidate. OLS finds that Anglos are moderately cohesive in CD 35 around differing candidates than Latinos in CD 35.

84. This can also be shown with different measurements. Ecological Inference (EI) is a statistical methodology that is widely accepted in social science research.

85. EI can be used to determine the levels of support for certain candidates in a given election.

86. EI the determination for CD 35 is also statistically significant. EI, just like OLS, has determined that Latinos are strongly politically cohesive in CD 35 and support opposing candidates to Anglos in some partisan general elections, non-partisan elections, and primary elections.

87. EI has also determined that Anglos are moderately cohesive in CD 35 elections in partisan general elections, non-partisan elections, and primary elections.

88. EI has also determined that Anglos vote sufficiently as a bloc to usually defeat the candidate of choice of Latinos in CD 35 elections.

89. The *Gingles* factors can also be seen in other kinds of empirical data in CD 35. In the portions of the district that are majority Anglo, Anglo candidates for school board, municipal office, and other non-partisan elections defeat Spanish-surnamed candidates.

90. Likewise, in Anglo-majority or Anglo-plurality portions of CD 35, Anglos are routinely elected in primary elections over Latino-preferred candidates.

91. In the most recent primary election, overwhelming won by Austin City Councilman Greg Casar, there is certainly evidence that Anglo Democratic primary voters in Travis, Hays, and Comal counties preferred Casar, while Latino voters in Bexar County and in Travis County preferred someone other than Casar. It is difficult to generate large-scale generalizations based on one primary, but the facts taken together suggest that decreasing the amount of HCVAPs in CD 35 has substantially decreased the likelihood of electing the Latino-preferred candidate in some elections.

92. In sum, there are many different ways to measure and evaluate the racial polarization of CD 35's voters. In each way listed here, and in other ways, CD 35 proves to be just like nearly every other congressional district in Texas. Latinos strongly support one candidate. Anglos support another opposing candidate in enough sufficiency as to defeat the Latino-preferred candidate. And, in the absence of a newly created CD 35 in which a majority of the citizen-voting age population are Latino, the Hispanic voters in CD 35 and the plaintiff in particular are injured. **To be clear, the plaintiff asserts no other voter's rights but his own and only as to CD 35.**

**Intent Allegations**

93. The defendants acted with invidious intent to dilute Latino voting strength in CD 35. This is shown through the particular circumstances surrounding of the adoption of SB 6.

94. First, the defendants acted in secret in order that their true intentions would not be easily known or devised.

95. In contrast to the legislative maps, the Congress map was drafted by mapmakers hundreds of miles away in Washington D.C at the National Republican Redistricting Trust.

96. After the map was crafted, those maps were sent to an outside counsel in Texas who represented most of the Republican incumbent congressman, but was unconnected to any state legislator. This map was then sent to the Texas Legislature.

97. At first, Senator Huffman expressed consternation at the slow process of the creation of the congressional map. She called her contacts in Texas and Washington D.C. to express those concerns and stated that there might not be enough time to get the congressional map done this session. Just before the 3rd called Session began, she again re-iterated her concern that the maps may not have enough time to get enacted by the filing deadline.

98. As result, rumors abounded about the delay in the congressional map. Likewise rumors flowed about the necessity of a fourth called special session to deal with the congressional map. These rumors, whether a subterfuge or not, created a false sense of security to combatants of the congressional map and isolated that map from meaningful input from affected voters, incumbents, and important voting rights groups.

99. These delays in the formulation of the congressional were overcome and outside counsel was able reach agreement with his clients and a few Democratic congressional representatives on the configuration of the map and that map was sent to Texas Senate sometime after the beginning of the third called special session.

100.    Most Democratic incumbent congressmen were left out of these negotiations with outside counsel or the Texas Senate. All members of the Texas legislature that are the candidates of minority preference were left out of these initial and subsequent discussions.

101.    As a consequence, the maps were created in secret without the input of the minority community with little to no time to rectify the patent errors in the map. Only the members of a byzantine and exclusive group had meaningful input into the creation of the congressional map.

102.    Today, there is no real certainty of the identity of the actual map drawer himself or herself who crafted the congressional map. That is function of the convoluted and secret machinations of the defendants and their agents. The real consequence of that action is that the legislative intent for the policy choices in the map will be difficult to discern because of the limitations of discovery and the paucity of direct knowledge about the choices of the policy makers. Here, the defendants outsourced their policy choices to unelected third parties, in order to obscure the real intent of the map, which is to dilute the strength of minority voters.

103.     But, a plan adopted in secret and in a system created to obscure the mapmakers motivation belies a darker, invidious purpose.

104.     Secondly, the policy choices inherent in PLAN C 2193 have a deeply deleterious effect on minority voting strength.  To begin with, the population growth in Texas is largely non-Anglo, such that if a robot drew the congressional map, one might expect the creation of, at least, one new majority minority district. No such district has been created.

105.     In fact, there are fewer majority minority districts in the enacted plan than in the benchmark. In PLAN C 2100, 8 out of 36 districts are majority HCVAP or 22.2%.

106.     In PLAN C 2193, only 7 out of 38 districts are majority HCVAP or 18.4%.

107.     This is a policy choice that was made to the detriment of Latino voters generally and the plaintiff specifically, as CD 35 was chosen for illegal retrogression.

108.     The map drawers and the defendants knew that diluting the HCVAP of CD 35 would decrease the likelihood that Latino voters would be able to elect the candidate of their choice. They knew this because of the findings of previous redistricting cases in Texas and because of their treatment of other congressional and legislative districts.

109.     In 2018, Senator Huffman was involved in the closest election of her time as an elected official. She very nearly lost in a general election. In order to solve this problem, she included more and more Anglo voters in her newly-enacted senate district in order to buttress the general election performance of the district to her benefit.

110.     The Texas Legislature did the same thing for CD 23, ultimately lowering its HCVAP by 6 percentage points. The policy choice is clear. More Anglos meant more likely to prevent the candidate of minority choice in the general and primary election.

111.     And the corollary is also clear and known by Legislators. Fewer Latinos means less support for the Latino candidate of choice to the detriment of Latino voters.

112.     The same is true in CD 35. This intent was manifested by lowering the HCVAP of that district below a majority. In so doing, the voting strength of Latinos in the general and, especially, in the primary election were also diminished.

113.     Thirdly, the defendant's invidiously used split precincts and bizarrely shaped districts throughout the map in order to diminish Latino voting strength.

114.     There are 11 split VTDS in Bexar County in PLAN C 2193's CD 35. Many of those precincts were split along racial lines to dilute the strength of Latino Voters.

115.     There are 4 VTD splits in Comal County in PLAN C 2193's CD 35. Those precinct splits were executed with a race as a predominant factor in their creation.

116.     There are 4 VTD splits in Hays County in PLAN C 2193's CD 35. Those precinct splits were executed with a race as a predominant factor in their creation.

117.     There is one precinct split in Travis County in PLAN C 2193's CD 35. That precinct split were executed with a race as a predominant factor in its creation.

118.     Several of the congressional districts adopted a bizarre shape in order to avoid to either avoid large minority populations or to sunder them into parts that could be sunk into Anglo areas. This is true in CD 35 on a smaller level. CD 35 strings together parts of Bexar County north to Austin. In parts of the district, the width of the district is very narrow. In other parts, there are clearly neighborhoods that Latino-majority that have been avoided. These policy choices cannot have been made by accident. They were chosen in order to dilute the strength of Latino voters and to the detriment of Latino voters.

119.     Fourthly, places of geographic importance were excluded from inclusion in to CD 35. Most notably, the Alamo was carved out CD 35 and placed into CD 28, which is a district based largely in Laredo. But, this also occurred with other locations of geographic import to San Antonio. Understandably, some of these choices were made by a three-judge panel a decade ago in its reformulation of CD 35. But, the choice to make another bizarrely shaped district that excluded important San Antonio locations in districts that could not and will not be represented by San Antonians also belies a darker intent. At the very, least it shows a recalcitrance to listen to Latino leaders from San Antonio regarding their desires concerning the shape and required geography of certain congressional districts.

120.     Fifthly, none of this had to happen quite in this manner. There were multiple attempts by many legislators in both chambers of the Texas Legislature to ameliorate the Latino voter dilution in CD 35.

121.     The first such attempt was made by Senator Gutierrez to create a proposed HCVAP majority district wholly contained in San Antonio, PLAN C 2129. This proposed map was rejected because it made too many changes to affected congressional representatives without their consent. This criteria for accepting amendments was not announced until the day of consideration the congressional map.

122.     Other amendments that represented the agreements of congressional members were rejected. Specifically, PLAN C 2124 which represented in part an agreement between Congressman Cuellar and Congressman Gonzales was rejected. Congressional approval by affected congress people clearly is a pre-textual excuse for the rejection of ameliorative amendments.

123.     Senator Huffman also adopted a bizarre and extra-legal standard for evaluating whether or not a district was a minority opportunity district. This protracted principal sought to explain the difference between the amount of African Americans or Latinos needed in order to justify the creation of a section 2 district or the federal protection of a district. Under her principal, no minority opportunity districts could be created and, in addition, only a few might be protected. There is no legal or factual basis for the Senate's adopted principle. The adoption of false standards in the evaluation of voting districts is also strong evidence of invidious intent. At the very least, it is yet another pre-textual explanation for ameliorative amendments.

124.     The pre-textual rejection of amendments aimed at curing some of the racial defects of PLAN C 2193 is evidence of invidious intent.

125.     There were precious few public meetings on any version of the congressional plan adopted by the Texas Senate. And, the deadlines adopted for consideration of amendments was essentially unmanageable by anyone who wished to combat the plan.

126.     As a consequence, several amendments were rejected by the Senate because of the imperfections caused by haste. At least once, in a deviation from normal procedure, an amendment to an amendment to cure a pairing in a proposed amendment was blocked and summarily rejected by Anglo lawmakers. This is the first time in the recent past in which an author of an amendment was not allowed to cure the defects in his proposed amendment.

127.     Chairman Todd Hunter is the Chair of the House Redistricting Committee. He too adopted and ratified the policy choices of a secret coalition of unelected map makers. He too held meetings in a quick and limited fashion. He too used extra-legal principles to prevent the creation of minority congressional districts. He too shut out input of minority law makers, if to a lesser degree than the Senate.

128.     But, Chair Hunter plays a special role in the adoption of CD 35. During the House debate on the congressional map, Chair Hunter made overtures to Latino legislators to see if CD 35 could become more Latino and created with a larger San Antonio focus. In addition, there would be other changes in the map in South Texas specifically. He stated that if the amendment could be placed without affecting certain districts and incorporate other already accepted changes, then a CD 35 that was more Latino and more San Antonio focused could be adopted. Those legislators worked quickly to try and meet these demands in the short time period allotted. An amendment was submitted that met all the stated requirements and it was partially adopted by House. Just a few hours later, despite the agreement the amendment was rejected by the conference committee.

129.     In the end, a small concession was made. The morning of the adoption of conference committee report, Chair Hunter announced a new version of CD 35. In the end, rather than the tens of thousands of new Latino voters in San Antonio as proposed, CD 35 added only 314 new voters from San Antonio's Westside and excluded tens of thousands from its downtown favoring, instead lower turnout Latino VTDs in the eastern portion of Bexar County. As a direct result of these policy choices, Latino voters in CD 35 have had their voting strength diminished.

130.     In total, the Legislature made decisions in secret to the exclusion of minority congressional representatives and minority legislators. It used precinct splits and bizarre district shapes to dilute the voting strength of Latino voters in CD 35. It retrogressed CD 35 specifically and Latino opportunity in the entire map without rationale or reason. It adopted a bizarre, non-legal basis for the rejection of amendments. It deviated from normal procedure in several instances in order to prevent the inclusion of more minority opportunity. It held perfunctory, public hearings that did not lead to any meaningful policy changes in SB 6. It set standards for the acceptance of

amendments and then rejected amendments that met those standards. All of these allegations are strong evidence of intentional racial discrimination.

131.     But, the most important thing that proves that these actions were all part of an "invidious whole" was that all of them were taken together to the detriment of the minority community. If a project or plan is on the level and free from discriminatory intent, it would be expected that there would be some give and take. Here, there was only take. The congressional representatives that were paired were minority members. The district that was retrogressed was a minority-majority district in the benchmark. The false principles that were used to evaluate amendments were done so to the harm of minority voters. The split precincts in the map are largely bordering at least one minority district. The need to act quickly was done to prevent mobilization by minority leaders. The rejection of amendments that may have prevented Latino vote dilution in CD 35, even those adopted by the Texas House, were categorically denied by the conference committee. All of these policy choices only work one way. They only function to prevent minority opportunity in CD 35 and throughout the map.

132.     The fact that the choices and errors only work one way rebuts the presumption that the State acted in good faith. It also negates the assertion that the delay in the Census caused this situation. No doubt the brevity of the session and some of the failures to hold more hearings on the plan can be explained by the delayed Census. But, the delayed census cannot explain the choice to exclude minority members of congress and minority legislators. It cannot explain the choice to split certain precincts or to retrogress a district below minority-majority. It cannot explain the choice to adopt a non-legal position to prevent the meaningful consideration of ameliorative amendments. It does not explain the secrecy of the creation of the map or the bizarre shape of any of the districts, including CD 35.

133.     In short, the State should own its policy choices. It made choices on account of race that has had the ultimate result of diluting Latino voting strength in CD 35. Again, the policy choices made in relation to CD 35 cannot be said to be based on partisanship. CD 35 is a Democratic district, by all measures. The choice, then, to diminish Latino voting strength in CD 35 has nothing to do with electing Republicans or Democrats, but only to diminish the ability of Latinos in CD 35 to elect the candidates of their choice in the Democratic primary.

134.     Plaintiff's injury would be ameliorated by a subsequent recreation of CD 35 that is free from invidious intent. If a CD 35 was created that had a majority of Latino voters, then it is axiomatic that Latino voters would be able to elect the candidate of their choice and have a far greater chance of electing the candidate of Latino preference in the primary election for CD 35.

135.     To be clear, again, the plaintiff asserts these rights solely as to CD 35 and not to any other district. The other alleged facts that reference the PLAN C 2193 generally or other districts besides CD 35 are relevant to this Court's consideration and evaluation of the legislative intent in the creation of CD 35. They are only offered, here, to buttress the claim that CD 35, itself, is the product of invidious discrimination.

## V.  Causes of Action

## Count 1 – Section 2 of the Voting Rights Act

136.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

137.     The adoption of SB 6 is an election change that results in a denial or abridgement of the right to vote of the plaintiff on account of his race, color, or ethnicity, by having the effect of canceling out or minimizing his individual voting strength as a minority in Texas. This election

change does not afford the plaintiff and other Latino voters in central Texas an equal opportunity to participate in the political process and to elect representatives of their choice, and denies individual plaintiffs and organizational plaintiff's members the right to vote in elections without distinction of race, color or previous condition of servitude in violation of 52 U.S.C. § 10301 *et seq*. Plaintiff's challenge to the central Texas districts "will not go beyond the district in which he votes." *See* Dkt. 205 at p. 2. Plaintiff is *only* challenging the enacted configuration of CD 35 in SB 6.

### Count 2- Equal Protection Clause of the 14th Amendment to the US. Constitution

138.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

139.     The choice by the State of Texas in adopting SB 6 is an election change that disfranchises minority voters and discriminate against plaintiffs on the basis race and national origin in violation of 14th Amendment to the U.S. Constitution. Plaintiff is *only* challenging the enacted configuration of CD 35 in SB 6. All other factual averments that mention or tangentially reference districts other than CD 35 are alleged in support of this claim against CD 35, as further proof of the Defendants' invidious intent.

## VI. Request for Injunctive Relief

140.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

141.     Plaintiff will likely succeed on the merits, because SB 6 dilutes the votes of minority voters in CD 35 and violates federal and state law. The policy choice of the State of Texas

to racially gerrymander CD 35 and to dilute the Latino majority in CD 35 in the benchmark is an election change that nullifies the electoral voice of the minority voters of CD 35, including the plaintiff.

142.     Plaintiff will suffer immediate and irreparable injury.

143.     There is no harm to the State of Texas or the defendants from being prevented from administering election districts that violate federal law and the U.S. Constitution.

144.     The injunction is in the public interest, because the right to cast a meaningful vote is the foundation upon which all other rights and freedoms are based.

145.     Plaintiff has no other adequate, plain, or complete remedy at all other than enjoining the SB 6 as to CD 35.

146.      Plaintiff requests that the Court enter a permanent injunction prohibiting Defendants implementing any future elections held pursuant to SB 6 as to CD 35.

### VII.     Conclusion and Requests for Relief

147. For the foregoing reasons, Plaintiff respectfully requests that Defendants be cited to appear and answer and that the Court take the following actions and grant the following relief:

A. Appropriate preliminary and permanent injunctive relief to which it shows itself entitled;

B. Entry of a declaratory judgment as described above;

C. Attorneys' fees and court costs; and,

D. Any other or further relief, in law or equity that the Court determines that plaintiffs are entitled to receive.

**DATED**: April 4, 2022

Respectfully,

By: /s/ *Martin Golando*

The Law Office of Martin Golando, PLLC
Texas Bar No. 24059153
2326 W. Magnolia Ave.
San Antonio, Texas 78201
Office: (210) 471-1185
Fax: (210) 405-6772
Email: martin.golando@gmail.com
Attorney for Plaintiff