# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § § | |
| *Plaintiffs,* | § § | Case No. 3:21-cv-00259 [Lead Case] |
| v. | § § | |
| GREG ABBOTT, *et al.*, | § § § | |
| *Defendants.* | § | |
| VERONICA ESCOBAR, | § § | |
| *Plaintiff,* | § § § | |
| v. | § § § | Case No. 3:22-cv-00022 [Consolidated Case] |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § | |

# MOTION TO DISMISS
# VERONICA ESCOBAR'S COMPLAINT

# TABLE OF CONTENTS

Table of Contents ............................................................................................................................. i
Introduction ..................................................................................................................................... 1
Argument ......................................................................................................................................... 4
    I.    Escobar Lacks Standing .................................................................................................. 4
        A.    Escobar Cannot Challenge CD23 Because She Resides in CD16 ..................... 4
        B.    Escobar Has Not Plausibly Alleged Any Other Injuries ...................................... 5
        C.    Escobar Cannot Bring Her Claims in Her Official Capacity ............................. 7
    II.    Escobar's Claims Fail on the Merits ............................................................................ 8
        A.    Escobar Has Failed to Plausibly Allege a Section 2 Effects Claim .................... 8
        B.    Escobar Has Failed to Plausibly Allege an Intentional-Discrimination Claim .............. 13
        C.    Section 2 Does Not Confer a Private Right of Action ..................................... 16
        D.    Escobar Has Failed to Plausibly Allege a Racial-Gerrymandering Claim ....................... 16
Conclusion ..................................................................................................................................... 17
Certificate of Service ..................................................................................................................... 18

## INTRODUCTION

This case, like many of the others consolidated before the Court, is about politics. The plaintiff is Congresswoman Veronica Escobar, the incumbent Democrat representing Congressional District 16. Her chief complaint is that her new district includes only part of, rather than all of, Fort Bliss. *See, e.g., Escobar v. Abbott*, No. 3:22-cv-22, ECF 1 ¶¶ 1–2 (W.D. Tex. Jan. 12, 2022) ("Compl."). Figure 1, below, illustrates the configuration set forth by the new congressional map, Plan C2193.



Figure 1. Plan C2193 – City Layout[1]

But the redistricting of a military base is not a legally cognizable injury. Rather, it is an abstract and generalized grievance, and Escobar lacks standing to challenge it, either as a congresswoman or a citizen. Perhaps sensing this deficiency, Escobar couches her claims as being based on vote dilution under Section 2 of the Voting Rights Act and intentional discrimination under the Fourteenth Amendment. However, she lacks standing to assert these claims too because they are directed at CD23. Escobar neither represents nor resides in CD23, and therefore lacks standing to assert claims

---

[1] https://dvr.capitol.texas.gov/Congress/57/PLANC2193; *see also* PlanC2193, https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/b916a06b-b7e3-42fe-997c-d06f97cd1724/download/planc2193_map_report_package.pdf at pdf page 18, 30. Labels and annotations added by counsel.

based on that congressional district.

To the extent Escobar directs her claims at CD16, they fail on the merits.[2] For the Section 2 claims, she cannot satisfy the three essential preconditions set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986). It is undisputed that CD16 has a 78.0% Hispanic Citizen Voting Age Population.[3] In light of this fact, Escobar cannot satisfy the first *Gingles* precondition because it presupposes that the racial of ethnic minority *does not already* constitute the majority in a single-member district. She also does not allege any specific facts showing that Latinos in CD16 vote cohesively, instead reciting basic legal elements. *See* Compl. ¶ 30 ("Latinos are political [sic] cohesive in CD 16 and CD 23 and vote as a bloc for the Latino-preferred candidates."). Nor does Escobar satisfy the third precondition because she fails to explain how White voters could act as a bloc to defeat the substantial Hispanic majority.

Escobar's vote-dilution claim fails for the additional reason that Section 2 of the VRA does not provide a private right of action. One district court has recently reached the same conclusion. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, No. 4:21-cv-1239, --- F. Supp. 3d ---, 2022 WL 496908, at *9–17 (E.D. Ark. Feb. 17, 2022). Defendants acknowledge that the Court has previously decided this issue. *See generally* ECF 58. Nonetheless Defendants respectfully maintain their position, and bring this to the Court's attention should it decide to revisit the issue.

Escobar's intentional-discrimination claims also fail. From the face of her complaint, it is not clear whether Escobar brings an intentional-vote-dilution claim, a racial-gerrymandering claim, or both. *Compare* Compl. ¶ 28 ("These policy choices were made deliberately and intentionally to dilute the voting strength of the minority community."), *with id.* ¶ 15 ("[T]he State of Texas engaged in a racial gerrymander that radically altered the border between CD 16 and CD 23."). Regardless, both

---

[2] If Escobar had standing to assert vote-dilution and intentional-discrimination claims as to CD23, they would also fail on the merits. But she does not, so Defendants will not address the merits of those claims at length.

[3] *See* PlanC2193, https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/b916a06b-b7e3-42fe-997c-d06f97cd1724/download/planc2193_map_report_package.pdf at pdf page 16.

forms of the claim would lack merit. As a preliminary matter, the complaint does not plausibly allege that the placement of Fort Bliss between CD16 and CD23 will have a discriminatory effect on Latinos. At best, Escobar speculates that Gonzales will not give Fort Bliss and the City of El Paso sufficient attention. *See, e.g.*, Compl. ¶ 51 ("The incumbent congressional representative of CD 16 is more responsive to the needs of taxpayers, voters, and employees of Ft. Bliss than a congressman elected out of San Antonio who has demonstrated that El Paso is low on his priority list."). However, speculation about potential abstract injuries like representational attention does not plausibly allege a discriminatory effect, which is a prerequisite to plausibly alleging a discriminatory-intent claim.

Equally invalidating, there are no discrete facts in Escobar's complaint supporting her claim that the Texas Legislature intended to dilute Latino voting strength in CD16, or that it drew that congressional district by predominantly considering ethnicity. Escobar offers nothing more than formulaic recitations of legal standards. *See, e.g.*, Compl. ¶ 17 ("The removal of critical communities of interest like Ft. Bliss from CD 16 is an act of intentional discrimination."); *id.* ¶ 18 ("Racial discrimination predominated the making of these policy choices."). These are legal conclusions, not specific factual allegations, and they cannot form the basis of a claim for relief, let alone rebut the strong presumption of legislative good faith.

At bottom, Escobar's complaint is about the redistricting of Fort Bliss, but Article III does not allow the litigation of abstract and generalized grievances such as this. Once that injury is properly disregarded, only the Section 2 and intentional-discrimination claims remain. Escobar does not have standing to bring them as to CD23 and they fail on the merits as to CD16. The Court should grant the motion to dismiss.

**ARGUMENT**

**I.      Escobar Lacks Standing**

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). At the pleading stage, Escobar must "clearly . . . allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016) (quotation omitted). These elements are: (1) an actual or imminent, concrete and particularized injury-in-fact; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Escobar seems to have two theories of standing, but neither suffices. First, alleged injuries to those living in CD23 are irrelevant because Escobar does not live in CD23. Second, speculation about the quality of representation provided by different congressmen does not support an inference that Fort Bliss will suffer, much less that Escobar herself will be injured.

**A.      Escobar Cannot Challenge CD23 Because She Resides in CD16**

Escobar's primary theory of injury seems to be that the new congressional map will be bad for people who live in CD23, but she is not one of those people. She lives in (and represents) CD16, not CD23. *See* Compl. ¶ 4. Although "[i]t is not unusual for elected officials to bring suit alleging racial discrimination in *their own* districts," ECF 119 at 3 (emphasis added), Escobar has no basis to challenge a district in which she does not live.

Escobar complains of vote dilution in CD23, *see* Compl. ¶¶ 16, 28, 48, 63, but any vote-dilution injury is by nature "district specific." *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018). Vote dilution "results from the boundaries of the particular district in which [the plaintiff] resides." *Id.* This Court previously concluded standing is satisfied when plaintiffs "reside[] in a district where their vote has been cracked or packed." ECF 119 at 2 (quoting *Harding v. Dallas County*, 948 F.3d 302, 307 (5th Cir. 2020)). By the

4

same token, Escobar cannot be injured by alleged vote dilution in CD23 because she does not vote in that district.

Escobar also complains that CD23 was racially gerrymandered, *see* Compl. ¶¶ 15–16, 55, but as this Court has already recognized, a plaintiff lacks standing to challenge a racially gerrymandered district unless "she resides in the district at issue." ECF 119 at 4; *see also United States v. Hays*, 515 U.S. 737, 746 (1995). Escobar's claims regarding CD23 should therefore be dismissed because the Court lacks jurisdiction to consider them.[4]

### B.  Escobar Has Not Plausibly Alleged Any Other Injuries

Escobar's second theory of injury seems to be that the redistricting of Fort Bliss will have adverse economic effects on the El Paso area, but that is a speculative assertion of a generalized grievance. The premise of Escobar's theory is that the congressman representing CD23 will not do a very good job representing his constituents. *See* Compl. ¶ 48. Indeed, Escobar seemingly implies that poor representation could lead to Fort Bliss's closure. *See id.* ¶¶ 9–10.

These allegations are speculative. To satisfy Article III, an alleged injury cannot be "speculative," but instead must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401–02 (2013). An alleged injury fails these requirements where the theory of liability rests "on a highly speculative and 'attenuated chain of possibilities' partially based on 'the decisions of independent actors.'" *Glass v. Paxton*, 900 F.3d 233, 239 (5th Cir. 2018) (quoting *Clapper*, 568 U.S. at 416). Applying these principles, the Court already ruled that allegations concerning "the responsivity of" congressmen are "too speculative to support an injury-in-fact" when it dismissed Plaintiff Damon James Wilson's claims. *See* ECF 63 at 2–3. The same reasoning applies here.

---

[4] To the extent that Escobar indeed challenges SB6 in its entirety, *see* Compl. ¶¶ 2, 67–68, she lacks standing to do so for the same reasons that she lacks standing to challenge CD23.

Even if Escobar had plausibly alleged that the El Paso region will imminently suffer from less effective representation, that injury would not be sufficiently particularized. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). By contrast, a generalized grievance is "common to all members of the public," *Ex parte Levitt*, 302 U.S. 633, 634 (1937) (per curiam), and the underlying interest is something "all citizens share." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217 (1974).

Escobar does not plausibly allege that she will be individually harmed by the supposed decline of Fort Bliss. Rather, her complaint alleges (albeit speculatively) that the general El Paso area will be negatively affected by the district reconfiguration. *See* Compl. ¶¶ 1–2, 10. But Escobar cannot assert claims on behalf of the general El Paso public. Article III requires that she "personally has suffered some actual or threatened injury." *Spokeo*, 578 U.S. at 339 (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 472 (1982)). She fails to allege any personal injury here. As a result, her claim regarding Fort Bliss is nothing more than a generalized grievance, not within the Court's jurisdiction to consider.

To the extent Escobar alleges that CD16 was the subject of a racial gerrymander, *see* Compl. ¶¶ 15–16, she does not allege that she was personally affected. Escobar claims that "thousands of El Paso County residents were moved into and out of CD16 in order to accomplish a racial gerrymander" affecting CD23, but she does not claim that she is among those alleged "thousands." *Id.* ¶ 16. In other words, she does not allege that she "was put in one district or another" because of her race. *Hays*, 515 U.S. at 744. That means she has not plausibly alleged an injury in fact. "[A]ny inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference." *Id.* at 745. Without a plausible factual allegation that Escobar was personally subjected to a racial classification, she is "asserting only a generalized grievance." *Id.*

6

### C. Escobar Cannot Bring Her Claims in Her Official Capacity

From the case caption, it is unclear if Escobar brings this lawsuit individually or in her capacity as a congresswoman. Compl. at 1 ("Veronica Escobar, U.S. Representative of the 16th congressional district of Texas."). To the extent Escobar sues in her official capacity, she lacks standing. This same deficiency was present in Representative Fischer's complaint. *See* ECF 205 at 4–5 (motion to dismiss). And indeed, Fischer has since amended his complaint to address this issue and clarify that he brings his claims in his personal capacity only. *See* ECF 217 ¶ 6 ("The Plaintiff is **not** suing in his official capacity." (emphasis in original)).

Legislators have standing to sue in their official capacity when their legislative role is impeded or their votes are not given full effect. *Compare Raines v. Byrd*, 521 U.S. 811, 823–24 (1997) ("[Plaintiffs] have not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated. In the vote on the Act, their votes were given full effect."), *with Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800, 803–04 (2015) (holding that the Arizona legislature had standing to challenge a voter-passed proposition stripping the legislature of its responsibility for redistricting). The crux of legislator standing is particularized injury to the legislator as a member of a legislative institution. *See Ariz. State Legislature*, 576 U.S. at 802 ("The Arizona Legislature, in contrast [to the *Raines* plaintiffs], is an institutional plaintiff asserting an institutional injury.").

Conversely, officials lack legislator standing to bring claims of "wholly abstract and widely dispersed" generalized grievances that "necessarily damage[]" all other members of the legislature (and the public). *Gohmert v. Pence*, 510 F. Supp. 3d 435, 440 (E.D. Tex. 2021) (quoting *Raines*, 521 U.S. at 821, 829). The Supreme Court of Texas has drawn on the federal analysis for legislator standing and held likewise. In 2001, the Court denied legislator standing to a city council member challenging a mayoral order, explaining that "a [legislator] plaintiff [must] allege some injury distinct from that

7

sustained by the public at large." *Brown v. Todd*, 53 S.W.3d 297, 302–04 (Tex. 2001) (relying on *Raines* in concluding that the plaintiff lacked legislator standing).

Here, Escobar has not alleged any interference with her legislative function. Rather, she alleges vote dilution and intentional discrimination—the exact same injury that the general voting public would face. *See, e.g.*, Compl. ¶¶ 4, 17, 28, 63. Because Escobar lacks legislator standing, this suit should be dismissed to the extent that she sues in her official capacity.

*        *        *

As is clear from the face of Escobar's complaint, the focus of her grievance is the redistricting of Fort Bliss to fall between CD16 and CD23. For the reasons explained above, Escobar cannot assert this injury because it is abstract, speculative, and undifferentiated from the general public's interest in the El Paso community. In the alternative, Escobar attempts to couch her claims as being based on vote dilution or racial gerrymandering. But as explained below, these claims clearly fail, especially when properly limited to CD16, where she resides.

## II.    Escobar's Claims Fail on the Merits

Escobar's claims fail on the merits because she has not adequately alleged either a Section 2 discriminatory-effects claim or a discriminatory-intent claim. The former requires alleging specific facts showing that a minority group, which is politically cohesive, could constitute a majority that would beat the otherwise-existent white majority, which also votes as a bloc. The latter requires alleging specific facts showing that the Legislature acted with "invidious intent." But Escobar has done neither. And her racial-gerrymandering claim fails for the same reason her Section 2 discriminatory-intent claim fails. For these additional reasons, the Court should dismiss this complaint.

### A.    Escobar Has Failed to Plausibly Allege a Section 2 Effects Claim

Escobar has not plausibly alleged a Section 2 discriminatory-effects violation. Section 2 of the VRA prohibits a "standard, practice, or procedure" from being "imposed or applied . . . in a manner

8

which results in a denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a). To establish a violation, a plaintiff must show that:

> [T]he political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 10301(b). A court can consider "[t]he extent to which members of a protected class have been elected to office in the State," but "nothing in [Section 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.*

> A plaintiff bringing such a suit must first establish three "necessary preconditions":
>
> (1) The minority group must be able to demonstrate it is sufficiently large and geographically compact to constitute a majority in a single-member district;
>
> (2) The minority group must be able to show that it is politically cohesive; and
>
> (3) The minority [group] must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Thornburgh v. Gingles*, 478 U.S. 30, 50–51 (1986); *see Growe v. Emison*, 507 U.S. 25, 39–41 (1993) (explaining that "*Gingles* preconditions" are required in "a § 2 dilution challenge to a single-member districting scheme").

The *Gingles* preconditions are a "bright line test." *Valdespino v. Alamo Heights ISD*, 168 F.3d 848, 8852 (5th Cir. 1999); *accord Benavidez v. Irving ISD*, 690 F. Supp. 2d 451, 456 (N.D. Tex. 2010). "Failure to establish any one of those threshold requirements is fatal." *Harding*, 948 F.3d at 308 (quotation omitted). Meeting the *Gingles* test is necessary but not sufficient to prevail. Yet here, Escobar fails to allege facts that would meet any of the *Gingles* preconditions.

9

### 1.   Escobar Has Not Alleged the First *Gingles* Precondition

Escobar has the burden of plausibly alleging that Latino voters are "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. Such an allegation is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district"—here, CD16. *Growe*, 507 U.S. at 40. But Escobar does not assert that the Legislature should have drawn CD16 to create a majority Latino district. That is because under Plan C2193, CD16 already is a Latino-majority district. Indeed, it is undisputed that CD16 has a 78.0% Hispanic Citizen Voting Age Population under the new plan.[5] Therefore, Escobar cannot establish the first *Gingles* precondition.

That is why Escobar does not allege any facts to establish the first *Gingles* precondition with respect to CD16. Instead, Escobar alleges facts only about CD23. But as explained above, Escobar lacks standing to challenge CD23. *See Gill*, 138 S. Ct. at 1930 (explaining that an injury must be the "results from the boundaries of the particular district in which [the plaintiff] resides"). Therefore, Escobar's failure to allege facts related to CD16 in turn fails to satisfy the first *Gingles* precondition. And as a result, her VRA claim fails as a matter of law.

### 2.   Escobar Has Not Alleged the Second *Gingles* Precondition

Escobar also has not satisfied the second *Gingles* precondition—that "the minority group . . . be able to show that it is politically cohesive." 478 U.S. at 51. First, Escobar's sole allegation of voter cohesion is a single terse sentence: "Latinos are politically cohesive in CD 16 . . . and vote as a bloc for the Latino-preferred candidates." Compl. ¶ 30. This is not enough under *Twombly* and *Iqbal*. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (requiring more than a "formulaic recitation"); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action,

---

[5] *See* PlanC2193, https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/b916a06b-b7e3-42fe-997c-d06f97cd1724/download/planc2193_map_report_package.pdf at pdf page 16.

supported by mere conclusory statements, do not suffice.").

What factual allegations Escobar does make beyond this sole sentence relate to minority cohesion in CD23 only. But again, Escobar lacks standing to challenge CD23. *See Gill*, 138 S. Ct. at 1930. Therefore, Escobar's failure to allege facts related to CD16 fails to satisfy the second *Gingles* precondition.

Even if allegations about CD23 were relevant, Escobar's allegations are inconsistent with any inference of cohesion. Latinos in CD23 constitute a commanding majority, so Latinos voting cohesively would make CD23 a safe district for the Latino candidate of choice. Yet Escobar alleged the exact opposite, characterizing "CD 23's political performance" as "marginal":

> It is a district that leans Republican, but has – at times – elected a Democrat. In the 2020 General Election, Trump won CD 23 with 50.2% of the Vote. Other statewide Republican candidates fared similarly. In 2018, Senator Cruz lost CD 23 to candidate Beto O'Rourke by 4 points (52.07% v. 47.11%). Some Republican statewide candidates won CD 23 and others lost. It's a swing district.

Compl. ¶ 25.

Finally, Escobar quotes the *Perez* panel's conclusion that "Hispanic voters are politically cohesive in general and primary elections." Compl. ¶ 34 (quoting *Perez v. Abbott*, No. 5:11-cv-360, ECF 1340 ¶ 690 (W.D. Tex. Mar. 10, 2017)). That is not a factual allegation. It is a different panel's decision in a different case. And it cannot stand in for the allegations that Escobar bears the burden of making to survive the pleading stage of this lawsuit. *See Twombly*, 550 U.S. at 570 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"); *id.* at 544 (courts "are not bound to accept as true a legal conclusion couched as a factual allegation") (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Because Escobar has not satisfied the second *Gingles* precondition, this case should be dismissed.

11

### 3.     Escobar Has Not Alleged the Third *Gingles* Precondition

Escobar also fails to allege facts supporting the third *Gingles* precondition—namely, "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51. Again, satisfying this requirement is a "bright-line test," *Valdespino*, 168 F.3d at 852, and Escobar's failure to satisfy it "is fatal." *Harding*, 948 F.3d at 308.

Here too, Escobar's complaint runs into a *Twombly-Iqbal* problem. Escobar proffers only a near-verbatim recitation of the third *Gingles* precondition:

> In . . . CD 16 . . . , Anglos (White Non-Hispanics) vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g. single-member districts), to defeat the minority voters' preferred candidates of choice. In . . . CD 16 . . . , Anglos vote as a politically cohesive bloc against minority-preferred candidates.

Compl. ¶ 31. That is not enough. Escobar could not include factual allegations supporting that conclusion because they would have fatally undermined her claim. White voters are only 16% of CD16's voting-age citizens.[6] Escobar does not include any factual allegations explaining how white voters could overwhelm Latino voters when white voters are such a small minority in CD16.

Outside of this conclusory allegation, Escobar makes no specific factual allegations about CD16—only CD23. Yet to reiterate, because Escobar lacks standing to challenge CD23, *see Gill*, 138 S. Ct. at 1930, she must allege facts specific to CD16. She has not done so. And for that reason alone, she has failed to satisfy the third *Gingles* precondition. Even if her CD23 allegations could somehow suffice, the allegations themselves preclude recovery. Escobar's allegations confirm that white voters do not constitute a majority in CD23. *See* Compl. ¶ 26 ("As currently configured, CD23 is . . . 57.8% HCVAP."). Indeed, white voters in CD23 are only about one-third of CD23's voting-age citizens.[7]

---

[6] For CD16, HCVAP is 78.0%, and the white CVAP is 16.0%. *See* PlanC2193, https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/b916a06b-b7e3-42fe-997c-d06f97cd1724/download/planc2193_map_report_package.pdf at pdf page 16.

[7] The white CVAP for CD23 is 35.1%. *See* PlanC2193, https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/b916a06b-b7e3-42fe-997c-d06f97cd1724/download/planc2193_map_report_package.pdf at pdf page 16.

Lastly, Escobar alleges that the political performance of white-preferred candidates improved in CD23. Compl. ¶ 27 ("The Texas Legislative Council (TLC) estimates that the political performance for Anglo-preferred candidates has increased 2-4 points depending upon the election and candidate."). But the third *Gingles* precondition does not inquire about the performance of white-preferred candidates. Rather, the inquiry is two-fold: (1) whether there is a white majority; and (2) if so, whether it "votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51. Here, by Escobar's own concession, there is no white majority—neither in CD16, which is at issue in this lawsuit; nor in CD23, which Escobar lacks standing to challenge. Hence, Escobar has not satisfied the third *Gingles* precondition. The Court should therefore dismiss this claim.

### B. Escobar Has Failed to Plausibly Allege an Intentional-Discrimination Claim

#### 1. Escobar Has Not Alleged Facts Showing Discriminatory Intent

Escobar has not alleged facts sufficient to infer a discriminatory purpose to support her Section 2 or Equal Protection claims. In redistricting cases, "the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). It is "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). The required intent is not mere "volition" or "awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Rather, the Legislature must have passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

Escobar proffers naked assertions that the Texas Legislature acted with discriminatory intent. *See* Compl. ¶¶ 17, 18, 28, 49, 56, 57. These assertions "amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Iqbal*, 556 U.S. at 681. "As such, the allegations are conclusory and not entitled to be assumed true," even at the pleading stage. *Id.*

13

The limited factual allegations that Escobar does make are insufficient. First, Escobar points to unrelated legislation to infer that the Texas Legislature acted with discriminatory intent in passing this map. *See* Compl. ¶¶ 36–39. But the Supreme Court recently reiterated that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Perez*, 138 S. Ct. at 2324 (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality op.)). Instead, the "ultimate question remains whether a discriminatory intent has been proven *in a given case*." *Mobile*, 446 U.S. at 74 (emphasis added). Even if Escobar could prove each of these allegations, it would not support an inference of discriminatory intent regarding the congressional map.

Second, Escobar protests the procedure surrounding adoption of the congressional map. She complains about "deviations from normal procedure, lack of transparency and public input, and a rushed, inconsistent process leading to enactment." Compl. ¶ 57. Although "[d]epartures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role" in government decision-making, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977), they raise no inference of "invidious discrimination" when there is an "obvious alternative explanation." *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567). And Escobar alleges nothing that contravenes the "obvious alternative explanation" of partisanship. *Twombly*, 550 U.S. at 567; *LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc).

Escobar also ignores another ready and obvious explanation: the federal census was delayed due to the pandemic, so the results were not delivered until more than ten weeks after the Texas Legislature's 87th regular session ended. That was more than four months after the statutory deadline of April 1. *See* 13 U.S.C. § 141(a), (c). As a result, the Texas Legislature had to redistrict during a special session, which is constitutionally limited to thirty days. *See* Tex. Const. art. III, § 40. With a compressed schedule due to pandemic-related delays, an allegedly rushed process would hardly be surprising, much less give a reason to infer intentional invidious discrimination. In *Abbott v. Perez*, the Supreme Court

14

could "not see how the brevity of the legislative process can give rise to an inference of bad faith." 138 S. Ct. at 2328–29. The evidence there was insufficient; the allegations here are even weaker.

Finally, Escobar alleges that "during the enactment of CD 16 and CD 23, stray comments were made about the incumbent representative of CD 16 that were racial, misogynistic, and revelatory of an impermissible intent in the creation of those congressional districts." Compl. ¶ 49. This conclusory assertion does not provide fair notice to Defendants (or the Court). First, the complaint does not specify what was said, so characterizing comments as "revelatory of an impermissible intent" or otherwise "racial" is conclusory, not factual.[8] Second, the complaint does not specify who made these alleged comments. It does not even allege that the people making these "stray comments" were members of the Legislature. *Id.* If the Court does not dismiss Escobar's complaint, it should order her to provide a more definite statement under Rule 12(e). Defendants "cannot reasonably prepare a response" to such a vague allegation. Fed. R. Civ. P. 12(e).

### 2. Escobar's Failure to Allege Discriminatory Effects Dooms Her Discriminatory-Intent Claim

Even if Escobar had plausibly alleged discriminatory intent, that would not be enough. This follows from "a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). "[N]o case in [the Supreme] Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Courts routinely require discriminatory effect in intentional-discrimination redistricting cases. *See, e.g.*, *Shaw v. Reno*, 509 U.S. 630, 649 (1993) ("We have . . . required plaintiffs to demonstrate that the challenged practice has the purpose and effect of diluting a racial group's voting strength."); *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 800 (S.D. Tex. 2013)

---

[8] Moreover, any "misogynistic" comments would be reproachable but irrelevant to Escobar's claims. *See* Compl. ¶ 49. Escobar's claims are based on alleged racial discrimination, not sex discrimination. *See id.* ¶¶ 59, 61.

15

("purpose and operative effect"); *LULAC v. N.E. ISD*, 903 F. Supp. 1071, 1093 (W.D. Tex. 1995) ("intentional discrimination" and "a resultant discriminatory effect").

The same is true under Section 2. "[T]he statute proscribes intentional discrimination only if it has a discriminatory effect, but proscribes practices with discriminatory effect whether or not intentional." *Chisom v. Roemer*, 501 U.S. 380, 406 (1991) (Scalia, J., dissenting); *accord Turner v. Arkansas*, 784 F. Supp. 553, 565 (E.D. Ark. 1991), *aff'd*, 504 U.S. 952 (1992).

As explained above, Escobar has not plausibly alleged discriminatory effects. Therefore, she has not established any real-world effect resulting from the alleged discriminatory intent.

### C. Section 2 Does Not Confer a Private Right of Action

Escobar's Section 2 claims should also be dismissed because Section 2 does not create a private right of action. As another district court recently recognized, under *Alexander v. Sandoval*, there is no private right of action under Section 2 because Congress did not create one. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, No. 4:21-v-01239-LPR, 2022 WL 496908, at *9–17 (E.D. Ark. Feb. 17, 2022) (citing 532 U.S. 275 (2001)). Defendants recognize that the Court has already decided this issue, *see generally* ECF 58, and do not wish to burden the Court with duplicative briefing. Defendants incorporate by reference their previous briefing. *See* ECF 12 at 16–19.

### D. Escobar Has Failed to Plausibly Allege a Racial-Gerrymandering Claim

Escobar asserts that CD16 is a racial gerrymander, but the complaint does not allege any factual support. To be sure, the complaint says, there was "a racial gerrymander," Compl. ¶¶ 15–16, but it does not provide any reason to think that is true. The closest it comes is the allegation that the Legislature "radically altered the border between CD 16 and CD 23" when it could have instead "add[ed] a few Voter Tabulation Districts" to CD16. *Id.* ¶ 15. But the complaint does not include any factual allegations suggesting that the changes were made based on racial data as opposed to partisan data (or any other data for that matter).

16

Escobar has fallen far short of plausibly alleging "that race was improperly used in the drawing of the boundaries of one or more specific electoral districts." *Ala. Legislative Black Caucus*, 575 U.S. at 263. A racial gerrymandering claim must allege that race was not simply *a* motivation for the drawing of a district, but the *predominant* factor motivating the legislature's districting decision. *See Harding*, 948 F.3d at 313 ("[R]ace must have been 'the predominant factor motivating' the redistricting process and 'subordinat[ing] traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests." (quoting *Miller*, 515 U.S. at 916)).

The burden of proof required for such claims is especially "demanding." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001). Courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Miller*, 515 U.S. at 916. As with an intentional vote-dilution claim, the awareness and use of racial demographics and statistics do not by themselves show discriminatory purpose. *See Miller*, 515 U.S. at 916 (explaining that even though legislatures are "almost always" aware of racial demographics, "it does not follow that race predominates in the redistricting process"). Instead, a plaintiff must show that the Legislature, in designing the particular district at issue, "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group." *Id.* (quoting *Feeney*, 442 U.S. at 279). For the same reasons that Escobar failed to allege facts plausibly suggesting that the Legislature drew the new maps with an intent to discriminate based on race, it has not alleged facts plausibly suggesting that race was the Legislature's predominant concern in drawing the new maps.

## CONCLUSION

Defendants respectfully request that the Court dismiss Plaintiff Veronica Escobar's complaint.

17

| | |
|---|---|
| Date: April 13, 2022 | Respectfully submitted. |
| KEN PAXTON<br>Attorney General of Texas | */s/ Patrick K. Sweeten*<br>PATRICK K. SWEETEN<br>Deputy Attorney General for Special Litigation<br>Tex. State Bar No. 00798537 |
| BRENT WEBSTER<br>First Assistant Attorney General | |

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

ARI M. HERBERT*
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24126093
*Application for admission pending*

JACK B. DISORBO
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24120804

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ari.herbert@oag.texas.gov
jack.disorbo@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on April 13, 2022, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN