# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § | |
| *Plaintiffs,* | § § | |
| EDDIE BERNICE JOHNSON, *et al.*, | § § | Case No. 3:21-cv-00259 |
| *Plaintiff-Intervenors* | § § | [Lead Case] |
| V. | § § | |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § | |

## MOTION TO DISMISS
## INTERVENORS' AMENDED COMPLAINT

## TABLE OF CONTENTS

Table of Contents ..................................................................................................................... i

Introduction ............................................................................................................................ 1

Argument ................................................................................................................................. 3

    I.    Intervenors Lack Standing ................................................................................... 3

        A.    Intervenors Cannot Bring Claims as to Districts where they Do Not Reside ............... 3

        B.    Intervenors Cannot Bring Claims in their Official Capacity ........................................ 5

        C.    Intervenors Cannot Bring Claims Based on Hispanic Ethnicity ................................. 6

    II.    The State of Texas Is Not a Proper Party ............................................................ 7

    III.    Intervenors' Claims Fail on the Merits ................................................................ 8

        A.    Intervenors Fail to Plausibly Allege a Section 2 Effects Claim ................................. 8

        B.    Intervenors Fail to Plausibly Allege an Intentional-Discrimination Claim .................. 12

        C.    Intervenors Fail to Plausibly Allege a Racial Gerrymandering Claim ........................ 16

Conclusion ............................................................................................................................. 18

Certificate of Service ............................................................................................................. 19

## INTRODUCTION

Congresswomen Eddie Bernice Johnson and Sheila Jackson-Lee and Congressman Al Green are the incumbent Democrats for Congressional Districts 30, 18, and 9, respectively. Johnson is not seeking re-election, and Jasmine Crockett is the expected nominee to succeed her in CD30. As shown in Table 1, below, each of the three congressional districts at issue here includes a substantial African American plurality, and well as a supermajority of African Americans and Hispanics. And as the four Plaintiff-Intervenors acknowledge, "Congressional Districts 9, 18, and 30 are all minority opportunity districts." ECF 209 ¶ 28 (Intervenors' first amended complaint) ("Compl."). The newly enacted congressional map, Plan C2193, makes modest changes to these districts' composition as compared to the benchmark map, Plan C2100.

**Table 1. Black and Hispanic Citizen Voting Age Comparison, C2193 and C2100[1]**

|      |      | BCVAP | HCVAP | (B+H) CVAP |
|------|------|-------|-------|------------|
| CD9  | 2022 | 46.8  | 24.4  | 71.2       |
|      | 2020 | 46.6  | 25.8  | 72.4       |
| CD18 | 2022 | 40.9  | 27.9  | 68.8       |
|      | 2020 | 44.0  | 27.6  | 71.6       |
| CD30 | 2022 | 49.0  | 20.4  | 69.4       |
|      | 2020 | 51.9  | 23.0  | 74.9       |

Intervenors bring discriminatory-effects claims under Section 2 of the Voting Rights Act, discriminatory-intent claims under the Fourteenth Amendment, and racial gerrymandering claims under *Shaw v. Reno*, 509 U.S. 630 (1993). But it is clear from the face of Intervenors' first amended

---

[1]   *See* Plan C2193, https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/b916a06b-b7e3-42fe-997c-d06f97ed1724/download/planc2193_map_report_package.pdf at pdf page 16 and Plan C2100 data.capitol.texas.gov/dataset/planc2100/resource/91bf40d6-4dde-49ae-bd59-e94241f0adb6 at pdf page 1.

These maps are publicly available at the Texas redistricting data website, *see generally* https://data.capitol.texas.gov/, and thus subject to judicial notice. *See* Fed. R. Evid. 201. Is well-established that, along with pleadings and attachments, "[j]udicially noticed facts may also be considered in ruling on a motion to dismiss." *Basic Capital Mgmt., Inc. v. Dynex Capital, Inc.*, 976 F.3d 585, 588 (5th Cir. 2020) (citation omitted).

complaint that their claims are focused not on their own congressional districts, but on the adjacent districts in the Houston and Dallas-Fort-Worth areas. They allege that CD9, CD18, and CD30 were reconfigured to allow white majorities to elect their candidates of choice in the nearby Congressional Districts 5, 6, 7, 14, 22, 24, 29, and 32. That allegation is false, but even if it were true, Intervenors would still not be able to bring claims as to the latter districts because they do not reside in them. A redistricting plaintiff has standing only to challenge the legality of the district in which he or she lives. The amended complaint must therefore be dismissed to the extent it asserts claims for districts other than CD9, CD18, and CD30.

Intervenors lack standing in three other significant respects. First, they purport to bring their claims to "protect the voters of the 9th, 18th and 30th Congressional Districts," Compl. ¶ 6, but those voters are not parties to this lawsuit. Intervenors cannot litigate claims belonging to third parties. Second, Intervenors raise vote-dilution claims as to both African Americans and Latinos. But they are each African American, and thus lack standing to assert claims on behalf of the class of Hispanics who could theoretically bring claims as to these districts. And third, insofar as the Intervenors bring this suit in their official capacity, they lack standing on that basis as well, because they have not alleged any interference with their legislative functions. The only claims they could possibly have standing to bring are vote-dilution and intentional-discrimination claims based on CD9, CD18, and CD30.

Those claims clearly fail on the merits. Indeed, the Court need go no further than to recognize, as Intervenors have, that African Americans have the opportunity to elect their candidate of choice in each of the three districts at issue. This necessarily defeats any vote-dilution claim under the VRA. Intervenors' stray comments regarding the perceived *retrogression* of the districts at issue are irrelevant because the retrogression standard does not apply to Section 2. Those allegations are also factually unfounded; the numbers listed above plainly show that CD9, CD18, and CD30 retain large African-

American pluralities. Plan C2193 makes insubstantial changes to these districts, and in fact increases the BCVAP in Congressional District 9.

African Americans' uncontested ability to elect their candidate of choice in the districts at issue also forecloses Intervenors' intentional-discrimination claims because they necessarily fail where there is no showing of discriminatory effect. And here, it is undisputed than there is no discriminatory effect as to African American voters within CD9, CD18, and CD30. Moreover, even if Intervenors could satisfy this essential prerequisite, which they cannot, their first amended complaint does not plausibly allege that Plan C2193 was drawn with the intent to discriminate against African Americans or that race predominated in its drawing.

In short, the majority of Intervenors' amended complaint is immaterial because it concerns districts in which Intervenors do not reside, and thus do have standing to challenge. And the claims regarding the districts Intervenors *can* challenge—CD9, CD18, and CD30—clearly fail on the merits. The Court should grant the motion to dismiss.

## ARGUMENT

### I.    Intervenors Lack Standing

#### A.    Intervenors Cannot Bring Claims as to Districts where they Do Not Reside

Intervenors purport to challenge a broad swath of congressional districts in the Houston and Dallas-Fort-Worth areas. *See* Compl. ¶ 3 (as to CD29); *id.* ¶ 5 (as to CD6); *id.* ¶ 23 (as to CD7); *id.* ¶ 27 (as to CD 14, CD22, and CD36); *id.* ¶ 28 (as to CD 5, CD24, and CD32); *id.* ¶ 52 (alleging injury "in the Harris County/Fort Bend Area and the Dallas/Fort Worth Metroplex Area."). But they lack standing to bring these claims because, respectively, they reside only in CD9, CD18, and CD30. *See id.* ¶¶ 10–13 (explaining that Intervenors live in CD9 (Green), CD18 (Jackson-Lee), and CD30 (Johnson and Crockett)). Where, as here, "plaintiffs' alleged harm is the dilution of their votes, that injury is district specific." *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018). Any alleged injury "therefore results

from the boundaries of the particular district in which he resides." *Id.* (citing *Baker v. Carr*, 369 U.S. 186, 206 (1962)).

This is in keeping with Supreme Court precedent restricting standing to bring redistricting claims. In a racial gerrymandering case, for example, a voter lacks Article III standing to challenge a map "in its entirety." *United States v. Hays*, 515 U.S. 737, 746 (1995). Establishing "individualized harm" requires showing that the "plaintiff resides in a racially gerrymandered district." *Id.* at 744–45. "On the other hand, where a plaintiff does not live in such a district," she lacks standing unless there is some other basis for concluding "that the plaintiff has personally been subjected to a racial classification." *Id.* at 745; *see also Sinkfield v. Kelley*, 531 U.S. 28, 30 (2000) (per curiam). Thus, "[a] racial gerrymandering claim"—like all redistricting claims—must proceed "district-by-district," and cannot purport to treat the State "as an undifferentiated 'whole.'" *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015); *accord Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 800 (2017).

Intervenors' vote-dilution and gerrymandering claims are aimed at the Houston and Dallas-Fort-Worth areas as a whole, but they lack standing to bring those claims because they neither represent nor reside in most of those congressional districts. As the Court has already recognized, this is a basic prerequisite to plausibly alleging injury in connection with a redistricting claim. *See* ECF 119 at 2 (Memorandum Opinion and Order) (explaining that a plaintiff must "reside[] in a district where their vote has been cracked or packed.") (quoting *Harding v. Dallas County*, 948 F.3d 302, 307 (5th Cir. 2020)); *id.* at 6 (dismissing claims brought by Plaintiff Deborah Spell, "who does not live in benchmark SD 10 or the newly enacted SD 10."); *see also, e.g.*, *Chen v. City of Houston*, 9 F. Supp. 2d 745, 749 (S.D. Tex. 1998) ("To challenge [a] redistricting plan, a plaintiff must be a resident of the district which he seeks to challenge.") (citing *Hays*, 515 U.S. at 745). Intervenors claims should be dismissed for lack of standing except as to CD9 for Green, CD18 for Jackson-Lee, and CD30 for Johnson and Crockett.

**B.      Intervenors Cannot Bring Claims in their Official Capacity**

From the face of the complaint, it is unclear whether Intervenors purport to bring this lawsuit individually or in their capacity as elected representatives. *See* Compl. ¶ 10 ("Congresswoman Johnson has worked to represent her district where she ably represents African-American voters and a coalition of African-American and Latino voters."); *id.* ¶¶ 11–13 (similar, as to Jackson-Lee, Green, and Crockett); *see also id.* ¶ 6 ("A ruling by this Court is necessary *to protect the voters of the 9th, 18th and 30th Congressional Districts*.") (emphasis added).

To the extent Intervenors sue in their official capacity, they lack standing. Legislators have standing to sue in their official capacity when their legislative role is impeded or their votes in Congress (or some other legislative body) are not given full effect. *Compare Raines v. Byrd*, 521 U.S. 811, 823–24 (1997) ("[Plaintiffs] have not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated. In the vote on the Act, their votes were given full effect."), *with Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800, 803–04 (2015) (holding that the Arizona legislature had standing to challenge a voter-passed proposition stripping the legislature of its responsibility for redistricting). The crux of legislator standing is particularized injury to the legislator as a member of a legislative institution. *See Ariz. State Legislature*, 576 U.S. at 802 ("The Arizona Legislature, in contrast [to the *Raines* plaintiffs], is an institutional plaintiff asserting an institutional injury.").

Conversely, officials lack legislator standing to bring claims of "wholly abstract and widely dispersed" generalized grievances that "necessarily damage[]" all other members of the legislature (and the public). *Gohmert v. Pence*, 510 F. Supp. 3d 435, 440 (E.D. Tex. 2021) (quoting *Raines*, 521 U.S. at 821, 829). The Supreme Court of Texas has drawn on the federal analysis for legislator standing and held likewise. In 2001, the Court denied legislator standing to a city council member challenging a mayoral order, explaining that "a [legislator] plaintiff [must] allege some injury distinct from that

5

sustained by the public at large." *Brown v. Todd*, 53 S.W.3d 297, 302–04 (Tex. 2001) (relying on *Raines* in concluding that the plaintiff lacked legislator standing).

Here, Intervenors have not alleged any interference with their legislative function. Rather, they allege vote dilution and intentional discrimination—the exact same injury that the general voting public would face. And insofar as Intervenors purport to bring this lawsuit on behalf of their district constituents, they run afoul of the well-established prohibition on third-party standing. *See, e.g.*, *Ward v. Santa Fe ISD*, 393 F.3d 599, 606 (5th Cir. 2004) ("[A] litigant must assert his or her own legal rights and interests and cannot rest a claim to relief on the legal rights or interests of third parties.") (citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). Because Intervenors lacks legislator standing, this suit should be dismissed to the extent that they sue in their official capacity.

C.    **Intervenors Cannot Bring Claims Based on Hispanic Ethnicity**

Intervenors purport to bring claims regarding the dilution of "the voting strength of African American and Latino voters," Compl. ¶ 2, but they have no standing regarding the latter. Each of the Intervenors are African American, not Latino. *See id.* ¶¶ 10–13. The Voting Rights Act applies only to "*members* of a class of citizens," 52 U.S.C. 10301(b) (emphasis added), and affords relief in instances where those "members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* And indeed, the first precondition set forth in *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986), presupposes that the plaintiff belongs to the "minority group" at issue. *Accord, e.g.*, *Harding*, 948 F.3d at 308. Likewise, intentional vote dilution and racial gerrymandering claims are based on the allegation that the defendant has discriminated against the plaintiff based on his or her race or ethnicity. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) (as to intentional vote dilution); *Harding*, 948 F.3d at 312 (as to racial gerrymandering) (citing *Shaw*, 509 U.S. at 641; *compare, e.g.*, *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 332 (5th Cir. 2019) (in the

context of an employment-discrimination claim, the plaintiff must "belong to the protected class") (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

Intervenors have standing only to the extent their vote has been diluted or their congressional district have been drawn because of their race. Intervenors are African Americans, so they only have standing to the extent the congressional districts at issue discriminate against African Americans. They lack standing to assert injury based on alleged discrimination against Latinos, and their claims in that capacity should therefore be dismissed.

## II.   The State of Texas Is Not a Proper Party

Intervenors name the State of Texas as a defendant, *see* Compl. ¶ 14, but it is immune from their claims and is therefore not a proper defendant. State sovereign immunity limits federal-court jurisdiction, *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996); *accord Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, 294 F.3d 684, 688 (5th Cir. 2002) (citing *Seminole Tribe*), and "bars private suits against nonconsenting states in federal court." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019).

Because the State of Texas is a sovereign entity, it is immune from suit unless there is waiver or abrogation by federal law. First, Intervenors rightly recognize they cannot bring constitutional claims against the State. *See* Compl. ¶ 14 ("Plaintiffs bring claims against the State of Texas solely as to the statutory claims."). And for good reason. "Congress has not abrogated state sovereign immunity . . . under § 1983." *Raj v. LSU*, 714 F.3d 322, 328 (5th Cir. 2018).[2] And the Intervenors cannot avail themselves of the *Ex Parte Young* exception, which applies only "to state officials"—"not to the states themselves." *Planned Parenthood Gulf Coast, Inc. v. Phillips*, 5 F.4th 568, 577 (5th Cir. 2021).

---

[2]   Nor does Section 1983 create a cause of action against States. Rather, it allows suits against "[e]very person who" takes certain actions, 42 U.S.C. § 1983, but "a State is not a 'person' within the meaning of § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989). Nevertheless, Intervenors assert constitutional claims against the State itself. *See* Compl. ¶ 14 ("Defendant the State of Texas is a political subdivision covered under the provisions of the Voting Rights Act and responsible for the actions of its officials with regard to state-wide redistricting. Plaintiffs bring claims against the State of Texas solely as to the statutory claims."). The Court should dismiss the constitutional claims against the State of Texas for this additional reason.

The Section 2 claims asserted against the State should also be dismissed. Current Fifth Circuit precedent maintains that the Voting Rights Act has abrogated state sovereign immunity for Section 2 claims. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017). Defendants respectfully contend that the decision is wrong. *See* ECF 239 at 17; *see also Ala. State Conf. of the NAACP v. Alabama*, 949 F.3d 647, 655 (11th Cir. 2020) (Branch, J., dissenting) ("Congress did not unequivocally abrogate state sovereign immunity under Section 2 of the Voting Rights Act.").

## III.     Intervenors' Claims Fail on the Merits

As explained above, Intervenors lack standing except as to their vote-dilution and intentional-discrimination claims with respect to CD9, CD18, and CD30.[3] Each of these claims fails on the merits.

### A.     Intervenors Fail to Plausibly Allege a Section 2 Effects Claim

#### 1.     The *Gingles* Test

Intervenors have not plausibly alleged a Section 2 discriminatory-effects claim. Section 2 of the VRA prohibits a "standard, practice, or procedure" from being "imposed or applied . . . in a manner which results in a denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a). To establish a violation, a plaintiff must show that:

> [T]he political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 10301(b). A court can consider "[t]he extent to which members of a protected class have been elected to office in the State," but "nothing in [Section 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.* A plaintiff bringing such a suit must establish three "necessary preconditions":

---

[3]     Intervenors nominally assert six counts, but several of these are duplicative. Counts I and II together assert one claim under Section 2 of the VRA. *See* Compl. ¶¶ 53–56. Counts III, IV, and V together assert one claim for intentional vote dilution. *See id.* ¶¶ 57–62. And Count VI asserts a claim for racial gerrymandering. *See id.* ¶¶ 63–68.

(1) The minority group must be able to demonstrate it is sufficiently large and geographically compact to constitute a majority in a single-member district;

(2) The minority group must be able to show that it is politically cohesive; and

(3) The minority [group] must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 50–51; *see Grove v. Emison*, 507 U.S. 25, 39–41 (1993) ("*Gingles* preconditions" are required in "a § 2 dilution challenge to a single-member districting scheme").

The *Gingles* preconditions are "a bright line test." *Valdespino v. Alamo Heights ISD*, 168 F.3d 848, 852 (5th Cir. 1999); *accord Benavidez v. Irving ISD*, 690 F. Supp. 2d 451, 456 (N.D. Tex. 2010). "Failure to establish any one of these threshold requirements is fatal." *Harding,* 948 F.3d at 308 (quotation omitted). But meeting "the three prongs of *Gingles*" is not enough. Plaintiff must also "establish that the 'totality of the circumstances' supports a finding of vote dilution." *Id.* at 308–09.

## 2. Intervenors Do Not Allege African Americans Will Be Unable to Elect Their Candidate of Choice in CD9, CD18, and CD30

Even if Intervenors could satisfy the first and second *Gingles* preconditions, their Section 2 claims fail because the amended complaint fails to allege that African Americans in CD9, CD18, and CD30 cannot elect their candidate of choice under C2193. In fact, their complaint carefully avoids making this assertion, instead focusing exclusively on the insubstantial change in African-American and Hispanic population in these districts. *See, e.g.*, Compl. ¶ 3 ("African American voter percentages and the related performance of the 18th decreased." It "retrogressed in terms of effectiveness."); *id.* ¶ 4 ("[T]he 30th was reduced from an above 50 percent Black Citizen Voting Age Majority District to a below 50 percent Black Citizen Voting Age Majority District."); *id.* ¶ 25 ("Congressional District 30 was unnecessarily reduced below a Citizen Voting Age population of 50 percent."); *id.* ¶ 26 (Congressional Districts 9, 18 and 30 were drawn in a way that causes retrogression of the minority voter strength."). But, as explained below, such allegations are immaterial to Intervenors' VRA claims

because the retrogression standard does not apply to Section 2 claims.

The reason for this circumlocution is that Intervenors know that CD9, CD18, and CD30 will each elect the African American candidate of choice. Indeed, Intervenors concede that "Congressional Districts 9, 18, and 30 are all minority opportunity districts." Compl. ¶ 28; *see also id.* ¶ 38 (describing "African American opportunity districts"). And it bears mention that Jackson-Lee and Green each won their Democratic primary election unopposed, and that Crockett (though she received 48.5% of the vote) is in a runoff against Jane Hope Hamilton, who is also an African American woman.[4] The Democratic nominee in each of the latter districts is widely expected to win the general election,[5] and nothing in Intervenors' amended complaint is to the contrary.

In short, Intervenors cannot support a vote-dilution claim because they admit they all reside in congressional districts in which African Americans will elect their candidate of choice. As such, they necessarily fail to show that a "white majority votes sufficiently as a bloc to enable it to . . . defeat [African Americans'] preferred candidate." *Gingles*, 478 U.S. at 51.

### 3.      Alleged Retrogression Is Not Actionable

Intervenors attempt to support their Section 2 claims by stressing the alleged "retrogression" of CD9, CD18, and CD30. Compl. at 10. But this argument fails on its face because "[r]etrogression is not the inquiry in § 2 dilution cases." *Holder v. Hall*, 512 U.S. 874, 884 (1994). Federal courts routinely "refuse to equate a § 2 vote dilution inquiry with the § 5 retrogression standard." *Georgia v. Ashcroft*, 539 U.S. 461, 478 (2003); *see, e.g., Luft v. Evers*, 963 F.3d 665, 673 (7th Cir. 2020) (Easterbrook, J.) ("The Voting Rights Act does contain an anti-retrogression rule, but it is in § 5(b). . . . Section 2 must not be

---

[4]    *See generally* Texas Secretary of State, *Texas Election Results*, https://results.texas-election.com/races.

[5]    For example, the political website 270 To Win rates CD9, CD18, and CD30 as being "safe" for the incumbent party, with, respectively, a 54.0%, 49.3%, and 57.4% projected margin of victory based on the 2020 presidential elections. *See 2022 Texas House Election Interactive Map*, 270towin.com/2022-house-election/states/texas.

read as equivalent to § 5(b).") (internal citation omitted). Alleged retrogression therefore does not support Intervenors' Section 2 claims.

Intervenors also seize on the fact that the Black citizen voting age population in CD30 fell from 51.9% to 49.0%, but this is legally insignificant. *See* Table 1, above; *see also* Compl. ¶ 4 ("Further, the 30th was reduced from an above 50 percent Black Citizen Voting Age Majority District to a below 50 percent Black Citizen Voting Age Majority District."); *id.* at ¶¶ 13, 25 (similar). The relevant inquiry under *Gingles* is whether the minority group has the opportunity to elect its candidate of choice. A racial or ethnic group may very well control an electoral district even if it comprises less than 50% of the district population. *See, e.g., Thomas v. Bryant*, 919 F.3d 298, 308 (5th Cir. 2019) ("The numerous local factors courts consider—including the strength of bloc voting, demographics, and voter turnout—may mean that a minority group has the equal electoral opportunity the Voting Rights Act guarantees when its members make up only 40% of a district, but not when they make up 51%."). Indeed, Intervenors candidly admit that "Congressional Districts 9, 18, and 30 are all minority opportunity districts." Compl. ¶ 28. As such, the insubstantial decrease in BCVAP is irrelevant to the vote-dilution analysis, and does not support Intervenors' Section 2 claims.

### 4.  Section 2 Does Not Confer a Private Right of Action

Intervenors' vote-dilution claim fails for the additional reason that Section 2 of the VRA does not provide a private right of action. One district court has recently reached the same conclusion. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, No. 4:21-cv-1239, --- F. Supp. 3d ---, 2022 WL 496908, at *9–17 (E.D. Ark. Feb. 17, 2022). Defendants acknowledge that the Court has previously decided this issue. *See generally* ECF 58. Nonetheless Defendants respectfully maintain their position, and bring this to the Court's attention should it decide to revisit the issue.

## B.      Intervenors Fail to Plausibly Allege an Intentional-Discrimination Claim

Intervenors fail to plausibly allege their intentional-discrimination claim for two independent reasons. First, as explained above, they fail to establish that their vote—with respect to CD9, CD18, and CD30—was diluted, and the presence of a discriminatory effect is a necessary (but insufficient) element of an intentional-discrimination claim. And second, Intervenors have not plausibly alleged the presence of discriminatory intent in the Legislature's actions relating to Plan C2193.

### 1.      Intervenors Do Not Establish Discriminatory Effects

Intervenors cannot succeed on their intentional-discrimination where they have failed to show a discriminatory effect. This follows from "a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). "[N]o case in [the Supreme] Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Courts routinely uphold this requirement in redistricting cases. *See, e.g.*, *Shaw v. Reno*, 509 U.S. 630, 641 (1993) ("a discriminatory purpose and have the effect of diluting minority voting strength"); *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 800 (S.D. Tex. 2013) ("purpose and operative effect"); *LULAC v. N.E. ISD*, 903 F. Supp. 1071, 1093 (W.D. Tex. 1995) ("intentional discrimination" and "a resultant discriminatory effect").

The same is true under Section 2. "[T]he statute proscribes intentional discrimination only if it has a discriminatory effect, but proscribes practices with discriminatory effect whether or not intentional." *Chisom v. Roemer*, 501 U.S. 380, 406 (1991) (Scalia, J., dissenting); *accord Turner v. Arkansas*, 784 F. Supp. 553, 565 (E.D. Ark. 1991), *aff'd*, 504 U.S. 952 (1992).

Intervenors concede that African Americans can elect their candidate of choice in CD9, CD18, and CD30. They allege that the new configuration of congressional districts has discriminatory effects for African Americans in *other* districts. That is false. But even assuming it were true, these Intervenors

have no standing to challenge those districts. And so with respect to the districts they *can* challenge, they fail to allege any discriminatory effects, and can therefore not support their discriminatory intent claims. The Court need go no further.

### 2.    Intervenors Do Not Establish Discriminatory Intent

Even if Intervenors had plausibly alleged discriminatory effects, they have still not alleged facts that would allow the Court to infer a discriminatory purpose. In redistricting cases, "the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). It is "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). The required intent is not mere "volition" or "awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). It requires that the Legislature have passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

Intervenors largely rely on bare assertions that the Texas Legislature acted with discriminatory intent without factual support. *See, e.g.*, Compl. ¶ 2 (alleging C2193 is "heavily infected with an intent to discriminate"); *see also id.* ¶¶ 26, 42, 45, 46, 50, 51, 52 (similar). These "bare assertions . . . amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Iqbal*, 556 U.S. at 681. "As such, the allegations are conclusory and not entitled to be assumed true," even at the pleading stage." *Id.* For instance, Intervenors allege that Plan C2193 "unnecessarily split communities of interest," "removed important economic engines," and "frustrate[d] effective and long-term voter coalitions in the area," with respect to CD9, CD18, and CD30. But the first amended complaint lacks a single factual allegation specifically identifying a community of interest, economic engine, or long-term voter coalition. These are legal conclusions, not factual allegations, and are thus not entitled to be accepted as true. *See Twombly*, 500 U.S. at 544 (explaining that courts "are not bound to accept as true a legal conclusion couched as a factual allegation") (quoting *Papasan v. Allain*, 478

U.S. 265, 286 (1986)).

In addition, Intervenors allege the presence of certain "irregularities," Compl. ¶ 33, during the third special session, and contend that these perceived irregularities "were overtly racial." *Id.* Although "[d]epartures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role" in government decisionmaking, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977), they raise no inference of "invidious discrimination" when there is an "obvious alternative explanation." *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567). Indeed, for each asserted irregularity, Intervenors fail to connect the issue to some form of discrimination, and fail to recognize the obvious alternative explanation.

First, like many of the other plaintiffs in these consolidated cases, Intervenors complain that the legislative process was too rushed. *See, e.g.*, Compl. ¶¶ 21–23 (complaining about the shortness of time available for hearings and debate); *id.* at ¶ 22 ("The hearing on the Senate Map was not only a surprise because of these representations but also because the hearing was set just 48 hours after the House was to debate its map."). But there is a ready explanation for the complained-of exigencies: The federal census was delayed due to the pandemic, and, therefore, the results were not delivered until more than ten weeks after the Texas Legislature's 87th Regular Session ended. That was more than four months after the statutory deadline of April 1. *See* 13 U.S.C. § 141(a), (c). As a result, the Texas Legislature had to redistrict during a special session, which is constitutionally limited to thirty days. *See* Tex. Const. art. III, § 40. With a compressed schedule due to pandemic-related delays, an allegedly rushed process would hardly be surprising, much less give a reason to infer intentional invidious discrimination. In *Perez v. Abbott*, the Supreme Court could "not see how the brevity of the legislative process can give rise to an inference of bad faith." 138 S. Ct. at 2328–29. The evidence there was insufficient; the allegations here are even weaker.

Second, Intervenors complain that the Senate rejected two amendments offered by members

of the minority party. *See* Compl. ¶ 21 (as to Plan C2131, offered by Democrat Senator Borris Miles); *id.* ¶ 24 (as to Plan C2139, offered by Democrat Representative Jasmine Crockett). They speculate that the Legislature rejected plans offered by African American members out of invidious discrimination. Of course, this contention is severely undercut by the fact that the House adopted Plan C2176, offered by Democrat Representative Senfronia Thompson, who is also an African American woman, with 123 *yeas* and only 16 *nays*.[6] Intervenors concede as much. *See* Compl. ¶ 39 (alleging that the "House through the efforts of Representative Thompson cured some" of the perceived "retrogression and dilution"); *id.* ¶ 46 (asserting that the House "adopted a plan that did make improvements on the Senate map").

The more accurate explanation for the defeat of the Miles and Crockett amendments is that the Legislature was acting according to partisan motives. Indeed, both amendments were defeated on party-line votes.[7] And the Supreme Court has stressed that "partisan motives are not the same as racial motives." *Brnovich v. DNC*, 141 S. Ct. 2321, 2349 (2021). It is thus improper to "infer . . . purposeful, invidious discrimination" in the face of likely alternatives. *See Iqbal*, 556 U.S. at 682. Intervenors' conclusory pleadings do not support the inference that the Legislature rejected the Miles and Crockett amendments due to discriminatory intent. The "obvious alternative explanation" is that it was acting according to partisan motivation. *Id.*

Intervenors' other perceived irregularities are just as easily explained. For instance, Intervenors complain that the Senate used a procedural rule requiring all proposed amendments to include the support of all affected members, insisting that such a rule gives all such members "overseer status over minority opportunity districts." Compl. ¶¶ 33(vi), 38. But the obvious explanation is that the

---

[6]   House Journal, 87th Leg., 3d C.S., at 257 (Oct. 16, 2021), also available at https://journals.house.texas.gov. Intervenors correctly note that a number of representatives later indicated they intended to vote no. *See id.* at 258–60. However, the vote would have passed by a large margin (93-46) even accounting for these changes.

[7]   The Miles amendment failed 13-18, on a straight party-line vote. *See* Senate Journal, 87th Leg., 3d C.S., at 110–11 (Oct. 8, 2021), also available at https://journals.senate.texas.gov. The Crockett amendment failed 38-84, with no Republicans voting in support, and many Democrats absent. *See* House Journal, 87th Leg., 3d C.S., at 255–56 (Oct. 16, 2021).

Special Senate Redistricting Committee wanted to ensure that affected Congressmen and women had an opportunity to review any proposed changes to their districts.

Intervenors also complain that legislators sometimes used citizen voting age population when referring to the Latino population but voting age population when referring to the African American population. *See id.* ¶ 42. The obvious explanation is that there tends to be a higher percentage of the Latino population that is of voting age, but not citizens, than the African American population. As such, HCVAP is often the most accurate number with respect to Hispanics, even though BVAP is often perfectly accurate with respect to African Americans. This distinction is widely understood and uncontroversial, and the fact that Intervenors use it in an attempt to buttress their amended complaint only highlights their claims' futility.

Intervenors assert these and other perceived irregularities, but nothing in the first amended complaint supports the inference that the Legislature acted *because of* the alleged racial consequences of the redistricting maps. For that reason, they have not plausibly alleged invidious discrimination. *See Feeney*, 442 U.S. at 279; *see also Twombly*, 550 U.S. at 557 (explaining "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with)" a legal violation). Intervenors' claims based on intentional discrimination should be dismissed.

### C.     Intervenors Fail to Plausibly Allege a Racial Gerrymandering Claim

Last, Intervenors assert a racial gerrymandering claim, but it also fails on the merits. "A racial gerrymandering claim is 'analytically distinct' from an intentional vote dilution claim." *Harding*, 948 F.3d at 312 (quoting *Shaw*, 509 U.S. at 652). It seeks to establish that "that race was improperly used in the drawing of the boundaries of one or more specific electoral districts." *Ala. Legislative Black Caucus*, 575 U.S. at 263. To be liable on this basis, "race must have been the predominant factor motivating the redistricting process and subordinat[ing] traditional race-neutral districting principles,

including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests[.]" *Harding*, 948 F.3d at 313 (quotation omitted).

The burden of proof required for such claims is especially "demanding." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001). Courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Miller*, 515 U.S. at 916. As with an intentional vote-dilution claim, the awareness and use of racial demographics and statistics do not by themselves show discriminatory purpose. *See Miller*, 515 U.S. at 916 ("Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process."). Instead, the plaintiff must demonstrate that the Legislature, in designing the districts at issue, "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group." *Id.* (quoting *Feeney*, 442 U.S. at 279).

As they do for their other claims, Intervenors focus on the boundaries of *other districts*. *See, e.g.*, Compl. ¶ 26 ("In the Houston area, there was an area racial gerrymander . . . ."); *id.* ¶ 37 (alleging that Plan C2193 creates "the Houston/Fort Bend gerrymander" and "the Dallas/Fort Worth Metroplex gerrymander"). But as this Court has already recognized, a plaintiff lacks standing to challenge a racially gerrymandered district unless "she resides in the district at issue." ECF 119 at 4; *see also Hays*, 515 U.S. at 746. Intervenors fail to allege with particularity how CD9, CD18, and CD30 were gerrymandered with respect to African Americans. Indeed, the amended complaint offers no district-specific analysis, points to no specific legislative actions, and fails to mention any racial data at all. These conclusory pleadings fall well short of supporting the inference that "race was improperly used in drawing the boundaries" of the latter districts. *Ala. Legislative Black Caucus*, 575 U.S. at 263.

In addition, Intervenors fail to allege that they were personally affected by the Legislature's alleged racial gerrymandering. The amended complaint mentions race and ethnicity only generally. *See, e.g.*, Compl. ¶ 46 (allegedly "racial gerrymandering . . . harm to African Americans and Latinos"); *id.*

¶ 6 ("[A]bsent corrective action from this Court, the new redistricting plan will continue to dilute the voting strength of Texas' African American and Latino citizens and deny them fair representation in the United States Congress."). That is not enough. Intervenors must allege that they themselves were "put in one district or another" because of their race. *Hays*, 515 U.S. at 744. This means they have not plausibly alleged an injury in fact. "[A]ny inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference." *Id.* at 745. Without a plausible factual allegation that Intervenors were personally subjected to a racial classification, they are "asserting only a generalized grievance." *Id.*

## CONCLUSION

Defendants respectfully request that the Court dismiss Intervenors' first amended complaint.

Date: April 14, 2022

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Respectfully submitted.

*Patrick K. Sweeten*
PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Tex. State Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

JACK B. DISORBO
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24120804

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
jack.disorbo@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on April 14, 2022, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN