**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIVIL ACTION NO. 21-CV-00259-DCG-JES-JVB |
| GREG ABBOTT, et al., | § § | [lead case] |
| *Defendants*. | § § § | |

| | | |
|---|---|---|
| VERONICA ESCOBAR, U.S. Representative of the 16th congressional district of Texas; and, RAMSEY ENGLISH CANTU. | § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIVIL ACTION NO. 3:22-CV-00022 |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas; JOHN SCOTT, in his official capacity as Secretary of the State of Texas, | § § § § § | [consolidated case] |
| *Defendants*. | § § | |

PLAINTIFFS' FIRST AMENDED COMPLAINT

## I. Introduction

1.  El Paso is unique among Texas counties: it is bilingual, bi-national, multi-cultural, and

geographically distinct. For instance, El Paso has over 800,000 residents, is over 82% Hispanic

and over 25% of its residents are foreign born. It is the largest border city in the United States, and one of the safest communities in the nation, leading the country in public safety. El Paso takes great pride in protecting all its residents and its values, and has been a leader in the fight against discrimination of all types for decades. El Paso is also a military community. Since the middle of the 19th Century, Fort Bliss has called El Paso home. Today, Fort Bliss is the home to the 1st Armored Division and to thousands of U.S. Army soldiers, officers, and their families. Fort Bliss is the single largest employer in the area supporting a total of 167,358 people with an estimated annual contribution of approximately $25.6 billion. For more than 150 years, the fate of El Paso and Ft. Bliss have been entwined. Fort Bliss and El Paso are one community working together for the safety and prosperity of all that live there.

2.    Today, the safety and prosperity of both Ft. Bliss and El Paso is threatened by racially discriminatory congressional maps. In September and October of 2021, the Texas Legislature adopted Senate Bill 6 ("SB 6"), which reapportioned Texas' delegation to the U.S. House of Representatives. SB 6 violates federal law and the U.S. Constitution in several ways and throughout Texas. However, most egregiously, SB 6 makes the inexplicable policy choice to remove Ft. Bliss from El Paso and connect it to a congressional district 500 miles away in San Antonio. This choice defies logic and is intentional discriminatory. SB 6 must be enjoined.

## II.   Jurisdiction & Venue

3.    Jurisdiction is based upon 28 U.S.C. § 1343(3) & (4) and upon 28 U.S.C. § 1331 for causes of action arising from 52 U.S.C. §§ 10301 and 10304. Jurisdiction for Plaintiffs' claim for declaratory relief is based upon 28 U.S.C. §§ 2201 and 2202. Jurisdiction for Plaintiffs' claims under the Fourteenth Amendment to the U.S. Constitution is based upon 42 U.S.C. § 1983 and 28 U.S.C. § 1331. Jurisdiction for Plaintiffs' claim for costs and attorney's fees is based upon

42 U.S.C. § 1988 and 52 U.S.C. § 10310(e). Venue is proper in this Court under 28 U.S.C. 1391(b) (2) because a substantial part of the events and omissions giving rise to the claims in this case occurred in the Western District of Texas and in El Paso County. Plaintiff requests a three-judge panel pursuant to 28 U.S.C. § 2284.

### III. Parties

4.    Plaintiff Veronica Escobar is the current U.S. Representative for Congressional District 16 (CD 16). She is a registered voter in CD 16 and will vote in future elections in CD 16, including the swiftly approaching 2022 Democratic primary election. She is injured by SB 6, because of the intentionally discriminatory choice to remove Ft. Bliss from CD 16, as the current congresswoman and as a registered voter in El Paso County. She may be served by and through her counsel in this matter. **She is not suing in her official capacity.**

5.    Plaintiff Ramsey English Cantu is a resident and registered voter in CD 23. He is a consistent voter primary and general elections and will vote in future congressional elections. Mr. Cantu is a minority voter. He may be served by and through his counsel in this matter.

6.    Defendant Gregory ("Greg") Abbott is the Governor of Texas and, pursuant to Article IV, Section I of the Texas Constitution, is the chief executive officer of the State of Texas. He is sued in his official capacity.

7.    Defendant John Scott is the Secretary of State of Texas. He is the chief election officer of the State of Texas and is currently responsible for administering and implementing the election laws in Texas, including SB 6. He is sued in his official capacity.

### IV. Facts

7.  Ft. Bliss has been in CD 16 since the creation of CD 16 in 1902.

**Texas Congressional Districts in 1902**



8.  This changed in 1992. From 1992 into 2000, Ft. Bliss was split between CD 23 and CD 16, with most of the land area of Ft. Bliss placed into CD 23.

**Close-up of CD 16 & CD 23 in 1992 Congressional Plan**



9.    After the split, in 1995, the Department of Defense recommended that the U.S. 3rd Armored Cavalry Regiment be relocated to Fort Carson, Colorado. Efforts to consolidate units from another post with those units that remained at Fort Bliss were overruled by the Base Realignment and Closing Commission, leaving Fort Bliss without any armored vehicle divisions.

10.  This put the military mission of Ft. Bliss in danger, devastated the local economy and threatened the livelihood of thousands of El Pasoans.

11.   This mistake was rectified in future congressional maps, which ensured that all or most of Ft. Bliss was connected to its hometown congressional representative.

12.  In SB 6, Ft. Bliss has been almost completely severed from El Paso and its congressional representative in CD 16.

### CD 16 & CD 23 in the 2020 Congressional Plan

13. CD 16 in the benchmark contained the entirety of Ft. Bliss.

14. After the publication of the U.S. Census, the baseline population of CD 16 was 757,362. The ideal population of a congressional district according to the U.S. Census is 766,987. In order to comply with the "one person, one vote" principle of the 14th Amendment, CD 16 only required the addition of a 9,625 people.

15. Instead of adding a few Voter Tabulation Districts (VTDs), the State of Texas engaged in a racial gerrymander that radically altered the border between CD 16 and CD 23 to detriment of El Pasoans and Latino Voters in both congressional districts.

16. In sum, thousands of El Paso County residents were moved into and out of CD 16 in order to accomplish a racial gerrymander that will prevent Latino voters in CD 23 from electing their preferred candidate and remove a critical community of interest from El Paso.

17. The removal of critical communities of interest like Ft. Bliss from CD 16 is an act of intentional discrimination.

18. The configuration of the border of CD 23 and CD 16 in El Paso County divides El Paso communities and VTDs along racial lines. Racial discrimination predominated the making of these policy choices.

19. CD 23 has long been the focus of federal litigation. In the last round of redistricting, CD 23 boundaries were challenged as violating federal law and the U.S. Constitution. CD 23's configuration as enacted by the State of Texas was eventually denied pre-clearance and enjoined.

20.   In the decade before that, the configuration of CD 23 was also challenged. Eventually, the U.S. Supreme Court said that the CD 23 violated federal law.

21.    District 23 in both the 2011 and 2003 Congressional plans violated the Voting Rights Act. By eliminating a Latino electoral opportunity for the third time in three decades, Texas has demonstrated a recalcitrant refusal to recognize the rights of Latino voters in this West Texas.

22.    In 2006, the Supreme Court addressed a Section 2 challenge to the 2003 configuration of District 23. In doing so, the Court stated that the State's actions bore "the mark of intentional discrimination that could give rise to an equal protection violation." *LULAC v. Perry*, 548 U.S. 399, 440 (2006).

23.   In 2012, a three-judge Court in Washington, D.C. found that although the version of District 23 created in 2006 as a remedy after *LULAC v. Perry* had provided Latino voters with the ability to elect their preferred candidates, the 2011 Congressional plan "took that ability away." *Texas v. United States*, 887 F. Supp. 2d 133, 154 (D.D.C. 2012) (three-judge court), *vacated*, 570 U.S. 928 (2013). A three-judge court in Texas subsequently found that the 2011 Congressional plan's "manipulation of Latino voter turnout and cohesion in [District] 23 denied Latino voters equal opportunity and had the intent and effect of diluting Latino voter opportunity." *Perez v. Abbott*, 253 F. Supp. 3d 864, 908 (W.D. Tex. 2017) (three-judge court) (2011 Congress).

24.   In the benchmark plan, CD 23 is a Latino majority, swing district. It has a 63.2% Hispanic Citizenship Voting Age Percentage (HCVAP). CD 23 is both rural and urban. It is larger in land area than nearly every U.S. state east of the Mississippi river. It is also one of the focal points of federal voting rights challenges to Texas' congressional districts.

25.   CD 23's political performance is marginal. It is a district that leans Republican, but has – at times – elected a Democrat. In the 2020 General Election, Trump won CD 23 with 50.2% of the Vote. Other statewide Republican candidates fared similarly. In 2018, Senator Cruz lost CD 23 to candidate Beto O'Rourke by 4 points (52.07% v. 47.11%). Some Republican statewide candidates won CD 23 and others lost. It's a swing district.

26.   As currently configured, CD 23 is now only 57.8% HCVAP. The Spanish Surname Voter Registration (SSVR) has also decreased to below a majority 49.2%, and the Spanish Surname Turnout has been reduced to 42.9%.

27.   As a result of the changes to CD 23, the political performance for minority preferred candidates has also been diminished. The Texas Legislative Council (TLC) estimates that the political performance for Anglo-preferred candidates has increased 2-4 points depending upon the election and candidate.

28.   These policy choices were made deliberately and intentionally to dilute the voting strength of the minority community and to intentional discriminate against Latinos in CD 16 and CD 23.

29.   Elections in CD 16 and CD 23 are racially polarized. In fact, elections throughout Texas are racially polarized.

30.   Latinos are political cohesive in CD 16 and CD 23 and vote as a bloc for the Latino-preferred candidates.

31.   In Texas and in CD 16 and CD 23, Anglos (White Non-Hispanics) vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g. single-member districts), to defeat the minority voters' preferred candidates of choice. In each of CD 23 and CD 16 and

throughout Texas as a whole, Anglos vote as a politically cohesive bloc against minority-preferred candidates.

32.  Texas has a despicable and regrettable history of racism. Congressional elections and the creation of congressional districts have also had a troubling history of segregation and racial conflict.

33.  Throughout Texas, federal courts have found that the elections in Texas bear the taint of racial polarization. "Regardless of methodology…experts [have] found that general election and primary election voting in Texas is highly polarized along racial-ethnic lines." *Perez, et al v. Abbott, et al.,* No. 5:11-cv-00360-OLG-JES-XR at ¶ 690 (W.D. Texas March 10, 2017) (Fact Findings General and Plan  C185).

34.  "Hispanic voters are politically cohesive in general and primary elections. African-American voters are politically cohesive in general and primary elections. With the exception of Travis County, Anglo voters are politically cohesive in general elections in support of the Republican candidate, regardless of the candidate's race." *Id.* at ¶¶ 703, 704, and 707.

35.  In the past decade, the State of Texas has instituted several barriers to minority participation that enhance minority vote dilution.

36.  In 2011, Texas enacted one of the most stringent voter qualification laws of the United States. Voter ID was the law of the land until enjoined because of violations of Section 2 of the Voting Rights Act and the 14th Amendment. Initially, Texas was found to have intentionally racially discriminated against minority voters by enacting and in the enforcement of its Voter ID law.

37.  Also in 2011, Texas enacted several redistricting plans many of which violated the 14th Amendment and Section 2 of the Voting Rights Act. In addition, in the adoption of those plans, a three-judge panel found that Texas had intentionally discriminated against minority voters.

38.  In the recent past, Texas instituted a voter purge of its voting rolls supposedly targeting non-citizen voters. However, Texas was enjoined before enacting its purge because Texas had in actuality haphazardly removed more citizens than non-citizens. Texas settled these claims before a court could make a determination of Texas' intent in these matters.

39.  In the last 90 days, Texas has enacted yet another voter disfranchisement bill, SB 1, which is aimed at the heart of the minority community that is currently being challenged in federal court.

40.   In Texas, there is a strong and consistent correlation between socio-economic welfare and race, such that Latinos and African Americans are more likely to be economically disadvantaged than their Anglo peers.

41.  Anglos in Texas have a mean per capita income of $45,278, which is almost three times the $14,511 mean per capita income for Latinos. Moreover, median income for Anglo households is more than twice that of Latino households, with median income of Anglos totaling $75,124, compared to the $38,916 median household income of Latinos.

42.  The American Community Survey (ACS), a data project of the U.S. Census Bureau, indicates that Latinos have a higher incidence of poverty than do Anglos. According to the ACS, 9.2% of Anglos earn less than 150% below the poverty level, but 34.5% of Latinos earn less than 150% of the poverty level.

43.  Latinos in Texas are substantially more likely to have received less education than Anglos: the ACS indicated that 28.3% of Latinos over the age of 25 had completed nine or fewer years of education, whereas only 1.8% of Anglos over the age of 25 had completed nine or fewer years.

44.  There is a strong correlation between the inability to elect minority-preferred candidates and the socio-economic disparities experienced by Texas minorities.

45.  Most of the socio-economic disparities experienced by all Texas Latinos are exacerbated in West Texas. Far East El Paso County, specifically the lower valley area, which is currently in TX-23 is one of the poorest geographic areas in Texas. The median household income in this area is $33,452 and 23% of families in CD 23 that reside in El Paso County (Fabens, Clint, San Elizario, Socorro and Tornillo) live far below the poverty line.

46.  In El Paso County, there are more than 150 *colonias*, subdivisions and neighborhoods that are substandard building developments that lack fundamental services like paved roads, street lights, and more importantly, water and wastewater. Most of these *colonias* are in profound need of federal investment, especially considering the limited resources available to local governments and the lack of investment from the State of Texas.

47. During the 117th Congress, for the first time in over a decade, Congress reinstated earmarks, an appropriations process eliminated years ago which allowed each member of Congress to select projects in his/her district that would receive direct federal funding. The appropriations process was significantly reformed, renamed (no longer called "earmarks," but renamed as "Community Project Funding") made more transparent and was intended to be community and district driven. This Community Project Funding affords members of Congress

the opportunity to invest in areas of high need, like the lower valley of El Paso in CD 23. The new Community Project Funding process in the 117th Congress demonstrates where members' top priorities lie. In CD 23, because the portion of El Paso that is within CD 23 is so far from the flagship office of CD 23 (San Antonio) and represented by a member of Congress 500 miles away, this area was not a priority for the incumbent congressman in CD 23.

48.  Rep. Tony Gonzales, the current incumbent for CD 23, requested $38,942,500 million in Community Project Funding investments. Despite the dire need for the low-income areas he represents in El Paso County, Rep. Gonzales requested only $798,000 for a project in the lower valley area of his district, one of the poorest in the state. In fact, most of his requested projects were centered in and around the San Antonio area. The current incumbent has failed to respond to the needs of minorities throughout CD 23 and in El Paso County, specifically. Moving even more of El Paso County - especially Fort Bliss - into CD 23 would only serve to further disenfranchise those voters.

49.  Texas elections are typified subtle and overt racial appeals. And, during the enactment of CD 16 and CD 23, stray comments were made about the incumbent representative of CD 16 that were racial, misogynistic, and revelatory of an impermissible intent in the creation of those congressional districts.

50.  In Texas, Latino-preferred candidates for state office are rarely, if ever, successful.

51.  The incumbent congressional representative of CD 16 is more responsive to the needs of taxpayers, voters, and employees of Ft. Bliss than a congressman elected out of San Antonio who has demonstrated that El Paso is low on his priority list.

52.  The removal Ft. Bliss and other areas of El Paso County from CD 16 was done for an impermissible purpose.

53.  There is no policy rationale that would justify the dissection and removal of Ft. Bliss from a congressional representative centered in El Paso.

54.  The policy choice to dissect CD 16 and remove Ft. Bliss will have a disparate impact on minority communities.

55.  The policy choice to racially gerrymander CD 23 in El Paso will have a disparate impact on minority communities.

56.  The legal and historical background of SB 6 is fueled by an impermissible purpose.

57.  The sequence of events leading up to the adoption of SB 6 was fueled by a racially discriminatory purpose, including deviations from normal procedure, lack of transparency and public input, and a rushed, inconsistent process leading to enactment.

**Racially Polarized Voting in CDs 16 & 23**

58. Latinos in CDs 16 & 23 are politically cohesive in most, if not all elections, including non-partisan elections for school board or municipal office. And, this is true in primary elections, as well. Partisanship plays little to no role in Latino political cohesion in these elections.

59. Anglos in CDs 16 & 23 are also politically cohesive to the extent that they vote sufficiently as a bloc to defeat the preferred candidate of choice of the Latino community in CD 23. This is true in primary elections and in non-partisan elections, in which partisanship plays little to no role in electoral choice.

60. When Latinos are politically cohesive in their support specific candidates, and the Anglos are sufficiently cohesive around opposing candidates, then that is called racially polarized voting.

61. CDs 16 & 23 have about 566 Voter Tabulation Districts (VTDs). The State uses VTDs in some measurements rather than precinct data, because some election precincts do not hew to Census geography. However, 99.9% of VTDs are the same geography as the election precincts utilized for election returns. The same is true in CDs 16 & 23 in Plan C 2193.

62. There are many VTDS that have a majority Anglo VAP. There are hundreds of VTDs that have a majority Latino VAP population.

63. The Anglo VTDs support different and opposing candidates than the Latino precincts. This is true in partisan general elections, primary elections, and non-partisan elections.

64. The HVAP majority VTDs are strongly politically cohesive and support different and opposing candidates from the Anglo precincts in some partisan general elections, primary elections, and non-partisan elections.

65. Mathematically, this can be measured using Ordinary Least Squares (OLS), which is a version of ecological regression.

66. The OLS measurement of CDs 16 & 23 racially polarized voting is statistically significant. OLS has determined that Latinos are strongly cohesive in enacted CD 16 & 23 support the same candidates in non-partisan, partisan, and primary elections.

67. OLS can also be used to determine the sufficiency of Anglo bloc voting to determine if there is an Anglo candidate of choice and the degree of cohesion around that candidate. OLS finds that Anglos are moderately cohesive in CDs 16 & 23 around differing candidates than Latinos in CD 16 and 23.

68. This can also be shown with different measurements. Ecological Inference (EI) is a statistical methodology that is widely accepted in social science research.

69. EI can be used to determine the levels of support for certain candidates in a given election.

70. EI the determination for CDs 16 and 23 is also statistically significant. EI, just like OLS, has determined that Latinos are strongly politically cohesive in CDs 16 and 23 and support opposing candidates to Anglos in some partisan general elections, non-partisan elections, and primary elections.

71. EI has also determined that Anglos are strongly cohesive in CDs 16 & 23 elections in partisan general elections, non-partisan elections, and primary elections.

72. EI has also determined that Anglos vote sufficiently as a bloc to usually defeat the candidate of choice of Latinos in CD 23 elections.

73. The *Gingles* factors can also be seen in other kinds of empirical data in CDs 16 & 23. In the portions of the district that are majority Anglo, Anglo candidates for school board, municipal office, and other non-partisan elections defeat Spanish-surnamed candidates.

74. Likewise, in Anglo-majority or Anglo-plurality portions of Cs 16 & 23, Anglos are routinely elected in primary elections over Latino-preferred candidates.

75. In sum, there are many different ways to measure and evaluate the racial polarization of CD 16 & 23's voters. In each way listed here, and in other ways, CD 16s and 23 prove to be just like nearly every other congressional district in Texas. Latinos strongly support one candidate. Anglos support another opposing candidate in enough sufficiency as to defeat the Latino-preferred candidate. And, in the absence of a newly created CD 23 in which more strongly performs for the minority-preferred candidate, the Hispanic voters in CD 23 and Plaintiff English Cantu in particular are injured.

**CD 16 is "packed" in order to diminish Latino opportunity in CD 23**

76.   The bench mark plan is the plan that was used for 2020 Election cycle. It is also called PLAN C 2100.

77.   In the benchmark plan, CD 16 has a 76.6% HCVAP. In PLAN C 2193 (SB 6), CD 16 has a 78.0% HCVAP.

78.   In CD 16, the Latino preferred candidate is the Democratic nominee in the general election. In the primary elections, both Republican and Democratic, usually a Latino surnamed candidate is the candidate of Latino preference. In the absence of a Latino surnamed candidate, the Latino voters in either primary coalesce around a specific candidate.

79.   In CD 16, the Anglo candidate of choice is usually the Republican candidate in the general election. In primary elections, both Republican and Democratic, the Anglos usually support the opposite candidate from Latino preference.

80.   CD 16 has a strong Democratic performance in the general election. In addition, the candidate of Latino preference in primary elections usually wins the Democratic voters.

81.   Latinos in CD 16 are politically cohesive and usually support the same candidate in the general election, in the Republican and Democratic primary election, and in non-partisan elections.

82.   Anglos in CD 16 are politically cohesive and usually support a different candidate than the Latino-preferred candidate in the general election, Republican and Democratic primary election, and non-partisan elections.

83.   CD 16 has performed as a Latino stronghold since, at least, 1996.

84.  After the publication of 2020 U.S. Census, CD 16 required very little change in order to comply with the "one person, one vote" guaranty of the 14th Amendment of the U.S. Constitution.

85.  Despite this, the Defendants engaged in a racial gerrymander to pack CD 16 with high propensity, Latino voters in order to diminish Latino opportunity in CD 23.

**The Racial Gerrymander of CD 16 and CD 23 in El Paso County**

86.  A careful look at the populations added and removed from CD 16 and CD 23 in PLAN C 2193 makes the racial gerrymander of CD 16 and CD 23 plain.

<u>**Portions added and removed from CD 16 in PLAN C 2193**</u>



87.  In the above map, the pink shaded area is "District 100" and represents the area removed from CD 16 and placed into CD 23. The orange shaded area denoted "District 101" is the area that has been added into CD 16 from CD 23.

88.   The area added into CD 16 is heavily Latino and contains 46,515 people, including 32,056 residents of Hispanic Voting Age. Its Spanish surname turnout rate for the 2020 General Election was 84.6% and its HCVAP was 94.5%.

89.   The area removed from CD 16 contains 36,877 people with 18,075 people of Hispanic Voting Age. Its Spanish surname turnout rate for the 2020 General Election was only 55.2% and its HCVAP was 64.5%.

90.   The difference is substantial. As a result of these changes, CD 23 has substantially fewer El Paso County Latino residents and voters. These changes in El Paso County, alone, substantially reduce the Latino opportunity in CD 23.

**HVAP % in Benchmark compared to PLAN C 2193 (SB 6) in El Paso County**

| Congressional District | HVAP in Benchmark | HVAP in PLAN C 2193 | Difference |
|---|---|---|---|
| 16 | 79.2% | 80.8% | 1.6% |
| 23 | 96.0% | 86.7% | - 9.3% |

**HCVAP % in Benchmark compared to PLAN C 2193 (SB 6) in El Paso County**

| Congressional District | HCVAP in Benchmark | HCVAP in PLAN C 2193 | Difference |
|---|---|---|---|
| 16 | 77.1% | 78.4% | 1.3% |
| 23 | 95.6% | 83.8% | - 11.8% |

91.   These changes radically altered the performance of the Latino-preferred candidates in El Paso County in both CD 16 and CD 23.

**Political Performance of Select Latino-Surnamed Candidates El Paso County by CD in Benchmark compared to PLAN C 2193 (SB 6)**

| CD | Benchmark | | | PLAN C 2193 (SB 6) | | |
|---|---|---|---|---|---|---|
| | Castaneda 2020 | Valdez 2018 | Suazo 2018 | Castaneda 2020 | Valdez 2018 | Suazo 2018 |
| 16 | 62.3% | 65.7% | 65.9% | 62.9% | 66.5% | 66.4% |
| 23 | 68.8% | 78.0% | 77.4% | 63.0% | 70.9 | 71.5% |

92.  The performance of the Latino preferred candidate in CD 23 has been substantially reduced by 6-8 percentage points in each of these racially polarized contests in El Paso County alone. This reduction affects the entirety of CD 23 and has helped to create a congressional district that is Latino majority but has no hope of electing the Latino-preferred candidate of choice.

93.  This was accomplished by targeting low turnout Latino areas in El Paso County and placing them into CD 23. And, it was accomplished by removing some of the highest Spanish surname turnout precincts in CD 23 and placing them into CD 16. The net result is that CD 16 has now been packed in order to reduce Latino opportunity in CD 23.

94.  The second way this was accomplished was by splitting voter tabulation districts (VTDs) along racial lines. Curiously, there are 11 split VTDs in El Paso County between CD 16 & CD 23. The precincts that have been split in El Paso County between the two congressional districts are as follows: 0050, 0086, 0127, 0156, 0157, 0168, 0169, 0170, 0181, 0194, 0195.

95.  The total population of these split VTDs is 72,601 with 55,623 Latino total population or 76.6%.

96. If a robot drew this district and choose to split these precincts, one might expect that the race neutral choices would not yield substantial differences in Latino concentrations in these precincts. But, there are substantial differences in the ratio of Hispanic Voting Age population split between these congressional districts. The differences in the aggregate are startling.

97. In the portion of the split VTDs that have been split into CD 16, there are 33,349. The HVAP% of these split VTDs is 76.3%.

98. In the portion of the split VTDs that have been placed into CD 23, there are 39,252. The HVAP% of these split VTDs is 72.7%.

99. This seems a small difference, but the policy choices to split these precincts was made with an invidious purpose predominated by race.

100. For Instance, in precinct 0086, the northern portion of the precinct is split off into CD 23 and the southern portion is placed into CD 16. The CD 23 has roughly 33% fewer Latinos than the CD 16 portion (16.6% v. 24.6%).

101. Similarly, in precinct 0050, the northern portion of the precinct is split off into CD 23 and the southern portion has been placed into CD 16. The CD 23 portion has fewer Latinos than the CD 16 portion.

102. These choices are also typified by strange deviations and contoured lines that belie a policy choice to increase the number of Latinos in CD 16 and decrease the amount in CD 23.

103. If population equality explained these choices, there would be fewer cuts and these cuts would not create the substantial racial deviation seen when the precincts are aggregated together.

104. These are not political choices, because there is no political data at the block level. These are racial choices that can be explained by geographic concerns or the need to equalize population between the districts.

105. There is one possible choice. The map drawer choose to split these precincts largely on racial lines. This is an impermissible policy choice.

**General facts concerning the racial intent of the creation of the Congressional Map**

106. The defendants acted with invidious intent to dilute Latino voting strength in CD 23 by packing CD 16 and using other impermissible policy choices. This is shown through the particular circumstances surrounding of the adoption of SB 6.

107. First, the defendants acted in secret in order that their true intentions would not be easily known or devised.

108. In contrast to the legislative maps, the Congress map was drafted by mapmakers hundreds of miles away in Washington D.C at the National Republican Redistricting Trust.

109. After the map was crafted, those maps were sent to an outside counsel in Texas who represented most of the Republican incumbent congressman, but was unconnected to any state legislator. This map was then sent to the Texas Legislature.

110. At first, Senator Huffman expressed consternation at the slow process of the creation of the congressional map. She called her contacts in Texas and Washington D.C. to express those concerns and stated that there might not be enough time to get the congressional map done this session. Just before the 3rd called Session began, she again re-iterated her concern that the maps may not have enough time to get enacted by the filing deadline.

111. As result, rumors abounded about the delay in the congressional map. Likewise rumors flowed about the necessity of a fourth called special session to deal with the

congressional map. These rumors, whether a subterfuge or not, created a false sense of security to combatants of the congressional map and isolated that map from meaningful input from affected voters, incumbents, and important voting rights groups.

112.     These delays in the formulation of the congressional were overcome and outside counsel was able reach agreement with his clients and a few Democratic congressional representatives on the configuration of the map and that map was sent to Texas Senate sometime after the beginning of the third called special session.

113.     Most Democratic incumbent congressmen, including Plaintiff Escober, were left out of these negotiations with outside counsel or the Texas Senate. All members of the Texas legislature that are the candidates of minority preference were left out of these initial and subsequent discussions.

114.     As a consequence, the maps were created in secret without the input of the minority community with little to no time to rectify the patent errors in the map. Only the members of a byzantine and exclusive group had meaningful input into the creation of the congressional map.

115.     Today, there is no real certainty of the identity of the actual map drawer himself or herself who crafted the congressional map. That is function of the convoluted and secret machinations of the defendants and their agents. The real consequence of that action is that the legislative intent for the policy choices in the map will be difficult to discern because of the limitations of discovery and the paucity of direct knowledge about the choices of the policy makers. Here, the defendants outsourced their policy choices to unelected third parties, in order to obscure the real intent of the map, which is to dilute the strength of minority voters.

116.     But, a plan adopted in secret and in a system created to obscure the mapmakers motivation belies a darker, invidious purpose.

117.     Secondly, the policy choices inherent in PLAN C 2193 have a deeply deleterious effect on minority voting strength.  To begin with, the population growth in Texas is largely non-Anglo, such that if a robot drew the congressional map, one might expect the creation of, at least, one new majority minority district. No such district has been created.

118.     In fact, there are fewer majority minority districts in the enacted plan than in the benchmark. In PLAN C 2100, 8 out of 36 districts are majority HCVAP or 22.2%.

119.     In PLAN C 2193, only 7 out of 38 districts are majority HCVAP or 18.4%. In the 7 majority HCVAP districts, one is CD 23, which no longer performs for the Latino-preferred candidate of choice.

120.     This is a policy choice that was made to the detriment of Latino voters generally and the plaintiffs specifically, as to CD 16 (packing) and CD 23 (racial gerrymander and section 2).

121.     The map drawers and the defendants knew that diluting the HCVAP of CD 23 would decrease the likelihood that Latino voters would be able to elect the candidate of their choice. They knew this because of the findings of previous redistricting cases in Texas and because of their treatment of other congressional and legislative districts.

122.     In 2018, Senator Huffman was involved in the closest election of her time as an elected official. She very nearly lost in a general election. In order to solve this problem, she included more and more Anglo voters in her newly-enacted senate district in order to buttress the general election performance of the district to her benefit.

123.     The Texas Legislature did the same thing for CD 23, ultimately lowering its HCVAP by 6 percentage points. The policy choice is clear. More Anglos meant more likely to prevent the candidate of minority choice in the general and primary election.

124.     And the corollary is also clear and known by Legislators and map drawers. Fewer Latinos means less support for the Latino candidate of choice to the detriment of Latino voters.

125.     The same is true in CD 23. This intent was manifested by lowering the HCVAP of that district far below its benchmark. In so doing, the voting strength of Latinos in the general and, especially, in the primary election were also diminished.

126.     Thirdly, the defendant's invidiously used split precincts and bizarrely shaped districts throughout the map in order to diminish Latino voting strength.

127.     There are 11 split VTDS in El Paso County in PLAN C 2193's between CDs 16 and 23. Many of those precincts were split along racial lines to dilute the strength of Latino Voters.

128.     There are 4 precinct splits in Bexar County regarding CD 23. Precinct 1080 is one of those precincts. Precinct 1080 has a total population of 11,533 with 67% HVAP. The portion of precinct 1080 that has been placed in CD 23 has only a 57% HVAP. The portion of 1080 split off into CD 20 has a 70.6% HVAP. This is not an accident and represents an active policy choice to limit the number of Latino voters in CD 23.

129.     Several of the congressional districts adopted a bizarre shape in order to avoid to either avoid large minority populations or to sunder them into parts that could be sunk into Anglo areas. This is true in CD 23 on a smaller level. There are clearly neighborhoods that are Latino-majority that have been avoided in San Antonio and El Paso. These policy choices cannot have been made by accident. They were chosen in order to dilute the strength of Latino voters and to the detriment of Latino voters.

130.     Fourthly, none of this had to happen quite in this manner. There were multiple attempts by many legislators in both chambers of the Texas Legislature to ameliorate the

choice to eliminate Ft. Bliss from CD 16 and to create a faux Latino opportunity district in CD 23.

131.     Senator Huffman also adopted a bizarre and extra-legal standard for evaluating whether or not a district was a minority opportunity district. This protracted principal sought to explain the difference between the amount of African Americans or Latinos needed in order to justify the creation of a section 2 district or the federal protection of a district. Under her principal, no minority opportunity districts could be created and, in addition, only a few might be protected. There is no legal or factual basis for the Senate's adopted principle. The adoption of false standards in the evaluation of voting districts is also strong evidence of invidious intent. At the very least, it is yet another pre-textual explanation for ameliorative amendments.

132.     The pre-textual rejection of amendments aimed at curing some of the racial defects of PLAN C 2193 is also evidence of invidious intent.

133.     There were precious few public meetings on any version of the congressional plan adopted by the Texas Senate. And, the deadlines adopted for consideration of amendments was essentially unmanageable by anyone who wished to combat the plan.

134.     As a consequence, several amendments were rejected by the Senate because of the imperfections caused by haste. At least once, in a deviation from normal procedure, an amendment to an amendment to cure a pairing in a proposed amendment was blocked and summarily rejected by Anglo lawmakers. This is the first time in the recent past in which an author of an amendment was not allowed to cure the defects in his proposed amendment.

135.     Chairman Todd Hunter is the Chair of the House Redistricting Committee. He too adopted and ratified the policy choices of a secret coalition of unelected map makers. He too held meetings in a quick and limited fashion. He too used extra-legal principles to prevent the

creation of minority congressional districts. He too shut out input of minority law makers, if to a lesser degree than the Senate.

136.     In total, the Legislature made decisions in secret to the exclusion of minority congressional representatives and minority legislators. It used precinct splits and bizarre district shapes to dilute the voting strength of Latino voters in CD 23. It retrogressed CD 23 specifically and Latino opportunity in the entire map without rationale or reason. It adopted a bizarre, non-legal basis for the rejection of amendments. It deviated from normal procedure in several instances in order to prevent the inclusion of more minority opportunity. It held perfunctory, public hearings that did not lead to any meaningful policy changes in SB 6. It set standards for the acceptance of amendments and then rejected amendments that met those standards. All of these allegations are strong evidence of intentional racial discrimination.

137.     But, the most important thing that proves that these actions were all part of an "invidious whole" was that all of them were taken together to the detriment of the minority community. If a project or plan is on the level and free from discriminatory intent, it would be expected that there would be some give and take. Here, there was only take. The congressional representatives that were paired were minority members. The district that was retrogressed was a minority-majority district in the benchmark. The false principles that were used to evaluate amendments were done so to the harm of minority voters. The split precincts in the map are largely bordering at least one minority district. The need to act quickly was done to prevent mobilization by minority leaders. The rejection of amendments that may have prevented Latino vote dilution in CD 23 were categorically denied. All of these policy choices only work one way. They only function to prevent minority opportunity in CD 23 and throughout the map.

138.     The fact that the choices and errors only work one way rebuts the presumption that the State acted in good faith. It also negates the assertion that the delay in the Census caused this situation. No doubt the brevity of the session and some of the failures to hold more hearings on the plan can be explained by the delayed Census. But, the delayed census cannot explain the choice to exclude minority members of congress and minority legislators. It cannot explain the choice to split certain precincts or to retrogress a district below minority-majority. It cannot explain the choice to adopt a non-legal position to prevent the meaningful consideration of ameliorative amendments. It does not explain the secrecy of the creation of the map or the bizarre shape of any of the districts, including CD 23.

139.     In short, the State should own its policy choices. It made choices on account of race that has had the ultimate result of diluting Latino voting strength in CD 23. Again, the policy choices made in relation to CD 23 cannot be said to be based on partisanship, because of the bizarre choice to split off Ft. Bliss from El Paso and Lackland from San Antonio. It was not a political choice to split precincts along racial lines in El Paso and Bexar Counties, because there is no racial data at the block level.

140.     Plaintiffs' injury would be ameliorated by a subsequent recreation of CD 23 that is free from invidious intent and CD 16 that has been unpacked containing Ft. Bliss. If a CD 23 was created that performed for Latino voters, then it is axiomatic that Latino voters would be able to elect the candidate of their choice and have a far greater chance of electing the candidate of Latino preference in the general election for CD 23. If Ft. Bliss was impermissibly excluded from CD 16 because of an invidious racial intent, then its inclusion back into CD 16 would be benefit both to Ft. Bliss and the Latino voters in CD 16, including Plaintiff Escobar.

## V.   Causes of Action

**Count 1 – Section 2 of the Voting Rights Act (CD 23)**

141. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

142. The adoption of SB 6 is an election change that results in a denial or abridgement of the right to vote of individual plaintiffs on account of their race, color, or ethnicity, by having the effect of canceling out or minimizing their individual voting strength as minorities in Texas. This election change does not afford Plaintiff Ramsey English Cantu and the voters of CD 23 an equal opportunity to participate in the political process and to elect representatives of their choice, and denies individual plaintiffs the right to vote in elections without distinction of race, color or previous condition of servitude in violation of 52 U.S.C. § 10301 *et seq*.

**Count 2- Equal Protection Clause of the 14th Amendment to the US. Constitution (CDs 16 & 23**

143. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

144. The choice by the State to Texas in adopting SB 6 is an election change that disfranchises minority voters and discriminate against plaintiffs on the basis race and national origin in violation of 14th Amendment to the U.S. Constitution. Specifically, CD 16 has been packed with Latinos in order to diminish the Latino voting strength in CD 23. In order to effectuate this impermissible policy choice, the Defendants divided communities along racial lines and excluded important geographic landmarks from Latino strongholds. The policy choices surrounding the creation of CD 16 and CD 23 were predominated by racial considerations.

**VI.  Request for Injunctive Relief**

145. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

146. Plaintiffs will likely succeed on the merits, because SB 6 dilutes the votes of minority voters in CD 23 and violates federal and state law. The policy choice of the State of Texas to remove Ft. Bliss from CD 16 is an election change that nullifies the electoral voice of the minority voters of El Paso, including the plaintiff Escobar.

147. Plaintiff will suffer immediate and irreparable injury.

148. There is no harm to the State of Texas or the defendants from being prevented from administering election districts that violate federal law and the U.S. Constitution.

149. The injunction is in the public interest, because the right to cast a meaningful vote is the foundation upon which all other rights and freedoms are based.

150. Plaintiffs have no other adequate, plain, or complete remedy at all other than enjoining the SB 6.

151. Plaintiffs request that the Court enter a permanent injunction prohibiting Defendants implementing any future elections held pursuant to SB 6.

## VII. Conclusion & Request for Relief

152. For the foregoing reasons, Plaintiffs respectfully request that Defendants be cited to appear and answer and that the Court take the following actions and grant the following relief:

    **A**. Appropriate preliminary and permanent injunctive relief to which it shows itself entitled;

    **B**. Entry of a declaratory judgment as described above;

    **C**. Attorneys' fees and court costs; and,

**D**. Any other or further relief, in law or equity that the Court determines that plaintiffs are entitled to receive.

**DATED**: April 14, 2022                                    Respectfully,

By: /s/ *Martin Golando*

The Law Office of Martin Golando, PLLC
Texas Bar No. 24059153
2326 W. Magnolia Ave.
San Antonio, Texas 78201
Office: (210) 471-1185
Fax: (210) 405-6772
Email: martin.golando@gmail.com

Attorney for Plaintiffs