**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT, MI FAMILIA VOTA, AMERICAN GI FORUM, LA UNION DEL PUEBLO ENTERO, MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS, TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION, WILLIAM C. VELASQUEZ INSTITUTE, FIEL HOUSTON INC., TEXAS ASSOCIATION OF LATINO ADMINISTRATORS AND SUPERINTENDENTS, PROYECTO AZTECA, REFORM IMMIGRATION FOR TEXAS ALLIANCE, WORKERS DEFENSE PROJECT, EMELDA MENENDEZ, GILBERTO MENENDEZ, JOSE OLIVARES, FLORINDA CHAVEZ,  JOEY CARDENAS, PAULITA SANCHEZ, JO ANN ACEVEDO, DAVID LOPEZ, DIANA MARTINEZ ALEXANDER, and JEANDRA ORTIZ,<br><br>        *Plaintiffs*<br><br>v.<br><br>GREG ABBOTT,  in his official capacity as Governor of the State of Texas; JOHN SCOTT, in his official capacity as Secretary of the State of Texas; and the STATE OF TEXAS;<br><br>        *Defendants*. | Case No.<br>3:21-cv-00259-DCG-JES-JVB |

**LULAC PLAINTIFFS' SECOND AMENDED COMPLAINT FOR DECLARATORY**

**AND INJUNCTIVE RELIEF**

## I.
## INTRODUCTION

1.  Plaintiffs are individual registered voters and a coalition of organizations that seek—on behalf of themselves and their members—declaratory and injunctive relief to enforce the Fourteenth Amendment to the United States Constitution and the Voting Rights Act of 1965. Plaintiffs challenge the redistricting plans adopted by the Texas Legislature for the State House, State Senate, Congress and State Board of Education ("SBOE").

2.  The 2020 Census reported that Texas's population increased by 3,999,944 since 2010.  As a result, Texas is the only one of the fifty states to have been apportioned two additional seats in the U.S. House of Representatives.

3.  Texas also experienced dramatic internal demographic changes. Over the past decade, Latinos constituted 50% of the population increase in Texas, and racial minorities constituted 95% of the population increase in Texas (including persons who identify as being of more than one race).

4.  According to the U.S. Census, from 2010 to 2020, the Hispanic population in Texas increased by 1.98 million, and the White Alone Non-Hispanic ("Anglo") population in Texas increased by 187,252.

5.  Based on recent demographic trends, the Texas State Data Center estimates that the Latino population of Texas will match the Anglo population in 2021.

6.  On October 15, 2021 and October 16, 2021, the 87th Texas Legislature approved redistricting plans for the Texas House, Senate and SBOE.[1]  On October 18, 2021, the 87th Texas

---

[1] The redistricting plans passed by the 87th Texas Legislature on October 15 and 16, 2021 are known as H2316, S2168 and E2106 and are available on the website of the Texas Legislative Council at https://dvr.capitol.texas.gov/.  The congressional redistricting plan adopted by the Senate and the House

Legislature approved a redistricting plan for Texas congressional districts.  On October 25, 2021, Defendant Abbott signed the redistricting plans for Texas House, Senate, Congress and SBOE.

7.  All four statewide redistricting plans enacted in 2021 discriminate—purposefully and in effect—against Latino voters in violation of the federal Voting Rights Act and the U.S. Constitution.  Specifically:

    a.  In the redistricting plan for the Texas House (Plan H2316):

        i.  Defendants failed to create additional Latino citizen voting age majority districts in:

           1.  Harris County;

           2.  Central Texas, including the geographic area including portions of Caldwell, Guadalupe, Hays and Travis counties;

           3.  West Texas, including the geographic area including portions of Brewster, Culberson, El Paso, Hudspeth, Jeff Davis, Pecos, Presidio, Terrell and Val Verde counties; and

        ii.  Defendants purposefully manipulated district boundaries to weaken Latino voting strength, such that Latinos do not have the ability to elect their preferred candidates, in: HD31, HD37, and HD118;

        iii.  Defendants purposefully manipulated district boundaries on the basis of race and to weaken Latino voting strength in HD90; and

        iv.  Defendants systematically and deliberately malapportioned districts in West Texas to favor the interests of communities and voters in the West Texas High

---

on October 18, 2021, is known as C2193 and is available on the website of the Texas Legislative Council at https://dvr.capitol.texas.gov/.

Plains and the Panhandle at the expense of communities and voters in El Paso and the Upper Rio Grande area of West Texas, and to favor Anglo voters at the expense of Latino voters—in violation of the U.S. Constitution.

b. In the redistricting plan for Texas Senate (Plan S2168):

   i. Defendants failed to create additional Latino citizen voting age majority districts in:

      1. the geographic area including portions of Dallas and Tarrant counties;

      2. South/Central Texas, including the geographic area including portions of Bastrop, Bexar, Comal, Caldwell, Guadalupe, Hays and Travis counties; and

   ii. Defendants manipulated district boundaries in SD27 with the purpose of reducing Latino voting strength and making it more difficult for Latinos to elect their preferred candidates.

c. In the redistricting plan for Texas SBOE (Plan E2106):

   i. Defendants failed to create an additional Latino citizen voting age majority district in Harris County; and

   ii. Defendants manipulated the district boundaries of ED3 with the purpose of reducing Latino voting strength and making it more difficult for Latinos to elect their preferred candidates.  Defendants also manipulated district boundaries in South Texas to limit Latino electoral opportunity in ED2 and ED3.

d. In the redistricting plan for Congress (C2193):

   i. Defendants failed to create Latino citizen voting age majority districts in:

4

1. the geographic area including portions of Dallas and Tarrant counties;

2. Harris County;

3. South/Central Texas, including the geographic area including portions of Nueces, San Patricio, Bee, Goliad, Karnes, Gonzales, Caldwell, Bastrop, Travis and Williamson counties; and

4. the geographic area of enacted CD35 (C2193)

ii. Defendants purposefully manipulated district boundaries to weaken Latino voting strength, such that Latinos do not have the ability to elect their preferred candidates, in CD23. Defendants also manipulated district boundaries in CD15 with the purpose of reducing Latino voting strength and making it more difficult for Latinos to elect their preferred candidates.

8. Plaintiffs seek a declaratory judgment that the redistricting plans for the Texas House (Plan H2316), Senate (Plan S2168), SBOE (Plan E2106) and Congress (C2193) violate their civil rights because the plans unlawfully dilute the voting strength of Latinos. Plaintiffs also seek a declaratory judgment that the newly enacted Texas House redistricting plan (H2316) is unconstitutionally malapportioned. Plaintiffs further seek a declaratory judgment that the newly enacted redistricting plans H2316, S2168, E2106 and C2193 intentionally discriminate against them on the basis of race and national origin. Plaintiffs seek a permanent injunction prohibiting the calling, holding, supervising, or certifying of any future Texas House, Senate, Congressional and SBOE elections under the newly enacted redistricting plans. Plaintiffs further seek the creation of Texas House, Senate, Congressional and SBOE redistricting plans that will not cancel out, minimize or dilute the voting strength of Latino voters in Texas. Plaintiffs seek an order subjecting Texas to the preclearance requirement of section 5 of the

Voting Rights Act under 52 U.S.C. § 10302(c) (section 3(c) of the Voting Rights Act), and Plaintiffs seek costs and attorney's fees.

## II.
## JURISDICTION

9.  Jurisdiction is based upon 28 U.S.C. § 1343(3) & (4) and upon 28 U.S.C. § 1331 for causes of action arising from 52 U.S.C. § 10301.  Jurisdiction for Plaintiffs' claim for declaratory relief is based upon 28 U.S.C. §§ 2201 and 2202.  Jurisdiction for Plaintiffs' claims under the Fourteenth Amendment to the U.S. Constitution is based upon 42 U.S.C. § 1983 and 28 U.S.C. § 1331.  Jurisdiction for Plaintiffs' claim for costs and attorney's fees is based upon 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).  Venue is proper in this Court under 28 U.S.C. § 1391(b).

## III.
## PLAINTIFFS

10. The plaintiff organizations in this case are members of the Texas Latino Redistricting Task Force, an unincorporated association of individuals and organizations committed to securing fair redistricting plans for Texas.  The Texas Latino Redistricting Task Force is chaired by one of its members and holds meetings at which the member organizations of the Task Force collectively decide how the Task Force will proceed to protect its members' interests.

11. Plaintiff LEAGUE OF UNITED LATIN AMERICAN CITIZENS ("LULAC") is the largest and oldest civil rights volunteer-based membership organization that empowers Hispanic Americans and builds strong Latino communities.  LULAC has a national office in Washington, D.C. and a membership office in El Paso, Texas, and it is organized under Texas law.  LULAC's mission is to advance the economic condition, educational attainment, political influence, housing, health and civil rights of Hispanic Americans through

community-based programs.   LULAC's mission includes achieving full and effective political participation by Latinos.   Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latinos cast effective votes, is critical to fulfilling LULAC's mission because political participation by Latinos secures LULAC's public policy goals.   To promote civic participation in the communities it serves and to expand Latino political influence, LULAC's members, volunteers and paid staff register eligible Latino voters;   host voter registration drives;   host voter education forums;   participate in issue-focused advocacy, including advocating for single member districting systems and fair redistricting plans; conduct census outreach; and conduct voter registration, education, and non-partisan get-out-the-vote campaigns ("GOTV").

12. LULAC has more than 1,000 LULAC councils nationwide.   LULAC's members pay dues and include Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside, have voted, and intend to vote in the future in areas where, as described below, Defendants could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts through manipulation of their composition to reduce Latino opportunity to elect their candidates of choice.   LULAC members also elect leadership and serve as the organization's leadership.   LULAC members participate in and guide the organization's efforts, both at the local council level, where members regularly meet, and at the organization-wide level each year at the LULAC national convention, when members serving as national delegates convene to discuss issues, set policies, and elect the organization's national leadership.   Thus, LULAC has associational standing to challenge those districts.

13. LULAC members include Latino registered voters who are injured by Defendants' dilution

of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice.  Thus, LULAC has associational standing to challenge those districts.

14. LULAC members live in the area of West Texas where, as described below, Defendants overpopulated districts in the newly-enacted Texas House plan to favor the interests of voters in areas of West Texas and the High Plains, Anglo voters and Anglo incumbents over the interests of voters in El Paso and the Upper Rio Grande and Latino voters.

15. Plans H2316, S2168, C2193 and E2106 will force LULAC to divert significant resources from its GOTV, voter registration and community education activities, which are central to its mission, in order to counteract the negative effects of the challenged redistricting plans. LULAC has conducted in the past, and will conduct in the future, GOTV activities aimed at increasing the turnout of Latino registered voters with low turnout.  Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and areas and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward).  As a result, LULAC must now expend significantly more resources to register and turn out Latino voters, particularly those who live in the challenged districts and areas, and who are discouraged by the absence of an equal opportunity to elect their candidate of choice; and to do so, LULAC must divert time and funding from its community education activities that further its mission and instead engage in efforts to convince Latinos to participate, despite the

discrimination in the challenged redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—which is not a regular activity of LULAC. Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, LULAC must spend significantly more resources in an attempt to educate Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged redistricting plans.  Because of the dilution of the Latino vote, Plans H2316, S2168, C2193 and E2106 thwart LULAC's mission to expand Latino political influence. Thus, LULAC has organizational standing to challenge the new redistricting plans.

16. Plaintiff SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT ("SVREP") is a non-profit and non-partisan organization committed to promoting and increasing the participation of Latinos and other minority communities in the democratic process through voter registration, voter education and voter participation activities.  SVREP's mission includes achieving full and effective political participation by Latinos.  Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latinos cast effective votes, is critical to fulfilling SVREP's mission because political participation by Latinos secures SVREP's public policy goals.  To effectuate its mission, SVREP conducts voter registration and organizes non-partisan GOTV drives to remind voters of election dates and to inform them about the requirements for voting.  SVREP conducts these activities for federal, state, and local elections in Texas.  Additionally, SVREP trains individuals to become organizers in their own communities, helping them learn how to determine what their community needs and develop the skills to advocate for those needs directly with their elected officials.  SVREP also trains individuals to run for office.  Through its work, SVREP

serves, among others, Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those individuals reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latino opportunity to elect their candidates of choice.

17. The new redistricting plans for Congress, the House, the Senate and the SBOE will force SVREP to divert its resources away from its GOTV and leadership-building activities—which are central to its mission—in order to counteract the negative effects of the challenged redistricting plans on the voters SVREP serves.   SVREP has in the past conducted, and in the future will conduct, GOTV activities aimed at increasing the turnout of Latino registered voters with low turnout.   Additionally, SVREP has in the past employed, and in the future will employ, paid canvassers to contact voters in person at their homes, to educate the voters about an upcoming election, to urge the voters to vote and to offer and deliver assistance to voters.   Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and areas and statewide, many Latinos will be discouraged from voting and fewer Latinos will register and turn out to vote in the 2022 election (and onward).   As a result, SVREP must now expend significantly more resources to register and turn out Latino voters discouraged by the absence of an equal opportunity to elect their candidate of choice; and to do so, SVREP must divert time and funding from its community-organizer and other skill development trainings that further its mission and instead engage in efforts to convince Latinos to participate, despite the dscrimination in the new plans, in elections in which they lack the opportunity to

elect their candidate of choice—which is not a regular activity of SVREP. Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, SVREP must spend significantly more resources in an attempt to educate Latino voters about discrimination and increase Latino voter registration and turnout to overcome the the unfair advantage afforded to Aglos in challenged redistricting plans. Because of the dilution of the Latino vote, the new redistricting plans thwart SVREP's mission to expand Latino political influence. Thus, SVREP has organizational standing to challenge the new redistricting plans.

18. Plaintiff MI FAMILIA VOTA is a national civic engagement organization that unites Latino, immigrant and allied communities to promote social and economic justice. MI FAMILIA VOTA's mission includes increasing the power and political representation of the Latino community and achieving full and effective political participation by Latinos. Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latinos cast effective votes, is critical to fulfilling MI FAMILIA VOTA's mission because political participation by Latinos secures MI FAMILIA VOTA's public policy goals. To effectuate its mission, MI FAMILIA VOTA conducts citizenship workshops and voter registration and mobilization drives. Additionally, MI FAMILIA VOTA advocates on all issues impacting the Latino community, including voting rights, immigration, education, health care, workers' rights and racial justice. To further its mission, MI FAMILIA VOTA also hosts programming such as citizenship assistance and youth and community leadership development. For example, in its youth leadership development efforts, MI FAMILIA VOTA educates young Latinos on issues that affect their community, empowers them with the skills and confidence to advocate on those issues, and provides them with opportunities to

take action, including by speaking at town halls and canvassing in the community. Additionally, MI FAMIA VOTA's community engagement workshops offer community members the opportunity to learn how to advocate for their needs through voting and other forms of advocacy. Through its workshops, MI FAMILIA VOTA also educates Latino community members on assistance on matters such as rental assistance. MI FAMILIA VOTA conducts its activities with, among others, Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those individuals reside in areas where, as described below, Defendants either could have created an additional Latino majority district but failed to do so, or weakened districts by manipulating their composition to reduce Latino opportunity to elect their candidates of choice.

19. The new redistricting plans for Congress, the House, the Senate and the SBOE will force MI FAMILIA VOTA to divert its resources away from its voter engagement, leadership-building activities and other community engagement efforts—which are central to its mission—in order to counteract the negative effects of the challenged redistricting plans on the community members and voters MI FAMILIA serves. MI FAMILIA VOTA has in the past conducted, and in the future will conduct, voter registration and GOTV activities aimed at increasing the turnout of Latino registered voters with low turnout. Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and areas and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward). As a result, MI FAMILIA VOTA must now expend significantly more resources to register and turn out Latino voters, particularly those who live in the challenged districts and areas, and

who are discouraged by the absence of an equal opportunity to elect their candidate of choice; and to do so, MI FAMILIA VOTA must divert time and funding from its youth development program, community engagement workshops and other educational efforts that further its mission and instead engage in efforts to convince Latinos to participate, despite the discrimination in the challenged redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—not a regular activity of MI FAMILIA VOTA. Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, MI FAMILIA VOTA must spend significantly more resources in an attempt to educate Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged redistricting plans.  Because of the dilution of the Latino vote, the new redistricting plans thwart MI FAMILIA VOTA's mission to expand Latino political influence. Thus, MI FAMILIA VOTA has organizational standing to challenge the new redistricting plans.

20. Plaintiff AMERICAN GI FORUM ("GI FORUM") is a veterans membership organization dedicated to addressing problems of discrimination and inequities endured by Hispanic veterans.  GI FORUM was founded in Corpus Christi, Texas, and it is organized under Texas law.  In 1998, the U.S. Congress chartered the American GI Forum as a Veteran's Family Organization.  GI FORUM's mission is to provide counseling, referral, job placement, and other related services to both U.S. military veterans and other non-military veterans.  GI FORUM's mission includes achieving full and effective political participation by Latinos. Promoting civic participation of Latinos, including voter registration and voting, and ensuring Latinos cast effective votes, is critical to fulfilling GI FORUM's mission because

political participation by Latinos secures GI FORUM's public policy goals.  To promote civic engagement in the communities it serves and to expand Latino political influence, GI FORUM's members: conduct know-your-rights discussions and membership meetings; participate in issue-focused advocacy; connect members to social services; and conduct voter registration and education.

21. GI FORUM has chapters throughout Texas.  GI FORUM's individual members pay dues and elect a national board of directors every year.  GI FORUM's members also participate directly in making and implementing decisions to guide the organization's efforts.  GI FORUM's members include Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice.  Thus, GI FORUM has associational standing to challenge those districts.

22. Plans S2168, C2193 and E2106 will force GI FORUM to divert significant resources from its voter registration, counseling, and job-related services, which are central to its mission, in order to counteract the negative effects of the challenged redistricting plans.  GI FORUM has in the past conducted, and in the future will conduct, voter registration activities aimed at increasing voting by Latinos.  Because of the reduced number of districts in the enacted plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and areas and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward).  As a result, GI FORUM must now expend significantly

more resources to register and turn out Latino voters, particularly those who live in the challenged districts and areas, and who are discouraged by the absence of an equal opportunity to elect their candidate of choice; and to do so, GI FORUM must divert time and funding from its counseling, referral and job placement efforts—along with other efforts to connect individuals to social services—that further its mission, and instead must engage in efforts to convince Latinos to participate, despite the discrimination in the new redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—which is not a regular activity of GI FORUM.  Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, GI FORUM must spend significantly more resources in an attempt to educate Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged redistricting plans. Because of the dilution of the Latino vote, the new redistricting plans thwart GI FORUM's mission to expand Latino political influence.  Thus, GI FORUM has organizational standing to challenge the new redistricting plans.

23. Plaintiff LA UNIÓN DEL PUEBLO ENTERO ("LUPE") is a non-partisan traditional membership organization founded by labor rights activists César Chávez and Dolores Huerta. LUPE is headquartered in San Juan, Texas, and it is organized under Texas law.  LUPE's mission is to build strong, healthy communities in the Texas Rio Grande Valley through community organizing and civic engagement, and to expand Latino political influence in Texas.   LUPE's mission includes achieving full and effective political participation by Latinos.   Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latinos cast effective votes, is critical to fulfilling LUPE's mission because

political participation by Latinos secures LUPE's public policy goals. To promote civic engagement in the communities it serves and to expand Latino political influence, LUPE's members and paid staff conduct know-your-rights discussions and membership meetings; participate in issue-focused advocacy; campaign to support or oppose nonpartisan ballot measures through in-person canvassing; connect members to social services; conduct census outreach; and conduct voter registration, education, and non-partisan GOTV campaigns.

24. LUPE has more than 8,000 members who reside primarily in Hidalgo, Cameron, Willacy and Starr Counties. LUPE's individual members pay dues, and members serve as the organization's leadership.

25. LUPE engages its membership to devise and conduct campaigns to achieve the mission of the organization; thus, LUPE members participate and guide the organization's efforts, and implement day-to-day decisions for the organization. LUPE also hosts regular events and meetings for members. LUPE members include Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latino opportunity to elect their candidates of choice. Thus, LUPE has associational standing to challenge those districts.

26. LUPE members include Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice. Thus, LUPE has associational

standing to challenge those districts.

27. Plans H2316, S2168, C2193 and E2106 will force LUPE to divert significant resources from its GOTV, voter registration and community education activities, which are central to its mission, in order to counteract the negative effects of the challenged redistricting plans. LUPE has in the past conducted, and in the future will conduct, GOTV activities aimed at increasing the turnout of Latino registered voters with low turnout.  Additionally, LUPE has in the past paid, and in the future will pay, employees who, among other duties:  educate voters about upcoming elections; urge the voters to vote; and encourage, offer and deliver assistance to the voters.  Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and areas and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward).  As a result, LUPE must now expend significantly more resources to register and turn out Latino voters, particularly those discouraged by the absence of an equal opportunity to elect their candidate of choice; and to do so, LUPE must divert time and funding from its community education activities that further its mission, and instead must engage in efforts to convince Latinos to participate, despite the discrimiantion in the redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—which is not a regular activity of LUPE.  Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, LUPE must spend significantly more resources to educate Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged redistricting plans.  Because of the dilution of

the Latino vote, Plans H2316, S2168, C2193 and E2106 thwart LUPE's mission to expand Latino political influence.   Thus, LUPE has organizational standing to challenge the new redistricting plans.

28. Plaintiff MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS ("MABA-TX") is a professional association of Latino lawyers located in Texas.   MABA-TX is a membership organization that is organized under Texas law, and members of MABA-TX reside throughout Texas.   MABA-TX's mission includes:  to provide a forum and means for lawyers to promote the social, economic and educational advancement of the people of Texas; to speak on behalf of the Latino community on legal issues affecting the community; to serve the Latino populace as a professional association by providing services, assistance and advice on matters of legal concern to the community; to work through legislation, advocacy and education to accomplish these goals; and to preserve high standards of integrity, honor and professional courtesy among lawyers.   MABA-TX's mission also includes achieving full and effective political participation by Latinos.   Promoting civic participation of Latinos is critical to fulfilling MABA-TX's mission because political participation by Latinos secures MABA-TX's public policy goals.

29. MABA-TX has members throughout the state that register with the organization, pay dues to finance the organization's activities, and attend meetings where they guide the activities of their local chapters.   Members of MABA-TX include Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice.   Thus,

MABA-TX has associational standing to challenge those districts.

30. Plans H2316, S2168, C2193 and E2106 will force MABA-TX to divert significant resources from its community engagement activities—which are central to its mission—in order to counteract the negative effects of the challenged redistricting plans.  MABA-TX has in the past worked, and will in the future work, to educate voters about upcoming elections, urge voters to vote and will offer and provide assistance to voters.  Because of the reduced number of districts in the enacted plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and areas, and statewide, fewer Latinos will register and turn out to vote in the 2022 election (and onward).  As a result, MABA-TX must now expend significantly more resources to educate and promote participation by Latino voters, particularly those who live in the challenged districts and areas, and who are discouraged by the absence of an equal opportunity to elect their candidate of choice; and to do so MABA-TX must divert time and funding from its community engagement activities that further its mission, and instead must engage in efforts to convince Latinos to participate, despite the discrimination in the challenged redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—which is not a regular activity of MABA-TX.  Moreover, because fewer Latinos will cast ballots, fewer Latino judges will win elections, resulting in MABA-TX's members practicing before less diverse judges.  Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, MABA-TX must spend significantly more resources in an attempt to educate Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged redistricting plans.

Because of the dilution of the Latino vote, Plans H2316, S2168, C2193 and E2106 thwart MABA-TX's ability to promote Latino community involvement in legal and legislative issues affecting the community.  Thus, MABA-TX has organizational standing to challenge the new redistricting plans.

31. Plaintiff TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION ("TEXAS HOPE") is a non-profit membership organization that seeks to empower Latinos in Texas through civic engagement, civic education and outreach.  TEXAS HOPE's activities include voter registration of Latino citizens, GOTV activities, poll watcher service, administering voter education workshops and legislative advocacy on issues important to the Latino community, including education, voting rights, immigrants' rights, healthcare and housing. TEXAS HOPE is organized under Texas law.  TEXAS HOPE's mission includes achieving full and effective political participation by Latinos.  Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latino cast effective votes, is critical to fulfilling TEXAS HOPE's mission because political participation by Latinos secures TEXAS HOPE's public policy goals.   To promote civic engagement in the communities it serves and to expand Latino political influence, TEXAS HOPE's members conduct know-your-rights discussions; participate in issue-focused advocacy; campaign to support or oppose nonpartisan ballot measures; and conduct voter registration, education, and non-partisan GOTV.

32. TEXAS HOPE has a board of directors and members who reside throughout Texas.  During membership meetings, Texas HOPE members guide the activities of the organization. TEXAS HOPE's members include Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as

described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice.  Thus, TEXAS HOPE has associational standing to challenge those districts.

33. Plans H2316, S2168, C2193 and E2106 will force TEXAS HOPE to divert significant resources from its GOTV, voter registration and community education activities, which are central to its mission, in order to counteract the negative effects of the challenged redistricting plans.  TEXAS HOPE has in the past conducted, and in the future will conduct, GOTV activities aimed at Latino registered voters, educated voters about upcoming elections and urged the voters to vote.  Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and areas and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward).  As a result, TEXAS HOPE must now expend significantly more resources to register and turn out Latino voters, particularly those who live in the challenged districts and areas, and who are discouraged by the absence of an equal opportunity to elect their candidate of choice; and to do so TEXAS HOPE must divert time and funding from its community education activities that further its mission, and must instead engage in efforts to convince Latinos to participate, despite the discrimination int he redistricting plans, in elections in which they lack the opportunity to elect their candidate of chioce—which is not a regular activity of TEXAS HOPE.  Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, TEXAS HOPE must spend significantly more resources in an attempt to educate

Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged redistricting plans. Because of the dilution of the Latino vote, Plans H2316, S2168, C2193 and E2106 thwart TEXAS HOPE's mission to empower and expand Latino political influence.  Thus, TEXAS HOPE has organizational standing to challenge the new redistricting plans.

34. Plaintiff  WILLIAM  C.  VELASQUEZ  INSTITUTE  ("WCVI")  is  a  nonprofit  and non-partisan public policy analysis organization that conducts research and works in Latino communities and with local leaders across Texas to increase Latino registration and voter turnout.  WCVI's mission includes improving the level of political participation for Latinos and other underrepresented communities.  WCVI's mission includes achieving full and effective  political  participation  by  Latinos.     Promoting  civic  participation  of Latinos—including voting—and ensuring that Latinos cast effective votes is critical to fulfilling WCVI's mission because political participation by Latinos secures WCVI's public policy goals.  WCVI analyzes and reports on Latino voter registration and participation and uses its research to educate and collaborate with Latino community leaders to increase Latino political participation.  WCVI's areas of research also include environmental justice, election reform, immigration reform, and foreign policy.  To effectuate its mission, WCVI conducts its work through research, policy seminars, media campaigns, and community workshops. Through its work, WCVI serves, among others, Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those individuals reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latino opportunity to elect their candidates of choice.

35. The new redistricting plans for Congress, the House, the Senate, and the SBOE will force WCVI to divert significant resources from research, policy seminars, and community workshops in areas outside of voting rights in order to counteract the discriminatory effects of the challenged redistricting plans on the community members and voters WCVI serves. Because of the new redistricting plans, WCVI must expend more resources on research, policy seminars, and community workshops to inform community members about how the new maps affect Latinos, especially in light of their reduced influence in the challenged districts.  For example, WCVI will have to use resources to educate community leaders and other Latinos regarding the areas in which Latinos have lost the ability to elect their candidate of choice, and therefore which areas will require more effort to ensure that there is an increase in Latino political participation.  Moreover, Latinos in areas where their vote has been diluted will feel discouraged from voting, requiring WCVI to expend more resources than before on efforts to encourage voter turnout and registration among Latinos.  Because WCVI must now focus its efforts on educating Latinos about the discrimination and efforts to combat it and convincing Latinos to participate, despite the discrimination in the challenged redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—which is not a regular activity of WCVI.  Thus, WCVI must divert its resources from other research areas, thereby thwarting the organization's mission in those areas, too. WCVI therefore has organizational standing to challenge the new redistricting plans.

36. Plaintiff FIEL Houston Inc. ("FIEL") is a non-profit, non-partisan membership organization in Houston, Texas that is organized under Texas law.  FIEL is an immigrant-led organization that advocates for just laws for immigrant youth and their families, access to higher education for all people regardless of immigration status, and access to justice for the Latino

community.  FIEL was born and raised out of the need for civic engagement in support of undocumented students seeking higher education, and it organizes for the betterment of the communities it serves through efforts that include voter registration, civic engagement and other advocacy efforts.  FIEL also provides services such as immigration assistance, financial aid, and education forums.  FIEL's mission includes achieving full and effective political participation by Latinos.  Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latinos cast effective votes, is critical to fulfilling FIEL's mission because political participation by Latinos secures FIEL's public policy goals.

37. FIEL has approximately 11,000 members in the greater Houston area.  FIEL's individual members pay dues, with a portion of the membership participating as scholarship members, and guide the organization's efforts.  FIEL's members elect its board, which consists of five members on staggered terms.  FIEL's individual members include Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice.  Thus, FIEL has associational standing to challenge those districts.

38. Plans H2316, C2193 and E2106 will force FIEL to divert significant resources from its GOTV, voter registration, immigration assistance, and education efforts—which are central to its mission—in order to counteract the negative effects of the challenged redistricting plans.  FIEL has in the past conducted, and in the future will conduct, GOTV activities aimed at increasing turnout of Latino registered voters with low turnout.  Additionally, FIEL has in the past employed, and in the future will employ, paid canvassers to contact voters in person

at their homes and educate the voters about an upcoming election, urge the voters to vote, and offer assistance to the voters.  Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and areas and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward).  As a result, FIEL must now expend significantly more resources to register and turn out Latino voters, particularly those discouraged by the absence of an equal opportunity to elect their candidate of choice; and to do so, FIEL must divert time and funding from its other initiatives, including its immigration assistance and community education activities that further its mission, and instead must engage in efforts to convince Latinos to participate, despite the discrimination in the challenged redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—which is not a regular activity of FIEL.  Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, FIEL must spend significantly more resources in an attempt to educate Latino voters about discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged redistricting plans.  Because of the dilution of the Latino vote, Plans H2316, C2193 and E2106 thwart FIEL's mission to expand Latino political influence and access to justice.  Thus, FIEL has organizational standing to challenge the new redistricting plans.

39. Plaintiff  TEXAS  ASSOCIATION  OF  LATINO  ADMINISTRATORS  AND SUPERINTENDENTS ("TALAS") is a non-profit membership organization that advocates for Latino learners' and leaders' growth and advancement in Texas.  TALAS' mission is to

provide leadership development, collective impact, advocacy and a proactive voice for Latino and non-Latino leaders passionate about serving the fastest-growing student population in Texas.  TALAS is headquartered in Austin, Texas, and it is organized under Texas law.   TALAS's mission includes achieving full and effective political participation by Latinos.   Promoting civic participation of Latinos—including voting—and ensuring that Latinos cast effective votes is critical to fulfilling TALAS's mission because political participation by Latinos secures TALAS's public policy goals.  To promote civic engagement in the communities it serves and to expand Latino political influence, TALAS's members conduct membership meetings; participate in issue-focused advocacy; campaign to support or oppose nonpartisan ballot measures; connect members to legislative updates as well as research studies related to the advancement of the Latino population in Texas public schools.

40. TALAS has nearly 200 Texas members who reside all across the state.  TALAS's members pay dues, elect leadership, serve as the organization's leadership, finance the organization's activities and participate in the organization's efforts.  TALAS members include Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their boundaries to reduce Latinos' opportunity to elect their candidates of choice.  Thus, TALAS has associational standing to challenge those districts.

41. Plans H2316, S2168, C2193 and E2106 will force TALAS to divert resources from its research and education activities, which are central to its mission, in order to counteract the negative effects of the challenged redistricting plans.  Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect

their preferred candidates, and the reduced influence of Latino voters in the challenged districts and areas and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward). As a result, fewer Latinos will cast ballots and fewer Latino candidates of choice will win elections, resulting in fewer Latino educational leaders than there otherwise would be, which will harm the ability of TALAS to achieve its policy goals. Because of the dilution of the Latino vote, Plans H2316, S2168, C2193 and E2106 thwart TALAS's mission to expand Latino leadership and representation. Thus, TALAS has organizational standing to challenge the new redistricting plans.

42. Plaintiff PROYECTO AZTECA is a non-profit self-help construction company located in San Juan, TX and serves low-income families in colonias and other rural areas in Hidalgo County. PROYECTO AZTECA's mission is to build a more equitable society through affordable and decent homeownership for the families it serves. PROYECTO AZTECA's mission also includes helping the families it serves increase their civic participation, including by voting. PROYECTO AZTECA's mission includes achieving full and effective political participation by Latinos. Promoting civic participation of Latinos—including voting—and ensuring that Latinos cast effective votes is critical to fulfilling PROYECTO AZTECA's mission because political participation by Latinos secures PROYECTO AZTECA's public policy goals. To effectuate its mission, PROYECTO AZTECA offers a variety of programs to respond to the housing crisis in Texas' Rio Grande Valley, and has helped to finance and train close to 1,000 families in the construction and first-time ownership of their own homes in over 150 colonias and rural areas. Additionally, PROYECTO AZTECA engages in GOTV efforts, including by phone banking and

canvassing families on where and how to vote, and it offers educational opportunities for those families on how to advocate on issues that implicate their home ownership. PROYECTO AZTECA also hosts community roundtables with candidates who are running for office, allowing the families it serves to engage with those candidates on matters such as education, housing, and health care.  Further, PROYECTO AZTECA hosts know-your-rights events for the families it serves.  PROYECTO AZTECA conducts its activities with, among others, Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those individuals reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice.

43. The new redistricting plans for Congress, House, Senate and SBOE will force PROYECTO AZTECA to divert its resources away from its voter engagement, community education activities and other community engagement efforts—which are central to its mission—in order to counteract the negative effects of the challenged redistricting plans on the community members and voters PROYECTO AZTECA serves.  PROYECTO AZTECA has in the past conducted, and in the future will conduct, GOTV activities aimed at increasing the turnout of Latino registered voters with low turnout.  Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and areas and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward).  As a result, PROYECTO AZTECA must now expend significantly more resources to register and turn

out Latino voters, particularly those who live in the challenged districts and areas, and who are discouraged by the absence of an equal opportunity to elect their candidate of choice; and to do so, PROYECTO AZTECA must divert time and funding from its community engagement and education efforts—such as its roundtables, advocacy training and know-your-rights events—that further its mission, and must instead engage in efforts to convince Latinos to participate, despite the discrimiantion in the redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—which is not a regular activity of PROYECTO AZTECA.  Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, PROYECTO AZTECA must spend significantly more resources in an attempt to educate Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged redistricting plans. Because of the dilution of the Latino vote, the challenged redistricting plans thwart PROYECTO AZTECA's  mission to expand Latino political influence.  Thus, PROYECTO AZTECA has organizational standing to challenge the new redistricting plans.

44. Plaintiff REFORM IMMIGRATION FOR TEXAS ALLIANCE ("RITA") is a Texas statewide coalition of individual members and grassroots organizations working to implement community-led advocacy campaigns that engage directly impacted communities and create policy change at the local, state, and national level. RITA works alongside business, religious, and law enforcement leaders to advance immigration reform.  RITA is headquartered in El Paso, Texas, and aims to connect Texas communities to share struggles, hopes, and successes; build capacity within immigrant communities to engage and impact policies; share strategies and resources to educate communities; and impact state and national

immigration policy through collaboration with diverse sectors at the local, regional, and national levels. RITA's mission includes achieving full and effective political participation by Latinos. Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latinos cast effective votes, is critical to fulfilling RITA's mission because political participation by Latinos secures RITA's public policy goals. To promote civic engagement in the communities it serves and to expand Latino political influence, RITA's members and paid staff conduct know-your-rights discussions; participate in issue-focused advocacy; campaign to support or oppose nonpartisan ballot measures through in-person canvassing; connect individual members to social services; and conduct voter registration, education, and non-partisan GOTV.

45. RITA has members throughout the state. RITA's individual members register with the organization, hold membership meetings and guide and participate in the organization's efforts. RITA's individual members include Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latino opportunity to elect their candidates of choice. Thus, RITA has associational standing to challenge those districts.

46. RITA's members also include Latino registered voters who live in the area of West Texas where, as described below, Defendants overpopulated districts in the newly enacted Texas House plan to favor the interests of voters in areas of West Texas and the High Plains, Anglo voters and Anglo incumbents over the interests of voters in El Paso and the Upper Rio Grande and Latino voters.

47. Plans H2316 and C2193 will force RITA to divert significant resources from its GOTV, voter registration and community education activities, which are central to its mission, in order to counteract the negative effects of the challenged redistricting plan.  RITA has in the past conducted, and in the future will conduct, GOTV activities aimed at increasing the turnout of Latino registered voters with low turnout.  Additionally, RITA has in the past paid, and in the future will pay, employees who, among other duties:  educate voters about upcoming elections; urge the voters to vote; and encourage, offer and deliver assistance to the voters.  Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and areas and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward).  As a result, RITA must now expend significantly more resources to register and turn out Latino voters, particularly those who live in the challenged districts and areas, and who are discouraged by the absence of an equal opportunity to elect their candidate of choice; and to do so, RITA must divert time and funding from its community education activities that further its mission, and instead must engage in efforts to convince Latinos to participate, despite the discrimination in the challenged redistricting plans, in elections in which they lack they lack the opportunity to elect their candidate of choice—which is not a regular activity of RITA.  Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, RITA must spend significantly more resources in an attempt to educate Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged redistricting plans.  Because of the dilution of

the Latino vote, Plan C2193 thwarts RITA's mission to expand Latino political influence. Thus, RITA has organizational standing to challenge the new redistricting plans.

48. Plaintiff WORKERS DEFENSE PROJECT ("WDP") is a community-led membership organization fighting the injustices against low-wage, immigrant workers in the construction industry. WDP's mission is to empower low-income workers to achieve fair employment through education, direct services, organizing and strategic partnerships. WDP is organized under Texas law with headquarters in Austin, Texas and offices in Houston and Dallas. WDP's mission includes achieving full and effective political participation by Latinos. Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latinos cast effective votes, is critical to fulfilling WDP's mission because political participation by Latinos secures WDP's public policy goals.  To promote civic engagement in the communities it serves and to expand Latino political influence, WDP's members and paid staff conduct know-your-rights discussions and membership meetings; participate in issue-focused advocacy; campaign to support or oppose nonpartisan ballot measures; connect members to social services; and conduct voter registration, education, and non-partisan GOTV.

49. WDP has registered members throughout Texas.  WDP has regular meetings in which members participate and guide the efforts of the organization.  Members also set the priorities for the organization.  WDP's individual members include Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice.  Thus, WDP

has associational standing to challenge those districts.

50. Plans H2316, S2168, C2193 and E2106 will force WDP to divert significant resources from its GOTV, voter registration and community education activities, which are central to its mission, in order to counteract the negative effects of the challenged redistricting plans. WDP has in the past conducted, and in the future will conduct, GOTV activities aimed at increasing the turnout of Latino registered voters with low turnout. Additionally, WDP has in the past paid, and will in the future pay, employees who, among other duties:  educate voters about upcoming elections; and urge the voters to vote.  Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and areas and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward).  As a result, WDP must now expend significantly more resources to register and turn out Latino voters, particularly those who live in the challenged districts and areas, and who are discouraged by the absence of an equal opportunity to elect their candidate of choice; and to do so, WDP must divert time and funding from its community education activities that further its mission, and must instead engage in efforts to convince Latinos to participate, despite the discrimination in the challenged redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—which is not a regular activity of WDP. Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, WDP must spend significantly more resources in an attempt to educate Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the

challenged redistricting plans. Because of the dilution of the Latino vote, Plans H2316, S2168, C2193 and E2106 thwart WDP's mission to expand Latino political influence. Thus, WDP has organizational standing to challenge the new redistricting plans.

51. Plaintiff Emelda Menendez is Latina and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE. She resides in San Antonio, Texas. In Plans H2316, S2168, C2193 and E2106, Plaintiff E. Menendez resides in Texas House District 120, Senate District 19, Congressional District 28 and SBOE District 3.

52. Plaintiff Gilberto Menendez is Latino and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE. He resides in San Antonio, Texas. In Plans H2316, S2168, C2193 and E2106, Plaintiff G. Menendez resides in Texas House District 120, Senate District 19, Congressional District 28 and SBOE District 3.

53. Plaintiff Jose Olivares is Latino and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE. He resides in Corpus Christi, Texas. In Plans H2316, S2168, C2193 and E2106, Plaintiff Olivares resides in Texas House District 32, Senate District 20, Congressional District 27 and SBOE District 2.

54. Plaintiff Florinda Chavez is Latina and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE. She resides in Austin, Texas. In Plans H2316, S2168, C2193 and E2106, Plaintiff Chavez resides in Texas House District 49, Senate District 21, Congressional District 37 and SBOE District 5.

55. Plaintiff Joey Cardenas is Latino and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE.  He resides in Louise, Texas.  In Plans H2316, S2168, C2193 and E2106, Plaintiff Cardenas resides in Texas House District 85, Senate District 17, Congressional District 22 and SBOE District 2.   Plaintiff Cardenas is also a member of Texas HOPE.

56. Plaintiff Paulita Sanchez is Latina and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE.  She resides in New Braunfels, Texas.   In Plans H2316, S2168, C2193 and E2106, Plaintiff Sanchez resides in Texas House District 73, Senate District 25, Congressional District 21 and SBOE District 10.   Plaintiff Sanchez is further injured by residing in an area in which Defendants should have created an additional Latino citizen voting age majority Senate district but failed to do so.

57. Plaintiff Jo Ann Acevedo is Latina and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE.  She resides in New Braunfels, Texas.   In Plans H2316, S2168, C2193 and E2106, Plaintiff Acevedo resides in Texas House District 73, Senate District 25, Congressional District 21 and SBOE District 10.   Plaintiff Acevedo is further injured by residing in an area in which Defendants should have created an additional Latino citizen voting age majority Senate district but failed to do so.

58. Plaintiff David Lopez is Latino and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE.  He resides in Houston, Texas.   In Plans H2316, S2168, C2193 and E2106, Plaintiff Lopez resides in Texas House District 138, Senate District 17, Congressional District 38 and SBOE

District 6.  Plaintiff Lopez is further injured by residing in an area in which Defendants should have created an additional Latino citizen voting age majority congressional district and SBOE district but failed to do so.

59. Plaintiff Diana Martinez Alexander is Latina and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE. She resides in Houston, Texas.  In Plans H2316, S2168, C2193 and E2106, Plaintiff Martinez Alexander resides in Texas House District 138, Senate District 15, Congressional District 38 and SBOE District 6.  Plaintiff Martinez is further injured by residing in an area in which Defendants should have created an additional Latino citizen voting age majority congressional district but failed to do so.

60. Plaintiff Jeandra Ortiz is Latina and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE.  She resides in Manor, Texas.  In Plans H2316, S2168, C2193 and E2106, Plaintiff Ortiz resides in Texas House District 46, Senate District 14, Congressional District 35 and SBOE District 5. Plaintiff Ortiz is further injured by residing in a congressional district, CD35, that is no longer majority Latino citizen voting age population in Plan C2193.

61. The dilution of Latino voting strength statewide in Plans H2316, S2168, C2193 and E2106 has injured all plaintiffs, including members of plaintiff organizations.  The dilution of Latino voting strength in individual districts in Plans H2316, S2168, C2193 and E2106 has injured plaintiffs who reside and vote in those individual districts, including members of plaintiff organizations.

## IV.
## DEFENDANTS

62. Defendant GREGORY W. ("Greg") ABBOTT is the Governor of Texas, and pursuant to

Article IV, Section I of the Texas Constitution, is the chief executive officer of the State of Texas.  He is sued in his official capacity.

63. Defendant JOHN SCOTT is the Secretary of the State of Texas.  Defendant SCOTT is the State's chief election officer and as such is responsible for overseeing the conduct of elections within the State.  He is sued in his official capacity.

64. Defendant the STATE OF TEXAS is one of the states of the United States of America. Plaintiffs' claims against Defendant STATE OF TEXAS are limited to those arising under Section 2 of the federal Voting Rights Act of 1965.  *See* 52 U.S.C. §§ 10301 and 10310(e).

**V.**
**FACTS**

**A. Texas's Long History of Discrimination Against Latino Voters**

65. Federal courts, including the Supreme Court, have recognized Texas's long history of discrimination against Latino voters, including in the area of voting.  *See LULAC v. Perry*, 548 U.S. 399, 439 (2006); *see also Bush v. Vera*, 517 U.S. 952, 981 (1994); *Perez v. Abbott*, 253 F. Supp. 3d 864, 888 (W.D. Tex. 2017); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 708 (S.D. Tex. 2017).  Indeed, as those courts have noted, "the poll tax, an all-white primary system, and restrictive voter registration time periods are" all part of Texas's "minority voting rights history."  *LULAC*, 548 U.S. at 439-40 (quotation omitted); *see also Patino*, 230 F. Supp. 3d at 683.  Those courts have also emphasized that "[t]he political, social, and economic legacy of past discrimination for Latinos in Texas . . . hinders their ability to participate effectively in the political process."  *Patino*, 230 F. Supp. 3d at 683.

66. From as early as 1845, the year of Texas's annexation into the United States, the State has suppressed the political participation of Latinos.  Laws prohibited Texans from using the Spanish language and barred Mexican-Americans from serving as election judges.

67. Decades later, the 1903 Terrell Election Law imposed a poll tax in the State. Tellingly, the law's sponsor explained that the law was implemented to close "the flood gates for illegal voting as one person could buy up the Mexican and Negro votes." The poll tax remained in effect for over sixty years in Texas.

68. A year later, in 1904, the Texas Democratic Executive Committee established a White Man's Primary Association, requiring members to take the following oath: "I am a white person and a Democrat." In 1923, the Texas Legislature passed a white primary law, which stated that "in no event shall a negro be eligible to participate in a Democratic party primary election held in the State of Texas." One Texas newspaper declared that the white primary "absolutely eliminates the Mexican vote as a factor in nominating county candidates, though we graciously grant the Mexican the privilege of voting for them afterwards."[2]

69. After the Supreme Court in *Nixon v. Herndon*, 273 U.S. 536 (1927) struck down Texas's white primary law pursuant to the Fourteenth Amendment, Texas enacted another law that authorized political parties to set their own voter qualifications. Pursuant to that law, the Texas Democratic Party enacted a rule that only white people could vote in its primary. The Supreme Court struck down that law in 1932, holding that it violated the Fourteenth Amendment. *See Nixon v. Condon*, 286 U.S. 73, 89 (1932).

70. In 1918, Texas enacted a law to eliminate interpreters at the polls, and the following year the State enacted a requirement that election officials communicate only in English at polling places.

71. After the Supreme Court in *Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966) invalidated the poll tax, the first Senate bill of the first Texas legislative session in 1966 required voters to register annually. In 1971, a federal court invalidated that requirement, as

---

[2] David Montejano, Anglos and Mexicans in the Making of Texas, 1836-1986 at p.144 (1986).

it had disenfranchised over a million Texans who would otherwise have been permitted to vote. *Beare v. Smith*, 321 F. Supp. 1100, 1108 (S.D. Tex. 1971), *aff'd sub nom. Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974).

72. Additionally, in the early 1900s, Texas Rangers discouraged Latinos from voting by actively investigating them and intimidating would-be voters, suggesting that they would imprison those voters if they were illiterate. The mere presence of armed Rangers at polling stations also intimidated Latino voters.

73. As a result of Texas's discriminatory efforts, only 44.4% of Latinos were registered to vote in 1972, whereas 73.4% of Anglos were registered at that time. *See Patino*, 239 F. Supp. 3d at 683.

74. In 1975, Texans testified before Congress regarding the discrimination Latinos that faced in the state. That testimony highlighted that far more Latinos in the state lived below the poverty line than did Anglos, and Latinos experienced far worse educational opportunities. Those societal effects, the testimony emphasized, were the result of the many discriminatory practices designed by Texas to exclude Latinos from civic engagement. The testimony emphasized that Anglos continued to intimidate Latino voters at the polls. For example, Latinos that had registered to vote were not placed on voting lists, election judges selectively and deliberately invalidated ballots cast by Latinos, and officials refused to aid Latino voters who could not read or speak English. Further, the testimony highlighted that there were widespread economic threats and coercion by Anglos directed at Latino voters, causing Latinos in Texas to fear economic reprisal by Anglos in the community, which resulted in low voter registration and turn out among Latino voters. Even law enforcement officials harassed and intimidated Latino voters, making excessive and unnecessary appearances at

polling places and at times actually threatening Latino voters.

75. Texas's history of official discrimination in the election process—stretching back to Reconstruction—led to the State's inclusion as a covered jurisdiction when, on September 25, 1975, Section 5 of the Voting Rights Act of 1965 was amended and extended. *LULAC*, 548 U.S. at 440. Since then, the Department of Justice has frequently interposed objections against Texas and its subdivisions pursuant to Section 5. *See id.*

76. In 2011, the Texas Legislature enacted what at the time was the nation's strictest voter identification law. A federal court concluded that, in light of the social and historical conditions that caused unequal opportunities for Black and Latino voters in Texas compared to Anglo voters, the law produced an impermissible discriminatory effect under the Voting Rights Act. *Veasey v. Perry*, 71 F. Supp. 3d 627, 698 (S.D. Tex. 2014), *aff'd in part, vacated in part, remanded sub nom. Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *on reh'g en banc*, 830 F.3d 216 (5th Cir. 2016). As the court noted, and the Fifth Circuit affirmed, the law had not by chance disproportionately affected Black and Latino voters; rather, it had "done so by its interaction with the vestiges of past and current discrimination," resulting in the denial or abridgment of the right to vote based on race, color, or membership in a language minority group. *Id.*

77. In every redistricting cycle since 1970, either the U.S. Department of Justice or a federal court has concluded that Texas discriminated against Latino voters in violation of the Voting Rights Act of 1965, including in the most recent redistricting cycle. *Perez*, 253 F. Supp. 3d at 888; *see also Patino*, 230 F. Supp. 3d at 721.

78. In the 2011 redistricting cycle, the U.S. District Court for the District of Columbia concluded that Texas had discriminated against Latino and other minority voters with the redistricting

plans it enacted in 2011 for the Texas House, Texas Senate, and Congress, emphasizing that Texas had enacted at least the Senate and congressional maps with discriminatory purpose, and accordingly denied preclearance for all three plans. *Texas v. United States*, 887 F. Supp. 2d 133, 178 (D.D.C. 2012), *vacated and remanded on other grounds*, 570 U.S. 928 (2013).[3]

**B. Texas's 2020 House, Senate, Congressional and SBOE Maps**

79. Texas's congressional and state legislative maps used in the 2020 election were created to remedy findings of minority vote dilution in the previous redistricting cycle. *See Abbott v. Perez*, 138 S. Ct. 2305, 2316–17, 2330 (2018).

80. In 2011, Texas enacted Texas House, Senate and SBOE redistricting plans during the 82nd Legislature's regular session. In a subsequent special session that same year, the Legislature adopted a congressional redistricting plan. At that time, Texas was required to obtain preclearance under Section 5 of the Voting Rights Act of 1965 before it could implement its redistricting plans; only the enacted SBOE redistricting plan received preclearance and went into effect for the 2012 election.

81. When Texas failed to secure preclearance for its House, Senate and congressional redistricting plans, the *Perez* court created interim maps for the 2012 election. In those maps, the *Perez* court redrew certain districts pursuant to instructions from the U.S. Supreme Court. Both the congressional and Texas House court-drawn redistricting plans departed significantly from the State's 2011 plans and changed at least 8 of the 36 congressional districts and 21 districts in the plan for the Texas House. *Id.* at 2316. In 2017, following trial, the *Perez* court concluded that the State-enacted 2011 State House and congressional

---

[3] Although the district court opinion was vacated in light of *Shelby County v. Holder*, 570 U.S. 529 (2013), the Fifth Circuit noted that "the opinion was not vacated on the merits and remains factually relevant as a contemporary example of State-sponsored discrimination based on the finding of a three-judge federal court," *Veasey v. Abbott*, 830 F.3d 216, 257 n.54 (5th Cir. 2016) (en banc).

plans unlawfully diluted minority voting strength and intentionally discriminated against minority voters. *Perez v. Abbott*, 250 F. Supp. 3d 123, 218-19 (W.D. Tex. 2017); *Perez v. Abbott*, 253 F. Supp. 3d 864, 972 (W.D. Tex. 2017). Texas did not appeal those rulings.

82. In 2013, Texas enacted the *Perez* court's interim remedial plans, with some changes to the Texas House plan. Following another trial, the *Perez* court concluded that one of those changes by Texas, to House District 90, was an unconstitutional racial gerrymander. The U.S. Supreme Court affirmed that ruling, *id.* at 2334–35, and the *Perez* court redrew House District 90 in May 2019 to remedy the constitutional violation.

83. Thus, as recently as 2019, a federal court redrew Texas district boundaries to cure racial discrimination. Nevertheless, history repeated itself in the Texas Legislature in 2021.

**C. Results of the 2020 Census**

84. On March 12, 2020, the U.S. Census Bureau commenced the 2020 Census. The following day, President Donald J. Trump declared the global pandemic COVID-19 a national emergency. As a result of the COVID-19 pandemic, the Census Bureau suspended field operations until July 2020. Despite U.S. Commerce Department Secretary Wilbur Ross's initial support of an extension, the Census Bureau ended its door-to-door operations on October 15, 2020.

85. On April 26, 2021, the U.S. Secretary of Commerce delivered the 2020 Census state population counts to the President for the purpose of apportioning the seats in the U.S. House of Representatives.[4]

86. On August 12, 2021, the U.S. Secretary of Commerce published the Texas redistricting data

---

[4] U.S. Census Bureau, "2020 Census Apportionment Results Delivered to the President," available at https://www.census.gov/newsroom/press-releases/2021/2020-census-apportionment-results.html (last visited Oct. 14, 2021).

file.[5]

87. The redistricting data revealed that the Texas House, Senate, congressional and SBOE districts used in the 2020 election needed to be redrawn.

88. According to the 2020 Census, the total population of Texas is 29,145,505. That figure represents a significant increase from a decade ago, when the 2010 Census reported a total population of 25,145,561. Texas experienced the third-largest percent increase in population of any state in the United States, and it is the only state to gain two congressional seats in the 2020 congressional apportionment. Beginning with the 2022 election, Texas voters will elect 38 members to the United States House of Representatives.

89. According to the 2020 Census, the Latino population of Texas is 11,441,717. Latinos constitute 50% of the total population growth in Texas between 2010 and 2020. Latinos are now 39.3% of Texas's population, and Anglos are now 39.7% of the state's population (a decrease from 45.3% a decade ago). The Latino citizen voting age population of Texas is 29.9% of the total citizen voting age population.

90. The pattern of strong Latino population growth relative to Anglo population growth was consistent across the state. For example, in Bexar County, the Latino population increased by 184,000, and the Anglo population increased by only 16,609; in Dallas County, the Latino population increased by 151,895, and the Anglo population decreased by 59,706; and in Harris County, the Latino population increased by 363,169, and the Anglo population decreased by 40,053.

91. In the new redistricting maps, the ideal population is: 194,303 for a State House district;

---

[5] U.S. Census Bureau, "2020 Census Statistics Highlight Local Population Changes and Nation's Racial and Ethnic Diversity- U.S. Census Bureau Delivers Data for States to Begin Redistricting Efforts," available at
https://www.census.gov/newsroom/press-releases/2021/population-changes-nations-diversity.html (last visited Oct. 14, 2021).

940,178 for a State Senate district; 766,987 for a congressional district; and 1,943,034 for an SBOE district.

**D. The Legislature adopts new redistricting plans during a special session called by Defendant Abbott.**

92. The Texas Legislature convened its 87th Regular Session on January 12, 2021, and adjourned *sine die* on May 31, 2021.  The Legislature did not enact redistricting plans during this time because the Census Bureau had not yet released the redistricting data file for Texas.

93. The U.S. Secretary of Commerce published the redistricting data file for Texas on August 12, 2021, more than ten weeks after the close of the Legislature's 87th Regular Session.

94. On August 31, 2021, in its second special session, the 87th Texas Legislature passed Senate Bill 1, a controversial new law that prohibits certain voting methods adopted during the COVID-19 pandemic (such as 24-hour and drive-thru voting), increases requirements for assisting limited English proficient and disabled voters, and prohibits certain assistance to mail voters.

95. On September 7, 2021, Defendant Abbott announced a third special session of the 87th Texas Legislature to address redistricting.  The third special session began on September 20, 2021.

96. Shortly before the special session on redistricting commenced, on September 16, 2021, Lieutenant Governor Dan Patrick, speaking on a national news broadcast, espoused the Great Replacement theory, a white supremacist tenet that the government seeks to replace Anglos with people of color.   More specifically, Lieutenant Governor Patrick stated that "a revolution has begun," elaborating that Latino migrants who arrived at the border, "[a]t least in 18 years, even if they all don't become citizens before then and can vote, in 18 years every one of them has two or three children, you're talking about millions and millions and millions of new voters, and they will thank the Democrats and Biden for bringing them

here."  Lieutenant Governor Patrick added, "Who do you think they are going to vote for? So this is trying to take over our country without firing a shot.  That is what is happening . . . [T]his is denying us our government that's run by our citizens with illegals who are here, who are gonna take our education, our healthcare."[6]

97. Following a highly compressed legislative process characterized by departures from normal procedure and substantive considerations, on October 15 and 16, 2021, the Legislature adopted redistricting plans for the Texas House (Plan H2316), Senate (Plan S2168) and SBOE (Plan E2106); on October 18, 2021, the Legislature adopted a redistricting plan for Congress (Plan C2193).  On October 25, 2021, Defendant Abbott signed the redistricting plans that adopted the Texas House, Texas Senate, Congress, and the Texas SBOE.

**E. The Legislature rushed passage of the redistricting plans.**

<u>Texas House Plan</u>

98. On September 30, 2021, Texas Representative Todd Hunter filed House Bill 1, a redistricting plan for the Texas House.  The presiding officer referred the bill to the House Redistricting Committee the same day.[7]

99. After the committee held a public hearing on House Bill 1 on October 4, 2021, the next day Representative Hunter introduced a committee substitute for the bill, and the committee voted out the bill the same day.  The committee did not hold a hearing on the substitute bill before voting it out of committee; as a result, there was no opportunity for public testimony on the substitute bill.

---

[6] Justin Baragona, *The Daily Beast*, "Texas Lt. Guv spews racist 'Great Replacement' theory on Fox:  'A revolution has begun,'" available at https://www.thedailybeast.com/texas-lt-gov-dan-patrick-spews-racist-great-replacement-theory-on-fox-news (Sept. 17, 2021).

[7] The House Redistricting Committee is also referred to as the "House Committee on Redistricting."

100.    On October 12, 2021, the full House heard House Bill 1 on second reading.  On October 13, 2021, the Texas House passed House Bill 1 on the third reading and reported the bill to the Senate.  On October 15, 2021, the Senate Special Committee on Redistricting held a public hearing on House Bill 1 and voted the bill out of committee.  The full Senate passed House Bill 1 that same day and adopted Plan H2316.

Texas Senate and SBOE Plans

101.    On September 18, 2021, Texas Senator Joan Huffman filed Senate Bill 4, a redistricting plan for the Texas Senate.

102.    On September 20, 2021, Senator Huffman filed Senate Bill 7, a redistricting plan for the SBOE.  That same day, the Lieutenant Governor referred Senate Bills 4 and 7 to the Senate Special Committee on Redistricting, and the committee issued a hearing notice for both bills for September 24, 2021.

103.    However, the evening before the committee held its hearing, Senator Huffman filed a committee substitute for Senate Bill 4.  As a result, most witnesses were deprived of the opportunity to analyze the committee substitute and modify their testimony before the hearing the following day.

104.    On September 24 and 25, 2021, the Senate Special Committee on Redistricting held a public hearing on both bills.  The committee voted out both bills on September 28, 2021.

105.    On October 4, 2021, the Texas Senate passed both bills.

106.    On October 11, 2021, the House Redistricting Committee held a public hearing on both bills, and that same day, the committee voted out both bills.   On October 15, 2021, the full House passed Senate Bills 4 and 7, adopting Plans S2168 and E2106, respectively.

Congressional Plan

107.    On September 27, 2021, Senator Huffman filed Senate Bill 6, a redistricting plan for congressional districts, and the Lieutenant Governor referred the bill to the Senate Special Committee on Redistricting.

108.    On September 30, 2021, the Senate Special Committee on Redistricting held a public hearing on Senate Bill 6 and left it pending.   On October 4, 2021, the Senate Special Committee on Redistricting held a public hearing on committee amendments for Senate Bill 6 and voted out a committee substitute. On October 8, 2021, the full Senate passed Senate Bill 6.  That same day, the House received the bill, and the presiding officer referred it to the House Redistricting Committee.

109.    On October 13, 2021, the House Redistricting Committee held a public hearing on the bill and voted it out.

110.    On October 16, 2021, the full House adopted several amendments to Senate Bill 6 and passed the bill on the second reading.

111.    On October 17, 2021, the House passed the amended version of Senate Bill 6 on the third reading, and the Senate refused to concur with the amendments.  That same day, Senate Bill 6 was referred to a conference committee, and the Senate and House appointed conferees.

112.    On October 18, 2021, the Legislature adopted Plan C2193.

**F. The Legislature departed from its normal procedures and normal substantive considerations in redistricting.**

113.    The 87th Texas Legislature's adoption of Plans H2316, S2168, C2193 and E2106 included departures from normal procedures and departures from normal substantive considerations in redistricting.

114.    For example, both the Texas House Redistricting Committee and the Senate Special Committee on Redistricting offered little advance notice of their hearings on the redistricting

bills.  On the night before the Senate Special Committee on Redistricting's hearing on the proposed Senate map, Senator Huffman, the Senate Redistricting Committee Chair, released a committee substitute for Senate Bill 4, and the next day the committee held a hearing on the committee substitute.  The House Redistricting Committee held a public hearing on the Texas House redistricting map on October 4, 2021 but on October 5, 2021, Representative Hunter, the House Redistricting Committee Chair, introduced a committee substitute for House Bill 1 and took no public testimony.  The committee voted out the committee substitute within 15 minutes.  On October 12, 2021, the House Redistricting Committee provided only 24-hour notice for a public hearing on the proposed congressional redistricting map and allowed only 12 hours for the public to register for virtual testimony. On October 16, 2021, the full House adopted several amendments to the proposed congressional redistricting map and provided no opportunity for public input on the amendments.

115.    Statements from the House and Senate committee chairs reveal departures from the normal and required substantive standards during the redistricting process.  For example, Senator Joan Huffman, who authored the State Senate and SBOE maps and chairs the Senate Redistricting Committee, told lawmakers and the public that the maps were "drawn blind to race."[8]

116.    Similarly, State Representative Todd Hunter, who authored the State House map and chairs the House Redistricting Committee, told lawmakers and the public that the House map created and evaluated majority-minority districts based on voting age population, instead of citizen voting age population, because citizen voting age population data is "not the same [as

---

[8] Acacia Coronado, *Associated Press*, "Texas GOP advances new maps that would tighten slipping grip," available at https://apnews.com/article/austin-texas-race-and-ethnicity-racial-injustice-elections-4a40e921b8cec9449e24ed5adc637d87 (Oct. 17, 2021).

those] based on census numbers."[9]

117.   These statements by the House and Senate committee chairs constitute significant departures from normal substantive considerations because, in previous redistricting cycles, bill sponsors, redistricting committee chairs and other members of legislative leadership acknowledged the need to examine citizen voting age population, as well as the impact of boundary changes on voters of different races, as integral to the redistricting process.

118.   Throughout the process, members of the Legislature, civil rights advocates and community members warned the legislative leadership that the proposed plans violated minority voting rights, but the Legislature did not cure the identified deficiencies.

Texas House Plan

119.   During its hearing on October 4, 2021, the Texas House Redistricting Committee failed to allow any invited testimony, which provides an opportunity for a legislative committee to hear from experts in the field.  Additionally, at the beginning of the hearing, Committee Chair Representative Todd Hunter announced that the committee would vote the bill out at the end of the hearing, which foreclosed any possibility that the committee would reevaluate the plan or make changes based on witness testimony.

120.   Chair Hunter also limited his bill layout for House Bill 1 to one hour and did not allow committee members to ask him questions during the bill layout.  Instead, Chair Hunter told committee members that they could submit written questions to him and that he would respond to them either after the hearing or on the House floor.

121.   On October 5, 2021, the House Redistricting Committee reconvened for 15 minutes. During that time, Chair Hunter introduced a committee substitute for House Bill 1 but did not

---

[9] Cassandra Pollock, *Texas Tribune*, "Texas House committee advances proposed map for lower chamber," available at
https://www.texastribune.org/2021/10/05/texas-house-redistricting-committee-map/ (Oct. 5, 2021).

allow any testimony.  The committee voted out the substitute bill at the end of the hearing.

122.    On October 13, 2021, the House passed House Bill 1.  The House sent the bill to the

Senate that same day, and the Lieutenant Governor referred the bill to the Senate Special

Committee on Redistricting.   On October 15, 2021, the Senate Special Committee on

Redistricting held a public hearing on House Bill 1.  The hearing lasted less than one hour,

and the committee voted out the bill at the end of the hearing.

123.    The Senate then suspended a rule for the regular order of business, voting out House Bill

1 the same day.

Texas Senate and SBOE Plans

124.    On September 20, 2021, the Senate Special Committee on Redistricting issued a hearing

notice for Senate Bills 4 and 7, setting a hearing on both bills for September 24, 2021.

125.    Senator Huffman filed a substitute for Senate Bill 4 on September 23, 2021, the night

before the hearing.

126.    On September 24 and 25, 2021, the Senate Special Committee on Redistricting held a

public hearing on Senate Bill 7 and the committee substitute for Senate Bill 4.   The

committee voted out both bills on September 28, 2021.

127.    On October 4, 2021, the full Senate voted to suspend the printing rule for Senate Bills 4

and 7.  That same day, the Senate passed both bills on the second and third readings.

128.    On October 11, 2021, the House Redistricting Committee held a public hearing on Senate

Bills 4 and 7.  The committee did not allow for invited testimony on either bill during the

hearing, and Committee Chair Hunter limited his bill layout time for each bill to 30 minutes.

At the beginning of the hearing, Chair Hunter announced that the committee would vote out

both bills at the end of the hearing, and any introduced committee amendments would occur

during the hearing.  That same day, the committee voted out both bills.

129.    Chair Hunter's announcements changed normal procedure.  Typically, committees do not hear and vote on bills on the same day, and votes for introduced amendments are set for a later time.  The normal procedure gives the committee members sufficient time to review the amendments before voting on them and the bill.  Thus, because of these changes in procedures, committee members and the public lacked time to review sufficiently the bills and any proposed amendments.

Congressional Plan

130.    On October 12, 2021, the House Redistricting Committee issued a notice for a public hearing on Senate Bill 6, setting the hearing for the very next day.  The committee thus gave only 24-hours notice of the hearing.  The committee also provided only 12 hours for the public to register to give virtual testimony at the hearing.

131.    At the public hearing on October 13, 2021, Chair Hunter limited the bill layout to just one hour.  At the beginning of the hearing, Chair Hunter announced that the committee would vote out the bill at the end of the hearing and that it would not consider committee amendments until after public testimony.  The committee did not allow invited testimony. That same day, the committee voted out the bill.

Texas House Representatives Plan

132.    The redistricting plan for the Texas House of Representatives contains 150 districts.

133.    The benchmark House plan included 33 districts with a majority Hispanic citizen voting age population ("CVAP").

134.    Newly-adopted Plan H2316 reduces the number of Hispanic CVAP majority districts from 33 to 30.

135.    However, the Latino population of Texas is sufficiently numerous and geographically compact to constitute the majority of the CVAP in at least 35 Texas House districts—or at least two more Latino opportunity districts than in the benchmark plan and five more than the enacted Plan H2316.

136.    Thus, at least 35 House districts can be created in Texas that offer Latino voters the opportunity to elect their candidate of choice.

137.    First, in Harris County, where the Latino population has increased by 363,169 over the past decade, the Latino population is sufficiently numerous and geographically compact to constitute the majority of the CVAP in at least one additional House district.  However, Plan H2316 fails to create an additional Latino citizen voting age majority House district there.

138.    Second, the Latino population in Central Texas along the I-35 corridor in Caldwell, Guadalupe, Hays and Travis counties is sufficiently numerous and geographically compact to constitute the majority of Hispanic CVAP in a House district.  However, Plan H2316 fails to create a Latino citizen voting age majority House district in that area.

139.    Third, the Latino population in West Texas—including the geographic area including portions of Brewster, Culberson, El Paso, Hudspeth, Jeff Davis, Pecos, Presidio, Terrell and Val Verde counties—is sufficiently numerous and geographically compact to constitute the majority of the CVAP in a House district.  However, Plan H2316 fails to create a Latino citizen voting age majority House district in that area.

140.    Despite the dramatic growth of the Latino population in Texas since 2010, the failure of Plan H2316 to create at least three additional Latino citizen voting age majority House district statewide dilutes Latino voting strength in those specific geographic areas and in Texas.

141.   In addition to failing to create additional Latino citizen voting age majority districts to reflect Latino population growth in Texas, Plan H2316 weakens existing Latino citizen voting age majority districts, such that those districts no longer afford Latinos the opportunity to elect their preferred candidate.

142.   For example, Plan H2316 weakens Latino voting strength in House District 118 in Bexar County while simultaneously increasing Latino voting strength in nearby House Districts 117 and 124, two existing Latino opportunity districts in the county.  Plan H2316 weakens House District 118 by manipulating population into and out of House District 117, 118 and 124 based on race, and strips Latino voters in HD118 of the opportunity to elect their candidate of choice.

143.   Additionally, Plan H2316 weakens Latino voting strength in House District 31 in the Rio Grande Valley by manipulating precincts into and out of the district based on race, and strips Latino voters in HD31 of the opportunity to elect their candidate of choice.

144.   Plan H2316 also weakens Latino voting strength in House District 37 in the Rio Grande Valley by manipulating precincts into and out of the district based on race, and strips Latino voters in HD37 of the opportunity to elect their candidate of choice.

145.   Plan H2316 also weakens Latino voting strength in House District 90 in Tarrant County by manipulating precincts into and out of the district based on race.

146.   Plan H2316 overpopulates districts in El Paso County and the Upper Rio Grande area of West Texas as follows:

HD74 (+8,936)

HD75 (+6,202)

HD77 (+9,618)

HD78 (+9,483)

HD79 (+7,076)

147.   At the same time, Plan H2316 underpopulates districts in West Texas and the Panhandle

as follows:

HD69 (-8,785)

HD71 (-2,986)

HD72 (-7,882)

HD81 (-9,633)

HD82 (-6,627)

HD83 (-8,334)

HD84 (-6,779)

HD86 (-8,995)

HD87 (-6,855)

HD88 (-8,244)

148.   Defendants' systematic and deliberate over- and underpopulation of districts in these

regions deliberately favors the interests of communities and voters in the West Texas High

Plains and the Panhandle at the expense of communities and voters in El Paso and the Upper

Rio Grande area of West Texas.

149.   Defendants also over- and underpopulate districts in these regions purposefully to avoid

creating a new Latino citizen voting age majority district, and to protect Anglo incumbents.

Defendants' over- and underpopulation of districts in these regions purposefully minimizes

Latino voting strength and Latino voters' ability to participate on an equal basis in elections

to the State House, both in the specific overpopulated districts and statewide.

150.    Within a total (or "top to bottom"[10]) deviation of 9.98%, Defendants deliberately favored Anglo voters over Latino voters for the purpose of preserving Anglo voting influence and Anglo incumbency, and thwarting the emergence of an additional House district in which Latino voters have the opportunity to elect their candidate of choice—even as the rate of Anglo population growth in West Texas lags behind that of Latino population growth.  The population deviations between West Texas House districts are not supported by any legitimate, consistently applied state policy and are tainted by discrimination.

Texas Senate Plan

151.    The benchmark Senate plan contains 31 Senate districts, seven of which contain a majority Hispanic CVAP.  Plan S2168 maintains the same number of Senate districts that contain a majority Hispanic CVAP.

152.    However, the Latino population of Texas is sufficiently numerous and geographically compact to comprise the majority of the CVAP in at least 9 Senate districts—or at least two additional Latino citizen voting age majority Senate districts compared to the benchmark map.

153.    First, in South/Central Texas, between San Antonio and Austin along the I-35 corridor—including the geographic area including portions of Bastrop, Bexar, Caldwell, Comal, Guadalupe, Hays and Travis Counties—the Latino population is sufficiently numerous and geographically compact to constitute the majority of the CVAP in at least one additional Latino majority Senate district.  However, Plan S2168 fails to create an additional Latino citizen voting age majority Senate district there.

---

[10] To calculate the "top to bottom deviation" of a plan, courts (1) determine the percentage difference between the population of the largest-populated district and the ideal population for a district, (2) determine the percentage difference between the population of the smallest-populated district and the ideal population for a district, and then (3) add those values together.

154.    Second, in the Dallas/Ft. Worth Metroplex, the Latino population is sufficiently numerous and geographically compact to constitute the majority of the CVAP in at least one additional Latino majority Senate district.  However, Plan S2168 fails to create an additional Latino citizen voting age majority Senate district there.

155.    Despite the dramatic growth of the Latino population in Texas since 2010, the failure of Plan S2168 to create additional Latino citizen voting age majority Senate districts means that Latinos have lost voting strength in Texas despite their dramatic growth over the decade.

156.    In addition to failing to create two additional Latino citizen voting age majority districts to reflect Latino population growth in Texas, Plan S2168 manipulates district boundaries in SD27 with the purpose of reducing Latino voting strength and making it more difficult for Latinos to elect their preferred candidates.  Plan S2168 purposefully weakens Latino voting strength in Senate District 27, which is located in South Texas along the Gulf Coast, by manipulating precincts into and out of the district based on race, and reduces the ability Latino voters in SD27 to elect their candidate of choice.

SBOE Plan

157.    The benchmark SBOE plan contains 15 SBOE districts, three of which contain a majority Hispanic CVAP.  Plan E2106 maintains the same number of SBOE districts with a majority Hispanic CVAP.

158.    The Latino population of Texas is sufficiently numerous and geographically compact to comprise the majority of the CVAP in at least 4 SBOE districts—or at least one additional Latino citizen voting age majority SBOE district compared to the benchmark map.

159.    In Harris County, the Latino population is sufficiently numerous and geographically compact to constitute the majority of the CVAP in an SBOE district.  However, Plan E2106

fails to create a Latino citizen voting age majority district there.

160.    Despite the dramatic growth of the Latino population in Texas since 2010, the failure of Plan E2106 to create an additional Latino citizen voting age majority SBOE district means that Latinos have lost voting strength in Texas despite their dramatic growth over the decade.

161.    Additionally, Plan E2106 manipulates the district boundaries of ED3—a district in South Texas—with the purpose of reducing Latino voting strength and making it more difficult for Latinos to elect their preferred candidates.  Defendants also purposefully manipulated district boundaries in South Texas on the basis of race to limit Latino electoral opportunity in ED2 and ED3.

Congressional Plan

162.    The benchmark congressional plan contains a total of 36 congressional districts, eight of which contain a majority Hispanic CVAP.  Plan C2193 contains a total of 38 congressional districts, seven of which contain a majority Latino citizen voting age population.

163.    The significant growth of the Latino population in Texas since 2010 allowed Texas to gain one, if not both, of its two new congressional districts.  Despite the growth of the Latino population over the past decade, Plan C2193 dilutes Latino voting strength by reducing the number of Hispanic CVAP majority congressional districts and failing to create any additional Hispanic CVAP majority congressional districts.

164.    The Latino population of Texas is sufficiently numerous and geographically compact to comprise the majority of the CVAP in at least three additional congressional districts compared to the benchmark maps.

165.    In Harris County, the Latino population is sufficiently numerous and geographically compact to comprise the majority of the CVAP in at least one additional Latino majority

congressional district.  However, Plan C2193 fails to create an additional Latino majority congressional district there.

166.   In the Dallas-Ft. Worth area, the Latino population is sufficiently numerous and geographically compact to comprise the majority of the CVAP in a congressional district. However, Plan C2193 fails to create an additional Latino citizen voting age majority congressional district there.

167.   In South/Central Texas, in an area along the I-35 corridor from Bexar to Travis counties, the Latino population is sufficiently numerous and geographically compact to comprise the majority of the CVAP in a congressional district.  The benchmark congressional redistricting plan continued such a district:  CD35.  However, Plan C2193 fails to create a Latino citizen voting age majority congressional district there.

168.   In South/Central Texas, in an area including Nueces, San Patricio, Bee, Goliad, Karnes, Gonzales, Caldwell, Bastrop, Travis and Williamson counties, the Latino population is sufficiently numerous and geographically compact to comprise the majority of the CVAP in a congressional district.   The benchmark congressional redistricting plan continued such a district:  CD35.  However, Plan C2193 fails to create an additional Latino citizen voting age majority congressional district there.

169.   In addition to failing to create additional Latino citizen voting age majority districts to reflect Latino population growth in Texas, C2193 weakens existing Latino citizen voting age majority districts.

170.   In South Texas, Plan C2193 weakens Latino voting strength in Congressional District 15 by intentionally "packing" Latino voters into neighboring Congressional District 34. Defendants manipulated district boundaries in CD15 with the purpose of reducing Latino

voting strength and making it more difficult for Latinos to elect their preferred candidates.

171.    Plan C2193 also weakens the Latino voting strength in Congressional District 23 by intentionally manipulating precincts into and out of the district based on race, and denies Latino voters in CD23 of the opportunity to elect their candidate of choice.

**G. The Newly Adopted Maps Dilute the Voting Strength of Latinos**

172.    Latinos in Texas are politically cohesive, including in the geographic areas described above in which Defendants either failed to create Latino citizen voting age majority districts or weakened existing Latino citizen voting age majority districts.

173.    Anglos in Texas—including in the geographic areas described above in which Defendants either failed to create Latino citizen voting age majority districts or weakened existing Latino citizen voting age majority districts—vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.

174.    As noted, there has been a long history of discrimination against Latinos in Texas. *See LULAC*, 548 U.S. at 439-40.  That discrimination included the poll tax, an all-white primary system, restrictive voter registration time periods, refusal to register Latino voters, intimidation by Anglos of Latino voters at the polls, segregated public accommodations and school and employment discrimination.

175.    Latinos bear the present effects of that discrimination in the form of lower socio-economic status and lower rates of political participation.  Indeed, educational achievement and earnings for Latinos lag far behind Anglos in the state, and the Latino registration and voter turnout rates remain below that of Anglos in Texas.  Moreover, Latinos remain underrepresented in federal, state, and local elected positions.

176.    In the new redistricting plans, Latinos do not constitute the majority in a number of districts proportional to their population, falling well below that figure.

177.    Plans H2316, S2168, C2193 and E2106 interact with social and historical conditions to cause an inequality in the opportunity of Latino voters to elect representatives of their choice as compared to Anglo voters.  Because these factors are present, Plans H2316, S2168, C2193 and E2106 have the effect of diluting Latino voting strength statewide and in the specific geographic areas and districts described above.

178.    Plans H2316, S2168, C2193 and E2106 also discriminate against Latino voters statewide, and in the specific geographic areas and districts described above, by intentionally manipulating district boundaries to reduce Latino voting strength such that Latinos either lose political strength or cannot elect their candidates of choice, and by making improper and excessive use of race in redistricting.

## VI.
## CAUSES OF ACTION

### COUNT 1

*Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution*
*(racial discrimination)*

179.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

180.    Texas House Plan H2316, Senate Plan S2168, Congressional Plan C2193 and SBOE Plan E2106 purposefully discriminate against Plaintiffs and other Latinos on the basis of race and national origin in violation of the 14th Amendment to the U.S. Constitution.

181.    Defendants purposefully discriminated against Latinos in Plan H2316 by failing to create new Latino citizen voting age majority districts in Harris County, Central Texas and West Texas; by weakening Latino voting strength in HD31, HD37, HD90 and HD118; and by

creating malapportioned House districts in West Texas. Defendants further purposefully discriminated against Latinos in Plan S2168 by failing to create new Latino citizen voting age majority districts in Dallas-Ft. Worth and South/Central Texas, and by weakening Latino voting strength in SD27. Defendants further purposefully discriminated against Latinos in Plan E2106 by failing to create a new Latino citizen voting age majority district in Harris County, and by weakening Latino voting strength in ED2 and ED3. Defendants further purposefully discriminated against Latinos in Plan C2193 by failing to create Latino citizen voting age majority districts in Harris County, Dallas-Ft. Worth and South/Central Texas, and by weakening Latino voting strength in CD15 and CD23.

## **COUNT 2**

*Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution*
*(unconstitutional population deviations)*

182.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

183.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution "requires that the seats in both houses of a bicameral state legislature [] be apportioned on a population basis." *Reynolds v. Sims*, 377 U.S. 533, 568 (1964).

184.    In Texas House Plan H2316, Defendants systematically overpopulate districts in El Paso County and the Upper Rio Grande area of West Texas (Districts 74, 75, 77, 78, and 79) and underpopulate districts in West Texas and the Panhandle (Districts 69, 71, 72, 81, 82, 83, 84, 86, 87, and 88). Defendants' over- and underpopulation of districts in these regions deliberately favors the interests of communities and voters in the West Texas High Plains and the Panhandle at the expense of communities and voters in El Paso and the Upper Rio Grande area of West Texas in violation of the one person, one vote principle of the Fourteenth Amendment of the United States Constitution.

185.    Defendants also over- and underpopulated districts in these regions to avoid creating a new Latino citizen voting age majority House district, and to protect the influence of Anglo voters and to preserve Anglo incumbents.  Defendants' over- and underpopulation of districts in these regions purposefully minimizes Latino voting strength and Latino voters' ability to participate on an equal basis in elections to the State House, both in the specific overpopulated districts and statewide.  Within a total (or "top to bottom") deviation of 9.98%, Defendants deliberately favored Anglo voters over Latino voters and thwarted the emergence of an additional House district in which Latino voters have the opportunity to elect their candidate of choice—even as the rate of Anglo population growth in West Texas lags behind that of Latino population growth.  The population deviations between West Texas House districts are not supported by any legitimate, consistently applied state policy and are tainted by discrimination; thus, they cannot withstand constitutional scrutiny.  The systematic under- and overpopulation of districts in West Texas based on race violates the one person, one vote principle of the Fourteenth Amendment of the United States Constitution.

## **COUNT 3**

### *Section 2 of the Voting Rights Act*

186.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

187.    Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, applies nationwide and prohibits voting practices and procedures that result in the denial or abridgement of the right of any citizen to vote on account of race, color or membership in a language minority group. Section 2 is a permanent provision of the federal Voting Rights Act.

188.    Texas House Plan H2316, Senate Plan S2168, Congressional Plan C2193 and SBOE Plan E2106 result in a denial or abridgment of the right to vote of individual plaintiffs and

organizational plaintiffs' members on account of their race, color or ethnicity by having the intent and effect of canceling out or minimizing their voting strength as Latinos in Texas. Texas House Plan H2316, Senate Plan S2168, Congressional Plan C2193 and SBOE Plan E2106 do not afford individual plaintiffs and organizational plaintiffs' members an equal opportunity to participate in the political process and to elect representatives of their choice, and deny individual plaintiffs and organizational plaintiffs' members the right to vote in elections without distinction of race, color or previous condition of servitude in violation of 52 U.S.C. § 10301.

189.    In Plan H2316, Defendants discriminated against Latinos in effect and purposefully by failing to create new Latino citizen voting age majority districts in Harris County, Central Texas and West Texas, and Defendants discriminated purposefully against Latinos by weakening Latino voting strength in HD31, HD37, HD90 and HD118 and by creating malapportioned House districts in West Texas.  In Plan S2168, Defendants discriminated against Latinos in effect and purposefully by failing to create new Latino citizen voting age majority districts in Dallas-Ft. Worth and South/Central Texas, and Defendants discriminated purposefully against Latinos by weakening Latino voting strength in SD27.  In Plan E2106, Defendants discriminated against Latinos in effect and purposefully by failing to create a new Latino citizen voting age majority district in Harris County, and discriminated purposefully by weakening Latino voting strength in ED2 and ED3.   In Plan C2193, Defendants discriminated purposefully and in effect against Latinos by failing to create Latino citizen voting age majority districts in Harris County, Dallas-Ft. Worth and South/Central Texas, and by weakening Latino voting strength in CD23. Defendants also discriminated purposefully against Latinos by weakening Latino voting strength in CD15.

**VII.**
**REQUEST FOR THREE-JUDGE COURT**

190.    Plaintiffs request a three-judge trial court pursuant to 28 U.S.C. § 2284.

**VIII.**
**ATTORNEY'S FEES**

191.    In accordance with 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e), Plaintiffs are entitled to recover reasonable attorney's fees, expenses and costs.

**IX.**
**PRAYER**

192.    WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that this Court:

(a) assume jurisdiction of this action and request a three-judge panel pursuant to 28 U.S.C. § 2284;

(b) issue a declaratory judgment finding that the Texas House Plan H2316, Senate Plan S2168, Congressional Plan C2193 and SBOE Plan E2106 illegally and unconstitutionally dilute the voting strength of Latino voters in Texas and are unlawful, null and void;

(c) issue a declaratory judgment finding that the newly-adopted Texas House Plan H2316 is unconstitutionally malapportioned;

(d) permanently enjoin Defendants from calling, holding, supervising or certifying any elections under Texas House Plan H2316, Senate Plan S2168, Congressional Plan C2193 and SBOE Plan E2106.  Plaintiffs have no adequate remedy at law other than the judicial relief sought herein, and unless the Defendants are enjoined from using Texas House Plan H2316, Senate Plan S2168, Congressional Plan C2193 and SBOE Plan E2106, individual plaintiffs and organizational plaintiffs' members will be irreparably harmed by the continued violation of their statutory and constitutional

rights;

(e) pursuant to 52 U.S.C. § 10302(c), issue an order requiring Texas to preclear its election changes during the ten-year period following the issuance of such order;

(f) set a reasonable deadline for state authorities to enact or adopt redistricting plans for Texas House, Senate, Congress and SBOE that do not dilute, cancel out or minimize the voting strength of Latino voters;

(g) if state authorities fail to enact or adopt valid redistricting plans by the Court's deadline, order new redistricting plans for Texas House, Senate, Congress and SBOE that do not dilute, cancel out or minimize the voting strength of Latino voters;

(h) adjudge all costs against Defendants, including reasonable attorney's fees;

(i) retain jurisdiction to render any and all further orders that this Court may; and

(j) grant any and all further relief to which Plaintiffs may show themselves to be entitled.

DATED: April 14, 2022                    Respectfully submitted,

MEXICAN AMERICAN LEGAL DEFENSE
AND EDUCATIONAL FUND

*/s/ Nina Perales*
Nina Perales
Texas Bar No. 24005046
Samantha Serna
Texas Bar No. 24090888
Fátima Menendez
Texas Bar No. 24090260
Kenneth Parreno*
Massachusetts Bar No. 705747
110 Broadway, Suite 300
San Antonio, TX 78205
(210) 224-5476
FAX (210) 224-5382

*Admitted *pro hac vice*

**<u>Certificate of Service</u>**

The undersigned counsel hereby certifies that she has electronically submitted for filing a true and correct copy of the above and foregoing in accordance with the Electronic Case Files System of the Western District of Texas on the 14th Day of April 2022.


<u>*/s/ Nina Perales*</u>
Nina Perales