# United States District Court
# for the Western District of Texas
## El Paso Division

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> *Plaintiffs*, <br><br> **v.** <br><br> GREG ABBOTT, *in his official capacity as Governor of the State of Texas, et al.*, <br><br> *Defendants*. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | **No. 3:21-CV-259-DCG-JES-JVB** <br> **[Lead Case]** |

| | | |
|---|---|---|
| ROY CHARLES BROOKS, *et al.*, <br><br> *Plaintiffs*, <br><br> **v.** <br><br> GREG ABBOTT, *in his official capacity as Governor of the State of Texas, et al.*, <br><br> *Defendants*. | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | **No. 1:21-CV-991-LY-JES-JVB** <br> **[Consolidated Case]** |

## PRELIMINARY-INJUNCTION
## MEMORANDUM OPINION AND ORDER

This case concerns a district of the Texas Senate centered in southern Tarrant County. Until recently, Senate District ("SD") 10 was contained entirely within Tarrant County. But as part of the recent redistricting, the Texas Legislature redrew the district, removing portions of Tarrant County and adding seven rural counties. The new district is significantly more Republican and

significantly more Anglo.

Plaintiffs seek a preliminary injunction barring Texas from using the newly enacted map in the 2022 election cycle. Though Plaintiffs have also alleged that the new map has discriminatory effects that violate Section 2 of the Voting Rights Act ("VRA"), they do not press that theory in seeking this injunction. Instead, they advance two overlapping theories: The legislature engaged in intentional dilution of minority voting power, and it engaged in racial gerrymandering.

This three-judge Court conducted a four-day hearing involving thirteen witnesses and 175 exhibits to assess Plaintiffs' request for preliminary relief. As explained below, Plaintiffs have not made the showings necessary to entitle them to a preliminary injunction.

Most importantly, they have not demonstrated a likelihood of success on the merits—although the new senate map may disproportionately affect minority voters in Tarrant County, and though the legislature may at times have given pretextual reasons for its redistricting decisions, Plaintiffs have pointed to no evidence indicating that the legislature's true intent was racial. On the remaining preliminary-injunction factors, Plaintiffs have demonstrated that they would suffer an irreparable injury, but they have failed to demonstrate that either the balance of equities or the public interest weighs in their favor.

Because Plaintiffs have failed to carry their burden, the Court DENIES a preliminary injunction. Also, having considered Plaintiffs' Rule 65(a)(2) motion to consolidate these preliminary findings with a final merits determination, the Court DENIES that motion as well.

**CONTENTS**

| | | |
|---|---|---|
| **I.** | **BACKGROUND** | 5 |
| A. | Senate District 10 | 5 |
| B. | Previous Litigation | 8 |
| C. | The 2021 Redistricting Process | 9 |
| D. | Procedural History | 12 |
| **II.** | **GOVERNING LAW** | 16 |
| A. | Standard of Review | 16 |
| B. | Intentional Vote Dilution and Racial Gerrymandering | 16 |
| C. | Discriminatory Effect and the Role of *Gingles* | 21 |
| **III.** | **FINDINGS AND ANALYSIS** | 25 |
| A. | The *Arlington Heights* Factors | 25 |
| | 1. Discriminatory Effect | 25 |
| | a) Credibility Determinations | 25 |
| | b) CVAP, VAP, and Total Population | 29 |
| | c) Political Cohesiveness | 31 |
| | d) Conclusion on Discriminatory Effect | 32 |
| | 2. Historical Context | 34 |
| | 3. Sequence of Events | 35 |
| | 4. Procedural and Substantive Departures | 37 |
| | 5. Legislative History | 40 |
| | 6. Conclusion on Discriminatory Intent | 43 |
| B. | Plaintiffs' Alternative Maps | 44 |
| C. | The Presumption of Legislative Good Faith | 48 |

D.  Conclusion on Likelihood of Success                          52

E.  The Remaining Preliminary-Injunction Factors                53

    1.    Irreparable Harm                                     53

    2.    The Balance of Equities and the Public Interest      54

F.  Conclusion                                                  60

**IV.   PLAINTIFFS' RULE 65(a)(2) MOTION**                       62

**V.    CONCLUSION**                                            63

# I. BACKGROUND

## A. Senate District 10

SD 10 is one of thirty-one districts that elect members of the Texas Senate. Benchmark SD 10 (that is, the district as it existed per the 2010 census) was entirely within Tarrant County, as shown below:



The new SD 10, however, is, to say the least, more geographically dispersed—in addition to a reduced portion of Tarrant County, in the northeast corner of the district, the district includes all or part of seven less-populous counties to the south and west.  The new SD 10 is shown below:



The district is currently represented by Senator Beverly Powell, a Democrat, and has experienced partisan swings for at least two decades. It was once a Republican bastion, and initially remained one after the 2001 redistricting cycle, when it was redrawn to roughly its benchmark borders. But in 2008, it elected Senator Wendy Davis, a Democrat. The seat then flipped back to Republicans in 2014, and flipped yet again in 2018, when Senator Powell was elected. The district's recent electoral history is summarized in Defendants' Exhibit 17:

### Raw Data[*]

| Year | | R | D | Margin (R) |
|------|---|-----|-----|------------|
| 2002 | | 58.7 | 39.9 | 18.8 |
| 2004 | | 59.3 | 40.1 | 19.2 |
| 2008 | | 47.5 | 49.9 | -2.4 |
| 2012 | | 48.9 | 51.1 | -2.2 |
| 2014 | | 52.8 | 44.7 | 8.1 |
| 2018 | | 48.2 | 51.7 | -3.5 |

In addition to its partisan performance, benchmark SD 10 is notable, for this Court's purposes, for its racial and ethnic makeup. According to the 2015–2019 ACS,[1] a source credited by both parties, benchmark SD 10 is 61.5% minority and 39.5% Anglo; more specifically, it is 32.2% Hispanic, 21.5% Black, and 5.7% Asian. Its voting age population ("VAP") is 43.9% Anglo, 28.8% Hispanic, 20.3% Black, and 5.5% Asian. Its *citizen* voting age population ("CVAP") is 53.9% Anglo, 20.4% Hispanic, 20.9% Black, and 3.6% Asian. Pls' Ex. 44 at 4. The district was thus not majority-minority by CVAP according to the five-year ACS figures, but the parties dispute whether it may have since become majority-minority. The Court returns to that dispute below.

Plaintiffs' Exhibits 66 and 68 illustrate the Hispanic (left) and Black (right) population distribution, measured by VAP, overlaid on the benchmark map of Tarrant County:



---

[1] ACS stands for "American Community Survey." It is an annual report the Census Bureau produces by sampling roughly 2% of all American households. Though the report is less thorough than the decennial census, which seeks to survey *all* American households, its annuality keeps it more timely. The ACS also collects data, such as citizenship status, that the decennial census does not. Five-year figures like these combine the results of five consecutive ACS reports, producing a result that is less current than the most recent ACS but has a sample size five times larger. R. at 2:118–19, 121.

As the Court noted above, the new SD 10, compared to the benchmark, is both significantly more Republican and significantly more Anglo.  The counties appended to Tarrant County are populated mostly by rural Anglos who tend by a large margin to vote Republican.  Pls.' Ex. 44 at 10.  With those voters added to the district and many in the Fort Worth area removed, the district's 2020 presidential election result would have been quite different.  President Biden won 53.1% of the vote in the benchmark district, but President Trump would have won 57.2% under the new map.  Defs.' Ex. 11, 16.  In terms of race, the new district is still only 49% Anglo, compared to 28.2% Hispanic, 17.7% Black, and 3.4% Asian.  But Anglos constitute 53.3% of VAP and 62.2% of CVAP.  Pls.' Ex. 44 at 6.  Plaintiffs' Exhibit 44 provides a visualization of the Anglo population's distribution in the new district:



## B. Previous Litigation

SD 10 has been subject to redistricting litigation before.  Most notably for our purposes, the district was the sole state senate district at issue in a 2012 decision by the U.S. District Court for the District of Columbia.  *See Texas v. United States*, 887 F. Supp. 2d 133, 162 (D.D.C. 2012) (three-judge court), *vacated on other grounds*, 570 U.S. 928 (2013) (hereinafter "*Texas Preclearance Litig.*").  That court refused

to allow Texas to redraw SD 10 along lines similar to the current plan.  *See id.* at 163–66.

That case was decided under the "preclearance" framework established by Section 5 of the VRA.  Under that framework, which has since been invalidated, *see Shelby County v. Holder*, 570 U.S. 529, 557 (2013), certain states, including Texas, were required to seek preapproval for changes to their election rules, including redistricting.  Importantly, the states seeking preclearance bore the burden to show that their proposed changes were nondiscriminatory.  *See Texas Preclearance Litig.*, 887 F. Supp. 2d at 163.

In the 2012 decision, the three-judge district court concluded that Texas had not carried its burden to show that the redrawing of SD 10 was enacted without discriminatory intent.  *Id.* at 166.  In reaching that conclusion, the court considered emails, procedural omissions, and differing treatment of senators from majority-minority districts, suggesting that supporters of the redrawing acted secretively and were not in fact open to outside input on the new senate map.  *See id.* at 163–66. That court's decision applied a legal standard different from the one at issue here, and this Court, of course, is not bound by its findings of fact.  But the decision was public knowledge, and it would plausibly have been known to many of those who served in the Texas Senate when it was decided.

On the other hand, SD 10 featured less prominently in the series of redistricting cases heard last decade by a different three-judge court within this district.  Notably, the district was not at issue in *Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017) (three-judge court).  That decision concerned Texas's federal congressional map rather than its state senate map.  *See id.* at 873.  Thus, though the court found impermissible racial discrimination in the drawing of congressional districts around Fort Worth, *see id.* at 938, it did not address SD 10, and its decision is not part of SD 10's litigation history.

## C. The 2021 Redistricting Process

The details of Texas's redistricting process are key to this Court's analysis of whether the legislature acted with discriminatory intent.  So the Court revisits

that process below.  This introductory section is only a high-level summary.

The Texas Legislature ordinarily conducts redistricting during its regular session immediately following the release of the U.S. Census data.  But this year, the COVID–19 pandemic delayed that release by several months.  So on September 7, 2021, which was promptly after the census data was made public, Governor Abbott called a special thirty-day session of the legislature to consider reapportionment beginning on September 20.  Defs.' Ex. 25.

But legislators had been discussing potential district lines long before that. Of particular note are three meetings between the staffs of Democratic Senator Powell, who represents SD 10, and Republican Senator Joan Huffman, who chaired the redistricting committee.

The first meeting occurred on February 12, 2020, between staffers for both senators.  Pls.' Ex. 22 at 1.  Rick Svatora, deputy chief of staff to Senator Powell, took handwritten notes.  *Id.*  According to those notes, Sean Opperman, chief of staff to Senator Huffman, told his counterparts to expect "very little change" because SD 10 was already close to ideal size.  Pls.' Ex. 23 at 2.

The second meeting, which included both senators and members of their staffs, occurred on November 19, 2020.  Pls.' Ex. 6 at 2.  There, Garry Jones, chief of staff to Senator Powell, recalls that either Opperman or Senator Huffman acknowledged that SD 10 was majority-minority.  *Id.*

The third meeting was September 14, 2021, after Governor Abbott had called the special session, between both senators and staff, including Anna Mackin, special counsel to Senator Huffman and an attorney with experience representing Texas in redistricting litigation.  *Id.* at 3.  At that meeting, Senator Huffman and her staff revealed their plans to redraw SD 10 by adding several rural counties.  Pls.' Ex. 2 at 2.

Senator Powell objected and, as part of her argument against the plan, handed the participants copies of maps of the district shaded to indicate the distribution of racial groups.  *Id.* at 2–3.  As she did so, Senator Powell read aloud the headers of each map; Senator Huffman looked at each map and asked that all

present initial and date the maps, which they did. *Id.* at 3. Jones recalls Mackin's remarking that the conversation was making her "uncomfortable." Pls.' Ex. 6 at 4. In addition to those meetings, Senator Powell and her staff sent various letters and emails to Senator Huffman and her staff, and to the Senate more generally, detailing the racial implications of the proposed changes to SD 10. Pls.' Ex. 11.

Senator Huffman, meanwhile, insisted that she was not considering race at all in her redistricting decisions. During an October 4 hearing, she remembered the September 14 meeting differently from the way Plaintiffs describe it—she claimed that she had looked at the racially shaded maps for "less than a second" and that when she realized each had racial data, she "turned it over flat and . . . said, 'I will not look at this.'" Pls.' Ex. 41 at 17.

Senator Powell and Jones expressly contradict that narrative. Similarly, Opperman responded to an email from Jones to say that he had closed the attachments immediately after realizing they contained racial data. Pls.' Ex. 12. Senator Huffman admitted she was aware that "there are minorities that live all over this state" but insisted she "blinded [her]self to that as [she] drew these maps." Pls.' Ex. 41 at 21. After drawing the maps, she ensured that they underwent a legal compliance check to avoid violating the VRA. *Id.* at 8.

Senator Huffman's office then released the full Senate plan on September 18. Pls.' Ex. 15. But she then announced amendments significantly affecting the shape of SD 10 on September 23, the day before a scheduled public hearing on the Senate plan. Defs.' Ex. 58 at 4–5. During that hearing, on September 24, Senator Huffman stated,

> My goals and priorities in developing these proposed plans include first and foremost abiding by all applicable law, equalizing population across districts, preserving political subdivisions and communities of interest when possible, preserving the cores of previous districts to the extent possible, avoiding pairing incumbent members, achieving geographic compactness when possible, and accommodating incumbent priorities also when possible.

*Id.* at 2. Plaintiffs draw attention to the absence of "partisan advantage" from her

list of considerations.  At that hearing and subsequent ones, many members of the public testified, including prominent individuals from benchmark SD 10 who complained of the reduction in minority voting strength.  Pls.' Ex. 16 at 2–20.

On September 28, the committee rejected an amendment that would have restored benchmark SD 10.  Pls.' Ex. 54 at 10–13.  Meanwhile, Senator Huffman claimed that "addressing partisan considerations" had been one of her redistricting criteria.  Defs.' Ex. 62 at 2.  Later, during an October 4 floor debate, Senator Huffman described the race-neutral process related above and again listed the criteria she used—without mentioning partisanship.  Pls.' Ex. 41 at 7.  But there, Senator Powell was asked by a fellow Democrat, "Do you believe that your district is being intentionally targeted for elimination as it being a Democratic trending district?"  She answered, "Absolutely, absolutely."  Pls.' Ex. 41 at 49.

The Senate passed Senator Huffman's plan as amended, but one Republican voted against it.  *Id.* at 66.  That was Senator Kel Seliger, who chaired the Senate redistricting committee in the last round of districting but who is now at odds with many in his own party.  Defs.' Ex. 40.  Senator Seliger explains his choice by claiming that the stated redistricting criteria (not including partisanship) were "pretext" and that "it was obvious to [him]" that the redrawing of SD 10 violated the VRA and the Constitution.  Pls.' Ex. 1 at 2–3.  Senator Seliger later clarified, however, that his main objection to SB 4 concerned the redrawing of his own district—SD 31—rather than SD 10.  R. at 4:48–49.  Meanwhile, three Democrats—Senators Hinojosa, Lucio, and Zaffirini—voted for the plan but signed a statement claiming that the redrawing of SD 10 violated the VRA.  Pls.' Ex. 40 at 5–6.

SB 4 proceeded to the House, where it passed on a compressed time schedule, despite the objections of various Democratic representatives.  Defs.' Ex. 60 at 237–56, 279.  Defendant Governor Abbott signed the bill into law.

**D. Procedural History**

This action is one of several consolidated before this three-judge court.  The first was filed on October 18, 2021, by the League of United Latin American

Citizens (LULAC), along with other organizations.  Dkt. 1.  The *LULAC* plaintiffs are individual voters and a coalition of organizations that seek an injunction against the maps for the State House, State Senate, Congress, and State Board of Education.  Dkt. 1.  The *LULAC* plaintiffs argue that the newly enacted plans would violate their civil rights by unlawfully diluting the voting strength of Hispanics.  Dkt. 1.  Because the suit challenges the apportionment of congressional and state legislative districts, a three-judge court was convened in that action under 28 U.S.C. § 2284(b).  Dkt. 3.

This case was filed on November 3 in a separate division of the same federal district.  *Brooks v. Abbott*, No. 1:21-cv-991 (W.D. Tex.).  On November 19, the Court issued an order consolidating *LULAC* with six additional cases,[2] including the case involving the *Brooks* plaintiffs' challenge to SD 10.  Dkt. 16.

Meanwhile, on November 15, Texas filed its first motion to dismiss the *LULAC* plaintiffs, in part arguing that Section 2 of the VRA does not confer a private cause of action.  Dkt. 12 at 16.  Then, on November 19, Texas moved to dismiss another group of plaintiffs, including the organization Voto Latino, again arguing in part that Section 2 of the VRA does not confer a private cause of action. Dkt. 22 at 1.

The *Brooks* plaintiffs moved for a preliminary injunction as to SD 10 on November 24.  Dkt. 39.  They contend that the legislature unlawfully broke up a minority crossover district.  *Id.* at 3–5.  Texas moved to dismiss the *Brooks* plaintiffs' claims on November 29, maintaining that the complaint did not allege facts sufficient to show the legislature's discriminatory intent, Dkt. 43 at 10–13, or facts to maintain a disparate-impact claim, *id.* at 2–10.

On November 30, the United States submitted a Statement of Interest

---

[2] Those cases are (1) *Wilson v. Texas*, No. 1:21-CV-943 (W.D. Tex.); (2) *Voto Latino v. Scott*, No. 1:21-CV-965 (W.D. Tex.); (3) *MALC v. Texas*, No. 1:21-CV-988 (W.D. Tex.); (4) *Brooks v. Abbott*, No. 1:21-CV-991 (W.D. Tex.); (5) *Texas State Conference of the NAACP v. Abbott*, No. 1:21-CV-1006 (W.D. Tex.); and (6) *Fair Maps Texas Action Committee v. Abbott*, No. 1:21-CV-1038 (W.D. Tex.).

under 28 U.S.C. § 517, expressing its support for the availability of a private cause of action to enforce Section 2 of the VRA. Dkt. 46 at 1. On December 3, this Court partially denied Texas's motion to dismiss the *LULAC* plaintiffs for want of a private cause of action, concluding that, under current caselaw, Section 2 includes a private cause of action. Dkt. 58 at 1–2.

The Court held the *Brooks* plaintiffs' motion for a preliminary injunction in abeyance on December 2 to conduct a scheduling conference, Dkt. 56 at 1–2, which occurred on December 7, Dkt. 76. That same day, the court set a briefing schedule for the *Brooks* plaintiffs' motion for a preliminary injunction. Dkt. 70 at 1–2. The following day, the Court set a hearing date for the motion to be on January 25, 2022. Dkt. 77.

The Court dismissed the complaint of another plaintiff, Damon Wilson, on December 3, 2021, for lack of standing. Dkt. 63 at 1–3. Wilson tried to amend his complaint on December 13. Dkt. 86. Because he failed to request the Court's leave before filing an amended complaint and because he would not have been able to establish a concrete injury-in-fact, the Court struck the amendment and dismissed his action on February 8, 2022. Dkt. 187 at 5.

Texas moved to dismiss two more complaints, those of the *MALC* and *NAACP* plaintiffs, on December 9. Dkts. 80, 82. The next day, the Court consolidated *United States v. Texas*, No. 3:21-CV-299 (W.D. Tex.), with the present case. Dkt. 83. On December 15, the Court consolidated *Fischer v. Abbott*, No. 3:21-CV-306 (W.D. Tex.), with the present case. Dkt. 92.

After receiving proposed scheduling orders from the parties, the Court set the scheduling order for the consolidated cases on December 17. Dkt. 96. A final trial on the merits was set for September 27, 2022. Dkt. 96 at 4. The scheduling order was amended on December 27, 2021, with the trial date changed to September 28, 2022. Dkt. 109.

Texas objected to several of the *Brooks* plaintiffs' preliminary-injunction exhibits on December 20, 2021. Dkt. 103. The *Brooks* plaintiffs timely filed their witness and exhibit lists as well as their designation of expert witnesses on January 7,

2022. Dkts. 129–131. Texas timely filed its witness and exhibit lists and designation of expert witnesses on January 14. Dkts. 140–142. Both sides filed amended exhibit lists on January 24. Dkts. 157, 160. The next day, the *Brooks* plaintiffs filed a second amended list, and the day after that, Texas filed a second amended list. Dkts. 162, 167.

The Court denied Texas's motion to dismiss the *Brooks* plaintiffs' complaint on January 18, holding that they had pleaded plausible discriminatory-effects and discriminatory-intent claims. Dkt. 144 at 1–2.

The parties in the other consolidated actions announced that they would not pursue a preliminary injunction, leaving the *Brooks* plaintiffs as the only parties seeking that relief. The Court held a hearing on the motion for a preliminary injunction from January 25 until January 28. Dkts. 183–186. The Court heard testimony from, among others, two expert witnesses from Plaintiffs, one expert witness from Defendants, and Senators Powell and Huffman. During the hearing, Plaintiffs argued that, if Senator Huffman testified, she would entirely waive her legislative privilege. R. at 5:147–48. Defendants replied that she would not testify as to privileged conversations, but only as to public statements. R. at 5:149–51. The Court determined on the record that she would not categorically waive her privilege by testifying. R. at 5:152.

Meanwhile, the parties raised other objections to one another's exhibits but eventually withdrew all but one of those objections. R. at 8:4–5. The one exception was Plaintiffs' Exhibit 102, a transcript of text messages that Defendants contended was hearsay, had not been properly authenticated, and lacked relevance. *Id.* at 8:4. The Court admitted that exhibit but noted that it would assign it due weight in light of those objections. R. at 9:4.

On February 1, 2022, the Court denied Plaintiffs' motion for a preliminary injunction in a brief order. Dkt. 176 at 3. The Court issued that order promptly to permit the March 1, 2022, primary to be conducted on schedule as designated by statute. The Court promised to state its reasoning "in a forthcoming opinion," *id.*, and does so in the instant memorandum opinion and order.

## II. GOVERNING LAW

### A. Standard of Review

A plaintiff seeking a preliminary injunction must make four showings: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). In evaluating those requirements, this Court is mindful that preliminary injunctions are "extraordinary remed[ies] never awarded as of right." *Id.* at 24. Thus, Plaintiffs have the burden of persuasion and are required to "clearly carr[y]" it "on all four requirements." *Planned Parenthood of Hous. & Se. Tex. v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005) (quotation omitted).[3]

### B. Intentional Vote Dilution and Racial Gerrymandering

Plaintiffs advance two legal theories to demonstrate likelihood of success on the merits: (1) Defendants have engaged in intentional vote dilution; and (2) Defendants have engaged in racial gerrymandering. Plaintiffs do *not* press, at least at this stage, their theory that Defendants have committed a purely statutory violation of Section 2 of the VRA. Understanding the implications of that choice requires a brief review of voting rights caselaw.

The VRA was enacted in 1965. Among its several provisions was Section 5, which has since been invalidated, and Section 2, which is most relevant for our

---

[3] A recent Supreme Court concurrence has suggested that a higher showing might be required where, as here, a plaintiff seeks to enjoin an impending election. Under that test, Plaintiffs would have to establish that "(i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring). But that test is not the law, and even if it were, it would not be necessary to apply it here because the Court concludes that Plaintiffs have failed to make the more traditional showing. Thus, the Court applies the standard four preliminary-injunction requirements.

purposes.  As initially enacted, that section provided that "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color."  Voting Rights Act of 1965, Pub. L. No. 89-110, § 2, 79 Stat. 437, 437.  In *City of Mobile v. Bolden*,  a plurality read that language as having "an effect no different from that of the Fifteenth Amendment."  446 U.S. 55, 61 (1980) (plurality opinion).  And that was a problem for voting-rights plaintiffs, because facially neutral state actions violate the Fifteenth Amendment "only if motivated by a discriminatory purpose."  *Id.* at 62.

Partly in response to that decision, Congress amended Section 2 in 1982, adding a new subsection.  *See* Voting Rights Act Amendments of 1982, Pub. L. No. 97–205, § 3, 96 Stat. 131, 134, *codified in relevant part at* 52 U.S.C. § 10301.  That subsection clarified that a violation was established if "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by" all racial groups such that their "members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C. § 10301(b).

The Supreme Court interpreted that new language in *Thornburg v. Gingles*, to mean that Section 2, unlike the Constitution, could be violated even if a state did not act with a racial motive.  478 U.S. 30, 35 (1986).  The Court also took a broad view of discriminatory effect, such that Section 2 generally requires the creation of legislative districts where a racial minority is (1) large and geographically compact, (2) politically cohesive, and (3) otherwise unable to overcome bloc voting by the racial majority.  *See id.* at 50–51.  "*Gingles* claims," as they are sometimes called, are regularly brought by voting-rights plaintiffs today, including Plaintiffs here, who listed a discriminatory-effects claim in their initial complaint.  Dkt. 7 Ex. 7 at 27.

But in seeking a preliminary injunction, Plaintiffs do not present their *Gingles* theory.  Instead, they rest primarily on a theory of intentional vote dilution—that is, the kind of theory that would have been viable even before the 1982 amendments.  *See Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481–82 (1997)

(explaining the amendments' effect). Such theories are seldom pursued because, at least according to conventional wisdom, they are more difficult to prove than are effects-only Section 2 claims. *See, e.g.*, *Harding v. County of Dallas*, 948 F.3d 302, 313 n.47 (5th Cir. 2020). We do not speculate on why Plaintiffs have made this choice, but we observe that it presents this Court with a relatively undeveloped body of precedent. *See Perez*, 253 F. Supp. 3d at 942.

As distinguished from the more specialized set of doctrines that has arisen from the *Gingles* caseline, intentional-vote-dilution theories call for the application of general constitutional principles. The theoretical origin of those principles is not entirely obvious. Although *Bolden* spoke of the Fifteenth Amendment, *see Bolden*, 446 U.S. at 60–61 (plurality opinion), *Reno* suggested that both the Fourteenth and Fifteenth Amendments were relevant to the constitutionality of vote dilution, *see Reno*, 520 U.S. at 481.[4]

Despite that ambiguity, courts evaluating intentional-discrimination claims in the voting-rights context fall back on doctrines established in Equal Protection cases. *See id.* at 481–82. And in that context, discriminatory purpose means more than awareness of a discriminatory effect—instead, it requires a plaintiff to establish that a state decisionmaker acted "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Still, the decisionmaker need not explicitly spell out its invidious goals—a court may sometimes infer discriminatory intent where an act has predictable discriminatory consequences. *See id.* at 279 n.25; *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68 (1977), the Court listed five factors that courts may look to in drawing such inferences: (1) discriminatory effect, (2)

---

[4] *Compare Backus v. South Carolina*, 857 F. Supp. 2d 553, 569 (D.S.C. 2012) (three-judge court) (discussing uncertainty about the Fifteenth Amendment's role), *with Prejean v. Foster*, 227 F.3d 504, 519 (5th Cir. 2000) ("[T]he Supreme Court has rejected application of the Fifteenth Amendment to vote dilution causes of action.").

historical background, (3) the sequence of events leading up to a challenged decision, (4) departures from normal procedure, and (5) legislative history.[5] But the Court stressed that those factors are not exhaustive and that the inquiry is highly sensitive and fact-bound. *See id.* at 266–68.

Turning to Plaintiffs' second theory of liability, the history of racial gerrymandering claims is more straightforward. The seminal case is *Shaw v. Reno*, 509 U.S. 630 (1993). There, in an attempt to comply with *Gingles*, North Carolina had drawn two unnaturally shaped Black-majority congressional districts. *See id.* at 635–36, 655–56. The Supreme Court held that the plaintiffs could challenge those districts under the Fourteenth Amendment's Equal Protection Clause insofar as "they rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race." *Id.* at 649.

The Court has since clarified that, to succeed in such a challenge, plaintiffs must show that race was the "predominant factor" in redistricting, such that "the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). If such a showing is made, the state must demonstrate that its use of race was narrowly tailored to a compelling interest. *See Shaw*, 509 U.S. at 653.

*Shaw* began a pattern in which plaintiffs brought racial gerrymandering claims *in opposition to* perceived excesses under *Gingles*. Sometimes those plaintiffs are Republicans who oppose the creation of majority-minority districts that are predicted to favor Democratic candidates. *See, e.g.*, *Bush v. Vera*, 517 U.S. 952, 957 (1996) (plurality opinion). At other times they are Democrats who fear that states are packing their minority co-partisans into as few districts as possible. *See, e.g.*,

---

[5] The factors are sometimes enumerated differently, including by various panels of the Fifth Circuit. One tally treats procedural and substantive departures from normal procedure as separate prongs, with discriminatory effect as a distinct "starting point." *See, e.g.*, *Rollerson v. Brazos River Harbor Navigation Dist.*, 6 F.4th 633, 639–40 (5th Cir. 2021) (plurality opinion) (quoting *Arlington Heights*, 429 U.S. at 266). This Court adopts the enumeration listed elsewhere, *see, e.g.*, *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020), primarily because it better aligns with the parties' briefing. That decision is organizational and has no effect on the underlying legal or factual analysis.

*Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 260 (2015). As a result, the doctrine associated with racial gerrymandering is relatively easy to disentangle from Section 2 jurisprudence.

But while Plaintiffs' theories may have different origins and tend to be deployed differently, they have strong substantive overlap. Both require Defendants to have acted purposefully to diminish the voting strength of minorities in SD 10, and both are rooted at least partly in the Fourteenth Amendment. Indeed, it would not be impossible to read *Shaw* and later racial-gerrymandering cases as merely elaborating upon the intentional-vote-dilution theory sketched in *Bolden* and *Reno*. But the Fifth Circuit continues to treat intentional vote dilution as a legal harm distinct from racial gerrymandering, *see, e.g.*, *Harding*, 948 F.3d at 312, as does the Supreme Court, *cf. Shaw*, 509 U.S. at 652; *Abbott v. Perez*, 138 S. Ct. 2305, 2314 (2018) (describing the two theories separately). And this Court does so as well.

There are several differences between intentional vote dilution and racial gerrymandering, the most important of which for present purposes is quantitative: Plaintiffs must make a stronger showing to demonstrate racial gerrymandering than to show intentional vote dilution. While intentional discrimination means only that a decisionmaker acted "at least in part" with a discriminatory purpose, *Feeney*, 442 U.S. at 279, racial gerrymandering requires that the decisionmaker "subordinated" other redistricting considerations to race, *Miller*, 515 U.S. at 916. Thus, Plaintiffs may show intentional vote dilution merely by establishing that race was *part* of Defendants' redistricting calculus, but to show racial gerrymandering they must go further and prove that race *predominated* over other considerations such as partisanship.[6] If, as we conclude, Plaintiffs fail to make the first showing, they logically cannot make the second.

There are also a few qualitative differences between intentional vote

---

[6] *Miller*, 515 U.S. at 916, stated only that race must subordinate "traditional . . . districting principles," a category from which, perhaps naively, partisanship is often omitted. But later decisions clarify that a partisan motive can defeat a racial-gerrymandering claim. *See, e.g.*, *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017).

dilution and racial gerrymandering that are less relevant at this stage. The two theories differ in how they conceive of a plaintiff's legal injury.

The injury in an intentional-vote-dilution claim is the same as it is for any other intentional-discrimination claim: The state has subjected minorities to invidious discrimination. *See, e.g.*, *Bolden*, 446 U.S. at 62 (plurality opinion). The injury inflicted by racial gerrymandering is more abstract. That injury arises when district lines "reinforce[ ] the perception that members of the same racial group . . . think alike, share the same political interests, and will prefer the same candidates at the polls." *Shaw*, 509 U.S. at 647. That difference was important to this Court's determination of which Plaintiffs had standing to bring which claims, *see* Dkt. 119 at 3–5, though it does not alter the merits.

Separately, racial gerrymandering has traditionally been subject to a narrow-tailoring defense, while intentional vote dilution has not. *See, e.g.*, *Perez*, 253 F. Supp. 3d at 891, 962 (conducting a narrow-tailoring analysis in the racial-gerrymandering context but not in the intentional-vote-dilution context). The theoretical basis for that difference is less clear, but the Court does not confront that uncertainty here because Defendants have not presented a narrow-tailoring defense to either theory.

Thus, the most relevant distinction between Plaintiffs' two theories at this stage is that, though both require discriminatory intent, racial gerrymandering requires a stronger showing. If Plaintiffs fail to demonstrate a likelihood of success on their intentional-vote-dilution theory, they will automatically fail on their racial-gerrymandering theory. Because the Court concludes that Plaintiffs do fail on their first theory, we do not separately consider the second one.

## C. Discriminatory Effect and the Role of *Gingles*

As explained above, this is not a *Gingles* action. But *Gingles* addresses discriminatory effect, which is required for any showing of intentional discrimination. Defendants therefore contend that, in order to prevail, Plaintiffs must show that benchmark SD 10 satisfied the three *Gingles* requirements. Thus, Defendants say, Plaintiffs cannot prevail unless SD 10's minority voters are

(1) numerous and compact, (2) vote cohesively, and (3) are systematically outvoted by the surrounding Anglo communities.

We disagree with the Defendants' understanding of the requirements. Plaintiffs may show discriminatory effect *without* making a full *Gingles* showing. As noted above, *Gingles* and its progeny do not articulate general legal principles for intentional discrimination but, instead, offer an interpretation of one section of the VRA. *Gingles* itself reached that interpretation by relying heavily on legislative history and scholarship interpreting the VRA. *See Gingles*, 478 U.S. at 48–51. As critics of the decision have been quick to point out, it is not clearly rooted in the VRA's plain text and is even further removed from the text of the Constitution. *See, e.g.*, *Holder v. Hall*, 512 U.S. 874, 895–98 (1994) (Thomas, J., concurring in the judgment).

The intentional-vote-dilution analysis, meanwhile, is derived from the Constitution, and the *Arlington Heights* framework deployed in that analysis states merely that effects are discriminatory when they "bear[ ] more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Incorporating the *Gingles* framework into the intentional-vote-dilution analysis, thereby constitutionalizing the *Gingles* factors, would thus be an unnatural result, and it is not one that this Court accepts.

This conclusion finds support in *Bartlett v. Strickland*, 556 U.S. 1 (2009). That case concerned the application of Section 2 of the VRA to "crossover districts"—that is, districts where a minority "is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." *Id.* at 13 (plurality opinion). A plurality of the Supreme Court held that Section 2 does not require the creation of crossover districts. *Id.* at 25–26. It reasoned primarily from the third prong of *Gingles*, which requires that the majority votes in a bloc to defeat minority-preferred candidates. *Gingles*, 478 U.S. at 51. Because, in a crossover district, a portion of the majority votes with the minority, it cannot be the type of district required by *Gingles*. *See Bartlett*, 556 U.S. at 16 (plurality opinion).

But the *Bartlett* plurality cautioned in *dictum* that "if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Id.* at 24. The plurality thus concluded both that *Gingles* does *not* require the creation of crossover districts and that the Constitution *might* be violated if a state intentionally destroyed a crossover district. *Id.* Under that reasoning, it must be possible for a state to violate the Constitution by dismantling a district that does not meet all three *Gingles* requirements. Though we are not bound by the *dictum* of a Supreme Court plurality, *Bartlett*'s reasoning provides persuasive authority against applying the *Gingles* framework to intentional-vote-dilution claims.

Defendants maintain that not considering the *Gingles* factors here conflicts with the approach taken by the Eleventh Circuit, but we disagree. The relevant case, *Johnson v. DeSoto County Board of Commissioners*, 72 F.3d 1556 (11th Cir. 1996), was grounded expressly in the VRA and not the Constitution. The *DeSoto* court, relying on *Voinovich v. Quilter*, 507 U.S. 146 (1993), reasoned from the key distinction between Section 2 and Fourteenth Amendment redistricting violations: The former do not require intent. *See DeSoto*, 72 F.3d at 1561–62. Because intent is not an element of a Section 2 violation, it followed that intent was not sufficient to establish a Section 2 violation. *See id.* at 1564.

That circuit's later decisions have thus required Section 2 plaintiffs alleging discriminatory intent to make a *Gingles* showing. *See, e.g., Burton v. City of Belle Glade*, 178 F.3d 1175, 1201 (11th Cir. 1999); *see also Thompson v. Kemp*, 309 F. Supp. 3d 1360, 1366–67 (N.D. Ga. 2018) (three-judge court). But *DeSoto*'s reasoning strongly suggests that that requirement is strictly statutory, so inapplicable to the constitutional theory here.[7] Moreover, the Ninth Circuit has addressed the issue more squarely and does not require a *Gingles* showing where

---

[7] It is also worth noting that the Eleventh Circuit did not have the benefit of the Supreme Court's guidance in *Bartlett* when it decided *DeSoto* and *Burton*. The Eleventh Circuit decided those cases in 1996 and 1999, respectively, while the Supreme Court decided *Bartlett* in 2009.

intentional discrimination is alleged. *See Garza v. County of Los Angeles*, 918 F.2d 763, 769–71 (9th Cir. 1990). The three-judge panel in Texas's previous redistricting cycle adopted the Ninth Circuit's approach, *see Perez*, 253 F. Supp. 3d at 944 (addressing statutory claims). This Court now does the same.

So, though Plaintiffs must show discriminatory effect to prevail on their intentional-vote-dilution theory, *see Harding*, 948 F.3d at 312, this Court concludes that that discriminatory effect does not require the benchmark district to meet all, or any, of the *Gingles* requirements for a Section 2 district.

## III. FINDINGS AND ANALYSIS

### A. The *Arlington Heights* Factors

*1. Discriminatory Effect*

To show a discriminatory effect in the context of intentional vote dilution, Plaintiffs must demonstrate that the redrawing of SD 10 "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (quoting *Washington*, 426 U.S. at 242). As this Court will explain, experts on both sides agree that voting in SD 10 is racially polarized—the Black and Hispanic electorate tends to vote Democrat, while Anglos tend to vote Republican. Similar patterns exist nationally. Almost any gerrymander that favors Republicans would therefore tend to lessen the voting strength of minorities relative to Anglos, and yet partisan gerrymandering is beyond the power of federal courts to police. *See Rucho v. Common Cause*, 139 S. Ct. 2484, 2506–07 (2019). Indeed, almost any gerrymander that favors Democrats would tend to lessen the relative voting strength of Anglos, whose voting rights are no less protected by the Constitution. *See, e.g.*, *Harding*, 948 F.3d at 306.

But this Court is loath to conclude that partisan gerrymandering creates an effectively automatic discriminatory effect for purposes of *Arlington Heights*, and this case does not require the Court to do so. Instead, the Court observes that the redrawing of SD 10 disperses the district's minority voters—irrespective of whether one conceives of them as a coalition—such that the candidates they support are far less likely to win election. Although a *Gingles* theory would require more, the Court concludes that Plaintiffs likely will demonstrate that the action they challenge produces a discriminatory effect. The Court begins by reviewing the testimony of the parties' expert witnesses.

*a) Credibility Determinations*

First, the Court finds the factual testimony of Plaintiffs' expert, Dr. Barreto, credible. Dr. Barreto is well-versed in conducting Ecological Inference Analysis to analyze racially polarized voting. R. at 2:109. His extensive record of academic research has focused on racial voting patterns. Pls.' Ex. 105 at 1–6. The Court accepted him as an expert without objection. R. at 2:122–23.

Dr. Barreto testified credibly that Black and Hispanic voters overwhelmingly prefer Democratic candidates in general elections. R. at 2:137–38. On direct examination, Dr. Barreto ably explained the methodology behind the figures in his report highlighting the disparity in general-election voting patterns between Anglo and minority voters. R. at 2:123–43, 3:4–35. Dr. Barreto used publicly available data from the Texas Legislative Council to conduct his analysis. R. at 2:115–16.

The Court is agnostic as to Dr. Barreto's factual determination that benchmark SD 10 is likely a majority-minority district by CVAP today. Pls.' Ex. 44 at 4; R. at 2:113, 3:58. Dr. Barreto explained how SD 10's minority population was rapidly growing before the September 2021 redistricting legislation. Pls.' Ex. 44 at 3. He admitted that the most recent ACS data, which is from 2019, do not reflect that SD 10 is a majority-minority district, R. at 3:70–74, but he credibly hypothesized that, projecting growth forward to today, SD 10 is likely a majority-minority district. Apart from asserting without elaboration that he "did calculations," R. at 3:73–74, he did not offer any mathematical support for that hypothesis, and so we are left to treat it as merely possible.

We give little weight to Dr. Barreto's ultimate conclusions. He maintained, throughout his testimony, that the only relevant factor in determining whether Black and Hispanic citizens vote as a cohesive group is how they vote in general elections. *E.g.*, R. at 3:107–08. Although that may be a defensible position in political science, whether general elections are sufficient to satisfy the legal criterion of voter cohesion is outside Dr. Barreto's stated field of expertise. Though we take his expert opinion into account, and though we agree that voter behavior in general elections is relevant, defining voter cohesion is ultimately a legal question reserved to the Court.

We also note that, as is forgivable in an adversary system, Dr. Barreto showed signs of partiality to his side's position. For instance, Dr. Barreto spoke of Dr. Alford's analysis in strongly negative terms, R. at 3:121, 8:70, but his rebuttal testimony suggested he had exaggerated. Specifically, Dr. Barreto implied that the data provided by Dr. Alford were analytically useless, but the main defect seemed

to be a solvable one: Dr. Alford had botched the dataset's key, such that results for the two candidates were swapped. R. at 7:102–03. While that reflects insufficient rigor on Dr. Alford's part, the Court does not accept that it justified Dr. Barreto's hyperbole. Similarly, Dr. Barreto claimed that he had generated "quite different" results using data from the same source as Dr. Alford, R. at 8:70, but Dr. Barreto never explained his own results. The Court observes that Dr. Barreto's testimony, though he is highly qualified and by no means disingenuous, must be viewed critically.

Second, we credit the testimony of Plaintiffs' other expert, Dr. Cortina, that the legislature could have drawn another map, such as the one submitted by Plaintiffs as Alternative Plan 4, that added a Republican-leaning senate district without depriving minority voters in SD 10 of the ability to elect the candidate of their choice. The Court accepted Dr. Cortina, without objection, as an expert on voter behavior. R. at 5:100. His testimony about the Plan 4 map was clear and persuasive as far as it went. But we do not treat that testimony as demonstrating that an alternate map could better or even equally serve the partisan interests the Texas Senate's Republican majority sought to accommodate by redrawing SD 10.

Dr. Cortina testified that he assumed a likely 10% margin of victory rendered a voting district "safe." R. at 5:109–10. He explained that, using the 10% number, both Alternative Plan 4 and Plan 2168 provide Republicans the same number of safe senate districts. R. at 5:113. He added that Alternative Plan 4 would even enable Republicans potentially to carry an additional district. R. at 5:114. As Defendants pointed out, in making his calculations Dr. Cortina looked only at the results from statewide races and only as far back as the 2018 elections. R. at 5:131. Dr. Cortina did not account or purport to account for senate-specific election results going back further than the last few years.

We credit Dr. Cortina's testimony that using his methodology, it is possible to produce a map favorable to Republicans other than Plan 2168. But Dr. Cortina also testified that he did not know which plans were considered by the legislature in September or whether the legislature took into account partisan considerations other than likely margin of victory. R. at 5:136–37. Nothing in his testimony

conflicts with Dr. Alford's subsequent testimony that it makes sense for the majority party, when it is attempting to strengthen its hold on a legislative body, first to address swing districts, and that SD 10—of all the State's Senate districts—was the swing district Republicans could most easily convert to Republican-leaning. R. at 7:56–58.

Dr. Cortina also showed admirable restraint in his conclusions. Defendants stressed that Dr. Cortina made no predictions about how the alternative maps would perform in future state senate elections. R. at 5:134. That was despite the fact that, in a more colloquial setting, many would comfortably predict that districts Senator Ted Cruz won by ten points in 2018 will likely elect Republican state senators in the future. The Court interprets Dr. Cortina's reticence as reflecting a commitment to stating only conclusions that he could establish empirically.

Third, we find the testimony of Dr. Alford—the Defendants' expert—credible. Dr. Alford has long been recognized for his expertise and experience in political science generally, and that expertise extends to redistricting. R. at 7:42–43. He has appeared as an expert witness in previous voting-rights cases and was accepted as an expert in this case without objection. R. at 7:42–43.

Dr. Alford testified that though the Black and Hispanic electorate votes cohesively in general elections—as both prefer Democrats over Republicans—that cohesion is not as evident in primary elections. R. at 7:46–50. The Court gives credit to Dr. Alford's conclusion that primary elections are relevant to analyzing divisions within political coalitions and that partisan affiliation is the main driver of voter behavior in general elections. The Court finds relevant and helpful Dr. Alford's analysis concerning the 2014 Democratic primary in SD 10, in which Black and Anglo voters preferred the Anglo candidate and Hispanic voters preferred the Hispanic candidate. Defs.' Ex. 34 at 4–5. But the Court gives limited weight to Dr. Alford's ultimate suggestion that minority voters in SD 10 do not vote cohesively, R. at 7:49–51, both because Dr. Alford analyzed only one (dated) primary election in arriving at that conclusion, R. 7:48, 77, and, as already mentioned, defining voter cohesion is ultimately a legal question reserved for the Court.

The Court also considers credible Dr. Alford's testimony concerning Alternative Plan 4. He testified that it made sense for the Senate Republican majority to look first to shore up its chance of winning SD 10, given that it was a swing district based in a Republican county. R. at 7:44, 57. Dr. Alford also testified that the Senate Republican majority may have had other legitimate partisan interests, which it sought to serve by redrawing SD 10, that may not have been achieved by another map, such as Plan 4. R. at 7:59, 135–37. The Court also credits Dr. Alford's uncontradicted testimony that, according to the most recent ACS data, SD 10 is not a majority-minority CVAP district, R. at 7:45, though that conclusion does not rule out that the district has become majority-minority since those data were taken in 2019.

The Court also observes that Dr. Alford's apparent digressions into advocacy were more striking than even Dr. Barreto's. Particularly during cross-examination, Dr. Alford tended to go beyond just presenting statistical conclusions: He provided legal and political opinions favorable to Defendants.

Among other things, Dr. Alford expressed moral distaste for the legal theory of political cohesion among minorities, remarking, for instance, that Congressman Marc Veasey, who is Black, had "stole[n]" what was once a Hispanic district. R. at 7:120–21. He also made clear that his conclusions regarding SD 10 resulted from his (or at least his colleagues') analysis of only one election—the 2014 primary. R. at 7:116. Dr. Alford's nonetheless expressed confidence in the conclusion because, he said, it was consistent with wider research on the way the Black and Hispanic electorate votes; he needed only ensure that SD 10 was not a "unicorn." R. at 7:116. While that may be correct, the Court's confidence in Dr. Alford's findings regarding SD 10 is less than it would be if he had conducted a more thorough analysis.

*b) CVAP, VAP, and Total Population*

As explained above, the precise racial breakdown of SD 10 can be read different ways depending on which population metric one uses and on how one analyzes trends since the latest ACS report. Those differences are important

because the destruction of a majority-minority district, particularly one controlled by one racial group, would be a relatively clear discriminatory impact. *Cf. Rogers v. Lodge*, 458 U.S. 613, 616 (1982) (noting that at-large election schemes have discriminatory effects because they prevent the existence of majority-minority districts). On the other hand, if a group's share of a district were reduced from, say, 10% to 5%, that group's political power would be weakened in only an abstract sense. The Court considers whether minority groups may be aggregated for this analysis below, but first the Court addresses whether Plaintiffs have carried their burden to show that benchmark SD 10 was majority-minority. We conclude that they have not.

The first question the Court must decide is whether total population, VAP, or CVAP is the relevant metric. We agree with the parties that it is CVAP. The Supreme Court has not always been pellucid on this subject. For instance, the plurality in *Bartlett* referred to VAP, 556 U.S. at 18, but the dissent characterized the plurality as discussing CVAP, *id.* at 27 (Souter, J., dissenting). In *Gingles*, meanwhile, the Court used neither term; it may have been thinking in terms of total population. *See Gingles*, 478 U.S. at 50.

One decision that does navigate that confusion is *LULAC v. Perry*, 548 U.S. 399 (2006). In that case, Texas had redrawn a congressional district such that the Hispanic CVAP fell below 50%, even as the total Hispanic population stayed above 50%. *Id.* at 424. The Court noted that use of CVAP as the relevant metric "fits the language of § 2 because only eligible voters affect a group's opportunity to elect candidates." *Id.* at 429.

Plaintiffs here press a constitutional theory rather than one based on Section 2, but the reasoning still applies. Both statutory and constitutional cases in this area concern the unequal allotment of political power, and that power depends on numbers of voters rather than total population. Further support lies in the fact that the new SD 10 is *still* majority-minority by total population, Pls.' Ex. 44 at 6, and yet both parties agree that it is less likely to elect minority-preferred Democrats.

If total population is not the correct metric because it does not capture

actual voting power, then surely VAP is inferior to CVAP. And indeed, neither party seriously disputes that conclusion. In cross-examining Dr. Barreto, Defendants' counsel pushed the position that CVAP was the appropriate metric, and Dr. Barreto never managed to squarely disagree. R. at 3:65. In the absence of dispute, the Court concludes that CVAP is the best metric currently before the Court for determining racial voting power in SD 10.

The second question is whether benchmark SD 10 was majority-minority by CVAP at the time of redistricting. Dr. Barreto says it was. As proof, he offers only the "steady decline in [the] Anglo share of the district's CVAP, and the lag inherent in the 5-year ACS estimates." Pls.' Ex. 44 at 4.

But Dr. Barreto did not show the work he used to infer that the Anglo population had fallen below 50% by 2021. Pls.' Ex. 44 at 4; R. at 3:73–74, 8:77–78. That omission gives the Court pause. According to the statistics cited by Dr. Barreto, the Anglo share of the district fell from 57.7% in about 2013 to 53.9% in about 2017. Pls.' Ex. 44 at 4.[8]

From those data alone, the Court cannot conclude that benchmark SD 10 is a majority-minority district by CVAP. The Court should not engage in *sua sponte* econometric modeling, and Dr. Barreto's bare conclusion is inadequate, his impressive expertise notwithstanding.

*c) Political Cohesiveness*

As explained, this Court finds that SD 10 was not majority-minority at the time of redistricting when judged by the most relevant metric. SD 10 is also unlike the prototypical *Gingles* district in another way—no single minority comes close to 50% of CVAP. The Fifth Circuit does allow different minority groups—say, Black and Hispanic voters—to be aggregated to form "coalition districts," provided that those districts meet the other *Gingles* factors. *See Campos v. Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988). The law in the Fifth Circuit is less clear on whether the

---

[8] These are the "midpoint" years of the five-year ACS reports. Dr. Alford stressed, and the Court accepts, that these are not "snapshots" of the years in question, and the Court uses them here only as rough approximations. R. at 7:71.

second *Gingles* factor—political cohesiveness—can be met without considering primary elections, a point that the parties hotly dispute.

But as this Court has noted, in seeking an injunction the Plaintiffs do not present a *Gingles* theory, so they are not required to show that SD 10 meets the *Gingles* requirements. Instead, they rely on the more generic Equal Protection framework in *Arlington Heights*, which finds discriminatory effects more readily.[9] Thus, while the Court appreciatively credits the testimony of Drs. Barreto and Alford about the contexts in which SD 10's minorities do and do not vote for the same candidate, that is the end of the purely factual inquiry.

Whether Black and Hispanic voters in SD 10 are politically cohesive enough to constitute a coalition under *Gingles* and *Campos* is a question of law, and, at least in the Fifth Circuit, the relative legal significance of general and primary elections remains undecided.[10] We have no occasion to make that decision here. Rather, we conclude that Plaintiffs may prevail on this prong by showing a discriminatory impact on either Black or Hispanic voters (or any other racial group), regardless of the level of political cohesion between those groups.

*d) Conclusion on Discriminatory Effect*

Instead of looking to any of the *Gingles* factors, this Court applies the first factor of *Arlington Heights*, asking whether the redrawing of SD 10 "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (quoting *Washington*, 426 U.S. at 242). As noted above, that test gives rise to a serious line-

---

[9] *See Arlington Heights*, 429 U.S. at 269 (stating that the impact of a zoning decision was "arguably" discriminatory because it tended to exclude members of income groups that were more heavily minority); *see also Washington*, 426 U.S. at 245–46 (referring to the "disproportionate impact" of a test that was passed at a higher rate by Anglos than Blacks).

[10] Other courts have reached the issue when evaluating theories other than intentional vote dilution. *Compare, e.g.*, *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 421 (S.D.N.Y.) (per curiam) (three-judge court) (concluding that divergence in primaries defeats a showing of political cohesion), *aff'd*, 543 U.S. 997 (2004) (mem.), *with, e.g.*, *Texas Preclearance Litig.*, 887 F. Supp. 2d at 174 (concluding that "shared voting preferences at the primary level would be powerful evidence of a working coalition, but it is not needed to prove cohesion").

drawing problem in the redistricting context because, given that race and partisanship correlate (however unevenly) throughout the United States, almost every reallocation of voting power at the hands of either party will tend to bear more heavily on some races and less on others.  But it does not follow that every redistricting gives rise to discriminatory effect of constitutional dimensions.

Fortunately, the facts of this case are dispositive enough that we need not draw any bright line between discriminatory and nondiscriminatory partisan shifts. Even without concluding that SD 10 is majority-minority and even without attempting to aggregate its different minority groups, it is apparent that the cracking of the district bears more heavily on Black and Hispanic voters[11] than it does on Anglos.  Both groups have been reduced as a percentage of the district's CVAP— Blacks from 20.9% to 17% and Hispanics from 20.4% to 17.5%.  Pls.' Ex. 44 at 4, 6. And while reductions of that magnitude might be academic in other contexts, in SD 10 they make a substantial difference.

As both parties' experts freely admit, SD 10's Black and Hispanic voters tend to favor Democrats and oppose Republicans.  R. at 2:137–38, 7:123–24.  Where previously the district often elected Democrats, it is now likely to elect Republicans. Thus, both groups have been substantially diminished in their ability to influence SD 10's elections.  Those removed from the district have, of course, been added to other, nearby districts, but those districts are, like the new SD 10, Republican-leaning.   Thus,  the  redrawing  of  SD 10  results  not  just  in  an  incremental diminishment in minority voting strength but also in the loss of a seat in which minorities were able to elect candidates they preferred.

When Texas previously attempted to redraw the district along similar lines, a different district court concluded that there was "little question" that the impact was discriminatory within the meaning of *Arlington Heights*.  *Texas Preclearance*

---

[11] This is not to suggest that the redrawing of SD 10 does not bear especially heavily on Asians or members of other minority groups.  But the impact on Black and Hispanic voters is especially easy to assess because those groups are relatively well-represented in SD 10 and because both parties have focused on those groups in their analysis.

*Litig.*, 887 F. Supp. 2d at 163.  That was despite the fact that the district had elected only one Democrat—Senator Davis, in 2008—up to that point.  *See id.* at 162–63. Texas had not denied that the redrawing of the district nonetheless constituted discriminatory impact.  *Id.* at 164.  Here, Defendants *do* deny discriminatory impact, but they do so by relying on the *Gingles* theory that this Court has now rejected. Dkt. 102 at 38–42.  Having denied that position, the Court concludes that Plaintiffs will likely be able to demonstrate a discriminatory effect, strengthening an inference of discriminatory intent.

### 2. Historical Context

The second *Arlington Heights* factor is whether history suggests discriminatory intent.  Historical evidence must be "reasonably contemporaneous with the challenged decision."  *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). Thus, for purposes of this analysis, this Court is concerned only with Texas's recent history and not with any longer legacy of racial discrimination.  But even with that constraint, it is evident that history favors an inference of discriminatory intent.

In every decade since the statute was passed in 1965, federal courts have held that Texas violated the VRA.  *Veasey v. Abbott*, 830 F.3d 216, 240 (5th Cir. 2016) (en banc).  That includes the most recent redistricting cycle and, most damningly, the 2012 decision holding that, among other violations, Texas had engaged in intentional vote dilution by redrawing SD 10 in a manner similar to that adopted in SB 4.  *See Texas Preclearance Litig.*, 887 F. Supp. 2d at 166.  As mentioned previously, that case was decided under a now-defunct legal framework and has accordingly been vacated.  *See Texas Preclearance Litig.*, 570 U.S. at 928.  But while the decision is not legally binding, and the burden of proof was the opposite of what it is now before this Court, that does not undo the historical significance of that three-judge decision.  For that reason, the en banc Fifth Circuit has pointed to the case as demonstrating a "contemporary example[ ] of State-sponsored discrimination."  *Veasey*, 830 F.3d at 239.

Defendants' contrary argument is feeble.  They point out that "those rulings addressed different maps passed by different legislators, and different map

drawers, at different times," Dkt. 102 at 35, but that is what history means.  Of course, *these* maps have not been struck down—they have only just been enacted.  And as Plaintiffs point out, Senator Huffman was on the 2011 redistricting committee (and Senator Seliger chaired it), suggesting that the principal personalities were not entirely different then.  Dkt. 108 at 6.  Indeed, Anna Mackin, a staffer for Senator Huffman who played a key role in redrawing SD 10, served as counsel for the defendants in the previous round of redistricting litigation.  Pls.' Ex. 25 at 1.  If the immediately preceding redistricting cycle is not "reasonably contemporaneous with the challenged decision," *McCleskey*, 481 U.S. at 298 n.20, then it is difficult to imagine what would be.

The Court does not mean to overstate Texas's history of discrimination within the past decade—for instance, the 2012 decision was reached under a framework that required Texas to prove a negative, *see Texas Preclearance Litig.*, 887 F. Supp. 2d at 166, and *Veasey*, though ruling against the state on discriminatory effect, reversed the district court's judgment that Texas had acted with discriminatory intent, *see Veasey*, 830 F.3d at 272.  Senator Seliger, for one, continues to maintain that the *Texas Preclearance Litigation* court was factually mistaken in its finding of discriminatory intent, and we have no occasion to address that possibility.  R. at 4:27.  But in terms of proximity and comparability to the passage of SB 4, it is a close match.  Plaintiffs will likely show that historical evidence weighs in favor of an inference of discriminatory intent.

### 3. Sequence of Events

The remaining *Arlington Heights* factors can be difficult to disentangle.  The "specific sequence of events leading up to the challenged decision," *Arlington Heights*, 429 U.S. at 267, could, in a case like this, be construed to include both departures from ordinary procedure and legislative history.  But for organizational clarity, the Court focuses, in this section, on events that were not part of the formal, public legislative process.  Specifically, we concentrate on the private meetings between Senators Powell and Huffman and their staffs, as well as correspondence involving those individuals.

The first meeting occurred on February 12, 2020—well before the release, in August 2021, of the 2020 census data that would guide the legislature's redistricting process.  Neither senator was present, but members of both staffs were.  Plaintiffs draw attention to this meeting because of statements made by Sean Opperman, a staffer for Senator Huffman, as recorded by Rick Svatora, a staffer for Senator Powell.  Specifically, Opperman said that SD 10 was "very close to ideal" population and so there would likely be no major changes to the district.  R. at 2:13.  To the contrary, the final plan *did* include major changes to SD 10.  Svatora thus feels that he was not told the truth during the meeting.  R. at 2:24.

The second meeting occurred on November 19, 2020, and was attended by both senators and their staffs.  That meeting was short, but one of Senator Powell's staffers remembers that either Opperman or Senator Huffman verbally acknowledged that SD 10 was "majority-minority."  Pls.' Ex. 6 at 2.  Maps of the district were present, and those maps included boxes with basic racial data, though the maps did not illustrate how racial minorities were distributed throughout the district.  Pls.' Ex. 6 at 2.

The third meeting occurred on September 14, 2021, after the 2020 census had been released and the legislature had been called into special session.  Both senators and their staffs were present.  Senator Huffman unveiled the redrawn SD 10—that version approximated the final configuration of the district in Tarrant County but included a different combination of rural counties.  R. at 4:154.  Senator Powell testifies that she asked no questions about the map, instead informing Senator Huffman that she "c[ould] clearly see what you're attempting to do here."  R. at 4:84.  Senator Powell and her staff had come prepared with maps of the benchmark district that highlighted its racial composition.  These were handed around and, at Senator Huffman's request, all those present initialed them.  R. at 4:129–30.  As the discussion went on, Anna Mackin, a member of Senator Huffman's staff, remarked that she felt "uncomfortable."  R. at 4:84.

Finally, in addition to these meetings, there were several messages exchanged between Senator Powell's staff and the legislature more broadly.  On August 19, 2021, before the last meeting, Opperman sent senate staffers a link to a

redistricting Dropbox, which included the maps with basic racial data that had been present at the November 2020 meeting.  Pls. Ex. 6 at 2.  On September 16, 2021, two days after the meeting in which Senator Huffman unveiled the new map, Senator Powell's staff emailed Senator Huffman's staff with a letter expressing concerns about the plan's racial impact and attachments illustrating those impacts. Pls.' Ex. 6 at 4.  Opperman responded to say that he had stopped looking at the documents once he realized they contained racial data.  Pls.' Ex. 6 at 5.

We do not find or infer discriminatory intent from those events.  It is not inherently suspicious that plans would change in the nineteen months between February 2020 and September 2021, especially when one considers that the census was conducted and its data were released within that timeframe.  And even assuming that Senator Huffman's staff withheld information from Senator Powell's staff, that omission would be unsurprising given that the redrawing of SD 10 was deleterious to Senator Powell's political prospects.

Nor is it suspicious that Senator Huffman and her staff were exposed to racial data on SD 10.  That exposure does not contradict Senator Huffman's assertion that she willfully "blinded [her]self" to race in drawing the maps.  R. at 6:113.  And even if Senator Huffman and her staff were fully aware of race in their redistricting,[12] that in itself does not merit any nefarious inference.  *See Miller*, 515 U.S. at 916 ("Redistricting legislatures will . . . almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process.").

*4. Procedural and Substantive Departures*

Now this Court focuses on departures from ordinary legislative procedure in the leadup to the passage of SB 4.  The parties agree that redistricting would

---

[12] And they well might have been.  Racial data can remain "fixed in [a mapdrawer's] head" even when they are not present on a computer screen, *Harris*, 137 S. Ct. at 1477, and Senator Huffman and her staff are knowledgeable civil servants who doubtless have some awareness of the state's demographics.  Indeed, as noted previously, one member of Senator Huffman's staff was counsel in previous litigation where the racial demographics of Tarrant County were at issue.  Pls.' Ex. 25 at 1.

normally have occurred during a regular, biennial session of the Texas legislature over a longer timeframe but that in this case it occurred within the more limited timeframe of a special session.  The parties disagree, of course, about whether the court may infer discriminatory intent from that irregularity.

"Departures from the normal procedural sequence ... might afford evidence that improper purposes are playing a role."  *Arlington Heights*, 429 U.S. at 267.  But they also might not.  During the last round of redistricting litigation, the Court in *Abbott v. Perez*, 138 S. Ct. 2305 (2018), reversed a decision of the three-judge district court and touched on a similar point.  Specifically, the Texas legislature had enacted redistricting bills in a special session, over a far shorter timeframe than would normally be the case.  *See id.* at 2328.  But although the three-judge court treated that brevity as an indication that the legislature had acted in bad faith, the Supreme Court disagreed.  *See id.* at 2328–29.  It pointed out that the legislature "had good reason to believe that" the plans it enacted "were sound," *id.* at 2329, because those plans had been issued by a court, *see id.* at 2327.  That innocuous and plausible alternative explanation meant that no nefarious inference could be drawn from the legislature's rush.

The circumstances here are different—the Texas Legislature was not enacting a court-issued senate plan but rather one of its own making—but the situations are alike in that Defendants present alternative explanations for the brevity of the session in which SB 4 was passed.  They posit two alternative theories: (1) The legislative process was abbreviated because the COVID–19 pandemic caused a delay in the publication of census results; and (2) the process was abbreviated because Texas Republicans feared that their Democratic colleagues might break quorum, as they had done earlier in 2021 to prevent the passage of an election-reform bill.

The Court finds Defendants' first explanation persuasive.  The COVID–19 pandemic has had disruptive effects in many ways.  The taking of the 2020 decennial census was one of them.  By statute, the Census Bureau was required to publish the results of the census on April 1, 2021.  *See* 13 U.S.C. § 141(c).  Regular sessions of the Texas Legislature occur once every two years and last for no more

than 140 days.  TEX. CONST. art. III, §§ 5, 24.  Those sessions begin "on the second Tuesday in January of each odd-numbered year."  TEX. GOV'T CODE ANN. § 301.001.  The legislature may be convened outside that timeframe only in special sessions called by the Governor, which are limited to thirty days.  TEX. CONST. art. III, § 40.

Ordinarily, those dates and numbers leave the legislature with time to complete redistricting during its regular session.  Representative Chris Turner, a witness for Plaintiffs, testified that the redistricting process ordinarily can take about two months—twice as long as a special session.  R. at 5:61.  So the legislature faced a problem when the Census Bureau, citing challenges caused by the pandemic, delayed publication of the results until after the regular session had already ended.  R. at 5:59.  The legislature was thus forced to redistrict during a special session, which did not provide the ordinary amount of time.

It was thus unavoidable that the legislature would depart from its ordinary procedures during the 2021 redistricting, for reasons that had nothing to do with discriminatory intent.  The Plaintiffs' claim of discriminatory intent stemming from the delay is extraordinarily weak.  For Plaintiffs to show that procedural departures here are suggestive of such intent, they must point to some other indication of nefarious purpose.  But they have not.

Plaintiffs note that the Texas Senate conducted only limited public hearings about the redrawing of SD 10, Dkt. 39 at 16 (describing a "rushed process"), and that the Senate slightly redrew the district (removing Young County but not altering the district within Tarrant County) before convening to discuss it, R. at 4:138, 156; Dkt. 39 at 18.  Plaintiffs also observe that the Texas House spent just one day considering the senate plan, providing significantly less opportunity for public discussion and amendments than would usually be the case.  R. at 5:39–43.  While those steps may have been atypical, all of them suggest a legislature pressed for time.

Because the Court concludes that the pandemic more than adequately explains Texas Republicans' decision to rush the redistricting process, we need not

evaluate Defendants' secondary explanation that Republicans feared Democrats would break quorum.

Plaintiffs point to another procedural irregularity: that Senator Huffman allegedly did not consider race in drawing the new senate map but later submitted her proposed map to the Texas Attorney General's office, which apparently made no changes to it. Dkt. 108 at 12. But Plaintiffs have not developed that point. Crucially, none of their witnesses testified that the ordinary procedural course was distinct from the one advanced by Senator Huffman.

*5. Legislative History*

The Court turns finally to statements made on the floor of the legislature before the passage of SB 4. The parties have directed the Court to several hearings and statements that may be relevant. The Court reviews each in turn and, in doing so, is informed primarily by the public record and by the testimony of Senator Powell. Senator Huffman, the other main legislative antagonist, asserted her legislative privilege to the fullest extent possible, with the result that she offered no additional comment on legislative matters beyond those she had made publicly.

First is a pair of committee hearings conducted on September 24 and 25, 2021, to receive input from fellow legislators and the public on the redrawing of SD 10. The committee had very recently released a new proposed SD 10, which would have added additional rural counties without altering the district lines within Tarrant County. R. at 4:138, 156. At the nonpublic hearing, Senator Huffman read from prepared remarks concerning her redistricting methodology:

> My goals and priorities in developing these proposed plans include, first and foremost, abiding by all applicable law, equalizing population across districts, preserving political subdivisions and communities of interest when possible, preserving the cores of previous districts to the extent possible, avoiding pairing incumbent members, achieving geographic compactness when possible, and accommodating incumbent priorities, also when possible.

R. at 4:94.

Then Senator Powell asked Senator Huffman a series of questions about her

methods for drawing the maps, implying that the redrawing of SD 10 was unjustifiable on the stated rationales and would have a disproportionate impact on minority voters. Pls.' Ex. 52 at 10–20. The next day, during the public hearing, a number of officials and concerned individuals testified about the redrawing of SD 10; many of them strongly refuted the premise that the redrawn district combined communities of interest. *See generally* Pls.' Ex. 53.

Second is a September 28 hearing of the redistricting committee. There, Senator Huffman again recited her redistricting criteria but this time added "partisan considerations" to the list. R. at 4:112. That hearing is also notable for the committee's rejection of an amendment that would have restored benchmark SD 10. Pls.' Ex. 54 at 13. In opposing that amendment, Senator Huffman restated that her map complied with the VRA and averred that redrawing SD 10 was warranted to balance population. Pls.' Ex. 54 at 11–12.

Third is a senate floor debate on October 4. Senator Huffman yet again recited her list of redistricting criteria, this time not listing partisanship. R. at 4:116–17. Senator Powell then debated Senator Huffman, interrogating her about why she had redrawn SD 10. Senator Huffman's answers were often evasive. For instance, she repeatedly stated that "all" of the redistricting criteria had informed various decisions, without elaboration. R. at 4:126. She also stated at one point that she believed SD 10 "needed population." R. at 4:125. But SD 10 was slightly overpopulated, and Senator Huffman smiled as she claimed otherwise. R. at 4:125.

Senator Powell also asked Senator Huffman about the September 14 meeting at which Senator Huffman had first revealed the planned redrawing of SD 10. Senator Huffman recalled that meeting quite differently from how Senator Powell and Garry Jones recounted it. R. at 4:128. Additionally, Senator Huffman claimed that, despite "hav[ing] an awareness that there are minorities that live all over this state," she had "blinded [her]self to that as [she] drew these maps." R. at 5:10–11. Later in the same debate, Senator Powell engaged in a friendly colloquy with a Democratic colleague. During that colloquy, Senator Powell expressed concerns about the racial consequences of redrawing SD 10, but she also agreed that the district was "absolutely" "being intentionally targeted for elimination as being

a Democratic-trending district." R. at 5:26–28.

Finally, the Texas House held a hearing on the senate plan on October 10. Republican Representative Todd Hunter, chairman of the redistricting committee, read a version of Senator Huffman's statements of redistricting criteria. That version did not include partisanship. The House voted on the bill later the same day it had been introduced, minimizing opportunities for public testimony or amendments. R. at 5:39–44; Pls.' Ex. 42 at 12–25.

Plaintiffs stress that supporters of SB 4—they focus primarily on Senator Huffman, though they also mention Chairman Hunter[13]—generally did not list "partisan advantage" as one of the goals of SB 4. The one notable exception was the September 28 hearing.

As with the nonpublic events preceding passage of SB 4, described above as the "sequence of events," the legislative history suggests that supporters of the bill were less than forthright about their motivations. The redrawing of SD 10 is a transparent attempt to crack a Democratic-leaning district in greater Fort Worth: It is not consistent with principles such as core retention, geographic compactness, or combining communities of interest. Nor does the Court find it likely that the redrawing was necessary for the sake of population equalization—it certainly is not true that the district itself "needed population," and Senator Huffman's smirk suggests that she may well have known as much.

---

[13] Defendants protest that "the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021). Thus, Defendants argue, even if Senator Huffman were shown to have acted based on discriminatory intent, it would not follow that the other senators and representatives who voted for it had the same intent, and so Plaintiffs' theory would still fail. We find that reading of *Brnovich* somewhat aggressive—though legislators are not "cat's paw[s]," *id.*, statements of discriminatory intent by a committee chair made during floor debate would doubtless be of some weight in judging the intentions of the body as a whole, particularly at this preliminary stage. And this would seem to be especially true where, as here, the committee chair and her team were solely responsible for drafting the map. But because we do not find evidence of discriminatory intent in Senator Huffman's statements, we decline to examine further the extent to which such intent could have been more broadly attributed.

But as with previous prongs, the Court finds that racial discrimination did not motivate the Texas legislature in passing SB 4. Partisan gerrymandering alone cannot support a federal constitutional claim. *See Rucho*, 139 S. Ct. at 2507–08. Plaintiffs have pointed to nothing—no stray remark, secret correspondence, or suspicious omission—that would tend to indicate that Senator Huffman or anyone else acted even partially because of the racial impact of SB 4. Without such evidence, the legislative history of SB 4 does not support the inference that the bill was passed with discriminatory intent.

*6. Conclusion on Discriminatory Intent*

Though the factors above are organized numerically, the Court stresses again that they cannot be analyzed mechanically. Superficially, the five prongs are split, with three (sequence of events, procedural departures, and legislative history) favoring Defendants and two (discriminatory effect and historical context) favoring Plaintiffs. The *Arlington Heights* inquiry, however, is too sensitive to be reduced to a scorecard. Indeed, inconsistencies in how courts number the *Arlington Heights* factors, *see supra* note 5, would make an additive approach particularly inapposite. Instead, this Court conducts a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," including any evidence not captured by the factors listed above. *Arlington Heights*, 429 U.S. at 266.

The Court pauses, however, to summarize its findings so far regarding the effect of SB 4 and the circumstances of its passage. The Court finds that the enactment of SB 4 had a discriminatory effect; it bore more heavily on the Black and Hispanic voters of SD 10, such that those voters will likely no longer be able to elect the candidates whom they tend to prefer. The recent history is suggestive of discriminatory intent; Texas has a long history of losing redistricting cases, and that history includes a finding of discriminatory intent the last time the state redrew SD 10.

Despite that context, however, the Court finds that the circumstances surrounding the passage of SB 4 do not suggest that the legislature acted with discriminatory intent. The specific sequence of events, departures from ordinary

procedure, and legislative history are all consistent with a time-pressed legislature seeking partisan advantage.  It is conceivable that the legislature was *also* driven by a hidden racial motive, but the circumstances of SB 4's passage provide no evidence for that conclusion.  The bill's discriminatory effect and Texas's litigation history are not enough to make up for that absence.

In sum, this Court concludes that the enumerated *Arlington Heights* factors, when weighed holistically, indicate that Plaintiffs are unlikely to succeed on the merits of their intentional-discrimination claim.  They have thus also failed to show a likelihood of success on their racial-gerrymandering claim, which requires even stronger evidence of intent.

The Court reiterates the context in which this finding is made.  The Court is not making a final determination on the merits, but, instead, is assessing whether Plaintiffs are *likely* to prevail based on the evidence presented so far.  The Court is well aware that extensive discovery is underway in preparation for the trial scheduled for this September.  The Court does not foreclose the possibility that new evidence and more complete presentations will result in different findings after trial.  Moreover, there are other considerations beyond the impact and history of SB 4 that bear on this Court's inquiry into any discriminatory intent.  We turn to those other factors now.

## B. Plaintiffs' Alternative Maps

Plaintiffs submit four alternative maps that, they say, achieve Republicans' partisan goals without cracking SD 10.  Pls.' Exs. 70, 76, 84, 92.  Specifically, those plans give Republicans the same number of seats as SB 4 but ensure that the weakest Republican seat is slightly safer.  Dkt. 39 at 40.  The Supreme Court has discussed the use of alternative maps in the context of racial gerrymandering, with all nine Justices agreeing that such maps are helpful evidence of legislative intent.  *See Harris*, 137 S. Ct. at 1479 (2017); *id.* at 1491 (Alito, J., dissenting).  That commonsense observation extends just as easily to intentional vote dilution.  But Defendants naturally dispute that Plaintiffs' proposed maps are probative of the state's intent in redrawing SD 10.

The Court begins by addressing several of Defendants' less-convincing objections. First, they stressed, in their briefing and at the hearing, that Plaintiffs' maps were never presented to the legislature. That uncontradicted factual assertion is true but irrelevant.

Defendants cite several cases for their proposed requirement that alternative maps be proffered, but none of them purports to set forth that condition. *See Harding*, 948 F.3d at 309–11; *Harris*, 137 S. Ct. at 1479; *Easley v. Cromartie*, 532 U.S. 234, 255–56 (2001). That absence makes sense given the purpose of alternative maps—they show that "[i]f you were *really* sorting by political behavior instead of skin color (so the argument goes) you would have done—or, at least, could just as well have done—*this*." *Harris*, 137 S. Ct. at 1479. It is not necessary to show that Defendants specifically declined to adopt the alternative plans— rather, the maps illustrate (Plaintiffs say) what a truly partisan legislature *might* have done. And, as Plaintiffs point out, accepting Defendants' conditions for the consideration of maps would impose a perverse burden. It would mean that Plaintiffs were required, between SB 4's proposal and passage, to provide the Texas Senate with a better Republican gerrymander, even as Texas Republicans (as we have seen) were refusing to admit that they were seeking a Republican gerrymander. The Court declines to apply Defendants' proposed test.

Defendants' other objections have shortcomings. Defendants seize on Plaintiffs' failure to include one Republican senator's residence in his district, but that is an apparent oversight that Plaintiffs easily correct in their later maps. Dkt. 102 at 31, Dkt. 108 at 23.

Defendants further suggest that the alternative maps would create a political problem for Republicans by placing Senator Sarah Eckhardt, a Democrat, in a seat where the incumbent Republican hopes to seek higher office, thus allowing Senator Eckhardt to "essentially run as the incumbent." Dkt. 102 at 31. But as Plaintiffs note, their maps would leave Senator Eckhardt in a district with a sizeable Republican advantage, strongly suggesting that a Republican would capture the seat. Dkt. 108 at 22.

Defendants also claim that Plaintiffs "radically realign[ ] Senate districts from nearly end-to-end," but their only examples are the shifting of one county between districts and the shifting of a district border in another county. Dkt. 102 at 32. Even if such objections were more strongly rooted, they still would not form a clear basis for rejecting Plaintiffs' alternative maps. There is no conceivable map that would not be subject to nitpicking on some basis. Maps may nonetheless be useful to show the results that would follow from hypothetical sets of priorities— for instance, an alternative plan could theoretically show what a legislature would have done if its only priority were to maximize the number of districts with more than a certain partisan margin.

But even putting Defendants' narrower objections aside, the Court does not find that Plaintiffs' alternative maps reveal any discriminatory intent on Defendants' part. Though differing in their details, all four of Plaintiffs' proposed maps achieve their allegedly superior partisan outcome in the same way: They crack SD 14, a Democratic bastion located mostly in Travis County, instead of SD 10.

Plaintiffs' theory seems to be that if the legislature truly cared about partisanship and not race, it would have prioritized SD 14 over SD 10. The Court does not buy that logic. According to the Census Bureau, Travis County is about as diverse as Tarrant County—48.9% Anglo (Travis) to 45.3% (Tarrant), by total population. SD 14 itself is 51.9% minority by total population, Pls.' Ex. 57 at 5, less than the 61.5% of benchmark SD 10, R. at 2:138, but still enough that cracking the district would produce about as clear a discriminatory effect.

That the legislature decided to crack one and not the other thus seems to yield no particular inference about the role of race in redistricting or about partisanship's role. If, as Plaintiffs say, cracking SD 14 would have fulfilled Defendants' partisan goals just as well as cracking SD 10, then surely they would have cracked *both* districts. Indeed, because both districts have large minority populations and tend to elect minority-preferred Democrats, a racially motivated legislature might also have cracked both SD 14 and SD 10.

Meanwhile, it is easy to hypothesize countless legally innocuous reasons why the Texas Legislature may have preserved SD 14. SD 10's recent partisan reversals may have made it a more obvious target. The legislature may have wanted SD 14 to function as a vote sink. It may have feared political fallout from destroying a longstanding Democratic bastion. Indeed, saving SD 14 may even have respected traditional redistricting criteria—Plaintiffs' version of that district is about as unnaturally shaped as is the current SD 10. The Court is thus reluctant to draw any inference of discriminatory intent from Plaintiffs' alternative maps.

The Court also notes that the experts superficially differed about how much partisan advantage a district must have to be considered "safe"—when he analyzed Plaintiffs' alternative maps, Dr. Cortina assumed that a Republican margin above 10% was safe, R. at 5:135, but Dr. Alford vehemently rejected that position, R. at 7:131. The Court does not perceive a factual disagreement here—political safety is not an either/or proposition, and it is plausible that Texas Republicans preferred districts that were even safer than those that would have resulted from Plaintiffs' alternative maps.

This Court rejects Plaintiffs' contentions regarding *dictum* in a ruling of the three-judge court in the preceding redistricting cycle. Plaintiffs point to the aside that "[t]he Legislature could have simply divided Travis County and Austin Democrats among five Republican districts" instead of achieving the same advantage by packing Hispanic voters. *Perez*, 253 F. Supp. 3d at 897. Rather than accept that blank check, Plaintiffs say, Defendants instead chose to repeat the same move—cracking SD 10—that a different district court had deemed intentionally discriminatory. *See Texas Preclearance Litig.*, 887 F. Supp. 2d at 166. But as discussed above, neither decision was controlling: *Texas Preclearance Litigation* was decided under the Section 5 standard, while *Perez* concerned congressional, rather than state senate, districts.

Moreover, even if one accepted that Senator Huffman and her staff had read those opinions, the Plaintiffs' desired inference about *Perez* does not follow. If the legislature attached weight to the *dictum* about Travis County (even in the state senate context), and if cracking that county would have equally served its partisan

- 47 -

goals, it surely *would* have cracked SD 14.  The same conclusion would follow even if the legislature pursued racial goals exclusively—such a legislature would have cracked SD 10 *and* SD 14, both of which are majority-minority by total population and elect minority-preferred Democrats.

Plaintiffs' desired conclusion follows only if the legislature's primary goal was neither race nor politics, but rather to thumb its nose at the federal judiciary. That is implausible.  It is far more likely that the legislature, despite the aside in *Perez*'s discussion of congressional districts, made different decisions about SD 10 and SD 14 for some political reason.

Thus, the Court does not agree that Plaintiffs' alternative plans strengthen an inference of discriminatory intent.  Plaintiffs are not required to provide maps at all, *see Harris*, 137 S. Ct. at 1479, and so their failure does not in itself prevent them from succeeding on the merits.  But it does mean they are no closer to carrying their burden.  Plaintiffs' alternative maps do not meaningfully alter their likelihood of success on the merits.

## C. The Presumption of Legislative Good Faith

Finally, although this Court, so far, has attempted to weigh the evidence presented by Plaintiffs evenly, the Court must address the fact that, in this area, the law puts a finger on the scale in favor of Defendants.  The legislature is entitled to a presumption that it redistricts in good faith.  *See Miller*, 515 U.S. at 915.

The law is less clear, however, on exactly what the presumption of good faith entails.  Plaintiffs aver that they have overcome the presumption by showing that the Texas Legislature's stated reasons for the redrawing of SD 10—such as that the district needed population, or that "all of" Senator Huffman's express redistricting criteria informed the decision—were not the real reasons.  R. at 9:14. Under Plaintiffs' theory, the presumption can be overcome even without a showing of racial motive—Plaintiffs need only establish that there was *some* undisclosed motive to the redistricting, even if that motive was unrelated to their claims.

That theory has intuitive force and some precedential support.  For instance, *Miller*, 515 U.S. at 916, formulates the presumption in relation to

"traditional race-neutral districting principles."   When the Supreme Court has listed those principles, it has not included partisanship.  *See, e.g.*, *Rucho*, 139 S. Ct. at 2500.  Indeed, even where the Court points out that partisan motivations may defeat racial-gerrymandering claims, it still treats those motivations separately from the "traditional" factors.  *See Harris*, 137 S. Ct. at 1473.  If partisanship is not a traditional redistricting criterion, and a legislature is shown to have had covert partisan motives as it redistricted, the reasoning goes, then it has not redistricted in good faith.

Plaintiffs have put forth substantial evidence that Senator Huffman was particularly less than forthright in explaining why she had redrawn SD 10 as she had.  Defendants now insist that partisanship was a major part of her motivation, but Senator Huffman did not give that impression on the senate floor.  Of the three times she listed her redistricting criteria, partisanship made the list only once, at the September 28 committee meeting. R. at 4:112. When Senator Powell asked Senator Huffman which of her criteria had led to various decisions, such as the extension of SD 10 into several rural counties, Senator Huffman evasively (and unconvincingly) answered, "All of them." R. at 4:125–26.

Senator Huffman gave an account of her September 14 meeting with Senator Powell that differs significantly from the accounts of either Senator Powell or her staffer—Senator Huffman claimed that she looked at the maps with racial shading for "less than a second" before turning them over and saying, "I will not look at this," while the other witnesses describe nothing of the sort. R. at 4:128. At the October 4 hearing, Senator Huffman insisted that SD 10 had been redrawn because "[the committee] believed [it] needed population." R. at 4:125. SD 10 did not need population, and Senator Huffman smirked as she claimed it did.

Senator Huffman did not rebut any of these allegations.   Instead, she asserted legislative privilege to the fullest extent possible and therefore declined to answer questions about her motivation. *See, e.g.*, R. at 7:35–36. Though courts may not draw negative inferences from a criminal defendant's assertion of his Fifth Amendment rights, no similar constraint binds our assessment of a civil witness's assertion of legislative privilege. Senator Huffman could have waived her legislative

privilege, just as Senator Powell did, and the Court would doubtless be better informed.

This case, however, does not present the same circumstances that led a sister court to deem legislative privilege waived. *See Singleton v. Merrill*, 21-CV-1291, 2021 WL 5979516, at *7 (N.D. Ala. Dec. 16, 2021). Thus, in ruling on the assertion of privilege, this Court declined to take the same step here.[14] R. at 5:152. Nevertheless, the Court interprets Senator Huffman's reticence as strengthening the inference that her previously stated reasons for redrawing SD 10 were, at best, highly incomplete and, at worst, disingenuous.

None of that, however, directly supports the proposition that Senator Huffman and her colleagues acted from *racial* motives. And so the Court finds, on the current state of the record, that they did not. Instead, all of the incongruities pointed out by Plaintiffs are consistent with a Republican legislature's seeking to hide its *partisan* redistricting motives.

There is even some direct evidence of such a motive. As noted, Senator Huffman *did* list partisanship as a guiding principle once, at the September 28 committee meeting. R. at 4:112. When Senator Powell questioned her during the October 4 debate, Senator Huffman mentioned several times that she had viewed maps with "partisan shading" or "partisan numbers." R. at 6:95–97. And Senator Powell at one point agreed with a Democratic colleague that her district was being "targeted for elimination as being a Democratic-trending district," though Senator Powell also discussed race in the same colloquy. R. at 5:26–28.

To be sure, Defendants' current theory would mean that Senator Huffman and her colleagues dramatically understated the role of partisanship in their decisionmaking, and that nondisclosure is frustrating from the standpoint of governmental transparency. But "partisan motives are not the same as racial

---

[14] Though the Court declined to adopt the approach taken in *Singleton* because of distinguishable contexts, the Court is nonetheless concerned about the scope of state legislative privilege as Senator Huffman and Defendants conceive of it. State legislative privilege in this context raises serious questions about whether this Court (or any court) could ever accurately and effectively determine intent.

motives." *Brnovich*, 141 S. Ct. at 2349.  Even without applying any presumptions, this Court does not find that any of the Plaintiffs' evidence is *more* consistent with racial motives than it is with exclusively partisan motives.

To act with a primarily partisan motivation while not admitting as much may constitute "bad faith" in a colloquial sense.  But the presumption of legislative good faith was articulated, and is often reaffirmed, specifically in the context of alleged racial motivations.  *See, e.g.*, *Harris*, 137 S. Ct. at 1474 n.8.  Indeed, *Miller* recognized the presumption as applying to allegations of "race-based decisionmaking."  515 U.S. at 915.

Importantly, reading "good faith" too stringently creates line-drawing problems. As Senator Seliger, Plaintiffs' witness, testified, legislators in Texas give incomplete reasons for their votes "[a]ll the time."  R. at 4:60.  If that is true (and particularly if it is true of legislators generally), then to conclude that the presumption of good faith is surrendered any time legislators are less than candid about their motivations risks nullifying a presumption that, as the Supreme Court repeatedly has cautioned, is not to be treated lightly.  *See, e.g.*, *Perez*, 138 S. Ct. at 2325.  Thus, in litigation such as this, there are strong reasons to conclude that the presumption of good faith is overcome only when there is a showing that a legislature acted with an ulterior *racial* motive.

Fortunately, deciding the motion for preliminary injunction does not require this Court to choose among the different possible understandings of "good faith" in the context of redistricting.  That is because Plaintiffs would fail to show a likelihood of success on the merits even if there were no presumption working against them.  Overcoming the presumption of legislative good faith would not shift the burden.  *Cf. id.* at 2324 (holding that the burden cannot be shifted by a previous finding of discrimination).  Instead, it would mean merely that the issue of legislative intent would be resolved according to the ordinary civil-litigation standard.  Plaintiffs would thus have to show that the preponderance of the evidence favored the conclusion that the legislature had acted with discriminatory

intent.[15]  For all the reasons stated above, this Court has determined that Plaintiffs are not likely able to do that.

Plaintiffs have presented substantial evidence that at least one member of the Texas Senate did not fully disclose her reasons for supporting SB 4.  But they have not presented evidence that that nondisclosure bore any connection to a racial motive or racial intent.  Determining whether Plaintiffs have overcome the presumption of legislative good faith thus depends on how that presumption is defined.  But because Plaintiffs fail regardless of whether the presumption applies, this Court need not, and does not, attempt to answer that unsettled question of law.

**D. Conclusion on Likelihood of Success**

Both of Plaintiffs' theories—intentional vote dilution and racial gerrymandering—require them to show that the legislature acted with discriminatory intent.  They may make that showing through circumstantial evidence.  But after carefully reviewing the evidence presented so far, the Court concludes that they are unlikely to do so.

The *Arlington Heights* factors do not favor Plaintiffs.  Though SB 4 bears more heavily on Black and Hispanic voters in SD 10 than it does on Anglo voters, and though recent history suggests that discriminatory intent is a possibility, the circumstances surrounding the passage of SB 4 are uniformly innocuous, at least from the standpoint of discriminatory intent.  Plaintiffs seek to add further circumstantial evidence in the form of alternative maps, but those maps are not persuasive.  They demonstrate that there was another racially diverse, Democratic district that the legislature could have cracked and did not—but that fact does not alone suggest that race was a consideration in how SD 10 was drawn.

Because Plaintiffs have failed to show a likelihood of success even under a preponderance-of-the-evidence standard, we need not consider whether their evidence of non-racial disingenuousness is sufficient to overcome the legislature's

---

[15] *Cf. CIGNA Corp. v. Amara*, 563 U.S. 421, 444 (2011) (noting that preponderance of the evidence is the "default [burden of proof] for civil cases").

presumption of good faith.  Racial and partisan considerations are difficult to disentangle, *see Harris*, 147 S. Ct. at 1473, but even without applying the presumption of legislative good faith, the preponderance of the evidence weighs against any finding that race played a role in the Texas legislature's redrawing of SD 10.  On the evidence currently before the Court, Plaintiffs have failed to show that they are likely to succeed on the merits.

### E. The Remaining Preliminary-Injunction Factors

*1. Irreparable Harm*

If Plaintiffs had shown they were likely to succeed on the merits, they would also have established that they were "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  That is because they allege that Defendants have infringed their rights under the Fourteenth and Fifteenth Amendments.  *See* Dkt. 39 at 24–25, 41.  Violations of those rights inflict irreparable injuries because "the loss of constitutional freedoms 'for even minimal periods of time . . . unquestionably constitutes irreparable injury.'"  *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) (omission in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).[16]

But even if Plaintiffs had not alleged constitutional injuries, they still could show that they would be likely to suffer an irreparable injury if their claims were meritorious.  According to this Court's current schedule, it will not resolve the merits of Plaintiffs' claims until after the November 2022 election.  Thus, even if Plaintiffs won on the merits and the Court ordered the "drastic remedy" of "[s]etting aside an election," *Rodriguez v. Bexar County*, 385 F.3d 853, 859 n.2 (5th

---

[16] *See also* 13 MOORE'S FEDERAL PRACTICE § 65.22 (3d ed.) (noting that the "deprivation of constitutional rights" has "ordinarily been held to be irreparable"), Lexis (database updated Dec. 2021); 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2948.1 (3d ed.) ("When an alleged deprivation of a constitutional right is involved . . . , most courts hold that no further showing of irreparable injury is necessary."), Westlaw (database updated Apr. 2021).

Cir. 2004),[17] they would be without properly elected representatives until a new election could be organized and held.  Since the 88th Legislature's regular session will occur between January and May 2023,[18] at least some—if not all—of the lawmaking activity for this election cycle would likely have occurred before Plaintiffs' new representative could be seated.  That is an injury that cannot be compensated with damages, making it irreparable.

For their part, Defendants do not seriously dispute that Plaintiffs have alleged irreparable injuries.  Instead, they reiterate their position that Plaintiffs are unlikely to succeed on the merits of their claims, and Defendants say the Plaintiffs therefore do not face the threat of irreparable injury.  Dkt. 102 at 46–47.[19]  Because the Court concludes that Plaintiffs are unlikely to succeed on the merits, it agrees with Defendants in some sense.  But that is a conclusion based on the merits, not the nature of Plaintiffs' allegation.  If they had met their burden on likelihood of success, they would have met it here, too.

### 2. The Balance of Equities and the Public Interest

Two factors remain.  An injunction may issue only if (1) it would not disserve the public interest and (2) the equities favor the movant.  *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016) (per curiam).  Plaintiffs have not satisfied their burden on those factors.

"[T]he balance of harm requirement . . . looks to the relative harm to both parties if the injunction is granted or denied."  *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 459 (5th Cir. 2016).  The public-interest factor looks to "the public consequences [of] employing the extraordinary remedy of injunction."

---

[17] Doing so can be appropriate where the election was conducted in a racially discriminatory manner.  *See Cook v. Luckett*, 735 F.2d 912, 922 (5th Cir. 1984).

[18] *Texas Legislative Sessions and Years*, Legis. Reference Libr. of Tex., http://lrl.texas.gov/sessions/sessionYears.cfm.

[19] Defendants purport to offer one argument independently of the likelihood-of-success element, but that theory also contests the merits of Plaintiffs' claims instead of the nature of their claimed injury.  *See* Dkt. 102 at 46 (second paragraph).

*Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Those factors "overlap considerably," so courts often address them together.[20] And in the related context of interim stays, "[t]hese factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). After all, "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws," and the State's "interest and harm" thus "merge with that of the public." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam) (citing *Nken*, 556 U.S. at 435). The Court therefore considers both factors together. *See, e.g.*, *Texas*, 809 F.3d at 186–87 (the Fifth Circuit doing the same).

Plaintiffs contend that both factors favor them: Because the redistricting plan "violates Plaintiffs' constitutional rights," "Defendants lack any legitimate interest in enforcing [that] plan." Dkt. 39 at 45. Citing *Reynolds v. Sims*, 377 U.S. 533, 586–87 (1964), Plaintiffs say that this Court could enjoin the maps despite the then-approaching primary election, Dkt. 108 at 28. Plaintiffs do not posit that Defendants would suffer no harm from an injunction. But they suggest that the burdens of a new election would be minimal because state legislation has "accounted for" the possibility of a delayed election. Dkt. 108 at 29.

Defendants reply first with *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam), in which the Supreme Court observed that enjoining an election risks "voter confusion" and other costs. That risk only grows "[a]s an election draws closer." *Id.* at 5. The Fifth Circuit has applied *Purcell* rigorously, staying several injunctions during the 2020 election. Dkt. 102 at 48 (collecting cases). Moreover, Defendants convincingly contended that the primary elections were already underway as this Court heard the preliminary-injunction motion, heightening the relevance of *Purcell*'s principle. A delay, Defendants' say, would require election administrators to duplicate their efforts, would increase costs (particularly for small

---

[20] *Texas v. United States*, 524 F. Supp. 3d 598, 663 (S.D. Tex. 2021) (citing *Texas*, 809 F.3d at 187).

counties), and would require some candidates to change where they seek office. Dkt. 102 at 49. It might further compromise the November 2022 general election. Dkt. 102 at 49. It would confuse voters. Dkt. 102 at 49. And it would "undermine the public's perception of election integrity" by enhancing the risk of tabulation errors and other mistakes, by both voters and election officials. Dkt. 102 at 49.

On this, the Court agrees with Defendants. "[C]ourt changes of election laws close in time to the election are strongly disfavored," *Tex. All. for Retired Ams. v. Hughs*, 976 F.3d 564, 567 (5th Cir. 2020) (per curiam), and the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election," *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam).[21] Those principles apply with equal force in redistricting cases. *See, e.g.*, *Benisek v. Lamone*, 138 S. Ct. 1942, 1944–45 (2018) (citing *Purcell*, 549 U.S. at 4–5); *Milligan*, 142 S. Ct. at 879 (Kavanaugh, J., concurring). Granting the requested injunction would flout those commands.

To assess the propriety of an injunction, this Court must "weigh . . . considerations specific to election cases." *Purcell*, 549 U.S. at 4. The caselaw identifies several relevant considerations. Foremost are the effects on voters and election administration. "Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls." *Id.* at 4–5. An injunction may unduly burden election officials, inflicting massive costs and risking mistakes or disenfranchisement. *Tex. All.*, 976 F.3d at 568. Election irregularities reduce voters' confidence in the system and diminish election integrity; abrupt changes thus disserve the public interest. *See id.* at 569. We also must mind the principle, oft repeated by the Fifth Circuit, that the public has a powerful interest in the enforcement of "duly enacted law[s]." *Id.* at 568.

This Court finds that those considerations weigh strongly against an injunction. At the hearing, Defendants' witnesses testified that an injunction would

---

[21] *See also Frank v. Walker*, 574 U.S. 929 (2014) (mem.); *Veasey v. Perry*, 574 U.S. 951 (2014) (mem.).

overload election officials and confuse and disenfranchise voters. This Court finds those witnesses knowledgeable, compelling, and credible, especially given that Plaintiffs did not attempt to rebut their testimony.

Keith Ingram, the director of the state Elections Division, testified that the March primary was "underway." R. at 7:174. He explained that county officials already had spent months preparing for the election. R. at 7:154. The candidate-filing deadline passed in December, R. at 7:159, and county officials had to program, proof, verify, and mail ballots to meet federal deadlines in January, R. at 7:159–61. Redistricting only added to those burdens. R. at 7:161–62, 164.

Asked whether the election could feasibly be delayed, Ingram replied that a delay was "kind of inconceivable." R. at 7:166. Most concerningly, Ingram testified that up to 100,000 voters had already submitted ballot applications. Some of those applications were rejected; others had been accepted, and some of *those* voters might have already cast their ballots. R. 7:166–67. Unwinding the election would create mass confusion: Voters who had received a ballot would not know whether it would count, and voters who had not received one would not know whether to request a new one or to await the one they had already requested. R. 7:166–67.

Ingram began in his job in 2012, when redistricting delayed an election. R. at 7:151. That delay, he testified, reduced voter trust: Voters "inevitably thought" that moving the election "was a conspiracy on the part of the other team to jerk around their particular candidate." R. 7:167. Ingram suspects the same would occur if this Court enjoined the redistricting maps: "It's very corrosive to the authenticity and legitimacy of the process whenever you change the rules in the middle of the game." R. at 7:173.

Defendants next presented testimony from two county election administrators. Since 2011, Staci Decker has administered elections for Kendall County, a relatively small county in the Texas Hill Country. Record. R. at 8:27. Bruce Sherbet administers elections for Collin County, the state's sixth largest. R. at 8:5–6. Sherbet has nearly fifty years of experience running elections, including almost twenty-five years of service as Dallas County's election administrator. R. at

8:7.

Both Decker and Sherbet testified that much of the work preparing for the March primary was already done.  For example, Decker stated that her four-person team had programmed ballots, prepped ballots for mailing to voters, ordered supplies for the election, prepared election-day kits, and contracted for polling locations.  R. at 8:30, 32, 43–44.  An injunction would require her office to undo much of that work and to mail out new ballots, an expense that Decker says her small county office cannot afford.  R. at 8:39–40, 43–44.

Decker substantiated Ingram's concern about voter confusion:  In 2012, during the last court-ordered election delay, many voters in her county received multiple ballots, and some of them returned their ballots in the wrong envelopes, which caused their disqualification.  R. at 8:49–50.  Decker also recalled receiving complaints from voters who did not know when to submit their ballots.  R. at 8:50.

Sherbet explained that Collin County was struggling to implement the redistricting plans thanks to supply-chain snarls, new compliance obligations, two special elections, and serious staffing challenges.  R. at 8:18–20.  Asked whether changing the maps would be "feasible" in time for the March primary, Sherbet responded that any changes would be "very problematic and really confusing."  R. at 8:20.

Plaintiffs offer no contrary testimony.  They instead press three reasons why this Court should disregard Defendants' showing.  All are unconvincing.

*First*, Plaintiffs suggest that *Reynolds v. Sims* decides this case, because there the Court approved a district court's injunction of a redistricting plan despite an approaching election.  Dkt. 108 at 28.  But *Reynolds* is distinguishable:  The injunction contested there issued several months before the election.  *See Reynolds*, 377 U.S. at 542–43.  And the majority stressed that a district court "should consider the proximity of a forthcoming election and . . . . endeavor to avoid a disruption of the election process."  *Id.* at 585.  In fact, the *Reynolds* Court expressly concluded that the injunction imposed no "great difficulty" on the State of Alabama, a finding that the evidence before this Court cannot support.  *Id.* at 586.

But even if *Reynolds* might permit an injunction here, the past three decades of Supreme Court precedent would not. In the past three years alone, the Court has repeatedly intervened to stay the hand of district courts that have tried to enjoin elections. *See, e.g.*, *Andino v. Middleton*, 141 S. Ct. 9 (2020) (mem.); *Clarno v. People Not Politicians Oregon*, 141 S. Ct. 206 (2020) (mem.); *Milligan*, 142 S. Ct. at 879 (mem.). That posture is not nascent; it is decades in the making. *See, e.g.*, *Purcell*, 549 U.S. at 4–5. "[T]he only constant principle than can be discerned from the Supreme Court's recent decisions . . . is that its concern about confusion resulting from court changes to election laws close in time to the election should carry the day in the stay analysis." *Veasey v. Perry*, 769 F.3d 890, 897 (5th Cir. 2014) (Costa, J., concurring in the judgment); *see also id.* at 895 (majority opinion) (making the same point). This Court agrees.

*Second*, pointing to Section 41.0075 of the Texas Election Code, Plaintiffs contend that Defendants already have accounted for the prospect of delay. That statute created three sets of election dates; which set would take effect would depend on the date that the Texas legislature enacted a redistricting plan. *See* TEX. ELEC. CODE § 41.0075(c)(1)–(3).

The Court does not perceive that statute's relevance. As Plaintiffs appear to acknowledge, Dkt. 108 at 29, the point of the statute was to accommodate *legislative* delays in *enacting* a redistricting plan. The law did not, as Plaintiffs suggest, "protect the state and the public's interest in orderly elections should the primary be delayed" for any *other* reason. Dkt. 108 at 29. Once the Texas Legislature enacted a redistricting plan, Section 41.0075 told election administrators and other officials across the state which election dates would apply. It did not create contingencies for other delays. But even if it had, that would not change our analysis. Plaintiffs do not explain why or how the legislature's anticipation of legal challenges to its redistricting plan would mitigate the harms of an injunction to the public's interest in orderly elections when the elections are underway and ballots are in voters' hands.

*Third*, Plaintiffs cite the Supreme Court's admonition that "injunctive relief is available in appropriate cases to block voting laws from going into effect." Dkt.

108 at 30 (quoting *Shelby County v. Holder*, 570 U.S. 529, 537 (2013)). But that prompts the question whether this is an "appropriate case[ ]," and the Supreme Court has made clear that a preliminary injunction so close to an election is *not* appropriate.

The core of Plaintiffs' theory seems to be that because they have a meritorious claim, they meet the balance-of-harms and public-interest factors. *See* Dkt. 108 at 27–28; Dkt. 39 at 45–46. That result does not necessarily follow. Even if Plaintiffs *were* likely to succeed on the merits, the Supreme Court and the Fifth Circuit have stressed that a likelihood of success on the merits does not dictate who prevails under the balance-of-harms and public-interest prongs.[22]

That is not to say that Plaintiffs cannot show, after a trial on the merits, that they are entitled to an injunction. But we must heed the consequences of preliminary relief for the March 2022 primaries. Defendants have established that an injunction would confuse and disenfranchise voters, leave candidates in the lurch, stress already overburdened election administrators, and inflict significant costs that would fall most heavily on the state's smallest counties. Plaintiffs had the burden to overcome that showing. They have not done so.

This Court finds that the balance of harms and the public interest favor Defendants. A preliminary injunction will not issue.

**F. Conclusion**

Plaintiffs have demonstrated that, absent an injunction, the injury they complain of would be irreparable. But they have not shown that they are likely to

---

[22] The Fifth Circuit has "expressly rejected" the idea that courts must presume that the balance of harms favored a plaintiff who has demonstrated a likelihood of success. *Def. Distributed*, 838 F.3d at 457 (quoting *S. Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185, 188 (5th Cir. Unit B 1982)). That principle holds when plaintiffs bring constitutional claims. *Id.* at 458 ("Ordinarily, of course, the protection of constitutional rights *would* be the highest public interest at issue in a case. [But] that is not necessarily true . . . ."); *see also Winter*, 555 U.S. at 23 (holding that the district court should have denied an injunction, despite that court's finding a likelihood of success on the merits, because the plaintiffs' injury "is outweighed by the public interest").

succeed on the merits.  And they have not established, as to two factors that overlap in this context, either that the balance of equities favors them or that granting an injunction would be in the public interest.

Failure on even one prong is sufficient to conclude that a preliminary injunction shall not issue.  *See Planned Parenthood*, 403 F.3d at 329.  Thus, a preliminary injunction is inappropriate here, and this Court may not issue one.

## IV. PLAINTIFFS' RULE 65(a)(2) MOTION

Plaintiffs have moved to consolidate under Federal Rule of Civil Procedure 65(a)(2), but the Court declines to do so.  Both parties made their presentations, and the Court evaluated them, in the context of a limited hearing.  As Defendants point out, they were given no warning—until closing statements— that Plaintiffs would move to consolidate, meaning that Defendants had no opportunity to prepare for a hearing that would result in a final judgment.  R. at 9:34.  That context also informed several of the Court's evidentiary rulings, most notably the decision to admit, without authentication, Plaintiffs' Exhibit 102, which purports to be a log of private text messages.

Moreover, it is not evident what benefit would follow from consolidation.  This memorandum and order reflects the Court's opinion that Plaintiffs are not likely to succeed on either their intentional discrimination or racial gerrymandering claim.  Admittedly, a final determination could spare the Court from fruitless relitigation of those theories.  But on the other hand, newly discovered evidence or authority could lead to the opposite outcome from the one we predict here.  And completely redundant presentations remain unnecessary in light of Rule 65(a)(2)'s stipulation that, "Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial."

We trust that Plaintiffs' interest in presenting an effective case will guide them in deciding whether to return to the theories addressed in this order or to rest entirely on their as-yet untested *Gingles* claim.  For all these reasons, we deny Plaintiffs' motion to consolidate this action and to issue a final judgment.

## V. CONCLUSION

Plaintiffs' motion for a preliminary injunction is DENIED for failure to show a likelihood of success on the merits and failure to show that the balance of equities and the public interest favor an injunction.  Plaintiffs' Rule 65(a)(2) motion to consolidate the motion into one for final judgment is also DENIED.

**SIGNED on this 4th day of May 2022.**

**David C. Guaderrama**
**United States District Judge**
**Western District of Texas**

*And on behalf of:*

**Jerry E. Smith**
**United States Circuit Judge**
**U.S. Court of Appeals**
**Fifth Circuit**

*-and-*

**Jeffrey V. Brown**
**United States District Judge**
**Southern District of Texas**