# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., | § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIVIL ACTION NO. 21-CV-00259-DCG-JES-JVB |
| GREG ABBOTT, et al., | § § | [lead case] |
| *Defendants*. | § § § | |

| | | |
|---|---|---|
| TREY MARTINEZ FISCHER, Texas State Representative (HD 116), | § § § | |
| *Plaintiff*, | § § § | |
| v. | § § | CIVIL ACTION NO. 3:21-CV-00306 |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas; JOHN SCOTT, in his official capacity as Secretary of the State of Texas, | § § § § § | [consolidated case] |
| *Defendants*. | § § § | |

## PLAINTIFF TREY MARTINEZ FISCHER'S RESPONSE TO
## THE DEFENDANTS' MOTION TO DISMISS

## I.      Introduction

In the past decade, Texas' population has grown by nearly 4 million people. 95% of that growth was minority population. Despite this, the State of Texas decreased the amount of minority-majority congressional districts. As a direct result of this failure to expand minority opportunity, plaintiff Trey Martinez Fischer filed this suit seeking the creation or the restoration of a majority Latino district in central Texas. By way of response, the State of Texas filed a motion to dismiss claiming that the plaintiff has not "plausibly" alleged either of his claims. Defendants argue the pleadings are insufficient to state claims under either the Voting Rights Act (VRA) or the United States Constitution. But these assertions are more properly cast as a merits-based disagreements over racially polarized voting or the intent and motives of the Texas Legislature in passing the redistricting maps. The plaintiff has filed a detailed complaint discussing suspicious circumstances surrounding the passage of the congressional map, statistical evidence of reduced or eliminated Hispanic and Latino voting power, the bizarre choices to split precincts along racial lines, and the effects and consequences of the racial gerrymander in central Texas. At the pleadings stage, this is more than sufficient. The plaintiff has met the pleading standard necessary to provide the defendant notice of his claims and plausibly, facially infer liability to the defendants. If this Court were to adopt the strict and picayune pleading standard that the defendants demand, then no plaintiff could seek relief from any defendant. Plainly, that should be rejected. The Motion to Dismiss should be denied.

## II.     Pleading Standards for Complaints

At this stage of the litigation, the Court must, "accept as true all material allegations of the complaint and . . . constru[ing] the complaint in favor of the complaining party." *Ass'n of Am.*

*Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (internal quotation marks omitted). Dismissal under Rule 12(b)(6) is unwarranted when a plaintiff pleads sufficient facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible on its face" where the pleaded facts allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### III.   Plaintiff alleges Plausible Violations of the VRA and the United States Constitution

The plaintiff seeks two categories of claims. First, the plaintiff seeks a cause of action based on violations of Section 2 of the Voting Rights Act. Within this claim, there are two different types of violations of Section 2: retrogression and dilution of Latino opportunity within CD 35, and dilution of Latino opportunity in the failure to create another Latino opportunity district within Central Texas. Both of these violations have been specifically alleged in plaintiff's amended complaint. The second cause of action that plaintiff seeks a violations of the 14th Amendment, including intentional discrimination and racial gerrymandering. Again, all facets of these violations have been averred by the plaintiff in his live pleading in this cause of action.

Subsection 2(a) of the VRA prevents states from imposing "any standards, practices, or procedures which result in the denial or abridgement of the right to vote of any citizen who is a member of a protected class of racial and language minorities." *Thornburg v. Gingles*, 478 U.S. 30, 43 (1986). Subsection 2(b) provides that a violation of § 2(a) is established if:

> [B]ased on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected] class . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301(b).

In *Thornburg v. Gingles*, the Supreme Court explained that "[t]he essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by [minority] and white voters to elect their preferred representatives." 478 U.S. at 47. Congress amended Section 2 of the VRA in 1982 to "make clear that a [§ 2] violation could be proved by showing discriminatory effect alone" and that proof of discriminatory intent was not required. *Id*. at 35.

To establish a Section 2 vote-dilution claim the plaintiff must first prove three "necessary preconditions." Id. at 50-51. First, the plaintiff must establish that the effected minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." Id. at 50. Second, the plaintiff must demonstrate the minority group "is politically cohesive." *Id*. at 51. And third, the plaintiff must show "that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed— usually to defeat the minority's preferred candidate." *Id*. (citations omitted). Courts have long recognized the rarity of Rule 12 dismissals of cases under the VRA: "It is no accident that most cases under section 2 have been decided on summary judgment or after a verdict, and not on a motion to dismiss." *Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004).

### A. Plaintiff adequately alleged sufficient information to prove Latino voter cohesion

*Gingles I* requires that a plaintiff prove that "the minority group must be sufficiently large and geographically compact to constitute a majority in a single-member district". To satisfy this first factor, plaintiffs generally submit evidence or allege a "hypothetical redistricting scheme[] in the form of an illustrative plan[]." *Gonzalez v. Harris Cnty.*, 601 F. App'x 255, 258 (5th Cir. 2015). (internal quotation marks omitted). The plaintiff has far exceeded this minimum standard. In his amended complaint, plaintiff alleged that he resided in several putative districts, which were

greater than 50% Hispanic Citizen Voting Age Population (HCVAP). Specifically, plaintiff alleged that he resided in CD 37, which a proposed district in Plan C 2129, which had 10 Latino Opportunity districts that contained majority HCVAP populations. Dkt. 217, ¶¶ 52, 54. Next, plaintiff alleged that Latinos in CD 37 of Plan C 2129 are cohesive because they "work and vote together to elect candidates of their choice to school boards, city councils, to the state legislature, and federal offices." *Id*. at ¶ 61. To support his allegation of political cohesion in the Latino, plaintiff alleged that "it is fairly easy to create a version of CD 35 or a central Texas congressional district regardless of its district number that has a citizen-voting age majority of Latinos." *Id*. at ¶ 50. Plaintiff, then, alleged that he was a resident of in another "putative single-member district plan that makes changes necessary to create a 50% HCVAP majority district in CD 35." *Id*., ¶¶ 63, 67. Finally, the Plaintiff alleged specific facts of the political cohesion of Latinos in CD 35 and central Texas. He described the Voter Tabulation Districts (VTDs) or election precincts in CD 35. He alleged that there are "109 VTDs that have a majority Latino VAP population" in CD 35. *Id*. at ¶ 78. In these VTDs and throughout CD 25, the Latinos vote for the same candidates in most, if not all elections, including non-partisan elections for school board, municipal office, and primary elections. *Id*., ¶¶ 74, 80. From this VTD analysis, the plaintiff averred that this cohesion can be quantified by several statistical measures, including Ordinary Least Squares and Ecological Inference. *Id*., ¶¶ 81, 84. Using both measures, the plaintiff alleged that Latinos "strongly political cohesive" and "statistically significant." *Id*., ¶¶ 82, 86. Then, plaintiff alleged that Latino political cohesion can be seen in other forms political data, specifically citing the most recent democratic primary election in CD 35. "In the most recent primary election, overwhelming won by Austin City Councilman Greg Casar, there is certainly evidence that Anglo Democratic primary voters in

Travis, Hays, and Comal counties preferred Casar, while Latino voters in Bexar County and in Travis County preferred someone other than Casar." *Id.* at ¶ 91.

In sum, the plaintiff has alleged Latino cohesion in the following ways:

- He is a resident of several putative central Texas districts that exceed 50% HCVAP;
- Latino voters in these putative districts, in CD 35, and in Central Texas are politically cohesive because they live and work together and vote for similar candidates in partisan, non-partisan, and municipal elections;
- The majority Latino VTDs and election precincts vote for similar candidates in primary, general, and non-partisan elections;
- This cohesions is measurable through multiple indices and they show strong political cohesion; and,
- In the most recent primary election, the candidate that won the primary was the preferred candidate for Anglos and Latinos preferred others.

The Defendants assert that these are conclusory allegations that are formulaic recitations. Mot. at 3. The Defendants are incorrect. The above alleged facts create a clear picture that Latinos in Central Texas vote together and are politically cohesive. This political cohesion can be seen empirically in election results and measured through mathematical regression. It can be further seen with a careful look at the election results by VTD and in the most recent primary election. None of these averred facts are formulaic recitations or conclusory allegations. By contrast, they are facts that if proven show the political cohesion of Latinos in Central Texas. Finally, the plaintiff alleged and provided proof that he resides in several demonstrative districts that are majority Latino citizenship and offered further allegations that the Latinos in those putative districts are politically cohesive. This gives ample notice to the defendants about pursued claims and meets the standard of the rule.

Next, the defendants argue that "the second *Gingles* precondition requires showing that the minority group on behalf of whom the plaintiff brings the suit is politically cohesive." As above, the plaintiff has averred facts that if true would prove political cohesion. Most instructive in this

instance, the plaintiff has averred that in the most recent primary election held in CD 35, the Anglo-preferred candidate won, while Latino's preferred other candidates. Dkt. 217 at ¶ 91.

Then, the defendants demand that the plaintiff does not allege facts that "'obvious alternative explanation' for this alleged voting pattern: partisanship." Mot. at 3. Yet, the plaintiff alleges that Latinos are politically cohesive in all or most elections, including elections that are non-partisan like school board elections, municipal elections, and primary elections. *See e.g. id.*, ¶¶ 73, 74, 79, 80, 82, 86-7, 90-1, 110, 112, 133, 134. Partisanship plays no role in these elections and cannot explain the racial polarization of those elections.

Finally, the defendants attack the plaintiff's allegations concerning OLS and EI. Mot. 4. In their words, "[p]laintiff must point to an actual study using such methods rather than merely invoke their names as though that alone is enough." *Id*. This is false and misstates the standards required to invoke the jurisdiction of the court. All that is required at the pleading stage are allegations that if true would reasonably infer that the defendant is liable for the misconduct alleged. The plaintiff's and others will prove racially polarized voting and Latino voter cohesion using ecological regression. The plaintiff avers this fact here to give the defendants notice of his claims and his also his modes of proof. But, these allegations buttress his claims concerning Latino political cohesion. The defendants suggest that the only way to prove up Latino cohesion is by showing election outcomes. Mot. at 3. But, the Plaintiff has done just that. Most notably, the plaintiff has alleged that in the most recent primary election concerning CD 35 the Anglo-preferred candidate defeated the other candidates of stronger Latino-preference. Dkt. #217 at ¶ 91.

In sum, these allegations provide enough facts in various ways to prove Latino political cohesion in CD 35. In the plaintiff's view, Latinos in CD 35 work and vote together. They vote for similar or the same candidates in most elections, including non-partisan elections. This cohesion is

measurable in several ways. First, looking at specific VTD data, the plaintiff has alleged that the majority Latino VTD strongly support the same candidates. Secondly, this cohesion can be measured using various forms of ecological regression that all show strong Latino political cohesion. Lastly, this political cohesion can be proven by looking at actual election results in the most recent and relevant election. All of these taken together are enough to prove Latino political cohesion and, more to the point, each of them give sufficient notice to the defendants about the nature of the plaintiff's claims.

**B.  Plaintiff has sufficiently alleged Anglo bloc-voting**

Plaintiff has specifically and generally alleged Anglo-bloc voting in CD 35 and Central Texas. First, plaintiff alleges that Anglos in CD 35 are politically cohesive in primary and general elections. Dkt. 217 at ¶ 74. Then, Plaintiff alleges that Anglos prefer differing candidates than Latinos in CD 35. *Id*. at ¶ 75. Then, the plaintiff offers several specific factual allegations, each of which is enough to give rise to the inference that Anglos are politically cohesive and support differing candidates than Latinos. First, Plaintiff alleges that there are 27 majority Anglo Voting Age Population VTDs in CD 35. *Id*. at ¶ 78. Then, he cites that in these VTDs the Anglos supported different and opposing candidates from majority Latino VTDS. *Id*. at ¶ 79. This polarization can be measured empirically by looking at mathematical regression and the plaintiff alleges that his mathematical regression reports show that Anglos are "moderately cohesive." *Id*., ¶¶ 83, 87. In addition, the plaintiff avers that that the racial polarization can be seen in the most recent election. *Id*. at ¶ 91. All of these allegations taken together strongly infer that Anglos in CD 35 vote together and against opposing Latino-preferred candidates. Some of these allegations are general, but each of them are supported by specific allegations concerning election outcomes and VTD analysis.

The defendants suggest that this is not enough. That this, again, is just a formulaic recitation of the factual elements. However, the above factual allegations disprove this. Most importantly, the defendants assert that "White voters are barely one-third of CD 35's voting-age citizens. For this reason alone, Plaintiff has failed to satisfy the third *Gingles* precondition, and his claim fails as a matter of law." Mot. pp. 4-5. Curiously, the defendants cite no law or jurisprudence for this extraordinary claim. To be clear, the defendants have misstated the requirements for the *Gingles* pre-conditions. The plaintiff makes two kinds of Section 2 claims concerning Central Texas. First, the plaintiff has alleged that CD 35 is no longer a Latino Opportunity district and the Latino vote is, therefore, necessarily diluted. Dkt. 217 at ¶ 15. Second, even supposing that CD 35 is still a performing Latino opportunity district, there is enough Latino population throughout Central Texas to create another mandatory Section 2 district.

As to the regression claim, plaintiff has alleged the necessary voter cohesion facts to prove that Latinos and Anglos vote dissimilarly in general and primary election. In addition, he has alleged that in the most recent elections that the Anglo-preferred candidate defeated the candidates of Latino preference. While Latinos form a strong plurality of voters in CD 35, they are not a majority of the primary voters as inferred from plaintiff's allegation. If that is true, then the State of Texas has reduced the number of Latino voters in an existing Latino Opportunity District with the net result being that CD 35 may no longer elect the Latino-preferred candidate in the primary election. This is the mirror-image of the defendants' main argument against coalition districts. All of the allegations taken together show a plausible claim, on its face, that CD 35 is no longer a Latino Opportunity district.

However, separate and distinct from the plaintiff's retrogression claim, the plaintiff has still alleged sufficient facts that there should be *another* Latino opportunity district in addition to CD

35 in Central Texas. Dkt. 217, ¶¶ 51-62. (discussing PLAN C 2129).  More to the point, Central Texas is majority Anglo, even though CD 35 is not, and this fact was alleged by the plaintiff. *Id*. at ¶ 62.

Finally, the defendants claim that the plaintiff has, once again, not alleged cohesion or racial polarization by citing mathematical regression in the way that defendants would prefer. However, the discussion concerning EI and OLS begins with the allegations concerning VTDs. Specifically, the plaintiff discusses racial makeup of the VTDs and their election history. Using these facts, the plaintiff cites EI and OLS analyses based, in part, on this data that show that in central Texas and in CD 35, elections are racially polarized. Taken together this is sufficient to meet the minimal standards to give the defendants notice of plaintiff's claims. A complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations. All that is required is that the plaintiff aver sufficient facts that create facial plausibility. Here, the plaintiff has done just that by offering specific VTD analyses with regression analyses and the most recent, relevant election outcome for the challenged district. Dkt. 217, ¶¶ 76-88, 91. If these facts are proven, there is no doubt that statistically significant, racially polarized voting exists in partisan, non-partisan, and primary elections throughout Central Texas. If so, the plaintiff has alleged a set of facts that plausibly infer liability for the defendants.

### C.  Plaintiff has alleged sufficient facts showing Discriminatory Intent

Defendants assert that plaintiff has failed to allege a claim for intentional discrimination. Mot. at 6-8. Yet again, Defendants ignore relevant sections of Plaintiff's pleading, and their argument for dismissal in this regard is merely a factual disagreement with the allegations or the inferences that may be reasonably drawn from those factual pleadings.

The plaintiff alleges that there are several bases to believe that the defendants acted with invidious intent in retrogressing the Latino population of CD 35. First, the defendants acted in secret in order that their true intentions were obscured. Dkt. 217 at ¶¶ 93-101. The plaintiff, then, describes the net effect of that secrecy, the exclusion of minority voters and their representatives from substantive decision-making concerning the creation of congressional districts. *Id*. at 101-3. The second reason cited by the plaintiff to prove invidious intent is that the policy choices made by the congressional decision-makers had a "deleterious effect on minority voting strength." *Id*. at ¶ 104. In order to bolster this claim, the plaintiff cites the retrogressive nature of SB 6 and that the defendants knew that lowering the number of Latinos meant diluting the voting strength of Latinos in the primary and general elections. *Id*. at ¶¶ 104-112. The third reason alleged by the plaintiff that proves the creation of CD 35 is infected with racial discrimination is the use of split precincts to remove Latinos from CD 35. *Id*. at ¶ 113. The plaintiff then provides a lengthy and detailed explanation of what splits were made and the net effect of their racial gerrymandering. *Id*. at ¶¶ 114-117. To further buttress this claim, the plaintiff cites the obvious non-compactness of several of the districts, including CD 35, as further evidence of the use of racial gerrymandering tactics to avoid minority populations to the detriment of Latino voters. *Id*. at ¶ 118. Fourthly, the plaintiff discussed the removal of areas of geographic importance to Latinos in San Antonio. *Id*. at ¶ 119. Next, the plaintiff cited the rejected amendments and attempts to restore CD 35 as a majority Latino opportunity district and the legislative process by which those attempts were rejected. *Id*. at ¶¶ 120-129. The deviations from normal procedure detailed, included the adoption of a pre-textual, non-legal justification for the rejection of amendments that would improve minority opportunity districts and the denial of the ability of legislators to use amendments to the amendment to cure minor defects in their alternate plans. *Id*. at ¶¶ 123, 126. Finally, the plaintiff

avers that the real proof that the adoption of SB 6 is infected with racial discrimination is that all of the outcomes were made to the disfavor minority voters. *Id.* at ¶ 131.

The defendants again call these threadbare allegations. But, rather than deal with the actual meat of what was presented, the Defendants engage in merits-based counter argument that is wholly inappropriate at this time. At this stage, these allegations are taken as true, no matter the protestations of the defendants. For instance, the defendants state the secrecy allegations are not evidence of racial intent, but rather an excuse by the plaintiffs. Evaluating this argument would require an evaluation of evidence or the lack thereof, which is premature at this time. The question before this Court is not whether the plaintiffs are excusing the lack of evidence; but rather, whether or not a map created in secret that has an obvious discriminatory effect on minority opportunity is a plausible, facial allegation of discriminatory intent. It plainly meets that standard. There may be other reasons why the map was adopted in secret, but those reasons are of no moment for this Court's consideration of this Motion to Dismiss. Next, the defendants suggest that there was an alternate reason for all of the cited procedural errors, namely the delayed census and partisanship. However, this omits the averments of the plaintiff that cannot be explained by the delayed Census or partisanship. The delayed census cannot explain away racially gerrymandered districts or precincts split along racial lines. The secrecy used and the non-legal position deployed to defeat minority amendments is also not explained by the delayed Census. In fact, those choices actually make the process less efficient and more time-sensitive. *See e.g.* Dkt. 217 at ¶ 97.

Strangely, the defendants state that "Plaintiffs [sic] have alleged no facts affirmatively showing that the Legislature deviated from established procedures to accomplish a discriminatory goal or in a way that targeted a minority group." Mot. at 8. But, the plaintiff did so. He alleges that minority congressional representatives were excluded from serious discussions about the creation of the

map and that minorities had few opportunities to affect the legislative process. In addition, he stated that minority legislators were not allowed, in some instances, to amend their amendments to make them more palatable to other lawmakers, in a stark deviation from normal procedure. The defendants, instead, say that this is the obvious result of partisanship. But, it's not so obvious. Partisanship cannot explain the choices made concerning CD 35. "[T]he policy choices made in relation to CD 35 cannot be said to be based on partisanship. CD 35 is a Democratic district, by all measures. The choice, then, to diminish Latino voting strength in CD 35 has nothing to do with electing Republicans or Democrats, but only to diminish the ability of Latinos in CD 35 to elect the candidates of their choice in the Democratic primary." Dkt. 217 at ¶ 133. More to the point, partisanship is not an obvious alternative explanation to override the odd and dangerous policy choices made by the creators of the congressional map. Instead, the defendants are again engaging in a merits-based rebuttal of their actions. No doubt the defendants will attempt to explain away their deeply harmful policy choices. Their explanation in this Motion to Dismiss puts the cart before the horse.

Next, the defendants state that "[t]here is a leap in logic that is missing between Plaintiff's allegations and a plausible allegation of discriminatory intent." In fact, they call this a "non sequitur". Mot. at 8. The allegation in question is pretty clear. The claim is that most Democratic congressmen *and* all members of the Texas Legislature that are the candidates of minority preference were excluded from the initial consideration and creation of the map. Dkt. 217 at ¶ 100. The defendants believe there is logical leap because they did not read the full allegation concerning the candidates of minority-preference being excluded. Again, no doubt the defendants have explanations for their behavior, but those are merits-based decisions that should be evaluated by this Court using evidence and testimony. They are also irrelevant at this time.

In total, the plaintiff has alleged a clear and plausible set of facts that if true reasonably infer that the defendants are liable. In short, the plan was created in secret to hide the motivations of the mapmakers. This map had a retrogressive and harmful effect on Latino voters generally, and in CD 35 specifically. There is real evidence of splitting voters along racial lines in VTDs in order to remove Latinos from CD 35 and there are bizarre shapes of districts throughout the congressional map, including CD 35. Race is the only plausible explanation for the strange shapes of these districts and the cutting of these VTDs. The legislative process was truncated and pronounced with deviations from normal procedure that affected the minority community and their elected representatives. Important geographic Latino areas were removed from CD 35 and placed in other districts in order to hurt the minority community. Every attempt to ameliorate CD 35 was rejected. There was the use of non-legal, pre-textual justification for the denial of ameliorative amendments and closed process for accepting amendments that prevented improvement of CD 35 for Latinos. The defendants attempt to attack these averments individually, but taken as a whole they paint a plausible picture of invidious discrimination because nearly every decision was made to the detriment of the minority community.

### D.  Plaintiff has alleged a Sufficient Discriminatory Effect

Defendants argue that plaintiff has not alleged a discriminatory effect because CD 35 is  – in their view – a minority opportunity district because Anglos makeup only a third of the Voting Age Population. Mot. at 9. As stated above, the Defendants mistake the plaintiff's claim. Plaintiff has alleged that CD 35 no longer performs as a Latino opportunity district because Latinos are not able to elect the candidate of Latino-preference in the Democratic Primary. *See* Dkt. 217 at ¶¶ 15, 91. If this is proven, then whatever policy choices were made, including and especially the multitude of needless precinct splits along racial lines, may have infected CD 35 with a discriminatory

purpose that has a deleterious effect.  In addition, even if CD 35 is a minority opportunity district, the failure to create another Latino opportunity in Central Texas, if done so on account of race also violates the 14th Amendment. Finally, just splitting VTDs with race as the predominant factor is enough to be liable for a finding of a racial gerrymander, even if there is no effect or little effect on the performance of the minority-preferred candidate. *See Perez, et al. v Abbott, et al.*, No. 17–586., 585 U.S. ____ , slip op. at p. 41 (2018). ("We hold that HD90 is an impermissible racial gerrymander.")

### IV.     There is a Private Right of Action under the VRA

The defendants again attempt to have this Court dismiss this cause of action because there is no private right of action authorized by the Voting Rights Act. This Court has previously decided this matter and made clear that "[a]bsent contrary direction from a higher court, [the Court] declines to break new ground on this particular issue." Dkt. 58 at p. 2. The defendants offer no new briefing on this matter nor a ruling from higher court that would countermand this Court's order. As such, it should be rejected. The plaintiff joins with the previous successful briefing of other plaintiffs to avoid needless duplication. There is a final reason to reject this attempted end round this Court's order. It is barred by the "law of the case doctrine". "[L]aw of the case is an amorphous concept," which "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983), decision supplemented, 466 U.S. 144 (1984). However, amorphous this doctrine is, the defendants have failed to provide any reason that this Court should deviate from its previous ruling. Thus, it should be denied.

DATED: May 4, 2022                           Respectfully submitted,


                                             */s/ Martin Golando_____*
                                             MARTIN GOLANDO
                                             Attorney at Law
                                             State Bar No. 24059153
                                             2326 W. Magnolia
                                             San Antonio, Texas 78201
                                             (210) 471-1185
                                             Martin.Golando@gmail.com

                                             Attorney for Trey Martinez
                                             Fischer



## CERTIFICATE OF SERVICE


I certify that on this, the 4th day of May, 2022 in accordance with the Federal Rules of Civil Procedure, a true and correct copy of the foregoing document was served, via ECF, to the counsel of record in this cause of action.

*/s/ Martin Golando*
Martin Golando