# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| LULAC, et. al., | § | |
| | § | |
| *Intervenors* | § | |
| | § | |
| Eddie Bernice Johnson, Sheila Jackson-Lee | § | |
| Alexander Green, and Jasmine | § | |
| Crockett | § | |
| | § | |
| Plaintiff-Intervenors | § | |
| | § | Case No.: EP-21-CV-00259-DCG- |
| | § | JES-JVB [Lead Case] |
| v. | § | |
| | § | |
| GREG ABBOTT, in his official capacity | § | |
| As Governor of Texas, et. al. | § | |
| | § | |
| *Defendants* | § | |

_____

**PLAINTIFF- INTERVENORS EDDIE BERNICE JOHNSON, SHEILA JACKSON-LEE, ALEXANDER GREEN, AND JASMINE CROCKETT RESPONSE TO THE DEFENDANTS MOTION TO DISMISS**

TABLE OF CONTENTS

Table of Contents .................................................................................................. i

I.   Background .................................................................................................... 1

II.  Objection to Motion as Deficient ................................................................ 2

III. Legal Standard ............................................................................................. 2

        Argument & Authorities ........................................................................ 3

IV.  Standing ....................................................................................................... 3

        A. Intervenors have met burden of pleading intentional discrimination ............................ 5

        B. Intervenors Have Met Burden of Pleading Racial Gerrymander ........................ 7

        C. Intervenors Have Met Burden of Pleading Intentional Vote Dilution ............................ 11

        D. Intervenors Have Met Their Burden of Voter Dilution Under § 2 ................................. 13

        E. Retrogression Analysis is Required Under § 2 ..................................... 13

        F.  § 2 Does Not Confer a Private Right of Action .................................. 15

        Merits ...................................................................................................... 16

V.   Intervenors Have Met Burden of Pleading Intentional Discrimination .............................. 16

VI.  Vote Dilution Burden Has Been Met .......................................................... 16

VII. Coalition Claims and Standing To Bring Them .................................. 18

VIII. State of Texas Immunity ............................................................................ 19

        Conclusion .............................................................................................. 19

        Certificate of Service .............................................................................. 19

I.      Background

Plaintiff Intervenors Eddie Bernice Johnson, Sheila Jackson Lee, Alexander Green[1] and

Jasmine Crockett moved to intervene in this action because they were aggrieved by the new

Congressional Plan adopted for use in Texas—C2193. Johnson, Jackson-Lee and Green are

members of the United States Congress (Congressional Districts 30, 18 and 9 respectively).

Representative Crockett is a member of the Texas Legislature who was actively involved in the fight

against C2193 and who is a candidate to replace Congresswoman Johnson in CD30.  All Plaintiff

Intervenors are voters in their respective districts who intend to vote and complain in this lawsuit

about how redistricting impacted them as voters in their districts as well as members of Congress.

In their First Amended Complaint Plaintiff-Intervenors allege vote dilution, intentional vote

dilution, racial gerrymandering and intentional discrimination.  Constitutional claims were lodged

under both the 14th and 15[th]Amendments to the United States Constitution.

Defendants Greg Abbott, John Scott and the State of Texas filed a Motion to Dismiss seeking

to have Plaintiff's claims for the following dismissed: (a) vote dilution under  § 2 of the Voting

Rights Act; (b) Racial Gerrymandering; and (c) Intentional Discrimination under the

14[th]Amendment. Defendants did not seek the dismissal of Intervenors' claims for intentional vote

dilution or any that were made under the Fifteenth Amendment to the United States Constitution.

---

[1] Intervenors adopt and incorporate for all purposes Exhibits A and B to the First Amended Complaint.

1

## II.   Objection to Motion as Deficient

The Federal Rules of Civil Procedure Rule 7(b)(1)(B) requires that motions must state with particularity the grounds for seeking the order.   However, in their Motion the movants fail to designate under what provision of the FRCP are they proceeding, leaving the Intervenors to guess about the authority under which they are proceeding.   There are different FRCP provisions regarding Motions to Dismiss and the rules thereunder are different.   It is essential that this level of particularity be provided so that there is adequate notice and a proper opportunity to respond. *Registration Control Systems v. Compusystems, Inc.,* 922 F.2d 805, 807 (Fed. Cir. 1999).

## III.   Legal Standards

At this stage in examining Defendants' motion, the court must assume that all material facts contained in the complaint are true and resolve all inferences in the plaintiff's favor. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).   The Complaint must give fair notice to the Defendant of the Claim by making a short and plain statement in the pleading indicating they are entitled to relief.   See FRCP 8(a)(2).   The Complaint should include plausible factual allegations to support the claim.   *Lormand v. U.S. Unwired, Inc*., 565 F. 3d 228, 232 (5th Cir. 2009).

### Argument & Authorities

## IV.   Standing

This Court decided questions regarding standing in this consolidated cause. That decision is relevant to the current motion. As the Court recently held in reference to the Brooks Intervenors Standing is necessary for this Court to have subject-matter jurisdiction. *League of United Latin*

2

*Am. Citizens v. Abbott*, No. EP-21-CV-00259-DCG-JES-JVB, at *1 (W.D. Tex. Dec. 30, 2021)(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  "Intervenors must show (1) an injury in fact, (2) a causal connection between the injury and the defendant's conduct, and (3) a likelihood that a favorable decision will redress the injury." *Id*. (quoting *Lujan* at 560–61 )

The Court has held that a voter who will vote and makes a claim of intentional discrimination has standing to bring the claim, as well as elected officials who are impacted by the map, see Dkt. 119 at 3–5.  This is particularly true of elected officials who are seeking re-election, see Dkt. 119 at 3–5.  Further, voters who complain in cases involving vote dilution or racial gerrymanders should take note that when one's district is cracked or packed, this provides standing to litigate such a possible illegal action.  *Harding v. County of Dallas*—cracking of a District provides standing, 948 F.3d 302 (5th Cir. 2020).  Importantly, in this case the complaint makes it clear how the intervenors are complaining about packing, cracking, eliminating the core of their districts and a host of other examples of the State not following traditional redistricting principles. *Texas v. U. S.* 887 F.Supp. 2d. 133, 159 (D.D.C. 2012) discussed the 9th, 18th and 30th Congressional Districts the last round and importantly noted that substantial but unnecessary surgery to the districts was probative of intentional discrimination.

Article III still applies to Congressional Representatives when they are acting in their official capacity *Diaz-Balart v. Browning* 2011 WL 13175016 (S.D. Fla.) 3-4[2].  However, when standing is at issue, Courts have well established that "the harm can relate to their ability to fulfill

---

[2]The Intervenors in this case were both members of the U.S. House of Representatives, Mario Diaz-Balart and Corrine Brown. The Florida House of Representatives acted as an intervenor in the case.

their responsibilities as congresspeople." Id.   Therefore, "federal courts may exercise power as a necessity.[3] Intervenor Representative Crockett is a member of the Texas Legislature who was actively involved in the fight against C2193 and who is a candidate to replace Congresswoman Johnson in CD30.  Crockett is a registered voter who intends to vote and complain in this lawsuit about how redistricting impacted them as voters in their districts as well as members of Congress. Crockett has alleged specific instances of conduct where defendants impeded her efforts to propose an alternative map as well as other bad acts that affected their ability to fulfill their responsibilities as congresspeople, which is sufficient for Article III standing, see dkt. 209,  ¶ 34 (i-x).

Here, the irregularities and intentional abandonment of a traditional process during the session that served as a direct impediment on Intervenor Crockett's ability to fulfill her responsibilities were overtly racial, and the cause and effect of bad faith behavior that directly relates to Congressional Representatives ability to fulfill their responsibilities as congresspeople and eliminates any good faith presumption afforded to the defendants see dkt. 209, ¶ 33 and ¶ 35-54.

All Plaintiff Intervenors are voters in their respective districts and complain in this lawsuit about how redistricting impacted them as voters in their districts.  Thus, Congresspersons and Representative Crockett  have standing as Registered Voters as well as legislators like Senator Powell.

Johnson, Jackson-Lee and Green are members of the United States Congress (Congressional Districts 30, 18 and 9 respectively).  Intervenor Crockett is a member of the Texas House of

---

[3](quoting *Chicago Grand Trunk R. Co.* v. *Wellman*, 143 U.S. 339, 345 (1892))" *Raines v. Byrd*, 521 U.S. 811, 819 (1997). Distinguishing *Raines*, their vote on the Act, "were given full effect. They simply lost that vote#." *Raines v. Byrd*, 521 U.S. 811, 824 (1997).

Representatives.   Intervenors have brought claims that involve their districts, but which are part of greater schemes to engage in a racial gerrymander, dilute the vote of African-American voters and their Latino allies and intentional discrimination in the adoption of C2193 by the State of Texas. Defendants argue that Intervenors lack standing to bring these claims because they reside only in CD9, CD18, and CD30, and because that district will elect the   candidate of choice of the African-American community they have no standing to complain about any discrimination in the map see Def.'s Mot. to Dismiss.  However, *Hays,* a case cited by the defendants themselves*,*  laid out the intricate difficulties when analyzing the context of standing when a "plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria " and how that is sufficient to satisfy standing to challenge the legislature's action.  This also includes challenging an entire map, notwithstanding residents who live outside of the district[4].

A. __Intervenors have met burden of pleading intentional discrimination__

The new plan ensured that Congressional Districts 9, 18 and 30, all minority opportunity districts, would be reduced in the Black Citizen Voting Age population of CD30 which went from 51% to 48%  see dkt. 209, ¶ 28.  African-American voters were moved from Congressional District to Congressional District to ensure white voter dominance in the Metroplex.  Black and Brown voters were moved from CD6 to CD30, and from CD30 to CD32, and from CD5 and CD24 to CD32, in order to accommodate this scheme see dkt. 209,  ¶ 28.  To add insult to Intervenors'

---

[4] *United States v. Hays*, 515 U.S. 737, 744 (1995) ("Demonstrating the individualized harm our standing doctrine requires may not be easy in the racial gerrymandering context, as it will frequently be difficult to discern why a particular citizen was put in one district or another. See *id*., at 644").

injury, the Texas Legislature declined to adopt an amendment that would have cured this retrogression.

Intervenors have met the burden of pleading intentional discrimination. What is clear from Appendix A[5] is that the First Amended Complaint expressly states that Defendants intentionally discriminated in adoption of the current redistricting plan, see dkt. 209 ¶ 2, 26. Paragraphs 23, 26, 27, and 28 allege facts in support of this claim, see dkt. 209 ¶ 23, 26, 27, 28. Facts such as how a full remedy required the approval of leadership, see dkt. 209, ¶ 23, or how Defendants acted to destroy a naturally occurring coalition district ,see dkt. 209, ¶ 25, and that communities were cracked and packed to preserve white power see dkt. 209, ¶ 26. These facts, *inter alia*, more than meet the standard of alleging facts that must be taken as true. Accordingly, Defendants cannot prevail on their motion to dismiss.

The new plan ensured that Congressional Districts 9, 18 and 30, all minority opportunity districts, were subjected to cracking and movement of their voters to dilute minority voting strength, and even reduced the Black Citizen Voting Age population of CD30 from 51% to 48% see dkt. 209, ¶ 28. African-American voters were moved from Congressional District to Congressional District to ensure white voter dominance in the Metroplex and in the Houston and Fort Bend area as well. Black and Brown voters were moved from CD6 to CD30, and from CD30 to CD32, and from CD5 and CD24 to CD32, in order to accommodate this scheme dkt. 209, ¶

---

[5] Intervenors again note that the construe Defendants' submission as a Motion to Dismiss pursuant to 12(b) of the FRCP. Intervenors do not request the Court to treat the submission as a Summary Judgment Motion.

6

28.   To add insult to Intervenors' injury, the Texas Legislature declined to adopt an amendment that would have cured this retrogression.

The history of prior plans is relevant to analysis. *Chen v. City of Houston*, 206 F.3d 502, 509 (5th Cir, 2020).   Texas prior plan in 2011 regarding these same districts were held to be intentionally discriminatory. *Texas v. U. S.*, 887 F.Supp. 2d. 133, 159 (D.D.C. 2012).   In the process of finding intentional discrimination in the plan's enactment, the Court found that the unnecessary surgery then, like now, was probative of intentional discrimination. *Texas*, *supra* at 159-161.   The Court noted too that the Arlington Heights Factors were also probative and revealing.

## Merits

### B.     Intervenors Have Met Burden of Pleading Racial Gerrymander.

Intervenors note that Defendants position that Intervernors lack standing to bring a racial gerrymander claim lacks support in case law. Indeed, "[w]here a plaintiff resides in a racially gerrymandered district, however, the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action." *United States v. Hays*, 515 U.S. 737, 744-45 (1995) (quoting *General Contractors* v. *Jacksonville*, 508 U.S. 656 (1993)). When evaluating evidence of racial gerrymandering, the Court recognizes that "voters can present statewide evidence in order to prove racial gerrymandering in a particular district[6]" because "Districts share borders... and a legislature may pursue a common

---

[6] *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 800 (2017); citing *Alabama, supra,* at −−−−, 135 S.Ct., at 1265 (emphasis deleted).

7

redistricting policy toward multiple districts... and a legislature's race-based decision making may be evident in a particular part of a district[7]." Thus, courts may consider evidence regarding certain portions of a district's lines, including portions that conflict with traditional redistricting principles[8].

The law provides that, a "Plaintiff's burden in a racial gerrymandering case is "to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district."*Miller,*515 U.S., at 916, 115 S.Ct. 2475. Cf. *Easley v. Cromartie,*532 U.S. 234, 258, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) (*Caucus v. Alabama*, 575 U.S. 254, 266-67 (2015).  In this case, race predominated over all other factors including traditional redistricting principles such as maintaining the core of districts, not performing unnecessary surgery on districts, maintaining communities of interest or ensuring that the districts are compast, all as alleged in our amended complaint.  Further, though we don't agree that race was not considered by the mapdrawers, the mere fact that they would suggest not considering race in light of the case law is an affirmative statement admitting that Defendants abandoned their obligations under the Voting Rights Act and that this fatally impacted the constitutionality of the districting scheme.   Intervenors can show, using traceable statewide evidence, that because the vote dilution scheme involves more than one district, and as such, Intervenors should have standing to challenge not only the gerrymandering of

---

[7] 135 S.Ct., at 1265
[8] 135 S.Ct., at 1265

8

their districts, but also the regional gerrymander which it is part of as any remedy would more than likely involve them all.  Furthermore, Congressional Districts 18 and 30 are retrogressed in the adopted plan and they are retrogressed so that area vote dilution and/or a racial gerrymander of each area likely would take place.

Congressional Districts 9, 18 and 30 were all redrawn as part of area schemes to gerrymander districts in favor of white voters, dilute the voting strength of African-American and Latino voters and to protect white incumbents of both political parties.  Simply because voters in part of a scheme may be able to elect the candidate of their choice does not impact their ability to litigate such an illegal scheme nor does it prevent voters residing in other areas from attacking it. What the State is suggesting is that others can raise issues and force the redrawing of CD9, CD18 and CD30, and the voters in CD9, CD18 and CD30 would have no say in the redrawing.  Before this discriminatory plan was  adopted, under the benchmark plan the 9th, 18th, and 30th Congressional Districts were all close to the optimal size of 766,000 persons for districts after the 2020 census. The 9th District in particular was only 3,611 persons above the optimum number of persons for a Texas Congressional District see dkt. 209,  ¶ 2.

Instead of following traditional redistricting principles and maintaining the core of each district, the Texas Legislature made  drastic changes to each of these districts and removed tens of thousands of voters from this optimum-sized district, then added tens of thousands of new voters to the district see dkt. 209,  ¶ 2.  Communities of interest were cracked out of each of those districts in order to benefit districts to be dominated by white voters, and in some instances new districts that were less compact resulted.  Further, the record is clear that Texas did not put the kind of

emphasis on identifying persons in the State for purposes of being counted in the 2021 census as did other States, and as a result it fell just short of  being entitled to 3 additional Congressional districts.  As the growth was almost exclusively minority and was majority Latino, this would have provided even more justification for creating new Latino or minority opportunity districts. These actions, along with several other actions by the defendants, were taken in order to ensure that white voters would be able to control a majority of the voting districts in the area, including those they had previously dominated.

Intervenors note that a racial gerrymandering claim that establishes "that race was improperly used in the drawing of the boundaries of one or more specific electoral districts." *Ala. Legislative Black Caucus v. Alabama* , 575 U.S. 254, 265.  Intervenors aver that the Supreme Court has held that racial gerrymanders can exist even where minorities retain their ability to elect the candidates of their choice. *Bush v. Vera*,  517 U.S. 952.  Indeed this decision considered the very Congressional Districts at issue today. *Id*. at 971-972 for CD30 and 974-976 for CD18.  To survive a 12 (b)(6) motion, Intervenors need only plead that race was improperly used in drawing districting lines.   But this precisely what Intervenors Plaintiffs herein have done. Intervenors specifically allege a racial gerrymander in the amended complaint, see dkt. 209, ¶ 25[9], 26[10], 28[11]. Indeed, Intervenors aver that race predominated over other considerations. *Id.* ¶. Again, FRCP 12(b)(6) requires no more.

---

[9] "Intervenor Crockett introduced an amendment to the retrogression, vote dilution or racial gerrymander but was not successful in achieving passage."

[10] "[T]here was an area racial gerrymander."

[11] "Congressional Districts 18 and 30 are retrogressed in the adopted plan and they are retrogressed so that area vote dilution and/or a racial gerrymander of each area likely would take place."

10

**C.   <u>Intervenors Have Met Burden of Pleading Intentional Vote Dilution.</u>**

As drawn in the congressional plan passed by the Texas Legislature, congressional districts in Harris, Fort Bend, Brazoria, Galveston and other area counties as well as in Dallas, Tarrant, Johnson and neighboring counties dilute the voting strength of African-American and Latino voters, causing an inequality in opportunities for minority voters to elect their preferred representative(s).  Plaintiff Intervenors have alleged sufficient facts to be heard on the issue, because Intervenors can establish standing in their intentional vote dilution claim in that the defendants manipulation of the new congressional plan that cracked out 10 precincts from allied communities of interest that had worked cohesively together, See dkt. 209, ¶ 3, 4, 53. created an inequality in opportunities for minority voters to elect their preferred representative(s) "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group[12].

Because intentional vote dilution claims are infrequently asserted, "[t]he role that § 2 and *Gingles* play in intentional vote dilution claims as opposed to results-only claims is somewhat unsettled." *Harding v. Cnty. of Dallas*, 948 F.3d 302, 312-13 (5th Cir. 2020). To that end, § 2 "on its face is broad enough to cover practices which are not permanent structures of the electoral system but nevertheless operate to dilute or diminish the vote of [minorities[13]]."  However, the decisionmaker need not explicitly spell out its invidious goals—a court may sometimes infer discriminatory intent where an act has predictable discriminatory consequences." (Preliminary Injunction Memorandum citing See id. at 279 n.25; *United States v. Brown*, 561 F.3d 420, 433 (5th

---

[12] Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979).
[13]*See, e.g., Toney v. White*, 488 F.2d 310, 311-12 (5th Cir. 1973)" *U.S. v. Brown*, 561 F.3d 420, 432 (5th Cir. 2009).

11

Cir. 2009).  Therefore, injury claims involving discriminatory intent do not require a challagener to be meticulous as you would be in *effects* cases, but you do need "*some* showing of injury"… to assure that the district court can impose a meaningful remedy." *Garza v. County of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990).

Black and Brown voters and voters who voted with them were moved into Congressional District 7 to strengthen that district on behalf of the white incumbent. Congressional District 7 was near the optimum size for districts in the 2021 round of redistricting, but the map drawers moved nearly a quarter of a million voters from the African-American Opportunity District in Congressional District 9 in order to strengthen Congressional District 7, see dkt. 209, ¶ 31, 66.

This major transfer of voters then required the map drawers to crack out 10 precincts from allied communities of interest that had worked cohesively together in the 18th Congressional District and place them in the 9th.  The facts in this case reaps heavily with the facts in *Garza v. County of Los Angeles,*[14] where the county decided seats to protect a white incumbent in order to preserve incumbency by intentionally cracking or "fragmenting" districts in a discriminatory way. In that case, the discriminatory result was that it created two new seats **to be dominated by white voters, and zero new seats to be dominated by Latino voters or minority voters in coalition with** each other as could have been created.  .

---

[14] Intervenors alleged that the existing boundaries, which had been drawn after the 1980 census, were gerrymandered boundaries that diluted Hispanic voting strength. They sought redistricting in order to create a district with a Hispanic majority for the 1990 Board of Supervisors election in which two board members were to be elected. *Garza v. County of Los Angeles*, 918 F.2d 763, 765 (9th Cir. 1990).

**D.** **Intervenors Have Plead Sufficient Facts to Meet Their Burden of Voter Dilution Under § 2.**

It is well established that Congress' intent behind § 2, was to eliminate all "discriminatory election systems or practices which operate, designedly or otherwise, to minimize or cancel out the voting strength and political effectiveness of minority groups." S. Rep. No. 97–417, p. 28 (1982) (S. Rep.)... and this also extends to every kind of voting or election rule[15].

Here, Intervenors seek to eliminate the discriminatory result that was imposed on them as voters, officials, and also on others similarly situated.  CD29, a Latino opportunity district,  was negatively impacted and lost an important community of interest that was placed in the 9th Congressional District, causing Intervenors' injury to be so interrelated with another individual's rights, that the injured party could raise the rights of the other. *Veasey v. Perry*, 29 F. Supp. 3d 896, 905 (S.D. Tex. 2014) (citing "In *Powers,* a white criminal defendant was permitted to raise the right of an African–American to serve on a jury without being eliminated on a peremptory challenge on the basis of race alone.") Both Districts took on unnecessary new voters see dkt. 209, ¶ 2, 26, 27. Intervenors are not seeking to litigate claims of retrogression alone, but that retrogression is actionable under § 2 when joined with other types of discrimination and is further evidence of intentional discrimination see dkt. 209, ¶ 6, 13, 19 .

**E.** **Retrogression Analysis is Required Under § 2.**

In just two short paragraphs, Defendants assert that retrogression is inapplicable to § 2 claims. For this proposition, Defendants rely, *inter alia,* on *Holder v. Hall*, (512 U.S. 874, 884 (1994)) and *Georgia v. Ashcroft*, (539 U.S. 461, 478 (2003)). To be sure, those cases stand for the

---

[15](quoting Justice Kagan's dissent; Brnovich v. Democratic National Committee, 594 U.S. ___ (2021).

proposition that §2 does not have an anti-retrogression standard. But to read more than this into those cases is logically unsound. This is so because retrogression means, in some way, reducing the ability of minorities to elect the candidates of their choice. *Bush v. Vera*, 517 U.S. 952, 982-983 (1996). It would be passing strange if a State could escape liability for reducing minority opportunity to elect the candidates of their choice without limits. There is surely a constitutional, and frankly statutory, floor beyond which any such retrogression cannot go.

Accordingly, merely noting that §5 retrogression does not apply to §2 claims does not solve the State's problem. Defendants cannot violate the Constitution or Federal voting rights laws and claim that because they previously offered minorities greater opportunities to elect candidates of there choice, they now have an unfettered hand to be discriminatory. The Constitution permits no such harbor for racist redistricting. Retrogression must, therefore, be read in light of prevailing law. Retrogression is legally applicable whenever the violation of minority rights violates current law. In the instant case, Intervenors bring a §2 effects claim, a §2 intentional discrimination claim, a 14th and 15th Amendment racial gerrymander claim. Any of these claims may occur after a period in which the ability of minorities to elect candidates of their choice was greater before the State's new plan was enacted.

The Fourth Circuit has explored this issue in some detail. In reviewing a lower court's determination that retrogression was inapplicable under §2, that Court determined that "Section 2, on its face, requires a broad totality of the circumstances review. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 241 (4th Cir. 2014)(quoting 52 U.S.C. §10301(b)(internal citations omitted)). Clearly, an eye toward past practices is part and parcel of the totality of the

14

circumstances." *Id*. That Court noted that their decision was in accord with the Tenth Circuit

(*Sanchez v. State of Colo.,* 97 F.3d 1303, 1325 (10th Cir.1996)) and with the Sixth Circuit[16].) *Ohio*

*State Conference of the Nat'l Ass'n for the Advancement of Colored People v. Husted*, 768 F.3d 524,

558 (6th Cir. 2014).

      **F.**      **§ 2 Does Confer a Private Right of Action.**

      If the States' complaints can be characterized by saying that there is much more light than

heat, on this claim, there isn't even light. Defendants advance the claim that § 2 of the VRA does

not provide a private right of action. This a bold claim, indeed. It is particularly so given the

veritable mountain of Intervenors who have brought private claims in pursuant to § 2. It might

surprise the State of Texas itself which has been defending § 2 claims almost since the inception of

the VRA in 1965.  The one group whom it will not surprise is Defendants themselves who, as even

they acknowledge (ECF 225), this very Court has decided this very issue in this very case. ECF 58.

Defendants' chutzpah, notwithstanding, Intervenors do not seek to improve upon the Court's

unambiguous pronouncement that this issue is without merit.

---

[16] "The retrogression analysis under § 5 involves comparing voting opportunities enjoyed by minorities under the status quo as compared to voting opportunities minorities would have under the electoral system if the proposed change is implemented. The focus is *solely* on voting opportunities enjoyed by minorities, and whether those opportunities would be reduced under the proposed law. In contrast, under the  § 2 analysis, the focus is whether minorities enjoy less opportunity to vote *as compared to other voters." Ohio State Conference of the Nat'l Ass'n for the Advancement of Colored People v. Husted*, 768 F.3d 524, 558 (6th Cir. 2014).

**V.   Intervenors Have Met Burden of Pleading Intentional Discrimination.**

Intervenors have met the burden of pleading intentional discrimination. What is clear from Appendix A is that the First Amended Complaint expressly states that Defendants intentionally discriminated in adoption of the current redistricting plan, see dkt. 209, ¶ 2, 26. Paragraphs 23, 26, 27, and 28 allege facts in support of this claim, see dkt. 209, ¶ 23, 26, 27, 28. Facts such as how a full remedy required the approval of leadership, see dkt. 209, ¶ 23, or how Defendants acted to destroy a naturally occurring coalition district, see dkt. 209, ¶ 25, and that communities were cracked and packed to preserve white power, see dkt. 209, ¶ 26. These facts, *inter alia*, more than meet the standard of alleging facts that must be taken as true. Accordingly, Defendants cannot prevail on their motion to dismiss.

**VI.   Vote Dilution Burden Has Been Met.**

Intervenors note from the outset that the  factors listed in *Thornburg v. Gingles*, (478 U.S. 30 (1986)) need not be proved in intentional vote dilution claims. In a motion to dismiss posture, that means, viewed in the light most favorable to Intervenors, the Court must determine if the Plaintiff has alleged sufficient facts to make out a claim for intentional vote dilution. These Intervenors demonstrably do. To the extent that this is at all an open question, this Court conclusively determined the answer, at least for the law of this case. In the Preliminary Injunction Opinion (ECF 258 at 23) this Court quoted the plurality in *Bartlett v. Strickland,* (556 U.S. 1, 24 (2009)), for the proposition that intentional action by the State might violate the Constitution even without a showing a violation of the factors articulated by. *Gingles*. And this result is obviously correct when considering that "*Gingles* and its progeny do not articulate general legal

16

principles for intentional discrimination but, instead, offer an interpretation of one section of the VRA." ECF 258 at 22. And any action by the State that lessens the voting power of covered minorities specifically because of their status as covered minorities offends the 14th and 15th Amendments.

It is also clear that Intervenors have alleged sufficient facts to prevail on the *Gingles* factors. *Gingles* requires Intervenors to demonstrate that a district can be drawn where minorities are (1) numerous and compact, (2) vote cohesively, and (3) are systematically outvoted by the surrounding Anglo communities. In the Amended Complaint, Intervenors specifically aver that a reasonably compact district can be created, see dkt. 209, ¶ 48, 49. The complaint also expressly avers that black and brown voters vote cohesively,  see dkt. 209, ¶ 3, that states elections in Texas are racially polarized, see dkt. 209, ¶ 33. Para, and that the performance of 18th Congressional District decreased and became less effective, see dkt. 209, ¶ 3. Finally, the complaint notes that the 30th Congressional District was drawn to fall below Black Citizen Voting Age Population, see dkt. 209, ¶ 25, 26. Moreover, this Court has already found the existence of polarized voting in the Dallas-Fortworth Metroplex. *See* ECF 258., 25. Rule 12(b)(6) requires no more.

Defendants also go to great lengths to excuse the behavior of the Texas Legislature regarding the rushed nature of the redistricting proceedings. But Defendants, again, forget that this is presumably a motion to dismiss pursuant to FRCP 12(b). Consequently, all of Intervenor's factual assertions are taken as true and any inferences drawn therefrom are viewed in light of the Intervenors. All of this is to say, that at least at this stage of the proceedings, Defendant's excuses for its behavior are immaterial.

17

### VII.    Coalition Claims and Standing To Bring Them.

Defendants complain that the Intervenors have no standing to bring a claim regarding Latino citizens, but the 5th Circuit has recognized that African-Americans and Latinos can be joined together to form one group for a Section 2 vote dilution analysis: There is nothing in the law that prevents the Intervenors from identifying the protected aggrieved minority to include both Blacks and Hispanics. Section 1973(a) protects the right to vote of both racial and language minorities. *See* 42 U.S.C. §§ 1973(a), 1973b(f)(2). Congress itself recognized "that voting discrimination against citizens of language minorities is pervasive and national in scope," 42 U.S.C. § 1973b(f)(1), and similar discrimination against Blacks is well documented. Voters in the benchmark district 30 could have been used to create a coalition or Latino opportunity district.

If, together, they are of such numbers residing geographically so as to constitute a majority in a single member district, they cross the *Gingles* threshold as potentially disadvantaged voters. To prove the fact of their electoral dilution, Intervenors must prove that the minorities so identified actually vote together and are impeded in their ability to elect their own candidates by all of the circumstances, including especially the bloc voting of a white majority that usually defeats the candidate of the minority. *Campos v. City of Baytown*, 830 F.2d 1240, 1244 (5th Cir. 1988).  This is plead in our Amended Complaint, and notably the Gingles requirements could be met both in a properly configured CD9, 18 or 30 while a coalition district or Latino opportunity district could be created.

18

**VIII.**   **State of Texas Immunity.**

The defendants disagree with the 5th circuit's ruling on state immunity. see MTD.  The 5th

circuit was correct in its decision on immunity being waived by Section 2  as declared in

*OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017).

### CONCLUSION

For the foregoing reasons, Plaintiff-Intervenors respectfully requests that this Court deny

defendants motion to dismiss the complaint. And to the extent that the Court finds Intervenors

First Amended Complaint deficient, Intervenors respectfully request the opportunity to replead.

Respectfully submitted,

By: /s/ Gary Bledsoe _____
   Gary L. Bledsoe
    State Bar No. 02476500
    Brooklynn Morris
    State Bar No. 24104428
    The Bledsoe Law Firm, PLLC
    6633 Highway 290 East #208
    Austin, Texas 78723-1157
    Telephone: 512-322-9992
    Fax: 512-322-0840
    gbledsoe@thebledsoelawfirm.com
    Garybledsoe@sbcglobal.net
    bmorris@thebledsoelawfirm.com

    Nicholas Spencer
    State Bar No. 24102529
    Spencer & Associates, PLLC.
    9100 Southwest Freeway, Suite 122
    Houston, TX 77074
    nas@naslegal.com

19

Attorneys for Plaintiff-Intervenors Eddie Bernice
Johnson, Sheila Jackson-Lee, Alexander Green
and Jasmine Crockett

## CERTIFICATE OF SERVICE

I certify that on May 12, 2022, a true and correct copy of Plaintiff-Intervenors' Response to the Defendants Motion to Dismiss was delivered via the Federal Court ECF system.

/s/Gary L. Bledsoe_____
Gary L. Bledsoe

20