# Appendix A.

| Facts | Citation | Claim |
|---|---|---|
| The plan is also heavily infected with an intent to discriminate, on the basis of race and ethnicity… The drastic changes made by the Texas Legislature removed tens of thousands of voters from this optimum-sized district, then added tens of thousands of new voters to the district. **These actions were taken in order to ensure that white voters would be able to control a majority of the voting districts in the area.** | Para. 2 | VRA, 14th, 15th. |
| Of the 10 Congressional Districts in the Houston area, white voters were drawn to control 7 of them, even though whites are only 33.6 percent of the area population. | Para. 3 | VRA, 14th, 15th. |
| Instead of being drawn a new Congressional District that they could control, Latino voters were packed into existing African-American and Latino opportunity districts, or cracked into white- or Anglo-dominated districts. | Para. 3 | VRA, 14th, 15th. |
| **Latinos and African-Americans were sliced and diced to make the map of the region achieve its discriminatory purpose and objective.** | Para. 3 | VRA, 14th, 15th. |

| | | |
|---|---|---|
| Congressional District 9, though in need of essentially no surgery, received 12 new precincts from Fort Bend County;<br>13 new precincts from Brazoria County; 10 new precincts from the 18th Congressional District in Harris County; and lost 11 precincts in Fort Bend County. Precincts in the Hobby Airport area were removed from Congressional District 29 and moved into Congressional District 9. As a result, the already optimal-sized district became a completely new district.<br>Performance figures show that the African-American voter percentages and the related performance of the 18th decreased. Thus,... it retrogressed in terms of effectiveness. | Para. 3 | VRA, 14th, 15th. |
| The 30th Congressional district lost voters to the 6th Congressional District. The minority voters who were lost from that district were placed into the 6th in order to provide population to the 6th Congressional District under circumstances where the **voters who were cracked out of the 30th would have no ability to elect the candidate of their choice.** | Para. 4 | VRA, 14th, 15th. |

| | | |
|---|---|---|
| Further, the **30th was reduced from an above 50 percent Black Citizen Voting Age Majority District to a below 50 percent Black Citizen Voting Age Majority District.** | Para. 4 | VRA, 14th, 15th. |
| **Besides being drawn to ensure that white voters would continue and dominate the majority of area districts in the Harris and Fort Bend Area as well as the Dallas Fort Worth Metroplex Area,** the districts were **designed to prevent the creation of either a new Latino opportunity district or a new Minority Coalition District with a plurality of Latino population from being drawn in either area.** | Para. 4 | VRA, 14th, 15th. |
| In the 6th Congressional District, a naturally occurring minority district was taking shape and growing. **To stymie that rise in minority voters, the map drawers cut out voters from the 6th and placed them in the 30th Congressional District**, thereby requiring displacement of existing voters in the nearly optimum sized district. | Para. 5 | VRA, 14th, 15th. |
| Furthermore, absent corrective action from this Court, this new redistricting plan will continue to dilute the voting strength of Texas' African American and Latino citizens and deny them | Para. 6 | VRA, 14th, 15th. |

| | | |
|---|---|---|
| fair representation in the United States Congress. | | |
| The individual Congresspersons are all elected with substantial support from the African-American and Latino voters in the districts which they represent. | Para. 17 | VRA, 14th, 15th. |
| Proportionally, voters of color in Texas are underrepresented in the U.S. House of Representatives in the new map, with white voters being able to control at least 24 of the 38 seats, but more than likely, at least 26 seats. The drafting scheme involved: (a) packing minority voters into districts that were already minority opportunity districts, and therefore, needed no additional minority voters; (b) moving minority voters into districts where they would be outvoted by white voters; and (c) a new third feature that involves placing minority voters in districts where they would be outvoted by progressive white voters. | Para. 20. | VRA, 14th, 15th. |
| The Senate, thereafter, adopted a map that was even more retrogressive as to the 9th and 18th than is the current proposed map. | Para. 21. | VRA, 14th, 15th. |

| | | |
|---|---|---|
| In the hastily called House Committee hearing on redistricting, surprisingly called 48 hours before the scheduled hearing by Chairman Hunter who may have been responding to pressure from anti-minority forces, and called on the same day the hearing on the State House Map was to take place without reasonable notice to members of the Black Caucus and even members of the House Redistricting Committee. | Para. 22. | VRA, 14th, 15th. |
| As were many of the members of the Legislative Black Caucus, Congresspersons Jackson-Lee and Green were surprised by the short notice of a hearing which came on the morning the House was scheduled to debate the new proposed State House Map. | Para. 22. | VRA, 14th, 15th. |
| The African-American Vice-Chair of the Redistricting Committee was also unaware that the hearing notice was to be sent out. | Para. 22. | VRA, 14th, 15th. |
| A full remedy as provided for in C2131 or other maps available to the Legislature was not supported by the Texas Legislative Leadership and this was necessary for it to be favorably considered. Support for such a full remedy would impair or defeat the chances of securing the desired white voter domination in the area. | Para. 23. | VRA, 14th, 15th. |

| | | |
|---|---|---|
| Congressional District 30 was unnecessarily reduced below a Citizen Voting Age population of 50 percent and voters were cracked out of the district to be placed in areas where their votes will essentially not count. Voters from the 6th Congressional district were added to the 30th Congressional District to prevent a naturally occurring minority coalition district and ensure continued dominance of white voters in the 6th. Movement of these voters required displacement of other voters already with Congressional District 30, so a number of African-American voters were cracked out of the district to make way for the new voters.<br>Congressional District 30 was near the optimal size so such surgery was unnecessary. Intervenor Crockett introduced an amendment to the retrogression, vote dilution or racial gerrymander but was not successful in achieving passage. | Para. 25. | VRA, 14th, 15th. |

| | | |
|---|---|---|
| The population increases in both the Harris County and Fort Bend Area as well as the Dallas Fort Worth Metroplex Area each justified the creation of new Congressional minority opportunity districts in each region. The 2021 plan did not create any additional minority opportunity or other Congressional districts in the Dallas Fort Worth Metroplex region, but it did create a new seat in the Harris County/Ford Bend County area. The new Harris County/For Bend seat will be dominated by white voters. A seat could have been drawn in this area that was either majority Hispanic CVAP or majority BHCVAP. | Para. 25. | VRA, 14th, 15th. |
| Congressional Districts 9, 18 and 30 were drawn in a way that causes retrogression of the minority voter strength and further undermines the ability of African-Americans and Latinos to effectively participate in the political process in those areas, elect the candidates of their choice, and intentionally discriminates against voters in those districts. | Para. 26. | VRA, 14th, 15th. |
| Communities of interest or neighborhoods were cracked or split and minorities were placed in districts for the purposes of enhancing white voter power. | Para. 26. | VRA, 14th, 15th. |

| | | |
|---|---|---|
| In the Houston area, there was an area racial gerrymander where black voters were moved between different Congressional Districts so that white voters would dominate and to avoid creating naturally occurring districts that would empower minority voters or districts that are required under § 2 of the Voting Rights Act. | Para. 26. | VRA, 14th, 15th. |
| Black and Brown voters who represented political problems in Congressional Districts such as 14, 22 and 36 were moved from those districts so that white voters would dominate. | Para. 27. | VRA, 14th, 15th. |
| Congressional Districts 18 and 30 are retrogressed in the adopted plan and they are retrogressed so that area vote dilution and/or a racial gerrymander of each area likely would take place. Both took on unnecessary new voters. Congressional Districts 9, 18 and 30 are all minority opportunity districts. The new plan reduced the Black Citizen Voting Age population of the 30th from 51 percent to 48 percent, and the Texas Legislature declined to adopt an amendment that would have cured this retrogression. | Para. 28. | VRA, 14th, 15th. |

| | | |
|---|---|---|
| African-American voters were moved from Congressional District to Congressional District to ensure white voter dominance in the Metroplex. Black and Brown voters were moved from the 6th to the 30th and from the 30th to the 32nd and from the 5th and 24th to the 32nd in order to accommodate this scheme. Congressional District 24 had become a majority non-white district but minority residents and voters were purged from the district so that it is now safely a predominately white district. | | |
| Black and Brown voters and voters who voted with them were moved into Congressional District 7 to strengthen that district on behalf of the white incumbent. This major transfer of voters then required the map drawers to crack out 10 precincts from allied communities of interest that had worked together in the 18th Congressional District and place them in the 9th. | Para. 30. | VRA, 14th, 15th. |

| | | |
|---|---|---|
| The Legislature failed to draw minority coalition districts between Black and Brown voters, who vote cohesively in areas where they are likely to constitute a majority of the citizen voting age population, but where white voters have voted as a block statewide (such as in the Dallas/Fort Worth Metroplex and in the Harris/Fort Bend County Area). That is another way of denying Black and Brown voters an election in which they decide the candidates they prefer and choose.<br>When they do get to choose, Black and Brown voters have voted cohesively in recent national, state and presidential elections, among others. Black and Brown voters have voted cohesively in the recent United States Senate race in 2018, the Lieutenant Governor's race in 2018 and the Presidential campaigns in 2016 and 2020, among many others. | Para. 31. | VRA, 14th, 15th. |
| The 2021 Congressional plans unnecessarily split communities of interest from the 9th, 18th, and 30th Congressional Districts; removed important economic engines from the 9th and 18th; packed Latino voters unnecessarily into the 18th and 9th Congressional Districts, and **were purposefully designed to undermine or frustrate effective and long-** | Para. 33. | VRA, 14th, 15th. |

| | | |
|---|---|---|
| **term voter coalitions in the area as well as effective minority voter participation.** | | |

| | | |
|---|---|---|
| i. The refusal to permit participation by the Chairperson of the Legislative Black Caucus, Nicole Collier, in Election Committee Hearings;<br>ii. the refusal of the Senate to put an African-American lawmaker on any election or redistricting conference committee;<br>iii. the refusal of the Senate to put a Latino lawmaker on the Congressional redistricting bill conference committee;<br>iv. the refusal of the Senate to hear virtual testimony on the redistricting bill even though the minority community in Texas was hugely impacted by the coronavirus pandemic;<br>v. instead of drafting its own Congressional map, the House decided to use the Senate adopted map as a base map for its work, even though House leadership was aware of the discrimination that existed in the Senate plan;<br>vi. instituting a rule that required before you could present an amendment to the proposed map for consideration in the Senate Committee, you must receive the consent of all Congresspersons who would be impacted;<br>vii. the refusal to receive any map for consideration in the Senate Redistricting Committee unless it was plugged into the proposed | | VRA, 14th, 15th. |

| statewide map drawn by the white Congresspersons;<br>viii. the refusal for transparency and appropriate notification. For example, on the day that the House Redistricting Map for the Texas House of Representatives was to be considered, the Chairman of the House Redistricting Committee made a surprise announcement that the House would have a hearing on a Congressional Plan in 48 hours and that the Senate Map would provide the base map for this process;<br>ix. the implementation of gate-keeping rules to prevent Black and Brown lawmakers from amending discriminatory or racial gerrymandering tactics, One example is that lawyers were brought in for the House debate on the Congressional bill, so that any amendments could no longer simply be authorized by the Redistricting Chair or the Speaker. This group of lawyers for the conservative white leadership were required to approve potential amendments before they were accepted for consideration on the floor; and<br>x. During the House debate on the Congressional Map Intervenor Applicant Crockett and others were required to deliver proposed Amendments to designated Representatives | | |
|---|---|---|

| | | |
|---|---|---|
| who would take them to a room in which they could not enter for the proposed Amendment to be reviewed by white lawyers before it could be offered. | | |