# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | § § § | |
| *Plaintiffs,* | § § | Case No. 3:21-cv-00259 |
| v. | § § | [Lead Case] |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § § | |
| ROY CHARLES BROOKS, *et al.* | § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Case No. 1:21-cv-00988 |
| | § | [Consolidated Case] |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § | |

## DEFENDANTS' MOTION TO DISMISS
## THE BROOKS PLAINTIFFS' FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

Introduction ........................................................................................................................................... 1

Standard ................................................................................................................................................. 1

Argument ............................................................................................................................................... 1

I.      Plaintiffs have not plausibly alleged a Section 2 discriminatory-effects claim regarding any district ................................................................................................................................ 3

        A.   Plaintiffs do not plausibly allege the size and compactness of districts where black and Hispanic voters could constitute a majority. ........................................................... 3

        B.   Plaintiffs do not plausibly allege that black and Hispanic voters are politically cohesive in any district other than SD10. ................................................................. 5

        C.   Plaintiffs do not plausibly allege Anglo bloc voting in any district other than SD10. ................................................................................................................................ 7

II.     Plaintiffs do not plausibly allege facts stating a claim of intentional discrimination. ................. 8

III.    Plaintiffs do not plausibly allege standing for several claims. ....................................................... 11

IV.    Section 2 does not provide Plaintiffs an implied private cause of action. ................................ 13

Conclusion ........................................................................................................................................... 14

Certificate of Service ............................................................................................................................ 15

**INTRODUCTION**

The Brooks Plaintiffs' First Amended Complaint, ECF 240, is an attempt at a second chance to bring valid claims. Their original Complaint was limited to a single district—SD10. And Plaintiffs presented their best case in their motion for a preliminary injunction—on the "two overlapping theories [that] [t]he legislature engaged in intentional dilution of minority voting power, and it engaged in racial gerrymandering." ECF 258 at 2. But the Court found that it was not likely to succeed on the merits. *See generally id.* So Plaintiffs now add challenges to Congressional Districts and House Districts, and a handful of new Plaintiffs. The Court should dismiss their First Amended Complaint for failure to state a claim and lack of subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1), 12(b)(6).

**STANDARD**

A plaintiff must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**ARGUMENT**

Plaintiffs were required to make factual allegations for each of the *Gingles* factors for every district they are challenging. Instead, they merely repeat the element for each factor. These are legal conclusions, not factual assertions, and are therefore not entitled to be accepted as true. *See Twombly*, 550 U.S. at 556 (courts "are not bound to accept as true a legal conclusion couched as a factual allegation.") (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

1

Plaintiffs have not plausibly alleged a Section 2 discriminatory-effects violation. Section 2 of the Voting Rights Act prohibits a "standard, practice, or procedure" from being "imposed or applied . . . in a manner which results in a denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a). To establish a violation, a plaintiff must show that:

> [T]he political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 10301(b). A court can consider "[t]he extent to which members of a protected class have been elected to office in the State," but "nothing in [Section 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.*

Under Supreme Court precedent interpreting Section 2, plaintiffs must establish three "necessary preconditions":

> (1) The minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district;
>
> (2) The minority group must be able to show that it is politically cohesive; and
>
> (3) The minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986); *see also Growe v. Emison*, 507 U.S. 25, 39–41 (1993) (explaining that the "*Gingles* preconditions" are required in "a § 2 dilution challenge to a single-member districting scheme").

The *Gingles* preconditions are a "bright-line test." *Valdespino v. Alamo Heights ISD*, 168 F.3d 848, 8852 (5th Cir. 1999); *accord Benavidez v. Irving ISD*, 690 F. Supp. 2d 451, 456 (N.D. Tex. 2010). "Failure to establish any one of those threshold requirements is fatal." *Harding v. Dallas County*, 948 F.3d 302, 308 (5th Cir. 2020) (quotation omitted). Meeting the *Gingles* test is necessary but not sufficient to prevail. Yet here, Plaintiffs fail to allege facts that would meet any of the *Gingles* preconditions.

2

**I.      Plaintiffs have not plausibly alleged a Section 2 discriminatory-effects claim regarding any district.**

**A.      Plaintiffs do not plausibly allege the size and compactness of districts where black and Hispanic voters could constitute a majority.**

Plaintiffs bear the burden of plausibly alleging that the population of minority voters are "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. Such an allegation is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Growe*, 507 U.S. at 40.

Plaintiffs fail to allege any geographic specifics that would permit any analysis of the plausibility of a claim that the populations of Hispanic or black voters are sufficiently large and geographically compact to constitute a majority within a district. Plaintiffs fail to identify the "relevant geographic area," *Bartlett v. Strickland*, 556 U.S. 1, 13, 18 (2009) (plurality op.), where these voters constitute a majority of the citizen voting-age population.

For example, the First Amended Complaint generally alleges that "Latino voters in the Houston area are sufficiently numerous and geographically compact to constitute a majority in an additional single-member congressional district." ECF 240 ¶ 231; *see also id.* at ¶ 228 (same for Dallas/ Fort Worth area). But Plaintiffs fail to specify where or how an additional or reconfigured districts could be drawn. For instance, regarding the Houston area, they plead no facts on the location of any compact Hispanic populations, and how an additional district could be drawn with a Hispanic majority; they offer only a recitation of the *Gingles* prong. *See* ECF 240 ¶ 128 ("An additional district in which a geographically compact Latino population forms the majority of eligible voters can be drawn in the Houston area, without eliminating any districts in the area in which Black and Latino voters already have the opportunity to elect their candidates of choice.").

Plaintiffs make the same conclusory allegation regarding a Congressional District in the Dallas/Fort Worth area. *See* ECF 240 ¶¶ 135, 228, 235. But leaving Defendants to guess how the map

3

should be altered is not enough. This is a mere "label and conclusion[,] and a formulaic recitation of the elements of the cause of action [that] will not do." *Twombly*, 550 U.S. at 555.

Regarding SD 10, Plaintiffs also assert that "53% of [Tarrant County's] voting-age population is non-Anglo," making it a "majority-minority county" that under the current Senate District Map "includes *zero* districts in which Tarrant County's minority voters have any opportunity to elect their candidate of choice." ECF 240 ¶ 4. Plaintiffs make similar allegations regarding the Congressional Districts in Tarrant County; ECF 240 ¶ 26 (Plaintiff Spell's "voting strength is diluted in violation of Section 2 of the Voting Rights Act by the cracking of Black and Latino voters in Tarrant County in a manner that permits white bloc voting to prevent candidates of choice of Black and Latino voters from being elected"); *see also id.* ("Alternative district configurations are possible in which Black and Latino voters, who vote cohesively, would form the majority of eligible voters in a state senate and congressional district in which they could elect their candidates of choice").

But this Court has already ruled that CVAP, not VAP, is the proper metric for evaluating populations under Section 2. ECF 258 at 30-31. And "this Court f[ound] that SD 10 was not majority-minority at the time of redistricting when judged by the relevant metric." *Id.* at 31. Combined with their failure to specify what areas in the Tarrant County area could be drawn together to form a majority-minority district, Plaintiffs therefore fail to allege facts that allow their claims regarding SD 10 (and regarding the challenge in Count 6 to Congressional Districts in the Dallas/Fort Worth area) to satisfy the first *Gingles* prong.

The same holds true for Plaintiffs' claims regarding House Districts in Bell County and HD 118 in Bexar County. Though they claim that "no changes were needed to balance HD 55's population in the benchmark plan" and "only [minor] changes" for HD 54, ECF 240 ¶ 190, and that "changes to [benchmark] HD 118 were not necessary," *id.* at ¶ 156, Plaintiffs plead themselves out of satisfying

4

this *Gingles* factor by pointing to the lack of a majority-minority coalition's ability to elect their candidates of choice in the benchmark districts that they deem needed no (or little) change. *See id.* at ¶ 197 (spinning losses of Democrat candidates in Bell County under previous maps as evidence that the purported coalition was "on the cusp" of victory); *id.* at ¶¶ 169–170 (noting electoral victories in benchmark HD 118 by candidate "who was not the Latino candidate of choice").

### B. Plaintiffs do not plausibly allege that black and Hispanic voters are politically cohesive in any district other than SD10.

Even if Plaintiffs could satisfy the first *Gingles* precondition, they would still fail the second: "[T]he minority group must be able to show that it is politically cohesive." 478 U.S. at 51. Plaintiffs do not allege any facts to establish this requirement.

When this Court denied Defendants' motion to dismiss the claims regarding SD 10, it reasoned that political cohesion had been adequately alleged because "the [original] complaint does list the results of several recent elections in which, it says, minority-preferred candidates have succeeded [which] plausibly indicate that SD 10's blacks and Hispanics vote cohesively for Democratic candidates." ECF 144 at 4.

But the First Amended Complaint does not replicate this with regard to the challenged House and Congressional Districts—no results of elections within the relevant areas are cited. Instead, there are only conclusory recitations of the second *Gingles* element. *See, e.g.,* ECF 240 ¶ 126 ("Black and Latino voters in the Dallas/Fort Worth area are politically cohesive"); *see also id.* (referring to "recent general and primary elections [that] illustrate the strong cohesion between the area's Black and Hispanic voters," but without specification); *id.* at ¶ 206 ("Black and Latino voters in Bell County vote cohesively together to elect their preferred candidates of choice."); *id.* at ¶ 175 ("Latino voters in HD 118 under the benchmark plan and Plan H2316 vote cohesively."); *id.* at ¶ 129 (alleging that "Black and Latino voters strongly favor[] Democratic candidates" in "the Dallas/Fort Worth and Houston areas"); *id.* at ¶ 232 ("Latino voters in the Houston area are politically cohesive."). These are nothing

5

more than "formulaic recitation[s]" of the second *Gingles* element. *Twombly*, 550 U.S. at 555. Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Plaintiffs cannot satisfy their pleading burden by broadly referring to unspecified "recent general and primary elections," ECF 240 ¶ 126, or by making allegations that "Black and Latino voters were on the cusp of electing their preferred candidates in the benchmark configuration of HD 54" while only noting the races and parties of the candidates without explaining which racial or ethnic groups favored which candidate. *Id.* at 197.[1] That is especially true in light of the "obvious alternative explanation" for any similar voting patterns: partisanship. *Twombly*, 550 U.S. at 567. Indeed, it is Plaintiffs' burden to disprove "that partisan affiliation, not race, best explains" any alleged bloc voting. *LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc). By neglecting to even mention partisanship as an explanation, much less address the extent to which partisanship accounts for any similar voting behavior, Plaintiffs have failed to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

Plaintiffs' allegations would not suffice in any Section 2 case, but they are particularly deficient here because Plaintiffs propose coalition districts. When the Supreme Court "[a]ssum[ed] (without deciding) that it was permissible for [a] District Court to combine distinct ethnic and language minority groups for purposes of assessing compliance with § 2," it found that there was "quite obviously a higher-than-usual need for the second of the *Gingles* showings." *Growe*, 507 U.S. at 41. Indeed, "when dilution of the power of such an agglomerated political bloc is the basis for an alleged violation, proof of minority political cohesion is all the more essential." *Id.* Accordingly, even after the Fifth Circuit assumed that coalition districts could satisfy the first *Gingles* precondition, that court did not hesitate

---

[1]   Plaintiffs cite no election results in the Houston area.

to dismiss cases proposing coalition districts based on a plaintiff's failure to meet the second *Gingles* precondition. *See, e.g.*, *Rollins v. Fort Bend Indep. Sch. Dist.*, 89 F.3d 1205, 1216 n.21 (5th Cir. 1996) (affirming dismissal where statistical evidence did not establish cohesion and "[n]o concrete, reliable, or credible evidence was presented at trial that Hispanic and African-American communities work together to accomplish common goals"); *Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989) (affirming dismissal due to "lack of statistical evidence of inter-minority political cohesion"). Because Plaintiffs do not satisfy this "higher-than-usual need" to allege facts to support the second *Gingles* prong, their claims must be dismissed.

**C. Plaintiffs do not plausibly allege Anglo bloc voting in any district other than SD10.**

In addition, Plaintiffs do not allege facts supporting the final *Gingles* precondition for their claims regarding districts other than SD 10, namely, "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51 (citation omitted). Satisfying this requirement is a "bright-line test," *Valdespino*, 168 F.3d at 852, and Plaintiffs' failure to satisfy it "is fatal." *Harding*, 948 F.3d at 308 (quotation omitted).

The First Amended Complaint makes no factual allegations regarding Anglo bloc voting that enable it to defeat a Hispanic–preferred candidate in any particular district. The allegations on this factor do not constitute factual allegations of Anglo bloc voting but merely restate the third *Gingles* factor. *See, e.g.,* ECF 240 ¶ 16 (alleging Plaintiff Minor's "voting strength is diluted . . . by the cracking of Black and Latino voters in Bell County in a manner that permits white bloc voting."); *id.* at ¶ 207 ("Anglo voters in Bell County usually vote as a bloc to defeat the minority's preferred candidates of choice."); *id.* at ¶ 233 ("Anglo voters in the Houston area, and in Plan C2193, vote sufficiently as a bloc to usually defeat the candidates of choice of the Latino voters."). Each such allegation is a mere "label and conclusion[,] and a formulaic recitation of the elements of the cause of action [that] will not do." *Twombly*, 550 U.S. at 555. Such "mere conclusory statements do not suffice." *Iqbal*, 556 U.S. at

7

678 (cleaned up). Unlike the situation with SD 10—where this Court found adequate allegations supporting this prong because of the inclusion of district-specific election results, ECF 144 at 5 (citing the original Complaint in *Brooks v. Abbott*, No. 1:21-cv-991, ECF 1 at 9–14 (W.D. Tex. Nov. 3, 2021))—Plaintiffs allege no recent election results that would allow any inference of Anglo bloc voting in any of the other challenged districts. *See Gingles*, 478 U.S. at 57 (noting that longtime voting patterns are highly probative of racial polarization).

Plaintiffs' challenge to HD 118 is particularly inadequate. *See* ECF 240 ¶ 39. Anglo voters are only 35.5% of HD 118's voting-age citizens, while Hispanics constitute 56.4%.[2] Plaintiffs include zero factual allegations that could plausibly support that "Anglo voters will vote as a bloc that will enable them to usually defeat Latino voters' preferred candidates," *id.* at ¶ 176, when Anglo voters are such a small minority in HD 118.[3]

**II.     Plaintiffs do not plausibly allege facts stating a claim of intentional discrimination.**

Plaintiffs also have not plausibly alleged their intentional-discrimination claims. *See* ECF 240 at Counts 1–4, 8–10. Plaintiffs bring intentional-vote-dilution claims under Section 2 and the Fourteenth and Fifteenth Amendments, as well as a racial-gerrymandering claim relating to SD 10. Although those two categories of claims are "analytically distinct," *Shaw v. Reno*, 509 U.S. 630, 652 (1993), both require some level of discriminatory intent; this Court has recently reiterated this in denying Plaintiffs' motion for preliminary injunction. ECF 258 at 21. Specifically, intentional-vote-dilution claims must allege that the State used redistricting "as a purposeful device" that was intended "to

---

[2]   *See* Plan Packet H2316 at 36 of 63, https://data.capitol.texas.gov/dataset/71af633c-21bf-42cf-ad48-4fe95593a897/resource/e8a63cb9-001b-4b1f-a7f8-9106cce80706/download/planh2316_map_report_package.pdf.

[3]   This is even stranger when one considers Plaintiffs' simultaneous allegation that a district with a Hispanic CVAP of 62.2% is unlawfully "packed" with too many Hispanic voters. ECF 240 ¶ 127 (claiming that Texas "pack[ed] Latino voters in CD29, which has a Latino CVAP of 62.23%"; *see* Plan Packet C2193 at 16 of 48 (showing CD 29 to have 62.2% HCVAP), https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/54155a32-537f-4425-a951-923457c5ffce/download/planc2193_map_report_package.pdf. Apparently, the only lawful districts would be somewhere in the zone between 56.4% and 62.2% HCVAP.

minimize or cancel out the voting potential of racial or ethnic minorities." *Miller v. Johnson*, 515 U.S. 900, 911 (1995). Racial-gerrymandering claims allege that race was the "predominant consideration in deciding to place a significant number of voters within or without a particular district." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 260 (2015). Plaintiffs have failed to plausibly allege discriminatory intent under either standard.

This Court has explained that *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), provides the relevant framework for ascertaining discriminatory intent, *see* ECF 144 at 6–7; ECF 258 at 25–44. But Plaintiffs' allegations do not support a finding of discriminatory intent under that framework.

First, unlike in that case—which involved a local government—the claim here involves a state legislature and its task of redistricting, where "the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). Indeed, "the Supreme Court has long cautioned against the quick attribution of improper motives, which would interfere with the legislature's rightful independence and ability to function." *Fusilier v. Landry*, 963 F.3d 447, 464 (5th Cir. 2020). It is therefore Plaintiffs' "burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). The required intent is not mere "volition" or "awareness of consequences." *Pers. Adm'r. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). It requires that the Legislature have passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* Thus, "showing that a redistricting plan intentionally discriminates is not ordinarily an easy task." *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000).

Second, *Arlington Heights* does not allow a free-wheeling use of disparate impact to show discriminatory intent. The language from that case should be examined in context:

> Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action whether it "bears more heavily on one

9

> race than another," *Washington v. Davis*, [426 U.S. 229, (1976)] may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. . . . The evidentiary inquiry is then relatively easy. But such cases are rare. Absent a pattern as stark as that in *Gomillion* [*v. Lightfoot*, 364 U.S. 339 (1960)] or *Yick Wo* [*v. Hopkins*, 118 U.S. 356 (1886)], impact alone is not determinative, and the Court must look to other evidence.

*Arlington Heights*, 429 U.S. at 266. Plaintiffs' allegations do not evidence such a "rare" case or "pattern as stark" as the two cases cited. *Gomillion* involved redistricting where "the boundaries of the City of Tuskegee [went]. . . from a square to an uncouth twenty-eight-sided figure." *Gomillion*, 364 U.S at 340. And *Yick Wo* involved a situation where all 200 Chinese laundry operators were denied the right to operate, while all 80 non-Chinese operators were granted the right under the same conditions. *Yick Wo*, 118 U.S. at 374.

This Court denied Defendants' motion to dismiss the original complaint's intentional-discrimination claims relating to SD 10 because of the allegations that "Texas legislators were aware that a previous redrawing of SD 10 along similar lines had been found to be intentionally discriminatory, that the legislature rushed its normal hearings process, and that the senator most responsible for the redistricting [Sen. Huffman] gave unconvincing reasons for her decisions." ECF 144 at 6; *see also id.* (stating "Plaintiffs may point to recent history, departures from normal procedure, and legislative history to infer racially discriminatory intent.").

But there are no allegations on any of these factors regarding districts other than SD 10—no allegations of legislators being aware of any previous findings of discrimination relating to any of the challenged districts; no similar allegations regarding the process for considering maps for Congressional Districts or House Districts; and no allegations of hidden rationales such as that for Sen. Huffman regarding SD 10.

Thus, Plaintiffs offer only naked assertions that the Texas Legislature acted with discriminatory intent. *See, e.g.*, ECF 240 at 179 ("[T]he changes made to HD 118 were the product of intentional

10

racial discrimination."); *id.* ¶ 209 ("[T]he changes made to the Bell County districts were the product of intentional racial discrimination."). But these "amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Iqbal*, 556 U.S. at 681. "As such, the allegations are conclusory and not entitled to be assumed true," even at the pleading stage. *Id.*

### III.     Plaintiffs do not plausibly allege standing for several claims.

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). At the pleading stage, Plaintiffs must "clearly . . . allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016) (quotation omitted). These elements are: (1) an actual or imminent, concrete and particularized injury-in-fact; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Courts analyze standing "on a claim-by-claim basis." *Hotze v. Hudspeth*, 16 F.4th 1121, 1125 (5th Cir. 2021); *accord In re Gee*, 941 F.3d 153, 170 (5th Cir. 2019) (per curiam). As this Court has previously held, Plaintiff Powell lacks standing to bring a discriminatory-results claim. ECF 119 at 4–5. She continues to lack standing for Counts 5, 6, & 7 in the First Amended Complaint on this basis. This Court also held that Powell lacked standing for her Fifteenth Amendment claim because she did not allege an abridgment of her right to vote, ECF 119 at 5; this continues to apply to Count 3 in the First Amended Complaint.

To the extent Plaintiffs allege that SD10 was the subject of a racial gerrymander in Count 4 of the First Amended Complaint, *see* ECF 240 ¶¶ 217–220, they do not allege that they were personally affected; they do not allege that they "were put in one district or another" because of their race. *Hays*, 515 U.S. at 744. That means they have not plausibly alleged an injury in fact. "[A]ny inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference." *Id.* at 745. Without a plausible factual allegation that

11

Plaintiffs were personally subjected to a racial classification, they are "asserting only a generalized grievance." *Id.*

Where, as here, "plaintiffs' alleged harm is the dilution of their votes, that injury is district specific." *Gill*, 138 S. Ct. at 1930. Because any injury to a plaintiff "results from the boundaries of the particular district in which he resides," any remedy "lies in the revision of the boundaries of the individual's own district." *Id.* This is in keeping with Supreme Court precedent restricting standing to bring related redistricting claims. In a "racial gerrymandering" case, for example, a voter does not have Article III standing to challenge a map "in its entirety." *United States v. Hays*, 515 U.S. 737, 746 (1995). Establishing "individualized harm" requires showing that the "plaintiff resides in a racially gerrymandered district." *Id.* at 744–45. "On the other hand, where a plaintiff does not live in such a district, he or she does not" have standing, unless there is some other basis for concluding "that the plaintiff has personally been subjected to a racial classification." *Id.* at 745; *see also Sinkfield v. Kelley*, 531 U.S. 28, 30 (2000) (per curiam). For this reason, a "racial gerrymandering claim" proceeds "district-by-district," and not "as an undifferentiated 'whole.'" *Ala. Legis. Black Caucus*, 575 U.S. at 262; *accord Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 800 (2017).

In *United States v. Hays*, the Supreme Court unequivocally created a distinction for plaintiffs that bring a racial gerrymandering claim: those who live in the district they challenge and those who do not. 515 U.S. 737, 745 (1995). The former has standing to challenge the legislature's alleged reliance on racial criteria when map drawing. *Id.* The latter do not. *Id.* The Court recognized that a plaintiff who does not live in the district they challenge inherently lacks standing to do so because they suffer no "special harms" as a result. *Id.* Thus, the only way a plaintiff can prove standing in this circumstance is to show "specific evidence that he personally has been subjected to a racial classification." *Shaw v. Hunt*, 517 U.S. 899, 904 (1996) (citing *id.* at 737).

Plaintiff Spell resides in SD22, not the sole Senate District challenged: SD 10. ECF 240 at

12

¶¶ 26–27. Nonetheless, she insists that she has standing to challenge SD 10 because it was drawn in a way that impacted how the district she does reside in was drawn. *Id.* She also alleges that she resides in CD 25, but was in benchmark CD 6 previously, and her vote is diluted by the new districts. *Id.*

Were it enough that the redrawing of neighboring district lines constitutes a "special harm" to confer standing, *Hays* and its subsequent authority recognizing the same principles would have no effect. After all, it is hard to imagine any plaintiff that could not plausibly claim that the redrawing of a district next to theirs impacted the way in which their districts was drawn—every district line affects the districts on either side of it.

If a plaintiff's challenge to her own district requires a remedy affecting a neighboring district, that is one thing. But a plaintiff cannot bootstrap standing to challenge her own district into a free-standing challenge to a neighboring district. *See, e.g.*, *Gill*, 138 S. Ct. at 1931 (explaining that "[r]emedying the individual voter's harm . . . does not necessarily require restructuring all of the State's legislative districts" but "revising only such districts as are necessary to reshape the voter's district—so that the voter may be unpacked or uncracked, as the case may be").

## IV. Section 2 does not provide Plaintiffs an implied private cause of action.

Plaintiffs' Section 2 claims—Counts 1, 5, 6, 7, & 8—should also be dismissed because that provision does not create a private right of action. As another district court recently recognized, under *Alexander v. Sandoval*, there is no private right of action under Section 2 because Congress did not create one. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, No. 4:21-cv-1239, 2022 WL 496908, at *9–17 (E.D. Ark. Feb. 17, 2022) (citing 532 U.S. 275 (2001)). Defendants recognize that the Court has already decided this issue, *see generally* ECF 58, and incorporate by reference their previous briefing. *See* ECF 12 at 16–19.[4]

---

[4] In addition, Plaintiffs' Section 2 claims should be dismissed because that provision "does not apply to redistricting." *Perez*, 138 S. Ct. at 2335 (Thomas, J. concurring); *see also Ala. Legis. Black Caucus*, 575 U.S. at 294–98 (Thomas, J.,

**CONCLUSION**

Defendants respectfully request that the Court grant their motion and dismiss the Brooks Plaintiffs' First Amended Complaint.

Date: May 18, 2022

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Respectfully submitted.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Tex. State Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

RYAN D. WALTERS
Special Counsel, Special Litigation Unit
Tex. State Bar No. 24105085

ARI M. HERBERT
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24126093

JACK B. DISORBO
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24120804

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410

---

dissenting); *Bartlett*, 556 U.S. at 26 (Thomas, J., concurring in the judgment); *Holder v. Hall*, 512 U.S. 874, 892–93 (1994) (Thomas, J., concurring in the judgment). Although this argument is currently foreclosed by precedent, Defendants preserve it for appeal.

patrick.sweeten@oag.texas.gov  
will.thompson@oag.texas.gov  
ryan.walters@oag.texas.gov  
ari.herbert@oag.texas.gov  
jack.disorbo@oag.texas.gov  

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 18, 2022, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN