# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> GREG ABBOTT, *et al.*, <br><br> *Defendants.* | § § § § § § § § § § § § | Case No. 3:21-cv-00259 <br> [Lead Case] |
| VERONICA ESCOBAR, <br><br> *Plaintiff,* <br><br> v. <br><br> GREG ABBOTT, *et al.*, <br><br> *Defendants.* | § § § § § § § § § § § § | Case No. 3:22-cv-00022 <br> [Consolidated Case] |

# MOTION TO DISMISS
# THE ESCOBAR PLAINTIFFS' FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

Table of Contents ...................................................................................................................................... i

Introduction ................................................................................................................................................ 1

Standard ....................................................................................................................................................... 4

Argument .................................................................................................................................................... 4

    I.    Plaintiffs Lack Standing ............................................................................................................ 4

    II.    Plaintiffs' Claims Fail on the Merits ....................................................................................... 6

        A.    Plaintiffs Have Failed to Plausibly Allege a Section 2 Effects Claim ............................... 7

        B.    Plaintiffs Have Failed to Plausibly Allege an Intentional-Discrimination Claim ........... 11

        C.    Section 2 Does Not Confer a Private Right of Action ...................................... 15

        D.    Plaintiffs Have Failed to Plausibly Allege a Racial-Gerrymandering Claim ................... 16

Conclusion ............................................................................................................................................... 18

Certificate of Service............................................................................................................................... 18

## INTRODUCTION

This case, like many of the others consolidated before the Court, is about politics. The original plaintiff in this lawsuit is Congresswoman Veronica Escobar, the incumbent Democrat representing Congressional District 16. Her chief complaint is that her new district includes only part of, rather than all of, Fort Bliss. ECF 229-1 ¶¶ 1–2.[1] Figure 1, below, illustrates the configuration set forth by the new congressional map, Plan C2193.

Figure 1. Plan C2193 – City Layout[2]



But the redistricting of a military base is not a legally cognizable injury. Rather, it is an abstract and generalized grievance. Perhaps sensing this deficiency, Plaintiff Escobar amended her complaint to add Plaintiff Ramsey English Cantu, a resident of CD23. And together, Plaintiffs couch their claims as a vote-dilution claim under Section 2 of the Voting Rights Act and an intentional-discrimination claim under the Fourteenth Amendment. Yet Plaintiffs lack standing to assert mere generalized

---

[1] Escobar attached her proposed amended complaint to her motion for leave to amend. That complaint does not appear to have been docketed as a separate entry, as is the case for some of the other amended complaints. For that reason, citations are made to ECF 229-1.

[2] https://dvr.capitol.texas.gov/Congress/57/PLANC2193; see also PlanC2193, https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/b916a06b-b7e3-42fe-997c-d06f97cd1724/download/planc2193_map_report_package.pdf at pdf page 18, 30. Labels and annotations added by counsel.

1

grievances that the congressman representing CD23 will not represent his constituents well.

More than that, Plaintiffs' claims fail on the merits. For the Section 2 claims, Plaintiffs cannot satisfy the three essential preconditions set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986). It is undisputed that CD16 and CD23 have 78.0% and 57.8% Hispanic Citizen Voting Age Populations respectively.[3] Therefore, Plaintiffs cannot meet the first *Gingles* precondition because it presupposes that the racial minority does not ***already*** constitute the majority in a single-member district. Plaintiffs also fail to allege specific facts showing that Latinos in CD16 and CD23 vote cohesively, instead simply reciting the elements of the legal standard for a claim under *Gingles*. *See, e.g.*, ECF 229-1 ¶ 30 ("Latinos are political [sic] cohesive in CD 16 and CD 23 and vote as a bloc for the Latino-preferred candidates."). Nor do Plaintiffs satisfy the third precondition because they fail to explain how white voters could act as a bloc to defeat the substantial Hispanic majorities.

Plaintiffs' vote-dilution claim fails for the additional reason that Section 2 of the VRA does not provide a private right of action. One district court has recently reached the same conclusion. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, No. 4:21-cv-1239, --- F. Supp. 3d ---, 2022 WL 496908, at *9–17 (E.D. Ark. Feb. 17, 2022). Defendants acknowledge that the Court has previously decided this issue. *See generally* ECF 58. Nonetheless, Defendants respectfully alert the Court of this new decision should the Court choose to revisit the issue.

Next, Plaintiffs' intentional-discrimination claims also fail. And at times, from the face of their complaint, it is not clear whether Plaintiffs bring an intentional-vote-dilution claim, a racial-gerrymandering claim, or both. *Compare* ECF 229-1 ¶ 28 ("These policy choices were made deliberately and intentionally to dilute the voting strength of the minority community."), *with id.* ¶ 15 ("[T]he State of Texas engaged in a racial gerrymander that radically altered the border between CD 16 and CD

---

[3] *See* PlanC2193, https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/b916a06b-b7e3-42fe-997c-d06f97cd1724/download/planc2193_map_report_package.pdf at pdf page 16.

23."). Regardless, a racial-gerrymandering claim also lacks merit. As a preliminary matter, the complaint does not plausibly allege that the placement of Fort Bliss between CD16 and CD23 will have a discriminatory effect on Latinos. At best, Plaintiffs speculate that Gonzales will not give Fort Bliss and the City of El Paso sufficient attention. *See, e.g.*, ECF 229-1 ¶ 51 ("The incumbent congressional representative of CD 16 is more responsive to the needs of taxpayers, voters, and employees of Ft. Bliss than a congressman elected out of San Antonio who has demonstrated that El Paso is low on his priority list."). But speculation about potential abstract injuries like representational attention does not plausibly allege a discriminatory effect, which is a prerequisite to plausibly alleging a discriminatory-intent claim.

Equally invalidating, there are no discrete facts in Plaintiffs' complaint supporting their claim that the Texas Legislature intended to dilute Latino voting strength in CD16 and CD 23, or that it drew those congressional districts by predominantly considering race. Instead, Plaintiffs offer nothing more than formulaic recitations of legal standards. *See, e.g.*, ECF 229-1 ¶ 17 ("The removal of critical communities of interest like Ft. Bliss from CD 16 is an act of intentional discrimination."); *id.* ¶ 18 ("Racial discrimination predominated the making of these policy choices."). These are legal conclusions, not specific factual allegations, and they cannot form the basis of a claim for relief—let alone rebut the strong presumption of legislative good faith.

At bottom, Plaintiffs' complaint is about the redistricting of Fort Bliss, but Article III does not allow the litigation of abstract and generalized grievances such as this. Once that injury is properly disregarded, only the Section 2 and intentional-discrimination claims remain. And these claims fail on the merits. The Court should grant the motion to dismiss.

3

**STANDARD**

A plaintiff must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 255 U.S. 41, 47 (1957)). "[A] plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**ARGUMENT**

**I.    Plaintiffs Lack Standing**

"[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). At the pleading stage, Plaintiffs must "clearly . . . allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016) (quotation omitted). These elements are: (1) an actual or imminent, concrete and particularized injury-in-fact; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

But Plaintiffs' speculation about the quality of representation provided by different congressmen does not support an inference that Fort Bliss will suffer, much less that Plaintiffs will be injured. Plaintiffs' theory of injury seems to be that the redistricting of Fort Bliss will have adverse economic effects on the El Paso area, but that is a speculative assertion of a generalized grievance. The premise of Plaintiffs' theory is that the congressman representing CD23 will not do a very good job representing his constituents. *See* ECF 229-1 ¶ 48. Indeed, Plaintiffs seemingly imply that poor

representation could lead to Fort Bliss's closure. *See id.* ¶¶ 9–10.

These allegations are speculative. To satisfy Article III, an alleged injury cannot be "speculative," but instead must be "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401–02 (2013). An alleged injury fails these requirements where the theory of liability rests "on a highly speculative and 'attenuated chain of possibilities' partially based on 'the decisions of independent actors.'" *Glass v. Paxton*, 900 F.3d 233, 239 (5th Cir. 2018) (quoting *Clapper*, 568 U.S. at 416). Applying these principles, the Court already ruled that allegations concerning "the responsivity of" congressmen are "too speculative to support an injury-in-fact" when it dismissed Plaintiff Damon James Wilson's claims. *See* ECF 63 at 2–3. The same reasoning applies here.

Even if Plaintiffs had plausibly alleged that the El Paso region will imminently suffer from less effective representation, that injury would not be sufficiently particularized. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). By contrast, a generalized grievance is "common to all members of the public," *Ex parte Levitt*, 302 U.S. 633, 634 (1937) (per curiam), and the underlying interest is something "all citizens share." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217 (1974).

Plaintiffs do not plausibly allege that they will be individually harmed by the supposed decline of Fort Bliss. Rather, their complaint alleges (albeit speculatively) that the general El Paso area will be negatively affected by the district reconfiguration. *See* ECF 229-1 ¶¶ 1–2, 10. But Plaintiffs cannot assert claims on behalf of the general El Paso public. Article III requires that they "personally ha[ve] suffered some actual or threatened injury." *Spokeo*, 578 U.S. at 339 (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 472 (1982)). They fail to allege any personal injury here. As a result, their claim regarding Fort Bliss is nothing more than a generalized grievance and not within the Court's jurisdiction to consider.

5

To the extent Plaintiffs allege that CD16 and CD23 were the subject of a racial gerrymander, *see* ECF 229-1 ¶¶ 15–16, they do not allege that they were personally affected. Plaintiffs claim that "thousands of El Paso County residents were moved into and out of CD16 in order to accomplish a racial gerrymander" affecting CD23, but they do not claim that they are among those alleged "thousands." *Id.* ¶ 16. In other words, they do not allege that they "were put in one district or another" because of their race. *Hays*, 515 U.S. at 744. That means they have not plausibly alleged an injury in fact. "[A]ny inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference." *Id.* at 745. Without a plausible factual allegation that Plaintiff Escobar and Plaintiff Cantu were personally subjected to a racial classification, they are "asserting only a generalized grievance." *Id.*

As is clear from the face of Plaintiffs' complaint, the focus of their grievance is the redistricting of Fort Bliss to fall between CD16 and CD23. For the reasons explained above, Plaintiffs cannot assert this injury because it is abstract, speculative, and undifferentiated from the general public's interest in the El Paso community. And should the Court find that Plaintiffs do have standing, their claims fail as a matter of law.

## II.     Plaintiffs' Claims Fail on the Merits

Plaintiffs' claims fail on the merits because they have not adequately alleged either a Section 2 discriminatory-effects claim or a discriminatory-intent claim. The former requires alleging specific facts showing that a minority group, which is politically cohesive, could constitute a majority that would beat the otherwise-existent white majority, which also votes as a bloc. The latter requires alleging specific facts showing that the Legislature acted with "invidious intent." But Plaintiffs have done neither. And their racial-gerrymandering claim fails for the same reason their Section 2 discriminatory-intent claim fails. For these reasons as well, the Court should dismiss this complaint.

6

### A.   Plaintiffs Have Failed to Plausibly Allege a Section 2 Effects Claim

Plaintiffs have not plausibly alleged a Section 2 discriminatory-effects violation. Section 2 of the VRA prohibits a "standard, practice, or procedure" from being "imposed or applied . . . in a manner which results in a denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a). To establish a violation, a plaintiff must show that:

> [T]he political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 10301(b). A court can consider "[t]he extent to which members of a protected class have been elected to office in the State," but "nothing in [Section 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.*

A plaintiff bringing such a suit must first establish three "necessary preconditions":

> (1) The minority group must be able to demonstrate it is sufficiently large and geographically compact to constitute a majority in a single-member district;
>
> (2) The minority group must be able to show that it is politically cohesive; and
>
> (3) The minority [group] must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Thornburgh v. Gingles*, 478 U.S. 30, 50–51 (1986); *see Growe v. Emison*, 507 U.S. 25, 39–41 (1993) (explaining that the "*Gingles* preconditions" are required in "a § 2 dilution challenge to a single-member districting scheme").

The *Gingles* preconditions are a "bright line test." *Valdespino v. Alamo Heights ISD*, 168 F.3d 848, 8852 (5th Cir. 1999); *accord Benavidez v. Irving ISD*, 690 F. Supp. 2d 451, 456 (N.D. Tex. 2010). "Failure to establish any one of those threshold requirements is fatal." *Harding*, 948 F.3d at 308

(quotation omitted). Meeting the *Gingles* test is necessary but not sufficient to prevail. Yet here, Plaintiffs fail to allege facts that would meet any of the *Gingles* preconditions.

### 1.  Plaintiffs Have Not Alleged the First *Gingles* Precondition

Plaintiffs bear the burden of plausibly alleging that Latino voters are "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. Such an allegation is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Growe*, 507 U.S. at 40. Yet Plaintiffs do not assert that the Legislature should have drawn CD16 and CD23 to create majority Latino districts. That is because under Plan C2193, CD16 and CD23 already are Latino-majority districts. Indeed, it is undisputed that CD16 has a 78.0% Hispanic Citizen Voting Age Population under the new plan.[4] And it is likewise undisputed that CD23 has a clear majority Hispanic Citizen Voting Age Population of 57.8%. ECF 229-1 ¶ 26 Therefore, Plaintiffs cannot establish the first *Gingles* precondition with respect to their claims against either CD16 or CD23. And as a result, their VRA claim fails as a matter of law.

### 2.  Plaintiffs Have Not Alleged the Second *Gingles* Precondition

Plaintiffs also have not satisfied the second *Gingles* precondition—that "the minority group . . . be able to show that it is politically cohesive." 478 U.S. at 51. Plaintiffs' allegations of voter cohesion amount to nothing more than rote recitations of the second *Gingles* precondition as set forth by the Supreme Court. For example, Plaintiffs allege that "Latinos are politically cohesive in CD 16 and CD 23 and vote as a bloc for the Latino-preferred candidates." ECF 229-1 ¶ 30. This is not enough under *Twombly* and *Iqbal*. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (requiring more than a "formulaic recitation"); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

---

[4]  *See* PlanC2193, https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/b916a06b-b7e3-42fe-997c-d06f97cd1724/download/planc2193_map_report_package.pdf at pdf page 16.

What assertions Plaintiffs do make beyond this sole sparse allegation are inconsistent with any inference of cohesion. Latinos in both CD 16 and CD23 constitute a commanding majority, so Latinos voting cohesively would make CD16 and CD23 sure-thing districts for Latino candidates of choice. Yet Plaintiffs allege the exact opposite. For example, Plaintiffs characterize "CD 23's political performance" as "marginal":

> It is a district that leans Republican, but has – at times – elected a Democrat. In the 2020 General Election, Trump won CD 23 with 50.2% of the Vote. Other statewide Republican candidates fared similarly. In 2018, Senator Cruz lost CD 23 to candidate Beto O'Rourke by 4 points (52.07% v. 47.11%). Some Republican statewide candidates won CD 23 and others lost. It's a swing district.

ECF 229-1 ¶ 25. The furthest Plaintiffs go is alleging that "Latinos in CDs 16 & 23 are politically cohesive in *most* . . . elections . . . ." ECF 229-1 ¶ 25. But "most" might mean as little as 51% of elections. And under that formulation, Latinos might vote cohesively in 51% of elections and non-cohesively in 49% of elections. That would not be cohesion under *Gingles*. And therefore, this is not an allegation of Latino voter cohesion as required by the second *Gingles* precondition. The same issue plagues Plaintiffs' assertion that "in *some* partisan general elections, primary elections, and non-partisan elections," "HVAP majority VTDs are strongly politically cohesive." ECF 229-1 ¶ 64. And the assertion that Latino voter cohesion "*can* be measured using Ordinary Least Squares (OLS)" is not the same as alleging that Latino voter cohesion *has* been measured using OLS. ECF 229-1 ¶ 64.

Finally, Plaintiffs quote the *Perez* panel's conclusion that "Hispanic voters are politically cohesive in general and primary elections." ECF 229-1 ¶ 34 (quoting *Perez v. Abbott*, No. 5:11-cv-360, ECF 1340 ¶ 690 (W.D. Tex. Mar. 10, 2017)). That is not a factual allegation. It is a different panel's decision in a different case. And it cannot stand in for the allegations for which Plaintiffs bear the burden of making to survive the pleading stage of this lawsuit. *See Twombly*, 550 U.S. at 570 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"); *id.* at 544 (courts "are not bound to accept as true

a legal conclusion couched as a factual allegation") (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Because Plaintiffs have not satisfied the second *Gingles* precondition, this case should be dismissed.

### 3. Plaintiffs Have Not Alleged the Third *Gingles* Precondition

Plaintiffs also fail to allege facts supporting the third *Gingles* precondition—namely, "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51. Again, satisfying this requirement is a "bright-line test," *Valdespino*, 168 F.3d at 852, and Plaintiffs' failure to satisfy it "is fatal." *Harding*, 948 F.3d at 308.

Here too, Plaintiffs' complaint runs into a *Twombly-Iqbal* problem. Plaintiffs proffer only a near-verbatim recitation of the third *Gingles* precondition:

> In . . . CD 16 . . . , Anglos (White Non-Hispanics) vote sufficiently as a bloc to enable them, in the absence of special circumstances (e.g. single-member districts), to defeat the minority voters' preferred candidates of choice. In . . . CD 16 . . . , Anglos vote as a politically cohesive bloc against minority-preferred candidates.

ECF 229-1 ¶ 31. That is not enough. Similarly, Plaintiffs allege that "Anglos in CD 16 & 23 are also politically cohesive ***to the extent that*** they vote sufficiently as a bloc to defeat the preferred candidate of choice of the Latino community in CD 23." ECF 229-1 ¶ 59 (emphasis added). This portion of the complaint does not even allege that whites do in fact vote as a bloc to usually defeat Latino-preferred candidates. Rather it merely asserts that ***if*** white vote as a bloc, ***then*** they are cohesive. Of course there would be voter cohesion if voters voted as a bloc. That is a tautology and a mere regurgitation of the *Gingles* precondition. Plaintiffs do not include real factual allegations because doing so would have fatally undermined their claim. White voters are only 16% of CD16's voting-age citizens.[5] Plaintiffs include zero factual allegations explaining how white voters could overwhelm Latino voters when white voters are such a small minority in CD16. Likewise, Plaintiffs' allegations confirm that white

---

[5] For CD16, HCVAP is 78.0%, and the white CVAP is 16.0%. *See* PlanC2193, https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/b916a06b-b7e3-42fe-997c-d06f97cd1724/download/planc2193_map_report_package.pdf at pdf page 16.

10

voters do not constitute a majority in CD23 either. *See* ECF 229-1 ¶ 26 ("As currently configured, CD23 is . . . 57.8% HCVAP."). Indeed, white voters in CD23 are only about one-third of CD23's voting-age citizens.[6]

Lastly, Plaintiffs allege that the political performance of white-preferred candidates improved in CD23. ECF 229-1 ¶ 27 ("The Texas Legislative Council (TLC) estimates that the political performance for Anglo-preferred candidates has increased 2-4 points depending upon the election and candidate."). But the third *Gingles* precondition does not inquire about the performance of white-preferred candidates. Rather, the inquiry is two-fold: (1) whether there is a white majority; and (2) if so, whether it "votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51. Here, by Plaintiffs' own concession, there is no white majority—not in CD16; nor in CD23. And Plaintiffs do not assert that whites vote cohesively in CD16 and CD23; rather, Plaintiffs assert only that OLS studies, if conducted, would show "that Anglos are *moderately* cohesive in CDs 16 & 23." ECF 229-1 ¶ 67. But "moderate cohesion" is not what is required under *Gingles*. Cohesion such that the white voting bloc may "usually [] defeat the minority's preferred candidate"—that is the test. *Gingles*, 478 U.S. at 50–51. For these reasons, Plaintiffs have not satisfied the third *Gingles* precondition. The Court should therefore dismiss this claim altogether.

### B. Plaintiffs Have Failed to Plausibly Allege an Intentional-Discrimination Claim

#### 1. Plaintiffs Have Not Alleged Facts Showing Discriminatory Intent

Plaintiffs have not alleged facts sufficient to infer a discriminatory purpose to support their Section 2 or Equal Protection claims. In redistricting cases, "the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). It is "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious

---

[6] The white CVAP for CD23 is 35.1%. *See* PlanC2193, https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/b916a06b-b7e3-42fe-997c-d06f97cd1724/download/planc2193_map_report_package.pdf at pdf page 16.

intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). The required intent is not mere "volition" or "awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Rather, the Legislature must have passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

Yet here, Plaintiffs offer only naked assertions that the Texas Legislature acted with discriminatory intent. *See* ECF 229-1 ¶¶ 17, 18, 28, 49, 56, 57, 105–40. These "amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Iqbal*, 556 U.S. at 681. "As such, the allegations are conclusory and not entitled to be assumed true," even at the pleading stage. *Id.* Likewise, rebutting the presumption of legislative good faith is an independent analytical requirement. Indeed, earlier this month, the Eleventh Circuit unanimously stayed a Florida district court's judgment in part because the court failed to "meaningfully account[] for the presumption at all." *League of Women Voters of Florida v. Lee*, --- F.4th ---, 2022 WL 1435597, at *5 (11th Cir. May 6, 2022) (per curiam). But Plaintiffs here simply assert, by inference alone, that the State could not have acted in good faith, ECF 229-1 ¶ 138, in light of, for example, the rejection of amendments "because of the imperfections caused by haste," ECF 229-1 ¶ 134, and the exclusion of "[m]ost Democratic incumbent congressmen," ECF 229-1 ¶ 113. These allegations are not allegations of racial animus. They are inferential guesses. And so they fail to meaningfully rebut the presumption of legislative good-faith with allegations of racial discriminatory intent.

The limited factual allegations that Plaintiffs do make are insufficient. First, Plaintiffs point to unrelated legislation to infer that the Texas Legislature acted with discriminatory intent in passing this map. *See* ECF 229-1 ¶¶ 36–39. But the Supreme Court recently reiterated that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Perez*, 138 S. Ct. at 2324 (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality op.)). Instead, the "ultimate question remains whether a discriminatory intent has been proven *in a given case*." *Mobile*, 446

12

U.S. at 74 (emphasis added). Even if Plaintiffs could prove each of these allegations, it would not support an inference of discriminatory intent regarding the congressional map.

Second, Plaintiffs protest the procedure surrounding adoption of the congressional map. They complain about "deviations from normal procedure, lack of transparency and public input, and a rushed, inconsistent process leading to enactment." ECF 229-1 ¶ 57; *see also* ECF 229-1 ¶ 106–16, 130–38. Although "[d]epartures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role" in government decision-making, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977), they raise no inference of "invidious discrimination" when there is an "obvious alternative explanation." *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567). And Plaintiffs allege nothing that contravenes the "obvious alternative explanation" of partisanship. *Twombly*, 550 U.S. at 567; *LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc). Indeed, Plaintiffs note that "[m]ost Democratic incumbent congressmen, including Plaintiff Escober, [*sic*] were left out of these negotiations with outside counsel or the Texas senate" regarding redistricting. ECF 229-1 ¶ 113. In other words, Plaintiffs' true gripe with the 2020 redistricting efforts is that Republicans in Texas, who enjoyed a majority in the Legislature, cut Democrats out of the process. But it is not illegal for partisan majorities to exclude partisan minorities from legislative deliberations for partisan reasons. That is the nature of electoral politics, and frustrating though it may be for those in the minority, it is a not a matter for the courts. Rather, it is one for the arena of electoral politics.

Furthermore, Plaintiffs shrug off another ready and obvious explanation: the federal census was delayed due to the pandemic, so the results were not delivered until more than ten weeks after the Texas Legislature's 87th regular session ended. That was more than four months after the statutory deadline of April 1. *See* 13 U.S.C. § 141(a), (c). As a result, the Texas Legislature had to redistrict during a special session, which is constitutionally limited to thirty days. *See* Tex. Const. art. III, § 40. With a compressed schedule due to pandemic-related delays, an allegedly rushed process would hardly be

surprising, much less give a reason to infer intentional invidious discrimination. Even Plaintiffs concede that, at minimum, "the brevity of the [Legislative] session and some of the failures to hold more hearings on the [redistricting] plan can be explained by the delayed Census." ECF 229-1 ¶ 138. In *Abbott v. Perez*, the Supreme Court could "not see how the brevity of the legislative process can give rise to an inference of bad faith." 138 S. Ct. at 2328–29. The evidence there was insufficient; the allegations here are even weaker.[7]

Finally, Plaintiffs allege that "during the enactment of CD 16 and CD 23, stray comments were made about the incumbent representative of CD 16 that were racial, misogynistic, and revelatory of an impermissible intent in the creation of those congressional districts." ECF 229-1 ¶ 49. This conclusory assertion does not provide fair notice to Defendants (or the Court). First, the complaint does not specify what was said, so characterizing comments as "revelatory of an impermissible intent" or otherwise "racial" is conclusory, not factual.[8] Second, the complaint does not specify who made these alleged comments. It does not even allege that the people making these "stray comments" were members of the Legislature. *Id.* If the Court does not dismiss Plaintiffs' complaint, it should order them to provide a more definite statement under Rule 12(e). Defendants "cannot reasonably prepare a response" to such a vague allegation. Fed. R. Civ. P. 12(e).[9]

---

[7] Indeed, the Court expressly recognized that the delay in the publication of the Census data caused the accelerated legislative schedule. *See* ECF 258 at 38–39 (The Defendants argue that "The legislative process was abbreviated because the COVID–19 pandemic caused a delay in the publication of census results. . . . The Court finds Defendants' first explanation persuasive. The COVID–19 pandemic has had disruptive effects in many ways. It was thus unavoidable that the legislature would depart from its ordinary procedures during the 2021 redistricting, for reasons that had nothing to do with discriminatory intent. The Plaintiffs' claim of discriminatory intent stemming from the delay is extraordinarily weak.").

[8] Moreover, any "misogynistic" comments would be reproachable but irrelevant to Plaintiffs' claims. *See* ECF 229-1 ¶ 49. Plaintiffs' claims are based on alleged racial discrimination, not sex discrimination. *See id.* ¶¶ 59, 61.

[9] Indeed, these allegations are akin to those raised by the Brooks Plaintiffs at the PI hearing. *See* ECF 258 at 39 ("For Plaintiffs to show that procedural departures here are suggestive of such intent, they must point to some other indication of nefarious purpose. But they have not.").

### 2. Plaintiffs' Failure to Allege Discriminatory Effects Dooms Their Discriminatory-Intent Claim

Even if Plaintiffs had plausibly alleged discriminatory intent, that would not be enough. This follows from "a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). "[N]o case in [the Supreme] Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Courts routinely require discriminatory effect in intentional-discrimination redistricting cases. *See, e.g.*, *Shaw v. Reno*, 509 U.S. 630, 649 (1993) ("We have . . . required plaintiffs to demonstrate that the challenged practice has the purpose and effect of diluting a racial group's voting strength."); *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 800 (S.D. Tex. 2013) ("purpose and operative effect"); *LULAC v. N.E. ISD*, 903 F. Supp. 1071, 1093 (W.D. Tex. 1995) ("'intentional discrimination' and 'a resultant discriminatory effect'").

The same is true under Section 2. "[T]he statute proscribes intentional discrimination only if it has a discriminatory effect, but proscribes practices with discriminatory effect whether or not intentional." *Chisom v. Roemer*, 501 U.S. 380, 406 (1991) (Scalia, J., dissenting); *accord Turner v. Arkansas*, 784 F. Supp. 553, 565 (E.D. Ark. 1991), *aff'd*, 504 U.S. 952 (1992). As explained above, Plaintiffs have not plausibly alleged discriminatory effects. Therefore, they have not established any real-world effect resulting from the alleged discriminatory intent.

### C. Section 2 Does Not Confer a Private Right of Action

Plaintiffs' Section 2 claims should also be dismissed because Section 2 does not create a private right of action. As another district court recently recognized, under *Alexander v. Sandoval*, there is no private right of action under Section 2 because Congress did not create one. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, No. 4:21-v-01239-LPR, 2022 WL 496908, at *9–17 (E.D. Ark. Feb. 17, 2022) (citing 532 U.S. 275 (2001)). Defendants recognize that the Court has already decided

15

this issue, *see generally* ECF 58, and do not wish to burden the Court with duplicative briefing. Defendants incorporate by reference their previous briefing. *See* ECF 12 at 16–19.

### D.  Plaintiffs Have Failed to Plausibly Allege a Racial-Gerrymandering Claim

Plaintiffs assert that CD16 is a racial gerrymander, but the complaint does not allege any factual support for this claim. To be sure, the complaint says, there was "a racial gerrymander," ECF 229-1 ¶¶ 15–16, but it does not provide any reason to think that is true. The closest it comes are two allegations. First, that the Legislature "radically altered the border between CD 16 and CD 23" when it could have instead "add[ed] a few Voter Tabulation Districts" to CD16. ECF 229-1 ¶ 15. But the complaint does not include any factual allegations suggesting that the changes were made based on racial data as opposed to partisan data (or any other data for that matter). Instead, the complaint asserts mere inferences of racial animus, which require leaps in logic.

Second, the complaint also alleges that "CD 16 required very little change in order to comply with the 'one person, one vote' guaranty [*sic*] of the 14th Amendment," and yet State Defendants supposedly "pack[ed] CD 16 with high propensity, Latino voters in order to diminish Latino opportunity in CD 23." ECF 229-1 ¶¶ 84–85. But by the complaint's own admission, CD16 went from a 76.6% HCVAP to a 78.0% one. ECF 229-1 ¶ 77. And CD23, which was a majority Latino district in the benchmark, remains one after redistricting. ECF 229-1 ¶ 26. In other words, under SB6, both CD16 and CD23 remain majority Latino districts.

This falls far short of plausibly alleging "that race was improperly used in the drawing of the boundaries of one or more specific electoral districts." *Ala. Legislative Black Caucus*, 575 U.S. at 263. A racial gerrymandering claim must allege that race was not simply *a* motivation for the drawing of a district, but the **predominant** factor motivating the legislature's districting decision. *See Harding*, 948 F.3d at 313 ("[R]ace must have been 'the predominant factor motivating' the redistricting process and 'subordinat[ing] traditional race-neutral districting principles, including but not limited to

16

compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests." (quoting *Miller*, 515 U.S. at 916)).

The burden on those alleging such claims is especially "demanding." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001). Courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Miller*, 515 U.S. at 916. As with an intentional vote-dilution claim, the awareness and use of racial demographics and statistics do not by themselves show discriminatory purpose. *See Miller*, 515 U.S. at 916 (explaining that even though legislatures are "almost always" aware of racial demographics, "it does not follow that race predominates in the redistricting process"). Instead, a plaintiff must show that the Legislature, in designing the particular district at issue, "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group." *Id.* (quoting *Feeney*, 442 U.S. at 279).

Yet Plaintiffs have failed to do this. Plaintiffs do not allege facts showing that the Legislators responsible for designing CD 23 and CD 16 harbored, and acted predominantly based on, an intent to discriminate against Latinos. Nor do Plaintiffs even allege that Legislators knew of racial demographics related to designing CD 16 and CD 23—which would of course still fall short of what is required to assert a racial-gerrymandering claim. Rather, Plaintiffs' allegations fall below even that. Plaintiffs allege, based on inference alone, only that "[t]here is one possible choice" (i.e., conclusion)—that the district designs of CD 16 and CD 23 "are racial choices." ECF 229-1 ¶¶ 104–05; *see also* ECF 229-1 ¶¶ 86–103 (drawing inferences). But under *Twombly* and *Iqbal*, a plaintiff must allege facts that can be proven or disproven through the adjudicatory process; not merely assert inferential conclusions.

In sum, for the same reasons that Plaintiffs failed to allege facts plausibly suggesting that the Legislature drew the new maps with an intent to discriminate based on race, they have not alleged facts showing that race was the Legislature's predominant concern in drawing the new maps.

17

## CONCLUSION

Defendants respectfully request that the Court dismiss Plaintiffs' complaint.

Date: May 18, 2022

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Tex. State Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

ARI M. HERBERT
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24126093

JACK B. DISORBO
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24120804

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ari.herbert@oag.texas.gov
jack.disorbo@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 18, 2022, and that all counsel of record were served by CM/ECF.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN