# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> GREG ABBOTT, *et al.*, <br><br> *Defendants.* | § § § § § § § § § § § § | Case No. 3:21-cv-00259 <br> [Lead Case] |
| VOTO LATINO, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> JOHN SCOTT, *et al.*, <br><br> *Defendants.* | § § § § § § § § § § § § | Case No. 1:21-cv-00965 <br> [Consolidated Case] |

# MOTION TO DISMISS
# THE VOTO LATINO PLAINTIFFS' FIRST AMENDED COMPLAINT

**TABLE OF CONTENTS**

Table of Contents ........................................................................................................................................ i
Introduction ................................................................................................................................................ 1
Standard ....................................................................................................................................................... 1
Argument .................................................................................................................................................... 1
    I.    Plaintiffs' Lack Standing to Challenge SB6 and HB1 In Toto ................................................... 1
    II.   Plaintiffs' Claims Fail on the Merits .............................................................................................. 3
        A.    Plaintiffs Have Failed to Plausibly Allege a Section 2 Effects Claim ............................... 3
        B.    Plaintiffs Have Failed to Plausibly Allege an Intentional-Discrimination Claim ........... 11
        C.    Section 2 Does Not Confer a Private Right of Action ...................................................... 14
        D.    Section 2 Does Not Countenance Coalition Claims .......................................................... 14
Conclusion ................................................................................................................................................ 14
Certificate of Service ............................................................................................................................... 15

**INTRODUCTION**

The Voto Latino Plaintiffs fired a broadside of under-articulated allegations of Section 2 violations against the new Congressional map in toto—and in this amended complaint, against the new House map in its entirety too, *see, e.g.*, ECF 235 ¶¶ 7, 155–63. But as Defendants explained in the briefing on their motion to dismiss the original complaint, which remains pending, the Voto Latino Plaintiffs lack standing. *See generally* ECF 22; ECF 72. But even if they had standing, Plaintiffs' claims fail on the merits as a matter of law. In sum, Plaintiffs' scattered and conclusory allegations miss the mark. The Court should grant this motion to dismiss.

Furthermore, Section 2 does not confer a private right of action. Nor does Section 2 require the creation of minority-coalition districts. The Court has previously addressed these issues, but Defendants respectfully preserve the issues here.

**STANDARD**

A plaintiff must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 255 U.S. 41, 47 (1957)). "[A] plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**ARGUMENT**

I.  **Plaintiffs' Lack Standing to Challenge SB6 and HB1 In Toto**

In the motion to dismiss the original complaint, and in the respective reply brief, Defendants explained that Plaintiffs lack standing. This Court has not mooted that motion and reply brief.

1

Therefore, Defendants do not wish to burden the Court with overly duplicative briefing. Defendants expressly incorporate by reference their previous briefing. *See generally* ECF 22; ECF 72. Furthermore, for the same reasons that Plaintiffs lacked standing to challenge SB6, they also lack standing to challenge HB1.

For the reasons explained in Defendants' previous briefing, Voto Latino lacks associational standing. ECF 22 at 2–5; *see also Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Despite adding challenges to HB1, Voto Latino has still not established that it has members at all. *See* ECF 235 ¶¶ 15–16; *see also* ECF 235 ¶ 16 ("Plaintiff Voto Latino brings this action on behalf of *its supporters and constituents* . . . ." (emphasis added)). Because Voto Latino has failed to identify members, any associational-standing claims should be dismissed. *See, e.g.*, *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018).

Voto Latino also lacks organizational standing, as explained in Defendants' previous briefing. A plaintiff with organizational standing brings suits "on its own behalf," *Henderson v. Stalder*, 287 F.3d 374, 381 (5th Cir. 2002), but even after the opportunity to amend its complaint, Voto Latino still maintains that it brings this suit "on behalf of its supporters and constituents." ECF 235 ¶ 16. For the reasons explained previously, this is not enough to confer organizational standing. *See* ECF 22 at 5–7.

Lastly, the individual plaintiffs lack standing to challenge SB6 and HB1 in toto. *Contra* ECF 235 at 39–41 (Prayer for Relief). Plaintiffs have added no additional individual plaintiffs. *Compare* ECF 1 ¶¶ 16–28 (No. 1:21-cv-965), *with* ECF 235 ¶¶ 17–29. But the individual plaintiffs do now contend that they intend to vote in future elections. *See* ECF 235 ¶¶ 17–29. Even so, Plaintiffs may not challenge the entirety of SB6 and HB1 for the reasons set forth in Defendants' previous briefing. *See* ECF 22 at 7–9. Where, as here, "plaintiffs' alleged harm is the dilution of their votes, that injury is district specific." *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018). The individual plaintiffs ignore this limitation. For example, Plaintiff Solis resides in CD33, *see* ECF 235 ¶ 27, and yet according to Plaintiffs, "[n]on-

white voters have a reasonable opportunity to elect their candidates of choice" in CD33, *see id.* ¶ 90. On the flip side, Plaintiffs challenge many districts that no individual plaintiff lives in. Plaintiffs challenge "nine districts" in "South and West Texas," ECF 235 ¶ 76, but no Plaintiff lives in five of them: CDs 15, 20, 28, 34, or 35. *Compare* ECF 235 ¶¶ 17–29, *with id.* ¶¶ 82–85, 87, 88. Likewise, Plaintiffs challenge HD90, HD95, HD128, HD129, HD143, and HD144 under HB1. ECF 235 ¶¶ 99–104. Yet for 11 out of the 13 the individual plaintiffs, Plaintiffs fail to allege that they even live in any of these districts under HB1—namely, Ms. Abuabara, Ms. Bacy, Mr. Flores, Ms. Garza, Ms. Gonzales, Ms. Montoya, Ms. Ramón, Ms. Sanchez, Ms. Solis, Ms. Ulloa, and Ms. Uribe. ECF 235 ¶¶ 17–21, 23–25, 27–29.

For these reasons, Voto Latino lacks standing altogether, and the individual plaintiffs lack standing to challenge districts they do not live in. The Court should dismiss their claims accordingly.

## II.     Plaintiffs' Claims Fail on the Merits

Plaintiffs' claims fail on the merits because they have not adequately alleged either a Section 2 discriminatory-effects claim or a discriminatory-intent claim. The former requires alleging a minority group that is cohesive and could constitute a majority but is defeated by a cohesive white majority. The latter demands allegations showing that the Legislature acted with "invidious intent." But Plaintiffs have alleged neither.

### A.     Plaintiffs Have Failed to Plausibly Allege a Section 2 Effects Claim

Plaintiffs have not plausibly alleged a Section 2 discriminatory-effects violation. Section 2 of the VRA prohibits a "standard, practice, or procedure" from being "imposed or applied . . . in a manner which results in a denial or abridgement of the right . . . to vote on account of race or color." 52 U.S.C. § 10301(a). To establish a violation, a plaintiff must show that:

> [T]he political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members

3

of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 10301(b). A court can consider "[t]he extent to which members of a protected class have been elected to office in the State," but "nothing in [Section 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.*

A plaintiff bringing such a suit must first establish three "necessary preconditions":

(1) The minority group must be able to demonstrate it is sufficiently large and geographically compact to constitute a majority in a single-member district;

(2) The minority group must be able to show that it is politically cohesive; and

(3) The minority [group] must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Thornburgh v. Gingles*, 478 U.S. 30, 50–51 (1986); *see Growe v. Emison*, 507 U.S. 25, 39–41 (1993) (explaining that the "*Gingles* preconditions" are required in "a § 2 dilution challenge to a single-member districting scheme").

The *Gingles* preconditions are a "bright line test." *Valdespino v. Alamo Heights ISD*, 168 F.3d 848, 8852 (5th Cir. 1999); *accord Benavidez v. Irving ISD*, 690 F. Supp. 2d 451, 456 (N.D. Tex. 2010). "Failure to establish any one of those threshold requirements is fatal." *Harding*, 948 F.3d at 308 (quotation omitted). Meeting the *Gingles* test is necessary but not sufficient to prevail.

Here, Plaintiffs challenge Senate Bill 6 (SB6), under Section 2 of the VRA, with respect to several districts in a region they refer to as "South and West Texas,"[1] six districts in Dallas and Tarrant

---

[1] Plaintiffs appear not to challenge CD28 at all. ECF 235 ¶ 82 ("**Senate Bill 6 leaves CD28 largely unchanged**, with a Latino voting-eligible population that is just under 70 percent." (emphasis added)). To the extent the Court considers this lawsuit to challenge CD28, Plaintiffs have failed to allege the first and second *Gingles* precondition for the same reason that they have failed to do so regarding CD23, and more critically have failed to allege any white majority that votes cohesively to override the Latino candidates of choice. *See infra* sections II.A.1, II.A.2, II.A.3. Therefore, if the Court concludes that Plaintiffs challenge CD28, the lawsuit should be dismissed at minimum with respect to CD28.

4

Counties, and three districts in Harris County. *See* ECF 235 ¶¶ 74–97. Plaintiffs likewise challenge House Bill 1 with respect to several districts in Harris and Tarrant Counties. *See* ECF 235 ¶¶ 98–106. For both its SB6 and HB1 challenges, Plaintiffs at times rely on a coalition-majority theory. *See infra* section D. Yet Plaintiffs fail to allege specific facts that would meet any of the *Gingles* preconditions.

**1.      Plaintiffs Have Not Alleged the First *Gingles* Precondition**

Plaintiffs bear the burden of plausibly alleging that minority voters are "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. Such an allegation is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Growe*, 507 U.S. at 40. Yet Plaintiffs fall far short of satisfactorily alleging the existence of such majorities for many of the districts they challenge.

In their "South and West Texas" challenge to SB6, Plaintiffs fail to assert that the Legislature should have drawn CD23, CD16, and CD20 to create majority Latino districts. That is because under Plan C2193, CD16 and CD23 already are Latino-majority districts. Plaintiffs contend that CD16 and CD20 were packed to diminish Latino voting power in CD23. *See* ECF 235 ¶¶ 78, 88. Plaintiffs concede that CD16 and CD20 already constitute Latino-majority districts, ECF 235 ¶¶ 78, 88, and yet Plaintiffs also concede that CD23 is already a Latino-majority district, ECF 235 ¶¶ 133–40. Thus, it is immaterial to argue that Latinos in CD23 could, if granted a redrawn district, "constitute a majority in a single-member district," *Gingles*, 478 U.S. at 50—they already do.

Conversely, although Plaintiffs allege that CD21 "crack[s] slices of Latino voters from Bexar and Travis Counties and plac[es] those voters in a predominantly white, rural district," Plaintiffs do

---

Likewise, Plaintiffs appear not to challenge CD15. ECF 235 ¶ 82 ("More than 70 percent of CD15's voting-eligible population is Latino, a percentage that is ***largely unchanged from the previous map***." (emphasis added)). But if the Court disagrees, Plaintiffs have failed to allege any of the *Gingles* preconditions—they have not alleged a Latino voting bloc that could otherwise form a majority, that votes cohesively, and that faces a white majority cohesively opposed to the Latino candidate of choice. *See* ECF 235 ¶ 82.

5

not actually allege that these voters could constitute a majority. *See* ECF 235 ¶ 89. Presumably, Plaintiffs would contend that the Latino voters in CD21 could each be absorbed by other Latino-heavy districts. But that is not the inquiry. The first *Gingles* precondition requires plaintiffs to allege that the Latinos challenging a district could—by themselves—otherwise constitute a majority.

And with respect to CD35, Plaintiffs argue that the Latinos in CD35 who live in Bexar County could be absorbed by another Latino-heavy district, and the Latinos in CD35 who live in Travis County do not need to be part of a Latino-majority district because "Latino and white voters in Travis County frequently favor the same political candidates—those affiliated with the Democratic Party." ECF 235 ¶ 87. In other words, here Plaintiffs do not allege that Latinos in CD35 can form a majority if the district is redrawn; instead, Plaintiffs allege that Latinos in CD35 should be separated between Travis and Bexar Counties in the way that best advantages the Democratic Party. This is not what Section 2 requires, and it does not satisfy the first *Gingles* precondition.

Peculiarly, with respect to CD15, Plaintiffs note that SB6 left CD15 "largely unchanged from the previous map." ECF 235 ¶ 82. Even so, Plaintiffs seem to suggest that CD15 should have been cut up to maintain a Latino majority in CD15 while also creating more commanding Latino majorities elsewhere. *See* ECF 235 ¶ 82 ("More compact districts could readily be drawn that would enable Latino voters to elect their candidates of choice."). That demand is not what Section 2 guarantees. Plaintiffs effectively argue that the Texas Legislature failed to racially alter the district lines of CD15 so as to afford Democrats a comfortable majority in CD15 plus a comfortable Democratic majority in a neighboring district. That does not constitute an allegation of a Latino group that could otherwise form "a majority in a single-member district," *Gingles*, 478 U.S. at 50—let alone constitute a cognizable theory under Section 2.

Plaintiffs also challenge six out of the nine congressional districts making up Dallas and Tarrant Counties, excluding CD30, CD32, and CD33. *See* ECF 235 ¶ 90. And Plaintiffs merely argue that

an additional district could have been drawn with a Latino majority or a Latino-and-black coalition majority. ECF 235 ¶ 92. But that does not actually identify and specifically identify that there exists a particular minority group that could constitute a majority. And therefore, it fails the pleading requirements under *Twombly* and *Iqbal. See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (requiring more than a "formulaic recitation"); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Likewise with Plaintiffs' challenge in Houston to CD29, the redrawing of which would "enable the creation of an additional district in Harris County" with either a Latino majority or a Latino–black coalition majority. ECF 235 ¶ 97. Plaintiffs also challenge CD2, CD36, and CD38, in Houston, as denying Latinos and blacks "the opportunity to elect their candidates of choice." ECF 235 ¶ 94. Yet this allegation fails to even mention the existence of a Latino majority.

Turning to HB1, Plaintiffs' allegations relating to Tarrant County fail to even allege an unidentified Latino or Latino–black coalition majority. *See* ECF 235 ¶ 101 (alleging merely that "[a]lternative districts could readily be drawn in Tarrant County that would create an additional district in which Latino and Black voters have a reasonable opportunity to form coalitions to elect their candidates of choice").

For these reasons, Plaintiffs cannot establish the first *Gingles* precondition with respect to any of their SB6 claims, nor with respect to their HB1 claims against Tarrant County. And as a result, their VRA claims fail accordingly.

### 2. Plaintiffs Have Not Alleged the Second *Gingles* Precondition

Plaintiffs also have not satisfied the second *Gingles* precondition—that "the minority group . . . be able to show that it is politically cohesive." 478 U.S. at 51. Plaintiffs' allegations of voter cohesion amount to nothing more than rote recitations of the second *Gingles* precondition as set forth by the Supreme Court. In fact, Plaintiffs assert a statewide allegation of Latino and black voter

7

cohesion generally. ECF 235 ¶ 107 ("Black and Latino voters across Texas cohesively vote for the same candidates."). This is devoid of any specificity or tailoring to the challenged districts in this lawsuit. It is a mere recitation of the standard and is therefore not enough under *Twombly* and *Iqbal*. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (requiring more than a "formulaic recitation"); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Plaintiffs may not simply treat Black and Latino voters as an undifferentiated whole, with the same interests across the whole State. *See Baird v. Consolidated City of Indianapolis*, 976 F.2d 357, 360 (7th Cir. 1992) ("References in *Gingles* to district-specific inquiries assume that each multi-member district spans a different part of the state, with different minority populations and, perhaps, different cohesiveness of majority and minority voters."); *Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rts. & Fight for Equal. By Any Means Necessary (BAMN)*, 572 U.S. 291, 308 (2014) ("It cannot be entertained as a serious proposition that all individuals of the same race think alike.").

Plaintiffs' other scattered and terse minority-cohesion allegations are no better. Plaintiffs repeatedly parrot facsimiles of the Supreme Court's definition of the second *Gingles* precondition. ECF 235 ¶ 80 ("Latino voters in CD23 cohesively prefer candidates affiliated with the Democratic Party . . . ."); ECF 235 ¶ 91 ("Latino and Black voters in Tarrant and Dallas Counties overwhelmingly and consistently join together in supporting candidates affiliated with the Democratic Party, and often favor the same candidates in primary elections . . . ."); ECF 235 ¶ 95 ("Latino and Black voters in Harris County overwhelmingly join together in supporting candidates affiliated with the Democratic Party, and often favor the same candidates in primary elections . . . ."); ECF 235 ¶ 100 ("Latino and Black voters in Tarrant County overwhelmingly and consistently join together in supporting candidates affiliated with the Democratic Party, and often favor the same candidates in primary elections . . . ."); ECF 235 ¶ 103 ("Latino voters in Harris County overwhelmingly support candidates

affiliated with the Democratic Party . . . .").

Respecting congressional districts 15, 16, 20, 21, 27, 28, 34, and 35, Plaintiffs do not even allege minority voter cohesion. ECF 235 ¶ 78, 82–89. And when it comes to CD35, not only do Plaintiffs fail to allege Latino cohesion, they characterize Latinos in CD35 as the result of "unnecessarily combining two, differently situated populations of Latinos." ECF 235 ¶ 87. That suggests the very opposite of cohesion. For these reasons, Plaintiffs have failed to satisfactorily allege the second *Gingles* precondition, and their VRA claims should thus be dismissed.

### 3.     Plaintiffs Have Not Alleged the Third *Gingles* Precondition

Plaintiffs also fail to allege facts supporting the third *Gingles* precondition—namely, "that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51. Again, satisfying this requirement is a "bright-line test," *Valdespino*, 168 F.3d at 852, and Plaintiffs' failure to satisfy it "is fatal." *Harding*, 948 F.3d at 308.

Here too, Plaintiffs' complaint runs into a *Twombly-Iqbal* problem. Plaintiffs offer a near-verbatim recitation of the third *Gingles* precondition at a statewide generalization: "[N]on-Hispanic white voters in Texas consistently vote as a bloc to defeat [Latinos and blacks' preferred] candidates, with just 15 percent of white Texas voters supporting President Biden and just 10 percent of white Texas voters supporting Lupe Valdez." ECF 235 ¶ 108. This high-level generality about the entire state of Texas—without any tailoring to the challenge districts—amounts to a mere recitation of the standard and is not enough under *Twombly* and *Iqbal*. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (requiring more than a "formulaic recitation"); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). And Plaintiffs' other white-cohesion allegations fare no better.

Over and over again, Plaintiffs offer up near copies of the Supreme Court's definition of the third *Gingles* precondition. ECF 235 ¶ 92 ("[W]hite voters vote as a bloc to oppose [Latinos' and blacks'

9

preferred] candidates in general elections.") (Dallas–Fort Worth); ECF 235 ¶ 95 ("[W]hite voters vote as a bloc to oppose [Latinos' and blacks' preferred] candidates in general elections.") (Houston); ECF 235 ¶ 100 ("[W]hite voters vote as a bloc to oppose such candidates in general elections.") (Tarrant County); ECF 235 ¶ 103 ("[W]hite voters vote as a bloc to oppose [Latino-supported] candidates in general elections.") (Harris County). And Plaintiffs fail to allege any white-voter cohesion sufficient to usually overcome the Latino-preferred, or Latino-and-black-preferred, candidates with respect to congressional districts 15, 16, 28, 34, 20, and 21. ECF 235 ¶¶ 78, 82–85, 88, 89.

In two instances, Plaintiffs explicitly conflate "higher turnout" of white voters with "bloc voting." ECF 235 ¶ 80 ("[T]he higher turnout and bloc voting of CD23's white residents ensured that even under the prior map, Latino voters were often unable to elect their candidates of choice."); ECF 235 ¶ 86 (Because of higher turnout and bloc voting among CD27's white voters, this configuration ensures that Latino voters in CD27 . . . will be unable to elect candidates of their choice."). But whether whites have a higher turnout rate is not what the third *Gingles* precondition demands. Instead, the inquiry is whether "the white majority votes sufficiently as a bloc." *Gingles*, 478 U.S. at 50–51. And since Plaintiffs have muddled the issue of white-voter turnout versus white-voter cohesion, Plaintiffs have not clearly alleged white-voter cohesion. Therefore, with respect to CD23 and CD27 as well, Plaintiffs have failed to allege the third *Gingles* precondition.

Lastly, for CD35, Plaintiffs do not allege cohesion among white voters. *See* ECF 235 ¶ 87. Indeed, Plaintiffs allege that "Latino and white voters in Travis County frequently favor the same political candidates—those affiliated with the Democratic Party." ECF 235 ¶ 87. In other words, in CD35, whites do ***not*** vote as a bloc to defeat the Latino-preferred candidates. Hence, there is no allegation of the third *Gingles* precondition here either.

For these reasons, Plaintiffs have failed to adequately allege the third *Gingles* precondition, and their VRA claims should be dismissed.

10

### B. Plaintiffs Have Failed to Plausibly Allege an Intentional-Discrimination Claim

#### 1. Plaintiffs Have Not Alleged Facts Showing Discriminatory Intent

To the extent Plaintiffs bring an intentional-discrimination claim under Section 2, they have not alleged facts sufficient to infer a discriminatory purpose. In redistricting cases, "the good faith of a state legislature must be presumed." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). It is "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). The required intent is not mere "volition" or "awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Rather, the Legislature must have passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

Yet here, Plaintiffs offer no assertions that the Texas Legislature acted with discriminatory intent—not even naked assertions as such. If they had, such assertions would "amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." *Iqbal*, 556 U.S. at 681. Any such "allegations [would be] conclusory and not entitled to be assumed true," even at the pleading stage. *Id.* What is more, plaintiffs must also rebut the presumption of legislative good faith. For example, earlier this month, the Eleventh Circuit unanimously stayed a Florida district court's judgment in part because the court failed to "meaningfully account[] for the presumption at all." *League of Women Voters of Florida v. Lee*, --- F.4th ---, 2022 WL 1435597, at *5 (11th Cir. May 6, 2022) (per curiam). Plaintiffs have not even addressed the presumption of legislative good faith.

Yet Plaintiffs do point to unrelated legislation and historical examples, which they offer under the heading of "Texas's History of Discrimination." *See* ECF 235 ¶¶ 111–32. Plaintiffs allege that "voting in nearly every region of Texas is severely racially polarized." *See* ECF 235 ¶¶ 107–10. Plaintiffs also allege that "[p]olitical campaigns in Texas commonly resort to racial appeals," and highlight supposed instances of such racial appeals in several 2018 and 2020 political campaigns. *See* ECF 235

11

¶¶ 133–40. Plaintiffs also decry the "stark disparities between the everyday lives" of black and Latino Texans versus white Texans. *See* ECF 235 ¶¶ 141–43. And Plaintiffs note the statistical underrepresentation of Latino and black lawmakers in Texas's elected offices. *See* ECF 235 ¶ 144.

These allegations do not constitute allegations of a racially discriminatory intent in the Texas Legislature's enactment of SB6 and HB1. Plaintiffs would have had to argue that these allegations somehow connect to SB6 and HB1. But they do not. To the extent the Court disagrees, the Supreme Court recently reiterated that "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Perez*, 138 S. Ct. at 2324 (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality op.)). Instead, the "ultimate question remains whether a discriminatory intent has been proven *in a given case*." *Mobile*, 446 U.S. at 74 (emphasis added).[2] And Plaintiffs have not made any such allegations.

Furthermore, Plaintiffs protest the procedure surrounding adoption of the congressional map. *See* ECF 235 ¶¶ 42–71. Although "[d]epartures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role" in government decision-making, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977), they raise no inference of "invidious discrimination" when there is an "obvious alternative explanation." *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567). And Plaintiffs allege nothing that contravenes the "obvious alternative explanation" of partisanship. *Twombly*, 550 U.S. at 567; *LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc).

---

[2] For a recent application of this principle, see *Johnson v. Waller County*, --- F. Supp. 3d ---, 2022 WL 873325, at *41 (S.D. Tex. Mar. 24, 2022) ("[A]ny putative burden" under Section 2 must be "***caused by or linked to*** social and historical conditions producing discrimination against members of the protected class such that the burden is on account of race." (emphasis added)); *id.* at *46 (The history of discrimination "isn't intended as some free-floating condemnation of all subsequent conduct by a political governing body. It's meant to inform consideration of particular conduct by particular defendants in particular lawsuits.").

Plaintiffs also fail to account for another ready and obvious explanation: the federal census was delayed due to the pandemic, so the results were not delivered until more than ten weeks after the Texas Legislature's 87th regular session ended. That was more than four months after the statutory deadline of April 1. *See* 13 U.S.C. § 141(a), (c). As a result, the Texas Legislature had to redistrict during a special session, which is constitutionally limited to thirty days. *See* Tex. Const. art. III, § 40. With a compressed schedule due to pandemic-related delays, an allegedly rushed process would hardly be surprising, much less give a reason to infer intentional invidious discrimination. In *Abbott v. Perez*, the Supreme Court could "not see how the brevity of the legislative process can give rise to an inference of bad faith." 138 S. Ct. at 2328–29. The evidence there was insufficient; the allegations here are even weaker.[3]

### 2. Failure to Allege Discriminatory Effects Dooms a Discriminatory-Intent Claim

Even if Plaintiffs had plausibly alleged discriminatory intent, that would not be enough. This follows from "a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). "[N]o case in [the Supreme] Court has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). Courts routinely require discriminatory effect in intentional-discrimination redistricting cases. *See, e.g., Shaw v. Reno*, 509 U.S. 630, 649 (1993) ("We have . . . required plaintiffs to demonstrate that the challenged practice has the purpose and effect of diluting a racial group's voting strength."); *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 800 (S.D. Tex. 2013) ("purpose and

---

[3] Indeed, the Court expressly recognized that the delay in the publication of the Census data caused the accelerated legislative schedule. *See* ECF 258 at 38–39 (The Defendants argue that "The legislative process was abbreviated because the COVID–19 pandemic caused a delay in the publication of census results. . . . The Court finds Defendants' first explanation persuasive. The COVID–19 pandemic has had disruptive effects in many ways. It was thus unavoidable that the legislature would depart from its ordinary procedures during the 2021 redistricting, for reasons that had nothing to do with discriminatory intent. The Plaintiffs' claim of discriminatory intent stemming from the delay is extraordinarily weak.").

13

operative effect"); *LULAC v. N.E. ISD*, 903 F. Supp. 1071, 1093 (W.D. Tex. 1995) ("intentional discrimination" and "a resultant discriminatory effect").

The same is true under Section 2. "[T]he statute proscribes intentional discrimination only if it has a discriminatory effect, but proscribes practices with discriminatory effect whether or not intentional." *Chisom v. Roemer*, 501 U.S. 380, 406 (1991) (Scalia, J., dissenting); *accord Turner v. Arkansas*, 784 F. Supp. 553, 565 (E.D. Ark. 1991), *aff'd*, 504 U.S. 952 (1992). As explained above, Plaintiffs have not plausibly alleged discriminatory effects. Therefore, they have not established any real-world effect resulting from the alleged discriminatory intent.

### C. Section 2 Does Not Confer a Private Right of Action

Plaintiffs' Section 2 claims should also be dismissed because Section 2 does not create a private right of action. As another district court recently recognized, under *Alexander v. Sandoval*, there is no private right of action under Section 2 because Congress did not create one. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, No. 4:21-cv-1239, 2022 WL 496908, at *9–17 (E.D. Ark. Feb. 17, 2022) (citing 532 U.S. 275 (2001)). Defendants recognize that the Court has already decided this issue, *see generally* ECF 58, and do not wish to burden the Court with duplicative briefing. Defendants incorporate by reference their previous briefing. *See* ECF 12 at 16–19.

### D. Section 2 Does Not Countenance Coalition Claims

Plaintiffs' Section 2 claims should be dismissed to the extent they allege that coalition districts of Latino and black voters must be drawn. *Compare Bartlett v. Strickland*, 556 U.S. 1, 13 (2009), *with Perry v. Perez*, 565 U.S. 388, 399 (2012). Defendants recognize that the Court has already decided this issue, *see generally* ECF 144, and do not wish to burden the Court with duplicative briefing. Defendants incorporate by reference their previous briefing. *See generally* ECF 43; ECF 115.

### CONCLUSION

Defendants respectfully ask the Court to dismiss Plaintiffs' complaint.

Date: May 18, 2022

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Respectfully submitted.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Tex. State Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

ARI M. HERBERT
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24126093

JACK B. DISORBO
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24120804

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ari.herbert@oag.texas.gov
jack.disorbo@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 18, 2022, and that all counsel of record were served by CM/ECF.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN