# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> GREG ABBOTT, *et al.*, <br><br> *Defendants.* | § § § § § § § § § § § § | Case No. 3:21-cv-00259 <br> [Lead Case] |
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> STATE OF TEXAS, *et al.*, <br><br> *Defendants.* | § § § § § § § § § § § § | Case No. 1:21-cv-988 <br> [Consolidated Case] |

# MOTION TO DISMISS
# THE MALC PLAINTIFFS' FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

Table of Contents ............................................................................................................................. i
Introduction ..................................................................................................................................... 1
Argument ......................................................................................................................................... 3
    I.    MALC Cannot Challenge Districts With a Substantial HCVAP Majority .............................. 3
        A.    MALC's Allegations Do Not Satisfy the *Gingles* Preconditions ......................................... 4
        B.    MALC Cannot Rely on Alleged Retrogression to Support Its Claims .............................. 5
    II.    MALC's *Larios* Claim Should be Dismissed ............................................................................ 6
    III.    MALC's Claims Against the State of Texas Should be Dismissed ......................................... 12
Conclusion .................................................................................................................................... 14
Certificate of Service ..................................................................................................................... 15

**INTRODUCTION**

MALC recently filed its first amended complaint, adding several individual plaintiffs and supplemental factual allegations. *See* ECF 247 ("Compl."). Defendants previously moved to dismiss the original complaint, *see* ECF 80, and that motion remains pending. *See also* ECF 226 (MALC's motion for leave to amend) ("The parties further agree that the pending motion to dismiss should not be treated as moot and that Defendants have an opportunity to file supplements to those motions to dismiss should they feel it necessary."). Defendants incorporate and re-urge the arguments made in the previous motion to dismiss.

To address two specific issues, nothing in the first amended complaint changes the fact that MALC has failed to allege facts that would support its having organizational or associational standing. The only change is that the complaint now alleges that each MALC member "usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections." Compl. ¶ 2. But this allegation does not cure the jurisdictional defect explained in the prior motion. *See* ECF 80 at 2–8. In addition, MALC adds no new factual allegations with respect to its intentional discrimination claims. Those claims should be dismissed for the same reasons as those explained in the previous motion. *See id.* at 17–23.

In addition, Defendants address three particular deficiencies in the amended complaint.[1] First, MALC brings a number of claims under Section 2 of the Voting Rights Act, but many of these fail on their face because the districts at issue have a substantial Hispanic Citizen Voting Age Population majority. To state a claim under Section 2, MALC must allege specific facts showing that the Latino population in the specific district is sufficiently large, politically cohesive, but is unable to elect their candidate of choice due to white bloc voting. However, the Latino populations in many of the

---

[1] The first amended complaint is also deficient for reasons not asserted in this Motion. But in the interests of litigation efficiency and the conservation of judicial resources, the Motion is limited to those deficiencies presented here.

1

challenged districts is substantially larger than the white population; at least 20.9% larger for all such districts, and in most cases even larger. As such, it must be the case either that the relevant Latino populations are not politically cohesive, or would not be defeated by white bloc voting. Given the numbers shown below, those two essential preconditions cannot logically both be true. And to the extent MALC relies on any "retrogression" of the HCVAP, those claims fail because Section 2 does not incorporate the retrogression standard.

Second, MALC brings a Fourteenth Amendment claim based on the controversial decision in *Larios v. Cox*, 300 F. Supp. 2d 1320, 1347 (N.D. Ga. 2004) (per curiam), *aff'd*, 542 U.S. 947 (2004). It argues that the House map "systematically," overpopulated several districts in the El Paso and upper Rio Grande Valley region, with the intent of discriminating against Hispanics. This claim is deficient because it is based only on population deviation numbers; nowhere does MALC allege facts tending to show that the deviations MALC alleges were made for a discriminatory purpose. These pleadings doom MALC's claim because where, as here, the total population deviation is less than 10%, a plaintiff fails to make a *prima facie* Fourteenth Amendment case. *See Brown v. Thompson*, 462 U.S. 835, 843 (1983). Only by alleging additional facts tending to show that the Legislature's purpose was arbitrary or discriminatory can a plaintiff rebut the presumption that the population deviations are the result of a good faith effort to draw legal proper electoral districts. This claim must be dismissed because MALC offers nothing more than the deviations themselves, even though it is undisputed that the overall deviation is less than 10%.

Third, Defendants give additional explanation, *compare* ECF 80 at 8–9, as to why the State of Texas is not a proper defendant. MALC does not identify any injury *the State* has imposed or any relief *the State* could give, in that capacity. Indeed, the Court recently recognized that some named parties in the consolidated cases may be unable to give plaintiffs the relief they seek: "Redistricting cases are complex, and the Court must take into account the inherent mismatch between the actors that may

2

cause a violation of the VRA and those actors that could provide relief from a violation." ECF 279 at 5. But a party is not a proper defendant unless it can give relief to a plaintiff's claim. MALC cannot identify any such relief *the State of Texas* could give, especially apart from any relief the Governor or Secretary of State could give.

For the reasons set forth below, Defendants respectfully request that the Court grant Defendants' motion and dismiss the relevant portions of the MALC Plaintiffs' first amended complaint. *See* Fed. R. Civ. P. 12(b)(1), 12(b)(6).

## ARGUMENT

### I. MALC Cannot Challenge Districts With a Substantial HCVAP Majority

MALC asserts a number of claims under Section 2, but many of them are deficient on their face because the districts at issue have a substantial Hispanic Citizen Voting Age Population majority. These districts are summarized in Table 1, below.[2]

**Table 1. Challenged Districts with Substantial HCVAP Majority**

| District | HCVAP | White CVAP | H - W | Citation |
|---|---|---|---|---|
| HD31 | 66.6 | 30.7 | +35.9 | Compl. ¶¶ 98–104 |
| HD37 | 77.8 | 20.3 | +57.6 | Compl. ¶¶ 105–13 |
| HD80 | 77.6 | 20.7 | +56.9 | Compl. ¶¶ 114–20 |
| HD118 | 56.4 | 35.5 | +20.9 | Compl. ¶¶ 128–32 |
| HD145 | 55.7 | 32.1 | +23.6 | Compl. ¶¶ 138–40 |
| CD23 | 57.8 | 35.1 | +22.7 | Compl. ¶¶ 148–47 |
| CD15 | 73.8 | 23.0 | +50.8 | Compl. ¶¶ 158–62 |
| ED2 | 71.5 | 24.5 | +47.0 | Compl. ¶¶ 167–68 |
| ED3 | 57.8 | 31.8 | +26.0 | Compl. ¶¶ 167–68 |

---

[2] This table is based on data contained in the red reports published by the Texas Legislative Council for the enacted House, Senate, Congressional, and State Board of Education maps. *See* Exhibit A (Plan H2316); Exhibit B (Plan S2168); Exhibit C (Plan C2193); Exhibit D (Plan E2106).

### A. MALC's Allegations Do Not Satisfy the *Gingles* Preconditions

Under *Thornburg v. Gingles*, a plaintiff bringing such a suit must establish three "necessary preconditions":

(1) The minority group must be able to demonstrate it is sufficiently large and geographically compact to constitute a majority in a single-member district;

(2) The minority group must be able to show that it is politically cohesive; and

(3) The minority [group] must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 50–51; *see Growe v. Emison*, 507 U.S. 25, 39–41 (1993) ("*Gingles* preconditions" are required in "a § 2 dilution challenge to a single-member districting scheme").

Where, as here, the challenged district comprises a substantial majority of the racial or ethnic group bringing the challenge, the claim necessarily fails either the second or third *Gingles* precondition. MALC alleges, without any supporting facts and without reference to specific districts, that Latinos are politically cohesive, and would be defeated by bloc white voting in all relevant districts:

Anglo bloc voting in the regions detailed in paragraphs 86-169 above is sufficient to prevent cohesive Latino and/or Spanish language voters from having an equal opportunity to elect the candidates of their choice in those regions under the adopted Plans.

Compl. ¶ 174. For one thing, these allegations are not allegations at all. Rather, they are formulaic recitations of the legal standards, and therefore not entitled to be accepted as true. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (Federal courts "are not bound to accept as true a legal conclusion couched as a factual allegation.") (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Moreover, given the numbers explained in Table 1, these two allegations cannot both be true. If the Latino majorities in the districts listed above really were politically cohesive, then they would undoubtedly elect their preferred candidate. Conversely, if an Anglo-preferred candidate prevails, it must be the case that the Latino population in that district is not cohesive. This is particularly obvious

4

in light of the modest white population in these districts. None of these districts have a White CVAP of greater than 35.5%, and that number is far less in most. *See* Table 1, above. In addition, the difference between the HCVAP and White CVAP is substantial. The HCVAP is at least 20.9% greater than the White CVAP in every districts, and in many cases much more than that.

MALC insists that these districts deny Latinos "an equal opportunity to elect the candidates of choice" in the pertinent districts, Compl. ¶ 174, but the numbers plainly contradict that legal conclusion. It does not, and cannot, satisfy the second and third *Gingles* preconditions for these districts.

### B.  MALC Cannot Rely on Alleged Retrogression to Support Its Claims

MALC appears to also base its Section 2 claims on a retrogression theory, alleging that the new districts *weaken* Latino voting strength in some districts. *See* Compl. ¶ 56 (Discussing the alleged "retrogression of Latino voting power in CD23."); *id.* at p. 29 ("Plan H2316 severely retrogresses the Latino and Spanish language community's voting power in Texas House District 80."); *id.* ¶ 120 (Noting the alleged "extreme retrogression of HD 31 and HD 37."). That is, MALC's complaint is that the HCVAP in some districts is less than the number that existed in the benchmark map. *Compare* Ex. A, *with* Ex. E (showing that the HCVAP in HD80 was 85.7 in Plan H2100 (the benchmark) and 77.6 in Plan H2316 (the enacted map)).[3]

But, as explained in the original motion to dismiss, *see* ECF 80 at 16–17, this argument fails on its face because "[r]etrogression is not the inquiry in § 2 dilution cases." *Holder v. Hall*, 512 U.S. 874, 884 (1994). Federal courts routinely "refuse to equate a § 2 vote dilution inquiry with the § 5 retrogression standard." *Georgia v. Ashcroft*, 539 U.S. 461, 478 (2003); *see, e.g.*, *Luft v. Evers*, 963 F.3d 665, 673 (7th Cir. 2020) (Easterbrook, J.) ("The Voting Rights Act does contain an anti-retrogression rule, but it is in § 5(b). . . . Section 2 must not be read as equivalent to § 5(b).") (internal citation omitted). Any

---

[3]  TLC prepares "special tabulations" of the citizen voting age population for districts as they exist in the benchmark. *See* Ex. E (special tabulation for Plan H2100).

retrogression thus does not support MALC's Section 2 claims.

## II. MALC's *Larios* Claim Should be Dismissed

MALC also asserts a claim based on *Larios v. Cox. See* Compl. ¶¶ 89–97, 246–49. *Larios* is based on the following controversial assertion: "[A] state legislative reapportionment plan that systematically and intentionally creates population deviations among districts in order to favor one geographic region of a state over another violates the one person, one vote principle firmly rooted in the Equal Protection Clause." *Larios*, 300 F. Supp. 2d at 1347.

MALC's theory is that the House map presents "systemic overpopulation" of districts in the El Paso region, designed for the purpose of preventing Latino voters of an additional House district. Compl. at p. 25. It points to a number of districts in West Texas and the Panhandle—namely, HD 69, 71, 72, 81, 82, 83, 84, 86, 87, and 88—notes that they are underpopulated relative to the ideal, and concludes that this difference is the result of "ethnic" and "regional bias." *Id.* ¶ 235. This is altogether conclusory and insufficient to state a claim under *Larios*.

Without more, MALC cannot plausibly allege that Plan H2316 was intentionally and systematically drawn to discriminate against Latino voters in the El Paso and upper Rio Grande Valley region. Nothing in the complaint tends to show that the districts to which MALC points were treated differently than any other over- or underpopulated district or series of districts. Indeed, there are plenty of examples of regions is Hispanic-majority districts that are underpopulated and White-majority districts that are overpopulated. For instance, the series of districts North of Harris County are nearly uniformly (i) majority white, and (ii) overpopulated.[4] And the series of districts in the lower Rio Grande Valley are nearly uniformly (ii) majority Hispanic, and (ii) underpopulated.[5]

---

[4] Across House Districts 3, 12, 14, 15, 16, 18, 85, and 127, every district has a majority white CVAP, and the average population deviation is + 3.40%.

[5] Across House Districts 35, 36, 37, 38, 39, 40, and 41, every district has a majority HCVAP, and the average population deviation is - 3.54%.

6

These numbers by themselves suggest that the lower Rio Grande Valley was treated favorably or the area North of Harris County treated unfavorably. They merely illustrate that MALC's comparison of the El Paso region to the series of districts in West Texas and the Panhandle comes entirely out of context, and with entirely no specific supporting facts. Nor does MALC grapple with the obvious alternative explanation: that El Paso and the upper and lower Rio Grande Valley lost population relative to the rest of the State. And it fails to recognize that Hispanic majority districts were, as a whole, neither overpopulated nor underpopulated.

As a preliminary matter, *Larios*'s reasoning is not binding on this Court because it is a summary affirmance. Such opinions "have limited precedential value." *Baca v. Berry*, 806 F.3d 1262, 1275 (10th Cir. 2015). As such, "the particularities of *Larios*'s holding that certain Georgia reapportionment plans violated one-person-one-vote principles have little to say to" claims asserted in different circumstances. *Id.* (internal citations omitted); *see also League of Women Voters of Chicago v. City of Chicago*, 757 F.3d 722, 725 n.2 (7th Cir. 2014) (affirming district court decision to dismiss *Larios* claim) ("[A] summary affirmance means that the Supreme Court agreed with the judgment "but not necessarily the reasoning by which it was reached.") (quoting *Mandel v. Bradley*, 432 U.S. 173, 176 (1977)).

Rather than *Larios*, the applicable principles flow from the Supreme Court's binding decisions. Firstly, an "apportionment plan with a maximum population deviation [from ideal district size] under 10% falls within" the "category of minor deviations" that are "insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Voinovich v. Quilter*, 507 U.S. 146, 161 (1993); *see also Brown v. Thompson*, 462 U.S. 835, 843 (1983). As such, minor population deviations are "presumed to be constitutionally valid absent a showing of 'arbitrariness or discrimination.'" *League of Women Voters of Chicago*, 757 F.3d at 725 (quoting *Roman v. Sincock*, 377 U.S. 695, 710 (1964)). "[I]f the maximum deviation is less than 10%, the population disparity is considered *de minimis* and the plaintiff cannot rely on it alone to prove invidious discrimination

7

or arbitrariness." *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996) (quoting *Roman*, 377 U.S. at 710 and *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)).

It is undisputed that the maximum deviation in Plan 2193 is less than 10%, namely 9.98%. *See* Ex. A at 1. For this reason, the State "is entitled to a presumption that the apportionment plan was the result of an 'honest and good faith effort to construct districts . . . as nearly of equal population as is practicable." *Daly*, 93 F.3d at 1220 (quoting *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)). And it is clear that rebutting the presumption of legislative good faith is an independent analytical requirement. Indeed, earlier this month, the Eleventh Circuit unanimously stayed a Florida district court's judgment in part because the court failed to "meaningfully account[] for the presumption at all." *League of Women Voters of Florida v. Lee*, --- F.4th ---, 2022 WL 1435597, at *5 (11th Cir. May 6, 2022) (per curiam).

It is black letter law that for deviations of less than 10%, "the population disparity is considered *de minimis* and the plaintiff cannot rely on it alone to prove invidious discrimination or arbitrariness." *Daly*, 93 F.3d at 1220. But that is precisely what MALC does. The second amended complaint offers nothing more than deviation numbers and related legal conclusions; it does not allege a single specific fact tending to show that the deviations in House map are "arbitrary" or "discriminatory." *Roman*, 377 U.S. at 710. In the complaint, MALC merely restates the deviation percentages, places them in a figure, *see* Compl. at p. 52, and concludes that "the pernicious effect is obvious." *Id.* ¶ 234. MALC goes on to conclude that "the systematic over-population of Latino districts in El Paso" operates to "deprive[] these communities of equal representation." *Id.* ¶¶ 97, 236. Those are legal conclusions, not factual bases from which to infer discrimination.

8

Figure 1. Plan H2100 Population Deviation Map



Moreover, MALC overlooks other highly-relevant background facts. First, it is clear that the House districts along the southern border substantially decreased in population relative to the rest of the State. Indeed, thirteen of the fifteen districts along the upper and lower Rio Grande Valley lost population relative to the ideal. *See* Figure 1, above; *see also* Ex. F. MALC does not dispute that population changes meant that, under federal one-person-one-vote precedent, the 2021 Legislature could not assign six districts to the same counties that the 2013 Legislature had. Nor does MALC dispute that the districts drawn by the 2021 Legislature are within the threshold established in the Supreme Court's one-person-one-vote cases.

Figure 1 illustrates a clear basis for the configuration in the El Paso region: those districts lost a substantial amount of population relative to the rest of the State. The Court need go no further to conclude that the numbers MALC cites do not rebut the presumption of good faith afforded to State legislatures in cases of deviations less than 10%. But if more were needed—which it is not—the Court should also note that districts with a majority HCVAP are almost perfectly balanced with respect to population deviations. *See* Table 2, below; *see also* Ex. A at 22–29.[6] Indeed, of the thirty such districts, fifteen have a positive population deviation, and fifteen have a negative deviation. The mean and median deviation are almost zero, being -.071% and -.195% respectively.

**Table 2. Population Deviation for HCVAP Majority Districts**

| House District | HCVAP | | Population Deviation |
|---|---|---|---|
| 31 | 66.6 | | -4.81 |
| 34 | 71.7 | | -2.44 |
| 35 | 93.7 | | -0.50 |
| 36 | 89.0 | | -3.90 |
| 37 | 77.8 | | -4.84 |
| 38 | 91.5 | | -4.19 |

---

[6] This table is based on data from Exhibit A. For the HCVAP data, *see* p. 33–37; for the population deviation data, *see* p. 22–29. Following the population deviation map, *see* Figure 1, the purple cells indicate a population deviation of less than zero, and green cells indicate a deviation greater than zero. Darker shades are used for deviations exceeding 2.50%.

10

| House District | HCVAP | | Population Deviation |
|---|---|---|---|
| 39 | 89.0 | | -4.17 |
| 40 | 90.5 | | -4.55 |
| 41 | 80.4 | | -2.62 |
| 42 | 92.6 | | -4.93 |
| 43 | 59.7 | | 1.17 |
| 74 | 77.4 | | 4.60 |
| 75 | 89.8 | | 3.19 |
| 77 | 85.6 | | 4.95 |
| 78 | 66.4 | | 4.88 |
| 79 | 75.1 | | 3.64 |
| 80 | 77.6 | | -0.88 |
| 81 | 51.9 | | -4.96 |
| 104 | 56.3 | | -4.53 |
| 116 | 59.1 | | 2.79 |
| 117 | 68.7 | | 4.51 |
| 118 | 56.4 | | 4.60 |
| 119 | 64.8 | | 3.72 |
| 123 | 62.0 | | 1.45 |
| 124 | 68.9 | | 0.11 |
| 125 | 62.6 | | 4.36 |
| 140 | 70.2 | | -4.18 |
| 143 | 60.0 | | 3.20 |
| 144 | 64.8 | | 4.97 |
| 145 | 55.7 | | -2.78 |

By contrast, in *Larios*, the discrimination was clear from the face of the legislative record. The Georgia democratic leaders admitted that they "made no effort to make the districts as nearly of equal population as was practicable," instead deliberately and openly under-populating Democratic leaning districts and overpopulating Republican leaning districts. *Larios*, 300 F. Supp. 2d at 1325–27. Among other things, the legislative maps paired forty Republican incumbents in the state House and six in the Senate. *Id.* at 1332–34. Perhaps most damning, the record was replete of statements confirming the

11

Democratic legislators' intent to oust Republican members. *See, e.g.*, *id.* at 1328 (Senator Robert Brown: "[Y]ou had the desire on the part of the rural senators to have as many rural senators as possible."); *id.* (Linda Meggers, principal map drawer: "I took all of south Georgia and lassoed it in as if it were one big district, and we had the population, and the deviation, and how many seats. So I knew how many seats I could draw and be within five percent.").

Nothing of the sort is present here. MALC has not plausibly alleged intentional discrimination against Hispanic voters. MALC's allegations, even if assumed to be true, do not "show that the present plan's deviations and boundary shapes result from the predominance of similarly illegitimate factors," which "makes Cox [v. Larios] inapposite here." *Harris v. Arizona Indep. Redistricting Comm'n*, 578 U.S. 253, 264 (2016). Other than the population deviations themselves, MALC alleges no facts that directly or circumstantially establish discriminatory intent. No procedural irregularities, no statements, or anything else. Without more, MALC cannot rebut the presumption that the population deviations present in the House map—which are less than 10%—are the result of good faith efforts to draw appropriate legislative districts. And to be sure, Defendants need not justify the population deviations in the House map because the plan falls within" the "category of minor deviations" that are "insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment." *Voinovich*, 507 U.S. at 161. But if it did, the circumstances explained above—and others—would more than adequately do so.

### III.   MALC's Claims Against the State of Texas Should be Dismissed

Defendants previously explained why the State of Texas is not a proper defendant to this case. *See* ECF 80 at 8–9. Defendants provide additional explanation here. MALC's injury, to the extent it exists at all, is neither traceable to *the State of Texas* nor redressable by an injunction directed at *the State*.

Article III does not permit courts to hear "a proceeding against the government in its sovereign capacity" when "the only judgment required is to settle the doubtful character of the legislation

12

in question." *Muskrat v. United States*, 219 U.S. 346, 361–62 (1911). MALC points to no action *the State of Texas* is taking that it seeks to enjoin, and identifies no relief it could give. Indeed, its entire treatment of the State consists of one sentence. *See* Compl. ¶ 6: "Defendant State of Texas is a political subdivision covered under the provisions of the Voting Rights Act and responsible for the actions of its officials with regard to state-wide redistricting." MALC has already named the Governor and Secretary of State as defendants, so the relief they seek from *the State* cannot be the same as the relief it seeks from the former. Nor can MALC seek relief from the other branches of the Texas government—such as an order directing the Legislature to adopt electoral maps MALC finds acceptable. We know this because, as the Court recently held: "For the purposes of party discovery in this redistricting litigation, "the State of Texas" is made up of state *executive agencies* or officials who have information that is relevant to the factual basis for the claim." ECF 279 at 6. In short, MALC fails to identify some separate part of *the State of Texas* from which it seeks relief.

It follows that, with respect to the State, MALC seeks only "to determine the constitutional validity of this class of legislation." *Muskrat*, 219 U.S. at 361. But absent some tangible requested relief, the State, though "made a defendant," has "no interest adverse to the claimants." *Id.* MALC identifies no injury that is traceable to *the State*, and more importantly, no injury that is redressable by an injunction directed at *the State*. As to the State, therefore, there is no "'case' or 'controversy,' to which, under the Constitution of the United States, the judicial power alone extends." *Id.*

The State should also be dismissed because the Voting Rights Act does not abrogate state sovereign immunity. The Fifth Circuit has held that it does, but that case was wrongly decided. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017) (citing *Mixon v. Ohio*, 193 F.3d 389, 398–99 (6th Cir. 1999)). Congress may abrogate state sovereign immunity only if it "makes its intention to abrogate unmistakably clear in the language of the statute." *Block*, 952 F.3d at 617 (quoting *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003)). But "Section 2 contains no express

13

authorization enabling individuals to maintain such an action in federal court against a State." *Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 658 (11th Cir. 2020) (Branch, J., dissenting). Nothing in the statute's text or structure suggests otherwise. Although this argument is currently foreclosed by precedent, Defendants preserve it for appeal.

### IV. Section 2 Does Not Confer a Private Right of Action

Plaintiffs' Section 2 claims should also be dismissed because Section 2 does not create a private right of action. As another district court recently recognized, under *Alexander v. Sandoval*, there is no private right of action under Section 2 because Congress did not create one. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, No. 4:21-cv-1239, 2022 WL 496908, at *9–17 (E.D. Ark. Feb. 17, 2022) (citing 532 U.S. 275 (2001)). Defendants recognize that the Court has already decided this issue, *see generally* ECF 58, and do not wish to burden the Court with duplicative briefing. Defendants incorporate by reference their previous briefing.

### CONCLUSION

Defendants respectfully request that the Court dismiss the portions of the MALC Plaintiffs' first amended complaint identified by this motion.

14

| | |
|---|---|
| Date: May 18, 2022 | Respectfully submitted. |
| KEN PAXTON<br>Attorney General of Texas | /s/ Patrick K. Sweeten<br>PATRICK K. SWEETEN<br>Deputy Attorney General for Special Litigation<br>Tex. State Bar No. 00798537 |
| BRENT WEBSTER<br>First Assistant Attorney General | WILLIAM T. THOMPSON<br>Deputy Chief, Special Litigation Unit<br>Tex. State Bar No. 24088531 |
| | ARI M. HERBERT<br>Assistant Attorney General, Special Litigation Unit<br>Tex. State Bar No. 24126093 |
| | JACK B. DISORBO<br>Assistant Attorney General, Special Litigation Unit<br>Tex. State Bar No. 24120804 |
| | OFFICE OF THE ATTORNEY GENERAL<br>P.O. Box 12548 (MC-009)<br>Austin, Texas 78711-2548<br>Tel.: (512) 463-2100<br>Fax: (512) 457-4410<br>patrick.sweeten@oag.texas.gov<br>will.thompson@oag.texas.gov<br>ari.herbert@oag.texas.gov<br>jack.disorbo@oag.texas.gov |
| | **COUNSEL FOR DEFENDANTS** |

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 18, 2022, and that all counsel of record were served by CM/ECF.

/s/ Patrick K. Sweeten
PATRICK K. SWEETEN