**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Case No. 3:21-cv-00259 [Lead Case] |
| GREG ABBOTT, *et al.*, | § § § | |
| *Defendants.* | § | |

**MOTION TO DISMISS
THE LULAC PLAINTIFFS' SECOND AMENDED COMPLAINT**

TABLE OF CONTENTS

Table of Contents .................................................................................................................................i
Introduction..........................................................................................................................................1
Argument ..............................................................................................................................................2
    I.    LULAC Cannot Challenge Districts With a Substantial HCVAP Majority.............................2
        A.    LULAC's Allegations Do Not Satisfy the *Gingles* Preconditions ......................................3
        B.    LULAC Cannot Rely on Alleged Retrogression to Support Its Claims............................4
    II.    LULAC's *Larios* Claim Should be Dismissed.................................................................................5
    III.  LULAC's Claims Against the State of Texas Should be Dismissed .......................................11
Conclusion ..........................................................................................................................................13
Certificate of Service..........................................................................................................................14

**INTRODUCTION**

LULAC and its twenty-three co-plaintiffs recently filed their second amended complaint. *See* ECF 237 ("Compl."). That complaint is deficient in at least three significant respects.[1]

First, LULAC brings a number of claims under Section 2 of the Voting Rights Act, but many of these fail on their face because the districts at issue have a substantial Hispanic Citizen Voting Age Population majority. To state a claim under Section 2, LULAC must allege specific facts showing that the Latino population in the specific district is sufficiently large, politically cohesive, but is unable to elect their candidate of choice due to white bloc voting. However, the Latino populations in many of the challenged districts is substantially larger than the white population; at least 20.9% larger for all such districts, and in most cases even larger. As such, it must be the case either that the relevant Latino populations are not politically cohesive, or would not be defeated by white bloc voting. Given the numbers shown below, those two essential preconditions cannot logically both be true. And to the extent LULAC relies on any "retrogression" of the HCVAP, those claims fail because Section 2 does not incorporate the retrogression standard.

Second, LULAC brings a Fourteenth Amendment claim based on the controversial decision in *Larios v. Cox*, 300 F. Supp. 2d 1320, 1347 (N.D. Ga. 2004) (per curiam), *aff'd*, 542 U.S. 947 (2004). It argues that the House map "systematically," and "purposefully," overpopulated several districts in the El Paso and upper Rio Grande Valley region, with the intent of discriminating against Hispanics. This claim is deficient because it relies exclusively on population deviation numbers; nothing in the second amended complaint contains any facts tending to show that the deviations LULAC alleges were made for a discriminatory purpose. These pleadings doom LULAC's claim because where, as here, the total population deviation is less than 10%, a plaintiff fails to make a *prima facie* Fourteenth

---

[1] The second amended complaint is also deficient for reasons not asserted in this Motion. But in the interests of litigation efficiency and the conservation of judicial resources, the Motion is limited to those deficiencies presented here.

1

Amendment case. *See Brown v. Thompson*, 462 U.S. 835, 843 (1983). Only by alleging additional facts tending to show that the Legislature's purpose was arbitrary or discriminatory can a plaintiff rebut the presumption that the population deviations are the result of a good faith effort to draw legal proper electoral districts. This claim must be dismissed because LULAC offers nothing more than the deviations themselves, even though it is undisputed that the overall deviation is less than 10%.

Third, LULAC now adds the State of Texas as a defendant to its VRA claims, but it is not a proper defendant. LULAC's treatment of the State in its complaint is cursory, and it does not identify any injury *the State* has imposed or any relief *the State* could give, in that capacity. Indeed, the Court recently recognized that some named parties in the consolidated cases may be unable to give plaintiffs the relief they seek: "Redistricting cases are complex, and the Court must take into account the inherent mismatch between the actors that may cause a violation of the VRA and those actors that could provide relief from a violation." ECF 279 at 5. But a party is not a proper defendant unless it can give relief to a plaintiff's claim. LULAC cannot identify any such relief *the State of Texas* could give, especially apart from any relief the Governor or Secretary of State could give.

For the reasons set forth below, Defendants respectfully request that the Court grant Defendants' motion and dismiss the relevant portions of the LULAC Plaintiffs' second amended complaint. *See* Fed. R. Civ. P. 12(b)(1), 12(b)(6).

## ARGUMENT

### I. LULAC Cannot Challenge Districts With a Substantial HCVAP Majority

LULAC asserts a number of claims under Section 2, but many of them are facially deficient because the districts at issue have a substantial Hispanic Citizen Voting Age Population majority. These districts are summarized in Table 1, below.[2]

---

[2] This table is based on data contained in the red reports published by the Texas Legislative Council for the enacted House, Senate, Congressional, and State Board of Education maps. *See* Exhibit A (Plan H2316); Exhibit B (Plan S2168); Exhibit C (Plan C2193); Exhibit D (Plan E2106).

2

**Table 1. Challenged Districts with Substantial HCVAP Majority**

| District | HCVAP | White CVAP | H - W | Citation |
|---|---|---|---|---|
| HD118 | 56.4 | 35.5 | +20.9 | Compl. ¶ 142 |
| HD31 | 66.6 | 30.7 | +35.9 | Compl. ¶ 143 |
| HD37 | 77.8 | 20.3 | +57.6 | Compl. ¶ 144 |
| SD27 | 78.3 | 19.4 | +58.9 | Compl. ¶ 156 |
| ED2 | 71.5 | 24.5 | +47.0 | Compl. ¶ 161 |
| ED3 | 57.8 | 31.8 | +26.0 | Compl. ¶ 161 |
| CD15 | 73.8 | 23.0 | +50.8 | Compl. ¶ 170 |
| CD23 | 57.8 | 35.1 | +22.7 | Compl. ¶ 171 |

### A. LULAC's Allegations Do Not Satisfy the *Gingles* Preconditions

Under *Thornburg v. Gingles*, a plaintiff bringing such a suit must establish three "necessary preconditions":

(1) The minority group must be able to demonstrate it is sufficiently large and geographically compact to constitute a majority in a single-member district;

(2) The minority group must be able to show that it is politically cohesive; and

(3) The minority [group] must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 50–51; *see Growe v. Emison*, 507 U.S. 25, 39–41 (1993) ("*Gingles* preconditions" are required in "a § 2 dilution challenge to a single-member districting scheme").

Where, as here, the challenged district comprises a substantial majority of the racial or ethnic group bringing the challenge, the claim necessarily fails either the second or third *Gingles* precondition. To be sure, LULAC alleges, without any supporting facts, that Latinos are politically cohesive: "Latinos in Texas are politically cohesive, including in the geographic areas described above in which Defendants either failed to create Latino citizen voting age majority districts or weakened existing Latino citizen voting age majority districts. Compl. ¶ 172. LULAC also alleges, without any supporting facts, that the Latino-preferred candidate will lose to the Anglo-preferred candidate in each race:

3

> Anglos in Texas—including in the geographic areas described above in which Defendants either failed to create Latino citizen voting age majority districts or weakened existing Latino citizen voting age majority districts—vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.

*Id.* ¶ 173. For one thing, these allegations are not allegations at all. Rather, they are formulaic recitations of the legal standards, and therefore not entitled to be accepted as true. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (Federal courts "are not bound to accept as true a legal conclusion couched as a factual allegation.") (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Moreover, given the numbers explained in Table 1, these two allegations cannot both be true. If the Latino majorities in the districts listed above really were politically cohesive, then they would undoubtedly elect their preferred candidate. Conversely, if an Anglo-preferred candidate prevails, it must be the case that the Latino population in that district is not cohesive. This is particularly obvious in light of the modest white population in these districts. None of these districts have a White CVAP of greater than 35.5%, and that number is far less in most. *See* Table 1, above. In addition, the difference between the HCVAP and White CVAP is substantial. The HCVAP is at least 20.9% greater than the White CVAP in every districts, and in many cases much more than that.

LULAC insists that these districts "strip[] Latino voters . . . of the opportunity to elect their candidate of choice," *e.g.*, Compl. ¶ 142, but the numbers plainly contradict that legal conclusion. It does not, and cannot, satisfy the second and third *Gingles* preconditions for these districts.

**B.    LULAC Cannot Rely on Alleged Retrogression to Support Its Claims**

LULAC appears to also base its Section 2 claims on a retrogression theory, though it does not say as much outright. That is, its complaint is that the HCVAP in some districts is less than the number that existed in the benchmark map. *See, e.g.*, Compl. ¶ 144 ("Plan H2316 *weakens* Latino voting strength in House District 37."); *compare* Ex. A, *with* Ex. E (showing that the HCVAP in HD37 was 85.7 in Plan

4

H2100 (the benchmark) and 77.8 in Plan H2316 (the enacted map)).[3]

But this argument fails on its face because "[r]etrogression is not the inquiry in § 2 dilution cases." *Holder v. Hall*, 512 U.S. 874, 884 (1994). Federal courts routinely "refuse to equate a § 2 vote dilution inquiry with the § 5 retrogression standard." *Georgia v. Ashcroft*, 539 U.S. 461, 478 (2003); *see, e.g.*, *Luft v. Evers*, 963 F.3d 665, 673 (7th Cir. 2020) (Easterbrook, J.) ("The Voting Rights Act does contain an anti-retrogression rule, but it is in § 5(b). . . . Section 2 must not be read as equivalent to § 5(b).") (internal citation omitted). Any retrogression thus does not support LULAC's Section 2 claims.

## II. LULAC's *Larios* Claim Should be Dismissed

LULAC also brings a claim under the Fourteenth Amendment for what it calls "unconstitutional population deviations." Compl. at 61. Though not stated in the complaint, this claim relies on the controversial *Larios* principle: "[A] state legislative reapportionment plan that systematically and intentionally creates population deviations among districts in order to favor one geographic region of a state over another violates the one person, one vote principle firmly rooted in the Equal Protection Clause." *Larios v. Cox*, 300 F. Supp. 2d 1320, 1347 (N.D. Ga. 2004) (per curiam), *aff'd*, 542 U.S. 947 (2004). LULAC's theory is that there should be another "Latino citizen voting age majority House district" in the region surrounding El Paso and the upper Rio Grande Valley. Compl. ¶ 185. It points to House Districts 74, 75, 77, 78, and 79, noting that they contain population deviations greater than zero. It then points to a configuration of districts in West Texas and the Panhandle—namely, HD 69, 71, 72, 81, 82, 83, 84, 86, 87, and 88—noting that they contain population deviations less than zero. *Id.* ¶ 184. From these basic facts, LULAC draws the conclusion that these deviations were "systematically" and "purposefully" designed "to protect the influence of Anglo voters and to preserve Anglo incumbents." *Id.* ¶ 184–85.

---

[3] TLC prepares "special tabulations" of the citizen voting age population for districts as they exist in the benchmark. *See* Exhibit E (special tabulation for Plan H2100).

5

This claim fails because LULAC fails to plausibly allege that Plan H2316 was intentionally and systematically drawn to discriminate against Latino voters in the El Paso and Upper Rio Grande Valley region. The second amended complaint is devoid of any specific allegations tending to show that the Legislature acted with discriminatory intent, let alone alleged facts sufficient to rebut the presumption of legislative good faith. Nor does LULAC grapple with the obvious alternative explanation: that El Paso and the upper and lower Rio Grande Valley lost population relative to the rest of the State. And it fails to recognize that Hispanic majority districts were, as a whole, neither overpopulated nor underpopulated.

As a preliminary matter, *Larios*'s reasoning is not binding on this Court because it is a summary affirmance. Such opinions "have limited precedential value." *Baca v. Berry*, 806 F.3d 1262, 1275 (10th Cir. 2015). As such, "the particularities of *Larios*'s holding that certain Georgia reapportionment plans violated one-person-one-vote principles have little to say to" claims asserted in different circumstances. *Id.* (internal citations omitted); *see also League of Women Voters of Chicago v. City of Chicago*, 757 F.3d 722, 725 n.2 (7th Cir. 2014) (affirming district court decision to dismiss *Larios* claim) ("[A] summary affirmance means that the Supreme Court agreed with the judgment 'but not necessarily the reasoning by which it was reached.'") (quoting *Mandel v. Bradley*, 432 U.S. 173, 176 (1977)).

Rather than *Larios*, the applicable principles flow from the Supreme Court's binding decisions. Firstly, an "apportionment plan with a maximum population deviation [from ideal district size] under 10% falls within" the "category of minor deviations" that are "insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Voinovich v. Quilter*, 507 U.S. 146, 161 (1993); *see also Brown v. Thompson*, 462 U.S. 835, 843 (1983). As such, minor population deviations are "presumed to be constitutionally valid absent a showing of 'arbitrariness or discrimination.'" *League of Women Voters of Chicago*, 757 F.3d at 725 (quoting *Roman v. Sincock*, 377 U.S. 695, 710 (1964)). "[I]f the maximum deviation is less than 10%, the population

6

disparity is considered *de minimis* and the plaintiff cannot rely on it alone to prove invidious discrimination or arbitrariness." *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996) (quoting *Roman*, 377 U.S. at 710 and *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)).

It is undisputed that the maximum deviation in Plan 2193 is less than 10%, namely 9.98%. *See* Ex. A at 1. For this reason, the State "is entitled to a presumption that the apportionment plan was the result of an 'honest and good faith effort to construct districts . . . as nearly of equal population as is practicable." *Daly*, 93 F.3d at 1220 (quoting *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)). And it is clear that rebutting the presumption of legislative good faith is an independent analytical requirement. Indeed, earlier this month, the Eleventh Circuit unanimously stayed a Florida district court's judgment in part because the court failed to "meaningfully account[] for the presumption at all." *League of Women Voters of Florida v. Lee*, --- F.4th ---, 2022 WL 1435597, at *5 (11th Cir. May 6, 2022) (per curiam).

It is black letter law that for deviations of less than 10%, "the population disparity is considered *de minimis* and the plaintiff cannot rely on it alone to prove invidious discrimination or arbitrariness." *Daly*, 93 F.3d at 1220. But that is precisely what LULAC does. The second amended complaint offers nothing more than deviation numbers and related legal conclusions; it does not allege a single specific fact tending to show that the deviations in House map are "arbitrary" or "discriminatory." *Roman*, 377 U.S. at 710. In the complaint, LULAC merely restates the deviation percentages, *see* Compl. ¶¶ 146–47, and concludes that "Defendants' deliberately favored Anglo voters over Latino voters for the purpose of preserving Anglo voting influence and Anglo incumbency." *Id.* ¶ 150. That is a formulaic recitation of the legal language, not a factual basis from which to infer discrimination.

**Figure 1. Plan H2100 Population Deviation Map**



8

Moreover, LULAC overlooks other highly relevant background facts. First, it is clear that the House districts along the southern border substantially decreased in population relative to the rest of the State. Indeed, thirteen of the fifteen districts along the Upper and Lower Rio Grande Valley lost population relative to the ideal. *See* Figure 1, above; *see also* Ex. F. LULAC does not dispute that population changes meant that, under federal one-person-one-vote precedent, the 2021 Legislature could not assign six districts to the same counties that the 2013 Legislature had. Nor does LULAC dispute that the districts drawn by the 2021 Legislature are within the threshold established in the Supreme Court's one-person-one-vote cases.

Figure 1 illustrates a clear basis for the configuration in the El Paso region: those districts lost a substantial amount of population relative to the rest of the State. The Court need go no further to conclude that the numbers LULAC cites do not rebut the presumption of good faith afforded to State legislatures in cases of deviations less than 10%. But if more were needed—which it is not—the Court should also note that districts with a majority HCVAP are almost perfectly balanced with respect to population deviations. *See* Table 2, below; *see also* Ex. A at 22–29.[4] Indeed, of the thirty such districts, fifteen have a positive population deviation, and fifteen have a negative deviation. The mean and median deviation are almost zero, being -.071% and -.195% respectively.

**Table 2. Population Deviation for HCVAP Majority Districts**

| House District | HCVAP | Population Deviation |
|---|---|---|
| 31 | 66.6 | -4.81 |
| 34 | 71.7 | -2.44 |
| 35 | 93.7 | -0.50 |
| 36 | 89.0 | -3.90 |
| 37 | 77.8 | -4.84 |
| 38 | 91.5 | -4.19 |

---

[4] This table is based on data from Exhibit A. For the HCVAP data, *see* p. 33–37; for the population deviation data, *see* p. 22–29. Following the population deviation map, *see* Figure 1, the purple cells indicate a population deviation of less than zero, and green cells indicate a deviation greater than zero. Darker shades are used for deviations exceeding 2.50%.

| House District | HCVAP | Population Deviation |
|---|---|---|
| 39 | 89.0 | -4.17 |
| 40 | 90.5 | -4.55 |
| 41 | 80.4 | -2.62 |
| 42 | 92.6 | -4.93 |
| 43 | 59.7 | 1.17 |
| 74 | 77.4 | 4.60 |
| 75 | 89.8 | 3.19 |
| 77 | 85.6 | 4.95 |
| 78 | 66.4 | 4.88 |
| 79 | 75.1 | 3.64 |
| 80 | 77.6 | -0.88 |
| 81 | 51.9 | -4.96 |
| 104 | 56.3 | -4.53 |
| 116 | 59.1 | 2.79 |
| 117 | 68.7 | 4.51 |
| 118 | 56.4 | 4.60 |
| 119 | 64.8 | 3.72 |
| 123 | 62.0 | 1.45 |
| 124 | 68.9 | 0.11 |
| 125 | 62.6 | 4.36 |
| 140 | 70.2 | -4.18 |
| 143 | 60.0 | 3.20 |
| 144 | 64.8 | 4.97 |
| 145 | 55.7 | -2.78 |

By contrast, in *Larios*, the discrimination was clear from the face of the legislative record. The Georgia democratic leaders admitted that they "made no effort to make the districts as nearly of equal population as was practicable," instead deliberately and openly under-populating Democratic leaning districts and overpopulating Republican leaning districts. *Larios*, 300 F. Supp. 2d at 1325–27. Among other things, the legislative maps paired forty Republican incumbents in the state House and six in the Senate. *Id.* at 1332–34. Perhaps most damning, the record was replete of statements confirming the

Democratic legislators' intent to oust Republican members. *See, e.g.*, *id.* at 1328 (Senator Robert Brown: "[Y]ou had the desire on the part of the rural senators to have as many rural senators as possible."); *id.* (Linda Meggers, principal map drawer: "I took all of south Georgia and lassoed it in as if it were one big district, and we had the population, and the deviation, and how many seats. So I knew how many seats I could draw and be within five percent.").

Nothing of the sort is present here. LULAC has not plausibly alleged intentional discrimination against Hispanic voters. LULAC's allegations, even if assumed to be true, do not "show that the present plan's deviations and boundary shapes result from the predominance of similarly illegitimate factors," which "makes *Cox* [*v. Larios*] inapposite here." *Harris v. Arizona Indep. Redistricting Comm'n*, 578 U.S. 253, 264 (2016). Other than the population deviations themselves, LULAC alleges no facts that directly or circumstantially establish discriminatory intent. No procedural irregularities, no statements, or anything else. Without more, LULAC cannot rebut the presumption that the population deviations present in the House map—which are less than 10%—are the result of good faith efforts to draw appropriate legislative districts. And to be sure, Defendants need not justify the population deviations in the House map because the plan falls within" the "category of minor deviations" that are "insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment." *Voinovich*, 507 U.S. at 161. But if it did, the circumstances explained above—and others— would more than adequately do so.

### III. LULAC's Claims Against the State of Texas Should be Dismissed

LULAC amends its complaint to add the State of Texas as a defendant as to the VRA claims, but the State is not a proper defendant to those claims. LULAC's injury, to the extent it exists at all, is neither traceable to *the State of Texas* nor redressable by an injunction directed at *the State*.

Article III does not permit courts to hear "a proceeding against the government in its sovereign capacity" when "the only judgment required is to settle the doubtful character of the legislation

11

in question." *Muskrat v. United States*, 219 U.S. 346, 361–62 (1911). LULAC points to no action *the State of Texas* is taking that it seeks to enjoin, and identifies no relief it could give. Indeed, its entire treatment of the State consists of two sentences. *See* Compl. ¶ 64: "Defendant the STATE OF TEXAS is one of the states of the United States of America. Plaintiffs' claims against Defendant STATE OF TEXAS are limited to those arising under Section 2 of the federal Voting Rights Act of 1965." LULAC has already named the Governor and Secretary of State as defendants, so the relief they seek from *the State* cannot be the same as the relief it seeks from the former. Nor can LULAC seek relief from the other branches of the Texas government—such as an order directing the Legislature to adopt electoral maps LULAC finds acceptable. We know this because, as the Court recently held: "For the purposes of party discovery in this redistricting litigation, "the State of Texas" is made up of state *executive agencies* or officials who have information that is relevant to the factual basis for the claim." ECF 279 at 6. In short, LULAC fails to identify some separate part of *the State of Texas* from which it seeks relief.

It follows that, with respect to the State, LULAC seeks only "to determine the constitutional validity of this class of legislation." *Muskrat*, 219 U.S. at 361. But absent some tangible requested relief, the State, though "made a defendant," has "no interest adverse to the claimants." *Id.* LULAC identifies no injury that is traceable to *the State*, and more importantly, no injury that is redressable by an injunction directed at *the State*. As to the State, therefore, there is no "'case' or 'controversy,' to which, under the Constitution of the United States, the judicial power alone extends." *Id.*

The State should also be dismissed because the Voting Rights Act does not abrogate state sovereign immunity. The Fifth Circuit has held that it does, but that case was wrongly decided. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017) (citing *Mixon v. Ohio*, 193 F.3d 389, 398–99 (6th Cir. 1999)). Congress may abrogate state sovereign immunity only if it "makes its intention to abrogate unmistakably clear in the language of the statute." *Block*, 952 F.3d at 617 (quoting *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003)). But "Section 2 contains no express

12

authorization enabling individuals to maintain such an action in federal court against a State." *Ala. State Conf. of NAACP v. Alabama*, 949 F.3d 647, 658 (11th Cir. 2020) (Branch, J., dissenting). Nothing in the statute's text or structure suggests otherwise. Although this argument is currently foreclosed by precedent, Defendants preserve it for appeal.

### IV.     Section 2 Does Not Confer a Private Right of Action

Plaintiffs' Section 2 claims should also be dismissed because Section 2 does not create a private right of action. As another district court recently recognized, under *Alexander v. Sandoval*, there is no private right of action under Section 2 because Congress did not create one. *See Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, No. 4:21-cv-1239, 2022 WL 496908, at *9–17 (E.D. Ark. Feb. 17, 2022) (citing 532 U.S. 275 (2001)). Defendants recognize that the Court has already decided this issue, *see generally* ECF 58, and do not wish to burden the Court with duplicative briefing. Defendants incorporate by reference their previous briefing.

### CONCLUSION

Defendants respectfully request that the Court dismiss the portions of the LULAC Plaintiffs' second amended complaint identified by this motion.

| | |
|---|---|
| Date: May 18, 2022 | Respectfully submitted. |
| | |
| KEN PAXTON | /s/ *Patrick K. Sweeten* |
| Attorney General of Texas | PATRICK K. SWEETEN |
| | Deputy Attorney General for Special Litigation |
| | Tex. State Bar No. 00798537 |
| BRENT WEBSTER | |
| First Assistant Attorney General | |
| | WILLIAM T. THOMPSON |
| | Deputy Chief, Special Litigation Unit |
| | Tex. State Bar No. 24088531 |
| | |
| | ARI M. HERBERT |
| | Assistant Attorney General, Special Litigation Unit |
| | Tex. State Bar No. 24126093 |
| | |
| | JACK B. DISORBO |
| | Assistant Attorney General, Special Litigation Unit |
| | Tex. State Bar No. 24120804 |
| | |
| | OFFICE OF THE ATTORNEY GENERAL |
| | P.O. Box 12548 (MC-009) |
| | Austin, Texas 78711-2548 |
| | Tel.: (512) 463-2100 |
| | Fax: (512) 457-4410 |
| | patrick.sweeten@oag.texas.gov |
| | will.thompson@oag.texas.gov |
| | ari.herbert@oag.texas.gov |
| | jack.disorbo@oag.texas.gov |

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 18, 2022, and that all counsel of record were served by CM/ECF.

/s/ *Patrick K. Sweeten*
PATRICK K. SWEETEN