**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § | |
| *Plaintiffs,* | § | |
| EDDIE BERNICE JOHNSON, *et al.*, | § | Case No. 3:21-cv-00259 [Lead Case] |
| *Plaintiff-Intervenors,* | § | |
| v. | § | |
| GREG ABBOTT, *et al.*, | § | |
| *Defendants.* | § | |

**REPLY IN SUPPORT OF MOTION TO DISMISS**

## TABLE OF CONTENTS


Introduction ........ 1

Argument ........ 2

I. Intervenors Lack Standing ........ 2

A. Intervenors Incorrectly Contend They Have Standing to Challenge Districts in which They Do Not Reside ........ 2

B. Intervenors Lack Official Capacity Standing Because they Do Not Plausibly Allege an Official Capacity Injury ........ 4

C. Intervenors Cannot Assert Claims on Behalf of an Ethnic Group to which They Do Not Belong ........ 5

II. The State of Texas is Not a Proper Party ........ 6

III. Intervenors' Claims Fail on the Merits ........ 6

A. Intervenors Concede African Americans Can Elect Their Candidate of Choice in CD9, CD18, and CD30 ........ 6

B. Intervenors Fail to Identify a Discriminatory Effect ........ 7

C. Intervenors Fail to Plausibly Allege Discriminatory Intent ........ 8

D. Intervenors Fail to Plausibly Allege Racial Gerrymanders ........ 10

Conclusion ........ 10

Certificate of Service ........ 11

## INTRODUCTION

In the Motion to Dismiss, *see* ECF 225, Defendants explained that the Intervenors lack standing in three significant respects, and that they have failed to adequately plead their claims under Section 2 of the Voting Rights Act, and the Fourteenth and Fifteenth Amendments. Intervenors oppose that motion, *see* ECF 273, but their brief concedes some of Defendants' arguments, misunderstands others, and broadly fails to address the deficiencies in the first amended complaint.

With respect to standing, Defendants noted that Intervenors cannot bring these redistricting claims in their official capacity because their official functions have not been impaired. Intervenors oppose this argument, but fail to identify any allegations of such impairment in their complaint. Defendants also explained the basic principle that standing in redistricting cases is limited to challenging districts in which the plaintiff resides. Intervenors disagree, insisting that they can challenge all districts in the Houston and Dallas-Fort-Worth areas to "eliminate the discriminatory result that was imposed on them as voters, officials, and also on others similarly situated." Opp. at 13. That is plainly wrong.

Finally, Defendants clarified that Intervenors lack standing to bring claims on behalf of Latinos because none of them is a member of that ethnic group. Intervenors respond that they may do so because their claims are based on a coalition theory respecting African-Americans and Hispanics. For one thing, it is seriously doubtful whether plaintiffs of one racial group could bring claims based on a coalition theory without including plaintiffs of the other ethnic group. But what is more, Intervenors do not actually pursue a coalition theory. They admit that each of their districts, Congressional Districts 9, 18, and 30, are African American opportunity districts. And they intervened in this case specifically to represent African Americans' interests. Their assertion regarding coalition districts is false.

And with respect to the merits, Intervenors all but concede that they cannot state discriminatory-effect claims because African Americans have the opportunity to elect their candidate of choice in each of the districts at issue. Even so, Intervenors' theory is that they should be allowed to challenge

other districts they contend are unlawful: "Simply because voters in part of a scheme may be able to elect the candidate of their choice does not impact their ability to litigate such an illegal scheme." Opp. at 9. That is simply wrong. A racial group's ability to elect its candidate of choice forecloses liability under Section 2; and Intervenors' failure to point to any tangible discriminatory effects *they personally* have sustained also forecloses liability for their discriminatory intent claims.

But even if Intervenors had made this threshold showing, their discriminatory intent and racial gerrymandering claims would still fail because the complaint does not contain specific facts that plausibly allege that the Legislature drew CD9, CD18, or CD30 "because of, not merely in spite of," any alleged adverse effects on African Americans in those districts. Intervenors' response fails to identify any such specific allegations in the first amended complaint because none exist. As such, Intervenors resort to reasserting their unadorned legal conclusions. *See* Opp. at 6 ("[T]he First Amended Complaint expressly states that Defendants intentionally discriminated in adoption of the current redistricting plan."); *Id.* at 10 n.10 ("[T]here was an area racial gerrymander.").

## Argument

### I. Intervenors Lack Standing

#### A. Intervenors Incorrectly Contend They Have Standing to Challenge Districts in which They Do Not Reside

Intervenors attempt to challenge many different congressional districts in the House and Dallas-Fort-Worth areas, but they cannot do so because they only reside in CD9, CD18, and CD30. *See* Mot. at 3–4. It is well-established that where "plaintiffs' alleged harm is the dilution of their votes, that injury is district specific." *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018). For this reason, any alleged injury "results from the boundaries of the particular district in which he resides." *Id.* (citing *Baker v. Carr*, 369 U.S. 186, 206 (1962)). This Court has recognized these basic principles in its previous orders. *See* ECF 119 at 2, 6.

Intervenors do not attempt to explain how they have standing to bring Section 2 or discriminatory intent claims as to districts other than CD9, CD18, and CD30. Nor could they if they tried. Instead, they merely reiterate their allegations that the votes of *other people*, in *other districts*, have been diluted. *See, e.g.*, Opp. at 13 ("CD29, a Latino opportunity district, was negatively impacted and lost an important community of interest."). That allegation and all those like it are irrelevant. Article III requires "individualized harm," *United States v. Hays*, 515 U.S. 737, 746 (1995), not harm to third parties.

The closest Intervenors come to responding to their standing deficiency is to argue that CD9, CD18, and CD30 are part of regional racial gerrymanders, and that those districts' role in those alleged gerrymanders confers standing to challenge their own districts. *See* Opp. at 9 ("Congressional Districts 9, 18 and 30 were all redrawn as part of area schemes to gerrymander districts in favor of white voters, dilute the voting strength of African-American and Latino voters and to protect white incumbents of both political parties."). To be sure, racial gerrymandering claims are "analytically distinct" from vote-dilution claims because the relevant injury is the use of race "as a basis for separating voters into districts." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (quoting *Shaw v. Reno*, 509 U.S. 630, 652 (1993)). As such, the Supreme Court has held that a plaintiff can bring such a claim even where, as here, he or she has sustained no vote-dilution injury. *See Hays*, 515 U.S. at 747.[1]

Even assuming the speculative theories about regional gerrymanders as true, the problem for the Intervenors is that their standing is *still* limited to challenging the districts in which they reside, even if the configuration of other districts might theoretically inform the configuration of their districts. To show "individualized harm," a plaintiff must show that he or she "resides in a racially gerrymandered district." *Hays*, 515 U.S. at 744–45; *see also id.* at 745 (The plaintiff must show that he or she has "personally been subjected to a racial classification."). This principle is the same for racial

---

1 *But see id.* at 751–52 (Souter J., concurring) (Arguing that plaintiffs lacks standing to assert a racial gerrymandering claim unless they also alleges vote dilution) (The plaintiffs at issue have not shown they had "been unconstitutionally denied [their] chance to effectively influence the political process.") (quoting *Shaw*, 509 U.S. at 662 (White, J., dissenting)).

gerrymandering claims as it is for other redistricting claims, as the Court has previously held. *See* ECF 119 at 2 (explaining that a plaintiff must "reside[] in a district where their vote has been cracked or packed.") (quoting *Harding v. Dallas County*, 948 F.3d 302, 307 (5th Cir. 2020)); *see also Chen v. City of Houston*, 9 F. Supp. 2d 745, 749 (S.D. Tex. 1998) ("To challenge [a] redistricting plan, a plaintiff must be a resident of the district which he seeks to challenge.") (citing *Hays*, 515 U.S. at 745). Restated, even if CD9, CD18, and CD30 are part of multidistrict gerrymanders—which they are not—Intervenors still would only have standing to challenge the configuration of their particular districts.

### B. Intervenors Lack Official Capacity Standing Because they Do Not Plausibly Allege an Official Capacity Injury

The Motion to Dismiss explained that the Intervenors cannot bring their claims in their official capacity because they do not allege an impairment with their official functions. Mot. at 5–6. *See Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 802 (2015) (explaining that official-capacity claims are only proper for "an institutional plaintiff asserting an institutional injury"). Intervenors' alleged injuries—vote dilution and racial gerrymandering—are no different than those that would be sustained by similarly situated members of the public. They therefore cannot be raised in Intervenors' official capacity. *See Brown v. Todd*, 53 S.W.3d 297, 302–04 (Tex. 2001) (clarifying that a legislator plaintiff must "allege some injury distinct from that sustained by the public at large").

Intervenors offer little in response. With respect to Congresswomen Jackson Lee and Johnson, and Congressman Green, they assert that legislators have standing when the alleged harm affects "their ability to fulfill their responsibilities as congresspeople." Opp. at 3–4 (quoting *Diaz-Balart v. Browning*, No. 1:10-cv-23968, 2011 WL 13175016, at *3–4 (S.D. Fla. Sept. 9, 2011). That is true, so far as it goes, but the principle clearly does not apply here. In *Diaz-Balart*, the issue presented was whether the State of Florida could—by ballot initiative—adopt partisan-gerrymandering restrictions on congressional redistricting. The Florida Legislature sued, as well as several independent legislators, arguing that such a procedure would violate the Elections Clause, which confers on state legislatures the right to draw

electoral districts. *See* 2011 WL 13175016, at *1–4. By contrast, as to Jackson Lee, Johnson, and Green, the opposition identifies no official function of theirs that has been allegedly impaired.

Intervenors' allegations with respect to Representative Crockett fare no better. The opposition generally complains of one instance where an amendment Crockett proposed was rejected. Opp. at 5. For one thing, that is not a cognizable injury at all. *See Raines v. Byrd*, 521 U.S. 811, 824 (1997) (holding that legislator-plaintiffs lacked standing to challenge the vote of the Line Item Veto Act) ("In the vote on the Act, [plaintiffs'] votes were given full effect. They simply lost the vote."). For another, that allegation is totally unrelated to the vote dilution injuries alleged in the first amended complaint.

**C. Intervenors Cannot Assert Claims on Behalf of an Ethnic Group to which They Do Not Belong**

Defendants previously explained that Intervenors lack standing to bring claims based on Hispanic ethnicity because they are African American, not Latino. *See* Mot. at 6–7. Plainly, a plaintiff lacks standing to assert an injury based on an ethnic classification if he does not belong to that ethnic group. *See Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986); *Harding*, 948 F.3d at 308; *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018); *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 332 (5th Cir. 2019).

Intervenors now contend, for the first time, that they can assert claims on behalf of Latinos because they are pursuing a coalition-district theory. *See* Opp. at 18 ("Coalition claims and standing to bring them."). But this argument fails because, as a matter of fact, Intervenors' first amended complaint does not assert coalition-district claims. The Motion to Dismiss explained that CD9, CD18, and CD30 are all African American opportunity districts. *See* Mot. at 1 tbl.1 (noting that the BCVAP in CD9, CD18, and CD30 is 46.8, 40.9, and 49.0, respectively). Nor do Intervenors contest this fact in their opposition. Moreover, in their motion to intervene, Intervenors previously represented that they seek to represent the interests of African Americans, not Latinos. *See* ECF 91 at 1:

> Plaintiff LULAC and other lead Plaintiffs are organizations dedicated to protecting the interests and preserving the civil rights of Latinos in the United States in

> Texas. . . . [Intervenors] seek intervention to protect their interests and that of all African American voters in Texas."

*See also id.* at 4 ("CD30, 18, and 9 are all drawn in a manner as to be unfair to the African-American community such that the impact of African-American voters has been diminished."). Indeed, Intervenors refer to themselves as the "Back Congresspersons" in a recent filing. ECF 295 at 1 n.1.

Some plaintiffs in these consolidated cases bring coalition-district claims. The Intervenors do not. Their claims are based on the theory that they have been discriminated against because they are African Americans. They therefore lack standing to assert claims based on Hispanic ethnicity.

## II. The State of Texas is Not a Proper Party

The Motion to Dismiss explained that the State of Texas is immune from Intervenors' constitutional claims. *See* Mot. at 7–8. Intervenors fail to respond to that argument, instead only contending that the State should remain as a defendant to their VRA claims. *See* Opp. at 19. At the very least, the constitutional claims against the State must be dismissed.

The Voting Rights Act claims against the State should also be dismissed. For one thing, Defendants respectfully contend that *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017), which held that Section 2 of the VRA abrogates sovereign immunity, was wrongly decided. But independent of *OCA-Greater Houston*, the State should be dismissed because there is no adversity between Intervenors and *the State of Texas*, in that capacity. Defendants incorporate by reference their recent briefing on this subject. *See* ECF 289 at 12–14 (Motion to dismiss the MALC plaintiffs' first amended complaint); ECF 290 at 11–13 (Motion to dismiss the LULAC plaintiffs' second amended complaint).

## III. Intervenors' Claims Fail on the Merits

### A. Intervenors Concede African Americans Can Elect Their Candidate of Choice in CD9, CD18, and CD30

Intervenors' Section 2 claims fail because African Americans are able to elect their candidate of choice in CD9, CD18, and CD30. *See* Mot. at 8–10. Indeed, the amended complaint describes these

districts as "African American opportunity districts." Compl. ¶ 38. Nor do Intervenors contest this fact in their response. *See* Opp. at 13, 16–17. For this reason, even if Intervenors could satisfy the first and second *Gingles* preconditions, they would fail to satisfy the third: "The minority [group] must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51.

Intervenors attempt to save their Section 2 claims by pointing to the alleged "retrogression" of the districts at issue. For instance, they complain that the new districts "lessen the voting power of covered minorities." Opp. at 17. But Defendants have already explained that "[r]etrogression is not the inquiry in § 2 dilution cases." *Holder v. Hall*, 512 U.S. 874, 884 (1994); *see also* Mot. at 10–11. Indeed, Intervenors admit that "§ 2 does not have an anti-regression standard." Opp. at 14. Notwithstanding this uncontroversial principle, Intervenors contradict themselves, insisting that "retrogression analysis is required under § 2." *Id.* at 13. This is so, they say, because "[r]etrogression must . . . be read in light of prevailing law." Although the latter statement is unclear, the binding law is not. Intervenors cannot state Section 2 claims based on alleged retrogression.[2] These claims should be dismissed.

**B. Intervenors Fail to Identify a Discriminatory Effect**

As an initial matter, Intervenors' discriminatory intent claims must be dismissed because the amended complaint fails to plausibly allege that Intervenors have suffered a discriminatory effect. *See* Mot. at 12–13. The Court previously held that plaintiffs "may show discriminatory effect *without* making a full *Gingles* showing." ECF 258 at 22 (memorandum and opinion denying motion for preliminary

---

[2] Nor can they state a Section 2 claim based on the fact that the BCVAP in CD30 fell below 50%. Intervenors reiterate their complaint on this subject. *See* Opp. at 6 ("The new plan . . . even reduced the Black Citizen Voting Age population of CD30 from 51% to 48%."). But as previously explained, *see* Mot. at 11, this fact is insignificant by itself. The relevant inquiry under *Gingles* is whether the minority group has the opportunity to elect its candidate of choice. Here, it is uncontested that African Americans can elect their candidate of choice in CD30.

injunction). This inquiry, the Court held, asks whether the district configuration at issue "bears more heavily on one race than another." *Id.* at 25, 32.

Here, Intervenors can point to no effect within CD9, CD18, or CD30 that bears more heavily on African Americans than another racial or ethnic group. Intervenors certainly allege the presence of discriminatory effects in *other districts*. Opp. at 5 (discussing CD5, CD6, CD24, and CD32); *id.* at 12 (as to CD7); *id.* at 13 (as to CD29). But, as explained above, Intervenors lack standing to challenge those districts. Intervenors can only challenge the configuration of CD9, CD18, and CD30, and within those districts, they fail to allege a discriminatory effect. The discriminatory intent claims must be dismissed.

### C. Intervenors Fail to Plausibly Allege Discriminatory Intent

Even if Intervenors could show a discriminatory effect, their intentional discrimination claims would still fail because they fail to plausibly allege discriminatory intent.[3] The beginning of any such analysis is the presumption of legislative good faith. In redistricting cases, "the good faith of a state legislature must be presumed." *Miller*, 515 U.S. at 915. It is "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Perez*, 138 S. Ct. at 2325. The required intent is not mere "volition" or "awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Rather, the Legislature must have passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* It is clear that

---

[3] Intervenors suggest that "Defendants did not seek the dismissal of Intervenors' claims for intentional vote dilution or any that were made under the Fifteenth Amendment to the United States Constitution." Opp. at 1. But in doing so, they misunderstand the nature of these claims. Intentional vote dilution claims proceed under the same analysis, irrespective of whether they are made under Section 2, the Fourteenth Amendment, or the Fifteenth Amendment. Moreover, it is not clear that Section 2 and the Fifteenth Amendment even prohibit such a practice. *See Barnett v. Daley*, 32 F.3d 1196, 1202 (7th Cir. 1994) (Posner, C.J.) ("It is, indeed, no longer clear that intent plays any role in a suit under section 2 of the Voting Rights Act."); *Voinovich v. Quilter*, 507 U.S. 146, 159 (1993) ("This Court has not decided whether the Fifteenth Amendment applies to vote-dilution claims; in fact, we never have held any legislative apportionment inconsistent with the Fifteenth Amendment.").

But if there is an intentional vote dilution claim under Section 2, it is analytically identical to those asserted under the Fourteenth Amendment. *See Abbott v. Perez*, 1318 S. Ct. 2305, 2338 n.1 (Sotomayor, J., dissenting) (equating Section 2 and 14A intentional-vote-dilution claims); *Georgia State Conference of the NAACP v. Georgia*, 269 F. Supp. 3d 1266, 1276 (N.D. Ga. 2017) ("Whether brought under the Fourteenth Amendment or Section 2, an intentional vote dilution claim alleges that a particular redistricting plan was crafted invidiously to minimize or cancel out the voting potential of racial or ethnic minorities.") (quotation omitted).

rebutting the presumption of legislative good faith is an independent analytical requirement. Indeed, earlier this month, the Eleventh Circuit unanimously stayed a Florida district court's judgment in part because the court failed to "meaningfully account[] for the presumption at all." *League of Women Voters of Florida v. Lee*, --- F.4th ---, 2022 WL 1435597, at *5 (11th Cir. May 6, 2022) (per curiam).

The Motion to Dismiss explained that Intervenors' assertions of discriminatory intent are entirely conclusory. *See* Mot. at 13–14. Defendants challenged Intervenors to identify *which* "communities of interest" "economic engines" or "long-term voter coalitions" were harmed within CD9, CD18, and CD30. *See id.* at 13 (quoting Compl. ¶ 32). Intervenors failed to do so, again relying only on general allegations. Opp. at 9 ("Communities of interest were cracked out of each of those districts."). These are legal conclusions and are thus not entitled to be accepted as true. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (explaining that courts "are not bound to accept as true a legal conclusion couched as a factual allegation") (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Defendants also specifically addressed each circumstance Intervenors contend supports their allegation of discriminatory intent, each time explaining the "obvious alternative explanation." *See Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009); *see also* Mot. at 14–16. Tellingly, Intervenors fail to mention all of these allegations in their opposition except the subject of the delay in receiving the Census data. As to the latter, they argue that "Defendants excuses for its behavior are immaterial." Opp. at 17. But these are explanations, not excuses, as the Court has already recognized. *See* ECF 258 at 38–39 (The Defendants argue that "The legislative process was abbreviated because the COVID–19 pandemic caused a delay in the publication of census results. . . . The Court finds Defendants' first explanation persuasive. The COVID–19 pandemic has had disruptive effects in many ways. It was thus unavoidable that the legislature would depart from its ordinary procedures during the 2021 redistricting, for reasons that had nothing to do with discriminatory intent. The Plaintiffs' claim of discriminatory intent stemming from the delay is extraordinarily weak.").

Intervenors do offer one new discriminatory-intent argument, though. They contend that African American and Latino voters were moved from CD9 into CD7 "to strengthen that district on behalf of the white incumbent." Opp. at 12. That argument fails for at least two reasons. First, the alleged discriminatory effect, to the extent it exists at all, exists for CD7, but none of the Intervenors live in that district. Second, the *white incumbent* of CD7 is Democrat Congresswoman Lizzie Fletcher. If, as Intervenors contend, African Americans and Latinos in this area typically support the candidate of the Democratic Party, their movement into CD7 actually *helps* them elect their candidate of choice. Intervenors' theory of discriminatory intent is unintelligible, and falls well short of rebutting the strong presumption of good faith afforded to the Texas legislature.

### D. Intervenors Fail to Plausibly Allege Racial Gerrymanders

Lastly, Intervenors' racial gerrymandering claims must also be dismissed. The Motion to Dismiss explained that Intervenors improperly focused their claims on districts other than CD9, CD18, and CD30. *See* Mot. at 16–18. It further explained that the amended complaint failed "to allege with particularity how CD9, CD18, and CD30 were gerrymandered with respect to African Americans." *Id.* at 17. Intervenors' opposition fails to address these points, preferring to maintain their allegations at 10,000 feet. It speaks only of "area schemes," and "drastic changes," Opp. at 9, without once mentioning how their particular districts were gerrymandered. Much like the intentional-vote-dilution allegations, these assertions are conclusory, and do not plausibly allege discriminatory intent.

## CONCLUSION

Defendants respectfully request that the Court grant their Motion and dismiss the Intervenors' first amended complaint. *See* Fed. R. Civ. P. 12(b)(1), 12(b)(6).[4]

---

[4] Intervenors object to the Motion to Dismiss as "deficient," Opp. at 2, because they are unable to tell which Rule 12 defenses Defendants assert. Those defenses are clear from the face of the Motion, but to the extent clarification would help Intervenors better understand the nature of the arguments, Defendants confirm that the standing arguments are made under Rule 12(b)(1) and the merits arguments are made under Rule 12(b)(6).

Date: May 19, 2022

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Tex. State Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

JACK B. DISORBO
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24120804

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ari.herbert@oag.texas.gov
jack.disorbo@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 19, 2022, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN