# United States District Court
# for the Western District of Texas
## El Paso Division

| | | |
|---|---|---|
| **LEAGUE OF UNITED LATIN AMERICAN CITIZENS,** *et al.*, | § § § § | |
| *Plaintiffs,* | § | |
| **v.** | § § | **No. 3:21-CV-259-DCG-JES-JVB** |
| **GREG ABBOTT,** *in his official capacity as Governor of the State of Texas,* *et al.*, | § § § § | **[Lead Case]** |
| *Defendants.* | § § | |
| **VOTO LATINO,** *et al.*, | § § | |
| *Plaintiffs,* | § § | |
| **v.** | § § | **No. 1:21-CV-965-RP-JES-JVB** |
| **JOHN SCOTT,** *in his official capacity as Texas Secretary of State,* *et al.*, | § § § | **[Consolidated Case]** |
| *Defendants.* | § § | |
| **MEXICAN AMERICAN LEGISLATIVE CAUCUS,** *Texas House of Representatives,* | § § § | |
| *Plaintiff,* | § § | **No. 1:21-CV-988-RP-JES-JVB** |
| **v.** | § § | **[Consolidated Case]** |
| **STATE OF TEXAS,** *et al.*, | § § | |
| *Defendants.* | § | |

| | | |
|---|---|---|
| **TEXAS STATE CONFERENCE OF THE NAACP,** | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **No. 1:21-CV-1006-RP-JES-JVB** |
| | § | **[Consolidated Case]** |
| **GREG ABBOTT,** *in his official capacity as Governor of the State of Texas,* *et al.,* | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| **FAIR MAPS TEXAS ACTION COMMITTEE,** *et al.,* | § | |
| | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **No. 1:21-CV-1038-RP-JES-JVB** |
| | § | **[Consolidated Case]** |
| **GREG ABBOTT,** *in his official capacity as Governor of the State of Texas,* *et al.,* | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **No. 3:21-CV-299-DCG-JES-JVB** |
| | § | **[Consolidated Case]** |
| **STATE OF TEXAS,** *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

**MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS TO DISMISS**

# CONTENTS

| | | |
|---|---|---|
| **I.** | **BACKGROUND** | 5 |
| A. | Scope of This Order | 5 |
| B. | Procedural History | 5 |
| **II.** | **JURISDICTION** | 9 |
| A. | Standing | 9 |
| 1. | Third-Party Standing | 9 |
| a) | Organizational Standing | 11 |
| b) | Associational Standing | 13 |
| c) | Conclusion on Third-Party Standing | 20 |
| 2. | Individual Standing | 20 |
| B. | Sovereign Immunity | 25 |
| **III.** | **MERITS OF THE CLAIMS** | 27 |
| A. | Predicate VRA Issues | 27 |
| 1. | Private Cause of Action | 27 |
| 2. | Application to Redistricting | 27 |
| 3. | The Role of Intent | 27 |
| B. | Section 2 Vote Dilution (*Gingles*) | 29 |
| 1. | Governing Law | 30 |
| 2. | Claims | 33 |
| a) | MALC | 33 |
| b) | NAACP | 39 |
| c) | Fair Maps | 42 |
| d) | The United States | 43 |

|  |  |  |  |
|---|---|---|---|
| (i) | CD 23 | | 44 |
| (ii) | New Harris County CD | | 47 |
| (iii) | HD 31 | | 48 |
| (iv) | HD 118 | | 50 |
| (v) | New West Texas HD | | 50 |

C.   Intentional Vote Dilution (Equal Protection) ........ 52

    1.   Discriminatory Effect ........ 52

    2.   Discriminatory Intent ........ 53

D.   Racial Gerrymandering ........ 55

E.   Malapportionment ........ 57

**IV.   CONCLUSION** ........ 58

# I. BACKGROUND

## A. Scope of This Order

Before the Court are five motions to dismiss—Dkts. 22, 80, 82, 111, and 181—brought by Defendants in five consolidated actions: (1) *Voto Latino v. Scott*, No. 1:21-CV-965 (W.D. Tex.); (2) *MALC v. Texas*, No. 1:21-CV-988 (W.D. Tex.); (3) *Texas State Conference of the NAACP v. Abbott*, No. 1:21-CV-1006 (W.D. Tex.); (4) *Fair Maps Texas Action Committee v. Abbott*, No. 1:21-CV-1038 (W.D. Tex.); and (5) *United States v. Texas*, No. 3:21-cv-233 (W.D. Tex.). Those motions challenge five complaints: (1) Voto Latino's First Amended Complaint, Dkt. 235; (2) MALC's First Amended Complaint, Dkt. 247; (3) NAACP's Complaint, No. 1:21-CV-1006 Dkt. 1; (4) Fair Maps's Complaint, No. 1:21-CV-1038 Dkt. 1; and (5) the United States' Complaint, No. 3:21-cv-233 Dkt. 1. The Court addresses these motions together because they raise common questions.

Similar motions to dismiss—Dkts. 225, 233, 286, 287, and 290—are also pending before the Court. The Court will address those motions in a future order. Moreover, Defendants have supplemented their motions to dismiss in *Voto Latino* and *MALC*. Dkts. 288, 289. Those Plaintiffs will be permitted to amend their complaints within fourteen days of this order, as the Court will explain. Insofar as those motions raise objections not mooted by future amendments or this order, the Court also will address them in a future order.

## B. Procedural History

These suits are five components of a larger action consolidated before this three-judge court. The first case was filed on October 18, 2021, by the League of United Latin American Citizens (LULAC), along with other organizations. Dkt. 1. The *LULAC* plaintiffs are individual voters and a coalition of organizations that seek an injunction against the maps for State House, State Senate, Congress, and the State Board of Education. Dkt. 1. The *LULAC* plaintiffs maintain that the newly enacted plans would violate their civil

rights by unlawfully diluting the voting strength of the Hispanic electorate. Dkt. 1. Two days later, because the suit challenges the apportionment of congressional and state legislative districts, a three-judge court was convened in *LULAC* under 28 U.S.C. § 2284(b). Dkt. 3.

On November 19, the Court issued an order consolidating *LULAC* with six additional cases.[1] Dkt. 16. Meanwhile, on November 15, Texas filed its first motion to dismiss the *LULAC* plaintiffs, in part reasoning that Section 2 of the VRA does not confer a private cause of action. Dkt. 12 at 16. Then, on November 19, Texas moved to dismiss another group of plaintiffs, including the organization Voto Latino, again contending in part that Section 2 of the VRA does not confer a private cause of action. Dkt. 22 at 1.

The *Brooks* plaintiffs moved for a preliminary injunction as to SD 10 on November 24. Dkt. 39. The motion contended that the legislature unlawfully broke up a minority crossover district. *Id.* at 3–5. Texas moved to dismiss the *Brooks* plaintiffs' claims on November 29, maintaining that the complaint neither alleged facts sufficient to show the legislature's discriminatory intent, Dkt. 43 at 10–13, nor stated a disparate-impact claim, *id.* at 2.

On November 30, the United States submitted a Statement of Interest under 28 U.S.C. § 517, expressing its desire to support the availability of a private cause of action to enforce Section 2 of the VRA. Dkt. 46 at 1. On December 3, this Court partially denied Texas's motion to dismiss the *LULAC* plaintiffs for want of a private cause of action, concluding that, under current caselaw, Section 2 includes a private right of action. Dkt. 58 at 1–2.

The Court dismissed the complaint of another plaintiff, Damon Wilson,

---

[1] Those cases are (1) *Wilson v. Texas*, No. 1:21-CV-943 (W.D. Tex.); (2) *Voto Latino v. Scott*, No. 1:21-CV-965 (W.D. Tex.); (3) *MALC v. Texas*, No. 1:21-CV-988 (W.D. Tex.); (4) *Brooks v. Abbott*, No. 1:21-CV-991 (W.D. Tex.); (5) *Texas State Conference of the NAACP v. Abbott*, No. 1:21-CV-1006 (W.D. Tex.); and (6) *Fair Maps Texas Action Committee v. Abbott*, No. 1:21-CV-1038 (W.D. Tex.).

on December 3, 2021, for lack of standing. Dkt. 63 at 1–3. Wilson tried to amend his complaint on December 13. Dkt. 86. Because he failed to request the Court's leave before filing an amended complaint, and because he would not have been able to establish a concrete injury-in-fact, the Court struck the amendment and dismissed his action on February 8, 2022. Dkt. 187 at 5.

Texas moved to dismiss two more complaints, those of the *MALC* and *NAACP* plaintiffs, on December 9. Dkts. 80, 82. The next day, the Court consolidated *United States v. Texas*, No. 3:21-CV-299 (W.D. Tex.), with the present case. Dkt. 83. On December 15, the court consolidated *Fischer v. Abbott*, No. 3:21-CV-306 (W.D. Tex.), with *LULAC*. Dkt. 92.

After receiving proposed scheduling orders from the parties, the Court set the scheduling order for the consolidated cases on December 17. Dkt. 96. A final trial on the merits was set for September 27, 2022. Dkt. 96 at 4. The scheduling order was amended on December 27, 2021, with the trial date changed to September 28, 2022. Dkt. 109.

Defendants moved to dismiss the United States' complaint on December 27, 2021. Dkt 111. The Court denied Texas's motion to dismiss the *Brooks* plaintiffs' complaint on January 18, holding that they had pleaded plausible discriminatory-effects and discriminatory-intent claims. Dkt. 144. Defendants moved to dismiss Fair Maps's complaint on February 5, 2022. Dkt. 181.

On January 11, 2022, the Court allowed four Congresspersons, led by Rep. Eddie Bernice Johnson, to permissively intervene as plaintiffs. Dkt. 132. Two days later, the Court consolidated *Escobar v. Abbott*, No. 3:22-CV-22 (W.D. Tex.) with *LULAC*. Dkt. 137.

On February 1, 2022, the Court denied Plaintiffs' motion for a preliminary injunction in a brief order. Dkt. 176 at 3. The Court issued that order promptly to permit the March 1, 2022, primary to be conducted on schedule as designated by statute. The Court followed up with a memorandum

opinion explaining the reasons for denying the preliminary injunction on May 4, 2022.  Dkt. 258.

Defendants next moved to dismiss the complaints of Fischer, Dkt. 204, and the Intervenor-Plaintiffs, Dkt. 205, on March 14, 2022.  Those plaintiffs amended their complaints on April 6, 2022, Dkt. 217, and March 28, 2022, Dkt. 209, respectively.  The Court mooted Defendants' motions to dismiss, Dkts. 204, 205, in text orders, after reading the amended complaints.

Defendants filed their next motions to dismiss in mid-April.  Those motions applied to *Escobar*, Dkt. 223, the Intervenor-Plaintiffs' First Amended Complaint, Dkt. 225, and Fischer's First Amended Complaint, Dkt. 233.  Plaintiffs then proposed amendments to their complaints, which the Court permitted.  Those proceedings led to the filing of the *LULAC* Plaintiffs' Second Amended Complaint, Dkt. 237, the *Brooks* Plaintiffs' First Amended Complaint, Dkt. 240, the *Voto Latino* Plaintiffs' First Amended Complaint, Dkt. 235, and MALC's First Amended Complaint, Dkt. 247.

The Court concluded that the motions to dismiss in *Escobar* and *LULAC* were mooted by the amendments.  But that wasn't true of those in *MALC* or *Voto Latino*, particularly in light of the *MALC* parties' agreement that "the pending motion to dismiss should not be treated as moot and that Defendants have an opportunity to file supplements to those motions to dismiss should they feel it necessary."  Dkt. 226 at 2.  Accordingly, the Court decides that the outstanding motions to dismiss in *Voto Latino*, Dkt. 22, *MALC*, Dkt. 80, *NAACP,* Dkt. 82, *United States*, Dkt. 111, and *Fair Maps*, Dkt. 181, are ripe for adjudication.

## II.   JURISDICTION

### A.   Standing

The Court begins, as it must, with standing.  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  Standing is a constitutional prerequisite for this Court's jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  To demonstrate standing, a plaintiff must show (1) an "injury-in-fact," (2) a "causal connection between the injury and the conduct complained of," and (3) a likelihood that the injury will be "redressed by a favorable decision." *Id.* at 560–61 (quotations omitted).  Standing is assessed plaintiff by plaintiff and claim by claim.  *See In re Gee*, 941 F.3d 153, 171 (5th Cir. 2019).

To survive a motion to dismiss, "a complaint must present enough facts to state a plausible claim to relief."[2]  That does not require "exhaustive detail," but "the pleaded facts must allow a reasonable inference that the plaintiff should prevail."   *Mandawala*, 16 F.4th at 1150.   We must also disregard "legal conclusions [and] 'threadbare recitals of the elements of a cause of action." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (alteration adopted).

Defendants challenge the standing of Plaintiffs in *Voto Latino*, *Fair Maps*, *MALC*, and *NAACP*.   Those challenges occupy two classes: third-party standing and individual standing.  The Court addresses each class in turn.

### 1.   *Third-Party Standing*

Defendants challenge the standing of various organizations, whom this Court will call "Entity Plaintiffs."  Entity Plaintiffs are:

- the Fair Maps Committee—which consists of the League of Women Voters of Texas, Clean Elections Texas, Texans Against

---

[2] *Mandawala v. Ne. Baptist Hosp.*, 16 F.4th 1144, 1150 (5th Cir. 2021); *see also Ghedi v. Mayorkas*, 16 F.4th 456, 464 (5th Cir. 2021) ("[T]he same plausibility standard that applies in the Rule 12(b)(6) context also applies to Rule 12(b)(1) [dismissals for want of subject-matter jurisdiction].").

Gerrymandering, Our Vote Texas, ACLU-Texas, the Greater Dallas Section of the National Council of Jewish Women, and Common Cause Texas—plus OCA-Greater Houston, the North Texas Chapter of the Asian Pacific Islander Americans Public Affairs Association, and Emgage, *see* Dkt. 181 at 3–8;

- Voto Latino, *see* Dkt. 22 at 2–7;

- MALC, *see* Dkt. 80 at 2–8; and

- NAACP, *see* Dkt. 82 at 2–7.

Defendants say Entity Plaintiffs have not demonstrated injury in fact. An organization may show injury-in-fact in two ways.

*First*, the organization may show that the defendants' acts injured the organization itself. *See NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010). That is "organizational standing." *Id.* To establish it, the organization must show that "the defendant's conduct significantly and perceptibly impaired" the organization's activities. *Id.* (quotation omitted). Such injury must be "far more than simply a setback to the organization's abstract social interests" or costs related to the instant litigation. *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also ACORN v. Fowler*, 178 F.3d 350, 361 n.7 (5th Cir. 1999) ("[S]howing that an organization's mission is in direct conflict with a defendant's conduct is insufficient . . . ."). "[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art[icle] III." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976). Put another way, even if an organization incurs some expense because of a defendant's conduct, that expense is not a cognizable Article III injury unless it "detract[s] or differ[s] from its routine activities." *Tenth St. Residential Ass'n v. City of Dall.*, 968 F.3d 492, 500 (5th Cir. 2020) (quotation omitted) (original alteration adopted).

*Second*, an organization may assert the standing of its members, insofar

as their interests in the suit are "germane" to the organization's "purpose." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). That is "associational standing." *Id.* An organization must identify "a specific member" to assert standing on his behalf.[3] After all, to assess our power to decide a case, this Court must know who was injured and how.

a)      *Organizational Standing*

No Entity Plaintiff has adequately pleaded organizational standing.

The Court turns first to the Entity Plaintiffs featured in the *Fair Maps* complaint. *See* Dkt. 181 (for Defendants' motion to dismiss). All assert the same boilerplate injury: that Texas's redistricting plan "frustrates[ ] and impedes" their "core missions." Fair Maps Compl. ¶ 13; *see also, e.g., id.* ¶¶ 9, 15, 17.

That injury is much too abstract to sustain organizational standing. *See, e.g., NAACP*, 626 F.3d at 238–39. Plaintiffs have not specified projects that Defendants' redistricting plan has compelled them to commence. *See, e.g., OCA-Greater Hous.*, 867 F.3d at 612. Nor have they specified how Defendants' conduct directly "frustrates" their ability to "promote civic participation," Fair Maps Compl. ¶ 13, "organize[ ] volunteers," *id.* ¶ 8(b), "educate on voting rights issues," *id.* ¶ 8(f), or fulfill their other organizational goals. Entity Plaintiffs must demonstrate that Defendants' redistricting plans "significantly and 'perceptibly impaired'" their actual activities, not just their abstract interests (no matter how important) in civic participation, voting rights, and the like. *NAACP*, 626 F.3d at 238 (quotation omitted). The Entity Plaintiffs in the *Fair Maps* suit have not done that.

The complaints of the remaining Entity Plaintiffs—MALC, NAACP,

---

[3] *NAACP v. City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("[T]he Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm . . . .").

and Voto Latino—suffer the same defect.

NAACP states that it "will have to commit significant time and resources to combatting the effects of these new maps" and therefore "will be unable to commit to other programs that are core to its mission." NAACP Compl. ¶ 22. But the Court cannot credit that legal conclusion, which NAACP does not support with specific factual allegations. *Mandawala*, 16 F.4th at 1150 (citing *Iqbal*, 556 U.S. at 678). And even if NAACP had pleaded facts showing it had diverted resources to addressing Defendants' conduct, that could not alone meet NAACP's burden. Mere redirection of resources in response to another party's actions does not supply standing; after all, there is "no legally-protected interest in *not* expending . . . resources on behalf of individuals for whom [the plaintiff] . . . advocates . . . ." *Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994). NAACP also complains that Defendants' conduct impedes its "organizational mission." Dkt. 107 at 8. But that cannot suffice, as this Court already has explained. If it could, anyone could "obtain judicial review of otherwise non-justiciable claims simply by . . . drafting a mission statement[ ] and then suing on behalf of the . . . extremely interested organization."[4]

It's not clear that MALC has even attempted to assert organizational standing. MALC does claim that it "will have to expend resource[s], including paid staff time . . . , [and] play[ ] defense against policies it opposes." MALC FAC ¶ 1. But the first asserted injury is unsupported by specific factual allegations, and the second is not cognizable under settled caselaw. *See, e.g.*, *ACORN*, 178 F.3d at 362 n.7. MALC thus lacks organizational standing.

Voto Latino also lacks organizational standing. It avers that it will "have to expend and divert additional funds and resources that it would otherwise spend" elsewhere "to combat" the effects of Defendants' redistricting plan on

---

[4] *Galveston Open Gov't Project v. HUD*, 17 F. Supp. 3d 599, 615–16 (S.D. Tex. 2014) (Costa, J.) (quoting *Nat'l Treasury Emps. Union*, 101 F.3d 1423, 1429 (D.C. Cir. 1996)).

"Latinx voters in Texas." Voto Latino FAC ¶ 16. Again, this Court cannot credit that cursory, unsupported assertion. And Voto Latino pleads nothing that would show or suggest that Defendants' redistricting maps impede its actual activities—*i.e.*, its ability "to educate, register, mobilize, and turn out Latinx voters across the United States, including in Texas." *Id.* ¶ 15.

b)   *Associational Standing*

Though no Entity Plaintiff has adequately pleaded organizational standing, Entity Plaintiffs can show standing through the standing of their members. Fair Maps has such associational standing to challenge House District 95, Senate District 10, and Congressional District 25.[5] And MALC has adequately alleged standing to challenge the House, Congressional, and State Board of Education districts where its members reside and are registered to vote, as well as to contest Defendants' failure to create certain minority opportunity districts. The remaining Entity Plaintiffs have not plausibly alleged standing.

This Court turns first to the Entity Plaintiffs featured in the *Fair Maps* complaint. Fair Maps, by virtue of the League of Women Voters of Texas, has adequately pleaded associational standing—but only to challenge HD 95, SD 10, and CD 25. Angela Rainey, a Black member of the League, resides in those districts, where she regularly votes and intends to vote in the future. Fair Maps Compl. ¶ 19. Rainey has plausibly alleged an injury in fact,[6] and Fair Maps may assert her injury as its own.

---

[5] The Court hereinafter uses "HD" to refer to particular state House districts, "SD" to refer to particular state Senate districts, "CD" to refer to particular congressional districts, and "ED" to refer to particular State Board of Education districts.

[6] In redistricting cases, plaintiffs typically meet the injury-in-fact requirement by establishing that an action by the state has reduced the power of their votes relative to the votes of others. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) (decrying the "debasement or dilution of the weight of a citizen's vote"); *Evenwel v. Abbott*, 136 S. Ct. 1120, 1125 (2016) (discussing plaintiffs' contention that "basing apportionment on total population dilutes their votes").

The remaining Entity Plaintiffs in the *Fair Maps* complaint don't clear that bar. Some allege no members at all. Others allude only generally to their members in Texas, whom the redistricting plan "harms . . . [by] preventing them from electing their candidates of choice." Fair Maps Compl. ¶ 9. That claimed harm is a naked legal conclusion, which this Court cannot credit. *Iqbal*, 556 U.S. at 678. But in any case, those allegations cannot sustain associational standing; they do not "identify members who have suffered the requisite harm." *Summers*, 555 U.S. at 499.[7]

So too with Voto Latino. Though the organization says that it sues "on behalf of its supporters and constituents," it does not identify any of them, Voto Latino FAC ¶ 16, and none of the individual plaintiffs named in the complaint are described as Voto Latino members, *see id.* ¶¶ 17–29. Without identifying its members or their injuries, Voto Latino cannot have associational standing.

NAACP at least pleads that it has "thousands" of members in Texas "who are registered voters" and "who reside in [challenged] districts." NAACP Compl. ¶ 21. But NAACP identifies none of those members with specificity, as it must do to show associational standing. If indeed Defendants' conduct has injured thousands of its members, NAACP should have no trouble identifying some of them in an amended pleading. *See Summers*, 555 U.S. at 497–99.

---

[7] The organizations that compose the Fair Maps Committee are not plaintiffs here. Their standing matters only because Fair Maps claims their standing as its own. *See* Dkt. 191 at 8–9. But Fair Maps cannot assert their standing because those organizations—save for the League of Women Voters as to HD 95, SD 10, and CD 25—have not shown that *they* have standing to challenge Texas's redistricting plan.

It changes nothing for Fair Maps to say, as it does, that its constituents "have members throughout Texas," even though it lists a few specific counties. Dkt. 191 at 9. The constituents could not claim standing through their members unless their members had standing to sue, yet no pleaded facts suggest that they do. And neither Fair Maps nor its constituents have adequately pleaded organizational standing. That means Fair Maps lacks standing except as to the districts in which Rainey, the League's member, lives.

That leaves MALC, which surmounts all the initial barriers to associational standing:  It pleads that it has members; it is a legislative caucus with members in the Texas House.  MALC FAC ¶ 1.  It also pleads that those members, whom the complaint specifically identifies, *see id*. ¶ 2, are "registered voter[s]," *id.*, who "reside in the challenged districts," *id.* ¶ 1.

MALC brings claims of intentional racial discrimination, racial gerrymandering, and malapportionment, along with vote dilution and *Gingles* claims under Section 2 of the Voting Rights Act.[8]  Proceeding claim by claim, *see Gee*, 941 F.3d at 171, this Court finds that MALC's members—and, therefore, MALC—have plausibly alleged standing for most of those claims.

A person has standing to bring racial-discrimination, racial-gerrymandering, malapportionment, or Section 2 vote-dilution claims only where she resides, votes, and personally suffers such injuries.[9]  The logic of that rule is clear:  Someone who complains of voting injury, but does not suffer it in her district, "asserts only a generalized grievance against governmental conduct of which . . . she does not approve."  *Gill*, 138 S. Ct. at 1930 (quotation omitted) (alteration adopted).  Such abstract grievances do not present cases or controversies within our judicial power.  U.S. CONST. art. III, § 2.

That said, the question of standing is quite separate from the question of remedy.  To vindicate a plaintiff who brings a valid malapportionment claim with respect to one district, for example, it may be necessary to redraw every other district in the state.  *See, e.g.*, *Evenwel*, 578 U.S. at 62 (for a malapportionment challenge to the entire Texas Senate map by plaintiffs living

---

[8] The Court uses the term "*Gingles* claim" to refer to a claim brought under the standard for vote dilution in districting recognized by *Thornburg v. Gingles*, 478 U.S. 30, 47–74 (1986), and *Growe v. Emison*, 507 U.S. 25, 38–42 (1993), among other cases.

[9] *See, e.g.*, *Harding v. Cnty. of Dall.*, 948 F.3d 302, 307 (5th Cir. 2020) (vote dilution); *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (racial gerrymandering) (citing *United States v. Hays*, 515 U.S. 737, 744–45 (1995)); *Baker v. Carr*, 369 U.S. 186, 206–08 (malapportionment).

in only two districts).  Such a remedy is entirely within the judicial power, to the extent that it is "limited to the inadequacy that produced the injury in fact that the plaintiff has established."  *Gill*, 138 S. Ct. at 1931 (quotation omitted).  But absent such injury-in-fact, this Court cannot grant *any* relief.  *See id.*

This Court finds that MALC has adequately alleged standing to bring its racial-gerrymandering, intentional-discrimination, and Section 2 vote-dilution claims, though such standing exists only with respect to those districts where MALC has alleged its identified members reside and vote.[10]  MALC also has standing to assert its claim that Defendants malapportioned HDs 74, 75, 77, 78, and 79 in south and west Texas.  *See* MALC FAC ¶¶ 233–37.  MALC members Eddie Morales, Mary Gonzalez, Lina Ortega, Joe Moody, and Art Fiero reside and are registered to vote in those districts, which Plaintiffs specifically allege are "systematic[ally] over-populat[ed]" to dilute Hispanic votes and disfavor southwest Texas.  *Id.* ¶ 236.

That leaves MALC's *Gingles* claim—that Defendants violated Section 2 of the VRA by not drawing enough minority opportunity districts.  *See id.* ¶ 241.  The standing analysis for that claim is not as straightforward as for the others.  The requisite injury in fact is not vote dilution or racial discrimination that directly harms the plaintiff in her current district, but Defendants' failure to draw the plaintiff into a *hypothetical* opportunity district that was not drawn at all.  That harm, as this Court observed in *Perez v. Abbott*, 267 F. Supp. 3d 750 (W.D. Tex. 2017), *rev'd in part on other grounds*, 138 S. Ct. 2305 (2018), "goes beyond the boundaries of a single district."  *Id.* at 774–75.  Even so, that fact does not eliminate the need for a plaintiff to plead specific facts tending to show that the defendant's failure to create a minority opportunity district directly injured her.  In other words, a plaintiff cannot survive a motion to dismiss unless

---

[10] Those districts are (1) CDs 6, 15, 16, 18, 23, 27, 29, and 33; (2) HDs 34, 37, 38, 40, 74, 75, 76, 77, 78, 79, 90, 103, 105, 140, 145, and 148; and (3) EDs 2 and 4.  MALC FAC ¶ 2.

the pleaded facts render it plausible, not merely conceivable, that she would have resided where that Section 2 district should have existed and that the district would have made it more likely that the plaintiff could elect a candidate of her choice.

An example may illustrate those principles. This Court determined that the *Brooks* plaintiffs who lived in SD 9 had adequately alleged standing for a *Gingles* claim because they appeared to request an alternative Section 2 district covering a similar geographic area as the benchmark SD 10, where those plaintiffs did reside before the new maps took effect. Dkt. 119 at 5–6. Yet we dismissed another plaintiff for want of standing: Although she had alleged residence in an adjacent district (SD 22), which crossed into the same county as the desired Section 2 district, we were "unable to discern," "[w]ithout resorting to speculation," "how she has been injured by the redrawing of SD 10 or how a redrawing more in line with the benchmark would redress that injury." Dkt. 119 at 6.

The Court now applies those principles. MALC alleges that Defendants should have drawn (1) additional Hispanic opportunity Texas House districts in "West Texas, Central Texas, and the Nueces County region," MALC FAC ¶¶ 144–47, as well as, seemingly, (2) in Harris County, *id.* ¶ 143; (3) a Hispanic opportunity congressional district in the Dallas–Fort Worth metroplex, *id.* ¶¶ 163–64; (4) an additional Hispanic opportunity congressional district in Harris County, *id.* ¶¶ 165–66; and (5) an additional Hispanic State Board of Education district in Harris County, *id.* ¶¶ 167–71. But MALC nowhere specifies which, if any, of its members plausibly would have been included in those new districts. And the geographic regions that MALC specifies are so large—in some cases, spanning multiple counties and regions—that, as to some of those claims, the Court can only speculate as to whether any MALC members might benefit from the drawing of additional minority opportunity districts.

With respect to claim (1), MALC alleges that "Latino opportunity

district[s] could be drawn" somewhere in the areas encompassing "Odessa and surrounding West Texas," in "Central Texas, in regions between Bexar and Travis Counties," and in "South Texas" somewhere near HD 32. MALC FAC ¶¶ 144–47. Of course, MALC has pleaded that it has several members who live in those vast areas. But those drive-by descriptions of swaths of Texas come nowhere close to demonstrating that some *specific* member plausibly might reside in an additional minority opportunity district drawn there. Indeed, as we have just observed, *supra* at 16 n.10, MALC has not even identified a member that lives in HD 32—the one precise geographic feature identified.[11]

Claim (2), if it is a claim at all, also needs further specification. Harris County has millions of citizens. Another "majority H[ispanic] CVAP district" could be drawn there in myriad ways. MALC FAC ¶ 143. MALC must identify at least one specific member who would plausibly benefit from the creation of a new Section 2 district in a reasonably identifiable area.

Claims (3), (4), and (5) are more detailed. Like claims (1) and (2), claim (3) appears to assert MALC's standing with respect to a large region: the Dallas–Fort Worth metroplex. But the complaint specifies that MALC members live in both districts—CDs 6 and 33—that are responsible for "slicing through Latino communities" there, MALC FAC ¶ 163, and then suggests that a new opportunity district would correct that allegedly unlawful cracking, *see id.* ¶ 164. It is plausible that those two members would benefit from the drawing of an additional minority opportunity district near the intersection of Dallas and Tarrant Counties.

---

[11] Were these allegations sufficient, the Court perceives no reason why MALC could not show standing by alleging, without elaboration, that Defendants should have drawn additional minority opportunity districts "somewhere in Texas." Of course, MALC has many members who reside in Texas and who could conceivably benefit from those districts. But that bare allegation obviously cannot suffice. The test for standing, at this stage, is whether it is *plausible*, given the pleaded facts, that Defendants' failure to draw an opportunity district harmed some specific MALC member(s). Some specificity is required before this Court may so conclude.

Claim (4) is that Defendants could have drawn a second majority-Hispanic congressional district in Harris County; the first such district is CD 29, where, MALC alleges, Defendants instead packed Hispanic voters. *Id.* ¶¶ 165–66. MALC has plausibly alleged standing for that *Gingles* claim: MALC members reside in Harris County in CD 29. Taking the complaint's factual allegations as true, the Court finds that Defendants' failure to draw a second majority-Hispanic district in Harris County plausibly injured those MALC members who, if drawn into such a district, would exit a district that dilutes their votes.

Finally, in claim (5), MALC asserts that Defendants should have drawn an additional majority-minority SBOE district "wholly contained in Harris County while . . . maintaining SBOE District 4 in roughly its current form." MALC FAC ¶ 171. Instead, MALC alleges, Defendants' plan "takes minority communities from District 6," which was "on the verge of becoming a competitive district," "and pairs them with the predominantly Anglo Montgomery County" to Houston's north. *Id.* ¶ 170. A favorable reading of the complaint thus suggests that MALC desires an uncracked version of ED 6, or a new district that occupies a similar area in west Houston.

The trouble is that, according to the complaint, MALC members reside in only two SBOE districts: ED 2, which is well south and west of Houston, and ED 4, a performing minority opportunity district which Plaintiffs say should remain essentially unchanged. The MALC members in ED 2 reside in its southernmost county, Cameron County, hundreds of miles from Houston. *See* MALC FAC ¶ 2(b), (c). The Court cannot imagine how—and MALC does not assert that—not creating an additional minority opportunity district in the Houston area could injure them. Likewise, it is implausible that MALC's members in ED 4, which MALC says should remain essentially unchanged, suffered harm from Defendants' failure to create a minority-performing district next door. For those reasons, the Court finds that MALC has not plausibly alleged standing to assert that Defendants should have created an additional

Hispanic opportunity SBOE district in Harris County.

*c)*   *Conclusion on Third-Party Standing*

Defendants have challenged the standing of the Fair Maps Committee, OCA-Greater Houston, the North Texas Chapter of the Asian Pacific Islander Americans Public Affairs Association, and Emgage; Voto Latino; MALC; and NAACP.  None has organizational standing.  And only two have associational standing.

*First*, Fair Maps, by virtue of its member organization the League of Women Voters of Texas, has plausibly alleged standing to challenge HD 95, SD 10, and CD 25.

*Second*, MALC has adequately alleged standing to bring its racial-gerrymandering, intentional-discrimination, and Section 2 vote-dilution claims regarding the House, Congressional, and State Board of Education districts where its identified members reside and vote.  With respect to its *Gingles* claims, MALC has standing to assert that Defendants should have drawn two additional minority opportunity districts: (1) a congressional district near the intersection of Dallas and Tarrant Counties, and (2) a congressional district in Harris County covering part of CD 29.

The remaining Entity Plaintiffs have not met their burden to adequately allege standing.

*2.*   *Individual Standing*

Next, Defendants challenge the standing of various individuals listed as plaintiffs in the *Fair Maps* and *Voto Latino* complaints.[12]  Generally, Defendants

---

[12] The individual plaintiffs are Khanay Turner, Angela Rainey, Austin Ruiz, Aya Eneli, Sofia Sheikh, Jennifer Cazares, Niloufar Hafizi, Lakshmi Ramakrishnan, Amatulla Contractor, Deborah Chen, Arthur Resa, Sumita Ghosh, and Anand Krishnaswamy (*Fair Maps*); and Rosalinda Ramos Abuabara, Akilah Bacy, Orlando Flores, Marilena Garza, Cecilia Gonzales, Agustin Loredo, Cinia Montoya, Ana Ramón, Jana Lynne Sanchez, Jerry Shafer, Debbie Lynn Solis, Angel Ulloa, and Mary Uribe (*Voto Latino*).

object to standing on two grounds. The first is that Plaintiffs cannot challenge districts in which they don't reside. The second is that some Plaintiffs haven't alleged an intent to vote.

With respect to the *Fair Maps* complaint, Defendants claim that no Plaintiff alleged residence in HDs 33, 61, 66, and 89; SD 22; or CDs 4, 6, 9, 26, 30, and 33. Dkt. 181 at 8. Appearing to concede that omission, Plaintiffs lean instead on the purported associational standing of the Entity Plaintiffs. Dkt. 191 at 11. But that does not work because, as discussed, the Entity Plaintiffs have not identified any specific members who reside in those districts. Associational standing does not exist, so it cannot cure a want of individual standing with respect to those districts.

Plaintiffs next contend that, even if they lack standing to challenge those districts specifically, they do have standing to contest Defendants' failure "to create opportunity coalition districts in [those] areas of Texas"—namely, the counties of Collin, Tarrant, and Fort Bend, as well as the regions of Dallas–Fort Worth and greater Houston. Dkt. 191 at 11; *see also* Fair Maps Compl. ¶ 153 (listing Plaintiffs' *Gingles* claims). That's because, according to Plaintiffs, they "have sufficiently pleaded that there is *at least* one plaintiff who has standing to challenge each of the specific geographic areas named in the Complaint, which are comp[osed] of the specific districts listed in Defendants' motion [to dismiss]." Dkt. 191 at 11.

Though the *Fair Maps* Plaintiffs do not specifically allege that they would live within the hypothetical coalition districts that they desire, this Court finds that the complaint is specific enough to show that they plausibly have standing to raise all but one of their *Gingles* claims: the claim that Defendants should have drawn an additional Hispanic or minority coalition congressional district in the Dallas–Fort Worth region. Plaintiffs allege that Defendants employed CD 6 to crack CD 33's Hispanic population and "discriminated against" Black voters by dividing them between CDs 6, 30, and 33. Fair Maps Compl. ¶ 139. Plaintiffs

then conclude that a *Gingles* district should have been drawn in that region. But no Plaintiff lives or has lived in the three allegedly offending districts, and Plaintiffs have not shown how the other Plaintiffs in the Dallas–Fort Worth region—those residing in CDs 3, 12, and 25—could suffer injury from the failure to draw a *Gingles* district in that area.[13]

With respect to the *Voto Latino* complaint, Defendants reprise their complaint that the Individual Plaintiffs do not reside in all the districts they challenge. Dkt. 22 at 7–9. *Voto Latino*'s Individual Plaintiffs live in CDs 12, 16, 21, 23, 25, 27, 33, 36, and 38, as well as HDs 94 and 143. Voto Latino FAC ¶¶ 17–29. Yet the complaint appears to challenge several other districts where no plaintiff resides. Those districts are CD 20, *id.* ¶ 88, CD 34, *id.* ¶ 84, and CD 35, *id.* ¶ 87, in south and west Texas, six unspecified districts in Dallas and Tarrant Counties, *id.* ¶ 90, and CDs 2 and 29 in the Houston metropolitan area, *see id.* ¶ 87–88; Dkt. 45 at 11.[14]

Standing appears lacking with respect to CDs 20, 34, and 35. None of the *Voto Latino* Individual Plaintiffs resides in those districts, and those who live nearby assert injury only insofar as their votes in their home districts were diluted. *See, e.g.*, Dkt. 45 at 7–8 ("[T]he Individual Plaintiffs specifically allege how decisions made in drawing those districts directly injures them by diluting their voting rights *in their adjoining home districts* . . . .") (emphasis added); *see also, e.g.*, Voto Latino FAC ¶¶ 84–85. Yet "[i]n vote dilution cases," it is well established that "the harm arises from the particular composition of the voter's own district, which causes his vote . . . to carry less weight than it would carry in another, hypothetical district." *Harding*, 948 F.3d at 307 (quotation omitted);

---

[13] *See Lujan*, 504 U.S. at 560–61 (requiring that the plaintiff plead an injury in fact that is "not conjectural or hypothetical" and show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" (quotations omitted)).

[14] Defendants suggest that Plaintiffs also challenged CDs 15 and 28. Dkt. 22 at 8–9. But the Court credits Plaintiffs' later concession, *see* Dkt. 45 at 7 n.3, that they do not question those districts.

*see also id.* at 306 (observing that the plaintiffs, who had standing, hailed from "each of the four [challenged] districts"). The *Voto Latino* Individual Plaintiffs residing in south and west Texas have not shown their standing to challenge districts where they don't live and have not plausibly alleged injury.

Likewise, Plaintiffs have not shown standing to contest the six districts in Dallas and Tarrant Counties. The threshold problem is that the complaint does not identify those districts. Voto Latino's response to Defendants' motion to dismiss belatedly identifies them as CDs 5, 6, 12, 24, 25, and 26. Dkt. 45 at 10. But even if Voto Latino had identified those districts in its complaint, Individual Plaintiffs reside in only two of them: CDs 12 and 25. Voto Latino FAC ¶¶ 21, 25; *see also* Dkt. 22 at 9. The Court agrees that those residents— specifically, Cecilia Gonzales and Jana Lynne Sanchez—would have standing to challenge vote dilution in their home districts. But absent additional factual allegations, those individuals' mere proximity to other districts where vote dilution may have occurred does not create standing to challenge the cracking of those districts. *See Gill*, 138 S. Ct. at 1930; *Harding*, 948 F.3d at 307. Likewise, so far as Voto Latino alleges that a *Gingles* district should have been drawn in the region, more specificity is required to show that those Plaintiffs plausibly suffered harm from Defendants' failure to draw such a district.

Again, the Court stresses that it is not precluded from authorizing a final judgment in this case that requires adjusting the boundaries of other districts, including ones that the Individual Plaintiffs lack standing to challenge directly, to the extent that doing so is required to redress the Individual Plaintiffs' injuries in their own districts. The Court finds only that a plaintiff who pleads mere proximity to a diluted district or some connection between that district's boundaries and vote dilution in her own district does not thereby have standing to challenge the neighboring district. *See Harding*, 948 F.3d at 307.

Voto Latino also contests CDs 2 and 29 in the Houston area. No Plaintiff lives in either district. But as to CD 29, Voto Latino alleges that Defendants

could have drawn a "more compact" district there that would have uncracked the adjacent district, CD 36, of Plaintiffs Jerry Shafer and Agustin Loredo. Voto Latino FAC ¶ 97. That allegation is sufficiently specific; from it, the Court can plausibly infer that Defendants' maps cracked Shafer and Loredo into CD 36 by redrawing CD 29 and that a new map complying with Section 2 of the VRA would revert that configuration.

By contrast, the complaint does not explain how the configuration of CD 2 injured Plaintiffs or which Plaintiffs it injured. Voto Latino does allege that CD 2's configuration "deprives Latino and Black voters" there "of the opportunity to elect their candidates of choice." Voto Latino FAC ¶ 94. But that formulation of the injury suggests that it falls principally, if not exclusively, on voters living in CD 2, and none of those voters is an Individual Plaintiff here. Absent more specific factual allegations demonstrating how CD 2's boundaries harmed specific Plaintiffs who don't reside in that district, this Court cannot say any *Voto Latino* Plaintiff has shown standing to contest its boundaries.

The Court now turns to the *Voto Latino* Plaintiffs' claims regarding state House districts in Tarrant and Harris Counties. Plaintiffs appear to claim that additional Section 2 districts should have been drawn in those regions. With respect to those claims, the Court finds that Individual Plaintiffs have adequately alleged standing.

Regarding Tarrant County, Plaintiffs contend that Defendants "pack[ed] Black and Latino voters into two bizarrely shaped and interlocking House districts spanning the city of Fort Worth: HD90 and HD95." Voto Latino FAC ¶ 99. Plaintiffs have no quarrel with HDs 90, 92, 95, and 101, where nonwhite voters "have a reasonable opportunity to elect candidates of their choice." *Id.* "The county's remaining non-white voters," Plaintiffs continue, "are either in HD92 . . . , in HD101 . . . [,] or cracked among the remaining seven districts in suburban areas of the county." *Id.* Those districts include HD 94, where Plaintiff Cecilia Gonzales resides. *Id.* ¶ 21. Plaintiffs conclude

that a *Gingles* district or districts "could readily be drawn in Tarrant County that would . . . provide additional Latino voters in the region, including Plaintiff Cecilia Gonzales, with the opportunity to elect her candidate of choice." *Id.* ¶ 101. From those statements, the Court finds that it is plausible, when all facts in the complaint are taken as true, that Gonzales resides in an area where a *Gingles* district should have been drawn. She therefore has plausibly alleged standing at this early stage.

Regarding Harris County, Plaintiffs allege that Defendants cracked and packed the Hispanic community in southeast Houston among four districts, including HD 143, where two Individual Plaintiffs (Shafer and Loredo) reside. Voto Latino FAC ¶¶ 102–06. Those individuals, Plaintiffs say, "would cease to have their votes diluted by the excessive packing of Latino voters" if a *Gingles* district were drawn "in the southeast Houston suburbs" such as Baytown, where Shafer and Loredo live. *Id.* ¶ 106. The Court finds that Shafer and Loredo have plausibly alleged that they reside where a *Gingles* district should have been drawn, so they have plausibly alleged standing.

## B.    Sovereign Immunity

MALC sues the State of Texas in addition to Abbott and Scott. But courts do not have jurisdiction to hear suits that would violate state sovereign immunity. *See City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019); *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature."). Sovereign immunity may be overcome only through waiver by the state, abrogation by Congress, or an exception to immunity. *See City of Austin*, 943 F.3d at 997. Texas does not dispute that the *Ex parte Young* exception allows individuals such as Abbott and Scott to be sued in their official capacities. Texas also does not dispute that, under Fifth Circuit precedent, the VRA abrogates immunity for the state itself. (Dkt. 80 at 9 n.1) (citing *OCA-Greater Hous.*, 867 F.3d at 614). But MALC in turn does not dispute that its non-VRA claims cannot be brought against Texas. (Dkt. 139 at 7). We thus dismiss Counts I, III,

and IV of MALC's complaint with regard to Texas but not with regard to Abbott
and Scott.

## III.   MERITS OF THE CLAIMS

### A.   Predicate VRA Issues

*1.   Private Cause of Action*

In two motions before this Court, Defendants seek to preserve their position that Section 2 of the VRA does not provide a cause of action for private plaintiffs. Dkt. 82 at 15; Dkt. 181 at 17. But as Defendants acknowledge, we have already rejected that position, Dkt. 58, and so the Court denies their motion to dismiss on those grounds.

*2.   Application to Redistricting*

Defendants also seek to preserve their position that Section 2 of the VRA does not apply to redistricting. Dkt. 111 at 24. But as precedent forecloses that position, the Court likewise denies their motion to dismiss on those grounds.

*3.   The Role of Intent in VRA Claims*

The United States alleges that Defendants have violated the VRA not just through the discriminatory effects of its redistricting, but also through discriminatory intent.  U.S. Compl. ¶ 164.  Defendants protest that discriminatory intent is not sufficient to state a claim for a VRA violation. Dkt. 111 at 10.  The distinction might seem academic—one imagines that a legislature that intended to discriminate on the basis of race in redistricting would usually manage to do so.  But discriminatory effect under Section 2 is specifically defined and is sometimes difficult to meet.  *See Gingles*, 478 U.S. at 45; *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338–40 (2021).  Thus, the Court must consider whether the United States' allegations of intent are sufficient to state a claim.

Defendants point to the 1982 amendments to the VRA.  Before those amendments, intent was integral to any Section 2 claim, which the Supreme Court had read as merely a restatement of the Fifteenth Amendment.  *See City of Mobile v. Bolden*, 446 U.S. 55, 61 (1980) (plurality opinion).  The 1982

- 27 -

amendments removed that requirement, allowing plaintiffs to show a violation by demonstrating discriminatory effect. *Chisom v. Roemer*, 501 U.S. 380, 395 (1991). The question is whether those amendments, in opening the door to claims of discriminatory effects, also closed the door to Section 2 claims of discriminatory intent.

The Court is bound to conclude that they did not close that door. The parties parse the relevant Supreme Court opinions differently, but they agree that there is Fifth Circuit precedent contrary to Defendants' position. Dkt. 111 at 8–9, Dkt. 161 at 16. In *McMillan v. Escambia County*, 748 F.2d 1037, 1046 (5th Cir. 1984), the court held that a "showing of intent is sufficient to constitute a violation of section 2." Precedent in the Fifth Circuit is governed by a strict rule of orderliness, such that later panels of that court, and much less district courts within the circuit, cannot overturn decisions of prior panels. Fifth Circuit precedents can, of course, be overturned by intervening Supreme Court decisions, but "[s]uch an intervening change in the law must be unequivocal, not a mere 'hint' of how the Court might rule in the future." *United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013).

Defendants point to nothing that would clear that bar and allow us to ignore *McMillan*. In *Voinovich v. Quilter*, 507 U.S. 146 (1993), the Court stressed that apportionment schemes must have "the *effect* of denying a protected class the equal opportunity to elect its candidate of choice," *id.* at 155, but it did so while rejecting the proposition that Section 2 prohibits some types of districts categorically. *Brnovich*, 141 S. Ct. 2321, noted that Section 2 "is violated only where" the political process is not equally open to the relevant groups, *id.* at 2337. But that discussion occurred outside the redistricting context and did not directly refute the intent-only theory of Section 2 liability. Such language might (or might not) be persuasive if we were considering this question in the first instance. But it is not sufficiently unequivocal to overcome Fifth Circuit precedent, and so we reject Defendants' contention that discriminatory intent alone is insufficient to allege a Section 2 violation.

Defendants further maintain that the United States' allegations of discriminatory intent are insufficient to state a claim. Dkt. 111 at 11, 13, 18. Defendants stress that state legislatures are entitled to a presumption that they redistrict in good faith, *see Miller v. Johnson*, 515 U.S. 900, 915 (1995), and that partisanship provides a plausible alternative explanation for the legislature's actions.    But as we have noted previously, the difficulty of proving discriminatory intent does not mean that, at the pleading stage, plaintiffs must present an airtight case or negate alternative theories. Dkt. 144 at 6–7. The United States has pointed to sufficient factual evidence, taken as true and read favorably, to nudge its claim over the line. Among other things, the United States has alleged that Defendants split precincts unevenly based on race, U.S. Compl. ¶ 53, an act that could imply racial intent, *see, e.g.*, *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 274 (2015). The United States has also alleged that Defendants redrew at least two districts along lines that were deemed intentionally discriminatory in the previous redistricting cycle. U.S. Compl. ¶¶ 65, 71. Those allegations are sufficient to state a plausible claim for discriminatory intent, and so we do not dismiss the United States' complaint on that ground.

## B.    Section 2 Vote Dilution (*Gingles*)

Plaintiffs in *MALC*, *NAACP*, *Fair Maps*, and *United States* bring vote-dilution claims under Section 2.[15]    Such claims are often called *Gingles* claims after *Thornburg v. Gingles*, 478 U.S. 30 (1986), because that case provides the "framework" for evaluating Section 2 vote-dilution claims. *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam).[16]    Defendants

---

[15] The *Voto Latino* Plaintiffs also bring such claims.  *Supra* Section II.A.2.  But Defendants did not initially move to dismiss those claims under Rule 12(b)(6).  *See* Dkt. 22. The Court will address Defendants' new contentions, *see* Dkt. 288, in a future order.

[16] *Gingles* itself involved Section 2 challenges to multimember districts, 478 U.S. at 46, but the Supreme Court later extended it to Section 2 challenges to single-member districts like the ones at issue here in *Growe*, 507 U.S. at 40–41.

have moved to dismiss the *Gingles* claims under Federal Rule of Civil Procedure 12(b)(6).[17] As explained below, the Court grants their motions in part and denies their motions in part.

1.    *Governing Law*

Section 2 prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).  That occurs when "the totality of circumstances" shows that a state's "political processes . . . are not equally open to participation by" members of a minority group "in that [they] have less opportunity . . . to participate in the political process and to elect representatives of their choice." *Id*. § 10301(b).

In *Gingles*, the Court "construed"[18] Section 2 to prohibit the "dispersal of a [minority] group's members into districts in which they constitute an ineffective minority of voters."[19]  When "minority and majority voters consistently prefer different candidates" in such districts, "the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters"—thus depriving minorities of an equal opportunity to elect representatives of their choice.  *Gingles*, 478 U.S. at 48.  A successful *Gingles* claim remedies that situation by undoing the dispersal of minorities.  It does so by requiring the state to concentrate them in a new, majority-minority district that will allow the group usually to be able to elect its preferred candidates.  *See*

---

[17] After Defendants moved to dismiss MALC's complaint, MALC sought and received permission to file an amended complaint.  Because MALC did not amend the portions of its complaint relevant to its *Gingles* claims, the Court treats Defendants' motion to dismiss its original complaint as a motion to dismiss its amended complaint with respect to those claims.  *See also* Dkt. 226 at 2 ("The parties further agree that the pending motion to dismiss should not be treated as moot . . . .").

[18] *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017).

[19] *Id.* (alteration adopted) (quoting *Gingles*, 478 U.S. at 46 n.11).

*Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality opinion).  Such Section 2-required districts are often described as "opportunity districts."  *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399, 428–29 (2006); Nicholas O. Stephanopoulos, *The South After* Shelby County, 2013 Sup. Ct. Rev. 55, 75 n.84.

      *Gingles* claims are complicated and analytically intensive.  To require a state to draw its proposed district, a *Gingles* plaintiff must make two showings.  First it must establish three preconditions.  *Wis. Legislature*, 142 S. Ct. at 1248.  Those preconditions are necessary to show that the *Gingles* theory describes the proposed district, *see Gingles*, 478 U.S. at 48–49, so each must be met for the claim to succeed, *Harris*, 137 S. Ct. at 1472.  *Second*, the plaintiff must show that, under the "totality of the circumstances," *Wis. Legislature*, 142 S. Ct. at 1248, the "political process is [not] equally open to minority voters" without the proposed district, *id.* (quoting *Gingles*, 478 U.S. at 79).  Because Defendants' motions focus on the three preconditions, the Court discusses them in further detail below.

      The first precondition is that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district."  *Gingles*, 478 U.S. at 50.  That is "needed to establish that the minority has the potential to elect a representative of its own choice."  *Growe*, 507 U.S. at 40.  Accordingly, the minority group must be able to constitute a majority by CVAP.  *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852–53 (5th Cir. 1999); *see also LULAC*, 548 U.S. at 428–29 (analyzing CVAP and noting that "only eligible voters affect a group's opportunity to elect candidates").  And the population for which that must be shown is the population in the proposed district.  *See Harris*, 137 S. Ct. at 1470; *LULAC*, 548 U.S. at 427–28; *Growe*, 507 U.S. at 40.[20]

---

[20] The Supreme Court has also interpreted the first *Gingles* precondition to include that the minority group is culturally compact, *see LULAC*, 548 U.S. at 430–35, but that requirement is not at issue in Defendants' motions.

The second and third preconditions are often discussed together. The second requires the minority group to be "politically cohesive." *Gingles*, 478 U.S. at 51. The third is that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (citation omitted). Unless both are met, "the challenged districting [does not] thwart[ ] a distinctive minority vote by submerging it in a larger white voting population." *Growe*, 507 U.S. at 40. Plaintiffs normally demonstrate minority political cohesion by showing that "a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56; *see also Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988). That is described as "bloc voting" (just like the third precondition)[21] and typically means that a large majority of the group favors the same candidates.[22] When both minorities and Anglos vote in blocs, courts conclude that voting is "racially polarized"[23] and typically hold that both the second and third preconditions have been met.[24]

---

[21] *E.g.*, *Strickland*, 556 U.S. at 19 (plurality opinion); *Fusilier v. Landry*, 963 F.3d 447, 458 (5th Cir. 2020).

[22] *Compare, e.g.*, *LULAC*, 548 U.S. at 427 (finding "especially severe" bloc voting when roughly 90% of each racial group votes for different candidates), *with, e.g.*, *Strickland*, 556 U.S. at 16 (plurality opinion) (noting "skeptic[ism]" about Anglo bloc voting when 20% of Anglos would need to cross over to satisfy the first *Gingles* precondition); *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (noting that only 22-38% crossover by Anglos and 20-23% crossover by Black voters supported a finding that voting was not racially polarized). The necessary size of the majority, however, is a district-specific inquiry. *See Gingles*, 478 U.S. at 55–56.

[23] *See, e.g.*, *Strickland*, 556 U.S. at 19 (plurality opinion); *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993); *Gingles*, 478 U.S. at 52 n.18; *Fusilier*, 963 F.3d at 458. The existence of racially polarized voting is also one of the factors that *Gingles* highlights as relevant to the totality-of-circumstances inquiry. *See* 478 U.S. at 44–45, 80.

[24] *See, e.g.*, *LULAC*, 548 U.S. at 427; *Gingles*, 478 U.S. at 56; *Fusilier*, 963 F.3d at 458–59; *Campos*, 840 F.2d at 1243. *But see LULAC v. Clements*, 999 F.2d 831, 849–51 (5th Cir. 1993) (en banc) (emphasizing that the plaintiff must still show that the bloc voting is "legally significant").

Even so, the second and third preconditions are not mirror-image requirements for different racial groups. As relevant here, a *Gingles* plaintiff must show the second precondition for the minority population that would be included in its proposed district. *See Harris*, 137 S. Ct. at 1470; *LULAC*, 548 U.S. at 427; *Growe*, 507 U.S. at 40. In contrast, the third precondition must be established for the *challenged* districting. *See Harris*, 137 S. Ct. at 1470; *LULAC*, 548 U.S. at 427; *Growe*, 507 U.S. at 40. Importantly, Fifth Circuit precedent does not preclude a plaintiff from establishing the third precondition even if the challenged district is not majority Anglo by CVAP. *See Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992). Even so, such a plaintiff faces an "obvious, difficult burden" in establishing that situation. *Id.*

One last note. It bears emphasizing that each of these preconditions must be shown on a district-by-district basis. *See Wis. Legislature*, 142 S. Ct. at 1250; *Perez*, 138 S. Ct. at 2332; *LULAC*, 548 U.S. at 437; *Gingles*, 478 U.S. at 59 n.23. Because *Gingles* claims relate to the political experiences of a minority group in a particular location, a "generalized conclusion" cannot adequately answer "'the relevant local question' whether the preconditions would be satisfied as to each district." *Wis. Legislature*, 142 S. Ct. at 1250 (quoting *Harris*, 137 S. Ct. at 1471 n.5).

2.   *Claims*

a)   *MALC*

MALC brings a litany of *Gingles* claims. It challenges the drawing of HDs 31, 32, 37, 80, 90, 118, 145, and 148; CDs 15, 23, and 27; and EDs 2, 3, and 6. Beyond that, it also requests additional Hispanic-majority HDs in Odessa, El Paso County, and Harris County and additional Hispanic-majority CDs in the Dallas-Fort Worth area and Harris County. Defendants move to dismiss all for failure to state a claim. As explained below, the Court grants Defendants' motion with respect to all of MALC's *Gingles* claims.

Before the merits, two preliminary matters. *First*, Defendants move to

strike all of MALC's allegations concerned the percentage of individuals in its districts that speak Spanish at home. *See* Dkt. 80 at 11–12. Federal Rule of Civil Procedure 12(f) permits the court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter," and Defendants say MALC's statements meet that standard because Section 2 protects only racial and ethnic minorities—not Spanish-speakers *per se*. *See* Dkt. 80 at 11–12. Under Fifth Circuit precedent, "the action of striking a pleading should be sparingly used." *United States v. Coney*, 689 F.3d 365, 379 (5th Cir. 2012) (quotation omitted). It is appropriate "only when the [statement] to be stricken has no possible relation to the controversy." *Id.* (quotation omitted). Here, MALC says in part that its Spanish-speaker allegations are relevant to *Gingles*'s totality-of-circumstances inquiry because the language barrier causes Hispanic voters to face special hurdles in participating in the political process. *See* Dkt. 139 at 14; MALC FAC ¶¶ 192, 195. The Court cannot say that that allegation has "no possible relation," *Coney*, 689 F.3d at 379 (quotation omitted), to the issue of whether Hispanic voters have "less opportunity" under "the totality of the circumstances" to "elect representatives of their choice," 52 U.S.C. § 10301(b); *see also Gingles*, 478 U.S. at 79. So Defendants' motion to strike those statements is denied.

*Second*, Defendants say that the Court must disregard any factual allegations in MALC's complaint that are made on information and belief. Dkt. 80 at 12. In their telling, that form of pleading is impermissible unless MALC specifies the "basis" for its factual allegations. Dkt. 80 at 12 (quotation omitted). But information-and-belief pleading is accepted in the Fifth Circuit and throughout the federal courts.[25] That's because the Court must accept all factual allegations as true at the motion-to-dismiss stage; the time to dispute

---

[25] *Johnson v. Johnson*, 385 F.3d 503, 531 n.19 (5th Cir. 2004); 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. § 1224 (4th ed.), Westlaw (database updated Apr. 2022); 2 MOORE'S FED. PRAC. § 8.04[4] (3d ed.), Lexis (database updated Mar. 2022).

their truth is at summary judgment. *See Iqbal*, 556 U.S. at 678. And in any event, many of MALC's information-and-belief allegations *do* identify their factual basis: American Community Survey data. *E.g.*, MALC FAC ¶ 100. The Court therefore declines Defendants' invitation to disregard factual allegations pleaded on information and belief—so long as they are truly factual and not "legal conclusion[s] couched as . . . factual allegation[s]." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Now the merits. Defendants first say that MALC has failed adequately to allege the first *Gingles* precondition for any of its proposed districts because it hasn't identified the location of those districts or pleaded facts that would suggest that Hispanic voters could constitute majorities of those districts. Dkt. 80 at 12–14.

For many districts, the Court disagrees. Some of MALC's claims ask for Hispanic voters to be added to districts that it alleges are *already* majority Hispanic by CVAP.[26] Since Hispanic voters in that geographic area are already numerous enough to constitute a majority of a single-member district, it is obviously plausible that the first *Gingles* precondition could be satisfied by adding others to the district. Other claims involve districts in which Hispanic voters were a majority before redistricting but are now a minority.[27] Because the Hispanic electorate enjoyed CVAP majorities in those districts until very recently, it is plausible that Hispanic voters are numerous and geographically compact there still.

Similar reasoning applies to the additional district that MALC requests in El Paso County. MALC alleges that El Paso County is overwhelmingly Hispanic and that the County would have enough population for an additional half-district if its current, overpopulated districts were ideal size. MALC FAC

---

[26] MALC FAC ¶ 101 (HD 31), ¶ 110 (HD 37), ¶ 117 (HD 80), ¶ 130 (HD 118), ¶ 140 (HD 145), ¶ 156 (CD 23).

[27] MALC FAC ¶¶ 125–26 (HD 90), ¶ 146 (HD 32).

¶¶ 90, 93, 95.  Accordingly, it's plausible that there are enough Hispanic voters in the El Paso region to constitute a majority in an additional district.  Current districts could be underpopulated, and voters could be added from other counties in West Texas.

But the Court agrees with Defendants that MALC has failed adequately to allege the first *Gingles* precondition for its remaining claims.

For most of its remaining districts, MALC provides a location in the form of a small locality or currently existing district.[28]  But understanding where MALC wishes its proposed districts to be drawn doesn't alone meet the first *Gingles* precondition.  MALC must also allege that there are enough Hispanic voters "in some reasonably configured . . . [hypothetical] district," *Harris*, 137 S. Ct. at 1470, to constitute a majority.  And for many of these claims, MALC doesn't allege *anything* about the size of the population of Hispanic voters outside the current districts.[29]  That means they haven't pleaded any facts that would allow the Court to conclude a majority-minority district can be drawn.  So they haven't adequately pleaded the first *Gingles* precondition.

For the others, MALC submits only a bald allegation that Hispanic voters there are "sufficiently numerous and geographically compact to comprise

---

[28] MALC FAC ¶ 144 (HD based in Odessa), ¶¶ 158–62 (CD 15 and CD 27), ¶ 163–64 (new CD in DFW drawn from portions of CD 6 and CD 33), ¶ 165–66 (additional CD in Harris County next to CD 29), ¶¶ 167–68 (adding Hispanic voters in Central Texas to ED 2 and ED 3), ¶¶ 169–171 (ED 6).

[29] MALC FAC ¶¶ 158–62 (CD 15 and CD 27), ¶¶ 167–68 (adding Hispanic voters in Central Texas to ED 2 and ED 3), ¶¶ 169–171 (ED 6).  Regarding the last of those claims, MALC provides nearly enough detail where it notes the sizes of Harris and Fort Bend Counties.  *Id.* ¶ 169.  But it falls short by providing only "non-Anglo" demographic information while appearing to advocate for a "Latino . . . majority" district, *id.* ¶ 171, despite some language suggesting a "coalition" theory, *id.* ¶ 170.  If MALC wishes to plead a theory advocating the creation of a Hispanic majority district, it needs to provide the Court with information to plausibly infer that enough Hispanic voters reside in the area in which the district would be created.  If it wishes to plead a theory based on a coalition district, it needs to state that more clearly.

a majority of the eligible voter population in at least one single member district."[30]  That is a "[t]hreadbare recital[ ] of [an] element[ ] of a cause of action," so the Court can't consider it.  *Iqbal*, 556 U.S. at 678.  MALC hasn't alleged "specific facts" supporting the first *Gingles* precondition for those districts, so those claims must be dismissed.  *Shaw v. Villanueva*, 918 F.3d 414, 418 (5th Cir. 2019).

That leaves MALC's two other proposed HDs in Harris County.  MALC says (1) that the benchmark HD 148 should be "restored" and (2) that an additional majority-minority HD should be drawn somewhere in Harris County without compromising an existing majority-minority district.  MALC FAC ¶¶ 133–43.  But the benchmark HD 148 was only 45.5% Hispanic by CVAP.  MALC FAC ¶ 141.  That's not a majority, so it isn't plausible that using the old lines for HD 148 would satisfy the first *Gingles* precondition.

In support of the latter claim, MALC alleges that there is sufficient Hispanic population in Harris County to draw an additional three or four Hispanic-majority districts beyond the ones that already exist.  MALC FAC ¶¶ 133, 136–38. That certainly makes it *conceivable* that such districts could be "reasonably configured." *Harris*, 137 S. Ct. at 1470.  But MALC doesn't say anything about the geographical compactness of the populations outside current majority-minority districts that is necessary to draw an additional district. Indeed, HDs in Harris County are quite small—there are 24 of them[31]—so voters must be quite compact to constitute the majority of a single House district.  Accordingly, MALC hasn't yet shown it is *plausible* that an additional district described by the first *Gingles* precondition could be drawn.

Next, the Defendants aver that MALC has not adequately alleged that

---

[30] MALC FAC ¶ 144 (HD based in Odessa); *see also* MALC FAC ¶¶ 163–64 (new CD in DFW drawn from portions of CD 6 and CD 33) (similar allegation), ¶¶ 165–66 (additional CD in Harris County next to CD 29) (similar allegation).

[31] MALC FAC ¶ 136.

any of its proposed districts meets the second and third *Gingles* preconditions. Dkt 80 at 14–15. In its telling, MALC's allegations are merely "legal conclusions" that do not suffice at the pleading stage. Dkt 80 at 14–15. The Court agrees.

MALC alleges very little in support of the second *Gingles* precondition for its proposed districts. MALC says that Hispanic voters are (1) "cohesive,"[32] that (2) "voting is polarized between Anglo and Latino voters at levels which are legally significant,"[33] that (3) the districts were or could easily be performing opportunity districts,[34] that (4) its districts have consistently elected Hispanic-preferred candidates,[35] or some mix thereof. The first type of allegation is a "[t]hreadbare recital[ ] of [an] element[ ] of a cause of action"; it isn't worth anything. *Iqbal*, 556 U.S. at 678. The second is a legal conclusion showing that the second precondition has been met.[36] That, too, can't be used to state a claim. *Iqbal*, 556 U.S. at 678–79.

The same goes for the third allegation. Pleading that a district is an "opportunity district" is an allegation that *Gingles* requires it to be drawn—*i.e.*, a legal conclusion.

MALC's fourth allegation is at least a factual one. But it doesn't say anything about how unified Hispanic voters are in supporting those candidates. For all we know, 51% of Hispanic voters supported those candidates—far short of the large majority typically required to show political cohesion. That

---

[32] MALC FAC ¶ 174 (all proposed districts); *see also* MALC FAC ¶ 97 (El Paso HD), ¶ 163 (DFW CD).

[33] MALC FAC ¶ 172; *see also* MALC FAC ¶ 114 (HD 80).

[34] MALC FAC ¶¶ 90–92 (El Paso HD), ¶ 114 (HD 80), ¶ 129 (HD 118), ¶ 138 (additional Harris County HD), ¶ 146 (Odessa HD and HD 32), ¶ 165 (Harris County CD), ¶¶ 167–68 (adding Hispanic voters in Central Texas to ED 2 and ED 3), ¶ 170 (ED 6).

[35] MALC FAC ¶ 98 (HD 31), ¶ 106 (HD 37), ¶ 114 (HD 80).

[36] *See, e.g.*, *Gingles*, 478 U.S. at 62 (plurality opinion) (describing racially polarized voting as a "legal concept").

allegation alone therefore makes it only conceivable that the second *Gingles* precondition has been met for those districts.

The story is the same for the third precondition. MALC claims that Anglos in those districts engage in "bloc voting,"[37] that "voting is polarized between Anglo and Latino voters at levels which are legally significant,"[38] or some mix thereof. Just as before, those allegations cannot be considered because they amount to an allegation that an element of a cause of action has been met or a legal conclusion necessary to that decision. *Iqbal*, 556 U.S. at 678–79. That is especially problematic for MALC, for it faces an "obvious, difficult burden" in showing that districts that are *already* majority Hispanic by CVAP could be dominated by an Anglo voting bloc. *Salas*, 964 F.2d at 1555. Since MALC doesn't allege any facts showing why that could be so, it is not even *conceivable* that the third *Gingles* precondition could be met for those districts—even if the Court credited its conclusory allegations about bloc voting and racial polarization.

All told, MALC has failed to state a *Gingles* claim for any of its proposed districts. Defendants' motion to dismiss those claims is therefore granted.

*b)*    *NAACP*

NAACP, too, brings a litany of *Gingles* claims. It alleges *Gingles* violations related to Senate districts in Tarrant, Dallas, and Fort Bend Counties; House districts in Tarrant, Dallas, Wise, Renton, Brazoria, and Lubbock Counties; and congressional districts in Tarrant, Dallas, and Fort Bend Counties.

Defendants raise three issues regarding NAACP's complaint. The first

---

[37] MALC FAC ¶ 174 (all proposed districts); *see also* MALC FAC ¶ 103 (HD 31), ¶ 112 (HD 37), ¶ 147 (Odessa HD and HD 32), ¶ 158–59 (CD 15), ¶¶ 167–69 (adding Hispanic voters in Central Texas to ED 2 and ED 3).

[38] MALC FAC ¶ 172 (all proposed districts); *see also* MALC FAC ¶ 114 (HD 80).

two are legal objections that the court has already rejected in connection with Defendants' motion to dismiss the *Brooks* case.  But the Court finds the last objection meritorious, so it dismisses NAACP's *Gingles* claims.

First is Defendants' objection to coalition districts—*i.e.*, districts in which minorities are together a CVAP majority, but no individual minority group is.  Defendants say that minority coalitions can never satisfy *Gingles*' first precondition.  *See* Dkt. 82 at 7–13.  But after Defendants finished briefing their motion, we rejected this contention in connection with their motion to dismiss the *Brooks* complaint.  *See* Dkt. 144 at 3–4.  As the Court explained then, "such coalitions *can* satisfy the first *Gingles* condition" under *Campos*, 840 F.2d at 1244.  Dkt. 144 at 3.  And neither of the cases Defendants advance—*Strickland*, 556 U.S. at 13, and *Perry v. Perez*, 565 U.S. 388, 399 (2012) (per curiam)—contradicts *Campos* plainly enough to justify departing from that case.  Dkt. 144 at 3–4.  The Court therefore rejects Defendants' contention here, too.

Next are Defendants' contentions on partisanship.  They say that even if minorities vote cohesively in general elections, NAACP hasn't explained why that behavior is best explained by race, not partisanship, in each of its proposed districts.  *See* Dkt. 82 at 13–14.  Defendants maintain that this prevents NAACP from plausibly alleging that its proposed districts satisfy the second *Gingles* precondition.  Dkt. 82 at 13–14.  But they said the same thing in their motion to dismiss the *Brooks* case.  Dkt. 43 at 8.  And there, the Court explained that—at least at the pleading stage—it is enough for a *Gingles* plaintiff to allege that minorities vote cohesively in general elections in the proposed district.  *See* Dkt. 144 at 4.  Accordingly, the Court rejects this position here, too.

But Defendants' last objection carries weight.  They contend that NAACP has not plausibly alleged that each of its proposed districts meets the second and third *Gingles* precondition because its allegations are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  Dkt. 82 at 13–15 (quoting *Iqbal*, 556 U.S. at 678).  The Court

agrees.

In connection with most of its proposed districts, NAACP merely alleges that minorities in Texas vote "cohesively,"[39] Anglos in Texas vote in a "bloc" to "usually prevent" minority coalitions from electing their candidates of choice,[40] and that Texas as a state suffers from "racially polarized voting."[41] These allegations aren't enough to state a claim. Two are "[t]hreadbare recitals of . . . elements of a cause of action," and the other is a "legal conclusion" showing that both of those elements have been met. *Iqbal*, 556 U.S. at 678–79.

The sole exception is NAACP's claim that *Gingles* requires the state to draw a majority-minority House district in Wise and Denton Counties. NAACP Compl. ¶¶ 166–71. It says that such a district could be drawn by adding additional minority voters to the benchmark HD 65, which was 54% Anglo and 46% minority by CVAP. NAACP Compl. ¶¶ 168, 170. NAACP also alleges that minority voters and "[a] small percentage" of Anglo voters narrowly carried the district for the minority-preferred candidate in the 2020 general election. NAACP Compl. ¶ 168. That candidate won 51.1% of the vote. NAACP Compl. ¶ 168. When the district's demographics are kept in mind, those facts indicate that large majorities of minority voters and Anglo voters supported different candidates in the 2020 general election. Although proving racially polarized voting will require more evidence, that is enough to make it plausible that there was racially polarized voting in the benchmark HD 65.

But the second *Gingles* precondition requires that the minority population *in the proposed district* vote cohesively, and NAACP hasn't alleged anything about the voting behavior of the minorities it would add to the benchmark HD 65. Moreover, the third *Gingles* precondition requires that the

---

[39] NAACP Compl. ¶¶ 7, 96–97, 217.

[40] NAACP Compl. ¶¶ 7, 96–97, 217.

[41] NAACP Compl. ¶¶ 97–98, 217.

Anglo voting bloc usually defeats the minority-preferred candidate under the current districting, and NAACP has made no allegations on that point. Indeed, the minority-preferred candidate *won* the 2020 election for HD 65. NAACP Compl. ¶ 168. Accordingly, based on these allegations, it is not yet plausible that the second and third *Gingles* preconditions can be met for this district.

NAACP has failed to state a *Gingles* claim for any of its proposed districts. So Defendants' motion to dismiss those claims is granted.

c)     *Fair Maps*

Fair Maps brings eight *Gingles* claims. It contends that new House districts must be drawn in Fort Bend, Bell, and Collin Counties; new Senate districts must be drawn in Fort Bend and Tarrant Counties; and new congressional districts must be drawn in the Dallas-Fort Worth and Houston areas (two in the latter region).

Defendants raise three issues regarding Fair Maps's complaint. The first two are criticisms they also advanced in the *Brooks* and *NAACP* cases—namely, that coalition districts cannot satisfy the first *Gingles* precondition and that a *Gingles* plaintiff must explain why partisanship is not the true cause of minority voting behavior at the pleading stage. *See* Dkt. 181 at 15–16. The Court rejects these contentions here for the same reason it rejected them in the *Brooks* and *NAACP* case, as discussed above.[42]

But Defendants' last claim is meritorious. They say that Fair Maps has merely alleged that its case satisfies the second and third *Gingles* preconditions without alleging specific facts that could plausibly show it is entitled to relief. *See* Dkt. 181 at 15–17. The Court agrees.

---

[42] Alternatively, Defendants ask this Court to certify that question to the Fifth Circuit. Dkt. 193 at 5–6. The Court declines, seeing no point to certifying a question the Fifth Circuit has decided.

Fair Maps alleges that minority voters are "cohesive,"[43] that Anglos "overwhelming[ly] vote as a bloc to defeat the candidate of choice of voters of color,"[44] that voting in Texas is "racially polarized,"[45] and that it is possible to draw a district "that meets the standards set forth in *Gingles v. Thornburg* [*sic*], 478 U.S. 30 (1986)" in those locations.[46]  None of that suffices to state a claim. The first two are elements of the cause of actions, and the latter two are legal conclusions—especially bare ones—that *Gingles* is satisfied for the proposed districts. *Iqbal*, 556 U.S. at 678–79.

The Court therefore dismisses all of Fair Maps's *Gingles* claims.  For each of its proposed districts, it has failed to allege facts showing that voting behavior plausibly satisfies the second and third preconditions.

d)    *The United States*

The United States brings five *Gingles* claims.  It contests the drawing of CD 23 and HDs 31 and 118.  It also says that an additional Hispanic-majority congressional district should have been drawn in Harris County and that an additional Hispanic-majority House district should have been drawn near El Paso.  Defendants move to dismiss all for failure to state a claim.  As explained

---

[43] Fair Maps Compl. ¶ 145 ("the areas highlighted in this complaint"); *see also* Fair Maps Compl. ¶ 90 (HD in Fort Bend County), ¶ 102 (HD in Bell County), ¶ 108 (HD in Collin County), ¶ 117 (SD in Fort Bend County), ¶ 126 (SD in Tarrant County).

[44] Fair Maps Compl. ¶ 144 (most parts of Texas "[w]ith very few geographic exceptions"); *see also* Fair Maps Compl. ¶ 90 (HD in Fort Bend County), ¶ 102 (HD in Bell County), ¶ 108 (HD in Collin County), ¶ 117 (SD in Fort Bend County), ¶ 126 (SD in Tarrant County).

[45] Fair Maps Compl. ¶ 143 (voting in Texas); *see also* Fair Maps Compl. ¶ 90 (HD in Fort Bend County), ¶ 102 (HD in Bell County), ¶ 108 (HD in Collin County), ¶ 117 (SD in Fort Bend County).

[46] Fair Maps Compl. ¶ 94 (HD in Fort Bend County); *see also* ¶ 103 (HD in Bell County), ¶ 109 (HD in Collin County), ¶ 118 (SD in Fort Bend County), ¶ 127 (SD in Tarrant County), ¶ 135 (coalition CD in the Houston area), ¶ 136 (Hispanic CD in the Houston area), ¶ 140 (CD in Dallas-Fort Worth).

below, the Court grants Defendants' motion in part and denies it in part.

i)   CD 23

The United States' first *Gingles* claim relates to CD 23.  *See* U.S. Compl. ¶¶ 39–55.  It contends that Defendants should have drawn the new CD 23 along the lines of the benchmark CD 23, in which Hispanic voters were a greater share of the district's CVAP.  *See* U.S. Compl. ¶¶ 44–46, 48, 52.

Defendants first say that the United States cannot satisfy the first *Gingles* precondition because the new CD 23 is *already* a majority Hispanic CVAP district.  Dkt. 111 at 3–4.  The Court disagrees.  The first *Gingles* precondition relates to the *proposed* district.  That the new CD 23 is already majority Hispanic CVAP will make it more difficult for the United States to prove the third *Gingles* precondition,[47] which relates to the current districting.  But it doesn't prevent the proposed district from satisfying the first *Gingles* precondition.

Defendants emphasize language from *Strickland*.  Dkt. 111 at 4.  In that case, the plurality noted that *Gingles* is violated when "when a minority group has 50 percent or more of the voting population and could constitute a compact voting majority but, despite racially polarized bloc voting, that group is not put into a district."  556 U.S. at 19.  That language neither comprehensively describes nor re-writes the first *Gingles* precondition.  *LULAC*, for example, notes that "it may be possible for a citizen voting-age majority to lack real electoral opportunity."  548 U.S. at 428.  And in any case, *Strickland* does not contradict *Salas* clearly enough to justifying ignoring the latter decision, which holds that "a registered voter majority class . . . [is] not precluded, as a matter of law, from seeking to prove [a *Gingles*] claim."  964 F.2d at 1555.

Defendants also protest that retrogression is not *per se* actionable under

---

[47] *See Salas*, 964 F.2d at 1555 (noting the "obvious, difficult burden" a plaintiff will face in demonstrating that an Anglo minority can prevent a Hispanic majority from electing its candidate of choice).

Section 2. *See* Dkt 111 at 6. True enough.[48] But that is not the United States' theory. So long as a retrogressed district actually meets *Gingles*'s requirements, the fact that the United States mentions the term "retrogression" does not prevent it from bringing a successful *Gingles* claim.

Next, Defendants claim that the United States has not adequately alleged the second *Gingles* precondition. Dkt. 111 at 4–5. They offer three reasons.

Defendants' first reason is that the United States does not allege anything beyond the fact that Hispanic voters are "cohesive," which is a legal conclusion that cannot be credited in a motion to dismiss. Defendants' legal observation is correct: Political cohesion is an element of the *Gingles* cause of action, so it can't be used to state a claim. *Iqbal*, 556 U.S. at 678.

But Defendants have misread the United States' complaint. It also alleges that a "majority of Latino voters in [benchmark CD] 23 have preferred Latino Democrats in most primary and general elections." U.S. Compl. ¶ 46. And while the benchmark CD 23 did not elect the Hispanic-preferred candidate after 2012, the United States also alleges that elections in the benchmark CD 23 were very close, including a one-point margin of victory in 2020. U.S. Compl. ¶¶ 45–46.

That brings us to Defendant's second reason. Backtracking on their first reason, they say that the United States' own factual allegations show that Hispanic voters do not "uniformly support" the same candidates and are therefore not cohesive. Dkt. 111 at 5. But the second *Gingles* precondition does not require uniformity, only a large majority. And it is here that Defendants' blows finally land. They also emphasize that the United States does not state "the level or degree of alleged cohesion." Dkt. 111 at 4. And that is fatal to its

---

[48] *See Georgia v. Ashcroft*, 539 U.S. 461, 478 (2003), *superseded by statute on other grounds*, Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, 120 Stat. 577, *as recognized in Ala. Legis. Black Caucus*, 575 U.S. at 276–77; *Holder v. Hall*, 512 U.S. 874, 884 (1994).

complaint.  Based on the facts that it has alleged, it is just as possible that a small majority of Hispanic voters favor the same candidates as a large one.  After all, a majority of voters in the benchmark CD 23 is Hispanic, but its favored candidate has lost the election for nearly a decade.  Thus, it is only conceivable—not plausible—that a large majority of Hispanic voters favors the same candidates.

The last reason Defendants offer is that the United States hasn't met its pleading standard because its allegations relate to the benchmark CD 23, not its proposed district.  It's true that the second *Gingles* precondition relates to the proposed district, but this contention is meritless.  The United States asks for its proposed district to be drawn based on the benchmark CD 23.  The voting patterns of the Hispanic electorate in the benchmark CD 23 are thus highly probative of voting patterns in the proposed district.  So if Hispanic voters in the benchmark CD 23 were cohesive, it would be plausible that Hispanic voters in the proposed version of CD 23 are cohesive, too.

Finally, Defendants say that the United States has failed adequately to allege the third *Gingles* precondition.  *See* Dkt. 111 at 5–6.  They say that it hasn't alleged anything that could explain how a minority of Anglo voters could usually defeat Hispanic-preferred candidates in a district that is majority Hispanic by CVAP.[49]  The Court agrees.  The only thing that the United States alleges about Anglo voters in the new CD 23 is the conclusory allegation that "bloc voting by Anglo voters will enable them to usually defeat Latino voters' preferred candidates."  U.S. Compl. ¶ 50.  As explained previously, that can't be considered.  *See Iqbal*, 556 U.S. at 678.  And although the United States alleges that Republican candidates regularly won in the benchmark CD 23, it doesn't allege anything about Anglo voters' preferences.  The facts that the United States has alleged are just as consistent with strong racial political preferences as with weak racial political preferences in this region.  Accordingly, the United States hasn't plausibly alleged that Anglos vote as a bloc and will usually defeat

---

[49] The new CD 23 is about 56% Hispanic by CVAP.  U.S. Compl. ¶ 48.

the Hispanic-preferred candidate.

In sum, the United States has failed adequately to allege the second and third *Gingles* preconditions with respect to its proposed version of CD 23. This claim is therefore dismissed.

ii)   <u>New Harris County CD</u>

The United States' next *Gingles* claim relates to an additional Hispanic-majority congressional district that it claims should have been drawn in Harris County. U.S. Compl. ¶¶ 76–94. It asserts that "a second Latino opportunity district" should have been "crafted in southeastern Harris County, composed of parts of current [CDs] 2, 29, and 36." U.S. Compl. ¶ 91.[50] Each of those districts shares a border with the other two.

Defendants first say that the United States has failed adequately to allege the first *Gingles* precondition with respect to this district. Dkt. 111 at 15–17. They say that the United States does not offer enough details about its proposed district to conclude that a sufficiently large population of Hispanic voters lives there. The Court disagrees. The United States alleges that Hispanics are 21.7%, 62%, and 22.0% of CVAP in CDs 2, 29, and 36, respectively. U.S. Compl. ¶¶ 85–87. It also alleges that CDs 9 and 18—which are located on CD 29's western border—are 25.8% and 28.5% Hispanic by CVAP, respectively. U.S. Compl. ¶¶ 86. That makes it at least plausible that Hispanic populations in these five districts could be recombined to form two majority-minority districts. Although much remains to be proven, the United States has satisfied the first *Gingles* precondition at this stage.

Defendants also say that the United States has failed adequately to allege that this district meets the second and third *Gingles* preconditions. Dkt. 111 at 17–18. The Court agrees. The United States alleges that "Latino voters in

---

[50] Hispanics already constitute a majority of voters and 62.0% of CVAP in CD 29. U.S. Compl. ¶¶ 85–87.

Harris County, including Latino voters in enacted [CD] 38, are cohesive in the most relevant elections," U.S. Compl. ¶ 93, and "[i]n enacted 2021 [CD] 38, bloc voting by Anglo voters will enable them usually to defeat Latino voters' preferred candidates," U.S. Compl. ¶ 94. Those are conclusory invocations of elements of the *Gingles* cause of action. They also pertain only to CD 38, which is on the other side of Harris County and whose populations would not be included in the proposed district. U.S. Compl. ¶ 94. The United States also alleges that "[i]n the past decade, multiple courts have found that voting is racially polarized in Harris County." U.S. Compl. ¶ 92 (citing *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686 (S.D. Tex. 2013)). In *Rodriguez*, the court concluded that the second and third *Gingles* preconditions were met among Hispanic and Anglo voters in the Harris County Commissioner District 2,[51] which overlaps with CDs 2, 29, and 36.[52] But a court's legal conclusion is still a legal conclusion—*i.e.*, something that the Court can't consider when evaluating whether the United States has stated a claim. *Iqbal*, 556 U.S. at 678. Its *Gingles* claim with respect to this district is therefore dismissed.

iii)   <u>HD 31</u>

The United States' third *Gingles* claim relates to HD 31. U.S. Compl. ¶¶ 117–30. It says that HD 31 should be redrawn by incorporating different, adjacent counties in South Texas with greater Hispanic populations. *See* U.S. Compl. ¶¶ 126–27 (proposing replacement of Wilson and Karnes Counties with Jim Wells and Kleberg Counties). Defendants move to dismiss this claim on two grounds.

First, Defendants maintain that the United States has not adequately alleged the first *Gingles* precondition because a majority of the new HD 31's

---

[51] 964 F. Supp. 2d at 756, 777.

[52] *See id*. at 705–06.

CVAP is Hispanic.  Dkt. 111 at 20.[53]   The Court disagrees.  As it already explained, the existence of a current majority-minority district does not prevent the United States from showing that the population in its proposed district meets the first *Gingles* precondition.

Second, Defendants say that the United States has not adequately alleged the second and third *Gingles* preconditions.  Dkt. 111 at 20–21.  The Court agrees.  In connection with its proposed district, the United States directs us, Dkt 161 at 5, to two allegations: that Hispanic voters in HD 31 have been "cohesive" in the past and that "extreme bloc voting by Anglo voters will enable them usually to defeat Latino voters' preferred candidates" in the future.  U.S. Compl. ¶¶ 128–29.  But the Court cannot credit "[t]hreadbare recitals of . . . elements of a cause of action."  *Iqbal*, 556 U.S. at 678–79.  The United States has therefore failed to state a claim with respect to this district.

Moreover, the United States faces an especially high burden with respect to the third *Gingles* precondition because it must allege facts that make it plausible an Anglo minority can usually beat the candidates preferred by the Hispanic majority.  *See Salas*, 964 F.2d at 1555.  The United States at least alleges that the Hispanic population in one of the counties included in HD 31 is significantly poorer on average than the Anglo population included in another county in the district.  *See* U.S. Compl. ¶ 130.  Although socioeconomic factors can help to explain why an Anglo minority could dominate a district, this allegation isn't enough.  The allegation compares apples and oranges: the Hispanic population in one district to the Anglo population in another.  It is just as possible that the socioeconomic divergence is explained by the location of those populations as racial factors.  What's more, HD 31's CVAP is 64.5% Hispanic.  U.S. Compl. ¶ 123.  That's a large majority; they outnumber all other voters by about two-to-one.  More is required to make it plausible that an Anglo

---

[53] Hispanics constitute 64.5% of CVAP.  U.S. Compl. ¶ 123.

minority dominates the district.

Because the United States has failed plausibly to allege the second and third *Gingles* preconditions with respect to this district, its claim is dismissed.

iv)    <u>HD 118</u>

The United States' fourth *Gingles* claim relates to HD 118.  U.S. Compl. ¶¶ 104–116.  It asks for HD 118 to be constituted along the lines of a proposal made by members of the Texas House, which left HD 118 "largely intact" compared to its benchmark version.  U.S. Compl. ¶¶ 109, 113–14.

Defendants first say that the United States has not adequately alleged the first *Gingles* precondition because the new HD 118 is already a majority Hispanic district by CVAP.  See Dkt. 111 at 19.  The new HD 118 is 57.5% Hispanic CVAP.  U.S. Compl. ¶ 111.  As the Court has already explained, that does not prevent the United States from meeting the first *Gingles* precondition.

Defendants next say that all of the United States' allegations regarding the second and third *Gingles* preconditions are conclusory invocations of the elements of the *Gingles* cause of action.  Dkt. 111 at 19–20.  The Court agrees. As with HD 31, the United States advances only two allegations with respect to HD 118: that Hispanic voters in HD 118 have been "cohesive" in the past and that "bloc voting by Anglo voters will enable them usually to defeat Latino voters' preferred candidates" in the future.  U.S. Compl. ¶¶ 115–16.  Those conclusory allegations can't be used to state a claim.  Plus, HD 118 is currently a majority-minority district.  The United States doesn't offer any facts specific to this district that might explain how its Anglo minority could usually win elections, so it failed plausibly to allege the third *Gingles* precondition twice over. Accordingly, its claim is dismissed.

v)    <u>New West Texas HD</u>

The United States' final *Gingles* claim relates to an additional House district in El Paso and West Texas.  U.S. Compl. ¶¶ 131–46.  But this *Gingles*

claim is a bit unusual.  The United States' main gripe is that the existing House districts in El Paso County are overpopulated.  It wants an additional district drawn but doesn't say that the Hispanic voters in the new district they want in El Paso County can't currently elect their candidate of choice.  Instead, its formal *Gingles* claim pertains to Hispanic voters in neighboring HDs 53 and 81, which incorporate Fort Stockton and Odessa, respectively.  *See* U.S. Compl ¶ 145–46.  The strategy appears to be that shifting Hispanic voters in those areas into the neighboring HD 74, which stretches from El Paso to the borders of those House districts, will indirectly require the creation of an additional Hispanic district in El Paso County.  So the United States' *Gingles* claim really pertains to Hispanic voters in the West Texas counties in HDs 53 and 81 that border HD 74.

Defendants say that the United States has failed plausibly to allege the first *Gingles* precondition.  *See* Dkt. 111 at 22–24.  They initially say it cannot be satisfied because the five districts that currently exist are all majority Hispanic by CVAP.[54]  As previously explained, the Court rejects that contention.

Next, Defendants say that the United States hasn't alleged anything about the Hispanic population that it seeks to protect in HD 53 and HD 81, so the first *Gingles* precondition can't be satisfied for that district.  Dkt. 111 at 22.  But the United States does allege that Hispanic voters live in those districts.  *See* U.S. Compl. ¶ 146.  It also alleges that HD 74 enjoys a large Hispanic majority (75.6% by CVAP).  U.S. Compl. ¶ 143.  When those allegations are combined, it is plausible that a district combining the westernmost parts of HDs 53 and 81 with most of HD 74 would contain a population in which at least a majority of voters is Hispanic.  While it wouldn't necessarily be true that drawing such a district would mandate the creation of an additional majority-minority district in West Texas, the United States has adequately alleged the first *Gingles*

---

[54] Hispanics constitute between 67.4% and 87.9% of the districts' CVAP.  U.S. Compl. ¶ 143.

precondition for that district.

Finally, Defendants complain that the United States is just trying to shoehorn a *Larios* claim (for which it has no cause of action) into a *Gingles* claim (for which it does).[55]   The Court has also noticed that the United States' objectives are not a perfect match with a *Gingles* claim.   Even if it succeeds in requiring Defendants to redraw the lines of HDs 53, 74, and 81, it is not clear that doing so will require the creation of another majority-minority district in West Texas.   But the discrepancy between the United States' hammer and nail doesn't logically prevent it from stating a *Gingles* claim with respect to the district if the *Gingles* preconditions have been met.[56]

Because Defendants have not shown that the United States has failed plausibly to allege a *Gingles* claim with respect to this district, its motion to dismiss that claim is denied.

## C.   Intentional Vote Dilution (Equal Protection)

### 1.   *Discriminatory Effect*

Defendants maintain that Plaintiffs' intentional-vote-dilution claims all must fail for failure to allege discriminatory effect.   Dkt. 80 at 17; Dkt. 82 at 15; Dkt. 181 at 17.   But Defendants do not separately develop that point in any of their motions to dismiss—instead, they rest on their contentions against plausible discriminatory effect under Section 2 of the VRA.   As we have discussed recently, showing discriminatory effect in the constitutional context

---

[55] *See Larios v. Cox*, 300 F. Supp. 2d 1320, 1347 (N.D. Ga. 2004) (three-judge court) ("[A] state legislative reapportionment plan that systematically and intentionally creates population deviations among districts in order to favor one geographic region of a state over another violates the one person, one vote principle firmly rooted in the Equal Protection Clause."), *aff'd*, 542 U.S. 947 (2004) (mem.).

[56] The Court observes that the United States' allegations regarding the second and third *Gingles* preconditions are similar to those made for *Gingles* claims we have dismissed, *see* U.S. Compl. ¶¶ 144–45, but Defendants do not appear to claim that the United States has failed to adequately allege those factors, *see* Dkt. 111 at 22–24.

is different, and often easier, than showing it under Section 2. Dkt. 258 at 21–24. Plaintiffs need not plausibly allege all three *Gingles* factors, but, instead, must plausibly allege that the redistricting "bears more heavily on one race than another." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). We do not understand Defendants to contest that Plaintiffs have made such allegations. Thus, we do not grant the motions to dismiss Plaintiffs' constitutional claims insofar as those motions rest on Plaintiffs' pleading as to discriminatory effect.

### 2.     *Discriminatory Intent*

Defendants aver that Plaintiffs' allegations of discriminatory intent contain insufficient factual matter to state a plausible claim. Dkt. 80 at 17–21; Dkt. 82 at 16–18; Dkt. 181 at 18–21. Broadly, Defendants stress the presumption of legislative good faith and contend that many of the legislative acts complained of by Plaintiffs have alternative, legally innocuous explanations. Partisanship, they say, is an "obvious alternative explanation." *Twombly*, 550 U.S. at 567. But as noted previously, it is not yet necessary for Plaintiffs to demonstrate that the Texas legislature more likely than not acted with discriminatory intent. It is sufficient for Plaintiffs to point to circumstantial evidence, such as procedural irregularities or apparent subterfuge, from which discriminatory intent can plausibly be inferred. *See Arlington Heights*, 429 U.S. at 266–68.

MALC points to several allegations that it says state a plausible claim of discriminatory intent. Like other plaintiffs, it stresses the brevity of the legislative process. MALC FAC ¶¶ 26–87. We recently concluded that, at least in the context of the senate plan, pandemic-related delays may be a more likely explanation of that brevity than is discriminatory intent. Dkt. 258 at 37–40.

But MALC also points to instances in which, it alleges, minority legislators were treated unfavorably. MALC FAC ¶¶ 77, 87. Similar evidence has been deemed probative in past redistricting cases. *See, e.g.*, *Texas v. United States*, 887 F. Supp. 2d 133, 164 (D.D.C. 2012) (three-judge court), *vacated on*

*other grounds*, 570 U.S. 928 (2013) (mem.).   MALC also alleges that the legislature adopted procedures that made it difficult for non-English speaking members of the public to participate.   Dkt. 226-1 at 16–17.   Proving these allegations would not necessarily make an airtight case for discriminatory intent, but they are sufficient to render MALC's theory of discriminatory intent plausible.

NAACP reiterates its allegations of discriminatory effect, described above, noting correctly that discriminatory effect can strengthen an inference of discriminatory intent.   Dkt. 107 at 18.   In addition, NAACP stresses that the passage of the House, Senate, and congressional maps was rushed, such that amendments were not seriously considered and there was limited opportunity for public comment.   NAACP Compl. ¶¶ 62–95.   It also names specific procedures, such as bill layouts and the printing rule, that it says were ignored. NAACP Compl. ¶ 61.   Whether these procedural departures are enough to nudge NAACP's claims of intent into the realm of plausibility is a close question.   As we have noted recently, Dkt. 258 at 37–40, the COVID–19 pandemic provides an obvious alternative explanation for the rushed redistricting process.   The claim that the rushed redistricting process alone demonstrates discriminatory intent is "extraordinarily weak," *id*. at 39, but when coupled with NAACP's other allegations, its complaint crosses the line from conceivable to plausible.

The *Fair Maps* plaintiffs make similar allegations.   For instance, they point to legislative acts in the previous redistricting cycle that were deemed to be discriminatory.   Fair Maps Compl. ¶¶ 42–52.   Defendants complain that those events occurred over a decade ago, Dkt. 193 at 9, but historical events are a potential basis for inferring discriminatory intent, *Arlington Heights*, 429 U.S. at 267, and the immediately preceding redistricting cycle is not so far removed from the present.   The *Fair Maps* plaintiffs also make thorough allegations about the legislative history of the various plans, including discussions of the plans' racial impacts.   Fair Maps Compl. ¶¶ 91–92, 97–99, 121–23.   While the *Fair*

*Maps* plaintiffs, like all the others, face a heavy evidentiary burden to prove discriminatory intent, we again conclude that the allegations are sufficient to state a claim.

It is not surprising that the factual allegations of the various plaintiffs would overlap—they claim to be aggrieved by many of the same legislative acts. Even where the specific votes are different, as between State Board of Education and congressional maps, there is considerable overlap in terms of the leading personalities and subjects of discussion. We acknowledge that Plaintiffs face a difficult task in overcoming the presumption of legislative good faith and proving discriminatory intent, but that does not itself make their allegations implausible. We deny Defendants' motions to dismiss insofar as they claim that Plaintiffs have not properly alleged discriminatory intent.

## D.    Racial Gerrymandering

Defendants move to dismiss claims by the *MALC*, *NAACP*, and the *Fair Maps* plaintiffs that Defendants engaged in unlawful racial gerrymandering. Dkt. 80 at 21–23; Dkt. 82 at 18–19; Dkt. 181 at 21–22. Though both have roots in the Fourteenth Amendment, racial-gerrymandering claims are "analytically distinct" from intentional-vote-dilution claims. *Shaw v. Reno*, 509 U.S. 630, 652 (1993). We have confronted that distinction before and have concluded that the two types of claim differ in terms of standing analysis. Dkt. 119 at 4–5.

On the merits, however, the only practical difference between intentional-vote-dilution and racial-gerrymandering claims is that racial gerrymandering is harder to show. To prove racial gerrymandering, a plaintiff must establish not just that race was a factor in redistricting, but that it was "the predominant factor." *Johnson*, 515 U.S. at 916. While that showing is more difficult, it is not qualitatively different; the types of evidence that would allow either claim to succeed are largely the same.

In their motions to dismiss the racial-gerrymandering claims of the *NAACP* and the *Fair Maps* plaintiffs, Defendants do not articulate separate

objections to these claims as distinguished from those based on intentional vote dilution. Dkt. 82 at 18–19; Dkt. 181 at 21–22. We thus do not separately analyze Defendants' objections to those plaintiffs' racial-gerrymandering claims. While success on those claims is logically less probable than success on intentional vote dilution, Plaintiffs need not show, at this stage, that they are likely to succeed. *See Twombly*, 550 U.S. at 556. Plaintiffs need show only that they have "nudged their claims across the line," *id.* at 570, and we have already considered that question in deciding whether they have plausibly alleged discriminatory intent.

In their motion to dismiss MALC's racial-gerrymandering claims, Defendants present a separate theory. They note that MALC does not identify the specific districts that it says are racially gerrymandered. Dkt. 80 at 21–22. In fact, MALC does refer to CDs 6 and 33 and ED 6, MALC FAC ¶¶ 229, 231, but it also levels racial-gerrymandering claims at "the Texas House, Congressional, and SBOE districts in Harris County, and the Congressional districts in the DFW metroplex," MALC FAC ¶ 223.

MALC's imprecision is a problem. "A racial gerrymandering claim . . . applies to the boundaries of individual districts." *Ala. Legis. Black Caucus*, 575 U.S. at 262. Classic racial-gerrymandering cases often include vivid descriptions of the specific districts at issue. *See, e.g.*, *Shaw*, 509 U.S. at 635–36, 655–56. Indeed, without notice of what districts are at issue, we cannot even determine our own jurisdiction, as plaintiffs do not have standing to bring racial-gerrymandering claims with regard to districts where they do not live. *Hays*, 515 U.S. at 739. MALC's description refers to all districts from up to three maps that are located in the state's two largest metropolitan areas. That is not enough to put the Court or Defendants on notice of their claims, and so MALC has failed to state a claim with regard to racial gerrymandering in the unnamed districts.

As for CDs 6 and 33 and ED 6, MALC's complaint does not have the same difficulty, but it must still allege sufficient facts for its claim to be plausible. We conclude that it has done so. In addition to its previously mentioned

allegations of intentional vote dilution, MALC points to the House committee chairman's statements stressing the number of majority-minority districts, the legislature's apparent desire to keep various racial groups above 50% of certain districts, and the irregular shapes of CD 6 and 33. MALC FAC ¶¶ 224–32. Defendants protest that the relevant legislators were probably concerned with ensuring VRA compliance, Dkt. 80 at 23, but VRA compliance is a common and not-always-successful defense to racial-gerrymandering claims, *see, e.g.*, *Harris*, 137 S. Ct. at 1469. While MALC still faces a heavy burden of proof, we conclude that it has stated a plausible racial-gerrymandering claim with regard to CDs 6 and 33 and ED 6.

## E.    Malapportionment

MALC asserts that Defendants have violated the Equal Protection Clause by contravening the "one-person, one-vote" principle. MALC FAC ¶¶ 233–37. They allege that Texas's House Plan has a 9.98% maximum population deviation. MALC FAC ¶ 248. But as Defendants correctly point out, state and local legislative maps presumptively comply with the one-person, one-vote rule as long as their population deviations are less than 10%. *See Evenwel*, 578 U.S. at 60. The Supreme Court has consistently "refused to require States to justify" deviations similar to the one at issue here. *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016).

True, the presumption that deviations under 10% are valid is not airtight. In "unusual cases," it may be possible to show that "a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors." *Id.* That the House Plan has less than a 10% maximum deviation would not save it if MALC were able to show that it had been drawn in violation of the VRA or the Constitution's guarantees against intentional racial discrimination. *Cf. Larios*, 542 U.S. at 949 (Stevens, J., concurring) (making a similar point in the now-defunct context of political gerrymandering). Deviations within the 10% threshold could conceivably serve as evidence to support MALC's other

theories.

But MALC has not plausibly alleged that claim here. MALC states that there is a "systemic overpopulation" of Hispanic-majority districts in the western part of the state, MALC FAC at 25, but it gives few details. MALC alleges divergence between Hispanic- and Anglo-majority districts "in West Texas." MALC FAC ¶ 95. It now clarifies which fifteen districts it refers to (the Texas House of Representatives has 150 seats). MALC FAC ¶ 233.[57] But the grouping is inherently arbitrary—the omission of HD 53 is striking—and trends within one sparsely populated region are not "systemic" within Texas as a whole. Given that the House plan is within the presumptively valid range, MALC has not adequately pleaded a violation of the one-person, one-vote requirement.

## IV.   CONCLUSION

Defendants' motions to dismiss, Dkts. 22, 80, 82, 111, and 181, are GRANTED IN PART, such that the following claims and parties are DISMISSED WITHOUT PREJUDICE:

- In *Voto Latino*, No. 1:21-CV-965:
  - Count I is dismissed for lack of standing insofar as it purports to challenge CDs 2, 20, 34, and 35, and the six unspecified (in the complaint) districts near Dallas–Fort Worth; and
  - Count II is dismissed for lack of standing insofar as it purports to challenge CDs 2, 20, 34, and 35, and the six unspecified (in the complaint) districts near Dallas–Fort Worth.

- In *MALC*, No. 1:21-CV-988:
  - Count I is dismissed for lack of standing except insofar as it relates to CDs 6, 15, 16, 18, 23, 27, 29, and 33; HDs 34, 37, 38, 40, 74, 75, 76, 77, 78, 79, 90, 103, 105, 140, 145, and 148; and EDs 2 and 4;

[57] HDs 69, 71, 72, 74, 75, 77, 78, 79, 81, 82, 83, 84, 86, 87, and 88.

- Count I is dismissed for lack of subject-matter jurisdiction insofar as it names Texas as a defendant;
- Count II is dismissed for lack of standing insofar as it purports to bring effects-based vote dilution claims except those relating to (1) the creation of a new opportunity district near the intersection of Dallas and Tarrant Counties, and (2) the creation of a new opportunity district in Harris County near CD 29; in all other respects, Count II is dismissed except insofar as it relates to CDs 6, 15, 16, 18, 23, 27, 29, and 33; HDs 34, 37, 38, 40, 74, 75, 76, 77, 78, 79, 90, 103, 105, 140, 145, and 148; and EDs 2 and 4;
- Count II is dismissed for failure to state a claim insofar as it brings effects-based vote-dilution claims;
- Count III is dismissed for lack of standing except insofar as it relates to CDs 6, 15, 16, 18, 23, 27, 29, and 33; HDs 34, 37, 38, 40, 74, 75, 76, 77, 78, 79, 90, 103, 105, 140, 145, and 148; and EDs 2 and 4;
- Count III is dismissed for lack of subject-matter jurisdiction insofar as it names Texas as a defendant;
- Count III is dismissed for failure to state a claim except insofar as it relates to CDs 6 and 33 and ED 6;
- Count IV is dismissed for lack of standing except insofar as it relates to CDs 6, 15, 16, 18, 23, 27, 29, and 33; HDs 34, 37, 38, 40, 74, 75, 76, 77, 78, 79, 90, 103, 105, 140, 145, and 148; and EDs 2 and 4;
- Count IV is dismissed for lack of subject-matter jurisdiction insofar as it names Texas as a defendant; and
- Count IV is dismissed for failure to state a claim.

- In *NAACP*, No. 1:21-CV-1006:
  - Count I is dismissed for lack of standing;
  - Count II is dismissed for lack of standing;

- Count II is dismissed for failure to state a claim insofar as it brings effects-based vote-dilution claims; and
- Count III is dismissed for lack of standing.

- In *Fair Maps*, No. 1:21-CV-1038:
  - OCA-Greater Houston is dismissed for lack of standing;
  - the North Texas Chapter of the Asian Pacific Islander Americans Public Affairs Association is dismissed for lack of standing;
  - Emgage is dismissed for lack of standing;
  - Count I is dismissed for lack of standing insofar as it purports to bring a VRA Section 2 vote dilution claim requiring the creation of a new opportunity district near Dallas–Fort Worth;
  - Count I is dismissed for failure to state a claim insofar as it brings effects-based vote-dilution claims;
  - Count II is dismissed for lack of standing except insofar as it relates to HDs 33, 61, 66, and 89; SD 22; and CDs 4, 6, 9, 26, 30, and 33; and
  - Count III is dismissed for lack of standing except insofar as it relates to HDs 33, 61, 66, and 89; SD 22; and CDs 4, 6, 9, 26, 30, and 33.

- In *United States*, No. 3:21-cv-233:
  - The Cause of Action is dismissed for failure to state a claim except insofar as it brings an effects-based vote-dilution claim requiring a new opportunity state House district near El Paso.

Notwithstanding the Court's scheduling order, all Plaintiffs shall have fourteen days to amend their complaints in response to this order. In all other respects, those motions to dismiss are DENIED.

**So ORDERED and SIGNED on this 23rd day of May 2022.**

_____

**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**

*And on behalf of:*

| | | |
|---|---|---|
| **Jerry E. Smith** | | **Jeffrey V. Brown** |
| **United States Circuit Judge** | *-and-* | **United States District Judge** |
| **U.S. Court of Appeals,** | | **Southern District of Texas** |
| **Fifth Circuit** | | |