## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., | Civil Action |
| Plaintiffs | |
| v. | Lead Case No.: 3:21-CV-00259-DCG-JES-JVB |
| GREG ABBOTT, et al., | |
| Defendants. | |
| ROSALINDA RAMOS ABUABARA, AKILAH BACY, ORLANDO FLORES, MARILENA GARZA, CECILIA GONZALES, AGUSTIN LOREDO, CINIA MONTOYA,  ANA RAMÓN, JANA LYNNE  SANCHEZ, JERRY SHAFER, DEBBIE LYNN SOLIS, ANGEL ULLOA, MARY URIBE, LUZ MORENO, and MARIA MONTES; | Consolidated Case No.: 1:21-CV-00965-RP-JES-JVB |
| Plaintiffs, | |
| v. | |
| JOHN SCOTT, in his official capacity as Texas Secretary of State, and GREGORY WAYNE ABBOTT, in his official capacity as the Governor of Texas; | |
| Defendants. | |

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Rosalinda Ramos Abuabara, Akilah Bacy, Orlando Flores, Marilena Garza,

Cecilia Gonzales, Agustin Loredo, Cinia Montoya, Ana Ramón, Jana Lynne Sanchez, Jerry

Schafer, Debbie Lynn Solis, Angel Ulloa, Mary Uribe, Luz Moreno, and Maria Montes file this

Complaint for Declaratory and Injunctive Relief against Defendants John Scott in his capacity as Texas Secretary of State and Gregory Wayne Abbott in his capacity as Governor of the State of Texas, and allege as follows:

1.      Plaintiffs bring this voting rights action to challenge Texas Senate Bill 6 and House Bill 1, which establish new congressional and state House districts for Texas based on the 2020 census, on the grounds that they violate Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, because they strategically crack and pack Texas communities of color. Senate Bill 6 and House Bill 1 particularly dilute the voting power of Texas's Latino and Black communities to ensure that white Texans, who now make up less than 40 percent of Texas's population, nevertheless form a majority of eligible voters in more than 60 percent of Texas's congressional districts and nearly 60 percent of Texas's House districts.

2.      Ninety-five percent of Texas's population growth between 2010 and 2020 came from communities of color. Black, Latino, and Asian communities all grew far faster than Texas's white population, with the Latino community growing fastest of all. As a direct result of this growth, Texas was apportioned two additional congressional seats.

3.      Yet Senate Bill 6 appropriates those additional congressional districts—and more—for white Texans. By doing so, Senate Bill 6 allows white Texans to choose representatives for congressional seats that exist only because of population growth in communities of color. Senate Bill 6 does so by packing and cracking communities of color along racial lines to ensure that those groups' growing populations will not translate to increased political influence.

4.      Section 2 of the Voting Rights Act prohibits this absurd result. There is widespread racially polarized voting in Texas. Latino and Black Voters across the state consistently and

cohesively favor particular candidates for office, but those candidates are repeatedly defeated as a result of bloc voting by white Texans.

5.    Latino communities in south and west Texas, from the border region north to Bexar County and south to the Gulf of Mexico (hereinafter "South and West Texas"), are sufficiently numerous and geographically compact to form a majority of eligible voters in at least eight congressional districts in the region—two more than Senate Bill 6 provides in that region. And this may be done without reducing the number of other districts in the region or statewide in which Latino communities are able to elect their representatives of choice. Senate Bill 6 also strategically draws at least one of the Latino-majority districts—CD23—to ensure that Latino Texans, despite their numerical majority, will rarely if ever succeed in electing their representatives of choice.

6.    Moreover, Senate Bill 6 improperly cracks and packs Latino and Black voters in convoluted districts in the Dallas–Fort Worth and Houston metropolitan areas, to avoid creating either an additional district in each metropolitan area in which a majority of eligible voters are Latino or an additional, more compact district in each metropolitan area in which coalitions of Latino and Black voters would form a majority and have the opportunity to elect their representatives of choice.

7.    House Bill 1 improperly cracks and packs Latino voters in Harris County, to avoid creating an additional House district in which a majority of eligible voters are Latino, and improperly cracks and packs Latino and Black voters in Tarrant County in convoluted districts with twisting lines to avoid creating an additional, more compact district in which coalitions of Latino and Black voters would form a majority and have the opportunity to elect their representatives of choice.

8.     Latino and Black voters in Texas have suffered from a long history of marginalization and discrimination, including, as here, the dilution of their voting strength through redistricting. Latino Texans now make up almost as large a proportion of Texas's population as white Texans, yet they have been systematically denied an equal opportunity to elect representatives of their choice. The result is a persistent neglect of their needs and concerns. As evidenced by an array of factors, such as the history of racial discrimination in voting, the perpetuation of racial appeals in Texas elections, and the socio-economic effects of decades of discrimination against Latino and Black Texans that hinder their ability to participate effectively in the political process, Texas's failure to create at least eight performing majority-Latino congressional districts in South and West Texas, plus additional districts in Dallas–Fort Worth and Houston in which either a majority of eligible voters are Latino or coalitions of Latino and Black Texans would have a reasonable opportunity to elect their representatives of choice, has resulted in the dilution of Latino and Black voting strength in violation of Section 2.

9.     Accordingly, Plaintiffs seek an order (i) declaring that Senate Bill 6 and House Bill 1 violate Section 2 of the Voting Rights Act; (ii) enjoining Defendants from conducting future elections under Senate Bill 6 and House Bill 1; (iii) ordering a congressional redistricting plan that includes eight congressional districts in South and West Texas in which Latino voters have a reasonable opportunity to elect their candidate of choice, without reducing the number of other districts in which Latino voters may already do so, plus additional districts in Dallas–Fort Worth and Houston in which either Latino Texans or Latino and Black Texans together have a reasonable opportunity to elect their representatives of choice; (iv) ordering a state House redistricting plan that includes an additional district in Tarrant County in which Latino and Black Texans have a reasonable opportunity to elect their candidates of choice, and an additional district in Harris

County in which Latino Texans have a reasonable opportunity to elect their candidates of choice, and (v) providing such additional relief as is appropriate.

## JURISDICTION AND VENUE

10. Plaintiffs bring this action under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

11. This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws of the United States and involve the assertion of deprivation, under color of state law, of rights under federal law.

12. This Court has personal jurisdiction over Defendants, who reside in Texas and are sued in their official capacities, pursuant to Fed. R. Civ. P. 4(k)(1)(A).

13. Venue is proper in this Court and this Division under 28 U.S.C. §§ 124(d)(1) and 1391(b) because a substantial part of the events that give rise to Plaintiffs' claims occurred in this judicial district.

14. This Court has the authority to enter declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

15. Plaintiff Rosalinda Ramos Abuabara is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of San Antonio, in Bexar County. Under Senate Bill 6, she resides in Texas's 23rd congressional district ("CD23"). Ms. Abuabara intends to vote in future congressional elections in CD23, or in any other district in which she is eligible to vote.

16. Plaintiff Akilah Bacy is an African-American citizen of the United States and of the State of Texas, a registered voter, and a resident of Houston, in Harris County. Under Senate

Bill 6, she resides in Texas's 38th congressional district ("CD38"). Ms. Bacy intends to vote in future congressional elections in CD38, or in any other district in which she is eligible to vote.

17.     Plaintiff Orlando Flores is a Latino citizen of the United States and of the State of Texas, a registered voter, and a resident of Fabens, in El Paso County. Under Senate Bill 6, he resides in CD23. Mr. Flores intends to vote in future congressional elections in CD23, or in any other district in which he is eligible to vote.

18.     Plaintiff Marilena Garza is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Corpus Christi, in Nueces County. Under Senate Bill 6, she resides in Texas's 27th congressional district ("CD27"). Ms. Garza intends to vote in future congressional elections in CD27, or in any other district in which he is eligible to vote.

19.     Plaintiff Cecilia Gonzales is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Arlington, in Tarrant County. Under Senate Bill 6, she resides in Texas's 25th congressional district ("CD25"). Under House Bill 1, she resides in Texas's 94th house district ("HD94"). Ms. Gonzales intends to vote in future congressional elections in CD25 and house elections in HD94, or in any other districts in which she is eligible to vote.

20.     Plaintiff Agustin Loredo is a Latino citizen of the United States and of the State of Texas, a registered voter, and a resident of Baytown, in Harris County. Under Senate Bill 6, he resides in Texas's 36th congressional district ("CD36"). Under House Bill 1, he resides in Texas's 143rd house district ("HD143"). Mr. Loredo intends to vote in future congressional elections in CD36 and house elections in HD143, or in any other districts in which he is eligible to vote.

21.     Plaintiff Cinia Montoya is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Corpus Christi, in Nueces County. Under Senate Bill

6, she resides in CD27. Ms. Montoya intends to vote in future congressional elections in CD27, or in any other district in which she is eligible to vote.

22. Plaintiff Ana Ramón is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of San Antonio, in Bexar County. Under Senate Bill 6, she resides in Texas's 21st congressional district ("CD21"). Ms. Ramón intends to vote in future congressional elections in CD21, or in any other district in which she is eligible to vote.

23. Plaintiff Jana Lynne Sanchez is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Fort Worth, in Tarrant County. Under Senate Bill 6, she resides in Texas's 33rd congressional district ("CD33"). Under House Bill 1, she resides in Texas's 90th House District ("HD90"). Ms. Sanchez intends to vote in future congressional elections in CD33 and house elections in HD90, or in any other district in which she is eligible to vote.

24. Plaintiff Jerry Shafer is a Latino citizen of the United States and of the State of Texas, a registered voter, and a resident of Baytown, in Harris County. Under Senate Bill 6, he resides in CD36. Under House Bill 1, he resides in Texas's 143rd house district ("HD143"). Mr. Shafer intends to vote in future congressional elections in CD36 and house elections in HD143, or in any other districts in which he is eligible to vote.

25. Plaintiff Debbie Lynn Solis is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Dallas, in Dallas County. Under Senate Bill 6, she resides in Texas's 33rd congressional district ("CD33"). Ms. Solis intends to vote in future congressional elections in CD33, or in any other district in which she is eligible to vote.

26. Plaintiff Angel Ulloa is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of El Paso, in El Paso County. Under Senate Bill 6, she

resides in Texas's 16th congressional district ("CD16"). Ms. Ulloa intends to vote in future congressional elections in CD16, or in any other district in which she is eligible to vote.

27.     Plaintiff Mary Uribe is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of San Antonio, in Bexar County. Under Senate Bill 6, she resides in Texas's 21st congressional district (CD21). Ms. Uribe intends to vote in future congressional elections in CD21, or in any other district in which she is eligible to vote.

28.     Plaintiff Luz Moreno is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Gonzales, Texas in Gonzales County. Under Senate Bill 6, she resides in Texas's 27th congressional district (CD27). Ms. Moreno intends to vote in future congressional elections in CD27, or in any other district in which she is eligible to vote.

29.     Plaintiff Maria Montes is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Houston, Texas in Harris County. Under Senate Bill 6, she resides in Texas's 29th congressional district (CD29). Ms. Montes intends to vote in future congressional elections in CD29, or in any other district in which she is eligible to vote.

30.     Defendant John Scott is sued in his official capacity as the Secretary of State of Texas. As Secretary of State, Mr. Scott serves as Texas's Chief Election Officer. Tex. Elec. Code § 31.001(a). As "the chief election officer of the state," *id.*, Mr. Scott is required to "obtain and maintain uniformity in the application, operation, and interpretation of" Texas's election laws, including by issuing directives and instructions to all state and local authorities having duties in the administration of these laws, *id.* § 31.003. Mr. Scott is further empowered to remedy voting rights violations by ordering any official to correct conduct that "impedes the free exercise of a citizen's voting rights." *Id.* § 31.005(b). Mr. Scott prescribes the form that individuals must complete for a place on a political party's general primary ballot, *see id.* §§ 141.031, 172.021-.024.

And political parties who wish to hold a primary must deliver written notice to the Secretary of State noting their intent to hold a primary election, *id.* § 172.002, and the party chairs must certify to the Secretary of State the name of each candidate who has qualified for placement on the general primary election ballot, *id.* § 172.028. The Secretary of State also serves as the filing authority for independent candidates for federal office, including members of Congress. *See id.* § 142.005. Finally, the adopted redistricting plans are filed with the Secretary of State to ensure that elections are conducted in accordance with those plans.

31.     Defendant Gregory Wayne Abbott is sued in his official capacity as the Governor of the State of Texas. Under Texas's election laws, Governor Abbott "shall order . . . each general election for . . . members of the United States Congress" by proclamation. Tex. Elec. Code § 3.003.

## LEGAL BACKGROUND

32.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" Thus, in addition to prohibiting practices that deny outright the exercise of the right to vote, Section 2 prohibits vote dilution. A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

33.     The dilution of voting strength "may be caused by the dispersal of [members of a racial or ethnic group] into districts in which they constitute an ineffective minority of voters or from the concentration of [members of that group] into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

9

34.    The United States Supreme Court, in *Thornburg v. Gingles*, identified three necessary preconditions ("the *Gingles* preconditions") for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51.

35.    Once all three preconditions are established, the statute directs courts to consider whether, under the totality of the circumstances, members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Senate Report on the 1982 amendments to the Voting Rights Act identifies several non-exclusive factors that courts should consider when determining if, under the totality of the circumstances in a jurisdiction, the operation of the electoral device being challenged results in a violation of Section 2.

36.    These Senate factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet-voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals

in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

37. The Senate Report itself and the cases interpreting it have made clear that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see also id.* ("The statute explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

## FACTUAL ALLEGATIONS

### A. The 2020 Census

38. On April 26, 2021, the U.S. Census Bureau announced that based on the 2020 decennial census, Texas would gain two additional seats in the United States House of Representatives. On August 12, the Census Bureau then released the detailed population and demographic data needed to draw new congressional districts. The Census Bureau's data revealed that Texas's population grew by nearly four million people between 2010 and 2020.

39. Texas's growth came overwhelmingly from communities of color. Texas's white population grew by just 187,252 between 2010 and 2020. In contrast, Texas's Latino population grew by 1,980,796; Texas's Asian population grew by 613,092; and Texas's Black population grew by 557,887. The number of Texans identifying as members of multiple races also grew significantly. In all, non-white Texans accounted for 95 percent of Texas' population growth from 2010 to 2020, and Latinos accounted for more than half of that growth. Latino Texans now make up just under 40 percent of Texas's population—only half a percentage point less than white Texans. Had it not been for the growth in its communities of color, Texas likely would have lost congressional seats instead of gaining them.

40.     Communities of color also grew significantly in their share of Texas's voting-age population. More than 36 percent of voting-age Texans are now Latino—an increase of almost three percentage points since 2010. More than 12 percent of voting-age Texans are now Black and more than 5 percent are Asian. Only 43 percent of Texas's voting age population is now white—a decrease of more than 6 percentage points since 2010.

41.     The 2020 census did not collect citizenship information. Based on the Census Bureau's 2015-2019 American Community Survey ("ACS"), Texas's citizen voting age population was 29.9 percent Latino, 13.1 percent Black, 3.7 percent Asian, and 51.6 percent white. Based on the 2016-2020 ACS, Texas's citizen voting age population was 30.5 percent Latino, 13 percent Black, 3.8 percent Asian, and 50.8 percent white.

**B.  The Redistricting Process**

42.     Senate Bill 6 and House Bill 1 are the direct results of the Texas Legislature's failure to meaningfully engage with voters and abdication of its map-drawing responsibility to outside interests.

43.     After a lengthy delay due to the coronavirus pandemic, the Texas Legislature began collecting public input on the redistricting process in January 2021.

44.     From January to March 2021, the Senate Special Committee on Redistricting, led by Republican Senator Joan Huffman, heard public testimony during a series of hearings with a regional focus. Each hearing was held over the Zoom two-way video conferencing platform.

45.     Although taking testimony remotely might as a matter of first impression appear to open the opportunity to give testimony to a greater number of people, the process was entirely inaccessible to many Texans. Not only did all but one of the twelve hearings held in those three months take place on weekdays during regular work hours—precluding working Texans from

testifying unless they took time off work to do so—only Texans with a computer or other device with an internet connection and video/audio capability, such as a smartphone or tablet, were able to participate in the hearings. Witnesses were required to have both audio and video capabilities in order to provide virtual testimony. And those who did not have access to such a personal device were advised—in the middle of a global pandemic that prohibited in-person regional hearings—to visit their local public library.

46. The Senate held four additional virtual hearings in September 2021.

47. On September 7, 2021, Governor Abbott announced a third special session of the Texas Legislature, commencing on September 20, for the purpose of redrawing legislative and congressional districts in accordance with the results of the 2020 census. One week later, on September 27, Senator Joan Huffman released congressional Plan 2101—the first proposed congressional district map, which later became Senate Bill 6, and scheduled a public hearing on it three days later.

### 1. Senate Bill 6

48. On September 30, 2021, Senate Bill 6 was considered by the Special Committee on Redistricting. The Committee considered invited and in-person public testimony.

49. During the September 30 hearing, Senator Huffman admitted that Plan 2101, the base map for Senate Bill 6, was drawn not by any Texas legislator or their staff but by the State's Republican congressional delegation's lawyer, indicating that the public testimony was nothing more than a perfunctory formality.

50. When asked by Senator John Whitmire about the fact that Plan 2101 paired two Houston Democrats in Harris County in the same district, Senator Huffman admitted that this plan had been provided to her by the Texas Republican congressional delegation. After Senator

Huffman received the plan, she made "some changes," and those changes were incorporated into Plan 2101 before she introduced it as Senate Bill 6.

51.      On October 4, 2021, the Senate Special Committee on Redistricting met to consider Senate Bill 6. After a public hearing in which witnesses were overwhelmingly opposed to the plan, the committee reported it favorably with minor amendments in the Dallas–Fort Worth Area.

52.      On October 8, 2021, the full Senate considered Senate Bill 6. Senate Bill 6 was amended to make minor changes to the border between CD6 and CD17 in East Texas. All other amendments that were offered failed. Senate Bill 6 then passed out of the Senate on party lines by a vote of 18-13.

53.      Senate Bill 6 then moved to the Texas House.

54.      Like the Senate, prior to the consideration of Senate Bill 6, the House had held a series of virtual hearings for the purpose of considering public testimony on the redistricting process.

55.      And, like the Senate, the process for providing public input during the map drawing process was held entirely online and almost entirely during the work week, all but ensuring the process was inaccessible for most Texans.

56.      And, like the Senate, the individuals responsible for redrawing the congressional maps did not directly receive or respond to public comments and criticisms during these hearings.

57.      On September 29, 2021, just after Plan 2101 became public, the Texas Tribune reported that Adam Foltz, a Republican lawyer and political operative who had previously played a key role in another state's redistricting process described by federal judges as "needlessly secret," had been hired by the House Redistricting Committee. Despite being paid by the non-partisan

Texas Legislative Council, Foltz was reporting directly to the Chair of the House Redistricting Committee, Representative Todd Hunter.

58.     Foltz's work was entirely separate from the House Redistricting Committee's public facing work and, until the Texas Tribune's story broke, at least one Democratic member of the Committee was unaware of Foltz's involvement in the process.

59.     The House process for considering Senate Bill 6 allowed for only limited public testimony. Senate Bill 6 was received by the House on October 8, 2021, and referred to the House's Redistricting Committee that same day. The Committee sat on the bill for five days until October 13, 2021, when they noticed a hearing for October 14, 2021—the very next day.

60.     Despite the less than 24 hours' notice that was provided for the hearing, 94 Texans testified before the House Redistricting Committee—93 of them opposed Senate Bill 6. Nonetheless, later that same day the House Redistricting Committee met again and passed Senate Bill 6 along a party line vote.

61.     On Saturday, October 16, the full House considered Senate Bill 6. The House considered a total of twenty-six amendments, of which five were adopted. Those amendments kept the general outline of Senate Bill 6 the same but made relatively minor changes in numerous counties and districts. The House rejected proposed amendments that would have created additional majority-minority districts. Early in the morning on Sunday, October 17, the House then voted 79 to 56 to pass Senate Bill 6 as amended.

62.     The Senate refused to concur in the House's amendments to Senate Bill 6, and a conference committee was immediately appointed. Less than 24 hours after the House version of Senate Bill 6 was adopted, on the evening of October 17, the conference committee issued a report.

The conference committee report adopted some of the House's amendments, rejected others, and made several other changes.

63.     Representative Todd Hunter, the Chair of the House Redistricting Committee, described the conference committee as a "casual discussion," explaining that the House "showed deference to the Senate. They took the lead and I agreed."

64.     On October 18, 2021, both the House and Senate passed the conference committee report, sending Senate Bill 6 to the Governor.

65.     Governor Abbott signed Senate Bill 6 on October 25, 2021.

   **2. House Bill 1**

66.     Representative Hunter, as Chair of the House Redistricting Committee, solicited proposed House maps from members beginning on September 9, 2021 in accordance with the longstanding tradition of the Texas House.

67.     On September 30, 2021, Representative Hunter filed a proposed redistricting plan for the House—House Bill 1. The same day, House Bill 1 was referred to the House Redistricting Committee.

68.     The House Redistricting Committee held only one hearing on its proposed plan— on October 4, 2021—with little advance notice. During the October 4 hearing, Representative Hunter acknowledged that he had hired Adam Foltz, as reported in the September 29 Texas Tribune story. The Committee did not allow any invited testimony, during which the Committee would have had the opportunity to hear from redistricting experts.

69.     On October 5, Representative Hunter reconvened the House Redistricting Committee for 15 minutes and introduced a committee substitute for House Bill 1. The committee approved the substitute without any further opportunity for public testimony. The substituted bill did not improve electoral opportunities for minority voters.

70. On October 12, the full House began its consideration of House Bill 1. During floor debate, minority members of the House proposed several amendments to improve the electoral opportunities and influence of minority voters in the House map. The House rejected each of those amendments. Meanwhile, members from regions of the state far from the affected areas proposed floor amendments that substantially altered several majority-minority districts. The House adopted those amendments over the opposition of members of the delegation from the affected areas by a vote of 72-70.

71. The House voted 83-63 to approve House Bill 1 late that night, at 3 a.m. on October 13—less than two weeks after the proposed maps were introduced by Representative Hunter. The enacted version of House Bill 1 reduced the number of districts in which Latinos make up a majority of eligible voters down to 30, from 33 in the previously enacted map. Meanwhile, the number of districts with a white majority among eligible voters increased from 83 to 89.

72. The Texas Senate's Special Committee on Redistricting held a public hearing on House Bill 1, lasting less than 20 minutes, on October 15. The only public testimony received was against the Bill. The Committee approved the Bill and the full Senate passed House Bill 1 the same day by a vote of 18-13.

73. Governor Abbot signed House Bill 1 into law on October 25, 2021.

**C. Political Behavior and Social Science Methodology**

### 1. Ecological Regression and Ecological Inference Analysis

74. Section 2 of the Voting Rights Act requires plaintiffs to establish, among other things, that the relevant minority group is politically cohesive and that the majority group votes as a bloc to prevent the minority group from electing its candidates of choice.

75. Election results do not report the race or ethnicity of the voters who supported each candidate, but social scientists have developed statistical techniques to enable them to infer the

political preferences of racial and ethnic groups from the precinct-level results of past elections. Two such techniques are "ecological regression" and "ecological inference." Using ecological regression and ecological inference analysis, it is possible to reliably estimate the vote shares that candidates received from particular racial and ethnic groups in past elections. Moreover, because ecological regression and ecological inference analysis rely upon precinct-level results, it is possible to estimate such vote shares in hypothetical districts, in addition to actual historical districts.

76.     Ecological regression and ecological inference analysis are accepted, reliable means by which plaintiffs in Section 2 cases may meet their burden of showing that minority groups are politically cohesive and that majority groups vote as a bloc to prevent the minority groups from electing their candidates of choice. *See, e.g.*, *Thornberg v. Gingles*, 478 U.S. 30, 52–53 (1986); *Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 759 (S.D. Tex. 2013).

### 2.   Non-Performing Majority-Minority Districts

77.     Even in districts where a majority of eligible voters are members of a politically cohesive minority group, that group may still be unable to elect its candidates of choice if the majority group engages in extreme bloc voting in opposition to the minority group's preferred candidates.

78.     For example, in a district in which 55% of eligible voters are Latino and 45% are white, if the groups turn out at similar rates and 95% of white voters favor candidates from the Republican Party, then even if 85% of Latino voters favor candidates from the Democratic Party, white voters' favored candidates will consistently defeat Latino voters' favored candidates. Differences in turnout between racial and ethnic groups will often exacerbate this phenomenon.

79.     As explained below in the context of particular districts, this possibility is not hypothetical. Ecological regression and ecological inference analysis demonstrate that it occurs in

some Texas congressional districts, where minority voters—despite making up a numerical majority of the eligible electorate—are prevented from electing their candidates of choice by extreme bloc voting by white voters.

### D. Senate Bill 6

80.     Senate Bill 6 creates significant problems focused in three parts of the State: in the districts in South and West Texas and neighboring districts to the north, which systematically dilute Latino voting strength, and in the Dallas–Fort Worth and Houston metropolitan areas, where Senate Bill 6 packs and cracks non-white voters to reduce the number of districts in which they have an opportunity to elect their candidates of choice.

#### 1. South and West Texas

81.     The U.S.–Mexico Border stretches for 1,254 miles across south Texas, from El Paso to Brownsville. The majority of Texans living in the border region are Latino, and Latino Texans in the border region cohesively support political candidates affiliated with the Democratic Party. North of the border, however, are many predominantly white, rural counties whose white residents vote as a bloc to oppose Latino voters' favored candidates.

82.     In Senate Bill 6, this region is divided into nine districts: CD16, CD23, CD28, CD15, and CD34 along the U.S.–Mexico Border, and CD27, CD35, CD20, and CD21 just north of the border districts.

83.     As explained in more detail in the paragraphs that follow, Senate Bill 6 systematically combines predominantly Latino areas in the border region with white counties in the interior to dilute the votes of Latino Texans and limit the number of congressional districts in which they may elect their candidates of choice. It also carefully packs and cracks non-white voters in Bexar County, denying those communities the opportunity to elect their candidate of choice. But for this packing and cracking, Latino eligible voters could form a numerical majority in two

additional districts in South and West Texas without compromising their ability to elect their candidates of choice in the existing districts.

84.     Attached to this Complaint as Exhibits 1 and 2 are two demonstration maps illustrating an alternative configuration of congressional districts in South and West Texas, which show how Latino eligible voters could form a numerical majority of eligible voters in two additional districts in the region without compromising their ability to elect their candidates of choice in the existing districts, and while modifying Congressional District 23 to allow Latino voters in that district to elect their candidates of choice. The maps are identical in South and West Texas—as explained below, they differ only in Harris County and Dallas–Fort Worth.

### a.  CD16

85.     CD16 is the western-most congressional district in Texas, centered in El Paso. It has long been an overwhelmingly Latino district. Under the previously enacted map, 76.5 percent of CD16's voting-eligible population—that is, of its U.S. Citizen population of voting age—was Latino. Senate Bill 6 packs CD16 still further with voting-eligible Latino Texans, so that 77.8 percent of CD16's eligible voters are now Latino. Senate Bill 6 does this by excising the comparatively white northeast portion of El Paso County from CD16, and replacing it with a more densely Latino area further south. The result is a less compact district that increases the packing of Latino voters in El Paso in CD16, further diluting their voting rights, including the voting rights of Plaintiff Angel Ulloa. By doing so, Senate Bill 6 also reduces the ability of Latino voters in neighboring districts, including Plaintiffs Orlando Flores and Rosalinda Ramos Abuabara in CD23, to elect their candidates of choice.

86.     White voters in Enacted CD16 consistently vote as a bloc in opposition to Latino voters' preferred candidates. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Enacted CD16 shows that 75 percent

of white voters in Enacted CD16 voted in opposition to the candidates that 84 percent of Latino voters in the district favored.

87.     Plaintiffs' demonstration maps reduce the packing of Latino voters in CD16 while ensuring that Latino voters still account for the majority of Proposed CD16's voting-eligible population (65.3 percent).

88.     Under Plaintiffs' demonstration maps, Proposed CD16 would include the following areas:



89.     Latino voters in Proposed CD16 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Proposed CD16 shows that 83 percent of Latino voters in Proposed CD16 support Democratic Party candidates in general elections.

90.     Plaintiffs' Proposed CD16 would prevent Latino voters in CD16, including Plaintiff Angel Ulloa, from having their voting rights diluted, by reducing the packing of Latino voters in the district from 77.8 percent to 65.3 percent. As explained in the paragraphs that follow, this change would allow for the creation of additional districts in the region in which Latino voters form a numerical majority and may elect their candidates of choice.

### b.  CD23

91.     Immediately east of CD16 is CD23, a large, predominantly rural district stretching along the U.S–Mexico Border from El Paso County to Maverick County. But CD23's vast geographic size is misleading, because the district includes many very sparsely populated counties in West Texas. In fact, the bulk of CD23's population is located in two pockets separated by more than 500 miles: in El Paso County at CD23's western extreme and in Bexar County at CD23's eastern extreme. Senate Bill 6 surgically alters CD23's boundaries in El Paso and Bexar Counties to reduce the district's population of voting-eligible Latinos from 63.1 percent under the previously enacted map to 58.1 percent under the new map.

92.     In previous litigation, a federal court ultimately concluded that the prior version of CD23 was a highly competitive district that still allowed Latino voters an opportunity to elect their candidates of choice, even though more often than not such candidates were in fact defeated. But Senate Bill 6's five percentage-point reduction in CD23's Latino voting-eligible population transforms CD23 into a non-competitive district and will prevent Latino voters in CD23, including Plaintiffs Orlando Flores and Rosalinda Ramos Abuabara from electing their candidates of choice in the future.

93.     White voters in Enacted CD23 consistently vote as a bloc in opposition to Latino voters' preferred candidates. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Enacted CD23 shows that 79 percent

of white voters in Enacted CD23 voted in opposition to the candidates that 73 percent of Latino voters in the district favored.

94.     White voters' extreme bloc voting, together with lower turnout among Latino voters in many parts of Enacted CD23 relative to white voters, means that white voters' candidates of choice will consistently win in Enacted CD23 despite Latino voters' numerical majority. In particular, analysis of precinct-level results from statewide elections in 2016, 2018, and 2020 shows that Latino voters' favored candidates in Enacted CD23 would have won just 2 out of the last 35 elections in Enacted CD23, with an average vote share of just 45 percent.

95.     Latino voters' inability to elect their candidates of choice in Enacted CD23 is no surprise. Latino voters were able to elect their preferred Congressional candidate in the prior CD23 just once, in 2012, and by less than a 5-point margin. Senate Bill 6's five percentage-point reduction in CD23's Latino voting-eligible population means that Latino voters' candidate of choice would not have won even that one election.

96.     Plaintiffs' demonstration maps reconfigure CD23 into a more compact district that would enable Latino voters in these areas, including Plaintiff Orlando Flores, to elect their candidates of choice in Proposed CD 23, while also allowing for the creation of an additional majority Latino district—Proposed CD21.

97.     Latino voters make up 72 percent of the voting eligible population in Proposed CD23.

98.     Under Plaintiffs' demonstration maps, Proposed CD23 would include the following areas:



99.     Latino voters in Proposed CD23 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Proposed CD23 shows that 80 percent of Latino voters in Proposed CD23 support Democratic Party candidates in general elections.

100.     Plaintiffs' Proposed CD23 would allow Latino voters in CD23, including Plaintiff Orlando Flores, to elect their candidates of choice in the future, rather than having their candidates defeated by extreme bloc voting by white voters under Enacted CD23.

### c.  CD28

101.     South of CD23 along the U.S.–Mexico border is CD28, which stretches from the City of Laredo and Starr County in the south to Bexar County in the north. Senate Bill 6 leaves CD28 largely unchanged, with a Latino voting-eligible population that is just under 70 percent.

Plaintiffs do not challenge CD28, although Plaintiffs' demonstration maps require some changes to CD28 to address issues in surrounding districts.

### d.  CD15

102.    Just east of CD28 is CD15, a skinny, more than 250-mile-long district running from McAllen to Guadalupe County. More than 70 percent of CD15's voting-eligible population is Latino, a percentage that is largely unchanged from the previous map. Plaintiffs do not challenge CD15, although Plaintiffs' demonstration maps require changes to CD15, which make CD15 more compact than it is in the Enacted Map, to address issues in surrounding districts.

### e.  CD34

103.    Southeast of CD15 is CD34, which includes the southernmost portion of Texas's gulf coast. Under the prior enacted map, nearly 79 percent of CD34's voting eligible population was Latino. Senate Bill 6 further packs Latino voters into CD34 by adding more of Hidalgo County into CD34, and by eliminating a tail that previously stretched north through several rural counties. As a result, Enacted CD34's voting-eligible population is now nearly 87 percent Latino.

104.    None of the Plaintiffs live in Enacted CD34. But Plaintiffs Marilena Garza and Cinia Montoya live in Enacted CD27 in Nueces County, immediately north of CD34. As explained in the next section, white bloc voting in Enacted CD27 prevents Latino voters in Nueces County, including Plaintiffs Garza and Montoya, from electing their candidates of choice.

105.    Under Plaintiffs' demonstration maps, Proposed CD34 would include Nueces County, including Plaintiffs Garza and Montoya:



106. Latino voters make up 72 percent of the voting-eligible population in Proposed CD34.

107. Latino voters in Proposed CD34 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Proposed CD34 shows that 78 percent of Latino voters in Proposed CD34 support Democratic Party candidates in general elections.

108. Plaintiffs' Proposed CD34 would allow Latino voters in Nueces County and throughout Proposed CD34, including Plaintiffs Marilena Garza and Cinia Montoya, the opportunity to elect their candidates of choice. This change also leads to the emergence of two additional majority-Latino districts—Proposed CD21 and Proposed CD10—that are described in more detail below.

### f.   CD27

109.    North of Enacted CD34 is Enacted CD27, which combines predominantly Latino Nueces County with predominantly white counties to its north and west, creating a district with a voting eligible population that is just 48.65 percent Latino.

110.    Plaintiffs Marilena Garza, Cinia Montoya, and Luz Moreno reside in Enacted CD27.

111.    White voters in Enacted CD27 consistently vote as a bloc in opposition to Latino voters' preferred candidates, including the candidates preferred by Plaintiffs Marilena Garza, Cinia Montoya, and Luz Moreno. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Enacted CD27 shows that 88 percent of white voters in Enacted CD27 voted in opposition to the candidates that 86 percent of Latino voters in the district favored.

112.    White voters' extreme bloc voting, together with lower turnout among Latino voters in Enacted CD27 as compared with white voters, means that white voters' candidates of choice will consistently win in Enacted CD27 despite Latino voters' numerical plurality. In particular, analysis of precinct-level results from statewide elections in 2016, 2018, and 2020 shows that Latino voters' favored candidates in Enacted CD27 would have won zero out of the last 35 elections in Enacted CD27, with an average vote share of just 38 percent.

113.    Enacted CD27's configuration therefore ensures that Latino voters in CD27, including Plaintiffs Marilena Garza, Cinia Montoya, and Luz Moreno, will be unable to elect their candidates of choice. By adopting such a configuration, Senate Bill 6 dilutes the votes of Latino voters in Enacted CD27, including Latino voters in Nueces County.

114.    Plaintiffs' demonstration maps remedy this vote dilution by placing Nueces County, where Plaintiffs Marilena Garza and Cinia Montoya live, in Proposed CD34, a district

with a 72 percent Latino voting-eligible population. As explained above, Latino voters in Proposed CD34 are politically cohesive and may elect their candidates of choice. Plaintiffs' demonstration maps further address the vote dilution caused by Enacted CD27 by placing other portions of Enacted CD27, including the area where Plaintiff Luz Moreno lives, in Proposed CD10. As explained below, Latino voters in Proposed CD10 are politically cohesive and may elect their candidates of choice.

### g.  CD35

115.    Northwest of Enacted CD27 is Enacted CD35, a narrow strip of a district that stretches along I-35 from Travis County to Bexar County, often covering an area little wider than I-35's median strip. The district combines separate Latino populations in Travis and Bexar County, for a voting-eligible population that is just under 48 percent Latino. While the Supreme Court ruled in 2018 that the existing CD35 was not necessarily an illegal racial gerrymander, the fact remains that there is no need for such contortions in this area.

116.    Plaintiffs do not directly challenge Enacted CD35. But its unusual and unnecessary configuration interferes with the creation of additional minority opportunity districts, which Plaintiffs do challenge. Unlike in other parts of Texas, Latino and white voters in Travis County frequently favor the same political candidates—those affiliated with the Democratic Party. Latino voters in Travis County may therefore elect their candidates of choice even if they do not form a majority of eligible voters in their districts. And Bexar County is a majority-Latino county, so it is entirely possible to create compact districts which allow Latinos in Bexar County to elect their candidates of choice without resorting to the geographic gymnastics typified by CD35. By unnecessarily combining two, differently situated populations of Latino voters in an oddly-shaped, non-compact district in CD35, Senate Bill 6 impairs the ability of Latino voters in neighboring districts, including Plaintiffs Marilena Garza, Cinia Montoya, and Luz Moreno in CD27, Plaintiffs

Ana Ramón and Mary Uribe in CD21, and Plaintiffs Orlando Flores and Rosalinda Ramos Abuabara in CD23, to elect their candidates of choice.

117.    To address the other districts that Plaintiffs do challenge, Plaintiffs' Demonstration Maps reconfigure Enacted CD35 to make it substantially more compact by moving the district further into Bexar County and taking in portions of Comal and Hays Counties. Plaintiffs' Demonstration Maps do so without diluting the votes of Latino voters in neighboring districts.

### h.  CD20

118.    CD20 is a small district centered in San Antonio, strategically drawn to cover many of the most Latino portions of Bexar County, while excluding precincts—like those covering Lackland Air Force Base—that are less Latino. The result is a district with a voting-eligible population that is 69.94 percent Latino, an increase of four percentage points from the prior enacted map.

119.    None of the Plaintiffs live in Enacted CD20. But Plaintiffs Ana Ramón and Mary Uribe live in Enacted CD21, immediately north of Enacted CD20. As explained in the next section, white bloc voting in Enacted CD21 prevents Latino voters in that district, including Plaintiffs Ramón and Uribe, from electing their candidates of choice.

120.    Under Plaintiffs' demonstration maps, Proposed CD20 would include the following areas, including the residences of Plaintiffs Ramón and Uribe:



121.    Latino voters make up 50.7 percent of the voting-eligible population in Proposed CD20.

122.    Latino voters in Proposed CD20 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Proposed CD20 shows that 87 percent of Latino voters in Proposed CD20 support Democratic Party candidates in general elections.

123.    Plaintiffs' Proposed CD20 would allow Latino voters who are currently in districts where white bloc voting prevents them from electing their candidates of choice, including Plaintiffs Ana Ramón and Mary Uribe, the opportunity to elect their candidates of choice.

### i.   CD21

124.    Enacted CD21 combines eight largely rural, predominantly white counties with more diverse slices of Bexar and Travis Counties to form a district that is 25.78 percent Latino.

125.    By cracking slices of Latino voters from Bexar and Travis Counties and placing those voters in a predominantly white, rural district, Senate Bill 6 dilutes the votes of Enacted CD21's Latino residents, including Plaintiffs Ana Ramón and Mary Uribe, and impairs their ability to elect their candidates of choice.

126.    White voters in Enacted CD21 consistently vote as a bloc in opposition to Latino voters' preferred candidates. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Enacted CD21 shows that 75 percent of white voters in Enacted CD21 voted in opposition to the candidates that 76 percent of Latino voters in the district favor.

127.    As Plaintiffs' demonstration maps show, Latino voters are sufficiently numerous and geographically compact to allow the creation of Proposed CD21, a majority-Latino district: 52.6 percent of Proposed CD21's voting-eligible population is Latino.



128.   Latino voters in Proposed CD21 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Proposed CD21 shows that 84 percent of Latino voters in Proposed CD21 support Democratic Party candidates in general elections. Proposed CD21 would allow those voters, including Plaintiff Rosalinda Ramos Abuabara, the opportunity to elect their candidates of choice.

### 2. Dallas–Fort Worth

129.   Senate Bill 6 carves up Dallas and Tarrant Counties, the core of the diverse Dallas–Fort Worth metropolitan area, among nine extraordinarily convoluted congressional districts. Non-white voters have a reasonable opportunity to elect their candidates of choice in just three of those districts: CD30, a predominantly Black district in southern Dallas County; CD32, a diverse coalition district in northwest Dallas County, and CD33, a bizarrely-shaped, predominantly Latino district that includes portions of Fort Worth and Downtown Dallas. Non-white voters elsewhere in the area are cracked among six predominantly rural districts in which such voters are unable to elect their candidates of choice. These districts are CD5, CD6, CD12, CD24, CD25, and CD26.

130.   Plaintiffs specifically challenge the configurations of Enacted CD25 and Enacted CD33, but remedying the problems with those districts would require changes to other districts in Dallas and Tarrant Counties.

### a. CD25

131.   Enacted CD25 is a predominantly white and rural congressional district with an arm that stretches into parts of central Tarrant County with substantial Black and Latino populations. Nearly 70 percent of Enacted CD25's voting-eligible population is white.

132.   By cracking predominantly Black and Latino portions of Tarrant County and placing those voters in overwhelmingly white, rural Enacted CD25, Senate Bill 6 dilutes the votes

of Enacted CD25's Latino residents, including Plaintiff Cecilia Gonzales, and impairs their ability to elect their candidates of choice.

133.    White voters in Enacted CD25 consistently vote as a bloc in opposition to Black and Latino voters' preferred candidates. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Enacted CD25 shows that 86 percent of white voters in Enacted CD25 voted in opposition to the candidates that 78 percent of Latino voters and 91 percent of Black voters in the district favor.

134.    As Plaintiffs' first demonstration map shows, Black and Latino Voters in Dallas and Tarrant Counties are sufficiently numerous and geographically compact to allow the drawing of a revised configuration of congressional districts in the area that would create an additional majority–Black and Latino voting-eligible-population district and therefore allow additional minority voters, including Plaintiff Cecilia Gonzales, an opportunity to elect their candidates of choice:



135.    Under Plaintiffs' first demonstration map, Plaintiff Cecilia Gonzales would reside in Proposed CD33, a 58.1 percent Black and Latino district wholly contained within Tarrant County. As explained in the next section, Black and Latino voters in the first demonstration map's Proposed CD33 are politically cohesive and may elect their candidates of choice.

136.    Alternatively, as Plaintiffs' second demonstration map shows, Latino voters in Dallas and Tarrant Counties are also sufficiently numerous and compact to allow the creation of an additional, majority-Latino voting-eligible-population district in the area:



137.    Under Plaintiffs' second demonstration map, Plaintiff Cecilia Gonzales would reside in Proposed CD33, a 53.1 percent Black and Latino district. As explained in the next section, Black and Latino voters in the second demonstration map's Proposed CD33 are politically cohesive and may elect their candidates of choice.

**b.  CD33**

138.    Enacted CD33 is a meandering, extraordinarily non-compact district that stretches from Fort Worth to downtown Dallas, packing many of the region's Black and Latino communities, including Plaintiffs Jana Lynne Sanchez and Debbie Lynn Solis, into a district with a voting-eligible population that is 69.6 percent Black and Latino.

139.   White voters in Enacted CD33 do not vote as a bloc in opposition to Black and Latino voters' preferred candidates. But ecological inference analysis shows that white voters in surrounding districts do engage in such bloc voting, including in Enacted CD6 (88 percent in opposition to minorities' favored candidates), Enacted CD12 (78 percent in opposition to minorities' favored candidates), Enacted CD24 (70 percent in opposition to minorities' favored candidates), and Enacted CD25 (86 percent in opposition to minorities' favored candidates). By packing a supermajority of minority voters into Enacted CD33, Senate Bill 6 dilutes those voters' votes while leaving other minority voters in Dallas–Fort Worth, including Plaintiff Cecilia Gonzales, exposed to white bloc voting that prevents them from electing their candidates of choice.

140.   Under Plaintiffs' first demonstration map, Plaintiff Jana Lynne Sanchez would reside in Proposed CD33, a significantly less packed, much more compact 53.1 percent Black and Latino district.

141.   Black and Latino voters in the first demonstration map's Proposed CD33 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within the first demonstration map's Proposed CD33 shows that 92 percent of Black voters and 84 percent of Latino voters in the district support Democratic Party candidates in general elections. Proposed CD33 would allow those voters, including Plaintiffs Jana Lynne Sanchez and Cecilia Gonzales, the opportunity to elect their candidates of choice.

142.   Black and Latino voters in the first demonstration map's Proposed CD33 are also politically cohesive in primary elections. Ecological inference analysis shows that a plurality of both groups favor the same candidates in Democratic Party primary elections in more than 80 percent of the elections examined in which each group had a clear first-choice candidate.

143.    Under Plaintiffs' first demonstration map, Plaintiff Debbie Lynn Solis would reside in Proposed CD12, a compact 56.8 percent Black and Latino voting-eligible-population district in Dallas County. As explained in the next section, Black and Latino voters in the first demonstration map's Proposed CD12 are politically cohesive and may elect their candidates of choice.

144.    Alternatively, under Plaintiffs' second demonstration map, Plaintiffs Jana Lynne Sanchez and Debbie Lynn Solis would each reside in the second demonstration map's Proposed CD12, a majority-Latino district in which 52.4 percent of eligible voters are Latino. As explained below, Latino voters in proposed CD12 are politically cohesive and may elect their candidates of choice.

### c.   CD12

145.    Enacted CD12 is a predominantly white congressional district (67.2 percent of the voting-eligible population) in Parker and Tarrant Counties.

146.    White voters in Enacted CD12 consistently vote as a bloc in opposition to Black and Latino voters' preferred candidates. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Enacted CD12 shows that 78 percent of white voters in Enacted CD12 voted in opposition to the candidates that 77 percent of Latino voters and 83 percent of Black voters in the district favor.

147.    None of the Plaintiffs live in Enacted CD12. But Plaintiffs Jana Lynne Sanchez and Debbie Lynn Solis live in Enacted CD33, immediately east of CD12. As explained in the previous section, Enacted CD33 is a packed district that dilutes the votes of Latino voters in that district, including Plaintiffs Sanchez and Solis.

148.    Under Plaintiffs' first demonstration map, Proposed CD12 would include Plaintiff Debbie Lynn Solis.

149.    Proposed CD12 in the first demonstration map is a compact, majority–Black and Latino district in Dallas County. 56.8 percent of the first demonstration map's Proposed CD12's voting-eligible population is Black or Latino.

150.    Black and Latino voters in the first demonstration map's Proposed CD12 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within the first demonstration map's Proposed CD12 shows that 85 percent of Black voters and 86 percent of Latino voters in the district support Democratic Party candidates in general elections. Proposed CD12 would allow those voters, including Plaintiff Debbie Lynn Solis, the opportunity to elect their candidates of choice without having their votes diluted by residing in a packed district.

151.    Black and Latino voters in the first demonstration map's Proposed CD12 are also politically cohesive in primary elections. Ecological inference analysis shows that a plurality of both groups favor the same candidates in Democratic Party primary elections in more than 90 percent of the elections examined in which each group had a clear first-choice candidate.

152.    Under Plaintiffs' second demonstration map, Proposed CD12 would include Plaintiffs Jana Lynne Sanchez and Debbie Lynn Solis.

153.    Proposed CD12 in the second demonstration map is a majority Latino district in Dallas and Tarrant Counties. In the second demonstration map, 52.4 percent of Proposed CD12's voting eligible population is Latino.

154.    Latino voters in the second demonstration map's Proposed CD12 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within the second demonstration map's Proposed CD12 shows that 89 percent of Latino voters in the district support Democratic Party candidates in general

elections. The second demonstration map's Proposed CD12 would allow those voters, including Plaintiffs Jana Lynne Sanchez and Debbie Lynn Solis, the opportunity to elect their candidates of choice without having their votes diluted by residing in a packed district.

### 3. Houston

155.   Harris County is the largest county in Texas and is home to more non-white residents than any other Texas county. In fact, there are more non-white residents in Harris County than there are *total* residents in any other Texas county. Just under 30 percent of Harris County residents are white—20 percent of the county's residents are Black and nearly 45 percent are Latino.

156.   Senate Bill 6 separates highly diverse Harris County into eight congressional districts. In terms of voting eligible population, five of those congressional districts—CD7, CD8, CD9, CD18, and CD29—are majority non-white, while three—CD2, CD36, and CD38—are majority white. This configuration deprives Latino and Black voters in CD2, CD36, and CD38 of the opportunity to elect their candidates of choice, while diluting the votes of Black and Latino voters in CD29, a packed district.

157.   Plaintiffs specifically challenge the configurations of CD29, CD36, and CD38, but remedying the problems with those districts would require changes to other districts in Harris County.

### a. CD29

158.   Senate Bill 6 is able to draw three majority-white districts in the diverse Harris County area principally via its configuration of CD29, an extraordinarily non-compact district which both (a) cracks compact Latino communities in southeast Harris County between CD29 and the predominantly white and rural CD36, and then (b) captures a separate, dense triangle of Latino voters north of Houston and places it in CD29. Such a configuration is unnecessary and improper.

159.     White voters in Enacted CD29 do not vote as a bloc in opposition to Black and Latino voters' preferred candidates. But ecological inference analysis shows that white voters in surrounding districts do engage in such bloc voting, including in Enacted CD2 (81 percent in opposition to minorities' favored candidates), Enacted CD22 (82 percent in opposition to minorities' favored candidates), Enacted CD36 (88 percent in opposition to minorities' favored candidates), and Enacted CD38 (77 percent in opposition to minorities' favored candidates). By packing a supermajority of minority voters into Enacted CD29, including Plaintiff Maria Montes, Senate Bill 6 dilutes those voters' votes while leaving other minority voters in the Harris County area, including Plaintiffs Akilah Bacy, Jerry Shafer, and Agustin Loredo, exposed to white bloc voting against their candidates of choice.

160.     As plaintiffs' first demonstration map shows, Enacted CD29 can be split in half to create two, more-compact districts in which minority voters form a majority of eligible voters and have an opportunity to elect their candidates of choice:



161.    In the first demonstration map, the southeastern portion Enacted CD29 is combined with the southwestern-most portion of Enacted CD36 to form the first demonstration map's Proposed CD38, a compact district in southeastern Harris County in which Latinos make up 53.4 percent of eligible voters. As explained below, Latino voters in the first demonstration map's Proposed CD38, including Plaintiffs Jerry Shafer and Agustin Loredo, are politically cohesive.

162.    The remainder of Enacted CD29 is then combined with additional areas to the west to form the first demonstration map's Proposed CD29, a compact district with a voting-eligible population that is 53.2 percent Black and Latino.

163.    Black and Latino voters in the first demonstration map's Proposed CD29 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within the first demonstration map's Proposed CD29 shows that 92 percent of Black voters and 86 percent of Latino voters in the district support Democratic Party candidates in general elections. The first demonstration map's Proposed CD29 would allow those voters, including Plaintiffs Akilah Bacy and Maria Montes, the opportunity to elect their candidates of choice without (in the case of Plaintiff Montes) having their votes diluted by residing in a packed district.

164.    Black and Latino voters in the first demonstration map's Proposed CD29 are also politically cohesive in primary elections. Ecological inference analysis shows that a plurality of both groups favor the same candidates in Democratic Party primary elections in more than 85 percent of the elections examined in which each group had a clear first-choice candidate.

165.    Alternatively, Plaintiffs' second demonstration map shows that Enacted CD29 could instead be split into two different districts, the second demonstration map's Proposed CD29 and Proposed CD38, each of which has a majority–Latino voting-eligible population.

166.    In the second demonstration map, much like the first, Proposed CD38 combines the easternmost portions of Enacted CD29 with the westernmost portions of Enacted CD36, in a district in which Latinos make up a majority (53 percent) of eligible voters. As explained below, Latino voters in the second demonstration map's Proposed CD38, including Plaintiffs Jerry Shafer and Agustin Loredo, are politically cohesive.



167.    Many of the remaining portions of Enacted CD29, including the residence of Plaintiff Maria Montes, are included in the second demonstration map's Proposed CD29, a district in central and western Harris County in which 51.4 percent of eligible voters are Latino.

168.    Latino voters in the second demonstration map's Proposed CD29 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within the second demonstration map's Proposed CD29 shows that 86 percent of Latino voters in the district support Democratic Party candidates in general elections. The second demonstration map's Proposed CD29 would allow those voters, including

Plaintiff Maria Montes, the opportunity to elect their candidates of choice without having their votes diluted by residing in a packed district.

### b. CD36

169.    Enacted CD36 is a predominantly white and rural district that cracks predominantly Latino areas in southeastern Harris County, including Baytown, where Plaintiffs Jerry Schafer and Agustin Loredo live, into a large district stretching all the way to the Louisiana border.

170.    White voters in Enacted CD36 consistently vote as a bloc in opposition to Latino voters' preferred candidates. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Enacted CD36 shows that 88 percent of white voters in Enacted CD36 voted in opposition to the candidates that 78 percent of Latino voters in the district favor.

171.    As explained above, Plaintiffs' first demonstration map shows that the southwestern-most portions of Enacted CD36 may be combined with the southeastern portions of Enacted CD29 to form the first demonstration map's Proposed CD38, a compact, majority-Latino district in southeastern Harris County.

172.    As explained below, Latino voters in the first demonstration map's Proposed CD38, including Plaintiffs Jerry Shafer and Agustin Loredo, are politically cohesive.

173.    Plaintiffs' second demonstration map similarly combines the southwestern-most portions of Enacted CD36 with the southeastern portions of Enacted CD29 to form the second demonstration map's Proposed CD38, a compact, majority-Latino district in southeastern Harris County.

174.    As explained below, Latino voters in the second demonstration map's Proposed CD38, including Plaintiffs Jerry Shafer and Agustin Loredo, are politically cohesive.

c. **CD38**

175.    Enacted CD38 is a congressional district in western Harris County in which 61.4 percent of eligible voters are white.

176.    White voters in Enacted CD38 consistently vote as a bloc in opposition to Black and Latino voters' preferred candidates, including the candidates preferred by Plaintiff Akilah Bacy. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Enacted CD38 shows that 77 percent of white voters in Enacted CD38 voted in opposition to the candidates that 65 percent of Latino voters and 65 percent of Black voters in the district favor.

177.    In Plaintiffs' first demonstration map, Plaintiff Akilah Bacy resides instead in Proposed CD29. As explained above, the first demonstration map's Proposed CD29 is a majority–Black and Latino district in which Black and Latino voters are politically cohesive and may elect their candidates of choice.

178.    Proposed CD38 in Plaintiffs' first demonstration map is relocated to southeastern Harris County, where it combines the western portion of Enacted CD36 with the eastern portion of Enacted CD29. Plaintiffs Agustin Loredo and Jerry Shafer live in the first demonstration map's Proposed CD38.

179.    The voting-eligible population of the first demonstration map's Proposed CD38 is 53.4 percent Latino.

180.    Latino voters in the first demonstration map's Proposed CD38 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within the first demonstration map's Proposed CD38 shows that 85 percent of Latino voters in the district support Democratic Party candidates in general elections.

The first demonstration map's Proposed CD38 would allow those voters, including Plaintiffs Agustin Loredo and Jerry Shafer, the opportunity to elect their candidates of choice.

181.   Proposed CD38 in Plaintiffs' second demonstration map is similar to Proposed CD38 in Plaintiffs' first demonstration map: a compact district in southeastern Harris County in which a majority (53%) of eligible voters are Latino.

182.   Latino voters in the second demonstration map's Proposed CD38 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within the second demonstration map's Proposed CD38 shows that 83 percent of Latino voters in the district support Democratic Party candidates in general elections. The second demonstration map's Proposed CD38 would allow those voters, including Plaintiffs Agustin Loredo and Jerry Shafer, the opportunity to elect their candidates of choice.

## E.  House Bill 1

183.   House Bill 1 systematically dilutes the voting strength of non-white voters in two key areas of the state: Tarrant County and Harris County.

### 4.  Tarrant County

184.   House Bill 1 divides Tarrant County into eleven House districts. Approximately 55% of Tarrant County's population is non-white, but non-white voters in the county have a reasonable opportunity to elect candidates of their choice in just four of its districts: HD90, HD92, HD95, and HD 101. In particular, House Bill 1 packs Black and Latino voters into two bizarrely shaped and interlocking House districts spanning the city of Fort Worth: HD90 and HD95. HD90 is a predominantly Latino district that wraps around Fort Worth in a meandering U shape, covering large areas to the north and south of the city, as well as narrower slivers to the east and west. HD 95 is a minority coalition district that spans the south and east of Fort Worth, except for a narrow spur that pulls in Fort Worth's downtown area. The county's remaining non-white voters are either

in HD92, a diverse, barely contiguous district in the eastern portion of the county; in HD101, a diverse coalition district in the southeastern portion of the county; or cracked among the remaining seven districts in suburban areas of the county, including in Enacted HD94, the 67.1% white voting-eligible-population district in which Plaintiff Cecilia Gonzales resides.

185.    White voters in Enacted HD94 consistently vote as a bloc in opposition to Black and Latino voters' preferred candidates, including the candidates preferred by Plaintiff Cecilia Gonzales. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Enacted HD94 shows that 67 percent of white voters in Enacted HD94 voted in opposition to the candidates that 66 percent of Latino voters and 64 percent of Black voters in the district favored.

186.    Attached to this Complaint as Exhibit 3 is a demonstration map showing an alternative configuration of districts in Tarrant County.

187.    Under plaintiffs' demonstration map, HD90 and HD95 are reconfigured into more compact districts, with Proposed HD90's voting-eligible population remaining majority-Latino as in Enacted HD90, and Proposed HD95's voting-eligible population remaining majority–Black and Latino as in Enacted HD95.

188.    These changes to Proposed HD90 and Proposed HD95 allow for the creation of Proposed HD94. Unlike Enacted HD94, a majority of the voting-eligible population of Proposed HD94 (61.2 percent) is Black or Latino.

189.    Black and Latino voters in Proposed HD94 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Proposed HD94 shows that 95 percent of Black voters and 87 percent of Latino voters in the district support Democratic Party candidates in general elections. Proposed HD94

would allow those voters, including Plaintiff Cecilia Gonzales, the opportunity to elect their candidates of choice.

190.   Black and Latino voters in the demonstration map's Proposed HD94 are also politically cohesive in primary elections. Ecological inference analysis shows that a plurality of both groups favor the same candidates in Democratic Party primary elections in 80 percent of the elections examined in which each group had a clear first-choice candidate.

### 5. Harris County

191.   Harris County, the most populous county in Texas, is home to more non-white residents than any other Texas county. Less than 30 percent of Harris County residents are white, while 20 percent of the county's residents are Black and nearly 45 percent are Latino. Harris County is divided into 25 House districts.

192.   House Bill 1 packs Latino voters in southeast Harris County into two House districts: HD143 and HD144, while cracking others into HD128 and HD129. HD143 is a predominantly Latino district that stretches east from Houston through the city's eastern suburbs, stopping at the San Jacinto River and then inexplicably leaping across the San Jacinto Bay to capture portions of predominantly Latino Baytown. The Baytown portion of HD143 is entirely separated from the rest of the district by water. HD144 is also a predominantly Latino district, covering the southeastern suburbs of Pasadena and South Houston as well as parts of Houston proper.

193.   Much of the remaining Latino population in southeast Harris County is cracked between two predominantly white districts: HD128 and HD129, which encompass the outer, predominantly white parts of the county as well as portions of predominantly Latino southeastern suburbs.

194.    The white population of each of these enacted districts votes as a bloc to defeat Latino voters' candidates of choice. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Enacted HD128, HD129, HD142, HD143, and HD144 shows that between 89 percent (in Enacted HD128) and 64 percent (in Enacted HD144) of white voters in each district vote in opposition to the candidates that between 62 percent (in Enacted HD128) and 80 percent (in Enacted HD142) of Latino voters in those districts favor.

195.    Plaintiffs Agustin Loredo and Jerry Shafer reside in Enacted HD143, in which 56.4 percent of eligible voters are Latino, 22.8 percent are Black, and just 18.6 percent of eligible voters are white.

196.    The packing of a supermajority of non-white voters into Enacted HD143 dilutes their votes, including the votes of Plaintiffs Agustin Loredo and Jerry Shafer.

197.    Attached to this Complaint as Exhibit 4 is a demonstration map showing an alternative configuration of districts in eastern Harris County.

198.    The demonstration map includes more compact versions of HD143 and HD144, Proposed HD143 and Proposed HD144, which remain districts in which a majority of eligible voters are Latino, but which reduce the packing of those districts with supermajorities of non-white voters.

199.    Latino voters in Proposed HD143 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Proposed HD143 shows that 83 percent of Latino voters in the district support Democratic Party candidates in general elections. Proposed HD143 would allow those voters the opportunity to elect their candidates of choice without having their votes diluted by being packed into a district with a supermajority of minority voters.

200.   Latino voters in Proposed HD144 are also politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Proposed HD144 shows that 85 percent of Latino voters in the district support Democratic Party candidates in general elections. Proposed HD144 would allow those voters, including Plaintiffs Agustin Loredo and Jerry Shafer, the opportunity to elect their candidates of choice without having their votes diluted by being packed into a district with a supermajority of minority voters.

201.   By reducing the packing of supermajorities of minority voters into HD143 and HD144, and thus reducing the dilution of votes of the residents of those districts, including of Plaintiffs Jerry Schafer and Agustin Loredo, the demonstration map allows the creation of Proposed HD129, a district in which 52 percent of eligible voters are Latino.

202.   Unlike Proposed HD129, Enacted HD129 is district in which a majority of the voting-eligible population (58.1 percent) is white. White voters in Enacted HD129 vote as a bloc to defeat Latino voters' candidates of choice. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Enacted HD129 shows that 72 percent of white voters in that district vote in opposition to the candidates that 56 percent of Latino voters in that district favor.

203.   Latino voters in Proposed HD129 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Proposed HD129 shows that 78 percent of Latino voters in the district support Democratic Party candidates in general elections. Proposed HD129 would allow those voters the opportunity to elect their candidates of choice. Proposed HD129 would do this as a direct result of reducing the dilution of votes by other Latino voters in eastern Harris County, including Plaintiffs Agustin

Loredo and Jerry Schafer, who are packed into supermajority-minority districts like HD143 in the enacted map.

### F. Racial Polarization

204.    As courts have long recognized, voting in nearly every region of Texas is severely racially polarized. *See Veasey v. Abbott*, 830 F.3d 216, 258 (5th Cir. 2016) (en banc) (noting State's failure to contest evidence that "racially polarized voting exists throughout Texas"); *Perez v. Abbott* ("*Perez I*"), 250 F. Supp. 3d 123, 180 (W.D. Tex. 2017) (three-judge panel) (noting "the existence of racially polarized voting throughout Texas").

205.    Black and Latino voters across Texas cohesively vote for the same candidates. For example, ecological regression analysis suggests that in the 2020 presidential election, more than 70 percent of Latino voters and more than 95 percent of Black voters statewide supported President Biden, the Latino and Black candidate of choice. Similarly, in the 2018 governor's race, more than 70 percent of Latino voters and more than 95 percent of Black voters supported candidate Lupe Valdez, the Latino and Black candidate of choice. In contrast, non-Hispanic white voters in Texas consistently vote as a bloc to defeat those candidates, with just 15 percent of white Texas voters supporting President Biden and just 10 percent of white Texas voters supporting Lupe Valdez.

206.    In the sections above, Plaintiffs have made specific allegations about racially polarized voting in the specific enacted and proposed districts at issue in their claims.

207.    The racially polarized voting patterns in Texas are driven in significant part by attitudes about race and ethnicity. Members of Texas's two major political parties exhibit sharp disagreements over issues relating to race and ethnicity. Members of the Democratic Party—which Latino and Black voters in the state overwhelmingly prefer—are significantly more likely to view Texas's voting laws as racially discriminatory, support removing Confederate monuments from

public spaces, oppose immediate deportation of undocumented immigrants, and support comprehensive immigration reform with a pathway to citizenship than members of the Republican Party, which white voters overwhelmingly prefer.

208.   In 2008, the Cooperative Congressional Election Study found that *60 percent* of Texas Republicans supported re-imposing a literacy test for voting, compared to just 24 percent of the state's Democrats.

### G. Texas's History of Discrimination

209.   Texas's attempts to dilute the Latino vote through redistricting are nothing new. This is simply the latest iteration of centuries-long efforts by Texas officials to suppress non-white political participation.

210.   "Texas has a long, well-documented history of discrimination that has touched upon the rights of Blacks and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 682–83 (S.D. Tex. 2017) (quoting *League of United Latin Am. Citizens v. Perry* ("*LULAC*"), 548 U.S. 399, 439–40 (2006)); *see also Perez v. Abbott* ("*Perez II*"), 253 F. Supp. 3d 864, 888, 906 (W.D. Tex. 2017) (three-judge panel noting that "Texas's history of official discrimination touching on the right of Hispanics to register, vote, and otherwise to participate in the democratic process is well documented").

211.   Texas's ongoing history of voting discrimination against minorities has deep historical roots. In 1866, Texas prohibited freed slaves from voting and holding office. After Reconstruction-era policies expanded ballot access, Texas systematically fought to suppress minority voting rights.

212.     In the decades before white Texans coalesced around the Republican Party, white Texans dominated the Democratic Party—and stopped minority voters from participating in its primaries. This was particularly problematic because the historic Democratic Party so dominated the State's politics into the mid-twentieth century that no other party was even relevant. By 1923, Texas had passed a law explicitly providing that "in no event shall a negro participate in a Democratic primary in the State of Texas and declaring ballots cast by negroes as void." S.B. 44, 38th Leg., 2d Sess. (Tex. 1923). After the U.S. Supreme Court invalidated that law, Texas maneuvered around the ruling by allowing political parties to set their own qualifications, after which Black and Latino voters were immediately barred from political participation once again.

213.     Texas further engaged in systematic disenfranchisement of Latino voters by capitalizing on language barriers and literacy disparities, going so far as to prohibit anyone from assisting "illiterate" individuals or non-English speakers at the polls. These restrictions remained in place until federal court intervention in 1970.

214.     Texas also used a poll tax to disenfranchise Black and Latino voters, who were significantly more likely to be living in poverty. This significantly depressed Black and Latino registration and turnout throughout much of the twentieth century.

215.     After the Voting Rights Act of 1965 increased registration rates among Black and Latino Texans, the State quickly legislated counteractive measures. The following year, Texas enacted a law requiring that every voter reregister each year, a measure intended to mimic the poll tax's burden on minority voters. After a federal court found this annual-registration requirement unconstitutional, *see Beare v. Smith*, 321 F. Supp. 1100, 1101–02 (S.D. Tex. 1971) (three-judge panel), *aff'd sub nom. Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974), Texas purged minority voters from its rolls by requiring all voters in the State to reregister before voting in future

elections. These and other tactics against minority voters eventually led Congress to include Texas as a covered state under Section 5 of the Voting Rights Act in 1975.

216.     While Texas's efforts to limit Black and Latino voters' access to the franchise have a long and shameful heritage, they are by no means a thing of the past. The State continues to lead the nation in efforts to suppress minority political participation.

217.     A 2018 study by the U.S. Commission on Civil Rights found that Texas had "the highest number of recent [Voting Rights Act] violations in the nation." U.S. Comm'n on C.R., *An Assessment of Minority Voting Rights Access in the United States* 74 (2018). In every redistricting cycle since 1970, a federal court has ruled at least once that the State violated the Voting Rights Act or the U.S. Constitution during the redistricting process.

218.     In 2006, the U.S. Supreme Court held that the State had enacted a congressional map that unlawfully diluted the voting strength of Latino voters in West Texas in direct response to those voters' growing political power. *See LULAC*, 548 U.S. at 436–42. These actions "b[ore] the mark of intentional discrimination that could give rise to an equal protection violation." *Id.* at 440.

219.     During the 2010 redistricting cycle, federal courts found that Texas had intentionally diluted Black and Latino voting strength in crafting new congressional and state legislative maps. *See Perez II*, 253 F. Supp. 3d at 949–62; *Perez I*, 250 F. Supp. 3d at 145–80 (W.D. Tex. 2017); *Texas v. United States*, 887 F. Supp. 2d 133, 159–66, 177–78 (D.D.C. 2012) (three-judge panel), *vacated and remanded on other grounds*, 570 U.S. 928 (2013). A three-judge court "found that the Texas Legislature intentionally discriminated in 2011 in numerous and significant ways" during the last decennial redistricting, and the Supreme Court "never addressed or in any way called into question [that court's] findings as to the Legislature's discriminatory

purpose in enacting the 2011 plans." *Perez v. Abbott*, 390 F. Supp. 3d 803, 811–12 (W.D. Tex. 2019).

220.    In 2016, an en banc panel of the U.S. Court of Appeals for the Fifth Circuit concluded that there was evidence that Texas's 2011 law requiring photo identification for voters was motivated by a discriminatory purpose. *See Veasey*, 830 F.3d at 225, 234–43. The Fifth Circuit further "conclude[d] that the district court did not clearly err in determining that [the photo identification law] ha[d] a discriminatory effect on minorities' voting rights in violation of Section 2 of the Voting Rights Act." *Id.* at 265.

221.    Texas also uses the enormous power of its criminal justice system to suppress minority political participation. Since Attorney General Paxton took office in 2015, at least 72 percent of the prosecutions brought by his Election Integrity Unit have been against Black and Latino individuals—who make up just over 50 percent of the State's population.

222.    Because the rules governing voter registration and ballot casting can be confusing, the threat of criminal prosecution for violating such rules significantly deters eligible voters from participating in the political process. The severe racial and ethnic disparities in Texas's election-related prosecutions thus intimidate minority voters against participating in the State's elections.

223.    Attorney General Paxton has not been alone in intimidating minority voters. In 2019, former Acting Secretary of State David Whitley issued an advisory decision to county registrars claiming to have a list of 95,000 noncitizens who were unlawfully registered to vote. The list was rife with errors, particularly because it failed to account for noncitizens who had since become naturalized. A federal judge called Secretary Whitley's actions in this incident "ham-handed and threatening" and lamented that these actions stoked "fear and anxiety" among the State's minority population and "intimidate[d] the least powerful among us." *Tex. League of*

*United Latin Am. Citizens v. Whitley*, No. SA-19-CA-74-FB, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019).

224.   In addition to the threat of criminal prosecution, Black and Latino Texans routinely face intimidation and misinformation at the polls.

225.   Dallas County's former elections administrator stated in 2018 that the severity and intensity of voter harassment and intimidation had reached levels she had not seen in her 30 years of service. During that year's election, a white poll worker in North Houston yelled racial insults at a Black voter, stating, "Maybe if I'd worn my blackface makeup today you could comprehend what I'm saying to you," and, "If you call the police, they're going to take you to jail and do something to you, because I'm white."

226.   The 2020 election was no better. On the first day of early voting at a Dallas polling place, an older white man falsely told a long line of mostly Black and Latino voters that they would not be allowed to vote if they were not inside the building by the time the polls closed.

227.   At a different Dallas polling location, supporters of former president Trump blared messages aimed at Latino and Black voters while one of them told the voters that he sends people to the morgue.

228.   On October 29, cars and military-style trucks gathered in the parking lot of a Fort Bend polling place with loudspeakers, bullhorns, and a coffin.

229.   Incidents of Trump supporters engaging in similar intimidating behavior were reported in Tarrant, Montgomery, and Harris Counties.

230.   And just this year, the Texas Legislature re-doubled its efforts to make it more difficult for Black and Latino Texans to vote, enacting an omnibus voter suppression bill that burdens voters, restricts access to the franchise, and targets the very measures that communities of

color disproportionately relied on to increase voter turnout in 2020 and other recent elections. *See generally* SB 1, 87th Leg., 2d Called Sess. (Tex. 2021). Disturbingly, SB 1 even empowered partisan poll watchers to employ voter intimidation tactics by granting them increased freedom in the polling place while limiting the oversight powers of election workers.

**H. Use of Racial Appeals in Political Campaigns**

231.    Political campaigns in Texas commonly resort to racial appeals that rely on stereotypes. During the 2018 campaign for the U.S. Senate, Senator Cruz ran ads capitalizing on fears founded on the stereotype that Latino immigrants are violent criminals and mocked his opponent's call for an investigation into the police shooting of an unarmed Black man in the man's own apartment.

232.    In support of former congressman Pete Olson, who was facing a challenge by Sri Preston Kulkarni in 2018, the Fort Bend County Republican Party circulated an advertisement depicting Ganesha, a Hindu deity, asking, "Would you worship a donkey or an elephant? The choice is yours."

233.    That same year, former congressman Pete Sessions claimed that his Black opponent, now-congressman Colin Allred, wanted to legalize crack cocaine, and ran a digital ad placing Congressman Allred's name over a picture of a dark-skinned hand clasping a white woman's mouth.

234.    Local campaigns have also included racial appeals. For example, Vic Cunningham, a white candidate for Dallas County Commissioner in 2018, explained to the *Dallas Morning News* that he believed it would be "Christian" only if his children married a person "that's Caucasian."

235.    Race played an enormous role in the 2020 election, fueled in significant part by police killings of Black Americans like George Floyd and Breonna Taylor. In Texas, Republican

officials publicly mocked the worldwide outrage and protests that these killings provoked. One county Republican chair posted a Martin Luther King Jr. quote on a background with a banana. Other county Republican chairs spread false conspiracy theories on social media suggesting that George Floyd's murder was staged in an effort to limit Black support for former president Trump and that the protesters demanding racial justice nationwide were being paid by George Soros. Taking these blatantly false assertions a step further, Republican Agriculture Commissioner Sid Miller publicly stated that Soros was starting a "race war."

236.   During the 2020 U.S. Senate race, Republican incumbent John Cornyn engaged in several racial appeals. He nicknamed potential opponent Royce West, who is Black, "Restful Royce"—a clear reference to a longstanding racist stereotype.

237.   Senator Cornyn also publicly blamed China's "culture" for the coronavirus outbreak, playing into the same racial appeals used by former president Trump and other Republicans, who, for example, referred to the pandemic as the "Kung-Flu." An Asian American studies expert called this language "textbook racist discourse."

238.   And, just a few months ago, a Republican candidate in the State's special congressional election for CD6 outright declared that she did not want Chinese immigrants in the United States.

**I.   Ongoing Effects of Texas's History of Discrimination**

239.   The long history of discrimination against Black and Latino Texans has produced stark disparities between the everyday lives of minority and white Texans. Black and Latino Texans make up a disproportionate number of individuals living in poverty. According to the U.S. Census Bureau's 2019 American Community Survey ("ACS") 5-Year Estimate, 8.4 percent of

white Texans lived below the poverty line, compared to 19.3 percent of Black Texans and 20.7 percent of Latino Texans.

240.    Disparities also exist in the areas of employment and income. According to the 2019 5-year ACS Estimate, the median income among non-Latino white Texan households ($75,879) was significantly higher than that among Black Texan households ($46,572) and Latino Texan households ($49,260). And according to a 2018 study by the Economic Policy Institute, non-white Texans had a significantly lower unemployment rate (3.9 percent) than Black Texans (5.7 percent) and Latino Texans (4.5 percent).

241.    Low-income voters face a number of hurdles to voter participation including working multiple jobs, working during polling place hours, lack of access to childcare, lack of access to transportation, and higher rates of illness and disability. All of these hurdles make it more difficult for poor and low-income voters to participate effectively in the political process.

**J.  Extent to Which Latino and Black Texans Have Been Elected to Public Office**

242.    The ongoing disparities in minority political participation are also reflected by the fact that Latino and Black lawmakers are underrepresented in the State's elected offices. While Latino Texans constitute more than 36 percent of Texas's voting-age population and nearly 30 percent of its citizen voting-age population, and Black Texans constitute more than 12 percent of Texas's voting age population and more than 13 percent of its citizen voting age population, just two of Texas's twenty-seven statewide elected State officials are Latino, and none is Black. Less than 20 percent of the seats in Texas's delegation to the U.S. House of Representatives, and less than 25 percent of the seats in the Texas Senate and Texas House are held by Latino lawmakers. At the local level, many communities with large Latino populations lack any minority representation at all.

## CLAIMS FOR RELIEF

### COUNT I

### SECTION 2 OF THE VOTING RIGHTS ACT – SENATE BILL 6

243.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

244.    Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race, color, or membership in a language minority group. 52 U.S.C. § 10301(a).

245.    The district boundaries created by Senate Bill 6 combine to "crack" and "pack" Latino Texans, resulting in the dilution of the electoral strength of the state's Latino and Black residents, in violation of Section 2 of the Voting Rights Act.

246.    Latino Texans in South and West Texas are sufficiently numerous and geographically compact to constitute a majority of eligible voters in two additional congressional districts, for a total of eight such districts in that region.

247.    Additionally, Senate Bill 6's CD23, which contains a majority of Latino eligible voters, is drawn to ensure that Latino voters do not have a reasonable opportunity to elect their candidates of choice. Latino voters in South and West Texas are sufficiently numerous and geographically compact to permit CD23 to be drawn in ways that would give the Latino residents of that district a reasonable opportunity to elect their candidates of choice.

248.    In addition, Black and Latino voters in the Dallas–Fort Worth and Houston metropolitan areas are sufficiently numerous and geographically compact to either (a) allow for an additional district in each of the Dallas–Fort Worth and Houston areas in which a majority of eligible voters are Latino, or (b) allow for an additional district in each of the Dallas–Fort Worth

and Houston areas in which Black and Latino eligible voters are, together, a majority of eligible voters.

249.    In sum, under Section 2 of the Voting Rights Act, the Texas legislature was required (a) to create two additional districts in which Latino Texans in South and West Texas have the opportunity to elect their candidates of choice, (b) to draw CD23 in a manner that would give Latino Texans in that district a reasonable opportunity to elect their candidates of choice, and (c) to create two additional districts—one each in the Dallas–Fort Worth and Houston areas—in which either Latino Texans or Black and Latino Texans together have a reasonable opportunity to elect their candidates of choice. Not one of these additional districts would reduce the number of minority opportunity districts in their respective regions or in the enacted map as a whole.

250.    Black and Latino voters in Dallas–Fort Worth and Houston, and Latino voters in South and West Texas, are politically cohesive, and elections in the state reveal a clear pattern of racially polarized voting that allows the bloc of white voters usually to defeat minority-preferred candidates.

251.    The totality of the circumstances establishes that the congressional map established by Senate Bill 6 has the effect of denying Black and Latino voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

252.    By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs' rights guaranteed to them by Section 2 of the Voting Rights Act. Defendants will continue to violate those rights absent relief granted by this Court.

## COUNT II

## SECTION 2 OF THE VOTING RIGHTS ACT – HOUSE BILL 1

253.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

254.    Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race, color, or membership in a language minority group. 52 U.S.C. § 10301(a).

255.    The district boundaries created by House Bill 1 combine to "crack" and "pack" Latino Texans, resulting in the dilution of the electoral strength of the state's Latino and Black residents, in violation of Section 2 of the Voting Rights Act.

256.    Latino and Black Texans in Tarrant County are sufficiently numerous and geographically compact to constitute a majority of eligible voters in one additional House district, for a total of five such districts in that county.

257.    Latino voters in Harris County are sufficiently numerous and geographically compact to allow for an additional district in the county in which a majority of eligible voters are Latino.

258.    In sum, under Section 2 of the Voting Rights Act, the Texas legislature was required (a) to create an additional district in Tarrant County in which Black and Latino Texans together have a reasonable opportunity to elect their candidates of choice, and (b) to create an additional district in Harris County in which Latino Texans have a reasonable opportunity to elect their candidates of choice. Not one of these additional districts would reduce the number of minority opportunity districts in their respective regions or in the enacted map as a whole.

259.     Black and Latino voters in Tarrant County, and Latino voters in Harris County, are politically cohesive, and elections in the state reveal a clear pattern of racially polarized voting that allows the bloc of white voters usually to defeat minority-preferred candidates.

260.     The totality of the circumstances establishes that the House map established by House Bill 1 has the effect of denying Black and Latino voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

261.     By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs' rights guaranteed to them by Section 2 of the Voting Rights Act. Defendants will continue to violate those rights absent relief granted by this Court.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a.  Declare that Senate Bill 6 violates Section 2 of the Voting Rights Act.

b.  Order the adoption of a valid congressional redistricting plan that includes:

   i.   Two additional districts in South and West Texas, from the border region north to Bexar County and south to the Gulf of Mexico, in which Latino voters have a reasonable opportunity to elect their candidates of choice, without reducing the number of such districts currently in the region or elsewhere in the State;

   ii.  A district that gives the Latino residents of TX-23 a reasonable opportunity to elect their candidates of choice;

   iii. An additional district in the Dallas–Fort Worth metropolitan area in which Latino voters or Black and Latino voters have a reasonable opportunity to elect their candidates of choice, without reducing the number of minority opportunity districts currently in the region; and

    iv.    An additional district in the Houston metropolitan area, in which Latino voters or a coalition of Black and Latino voters have a reasonable opportunity to elect their candidates of choice, without reducing the number of minority opportunity districts currently in the region.

c.  Declare that House Bill 1 violates Section 2 of the Voting Rights Act.

d.  Order the adoption of a valid House redistricting plan that includes:

    i.    An additional district in Tarrant County in which Black and Latino voters have a reasonable opportunity to elect their candidates of choice, without reducing the number of minority opportunity districts currently in the county; and

    ii.    An additional district in the southeastern portion of Harris County in which Latino voters have a reasonable opportunity to elect their candidates of choice, without reducing the number of minority opportunity districts currently in the region.

e.  Enjoin Defendants, as well as their agents and successors in office, from enforcing or giving any effect to the boundaries of the congressional or state House districts as drawn in Senate Bill 6 and House Bill 1, including an injunction barring Defendants from conducting any further congressional or House elections under the current map.

f.  Hold hearings, consider briefing and evidence, and otherwise take actions necessary to determine and order a valid plan for new congressional and state House districts in the State of Texas; and

g.  Grant such other or further relief the Court deems to be appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.

Dated: June 6, 2022.

Respectfully submitted,

*/s/ Abha Khanna*

Abha Khanna*

**ELIAS LAW GROUP LLP**

Renea Hicks
Attorney at Law
Texas Bar No. 09580400

1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
akhanna@elias.law

Law Office of Max Renea Hicks
P.O. Box 303187
Austin, Texas 78703-0504
(512) 480-8231
rhicks@renea-hicks.com

Aria C. Branch*
David R. Fox*
Francesca Gibson*
Richard A. Medina*

**ELIAS LAW GROUP LLP**

10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
abranch@elias.law
dfox@elias.law
fgibson@elias.law
rmedina@elias.law

Kevin J. Hamilton*

**PERKINS COIE**

1201 Third Avenue
Suite 4900
Seattle, WA 98101-3099
Telephone: (206) 359-8000
khamilton@perkinscoie.com

*Counsel for Plaintiffs*

*Admitted *Pro Hac Vice*

# Exhibit 1

First Congressional Demonstration Map



# Exhibit 2

Second Congressional Demonstration Map



# Exhibit 3

Tarrant County Texas House Demonstration Map



# Exhibit 4

Harris County Texas House Demonstration Map

