**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § | |
| *Plaintiffs,* | § § | |
| V. | § § | Case No. 3:21-cv-00259 [Lead Case] |
| GREG ABBOTT, *et al.*, | § § § | |
| *Defendants.* | § | |
| UNITED STATES OF AMERICA, | § § | |
| *Plaintiff,* | § § | |
| V. | § § | Case No. 3:21-cv-00299 [Consolidated Case] |
| STATE OF TEXAS, *et al.*, | § § § | |
| *Defendants.* | § | |

**RESPONSE TO UNITED STATES' MOTION TO ENFORCE**
**THIRD-PARTY SUBPOENAS *DUCES TECUM***

## INTRODUCTION

The motion to compel by the United States asks this Court to put a sweeping pursuit of third-party document discovery ahead of two fundamental privileges: the attorney-client and legislative privileges. The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law," and "[i]ts purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Likewise, the legislative privilege predates this country's Founding and was inscribed in some of the States' earliest constitutions. *Tenney v. Brandhove*, 341 U.S. 367, 375-77 (1951). As necessary to protect the legislative process, central to our form of representative government, it is "not consonant with our scheme of government for a court to inquire into the motives of legislators." *Id.* at 377.[1]

Last December, the United States sued Texas over redistricting legislation for the Texas House and congressional districts. This Court dismissed most claims in its complaint. *See* Order, ECF 307. The United States has filed an amended complaint, ECF 318, with any motion to dismiss by Defendants due shortly. In the meantime, the United States along with private plaintiffs have sought sweeping document discovery, including deposing a multitude of legislators and legislative employees. At issue in this motion, the United States has also served more than two dozen document subpoenas to legislators, legislative employees, and other government officials (collectively "legislators") involved in the legislative redistricting process. *See* Mot. Ex. 1. The subpoenas seek any and all documents related to redistricting, including any documents "relating to any redistricting proposal" or "the redistricting process." *See, e.g., id.* at 106-07. In response to those subpoenas, the legislators have produced 8,249 documents, and 17,716 pages; the legislators withheld other documents for privilege, which the United

---

[1]   Addressed below, subpoena recipients will promptly produce some documents to the United States that, upon further review, should not be withheld as privileged.

States now contends does not apply. In its motion (at 2), the United States wrongly asserts that only "one-third" of responsive documents were disclosed. On the contrary, 8,249 of 10,180 responsive documents were produced, which equates to 81 percent. Additionally, the entire bill file of 3,248 documents (18,874 pages) has been produced.

**ARGUMENT**

## I.     Attorney-Client Privilege

The attorney-client privilege is necessary "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn*, 449 U.S. at 389. As the Supreme Court warned now more than four decades ago, when the scope of the attorney-client is unduly narrowed, that limits "valuable efforts" of counsel "to ensure their client's compliance with the law." *Id.* at 392. Even if privileged "facts to be disclosed are vital, highly probative, directly relevant, or even go to the heart of an issue," privilege does not give way to relevance. *In re Itron, Inc.*, 883 F.3d 553, 561 (5th Cir. 2018) (quotation marks omitted). Attorney-client privileged documents "may be quite helpful" to an adversary, "but this is not a sufficient basis for abrogating the privilege," *In re Burlington*, 822 F.2d 518, 533 (5th Cir. 1987). "Such a defeatable 'privilege' is hardly a privilege at all." *In re Intron*, 883 F.3d at 562.

Applied here, counsel was retained during the redistricting process to ensure compliance with the law, as stated hundreds of times on the legislators' privilege logs. Now in discovery, the United States seeks to compel privileged and confidential communications resulting from those attorney-client relationships. There is no applicable exception to the attorney-client privilege that would warrant such a thing. The subpoena recipients have withheld documents that would reveal confidential communications (or, relatedly, work product created at the direction of counsel). They should remain privileged, lest Rule 45 become a tool for the "mental processes of lawyers" to be "opened to the free scrutiny of their adversaries." *Hickman v. Taylor*, 329 U.S. 495, 514 (1947).

**A. Redistricting documents concerning redistricting proposals are not merely factual; they are communications.** The United States contends that roughly "300 documents relating to redistricting data" and "concerning House and Congressional redistricting proposals" have been "improperly withheld." Mot. 4 (citing Index 1-25); *see also* Index 235-255 (describing withheld documents for legislative privilege, attorney-client privilege, and work product privilege merely as "documents containing factual information"). The argument rests on the truism that "the attorney-client privilege 'does not protect disclosure of underlying facts.'" Mot. 4 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981)). The parties can all agree on that basic rule; the difficulty here, as in most cases, is whether the disclosure of a document merely discloses "underlying facts" or something more. *See Butler v. Am. Heritage Life Ins. Co.*, , 2016 WL 367314, at *6 (E.D. Tex. Jan. 29, 2016) (acknowledging privilege does not prevent disclosure of underlying facts while concluding documents sent "to aid in the providing [of] needed legal advice" were privileged); *see also Crostley v. Lamar County*, No. 5:10-cv-17, 2011 WL 13134887, at *8 (E.D. Tex. June 23, 2011) (discussing circumstances where "facts are so intertwined with the mental impressions of the attorney or other work-product protected materials").

To the extent United States assumes that all analyses or data created or received for the purpose of working on redistricting legislation is merely factual and must be revealed, Mot. 4, that is incorrect. Properly applied, the attorney-client privilege will sometimes apply to such data and sometimes not. As the United States' own categorization reveals, the withheld documents are "[c]*ontaining factual information*" (*e.g.*, Index 254). That is distinct from documents that are purely factual. Every document, indeed every human communication, will necessarily *contain* factual information. The question is whether the factual information is part-and-parcel of the legal communication. For example, consider the "facts" of the 2020 census data alone. Those facts are discoverable. Conveying that raw census data, without more, to or from an attorney does not make the facts of the 2020 census non-discoverable. *See Upjohn*, 449 U.S. at 396 (client cannot "refuse to disclose any relevant fact within his

knowledge merely because he *incorporated* a statement of such fact into his communications to his attorney" (quotation marks omitted)); *Bishop Rink Holdings, LLC v. Cimco Refrigeration, Inc.*, 2013 WL 4047143, at *3 (D. Kan. Aug. 9, 2013) ("if a party involved in a car accident was adjusting his radio at the time of the accident, he may be required to disclose that fact in his deposition" because that "fact does not become privileged because … he communicated the fact to his attorney"). But next consider a report containing population data or other analyses associated with a draft redistricting proposal. Assume the report is created for the purpose of requesting the attorney's assessment of legal compliance. *See, e.g.*, Index 1-25 (describing documents with "data relating to redistricting map proposal" and "used by counsel retained for the purpose of advising on the legality of redistricting legislation" or "includ[ing] contributions and advice from counsel on the legality of the proposed legislation"); *see also Upjohn*, 449 U.S. at 390 ("the privilege exists to protect not only the giving of professional advice to those who can act on it, but also the giving of information to the lawyer to enable him to give sound and informed legal advice"). That document is not census data alone. It is data further manipulated for purposes of describing or evaluating a particular proposal, to thereby effectuate a privileged communication between client and attorney. In such circumstances, revealing the analyses or data also reveals the privileged communication. *See, e.g.*, *Upjohn*, 449 U.S. at 395 ("The client "cannot be compelled to answer the question," by document production or deposition, "'What did you say or write to the attorney?'"); *Bishop Rink Holdings*, 2013 WL 4047143, at *2 ("communication of discoverable facts within those documents remains privileged"); *Smithkline Beecham Corp. v. Apotex Corp.*, 193 F.R.D. 530, 537 (N.D. Ill.), *on reconsideration in part*, 194 F.R.D. 624 (N.D. Ill. 2000) (explaining in patent dispute that "[w]hile the application and communications with the patent office may themselves be a matter of public record and not privileged, the same cannot be said for the [attorney and client's]

honing of technical specifications, claims, and decisions regarding inclusion or exclusion of infor-

mation that occurs before the application itself").[2] It is privileged and nondiscoverable.

Applied here, the withheld documents, which are adequately described on the privilege log as

confidential redistricting data and other analyses related to redistricting proposals involving counsel,

remain privileged. They were in furtherance of the solicitation or receipt of legal advice from counsel

engaged to advise on the legal compliance of proposed legislation. They are properly withheld.

**B. Withheld calendar entries are privileged.** Contrary to the United States' arguments,

"calendar entries and other scheduling materials," Mot. 5 (citing Index 48), can also be attorney-client

privileged. When disclosure of administrative documents, including time records or calendar entries

would "reveal the motive of the client in seeking representation, litigation strategy, or the specific

nature of the services provided," they are privileged. *Chaudhry v. Gallerizzo*, 174 F.3d 394, 402 (4th Cir.

1999); *see Bernstein v. Mafcote, Inc.*, 2014 WL 3579522, at *7 (D. Conn. July 21, 2014); *see also, e.g., Bretillot

v. Burrow*, 2015 WL 530624, at *25 (S.D.N.Y. June 30, 2015) ("time records … contain[ed] privileged

material"); *MacEachern v. Quicken Loans, Inc.*, 2016 WL 3964814, at *3 (E.D. Mich. July 25, 2016) (sim-

ilar); *Estate of Robles ex rel. Montiel v. Vanderbilt Univ. Med. Ctr.*, 2012 WL 3067936, at *3 (M.D. Tenn.

July 27, 2012) (similar); *United States v. Heine*, 2017 WL 1393493, at *5 (D. Ore. Apr. 11, 2017) (similar).

Moreover here, the legislative privilege independently protects such documents insofar as they

relate to and reveal nonpublic events or impressions concerning the passage of legislation or other

legislative acts. *Hall v. Louisiana*, 2014 WL 1652791, at *10 (M.D. La. Apr. 23, 2014) ("opinions, mo-

tives, recommendations or advice about legislative decisions between legislators or between legislators

and their staff" legislatively privileged); *Comm. For a Fair & Balanced Map v. Ill. State Bd. of Elections*,

---

[2]   Additionally, legislators or legislative aides cannot be compelled to answer questions relating to analyses or data for
     draft redistricting proposals or other redistricting legislative acts, unless legislative privilege is waived. *Infra* Part II; *cf.
     In re LTV Sec. Litig.*, 89 F.R.D. 595, 601 (N.D. Tex. 1981) (explaining that the use of confidential information gathered
     both for "business use" and for legal advice does not negate the privileged nature of the information).

2011 WL 4837508, at *11 (N.D. Ill. Oct. 12, 2011) (similar). They remain so even where the scheduling entails legislators' meetings outside the legislature, be it with counsel or others. *See Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007) (explaining such meetings with those "outside the legislature … assist legislators in the discharge of their legislative duty").

Applied here, the legislators have not withheld all calendar entries or related documents.[3] But to the extent such documents reveal the legislators' requests for legal advice or the nature of the attorney services provided, they are properly withheld as attorney-client privileged. Likewise, to the extent they relate to the nonpublic facets of the legislative fact-gathering and decision-making process, they are properly withheld as legislatively privileged.

**C. Talking points are privileged.** Likewise, "talking points" can be attorney-client privileged. *But see* Mot. 5 (citing Index 49-50). Where attorneys are involved in "[t]he review and editing of the draft" of talking points, they reveal attorney-client advice no different than a legal memorandum sent from attorney to client. *In re Blue Cross Blue Shield Antitrust Litig.*, 2018 WL 10801570, at *3 (N.D. Ala. Jan. 29, 2018). This is especially so if the talking points were intended to be "confidential" and for "internal use-only," thus showing "the desire to maintain the document's confidentiality and privileged nature." *Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 660 (D. Nev. 2013) (same).

The same is true of talking points and the legislative privilege. Confidential drafts of talking points or talking points for internal use-only are necessarily an indication of "a legislator's motives" or "legislative acts taken," the disclosure of these documents would be "impermissible" under legislative privilege. *Texas v. Holder*, 2012 WL 13070060, at *3 (D.D.C. June 5, 2012); *cf. Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 420 (D.C. Cir. 1995).

---

[3]   The legislators will be promptly producing additional calendar entries beyond those already produced that, upon further review, disclose only public meetings information without internal annotations.

Applied here, the talking points withheld were prepared for Senator Joan Huffman for pro-

ceedings in the Senate Redistricting Committee and on the Senate Floor. *See* Index 49-50. They were

intended to help her present certain bills and amendments relating to various redistricting bills. Senator

Huffman's attorneys were involved in the drafting of these talking points and gave legal advice on the

substance of the remarks. The talking points also directly reveal Senator Huffman's mental impres-

sions, giving insight into the reasons why she supported or opposed certain bills or amendments. They

are therefore subject to both the attorney-client and legislative privileges, and are properly withheld.

**D. Retainer agreements and invoices.** Retainer agreements and invoices can also be privi-

leged. Generally, "correspondence between attorney and client which reveals the client's motivation

for creation of the relationship or possible litigation strategy ought to be protected. Similarly, bills,

ledgers, statements, time records and the like which also reveal the nature of the services provided,

such as researching particular areas of law, also should fall within the privilege." *In re Grand Jury Witness*,

695 F.2d 359, 362 (9th Cir. 1982) (citing *In re Grand Jury Proceedings*, 517 F.2d 666, 674-75 (5th Cir.

1975)). The particular label or purpose of a document as an engagement agreement or an invoice is

not dispositive of the privilege inquiry; what matters is whether the documents "reveal communica-

tions involved in the strategizing process," or otherwise reveal privileged legal advice. *Smithkline*, 193

F.R.D. at 537. Applied here, the legislators have withheld any such documents that "reveal the nature

of the services provided," *In re Grand Jury Witness*, 695 F.2d at 362, including invoices listing in detail

the particular services provided by counsel or agreements otherwise disclosing attorney strategy.

**E. Documents containing attorney input or contributions are inherently privileged.**

The United States' also challenges roughly 250 internal documents described as containing "input

from attorneys," "contributions from counsel," and "communications with outside counsel." Mot. 6

(citing Index 53-91). But these documents fall squarely within the category of redistricting documents

protected from disclosure so as to protect the communications between legislators and staff and

"retained [counsel] to provide legal advice on redistricting." *Perez v. Perry*, 2014 WL 3359324, at *1-2 (W.D. Tex. July 9, 2014). As in *Perez*, the legislators retained counsel for legal advice on the innumerable legal compliance issues inherent in redistricting. The withheld documents are "'for the purpose of giving or obtaining legal advice or services.'" *Id.* at *1. The scope of the attorney-client privilege necessarily encompasses such communications, lest courts frustrate "valuable efforts" of the Legislature "to ensure their client's compliance with the law." *Upjohn Co.*, 449 U.S. at 392.

The United States' only rejoinder is to liken outside counsel to "[legislative] staff attorney work" and to cite generic material from Butler Snow's website (the House's outside counsel) showing that the national law firm maintains a "government relations" practice area. Mot. 6. But even the United States' excerpt from the House Redistricting Committee hearing transcript states that Chairman Hunter "had them run the legal and the data" on redistricting proposals. Mot. Ex. 5 at 4:17. Moreover, other remarks made on the House Floor clarify that the Members' understood Butler Snow's role in advising in giving legal advice on the bill. *See* House Journal, October 16, at S213:

> Representative Turner: Can you tell us who counseled you and other members that this is, in fact, a legal map?
>
> Representative Hunter: Well, first, I cannot tell you, as I said earlier, who the senate legal advisors are. The senate specifics, as I indicated, they have a whole different group than we do. In mine, I have talked with our Butler Snow group…

Their compliance role is further confirmed by the particular Butler Snow attorneys identified on the privilege log, who hold themselves out as "redistricting and voting rights" and "government litigation" counsel, distinct from purely government relations counsel, among other areas of expertise.[4]

**F. Documents involving demographers retained by outside counsel in furtherance of those compliance efforts remain privileged and protected work product.** The United States

---

[4]  Outside counsel and former Judge Scott Field has extensive litigation experience and six years of service on the Texas Third Court of Appeals in Austin, where he authored over 900 opinions, www.butlersnow.com/attorney/scott-field/. Likewise, counsel Tommie Cardin has extensive redistricting litigation experience and has co-authored numerous articles regarding redistricting including on VRA compliance, www.butlersnow.com/pdf/bios/tcardin.pdf.

concedes that these "consultants" were "retained by Butler Snow [the law firm]," as confirmed by the legislators' log. Mot. 6; *see* Index at 86-91.[5] The attorney-client privilege, and related work-product privilege for work done at the direction of counsel, necessarily protects communications with agents of retained counsel when such communications are kept confidential and in furtherance of the attorney-client relationship. *See, e.g.*, *United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) (translator does not pierce attorney-client privilege); *Ferko v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 218 F.R.D.125, 139-40 (E.D. Tex. 2003) ("assistance by an accounting firm enables attorneys to 'give sound and informed advice'" and is protected); *In re Hardwood P-G, Inc.*, 403 B.R. 445, 458 (W.D. Tex. 2009) ("communications to third party professionals" hired by attorney are protected). That these consultants assisted on "technical" matters does not take their work beyond the scope of the attorney-client privilege or related work-product protections. Such technical work would have been necessary to reviewing the legality of the proposed legislations and compliance with the VRA—just as technical work is often necessary in other areas of the law. The "[t]he communications at issue" no less "fall well within the scope of legal advice given the nature of the redistricting plan undertaking." *Pope v. Cnty. of Albany*, 2012 WL 12871181, at *8 (N.D.N.Y. July 31, 2012); *see, e.g.*, *Smithkline*, 193 F.R.D. at 537 ("fact that such advice may bear on technical issues or require technical information does not necessarily render it any less confidential than legal advice pertinent to a financial dispute, a tort case, or a criminal matter"). Because these consultants were retained by—and acting under the direction of—counsel, the privilege holds.

Finally, with respect to related work product protections, the United States announces a categorical rule that "[d]ocuments created during the legislative process are not protected by the work

---

[5]    So described on the legislators' privilege log, an *in-camera* inspection is unnecessary. *See Texas v. Holder*, 2012 WL 13070060, at *5 (D.D.C. June 5, 2012) (log was sufficient when it stated that the documents were "for the purpose of giving or seeking legal advice"). And because these documents "are withheld under multiple privileges," including legislative privilege, *infra*, there's no reason to reach the attorney-client privilege issues or any *in camera* review given that legislative indisputably warrants withholding these documents. *Texas v. Holder*, 2012 WL 13070060, at *6.

product doctrine." Mot. 7. The United States mischaracterizes the legislators' attorney-client relation-ship with outside compliance counsel as merely "an insulating layer between the Legislature and out-side map-drawers." *Id.* at 8 (citing Index 216-231). As an initial matter, the imputation of wrongdoing in the legislators' formation of redistricting legislation (*id.* at 8 & n.3)—including reducing the retention of outside counsel as a mere "insulating layer" to shield documents—is at odds with the presumption of legislative good faith that must be applied in redistricting cases. *See Miller v. Johnson*, 515 U.S. 900, 915 (1995); *Abbott v. Perez*, 138 S. Ct. 2305, 2324-25 (2018).

On the merits, documents relating to the legal compliance of redistricting proposals—or put another way, documents created as part of assessing litigation risk—are not categorically excluded from the work product protection. *See United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. 1981) (asking whether "the primary motivating purpose behind the creation of the document was to aid in possible future litigation"). If there were categorically no work product protection for work related to draft legislation as the United States suggests, Mot. 7-8, it is difficult to imagine a better example of the perverse effects of unduly constricting the attorney-client privilege and work product protection. *See Upjohn*, 449 U.S. at 392. If the United States were correct, then legislators have second-class status when it comes to obtaining legal advice, and the associated protections accommodating the full and frank exchange of such advice for legislation—to the great detriment of the people then subject to the legislation. But ultimately, the Court need not resolve the parties' dispute about work product for the withheld documents, given the applicable attorney-client and legislative privileges justifying the with-holding of the same documents.

## II.    Legislative Privilege

Legislative privilege has long "protect[ed] 'against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts'" and "precludes any showing of how [a legislator] acted, voted, or decided." *United States v. Helstoski*, 442 U.S. 477, 489 (1979)

(second alteration in original). It generally shields legislators and their agents from undertaken when "acting in the sphere of legitimate legislative activity." *Tenney*, 341 U.S. at 376. Applying legislative privilege, courts of appeals have precluded plaintiffs from seeking discovery from legislators in redistricting and other intentional discrimination suits. The Eleventh Circuit, for example, has explained that "[t]he privilege protects the legislative process itself, and therefore covers both governors' and legislators' actions in the proposal, formulation, and passage of legislation." *In re Hubbard*, 803 F.3d 1298, 1308 (11th Cir. 2015) (collecting cases). Applying that rule in *Hubbard*, the Eleventh Circuit ordered quashed document subpoenas for legislative documents. *Id.* at 1315. The Eleventh Circuit rejected the district court's decision "that the lawmakers had forfeited their privileges." *Id.* at 1308. The Eleventh Circuit explained, "The privilege applies with full force against requests for information about the motives for legislative votes and legislative enactments." *Id.* at 1310. And because "[t]he subpoenas' only purpose was to support the lawsuit's inquiry into the motivations" of legislators, that "str[uck] at the heart of the legislative privilege." *Id.*; *accord Lee v. City of Los Angeles*, 908 F.3d 1175, 1187-88 (9th Cir. 2018) ("plaintiffs are generally barred from deposing local legislators even in 'extraordinary circumstances'").

**A. Documents Should Not Be Produced Over Legislative Privilege Objections When a Fifth Circuit Appeal on that Question is Pending.** For its privilege arguments, the United States relies on a recent district court decision in *La Union Del Pueblo Entero v. Abbott*, 2022 WL 1667687 (W.D. Tex. May 25, 2022) ("*LUPE*"), which concluded that legislative privilege did not shield legislators' documents from discovery. *See* Mot. 11, 13. That decision is stayed, and the Fifth Circuit is reviewing it on appeal on an expedited basis. That pending appeal will necessarily clarify the ground rules for legislative privilege in the Fifth Circuit, beyond the *dicta* merely generally describing the nature legislative privilege in *Jefferson Community Health Care Centers, Inc. v. Jefferson Parish Government*, 849 F.3d 615, 624 (5th Cir. 2017). It will require the Fifth Circuit to decide whether to apply legislative privilege

as it has been in the other courts of appeals—generally shielding discovery of legislators' non-public acts without resorting to a nebulous balancing test—or whether in the Fifth Circuit legislative privilege is to be balanced as one of many factors, more often than not reducing it to a nullity.[6] In light of that pending appeal, the most prudent course here would be to hold the United States' motion in abeyance pending the resolution of that appeal. That course avoids the unseemly possibility that legislators turn over documents that the Fifth Circuit then clarifies are privileged. Any Fifth Circuit ruling *after* documents are produced does the legislators little good because, once produced, the proverbial "cat is out of the bag." *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 761 (D.C. Cir. 2014).[7]

**B. There is no basis for comity-frustrating discovery of legislatively privileged documents for House redistricting plans.** With respect to the House redistricting plans, and documents sought from legislators and employees regarding the same, the United States has not alleged legislative intent is even relevant to its Section 2 claims. The United States brings only effects claims with respect to the House plan. *See* U.S. Am. Compl. ¶199, ECF 318. In such cases involving the *effects* of legislation, "the need for discovery … is simply too little to justify such a breach of comity," for "the proof is very likely in the eating, and not in the cook's intentions." *Alviti*, 14 F.4th at 90; *see id.* at 89-90 ("proof of the subjective intent of state lawmakers is unlikely to be significant enough in this case to warrant

---

[6]   *Compare Jefferson Comm. Health Care Ctrs., Inc. v. Jefferson Parish Gov't*, 849 F.3d 615, 624 (5th Cir. 2017) (*dicta* assuming legislative privilege applied while describing the privilege as "qualified" and to be "strictly construed"), *with Hubbard*, 1298 F.3d at 1308 (quashing document subpoenas intruding on the privilege's protection of "the legislative process itself"); *Lee*, 908 F.3d at 1188 (rejecting "categorical exception" to privilege "whenever a constitutional claim directly implicates the government's intent"); *Am. Trucking Assoc., Inc. v. Alviti*, 14 F.4th 76, 88-90 (1st Cir. 2021) (quashing subpoenas for legislative discovery in civil case where, though the United States was not a party, did "implicate the federal interest in enforcing the dormant Commerce Clause"); *see also Almonte*, 478 F.3d at 107 (explaining legislative immunity is "not limited to the casting of a vote" but "cover[] all aspects of the legislative process").

[7]   To the extent the United States argues that there is insufficient time to wait for a decision on the Fifth Circuit appeal, that timing concern ignores other ongoing discovery in this case. Separate from the document subpoenas, which have yielded thousands of documents, the parties have or will be deposing dozens of legislators and legislative employees who are required to answer questions regarding the legislative process, over their legislative privilege objections. *See* Order, ECF 282.

setting aside the privilege"). Accordingly, the United States' motion to compel should be denied for documents related to draft legislation for any House districts.

**C. There is no basis for piercing legislative privilege with respect to legislatively privileged documents relating to the congressional plan.** With respect to the congressional redistricting plan, for which the United States does press intentional discrimination claims, the United States argues that legislator discovery is relevant to probe the intent of the legislators. But even then, any "probative value of the discovery" is "reduced by the inherent challenges of using evidence of individual lawmakers' motives to establish that the legislature as a whole enacted [the law] with any particular purpose." *Alviti*, 14 F.4th at 90. Such discovery of what "motivate[d] legislators individually" necessarily "invites speculation and risks overlooking the reality that individual [legislators] often pursue multiple and competing purposes, many of which are compromised to secure a law's passage and few of which are fully realized in the final product." *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907-08 (2019) (plurality op.); *see United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.").

For its part, the United States continues to rely on *Jefferson Community Health Care Centers, Inc. v. Jefferson Parish Government*, 849 F.3d 615 (5th Cir. 2017). *See* Mot. 4, 12. Noted above, *Jefferson*'s *dicta* will soon be replaced by an actual rule. The United States fails to acknowledge that *Jefferson* did not have an occasion to explore the scope of the legislative privilege—rather, *Jefferson* assumed legislative privilege applied—making its discussion of privilege dicta. 849 F.3d at 624. Moreover, *Jefferson*'s reference to the "qualified" nature of legislative privilege refers to the Supreme Court's holding that the privilege must yield in the context of a federal criminal prosecution, *United States v. Gillock*, 445 U.S. 360, 373 (1980)—inapplicable to this civil litigation. *Accord Sup. Ct. of Va. v. Consumers Union*, 446 U.S. 719, 732-33 (1980) (generally equating immunity for state legislators in §1983 civil rights actions to that accorded

to Congressmen under the Constitution); *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998) (same). Finally, a "qualified" privilege is not synonymous with a non-existent privilege. Every privilege is "qualified" to some degree. *See, e.g.*, *United States v. Zolin*, 491 U.S. 554, 562-63 (1989) (crime-fraud exception to attorney-client privilege). But privileges still routinely apply, not routinely reduced to a nullity. Finally, even under the United States' preferred balancing test, there is no basis for discarding the privilege here. *See, e.g.*, Order, *Perez v. Perry*, No. 5:11-cv-360 (W.D. Tex. July 11, 2014), ECF 1138 at 1-2 (applying balancing test to conclude that redistricting dispute did not justify "discarding the privilege"); *Lee*, 908 F.3d at 1188 (rejecting "categorical exception" to legislative privilege "whenever a constitutional claim directly implicates the governments intent," which "would render the privilege 'of little value'"); *Alviti*, 14 F.4th at 88-89 ("proof of the subjective intent of state lawmakers is unlikely to be significant enough in this case to warrant setting aside the privilege").

**D. Documents related to draft legislation are privileged.** Relying on a now-stayed district court decision, the United States appears to argue that redistricting proposals and related data—that is, draft redistricting legislation and related data[8]— created or considered during the redistricting process are not legislatively privileged. Mot. 11. But these materials are at the core of the legislative privilege's protection of "the legislative process itself." *Hubbard*, 803 F.3d at 1308; *see, e.g.*, *Puente Arizona v. Arpaio*, 314 F.R.D. 664, 670 (D. Ariz. 2016) (concluding that emails protected by legislative privilege where "emails at issue in this case were created in connection with *bona fide* legislative activity—all but two of them refer to specific legislation in their subject line, and many of them include draft legislation"). Importantly, all parties have access to the public record, including publicly proposed amendments. But to safeguard the legislative process, its independence, and the free consideration of all

---

8    In redistricting, just as everywhere else, the ultimate product of the legislative process is a bill. A final redistricting bill translates the agreed-upon redistricting map into legislative text, sorting geographical units making up one district or another into different bill sections. *See, e.g.*, Tex. 87(3) House Bill 1, art. II, §1 ("District 1 is composed of Bowie, Cass, Lamar, Morris and Red River Counties."). Draft legislation in redistricting therefore encompasses any visual representations of draft redistricting maps, associated data, and similar proposals about where lines could or couldn't be drawn.

14

possible legislative proposals, the internal deliberations of the legislature regarding those publicly pro-

posed amendments or other proposals that never made it to committee of the House or Senate floor

remain privileged.

Quoting the stayed *LUPE* district court's decision on appeal in the Fifth Circuit, the United

States argues that such documents "factually based information" and so must be disclosed. Mot. 11

(citing Index 315-56). That argument is contrary to the weight of authority, including in the courts of

appeals. *See supra*, n.6; *see, e.g.*, *Citizens Union of City of New York v. Att'y Gen. of New York*, 269 F. Supp.

3d 124, 161 (S.D.N.Y. 2017) (describing "argument that the legislative privilege does not apply to

documents reflecting or containing facts" as "contrary to the weight of authority"). And it is contrary

to the legislative privilege itself. The legislators are not intending to withhold raw census data, without

more, for example. Rather, the legislators are withholding a subset of documents or data considered

and/or created as part of the legislative process on the way to the final redistricting bills. Much ulti-

mately became part of the public record—as formally introduced amendments, committee reports, or

translated to floor speeches transcribed in the Senate or House Journal. But there are necessarily doc-

uments that were created for a legislator's internal deliberations, necessary to allow the legislator to

suss out what he will sponsor or how he will ultimately vote. Allowing for the free and frank discussion

of draft legislative proposals necessarily includes consideration of the "factually based information"

related to or defining such proposals. *Cf. Tenney*, 341 U.S. at 377 ("not consonant with our scheme of

government for a court to inquire into the motives of legislators"); *Helstoski*, 442 U.S. at 489. Those

documents, not part of the public record, remain privileged.[9]

---

[9]   The United States identifies six documents withheld for legislative privilege, four of which are also withheld for attor-
     ney-client privilege and work product, created after the date of the enactment, according to the documents' metadata.
     *See* Mot. 11 (citing Index 310). The four documents withheld for attorney-client privilege not only postdate the enact-
     ment, they also postdate the commencement of redistricting litigation in Texas, *see, e.g.*, *LULAC* Compl., ECF 1 (filed
     Oct. 18, 2021), and are marked as "used by counsel retained for the purpose of advising on the legality of redistricting
     legislation" and are properly withheld for attorney-client privilege. The two additional documents are legislatively priv-
     ileged, insofar as they relate to "the creation and design of the new electoral maps" based on the legislation and internal

**E. Legislative privilege is not limited to include only those on the legislative payroll.**

The Court should reject arguments that legislative privilege does not extend to documents with executive branch officials or "outsiders" (who are not in fact outsiders to the legislative process). The privilege applies whenever the legislator or his agent was "acting in the sphere of legitimate legislative activity." *Tenney*, 341 U.S. at 376. The privilege covers "legislators' actions in the proposal, formulation, and passage of legislation." *Hubbard*, 803 F.3d at 1308. That necessarily includes "[m]eeting[s] with persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation . . . [and] assist legislators in the discharge of their legislative duty," *Almonte*, 478 F.3d at 107; *accord Baraka v. McGreevey*, 481 F.3d 187, 196-97 (3d Cir. 2007) (holding that a governor falls within the sphere of legislative activity when "advocating and promoting legislation"). "Meeting with 'interest' groups, professional or amateur, regardless of their motivation, is a part and parcel of the modern legislative procedures." *Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980). Limiting the legislative privilege to legislative acts involving only those on the Legislature's payroll has the perverse effect of stunting the legislative process—leading legislators to legislate in a vacuum. *But see Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975) ("legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change"). That effect, in turn, is at odds with the legislative privilege, preserving the independence and operation of the legislative branch. *See Tenney*, 341 U.S. at 373-74; *Hubbard*, 803 F.3d at 1307-08.

---

discussions about how to respond to inquiries about the legislative process. *See Baraka*, 481 F.3d at 196-97 ("advocating and promoting legislation").

Relatedly, the United States has identified a set of older documents, where the metadata indicates they were created well before potential 2021 litigation. *See* Mot. 9 (citing Index 288-290). As the privilege log indicates, some came from the Texas Legislative Counsel, with which legislators and legislative employees maintain a legislatively privileged and attorney-client privileged relationship. Tex. Gov't Code §308.006(a)-(b). The legislators will promptly produce some such documents. But others are data associated with past redistricting plans, some with annotations; such documents are revealing of the legislative fact-gathering process for the 2021 legislation and are thus legislatively privileged.

As for the United States' characterization of certain documents involving "outsiders," not all such documents can be treated the same. To be sure, some documents from outsiders are not covered by the legislative privilege. And indeed, thousands of pages of communications with members of the public have been produced. No legislator took the position that such documents with "members of the public" (Mot. 9-10) are privileged. But as for other documents that were withheld, involving others whom the United States characterizes (at 9) as "outsiders," an examination of the United States' own index (291-301) reveals that these individuals are not true "outsiders," equivalent to a member of the public who reaches out to a legislator unsolicited. Where documents involve individuals such as expert demographers retained by counsel in furtherance of the legislative process, that does not pierce the legislative privilege. Just as a legislator tasked with drafting a piece of environmental clean-up legislation will necessarily seek out expertise on that important topic, thereby engaging in a privileged research mission as part of the creation of smarter legislation, legislators involved in redistricting necessarily sought out expertise from demographers and others on redistricting. So long as the legislator was "acting in the sphere of legitimate legislative activity" and the documents are part and parcel of "the regular course of the legislative process." *Tenney*, 341 U.S. at 376; *Helstoski*, 442 U.S. at 489; *see*, *e.g.*, *Almonte v*, 478 F.3d at 107 ("[m]eeting[s] with persons outside the legislature…to discuss issues that bear on potential legislation…assist legislators in the discharge of their legislative duty"); *Bruce*, 631 F.2d at 280; *accord In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) (describing "need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources").

## CONCLUSION

The Court should deny the motion or alternatively hold the motion in abeyance pending the resolution of *La Union del Pueblo Entero v. Abbott*, 5th Cir. No. 22-50435.

Date: June 24, 2022                          Respectfully submitted,


KEN PAXTON                                   /s/ Patrick K. Sweeten
Attorney General of Texas                    PATRICK K. SWEETEN
                                             Deputy Attorney General for Special Litigation
                                             Tex. State Bar No. 00798537
BRENT WEBSTER
First Assistant Attorney General
                                             WILLIAM T. THOMPSON
                                             Deputy Chief, Special Litigation Unit
                                             Tex. State Bar No. 24088531

                                             JACK B. DISORBO
                                             Assistant Attorney General, Special Litigation Unit
                                             Tex. State Bar No. 24120804

                                             OFFICE OF THE ATTORNEY GENERAL

                                             P.O. Box 12548 (MC-009)
                                             Austin, Texas 78711-2548
                                             Tel.: (512) 463-2100
                                             Fax: (512) 457-4410
                                             patrick.sweeten@oag.texas.gov
                                             will.thompson@oag.texas.gov
                                             jack.disorbo@oag.texas.gov

                                             Counsel for Defendants, Senate and House Legislators and Staff

Adam K. Mortara                              /s/ Taylor A.R. Meehan
LAWFAIR LLC                                  J. Michael Connolly
125 South Wacker, Suite 300                  Taylor A.R. Meehan
Chicago, IL 60606                            Frank H. Chang
Tel: (773) 750-7154                          Jeffrey S. Hetzel
mortara@lawfairllc.com                       CONSOVOY MCCARTHY PLLC
                                             1600 Wilson Blvd., Suite 700
                                             Arlington, VA 22209
                                             Tel: (703) 243-9423
                                             mike@consovoymccarthy.com
                                             taylor@consovoymccarthy.com
                                             frank@consovoymccarthy.com
                                             jhetzel@consovoymccarthy.com

                                             Counsel for House Legislators and Staff

18

19

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on June 24, 2022, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN

19