IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § | |
| *Plaintiffs,* | § § | |
| EDDIE BERNICE JOHNSON, *et al.*, | § § | Case No. 3:21-cv-00259 |
| *Plaintiff-Intervenors,* | § § | [Lead Case] |
| v. | § § § | |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § § | |
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, *et al.*, | § § § | |
| *Plaintiffs,* | § § | Case No. 3:21-cv-988 |
| v. | § § | [Consolidated Case] |
| STATE OF TEXAS, *et al*, | § § | |
| *Defendants.* | § § | |

**MOTION TO DISMISS
THE MALC PLAINTIFFS' SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Introduction ............................................................................................................................................1

Argument ................................................................................................................................................1

    I.    Several of MALC's *Gingles* Claims Should be Dismissed..............................................1

    II.   MALC's *Larios* Claim Should be Dismissed ..................................................................7

Conclusion ...........................................................................................................................................15

Certificate of Service...........................................................................................................................16

i

**INTRODUCTION**

Despite the Court's guidance in its Memorandum Opinion and Order on Defendants' motions to dismiss, *see* ECF 307 ("Opinion"), and despite multiple attempts at repleading, several of the claims asserted in MALC's second amended complaint are plainly deficient. The Court should grant the motion to dismiss and, in so doing, narrow the scope of the issues to be presented at trial.

First, MALC has failed to adequately plead several of its vote dilution claims brought under *Thornburg v. Gingles*, 478 U.S. 30 (1985). Most glaringly, for several districts—HD37, HD90, CD15, ED2, and ED3—MALC fails to allege that the minority preferred candidate will "usually" lose due to which bloc voting under the enacted maps. MALC therefore cannot satisfy the third *Gingles* precondition for those claims.

Second, MALC has failed to adequately plead its malapportionment claim under *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004) (three-judge court). Where, as here, a plan's maximum population deviation is less than 10%, the plan is presumptively constitutional. Only by rebutting that presumption with clear evidence that the challenged population deviations are intentionally discriminatory or arbitrary can a plaintiff succeed. MALC fails to do so because it pleads no facts tending to show discriminatory intent, pointing only to population deviations in the El Paso, West Texas, and Panhandle areas. But as the Court has already recognized, "the grouping is inherently arbitrary." Opinion at 58. MALC fails to substantively add to its allegations on repleading. Thus, without more, MALC cannot rebut the presumption that the deviations found in the new House map are constitutional.

**ARGUMENT**

**I.    Several of MALC's *Gingles* Claims Should be Dismissed**

In the Court's Opinion, it clarified the allegations required to plead a vote dilution claim under *Thornburg v. Gingles*. Opinion at 30–33. At this stage, the three essential preconditions are well known.

> (1) The minority group must be able to demonstrate it is sufficiently large and geographically compact to constitute a majority in a single-member district;

1

>(2) The minority group must be able to show that it is politically cohesive; and
>
>(3) The minority [group] must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 50–51; *see Growe v. Emison*, 507 U.S. 25, 39–41 (1993) ("*Gingles* preconditions" are required in "a § 2 dilution challenge to a single-member districting scheme"). The Court stressed that the plaintiff must allege *facts* supporting the preconditions. For instance, a plaintiff cannot simply allege that a racial group is "cohesive." That "type of allegation is a '[t]hreadbare recital[ ] of [an] element[ ] of a cause of action'; it isn't worth anything." Opinion at 38 (quoting *Iqbal*, 556 U.S. at 678).

In response to the Court's Opinion, MALC chose not to reallege several claims—including HD31, HD80, HD118, and claims pertaining to House districts in "West Texas, Central Texas, and the Nueces County region." *See* ECF 247 ¶¶ 98–104, 114–20, 128–32, 144–47. And correctly so, for these allegations suffered important defects. But the defects extend to several claims even as repleaded.

At least five of MALC's claims fail to allege facts that, if proven, would satisfy the third *Gingles* precondition. Some of these claims fail to allege that the Hispanic candidate of choice will lose at all. But most of them allege that the Hispanic candidate of choice *may* or *could* lose as a result of Anglo bloc voting. This is not what *Gingles* requires. On the contrary, *Gingles* requires that "the white majority votes sufficiently as a bloc to enable it . . . *usually* to defeat the minority's preferred candidate." Opinion at 32 (quoting *Gingles*, 478 U.S. at 51) (emphasis added). "So the question posed by the third *Gingles* precondition is concrete: If the state's districting plan takes effect, will the voting behavior of the white majority cause the relevant minority group's preferred candidate 'usually to be defeated?'" *Robinson v. Ardoin*, --- F.4th ---, 2022 WL 2104123, at *9 (5th Cir. June 12, 2022). In addition, a plaintiff faces an "'obvious, difficult burden' in establishing" the third precondition where, as here, the districts at issue are "not majority Anglo by CVAP." Opinion at 33 (quoting *Salas v. Southwest Texas Junior College District*,

964 F.2d 1542, 1555 (5th Cir. 1992)).[1] *See* Table 1, below.

**Table 1. Citizen Voting Age Population for Selected Districts**[2]

| District | HCVAP | Anglo CVAP | BCVAP |
|---|---|---|---|
| HD37 | 77.8 | 20.3 | 0.7 |
| HD90 | 49.2 | 30.3 | 18.1 |
| CD15 | 73.8 | 23.0 | 1.6 |
| ED2 | 71.5 | 24.5 | 2.4 |
| ED3 | 57.8 | 31.8 | 7.4 |

Moreover, *usually* not just mean 51%. *See, e.g.*, *Lewis v. Alamance County*, 99 F.3d 600, 606 n.4 (4th Cir. 1996) ("We do not imply that the third *Gingles* element is met if plaintiffs merely show that white bloc voting defeats the minority-preferred candidate more often than not.") (Luttig, J.) (collecting cases); *Gingles*, 478 U.S. at 99–100 (O'Connor, J., concurring) ("The Court must find that even substantial minority success will be *highly infrequent*.") (emphasis added); *Uno v. City of Holyoke*, 72 F.3d 973, 985 (1st Cir. 1995) ("[T]o be legally significant, racially polarized voting in a specific community must be such that, over a period of years, whites vote sufficiently as a bloc to defeat minority [-preferred] candidates *most of the time*.") (emphasis added). To be sure, plaintiffs "are not required to show that minority candidates *always* lose to white candidates." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Albany County*, 281 F. Supp. 2d 436, 450 (S.D.N.Y. 2003) (That minority-preferred candidates were successful 11% of the time could not disprove that the minority-preferred candidate usually lost). But they must allege specific facts tending to show that the minority candidate of choice will suffer "usual and predictable defeat." *LULAC v. Clements*, 999 F.3d 831, 888 (5th Cir. 1993) (en banc). For

---

[1]   Though to be sure, the fact that a district is not Anglo majority does not "preclude" a plaintiff from making the required showing. Opinion at 33.

[2]   This Table uses data from the Plan H2316, C2193, and E2106 plan packets. *See* Ex. A, Ex. B, Ex. C. These packets are available on the State's Capitol Data Portal website. *See generally* https://data.capitol.texas.gov/. These and other publicly available materials are subject to judicial notice and therefore may be considered in deciding a motion to dismiss. *See* Fed. R. Evid. 201; *e.g.*, *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) ("In deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record.").

"the usual predictability of the majority's success distinguishes structural dilution from the mere loss of an occasional election." *Gingles*, 478 U.S. at 51.

HD37. MALC fails to allege the Latino candidate of choice in HD37 will usually be defeated by bloc Anglo votes. Indeed, Anglo voters constitute only 20.3 CVAP. Table 1. Instead, MALC alleges only that the Latino preferred candidate *might* lose: "It is possible for the Anglo majority to control elections in HD37." Compl. ¶ 118. That is not enough. This claim should be dismissed because MALC fails to allege that white bloc voting will *usually* case the Latino preferred candidate to lose.

HD90. MALC fails to allege that the Latino preferred candidate will lose in HD90. That alone damns its claim. To be sure, MALC alleges that Latinos have less voting power under the new district. *See* Compl. ¶ 123 (Plan H2316 "reduced Latino voting power in the district, weakening the ability of Latino voters in the area to elect the candidate of their choice in Democratic primary elections."); *id.* ¶ 130 (HD90 "serves to undermine the ability of Latinos in the area to elect their candidate of choice in primary elections."). But MALC stops short of alleging that the Latino preferred candidate will actually lose either the primary or general election. This omission is striking in comparison to other sections of the complaint. *Compare id.* ¶ 151 (as to HD17, "Anglos in the current HD 17 vote as a bloc to consistently defeat the Latino candidate of choice. Ecological inference indicates that between 75% and 95% of Anglos bloc voted to defeat the Latino candidate of choice in reconstituted statewide election results in every general election between 2014 and 2020."). Without any specific facts tending to show that the Latino preferred candidate will lose in HD90, MALC cannot support its claim.

But even if MALC could show that the Latino preferred candidate would lose—which it has not—it still would not be able to state a vote-dilution claim. MALC focuses on the Democratic primary election, alleging that Anglo and Black voters (48.4 CVAP combined) will vote together and against the Hispanic (49.2 HCVAP) preferred candidate. *See* Compl. ¶¶ 120–30. Even assuming the Hispanic candidate were to lose in this situation, the *cause* would not be Anglo bloc voting. Rather, by

4

MALC's own pleading, Anglo and Black voters will have formed a coalition. The third precondition is not satisfied where a minority's candidate of choice loses because of coalition voting. This is nearly the exact same fact pattern as one of the claims in *LULAC v. Clements. See* 999 F.2d at 888:

> In the one district court and two county court primary elections analyzed by the parties, the Hispanic, and Hispanic-preferred, candidate was defeated by a white majority. In one of these races, however, white voters gave their support to a black candidate, and thereby defeated both the Hispanic Castro and Hughes, a white candidate. Kennedy, the black candidate, had the overwhelming support of black as well as white voters, so it is difficult to conclude that Castro was defeated by a white bloc. *Castro and Hughes were defeated by a black-white coalition.* Thus, Castro's defeat is not evidence of the white majority's ability "usually to defeat the minority's preferred candidate.

So too here. Even if the Latino preferred candidate were to lose HD90—which MALC has not alleged—the cause would be a white and black coalition, not white bloc voting. The HD90 claim should be dismissed for this additional reason as well.

<u>CD15</u>. MALC also fails to show that the Latino preferred candidate will lose in CD15. As with several of MALC's other claims, here MALC only alleges that the Hispanic preferred candidate *may* lose. *See* Compl. ¶ 176 ("Reconstituted election results indicate that in 4 out of 8 analyzed statewide elections between 2014 and 2020, the Latino candidate of choice would have lost in the enacted CD 15."). Assuming those allegations as true, they do not show that the minority candidate of choice will *usually* lose; they show only that it is equally likely the Latino preferred candidate will win as it is that he or she will lose. This is insufficient to satisfy the third *Gingles* precondition.

MALC may respond that it has alleged the Latino candidate of choice in CD27 is sure to lose, but that allegation is irrelevant. *See* Compl. ¶ 176 ("Reconstituted election results indicate that . . . in 8 of the 8 elections . . . the Latino candidate of choice . . . would have lost in CD 27."). MALC proposes to reconfigure CD15 and CD27 to pack Latino voters in CD15 at the expense of CD27. To illustrate, under proposed Plan C2167—on which MALC's remedial map appears to be based, *see* Figure 1, below—the HCVAP in CD15 grows from 73.8 to 82.1, and the HCVAP in CD27 falls from 48.8 to 42.5. *Compare* Ex. A, *with* Ex. D. In other words, even under MALC's preferred configuration, MALC

5

does not allege the Latino preferred candidate would win CD27.

**Figure 1. Comparison of Plan C2166 and MALC Proposed Alternative Map**

MALC Proposal                                    Plan C2167

The upshot is that MALC does not identify a Hispanic population in the CD27 region that it contends *should* be able to elect its candidate of choice. Therefore, allegations tending to show that the Latino preferred candidate in CD27 as presently drawn will lose are irrelevant to its claim as to CD15.

ED2 and ED3. A similar defect is present with respect to MALC's claims as to ED2 and ED3. As always, MALC is required to allege specific facts showing that the Latino candidate of choice will *usually* lose due to bloc Anglo voting. But here, MALC alleges only that the Hispanic preferred candidate win, or may not. *See* Compl. ¶ 186 ("the performance of [ED2 and ED3] is at best marginal when

6

it comes to electing candidates of choice."). Elsewhere, MALC alleges that in 55% (ED2) or 22% (ED3) of some subset of analyzed elections, the Latino preferred candidate would lose. *See id.* ¶¶ 188, 190. That is not enough. Merely alleging that the Latino candidate of choice would lose *some* elections is not the same thing as showing that the same candidate would usually lose, absent exceptional circumstances. Even alleging that the probability of electoral defeat is greater than 50%, as with ED2, does not suffice. MALC must allege that the Latino preferred candidate will suffer "usual and predictable defeat." *LULAC*, 999 F.3d at 888. Simply alleging that such a candidate would lose five out of nine arbitrarily chosen elections falls short of establishing that he or she would lose "most of the time." *Uno*, 72 F.3d at 985.

## II. MALC's *Larios* Claim Should be Dismissed

The Court dismissed MALC's *Larios* claim, Opinion at 57–58, and MALC has failed to state a claim on repleading. *Larios* is based on the following controversial assertion: "[A] state legislative reapportionment plan that systematically and intentionally creates population deviations among districts in order to favor one geographic region of a state over another violates the one person, one vote principle firmly rooted in the Equal Protection Clause." *Larios*, 300 F. Supp. 2d at 1347. But that decision is not binding here due to the nature of the Supreme Court's review. Summary affirmances like *Larios* "have limited precedential value." *Baca v. Berry*, 806 F.3d 1262, 1275 (10th Cir. 2015).[3]

Rather than *Larios*, the applicable principles flow from the Supreme Court's binding decisions. Firstly, an "apportionment plan with a maximum population deviation [from ideal district size] under 10% falls within" the "category of minor deviations" that are "insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the

---

[3] As such, "the particularities of *Larios*'s holding that certain Georgia reapportionment plans violated one-person-one-vote principles have little to say to" claims asserted in different circumstances. *Id.* (internal citations omitted); *see also League of Women Voters of Chicago v. City of Chicago*, 757 F.3d 722, 725 n.2 (7th Cir. 2014) (affirming district court decision to dismiss *Larios* claim) ("[A] summary affirmance means that the Supreme Court agreed with the judgment "but not necessarily the reasoning by which it was reached.") (quoting *Mandel v. Bradley*, 432 U.S. 173, 176 (1977)).

State." *Voinovich v. Quilter*, 507 U.S. 146, 161 (1993); *see also Brown v. Thompson*, 462 U.S. 835, 843 (1983). As such, minor population deviations are "presumed to be constitutionally valid absent a showing of 'arbitrariness or discrimination.'" *League of Women Voters of Chicago*, 757 F.3d at 725 (quoting *Roman v. Sincock*, 377 U.S. 695, 710 (1964)). "[I]f the maximum deviation is less than 10%, the population disparity is considered *de minimis* and the plaintiff cannot rely on it alone to prove invidious discrimination or arbitrariness." *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996) (quoting *Roman*, 377 U.S. at 710 and *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)).

MALC's theory is that the House map presents "systemic overpopulation" of districts in the El Paso region, designed for the purpose of preventing Latino voters of an additional House district. Compl. at p. 27. It points to a number of districts in West Texas and the Panhandle—namely, HD 69, 71, 72, 81, 82, 83, 84, 86, 87, and 88—notes that they are underpopulated relative to the ideal, and concludes that this difference is the result of "ethnic" and "regional bias." *Id.* ¶ 260. This is altogether conclusory and insufficient to state a claim under *Larios*.

Without more, MALC cannot plausibly allege that Plan H2316 was intentionally and systematically drawn to discriminate against Latino voters in the El Paso and upper Rio Grande Valley region. Nothing in the complaint tends to show that the districts to which MALC points were treated differently than any other over- or underpopulated district or series of districts. Indeed, there are plenty of examples of regions in Hispanic-majority districts that are underpopulated and White-majority districts that are overpopulated. For instance, a series of districts North of Harris County are nearly uniformly (i) majority white, and (ii) overpopulated.[4] And a series of districts in the lower Rio Grande Valley are nearly uniformly (ii) majority Hispanic, and (ii) underpopulated.[5]

---

[4] Across House Districts 3, 12, 14, 15, 16, 18, 85, and 127, every district has a majority white CVAP, and the average population deviation is + 3.40%. *See* Ex. A.

[5] Across House Districts 35, 36, 37, 38, 39, 40, and 41, every district has a majority HCVAP, and the average population deviation is - 3.54%. *See* Ex. A.

8

Under MALC's logic, these numbers would suggest the lower Rio Grande Valley was treated favorably and the area North of Harris County treated unfavorably. But in reality, they merely illustrate that MALC's comparison of the El Paso region to the series of districts in West Texas and the Panhandle comes entirely out of context, and with entirely no specific supporting facts. Nor does MALC grapple with the obvious alternative explanation: that El Paso and the upper and lower Rio Grande Valley lost population relative to the rest of the State. And it fails to recognize that Hispanic majority districts were, as a whole, neither overpopulated nor underpopulated.

It is undisputed that Plan H2316 has a maximum deviation of 9.98%—below the 10% limit set forth by Supreme Court precedent. As the Court explained, "state and local legislative maps presumptively comply with the one-person, one-vote rule as long as their population deviations are less than 10%." Opinion at 57. For this reason, the State "is entitled to a presumption that the apportionment plan was the result of an 'honest and good faith effort to construct districts . . . as nearly of equal population as is practicable." *Daly*, 93 F.3d at 1220 (quoting *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)).[6]

MALC previously failed to state a claim because it alleged only that the new House map "systematically overpopulates" Hispanic-majority districts, without alleging any facts tending to show that the deviations in House map are "arbitrary" or "discriminatory." *Roman*, 377 U.S. at 710. Indeed, the Court recognized that MALC provided "few details." Opinion at 58. MALC alleged the El Paso districts were overpopulated at the expense of districts in West Texas and the Panhandle, but the Court rightly discredited that assertion as "inherently arbitrary," further explaining that "trends within one sparsely populated region are not 'systemic' within Texas as a whole." *Id.* Without more, MALC failed to state a malapportionment claim. *See id.* ("Given that the House plan is within the presumptively

---

[6] It is clear that rebutting the presumption of legislative good faith is an independent analytical requirement. Indeed, earlier this month, the Eleventh Circuit unanimously stayed a Florida district court's judgment in part because the court failed to "meaningfully account[] for the presumption at all." *League of Women Voters of Florida v. Lee*, 32 F.4th 1363, 1373 (11th Cir. 2022) (per curiam).

9

valid range, MALC has not adequately pleaded a violation of the one-person, one-vote requirement.").

The second amended complaint does not cure these deficiencies. As before, its grouping of districts is "inherently arbitrary," focusing on El Paso and West Texas without any evidence that the drawing of districts in these regions was in any way connected. Indeed, the allegations in the amended complaint are largely unchanged, except including a proposed remedial map. *Compare* Compl. ¶¶ 93–106, *with* ECF 247 ¶¶ 89–97. MALC also adds a figure depicting the population deviations in what it believes to be the pertinent districts, *see* Compl. Figure 4, but this is just a visualization of arbitrarily selected population numbers. And despite the Court's observation that the omission of HD53 from MALC's analysis is "striking," Opinion at 58, MALC leaves HD53—which is both majority Anglo and overpopulated—out of its new figure.[7]

It is black letter law that for deviations of less than 10%, "the population disparity is considered *de minimis* and the plaintiff cannot rely on it alone to prove invidious discrimination or arbitrariness." *Daly*, 93 F.3d at 1220. But that is precisely what MALC does. The second amended complaint offers nothing more than deviation numbers and related legal conclusions; it does not allege a single specific fact tending to show that the deviations in House map are "arbitrary" or "discriminatory." *Roman*, 377 U.S. at 710. In the complaint, MALC merely restates the deviation percentages, places them in a figure, *see* Compl. at p. 73, and concludes that "the pernicious effect is obvious." *Id.* ¶ 259. MALC goes on to conclude that "the systematic over-population of Latino districts in El Paso" operates to "deprive[] these communities of equal representation." *Id.* ¶¶ 102, 262. Those are legal conclusions, not factual bases from which to infer discrimination.

---

[7]   MALC attempts to justify this omission by arguing that HD53 is more "accurately characterized as being in the Texas Hill Country, rather than West Texas." Compl. ¶ 258. But this purported distinction just highlights the flaw in MALC's claim: there is no evidence whatsoever that these district groupings were considered by the Legislature.

10

**Figure 2. Plan H2100 Population Deviation Map**



MALC's attempt to identify a basis for grouping El Paso, West Texas, and the Panhandle is unavailing: "Further, the grouping is not arbitrary because it represents an impermissible regional bias that clearly also advantages one ethnic group over the other." Compl. ¶ 260. That assertion is circular: The grouping is not arbitrary because it shows regional bias; The grouping shows regional bias because it is not arbitrary. Simply put, the second amended complaint, as before, alleges no specific facts tending to show that any "trend" in El Paso is related to any "trends" in West Texas and the Panhandle, to the extent there are meaningful trends at all.

Moreover, MALC overlooks other highly-relevant background facts. First, it is clear that the House districts along the southern border substantially decreased in population relative to the rest of the State. Indeed, thirteen of the fifteen districts along the upper and lower Rio Grande Valley lost population relative to the ideal. *See* Figure 2, above. MALC does not dispute that population changes meant that, under federal one-person-one-vote precedent, the 2021 Legislature could not assign six districts to El Paso County, as the 2013 Legislature had. Nor does MALC dispute that the districts drawn by the 2021 Legislature are within the threshold established in the Supreme Court's one-person-one-vote cases.

Figure 2 illustrates a clear basis for the configuration in the El Paso region: those districts lost a substantial amount of population relative to the rest of the State. The Court need go no further to conclude that the numbers MALC cites do not rebut the presumption of good faith afforded to State legislatures in cases of deviations less than 10%. But if more were needed—which it is not—the Court should also note that districts with a majority HCVAP are almost perfectly balanced with respect to population deviations. *See* Table 2, below; *see also* Ex. A at 22–29.[8] Indeed, of the thirty such districts, fifteen have a positive population deviation, and fifteen have a negative deviation. The mean and

---

[8] This table is based on data from Exhibit A. For the HCVAP data, *see* p. 33–37; for the population deviation data, *see* p. 22–29. Following the population deviation map, *see* Figure 1, the purple cells indicate a population deviation of less than zero, and green cells indicate a deviation greater than zero. Darker shades are used for deviations exceeding 2.50%.

12

median deviation are almost zero, being -.071% and -.195% respectively.

**Table 2. Population Deviation for HCVAP Majority Districts**

| House District | HCVAP | Population Deviation |
|---|---|---|
| 31 | 66.6 | -4.81 |
| 34 | 71.7 | -2.44 |
| 35 | 93.7 | -0.50 |
| 36 | 89.0 | -3.90 |
| 37 | 77.8 | -4.84 |
| 38 | 91.5 | -4.19 |
| 39 | 89.0 | -4.17 |
| 40 | 90.5 | -4.55 |
| 41 | 80.4 | -2.62 |
| 42 | 92.6 | -4.93 |
| 43 | 59.7 | 1.17 |
| 74 | 77.4 | 4.60 |
| 75 | 89.8 | 3.19 |
| 77 | 85.6 | 4.95 |
| 78 | 66.4 | 4.88 |
| 79 | 75.1 | 3.64 |
| 80 | 77.6 | -0.88 |
| 81 | 51.9 | -4.96 |
| 104 | 56.3 | -4.53 |
| 116 | 59.1 | 2.79 |
| 117 | 68.7 | 4.51 |
| 118 | 56.4 | 4.60 |
| 119 | 64.8 | 3.72 |
| 123 | 62.0 | 1.45 |
| 124 | 68.9 | 0.11 |
| 125 | 62.6 | 4.36 |
| 140 | 70.2 | -4.18 |

| House District | HCVAP | | Population Deviation |
|---|---|---|---|
| 143 | 60.0 | | 3.20 |
| 144 | 64.8 | | 4.97 |
| 145 | 55.7 | | -2.78 |

By contrast, in *Larios*, the discrimination was clear from the face of the legislative record. The Georgia democratic leaders admitted that they "made no effort to make the districts as nearly of equal population as was practicable," instead deliberately and openly under-populating Democratic leaning districts and overpopulating Republican leaning districts. *Larios*, 300 F. Supp. 2d at 1325–27. Among other things, the legislative maps paired forty Republican incumbents in the state House and six in the Senate. *Id.* at 1332–34. Perhaps most damning, the record was replete of statements confirming the Democratic legislators' intent to oust Republican members. *See, e.g., id.* at 1328 (Senator Robert Brown: "[Y]ou had the desire on the part of the rural senators to have as many rural senators as possible."); *id.* (Linda Meggers, principal map drawer: "I took all of south Georgia and lassoed it in as if it were one big district, and we had the population, and the deviation, and how many seats. So I knew how many seats I could draw and be within five percent.").

Nothing of the sort is present here. MALC has not plausibly alleged intentional discrimination against Hispanic voters. MALC's allegations, even if assumed to be true, do not "show that the present plan's deviations and boundary shapes result from the predominance of similarly illegitimate factors," which "makes Cox [v. Larios] inapposite here." *Harris v. Arizona Indep. Redistricting Comm'n*, 578 U.S. 253, 264 (2016). Other than the population deviations themselves, MALC alleges no facts that directly or circumstantially establish discriminatory intent. No procedural irregularities, no statements, or anything else. Without more, MALC cannot rebut the presumption that the population deviations present in the House map—which are less than 10%—are the result of good faith efforts to draw appropriate legislative districts. And to be sure, Defendants need not justify the population deviations

14

in the House map because the plan falls within" the "category of minor deviations" that are "insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment." *Voinovich*, 507 U.S. at 161. But if it did, the circumstances explained above—and others—would more than adequately do so.

## CONCLUSION

Defendants respectfully request that the Court dismiss the portions of the MALC Plaintiffs' second amended complaint identified by this motion.

Date: July 1, 2022

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Respectfully submitted.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Tex. State Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

RYAN D. WALTERS
Special Counsel, Special Litigation Unit
Tex. State Bar No. 24105085

ARI M. HERBERT
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24126093

JACK B. DISORBO
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24120804

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov
ari.herbert@oag.texas.gov
jack.disorbo@oag.texas.gov

15

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on July 1, 2022, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
