# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, § § § | | |
| *Plaintiffs*, § | | |
| EDDIE BERNICE JOHNSON, *et al.*, § § | Case No. 3:21-cv-00259 | |
| *Plaintiff-Intervenors*, § § | [Lead Case] | |
| v. § § | | |
| GREG ABBOTT, *et al.*, § § | | |
| *Defendants*. § | | |
| UNITED STATES OF AMERICA, § § | | |
| *Plaintiff*, § § | Case No. 3:21-cv-299 | |
| v. § § | [Consolidated Case] | |
| STATE OF TEXAS, *et al*, § § | | |
| *Defendants*. § | | |

**MOTION TO DISMISS
THE UNITED STATES' AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Table of Contents ..................................................................................................................................i
Introduction..........................................................................................................................................1
Argument ..............................................................................................................................................3
    I.   The United States Has Failed to State a Claim as to Congressional Districts in Harris County..................................................................................................................................3
    II.  The United States Has Failed to State a Claim as to House District 31...................................6
    III. The United States Has Failed to State a Claim as to House Districts in El Paso County....10
Conclusion ..........................................................................................................................................14
Certificate of Service..........................................................................................................................15

**INTRODUCTION**

Despite the Court's guidance from its Memorandum Opinion and Order on Defendants' motions to dismiss, ECF 307 ("Opinion"), and despite the opportunity to incorporate analysis from its retained expert, the United States' amended complaint is deficient in several respects. The claims identified below fail as pleaded, and should not proceed to trial.

The United States asserts that Section 2 requires an additional Latino congressional district to be drawn in Harris County. That claim fails because, in creating a new CD38, the United States' proposed map eliminates a preexisting Latino-majority district—CD29. Under the current map, CD29 is 62.2 HCVAP. *See* Ex. A.[1] The United States fails to allege that, under its proposed map, Latinos constitute a majority in CD29, or are politically cohesive. Nor is the proposed CD29 "culturally compact." Opinion at 31 n.20. Rather, it snakes around different Latino populations in the Houston area with no indication that these communities are connected for any reason other than race. The United States cannot state a claim as to CD38 if it eliminates another Latino majority district (CD29) in the process.

That claim fails for the additional reason that the United States' proposed CD38 is a majority Latino district only according to the 2016-2020 American Community Survey Data. Compl. ¶ 105. This data, however, was not available to the Texas Legislature during the redistricting process. Because the Census is only conducted once every ten years, electoral maps operate under the "legal fiction" that they remain properly apportioned if they are lawful when drawn. *LULAC v. Perry*, 548 U.S. 399, 421 (2006). Subsequent population changes, therefore, do not affect an electoral map's legality. To state a valid claim, the United States must show that the congressional map was unlawful based on data that was available to the Texas Legislature when it was drawing the map.

---

[1] This plan packet is available on the State's Capitol Data Portal website. *See generally* https://data.capitol.texas.gov/. These and other publicly available materials are subject to judicial notice and therefore may be considered in deciding a motion to dismiss. *See* Fed. R. Evid. 201; *e.g., Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) ("In deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record.").

The United States also asserts that the configuration of House District 31 unlawfully denies Latino voters the opportunity to elect their candidate of choice. That claim fails because the United States fails to allege that the Latino-preferred candidate will be defeated. According to the United States' own allegations, incumbent Representative Ryan Guillen is preferred by a "cohesive majority" of Latinos in HD31. Compl ¶ 142. Representative Guillen has changed affiliations from the Democratic Party to the Republican Party, but the amended complaint fails to allege that Latinos will no longer support him because of that change. Nor does the amended complaint allege that Latinos in HD31 tend to support one party or the other in general elections. *See generally id.* ¶¶ 138–55. It also does not allege that Representative Guillen is likely to be defeated by Anglo bloc voting. As a result, the logical conclusion of the United States' allegations is that Representative Guillen (i) is the Latino preferred candidate in HD31, and (ii) will win the November general election. Those conclusions do not support a *Gingles* claim as to HD31.

Last, the United States asserts an unconventional *Gingles* claim as to the House districts in the El Paso area. Its' "main gripe," Opinion at 51, is that districts near El Paso are overpopulated. But it has no cause of action to bring a *Larios* claim, *id.* at 52, so it molds this claim into the *Gingles* framework. The United States' theory is that Section 2 requires there to be six Latino opportunity districts in the El Paso and West Texas region: House Districts 74, 75, 77, 78, 79, and 81. The claim fails because the United States fails to satisfy the *Gingles* precondition as to HD81. Specifically, the amended complaint fails to allege that (i) the proposed HD81 is culturally compact, (ii) Latinos in the proposed HD81 are politically cohesive, and (iii) that the Latino-preferred candidate in HD81 will usually lose as a result of Anglo bloc voting. Given that incumbent Representative Brooks Landgraf is running unopposed, the United States cannot even allege there will be an opposing candidate whom Latinos could prefer.

2

**ARGUMENT**

**I.   The United States Has Failed to State a Claim as to Congressional Districts in Harris County**

Under the new map, nine congressional districts are located at least partially in Harris County: Congressional Districts 2, 7, 8, 9, 18, 22, 29, 36, and 38. The United States acknowledges that Latinos can elect their candidate of choice in CD29. *See* Compl. ¶ 98. But the United States alleges that Latinos are unable to elect their candidate of choice in four districts: CD2, CD22, CD36, and CD38. *Id.* ¶ 99. The United States further alleges that the Harris County districts can be reconfigured to create a Latino opportunity district in CD38 while maintaining CD29. *Id.* ¶ 104. As such, the United States concludes, the present configuration violates Section 2 of the Voting Rights Act.

This claim should be dismissed for two independent reasons. First, the United States fails to allege facts that, if proven, would show that CD29 can be maintained as a Latino opportunity district. Specifically, the United States fails to allege that the proposed CD29 (or CD29* as referred to in the amended complaint) is (i) majority Latino by CVAP, (ii) politically cohesive, or (iii) culturally compact.

The configuration of CD29* is relevant to the question of whether the United States has stated a claim as to CD38* because for *Gingles* claims, "the ultimate question is whether a districting decision dilutes the votes of minority voters." *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018) (citing *LULAC*, 548 U.S. at 425–26). To make this showing, a plaintiff must establish the existence of an alternative map that does not eliminate an already-existing opportunity district. *See, e.g.*, *Harding v. Dallas County*, 948 F.3d 302, 309–11 (5th Cir. 2020). Otherwise, the proposal is just substituting one minority-majority district for another. As a matter of law, that does not "enhance the ability of minority voters to elect the candidates of their choice." *Perez*, 138 S. Ct. at 2332.

The amended complaint clearly fails to allege facts satisfying the first and second preconditions as to CD29*. The United States addresses CD29* only in a footnote. *See* Compl. ¶ 107 n.6 ("This illustrative configuration unpacks current Congressional District 29, while maintaining Latino voters'

opportunity to elect their preferred candidates in illustrative District 29*. Latino-preferred candidates would receive the most votes in all contested statewide contests ."). This footnote is insufficient to satisfy the first and second *Gingles* preconditions. It does not allege that CD29* has a majority HCVAP. (*Gingles* 1.) It does not allege that Latino voters in CD29* are politically cohesive. (*Gingles* 2.) Nor can the latter assertion be assumed—the United States candidly acknowledges that Latino communities in various parts of Harris County are *not* cohesive. *Id.* ¶ 100 (alleging that in CD2 and CD22, "less than 60% of Latino voters voted for the same candidates."). The truth is that an additional Latino-majority congressional district cannot be created without eliminating the Latino majority in CD29.

Nor does the United States allege that CD29* is "culturally compact." Opinion at 31 n.20. A plaintiffs' proposed district must be culturally compact because "there is no § 2 right to a district that is not compact." *LULAC*, 548 U.S. at 430. In determining whether a proposed district is compact, courts rely on "traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id.* at 433 (quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997)). Although that inquiry is fact-specific, it is clear that "a district that 'reaches out to grab small and apparently isolated minority communities' is not reasonably compact." *Id.* (quoting *Bush v. Vera*, 517 U.S. 952, 979 (1996)). This is so because an ethnic population in one part of the State may very well have other interests, concerns, and associations than a population of the same ethnicity in a different part of the State. *See id.* (stressing that "a State may not 'assum[e] from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls'") (quoting *Miller v. Johnson*, 515 U.S. 900, 920 (1995)). Setting aside that "prohibited assumption," there is "no basis to believe a district that combines two farflung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first Gingles condition contemplates." *Id.*; *see also Vera*, 517 U.S. at 980–81 (explaining that the "bizarre shaping of" a district that "cut[s] across pre-existing precinct lines and other natural or traditional divisions," suggests "a level of racial manipulation that

4

exceeds what § 2 could justify.").

**Figure 1. United States' Proposed Map—Harris County**



The proposed district combines disparate Houston neighborhoods. It begins in the Greater Fifth Ward, extends South into the Second Ward, squeezes North through downtown, continues to Aldine, loops around the Beltway to Jersey Village, then juts West toward Katy. The United States alleges no specific facts tending to show that Latinos in CD29* have similar beliefs, concerns, and issues. Without such allegations, one is left to conclude that the United States combined Latinos in this proposed district just because they are Latinos. That is impermissible, and does not satisfy the cultural compactness requirement of the first *Gingles* precondition.

This claim should be dismissed for the additional reason that the United States fails to allege that the proposed CD38 (or CD38*) is majority Latino. The complaint alleges that CD38* is 50.8%

5

HCVAP according to the 2016-2020 ACS data, Compl. ¶ 105, but that data was unavailable to the Texas Legislature when it drew the new maps, and therefore may not be used to determine whether the maps it passed violate the Voting Rights Act.

*Gingles* and other redistricting cases rest on the well-established "legal fiction" that electoral maps are "constitutionally apportioned throughout the decade, a presumption that is necessary to avoid constant redistricting, with accompanying costs and instability." *LULAC*, 548 U.S. at 421; *see also Johnson v. Miller*, 922 F. Supp. 1556, 1563 (S.D. Ga. 1995) (three-judge court) ("Since the population is not static, we adhered to the fiction that the census block figures are accurate to the exclusion of all others."), *aff'd sub nom. Abrams v. Johnson*, 521 U.S. 74 (1997).[2] Applying this principle, the United States cannot use the 2016-2020 ACS numbers to allege that CD38* is a majority Latino because those data were not available to the Legislature during the third special session; the Legislature instead relied upon the 2015-2019 ACS data.[3] To be sure, a plaintiff may attempt to prove a *Gingles* claim using data other than that relied upon by the legislature. This is what the Brooks plaintiffs did in the preliminary-injunction litigation. *See* ECF 258 at 31 (Order denying preliminary injunction, assessing probative value of ACS annual estimates (*e.g.*, 2019) instead of five-year estimates (*e.g.*, 2015-2019)). But a plaintiff may not satisfy the *Gingles* preconditions using data that did not exist when the Legislature drew the maps. Under the *LULAC* court's legal fiction, a lawful redistricting plan does not become unlawful simply by the passage of time and the movement of population.

## II. The United States Has Failed to State a Claim as to House District 31

House District 31 is 66.7% HCVAP; Latinos there "outnumber all other voters by about two-

---

[2] To be sure, *LULAC* applied the "legal fiction" in the context of a malapportionment claim, but the logic extends with equal force to other redistricting claims. A state's population is constantly shifting. Unless the legislature can base new electoral on some (fictitiously) fixed reference point, both Section 2 of the Voting Rights Act and the Fourteenth Amendment would require "constant redistricting." *LULAC*, 548 U.S. at 421.

[3] The 2016-2020 data set was released on March 17, 2022. *See* Press Release, United States Census Bureau, https://www.census.gov/newsroom/press-releases/2022/acs-5-year-estimates.html.

to-one." Opinion at 49; *see also* Ex. B. The United States admits that incumbent Ryan Guillen of HD31 is the Latino candidate of choice, receiving the support of a "a cohesive majority of Latino voters" in 2020. Compl. ¶ 142. Indeed, Latino voters have elected Representative Guillen "for nearly two decades." *Id.* ¶ 149. Having won his primary election by a comfortable margin (56.7-34.1%),[4] Representative Guillen is poised to be re-elected in the Fall. But the United States takes issue with HD31 because Representative Guillen recently switched affiliations from the Democratic Party to the Republican Party. *Id.* In response, the United States proposes to reconfigure several South Texas districts, drastically increasing the HCVAP of HD31 to from 66.7 to 79.7%, *see* Compl. ¶ 152.

This claim fails for three reasons. First, the United States fails to plausibly allege that white bloc voting will cause the Latino candidate of choice will lose in HD31. Recall that in HD31, HCVAP is 66.7 and White CVAP is 30.7. Ex. B. A plaintiff faces an "'obvious, difficult burden' in establishing" the third precondition where, as here, the districts at issue are "not majority Anglo by CVAP." Opinion at 33 (quoting *Salas v. Southwest Texas Junior College District*, 964 F.2d 1542, 1555 (5th Cir. 1992)). To make that showing, the United States needed to do one of two things: (i) allege that Representative Guillen will win the general election, but that he is not the Latino candidate of choice, or (ii) if Representative Guillen is the Latino candidate of choice, allege he will lose the general election due to white bloc voting. It did neither. As explained above, the United States alleges that Representative Guillen is the Latino candidate of choice in HD31—and has been for twenty years. *See* Compl. ¶¶ 138, 141–42, 149. Nothing in the amended complaint alleges that Latino voters will abandon their longstanding support for him just because he has changed parties. Nor does the United States not allege that Latinos in HD31 generally support the Democratic candidate in general elections. *See generally id.* ¶¶ 138–55.

As such, the only way for the United States to satisfy the third *Gingles* precondition is to allege

---

[4] *See* Texas Secretary of State, Election Results, March 2022 Republican Primary, results.texas-election.com/races.

that Representative Guillen will lose the general election due to white bloc voting. It fails to do so. The only allegation relevant to the third precondition does not account for Representative Guillen's historical support from the Latino community: "As a result of extreme bloc voting and substantially higher Anglo turnout relative to Latino turnout, Latino-preferred candidates did not receive the most votes within current District 31 in more than two-thirds of statewide contests between 2014 and 2020." Compl. ¶ 148. This allegation is only relevant if Representative Guillen is *not* the Latino-preferred candidate. But the United States' own allegations assert that he is, as explained above. For this reason, the allegation above does not support an inference that Representative Guillen will lose in the 2022 general election. Nothing else in the amended complaint addresses this subject. The United States contends that Representative Ryan Guillen in the Latino candidate of choice in HD31 but fails to allege specific facts tending to show that he will lose the general election due to white bloc voting. As such, the United States fails to satisfy the third *Gingles* precondition for this claim.

Second, the United States fail to satisfy the second precondition because it fails to allege that Latinos in the proposed HD31 are politically cohesive. To do so, plaintiffs must allege specific facts showing that "a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56. *See also Kumar v. Frisco ISD*, 476 F. Supp. 3d 439, 503 (E.D. Tex. 2020) ("The notion of political cohesiveness contemplates that a specified group of voters shares common beliefs, ideals, principles, agendas, concerns, and the like such that they generally unite behind or coalesce around particular candidates and issues."). This inquiry is supposed to be general, but the United States limits it to only "statewide contests including Latino candidates." In other words, to elections in which a Latino candidate runs against a non-Latino candidate. *See* Compl. ¶ 153 ("Latino voters in illustrative District 31* are highly cohesive. On average, across contested statewide contests including Latino candidates between 2014 and 2020, 80% of Latino voters preferred the same candidates."); *id.* ¶ 148 ("[O]n average across contested statewide contests including Latino candidates between 2014 and

8

2020, less than 10% of Anglo voters in current District 31 supported the Latino-preferred candidate.").

This approach is flawed for at least two reasons. As an initial matter, it improperly limits the cohesion analysis to one subset of elections. The second precondition requires that Latino voters in the proposed district be *generally* politically cohesive, not just cohesive in elections involving Latino candidates. As such, the amended complaints contains no allegations showing that Latinos in HD31* are cohesive in other elections. This is insufficient to satisfy the second precondition. And even if a subset of political cohesiveness could be relevant in some circumstances, it is certainly not relevant here because the 2022 general election involves two Latino candidates: Representative Guillen (R) and Martha Gutierrez (D).[5] The United States' allegations say nothing about whether Hispanics will vote cohesively in such an election. It fails to satisfy the second *Gingles* precondition as to HD31.

Finally, the HD31 claim fails for the additional reason that the United States' proposed reconfiguration eliminates a Latino-majority district: HD43. That district is predominately Hispanic, with HCVAP of 59.7 and Anglo CVAP of 35.1. Ex. B. Republican Latino J.M. Lozano has represented HD43 since 2012. In the last three contested general elections, Representative Lozano defeated his Democratic opponent by comfortable margins.[6] And in 2020 he ran unopposed.

Despite these uncontroversial facts, the United States contends that "House District 43 does not provide a Latino electoral opportunity in either the current House Plan or in this illustrative configuration." Compl. ¶ 154 n.8. But they fail to allege any specific facts substantiating that contention. Operating under the assumption that the Republican HD43 is not a Latino opportunity district, the United States dismantles HD43 in order to pack HD31*. It takes the heavily Latino Kleberg and Jim Wells Counties from HD43 and gives them to HD31*, increasing the HVCAP in the latter from 66.7

---

[5] *See* Texas Secretary of State, Election Results, March 2022 Democratic Primary, results.texas-election.com/races.
[6] In 2014, the margin was 61.4 to 38.6. In 2016, the margin was 61.1 to 38.9. The margin in 2018 was identical, 61.1 to 38.9. *See* Texas Secretary of State, Election Results, 2014 General Election, 2016 General Election, 2018 General Election. https://elections.sos.state.tx.us/elchist331_state.htm.

9

to 79.7%. *See* Compl. ¶ 152 & fig.16.

The United States uses HD43 to reconfigure HD31 based on the assumption that HD43 is not a Latino opportunity district. But it fails to allege facts that would support that assertion. A plaintiff cannot state a *Gingles* claim if the creation of the proposed opportunity district would eliminate the existence of another one. *Perez*, 138 S. Ct. at 2332; *Harding*, 948 F.3d at 309–11. But that is what the United States does here. The claim should be dismissed.

### III. The United States Has Failed to State a Claim as to House Districts in El Paso County

Before, the United States' claim as to West Texas appeared to be based on a *Larios* theory, for which it has no cause of action. *See* Opinion at 52 ("The Court has also noticed that the United States' objectives are not a perfect match with a *Gingles* claim."). The United States now amends its theory, alleging that House District 81 (HCVAP 51.9, Anglo CVAP 41.5) denies Latinos the opportunity to elect their candidate of choice. It contends that Section 2 requires six Latino opportunity districts in the region around El Paso County and West Texas—House Districts 74, 75, 77, 78, 79, and 81. The United States proposes a large-scale reconfiguration of the districts in this area to achieve this result.

This claim should be dismissed for three reasons. First, the United States fails to allege that the Latino populations in the proposed HD81 (HD81*) are culturally compact. In order to raise the district's HCVAP, HD81* includes a sliver of the City of El Paso, before connecting eight largely rural counties from Hudspeth to Gaines. *See* Figure 2, below. The United States fails to allege any facts tending to show that this small portion of the City of El Paso bears any cultural similarities with the rest of the district. *See* Compl. ¶¶ 174–75. On the contrary, the face of the proposed district suggests that the United States added the sliver in El Paso for the sole purpose of picking up Hispanic voters. *Compare LULAC*, 548 U.S. at 433 ("[A] district that 'reaches out to grab small and apparently isolated minority communities' is not reasonably compact.").

**Figure 2. United States Proposed Map—El Paso and West Texas**





11

The only related allegation suggests that Latinos in HD81* have a shared interest in the oil and gas industry. *See* Compl. ¶ 175 ("This illustrative configuration would combine portions of El Paso County and nearby rural counties in illustrative District 81*, connecting communities with shared economic interests, including in the oil and gas industry."). But this conclusory assertion lacks any supporting facts. The United States fails to allege that the portion of El Paso contained in HD81* has any particular connection to the oil and gas industry; for instance, that many residents who live there work in oil and gas, or that a major refinery is located there. The United States also fails to allege any specific facts about the oil and gas industry relating to the rural districts joined in HD81*. Without more, the United States fails to allege that the Latino populations in HD81* are connected for any reason other than race. Therefore, the United States fails to allege that those populations are culturally compact, and fails to satisfy the first *Gingles* precondition.

Second, the United States fails to allege that Hispanics in HD81* are politically cohesive. In fact, several pleadings cut directly in the other direction. *See* Compl. ¶ 171 ("Current District 81 combines the least cohesive Latino voters in the region."); *id.* ¶ 172 ("In 2014, statewide contests including Latino candidates were not clearly polarized in District 81."). More fundamentally, the United States improperly limits its cohesion allegations to only "statewide contests including Latino candidates." *Id.* ¶ 177. As explained above, the political-cohesion inquiry is general, and may not be limited to one subset of elections. *See Gingles*, 478 U.S. at 56; *Kumar*, 476 F. Supp. 3d at 503. The amended complaint says nothing about whether Latinos in this region are cohesive in other elections. The United States cannot satisfy the second *Gingles* precondition without alleging whether, *in general*, Latinos in HD81* are politically cohesive. Because the United States fails to do so, the claim must be dismissed.

Third, the United States fails to allege that the Latino-preferred candidate in current HD81 will lose because of Anglo bloc voting. As with political cohesion, the United States limits its allegations on bloc voting to only contests involving Latino candidates. *See* Compl. ¶ 172 ("As a result of

12

bloc voting and high Anglo turnout relative to Latino eligible voters, Latino-preferred Latino candidates did not receive the most votes within current District 81 in any statewide contests between 2016 and 2020."). This does not satisfy the showing *Gingles* requires.

*Gingles* requires that "the white majority votes sufficiently as a bloc to enable it . . . *usually* to defeat the minority's preferred candidate." Opinion at 32 (quoting *Gingles*, 478 U.S. at 51) (emphasis added). "So the question posed by the third *Gingles* precondition is concrete: If the state's districting plan takes effect, will the voting behavior of the white majority cause the relevant minority group's preferred candidate 'usually to be defeated?'" *Robinson v. Ardoin*, --- F.4th ---, 2022 WL 2104123, at *9 (5th Cir. June 12, 2022). In addition, a plaintiff faces an "'obvious, difficult burden' in establishing" the third precondition where, as here, the districts at issue are "not majority Anglo by CVAP." Opinion at 33 (quoting *Salas v. Southwest Texas Junior College District*, 964 F.2d 1542, 1555 (5th Cir. 1992)).

The United States fails to allege that the Latino preferred candidate will usually be defeated by Anglo bloc voting because it alleges nothing about racially polarized voting in normal circumstances. The amended complaint deals only with special circumstances. As such, the complaint does not plausibly allege that white bloc voting will defeat the minority-preferred candidate "most of the time." *Uno v. City of Holyoke*, 72 F.3d 973, 985 (1st Cir. 1995). Moreover, the United States cannot show the Latino-preferred candidate will lose in HD81 because Representative Landgraf is running opposed.[7] As the United States recognizes, a Democrat has only run against Representative Landgraf once since 2014. *See* Compl. ¶ 170. As such, the United States does not even plausibly allege that there will be an opposing candidate who Latino voters *could* prefer to Representative Landgraf.

As before, the United States attempts to "shoehorn" a *Larios* claim into the *Gingles* framework. Opinion at 52; *see also id.* at 51 ("The United States' main gripe is that the existing House districts in

---

[7] *See* Texas Secretary of State, Election Results, March 2022 Democratic Primary, results.texas-election.com/races. (showing that no Democrat ran for House District 81).

13

El Paso County are overpopulated."). It again points to an arbitrary grouping of districts in West Texas and the Panhandle, alleging they are improperly underpopulated. Compl. ¶ 165. But as the Court has recognized, the United States cannot bring a *Larios* claim. Opinion at 52. As such, the United States attempts to reform its claim to center on House District 81. But as explained above, the United States fails to satisfy the three *Gingles* preconditions for that claim. It should be dismissed.

## CONCLUSION

Defendants respectfully request that the Court dismiss the portions of the United States' first amended complaint identified by this motion.

Date: July 1, 2022                                  Respectfully submitted.

KEN PAXTON                                          */s/ Patrick K. Sweeten*
Attorney General of Texas                           PATRICK K. SWEETEN
                                                    Deputy Attorney General for Special Litigation
BRENT WEBSTER                                       Tex. State Bar No. 00798537
First Assistant Attorney General

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

RYAN D. WALTERS
Special Counsel, Special Litigation Unit
Tex. State Bar No. 24105085

ARI M. HERBERT
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24126093

JACK B. DISORBO
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24120804

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ari.herbert@oag.texas.gov

14

jack.disorbo@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on July 1, 2022, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN