# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § | |
| *Plaintiffs,* | § § | |
| EDDIE BERNICE JOHNSON, *et al.*, | § § | |
| *Plaintiff-Intervenors,* | § § § | Case No. 3:21-cv-00259 [Lead Case] |
| V. | § § | |
| GREG ABBOTT, *et al.*, | § § § | |
| *Defendants.* | § | |

---

# MOTION TO DISMISS
# THE LULAC PLAINTIFFS' THIRD AMENDED COMPLAINT

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... i

Introduction ................................................................................................................... 1

Argument ....................................................................................................................... 1

    I.   Plaintiffs Have Not Plausibly Alleged Standing ................................................ 1

        A.   The Entity Plaintiffs Lack Organizational Standing ................................ 2

        B.   Several Entity Plaintiffs Also Lack Associational Standing ................... 7

        C.   No Plaintiff has Alleged Standing to Challenge HD118 ....................... 7

    II.   The *Larios* Claim Should be Dismissed ......................................................... 7

    III.   The *Gingles* Claims Should be Dismissed Because Plaintiffs Do Not Allege that Hispanic Populations in the Proposed Districts are Culturally Compact ................................... 15

    IV.   The Challenges to Several Districts Fail to Satisfy the Third *Gingles* Precondition ............... 17

    V.   The Challenge to HD31 Should be Dismissed ........................................... 18

Conclusion .................................................................................................................. 20

Certificate of Service ................................................................................................. 21

## INTRODUCTION

Despite the Court's guidance in its Memorandum Opinion and Order on Defendants' motions to dismiss, *see* ECF 307 ("Opinion"), and despite multiple attempts at repleading, several of the claims asserted in the LULAC Plaintiffs' third amended complaint, ECF 324-1, are plainly deficient, and many of the Plaintiffs lack standing. The Court should grant this motion to dismiss and narrow the scope of the issues to be presented at trial.

## ARGUMENT

## I.   Plaintiffs Have Not Plausibly Alleged Standing

This Court should dismiss for lack of subject-matter jurisdiction because Plaintiffs do not have Article III standing. "[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (quotation omitted). At the pleading stage, plaintiffs must "clearly . . . allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 339 (2016) (quotation omitted). These are: (1) an actual or imminent, concrete and particularized injury-in-fact; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision. *Lujan v. Def's of Wildlife*, 504 U.S. 555, 561 (1992).

Entities—like League of United Latin American Citizens ("LULAC"), Southwest Voter Registration Education Project ("SVREP"), Mi Familia Vota, American GI Forum, La Unión Del Pueblo Entero ("LUPE"), Mexican American Bar Association of Texas ("MABA-TX"), Texas Hispanics Organized for Political Education ("Texas HOPE"), William C. Velasquez Institute ("WCVI"), FIEL, Texas Association of Latino Administrators and Superintendents ("TALAS"), Proyecto Azteca, Reform Immigration for Texas Alliance ("RITA"), and Workers Defense Project ("WDP") (collectively, the "Entity Plaintiffs")—can establish an injury-in-fact under two theories: organizational standing or associational standing. *Tenth St. Residential Ass'n. v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020). The

Entity Plaintiffs' allegations, however, support neither theory and their claims should be dismissed.

Apart from the Entity Plaintiffs, Plaintiffs Emelda Menendez, Gilberto Menendez, Jose Olivares, Florinda Chavez, Joey Cardenas, Paulita Sanchez, Jo Ann Acevedo, David Lopez, Diana Martinez Alexander, and Jeandra Ortiz (collectively, the "Individual Plaintiffs") also lack standing to challenge any districts in which they do not reside.

### A.    The Entity Plaintiffs Lack Organizational Standing

The Entity Plaintiffs lack organizational standing, by which a plaintiff organization brings suit "on its own behalf." *Henderson v. Stalder*, 287 F.3d 374, 381 (5th Cir. 2002). The Entity Plaintiffs do not contend that they are "the object of the government action or inaction [they] challenge[]," so their standing is "substantially more difficult to establish." *Lujan*, 504 U.S. at 562 (quotation omitted). "A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Zimmerman v. City of Austin,* 881 F.3d 378, 388 (5th Cir. 2018) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). "An organization . . . cannot manufacture the injury by . . . simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (citing *Fair Employment Council v. BMC Mktg. Corp.,* 28 F.3d 1268, 1276–77 (D.C. Cir. 1994)). "It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.*

But the Entity Plaintiffs do not state "how the allegedly discriminatory . . . practice is going to impair [their] activities." *Galveston Open Gov't Project v. U.S. Dep't of Hous. & Urban Dev.*, 17 F. Supp. 3d 599, 613 (S.D. Tex. 2014) (Costa, J.). Indeed, a redistricting map cannot impair the Entity Plaintiffs' activities. This Court has explained that "Entity Plaintiffs must demonstrate that Defendants' redistricting plans significantly and perceptibly impaired their actual activities, not just their abstract interests (no matter how important) in civic participation, voting rights, and the like." Opinion at 11

(cleaned up). But each of the Entity Plaintiffs here remain free to conduct the various activities—such as voter registration, organizing get-out-the-vote drives, and hosting voter education forums—that they allege to undertake to further the purpose of the particular organization. *See* ECF 324-1 at ¶¶ 11–12 (LULAC), 25–26 (SVREP), 27–28 (Mi Familia Vota), 29–30 (GI Forum), 35–36 (LUPE), 50–51 (MABA-TX), 62–63 (Texas HOPE), 71–73 (WCVI), 74–75 (FIEL), 77–78 (TALAS), 85–87 (Proyecto Azteca), 88–89 (RITA), 96–97 (WDP). This Court has rejected organizational standing because of a lack of allegations "that would show or suggest that Defendants' redistricting maps impede [the organization's] actual activities; *i.e.*, its ability to educate, register, mobilize, and turn out Latin[o] voters across the United States, including in Texas." Opinion at 13.

The Entity Plaintiffs have remarkably similar allegations regarding their organizational standing. LULAC alleges that "[b]ecause of the dilution of the Latino vote, Plans H2316, S2168, C2193 and E2106 thwart [its] mission to expand Latino political influence." ECF 324-1 at ¶ 12; *see also id.* at ¶ 26 (SVREP); *id.* at ¶ 28 (Mi Familia Vota); *id.* at ¶ 30 (American GI Forum); *id.* at ¶ 36(LUPE); *id.* at ¶ 51 (MABA-TX); *id.* at ¶ 63 (Texas HOPE); *id.* at ¶ 73 (WCVI); *id.* at ¶ 75 (FIEL); *id.* at ¶ 78 (TALAS); *id.* at ¶87 (Proyecto Azteca); *id.* at ¶ 89 (RITA); *id.* at ¶ 97 (WDP). But "[f]rustration of an organization's objectives is the type of abstract concern that does not impart standing." *Nat'l Treas. Emps. Union v. United States*, 101 F.3d 1423, 1429 (D.C. Cir. 1996) (cleaned up). Rather, there must be "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitut[ing] far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). No matter how laudable an organization's goal, it cannot establish "standing simply on the basis of that goal." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976) (rejecting standing of an organization "dedicated to promoting access of the poor to health services" based on allegations that the challenged law made it harder for the poor to access such services). Thus, "a showing that an organization's mission is in direct conflict with a

defendant's conduct is insufficient, in and of itself, to confer standing on the organization to sue on its own behalf." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 361 n.7 (5th Cir. 1999).

Continuing with LULAC's allegations as representative of the other Entity Plaintiffs, it further asserts that "Plans H2316, S2168, C2193 and E2106 will force [it] to divert significant resources from its GOTV, voter registration and community education activities, which are central to its mission, in order to counteract the negative effects of the challenged redistricting plans." ECF 324-1 at ¶ 12 (LULAC); *see also id.* at ¶¶ 26 (SVREP), 28 (Mi Familia Vota), 30 (GI Forum), 36 (LUPE), 51 (MABA-TX), 63 (Texas HOPE), 73 (WCVI), 75 (FIEL), 78 (TALAS), 87 (Proyecto Azteca), 89 (RITA), 97 (WDP). But this Court has already ruled that similar allegations are insufficient. *See* Opinion at 12 ("disregarding as a "legal conclusion" NAACP's allegation that it "will have to commit significant time and resources to combatting the effects of these new maps"); *see also id.* (rejecting MALC's allegations that it "will have to expend resources, including paid staff time, and play defense against policies it opposes" as sufficient for standing) (cleaned up). Indeed, even if Entity Plaintiffs "had pleaded facts showing [they] had diverted resources to addressing Defendants' conduct, that could not alone meet [their] burden," Opinion at 12, because "[m]ere redirection of resources in response to another party's actions does not supply standing; after all, there is no legally cognizable interest in not expending resources on behalf of individuals for whom the [Entity Plaintiffs] advocate." *Id.* (cleaned up).

LULAC describes these resources as being diverted to "engag[ing] in efforts to convince Latinos to participate" in elections. ECF 324-1 at ¶ 12; *see also id.* at ¶¶ 26 (SVREP), 28 (Mi Familia Vota), 30 (GI Forum), 36 (LUPE), 51 (MABA-TX), 63 (Texas HOPE), 73 (WCVI), 75 (FIEL), 78 (TALAS), 87 (Proyecto Azteca), 89 (RITA), 97 (WDP). This diversion is supposedly necessary because "many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward)." *Id.* The cause of this discouragement is alleged to be "the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their

preferred candidates, and the reduced influence of Latino voters in the challenged districts and statewide." *Id.*

But the Entity Plaintiffs have "neither mentioned any specific projects" they had to "put on hold" due to the need to divert resources, nor "describe[d] in any detail" how they would have to "re-double [their] efforts." *Louisiana ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000). They only allege that the challenged maps "*will* force [them] to divert significant resources from" their standard activities in order to counter the maps. ECF 324-1 at ¶ 12 (LULAC); *see also id.* at ¶¶ 26 (SVREP), 28 (Mi Familia Vota), 30 (GI Forum), 36 (LUPE), 51 (MABA-TX), 63 (Texas HOPE), 73 (WCVI), 75 (FIEL), 78 (TALAS), 87 (Proyecto Azteca), 89 (RITA), 97 (WDP). But "[s]uch 'some day' intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Summers v. Earth Island Inst.,* 555 U.S. 488, 496 (2009) (quoting *Lujan,* 504 U.S. at 564 (italics in original)). The Entity Plaintiffs cannot "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013).

Although LULAC makes the bare recitation of the requirement that the diversion "is not a regular activity of LULAC," ECF 324-1 at ¶ 12; *see also id.* at ¶¶ 26 (SVREP), 28 (Mi Familia Vota), 30 (GI Forum), 36 (LUPE), 51 (MABA-TX), 63 (Texas HOPE), 73 (WCVI), 75 (FIEL), 78 (TALAS), 87 (Proyecto Azteca), 89 (RITA), 97 (WDP), this is a mere recital of the requirement that it "detracts or differs from its routine activities," Opinion at 10 (quoting *Tenth St. Residential Ass'n*, 968 F.3d at 500 (cleaned up)). And this contradicts LULAC's allegations about its purpose and existing activities.

LULAC alleges that its "mission is to advance the . . . political influence . . . of Hispanic Americans through community-based programs," and "includes achieving full and effective political participation by Latinos." ECF 324-1 at ¶ 11; *see also id.* at ¶¶ 25 (SVREP), 27 (Mi Familia Vota), 30

(GI Forum), 35 (LUPE), 50 (MABA-TX), 62 (Texas HOPE), 71 (WCVI), 74 (FIEL), 77 (TALAS), 85 (Proyecto Azteca), 88 (RITA), 96 (WDP). Indeed, "[p]romoting civic participation of Latinos, including voter registration and voting, and ensuring that Latinos cast effective votes" is critical to that mission. *Id.* And LULAC regularly fulfills that mission by "register[ing] eligible Latino voters; host[ing] voter registration drives [and] voter education forums . . . conduct[ing] voter registration, education, and non-partisan get-out-the vote campaigns." *Id.* The efforts for which the Entity Plaintiffs have purportedly "diverted" their resources in response to the challenged maps—"engag[ing] in efforts to convince Latinos to participate" in elections, *id.* at ¶ 12; *see also id.* at ¶¶ 26 (SVREP), 28 (Mi Familia Vota), 30 (GI Forum), 36 (LUPE), 51 (MABA-TX), 63 (Texas HOPE), 73 (WCVI), 75 (FIEL), 78 (TALAS), 87 (Proyecto Azteca), 89 (RITA), 97 (WDP)—easily fall within these routine activities.

In light of these allegations, the Entity Plaintiffs plead themselves out of organizational standing because they have not adequately alleged how their alleged diversion of resources differs from their typical allocation of those same resources for the same purposes—they have only alleged that they will continue with their normal advocacy efforts in the face of laws they do not like.

Finally, the Entity Plaintiffs fail to allege that any of their diverted resources have been expended in any of the challenged districts. In determining whether an organization has organizational standing, "we conduct the same inquiry as in the case of an individual." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). So where "plaintiffs' alleged harm is the dilution of their [beneficiaries'] votes, that injury is district specific," *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018)—any injury to an individual voter "results from the boundaries of the particular district in which he resides." *Id.* The failure to allege in which particular challenged district they have diverted their resources dooms the Entity Plaintiffs' organizational standing. *See, e.g.*, ECF 324-1 at ¶ 12 (without specifying where resources are actually expended, alleging "LULAC must now expend new and significantly more resources to register and turn our Latino voters, particularly those who live in the challenged districts

and areas"); *see also id.* at ¶¶ 26 (SVREP), 28 (Mi Familia Vota), 30 (GI Forum), 36 (LUPE), 51 (MABA-TX), 63 (Texas HOPE), 73 (WCVI), 75 (FIEL), 78 (TALAS), 87 (Proyecto Azteca), 89 (RITA), 97 (WDP).

### B.    Several Entity Plaintiffs Also Lack Associational Standing

As explained above, none of the Entity Plaintiffs satisfy the requirements for organizational standing. As several of the Entity Plaintiffs fail to allege associational standing, they should be dismissed from this case altogether. This includes SVREP (ECF 324-1 at ¶ 25 ("SVREP does not have members")), Mi Familia Vota (*id.* at ¶ 27 ("MI FAMILIA VOTA does not have members")), WCVI (*id.* at ¶ 71 ("WCVI does not have members")), and Proyecto Azteca (*id.* at ¶ 85 ("PROYECTO AZ-TECA does not have members")). Finally, FIEL claims associational standing but fails to identify any members or which districts they reside in. *See id.* at ¶ 76. But as this Court has held, "[w]ithout identifying its members or their injuries, [FIEL] cannot have associational standing." Opinion at 14.

### C.    No Plaintiff has Alleged Standing to Challenge HD118

Where, as here, the "Plaintiffs' alleged harm is the dilution of their votes, that injury is district specific." *Gill*, 138 S. Ct. at 1930. The LULAC Plaintiffs challenge HD118, ECF 324-1 at ¶¶ 193, 283-299, but there is no allegation that any Entity Plaintiff has members in HD118, or that any Individual Plaintiff resides in that district. All claims relating to HD118 must be dismissed for lack of standing.

## II.    The *Larios* Claim Should be Dismissed

The Court dismissed the *Larios* claim of MALC, Opinion at 57–58, and the LULAC Plaintiffs' claim in Count 2 should suffer the same fate. *Larios* is based on the following controversial assertion: "[A] state legislative reapportionment plan that systematically and intentionally creates population deviations among districts in order to favor one geographic region of a state over another violates the one person, one vote principle firmly rooted in the Equal Protection Clause." *Larios*, 300 F. Supp. 2d at 1347. But that decision is not binding here due to the nature of the Supreme Court's review.

Summary affirmances like *Larios* "have limited precedential value." *Baca v. Berry*, 806 F.3d 1262, 1275 (10th Cir. 2015).[1]

Rather than *Larios*, the applicable principles flow from the Supreme Court's binding decisions. First, an "apportionment plan with a maximum population deviation [from ideal district size] under 10% falls within" the "category of minor deviations" that are "insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Voinovich v. Quilter*, 507 U.S. 146, 161 (1993); *see also Brown v. Thompson*, 462 U.S. 835, 843 (1983). As such, minor population deviations are "presumed to be constitutionally valid absent a showing of 'arbitrariness or discrimination.'" *League of Women Voters of Chicago*, 757 F.3d at 725 (quoting *Roman v. Sincock*, 377 U.S. 695, 710 (1964)). "[I]f the maximum deviation is less than 10%, the population disparity is considered *de minimis* and the plaintiff cannot rely on it alone to prove invidious discrimination or arbitrariness." *Daly v. Hunt*, 93 F.3d 1212, 1220 (4th Cir. 1996) (quoting *Roman*, 377 U.S. at 710 and *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)).

The LULAC Plaintiffs' theory is that the House map presents the overpopulation of districts in the El Paso region, designed for the purpose of preventing Hispanic voters of an additional House district. ECF 324-1 at pp. 119–21. They point to a number of districts in West Texas and the Panhandle—namely, HD 69, 71, 72, 81, 82, 83, 84, 86, 87, and 88—and note that they are underpopulated relative to the ideal and conclude that this difference is the result of H2316's "purpose of preserving Anglo voting influence and Anglo incumbency, and preventing the creation of House districts in which Latino voters have the opportunity to elect their candidate of choice." *Id.* at ¶ 307. This is altogether conclusory and insufficient to state a claim under *Larios*.

---

[1]  As such, "the particularities of *Larios*'s holding that certain Georgia reapportionment plans violated one-person-one-vote principles have little to say to" claims asserted in different circumstances. *Id.* (internal citations omitted); *see also League of Women Voters of Chicago v. City of Chicago*, 757 F.3d 722, 725 n.2 (7th Cir. 2014) (affirming district court decision to dismiss *Larios* claim) ("[A] summary affirmance means that the Supreme Court agreed with the judgment "but not necessarily the reasoning by which it was reached.") (quoting *Mandel v. Bradley*, 432 U.S. 173, 176 (1977)).

Without more, the LULAC Plaintiffs cannot plausibly allege that Plan H2316 was intentionally and systematically drawn to discriminate against Hispanic voters in the El Paso and upper Rio Grande Valley region. Nothing in the complaint tends to show that the districts to which LULAC Plaintiffs point were treated differently than any other over- or underpopulated district or series of districts. Indeed, there are plenty of examples of regions is Hispanic-majority districts that are underpopulated and Anglo-majority districts that are overpopulated. For instance, a series of districts North of Harris County are nearly uniformly (i) majority white, and (ii) overpopulated.[2] And a series of districts in the lower Rio Grande Valley are nearly uniformly (ii) majority Hispanic, and (ii) underpopulated.[3]

Under the LULAC Plaintiffs' logic, these numbers would suggest the lower Rio Grande Valley was treated favorably and the area North of Harris County treated unfavorably. But in reality, they merely illustrate that their comparison of the El Paso region to the series of districts in West Texas and the Panhandle comes entirely out of context, and entirely lacking in specific supporting facts. Nor do the LULAC Plaintiffs grapple with the obvious alternative explanation: that El Paso and the upper and lower Rio Grande Valley lost population relative to the rest of the State. And they fail to recognize that Hispanic majority districts were, as a whole, neither overpopulated nor underpopulated.

It is undisputed that Plan H2316 has a maximum deviation of 9.98%—below the 10% limit set forth by Supreme Court precedent. As the Court explained, "state and local legislative maps presumptively comply with the one-person, one-vote rule as long as their population deviations are less than 10%." Opinion at 57. For this reason, the State "is entitled to a presumption that the apportionment plan was the result of an 'honest and good faith effort to construct districts . . . as nearly of equal

---

[2]   Across House Districts 3, 12, 14, 15, 16, 18, 85, and 127, every district has a majority white CVAP, and the average population deviation is + 3.40%.

[3]   Across House Districts 35, 36, 37, 38, 39, 40, and 41, every district has a majority HCVAP, and the average population deviation is - 3.54%.

population as is practicable." *Daly*, 93 F.3d at 1220 (quoting *Reynolds v. Sims*, 377 U.S. 533, 577 (1964)).[4]

In one of the cases consolidated with this one, MALC previously failed to state a claim because it alleged only that the new House map "systematically overpopulates" Hispanic-majority districts, without alleging any facts tending to show that the deviations in House map are "arbitrary" or "discriminatory." *Roman*, 377 U.S. at 710. Indeed, the Court recognized that MALC provided "few details." Opinion at 58. MALC alleged the El Paso districts were overpopulated at the expense of districts in West Texas and the Panhandle, but the Court rightly discredited that assertion as "inherently arbitrary," further explaining that "trends within one sparsely populated region are not 'systemic' within Texas as a whole." *Id*. Without more, MALC failed to state a malapportionment claim. *See id*. ("Given that the House plan is within the presumptively valid range, MALC has not adequately pleaded a violation of the one-person, one-vote requirement.").

The LULAC Plaintiffs' third amended complaint does not cure these deficiencies the Court recognized in MALC's *Larios* claim. As with MALC's, their grouping of districts is "inherently arbitrary," focusing on El Paso and West Texas without any evidence that the drawing of districts in these regions was in any way connected. And despite the Court's observation that the omission of HD53 from MALC's analysis was "striking," Opinion at 58, the LULAC Plaintiffs leave HD53—which is both majority Anglo and overpopulated—out of their allegations.

It is black letter law that for deviations of less than 10%, "the population disparity is considered *de minimis* and the plaintiff cannot rely on it alone to prove invidious discrimination or arbitrariness." *Daly*, 93 F.3d at 1220. But that is precisely what the LULAC Plaintiffs do. Their third amended complaint offers nothing more than deviation numbers and related legal conclusions; it does not allege

---

[4]   It is clear that rebutting the presumption of legislative good faith is an independent analytical requirement. Indeed, earlier this month, the Eleventh Circuit unanimously stayed a Florida district court's judgment in part because the court failed to "meaningfully account[] for the presumption at all." *League of Women Voters of Florida v. Lee*, 32 F.4th 1363, 1373 (11th Cir. 2022) (per curiam).

a single specific fact tending to show that the deviations in House map are "arbitrary" or "discriminatory." *Roman*, 377 U.S. at 710. The LULAC Plaintiffs merely state the deviation numbers and conclude that "the systematic and deliberate over- and under-population of districts in these regions deliberately favors the interests of communities and voters in the Texas Panhandle, and extending south to include the area of original Tom Green County, at the expense of communities and voters in El Paso and the Upper Rio Grande area of West Texas." ECF 324-1 at ¶ 302. They go on to conclude that "Defendants over- and under-populated districts in these regions purposefully to weaken Latino voting strength, and to protect Anglo incumbents," *id.* at ¶ 303, and that the House map "purposefully minimizes Latino voting strength and Latino voters' ability to participate on an equal basis in elections to the State House, both in the specific overpopulated districts and statewide." *Id.* at ¶ 305. But those are legal conclusions, not factual bases from which to infer discrimination.

Moreover, the LULAC Plaintiffs overlook other highly relevant background facts. First, it is clear that the House districts along the southern border substantially decreased in population relative to the rest of the State. Indeed, thirteen of the fifteen districts along the upper and lower Rio Grande Valley lost population relative to the ideal. *See* Figure 1, below. The LULAC Plaintiffs do not dispute that population changes meant that, under federal one-person-one-vote precedent, the 2021 Legislature could not assign six districts to El Paso County, as the 2013 Legislature had. Nor do they dispute that the districts drawn by the 2021 Legislature are within the threshold established in the Supreme Court's one-person-one-vote cases.

**Figure 1. Plan H2100 Population Deviation Map**



Figure 1 illustrates a clear basis for the configuration in the El Paso region: those districts lost a substantial amount of population relative to the rest of the State. The Court need go no further to conclude that the numbers the LULAC Plaintiffs cite do not rebut the presumption of good faith afforded to State legislatures in cases of deviations less than 10%. But if more were needed—which it is not—the Court should also note that districts with a majority HCVAP are almost perfectly balanced with respect to population deviations. *See* Table 2, below.[5] Indeed, of the thirty such districts, fifteen have a positive population deviation, and fifteen have a negative deviation. The mean and median deviation are almost zero, being -.071% and -.195% respectively.

**Table 2. Population Deviation for HCVAP Majority Districts**

| House District | HCVAP | | Population Deviation |
|:---:|:---:|:---:|:---:|
| 31 | 66.6 | | -4.81 |
| 34 | 71.7 | | -2.44 |
| 35 | 93.7 | | -0.50 |
| 36 | 89.0 | | -3.90 |
| 37 | 77.8 | | -4.84 |
| 38 | 91.5 | | -4.19 |
| 39 | 89.0 | | -4.17 |
| 40 | 90.5 | | -4.55 |
| 41 | 80.4 | | -2.62 |
| 42 | 92.6 | | -4.93 |
| 43 | 59.7 | | 1.17 |
| 74 | 77.4 | | 4.60 |
| 75 | 89.8 | | 3.19 |
| 77 | 85.6 | | 4.95 |
| 78 | 66.4 | | 4.88 |

---

[5]   This table is based on data from Ex. A. For the HCVAP data, *see* pp. 33–37; for the population deviation data, *see* pp. 22–29. Following the population deviation map, *see* Figure 1, the purple cells indicate a population deviation of less than zero, and green cells indicate a deviation greater than zero. Darker shades are used for deviations exceeding 2.50%.

| House District | HCVAP | | Population Deviation |
|:---:|:---:|:---:|:---:|
| 79 | 75.1 | | 3.64 |
| 80 | 77.6 | | -0.88 |
| 81 | 51.9 | | -4.96 |
| 104 | 56.3 | | -4.53 |
| 116 | 59.1 | | 2.79 |
| 117 | 68.7 | | 4.51 |
| 118 | 56.4 | | 4.60 |
| 119 | 64.8 | | 3.72 |
| 123 | 62.0 | | 1.45 |
| 124 | 68.9 | | 0.11 |
| 125 | 62.6 | | 4.36 |
| 140 | 70.2 | | -4.18 |
| 143 | 60.0 | | 3.20 |
| 144 | 64.8 | | 4.97 |
| 145 | 55.7 | | -2.78 |

By contrast, in *Larios*, the discrimination was clear from the face of the legislative record. The Georgia democratic leaders admitted that they "made no effort to make the districts as nearly of equal population as was practicable," instead deliberately and openly under-populating Democratic leaning districts and overpopulating Republican leaning districts. *Larios*, 300 F. Supp. 2d at 1325–27. Among other things, the legislative maps paired forty Republican incumbents in the state House and six in the Senate. *Id.* at 1332–34. Perhaps most damning, the record was replete of statements confirming the Democratic legislators' intent to oust Republican members. *See, e.g.*, *id.* at 1328 (Senator Robert Brown: "[Y]ou had the desire on the part of the rural senators to have as many rural senators as possible."); *id.* (Linda Meggers, principal map drawer: "I took all of south Georgia and lassoed it in as if it were one big district, and we had the population, and the deviation, and how many seats. So I knew how many seats I could draw and be within five percent.").

Nothing of the sort is present here. The LULAC Plaintiffs have not plausibly alleged intentional discrimination against Hispanic voters. Their allegations, even if assumed to be true, do not "show that the pre-sent plan's deviations and boundary shapes result from the predominance of similarly illegitimate factors," which "makes *Cox* [*v. Larios*] inapposite here." *Harris v. Arizona Indep. Redistricting Comm'n*, 578 U.S. 253, 264 (2016). Other than the population deviations themselves, the LULAC Plaintiffs allege no facts that directly or circumstantially establish discriminatory intent on this ground—no procedural irregularities, no statements, or anything else. Without more, they cannot rebut the presumption that the population deviations present in the House map—which are less than 10%—are the result of good faith efforts to draw appropriate legislative districts. And to be sure, Defendants need not justify the population deviations in the House map because the plan falls within the "category of minor deviations" that are "insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment." *Voinovich*, 507 U.S. at 161. But the circumstances explained above—and others—would more than adequately do so.

## III. The *Gingles* Claims Should be Dismissed Because Plaintiffs Do Not Allege that Hispanic Populations in the Proposed Districts are Culturally Compact

The Court should dismiss Count 3 of the LULAC Plaintiffs' third amended complaint because the allegations relating to all districts for that claim are based on a fundamentally flawed understanding of Section 2 of the Voting Rights Act. Specifically, they fail to understand that Section 2 is violated only where a "culturally compact" minority population is dispersed into districts that dilute its ability to elect its candidate of choice. *See* Opinion at 31 n.20. Section 2 does not require a State to draw a district with a majority of a racial or ethnic group just because it is technically possible. Rather, Section 2 requires a State to draw such a district only if the racial or ethnic group is of sufficient size *and* geographically *and* culturally compact. *See LULAC v. Perry*, 548 U.S. 399, 435 (2006) ("The mathematical possibility of a racial bloc does not make a district compact.").

The third amended complaint does not account for this basic principle. The LULAC Plaintiffs,

like all plaintiffs in these consolidated cases, repeat the refrain that minorities accounted for 95% of the population growth in Texas from 2010–2020. ECF 324-1 at ¶¶ 2-3. But they fail to acknowledge that this growth was dispersed throughout the entire State, not concentrated is one or two areas. For this reason, many minority populations, though growing, are of insufficient size to trigger Section 2.

Indeed, the LULAC Plaintiffs fail to include any allegations at all relating to the cultural compactness of any of their proposed districts—they refer solely to geographical compactness. *See* ECF 324-1 at ¶ 190 (referring to "geographically compact" Hispanic population). This is true for all challenges to House districts. *See id.* at ¶¶ 196, 198, 200 (same for proposed additional House district in NW Harris County); *id.* at ¶¶ 208, 210, 212 (same for proposed additional House district in SE Harris County); *id.* at ¶¶ 220, 222, 224 (same for proposed additional House district in Central Texas); *id.* at ¶ 241 (same for challenge to HD31); *id.* at ¶¶ 255-256 (same for challenge to HD37); *id.* at ¶ 273 (same for challenge to HD90); *id.* at ¶ 293 (same for challenge to HD118).

This is also true for all challenges to Senate districts. *See id.* at ¶ 309 (same for challenge to S2168 statewide); *id.* at ¶¶ 312, 314, 316 (same for proposed additional Senate district in South/Central Texas); *id.* at ¶¶ 325, 327, 329-330 (same for proposed additional Senate district in Dallas and Tarrant Counties); *id.* at ¶ 347 (same for challenge to SD27).

This failure continues for all challenges to State Board of Education districts. *See id.* at ¶ 358 (same for challenge to E2106 statewide); *id.* at ¶¶ 361, 363, 365 (same for proposed additional Education district in Harris County); *id.* at ¶ 382 (same for challenge to ED3).

And the challenges to the remaining challenged districts—congressional districts—also fail because there are no allegations relating to cultural compactness. *See id.* at ¶ 393 (same for challenge to C2193 statewide); *id.* at ¶¶ 395, 397, 399 (same for proposed additional congressional district in Harris County); *id.* at ¶¶ 411, 413, 416 (same for proposed additional congressional district in Dallas and Tarrant Counties); *id.* at ¶¶ 426, 428, 430 (same for proposed additional congressional district in

South/Central Texas); *id.* at ¶ 445 (same for challenge to CD15); *id.* at ¶ 461 (same for challenge to CD23); *id.* at ¶¶ 469 (same for challenge to CD35).

The LULAC Plaintiffs were required to allege specific facts that, if proven, would show that the different Hispanic communities—especially communities separated by large "geographic distance[s]"—have the same "needs and interest[s]." *LULAC*, 548 U.S. at 435. Their proposed districts combine many disparate populations, but the third amended complaint fails to explain how they are connected other than a shared Hispanic ethnicity. The omission of such allegations by itself is sufficient to warrant dismissal of their Section 2 claims.

Although, at this pleading stage, Defendants cannot offer evidence that the districts in the LULAC Plaintiffs' proposed districts are *not* culturally compact, the point is that—despite three rounds of amended complaints—the LULAC Plaintiffs have alleged no facts tending to show that the Hispanic populations in any districts *are* culturally compact. For this reason, they cannot satisfy the first *Gingles* precondition, and all of their Section 2 claims should be dismissed.

## IV. The Challenges to Several Districts Fail to Satisfy the Third *Gingles* Precondition

*Gingles* requires that "the white majority votes sufficiently as a bloc to enable it . . . *usually* to defeat the minority's preferred candidate." Opinion at 32 (quoting *Gingles*, 478 U.S. at 51) (emphasis added). "So the question posed by the third *Gingles* precondition is concrete: If the state's districting plan takes effect, will the voting behavior of the white majority cause the relevant minority group's preferred candidate 'usually to be defeated?'" *Robinson v. Ardoin*, --- F.4th ---, 2022 WL 2104123, at *9 (5th Cir. June 12, 2022). In addition, a plaintiff faces an "'obvious, difficult burden' in establishing" the third precondition where, as some here (*e.g.*, HD118 with 55.9% HCVAP (ECF 324-1 at ¶ 289), CD23 with 58.1% HCVAP (*id.* at ¶ 458)), the districts at issue are "not majority Anglo by CVAP." Opinion at 33 (quoting *Salas v. Southwest Texas Junior College District*, 964 F.2d 1542, 1555 (5th Cir. 1992)).

Here, the LULAC Plaintiffs have failed to adequately allege that the Anglo majority votes cohesively to enable it to usually defeat the Hispanic-preferred candidate in several of the challenged districts. Their allegations show that Hispanic-preferred candidates in past races would have won their races in HD31 (discussed further below), HD37 (ECF 324-1 at ¶ 253 (52.5% in 2018 [sic] Supreme Court race)), SD27 (*id.* at ¶ 346 (50.7% in 2018 Governor race, 51.3% in 2018 Land Commissioner race)), and ED3 (*id.* at ¶ 380 (53.9% in 2020 Supreme Court race))—or at least had close enough races to make it implausible that Anglo bloc voting will defeat the Hispanic-preferred candidate "most of the time." *Uno v. City of Holyoke*, 72 F.3d 973, 985 (1st Cir. 1995). *See* ECF 324-1 at ¶ 253 (HD37: 48.5% in 2018 Land Commissioner race, 45.08% in 2018 Governor race) *id.* at ¶ 291 (HD118: 49.3% in 2018 Supreme Court race, 45.6% in 2018 Governor race, 46.5% in 2018 Land Commissioner race); *id.* at ¶ 443 (CD15: 49.6% in Supreme Court race, 49.5% in 2018 Governor race); *id.* at ¶ 459 (CD23: 44.7% in 2020 Supreme Court race, 42.2% in 2018 Governor race, 42.6% in 2018 Land Commissioner race). For one challenged district, the LULAC Plaintiffs provide no allegations that the Hispanic-preferred candidates in past races would win or lose. *See* ECF 324-1 at ¶¶ 266–82 (HD90).

All of the LULAC Plaintiffs' Section 2 claims relating to these districts should be dismissed.

## V.   The Challenge to HD31 Should be Dismissed

House District 31 is 66.7% HCVAP—Hispanics there "outnumber all other voters by about two-to-one." Opinion at 49. The LULAC Plaintiffs admit that incumbent Ryan Guillen of HD31 is the Hispanic candidate of choice, receiving the support of a "75% of Latino voters" in 2020. ECF 324-1 at ¶ 233. Indeed, Hispanic voters have elected Representative Guillen "[s]ince 2002." *Id.* at ¶ 233. Having won his primary election by a comfortable margin (56.7-34.1%),[6] Representative Guillen is poised to be re-elected in the Fall.

But the LULAC Plaintiffs apparently take issue with HD31 because Representative Guillen

---

[6]   *See* Texas Secretary of State, Election Results, March 2022 Republican Primary, results.texas-election.com/races.

recently switched affiliations from the Democratic Party to the Republican Party. *Id.* at ¶ 240. That claim fails because the United States fails to allege that the Hispanic-preferred candidate will be defeated.

This claim fails because the LULAC Plaintiffs fail to plausibly allege that white bloc voting will cause the Hispanic candidate of choice will lose in HD31. A plaintiff faces an "'obvious, difficult burden' in establishing" the third precondition where, as here, the districts at issue are "not majority Anglo by CVAP." Opinion at 33 (quoting *Salas v. Southwest Texas Junior College District*, 964 F.2d 1542, 1555 (5th Cir. 1992)). To make that showing, the LULAC Plaintiffs needed to do one of two things: (i) allege that Representative Guillen will win the general election, but that he is not the Hispanic candidate of choice, or (ii) if Representative Guillen is the Hispanic candidate of choice, allege he will lose the general election due to white bloc voting. They did neither.

Although Representative Guillen has changed affiliations from the Democratic Party to the Republican Party, the third amended complaint fails to allege that Hispanics will no longer support him because of that change. *See* ECF 324-1 at ¶¶ 232–247. Nor does it allege that Hispanics in HD31 tend to support one party or the other in general elections. *See id.* It also does not allege that Representative Guillen is likely to be defeated by Anglo bloc voting. As a result, the logical conclusion of the LULAC Plaintiffs' allegations is that Representative Guillen (i) is the Hispanic preferred candidate in HD31, and (ii) will win the November general election. Those conclusions do not support a *Gingles* claim as to HD31.

As such, the only way for the United States to satisfy the third *Gingles* precondition is to allege that Representative Guillen will lose the general election due to Anglo bloc voting. It fails to do so. The only allegation relevant to the third precondition does not account for Representative Guillen's historical support from the Hispanic community: "Anglos in this area vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed,

usually to defeat Latino voters' preferred candidates." ECF 324-1 at ¶ 243. This allegation is only relevant if Representative Guillen is *not* the Hispanic-preferred candidate. But the LULAC Plaintiffs' own allegations assert that he is, as explained above. For this reason, the allegation above does not support an inference that Representative Guillen will lose in the 2022 general election. Nothing else in the third amended complaint addresses this subject. As such, the LULAC Plaintiffs fail to satisfy the third *Gingles* precondition for this claim.

## CONCLUSION

Defendants respectfully request that the Court dismiss the relevant portions of the LULAC Plaintiffs' third amended complaint.

Date: July 1, 2022

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Respectfully submitted.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Tex. State Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

RYAN D. WALTERS
Special Counsel, Special Litigation Unit
Tex. State Bar No. 24105085

ARI M. HERBERT
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24126093

JACK B. DISORBO
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24120804

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ari.herbert@oag.texas.gov
jack.disorbo@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via

CM/ECF) on July 1, 2022, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN

21