IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br>    *Plaintiffs,* <br><br> EDDIE BERNICE JOHNSON, *et al.*, <br><br>    *Plaintiff-Intervenors,* <br><br> v. <br><br> GREG ABBOTT, *et al.*, <br><br>    *Defendants.* | §§§§§§§§§§§§§§§§ | Case No. 3:21-cv-00259 <br> [Lead Case] |
| ROSALINA RAMOS ABUABARA, <br><br>    *Plaintiff,* <br><br> v. <br><br> JOHN SCOTT, *et al*, <br><br>    *Defendants.* | §§§§§§§§§§ | Case No. 1:21-cv-965 <br> [Consolidated Case] |

**MOTION TO DISMISS
THE ABUABARA PLAINTIFFS' SECOND AMENDED COMPLAINT**

TABLE OF CONTENTS

Introduction ........................................................................................................................................ 1
Argument ............................................................................................................................................ 2
    I.    Plaintiffs Do Not Allege that Latino Populations in the Proposed Districts are Culturally Compact ............................................................................................................................ 2
          A.    South and West Texas ................................................................................................ 3
          B.    Houston and Dallas-Fort-Worth ............................................................................ 6
    II.   Plaintiffs Fail to Satisfy the First and Second Preconditions as to Proposed CD10 ............... 7
    III.  Plaintiffs Should Not Be Allowed to Replead .......................................................................... 8
Conclusion .......................................................................................................................................... 9
Certificate of Service ........................................................................................................................ 10

**INTRODUCTION**

The Court should dismiss the Abuabara plaintiffs' second amended complaint because the claims presented therein are based on a fundamentally flawed understanding of Section 2 of the Voting Rights Act. Specifically, plaintiffs fail to understand that Section 2 is violated only where a "culturally compact," minority population is dispersed into districts that dilute its ability to elect its candidate of choice. *See* ECF 307 at 31 n.20 ("Opinion"). Section 2 does not require a State to draw a district with a majority of a racial or ethnic group just because it is technically possible. Rather, Section 2 requires a State to draw such a district only if the racial or ethnic group is of sufficient size *and* geographically and culturally compact. *See LULAC v. Perry*, 548 U.S. 399, 435 (2006) ("The mathematical possibility of a racial bloc does not make a district compact.").

The second amended complaint does not account for this basic principle. The Abuabara plaintiffs, like all plaintiffs in these consolidated cases, repeat the refrain that minorities accounted for 95% of the population growth in Texas from 2010–2020. Compl. ¶ 2. But they fail to acknowledge that this growth was dispersed throughout the entire State, not concentrated is one or two areas. For this reason, many minority populations, though growing, are not of sufficient size to trigger Section 2.

Plaintiffs' proposed alternative maps concede as much. In order to manufacture districts that contain a sufficient number of Latinos or African Americans, the Abuabara plaintiffs stitch together disparate minority populations, without alleging these communities have anything in common other than ethnicity or race. The proposals as to South and West Texas are especially glaring. Compl. Ex. 1.

One proposed congressional district (CD28) splits the cities of McAllen and Laredo in half, combines the fragments, and arches north—avoiding Corpus Christi—to pick up the majority-Latino Victoria, without offering any explanation how these distinct communities have anything to do with each other. Nor is this example the only offending proposal; the Abuabara plaintiffs fail to allege that the minority populations combined in their proposed districts are culturally compact as to *any* of their

claims. Without those allegations, plaintiffs cannot show that the Latinos and African Americans throughout the State are connected in any way other than race or ethnicity. *See LULAC*, 548 U.S. at 435 (Section 2 does not mandate the creation of a district where "the only common index is race.").

Latino and African American communities are not fungible; plaintiffs may not mix and match them in a mathematical endeavor to optimize the number of Latino, African American, or coalition districts. But this is precisely what the Abuabara plaintiffs do. Because they fail to include any allegations tending to show the pertinent minority communities are "culturally compact," *see* Opinion at 31 n.20, their claims should be dismissed.

## ARGUMENT

### I. Plaintiffs Do Not Allege that Latino Populations in the Proposed Districts are Culturally Compact

In the Court's Opinion, it explained that the first *Gingles* precondition requires a plaintiff to plead specific facts showing that the minority populations in the proposed district are "culturally compact." Opinion at 31 n.20 (citing *LULAC*, 548 U.S. at 430–35). The second amended complaint lacks any allegations addressing this requirement. Plaintiffs allege that Latinos or Latinos and African Americans typically vote for the Democratic candidate in general elections, but they fail altogether to allege that these minority populations share common interests, concerns, and beliefs, or are even part of the same communities. Their claims should be dismissed for failure to satisfy the first *Gingles* precondition.

A plaintiffs' proposed district must be culturally compact because "there is no § 2 right to a district that is not compact." *LULAC*, 548 U.S. at 430. In determining whether a proposed district is compact, courts rely on "traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id.* at 433 (quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997)). Although that inquiry is fact-specific, it is clear that "a district that 'reaches out to grab small and apparently isolated minority communities' is not reasonably compact." *Id.* (quoting *Bush v. Vera*, 517 U.S. 952, 979 (1996)). This is so because an ethnic population in one part of the State may very well have other

interests, concerns, and associations than a population of the same ethnicity in a different part of the State. *See id.* (stressing that "a State may not 'assum[e] from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls'") (quoting *Miller v. Johnson*, 515 U.S. 900, 920 (1995)). Setting aside that "prohibited assumption," there is "no basis to believe a district that combines two far-flung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first Gingles condition contemplates." *Id.*

Therefore, a plaintiff fails to satisfy the first *Gingles* precondition where she fails to allege specific facts tending to show that the minority population in the proposed district is culturally compact under the standards recited above. *See, e.g.*, *Alabama State Conf. of the NAACP v. Alabama*, --- F. Supp. 3d ---, 2020 WL 583803, at *22–25 (granting judgment as to *Gingles* claim based on first precondition, explaining that plaintiffs failed to prove the African American population in proposed district was compact). For purposes of the first precondition, it does not suffice that it is *possible* to draw a district that composes a majority of a racial or ethnic group. "The mathematical possibility of a racial bloc does not make a district compact." *LULAC*, 548 U.S. at 435.

  A.  **South and West Texas**

The Abuabara plaintiffs' first series of claims pertains to South and West Texas. Compl. ¶¶ 81–128. By reconfiguring nine congressional districts—nearly 25% of the State's congressional delegation—plaintiffs allege they can draw two additional Latino opportunity districts and increase the Hispanic concentration in CD23. *See id.* ¶ 84. That such a configuration is *numerically possible* must be accepted as true at the pleading stage. But in order to create this map, the Abuabara plaintiffs fail to recognize any distinctions between the many different Latino communities across these regions.

Indeed, plaintiffs fail to include any allegations at all relating to the cultural compactness of the proposed districts. The closest plaintiffs come is to allege that most Latinos along the Southern border vote for the Democratic candidate in general elections. Compl. ¶ 81 ("The majority of Texans

living in the border region are Latino, and Latino Texans in the border region cohesively support political candidates affiliated with the Democratic Party."). They include similar allegations as to specific districts. *See id.* ¶ 89 ("Latino voters in Proposed CD16 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Proposed CD16 shows that 83 percent of Latino voters in Proposed CD16 support Democratic Party candidates in general elections."); *id.* ¶¶ 99, 107, 114, 122, 128 (similar, as to other challenged districts). But those allegations go to the second *Gingles* precondition, not the first. *See LULAC*, 548 U.S. at 434–35 (explaining that political cohesion and cultural compactness are separate inquiries).

Rather than political cohesion, plaintiffs must allege specific facts that, if proven, would show that the different Latino communities—especially communities separated by large "geographic distance[s]—have the same "needs and interest[s]." *LULAC*, 548 U.S. at 435. Plaintiffs' proposed districts combine many disparate populations, but the second amended complaint fails to explain how they are connected other than race. The omission of such allegations by itself is sufficient to warrant dismissal of their claims. Specific consideration of each proposed district also shows that they are not *prima facie* culturally compact. *See* Compl. Ex. 1 (reproduced below as Figure 1).

In search of Latino population for the proposed CD16, plaintiffs cut the City of El Paso in half and combine that Latino population with Odessa and part of Midland. As for the other half of El Paso, in CD23, it's placed in a district that extends in all directions; North including the other part of Midland, as well as Southeast along the upper Rio Grande Valley, picking up Del Rio, Eagle Pass, and half of Laredo. The proposed CD15 splits McAllen and Harlingen, and snakes around the proposed CD34 to Rockport. The proposed CD28 also divides local communities and combines unrelated ones. It combines the split portions of Laredo and McAllen, curving around the proposed CD15 all the way up to Victoria. The proposed CD10 fares no better; it starts in downtown Austin, weaves to the East of I-35 and through Seguin, picks up Southside San Antonio, and terminates in Atascosa County. Last

is the proposed CD21—beginning in West Bexar County and including parts of San Antonio, then extending West through Media and Uvalde Counties, and then South as far as La Salle.

**Figure 1. Abuabara Plaintiffs' Proposed Map**



The Abuabara plaintiffs' proposed map prioritizes Latino numbers over Latino communities. In order to maximize the number of Latino-majority districts, it divides many Latino-majority cities, including San Antonio, El Paso, McAllen, Laredo, and others. It combines urban areas, like Austin and San Antonio, with rural areas, like Uvalde and Gonzalez County, without any allegation that these areas bear cultural similarities. And the proposed map pairs Latino populations from vastly different geographic regions; El Paso with Laredo; McAllen with Victoria. Indeed, plaintiffs' proposal for CD34 places Corpus Christi with Brownsville even though in the last round of redistricting Corpus Christi citizens expressly asked for a congressional district apart from the City (and ports) of Brownsville.

To be sure, at this pleading stage, Defendants cannot offer evidence that the districts in

5

plaintiffs' proposed districts are not culturally compact. That's not the point. The point is that—despite three rounds of amended complaints—the Abuabara plaintiffs have alleged no facts tending to show that the Latino populations in these districts *are* culturally compact. For this reason, plaintiffs cannot satisfy the first *Gingles* precondition. These claims should be dismissed.

### B. Houston and Dallas-Fort-Worth

The Abuabara plaintiffs also bring claims as to the Houston and Dallas-Fort-Worth areas, challenging both the congressional and House maps, but these claims fail for the same reason as those as South and West Texas. Specially, plaintiffs allege (i) that an additional Latino opportunity congressional district (or in the alternative, Latino-African-American coalition district) can be drawn both in Houston and Dallas-Fort-Worth, (ii) that an additional Latino-African-American coalition House district can be drawn in Tarrant County, and (iii) that an additional Latino opportunity House district can be drawn in Harris County. *See* Compl. ¶¶ 129–54 (congressional, Dallas-Fort-Worth), *id.* ¶¶ 155–82 (congressional, Houston), *id.* ¶¶ 183–90 (House, Tarrant County), *id.* ¶¶ 191–203 (House, Houston).

Plaintiffs fail to allege any facts tending to show that the Latino and African American communities combined in the proposed districts are culturally compact. To be sure, these proposed districts are not as geographically distant as, for instance, El Paso and Laredo. But geographic proximity does not, by itself, demonstrate cultural compactness. There are many different communities within Harris, Tarrant, and Dallas Counties. For example, any Houstonian could identify Third Ward and Sunnyside as historical African American communities, but these neighborhoods possess unique interests, concerns, and history. Indeed, Third Ward and Sunnyside have historically been represented by different congressional members.[1] This example illustrates that even within large metropolitan areas, minority populations may be culturally compact, or they may not.

---

[1] At present, Congresswoman Sheila Jackson Lee represents CD18 (which includes Third Ward) and Congressman Al Green represents CD9 (which includes Sunnyside).

6

Plaintiffs' claims should be dismissed because the second amended complaint *assumes* that all Latino and African American populations within Harris County and Dallas-Fort-Worth respectively are culturally compact. They include no allegations that the minority populations they have stitched together in the proposed maps share similar beliefs, concerns, issues, or other cultural connections. Without such allegations, plaintiffs cannot satisfy the first *Gingles* precondition.

## II.     Plaintiffs Fail to Satisfy the First and Second Preconditions as to Proposed CD10

The Court need go no further than to recognize that plaintiffs have failed to allege any facts going to the cultural compactness of their proposed districts. But even if plaintiffs had alleged such facts, dismissal would still be warranted for their claim as to CD27 (reconfigured as Proposed CD10) because plaintiffs fail to otherwise satisfy the first and second *Gingles* preconditions.

The parties agree that the *Gingles* preconditions are as follows:

(1) The minority group must be able to demonstrate it is sufficiently large and geographically compact to constitute a majority in a single-member district;

(2) The minority group must be able to show that it is politically cohesive; and

(3) The minority [group] must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 50–51. Plaintiffs' theory for CD27 is that it should be reformed in order to make CD10 a Latino opportunity district. Compl. ¶ 108 (as to Proposed CD10), *id.* ¶¶ 109–14 (as to CD27). But plaintiffs fail to allege specific facts showing either (i) that the proposed CD10 would be majority Latino, or (ii) that Latinos in the proposed CD10 are politically cohesive. Indeed, proposed CD10 is only mentioned twice in the amended complaint. *See id.* ¶ 108 ("This change also leads to the emergence of two additional majority-Latino districts—Proposed CD21 and Proposed CD10—that are described in more detail below."); *id.* ¶ 114 ("Plaintiffs' demonstration maps further address the vote dilution caused by Enacted CD27 by placing other portions of Enacted CD27, including the area

7

where Plaintiff Luz Moreno lives, in Proposed CD10. As explained below, Latino voters in Proposed CD10 are politically cohesive and may elect their candidates of choice.").

The amended complaint lacks any factual allegations respecting CD10. It fails to allege figures regarding the Latino population, though it does for other proposed districts. *Compare* Compl. ¶ 97 ("Latino voters make up 72 percent of the voting eligible population in Proposed CD23."). Similarly, the complaint fails to allege any cohesion statistics, though it does for other proposed districts. *Compare id.* ¶ 107 ("Latino voters in Proposed CD34 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Proposed CD34 shows that 78 percent of Latino voters in Proposed CD34 support Democratic Party candidates in general elections."). To be sure, plaintiffs assert that "Latino voters in Proposed CD10 are politically cohesive." *Id.* ¶ 114. But that is a legal conclusion, not a factual allegation. And in determining whether a plaintiff has stated a claim for relief, a legal conclusion "isn't worth anything." Opinion at 38.

Plaintiffs attempt to satisfy the *Gingles* preconditions for their claim as to CD27 by proposing a new CD10. But they fail to allege specific facts satisfying the first and second *Gingles* preconditions as to the proposed CD10. For this reason, plaintiffs' claim as to CD27 must be dismissed.

### III.  Plaintiffs Should Not Be Allowed to Replead

Leave to amend should be denied "when it would cause undue delay, be the result of bad faith, represent the repeated failure to cure previous amendments, create undue prejudice, or be futile." *Morgan v. Chapman*, 969 F.3d 238, 248 (5th Cir. 2020). The Abuabara plaintiffs should not be allowed to replead their claims because they have already had three opportunities to adequately plead them. *See Voto Latino v. Abbott*, No. 1:21-cv-965, ECF 1 (W.D. Tex. Oct. 25, 2021) (original complaint); ECF 235 (April 21, 2022) (first amended complaint); ECF 356 (June 21, 2022) (second amended complaint). In fact, the Court granted the Abuabara plaintiffs leave to amend their complaint a third time even though the original scheduling order established a deadline of April 14 to seek leave to amend. ECF

96; *compare* Opinion at 60 (granting leave).

The Abuabara plaintiffs have had ample opportunity to plead their claims. Any repleading at this late stage would be highly prejudicial to Defendants. To establish the cultural compactness of the proposed districts, plaintiffs would need to add substantial factual allegations. Defendants would need to conduct discovery into those additional factual allegations, possibly delaying the factual and expert discovery that is proceeding at breakneck pace. The amended complaint was plaintiffs' last chance to state claims for relief. If the Court grants the motion to dismiss, leave to amend should be denied.

## Conclusion

Defendants respectfully request that the Court dismiss the claims asserted in the Abuabara plaintiffs second amended complaint.

Date: July 1, 2022

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Respectfully submitted.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Tex. State Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

RYAN D. WALTERS
Special Counsel, Special Litigation Unit
Tex. State Bar No. 24105085

ARI M. HERBERT
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24126093

JACK B. DISORBO
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24120804

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410

patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov
ari.herbert@oag.texas.gov
jack.disorbo@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on July 1, 2022, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN