## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § | |
| *Plaintiffs,* | § § | |
| EDDIE BERNICE JOHNSON, *et al.*, | § § | Case No. 3:21-cv-00259 |
| *Plaintiff-Intervenors,* | § § | [Lead Case] |
| v. | § § | |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § | |
| FAIR MAPS TEXAS ACTION COMMITTEE, *et al.*, | § § § | |
| *Plaintiffs,* | § § | Case No. 3:21-cv-1038 |
| v. | § § | [Consolidated Case] |
| GREG ABBOTT, *et al*, | § § | |
| *Defendants.* | § § | |

## MOTION TO DISMISS
## THE *FAIR MAPS* PLAINTIFFS' FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

Table of Contents ................................................................................................................................i

Introduction ....................................................................................................................................2

Argument ........................................................................................................................................2

    I.    The Entity Plaintiffs Lack Organizational Standing.....................................................2

    II.   The *Fair Maps* Plaintiffs Have Failed to Adequately Allege the *Gingles* Preconditions for the Challenged Districts ...............................................................................................3

        A.   House Districts in Fort Bend County .................................................................4

        B.   House Districts in Bell County..........................................................................7

        C.   House Districts in Collin County.......................................................................8

        D.   Senate Districts in Fort Bend County .............................................................11

        E.   Senate Districts in Tarrant County .................................................................12

        F.   Congressional Districts in the Harris–Fort Bend Area....................................16

        G.   Congressional Districts in Dallas–Fort Worth and the Surrounding Counties ............18

Conclusion....................................................................................................................................20

Certificate of Service....................................................................................................................21

## INTRODUCTION

In its Memorandum Opinion and Order on Defendants' motions to dismiss, this Court provided guidance on what plaintiffs must plead to state a claim. *See generally* ECF 307. Yet despite having another bite at the apple, the *Fair Maps* Plaintiffs' first amended complaint still has deficiencies. To start, the *Fair Maps* Plaintiffs no longer assert organizational standing. But to the extent their first amended complaint may nonetheless be read to assert organizational standing, they have failed to establish an organizational injury sufficient for Article III. More critically, the *Fair Maps* Plaintiffs have not adequately alleged the *Gingles* preconditions for the districts they challenge. The Court should therefore grant this motion to dismiss.

## ARGUMENT

### I.    The Entity Plaintiffs Lack Organizational Standing

In its recent order, this Court laid out what entity plaintiffs must plead to establish third-party standing. *See* ECF 307 at 9–11. An entity plaintiff can establish organizational standing or associational standing. *See* ECF 307 at 10–11. To establish organizational standing, an entity plaintiff must allege an injury that is "far more than simply a setback to the organization's abstract social interests." *See* ECF 307 at 10 (quoting *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010)). And "even if an organization incurs some expense because of a defendant's conduct, that expense is not a cognizable Article III injury unless it 'detract[s] or differ[s] from its routine activities.'" ECF 307 at 10 (quoting *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020)).

It is not clear whether the Entity Plaintiffs in the *Fair Maps* suit still assert organizational standing. *See, e.g.*, ECF 322 ¶ 7 ("Plaintiff Action Committee files this lawsuit on behalf of its constituent organizations and their members."); *see also* ECF 322 ¶¶ 7, 9, 13, 15. And as with their last complaint, the Entity Plaintiffs merely reiterate the same abstract, boilerplate organizational injuries. *See* ECF 322 ¶ 9 ("Unlawful and discriminatory redistricting in Texas frustrates and impedes the core mission of

the Action Committee and the purpose for which the group is organized."); ECF 322 ¶ 13 ("Unlawful and discriminatory redistricting in Texas, particularly aimed at the AAPI population, frustrates, and impedes the core missions of OCA-GH to promote civic participation and advance coalition and community building."); ECF 322 ¶ 15 ("Unlawful and discriminatory redistricting in Texas, particularly aimed at Muslim American Texans, frustrates, and impedes the core missions of Emgage and impedes its mission to empower Muslim communities."). Such rote assertions are the sole allegations of organizational injury here.

In other words, the Entity Plaintiffs have still failed to show that Defendants' redistricting plans "significantly and 'perceptibly impaired'" the Entity Plaintiffs' actual activities, rather than just their abstract interests. *See NAACP*, 626 F.3d at 238; *see also OCA-Greater Hous.*, 867 F.3d 604, 612 (5th Cir. 2017); ECF 307 at 11 (quoting same). Therefore, the Entity Plaintiffs have no standing to assert claims on their own behalf.

## II.  The *Fair Maps* Plaintiffs Have Failed to Adequately Allege the *Gingles* Preconditions for the Challenged Districts

This Court has also clarified what allegations a plaintiff must plead for a vote-dilution claim under Section 2 of the Voting Rights Act. ECF 307 at 30–33. At this point, the three *Gingles* preconditions are well known:

> (1) The minority group must be able to demonstrate it is sufficiently large and geo-graphically compact to constitute a majority in a single-member district;
>
> (2) The minority group must be able to show that it is politically cohesive; and
>
> (3) The minority [group] must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

*Thornburg v. Gingles*, 487 U.S. 30, 50–51 (1986); *see Growe v. Emison*, 507 U.S. 25, 39–41 (1993) (explaining that "*Gingles* preconditions" are required in "a § 2 dilution challenge to a single-member districting

scheme"). As this Court has stressed, it is essential to allege concrete facts in support of each *Gingles* precondition. Otherwise, a plaintiff has failed to state a claim. It is not enough to simply allege that a racial group is "cohesive." That "type of allegation is a '[t]hreadbare recital[ ] of [an] element[ ] of a cause of action'; it isn't worth anything." ECF 307 at 38 (quoting *Iqbal*, 556 U.S. at 678).

As with its previous complaint, the *Fair Maps* Plaintiffs brings Section 2 *Gingles* claims against the House districts in Fort Bend, Bell, and Collin Counties; the Senate districts in Fort Bend and Tarrant Counties; and the congressional districts in the Harris–Fort Bend and Dallas–Fort Worth areas. Yet despite this Court's recent order, Plaintiffs still have not met the *Gingles* preconditions.

A.      **House Districts in Fort Bend County**

Plaintiffs' *Gingles* claims against the house districts in Fort Bend County fail because Plaintiffs fail to allege that the proposed districts are culturally compact. In this Court's Opinion, it explained that the first *Gingles* precondition requires a plaintiff to plead specific facts showing that the minority populations in the proposed district are "culturally compact." ECF 307 at 31 n.20 (citing *LULAC v. Perry*, 548 U.S. 399, 430–35 (2006)). Indeed, "there is no § 2 right to a district that is not compact." *LULAC*, 548 U.S. at 430.

To determine if a proposed district is compact, courts rely on "traditional districting principles such as maintaining communities of interest and traditional boundaries." *Id.* at 433 (quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997)). Although the inquiry is fact-specific, it is clear that "a district that 'reaches out to grab small and apparently isolated minority communities' is not reasonably compact." *Id.* (quoting *Bush v. Vera*, 517 U.S. 952, 979 (1996)). That is because an ethnic population in one part of a state may very well have other interests, concerns, and associations than a population of the same ethnicity in a different part of the state. *See id.* (stressing that "a State may not 'assum[e] from a group of voters' race that they 'think alike, share the same political interests, and will prefer the same candidates at the polls'" (quoting *Miller v. Johnson*, 515 U.S. 900, 920 (1995))). Setting aside that "prohibited

4

assumption," there is "no basis to believe a district that combines two far-flung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first *Gingles* condition contemplates." *Id.*

Therefore, a plaintiff fails to satisfy the first *Gingles* precondition where she fails to allege specific facts tending to show that the minority population in the proposed district is culturally compact. *See, e.g., Ala. State Conf. of the NAACP v. Alabama,* --- F. Supp. 3d ---, 2020 WL 583803, at *22–25 (holding that plaintiffs failed to prove the first *Gingles* precondition because they had not shown that the black population in the proposed district was compact). Under the first *Gingles* precondition, it is not enough simply to be able to draw a district with a racial or ethnic majority: "The mathematical possibility of a racial bloc does not make a district compact." *LULAC*, 548 U.S. at 435.

Yet here, the *Fair Maps* Plaintiffs fail to allege facts that would show that the proposed minority group is culturally compact. The complaint proposes demonstrative districts that would make HDs 26 and 28 into majority-minority coalition districts. *See* ECF 322 ¶ 100 ("[T]he AAPI community . . . forms a significant part of emerging coalition districts, along with the Black and Latino communities in this region, specifically in Districts 26 and 28."). In support, Plaintiffs propose a demonstrative district map.

**Fig. 1—Fort Bend County (Enacted House Districts)**



**Fig. 2—Fort Bend County (Demonstrative House Districts)**



The proposed HDs 26 and 28 combine disparate portions of Fort Bend County, but Plaintiffs

fail to allege that these areas have any cultural similarities. There are no allegations that Asians, blacks,

and Latinos in these particular areas share the same concerns, issues, or are similar in any way other

than their respective ethnicities. The demonstrative HD26, for example, includes a large segment of

the northern portion of the county, then a narrow strip along the northeastern part of the county, before dipping down to take a large portion of the more easterly part of the county. And the demonstrative HD 28 takes a sizeable part of the northwestern area of the county, then has a narrow bottle-neck before taking a central part of the county, and then stretches far and wide to the southwestern area of the county. Yet the amended complaint utterly fails to allege the cultural compactness of the coalition minority groups in each of these districts. *See generally* ECF 322 ¶¶ 96–107. Therefore, the *Fair Maps* Plaintiffs have failed to adequately allege the first *Gingles* precondition for the Fort Bend house districts, and the complaint should be dismissed with respect to those districts.

### B.    House Districts in Bell County

Plaintiffs have failed to adequately allege a Section 2 claim for the House districts in Bell County. Under the demonstrative HD54, the minority CVAP is only 34.9%. *See* ECF 322 at 38 (figure below map). Whereas for the currently enacted HD54, the minority CVAP is 52.4%. *See* ECF 322 at 35 (figure below map). The practical difference is that under the enacted plan, minorities in HD54 hold a slim majority (52.4%), and in HD55, whites hold a slim majority (53.9%); but under the demonstrative plan, the districts flip and the majorities become larger. Under the demonstrative plan, in HD54, whites would hold a commanding majority (65%), and so too for minorities in HD55 (64.6%). *Compare* ECF 322 at 37 (figure at top of page), *with* ECF 322 at 38 (figure above ¶ 118).

But Plaintiffs have not satisfactorily alleged the second *Gingles* precondition—the requirement that "the minority group . . . be 'politically cohesive.'" *See* ECF 307 at 32 (quoting *Gingles*, 478 U.S. at 51). A plaintiff bears the burden of satisfactorily alleging such cohesion. Doing so requires more than alleging simply that a minority racial group is "cohesive." Rather, an adequate cohesion allegation requires specific facts that support a showing of cohesion. Generally, a plaintiff must "show[] that 'a significant number of minority group members usually vote for the same candidates.'" ECF 307 at 32 (quoting *Gingles*, 478 U.S. at 51). And crucially, as this Court has explained, "a *Gingles* plaintiff must

show the second precondition for the minority population that would be included in its ***proposed*** district." ECF 307 at 33 (emphasis added). In other words, a plaintiff has to allege minority-group cohesion in the demonstrative district—not in the currently enacted district. What's more, a plaintiff must do so on a district-by-district basis. *See* ECF 307 at 33 ("It bears emphasizing that each of these preconditions must be shown on a district-by-district basis.").

But here, Plaintiffs have neglected to do so. True, Plaintiffs offer figures showing white support for Trump in the enacted HDs 54 and 55, *see* ECF 322 at 37 (figure above ¶ 116)—thus satisfactorily alleging white cohesion under the third *Gingles* precondition. But Plaintiffs entirely fail to allege minority cohesion in the demonstrative minority-majority district; Plaintiffs instead offer figures showing minority support for Biden only with respect to the demonstrative HD 54. ECF 322 at 38 (figure below ¶ 118). But not for the demonstrative HD55. And the demonstrative HD55 is Plaintiffs' proffered minority-majority district. By contrast, the demonstrative HD54 would be a significant white-majority district, so minority cohesion in demonstrative HD54 is irrelevant. And therefore, Plaintiffs have not successfully alleged the second *Gingles* precondition.

### C.    House Districts in Collin County

Plaintiffs' *Gingles* claims as to the house districts in Collin County fail because Plaintiffs fail to allege that the proposed districts are culturally compact. Under the first *Gingles* precondition, it is not enough simply to be able to draw a district with a racial or ethnic majority: "The mathematical possibility of a racial bloc does not make a district compact." *LULAC*, 548 U.S. at 435. A plaintiff must allege specific facts tending to show that the minority population in the proposed district is culturally compact. *See, e.g.*, *Ala. State Conf. of the NAACP*, 2020 WL 583803, at *22–25.

Here, the complaint proposes demonstrative districts that would turn HDs 33 and 61 into majority-minority coalition districts. *See* ECF 322 at 44 (figure at top showing minority CVAP for demonstrative HDs 33 and 61, as well as the Asian, black, and Hispanic CVAP breakdown for each

district). In support, Plaintiffs include a demonstrative district map showing how both districts would

become coalition districts.

**Fig. 3—Collin County (Enacted House Districts)**



**Fig. 4—Collin County (Demonstrative House Districts)**



The proposed HDs 33 and 61 combine disparate portions of Collin and Rockwall Counties, but Plaintiffs fail to allege that these areas have any cultural similarities. There are no allegations that Asians, blacks, and Latinos in these particular areas share the same concerns, issues, or are similar in any way other than their respective ethnicities. The demonstrative HD33, for example, covers all of Rockwall County, just like the enacted HD33; but the demonstrative HD33 then snakes its way up the coastline of Lake Ray Hubbard and part of the western coastline of Lavon Lake, before then reaching out and excising a small portion of Allen. And the demonstrative HD61 resembles a vertical sine wave—capturing the northeastern part of Frisco, some of the neighborhoods between Frisco and McKinney, a snippet of Allen, and a hanging tail that captures part of Hunters Glen. Yet the amended complaint fails to include any allegations at all regarding the cultural compactness of the coalition minority groups in each of these districts. *See generally* ECF 322 ¶¶ 119–27. Therefore, the *Fair Maps* Plaintiffs have failed to adequately allege the first *Gingles* precondition for the Collin County house

districts, and the complaint should be dismissed with respect to those districts.

### D.    Senate Districts in Fort Bend County

Plaintiffs have failed to adequately allege the first *Gingles* precondition with respect to the Fort Bend County senate districts. Plaintiffs have not alleged that the proposed districts are culturally compact. *See, e.g., Ala. State Conf. of the NAACP*, 2020 WL 583803, at *22–25. Here, the complaint proposes demonstrative districts that would turn SD17 into a majority-minority coalition district. *See* ECF 322 at 59 (figure at top showing minority CVAP for demonstrative SD17, as well as the Asian, black, and Hispanic CVAP breakdown for it). In support, Plaintiffs include a demonstrative district map.

**Fig. 5—Fort Bend County (Enacted Senate Districts)**



**Fig. 6—Fort Bend County (Demonstrative Senate Districts)**



The proposed SD17 combines disparate portions of Fort Bend, Harris, and Waller Counties, but Plaintiffs fail to allege that these areas have any cultural similarities. There are no allegations that Asians, blacks, and Latinos in these particular areas share the same concerns, issues, or are similar in any way other than their respective ethnicities. The demonstrative SD17 resembles a semi-circle that begins along the SR-59/I-69 corridor grabbing Kendleton, Beasley, Rosenberg, and part of Sugar Land; then circles up and takes bits of Alief and Katy before circling back and up into Waller County. Yet the amended complaint fails to include any allegations at all regarding the cultural compactness of the coalition minority groups in each of these districts. *See generally* ECF 322 ¶¶ 132–38. Therefore, the *Fair Maps* Plaintiffs have failed to adequately allege the first *Gingles* precondition for the Fort Bend County senate districts.

### E.    Senate Districts in Tarrant County

Plaintiffs have failed to allege a Section 2 claim for the Senate Districts in Tarrant County.

True, Plaintiffs allege white cohesion in SDs 9, 10, 12, 16, 22, and 23. *See* ECF 322 at 52 (figure). Plaintiffs also allege that four of those six districts are Trump-supporting districts. *See* ECF 322 at 52 (figure). In other words, Plaintiffs allege the third *Gingles* precondition with respect to those six districts. Yet when it comes to the second *Gingles* precondition, Plaintiffs allege minority CVAP and cohesion information for only three of those six districts—SDs 9, 10, and 22. *See* ECF 322 at 54 (both figures). Under the currently enacted plan, all three of those districts are Trump-supporting, whereas under the demonstrative plan, SD22 becomes a Biden-supporting district. But Plaintiffs omit what happens to SDs 12, 16, and 23 under their demonstrative plan—the latter two of which are Biden-supporting under the currently enacted plan. This omission is in stark contrast to Plaintiffs' allegations surrounding the House districts in the Fort Bend area. *Contra* ECF 322 at 33–34 (figures showing CVAP and cohesion figures for all demonstrative districts in the Fort Bend County area).

For all Defendants and the Court know, the demonstrative plan that Plaintiffs proffer might turn SDs 16 or 23 into Trump-supporting districts. Under the currently enacted plan, four out of six districts are Trump-supporting despite allegedly cohesive minority support for Biden. But Plaintiffs fail to allege that the demonstrative plan increases the number of minority-performing districts. Therefore, Plaintiffs have failed to adequately allege that redrawing the Senate districts in Tarrant County would change anything—i.e., would result in minority voters having the opportunity to elect their preferred candidate where they currently are stymied by a cohesive white majority. For that reason, Plaintiffs have failed to adequately allege the second or third *Gingles* preconditions with respect to the Senate Map for Tarrant County.

Plaintiffs have also failed to adequately allege the first *Gingles* precondition since they have not alleged that the proposed districts are culturally compact. *See, e.g., Ala. State Conf. of the NAACP*, 2020 WL 583803, at *22–25. Here, the complaint proposes demonstrative districts that would turn SD22 into a majority-minority coalition district. *See* ECF 322 at 54 (figure at top showing minority CVAP

for demonstrative SD22, as well as the Asian, black, and Hispanic CVAP breakdown for it). In support, Plaintiffs include a demonstrative district map.

**Fig. 7—Tarrant County (Enacted Senate Districts)**

**Fig. 8—Tarrant County (Demonstrative Senate Districts)**



The proposed SD22 combines disparate portions of Tarrant County, but Plaintiffs fail to allege that these areas have any cultural similarities. And in redrawing SDs 9 and 10, Plaintiffs combine disparate portions of Tarrant County in the former and disparate portions of 18 counties in the latter.

Yet for none of these districts are there any allegations that Asians, blacks, and Latinos in these particular areas share the same concerns, issues, or are similar in any way other than their respective ethnicities. The demonstrative SD22 consumes Fort Worth and cherry-picks bits of North Richland Hills, Saginaw, Lake Worth, White Settlement, Everman, and Kennedale; then there is a narrow cat-walk to Globe Life Field; and then there is a ponytail that hangs down and selects parts of Arlington. Yet the amended complaint fails to include any allegations at all regarding the cultural compactness of the coalition minority groups in each of these districts. *See generally* ECF 322 ¶¶ 139–53. Therefore, the *Fair Maps* Plaintiffs have failed to adequately allege the first *Gingles* precondition for the Tarrant County senate districts, and the complaint should be dismissed with respect to those districts.

### F.   Congressional Districts in the Harris–Fort Bend Area

Plaintiffs also fail to satisfactorily allege a Section 2 claim against the congressional districts in the Harris–Fort Bend area. To reiterate, *Gingles* requires that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." ECF 307 at 32 (quoting *Gingles*, 478 U.S. at 51). "So the question posed by the third *Gingles* precondition is concrete: If the state's districting plan takes effect, will the voting behavior of the white majority cause the relevant minority group's preferred candidate 'usually to be defeated?'" *Robinson v. Ardoin*, --- F.4th ---, 2022 WL 2104123, at *9 (5th Cir. June 12, 2022).

Here, Plaintiffs have failed to adequately allege that the white majority votes cohesively to enable it to usually defeat the minority's preferred candidate. In CD9, a bare majority of 54.6% of white voters from the enacted CD9 supported Trump according to the Plaintiffs. *See* ECF 322 at 58 (figure). What's more, CD22—a white-majority, Trump-supporting district under the enacted plan— remains a Trump-supporting district in the demonstrative plan. *See* ECF 322 at 60 (figure at top). And that is despite the demonstrative CD22 being a majority-minority district. In other words, Plaintiffs have failed to allege that the minority-preferred candidate in CD22 will usually be defeated by "the

voting behavior of the white majority." *See Robinson*, 2022 WL 2104123, at *9. To the contrary, Plain-tiffs' demonstrative districts change nothing. In effect, Plaintiffs have not alleged that redrawing CD22 will enable minority voters to overcome a white majority and elect the minority-preferred candidate. Therefore, Plaintiffs have failed to plausibly allege the third *Gingles* precondition with respect to the Harris–Fort Bend area congressional districts.

Not only that. Plaintiffs fail to allege that the proposed districts are culturally compact. *See, e.g.*, *Ala. State Conf. of the NAACP*, 2020 WL 583803, at *22–25. The complaint proposes demonstrative districts that would turn CD22 into a bare majority-minority coalition district. *See* ECF 322 at 59 (figure at bottom showing 50.7% minority CVAP for demonstrative CD22, plus the Asian, black, and Hispanic CVAP breakdown for it). Plaintiffs include a demonstrative district map.

**Fig. 9—Harris–Fort Bend (Enacted Congressional Districts)**



**Fig. 10—Harris–Fort Bend (Demonstrative Congressional Districts**



The proposed CD22 combines disparate portions of Wharton, Fort Bend, Brazoria, and Matagorda Counties. This district would stretch out from its center with tentacles that split Lake Jackson and Freeport in half, take parts of Bay City and El Campo, and nab bits of the southwest Houston suburbs. Yet the amended complaint fails to include any allegations at all regarding the cultural compactness of the coalition minority groups in each of these districts. *See generally* ECF 322 ¶¶ 154–61. Therefore, the *Fair Maps* Plaintiffs have failed to adequately allege the first *Gingles* precondition for the Harris–Fort Bend area congressional districts as well.

## G.    Congressional Districts in Dallas–Fort Worth and the Surrounding Counties

Lastly, Plaintiffs fail to plausibly allege a Section 2 claim against the congressional districts in the Dallas–Fort Worth area and surrounding counties. Specifically, Plaintiffs challenge the congressional map for the districts in the Dallas–Fort Worth area plus Collin and Denton Counties—namely, CDs 3, 4, 6, 12, 24, 26, 30, 32, and 33. ECF 322 ¶ 162.

Plaintiffs allege that under the demonstrative plan, minority voters in CDs 6, 30, 32, and 33 vote cohesively, *see* ECF 322 at 64 (figures); and that under the enacted plan, white voters in CDs 6, 30, 32, and 33 vote cohesively, *see* ECF 322 at 61, 63 (figures). Yet the demonstrative plan for the Dallas–Fort Worth area appears also to involve the redrawing of the other districts that Plaintiffs also identified—CDs 3, 4, 12, 24, and 26. *Compare* ECF 322 at 60 (enacted map at bottom), *with* ECF 322 at 63 (demonstrative map at bottom). Put differently, Plaintiffs neglect to mention what happens to CDs 3, 4, 12, 24, and 26 under their demonstrative plan. And so Defendants—and this Court—are left to speculate on whether Plaintiffs have actually alleged that the congressional districts in the Dallas–Fort Worth area can be redrawn in a way that indeed increases the number of minority-performing districts.

Plaintiffs' allegations—taken alone—are equally consistent with the possibility that redrawing CDs 6, 30, 32, and 33 will be offset by losing an equal number of minority-performing districts, which would put Plaintiffs in the same position they are in under the currently enacted plan. For this reason, Plaintiffs have failed to adequately allege the second or third *Gingles* preconditions with respect to the congressional map for Dallas–Fort Worth and the surrounding counties.

Furthermore, Plaintiffs' Collin County-specific allegations are independently deficient. The sum total of those allegations is a single paragraph. *See* ECF 322 ¶ 170 (and accompanying enacted map). In that paragraph, Plaintiffs merely assert that "Plan C2193" "cracks AAPI neighborhoods" in what was previously CD3 and "places a significant percentage of them into" CD4. ECF 322 ¶ 170. According to Plaintiffs, this amounts to "dilut[ing] the votes of AAPI voters in both districts." ECF 322 ¶ 170. But this meager paragraph falls far short of even conclusory *Gingles* allegations. This Court has, by contrast, required that each of the Gingles preconditions "be shown on a district-by-district basis." ECF 307 at 33.  And yet Plaintiffs fail to allege minority cohesion in a demonstrative district. *See* ECF 322 ¶ 170. In fact, Plaintiffs fail to even propose a demonstrative district. As a result, Plaintiffs

fail to satisfy the first and second *Gingles* preconditions. Similarly, Plaintiffs fail to allege white-majority cohesion in enacted districts. *See* ECF 322 ¶ 170. And so, Plaintiffs also fail to satisfy the third *Gingles* precondition. Therefore, at minimum, Plaintiffs' Section 2 claim against Collin County's congressional districts should be dismissed.

## CONCLUSION

Defendants respectfully ask that the Court dismiss the portions of the *Fair Maps* Plaintiffs' first amended complaint that this motion identifies.

Date: July 1, 2022

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN
Deputy Attorney General for Special Litigation
Tex. State Bar No. 00798537

WILLIAM T. THOMPSON
Deputy Chief, Special Litigation Unit
Tex. State Bar No. 24088531

RYAN D. WALTERS
Special Counsel, Special Litigation Unit
Tex. State Bar No. 24105085

ARI M. HERBERT
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24126093

JACK B. DISORBO
Assistant Attorney General, Special Litigation Unit
Tex. State Bar No. 24120804

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
Fax: (512) 457-4410
patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov
ari.herbert@oag.texas.gov
jack.disorbo@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on July 1, 2022, and that all counsel of record were served by CM/ECF.

*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN