**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), et al., <br>         Plaintiffs, <br>    v. <br> GREGORY W. ABBOTT et al., <br>         Defendants. | Civil Action No. 3:21-cv-00259 (Lead Case) |

--------------------------------------------------------

| | |
|---|---|
| FAIR MAPS TEXAS ACTION COMMITTEE, OCA-GREATER HOUSTON, EMGAGE, KHANAY TURNER, ANGELA RAINEY, AUSTIN RUIZ, AYA ENELI, SOFIA SHEIKH, NILOUFAR HAFIZI, LAKSHMI RAMAKRISHNAN, AMATULLAH CONTRACTOR, DEBORAH CHEN, ARTHUR RESA, SUMITA GHOSH, ANAND KRISHNASWAMY, PETER JOHNSON, ZAHRA SYED, CHANDRASHEKAR BENAKATTI, DONA MURPHEY, CHETAN REDDY, SANKAR MUTHUKRISHNAN, CHRISTINA LU, JASON ZHANG, CHRIS LEAL, ASHLEY WASHINGTON, and SARIKA MAHESHWARI, <br><br>    *Plaintiffs,* <br><br>    *vs.* <br><br> GREG ABBOTT, in his official capacity as Governor of the State of Texas; JOHN SCOTT, in his official capacity as the Secretary of State of Texas, <br><br>    *Defendants.* | Civil Action No. 3:21-cv-01038 (Consolidated case) |

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    The 2020 Census data showed that people of color accounted for 95% of Texas's

population increase this past decade. Texas grew faster than any other state and is now one of the

most racially and ethnically diverse states in the United States. But the newly enacted State House, State Senate, and Congressional redistricting plans do not reflect this reality. Instead, Texas has once again done what it has done several times before, drawing electoral districts that intentionally discriminate against the state's minority populations and dilute their voting power.

2.      Despite consistent federal-court intervention against Texas's tactics, the Legislature once again cracked and packed minority populations, refused to create minority opportunity districts required by the Voting Rights Act, and racially gerrymandered electoral districts. Each of the above-mentioned redistricting plans intentionally dilutes the voting power of and discriminates against Black, Latino, and Asian American and Pacific Islander ("AAPI") voters. These plans deprive minority voters of an equal opportunity to elect candidates of their choice to the Texas State House, Senate, and United States Congress on the basis of their race or ethnicity.

3.      Plaintiffs will show that Texas's present discrimination reflects a somber legacy. Courts have long recognized that there is racially polarized voting in Texas: that Black, Latino, and AAPI voters often vote cohesively to elect their preferred candidates of choice, and that white voters in turn vote as a bloc to prevent minority populations from electing their candidates of choice. To silence the votes of Black, Latino, and AAPI voters, the Texas Legislature targeted areas in which there are present or emerging coalitions of minority voters to elect candidates of their choice, electorally cracking minority coalitions to dilute their voting power.

4.      Plaintiffs Fair Maps Texas Action Committee, OCA-Greater Houston, Emgage, and individual registered voters (together, "Plaintiffs"), bring this action against Defendants Governor Greg Abbott and Secretary of State John Scott. Plaintiffs seek declaratory and injunctive relief to prevent the implementation of 2021 redistricting plans for the Texas State

House, State Senate, and Congressional districts. Declaratory and injunctive relief are necessary to ensure compliance with the laws and Constitution and to prevent irreparable harm to Plaintiffs.[1]

## I. JURISDICTION

5.      Plaintiffs raise exclusively federal constitutional and statutory claims, including claims arising under the Fourteenth and Fifteenth Amendments to the United States Constitution and 52 U.S.C. §§ 103101 & 1304. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 28 U.S.C. § 1343(a)(3) & (4) (deprivation of civil rights and elective franchise), and 42 U.S.C. §§ 1983 & 1988 (civil action for deprivation of rights). Plaintiffs seek declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 & 2202.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this district and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## II. PARTIES

### *Plaintiffs*

7.      Plaintiff Fair Maps Texas Action Committee ("Action Committee") is a committee of seven nonpartisan organizations dedicated to outreach, education, mobilization, and organizing in favor of equitable redistricting. The Action Committee is a constituent of Fair Maps Texas, a nonpartisan coalition of organizations that study redistricting, educate their membership and the public, and provide resources for public participation in redistricting, including training the public and their membership in the use of redistricting tools and providing expertise to the public, organizational members, and lawmakers. The purpose of the Action

---

[1] Plaintiffs file this amended complaint in response to the Court's Order dated May 23, 2022, granting in part Defendants' motion to dismiss Plaintiffs' Complaint.

Committee is to secure racially equitable electoral power and sustain it through a transparent, equitable, and accountable redistricting process. Plaintiff Action Committee files this lawsuit on behalf of its constituent organizations and their members.

8.      The Action Committee is comprised of the seven following constituent organizations: League of Women Voters of Texas, Clean Elections Texas, Texans Against Gerrymandering, Our Vote Texas, American Civil Liberties Union of Texas, National Council of Jewish Women-Greater Dallas Section, and Common Cause Texas.

a.      League of Women Voters of Texas is a nonprofit, nonpartisan, grassroots civic organization that encourages informed and active participation in government and works to empower voters and defend democracy. It advocates for a state redistricting process and standards that promote fair and effective representation with maximum opportunity for public scrutiny. It is a membership organization with racially diverse members residing throughout Texas, including in Bell, Collin, Dallas, Denton, Fort Bend, Harris, and Tarrant Counties. It has members who regularly vote and intend to vote in the future. The League of Women Voters of Texas has local chapters throughout Texas, including in these counties. Individual Plaintiff Angela Rainey is a member of the League of Women Voters of Texas.

b.      Clean Elections Texas is a grassroots nonpartisan organization promoting accountable and representative government in Texas through voter education, organizing, and advocacy. It organizes volunteers in educational and advocacy activities statewide, with a concentration of volunteers in the Dallas-Fort Worth area, including Collin, Dallas, and Tarrant Counties. Clean Elections Texas focuses on the interests of racial and language minority voters who are injured by the dilution of minority voting strength statewide as well as in the districts

where they reside, particularly in Collin, Dallas, and Tarrant Counties, and works to improve accessibility to voting and increase voter participation.

c.  <u>Texans Against Gerrymandering</u> is a nonprofit and nonpartisan organization that works to educate, organize, and empower communities to end gerrymandering in Texas through redistricting reform. Texans Against Gerrymandering is based in the Houston area and partners with individuals and organizations in Fort Bend and Harris Counties, as well as statewide, to fight for racial equity in voting.

d.  <u>Our Vote Texas</u>, formerly Texas Progressive Action Network, is a nonprofit group committed to advancing voter and civic education and voter rights in Texas through advocacy and outreach. It has worked throughout the state, including in Collin, Dallas, Denton, Harris, and Tarrant Counties.

e.  <u>American Civil Liberties Union of Texas</u> ("ACLU of Texas") is a nonprofit organization committed to protecting and advancing civil rights and liberties, including the rights to vote and to have votes equitably counted. The ACLU of Texas monitors, reports on, educates in regards to, organizes members and volunteers in furtherance of, and engages in dialogue with stakeholders regarding voting rights, accessibility, and equity. The ACLU of Texas is a nearly 60,000-member organization, led by people of color and with a statewide membership that includes racially and ethnically diverse members in Bell, Collin, Fort Bend, Dallas, Harris, and Tarrant counties, including each of the districts referred to in this Complaint. It has members who regularly vote and intend to vote in the future. ACLU of Texas's members drive the organization's activities, including by electing members of the organization's board of directors, participating in membership meetings, and regularly communicating with the organization to

frame its strategic priorities. The ACLU of Texas has a member, Fair Maps Member 1,[2] who resides in Dallas County and identifies as Black. They vote regularly and intend to vote in the future. Under the state's new redistricting plans, Fair Maps Member 1 resides in House District 104, Senate District 23, and Congressional District 33.

       f.    <u>National Council of Jewish Women-Greater Dallas Section</u> is a grassroots organization of volunteers and advocates working to expand voting rights, drive voter turnout, and educate on voting rights issues. It advocates for election laws, policies, and practices that ensure safe, easy, and equitable access to the ballot, and for elimination of obstacles to participation in the electoral process.

       g.    <u>Common Cause Texas</u> is a grassroots, nonpartisan, statewide organization, and part of the Common Cause national network. Using a powerful combination of grassroots organizing, coalition building, policy development, public education, and advocacy, it is working towards solutions that will reduce the influence of money in politics, end gerrymandering, and ensure that Texas elections are free, fair, and accessible. Common Cause Texas has over 50,000 members residing throughout Texas, including in Bell, Collin, Fort Bend, Dallas, Harris, and Tarrant counties. It has members who regularly vote and intend to vote in the future.

    9.    Unlawful and discriminatory redistricting in Texas frustrates and impedes the core mission of the Action Committee and the purpose for which the group is organized. It directly harms the coalition's organizational and individual members and the communities that the Action Committee serves, preventing them from electing their candidates of choice. The Action Committee brings these claims on their behalf.

---

[2] The Action Committee and Emgage members intend to be named in this lawsuit as non-parties and proceed pseudonymously. Plaintiffs file this amended complaint in accordance with the approach outlined in the Court's July 18, 2022 Order.

10.     In addition to the Action Committee, the following organizations and individuals are plaintiffs in this lawsuit.

11.     OCA-Greater Houston ("OCA-GH") files this lawsuit on behalf of its members. OCA is a national membership-driven civil rights organization of community advocates dedicated to advancing the social, political, and economic well-being of the AAPI population. Established in 1979, OCA-GH is one of more than 100 OCA chapters and college affiliates around the country, with a long track record of programs and initiatives that work to advance the four main goals of OCA's mission: (1) to advocate for social justice, equal opportunity, and fair treatment; (2) to promote civic participation, education, and leadership; (3) to advance coalitions and community building; and (4) to foster cultural heritage.

12.     OCA-GH is a membership organization of volunteers and community advocates that strives to meet the current and evolving needs of a diverse population through a comprehensive continuum of programs targeting different life stages of AAPIs with a focus on developing advocacy, leadership, and civic engagement participation of AAPIs. OCA-GH's members perform voter protection and education work, voter registration, get out the vote (GOTV) civic engagement programs, and ultimately strive to increase civic engagement within the AAPI community in Texas. OCA-GH has AAPI members in and serves AAPI communities in Harris, Fort Bend, Waller, Brazoria, and other counties throughout Texas. It has members who regularly vote and intend to vote in the future. Individual Plaintiff Deborah Chen is a member of OCA-GH.

a.   OCA-GH has a member, Fair Maps Member 2, who resides in Harris County and identifies as Asian. They vote regularly and intend to vote in the future.

Under the state's new redistricting plans, Fair Maps Member 2 lives in House District 146, Senate District 13, and Congressional District 9.

b. OCA-GH has a member, Fair Maps Member 3, who resides in Harris County and identifies as Asian. They vote regularly and intend to vote in the future. Under the state's new redistricting plans, Fair Maps Member 3 lives in House District 131, Senate District 13, and Congressional District 9.

13. Unlawful and discriminatory redistricting in Texas, particularly aimed at the AAPI population, frustrates, and impedes the core missions of OCA-GH to promote civic participation and advance coalition and community building. It directly harms OCA-GH's members and the communities that OCA-GH serves by preventing them from electing their candidates of choice.

14. Emgage is a nonprofit organization that seeks to educate, engage, and empower Muslim American communities through educational events, voter initiatives, and leadership development for the purpose of creating a community of equitable, knowledgeable, and motivated citizens. Emgage has established local state committees and regional committee AAPI members that are in priority counties for the organization such as Harris, Fort Bend, Collin, Brazoria, and Dallas counties. Emgage has members that serve on its board of directors and fund the organization's activities. It has members who regularly vote and intend to vote in the future. Individual Plaintiff Amatullah Contractor is a member of Emgage.

a. Emgage has a member, Fair Maps Member 4, who resides in Fort Bend County and identifies as Asian. They vote regularly and intend to vote in the future. Under the state's new redistricting plans, Fair Maps Member 4 lives in House District 27, Senate District 13, and Congressional District 9.

b.  Emgage has a member, Fair Maps Member 5, who resides in Tarrant County and identifies as Asian. They vote regularly and intend to vote in the future. Under the state's new redistricting plan, Fair Maps Member 5 lives in House District 96, Senate District 10, and Congressional District 25.

c.  Emgage has a member, Fair Maps Member 6, who resides in Fort Bend County and identifies as Asian. They vote regularly and intend to vote in the future. Under the state's new redistricting plan, Fair Maps Member 6 lives in House District 76, Senate District 18, and Congressional District 7.

d.  Emgage has a member, Fair Maps Member 7, who resides in Fort Bend County and identifies as Asian. They vote regularly and intend to vote in the future. Under the state's new redistricting plan, Fair Maps Member 7 lives in House District 26, Senate District 18, and Congressional District 22.

e.  Emgage has a member, Fair Maps Member 8, who resides in Collin County and identifies as Asian. They vote regularly and intend to vote in the future. Under the state's new redistricting plan, Fair Maps Member 8 lives in House District 33, Senate District 2, and Congressional District 32.

15. Unlawful and discriminatory redistricting in Texas, particularly aimed at Muslim American Texans, frustrates, and impedes the core missions of Emgage and impedes its mission to empower Muslim communities. It directly harms Emgage's members and the communities that Emgage serves from electing their candidates of choice.

16. Plaintiff Khanay Turner resides in Tarrant County. Plaintiff Turner identifies as Black. They are a registered voter who votes regularly and intends to vote in the future. Under

the state's new redistricting plans, Plaintiff Turner lives in House District 97, Senate District 10, and Congressional District 12.

17.     Plaintiff Angela Rainey resides in Tarrant County. Plaintiff Rainey identifies as Black and is a member of the League of Women Voters of Tarrant County. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Rainey lives in House District 95, Senate District 10, and Congressional District 25.

18.     Plaintiff Austin Ruiz resides in Harris County. Plaintiff Ruiz identifies as Latino. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Ruiz lives in House District 145, Senate District 6, and Congressional District 29.

19.     Plaintiff Aya Eneli resides in Bell County. Plaintiff Eneli identifies as Black. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Eneli lives in House District 55, Senate District 24, and Congressional District 31.

20.     Plaintiff Sofia Sheikh resides in Fort Bend County. Plaintiff Sheikh identifies as Asian. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Sheikh lives in House District 28, Senate District 17, and Congressional District 22.

21.     Plaintiff Niloufar Hafizi resides in Fort Bend County. Plaintiff Hafizi identifies as Asian. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Hafizi lives in House District 26, Senate District 18, and Congressional District 22.

22.     Plaintiff Lakshmi Ramakrishnan resides in Fort Bend County. Plaintiff Ramakrishnan identifies as Asian. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Ramakrishnan lives in House District 28, Senate District 18, and Congressional District 7.

23.     Plaintiff Amatullah Contractor resides in Harris County. Plaintiff Contractor identifies as Asian. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Contractor lives in House District 135, Senate District 7, and Congressional District 8.

24.     Plaintiff Deborah Chen resides in Harris County. Plaintiff Chen identifies as Asian and is a member of OCA-GH.  They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Chen lives in House District 137, Senate District 13, and Congressional District 7.

25.     Plaintiff Arthur Resa resides in Bell County. Plaintiff Resa identifies as Latino. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Resa lives in House District 55, Senate District 24, and Congressional District 31.

26.     Plaintiff Sumita Ghosh resides in Fort Bend County. Plaintiff Ghosh identifies as Asian. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Ghosh lives in House District 85, Senate District 17, and Congressional District 22.

27.     Plaintiff Anand Krishnaswamy resides in Collin County. Plaintiff Krishnaswamy identifies as Asian. They are a registered voter who votes regularly and intends to vote in the

11

future. Under the state's new redistricting plans, Plaintiff Krishnaswamy lives in House District 70, Senate District 8, and Congressional District 3.

28.     Plaintiff Peter Johnson resides in Dallas County. Plaintiff Johnson identifies as Black. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Johnson lives in House District 111, Senate District 23, and Congressional District 30.

29.     Plaintiff Zahra Syed resides in Fort Bend County. Plaintiff Syed identifies as Asian. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Syed lives in House District 76, Senate District 18, and Congressional District 7.

30.     Plaintiff Chandrashekar Benakatti resides in Collin County. Plaintiff Benakatti identifies as Asian. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Benakatti lives in House District 70, Senate District 8, and Congressional District 3.

31.     Plaintiff Sankar Muthukrishnan resides in Tarrant County. Plaintiff Muthukrishnan identifies as Asian. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Muthukrishnan lives in House District 92, Senate District 22, and Congressional District 24.

32.     Plaintiff Dona Murphey resides in Brazoria County. Plaintiff Murphey identifies as Asian. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Murphey lives in House District 29, Senate District 11, and Congressional District 9.

33.     Plaintiff Chetan Reddy resides in Collin County. Plaintiff Reddy identifies as Asian. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Reddy lives in House District 70, Senate District 8, and Congressional District 3.

34.     Plaintiff Christina Lu resides in Collin County. Plaintiff Lu identifies as Asian. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Lu lives in House District 66, Senate District 8, and Congressional District 3.

35.     Plaintiff Jason Zhang resides in Collin County. Plaintiff Zhang identifies as Asian. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Zhang lives in House District 61, Senate District 30, and Congressional District 3.

36.     Plaintiff Chris Leal resides in Dallas County. Plaintiff Leal identifies as Latino. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Leal lives in House District 114, Senate District 23, and Congressional District 30.

37.     Plaintiff Ashley Washington resides in Dallas County. Plaintiff Washington identifies as Black. They are a registered voter who votes regularly and intends to vote in the future. Under the state's new redistricting plans, Plaintiff Washington lives in House District 115, Senate District 16, and Congressional District 6.

38.     Plaintiff Sarika Maheshwari resides in Fort Bend County. Plaintiff Maheshwari identifies as Asian. They are a registered voter who votes regularly and intends to vote in the

future. Under the state's new redistricting plans, Plaintiff Maheshwari lives in House District 27, Senate District 13, and Congressional District 22.

39.     Each of these individual plaintiffs is harmed by the discriminatory maps passed by the Texas Legislature. Additionally, each of the organizational plaintiffs have members who are harmed by these maps.

### *Defendants*

40.     Defendant Greg Abbott is the duly elected and acting Governor of the State of Texas. Under Article IV, Section 1 of the Texas Constitution, he is the chief executive officer of the State of Texas. He is responsible for ordering the elections for state legislative office and for the United States House of Representatives. He is sued in his official capacity.

41.     Defendant John Scott is the current Texas Secretary of State, appointed by Governor Greg Abbott on October 21, 2021. The Secretary of State is the chief election officer of Texas. Tex. Elec. Code § 31.001(a). The Secretary of State "shall assist and advise all election authorities with regard to the application, operation, and interpretation of this code and of the election laws outside this code." Tex. Elec. Code §§ 31.001(a), 31.004(a). He is sued in his official capacity.

### III. FACTS

### *The 2020 Census Confirms Diverse Population Growth in Texas*

42.     The U.S. Census Bureau released the first population counts from the 2020 Census for apportionment on April 26, 2021. It released the detailed data in legacy format to the states to use in redrawing districts approximately four months later, on August 12, 2021.

43.     According to the 2020 Census data, the population of Texas increased by nearly four million people between 2010 and 2020. People of color account for 95% of this total

increase in population. In consequence, Texas not only grew faster than any other state, but is one of the most racially and ethnically diverse states in the United States.

44.     Texas's significant population growth has been concentrated in and around the state's urban centers, such as Houston (including Harris, Fort Bend, and Brazoria Counties), and Dallas/Fort Worth (including Dallas, Tarrant, Collin, Denton, and other surrounding counties).

45.     The total population is now split amongst racial and ethnic groups as follows:

> White (non-Latino) = 41.2%;
> Latino = 39.7%;
> Black or African American = 12.9%;
> AAPI = 5.3%.

46.     The AAPI community has become the fastest growing racial group in the United States over the last ten years (36%). The AAPI community's growth has been especially notable in Texas (65%). Counties with AAPI communities of interest experienced tremendous growth in the AAPI population, such as in Williamson (169%), Collin (116%), Denton (115%), Fort Bend (84%), Travis (71%), Dallas (54%), Tarrant (53%), and Harris (38%) Counties.[3]

47.     Indeed, of all racial groups in Texas, the AAPI population grew at the fastest rate over the last decade. The growth of AAPI communities in Texas outpaced that of white residents by a factor of nearly 4 to 1, with the AAPI population of the state increasing from 3.8% to 5.4% from 2010 to 2019, including localized county increases in population by as much as 83.7%. For example, Fort Bend County grew to more than 22% AAPI. In the decade preceding the 2020 census, the AAPI population in Texas increased by nearly two-thirds to over 1.5 million.[4]

---

[3] *Race and Ethnicity in the United States: 2010 Census and 2020 Census*, U.S. CENSUS BUREAU (Aug. 12, 2021), https://www.census.gov/library/visualizations/interactive/race-and-ethnicity-in-the-united-state-2010-and-2020-census.html?linkId=100000060666476.
[4] *See* Alexa Ura et al., *People of Color Make Up 95% of Texas' Population Growth, and Cities and Suburbs Are Booming, 2020 Census Shows*, TEX. TRIBUNE (Aug. 12, 2021), https://www.texastribune.org/2021/08/12/texas-2020-census.

48.     Texas first became a "majority-minority state" between 2000 and 2010, "with Anglos no longer comprising a majority of the state's population." *Veasey v. Perry*, 71 F. Supp. 3d 627, 700 (S.D. Tex. 2014). By 2019, white non-Latino Texans accounted for only 41.2% of the state's population, with Latino residents accounting for 39.7%, Black residents for 12.9%, and AAPI residents for 5.2%.[5] In the decade preceding 2020, the proportion of white non-Latino Texans decreased to 39.8% of the total population, a mere half percent more than the Latino population, which increased by nearly two million people.[6]

49.     Growth in Texas's citizen voting age population ("CVAP") also mirrors this diversity: non-white voters made up over 80% of Texas's growth in CVAP, with over half of the increase coming from the Latino community alone. In fact, based on the most recent voting citizenship data available from the 2019 American Community Survey, nonwhite Texans currently make up almost 50% of the CVAP in Texas.

### *Texas Has a Long History of Racial Discrimination in Redistricting*

50.     In every decade since the passage of the Voting Rights Act in 1965, Texas has unlawfully discriminated against voters of color.[7] This year, the state has pursued the same course. As during the preceding decades, federal court intervention is urgently necessary to block the state's unlawful designs.

51.     Indeed, Texas has followed a discriminatory path rebuked by the federal courts as recently as the 2010 redistricting cycle, relying on misleading statistics and manipulating

---

[5] *Quick Facts*: Texas, U.S. CENSUS BUREAU (July 1, 2019), https://www.census.gov/quickfacts/TX.
[6] *See* Alexa Ura et al., *People of Color Make Up 95% of Texas' Population Growth, and Cities and Suburbs Are Booming, 2020 Census Shows*, TEX. TRIBUNE (Aug. 12, 2021), https://www.texastribune.org/2021/08/12/texas-2020-census.
[7] James Barragán, Abby Livingston & Carla Astudillo, *Texas Reduces Black and Hispanic Majority Congressional Districts in Proposed Map, Despite People of Color Fueling Population Growth*, TEX. TRIBUNE (Sept. 27, 2021, 1:00 PM), https://www.texastribune.org/2021/09/24/texas-congressional-redistricting/.

minority populations with surgical precision to saturate some minority districts while elsewhere cracking minority communities, all towards the end of diluting minority voting strength.

52.    At the time the Legislature passed the 2011 redistricting maps, Texas was subject to preclearance under Section 5 of the Voting Rights Act. Rather than seek preclearance from the Department of Justice, Texas submitted its plans to the United States District Court for the District of Columbia for declaratory judgment. *See Texas v. United States*, 887 F. Supp. 2d 133, 138 (D.D.C. 2012), *vacated and remanded*, 570 U.S. 928 (2013).

53.    On August 28, 2012, the district court denied preclearance, finding both that the Texas House, Senate, and Congressional plans had a retrogressive effect on minority power *and* that legislators appeared to have acted with the purpose of effecting the discriminatory consequence. *See Texas v. United States*, 887 F. Supp. 2d 133, 178 (D.D.C. Aug. 28, 2012). The court found that Texas had cracked minority communities, excluded the participation of legislators representing minority opportunity districts from the redistricting process, proceeded unusually fast to adopt and implement maps, and failed to determine compliance with the Voting Rights Act ("VRA"). *See id.* at 161, 163, 178.

54.    For example, the district court rejected the state's House District 149. At that time, the district had a combined minority CVAP of around 62%[8] by which, since 2004, the AAPI community had voted as a bloc with Latino and Black voters to elect Hubert Vo, a Vietnamese American, as their state representative. Representative Vo's election was particularly significant for the AAPI community because he was the first Vietnamese American state representative in

---

[8] *See* United States and Defendant-Intervenors Identification of Issues at 6, *Texas v. United States*, No. 11-1303 (D.D.C. Sept. 29, 2011), Dkt. No. 53.

Texas history.[9] The challenged district would have eliminated Representative Vo's seat and redistributed this coalition of minority voters to the surrounding three districts with larger non-minority populations.[10] The court concluded that, in so doing, The proposed map would have hindered the AAPI community's right to vote in Texas by spreading the AAPI population across multiple different district lines and unlawfully diluted their voting power.

55.     Separately, a coalition of individual and organizational plaintiffs representing Black and Latino voters challenged the same maps in the San Antonio division of the Western District of Texas.[11] Over years of litigation, that court and, ultimately, the United States Supreme Court, likewise found that Texas had intentionally discriminated against minority voters in drawing electoral maps.

56.     On April 20, 2017, the district court found that Texas's 2011 House map violated both Section 2 of the VRA and the Equal Protection Clause of the Fourteenth Amendment. *See Perez v. Abbott*, 250 F. Supp. 3d 123, 149 (W.D. Tex. 2017). Then, as now, "[d]espite the massive minority population growth, [the House plan] not only failed to create any new minority opportunity districts, it *reduced* the number of minority opportunity districts[.]" *Id.* at 179 (emphasis in original).

---

[9] *See* Test. of Ed Martin, Trial Tr. at 350:15-23, *Perez v. Perry*, 835 F. Supp. 2d 209 (W.D. Tex. 2011) (hereinafter "Martin Test."); Test. of Rogene Calvert, Trial Tr. at 420:2–421:13, *Perez,* 835 F. Supp. 2d 209; Test. of Sarah Winkler, Trial Tr. at 425:18–426:10, *Perez,* 835 F. Supp. 2d 209.

[10] *See* Martin Test. at 350:25–352:25. District 149 would have been relocated to a county on the other side of the State, where there are few minority voters. *See* Plan H283, *available at* https://data.capitol.texas.gov/dataset/48c7f427-7af9-427e-a6e5-84027a98aefd/resource/b7d69c1c-f1c7-4a36-a13d-784c1eed8639/download/planh283_map_statewide_36x40.pdf (last visited Nov. 16, 2021).

[11] Because Texas would fail to obtain clearance of the challenged maps in time for the 2012 elections, the court proceeded to issue alternate plans for the Texas House of Representatives, *see U.S. Dist. Ct. v. Texas*, 2012 U.S. Dist. LEXIS 190609 (W.D. Tex. Mar. 19, 2012), Texas Senate, *see* Order, *Davis v. Perry*, No. SA-11-CA-788-OLG-JES-XR (W.D. Tex. Dismissed Sept. 4, 2013), and for the United States House of Representatives, *see Perez v. Perry*, 891 F. Supp. 2d 808 (W.D. Tex. 2012). On June 26, 2013, the State of Texas enacted a new plan for apportionment in the Texas House of Representatives that deviated from the court's proposed interim plans. *See* S.B. 3, 83d Leg., 1st Spec. Sess. (Tex. 2013). But it ratified and adopted the court's interim Senate and Congressional plans. *See* S.B. 2, 83d Leg., 1st Spec. Sess. (Tex. 2013); S.B. 4, 83d Leg., 1st Spec. Sess. (Tex. 2013).

57.     Ultimately, several House Districts in the 2011 map, including those in Harris, Dallas, Tarrant, and Bell Counties, were found to be intentionally vote dilutive under Section 2 and the Fourteenth Amendment. *See id.* at 218–19. Past is prologue, and then as now Texas legislators employed irrelevant statistical figures to argue that they had created minority opportunity districts when they had, in fact, *reduced* the number of opportunity districts. They swapped high-turnout areas for low-turnout areas to superficially raise the number of Latino individuals in certain districts while still ensuring they did not have the ability to elect a candidate of their choice. *See id.* at 148, 156–57. Legislators also packed additional Latino voters into districts that they knew were already performing, professing publicly to have *created* new opportunity districts. *See id.* at 163. The court rejected the suggestion that the act was an exercise of partisan gerrymandering, and found that the House map, including the number of split precincts, was inexplicable but-for racial gerrymandering. *See id.* at 156.

58.     The court further determined that the Texas Legislature had intentionally engaged in racial gerrymandering in violation of the Fourteenth amendment in Bexar County. *See id.* at 182. Most tellingly, the Texas Legislature had used a racial quota, intentionally creating districts with 50%, but no more than 50.1%, Spanish Surname Voter Registration ("SSVR") while also creating the least possible number of Latino opportunity districts. *See id.*

59.     Then, on March 10, 2017, the district court ruled that the 2011 Congressional plans contained districts that violated the United States Constitution and Section 2 of the Voting Rights Act. *See Perez v. Abbot*, 2017 U.S. Dist. LEXIS 35012 (W.D. Tex. Mar. 10, 2017), *amended by* 253 F. Supp. 3d 864 (W.D. Tex. 2017). Specifically, the court found that the plan diluted the ability of Latino voters in Southwest Texas to elect the candidates of their choice in violation of Section 2 of the Voting Rights Act. *See id.* at *91–92. As with the 2011 House map

(and the 2021 maps), legislators had cracked minority communities across multiple districts on the suggestion that a superficial number of Latino individuals made those districts opportunity districts, knowing that minority voters could not elect their candidates of choice in these districts. *See id.* at \*41–42. The court also found racial gerrymanders in violation of the Fourteenth Amendment in Maverick County, Nueces County, and Travis County. *See id.* at \*59, \*242. Legislators used race, not party affiliation, to determine into which districts to place voters to target the incumbents of particular districts. *See id.* at \*70. As the court stated, "The fact that creation of an [Hispanic Citizen Voting Age Population ("HCVAP")]-majority district also fulfilled a political goal does not mean that the district was not created with race as the predominant consideration." *Id.* at \*71.

60.     Litigation continued regarding the legality of the 2013 redistricting plans until June 28, 2018, when the United States Supreme Court ruled that the Texas Legislature had engaged in a racial gerrymander in violation of the Fourteenth Amendment when drawing House District 90 in Tarrant County. *See Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018). The court found that Texas had intentionally redistricted communities of color without sufficient evidence that doing so was necessary to comply with Section 2 of the Voting Rights Act. *See id.* at 2334–35. In other words, Texas could not then, and cannot now, claim that it created districts compliant with Section 2 of the Voting Rights Act without proper analysis of racial data.

### *2021 Decennial Redistricting*

61.     The legislative process culminating in adoption of the challenged maps was opaque, procedurally inadequate, and reflected explicit and implicit racial discrimination.

62.     For more than two years before the Texas Legislature steamrolled the challenged maps through the legislative process in September and October 2021, Fair Maps Texas and the

members of the Action Committee engaged legislators to urge additional and accessible opportunities for public testimony by Texans, and particularly people of color.[12]

63.    Toward the end of "work[ing] with [Redistricting Committee member] offices," Fair Maps requested additional hearing locations based on "growth, diversity, and a history of previous redistricting litigation," emphasizing the urgency of public input to ensure justice for communities of color in places such as Dallas, Collin, Tarrant, and Fort Bend Counties.[13] Following correspondence with legislators, Fair Maps Texas and its partners worked with their membership to publicize hearings and opportunities for testimony, to educate the public about the mapmaking requirements and methods, and to continue to press legislators for a fair and open process. Indeed, the coalition went so far as to host its own public input hearing on December 8, 2020.[14]

64.    The goals of Fair Maps Texas's work were to increase transparency, expand public access, and reflect Texas's minority population growth in proposed and adopted maps. Throughout 2020, Fair Maps Texas wrote a series of letters to legislative leadership and the House and Senate Redistricting Committees requesting that accessible public input hearings be held before and after census data was released.[15] During the regular legislative session, Fair Maps Texas advocated for and organized in favor of HB 3112, the Redistricting Transparency Act. Fair Maps Texas urged the Legislature to change its 2021 redistricting rules to allow seven

---

[12] *See, e.g.*, Letter from Fair Maps Texas to Phil King and Members, Texas House Comm. on Redistricting 1 (Apr. 12, 2019), https://0f1c66a2-2e43-4a43-921f-ec1443ec1725.filesusr.com/ugd/2a8eca_faac000e9b4a4bd0a3f53f175e 2ce8c5.pdf (highlighting necessity of public input in Houston Metroplex, Fort Bend, and DFW area); Letter from Fair Maps Texas to Phil King and Members, Texas House Comm. on Redistricting (June 13, 2021), https://0f1c66a2-2e43-4a43-921f-ec1443ec1725.filesusr.com/ugd/2a8eca_0be8fcdfbb154b97975962de0a679537.pdf (same, and discussing "particularly unique situation" in Bell County and Fort Bend County).
[13] Letter from Fair Maps Texas Coalition to Phil King and Members, Texas House Comm. on Redistricting 2, App. A. (Apr. 12, 2019).
[14] *See, e.g.*, Letter from Fair Maps Texas Coalition to Joan Huffman and Dan Patrick (Dec 1, 2020).
[15] *See, e.g.*, Letter from Fair Maps Texas Coalition to Phil King and Members, House Comm. on Redistricting (Dec. 1, 2020); Letter from Fair Maps Texas Coalition to Senator Joan Huffman (Dec. 1, 2020).

days to review any proposed maps, extend the time available to review amendments, and provide a month's notice in advance of regional public input hearings, as well as other suggestions.

65.     Between January and March 2021, in advance of the release of 2020 redistricting data, the Texas Legislature began hearing public testimony about redistricting. In February of 2021, Fair Maps, along with the Texas AAPI Redistricting Coalition and the Texas Department of Transformation (a nonprofit organization), successfully expanded language access at the Senate's public input hearings after the committee clerk initially refused to provide an interpreter, thereby enabling members of the Latino and AAPI communities to participate in the redistricting process.

66.     Nevertheless, in intention and effect, these hearings offered little transparency and opportunity for meaningful public input. Discussions were either not held or rushed; testimony was cut short and ignored; and several serious warnings of racially discriminatory intention and effect were set aside and discarded.

### *The Third Special Legislative Session*

67.     Following the U.S. Secretary of Commerce's release of Texas redistricting data, on September 7, 2021, Governor Greg Abbott called a special session of the Texas Legislature to address redistricting. The legislative session began on September 20, 2021.

68.     Over the next month, legislators filed redistricting maps for the Texas House, Texas Senate, and Texas Congressional districts. The House and Senate held committee hearings with testimony on the proposed maps and debated the maps on the House and Senate floors. On October 15 and 16, 2021, the Legislature passed redistricting plans for the Texas House (Plan H2316) and Texas Senate (Plan S2168). On October 17, 2021, a conference committee of the

Texas House and Senate reported out a congressional redistricting plan (Plan C2193). Governor Abbott approved of the maps on October 25, 2021.

69.     The Legislature routinely departed from normal procedures in evaluating and passing these redistricting maps. For example, the Texas House Redistricting Committee and Senate Special Committee on Redistricting offered limited prior notice of their hearings on the redistricting bills, and the public either had no or limited opportunity to testify.

70.     Likewise, committee substitutes were repeatedly released shortly before being adopted, sometimes without any public testimony. Amendments highlighting racially discriminatory disparities and proposing solutions were discarded. Ultimately, both houses of the Legislature adopted the challenged maps despite overwhelming and undisputed public testimony demonstrating vote dilution and racial discrimination.

71.     The Legislature's procedural shortcomings were exacerbated by legal and substantive errors.

72.     Despite their obligations to comply with the Constitution and the Voting Rights Act, legislators professed to draw maps "race blind."[16] In doing so, legislators ignored testimony from legal experts explaining that examining race data was necessary to ensure compliance with the Voting Rights Act, including for the creation of coalition districts.[17]

---

[16] For instance, on September 24, 2021, during the Senate Redistricting hearing, Senator Joan Huffman, Chair of the Senate Redistricting Committee, stated, "We drew these maps race blind, we have not looked at any racial data as we drew these maps, and to this date I have not looked at any racial data."

[17] Among other testimony, Michael Li, Senior Counsel for the Brennan Center for Justice, testified to emphasize that Texas could and should not purport "blindness" to race as a means to accomplish the requirements of the VRA and the Constitution. *Hearing on S.B. 6 Before the Senate Select Comm. on Redistricting*, 87th Leg., Spec. Sess. 3d (Tex. 2021) (statement of Michael C. Li, Senior Counsel, Brennan Center for Justice), https://www.brennancenter.org/sites/default/files/2021-10/texas%20senate%20select%20committee%20on%20redistricting%2009.30.21%20-%20FINAL.pdf.

73.     While Senator Huffman professed to dismiss the permissibility of coalition districts in the Senate, House Committee Chair Todd Hunter professed to create coalition districts in the House, identifying specifically Fort Bend, Hays, and Tarrant Counties.

74.     He did so, however, in reliance on the wrong metrics that created only a mere pretense of coalition districts. Chair Hunter stated that he used voting age population ("VAP") data to evaluate coalition districts, despite objections from the public and other legislators that CVAP data should be used to create coalition districts. Reliance on VAP data as opposed to CVAP data is inappropriate.[18] While VAP data refers to the portion of the population that is at least eighteen years old, CVAP data includes those who are at least eighteen years old and are also United States citizens. CVAP data therefore provides a more accurate metric for analyzing minority voters' opportunity to elect their preferred candidate. That is why the Fifth Circuit held that CVAP is the proper metric to use when examining vote dilution under the Voting Rights Act. *See Campos v. City of Houston*, 113 F.3d 544, 547–48 (5th Cir. 1997). The consequences of the sleight of hand are apparent: despite an overwhelming *increase* in minority populations statewide, the House maps passed by the Legislature and signed by Defendant Abbott *decrease* the number of majority Latino and majority Black CVAP districts.

75.     And throughout the process, the House and Senate consistently voted down amendments that would have adjusted districts to decrease the harm to minority voters. Indeed, even amendments ordering simple *analysis* of the racial impact of new electoral districts were rejected, even though, as one sponsor noted, such analyses would protect against "intentional[], purposeful[]" willful blindness to racially discriminatory intention, impact, and vote dilution. The Legislature as a whole refused.

---

[18] Representative Todd Hunter described the distinction during the October 4, 2021 House Redistricting Committee hearing, stating that CVAP data is "not the same [as those] based on census numbers."

76.     This refusal to even analyze racial impact results in maps that, consistent with the Legislature's vote-dilutive and discriminatory purposes, entrench white voters' electoral power statewide.

***Texas House Map Process***

77.     The legislative process was plagued with disregard for public input or consideration of minority voters, beginning with the Texas House map. On September 30, 2021, House Redistricting Committee Chair Todd Hunter filed House Bill 1 ("HB 1"), the redistricting plan for the Texas House, which was referred to the House Redistricting Committee on the same day.

78.     On October 4, 2021, the committee held a public hearing on HB 1. Committee members were informed that they needed to file amendments to HB 1 by noon on the day of the hearing. Breaking from historical practice, committee members were denied the opportunity for live questions, and were instead limited to written questions that were in any event not answered.[19]

79.     Likewise breaking from historical and best practice, the committee did not allow any invited testimony, including from voting rights and redistricting experts, the Texas Legislative Counsel, or even the Office of the Attorney General. Indeed, member requests for expert and other testimony were denied.

80.     Instead, the hearing was intended to greenlight proposed maps without expert or public testimony. At the start of the October 4th hearing, Chair Hunter stated that the committee would vote HB 1 out at the end of the hearing, all but ensuring that testimony would not be taken into consideration. Over the course of 16 hours, hundreds of people testified against the plan and

---

[19] Chair Hunter, who so limited member questions, acknowledged during debate on the House floor on October 12, 2021, that questions remained unanswered.

several legislators challenged the process and substance of the proposed maps. For instance, Representative Nicole Collier objected that "the proposed map creates fewer people of color-majority districts."

81.     During committee hearings and debate on HB 1, several legislators objected that proposed districts violated the Texas Constitution by ignoring the "county line rule" without a compelling reason. Article III, Section 26 of the Texas Constitution requires that counties should not be separated into different Texas House districts. *See* Tex. Const. art. III, § 26. When a county's population is too large to be included in one House district, the county should be separated into as few House districts as possible based on its population. *See id.* The rule is designed to minimize dividing counties among different House districts.

82.     During the sixteen-hour hearing, multiple members requested adjournment for meaningful review of proposed and adopted changes to the maps, but members were instead required to hear approximately thirty proposed amendments before adjournment of the hearing.

83.     A day after the hearing, Chair Hunter introduced a committee substitute for the bill that was immediately affirmed by committee vote with only fifteen minutes of consideration and no testimony.

84.     On October 12, 2021, the full House heard HB 1 on second reading. The House voted down numerous amendments that would have improved minority representation and would have evaluated the racial impact of the new districts. On October 13, 2021, the House passed HB 1 on the third reading and reported the bill to the Senate. On October 15, 2021, the Senate Special Committee on Redistricting held a public hearing on HB 1 that lasted less than an hour before affirmation by the committee. The full Senate suspended a rule for the regular order of business and passed HB 1 that same day, adopting Plan H2316.

### Texas Senate Map Process

85.     On September 18, 2021, Texas Senate Redistricting Committee Chair Joan Huffman filed Senate Bill 7 ("SB 7"), a redistricting plan for the Texas Senate. SB 7 was referred to the Senate Special Committee on Redistricting on September 20, 2021 for two days of hearings beginning on September 24, 2021. At approximately 9 p.m. the night before scheduled hearings, Senator Huffman filed a substitute. On September 28, 2021, the committee voted out the committee substitute. On October 4, 2021, the Texas Senate passed SB 7 on second and third reading, suspending the printing rule, which ordinarily requires a hard copy of bills to be placed on each Senator's desk, in order to pass the bill in one day.

86.     During the Senate's debate on SB 7, Senator Beverly Powell questioned Senator Huffman as to why the bill reduced the number of majority-minority Senate districts in Texas, despite racial minorities constituting 95% of the population growth in Texas since 2010. Senator Huffman repeatedly stated that she had not looked at any racial data for the proposed Senate districts.

87.     On October 11, 2021, the House Redistricting Committee held a public hearing on the bill and voted it out on the same day. The hearing did not allow for invited testimony and allowed only limited public testimony. On October 15, 2021, the House of Representatives passed Senate Bill 7, adopting plan S2168.

### Texas Congressional Map Process

88.     On September 27, 2021, Senator Huffman filed Senate Bill 6 ("SB 6"), a redistricting plan for Texas congressional districts. On September 30, 2021, the Senate Redistricting Committee held a public hearing. On October 4, 2021, the committee held a second public hearing and voted out a committee substitute. On October 8, 2021, the Senate suspended

the printing rule and passed SB 6, and the House referred it to the House Redistricting Committee.

89.     On October 13, 2021, the House committee held a public hearing and voted out the bill on the same day. The committee provided less than 24-hour notice for the hearing, with only twelve hours to register to give virtual testimony. The committee did not allow invited testimony.

90.     On October 16, 2021, the House passed the bill on the second reading. The House rejected several proposed amendments that would have increased the number of majority-minority districts. On October 17, 2021, the House passed the amended bill on third reading. The amended bill was referred to a conference committee after the Senate refused to concur on the House amendments that were adopted. On October 17, 2021, the Senate and House conference committee reported out plan C2193.

### *The Plans Unlawfully Discriminate Against Latino, Black, and AAPI Voters in Texas*

91.      Plans H2316, S2168, and C2193 each discriminate against voters of color by failing to create additional districts that afford opportunities for voters of color to elect their candidates of choice, whether by single racial or ethnic group or by voting in coalition, as mandated by Section 2 of the VRA. Each plan intentionally cracks voters of color into several districts to prevent the emergence of a naturally occurring minority opportunity district, *see LULAC v. Perry*, 548 U.S. 399, 429–30 (2006), and/or destroys functional crossover and coalition districts, *see Bartlett v. Strickland*, 566 U.S. 1, 24 (2009). And each plan dilutes the effectiveness of votes cast by voters of color.

#### *House of Representatives Redistricting Plan H2136 is Discriminatory*

92.     Although voters of color make up almost 50% of CVAP in Texas, Plan H2316 creates nonwhite CVAP majorities in only 51 districts—approximately 34% of the districts in the

state. By comparison, Plan H2316 provides white voters majority CVAP in 99 districts, equating to approximately 66% of the districts. This gross lack of proportional representation for voters of color implicates both the Voting Rights Act and the Fourteenth Amendment.

93.     This imbalance in representation was the result of intentional discrimination by map drawers who cracked diverse urban centers into multiple non-compact districts to dilute the vote of Texans of color.

94.     While this trend is present and illegal statewide, the pattern is particularly clear in Fort Bend, Bell, and Collin Counties.

Fort Bend County

95.     Fort Bend County is a diverse, populous county near Houston, Texas, split into House Districts 26, 27, 28, 76.

**Fort Bend County (Enacted House Districts)**



**Fort Bend County (Enacted House Districts)**

|  | TOTAL CVAP | WCVAP | MCVAP | HCVAP | BCVAP | ACVAP |
|---|---|---|---|---|---|---|
| HD 26 | 104,688 | 54.0% | 46.0% | 20.6% | 11.4% | 12.8% |
| HD 27 | 116,741 | 21.3% | 78.8% | 17.6% | 48.6% | 12.0% |
| HD 28 | 109,323 | 51.6% | 48.4% | 22.7% | 10.5% | 14.8% |
| HD 76 | 118,675 | 32.8% | 67.2% | 18.1% | 22.3% | 26.3% |

96.     House Districts 26, 27, 28, 76 impermissibly cut into and split the AAPI community, most concentrated in and around Sugar Land, Texas, as follows:

District 26: 12.82% CVAP;
District 27: 12.03% CVAP;
District 28: 14.83% CVAP;
District 76: 26.28% CVAP.

97.     This can be seen when demographic shading is added to the map of the districts, as shown below. The darker purple shading reflects higher densities of AAPI population.

### Fort Bend County (AAPI Demographic Shading)



98.     AAPI, Black, and Latino voters are also impermissibly packed into House District 27, making up 78.75% CVAP in that district.

99.     This cracking of AAPI voters among 4 districts, and packing minority voters into 1 district, was done intentionally to dilute the on-the-ground voting power of the AAPI community, which forms a significant part of emerging coalition districts, along with the Black and Latino communities in this region, and specifically in Districts 26 and 28.

100.    During House floor debate on HB 1, Representative Jasmine Crockett questioned Representative Jacey Jetton about his district, House District 26, in Fort Bend. Representative Crockett asked why the CVAP data indicated that the percentage of Anglo voters in the district had increased to over 50%: "It seems as if your district goes from a majority-minority district to not being a majority-minority district anymore."

101.    Representative Jetton responded that his district remains a majority-minority district. But Representative Jetton appears to have incorrectly based his assessment on inflated VAP numbers, rather than CVAP. Using CVAP data, House District 26 is 54.03% white, 20.6% Latino, 11.38% Black, and 12.82% AAPI.

102.    Using CVAP data, House District 28 is 51.6% white, 22.66% Latino, 10.54% Black, and 14.83% AAPI.

103.    On information and belief, white voters in House Districts 26, 27, 28, and 76 consistently cast ballots opposing candidates supported by minority voters, resulting in significant racially polarized voting. For example, in the 2020 Presidential Election, white majority voters overwhelmingly voted for Former President Trump, while minority voters preferred President Biden, as follows:

**Fort Bend County (Enacted House Districts)**

| | BIDEN SUPPORT WHITE VOTERS | TRUMP SUPPORT WHITE VOTERS | BIDEN SUPPORT MINORITY VOTERS | TRUMP SUPPORT MINORITY VOTERS | OVERALL BIDEN | OVERALL TRUMP |
|---|---|---|---|---|---|---|
| HD 26 | 20.2% | 78.5% | 79.9% | 18.0% | 43.6% | 54.8% |
| HD 27 | 36.5% | 68.5% | 84.0% | 13.7% | 71.2% | 27.6% |
| HD 28 | 17.1% | 80.7% | 75.6% | 23.6% | 44.0% | 54.5% |
| HD 76 | 27.1% | 70.3% | 75.8% | 23.3% | 60.6% | 38.0% |

104.    On information and belief, given the numerical advantage of white voters as established by CVAP (see above) and their consistent pattern of bloc voting, white voters will usually defeat minority preferred candidates in House Districts 26 and 28 under the district configuration as enacted, which impermissibly dilutes the voting power of minority voters.

105.    On information and belief, it is possible to configure alternative House Districts in Fort Bend County in which minority voters would have an opportunity to elect their candidates of choice because those minority voters vote cohesively in the manner set forth in *Gingles v. Thornburg*, 478 U.S. 30 (1986), as described this Court's May 23, 2022 Order,[20] as shown below:

**Fort Bend County (Demonstrative House Districts)**

---

[20] As set forth in the Court's May 23rd Order, "the second *Gingles* precondition requires that the minority population in the proposed district vote cohesively, . . ." while "the third *Gingles* precondition requires that the Anglo voting bloc usually defeats the minority-preferred candidate under the current districting, . . . ." Order at 41–42.



**Fort Bend County (Demonstrative House Districts)**

| TOTAL CVAP | WCVAP | MCVAP | HCVAP | BCVAP | ACVAP |
|---|---|---|---|---|---|
| 113,511 | 41.8% | 58.3% | 18.5% | 18.3% | 20.6% |
| 115,136 | 23.5% | 76.5% | 18.3% | 48.0% | 9.7% |
| 107,659 | 50.0% | 50.1% | 28.3% | 13.8% | 7.2% |
| 106,971 | 37.4% | 62.6% | 12.2% | 14.4% | 35.6% |

106.    On information and belief, this map demonstrates that it is possible to draw an additional minority opportunity district that is geographically compact, maintains communities with shared or common interests, and is politically cohesive. For example, under the demonstrative map, a significant majority of minority voters would have voted for President Biden as follows:

**Fort Bend County (Demonstrative House Districts)**

|  | BIDEN SUPPORT MINORITY VOTERS | TRUMP SUPPORT MINORITY VOTERS | OVERALL BIDEN | OVERALL TRUMP |
|---|---|---|---|---|
| Demo HD 26 | 75.1% | 23.1% | 52.0% | 46.4% |
| Demo HD 27 | 89.7% | 9.1% | 71.2% | 27.6% |
| Demo HD 28 | 80.0% | 13.3% | 42.9% | 55.6% |
| Demo HD 76 | 72.8% | 26.2% | 57.7% | 41.0% |

Bell County

107.    Bell County is made up of House Districts 54 and 55. Under the benchmark plan, Killeen, Texas is kept together in House District 54.

108.    Plan H2136, however, splits the City of Killeen—a majority-minority city that is 40% Black—between House Districts 54 and 55. As seen in the image below, House District 54 is drawn as a ring around House District 55, which sits in the middle of that ring.

**Bell County (Enacted House Districts)**



**Bell County (Enacted House Districts)**

|        | TOTAL CVAP | WCVAP | MCVAP | HCVAP | BCVAP | ACVAP |
|--------|-----------|-------|-------|-------|-------|-------|
| HD 54  | 125,849   | 47.6% | 52.4% | 19.8% | 26.4% | 3.6%  |
| HD 55  | 118,446   | 53.9% | 46.1% | 21.3% | 20.4% | 2.6%  |

109.     During the committee hearing on October 4, 2021, Representative Rafael Anchía questioned the rationale for splitting the Black population in Killeen between the two districts as opposed to drawing the boundary elsewhere. Representative Chris Turner, referencing a Black shading map of Bell County, informed the House Redistricting Committee that it was clear that "this boundary between district 55 and district 54 really . . . cuts right through the heart of the Black community [in] the city of Killeen . . . it's a really clear example of cracking." During debate on the House floor on October 12, 2021, Representative Turner distributed the shading map of Bell County to every Representative's desk.

110.     Representative Yvonne Davis's proposed floor amendment 18, which would have adjusted House Districts 54 and 55 to create a majority Black district in House District 54, was rejected. During debate on the amendment, Representative Davis pointed to the fact that Killeen has elected primarily Black and Latino city council members, which "speaks to how they will vote if they have an opportunity."

111.     The House committee did accept, however, another amendment that preserved *only* the boundaries of Belton, Texas and Temple, Texas, which are majority white cities.

112.     The House's maneuver represents a dramatic shift from Texas's litigation posture during the last redistricting cycle. As recently as 2017, during a redistricting trial challenging the 2013 State House plan, Texas asserted that it refused to draw a minority opportunity district in Bell County that would have combined parts of Killeen with parts of Belton because the communities were incongruous with each other. Just four years later, the Texas Legislature

35

reversed course, now combining the two communities rather than creating a district that would keep Killeen whole. The only difference between then and now is that new census data revealed that keeping Killeen whole, as done in the previous version of the district, would enable minority voters to elect their candidate of choice.

113.    The House Committee therefore intentionally split the Black community in Killeen in order prevent Black and Latino voters from electing their candidate of choice in a minority opportunity district.

114.    On information and belief, white voters in challenged House Districts 54 and 55 consistently cast ballots opposing candidates supported by minority voters, resulting in significant racially polarized voting. For example, in the 2020 Presidential election, white majority voters overwhelmingly voted for Former President Trump, while minority voters preferred President Biden, as follows:

**Bell County (Enacted House Districts)**

|  | BIDEN SUPPORT WHITE VOTERS | TRUMP SUPPORT WHITE VOTERS | BIDEN SUPPORT MINORITY VOTERS | TRUMP SUPPORT MINORITY VOTERS | OVERALL BIDEN | OVERALL TRUMP |
|---|---|---|---|---|---|---|
| HD 54 | 13.7% | 86.7% | 98.1% | 0.3% | 45.5% | 52.4% |
| HD 55 | 16.9% | 80.8% | 96.1% | 2.0% | 43.9% | 53.8% |

115.    On information and belief, given the numerical advantage of white voters as established by CVAP (see above) and their consistent pattern of bloc voting, white voters will usually defeat minority preferred candidates in House district 54 and 55 under the district configuration as enacted, which impermissibly dilutes the voting power of minority voters.

116.    On information and belief, it is possible to configure alternative House Districts in Bell County in which minority voters would have an opportunity to elect their candidates of choice because those minority voters vote cohesively in the manner set forth in *Gingles v. Thornburg*, 478 U.S. 30 (1986), as described this Court's May 23, 2022 Order, as shown below:

**Bell County (Demonstrative House Districts)**



**Bell County (Demonstrative House Districts)**

|  | TOTAL CVAP | WCVAP | MCVAP | HCVAP | BCVAP | ACVAP |
|---|---|---|---|---|---|---|
| Demo HD 54 | 125,484 | 65 | 34.9% | 19.0% | 12.5% | 1.7% |
| Demo HD 55 | 118,811 | 35 | 64.6% | 22.1% | 35.1% | 4.7% |

117.   On information and belief, this map demonstrates that it is possible to draw a minority opportunity district that is geographically compact, maintains communities with shared or common interests, and is politically cohesive. For example, under the demonstrative map, a significant majority of minority voters would have voted for President Biden as follows:

**Bell County (Demonstrative House District)**

|  | BIDEN SUPPORT MINORITY VOTERS | TRUMP SUPPORT MINORITY VOTERS | OVERALL BIDEN | OVERALL TRUMP |
|---|---|---|---|---|
| Demo HD 54 | 98.1% | 0.3% | 55.2% | 44.8% |

<u>Collin County</u>

118.     Collin County contains House Districts 61, 66, 67, 70, and 89, as well as a portion of District 33 from neighboring Rockwall County.



**Collin County (Enacted House Districts)**



**Collin County (Enacted House Districts)**

|        | TOTAL CVAP | WCVAP | MCVAP | HCVAP | BCVAP | ACVAP |
|--------|-----------|-------|-------|-------|-------|-------|
| HD 33  | 112,407   | 70.7% | 29.3% | 12.0% | 8.5%  | 7.6%  |
| HD 61  | 108,278   | 68.8% | 31.2% | 9.7%  | 11.8% | 8.7%  |
| HD 66  | 124,685   | 69.8% | 30.2% | 8.8%  | 8.3%  | 11.9% |
| HD 67  | 113,918   | 68.3% | 31.7% | 11.6% | 10.9% | 8.5%  |
| HD 70  | 116,409   | 64.4% | 35.6% | 10.0% | 11.7% | 12.4% |
| HD 89  | 111,941   | 66.3% | 33.7% | 11.8% | 10.9% | 9.8%  |

119.   Each of House Districts enacted in Collin County has a white majority CVAP. The racial demographic breakdown in these districts is as follows:

120.   House Districts 33, 61, 66, 67, 70, and 89 impermissibly cut into and split the AAPI community as follows:

HD 33: 7.58% CVAP;
HD 61: 8.72% CVAP;
HD 66: 11.89% CVAP;
HD 67: 8.52% CVAP;
HD 70: 12.37% CVAP;
HD 89: 9.80% CVAP.

121.   This can be seen when demographic shading is added to the map of the districts. The darker purple shading reflects higher densities of AAPI population, as shown below.

**Collin County (AAPI Demographic Shading)**



122.    The House Committee intentionally cracked the growing AAPI community to dilute the vote of AAPI voters in that area.

123.    On information and belief, white voters in challenged House Districts 33, 61, 66, 67, 70, and 89 regularly and consistently cast ballots opposing candidates supported by minority voters resulting in significantly racially polarized voting. For example, in the 2020 Presidential Election, white majority voters overwhelmingly voted for Former President Trump, while minority voters preferred President Biden, as follows:

**Collin County (Enacted House Districts)**

|  | BIDEN SUPPORT WHITE VOTERS | TRUMP SUPPORT WHITE VOTERS | BIDEN SUPPORT MINORITY VOTERS | TRUMP SUPPORT MINORITY VOTERS | OVERALL BIDEN | OVERALL TRUMP |
|---|---|---|---|---|---|---|
| HD 61 | 31.5% | 66.8% | 78.3% | 20.7% | 45.2% | 53.0% |
| HD 66 | 28.1% | 70.4% | 98.5% | 8.3% | 45.2% | 53.1% |
| HD 67 | 25.9% | 71.9% | 79.2% | 18.8% | 44.6% | 53.5% |
| HD 70 | 41.7% | 56.3% | 83.3% | 16.0% | 54.7% | 43.6% |
| HD 89 | 21.0% | 76.9% | 96.1% | 2.5% | 43.5% | 54.5% |
| HD 33 | 20.2% | 78.1% | 94.4% | 0.3% | 39.3% | 58.9% |

124.    On information and belief, given the numerical advantage of white voters as established by CVAP (see above) and their consistent pattern of bloc voting, white voters will

usually defeat minority preferred candidates in House Districts 33, 61, 66, 67, and 89 under the district configuration as enacted, which impermissibly dilutes the voting power of minority voters.

125.    On information and belief, it is possible to configure alternative House Districts in Collin County in which minority voters would have an opportunity to elect their candidates of choice because those minority voters vote cohesively in the manner set forth in *Gingles v. Thornburg*, 478 U.S. 30 (1986), as described this Court's May 23, 2022 Order, as shown below:

**Collin County (Demonstrative House Districts)**



**Collin County (Demonstrative House Districts)**

|  | TOTAL CVAP | WCVAP | MCVAP | HCVAP | BCVAP | ACVAP |
|---|---|---|---|---|---|---|
| Demo HD 33 | 154,174 | 46.9% | 53.1% | 16.8% | 12.2% | 22.3% |
| Demo HD 61 | 131,051 | 40.1% | 59.9% | 8.5% | 11.2% | 38.7% |
| Demo HD 66 | 139,159 | 63.6% | 36.4% | 11.9% | 9.5% | 12.7% |
| Demo HD 67 | 139,548 | 59.0% | 41.0% | 21.5% | 11.5% | 5.3% |
| Demo HD 70 | 164,007 | 57.1% | 42.9% | 12.8% | 11.2% | 16.9% |
| Demo HD 89 | 137,424 | 65.6% | 34.4% | 15.5% | 8.7% | 7.4% |

126.    On information and belief, this map demonstrates that it is possible to draw additional opportunity districts that are geographically compact, maintain communities with shared or common interests, and are politically cohesive. For example, under the demonstrative map, a significant majority of minority voters would have voted for President Biden as follows:

**Collin County (Demonstrative House Districts)**

|  | BIDEN SUPPORT MINORITY VOTERS | TRUMP SUPPORT MINORITY VOTERS | OVERALL BIDEN | OVERALL TRUMP |
|---|---|---|---|---|
| Demo HD 61 | 66.5% | 32.3% | 55.4% | 43.1% |
| Demo HD 66 | 93.4% | 6.9% | 40.1% | 58.1% |
| Demo HD 67 | 92.2% | 7.8% | 60.0% | 38.1% |
| Demo HD 70 | 90.9% | 8.7% | 51.8% | 46.4% |
| Demo HD 89 | 88.7% | 10.7% | 52.8% | 45.4% |
| Demo HD 33 | 93.3% | 6.2% | 34.9% | 63.2% |

### _Senate Redistricting Plan S2168 is Discriminatory_

127.    The racial imbalance in Plan S2168 is as plain as in House Plan 2316. Despite Texas's majority-minority status, out of a total of 31 Senate districts, Plan S2168 provides only 11 districts in which there is a nonwhite majority CVAP, equating to approximately 35% of all districts. By contrast, Plan S2168 provides 20 districts that are majority white CVAP, equating to approximately 65% of all districts.

128.    That results in gross lack of proportionality in representation for voters of color, violating both the Voting Rights Act and the Fourteenth Amendment.

129.    This imbalance in representation was a result of intentional discrimination by map drawers who cracked diverse urban centers into multiple non-compact districts with the intention of diluting the vote of Texans of color.

130.    This is clear in Fort Bend and Tarrant counties.

*Fort Bend County*

131.    Fort Bend County is a diverse region with significant Latino, Black and AAPI

communities. Under Plan S2168, it is split into Senate Districts: 13, 17, and 18.

### Fort Bend County (Enacted Senate Districts)



**Fort Bend County (Enacted Senate Districts)**

|  | TOTAL CVAP | WCVAP | MCVAP | HCVAP | BCVAP | ACVAP |
|---|---|---|---|---|---|---|
| SD 13 | 525,669 | 17.3% | 82.7% | 22.3% | 50.8% | 9.1% |
| SD 17 | 549,855 | 57.2% | 42.8% | 20.9% | 11.9% | 9.2% |
| SD 18 | 588,644 | 51.7% | 48.3% | 23.6% | 15.0% | 9.0% |

132.    As demonstrated in the image below, legislators purposefully cracked the AAPI community into Senate Districts 13, 17, and 18. The darker purple shading reflects denser AAPI populations.

**Fort Bend County (AAPI Demographic Shading)**



133.    Senate District 17 is non-compact and sprawls from the south and west into Fort Bend with an oddly shaped tentacle to remove voters of color and combine them with rural white voters in areas that were previously in Senate District 18.



134.     On information and belief, white voters in Senate Districts 13, 17, and 18 consistently cast ballots opposing candidates supported by minority voters resulting in significant racially polarized voting. For example, in the 2020 Presidential Election, white majority voters overwhelmingly voted for Former President Trump, while minority voters preferred President Biden, as follows:

**Fort Bend County (Enacted Senate Districts)**

| | BIDEN SUPPORT WHITE VOTERS | TRUMP SUPPORT WHITE VOTERS | BIDEN SUPPORT MINORITY VOTERS | TRUMP SUPPORT MINORITY VOTERS | OVERALL BIDEN | OVERALL TRUMP |
|---|---|---|---|---|---|---|
| SD 13 | 38.0% | 60.4% | 89.0% | 9.9% | 78.1% | 20.8% |
| SD 17 | 19.6% | 78.0% | 77.0% | 20.9% | 40.4% | 58.2% |
| SD 18 | 9.8% | 89.2% | 81.8% | 16.9% | 39.8% | 58.9% |

135.     On information and belief, given the numerical advantage of white voters as established by CVAP (see above) and their consistent pattern of bloc voting, white voters will

usually defeat minority preferred candidates in Senate District 17 and 18 under the district configuration as enacted, which impermissibly dilutes the voting power of minority voters.

136.    On information and belief, it is possible to configure alternative Senate Districts in Fort Bend County in which minority voters would have an opportunity to elect their candidates of choice because those minority voters vote cohesively in the manner set forth in *Gingles v. Thornburg*, 478 U.S. 30 (1986), as described this Court's May 23, 2022 Order, as shown below:

**Fort Bend County (Demonstrative Senate Districts)**



**Fort Bend County (Demonstrative Senate Districts)**

|  | TOTAL CVAP | WCVAP | MCVAP | HCVAP | BCVAP | ACVAP |
|---|---|---|---|---|---|---|
| Demo SD 13 | 527,543 | 16.0% | 84.0% | 26.1% | 50.2% | 7.2% |
| Demo SD 17 | 543,298 | 37.3% | 62.8% | 24.9% | 20.1% | 17.0% |
| Demo SD 18 | 605,321 | 63.7% | 36.3% | 22.8% | 9.4% | 3.2% |

137.    On information and belief, this map demonstrates that it is possible to draw an additional opportunity district that is geographically compact, maintains communities with shared or common interests, and is politically cohesive. For example, under the demonstrative map, a significant majority of minority voters would have voted for President Biden as follows:

**Fort Bend County (Demonstrative Senate Districts)**

|  | BIDEN SUPPORT MINORITY VOTERS | TRUMP SUPPORT MINORITY VOTERS | OVERALL BIDEN | OVERALL TRUMP |
|---|---|---|---|---|
| Demo SD 13 | 88.3% | 10.6% | 79.6% | 19.3% |
| Demo SD 17 | 76.5% | 22.2% | 54.8% | 43.8% |
| Demo SD 18 | 76.8% | 21.9% | 28.5% | 70.2% |

*Tarrant County*

138.    Under Plan S2168, Tarrant County is split into 6 different non-compact districts: 9, 10, 12, 16, 22, and 23.

### Tarrant County (Enacted Senate Districts)



**Tarrant County (Enacted Senate Districts)**

|  | TOTAL CVAP | WCVAP | MCVAP | HCVAP | BCVAP | ACVAP |
|---|---|---|---|---|---|---|
| **SD 9** | 718,725 | 54.2% | 45.8% | 26.0% | 10.8% | 6.7% |
| **SD 10** | 609,367 | 62.4% | 37.6% | 17.4% | 17.1% | 2.0% |
| **SD 22** | 636,008 | 63.1% | 36.9% | 17.4% | 14.9% | 3.4% |

139.    The enacted map splits communities of color, particularly in Senate Districts 9, 10, and 22.

140.    Senate District 10 stretches far from rural areas in the west into Tarrant County for the purpose of splitting communities of interest and cracking voters of color from Tarrant County. Senate District 10 has a majority white CVAP of 62.38% and a nonwhite CVAP of 37.62%.

141.    There was extensive testimony that the proposed map for Senate District 10 significantly reduced the minority population in what was previously a coalition district. For example, the Mayor of Mansfield, a rapidly growing city previously entirely within Senate District 10, testified before the Senate Redistricting Committee that Black and Latino residents in Mansfield collectively vote to elect their candidates of choice. However, the new proposed district for Senate District 10 splits Mansfield, and specifically its racial minority residents, into two white majority districts.

142.    Similarly, five Fort Worth city councilmembers presented a letter to the Senate Redistricting Committee objecting that the proposed Senate map "cracks Fort Worth's historic and growing minority communities," which was previously "a prime example of an effective coalition cross over district," but now prevented their constituents from electing their candidate of choice in Senate District 10.

143.    Legislators proposed several amendments that would have preserved Senate District 10 as a coalition district; the amendments were not adopted.

144.    Senate District 22 also stretches inelegantly to combine voters of color from Tarrant County with voters in white, rural areas to the south. Senate District 22 has a majority white CVAP of 63.13%, and a nonwhite CVAP of 36.87%.

145.    Plan S2168 intentionally repeats the same racial discrimination from the last redistricting cycle, in which a three-judge panel refused to preclear a proposed plan under

Section 5 of the Voting Rights Act because Senate District 10 cracked communities of color in Tarrant County to destroy a coalition district. *See Texas v. United States*, 887 F. Supp. 2d 133, *rev'd sub nom. Texas v. United States*, 570 U.S. 978 (2013).

146.     On information and belief, white voters in Senate Districts 9, 10, and 12 consistently cast ballots opposing candidates supported by minority voters resulting in significant racially polarized voting. For example, in the 2020 Presidential Election, white majority voters overwhelmingly voted for Former President Trump, while minority voters preferred President Biden, as follows:

**Tarrant County (Enacted Senate Districts)**

|  | BIDEN SUPPORT WHITE VOTERS | TRUMP SUPPORT WHITE VOTERS | BIDEN SUPPORT MINORITY VOTERS | TRUMP SUPPORT MINORITY VOTERS | OVERALL BIDEN | OVERALL TRUMP |
|---|---|---|---|---|---|---|
| **SD 9** | 27.3% | 70.9% | 81.5% | 16.8% | 42.6% | 55.7% |
| **SD 10** | 19.1% | 79.4% | 92.9% | 6.3% | 41.4% | 57.2% |
| **SD 12** | 30.7% | 67.7% | 89.7% | 9.6% | 43.3% | 55.2% |
| **SD 16** | 50.5% | 47.9% | 79.7% | 19.9% | 64.4% | 34.1% |
| **SD 22** | 15.9% | 82.3% | 92.9% | 6.5% | 38.3% | 60.2% |
| **SD 23** | 47.3% | 52.0% | 92.3% | 6.3% | 77.5% | 21.2% |

147.     On information and belief, given the numerical advantage of white voters as established by CVAP (see above) and their consistent pattern of bloc voting, white voters will usually defeat minority preferred candidates in Senate Districts 9, 10, and 12 under the district configuration as enacted, which impermissibly dilutes the voting power of minority voters.

148.     On information and belief, it is possible to configure alternative Senate Districts in Tarrant County in which minority voters would have an opportunity to elect their candidates of choice because those minority voters vote cohesively in the manner set forth in *Gingles v. Thornburg*, 478 U.S. 30 (1986), as described this Court's May 23, 2022 Order, as shown below:

**Tarrant County (Demonstrative Senate Districts)**



**Tarrant County (Demonstrative Senate Districts)**

|        | TOTAL CVAP | WCVAP | MCVAP | HCVAP | BCVAP | ACVAP |
|--------|-----------|-------|-------|-------|-------|-------|
| SD 9   | 637,308   | 69.5% | 30.5% | 13.3% | 10.7% | 5.2%  |
| SD 10  | 644,099   | 75.3% | 24.7% | 15.0% | 7.5%  | 0.9%  |
| SD 22  | 552,076   | 42.1% | 57.9% | 27.5% | 25.2% | 4.0%  |

149.    On information and belief, this map demonstrates that it is possible to draw an additional opportunity district that is geographically compact, maintains communities with shared or common interests, and is politically cohesive. For example, under the demonstrative map, a significant majority of minority voters would have voted for President Biden as follows:

| Tarrant County (Demonstrative Senate Districts) | | | | |
|---|---|---|---|---|
| | BIDEN SUPPORT MINORITY VOTERS | TRUMP SUPPORT MINORITY VOTERS | OVERALL BIDEN | OVERALL TRUMP |
| Demo SD 9 | 92.2% | 7.3% | 41.1% | 57.2% |
| Demo SD 10 | 89.5% | 9.7% | 24.9% | 73.7% |
| Demo SD 22 | 86.5% | 12.2% | 61.6% | 36.8% |

### *Congressional Redistricting Plan C2193 is Discriminatory*

150.    Based on the 2020 Census, Texas gained two new Congressional seats because of its dramatic increase in population, for a total of 38 seats. People of color accounted for 95% of that growth, a fact which should be reflected in the new maps. Against all nondiscriminatory reason, the Texas Legislature drew two new majority white CVAP districts, further diluting the vote of people of color.

151.    Overall, Plan C2193 has 10 majority Latino CVAP districts, three majority Black CVAP districts, and zero majority AAPI CVAP districts. In contrast, Texas's white non-Latino population constitutes a majority CVAP in 25 districts, or 66% of Texas's federal congressional delegation.

152.    To accomplish this disproportionate feat, the Legislature cracked diverse communities. That results in gross lack of proportional representation for voters of color, violating both the Voting Rights Act and the Fourteenth Amendment. This is apparent in the Harris-Fort Bend and Dallas-Fort Worth regions.

*Harris-Fort Bend*

153.    Under Plan C2193, Harris and Fort Bend Counties are split into Congressional

Districts 2, 7, 8, 9, 18, 22, 29, and 38.

## Harris-Fort Bend (Enacted Congressional Districts)



**Harris Fort Bend Counties (Enacted Congressional Districts)**

|        | TOTAL CVAP | WCVAP | MCVAP | HCVAP | BCVAP | ACVAP |
|--------|-----------|-------|-------|-------|-------|-------|
| CD 7   | 431,629   | 41.2% | 58.8% | 19.7% | 20.0% | 18.2% |
| CD 9   | 437,272   | 19.3% | 80.7% | 24.4% | 47.1% | 8.8%  |
| CD 22  | 456,201   | 54.5% | 45.6% | 23.3% | 11.5% | 9.9%  |

154.   These eight districts are non-compact and have oddly shaped configurations that purposely dive into diverse urban centers in Harris and Fort Bend Counties to crack communities of color. For example, Congressional Districts 7, 9, and 22 significantly crack the AAPI community.

**Harris-Fort Bend (AAPI Demographic Shading)**



155.   Congressional District 22 takes AAPI voters and other voters of color and combines them with populations in other areas with which they have no nexus to ensure a white majority CVAP of 54.45%.

156.   The Senate Redistricting Committee ignored testimony that the proposed maps increased the white voting population in Congressional District 22 to a majority while decreasing the AAPI and Black populations.

157.   On information and belief, white voters in challenged Congressional Districts 7, 9, and 22, regularly and consistently cast ballots opposing candidates supported by minority

voters resulting in significant racially polarized voting. For example, in the 2020 Presidential Election, white majority voters overwhelmingly voted for Former President Trump, while minority voters preferred President Biden, as follows:

**Harris-Fort Bend Counties (Enacted Congressional Districts)**

|  | BIDEN SUPPORT WHITE VOTERS | TRUMP SUPPORT WHITE VOTERS | BIDEN SUPPORT MINORITY VOTERS | TRUMP SUPPORT MINORITY VOTERS | OVERALL BIDEN | OVERALL TRUMP |
|---|---|---|---|---|---|---|
| **CD 7** | 62.1% | 36.2% | 65.7% | 33.2% | 64.2% | 34.5% |
| **CD 9** | 44.7% | 54.6% | 86.7% | 11.9% | 76.1% | 22.7% |
| **CD 22** | 14.2% | 84.1% | 83.3% | 15.4% | 41.2% | 57.3% |

158.    On information and belief, given the numerical advantage of white voters as established by CVAP (see above) and their consistent pattern of bloc voting, white voters will usually defeat minority preferred candidates in challenged Congressional Districts 7, 9, and 22 under the district configuration as enacted, which impermissibly dilutes the voting power of minority voters.

159.    On information and belief, it is possible to configure alternative Congressional Districts in Harris and Ford Bend Counties in which minority voters would have an opportunity to elect their candidates of choice because those minority voters vote cohesively in the manner set forth in *Gingles v. Thornburg*, 478 U.S. 30 (1986), as described this Court's May 23, 2022 Order, as shown below:

**Harris-Fort Bend (Demonstrative Congressional Districts)**



**Harris Fort Bend Counties (Demonstrative Congressional Districts)**

|  | TOTAL CVAP | WCVAP | MCVAP | HCVAP | BCVAP | ACVAP |
|---|---|---|---|---|---|---|
| Demo CD 7 | 427,450 | 43.6% | 56.4% | 20.6% | 19.8% | 15.2% |
| Demo CD 9 | 440,477 | 20.9% | 79.2% | 23.1% | 47.6% | 7.9% |
| Demo CD 22 | 481,213 | 49.3% | 50.7% | 23.8% | 13.8% | 12.4% |

160.   On information and belief, this map demonstrates that it is possible to draw an additional opportunity district that is geographically compact, maintains communities with shared or common interests, and is politically cohesive. For example, under the demonstrative map, a significant majority of minority voters would have voted for President Biden as follows:

**Harris-Fort Bend Counties (Demonstrative Congressional Districts)**

|  | BIDEN SUPPORT MINORITY VOTERS | TRUMP SUPPORT MINORITY VOTERS | OVERALL BIDEN | OVERALL TRUMP |
|---|---|---|---|---|
| Demo CD 7 | 68.6% | 30.9% | 61.5% | 37.1% |
| Demo CD 9 | 87.6% | 11.1% | 75.8% | 23.1% |
| Demo CD 22 | 81.9% | 16.7% | 43.3% | 55.1% |

### *Dallas-Fort Worth and surrounding counties*

161.    The Dallas-Fort Worth area, along with surrounding counties including Collin and Denton, is a complex region that is split into at least 9 different districts: 3, 4, 6, 12, 24, 26, 30, 32, and 33.

**Dallas-Fort Worth (Enacted Congressional Districts)**



**Dallas-Fort Worth (Enacted Congressional Districts)**

|  | TOTAL CVAP | WCVAP | MCVAP | HCVAP | BCVAP | ACVAP |
|---|---|---|---|---|---|---|
| CD 6 | 461,766 | 60.2% | 39.8% | 20.7% | 14.9% | 3.0% |
| CD 30 | 475,904 | 25.9% | 74.1% | 20.4% | 49.8% | 3.2% |
| CD 32 | 444,011 | 48.2% | 51.8% | 20.2% | 23.2% | 7.1% |
| CD 33 | 369,354 | 25.2% | 74.8% | 41.8% | 27.6% | 4.4% |

162.   First, as seen in the image below, Congressional District 6 appears to slice into Congressional District 33 to crack the Latino population. Congressional District 6 has 20.72% HCVAP, while District 33 has 41.79% CVAP. The darker green shading reflects denser Latino populations.

### Dallas-Fort Worth (Latino Demographic Shading)





163.   Black voters were likewise discriminated against. Congressional District 6 has

14.94% BCVAP, while Congressional District 30 has 49.79% BCVAP and District 33 has

27.58% BCVAP. The darker yellow shading reflects denser Black populations.

**Dallas-Fort Worth (Black Demographic Shading)**



164.   On information and belief, white voters in challenged Congressional Districts 6

and 30 regularly       cast ballots opposing candidates supported by minority voters resulting in

significant racially polarized voting. For example, in the 2020 Presidential Election, white

majority voters overwhelmingly voted for Former President Trump, while minority voters preferred President Biden, as follows:

**Dallas-Fort Worth Counties (Enacted Congressional Districts)**

|  | BIDEN SUPPORT WHITE VOTERS | TRUMP SUPPORT WHITE VOTERS | BIDEN SUPPORT MINORITY VOTERS | TRUMP SUPPORT MINORITY VOTERS | OVERALL BIDEN | OVERALL TRUMP |
|---|---|---|---|---|---|---|
| CD 6 | 11.4% | 87.0% | 91.9% | 7.3% | 37.4% | 61.3% |
| CD 30 | 43.1% | 56.5% | 93.8% | 5.0% | 77.8% | 21.0% |
| CD 32 | 55.3% | 42.9% | 17.7% | 80.2% | 65.6% | 32.7% |
| CD 33 | 48.4% | 49.6% | 14.7% | 84.1% | 74.3% | 24.3% |

165.    On information and belief, given the numerical advantage of white voters as established by CVAP (see above) and their consistent pattern of bloc voting, white voters will usually defeat minority preferred candidates in challenged Congressional District 6 under the district configuration as enacted, which impermissibly dilutes the voting power of minority voters.

166.    On information and belief, it is possible to configure alternative Congressional Districts in the Dallas-Fort Worth area in which minority voters would have an opportunity to elect their candidates of choice because those minority voters vote cohesively in the manner set forth in *Gingles v. Thornburg*, 478 U.S. 30 (1986), as described this Court's May 23, 2022 Order, as shown below:

**Dallas-Fort Worth (Demonstrative Congressional Districts)**



**Dallas-Fort Worth (Demonstrative Congressional Districts)**

|           | TOTAL CVAP | WCVAP | MCVAP | HCVAP | BCVAP | ACVAP |
|-----------|-----------|-------|-------|-------|-------|-------|
| Demo CD 6 | 399,536 | 37.9% | 62.1% | 34.8% | 20.3% | 5.9% |
| Demo CD 30 | 466,271 | 29.3% | 70.7% | 20.4% | 46.2% | 3.3% |
| Demo CD 32 | 430,393 | 44.0% | 56.0% | 23.8% | 24.7% | 6.4% |
| Demo CD 33 | 431,008 | 32.9% | 67.1% | 29.7% | 31.1% | 5.3% |

167.     On information and belief, this map demonstrates that it is possible to draw an additional opportunity district that is geographically compact, maintains communities with shared or common interests, and is politically cohesive. For example, under the demonstrative map, a significant majority of minority voters would have voted for President Biden as follows:

**Dallas-Fort Worth Counties (Demonstrative Congressional Districts)**

|           | BIDEN SUPPORT MINORITY VOTERS | TRUMP SUPPORT MINORITY VOTERS | OVERALL BIDEN | OVERALL TRUMP |
|-----------|-------------------------------|-------------------------------|---------------|---------------|
| Demo CD 6 | 82.7% | 16.1% | 60.2% | 38.3% |
| Demo CD 30 | 92.7% | 6.2% | 74.3% | 24.5% |
| Demo CD 32 | 85.9% | 14.0% | 63.4% | 35.0% |
| Demo CD 33 | 85.0% | 13.7% | 71.0% | 27.5% |

168.     Moreover, the AAPI community was also fractured in Collin County. Congressional District 3 has 8.59% AAPI CVAP; Congressional District 4 has 5.63% AAPI

CVAP; and District 26 has 6.37% AAPI CVAP.  The darker purple shading reflects denser AAPI populations.

**Collin County (AAPI Demographic Shading)**



169.   A large concentration of the AAPI community in Collin County was previously within Congressional District 3. Plan C2193, however, cracks AAPI neighborhoods with almost surgical precision and places a significant percentage of them into Congressional District 4, which is a large district that spans 12 counties and is 74.31% white CVAP. This dilutes the votes of AAPI voters in both districts.

### *Voting in Texas is Racially Polarized*

170.   In the decades in which Texas has been embroiled in redistricting litigation because of its intentional acts to suppress the political voice of rapidly growing communities of color, it has been well-settled that voting in the state is racially polarized.

171.   With very few geographic exceptions, white voters overwhelming vote as a bloc to defeat the candidate of choice of voters of color.

172.    In the areas highlighted in this complaint, not only are Black, Latino and AAPI voters highly cohesive within those groups, but they are politically cohesive together and broadly share political goals and needs, as manifested in their voting patterns and organizing efforts.

173.    Moreover, voters of color in Texas continue to bear the brunt of state-sponsored and private discrimination, all of which impedes their ability to participate in the political process and have an equal opportunity to elect their candidate of choice.

174.    Latino, AAPI and Black voters have been the targets of historical and recent voting-related discrimination in the state; the state has adopted and utilized voting practices that enhanced opportunities for discrimination against Black, Latino and AAPI voters; these voters bear the effects of past discrimination in areas such as education, employment and health; AAPI, Latino, and Black voters continue to be subject to the use of overt or subtle racial appeals in political campaigns; Black, Latino, and AAPI voters continue to be proportionally under-represented in the Texas legislature and congressional delegation; AAPI, Black and Latino voters constantly deal with unresponsiveness of white state elected officials to the particularized needs of their groups, individually and collectively. *Gingles*, 478 U.S. at 44–45; *see also* S. Rep. No. 97-417, at 28-29.

175.    As AAPI and other minority populations continue to increase rapidly, particularly in Texas, levels of racial tension and discrimination against these communities are increasing. In fact, many hate crimes and other racist incidents have been reported against Asian Americans in Texas in recent years.[21] As just one example of many, even a Texas lawmaker, Betty Brown,

---

[21] *See, e.g.*, Margaret Kadifa, *Houston Man Charged with Hate Crime After Attacking Lyft Driver*, HOUSTON CHRONICLE (Sept. 21, 2017), https://www.houstonchronicle.com/neighborhood/champions-klein/news/article/Man-charged-with-hate-crime-after-attacking-Lyft-12217494.php (verbal and physical assault of Lyft driver due to Pakistani background); Alex Zielinski, *Fake Cards Appear in San Antonio, Offering $100 to Anyone Who Reports Undocumented Immigrants to ICE*, SAN ANTONIO CURRENT (Aug. 10, 2017), https://www.sacurrent.com/the-daily/archives/2017/08/10/fake-cards-appear-in-san-antonio-offering-100-to-anyone-who-reports-undocumented-immigrants-to-ice?media=AMP+HTML (distribution of unofficial business cards in San Antonio offering $100

publicly commented that Asian American voters should change their names to accommodate poll workers. At a hearing regarding voter identification, Brown stated: "Rather than everyone here having to learn Chinese—I understand it's a rather difficult language—do you think that it would behoove *you and your citizens* to adopt a name that *we* could deal with more readily here? . . . Can't you see that this is something that would make it a lot easier for you and the people who are poll workers if you could adopt a name just for identification purposes that's easier for *Americans* to deal with?"[22]

176.    Plaintiffs will further describe this legacy of racism and its effects on voting in Texas in subsequent submissions.

## CAUSES OF ACTION

177.    For each of the following counts, Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint as though fully set forth therein.

### Count I
### Violation of Section 2 of the Voting Rights Act

178.    Section 2 is a permanent provision of the Voting Rights Act of 1965, 42 U.S.C. § 1973, and prohibits voting practices and procedures that result in the denial or abridgement of the right of any citizen to vote on account of race, color, or membership in a language minority group. Section 2 applies where members of a historically disenfranchised group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

---

reward for reporting an "undocumented alien" to ICE who would then be arrested and deported); Lindsay Ellis, *Posters at UT Latest Display of Campus Post-Election Racism*, HOUSTON CHRONICLE (Feb. 14, 2017), https://www.chron.com/local/education/campus-chronicles/article/Racist-posters-at-UT-latest-post-election-10931366.php (posters targeting Muslims, racial minorities, and immigrants at the University of Texas-Austin).
[22] R.G. Ratcliffe, *Texas lawmaker suggests Asians adopt easier names*, HOUSTON CHRONICLE (Apr. 8, 2009), https://www.chron.com/news/houston-texas/article/Texas-lawmaker-suggests-Asians-adopt-easier-names-1550512.php (emphasis added).

179.     House Plan 2316, Senate Plan 2168, and Congressional Plan 2193 violate Section 2 because in intention and effect they dilute the votes of Texans of color by cracking and packing minority districts throughout Texas and failing to create new opportunity districts, including districts where coalitions of minority voters could together elect candidates of their choice. As a result, Texans of color "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

180.     Additionally, Defendants violated Section 2 by failing to create minority opportunity districts, including coalition districts, in Harris and/or Fort Bend Counties in Plans H2316, S2168, and C2198; the Dallas-Fort Worth area in Plan C2198; Collin County in Plan H2316; Bell County in Plan H2316; and Tarrant County in Plan S2168.

**Count II**
**Intentional Discrimination in Violation of the Fourteenth and Fifteenth Amendments**

181.     The Fourteenth Amendment to the United States Constitution prohibits any state from making or enforcing laws that "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

182.     The Fifteenth Amendment to the United States Constitution provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1.

183.     The Texas Legislature drew, and Defendants adopted and will implement House Plan 2316, Senate Plan 2168, and Congressional Plan 2193, with the intent to discriminate statewide against Texans of color by packing and cracking their communities to prevent them from electing their candidates of choice.

184.    The resulting denial of equal protection of the laws, as well as denial and abridgement of the right to vote on account of race or color, violates the Constitution.

## Count III
### Racial Gerrymandering in Violation of the Fourteenth Amendment
### (*Shaw* violation)

185.    House Plan 2316, Senate Plan 2168, and Congressional Plan 2193 all violate the Equal Protection Clause of the Fourteenth Amendment because they constitute racial gerrymanders. *See Shaw v. Reno*, 509 U.S. 630 (1993).

186.    Specifically, race was the predominant factor in the cracking of the AAPI community in Collin County in Plans H2316 and C2193 and in Fort Bend County in Plan H2316. Race was also the predominant factor in the cracking of minority communities in Tarrant County in Plan S2168, particularly in Senate Districts 10 and 22.

187.    The Texas Legislature violated traditional redistricting principles, including compactness and preservation of communities of interest, and subordinated these principles to racial considerations.

188.    The Texas Legislature had no interest sufficient to justify discrimination on the basis of race in Plans H2316, S2168, and C2193.

### BASIS FOR EQUITABLE RELIEF

189.    Plaintiffs have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, and this suit for declaratory judgment and injunctive relief is their only means of securing adequate redress from Defendants' unlawful practices.

190.    Plaintiffs will continue to suffer irreparable injury from Defendants' intentional acts, policies, and practices set forth herein unless enjoined by this Court.

### ATTORNEYS' FEES

191.    In accordance with 42 U.S.C. §§ 1973-1(e) & 1988, Plaintiffs are entitled to recover reasonable attorneys' fees, expenses, and costs.

## PRAYER

Plaintiffs respectfully pray that this Court enter Judgment granting:

A.    A declaratory judgment that Plans H2316, S2168, and C2198 violate the rights of Plaintiffs as protected by Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 *et seq.*, the Fourteenth Amendment to the United States Constitution, the Fifteenth Amendment to the United States Constitution, and 42 U.S.C. § 1983; and

B.    Preliminary and permanent injunctive relief requiring Defendants, their successors in office, agents, employees, attorneys, and those persons acting in concert with them and/or at their discretion – to develop redistricting plans that do not dilute minority voting strength for the Texas House and Senate and the United States Congress, and enjoining and forbidding the use of Plans H2316, S2168, and C2198; and

C.    If need be, an interim electoral plan for the 2022 elections; and

D.    If need be, retain jurisdiction over this matter to secure compliance with orders and mandates of this Court; and

E.    Order Defendants to pay all costs, including reasonable attorneys' fees; and

F.    Order such other and further relief as the Court may deem just and proper.

Dated: July 22, 2022

Respectfully Submitted,

*/s/ Noor Taj*
Noor Taj*
P.A. State Bar No. 309594
Allison J. Riggs*
N.C. State Bar No. 40028

Hilary Harris Klein*
N.C. State Bar No. 53711
Mitchell Brown*
N.C. State Bar No. 56122
Katelin Kaiser*
N.C. State Bar No. 56799
SOUTHERN COALITION FOR SOCIAL JUSTICE
1415 West Highway 54, Suite 101
Durham, NC 27707
Telephone: 919-323-3380
Fax: 919-323-3942
Allison@southerncoalition.org
Noor@scsj.org
hilaryhklein@scsj.org
mitchellbrown@scsj.org
katelin@scsj.org

David A. Donatti
TX Bar No. 24097612
Ashley Harris
Texas Bar No. 24078344
Thomas Buser-Clancy
Texas Bar No. 24123238
Adriana Pinon
Texas Bar No. 24089768
ACLU FOUNDATION OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288
Tel. (713) 942-8146 Fax. (713) 942-8966
ddonnati@aclutx.org
aharris@aclutx.org
tbuser-clancy@aclutx.org
apinon@aclutx.org

Jerry Vattamala*
N.Y. State Bar No. 4426458
Susana Lorenzo-Giguere*
N.Y. State Bar No. 2428688
Patrick Stegemoeller*
N.Y. State Bar No. 5819982
Asian American Legal Defense and Education Fund

99 Hudson Street, 12th Floor
New York, NY 10013
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org

pstegemoeller@aaldef.org

Yurij Rudensky*
N.Y. State Bar No. 5798210
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
rudenskyy@brennan.law.nyu.edu

*Admitted pro hac vice

*ATTORNEYS FOR FAIR MAPS PLAINTIFFS*

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was served in compliance with the Federal Rules of Civil Procedure upon all counsel of record via this Court's ECF on July 22, 2022:

/s *Ashley Harris*
Ashley Harris