UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **LEAGUE OF UNITED LATIN AMERICAN CITIZENS,** *et al.*, | § § § § § | |
| *Plaintiffs*, | § § | |
| **EDDIE BERNICE JOHNSON,** *et al.*, | § § § | EP-21-CV-00259-DCG-JES-JVB |
| *Plaintiff-Intervenors*, | § § | **[Lead Case]** |
| v. | § § | |
| **GREG ABBOTT,** *in his official capacity as Governor of the State of Texas*, *et al.*, | § § § § | |
| *Defendants.* | § § | |
| **TREY MARTINEZ FISCHER,** | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | Case No. 3:21-CV-00306-DCG-JES-JVB |
| **GREG ABBOTT**, *in his official capacity as Governor of the State of Texas*, *et al.* | § § § § | **[Consolidated Case]** |
| *Defendants.* | § § § | |

## MEMORANDUM OPINION AND ORDER

Defendants move to dismiss Plaintiff Trey Martinez Fischer's First Amended Complaint (ECF No. 217) for failure to state a claim.  Mot. Dismiss, ECF No. 233 ("Motion").  The Motion is GRANTED in part and DENIED in part.

### I.   BACKGROUND

#### A.  Factual Background

Fischer challenges Texas's redistricting of Texas Congressional District 35 ("CD 35"). First Am. Compl. ("FAC"), ECF No. 217.  He alleges that Defendants diluted the Latino electorate's voting strength by redrawing benchmark CD 35, which had a Hispanic Voting-Age

Population ("HCVAP") of 52.6%, FAC ¶¶ 2, 13, to its current boundaries, which has "below a majority" HCVAP, *Id.* ¶¶ 2, 112.  In other words, Fischer complains that Defendants took away a Latino opportunity district—that is, a district where a minority group has the opportunity to elect its preferred candidate by virtue of its share of the electorate.  *Id.* ¶ 15.

Fischer brings three claims.  First, he claims that Defendants violated Section 2 of the Voting Rights Act ("VRA") by redrawing CD 35 in a manner that diluted Latino voting power in the area including and around benchmark CD 35 and CD 35.  *Id.* ¶¶ 136–37.  Second, he claims that Defendants violated the Fourteenth Amendment of the United States Constitution by intentionally diluting Latino voting power.  *Id.* ¶¶ 138–39.  Third, he claims that Defendants racially gerrymandered CD 35 in violation of the Fourteenth Amendment.  *Id.* ¶¶ 34, 94–101, 104, 107–08, 113–18, 121–22, 124–27, 128–29, 141.

For these alleged violations, Fischer asks for a new Latino opportunity district in central Texas.  *Id.* ¶ 23.  His requested relief can be characterized as the restoration of a Latino opportunity district in the area around CD 35.  Fischer, however, does not request that CD 35 return to its benchmark form, though the new Latino opportunity district could look substantially like benchmark CD 35 and include many of the voters the district now includes.  *Id.* ¶ 23; *see also id.* ¶¶ 51–72.

### B. Procedural Background

Fischer filed his first amended complaint on April 6, 2022.  ECF No. 217.  Defendants moved to dismiss that complaint.  ECF No. 233.  Defendants argue that Fischer has failed to sufficiently allege both his discriminatory effects claim under Section 2 and his discriminatory intent and racial gerrymandering claims under the Fourteenth Amendment.  *Id.*; Reply at 4–6.  Fischer disagrees on both points.  Resp., ECF No. 260.

## II.   DISCUSSION

To survive a motion to dismiss, a plaintiff must have stated facts in their complaint which, accepted as true, support "a claim to relief that is plausible on its face." *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007); *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga.*, 892 F.3d 719, 726 (5th Cir. 2018).  To meet the "facial plausibility" standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[A] plaintiff's obligation [is] to provide the grounds of his entitlement to relief, [which] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555–56 (quotations omitted).

Courts view well-pleaded "facts in the light most favorable to the plaintiff," *Innova Hosp.*, 892 F.3d at 726, but will not accept as true "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (cleaned up)). Courts are generally limited to facts contained in the complaint, although courts may also "rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Right, Ltd.*, 551 U.S. 308, 322 (2007)).  In the end, a court's obligation is "to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 385 (5th Cir. 2017) (quotation omitted).

### A. Fischer's Discriminatory Effects Claim (Section 2)

Fischer brings a discriminatory effects claim under Section 2 of the VRA. Section 2 prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). A political entity violates Section 2 when "the totality of circumstances" shows that the "political processes . . . are not equally open to participation by" one or more minority groups "in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

As a threshold matter, to prove a Section 2 claim, a plaintiff must establish three preconditions: (1) a minority electorate that is sufficiently large and compact to form a majority of a single district; (2) the minority electorate is politically cohesive; and (3) the majority votes as a bloc to defeat the minority electorate's preferred candidates. *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). Courts often refer to these prerequisites as the *Gingles* factors or *Gingles* preconditions. After establishing the *Gingles* preconditions, to ultimately prevail on a discriminatory effects claim, a plaintiff must show that, under the "totality of circumstances," the "political process is [not] equally open to minority voters." *E.g.*, *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (citing 52 U.S.C. § 10301(b) and *Gingles*, 478 U.S. at 46–51). Defendants focus their challenge on the second and third *Gingles* preconditions.[1] Mot. at 1–6.

---

[1] Defendants again seek to preserve their position that Section 2 does not provide a private cause of action. Mot. at 10. For reasons already stated, ECF No. 85, the Court denies Defendants' motion to dismiss on that ground.

### *1. Minority Electorate Political Cohesion*

Defendants first say that Fischer fails to provide sufficient factual support for his allegation that the minority electorate is politically cohesive. *Id.* at 3. We agree. But as a preliminary matter, Defendants are wrong that Fischer's allegations of Latino voter cohesion in a proposed remedial plan do not support his *Gingles* claim. *Id.* They do. As we have previously explained, "a *Gingles* plaintiff must show the second precondition for the minority population that would be included in its proposed district." *LULAC v. Abbott*, 3:21-cv-00259, 2022 WL 1631301, at *15 (W.D. Tex. May 23, 2022) (collecting cases).

Fischer discusses two specific proposed districts. FAC at 11–13. Under both proposed districts he alleges that the Latino electorate "work[s] and vote[s] together to elect candidates of their choice to school boards, city councils, to the state legislature, and federal offices." FAC ¶¶ 61, 70. This is a conclusory restatement of an element of the cause of action only slightly dressed up by invocations of unspecified elections. *Iqbal*, 556 U.S. at 678 (it is insufficient "tender naked assertions devoid of further factual enhancement" (cleaned up)).

Fischer next discusses minority voter cohesion in CD 35. While minority voter cohesion in a *proposed* district is the focus of the second *Gingles* precondition inquiry, *e.g.*, *Cooper v. Harris*, 137 S. Ct. 1455, 1470 (2017) (explaining first two preconditions "are needed to establish that the minority group has the potential to elect a representative of its own choice" (cleaned up)), there is substantial geographic overlap between one of Fischer's proposed districts and CD 35, FAC ¶ 64. So, keeping in mind the population overlap, the Court will credit Fischer's allegations of Latino voter cohesion in CD 35 as providing insight into his allegation of Latino voter cohesion in a proposed district.

But in his description of CD 35 Fischer does not go beyond a simple recitation of the elements of the claim, though he disguises some of his recitals as factual conclusions. Fischer

alleges that "Latinos in CD 35 are politically cohesive in . . . non-partisan elections for school board or municipal office." *Id.* ¶ 73. As discussed above, this is a thinly veiled recital of an element of the cause of action, which is insufficient. *Iqbal*, 556 U.S. at 678.

Fischer asks us to take him at his word that statistical methods plausibly show CD 35's minority electorate is politically cohesive. He alleges that Ordinary Least Squares (OLS), a method of ecological regression, shows "that Latinos are strongly cohesive in enacted CD 35" and that Latinos in CD 35 "support the same candidates in non-partisan, partisan, and primary elections." *Id.* ¶ 82. He makes similar allegations with respect to ecological inference results. *Id.* ¶ 86. But without any discussion of the underlying data—for example, what voters live in the area, how they vote, and which elections show they vote a particular way—Fischer's use of these statistical methods in his complaint are nothing more than legal conclusions couched as factual claims. The Court concludes that Fischer has failed to state sufficient factual matter from which the Court can draw a reasonable inference that the Latino electorate in a proposed district is politically cohesive. *See Iqbal*, 556 U.S. at 678. Defendant's motion to dismiss is granted as it applies to the second *Gingles* precondition.

One final thing to address regarding the second *Gingles* precondition. Defendants argue that Fischer fails to grapple with partisanship as an obvious alternative explanation for minority political cohesion. Mot. at 3–4 (citing *Twombly*, 550 U.S. at 567). But Fischer does not have to overcome partisanship explanations at the pleading stage. Mem. Op., ECF No. 144, at 5. While he may later have to address the possibility that partisanship explains alleged voting patterns, *LULAC v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc), sufficiently supported allegations that the Latino electorate votes cohesively is enough to move the needle from conceivable to plausible on the second *Gingles* precondition. The Court therefore denies

Defendants' motion to dismiss insofar as they argue Fischer failed to allege facts that rebut partisanship as an obvious alternative explanation for minority voting patterns.

### 2. White Bloc Voting

On the third *Gingles* precondition, Defendants argue that Fischer fails to walk through the door. That's because, Defendants say, *Gingles* requires that white voters hold a majority in the challenged district, and they do not in CD 35. Mot. at 4–5, 5 n.2.

There is no such requirement under the Fifth Circuit's interpretation of *Gingles*. Vote dilution inquiries are extraordinarily fact-dependent. So too "the legal significance of white bloc voting is a factual inquiry that will vary with the circumstances of each case." *Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992). In recognition of the intensely local nature of the inquiry, courts have held that white bloc voting can be legally significant even when "the protected class [] constitutes a registered voter majority." *Salas*, 964 F.2d at 1555; *LULAC*, 2022 WL 1631301, at *15. After all, it's "possible for a citizen voting-age majority to lack real electoral opportunity." *LULAC v. Perry*, 548 U.S. 399, 428 (2006). Plaintiffs need not allege that white voters constitute a majority of the electorate in a challenged district in order to clear the *Gingles* hurdle and get to the totality of the circumstances analysis.

Defendants' next argument gains traction, however. Fischer does not allege sufficient facts from which the Court can infer that CD 35's white electorate will usually defeat the minority preferred candidate. *Gingles*, 478 U.S. at 51. Fischer lodges a series of formulaic recitations of the third *Gingles* precondition. *E.g.*, FAC ¶¶ 62 ("The Anglos in Texas and in central Texas vote sufficiently as a bloc to enable them—in the absence of special circumstances—to usually defeat the Latino's preferred candidate."), 71 (same), 74 ("Anglos in CD 35 are also politically cohesive to the extent that they vote sufficiently as a bloc to defeat the preferred candidate of choice of the Latino community in CD 35."), 79 ("The Anglo VTDs

support different and opposing candidates than the Latino precincts."); *see also LULAC*, 2022 WL 1631301, at *18 (concluding similar allegations were not entitled to presumption of truth). He then invokes OLS and ecological inference results (again without citation or explanation) but alleges only that the white electorate is "moderately cohesive." FAC ¶¶ 83, 88. He stops there. Fischer does nothing to tell the Court what supports his theory that it's plausible a "moderately cohesive" white electorate will usually win elections in CD 35.

Fischer asserts that "[i]n the portions of the district that are majority Anglo, Anglo candidates for school board, municipal office, and other non-partisan elections defeat Spanish-surnamed candidates." FAC ¶ 89. This suffers from two flaws. First, Fischer fails to describe white bloc voting with reference to the entire district. He instead leaves the Court guessing about the extent to which "majority Anglo" "portions of the district" describe white bloc voting in CD 35 as a whole. Second, simply because voters elect "Anglo candidates" does not necessarily mean the white electorate is usually preventing the election of a minority preferred candidate. We know no specifics of the electoral results or vote breakdown. Latinos could be voting cohesively but joining the white electorate to elect Anglo candidates. Or perhaps Latino voters are voting cohesively for Spanish-surnamed candidates and usually lose out to the white electorate. But on the facts Fischer alleges in his First Amended Complaint, we just don't know. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (cleaned up)).

Even considering the one specific election Fischer mentions, we are unable to conclude that it's plausible CD 35's white electorate will usually prevent the election of minority preferred candidates. Fischer alleges "there is certainly evidence that Anglo Democratic primary voters in

Travis, Hays, and Comal counties preferred" CD 35 Democratic primary election candidate Greg Casar, "while Latino voters in Bexar County and Travis County preferred someone other than Casar." FAC ¶ 91. This leaves us asking: What about Anglo voters in Bexar County? If the white electorate in CD 35 is only "moderately cohesive," FAC ¶¶ 83, 88, the voting pattern of Anglo voters in Bexar County—indeed across the entire district—is likely a consequential fact, *e.g.*, *Wis. Legislature.*, 142 S. Ct. at 1250; *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018) ("We have made clear that redistricting analysis must take place at the district level.").

Furthermore, Fischer alleges no facts about CD 35 that explain why it's plausible the white electorate—a minority in CD 35—would usually elect its preferred candidates. *LULAC*, 2022 WL 1631301, at *24 (dismissing *Gingles* claim because "[t]he United States [didn't] offer any facts specific to [the challenged] district that might explain how its Anglo minority could usually win elections"). What potentially helpful information Fischer does allege is in reference to Texas as a whole. FAC ¶¶ 37–40. Accepting those allegations as necessarily descriptive of CD 35, however, would break from the command that *Gingles* claims be analyzed on a district-by-district basis. *E.g.*, *Wis. Legislature*, 142 S. Ct. at 1250; *Perez*, 138 S. Ct. at 2332.

It's not that moderate levels of white bloc voting means Fischer will invariably fail to state a Section 2 claim. *Johnson v. De Grandy*, 512 U.S. 997, 1011 (1994) (explaining that white "bloc voting [i]s a matter of degree, with a variable legal significance depending on other facts"). But this time around Fischer has failed to allege, with sufficient specificity, why it's plausible that moderate white bloc voting in CD 35 is legally significant. This is an especially important task for Fischer because, in CD 35, white CVAP is 33.9% (±0.6), while Hispanic CVAP is 48.0% (±0.9).[2] *Cf. Salas*, 964 F.3d at 1555 ("[A] registered voter majority class faces an

---

[2] Tex. Legis. Couns., *American Community Survey Special Tabulation Using Census and American Community Survey Data: Congressional Districts – PlanC2193* (Oct. 17, 2021), at 17

obvious, difficult burden in proving that their inability to elect results from white bloc voting."). More is required.

### B. Fischer's Intentional Vote Dilution Claim

#### 1. *Discriminatory Effects*

Defendants' only argument for dismissing Fischer's intentional vote dilution claim for failure to show discriminatory effect is that Fischer fails to sufficiently plead discriminatory effect that would satisfy Section 2. Mot. at 9–10. But, as we have explained, a plaintiff need not clear the *Gingles* hurdle for an intentional vote dilution claim. *Brooks v. Abbott*, No. 1:21-CV-991-LY-JES-JVB, 2022 WL 1410729, at *11–12 (W.D. Tex. May 4, 2022). Because an intentional vote dilution claim is constitutionally grounded, a plaintiff need only, at the pleading stage, show that it's plausible that the effect of redistricting "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266; *Brooks*, 2022 WL 1410729, at *11.

Defendants have not challenged that redistricting CD 35 bears more heavily on Latino voters. Mot. at 9. Thus, insofar as Defendants seek dismissal of Fischer's Fourteenth Amendment claim for failure to allege discriminatory effect, Defendants' Motion is denied.

#### 2. *Discriminatory Intent*

For a state to violate the Fourteenth Amendment's Equal Protection Clause, it must have enacted the challenged law for a discriminatory purpose. *See, e.g.*, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *Washington v. Davis*, 426 U.S. 229 (1976). It being highly unlikely that discriminatory purpose will be found "on the face of the statute," *see Davis*, 426 U.S. at 241,

---

(PDF pagination), https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/b916a06b-b7e3-42fe-997c-d06f97cd1724/download/planc2193_map_report. The Court takes judicial notice of this fact. *Hollinger v. Home State Mut. Ins. Co.*, 654 F.3d 564, 571–72 (5th Cir. 2011) ("United States census data is an appropriate and frequent subject of judicial notice.").

there is no requirement for a plaintiff to show direct evidence of discrimination, *see Arlington Heights*, 429 U.S. at 266; *Veasey v. Abbott*, 830 F.3d 216, 235–36 (5th Cir. 2016) (en banc). Rather, a plaintiff may use circumstantial evidence to prove a violation. *Arlington Heights*, 429 U.S. at 266. That evidence must show the state "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney*, 442 U.S. at 279.

To prevail in showing discriminatory purpose for an intentional vote dilution claim, a plaintiff need only show that race was "*a* motivating factor in the decision." *Arlington Heights*, 429 U.S. at 265–68 (emphasis added); *Veasey*, 830 F.3d at 230 ("[R]acial discrimination need only be one purpose . . . of an official action for a violation to occur." (cleaned up)). While courts must presume that legislatures act in good faith, *Miller v. Johnson*, 515 U.S. 900, 915 (1995), and "courts must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus," *Perez*, 138 S. Ct. at 2324 (cleaned up), "when the adverse consequences of a law upon an identifiable group are [] inevitable . . . a strong inference that the adverse effects were desired can reasonably be drawn," *see Feeney*, 442 U.S. at 279 n.25; *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 222–23 (4th Cir. 2016).

Fischer alleges multiple facts that he says supports a claim of discriminatory intent:

- First, he points to facts suggesting Texas has a history of discrimination. Specifically, Fischer invokes the finding of the last three-judge panel to hear Texas redistricting cases that the State intentionally discriminated against minority voters. FAC ¶ 34. Courts have found similar evidence relevant to the discriminatory intent analysis. *See, e.g.*, *Arlington Heights*, 429 U.S. at 267 (noting "historical background" as a potential source of evidence); *Veasey*, 830 F.3d at 239–40 (discussing "contemporary examples of State-sponsored discrimination").

- Second, Fischer alleges that the Texas legislature drew the congressional map largely in secret such that minorities, and certain representatives, were shut out of the process. FAC ¶¶ 94–101. This too can support a case for discriminatory intent.

> *Arlington Heights*, 429 U.S. at 267 (noting "specific sequence of events leading up to challenged decision" as source of evidence).

- Third, Fischer alleges multiple procedural departures, such as delays in defining criteria for amending proposed maps. FAC ¶¶ 121–22, 124–27. Such procedural departures can also support a finding of discriminatory intent. *Arlington Heights*, 429 U.S. at 267 ("Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.").

- Fourth, Fischer alleges that the Texas legislature split precincts, which Fischer seems to indicate is a substantive departure from redistricting criteria. *See* FAC ¶¶ 113–18. Splitting precincts, especially when doing so is contrary to a legislature's stated redistricting criteria, can support a finding of discriminatory intent. *See Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 273–74 (2015).

- Fifth, Fischer alleges that the Texas legislature knew that redrawing CD 35 to its current form would inevitably and negatively impact Latino voting strength. FAC ¶¶ 104, 107–08, 128–29. If true, this can support a "strong inference" of discriminatory intent, *see Feeney*, 442 U.S. at 279 n. 25.

In sum, Fischer's allegations are sufficient to state a plausible claim of discriminatory intent. Defendants' motion to dismiss is therefore denied insofar as they contend Fischer failed to state a claim for intentional vote dilution under the Fourteenth Amendment.

### C. Fischer's Racial Gerrymandering Claim

In his response to Defendants' motion to dismiss, Fischer says he stated a racial gerrymandering claim in his First Amended Complaint. Resp. at 3. Defendants protest that his complaint cannot reasonably be read as having given them notice that Fischer pleads that claim. Reply, ECF No. 267, at 4–6. In his list of causes of action, Fischer makes no mention of racial gerrymandering. FAC ¶¶ 136–39. In fact, he mentions racial gerrymandering only one time, and does so in passing. *See generally* FAC; FAC ¶ 141. On the other hand, Fischer invokes the language of a racial gerrymandering claim three times, all with reference to allegedly split

precincts. FAC ¶¶ 115–17 (noting "precinct splits were executed with race as a predominant factor in their creation").

Whatever we may think of the clarity of Fischer's complaint, he is not required to explicitly state the legal theories he relies on. *E.g.*, *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam). Fischer is only required to adequately state "the factual basis for [his] complaint." *Id.* at 12. And he has done so. As we previously noted, "the types of evidence that would allow either [an intentional vote dilution claim or a racial gerrymandering] claim to succeed are largely the same." *LULAC*, 2022 WL 1631301, at *27. Fischer's factual allegations that support his intentional vote dilution claim also support his racial gerrymandering claim. *See supra* Section II.B.2. His use of the language of a racial gerrymandering claim in reference to allegedly split precincts provides particular support for the plausibility of his claim. *See Ala. Legis. Black Caucus*, 575 U.S. at 273–74. Defendants are right that Fischer faces a demanding burden of proof, Reply at 6, but Fischer has met his burden at the pleading stage. Defendants' motion to dismiss is denied insofar as they contend Fischer failed to state a racial gerrymandering claim.

### III. CONCLUSION

**IT IS ORDERED** that Defendants' "Motion to Dismiss Plaintiff Trey Martinez Fischer's First Amended Complaint" (ECF No. 233) is **GRANTED IN PART and DENIED IN PART.** Defendants' Motion is **GRANTED** as to Plaintiff's Section 2 claim. Defendants' Motion is **DENIED** as to Plaintiff's Fourteenth Amendment intentional vote dilution and racial gerrymandering claims. Plaintiff Trey Martinez Fischer has until **August 1, 2022** to amend his complaint in response to this order.

So **ORDERED** and **SIGNED** this 25th day of July 2022.

_____
**DAVID C. GUADERRAMA
UNITED STATES DISTRICT JUDGE**

*And on behalf of:*

| | | |
|---|---|---|
| **Jerry E. Smith** | | **Jeffrey V. Brown** |
| **United States Circuit Judge** | *-and-* | **United States District Judge** |
| **U.S. Court of Appeals, Fifth Circuit** | | **Southern District of Texas** |