## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF REPRESENTATIVES, | § § § § | Civil Action |
| Plaintiffs | § § | |
| | § | Case No. 21-cv-259-DCG-JES-JVB |
| v. | § § | |
| STATE OF TEXAS, GREG ABBOTT, GOVERNOR OF THE STATE OF TEXAS, in his official capacity, and JOHN SCOTT, SECRETARY OF STATE OF TEXAS, in his official capacity | § § § § § § § | |
| Defendants | § | |

## PLAINTIFF MALC'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## INTRODUCTION

In the third special legislative session of 2021, the 87th Texas Legislature adopted a series of redistricting maps that intentionally discriminated against Hispanic and Latino communities. The redistricting maps for the Texas House of Representatives, Congressional delegation, and the State Board of Education all reduce or minimize Hispanic and Latino voting strength or otherwise fail to provide an equal opportunity for Hispanic and Latino communities to participate in the political process and elect candidates of their choice. Plaintiff Mexican American Legislative Caucus ("MALC" or "Plaintiff") brings claims under Section 2 of the Voting Rights Act of 1965 ("VRA") as well as the Fourteenth and Fifteenth Amendments to the United States Constitution to remedy these wrongs.

## ARGUMENT

### I.      MALC Alleges Plausible Violations of The Voting Rights Act.

Defendants change the applicable pleading standard to impose an improper burden on Plaintiffs. Defendants write, "[a]t least five of MALC's claims fail to allege facts that, if proven, would satisfy the third *Gingles* precondition." *See* Motion at 2. But it is not MALC's burden to prove its claims in its pleadings, it simply must plead facts that, if taken as true, "render it plausible" that MALC will ultimately be able to satisfy its burdens. *See* Order on Motion to Dismiss (Dkt. 307) at 16-17.

At this stage a court's role is only "to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 385 (5th Cir. 2017) (quotation omitted). In a Section 2 redistricting case, courts necessarily rely on the testimony of trained political science experts to determine, for example, which elections exhibit racially polarized voting, who is the candidate of choice for each racial or ethnic group in each election, and how voting patterns are likely to play out

1

across the challenged maps in the future. At the pleadings stage, it is not for Plaintiffs to play armchair statistician, they simply must allege facts that make it plausible they can eventually prove "based on the totality of circumstances, . . . the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected class] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C.A. § 10301. Thus, courts have long recognized the rarity of Rule 12 dismissals of cases under the VRA: "It is no accident that most cases under section 2 have been decided on summary judgment or after a verdict, and not on a motion to dismiss." *Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004).

The specific circumstances of each Section 2 claim are also relevant to how the *Gingles* factors are applied. *See Voinovich v. Quilter*, 507 U.S. 146, 158 (1993) ("Of course, the *Gingles* factors cannot be applied mechanically and without regard to the nature of the claim."). In cases involving systematic statewide vote dilution across multiple districts and failure to draw new opportunity districts to account for population growth, as MALC alleges has occurred here, courts consider the overall effect of a redistricting plan on the minority community's ability to elect candidates of choice. *See, e.g.*, *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 360 (7th Cir. 1992) ("Yet the Justices cannot have meant to foreclose examination of electoral patterns in multiple districts—for it is only by looking across multiple districts and elections that we can see patterns of success or failure. Section 2(b) expressly requires a court to consider the "totality of circumstances". All of the Justices in *Gingles* considered how black candidates fared in multiple elections spread over many districts and many years.") (citing *Thornburg v. Gingles*, 478 U.S. 30 (1986) and *Board of Estimate v. Morris*, 489 U.S. 688, 701 & n. 8 (1989)).

Failing to account for the circumstances of each Section 2 claim would lead to perverse results. For example, consider a state that has 10 districts, significant racially polarized voting, is

60% Anglo CVAP and 40% Hispanic CVAP, and in which present and historical barriers to participation render Hispanic turnout lower than Anglo turnout. Under Defendants' version of the law, the Legislature could draw districts such that Anglo's easily win every election in 6 districts while the Hispanic voting power is spread out over 4 hyper-competitive districts, leading to Anglos controlling all 10 districts in half of the election cycles and 6 districts in the other half of election cycles.

Although Section 2 is "not a guarantee of electoral success for minority-preferred candidates," *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994), it certainly cannot condone the case where Anglos *are* guaranteed success and are entirely "immune from the obligation to pull, haul, and trade to find common political ground," *id.* at 1020, while minorities must struggle their utmost and hope for less extreme Anglo bloc voting to achieve representation only occasionally. That is not having an equal opportunity "to participate in the political process and to elect representatives of their choice," and Congress did not mean to sanction such an outcome in adopting its discriminatory effects test.

Further, in Texas's last redistricting cycle, courts found the Legislature violated both Section 2 and the Constitution by systematically pairing lower turnout, poor performing majority Hispanic precincts with higher turnout Anglo precincts in order to minimally "nudge" the districts towards worse minority electoral performance. *See Perez v. Abbott*, 390 F. Supp. 3d 803, 815 (W.D. Tex. 2019) ("Mapdrawers manipulated Latino cohesion and turnout to pursue the "nudge factor" proposal and create the façade of a Latino opportunity district. It was undisputed that Latino performance in CD23 decreased, and the Court found that CD23 was purposefully racially discriminatory."); *see also, Texas v. United States*, 887 F. Supp. 2d 133, 207 (D.D.C. 2012), *vacated and remanded*, 570 U.S. 928 (2013) (citing the Legislature's use of "certain data [that was] useful in identifying a nudge factor by which one can analyze which census blocks, when added to a particular district, especially

50–plus–1 majority-minority districts, help pull the districts total Hispanic pop[ulation] and the Hispanic CVAP up to majority status, but leave the Spanish surnamed registered voters and turnout the lowest."). This is the type of claim MALC makes in regard to the nominally majority Latino districts that Defendants seek to dismiss. MALC Second Amended Complaint, Dkt. 319 at ¶ 118 (HD 37); ¶¶ 168-69, 177 (CD 15 and 27) ; ¶¶ 186, 192 (SBOE 2 and 3).

Of course, there are many factors that ultimately determine whether a minority group is denied an equal opportunity to participate "on account of race," but, take for example, Plaintiffs' challenge to the enacted Congressional Districts 15 and 27. Plaintiffs allege the Legislature systematically kept in low-turnout Latino areas and paired those areas with high turnout Anglo areas that feature extreme (~90%) bloc voting, *id.* at ¶¶ 168-69, 172-73; the Legislature cracked apart Hispanics in Nueces County, who under traditional redistricting principles should be included in a South Texas district, and put them in a completely non-performing Anglo-controlled district, *id.* at ¶¶ 171, 174-77; the Legislature failed to create at least two new opportunity districts to reflect Latino population growth, *id.* at ¶¶ 178-85; and that the Legislature weakened a third prior opportunity district such that it never performs for the Latino candidate of choice, *id.* at ¶¶ 152-67.

At the pleadings stage, Plaintiffs picked a somewhat arbitrary sampling of election results, unguided by an expert opinion, in CD 15 to show that the dilution of Hispanic voting power led to the alleged Hispanic candidate of choice winning only 4 of 8 instead of 8 of 8 elections. Plaintiffs could have picked some other smaller or larger set of elections to show a 40% or 30% success rate and could amend their pleading to do so, if necessary; but considering that this is the pleading stage in a case with now-designated expert testimony and evidence that will focus on which elections are most pertinent, Plaintiffs' alleged facts taken together make it at least plausible they will ultimately be able to show Hispanics do not have an equal opportunity to participate in the political process and

elect representatives of their choice, and that the cracking of Hispanic populations between CD 15 and CD 27 is an aspect of that violation.

Similarly, their allegations that the 8.3% reduction in SSTO and diminished electoral performance in HD 37, *id.* at ¶¶ 113, 118, that the 10.2% reduction in SSTO in HD 90 combined with the historical composition, performance, and legal background of that district, *id.* at ¶¶ 120-21, 125, 130, and the diminished performance of SBOE districts, *id.* at ¶188, are sufficient to survive the pleadings stage and be the subject of further factual development.

## II.    MALC Has Alleged Plausible Malapportionment Claims.

Defendants again argue that MALC's claim for malapportionment under *Cox v. Larios*, 542 U.S. 947 (2004) should be dismissed. Defendants' motion should be denied because the pleadings state a plausible claim and the issues should be decided on a full factual record at trial before the Court.

In *Larios*, the Supreme Court refused to create a complete safe-harbor for population deviations within 10% between the largest and smallest districts and specifically found that the Constitution's protection under the equal protection clause for one-person, one-vote was sufficiently strong that it precluded racial, regional, and even partisan gerrymanders in Georgia maps. *Larios*, 542 U.S. at 949 ("In challenging the District Court's judgment, appellant invites us to weaken the one-person, one-vote standard by creating a safe harbor for population deviations of less than ten percent, within which districting decisions could be made for any reason whatsoever. The Court properly rejects that invitation.").

This Court adopted and applied *Larios* in *Perez v. Abbott*, 250 F. Supp 3d 123, 195 (W.D. Tex. 2017) during the 2011 redistricting cycle. Specifically, the Court held that population deviation patterns within a localized region can violate the one person, one vote principle. As the Court noted, "[i]n sum, if a plaintiff characterizes his one person, one vote claim as a challenge to an entire plan

with an overall deviation of less than 10%, the geographic nature of that claim is plan-wide. ***On the other hand, if a plaintiff characterizes his one person, one vote claim as a challenge to a specific piece within an entire plan with an overall deviation of less than 10%, the geographic nature of that claim is limited to that specific piece of the plan. Both are valid legal theories*** for challenging a plan, and both claims can be made together." (emphasis added).

MALC has challenged a specific piece of the House redistricting map for violating the one person, one vote principle in West Texas, even though the plan as a whole is within the 10% deviation limit. Under this Court's precedents and the United States Supreme Court's precedents discussing *Larios*, this is a permissible claim and one that supports a plausible claim for an intentional malapportionment in West Texas to deprive Latinos in El Paso of a representative.

In its previous May 23rd Memorandum Opinion and Order, the Court relied on *Harris v. Arizona Independent Redistricting Commission*, 578 U.S. 253 (2016), in noting that a *Larios* claim would be typically applied in "unusual cases." Importantly, *Harris* was an appeal from a case developed on a full factual record after a five-day bench trial. *Id.* at 257. In addition, *Harris* was a challenge to the Arizona plan based on a plan-wide claim of malapportionment, as opposed to a regional or localized claim as asserted here and as recognized as a viable theory in this Court's *Perez* decision from the last redistricting cycle. *Harris* was centrally concerned with rejecting the notion that partisanship alone can suffice to be an illegitimate state interest in asserting a malapportionment equal protection claim against a plan within the presumptively valid 10% plan-wide deviation.

MALC alleges that systematic over-population of districts in El Paso with Hispanic and Latino voters and systematic under-population of Anglo voter districts in North and East Texas improperly diluted Hispanic and Latino voting strength in House Districts 74, 75, and 77. *See* 2nd Am. Compl. at ¶ 257. As alleged in the Second Amended Complaint, the "pernicious effect is obvious: minimized representation for Latinos in the area and maximized representation for Anglos.

H2316 avoids eliminating Anglo majority districts or pairing incumbent Anglo representatives and does so at the expense of Latino voters and by pairing the Latina representatives, and MALC members from HD 76 and 77." *Id.* at ¶ 259.

The Defendants argue this is simply an unsupported conclusion and that other areas of Texas have similarly been under-populated and over-populated such that MALC cannot assert a malapportionment claim. These arguments should be rejected, however. First, the "pernicious effect" allegation is not unsupported because it is grounded in the factual allegations of the targeting of two Latina incumbents in El Paso County. In effect, the intentional malapportionment – even though it is within the 10% deviation – was a means to accomplish eliminating a Latina representative and ensuring that predominantly Anglo counties in the Texas panhandle had significantly greater representational in the Texas Legislature. *See* Second Am. Compl. at ¶¶ 259-263. In addition, MALC alleges these manipulations have an even greater effect in this region of Texas because of other socio-economic factors that magnify the impact, such as "dramatically lower census participation rates and the disparate impact of how prison populations are counted." *Id.* at ¶ 263.

Second, the Second Amended Complaint graphically shows the stark reality that the deviations appear specifically targeted at Latino voters in West Texas for the benefit of Anglo voters in neighboring counties:



These allegations track and are consistent with the rule in *Larios* that manipulations of populations to dilute voting power of communities of interest violates the Equal Protection Clause's one-person, one-vote requirement and are sufficient to state a plausible claim for relief. Indeed, just as in *Larios*, candidates were paired against each other to reduce voting power of the affected demographic, the difference being that the candidates were paired not based on partisanship but instead paired on account of race and region.

In its previous May 23rd Memorandum Opinion and Order originally dismissing this claim, the Court noted that the selection of the region to challenge the plan on a localized basis was inherently arbitrary. In doing so, the Court noted that the omission of House District 53 from the localized challenge was indicative of the arbitrariness of the selection. MALC respectfully disagrees and has alleged facts in the Second Amended Complaint that explain both the selection and even what the effect of including HD 53 in the region would be. First, the challenge focuses on traditional West Texas counties because the discriminatory targeting appears in El Paso County where the two

Latina incumbents were paired against each other and the surrounding panhandle counties that are the beneficiaries of that targeting. *Id.* at ¶ 259. Further, the Second Amended Complaint alleges that HD 53 is more typically considered a Texas Hill Country district based on its population densities being in Kerr, Bandera, Medina and Llano counties. *See id.* at ¶ 258. But setting aside the geographical distinctiveness of HD 53, even including that district in the analysis simply places another predominantly Anglo CVAP district in the analysis that only has the effect of lowering the underpopulation deviation of Anglo CVAP districts to 3.15%. *Id.* As the Second Amended Complaint alleges, this shift nevertheless "represents a systemic effort to dramatically alter the voting power of citizens in approximately 10% of the Texas House of Representatives in a way that directly favors Anglo voters and directly disadvantages Latino voters." *Id.*

Defendants also argue that other areas of Texas disprove an intentional malapportionment because other areas are either under-populated or over-populated. This is a *non sequitur* because MALC is alleging that the regionalized pattern of underpopulation Hispanic districts and overpopulation of Anglo districts in West Texas was done purposefully to ensure the dismembering of a Latino controlled district and to proportionally strengthen the representational power of Anglo panhandle counties. The fact that the Defendants can point to other districts that are over-populated or under-populated is simply not relevant to the analysis in West Texas and does not establish the arbitrariness of MALC's claim. Indeed, the fact that deviations exist in other areas is nothing more than a recognition that perfectly ideal districts are unlikely and that there can be presumptively permissible deviations. But here, as in *Larios*, there is evidence that racial and regional biases played an outsized and impermissible role in the deviations beyond the ideal, which is why the MALC claim is focused on this localized area. And if the under-population or over-population was both systemic within the region and done with an improper purpose (e.g., racial motivations or regional biases), a *Larios* claim might exist in those areas. But the existence of other areas of the map with deviations

9

is not relevant to whether MALC has stated a claim in *Larios* for the districts challenged in West Texas. Again, as the *Perez* 3-Judge Panel noted, "if a plaintiff characterizes his one person, one vote claim as a challenge to a specific piece within an entire plan with an overall deviation of less than 10%, the geographic nature of that claim is limited to that specific piece of the plan." 250 F. Supp 3d at 195. That is precisely what MALC has done here and the pleadings are sufficient to withstand a *Twombly* plausibility challenge.

Defendants finally point to the statewide population deviation map and argue that the deviations were based on permissible justifications – namely, relative disparities in population growth rates during the last Census cycle. *See* Motion at 11-12. Besides going beyond MALC's pleadings to make this argument, the Defendants are impermissibly raising a factual defense – *e.g.,* the Texas Legislature was justified in drawing the map in its configuration because of population trends – to MALC's claims at the Rule 12(b)(6) pleadings stage. But this is the ultimate issue the Court should decide after a full factual record and trial on the matter and not on the pleadings. The familiar pleading standards of Rule 12(b)(6) require the Court to consider MALC's pleadings as true and draw all inferences *against* the Defendants at this stage. *See Allen v. Vertafore, Inc.*, 28 F.4th 613, 616 (5th Cir. 2022) ("In reviewing a motion to dismiss, we accept [] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff."). Defendants' invitation to the Court to make a factual ruling contrary to the pleadings in support of their ultimate defense is improper and should be rejected.

Finally, since the filing of the Second Amended Complaint, MALC has also developed expert opinion testimony and factual evidence further supporting the *Larios* claim. For example, Dr. J. Morgan Kousser opines that:

> More important, all 5 of the Hispanic majority districts are overpopulated – 3 of the 6 are over 4% overpopulated -- while all of the Hispanic minority districts are underpopulated – 6 of the 10 by over 4%. Unlike in the previous decade, Hispanics appear to be packed – indeed, over-packed – into a few districts, while every one

of the Anglo-majority districts is underpopulated. It is difficult to imagine a more clear-cut prima facie violation of the logic behind Larios – that the State had "arbitrarily and discriminatorily dilute[d] and debase[d] the weight of certain citizens' votes."

He supports his opinions with factual data from the 87th Legislative Third Special Session and the statistical data provided during the redistricting cycle, including comparing and contrasting specific alternative map proposals offered during the Special Session that show how intentional, conscious design can be inferred from the configuration of West Texas in Plan H2316.

MALC has also subsequently developed factual testimony that has elucidated the intent underlying the population deviations in the region and the exclusion of Latino legislators from the region from the mapmaking process. The pertinent transcripts are presently sealed due to the Court's order and protocol concerning the Representatives' assertion of legislative privilege. MALC will be seeking leave to unseal these transcripts consistent with the Court's orders, but obviously cannot attach or specifically quote the testimony in response to this Rule 12(b)(6) motion at this time.

MALC recognizes the Court should not generally consider these facts and opinions because the Defendants have challenged the claims under Rule 12(b)(6). *See Lone Star Fund V (U.S.), L.P. v. Barclays Bank ,PLC*, 594 F.3d 383, 387 (5th Cir. 2010) ("The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."). But the subsequent factual development that occurred since the pleading deadline in this case would enable MALC to amend the pleading and cure any defects the Defendants have raised. As a result, MALC could allege facts that further support an intentional malapportionment in West Texas if necessary and should be granted leave to replead. Alternatively, the Court should simply carry this motion until such time as summary judgment motions may be filed and permit MALC to respond with a factual record or deny the motions outright and let the parties proceed to trial.

**CONCLUSION**

In the final analysis, the Defendants simply make factual arguments based on contested issues of fact to argue that MALC has not stated a plausible claim under Rule 12(b)(6). But that type of argument, at its core, is improper at the pleadings stage. Naturally the Defendants disagree with the Plaintiffs' facts and the interpretation of those facts, but the Court must not do so at the pleadings stage. And taken the well-pleaded facts as true, as the Court must at this stage of the proceedings, requires the Court to dismiss the pleadings challenge because MALC has asserted plausible claims under Section 2 of the Voting Rights Act and for malapportionment.

Dated: July 25, 2022.

Respectfully submitted,

SOMMERMAN, MCCAFFITY,
QUESADA &GEISLER, L.L.P.

*/s/ Sean J. McCaffity*
_____
George (Tex) Quesada
State Bar No. 16427750
Email: quesada@textrial.com

Sean J. McCaffity
State Bar No. 24013122
Email: smccaffity@textrial.com

3811 Turtle Creek Boulevard, Suite 1400
Dallas, Texas  75219-4461
214/720-0720 (Telephone)
214/720-0184 (Facsimile)

-and-

Joaquin Gonzalez
Texas Bar No. 24109935
1055 Sutton Dr.
San Antonio, TX  78228
jgonzalez@malc.org

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Response to Motion to Consolidate was filed and served via CM/ECF electronic service on July 25, 2022 to all counsel of record.

*/s/ Sean J. McCaffity*
_____