IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), et al., <br><br>         Plaintiffs, <br><br>     v. <br><br> GREG ABBOTT, et al., <br><br>         Defendants. | Civil Action No. 3:21-cv-259 (DCG-JES-JVB) (consolidated cases) |

**UNITED STATES' OPPOSITION TO TEXAS'S MOTION TO DISMISS**

## Table of Contents

Introduction.................................................................................................................... 1

Procedural Background.................................................................................................. 1

Statutory Background .................................................................................................... 2

Legal Standard .............................................................................................................. 3

Argument ....................................................................................................................... 4

    I.      The United States Has Adequately Alleged that the 2021 Congressional Plan Has a Discriminatory Result in Harris County. ...................................... 4

        A.      The *Gingles* Preconditions Do Not Apply to Existing Opportunity Districts. ....... 5

        B.      Discriminatory Results Claims May Rely on the Latest U.S. Census Data. .......... 9

    II.     The United States Has Adequately Alleged that the 2021 House Plan Has a Discriminatory Result in South Texas. ...................................................... 12

        A.      The State Cannot Undermine the South Texas Claim with Allegations Concerning Future Elections................................................................ 13

        B.      Cohesion Allegations May Rest on only the Most Relevant Elections. ............... 14

        C.      The United States Need Not Offer Detailed Allegations Concerning Unchallenged Districts that Do Not Provide Minority Electoral Opportunities... 15

    III.    The United States Has Adequately Alleged that the 2021 House Plan Has a Discriminatory Result in El Paso County and West Texas........................................ 16

        A.      Reconsideration of this Court's Order Concerning the El Paso Claim Is Unwarranted............................................................................................ 17

        B.      The Amended Complaint Establishes the *Gingles* Preconditions in HD 81......... 18

Conclusion ................................................................................................................... 20

## Table of Authorities

**Cases**

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ................................................................. 3, 6, 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................. 3, 4, 19

*Austin v. Kroger Tex., L.P.*, 864 F.3d 326 (5th Cir. 2017) ......................................... 18

*Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, *modified and reh'g denied*,
    409 F.3d 653 (5th Cir. 2005) ................................................................................... 8

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ................................................................... 5

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 9

*Benavidez v. Irving ISD*, No. 3:13-cv-87, 2014 WL 4055366 (N.D. Tex. Aug. 15, 2014) ......... 10

*Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988) ........................................ 14

*Carter v. First Nat'l Collection Bureau*, 135 F. Supp. 3d 565 (S.D. Tex. 2015) ............. 8

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ...................................... 8

*Chisom v. Roemer*, 501 U.S. 380 (1991) ..................................................................... 2

*Cisneros v. Pasadena ISD*, No. 4:12-cv-2579, 2014 WL 1668500 (S.D. Tex. Apr. 25, 2014) .... 11

*Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496 (5th Cir. 1987) ............... 14

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) ............................................. 12

*Diebler v. SanMedica Int'l, LLC*, 488 F. Supp. 3d 169 (D.N.J. 2020) ............................. 8

*Fabela v. City of Farmers Branch¸* No. 3:10-cv-1425, 2012 WL 3135545
    (N.D. Tex. Aug. 2, 2012) ........................................................................................ 11

*Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207 (5th Cir. 1986) ................................. 18

*Funk v. Stryker Corp.*, 631 F.3d 777 (5th Cir. 2011) ................................................. 4, 9

*Gomez v. Toledo*, 446 U.S. 635 (1980) ...................................................................... 16

*Harding v. Cnty. of Dallas*, 336 F. Supp. 3d 677 (N.D. Tex. 2018),
    *aff'd*, 948 F.3d 302 (5th Cir. 2020) ...................................................................... 11

*Harding v. Cnty. of Dallas*, 948 F.3d 302 (5th Cir. 2020) ......................................... 6

*Harris v. Ariz. Independent Redistricting Comm'n*, 578 U.S. 253 (2016) ...................... 11

*Jeffers v. Clinton*, 730 F. Supp. 196 (E.D. Ark. 1989) (three-judge court),
    *aff'd*, 498 U.S. 1019 (1991) ................................................................................. 7

*Karcher v. Daggett*, 462 U.S. 725 (1983) ................................................................. 11

*Kumar v. Frisco ISD*, 476 F. Supp. 3d 439 (E.D. Tex. 2020) ...................................... 8, 11

*La Comb v. Growe*, 541 F. Supp. 145 (D. Minn.) (three-judge court),
    *aff'd sub nom. Orwoll v. LaComb*, 456 U.S. 966 (1982) ........................................... 7

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................ 6, 16

*LULAC v. Clements*, 999 F.2d 831 (5th Cir. 1993) (en banc) ...................................... 14, 20

*LULAC v. Perry*, 548 U.S. 399 (2006) ...................................................................... 3, 6, 8, 13

Magnolia Bar Ass'n, Inc. v. Lee, 994 F.2d 1143 (5th Cir. 1993) ................................... 14

*McMillan v. Escambia Cnty.*, 748 F.2d 1037 (Former 5th Cir. 1984) ............................ 20

*Meyers v. Textron, Inc.*, 540 F. App'x 408 (5th Cir. 2013) ........................................ 8

*Patiño v. City of Pasadena*, 230 F. Supp. 3d 667 (S.D. Tex. 2017) .............................. 11

*Perez v. Abbott*, 253 F. Supp. 3d 864 (W.D. Tex. 2017) (three-judge court) .................. 11

*Perez v. Abbott*, 274 F. Supp. 3d 624 (W.D. Tex. 2017) (three-judge court),
    *rev'd*, 138 S. Ct. 2305 (2018) .............................................................................. 10

*Perez v. Abbott*, No. 5:11-cv-360, 2017 WL 962686 (W.D. Tex. Mar. 10, 2017)
(three-judge court) ........................................................................................... 11
*Perez v. Pasadena ISD*, 958 F. Supp. 1196 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368
(5th Cir. 1999) .................................................................................................. 10
*Robinson v. Ardoin*, 37 F.4th 208 (5th Cir. 2022), *cert. granted*, No. 21-1596,
2022 WL 2312680 (U.S. June 28, 2022) ............................................................ 7
*Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686 (S.D. Tex. 2013),
*aff'd sub nom. Gonzalez v. Harris Cnty.*, 601 F. App'x 255 (5th Cir. 2015) ............ 11, 12
*Rogers v. Lodge*, 458 U.S. 613 (1982) ..................................................................... 10
*Scanlan v. Tex. A&M Univ.*, 343 F.3d 533 (5th Cir. 2003) ...................................... 4, 15
*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ............................................................. 2
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............................. 4
*Thornburg v. Gingles*, 478 U.S. 30 (1986) ....................................................... passim
*Tolleson v. Livingston*, No. 2:12-cv-201, 2014 WL 1386319 (S.D. Tex. Apr. 9, 2014) ............. 18
*Valdespino v. Alamo Heights ISD*, 168 F.3d 848 (5th Cir. 1999) ............................... 10
*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) .......................................... 2
*Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201 (5th Cir. 1989) ........... 20
*Westwego Citizens for Better Gov't v. City of Westwego*, 906 F.2d 1042 (5th Cir. 1990) ........... 10
*Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109 (5th Cir. 1991) ........... 14

**Statutes**
52 U.S.C. § 10301 ............................................................................................ 1, 2, 12
Tex. Educ. Code § 130.182 ...................................................................................... 7

**Secondary Sources**
Daniel R. Ortiz, *Cultural Compactness*, 105 Mich. L. Rev. First Impressions 48 (2006) ............ 7
U.S. Census Bureau, *A Compass to Understanding and Using American
Community Survey Data* (2009) ........................................................................ 10, 12
U.S. Census Bureau, *Citizen Voting Age Population by Race and Ethnicity* (2022) .................. 10

**Rules**
Fed. R. Civ. P. 26 .................................................................................................... 9
Fed. R. Civ. P. 54 .................................................................................................. 18

## INTRODUCTION

In 2021, Texas enacted redistricting plans that discriminate against minority voters, just as it had in every redistricting cycle since the 1970s.  This Court has already concluded that the United States has stated valid claims against Texas's Congressional and State House plans.  *See* MTD Order, ECF No. 307; Clarification, ECF No. 312.  Texas seeks dismissal of three claims in the United States' amended complaint—including one this Court already declined to dismiss— by injecting novel and unfounded requirements into the discriminatory results test and asserting unsupported contentions outside of the complaint.  Tex. Mot., ECF No. 397.  For example, Texas claims that, to challenge the Harris County Congressional configuration, the United States must allege facts establishing that the *Gingles* preconditions are met in existing opportunity districts.  Under *Gingles* and this Court's prior order, however, the United States need allege such facts only with respect to the challenged district.  To challenge the South Texas and El Paso/West Texas House configurations, the United States must allege polarized voting in the most probative elections but need not allege polarization in contests between Anglo candidates.  Texas's other arguments similarly fail, and so the State's motion to dismiss should be denied.

## PROCEDURAL BACKGROUND

The United States has alleged that Texas's 2021 Congressional Plan and 2021 House Plan violate Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.  Compl., *United States v. Texas*, No. 3:21-cv-299 (W.D. Tex. Dec. 6, 2021).  The State of Texas and Texas Secretary of State John Scott moved to dismiss, which this Court denied with respect to the United States' discriminatory intent claims against the Congressional plan and the United States' discriminatory results claim against the El Paso/West Texas House configuration.  MTD Order at 29, 50-52; Clarification Order, ECF No. 312.  The Court dismissed without prejudice the United

States' discriminatory results claims concerning Congressional District (CD) 23, the Harris County Congressional configuration, House District (HD) 118, and HD 31.  MTD Order at 60.

The United States' Amended Complaint (Amended Complaint) presents highly detailed allegations against the Congressional and State House plans.  Am. Compl., ECF No. 318.  In the Congressional plan, the United States challenges CD 23 in West Texas for its discriminatory purpose and discriminatory result, Am. Compl. ¶¶ 40-62; the Dallas-Fort Worth (DFW) configuration for its discriminatory purpose, Am. Compl. ¶¶ 63-86; and the Harris County configuration for its discriminatory result, Am. Compl. ¶¶ 87-108.  In the House plan, the United States challenges HD 118 in Bexar County, Am. Compl. ¶¶ 119-137; HD 31 in South Texas, Am. Compl. ¶¶ 138-155; and the El Paso/West Texas configuration, U.S. Am. Compl. ¶¶ 156-179, all for their discriminatory results.  Defendants have moved to dismiss the discriminatory results claims against the Harris County Congressional configuration and HD 31 in South Texas, and in essence, Defendants ask for reconsideration of the Court's decision not to dismiss the El Paso/West Texas House claim.  Tex. Mot., ECF No. 397.

## STATUTORY BACKGROUND

Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013).  While Section 2 encompasses claims based on discriminatory intent, a violation can "be established by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 394 n.21, 404 (1991); *see also, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc).  Section 2 prohibits vote dilution, such as the use of redistricting plans that "minimize or cancel out the voting strength of racial [minorities in] the voting population." *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) (internal citations and quotation marks omitted).

In *Gingles*, the Supreme Court set out three preconditions to a vote dilution claim. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2330-31 (2018).  "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50; *see also* MTD Order at 31 & n.20 (requiring that "the minority group must be able to constitute a majority by CVAP . . . in the proposed district" and must be "culturally compact").  "Second, the minority group must be able to show that it is politically cohesive." *Gingles*, 478 U.S. at 51; *see also* MTD Order at 33 (requiring this showing in a "proposed district").  "Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (internal citations omitted); *see also* MTD Order at 33 (requiring this showing in "the *challenged* districting").  If a plaintiff establishes all three preconditions, consideration proceeds to the totality of the circumstances analysis, which incorporates factors enumerated in the Senate Report that accompanied the 1982 Voting Rights Act Amendments (Senate Factors), as well as other relevant evidence.  *See Perez*, 138 S. Ct. at 2331; *Gingles*, 478 U.S. at 36-37 (quoting S. Rep. No. 97-417, at 28-29 (1982)); *see also, e.g.*, *LULAC v. Perry*, 548 U.S. 399, 425-26, 436-41 (2006); MTD Order at 31.  Ultimately, a plaintiff must prove that an "alternative to the districting decision at issue would . . . enhance the ability of minority voters to elect the candidates of their choice." *Perez*, 138 S. Ct. at 2332.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up); *see also Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th

Cir. 2003) (directing district courts to "accept all well-pleaded facts as true, viewing those facts most favorably to the plaintiff").  "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see also Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (permitting consideration of "publicly-available documents and transcripts").  The motion to dismiss must be denied so long as the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable."  *Iqbal*, 556 U.S. at 678.

## ARGUMENT

**I.     The United States Has Adequately Alleged that the 2021 Congressional Plan Has a Discriminatory Result in Harris County.**

The United States has adequately pled that the Harris County Congressional configuration violates Section 2.  The United States specifically challenges the creation of a new, majority Anglo Congressional District (CD) 38 in northwest Harris County, rather than a majority Latino CD 38 in southeast Harris County.  Am. Compl. ¶¶ 87-108.  As alleged in the Amended Complaint, using the most recent U.S. Census data, it is possible to draw an illustrative CD 38* that connects "growing Latino communities on the east and southeast side of Houston and along the Houston Ship Channel," yielding a 50.8% estimated Latino CVAP concentration and meeting the first *Gingles* precondition.  Am. Compl. ¶¶ 104-05.[1]  In contested statewide contests including Latino candidates between 2014 and 2020, over 80% of Latino voters in this illustrative CD 38* preferred the same candidates, meeting the second precondition.  In those

---

[1] The United States denotes districts in illustrative plans with an asterisk, *e.g.*, CD 38*.

same contests, less than 20% of Anglo voters in challenged districts overlapping with illustrative CD 38*—CD 2, CD 22, and CD 36—supported the Latino-preferred candidates in these contests, enabling them usually to defeat the minority's preferred candidate, meeting the third precondition.  Am. Compl. ¶¶ 101, 106-07.  The Amended Complaint also includes allegations addressing the Senate Factors.  Am. Compl. ¶¶ 103, 108, 180-93.  Finally, illustrative CD 38* would create a new minority electoral opportunity district without undermining the minority existing opportunity to elect in CD 29, reconfigured in part as illustrative CD 29*.  Am. Compl. ¶ 104 & n.5.  Therefore, the United States has stated a claim upon which relief can be granted.

A.     **The *Gingles* Preconditions Do Not Apply to Existing Opportunity Districts.**

Texas contends that the United States must also allege that the first and second *Gingles* preconditions are met with respect to the existing Latino opportunity district in Harris County, Tex. Mot. 3-4.  In so doing, Texas ignores that the Court has already clarified that the "preconditions are necessary to show that the *Gingles* theory describes *the proposed district*." MTD Order at 31 (emphasis added); *see also Bartlett v. Strickland*, 556 U.S. 1, 3 (2009) (plurality opinion) (explaining that a "party asserting § 2 liability must show . . . that the minority population in the potential election district is greater than 50 percent").  Section 2 does not require plaintiffs to plead facts establishing the preconditions in an existing opportunity district. Further, because the United States has not alleged that Anglos vote as a bloc to defeat Latino-preferred candidates in enacted CD 29, the third *Gingles* precondition, it makes little sense to require allegations of the first and second preconditions.  *See also Bartlett*, 556 U.S. at 14-15 (explaining that the first precondition establishes that "a wrong" can be remedied (quoting *Gingles*, 478 U.S. at 41)); *Gingles*, 478 U.S. at 51 (explaining that the second precondition proves that "an electoral structure thwarts distinctive minority group interests").

Even if Section 2 results claims required allegations establishing the first two *Gingles* preconditions with respect to adjusted configurations of existing opportunity districts—and they do not—the Amended Complaint meets these requirements. This Court already concluded that the United States' original complaint established the first precondition with respect to the Harris County claim. MTD Order at 47. The Amended Complaint specifically alleges that the Latino community in "Harris County is sufficiently large and geographically compact to constitute a majority in a second single-member district." Am. Compl. ¶ 104. The substantial Latino CVAP majority in enacted CD 29, the map of illustrative CD 29*, and the Latino CVAP concentrations in the enacted districts from which illustrative CD 29* draws population are enough to confirm that illustrative CD 29* retains its Latino CVAP majority. *See* MTD Order at 47 (addressing data from common geography); TMF MTD Order at 5, ECF No. 468 (same); Am. Compl. ¶¶ 93-98, tbl. 3, & fig. 10; Tex. Mot. 1 (CVAP); *see also, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." (cleaned up)).[2]

Contrary to the State's assertion, Tex. Mot. 4-5, illustrative CD 29* is also a reasonably compact district, situated entirely within Harris County. *See* Am. Compl. ¶ 104 & n.5, fig.10. The configuration is a far cry from the district deemed non-compact in *LULAC v. Perry*, which joined "Austin and Mexican-border communities," crossing "enormous geographical distance" to

---

[2] Similarly, though attempts to craft an opportunity district may have ripple effects, *see Perez*, 138 S. Ct. at 2332 (addressing circumstances where it is "not possible to [craft] more than one *performing* Latino district"); *cf. Harding v. Cnty. of Dallas*, 948 F.3d 302, 309 (5th Cir. 2020) (rejecting plan that would "lessen the potential for . . . voters to elect a second county commissioner"), the United States has alleged that eliminating vote dilution in southeast Harris County does not undermine the existing opportunity in CD 29. Am. Compl. ¶ 104 & n.5.

join areas with distinct cultures and needs.  548 U.S. at 435.  Many features of which the State complains—connecting the Greater Fifth Ward, the Second Ward, and Aldine—are retained elements of enacted CD 29.  *See* Am. Compl. figs. 9-10.  Adding adjacent "growing Latino communities" still within Harris County—in effect substituting Latino neighborhoods outside of Loop 610 to the west for those to the east, Am. Compl. ¶ 104 n.5, figs. 9-10—does not undermine cultural compactness.  *See Robinson v. Ardoin*, 37 F.4th 208, 218-19 (5th Cir. 2022) (affirming cultural compactness between two distinct regions on factors including shared media markets, sports teams, and economic interests), *cert. granted*, No. 21-1596, 2022 WL 2312680 (U.S. June 28, 2022).[3]  When compared to the last two decades of Harris County and DFW Congressional configurations, illustrative CD 29* is more compact than a number of those districts and is comparable to enacted CD 29.  *See* U.S. Compl. figs. 6-9; *see also Jeffers v. Clinton*, 730 F. Supp. 196, 207 (E.D. Ark. 1989) (three-judge court) (comparing illustrative map to "the present apportionment plan"), *aff'd*, 498 U.S. 1019 (1991).  Rather, illustrative CD 29* joins communities of interest.  *See* Am. Compl. ¶ 104 n.5; *see also, e.g.*, Tex. Educ. Code § 130.182(1) (joining Spring Branch ISD and Katy ISD with Houston ISD in a common community college district); Spring Branch Community Health Center, *Our Locations*, https://perma.cc824U-8L9Z (describing health provider for low-income residents of Spring Branch, West Houston, Katy, and nearby areas).  "In some cases members of a racial group [even] in different areas . . . share similar interests and therefore form a compact district if the

---

[3] *See also La Comb v. Growe*, 541 F. Supp. 145, 148 (D. Minn.) (three-judge court) (recognizing "the community of interests that metropolitan residents share"), *aff'd sub nom. Orwoll v. LaComb*, 456 U.S. 966 (1982); Daniel R. Ortiz, *Cultural Compactness*, 105 Mich. L. Rev. First Impressions 48, 50 (2006) ("[*LULAC v. Perry*] suggests that [cultural compactness] applies only across geographically compact subgroups that are themselves geographically dispersed, not within the overall dispersed group.").

areas are in reasonably close proximity." *LULAC v. Perry*, 548 U.S. at 435; *see also Kumar v. Frisco ISD*, 476 F. Supp. 3d 439, 494-97 (E.D. Tex. 2020) (finding an illustrative district that joined multiple "concentrations of minorities" to be compact).

Although Texas also argues that Latino voters in illustrative CD 29* are not cohesive, Tex. Mot. 4, the State's concession that enacted CD 29 is an opportunity district, Tex. Mot. 3, is fatal to the argument. The concession sets adequate Latino cohesion in enacted CD 29 as a baseline, and changes to that district to form illustrative CD 29* should not be presumed to undermine cohesion. Rather, the United States has alleged that "approximately 85% of Latino voters in Harris County voted for the same candidates" in contested statewide elections between Latino and Anglo candidates from 2014 to 2020. Am. Compl. ¶ 100; *cf.* MTD Order at 47 (drawing on overlap between different plans); TMF MTD Order at 5 (same).[4] Therefore, the United States' complaint sufficiently alleges Latino cohesion in illustrative CD 29*.

In addition, expert reports served before the instant motion, which this Court may also consider, reinforce the plausible allegation that Illustrative CD 29* does not undermine existing Latino majorities or electoral cohesion.[5] Illustrative CD 29* has a 50.7% Latino CVAP

---

[4] Although Latino cohesion is lower in enacted CD 2 and enacted CD 22, *see* Tex. Mot. 4, neither district overlaps with illustrative CD 29*. *See* Am. Compl. figs. 9-10.

[5] Particularly where expert reports predate the instant motion, this Court should "take into account documents . . . integral to the claim," *Meyers v. Textron, Inc.*, 540 F. App'x 408, 409 (5th Cir. 2013), including "sworn expert analysis," *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257-58, *modified and reh'g denied*, 409 F.3d 653 (5th Cir. 2005). *See also, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (permitting consideration of "documents plaintiffs had either in [their] possession or had knowledge of and upon which they relied in bringing suit" (internal quotation marks and citation omitted)); *Diebler v. SanMedica Int'l, LLC*, 488 F. Supp. 3d 169, 179 (D.N.J. 2020) (considering expert reports "[t]o the extent that these expert reports contain factual allegations rather than conclusory statements, opinions, or legal conclusions"); *Carter v. First Nat'l Collection Bureau*, 135 F. Supp. 3d 565, 574 (S.D. Tex. 2015) (relying on an "expert report [that] supports the plausibility of Plaintiff's contentions" in denying a motion to dismiss). There is no functional distinction between a sworn statement by

concentration, based on the most recent U.S. Census data.  *See* Corrected Report of Dr. John

Logan at 12-13 & tbl. 1 (May 20, 2022, corrected June 14, 2022) (Ex. 1).[6]  An additional map

demonstrates the overlap between the urban cores of enacted CD 29 and illustrative CD 29*, *see*

*id.* at 12 map 1C, and quantitative compactness scores illustrate that illustrative CD 29* is twice

as compact as the least compact district in the enacted plan and more compact than others as

well.  *Id.* at App. 10; Tex. Leg. Council, *Compactness Analysis: Plan C2193*,

https://perma.cc/MHK2-CEJT (providing comparable perimeter-to-area measurements).  Finally,

87% of Latino voters in Illustrative CD 29* preferred the same candidates in contested statewide

contests including Latino candidates between 2014 and 2020, establishing that that the Latino

community is highly cohesive.  Supplemental Report of Dr. Ryan Enos (June 14, 2022) (Ex. 2).

**B.      Discriminatory Results Claims May Rely on the Latest U.S. Census Data.**

The State separately argues that this Court must disregard the United States' specific

allegation that an additional majority-Latino Congressional District may be drawn in Harris

County with 50.8% Latino CVAP, Am. Compl. ¶ 105, because the allegation is based on 2016-

2020 American Community Survey (ACS) data rather than 2015-2019 data available during the

2021 redistricting process, Tex. Mot. 5-6, but this assertion has no basis in logic or precedent.[7]

_____

an expert witness made prior to a motion to dismiss, *see* Fed. R. Civ. P. 26(b)(2), and
"transcripts," which may be considered, *Funk*, 631 F.3d at 783.  Fundamentally, it makes little
sense under this Court's expedited scheduling order to require the United States to replead its
allegations with the materials in these reports converted into numbered paragraphs. *See, e.g.*,
*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (describing the purpose of a complaint as
providing "fair notice of what the . . . claim is and the grounds upon which it rests" (alteration in
original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957))).

[6] Remarkably, the State asserts that "an additional Latino-majority congressional district cannot
be created without eliminating the Latino majority in CD29."  Tex. Mot. 4.  Dr. Logan's report
establishes that this claim is untrue.

[7] The ACS is a nationwide survey conducted by the U.S. Census Bureau to provide reliable and
timely demographic, social, economic, and housing data.  U.S. Census Bureau, *A Compass to*

The results test requires a "practical evaluation of past and present reality," *Gingles*, 478 U.S. at 65 (quoting S. Rep. No. 97-417, at 30); it does not merely question whether a challenged district was discriminatory at its origin.  *Cf. Rogers v. Lodge*, 458 U.S. 613, 616 (1982) (addressing whether a method of election "racially neutral when adopted" was "being *maintained* for invidious purposes" (emphasis in original)).  Thus, liability turns on the "best available data before th[e] court," not the best available data before the legislature at enactment.  *Perez v. Pasadena ISD*, 958 F. Supp. 1196, 1228-29 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999); *see also Valdespino v. Alamo Heights ISD*, 168 F.3d 848, 853-55 (5th Cir. 1999).[8]  This is particularly the case with ACS citizenship data, which lags in time significantly behind the decennial census.  *See, e.g.*, *Benavidez v. Irving ISD*, No. 3:13-cv-87, 2014 WL 4055366, at *2, *15 (N.D. Tex. Aug. 15, 2014) (relying on "two sets of pooled five-year data—the 2007-2011 five year ACS data and the 2008-2012 five-year ACS data" not available during challenged 2012 redistricting); *see also Perez v. Abbott*, 274 F. Supp. 3d 624, 638 n.19 (W.D. Tex. 2017) (three-judge court) ("[E]vidence that best reflects the population at the time of redistricting should be considered to determine whether vote dilution resulted from the districting plans, regardless of whether the evidence or data was available to the Legislature at the time of redistricting."), *rev'd on other grounds*, 138 S. Ct. 2305 (2018).  As a result, courts typically apply the most recent

---

*Understanding and Using American Community Survey Data* iv (2009), https://perma.cc/EYS8-XLXU.  The annual ACS release includes five-year and one-year period estimates of citizen voting-age population, *see* U.S. Census Bureau, *Citizen Voting Age Population by Race and Ethnicity* (2022), https://perma.cc/T2D8-PQYP, in contrast to the point estimates of population and voting age population in the decennial census, *see A Compass to Understanding* at 3.

[8] This is a necessity in the quintessential Section 2 results claim: a vote dilution challenge to a longstanding at-large election scheme.  *See, e.g.*, *Westwego Citizens for Better Gov't v. City of Westwego*, 906 F.2d 1042, 1046 (5th Cir. 1990) (permitting consideration of current "[m]inority voting age population data" and "minority voter registration data").

available ACS data when addressing the first *Gingles* precondition.  *See, e.g.*, *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 732-33 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cnty.*, 601 F. App'x 255 (5th Cir. 2015); *Perez v. Abbott*, No. 5:11-cv-360, 2017 WL 962686, at *166 (W.D. Tex. Mar. 10, 2017) (three-judge court); *see also Perez v. Abbott*, 253 F. Supp. 3d 864, 920 (W.D. Tex. 2017) (three-judge court) ("[P]arties may use non-census data . . . to prove that the CVAP is sufficiently changed from . . . data used at redistricting.").[9]

Ignoring this binding precedent, Texas attempts to fix population statistics across the decade by shoehorning one-person, one-vote jurisprudence into a Section 2 results claim.  Tex. Mot. 5-6.  In any case, the analogy does not hold.  Malapportionment claims are constitutional and therefore rest in part on subjective considerations of lawmakers, *see, e.g.*, *Harris v. Ariz. Independent Redistricting Comm'n*, 578 U.S. 253, 259 (2016), whereas the Section 2 results test at issue here is principally based on current considerations, even including elections conducted after enactment under a challenged plan. *See, e.g.*, *Gingles*, 478 U.S. at 58-61.  Moreover, Congressional redistricting requires population equality, and the decennial Census is the only actual enumeration of population at the requisite level of detail, making it the "best population data available."  *Karcher v. Daggett*, 462 U.S. 725, 731-34 (1983).  In contrast, the first *Gingles* precondition may rely on ACS data released on an annual basis.  Moreover, the most accurate local data are five-year ACS estimates, which incorporate older data at the time of release.  *See*

---

[9] *See also, e.g.*, *Kumar*, 476 F. Supp. 3d at 478; *Harding v. Cnty. of Dallas*, 336 F. Supp. 3d 677, 689-90 (N.D. Tex. 2018), *aff'd*, 948 F.3d 302 (5th Cir. 2020); *Patiño v. City of Pasadena*, 230 F. Supp. 3d 667, 687 (S.D. Tex. 2017); *Cisneros v. Pasadena ISD*, No. 4:12-cv-2579, 2014 WL 1668500, at *5 (S.D. Tex. Apr. 25, 2014); *Fabela v. City of Farmers Branch¸* No. 3:10-cv-1425, 2012 WL 3135545, at *4 (N.D. Tex. Aug. 2, 2012).

*Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2562 (2019).[10]  Ultimately, no factfinder has

ever rejected the most recent, reliable data when assessing the first *Gingles* precondition.[11]

## II.      The United States Has Adequately Alleged that the 2021 House Plan Has a Discriminatory Result in South Texas.

The United States has also adequately pled that House District (HD) 31 in South Texas

violates Section 2 by unnecessarily eliminating a Latino electoral opportunity.  Am. Compl.

¶¶ 138-55.  Using the most recent U.S. Census data, it is possible to draw an illustrative HD 31*

that "combines rural South Texas counties into a compact district" with a Latino CVAP

concentration of 79.7%, meeting the first *Gingles* precondition.  Am. Compl. ¶¶ 151-52.  80% of

Latino voters in illustrative HD 31* preferred the same candidates in contested statewide

elections including Latino candidates between 2014 and 2020, meeting the second precondition.

Am. Compl. ¶ 153.  In those same contests, less than 10% of Anglo voters in enacted HD 31

supported the Latino-preferred candidates, enabling these higher turnout voters usually to defeat

the minority's preferred candidate and meeting the third precondition.  Am. Compl. ¶ 148.  The

Amended Complaint also sets out statewide and localized Senate Factor allegations, Am. Compl.

¶¶ 103, 155, 180-193, and illustrative HD 31* would create a new minority electoral opportunity

district, Am. Compl. ¶ 154.  Again, the United States has stated a claim.

---

[10] *See also A Compass to Understanding* at 3, 7-8, 11-2.

[11] Reliance on the most recent ACS data also will not require "constant redistricting."  Tex. Mot. 6 n.2 (quoting *LULAC v. Perry*, 548 U.S. at 421).  Section 2 only requires jurisdictions to draw minority opportunity districts where the *Gingles* preconditions are present and the current plan gives minority voters "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice," under the "totality of circumstances." 52 U.S.C. § 10301(b).  Here, Texas ignored proposals to craft a second opportunity district for Latino voters in Harris County, despite population growth, persistent findings of racial polarization, underrepresentation, and other Senate Factor evidence.  Am. Compl. ¶¶ 94, 102-03, 108, 181-93; *see also Rodriguez*, 964 F. Supp. 2d at 754-77 (polarization).

**A.    The State Cannot Undermine the South Texas Claim with Allegations Concerning Future Elections.**

The Voting Rights Act claim here addresses minority voters' opportunity to elect preferred candidates under a challenged redistricting plan, not the likely outcome of a single contest.  *See, e.g.*, *Gingles*, 478 U.S. at 57 ("[L]oss of political power through vote dilution is distinct from the mere inability to win a particular election." (citing *Whitcomb v. Chavis*, 403 U.S. 124, 153 (1971))).  Texas attempts to undermine the relevant allegations through prospective speculation regarding the upcoming 2022 election, which is both improper and unsupported.  The State cannot know whether the incumbent, Representative Ryan Guillen, will be the Latino candidate of choice next November merely because he was the candidate of choice prior to changing parties post-redistricting and running on a different party platform.  *See* Tex. Mot. 7-8; *see also, e.g.*, Tex. H.J., 87th Leg., Reg. Sess. 2721 (2021), https://perma.cc/L6KW-ZQJ5 (voting against ban on "critical race theory"); Tex. H.J., 82d Leg., Reg. Sess. 1039 (2011), https://perma.cc/EC6B-SBFJ (voting against photographic voter ID requirements).  The State also cannot know whether "Guillen is poised to be re-elected in the Fall" merely because he narrowly escaped a Republican primary run-off.  Tex. Mot. 7.  The United States has made sufficient allegations concerning facts that can be known to support its claim.[12]

---

[12] To the extent that Guillen is reelected as a Latino candidate of choice, the contest would occur under quintessential "special circumstances" that discount its relevance.  *Gingles*, 478 U.S. at 51. The reelection of a twenty-year incumbent who has switched parties, Am. Compl. ¶¶ 138, 141, 149, received new endorsements and massive contributions from prominent Anglo politicians, *see, e.g.*, TransparencyUSA, *Ryan Guillen*, https://perma.cc/89V4-WTRC (noting $137,400 in donations from Speaker Phelan), and deterred donations to his Democratic challenger, *see, e.g.*, TransparencyUSA, *Texas House of Representatives District 31*, https://perma.cc/H3SN-W2GZ (noting over $1,100,000 in campaign spending), says little about the "usual predictability" of the Latino community's opportunity to elect its preferred candidate in enacted House District 31. *See Gingles*, 478 U.S. at 51, 57 (including "the absence of an opponent" and "incumbency" as factors favoring a finding of special circumstances); *id.* at 76 (discounting an "election that occurred after the instant lawsuit had been filed"); *see also LULAC v. Perry*, 548 U.S. at 434

B.      **Cohesion Allegations May Rest on only the Most Relevant Elections.**

The State also contends that the United States has failed to plead the second *Gingles* precondition regarding HD 31, Tex. Mot. 8-9, despite detailed allegations concerning the most relevant elections.  The allegation of minority cohesion rests on elections in which Latino voters have the opportunity to vote for Latino candidates.  Am. Compl. ¶¶ 142, 147, 153.  Texas argues that the second precondition requires an examination of all elections to assess Latino political cohesion, Tex. Mot. 9, but that is not the law.  When assessing minority cohesion, "the most probative elections are generally those in which a minority candidate runs against a white candidate."  *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993).[13]  In fact, *Gingles* relied only on interracial contests to determine whether minority voters were cohesive. *See* 478 U.S. at 80-82.  To prove the second *Gingles* precondition, there is no need for the United States to rely upon cohesion in contests solely between Anglo candidates, let alone to prove cohesion in those contests as a separate matter, as the State suggests.  Tex. Mot. 9.

Nor does the fact that the 2022 general election in HD 31 will feature two Latino candidates change the legal framework.  Tex. Mot. 9.  And as a factual matter, analysis of "contests including Latino candidates," Am. Compl. ¶¶ 147, 153, is not perforce limited "to elections in which a Latino candidate runs against a non-Latino candidate."  Tex. Mot. 8.  It makes little sense to require analysis of races between non-Latino candidates to prove that Latino voters are cohesive in races between Latino candidates.  *See* Tex. Mot. 7-8.

_____

(noting that a reconfigured district "could make it more difficult for thinly financed Latino-preferred candidates to achieve electoral success and to provide adequate and responsive representation once elected" (internal citation and quotation marks omitted)).

[13] *See also, e.g.*, *LULAC v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993) (en banc); *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1119 n.15 (5th Cir. 1991); *Campos v. City of Baytown*, 840 F.2d 1240, 1245 (5th Cir. 1988); *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 503 (5th Cir. 1987).

**C.     The United States Need Not Offer Detailed Allegations Concerning Unchallenged Districts that Do Not Provide Minority Electoral Opportunities.**

The United States has alleged that enacted HD 43—another South Texas district east of HD 31—is not a Latino opportunity district in the enacted plan, and HD 43* continues not to be a Latino opportunity district in the United States' illustrative plan.  Am. Compl. ¶ 49 n.8.  The State argues that the United States makes an "assumption" to this effect, Tex. Mot. 9, but this fundamentally misunderstands the function of a motion to dismiss.  *See, e.g.*, *Scanlan*, 343 F.3d at 536 ("The district court can grant a motion to dismiss only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.").  Texas may attempt to prove that enacted HD 43 is a Latino opportunity district as a defense at trial, but it may not simply assert that to be the case here.  Moreover, it is far from implausible that enacted HD 43, in which Latino voters make up less than 50% of voters who cast ballots even in high-turnout elections, does not provide Latino voters with the opportunity to elect their preferred candidates.  *See* Tex. Leg. Council, *Hispanic Population Profile: Plan H2316*, https://perma.cc/E5BA-BT3E (46.9% Spanish Surname Turnout in November 2020).  This is particularly true given the extreme level of Anglo bloc voting in South Texas, including in the portion of enacted HD 43 moved into illustrative HD 31*.  *See* Am. Compl. ¶¶ 148, 154.

In fact, an expert report served long before the instant motion to dismiss confirms that enacted HD 43 is not a Latino opportunity district.  *See* Report of Dr. Ryan Enos ¶ 44 (May 20, 2022) (Ex. 3).  Although more than 80% of Latino voters in enacted HD 43 preferred the same candidates in contested statewide elections, including Latino candidates between 2014 and 2020, less than 10% of Anglo voters supported the Latino-preferred candidates in these contests.  *See id.* at 32 tbl. A9.  As a result, the Latino-preferred candidate was defeated within the district in each such election.  *See id.*at 19 tbl. 4.  Moreover, in HD 43 prior to the 2021 redistricting—

which consisted of four of the six counties that make up enacted HD 43—incumbent

Representative J.M. Lozano was not the Latino candidate of choice in any contested elections

between 2014 and 2020.  *See id.* at 32 tbl. A9; *see also* Tex. Leg. Council, *Plan H2316*

*Comparison to Plan H2100*, https://perma.cc/S56D-JG75 (illustrating overlap).  Rather, Lozano

won his elections on nearly uniform support among Anglo voters.  *See* Enos Rep. at 32 tbl. A9.[14]

 In sum, changes to HD 43 that restore Latino electoral opportunity in HD 31 do not

eliminate an existing Latino electoral opportunity.  *Cf. Perez*, 138 S. Ct. at 2332.  Once again,

"[a]t the pleading stage, general factual allegations of injury" are sufficient insofar as they may

"embrace . . . specific facts," *Lujan*, 504 U.S. at 561 (cleaned up), and plaintiffs need not allege

facts to rebut potential defenses, *see, e.g.*, *Gomez v. Toledo*, 446 U.S. 635, 640-41 (1980).

### III. The United States Has Adequately Alleged that the 2021 House Plan Has a Discriminatory Result in El Paso County and West Texas.

 The United States has adequately pled that the El Paso and West Texas House

configuration violates Section 2.  *See* MTD Opinion at 50-52.  The United States specifically

challenges the removal of a Latino opportunity district from El Paso County and West Texas,

which the State achieved by packing and overpopulating the remaining opportunity districts and

underpopulating Anglo-controlled seats across West Texas.  Am. Compl. ¶¶ 156-79.  Using the

most recent U.S. Census data, it is possible to draw six illustrative Latino opportunity districts in

West Texas with Latino CVAP concentrations above 70%.  *See* Am. Compl. ¶ 176 (illustrative

HDs 74*, 75*, 77*, 78*, 79* and 81*).  Illustrative HDs 75*, 77*, 78*, and 79* are entirely

---

[14] The State incorrectly asserts that Lozano "has represented HD 43 since 2012."  Tex. Mot. 9.
Lozano was first elected in 2010, as a Democrat.  *See* Tex. Sec'y of State, *Race Summary Report: 2010 General Election*, https://perma.cc/7VRZ-5P3H.  Much like Guillen, Lozano changed parties after his district was reconfigured northward, adding high-turnout Anglo voters. *See, e.g.*, Melissa del Bosque, *Portrait of a Party-Switcher*, Tex. Observer, May 14, 2012, https://perma.cc/75KQ-Y4P3.

within El Paso County.  Am. Compl. ¶ 174 & fig. 22.  Illustrative HD 74* retains most of its

border counties, while regaining Pecos County and adding neighboring Latino communities in

and around Odessa.  Am. Compl. ¶ 174, figs. 17, 21.  Finally, illustrative HD 81* includes

portions of El Paso County and rural counties to the east along the Texas/New Mexico border.

Am. Compl. ¶ 175, figs. 21-22.  Thus, these reasonably compact districts meet the first *Gingles*

precondition.  Moreover, over 70% of Latino voters in each illustrative district preferred the

same candidates in contested statewide contests including Latino candidates between 2014 and

2020, meeting the second precondition.  Am. Compl. 177 & n.10.  However, in these same

contests, less than 10% of Anglo voters in enacted HD 81 supported the Latino-preferred

candidates, meeting the third precondition.  Am. Compl. ¶ 172.[15]  The Amended Complaint also

sets out additional statewide and localized Senate Factor allegations, Am. Compl. ¶¶ 179, 180-

193, and the illustrative configuration would restore six Latino opportunity districts to the region.

Am. Compl. ¶ 178.  Therefore, the United States has stated a claim.[16]

## A.  Reconsideration of this Court's Order Concerning the El Paso Claim Is Unwarranted.

This Court has already concluded that the United States has stated a Section 2 claim

concerning the El Paso/West Texas House configuration.  MTD Order at 50-52.  In effect, the

State's challenge to the more detailed allegations in the Amended Complaint, Tex. Mot. 10-14,

requests reconsideration of that decision, given the consistent core allegations.  *Compare* Compl.

¶¶ 131-46, *with* Am. Compl. ¶¶ 156-79.  The United States has not "amend[ed] its theory,

---

[15] Enacted HD 81 overlaps significantly with illustrative HD 81*.  Relevant candidates of choice are those preferred by cohesive minority voters in illustrative HD 81*.  *See* MTD Order at 32-33.

[16] The United States does not assert a *Larios* claim.  Tex. Mot. 13-14.  Rather, overpopulation of minority opportunity districts and underpopulation of Anglo-controlled districts is the mechanism by which Texas diluted minority voting strength.  Am. Compl. ¶¶ 156, 164-65.

alleging that House District 81 . . . denies Latinos the opportunity to elect their candidates of choice." Tex. Mot. 10.  The United States alleged the same in its original complaint.  *See* Compl. ¶ 145 ("Latino voters . . . in Districts 53 and 81 . . . will not be able to elect their preferred candidates."); *see also* MTD Order at 52 ("So the United States' *Gingles* claim really pertains to Hispanic voters in the West Texas counties in HDs 53 and 81 that border HD 74.").

Reconsideration is unwarranted here.[17]  The discretion to grant reconsideration should "be exercised sparingly in order to forestall the perpetual reexamination of orders and the resulting burdens and delays."  *Tolleson v. Livingston*, No. 2:12-cv-201, 2014 WL 1386319, at *2 (S.D. Tex. Apr. 9, 2014).  A request for reconsideration should not be employed "to relitigate old issues, to advance new theories, or to secure a rehearing on the merits."  *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1219 (5th Cir. 1986).  By raising new arguments not addressed in its initial motion concerning cultural compactness, minority cohesion, and Anglo bloc voting, the State lodges a second attack on allegations already deemed sufficient.  *Compare* 1st Tex. Mot. 22-24, ECF No. 111, *with* Tex. Mot. 10-14.  It is within this Court's discretion to deny the motion with respect to the El Paso and West Texas House districts on these grounds alone.

**B.    The Amended Complaint Establishes the *Gingles* Preconditions in HD 81.**

In its second motion to dismiss, Texas seeks to undermine allegations concerning the *Gingles* preconditions in HD 81, but the Amended Complaint, reasonable inferences, and other materials on which this Court may rely all firmly establish the prerequisites to Section 2 liability.

---

[17] Federal Rule of Civil Procedure 54(b) governs a motion for reconsideration of an interlocutory order.  *See Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017).  Rule 54(b) provides that "any order or other decision . . . that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment."  Fed. R. Civ. P. 54(b).  Whether to grant reconsideration under Rule 54(b) is "committed to the discretion of the District Court."  *Austin*, 864 F.3d at 337 (internal quotation marks and citation omitted).

Illustrative HD 81* is a reasonably compact district that combines portions of northeast El Paso County, Hudspeth County, Culberson County, and Reeves County, as in enacted HD 74, before continuing east to additional rural areas "with shared economic interests, including in the oil and gas industry." Am. Compl. ¶¶ 174-75, figs. 19-22. The State asserts that the portion of El Paso County within illustrative HD 81* "suggests that the United States added the sliver in El Paso for the sole purpose of picking up Hispanic voters." Tex. Mot. 10. This is incorrect. First, El Paso County provides more than half of HD 81*'s population, not a few scattered voters.[18] Second, the configuration in the El Paso portion of illustrative HD 81* prevents the pairing of an incumbent living near the intersection of I-10 and Loop 375. *See* Logan Rep. ¶ 23. Making sure incumbents were not paired has been listed as a redistricting priority for the State, but the enacted House plan paired returning Latina incumbents in El Paso County. *See* Am. Compl. ¶ 156. It is also not necessary to plead the location of "a major refinery" or the share of residents in a "small portion" of the district who work in a common industry, Tex. Mot. 10-12, to establish that residents of El Paso County and nearby counties are culturally compact. *See, e.g.*, *Iqbal*, 556 U.S. at 678 (cautioning against requiring "detailed factual allegations").

For the reasons already discussed, this Court should also reject the State's contention that allegations concerning "contests including Latino candidates" are insufficient to establish minority cohesion or Anglo bloc voting. Tex. Mot. 12; *see also* Section II.B, *supra*. The State

---

[18] Enacted HD 74 also includes a portion of El Paso County, including portions of the City of El Paso, *see* Am. Compl. fig. 20, but because the United States' illustrative plan does not uniformly overpopulate the four districts wholly within El Paso County, illustrative HD 81* includes substantially more of El Paso County than enacted HD 74 does. Specifically, illustrative HD 81* includes 117,446 El Paso County residents, *see* Logan Rep. tbl. 3 (HD 81* and other districts wholly within El Paso County); U.S. Census Bureau, *QuickFacts: El Paso County, Texas*, https://perma.cc/8E9P-RTTZ (total population), whereas enacted HD 74 contains only 56,066 El Paso County residents, *see* Tex. Leg. Council, *District Population Analysis with County Subtotals: Plan H2316*, at 12, https://perma.cc/LX93-FW29.

provides no support for the notion that plaintiffs must analyze contests solely between Anglo candidates. While such contests may be considered, they are not a necessary component of a Section 2 claim. *See, e.g.*, *LULAC v. Clements*, 999 F.2d at 864.

Finally, the infrequency of minority candidates in the former and enacted configurations of HD 81 does not undercut the United States' allegation that the Latino preferred candidate will usually be defeated by Anglo bloc voting. Tex. Mot. 12-14. If anything, it is evidence that Latino voters lack the opportunity to elect their candidates of choice. In 2018, the minority candidate who ran in former HD 81 was defeated despite cohesive Latino support. Am. Compl. ¶ 170.[19] Sophisticated candidates are unlikely to run again after such a defeat. *See, e.g.*, *McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1045 (Former 5th Cir. 1984) ("[T]he lack of black candidates is a likely result of a racially discriminatory system."); *see also Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1207-10 (5th Cir. 1989) (holding that plaintiffs could prove a Section 2 violation even when "there have been no black candidates"). And it cannot be that the absence of a Latino challenger only in 2022 forecloses a vote dilution claim, as the State suggests. *See, e.g.*, *Gingles*, 478 U.S. at 57 n.25 ("Where a minority group has never been able to sponsor a candidate, courts must rely on other factors that tend to prove unequal access to the electoral process.").[20]

## CONCLUSION

For the foregoing reasons, Texas's motion to dismiss should be denied.

---

[19] That highly probative contest cannot be excluded as occurring under "special circumstances." Tex. Mot. 13. Under *Gingles*, special circumstances occur in contests where minority candidates succeed based on "running unopposed," "incumbency," or "lack of opposition," not those where they are defeated due to Anglo bloc voting. 478 U.S. at 51, 54, 57.

[20] Nor should this Court apply a heightened burden to prove polarization in this district, where Latino voters make up only 43.7% of registered voters and only 36.5% of voters who cast ballots in November 2020. *See Hispanic Population Profile: Plan H2316*, *supra*.

Date:  July 25, 2022

JOHNATHAN SMITH
Acting Principal Deputy Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Acting Deputy Assistant Attorney General
Civil Rights Division

*/s/ Daniel J. Freeman*
T. CHRISTIAN HERREN, JR.
TIMOTHY F. MELLETT
DANIEL J. FREEMAN
JANIE ALLISON (JAYE) SITTON
MICHELLE RUPP
JACKI L. ANDERSON
JASMIN LOTT
HOLLY F.B. BERLIN
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
(800) 253-3931
daniel.freeman@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2022, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

*/s/ Daniel J. Freeman*
Daniel J. Freeman
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530
(202) 305-4355
daniel.freeman@usdoj.gov