# Exhibit B

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | § § § | |
| *Plaintiffs,* | § | Case No. 3:21-cv-00259 |
| V. | § | [Lead Case] |
| GREG ABBOTT, *et al.,* | § § § | |
| *Defendants.* | § § | |
| TEXAS STATE CONFERENCE OF THE NAACP, | § § § | |
| *Plaintiff,* | § § | Case No. 1:21-cv-01006 |
| V. | § § | [Consolidated Case] |
| GREG ABBOTT, *et al.,* | § § § | |
| *Defendants.* | § § | |

**~~FIRST~~ SECOND AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff TEXAS STATE CONFERENCE OF THE NAACP, acting by and through their

counsel, files this Complaint for Declaratory and Injunctive Relief against Defendants

GOVERNOR GREG ABBOTT and SECRETARY OF STATE JOHN SCOTT, and allege as

follows:

**INTRODUCTION**

1.      The 87th Texas legislature passed statewide redistricting maps for the state house,

the state senate, and the U.S. Congress that are based on the unconstitutional and unlawful use of

race. On the one hand, manipulation of populations based on race predominated in crucial

districting decisions, diluting the voting rights of Black voters and other voters of color. On the other hand, the legislature and its line drawers not only completely ignored the astounding growth of communities of color in failing to create additional majority-minority districts, but actually reduced the number of majority-minority districts in the state. The maps are an affront to Texas's voters of color. This Court should throw out these three plans and order a redrawing of the plans so as to restore the voting strength legally due to Black voters and other voters of color in Texas.

2.      According to the 2020 census, Texas gained the most residents of any state in the country since 2010, and 95% of that growth came from communities of color. Despite the well-documented undercounting of racial and ethnic minorities in the 2020 Census, Texas's 3,999,944 new residents were almost all Black, Hispanic, and Asian.

3.      Had the map drawers and the legislature even attempted to draw districts that accurately reflect Texas's population without the improper consideration of race, opportunities for people of color to elect candidates of their choice would have necessarily increased. But even though the growth of communities of color throughout the state has resulted in numerous areas where majority-minority districts could be created, the new redistricting maps fail to create additional districts in which voters of color have the opportunity to elect candidates of choice. Adding insult to injury, the legislature's maps actually *decrease* the number of majority-minority districts in all three of the plans.

4.      These maps ensure that, contrary to what should occur given their dwindling population, Anglo[1] voters will maintain control of the state legislature and the congressional delegation for the foreseeable future, at the expense of providing voters of color an opportunity to elect candidates of their preference.

---

[1] Plaintiff uses "Anglo" and "white' interchangeably throughout the complaint. Plaintiff uses "Hispanic" and "Latino" interchangeably throughout the complaint.

5.     To accomplish this, the map drawers used similar tactics on all three maps. First, they unconstitutionally manipulated populations based on race in many districts, moving populations of color in and out of key districts. Second, they unlawfully diluted the voting strength of Black voters and other voters of color in many districts. And, finally, they abdicated their legal responsibility to create appropriate majority-minority coalition districts where necessary to give voters of color an opportunity to elect candidates of their choice.

6.     These illegal techniques in redistricting are not new. In fact, in the last five redistricting cycles, federal courts have invalidated state-drawn state house, state senate, and congressional districts that disadvantaged Black people and other people of color by impermissibly drawing district lines based on race.

7.     That Texas's unconstitutional racial gerrymander and unlawful dilution of votes of persons of color may promise to maintain the majority Anglo voter favored political party in power is scarcely an excuse. Rather it is itself the stuff that subjects these maps to strict scrutiny and to remedies under the Voting Rights Act. It is well documented that Black, Hispanic, and Asian voters often vote cohesively in the state to elect preferred candidates of choice, and that Anglo voters in Texas vote as a bloc so as to usually prevent voters of color from electing candidates of their choice. That the map drawers recognized this fact, and used it to their benefit by manipulating populations of Black voters and other voters of color in and out of districts to make otherwise competitive districts safe for Anglo voters is simply unconstitutional. Manipulating populations by race and diluting the votes of persons of color with the goal of maintaining political power are no more lawful when Republicans do it in Texas today than it was when Democrats did it decades ago.

8.     Moreover, the legislature and map drawers' actions were intentional, occurring in

an atmosphere that was racially charged. These three plans were enacted during a legislative period that was undeniably hostile to Black people and other persons of color. Just this year, the 87th legislature enacted laws that removed the state's requirement that students be taught about slavery and white supremacy as morally wrong; eliminated voting options that were successfully employed in the counties and cities in Texas that have especially high populations of people of color, resulting in high voter turnout and voters of color electing their candidates of choice; and provided a clear path for the intimidation of voters by partisan poll watchers, which has been a technique repeatedly used against voters of color in Texas over several decades.

9.      From rushing the bills through a dubious legislative process by which the three plans were passed, to map-drawing maneuvers that included strategically carving up Black voters and other voters of color from existing and performing majority-minority districts and dispersing them into Anglo majority districts in rural and/or suburban counties where they will no longer have the ability to elect the candidates of their choice, to packing Black voters and other voters of color into districts with high minority populations (in some instances higher than twice the population of that required to elect candidates of their choice), legislators could have had only one motive for passing such facially unconstitutional plans: the desire to limit the voting strength of voters of color statewide.

10.     As further alleged in detail below, Plaintiff Texas State Conference of the NAACP respectfully seeks a declaratory judgment that the redistricting plans for the state senate (S2168), state house (H2316), and Congress (C2193) are racial gerrymanders in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution; that these redistricting plans dilute the voting strength of voters of color and deny them the opportunity to elect preferred candidates of their choice in violation of Section 2 of the Voting Rights Act of 1965; and that these

redistricting plans were drawn by legislators and adopted by the Governor for the express purpose of impermissibly discriminating against voters of color in violation of the Fourteenth Amendment to the United States Constitution and the intent prong of Section 2 of the Voting Rights Act.

11.   Plaintiff seeks a permanent injunction that prohibits Defendants from calling, holding, supervising, or certifying any election under these plans and further requests the creation of revised redistricting plans that do not infringe upon the constitutional rights of Texans of color by diluting their voting strength.

## JURISDICTION AND VENUE

12.   Jurisdiction is appropriate under 28 U.S.C. § 1331. Plaintiff's claims arise "under the Constitution, laws, or treaties of the United States," including the Fourteenth and Fifteenth Amendments to the United States Constitution, 52 U.S.C. §§ 103101 and 1304, 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.

13.   Jurisdiction is also appropriate under 28 U.S.C. § 1343 because Plaintiff seeks to "redress deprivation" of a "privilege or immunity secured by the Constitution of the United States" and seek "equitable relief . . . under [an] Act of Congress providing for the protection of civil rights, including the right to vote."

14.   Venue in this Court is appropriate under 28 U.S.C. § 1391(b) because Plaintiff's members' voting rights are being infringed upon in this District and in this county.

## REQUEST FOR THREE-JUDGE PANEL

15.   Because this action challenges the constitutionality of the apportionment of a statewide legislative body, as well as the apportionment of a state's congressional delegation, Plaintiff requests the convening of a three-judge panel pursuant to 28 U.S.C. § 2284.

## PARTIES

16.     Plaintiff **TEXAS STATE CONFERENCE OF THE NAACP** ("Texas NAACP") is a subsidiary organization of the National Association for the Advancement of Colored People, Inc. ("NAACP"), a national non-profit, non-partisan organization founded in 1909, which has more than 2,200 units across the nation and is powered by more than two million activists. The NAACP works to ensure the political, educational, social, and economic equality of all persons and to eliminate racial hatred and racial discrimination, including by removing all barriers of racial discrimination through democratic processes.

17.     The Texas NAACP is the oldest and one of the largest and most significant organizations promoting and protecting the civil rights of Texans of color, including Black Texans—who have been its primary focus—as well as Hispanic and Asian Texans. The first Texas branches of the NAACP were formed in 1915, and the Texas State Conference was formally organized in 1937. Since then, the Texas NAACP has used litigation, policy advocacy, community organizing, and public education to ensure the political equality of all Texans. To achieve its mission, the Texas NAACP engages in voter education, registration, mobilization, and other civic engagement activities.

18.     The Texas NAACP is headquartered in Austin and has more than 100 local branch units, college chapters, and youth councils across the State, with members in many counties throughout Texas. A large portion of the Organization's more than 10,000 members are residents registered to vote in Texas. The Texas NAACP's membership consists largely of Black people and other people of color. A large segment of Texas NAACP's membership lives in this federal court district.

19.     The Texas NAACP has a history of advocating for majority-minority coalition districts with Black, Hispanic, and Asian voters. In the last two decades, the Texas NAACP

engaged in litigation challenging statewide plans. In 2011, the organization advocated for the creation of majority-minority coalition districts in Travis and Bell Counties, the creation of Black opportunity districts in the Dallas-Fort Worth metroplex, and the protection of existing performing Black districts in the Dallas-Fort Worth metroplex. In 2013, the organization successfully advocated for a new configuration of CD 9 in Harris and Fort Bend Counties.

20.    This cycle, the Texas NAACP provided public testimony on the three challenged maps and engaged with legislators and members of the public during the committee hearings held on the plans. Texas NAACP developed questions to ask legislators at hearings about their rationales behind the enactment of different districts in the draft maps. To prepare its constituents for the redistricting cycle, the organization also conducted education and advocacy around the redistricting process in Texas, including preparing trainings to share information on redistricting principles and communities of interest. Texas NAACP encouraged its members to testify and held workshops to train members on how to provide public testimony.

21.    Texas NAACP will have to commit significant time and resources to combatting the effects of these new maps on communities of color throughout the state. By allocating time and resources to these priorities, Texas NAACP will be unable to commit to other programs that are core to its mission.

22.    Texas NAACP brings this action on behalf of its members, including the thousands of Texas NAACP members who are registered voters who reside in state house, state senate, and congressional districts where their voting power will be reduced under the new plans.

23.    **TX NAACP Member A**[2] is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted

---

[2] The names of the members are provided to the Court in Exhibit A, filed with the Court under seal.

CD 2 and SD 15. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member A was in CD 2 and SD 15. TX NAACP Member A identifies as Black.

24.     TX NAACP Member A's residence is in the newly enacted CD 2. They are a registered voter in CD 2. They plan to vote in future elections in CD 2. As enacted under the State's plan C2193, the boundaries of CD 2 result in the packing of voters of color into neighboring CD 29. The enacted boundaries of CD 2 injure TX NAACP Member A by diluting their vote because CD 2's voting population of color was reduced from approximately 46% prior to the redistricting to approximately 35% under the State's enacted plan, thereby maintaining control for Anglo voters' preferences.

25.     CDs 2, 7, 9, 14, 18, 22, 29, and 38 form an 8-district cluster comprising Harris and Fort Bend Counties. After the redistricting, the minority coalition percentage in CD 2 was significantly reduced, and as a result TX NAACP Member A's voting power in the enacted CD 2 has been diluted. Under a proposed alternative drawing of the State's enacted CD 2, the new proposed district (proposed CD 2) would be 27.07% BCVAP, 27.54% HCVAP, and 2.22% ACVAP. The proposed alternative CD 2, similar to the State's enacted CD 2, would be located in the northwest portion of Harris County. But under this new alternative configuration of proposed CD 2, TX NAACP Member A's vote would not be diluted, and they would have a reasonable opportunity to elect their candidate of choice. Under another proposed alternative plan, a district could be drawn that is 23.77% BCVAP, 18.87%% HCVAP, and 19.06% ACVAP. Were TX NAACP Member A to be placed in this second alternative district, their vote would not be diluted, and they would have a reasonable opportunity to elect their candidate of choice. In addition, at least four other configurations of alternative and highly effective districts could be drawn in this congressional cluster, and placing TX NAACP Member A in any one of these alternatives would

afford TX NAACP Member A a reasonable opportunity to elect their preferred candidate of choice.

26.     TX NAACP Member A's residence is also in the newly enacted SD 15. They are a registered voter in SD 15. They plan to vote in future elections in SD 15. As enacted under the State's plan S2168, SD 15 is a non-compact district that wraps like a horse shoe around SD 6, cracking voters of color in the city of Houston between SD 6 and SD 15. The district carefully splits population so that Hispanic voters are kept out of SD 15 and pushed into SD 6, where they are packed with 82% voters of color. The newly drawn SD 15 injures TX NAACP Member A with its exceedingly race-conscious lines that divide voters of color in and around Houston.

27.     **TX NAACP Member B** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted CD 2 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member B was in CD 2. TX NAACP Member B identifies as Black.

28.     TX NAACP Member B's residence is in the newly enacted CD 2. They are a registered voter in CD 2. They plan to vote in future elections in CD 2. As enacted under the State's plan C2193, the boundaries of CD 2 result in the packing of voters of color into neighboring CD 29. The enacted boundaries of CD 2 injure TX NAACP Member B by diluting their vote because CD 2's minority coalition population was reduced from approximately 46% prior to the redistricting to approximately 35% under the State's enacted plan, thereby maintaining control for Anglo voters' preferences.

29.     CDs 2, 7, 9, 14, 18, 22, 29, and 38 form an 8-district cluster comprising Harris and Fort Bend Counties. After the redistricting, the minority coalition percentage in CD 2 was significantly reduced, and as a result TX NAACP Member B's voting power in the enacted CD 2 has been diluted. Under a proposed alternative drawing of the State's enacted CD 2, the new

proposed district (proposed CD 2) would be 27.07% BCVAP, 27.54% HCVAP, and 2.22% ACVAP. The proposed alternative CD 2, similar to the State's enacted CD 2, would be located in the northwest portion of Harris County. But under this new alternative configuration of proposed CD 2, TX NAACP Member B's vote would not be diluted, and they would have a reasonable opportunity to elect their candidate of choice. Under another proposed alternative plan, a district could be drawn that is 23.77% BCVAP, 18.87%% HCVAP, and 19.06% ACVAP. Were TX NAACP Member B to be placed in this second alternative district, their vote would not be diluted, and they would have a reasonable opportunity to elect their candidate of choice. In addition, at least four other configurations of alternative and highly effective districts could be drawn in this congressional cluster, and placing TX NAACP Member B in any one of these alternatives would afford TX NAACP Member B a reasonable opportunity to elect their preferred candidate of choice.

30.      **TX NAACP Member C** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted CD 6 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member C was in CD 33. TX NAACP Member C identifies as Black.

31.      TX NAACP Member C's residence is in the newly enacted CD 6. They are a registered voter in CD 6. They plan to vote in future elections in CD 6. As enacted under the State's plan C2193, the newly drawn CD 6 injures TX NAACP Member C by cracking voters of color in southeast Tarrant and northwest Dallas County across multiple districts, conspicuously excluding precincts with a high Black population and leaving CD 6 with just 14% Black population, down from 21% under the previous decade's plan.

32.      CDs 6, 12, 24, 25, 30, 32, and 33 form a 7-district cluster around Dallas and Tarrant Counties. By being placed in CD 6 under the State's enacted plan, TX NAACP Member C is

among the voters of color whose votes have been diluted because they were placed in a predominantly Anglo district. TX NAACP Member C lives in a census block that can be added to an alternative majority-minority coalition district (proposed CD 12) that would be 20.64% BCVAP, 40.02% HCVAP, and 5.23% ACVAP. The proposed alternative CD 12 would now be located in the central west portion of Dallas County. Were TX NAACP Member C to be placed in this alternative majority-minority coalition district, their vote would not be diluted, and they would have a reasonable opportunity to elect their candidate of choice. In addition, at least four alternative and highly effective districts could be drawn in this congressional cluster each with a minority-coalition CVAP above 53% and below 70%, and placing TX NAACP Member C in any one of these alternative districts would afford TX NAACP Member C a reasonable opportunity to elect their preferred candidate of choice.

33.    **TX NAACP Member D** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted CD 6 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member D was in CD 33. TX NAACP Member D identifies as Black.

34.    TX NAACP Member D's residence is in the newly enacted CD 6. They are a registered voter in CD 6. They plan to vote in future elections in CD 6. As enacted under the State's plan C2193, the newly drawn CD 6 injures TX NAACP Member D by cracking voters of color in southeast Tarrant and northwest Dallas County across multiple districts, conspicuously excluding precincts with a high Black population and leaving CD 6 with just 14% Black population, down from 21% under the previous decade's plan.

35.    CDs 6, 12, 24, 25, 30, 32, and 33 form a 7-district cluster around Dallas and Tarrant Counties. By being placed in CD 6 under the State's enacted plan, TX NAACP Member D is

among the voters of color whose votes have been diluted because they were placed in a predominantly Anglo district. TX NAACP Member D lives in a census block that can be added to an alternative majority-minority coalition district (proposed CD 12) that would be 20.64% BCVAP, 40.02% HCVAP, and 5.23% ACVAP. The proposed alternative CD 12 would now be located in the central west portion of Dallas County. Were TX NAACP Member D to be placed in this alternative majority-minority coalition district, their vote would not be diluted, and they would have a reasonable opportunity to elect their candidate of choice. In addition, at least four alternative and highly effective districts could be drawn in this congressional cluster, each with a minority-coalition CVAP above 53% and below 70%. Placing TX NAACP Member D in any one of these alternative districts would afford TX NAACP Member D a reasonable opportunity to elect their preferred candidate of choice.

36.     **TX NAACP Member E** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted CD 6 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member E was in CD 33. TX NAACP Member E identifies as Black.

37.     TX NAACP Member E's residence is in the newly enacted CD 6. They are a registered voter in CD 6. They plan to vote in future elections in CD 6. As enacted under the State's plan C2193, the newly drawn CD 6 injures TX NAACP Member E by cracking voters of color in southeast Tarrant and northwest Dallas County across multiple districts, conspicuously excluding precincts with a high Black population and leaving CD 6 with just 14% Black population, down from 21% under the previous decade's plan.

38.     CDs 6, 12, 24, 25, 30, 32, and 33 form a 7-district cluster around Dallas and Tarrant Counties. By being placed in CD 6 under the State's enacted plan, TX NAACP Member E is

among the voters of color whose votes have been diluted because they were placed in a predominantly Anglo district. TX NAACP Member E lives in a census block that can be added to an alternative majority-minority district (proposed CD 12) that would be 20.64% BCVAP, 40.02% HCVAP, and 5.23% ACVAP. The proposed alternative CD 12 would now be located in the central west portion of Dallas County. Were TX NAACP Member E to be placed in this alternative majority-minority coalition district, their vote would not be diluted, and they would have a reasonable opportunity to elect their candidate of choice. In addition, at least four alternative and highly effective districts could be drawn in this congressional cluster each with a minority-coalition CVAP above 53% and below 70%. Placing TX NAACP Member E in any one of these alternative districts would afford TX NAACP Member E a reasonable opportunity to elect their preferred candidate of choice.

39.     **TX NAACP Member F** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted CD 22 and SD 17. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member F was in CD 27 and SD 18. TX NAACP Member F identifies as Black.

40.     TX NAACP Member F's residence is in the newly enacted CD 22. They are a registered voter in CD 22. They plan to vote in future elections in CD 22. As enacted under the State's plan C2193, CD 22 injures TX NAACP Member F by cracking Black voters and other voters of color between CD 22, CD 7, CD 9, CD 29, and CD 36 and splitting a number of cities in the process, including Sugar Land, Manvel, and Pearland. The boundary line between CD 22 and CD 9, in particular, appears surgically drawn to push Black voters out of CD 22. The resulting district lines reduce the majority-minority coalition percentage from almost 55% under the old

lines to barely 46%.

41.     TX NAACP Member F's residence is also in the newly enacted SD 17. They are a registered voter in SD 17. They plan to vote in future elections in SD 17. As enacted under the State's plan S2168, SD 17 injures TX NAACP Member F by splitting the city of Sugar Land and other areas with a significant share of people of color, thereby reducing the percentage of voters of color from nearly 49% to 43%.

42.     SDs 6, 13, 15, 17, and 18 form a 5-district cluster encompassing Fort Bend County. Before the 2021 redistricting, SD 17 was around 48% minority coalition, and after the redistricting the district became 43% minority coalition. Under last decade's plan, TX NAACP Member F was in SD 18, which after the 2021 redistricting, became nearly 50% majority-minority coalition. By being placed in SD 17 under the State's enacted plan, TX NAACP Member F's vote is diluted and they are among the population of color that has been cracked. TX NAACP Member F lives in a census block that can be added to an alternative majority-minority coalition district (proposed SD 17), that would be would be 17.24% BCVAP, 24.47% HCVAP, and 15.58% ACVAP. Were TX NAACP Member F to be placed in this alternative coalition district, their vote would not be diluted, and they would have a reasonable opportunity to elect a candidate of their choice. Under another proposed alternative plan, a district could be drawn that is 29.24% BCVAP, 25% HCVAP, and 16.8% ACVAP. Were TX NAACP Member F to be placed in this second alternative district, their vote would not be diluted, and they would have a reasonable opportunity to elect their candidate of choice. In addition, at least four other configurations of alternative and highly effective districts could be drawn in this senate cluster, and placing TX NAACP Member F in any one of these alternatives would afford TX NAACP Member F a reasonable opportunity to elect their preferred candidate of choice.

43.     **TX NAACP Member G** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly exacted CD 22 and SD 17. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member G was in CD 22 and SD 17. TX NAACP Member G identifies as Black.

44.     TX NAACP Member G's residence is in the newly enacted CD 22. They are a registered voter in CD 22. They plan to vote in future elections in CD 22. As enacted under the State's plan C2193, CD 22 injures TX NAACP Member G by cracking Black voters and other voters of color between CD 22, CD 7, CD 9, CD 29, and CD 36 and splitting a number of cities in the process, including Sugar Land, Manvel, and Pearland. The boundary line between CD 22 and CD 9, in particular, appears surgically drawn to push Black voters out of CD 22. The resulting district lines reduce the majority-minority coalition percentage from almost 55% under the old lines to barely 46%.

45.     TX NAACP Member G's residence is also in the newly enacted SD 17. They are a registered voter in SD 17. They plan to vote in future elections in SD 17. As enacted under the State's plan S2168, SD 17 injures TX NAACP Member G by splitting the city of Sugar Land and other areas with a significant share of people of color, thereby reducing the percentage of voters of color from nearly 49% to 43%.

46.     SDs 6, 13, 15, 17, and 18 form a 5-district cluster encompassing Fort Bend County. Before the 2021 redistricting, SD 17 was around 48% minority coalition, and after the redistricting the district became 43% minority coalition. By being placed in the State's enacted SD 17, TX NAACP Member G is among the population of color in Sugar Land that has been cracked. TX NAACP Member G lives in a census block that can be added to an alternative majority-minority

coalition district (proposed SD 17), that would be 17.24% BCVAP, 24.47% HCVAP, and 15.58% ACVAP. Were TX NAACP Member G to be placed in this alternative coalition district, their vote would not be diluted. Under another proposed alternative plan, a district could be drawn that is 29.24% BCVAP, 25% HCVAP, and 16.8% ACVAP. Were TX NAACP Member G to be placed in this second alternative district, their vote would not be diluted, and they would have a reasonable opportunity to elect their candidate of choice. In addition, at least four other configurations of alternative and highly effective districts could be drawn in this senate cluster. Placing TX NAACP Member G in any one of these alternatives would afford TX NAACP Member G a reasonable opportunity to elect their preferred candidate of choice.

47. **TX NAACP Member H** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted CD 22, SD 18, and HD 26. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member H was in CD 22, SD 18, and HD 28. TX NAACP Member H identifies as Black.

48. TX NAACP Member H's residence is in the newly enacted CD 22. They are a registered voter in CD 22. They plan to vote in future elections in CD 22. As enacted under the State's plan C2193, CD 22 injures TX NAACP Member H by cracking Black voters and other voters of color between CD 22, CD 7, CD 9, CD 29, and CD 36 and splitting a number of cities in the process, including Sugar Land, Manvel, and Pearland. The boundary line between CD 22 and CD 9, in particular, appears surgically drawn to push Black voters out of CD 22. The resulting district lines reduce the percentage of voters of color from almost 55% under the old lines to barely 46%.

49. TX NAACP Member H's residence is also in the newly enacted SD 18. They are a

registered voter in SD 18. They plan to vote in future elections in SD 18. As enacted under the State's plan S2168, the newly drawn SD 18 weaves around Brazos County (including College Station and Texas A&M University) in order to avoid the Anglo population that is mostly likely to cross over to support the preferred candidates of voters of color. As a result, though the district is nearly made up of a majority of voters of color, its careful line-drawing ensures that the district is safely out of reach for voters of color like TX NAACP Member H.

50.    TX NAACP Member H's residence is also in the newly enacted HD 26. They are a registered voter in HD 26. They plan to vote in future elections in HD 26. As enacted under the State's plan H2316, the new HD 26 injures TX NAACP Member H by diluting their vote. The newly drawn HD 26 injures TX NAACP Member H by drastically reconfiguring the prior decade's plan in order to shed minority population and reduce the share of voters of color from approximately 55% to 46%. In order to do this, the newly drawn HD 26 splits the majority-Latino city of Rosenberg, thus cracking persons of color.

51.    **TX NAACP Member I** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted CD 24 and HD 108. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member I was in CD 32 and HD 114. TX NAACP Member I identifies as Black.

52.    TX NAACP Member I's residence is in the newly enacted CD 24. They are a registered voter in CD 24. They plan to vote in future elections in CD 24. As enacted under the State's plan C2193, the newly drawn CD 24 injures TX NAACP Member I by fracturing the cities of Irving, Farmers Branch, and Carrollton and breaking precincts along the way in order to connect predominantly Anglo communities in Tarrant County with similar voters in northern Dallas

County. The resulting district avoids Black, Hispanic, and Asian voters, thereby packing neighboring districts, reducing the percentage of voters of color from nearly 41% to just 26% in CD 24, and ensuring voters of color have less voting opportunity in the new district.

53.     TX NAACP Member I's residence is also in the newly enacted HD 108. They are a registered voter in HD 108. They plan to vote in future elections in HD 108. As enacted under the State's plan H2316, the newly drawn HD 108 is highly non-compact, with jagged ends that protrude to the east and south. HD 108, together with neighboring HD 114, are drawn to include extremely Anglo precincts in northeast Dallas County. The rest of the district is drawn to incorporate heavily Anglo precincts while excluding communities of color, injuring TX NAACP Member I and voters like them.

54.     **TX NAACP Member J** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly exacted CD 38 and SD 18. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member J was in CD 2 and SD 17. TX NAACP Member J identifies as Black.

55.     TX NAACP Member J's residence is in the newly enacted CD 38. They are a registered voter in CD 38. They plan to vote in future elections in CD 38. As enacted under the State's plan C2193, the newly drawn CD 38 injures TX NAACP Member J by cutting an hourglass shape through Harris County in order to avoid areas with larger populations of color and unite areas with larger Anglo populations located in different parts of the County. This results in voters of color being packed into CD 7 to the south, CD 8 to the west, and CD 18 to the east of CD 38.

56.     TX NAACP Member J's residence is also in the newly enacted SD 17. They are a registered voter in SD 17. They plan to vote in future elections in SD 17. As enacted under the State's plan S2168, SD 17 injures TX NAACP Member J by splitting the city of Sugar Land and

other areas with a significant share of people of color, thereby reducing the percentage of voters of color from nearly 49% to 43%.

57.     **TX NAACP Member K** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly exacted CD 38 and SD 18. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member K was in CD 2 and SD 15. TX NAACP Member K identifies as Black.

58.     TX NAACP Member K's residence is in the newly enacted CD 38. They are a registered voter in CD 38. They plan to vote in future elections in CD 38. As enacted under the State's plan C2193, the newly drawn CD 38 injures TX NAACP Member K by cutting an hourglass shape through Harris County in order to avoid areas with larger populations of color and unite more Anglo communities located in different parts of the County. This results in voters of color being packed into CD 7 to the south, CD 8 to the west, and CD 18 to the east of CD 38.

59.     TX NAACP Member K's residence is also in the newly enacted SD 17. They are a registered voter in SD 17. They plan to vote in future elections in SD 17. As enacted under the State's plan S2168, SD 17 injures TX NAACP Member K by splitting the city of Sugar Land and other areas with a significant share of people of color, thereby reducing the percentage of voters of color from nearly 49% to approximately 43%.

60.     **TX NAACP Member L** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted SD 2 and HD 112. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member L was in SD 16 and HD 112. TX NAACP Member L identifies as Black.

61.     TX NAACP Member L's residence is in the newly enacted SD 2. They are a

registered voter in SD 2. They plan to vote in future elections in SD 2. As enacted under the State's plan S2168, the newly drawn SD 2 pairs a number of rural counties with two chunks of Dallas County and a sliver of Collin County, winding to touch seven counties overall. Latino voters are carefully split along the border of SD 2 and SD 16. SD 2 injures TX NAACP Member L by bringing these small groups of voters of color into a sea of Anglo rural counties, weakening their ability to elect candidates of choice.

62.    TX NAACP Member L's residence is also in the newly enacted HD 112. They are a registered voter in HD 112. They plan to vote in future elections in HD 112. As enacted under the State's plan H2316, the newly drawn HD 112 is one of the three districts, along with HD 10 and HD 113, that split communities of color in Garland, Sachse, and Rowlett. At the same time, HD 112 closely traces the northeast outer boundary of Dallas County, including the most heavily Anglo precincts. As a result, the newly enacted HD 112 injures TX NAACP Member L by reducing the voting share of people of color from approximately 51% under the prior decade's plan to approximately 33% under the newly enacted plan.

63.    **TX NAACP Member M** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted SD 2 and HD 112. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member M was in SD 8 and HD 112. TX NAACP Member M identifies as Black.

64.    TX NAACP Member M's residence is in the newly enacted SD 2. They are a registered voter in SD 2. They plan to vote in future elections in SD 2. As enacted under the State's plan S2168, the newly drawn SD 2 pairs a number of rural counties with two chunks of Dallas County and a sliver of Collin County, winding to touch seven counties overall. Latino voters are

carefully split along the border of SD 2 and SD 16. SD 2 injures TX NAACP Member M by bringing these small groups of voters of color into a sea of Anglo rural counties, weakening their ability to elect candidates of choice.

65.     TX NAACP Member M's residence is also in the newly enacted HD 112. They are a registered voter in HD 112. They plan to vote in future elections in HD 112. As enacted under the State's plan H2316, the newly drawn HD 112 is one of the three districts, along with HD 10 and HD 113, that split communities of color in Garland, Sachse, and Rowlett. At the same time, HD 112 closely traces the northeast outer boundary of Dallas County, including the most heavily Anglo precincts. As a result, the newly enacted HD 112 injures TX NAACP Member M by reducing the voting share of people of color from approximately 51% under the prior decade's plan to approximately 33% under the newly enacted plan.

66.     **TX NAACP Member N** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted SD 9 and HD 94. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member N was in SD 9 and HD 95. TX NAACP Member N identifies as Black.

67.     TX NAACP Member N's residence is in the newly enacted SD 9. They are a registered voter in SD 9. They plan to vote in future elections in SD 9. As enacted under the State's plan S2168, SD 9 is crammed into the northwest corner of Tarrant County and splits the racially diverse city of Fort Worth between SD 9 and SD 10 in the process. The resulting shape holds the percentage of voters of color to just 35% in SD 9, pared back from nearly 45% under the previous decade's district lines.

68.     SDs 9, 10, 12, 16, 22, 23, and 30 form a 7-district cluster comprising Tarrant and Dallas Counties. Under last decade's plan, TX NAACP Member N's residence was in SD 10, a

district on the verge of becoming a majority-minority coalition district by CVAP. By being placed in SD 9 under the State's enacted plan, TX NAACP Member N's vote has been diluted because it has been cracked. The enacted SD 9 is 35% Black, Hispanic, and Asian by coalition CVAP. TX NAACP Member N lives in a census block that can be added to an alternative majority-minority district (proposed SD 10) that would be 23.31% BCVAP, 26.28% HCVAP, and 6.54% ACVAP. The new proposed SD 10 would fall squarely within Tarrant and Dallas Counties, and not include the Anglo electorate from rural counties that are included in the State's enacted SD 10. Were TX NAACP Member N to be placed in this alternative coalition district, their vote would not be diluted, and they would have a reasonable opportunity to elect their candidate of choice. In addition, at least three alternative and highly effective districts could be drawn in this senate cluster each with a minority-coalition CVAP of upwards of 53%. Placing TX NAACP Member N in any one of these alternative districts would afford TX NAACP Member N a reasonable opportunity to elect their preferred candidate of choice.

69.     TX NAACP Member N's residence is also in the newly enacted HD 94. They are a registered voter in HD 94. They plan to vote in future elections in HD 94. As enacted under the State's plan H2316, the newly drawn HD 94 includes portions of Fort Worth, part of Arlington, and number of small, heavily Anglo suburbs such as Pantego, Dalworthington Gardens, and Bedford. Notably, the district twists and turns in all directions to dodge concentrated populations of persons of color. The newly enacted HD 94 thus injures TX NAACP Member N by diluting TX NAACP Member N's vote—because of its non-compact shape, the district is significantly more Anglo than the prior district's plan, with minority coalition CVAP coming in at just under 32%.

70.     **TX NAACP Member O** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted

SD 9 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member O was in SD 9. TX NAACP Member O identifies as Black.

71.     TX NAACP Member O's residence is in the newly enacted SD 9. They are a registered voter in SD 9. They plan to vote in future elections in SD 9. As enacted under the State's plan S2168, SD 9 is crammed into the northwest corner of Tarrant County and splits the racially diverse city of Fort Worth between SD 9 and SD 10 in the process. The resulting shape holds the percentage of voters of color to just 35% in SD 9, pared back from nearly 45% under the previous decade's district lines.

72.     **TX NAACP Member P** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted SD 9 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member P was in SD 10. TX NAACP Member P identifies as Black.

73.     TX NAACP Member P's residence is in the newly enacted SD 9. They are a registered voter in SD 9. They plan to vote in future elections in SD 9. As enacted under the State's plan S2168, SD 9 is crammed into the northwest corner of Tarrant County and splits the racially diverse city of Fort Worth between SD 9 and SD 10 in the process. The resulting shape holds the percentage of voters of color to just 35% in SD 9, pared back from nearly 45% under the previous decade's district lines.

74.     SDs 9, 10, 12, 16, 22, 23, and 30 form a 7-district cluster comprising Tarrant and Dallas Counties. Under last decade's plan, TX NAACP Member P's residence was in SD 10, a district on the verge of becoming a majority-minority coalition district by CVAP. By being placed in SD 9 under the State's enacted plan, TX NAACP Member P's vote has been diluted because it has been cracked. The enacted SD 9 is 35% Black, Hispanic, and Asian by coalition CVAP. TX

NAACP Member P lives in a census block that can be added to an alternative majority-minority district (proposed SD 10) that would be 23.31% BCVAP, 26.28% HCVAP, and 6.54% ACVAP. The new proposed SD 10 would fall squarely within Tarrant and Dallas Counties, and not include the Anglo electorate from rural counties that are included in the State's enacted SD 10. Were TX NAACP Member P to be placed in this alternative coalition district, their vote would not be diluted, and they would have a reasonable opportunity to elect their candidate of choice. In addition, at least three alternative and highly effective districts could be drawn in this senate cluster, each with a minority-coalition CVAP of upwards of 53%. Placing TX NAACP Member P in any one of these alternative districts would afford TX NAACP Member P a reasonable opportunity to elect their preferred candidate of choice.

75.     **TX NAACP Member Q** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted SD 10 and HD 94. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member Q was in SD 10 and HD 94. TX NAACP Member Q identifies as Black.

76.     TX NAACP Member Q's residence is in the newly enacted SD 10. They are a registered voter in SD 10. They plan to vote in future elections in SD 10. As enacted under the State's plan S2168, the newly drawn SD 10—formerly contained entirely in Tarrant County—now encompasses seven additional rural counties, reducing the percentage of voters of color in SD 10 from 46% under the previous decade's map to 38% under the newly enacted map. These new district boundaries were drawn just as voters of color in the old SD 10 were on the cusp of becoming the majority and thus injure TX NAACP Member Q by denying voters of color like them the opportunity to elect representatives of choice.

77.     SDs 9, 10, 12, 16, 22, 23, and 30 form a 7-district cluster comprising Tarrant and Dallas Counties. Under last decade's plan, TX NAACP Member Q's residence was in SD 10, a district on the verge of becoming a majority-minority coalition district by CVAP. Under the State's enacted plan, SD 10 dilutes TX NAACP Member Q's vote by placing TX NAACP Member Q in a district with a significantly higher percentage of Anglo voters from rural counties. Under a proposed alternative drawing of the State's enacted SD 10, the new proposed district (proposed SD 10) would be 23.31% BCVAP, 26.28% HCVAP, and 6.54% ACVAP. The new proposed SD 10 would fall squarely within Tarrant and Dallas Counties and not include the Anglo electorate from rural counties that are included in the State's enacted SD 10. Under this new alternative configuration of proposed SD 10, TX NAACP Member Q's vote would not be diluted, and they would have a reasonable opportunity to elect their candidate of choice. In addition, at least three alternative and highly effective districts could be drawn in this senate cluster, each with a minority-coalition CVAP of upwards of 53%. Placing TX NAACP Member Q in any one of these alternative districts would afford TX NAACP Member Q a reasonable opportunity to elect their preferred candidate of choice.

78.     TX NAACP Member Q's residence is also in the newly enacted HD 94. They are a registered voter in HD 94. They plan to vote in future elections in HD 94. As enacted under the State's plan H2316, the newly drawn HD 94 includes portions of Fort Worth, part of Arlington, and number of small, heavily Anglo suburbs such as Pantego, Dalworthington Gardens, and Bedford. Notably, the district twists and turns in all directions to dodge concentrated populations of persons of color. The newly enacted HD 94 thus injures TX NAACP Member Q by diluting TX NAACP Member Q's vote—because of its non-compact shape, the district it is significantly more Anglo than the prior district's plan, with minority coalition CVAP coming in at just under 32%.

79.    **TX NAACP Member R** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted SD 10 and HD 94. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member R was in SD 10 and HD 94. TX NAACP Member R identifies as Black.

80.    TX NAACP Member R's residence is in the newly enacted SD 10. They are a registered voter in SD 10. They plan to vote in future elections in SD 10. As enacted under the State's plan S2168, the newly drawn SD 10—formerly contained entirely in Tarrant County—now encompasses seven additional rural counties, reducing the percentage of voters of color in SD 10 from 46% under the previous decade's map to 38% under the newly enacted map. These new district boundaries were drawn just as voters of color in the old SD 10 were on the cusp of becoming the majority and thus injure TX NAACP Member R by denying voters of color like them the opportunity to elect representatives of choice.

81.    SDs 9, 10, 12, 16, 22, 23, and 30 form a 7-district cluster comprising Tarrant and Dallas Counties. Under last decade's plan, TX NAACP Member R's residence was in SD 10, a district on the verge of becoming a majority-minority coalition district by CVAP. Under the State's enacted plan, SD 10 dilutes TX NAACP Member R's vote by placing TX NAACP Member R in a district with a significantly higher percentage of Anglo voters from rural counties. Under a proposed alternative drawing of the State's enacted SD 10, the new proposed district (proposed SD 10) would be 23.31% BCVAP, 26.28% HCVAP, and 6.54% ACVAP. The new proposed SD 10 would fall squarely within Tarrant and Dallas Counties and not include the Anglo electorate from rural counties that are included in the State's enacted SD 10. Under this new alternative configuration of proposed SD 10, TX NAACP Member R's vote would not be diluted, and they

would have a reasonable opportunity to elect their candidate of choice. In addition, at least three alternative and highly effective districts could be drawn in this senate cluster each, with a minority-coalition CVAP of upwards of 53%. Placing TX NAACP Member R in any one of these alternative districts would afford TX NAACP Member R a reasonable opportunity to elect their preferred candidate of choice.

82.     TX NAACP Member R's residence is also in the newly enacted HD 94. They are a registered voter in HD 94. They plan to vote in future elections in HD 94. As enacted under the State's plan H2316, the newly drawn HD 94 includes portions of Fort Worth, part of Arlington, and number of small, heavily Anglo suburbs such as Pantego, Dalworthington Gardens, and Bedford. Notably, the district twists and turns in all directions to dodge concentrated populations of persons of color. The newly enacted HD 94 thus injures TX NAACP Member R by diluting TX NAACP Member R's vote—because of its non-compact shape, the district it is significantly more Anglo than the prior district's plan, with minority coalition CVAP coming in at just under 32%.

83.     HD 94 is a part of an 11-district cluster in Tarrant County that includes HDs 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, and 101. TX NAACP Member R is among the population of color in Arlington that has been cracked by the reconfigured house cluster and by the enacted HD 94, and TX NAACP Member R's voting power has been diluted. By being placed in HD 94 under the State's enacted plan, TX NAACP Member R's vote is diluted because they are among population of color that has been cracked. TX NAACP Member R lives in a census block that can be added to an alternative majority-minority coalition district (proposed HD 94) that would be 34.36% BCVAP, 19.01% HCVAP, and 4.71% ACVAP and would fall in the central-eastern portion of Tarrant County. Were TX NAACP Member R to be placed in this alternative coalition district, their vote would not be diluted, and they would have a reasonable opportunity to elect a candidate

of their choice. In addition, at least four alternative and highly effective districts could be drawn in this house cluster, and placing TX NAACP Member R in any one of these alternative districts would afford them a reasonable opportunity to elect their preferred candidate of choice.

84.     **TX NAACP Member S** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted SD 10 and HD 94. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member S was in SD 10 and HD 94. TX NAACP Member S identifies as Black.

85.     TX NAACP Member S's residence is in the newly enacted SD 10. They are a registered voter in SD 10. They plan to vote in future elections in SD 10. As enacted under the State's plan S2168, the newly drawn SD 10—formerly contained entirely in Tarrant County—now encompasses seven additional rural counties, reducing the percentage of voters of color in SD 10 from 46% under the previous decade's map to 38% under the newly enacted map. These new district boundaries were drawn just as voters of color in the old SD 10 were on the cusp of becoming the majority and thus injure TX NAACP Member S by denying voters of color like them the opportunity to elect representatives of choice.

86.     SDs 9, 10, 12, 16, 22, 23, and 30 form a 7-district cluster comprising Tarrant and Dallas Counties. Under last decade's plan, TX NAACP Member S's residence was in SD 10, a district on the verge of becoming a majority-minority coalition district by CVAP. Under the State's enacted plan, SD 10 dilutes TX NAACP Member S's vote by placing TX NAACP Member S in a district with a significantly higher percentage of Anglo voters from rural counties. Under a proposed alternative drawing of the State's enacted SD 10, the new proposed district (proposed SD 10) would be 23.31% BCVAP, 26.28% HCVAP, and 6.54% ACVAP. The new proposed SD

10 would fall squarely within Tarrant and Dallas Counties and not include the Anglo electorate from rural counties that are included in the State's enacted SD 10. Under this new alternative configuration of proposed SD 10, TX NAACP Member S's vote would not be diluted, and they would have a reasonable opportunity to elect their candidate of choice. In addition, at least three alternative and highly effective districts could be drawn in this senate cluster, each with a minority-coalition CVAP of upwards of 53%. Placing TX NAACP Member S in any one of these alternative districts would afford TX NAACP Member S a reasonable opportunity to elect their preferred candidate of choice.

87.    TX NAACP Member S's residence is also in the newly enacted HD 94. They are a registered voter in HD 94. They plan to vote in future elections in HD 94. As enacted under the State's plan H2316, the newly drawn HD 94 includes portions of Fort Worth, part of Arlington, and number of small, heavily Anglo suburbs such as Pantego, Dalworthington Gardens, and Bedford. Notably, the district twists and turns in all directions to dodge concentrated populations of persons of color. The newly enacted HD 94 thus injures TX NAACP Member S by diluting TX NAACP Member S's vote—because of its non-compact shape, the district it is significantly more Anglo than the prior district's plan, with minority coalition CVAP coming in at just under 32%.

88.    HD 94 is a part of an 11-district cluster in Tarrant County that includes HDs 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, and 101. TX NAACP Member S is among the population of color in Arlington that has been cracked by the reconfigured house cluster and by the enacted HD 94, and TX NAACP Member S's voting power has been diluted. By being placed in HD 94 under the State's enacted plan, TX NAACP Member S's vote is diluted because they are among population of color that has been cracked. TX NAACP Member S lives in a census block that can be added to an alternative majority-minority coalition district (proposed HD 94) that would be 34.36%

BCVAP, 19.01% HCVAP, and 4.71% ACVAP and would fall in the central-eastern portion of Tarrant County. Were TX NAACP Member S to be placed in this alternative coalition district, their vote would not be diluted, and they would have a reasonable opportunity to elect a candidate of their choice. In addition, at least four alternative and highly effective districts could be drawn in this house cluster, and placing TX NAACP Member S in any one of these alternative districts would afford them a reasonable opportunity to elect their preferred candidate of choice.

89.     **TX NAACP Member T** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted SD 10 and HD 96. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member T was in SD 10 and HD 96. TX NAACP Member T identifies as Black.

90.     TX NAACP Member T's residence is in the newly enacted SD 10. They are a registered voter in SD 10. They plan to vote in future elections in SD 10. As enacted under the State's plan S2168, the newly drawn SD 10—formerly contained entirely in Tarrant County—now encompasses seven additional rural counties, reducing the percentage of voters of color in SD 10 from 46% under the previous decade's map to 38% under the newly enacted map. These new district boundaries were drawn just as voters of color in the old SD 10 were on the cusp of becoming the majority and thus injure TX NAACP Member T by denying voters of color like them the opportunity to elect representatives of choice.

91.     TX NAACP Member T's residence is also in the newly enacted HD 96. They are a registered voter in HD 96. They plan to vote in future elections in HD 96. As enacted under the State's plan H2316, the newly drawn HD 96 injures TX NAACP Member T by dividing voters of color like TX NAACP Member T among districts 90, 95, 97, and 101, all of which end up with

shares of voters of color below 30% or over 65%.

92.     **TX NAACP Member U** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted SD 15 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member U was in SD 15. TX NAACP Member U identifies as Black.

93.     TX NAACP Member U's residence is in the newly enacted SD 15. They are a registered voter in SD 15. They plan to vote in future elections in SD 15. As enacted under the State's plan S2168, SD 15 is a non-compact district that wraps like a horse shoe around SD 6, cracking voters of color in the city of Houston between SD 6 and SD 15. The district carefully splits population so that Hispanic voters are kept out of SD 15 and pushed into SD 6, where they are packed with 82% voters of color. The newly drawn SD 15 injures TX NAACP Member U with its exceedingly race-conscious lines that divide voters of color in and around Houston.

94.     **TX NAACP Member V** is a member of the Texas NAACP. They are a citizen of the United States. They over the age of 18. They are a registered voter in the newly enacted SD 17 and HD 25. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member V was in SD 17 and HD 25. TX NAACP Member V identifies as Black.

95.     TX NAACP Member V's residence is in the newly enacted SD 17. They are a registered voter in SD 17. They plan to vote in future elections in SD 17. As enacted under the State's plan S2168, SD 17 injures TX NAACP Member V by splitting the city of Sugar Land and other areas with a significant share of people of color, thereby reducing the percentage of voters of color from nearly 49% to 43%.

96.     TX NAACP Member V's residence is also in the newly enacted HD 25. They are a registered voter in HD 25. They plan to vote in future elections in HD 25. HD 25 and HD 29

make up the entire house cluster in Brazoria County. As enacted under the State's plan H2316, the dividing line between the two districts is drawn to ensure that neither of the districts is a majority-minority district. To do this, HD 25 and HD 29 crack Hispanic and Black communities by splitting the cities of Pearland, Manvel, Iowa Colony, Richwood, and Freeport. The newly enacted HD 25 thus injures TX NAACP Member V by diluting their vote.

97.    **TX NAACP Member W** is a member of the Texas NAACP. They are a citizen of the United States. They over the age of 18. They are a registered voter in the newly enacted SD 17 and HD 25. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member W was in SD 17 and HD 25. TX NAACP Member W identifies as Black.

98.    TX NAACP Member W's residence is in the newly enacted SD 17. They are a registered voter in SD 17. They plan to vote in future elections in SD 17. As enacted under the State's plan S2168, SD 17 injures TX NAACP Member W by splitting the city of Sugar Land and other areas with a significant share of people of color, thereby reducing the percentage of voters of color from nearly 49% to 43%.

99.    TX NAACP Member W's residence is also in the newly enacted HD 25. They are a registered voter in HD 25. They plan to vote in future elections in HD 25. HD 25 and HD 29 make up the entire house cluster in Brazoria County. As enacted under the State's plan H2316, the dividing line between the two districts is drawn to ensure that neither of the districts is a majority-minority district. To do this, HD 25 and HD 29 crack Hispanic and Black communities by splitting the cities of Pearland, Manvel, Iowa Colony, Richwood, and Freeport. The newly enacted HD 25 thus injures TX NAACP Member W by diluting their vote.

100.    **TX NAACP Member X** is a member of the Texas NAACP. They are a citizen of the United States. They over the age of 18. They are a registered voter in the newly enacted SD 17

and HD 25. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member X was in SD 17 and HD 25. TX NAACP Member X identifies as Black.

101.    TX NAACP Member X's residence is in the newly enacted SD 17. They are a registered voter in SD 17. They plan to vote in future elections in SD 17. As enacted under the State's plan S2168, SD 17 injures TX NAACP Member X by splitting the city of Sugar Land and other areas with a significant share of people of color, thereby reducing the percentage of voters of color from nearly 49% to 43%.

102.    TX NAACP Member X's residence is also in the newly enacted HD 25. They are a registered voter in HD 25. They plan to vote in future elections in HD 25. HD 25 and HD 29 make up the entire house cluster in Brazoria County. As enacted under the State's plan H2316, the dividing line between the two districts is drawn to ensure that neither of the districts is a majority-minority district. To do this, HD 25 and HD 29 crack Hispanic and Black communities by splitting the cities of Pearland, Manvel, Iowa Colony, Richwood, and Freeport. The newly enacted HD 25 thus injures TX NAACP Member X by diluting their vote.

103.    **TX NAACP Member Y** is a member of the Texas NAACP. They are a citizen of the United States. They over the age of 18. They are a registered voter in the newly enacted SD 17 and HD 25. They intend to vote in those districts in the future. Under the previous decade's maps, TX NAACP Member Y was in SD 17 and HD 25. TX NAACP Member Y identifies as Black.

104.    TX NAACP Member Y's residence is in the newly enacted SD 17. They are a registered voter in SD 17. They plan to vote in future elections in SD 17. As enacted under the State's plan S2168, SD 17 injures TX NAACP Member Y by splitting the city of Sugar Land and other areas with a significant share of people of color, thereby reducing the percentage of voters of color from nearly 49% to 43%.

105.     TX NAACP Member Y's residence is also in the newly enacted HD 25. They are a registered voter in HD 25. They plan to vote in future elections in HD 25. HD 25 and HD 29 make up the entire house cluster in Brazoria County. As enacted under the State's plan H2316, the dividing line between the two districts is drawn to ensure that neither of the districts is a majority-minority district. To do this, HD 25 and HD 29 crack Hispanic and Black communities by splitting the cities of Pearland, Manvel, Iowa Colony, Richwood, and Freeport. The newly enacted HD 25 thus injures TX NAACP Member Y by diluting their vote.

106.     **TX NAACP Member Z** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted SD 18 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member Z was in SD 17. TX NAACP Member Z identifies as Black.

107.     TX NAACP Member Z's residence is in the newly enacted SD 18. They are a registered voter in SD 18. They plan to vote in future elections in SD 18. As enacted under the State's plan S2168, the newly drawn SD 18 weaves around Brazos County (including College Station and Texas A&M University) in order to avoid the Anglo population that is mostly likely to cross over to support the preferred candidates of voters of color. As a result, though the district is nearly made up of a majority of voters of color, its careful line-drawing ensures that the district is safely out of reach for voters of color like TX NAACP Member Z.

108.     **TX NAACP Member AA** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted SD 22 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member AA was in SD 22. TX NAACP Member AA identifies as Black.

109.     TX NAACP Member AA's residence is in the newly enacted SD 22. They are a

registered voter in SD 22. They plan to vote in future elections in SD 22. As enacted under the State's plan S2168, the newly drawn SD 22 includes a dense, tentacle-like protrusion in the north that grabs urban, more diverse precincts in the city of Arlington and combines it with nine low-density, Anglo counties to the south. The protrusion in Arlington could have easily remained in Arlington (and SD 10), where communities of color would have had a stronger possibility of electing a candidate of their choice. By pairing the tentacle in Arlington with the low-density Anglo communities to the south, the map-drawers diluted the voting strength of Black voters like TX NAACP Member AA.

110.    **TX NAACP Member BB** is a member of the Texas NAACP and the President of the Brazoria County chapter of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 29 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member BB was in HD 29. TX NAACP Member BB identifies as Black.

111.    TX NAACP Member BB's residence is in the newly enacted HD 29. They are a registered voter in HD 29. They plan to vote in future elections in HD 29. HD 25 and HD 29 make up the entire house cluster in Brazoria County. As enacted under the State's plan H2316, the dividing line between the two districts is drawn to ensure that neither of the districts is a majority-minority district. To do this, HD 25 and HD 29 crack Hispanic and Black communities by splitting the cities of Pearland, Manvel, Iowa Colony, Richwood, and Freeport. The newly enacted HD 29 thus injures TX NAACP Member BB by diluting their vote.

112.    HD 29 is a part of a 2-district cluster around Brazoria County that includes HDs 25 and 29. TX NAACP Member BB is among the population of color in Pearland that has been cracked between the State's enacted HD 29 and HD 25, and their voting power has, therefore, been

diluted. TX NAACP Member BB lives in a census block that can be added to an alternative majority-minority coalition district that proposes redrawing HD 29 to include 23.03% BCVAP, 22.89% HCVAP, and 10.58% ACVAP. The proposed HD 29 would be located at the northwest corner of Brazoria County. Were TX NAACP Member BB to be placed in this proposed alternative coalition district, their vote would not be diluted, and they would have a reasonable opportunity to elect a candidate of their choice.

113.   **TX NAACP Member CC** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 54 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member CC was in HD 54. TX NAACP Member CC identifies as Black.

114.   TX NAACP Member CC's residence is in the newly enacted HD 54. They are a registered voter in HD 54. They plan to vote in future elections in HD 54. As enacted under the State's plan H2316, the newly drawn HD 54 and HD 55 make up all of Bell County's house cluster. HD 54 entirely consumes HD 55 in a donut shape. The county is almost 50% voters of color, but the border of HD 54 cuts through the plurality-Black city of Killeen, needlessly splitting its precincts, even though Killeen has enough population to anchor its own house district. No precincts are split anywhere else in Bell County. This highly unconventional, donut configuration injures TX NAACP Member CC by needlessly splitting the plurality-Black City of Killeen, undermining the voting strength of Black voters and other voters of color.

115.   **TX NAACP Member DD** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 54 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member DD was in HD 54. TX NAACP Member DD identifies as Black.

116.    TX NAACP Member DD's residence is in the newly enacted HD 54. They are a registered voter in HD 54. They plan to vote in future elections in HD 54. As enacted under the State's plan H2316, the newly drawn HD 54 and HD 55 make up all of Bell County's house cluster. HD 54 entirely consumes HD 55 in a donut shape. The county is almost 50% voters of color, but the border of HD 54 cuts through the plurality-Black city of Killeen, needlessly splitting its precincts, even though Killeen has enough population to anchor its own house district. No precincts are split anywhere else in Bell County. This highly unconventional, donut configuration injures TX NAACP Member DD by needlessly splitting the plurality-Black City of Killeen, undermining the voting strength of Black voters and other voters of color.

117.    **TX NAACP Member EE** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 54 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member EE was in HD 54. TX NAACP Member EE identifies as Black.

118.    TX NAACP Member EE's residence is in the newly enacted HD 54. They are a registered voter in HD 54. They plan to vote in future elections in HD 54. As enacted under the State's plan H2316, the newly drawn HD 54 and HD 55 make up all of Bell County's house cluster. HD 54 entirely consumes HD 55 in a donut shape. The county is almost 50% voters of color, but the border of HD 54 cuts through the plurality-Black city of Killeen, needlessly splitting its precincts, even though Killeen has enough population to anchor its own house district. No precincts are split anywhere else in Bell County. This highly unconventional, donut configuration injures TX NAACP Member EE by needlessly splitting the plurality-Black City of Killeen, undermining the voting strength of Black voters and other voters of color.

119.    **TX NAACP Member FF** is a member of the Texas NAACP. They are a citizen of

the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 54 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member FF was in HD 54. TX NAACP Member FF identifies as Black.

120. TX NAACP Member FF's residence is in the newly enacted HD 54. They are a registered voter in HD 54. They plan to vote in future elections in HD 54. As enacted under the State's plan H2316, the newly drawn HD 54 and HD 55 make up all of Bell County's house cluster. HD 54 entirely consumes HD 55 in a donut shape. The county is almost 50% voters of color, but the border of HD 54 cuts through the plurality-Black city of Killeen, needlessly splitting its precincts, even though Killeen has enough population to anchor its own house district. No precincts are split anywhere else in Bell County. This highly unconventional, donut configuration injures TX NAACP Member FF by needlessly splitting the plurality-Black City of Killeen, undermining the voting strength of Black voters and other voters of color.

121. **TX NAACP Member GG** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 55 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member GG was in 54. TX NAACP Member GG identifies as Black.

122. TX NAACP Member GG's residence is in the newly enacted HD 55. They are a registered voter in HD 55. They plan to vote in future elections in HD 55. As enacted under the State's plan H2316, the newly drawn HD 54 and HD 55 make up all of Bell County's house cluster. HD 54 entirely consumes HD 55 in a donut shape. The county is almost 50% voters of color, but the border of HD 54 cuts through the plurality-Black city of Killeen, needlessly splitting its precincts, even though Killeen has enough population to anchor its own house district. No precincts are split anywhere else in Bell County. This highly unconventional, donut configuration

injures TX NAACP Member GG by needlessly splitting the plurality-Black City of Killeen, undermining the voting strength of Black voters and other voters of color.

123.   **TX NAACP Member HH** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 55 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member HH was in 54. TX NAACP Member HH identifies as Black.

124.   TX NAACP Member HH's residence is in the newly enacted HD 55. They are a registered voter in HD 55. They plan to vote in future elections in HD 55. As enacted under the State's plan H2316, the newly drawn HD 54 and HD 55 make up all of Bell County's house cluster. HD 54 entirely consumes HD 55 in a donut shape. The county is almost 50% voters of color, but the border of HD 54 cuts through the plurality-Black city of Killeen, needlessly splitting its precincts, even though Killeen has enough population to anchor its own house district. No precincts are split anywhere else in Bell County. This highly unconventional, donut configuration injures TX NAACP Member HH by needlessly splitting the plurality-Black City of Killeen, undermining the voting strength of Black voters and other voters of color.

125.   **TX NAACP Member II** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 63 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member II was in HD 63. TX NAACP Member II identifies as Black.

126.   TX NAACP Member II's residence is in the newly enacted HD 63. They are a registered voter in HD 63. They plan to vote in future elections in HD 63. As enacted under the State's plan H2316, the newly drawn HD 63 is one of three districts that splits communities of color in the city of Lewisville, which has a minority coalition voting population of 63%, in order

to preserve an Anglo majority voting population. This configuration of HD 63 thus injures TX NAACP Member II by diluting TX NAACP Member II's vote.

127.     **TX NAACP Member JJ** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 63 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member JJ was in HD 63. TX NAACP Member JJ identifies as Black.

128.     TX NAACP Member JJ's residence is in the newly enacted HD 63. They are a registered voter in HD 63. They plan to vote in future elections in HD 63. As enacted under the State's plan H2316, the newly drawn HD 63 is one of three districts that splits communities of color in the city of Lewisville, which has a minority coalition voting population of 63%, in order to preserve an Anglo majority voting population. This configuration of HD 63 thus injures TX NAACP Member JJ by diluting TX NAACP Member JJ's vote.

129.     **TX NAACP Member KK** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 65. They intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member KK was in HD 65. TX NAACP Member KK identifies as Black.

130.     TX NAACP Member KK's residence is in the newly enacted HD 65. They are a registered voter in HD 65. They plan to vote in future elections in HD 65. As enacted under the State's plan H2316, the newly drawn HD 65 is a narrow district that spans Denton County from east to west. The district injures TX NAACP Member KK because it is a part of a three-way cracking of the cities of Lewisville and Carrollton in the southeastern part of the county that drops the voting population of color by over ten percentage points. This cracking occurred right after a coalition of minority voters—who made up approximately 45% of the voting population of the

district under the prior decades plan—were able to elect their candidate of choice in 2018, who was narrowly re-elected in 2020.

131.     HD 65 is a part of a 5-district cluster comprising Denton and Wise Counties. HDs 57, 63, 64, 65, and 106 form this 5-district cluster in and around Denton and Wise. Under the State's enacted plan, HD 65 is approximately 35% minority coalition by CVAP. Given the increase in the population of color in and around Wise/Denton, the State could have drawn HD 65 as a minority-coalition district with 18.44% BCVAP, 20.10% HCVAP, and 11.67% ACVAP. This alternative configuration of HD 65 would be located in the southeast corner of Denton County. Were TX NAACP Member KK to be placed in this alternative coalition district, their vote would not be diluted, and they would have a reasonable opportunity to elect a candidate of their choice.

132.     **TX NAACP Member LL** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 65. They intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member LL was in HD 65. TX NAACP Member LL identifies as Black.

133.     TX NAACP Member LL's residence is in the newly enacted HD 65. They are a registered voter in HD 65. They plan to vote in future elections in HD 65. As enacted under the State's plan H2316, the newly drawn HD 65 is a narrow district that spans Denton County from east to west. The district injures TX NAACP Member LL because it is a part of a three-way cracking of the cities of Lewisville and Carrollton in the southeastern part of the county that drops the voting population of color by over ten percentage points. This cracking occurred right after a coalition of minority voters—who made up approximately 45% of the voting population of the district under the prior decades plan—were able to elect their candidate of choice in 2018, who was narrowly re-elected in 2020.

134.     HD 65 is a part of a 5-district cluster comprising Denton and Wise Counties. HDs 57, 63, 64, 65, and 106 form this 5-district cluster in and around Denton and Wise. Under the State's enacted plan, HD 65 is approximately 35% minority coalition by CVAP. Given the increase in the population of color in and around Wise/Denton, the State could have drawn HD 65 as a minority-coalition district with 18.44% BCVAP, 20.10% HCVAP, and 11.67% ACVAP. This alternative configuration of HD 65 would be located in the southeast corner of Denton County. Were TX NAACP Member LL to be placed in this alternative coalition district, their vote would not be diluted, and they would have a reasonable opportunity to elect a candidate of their choice.

135.     **TX NAACP Member MM** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 66. They intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member MM was in HD 33. TX NAACP Member MM identifies as Black.

136.     TX NAACP Member MM's residence is in the newly enacted HD 66. They are a registered voter in HD 66. They plan to vote in future elections in HD 66. HDs 66 and HD 67 used to be compact, neighboring districts in the southwestern corner of Collin County. As enacted under the State's plan H2316, they are sprawling tentacles that extend throughout the county and are used to split the communities of color in the cities of Plano, Frisco, and Allen. As a result, persons of color like TX NAACP Member MM are injured in HD 66 because their voting power is diluted through the careful cracking of the Black, Latino, and Asian population in Collin County.

137.     **TX NAACP Member NN** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 66. They intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member NN was in HD 66. TX NAACP Member NN identifies as Black.

138.   TX NAACP Member NN's residence is in the newly enacted HD 66. They are a registered voter in HD 66. They plan to vote in future elections in HD 66. HDs 66 and HD 67 used to be compact, neighboring districts in the southwestern corner of Collin County. As enacted under the State's plan H2316, they are sprawling tentacles that extend throughout the county and are used to split the communities of color in the cities of Plano, Frisco, and Allen. As a result, persons of color like TX NAACP Member NN are injured in HD 66 because their voting power is diluted through the careful cracking of the Black, Latino, and Asian population in Collin County.

139.   **TX NAACP Member OO** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 67. They intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member OO was in HD 67. TX NAACP Member OO identifies as Black.

140.   TX NAACP Member OO's residence is in the newly enacted HD 67. They are a registered voter in HD 67. They plan to vote in future elections in HD 67. HDs 66 and HD 67 used to be compact, neighboring districts in the southwestern corner of Collin County. As enacted under the State's plan H2316, they are sprawling tentacles that extend throughout the county and are used to split the communities of color in the cities of Plano, Frisco, and Allen. As a result, persons of color like TX NAACP Member OO are injured in HD 67 because their voting power is diluted through the careful cracking of the Black, Latino, and Asian population in Collin County.

141.   **TX NAACP Member PP** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 67. They intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member PP was in HD 67. TX NAACP Member PP identifies as Black.

142.   TX NAACP Member PP's residence is in the newly enacted HD 67. They are a

registered voter in HD 67. They plan to vote in future elections in HD 67. HDs 66 and HD 67 used to be compact, neighboring districts in the southwestern corner of Collin County. As enacted under the State's plan H2316, they are sprawling tentacles that extend throughout the county and are used to split the communities of color in the cities of Plano, Frisco, and Allen. As a result, persons of color like TX NAACP Member PP are injured in HD 67 because their voting power is diluted through the careful cracking of the Black, Latino, and Asian population in Collin County.

143.    **TX NAACP Member QQ** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 97 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member QQ was in HD 97. TX NAACP Member QQ identifies as Black.

144.    TX NAACP Member QQ's residence is in the newly enacted HD 97. They are a registered voter in HD 97. They plan to vote in future elections in HD 97. As enacted under the State's plan H2316, the newly drawn HD 97 cracks persons of color by carving communities of color out of the district, including a cluster of majority-minority precincts in the Western Hills neighborhood of Fort Worth that were included in the prior decade's HD 97. As a result, the newly drawn HD 97 injures TX NAACP Member QQ by reducing the share of voters of color in the district by approximately 5 percentage points.

145.    **TX NAACP Member RR** is a member of the Texas NAACP and is the President of the Texas NAACP's San Antonio branch. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 121 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member RR was in HD 122. TX NAACP Member RR identifies as Black.

146.    TX NAACP Member RR's residence is in the newly enacted HD 121. They are a

registered voter in HD 121. They plan to vote in future elections in HD 121. As enacted under the State's plan H2316, the newly drawn district shares a jagged border with HD 123 to the southwest, which is located within the city of San Antonio. The district precisely carves out communities of color in the Northeast Park neighborhood, close to the airport, and precisely includes the heavily Anglo suburbs of Terrell Hills, Alamo Heights, and Olmos park. As a result, the newly enacted HD 123 injures TX NAACP Member RR by reducing the share of voters of color from the last decade's plan to just 42%.

147. **TX NAACP Member SS** is a member of the Texas NAACP and is the President of the Texas NAACP's San Antonio branch. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 121 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member SS was in HD 121. TX NAACP Member SS identifies as Black.

148. TX NAACP Member SS's residence is in the newly enacted HD 121. They are a registered voter in HD 121. They plan to vote in future elections in HD 121. As enacted under the State's plan H2316, the newly drawn district shares a jagged border with HD 123 to the southwest, which is located within the city of San Antonio. The district precisely carves out communities of color in the Northeast Park neighborhood, close to the airport, and precisely includes the heavily Anglo suburbs of Terrell Hills, Alamo Heights, and Olmos park. As a result, the newly enacted HD 123 injures TX NAACP Member SS by reducing the share of voters of color from the last decade's plan to just 42%.

149. **TX NAACP Member TT** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 126 and intend to vote in that district in the future. Under the previous decade's maps, TX

NAACP Member TT was in HD 126. TX NAACP Member TT identifies as Black.

150.    TX NAACP Member TT's residence is in the newly enacted HD 126. They are a registered voter in HD 126. They plan to vote in future elections in HD 126. As enacted under the State's plan H2316, the newly drawn HD 126 cracks people of color into the neighboring districts of HD 139 and HD 148, which each are composed of minority shares of voter of color of between 70% and 80%. This cracking dilutes the votes of people of color like TX NAACP Member TT by dropping HD 126's minority share of voters of color from approximately 57% under the prior decade's plan to approximately 45% under the new plan. As a result, TX NAACP Member TT, and other voters of color, have diminished opportunity to elect candidates of their choice.

151.    **TX NAACP Member UU** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 132 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member UU was in HD 132. TX NAACP Member UU identifies as Black.

152.    TX NAACP Member UU's residence is in the newly enacted HD 132. They are a registered voter in HD 132. They plan to vote in future elections in HD 132. The newly drawn HD 132 injures TX NAACP Member UU by cracking the population of color, removing significant concentrations of Black and Latino Texans from HD 132 to neighboring districts 135 and 149. As a result, HD 135 is over-packed with voters of color and HD 132 is left with a share of voters of color of just 41%, down from about 54% under the previous decade's plan.

153.    **TX NAACP Member VV** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 84 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member VV was in HD 84. TX NAACP Member VV identifies as Black.

154.    TX NAACP Member VV's residence is in HD 84 under the State's enacted plan H2316, which is a part of a 2-district cluster in and around Lubbock County. The cluster is composed of HDs 83 and 84. TX NAACP Member VV is among the population of color that has been cracked by the reconfigured house cluster and by the enacted HD 84, and as a result, their voting power has been diluted. TX NAACP Member VV lives in a census block that can be added to an alternative majority-minority coalition district (proposed HD 83) that would be 8.95% BCVAP, 42.22% HCVAP, and 8.95% ACVAP and largely covering the same area as enacted HD 83. Were TX NAACP Member VV to be placed in this alternative coalition district, their vote would not be diluted, and they would have more of an opportunity to elect a candidate of their choice. In addition, at least one alternative and highly effective district could be drawn in this house cluster, and placing TX NAACP Member VV in this alternative would afford TX NAACP Member VV a reasonable opportunity to elect their preferred candidate of choice.

155.    **TX NAACP Member WW** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 84 and intend to vote in that district in the future. Under the previous decade's maps, TX NAACP Member WW was in HD 84. TX NAACP Member WW identifies as Black.

156.    TX NAACP Member WW's residence is in HD 84 under the State's enacted plan H2316, which is a part of a 2-district cluster in and around Lubbock County. The cluster is composed of HDs 83 and 84. TX NAACP Member WW is among the population of color that has been cracked by the reconfigured house cluster and by the enacted HD 84, and as a result, their voting power has been diluted. TX NAACP Member WW lives in a census block that can be added to an alternative majority-minority coalition district (proposed HD 83) that would be 8.95% BCVAP, 42.22% HCVAP, and 8.95% ACVAP and largely covering the same area as enacted HD

83. Were TX NAACP Member WW to be placed in this alternative coalition district, their vote would not be diluted, and they would have more of an opportunity to elect a candidate of their choice. In addition, at least one alternative and highly effective district could be drawn in this house cluster, and placing TX NAACP Member WW in in this alternative would afford TX NAACP Member WW a reasonable opportunity to elect their preferred candidate of choice.

157.    **TX NAACP Member XX** is a member of the Texas NAACP. They are a citizen of the United States. They are over the age of 18. They are a registered voter in the newly enacted HD 57 and intend to vote in that district in the future. Under the prior decade's maps, they were in HD 63. Texas NAACP Member XX identifies as Black.

158.    TX NAACP Member XX's residence is in HD 57. They are a registered voter in HD 57. As such, they plan to vote in future elections in HD 57. The newly drawn HD 57 injuries TX NAACP Member XX because it was drawn as a barbell-shaped district to avoid the city of Denton. The newly enacted HD 57 splits communities of color in southeast Denton County and dilutes the voting power of persons of color like TX NAACP Member XX.

157.159.    Defendant **GREG ABBOTT** is the Governor of Texas and, pursuant to Article IV, Section I of the Texas Constitution, is the chief executive officer of the State of Texas. Governor Abbott is sued in his official capacity.

158.160.    Defendant **JOHN SCOTT** is the Secretary of State of Texas. Pursuant to Article IV, Section 21 of the Texas Constitution, the Secretary is the "chief election officer" of the State and is responsible for "assist[ing] and advis[ing] all election authorities with regard to the application, operation, and interpretation of this code and of the election laws outside of this code." Tex. Elec. Code §§ 31.001(a), 31.004(a). The Secretary also oversees the Texas Elections Division, which is responsible for administering the Texas Election Code and applying it voters,

elections, voting systems, candidates, and political parties. *Id.* at § 31.001(b). Scott is sued in his official capacity.

## SPECIFIC FACTUAL ALLEGATIONS

### A. *Statewide demographic shifts*

159.161.    In the last decade, Texas added 3,999,944 residents, the most of any state in the country. This growth made it the only state in the nation that was apportioned two additional seats in the U.S. House of Representatives.

160.162.    The results of the 2020 Census increased the ideal populations in Texas's districts to 194,303 for a state house district, 940,178 for a state senate district, and 766,987 for a congressional district.

161.163.    People of color ("POC")—meaning all Texans other than Anglo, non-Hispanic people—made up more than 95% of the growth in Texas in the last decade, despite the well-documented undercounting of racial and ethnic minorities in the 2020 Census. Those people who identified themselves as Black in the 2020 Census accounted for 14% of the total growth and those people who identified themselves as any part Black in the 2020 Census made up nearly 20% of the growth. Hispanic people accounted for approximately 50% of the growth since 2010, and Asian people accounted for 15% of the growth.

162.164.    Based on the most recent voting citizenship data available from the 2019 American Community Survey, POC currently make up 48.8% of the citizen voting age population ("CVAP") of Texas, with 13.1% Black CVAP ("BCVAP"), 29.9% Hispanic CVAP ("HCVAP"), and 3.7% Asian CVAP ("ACVAP"). Anglo non-Hispanic people make up 51.6% CVAP ("WCVAP").

163.165.    This makes Texas one of the most racially and ethnically diverse states in

the country, with the largest number of Black Americans, the second largest number of Hispanic Americans, and the third largest number of Asian Americans of any state in the nation.

164.166.        Texas's growth in population has been concentrated in and around the state's urban counties—for example, in Brazoria, Fort Bend, and Harris Counties around Houston, and in Denton, Dallas, Tarrant, and Wise Counties around Dallas.

165.167.        These have long been some of the most racially and ethnically diverse counties in the state, and this has become even more true over the past ten years as the POC population has grown:

| Percent of growth by CVAP in counties attributable to different racial and ethnic groups in the last decade (2010–2019) | | | | | |
|---|---|---|---|---|---|
| County | WCVAP Percent Share of Growth | POC CVAP Percent Share of Growth | BCVAP Percent Share of Growth | HCVAP Percent Share of Growth | ACVAP Percent Share of Growth |
| Brazoria | 11.9% | 88.1% | 27.1% | 46.7% | 12.0% |
| Dallas | -14.3% | 114.3% | 37.1% | 58.6% | 13.7% |
| Denton | 47.3% | 52.7% | 15.4% | 22.4% | 11.8% |
| Fort Bend | 26.2% | 73.8% | 21.8% | 24.7% | 25.1% |
| Harris | 4.6% | 95.3% | 21.1% | 58.6% | 11.6% |
| Lubbock | 14.1% | 86.0% | 3.8% | 73.9% | 3.1% |
| Tarrant | 17.3% | 82.7% | 26.5% | 42.6% | 9.2% |
| Wise | 61.3% | 38.6% | 2.9% | 32.0% | 0.1% |

166.168.        Those in the political party favored by Anglo Texans and currently in power in the Texas legislature, who were responsible for decision-making on the new maps, were aware of these changing demographic dynamics in Texas during the map-drawing and approval process.

167.169.        And yet the new house, senate, and congressional plans adopted by the legislature do not accurately reflect the state's new demographics based on the population growth of the past ten years.

168.170.        Instead, the map drawers created new plans that include fewer majority-minority districts than the old plans. As a result, under the new plans, people of color have less relative opportunity than Anglo people to elect candidates of their choice.

### B. *History of voting discrimination in Texas*

~~169.~~171.      Texas has a long and unbroken history of discriminating against Black people and other voters of color.

~~170.~~172.      Immediately following the Civil War, Texas created unofficial barriers designed to prevent Black voters and other voters of color from casting ballots. Beginning in the late 1870s and lasting through the early 1970s, Texas implemented a white primary system that disenfranchised Black voters by denying them participation in primaries; ratified a constitutional amendment requiring voters to pay a $1.50 poll tax as a prerequisite for voting; and prohibited voters from bringing a person to assist them in reading, marking, and submitting their ballots at the polls.

~~171.~~173.      Between 1927 and 1953, Texas went to the U.S. Supreme Court at least four times to maintain its racially discriminatory voting policies against Black voters. *Nixon v. Herndon*, 273 U.S. 536 (1927); *Nixon v. Condon*, 286 U.S. 73 (1932); *Smith v. Allwright*, 321 U.S. 649 (1944); *Terry v. Adams*, 345 U.S. 461 (1953).

~~172.~~174.      Over the years, numerous courts have recognized Texas's long history and present-day legacy of enacting racially discriminatory voting laws that disenfranchise voters on account of race.

- *Graves v. Barnes*, 343 F. Supp. 704, 725–26 (W.D. Tex. 1972) ("There exist innumerable instances, covering virtually the entire gamut of human relationships, in which the State has adopted and maintained an official policy of racial discrimination against the Negro. Indeed, even the Negro's right to vote and to participate in the electoral process has not remained untouched by the State's policy.").

- *League of United Latin Am. Citizens v. Clements*, 999 F.2d 831, 866 (5th Cir. 1993) ("Texas' long history of discrimination against its [B]lack and Hispanic citizens in all areas of public life is not the subject of dispute among the parties.");

- *Vera v. Richards*, 861 F. Supp. 1304, 1317 (S.D. Tex. 1994) ("Texas has a long, well-documented history of discrimination that has touched upon the rights of African Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history.");

- *Veasey v. Perry*, 71 F. Supp. 3d 627, 633 (S.D. Tex. 2014) ("The careful and meticulous scrutiny of alleged infringement of the right to vote . . . includes understanding the history of impairments that have plagued the right to vote in Texas, the racially discriminatory motivations and effects of burdensome qualifications on the right to vote, and their undeniable legacy with respect to the State's minority population.").

173.175.      This history of official discrimination against voters of color in Texas led to the inclusion of the state as a covered jurisdiction under Section 5 of the Voting Rights Act ("VRA").

174.176.      While in effect, the Section 5 preclearance process helped to block many discriminatory practices, including but not limited to the state's racially discriminatory property ownership qualifications for candidates (2008); the state's plan for the state house that would have led to retrogression in three majority-minority house districts (2001); the state's proof of citizenship requirements for voter registration (1996); and the state's inadequate bilingual

assistance programs that had the effect of diluting the voting strength of minority voters (1995).

175.177.    Between 1976 and 2013, the U.S. Department of Justice objected to more than 200 proposed voting changes in Texas, more than in any other state in the country during this period. These objections—which found that decisionmakers in Texas had purposefully intended to discriminate on the basis of race or that the proposed changes had a retrogressive effect on the ability of minority voters to participate equally in the political process—covered a wide range of discriminatory voting rules, such as last-minute polling place consolidations and discriminatory redistricting plans that resulted in the retrogression of districts in which Black voters and other voters of color could elect their candidates of choice. Notably, these objections all arose during periods when Anglo voters maintained control in Texas, but Democrats and Republicans both held power during this period.

176.178.    Sixty-one of those 200 total objections issued by DOJ addressed proposed congressional, state legislative, county, city, school district, or community college district redistricting plans.

177.179.    Between 2005 and 2009, the United States filed ten lawsuits against ten separate local jurisdictions for violations of Section 203 of the VRA because these jurisdictions were covered for Spanish-speaking, limited-English proficient voters. These lawsuits resulted in the respective jurisdictions entering into consent decrees that then led to the jurisdictions implementing the Spanish-language assistance programs required under Section 203.

178.180.    After the Supreme Court invalidated Section 5's preclearance coverage formula in 2013, Texas immediately began enforcing Senate Bill 14, which had previously failed to receive preclearance. SB 14 created one of the most restrictive photo ID regimes in the fifty states. A federal district court and the Fifth Circuit noted that voters of color disproportionately

lacked the types of photo IDs that SB 14 required for voters to cast their ballots. After years of protracted litigation, the Fifth Circuit en banc panel found that SB 14 impermissibly denied minority voters the opportunity to participate in the political process and, thus, violated the effects prong of Section 2. *Veasey v. Abbott*, 888 F.3d 719 (2018).

### C. *History of redistricting in Texas*

~~179.~~181.    Over the last five decades, Texas has frequently been ground zero for redistricting battles. In every decade since 1970, courts have struck down or blocked at least one of Texas's statewide redistricting plans on the basis that the plans violated the Voting Rights Act and/or the U.S. Constitution.

~~180.~~182.    Following the 1970, 2000, and 2010 censuses, federal courts found that Texas's redistricting plans were intentionally discriminatory or bore the mark of intentional discrimination in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution. *White v. Regester,* 412 U.S. 755 (1973); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006); *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012), *vacated and remanded on other grounds*, 570 U.S. 928 (2013); *Abbott v. Perez*, 138 S. Ct. 2305 (2018). Following the 1980 census, the Attorney General objected to the state's drawing of two contiguous congressional districts on the Gulf Coast under Section 5, pointing specifically to the packing of these districts with more than 80% Hispanic population, more than required for Hispanics to elect candidates of their choice. The three-judge court found that these districts were "invidiously discriminatory" and diluted the strength of minority voters and ordered these districts redrawn. *Seamon v. Upham*, 536 F. Supp. 931, 1009–12 (E.D. Tex. 1982), rev'd on other grounds in *Upham v. Seamon*, 456 U.S. 37 (1982).

~~181.~~183.    After the 1990 census, a three-judge panel found, and the Supreme Court later affirmed, that several oddly shaped congressional districts that did not meet traditional

districting principles, such as compactness, were racial gerrymanders under the Fourteenth Amendment because race was the predominant factor in the state's drawing of those districts. *See Vera v. Richards*, 861 F. Supp. 1304, 1325–26 (S.D. Tex. 1994), aff'd in *Bush v. Vera*, 517 U.S. 952 (1996).

~~182.~~184.     As recently as 2012 when the state was covered under Section 5, one federal court denied Texas's request to preclear state house and congressional redistricting plans—first, on the grounds the plans had been enacted with a discriminatory purpose, and second, on the basis that the plans had a retrogressive effect on the strength of minority voters and that the evidence showed that the retrogression may not have been "accidental" on the legislature's part. *Texas v. United States*, 887 F. Supp. 2d 133, 178 (D.D.C. 2012).

~~183.~~185.     As Texas's preclearance process continued to be litigated in the District of Columbia in *Texas v. United States*, a three-judge panel in Texas drew an interim plan to be used to elect members to the Texas house for the 2012 primary and general elections in Texas. Pointing to one district in Hidalgo County, the district court reasoned "that the decisionmakers were impermissibly focused on race in trying to make the district more Republican" when drawing the 2011 Texas house plan. *Perez v. Texas*, 2012 WL 13124275, at *3 (W.D. Tex. Mar. 19, 2012) (redrawing Texas's house plan after the Supreme Court, in *Perry v. Perez*, 565 U.S. 388 (2012), invalidated the interim plans drawn by the district court in 2011 for failing to defer to the state legislature's enacted plan and then remanded to the district court to draw interim plans that only altered "legally defective" districts in which the plaintiffs had shown a probability of succeeding on the merits).

**D. *The development and passage of redistricting plans S2168, H2316, and C2193***

~~184.~~186.     On September 7, Governor Abbott issued a proclamation setting the third

special session of the 87th Texas legislature for September 20.

185.187.    The first item on the agenda was "legislation relating to the apportionment of the State of Texas into districts used to elect members of the Texas House of Representatives, the Texas Senate, the State Board of Education, and the United States House of Representatives."

186.188.    A special session cannot last for more than 30 days under Article 3, § 40 of the Texas Constitution, though the Constitution does not limit the number of special sessions that the Governor may call.

187.189.    In these thirty days, the legislature proposed, considered, and passed four statewide plans that will remain in place for the next decade. Governor Abbott signed all four plans on October 25.

188.190.    Since their introduction in late September, the state house, state senate, and congressional plans were rushed through a legislative process defined by irregular procedures, delayed disclosure of proposed plans, inadequate public input, and hurried deliberations.

189.191.    Even prior to their introduction, the legislature was focused on passing other laws despite vociferous opposition from civil rights groups. For example, the state's omnibus election-related bill, SB 1, was passed despite near-constant warnings from Plaintiff Texas NAACP and other civil rights groups that the bill discriminated against voters of color.

190.192.    The legislature also scheduled and then cancelled multiple public hearings on redistricting, which hindered, delayed, and, in some cases, eliminated public participation. For many of these hearings, notice was inadequate and whether testimony could be given in person and/or online was unclear.

191.193.    Once the maps were introduced, civil rights groups, non-partisan redistricting experts, and members of the public repeatedly urged Republican lawmakers to tweak

their maps to address the dilutive effect of the maps on the voting strength of voters of color. For example, in the initial congressional map, the map drawers placed Representatives Sheila Jackson Lee (CD 18) and Al Green in the same district (CD 9), which meant that the two would have to run against each other in the next election. The legislature did not need to manipulate these districts, as Congresswoman Lee's district was 30,000 people above optimum size for a district following the census count and Congressman Green's district was just 4,000 above the optimum size. After significant public pressure and scrutiny from legislators, members of the public, and Plaintiff Texas NAACP, the map drawers changed this configuration by placing Lee and Green back in their respective districts and restoring some of the lost voters and territory.

192.194.     But map drawers still ignored many other amendments offered by Black legislators, who were actively fighting against packing, cracking, and the failure to create new opportunity districts or recognize those already in existence. Overall, the three plans do not reflect the voices of Black legislators or the voices of Texas NAACP's members and constituents.

193.195.     Furthermore, as the legislature moved swiftly to adopt these plans, the process was marred by departures from normal procedures.

194.196.     Even though many constituents and members of the house and senate requested additional time to review proposed changes to the maps—including the last-minute adoption of amendments—Republican legislators pushed all three proposals through the process to meet the tight thirty-day deadline.

195.197.     From suspending the "regular order of business," i.e., overlooking established legislative procedures such as bill layouts (when sponsors explain a bill and the reasoning behind it), to skipping the printing rule (when bills are printed and placed on legislators' desks prior to a vote), to requiring special procedures for legislators to introduce amendments to

the bills, to rushing middle-of-the-night votes, to name a few, the Republican leadership of the legislature gave short shrift to well-established and adhered-to legislative procedures.

### i.   Legislative background on the Texas house plan

~~196.~~198.      Representative Todd Hunter, chair of the House Redistricting Committee, filed House Bill 1 ("HB 1")—the redistricting plan for the Texas state house—on September 30, 2021.

~~197.~~199.      The house committee held its first public hearing on HB 1 regarding the composition of districts for the election of members of the Texas house on October 4. It had scheduled hearings earlier from June through August to solicit input from the members of the public on communities of interest, but many of these hearings were cancelled as the legislature focused its efforts on passing other pieces of legislation in the first and second special sessions.

~~198.~~200.      The house has a custom of allowing urban counties to submit their own plans to be included in the overall map that the house votes on. Several of the delegations submitted plans that were rejected in whole or in part, and substitutions and changes were made that were harmful in many ways to minority voters.

~~199.~~201.      During the house committee's first public hearing on HB 1, Representative Hunter declined to allow any invited testimony from experts in the field, preventing legislators and the public from hearing experts' opinions on the proposed maps. He also limited his bill layout for HB 1 to one hour and refused to allow committee members to ask him questions during the layout.

~~200.~~202.      Representative Hunter kicked off the hearing by explaining that the house committee would vote the bill out at the end of the hearing, effectively announcing that public input would have no effect on the proposed plan.

~~201.~~203.      As the hearing carried into the morning of October 5, Representative Hunter

declined committee members' requests to adjourn the meeting due to the late hour and to have more time to review proposed changes to the draft maps. Chair Hunter also rejected a number of proposed amendments and indicated that they could be made on the House Floor instead.

202.204.    On October 5, the house committee voted out a committee substitute on HB 1, which implemented significant changes to the house plan, despite the fact that the committee had not yet held a public hearing on the substitute. Public testimony was thus never heard on the committee substitute. The house committee voted out the substitute bill after just 15 minutes of consideration.

203.205.    On October 13, the house passed HB 1. The house sent the bill to the senate that same day, and the lieutenant governor referred the bill to the Senate Special Committee on Redistricting.

204.206.    On October 15, the Senate Special Committee on Redistricting held a public hearing on HB 1. The hearing lasted less than one hour, and the senate committee voted out the bill at the end of the hearing.

205.207.    The full senate then suspended a rule for the regular order of business, voting out HB 1 on October 15, the same day. HB 1 was then sent to the Governor Abbott's desk.

206.208.    On October 25, Governor Abbott signed HB 1, the Texas state house plan, into law.

### ii. Legislative background on the Texas senate plan

207.209.    Senator Joan Huffman, chair of the Senate Special Committee on Redistricting, filed Senate Bill 4 ("SB 4")—a redistricting plan for the Texas state senate—on September 18, 2021. Before the bill was introduced, the senate committee had scheduled public hearings on communities of interest in July and August of 2021. Those hearings were cancelled

because senators were preoccupied with the other legislative agenda items set by Governor Abbott during the first and second special sessions.

208.210.     On September 20, the senate committee issued a hearing notice for SB 4, setting a hearing on the bill for September 24.

209.211.     On September 24 and 25, the senate committee held public hearings on SB 4.

210.212.     Senator Huffman declined requests from fellow legislators to specify what measures were used to ensure the maps complied with the VRA. Senator Huffman told lawmakers and the public that the maps were "drawn blind to race," despite the fact that some consideration of race is necessary for compliance with the VRA. That claim by Huffman was also surprising considering that many of the new districts combined known majority-minority urban areas with majority Anglo rural areas to create safe Anglo districts and dilute the votes of minorities.

211.213.     The senate committee voted out the bill on September 28.

212.214.     On October 4, the full senate voted to suspend the printing rule for SB 4. The printing rule requires that a hard copy of the bill under consideration be placed on each senator's desk before a vote. This is to ensure that every senator has the opportunity to review a bill. With the printing rule suspended, that same day, the senate passed the bill on its third reading.

213.215.     On October 11, the House Redistricting Committee held a public hearing on the senate's newly approved SB 4. Once again, the house committee did not allow for invited testimony on the bill during the hearing. Senator Huffman limited the bill layout time for each bill to 30 minutes.

214.216.     Representative Hunter also announced during the hearing that the house committee would vote out SB 4 at the end of the hearing, along with any introduced amendments.

215.217.　　　House Committee members and members of the public had little time to review the amendments before voting on the bill, and the public did not have adequate time to review or provide feedback on the changes. That same day, the house committee voted out SB 1.

216.218.　　　All members of the house voted out SB 1 on October 15.

217.219.　　　Governor Abbott signed into law SB 1, the Texas state senate plan, on October 25.

### iii. Legislative background on the congressional plan

218.220.　　　Senator Huffman also filed SB 6 ("SB 6")—a redistricting plan for congressional districts—on September 27, 2021.

219.221.　　　On October 4, the Senate Special Committee on Redistricting held public hearings on SB 6.

220.222.　　　In those hearings, the senate committee adopted a novel rule requiring that, before an amendment could be filed, any congressional representative who would be impacted by the amendment had to consent to the change. This was an irregular move that made offering amendments cumbersome and time-consuming.

221.223.　　　When asked why a new opportunity district had not been created for voters of color, Senator Huffman said her team had seen "no strong basis in evidence" to create such a district.

222.224.　　　On October 6, the full senate voted to suspend the printing rule for SB 6. That same day, the senate passed SB 6 on the third reading.

223.225.　　　The House Redistricting Committee gave only 24-hour hearing notice to the public, issuing a notice for a public hearing on SB 6 on October 12, and setting the hearing for the very next day. The house committee also provided only 12 hours for the public to register to give

virtual testimony at the hearing.

224.226.        At the public hearing on October 13, State Representative Hunter limited the bill layout to just one hour. At the beginning of the hearing, State Representative Hunter announced that the Committee would vote out the bill at the end of the hearing and that it would not consider committee amendments until after public testimony. The committee did not allow invited testimony. That same day, the committee voted out SB 6.

225.227.        On October 16, the House adopted several amendments to SB 6 and passed it out on second reading. There was no opportunity for public input on any of these amendments.

226.228.        There were some differences between the version of SB 6 that the senate had passed and the version of SB 6 that the house passed. This required the convening of a conference committee between 5 members appointed from the house and 5 members appointed from the senate. The conference committee included 5 Anglo Republican senators and 4 Republican representatives. One of the conference committee representatives was a Black Democrat.

227.229.        The conference committee met on October 17, a Sunday, to hash out the differences in the two versions of bill and passed, for final consideration, a new reconciled version of SB 6. The process took less than twenty-four hours. Representative Senfronia Thompson, the only Black member and the only Democratic member of the conference committee, did not sign the committee report.

228.230.        The reconciled bill then went to the two chambers the very next day on October 18, with both chambers then voting to pass the bill. Legislators had little time to examine the final version of SB 6.

229.231.        Governor Abbott then signed into law SB 6, the Texas congressional plan,

on October 25.

### E. Analysis of Texas's new plans S2168, H2316, and C2193

230.232.        The vast majority of voters of color in Texas vote cohesively for the same candidates. This holds true for most Black, Hispanic, and Asian voters.

231.233.        In all parts of the state, Black voters vote cohesively for Democratic candidates and Anglo voters usually vote as a bloc to defeat those candidates. And in most parts of the state, Black, Hispanic, and Asian voters vote cohesively for Democratic candidates and Anglo voters usually vote as a bloc to defeat those candidates, too. Voting is thus racially polarized in Texas and has been for decades.

232.234.        Those in the Republican leadership of the Texas legislature, who were responsible for decision-making on the new maps, are aware that voting in Texas is racially polarized. These legislators and their map makers used this knowledge to draw maps in which they placed significant numbers of voters within or without districts predominantly because of their race.

233.235.        The map drawers prioritized racial considerations above traditional redistricting principles. The resulting plans thus do not preserve communities of interest adequately, nor do the plans follow traditional districting principles by including districts that are compact. Instead, these plans impermissibly manipulate populations, including Black populations.

234.236.        One way those responsible for the drawing and the approval of the plans manipulated populations by race is by reshaping districts in which Republican incumbents won or lost by narrow margins in the last election. These districts were primarily areas where demographic change meant voters of color were poised to elect their candidates of choice.

235.237.        To many of these districts, the map drawers added more Anglo voters at

levels similar to if not slightly greater than those that were drawn at the beginning of the last redistricting cycle, and reduced POC voters to levels similar to if not slightly lower than those that were drawn at the beginning of the last redistricting cycle.

236.238.      These adjustments will have the effect of diluting POC voting strength in these districts and statewide over the next decade until the next redistricting cycle in 2030.

237.239.      Another way those responsible for the drawing and the approval of the plans manipulated populations by race is by reshaping those districts in urban areas and their adjacent suburbs—areas that have witnessed some of the highest growth in voters of color.

238.240.      In these districts, the map drawers packed voters of color into urban epicenters, brought Anglo voters from more rural parts of the state into the districts bordering urban epicenters where POC have been the drivers of growth, and spread voters of color out into more sprawling districts.

239.241.      Together, these maneuvers, which include the racial manipulation of competitive Democratic and Republican districts and the flouting of traditional redistricting principles, will have the effect of diluting POC voting strength in specific districts and statewide. Additionally, as in the past, the maps drawn by the legislature and its map drawers constitute serious retrogression as to existing minority voting strength in Texas.

### i. State senate plan (S2168)

240.242.      The state senate is composed of 31 members.

241.243.      Only 2 state senators are Black. Both are Democrats and were elected from state senate districts that had above 75% POC CVAP and above 45% BCVAP under the old plan.

242.244.      Only 6 state senators are Hispanic. All 6 are Democrats and were elected from state senate districts (SDs 6, 19, 20 26, 27, and 29) that had above 70% POC CVAP as of

2019 under the old plan and had above 60% HCVAP as of 2019 under the old plan.

243.245.        Twenty-three senators are Anglo. Of the Anglo senators, 18 are Republican and were elected from majority Anglo CVAP districts which were all above 60% in Anglo CVAP under the old plan. There are no Republican senators of color in the state senate.

244.246.        Of the 23 Anglo senators, there are 5 Anglo Democratic senators. All were elected from senate districts that had significant populations of voters of color who voted cohesively behind their preferred candidates of choice, along with Anglo crossover voters who joined them to elect POC-preferred candidates. Under the old plan, 2 of these districts (SDs 15 and 21) had a POC CVAP above 60% and 1 district (SD 10) had a POC CVAP around 47%, close to majority. In the remaining districts (SDs 14 and 16), the POC CVAP under the old plan was significant—close to 40% POC CVAP in each district.

245.247.        Under the old plan, 9 senate districts had between 50% and 60% Anglo CVAP. Of those 9 senate districts, 7 of those districts (SDs 7, 9, 11, 17, 18, 28, and 31) elected Anglo Republicans and 2 of those districts (SDs 10 and 16) elected Anglo Democrats.

246.248.        Under the new plan, known as S2168, map drawers significantly increased the Anglo CVAP and concomitantly decreased the POC CVAP in most of the districts that elected Anglo candidates to the state senate, with the exception of SD 16, which packs voters of color into a "safe" Democratic district.

247.249.        Some of these manipulated districts incorporate parts of the two suburban counties of Tarrant and Fort Bend, whose growth over the past decade was driven primarily by POC. Some manipulated districts are in Dallas County, which witnessed a decline in the total number of Anglo people, attributing all of its growth to POC.

248.250.        Under the new map, the map drawers were able to evade the growth of POC

and ultimately draw fewer majority-minority coalition districts that could have given voters of color the opportunity to elect candidates of choice. The map as a whole also results in the retrogression of minority voting strength.

### a.   *Tarrant/Dallas senate districts*

~~249.~~251.      Tarrant County is located in north central Texas and encompasses the city of Fort Worth, the county seat. In the past decade, approximately 83% of the county's CVAP growth can be attributed to POC, with BCVAP comprising 26%, HCVAP comprising nearly 43%, and ACVAP comprising 9% of the overall CVAP growth in Tarrant County.

~~250.~~252.      Under the new plan, SDs 9, 10, 12, 16, 22, 23, and 30 make up the Tarrant/Dallas County senate district grouping. Under the State's enacted plan, the cluster contains two majority-minority coalition districts by CVAP. An additional majority-minority district could have been drawn in this cluster by making SD 10 into a majority-coalition district by bringing voters of color from SD 9 into SD 10, while maintaining the State's two majority-minority districts.


*Tarrant County cluster under the old senate plan*


*Tarrant County cluster under the new senate plan*

~~251.~~253.      Under the old senate plan, these districts were compact and drawn to keep Tarrant County and its immediate neighbors together.

252.254.      The new Tarrant County grouping is irregular in shape and much less compact compared to the grouping under the old senate plan. In fact, many of its districts are geographically sprawling. SD 10 stretches further west and south, splitting Tarrant County lines to disperse voters of color into rural districts. As enacted under the State's plan S2168, the newly drawn SD 10—formerly contained entirely in Tarrant County—now encompasses seven additional rural counties, reducing the percentage of voters of color in SD 10 from 46% under the previous decade's map to 38% under the newly enacted map. These new district boundaries were drawn just as voters of color in the old SD 10 were on the cusp of becoming the majority and thus diminish the opportunity of voters of color to elect representatives of choice.

253.255.      SD 22 similarly reaches into the heart of Tarrant County to bring in voters of color into the more Anglo, more rural districts that are a part of SD 22. As enacted under the State's plan S2168, the newly drawn SD 22 includes a dense, tentacle-like protrusion in the north that grabs urban, more diverse precincts in the city of Arlington and combines it with nine low-density, Anglo counties to the south. The protrusion in Arlington could have easily remained in Arlington (and SD 10), where communities of color would have had a stronger possibility of electing a candidate of their choice. By pairing the tentacle in Arlington with the low-density Anglo communities to the south, the map-drawers diluted the voting strength of Black voters.

254.256.      SD 9 has now been squeezed into the northwest corner of Tarrant County, where legislators knew there were very few POC residents as compared to the district's prior configuration.

255.257.      The new SD 22 has an Anglo CVAP percentage of approximately 63% and reaches into Tarrant County to pick up minority populations.

256.258.      Meanwhile in SD 9, the map drawers increased the Anglo CVAP from 55%

under the old plan to 65% under the new plan. Similarly, the POC CVAP in the new SD 9 went from 45% under the old plan to 35% under the new plan. In the last election, SD 9 elected an Anglo Republican by about 8 percentage points (fewer than 20,000 votes). That candidate was not the preferred candidate of choice of voters of color. By adding more white voters and decreasing POC voters, the new plan offers less opportunity for voters of color to elect their candidate of choice.

257.259.      In SD 10, the Anglo CVAP increased from 54% under the old plan to 62% under the new plan. Meanwhile, the POC CVAP significantly decreased from 46% under the old plan to 38% under the new plan. SD 10 is currently represented by Beverly Powell, an Anglo Democrat, who flipped the district in a close race in 2018 when she beat Konni Burton, an Anglo Republican, by about 3 percentage points (fewer than 10,000 votes). By extracting voters of color from the district and replacing them with Anglo voters from Parker, Johnson, Shackelford, and Callahan Counties, among others, the new plan significantly reduces the political strength of voters of color in SD 10.

258.260.      Under this reconfiguration of the district, the vast majority of voters of color who voted cohesively behind Powell will be denied the opportunity to elect representatives of their choice. Recognizing the demographic shifts in this area, the map drawers significantly reshaped SDs 9 and 10 by bringing in more Anglo voters from surrounding rural counties and moving voters of color from these competitive districts into more rural, more Anglo districts considered "safe" Republican seats (e.g., SDs 22 and 30).

259.261.      Over the last 10 years, the Black, Hispanic, and Asian coalition in SD 10 under the previous

260.262.      During this same time period, Anglos consistently voted as a bloc in the geographic area covered by SD 10 to defeat the candidate of choice of Black, Hispanic and Asian

voters. For example, in the 2020 presidential election, the Anglo bloc was estimated at 71%, which was enough to defeat the coalition candidate.

261.263.    The State's enacted plan dilutes the votes of Black, Hispanic, and Asian voters in SD 10 by placing them in a district where their candidates of choice have been consistently defeated by Anglo voters.

262.264.    One possible reconfiguration of the Tarrant/Dallas cluster proposes an alternative drawing of SD 9 that adds Black, Hispanic, and Asian voters who are in the enacted SD 9 to SD 10, such that SD 10 will be majority-coalition with 23.31% BCVAP, 26.28% HCVAP, and 6.54% ACVAP. Under this alternative configuration, voters of color in SD 10 will have reasonable opportunity to elect their candidates of choice, given the polarization discussed above and the specific electoral history in the precincts making up the district.

263.265.    Voters of color are cohesive in this alternative drawing of SD 10, which, in part, includes those voters who were cracked and placed in SD 9 under the State's enacted plan. Based on past electoral history in the precincts that were in SD 10 under the previous decade's plan and have since been added to SD 9 under the State's enacted plan, coalition voters typically support the same candidate with upwards of 80% cohesion. Each subgroup of the coalition also voted cohesively during this period. Based on the electoral history over the past ten years, this new configuration of districts has at least three highly effective districts for Black, Hispanic, and Asian voters.

264.266.    Notably, in the last redistricting cycle, SD 10 was the subject of similar racial manipulation that resulted in Black and Hispanic voters being cracked into surrounding districts. *Texas v. United States*, 887 F. Supp. 2d 133, *rev'd sub nom.* 570 U.S. 978 (2013) (vacating and remanding in light of *Shelby County v. Holder* decision but leaving undisturbed the merits of

the three-judge panel's decision). The three-judge panel did not preclear Texas's senate plan, particularly noting with respect to SD 10 that "[t]he demolition of District 10 was achieved by cracking the African American and Hispanic voters into three other districts that share few, if any, common interests with the existing District's minority coalition. The African American community in Fort Worth is "exported" into rural District 22—an Anglo-controlled District that stretches over 120 miles south to Falls [County]. The Hispanic Ft. Worth North Side community is placed in Anglo suburban District 12, based in Denton County, while the growing South side Hispanic population remains in the reconfigured majority Anglo District 10." *See id.* at 163–64.

265.267.     Similar to its twin in the metroplex, Dallas County grew considerably in the last decade, with an 8-percentage point increase in total CVAP from 2010 to 2019. Overall, the county lost Anglo people, so more than 100% of its growth over the last ten years is attributed to POC populations. Black voters contributed to 37% of the CVAP growth in the county, while Hispanic voters made up 58% of it and Asian voters made up 14% of it.

266.268.     Under the new plan, SDs 12, 16, 23, and 2 incorporate most of Dallas County.



*Dallas County cluster under the old senate plan*          *Dallas County cluster under the new senate plan*

267.269.     Like the new Tarrant County grouping, the new Dallas County cluster is far less compact than it was under the old plan. SD 2, for example, is an enormous district that now

encompasses many rural counties and reaches into north Dallas County. Under the old plan, SD 2 was more compact. Under the new plan, the district is sprawling. Additionally, under the new plan, 2 of the Dallas County districts, SDs 23 and 16, have POC CVAPs above 50%.

268.270.    As enacted under the State's plan S2168, the newly drawn SD 2 pairs a number of rural counties with two chunks of Dallas County and a sliver of Collin County, winding to touch seven counties overall. Latino voters are carefully split along the border of SD 2 and SD 16. SD 2 brings these small groups of voters of color into a sea of Anglo rural counties, weakening their ability to elect candidates of choice.

*b.   Fort Bend County and adjacent senate districts*

269.271.    Fort Bend County is a suburban county located to the south and to the west of Harris County. Fort Bend, over the past decade, has become increasingly diverse, owing most of its growth to POC. In fact, 73% of the CVAP growth in the county came from POC, with Black, Hispanic, and Asian people driving 26%, 25%, and 25% of the total POC CVAP growth, respectively.

270.272.    SDs 6, 13, 15, 17, and 18 are part of the Fort Bend senate cluster. Under the State's enacted plan, the cluster contains three majority-minority districts. An additional majority-minority district could have been drawn in this cluster by making SD 17 into a majority coalition district.



*Fort Bend County cluster under the old senate plan*    *Fort Bend County cluster under the new senate plan*

271.273.      The Fort Bend County districts are far less compact in the new plan as compared to the old plan. SD 18 has an irregular shape with multiple fingers that reach into Fort Bend and wrap around SDs 13, 7, and 17. Meanwhile, SD 17 is less geographically compact under the new plan, as well. Part of SD 17 reaches into the counties that used to be a part of SD 18. And SD 15, in the heart of Harris County, now wraps like a horse shoe around SD 6—the southwestern tip of the district pulls in residents that used to fall into SD 17, and the southeastern tip now curves inward in a skinny, jagged line. Overall, this cluster now incorporates multiple county splits that have the overall effect of cracking voters of color.

272.274.      Under the new map, map drawers cracked most of Fort Bend County's population of color into SD 18 or packed it into SD 13. In so doing, the map drawers increased the Anglo CVAP in SD 17 from 52% under the old plan to 58% under the new plan. Similarly, the POC CVAP in SD 17 decreased, from 48% under the old plan to 42% under the new plan. In the last election in SD 17, the Anglo Republican candidate—who was not the preferred candidate of choice of voters of color—won by just 4.7 percentage points.

273.275.      The map drawers remade the demographics of SD 17 by redrawing the

district's western and northern boundaries to bring in more Anglo populations from Colorado, Jackson, Matagorda, and Wharton Counties—all previously part of SD 18—and new portions of Waller County, while also packing more voters of color into neighboring SD 13, an already reliable Democratic seat held by a Black state senator.

274.276.      By manipulating the district boundaries to include more Anglo voters from rural counties and exclude voters of color in Fort Bend County, the new plan for SD 17 once again diminishes the opportunity for voters of color to elect their candidate of choice.

275.277.      Under the new map, POC voters were taken out of SD 15, and as a result the POC CVAP fell from approximately 64% under the old plan to approximately 59% under the new plan.

276.278.      Over the last 10 years, the Black, Hispanic, and Asian coalition in SD 17 has consistently supported their candidates of choice with at least 80% cohesion. For example, in the 2020 presidential election, the Black, Hispanic, and Asian coalition had an estimated 84% support for the same candidate of choice. Even regarding each subgroup individually, over the last ten years, each subgroup voted cohesively to support their preferred candidates of choice in the previous decade's configuration of SD 17.

277.279.      Over the last ten years, Anglos have consistently voted as a bloc in the area covered by SD 17 to defeat the candidate of choice of Black, Hispanic, and Asian voters. In the 2020 presidential election, Anglo bloc voting was at an estimated 76%, and the candidate of choice of voters of color lost by a margin of 17 percentage points.

278.280.      The enacted plan dilutes the votes of Black, Hispanic, and Asian voters in SD 17 by placing them in a district where their candidates of choice have been consistently defeated by Anglo voters.

279.281.　　　One proposed reconfiguration of the Fort Bend cluster proposes an alternative drawing of SD 17 that adds Black, Hispanic, and Asian voters who were in SDs 6, 13, and 15 into SD 17, such that SD 17 will be majority-coalition with 17.24% BCVAP, 24.47% HCVAP, and 15.58% ACVAP. This reconfiguration of SD 17 will provide coalition voters in the district with a reasonable opportunity to elect their candidate of choice, based on the polarization estimates and the electoral history of the precincts in the district that shows that the voters of color who are added to the proposed district vote cohesively.

280.282.　　　Under another proposed alternative plan, a district could be drawn that is 29.24% BCVAP, 25% HCVAP, and 16.8% ACVAP. In addition, at least four other configurations of alternative and highly effective districts could be drawn in the Fort Bend senate cluster, and placing voters of color who were cracked out of SD 17 and placed into another district and placing them into SD 17 would afford them a reasonable opportunity to elect their preferred candidate of choice. These alternatives would have respected the communities of interest in Fort Bend County by allowing most of the county, except for what is in SD 13, to be incorporated into one district. It would have also given voters of color in Fort Bend County the opportunity to elect their candidate of choice.

### ii. State house plan (H2316)

281.283.　　　The state house is composed of 150 members.

282.284.　　　Ten years ago, 96 house districts had majority- Anglo CVAPs and 54 districts had majority-minority CVAPs. Over the past decade, the POC population increased, reducing the number of majority- Anglo CVAP districts to 84 and increasing the number of majority-minority CVAP districts to 66. Of the 66 majority-minority districts under the old map, 7 would have had Black CVAPs above 50%.

283.285.     The new plan, known as H2316, reconfigures the old state house districts, creating fewer districts with POC CVAP majorities than there would have been had the old house plan still been in place. Under the new plan, 89 house districts have Anglo CVAPs above 50% and just 61 house districts have POC CVAPs above 50%.

| As of 2010… | | As of 2019… | | Under the 2021 proposed plan… |
|---|---|---|---|---|
| • 96 districts had a majority Anglo CVAP. | ☐ | • 84 districts have a majority Anglo CVAP. | ☐ | • 89 districts will have a majority Anglo CVAP. |
| • 54 districts had a majority-minority CVAP. | | • 66 districts have a majority-minority CVAP. | | • 61 districts will have a majority-minority CVAP. |

*Comparison of majority-minority versus majority-Anglo districts in the state house since 2010.*

284.286.     By redrawing the old districts, overall, the number of majority Black CVAP districts decreased. The decrease in the overall number of majority Black CVAP districts is retrogressive as to the rights of Black voters. Had the old plan been kept in place, 7 districts would have had majority-Black CVAPs (HDs 22, 109, 110, 111, 131, 146, and 141). Under the new plan, only 6 districts have majority-Black CVAPs (HDs 100, 109, 110, 111, 141, and 146).

285.287.     Under the new plan, map drawers also decreased the number of districts that would have had majority-Hispanic CVAPs as compared to the old plan. There would have been 33 majority-HCVAP districts under the old plan. But under the new plan, there are just 30 majority-HCVAP districts.

286.288.     The plan drawers thus achieved a net reduction in majority-minority districts, including both majority-Black and majority-Hispanic districts, by moving voters of color out of competitive districts that elected Republicans by a small margin and by moving more Anglo voters into those districts.

287.289.     Under the old plan, there were 16 house districts in which Republicans won

by fewer than 10 percentage points in the last election. Map drawers reconfigured many of those districts (HDs 26, 54, 64, 66, 67, 93, 94, 96, 97, 108, 112, 121, 126, and 132) by redrawing district boundaries to add more Anglo voters. In doing so, they reduced the ability of voters of color to elect candidates of choice in those districts where they were on the cusp of being able to elect their preferred candidates.

| House District | Republican Margin of Victory in the 2020 General Election (percentage points) | POC CVAP (2010) under the Old House Plan | POC CVAP (2019) under the Old House Plan | POC CVAP (2019) under the New House Plan |
|---|---|---|---|---|
| HD 26 | 3.6 | 46.3% | 53.3% | 45.3% |
| HD 54 | 6.8 | 46.2% | 54.1% | 52.4% |
| HD 64 | 9.9 | 23.4% | 28.5% | 25.2% |
| HD 66 | 1.0 | 28.0% | 36.2% | 29.3% |
| HD 67 | 3.4 | 25.9% | 34.2% | 31.5% |
| HD 93 | 8.9 | 33.7% | 42.4% | 36.4% |
| HD 94 | 5.2 | 28.4% | 36.8% | 30.3% |
| HD 96 | 5.3 | 32.1% | 44.2% | 35.9% |
| HD 97 | 7.5 | 23.8% | 33.0% | 28.1% |
| HD 108 | 1.7 | 24.0% | 24.5% | 16.0% |
| HD 112 | 0.3 | 41.8% | 51.4% | 34.3% |
| HD 121 | 6.9 | 36.8% | 44.7% | 41.7% |
| HD 126 | 6.6 | 42.4% | 52.8% | 40.4% |
| HD 132 | 3.8 | 41.8% | 54.0% | 42.0% |

*Chart showing POC CVAP percentages in competitive districts under old and new maps.*

288.290.    While the lack of compactness of HDs 93, 94, 96, and 97 are discussed below as a part of the Tarrant County grouping of house districts, the rest of the Tarrant County cluster districts also violate traditional redistricting principles.



*HDs 26, 132, and 126 under the old house plan*                    *HDs 26, 132, and 126 under the old house plan*

289.291.    HD 26 is less compact than it was under the old plan. Whereas previously the district was nestled in a small northeast segment of Fort Bend County, it now carves a path from the most northern tip of the county down to the center of the county.

290.292.    HD 132 remains planted along the border of Harris County under the new map, but it is less compact than it was under the old plan. It now wraps one finger around the top of HD 135 and another around the side of HD 149.

291.293.    HD 126 is also less compact under the new map than it was under the old map. The new district has two arms pointing outward, one toward the southwest and one toward the northeast, bringing more of Harris County's Anglo voters within the district. Whereas under the old plan HD 126 would have had a POC CVAP of 53%, under the new district it has a POC CVAP of just 40%.




*HDs 66, 67, and 112 under the old house plan*    *HDs 66, 67, and 112 under the new house plan*

292.294.        HDs 66 and 67, in Collin County, are also less compact under the new plan than they were under the old plan. Under the new plan, HD 66 extends further north, tracing almost the entire western border of the county, and protrudes into the county at various points. HD 67 has also been moved from the southwest corner of the county to the northeast corner of the county, and also includes a spindly arm that protrudes into the southwest corner.

293.295.        Similarly, HD 112 in Dallas County is much less compact under the new map than it was under the old map. Previously, the district was drawn in the northeast corner of the county, bordering Collin County. In 2020, it included a significant POC population. Map drawers redrew the district in an irregular shape to wrap around the border of Dallas County in a right-angle shape, reducing the POC CVAP from 51% under the old plan to 34% under the new plan.

 

*HD 108 under the old house plan*    *HD 108 under the new house plan*

294.296.    HD 108 is also in the Dallas County region. Its POC CVAP was decreased

under the new map, from 25% POC CVAP to 16%. And it is also less compact than it was under

the old map. It now has 4 tentacles reaching up into more Anglo areas to the north, south, and east

to bring in more Anglo residents.

 

*HD 54 under the old house plan*    *HD 54 under the new house plan*

295.297.    HD 54 in Bell County is also less compact and bizarrely situated under the

new plan. The district now has a donut-shaped hole in the middle where HD 55 is drawn.

 

*HD 121 under the old house plan*          *HD 121 under the new house plan*

~~296.~~298.        HD 121, located in Bexar County, is less compact under the new plan, too.

HD 121 has tentacles that reach upward into more Anglo suburbs to bring in additional Anglo

population.

> a. *Tarrant County house district irregularities and potential majority-minority*
> *coalitions*

~~297.~~299.        The Tarrant County house districts (HDs 90, 91, 92, 93, 94, 95, 96, 97, 98,

99, 101) highlight the ways that map drawers used racial manipulation to diminish the voting

strength of voters of color and illustrate their failure to draw additional majority-minority coalition

seats that could have led to a net increase in majority-POC CVAP house districts.

 

*Tarrant County cluster under the old house plan*      *Tarrant County cluster under the new house plan*

298.300.       Many of the house districts under the new plan are less compact, have irregular shapes, and split communities of interest apart as compared to the old plan. HD 94 has several arms that reach into surrounding districts in nearly every direction, and the top portion of HD 96 now reaches further north to capture POC communities from Tarrant County. HD 101 also reaches up further north under the new plan.

299.301.       The newly drawn HD 97, located in the southwest corner of Tarrant County, witnessed a drop in POC CVAP by about 5 percentage points under the new lines as compared to what the POC population percentage would have been had the old boundaries remained. The boundaries of the district were redrawn into a less compact shape to include lower POC CVAP percentages and higher Anglo CVAP percentages, diminishing the opportunities for voters of color to elect candidates of their preference.

300.302.       The newly drawn HDs 94 and 96 in Tarrant County serve as examples of the strategies the map drawers purposefully used to evade POC growth in key counties.

301.303.       During the last elections held in each of these districts, Republican candidates won by margins of less than 10 percentage points in their respective districts. In response, map drawers redrew these districts, removing POC voters and replacing them with Anglo voters.

302.304.       In HD 94, for example, an Anglo Republican candidate won re-election in 2020 by receiving 51% of the vote. Over the last ten years under the old plan, the district's demographics changed from 28% POC CVAP to 37% POC CVAP. But under the new plan, the map drawers brought the POC CVAP back down 7 percentage points to 30%—drawing the district much farther north, with two arms reaching eastward to capture more Anglo voters.

303.305.      In HD 96, an Anglo Republican candidate won the election in 2020 with 51.2% of the vote. Before that, an Anglo Republican incumbent had represented the district since at least 2012. Under the old plan, the district's POC demographics increased from 32% POC CVAP in 2010 to 44% POC CVAP in 2020. Under the new plan, the map drawers redrew the district to have a POC CVAP of 36%, 8 percentage points less than what it would have been under the old plan.

304.306.      Under the new plan, Tarrant County's 11-seat grouping contains 4 majority-minority CVAP seats (HDs 90, 92, 95, and 101). Under the old plan, HD 92 had elected an Anglo Republican candidate who received 50.9% of the vote in 2020. In 2019, HD 92 had a POC CVAP of 36% under the old plan and an Anglo CVAP of 64%. Under the new plan, map drawers had to concede HD 92, making it into a majority-minority coalition seat with 57% POC CVAP and 43% Anglo CVAP (in order to protect the 7 majority-Anglo CVAP districts (HDs 91, 93, 94, 96, 97, 98, and 99) in Tarrant County.

305.307.      To protect these 7 majority-Anglo CVAP districts, the new map cracked the POC populations in at least two districts (HDs 94 and 96) and incorporated them into the surrounding POC-heavy districts. Had the map drawers not cracked the POC populations in these two districts to protect the grouping of 7 majority-Anglo VAP seats in Tarrant County, they could have drawn two more coalition districts with sizeable Black contingents. This could have been done by creating one district in the cities of Arlington and Grand Prairie and creating another district in the city of Fort Worth.

| House District (11-seat Tarrant County Cluster under the New Plan) | Republican Margin of Victory in 2020 General (in percentage points) | White CVAP under the Old House Plan (2019) | White CVAP under the New House Plan (2019) |
|---|---|---|---|
| HD 90 | - 44.8 | 24.3% | 29.4% |
| HD 92 | 3.7 | 63.6% | 42.5% |
| HD 95 | - 100 (unopposed D) | 27.6% | 27.6% |
| HD 101 | - 100 (unopposed D) | 28.4% | 32.3% |
| HD 91 | 27.8 | 68.5% | 68.4% |
| HD 93 | 9 | 57.6% | 63.6% |
| HD 94 | 5.1 | 63.2% | 70.0% |
| HD 96 | 5.1 | 55.8% | 64.1% |
| HD 97 | 7.4 | 67.0% | 71.8% |
| HD 98 | 35.6 | 79.5% | 79.4% |
| HD 99 | 100 (unopposed R) | 70.7% | 67.0% |

*Comparison of white voting age population in Tarrant County house districts under old and new maps.*

306.308.   Under the State's enacted plan, the cluster contains four majority-minority districts. One alternative mapping shows that HD 94 could have also been made into a majority-minority district by moving in voters of color from HD 91.

307.309.   In particular, Black, Hispanic, and Asian voters have voted cohesively in HD 94 over the last 10 years. The levels of cohesion have increased over the past 10 years, with voters of color generally supporting the same candidate with upwards of 87% cohesion. In the 2020 presidential election, the Black, Hispanic, and Asian coalition had an estimated 88% support for the preferred candidate of choice. Even regarding each subgroup individually, over the last ten years, each subgroup voted cohesively to support their preferred candidates of choice in the previous decade's configuration of HD 94.

308.310.   Over the last 10 years, Anglos consistently voted as a bloc in the geographic area covered by HD 94 to defeat the candidate of choice of Black, Hispanic and Asian voters. In the 2020 presidential election, Anglo bloc voting was estimated at 73%, and the candidate of choice of voters of color lost by a margin of nine percentage points.

309.311.   The enacted plan dilutes the votes of Black, Hispanic, and Asian voters in HD 94 by placing them in a district where their candidates of choice have been consistently defeated by Anglo voters.

310.312.   One possible reconfiguration of the Tarrant house cluster proposes an alternative drawing of HD 94 that adds Black, Hispanic, and Asian voters who are in neighboring districts including HD 91 to a new proposed configuration of HD 94. Under this configuration, HD 94 will be majority-coalition with 34.36% BCVAP, 19.01% HCVAP, and 4.71% ACVAP. This reconfiguration of HD 94 will allow coalition voters in the district the opportunity to elect their candidate of choice, based on the polarization described above and the specific electoral history of the precincts.  Past election results in the precincts covered by HD 94 and the proposed precincts to be added to the alternative drawing of HD 94 show that voters of color vote cohesively, both together and within their subgroup, to elect their candidate of choice.

311.313.   In addition, at least four alternative and highly effective districts could be drawn in this house cluster, and placing voters of color in any one of these alternative districts would afford them a reasonable opportunity to elect their preferred candidate of choice.

> b.   *Wise and Denton Counties potential majority-minority coalition house districts*

312.314.   Wise and Denton Counties, for example, constitute a 5-seat grouping of house districts (HDs 61, 63, 64, 65, and 106 under the old plan; HDs 57, 63, 64, 65, and 106 under the new plan). Under both the old and new maps, none of the districts had majority-minority CVAP seats.

 

*Wise & Denton County cluster under the old house plan*  *Wise & Denton County cluster under the new house plan*

~~313.~~315.      In the newly drawn Wise and Denton cluster, HD 57 cuts an irregular shape inside Denton County, linking the central west portion of the county to the central east portion. Meanwhile, HD 65 stretches across the bottom of Denton County, and HD 63 snakes in below it. Together, these three districts look like horizontal strips stretching across the county.

~~314.~~316.      HD 65, which was drawn compactly around Lewisville and Carrolton in the old map, had elected the POC-preferred candidate of choice in 2020, Anglo Democrat Michelle Beckley, with 51.1% of the votes. A small percentage of Anglo crossover voters and voters of color voted together to elect Beckley, the POC-preferred candidate of choice, from a 54% Anglo CVAP and a 46% POC CVAP district under the old maps.

~~315.~~317.      After map drawers redrew this grouping, the district added 10 percentage points of Anglo CVAP. Under the new map, HD 65 has a 64% Anglo CVAP and a 36% POC CVAP.

~~316.~~318.      By moving HD 65 from the southeastern corner of Denton County to stretch across the entire bottom strip of the county, the map drawers divided voters of color between HDs

57, 63, 65, and 106, significantly reducing their political strength in HD 65, which could have been drawn as a majority-minority seat in the new map.

317.319.      Under the State's enacted plan, the cluster contains four majority-minority districts. One alternate mapping shows that HD 65 could have also been made into a majority-minority district by moving in voters of color from HD 63.

318.320.      In particular, Black, Hispanic, and Asian voters have voted cohesively in HD 65 over the last 10 years. The levels of cohesion have increased over the past 10 years generally supporting the same candidate with upwards of 85% cohesion. In the 2020 presidential election, the Black, Hispanic, and Asian coalition had estimated 89.6% support for the same candidate of choice. Even regarding each subgroup individually, over the past ten years, each subgroup voted cohesively to support their preferred candidates of choice in the previous decade's configuration of HD 65.

319.321.      Over the last 10 years, Anglos consistently voted as a bloc in the area covering HD 65 to defeat the candidate of choice of Black, Hispanic, and Asian voters. In the 2020 presidential election, Anglo bloc voting was at an estimated 78% and the candidate of choice of voters of color lost by 7% over the past 10 years.

320.322.      One possible reconfiguration of the Denton/Wise cluster proposes an alternative drawing of HD 65 that adds Black, Hispanic, and Asian voters who were in HD 63 to create a majority-coalition with 18.44% BCVAP, 20.1% HCVAP, and 11.67% ACVAP. This possible reconfiguration of HD 65 would allow coalition voters in the district the opportunity to elect their candidate of choice.

321.323.      Under the proposed alternative, the voters of color who would be added from the precincts in HD 63 into HD 64 vote cohesively, based on past election results that show

that coalition voters in these precincts typically support the same candidates of choice with upwards of 85% cohesion.

~~322.~~324.        This new alternative configuration of districts has a likely effective district for Black, Hispanic, and Asian voters, replacing the State's plan that has none.

*c. Brazoria County potential coalition house district*

~~323.~~325.        In the last ten years, 88% of the CVAP growth in Brazoria County came from POC, with Black CVAP making up 28% of the growth, Hispanic CVAP making up 46% of the growth, and Asian CVAP making up 12% of the total growth in the county.

~~324.~~326.        Under the old map, Brazoria County was split between two house districts—HDs 25 and 29—that elected Anglo Republican candidates in the last election.

~~325.~~327.        In 2010, HD 29 had a POC CVAP of about 45%, and by 2020, it had a POC CVAP of 50%. Thus in 2020, HD 29 was on the cusp of becoming a majority-minority opportunity district because of the growth of the population of color over the past ten years.




*Brazoria County cluster under the old house plan*        *Brazoria County cluster under the new house plan*

~~326.~~328.        But under the new map, the map drawers reconfigured the district by decreasing the POC CVAP to 45% and bringing HD 29 back to 2010 POC CVAP levels. Under the new plan, HD 29 is far less compact. The southern portion of the district extends into Brazoria

to capture some of the POC population there. HD 25 has a finger that wraps around the side of HD 27, sharing the border with HDs 27 and 29. This extension prevents HDs 27 and 29 from sharing a boundary and it limits the ability of the POC voters in Brazoria to make up a majority-minority coalition district.

327.329.    Geographically, the map drawers changed the demographics of HD 29 by extending it further south to capture additional Anglo voters, rather than drawing a compact coalition seat around Pearland in the north of the county.

328.330.    Under the State's enacted plan, Brazoria cluster (HDs 25 and 29) did not contain any majority-minority districts. However, a reconfiguration of these two districts can make HD 29 a majority-minority district.

329.331.    In particular, Black, Hispanic, and Asian voters have voted cohesively in HD 29 over the last 10 years. The levels of cohesion have increased over the past 10 years, with voters of color generally supporting the same candidate with upwards of 80% cohesion. In the 2020 presidential election, the Black, Hispanic, and Asian coalition had an estimated 87.2% support for the same candidate of choice. Even regarding each subgroup individually, over the last ten years, each subgroup voted cohesively to support their preferred candidates of choice in the previous decade's configuration of HD 29.

330.332.    During that same time period, Anglos consistently voted as a bloc in the area covering HD 29 to defeat the candidate of choice of Black, Hispanic and Asian voters. In the 2020 presidential election, Anglo bloc voting was at 76%.

331.333.    The enacted plan dilutes the votes of Black, Hispanic, and Asian voters in HD 29 by placing them in a district where their candidates of choice have been consistently defeated by Anglo voters.

332.334.        One possible reconfiguration of the Brazoria cluster proposes an alternative drawing of HDs 25 and 29 that moves precincts between them to make a majority coalition district in HD 29. In this new configuration, Black, Hispanic, and Asian voters will be majority-coalition with 23.03% BCVAP, 22.89% HCVAP, and 10.58 % ACVAP. Past electoral history over ten years indicates that voters of color in the alternative district configuration are cohesive both in the district and in the precincts to be moved between HDs 25 and 29.

333.335.        This new configuration of districts has a likely effective district for Black, Asian, and Hispanic voters, while the enacted plan has none.

### d. *Lubbock County potential coalition house district*

334.336.        In Lubbock County, 85% of the CVAP growth in the last decade can be attributed to POC. Under the old and new maps, the county covers a two-seat grouping, HDs 83 and 84.




*Lubbock County cluster under the old house plan*          *Lubbock County cluster under the new house plan*

335.337.        Under the new plan, HD 84 rests in the northwest corner of the County and straddles the border between HDs 88 and 83. HD 84 has fingers that extend into parts of the County but do not encompass the County as a whole. This results in Lubbock County being unnecessarily split between HDs 84 and 83.

336.338.      When the map drawers redrew the two districts in 2020, they made few changes to the POC and Anglo CVAP percentages, so the district's demographics remained essentially the same under the new plan as under the old plan. Under the new plan, HD 84 has a POC CVAP of 47% and HD 83 has a POC CVAP of 35%. Had the old plan been in place, the POC CVAPs in the two districts would have been more or less the same.

337.339.      Under the State's enacted plan, the Lubbock cluster (HDs 83 and 84) did not contain any majority-minority districts. However, a reconfiguration of these two districts can make HD 83 a majority-coalition district.

338.340.      Black, Hispanic, and Asian voters have voted cohesively in HD 83 over the last 10 years. Indeed, the levels of cohesion have increased over the past 10 years, with voters of color generally supporting the same candidate with upwards of 78% cohesion. In the 2020 presidential election, the Black, Hispanic, and Asian coalition had an estimated 78% support for the candidate of choice. Even regarding each subgroup individually, over the last ten years, each subgroup voted cohesively to support their preferred candidates of choice in the previous decade's configuration of HD 83.

339.341.      Over the last 10 years, Anglos consistently voted as a bloc in the area covered by HD 83 to defeat the candidate of choice of Black, Hispanic, and Asian voters. In the 2020 presidential election, Anglo bloc voting was an estimated 75%.

340.342.      The enacted plan dilutes the votes of Black, Hispanic, and Asian voters in HD 83 by placing them in a district where their candidates of choice have been consistently defeated by Anglo voters.

341.343.      One proposed reconfiguration of the Lubbock cluster proposes an alternative drawing of HDs 83 and 84 that moves precincts between them to make a majority-

minority coalition district in HD 83. In this new configuration, Black, Hispanic, and Asian voters will be a majority-coalition with 8.95% BCVAP, 42.22% HCVAP, and 0.9% ACVAP. Voters of color are cohesive in this alternative drawing of the district, which includes the precincts that would be moved from HD 83 into HD 84 under the proposed alternative plan. And based on past electoral history in the district, they support the same candidates of choice at upwards of an estimated 78% cohesion.

### iii. Congressional plan (C2193)

342.344.      After the 2020 Census, Texas was the only state that added more than one seat to its congressional delegation. In 2022, Texas will elect two more members to the U.S. House of Representatives, accounting for a total of 38 members in the U.S. House. Texas's gaining two seats can be almost exclusively attributed to the growth of people of color in the state over the past decade.

343.345.      Despite this growth, the state's new congressional map does not accurately reflect the state's demographics or demographic trends. Under the new plan, known as C2193, neither of the two new districts have majority POC CVAPs. Both districts have Anglo CVAPs above 63% and POC CVAPs below 40%. The new plan gives the new CD 37 an Anglo CVAP of 65% and a POC CVAP of 35%, and it gives the new CD 38 an Anglo CVAP of 63% and a POC CVAP of 37%.

344.346.      As is the case with the new state house and senate plans, the new congressional plan manipulates populations based on race—namely, by increasing the Anglo CVAP and decreasing the POC CVAP—in competitive districts where Anglo Republican incumbents won by small margins. These patterns are most salient in the Dallas-Fort Worth metroplex and in the Greater Houston-Fort Bend regions.

345.347.    In the Dallas-Fort Worth area, CD 24 elected an Anglo Republican candidate by just 1.4 percentage points in the last election. Under the new plan, map drawers added about 15 percentage points of Anglo CVAP to CD 24, increasing the Anglo CVAP from 59% under the old plan in 2019 to 74% under the new plan. The new CD 24 pulls Anglo suburban voters into the district to dilute the votes of people of color. CD 24 also has an irregular shape—it stretches horizontally between Tarrant, Denton, and Dallas Counties. The part of CD 24 that extends into Dallas County has arms that protrude into the county.

346.348.    In CD 6, also in the Dallas-Fort Worth region, voters elected an Anglo Republican candidate in the last election by about 9 percentage points. Under the new plan, the map drawers increased the Anglo CVAP by about 4 percentage points, raising it from 56% under the old plan to 60% under the new plan, and simultaneously decreased the POC CVAP by 4 percentage points to reduce it to 40%. CD 6 has an irregular shape because the top half of it extends into Dallas and Tarrant Counties. The district is also less compact under the new plan than it was under the old plan because it stretches out horizontally to the west into Navarro, Hill, Anderson, and Cherokee Counties.

347.349.    CD 22, encompassing Fort Bend County outside Houston, has reliably elected Anglo Republicans in recent years. But over the past decade, Fort Bend County's POC population has grown sizably, and traditionally Republican seats have become increasingly competitive, giving voters of color increasing opportunities to elect candidates of their choice.

348.350.    In fact, under the old maps, CD 22 went from having a majority-Anglo CVAP in 2010 to having a majority-POC CVAP in 2019. To evade the effect of these demographic changes, map drawers extended the new CD 22 much farther south and west to incorporate more rural Anglo voters, splitting diverse Fort Bend County in the process. In so doing, the new CD 22

maintains a POC CVAP around 45% and Anglo CVAP at 55%, effectively resetting the district's demographics to around their 2010 levels, despite the sizeable increase in POC. CD 22 is less compact under the new plan as compared to the old plan because it reaches downward to bring in voters from Matagorda and Wharton Counties. It also has irregular tentacle-like extensions that reach into the north of Fort Bend County.

349.351.    Nearby, a similar pattern is evident in CD 2, another district in the Houston area that elected an Anglo Republican candidate in 2019 and elected an Anglo Republican for fourteen years before him. Despite the fact that the district's actual Anglo CVAP decreased approximately 9 percentage points in the last decade and the POC CVAP increased as much under the old plan, map drawers redrew CD 2 to increase the Anglo CVAP by nearly 9 percentage points, from 56% under the old plan to 65% under the new plan. To do so, map drawers altered the shape of CD 2 under the new congressional map, extending it much further north to incorporate more rural, Anglo voters in Kingwood and Montgomery Counties.

350.352.    The new CD 38, located in the northern portion of Harris County, has a 63% Anglo CVAP and a 37% POC CVAP under the new plan. CD 38 takes over much of the area that fell into CD 2 under the old plan. Under the old plan, CD 2 was in the northeastern corner of Harris County and wrapped around old CD 18. The new CD 38 now encompasses part of the old CD 2 by incorporating the more conservative, more Anglo populations in north and west Houston. This explains CD 38's odd hourglass shape that has protrusions on the top and the bottom of the district. Through these extensions, the bottom half of CD 38 incorporates POC populations from the heart of Harris County, while the top half extends further away from the city center to incorporate a larger Anglo population, keeping the POC CVAP at about 37%. Additionally, CD 8 cuts into CD 38 from the west, and CD 18 cuts into the district from the east.

~~351.~~353.      Across these districts, Dallas/Tarrant Counties and Harris/Fort Bend Counties can attribute more than 75% of their population growth to people of color. As such, map drawers could have created multiple majority-minority coalition districts in these areas.

      *a.*      *Dallas/Tarrant Counties potential coalition congressional districts*

~~352.~~354.      CDs, 6, 12, 24, 25, 30, 32, and 33 are part of the Tarrant/Dallas congressional cluster. Under the State's enacted plan, the cluster contains three majority-minority districts. An additional majority-minority district could have been drawn in this cluster by making CD 12 into a majority-minority coalition district by adding voters of color from CD 6 to CD 12 and maintaining the state's three majority-minority districts.



*Dallas and Tarrant County cluster under the old congressional plan*



*Dallas and Tarrant County cluster under the new congressional plan*

353.355.    Under the old plan, four districts (CDs 6, 12, 24, and 25) elected Anglo Republicans in the last election and three districts (CDs 30, 32, and 33) elected Black Democrats in the last election.

354.356.    In particular, Black, Hispanic, and Asian voters have voted cohesively in CD 6 over the last 10 years. There is reliable, and increasing, cohesion over this period, with coalition voters typically supporting the same candidate with upwards of 80% cohesion—both as a coalition and within each subgroup. For example, in the 2020 presidential election, the Black, Hispanic, and Asian coalition had an estimated 86% support level for the candidate of choice. Even regarding each subgroup individually, over the last ten years, each subgroup voted cohesively to support their preferred candidates of choice in the previous decade's configuration of CD 6.

355.357.    Over the same time period, Anglos consistently voted to defeat the candidate of choice of Black, Hispanic and Asian voters in the area covered by CD 6. In the 2020

presidential election, Anglo bloc voting was estimated at 81%, which was enough to defeat the coalition candidate of choice.

356.358.      The enacted plan dilutes the votes of Black, Hispanic, and Asian voters in the area covered by CD 6 by placing them in a district where their candidates of choice have been consistently defeated by Anglo voters.

357.359.      One possible reconfiguration of the Tarrant/Dallas cluster proposes an alternative drawing of CD 12 that adds Black, Hispanic, and Asian voters who were in CD 6 to CD 12, such that CD 12 will be majority-minority coalition by 20.64% BCVAP, 40.02% HCVAP, and 5.23% ACVAP. Under this alternative configuration, voters of color in CD 12 will a reasonable opportunity to elect their candidates of choice.

358.360.      Voters of color are cohesive in this alternative drawing of CD 12, which, in part, includes those voters of color who were moved from the State's enacted CD 6 into the alternative CD 12. Based on past election results, coalition voters typically support the same candidate with upwards of 80% cohesion in each group (Black, Hispanic, and Asian), and each subgroup within the coalition is similarly cohesive in its support of candidates. Location-specific RPV estimates indicate that voters of color in the new CD 12 are likely to vote cohesively at ≥80% levels.

359.361.      In addition, at least four alternative and highly effective districts could be drawn in this congressional cluster each with a minority-coalition CVAP above 53% and below 70%, and placing voters of color in CD 6 any one of these alternative districts would afford them

a reasonable opportunity to elect their preferred candidate of choice. Coalition voters vote cohesively for candidates of their choice, both as a coalition group and within each subgroup, in the district contained in each of these alternative plans.

   b. *Harris/Fort Bend Counties potential coalition congressional districts*

~~360.~~362.　　　The Harris/Fort Bend congressional cluster is made up of CDs 2, 7, 9, 14, 18, 22, 29, and 38. Under the State's enacted plan, the cluster contains four majority-coalition districts. An additional majority-coalition district could have been drawn in this cluster by moving voters of color from CDs 18 and 29 into CD 2.



*Harris and Fort Bend County cluster under the old congressional plan*



*Harris and Fort Bend County cluster under the new congressional plan*

361.363.	Under the old plan, CDs 2, 14, and 22 elected Anglo Republicans and CDs 7, 9, 18, and 29 elected Democrats—one Anglo, two Black, and one Hispanic in the last election. CD 38 is a new congressional district Texas gained from reapportionment.

362.364.	In the new plan, CD 22 is less compact than it was under the old plan. CD 22 extends further south, incorporating Gulf Coast counties to increase the district's Anglo CVAP and adding irregular extensions that wrap around CDs 7 and 9. The populations in Fort Bend have little in common with those that border the Gulf.

363.365.	Elections have also become significantly more competitive over the past six years in CD 22, with a 35-percentage point Republican margin of victory in 2014 shrinking to a 7-percentage point margin in 2020.

364.366.	In particular, Black, Hispanic, and Asian voters have voted cohesively in CD 2 over the last 10 years. During this period, the Black, Hispanic, and Asian coalition in CD 2 has consistently supported

their candidates of choice with ≥80% cohesion. One example is the 2020 presidential election, in which, Black, Hispanic, and Asian voters voted with over 82% estimated support for the same candidate of choice. Even regarding each subgroup individually, over the last 10 years, each subgroup voted cohesively to support their preferred candidates of choice in the previous decade's configuration of CD 2.

365.367.    Over this same time period, Anglos consistently voted as a bloc in the area covered by CD 2 to defeat the candidate of choice of Black, Hispanic and Asian voters. In the 2020 presidential election, Anglo voters gave an estimated 73% support to the non-coalition candidate.

366.368.    The enacted plan dilutes the votes of Black, Hispanic, and Asian voters in CD 2 by placing them in a district where their candidates of choice have been consistently defeated by Anglo voters.

367.369.    One proposed reconfiguration of the Harris/Fort Bend cluster creates an alternate composition of CD 2 that adds higher percentages of Black, Hispanic, and Asian voters, resulting in a 27.07% BCVAP, 27.54% HCVAP, and 2.22% ACVAP. Under this alternative configuration, voters of color in CD 2 will have a reasonable opportunity to elect their candidates of choice.

368.370.    Under another proposed alternative plan, a district could be drawn that is 23.77% BCVAP, 18.87%% HCVAP, and 19.06% ACVAP. In addition, at least four other configurations of alternative and highly effective districts could be drawn in this congressional cluster, and placing voters of color in any one of these alternatives would afford them a reasonable opportunity to elect their preferred candidate of choice.

369.371.    Based on past electoral history, voters of color in the precincts that would be moved into the alternate compositions of CD 2 vote cohesively with upwards of 80% cohesion,

and voters in the subgroups within the coalition similarly vote cohesively in these precincts. Voters of color in these new alternative districts will thus have a reasonable opportunity to elect their candidates of choice.

## COUNT I
### 42 U.S.C. § 1983
### Racial gerrymandering in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution

370.372.       Plaintiff repeats and re-alleges each and every allegation contained in the paragraphs above, as if fully set forth herein.

371.373.       Race predominated with respect to the redistricting in the new H2316, S2168, and C2193 plans. Specifically, state senate districts 2, 9, 10, 15, 17, 18, and 22 under plan S2168; state house districts 26, 132, and 126 (Harris/Waller), 66, 67, and 112 (Collin/Denton), 108 (Dallas), 54 (Bell), 121 (Bexar), 94, 96, and 97 (Tarrant), 57, 63, and 65 (Wise/Denton), and 25 and 29 (Fort Bend/Brazoria)under plan H2316; and congressional districts 2, 6, 22, 24, and 38 under plan C2193 constitute unconstitutional racial gerrymanders. In each of these plans, the map drawers and legislators made the conscious choice of manipulating populations by race.

372.374.       Racial considerations were the legislature's controlling rationale behind these plans and traditional redistricting principles were subordinated.

373.375.       Because racial considerations predominated the map drawing, Defendants' justifications for the maps are subject to strict scrutiny.

374.376.       The maps challenged in this Complaint cannot survive strict scrutiny.

375.377.       By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiff rights guaranteed to them by the Fourteenth and Fifteenth Amendments to the U.S. Constitution, and will continue to violate those rights absent relief granted by this Court.

## COUNT II
### 52 U.S.C. § 10301
### Vote dilution in violation of Section 2 of the Voting Rights Act

~~376.~~378.      Plaintiff repeats and re-alleges each and every allegation contained in the paragraphs above, as if fully set forth herein.

~~377.~~379.      Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

~~378.~~380.      Section 2 of the Voting Rights Act prohibits the dilution of minority voting strength. The dilution of minority voting strength may be caused by, among other things, the dispersal of the minority population into districts where they constitute an ineffective minority—known as "cracking"—and the concentration of minority voters into districts where they constitute an excessive majority—known as "packing." Thornburg v. Gingles, 478 U.S. 30, 46 n.11 (1986).

~~379.~~381.      The map drawers failed to draw sufficient minority coalition districts in Plans S2168, H2316, and C2193, instead diluting the votes of Black, Hispanic, and Asian voters in specific regions that witnessed significant POC growth in the past decade and reducing opportunities for voters of color to elect candidates of their choice across the state.

~~380.~~382.      New state senate coalition districts could have been drawn in Tarrant, Dallas, and Fort Bend Counties, among others; new state house coalition districts could have been drawn in Tarrant, Wise, Denton, Brazoria, and Lubbock Counties, among others; and new

congressional coalition districts could have been drawn in Tarrant, Dallas, Harris, and Fort Bend Counties, among others.

381.383.      Voters of color in these counties are sufficiently numerous and geographically compact in the districts described in the preceding paragraphs to constitute coalition districts, in which the majority of eligible voters are Black, Hispanic, and Asian.

382.384.      The vast majority of voters of color in the districts described in the preceding paragraphs are politically cohesive, and Anglo voters usually vote to defeat the preferred candidates of voters of color. In short, voting is racially polarized in these districts.

383.385.      The totality of the circumstances, including the retrogressive effect of the plans, interact with historical and socio-economic factors to deny voters of color, including Black voters, the opportunity to elect preferred candidates of choice in Texas as a whole and in these districts. Texas has a long history of official voting-related discrimination conducted by the Anglo majority political power in power (previously Democrats, now Republicans); elections are racially polarized in Texas; the state has used voting practices and procedures, even as recently as 2021, that tend to enhance the opportunity for discrimination against voters of color; evidence suggests that people of color in Texas bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; numerous candidates who have run for political campaigns use overt and subtle racial appeals in political campaigns; and every decade, including this one, Texas has drawn maps that have an overall retrogressive effect in that they decrease the number of majority-minority and minority opportunity districts in the state. The totality of the circumstances establishes that the manner in which S2168, H2316, and C2193 were drawn and passed has the effect of denying voters of color an equal opportunity to participate in the political process and to elect candidates

of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

384.386.    By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiff the rights guaranteed to them by Section 2 of the Voting Rights Act, and will continue to violate those rights absent relief granted by this Court.

**COUNT III**
**52 U.S.C. § 10301 and 42 U.S.C. § 1983**
**Discriminatory purpose in violation of the Fourteenth Amendment to the United States Constitution and Section 2 of the Voting Rights Act**

385.387.    Plaintiff repeats and re-alleges each and every allegation contained in the paragraphs above, as if fully set forth herein.

386.388.    42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

387.389.    Article 1 of the Fourteenth Amendment to the United States Constitution provides:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

388.390.    Section 2 of the Voting Rights Act of 1965 prohibits the imposition of any voting standard, practice, or procedure enacted with a discriminatory purpose. 52 U.S.C. § 10301(a).

389.391.    The new plans—H2316, S2168, and C2193—were adopted, at least in part, for the purpose of disadvantaging voters of color, in particular, Black, Hispanic, and Asian voters relative to Anglo voters across the State.

390.392.    From the outset, the map drawers intended to reduce the number of state

house, senate, and congressional districts in which voters of color could elect candidates of choice, thereby weakening the voting strength of voters of color over the next decade.

391.393.      Several of the indicia of discriminatory purpose are present in this case. There is evidence of substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and the legislative and administrative history of the decision, including contemporaneous statements by decision makers.

392.394.      Legislators provided virtually no notice of the proposed changes, sought to minimize or eliminate public comment, and expedited the legislative process in ways intended to reduce input from anyone other than its main proponents. From last-minute announcements of public hearings to the complicated procedural rules that made it more difficult for members of the public to sign up to testify at these hearings, to new amendments introduced and adopted without public notice, to the failure of legislators to adopt plans submitted by groups representing the interests of voters of color, to legislators' awareness, based on testimony from numerous civil rights groups, including Plaintiff's organization, about the dilutive effect of these Plans—legislators moved the goal posts to make certain districts in all three plans noncompetitive.

393.395.      Statements and communications from key decision makers indicate that they were aware that the new plans would have an effect on the ability of minority voters to elect candidates of choice to the state senate, the state house, and the U.S. House, in the context of racially polarized voting.

394.396.      Defendants will be unable to prove that the maps would have been enacted without the discriminatory intent described above.

395.397.      By engaging in the acts and omissions alleged herein, Defendants acted and

continue to act under color of law to deny the Plaintiff the rights guaranteed to them by the Fourteenth Amendment to the U.S. Constitution and Section 2 of the Voting Rights Act, and will continue to violate those rights absent relief granted by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

i.      Convene a court of three judges pursuant to 28 U.S.C. § 2284(a);

ii.     Declare that state senate districts 2, 9, 10, 15, 17, 18, and 22 under plan S2168, state house districts 26, 132, and 126 (Harris/Waller), 66, 67, and 112 (Collin/Denton), 108 (Dallas), 54 (Bell), 121 (Bexar), 94, 96, and 97 (Tarrant), 57, 63, and 65 (Wise/Denton), and 25 and 29 (Fort Bend) under plan H2316, and congressional districts 2, 6, 22, 24, and 38 under plan C2193 constitute racial gerrymanders in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution;

iii.    Declare that map drawers' failure to maintain the same number of or draw additional majority-minority coalition (1) senate seats in Tarrant, Dallas, and Fort Bend Counties, (2) house seats in Tarrant, Wise, Denton, Brazoria, and Lubbock Counties, and (3) congressional seats in Tarrant, Dallas, Harris, and Fort Bend Counties, among others, unlawfully results in a denial or abridgement of the right of Black, Hispanic, and Asian voters to vote on account of their race or color in violation of Section 2's effects test of the Voting Rights Act;

iv.     Declare that the S2168, H2316, and C2193 plans, in their entirety, were enacted with an impermissible discriminatory purpose on the basis of race in violation of Article I of the Fourteenth Amendment to the United States Constitution and the intent prong of Section 2 of the Voting Rights Act;

v.      Issue a permanent injunction enjoining Defendants from enforcing or giving effect to the boundaries of the violative districts, including an injunction barring Defendants from conducting any elections in the violative districts;

vi.     Hold hearings, consider briefing and evidence, and otherwise take actions necessary to determine and order valid plans for the Texas house, senate, and U.S. Congress, which include majority-minority coalition districts and minority opportunity districts, that give voters of color the ability to elect candidates of choice;

vii.    Make all further orders as are just, necessary, and proper to ensure complete relief consistent with this Court's orders; and

viii.   Grant such other or further relief as the Court deems to be appropriate, including but not limited to an award of Plaintiff's attorneys' fees, expense and reasonable costs, as authorized by 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).

Respectfully submitted,

_s/s Lindsey B. Cohan_
Lindsey B. Cohan
Texas Bar No. 24083903
DECHERT LLP
515 Congress Avenue, Suite 1400
Austin, TX 78701
(512) 394-3000
_lindsey.cohan@dechert.com_

Jon Greenbaum*
Ezra D. Rosenberg*
Pooja Chaudhuri*
Sofia Fernandez Gold*
Alexander S. Davis*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street, Suite 900
Washington, DC 20005
(202) 662-8600
*jgreenbaum@lawyerscommittee.org*
*erosenberg@lawyerscommittee.org*
*pchaudhuri@lawyerscommittee.org*
*sfgold@lawyerscommittee.org*
*adavis@lawyerscommittee.org*

Neil Steiner*
Nicholas Gersh*
Margaret Mortimer*
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
*neil.steiner@dechert.com*
*nicholas.gersh@dechert.com*
*margaret.mortimer@dechert.com*

Robert Notzon
Texas Bar No. 00797934
THE LAW OFFICE OF ROBERT
NOTZON
1502 West Avenue
Austin, Texas 78701
(512) 474-7563
*robert@notzonlaw.com*

Gary Bledsoe
Texas Bar No. 02476500
THE BLEDSOE LAW FIRM PLLC
6633 Highway 290 East #208
Austin, Texas 78723-1157
(512) 322-9992
*gbledsoe@thebledsoelawfirm.com*
*Attorney only as to Texas NAACP's claims*
*related to Texas state senate and state house*
*plans*

Anthony P. Ashton*
NAACP OFFICE OF THE GENERAL
COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
*aashton@naacpnet.org*

Janette M. Louard
Anna Kathryn Barnes
NAACP OFFICE OF THE GENERAL
COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
*jlouard@naacpnet.org*
*abarnes@naacpnet.org*
*Attorneys appearing of counsel*

*Admitted pro hac vice*

*ATTORNEYS FOR THE TEXAS STATE
CONFERENCE OF NAACP*