**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | § § § | |
| *Plaintiffs,* | § § | Case No. 3:21-cv-00259 |
| V. | § | [Lead Case] |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § § | |
| TEXAS STATE CONFERENCE OF THE NAACP, | § § § | |
| *Plaintiff,* | § § | Case No. 1:21-cv-01006 |
| V. | § | [Consolidated Case] |
| | § | |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § | |

**PLAINTIFF TEXAS NAACP'S BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS TEXAS NAACP'S FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

ARGUMENT ............................................................................................................... 3

   I.   Legal Standard. ................................................................................................. 3

   II.  The FAC Plausibly Alleges the *Gingles* Preconditions. ................................... 4

     A.    The FAC Adequately Pleads the *Gingles* 2 and *Gingles* 3 Preconditions.................... 5

       1.   Texas NAACP's Challenges to Senate Districts in Tarrant and Dallas Counties Sufficiently Allege Gingles 2 and Gingles 3. ............................................................ 6

       2.   Texas NAACP's Challenges to Senate Districts in Fort Bend County and Adjacent Districts Sufficiently Allege Gingles 2 and Gingles 3. ................................................ 7

       3.   Texas NAACP's Challenges to House Districts in Tarrant County Sufficiently Allege Gingles 2 and Gingles 3........................................................................... 9

       4.   Texas NAACP's Challenges to House Districts in Wise and Denton Counties Sufficiently Allege Gingles 2 and Gingles 3. ........................................................... 11

       5.   Texas NAACP's Challenges to House Districts in Brazoria County Sufficiently Allege Gingles 2 and Gingles 3.................................................................... 12

       6.   Texas NAACP's Challenges to House Districts in Lubbock County Sufficiently Allege Gingles 2 and Gingles 3.................................................................... 13

       7.   Texas NAACP's Challenges to Congressional Districts in Harris and Fort Bend Counties Sufficiently Allege Gingles 2 and Gingles 3............................................. 14

     B.    *Gingles* 1 Does not Require Affirmative Pleading of Cultural Compactness. ........... 15

CONCLUSION.......................................................................................................... 19

## INTRODUCTION

This Court's memorandum opinion ("Mem. Opinion") (ECF No. 307) granted Texas NAACP leave to file an amended complaint. Texas NAACP did so on June 6, 2022, *see* First Amended Compl., ("FAC") (ECF No. 461), rectifying the issues raised by this Court. Defendants' brief in support of their motion to dismiss the FAC ("Br.") (ECF No. 402), raises two assertions as to standing that can be easily resolved in this Introduction without further argument.

As to organizational standing, Texas NAACP did not amend its pleadings in support of organizational standing after this Court's decision that those pleadings were insufficient. Plaintiffs have advised Defendants that, in light of this Court's ruling, Texas NAACP will be proceeding on associational standing only as its basis for Article III injury.

As to the remaining associational standing issue regarding HD 57, Texas NAACP identified fifty members who reside in the challenged districts and areas affected by the new redistricting plans, but inadvertently left one off—a resident of newly enacted HD 57—when it filed the FAC. Texas NAACP so informed Defendants and requested Defendants' consent to allow Texas NAACP to add the member in its filing of the complaint under seal on July 22, in accordance with the Court's July 18 order on the various motions to seal. *See* ECF No. 439. Defendants declined and Texas NAACP has now filed an opposed motion for leave to file a second amended complaint under seal, for good cause, adding the member who resides in HD 57. Defendants do not dispute Texas NAACP's associational standing with respect to any other challenged districts.[1]

---

[1] Texas NAACP stipulates that its motion for leave to file a second amended complaint, which is limited to adding the member who lives in HD 57 that NAACP inadvertently omitted from the FAC, does not render moot the motion to dismiss the FAC, except as to the associational standing issue.

Turning to the non-standing issues raised by Defendants, the FAC adequately alleges racially polarized voting in the proposed and existing districts under *Gingles* 2 and 3, in accordance with the Court's May 23 memorandum opinion. As to each Section 2 claim, the FAC clearly and specifically avers that voters of color vote cohesively in the proposed *Gingles* 1 districts and that white voters vote as a bloc to usually defeat the preferred candidates of voters of color in the enacted districts. As to the fourth issue, Texas NAACP need not plead "cultural compactness" to allege *Gingles* 1, as explained in detail below. *LULAC v. Perry*, 548 U.S. 399, 430–35 (2006), discussed the issue in the context of a *defense* to a Section 2 claim where Texas claimed that it had drawn a different majority Latino district, which brought together disparate majority Latino communities that were several hundred miles apart and shared little in common except for their racial and ethnic demographics. Here, the FAC alleges sufficient facts as to each county cluster which groups together neighboring, typically urban, communities, demonstrating the compactness of the populations of color in the alternative districts.

Finally, Texas NAACP notes that, at this stage of the case, Defendants have benefitted from two reports of Plaintiffs' expert Dr. Moon Duchin, in which she provides detailed maps of all proposed alternative *Gingles* 1 districts, spells out in detail their precise contours, and details racial polarization voting analyses and back-up data setting forth the precise levels of cohesion of Black, Latino, and Asian American voters in each of the districts pled in the complaint and the degree of white bloc voting for each of the enacted districts at issue. Even were there some remaining deficiencies in Plaintiffs' FAC—which there are decidedly not—Defendants are not

prejudiced in any way as they have had full notice of the specifics of all allegations pled by Texas NAACP.[2]

## ARGUMENT

### I.  Legal Standard.

A motion to dismiss brought under Rule 12(b)(6) for failure to state a claim "[is] viewed with disfavor and [is] rarely granted." *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009) (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)). Such motions are governed by the facial plausibility standard articulated in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). *See also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). To establish "facial plausibility," the complaint need plead only factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 219 (5th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). "In considering a motion to dismiss for failure to state a claim, the Court must accept as true the well-pleaded factual allegations and any reasonable inference to be drawn from them," *Fisher v. Bank of Am.*, 2013 WL 12116508, at *1 (W.D. Tex. Jan. 3, 2013), and may not dismiss a complaint under Rule 12(b)(6) unless it "seems beyond doubt that plaintiff cannot prove any set of facts entitling her to relief," *Kaufman ex rel. Kaufman v. Robinson Prop. Grp. Ltd. P'ship*, 331 F. App'x 276, 277 (5th Cir. 2008). The question is "whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief." *Id.*

A court may dismiss a complaint as a matter of law only if the complaint (1) lacks a cognizable legal theory or (2) fails to contain sufficient facts to support a cognizable legal claim.

---

[2] If the Court believes that there are still more specifics to be pled, Texas NAACP requests that it be given a few days to file an amended complaint that would attach and incorporate Dr. Duchin's reports.

*Garrett v. Commonwealth Mortg. Corp.*, 938 F.2d 591, 594 (5th Cir. 1991). "A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory or a violation of a legal interest that does not exist." *Residents Against Flooding v. Reinvestment Zone No. Seventeen*, 260 F. Supp. 3d 738, 756 (S.D. Tex. 2017), *aff'd*, 734 F. App'x 916 (5th Cir. 2018) (internal quotation omitted). But when a complaint contains "either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory," it is considered well-pled. *Fisher*, 2013 WL 12116508, at *1 (quoting *Twombly*, 550 U.S at 562).

## II.    The FAC Plausibly Alleges the *Gingles* Preconditions.

In this Court's May 23 memorandum opinion, the Court dismissed Texas NAACP's *Gingles* claims without prejudice on the grounds that Texas NAACP did not adequately plead *Gingles* 2 and *Gingles* 3. *See* Mem. Op. at 39–42. For *Gingles* 2, the Court instructed that Texas NAACP include averments from which the Court could "plausibl[y]" infer that "the minority population" in a "proposed," additional majority-minority district "vote[s] cohesively." *Id.* at 41. For *Gingles* 3, the Court directed that Texas NAACP allege facts from which the Court can "plausibl[y]" infer that "Anglo voting bloc usually defeats the minority-preferred candidate under the current districting." *Id.* at 41-42. This is precisely what Texas NAACP has done. In the FAC, Texas NAACP followed the Court's guidance and included not only descriptions of the proposed districts but also factual allegations as to levels of cohesion in the proposed districts and Anglo bloc voting in the benchmark districts. Texas NAACP described in detail how each member's vote is diluted under the current redistricting and how under its proposed alternative plans, a member will have more opportunity to elect a candidate of choice.

4

### A.  The FAC Adequately Pleads the *Gingles* 2 and *Gingles* 3 Preconditions.

Defendants posit a series of challenges to Texas NAACP's *Gingles* 2 and *Gingles* 3 allegations, ranging from their being "ambiguous" to their being "conclusory" or "threadbare," to complaining about an obvious "typo." *See* Br. at 6, 8, 9, 10, 11, 12, 13. Every one of Defendants' arguments is invalid, because the FAC clearly and sufficiently pleads cohesiveness of voters of color in the proposed alternative districts, and white bloc voting that usually prevents voters of color from electing candidates of their choice in the challenged, enacted districts as discussed in detail below.

At the outset, Texas NAACP addresses Defendants' attempt to create a new legal hurdle applicable to all of the Section 2 claims: their argument that Texas NAACP has not provided the "specific electoral histor[ies]," including which elections, primaries or generals and in which years, that support the *Gingles* 2 and 3 allegations. Br. at 6–7 (Tarrant County and Dallas County senate cluster); 8 (Fort Bend senate cluster); 9 (Tarrant house cluster); 10 (Wise County and Denton County house cluster); 10-11 (Brazoria County house cluster); 12 (Lubbock County house cluster); 12 –13 (Harris County and Fort Bend Country congressional cluster). Plaintiff is unaware of any case that has ever dismissed a Section 2 complaint for failure to specify which elections support allegations of racially polarized voting. Conclusions as to racially polarized voting are supported through expert reports; this analysis is not a requirement at the pleadings stage. And Defendants now have Plaintiff's expert's reports and back-up data, providing information as to the elections she considered for her RPV analyses. And Defendants' expert has already issued his report in response. For now, Texas NAACP's allegations that precinct-level electoral histories show the political cohesion among voters of color and the requisite white bloc voting are sufficient and *must* be accepted as true. *See Fisher v. Bank of Am.*, 2013 WL 12116508, at *1 (W.D. Tex. Jan. 3, 2013).

1. *Texas NAACP's Challenges to Senate Districts in Tarrant and Dallas Counties Sufficiently Allege* Gingles *2 and* Gingles *3.*

Texas NAACP alleges that, under the last decade's plan, SD 10 in the Tarrant and Dallas counties area was on the verge of becoming a majority-minority district. *See* FAC ¶¶ 68, 74, 77, 81, 86, 252, 257. Under the new plan, voters of color were cracked from the old SD 10 and placed into the more Anglo SD 9 and SD 22, dropping the percentage of voters of color from 46% to 38%. *Id.* ¶¶ 252–57. *See also id.* ¶¶ 68, 74, 77, 81, 86. The FAC alleges that SD 10 could have been drawn "squarely within Tarrant and Dallas Counties" as an additional majority-minority coalition district that kept communities of color whole and did not include the Anglo populations that were added to the district in the enacted plan—allegations defendants completely ignore, *id.* ¶¶ 68, 74, 77, 81, 86, 262—and that doing so would provide voters of color—like Texas NAACP Members N, P, Q, R, and S—a reasonable opportunity to elect the candidates of their choice. *Id.* ¶¶ 68, 74, 77, 81, 86, 262. Texas NAACP further alleges that at least three alternative configurations of SD 10 could be drawn in this senate cluster with minority-coalition CVAPs of over 53%, and that each of these alternative configurations of SD 10 would provide voters of color—like Texas NAACP Members N, P, Q, R, and S—reasonable opportunities to elect candidates of their choice. *Id.* ¶¶ 68, 74, 77, 81, 86.

Defendants argue that Texas NAACP alleges minority cohesion in the previously enacted districts instead of in the Tarrant County and Dallas County senate cluster. Br. at 6. But Texas NAACP specifically alleges cohesion for "[v]oters of color in this alternative drawing of SD 10, which, in part includes those voters who were cracked and placed in SD 9 under the State's enacted plan." FAC ¶ 263. Texas NAACP also alleges that voters of color in "the precincts that were in SD 10 under the previous decade's plan and have since been added to SD 9 under the State's enacted plan, coalition voters typically support the same candidate with upwards of 80%

cohesion." *Id.* ¶ 263. Further, Texas NAACP alleges that "the Black, Hispanic, and Asian coalition in SD 10 under the previous decade's plan cohesively supported a preferred candidate of choice with voting percentages over 85%," and that during the 2020 presidential election, such voters had an "estimated 86% of the support for the same candidate of choice." *Id.* ¶ 259. These allegations, taken together, clearly allege that the coalition groups will cohesively support the same candidates in a district comprised largely of the prior SD 10 and part of the new SD 9, thus easily satisfying *Gingles* 2.

Defendants assert that, as to the Tarrant/Dallas Senate cluster, "NAACP has failed to allege white bloc voting with respect to the enacted—*i.e.*, benchmark—district[s]." Br. at 7. But, Texas NAACP specifically alleges that over the last 10 years, "Anglos consistently voted as a bloc in the geographic area covered by SD 10 to defeat the candidate of choice of Black, Hispanic and Asian voters." FAC ¶ 260. Any doubt that the phrase "in the geographic area covered by SD-10" is intended to refer to the enacted plan is dispelled by the very next paragraph of the complaint, which alleges that "[t]he State's enacted plan dilutes the votes of Black, Hispanic, and Asian voters in SD 10 by placing them in a district where their candidates of choice have been consistently defeated by Anglo voters." *Id.* ¶ 261. Each of these allegations, assumed as true with all inferences in Texas NAACP's favor, combine to plausibly allege that in an alternative, majority-minority configuration of SD 10, voters of color vote cohesively, and that Anglo voters in the enacted SD 10 vote as a bloc to defeat the preferred candidate of voters of color.

> 2. *Texas NAACP's Challenges to Senate Districts in Fort Bend County and Adjacent Districts Sufficiently Allege* Gingles *2 and* Gingles *3.*

The FAC plausibly alleges that Texas NAACP's Section 2 challenge to senate districts in Fort Bend County satisfies *Gingles* 2 and *Gingles* 3. Texas NAACP alleges that under the prior

decade's map, SD 17 was on the verge of electing the candidate of choice of voters of color—with the minority coalition population consisting of approximately 48% of the total population of the district. FAC ¶¶ 42, 46, 272. The FAC explains that the newly enacted redistricting plan packed white voters from different counties—most of whom previously resided in SD 18—into SD 17, and packed voters of color who previously resided in SD 17 into SD 13, which is already a seat held by a Black Democratic state senator. *Id.* ¶¶ 272–73. Texas NAACP further alleges that SD 17 could have been drawn as a majority-minority coalition district by combining Black, Hispanic, and Asian communities that were previously in SDs 6, 13, 15, and 17, *Id.* ¶¶ 42, 46, 270, and that doing so would provide voters of color—like Texas NAACP members F and G—a reasonable opportunity to elect a candidate of their choice. *Id.* ¶¶ 42, 46. Texas NAACP further alleges that it is possible to draw at least four other configurations of SD 17 in which SD 17 is a "highly effective" majority-minority district, and that voters of color— Texas NAACP members F and G—would have a reasonable opportunity to elect a candidate of their choice in each of those alternative districts. *Id.* ¶¶ 42, 46.

Defendants argue that Texas NAACP does not make any minority-cohesion allegations directed at a *proposed*, alternative majority-minority coalition district. Br. at 8. But in the very next paragraph, Defendants admit that is not true, *id.*, acknowledging that Texas NAACP alleges a proposed "'reconfiguration of SD 17 will provide coalition voters in the district with a reasonable opportunity to elect their candidate of choice, based on the polarization estimates and the electoral history of the precincts in the district that shows [sic] that the voters of color who are added to the proposed district vote cohesively,'" *id.* (quoting FAC ¶ 279). Indeed, Texas NAACP specifically alleges that polarization estimates and past election results in the precincts that would be added to last decade's SD 17 (in which voters of color had approximately 80% cohesion over the last 10

years) show that the additional voters of color vote cohesively. FAC ¶¶ 276, 279. Texas NAACP further alleges that past election results indicate that "coalition voters vote cohesively for candidates of their choice, both as a coalition group and within each subgroup, in the district contained in its proposed alternative plan." *Id.* ¶ 280.

Defendants next argue that alleging "voters 'who are added to the proposed district vote cohesively' is not the same as an allegation that the overall minority coalition would vote cohesively." Br. at 8 (quoting FAC ¶ 279). But Plaintiff alleges not only that the Black, Hispanic, and Asian voters from SDs 6, 13, and 15 who would be added to the prior SD 17 vote cohesively, FAC ¶ 279, but also that voters of color in the prior SD 17 voted cohesively, *id.* ¶ 276. The plausible inference from these two facts is that the proposed district would contain a cohesive minority coalition population, easily meeting the *Gingles* 2 standards.

Clearly meeting *Gingles* 3, Texas NAACP alleges that "[o]ver the last ten years, Anglos have consistently voted as a bloc in the area covered by SD 17 to defeat the candidate of choice of Black, Hispanic, and Asian voters," and that in the 2020 general election, Anglo bloc voting in that area was estimated at 76%, and the Anglo-preferred candidate defeated the candidate of choice of voters of color by a margin of 17 percentage points. *Id.* ¶ 277.

> 3. *Texas NAACP's Challenges to House Districts in Tarrant County Sufficiently Allege* Gingles *2 and* Gingles *3.*

Defendants argue that the Texas NAACP fails to "satisfactorily allege minority cohesion" in a proposed alternative to HD 94 in Tarrant County. Br. at 9. The FAC pleads the claim with sufficient specificity.

Texas NAACP alleges that the newly enacted house cluster in Tarrant County, among other things, cracks populations of color in Arlington who used to reside in HD 94, a district in which voters of color voted with increasing cohesion over the last 10 years—demonstrating upwards of

87% cohesion. *See, e.g.*, FAC ¶¶ 83, 88, 308. Texas NAACP alleges that additional majority-minority districts could have been drawn in this cluster, *id.* ¶¶ 83, 88, 306–07, 311–12, and goes on to clearly allege cohesion in precincts covered by HD 94 "and [in] the proposed precincts to be added to the alternative drawing of HD 94." *Id.* ¶ 311. For example, Texas NAACP alleges that an alternative majority-minority coalition HD 94 could be drawn in the central-eastern portion of Tarrant County with a population of 34.36% BCVAP, 19.01% HCVAP, and 4.71% ACVAP. *Id.* ¶¶ 83, 88, 311. Texas NAACP alleges that in this alternative district, voters of color, such as Texas NAACP members R and S, would have a reasonable opportunity to elect candidates of their choice. *Id.* ¶¶ 83, 88. Texas NAACP further alleges that at least four alternative, "highly effective" majority-minority coalition districts could be drawn in this cluster, each of which would provide voters of color—like Texas NAACP members R and S—a reasonable opportunity to elect candidates of their choice. *Id.* ¶¶ 83, 88. Texas NAACP also alleges that "[p]ast election results in the precincts covered by HD 94 and the proposed precincts to be added to the alternative drawing of HD 94 show that voters of color vote cohesively." *Id.* ¶ 311.

These allegations easily meet *Gingles* 2. Contrary to Defendants' argument, at the pleadings stage, Plaintiff is not required to identify the specific precinct numbers and districts in the central-eastern portion of the County from which voters of color would be pulled. Instead, Texas NAACP's factual allegations about precinct level cohesion must be accepted as true. *See Fisher*, 2013 WL 12116508, at *1. And, again, Defendants have been provided the specific data analyses supporting these claims in Plaintiff's expert's reports and the back-up data.

Defendants argue that "NAACP [does not] allege white bloc-coting [sic] as required by the third *Gingles* precondition," but provide no other argument about why Texas NAACP fails to allege *Gingles* III in this cluster. Br. at 9. That may be because the FAC clearly alleges that, "[o]ver

the last 10 years, Anglos consistently voted as a bloc in the geographic area covered by HD 94 to defeat the candidate of choice of Black, Hispanic and Asian voters," and that in the 2020 election, Anglo bloc voting in that area was estimated at 73%. FAC ¶ 309, thus meeting *Gingles* 3.

        4.  *Texas NAACP's Challenges to House Districts in Wise and Denton Counties Sufficiently Allege Gingles 2 and Gingles 3.*

The FAC plausibly alleges that Texas NAACP's Section 2 challenge to house districts in Wise and Denton Counties satisfies *Gingles* 2 and *Gingles* 3. Texas NAACP alleges that under the prior decade's plan, voters of color in HD 65 (who comprised 46% of the CVAP of the district)—along with a small number of Anglo crossover voters, narrowly elected their candidate of choice in 2020. FAC ¶ 315. Texas NAACP alleges that in the newly enacted map, map-drawers flooded this district with Anglo voters, dropping the CVAP of persons of color from 46% to 36%. *Id.* ¶ 316. Texas NAACP alleges that, given the population growth of persons of color in and around Denton and Wise Counties, HD 65 could have been drawn as a majority-minority coalition district, combining voters of color from the enacted HD 65 with voters of color from HD 63. *Id.* ¶¶ 131, 134, 318, 321. Specifically, Texas NAACP alleges that a majority-minority coalition HD 65 could have been drawn in southeast Denton County with a population of 18.44% BCVAP, 20.10% HCVAP, and 11.67% ACVAP. *Id.* ¶¶ 131, 134, 321. Texas NAACP also alleges that in such an alternative HD 65, voters of color—like Texas NAACP members KK and LL—would have a reasonable opportunity to elect the candidates of their choice. *See id.*

Defendants argue that Texas NAACP has not sufficiently pled *Gingles* 2. Br. at 9–10. But Texas NAACP alleges that voters of color in HD 65 voted with upwards of 85% cohesion over the last 10 years, and that voters of color in HD 65 voted with an estimated 89.6% cohesion in the 2020 presidential election. FAC ¶ 319. Texas NAACP also alleges that voters of color from the precincts in HD 63 that would be combined with voters of color in HD 65 vote cohesively at a

level of 85%. *Id.* ¶ 322. Defendants seem to argue that whether voters in HD 63 vote cohesively is irrelevant to whether voters of color in the "proposed HD 65 would vote cohesively." Br. at 10. But the FAC clearly alleges that adding voters of color from precincts in HD 63 that are cohesive to the former HD 65, in which voters of color are also cohesive, would result in a cohesive, majority-minority coalition district. FAC ¶¶ 319, 323. These allegations meet *Gingles* 2.[3]

Defendants do not appear to challenge the sufficiency of Plaintiff's pleadings as to *Gingles* 3. In any event, Texas NAACP specifically alleges that Anglo bloc voting in the enacted HD 65 defeats the candidates of choice of voters of color, and that such bloc voting was estimated at 78% in the 2020 presidential election. *Id.* ¶ 320. These allegations clearly meet *Gingles* 3.

5.   *Texas NAACP's Challenges to House Districts in Brazoria County Sufficiently Allege Gingles 2 and Gingles 3.*

The FAC plausibly alleges that Texas NAACP's Section 2 challenge to house districts in Brazoria County satisfies *Gingles* 2 and *Gingles* 3. Texas NAACP alleges that "in 2020, HD 29 was on the cusp of becoming a majority-minority district." FAC ¶ 326. Texas NAACP alleges that the enacted plan cracks communities of color in Brazoria County HD 29 by splitting communities of color in Pearland, Marvel, Iowa, Colony, Richwood, and Freeport. *Id.* ¶¶ 96, 99, 102, 105, 111-12. Texas NAACP alleges that HD 29 could have been reconfigured into a majority-minority coalition district by rejoining these communities and moving precincts from HD 25 into HD 29. *Id.* ¶¶ 329, 333. Specifically, Texas NAACP alleges that HD 29 can be drawn as a majority-minority coalition district in the northwest corner of Brazoria County consisting of 23.03% BCVAP, 22.89% HCVAP, and 10.58% ACVAP, and that in this alternative district, voters of color

---

[3] Defendants' only other argument on this cluster is based on what they acknowledge as a "typo," that the FAC referred to voters of color of HD 63 being brought into "HD 64," when Texas NAACP clearly meant "HD 65." Br. at 10.

like Texas NAACP member BB would have a reasonable opportunity to elect their candidates of choice. *Id.* ¶¶ 112, 333.

Defendants' only argument as to this cluster is that Plaintiff's allegations as to *Gingles* 2 and 3 are "threadbare" conclusions, without explaining why that is so. Br. at 11. The allegations in the FAC are beyond sufficient. Texas NAACP alleges that voters of color in the prior decade's HD 29 voted with cohesion upwards of 85% over the last ten years, and had an estimated cohesion of 87.2% in the 2020 presidential election, FAC ¶ 330, and that, based on prior election history at the precinct level, "voters of color in the alternative district configuration are cohesive both in the district and in the precincts to be moved from HD 25 to HD 29." *Id.* ¶ 333. Thus, Texas NAACP specifically alleges that voters of color in the precincts to be moved from HD 25 to join precincts in HD 29—which would be the base of the majority-minority district—voted cohesively, and that precinct data indicates that the voters of color who in the precincts in SD 29, who would be joined by those from SD 25, also vote cohesively, easily meeting *Gingles* 2. Texas NAACP also alleges that over the last ten years, Anglos voted consistently as a bloc to defeat the candidates of choice of voters of color in "the area covering HD 29," and that in the 2020 presidential election, Anglo bloc voting in that area was approximately 76%, *id.* ¶ 331, thus meeting *Gingles* 3.

6.   *Texas NAACP's Challenges to House Districts in Lubbock County Sufficiently Allege* Gingles *2 and* Gingles *3.*

Texas NAACP alleges that the new Lubbock County house cluster (HDs 83 and 84) makes few changes to the persons of color and Anglo CVAP percentages in the relevant districts, despite the fact that 85% of the CVAP growth in the county can be attributed to persons of color. *See* FAC ¶¶ 335, 337. Texas NAACP alleges that HD 83 could have been drawn as an alternative, highly effective majority-minority coalition district consisting of 8.95% BCVAP, 42.22% HCVAP, and 8.95% ACVAP covering largely the same area as the enacted HD 83. *Id* ¶¶ 154, 156. *See also id.*

¶¶ 338, 342. Texas NAACP alleges that in this alternative district, voters of color—such as Texas NAACP members VV and WW—would have a reasonable opportunity to elect candidates of their choice. *Id.* ¶¶ 154, 156.

Defendants seem to assert that Texas NAACP does not plausibly allege minority cohesion in the alternative district because it is unclear whether Texas NAACP's cohesion allegations refer to the previously enacted HD 83 or the currently enacted HD 83. Br. at 12. The FAC is clear: Texas NAACP alleges that based upon precinct level electoral history, voters of color in the "proposed alternative plan" "support the same candidates of choice at upwards of an estimated 78%." *Id.* ¶ 342.[4] In addition, Texas NAACP alleges that over the last 10 years, "in the area covered by HD 83" Anglo voters have consistently voted as a bloc to defeat the candidate of choice of voters of color, and that in the 2020 election, Anglo bloc voting in that area was approximately 75%. *Id.* ¶ 340. Texas NAACP thus clearly alleges that persons of color vote cohesively in the alternative, minority-majority coalition HD 83, and that Anglo voters in the enacted HD 83 vote as a bloc to defeat the candidate of choice of voters of color, meeting *Gingles* 2 and 3.

> 7. *Texas NAACP's Challenges to Congressional Districts in Harris and Fort Bend Counties Sufficiently Allege* Gingles *2 and* Gingles *3.*

Texas NAACP alleges that the enacted congressional district map in the Harris and Fort Bend area significantly reduced the minority coalition population in CD 2, and that an alternative CD 2 could have been drawn in the northwest portion of Harris County consisting of 27.07% BCVAP, 27.54% HCVAP, and 2.22% ACVAP, where voters of color—such as Texas NAACP members A and B—would have a reasonable opportunity to elect their candidates of choice. FAC

---

[4] Texas NAACP also alleges cohesion among voters of color in the enacted HD 83 – which would largely comprise the proposed majority-minority district – was upwards of 78%. FAC ¶ 339, but that is not essential for *Gingles* 2.

¶¶ 25, 29, 368. Texas NAACP also alleges that an alternative majority-minority coalition district could have been drawn that is 23.77% BCVAP, 18.87%% HCVAP, and 19.06% ACVAP. where voters of color also would have a reasonable opportunity to elect the candidates of their choice. *Id.* ¶¶ 25, 29, 369. Further, Texas NAACP alleges that four additional configurations of this cluster could be drawn to contain an additional majority-minority coalition district, in which voters of color would have a reasonable opportunity to elect the candidates of their choice. *Id.* ¶¶ 25, 29.

Defendants' sole challenge to the sufficiency of Plaintiff's pleading as to *Gingles* 2 and 3 is that Texas NAACP's allegations are somehow "ambiguous." Br. at 12–13 ("The NAACP alleges that black, Latino, and Asian voters are cohesive in CD 2, but it is not clear what configuration of CD 2 the NAACP is referring to. . . ."). The FAC is, however, unambiguous on this point: it alleges that "[b]ased on electoral history, voters of color in the precincts that would be moved into the alternate compositions of CD 2 vote cohesively with upwards of 80% cohesion," FAC ¶ 370, thus meeting *Gingles* 2. Further, Texas NAACP alleges that the "enacted plan dilutes the votes of Black, Hispanic, and Asian voters in CD 2 by placing them in a district where the candidates of choice have been consistently defeated by Anglo voters." *Id.* ¶ 367. Texas NAACP alleges that over the last ten years, Anglos consistently voted as bloc to defeat the candidate of choice of voters of color in the "area covered" by CD 2, and that in the 2022 election, Anglo bloc voting in that area is estimated at 73%. *Id.* ¶ 366, thus meeting *Gingles* 3.

### B. *Gingles* 1 Does not Require Affirmative Pleading of Cultural Compactness.

For the first time in this case, Defendant's argue that Texas NAACP fails to allege *Gingles* 1, because it does not plead "cultural compactness"—an argument that Defendants did not raise during the first round of motion to dismiss briefing. *See* Defs.' Mot. to dismiss NAACP's Compl. at 7-15, (ECF No. 259). Now, confronted with an amended complaint that adds *more* factual

allegations supporting all of the *Gingles* factors, relying on a footnote in this Court's May 23 memorandum opinion, Defendants assert that the *more* comprehensive factual averments in the FAC insufficiently plead facts as to *Gingles* 1, br. at 13–14, while the original, *less* specific complaint was apparently well-pled on this issue.

Leaving aside the unfairness of Defendants' playing a form of whack-a-mole in reverse, there is a reason that Defendants believed the original complaint, and necessarily the FAC, sufficiently pled *Gingles* 1: No court has ever held that a plaintiff must plead "cultural compactness" to plead *Gingles* 1. While the issue may be relevant, based on the specific facts of a particular case—one where the proposed *Gingles* 1 district connects disparate and enormously distanced communities of color—it is a matter typically dealt with in discovery and at trial. In any event, here, to the extent that the Court rules that the issue is one that must be pled, Texas NAACP's complaint, which describes highly geographically compact districts with high levels of political cohesion that maintain communities of interest, is sufficient at this stage.[5]

In the above-referenced footnote relied on by Defendants, this Court stated that: "The Supreme Court has also interpreted the first *Gingles* precondition to include that the minority group is culturally compact, *see LULAC*, 548 U.S. at 430–35, but that requirement is not at issue in Defendants' motion," mem. op., at 32 n. 20. *LULAC*, however, did not purport to change the *Gingles* 1 precondition, which provides that the racial group is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). Indeed, it held that "[w]hile no precise rule has emerged

---

[5] If it is not sufficient, Texas NAACP requests that it be granted a few days to file an amended complaint, in which they would specifically provide more detailed allegations as to "cultural compactness," as they have already provided Defendants with expert reports and the identity of witnesses who will be testifying on such issues at trial.

governing §2 compactness, the 'inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *LULAC*, 548 U.S. at 433 (quoting *Abrams v. Johnson*, 521 U.S. 74, 92 (1997)). Indeed, the Supreme Court has explained that district shape is relevant to determining whether a district satisfies the compactness inquiry. *Bush v. Vera*, 517 U.S. 952, 980 (1996) ("District shape is not irrelevant [to §2 compactness.]"). *See also Sensley v. Albritton*, 385 F. 3d 591, 596 (5th Cir. 2004) (geographical shape of proposed district "necessarily directly relates to the geographical compactness and population dispersal of the minority community in question.").

The *LULAC* Court's discussion beyond these points—which never uses the phrase "cultural compactness"—was not directed at the *LULAC* plaintiffs' compliance with *Gingles* 1, but rather with the way the *State* was *defending* against a Section 2 violation. In *LULAC*, the Court first found—without any discussion of "cultural compactness"—that the plaintiffs' proposed CD 23 met all three *Gingles* preconditions. 548 U.S. at 429. Texas tried to defend on the basis that its *enacted* Plan 1374C cured the Section 2 violation, with the creation of a majority Latino district, CD 25, that stretched from Austin to the Gulf of Mexico, a distance of several hundred miles. *See id.* at 432-435. Therefore, the Court undertook a compactness inquiry of CD 25, "since there is no §2 right to a district that is not reasonably compact, . . . the creation of a noncompact district does not compensate for the dismantling of a compact opportunity district." *Id.* at 430–31.

In this context, the Court explained, "there is no basis to believe a district that combines two farflung segments of a racial group with disparate interests provides the opportunity that the first *Gingles* condition contemplates." *Id.* at 433. Specifically, the Court found, "[i]n these cases the District Court's findings regarding the different characteristics, needs, and interests of the Latino community near the Mexican border and the one in and around Austin are well supported

and uncontested. . . .," and that the "practical consequence of drawing a district to cover two distant, disparate communities is that one or both groups will be unable to achieve their political goals," a fact supported by testimony at trial. *Id.* at 434. The Court concluded its discussion by tying the need for this sort of examination specifically, if not exclusively, to the sort of circumstances presented by the case before it:

> We emphasize it is the enormous geographical distance separating the Austin and Mexican-border communities, coupled with the disparate needs and interests of these populations – not either factor alone – that renders District 25 noncompact for §2 purposes.

*Id.* at 435.[6] Nowhere does the Court suggest, let alone hold, that the concept of "cultural compactness" is an essential element that must be pled in a Section 2 vote dilution case.

Here, Texas NAACP's FAC pleads a series of geographically compact proposed *Gingles* 1 districts, none of which even hint at the issues raised in *LULAC*. First, each of the proposed districts is sufficiently described as geographically compact, either within the county or immediately adjacent counties within the same largely urban areas, and are designed to cure less compact districts that split cities, communities of interest, or attach rural areas to urban areas. *See e.g.*, FAC ¶¶ 24-25, 28-29, 361–70 (Harris County and Fort Bend County congressional cluster); 32, 35, 38, 353-360 (Dallas County and Tarrant County congressional cluster); 41-42, 45-46, 269–81 (Fort Bend County senate cluster); 67-68, 73-74, 76-77, 80-81, 85-86, 249–68 (Dallas County and Tarrant County senate cluster); 83, 88, 298–12 (Tarrant County house cluster); 112, 324–34 (Brazoria County house cluster); 131, 134, 313–23 (Denton County and Wise County house

---

[6] Along the same lines, the only authority relied on by Defendants other than *LULAC* is *Alabama State Conference of the NAACP v. Alabama*, --- F. Supp. 3d ---, 2020 WL 583803, at *22–25, which has nothing to do with "cultural compactness," let alone pleading requirements. In that case, the district court, after a trial on the merits, concluded that certain illustrative plans examined "*geographic* compactness" instead of the "compactness of the African-American population within the [illustrative] district's boundaries," an issue in that case because the proposed map separated Black communities by 1622 square miles. *Id.* at *22 (emphasis in original).

cluster); 154, 335–42 (Lubbock County house cluster). On its face, Texas NAACP's complaint does not raise the issues relating to "enormous geographical distance" or "disparate needs" of the populations of color involved in *LULAC*. To the contrary, a fair inference from these allegations is that the districts in question, being largely centered on urban and suburban ring areas, have geographical areas that largely comport with concentrated areas of communities of color.

Defendants further complain that they are "unaware of what the NAACP's proposed districts would look like," br. at 14, but as set forth above, the complaint describes the sort of changes that would be made to create the alternative districts in each county or district cluster. No court, to Plaintiff's knowledge, has ever ordered the production of maps in a Section 2 vote dilution complaint itself as a requirement for a sufficient pleading, and at least one has explicitly observed that such a requirement would "[f]orc[e] plaintiffs to develop an unobjectionable map, before discovery even begins . . . putting the cart before the horse," *Luna v. Cty. of Kern*¸ 2016 WL 4679723, at *5 (E.D. Cal. Sept. 6, 2016), and "inevitably lead to some statistical and other factual expert analysis," *id.* Significantly, Defendants have now been served with Dr. Moon Duchin's reports that include detailed analyses of proposed districts, with images, demographics, and other relevant data pertaining to all proposed *Gingles* 1 districts. Texas NAACP's FAC sufficiently pleads *Gingles* 1 so as to survive Defendants' new argument.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motion to dismiss Texas NAACP's FAC.

Dated: July, 25 2022

                                       Respectfully submitted,

                                       *s/s Lindsey B. Cohan*
Lindsey B. Cohan
Texas Bar No. 24083903
DECHERT LLP
515 Congress Avenue, Suite 1400
Austin, TX 78701
(512) 394-3000
*lindsey.cohan@dechert.com*

Jon Greenbaum*
Ezra D. Rosenberg*
Pooja Chaudhuri*
Sofia Fernandez Gold*
Alexander S. Davis*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street, Suite 900
Washington, DC 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org
sfgold@lawyerscommittee.org
adavis@lawyerscommittee.org

Neil Steiner*
Nicholas Gersh*
Margaret Mortimer*
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com
nicholas.gersh@dechert.com
margaret.mortimer@dechert.com

Robert Notzon
Texas Bar No. 00797934
THE LAW OFFICE OF ROBERT
NOTZON
1502 West Avenue
Austin, Texas 78701

(512) 474-7563
robert@notzonlaw.com

Gary Bledsoe
Texas Bar No. 02476500
THE BLEDSOE LAW FIRM PLLC
6633 Highway 290 East #208
Austin, Texas 78723-1157
(512) 322-9992
gbledsoe@thebledsoelawfirm.com
*Attorney only as to Texas NAACP's claims
related to Texas state senate and state house
plans*

Anthony P. Ashton*
NAACP OFFICE OF THE GENERAL
COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
aashton@naacpnet.org

Janette M. Louard
Anna Kathryn Barnes
NAACP OFFICE OF THE GENERAL
COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
jlouard@naacpnet.org
abarnes@naacpnet.org
*Attorneys appearing of counsel*

*Admitted pro hac vice*

*ATTORNEYS FOR THE TEXAS STATE
CONFERENCE OF NAACP*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing and all attachments were served on counsel of record via the Court's ECF system on July 25, 2022.


*/s/ Lindsey B. Cohan*
Lindsey B. Cohan
*Counsel for Plaintiff Texas NAACP*