**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), et al., <br><br> Plaintiffs, <br><br> v. <br><br> GREG ABBOTT et al., <br><br> Defendants. | Civil Action No. 3:21-cv-00259 <br> (Lead Case) |
| FAIR MAPS TEXAS ACTION COMMITTEE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GREG ABBOTT et al., <br><br> Defendants. | Civil Action No. 3:21-cv-01038 <br> (Consolidated case) |

**FAIR MAPS PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................... 1

STANDARD ....................................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

   I.   Entity Plaintiffs Sufficiently Alleged Associational Standing. ........................... 2

   II.  Fair Maps Plaintiffs Sufficiently Alleged the First *Gingles* Precondition Regarding Compactness. .................................................................................................... 2

      A.  Fair Maps Plaintiffs Are Not Required to Specifically Allege Cultural Compactness. ... 3

      B.  Fair Maps Plaintiffs' First Amended Complaint Sufficiently Alleged Cultural Compactness. ................................................................................. 6

   III. Fair Maps Plaintiffs Sufficiently Alleged the Second and Third *Gingles* Preconditions... 10

      A.  Bell County House Districts......................................................................... 11

      B.  Dallas-Fort Worth Congressional Districts and Tarrant County Senate Districts ......... 12

      C.  Harris-Fort Bend Congressional Districts .................................................... 15

CONCLUSION................................................................................................................... 17

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Ala. State Conf. of the NAACP v. Alabama*,
   2020 U.S. Dist. LEXIS 18938 (M.D. Ala. 2020). Dkt. 401.................................5, 10

*Anderson v. HUD*,
   554 F.3d 525 .......................................................................................................6

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................6, 12

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*,
   627 F.3d 547 (5th Cir. 2010) ..............................................................................2

*Body by Cook, Inc. v. State Farm Mut. Auto Ins.*,
   869 F.3d 381 (5th Cir. 2017) ..............................................................................2

*Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*,
   892 F.3d 719 (5th Cir. 2018) ..............................................................................1

*Johnson v. Ardoin*,
   No. 18-625-SDD-EWD, 2019 U.S. Dist. LEXIS 91449 (M.D. La. May 31,
   2019) ................................................................................................................7, 9

*Johnson v. De Grandy*
   512 U.S. 997 (1994)............................................................................................3

*In re Katrina Canal Breaches Litig.*,
   495 F.3d 191 (5th Cir. 2007) .............................................................................14

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank, PLC*,
   594 F.3d 383 (5th Cir. 2010) .......................................................................11, 15

*Lopez v. Abbott*,
   No. 2:16-CV-303, 2017 WL 1209846 (S.D. Tex. Apr. 3, 2017).........................9, 15

*LULAC v. Perry*,
   548 U.S. 399 (2006).............................................................................4, 5, 8, 9

*Lyn–Lea Travel Corp. v. Am. Airlines*,
   283 F.3d 282 (5th Cir. 2002) .............................................................................12

*Pease v. First Nat'l Bank*,
   335 Fed Appx. 412 (5th Cir. 2009).......................................................................1

*Perez v. Perry*,
   No. SA-11-CV-360, 2017 WL 962686 (W.D. Tex. Mar. 10, 2017).....................14

*Robinson v. Ardoin*,
    37 F.4th 208 (U.S. 5th Cir. 2022) ............................................................................5

*Robinson v. Ardoin*,
    No. 22-30333, 2022 U.S. App. LEXIS 16126 (5th Cir. June 12, 2022)..................................10

*Robinson v. Ardoin*,
    No. 3:22-cv-00211-SDD-RLB (M.D. La. Mar. 30, 2022)....................................6, 9

*Taylor v. Realty Execs. Int'l, Inc.*,
    No. 08-CA-746-LY, 2008 U.S. Dist. LEXIS 127896 (W.D. Tex. Dec. 12,
    2008) ..........................................................................................................................2

*Thornburg v. Gingles*,
    478 U.S. 30 (1986)......................................................................................... *passim*

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) ........................................................................10, 11

*Walker v. Beaumont Indep. Sch. Dist.*,
    No. 17-40752, 2019 WL 4458378 (5th Cir. Sept. 18, 2019)....................................15

## INTRODUCTION

Defendants' motion to dismiss Fair Maps Plaintiffs' Amended Complaint seeks to erect unrecognizable barriers to federal review of Voting Rights Act claims. Based upon a tenuous reading of this Court's order dismissing in part the Section 2 claims in Plaintiffs' original complaint, Defendants argue that Fair Maps Plaintiffs have failed to allege their demonstrative majority-minority districts are "culturally compact." The requirement has never been adopted by any court. And if it were, Fair Maps Plaintiffs' Amended Complaint makes the heightened showing. This Court should deny Defendants' motion.

Further, Defendants make several arguments regarding whether Plaintiffs sufficiently alleged the second and third Gingles preconditions. In doing so, Defendants again attempt to heighten the pleading standard, and otherwise ignore the posture of this case regarding developments that have occurred throughout discovery. Accordingly, Fair Maps Plaintiffs seek leave in the alternative to dismissal only in limited instances to narrowly amend their complaint.

## STANDARD

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter which, when taken as true, states 'a claim to relief that is plausible on its face.'" *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

When deciding a motion to dismiss, courts "construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor." *Pease v. First*

1

*Nat'l Bank*, 335 Fed Appx. 412, 414 (5th Cir. 2009). A court's obligation is "to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Body by Cook, Inc. v. State Farm Mut. Auto Ins.*, 869 F.3d 381, 385 (5th Cir. 2017) (quotation omitted). A motion to dismiss "is viewed with disfavor and is rarely granted." *Taylor v. Realty Execs. Int'l, Inc.*, No. 08-CA-746-LY, 2008 U.S. Dist. LEXIS 127896, at *5 (W.D. Tex. Dec. 12, 2008) (citing *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997)).

## ARGUMENT

### I.     Entity Plaintiffs Sufficiently Alleged Associational Standing.

As an initial matter, Fair Maps Texas Action Committee, OCA-Greater Houston, and Emgage, (together, "Entity Plaintiffs") have each sufficiently pleaded associational standing, including the requirement that the interests they seek to protect are germane to the organization's purpose. *See, e.g.*, Dkt. 458 ¶¶ 9, 13, 15 (discriminatory redistricting in Texas impedes the core missions of Action Committee, OCA-GH, and Emgage); *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (discussing the standards). Defendants do not challenge Entity Plaintiffs' associational standing, suggesting instead that Entity Plaintiffs lack *organizational* standing. Dkt. 401 at 3–4. Defendants' arguments are inapposite because Entity Plaintiffs only rely on associational standing.

### II.    Fair Maps Plaintiffs Sufficiently Alleged the First *Gingles* Precondition Regarding Compactness.

In its May 23, 2022 Order this Court found that Fair Maps Plaintiffs had not sufficiently alleged facts in support of the *Gingles* preconditions for its Section 2 VRA claims, and invited Plaintiffs to amend their complaint to include such allegations. Dkt. 307 at 43, 60.[1] Fair Maps

---

[1] The Court's Order outlined that Section 2 claims must meet three *Gingles* preconditions: 1) that minority voters "be able to constitute a majority by CVAP . . . in the proposed district"; 2) "that the minority population in the

Plaintiffs did exactly that with their First Amended Complaint. Dkt. 458. Now, despite failing to raise this argument in their first motion, Defendants assert that Fair Maps Plaintiffs failed to allege cultural compactness for their demonstrative *Gingles* districts, and argue that Plaintiffs therefore fail to allege the first *Gingles* precondition for these districts. *See, e.g.*, Dkt. 401 at 4–5 (citing *Ala. State Conf. of the NAACP v. Alabama*, --- F. Supp. 3d ---, 2020 WL 583803, at \*22–25).

This argument fails for two reasons. First, Defendants misconstrue *Gingles* and this Court's order. As made clear by the U.S. Supreme Court and Fifth Circuit case law cultural compactness is merely a part of the first *Gingles* precondition—whether the minority population is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). No court has found that plaintiffs are required to allege "specific facts" demonstrating cultural compactness when pleading the *Gingles* preconditions, and certainly not to the level of specificity that Defendants argue. Indeed, it is telling that Defendants failed to make the argument in their first Rule 12 motion. Second, even assuming that some allegations regarding cultural compactness are required at the pleading stage, Fair Maps Plaintiffs have exceeded the requirement by providing geographically compact and politically cohesive demonstrative districts, as well as additional allegations about communities of interest, all of which are together more than enough to plead a plausible claim.

### A. Fair Maps Plaintiffs Are Not Required to Specifically Allege Cultural Compactness.

The first *Gingles* precondition sets forth numerosity and compactness requirements. *Johnson v. De Grandy* 512 U.S. 997, 1011 (1994); *see generally Thornburg v. Gingles*, 478 U.S. 30 (1986). Relatedly and at issue here, the Court stated in a footnote in its May 23, 2022 Order

---

proposed district vote cohesively"; and 3) "that the Anglo voting bloc usually defeats the minority-preferred candidate under the current districting." Dkt. 307, at 31, 41–42.

that the first *Gingles* precondition also requires "that the minority group is culturally compact," citing specific pages in *LULAC v. Perry*. Dkt. 307 at 31 n.20 (citing 548 U.S. 399, 430–35 (2006)).

The procedural history of *LULAC v. Perry* ("*Perry*") is telling. *LULAC* considered a remedial map drawn by the Texas Legislature. Following *a trial*, and adversarial, comprehensive evidence, the Court rejected a district that was *both* geographically disparate and bore no hallmarks of cultural compactness. In Perry, the Texas Legislature redrew Congressional District 23, a Latino opportunity district. Perry, 548 U.S. at 425. The Latino opportunity district drawn to take its place, Congressional District 25, stretched from Austin to the Rio Grande Valley, connecting large Latino populations over 300 miles apart. Id. at 424. The U.S. Supreme Court found that, in blessing the district, the three-judge district court did not make any findings as to whether Congressional District 25 was reasonably compact under the first precondition of *Gingles*. The U.S. Supreme Court addressed compactness in Congressional District 25 because the three-judge district court did not make any findings as to whether Congressional District 25 was reasonably compact under the first precondition of *Gingles*. The Supreme Court explained that "while no precise rule has emerged governing § 2 compactness, the 'inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Id.* (citations omitted). The three-judge court had ignored the plaintiffs' factual evidence presented at trial that Congressional District 25 "combine[d] two farflung segments of a racial group with disparate interests . . . "; that "it includes seven full counties, but 77% of its population resides in split counties at the northern and southern ends."; and "Latino communities at the opposite ends of District 25 have divergent 'needs and interests' owing to 'differences in socio-economic status, education, employment, health, and other characteristics." *Id.* at 424.

4

Importantly, the Supreme Court was careful to delineate that it was specifically the combination of wide disparities in both geography and community interests that made Congressional District 25 non-compact. "We emphasize that it is the enormous geographical distance separating the Austin and Mexican-border communities, coupled with the disparate needs and interests of these populations—not either factor alone—that renders District 25 non-compact for Section 2 purposes." *Id.* at 435.

Since *Perry*, no court has found that cultural compactness is a separate pleading requirement, as Defendants now suggest. Rather, the inquiry is fact-intensive, conducted *after* extensive record development at trial, and within the totality of circumstances. Defendants' citations illustrate this fact. *See Ala. State Conf. of the NAACP v. Alabama*, 2020 U.S. Dist. LEXIS 18938 (M.D. Ala. 2020). Dkt. 401, at 6. In *Alabama State Conference of the NAACP*, the district court evaluated compactness of the map at issue after a six-day bench trial, including testimony from twenty-one witnesses. *Id.* at *10. *Alabama State Conference* does not suggest that cultural compactness is a separate pleading requirement. *See also Robinson v. Ardoin*, 37 F.4th 208 (U.S. 5th Cir. 2022), (determining Congressional District 5 was culturally compact by evaluating the evidence that the plaintiffs presented at a five-day evidentiary hearing, which included comparisons to the benchmark district, testimony from map-drawing experts on the mathematical measures of compactness and requirements of traditional redistricting criteria, and testimony from lay witnesses on the preservation of communities of interest). Defendants endeavor to transform notice pleading beyond recognition and create insurmountable barriers to federal judicial review.

The injustice of Defendants' proposed pleading standard is evident. Fair Maps Plaintiffs have alleged each of the *Gingles* preconditions, submitted demonstrative districts, and proffered expert reports. Fact discovery recently closed on July 15. Dkt. 325. To litigate cultural

compactness—which Defendants do not define—at the pleading stage ignores the complexity of the issue and its significance to the factfinder. Instead, this Court should follow the approach taken by every other court to consider VRA challenges. The most recent case law in this Circuit confirms this approach, where plaintiffs were not required to make specific allegations about cultural compactness at the pleading stage. *See* Complaint, *Robinson v. Ardoin*, No. 3:22-cv-00211-SDD-RLB, at \*29-31 (M.D. La. Mar. 30, 2022) ("Louisiana's Black voters are sufficiently numerous and geographically compact to form a majority in two properly apportioned congressional districts in a six-district plan.")

### B. Fair Maps Plaintiffs' First Amended Complaint Sufficiently Alleged Cultural Compactness.

Defendants concede that the cultural compactness inquiry is "fact-specific." Dkt. 401 at 4. This is proven by the level of specificity Defendants seem to be demanding, which is not reconcilable with the notice pleading standard. Rule 8(a)(2) requires Fair Maps Plaintiffs to include "'a short and plain statement of the claim showing that the pleader is entitled to relief'" in a pleading. *Iqbal*, 556 U.S. at 677 (quoting Fed R. Civ. P. 8(a)(2)); *see Anderson v. HUD*, 554 F.3d 525, 528 (holding that notice pleading "does not require pleading specific facts" but rather "must 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'" (citing *Twombly*, 550 U.S. at 555)). However, to the extent that plaintiffs are required to plead facts regarding cultural compactness, Fair Maps Plaintiffs sufficiently allege plausible claims.

Fair Maps Plaintiffs' First Amended Complaint plausibly alleges cultural compactness for each Section 2 claim at issue, including because it contains demonstrative maps for every Section 2 claim. Dkt. 458 at 33 (Fort Bend House); 42 (Collin House); 47 (Fort Bend Senate); 52 (Tarrant Senate); 57 (Fort Bend-Harris Congressional). On their own, the demonstrative maps for

each claim provide specific and data-supported factual allegations regarding which cohesive communities of interest are geographically included within each district. Including the demonstratives in the complaint rises far above the level of specificity that courts in the Fifth Circuit have required for *Gingles* claims. *Cf. Johnson v. Ardoin*, No. 18-625-SDD-EWD, 2019 U.S. Dist. LEXIS 91449, at *12 (M.D. La. May 31, 2019) ("[A]t the motion to dismiss stage, the Court is bound to accept Plaintiffs' well-pleaded facts as true and does not require submitting as evidence hypothetical redistricting schemes.") (internal citations omitted).

Further, the demonstrative maps must be viewed in the context of all of the allegations in the First Amended Complaint, which separately identifies communities of interest. The First Amended Complaint outlined its allegations according to specific counties and/or regions based on communities of interests in those regions. *See, e.g.*, Dkt. 458 ¶¶ 95–106 (allegations regarding House districts in Fort Bend County). Accordingly, each demonstrative is limited to a specific county or identifiable region, which contains certain communities of interest. Moreover, Fair Maps Plaintiffs include illustrative maps that show how the AAPI community in a particular area has been cracked for four of the VRA claims at issue.[2] Dkt. 458 at 30 (Fort Bend House); 40 (Collin County House); 45 (Fort Bend Senate); 55 (Fort Bend-Harris Congressional). These maps document the extent to which the enacted plans split apart AAPI populations in each of these areas. Fair Map Plaintiffs allege that these populations constitute communities of interest, and the demonstrative districts offered are in part meant to remedy this cracking. Therefore, when read in concert with the demonstrative maps included for each of these claims, these illustrative maps identify the communities of interest that are kept whole by the demonstratives.

---

[2] The Tarrant County Senate districts, the only claim where cultural compactness is at issue without such a map, contain very specific allegations concerning the communities of interest that are split by the enacted Senate map. Dkt. 458 at 50.

This supports a plausible inference that Fair Maps Plaintiffs' alleged demonstrative districts are culturally compact.

In describing cultural compactness, Defendants explain that while "the inquiry is fact-specific, it is clear that "a district that 'reaches out to grab small and apparently isolated minority communities' is not reasonably compact." Dkt. 401 at 5 (quoting *LULAC v. Perry*, 548 U.S. at 433 (2006)). But Defendants cannot argue that Fair Maps Plaintiffs' demonstrative maps, on their face combine "isolated minority communities[.]" They do not. The Court in *Perry* "emphasize[d] that it is the enormous geographical distance separating the Austin and Mexican-border communities, coupled with the disparate needs and interests of these populations—*not either factor alone*—that render[ed] District 25 noncompact for § 2 purposes." 548 U.S. at 435 (emphasis added). Plaintiffs' demonstrative districts cannot be compared to the 300-mile long Congressional District 25.

Fair Map Plaintiffs avoid this first obstacle by pleading geographically compact districts. Defendants do not argue otherwise. Fair Map Plaintiffs avoid the second obstacle about different communities by specifically alleging that communities of interest are kept whole in their demonstratives. Dkt. 458 at 33 (alleging this for Fort Bend House); 43 (same for Collin House); 48 (Fort Bend Senate); 53 (Tarrant Senate); 57 (Fort Bend-Harris Congressional).

Defendants appear to suggest Fair Maps Plaintiffs have failed to say the right "magic words." Beyond such an illusory, unsupported requirement, it is clear Fair Maps Plaintiffs have asserted cultural compactness. By providing Defendants with the precise geographic contours of the demonstrative districts, Fair Map Plaintiffs allege far more than is necessary to notify Defendants at the pleading stage which communities are at issue. This is illustrated by the specific nature of Defendants' cultural compactness arguments. Defendants ask numerous

detailed questions about the *extent* of the cultural compactness within these districts, identifying with particularity the communities combined in the demonstratives. *See, e.g.*, Dkt. 401 at 15–16 (describing the specific contours of Fair Maps' demonstrative Senate districts in Tarrant County and asking how the specifically enumerated communities are culturally compact); *see also id.* at 6–7 (same for Fort Bend House); 8–10 (Collin House); 11–12 (Fort Bend Senate); 17–18 (Fort Bend-Harris Congressional). For example, when discussing the Senate claims in Fort Bend County, Defendants state that "[t]he demonstrative SD17 resembles a semi-circle that begins along the SR-59/I-69 corridor grabbing Kendleton, Beasley, Rosenberg, and part of Sugar Land; then circles up and takes bits of Alief and Katy before circling back and up into Waller County." Dkt. 401 at 12. Defendants argue that Fair Maps Plaintiffs should have alleged with specificity how "Asians, [B]lacks, and Latinos in these particular areas share the same concerns, issues, or are similar in any way other than their respective ethnicities." *Id.* But whether Defendants *agree* with Plaintiffs' characterization of these districts, Plaintiffs' claims and the factual bases therefor are clear.

No more is required in a complaint. *See, e.g.*, Complaint, Dkt. 1, *Robinson v. Ardoin*, No. 3:22-cv-00211-SDD-RLB, at *29–31 (M.D. La. Mar. 30, 2022); *see also Johnson v. Ardoin*, 2019 U.S. Dist. LEXIS 91449, at *12. Rather, disagreements about the factors wrapped into *Gingles*, including cultural compactness, are subjects for litigation, developed through discovery and expert reports. Defendants' motion demonstrates that Fair Maps has alleged facts specific enough to allow Defendants to litigate the issue. *See, e.g.*, *Lopez v. Abbott*, No. 2:16-CV-303, 2017 U.S. Dist. LEXIS 50216, at *16-17, 21 (S.D. Tex. Apr. 3, 2017) (finding that plaintiffs had sufficiently pleaded the first *Gingles* precondition, denying defendants' motion to dismiss, and

noting that arguments raised by defendants' motion were "all questions to be considered upon the evidence proffered in [the] case.").

What is clear, however, is that these questions are better addressed beyond a motion to dismiss. *See Ala. State Conf. of the NAACP v. Alabama*, No. 2:16-CV-731-WKW, 2020 U.S. Dist. LEXIS 18938, at *69–74 (M.D. Ala. 2020) (reaching its determination of noncompactness with the aid of an extensive factual record and expert reports); *Robinson v. Ardoin*, No. 22-30333, 2022 U.S. App. LEXIS 16126, at *14-17 (5th Cir. June 12, 2022) (discussing the relative strengths and weaknesses of the evidence introduced by plaintiffs and defendants on cultural compactness).

Indeed, this Court has noted, "*Gingles* claims are complicated and analytically intensive." Dkt. 307 at 31. Courts frequently reserve such fact-intensive determinations for trial. *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 248–49 (5th Cir. 2016) (noting that "district courts are well suited to conduct [the] fact-intensive analysis" that Section 2 requires, and discussing the "copious evidence from a bench trial and a record that spans more than one hundred thousand pages."). Because cultural compactness is precisely such a question that will turn on the Court's consideration of all the facts available to it, Defendants' attempt to resolve the question in a motion to dismiss is not appropriate.[3]

### III. Fair Maps Plaintiffs Sufficiently Alleged the Second and Third *Gingles* Preconditions.

---

[3] To the extent the Court finds that Fair Maps Plaintiffs have not pleaded cultural compactness, Fair Map Plaintiffs seeks leave to amend their complaint in the alternative to dismissal to include information in the factual record from depositions and expert reports that demonstrate cultural compactness. Fair Maps recognizes that the Court should not generally consider these facts and opinions in resolving a 12(b)(6) motion. But the subsequent factual development that has occurred since the filing of Fair Maps' First Amended Complaint would enable Fair Maps to cure any defects Defendants have raised, and accordingly leave to amend should be granted.

Finally, Fair Maps Plaintiffs have pleaded that there is racially polarized voting sufficient to support their Section 2 claims.[4] Consistent with the Court's May 23, 2022 Order, Fair Maps Plaintiffs filed their First Amended Complaint, alleging with specificity population and voting data for currently enacted districts and demonstrative districts.[5] Dkt. 458. Fair Maps Plaintiffs provided substantial data in their First Amended Complaint to establish the plausibility of their Section 2 VRA claims.

### A. Bell County House Districts

Defendants challenge the second *Gingles* requirement, minority political cohesion, for the demonstrative state house district in Bell County, based solely on a clerical error.

As Plaintiffs informed Defendants, Plaintiffs' First Amended Complaint inadvertently switches the numbering of demonstrative House Districts 54 and 55 in a table discussing population totals. Dkt. 458 at 37, ¶ 116. The table should have listed demonstrative House District 54 as the majority-minority district with 64.6% minority CVAP, instead of House District 55. *See id.* (reversing CVAP percentages for demonstrative House Districts 54 and 55). Plaintiffs' scrivener's error is manifest, and there is no room for doubt as to Plaintiffs' claims.[6]

---

[4] "When both minorities and Anglos vote in blocs, courts conclude that voting is 'racially polarized' and typically hold that both the second and third [*Gingles*] preconditions have been met." Dkt. 307 at 32.

[5] Defendants argue that the First Amended Complaint did not provide similar data for Collin County Congressional Districts 3 and 4. Dkt. 401 at 20. However, Fair Maps Plaintiffs bring only Constitutional claims concerning these districts. Dkt. 458 ¶¶ 181–84, 186. Fair Maps Plaintiffs therefore do no need to meet the *Gingles* preconditions. *See* Dkt. 307 at 52–53 (explaining that for constitutional claims in this context, "Plaintiffs need not plausibly allege all three *Gingles* factors").

[6] Since the filing of Plaintiffs' First Amended Complaint, the parties have acknowledged the error and proceeded to exchange discovery without issue. For example, Plaintiffs identified the labeling error regarding HD 54 in Dr. Collingwood's supplemental expert report served on Defendants on June 15, 2022, as well as in their supplemental responses to Defendants' first set of interrogatories exchanged on July 15, 2022. Although Courts generally do not consider outside evidence in deciding motions to dismiss, *see Lone Star Fund V (U.S.), L.P. v. Barclays Bank, PLC*, 594 F.3d 383, 387 (5th Cir. 2010), factual development that has occurred in discovery would allow Fair Maps Plaintiffs to allege more detailed and accurate facts as needed in either an amended complaint or at trial.

Despite this error, the First Amended Complaint clearly states that Fair Maps Plaintiffs are proposing a minority opportunity district that is politically cohesive with 98.1% of minority voters supporting President Biden in the 2020 presidential election. Dkt. 458 ¶ 117 ("[T]his map demonstrates that it is possible to draw a minority opportunity district that is . . . politically cohesive. . . . [A] significant majority of minority voters would have voted for President Biden."). Further, Defendants admit that if House District 54 was not intended to be the majority-minority opportunity district, providing political cohesion data for that demonstrative district would be "irrelevant." Dkt. 401, at 9. Plaintiffs' inclusion of this data for House District 54 and their description of the district as an "opportunity district" make it clear that the demonstrative map was intended to represent House District 54 as a majority-minority district. Dkt. 458 ¶ 117. Together, these allegations satisfy the second *Gingles* precondition by providing a demonstrative district with a sufficiently large and politically cohesive population of minority voters. *See Iqbal*, 556 U.S. at 678 (requiring that "the plaintiff pleads factual content that allows the court to draw the reasonable inference" of misconduct).[7]

### B. Dallas-Fort Worth Congressional Districts and Tarrant County Senate Districts

Defendants do not argue that Fair Maps Plaintiffs failed to allege cohesion in the demonstrative districts provided for the Dallas-Fort Worth region. Instead, Defendants argue that Fair Maps Plaintiffs demonstratives "*might*" affect the performance of surrounding districts, calling into question whether the demonstrative districts are a proper remedy to provide additional majority-minority districts. In other words, Defendants do not adequately challenge the

---

[7] To the extent Plaintiffs' amended complaint is insufficiently clear, Fair Maps Plaintiffs intend to seek leave to amend their complaint to correct the mislabeling regarding House District 54 and 55. *See Lyn–Lea Travel Corp. v. Am. Airlines*, 283 F.3d 282, 286 (5th Cir. 2002) (noting that Federal Rule 15(a) "requires the trial court to grant leave to amend freely, and the language of this rule evinces a bias in favor of granting leave to amend.") (citations omitted); FRCP 15(a)(2) "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."

demonstrative districts for Congressional Districts 6, 30, 32, or 33 in Dallas-Fort Worth, or Senate Districts 9, 10, or 22 in Tarrant County.

Fundamentally, Defendants misconstrue the *Gingles* requirements at the pleading stage. As this Court has explained, plaintiffs must plead cohesion among the minority population in *the demonstrative* district(s). Dkt. 307 at 33. Fair Maps Plaintiffs have done so for each of its proposed demonstrative districts in Congressional Districts 6, 30, 32, and 33 and Senate Districts 9, 10, and 22. Fair Maps Plaintiffs have also pleaded that white bloc voting exists in the parallel enacted districts. Dkt. 458 ¶¶ 146, 164. As such, Fair Maps Plaintiffs have met their burden at the pleading stage to show that the "*Gingles* theory describes the *proposed district[s]*," (emphasis added), and by addressing the *Gingles* preconditions on a "district-by-district" basis. Dkt. 307, at 31, 33.

Defendants demand that the second and third *Gingles* preconditions also be applied to surrounding districts—a detailed analysis that is not required at the pleading stage and spills beyond districts plaintiffs are challenging or proposing. Defendants further argue that Fair Maps Plaintiffs must demonstrate the effectiveness of its demonstrative districts on the performance of all surrounding districts. This is an impractical requirement at the pleading stage, and is better left for the remedial stage after the conclusion of discovery and trial. This Court has previously explained that "[t]o vindicate a plaintiff who brings a valid malapportionment claim with respect to one district, for example, it may be necessary to redraw every other district in the state." Dkt. 307, at 15. This Court confirmed that "[s]uch *a remedy* is entirely within the judicial power, to the extent that it is 'limited to the inadequacy that produced the injury in fact that the plaintiff has established.'" *Id.* at 16 (emphasis added) (citing *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018)).

Tellingly, Defendants do not cite any caselaw in support of their untenable pleading requirement for surrounding districts. They could not do so, as potential adjustments to districts

outside of Fair Maps Plaintiffs' demonstrative districts and those districts' performance are factual questions better suited for discovery, trial, or determining relief. *Cf. Perez v. Perry*, No. SA-11-CV-360, 2017 WL 962686, at *2 (W.D. Tex. Mar. 10, 2017) (discussing a court-imposed *remedy* that redrew the boundaries for challenged districts "and portions of other nearby districts" (citing *Vera v. Bush*, 933 F. Supp. 1341 (1996)).

Moreover, Defendants' arguments rely solely on baseless hypotheticals. They ask the Court to speculate about the "possibility" that the plan will decrease minority-performing districts overall. Dkt. 401 at 14, 20. Without providing any reasoning for this assertion, Defendants merely speculate, saying "[f]or all Defendants and the Court know," surrounding performing districts might become nonperforming. Defendants admit that either outcome, performance or nonperformance for those districts, is "equally consistent" with Plaintiffs' allegations. *Id.* at 14, 20. By doing so, however, Defendants necessarily concede that it is plausible that the overall performance of surrounding districts is unchanged. However, in addition to providing the demonstrative maps, Fair Maps Plaintiffs expressly alleged that these are "*additional* opportunity district[s]." Dkt. 458 ¶¶ 149, 167 (emphasis added).[8] These well-pleaded facts should be accepted "as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). Despite this, Defendants improperly insist that the Court should draw inferences *against* Plaintiffs. Any factual disputes about the impact of the demonstrative districts in the First Amended Complaint are questions that can only be answered

---

[8] Moreover, the demonstrative map for Tarrant County provided in the Amended Complaint does include the boundaries of nearby districts, and shows that the boundaries of districts outside of the altered demonstrative districts have not been altered from the enacted districts. Specifically, the demonstrative map includes the adjacent boundaries of Senate District 12, 16, 23 and 30—which are unchanged from the enacted map. *Compare* DKT. 458 at 49 (enacted Tarrant County Senate map), *with* Dkt. 458 at 52 (demonstrative Tarrant County Senate map). These unchanged district boundaries even further refute Defendants' claims that "the demonstrative plan . . . might turn SDs 16 or 23 into Trump-supporting districts." *See* Dkt. 401, at 14.

after the fact and expert development through discovery and at trial. *See Walker v. Beaumont Indep. Sch. Dist.*, No. 17-40752, 2019 WL 4458378, at *4 (5th Cir. Sept. 18, 2019) (for a motion to dismiss, "all questions of fact and any ambiguities in the controlling substantive law must be resolved in the plaintiff's favor."); *Lopez v. Abbott*, No. 2:16-CV-303, 2017 WL 1209846, at *7 (S.D. Tex. Apr. 3, 2017) ("[Plaintiffs] suggested one plausible remedy. It is not the task of this Court to determine at this juncture whether that remedy should be imposed, contrasted with any other remedy that may arise or no remedy at all. Those are all questions to be considered upon the evidence.").

At the pleading stage this Court must only determine whether Fair Maps Plaintiffs "stated a legally cognizable claim that is plausible, not to evaluate likelihood of success." Dkt. No. 144 at 2 (quoting *Doe* ex rel. *Magee v. Covington Cnty. Sch. Dist.* ex rel. *Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (en banc) (cleaned up)). Fair Maps Plaintiffs have sufficiently pleaded claims challenging Congressional Districts 6, 30, 32, and 33 as well as Senate Districts 9, 10, and 22 by providing demonstrative districts that meet the *Gingles* requirements and are "*additional* opportunity district[s]." Dkt. 458 ¶¶ 149, 167 (emphasis added).[9]

### C.  Harris-Fort Bend Congressional Districts

Finally, in Harris and Fort Bend Counties, Fair Maps Plaintiffs have pleaded that it is possible to draw an additional minority-opportunity district among Congressional Districts 7, 9, and 22. Dkt. 458 at 153–160.

---

[9] While Plaintiffs maintain they have satisfied their burden at this stage of the litigation, since their First Amended Complaint they produced relevant data about these surrounding demonstrative districts on June 15, 2022 in Dr. Collingwood's supplemental expert report. Although Courts generally do not consider outside evidence in deciding motions to dismiss, *see Barclays Bank* at 387, factual development that has occurred in discovery would allow Fair Maps Plaintiffs to allege more detailed and accurate facts as needed in either an amended complaint or at trial. Therefore, to the extent this Court considers it necessary to provide such data in a complaint, Fair Maps Plaintiffs seek leave to amend their complaint accordingly in the alternative to dismissal.

Defendants first argue that Fair Maps Plaintiffs did not adequately plead white bloc voting in benchmark Congressional District 9 because "a bare majority of 54.6% of white voters from the enacted CD 9 supported Trump . . ." Dkt. 401 at 17. However, Fair Maps Plaintiffs' Section 2 claims in Congressional Districts 7, 9, and 22 are based on cracking AAPI voters among the three districts, such that Congressional District 22 should become an additional opportunity district in Plaintiffs' demonstrative. *Id.* at ¶ ¶ 154–56. Fair Maps Plaintiffs need only allege white bloc voting in the enacted district intended to become a minority-opportunity district—Congressional District 22. Fair Maps Plaintiffs meet this standard by alleging that a significant majority, 84.1% of white voters in enacted Congressional District 22 voted for Former President Trump in the 2020 presidential election. Dkt. 458 at 56.

Defendants then argue that Fair Maps Plaintiffs did not plead that the demonstrative Congressional District 22 set forth in the First Amended Complaint performs, because it remains a Trump-supporting district. *See* Dkt. 401 at 17–18; Dkt. 458 at 58. One week after filing the First Amended Complaint, Fair Maps Plaintiffs' expert, Dr. Loren Collingwood, included a corrected demonstrative map in his supplemental expert report that was served on Defendants on June 15, 2022, and confirmed that it creates an additional opportunity district that elects the minority candidate of choice. The correct demonstrative map was also included in Fair Maps Plaintiffs' supplemental responses to Defendants' first set of interrogatories exchanged on July 15, 2022.

Accordingly, Fair Maps Plaintiffs respectfully intend to seek leave to amend their complaint to include the correct demonstrative map, which has been the basis of the expert reports produced in discovery, as well as written discovery responses.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss Fair Maps

Plaintiffs' First Amended Complaint, or in the alternative grant leave to amend.

Dated: July 25, 2022

Respectfully submitted,

*/s/ Noor Taj* (*by permission*)
Noor Taj
P.A. State Bar No. 309594*
Allison J. Riggs
N.C. State Bar No. 40028*
Hilary Harris Klein
N.C. State Bar No. 53711*
Mitchell Brown
N.C. State Bar No. 56122*
Katelin Kaiser
N.C. State Bar No. 56799*
SOUTHERN COALITION FOR SOCIAL JUSTICE
1415 West Highway 54, Suite 101
Durham, NC 27707
Telephone: 919-323-3380
Fax: 919-323-3942
Allison@southerncoalition.org
Noor@scsj.org
hilaryhklein@scsj.org
mitchellbrown@scsj.org
katelin@scscj.org

David A. Donatti
TX Bar No. 24097612
Ashley Harris
TX Bar No. 24078344
Thomas Buser-Clancy
TX Bar No. 24123238
Adriana Pinon
Texas Bar No. 24089768
ACLU FOUNDATION OF TEXAS, INC.
P.O. Box 8306
Houston, TX 77288

Tel. (713) 942-8146 Fax. (713) 942-8966
ddonnati@aclutx.org
aharris@aclutx.org
tbuser-clancy@aclutx.org
apinon@aclutx.org

Jerry Vattamala
N.Y. State Bar No. 4426458*
Susana Lorenzo-Giguere
N.Y. State Bar No. 2428688*
Patrick Stegemoeller
N.Y. State Bar No. 5819982*
ASIAN AMERICAN LEGAL DEFENSE
AND EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932 (phone)
(212) 966 4303 (fax)
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org
pstegemoeller@aaldef.org

Yurij Rudensky*
New York Bar No. 5798210
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
20 Broadway, Suite 1750
New York, NY 10271
Tel: (646) 292-8310
Fax: (212) 463-7308 yurij.rudensky@nyu.edu

*Admitted Pro Hac Vice

Counsel for Fair Maps Texas Plaintiffs

## **CERTIFICATE OF SERVICE**

I certify that on July 25, 2022, the foregoing response was served on all counsel of record via the Court's CM/ECF.

*/s/ Ashley Harris*
Ashley Harris