**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> GREG ABBOTT, in his official capacity as Governor of the State of Texas, *et al.*, <br><br> *Defendants*. | CIVIL ACTION NO. <br> 3:21-cv-00259-DCG-JES-JVB <br> [Consolidated Action: Lead Case] |

## **LULAC PLAINTIFFS' OPPOSITION TO THE STATE'S MOTION TO DISMISS THE THIRD AMENDED COMPLAINT**

Plaintiffs LULAC, *et al.* ("LULAC Plaintiffs") file this response to the State's motion to dismiss LULAC Plaintiffs' Third Amended Complaint. *See* Dkt. 398.

### I.   INTRODUCTION

On June 13, 2022, the Court docketed the Third Amended Complaint of Plaintiffs LULAC, *et al.* ("LULAC Plaintiffs"). *See* Complaint, Dkt 338. LULAC Plaintiffs' Complaint included 180 pages of detailed allegations challenging all four of Texas's 2021 redistricting plans. The State's motion to dismiss—which seeks dismissal of some (but not all) of LULAC Plaintiffs, and dismissal of two claims—fails because it does not adhere to controlling authority and relies on unsupported assertions of fact that are inappropriate at the motion-to-dismiss stage.

### II.   LEGAL STANDARD

As the Court has explained, "[t]o survive a motion to dismiss, a complaint must present enough facts to state a plausible claim to relief. That does not require exhaustive detail, but the

1

pleaded facts must allow a reasonable inference that the plaintiff should prevail." Dkt. 307 at 9 (citing *Mandawala v. Ne. Baptist Hosp.*, 16 F.4th 1144, 1150 (5th Cir. 2021) (quotations omitted)); *see also Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014) ("A plaintiff, [*Twombly* and *Iqbal*] instruct, must plead facts sufficient to show that her claim has substantive plausibility.").

### III.   ARGUMENT

The State ignores that, at the *pleading* stage, LULAC Plaintiffs need only "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In addition, the State frequently asks the Court to rely on information outside of LULAC Plaintiffs' Complaint, weigh evidence, and make findings of fact.  *See e.g.* Dkt. 398 at 13–16, 20–21.  Furthermore, the State improperly insists that LULAC Plaintiffs must "grapple" with "alternative explanation[s]" for their claims in order to avoid dismissal.  Dkt. 398 at 11.  However, as the Court emphasized in its earlier order, "at the pleading stage," "plaintiffs need not negate alternative theories."  Dkt. 307 at 29; *see also id.* at 53 (rejecting the State's argument that plaintiffs must allege facts negating an "obvious alternative explanation").  Accordingly, there is no reason to accept the State's invitation to apply a heightened standard at this procedural posture.

### A.  LULAC Plaintiffs Have Plausibly Alleged Standing.

The State's motion to dismiss LULAC Plaintiffs' claims for lack of standing fails because LULAC Plaintiffs alleged facts sufficient to plead injury-in-fact, a causal connection between the injury and the State's actions, and a likelihood that the Court can correct the injury with a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  LULAC Plaintiffs' Third Amended Complaint more than meets the standing requirements to survive a motion to dismiss for each listed entity and individual.  As described below, LULAC Plaintiffs have adequately alleged the

relevant standing for all individual plaintiffs, associational standing for all relevant plaintiffs, organizational standing for all relevant plaintiffs, and specific standing for HD118.

### 1. LULAC Plaintiffs Have Plausibly Alleged Individual Plaintiff Standing.

The State does not dispute the standing of the individual plaintiffs to challenge the districts in which they reside.[1] Nevertheless, the State's motion includes a single sentence stating that the individual plaintiffs lack standing "to challenge any districts in which they do not reside." Dkt. 398 at 4. Individual LULAC Plaintiffs bring claims challenging the districts in which they live. The Court has already addressed the requirements for individual standing, Dkt. 307 at 20–25, and found standing for individual voters, like LULAC individual plaintiffs, who challenge the districts in which they live. *Id.*

### 2. LULAC Plaintiffs Have Plausibly Alleged Associational Standing.

The State does not challenge the associational standing of plaintiffs LULAC, GI FORUM, LUPE, MABA-TX, TEXAS HOPE, TALAS, RITA or WDP. FIEL's associational standing—the only associational standing claim that the State has moved to dismiss—is adequately pleaded in LULAC Plaintiffs' Third Amended Complaint.

FIEL has alleged that it has 11,000 members specifically in the Houston area, that its membership pays dues (a portion of which goes toward guiding FIEL's activities), and that its individual members include Latino voters who live in challenged or proposed districts. Complaint ¶ 76. These facts identify FIEL's membership and allege concrete, particularized injury. FIEL

---

[1] The individual plaintiffs, and the challenged districts in which they reside, are Emelda Menendez (HD120; SD19; CD28; ED3), Gilberto Menendez (HD120; SD19; CD28; ED3), Jose Olivares (HD32; SD20; CD27; ED2), Florinda Chavez (HD49; SD21; CD37; ED5), Joey Cardenas (HD85; SD17; CD22; ED2), Paulita Sanchez (HD73; SD25; CD21; ED10), Jo Ann Acevedo (HD73; SD25; CD21; ED10), David Lopez (HD138; SD17; CD38; ED6), Diana Martinez Alexander (HD138; SD15; CD38; ED6), and Jeandra Ortiz (HD46; SD14; CD35; ED5).

further alleges that the challenged redistricting plans cause specific injuries to FIEL as an organization. *See infra*, Section III.A.3. To the extent the Court concludes that FIEL lacks associational standing because it did not name a member in the complaint, FIEL continues to have organizational standing.

The remaining organizational plaintiffs—SVREP, MI FAMILIA VOTA, WCVI, and PROYECTO AZTECA—did not plead that they have members, and thus do not seek to establish associational standing. Because they plausibly alleged their organizational standing (in Section III.A.3, *infra*), there is no reason for the Court to dismiss their claims.

### 3.   *LULAC Plaintiffs Have Plausibly Alleged Organizational Standing.*

The State's only challenge to LULAC Plaintiffs' organizational standing relates to the injury in fact requirement of the *Lujan* test. Dkt. 398 at 4–9. LULAC Plaintiffs' Complaint alleges sufficient injury to each organizational plaintiff and does so with specificity.

LULAC Plaintiffs allege facts "that would show or suggest that [the State's] redistricting maps impede [the organizations'] actual activities—i.e., [their] ability 'to educate, register, mobilize, and turn out Latin[o] voters across the United States, including in Texas.'" Dkt. 307 at 13. The Court explained that organizational plaintiffs "must demonstrate that [the State's] redistricting plans significantly and perceptibly impaired their actual activities, not just their abstract interests (no matter how important) in civic participation, voting rights, and the like." *Id.* at 11 (citing *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (quotation omitted)). The Fifth Circuit has clarified that identifying "specific projects . . . was not a heightening of the *Lujan* standard, but an *example* of how to satisfy it by pointing to a non-litigation-related expense." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (emphasis added).

4

Contrary to the State's assertions, LULAC Plaintiff organizations did not allege a "[m]ere redirection" of resources, Dkt. 307 at 12, but rather alleged with specificity that the State's actions will cause them to devote additional time and resources to activities in which they would not otherwise have engaged.[2] As such, LULAC Plaintiffs have met the pleading requirement.

For every plaintiff, LULAC Plaintiffs' Third Amended Complaint is specific enough to survive the State's motion. For example, Plaintiff SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT ("SVREP") adequately alleged that "As a result [of the effect of the challenged redistricting plans], SVREP must now expend *new* and *significantly more* resources to register and turn out Latino voters discouraged by the absence of an equal opportunity to elect their candidate of choice." Complaint ¶ 26 (emphasis added). As alleged in the Third Amended Complaint, some of these resources would otherwise have been spent elsewhere by SVREP and some of these resources will be additional new expenditures SVREP would not have otherwise spent.[3] These allegations, and others included in the Third Amended Complaint, involve actual activities—both newly required and existing but impaired. Accordingly, SVREP adequately alleged organizational standing.

---

[2] As noted by the Fifth Circuit in *OCA-Greater Houston*:

> [A]ddressing the challenged provisions frustrates and complicates [OCA's] routine community outreach activities . . . OCA's primary mission is voter outreach and civic education, particularly "getting out the vote" among its members . . . OCA calibrated its outreach efforts to spend extra time and money educating its members about these Texas provisions and how to avoid their negative effects . . . [T]hese in-depth conversations take more time than merely explaining the requirements of the VRA, and therefore OCA must spend more time on each call (and reach fewer people in the same amount of time) because of Texas's law.

867 F.3d at 610. This differs from *City of Kyle*, in which "plaintiffs were dedicated lobbying groups who claimed their lobbying and litigation-related expenses as their injury." *Id.* at 611.

[3] The State's assertion that LULAC Plaintiffs' "failure to allege in which particular challenged district they have diverted their resources dooms the[ir] organizational standing," Dkt. 398 at 6, is flatly incorrect; this purported requirement is simply not found in any precedent.

The remaining LULAC Plaintiff organizations also adequately alleged specific injuries. *See* Complaint ¶ 28 ("MI FAMILIA VOTA must divert time and funding from its youth development program, community engagement workshops and other educational efforts that further its mission and instead engage in efforts to convince Latinos to participate, despite the discrimination in the challenged redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—not a regular activity of MI FAMILIA VOTA."), ¶ 73 (WILLIAM C. VELASQUEZ INSTITUTE will "have to use new resources to educate community leaders and other Latinos regarding the areas in which Latinos have lost the ability to elect their candidate of choice . . . which is not a regular activity of WCVI [and] stop using its resources on other research areas[.]"), ¶ 75 ("FIEL must now expend new and significantly more resources to register and turn out Latino voters, particularly those discouraged by the absence of an equal opportunity[;] to do so, FIEL must divert time and funding from its other initiatives, including its immigration assistance and community education activities[.]"), and ¶ 86 ("PROYECTO AZTECA must divert time and funding from its community engagement and education efforts—such as its roundtables, advocacy training and know-your-rights events—that further its mission, and must instead engage in efforts to convince Latinos to participate, despite the discrimination in the redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—which is not a regular activity of PROYECTO AZTECA.").

These injuries are concrete and affect the actual activities of each organization. Like OCA in *OCA-Greater Houston*, LULAC Plaintiff organizations' routine community-based activities have been frustrated by new demands of voter education and engagement.

Finally, even if LULAC Plaintiff organizations had not plausibly alleged standing here (and they did), the standing of one plaintiff establishes the jurisdiction of the Court to hear that

claim. *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S.Ct. 2367, 2379 n. 6 (2020) (where another plaintiff had standing, the "Third Circuit accordingly erred by inquiring into the Little Sisters' independent Article III standing."); *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). The State does not challenge the standing of LULAC, GI FORUM, LUPE, MABA-TX, TEXAS HOPE, TALAS, RITA or WDP. Accordingly, the remaining LULAC Plaintiff organizations should not be dismissed for lack of jurisdiction.

        **4.**    *LULAC Plaintiffs Have Plausibly Alleged Standing to Challenge HD118.*

LULAC Plaintiffs have plausibly alleged standing to challenge HD118 because LULAC Plaintiffs, in the Third Amended Complaint (and incorporated sealed filing Dkt. 440), alleged that Plaintiff LULAC has a member who resides in HD118.

The Third Amended Complaint incorporated and relied on "[t]he names of the members of plaintiff organizations [that] are provided to the Court in Exhibit A, filed with the Court under seal." Complaint ¶ 14 n.3. Exhibit A to the complaint identified "LULAC Member J" as a resident of HD118. *See* Dkt. 440 (Exhibit A) and Dkt. 439 (order granting leave to file under seal). However, LULAC Plaintiffs' Complaint inadvertently omitted the relevant paragraph describing LULAC Member J as a resident of HD118. *See* Complaint ¶¶ 22–23.

In addition to identifying LULAC Member J as a resident of HD118 in sealed Exhibit A, Plaintiff LULAC further alleged:

> LULAC members include Latino registered voters who are injured by [the State's] dilution of Latino voting strength and intentional discrimination, because those members reside in areas where, as described below, [the State] either could have created additional Latino citizen voting age majority districts but failed to do so, or

7

weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice.

Complaint ¶ 23. LULAC Plaintiffs also alleged in detail facts supporting their challenge to HD118. *Id*. ¶¶ 193, 283–99.

As noted in the Court's order on LULAC Plaintiffs' motion for leave to file under seal an exhibit to their Third Amended Complaint, "[c]omplaints, as well as the exhibit the LULAC Plaintiffs want to file, are judicial records." Dkt. 439 at 6. The Court further noted that, because LULAC Plaintiffs "will provide [the State] with the Association Members' true names," the State "will be able to fully scrutinize whether Plaintiffs have associational standing." *Id.* at 3, 9–10. Thus, despite LULAC Plaintiffs' inadvertent omission of LULAC Member J from the body of the Third Amended Complaint, the State has received the sealed filing, is on notice of the relevant information about LULAC Member J, and has the opportunity to scrutinize this LULAC member's standing.

Although the Third Amended Complaint and the incorporated Exhibit A are sufficient to allege standing of LULAC Plaintiffs to challenge HD118, should the Court deem amendment necessary, LULAC Plaintiffs will seek leave to amend their complaint for the sole purpose of including the omitted paragraph.

### B. LULAC Plaintiffs Sufficiently Pleaded Their Malapportionment Claim.

1. *The* Larios *standard is the appropriate legal standard and permits location-specific claims.*

Contrary to the State's argument, the Court must assess LULAC Plaintiffs' malapportionment claim under the standards set forth in *Larios v. Cox*, 300 F. Supp. 2d 1320, 1347 (N.D. Ga. 2004) (three-judge court), *aff'd*, 542 U.S. 947 (2004). Since *Larios*, courts have embraced the principles set forth in that case. *See e.g. Harris v. Arizona Indep. Redistricting*

*Comm'n*, 578 U.S. 253, 259 (2016); *Perez v. Abbott*, 250 F. Supp. 3d 123, 183, 185 (W.D. Tex. 2017).[4]  There is no reason to revisit this well-settled law.

In *Larios*, the U.S. Supreme Court explained, "population deviations of less than 10% are not within a safe harbor and may still be challenged." *Perez*, 250 F. Supp. 3d at 191; *see also* Dkt. 307 at 58.  Where a plan contains "a top-to-bottom deviation of less than 10%," at the evidentiary stage, a plaintiff "must show that it is more probable than not that the deviations reflect the predominance of illegitimate reapportionment factors rather than the 'legitimate considerations' identified by [*Reynolds v. Sims*, 377 U.S. 533, 568 (1964)] and later cases." *Perez*, 250 F. Supp. 3d at 191 (quoting *Harris*, 578 U.S. at 259).  For the reasons discussed below, LULAC Plaintiffs sufficiently pleaded such a claim.

The State incorrectly attempts to limit the scope of a malapportionment claim, suggesting that the Court must evaluate "Hispanic majority districts . . . as a whole," and that LULAC Plaintiffs must show that the challenged districts "were treated differently than any other over- or underpopulated district or series of districts." Dkt. 398 at 11.  But as the *Perez* court emphasized—and the State fails to acknowledge—malapportionment "challenges can be plan-wide, location-specific, or both." *Perez*, 250 F. Supp. 3d at 194.  As *Perez* articulated, "like a voter in a racially gerrymandered district, a voter in an overpopulated district suffers a harm that is personal to him and is not necessarily experienced by a voter in another part of the state." *Id.* at 195.  As such, and consistent with the Supreme Court's precedent regarding one person, one vote claims, "both a state-wide challenge and a localized challenge are legally cognizable theories under the one

---

[4] Tellingly, most of the cases the State relies on embrace the standard set forth in *Larios*.  *See e.g. League of Women Voters of Chicago v. City of Chicago*, 757 F.3d 722, 726 (7th Cir. 2014).  The only opinion to which the State cites that did not fully embrace the principles set forth in *Larios* occurred *before* the Supreme Court's reiteration of those principles in *Harris*.  *See Baca v. Berry*, 806 F.3d 1262, 1275 (10th Cir. 2015).

9

person, one vote principle, and that is up to the plaintiff to choose his challenge." *Id.* Accordingly, "if a plaintiff characterizes his one person, one vote claim as a challenge to a specific piece within an entire plan with an overall deviation of less than 10%, the geographic nature of that claim is limited to that specific piece of that plan." *Id.*; *see also Connor v. Finch*, 431 U.S. 407, 421 n.19 (1977).

### 2. *LULAC Plaintiffs sufficiently pleaded a* Larios *claim.*

In its motion, the State overlooks the numerous allegations in the Complaint that support LULAC Plaintiffs' *Larios* claim. When taking into account the allegations in the Third Amended Complaint—and ignoring the State's improper attempt, at this juncture, to request that the Court weigh evidence or alternative explanations—the conclusion is that LULAC Plaintiffs sufficiently pleaded a malapportionment claim.

As an initial matter, LULAC Plaintiffs' allegations regarding the population deviations are sufficient to satisfy the standard under *Larios*. LULAC Plaintiffs alleged that the mapdrawers relied on "illegitimate reapportionment factors" to draw house districts in El Paso, the Upper Rio Grande Valley, the area of original Tom Green County, and the Panhandle. Complaint ¶ 300-04] *See Harris*, 578 U.S. at 259. LULAC Plaintiffs alleged with specificity the regions favored by the malapportionment discrimination, including "the area of original Tom Green County and the Panhandle" which excludes enacted HD 53, which includes portions of the Texas Hill Country. Complaint ¶ 194, 300-302. LULAC Plaintiffs also alleged that the State over- and under-populated districts in these regions purposefully to weaken Latino voting strength and to protect Anglo incumbents. *Id.* ¶ 303. Further, LULAC Plaintiffs allege that by overpopulating El Paso County House districts, the drafters of Plan H2316 minimized the number of Latinos voters "spilled" out of El Paso County who could have been combined with other Latinos in South and

West Texas to create districts (including HD31) that offered Latino voters the opportunity to elect their candidate of choice. Complaint ¶ 303. Further, LULAC Plaintiffs allege that within a total (or "top to bottom") deviation of 9.98%, the drafters of H2316 deliberately favored Anglo voters in the Panhandle over Latino voters in South and West Texas to preserve Anglo voting influence and Anglo incumbency, and prevent the creation of House districts in which Latino voters have the opportunity to elect their candidate of choice—even as the rate of Anglo population growth in this part of the state lags behind that of Latino population growth. *Id.* ¶ 307. These allegations, standing alone, are more than sufficient to support a malapportionment claim at this juncture, as they at least support an inference that the 9.98% reflected the predominance of illegitimate factors—here, race and/or regional preferences.

Contrary to the State's claim that LULAC Plaintiffs "allege no facts that directly or circumstantially establish discriminatory intent on the ground," Dkt. 398 at 17, in addition to the allegations described above, LULAC Plaintiffs further allege that legislators were aware that the over- and under-population of the districts in these regions weakened Latino voting strength—and that effect was intentional. Indeed, as alleged in the Third Amended Complaint, some legislators warned other legislators of the effect of these deviations. Complaint ¶ 306 ("During the House floor debate on the State House plan[,] Representative Anchia argued that 'this proposal will systematically overpopulate at the higher end of the deviation for El Paso district, diluting the votes of those individuals[.]'") Further, LULAC Plaintiffs made several allegations regarding the procedural departures around the Texas House plan—and those allegations would apply specifically to their *Larios* claim. For example, the Third Amended Complaint states that "[t]he House Redistricting Committee did not provide interpreters to assist non-English speaking witnesses who wished or registered to testify at any House Redistricting Committee," and that

11

"Chairman Hunter also did not allow for expert witnesses to testify as invited testimony at any of the public hearings." *Id.* ¶ 169; *see also* Dkt. 307 at 54. Those allegations—along with the myriad other allegations regarding the procedural and substantive departures regarding the Texas House plan, and the allegations regarding population deviations in the challenged region—are more than sufficient to defeat a motion to dismiss. Dkt. 307 at 53 ("It is sufficient for Plaintiffs to point to circumstantial evidence, such as procedural irregularities or apparent subterfuge, from which discriminatory intent can plausibly inferred.").

Accordingly, LULAC Plaintiffs sufficiently alleged facts to plead a malapportionment claim.

### C. LULAC Plaintiffs Have Plausibly Alleged Their *Gingles* Claims.

Aside from inappropriate *ad hominem* attacks claiming that LULAC Plaintiffs have "a fundamentally flawed understanding of Section 2 of the Voting Rights Act," and "fail to understand" Section 2, Dkt. 398 at 17, the State's argument urging dismissal of LULAC Plaintiffs' Section 2 claims contains little substance and even less legal authority.

*1.     LULAC Plaintiffs Have Plausibly Alleged the First* Gingles *Precondition.*

Section 2 of the Voting Rights prohibits redistricting "which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," and provides, in relevant part, that a violation:

> is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

12

52 U.S.C. § 10301.

*Thornburg v. Gingles*, 478 U.S. 30 (1986), provides a framework for determining whether a redistricting plan impairs the ability of Latinos to elect representatives of their choice in violation of Section 2. In *Gingles*, the Supreme Court established three preconditions that a minority group plaintiff must prove: (1) "that it is sufficiently large and geographically compact to constitute a majority in a single-member district;" (2) "that it is politically cohesive;" and (3) "that the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, . . . usually to defeat the minority's preferred candidate." *Id.* at 50–51.

The three *Gingles* preconditions guide the Court's analysis of LULAC Plaintiffs' Section 2 vote dilution claims. For this reason, where they present claims that Texas failed to create Latino majority districts, LULAC Plaintiffs alleged specific facts related to the *Gingles* preconditions, including, for example, that Latinos are sufficiently large and geographically compact to constitute the majority in a district. *See* Complaint ¶¶ 196–201, 208–13, 220–25, 312–17, 325–31, 361–66, 395–400, 411–17 and 426–31.

LULAC Plaintiffs also included maps showing compact demonstrative districts in the areas where LULAC Plaintiffs alleged that Latinos are sufficiently numerous and geographically compact to constitute the majority in new districts. *See id.* ¶¶ 199, 211, 223, 315, 328, 364, 398, 415 and 429.

Finally, LULAC Plaintiffs alleged specific facts showing that Latinos in the geographic areas where new Latino majority districts can be drawn share common characteristics including, for example, comparatively lower voter turnout rates, lower home ownership rates and home values, lower educational achievement rates, and lower median income. *See id.* ¶¶ 205–06, 217, 228–29, 321–22, 335–36, 370–71, 404–05, 421–22 and 435–36.

LULAC Plaintiffs' Complaint more than adequately alleges that Latinos in areas where the State failed to create districts are sufficiently numerous, compact, and share common characteristics. Nevertheless, the State argues that LULAC Plaintiffs' Complaint must be dismissed for failure to state a Section 2 claim because LULAC Plaintiffs did not allege "cultural compactness." Dkt. 398 at 17.[5] However, there is simply no support for the contention that a Section 2 complaint must "include . . . allegations . . . relating to the cultural compactness of [the] proposed districts" (*id*. at 18) in order to plausibly plead the first *Gingles* precondition.

*Thornburg v. Gingles*, which guides the Court's Section 2 analysis, makes no mention of "cultural compactness" even at the proof stage of a case. The cases on which the State relies for their motion make no mention of a requirement to *plead* "cultural compactness" in a complaint. *See e.g. Robinson v. Ardoin*, 37 F.4th 208, 219 (5th Cir. 2022) (observing that at an evidentiary hearing "[t]he plaintiffs introduced extensive lay testimony supporting their claim that the black populations in the illustrative CD 5 were culturally compact."). The State vastly over reads *LULAC v. Perry*, in which the U.S. Supreme Court explained, based on the district court's *fact findings after trial*, that "the enormous geographical distance separating the Austin and Mexican-border communities, coupled with the disparate needs and interests of these populations—not either factor alone—[] renders District 25 noncompact for § 2 purposes." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 435 (2006).

The State tries to bootstrap its argument about non-existent pleading requirements by asserting non-existent facts. At this stage in the case, the State cannot secure dismissal of a complaint by claiming, without any evidence, that minority population "growth was dispersed

---

[5] Inexplicably, the State further suggests that LULAC Plaintiffs were required to allege "cultural compactness" to justify Latino majority districts enacted by the State itself. *See, e.g.* Dkt. 398 at 18 (referring to enacted HD31 and HD37).

14

throughout the entire State, not concentrated in one or two areas" and that LULAC Plaintiffs' "proposed districts combine many disparate populations[.]" *See* Dkt. 398 at 18.

In sum, LULAC Plaintiffs pleaded, extensively and in detail, facts supporting the first *Gingles* precondition, including presenting maps that show compact demonstrative districts and making specific allegations of common socioeconomic characteristics shared by the Latino residents in these demonstrative districts. The State cites no case holding that a complaint must be dismissed for failure to plead what it calls "cultural compactness," and further fails to explain its assertion that "cultural compactness" must be specifically pleaded at the complaint stage while other elements of *Gingles* prong one compactness (including demonstrative district shape and size) can be left for the proof stage.

### 2.    *LULAC Plaintiffs Have Plausibly Alleged the Third* Gingles *Precondition.*

The third *Gingles* precondition requires plaintiffs to prove that "that the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, . . . usually to defeat the minority's preferred candidate." *Gingles,* 478 U.S. at 50–51. The State argues that LULAC Plaintiffs' allegations of Anglo bloc voting are insufficient to plead a Section 2 claim with respect to four challenged districts (HD31, HD37, SD27 and ED3) because LULAC Plaintiffs alleged that Anglo voters *usually* bloc vote to defeat the Latino-preferred candidate. Dkt. 398 at 18. The State further argues that with respect to challenged HD90, LULAC Plaintiffs "provide no allegations that the Hispanic-preferred candidates in past races would win or lose." *Id.*

The State fails to explain how LULAC Plaintiffs' allegations related to the third *Gingles* precondition are insufficient to plead discriminatory purpose under Section 2. *See* Complaint ¶ 490 (alleging only discriminatory purpose with respect to challenged HD31, HD37, HD90, SD27 and ED3). But even if the State were to explain its argument, LULAC Plaintiffs adequately alleged

15

that Anglos in challenged HD31, HD37, HD90, SD27 and ED3 bloc vote usually to defeat the Latino preferred candidate.  *See* Complaint ¶¶ 243, 258, 275, 349 and 384.  LULAC Plaintiffs specifically alleged that, with respect to HD31, HD37, SD27 and ED3, re-aggregated election results from statewide elections showed that Anglo preferred candidates usually defeat Latino preferred candidates. *See* Complaint ¶¶ 243, 258, 349 and 384.  In each of the aforementioned districts, LULAC Plaintiffs' complaint alleges, based on re-aggregating statewide (*i.e.* exogenous) racially contested elections, that the Latino preferred candidate won only one of several recent elections.  With respect to challenged HD90, LULAC Plaintiffs specifically alleged that, based on past state representative elections within HD90, Anglos bloc vote such that Anglo preferred candidates will usually defeat Latino preferred candidates.  *See* Complaint ¶ 275.

Contrary to the State's argument, Plaintiffs are not required to allege, or prove, that Anglo preferred candidates will *always* defeat Latino preferred candidates in the challenged districts—in fact the opposite true.  *See Gingles,* 478 U.S. at 50–51 (whites must vote as a bloc "*usually* to defeat the minority's preferred candidate." (emphasis added)).  The State concedes that LULAC Plaintiffs alleged that in most re-aggregated elections in the challenged districts, the Latino preferred candidate loses.  Dkt. 398 at 20.

Finally, LULAC Plaintiffs' allegations that the vote shares garnered by Latino preferred candidates in the challenged districts are "nudged" below the 50% threshold do not, as the State asserts, undermine LULAC Plaintiffs' claims.  *See Perez*, 250 F. Supp. 3d at 148–49 ("Interiano drew the district to increase SSVR while intentionally minimizing any gains in Latino electoral performance. . . . the Court finds that mapdrawers intentionally diluted the Latino vote in HD117 in violation of § 2 and the Fourteenth Amendment.").  Close only counts in horseshoes, and the

16

alleged losses by Latino preferred candidates due to Anglo bloc voting are sufficient to plead the third *Gingles* precondition.

### D. LULAC Plaintiffs Have Plausibly Alleged Their Challenge to HD31.

The State's arguments regarding dismissal of claims related to HD31 are largely aimed at the United States, not LULAC Plaintiffs. *See* Dkt. 398 at 21 ("the United States fails to allege that the Hispanic-preferred candidate will be defeated" and "the only way for the United States to satisfy the third Gingles precondition is to allege that Representative Guillen will lose the general election due to Anglo bloc voting. It fails to do so.").

The State's arguments aimed at LULAC Plaintiffs do not support dismissal because they are not arguments—they are assertions of unproven facts and speculation as to future events. The State claims that LULAC Plaintiffs' challenge to HD31 must be dismissed because State Representative Ryan Guillen, the current incumbent of HD31, "is poised to be re-elected in the Fall," "will win the November general election" and will be "the Hispanic preferred candidate in HD31" in November 2022.

The State's version of future events cannot support a motion to dismiss for two reasons. First, at the motion to dismiss stage, the court "must accept as true all the factual allegations in the complaint." *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993) (citation omitted). LULAC Plaintiffs alleged, among other facts, that Texas reconfigured the boundaries of HD31 in order to "manipulate[] the electorate to reduce the number of Latino voters and their turnout." Complaint ¶ 237. LULAC Plaintiffs alleged that voting is racially polarized in HD31. *Id.* ¶¶ 233, 234, 242–44. LULAC Plaintiffs alleged that Texas's reduction of the proportion of Latinos who turn out to vote in HD31 "results in Latinos being

17

unable to elect their candidate of choice absent almost perfect cohesion."[6] *Id*. ¶ 239. LULAC Plaintiffs further alleged that Texas rejected an amendment that would have repaired the reduction of Latino voting strength in HD31 and offered a tenuous justification for rejecting the amendment. *Id*. ¶ 247. Taken as true, LULAC Plaintiffs' allegations with respect to HD31 are more than sufficient to plausibly plead a claim of intentional vote dilution under Section 2 of the Voting Rights Act and the Fourteenth Amendment.

Second, the State's argument that LULAC Plaintiffs must allege the State's future speculative facts is without basis. LULAC Plaintiffs have sufficiently alleged that the Latino preferred candidate usually will be defeated in challenged HD31. The November 2022 election has not yet occurred. Candidates are still making their cases to the voters of HD31. The State cites no controlling authority (nor can it) holding that LULAC Plaintiffs must predict now which candidate will win the November 2022 election, and which candidate will be preferred by Latino voters.

## IV. CONCLUSION

For the foregoing reasons, LULAC Plaintiffs respectfully request that the Court deny the State's motion to dismiss their Third Amended Complaint—and should the Court deem amendment necessary, grant them leave to file a Fourth Amended Complaint for the limited purpose of including a paragraph regarding LULAC Member J in HD118.

Dated: July 25, 2022                            Respectfully submitted,

                                                */s/ Nina Perales*
                                                Nina Perales
                                                Fátima Menendez
                                                Kenneth Parreno*

---

[6] The State errs when it claims that LULAC Plaintiffs "apparently take issue" with Rep. Guillen's party switch. Dkt. 398 at 20–21. Contrary to the State's assertion, LULAC Plaintiffs alleged that three weeks after Texas weakened Latino voting strength in HD31, which had successfully elected Rep. Guillen to office as a Democrat for nearly 20 years, Rep. Guillen changed political parties. Complaint ¶ 240.

Julia Longoria
Mexican American Legal Defense and Educational Fund (MALDEF)
110 Broadway Street, Suite 300
San Antonio, TX 78205
(210) 224-5476
Fax: (210) 224-5382

Nikolas Youngsmith*
Mexican American Legal Defense and Educational Fund (MALDEF)
1016 16th Street NW, Suite 100
Washington, DC 20036
(202) 293-2828
Fax: (202) 283-2848

*Admitted *pro hac vice*

*Counsel for LULAC Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that she has electronically submitted a true and correct copy of the above and foregoing via the Court's electronic filing system on the 25th day of July 2022.

*/s/ Nina Perales*
Nina Perales