# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § | |
| *Plaintiffs,* | § § | |
| EDDIE BERNICE JOHNSON, *et al.*, | § § | Case No. 3:21-cv-00259 |
| *Plaintiff-Intervenors,* | § § | [Lead Case] |
| v. | § § | |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § | |
| UNITED STATES OF AMERICA, | § § | |
| *Plaintiff,* | § § | |
| v. | § § | Case No. 3:21-cv-299 |
| STATE OF TEXAS, *et al*, | § § | [Consolidated Case] |
| *Defendants.* | § | |

## REPLY IN SUPPORT OF MOTION TO DISMISS

**TABLE OF CONTENTS**

Introduction.................................................................................................................................1

Argument ..................................................................................................................................1

    I.    The Claim as to the Harris County Congressional Districts Should be Dismissed................1

    II.   The Claim as to House District 31 Should be Dismissed ........................................5

    III.  The Claim as to the El Paso and West Texas House Districts Should be Dismissed............7

Conclusion ...............................................................................................................................10

Certificate of Service.................................................................................................................11

**INTRODUCTION**

Three of the United States' claims should be dismissed. Most notably, the United States fails to allege that its proposed Congressional Districts in Harris County and its proposed House Districts in El Paso County are culturally compact. The amended complaint is completely silent on this issue. ECF 318 ("Compl."). The only thing the United States offers in response are unsupported legal arguments as to why the areas at issue are culturally similar, but these are all made after-the-fact, and not included in the amended complaint. *See generally* ECF 472 ("Opp.").

In addition, the United States' claim as to House District 31 should be dismissed because the complaint alleges (i) that longtime-incumbent Representative Ryan Guillen is the Latino candidate of choice, but not (ii) that he will lose in the November 2022 general election. The logical implication of the United States' own allegations is that the Latino-preferred candidate will win in November, which means the third *Gingles* precondition cannot be satisfied. The United States construes the argument as being an improper factual assertion, but in reality it is the United States who failed to plausibly allege the facts needed to support its claim. Defendants only identify the logical gaps in the complaint.

For these and other reasons set forth in Defendants motion, *see* ECF 397 ("Mot."), the claims identified below should be dismissed, and the issues to be presented at trial narrowed.

**ARGUMENT**

## I.    The Claim as to the Harris County Congressional Districts Should be Dismissed

The motion to dismiss explained that the United States' claim with respect to the congressional districts in Harris County should be dismissed for three independent reasons: (i) because the amended complaint fails to allege that CD29* and CD38* are culturally compact, Mot. at 4-5, (ii) because the amended complaint does not plausibly allege that CD29* and CD38* are majority Latino by CVAP, *id.* at 5-6, and (iii) because the amended complaint fails to allege that CD29* can be maintained as a Latino opportunity district, *id.* at 3-4.

1

As to *cultural compactness*, the amended complaint says nothing about whether the Latino populations in CD29* and CD38* share similar cultural interests. In response, the United States points to community college districts, saying that parts of Houston, Katy, and Spring Branch ISD share such a district. Opp. at 7. This is nothing more than a *post hoc* rationalization; an argument based on facts not alleged in the complaint. The amended complaint includes no specific facts related to the similarity (or dissimilarity) of the locations at issue; the arbitrary reference to a community college district is just an attempt to prop-up a district configuration that was drawn without consideration of cultural similarities. Nor could the United States make such an allegation. The expert report of Dr. John Logan, the expert who drew the United States' illustrative districts, makes no mention of his considering the cultural similarity of combined minority populations. To be sure, expert reports should not be considered at the motion-to-dismiss stage, but insofar as the United States urges their consideration, Opp. at 8 n.5, they only demonstrate the deficiency of this claim.

The United States also quotes the *LULAC* Court for the proposition that "[i]n some cases members of a racial group [even] in different areas . . . share similar interests and therefore form a compact district if the areas are in reasonably close proximity." Opp. at 7-8 (quoting 548 U.S. at 435). Indeed, *in some cases*. The problem is that nothing in the United States' complaint supports the assertion that this is such a case. This claim should be dismissed because the United States fails to allege that CD29* and CD38* are culturally compact.

As to *majority HCVAP status*, the amended complaint does not plausibly allege that two districts can be drawn such that they are over 50% HCVAP based on the relevant data. Defendants previously explained that the United States impermissibly relies on the 2016-2020 ACS data because it was not available to the Legislature at the time of redistricting. If subsequent data could be used to support a *Gingles* claim, districts that were lawful at the time of passing could become unlawful solely with the passage of time. Mot. at 5-6. That would violate the "legal fiction" that electoral maps remain

lawful "throughout the decade, a presumption that is necessary to avoid constant redistricting, with accompanying costs and instability." *LULAC*, 548 U.S. at 421.

The United States attempts to distinguish malapportionment precedent explaining that legal fiction on the ground that such "claims are constitutional and therefore rest in part on subjective considerations of lawmakers," Opp. at 11, but malapportionment cases "have attached no significance to the subjective intent of the decisionmakers who adopted or maintained the official rule under attack." *Rogers v. Lodge*, 458 U.S. 613, 635 (1982) (Stevens, J., dissenting). The United States' citation is not to the contrary. *See Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016) (discussing a mathematical rule without analyzing subjective intent). Even if the United States' distinction were correct, it would highlight the constitutional problems with broad readings of Section 2. As an exercise of Congress's enforcement power, Section 2 must be congruent and proportional to the constitutional standard that turns on intent. *City of Boerne v. Flores*, 521 U.S. 507, 530 (1997) ("While preventive rules are sometimes appropriate remedial measures, there must be a congruence between the means used and the ends to be achieved. . . . Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one."). Making Section 2 rulings based on data that was not could not have been before the Legislature—on the theory that Section 2 need not have any relationship to intent—would raise additional questions about the constitutionality of Section 2. *See, e.g.*, *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204-05 (2009) (applying canon of constitutional avoidance to the Voting Rights Act) ("[I]t is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.").

Moreover, without the legal fiction that the numbers available at the time of redistricting are stable for ten years, a state could be subject to constant redistricting litigation. Consider, for instance, the large population growth in Fort Bend County. Under the benchmark map, House District 28

(within the county) was 52.9% overpopulated.[1] But under Supreme Court precedent, that district is considered legal if properly apportioned at the time of redistricting. The United States' approach poses the same problem. By using data gathered only after the legislative redistricting, districts that were once lawful under Section 2 could become unlawful mid-decade. This is the precise problem the legal fiction is designed to avoid.

As previously explained, a plaintiff can certainly use *other* evidence to estimate CVAP—it just may not use evidence that was not available at the time of redistricting. Mot. at 6. The United States cites numerous cases where plaintiffs offered citizenship evidence other than that directly used by the legislative body at issue, insisting they stand for the proposition that federal courts regularly rely on subsequently gathered data. Opp. at 10-11. This is sleight of hand. In only one decision did the court affirmatively determine that it was proper to use data not available to the legislature. *Id.* at 10 (citing *Perez v. Abbott*, 274 F. Supp. 3d 624, 638 n.19 (W.D. Tex. 2017) (three-judge court) ("[E]vidence that best reflects the population at the time of redistricting should be considered to determine whether vote dilution resulted from the districting plans, regardless of whether the evidence or data was available to the Legislature at the time of redistricting."). As the United States knows full well, that decision has no precedential value because the Supreme Court reversed it (albeit without reference to the quote at issue here). 138 S. Ct. 2305 (2018).

Finally, as to *CD29\* being maintained as a Latino opportunity district*, the amended complaint fails to plausibly allege that, despite the changes made to CD38\*, CD29\* will continue to provide Latino voters the opportunity to elect their candidate of choice. Mot. at 3-4. Of course, a proposed map may not merely substitute one opportunity district for another because that would not "enhance the ability of minority voters to elect the candidates of their choice." *Perez*, 138 S. Ct. at 2332; *see also Harding v.*

---

[1]   *See* Plan H2100 at 5, data.capitol.texas.gov/dataset/8ffedc80-047c-457f-9ba4-8fa4294a6d12/resource/7390d5ca-37c3 -4e99-83b4-f3b8f6c4eee9/download/planh2100_map_report_package.pdf

*Dallas County*, 948 F.3d 302, 309–11 (5th Cir. 2020).

In response, the United States points to its expert reports to attempt to show that Latinos in CD29* are of sufficient population and are politically cohesive. Opp. at 8-9. But the United States did not include these statistics in the amended complaint and, in any event, expert reports and testimony are not pleadings. The United States had every opportunity to include these data, but failed to do so.

## II.    The Claim as to House District 31 Should be Dismissed

The United States has pleaded itself out of this claim. Its first amended complaint admits that incumbent Representative Ryan Guillen is the Latino candidate of choice, receiving the support of "a cohesive majority of Latino voters" in 2020, Compl. ¶ 142, and that Latino voters have elected him "for nearly two decades." *Id.* ¶ 149. Nothing in the amended complaint alleges that Latinos will abandon their longstanding support for Representative Guillen. Nor does the complaint allege that Representative Guillen is likely to lose the November general election. As such, the United States fails to allege that the Latino-preferred candidate will usually lose due to white bloc voting (*Gingles* 3).

The United States construes Defendants' argument as asserting "allegations concerning future elections," Opp. at 13, but this misunderstands the burdens at the pleading stage. As the party seeking relief, it is the United States' burden to set forth facts that plausibly state a claim. *See, e.g.*, *Kaswatuka v. U.S. Dep't of Homeland Security*, 7 F.4th 327, 329 (5th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But its own allegations fail to allege that the Latino-preferred candidate will usually lose. This does not satisfy the third *Gingles* precondition.

But even if Representative Guillen is the Latino candidate of choice and wins in November, the United States would "discount" that election's "relevance" on assertion that it would constitute "special circumstances." Opp. at 13 n.12. For one thing, Representative Guillen's election as the Latino candidate of choice would not be a one-off occasion. It is not as if the United States alleges that Representative Guillen will fail to run for re-election in subsequent years. (Nor could it: Representative

Guillen has candidly admitted that he intends to continue running for office as a Republican.)

In addition, in making this argument, and in contending that Republican Hispanic J.M. Lozano does not allow Latino voters to represent their candidate of choice, *see* Opp. at 15-16, the United States rejects the notion that Hispanics might be trending towards supporting Republicans. On the contrary, should Representative Guillen be re-elected in November as a Republican, the victory would be indicative of a growing trend, not special circumstances to be discounted.

There are numerous examples of Texas Latinos' growing support for Republican, especially in South Texas and the border areas. For instance, Congresswoman Mayra Flores recently won the special election in Congressional District 34—the first Republican to represent that area of South Texas in a century.[2] Elsewhere, Republicans are nominating Latinos in primary elections—for example, Monica de la Cruz in CD15 and Cassy Garcia in CD28[3]—and voting in Republican primary elections in record numbers.[4] Other examples abound.

Ultimately, the Court need not address why or why not Representative Guillen—the undisputed Latino candidate of choice—might lose in November because the United States does not allege that it will happen at all. This alone dooms the United States' claim. But to say that Latinos' preferring a Republican candidate *per se* constitutes "special circumstances" is simply incorrect.

The claim should be dismissed for the additional reason that the proposed districts eliminate the Latino majority in HD43—represented for J.M. Lozano. *See* Mot. at 9-10. In response, the United States contends that Representative Lozano is not the Latino candidate of choice, Opp. at 15-16, but these allegations are not present in the amended complaint. It stresses that the change to HD43 is to "restore Latino electoral opportunity in HD31," *id.* at 16, but what it really means is restoring *Democrat*

---

[2]   Patrick Svitek, Texas Tribune, *Republicans Flip U.S. House Seat in South Texas, Historically a Democratic Stronghold* (June 14, 2022), https://www.texastribune.org/2022/06/14/texas-special-election-tx-34-mayra-flores-dan-sanchez/.

[3]   *See* Texas Secretary of State Election Results, https://results.texas-election.com/races

[4]   *See* David Weigel & Colby Itkowitz, Washington Post, *Republicans Celebrate in Texas, as Democrats Gird for November* (Mar. 2, 2022), washingtonpost.com/elections/2022/03/02/texas-republicans-latinos/

Latino electoral opportunity. Contrary to the United States' implication, Texas Latinos can prefer Republican candidates—and are doing so in increasing numbers.

## III.   The Claim as to the El Paso and West Texas House Districts Should be Dismissed

The motion to dismiss explained that the United States' claim as to House Districts in El Paso and West Texas should be dismissed because (i) the amended complaint fails to allege that the Latino population in HD81* is culturally compact, (ii) the amended complaint fails to allege that Latinos in HD81* are politically cohesive, and (iii) the amended complaint fails to allege that the Latino-preferred candidate in HD81 will usually lose due to white bloc voting. Mot. at 10-14.

Of note, the United States has changed its claim from being focused on population deviations to now centering on Latino voters' ability to elect their candidate of choice in HD74, HD75, HD77, HD78, HD79, and—especially—HD81. Opp. at 17 n.16 ("The United States does not assert a *Larios* claim."). Instead, the United States appear to now pursue a traditional *Gingles* claim.

**Figure 1. United States' Proposed House Map—El Paso and West Texas**



As to *cultural compactness*, the amended complaint offers little to suggest that Latinos across the proposed HD81* have anything in common other than being Latino. The proposed districts adds a sliver of the City of El Paso to rural areas extending up to Gains and Andrews Counties. *Compare LULAC*, 548 U.S. at 433 ("[A] district that 'reaches out to grab small and apparently isolated minority communities' is not reasonably compact."). The United States' only related allegation is that the populations in HD81* share "economic interests, including the oil and gas community." Compl. ¶ 174. But as previously explained, *see* Mot. at 12, the United States fails to support that conclusion with any specific facts. It alleges nothing tending to show that Latinos in HD81* actually have common economic interests—like common employers or job sites. The United States offers nothing more in response. Opp. at 19. In short, the United States fails to allege that the disparate Hispanic populations across HD81* are culturally compact.

As to *political cohesion*, the claim is deficient because the amended complaint does not allege whether and to what extent Latinos in HD81* are cohesive as a general matter. Mot. at 12. The United States only makes allegations as to a subset of potentially relevant elections. Opp. at 19-20.

And as to *white bloc voting*, the claim is deficient because the United States fails to allege that the

Latino-preferred candidate will usually lose due to white bloc voting. Mot. at 12-14. Nor could it—incumbent Representative Brooks Landgraf is running opposed in 2022 and has been opposed in the general election only once since 2014. The United States misapplies this fact, citing cases for the proposition that the absence of a minority candidate can support a claim of discrimination. Opp. at 20. But the situation here is that there has not been opponent *at all*—not that there have been only non-Latino opponents. As such, the United States fails to allege that Representative Landgraf will even be opposed in the general election—let alone that the minority-preferred candidate will usually lose.

The United States also attempts to construe the motion to dismiss as a motion for reconsideration, Opp. at 17-18, but that is wrong because, as explained above, the United States has changed the theory of its claim. This is illustrated by the changes in the complaint. As originally filed, this claim centered on the relocation of HD76 to Fort Bend County, and population deviations in other House districts. *See United States v. Texas*, No. 3:21-cv-299, ECF 1 (W.D. Tex. Dec. 6, 2021), at ¶ 131 ("The enacted 2021 House plan entirely removes District 76 from El Paso County, eliminating an effective Latino opportunity district and pairing two Latina incumbents. This allowed the House plan to substantially overpopulate heavily Latino districts in El Paso County and West Texas and substantially underpopulate heavily Anglo districts in West Texas and the Panhandle, protecting Anglo voting strength and Anglo incumbents in a slow-growth region."). And although HD81 features prominently in the amended complaint, it is mentioned only once in the original complaint. *Id.* ¶ 145.

The instant motion is not a motion for reconsideration because it raises a different issue than before. In the prior motion to dismiss, Defendants moved to dismiss the United States' *Larios*-esque claim. *See* ECF 111 at 22-24. In response to the Court's Opinion on the motions to dismiss, the United States has now amended its claim. Defendants move to dismiss the claim as newly pleaded. That is an independent motion to dismiss, not a motion for reconsideration. But even if the motion is construed as one asserted under Rule 54(b)—which it is not—the Court has broad discretion to consider issues

previously addressed. *See, e.g.*, *Austin v. Kroger LP*, 864 F.3d 326, 336 (5th Cir. 2018) ("Under Rule 54(b), the trial court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law.") (quotation omitted).

### CONCLUSION

Defendants respectfully request that the Court grant their motion and dismiss the claims identified in the opening brief.

Date: August 8, 2022                    Respectfully submitted,

KEN PAXTON                              */s/ Patrick K. Sweeten*
Attorney General of Texas               PATRICK K. SWEETEN
                                        Deputy Attorney General for Special Litigation
BRENT WEBSTER                           Tex. State Bar No. 00798537
First Assistant Attorney General
                                        WILLIAM T. THOMPSON
                                        Deputy Chief, Special Litigation Unit
                                        Tex. State Bar No. 24088531

                                        RYAN D. WALTERS
                                        Special Counsel, Special Litigation Unit
                                        Tex. State Bar No. 24105085

                                        ARI M. HERBERT
                                        Assistant Attorney General, Special Litigation Unit
                                        Tex. State Bar No. 24126093

                                        */s/ Jack DiSorbo*
                                        JACK B. DISORBO
                                        Assistant Attorney General, Special Litigation Unit
                                        Tex. State Bar No. 24120804

                                        OFFICE OF THE ATTORNEY GENERAL
                                        P.O. Box 12548 (MC-009)
                                        Austin, Texas 78711-2548
                                        Tel.: (512) 463-2100
                                        Fax: (512) 457-4410

patrick.sweeten@oag.texas.gov
will.thompson@oag.texas.gov
ryan.walters@oag.texas.gov
ari.herbert@oag.texas.gov
jack.disorbo@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via

CM/ECF) on August 8, 2022, and that all counsel of record were served by CM/ECF.


*/s/ Patrick K. Sweeten*
PATRICK K. SWEETEN

*/s/ Jack DiSorbo*
JACK B. DISORBO