IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of the State of Texas, *et al.*,<br><br>*Defendants*. | CIVIL ACTION NO.<br>3:21-cv-00259-DCG-JES-JVB<br>[Consolidated Action: Lead Case] |

## LULAC PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS BY THE STATE OF TEXAS

LULAC Plaintiffs brought suit to challenge the redistricting plans recently enacted by the Texas Legislature, alleging violations of the Voting Rights Act and the United States Constitution. LULAC Plaintiffs allege, among other things, that the Texas Legislature enacted the redistricting plans with the intent to discriminate against Latinos, and assert that the totality of circumstances shows that Latinos have less opportunity to participate in the political process and to elect representatives of their choice. To that end, LULAC Plaintiffs served their requests for production of documents on Defendant the State of Texas ("the State"), which for the purposes of the instant suit includes the Office of the Attorney General ("OAG"). Dkt. 279.

Based on sweeping claims of privilege, the State withheld over 800 documents, most of which were created by the OAG—an executive agency—in connection with pending redistricting legislation. Accordingly, neither the legislative privilege, nor the attorney-client privilege, nor the work product doctrine applies to the documents the State has withheld.

1

After multiple meet and confer meetings and correspondence between the parties did not resolve the parties' dispute, LULAC Plaintiffs now respectfully request that the Court compel disclosure of the documents listed in Exhibit A.

## I. BACKGROUND

On May 17, 2022, LULAC Plaintiffs served their first set of requests for production of documents on the State. Ex. B. On June 16, 2022, the State responded to LULAC Plaintiffs' discovery requests with a letter asserting various objections to those requests, including broad claims of the legislative privilege, deliberative-process privilege, attorney-client privilege, and protection from disclosure under Texas Government Code § 323.017. Ex. C. In an email that same day, the State indicated that it does "not currently have any documents from the Office of the Attorney General that are non-privileged and responsive to the LULAC Plaintiffs' requests." Ex. D. Pursuant to the parties' Stipulated ESI Agreement, the State should have provided a privilege log by July 18, 2022, but failed to do so. *See* Dkt. 203 at 16.

On July 19, 2022, LULAC Plaintiffs sent an email to the State requesting the missing privilege log. Ex. E. On July 20, 2022, the State served a privilege log that it said "concerns documents relating to the Office of the Attorney General's representation of Senator Huffman in connection with the redistricting litigation" (the "Original Privilege Log"). *See* Exs. F (email) and G (the Original Privilege Log). On July 26, 2022, LULAC Plaintiffs, the United States, and the State participated in a meet and confer regarding the Original Privilege Log.

Following that meet and confer, on August 2, 2022, the State served a supplemental privilege log (the "Supplemental Privilege Log"). Ex. H. On August 8, 2022, LULAC Plaintiffs, the United States, and the State participated in a meet and confer regarding that log. On August 11, 2022, LULAC Plaintiffs sent the State a letter seeking clarification regarding a

2

few documents in the Supplemental Privilege Log, as well as seeking confirmation that the State did not intend to produce any of the documents in the log.  Ex. I.  On August 15, 2022, the State responded and confirmed that it did not intend to produce any documents listed in the Supplemental Privilege Log.  Ex. J at 2.

In light of the disagreement between the parties, LULAC Plaintiffs now seek to compel the production of several documents listed in the Supplemental Privilege Log.  Exhibit A lists the documents LULAC Plaintiffs seek in the instant motion.

## II.     LEGAL STANDARD

"A party seeking discovery may move for an order compelling an answer, designation, production, or inspection" if the other party "fails to produce documents or fails to respond that inspection will be permitted—or fails to permit inspection—as requested under Rule 34."  Fed. R. Civ. P. 37(a)(3)(B)(iv).  Rule 34 permits parties to serve upon each other "a request within the scope of Rule 26(b)" to produce certain items "in the responding party's possession, custody, or control."  Fed. R. Civ. P. 34(a)(1).  "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).

Rule 26 requires a party that asserts a privilege to "describe the nature of the documents, communications, or tangible things not produced or disclosed—and to do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."  Fed. R. Civ. P. 26(b)(5)(A)(ii).  "It is well settled that the party asserting the privilege has the burden of establishing its applicability."  *Perez v. Perry*, No. SA-11-CV-360-OLG-JES-XR, 2014 WL 3495414, at *2 (W.D. Tex. July 11, 2014) (citing *Hodges, Grant & Kaufmann v. United States*, 768 F.2d 719, 721 (5th Cir. 1985)).  Conclusory

assertions are "insufficient to carry out the proponent's burden of establishing" privilege. *E.E.O.C. v. BDO USA, L.L.P.*, 876 F.3d 690, 696 (5th Cir. 2017).

When a motion to compel "is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party . . . whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A).

### III. ARGUMENT

#### A. OAG Cannot Withhold Documents Based on the Legislative Privilege.

*1. OAG Lacks Standing to Assert the Legislative Privilege*

As an initial matter, the State lacks standing to assert the legislative privilege.

"State legislative privilege is a federal common law privilege, 'applied through Rule 501 of the Federal Rules of Evidence.'"[1] Dkt. 282 at 2 (quoting *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Parish Gov't*, 849 F.3d 615, 624 (5th Cir. 2017)). "The privilege 'is, at best, one which is qualified.'" *Id.* (quoting *Jefferson Cmty.*, 849 F.3d at 624). To that end, the privilege "must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth." *Id.* (quoting *Jefferson Cmty.*, 849 F.3d at 624).

Courts in this Circuit have consistently emphasized that "[n]either the Governor, nor the Secretary of State or *the State of Texas* has standing to assert the legislative privilege on behalf of

---

[1] At various points, the State has asserted that Texas Government Code § 323.017 governs the scope of the legislative privilege. For the reasons already discussed in LULAC Plaintiffs' prior motions to compel, Texas Government Code § 323.017 is inapplicable, as federal common law—not state law—governs the scope of the privilege here. *See, e.g.*, Dkt. 447 at 4 n.2.

4

any legislator or staff member." Dkt. 526 at 2 (emphasis added) (quoting *Perez v. Perry*, No. SA-11-cv-360, 2014 WL 106927, at *1 (W.D. Tex. Jan. 8, 2014)); *see also La Union Del Pueblo Entero (LUPE) v. Abbott*, No. SA-21-CV-00844-XR, 2022 WL 1667687, at *2 (W.D. Tex. May 25, 2022), *appeal docketed sub nom. LULAC v. Hughes*, No. 22-50435 (5th Cir. May 27, 2022); *Gilby v. Hughes*, 471 F. Supp. 3d 763, 768 (W.D. Tex. 2020); *TitleMax of Tex., Inc. v. City of Dallas*, No. 3:21-cv-1040, 2022 WL 326566, at *6 (N.D. Tex. Feb. 3, 2022). That is because the "[l]egislative privilege is a personal privilege" that may be waived or asserted by each individual legislator. *See* Dkt. 526 at 2; *see also Gilby*, 471 F. Supp. 2d at 767. The OAG—as an executive agency—is not a part of the legislative branch. *See* Tex. Const. art. IV, § 1 ("[T]he Executive Department of the State shall consistent of," among others, the "Attorney General."); *see also LUPE*, 2022 WL 1667687, at *4 (concluding that OAG is an "outsider" for purposes of legislative privilege). Accordingly, the State lacks standing to assert the legislative privilege.

Nor could the State assert the legislative privilege on its own behalf, for the same reasons articulated in LULAC Plaintiffs' motion to compel documents from Defendant Abbott, and LULAC Plaintiffs incorporate by reference and re-urge those arguments here. *See* Dkts. 380 at 7–12 and 441 at 3–5. As the Court recently held, Defendant Abbott—as the Governor—cannot invoke the legislative privilege in connection with his ability to call a special session, as doing so does not implicate a legislative power. *See* Dkt. 526. The case for the State's invocation of the legislative privilege is even weaker than that of the Governor, given that the Texas Constitution contemplates no connection between OAG and the legislation considered during a special session. *See* Tex. Const. art. III, § 40. Indeed, the Texas "Constitution is designed such that *core legislative power*—the power to enact laws—is vested in the Legislature, while the executive is charged with enforcing those laws." *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 482 (Tex.

5

2011) (Willett, J., concurring); *see also Abbott v. MALC*, No. 22-0008, 2022 WL 2283221, at *14 (Tex. June 24, 2022) ("In apportioning legislative districts, the Legislature is exercising its legislative power to make laws, not 'a power ordinarily and intrinsically belonging to another department of the government.'" (quoting *Walker v. Baker*, 196 S.W.2d 324, 328 (Tex. 1946))). Because the Texas Constitution vests no such power to the OAG here, the State cannot invoke the legislative privilege on its own behalf.

> 2. *The Legislative Privilege Does Not Apply to the Documents Listed in the Supplemental Privilege Log.*

Even if the State could invoke the legislative privilege on behalf of a legislator or legislative staff—and as just discussed, it cannot—the privilege still does not apply to any of the documents included in the Supplemental Privilege Log.

As an initial matter, several entries reflect documents that the legislators or legislative staff never even saw—much less relied on. But the legislative privilege applies only to "documents or information that contains or involves opinions, motives, recommendations or advice about legislative decisions between legislators or between legislators and their staff.'" *LUPE*, 2022 WL 1667687, at *2 (quoting *Jackson Mun. Airport Auth. v. Bryant*, No. 3:16-CV-246-CWR-FKB, 2017 WL 6520967, at *7 (S.D. Miss. Dec. 19, 2017)). According to the State, 795 documents were "provided directly by staff to" an attorney in the OAG, and were provided "to no other person within or outside of the [OAG]." Ex. K. Thus, these documents necessarily do not contain or involve "opinions, motives, recommendations, or advice about legislative decisions between legislators or between legislators and their staff," and therefore fall outside of the scope of the legislative privilege. *LUPE*, 2022 WL 1667687, at *2.

For the remaining 19 documents in the log, the legislative privilege has been waived. *See* Ex. L. Each of the purportedly privileged documents has been shared with OAG, which is part

6

of the executive branch, not the legislative branch. *See* Tex. Const. art. IV, § 1. "To the extent that legislators or legislative staff communicated with any outsider (*e.g.*, non-legislators, non-legislative staff), any legislative privilege is waived as to the contents of those communications." Dkt. 526 at 2 n.3 (cleaned up) (quoting *Gilby*, 471 F. Supp. 3d at 767); *see also Perez*, 2014 WL 106927, at *2; *Gilby*, 471 F. Supp. 3d at 767; *Favors v. Cuomo*, 285 F.R.D. 187, 212 (S.D.N.Y. 2012) (noting that "communications with 'knowledgeable outsiders' . . . fall outside the privilege"). As such, "the legislative privilege is waived when a state legislator communicates with executive branch officials." *LUPE*, 2022 WL 1667687, at *4; *see also* Dkt. 526 at 2 n.3; *Perez*, 2014 WL 106927, at *2. Because the documents listed in Exhibit L were shared with OAG—*i.e.*, with executive branch officials—any claim of legislative privilege has been waived.

### 3. The Substance of Almost All of the Documents Listed in the Privilege Log Does Not Qualify for the Legislative Privilege.

Additionally, the substance of the vast majority of the documents in the Supplemental Privilege Log does not fall within the scope of the legislative privilege.

The legislative privilege "does not apply . . . to 'documents containing factually based information used in the decision-making process or disseminated to legislators or committees, such as committee reports and minutes of meetings,' or 'the materials and information available [to lawmakers] at the time a decision was made.'" *LUPE*, 2022 WL 1667687, at *2 (quoting *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, No. 11 C 5065, 2011 WL 4837508, at *9 (N.D. Ill. Oct. 11, 2011)). Examples of such documents include "committee reports," "minutes of meetings," "materials and information available [to lawmakers] at the time a decision was made," *id.*, "alternative maps considered during the redistricting process," Dkt. 282 at 4, and "demographic data," *see, e.g.*, *League of Women Voters of Mich.*, 2018 WL

7

2335805, at *7 (ordering the disclosure of "strictly factual materials and information available to lawmakers at the time the legislation was enacted").

The vast majority of the documents listed in the Supplemental Privilege Log contain fact-based information not protected by the legislative privilege. Indeed, the lion's share of these documents contain data related to demographics, voting behavior, and compactness, *see* Ex. M, all of which are quintessential fact-based information, *see League of Women Voters of Mich.*, 2018 WL 2335805, at *7. Other documents contain alternative maps considered during the redistricting process. Ex. N; *see also* Dkt. 282. And to the extent that other documents in the Supplemental Privilege Log contain fact-based information, that information must likewise be disclosed. *See* Ex. O.[2]

In addition, some documents in the Supplemental Privilege Log were created *after* the challenged legislation was enacted and therefore fall outside the scope of the legislative privilege. Ex. P. The legislative privilege only "protects 'integral steps' in the legislative process and does not extend to commentary or analysis following the legislation's enactment." *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d 323, 343 (E.D. Va. 2015); *see also League of Women Voters of Mich. v. Johnson*, No. 17-14148, 2018 WL 2335805, at *6 (E.D. Mich. May 23, 2018) (requiring disclosure of "communications created after the date of enactment"). Once a bill has been "passed [by] both houses of the Legislature," that bill "shall be presented to the Governor for his approval." Tex. Const. art. IV, § 14. In other words, once sent to the Governor, the Legislature has no authority over the enactment of the legislation unless

---

[2] In their August 11, 2022 letter, LULAC Plaintiffs requested that the State produce the documents listed in Exhibit O because they appeared to contain underlying fact-based information. Ex. I at 3. On August 15, 2022, the State responded to that letter but failed to indicate whether those documents contained underlying fact-based information. *See* Ex. J at 1. To the extent that these or any other documents may also contain information that is legislatively privileged, LULAC Plaintiffs respectfully request that the Court order that such information be redacted and the remainder of the documents be produced.

8

the Governor vetoes the legislation, and then the Legislature may only vote to override the Governor's veto. *See id.* Accordingly, any documents created after a bill has been sent to the Governor does not fall within the scope of the legislative privilege, as those communications do not reflect "integral steps" in the legislative process. *Bethune-Hill*, 114 F. Supp. 3d at 343.

Here, the bills enacting the plans for the Texas House, Texas Senate, and State Board of Education were sent to the Governor on October 18, 2021.[3] Accordingly, any document created after that date and related to those plans is not privileged. Ex. P.

> 4. *Even if the State Could Invoke the Legislative Privilege, That Privilege Should Yield.*

Even if applicable, the legislative privilege should yield to the need for discovery for all of the documents included in the Supplemental Privilege Log, Ex. A, including documents containing talking points and advice to legislative staffers, *see* Exs. Q (talking points) and R (advice to staff). To determine whether the privilege should yield, courts in this Circuit and elsewhere have consistently considered the following five factors: (1) the relevance of the evidence sought to be protected; (2) the availability of other evidence; (3) the seriousness of the litigation and issues involved; (4) the role of the government in the litigation; and (5) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable. *Perez*, 2014 WL 106927, at *2. Further, as the Court recently emphasized, the legislative privilege "must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending

---

[3] Plan H2316, Plan S2168, and Plan E2106 were sent to the Governor on October 18, 2021. *See* Texas Legislature Online, "Bill: SB 4, Legislative Session: 87(3)," available at https://capitol.texas.gov/BillLookup/History.aspx?LegSess=873&Bill=SB4 (last visited Aug. 15, 2022); Texas Legislature Online, "Bill: HB1, Legislative Session: 87(3)," available at https://capitol.texas.gov/BillLookup/History.aspx?LegSess=873&Bill=HB1 (last visited Aug. 15, 2022); Texas Legislature Online, "Bill: SB7, Legislative Session: 87(3)," available at https://capitol.texas.gov/BillLookup/History.aspx?LegSess=873&Bill=SB7 (last visited Aug. 15, 2022).

the normally predominant principle of utilizing all rational means for ascertaining the truth." Dkt. 282 at 2 (quoting *Jefferson Cmty.*, 849 F.3d at 624); *see also Perez*, 2014 WL 106927, at *2.

For the reasons articulated in LULAC Plaintiffs' prior motions to compel, all five factors weigh strongly in favor of disclosure, and LULAC Plaintiffs incorporate by reference and re-urge those arguments here. *See* Dkts. 380 at 12–15 and 447 at 8–10. Statistical analyses and other documents relating to voting behavior or demographic data pertain to or reveal an awareness of racial considerations in the redistricting process, and are thus highly relevant to LULAC Plaintiffs' claims. Thus, as in LULAC Plaintiffs' prior motions to compel: the evidence here—listed in Exhibit A—is relevant and vital to LULAC Plaintiffs' claims under the Voting Rights Act and the U.S. Constitution and is among the most probative evidence regarding the challenged legislation; this suit raises serious questions about whether the challenged plans comply with the Voting Rights Act and the U.S. Constitution, there is no question about the government's role in the litigation, and there is no possible chilling effect resulting from disclosure. *See* Dkts. 380 at 12–15 and 447 at 8–10. Further, even if there were a chilling effect, courts have repeatedly found—particularly in the voting rights context—"that the need for accurate fact finding outweighs any chill to the legislature's deliberations." *LUPE*, 2022 WL 1667687, at *7; *see also Veasey*, 2014 WL 1340077, at *2; *Baldus v. Brennan*, No. 11-CV-562, 2011 WL 6122542, at *2 (E.D. Wis. Dec. 8, 2011) (concluding that potential "chilling effect" on state legislature "is outweighed by the highly relevant and potentially unique nature of the evidence").

Further, the *Perez* factors especially favor disclosure where, as here, the withheld documents include demographic and voting analyses—information that likely "pertains to, or 'reveals an awareness' of: racial considerations employed in the districting process, sorting of

voters according to race, or the impact of redistricting upon the ability of minority voters to elect a candidate of choice." *See Bethune-Hill*, 114 F. Supp. 3d at 344–45 (citing *Favors v. Cuomo*, No. 11-cv-5632, 2013 WL 5818773 (E.D.N.Y. 2013)); *see also League of Women Voters of Michigan v. Johnson*, No. 17-14148, 2018 WL 2335805, at *7 (E.D. Mich. May 23, 2018); *see also LUPE*, 2022 WL 1667687, at *6. Accordingly, the *Perez* factors strongly favor disclosure, and where it applies, the legislative privilege should yield for any document listed in Exhibit A.

### B. Attorney-Client Privilege[4]

The State incorrectly withholds all documents in the Supplemental Privilege Log based on a misapplication of the attorney-client privilege. *See* Ex. A. To establish attorney-client privilege, the responding party must show: "(1) that he made a confidential communication; (2) to a lawyer or his subordinate; (3) for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding." Dkt. 530 at 7 (quoting *E.E.O.C. v. BDO USA, L.L.P.*, 876 F.3d 690, 695 (5th Cir. 2017)) (emphasis removed and citation omitted). As described below, the State cannot assert attorney-client privilege (as a non-client) or improperly asserts privilege in a conclusory manner over documents that do not in substance qualify for the privilege.

#### 1. *The State cannot assert the attorney-client privilege because OAG is not a client.*

The State cannot assert attorney-client privilege over the documents in the Supplemental Privilege Log because OAG is not a client. Under federal common law, "the client, not the client's attorney, holds the privilege." *Alpert v. Riley*, 267 F.R.D. 202, 208 (S.D. Tex. 2010). The basis for the attorney-client "privilege . . . [is] 'to encourage clients to make full disclosure

---

[4] In addition to the arguments made here, LULAC Plaintiffs incorporate by reference and assert the arguments made by the United States in its Motion to Enforce Order Compelling the Production of OAG Documents from the State of Texas. Dkt. 527 at 5–6.

11

to their attorneys.'" *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)). Accordingly, "[b]ecause the attorney-client privilege exists for the benefit of the client, the client holds the privilege." *In re Grand Jury Proc. #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 250 (4th Cir. 2005); *cf. In re Grand Jury Subpoenas*, 561 F.3d 408, 411 (5th Cir. 2009) ("Work product protections, *unlike the attorney-client privilege*, are held by the attorney as well as the client.") (emphasis added). Because OAG is the attorney—not the client—in the instant suit, the State cannot invoke the attorney-client privilege.[5]

### 2. The State's attorney-client privilege assertions are conclusory and boilerplate.

Even if OAG can assert the attorney-client privilege on behalf of its clients, the State's privilege assertions are conclusory and insufficient to establish attorney-client privilege. As the Court recently emphasized, "[p]rivilege claims must be detailed," Dkt. 530 at 7, and "[s]imply describing a [communication] as legal, without more, is conclusory and insufficient to carry out the proponent's burden of establishing attorney-client privilege.'" *id.* at 7–8 (quoting *BDO USA*, 876 F.3d at 696). Further, "a claim that attorneys worked on or reviewed documents does not alone establish attorney-client privilege." *Id.* at 8.

In the Supplemental Privilege Log, the State's boilerplate invocation of "legal advice" is conclusory. *See* Ex. A. Further, for the few documents actually shared between an attorney and client, those documents do nothing more than describe that "attorneys worked on or reviewed documents." Dkt. 530 at 7; *see also* Exs. Q and R. These assertions simply do not have the requisite level of detail needed to support attorney-client privilege because, at bottom, they do nothing more than state that a document is "legal." *See* Dkt. 530 at 7 (quoting *BDO USA*, 876

---

[5] In its August 15, 2022 letter, OAG stated that it "maintain[s] that—as our clients' attorneys—we are entitled to assert the attorney client privilege when so directed." Ex. J at 1. OAG did not say, however, that it had been directed by any client to invoke the attorney-client privilege.

12

F.3d at 696). Accordingly, the State has failed to meet its burden to establish that the attorney-client privilege applies.

> 3. *The vast majority of documents were never shared with a client and therefore are not subject to the attorney-client privilege.*

Several documents in the Supplemental Privilege Log cannot be privileged because they were never shared with a client. A document must have been shared between a lawyer (or her subordinate) and a client in order to receive the protection of the attorney-client privilege. *See BDO USA*, 876 F.3d at 695. As such, "the protective cloak of [attorney-client] privilege does not extend to information which an attorney secures," *Hickman v. Taylor*, 329 U.S. 495, 508 (1947), or keeps "hidden in an attorney's file," *id.* at 511. Documents that were never shared outside of the OAG therefore fall outside of the scope of the privilege.

According to the State's own characterization, nearly 800 documents in the Supplemental Privilege Log were "provided directly by staff to attorney Chris Hilton and to no other person within or outside of the Office of Attorney General, *not even the client*." Ex. K (emphasis added). Because these documents were not shared with a client, they are not subject to the attorney-client privilege.

> 4. *The State cannot claim attorney-client privilege over documents that are not for the primary purpose of legal advice.*

The State incorrectly withholds documents that concern policy, strategic, political, or technical advice. But as the Court recently emphasized, communications "concerning advice on political, strategic or policy issues . . . [are] not [] shielded from disclosure by the attorney-client privilege." Dkt. 530 at 8 (quoting *Evans v. City of Chicago*, 231 F.R.D. 302, 312 (N.D. Ill. 2005)). Indeed, the attorney-client privilege does not categorically protect documents merely because they also contain staff attorney or retained counsel contributions or input. Dkt. 526 at

13

9–10. After all, "documents do not become cloaked with the lawyer-client privilege merely by the fact of their being passed from client to lawyer." *United States v. Robinson*, 121 F.3d 971, 975 (5th Cir. 1997).

The State has failed to show that the documents listed in the Supplemental Privilege Log were created "for the *primary* purpose of *legal* advice." Dkt. 530 at 8. Although these documents pertain to the enactment of redistricting legislation, when they provide "advice on political, strategic or policy issues," they must be disclosed. *Baldus*, 2011 WL 6385645, at *3 (quoting *Evans*, 231 F.R.D. at 312); *see also Perez*, 2014 WL 3359324, at *1. Further, to the extent that any document contains a mixed discussion of legal and non-legal advice (*e.g.*, business, political, strategic, or policy), "courts should consider the 'context . . . key,' ultimately seeking to glean the 'manifest purpose' of the communication." *See BDO USA*, 876 F.3d at 696 (quoting *Exxon Mobil Corp. v. Hill*, 751 F.3d 379, 382 (5th Cir. 2014)).[6]

> 5. *The attorney-client privilege has been waived for communications with the Texas Legislative Council.*

Additionally, the State has waived the attorney-client privilege on draft documents containing communications between technical experts from OAG and the Texas Legislative Council. Ex. S. Draft documents that are shared "in the presence of third parties" are not privileged. *United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir. 1976). Here, the State has failed to establish that there is a common interest that extends to the Texas Legislative Council. Accordingly, the attorney-client privilege cannot apply to the documents identified in Exhibit S.[7]

---

[6] To the extent that the State's failure to establish privilege is not alone sufficient to warrant disclosure, *in camera* review may be necessary to distinguish between documents providing only legal advice and those that concern policy, political, strategic, or technical matters.

[7] To the extent any document has annotations or notes implicating *bona fide* legal advice, LULAC Plaintiffs respectfully request that the Court direct the State to produce a redacted version of any such document.

> 6. *The State cannot assert the privilege with respect to underlying facts in documents.*

Finally, the State cannot assert the attorney-client privilege over underlying facts contained in the documents. "Facts within the client's knowledge are not protected by the attorney-client privilege, even if the client learned those facts through communications with counsel." Dkt. 530 at 8 (quoting *LUPE*, 2022 WL 1667687, at *7); *see also Upjohn Co.*, 449 U.S. at 395 (stating that the "privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts"). "If what is sought is not legal advice but only [data analysis] . . . or if the advice sought is the [statistician's] rather than the lawyer's, no privilege exists." *Tonti Mgmt. Co., Inc. v. Soggy Doggie, LLC*, No. 19-13134, 2020 WL 9172077, at *5 (E.D. La. June 25, 2020) (citing *United States v. Kovel*, 296 F.2d 918, 921–922 (2d Cir. 1961); *see also Ohio A. Philip Randolph Inst. v. Smith*, No. 1:18cv357, 2018 WL 6591622, at *3 (S.D. Ohio Dec. 15, 2018) (ordering production of "facts, data, and maps" over assertions of attorney-client privilege).

Here, the State improperly attempts to assert the attorney-client privilege over data and alternative maps. *See* Exs. M (data) and N (maps). Further, the Supplemental Privilege Log lists additional "statistical analyses" that likely contain underlying data not subject to the privilege. *See* Ex. O.[8] Because these documents fall outside of the attorney-client privilege, they must be disclosed.

### C. Work Product Doctrine

Finally, the State's assertions of the work product doctrine are also unavailing. According to the State's descriptions, every document in the Supplemental Privilege Log relates

---

[8] As noted in Footnote 2, the State failed to indicate whether the documents listed in Exhibit O contained underlying fact-based information. *See* Ex. J at 1. LULAC Plaintiffs respectfully request that the Court examine these documents *in camera* to determine whether and to what extent they contain fact-based information not subject to the attorney-client privilege.

to the enactment of redistricting legislation. *See* Ex. A. As the Court has recently emphasized, "the work product doctrine is inapplicable" over documents created "while assisting the Texas Legislature with redistricting legislation." Dkt. 530 at 10 (citing *Bethune-Hill*, 114 F. Supp. 3d at 348); *see also id.* at 9 ("[D]ocuments created in the ordinary course of drafting legislation—including redistricting legislation—are not covered by the work product doctrine[.]"); Dkt. 526 at 11–12. Accordingly, the State may not withhold any of the documents in the Supplemental Privilege Log based on the work product doctrine.

## IV. CONCLUSION

For the foregoing reasons, LULAC Plaintiffs respectfully request that the Court grant their motion to compel.

Dated: August 16, 2022

Respectfully submitted,

*/s/ Nina Perales*
Nina Perales
Fátima Menendez
Kenneth Parreno*
Julia Longoria
Mexican American Legal Defense and Educational Fund (MALDEF)
110 Broadway Street, Suite 300
San Antonio, TX 78205
(210) 224-5476
Fax: (210) 224-5382

Nikolas Youngsmith*
1016 16th Street NW, Suite 100
Washington, DC 20036
(202) 293-2828
Fax: (202) 293-2848
nyoungsmith@maldef.org

*Admitted *pro hac vice*

*Counsel for LULAC Plaintiffs*

**CERTIFICATE OF CONFERENCE**

I hereby certify that, on July 26, 2022, August 8, 2022, August 11, 2022, and August 15, 2022, counsel for LULAC Plaintiffs conferred with counsel for Defendants concerning the subject of the instant motion. Counsel for Defendants stated that they opposed the relief sought.

*/s/ Nina Perales*
Nina Perales

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that she has electronically submitted a true and correct copy of the above and foregoing via the Court's electronic filing system on the 16th day of August 2022.

*/s/ Nina Perales*
Nina Perales