IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* <br><br> *Plaintiffs,* <br> v. <br><br> GREG ABBOTT, *et al.*, <br><br> *Defendants.* | § § § § § § § § § § | Case No. 3:21-cv-00259 <br> [Lead Case] |

**DEFENDANTS' OPPOSITION TO LULAC'S MOTION TO COMPEL PRODUCTION
OF DOCUMENTS BY THE STATE OF TEXAS**

**INTRODUCTION**

The LULAC Plaintiffs have now, like the United States, moved to compel privileged documents belonging to the Office of the Attorney General of Texas (OAG) that reflect, among others, core attorney–client privileged material. *See generally* ECF No. 548. The attorney–client privilege dates to the 16th century.[1] Writing 44 years ago in the *California Law Review*, Professor Geoffrey Hazard noted that the privilege has historically been recognized as "necessary to the lawyer's function as confidential counselor in law" to his client.[2] "There is no responsible opinion," he wrote, "suggesting that the privilege be completely abolished." But today, the motion to compel before the Court in effect seeks to do just that for OAG.

The OAG occupies a special position of trust and responsibility for the people of Texas. The Attorney General is constitutionally charged with "represent[ing] the State in all suits and pleas in the Supreme Court of the State in which the State may be party." TEX. CONST. art. IV, § 22. In that vital role, OAG serves as legal counsel to Texas governmental agencies and legislators upon request. And as counselors in law, OAG affords its clients the same ability to assert the attorney–client privilege as any other lawyer would. If those privileges are abrogated, OAG cannot provide effective counsel. Here, OAG is asserting attorney–client privilege, attorney work-product privilege, and legislative privilege on behalf of Senator Huffman. *See* Ex. A ¶ 11 (Declaration of Christopher Hilton).

In the last decade's redistricting, the three-judge panel found that by widely sharing analyses prepared for rendering legal advice to its client, OAG had waived attorney–client privilege. *See generally Texas v. United States*, 279 F.R.D. 24 (D.D.C. 2012), *vacated in part*, 279 F.R.D. 176 (D.D.C. 2012). In this decade's redistricting, mindful of that decision, OAG shared no materials prepared at attorney

---

[1]  A. Kenneth Pye, *Fundamentals of the Attorney-Client Privilege*, THE PRACTICING LAWYER, Nov. 1969, at 16.
[2]  Geoffrey Hazard, *An Historical Perspective on the Attorney-Client Privilege*, 66 CAL. L. REV. 1061, 1061 (1978).

direction with anyone. In fact, it maintained the utmost confidentiality of materials prepared for rendering legal advice to its client. Despite those material differences, LULAC Plaintiffs now argue, in part, that the failure to transmit such materials to the client—i.e., maintaining too great a confidentiality—renders them entirely unprotected and subject to production. It appears to be LULAC Plaintiffs' view that the lawyer for the Chairman of the Senate Redistricting Committee may not engage in his own efforts to assess the legality of proposed legislation—despite the extraordinary complexities associated with federal and state redistricting law—without later being compelled to share those materials with opposing counsel. That view is contrary to law, and it is unclear how under that novel view, future redistricting counsel could fully and frankly advise their clients.

At the heart of this discovery dispute are confidential statistical analyses of numerous redistricting plans that were considered during the Third Special Session of the 87th Legislature. *See* Ex. A ¶ 3. These analyses were not transmitted to anyone. Instead, they formed the basis of, and thus reflect, OAG attorney Chris Hilton's oral communications of legal advice to his client, Senator Huffman. *See id.* Defendants acknowledge that this Court has previously ruled that documents such as statistical reports and draft maps held by legislators constituted underlying facts that must be produced. ECF No. 467, *administratively stayed*, No. 22-50662 (5th Cir. July 27, 2022). Even so, the documents relating to that ruling did not reside solely in the hands of attorneys. These do. And the documents subject to the Court's prior rulings were not created by attorneys or employees of attorneys solely for attorney use in providing legal advice. These were.

Compelling OAG to produce these documents would incentivize its clients to simply not seek legal advice. That would undermine both the attorney–client and attorney work-product privileges as established by Supreme Court precedent. And it would also do a great disservice to future legislatures and all Texans, who have a strong interest in ensuring that the laws that are enacted are lawful.

**ARGUMENT**

### I. The Attorney–Client Privilege Applies

The attorney–client privilege "protects communications made in confidence by a client to his lawyer," and vice versa, "for the purpose of obtaining legal advice." *Hodges, Grant & Kaufmann v. IRS*, 768 F.2d 719, 720–21 (5th Cir. 1985). "There are a number of ways to organize the essential elements of the attorney–client privilege to provide for an orderly analysis." 24 Charles Alan Wright & Kenneth W. Graham Jr., *Federal Practice and Procedure* § 5473, at 103–04 (1986). But "there is some question as to whether [such schema] completely state[] the modern privilege." *Id.* Ultimately, the privilege is "supported in part by its traditional utilitarian justification, and in part by the integral role it is perceived to play in the adversary system itself." John W. Strong, *McCormick on Evidence* § 87, at 121–22 (4th ed. 1992). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The documents that the Office of the Attorney General (OAG) has withheld, and that LULAC Plaintiffs seek, are protected by the attorney–client privilege because they are (i) communications (ii) that were kept confidential and (iii) were made for the primary purpose of providing legal advice to the client.

LULAC Plaintiffs disagree. To begin with, they contend that the State of Texas "cannot assert the attorney–client privilege" over OAG documents since the State of Texas is not the OAG's attorney, and "OAG is not a client" of the State of Texas's client. *See* ECF 548 at 11–12. That is a strawman argument. Defendants do not argue that the State of Texas is asserting the attorney–client privilege over OAG documents. Instead, it is Senator Huffman invoking the attorney–client privilege over documents in the custody of her lawyer, Chris Hilton. Ex. A ¶ 11 ("[Senator Huffman] has instructed [Chris Hilton] to assert and preserve the attorney–client privilege, the attorney work-product privilege, the legislative privilege, and all other applicable privileges."). Indeed, later in their motion to compel,

LULAC Plaintiffs appear concede that OAG has clients, and that it is OAG's client who is asserting the attorney–client privilege. *See* ECF 548 at 12 ("Even if OAG can assert the attorney–client privilege on behalf of its clients" (emphasis added)).

Next, LULAC Plaintiffs contend that OAG has offered mere "conclusory" and "boilerplate" privilege assertions because the entries in the privilege log "do nothing more than state that a document is 'legal.'" ECF 548 at 7 (quoting *EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 696 (5th Cir. 2017)). Not so. The parties met and conferred after Defendants initially served their privilege log. In response to the United States' and LULAC Plaintiffs' requests, Defendants provided a revised privilege log. *See* ECF 548-9 (Ex. H). That revised privilege log contains an array of categories of information specific to each and every entry. To start, the nature of the document was explained. For example, some documents were described as "[c]onfidential statistical analys[e]s" whereas others were described as "[c]onfidential draft maps." *Compare id.* at 6 (Entry 22), *with id.* (Entry 23). The entries also explained the subject matter of each document. For example, some of the confidential statistical analyses that were withheld pertained to "demographics," *see, e.g.*, ECF 548-9 at 3 (Entry 10); some pertained to "voting behavior," *see, e.g., id.* at 5 (Entry 18); some pertained to the "demographic detail for new and old districts" in a given plan, *see, e.g., id.* at 6 (Entry 24). The entries also explained the specific district plans that the documents related to. For instance, a confidential statistical analysis might be identified as pertaining to "Congressional Plans C2100, C2135, C2152, and C2154," *id.* at 136 (Entry 541), or it might be identified as pertaining only to "House Plan H2261," *id.* at 179 (Entry 714). And for draft maps, the entries include that same information—for example, an entry might include that a map covered "proposed districts in Congressional Plan USB1C0004." *Id.* at 69 (Entry 275).

The entries explained how the documents were created. *See, e.g.*, ECF 548-9 (Ex. H) at 69 (Entry 276) ("[c]ustom generated" "internally by in-house OAG consulting experts"). The entries explained that the documents were created solely "at the direction, under the supervision, and for the

sole use of attorney Chris Hilton." *See, e.g., id.* The entries explained how each document was used. *See, e.g., id.* ("for the purpose and use of attorney Chris Hilton to form mental impressions regarding the legal compliance of Plan C0004 to assist in providing legal assistance and advice to Senator Huffman regarding redistricting legislation"). In short, the OAG's privilege log provided a variety of detailed information for each entry in the log. Insofar as LULAC Plaintiffs complain that many of the entries are similar in nature, that is because many of the documents are similar in nature. But privileged documents do not become non-privileged simply by virtue of the fact that an attorney is in possession of many privileged documents.

LULAC Plaintiffs also contend that the documents sought "cannot be privileged because they were never shared with a client" and because "they were never shared outside of the OAG." ECF 548 at 13. But the documents sought are not mere "underlying facts," and attorney–client privileged material is not limited to emails between the lawyer and the client.

### A. Communications, Not "Underlying Facts"

It is true that "underlying facts" are not protected by the attorney–client privilege. *See, e.g.*, ECF 467 at 14. As the Supreme Court in *Upjohn* explained, "a client . . . may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." 449 U.S. at 396. But there is a critical distinction between (1) pre-existing documents a client gives to a lawyer and (2) documents a lawyer created solely for his own use because a client sought legal advice. *Cf. id.* ("[T]he Government . . . [may not] subpoena[] the questionnaires and notes taken by petitioner's attorneys."). In *Upjohn*, the Supreme Court explained that although subpoenaing the attorneys' notes "would probably be more convenient for the Government," "such considerations of convenience do not overcome the policies served by the attorney–client privilege." *Id.* After all, "[d]iscovery was hardly intended to enable a learned profession to perform its functions . . . on wits borrowed from the adversary." *Id.*

5

Here, OAG is not trying to hide facts that exist independently. Rather, OAG is withholding materials that would never have existed but for OAG's staff creating them at the attorney's behest in service of the client's legal representation. LULAC Plaintiffs groups the withheld documents into two general categories: "data" and "alternative maps." ECF 548 at 15.

The former category refers to confidential statistical analyses of numerous redistricting plans considered during the Third Special Session of the 87th Legislature. *See* Ex. A ¶ 3. The analyses were prepared by in-house consulting experts employed by OAG, who did so solely at the discretion of attorney Chris Hilton. *Id.* Those internal consulting experts were members of OAG's Legal Technical Support Division, and they included the Division Chief, Dr. David Falk, and Data Analysts Dr. Joshua Zahn and Mr. Todd Giberson. *Id.* The OAG experts transmitted these analyses directly to Mr. Hilton. *Id.* And the analyses formed the basis of and reflect the content of Mr. Hilton's oral communications to the client, Senator Huffman. *Id.* ¶ 4 ("[Chris Hilton] directed Dr. Falk, Dr. Zahn, and Mr. Giberson to produce these analyses so that [he] could form mental impressions, form legal opinions and conclusions, formulate legal strategy, and render legal advice to Senator Huffman and her staff in anticipation of litigation connected to the redistricting plans."). These analyses "exist only because Senator Huffman and her staff sought legal advice from the Office of the Attorney General." *Id.*

The latter category of "alternative maps" does not refer to copies of maps proposed by the Texas Legislature, but not adopted. Instead, these maps were created by the same members of the OAG's Legal Technical Support Division, Dr. Falk, Dr. Zahn, and Mr. Giberson, for the sole use of attorney Chris Hilton. Mr. Hilton used these maps to form mental impressions, through which he was then able to communicate legal-compliance advice to Senator Huffman within their attorney–client relationship. Ex. A ¶ 5. Therefore, this category of materials includes the exchange of documents and communications that reflect the legal advice from Mr. Hilton to Senator Huffman and her staff.

Accordingly, all these withheld documents constitute attorney–client privileged material. And "communications," for purpose of the privilege, are not defined as narrowly as LULAC Plaintiffs insist. For example, a communication need not be an email between lawyer and client for it to be privileged. Indeed, the attorney–client privilege also covers documents that simply reveal communications between lawyer and client. As the Supreme Court explained in *Upjohn*, "[i]f [notes and memoranda] reveal communications, they are . . . protected by the attorney–client privilege." 449 U.S. at 401; *see also Regeneron Pharms., Inc. v. Merus B.V.*, No. 14-cv-1650, 2014 WL 11344040, at *2 (S.D.N.Y. Dec. 5, 2014) (quoting same); *In re Grand Jury Subpoena*, 419 F.3d 329, 340 (5th Cir. 2005) (considering the scope of the crime-fraud exception to the attorney–client privilege for a subpoena compelling all attorney–client communications, "written, oral, or **otherwise**" (emphasis added)).

What's more, a "document need not be authored or addressed to an attorney in order to be properly withheld on attorney–client privilege grounds." *Santrade, Ltd. v. Gen. Elec. Co.*, 150 F.R.D. 539, 545 (E.D.N.C. 1993). And the attorney–client privilege also covers oral communications. *See Ward v. Succession of Freeman*, 854 F.2d 780, 787–88 (5th Cir. 1988) (reiterating the rule for waiver of "the attorney–client privilege with respect to all communications, whether written or oral"); *Musco Propane, LLP v. Town of Wolcott,* No. 3:10-cv-1400, 2011 WL 6300235, at *3 (D. Conn. Dec. 15, 2011).

Hence, a document not authored by the attorney, but prepared by his staff, that forms the basis of and reflects an oral communication of legal advice to the client is subject to the attorney–client privilege. And "[t]o the extent [such notes and memoranda] do not reveal communications, they reveal the attorneys' mental processes in evaluating the communications." *Upjohn Co.*, 449 U.S. at 401. The withheld documents are thus "communications" protected by attorney–client privilege because they reflect and reveal the oral communications of legal advice Mr. Hilton rendered to his client.

**B. The Confidentiality of Materials Created Solely for Providing Legal Advice**

LULAC Plaintiffs believe that because a large portion of the withheld materials were never transmitted to the client, they cannot be privileged attorney–client material. ECF 548 at 13. LULAC Plaintiffs invoke the Supreme Court's decision in *Hickman v. Taylor* for the proposition that "[d]ocuments kept 'hidden in an attorney's file' thus 'fall outside the scope of the attorney–client privilege.'" ECF 548 at 13 (quoting 329 U.S. 495, 508, 512 (1947)). But these two quotation segments from *Hickman* refer to discrete ideas. First, the Court held that the attorney's "memoranda" and notes on "statements" from witnesses in the case "fall outside the scope of the attorney–client privilege" because they were made "in anticipation of litigation" and for the attorney's "own use in prosecuting his client's case." 329 U.S. at 499, 501–03, 508. And second, the Court held that when "relevant and non-privileged **facts** remain hidden in an attorney's file," production is appropriate. *Id.* at 511 (emphasis added). In other words, the Court was discussing the "underlying fact" versus "communication" distinction. The Court did not hold that by mere virtue of being kept confidential, a document is not privileged under the attorney–client privilege. It is also worth noting that in *Hickman*, the Supreme Court refused to require the attorney to turn over his files from the representation of his client. *Id.* at 514.

Here, what the LULAC Plaintiffs call "hiding in an attorney's file" is in truth the OAG's earnest attempt at guarding the confidentiality of the advice it provided to its client. The withheld analyses were never themselves transmitted to the client because Mr. Hilton kept his legal advice absolutely as confidential as possible. As this Court has long warned, "disclosure of any significant portion of a confidential communication waives the privilege as to the whole." *United States v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982) (quoting *United States v. Davis*, 636 F.2d 1028, 1043 n.18 (5th Cir. 1981)).

Mr. Hilton's strict policy of utmost confidentiality was particularly a result of the last decade's redistricting litigation. *See generally Texas v. United States*, 279 F.R.D. 24 (D.D.C. 2012), *vacated in part*, 279 F.R.D. 176 (D.D.C. 2012). In that case, OAG had conducted racially polarized voting analyses plus a set of reconstituted election analyses known as the "OAG 10." *Id.* at 34–35. The United States

8

complained that "the summaries and other reports prepared by the OAG's technicians" were shared with map drawers, the State's expert, the redistricting committee chairs, and "any legislator upon request." *Texas v. United States,* 279 F.R.D. 24 (D.D.C. 2012), ECF 134. The three-judge panel agreed, ordering the State to produce those documents. 279 F.R.D. at 34–35.

For this decade's redistricting, the OAG provided its legal advice in a completely different manner. The analyses were used by Mr. Hilton solely to provide legal advice to Senator Huffman alone, and as such, they reflect Mr. Hilton's legal advice. Ex. A ¶ 3. The analyses were never provided to legislators, map drawers, experts retained in this case, or anyone else. Ex. A ¶ 3. And Mr. Hilton provided legal advice solely to Senator Huffman. Ex. A ¶ 2. He did not meet, let alone give advice to, other Senators, the Republican Caucus, or House members. Ex. A ¶ 2. For these reasons, the withheld material is core attorney–client privilege material.

## II. The Attorney Work-Product Privilege Applies

The attorney work-product doctrine "protects documents produced by or for an attorney preparing for litigation." *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 875 (5th Cir. 1991). "It protects materials prepared in anticipation of litigation, whether those materials were prepared by the attorney or by agents of the attorney." *Adams v. Mem'l Hermann*, 973 F.3d 343, 349 (5th Cir. 2020). A document is prepared in anticipation of litigation when the purpose in its preparation is "because of the prospect of litigation." *Stampley v. State Farm & Cas. Co.*, 23 F. App'x 467, 470 (6th Cir. 2001). Just because a document is prepared "before a suit is filed does not mean that it was not done because of the prospect of litigation." *Id.* On the flip side, litigation was not anticipated if the document "would have been created regardless of whether the litigation was also expected to ensue." *Tonti Mgmt. Co. v. Soggy Doggie*, No. 19-cv-13134, 2020 WL 9172077, at *5 (E.D. La. June 25, 2020). Thus, the key issue is if the lawyer

9

had a "subjective anticipation of litigation" and if "that subjective anticipation was objectively reasonable." *Ohio A. Philip Randolph Inst. v. Smith*, No. 1:18-cv-357, 2018 WL 6591622, at *2 (S.D. Ohio Dec. 15, 2018) (quoting *In re Profs. Direct Ins. Co.*, 578 F.3d 432, 439 (6th Cir. 2009)).

Here, Mr. Hilton had a subjective anticipation of litigation. *See* Ex. A ¶ 8. For one thing, Mr. Hilton expected another round of redistricting litigation as had occurred from the last decade's redistricting, and thus took extra precautions to ensure the confidentiality of documents prepared at his direction. *Id.* ¶ 8. Indeed, the manner in which Mr. Hilton directed his experts to create analyses was fundamentally informed by the previous decade's redistricting litigation. But for that expectation of litigation, Mr. Hilton would not have directed his experts to create these analyses. *Id.* ¶ 7 ("[He] directed Dr. Falk, Dr. Zahn, and Mr. Giberson to produce these analyses so that [he] could . . . render legal advice to Senator Huffman and her staff in anticipation of litigation."). In addition, Mr. Hilton was aware "that litigation had already begun regarding redistricting at the time [he] directed Dr. Falk, Dr. Zahn, and Mr. Giberson to perform the analyses." *Id.* ¶ 8. Therefore, Mr. Hilton's subjective anticipation of litigation was also reasonable—litigation from last decade's redistricting was known to him, litigation from this decade's redistricting had already begun, and more litigation from this decade's redistricting was soon to follow.

But LULAC Plaintiffs point to this Court's citation to *Bethune-Hill v. Va. State Board of Elections* for the proposition that the work-product doctrine cannot apply to "legislative counsel" since "the legislature could *always* have a reasonable belief that *any* of its enactments would result in litigation." ECF No. 526; *see also* 114 F. Supp. 3d 323, 348 (E.D. Va. 2015) (quoting *Baldus v. Brennan*, No. 11-cv-562, 2011 WL 6385645, at *2 (E.D. Wis. Dec. 20, 2011)). Even so, this assertion of attorney work-product privilege is fundamentally different than the work-product assertion from the case that *Bethune-Hill* was quoting. In that case, *Baldus v. Brennan*, a nonlawyer was hired by the Wisconsin Legislature at large. 2011 WL 6385645, at *1. The nonlawyer, Mr. Handrick, provided the Legislature with

10

independent consulting services for its redistricting efforts. *Id.* And because Mr. Handrick happened to be an employee of a law firm, Mr. Handrick attempted to assert attorney work-product privilege over his files on behalf of the Legislature. *Id.*

Mr. Handrick did so even though he himself was directly hired and "consulted by the Legislature independently"—no lawyers were ever involved with the engagement whatsoever. *Id.* The court held that "[t]he Legislature may not shield the opinions and conclusions of an individual hired with taxpayer money, simply by funneling the hiring of that individual through outside counsel." *Id.* Because "the Legislature was the client paying Mr. Handrick—a non-lawyer—[] his opinions and conclusions [were] not subject to any work-product or attorney–client privilege." *Id.* Furthermore, Mr. Handrick was hired by the entire Legislature, and the court was not willing to allow the entire Legislature to "shield all of its actions from any discovery." *Id.* at *2. In that sense—speaking about the Legislature as a whole—the court explained that "[t]he Legislature could always have a reasonable belief that any of its enactments would result in litigation." *Id.*

None of that is the case here. Unlike Mr. Handrick, Mr. Hilton is a lawyer. Unlike Mr. Handrick, Mr. Hilton was not hired by the Legislature at large. Mr. Hilton has one client, the Chair of the Senate Redistricting Committee. Ex. A ¶ 2. And unlike Mr. Handrick, Mr. Hilton was not providing consulting services, he was giving legal advice. *Id.* For these reasons, this work-product assertion is qualitatively different—even from the privilege assertion this Court considered for the Governor documents, *see* ECF 526. Mr. Hilton's documents are core attorney work-product material.

### III. The Legislative Privilege Applies

Legislators are entitled to the legislative privilege when they seek confidential legal advice in furtherance of their legislative responsibilities. Contrary to LULAC Plaintiffs' position, the privilege does apply to the materials OAG is withholding. *Contra* ECF 548 at 4. As an initial matter, LULAC Plaintiffs argue that the State lacks standing to assert the legislative privilege because "the State of

11

Texas" does not have "standing to assert the legislative privilege on behalf of any legislator or staff member." ECF 548 at 4–5 (quoting ECF No. 526 at 2; *Perez v. Perry*, No. SA-11-cv-360, 2014 WL 106927, at *1 (W.D. Tex. Jan. 8, 2014)). But just because this Court has concluded that, in a particular context, the OAG can be included as part of the State of Texas, that does not mean that the State of Texas is purporting to assert the legislative privilege on behalf of a legislator. Indeed, this is another straw-man argument. The State of Texas is not asserting the legislative privilege on behalf of Senator Huffman in its capacity as the State of Texas; rather, Senator Huffman's lawyer is asserting the legislative privilege on her behalf and at her direction. Ex. A ¶ 11 ("[Chris Hilton's] client [(Senator Huffman)] has instructed [him] to assert and preserve . . . the legislative privilege . . . .").

Furthermore, LULAC Plaintiffs maintain that the withheld documents are not legislatively privileged because the privilege applies only to communications between "legislators or legislative staff." ECF 548 at 7. LULAC Plaintiffs cite a case for the proposition that "the legislative privilege is waived when a state legislator communicates with executive branch officials." *Id.* (quoting *LUPE v. Abbott*, No. SA-21-cv-00844, 2022 WL 1667687, at *4 (W.D. Tex. May 25, 2022)). But there, the court was concerned with "communications between state legislators" and "any outsider." *LUPE*, 2022 WL 1667687, at *4. This is a distinction that is part of a long line of cases in which courts have explained the legislative privilege applies only when communications truly stay confidential, not when they are public (and thus nonconfidential). *See, e.g.*, *TitleMax of Tex., Inc. v. City of Dallas*, No. 21-cv-1040, 2022 WL 326566, at *5 (N.D. Tex. Feb. 3, 2022)) (quoting *Jackson Mun. Airport Auth. v. Bryant*, No. 3:16-cv-246, 2017 WL 6520967 (S.D. Miss. Dec. 19, 2017)).

In *TitleMax*, for example, the court was concerned about "conversations or communications with any outsider[s]"—e.g., "lobbyists" or "constituents." 2017 WL 6520967, at *7; *see also Gilby v. Hughs*, 472 F. Supp. 3d 763, 767 (W.D. Tex. 2020) (explaining that privilege is waived if the legislator "communicated with any outsider"). But Mr. Hilton is not an "outsider." He is Senator Huffman's

12

attorney. Hence, Senator Huffman may still assert the legislative privilege over materials reflecting legal advice her lawyer gave her, which she used in furtherance of her legislative duties.

To reiterate, these materials are not mere underlying facts. "All documents or communications reflecting strictly factual information—regardless of source—are to be produced." *League of Women Voters of Mich. v. Johnson*, No. 17-cv-14148, 2018 WL 2335805, at *6 (E.D. Mich. May 23, 2018) (quoting *Bethune-Hill*, 114 F. Supp. 3d at 343). Factual information would still exist independent of the client's legal representation. To the contrary, the materials that OAG is withholding would never have existed in the first place, but for Mr. Hilton's representation of Senator Huffman. The "statistical analyses of redistricting data and numerous redistricting plans throughout the entire Third Special Session" are not "mere recitation[s] of facts." Ex. A ¶ 5. To the contrary, each analysis is "a proprietary analysis that is inextricably intertwined with the legal advice [Chris Hilton] provided" for Senator Huffman regarding redistricting legislation. Ex. A ¶ 5.

"These documents exist only because Senator Huffman and her staff sought legal advice from the Office of the Attorney General." Ex. A ¶ 7. "Producing these documents would reveal information about the specific legal advice Senator Huffman and her staff sought, the contents of [Chris Hilton's] communications with Senator Huffman and her staff, and [Chris Hilton's] thoughts and mental impressions formed in anticipation of litigation and the bases therefor." Ex. A ¶ 7.

Furthermore, "[a]ny comments, 'redlines,' additions, edits, or suggestions contained in [draft documents]—and equally as important, any lack thereof—reflect [Chris Hilton's] legal analysis and [his] legal advice to Senator Huffman" regarding redistricting legislation. Ex. A ¶ 9. "Senator Huffman relied on [Chris Hilton's] legal advice and counsel regarding draft redistricting legislation and legal compliance matters related to redistricting to inform her mental impressions, her opinions, and her decision-making regarding redistricting legislation throughout the court of the Third Special Session." Ex. A ¶ 10.

Finally, disclosure of these documents is certain to have a chilling effect on legislators. OAG's clients would be incentivized to simply not seek legal advice moving forward. *See* Ex. A ¶ 11 ("[Chris Hilton's] personal opinion," as Chief of the General Litigation Division of OAG, "is that, were [his] privileged documents disclosed, it would irrevocably undermine the trust that [his] clients place in the Office of the Attorney General."). Disclosure of these documents would mean that OAG attorneys "would no longer be free to conduct any legal analysis and develop the advice that [OAG] give[s] to [its] clients without fear that these private deliberations may one day become public." Ex. A ¶ 12. This would therefore also have an extreme deleterious effect on the public. Texans have a deep interest in ensuring that their legislators receive effective counsel to assess the legality of the laws the Legislature enacts.

## CONCLUSION

For the reasons explained above, Defendants respectfully ask that the Court deny the motion.

| | |
|---|---|
| Date: August 24, 2022 | Respectfully submitted. |
| | |
| KEN PAXTON | PATRICK K. SWEETEN |
| Attorney General of Texas | Deputy Attorney General for Special Litigation |
| | Tex. State Bar No. 00798537 |
| BRENT WEBSTER | |
| First Assistant Attorney General | CHRISTOPHER D. HILTON |
| | Chief, General Litigation Division |
| | Tex. State Bar No. 24087727 |
| | |
| | WILLIAM T. THOMPSON |
| | Deputy Chief, Special Litigation Unit |
| | Tex. State Bar No. 24088531 |
| | |
| | */s/ Ari M. Herbert* |
| | ARI M. HERBERT |
| | Special Counsel, Special Litigation Unit |
| | Tex. State Bar No. 24126093 |
| | |
| | ZACHARY W. BERG |
| | Special counsel, Special Litigation Unit |
| | Tex. State Bar No. 24107706 |
| | |
| | OFFICE OF THE ATTORNEY GENERAL |
| | P.O. Box 12548 (MC-009) |
| | Austin, Texas 78711-2548 |
| | Tel.: (512) 463-2100 |
| | Fax: (512) 457-4410 |
| | patrick.sweeten@oag.texas.gov |
| | christopher.hilton@oag.texas.gov |
| | will.thompson@oag.texas.gov |
| | ari.herbert@oag.texas.gov |
| | zachary.berg@oag.texas.gov |
| | |
| | COUNSEL FOR DEFENDANTS |

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on August 24, 2022, and that all counsel of record were served by CM/ECF.

*/s/ Ari M. Herbert*
ARI M. HERBERT

15