**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **LEAGUE OF UNITED LATIN AMERICAN CITIZENS,** *et al.*, | § § § § | |
| *Plaintiffs*, | § § | |
| **EDDIE BERNICE JOHNSON,** *et al.*, | § § | EP-21-CV-00259-DCG-JES-JVB [Lead Case] |
| *Plaintiff-Intervenors*, | § § | |
| v. | § § | & |
| **GREG ABBOTT,** *in his official capacity as Governor of the State of Texas*, *et al.*, | § § § § | All Consolidated Cases |
| *Defendants*. | § § | |

## ORDER

Todd Hunter served as the Chair of the House Redistricting Committee during Texas' 87th Legislature, making him a pivotal player in the 2021 redistricting cycle. *See* U.S. Mot. at 1, ECF No. 503; Hunter Depo. at 49–50, ECF No. 503 Ex. 1. The United States subpoenaed Chairman Hunter to testify at a deposition as part of its Voting Rights Act challenge to Texas' electoral maps. *See* Mot. at 1. But at his deposition, Chairman Hunter refused to answer a significant portion of the United States' substantive questions based on attorney-client privilege. *See generally* Hunter Depo. The questions that Chairman Hunter objected to varied significantly, ranging from whether Chairman Hunter knew the meaning of the phrase "minority opportunity district," Hunter Depo. at 88, to what data Chairman Hunter used to reach certain public conclusions, *id.* at 92. Now the United States seeks to reopen the deposition and compel Chairman Hunter to answer a variety of questions—85, by their count—where it claims that attorney-client privilege was improperly raised. Mot. at 3. Chairman Hunter opposes the United States' motion. *See* Hunter Resp., ECF No. 524.

For the reasons that follow, the Court concludes that Chairman Hunter unjustifiably asserted an expansive notion of attorney-client privilege over a variety of discoverable information. But it also finds that certain limitations are necessary to prevent the plaintiffs from circumventing attorney-client privilege in a second deposition. Accordingly, the Court GRANTS the United States' motion in part and DENIES it in part. It ORDERS the parties to reopen the deposition of Todd Hunter, subject to the strict parameters detailed below.

## I.   BACKGROUND

At this point, the basics of this case are well-known. The United States brought an action against the State of Texas over its 2021 Congressional and House redistricting plans, alleging that Texas' maps violate Section 2 of the Voting Rights Act. U.S. Am. Compl. ¶¶ 6–8, 11, ECF No. 318. The suit was consolidated with a host of related cases brought by private plaintiffs. *See* ECF No. 83.

The Justice Department subpoenaed Todd Hunter for his deposition testimony. Hunter Subpoena, ECF No. 333 Ex. 6. As Chair of the Texas House Redistricting Committee, Hunter had a front-row seat to the contested redistricting process. *See* Mot. at 1. He oversaw the drawing, development, and passage of the state legislative and congressional electoral districts. *Id.* During this period, Todd Hunter retained the law firm of Butler Snow for advice and services regarding redistricting. Resp. at 6, 8.

Chairman Hunter's deposition took place on July 15, 2022. Hunter Depo. at 1. It quickly evolved into a protracted battle over attorney-client privilege. *See generally id.* In response to questions from both the United States and the private plaintiffs, Chairman Hunter and his attorney repeatedly asserted that any answer would reveal protected attorney-client communications. *See, e.g.*, Hunter Depo at 74, 270–71; *see also* Mot. at 2 (identifying

"hundreds" of invocations of the privilege). Indeed, Chairman Hunter's attorney occupies much of the deposition transcript with his objections and instructions for Chairman Hunter not to answer.[1] *See, e.g.*, Hunter Depo. at 214. For his part, Chairman Hunter often responded with a single-sentence claim that any answer would compromise his attorney-client privilege. *See, e.g.*, *id.* at 191. After nine hours of this (seven of them on the record), both the United States and the private plaintiffs adjourned per Federal Rule of Civil Procedure 37(a)(3)(C). *See* Resp. at 1; Hunter Depo. at 219–20, 282.[2]

The present motion soon followed.[3] In it, the United States requests leave to depose Chairman Hunter for another seven hours and moves to compel answers to 85 specific questions that the chairman refused to answer. Mot. at 1. The United States also asks that the private plaintiffs have the opportunity to reprise their questioning at the reopened deposition. *Id.* at 3–4. In response, Chairman Hunter maintains that his reliance on attorney-client privilege was justified and that another day of deposition would be onerous and duplicative. Resp. at 1–2. The motion is ripe for review.

## II.   DISCUSSION

A party's attorney may "instruct a deponent not to answer" when "necessary to preserve a privilege," *see* FED. R. CIV. P. 30(c)(2), but an opposing party may move to compel the answer to

---

[1] Chairman Hunter and his attorney also repeatedly objected to questions because of legislative privilege but he did not refuse to answer on that basis, *see, e.g.*, Hunter Depo. at 49, so the United States has only challenged the reliance on attorney-client privilege in their motion, *see* Mot. at 3 n.1.

[2] An attorney for MALC asked to "reserve" further questions for Chairman "until and unless we get a ruling from the Court on these attorney/client privilege issues." Hunter Depo. at 220. The Texas NAACP and the Abuabara plaintiffs concurred. *Id.* The attorneys for Fair Maps made a similar statement at the end of their questioning. *Id.* at 282 ("[W]ith respect to questions that were not answered because of the attorney/client privilege, where we believe it does not apply, we want to state for the record that we will seek to reopen.").

[3] The United States' motion is dated August 1, seventeen days after the July 15 deposition. *See* Mot. at 11. While Chairman Hunter suggests that somehow the lag should be counted against the United States, *see* Resp. at 10, nothing about the United States' timing suggests improper delay.

such questions if the deponent wrongfully declines to answer, *see* FED. R. CIV. P. 37(a)(3)(B)(i). Whether to reopen Chairman Hunter's deposition thus turns on whether attorney-client privilege was properly invoked in each instance.

### A. Legal Standard

We begin with the familiar formulation of the attorney-client privilege. A statement is privileged if it is (1) a "*confidential* communication," (2) made "to a lawyer or his subordinate," (3) "for the primary purpose of securing either a legal opinion or legal services, or assistance in some legal proceeding." *EEOC v. BDO USA, LLP*, 876 F.3d 690, 695 (5th Cir. 2017) (quoting *United States v. Robinson*, 121 F.3d 971, 974 (5th Cir. 1997)). While the paradigm examples of privileged statements are private client-to-lawyer communications, "[t]he privilege also protects communications from the lawyer to his client, at least if they would tend to disclose the client's confidential communications." *Hodges, Grant & Kaufmann v. IRS*, 768 F.2d 719, 721 (5th Cir. 1985). "The application of the attorney-client privilege is a question of fact, to be determined in the light of the purpose of the privilege and guided by judicial precedents." *Taylor Lohmeyer L. Firm PLLC v. United States*, 957 F.3d 505, 509 (5th Cir. 2020) (quotation omitted). The privilege exists "to encourage full and frank communication between attorneys and their clients." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "[B]ecause the privilege 'has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose.'" *Robinson*, 121 F.3d at 974 (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

"[T]he party asserting the privilege bears the burden of proving its applicability." *Stoffels v. SBC Commc'ns, Inc.*, 263 F.R.D. 406, 411 (W.D. Tex. 2009) (citing *United States v. Kelly*, 569 F.2d 928, 938 (5th Cir. 1978)). That burden cannot be satisfied with mere generalities—the

objecting party must prove that privilege applies to each withheld statement. *See SEC v. Microtune, Inc.*, 258 F.R.D. 310, 315 (N.D. Tex. 2009); *see also McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990). Any "ambiguities as to whether the elements of a privilege claim have been met are construed against the proponent." *BDO USA, LLP*, 876 F.3d at 695.

The United States has correctly identified three categories of answers that are not protected by the attorney-client privilege. *First*, the attorney-client privilege protects only *communications*, not the underlying facts. *Upjohn*, 449 U.S. at 395. The plaintiffs are entitled to discovery of relevant information, *see* FED. R. CIV. P. 26(b)(1); information is not "cloaked with the lawyer-client privilege" just because it was "passed from client to lawyer," *Robinson*, 121 F.3d at 975. *Second*, a statement is privileged only if it was for the "primary purpose" of legal advice or services. *Robinson*, 121 F.3d at 974. Communications to a lawyer that "do not pertain to the rendering of . . . legal services" are not privileged, *Perez v. Perry*, No. 5:11-cv-360, 2014 WL 3359324, at *1 (W.D. Tex. July 9, 2014) (three-judge court), nor is a lawyer's "advice on political, strategic, or policy issues . . . shielded from disclosure," *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998). *Third*, a client can waive the privilege by speaking about a protected statement publicly. A client's "disclosure of any significant portion of a confidential communication waives the privilege as to the whole." *United States v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982) (quotation omitted). Chairman Hunter does not object to these rules in theory but objects only to the application of these principles.

**B. Analysis**

The United States has catalogued 85 separate questions that Chairman Hunter declined to answer on the basis of attorney-client privilege. *See* U.S. App'x Challenged Objs., ECF No. 503

Ex. 2 ("U.S. App'x").[4]  Whether the attorney-client privilege attaches to an answer, however, is fact-specific. *Taylor Lohmeyer*, 957 F.3d at 510. In this context, that also means the applicability of the privilege is statement-specific. *See id.* (citing *United States v. Davis*, 636 F.2d 1028, 1038–39 (5th Cir. Unit A Feb. 1981)). The Court has little choice but to proceed statement-by-statement, grouping questions where possible.

Our task is made doubly difficult by the fact that the United States often failed to ask follow-up questions about the scope or features of the supposedly privileged information. Meanwhile, Chairman Hunter was rarely specific about his refusal to answer, sometimes claiming attorney-client privilege over an entire line of questioning without explaining what kinds of statements were implicated and why those statements were protected. The combination makes it difficult to assess privilege in every instance. *See Advocare Int'l, LP v. Horizon Lab'ys, Inc.*, No. 3:04-CV-1988-H, 2006 WL 8437063, at *4 (N.D. Tex. Jan. 23, 2006); *see also Alexander v. FBI*, 186 F.R.D. 21, 46 (D.D.C. 1998) (criticizing "the 'knee-jerk' invocation of the attorney-client privilege and plaintiffs' refusal to pose alternate questions which may establish circumstantial facts").

Nevertheless, the record provides enough clarity to conclude that Chairman Hunter improperly asserted privilege in response to each of three types of questions that the United States has identified. *See* U.S. App'x. Chairman Hunter will be compelled to answer those questions. For other questions, the United States did appear to implicate privileged information, and its request to compel further answers will be denied. Finally, for some questions and answers, there are not enough facts to conclusively determine whether privilege applies, and the Court will permit further questions on context and scope but will not compel a particular answer.

---

[4] The Court will use the United States' organization in its Appendix for citations and ease of reference, but it does not wholeheartedly adopt the United States' conclusions about each question.

The three categories of questions the United States has identified raise different issues, so we will deal with each in turn.

### 1. *Factual Information*

Chairman Hunter wrongly asserted attorney-client privilege in response to questions seeking exclusively factual information. This is the largest category of improper privilege claims in Chairman Hunter's deposition. *See* U.S. App'x at I.1–52. "[U]nderlying facts are not privileged merely because they are communicated to an attorney." *Perez*, 2014 WL 3359324, at *2 (citing *Upjohn*, 449 U.S. at 395). Nevertheless, Chairman Hunter asserted attorney-client privilege in answer to each to the following questions:

- "[S]itting here today, is it your understanding that your plan, H 2101, created two new majority Hispanic [voting age population] districts as compared to the prior plan?" Hunter Depo. at 86 (U.S. App'x I.2).
- "Do you understand the concept of a minority opportunity to elect preferred candidates?" *Id.* at 87–88 (U.S. App'x I.3).
- "Did you review any analysis of racial block voting, otherwise known as racially polarize[d] voting in drawing up plan H 2101?" *Id.* at 105 (U.S. App'x I.10)
- "Did your initial state[-]wide plan H 2101 decrease Latino population share in House district 31 Ryan Guillen district?" *Id.* at 114 (U.S. App'x I.17)
- "Did you vote against or speak against any amendments that would've created a second majority Hispanic district in greater Houston?" *Id.* at 205 (U.S. App'x I.33)
- "[D]id you make any examination whether it was possible to create . . . a new Hispanic Congressional District in the Dallas/Fort Worth area?" *Id.* at 277–78 (U.S. App'x I.43)
- "Independent of any advice you've received from Counsel, do you have any understanding of whether districts with a majority-minority population provide an opportunity for minority citizens to elect their preferred candidate of choice?" *Id.* at 285 (U.S. App'x I.49)

Each of these questions inquired exclusively about Chairman Hunter's personal knowledge, his actions (or inaction), and empirical features of the redistricting plans. None of these questions asked Chairman Hunter to reveal attorney-client communications, either explicitly or implicitly.

The same is true of most of the United States' similar questions. *See* U.S. App'x at I.1–10, 12–15, 17–22, 27–28, 30–52.

Chairman Hunter's defense of his answers is largely unpersuasive. At the outset, we reject Chairman Hunter's conclusory statement that he already answered the plaintiffs' questions as fully as he was capable without divulging privileged information. Resp. at 2. There are certainly a few instances where it appears Chairman Hunter did provide cooperative or comprehensive answers. *See, e.g.*, Hunter Depo. at 270–71 (U.S. App'x at I.40); *id.* at 126 (U.S. App'x at I.19) ("I don't recall."). But these were the exception, not the rule. *See, e.g.*, *id.* at 281. For most statements, we have no explanation for why Chairman Hunter truncated his answers. And we cannot defer to Chairman Hunter's in-deposition judgment, as he asks us to do. Resp. at 8. For one thing, there is evidence that Chairman fundamentally misunderstand the nature of the privilege.[5] Plus, as the deponent (and a partisan state legislator with a political stake in the outcome of this litigation), Chairman Hunter has an undeniable incentive to claim as much privilege as possible. But it is his to prove that each of his hidden answers was privileged under the appropriate legal standard. *See BDO USA*, 876 F.3d at 695. For most questions, he failed to do so either in the deposition or in his briefing.

Second, Chairman Hunter claims that a number of the United States' and private plaintiffs' factual questions "baked . . . the substance of the legal communication into the questions' premise." Resp. at 5 (quotation omitted). But of the seven examples he gives of the supposed practice, none matches this description. The first two questions he identifies are about

---

[5] In addition to the improper invocations of privilege, detailed above, Chairman Hunter misstated the scope of the privilege at various points in the transcript. *See, e.g.*, Hunter Depo. at 271 (suggesting that the privilege covered everything that "impact[ed] lawyers"); *id.* at 177 (suggesting that he could not answer something regarding the same "subject matter" he discussed with counsel); *id.* at 284 (refusing to answer a question because of the "law impact" of a phrase). But the attorney-client privilege extends only to those communications made in confidence for the purpose of seeking legal advice. *BDO USA*, 876 F.3d at 695. It does not shield all law-adjacent subjects from discovery.

"*who*" provided legal advice about a certain topic.[6] Not only is an attorney's identity not privileged information, *see Lott v. AXA Equitable Life Ins. Co.*, No. 1:18CV63-GHD-DAS, 2019 WL 2550324, at *5 (N.D. Miss. June 20, 2019), but the United States has "the right" to ask questions about the participants in a conversation to probe whether the attorney-client privilege is applicable, *Steward ex rel. Minor v. Smith*, No. CV SA-10-CA-1025-OG, 2018 WL 11361754, at *3 (W.D. Tex. July 31, 2018). Indeed, to get to the bottom of privilege claims, courts have insisted that parties ask such questions. *See Advocare Int'l*, 2006 WL 8437063, at *4; *Alexander*, 186 F.R.D. at 46–47. The remaining five questions that Chairman Hunter identifies asked about the process by which certain decisions were reached or made. Resp. at 6.[7] Once again, Chairman Hunter can testify to the legislative process without revealing the substantive communications he exchanged with attorneys.

Chairman Hunter's third objection is that the deposing attorney used the pronoun "you" in many questions, which could plausibly be a singular "you" (referring to Chairman Hunter) or a plural "you" (meaning Chairman Hunter with his attorneys). Resp. at 7–8. It is not clear, however, that any of the United States' questions can reasonably be read to ask about Chairman Hunter's attorneys. *See* U.S. App'x at I.27, 28, 31. As the deponent, Chairman Hunter was the obvious target of the word "you." Moreover, even if the questions could be understood to

---

[6] "*Who* provided you with analysis of racial block voting?" Hunter Depo. at 106 (U.S. App'x at I.11) emphasis added); "*Who* provided the legal advice that is the basis for your assertion of attorney/client privilege with respect to my question about whether the political performance of HD31 remains essentially the same in plan H2101?" *Id.* at 110 (U.S. App'x at I.16) (emphasis added).

[7] *E.g.*, "*[H]ow* did you determine whether the House plan created new coalition majority-minority districts were possible?" Hunter Depo. at 306 (U.S. App'x at III.19) (emphasis added). The only outlier in Chairman Hunter's list is the question: "[W]hat conclusion did you reach [regarding which districts were protected under the VRA]?" *Id.* at 193 (U.S. App'x at II.12). But that question only came after Chairman Hunter refused to answer how he determined the applicability of the VRA. *See id.* On that question alone, more questions would be necessary whether the United States called for attorney-client communications or for the product of a legislative process.

encompass attorneys, the questions Chairman Hunter objects to still asked "whether" particular analysis was conducted or whether a conclusion was reached, they did not ask about his attorneys' legal conclusion or the substance of any advice Chairman Hunter was given.[8] *See id.*

The United States' questions that directly called for attorney-client communications are closer to the line. One of the United States' questions was whether Chairman Hunter had directed his lawyers to "coordinat[e]" with the Senate on the "development of the Congressional plan." U.S. App'x at I.29. While this does call for a client-to-attorney communication, more context is necessary to determine whether this was (a) a confidential instruction and (b) primarily for the purpose of receiving legal services, as opposed to legislative assistance. Similarly, the United States asked a series of questions about whether Chairman Hunter's attorneys found "racially polarized voting" in various areas of Texas. *See* U.S. App'x at I.23–26.[9] While those questions directly called for attorney-client communications on their face, it is not clear from the deposition transcript whether the United States was asking about the legal implications of polarized voting, or a mere statistical conclusion—i.e. voting patterns by race. *See id.* The former would be privileged, the latter would not be. *Perry*, 2014 WL 3359324, at *1; *cf. Am. Elec. Power Co. v. Affiliated FM Ins. Co.*, No. 3:02-cv-1133, 2007 WL 9700756, at *4 (M.D. La. Apr. 9, 2007) ("[T]echnical advice . . . is not covered by the attorney-client privilege"). Only to the extent that the United States seeks statistical information will Chairman Hunter be compelled to answer such questions in the reopened deposition.

---

[8] For example, "Did you determine whether H D 118 would continue to provide minority voters with an opportunity to elect their candidates of choice before voting on the Jetton amendment?" Hunter Depo. at 176.

[9] The United States has retroactively claimed in its briefing that they were asking about non-privileged communications by a "demographer" hired by Butler Snow. U.S. App'x at I.23–26. But that is not what it asked Chairman Hunter in the deposition. In the deposition it asked whether Chairman Hunter's "*attorneys*" had found polarization. *See* Hunter Depo. at 169–71.

### 2. *Strategic, Policy, or Political Information*

The United States' second contention is that Chairman Hunter withheld answers to fourteen questions that asked about strategic, policy, or political information. *See* U.S. App'x at II.1–14. However, many of these questions that supposedly probed "political" information are difficult to differentiate from the questions seeking "factual" information, discussed above. *See* U.S. App'x at 2, 5–7, 9, 11. These include questions like:

- "Did your initial state[-]wide plan increase the number of districts in which Hispanic voters had the opportunity to elect their preferred candidates?" Hunter Depo. at 95 (U.S. App'x at II.2).
- "Do you know if it would've been possible for El Paso County to retain a fifth district that doesn't go all the way down to [M]averick [County] . . . if the districts were not over[-]populated?" *Id.* at 125 (U.S. App'x at II.7).
- "Did you personally consider CVAP before bringing [HB1] to the floor?" *Id.* at 161 (U.S. App'x at II.9).

But facts within the client's knowledge are not privileged, "even if the client learned those facts through communications with counsel." *Thurmond v. Compaq Comput. Corp.*, 198 F.R.D. 475, 481 (E.D. Tex. 2000); *see also La Union Del Pueblo Entero v. Abbott*, No. SA-21-CV-00844-XR, 2022 WL 1667687, at *7 (W.D. Tex. May 25, 2022) (adopting this rule). Similarly, questions about the rationale behind legislative choices do not necessarily transgress privilege, even if the answers have legal consequences or expose the legislature to legal liability. *See, e.g.*, U.S. App'x at II.1, 14. Regardless of whether those are characterized as procedural or political facts, the bottom-line is the same: they did not require the disclosure of communications with his attorneys, and therefore Chairman Hunter's refusal to answer was improper.

Some questions from the United States do appear to call for Chairman Hunter's legal perspective that might have been informed by conversations with attorneys. *See* U.S. App'x at II.3–4, 10, 12–13. While a lay witness's opinion about the legal ramifications of a particular action may or may not be admissible at trial, *see United States v. Churchwell*, 807 F.3d 107, 118

(5th Cir. 2015), this does not make his beliefs privileged. Nor do such questions require that he share attorney-to-client communication. Indeed, it is not even clear that Chairman Hunter got his opinion from lawyers or that their advice was legal, as opposed to political. *See* U.S. App'x at II.3–6, 10, 13. The burden is on Chairman Hunter to prove that. *See BDO USA*, 876 F.3d at 695. Given this uncertainty, the Court will allow further questions to clarify how (if at all) attorneys were involved in forming Chairman Hunter's legal judgments.

But the United States went a bridge too far by directly asking about the advice that Butler Snow gave Chairman Hunter regarding proposed House Bill 1. *See* U.S. App'x at II.8. It is hard to see how this question asks for anything less than the privileged communications given by lawyers to their client. *See* Hunter Depo. at 130–31. The United States protests that the nature of the advice was not certain since a law firm can be retained for non-legal services. *See* Mot. at 7–8. They even append some evidence to their motion suggesting Butler Snow was involved in redistricting in both a legal and non-legal capacity. *See* U.S. Reply at 1–2, ECF No. 541; *id.* Exs. 1–3. But even if that were true at a high level, Chairman Hunter expressly stated in the deposition that, in this context, he asked Butler Snow to "run the legal" on House Bill 1, and the United States asked to hear their ensuing suggestions. Hunter Depo. at 130. That directly calls for Butler Snow's legal advice. Here, Chairman Hunter has proven just enough to justify his silence.

### 3. *Waiver by Disclosure*

Finally, the United States argues that Chairman Hunter waived privilege for a number of communications since he publicly discussed a related subject matter in a committee hearing. Mot. at 8–9. The ordinary rule is that when a client intentionally discloses attorney-client communications, those communications are no longer privileged. *El Paso Co.*, 682 F.2d at 538.

Even when a client reveals a significant portion of a document or communication, the other parts of that document related to the same subject matter also lose their privilege, as disclosing key elements of a communication is incompatible with the attorney-client privilege's confidentiality requirement. *Id.*; *see also Alldread v. City of Grenada,* 988 F.2d 1425, 1434 (5th Cir. 1993). However, this waiver doctrine does not apply here. None of the United States' questions asked about a communication or document that had already been partially disclosed. Instead, the government's questions call for further clarification about Chairman Hunter's public statements, or for his underlying rationales. The United States is wrong to suggest that speaking about a legal conclusion in public waives privilege for all the underlying attorney communications that informed that statement. Mot. at 8–9. Indeed, it cites no authority for such a rule.

      Nevertheless, the United States is correct that its questions in this third category did not violate privilege. *See* U.S. App'x at III.1–19. Most of those questions did not ask for communications at all, let alone communications that had been waived by disclosure. Take, for example, the question: "Why did you emphasi[ze] CVAP more on the House floor than you did in committee?" Hunter Depo. at 160. Or the question: "What did you mean by [']political performance['] [when you said it in a public hearing]?" *Id.* at 91. Such questions probe Chairman Hunter's understanding and personal beliefs, not privileged communications. To the extent the United States' other questions do this, they do not run afoul of privilege protections. *See* U.S. App'x at III.1, 6.

      The same is true of the United States' questions about the *process* of certain legislative decisions. Many of the plaintiffs' questions asked "how" Chairman Hunter came to a particular conclusion. *See, e.g.*, U.S. App'x at III.12, 18–19. Such inquiries demand certain facts about the decision-making process, not the substance of attorney-client communications. Just because

attorneys were involved with the redistricting process or attorneys advised the legislature does not mean that all facts about a legislative decision are shielded from discovery. Chairman Hunter must do more than incant "attorney-client privilege" over the deliberative process to avoid his obligation to answer. His burden to demonstrate that a particular statement is privileged requires, at a minimum, describing what role attorneys played in the decision-making process, who was involved, and in what context he (or attorneys) made the statements that he claims are privileged. *See Advocare Int'l*, 2006 WL 8437063, at *4. He may also need to describe the nature of the attorney statements in a way that does not reveal the substance. *See BDO USA, LLP*, 876 F.3d at 696–97. Only then will this Court have enough information to conclude that Chairman Hunter's privilege claims survive.

### C. Appropriate Relief

The United States is entitled to discovery of all relevant, non-privileged information by rule. FED. R. CIV. P. 26(b)(1). The United States' questions about the process and motivations for various redistricting decisions are undoubtedly relevant to their Voting Rights Act claim. Because Chairman Hunter erroneously refused to answer a host of questions, the correct remedy is to reopen the deposition and compel him to answer. *See* FED. R. CIV. P. 37(a)(3)(B).

Chairman Hunter's protests that another deposition would be "unreasonable and disproportional," as the chairman was already deposed for a full day. Resp. at 9. But Chairman Hunter ran the risk of this prolonged dispute when he asserted attorney-client privilege to question after question. He cannot avoid a second deposition entirely. However, the Court is not insensitive to the physical and financial costs of additional questioning. The Court recognizes that the United States' 85 questions represent a fraction of the original deposition transcript. Plus, we are ultimately compelling answers in most—but not all—of the original 85 questions.

For that reason, the Court believes that a partial day of deposition will be sufficient for the plaintiffs to ask both their unanswered questions from the July 15 deposition and any reasonable follow-up questions. While Chairman Hunter may still object to new questions on the grounds of privilege, he may not refuse to answer questions in such a way as to contravene this Order. *See* FED. R. CIV. P. 37(b). And as always, the burden to prove attorney-client privilege rests with him. "[C]onclusory" descriptions that a topic is "legal" will not do. *BDO USA, LLP*, 876 F.3d at 696.

### III. CONCLUSION

Given the aforementioned, the Court **GRANTS** the United States' "Motion to Reopen the Hunter Deposition and Compel Deposition Answers" (ECF No. 503) in part and **DENIES** it in part.

The parties **SHALL** reopen the deposition of Todd Hunter at a date to be set by the parties by mutual agreement, but no later than **30 days** after the issuance of this Order. The deposition **SHALL NOT** last longer than four hours of record time. Todd Hunter is **COMPELLED** to provide answers to the following questions from the previous deposition (as numbered in the United States' Appendix, ECF 503 Ex. 2):

- I. 1–22, 27–28, 30–52
- II. 1–2, 5–7, 9, 11, 14
- III. 1–11, 13–17

The parties **MAY** also ask reasonable follow-up questions, so long as they do not exceed the scope of the aforementioned questions.

The plaintiffs **MAY** also re-ask the following questions, along with reasonable follow-up questions within the scope of the original questions and supplemental questions to probe the applicability of Hunter's claimed attorney-client privilege:

- I.  23–26, 29
- II.  3–4, 10, 12–13
- III.  12, 18–19

The parties that expressly reserved their questions at the July 15 deposition of Chairman Hunter—MALC, Fair Maps, the Abuabara Plaintiffs, and the Texas NAACP—**MAY** ask additional questions at the reopened deposition, but the combined questioning from all plaintiffs, including the United States, **SHALL NOT** exceed four hours of record time.  The plaintiffs **SHALL** decide how to apportion the time among themselves.

Finally, nothing in this order should be construed to prohibit valid claims of privilege to questions unasked in the July 15 deposition.  If Chairman Hunter believes additional questions call for privileged communications, he **SHALL** "support" any objection "with specific information that will allow both the parties and the Court to ascertain the applicability of attorney-client privilege," such as "the parties participating in the conversation, the number of conversations, and the general subject matter discussed."  *Advocare Int'l*, 2006 WL 8437063, at *4.  This information can be provided without revealing the actual substance of communications.

**So ORDERED and SIGNED on this 8th day of September 2022.**

*[signature]*

**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**

*And on behalf of:*

| | | |
|---|---|---|
| **Jerry E. Smith** | | **Jeffrey V. Brown** |
| **United States Circuit Judge** | *-and-* | **United States District Judge** |
| **U.S. Court of Appeals, Fifth Circuit** | | **Southern District of Texas** |