# United States District Court
# for the Western District of Texas
## El Paso Division

| | | |
|---|---|---|
| **LEAGUE OF UNITED LATIN AMERICAN CITIZENS,** *et al.*, <br> *Plaintiffs*, <br><br> v. <br><br> **GREG ABBOTT,** *in his official capacity as Governor of the State of Texas*, *et al.*, <br> *Defendants*. | § § § § § § § § § § § § § | **No. 3:21-CV-259-DCG-JES-JVB** <br> **[Lead Case]** |
| **FAIR MAPS TEXAS ACTION COMMITTEE,** *et al.*, <br> *Plaintiffs*, <br><br> v. <br><br> **GREG ABBOTT,** *in his official capacity as Governor of the State of Texas*, *et al.*, <br> *Defendants*. | § § § § § § § § § § § § | **No. 1:21-CV-1038-RP-JES-JVB** <br> **[Consolidated Case]** |

**MEMORANDUM OPINION AND ORDER
DENYING
DEFENDANTS' MOTION TO DISMISS**

Before the Court is the Defendants' motion to dismiss the Fair Maps Plaintiffs'[1] second amended complaint under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Dkt. 401. The Court denies this motion to dismiss.

---

[1] The Fair Maps Plaintiffs are Fair Maps Texas Action Committee, OCA-Greater Houston, Emgage, Khanay Turner, Angela Rainey, Austin Ruiz, Aya Eneli, Sofia Sheikh, Niloufar Hafizi, Lakshmi Ramakrishnan, Amatullah Contractor, Deborah Chen, Arthur Resa, Sumita Ghosh, Anand Krishnaswamy,

I.       **BACKGROUND**[2]

The Fair Maps Plaintiffs allege that Texas's enacted State House, State Senate, and Congressional redistricting plans, which established new districts for Texas after the 2020 census, intentionally discriminate against Texas's Latino, Black, and Asian American and Pacific Islander ("AAPI") communities. Dkt. 502 at 2. The Fair Maps Plaintiffs allege that the redistricting maps established by Senate Bill 6 (Congressional Plan C2193), Senate Bill 7 (Senate Plan S2168), and House Bill 1 (House Plan H2316) deny minority voters an equal opportunity to participate in the political process and to elect representatives of their choice. *Id.* at 25–28. The Plaintiffs bring these challenges against the House Districts in Fort Bend, Bell, and Collin Counties, *id.* at 29, the Senate Districts in Fort Bend and Tarrant Counties, *id.* at 43, and the Congressional districts in the Harris-Fort Bend and Dallas-Fort Worth regions, *id.* at 53.

The Fair Maps Plaintiffs sued the State of Texas, Governor Greg Abbott, and Secretary of State John Scott, bringing claims under section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 ("VRA"), as well as the Fourteenth and Fifteenth Amendments to the United States Constitution. *Id.* at 1–2. The Plaintiffs challenge Congressional Plan C2193, Senate Plan S2168, and House Plan H2136 as violating (1) the Fourteenth and Fifteenth Amendments' protections against intentional racial discrimination; (2) section 2 of the Voting Rights Act; and (3) the Fourteenth Amendment's protections against unconstitutional racial gerrymandering. *Id.* at 65–67.

---

Peter Johnson, Zahra Syed, Chandrashekar Benakatti, Dona Murphey, Chetan Reddy, Sankar Muthukrishnan, Christina Lu, Jason Zhang, Chris Leal, Ashley Washington, and Sarika Maheshwari.

[2] On a motion to dismiss under Rule 12(b)(6), well-pleaded, non-conclusory factual allegations in the complaint must be taken as true and construed favorably to the plaintiff. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). The facts in this section are taken from the Fair Maps Plaintiffs' pleadings.

This Court's opinion issued May 23, 2022, dealt with the Fair Maps Plaintiffs' Original Complaint and Defendants' first motion to dismiss. *See* Dkt. 307 at 60. All of the Plaintiffs in that omnibus opinion were given fourteen days to amend their complaints in response to that Order. *Id.* at 60. After the filing of an amended complaint, the Court gave the Plaintiffs leave to file a second amended complaint, Dkt. 495, which mooted a subset of arguments made by the Defendants in their motion to dismiss.[3] *See* Dkt. 502, Dkt. 518. The Defendants now move to dismiss the Fair Maps Plaintiffs' remaining section 2 vote-dilution claims as raised in their Second Amended Complaint. Dkt. 401; Dkt. 518.

## II.   LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when well-pleaded facts allow the court to reasonably infer that the defendant is liable for the alleged conduct. *Id.* The court does not "strain to find inferences favorable to the plaintiffs" or "accept conclusory allegations, unwarranted deductions, or legal conclusions." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (quotations omitted). Naked assertions and formulaic recitals of the elements of the cause of action will not suffice. *Iqbal*, 556 U.S. at 678. Even if the facts are well-pleaded, the court must still determine plausibility. *Id.* at 679.

## III.   ANALYSIS

First, the Defendants claim that Plaintiffs Texas Action Committee, OCA-Greater

---

[3] Specifically, the claims which are mooted are claims regarding House Districts 54 and 55 in Bell County and Congressional District 22 in the Harris-Fort Bend region. Dkt. 495 at 6–7.

Houston, and Emgage ("Entity Plaintiffs") lack organizational standing. Dkt. 401 at 2. Next, the Defendants maintain that the Fair Maps Plaintiffs have failed to adequately plead some of their vote-dilution claims brought under section 2 of the VRA, per the *Thornburg v. Gingles*, 478 U.S. 30 (1986) preconditions. Dkt. 401 at 3. After specific claims were mooted, *see* Dkt. 495; Dkt. 518, the Defendants aver that the Fair Maps Plaintiffs failed to adequately plead the first *Gingles* precondition for their challenges to House Districts in Fort Bend, Dkt. 401 at 7, and Collins County, *id.* at 10–11, the Senate Districts in Fort Bend, *id.* at 12, and Tarrant County, *id.* at 16, and the Congressional Districts in the Harris-Fort Bend region, *id.* at 18. The Defendants additionally claim that the Fair Maps Plaintiffs failed to adequately plead the second and third *Gingles* preconditions for the Congressional Districts in the Dallas-Fort Worth region and the Senate Districts in Tarrant County.[4] Dkt. 518 at 2.

### A. Standing

The Court begins with standing. Standing is a constitutional prerequisite for jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To demonstrate standing, a plaintiff must show (1) an "injury in fact," (2) a "causal connection between the injury and the conduct complained of," and (3) a likelihood that the injury will be "redressed by a favorable decision." *Id.* at 560–61 (quotations omitted). Standing is assessed plaintiff by plaintiff and claim by claim. *See In re Gee*, 941 F.3d 153, 171 (5th Cir. 2019). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 516 (1975)).

An organization may show injury in fact in two ways. First, for organizational standing,

---

[4] Defendants do not move to dismiss the Fair Maps Plaintiffs' constitutional challenges.

the organization may show that the defendants' acts injured the organization itself. *See NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010). Secondly, an organization may assert the standing of its members, insofar as their interests in the suit are "germane" to the organization's "purpose." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017). That is "associational standing." *Id.* For associational standing, an organization must identify "a specific member" to assert standing on his behalf. *City of Kyle*, 626 F.3d at 237; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("[T]he Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm . . . .").

The Defendants posit that the Entity Plaintiffs lack organizational standing because they failed to show that the Defendants' redistricting plans impaired the Entity Plaintiffs' actual activities instead of merely affecting their abstract interests in the litigation. Dkt. 401 at 3–4. The Entity Plaintiffs concede that they have not pleaded organizational standing but maintain that they have sufficiently pleaded associational standing. Dkt. 476 at 2.

In their reply, the Defendants make no effort to rebut the Fair Maps Plaintiffs' contention that the Entity Plaintiffs have sufficiently pleaded associational standing. Dkt. 518. Still, courts have an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)). As a result, this Court has independently determined that the Entity Plaintiffs have sufficiently pleaded associational standing. Each Entity Plaintiff has identified a specific member to assert standing on the organization's behalf within each challenged district, and the interests they assert they are seeking to protect are germane to the organization's purpose. *See* Dkt. 502 at 7–14. The Entity Plaintiffs may assert their specific members' injuries as their own.

### B. *Gingles* Claims

The Fair Maps Plaintiffs bring vote-dilution claims under section 2 of the VRA. *Id.* at 65. Such claims are often called *Gingles* claims after *Thornburg v. Gingles*, 478 U.S. 30 (1986), because that case provides the "framework" for evaluating section 2 vote-dilution claims. *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam).[5]

#### 1. Governing Law

Section 2 prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). That occurs when "the totality of circumstances" shows that a state's "political processes . . . are not equally open to participation by" members of a minority group "in that [they] have less opportunity . . . to participate in the political process and to elect representatives of their choice." *Id*. § 10301(b).

In *Gingles*, the Court "construed" section 2 to prohibit the "dispersal of a [minority] group's members into districts in which they constitute an ineffective minority of voters." *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) (alteration adopted) (quoting *Gingles*, 478 U.S. at 46 n.11). When "minority and majority voters consistently prefer different candidates" in such districts, "the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters," thus depriving minorities of an equal opportunity to elect representatives of their choice. *Gingles*, 478 U.S. at 48.

A successful *Gingles* claim remedies that situation by undoing the dispersal of minorities. It does so by requiring the state to concentrate them in a new, majority-minority district that will

---

[5] *Gingles* involved section 2 challenges to multimember districts, 478 U.S. at 46, but the Supreme Court later extended the analysis to apply to section 2 challenges to single-member districts like the ones at issue here. *See Growe v. Emison*, 507 U.S. 25, 40–41 (1993).

allow the group, usually, to be able to elect its preferred candidates. *See Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality opinion). Such section 2–required districts are often described as "opportunity districts." *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399, 428–29 (2006); Nicholas O. Stephanopoulos, *The South After* Shelby County, 2013 SUP. CT. REV. 55, 75 n.84 (2013).

*Gingles* claims are complicated and analytically intensive. A *Gingles* plaintiff must make two showings to require a state to draw its proposed district. *First,* it must establish three preconditions. *Wis. Legislature*, 142 S. Ct. at 1248. Those preconditions—described below—are necessary to show that the *Gingles* theory describes the proposed district, *see Gingles*, 478 U.S. at 48–49, so each must be met for the claim to succeed, *Harris*, 137 S. Ct. at 1472. *Second*, the plaintiff must show that, under the "totality of circumstances," the "political process is [not] equally open to minority voters" without the proposed district. *Wis. Legislature*, 142 S. Ct. at 1248 (quoting *Gingles*, 478 U.S. at 79).

The first precondition is that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. That is "needed to establish that the minority has the potential to elect a representative of its own choice." *Growe*, 507 U.S. at 40. Accordingly, the minority group must be able to constitute a majority by CVAP.[6] *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852–53 (5th Cir. 1999); *see also LULAC*, 548 U.S. at 428–29 (analyzing CVAP and noting that "only eligible voters affect a group's opportunity to elect candidates"). And the population for which that must be shown is the population in the proposed district. *See Harris*, 137 S. Ct. at 1470; *LULAC*, 548 U.S. at 427–28; *Growe*, 507 U.S. at 40.

---

[6] Citizen Voting Age Population, or CVAP, is the segment of the population that is, by virtue of age and citizenship, eligible to vote.

Additionally, a plaintiff must also allege that its proposed majority-minority district "is consistent with 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022) (quoting *LULAC*, 548 U.S. at 433). "[C]ombining 'discrete communities of interest'—with 'differences in socio-economic status, education, employment, health, and other characteristics'—is impermissible." *Id.* (quoting *LULAC*, 548 U.S. at 432); *see also id.* at 219 (concluding that testimony indicating that the proposed alternative district was "culturally compact" supported the finding that the proposed district "preserve[d] communities of interest").

The second and third preconditions are often discussed together. The second requires the minority group to be "politically cohesive." *Gingles*, 478 U.S. at 51. The third is that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (citation omitted). Unless both are met, "the challenged districting [does not] thwart[] a distinctive minority vote by submerging it in a larger white voting population." *Growe*, 507 U.S. at 40.

Plaintiffs typically demonstrate minority political cohesion by showing that "a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56; *see also Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988). That is described as "bloc voting" (just like the third precondition)[7] and typically means that a large majority of the group favors the same candidates.[8] When both minorities and Anglos vote in blocs, courts

---

[7] *E.g.*, *Strickland*, 556 U.S. at 19 (plurality opinion); *Fusilier v. Landry*, 963 F.3d 447, 458 (5th Cir. 2020).

[8] *Compare, e.g.*, *LULAC*, 548 U.S. at 427 (finding "especially severe" bloc voting when roughly 90% of each racial group votes for different candidates), *with, e.g.*, *Strickland*, 556 U.S. at 16 (plurality opinion) (noting "skeptic[ism]" about Anglo bloc voting when 20% of Anglos would need to cross over to satisfy the first *Gingles* precondition), *and Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (noting that only 22–38% crossover by Anglos and 20–23% crossover by Black voters supported a finding that voting was

conclude that voting is "racially polarized"[9] and typically hold that both the second and third preconditions have been met.[10]

Even so, the second and third preconditions are not mirror-image requirements for different racial groups. As relevant here, a *Gingles* plaintiff must show the second precondition for the minority population that would be included in its proposed district. *See Harris*, 137 S. Ct. at 1470; *LULAC*, 548 U.S. at 427; *Growe*, 507 U.S. at 40. By contrast, the third precondition must be established for the *challenged* districting. *See Harris*, 137 S. Ct. at 1470; *LULAC*, 548 U.S. at 427; *Growe*, 507 U.S. at 40. Importantly, Fifth Circuit precedent does not preclude a plaintiff from establishing the third precondition even if the challenged district is not majority Anglo by CVAP. *See Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992). Even so, such a plaintiff faces an "obvious, difficult burden" in establishing that requirement. *Id*.

One last note. It bears emphasizing that each of these preconditions must be shown on a district-by-district basis. *See Wis. Legislature*, 142 S. Ct. at 1250; *Perez*, 138 S. Ct. at 2332; *LULAC*, 548 U.S. at 437; *Gingles*, 478 U.S. at 59 n.23. Because *Gingles* claims relate to the political experiences of a minority group in a particular location, a "generalized conclusion" cannot adequately answer "'the relevant local question' whether the preconditions would be satisfied as to each district." *Wis. Legislature*, 142 S. Ct. at 1250 (quoting *Harris*, 137 S. Ct. at 1471 n.5).

---

not racially polarized). The necessary size of the majority, however, is a district-specific inquiry. *See Gingles*, 478 U.S. at 55–56.

[9] *See, e.g.*, *Strickland*, 556 U.S. at 19 (plurality opinion); *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993); *Gingles*, 478 U.S. at 52 n.18; *Fusilier*, 963 F.3d at 458. The existence of racially polarized voting is also one of the factors that *Gingles* highlights as relevant to the totality-of-circumstances inquiry. *See* 478 U.S. at 44–45, 80.

[10] *See, e.g.*, *LULAC*, 548 U.S. at 427; *Gingles*, 478 U.S. at 56; *Fusilier*, 963 F.3d at 458–59; *Campos*, 840 F.2d at 1243. *But see LULAC v. Clements*, 999 F.2d 831, 849–51 (5th Cir. 1993) (en banc) (emphasizing that the plaintiff must still show that the bloc voting is "legally significant").

### 2. Challenged Claims

Defendants contend that Plaintiffs failed to adequately plead the first *Gingles* precondition for their challenges to House Districts in Fort Bend, Dkt. 401 at 7, and Collin County, *id.* at 10–11, the Senate Districts in Fort Bend, *id.* at 12, and Tarrant County, *id.* at 16, and the Congressional Districts in the Harris-Fort Bend region, *id.* at 18. In the Defendants' eyes, the Fair Maps Plaintiffs have failed to plead that their proposed majority-minority districts are consistent with traditional redistricting criteria. Dkt. 518 at 1–2; *see also Robinson*, 37 F.4th at 218. Specifically, Defendants contend that the Fair Maps Plaintiffs have failed to plead any facts that the minority populations in their proposed districts are "culturally compact," relying on a footnote from this Court's prior opinion.[11] Dkt. 401 at 4.

Defendants also maintain that the Fair Maps Plaintiffs failed to adequately plead the second and third *Gingles* preconditions for the Congressional Districts in the Dallas-Fort Worth region and the Senate Districts in Tarrant County. Dkt. 518 at 2. Defendants assert that the Fair Maps Plaintiffs failed to allege specific facts showing that the minority populations in their remedial proposals would be politically cohesive and that the challenged districts engage in racial bloc voting. Dkt. 518 at 3–4.

#### i. Cultural Compactness Challenges

Defendants contend that the Fair Maps Plaintiffs failed to plead sufficient facts to satisfy the first *Gingles* prong for their challenges to particular House, Senate, and Congressional Districts. *See* Dkt. 401 at 7, 10–12, 16, 18. Defendants use this Court's footnote in a prior opinion,

---

[11] The full footnote is reproduced here: "The Supreme Court has also interpreted the first *Gingles* precondition to include that the minority group is culturally compact, *see LULAC*, 548 U.S. at 430–35, but that requirement is not at issue in Defendants' motions." Dkt. 307 at 31 n.20 (citing *LULAC*, 548 U.S. at 430–35).

raised by the Court *sua sponte*, as support for the contention that VRA section 2 requires a "plaintiff to allege [cultural] compactness." Dkt. 518 at 1 (citing Dkt. 307 at 31 n.20 (citing *LULAC*, 548 U.S. at 430–35)). Defendants thus aver that "cultural compactness" is dispositive within the traditional redistricting criteria portion of *Gingles*, and failure to plead facts allegations tending to show the cultural compactness of pertinent minority communities warrants dismissal. *Id.*

The footnote cannot bear the weight that the Defendants place on it. This Court's opinion indicated that a showing of cultural compactness is a relevant factor included within the traditional redistricting criteria requirement in the first *Gingles* prong. *See* Dkt. 307 at 31; *see also Robinson*, 37 F.4th at 219 (concluding that presented evidence demonstrating cultural compactness in the proposed district supported the finding that the proposed district met traditional redistricting criteria).

It is not a required factor, though. At this stage in the litigation, it is not fatal to allege no facts tending to show that pertinent minority populations are culturally compact in a proposed district. Cultural compactness, while a factor in the first *Gingles* requirement, is a highly fact-intensive determination better addressed during trial. *See Robinson*, 37 F.4th at 219. The Fair Maps Plaintiffs were merely required to plead facts that make it plausible that proposed remedial maps meet the first *Gingles* requirement.

Defendants do not note any deficiencies, aside from cultural compactness, in the Fair Maps Plaintiffs' remedial maps that indicate the proposed districts do not meet the traditional redistricting criteria. In all challenged districts, the Plaintiffs have alleged sufficient facts to indicate that the minority group in each district is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. Those allegations

are sufficient to clear the low bar of plausibility.

### ii. Challenges to the Congressional Districts in Dallas-Fort Worth and the Senate Districts in Tarrant County

Separately, Defendants contend that the Fair Maps Plaintiffs fail to satisfy the second and third *Gingles* prongs for their challenges to the Congressional Districts in Dallas-Fort Worth and the Senate Districts in Tarrant County. Dkt. 401 at 18. Defendants argue that the Fair Maps Plaintiffs "challenge[] a cluster of districts—grouped and considered jointly in one section of a complaint." Dkt. 518 at 3. In Dallas-Fort Worth, Defendants claim that the Plaintiffs are challenging Enacted Congressional Districts 3, 4, 6, 12, 24, 26, 30, 32, and 33. *Id.* In Tarrant County, Defendants maintain that Plaintiffs are challenging Enacted Senate Districts 9, 10, 12, 16, 22, 23. *Id.* (citing Dkt. 322 at 52–54). Defendants claim that to satisfy the second and third *Gingles* prongs, the Fair Maps Plaintiffs must include electoral-performance allegations for all districts in these clusters. *Id.*

The Fair Maps Plaintiffs, on the other hand, contend that they are not challenging all the Congressional Districts in Dallas-Fort Worth nor all the Senate Districts in Tarrant County. Instead, the Fair Maps Plaintiffs state that they are challenging Enacted Congressional Districts 6, 30, 32, and 33 in Dallas-Fort Worth, Dkt. 502 at 60–61, and Enacted Senate Districts 9, 10, and 22 in Tarrant County, *id.* at 49–52. Additional information about the other districts in those regions was included for background information and to help prove information about white bloc voting in the enacted Districts. *See, e.g.*, *id.* at 50–51.

The Fair Maps Plaintiffs have the better argument. The Fair Maps Plaintiffs do not directly challenge all Senate Districts in Tarrant County or all Congressional Districts in Dallas-Fort Worth. Instead, the Plaintiffs carefully list out the challenged districts and have pleaded sufficient information, at this stage, for the *Gingles* preconditions. *See id.* at 49–52, 60–61.

Defendants also appear to conflate surrounding and unrelated districts with the districts for which the Plaintiffs are alleging violations of section 2 of the VRA. An example of this is as follows. Defendants point to information about the AAPI population in Collin County, included within Enacted Congressional District 3, that the Fair Maps Plaintiffs included in their challenge to Congressional Redistricting Plan C2913. *See* Dkt. 401 at 19–20. Defendants claim Plaintiffs "allege CD3 violates § 2, [but] fail to allege minority cohesion or even propose a demonstrative district for CD3." Dkt. 518 at 3. Nevertheless, the Fair Maps Plaintiffs are not challenging CD 3 under section 2 of the VRA. Instead, the Plaintiffs include this information to support their racial gerrymandering claim against C2913, which is not at issue in the motion to dismiss. *See* Dkt. 502 at 62, 66.

As this Court stated earlier, to satisfy the second *Gingles* precondition, the Fair Maps Plaintiffs were required to plead political cohesion among minority communities in their proposed remedial districts. *See Harris*, 137 S. Ct. at 1470; *LULAC*, 548 U.S. at 427; *Growe*, 507 U.S. at 40. The Plaintiffs have done so for the challenged Congressional Districts in Dallas-Fort Worth (CD 6, 30, 32, 33), Dkt. 502 at 61–62, and the Senate Districts in Tarrant County (SD 9, 10, 22), *id.* at 53.

Additionally, for the third precondition, this Court stated that Plaintiffs must plead that white bloc voting exists in the parallel enacted districts. *See Harris*, 137 S. Ct. at 1470; *LULAC*, 548 U.S. at 427; *Growe*, 507 U.S. at 40. Plaintiffs have adequately pleaded this racial polarization precondition for the parallel enacted Congressional Districts in Dallas-Fort Worth, Dkt. 502 at 60, and the parallel enacted Senate Districts in Tarrant County, *id.* at 51.

In contrast to these well-established tests, Defendants are asking the Court to heighten the pleading standards required for the second and third *Gingles* prongs. Defendants ask the Court to

extend the tests to include districts that surround the challenged districts merely because changes in any future remedial districting may impact the surrounding districts. This is impractical at the pleading stage and is not required by the caselaw. As mentioned previously, the Court "is not precluded from authorizing a final judgment in this case that requires adjusting the boundaries of other districts, including ones that the [Plaintiffs] lack standing to challenge directly, to the extent that doing so is required to redress [Plaintiffs'] injuries in their own districts." Dkt. 307 at 23.

Consequently, at the pleading stage, viewing all facts in the light most favorable to the plaintiffs, the Fair Maps Plaintiffs have adequately stated legally cognizable claims that meet the plausibility threshold. Accordingly, Fair Maps Plaintiffs have sufficiently pleaded claims challenging Enacted Congressional Districts 6, 30, 32, and 33 and Enacted Senate Districts 9, 10, and 22.

## IV. CONCLUSION

For the reasons above, Defendants' "Motion to Dismiss the *Fair Maps* Plaintiffs' First Amended Complaint" (Dkt. 401) is **DENIED**.

**So ORDERED and SIGNED on this 28th day of September 2022.**

_____
**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**

*And on behalf of:*

| | | |
|---|---|---|
| **Jerry E. Smith** | | **Jeffrey V. Brown** |
| **United States Circuit Judge** | -and- | **United States District Judge** |
| **U.S. Court of Appeals,** | | **Southern District of Texas** |
| **Fifth Circuit** | | |