UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **LEAGUE OF UNITED LATIN AMERICAN CITIZENS,** *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | **EP-21-CV-00259-DCG-JES-JVB** |
| **EDDIE BERNICE JOHNSON,** *et al.*, | § | **[Lead Case]** |
| | § | |
| *Plaintiff-Intervenors*, | § | **&** |
| **v.** | § | |
| | § | **All Consolidated Cases** |
| **GREG ABBOTT,** *in his official capacity as Governor of the State of Texas*, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

<u>**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS INTERVENORS' FIRST AMENDED COMPLAINT**</u>

Texas Representative Jasmine Crockett and U.S. Representatives Eddie Bernice Johnson, Sheila Jackson Lee, and Alexander Green ("Intervenors")[1] bring various statutory and constitutional challenges to Texas's 2021 Congressional Plan C2193 (the "Plan"), which altered Texas's districting map for electing U.S. Representatives.  1st Am. Compl., ECF No. 209. Plaintiffs name the State of Texas, Governor Greg Abbott, and Texas Secretary of State John B. Scott as Defendants.[2]  *Id.* at 6.[3]  Defendants move to dismiss the Intervenors' claims.  Mot., ECF No. 225.

---

[1] We previously permitted Intervenors to intervene as plaintiffs in these consolidated proceedings. ECF No. 132.

[2] Plaintiffs sue Governor Abbott and Secretary Scott in their official capacities.  1st Am. Compl. at 6.

[3] References to page numbers in this Order refer to the page numbers assigned by the Court's CM/ECF system, rather than to the cited document's internal pagination.

As discussed below, Intervenors lack Article III standing to pursue certain aspects of their challenges. For all but one of the claims Intervenors *do* have standing to bring, they have failed to plead non-conclusory factual allegations sufficient to survive dismissal. The Court will give Intervenors 14 days to amend their pleadings.

## I.     BACKGROUND

The Plan reconfigured the boundary lines of numerous Texas Congressional Districts, including Congressional Districts 9, 18, and 30. *See* 1st Am. Compl. at 4–5. Intervenor Johnson lives in Congressional District 30. *Id.* at 4. Intervenor Johnson currently represents Congressional District 30, but she is not seeking reelection this cycle.[4] Intervenor Crockett lives in Congressional District 30, *see id.* at 5, and is currently running for Intervenor Johnson's seat.[5] Intervenor Jackson Lee lives in and represents Congressional District 18, and Intervenor Green lives in and represents Congressional District 9. *Id.* at 4–5. Intervenors claim that the Plan is unlawful in multiple respects. *See id.* at 21–25.

Unlike other plaintiffs in these consolidated proceedings,[6] Intervenors have not labeled the counts of their complaint with headings identifying the legal theories upon which each count is based. *See id.* at 21–25. This has made it difficult to determine exactly which causes of action Intervenors are attempting to assert. We interpret the First Amended Complaint to assert the following challenges to the Plan:

(1)     Vote Dilution claims under Section 2 of the Voting Rights Act ("VRA") (Counts I and II);

---

[4] *See infra* note 18 and accompanying text.

[5] *See infra* note 19 and accompanying text.

[6] *See, e.g.*, Fair Maps Pls.' 2d Am. Compl. for Declaratory & Injunctive Relief, ECF No. 502, at 65–66; 1st Am. Compl. for Declaratory & Injunctive Relief, ECF No. 461, at 99–103.

(2)    Intentional Vote Dilution claims under the Fourteenth Amendment's Equal Protection Clause, the Fifteenth Amendment,[7] and 42 U.S.C. § 1983[8] (Count IV);

(3)    Racial Gerrymandering claims under the Fourteenth and Fifteenth Amendments[9] (Count VI); and

---

[7] "The Supreme Court has not yet determined conclusively whether vote dilution is prohibited by the Fourteenth Amendment, the Fifteenth Amendment, or both." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 n.9 (11th Cir. 1999); *see also League of United Latin Am. Citizens v. Abbott*, No. 3:21-CV-259, 2022 WL 1410729, at *9 (W.D. Tex. May 4, 2022) (hereinafter "*Prelim. Inj. Op.*"). *But see Perez v. Abbott*, 253 F. Supp. 3d 864, 873 n.3 (W.D. Tex. 2017) (opining "that the law does not recognize a claim under the Fifteenth Amendment for vote dilution").

This case does not require us to answer that question because Intervenors haven't argued that the applicable legal standards vary depending on whether they invoke the Fourteenth Amendment, the Fifteenth Amendment, or both. *See* Resp., ECF No. 273, at 3; *see also Burton*, 178 F.3d at 1187 n.9 ("Both Amendments . . . require proof of discriminatory purpose. Therefore, we decline to address the distinction." (internal citations omitted)).

For that same reason, Intervenors' assertion that "Defendants did not seek the dismissal of Intervenors'" intentional vote dilution claims "under the Fifteenth Amendment" misses the mark. *Contra* Resp. at 3. Defendants' arguments for dismissing Intervenors' Fourteenth Amendment intentional vote dilution claims are equally applicable to Intervenors' Fifteenth Amendment intentional vote dilution claims. *See, e.g.*, *Backus v. South Carolina*, 857 F. Supp. 2d 553, 569 (D.S.C. 2012) ("Even if vote-dilution claims exist under the Fifteenth Amendment, . . . they are essentially congruent with vote-dilution claims under the Fourteenth Amendment. Both require proof of discriminatory purpose and discriminatory, or dilutive, effect. For the same reasons that Plaintiffs have failed to prove a Fourteenth Amendment vote-dilution claim, they have failed to prove a Fifteenth Amendment vote-dilution claim." (internal citations omitted)).

[8] "Section 1983 creates a cause of action against individuals who, under color of state law, deprive the plaintiff of his constitutional rights." *Santos v. White*, 18 F.4th 472, 475 (5th Cir. 2021).

[9] Courts agree that racial gerrymandering can violate the Fourteenth and Fifteenth Amendments alike. *See Cannon v. N.C. State Bd. of Educ.*, 917 F. Supp. 387, 390 (E.D.N.C. 1996); *Hastert v. State Bd. of Elections*, 777 F. Supp. 634, 645 (N.D. Ill. 1991). At least some courts have applied the same legal standard to Fifteenth Amendment racial gerrymandering claims as those under the Fourteenth Amendment. *See Cannon*, 917 F. Supp. at 390; *Hastert*, 777 F. Supp. at 645. Intervenors do not argue that the Court should do otherwise, *see* Resp. at 3, so the Court will do the same.

Because Intervenors do not advocate applying different standards to Fourteenth and Fifteenth Amendment racial gerrymandering claims, the Court rejects Intervenors' argument that Defendants waived their challenge to Intervenors' Fifteenth Amendment racial gerrymandering claims by failing to brief the issue. *See* Resp. at 3. All of Defendants' arguments in favor of dismissing Intervenors' Fourteenth Amendment claims apply equally to their Fifteenth Amendment claims.

The Court recognizes that at least one three-judge panel has held "that courts must differentiate between Fourteenth and Fifteenth Amendment racial gerrymandering claims." *Backus*, 857 F. Supp. 2d at 570. According to that court,

(4)    Intentional Discrimination claims under the Fourteenth Amendment's Equal Protection Clause, the Fifteenth Amendment, and 42 U.S.C. § 1983 (Count III).

*See* 1st Am. Compl. at 21–25.[10]  *See also* Resp. at 3 ("In their First Amended Complaint[,] Plaintiff-Intervenors allege vote dilution, intentional vote dilution, racial gerrymandering and intentional discrimination.").

Defendants maintain that Intervenors lack standing to pursue their claims "except as to their vote-dilution and intentional-discrimination claims with respect to CD9, CD18, and CD30." Mot. at 5–10.  On the merits, Defendants contend that Intervenors have failed to adequately plead any of their claims.  *Id.* at 10–20.

---

Racial gerrymandering runs afoul of the Fifteenth Amendment when it denies racial minorities the ability to vote *at all* in an election based on their race . . . Fourteenth Amendment racial gerrymandering claims do not necessarily result in the denial of the right to vote.  Instead, the harm arising under the Fourteenth Amendment involves the State using racial classifications *generally*.  Under Fourteenth Amendment claims, "[t]he voter *is* allowed to vote, albeit in a different district than she prefers."

*Id.* (emphasis added) (quoting Henry L. Chambers, Jr., *Colorblindness, Race Neutrality, and Voting Rights*, 51 EMORY L.J. 1397, 1431 n.139 (2002)); *see also id.* at 569–70 (analyzing *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), in which the City of Tuskegee redrew its city lines to remove virtually all of the city's African-American voters, thereby denying them the right to vote in municipal elections).

Intervenors do not allege that minorities are *completely* unable to vote in congressional elections; they instead argue that minority voters must vote in less desirable districts.  *See generally* 1st Am. Compl. Thus, even if the Court applied different standards to Intervenors' Fourteenth and Fifteenth Amendment racial gerrymandering claims, the Court would dismiss the latter.

[10] Count V of the First Amended Complaint asks the Court to require "the State of Texas to submit to this Court for preclearance, under Section 3(c) of the VRA, any change to any voting practice or procedure, including but not limited to any new redistricting plan, for a period not less than 10 years."  1st Am. Compl. at 23, 26.  Preclearance under Section 3(c) is a *remedy* for violations of the Fourteenth and Fifteenth Amendments, rather than a freestanding cause of action.  *See* 52 U.S.C. § 10302(c).

## II.     STANDARD OF REVIEW

### A.     Federal Rule of Civil Procedure 12(b)(1)

To the extent Defendants challenge Intervenors' standing, the Court assesses the Motion under Federal Rule of Civil Procedure 12(b)(1).[11]  *See, e.g.*, *Moore v. Bryant*, 853 F.3d 245, 248 n.2 (5th Cir. 2017) ("Dismissals for lack of Constitutional standing are granted pursuant to Rule 12(b)(1)."). Rule 12(b)(1) empowers a Court to dismiss a suit for "lack of subject-matter jurisdiction." FED. R. CIV. P. 12(b)(1). "The burden of proving subject matter jurisdiction lies with the party asserting jurisdiction"—here, Intervenors. *In re S. Recycling, L.L.C.*, 982 F.3d 374, 379 (5th Cir. 2020).

### B.     Federal Rule of Civil Procedure 12(b)(6)

To the extent Defendants attack Intervenors' claims on the merits, the Court assesses the Motion under Federal Rule of Civil Procedure 12(b)(6), which empowers the Court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must accept the complaint's well-pleaded factual allegations as true and view them in the light most favorable to the plaintiff. *George v. SI Grp., Inc.*, 36 F.4th 611, 619 (5th Cir. 2022). The Court need not, however, accept the complaint's *legal conclusions* as true.

---

[11] The Intervenors characterize the Defendants' Motion to Dismiss as "deficient" for "fail[ing] to designate under what provision of the [Federal Rules of Civil Procedure] are they proceeding [sic]," leaving the Intervenors to guess about the authority under which they are proceeding." Resp. at 4. To the extent the Defendants seek to dismiss the Intervenors' claims on standing grounds, they are clearly moving under Rule 12(b)(1), and to the extent they challenge Intervenors' claims on the merits, they are moving under Rule 12(b)(6).

*Iqbal*, 556 U.S. at 678.  Nor are *conclusory* factual allegations entitled to the presumption of truth.  *E.g.*, *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020).

With limited exceptions, "a Rule 12(b)(6) motion typically cannot rely on evidence outside the complaint."  *George*, 36 F.4th at 619 (quoting *C&C Inv. Props., L.L.C. v. Trustmark Nat'l Bank*, 838 F.3d 655, 660 (5th Cir. 2016)).  However, "a district court may rely on evidence outside the complaint . . . if that evidence is . . . a matter subject to judicial notice."  *Id*.  The Court may also "consider documents attached to the complaint."  *Kennedy v. Chase Manhattan Bank USA, NA*, 369 F.3d 833, 839 (5th Cir. 2004).

### III.    ANALYSIS

**A.    Article III Standing**

Because Article III standing is a prerequisite to this Court's subject matter jurisdiction, the Court considers first whether Intervenors have standing to bring their claims.  *See, e.g.*, *Trump v. Hawaiʻi*, 138 S. Ct. 2392, 2415–16 (2018) ("Because we have an obligation to assure ourselves of jurisdiction under Article III, we begin by addressing the question whether plaintiffs have standing . . . ."); *D&G Holdings, L.L.C. v. Becerra*, 22 F.4th 470, 474 (5th Cir. 2022) ("When a Rule 12(b)(1) motion is filed with other Rule 12 motions, the court should consider the Rule 12(b)(1) motion 'before addressing any attack on the merits.'" (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001))).

**1.    Legal Standard**

Article III, Section 2 of the U.S. Constitution limits the federal "judicial Power" to specified categories of "Cases" and "Controversies."  U.S. CONST. art. III, § 2, cl. 1.  The Supreme Court has interpreted Article III's "Case or Controversy" language to require litigants seeking judicial relief to demonstrate "standing" to pursue their claims in federal court.  *E.g.*,

*Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)). Likewise, intervenor-plaintiffs—like Intervenors here—"must demonstrate Article III standing when" they seek "additional relief beyond that which the [named] plaintiff requests." *Id.* at 1651.

To establish standing, a litigant must allege that she:

(1)     suffered an injury in fact;

(2)     that is fairly traceable to the defendant's conduct; and

(3)     is likely to be redressed by a favorable judicial decision.

*Spokeo*, 578 U.S. at 338. "Where, as here, the case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Id.*

The "injury in fact" requirement is "the '[f]irst and foremost' of standing's three elements." *Id.* (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1). Put another way, a litigant must have "a personal stake in the outcome of the controversy." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

A litigant "raising only a generally available grievance about government— claiming only harm to his and every citizen's interest in proper application of the

Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."

*Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013) (quoting *Lujan*, 504 U.S. at 573–74).

With limited exceptions, a litigant "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties" not before the court.  *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  A litigant may "bring actions on behalf of third parties" only if:

(1)  That litigant has "suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute";

(2)  The litigant has "a close relation to the third party"; and

(3)  There exists "some hindrance to the third party's ability to protect his or her own interests."

*Powers v. Ohio*, 499 U.S. 400, 410–11 (1991) (quoting *Singleton v. Wulff*, 428 U.S. 106, 112 (1976)).

The federal judiciary must rigorously enforce Article III's injury-in-fact requirement to preserve the constitutional separation of powers.  *See, e.g.*, *Town of Chester*, 137 S. Ct. at 1650 ("The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches.  Our standing doctrine accomplishes this by requiring plaintiffs to allege such a personal stake in the outcome of the controversy as to justify the exercise of the court's remedial powers on their behalf." (cleaned up) (internal citations omitted)).  Separation-of-powers concerns are particularly acute where an individual member of a legislative body—such as Intervenor Crockett here—challenges the constitutionality of a law that legislative body enacted.  *See, e.g.*, *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).

## 2.     Intervenors Lack Standing to Challenge Districts Other than Those in Which They Reside

As noted above, Intervenors reside in three Texas Congressional Districts: the 9th, the 18th, and the 30th.  1st Am. Compl. at 4–5.  However, Intervenors do not limit their challenges to those three districts; they also attack the Plan's reconfiguration of other districts in the Houston and Dallas/Fort Worth metropolitan areas.[12]

Defendants assert that Intervenors lack standing to pursue their racial gerrymandering and vote dilution challenges to districts in which they do not reside.  Mot. at 5–6.  Intervenors, by contrast, insist that they "have standing to challenge not only the gerrymandering of *their* districts, but also the *regional* gerrymander which it is a part of."  Resp. at 10–11 (emphasis added).

Defendants are correct.  In the racial gerrymandering context, the Supreme Court has held that plaintiffs who "do not live in the district that is the primary focus of their racial gerrymandering claim" "lack standing" to challenge gerrymandering in that district.  *United*

---

[12] *See, e.g.*, 1st Am. Compl. at 3 ("A ruling by this Court is necessary to protect the voters of the 9th, 18th and 30th Congressional Districts.  *A ruling by this Court is also necessary to protect the voters in the Harris County and Fort Bend Area as well as the Dallas Fort Worth area*." (emphasis added)); *id.* at 25 (asking the Court to order Defendants "to develop redistricting plans that" neither "racially gerrymander in the 9th, 18th and 30th Congressional Districts *nor in the Harris-Fort Bend Area of* [sic] *the Dallas-Fort Worth Metroplex Area*" (emphasis added)); *id.* at 10 ("Voters from the 6th Congressional district were added to the 30th Congressional District to prevent a naturally occurring minority coalition district and ensure continued dominance of white voters *in the 6th*." (emphasis added)); *id.* at 11 ("In *the Houston area*, there was an area racial gerrymander where black voters were moved between different Congressional Districts so that white voters would dominate and to avoid creating naturally occurring districts that would empower minority voters or districts that are required under Section 2 of the Voting Rights Act." (emphasis added)); *id.* ("Black and Brown voters who represented political problems in Congressional Districts such as *14, 22 and 36* were moved from those districts so that white voters would dominate." (emphasis added)); *id.* at 24 ("[M]inority voters were moved from *Congressional District 6 and 5* into Congressional Districts 30 *and 32* in order to ensure continued white voter control of those districts." (emphasis added)); *id.* at 23 (alleging that "minority voter controlled districts 9, 18, *and 29* . . . were impacted by the racial gerrymander" (emphasis added)); *id.* ("In the Dallas/Fort Worth Metroplex Area, the Congressional Districts impacted were white voter dominated Congressional Districts 6, 12, 24 and 25 whose drawing caused the encompassing of minority voter dominated Congressional Districts 30, *32 and 33*." (emphasis added)).

*States v. Hays*, 515 U.S. 737, 739 (1995); *see also Perez*, 253 F. Supp. 3d at 929 ("It is well settled that a plaintiff must reside in the specific district subject to a . . . racial gerrymandering claim in order to have standing.").  A complaint that racial gerrymandering is occurring somewhere outside one's home district is merely "a generalized grievance against governmental conduct" that cannot establish standing.  *Hays*, 515 U.S. at 745.  Thus, Intervenors lack standing to challenge alleged racial gerrymandering anywhere other than Congressional Districts 9, 18, and 30.

       To attempt to establish standing to challenge districts in which they do not live, Intervenors emphasize that the Supreme Court has held that "[v]oters . . . can present statewide evidence in order to prove racial gerrymandering in a particular district."  Resp. at 9 (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 800 (2017) (hereinafter *Va. State Bd.*)).  That's true, but that just means that Intervenors can rely on evidence from the surrounding region to prove that racial gerrymandering occurred *in Congressional Districts 9, 18, and 30*; they cannot challenge racial gerrymandering in other districts nearby.  *See Hays*, 515 U.S. at 739 ("[A]ppellees do not live in the district that is the primary focus of their racial gerrymandering claim . . . . For that reason, we conclude that appellees lack standing to bring this lawsuit."); *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015) ("[T]he harms that underlie a racial gerrymandering claim . . . are personal.  They directly threaten a voter who lives in the *district* attacked.  But they do not so keenly threaten a voter who lives elsewhere in the State.  Indeed, the latter voter normally lacks standing to pursue a racial gerrymandering claim.").

       As for Intervenors' standing to pursue their *vote dilution* claims, the Supreme Court has likewise explained that the injury resulting from vote dilution "is district specific."  *Gill*, 138 S. Ct. 1916 at (2018); *see also Harding v. County of Dallas*, 948 F.3d 302, 307 & n.11 (5th Cir.

2020) (applying *Gill*'s holding in the racial vote dilution context). "[M]ere proximity to other districts where vote dilution may have occurred does not create standing to challenge . . . those districts." *League of United Latin Am. Citizens v. Abbott*, No. 21-CV-259-DCG-JES-JVB, 2022 WL 1631301, at *11 (W.D. Tex. May 23, 2022) (hereinafter "*Consol. MTD Op.*"). Thus, just as Intervenors lack standing to challenge alleged racial gerrymandering in any district other than Congressional Districts 9, 18, and 30, they also lack standing to challenge alleged vote dilution in those other districts.

The Court hastens to add that it "is not precluded from authorizing a final judgment in this case that requires adjusting the boundaries of other districts, including ones that [Intervenors] lack standing to challenge directly, to the extent that doing so is required to redress the [Intervenors'] injuries *in their own districts*." *Id.* (emphasis added). We hold only "that a plaintiff who pleads mere proximity to a diluted" or gerrymandered district—or "some connection between that district's boundaries and vote dilution" or racial gerrymandering in her own district—"does not thereby have standing to challenge the neighboring district." *Id.*

### 3. Intervenors' Standing to Pursue Racial Gerrymandering Claims in Their Own Districts

Defendants don't just argue that Intervenors lack standing to challenge alleged racial gerrymandering *outside* their home districts; Defendants also argue that Intervenors lack standing to bring racial gerrymandering challenges to their *own* districts. According to Defendants, Intervenors have failed "to allege that they were personally affected by the Legislature's alleged racial gerrymandering" for the purposes of pleading an Article III injury-in-fact. Mot. at 19–20. Defendants assert that the First Amended Complaint "mentions race and ethnicity only generally. That is not enough. Intervenors must allege that they themselves were 'put in one district or another' because of their race." *Id.* (quoting *Hays*, 515 U.S. at 744).

- 11 -

"Without a plausible factual allegation that Intervenors were personally subjected to a racial classification," Defendants argue, Intervenors are "asserting only a generalized grievance" that does not create Article III standing.  *Id.* at 20 (quoting *Hays*, 515 U.S. at 745).

Citing the Fifth Circuit's decision in *Harding v. County of Dallas*, Intervenors respond that "voters who complain in cases involving . . . racial gerrymanders should take note that when one's district is cracked or packed, this provides standing to litigate such a possible illegal action."  Resp. at 5.  *Harding* holds in relevant part that voters who "reside in a district where their vote has been cracked or packed" generally have standing to raise a "*§ 2 vote dilution* claim" under the *Voting Rights Act*.  948 F.3d at 307 (emphasis added); *see also id.* ("In *vote dilution* cases, the 'harm arises from the particular composition of the voter's own district, which causes his vote—having been cracked or packed—to carry less weight than it would carry in another, hypothetical district.'" (emphasis added) (quoting *Gill*, 138 S. Ct. at 1931)).  *Harding* thus casts little light on whether Intervenors have standing to pursue their *constitutional racial gerrymandering* claims.  *See Perez*, 253 F. Supp. 3d at 893 n.31 (explaining that "[t]he harm" of racial gerrymandering "flows from being personally subjected to a racial classification, *not from vote dilution*" (emphasis added) (cleaned up) (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 263)).

We nonetheless conclude that Intervenors have standing to pursue their racial gerrymandering claims in their home districts.  The Supreme Court has held that a plaintiff who "resides in a racially gerrymandered district" has "standing to challenge the legislature's action" because "the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria."  *Hays*, 515 U.S. at 744–45.  Intervenors are African-American voters who allege that they reside within Congressional Districts 9, 18, and 30, *see* 1st Am. Compl. at 4–5; *see also*

Mot. Intervene, ECF No. 91, at 1 (identifying Intervenors as African-American), so they have

standing to challenge the alleged racial gerrymandering of those districts, *see S.C. State Conf. of*

*NAACP v. Alexander*, No. 3:21-cv-03302, 2022 WL 453533, at *2 (D.S.C. Feb. 14, 2022)

("Scott has adequately alleged standing to challenge South Carolina's first congressional district

[on racial gerrymandering grounds] by alleging that he is a Black voter living in that district.");

*Ala. Legis. Black Caucus v. Alabama*, No. 2:12-CV-691, 2017 WL 4563868, at *4 (M.D. Ala.

Oct. 12, 2017) ("A plaintiff has standing to challenge a racially gerrymandered district if he

resides in that district.").

### 4.      Legislative Standing

Besides challenging the Plan in their capacities as *voters*, Intervenors also purport to

attack the Plan in their capacities as *legislators*.  *See* 1st Am. Compl. at 21 ("The plaintiff

intervenors were not afforded an equal opportunity to participate in the political process as

citizens *or elected officials* . . . ." (emphasis added)); *id.* at 4–6, 9–10; Resp. at 3 ("Intervenors

. . . complain in this lawsuit about how redistricting impacted them as voters in their districts *as*

*well as members of Congress*." (emphasis added)); *id.* at 5–7.

#### a.      Representative Crockett's Advocacy Efforts in the Texas Legislature

For instance, Representative Crockett asserts she has standing to pursue her claims in her

legislative capacity because she was "actively involved in the fight against" the Plan in the Texas

Legislature.  Resp. at 6.  Representative Crockett "unsuccessfully submitted an amendment

. . . to the proposed State Congressional plan that would have prevented retrogression of the 30th

Congressional District," but that amendment did not pass.  1st Am. Compl. at 5, 9–10.

To explain why Representative Crockett's allegations do not establish legislative

standing, the Court compares two Supreme Court opinions analyzing individual legislators'

standing to challenge legislative acts: *Coleman v. Miller*, 307 U.S. 433 (1939), and *Raines v. Byrd*, 521 U.S. 811 (1997). In *Coleman*, the Kansas Senate introduced a resolution adopting an amendment to the U.S. Constitution. 307 U.S. at 435–36. Twenty senators voted for the resolution; twenty voted against. *Id.* at 436. Kansas's Lieutenant Governor cast a putative tie-breaking vote to pass the resolution. *Id.* The twenty senators who voted against the resolution filed suit, arguing that the Lieutenant Governor lacked authority to cast the deciding vote. *Id.*

The Supreme Court ruled that the twenty dissenting senators had standing to challenge the resolution. *See id.* at 437–46. The Court emphasized that the challengers' votes "would have been sufficient to defeat ratification" had the Lieutenant Governor not cast the allegedly unlawful tie-breaking vote; thus, the dissenters' "votes against ratification" had "been overridden and virtually held for naught." *Id.* at 438. The senators accordingly had "a plain, direct and adequate interest in maintaining the effectiveness of their votes" that was sufficient to create standing. *Id.*; *see also Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1954 (2019) (hereinafter *Va. House of Delegates*) ("*Coleman* stands . . . 'for the proposition that legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislation goes into effect (or does not go into effect), on the ground that their votes have been completely nullified.'" (quoting *Raines*, 521 U.S. at 823)).

In *Raines v. Byrd*, by contrast, the U.S. Congress passed a bill over several legislators' dissenting votes. 521 U.S. at 814. Six of the dissenting Congresspersons sued to challenge the law's constitutionality. *Id.* The Supreme Court held that the six challengers lacked "a sufficient 'personal stake' in th[e] dispute" to establish Article III standing. *Id.* at 830. Distinguishing *Coleman*, the Court emphasized that the legislators had "not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed

- 14 -

defeated." *Id.* at 824.  To the contrary, "their votes were given full effect.  They simply lost that vote." *Id.*

Here, Representative Crockett alleges that "as a State Representative she tendered proposed changes to Congressional District 30 that would have permitted it to continue as a 50 percent African-American Citizen Voting Age population district," but that amendment "failed to pass."  1st Am. Compl. at 5; *see also id.* at 9–10.  She does not allege "that there were sufficient votes to pass" her proposed amendment and that the Texas House of Representatives "nonetheless deemed [the amendment] defeated." *Contra Raines*, 521 U.S. at 824.  Thus, her putative injury is much closer to the allegations the Supreme Court deemed insufficient to create standing in *Raines* than the vote nullification injury in *Coleman*.  *Compare* 1st Am. Compl. at 10 ("Intervenor Crockett introduced an amendment . . . but was not successful in achieving passage."), *with Raines*, 521 U.S. at 824 ("[T]heir votes were given full effect.  They simply lost that vote."); *see also Baird v. Norton*, 266 F.3d 408, 412 (6th Cir. 2001) (explaining that legislators' complaint that they "lost a vote and believed that the resulting legislation was unconstitutional" was "not a sufficient injury to give them standing").   Because Representative Crockett does not allege that she and her colleagues possessed sufficient votes to defeat or amend the Plan, her assertion that Defendants "impeded her efforts to propose an alternative map" does not convert her grievance into the type of "vote nullification" injury that creates legislative standing under *Coleman*.[13]  *Contra* Resp. at 6; 1st Am. Compl. at 14–15.

---

[13] *See Baird*, 266 F.3d at 412 ("For legislators to have standing as legislators, . . . they must possess votes sufficient to have either defeated or approved the measure at issue . . . . Baird claims vote nullification, but her vote alone would not have been sufficient to defeat either the concurrent resolution, which passed despite her 'nay' vote, or legislation to similar effect."); *Va. House of Delegates*, 139 S. Ct. at 1954 ("Unlike *Coleman*, this case does not concern the results of a legislative chamber's poll or the validity of any counted or uncounted vote.  At issue here, instead, is the constitutionality of a concededly enacted redistricting plan."); *Quilter v. Voinovich*, 981 F. Supp. 1032, 1038 (N.D. Ohio 1997), *aff'd*, 523 U.S. 1043 (1998) ("[T]he plaintiffs' alleged injury in this case resulted from the majority's decision to

### b.      Alleged Interference with Legislative Responsibilities

Intervenors also claim that the Plan hinders Intervenors from "fulfill[ing] their responsibilities as congresspeople, which is sufficient to Article III standing."  Resp. at 6.

The Court agrees with Defendants that Congresspersons Jackson Lee, Johnson, and Green have "identifie[d] no official function of theirs that has been allegedly impaired."  Reply, ECF No. 298, at 7.  Neither the First Amended Complaint, nor the exhibits thereto, nor Intervenors' Response to Defendants' Motion to Dismiss identifies any specific legislative responsibility that the Plan renders Intervenors Jackson Lee, Johnson, and Green unable to fulfill as sitting U.S. Representatives.  *See* 1st Am. Compl. at 1–26; 1st Am. Compl. Exs. A–C, ECF No. 209-1; Resp. at 3, 4–7, 9–11, 13, 20.  Those Intervenors have therefore failed to establish an injury to their legislative duties that qualifies as a cognizable injury-in-fact for Article III standing purposes.  *See Spokeo*, 578 U.S. at 338 ("Where, as here, the case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element.").

To attempt to establish interference with her legislative functions in the Texas House of Representatives, Intervenor Crockett insists that she "alleged specific instances of conduct where [D]efendants impeded her efforts to propose an alternative map as well as other bad acts" that "served as a direct impediment on [her] ability to fulfill her responsibilities."  Resp. at 6.  Intervenor Crockett points to a paragraph in the First Amended Complaint that lists various

---

choose a course of action that the outnumbered members thought to be unconstitutional . . . [T]he precedent of granting the plaintiffs standing in this context would invite any legislator who was outvoted on a particular measure to bring a constitutional challenge to that measure merely because he or she had not prevailed."); *Corman v. Torres*, 287 F. Supp. 3d 558, 568–69 (M.D. Pa. 2018) ("The State Legislative Plaintiffs are only two of 253 members of the Pennsylvania General Assembly . . . Two votes could not on their own have defeated or enacted any proposed remedial redistricting legislation that might have . . . come up for a final vote in the Pennsylvania Senate . . . . [T]he State Legislative Plaintiffs lack standing . . . .").

procedural irregularities that allegedly occurred during the session in which the Texas

Legislature passed the Plan.  *Id.* (citing 1st Am. Compl. at 14–15).

Most of those alleged irregularities did not directly and personally affect Intervenor

Crockett for Article III standing purposes.  For instance, Intervenor Crockett cannot base

standing on the Texas Legislature's alleged "refusal to permit participation by the Chairperson of

the Legislative Black Caucus, Nicole Collier, in Election Committee Hearings," 1st Am. Compl.

at 14; *see also* Resp. at 6, as Intervenor Crockett lacks standing to challenge the Legislature's

alleged interference with another legislator's duties.  *See, e.g.*, *Warth*, 422 U.S. at 499 ("[A]

plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to

relief on the legal rights or interests of third parties.").  For similar reasons, Intervenor Crockett

cannot claim that alleged irregularities and discrimination in the Texas *Senate* impeded her

legislative functions as a Member of the Texas *House of Representatives* for the purposes of

Article III standing.[14]  *See id.*

That leaves Intervenor Crockett's remaining allegations regarding the Texas House of

Representatives' alleged deviations from ordinary legislative procedure which hindered

Intervenor Crockett from advancing her preferred redistricting map.[15]  *See* Resp. at 6 ("Crockett

---

[14] *See* 1st Am. Compl. at 14 (citing "the refusal of the *Senate* to put an African-American lawmaker on any election or redistricting conference committee" (emphasis added)); *id.* at 15 (citing "the refusal of the *Senate* to put a Latino lawmaker on the Congressional redistricting bill conference committee (emphasis added)); *id.* (citing "the refusal of the *Senate* to hear virtual testimony on the redistricting bill even though the minority community in Texas was hugely impacted by the coronavirus pandemic" (emphasis added)); *id.* (chiding the Senate for "instituting a rule that required before you could present an amendment to the proposed map for consideration in the *Senate* committee, you must receive the consent of all Congresspersons who would be impacted" (emphasis added)); *id.* (citing "the refusal to receive any map for consideration in the *Senate* Redistricting Committee unless it was plugged into the proposed statewide map drawn by the white Congresspersons" (emphasis added)).

[15] *See* 1st Am. Compl. at 15 ("[I]nstead of drafting its own Congressional map, the House decided to use the Senate adopted map as a base map for its work, even though House leadership was aware of the discrimination that existed in the Senate plan."); *id.* (citing "the refusal for transparency and appropriate notification.  For example, on the day that the House Redistricting Map for the Texas House of

has alleged specific instances of conduct where defendants impeded her efforts to propose an alternative map as well as other bad acts . . . . that served as a direct impediment on Intervenor Crockett's ability to fulfill her responsibilities . . . .") (citing 1st Am. Compl. at 14–15).

The Sixth Circuit's opinion in *Baird v. Norton* demonstrates why those alleged procedural irregularities do not by themselves grant Intervenor Crockett legislative standing.  In *Baird*, the Michigan State Legislature passed certain gaming compacts by concurrent resolution—which required "only a majority of votes *cast*" to pass—rather than by ordinary legislation, which required "a majority of *all* members' votes."  266 F.3d at 410 (emphasis added).  Two state legislators who voted against the compacts challenged them in court.  *Id.* at 409–10.

The Sixth Circuit held that the state legislators did not "have standing to sue based on their status as state legislators aggrieved by the state legislature's use of allegedly unconstitutional procedures."  *Id.* at 410.  The court rejected the legislators' argument "that their votes were nullified by the state legislature's use of improper procedures in enacting the gaming compacts."  *Id.* at 411.  The Sixth Circuit acknowledged that, under *Coleman*, "vote nullification may give legislators standing to challenge improper procedures" in "certain circumstances."  *Id.* However, "[f]or legislators to have standing as legislators" under *Coleman*, "they must possess

---

Representatives was to be considered, the Chairman of the House Redistricting Committee made a surprise announcement that the House would have a hearing on a Congressional Plan in 48 hours and that the Senate Map would provide the base map for this process."); *id.* (citing "the implementation of gate-keeping rules to prevent Black and Brown lawmakers from amending discriminatory or racial gerrymandering tactics[.]  One example is that lawyers were brought in for the House debate on the Congressional bill, so that any amendments could no longer simply be authorized by the Redistricting Chair or the Speaker.  This group of lawyers for the conservative white leadership were [sic] required to approve potential amendments before they were accepted for consideration on the floor."); *id.* ("During the House debate on the Congressional Map[,] Intervenor Applicant Crockett and others were required to deliver proposed Amendments to designated Representatives who would take them to a room in which they could not enter for the proposed Amendment to be reviewed by white lawyers before it could be offered."); *id.* at 18 (alleging that the Texas Legislature "utilized rules and procedures to prevent the receipt of other plans that limited minority vote dilution").

votes sufficient to have either defeated or approved the measure at issue." *Id.* at 412. Because

the state legislators in *Baird* did not possess such votes, they could not challenge the legislature's

procedures in enacting the compacts. *Id.* at 412.

Again, Intervenor Crockett does not allege that she would have had sufficient votes to

defeat or amend the Plan, such that she could have passed her preferred redistricting map had the

Texas House of Representatives not erected procedural hurdles in her path. *See* 1st Am. Compl.

at 14–15. Intervenor Crockett's allegations are therefore not "sufficient for Article III standing"

as Intervenors contend. *Contra* Resp. at 6.

To be clear, alleged irregularities in the legislative process may serve as evidence to

support the *merits* of Intervenors' claims to the extent Intervenors have standing to pursue them

in other capacities. *See Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252,

267 (1977) ("Departures from the normal procedural sequence also might afford evidence that

improper purposes are playing a role."); *see also infra* Section III.B.2.d. The Court merely holds

that the departures from ordinary legislative procedure that Intervenors cite in the First Amended

Complaint do not give Intervenor Crockett *standing* insofar as she bases her claims on alleged

interference with her legislative functions. *See, e.g.*, *Legacy Cmty. Health Servs., Inc. v. Smith*,

881 F.3d 358, 369 (5th Cir. 2018) (admonishing litigants not to "conflate[] the merits of the case

with standing").

Thus, none of the Intervenors have alleged a cognizable injury-in-fact based on

interference with "their ability to fulfill their responsibilities as congresspeople." *Contra* Resp.

at 6.

**c.    Intervenors' Interests as Incumbent Legislators Running for Reelection or Current Candidates for Office**

Intervenors next claim that "elected officials who are impacted by [a redistricting] map"—especially "elected officials who are seeking re-election"—have standing to challenge that map.  *Id.* at 5.  Intervenors base that argument on *Diaz-Balart v. Browning*, in which two U.S. Representatives challenged an amendment to the Florida Constitution establishing standards for drawing congressional district boundaries.  No. 10-23968, 2011 WL 13175016, at *1–2 (S.D. Fla. Sept. 9, 2011); Resp. at 5–6.  The *Diaz-Balart* court held that the Representatives had standing to pursue their claims because, "as members of Congress," they stood "to incur a particularized harm should their districts be redrawn as a result of an unconstitutional redistricting process."  *Id.* at *3; *see also Johnson v. Mortham*, 915 F. Supp. 1529, 1538 (N.D. Fla. 1995) ("Elected officials have personal interests in their office sufficient to give them standing when the district they represent is subject to a constitutional challenge.").

It is unclear whether the Fifth Circuit would follow the Southern District of Florida's holding in *Diaz-Balart*.  The Supreme Court has not yet determined whether an incumbent legislator has a legally cognizable interest in her district's borders insofar as the district's composition may affect her reelection prospects.  For example, in *Wittman v. Personhuballah*, the Supreme Court "assum[ed], without deciding," that two U.S. Representatives had a "legally cognizable" injury-in-fact based on their claim that a court order striking down a redistricting plan would "reduc[e] the likelihood" that voters would reelect them.  578 U.S. 539, 545 (2016). The Court nonetheless concluded that the Representatives failed to prove standing because they had "not identified record evidence establishing their alleged harm."  *Id.*

At least one other district court has held that incumbent legislators do *not* have a legally cognizable interest in their districts' boundaries.  In *Corman v. Torres*, several U.S.

- 20 -

Representatives sued to challenge a Pennsylvania Supreme Court decision imposing a remedial congressional redistricting map.  287 F. Supp. 3d at 561.  The Representatives claimed they had standing to pursue their challenge because "their current congressional districts [we]re 'radically altered,' thereby reducing their incumbency advantage."  *Id.* at 569.  The U.S. District Court for the Middle District of Pennsylvania nonetheless determined that the Representatives lacked standing because "a legislator has no legally cognizable interest in the composition of the district he or she represents."  *Id.*  The court reasoned that when "district boundaries are adjusted" in an allegedly unlawful manner, the alleged injury "belongs to the voters, if to anyone."  *Id.* (cleaned up) (quoting *City of Philadelphia v. Klutznick*, 503 F. Supp. 663, 672 (E.D. Pa. 1980)).

> ### i.   Intervenors Have Standing to Pursue Their Intentional Vote Dilution and Racial Gerrymandering Claims in Their Capacities as Candidates or Incumbent Legislators

This panel, however, is not writing on a blank slate.  We previously considered whether Beverly Powell, an "incumbent state senator in SD10," had "standing to bring her claims of intentional racial discrimination under the Voting Rights Act and the Fourteenth Amendment."  Mem. Op. & Order, ECF No. 119, at 3–4.  Even though Senator Powell's complaint did not allege that she intended to seek reelection, we took judicial notice of other sources indicating that she was running for reelection.  *See id.* at 3 & n.3.  Because Senator Powell had "alleged that she reside[d] in the district at issue and [sought] reelection there," we held that Senator Powell "made a sufficient showing of standing" to pursue her intentional vote dilution and racial gerrymandering claims.[16]  *Id.* at 4.

Here, Intervenors Jackson Lee and Green reside in Congressional Districts 18 and 9, respectively.  *See* 1st Am. Compl. at 4–5.  Like it did for Senator Powell, the Court takes judicial

---

[16] As we discuss below, however, the Court determined that Senator Powell did *not* have standing to pursue her vote dilution claim under section 2 of the VRA.  Mem. Op. & Order, at 4–5.

notice that Representative Jackson Lee and Representative Green are both running for reelection in their respective districts.[17]  The Court thus determines that Representatives Jackson Lee and Green have standing to pursue their racial gerrymandering and intentional vote dilution challenges to those districts.  *See* Mem. Op. & Order at 4.  They have standing to bring those claims not only as incumbent legislators running for reelection, but also as voters who live in those districts.  *See, e.g.*, *S.C. State Conf. of NAACP*, 2022 WL 453533, at *2 ("Scott has adequately alleged standing to challenge South Carolina's first congressional district by alleging that he is a Black voter living in that district.").

Intervenor Johnson is not running for reelection in Congressional District 30.[18] Intervenor Crockett, however, has advanced to a runoff election in Congressional District 30's Democratic primary.[19]  The Court thus concludes that Intervenor Crockett has standing to pursue her racial gerrymandering and intentional vote dilution challenges to that district in her capacity as a current candidate for that office.  *See LaRoque v. Holder*, 650 F.3d 777, 787 (D.C. Cir. 2011) ("[C]andidates may have standing to challenge 'illegally structured' campaign environments even if 'the multiplicity of factors bearing on elections' prevents them from establishing 'with any certainty that the challenged rules will disadvantage their

---

[17] *Texas 18th Congressional District Primary Election Results*, N.Y. TIMES (Mar. 14, 2022), https://www.nytimes.com/interactive/2022/03/01/us/elections/results-texas-us-house-district-18.html (indicating that Representative Jackson Lee advanced from an uncontested Democratic primary for the 2022 election); *Texas Ninth Congressional District Primary Election Results*, N.Y. TIMES (Mar. 14, 2022), https://www.nytimes.com/interactive/2022/03/01/us/elections/results-texas-us-house-district-9.html (indicating that Representative Green advanced from an uncontested Democratic primary for the 2022 election).

[18] Gromer Jeffers Jr., *Eddie Bernice Johnson Says She Will Retire from Congress After Almost 30 Years*, DALL. MORNING NEWS (Nov. 20, 2021, 11:59 AM), https://www.dallasnews.com/news/politics/2021/11/20/watch-live-eddie-bernice-johnson-announces-her-decision-on-seeking-another-term-in-congress/.

[19] *Texas 30th Congressional District Primary Election Results*, N.Y. TIMES (Mar. 17, 2022), https://www.nytimes.com/interactive/2022/03/01/us/elections/results-texas-us-house-district-30.html.

. . . campaigns.'" (quoting *Shays v. Fed. Election Comm'n*, 414 F.3d 76, 90–91 (D.C. Cir. 2005))).  Moreover, both Intervenor Johnson and Intervenor Crockett have standing in their personal capacities as voters to challenge Congressional District 30 on racial gerrymandering and intentional vote dilution grounds.  *See, e.g.*, *S.C. State Conf. of NAACP*, 2022 WL 453533, at *2.

### ii.    Intervenors Have Standing to Pursue Their Section 2 Claims in Their Capacities as Voters, Irrespective of Whether They Would Also Have Standing in Their Legislative Capacities

As for Intervenors' results-based vote dilution claims under section 2 of the VRA, our analysis differs slightly.  In our prior Memorandum Opinion and Order, we held that "to show standing" to pursue a section 2 claim, "a plaintiff must be a racial minority within the relevant geographic context."  Mem. Op. & Order at 5.  Because Senator Powell did "not allege that she [wa]s one," we determined she lacked "standing to bring a discriminatory-results claim" in either her personal capacity or her legislative capacity.  *Id.* at 4–5.

Here, by contrast, Intervenors are Black voters challenging the Plan's alleged dilutive effect on Black voting power.  *See* 1st Am. Compl. at 3–4, 11, 13, 21–22; Mot. Intervene at 1. Intervenors thus have standing in their capacity as voters to pursue their section 2 claims to the extent they challenge the alleged dilution of the Black electorate, irrespective of whether Intervenors would also have standing to pursue those claims in their legislative capacities.  *See* Mem. Op. & Order at 4–5.

### 5.    Intervenors' Standing to Vindicate the Rights of Latino Voters

Notably, however, Intervenors are not just suing to vindicate the rights of Black voters; they are also attempting to vindicate *Latino* voters' rights.  *See, e.g.*, 1st Am. Compl. at 2; Resp. at 15, 20.  Defendants maintain that Intervenors "lack standing to assert injury based on alleged discrimination against Latinos" because none of the Intervenors are Latino; rather, the

"Intervenors are African Americans."  Mot. at 8–9; *see also* Mot. Intervene at 1 (identifying Intervenors as African-American).  Thus, Defendants argue, Intervenors "only have standing to the extent the congressional districts at issue discriminate against African Americans."  Mot. at 9.

Intervenors insist that they have standing to vindicate Latino voters' interests under the authority of *Powers v. Ohio*, *see* Resp. at 15, in which the Supreme Court ruled that a White criminal defendant had standing to object to the prosecution's exercise of peremptory challenges against Black prospective jurors, 499 U.S. at 402–03.  According to Intervenors, because the Plan transferred a community of interest from the Latino opportunity district in Congressional District 29 to Congressional District 9, Intervenors' alleged injuries are "so interrelated with" those of Latino voters that the former may "raise the rights of" the latter under *Powers*.  Resp. at 15.

*Powers* itself explained, however, that "[i]n the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties."  499 U.S. at 410.  *Powers* states in relevant part that litigants possess standing to "bring actions on behalf of third parties" only when, among other prerequisites, there "exist[s] some hindrance to the third party's ability to protect his or her own interests."  *Id.* at 410–11.  Intervenors have not identified any obstacle to Latinos protecting their own interests in these consolidated proceedings.  *See* Resp. at 15.  Indeed, several of the plaintiffs in these consolidated proceedings are organizations or individuals challenging Texas's redistricting plans on Latino voters' behalf.  *See, e.g.*, LULAC 3d Am. Compl., ECF No. 338.  Thus, *Powers* does not support Intervenors' standing argument.

Intervenors also argue that they have "standing to bring a claim regarding Latino citizens" because "the 5th Circuit has recognized that African-Americans and Latinos can be joined together to form one group for a Section 2 vote dilution analysis."  Resp. at 20. Intervenors base that argument on *Campos v. City of Baytown*, in which the Fifth Circuit remarked that "[t]here is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved minority" for the purposes of a section 2 vote dilution claim "to include both Blacks and Hispanics."  Resp. at 20 (quoting *Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988) (hereinafter "*City of Baytown*")).  Critically, however, the plaintiffs in *City of Baytown* included *both* Black and Latino voters; unlike Intervenors here, the *City of Baytown* plaintiffs weren't attempting to vindicate an absent racial group's rights.  *See City of Baytown*, 840 F.2d at 1242 ("A number of *Hispanic and* Black citizens of Baytown brought this suit . . . ." (emphasis added)).  Indeed, the *City of Baytown* opinion does not mention Article III standing at all; the opinion instead addresses the type of proof plaintiffs can introduce to prove a Section 2 claim on the *merits*.  *See id.* at 1241–52.  Thus, *City of Baytown* does not support Intervenors' standing arguments either.  *See Legacy Cmty. Health Servs., Inc.*, 881 F.3d at 369 (admonishing litigants not to "conflate[] the merits of the case with standing").

<blockquote>

a.    **Intervenors Have Standing in Their Legislative Capacities to Pursue Their Racial Gerrymandering and Intentional Vote Dilution Claims on Latino Voters' Behalf**

</blockquote>

The Court nonetheless holds that Intervenors have standing as *legislators* to base their *racial gerrymandering and intentional vote dilution* claims on alleged discrimination against Latinos and African-Americans alike—even if Intervenors might lack such standing in their capacities as *voters*.  We base that conclusion on our aforementioned Memorandum Opinion & Order holding that State Senator Beverly Powell possessed standing to pursue similar claims.

Defendants argued that Senator Powell—a non-Hispanic White elected official—"ha[d] not demonstrated standing . . . because she d[id] not allege membership in a racial minority."  Mem. Op. & Order at 3.  While we noted that we were "not aware . . . of any case in which non-Hispanic white officials sued on the theory that they were injured by the diminishment of Hispanic and black voting power within their district," we also observed that "[i]t is not unusual for elected officials to bring suit alleging racial discrimination in their own districts."  *Id.* at 3–4 (citing *Perez v. Texas*, No. 11-CA-360, 2011 WL 9160142, at *7 (W.D. Tex. Sept. 2, 2011)).  Because Senator Powell had "alleged that she resides in the district at issue" and "seeks reelection there," we determined that she had "made a sufficient showing of standing to bring her claims of intentional racial discrimination under the Voting Rights Act and the Fourteenth Amendment."  *Id.* at 4.

For each of the districts at issue here, at least one of the Intervenors resides in the district and seeks election or reelection there.  *See supra* Section I.  Thus, just as Senator Powell had standing to challenge "the diminishment of Hispanic and black voting power within [her] district" in her legislative capacity even though she is neither Hispanic nor Black, we likewise conclude that Intervenors have standing as legislators to challenge intentional discrimination against Latino and Black voters alike.  *See* Mem. Op. & Order at 4.

### b.    Intervenors Lack Standing to Pursue Their Section 2 Claims on Latino Voters' Behalf

However, Intervenors lack standing to pursue their *section 2* vote dilution claims to the extent Intervenors challenge the Plan's dilutive effect on Latino voters—irrespective of whether Intervenors pursue those claims in their legislative or personal capacities.  In our Memorandum Opinion & Order, we held that Senator Powell lacked standing to pursue section 2 claims on behalf of racial groups other than her own.  *See id.* at 4–5.  Just as Senator Powell—a White

incumbent—lacked standing to challenge the redistricting plan's alleged dilutive effect on non-White voters, we conclude that Intervenors—as Black incumbents and candidates—lack standing to challenge the Plan's alleged dilutive effect on non-Black voters.  *See, e.g.*, *Warth*, 422 U.S. at 499 ("[A] plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").

### 6.       Conclusion

To summarize, Intervenors have standing as *voters* to challenge the redistricting of Congressional Districts 9, 18, and 30—but only those districts.

Intervenors also have standing to pursue their racial gerrymandering and intentional vote dilution challenges to those districts in their capacities as *incumbent legislators or legislative candidates*.  Insofar as they pursue those claims in their legislative capacities, they may assert those challenges on behalf of both Black and Latino voters.

However, Intervenors *lack* standing to pursue their *section 2* claims on behalf of Latino voters in either their legislative or personal capacities.

## B.      Merits

Having determined that Intervenors have standing to assert at least some of their claims, the Court next evaluates whether Intervenors' claims survive dismissal under Rule 12(b)(6).

### 1.       Vote Dilution Claims Under Section 2 of the VRA

The Court first considers Intervenors' vote dilution claims under section 2 of the VRA. *See* 1st Am. Compl. at 21–22.

#### a.       Legal Standard

Section 2 of the VRA forbids "any State" from imposing any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement

of the right of any citizen of the United States to vote on account of race or color."  52 U.S.C.

§ 10301(a).  A plaintiff may establish a section 2 violation by proving, "based on the totality of

circumstances," that "political processes leading to nomination or election in the State . . . are not

equally open to participation by members" of a particular racial group "in that its members have

less opportunity than other members of the electorate to participate in the political process and to

elect representatives of their choice."  *Id.* § 10301(b).

The Supreme Court has "construed § 2 to prohibit the distribution of minority voters into

districts in a way that dilutes their voting power."  *Wis. Legislature v. Wis. Elections Comm'n*,

142 S. Ct. 1245, 1248 (2022).  The Supreme Court's opinion in *Thornburg v. Gingles*, 478 U.S.

30 (1986), provides the "framework" for pleading a vote dilution claim under section 2.  *Wis.*

*Legislature*, 142 S. Ct. at 1248.  The plaintiff first must plead the following three preconditions:

(1)     The minority group is sufficiently large and compact to constitute a majority
        in a hypothetical alternative district that is "reasonably configured;"

(2)     That minority group is politically cohesive; and

(3)     A majority group votes sufficiently as a bloc to enable it to usually defeat
        the minority group's preferred candidate.[20]

*Id*.  Whereas courts evaluate the second *Gingles* precondition (minority voter cohesion) with

reference to *the challenger's proposed hypothetical district*, courts evaluate the third

precondition (majority bloc voting) with reference to *the existing district the plaintiff is*

*challenging*.  *Consol. MTD Op.*, 2022 WL 1631301, at *15.  A plaintiff must validly plead all

three preconditions to state a valid claim.  *E.g.*, *Campos v. City of Houston*, 113 F.3d 544, 547

(5th Cir. 1997) (hereinafter "*City of Houston*").

---

[20] "Although the three *Gingles* factors were devised in cases challenging multi-member
districting, the Supreme Court held in *Growe v. Emison*, 507 U.S. 25, 40–41 (1993), that the *Gingles*
analysis applies equally to vote dilution claims involving single-member districts" like the Congressional
Districts at issue here.  *Cano*, 211 F. Supp. 2d at 1232.

If the plaintiff successfully pleads those preconditions, the Court then "considers the totality of the circumstances to determine 'whether the political process is equally open to minority voters.'"[21] *Wis. Legislature*, 142 S. Ct. at 1248 (quoting *Gingles*, 478 U.S. at 79 (1986)); *see also Cano v. Davis*, 211 F. Supp. 2d 1208, 1232 (C.D. Cal. 2002) ("[A]lthough the *Gingles* factors are necessary to prove a § 2 violation, they are not sufficient.").

Notably, to assert a traditional vote dilution claim under section 2 of the VRA, a plaintiff need only plead non-conclusory allegations "that the creation of the challenged district has the 'effect' of diluting the electoral power of minority voters.  Intent is not an element."[22] *Cano*, 211 F. Supp. 2d at 1215.

### b. Intervenors Have Failed to Validly Plead the Third *Gingles* Precondition

The First Amended Complaint lacks well-pleaded allegations establishing the third *Gingles* precondition—namely, that a majority group votes sufficiently as a bloc in Congressional Districts 9, 18, and 30 to enable that majority to defeat minority-preferred candidates.  Intervenors rely solely on Paragraph 33 of their First Amended Complaint—which states in relevant part that "[e]lections in Texas continue to be racially polarized"—to satisfy their burden to plead the third *Gingles* element.  1st Am. Compl. at 14; Resp. at 19.  That statement is a legal conclusion that Intervenors must allege well-pleaded facts to establish, *see Consol. MTD Op.*, 2022 WL 1631301, at *19 (holding that allegation "that Texas as a state

---

[21] The Supreme Court has articulated a set of considerations, known as the "Senate factors" or the "*Zimmer* factors," that bear on the totality-of-the-circumstances inquiry.  *See Johnson v. De Grandy*, 512 U.S. 997, 1010 n.9 (1994) (citing *Gingles*, 478 U.S. at 44–45); *see also Cano*, 211 F. Supp. 2d at 1232 n.27 (calling these considerations "the 'Senate factors' or the '*Zimmer* factors'").  Because, as discussed below, Intervenors have not validly pleaded the third *Gingles* precondition, *see infra* Section III.B.1.b, the Court need not recite or analyze the Senate factors here.

[22] Intervenors' section 2 vote dilution claims are therefore distinct from their intentional vote dilution claims under the U.S. Constitution, which we discuss below.  *See infra* Section III.B.2.

suffers from 'racially polarized voting'" was not "enough to state a claim"), so the Court can't accept that statement as true when ruling on Defendants' motion to dismiss, *see Arnold*, 979 F.3d at 266 ("While the court must accept the facts in the complaint as true, it will 'not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.'" (quoting *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010))).  In any event, the relevant question is not whether "[e]lections in *Texas* continue to be racially polarized," *contra* 1st Am. Compl. at 14 (emphasis added), but rather whether majority voters in *Congressional Districts 9, 18, and 30* vote as a bloc to defeat minority-preferred candidates.  *See League of United Latin Am. Citizens v. Abbott*, No. EP-21-CV-00259, 2022 WL 2922522, at *4 (W.D. Tex. July 25, 2022) (hereinafter "*Fischer MTD Op.*") ("What potentially helpful information Fischer does allege is in reference to Texas as a whole.  Accepting those allegations as necessarily descriptive of CD 35, however, would break from the command that *Gingles* claims be analyzed on a district-by-district basis." (internal citations omitted)); *Cano*, 211 F. Supp. 2d at 1245 ("[T]he third *Gingles* pre-condition cannot be satisfied by a theoretical projection of a minority candidate's chances of winning or losing that is based on statewide figures.").

The Court has independently reviewed the First Amended Complaint and its attached appendices for other allegations that might satisfy Intervenors' burden as to the third *Gingles* element.  For instance, Paragraph 37 states:

> Anglos in Texas and in the counties included in the Houston/Fort Bend gerrymander and those in the Dallas/Fort Worth Metroplex gerrymander generally vote as a group, are politically cohesive and vote sufficiently as a block [sic] to defeat the preferred candidate of Latino and African-American voters absent fair and equitable majority-minority single member districts.

1st Am. Compl. at 16; *see also id.* at 13 (alleging that "white voters have voted as a block [sic] statewide," including "in the Dallas/Fort Worth Metroplex and in the Harris/Fort Bend County

Area").  These too are conclusory allegations and legal conclusions that are insufficient to satisfy

Intervenors' pleading burden.  *See Consol. MTD Op.*, 2022 WL 1631301, at *19 ("NAACP

merely alleges that . . . Anglos in Texas vote in a 'bloc' to 'usually prevent' minority coalitions

from electing candidates of their choice . . . These allegations aren't enough to state a claim.").

And again, allegations regarding White voting patterns in Texas as a whole or the Dallas and

Houston metropolitan areas generally do not suffice to establish majority bloc voting in the

specific districts Intervenors challenge.  *See Fischer MTD Op.*, 2022 WL 2922522, at *4; *Cano*,

211 F. Supp. 2d at 1245.

Intervenors state flatly that "federal and state courts, the United States Commission on

Civil Rights, and . . . the United States Congress" have corroborated Paragraph 37's bare

allegation that Anglos vote as a bloc.  1st Am. Compl. at 16.  Without further detail, however,

that too is a conclusory assertion that does not save Intervenors' Section 2 claims from dismissal.

*Cf. Fischer MTD Op.*, 2022 WL 2922522, at *3 (holding that oblique references to statistical

evidence "without citation or explanation" did not convert "formulaic recitations of the third

*Gingles* precondition" into a plausible claim for relief).

Nor do Intervenors' repeated invocations of the phrase "white voter dominance" satisfy

the third *Gingles* precondition.[23]  For one, at least some of these allegations relate to districts that

---

[23] *See, e.g.*, 1st Am. Compl. at 10 ("The new Harris County/For [sic] Bend seat will be dominated
by white voters."); *id.* at 11 ("In the Houston area, there was an area racial gerrymander where black
voters were moved between different Congressional Districts so that white voters would dominate . . . .");
*id.* ("African-American voters were moved from Congressional District to Congressional District to
ensure white voter dominance in the Metroplex."); *id.* at 13–14 ("The new Congressional District in the
Houston area will be dominated by white voters . . . ."); *id.* at 20 (referencing "the creation of 60 percent
or greater of Texas Congressional districts that are white dominated and/or likely to elect white voter
candidates of choice"); *id.* at 23 ("In the Dallas/Fort Worth Metroplex, the Congressional districts
impacted were white voter dominated Congressional Districts 6, 12, 24, and 25 whose drawing caused the
encompassing of minority voter dominated Congressional Districts 30, 32 and 33.  In the Houston/Fort
Bend County Area, the Congressional Districts impacted were conservative white voter dominated
Congressional Districts 2, 14, 18 and 22, white voter controlled Congressional District 7 and minority

Intervenors lack standing to challenge.[24]  *See Gill*, 138 S. Ct. at 1930 ("To the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific."); *see also supra* Section III.A.2.  But more importantly, merely stating that White voters *dominate* in a district does not necessarily entail that White voter preferences *diverge* from minority voter preferences in that district, such that Whites vote sufficiently as a bloc to enable them to *defeat* the minority group's preferred candidate.  *See, e.g.*, *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, 835 F. Supp. 2d 563, 588 (N.D. Ill. 2011) ("[P]roof of vote dilution requires two steps.  The [challenger] *must first show that Latinos and non-Latinos prefer different candidates*, and second, that the non-Latino voting bloc is sufficiently strong to usually defeat the Latino candidate of choice." (emphasis added)).

Finally, Intervenors insist that their vote dilution claim survives dismissal because "this Court has already found the existence of polarized voting in the Dallas-Fortworth [sic] Metroplex," which contains Congressional District 30.  Resp. at 19 (citing ECF No. 258, at 25).  Intervenors base that assertion on our prior Order denying other challengers a preliminary injunction barring Texas from implementing its *State Senate* plan in the 2022 election cycle.  *See League of United Latin Am. Citizens v. Abbott*, No. 3:21-CV-259, 2022 WL 1410729, at *12-13 (W.D. Tex. May 4, 2022) (hereinafter "*Prelim. Inj. Op.*").  Intervenors specifically cite the page in which we remarked that both sides' experts "agree[d] that voting in [State Senate District] 10 is racially polarized."  *Id.* at *12.  That fact does not help Intervenors because State Senate

---

voter controlled districts 9, 18 and 29 which were impacted by the racial gerrymander to enhance Congressional Districts 2, 7, 14, 18 and 22.").

[24] *See* 1st Am. Compl. at 11 ("*Congressional District 24* had become a majority non-white district but minority residents and voters were purged from the district so that it is now safely a predominately white district." (emphasis added)); *id.* at 23 (attempting to assert an injury to voters in Congressional Districts 29, 32, and 33).

District 10 is far west of Congressional District 30's outer boundary.[25]  *See Redistricting*

*Process*, TEX. REDISTRICTING, https://redistricting.capitol.texas.gov/ (last visited Sept. 26,

2022).  The existence of racially-polarized voting in State Senate District 10 thus tells us nothing

about whether such polarization exists in Congressional District 30.  *See, e.g.*, *Fischer MTD Op.*,

2022 WL 2922522, at *4 (emphasizing that *Gingles* claims must "be analyzed on a district-by-

district basis").  In any event, the existence of racially-polarized voting in the Dallas/Fort Worth

Metroplex cannot support Intervenors' claims of vote dilution in Congressional Districts 9 and

18, which are in the Houston metropolitan area.  *See Redistricting Process*, *supra*.

    For these reasons, the Court **GRANTS** Defendants' Motion to Dismiss to the extent it

seeks to dismiss Intervenors' vote dilution claims under section 2 of the VRA.[26]

### c.    The Remaining *Gingles* Preconditions

    Defendants primarily focus their attack on the third *Gingles* precondition.[27]  *See* Mot. at

11–12.  The Court's determination that Intervenors have not validly pleaded that precondition is

---

[25] The Court takes judicial notice of the boundaries and locations of all districts we mention in this Order.  *See* FED. R. EVID. 201.

[26] The parties extensively debate whether and to what extent retrogression is relevant to Intervenors' section 2 claims.  *See* Mot. at 12–13; Resp. at 15–17; Reply at 9; *see also Va. State Bd.*, 137 S. Ct. at 800 ("[A] plan leads to impermissible retrogression when, compared to the plan currently in effect (typically called a 'benchmark plan'), the new plan diminishes the number of districts in which minority groups can 'elect their preferred candidates of choice' (often called 'ability-to-elect' districts).").  Given our conclusion that Intervenors' allegations regarding the third *Gingles* precondition are insufficient, the Court need not resolve the parties' dispute.  The Court notes, however, that we previously held that "[s]o long as a retrogressed district actually meets *Gingles*'s requirements, the fact that" a challenger "mentions the term 'retrogression' does not prevent it from bringing a successful *Gingles* claim."  *Consol. MTD Op.*, 2022 WL 1631301, at *21.

[27] Defendants also argue that state sovereign immunity bars Intervenors' section 2 claims.  *See* Mot. at 10.  As Defendants acknowledge, *see* Mot. at 10, we have previously ruled that binding Fifth Circuit precedent forecloses that argument, *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017) ("The VRA, which Congress passed pursuant to its Fifteenth Amendment enforcement power, validly abrogated state sovereign immunity."); *Consol. MTD Op.*, 2022 WL 1631301, at *12 ("[U]nder Fifth Circuit precedent, the VRA abrogates immunity for the state itself.").

alone sufficient to defeat their section 2 claim.  *See City of Houston*, 113 F.3d at 547 ("Failure to establish any one of [the three *Gingles*] requirements is fatal.").  Because the Court is affording Intervenors a chance to amend their pleadings, however, *see infra* Section III.C, the Court warns Intervenors that, at least in its current form, the First Amended Complaint does not validly plead the first or second *Gingles* preconditions either.

### i.     The First *Gingles* Precondition

First, Intervenors have failed to plead non-conclusory allegations that the relevant minority group is "sufficiently large and compact to constitute a majority in a reasonably configured district."  *See Wis. Legislature*, 142 S. Ct. at 1248.  All of Intervenors' allegations pertaining to the relevant minority communities' compactness are legal conclusions and conclusory allegations that the Court cannot presume to be true.[28]  *See Consol. MTD Op.*, 2022 WL 1631301, at *17 ("MALC submits only a bald allegation that Hispanic voters . . . are 'sufficiently numerous and geographically compact to comprise a majority of the eligible voter

---

We likewise continue to reject Defendants' argument that section 2 does not create a private right of action.  *Compare* Mot. at 13, *with Consol. MTD Op.*, 2022 WL 1631301, at *12 ("Defendants seek to preserve their position that Section 2 of the VRA does not provide a cause of action for private plaintiffs. But as Defendants acknowledge, we have already rejected that position, and so the Court denies their motion to dismiss on those grounds." (internal citations omitted)).

[28] *See* 1st Am. Compl. at 19 ("[T]he minority population growth in the Dallas-Fort Worth Metroplex and the Harris County-Fort Bend-Brazoria Areas was more than sufficient to support an additional, reasonably-compact district in which minority voters, especially Latino voters, would have an opportunity to elect the candidate of their choice."); *id.* at 20 ("There is sufficient Latino population in the Dallas-Fort Worth metroplex to construct a reasonably-compact district in which Latino voters or Latino voters in cooperation with Black voters have an opportunity to elect their candidate of choice.  This district can be drawn while still maintaining the ability of black voters to elect their candidates of choice in Congressional Districts 30, 32 and 33."); *id.* ("There is sufficient Latino population in the Harris County-Fort Bend Area to construct a reasonably-compact district in which Latino voters have an opportunity to elect their candidate of choice.  This district can be drawn while still maintaining the ability of black voters to elect their candidates of choice in Congressional Districts 9 and 18."); *id.* at 24 ("[P]opulation figures . . . show Latino growth was so substantial in each of these areas that such seats were naturally occurring and could have easily been drawn by the Legislature.").

population in at least one single member district.' That is a 'threadbare recital of an element of a

cause of action,' so the Court can't consider it." (cleaned up)).

### ii.      The Second *Gingles* Precondition

Nor does the First Amended Complaint contain well-pleaded allegations that the minority

group at issue is "politically cohesive." *See Wis. Legislature*, 142 S. Ct. at 1248.  All but one of

Intervenors' allegations regarding minority political cohesion are either conclusory allegations or

bare legal conclusions that the Court cannot presume true.[29]  *See Consol. MTD Op.*, 2022 WL

1631301, at *18 (holding that allegations "that Hispanic voters are (1) 'cohesive,' that (2) 'voting

is polarized between Anglo and Latino voters at levels which are legally significant,' that (3) the

districts were or could easily be performing opportunity districts, that (4) its districts have

consistently elected Hispanic-preferred candidates, or some mix thereof" were insufficient to

plead the second *Gingles* precondition).

The only non-conclusory allegation bearing on *Gingles*' second precondition is

Intervenors' averment that "Congresswoman Jackson Lee . . . recently prevailed *in Latino

precincts* when opposed by opponents with Spanish surnames."  1st Am. Compl. at 13 (emphasis

added).  That allegation, if proven, might support a finding that Latino voters *in those precincts*

---

[29] *See* 1st Am. Compl. at 13 ("Black and Brown voters . . . vote cohesively in areas where they are likely to constitute a majority of the citizen voting age population . . . ."); *id.* ("When they do get to choose, Black and Brown voters have voted cohesively in recent national, state and presidential elections, among others.  Black and Brown voters have voted cohesively in the recent United States Senate race in 2018, the Lieutenant Governor's race in 2018 and the Presidential campaigns in 2016 and 2020, among many others."); *id.* at 14 ("Elections in Texas continue to be racially polarized."); *id.* at 15 ("African-Americans in Texas generally vote as a group and are politically cohesive."); *id.* at 15 ("Latinos in Texas vote as a group and are politically cohesive."); *id.* at 15–16 ("Latinos and African-Americans in Texas vote as a group and are politically cohesive.  Latinos and African-Americans in Congressional District 30, Congressional District 9 and Congressional District 18 vote as a group and are politically cohesive in ensuring the continued character of the districts.  Latinos and African-Americans in Dallas and Tarrant Counties vote as a group and are politically cohesive.  Latinos and African-Americans in Harris, Fort Bend, Galveston and Brazoria counties vote as a group and are politically cohesive."); *id.* at 20 (referring to "a cohesive community of color . . . in Congressional Districts 9, 18, and 30"); *id.* at 13 ("The African-American Congresspersons all have strong African-American and Latino support . . . .").

vote in tandem.  However, courts must evaluate section 2 claims "at the *district* level." *Wis. Legislature*, 142 S. Ct. at 1248.  Absent any non-conclusory allegation that minority voter patterns in Congressional District 18's *majority-Latino precincts* mirror minority voter patterns in Intervenors' hypothetical reconstructed Congressional District 18 *as a whole*—or, alternatively, that the hypothetical alternative district consists entirely of "Latino precincts" in which Congressperson Jackson Lee "recently prevailed"—the Court cannot infer that minority voters vote cohesively in Intervenors' proposed alternative district writ large.[30]  In any event, even if the Court could draw such an inference as to Congressional District *18*, the First Amended Complaint would still lack any well-pleaded allegations regarding minority voter cohesiveness in Congressional Districts *9 or 30*.  *Fischer MTD Op.*, 2022 WL 2922522, at *4 (reiterating "the command that *Gingles* claims be analyzed on a district-by-district basis").

### 2. Intentional Vote Dilution Claims

Besides their *statutory* vote dilution claims, Intervenors also assert an intentional vote dilution claim under the *U.S. Constitution*.[31]  1st Am. Compl. at 22–23.

### a. Legal Standard

"Redistricting plans are unconstitutional" under an intentional vote dilution theory if they are "conceived or operated as purposeful devices to further racial discrimination by minimizing,

---

[30] *Cf. Fischer MTD Op.*, 2022 WL 2922522, at *4 ("Fischer asserts that '[i]n the portions of the district that are majority Anglo, Anglo candidates for school board, municipal office, and other non-partisan elections defeat Spanish-surnamed candidates.'  This suffers from two flaws.  First, Fischer fails to describe white bloc voting with reference to the entire district.  He instead leaves the Court guessing about the extent to which 'majority Anglo' 'portions of the district' describe white bloc voting in CD 35 as a whole.").  While this excerpt from our prior opinion analyzes the third *Gingles* precondition rather than the second, it illustrates that allegations regarding voter cohesiveness in a subpart of a district do not necessarily suffice to establish voter cohesiveness in the district as a whole.

[31] For the purposes of Intervenors' constitutional claims, the term "Defendants" excludes the State of Texas.  *See* 1st Am. Compl. at 6 ("Plaintiffs bring claims against the State of Texas solely as to the statutory claims.").

cancelling out or diluting the voting strength of racial elements in the voting population."

*Harding*, 948 F.3d at 312 (quoting *Rogers v. Lodge*, 458 U.S. 613, 617 (1982)).  For instance, a map-drawer might attempt to dilute minority voting power *via* "cracking"—*i.e.*, cleaving a racial group into separate districts in which they constitute an ineffective minority of voters.  *Perez*, 253 F. Supp. 3d at 939–40 (citing *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993)).  Alternatively, a map-drawer might seek to dilute minority voting power *via* "packing"—*i.e.*, concentrating voters of a particular racial group into a single district in which they constitute a majority that is larger than necessary to elect their preferred candidates.  *Id.* (citing *Voinovich*, 507 U.S. at 153).

To validly plead an intentional vote dilution claim, a plaintiff must allege both a discriminatory *effect* and a discriminatory *purpose*.  *Harding*, 948 F.3d at 312.

### i.    Discriminatory Effect

Unlike a plaintiff pursuing a discriminatory-results claim under section 2 of the VRA, a plaintiff pursuing an intentional vote dilution claim need not satisfy the *Gingles* factors to validly plead a discriminatory effect.[32]  Instead, the plaintiff must allege that the defendant's redistricting plan "bears more heavily on one race than another."  *Prelim. Inj. Op.*, 2022 WL 1410729, at *12.

### ii.    Discriminatory Purpose

"[A]n intentional discrimination claim under the Fourteenth Amendment requires proof that the disputed plan was conceived or operated as a purposeful device to further racial

---

[32] *See Prelim. Inj. Op.*, 2022 WL 1410729, at *11 ("Plaintiffs may show discriminatory effect without making a full *Gingles* showing . . . . Incorporating the *Gingles* framework into the intentional-vote-dilution analysis, thereby constitutionalizing the *Gingles* factors, would . . . be an unnatural result, and it is not one that this Court accepts.").  *But see Ga. State Conf. of NAACP v. Georgia*, 269 F. Supp. 3d 1266, 1276–79 (N.D. Ga. 2017) (reaching the opposite conclusion).

discrimination by minimizing, cancelling out, or diluting the voting strength of racial elements in the voting population." *Perez*, 253 F. Supp. 3d at 941 (citing *City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980)). To satisfy this "discriminatory purpose" element, the plaintiff must plead "more than an awareness of a discriminatory effect"; the plaintiff must plead "that a state decisionmaker acted 'at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.'" *See Prelim. Inj. Op.*, 2022 WL 1410729, at *9 (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). That said, "[t]o prevail in showing discriminatory purpose for an intentional vote dilution claim, a plaintiff need only show that race was '*a* motivating factor in the decision'"; it need not be the *sole* motivating factor. *Fischer MTD Op.*, 2022 WL 2922522, at *5 (quoting *Arlington Heights*, 429 U.S. at 265–68).

Because "government actors will rarely provide direct evidence of discrimination," *Perez*, 253 F. Supp. 3d at 955, courts "may sometimes infer discriminatory intent when an act has predictable discriminatory consequences," *Prelim. Inj. Op.*, 2022 WL 1410729, at *9. "While courts must presume that legislatures act in good faith, and courts must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus, when the adverse consequences of a law upon an identifiable group are inevitable, a strong inference that the adverse effects were desired can reasonably be drawn." *Fischer MTD Op.*, 2022 WL 2922522, at *5 (cleaned up).

To evaluate whether it is appropriate to infer a discriminatory purpose, courts assess the so-called "*Arlington Heights*" factors:

(1)   Discriminatory effect;

(2)   Historical background;

(3)   The sequence of events leading up to a challenged decision;

(4)     Procedural or substantive departures from normal decisionmaking; and

(5)     Legislative history.

*Prelim. Inj. Op.*, 2022 WL 1410729, at *9 (citing *Arlington Heights*, 429 U.S. at 266–68).  These

factors are not exhaustive, and courts balance the factors holistically rather than mechanically

when they point in opposite directions.  *Id.* at *9, *23; *see also Perez*, 253 F. Supp. 3d at 956

("Consideration of the *Arlington Heights* factors, when viewed in totality with the entire record

evidence, may support a finding of intentional racial discrimination, even where the individual

factors considered alone are not compelling.").

### b.     Defendants Have Not Waived Their Challenge to Intervenors' Intentional Vote Dilution Claims

Intervenors first insist that their intentional vote dilution claims survive dismissal because

Defendants' Motion does not seek to dismiss them.  Resp. at 3.  According to Intervenors,

Defendants have only sought to dismiss their intentional *discrimination* claim, not their

intentional *vote dilution* claim.  *Id.*

The Court acknowledges that Defendants placed their challenge to Intervenors'

intentional vote dilution claim under the heading "Intervenors Fail to Plausibly Allege an

Intentional-*Discrimination* Claim."  Mot. at 14 (emphasis added).  However, that section of the

Motion explicitly argues that Intervenors "fail to establish that their vote . . . was *diluted*,"

making it clear that this section of the Motion attacks Intervenors' intentional vote dilution

claim.  *Id.* (emphasis added).  That portion of the Motion also expressly argues that Intervenors

have failed to plausibly allege either discriminatory effect or a discriminatory purpose, which, as

discussed above, are the two elements of an intentional vote dilution claim.  *See id.* at 14–18.

Thus, Defendants have not waived their challenge to Plaintiffs' intentional vote dilution claim by failing to brief it.[33]

        **c.**      **Discriminatory Effect**

           **i.**      **Congressional District 30**

Intervenors allege that the Plan reduced Congressional District 30's "Black Citizen Voting Age Population" (or "BCVAP") "from 51 percent to 48 percent," such that Black voters no longer constitute a majority in the district. 1st Am. Compl. at 11.[34] That allegation is sufficient to plead that the Plan "bears more heavily" on Black voters in Congressional District 30 than on races whose proportional share of the electorate increased. *See Prelim. Inj. Op.*, 2022 WL 1410729, at *12.

Defendants resist this conclusion by seizing on the fact that the First Amended Complaint repeatedly characterizes Congressional District 30 as a "minority opportunity district." *See* Mot. at 12, 14–15; *see also* 1st Am. Compl. at 11, 16. An "opportunity district" is "a district in which members of a minority group . . . , alone, are able to elect candidates of their choice." *Rodriguez v. Harris County*, 964 F. Supp. 2d 686, 707 (S.D. Tex. 2013). Defendants thus contend that Intervenors essentially "concede that African Americans can elect the candidate of their choice

---

[33] Moreover, as the Court explains below, Intervenors' intentional discrimination claim appears to overlap entirely with their other constitutional claims. *See infra* Section III.B.4.

[34] *See also* 1st Am. Compl. at 3 (alleging that Congressional District 30 "was reduced from an above 50 percent Black Citizen Voting Age Majority District to a below 50 percent Black Citizen Voting Age Majority District"); *id.* at 9–10 ("Congressional District 30 was unnecessarily reduced below a Citizen Voting Age population of 50 percent and voters were cracked out of the district to be placed in areas where their votes will essentially not count."); *id.* at 10 (alleging that a "number of African-American voters were cracked out of" Congressional District 30 "to make way for . . . new voters" from Congressional District 6); *id.* at 11 ("Black and Brown voters were moved from the 6th to the 30th and from the 30th to the 32nd . . . ."); *id.* at 24 ("Minority voters were joined to the 30th, 32nd and 33rd that could have been used to create a new Latino opportunity district, and minority voters were moved from Congressional District 6 and 5 into Congressional Districts 30 and 32 in order to ensure continued white voter control of those districts.").

in" Congressional District 30 and therefore cannot establish a discriminatory effect.  Mot. at 12, 14–15.

Recall, however, that the test for discriminatory effect in the intentional vote dilution context is whether the redistricting plan "*bears more heavily* on one race than another."  *Prelim. Inj. Op.*, 2022 WL 1410729, at *12 (emphasis added).  Intervenors allege that Black voters once constituted a majority in Congressional District 30, but now they do not.  *See, e.g.*, 1st Am. Compl. at 11.  Assuming that non-conclusory allegation to be true (as the Court must), that mathematically means that the proportion of non-Black voters in that district increased *vis-à-vis* Black voters.  Thus, at least as to Congressional District 30, Intervenors have plausibly alleged that the Plan bears more heavily on Black voters.

### ii.   Congressional District 18

Intervenors' allegations regarding the Plan's effect on Congressional District *18's* minority voters, by contrast, are far vaguer.  The First Amended Complaint asserts that "[p]erformance figures show that the African-American voter percentages and the related performance of the 18th [Congressional District] decreased."  1st Am. Compl. at 3.  Intervenors do not clarify what these unspecified "performance figures" are or what they say.  *See id.*  As we previously ruled in a related context, a plaintiff challenging a redistricting plan cannot meet her pleading burden by alluding to unidentified empirical studies "without citation or explanation."  *See Fischer MTD Op.*, 2022 WL 2922522, at *4.[35]

---

[35] *Cf. Fischer MTD Op.*, 2022 WL 2922522, at *3 ("Fischer asks us to take him at his word that statistical methods plausibly show CD 35's minority electorate is politically cohesive.  He alleges that Ordinary Least Squares (OLS), a method of ecological regression, shows 'that Latinos are strongly cohesive in enacted CD 35' and that Latinos in CD 35 'support the same candidates in non-partisan, partisan, and primary elections.'  He makes similar allegations with respect to ecological inference results.  But without any discussion of the underlying data—for example, what voters live in the area, how they vote, and which elections show they vote a particular way—Fischer's use of these statistical methods in his complaint are nothing more than legal conclusions couched as factual claims.  The Court

All the remaining allegations concerning Congressional District 18 are too vague or conclusory to permit the inference that the Plan bears more heavily on one race than another.[36] *See Arnold*, 979 F.3d at 266 ("While the court must accept the facts in the complaint as true, it will 'not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.'" (quoting *Gentilello*, 627 F.3d at 544)).  For instance, Intervenors' allegations that the Texas Legislature reassigned various precincts from Congressional District 18 to Congressional District 9 say nothing about those precincts' racial proportions, making it impossible to tell how those precinct reassignments affected minority voters *vis-à-vis* non-minority voters.[37]

---

concludes that Fischer has failed to state sufficient factual matter from which the Court can draw a reasonable inference that the Latino electorate in a proposed district is politically cohesive." (internal citations omitted)).

[36] *See* 1st Am. Compl. at 2 (alleging that Congressional District 9 received "10 new precincts from the 18th Congressional District"); *id.* at 8, 10–12, 17, 20–21, 25 (describing Congressional District 18 as "retrogress[ed]" or "dilut[ed]" without providing any factual detail); *id.* at 12 ("This major transfer of voters then required the map drawers to crack out 10 precincts from allied communities of interest that had worked together in the 18th Congressional District and place them in the 9th."); *id.* at 13 ("The 2021 Congressional plans unnecessarily split communities of interest from the 9th, 18th, and 30th Congressional Districts; removed important economic engines from the 9th and 18th; packed Latino voters unnecessarily into the 18th and 9th Congressional Districts, and were purposefully designed to undermine or frustrate effective and long-term voter coalitions in the area as well as effective minority voter participation."); *id.* at 23 ("In the Houston/Fort Bend County Area, the Congressional Districts impacted were conservative white voter dominated Congressional Districts 2, 14, 18 and 22, white voter controlled Congressional District 7 and minority voter controlled districts 9, 18 and 29 which were impacted by the racial gerrymander to enhance Congressional Districts 2, 7, 14, 18 and 22.").

While Intervenors preface at least some of their allegations by stating that "Latinos and African-Americans were sliced and diced to make the map of the region achieve its discriminatory purpose and objective," they stop short of explicitly identifying the racial makeup of the precincts the Texas Legislature reassigned.  *See* 1st Am. Compl. at 2.

[37] *See* 1st Am. Compl. at 2 (alleging that Congressional District 9 received "10 new precincts from the 18th Congressional District"); *id.* at 12 ("This major transfer of voters then required the map drawers to crack out 10 precincts from allied communities of interest that had worked together in the 18th Congressional District and place them in the 9th.").

- 42 -

Besides examining the allegations in the First Amended Complaint, the Court also reviewed the exhibits Intervenors attached to their pleadings for factual matter relevant to their claims.  *See Kennedy*, 369 F.3d at 839 ("Although the court may not go outside the complaint, the court may consider documents attached to the complaint."); *see also* 1st Am. Compl. at 8 (affirming that Intervenors' exhibits are "incorporated for all purposes as if fully set forth" in the First Amended Complaint).  Exhibit B to the First Amended Complaint is a letter that Intervenors Jackson Lee and Green sent to the Chairpersons of the Texas Senate Special Committee on Redistricting and the Texas House Committee on Redistricting objecting "to the *initial* congressional map (C2101) released by the Texas Senate Committee on Redistricting on September 27, 2021."  1st Am. Compl., Ex. B, at 6–8 (emphasis added).  The letter identifies several specific locations that C2101 proposed to remove from Congressional District 18.[38]

While the information in the letter is specific enough to qualify as well-pleaded, that factual matter does not support Intervenors' claim that the Plan intentionally dilutes minority voter power in Congressional District 18.  For one, nothing in the letter specifies the racial makeup of the neighborhoods C2101 proposed to remove from Congressional District 18.  *See id*.  Without that information, the Court cannot infer that C2101 bore more heavily on one race than another.

More fundamentally, the Texas Legislature did not enact C2101; it enacted *C2193*.  Although Intervenors allege that C2101 formed the *initial blueprint* for the map that eventually

---

[38] *See* 1st Am. Compl. Ex. B, at 6 ("The proposed map moves the . . . Downtown Business District from the 18th District to an adjacent proposed district with fewer than 12 percent Black residents.  Other important assets in the 18th District, such as the campuses of Texas Southern University and the University of Houston, are moved by C2101."); *id.* at 6–7 ("The proposed map radically alters the local congressional map by moving the historic Third Ward and MacGregor areas from the 18th District to the 9th . . . . [F]or the first time since Barbara Jordan took the 18th District seat in January, 1973, the iconic Fifth Ward and Third Ward constituencies have been placed in separate districts with no input from these communities.").

became the Plan,[39] Intervenors concede that the Texas Legislature made various changes to that

template to lessen its alleged adverse effect on minority voters.[40]  While Intervenors insist that

these modifications did not fully remedy the enacted Plan's dilutive effect on minority votes,[41]

that brings Intervenors right back where they started: the First Amended Complaint contains no

well-pleaded allegations illustrating how the enacted Plan continued to dilute minority votes in

Congressional District 18 after the Legislature removed several of C2101's allegedly offending

provisions.  Thus, Exhibit B does not supply the well-pleaded facts regarding the enacted Plan's

alleged dilutive effect that the First Amended Complaint lacks.

　　　For these reasons, the Court dismisses Intervenors' intentional vote dilution challenge to

Congressional District 18.

---

[39] *See* 1st Am. Compl. at 8 (alleging that the Texas House of Representatives used "the Senate adopted map" as "a basis for creating the Congressional Plan to be voted on by the House"); *id.* at 15 ("[T]he House decided to use the Senate adopted map as a base map for its work . . . .").

[40] *See id.* at 8 (alleging that the Senate map "was even more retrogressive as to" Congressional District 18 "than is the current proposed map"); *id.* at 9 ("Chairwoman Senfronia Thompson, the Dean of the House, made a proposal which essentially took the limited territory from the 3 minority opportunity districts in Harris and Fort Bend Counties (now including Brazoria) and reconfigured them to lessen the retrogression and dilution as to those districts . . . This proposal was adopted . . . ."); *id.* at 9 ("A small exchange of voters was also made between the 7th and 18th Congressional Districts."); *id.* at 17 ("The Congressional Plan was modified in the House . . . Because the House version was different from the Senate's, a Conference Committee . . . was appointed and it agreed to many of the House changes. Thereafter the Conference Committee version was signed into law by the Governor."); *id.* at 19 (admitting that the House plan "ma[d]e improvements on the Senate map").

Perhaps most notably, the letter indicates that C2101 proposed to move "the residence and main district offices of Congresswoman Sheila Jackson Lee" "from the 18th District to the 9th."  1st Am. Compl. Ex. B, at 6.  Intervenor Jackson Lee appears to admit in the First Amended Complaint that the enacted Plan retained her residence within Congressional District 18.  1st Am. Compl. at 4–5.  This reinforces that the differences between C2101 and the enacted Plan are significant enough to render Exhibit B an unreliable indicator of the enacted Plan's alleged dilutive effect.

[41] *See* 1st Am. Compl. at 9 (alleging that "a full fix that would have involved impacting 7 as opposed to 4 districts would not be permitted"); *id.* at 9 ("A full remedy . . . was not supported by the Texas Legislative Leadership and this was necessary for it to be favorably considered."); *id.* at 19 (asserting that the House's "improvements on the Senate map . . . did not come close to eliminating the retrogression, vote dilution, racial gerrymandering nor the unconstitutional intentional discrimination harm to African-Americans and Latinos").

### iii.    Congressional District 9

Intervenors' allegations regarding the Plan's effect on minority voters in Congressional District 9 fare no better.  Intervenors allege that the Texas Legislature shuffled numerous precincts between Congressional District 9 and its neighboring districts.[42]  Absent any non-conclusory allegations identifying the racial proportions of those relocated precincts, however, the Court cannot infer that the reconfiguration process bore more heavily on minority voters than other races.[43]  *See Arnold*, 979 F.3d at 266 (5th Cir. 2020).  The rest of the allegations that mention Congressional District 9 are likewise conclusory allegations or legal conclusions that do not enjoy the presumption of truth.[44]  *See id.*

---

[42] *See id.* at 2 ("The 9th, 18th, and 30th Congressional Districts were all close to the optimal size of 766,000 persons for districts after the 2020 census.  The 9th District in particular was only 3,611 persons above the optimum number of persons for a Texas Congressional District.  The drastic changes made by the Texas Legislature removed tens of thousands of voters from this optimum-sized district, then added tens of thousands of new voters to the district.  These actions were taken in order to ensure that white voters would be able to control a majority of the voting districts in the area."); *id.* at 2–3 ("Congressional District 9, though in need of essentially no surgery, received 12 new precincts from Fort Bend County; 13 new precincts from Brazoria County; 10 new precincts from the 18th Congressional District in Harris County; and lost 11 precincts from Fort Bend County.  Precincts in the Hobby Airport area were removed from Congressional District 29 and moved into Congressional District 9.  As a result, the already optimal-sized district became a completely new district."); *id.* at 12–13 ("Congressional District 7 was near the optimum size for districts in the 2021 round of redistricting, but the map drawers moved nearly a quarter of a million voters from the African-American Opportunity District in Congressional District 9 in order to strengthen Congressional District 7.  This major transfer of voters then required the map drawers to crack out 10 precincts from allied communities of interest that had worked together in the 18th Congressional District and place them in the 9th.  The Latino opportunity District CD29 was negatively impacted and lost an important community of interest that was placed in the 9th Congressional District.").

[43] While Intervenors preface at least some of their allegations by stating that "Latinos and African-Americans were sliced and diced to make the map of the region achieve its discriminatory purpose and objective," they stop short of explicitly identifying the racial makeup of the precincts the Texas Legislature reassigned.  *See* 1st Am. Compl. at 2.

[44] *See* 1st Am. Compl. at 8, 10, 12, 17 (describing Congressional District 9 as "retrogress[ed]" or "dilut[ed]" without providing factual detail); *id.* at 13 ("The 2021 Congressional plans unnecessarily split communities of interest from the 9th, 18th, and 30th Congressional Districts; removed important economic engines from the 9th and 18th; packed Latino voters unnecessarily into the 18th and 9th Congressional Districts, and were purposefully designed to undermine or frustrate effective and long-term voter coalitions in the area as well as effective minority voter participation."); *id.* at 20 ("The failure to

The Intervenors' letter to the Chairs of the Texas Legislature's redistricting committees provides at least some factual content regarding how the initial Texas Senate map, if enacted, could have diluted minority votes.[45]  Again, however, absent well-pleaded factual allegations explaining how the enacted Plan continued to dilute minority voting strength in Congressional District 9 even after the Texas Legislature mitigated some of C2101's allegedly discriminatory effects,[46] the information in that letter does not save Intervenors' claim from dismissal.

The Court thus dismisses Intervenors' intentional vote dilution challenge to Congressional District 9 as well.

---

remedy the intentional cracking of a cohesive community of color in the congressional plan in Congressional Districts 9, 18, and 30 are remnants of and perpetuation of the state's intent to discriminate against voters of color."); *id.* at 20–21 ("The failure to remedy the retrogression of Congressional Districts 9, 18 and 30, the removal of economic engines from the 9th and 18th and unnecessary surgery, including cracking of minority communities in each of the districts, is a remnant and perpetuation of the state's intent to discriminate against voters of color that persists in the 2021 adopted Congressional plan. Those factors are compounded by the dilution of minority voting strength, including the unnecessary packing of Latino voters within the 9th, 18th and 30th Congressional Districts . . . ."); *id.* at 23 ("In the Houston/Fort Bend County Area, the Congressional Districts impacted were conservative white voter dominated Congressional Districts 2, 14, 18 and 22, white voter controlled Congressional District 7 and minority voter controlled districts 9, 18 and 29 which were impacted by the racial gerrymander to enhance Congressional Districts 2, 7, 14, 18 and 22.").

[45] *See* 1st Am. Compl. Ex. B, at 7 ("The changes to the Ninth District remove some of the most diverse and fastest growing communities in Fort Bend County, communities with a proven record of supporting the candidates of choice of Black voters.  The proposed plan would add a number of new precincts from the City of Pearland in Brazoria County—a community with a history of opposing candidates supported by Black voters.").

[46] *See* 1st Am. Compl. at 8 (conceding that the Senate map "was even more retrogressive as to the 9th [Congressional District] . . . than is the current proposed map"); *id.* at 9 ("Chairwoman Senfronia Thompson, the Dean of the House, made a proposal which essentially took the limited territory from the 3 minority opportunity districts in Harris and Fort Bend Counties (now including Brazoria) and reconfigured them to lessen the retrogression and dilution as to those districts . . . This proposal was adopted . . . ."); *id.* at 17 ("The Congressional Plan was modified in the House . . . Because the House version was different from the Senate's, a Conference Committee . . . was appointed and it agreed to many of the House changes.  Thereafter the Conference Committee version was signed into law by the Governor."); *id.* at 19 (admitting that the House plan "ma[d]e improvements on the Senate map").

### d.     Discriminatory Intent

Having concluded that Intervenors validly pleaded that the Plan had a discriminatory effect on minority voters in Congressional District 30, the Court analyzes the remaining *Arlington Heights* factors to determine whether Intervenors have also validly pleaded that the Texas Legislature acted with a discriminatory purpose.

Beginning with the "historical background" factor, this panel previously ruled that Texas's recent history of noncompliance with the VRA could help support an inference of discriminatory purpose.  *Prelim. Inj. Op.*, 2022 WL 1410729, at *18; *see also Perez*, 253 F. Supp. 3d at 888.  That factor thus weighs in favor of Intervenors.

The other *Arlington Heights* factors—namely, the sequence of events, procedural and substantive departures, and legislative history—"can be difficult to disentangle" in a redistricting case, where most (if not all) of the relevant events took place in the Texas Legislature.  *Prelim. Inj. Op.*, 2022 WL 1410729, at *19 ("The 'specific sequence of events leading up to the challenged decision' could, in a case like this, be construed to include both departures from ordinary procedure and legislative history." (internal citations omitted)).  As discussed below, when considered in total, Intervenors have pleaded enough non-conclusory allegations bearing on the remaining *Arlington Heights* factors to permit an inference that the Texas Legislature acted with a discriminatory purpose.

To begin, Intervenors allege that the Texas Legislature excluded minority legislators and stakeholders from the redistricting process.[47]  Such allegations, if true, could suggest discriminatory intent.[48]

Intervenors also allege that the Texas Legislature's process of developing and enacting the Plan was secretive and rushed.[49]  As another three-judge panel of this Court determined during the last redistricting cycle, developing redistricting legislation at a "hurried pace" that affords "little opportunity for public input or meaningful amendments" suggests "an attempt to avoid in-depth scrutiny" and constitutes "circumstantial evidence of improper motive."  *See*

---

[47] *See* 1st Am. Compl. at 14 (citing "[t]he refusal to permit participation by the Chairperson of the Legislative Black Caucus, Nicole Collier, in Election Committee Hearings"); *id.* at 14–15 (alleging that the Texas Senate refused "to put an African-American lawmaker on any election or redistricting conference committee" and refused "to put a Latino lawmaker on the Congressional redistricting bill conference committee"); *id.* at 17 ("Because the House version was different from the Senate's, a Conference Committee with no Black or Latino senators . . . was appointed . . . ."); *id.* at 15 (averring that the Texas Senate refused "to hear virtual testimony on the redistricting bill even though the minority community in Texas was hugely impacted by the coronavirus pandemic"); *id.* at 24 ("The Senate delegation on the Conference Committee on C2193 had no African-Americans or Latinos and the House Conference Committee had no Latinos."); 1st Am. Compl. at 8 ("State Representative Toni Rose, Vice-Chair of the Redistricting Committee and a member of the Texas Legislative Black Caucus, also was not provided with [important] information on a timely basis.").

[48] *See Fischer MTD Op.*, 2022 WL 2922522, at *5 ("Fischer alleges that the Texas legislature drew the congressional map largely in secret such that minorities, and certain representatives, were shut out of the process.  This too can support a case for discriminatory intent." (internal citations omitted)); *Perez*, 253 F. Supp. 3d at 960 ("[N]o minority member of the Senate was involved in drawing the plan. Minority members of the house and senate redistricting *committees* were generally shut out of the mapdrawing process . . . [D]ata was not shared with minority members of the Legislature or even the redistricting committee.").

[49] *See* 1st Am. Compl. at 15 ("During the House debate on the Congressional Map[,] Intervenor Applicant Crockett and others were required to deliver proposed Amendments to designated Representatives who would take them to a room in which they could not enter for the proposed Amendment to be reviewed by white lawyers before it could be offered."); *id.* at 8 (referencing "the hastily called House Committee hearing on redistricting, surprisingly called 48 hours before the scheduled hearing by Chairman Hunter who may have been responding to pressure from anti-minority forces, and called on the same day the hearing State House Map was to take place without reasonable notice to members of the Black Caucus and even members of the House Redistricting Committee"); *id.* at 15 ("[O]n the day that the House Redistricting Map for the Texas House of Representatives was to be considered, the Chairman of the House Redistricting Committee made a surprise announcement that the House would have a hearing on a Congressional Plan in 48 hours . . . .").

*Perez*, 253 F. Supp. 3d at 960–61 (quoting *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 228 (4th Cir. 2016)).[50]

Defendants insist "there is a ready explanation" for the rushed legislative process here: "The federal census was delayed due to the pandemic, and, therefore, the results were not delivered until more than ten weeks after the Texas Legislature's 87th Regular Session ended." Mot. at 16. "As a result," claim Defendants, "the Texas Legislature had to redistrict during a special session, which is constitutionally limited to thirty days. With a compressed schedule due to pandemic-related delays, an allegedly rushed process would hardly be surprising, much less a reason to infer intentional invidious discrimination." *Id.* (internal citations omitted).

As this panel acknowledged when ruling on other motions to dismiss in these consolidated proceedings, "pandemic-related delays may be a more likely explanation" than discriminatory animus for the haste with which the Texas Legislature conducted this round of redistricting. *Consol. MTD Op.*, 2022 WL 1631301, at *26. We nonetheless concluded that, "when coupled with . . . other allegations" of discriminatory purpose, allegations that the Texas Legislature acted with unusual swiftness allowed those plaintiffs' intentional vote dilution claims to "cross[] the line from conceivable to plausible." *Id.* The same holds true for Intervenors' claims, which are not based on "the rushed redistricting process alone." *See id.*

Intervenors also allege that the Texas Legislature imposed various procedural hurdles that hindered legislators from proposing alternate maps that would affect minority voters less

---

[50] *See also Fischer MTD Op.*, 2022 WL 2922522, at *5 ("Fischer alleges that the Texas legislature drew the congressional map largely in secret such that minorities, and certain representatives, were shut out of the process. This too can support a case for discriminatory intent." (internal citations omitted)).

adversely.[51]  Furthermore, Intervenors allege substantive discrepancies in the ways the Texas

Legislature evaluated population data when crafting the challenged map.[52]  These allegations

could potentially support a finding of discriminatory purpose.[53]

---

[51] *See* 1st Am. Compl. at 15 (alleging that the Texas Legislature implemented "gate-keeping rules to prevent Black and Brown lawmakers from amending discriminatory or racial gerrymandering tactics[.] One example is that lawyers were brought in for the House debate on the Congressional bill, so that any amendments could no longer be simply authorized by the Redistricting Chair or the Speaker.  This group of lawyers for the conservative white leadership were [sic] required to approve potential amendments before they were accepted for consideration on the floor."); *id.* ("During the House debate on the Congressional Map[,] Intervenor Applicant Crockett and others were required to deliver proposed Amendments to designated Representatives who would take them to a room in which they could not enter for the proposed Amendment to be reviewed by white lawyers before it could be offered."); *id.* (citing "the refusal to receive any map for consideration in the Senate Redistricting Committee unless it was plugged into the proposed statewide map drawn by the white Congresspersons"); *id.* at 16 ("The Senate Committee on Redistricting did not accept any amendment for consideration that was not agreed to by any and every Congressperson affected by the change, and further any proposed change had to use the proposed map as a basis or beginning from which to draft them."); *id.* at 7–8 ("Senator Miles, in a Senate presided over by Lieutenant Governor Dan Patrick and in response to rules or practices utilized by the Senate Redistricting Committee under the leadership of its Chairman Senator Joan Huffman, was not able to formally file the proposal that would provide a proper remedy to what the Senate had proposed."); *id.* at 17–18 ("[T]he actions of the Legislature in reference to limiting testimony in the Senate, giving short notice for the House Committee hearing, not permitting amendments to be considered in the Committee, and the failure of the Senate to put a minority on the Conference Committee at a critical point when the bill was considered in the special-called session, (and the many other irregularities), all support the clear fact that the Legislature's action in adopting this map was infused with discrimination."); *id.* at 18 (alleging that the Texas Legislature "utilized rules and procedures to prevent the receipt of other plans that limited minority vote dilution").

[52] *See id.* at 18 ("It is revealing how the white majority used population data in the treatment of Black and Latino voters.  This is indicative of discriminatory intent.  In the case of African Americans, majority party leaders used voting age population data to justify actions in reference to Black districts. By contrast, they used different data that included citizenship to justify actions in reference to Latino voters.  In each instance they chose to justify the plan as to these two minority groups in specific ways that would empower and prefer white voters and disadvantage minority voters.").

[53] *See Arlington Heights*, 429 U.S. at 267 ("Departures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached."); *Perez*, 253 F. Supp. 3d at 961 (holding that "a legislature need not break its own rules to engage in unusual procedures" from which a court can infer discriminatory intent (quoting *N.C. State Conf. of NAACP*, 831 F.3d at 228)).

Intervenors also allege that the Texas Legislature enacted the Plan amidst a racially-hostile political environment.[54]  A three-judge panel of this Court held during the past redistricting cycle that evidence of a prevailing anti-minority milieu bore on whether the Texas Legislature acted with discriminatory intent.  *See Perez*, 253 F. Supp. 3d at 959–60 (emphasizing that the Legislature enacted the challenged redistricting plan "in the context of strong racial tension and heated debate about Latinos, Spanish-speaking people," and political issues salient to the Latino population).  We agree that the prevailing political environment may provide at least some support for a finding of discriminatory intent—or, at minimum, context for a legislature's decision making.

Finally, Intervenors allege that key legislators misled Intervenors and other major stakeholders about the redistricting process.[55]  These allegations, if true, corroborate Intervenors' assertion that the Texas Legislature harbored discriminatory intent.  *Cf. Perez*, 253 F. Supp. 3d at 886 (finding discriminatory purpose where, among other proof, challengers introduced evidence

---

[54] *See* 1st Am. Compl. at 14 ("Statewide officials in Texas have become more anti-Black and anti-Brown in their public statements and overt actions particularly in 2021.  Massive election revisions were adopted by the 2021 Legislature, many of which are intentionally discriminatory against and target African-Americans or Latinos.  Considering that the State adopted many other discriminatory laws such as laws banning the utilization of critical race theory in public schools, it is important to mention that critical race theory has never been taught or studied in Texas public grade schools but now is being used to erase or diminish the teaching of legitimate history and facts regarding African Americans and their history and culture in Texas and the U.S.  The sponsors of the Legislation made it clear that white voters did not want to feel bad about what their ancestors did and they did not want such taught to their children.  Even the rhetoric was racially-charged: When Black, Brown and some white legislators left the State, some white public officials indicated that they should be arrested and 'quartered' until the voting takes place.  Such language represents vestiges of Texas' Jim Crow past, and its return to the present.").

[55] *See* 1st Am. Compl. at 8 (alleging that the Texas House of Representatives based its redistricting proposal on the Texas Senate's map "even after House Chairman Hunter assured Congresswoman Jackson-Lee, Congressman Green, and Texas Black Caucus Vice-Chair Ron Reynolds that they would not use the Senate map as a basis for creating the Congressional Plan to be voted on by the House").

that Chairman "actively misled other legislators about why changes were made and about the district's performance").

Considered in tandem, the allegations above are sufficient to plead discriminatory intent for the purposes of alleging an intentional vote dilution claim.  *See Perez*, 253 F. Supp. 3d at 956 ("Consideration of the *Arlington Heights* factors, when viewed in totality with the entire record evidence, may support a finding of intentional racial discrimination . . . .").

In response, Defendants emphasize that, as Intervenors explicitly admit in their First Amended Complaint,[56] the Texas House of Representatives adopted a proposal by Chairwoman Senfronia Thompson—an African-American State Representative—to modify certain aspects of the draft redistricting plan to favor minority voters.  Mot. at 17.  Defendants claim that the Legislature's adoption of those changes "severely undercut[s]" any inference "that the Legislature rejected plans offered by African American members out of invidious discrimination."  *Id.*  Intervenors also allege, however, that the Texas Legislature rejected other Black legislators' proposals to maintain Congressional District 30's 50% BCVAP.[57]  The Court thus cannot hold that the Legislature's acceptance of Chairwoman Thompson's proposal conclusively negates Intervenors' other allegations suggesting discriminatory intent.

---

[56] *See* 1st Am. Compl. at 9 ("Chairwoman Senfronia Thompson, the Dean of the House, made a proposal which essentially took the limited territory from the 3 minority opportunity districts in Harris and Fort Bend Counties (now including Brazoria) and reconfigured them to lessen the retrogression and dilution as to those districts.  This was done specifically because a full fix that would have involved impacting 7 as opposed to 4 districts would not be permitted.  This proposal was adopted, though many Members changed their yea votes to nay shortly after the formal vote."); *id.* at 17 ("The House through the efforts of Representative Thompson cured some, but not all, of the retrogression and dilution in Congressional Districts 9 and 18.").

[57] *See, e.g.*, 1st Am. Compl. at 5 (alleging that, "[a]s a Representative in the Texas Legislature," Intervenor Crockett "tendered proposed changes to Congressional District 30 that would have permitted it to continue as a 50 percent African-American Citizen Voting Age population district," but the amendment "failed to pass").

Defendants also insist that "[t]he more accurate explanation for the defeat of" amendments that could have remedied the alleged vote dilution "is that the Legislature was acting according to partisan motives," rather than discriminatory racial motives.  Mot. at 17.  As we explained when ruling on other motions to dismiss in these consolidated proceedings, however, "it is not yet necessary for [the challengers] to demonstrate that the Texas legislature more likely than not acted with discriminatory intent"; nor must their pleadings' conclusively foreclose partisan or other lawful explanations for the Legislature's actions.  *Consol. MTD Op.*, 2022 WL 1631301, at *26; *see also Fischer MTD Op.*, 2022 WL 2922522, at *3 ("Fischer does not have to overcome partisanship explanations at the pleading stage.").  "It is sufficient for [Intervenors] to point to circumstantial evidence, such as procedural irregularities or apparent subterfuge, from which discriminatory intent can plausibly be inferred."  *Consol. MTD Op.*, 2022 WL 1631301, at *26.  For the foregoing reasons, Intervenors have done so here.[58]

The Court thus **DENIES** Defendants' Motion to Dismiss insofar as it seeks to dismiss Intervenors' intentional vote dilution challenge to Congressional District 30.  The Court **GRANTS** the Motion to the extent it seeks to dismiss Intervenors' intentional vote challenges to Congressional Districts 9 and 18.

### 3.    Racial Gerrymandering Claims

We turn next to Intervenors' racial gerrymandering challenges.

---

[58] The same goes for Defendants' argument that "the obvious [nondiscriminatory] explanation" for the Texas Senate imposing "a procedural rule requiring all proposed amendments to include the support of all affected members" was "to ensure that affected Congressmen and women had an opportunity to review any proposed changes to their districts."  *See* Mot. at 17–18.  Nor must Intervenors' complaint affirmatively negate the possibility that "[t]he obvious explanation" for using "citizen voting age population when referring to the Latino population but voting age population when referring to the African American population" is "that there tends to be a higher percentage of the Latino population that is of voting age, but not citizens, than the African American population."  *See id.* at 18.

### a.   Legal Standard

"A plaintiff pursuing a racial gerrymandering claim must show that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'"  *Ala. Legis. Black Caucus*, 575 U.S. at 272 (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).  "To do so, the 'plaintiff must prove that the legislature subordinated traditional race-neutral districting principles to racial considerations.'"  *Id.* (cleaned up).  Traditional race-neutral redistricting principles include, but are not limited to, "compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests."  *Miller*, 515 U.S. at 916.

While racial gerrymandering claims resemble intentional vote dilution claims, there are critical differences.  *Prelim. Inj. Op.*, 2022 WL 1410729, at *8–11.  While both claims require the plaintiff to validly plead discriminatory intent, *id.* at *11, "the harm" of racial gerrymandering "flows from being personally subjected to a racial classification, not from vote dilution or intentional discrimination."  *Perez*, 253 F. Supp. 3d at 893 n.31 (cleaned up) (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 263).  Moreover, "[p]laintiffs must make a stronger showing to demonstrate racial gerrymandering than to show intentional vote dilution."  *Prelim. Inj. Op.*, 2022 WL 1410729, at *10.  To validly plead intentional vote dilution, the plaintiff need only plead non-conclusory allegations "that race was *part* of Defendants' redistricting calculus."  *Id.*  To validly plead racial gerrymandering, however, the plaintiff "must go further and prove that race *predominated* over other considerations such as partisanship."  *Id.*

### b.   Analysis

Defendants contend that Intervenors have failed "to allege with particularity how CD9, CD18, and CD30 were gerrymandered."  Mot. at 19.  According to Defendants, the First

Amended Complaint "offers no district-specific analysis, points to no specific legislative actions, and fails to mention any racial data at all." *Id.* Thus, Defendants argue, the First Amended Complaint "fall[s] well short of supporting the inference that 'race was improperly used in drawing the boundaries of'" Congressional Districts 9, 18, and 30. *Id.* (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 263).

Intervenors identify several excerpts from the First Amended Complaint, that, in their view, satisfy their pleading burden. *See* Resp. at 11–12. Most of those allegations are conclusory allegations or legal conclusions that the Texas Legislature engaged in racial gerrymandering, which are not entitled to the presumption of truth.[59] *Cf. Dunham v. Jackson County*, No. 13-473, 2013 WL 6068527, at *4 (S.D. Ill. Nov. 18, 2013) (holding that "bare allegations" amounting "to nothing more than a 'formulaic recitation of the elements' of a claim for . . . gerrymandering" were "not entitled to be assumed true" (quoting *Iqbal*, 556 U.S. at 681)).

Intervenors maintain they have validly pleaded that "[c]ommunities of interest were cracked out of" Congressional Districts 9, 18, and 30 "in order to benefit districts to be dominated by white voters." Resp. at 11. However, the First Amended Complaint never identifies a specific community, explains why "actual shared interests" unite that community, and specifies how the Plan divides that community amongst two or more Districts.[60] *See Miller*,

---

[59] *See* Resp. at 12 n.10 ("[T]here was an area racial gerrymander." (quoting 1st Am. Compl. at 11)); *id.* at 12 n.11 ("Congressional Districts 18 and 30 are retrogressed in the adopted plan and they are retrogressed so that area vote dilution and/or a *racial gerrymander* of each area likely would take place." (emphasis added) (quoting 1st Am. Compl. at 11)); *id.* at 12 n.9 ("Intervenor Crockett introduced an amendment to the retrogression, vote dilution or *racial gerrymander* but was not successful in achieving passage." (quoting 1st Am. Compl. at 10) (emphasis added)); *see also* 1st Am. Compl. at 23 ("*Race was the predominant factor* in the drawing of the Congressional Districts both in the Dallas/Fort Worth Metroplex and the Harris County/Fort Bend Area." (emphasis added)); *id.* at 24 ("*[R]acial considerations predominated* in the map drawing . . . ." (emphasis added)).

[60] *See* 1st Am. Compl. at 13 ("The 2021 Congressional plans unnecessarily split communities of interest from the 9th, 18th and 30th Congressional Districts; removed important economic engines from the 9th and 18th; packed Latino voters unnecessarily into the 18th and 9th Congressional Districts, and

515 U.S. at 916 (listing "respect for . . . communities *defined by actual shared interests*" as one of several traditional race-neutral redistricting principles (emphasis added)).  The complaint's repeated recitation of the phrase "communities of interest" is thus too unspecific and conclusory to save Intervenors' racial gerrymandering claims from dismissal.  *See, e.g.*, *Arnold*, 979 F.3d at 266 ("While the court must accept the facts in the complaint as true, it will 'not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.'" (quoting *Gentilello*, 627 F.3d at 544)).

> Intervenors also recite their allegation that
>
> [t]he 9th, 18th, and 30th Congressional Districts were all close to the optimal size of 766,000 persons for districts after the 2020 census.  The 9th District in particular was only 3,611 persons above the optimum number of persons for a Texas Congressional District.  The drastic changes made by the Texas Legislature removed tens of thousands of voters from this optimum-sized district, and then added tens of thousands of new voters to the district.[61]

1st Am. Compl. at 2; *see also* Resp. at 11.  However, absent any well-pleaded allegation indicating that the Texas Legislature disregarded traditional race-neutral principles like

---

were purposefully designed to undermine or frustrate effective and long-term voter coalitions in the area as well as effective minority voter participation."); *id.* at 10–11 ("Communities of interest or neighborhoods were cracked or split and minorities were placed in districts for the purposes of enhancing white voter power."); *id.* at 12–13 ("This major transfer of voters then required the map drawers to crack out 10 precincts from allied communities of interest that had worked together in the 18th Congressional District and place them in the 9th.  The Latino opportunity District CD29 was negatively impacted and lost an important community of interest that was placed in the 9th Congressional District."); *id.* at 20–21 ("The failure to remedy the retrogression of Congressional Districts 9, 18 and 30, the removal of economic engines from the 9th and 18th and unnecessary surgery, including cracking of minority communities in each of the districts, is a remnant and perpetuation of the state's intent to discriminate against voters of color that persists in the 2021 adopted Congressional plan.").

[61] *See also* 1st Am. Compl. at 2–3 ("Latinos and African-Americans were sliced and diced to make the map of the region achieve its discriminatory purpose and objective.  Congressional District 9, though in need of essentially no surgery, received 12 new precincts from Fort Bend County; 13 new precincts from Brazoria County; 10 new precincts from the 18th Congressional District in Harris County; and lost 11 precincts in Fort Bend County.  Precincts in the Hobby Airport area were removed from Congressional District 29 and moved into Congressional District 9.  As a result, the already optimal-sized district became a completely new district.").

compactness, contiguity, and respect for communities of interest and political subdivisions, the mere fact that the Legislature exchanged one group of voters in Congressional District 9 with another does not alone support an inference of racial gerrymandering. *See, e.g.*, *Ala. Legis. Black Caucus*, 575 U.S. at 272; *Miller*, 515 U.S. at 916. Intervenors attempt to save this allegation by asserting that Defendants "sliced and diced" Latino and African-American voters "to ensure that white voters would be able to control a majority of the voting districts in the area," 1st Am. Compl. at 2–3, but that is a legal conclusion that the Texas Legislature engaged in racial gerrymandering, which Intervenors must plead non-conclusory factual allegations to support, *cf. Dunham*, 2013 WL 6068527, at *4 (holding that "bare allegations" amounting "to nothing more than a 'formulaic recitation of the elements' of a claim for . . . gerrymandering" were "not entitled to be assumed true" (quoting *Iqbal*, 556 U.S. at 681)).

Finally, Intervenors rely on their allegation that

> After the last decennial census, the Texas Congressional apportionment increased from 36 representatives to 38 representatives, due to an overall population increase of approximately 4 million persons. Texas did not put the kind of emphasis on identifying persons in the State for purposes of being counted in the census as did other States, and as a result it fell just short of being entitled to 3 additional Congressional districts. Non-whites accounted for approximately 95 percent of the growth.[62]

1st Am. Compl. at 7; *see also* Resp. at 11–12. Intervenors further allege that at least some of this minority population growth occurred in Congressional Districts 9, 18, and 30, as well as the areas surrounding those districts.[63] According to Intervenors, because this population growth

---

[62] *See also* 1st Am. Compl. at 18 (alleging that "the state's population has reached a point in which the majority of its citizens are minority").

[63] *See* 1st Am. Compl. at 3 ("In the 6th Congressional District, a naturally occurring minority district was taking shape and growing. To stymie that rise in minority voters, the map drawers cut out voters from the 6th and placed them in the 30th Congressional District, thereby requiring displacement of existing voters in the nearly optimum sized district."); *id.* at 10 ("The population increases in both the Harris County and Fort Bend Area as well as the Dallas Fort Worth Metroplex Area each justified the

"was almost exclusively minority and was majority Latino, this would have provided even more justification for creating new Latino or minority opportunity districts."  Resp. at 12.

To the extent these allegations relate to minority growth in Texas as a whole, the Dallas and Houston metropolitan areas generally, or districts other than Congressional Districts 9, 18, and 30, they do not support Intervenors' racial gerrymandering claims because Intervenors lack standing to challenge alleged racial gerrymandering outside their home districts.[64]  *See supra*

creation of new Congressional minority opportunity districts in each regions."); *id.* at 11 ("Congressional District 24 had become a majority non-white district but minority residents and voters were purged from the district so that it is now safely a predominately white district.  The Legislature was mindful of electoral changes that took place in different districts around Texas where minority voters had become dominant or controlling in different elective districts . . . ."); *id.* at 12 ("[T]he 32nd Congressional District saw an incredible rise in its minority and Black and Hispanic population and voter percentages."); *id.* at 13–14 ("The new Congressional District in the Houston area will be dominated by white voters, even though Latinos were the group most responsible for the state's population increase."); *id.* at 19 ("[T]he minority population growth in the Dallas-Fort Worth Metroplex and the Harris County-Fort Bend-Brazoria Areas was more than sufficient to support an additional, reasonably-compact district in which minority voters, especially Latino voters, would have an opportunity to elect the candidate of their choice."); *id.* at 24 ("Latinos were responsible for approximately 52 percent of the State's growth and were responsible for 65 percent of the State's growth according to the 2010 Census but the Legislature chose to engage in this racial gerrymander to ensure that Latino voters would not be drawn to a seat which they would control.  That goes against population figures that show Latino growth was so substantial in [the Dallas/Fort Worth Metroplex and the Harris County/Fort Bend area] that such seats were naturally occurring and could have easily been drawn by the Legislature.").

[64] *See* 1st Am. Compl. at 7 (citing minority population growth in Texas as a whole); *id.* at 10 ("The population increases in both *the Harris County and Fort Bend Area as well as the Dallas Fort Worth Metroplex Area* each justified the creation of new Congressional minority opportunity districts in each regions." (emphasis added)); *id.* at 11 ("*Congressional District 24* had become a majority non-white district but minority residents and voters were purged from the district so that it is now safely a predominately white district." (emphasis added)); *id.* at 12 ("[T]he *32nd Congressional District* saw an incredible rise in its minority and Black and Hispanic population and voter percentages." (emphasis added)); *id.* at 13–14 ("The *new Congressional District in the Houston area* will be dominated by white voters, even though Latinos were the group most responsible for the state's population increase." (emphasis added)); *id.* at 19 ("[T]he minority population growth *in the Dallas-Fort Worth Metroplex and the Harris County-Fort Bend-Brazoria Areas* was more than sufficient to support an additional, reasonably-compact district in which minority voters, especially Latino voters, would have an opportunity to elect the candidate of their choice." (emphasis added)); *id.* at 24 ("Latinos were responsible for approximately 52 percent of *the State's* growth and were responsible for 65 percent of *the State's* growth according to the 2010 Census but the Legislature chose to engage in this racial gerrymander to ensure that Latino voters would not be drawn to a seat which they would control.  That goes against population figures that show Latino growth was so substantial in [*the Dallas/Fort Worth Metroplex and the Harris County/Fort Bend area*] that such seats were naturally occurring and could have easily been drawn by the Legislature." (emphasis added)).

Section III.A.2.  Although voters "can present statewide *evidence* in order to prove racial gerrymandering in a *particular* district," a racial gerrymandering claim "applies to the boundaries of individual districts.  It applies district-by-district.  It does not apply to a State considered as an undifferentiated 'whole'"; nor does it apply to metropolitan areas as an undifferentiated whole.  *Ala. Legis. Black Caucus*, 575 U.S. at 262–63 (second emphasis added).  Thus, merely alleging that the Texas Legislature had "justification for creating new Latino or minority opportunity districts" somewhere in the State or somewhere in the Dallas and Houston metropolitan areas, Resp. at 12, does not alone permit an inference that, *when drawing the specific boundary lines of Congressional Districts 9, 18, or 30*, the Texas Legislature emphasized racial concerns over traditional, race-neutral redistricting principles.  *See Ala. Legis. Black Caucus*, 575 U.S. at 263 ("[T]he harms that underlie a racial gerrymandering claim . . . are personal.  They directly threaten a voter who lives in the *district* attacked.  But they do not so keenly threaten a voter who lives elsewhere in the State.  Indeed, the latter voter normally lacks standing to pursue a racial gerrymandering claim.").

The only allegation that specifically connects minority population growth to one or more of the districts Intervenors have standing to challenge is Paragraph 5, which states:

> In the 6th Congressional District, a naturally occurring minority district was taking shape and growing.  To stymie that rise in minority voters, the map drawers cut out voters from the 6th and placed them in the 30th Congressional District, thereby requiring displacement of existing voters in the nearly optimum sized district.

1st Am. Compl. at 3.  Again, however, a plaintiff alleging racial gerrymandering cannot meet its pleading burden by stating flatly that the Legislature drew a district's lines "[t]o stymie th[e] rise in minority voters"; that is the ultimate legal conclusion Intervenors are trying to establish, so they must allege well-pleaded facts to support it.  *Cf. Dunham*, 2013 WL 6068527, at *4.  Absent any non-conclusory allegations indicating that the Legislature's decision to reassign certain

- 59 -

voters from the 6th District to the 30th contravened traditional race-neutral districting principles, Intervenors have failed to state a racial gerrymandering claim.  *See Ala. Legis. Black Caucus*, 575 U.S. at 272.

The First Amended Complaint is perhaps more notable for what it does *not* include.  As this panel has observed, "[c]lassic racial-gerrymandering cases often include vivid descriptions of the specific districts at issue."  *Consol. MTD Op.*, 2022 WL 1631301, at *27.  The First Amended Complaint doesn't even contain a map of the districts Intervenors are attempting to challenge.[65]  *See generally* 1st Am. Compl.  Nor does the First Amended Complaint mention how Congressional Districts 9, 18, and 30 score on several of the primary metrics of race-neutral redistricting, such as contiguity, compactness,[66] and respect for political subdivisions.  *Compare Miller*, 515 U.S. at 916, *with* 1st Am. Compl. 1–26.

Nor does the First Amended Complaint contain any allegations that Congressional Districts 9, 18, or 30 are so bizarrely shaped that racial considerations are the only rational explanation for their boundaries.  While Supreme Court precedent does not *require* "that a district . . . be bizarre on its face before there is a constitutional violation," a district's shape can constitute "persuasive circumstantial evidence that race for its own sake, and not other districting

---

[65] The only map Intervenors appended to their complaint was an alternative plan the Texas Legislature did not enact.  *See* 1st Am. Compl. Ex. C, at 10.

[66] The First Amended Complaint mentions compactness only in reference to hypothetical *alternative* districts for the first *Gingles* precondition.  *See* 1st Am. Compl. at 19 ("[T]he minority population growth in the Dallas-Fort Worth Metroplex and the Harris County-Fort Bend-Brazoria Areas was more than sufficient to support an additional, reasonably-compact district in which minority voters, especially Latino voters, would have an opportunity to elect the candidate of their choice."); *id.* at 20 ("There is sufficient Latino population in the Dallas-Fort Worth metroplex to construct a reasonably-compact district in which Latino voters or Latino voters in cooperation with Black voters have an opportunity to elect their candidate of choice."); *id.* at 20 ("There is sufficient Latino population in the Harris County-Fort Bend Area to construct a reasonably-compact district in which Latino voters have an opportunity to elect their candidate of choice.").  All those allegations are conclusory, as discussed above. *See supra* Section III.B.1.c.i.

principles, was the legislature's dominant and controlling rationale in drawing its district lines."
*Miller*, 515 U.S. at 912–13.  The closest Intervenors come to alleging facts regarding the
districts' shapes is Paragraph 66, which states: "white voters of both parties were given stronger
districts and each a new district.  Some of the districts were irregular in shape."  1st Am. Compl.
at 24.  That allegation does not specify whether Congressional Districts 9, 18, or 30 were among
those "irregular" districts.  *See id.*  Thus, although Intervenors were not *required* to allege that
the shapes of Congressional Districts 9, 18, and 30 are sufficiently unusual to infer that the Texas
Legislature subordinated traditional redistricting principles to racial considerations, the fact that
Intervenors haven't pleaded such allegations only underscores the complete dearth of well-
pleaded facts supporting Intervenors' racial gerrymandering claims.

In sum, the First Amended Complaint contains zero non-conclusory allegations to
support Intervenors' racial gerrymandering claims.  The Court therefore dismisses them.

### 4.    Intentional Discrimination Claims

Besides the claims we've already discussed, Intervenors also assert a distinct, separate
claim for "intentional discrimination."  *See* Resp. at 3.[67]  Intervenors do not explain—and the
Court cannot perceive—how their separate intentional discrimination claim differs from the
intentional vote dilution and racial gerrymandering claims the Court has already addressed
above.  *See id.* at 7–9, 18; *see also Prelim. Inj. Op.*, 2022 WL 1410729, at *11 (explaining that
"[t]he injury in an intentional-vote-dilution claim is the same as it is for any other intentional-
discrimination claim: The state has subjected minorities to invidious discrimination.").  The

---

[67] *See also* 1st Am. Compl. at 22 ("The 2021 redistricting plans adopted by the Texas Legislature
were developed with the intent to disadvantage African-American and other minority voters including
those in the 9th, 18th and 30th Congressional Districts.  That intentional discrimination is in violation of
the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, the Fifteenth
Amendment of the United States Constitution, and 42 U.S.C. § 1983.").

Court thus dismisses Count III of the First Amended Complaint as duplicative. *Cf. Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 236–37 (1st Cir. 2013) (dismissing as duplicative a cause of action that did "not plead a claim for relief distinct from" another count in the plaintiff's complaint).

## C.   Leave to Amend

Intervenors request leave to amend their complaint to the extent the Court grants' Intervenors Motion to Dismiss.  Resp. at 21.  Ordinarily, when granting a Rule 12(b)(6) motion, courts freely grant plaintiffs leave to amend the complaint instead of dismissing the case entirely. *E.g.*, *Doe v. Baylor Univ.*, 313 F. Supp. 3d 786, 793 (W.D. Tex. 2018) ("[T]here is a strong presumption in favor of allowing amendment rather than dismissal, and '[l]eave to amend should be freely granted when justice requires.'" (quoting *Fin. Acquisition Partners, L.P. v. Blackwell*, 440 F.3d 278, 291 (5th Cir. 2006))).  A district court may nonetheless "refuse leave to amend if the filing of the amended complaint would be futile, *i.e.*, 'if the complaint as amended would be subject to dismissal.'" *Varela v. Gonzales*, 773 F.3d 704, 707 (5th Cir. 2014) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 208 (5th Cir. 2009)).

Intervenors may be able to correct some or all of the aforementioned pleading defects by amending their complaint.  Thus, allowing Intervenors to amend their pleadings would not be futile.  Moreover, this is the first motion to dismiss Intervenors' claims this panel has ruled upon.[68]  When this panel partially granted motions to dismiss other plaintiffs' claims in these consolidated proceedings, it afforded those plaintiffs an opportunity to correct their pleadings. *See Consol. MTD Op.*, 2022 WL 1631301, at *29; *Fischer MTD Op.*, 2022 WL 2922522, at *6.

---

[68] Defendants previously moved to dismiss Intervenors' original complaint in part.  ECF No. 204. Before the Court ruled on that motion, Intervenors filed their First Amended Complaint, thereby mooting the pending motion to dismiss.  This Order is therefore the first indication the Court has given Intervenors that their pleadings are deficient.

Fairness dictates that the Court do the same here. The Court thus **GRANTS** Intervenors leave to amend their pleadings within **14 days**.

## IV.    CONCLUSION

The Court thus **GRANTS** Defendants' "Motion to Dismiss Intervenors' Amended Complaint" (ECF No. 225) **IN PART** and **DENIES** the Motion **IN PART**. The Court **DENIES** the Motion insofar as Defendants seek to dismiss Intervenor Johnson and Intervenor Crockett's intentional vote dilution challenge to Congressional District 30. The Court **GRANTS** the Motion in all other respects.

The Court **GRANTS** Intervenors **LEAVE TO AMEND** their First Amended Complaint. Intervenors may file a Second Amended Complaint on or before **October 12, 2022**. The Court **MODIFIES** its "Scheduling Order" (ECF No. 96) to the extent it imposes a deadline for Intervenors to amend their pleadings that is inconsistent with this Order.

**So ORDERED and SIGNED this 28th day of September 2022.**

**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**

*And on behalf of:*

Jerry E. Smith
**United States Circuit Judge**        *-and-*
**U.S. Court of Appeals, Fifth Circuit**

Jeffrey V. Brown
**United States District Judge**
**Southern District of Texas**