# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | |
|---|---|
| LULAC, *et al.*,<br><br>       *Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of Texas, *et al.*,<br><br>       *Defendants.* | Case No. 3:21-CV-00259-DCG-JES-JVB<br>[Lead Case] |
| ROY CHARLES BROOKS, FELIPE GUTIERREZ, PHYLLIS GOINES, EVA BONILLA, CLARA FAULKNER, DEBORAH SPELL, SANDRA M. PUENTE, JOSE R. REYES, SHIRLEY ANNA FLEMING, LOUIE MINOR JR, NORMA CAVAZOS, LYDIA ALCALAN, and MARTIN SAENZ,<br><br>       *Plaintiffs,*<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of Texas; JOHN SCOTT, in his official capacity as Secretary of State of Texas, and STATE OF TEXAS,<br><br>       *Defendants.* | Case No. 1:21-CV-00991-DCG-JES-JVB<br>[Consolidated Case] |

**THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Pursuant to 42 U.S.C. § 1983 and 52 U.S.C. § 10301, Plaintiffs allege as follows:

1

**INTRODUCTION**

1.      In each decennial redistricting cycle in modern history, Texas has enacted plans that federal courts have ruled to be racially discriminatory in intent and/or effect. Like clockwork, Texas has done so again.

2.      The discriminatory intent and results are present in the state senate, congressional, and state house plans.

3.      Remarkably, Texas has enacted the *same* racially discriminatory scheme to dismantle Senate District 10 ("SD10") as a performing crossover district for Tarrant County's minority voters that a federal court declared intentionally discriminatory last decade. With knowledge of that federal court ruling, and with full knowledge of where Tarrant County's Black, Latino[1], and Asian voters reside, the mapdrawers acted with racially discriminatory intent in drawing Plan S2168, which cracks apart Tarrant County's Black, Latino, and Asian voters and submerges them in Anglo-dominated districts in which they will have no opportunity to elect their preferred candidates. As the map below show, the legislature purposefully cracked apart Tarrant County's minority voters, shown in pink shading, and splintered them across three senate districts in which they will be overpowered by Anglo bloc-voting against their candidate of choice. Those districts take tortured shapes, as they did when the federal court invalidated them last decade. Indeed, the legislature has reprised the infamous "lightning bolt" from its 2011 Tarrant County congressional plan, inverting it this time to come from the south.

---

[1] This Complaint uses the terms "Latino" and "Hispanic" interchangeably to refer to persons of Hispanic Origin as defined by the United States Census Bureau and United States Office of Management and Budget.



4.    Since the federal court last enjoined this same scheme just nine years ago, SD10's Anglo population has fallen nearly ten points, making this latest attack on SD10's minority population even more egregious. Indeed, 57% of Tarrant County's population is non-Anglo, and 53% of its voting-age population is non-Anglo. Yet in this majority-minority county with over 2 million residents, SB4 includes *zero* districts in which Tarrant County's minority voters have any opportunity to elect their candidate of choice.

5.    Every member of the legislature was made aware of this intentionally racially discriminatory scheme, and the adverse effect it would have on the electoral opportunity for Tarrant County's minority voters. Each member saw maps showing the details of the cracking of minority populations in SD10, and each received and heard detailed demographic information

about the discriminatory changes to SD10. A floor amendment in the senate to restore SD10 to its benchmark configuration received bipartisan support—including the vote of Sen. Kel Seliger (R), who chaired the redistricting committee last decade when the federal court ordered the restoration of SD10—but nevertheless failed to pass.

6.    The legislature knew what it was doing, and intended the discriminatory result it achieved by cracking SD10's minority voters and submerging them in Anglo-controlled districts.

7.    In addition to engaging in intentional racial discrimination by dismantling SD10, the legislature has diluted the votes of Tarrant County's Black and Latino voters by failing to create a new majority Black/Latino coalition senate district in Tarrant County as Section 2 of the Voting Rights Act ("VRA") requires.

8.    Further, the legislature's congressional map, Plan C2193, does not reflect the vast population growth among minorities in Texas over the past decade. Texas's population rose by 4 million between 2010 and 2020, and 95% of that growth came from minority voters. Texas gained 2 additional congressional seats because of that growth in minority population. Yet instead of increasing the congressional districts in which minority voters can be expected to elect their candidates of choice, SB6 *reduces* the overall number of minority opportunity seats.

9.    This dilutes the voting strength of minority voters in violation of Section 2 of the Voting Rights Act. In particular, Black and Latino voters in Dallas/Fort-Worth have a right to an additional opportunity district, and Latino voters in the Houston area have a right to an additional opportunity district.

10.    The State House plan likewise dilutes minorities' voting strength. In Bell County, HD 54 and 55 are drawn in a manner that cracks the county's substantial minority population to ensure two districts where Anglo voters can elect their preferred candidates. Alternative district

configurations are possible in which Black and Latino voters would constitute a majority of a district and would be able to elect their preferred candidates. And in Bexar County, HD118 was drawn in a manner that dilutes the ability of Latino voters to elect their candidates of choice. Alternative district configurations are possible in which Latino voters constitute an effective majority of the district and would be able to elect their preferred candidates.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1357, 42 U.S.C. § 1983; and pursuant to 52 U.S.C. § 10301 *et seq*. Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as by Rules 57 and 65 of the Federal Rules of Civil Procedure. Jurisdiction for Plaintiffs' claim for costs and attorneys' fees' is based upon Fed. R. Civ. P. 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e). Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to the claims in this case occurred in the Western District of Texas and Defendants reside in this district.

## PARTIES

12.     Plaintiffs challenging Senate Plan S2168 are citizens and registered voters residing in benchmark SD10.

13.     Plaintiffs challenging Congressional Plan C2193 are citizens and registered voters residing in CDs 6, 12, 25, 29, and 33.

14.     Plaintiffs challenging House Plan H2316 are citizens and registered voters residing in HDs 54 and 118.

15.     Plaintiffs have standing to bring this action under 42 U.S.C. § 1983 to redress injuries suffered through the deprivation, under color of state law, of rights secured by the

Constitution and the Voting Rights Act of 1965, 52 U.S.C. § 10301 et seq., as well as standing to bring this action directly under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

16.     Plaintiff Roy Charles Brooks is a Black citizen and registered voter. He resides in benchmark SD10 and under Plan S2168 resides in SD10. Mr. Brooks resides in benchmark CD12 and under Plan C2193 resides in CD12. His voting strength is diluted in violation of Section 2 of the Voting Rights Act by the cracking of Black and Latino voters in Tarrant County in a manner that permits white bloc voting to prevent candidates of choice of Black and Latino voters from being elected. Alternative district configurations are possible in which Black and Latino voters, who vote cohesively, would form a majority of eligible voters in a state senate and congressional district in which they could elect candidates of their choice. Mr. Brooks is likewise harmed by the legislature's removal of Black and Latino voters from and addition of Anglo voters to SD10 on the basis of race, and the intentional dismantling of benchmark SD10 as a performing crossover district.

17.     Plaintiff Brooks has voted in past elections and intends to vote in the 2022 and future elections.

18.     Plaintiff Felipe Gutierrez is a Latino citizen and registered voter. He resides in benchmark SD10 and under Plan S2168 resides in SD9. Mr. Gutierrez resides in benchmark CD12 and under Plan C2193 resides in CD12. His voting strength is diluted in violation of Section 2 of the Voting Rights Act by the cracking of Black and Latino voters in Tarrant County in a manner that permits white bloc voting to prevent candidates of choice of Black and Latino voters from being elected. Alternative district configurations are possible in which Black and Latino voters, who vote cohesively, would form a majority of eligible voters in a state senate and congressional district in which they could elect candidates of their choice. For example, under Plan S2134, Mr.

6

Gutierrez would reside in a Black and Latino majority CVAP configuration of SD10. Mr. Gutierrez is likewise harmed by the legislature's removal of Black and Latino voters from and addition of Anglo voters to SD10 on the basis of race, and the intentional dismantling of benchmark SD10 as a performing crossover district.

19.     Plaintiff Gutierrez has voted in past elections and intends to vote in the 2022 and future elections.

20.     Plaintiff Phyllis Goines is a Black citizen and registered voter. She resides in benchmark SD10 and under Plan S2168 resides in SD9. Ms. Goines resides in benchmark CD33 and under Plan C2193 resides in CD33. Her voting strength is diluted in violation of Section 2 of the Voting Rights Act by the cracking of Black and Latino voters in Tarrant County in a manner that permits white bloc voting to prevent candidates of choice of Black and Latino voters from being elected to the state senate, and the cracking and packing of Black and Latino voters to reduce the number of congressional districts in which they can elect their candidates of choice. Alternative district configurations are possible in which Black and Latino voters, who vote cohesively, would form the majority of eligible voters in a state senate district in which they would be able to elect candidates of their choice, and an additional congressional district in the DFW area in which they can elect candidates of their choice. Under Plans C2163 and C2167, Ms. Goines would reside in CD33, a majority Black and Latino CVAP district, and under Plan S2134 she would reside in SD10, a majority Black and Latino CVAP district. Ms. Goines is likewise harmed by the legislature's removal of Black and Latino voters from and addition of Anglo voters to SD10 on the basis of race, and the intentional dismantling of SD10 as a performing crossover district.

21.     Plaintiff Goines has voted in past elections and intends to vote in the 2022 and future elections.

22.     Plaintiff Eva Bonilla is a Latina citizen and registered voter. She resides in benchmark SD10 and under Plan S2168 resides in SD9. Ms. Bonilla resides in benchmark CD12 and under Plan C2193 resides in CD12. Her voting strength is diluted in violation of Section 2 of the Voting Rights Act by the cracking of Black and Latino voters in Tarrant County in a manner that permits white bloc voting to prevent candidates of choice of Black and Latino voters from being elected. Alternative district configurations are possible in which Black and Latino voters, who vote cohesively, would form a majority of eligible voters in a state senate and congressional district in which they could elect candidates of their choice. For example, under Plan S2134 Ms. Bonilla would reside in a Black and Latino CVAP majority configuration of SD10. Ms. Bonilla is likewise harmed by the legislature's removal of Black and Latino voters from and addition of Anglo voters to SD10 on the basis of race, and the intentional dismantling of benchmark SD10 as a performing crossover district.

23.     Plaintiff Bonilla has voted in past elections and intends to vote in the 2022 and future elections.

24.     Plaintiff Clara Faulkner is a Black citizen and registered voter. She resides in benchmark SD10 and under Plan S2168 resides in SD10. Ms. Faulkner resides in benchmark CD33 and under Plan C2193 resides in CD33. Her voting strength is diluted in violation of Section 2 of the Voting Rights Act by the cracking of Black and Latino voters in Tarrant County in a manner that permits white bloc voting to prevent candidates of choice of Black and Latino voters from being elected to the state senate, and the cracking and packing of Black and Latino voters to reduce the number of congressional districts in which they can elect their candidates of choice. Alternative district configurations are possible in which Black and Latino voters, who vote cohesively, would form the majority of eligible voters in a state senate district in which they would be able to elect

candidates of their choice, and an additional congressional district in which they can elect candidates of their choice. For example, under Plans C2163 and C2167, Ms. Faulkner would reside in a Black and Latino majority CVAP configuration of CD33, and under Plan S2134 Ms. Faulkner would reside in a Black and Latino majority CVAP configuration of SD10. Ms. Faulkner is likewise harmed by the legislature's removal of Black and Latino voters from and addition of Anglo voters to SD10 on the basis of race, and the intentional dismantling of SD10 as a performing crossover district.

25.     Plaintiff Faulkner has voted in past elections and intends to vote in the 2022 and future elections.

26.     Plaintiff Deborah Spell is a Black citizen and registered voter. She resides in benchmark SD22 and under Plan S2168 resides in SD22. Ms. Spell resides in benchmark CD 6 and under Plan C2193 resides in CD 25. Her voting strength is diluted in violation of Section 2 of the Voting Rights Act by the cracking of Black and Latino voters in Tarrant County in a manner that permits white bloc voting to prevent candidates of choice of Black and Latino voters from being elected. Alternative district configurations are possible in which Black and Latino voters, who vote cohesively, would form the majority of eligible voters in a state senate and congressional district in which they could elect their candidates of choice.

27.     Plaintiff Spell is cracked apart from other minority voters under Plan S2168 and Plan C2193, residing in SD 22 and CD25. By contrast, under Plan S2134, Plaintiff Spell would reside in a newly configured version of SD 10 in which Black and Latino voters constitute the majority of the district's CVAP, and she would thus have an equal opportunity to elect her preferred candidate. Likewise, under either Plan C2163 or C2167, Plaintiff Spell would reside in CD 33, a majority Black and Latino CVAP district in which she would have an equal opportunity

to elect her preferred candidate, as opposed to her residency in CD 25 under enacted Plan C2193, in which Anglo voters bloc the election of minority-preferred candidates.

28.     Plaintiff Spell has voted in past elections and intends to vote in the 2022 and future elections.

29.     Plaintiff Sandra M. Puente is a Latina citizen and is registered to vote. She resides in benchmark CD 29 and under Plan C2139 resides in CD 29. Her voting strength is diluted in violation of Section 2 of the Voting Rights Act by the concentration of Latino voters in just one Houston-area Latino opportunity congressional district when two such districts are required. Under Plans C2163 and C2167, a second Latino majority CVAP congressional district would be created, and Ms. Puente would reside in one of those two districts (CD 29).

30.     Plaintiff Puente has voted in past elections and intends to vote in the 2022 and future elections.

31.     Plaintiff Jose R. Reyes is a Latino citizen and is registered to vote. He resides in benchmark CD 29 and under Plan C2139 resides in CD 29. His voting strength is diluted in violation of Section 2 of the Voting Rights Act by the concentration of Latino voters in just one Houston-area Latino opportunity congressional district when two such districts are required. Under Plans C2163 and C2167, a second Latino majority CVAP congressional district would be created, and Mr. Reyes would reside in one of those two districts (CD 29).

32.     Plaintiff Reyes has voted in past elections and intends to vote in the 2022 and future elections.

33.     Plaintiff Shirley Anna Fleming is a Black citizen and is registered to vote. She resides in HD 54 in Plan H2316. Her voting strength is diluted in violation of Section 2 of the Voting Rights Act by the cracking of Black and Latino voters in Bell County in a manner that

permits white bloc voting to prevent the candidates of choice of Black and Latino voters from being elected. Alternative district configurations are possible in which Black and Latino voters, who vote cohesively, would form the majority of eligible voters in a district and would be able to elect their candidates of choice. For example, under Plan H2216, HD54 would be a majority Black and Latino CVAP district in which Ms. Fleming would reside.

34.     Plaintiff Fleming has voted in past elections and intends to vote in the 2022 and future elections.

35.     Plaintiff Louie Minor Jr. is a Latino citizen and is registered to vote. He resides in HD 54 in Plan H2316. His voting strength is diluted in violation of Section 2 of the Voting Rights Act by the cracking of Black and Latino voters in Bell County in a manner that permits white bloc voting to prevent candidates of choice of Black and Latino voters from being elected. Alternative district configurations are possible in which Black and Latino voters, who vote cohesively, would form the majority of eligible voters in a district and would be able to elect their candidates of choice. For example, under Plan H2216, HD54 would be a majority Black and Latino CVAP district in which Mr. Minor would reside.

36.     Plaintiff Minor has voted in past elections and intends to vote in the 2022 and future elections.

37.     Plaintiff Norma Cavazos is a Latina citizen and is registered to vote. She resides in HD118 in Plan H2316. Her voting strength is diluted in violation of Section 2 of the Voting Rights Act by the removal of Latino voters from the district and addition of Anglo voters, which will result in the district ceasing to perform as a Latino opportunity district. Alternative district configurations are possible in which Latino voters, who vote cohesively, would form an effective majority of eligible voters in a district and would be able to elect their candidates of choice. For

example, under Plan H2156, Ms. Cavazos would reside in HD 118, in which Latino voters would form an effective majority of voters, including a majority of Spanish Surname Voter Registration and Spanish Surname Turnout. By contrast, under the enacted version of HD 118, SSVR and SSTO is less than a majority.

38.     Plaintiff Lydia Alcalan is a Latina citizen and is registered to vote. She resides in CD 6 in Plan C2193. Her voting strength is diluted in violation of Section 2 of the Voting Rights Act by the cracking of Black and Latino voters in the Dallas Fort Worth area in a manner that permits white bloc voting to prevent candidates of choice of Black and Latino voters from being elected. Alternative district configurations are possible in which Black and Latino voters, who vote cohesively, would form the majority of eligible voters in a congressional district in which they could elect their candidates of choice. For example, under Plan C2163, Plaintiff Alcalan would reside in CD37, a district that is majority Latino CVAP. Under Plan C2167, Plaintiff Alcalan would reside in CD6, a district that is majority Black and Latino CVAP. By contrast, under the enacted Plan C2193, Plaintiff Alcalan resides in a majority Anglo district in which Black and Latino voters cannot elect their candidate of choice.

39.     Plaintiff Alcalan has voted in past elections and intends to vote in the 2022 and future elections.

40.     Plaintiff Martin Saenz is a Latino citizen and is registered to vote. He resides in CD 6 in Plan C2193. His voting strength is diluted in violation of Section 2 of the Voting Rights Act by the cracking of Black and Latino voters in the Dallas Fort Worth area in a manner that permits white bloc voting to prevent candidates of choice of Black and Latino voters from being elected. Alternative district configurations are possible in which Black and Latino voters, who vote cohesively, would from a majority of eligible voters in a congressional district in which they could

elect their candidate of choice. For example, under Plan C2163, Plaintiff Saenz would reside in CD37, a district that is majority Latino CVAP. Under Plan C2167, Plaintiff Saenz would reside in CD6, a district that is majority Black and Latino CVAP. By contrast, under enacted Plan C2193, Plaintiff Saenz resides in a majority Anglo district in which Black and Latino voters cannot elect their candidate of choice.

41.     Plaintiff Saenz has voted in past elections and intends to vote in the 2022 and future elections.

42.     Defendant Greg Abbott is sued in his official capacity as the Governor of the State of Texas. Under Texas election laws, Governor Abbott "shall order . . . each general election for officers of the state government" by proclamation. Tex. Elec. Code § 3.003.

43.     Defendant John Scott is sued in his official capacity as the Secretary of State of Texas. Mr. Scott is "the chief election officers of the state," Tex. Elec. Code § 31.001(a), and is required to "obtain and maintain uniformity in the application, operation, and interpretation of" Texas election laws, such as by issuing directives and instructions to all state and local authorities having duties in the administration of these laws, *id.* § 31.003. As Secretary of State, Mr. Scott is empowered to remedy voting rights violations by ordering any official to correct conduct that "impedes the free exercise of a citizen's voting rights." *Id.* § 31.005(b). Mr. Scott prescribes the forms used to obtain a place on a party's general primary ballot, *see id.* §§ 141.031, 172.021-.024. A political party wishing to hold a primary must deliver written notice to Mr. Scott noting its intent to hold a primary election, *id.* § 172.002, and must certify to Mr. Scott the name of each candidate who has qualified for placement on the general primary election ballot, *id.* § 172.028. Finally, the adopted redistricting plans are filed with the Secretary of State to ensure that elections are conducted in accordance with those plans.

44.     Defendant State of Texas is sued only with respect to the Section 2 statutory claims stated herein, for which Congress has abrogated sovereign immunity.

## FACTS

### I.     Senate District 10.

*Federal Court Declares 2011 Effort to Dismantle SD10 Intentionally Racially Discriminatory*

45.     In 2011, the legislature cracked SD10's minority population across three districts, ensuring that they would have no ability to elect their preferred candidates. Examining the evidence, a three-judge federal court concluded that "the Senate Plan was enacted with discriminatory purpose as to SD 10." *United States v. Texas*, 887 F. Supp. 2d 133, 166 (D.D.C. 2012).

46.     The court provided a detailed account of the fracturing, explaining that SD10 contained "almost all the traditional and growing minority neighborhoods of Tarrant County in and around Fort Worth, including the historic Northside Hispanic area, the growing Southside Hispanic area, and the predominantly Black areas of Southeast Fort Worth, Forest Hill, and Everman." *Id.* at 226 (citation omitted). The court explained that in the 2011 Plan, "[t]hese areas are broken apart and placed into Anglo-controlled districts." *Id.*

47.     In particular, the court noted the "community known as the 'north side Latino community,' which [was] moved out of SD 10" in the 2011 Plan. *Id.* at 228.

48.     The changes to SD10 in the 2011 Plan were not explainable by the need for population adjustments, the court reasoned, because SD10's deviation was "well within the population deviation accepted for redistricting" state legislative districts. *Id.* at 226.

49.     The court noted that the mapdrawers knew the areas removed from SD10 were minority neighborhoods, and rejected the mapdrawers' contention that partisanship explained their

decision to fracture SD10's minority population. *Id.* at 228-229. Concluding that the dismantling of SD10 was the product of intentional racial discrimination, the court noted that "[t]he dismantling of SD 10 will have a disparate and negative impact on minority groups in the District." *Id.* at 229.

50.     On April 18, 2013, then-Attorney General Greg Abbott sent a letter to the House and Senate Redistricting Chairs, copying all committee members, explaining that "the D.C. court concluded that all three maps were tainted by evidence of discriminatory purpose" and "[t]hat is exactly why you should take action. The Legislature has both the opportunity and the obligation to remove the specter of discrimination." Mr. Abbott advised the legislature "to adopt the court-drawn interim plans as the State's permanent redistricting maps," including the benchmark configuration of SD10.

51.     Sen. Joan Huffman—the Chair of the Senate Redistricting Committee this year—was a member of the Senate Redistricting Committee in 2011 and 2013, received the letter from then-Attorney General Abbott, and was present at committee meetings in which the federal court's discriminatory intent ruling regarding SD10 was discussed. She voted to adopt Plan S172, which restored SD10 to its benchmark configuration, a bill that passed and was signed into law by then-Governor Rick Perry.

52.     After the legislature repealed the 2011 Plan, acquiescing to the federal court's intentional discrimination ruling, the federal court declared then-Senator Davis the prevailing party and ordered Texas to pay her (and her co-litigants') attorneys' fees in excess of $1 million—a ruling that was upheld on appeal and which the Supreme Court declined to disturb.

### *2020 Census*

53.     Under 13 U.S.C. § 141, commonly referred to as Public Law 94-171 or P.L. 94-171, the Secretary of Commerce must complete, report, and transmit to each state the detailed

tabulations of population for specific geographic areas within each state. States ordinarily use the P.L. 94-171 data to redraw district lines.

54.     States, including Texas, received the P.L. 94-171 dated on August 12, 2021.

55.     The 2020 Census revealed that Texas's population grew by roughly 4 million people from 2010 to 2020, and this growth was driven almost exclusively by minorities. Minorities accounted for *95%* of the roughly 4 million new Texans.

56.     Texas is a majority-minority state. The 2020 Census shows that 39.7% of Texans are Anglo, 39.3% are Hispanic, 13.6% are Black, and 6.3% are Asian. Minorities also constitute a majority—56.8%—of Texas's voting age population.

57.     The 2020 Census also revealed explosive growth among Tarrant County's Black, Hispanic, and Asian populations. Tarrant County has a total population of 2,110,640 persons, of whom 42.9% are Anglo, 29.4% are Hispanic, 19.2% are Black, and 7.2% are Asian.

58.     As of the 2020 Census, Tarrant County's voting age population is 46.9% Anglo, 26.3% Hispanic, 17.9% Black, and 7.1% Asian. This reflects a rapid growth in the minority share of Tarrant County's voting age population and a steep decline in the Anglo share of its voting age population. At the time of the 2010 Census, Tarrant County's voting age population was 56.6% Anglo, 22.9% Hispanic, 14.6% Black, and 5.3% Asian.

### *Benchmark SD10 Is a Performing Crossover District that Effectively Elects Minority Voters' Candidates of Choice*

59.     SD10 has existed in essentially the same configuration since 2001. The 2020 Census revealed that it had a population of 945,496 persons, just 5,318 above the ideal population. This translates to a 0.57% deviation—the fourth lowest among any senate district in the benchmark plan—and well within the legally permissible deviation.

60.    The population deviations of the neighboring senate districts could have nearly perfectly offset one another, such that no changes to SD10 were needed to balance the population of any other district. For example, while benchmark SD8 was overpopulated by 6.16%, benchmark SD16 and SD23 were underpopulated by 1.42% and 5.64% respectively. Moreover, while benchmark SD12 was overpopulated by 15.55% and benchmark SD30 was overpopulated by 9.26%, those deviations could have been remedied by shifting population to neighboring SD28, which was underpopulated by 15.33% and SD31, which was underpopulated by 7.54%.

61.    As of the 2010 Census—the data available when the federal court ruled the prior attempt to dismantle SD10 was unlawful racial discrimination—SD10's population was 47.6% Anglo, 28.9% Hispanic, and 19.2% Black. Its Anglo citizen voting age population ("CVAP") was 62.7%.

62.    The 2020 Census revealed a large increase in minority population in SD10, and a corresponding decline in Anglo population. SD10's total population under the benchmark map is now 39.5% Anglo, 32.2% Hispanic, and 21.5% Black. Its Anglo CVAP has fallen to 53.8% according to the 2019 ACS data, and in fact as of 2022 trends show that the district is actually now majority minority by CVAP, with a projected non-Anglo CVAP of 52.8% and an Anglo CVAP of 47.2%.

63.    The map below shows SD10's boundaries as they existed in the benchmark map and includes shading to show the areas where SD10's minority populations are concentrated.



64.     SD10 has performed as an effective crossover district in which its minority voters
succeed, with some crossover Anglo support, in electing their candidates of choice. For example,
then-Sen. Davis (D) won the district in 2008 and 2012, carrying the vast majority of SD10's
minority voters. Likewise, Sen. Beverly Powell (D) won the district in 2018, with overwhelming
support from the district's minority voters. In recent years, minority candidates of choice for
statewide or national office have likewise carried the district. In the 2020 presidential election,
Biden (D) prevailed in SD10 over Trump (R) (53.1% to 45.4%), in the 2020 U.S. Senate election
Hegar (D) prevailed in SD10 over Cornyn (R) (49.8% to 47.7%), in the 2018 U.S. Senate election
O'Rourke (D) prevailed in SD10 over Cruz (R) (53.3% to 45.9%), in the 2018 Attorney General
race Nelson (D) prevailed in SD10 over Paxton (R) (51.6% to 46.1%), and in the 2018 Lieutenant
Governor election Collier (D) prevailed in SD10 over Patrick (R) (50.8% to 46.9%). Moreover, in
the 2020 Tarrant County Sheriff race, Vance Keyes, a Black Democratic candidate, carried SD10
over Anglo Republican candidate Bill Waybourn by a margin of 51.2% to 48.8%.

### Enacted SD10 Cracks Tarrant County's Minority Population

65.     The enacted SD10 in Plan S2168 intentionally cracks Tarrant County's minority population in order to dismantle the district's status as a performing crossover district for minority voters. The map below shows, in circles, the minority population that is cleaved from SD10.



66.     SB4 also eliminates Anglo crossover voters from SD10 and replaces them with Anglo voters from seven rural counties who vote almost entirely as a bloc against minority-preferred candidates. The maps below show in red circles the Anglo crossover voters from current SD10 who are eliminated from the district by SB4. In the areas shown in red, a portion of Anglo voters crossover to support minority-preferred candidates. Together, the areas shown in red have a roughly 78% Anglo CVAP, but the Anglo-preferred candidates generally receive vote percentages of 13-17 points below that number (*i.e.* Anglo-preferred candidates receive about 61-65% of the vote in the areas shown in red).



67.     By contrast, SB4 eliminates these regions with Anglo crossover voters and replaces them (as well as the cleaved minority populations shown in the previous maps) with seven rural counties dominated by Anglo voters who engage in little to no crossover voting. The map below shows the enacted version of SD10. The seven rural counties added to SD10 have an 80.4% Anglo CVAP, and the Anglo-preferred candidates generally receive vote percentages nearly equal to the Anglo share of CVAP (*i.e.*, Anglo-preferred candidates receive about 78.1-82.7% of the vote in those seven counties).



68.     The map below compares three regions: (1) in green, the area in current SD10 that SB4 retains, (2) in red, the area in current SD10 that SB4 eliminates, and (3) in blue, the new area added to SD10 in SB4.



69.     The green area contains 558,335 people, of whom 205,181 (36.7%) are Anglo, 182,243 (32.6%) are Hispanic, 140,270 (25.1%) are Black, and 26,019 (4.7%) are Asian.

70.     The red area—the area removed from SD10—contains 387,161 people, of whom 168,721 (43.6%) are Anglo, 122,446 (31.6%) are Hispanic, 63,362 (16.4%) are Black, and 27,522 (7.1%) are Asian.

71.     The blue area—the area added to SD10—contains 377,534 people, of whom 253,532 (67.2%) are Anglo, 81,604 (21.6%) are Hispanic, 25,138 (6.7%) are Black, and 5,734 (1.5%) are Asian.

72.     The ***Anglo*** population share is 23.6 percentage points ***higher*** in the new area than in the eliminated area, the ***Hispanic*** population share is 10 percentage points ***lower*** in the new area than in the eliminated area, the ***Black*** population share is 9.7 percentage points ***lower*** in the new area than in the eliminated area, and the Asian population share is 5.6 percentage points ***lower*** in the new area than in the eliminated area.

73.     SB4 thus increases SD10's Anglo population by 84,811, decreases its Hispanic population by 40,842, decreases its Black population by 38,224, and decreases is Asian population by 21,788.

74.     The net effect of SB4's cracking of minority populations, its elimination of Anglo crossover voters, and its addition of near-uniformly bloc-voting Anglo voters is the intentional dismantling of a performing crossover district. Unlike current SD10, which performs to elect minority voters' candidates of choice, the new SD10 will reliably defeat minority voters' preferred candidates. For example, Trump (R) defeated Biden (D) in this district 57.2% to 41.4%, Cornyn (R) defeated Hegar (D) 58.5% to 39.1%, Cruz (R) defeated O'Rourke (D) 56.9% to 42.3%, Paxton (R) defeated Nelson (D) 56.4% to 41.3%, and Patrick (R) defeated Collier (D) 57.0% to 40.8%.

75.     As the map below shows, the new senate districts for Tarrant County crack its minority populations into pieces, spreading them across three districts that will be controlled by Anglo voters. In a majority-minority county of over 2 million residents, minority voters will have their voices shut out completely, reducing from **one** to **zero** the number of senate districts in which they will be able to elect their candidate of choice.



***The Dismantling of SD10 as a Performing Crossover District Was Intentionally Racially Discriminatory***

76.     These extreme changes to SD10—a district that had near perfect population equality and that was ordered in place last decade to remedy intentional racial discrimination—were done in order to destroy its performing crossover status. This was intentionally racially discriminatory against Tarrant County's minority voters.

77.    The Chair of the Senate Redistricting Committee, Sen. Joan Huffman, served on the 2011 Senate Redistricting Committee that was responsible for the 2011 Senate Plan ruled by the federal court to be intentionally discriminatory as to SD10. She attended committee meetings in which witnesses testified about the particular neighborhoods within SD10 that had large concentrations of minority voters.

78.    Chair Huffman acknowledged that she "probably" has read the federal court's order ruling SD10 to be the product of intentional racial discrimination, and she was well aware of the Court's ruling with respect to SD10.

79.    Chair Huffman received the April 18, 2013 letter from then-Attorney General Abbott acknowledging the federal court's ruling that SD10 was the product of intentional racial discrimination and urging the committee to remedy that violation by adopting the benchmark configuration of SD10 that reunited its minority population.

80.    Chair Huffman served on the 2013 Senate Redistricting Committee and attended meetings in which the federal court's ruling that SD10 was the product of intentional racial discrimination was discussed. Chair Huffman voted to repeal the discriminatory 2011 Plan and adopt the benchmark configuration of SD10 in its place, in response to the federal court's ruling and the urging of then-Attorney General Abbott that the committee correct the violation of law with respect to SD10.

81.    Chair Huffman presided over multiple senate redistricting committee hearings prior to drawing Plan S2168 in which the State Demographer, Dr. Potter, discussed the explosive growth of minority communities, including in Tarrant County.

82.   Chair Huffman is fully aware of the location of Tarrant County's minority population. Moreover, her lead staffer responsible for actually drawing the district lines, Anna Mackin, is likewise fully aware of the location of Tarrant County's minority population.

83.   During the Senate Redistricting Committee hearings, multiple witnesses—voters, elected officials, and community leaders from across SD10—spoke in great detail about how the proposed plan would fracture SD10's minority community, with the names of particular neighborhoods and the specific numbers of minority residents cracked apart by the proposal provided repeatedly by witnesses.

84.   During a meeting with Sen. Huffman and her aides Anna Mackin and Sean Opperman prior to the release of the proposed plan, Sen. Powell—who currently represents SD10—showed Sen. Huffman maps of current SD10 with shading to indicate the location of the district's minority population. Sen. Huffman viewed each of several maps, initialed, and dated each map. Sen. Huffman was also provided a copy of the federal court order from 2012 declaring the prior attempt to dismantle SD10 was the result of purposeful racial discrimination. Anna Mackin displayed in-depth knowledge of the decision—a fact obvious from her decade of extensive involvement in Texas redistricting, including *Perez v. Abbott*.

85.   Sen. Powell followed up with a letter to Sen. Huffman on September 16, 2021, which included the maps showing the location of SD10's minority population, and attachments providing detailed facts of SD10's minority population and its status as a performing crossover district for minority voters.

86.   Before the senate plan was released, Sen. Powell emailed each member of the Senate a copy of the letter, maps, federal court order, and fact sheet that she had sent to Sen. Huffman. The cover email included a map showing how the proposed plan cracked apart SD10's

minority population in order to destroy its performance as a crossover district. When the senate plan was introduced in the House, Sen. Powell sent similar correspondence and materials to the House Redistricting Committee members, and then to all members of the Texas House.

87.     During the floor debate on SB4, Sen. Powell questioned Sen. Huffman at length about the redistricting process and the choice to intentionally dismantle SD10 so that it would no longer perform as a crossover district for minority voters.

88.     Sen. Huffman offered demonstrably false, pretextual statements in support of her dismantling of SD10 as a preforming crossover district for minority voters, such as the goals of population equality (until a last minute change, proposed SD10 had a population deviation four times its benchmark deviation), preserving political subdivisions (the plan splits Arlington into four senate districts), compactness (the plan worsens it), preserving the core of existing districts (the plan splits apart the core of the existing district and appends seven rural counties), preserving communities of interest (the plan cracks apart SD10's core communities of interest), and incumbent protection (the plan would likely cause the defeat of the minority-preferred incumbent). Sen. Huffman could not cite which of these criteria she followed when drawing SD10; she falsely and pretextually asserted that her decision to crack apart SD10's minority communities served "all" of these supposed redistricting criteria.

89.     Sen. Huffman was speechless when asked by Sen. Powell during the floor debate to explain how she managed to draw a plan that reduced the number of majority-minority senate districts from the benchmark plan notwithstanding the fact that minority voters constituted 95% of the 4-million-person growth in the state.

90.     Sen. Huffman was speechless when asked by Sen. Powell during the floor debate to explain how it came to be that the districts with the largest *increases* in their share of minority

population were those in which the added minority population would have ***no effect*** on electoral outcomes.

91.     Sen. Huffman was speechless when asked by Sen. Powell during the floor debate to explain how the districts with the largest ***decreases*** in their share of minorities were those in which the Anglo-preferred incumbents were most at risk of electoral defeat in upcoming elections.

92.     None of this was a coincidence. It was the result of intentional racial discrimination in order to dilute minority voters' ability to elect their preferred candidates.

93.     Sen. Powell offered a floor amendment to return SD10 to essentially its benchmark configuration. When that amendment was offered, Republican Sen. Kel Seliger, who had chaired the 2011 and 2013 Senate Redistricting Committees, commented that SB4 proposed "a substantial decrease in [SD10] in the . . . voting age population of Hispanic an African American voters." Sen. Seliger voted in favor of the amendment to restore SD10 and voted against SB4. A bipartisan group of senators supported eliminating the intentional racial discrimination in SB4 with respect to SD10, but to no avail.

94.     During the House debate on SB4, Rep. Chris Turner placed maps on each House member's desk showing, with shading, how the proposed senate plan cracked apart SD10's minority community. He also displayed a large poster on the House floor, as shown below. Every member of the Legislature was fully aware of the intentional cracking of SD10's minority community, and its discriminatory effect.



95.     The process of adopting SB4 demonstrated departures from the normal procedures and from the substantive considerations usually deemed important by the Legislature in redistricting.

96.     The Senate Redistricting Committee offered little advance notice of its hearing. Late in the evening before a hearing on the senate redistricting plan, Sen. Huffman released a committee amendment, S2108, that radically altered SD10 even more than the original proposal, tacking on an additional eight rural counties. The hearing at which the public was to testify was held the very next morning, and the large blown-up maps in the room that the public could see in order to comment on the maps were of the *old* proposal, rather than the committee substitute.

97.     The Senate Redistricting Committee conducted no field hearings, and Sen. Huffman refused Sen. Powell's invitation for the Committee to come to Tarrant County to hear from minority voters victimized by the discriminatory proposal.

28

98.     When Sen. Huffman made changes throughout the process to SD10 and its neighboring districts, she kept all the other affected members informed except for Sen. Powell, who represented the district controlled by minority voters.

99.     The historical background of the decision to dismantle SD10 reveals a discriminatory purpose. The *precise same* scheme was ruled intentionally racially discriminatory in 2012. Sen. Huffman has acknowledged that she "probably" read that decision and is familiar with its ruling regarding SD10, was on the Committee that drew the invalidated plan, received the legal advice from then-Attorney General Abbott that the legislature was duty-bound to correct that discrimination, and ultimately voted to reinstate SD10 to its benchmark configuration to remedy that discrimination in 2013. The decision to knowingly revive the same discriminatory scheme, in light of that history, evidences purposeful racial discrimination.

100.    The specific sequence of events leading to the enactment of SB4 illustrates its racially discriminatory purpose. As just one example, Sen. Huffman offered shifting pretextual explanations for the choice to dismantle SD10 as a performing crossover district, while ignoring the cavalcade of testimony of minority voters and community leaders asking the legislature not to repeat the same discriminatory tactic that had been declared unlawful in 2012.

101.    SB4, including its dismantling of SD10 as a performing crossover district for minority voters, has an extreme, disproportionate negative impact on minority voters compare to Anglo voters. With the destruction of SD10, SB4 reduces the number of districts in which Texas voters of color can elect their candidate of choice, even though Texans of color are responsible for *95%* of the State's explosive population growth since 2010.

102.    The legislature intended the discriminatory result it achieved—a second attempt in ten years to accomplish the same illegal goal with respect to SD10.

*Race Predominated in the Drawing of SD10*

103.    Race—cracking minority communities and adding multiple Anglo-controlled counties—was the predominant consideration in the drawing of SD10, and it was not in service of a compelling interest like complying with the Voting Rights Act.

104.    Other districting criteria, like compactness, respect for political subdivisions, communities of interest, incumbent protection, and others were subordinated to race.

*Tarrant County's Black and Latino Voters Form a Geographically Compact, Politically Cohesive Group Entitled to a Coalition Senate District Under Section 2 of the VRA*

105.    SB4 cracks apart Tarrant County's minority populations, diluting their voting strength by submerging them in Anglo-controlled senate districts.

106.    The population of Black and Hispanic voters in Tarrant County is sufficiently large and geographically compact to constitute a majority in a newly configured SD10. For example, Plan S2134, shown below, was offered as a floor amendment by Sen. Powell.

107.    Under Plan S2134, SD10 has an Anglo CVAP of 41.8%, a Black CVAP of 26.3%, a Hispanic CVAP of 26.3%, and an Asian CVAP of 3.7%. Its combined Black and Hispanic CVAP is thus 52.6%, as shown below.

**Plan S2134 SD10**



108.     Black and Hispanic voters in Tarrant County are politically cohesive. General elections are most probative, given the high voter participation and the political unity that exists within the choice of which party's primary to vote in. But both recent general and primary elections illustrate the strong cohesion between Tarrant County's Black and Hispanic voters.

109.     Ecological inference analysis shows this cohesion. For example, in Tarrant County Black voters voted for the following Democratic candidates at the following percentages: Biden (90.4%), Hegar (89.5%), Valdez (89.1%), O'Rourke (90.9%), Clinton (89.5%, and Davis (88.7%). Latino voters overwhelmingly voted in cohesion at the following percentages: Biden (80.8%), Hegar (79.3%), Valdez (83.5%), O'Rourke (85.0%), Clinton (83.8%), Davis (79.9%).

110.     This cohesion among Black and Latino voters in Plan S2134's version of SD10 is also illustrated by reconstituted election results; the candidates of choice of Black and Latino voters would have prevailed by large margins: President Biden would have received 62.4%, 2020 senate challenger Hegar would have received 59.4%, 2018 senate challenger O'Rourke would have received 63.8%, 2018 gubernatorial challenger Valdez would have received 58.1%, 2018

lieutenant governor challenger Collier would have received 61.2%, 2018 attorney general challenger Nelson would have received 62.0%, 2016 presidential candidate Clinton would have received 57.9%, 2014 senate challenger Alameel would have received 51.4%, 2014 gubernatorial challenger Davis would have received 56.3%, 2014 lieutenant governor challenger Van De Putte would have received 54.7%, and 2014 attorney general challenger Houston would have received 54.1%.

111.    Anglo voters in SB4's configuration of SD10 bloc vote in favor of Republican candidates by wide margins, with ecological inference analysis showing the following margins for Republican candidates among Anglo voters in the district: Trump 2020 (86.2%), Cornyn 2020 (88.2%), Abbott 2018 (91.1%), Cruz 2018 (86.3%), Trump 2016 (87.8%), and Abbott 2014 (88.2%).

112.    Moreover, as SB4's configuration of SD10 illustrates, this extreme Anglo bloc voting will usually defeat Black and Hispanic voters' candidates of choice in the enacted version of SD10, as the Republican candidates opposed by minority voters would prevail in each statewide election from 2014, 2016, 2018, and 2020 in the district.

113.    Even in just Tarrant County, which is 57.1% Anglo CVAP, the candidates preferred by Black and Hispanic voters lost 7 of the 9 most recent elections statewide elections (2020 Senate, 2018 Governor, 2018 Lieutenant Governor, 2018 Attorney General, 2016 President, 2014 Senate, 2014 Governor).

114.    The totality of circumstances demonstrate that Black and Hispanic voters have less opportunity that other members of the electorate to participate in the political process and to elect representatives of their choice. *See* 52 U.S.C. § 10301(b).

115.    There is a history of official voting-related discrimination in Texas. Indeed, the federal court found that the legislature acted with racially discriminatory intent in its last redistricting of SD10. Moreover, the San Antonio federal court ruled that the legislature's cracking and packing of minority voters in the 2011 Dallas Forth-Worth area congressional districts was the product of intentional racial discrimination. And the *en banc* Fifth Circuit held in 2016 that Texas's voter ID law had a racially discriminatory effect in violation of Section 2 of the Voting Rights Act. History is replete with examples in Texas, which hasn't made it through a single redistricting cycle in modern history without being found to have racially discriminated in intent or effect.

116.    Voting in Tarrant County is racially polarized, with Anglo voters preferring Republican candidates by wide margins and Black and Hispanic voters preferring Democratic candidates by wide margins.

117.    Black and Hispanic residents of Tarrant County bear the effects of discrimination in education, employment, and health, which hinders their ability to participate effectively in the political process. For example, in 2017, the Fort Worth City Council appointed a task force on Race and Culture and the task force issued its report on December 4, 2018.

118.    The task force found that in Fort Worth in 2016, the unemployment rate among Anglo residents was 4.2%, while it was 6.1% among Black residents and 5.7% among Hispanic residents. The 2016 median household income in Fort Worth was $63,704 for Anglo households, $41,317 for Black households, and $44,748 for Hispanic households.

119.    The task force found that, in Fort Worth, Anglo residents are more likely to hold a bachelor's degree than Black and Hispanic residents, and Black and Hispanic residents are more likely to live in economically depressed areas.

120.     The task force found that in the Fort Worth ISD, 62% of Anglo third-grade students were reading at grade level, while just 32% of Hispanic and 20% of Black third-grade students were.

121.     The task force reported, based on 2015 statistics, that the infant death rate in Tarrant County was 9.6 per 1,000 for Black babies, 6.2 per 1,000 for Hispanic babies, and 4.3 per 1,000 for Anglo babies.

122.     Health disparities are evident in diabetes diagnoses in Tarrant County. The task force reported that 16% of Black residents had been diagnosed with diabetes, 12% of Hispanic residents had, and 9% of Anglo residents had.

123.     Elections in Tarrant County have seen frequent overt and subtle racial appeals in campaigns, from President down to local offices.

124.     Black and Hispanic residents are underrepresented in elected office in Tarrant County. The Fort Worth task force found that Hispanic residents were underrepresented on the city council. Until recently, only 1 of the 5 members of the Tarrant County Commissioners Court were Black; now 2 are. There are no Hispanic Commissioners. Only 1 of Tarrant County's 11 state house members is Black, and only 1 is Hispanic.

125.     Black and Hispanic voters are a combined 43.4% of the CVAP in Texas, yet only 11 of 31 senate districts (35.5%) in SB4 are majority Black and/or Hispanic.

## II.     Congressional Plan C2193

126.     Since 2010, Texas's Anglo population grew by only 187,252 persons, while its Latino population grew by 1,980,796, its Asian population grew by 613,092, and its Black population grew by 557,887. There was a significant increase in the population of Texans who identify as members of multiple races.

127.     Of the roughly 4 million new Texans, **95%** are minorities.

128.     The Census Bureau's 2019 American Community Survey ("ACS") reports that Texas's CVAP is 50.1% Anglo, 30.9% Latino, 13.4% Black, and 3.9% Asian.

A.  **Dallas Fort Worth Area**

129.     Plan C2193, enacted in SB6, splits Dallas and Tarrant Counties among nine congressional districts, with only three in which Black and Latino voters can elect their candidate of choice: CD30, CD32, and CD33.

130.     The substantial, remaining population of Black and Latino voters in the Dallas/Fort Worth area are cracked among the remaining districts, many of which are predominantly rural districts dominated by Anglo voters.

131.     An additional district can be drawn with a geographically compact minority population, either majority Latino CVAP or combined majority Black and Latino CVAP, without eliminating any districts in the area in which Black and Latino voters already have the opportunity to elect their candidates of choice.

132.     For example, Plan C2163 creates a Latino CVAP majority district in Dallas/Fort Worth (DFW), District 37, while maintaining the existing three districts (CDs 30, 32, and 33) in which Black and Latino voters can elect their candidates of choice. Under Plan C2163, District 37 as shown below is 51.4% Latino CVAP.

**Plan C2163 DFW Area**



133.    Alternatively, Plan C2167 creates a Black and Latino CVAP majority district in DFW, District 6, while maintaining the existing three districts (CDs 30, 32, and 33) in which Black and Latino voters can elect their candidates of choice. Under Plan C2167, District 6 as shown below is 44.5% Latino CVAP, 18.9% Black CVAP, and 31.2% Anglo CVAP, for a combined Black and Latino CVAP of 63.4%.

**Plan C2167 DFW Area**



134.    Black and Latino voters in the DFW area are politically cohesive. General elections are most probative, given the high voter participation and the political unity that exists within the choice of which party's primary to vote in. But both recent general and primary elections illustrate the strong cohesion between the area's Black and Hispanic voters. Black and Latino voters in DFW strongly prefer Democratic candidates.

135.    For example, candidates preferred by Latino and Black voters would have carried District 37 in Plan C2163 by large margins.  President Biden would have received 69.8%, 2020 senate candidate Hegar would have received 67.2%, 2018 senate candidate O'Rourke would have received 74.3%, 2018 governor challenger Valdez would have received 69.2%, 2018 lieutenant governor challenger Collier would have received 71.2%, 2018 attorney general challenger Nelson would have received 72.0%, 2016 presidential candidate Clinton would have received 68.8%, 2014 senate challenger Alameel would have received 56.5%, 2014 governor challenger Davis would have received 61.2%, 2018 lieutenant governor challenger Van De Putte would have received

60.1%, and 2014 attorney general challenger Houston would have received 59.5%. Likewise, candidates preferred by Latino and Black voters would have carried District 6 in Plan C2167 by large margins. President Biden would have received 70.2%, 2018 senate challenger O'Rourke would have received 74.1%, 2018 governor challenger Valdez would have received 68.4%, 2018 lieutenant governor challenger Collier would have received 70.8%, 2018 attorney general challenger Nelson would have received 71.7%, 2016 presidential candidate Clinton would have received 68.5%, and 2014 governor challenger Davis would have received 60.7%.

136.    Anglo voters bloc vote against the candidates preferred by Black and Latino voters in DFW, and in the absence of a remedy plan such as Plans C2163 or C2167 that draw a fourth DFW district in which Black and Latino voters can elect their preferred candidate, Anglo voters will usually defeat the candidate preferred by Black and Latino voters in all but three DFW congressional districts. Rather than creating a fourth minority opportunity district in DFW, Plan C2193 (the enacted plan) fractures minority voters and ensures that bloc voting Anglo voters will control electoral outcomes in surrounding districts, such as CDs 6, 24, and 25, as shown below. CD 6 has an Anglo CVAP of 60.1%, CD 24 has an Anglo CVAP of 74.2%, and CD 25 has an Anglo CVAP of 70.2%.

137.    Further, elections in the DFW area exhibit racial polarization. Latino and Black voters vote cohesively for preferred candidates who associate with the Democratic party, while Anglo voters vote in the opposite direction, voting against Latino and Black preferred candidates and for candidates who associate with the Republican party.

138.    In Dallas County, racial polarization was exhibited in elections in 2014, 2016, 2018, and 2020, as well as earlier years.

139.    In the 2016 Presential election in Dallas County, 80 percent of Latino voters and 93.1 percent of Black voters preferred Clinton (the Democratic candidate), compared to only 26.8 percent of Anglo voters. Anglo voters have a preferred candidate in Trump (the Republican candidate), with 68 percent of Anglo voters voting in favor of him, however, only 6.4 percent of Black voters voted for Trump and 17.3 percent of Hispanic voters.

140.    In Dallas County during the 2018 election, Latino and Black voters voted cohesively for Valdez (the Democratic candidate) with 81.1 percent of Latinos and 92.4 percent of Black voters in Dallas County voting for Valdez. In contrast, 74.6 percent of Anglo voters strongly preferred Abbott, making Abbott the preferred candidate.

141.    Further, the 2018 Senate election between O'Rourke (the Democratic candidate) and Cruz (the Republican candidate) exhibited racial polarization. In Dallas County, Latino and Black voters' preferred O'Rourke with 83.9 percent of Latino voters and 94.0 percent of Black voters preferring O'Rourke, compared to only 34.7 percent of Anglos. Anglo voted cohesively against the Latino and Black preferred candidate and for their own candidate of choice, Cruz, with 65.3 percent of Anglos casting their ballot for him, compared to only 6 percent of Black voters and 16.1 percent of Latino voters.

142.    The 2020 Senate election exhibited racial polarization in Dallas County. Latino and Black voters in Dallas County strongly preferred Hegar (the Democratic candidate) over Cornyn (the Republican candidate) with 75.7 percent of Latinos and 95.1 percent of Black voters in Dallas County voting for Hegar, while only 30 percent of Anglos did the same. Anglos preferred candidate was Cornyn, as 69.1 percent of Anglo voters voted for him.

143.    When viewing both Dallas County and Tarrant County together, racial polarization is present in elections, with Latino and Black voters coalescing together to vote for preferred

candidates, while Anglo voters coalescing around different candidates than those of Latino and Black voters.

144.    Racial polarization was exhibited in elections in 2014, 2016, 2018 and 2020 in Dallas and Tarrant County combined.

145.    For example, in the 2014 election, Hispanic and Black voters in Dallas and Tarrant counties strongly preferred Davis (the Democratic candidate) over Abbott, with 77.3 percent of Hispanic voters and 91.6 percent of Black voters supporting Davis, compared to only 17.6 percent of Anglos. Anglo voters, however, strongly preferred Abbott, with 81.2 percent of Anglos voting for Abbott compared to only 20.9 percent of Hispanic voters and 7.4 percent of Black voters.

146.    The 2016 Presidential election also demonstrated polarized voting in Dallas and Tarrant counties. In 2016, Black and Hispanic voters strongly preferred Clinton (the Democratic candidate), with 82.8 percent of Hispanic voters and 91.6 percent of Black voters preferring Clinton, compared to only 17.7 percent of Anglos. Anglos, however, had their own preferred candidate, voting strongly for Trump (the Republican candidate) at 77.8 percent over Clinton. Hispanic and Black voters did not prefer Trump as only 15 percent of Latino voters and 7.5 percent of Black voters casting their ballot for him in Dallas and Tarrant combined.

147.    Racial polarization in voting was also found in the 2018 Senate election between Cruz (the Republican candidate) and O'Rourke (the Democratic candidate. Latino and Black voters in Dallas and Tarrant counties combined coalesced around O'Rourke at 85.6 percent of Latinos and 92.9 percent of Black voters in favor of O'Rourke. Anglo voters had a different preferred candidate, 75.6 percent of Anglo voters supported Cruz, compared to only 13.8 percent of Hispanic voters and 7.0 percent of Black voters.

148.    The 2020 Presidential election exhibited racial polarization in Dallas and Tarrant counites combined as Black and Latino voters supported Biden (the Democratic candidate) while Anglo voters rebuked Biden and preferred Trump (the Republican candidate). 81.3 percent of Latino voters and 93.0 percent of Black voters supported Biden, compared to only one fourth of Anglos. Anglos, however, strongly preferred Trump, as 73.4 percent voted in favor of Trump.

149.    That racial polarization countywide is apparent at the district level as well. For example, in benchmark CD6, the 2014 Gubernatorial election, 2014 Senate election, 2016 Presidential election, 2018 Attorney General election, 2018 Gubernatorial election, 2018 Lt. Gubernatorial election, 2018 Senate election, and 2020 Presential election all exhibit racial polarization.

150.    In each of these elections, Hispanic and Black voters in CD 6 voted cohesively for candidates who associate with the Democratic party, while Anglo voters vote for candidates who associate with the Republican party.

151.    In the 2014 Gubernatorial election, Hispanic voters in CD 6 voted two to one for Wendy Davis (the Democrat), while Black voters in CD 6 voted over 80 percent for Davis. Anglo voters in CD 6 voted over 90 percent for Greg Abbott (the Republican), while only 35.2 percent of Latinos voters and 16.9 percent of Black voters preferred Abbott.

152.    Polarization was strong in the 2016 Presidential election in CD 6. Hispanic voters voted 73.5 percent for Clinton and Black voters in CD 6 voted 82.2 percent for Clinton. In CD 6, less than 6 percent of Anglo voters voted for Clinton. Anglo voters in CD 6, however, voted 94.2 percent for Trump, compared to 26.7 percent of Hispanic voters in CD 6 voting for Trump and 18.1 percent of Black voters.

153.    Polarization was also found in the 2018 Attorney General and Governor races in CD 6. In the 2018 Attorney General's election, Hispanic voters in CD 6 voted 79.7 percent for Nelson and Black voters voted for Nelson at 86.3 percent, while only 8.1 percent of Anglo voters in CD 6 voted for Nelson. 92 percent of Anglo voters, however, voted in favor of Paxton. In the Governor's race, 95.1 percent of Anglos voted for Abbott, while only 27.8 of Hispanic voters and 14.3 percent of Black voters in CD 6 preferred Abbott.

154.    Racial polarization was high during the 2020 Presidential election in CD 6. 78.1 percent of Hispanic voters and 85.5 percent of Black voters in CD 6 voted for Biden, compared to only 8.6 percent of Anglo voters, demonstrating clear polarization. Anglo voters strongly preferred Trump, with 91.4 percent of Anglo voters in CD 6 casting their ballot for him over Biden.

155.    As such, racial polarization is exhibited in multiple elections in CD 6 as Hispanic and Black voters have clear preferred candidates, Hispanic and Black voters in recent elections voting for those candidates at high margins and against Anglo preferred candidates. Similarly, Anglo voters have clear preferred candidates and vote for those candidates at high rates, in many instances at over 90 percent.

156.    Additionally, racial polarization is found in elections for congressional districts that surround CD 6, including benchmark CD 24 and CD 25.

157.    Elections in benchmark CD 24 exhibit racial polarization. Black and Latino voters are cohesive, voting together for preferred candidates who are associated with the Democratic party, while Anglo voters are cohesive with one another and vote for their own preferred candidates, who are associated with the Republican party.

158.    Elections in 2014, 2016, 2018, and 2020 all demonstrate racial polarization.

159.    In the 2014 Gubernatorial election,  Latino and Black voters in CD 24 voted in favor of Davis with Davis receiving 69.1 percent of Latino votes and 81.9 percent of Black votes. Anglo voters, however, voted against Davis and strongly for Abbott, with 78.6 percent of Anglos voting for Abbott.

160.    In 2016, Black and Latino voters strongly preferred Clinton to Trump, with Hispanic voters in CD 24 voting in favor of Clinton at 72.2 percent and Black voters supporting Clinton at 87.1 percent. Anglo voters did not support Clinton and instead preferred Trump, with 71.1 percent of Anglo voters casting their ballot for him in the 2016 Presidential election.

161.    The 2016 Presidential election is a clear showing of racial polarization and cohesion among Black and Hispanic voters in this area.

162.    Latino and Black voters were cohesive in the 2018 Senatorial election between O'Rourke and Cruz, with Latino voters supporting O'Rourke at 79.7 percent and Black voters preferring O'Rourke at 93.2 percent, compared to only 32.5 percent of Anglo voters. Anglo voters strongly preferred Cruz, who they voted for at a two-to-one margin in CD 24.

163.    In CD 25, Latino and Black voters are also cohesive and have preferred candidates that differ from Anglo voters, who are themselves cohesive.

164.    Racial polarization was found in elections in 2014, 2016, 2018, and 2020 in CD 25.

165.    For example, during the 2016 election, Latino and Black voters preferred Clinton, with Latino voters supporting Clinton at 70.3 percent and Black voters at 89.3 percent compared to only 8.7 percent of Anglo voters in CD 25. Anglo voters, however, strongly preferred Trump with 91.3 percent of Anglos voting for Trump.

166.    In 2020, Black and Latino voters in CD 25 preferred Hegar and for both groups, Hagar was the candidate of choice. 91.8 percent of Black voters and over two-thirds of Latino

voters supported Hegar compared to only 11 percent of Anglo voters. Anglo voters instead cohesively voted for Cornyn with 89.1 percent of Anglos voting in favor of him in CD 25.

**Plan C2193 DFW Area**



167.    Ecological inference analysis shows that Anglo voters in CDs 6, 24, and 25 are cohesive. For example, in enacted CD 6, Anglo voters cohesively preferred the following Republican candidates at the following percentages: Trump (91.4%), Cornyn 2020 (93.0%), Cruz 2018 (91.6%), Patrick 2018 (92.0%), Abbott 2018 (95.1%), Paxton 2018 (91.7%), Trump 2016 (94.2%), Cornyn 2014 (88.0%), and Abbott 2014 (93.8%). Likewise, ecological inference analysis shows that Anglo voters in CD 24 cohesively supported Republican candidates at the following percentages: Trump 2020 (65.1%), Cornyn 2020 (72.7%), Cruz 2018 (67.4%), Abbott 2018 (77.4%), Patrick 2018 (69.8%), Paxton 2018 (68.6%), Trump 2016 (71.1%), Cornyn 2014 (86.7%), and Abbott 2014 (78.6%). And in CD 25, ecological inference analysis shows that Anglo

voters cohesively supported Republican candidates at the following percentages: Trump 2020 (87.2%), Cornyn 2020 (89.1%), Cruz 2018 (86.7%), Abbott 2018 (91.6%), Patrick 2018 (87.8%), Paxton 2018 (87.2%), Trump 2016 (91.3%), Cornyn 2014 (93.6%), and Abbott 2014 (90.2%).

168.    Given the demographics of CDs 6, 24, and 25 together with this this strong Anglo bloc voting, Anglo voters in these districts will usually defeat Black and Latino voters' preferred candidates.

169.    For example, in CD 6, Trump (2020) would have received 61.3%, Cornyn (2020) would have received 62.1%, Cruz (2018) would have received 61.5%, Abbott (2018) would have received 65.5%, Patrick (2018) would have received 61.1%, Paxton (2018) would have received 60.6%, Trump (2016) would have received 63.7%, Cornyn (2014) would have received 70.5%, Abbott (2014) would have received 68.5%, Patrick (2014) would have received 68.3%, and Paxton (2014) would have received 68.6%. In CD 24, Trump (2020) would have received 55.4%, Cruz (2018) would have received 56.9%, Abbott (2018) would have received 64.0%, Patrick (2018) would have received 58.2%, Paxton (2018) would have received 57.0%, Trump (2016) would have received 59.3%, Cornyn (2014) would have received 71.9%, Abbott (2014) would have received 68.0%, Patrick (2014) would have received 66.3%, and Paxton (2014) would have received 68.1%. In CD25, Trump (2020) would have received 64.9%, Cruz (2018) would have received 64.5%, Abbott (2018) would have received 68.5%, Patrick (2018) would have received 64.2%, Paxton (2018) would have received 63.7%, Trump (2016) would have received 66.3%, Cornyn (2014) would have received 70.7%, Abbott (2014) would have received 68.2%, Patrick (2014) would have received 68.1%, and Paxton (2014) would have received 68.8%.

### B.  Houston Area

170.    Plan C2193 dilutes the voting strength of Latino voters in the Houston area, by concentrating Latino voters in CD29, which has a Latino CVAP of 62.23%, and cracking the remaining Latino population into other districts, including those dominated by Anglo voters.

171.    An additional district in which a geographically compact Latino population forms the majority of eligible voters can be drawn in the Houston area, without eliminating any districts in the area in which Black and Latino voters already have the opportunity to elect their candidates of choice.

172.    For example, Plan C2163 has two Latino majority CVAP congressional districts, CDs 29 and 38, as shown below. CD 29 has a Latino CVAP of 50.7% and CD 38 has a Latino CVAP of 50.9%. Plan C2167 similarly has two Latino majority CVAP congressional districts in the Houston area.

**Plan C2163 Houston Area**



173.    Latino voters in Plan C2163's CD29 and 38 are politically cohesive, and strongly prefer Democratic candidates. For example, ecological inference analysis shows that Harris County Latino voters cohesively voted for the following Democratic candidates at the following percentages: Biden (70.1%), Hegar (68.4%), O'Rourke (81.5%), Valdez (75.4%), Collier (78.1%), Nelson (81.4%), Clinton (78.9%), Alameel (54.6%), and Davis (68.7%).

174.    This cohesion among Houston-area Latinos is illustrated by reconstituted election results in Plan C2163's CDs 29 and 38, in which the Latino preferred candidates prevail by large margins. For example, in Plan C2163's CD29, President Biden would have received 65.6%, 2020 senate challenger Hegar would have received 63.1%, 2018 senate challenger O'Rourke would have received 71.5%, 2018 governor challenger Valdez would have received 66.3%, 2018 lieutenant governor challenger Collier would have received 69.0%, 2018 attorney general challenger Nelson would have received 70.1%, 2016 presidential candidate Clinton would have received 67.6%, 2014 senate challenger Alameel would have received 53.9%, 2014 governor challenger Davis would have received 58.9%, 2014 lieutenant governor challenger Van De Putte would have received 58.1%, and 2014 attorney general challenger Houston would have received 57.6%. In Plan C2163's CD 38, President Biden would have prevailed by 54.5%, 2018 senate challenger O'Rourke would have prevailed by 60.2%, 2018 governor challenger Valdez would have prevailed by 55.5%, 2018 lieutenant governor challenger Collier would have prevailed by 58.3%, 2018 attorney general challenger Nelson would have prevailed by 59.3%, and 2016 presidential candidate Clinton would have prevailed by 56.8%. Plan C2167 has similar election results.

175.    Anglo voters in the Houston area vote as a bloc against candidates preferred by Latino voters and in favor of Republican candidates. For example, ecological inference analysis

shows that Harris County Anglo voters favored the following Republican candidates by the following percentages: Trump 2020 (77.6%), Cornyn 2020 (81.4%), Crus 2018 (78.8%), Abbott 2018 (84.2%), Patrick 2018 (79.5%), Paxton 2018 (79.2%), Trump 2016 (79.3%), Cornyn 2014 (85.7%), and Abbott 2014 (82.0%).

176.    Under Plan C2193, a large number of Latino voters are cracked apart from those in CD 29, with others cracked into Anglo-controlled districts such as CD 36, which has a Latino CVAP of 20.7%. The demographics of CD 36 together with substantial Anglo bloc voting in the districts means that Anglo voters will usually defeat the candidates of choice of Latino voters, with Republican candidates favored by Anglo voters and opposed by Latino voters prevailing by the following percentages in the district: Trump 2020 (65.2%), Cornyn 2020 (65.6%), Cruz 2018 (64.4%), Abbott 2018 (67.8%), Patrick 2018 (63.9%), Paxton 2018 (63.4%), Trump 2016 (64.9%), Cornyn 2014 (70.7%), Abbott 2014 (69.2%), Patrick 2014 (68.4%), and Paxton 2014 (68.7%).

177.    Two districts can be created in which Latino voters can elect their preferred candidates, such as Plan C2163's CDs 29 and 38.

**C.  Totality of Circumstances.**

178.    Attitudes about race and ethnicity contribute significantly to the racially polarized voting in the DFW and Houston areas polarization. Issues like the removal of Confederate monuments, the teaching of America's history of slavery and racism to public school students, the experience of people of color and policing, the construction of a "Border Wall," and immigration policies generally dominate the political process.

179.    The totality of circumstances demonstrate that Black and Hispanic voters have less opportunity that other members of the electorate to participate in the political process and to elect

representatives of their choice in both the Dallas/Fort-Worth area congressional districts and the Houston area congressional districts. *See* 52 U.S.C. § 10301(b).

180.    As explained *supra* in the allegations regarding SD 10, there is a long history of voting-related discrimination in Texas.

181.    Black and Latino residents in the Dallas/Fort-Worth and Houston areas bear the effects of discrimination in education, employment, and health, which hinders their ability to participate effectively in the political process.

182.    For example, the Census Bureau's 2019 ACS 5-Year Survey reports that 8.4% of Anglo Texans lived below the poverty line, compares to 19.3% of Black Texans and 20.7% of Latino Texans.

183.    The ACS also shows that the median income for Anglo Texan households was $75,879, while it was $46,572 for Black Texan households and $49,260 for Latino Texan households.

184.    Unemployment rates are higher for Black and Latino Texans than they are for Anglo Texans.

185.    A 2021 report of the Texas Education Agency revealed that the number of Black and Latino students who scored close to, at, or above their grade level in math and reading standardized tests decreased at a higher rate than Anglo students during the COVID-19 pandemic.

186.    Black and Latino Texans are more likely that Anglo Texans to lack health insurance and are more likely to suffer from chronic diseases than Anglo Texans.

187.    Elections in the Dallas/Fort-Worth and Houston area, and throughout Texas, experience overt and subtle racial appeals.

188.    For example, in 2018 former congressman Pete Sessions contended that his Black opponent, now-congressman Colin Allred, wanted to legalize crack cocaine, and ran a digital ad with racial overtures.

189.    Sen. Cornyn labeled one of his potential opponents, Black state senator Royce West from Dallas County "Restful Royce,"—referencing a racial stereotype.

190.    Attacks on Asian Americans increased throughout the 2020 campaign, as former President Trump used phrases like "Kung-Flu" to refer to the coronavirus pandemic, which Sen. Cornyn blamed on China's "culture."

191.    Black and Latino voters are underrepresented in elected office in Texas. For example, Black and Latino voters form a combined 44.3% of Texas CVAP, yet only 33% of Texas's members of Congress are either Black or Latino.

## III.    State House Plan

### *Texas House District 118's (HD 118) Configuration Dilutes the Ability of Latino Voters to Elect Candidates of Choice*

192.    The configuration of HD 118 under Plan H2316, which replaced Latino voters with high-turnout Anglo voters, eliminated the ability for Latino voters to elect candidates of choice in the district.

193.    The benchmark HD 118 was a performing Latino opportunity district; Latino voters were able to elect candidates of choice in the vast majority of HD 118 elections.

194.    Under Plan H2316, Latino voters in the district will not be able to elect candidates of choice due to the increase of bloc-voting Anglo voters in the new HD 118.

195.    The benchmark HD 118 had a Hispanic CVAP of 68.2%.

196.    Additionally, benchmark HD 118 had a 2020 General Election Spanish Surname Voter Registration (SSVR) of 59.5%. SSVR is a precinct-level summation of registered voters

50

with Spanish surnames and is used to ascertain the number of Latino or Hispanic voters in a voting district.

197.    The benchmark HD 118 has a 2020 General Election Spanish Surname Turnout (SSTO) of 55.7%.

198.    The new HD 118, under Plan H2316, has a Hispanic CVAP of 56.4%.

199.    This is almost a 12% decrease in Hispanic CVAP in the district.

200.    As enacted, HD 118 has a SSVR of 47.6% and a SSTO of 43.9%.

201.    HD 118 under Plan H2316 reduces the SSVR of the district by 11.9% compared to the benchmark and the SSTO by 11.8% compared to the benchmark.

202.    The new HD 118 substantially reduces Latino population share, such that the district no longer has a majority of 2020 SSVR or SSTO.

203.    The changes to HD 118 were not necessary.

204.    During the redistricting process there were proposals introduced from members of the Bexar County delegation in the Texas House and other members that would have kept HD 118 a Latino opportunity district.

205.    For example, Plan H2176 which was the complete committee substitute plan, was voted out of the House Redistricting Committee by an 8 to 6 vote on October 5, 2021.

206.    Under Plan H2176, the Hispanic CVAP was 63.6% and the SSVR was 55.0% in HD 118.

207.    While Plan H2176 initially retained the Latino opportunity district, Plan H2176 was ultimately amended to remove HD 118 as a Latino opportunity district.

208.    During the floor debate, Representative Jacey Jetton of Fort Bend County introduced an amendment to the districts of Bexar County, of which HD 118 is a part of, that substantially altered the district.

209.    During the debate, Representative Jetton was unable to provide substantive details regarding the proposal.

210.    Despite the lack of details to the changes to HD 118, the Amendment was approved over the objection of most of the Bexar County delegation.

211.    The House approved of the Jetton Amendment, which established the final boundaries of HD 118 in Plan H2316.

212.    Under Plan H2316, HD 118's new configuration enables Anglo voters to defeat Latino voters' candidates of choice, even in high turnout general elections.

213.    HD 118 under the benchmark plan included dense neighborhoods within Loop 410, southern San Antonio, outlying communities in southern Bexar County, and small portions of eastern and northeaster Bexar County.

214.    HD 118 consistently elected Latino candidates of choice in regular elections through the past decade.

215.    Voters in HD 118 reelected Representative Leo Pacheco with 56.8% of the 58,558 votes cast.[2] In low turnout special elections in 2016 and 2021, voters in HD 118 elected Republican John Lujan, who was not the Latino candidates of choice. Lujan in 2016 won a special election with 52.4% of the vote that only saw 3,589 votes cast but his same Democratic opponent defeated

---

[2] Representative Pacheco resigned from his position in August of 2021 to teach full time at San Antonio College. *See* Daniel Friend, *Texas Rep. Leo Pacheco to Resign from State Legislature,* TEXAN NEWS (Aug. 9, 2021), https://thetexan.news/texas-rep-leo-pacheco-to-resign-from-state-legislature/.

him in the 2016 general election. Lujan was elected in November of 2021, winning 51.2% of the 11,569 votes cast.

216.    Alternative configurations are possible in which Latino voters maintain a majority of the CVAP of HD 118 yet will actually be able to elect their candidates of choice. For example, under Plan H2156, Latino voters constitute 63.8% of the district's CVAP.

217.    Ecological inference analysis shows that Latino voters in HD 118 are cohesive, supporting the following Democratic candidates at the following percentages: Biden (70.0%), Hegar (69.2%), O'Rourke (78.6%), Collier (75.9%), Valdez (72.2%), Nelson (78.8%), Clinton (78.2%), Alameel (68.1%), and Davis (75.9%).

218.    Anglo voters in HD 118 strongly bloc vote against Latino-preferred candidates. Ecological inference analysis shows that Anglo voters supported the following Republican candidates at the following percentages: Trump 2020 (92.3%), Cornyn 2020 (94.2%), Cruz 2018 (95.0%), Patrick 2018 (95.0%), Abbott 2018 (95.3%), Paxton 2018 (95.2%), Trump 2016 (98.9%), Cornyn 2014 (97.1%), and Abbott 2014 (96.4%).

219.    This extreme Anglo bloc voting coupled with the reduction of HD 118's Latino CVAP and its configuration such that its SSVR and SSTO are now below 50% mean that candidates preferred by Anglo voters in HD 118 will usually defeat candidates preferred by Latino voters.

220.    For example, the 2018 general election for governor featured a white Republican, Greg Abbott, versus a Latina Democrat, Lupe Valdez. Valdez was the candidate of choice of Latino voters in the district, while Anglo voters preferred Abbott. Under the benchmark version of HD 118, Valdez prevailed 52.6% to 45.9%. But under Plan H2316's version of HD 118, Abbott would have prevailed 52.7% to 45.7%.

221.    The same pattern is true for other elections featuring Latino Democratic candidates. For example, under the enacted version of HD 118, Miguel Suazo, the Democratic candidate for Land Commissioner in 2018 and Dori Contreras, a Democratic candidate for state supreme court in 2016, both would have lost HD 118 to their Republican opponents. By contrast, both carried the benchmark version of HD 118 by a large margin.

222.    Additionally, under Plan H2316, HD 118's shape changed dramatically. Under the benchmark plan, HD 118 included communities in southern San Antonio and neighborhoods within the Loop 410.



223.    HD 118 under Plan H2316, loses much of the territory it had inside of Loop 410 and excludes many of the Latino neighborhoods north of SW Military Drive.



224. Instead, under Plan H2316, HD 118 gained large portions of southwest Bexar County, extends west of highway 35, eats into HD 117, and increases in the eastern and northern areas of Bexar County around the Randolph Air Force Base.

225. Enacted HD 118 destroys a performing Latino opportunity district and prevents Latino voters in the district from being able to elect candidates of choice.

226. Latino voters in HD 118 suffer the effects of discrimination that reduces their ability to participate in the political process and, together with other considerations under the totality of circumstances, dilutes their voting strength. For example, the City of San Antonio's 2019 Racial Equity Indicator Report showed that 21.9% of the city's Latino population lived in poverty

compares to 11.2% of its Anglo population. Among the city's Anglo population, 43.4% had received a bachelor's degree or higher, compared to 16.2% of the city's Latino population. 19.7% of the city's Latino population lacked health insurance, versus 9.4% of the city's Anglo population. These factors combine to reduce Latino voter participation compared to Anglo voter participation, and together with other totality of circumstances considerations demonstrate vote dilution among Latino voters in HD 118.

227.    Moreover, the changes made to HD 118 were the product of intentional racial discrimination. The Legislature purposefully drew HD 118 to reduce its Hispanic population and increase its Anglo population to prevent Latino voters from being able to elect their candidates of choice.

228.    Texas has a long history of racial discrimination in voting, *see supra*. Moreover, the process by which the state house plan was adopted features significant procedural departures from normal procedures.  For example, the House Redistricting Committee refused to allow invited expert witness testimony or resource witnesses at the Committee hearing at which the state house plan was adopted. Further, the events leading up to the adoption of HD 118, including the last minute changes to the district that diluted Latino voting power, reflect an intent to discriminate against Latino voters.

### *The Texas House districts 54 and 55 in Bell County were drawn in a manner to dilute Black and Latino voters' ability to elect candidates of choice*

229.    The Texas House districts in Bell County were drawn to dilute Black and Latino voters' ability to elect candidates of choice.

230.    Specifically, House districts in Bell County were drawn in a manner that splits the Black community in Killeen in order to prevent Black and Latino voters from electing candidates of choice in coalition district.

231.    Bell County is comprised of House Districts 54 and 55 (HD 54 and HD 55).

232.    Under the benchmark plan, the city of Killeen was almost entirely situated within HD 54.

233.    Under the enacted map, Killeen is split between HD 54 and 55.



234.    Killeen is a majority-minority city with the Black population being the largest racial or ethnic group in the city.

235.    The district lines of HD 55, as demonstrated in the map above, cuts right through the middle of Killen, splitting apart the near-majority Black CVAP census tracts near Harker Heights from the rest of the city.

236.    Additionally, under the enacted map, HD 54 is less compact and bizarrely situated.

237.    HD 54 is drawn around HD 55; HD 55 is situated as a hole inside of HD 54.

238.    No changes were needed to balance HD 55's population in the benchmark plan and the only changes that were needed to bring HD 54 within acceptable population deviation were to remove Lampasas County from the district. Instead the districts were radically redrawn.

239.    The cracking of Killeen's Black population was addressed in the House debates and on the floor of the House.

240.    For example, during the October 4, 2021, committee hearing, Representative Rafael Anchía questioned why the Black population of Killeen was being split between two districts as opposed to drawing the boundary elsewhere. Representative Turner showed the committee a racial shading map illustrating how the proposal cracked Bell County's minority population.

241.    On October 12, 2021, Representative Turner during the debate on the House floor distributed a Black shading map of Bell County to every Representative's desk.

242.    In response to the cracking of the Killeen, Representative Yvonne Davis proposed and amendment, Plan H2216, which would have adjusted HD 54 and HD 55 to create a majority minority district in HD 54.

243.    The amendment were rejected.

244.    During the debate, Representative Davis pointed out that the city of Killeen has elected primarily Black and Latino city council members and believed that the election of primarily Black and Latino city council members provided insight into how a majority minority district would vote if such an opportunity was created.

245.    Black and Latino voters were on the cusp of electing their preferred candidates in the benchmark configuration of HD 54. For example, in the 2020 election for HD 54, Anglo Republican Brad Buckley received 53.4% to Black Democrat Likeithia Williams's 46.6%. At the top of the ticket, Republican Trump carried the district by less than 100 votes, 49.0% to Biden's 48.9%.

246.    The House committee accepted other amendments that preserved the boundaries of two majority white cities in Bell County, the cities of Belton and Temple.

247.    The changes made to Bell County during the 2021 redistricting, especially with respect to the Black and Latino communities, are diametrically opposed from the State of Texas' litigation stance during the last redistricting cycle.

248.    For example, during the redistricting trial challenging the 2013 Texas House map, Texas asserted that it refused to draw a minority opportunity district in Bell County that would have combined parts of the city of Killeen with parts of the city of Belton because the communities were different from each other.

249.    Now, in 2021, the Texas Legislature combined the two communities it previously said were incongruous.

250.    Rather than keep the city of Killeen whole; Killeen is split in half, with one half being paired with the city of Temple in HD 55, and the other half of Killeen in a district with the city of Troy across the district closer to Falls County, TX.

251.    Further, all three *Gingles* factors can be met in Bell County that would warrant drawing an opportunity district for voters of color in Bell County.

252.    There is a sizable population of Black and Latino voters, such that a majority-minority district of Black and Latino voters could be drawn for one of the House Districts situated in the County. For example, under Plan H2216, HD 54 has a Black CVAP of 34.0%, a Latino CVAP of 22.3%, and an Anglo CVAP of 36.2%. Its combined Black and Latino CVAP is thus 56.3%. Plan H2216 is shown below

**Plan H2216 Bell County**



253.    Voting in Bell County is racially polarized.

254.    Black and Latino voters in Bell County vote cohesively together to elect their preferred candidates of choice. Ecological inference analysis shows that Black voters in Bell County supported the following Democratic candidates by the following percentages: Biden (100%), Hegar (99.8%), O'Rourke (99.5%), Collier (99.4%), Valdez (99.2%), Nelson (98.1%), Clinton (99.2%), Alameel (98.9%), Davis (99.1%). Ecological inference analysis likewise shows that Latino voters cohesively supported the same candidates at the following percentages: Biden (77.4%), Hegar (84.7%), O'Rourke (65.0%), Collier (86.0%), Valdez (84.0%), Nelson (81.3%), Clinton (87.8%), Alameel (69.9%), and Davis (75.1%).

255.    Anglo voters in Bell County bloc vote against Black and Latino preferred candidates. For example, ecological inference analysis shows that Anglo voters supported the following Republican candidates at the following percentages: Trump 2020 (95.6%), Cornyn 2020 (97.2%), Cruz 2018 (96.3%), Abbott 2018 (99.1%), Patrick 2018 (96.3%), Paxton 2018 (96.8%), Trump 2016 (96.5%), Cornyn 2018 (98.9%), and Abbott 2014 (98.7%).

256.     The Anglo bloc voting in Bell County, together with the cracking apart of Black and Latino voters between HD 54 and 55 in the enacted plan mean that Anglo voters will usually defeat the candidates of choice of Black and Latino voters in both districts. For example, reconstituted election results show that under the enacted plan, Republican candidates favored by Anglo voters would have prevailed in every statewide election in 2014, 2016, 2018, and 2020 in both HD 54 and HD 55.

257.     By contrast, under Plan H2216, Black and Latino voters' preferred candidates would have carried HD 54 in those same elections.

258.     Black and Latino voters in Bell County suffer the effects of discrimination that provides them less opportunity than other voters to equally participate in the political process. This, along with other considerations under the totality of circumstances, demonstrate that Plan H2316 dilutes the votes of Black and Latino voters in Bell County.

259.     Moreover, the changes made to the Bell County districts were the product of intentional racial discrimination. The Legislature purposefully drew the Bell County districts to prevent Black and Latino voters from electing their candidates of choice.

260.     Texas has a long history of racial discrimination in voting, *see supra*. Moreover, the process by which the state house plan was adopted features significant procedural departures from normal procedures. For example, the House Redistricting Committee refused to allow invited expert witness testimony or resource witnesses at the Committee hearing at which the state house plan was adopted. Further, the events leading up to the adoption of the Bell County districts, including the robust debate making clear the discriminatory effects of the bizarre line drawing, reflect an intent to discriminate against Black and Latino voters.

## CAUSES OF ACTION

### COUNT 1

***Intentional Racial Discrimination in Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 et seq., 42 U.S.C. § 1983 (SD10)***

261.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

262.   Texas Senate Plan S2168, as reflected in SB4, was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dismantling of SD10 as an effective crossover district for minority voters.

### COUNT 2

***Intentional Racial Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment (SD10)***

263.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

264.   Texas Senate Plan S2168, as reflected in SB4, was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dismantling of SD10 as an effective crossover district for minority voters.

### COUNT 3

***Intentional Racial Discrimination in Violation of the Fifteenth Amendment (SD10)***

265.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

266.   Texas Senate Plan S2168, as reflected in SB4, was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dismantling of SD10 as an effective crossover district for minority voters.

## COUNT 4

### *Predominant use of race in violation of Equal Protection Clause of the Fourteenth Amendment (*Shaw *Violation) (SD10)*

267.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

268.    Race was the predominant consideration in the drawing of SD10, with other districting criteria, such as compactness, respect for communities of interest, respect for political subdivisions, and other considerations subordinated to racial considerations.

269.    There is no compelling interest that justifies the racial predominance in the drawing of SD10. While Section 2 of the Voting Rights Act provided a compelling justification to draw an alternative district in which Black and Latino voters would form the majority of eligible voters in a newly configured SD10 based solely in Tarrant County, SD10 as enacted violates, rather than advances, Section 2 of the Voting Rights Act.

270.    The racial predominance in the drawing of SD10 violates the Equal Protection Clause.

## COUNT 5

### *Discriminatory Results in Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 et seq., 42 U.S.C. § 1983* **(State Senate/Tarrant County)**

271.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

272.    Black and Hispanic voters in Tarrant County are sufficiently numerous and geographically compact to constitute a majority in a single member senate district.

273.    Black and Hispanic voters in Tarrant County are politically cohesive.

274.     Anglo voters in Tarrant County, and in the legislature's enacted version of SD10 in SB4, vote sufficiently as a bloc to usually defeat the candidates of choice of Black and Hispanic voters.

275.     The totality of circumstances reveals that Black and Latino voters in Tarrant County have less opportunity than other groups of the electorate to elect their candidates of choice and to participate in the political process.

276.     Black and Hispanic voters are thus entitled, under Section 2 of the Voting Rights Act, to a coalition district that would provide them with an effective opportunity to elect the candidate of their choice to the Texas State Senate.

## COUNT 6

### *Discriminatory Results in Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 et seq., 42 U.S.C. § 1983* **(Congress, Dallas/Fort Worth & Houston Areas)**

277.     Plaintiffs reincorporate all preceding paragraphs as if fully set forth herein.

278.     Black and Hispanic voters in the Dallas-Fort-Worth area are sufficiently numerous and geographically compact to constitute a majority in an additional single-member congressional district.

279.     Black and Hispanic voters in the Dallas-Fort Worth area are politically cohesive.

280.     Anglo voters in the Dallas-Fort Worth area, and in the Plan C2193, vote sufficiently as a bloc to usually defeat the candidates of choice of the Black and Hispanic voters.

281.     Latino voters in the Houston area are sufficiently numerous and geographically compact to constitute a majority in an additional single-member congressional district.

282.     Latino voters in the Houston area are politically cohesive.

283.     Anglo voters in the Houston area, and in Plan C2193, vote sufficiently as a bloc to usually defeat the candidates of choice of the Latino voters.

284.     The totality of circumstances reveals that Black and Hispanic voters in the Dallas-Fort-Worth and Houston areas have less opportunity than other groups of the electorate to elect their candidates of choice and to participate in the political process.

285.     Black and Hispanic voters are thus entitled, under Section 2 of the Voting Rights Act, to additional congressional districts in the Dallas/Fort-Worth and Houston areas that provide an opportunity to elect their candidates of choice, without eliminating any existing district in which minority voters have the opportunity to elect their candidates of choice.

## COUNT 7

*Discriminatory Results in Violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 et seq., 42 U.S.C. § 1983* (State House Districts 54 & 55 in Bell County, HD 118 in Bexar County)

286.     Plaintiffs reincorporate all preceding paragraphs as if fully set forth herein.

287.     HD 118 in Plan H2316 dilutes the ability of Latino voters to elect their preferred candidates.

288.     Alternative configurations of HD 118 can be drawn that make Latino voters an effective majority of eligible voters such that they will be able to elect their preferred candidates, as was the case the in vast majority of elections under the benchmark configuration of the district.

289.     Latino voters in HD 118 vote cohesively.

290.     Anglo voters bloc vote against Latino preferred candidates in HD 118, and under Plan H2316, will vote sufficiently as a bloc to usually defeat Latino voters' preferred candidates.

291.     Latinos in Texas as a whole, and in Bexar County, suffer the effects of past and present discrimination that reduce their ability to equally participate in the political process. These factors combine to reduce Latino voter participation compared to Anglo voter participation, and

together with other totality of circumstances considerations demonstrate vote dilution among Latino voters in HD 118.

292.    The configuration of Bell County districts HD 54 and HD 55 dilutes the voting strength of Black and Latino voters.

293.    Alternative district configurations in Bell County are possible in which Black and Latino voters constitute the majority of eligible voters and would be able to elect their candidates of choice.

294.    Black and Latino voters in Bell County are politically cohesive.

295.    Anglo voters in Bell County vote as a bloc to usually defeat the candidates preferred by Black and Latino voters.

296.    Black and Latino voters in Bell County suffer from a history of discrimination and socioeconomic disparities that reduce their ability to equally participate in the political process. The totality of circumstances shows that these voters suffer from vote dilution under the configuration of HD 54 and 55 in Plan H2316.

## COUNT 8

*Intentional Racial Discrimination in Violation of Section 2 of the Voting Rights Act, 52 U.S.C.*
*§ 10301 et seq, 42 U.S.C. § 1983 (HD 54 & 55 in Bell County and HD 118 in Bexar County)*

297.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

298.    Texas House Plan H2316 was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dilution of Latino voting strength in HD 118 and the intentional dilution of Black and Latino voting strength in Bell County Districts HD 54 and 55.

## COUNT 9

### *Intentional Racial Discrimination in Violation of the Fourteenth Amendment to the United States Constitution (HD 54 & 55 in Bell County and HD 118 in Bexar County)*

299.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

300.   Texas House Plan H2316 was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dilution of Latino voting strength in HD 118 and the intentional dilution of Black and Latino voting strength in Bell County Districts HD 54 and 55.

## COUNT 10

### *Intentional Racial Discrimination in Violation of the Fifteenth Amendment to the United States Constitution (HD 54 & 55 in Bell County and HD 118 in Bexar County)*

301.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

302.   Texas House Plan H2316 was enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis, by the intentional dilution of Latino voting strength in HD 118 and the intentional dilution of Black and Latino voting strength in Bell County Districts HD 54 and 55.

## REQUESTED RELIEF

Plaintiffs request that the Court:

a) Issue a declaratory judgment that Texas Senate Plan S2168, enacted in SB4, unlawfully dilutes minorities' voting rights, through intentional racial discrimination in violation of Section 2 of the Voting Rights Act, the Fourteenth Amendment, and the Fifteenth Amendment in SD10 by intentionally dismantling a performing crossover district;

b) Issue a declaratory judgment that SD10, as enacted under Texas Senate Plan S2168, was drawn predominantly based on race, that other traditional redistricting criteria were subordinated to race, and that the use of race in drawing SD10 under S2168 does not serve a compelling purpose, in violation of the Fourteenth Amendment.

c) Issue a declaratory judgment that Texas Senate Plan S2168, enacted in SB4, violates the discriminatory results prong of Section 2 of the Voting Rights Act by failing to draw a coalition district in Tarrant County for Black and Latino voters in which they would have the opportunity to elect their candidate of choice to the state senate;

d) Issue a declaratory judgment that Texas Congressional Plan C2193, enacted in SB6, violates the discriminatory results prong of Section 2 of the Voting Rights Act by failing to draw additional congressional districts in the Dallas/Fort-Worth in which Black and Latino voters can elect their candidate of choice and in the Houston area in which Latino voters can elect their candidates of choice to Congress;

e) Issue a declaratory judgment that Texas House Plan H2316, enacted in HB1, unlawfully dilutes minorities' voting rights, through intentional racial discrimination in violation of Section 2 of the Voting Rights Act, the Fourteenth Amendment, and the Fifteenth Amendment in HD 54 and 55 in Bell County and HD 118 in Bexar County;

f) Issue a declaratory judgment that Texas House Plan H2316, enacted in HB1, violates the discriminatory results prong of Section 2 of the Voting Rights Act by failing to draw a district in Bell County in which Black and Latino voters would have an equal opportunity to elect their candidates of choice and failing to draw a Latino opportunity district in HD 118 in which Latino voters could elect their candidates of choice.

g) Preliminarily and permanently enjoin Defendants from calling, holding, supervising, or certifying any elections under Texas Senate Plan S2168, as enacted in SB4, with respect to SD10. Plaintiffs have no adequate remedy at law other than judicial relief sought herein, and unless Defendants are enjoined from using Texas Senate Plan S2168 with respect to SD10, Plaintiffs will be irreparably injured by the continued violation of their statutory rights;

h) Preliminarily and permanently enjoin Defendants from calling, holding, supervising, or certifying any elections under Texas Congressional Plan C2193, enacted in SB6, with respect to the Dallas/Fort-Worth and Houston areas. Plaintiffs have no adequate remedy at law other than judicial relief sought herein, and unless Defendants are enjoined from using Texas Congressional Plan C2193 with respect to the Dallas/Fort-Worth and Houston areas, Plaintiffs will be irreparably injured by the continued violation of their statutory rights;

i) Preliminarily and permanently enjoin Defendants from calling, holding, supervising, or certifying any elections under Texas House Plan H2316, as enacted in HB1, with respect to Bell County districts HD 54 and 55 and Bexar County district HD 118. Plaintiffs have no adequate remedy at law other than judicial relief sought herein, and unless Defendants are enjoined from using Texas House Plan H2316 with respect to Bell County districts HD 54 and 55 and Bexar County district HD 118, Plaintiffs will be irreparably injured by the continued violation of their statutory rights

j) Set a reasonable deadline for state authorities to enact or adopt  redistricting plans with respect to SD10, Dallas/Fort-Worth and Houston area congressional districts, Bell County state house districts 54 and 55, and Bexar County HD 118, that do not dilute, cancel out, or minimize the voting strength of minority voters;

k)  If state authorities fail to enact or adopt a valid redistricting plans by the Court's deadline, order a new redistricting plans that do not dilute, cancel out, or minimize the voting strength of minority voters;

l)  Award Plaintiffs their costs and reasonable attorneys' fees pursuant to Fed. R. Civ. P. 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e);

m)  Retain jurisdiction and render any and further orders that the Court may; and

n)  Grant any and all further relief to which Plaintiffs may show themselves to be entitled.

October 13, 2022                                 Respectfully submitted,

*/s/ Chad W. Dunn*
Chad W. Dunn (Tex. Bar No. 24036507)
Brazil & Dunn
4407 Bee Caves Road
Building 1, Ste. 111
Austin, TX 78746
(512) 717-9822
chad@brazilanddunn.com

*/s/ Mark P. Gaber*
Mark P. Gaber*
Mark P. Gaber PLLC
P.O. Box 34481
Washington, DC 20043
(715) 482-4066
mark@markgaber.com

Jesse Gaines* (Tex. Bar. No. 07570800)
P.O. Box 50093
Fort Worth, TX 76105
817-714-9988
gainesjesse@ymail.com

Molly E. Danahy*
P.O. Box 26277
Baltimore, MD 21211

(208) 301-1202
danahy.molly@gmail.com

Sonni Waknin*
10300 Venice Blvd. # 204
Culver City, CA 90232
732-610-1283
sonniwaknin@gmail.com


*Admitted *pro hac vice*

*Counsel for Plaintiffs*