Sean P. Trende
September 02, 2022

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

- - -

League of United Latin       :
American Citizens, et al.,    :
                             :
        Plaintiffs,          :
                             :
        vs.                  :    Case No.
                             :     3:21-CV-00259
Greg Abbott, et al.,         :
                             :
        Defendants.          :

- - -

DEPOSITION OF SEAN P. TRENDE

- - -

                        Friday, September 2, 2022
                        9:00 a.m.
                        Squire Patton Boggs
                        41 South High Street
                        Suite 2000
                        Columbus, Ohio  43215-6101


- - -
SUSAN L. COOTS, RPR
REGISTERED PROFESSIONAL REPORTER
- - -

Sean P. Trende
September 02, 2022

Page 2

```
1  APPEARANCES:
2
        POOJA CHAUDHURI, Attorney at Law
3       EZRA ROSENBERG, Attorney at Law
        (In person)
4       SOFIA FERNANDEZ GOLD, Attorney at Law
        (Via Zoom)
5       Lawyers' Committee for Civil Rights Under Law
        1500 K Street Northwest
6       Suite 900
        Washington, DC  20005
7       (202) 662-8600
        pchaudhuri@lawyerscommittee.org
8       erosenberg@lawyerscommittee.org
        sfgold@lawyerscommittee.org
9
            On behalf of the Plaintiff, Texas NAACP.
10
        NINA PERALES, Attorney at Law
11      Mexican American Legal Defense
        and Educational Fund
12      110 Broadway
        Suite 300
13      San Antonio, Texas  78205
        (210) 224-5476
14      nperales@maldef.org
15          On behalf of LULAC Plaintiffs.
16      JACKI L. ANDERSON, Attorney at Law
        MICHELLE RUPP, Attorney at Law
17      U.S. Department of Justice
        Civil Rights Division
18      950 Pennsylvania Avenue Northwest
        Washington, DC  20530-0001
19      (202) 514-2000
20          On behalf of Plaintiff,
            United States of America.
21
22
23
24
25
```

Page 3

```
1  APPEARANCES, continued.
2       PAUL BRACHMAN, Attorney at Law
        Paul, Weiss, Rifkind, Wharton & Garrison, LLP
3       2001 K Street Northwest
        Washington, DC  20006-1067
4       (202) 223-7440
        pbrachman@paulweiss.com
5
            On behalf of Fair Maps Texas
6           Action Committee.
7       CHRIS SHENTON, Attorney at Law
        Southern Coalition for Social Justice
8       1415 West Highway 54
        Suite 101
9       Durham, North Carolina  27707
        (919) 323-3380
10      chrisshenton@scsj.org
        (Via Zoom)
11
            AND
12
        YURIJ RUDENSKY, Attorney at Law
13      Brennan Center for Justice at
        NYU School of Law
14      120 Broadway
        Suite 1750
15      New York, New York  10271
        (646) 292-8310
16      yurij.rudensky@nyu.edu
        (Via Zoom)
17
            On behalf of Plaintiff, Fair Maps.
18
        DAVID FOX, Attorney at Law
19      Alias Law Group
        10 G Street NW
20      Suite 600
        Washington, DC  20002
21      (202) 968-4546
        (Via Zoom)
22
            On behalf of the Abuabara Plaintiffs.
23
24
25
```

Page 4

```
1  APPEARANCES, continued.
2       SEAN McCAFFITY, Attorney at Law
        Sommerman, McCaffity, Quesada &
3       Geisler, L.L.P.
        3811 Turtle Creek Boulevard
4       Suite 1400
        Dallas, Texas  75219-4461
5       (214) 720-0720
        smccaffity@textrial.com
6       (Via Zoom)
7           On behalf of MALC Plaintiffs.
8       RYAN KERCHER, Attorney at Law
        PATRICK SWEETEN, Attorney at Law
9       (In person)
        WILLIAM THOMPSON, Attorney at Law
10      (Via Zoom)
        Assistant Attorneys General
11      Texas Attorney General
        P.O. Box 12548
12      Austin, Texas  78711-2548
        (512) 936-0707
13      ryan.kercher@oag.texas.gov
        patrick.sweeten@oag.texas.gov
14      william.thompson@oag.texas.gov
15          On behalf of Defendants,
            House Members and Employees and
16          Senate Members and Employees.
17              - - -
18
19
20
21
22
23
24
25
```

Page 5

```
1                    I N D E X
2                      - - -
3  WITNESS                              PAGE
   SEAN P. TRENDE
4       Examination                       7
        (By Ms. Chaudhuri)
5       Examination                      93
        (By Ms. Anderson)
6       Examination                     150
        (By Ms. Perales)
7       Examination                     207
        (By M. Brachman)
8       Examination                     258
        (By Mr. McCaffity)
9
                       - - -
10
   EXHIBITS                           MARKED
11 Plaintiff's Exhibit No. 1            7
   (Trende Expert Report, 7-23-22)
12
   Plaintiff's Exhibit No. 2           69
13 (Duchin Supplemental Report on
   District Alternatives, Local
14 Polarization, and Effectiveness,
   6-20-22)
15
   Plaintiff's Exhibit No. 3           81
16 (Duchin Response to Reports of
   Alford and Trende, 8-1-22)
17
   Plaintiff's Exhibit No. 4           98
18 (Sean Trende - The Lost Majority
   Excerpt)
19
   Plaintiff's Exhibit No. 5          115
20 (Trende Tweet, 8-7-19)
21 Plaintiff's Exhibit No. 6          117
   (Excerpt Barack Obama and
22 The New America)
23 Plaintiff's Exhibit No. 7          119
   (Trende - Real Clear Politics -
24 The Case of the Missing White Voters)
25
```

Sean P. Trende
September 02, 2022

Page 6

```
1   Index, continued.
2   EXHIBITS                                  MARKED
    Plaintiff's Exhibit No. 8          139
3   (Trende - Tweet, 12-4-13)
4   Plaintiff's Exhibit No. 9          140
    (Trende - Why Most Proposals Offer
5   The Best Solution for Combating
    Racial Profiling)
6
    Plaintiff's Exhibit No. 10         146
7   (Trende- Tweet, 12-14-20)
8   Plaintiff's Exhibit No. 11         232
    (Texas Congressional Districts
9   2021 Enacted Plan - Harris/Fort Bend)
10  Plaintiff's Exhibit No. 12         250
    (Map Lampasas, Coryell, Bell
11  and Burnet, Texas Counties)
12  Plaintiff's Exhibit No. 13         254
    (Trende - When Your Vote Doesn't
13  Matter, Try Switching Ballots
14
15                      - - -
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
1                  P R O C E E D I N G S
2                          - - -
3                  SEAN P. TRENDE,
4   being by me first duly sworn, as hereinafter
5   certified, deposes and says as follows:
6                  EXAMINATION
7   BY MS. CHAUDHURI:
8   Q.        Good morning, Mr. Trende.  My name is
9   Pooja Chaudhuri.  I represent the Plaintiff, Texas
10  NAACP, and I'll be your first questioner.
11            Have you ever been deposed before?
12  A.        Yes.
13  Q.        Okay.  So I won't take up your time in going
14  through all of the ground rules and I'll dive right
15  into the substance.
16            I'd like to mark the first exhibit.
17                         - - -
18            And, thereupon, Plaintiff's Exhibit No. 1
19  was marked for purposes of identification.
20                         - - -
21  BY MS. CHAUDHURI:
22  Q.        Do you recognize Exhibit 1?
23  A.        Yes.
24  Q.        And what is it?
25  A.        It is the Expert Report of Sean P. Trende.
```

Page 8

```
1   Q.        Did you write this report?
2   A.        Yes.
3   Q.        Okay.  So we'll set it aside and come back
4   to it.
5             How would you describe your field of
6   expertise?
7   A.        Well, "expertise" is a legal term, and
8   I don't know what the lawyers plan on tendering me as
9   an expert witness as.  But I would probably classify
10  it as political science with a focus on American
11  politics, specifically elections --
12  Q.        Okay.
13  A.        -- and political methodology.
14  Q.        Okay.  Thank you.
15            And do you use statistical methods in your
16  field of your specialty?
17            MR. KERCHER:  Object to the form.
18  A.        Yes.
19  Q.        What kinds of statistical methods do you
20  typically use?
21            MR. KERCHER:  Object to the form.
22            You can answer.
23  A.        That's a very broad question.  There are
24  descriptive statistics that just about everyone uses
25  in their day-to-day life, like averages, but
```

Page 9

```
1   calculation of confidence intervals for polls.  I keep
2   survey methodology, and part of that involves things
3   like demonstrating the central limit theorem with a
4   lot of large numbers.  Regression analysis is a
5   regular part of the day-to-day work that I do.
6   Manipulating data.  Generating maps.
7             There's probably more, but, again, we're
8   talking about 11 years at this job and a couple other
9   jobs in a variety of contexts.
10  Q.        Okay.  Thank you.
11            Can you turn to Page 7 of Plaintiff's 1 of
12  your report.  So in Part Four, which is titled Data
13  Relied Upon in Construction of Data Sets, do you see
14  that section on Page 7?
15  A.        Yes.
16  Q.        And, here, you list -- the bullet points are
17  where you list data that you relied on, right?
18  A.        Yes.
19  Q.        Did you rely on any of the raw data that was
20  turned over by Dr. Moon Duchin?
21  A.        No.
22  Q.        Do you recall relying on any of Dr. Duchin's
23  computer code?
24  A.        No.
25  Q.        Is there anything else -- any other data
```

Sean P. Trende
September 02, 2022

Page 10

1  that's not mentioned in these bullet points that you
2  relied on?
3  A.       Not that I can think of as I sit here.  We
4  may discover some as we work through the report.
5  Q.       Okay.  Did you perform any statistical
6  analysis on Dr. Moon Duchin's data?
7       MR. KERCHER:  Object to the form.
8       You can answer.
9  A.       I didn't review her data so I didn't do
10 anything directly with her data.
11 Q.       Okay.  Thank you.
12      Let's turn to Page 41 of your report.  So
13 here, the second paragraph, second sentence, you
14 write, "Rather than using Dr. Duchin's program, I rely
15 on Sequential Monte Carlo developed by Kosuke Imai and
16 implemented through the redistricting Package R."
17      Is that a general approximation of -- Do you
18 disagree with that reading, that sentence?
19 A.       It's the "redist" package, not the
20 redistricting package; but otherwise, that's correct.
21 Q.       And I am not a statistician; you are.  If
22 I use anything, you know, incorrectly, please let me
23 know.
24      So you used SMC rather than Dr. Duchin's
25 program.  Do you know what computer program Dr. Duchin

Page 11

1  used to run ensembles?
2  A.       It would be easier if I had her report, but
3  I believe she uses GerryChain.
4  Q.       Are you aware of a computer language called
5  Python?
6  A.       Yes.
7  Q.       Any reason for you to disagree if
8  I represented to you that Dr. Duchin uses Python?
9       MR. KERCHER:  Object to the form.
10      You can answer.
11 A.       No reason to disagree.
12 Q.       So Dr. Duchin provided the State with her
13 Python files for her ensembles.  Did you ever review
14 those Python files?
15 A.       Yes.
16 Q.       And what was the extent of your review?
17 A.       I looked through the files to see what was
18 contained in them to get a sense of what it was that
19 she was doing.  And that is the extent of it.
20 Q.       Okay.  And how did you then use your review
21 of her Python files to conduct your analysis?
22 A.       I didn't.
23 Q.       Okay.  So you just reviewed it to get an
24 understanding of what she did?
25 A.       That's right.

Page 12

1  Q.       Okay.  And do you use Python in your own
2  work?
3  A.       I know enough Python code to get myself in
4  trouble.  It's not -- it's not my go-to language that
5  I use regularly.
6  Q.       And what is your go-to language?
7  A.       I typically do statistical programming in --
8  probably 90 percent in R, just the letter "R," and
9  10 percent in Stata, S-T-A-T-A.
10 Q.       Okay.  So SMC, can you tell me what that is?
11 A.       Yes.  Sequential Monte Carlo is an algorithm
12 that's used to generate random maps.  It's part of a
13 family of approaches to the -- what we call the
14 "ensemble method" of evaluating political
15 gerrymanders.
16 Q.       And is it a program that's already written?
17 A.       Yes.  Well, it's part of a package that's
18 available in R, the "redist" package.
19 Q.       So you don't have to write your own
20 algorithms, right, to use SMC?
21 A.       You have to do -- Well, you have to do quite
22 a bit of coding to get it to work; but the actual SMC
23 command is not something I wrote.  No.
24 Q.       Okay.  So when you're using SMC are there
25 certain parameters that you -- that are in SMC that

Page 13

1  you can control for?
2  A.       Yes.
3  Q.       Okay.  Are they typically called target
4  distribution parameters?
5  A.       I don't know that they're typically referred
6  to as that, but I understand what that is.  There's,
7  like, a 200-page user manual to SMC, and I don't know
8  if that specific phrase appears in it, but I would
9  have to see the user manuals.
10 Q.       Okay.  So you mentioned that, you know,
11 you're familiar with the concept of the target
12 distribution parameters.  Can you tell me what that
13 means to you?
14 A.       So the target distribution is what you're
15 attempting to sample from.  Some of the earlier
16 approaches to random generated maps, we call it the
17 Constructive Monte Carlo approach, the Jowei Chen
18 approach, J-O-W-E-I, C-H-E-N, has a problem that it
19 doesn't specify the distribution from which it's
20 sampling.  So one of the benefits of these newer
21 methods is that they do, and so you have a higher
22 degree of confidence that they sample -- that they
23 cover the entire distribution; that if you ran them
24 long enough, you would, in fact, get every available
25 map within a certain set of parameters.

Sean P. Trende
September 02, 2022

Page 14

1    So the target distribution, which is written
2  down in the McCarton NMI paper, is the distribution of
3  maps from which you're sampling.
4    Q.    Okay.  So you said that you can set certain
5  parameters to, ultimately, you know, get you to the
6  target distribution.  What were the parameters that
7  you set on SMC?
8    A.    I would have to see my code.
9    Q.    So sitting here, you don't recall what
10  factors you put into the code?
11    MR. KERCHER:  Object to the form.
12    A.    I believe I used a compactness parameter.
13  But, beyond that, I would have to see my code.
14    Q.    Okay.  Do you recall, you know, not whether
15  you used the parameter, but can contiguity be a
16  parameter in the code?
17    A.    Because of the way the SMC algorithm works,
18  the districts are all contiguous.
19    Q.    Can you put in CVAP, Citizen Voting Age
20  Population, threshold to be a parameter?
21    A.    Yeah.  There's a command that I think I used
22  in the Maryland case that allows you to guarantee a
23  certain number of districts that would be drawn -- or
24  the algorithm would prefer and put a weight on
25  districts that produce a certain number of outcomes

Page 15

1  with a given VAP is how we used it, but I don't know
2  why it couldn't be assigned to CVAP.
3    Q.    Do you recall if you used CVAP when you ran
4  your algorithm?
5    A.    I don't believe I did.
6    Q.    Can partisan vote share threshold be a
7  parameter that you can put into the code?
8    A.    Again, I would have to see the user manual,
9  if you will, for the redist package.  But I don't see
10  why you couldn't set -- call partisan vote share
11  CVAP, or Voting Age Population, and the program
12  wouldn't be able to tell the difference.
13    Q.    And did you use that parameter when you were
14  running your simulations?
15    A.    No.
16    Q.    Okay.  So as of now, you're sure that you
17  just used compactness; is that right?
18    MR. KERCHER:  Object to the form.
19    A.    I don't think I said that.
20    Q.    So earlier, and correct me if I'm wrong, you
21  said that you likely used compactness as a parameter
22  and that you would have to check your code to see if
23  you used any other parameters.  Do you agree with that
24  representation?
25    A.    Yes.

Page 16

1    Q.    Okay.  So for the parameters, you can give
2  them different weights; is that right?
3    MR. KERCHER:  Object to the form.
4    A.    That's correct.
5    Q.    Okay.  How did you decide -- How much weight
6  did you give to compactness?
7    A.    I would have to look at the code, but I
8  believe it was compactness of 1.
9    Q.    Okay.  So the row exponent was 1 for the
10  compactness?
11    A.    Yes.
12    Q.    If you turn to Page 41 of your report and
13  looking at the second sentence, and I'll read it for
14  you, it says, "The simulations work best when they
15  control for the legitimate factors upon which the
16  legislature relied when drawing their maps.  This
17  ensures that the simulation sample from the same
18  distribution of maps as the legislature effectively
19  did."
20    So when you wrote that, "The simulations
21  work best when they control for their legitimate
22  factors on which the legislature relied," what did you
23  mean?
24    A.    I mean that if you're trying to draw an
25  inference that race was the predominant factor, which

Page 17

1  Dr. Duchin seems to draw, you want to try to control
2  for everything the legislature is doing.
3    Q.    Okay.  But when you ran your code, again,
4  you ran it race blind and partisan -- and party blind;
5  is that right?
6    A.    Correct.
7    Q.    And is your understanding that Dr. Duchin
8  ran her code race blind and party blind?
9    A.    That's my understanding.
10    Q.    Okay.  Do you recall -- Again, back to the
11  parameters.  Do you recall whether you used any of the
12  default settings in SMC without changing the
13  parameters on the default settings?
14    A.    I would have to see my code.
15    Q.    Okay.  So I just -- Again, I'm not a
16  statistician, but I just want to understand that MCMC,
17  the chain process.  You're familiar with MCMC, right?
18    A.    Yes.
19    Q.    Okay.  And, again, what does that acronym
20  stand for?
21    A.    Markov chain Monte Carl.
22    Q.    So when you run a Markov chain, it gives you
23  an output, right?
24    A.    Yes.
25    Q.    And what is that output?  Is it a number?

Sean P. Trende
September 02, 2022

Page 18

1   A.        It's in numeric form.
2   Q.        Okay.  Does that translate to a plan?
3   A.        So yes.  I mean, the way you phrased the
4   question, Markov's chain Monte Carlo is just a form of
5   a stochastic process that can be used in a bunch of
6   different situations.  In this particular application
7   of redistricting, the Monte Carlo programs do produce
8   a series of districting maps.
9   Q.        Okay.  And so you -- When you run 100,000
10  simulations, that basically means that you're running
11  the chains 100,000 times; is that right?
12  A.        For the SMC approach, that's right.  For
13  some of the other approaches, you would use a burn-in.
14  So a number of stages in the process to get the -- to
15  get the simulation running, but SMC doesn't use
16  burn-ins.
17  Q.        Okay.  So just focusing in on SMC, you're
18  getting 100,000 draws, right, of different plans?
19  A.        You're getting 100,000 draws of plans.
20  Q.        Okay.  And then, in your process, you've
21  analyzed those 100,000 draws.  Are those draws called
22  ensembles?
23  A.        Yes, the draws are called ensembles.
24  Q.        So then you're analyzing the ensembles for
25  different properties; is that right?

Page 19

1   A.        That's right.
2   Q.        In your report -- And we'll hone in on, you
3   know, specific -- some of your dotplots.  But in your
4   report, you analyzed these ensembles from the
5   perspective of minority CVAP share, right?
6   A.        That's one of the things I did.  Yes.
7   Q.        Okay.  And you analyzed, again, these draws
8   from the perspective of the democratic vote share in
9   the Biden/Trump election, right?
10  A.        That's correct.
11  Q.        The 100,000 ensembles that you get, that's a
12  sample, right?
13  A.        It's one ensemble.  But the 100,000 maps you
14  get are samples.
15  Q.        Okay.  Thank you.
16            Is it possible to have biases in a sample?
17  A.        Have what?
18  Q.        Biases.
19  A.        You would have to define that term.
20  Q.        How do you know that your sample is not
21  skewed?
22            MR. KERCHER:  Object to the form.
23  A.        In what sense?
24  Q.        How do you know that your sample contains,
25  you know, plans that are not -- highly not compact,

Page 20

1   for example?
2            MR. KERCHER:  Object to the form.
3   A.        Because that's what the SMC algorithm is
4   supposed to do.  Dr. Imai has disclaimed SMC, then
5   maybe it doesn't.
6   Q.        So there is a connection to what you put in
7   the initial parent parameters that define the
8   distribution, and that's what gives you a control on
9   your sample, right?
10  A.        That's right.
11  Q.        Okay.  How did you know that your sample was
12  representative?
13            MR. KERCHER:  Object to the form.
14  A.        Again, this is something that has been used
15  in redistricting litigation, and the paper, which is
16  probably -- from probably the second-most prominent
17  political methodologist in political science, has been
18  run and tested to ensure it produces a representative
19  sample given certain parameters.
20  Q.        Okay.  So a representative sample would be
21  close to what the set of plans that the legislature
22  might have considered, right?  Strike that.
23            A representative sample in this case would
24  have to be close to the set of plans that the Texas
25  legislature considered, right?

Page 21

1            MR. KERCHER:  Objection to the form.
2   A.        That's what you would shoot for.  Yes.
3   Q.        Did you know what parameters the Texas
4   legislature looked at in drawing their plans?
5   A.        No, but I wasn't trying to ensure that my
6   ensemble drew from the same distribution as the Texas
7   legislature.
8   Q.        Okay.  What distribution were you trying to
9   ensure that your ensemble drew from?
10  A.        I was trying to see if I was drawing from
11  the same ensemble as Dr. Duchin.
12  Q.        Got it.  Okay.
13            How were you able to verify that your
14  ensemble was drawing from the same distribution as
15  Dr. Duchin?
16  A.        I compared our outputs and they were
17  consistently the same.
18  Q.        Okay.  But you didn't know what parameters
19  she used, right?
20  A.        No.  Like I said, I compared our outputs
21  that we put out in the case; they were the same
22  outputs.
23  Q.        Okay.  So other than looking at similarities
24  or inferring that your distribution and her
25  distribution were the same, did you do anything else

Sean P. Trende
September 02, 2022

<table>
<tr><td>

Page 22

1   to verify that your sample essentially looked good?
2               MR. KERCHER: Object to the form.
3   A.      Well, understanding how the SMC algorithm
4   works and what it's supposed to produce, yes. And
5   I actually do think, at least for the first run or
6   two, I looked at the compactness of the sample
7   compared to the compactness of the legislative maps.
8   But, even then, the legislative maps have some odd
9   districts, so I don't know. I'm pretty sure I did
10  that, though.
11  Q.      Again, MCMC, it gives -- it's a
12  probabilistic model, right?
13  A.      That's right.
14  Q.      And is there a level of uncertainty in
15  probabilistic models?
16  A.      By definition.
17  Q.      Okay. So when you ran a chain and it gave
18  you an output, did you conduct any error rate
19  analysis. Sorry. Correct me. My terminology might
20  be off. Did you conduct any -- Did you look at the
21  error rates between that output and your target
22  output?
23              MR. KERCHER: Object to the form.
24  A.      Yes.
25  Q.      Do you report those error rates anywhere in

</td><td>

Page 23

1   your report?
2   A.      No, because I was comparing to Dr. Duchin's
3   output.
4   Q.      Okay. Did you look at any standard
5   deviations of your outputs and compare them to the
6   target distribution?
7   A.      No.
8   Q.      So is it fair to say that you don't dispute
9   Dr. Duchin's methods with respect to ensembles?
10              MR. KERCHER: Object to the form.
11  A.      Yeah. In the report, I don't give any
12  objections to the GerryChain approach.
13  Q.      Okay. And then is it fair to say that you
14  don't dispute the results of Dr. Duchin's simulation?
15              MR. KERCHER: Object to the form.
16  BY MS. CHAUDHURI:
17  Q.      Is that right?
18  A.      Yeah. I wasn't asked to look at the
19  GerryChain model itself and don't have anything in the
20  report objecting to it.
21  Q.      Okay. So your only dispute as to her
22  ensemble analysis is the interpretation of her
23  outputs, right?
24              MR. KERCHER: Object to the form.
25  A.      Well, I don't know that that's quite right

</td></tr>
<tr><td>

Page 24

1   because if the legislature had partisan goals, she
2   should have controlled for those. But, beyond that,
3   that's the extent of my -- beyond that, it's an
4   objection about interpretation.
5   Q.      Okay. So when you say that she should have
6   controlled for partisan goals, are you saying that she
7   should have put in partisanship as a parameter in her
8   algorithm when she ran it?
9               MR. KERCHER: Objection to the form.
10  Misstates his testimony.
11  A.      The legislature was trying to draw
12  25 Republican districts, and that was a goal. And
13  she's trying to, within that universe, control for --
14  and I should say sufficiently Republican districts.
15  She's trying to determine whether race was the
16  predominant factor. Yes, she should have controlled
17  for 25 sufficiently Republican districts.
18              The whole way that this works is by ruling
19  out alternative explanations. And if you don't
20  control for it, you don't really rule out the
21  explanation.
22  Q.      Uh-huh. So when you -- I'm just trying to
23  understand. When you say "control for it," is it
24  basically analyzing the ensembles for a particular
25  property? Is that what you mean by "control for it"?

</td><td>

Page 25

1   A.      So there's a couple ways you can do it.
2   Q.      Okay.
3   A.      You can do it by controlling the parameters
4   to ensure that you are doing the same thing the
5   legislature is doing. Or you can -- Well, actually,
6   I guess three ways. Can you freeze certain districts
7   in place.
8   Q.      Uh-huh.
9   A.      So, for example, in the Maryland case, when
10  we were trying to demonstrate that politics was the
11  explanation, one of the approaches we used for the
12  Voting Rights Act District -- I guess in New York as
13  well -- was to just take the precincts for their
14  Voting Rights Act Districts out of the ensembles to
15  guarantee that the map would perform at least as well
16  as the enacted -- the ensembles would perform at least
17  as well as the Enacted Map on the Voting Rights Act.
18              Or -- and this was another thing that was
19  done in Maryland -- you can discard maps that don't
20  achieve a certain target for Voting Rights Act
21  performance.
22  Q.      Okay.
23  A.      I shouldn't say "discard." You can filter
24  them from your analysis.
25  Q.      Got it. And if you analyze the ensemble for

</td></tr>
</table>

Sean P. Trende
September 02, 2022

Page 26

1  certain properties, say you analyze the ensemble for
2  having certain partisan properties, is that a way to
3  control for partisanship?
4  A.      It's a way to implement some kind of
5  control.
6  Q.      Is that what you did when you did your
7  dotplots?
8  A.      No, because I want my dotplots to look
9  roughly like Dr. Duchin's boxplots.
10 Q.      Why don't we turn to Page 42 and 43 of your
11 report.  So is it -- And it's a boxplot; is that what
12 I should call it?
13 A.      Mine are dotplots; Dr. Duchin's are
14 boxplots.
15 Q.      The dotplot on the left, figure 26, and the
16 dotplot on the right, figure 27, are these based on
17 the same ensembles?
18 A.      Yes.
19 Q.      The dotplot on the left, you're looking at
20 the CVAP, the percent minority properties of your full
21 ensemble, right?  And you're plotting them in the
22 graph?
23         MR. KERCHER:  Objection to the form.
24         Counsel, could you refer to the figure
25 number to make sure that his left and right are the

Page 27

1  same as yours?
2  BY MS. CHAUDHURI:
3  Q.      Sure.  I'm referring to figure 26.
4  A.      Can you repeat the question?
5  Q.      So figure 26, you're looking at the minority
6  CVAP share in the ensemble, right?
7  A.      Correct.
8  Q.      Okay.  In figure 27 on Page 43, you're
9  looking at the Democratic vote share of the different
10 maps in the ensemble, right?
11 A.      That's right.
12 Q.      And you're looking at the seven-district
13 Dallas/Fort Worth congressional cluster of districts
14 in both of these figures; is that right?
15 A.      That's correct.
16 Q.      Okay.  And if you look at figure 26, there
17 are black dots in each of the -- Are they bars?  Is
18 that what I should call them?
19 A.      If you call them -- if you call the columns
20 bars, I'll know what you're referring to.
21 Q.      Okay.  So the black dot represents the
22 State's Enacted Plan; is that right?
23 A.      Yes.
24 Q.      Okay.  And if the black dot is higher on one
25 extreme of the column, then you would say the black

Page 28

1  dot is an outlier, right?
2  A.      Yes.
3  Q.      Okay.  So you're analyzing the same
4  ensemble, but with respect to percent minority in
5  figure 26 and percent Democratic in figure 27, are
6  there any overlaps between the map -- the maps that
7  you've considered?  Does that make sense?
8          MR. KERCHER:  Object to the form.
9  A.      It does not.
10 Q.      Okay.  I'll come back to that.
11 If you go to the bottom of Page 43, the last
12 sentence, it says, "Republicans sought to take an area
13 where they would naturally win two or three seats and
14 turn it into one where they win four."
15 Can you tell me, in figure 27, which
16 district is the fourth district that you're referring
17 to?
18 A.      So, first off, that's not the last sentence.
19 The last sentence has a preface to it.  "But here, the
20 data and history are more consistent with the
21 political story."
22 The fourth Republican district is the fourth
23 column that is around 45 percent Donald Trump.  So
24 about 7 percentage points more Republican than the
25 country as a whole.  I believe that would make it

Page 29

1  District 24.
2  Q.      So it's numbered 4 in figure 27, right?
3  A.      That's correct.
4  Q.      So based on the fourth column, is it fair to
5  say that the State's Enacted Plan for District 4 is
6  more extreme in its Republican Party vote share than
7  most of the other plans generated in the distribution?
8          MR. KERCHER:  Object to the form.
9  A.      It's more Republican than almost all of the
10 plans generated by the ensemble.
11 Q.      And that is visually represented by the
12 black dot being at the bottom of the red portion of
13 the column, right?
14         MR. KERCHER:  Object to the form.
15 A.      That's correct.
16 Q.      Okay.  And based on that, you've concluded
17 that partisan interests predominated and that it
18 wasn't a politically neutral process, right?
19         MR. KERCHER:  Object to the form.
20 A.      I don't know that I say that anywhere in my
21 report.
22 Q.      So if you go to the top of Page 43, above
23 the graph, it says, "The Enacted Map, however,
24 produces four districts where Trump won in excess of
25 55 percent of the vote.  In other words, the mapmakers

Sean P. Trende
September 02, 2022

Page 30

```
1   did create a Republican district where we wouldn't
2   expect a political-neutral process to create one."
3   A.      Yes.
4   Q.      Do you see that?  Okay.
5           So what was your basis for saying that with
6   respect to the Dallas/Fort Worth congressional
7   districts?
8   A.      Well, if you look on the ensembles, there
9   are always three districts generated that Donald Trump
10  won with less than 55 percent of the vote, and there
11  are always two districts generated before
12  Donald Trump -- Well, I shouldn't say always.  There
13  is always one district generated where Donald Trump
14  wins in excess of 45 percent of the vote.
15          There are usually two districts generated
16  where Donald Trump wins in excess of 45 percent of the
17  vote.  There are usually -- the third district would
18  be a district that Donald Trump won, but with less
19  than 45 percent of the vote.  Yet, the Enacted Map
20  produces a third such district.
21          And then, in the fourth ordered district, it
22  typically produces a district that Joe Biden won, and
23  it almost always produces a district that Joe Biden
24  -- that Donald Trump received less than 55 percent of
25  the vote.  So they under -- using the ensembles, a map
```

Page 31

```
1   drawn without respect to politics would not tend to
2   create -- We would not expect a map drawn without
3   respect to politics to create four districts where
4   Donald Trump won in excess of 55 percent of the vote.
5           I think in that answer I sometimes said
6   Donald Trump at 45 percent.  This is Joe Biden vote
7   share, so it would be Donald Trump at 55 percent.
8   Q.      Okay.  So you're saying if the process was
9   politically neutral, then it would be more likely that
10  that fourth district would have a higher Democratic
11  vote share, right?
12  A.      I said we would expect --
13  Q.      Okay.
14  A.      -- a politically neutral process to produce
15  a higher Democratic vote share.
16  Q.      Okay.  I think I understand.  Thank you.
17          So I have some questions about figure 26 on
18  Page 42.  If you look at the first paragraph, the
19  third sentence that starts with the word "Note."  You
20  say, "Note, too, that in both Dr. Duchin's and my
21  simulations, the Enacted Plan produces the same number
22  of minority CVAP majority districts as race- and
23  politics-blind simulation expects.  In other words, a
24  fourth majority CVAP district is not naturally
25  occurring."
```

Page 32

```
1           So when you say a "fourth majority CVAP
2   district," are you still looking at District 4 in
3   figure 26?
4   A.      I think that's actually the fourth sentence,
5   not the third.
6   Q.      Thank you.
7   A.      Just because this transcript is going to
8   follow me around for the rest of my life.  Sorry if
9   that's pedantic.
10  Q.      No, no, no.  Correct me if I'm wrong.
11          So yes, the fourth sentence.
12  A.      Yeah.  And that is, obviously, in
13  simulation.  That's right, yeah.  That's what those
14  sentences say.
15  Q.      When you say that "A fourth majority CVAP
16  district is not naturally occurring," what do you mean
17  when you say that?
18  A.      So if you look at my simulations and
19  Dr. Duchin's simulations, the fourth district tends
20  not to be majority CVAP.  So if you're just drawing
21  race- and politics-blind maps, you're not going to
22  tend to get a fourth majority/majority CVAP district
23  in the Dallas/Fort Worth area using the seven
24  districts that Dr. Duchin has selected.
25  Q.      Okay.  If you look at the black dot on the
```

Page 33

```
1   fourth column, again, I'm looking at figure 26, the
2   black dot is towards the bottom of the red portion of
3   the column.  Do you see that?
4   A.      Yes.
5   Q.      Okay.  Does that mean that the black dot
6   State's Enacted Plan is more extreme than the rest of
7   the plans in the distribution?
8           MR. KERCHER:  Object to the form.
9   A.      No.
10  Q.      It doesn't?  If the black dot is lower in
11  the column, it doesn't mean that it's more of an
12  outlier than all of the plans that are the dots above
13  it?
14          MR. KERCHER:  Object to the form.
15  A.      The fourth column -- the fourth dot is
16  within the distribution, so it is not more extreme
17  than all of the plans of the ensemble.
18  Q.      But it's towards the bottom of the
19  distribution.  Does that make any kind of difference?
20          MR. KERCHER:  Object to the form.
21  A.      You asked me if it was more extreme than all
22  of the plans in the distribution.  That is untrue.
23  There are obviously plans with even lower CVAP than
24  the distribution; so it's flatly wrong to say it's
25  more extreme than all of the plans in the ensemble.
```

Sean P. Trende
September 02, 2022

Page 34

1  Q.      Okay.  Well, then, how do I tell what
2  percentile the black dot represents?  What percentile
3  within the distribution?
4  A.      If you're interested in that, you can look
5  at the code that I produced which will generate the
6  ensembles, and you can pull that information from the
7  code.  You could look at a boxplot.  My experience
8  from the Maryland case is that normal human beings see
9  a boxplot and their eyes glaze over, given the
10  expletive I received from the judge when the boxplot
11  went up.
12  Q.      Oh, no.  Uh-oh.
13  A.      So I shouldn't say "expletive."  She didn't
14  curse at me, but she was very dismayed.  So Dr. Imai
15  has also used dotplots, and it's a built-in feature of
16  the redist package.  I find that this is a more
17  intuitive way to produce the data, even if you do lose
18  some visually -- some information in the process.
19  Q.      So can you eyeball the percentile from your
20  dotplot?
21  A.      No.
22  Q.      Okay.
23  A.      But the data are available if you're
24  interested in it.
25  Q.      I'm just trying to understand.  You say a

Page 35

1  majority CVAP district is not naturally occurring.
2  But my question is how do you know that the State's
3  Enacted Plan is not extreme in how low the minority
4  CVAP is?
5          MR. KERCHER:  Object to the form.
6  A.      Those are two concepts that aren't really
7  related.  The statement about it being naturally
8  occurring or not naturally occurring has to do with
9  where the center of the distribution is.  An inference
10  about the dotplot or the Enacted Map has to do with
11  where that black dot is.
12  Q.      So wouldn't an inference that the State's
13  Enacted Plan had a lower CVAP share than all of the
14  other plans in the distribution, wouldn't that tell
15  you something about whether the process was racially
16  neutral or not?
17          MR. KERCHER:  Object to the form.
18  A.      No, because you aren't also controlling for
19  politics, which in a state -- As I say on Page 43, "In
20  a world where race and politics often correlate, it's
21  sometimes difficult to sort the two out.  What to do
22  in that situation is a question for lawyers to argue
23  about and judges to decide."
24  Q.      Okay.  So you're saying that it's not
25  necessarily helpful to know whether this -- where in

Page 36

1  the distribution the State's Enacted Plan falls with
2  respect to race?
3          MR. KERCHER:  Objection.  Form.
4  A.      I didn't say that.
5  Q.      Okay.  So stepping back, again, in some of
6  these dotplots you've shown that the State's Enacted
7  Plans were racial outliers, and figure 27 -- I'm
8  sorry.  That the State's Enacted Plan were partisan
9  outliers, and figure 27 represents that, right?
10          MR. KERCHER:  Object to the form.
11  A.      Yes.  That is one of the things that figure
12  27 shows.
13  Q.      Okay.  And in some of your dotplots, you've
14  also shown that the State's plan are racial outliers,
15  right?
16          MR. KERCHER:  Object to the form.
17  A.      Right.  And the point here is that, in a
18  world where race and politics correlated, you're going
19  to tend to get both; something that appears as a
20  racial outlier will also appear as a political
21  outlier.
22          Dr. Duchin's report only showed that the
23  maps were racial outliers.  I wanted to show that they
24  were political outliers as well, not to contest what
25  her findings are.

Page 37

1          I say, on Page 43, which, for legal
2  purposes, which is not what I'm here to decide.  For
3  legal purposes, I will let you all fight over that,
4  and the judge decide, which is the proper thing for an
5  expert to do I believe.
6  Q.      Uh-huh.  So your maps -- your ensemble
7  analysis doesn't necessarily rule out race as a
8  motivation -- as motivation of the legislature, does
9  it?
10          MR. KERCHER:  Object to the form.
11  A.      Well, as you stated at the beginning, it's a
12  probabilistic inquiry so you never rule out anything
13  with statistics.  But what it does show is that
14  politics -- the maps are also political outliers
15  consistent with political gerrymandering.
16  Q.      Okay.  But it's possible that race may have
17  been a driving force behind the legislature's -- their
18  Enacted Maps, right?
19          MR. KERCHER:  Object to the form.  Asked and
20  answered.  Misstates his testimony.
21  A.      You know, I'm not here to talk about all of
22  the things that could be possible.  I know there is an
23  entire universe of fact testimony that's going on in
24  this case that I am blissfully unaware of.
25          All that these simulations show and are

Sean P. Trende
September 02, 2022

Page 38

1   really meant to show is that these maps are also
2   political outliers, without disputing the data that
3   Dr. Duchin shows.
4   Q.        Did you look at the correlation between
5   politics and race?
6             MR. KERCHER:  Object to the form.
7   A.        I did not.  I believe Dr. Kousser estimated
8   it at like .67, but I don't know if that's right or
9   not.
10  Q.        Did you look at the racial features of plans
11  that were more partisan in your ensemble?
12            MR. KERCHER:  Object to the form.
13  A.        No, because I think there were only a
14  handful of plans that are as -- Matter of fact, there
15  are no plans that match the partisanship of what the
16  legislature did.
17  Q.        Can you elaborate on that?  What do you mean
18  by that?
19  A.        Well, if you look at Districts 5 and 6, the
20  Enacted Plans fall completely outside of the
21  distribution of the drawn maps.  So I cannot pull out
22  maps from the ensemble that reflect the political
23  distribution of maps that the legislature enacted.
24  Q.        Sorry.  Which figure are you referring to?
25  A.        This is in reference to figure 27.

Page 39

1   Q.        Okay.  And with respect to 5 and 6, can you
2   repeat what you said?
3   A.        Yes.  You can see from looking at the
4   Enacted Plan compared to the ensemble.
5   Q.        Uh-huh.
6   A.        And I'm not 100 percent sure about 5 because
7   I forgot to bring my readers, but I'm sure about 6.
8   Those districts are more Democratic than anything that
9   appears in the ensemble.  So you can't really -- And
10  even with respect to District 4, there is only a --
11  there are only a handful of maps that are Republican
12  as that district is.
13            So you can't really filter out just the
14  districts -- just the maps that produce four districts
15  where Donald Trump won in excess of 55 percent of the
16  vote and where that third district is almost
17  60 percent Trump, which is what pushes those other two
18  down or up on the map, because they don't exist in the
19  ensemble.
20  Q.        Okay.  But if you go to column six in
21  figure 26, the black dot is way above the blue portion
22  of the column, right?
23            MR. KERCHER:  Object to the form.
24  A.        It's above the -- I don't know about way
25  above, and I don't think I used that with respect to

Page 40

1   any of the columns.  If I did, I apologize.  But
2   I don't know about "way above."  It is above the
3   distribution.
4             But my point is that, in a world where race
5   and politics are correlated, when you produce two
6   districts that are political outliers, you're also --
7   there is a good chance you're going to produce a
8   district that's a racial outlier inadvertently, even
9   if you are drawing blind to race.
10  Q.        Okay.  Couldn't it be evidence -- couldn't
11  your ensembles also be evidence that race was more of
12  a factor than partisanship, if it's both an outlier in
13  terms of race and partisanship?
14            MR. KERCHER:  Object to the form.
15  A.        Again, "evidence" is a legal term of art.
16  I don't know how people are going to use this in court
17  or would intend to use it.  My guess is -- or my sense
18  is no because the ensembles produced at the end of the
19  day produced the same number of minority majority
20  districts as you would expect from a race-drawn plan.
21            So there are the same number of districts
22  where the minority group would tend to be a majority
23  in it.  But there are not the same number of districts
24  where either Donald Trump won or where Donald Trump
25  performed very well.

Page 41

1             I think looking at this data, politics is a
2   better example or a better explanation for what went
3   on, but I suppose you could try to offer it up as
4   evidence for a racial claim.
5   Q.        Okay.  Did you study, again, a subset of
6   districts from your ensemble that were Republican
7   leaning?
8   A.        No, because the maps -- the Enacted Plans
9   don't produce just Republican-leaning districts.  They
10  produced four districts that Donald Trump won
11  overwhelmingly, which is the goal.
12  Q.        Okay.  So to understand how race and
13  politics correlate, would it have been helpful to
14  control your ensemble and your 100,000, you know,
15  simulations and only look at the Republican-leaning
16  districts?
17            MR. KERCHER:  Object to the form.
18  A.        No, because the district didn't try to
19  draw -- or the Republicans didn't draw a map where
20  Donald Trump or Joe Biden won 51 percent of the vote,
21  which would be a Republican-leaning district, given
22  that he won naturally with 52 percent of the vote.
23  And that's understandable.
24            I can -- You know, if you draw a
25  50.001 percent Trump district in the Dallas suburbs

Sean P. Trende
September 02, 2022

Page 42

1  today, given trends there, there's a reasonable chance
2  that it is going to be a Biden district by the end of
3  the decade.  You want to build in a cushion when
4  you're gerrymandering.
5          So I think looking at districts where
6  Donald Trump won 50.001 percent of the vote isn't --
7  doesn't shine a whole lot of light on things,
8  especially since, given that race and politics are
9  correlated, pushing a district down to 50 or
10  45 percent Biden and pushing that third district down
11  to 40 Biden is going to pop things up on the other
12  side, probably both with respect to race and politics.
13  So I don't think looking at a bunch of 50.001 percent
14  Trump districts is going to illuminate much.
15  Q.          Okay.  So, hypothetically speaking, if --
16  Again, you know, tell me if you don't understand my
17  question.  But if you control your ensemble again for
18  just Republican-leaning plans, and then you look at
19  whether those -- the State's Enacted Plan, as compared
20  to the Republican-leaning plans, and you want to value
21  whether there are extremes racially or not, would that
22  allow you to test your hypothesis whether the process
23  was racially neutral or not?
24          MR. KERCHER:  Object to the form.
25  A.          As someone who studies American politics in

Page 43

1  elections, and whose job is to evaluate the
2  competitiveness of the elections, I don't believe that
3  would be particularly illuminative.
4          Perhaps someone looking at these data who
5  doesn't have a lot of experience evaluating elections
6  might think that's a sensible way to go about it; but
7  it is not because when -- what the legislature does
8  when it creates a 45 percent -- Well, first off, if
9  you're looking at Republican-leaning districts, you
10  would want to include districts up to where Biden won
11  at least 52 percent of the vote which is his
12  nationwide vote total.
13          But when you're pushing Joe Biden's vote
14  share down to 45 percent, you're not just creating a
15  Republican-leaning district; you're creating a solidly
16  Republican district.  And so looking at these
17  politically marginal districts wouldn't illuminate
18  much for you.
19  Q.          You wouldn't learn anything if you looked at
20  the racial features of those districts?  You're saying
21  you wouldn't learn anything about them?
22          MR. KERCHER:  Object to the form.  Misstates
23  his testimony.
24  A.          You would learn a lot about those lean -- or
25  marginally Republican districts.  You wouldn't learn a

Page 44

1  lot about the Enacted Plan because it doesn't create
2  marginally Republican districts.
3  Q.          But the State's Enacted Plan could be
4  compared to any subset of plans, right?  Whether
5  they're Republican-leaning or whether they're
6  Democrat-leaning.  So I don't understand; why couldn't
7  you compare the State's Enacted Plan and look at
8  whether the State's Enacted Plan was racially extreme
9  as compared to plans that are more solidly
10  Republican leaning?
11          MR. KERCHER:  Object to the form.
12  A.          You can compare the Enacted Plan to any
13  subset of the ensembles that you wish.  My point is
14  that if you want to actually draw some inferences
15  about the Enacted Plan by controlling, you have to
16  look at a subset of plans that are like the Enacted
17  Plan.  And a subset of plans that has 50.001 percent
18  Trump districts is not like -- especially when you're
19  in the Dallas/Fort Worth suburbs is not like the
20  Enacted Plan.  You're comparing apples to oranges in
21  that situation, as someone who evaluates elections for
22  a living.
23  Q.          Okay.  Now, I mean, again, you're the
24  expert; I'm just trying to understand.
25  A.          We've been going about an hour.  Can we take

Page 45

1  a break?
2  Q.          Yeah.  Sure.  Want to take a ten-minute
3  break?
4  A.          Yeah.  Sure.
5          (Recess taken.)
6          MS. CHAUDHURI:  Back on the record.
7  BY MS. CHAUDHURI:
8  Q.          So, Mr. Trende, you're aware of the
9  Ecological Inference method?
10  A.          Yes.
11  Q.          In your own words, can you describe to me
12  what "Ecological Inference" means?  I know it's a
13  broad question.
14  A.          Yes.  So one of the problems we have with
15  data analysis, particularly with respect to elections,
16  is that -- It's not really a -- it's a problem with
17  respect to elections analysis; it's not really a
18  problem.  But we have secret ballots, which is good,
19  but we don't know how individuals vote.  And the
20  question is often, Okay, you know, we want to know how
21  members of different groups vote.
22  Q.          Uh-huh.
23  A.          And one solution is just talk to them,
24  conduct an exit poll or some of these other polls; but
25  a lot of times we don't have that available.

Sean P. Trende
September 02, 2022

Page 46

1    So one way to do that was -- two things were
2  developed at about the same time in the mid 1900s.
3  The first is the Method of Bounds -- And all of this
4  is necessary to answering the question about
5  Ecological Inference.
6    One of these is the Method of Bounds, which
7  is you can look at a precinct, and -- Well, I guess,
8  the other issue is that if you're just looking at
9  precinct-level data, you can have a district that is
10  70/80 -- or 70/30 percent African American, and vote
11  70/30 Democrat, but you don't know whether all of the
12  African Americans are voting Democrat, or, you know,
13  90 percent are, and whatever the -- it would be, like,
14  20 percent of the non-African Americans are voting
15  Democrat as well.
16    So what the Method of Bounds does -- That's
17  called the Ecological -- the problem of Ecological
18  Inference.
19    What the Method of Bounds does is say, Okay.
20  We can't know with -- or we don't know with precision
21  what the vote share is that Blacks are voting
22  Republican or Demonstrate.  But since Blacks are
23  70 percent of the population, and 70 percent of the
24  votes are for Democrats, there's a lower bound on how
25  heavy Black Republican voting can be and still produce

Page 47

1  that 70 percent overall vote share.  There's an upper
2  bound as well.  I think in the example I gave, it's
3  100 percent.
4    There is also Ecological Regression, which
5  is when you conduct a regression analysis of the
6  aerial units on the demographics of the aerial units
7  on vote share.
8    The problem with that is that you will
9  frequently produce estimates in excess of 100 percent,
10  which is, Yogi Berra aside, not possible.
11    So those were the kind of two going
12  approaches for a long time; and then, in the 1990s,
13  there was renewed interest in other methods.  One
14  method is Ecological Inference, which is a lengthy
15  algorithm which draws on -- an iterative algorithm
16  that draws on both ecological regression and
17  Ecological Inference -- or Method of Bounds, using the
18  Method of Bounds to kind of bend the line that
19  regression analysis produces to ensure it doesn't go
20  past the bounds of zero or 1.
21  Q.    Okay.  To your knowledge, has EI, which is
22  the acronym for Ecological Inference, has it been
23  accepted by the courts?
24  A.    To my knowledge, it has.
25  Q.    Okay.  And you're aware of the Homogenous

Page 48

1  Precinct method as well?
2  A.    Yes.
3  Q.    Can you describe what that means to you?
4  A.    Yeah.  HPA, which is -- or the Homogenous
5  Precinct Analysis is when you look at districts with a
6  minority population in excess of some threshold.
7  I mean, ideally, you would have 100 percent minority
8  precincts because, then, there is no problem of
9  Ecological Inference.  The voting rates of those
10  Homogenous Precincts are going to be equal to the
11  minority voting shares within those precincts.
12    You know, you can take the threshold down to
13  90 percent and your error is going to be constrained
14  by the Method of Bounds to be pretty small.
15  Q.    So Homogenous Precincts require the minority
16  CVAP, or whatever VAP, whatever metric you're using,
17  to be above a certain threshold to give meaningful
18  data, right?
19  A.    That's right.  The further you move away
20  from 100 percent, the kind of broader the potential
21  error margin is from the possible bounds.  You want to
22  be as close to 100 if you're doing that, as you can,
23  but that's not always possible.
24  Q.    Okay.  So, you know, in your study of the
25  Texas districts, do you have an expert opinion as to

Page 49

1  whether one method or another method is better for
2  understanding how people voted?
3    MR. KERCHER:  Object to the form.
4  A.    I wasn't asked to look at that.
5  Q.    Okay.  In your understanding -- or to your
6  knowledge, is -- Homogenous Precinct, has that method
7  been accepted by the courts?
8  A.    I don't know.
9  Q.    Are you familiar with the concept of peer
10  review?
11  A.    Yes.
12  Q.    What does it mean to you?
13  A.    So peer review is being -- having an article
14  submission or book reviewed in a double-blind
15  situation where you don't know the reviewers.  And, at
16  least in theory, the reviewers don't know who wrote
17  the article; and they give such analysis and opinions
18  on whether the book or article is suitable for
19  publication.
20  Q.    Uh-huh.  And do you have an opinion as to
21  whether peer review is an important factor in
22  assessing whether a method is sound or not?
23    MR. KERCHER:  Object to the form.
24  A.    I believe it's one with the Daubert factors
25  on a legal context.  Yes.

Sean P. Trende
September 02, 2022

Page 50

1  Q.        But in an expert context, outside of the
2  legal context?
3            MR. KERCHER: Object to the form.
4  A.        It can be useful.  But a lot of junk gets
5  through peer review, and there is a lot of sound
6  analysis out there that isn't produced in
7  peer-reviewed journals.
8  Q.        Okay.  So you mentioned earlier that SMC is
9  a peer-reviewed method that you've used, right?
10 A.        I don't think I said it was peer-reviewed.
11 I said it was accepted by courts in multiple
12 circumstances.
13 Q.        Okay.  So you don't know whether it's
14 peer-reviewed or not.
15           MR. KERCHER: Object to the form.  Misstates
16 his testimony.
17           You can answer.
18 A.        My understanding is it's under submission.
19 I don't know if it has completed peer review or not.
20 Q.        Okay.  Are you familiar with the Election
21 Law Journal?
22 A.        Yes.
23 Q.        Is it an accepted authority in your field?
24 A.        I mean, it produces peer-reviewed
25 literature.  That doesn't mean -- and people will rely

Page 51

1  on some of those articles.  That doesn't mean that
2  everything that's published in it is good.
3  Q.        Okay.  And you're familiar with, I guess,
4  the editors of the Election Law Journal?
5            MR. KERCHER: Object to the form.
6  A.        The last I checked, which was a while ago,
7  Paul Gronke was the editor.  I don't know who is the
8  editor now, and I certainly haven't looked at the
9  masthead.
10 Q.        Are you familiar with Richard Hasen?
11 A.        Yes.
12 Q.        Is he an accepted authority in your field?
13 A.        Elections, in general, yes.  I don't know if
14 he's done much for gerrymandering.  But, yeah, he
15 does -- he tends to be more on what we call the vote
16 supression cases.
17 Q.        And are you familiar with Dan Lowenstein?
18 A.        That name is familiar.
19 Q.        Do you have an opinion as to whether he's an
20 accepted authority in the field of election?
21 A.        I'm not as familiar with his work.  I don't
22 think I've seen him much in the gerrymandering
23 literature.  If he's on their masthead, I'm sure he
24 has some expertise in some field of election law.
25 Q.        Okay.  So I want to ask you about your

Page 52

1  critiques of Dr. Duchin's demonstration plans.
2  In various places in your report, you critique
3  Dr. Duchin's demonstration plans, right?
4  A.        That's correct.
5  Q.        Okay.  Let's turn to Page 115 of your
6  report.  Okay.  Can you tell me what was the purpose
7  of your critique of Dr. Duchin's plans?
8            MR. KERCHER: Object to the form.
9  A.        I was asked by counsel to review her
10 demonstration plans and I did that.
11 Q.        Okay.  And if you look at the second
12 sentence, correct me if I'm wrong on this, but it
13 says, "The purpose of this, to my understanding, is to
14 satisfy Gingles prong 1:"
15           And then you say, "Demonstrating that
16 minority group is sufficiently numerous and compact to
17 create a majority in a district."  Did I read that
18 right?
19 A.        Yes.
20 Q.        Okay.  So what is your understanding of what
21 the Gingles 1 prong requires?
22 A.        It would be better with the Gingles decision
23 in front of me.  And, first, to clarify this, in that
24 sentence you just read, since we're just talking about
25 my purpose, is not a reference to my purpose.  The

Page 53

1  purpose in that sentence is referring to what I
2  understand Drs. Duchin and Morales to be doing.
3            It would be better with the Gingles decision
4  in front of me.  But my understanding of Gingles
5  prong 1 is that, for a Voting Rights Act district to
6  be required, or however you want to phrase it, a
7  minority opportunity district, you, first, have to
8  demonstrate that the minority group is sufficiently
9  numerous and compact to create a majority in the
10 district.
11 Q.        Okay.  So compactness is a requirement.
12           What's your understanding of how compactness
13 is -- Sorry.  Strike that.
14           What's your understanding of how compactness
15 is measured for the purposes of Gingles 1?
16 A.        Well, that is an excellent question that --
17 and Gingles is G-I-N-G-L-E-S.  That is an excellent
18 question that we will probably get some insight from
19 the Court on when it renders its decision in the
20 Alabama case.
21           My understanding, from reading Gingles, is
22 that it is a reference to the minority group itself,
23 not to the shape of the district; although, it is
24 frequently referred to in terms of the district shape.
25 Q.        Okay.  And by reference to the minority

Sean P. Trende
September 02, 2022

Page 54

1 group itself, can you clarify that a little more?
2 What does that mean vis-a-vis compactness?
3 A.      Well, you can imagine a district that is
4 shaped like a square.
5 Q.      Uh-huh.
6 A.      And there is a minority group that is
7 12.5 percent of the population of the district in the
8 upper-left corner; 12.5 percent of the population of
9 the district in the upper-right corner; 12.5 percent
10 of the population of the district in the lower-right
11 corner; and 12.6 percent of the population of the
12 district in the lower-left corner.
13 Q.      Okay.
14 A.      In that situation, you would have a district
15 where the Convex Hull Score is 1, but I don't think
16 under any reasonable definition the minority group
17 itself would be considered compact.
18         You have four clusters at the four
19 extremities of the districts.  So that is how I think
20 of the difference between district compactness and
21 population compactness.
22 Q.      Okay.  So you're saying that, if the
23 district was square, its compactness score, and you're
24 using a -- whatever scale you mentioned, and I don't
25 remember what it was -- but that that district has

Page 55

1 a -- is compact in terms of its score, in terms of its
2 shape.  But because the minority population lives in
3 different corners, that the minority population,
4 itself, is not necessarily compact, right?
5 A.      That's the example.  Yes.  And the metric is
6 the Convex Hull Metric.  If you wanted to use the more
7 commonly used Reock, the compactness score for the
8 district would be, like, .65, which is still
9 relatively compact.
10 Q.      Do you have a sense of how geographically
11 dispersed the minority groups have to be to meet or
12 not meet compactness goals under Gingles 1?
13 A.      No.  I'm not sure how compact the districts
14 have to be to meet compactness goals under Gingles 1
15 because all of these metrics we have have the problem
16 that they don't really have good cutoffs.  And so as
17 Justice O'Connor famously wrote, "This is an area
18 where appearances do matter."  It inevitably becomes
19 more of a I-know-it-when-I-see-it-type test.
20 Q.      Uh-huh.  And is that -- Do you recall which
21 case she said that in?
22 A.      I don't, but it should be in Westlaw.
23 Q.      Okay.  Was it Voinovich that she said it in?
24 You don't remember?
25 A.      (Witness shakes head.)

Page 56

1 Q.      I know you said it would be helpful to have
2 Gingles in front of you.  But do you -- sitting here
3 today, without Gingles in front of you, do you have
4 any recollection as to whether the Gingles court
5 talked about compactness the way you did as part of
6 Gingles 1?
7 A.      Yes.
8 Q.      You do.  The Gingles court -- Did the
9 Gingles court say that the minority population has to
10 be close together?
11 MR. KERCHER:  Object to the form.
12         If you have a copy of the case, that would
13 probably be helpful.
14 A.      My recitation of Gingles prong 1, I believe,
15 is pretty close to a quotation from the opinion that
16 the minority group has to be sufficiently numerous and
17 compact.  And before that sentence in the opinion,
18 maybe two or three sentences earlier, there is a
19 reference to the compactness of the minority group.
20 Q.      Okay.
21 A.      So that's my recollection.  But at the end
22 of the day, this is a legal fight that I suspect you
23 all will have either here or in the Supreme Court in a
24 different case.
25 Q.      So I'd like you to go to paragraph two, or

Page 57

1 maybe it's three.  I don't know.  Anyway, it's the
2 last sentence.  It says, "A State's Enacted Plan,
3 however, is not necessarily a good comparator.  If a
4 state pursues a partisan gerrymander, and its partisan
5 goal outweighs its compactness goal, then its enacted
6 districts may not be very compact."
7         Do you see that sentence -- two sentences?
8 A.      I see the final two sentences of the
9 paragraph.  Yes.
10 Q.      Okay.  Thanks.
11         So you were talking about compactness in
12 terms of the Polsby-Popper scores, right?
13 A.      Yes.
14 Q.      So can you explain what you meant in
15 writing -- or when you wrote that, "The enacted plan
16 is not a good comparator for the compactness of
17 demonstration plans," why isn't it a good comparator?
18 A.      Because the Enacted Plan's districts can be
19 extremely non-compact without being a racial
20 gerrymander.  It could be a partisan gerrymander.
21         If I were looking for compactness under the
22 old Maryland plan, I certainly would not want to use
23 those districts as a definition of what a compact
24 district would be.
25 Q.      Okay.  So how does that relate to, if at

Sean P. Trende
September 02, 2022

Page 58

1  all, your Gingles 1 analysis?
2  A.       I think it should -- Gingles 1 is referring
3  to compactness of the minority group itself.  But I'm
4  also responding to the Duchin report here.  And so
5  Dr. Duchin's report, as I remember it, references the
6  Polsby-Popper scores and compares them to the Enacted
7  Plan.  And so, in response to Dr. Duchin, I am saying
8  that I don't think the Enacted Plan is necessarily a
9  good baseline for determining whether a district is
10  compact or not.
11  Q.       Got it.  Okay.  So turning, again, to that
12  last sentence, "If a state pursues a partisan
13  gerrymander, then its enacted districts may not be
14  very compact."  I omitted the middle part.
15           But is it your expert opinion that mapmakers
16  in Texas pursued partisan goals at the cost of
17  traditional redistricting principles, like
18  compactness?
19      MR. KERCHER:  Object to the form.
20  A.       No.  My opinion here is that the maps that
21  are drawn are consistent with partisan goals.  This
22  statement here is not Texas-specific.  It's an example
23  of why using a district's -- a state's map as a
24  baseline isn't necessarily particularly useful.  I
25  think a better example are the Maryland districts

Page 59

1  which were held to be a partisan gerrymander and were
2  extraordinarily convoluted.
3           I don't think producing a demonstration
4  district that was as convoluted as the Maryland
5  districts were would be producing a compact district.
6  And, in any event, that wouldn't be demonstrating
7  compact population.
8  Q.       Okay.  Can you turn to Page 116.  So 116
9  represents your creative and colorful term, "The
10  Carmen Miranda District."  Right?
11  A.       Hats off to my wife for that one.  But yes.
12  Q.       Well, I love that.  Now we call it "The
13  Carmen Miranda District," so she's had a lot of
14  impact.
15           So in figures -- Now, I want to look at
16  Pages 116, 117, 118, and 119, figures 82, 83, 84, and
17  85 of your report, that all are representations of
18  "The Carmine Miranda District" in Dallas.  So in
19  figure 83 -- in figures 83, 84, and 85, you look at
20  concentrations of Black, Latino, and Asian voters
21  separately in that proposed district, right?
22  A.       That's correct.
23  Q.       And on Page 119, if you go to Page 119, and
24  you read the sentence, and I'll read it for the
25  record.  It says, "In other words, even if we accept

Page 60

1  that the district itself is compact, and it isn't, the
2  majority groups that comprise the district are not."
3           What was your basis for saying that the
4  minority groups in that district are not compact?
5  A.       Because if you look at the concentrations of
6  the groups in the district by way of the dotplot, in
7  all of the instances, their concentrations are spread
8  out from the districts.  So, as I explained, to draw
9  an example from the preceding text on Page 8, the
10  Asian population has a cluster in Carmen Miranda's
11  hand and the back of her head.
12  Q.       Uh-huh.
13  A.       And in the top of the hat.
14  Q.       Okay.
15  A.       Those are distinct clusters of population.
16  Q.       Okay.  Did you look at whether the minority
17  communities were connected in any other way in this
18  district?
19  A.       No.  I was looking at their geographic
20  dispersement.
21  Q.       You didn't consider whether they are
22  connected through transportation means?
23  A.       No.
24  Q.       You didn't look at whether they share media
25  markets?

Page 61

1  A.       No.  I'm looking at their geographic
2  concentrations.
3  Q.       You didn't -- Okay.  Are you familiar with
4  the concept of communities of interest?
5  A.       Yes.
6  Q.       Okay.  In your own words, for the record,
7  what does that term mean to you?
8  A.       That is a very good question.  It is a term
9  that the Supreme Court threw out into the
10  redistricting world in the 1990s, and people have kind
11  of struggled since then to figure out exactly what it
12  means.  But it's different ways for communities --
13  different ways that communities may be formed on
14  different bases.
15           I'm sorry.  Justice O'Connor listed a bunch
16  of examples of how you might form a community of
17  interest.  I think it was the Miller case.
18  Q.       Uh-huh.
19  A.       But they are nonexclusive.  Different states
20  define them in different ways.  Some of them have them
21  written directly into their redistricting guidelines.
22  Yeah.  There's multiple ways that people have tried to
23  explain what a community of interest is.
24  Q.       And, to your knowledge, do you know how
25  Texas defines communities of interest?

Sean P. Trende
September 02, 2022

Page 62

1    A.        I do not.
2    Q.        Okay.  So to eval -- Did you conduct any
3    evaluation as to whether these minority groups form a
4    community of interest --
5              MR. KERCHER:  Object.
6    BY MS. CHAUDHURI:
7    Q.        -- in proposed District 32?
8              MR. KERCHER:  Object to the form.
9    A.        I did not.  I don't know that that's
10   relevant to a compactness analysis, but I didn't do
11   it.
12   Q.        Did you evaluate whether there are cultural
13   components that tie together the communities?
14             MR. KERCHER:  Object to the form.
15   A.        I did not.
16   Q.        Did you speak with anybody at, say, the
17   Texas NAACP or LULAC, or other civic engagement groups
18   about whether these minority communities form
19   communities of interest in proposed District 32?
20             MR. KERCHER:  Object to the form.
21   A.        I believe I would be terminated if I look to
22   LULAC or the NAACP.  But no, I -- for the other civic
23   engagement groups.  I did not.
24   Q.        Did you calculate the compactness of any of
25   the minority populations in proposed District 32?

Page 63

1    A.        So that is something that is lacking from
2    the literature which is focused on the shapes of
3    districts and was developed in a political
4    gerrymandering context.  I'm not sure what -- I'm not
5    sure what tests you would use for assessing the
6    compactness of the individuals.
7    Q.        Did you undertake this kind of analysis, you
8    know, to learn about what ties the minority groups
9    together, other than just their race, in any of the
10   other proposed congressional districts that you
11   critiqued?
12             MR. KERCHER:  Object to the form.
13   A.        No, because I'm conducting this analysis
14   specifically within the context of a proposed VRA
15   district that is seeking, to my understanding, to
16   demonstrate a minority group that is sufficiently
17   compact and numerous to constitute a majority number
18   in the district.  It's a very specific inquiry that
19   wouldn't have much to do with a Shaw claim, for
20   example, necessarily.
21   Q.        And is your opinion as to where the
22   minorities are located in the district, is it based on
23   you just eyeballing where the blue dots are?
24             MR. KERCHER:  Object to the form.
25   A.        As Justice O'Connor wrote, this is something

Page 64

1    where appearances do matter.  And so just as -- and in
2    some of these -- Actually, I get in some of these Shaw
3    cases, you do look at the location of the minority
4    groups.  Looking at the location of the minority
5    groups here.
6    Q.        Okay.  And so do you have an opinion as to
7    how geographically close the minority groups have to
8    be to meet the compactness requirement under
9    Gingles 1?
10   A.        If there's case law that develops that,
11   I'd certainly be interested in seeing it; but, to my
12   understanding, that type of ruling hasn't been made.
13   Maybe after the Alabama case, we'll get a better idea
14   of how that lies, if at all.  But for right now, no,
15   I don't know a specific threshold.  I just know that
16   it's fairly obvious for something like figure 85 that
17   those groups aren't compact.
18   Q.        Uh-huh.  Okay.  So there is a certain amount
19   of discretion that you had to use to conclude that
20   these groups were not compact, right?
21   A.        For all compactness inquiries, including an
22   inquiry into the compactness of the district, there's
23   discretion used because a Reock score is effectively
24   meaningless.  There have been attempts to give it some
25   meaning.  But at the end of the day, whether .14 is

Page 65

1    too little and .141 is just right is tough to come up
2    with a cutoff.  So it has the same amount of
3    discretion as any compactness requirement that's
4    undertaken.
5    Q.        But a Reock score describes the shape; how
6    compact the physical shape of a district is, right?
7    A.        Oh, that's right.
8    Q.        Okay.
9    A.        But you were asking me about interpretation;
10   and the interpretation of Reock scores requires
11   discretion usually.
12   Q.        Okay.  As you know, as we've established, as
13   does trying to figure out whether minorities living in
14   different corners of a district constitute a compact
15   group, right?
16   A.        I'm sorry.  Can you repeat that?
17   Q.        Sorry.  But that requires a level of
18   interpretation.
19             MR. KERCHER:  Object to the form.
20   A.        I think the example that I gave is --
21   I don't think you can make a less compact grouping
22   than having the group equally divided at corners of a
23   square.  And so if that is too much discretion being
24   used, then you've effectively eliminated the
25   compactness requirement for populations.

Sean P. Trende
September 02, 2022

Page 66

1  Q.      Let's turn to Page 203 and 204 of your
2  report.
3          And before we move on, just for the record,
4  you didn't look at any communities of interest or
5  evaluate those for the purpose of a compactness
6  analysis for the state senate demonstration district
7  that you critiqued, did you?
8  A.      That's right.  I didn't do a communities of
9  interest analysis for state senate districts.
10 Q.      And you didn't do that same analysis for the
11 house demonstration districts, right?
12 A.      That's correct.
13 Q.      On Page 203, my understanding is that you
14 critiqued Dr. Duchin's demonstration plans for house
15 districts in Denton-Wise, Brazoria, and Lubbock,
16 right?  Please take your time to review 203 and 204.
17 A.      That's correct.
18 Q.      Okay.  Your Denton-Wise plan, what is your
19 critique based on?
20 A.        It is based on the data presented in
21 Dr. Duchin's report and simulations in that area.
22 Q.      Okay.  In the second sentence, and I'll read
23 it.  "I note, however, that the district in
24 Denton-Wise only barely crosses the 50.21 percent
25 threshold using a collection of minority groups where

Page 67

1  no minority group constitutes more than 20.1 percent
2  of the CVAP."
3          Why was it -- why was the 50.21 percent
4  threshold significant to your analysis of compactness?
5  A.      This is a numerosity comment, not a
6  compactness comment.
7  Q.      Can you explain your numerosity comment?
8  A.      Yes.  So to qualify, if you will, for
9  Gingles prong 1, you have to reach 50.1 percent.  This
10 district barely crosses that threshold and it does so
11 by using the coalition of minority groups where
12 none of the groups constitutes more than 20.1 percent
13 of the CVAP.  I note that.  I don't know how the
14 lawyers are likely to use this.  I can conjure
15 scenarios.  But that is something I noted.
16 Q.      Okay.
17 A.      I don't draw strong conclusions from it.
18 Q.      Okay.  So you don't -- Okay.  So you're
19 not -- You're just noting.  You're not necessarily
20 critiquing the Denton-Wise district just because it
21 combines separate minority groups to meet the
22 50.21 percent threshold, right?
23          MR. KERCHER:  Object to the form.
24 A.      To meet the 50-percent-plus-1 threshold.
25 Q.      Right.  Is that a "Yes" or "No"?

Page 68

1  A.      Yes.  To meet the -- with qualification of
2  50-percent-plus-1 threshold from Gingles.
3  Q.      Okay.  I just wanted to understand what your
4  critique was of that.  Okay.
5          Let's move on to the second paragraph in
6  which you discuss her Lubbock demonstration plan.
7  What is your critique of the Lubbock demonstration
8  plan vis-a-vis Gingles 1?
9  A.      Well, as I understand, that's not Gingles 1.
10 As I understand the Gingles analysis, you have to
11 create a district that is likely -- that gives an
12 opportunity to elect the candidate of choice of the
13 minority group.
14          In a district where Joe Biden won only
15 33.5 percent of the two-party vote is one that is --
16 it would be a freakishly unlikely occurrence, given
17 what we see in other districts for that district to
18 elect the minority candidate of choice.
19          More importantly, I didn't note any analysis
20 from Dr. Duchin suggesting that a Biden 33.5 district
21 would elect the minority candidate of choice.
22 Q.      Okay.  So then your critique, again, just
23 for the record, is not vis-a-vis some compactness or
24 numerosity as to Dr. Duchin's Lubbock demonstration
25 plan, right?

Page 69

1  A.      That's correct.
2  Q.      Okay.  Is your critique based on an
3  effectiveness analysis as to the Lubbock district --
4  the proposed district?
5  A.      Yeah.  My critique is that I don't see any
6  evidence that this district will elect the minority
7  candidate of choice, and it would be a freakish
8  occurrence, in my experience, at any level of
9  government for a 33.5 percent Biden district to elect
10 the minority candidate of choice, assuming that's a
11 Democrat.
12          MS. CHAUDHURI:  I'd like to introduce
13 Exhibit 2.
14                    - - -
15          And, thereupon, Plaintiff's Exhibit No. 2
16 was marked for purposes of identification.
17                    - - -
18 BY MS. CHAUDHURI:
19 Q.      Do you recognize this document?
20 A.      Yes.  This is the supplement.  Yes.
21 Q.      What is it?
22 A.      It is the Supplemental Report on Districting
23 Alternatives, Local Polarization, and Effectiveness
24 from Dr. Duchin.
25 Q.      Did you ever review this document?

Sean P. Trende
September 02, 2022

Page 70

1  A.       I did.
2  Q.       Okay.  For the alternative -- for the
3  proposed districts that you have critiqued, did you
4  critique any of the alternative proposals that were
5  provided by Dr. Duchin in this report?
6  A.       I don't know if she changed them
7  significantly from what was in her initial report or
8  not.  I'm not sure.
9  Q.       Okay.  So your -- So would it be fair to say
10 that the demonstration plans that you looked at were
11 from her initial report only in your report?
12         MR. KERCHER:  Object to the form.
13 A.       I don't know.
14 Q.       Okay.  And you wouldn't be able to tell me
15 which of her plans you were critiquing, whether it was
16 from her supplemental report or her initial report,
17 right?
18         MR. KERCHER:  Object to the form.
19 A.       Not as I sit here.  You would be able to
20 tell from the code.
21 Q.       Okay.  So let's turn back to Page 203 of
22 your report.  I'd like to focus in on the last
23 paragraph dealing with Dr. Duchin's Brazoria --
24 proposed demonstration plan for Brazoria house
25 districts.  What was your critique of the Brazoria

Page 71

1  districts?
2  A.       So it looks like there are a couple of
3  points.  The first is that the proposed district is
4  less compact than other districts in the area to the
5  extent that that's a reasonable consideration.
6         Second.  Joe Biden in the district won
7  53.5 percent of the vote, which there's no
8  demonstration that this district would consistently
9  elect Democratic candidates.
10        And, finally, there is not a demonstration
11 that the district population is -- that a minority
12 population of the district is compact.
13 Q.       Okay.  So the first sentence when you --
14 over the first point that you made, that the proposed
15 district is less compact than any other district in
16 the area, are you looking at Reock scores, or are you
17 looking at the minority compactness?
18 A.       I think neither.  I believe I was looking at
19 the Polsby-Popper score.  Or it could be Reock.
20 Q.       So you're looking at the shape of -- the
21 compactness of the shape of the district, right?
22 A.       That's right.  To the extent that the shape
23 of the district and the proposed approach to the shape
24 of the district from earlier are valid approaches.
25 This is not more compact -- This is less compact than

Page 72

1  other districts in the area.
2  Q.       Okay.  Earlier, for other districts in the
3  area, that's according to the state's plan, right?
4  A.       I think that's right.
5  Q.       Okay.  And so you necessarily would have had
6  to compare the Polsby-Popper of Duchin's proposed
7  district to the Polsby-Popper -- the state's other
8  districts in the area, to say -- to conclude that
9  Duchin's district is less compact than the other
10 districts, right?
11 A.       I think that's how I did it.
12 Q.       And, earlier, do you recall on Page 115, if
13 we can go back to page 115.  Okay.  If you, again,
14 look at the second, or maybe the -- second-to-last
15 sentence of the second paragraph, and you've said,
16 "A State's Enacted Plan, however, is not necessarily a
17 good comparator."  Do you see that?
18 A.       Yes.
19 Q.       Okay.  So if a State's Enacted Plan is not
20 necessarily a good comparator, then why did you even
21 conduct this analysis of looking at Brazoria's
22 proposed district vis-a-vis the state's districts?
23 A.       Because the court may disagree with me about
24 that statement.
25 Q.       Okay.

Page 73

1  A.       I don't think there's anything wrong with
2  conducting an analysis under the opposing expert's
3  standard, rather than taking for granted that the
4  court is going to accept your analysis of why that
5  standard is bad.
6  Q.       Okay.  So you did that analysis just for the
7  court to have that?
8  A.       Yes.  Belt and suspenders.
9  Q.       Okay.  But it doesn't -- it's not
10 necessarily -- so your Polsby-Popper compactness
11 analysis for Brazoria doesn't necessarily -- Strike
12 that.
13        So your Polsby-Popper analysis as to
14 Brazoria, that is not necessarily a relevant
15 consideration for Gingles 1, right?
16         MR. KERCHER:  Object to the form.
17 A.       I would urge the court to say that that sort
18 of analysis is not relevant to Gingles 1 and strike
19 Dr. -- or ignore Dr. Duchin's analysis along those
20 lines as well.
21 Q.       And as to the other demonstration districts
22 that you looked at, you know, the Carmen Miranda
23 district, the Lubbock districts, the Denton-Wise
24 proposed districts, you didn't conduct this kind of
25 analysis, right, in comparing those districts to the

Sean P. Trende
September 02, 2022

Page 74

1    State's enacted districts?
2          MR. KERCHER:  Object to the form.
3    A.    That's not right.
4    Q.    Okay.  What's not right about it?
5    A.    I did conduct that analysis.
6    Q.    You, for the other districts, looked at
7    whether Duchin's proposed district was less compact in
8    terms -- with respect to Polsby-Popper than the
9    state's districts?
10   A.    It's right there in the fourth full
11   paragraph on Page 115.
12   Q.    Okay.  But did you report it for all the
13   other proposed demonstration districts that you
14   critiqued?
15   A.    We can go through them, if you wish.
16   Q.    Yeah.
17   A.    You asked if I had done it for any of them,
18   and I clearly did it for the DFW districts in the
19   fourth full paragraph on Page 115, and I framed it the
20   same way, even under that standard, that Dr. Duchin
21   proposes.  So if the court --
22   Q.    Okay.
23   A.    Well, I'd like to finish.
24   Q.    Okay.
25   A.    Even if the court were to accept that

Page 75

1    standard, two of these districts would fail, but it
2    shouldn't accept the standard.
3    Q.    So if you go to Page 203 and you look at the
4    first two paragraphs, Denton-Wise and Lubbock -- and
5    we just talked about them.  It doesn't look like
6    you've reported a Polsby-Popper comparison for these
7    demonstration districts, right?
8    A.    That's correct.
9    Q.    Okay.  Why not?
10   A.    I don't know.  I was on Page 203 of the
11   report and was probably looking to finish.
12   Q.    I want to switch topics.  Let's go to
13   Page 7.
14         Would you like a break?  I'm happy to give
15   you a break if you want.
16         MR. KERCHER:  It's up to you.
17         THE WITNESS:  Sure.
18         MS. CHAUDHURI:  Five minutes?
19         THE WITNESS:  Yeah.  Sure.
20         (Recess taken.)
21         MS. CHAUDHURI:  Back on the record.
22   BY MS. CHAUDHURI:
23   Q.    Okay.  Mr. Trende, can you go to Page 7 of
24   your report.  I want to understand this split precinct
25   analysis that you did.  So can you just take a little

Page 76

1    bit of time and review the last paragraph, the last
2    part of 7, and then the next page.  And tell me when
3    you're done.
4    A.    Okay.
5    Q.    Okay.  So the first sentence reads, "Because
6    election data are made available at the precinct
7    level, most of the district-wide election data is
8    accurate."
9          What do you mean that most of the
10   district-wide election data is accurate?
11   A.    I think that's just a hedge.  I don't think
12   I have any reason to believe that the district-wide --
13   Oh.
14   Q.    Why is it "mostly"?
15   A.    No, no.  I'm sorry.  I'm understanding now
16   what I did.
17         So what that's saying is that, at the
18   precinct level, the votes are the votes.  And since
19   most of the precinct -- the overwhelming majority of
20   the precincts in the map are kept intact, those votes
21   will be spot on.
22         When precincts are split, though, you need
23   to estimate because the votes are still -- for
24   state-wide office are still tallied at the precinct
25   level, you have to figure out how you're going to

Page 77

1    apportion those votes to take account of the split.
2    Q.    Okay.  So "Most of the election -- of the
3    district-wide election data is accurate."  The
4    election data that may not be 100 percent accurate,
5    you were referring to split precincts, right?
6    A.    That's correct.
7    Q.    Anything else?
8    A.    There may be tabulation errors, or, you
9    know, the little things that appear in datasets.  But
10   I don't have any reason to believe that exists.
11   Q.    Okay.  And so going to your split precincts,
12   do you recall how many total split precincts you had
13   to deal with in your analyses of particular districts?
14   A.    No.
15   Q.    Can you estimate, you know, whether it would
16   have been under 100?  Over 100?
17   A.    No.
18   Q.    Okay.
19   A.    Not as I sit here.
20   Q.    Okay.  And what would allow you to be able
21   to estimate how many split precincts you had to deal
22   with in your analysis of how precincts were moved
23   based on Biden share or Trump share?
24         MR. KERCHER:  Object to the form.
25   A.    My code in my laptop could give a precise

Sean P. Trende
September 02, 2022

Page 78

1  answer, not an estimate --
2  Q.      Okay.
3  A.      -- of how many precincts were split.
4  Q.      Uh-huh.  Okay.  And then, if you look at the
5  bottom sentence, it starts with "Rather."  So it
6  reads, "Rather than simply dividing by the number of
7  blocks, analysts usually weight census blocks by some
8  number."
9          Can you explain that?  What did you mean
10 when you said "analysts weight census blocks by some
11 number"?
12 A.      So assume -- Let's just make it simple --
13 Q.      Okay.
14 A.      -- and say that the precinct has one block
15 with 100 people in it, and 50 blocks that are empty;
16 it's parkland, or a river, or something like that.  If
17 you split the district down the middle, you wouldn't
18 want to assign the vote share 50/50 because one of
19 those districts is made up entirely of blocks with no
20 population.
21 Q.      Uh-huh.
22 A.      So when assigning the votes, you would look
23 at the census block with 100 people in it, note that
24 it has 100 percent of the population of the district
25 in it, and assign all of the votes to that block, and

Page 79

1  therefore, to the precinct in which that block is
2  placed.
3  Q.      Okay.  So how did you weight or assign
4  percentages to the different split precincts?
5  A.      The standard way this is done in the field,
6  including by the people who maintained the
7  redistricting data hub from which I got most of this
8  data, you weight it by the Voting Age Population in
9  each block.  If a block has 20 percent of the Voting
10 Age Population in the precinct, it will be assigned
11 20 percent of the votes for each candidate, and so
12 forth.
13 Q.      Okay.  Is there any value to using CVAP
14 instead of Voting Age Population to do the weighting?
15 A.      You could do it with CVAP.
16 Q.      If you used CVAP, would that produce
17 different results?
18 A.      I don't know.
19 Q.      So you didn't undertake this weighting
20 process using the CVAP metric?
21 A.      I did not.
22 Q.      Okay.
23 A.      And as I understand it, the CVAP isn't
24 available at the block level so you would have to
25 project that down with an estimation technique as

Page 80

1  well.  So you would be, you know, putting an estimate
2  on top of an estimate, as opposed to VAP, which is a
3  census number.  You could, but it would be using an
4  estimate of where the populations are.
5  Q.      In Texas, there's a marked difference
6  between VAP and CVAP, would you agree, for at least
7  some populations?
8          MR. KERCHER:  Object to the form.
9  A.      For some populations.  Yes.
10 Q.      Okay.  So would it have been useful to, you
11 know, conduct this analysis based on CVAP, given that
12 some populations, there's, again, a huge discrepancy
13 between VAP and CVAP?
14         MR. KERCHER:  Object to the form.
15 A.      Again, my problem with that approach --
16 I don't know that it would be completely invalid.
17 But my problem with that approach is that the -- Well,
18 on top of that, the CVAP comes from the ACS data which
19 is an estimate.  And then, on top of that, you have to
20 estimate it down to the block level, and then you're
21 estimating vote share on top of that.
22         Perhaps, if Donald Trump had won his census
23 lawsuit, we would have the citizen population
24 specifically at the block level or the census
25 question.  But we don't have that data, and so I think

Page 81

1  you would be really risking yourself if you were to
2  pile inference upon inference upon inference in that
3  fashion.
4  Q.      Uh-huh.
5  A.      That is not to imply that Donald Trump
6  should have won the census lawsuit, which I don't
7  think he should have; but had he, we would have that
8  data.
9  Q.      Okay.  But this is a -- That's a different
10 way of figuring out the weight of the votes in the
11 precinct by using the metric of CVAP, right?
12         MR. KERCHER:  Object to the form.
13 A.      If you use CVAP, you are using a different
14 data set to weight for, so I guess you could frame
15 that as a different method.
16         MS. CHAUDHURI:  I would like to introduce
17 another document as an exhibit.  This is the -- Sorry.
18 I'm just looking for if I have another color copy of
19 this document to give you, Mr. Trende.
20         So let's mark this as Exhibit 3.
21              - - -
22         And, thereupon, Plaintiff's Exhibit No. 3
23 was marked for purposes of identification.
24              - - -
25 BY MS. CHAUDHURI:

Sean P. Trende
September 02, 2022

Page 82

1  Q.      Do you recognize this document?
2  A.      Yes.
3  Q.      What is it?
4  A.      It is the Response to Reports of Alfred and
5  Trende of Duchin.
6  Q.      And did you review this report at any point?
7  A.      The parts that responded to me.
8  Q.      Okay.  And do you intend to offer any
9  opinions on this report?
10         MR. KERCHER:  Object to the form.
11         You can answer.
12 A.      I don't have any intentions on what opinions
13 I'm going to offer.  Counsel will ask me questions, if
14 I'm called at trial, and I'll answer them.
15 Q.      Okay.  So you mentioned that you reviewed
16 the parts of the report that responded to you?
17         MS. CHAUDHURI:  Sorry, counsel.  Did I give
18 you a copy?
19         MR. KERCHER:  You didn't.
20         MS. CHAUDHURI:  I apologize.  I was very
21 focused on finding a color copy.
22         MR. KERCHER:  No worries.
23 BY MS. CHAUDHURI:
24 Q.      Do you have any opinions on Dr. Duchin's
25 rebuttal report?

Page 83

1         MR. KERCHER:  Object to the form.
2  A.      Not as I sit here off the top of my head.
3  Q.      I'd like you to turn to Page 14 of her
4  rebuttal report.  And did you conduct any analysis of
5  Dr. Duchin's analysis in the rebuttal report?
6         MR. KERCHER:  Object to the form.
7  A.      I read it and thought about it.  I didn't do
8  any additional work.
9  Q.      Okay.  So Page 14, Dr. Duchin has a table.
10 Do you have any opinions about this table?
11 A.      Yes.
12 Q.      Can you share them?
13 A.      I don't think it's useful.
14 Q.      Why not?
15 A.      For the reason we discussed at some length
16 earlier in the deposition.  I don't think it's enough
17 to look as many districts where Trump beats Biden.
18 You need to look at districts where the partisanship
19 of the map where Trump is beating Biden by a
20 substantial margin, in the third and fourth most
21 Republican districts where that occurs.  Because if
22 you're only looking at districts where Trump beats
23 Biden up to 50.0001 percent, Biden -- the process of
24 pushing down Biden's vote share from 49.99 percent to
25 45 percent in a universe where race and partisanship

Page 84

1  are correlated is likely going to have an effect on
2  the racial composition of those districts as well.
3  Q.      Uh-huh.  Okay.  So, hypothetically, if a
4  subset of ensemble plans were drawn where the
5  Trump share is higher than 50 percent, say, it's like
6  60 percent, that would necessarily decrease the number
7  of drops, right, from the ensemble?
8  A.      You're going to have to rephrase that.  I
9  don't understand the question.
10 Q.      Okay.  So if you're limiting the ensemble
11 subset --
12 A.      Are we talking about Dr. Duchin's ensemble?
13 Q.      I'm talking about Dr. Duchin's ensemble.
14 Yes.
15         So, hypothetically, if you're limiting the
16 subsets, and you're saying, Okay.  I want to control
17 for all the districts in this ensemble that have
18 greater than 60 percent Trump share, so they're
19 solidly Republican.  Do you understand that?
20 A.      Uh-huh.
21 Q.      So if you did that, and then you analyzed
22 that subset for other properties and wanted to compare
23 those other properties to the properties in the
24 state's plan, is that, in your opinion, a proper
25 comparison?

Page 85

1         MR. KERCHER:  Object to the form.
2         You can answer.
3  A.      You'd have to look at the specifics of the
4  ensemble, but it would -- if you had four 60 percent
5  Trump districts, at least 60 percent of the Trump
6  districts in all the ensemble maps, it would solve the
7  problem of only looking at 50.001 percent Trump
8  districts.
9  Q.      Uh-huh.  And if, hypothetically, in this,
10 again, smaller subset of solidly Republican districts
11 that you drew from Dr. Duchin's ensemble, you were to
12 hypothetically find that the State's Enacted Plan
13 compared to the subset vis-a-vis race was extreme,
14 what would that tell you?
15         MR. KERCHER:  Object to the form.
16 BY MS. CHAUDHURI:
17 Q.      If anything?
18         MR. KERCHER:  Same objection.
19 A.      As I said before, it would depend on the
20 particulars of the ensemble and how well it's
21 controlling for all the factors considered by the
22 legislature.
23         Again, there's a fact discovery side of this
24 case going on that I know nothing about, or very
25 little about, so it's hard to say.  It would be a

Sean P. Trende
September 02, 2022

Page 86

1  stronger argument for it than what we have right here
2  which is the, you know, number of four Trump-won
3  districts.
4  Q.      And strong argument for what?  You said
5  "it."  For what?
6  A.      Oh, that you had controlled for politics.
7  Q.      Okay.  If you were hypothetically to find
8  that in those solid Republican subset districts that
9  compared to the CVAP level in those districts, the
10  state CVAP level in its Enacted District was much
11  lower, then would that tell you that -- potentially,
12  possibly, allow you to infer that racial
13  considerations drove the process as opposed to
14  political considerations?
15  MR. KERCHER:  Object to the form.
16  A.      Again, it would depend on the particulars of
17  the ensemble and how well they control for other
18  factors being used by the legislature.  You know,
19  you've phrased it as "possible."  So I suppose it's
20  possible, but there's a whole bunch of other stuff you
21  would need to consider.
22  Q.      Okay.  I'm just trying to understand, you
23  know, what you can rule out and what you cannot rule
24  out as possible causes.  It sounds like, in this type
25  of analysis, it is possible that that's your

Page 87

1  testimony, right?
2  MR. KERCHER:  Object to the form.  Misstates
3  his testimony.  Compound and vague.
4  A.      Yeah.  My testimony is that, if you want --
5  In a world where -- especially in a world where race
6  and politics are correlated, you want to look at these
7  ensembles and determine that race is the factor, you
8  need to actually do a control -- a good control for
9  politics.
10  No control for politics, which is what we
11  saw in the initial Duchin report, is not good, and
12  controlling only for four districts where Donald Trump
13  got at least 50.0001 percent of the vote is not
14  useful, at least in a scenario where the legislature
15  had drawn things up to at least 55 percent Trump
16  performance.
17  Q.      Uh-huh.  And if you had to control for
18  politics, how would you do it?
19  MR. KERCHER:  Object to the form.
20  A.      Well, as I've said, I don't know that you
21  can do that at all here because the districts that
22  were drawn fall outside the ensemble -- outside of all
23  of the plans on the ensemble for partisanship.  So
24  trying to match or come extremely close to what the
25  district -- what the legislature did, you're, at best,

Page 88

1  going to have a handful of maps to evaluate.  Because
2  they are, you know, so far afield of the ensemble in
3  terms of politics, it's very difficult to do.
4  Q.      Okay.  So now, your conclusion that it was
5  politics that drove the redistricting, it's not based
6  on discussions that you had with map drawers, is it?
7  MR. KERCHER:  Object to the form.  Misstates
8  his testimony and his conclusions.
9  You can answer, if you know.
10  A.      I didn't testify that it was politics.  My
11  report says it's consistent with the political draw.
12  There's a whole universe of fact testimony that's
13  being conducted in the case, which I haven't reviewed,
14  that may give further illustration on what the direct
15  intent is.
16  Q.      Okay.  So your report doesn't offer any
17  conclusions on what the intent was; it just shows that
18  politics may have been considered?
19  MR. KERCHER:  Object to the form.  Report
20  speaks for itself.
21  You can answer, if you know.
22  A.      The report says that it's consistent with
23  politics as a cause.  But, you know, the ultimate
24  conclusion of intent is a legal conclusion that I try
25  to avoid testifying to and is dependent on a broader

Page 89

1  inquiry.  This is just suggesting that it is
2  consistent with politics.
3  Q.      Okay.  And, you know, hypothetically, is
4  it -- if mapmakers -- if you knew that the mapmakers
5  were aware of where certain racial groups lived in the
6  districts, would you say it would be easy for them to
7  draw maps that had a desired partisan effect?
8  MR. KERCHER:  Object to the form.  Vague.
9  Calls for speculation.
10  A.      No.
11  Q.      Why not?
12  A.      Well, for one thing, the white population in
13  these districts is politically diverse.  There are
14  areas of Dallas where you get a lot of white liberals.
15  And so just knowing the racial makeup, you may draw in
16  too many people from Deep Ellum that that would skew
17  the partisanship of the district away from what you
18  would expect it to be if you were just doing a crude
19  racial analysis.
20  Q.      Okay.  Do you have opinion as to whether a
21  partisan gerrymander can also be a racial gerrymander?
22  MR. KERCHER:  Object to the form.
23  A.      I haven't looked at that here.
24  Q.      But you have looked at whether there is
25  evidence that could support whether the state's plan

Sean P. Trende
September 02, 2022

Page 90

1   is a partisan gerrymander, right?
2           MR. KERCHER:  Object to the form.
3   A.      Yeah.  I looked at -- I looked at whether
4   it's consistent with a political motivation drawing.
5   That's right.
6   Q.      But your analysis doesn't necessarily rule
7   out that the maps -- that it's possible that the maps
8   are a racial gerrymander, right?
9           MR. KERCHER:  Object to the form.
10  A.      I don't know what's possible or
11  impossible --
12  Q.      Okay.
13  A.      -- given the fact side of things.  All the
14  report says is that it's consistent with -- At least
15  with respect to Shaw claims, it's consistent with
16  political -- an attempt to shore up Republican
17  prospects in the state.
18  Q.      Does your report contain the full scope of
19  the opinions that you intend to offer in this case?
20          MR. KERCHER:  Object to the form.
21  A.      I don't have any intent to offer opinions.
22  I'll ask questions that counsel asks of me.  I'll
23  answer the questions that counsel asks of me.
24          MS. CHAUDHURI:  Maybe we can take a
25  two-minute break.  I'm almost at the end of my

Page 91

1   questioning.
2           (Recess taken.)
3           MS. CHAUDHURI:  Back on the record.
4   BY MS. CHAUDHURI:
5   Q.      So I am at the very end of my questioning.
6   I just have a few points for you.
7           I just want to clarify:  Did you conduct
8   your own effectiveness analysis for any of -- for any
9   of Dr. Duchin's districts?
10          MR. KERCHER:  Object to the form.
11  A.      Besides the analysis of the Lubbock
12  district, no.
13  Q.      Okay.  And sitting here today, you're not
14  prepared to offer any opinions other than those in
15  your report, right?
16          MR. KERCHER:  Object to the form.
17  A.      I could probably offer a lot of opinions,
18  but the opinions that I've thought of and investigated
19  are in my report.
20          MS. CHAUDHURI:  Okay.  Thank you.
21          That concludes questioning for the Texas
22  NAACP.
23          MS. ANDERSON:  Could we take a lunch break
24  now?
25          THE WITNESS:  I guess if we're going to take

Page 92

1   an hour or 45 minutes, or whatever, it doesn't matter
2   to me.
3           MR. ROSENBERG:  We should decide how long we
4   want to do this.
5           MR. SWEETEN:  It's 10:56 --
6           THE WITNESS:  11:00.  We're on normal time.
7           MR. SWEETEN:  Let's come back at 12:45.
8   Would that work for everybody?
9           MS. ANDERSON:  Yes.
10                          - - -
11          And, thereupon, a lunch recess was taken.
12                          - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 93

1                              FRIDAY AFTERNOON SESSION
                                Friday, September 2, 2022
2                                   12:45 p.m.
                                    - - -
3                                EXAMINATION
4   BY MS. ANDERSON:
5   Q.      Good afternoon, Mr. Trende.  My name is
6   Jacki Anderson; I'm on behalf of the United States.
7           Mr. Trende, is there any reason you can
8   think of today why you would not be able to answer
9   questions fully and accurately?
10  A.      No.
11  Q.      And are you on any type of medication or
12  drugs of any kind that might make it difficult for you
13  to understand and answer questions?
14  A.      No.
15  Q.      And then last thing of the preliminary
16  questions, I just want to remind you that you're under
17  oath and subject to federal penalties for giving false
18  or misleading testimony; so it's important to answer
19  my questions truthfully and accurately.  Do you
20  understand?
21  A.      Yes.
22  Q.      Mr. Trende, do you mention Dr. John Logan in
23  your report?
24  A.      Who?
25  Q.      Dr. John Logan.

Sean P. Trende
September 02, 2022

Page 94

1  A.        I don't believe so.
2  Q.        And nothing in your report critiques
3  Dr. Logan's report, correct?
4  A.        At least not directly.
5  Q.        And you don't plan to offer an opinion on
6  Dr. Rogan -- or Dr. Logan's report going forward,
7  correct?
8  A.        Again, not directly.  I don't know.
9  I've never even read the Logan report or seen it.  But
10  some -- If my opinions are relevant to it, counsel may
11  use it that way.
12  Q.        And nothing in your report critiques
13  Dr. Enos's report, correct?
14  A.        Not directly.
15  Q.        You don't plan to offer an opinion on
16  Dr. Enos's report going forward, do you?
17  A.        Again, not directly.
18  Q.        Do you plan to do that indirectly?
19  A.        Well, like I'd said, some of the things that
20  I say may come to bear on Dr. Enos's report.  I don't
21  know how counsel might use it.  But if there's overlap
22  between his report and other reports, I guess it would
23  be in response to it, but I wouldn't be commenting on
24  it directly.
25  Q.        Mr. Trende, could you please turn to Page 9

Page 95

1  of Exhibit 1.  Mr. Trende, in the second-to-the-last
2  sentence, in the second paragraph of Page 9, do you
3  state that, "As the decade progressed, the suburbs
4  swung towards Democrats"?
5  A.        Yes.
6  Q.        Mr. Trende, are you aware that Texas's
7  minority population grew in the last ten years?
8  A.        Yes.
9  Q.        Are you aware that Texas's minority
10  population in the suburbs grew in the last ten years?
11  A.        Yes.
12  Q.        Was the movement of the minority population
13  into the suburbs one factor as to why the suburbs
14  swung Democrats in Texas?
15  A.        To the extent the minority groups are voting
16  Democratic, increased minority population in the
17  suburbs would produce movement towards Democrats; but
18  I haven't done any specific analysis of Texas.
19  Q.        In your report, Mr. Trende, do you describe
20  a growing trend towards Democratic support in the
21  DFW region?
22  A.        Yes.
23  Q.        And are you aware that the DFW area grew in
24  the last ten years?
25  A.        Yes.

Page 96

1  Q.        Are you aware that the minority population
2  grew in DFW in the last ten years?
3  A.        That's my understanding.
4  Q.        And were you aware that the minority
5  population grew in the DFW suburbs?
6  A.        That's my understanding.
7  Q.        And, Mr. Trende, do you believe that
8  minority growth in the DFW suburbs was one reason for
9  why the suburbs swung towards the Democrat?
10  A.        Again, to the extent that the minority
11  groups are voting Democratic, their growth in the
12  suburbs would push the suburbs towards the Democrats,
13  assuming that those suburbs didn't have white voters
14  who were even more Democratic than those groups to
15  begin with.
16  Q.        Mr. Trende, do you describe in your report a
17  growing trend towards Democratic support in CD 23,
18  which is the San Antonio/El Paso area?
19  A.        I know -- Yeah.  I don't know if I discussed
20  that.
21  Q.        Mr. Trende, are you aware that the
22  population of San Antonio and El Paso grew in the last
23  ten years?
24  A.        I know that with respect to San Antonio, and
25  don't know one way or the other with El Paso; though,

Page 97

1  I'd be surprised if it didn't.
2  Q.        Mr. Trende, are you aware that in
3  San Antonio, the minority population grew in the last
4  ten years?
5  A.        It's my understanding.
6  Q.        Mr. Trende, are you aware that the minority
7  population grew in San Antonio in the last ten years
8  in the suburbs?
9  MR. KERCHER:  Object to the form.  Assumes
10  facts not in evidence.
11  A.        That's my understanding.
12  Q.        And do you believe that the minority growth
13  in the suburbs of San Antonio was one reason for why
14  the suburbs swung towards the Democrats?
15  MR. KERCHER:  Object to the form.
16  A.        Again, to the extent that those minority
17  groups are voting more heavily Democratic than
18  previous residents of the areas they moved to, that
19  would turn those area towards the Democrats or push
20  those areas towards the Democrats.
21  Q.        Mr. Trende, have you ever written on the
22  growth of the Latino population would impact the
23  Republican vote in Texas?
24  A.        Yes.
25  Q.        Did you do that in your book, "The Last

Sean P. Trende
September 02, 2022

Page 98

1  Majority - Why The Future of Government Is Up For
2  Grabs And Who Will Take It"?
3  A.      I don't remember.
4  Q.      Do you remember what you wrote about the
5  growth of the Latino population and how that would
6  impact the Republican vote in Texas?
7  A.      I don't remember.
8                      - - -
9          And, thereupon, Plaintiff's Exhibit No. 4
10 was marked for purposes of identification.
11                     - - -
12 BY MS. ANDERSON:
13 Q.      Mr. Trende, the court reporter has handed
14 you what has been marked as Exhibit 3.  Mr. Trende,
15 what did I just hand to you?
16 A.      I believe this is Exhibit 4.
17 Q.      Oh, sorry.  Exhibit 4.
18 A.      And this is the title page or the cover of
19 my book.  I've forgotten 7th and 8th grade English.
20 I have no idea what these two pages are called, but
21 they're from the intro, and then one page out of the
22 book.
23 Q.      And what page is that?
24 A.      Page No. 145.
25 Q.      And who drafted this book?

Page 99

1  A.      I did.
2  Q.      And then, Mr. Trende, do you have any reason
3  to believe that Exhibit 4 is not a true and correct or
4  true and accurate copy of Page 145 of the book, "The
5  Lost Majority - Why The Future of Government Is Up For
6  Grabs And Who Will Take It"?
7  A.      I don't.
8  Q.      And then, Mr. Trende, could I please turn
9  your attention to the first paragraph on Page 145.
10 And do you see the sentence, I believe it's the third
11 sentence on Page 145 that says, "This is not to
12 dismiss the challenge that the growing Latino
13 population presents for the GOP, but rather to put it
14 in perspective - the critical mass necessary to create
15 the problem is probably still some years off.  And if
16 the Latino vote falls off trend, as it did in 2010,
17 those numbers will take longer to arrive."
18         Is that a correct reading of that, what's on
19 the page?
20 A.      Yes.
21 Q.      And were you referring to Texas with that
22 statement?
23         MR. KERCHER:  Object to the form.
24         You don't have a copy of the whole book so
25 he can get the context of the page, or did you just

Page 100

1  bring the one page?
2          MS. ANDERSON:  Just the one page.
3  BY MS. ANDERSON:
4  Q.      If you go up to the top, it says, "In Texas,
5  the Latino share of the electorate would have to
6  almost triple before Rick Perry would have been
7  threatened with a loss.  This not to dismiss the
8  challenge that the growing Latino population presents
9  for the GOP, but rather to put it in perspective - the
10 critical mass necessary to create the problem is
11 probably still some years off.  And if Latino vote
12 falls off trend, as it did in 2010, those numbers will
13 take longer to arrive."
14         Mr. Trende, does that part of Page 145 deal
15 with Texas?
16         MR. KERCHER:  Object to the form.
17         My question still stands.  I appreciate you
18 reading more from the page you provided, but did you
19 bring the book?
20         MS. ANDERSON:  I did not bring the book.
21 BY MS. ANDERSON:
22 Q.      So if you could just answer as to what he
23 sees.
24 A.      I don't know the broader context.  What's on
25 Page 144 may -- you know, when I go home and pull out

Page 101

1  my copy, may alter my view.  But those sentences that
2  you're referring to are talking about Texas.
3  Q.      And do you recall what year the book was
4  written?
5  A.      I wrote it with my middle son in the Baby
6  Bjorn, so that would be early 2011.
7  Q.      And have your opinions changed that you just
8  read on Page 145 since then?
9  A.      They've modified somewhat.
10 Q.      How so?
11 A.      Well, first, I don't think the Hispanic
12 population is as heavily Democratic as people expected
13 it would be back in 2011.  And even Ruy Teixeira, who
14 is one of the authors of "The Emerging Democratic
15 Majority," to which this book is a response, has -- or
16 a modification more than a response, even Ruy Teixeira
17 has backed off of that view.
18         And, second, if you go -- And this is the
19 importance of having the broader context.  If you go
20 down to the second half of the page, there's a
21 discussion of what is really the main thesis of the
22 book which is that politics doesn't go in straight
23 lines.  People respond to contingency.  And so trying
24 to do a straight-line projection of how growth in one
25 demographic group or another can affect things in the

Sean P. Trende
September 02, 2022

Page 102

1  medium- to long-term is problematic.
2  Q.       So I'm going to switch gears, and we'll come
3  back again to that general topic.
4           Mr. Trende, did you ever consider
5  explanations other than partisanship for why the
6  congressional districts were drawn the way that they
7  were in the Enacted Map?
8           MR. KERCHER:  Object to the form.
9  A.       No.  I was only asked to look at whether
10 the -- to respond to certain expert reports and to
11 look at whether the maps were consistent with
12 partisanship.
13 Q.       And then going back to the trend of race and
14 partisanship, Mr. Trende, I believe earlier you said
15 that partisanship or race are generally correlated in
16 Texas; is that correct?
17          MR. KERCHER:  Object to the form.  Misstates
18 his testimony.
19 A.       I said that minority voting and partisanship
20 are correlated.
21 Q.       How are they correlated?
22 A.       It depends on the particular minority group.
23 But, for example, African Americans are generally, to
24 my understanding at least, heavily, heavily Democratic
25 in Texas.  I think there's some dispute about -- and a

Page 103

1  fair degree of uncertainty about the status of
2  Hispanic residents of Texas.  And the Asian
3  population, a little more touch and go, depending on
4  the election.
5           So, overall, you know, at least according to
6  the stuff I've read, I don't know the specific numbers
7  and haven't looked into it, specifically, but my sense
8  is that minority groups tend to be more Democratic
9  depending on the group.
10 Q.       Mr. Trende, did you look at any racially
11 polarized voting analyses in drafting your report?
12 A.       I'm sure I read it in the expert reports.
13 Q.       So did you read that expert report of
14 Dr. Alfred in drafting your report?
15 A.       No.
16 Q.       Mr. Trende, are African American voters in
17 the DFW area likely to vote for Democratic candidates
18 generally?
19          MR. KERCHER:  Object to the form.
20 A.       I haven't done that analysis specifically.
21 Q.       And are Hispanic voters in the DFW area
22 likely to vote for Democrats generally?
23          MR. KERCHER:  Object to the form.
24 A.       I haven't done that analysis.  And I'm not
25 as sure, generally, because some of the changes we've

Page 104

1  seen in voting patterns in recent years.
2  Q.       Mr. Trende, are race and politics at least
3  somewhat correlated in the El Paso area?
4           MR. KERCHER:  Object to the form.
5  A.       There is some degree of correlation between
6  race and politics, to my understanding, as it's been
7  presented by some of the experts in this case.  But
8  I haven't done an independent analysis specific to
9  El Paso.
10 Q.       Would you say that Hispanic voters in the
11 El Paso area generally are likely to vote for
12 Democratic candidates?
13          MR. KERCHER:  Object to the form.
14 A.       Like I said, I haven't done an analysis
15 specific to the El Paso area.
16 Q.       And, Mr. Trende, are race and politics at
17 least somewhat correlated in the San Antonio area?
18          MR. KERCHER:  Same objection.
19 A.       In my understanding from the representations
20 made by Plaintiffs' experts is that there is, and
21 that's what causes a problem with the simulation
22 approach.  But I haven't done an independent analysis
23 specific to San Antonio.
24 Q.       Are Hispanic voters in the San Antonio area
25 likely to vote for Democrats generally, would you say?

Page 105

1           MR. KERCHER:  Object to the form.
2  A.       Again, I haven't done an analysis specific
3  to San Antonio.  And I think, given some of the
4  changes we've seen in recent elections, I'm less
5  certain of that than I would have been in the past.
6  Q.       Mr. Trende, are there specific areas of
7  Texas where race and politics are not at least
8  somewhat correlated?
9           MR. KERCHER:  Object to the form.  He's
10 testified he has not undertaken that analysis.
11 A.       Yeah.  I haven't undertaken the analysis.
12 I know that there's some stuff in my report from the
13 article that Dr. Ansolabehere -- A-N-S-O -- I'm not
14 going to try.  We can do that at the break.  -- that
15 has some areas that don't have -- don't seem to have
16 strong polarization; others that may.  So I don't know
17 off the top of my head.
18 Q.       So could you please turn to Page 99 of your
19 report.  Mr. Trende, on Page 99, on the second -- in
20 the second sentence, do you start that sentence with,
21 "Although the Enacted Map deviates in some ways from
22 the ensemble, which we should expect in a place where
23 race correlates with politics and map drawers care
24 about politics."
25           I'm just going to stop the quote there.  Is

Sean P. Trende
September 02, 2022

Page 106

1  that an accurate statement of yours on Page 99?
2       MR. KERCHER: Object to the fact that you
3  didn't read the whole sentence.
4  A.      It's not the whole sentence, but those are
5  the first two phrases of that sentence, or clauses.
6  I don't know which is which.
7  Q.      Is the rest of the sentence, "The Enacted
8  Map contains the same number of districts where
9  minority groups are a majority of the citizen voting
10 each population as we find in the ensemble"?
11      MR. KERCHER: Object to the form.
12 A.      Yes.  That is the second or third
13 clause/phrase of the sentence.
14 Q.      So I have a question.  What do you mean by
15 the phrase, "map drawers care about politics"?
16 A.      Well, it has to be -- that phrase has to be
17 read in the context of the entire sentence, and,
18 really, the report.  But the Enacted Map deviates from
19 the -- which is referring -- First off, we're
20 referring to the charts, figures 71 and 72 found on
21 Pages 100 and 101.
22      And if you are in a place where race
23 correlates with politics, and if the map drawers are
24 motivated by politics in their drawing, you wouldn't
25 necessarily expect an ensemble -- an Enacted Map to

Page 107

1  match up with the racial demographics of the ensemble,
2  even if the map drawers are in different politics.
3  Because if there is a correlation, as you move around
4  the political makeup of the districts, you will also
5  change the racial makeups of the district, even if
6  you're completely ignorant or indifferent to race.
7  Q.      Mr. Trende, which map drawers were you
8  referring to with that statement?
9       MR. KERCHER: Object to the form.
10 A.      Well, it doesn't say "the map drawers."  It
11 just says, "In a place where race correlates with
12 politics and map drawers care about politics."
13 Q.      So that's an assumption that you're making?
14      MR. KERCHER: Object to the form.
15 A.      No.
16 Q.      So map drawers care about politics, why is
17 that not an assumption that you're making?
18      MR. KERCHER: Object to the form.
19 A.      Because it's conditional.  We would expect
20 this in a place where race correlates with politics
21 and map drawers care about politics.
22 Q.      So you're not saying the Texas legislature
23 necessarily cared about politics with that statement?
24      MR. KERCHER: Object to the form.  The
25 report speaks for itself and taking three words out of

Page 108

1  it is not going to make the meaning of the report
2  change.
3  BY MS. ANDERSON:
4  Q.      You can answer.
5  A.      I don't recall the exact phrasing of the
6  question to answer yes or no.  But the report is about
7  whether the maps are consistent with politics.  I know
8  that there's an entire universe of fact discovery
9  being done that I am not aware of that may go more
10 directly to the question of intent.  This is just
11 saying that the map is consistent with the particular
12 outcome.  It is not a statement of their intent.
13 Q.      And, Mr. Trende, do you know who drew the
14 congressional map?
15 A.      No.
16 Q.      So you never spoke to the map drawers?
17      MR. KERCHER: Object to the form.
18 A.      No, that's not the inquiry I'm conducting.
19 I'm not trying to figure out exactly what their intent
20 is.  I'm trying to figure out whether the outcome is
21 consistent with a political intent.
22 Q.      Mr. Trende, did you say earlier that race
23 and politics often correlate and it can sometimes be
24 difficult to sort race and politics out?
25      MR. KERCHER: Object to the form.

Page 109

1  A.      I don't remember my exact testimony, but
2  something -- at least something to that effect; that
3  when race and politics correlate, it's difficult to
4  sort out which is which.
5  Q.      How do political scientists generally go
6  about sorting race and politics?
7       MR. KERCHER: Object to the form.
8  A.      I don't know that you can make a specific
9  statement on that.  Most of the political science
10 literature isn't really concerned with that; it's
11 something that comes up in litigation.  But I think
12 more for this inquiry, I'm just looking at whether
13 it's consistent with politics and not trying to sort
14 them out.
15 Q.      Mr. Trende, have you ever, in any other
16 context, tried to sort out race and politics for any
17 other expert report or academic scholarship or any
18 other reason?
19      MR. KERCHER: Object to the form.
20      You can answer.
21 A.      Yes.
22 Q.      How did you go about trying to sort out race
23 and politics in the other circumstance?
24 A.      So, for example, in the Maryland case, one
25 of the objections possibly was that Maryland is

Sean P. Trende
September 02, 2022

Page 110

1  subject to the Voting Rights Act, as are all states
2  now, I guess, since it's just Section 2.  And that it
3  would have to draw some Section 2 districts and that
4  this might account for the skew that we saw in the
5  political drawing of the maps.
6       So the way we addressed it there was simply
7  by freezing districts that the legislature had drawn,
8  conceding them the two minority majority districts and
9  then the one other district that was completely
10 enclosed by those two districts, and examining the
11 remaining districts.
12       Likewise, in the New York litigation, faced
13 with a similar objection, we froze the minority
14 majority districts, or at least the arguable -- I
15 guess they weren't even minority majority there.  The
16 arguable ability to elect districts and just examined
17 the remainder and saw that they had a significant
18 political skew.
19 Q.     And, Mr. Trende, with your work in this
20 case, did you do the same?  Did you freeze the
21 arguable ability to elect congressional districts in
22 this case to try to disentangle race and politics?
23       MR. KERCHER:  Object to the form.
24 A.     No, I didn't think it would be particularly
25 helpful to do an analysis here that excluded the

Page 111

1  districts that we are most interested in.
2  Q.     Mr. Trende, would you say that you were
3  successful in sorting out race and politics for your
4  work in this case?
5       MR. KERCHER:  Object to the form.
6  A.     In this case?
7  Q.     In this case.
8  A.     I'm not answering the question of how much
9  race or politics.  I'm answering the question of
10 whether the maps are drawn in a way that's consistent
11 with a political draw.
12 Q.     So, Mr. Trende, you didn't try to sort out
13 race and politics for each line of each precinct or
14 each of Texas's 38 congressional districts?
15       MR. KERCHER:  Objection.  Asked and answered
16 several times.  Several times.  We're not going to do
17 this where you ask the same question 17 times.  We're
18 already set up to be here for eight hours.  If we
19 continue asking the same question, I'm going to ask
20 you to move on.
21       Mr. Trende, you may answer this question.
22 A.     I did not do a line-by-line analysis of
23 every precinct in the state of Texas to determine
24 whether it is race or politics.
25 Q.     Thank you.

Page 112

1       Could you please turn to Page 133.  Could
2  you please turn to the last sentence on Page 133.
3  Could you please read that out loud.
4  A.     "Regardless, showing that the districts with the
5  weakest Republican showing were also the most
6  heavily white, and that by increasing the Republican
7  share one also tended to increase the white share does
8  not give rise to an immediate inference that race was
9  the predominant factor."
10 Q.     So, Mr. Trende, is it your understanding
11 with that sentence that, by increasing their
12 Republican share in the congressional district, the
13 white population share increases, too?
14       MR. KERCHER:  Object to the form.
15 A.     I don't think that's what I'm saying.
16 Q.     What are you saying?
17 A.     Showing that the districts with the weakest
18 Republican showing were almost -- were almost the most
19 heavily white, and that by increasing the Republican
20 share, one also tended to increase the white share
21 does not give rise to immediate inference that race
22 was the predominant factor.
23 Q.     Would it give rise to an inference that race
24 was one factor; not the predominant factor?
25       MR. KERCHER:  Object to the form.

Page 113

1  A.     I haven't considered that, but I don't know
2  why it would necessarily do that.
3  Q.     Mr. Trende, could it ever be true that
4  increasing the white share of a district would give
5  rise to an inference that race was considered in
6  drawing the districting lines?
7       MR. KERCHER:  Object to the form.
8  A.     I don't know.  I haven't been able --
9  I haven't been asked to consider every possible
10 scenario and what would be possible and what wouldn't.
11 Q.     So you don't know?
12       MR. KERCHER:  Object to the form.
13 A.     I don't know.  I haven't been asked to
14 consider every possible scenario and decide what would
15 be possible and what wouldn't.
16 Q.     Could you please turn to Page 132 of your
17 report which is Exhibit 1.  Could you please read the
18 first sentence, the last paragraph on Page 132,
19 please.
20 A.     "Kousser ignores the fact that there are
21 multiple instances where district lines were drawn
22 that have a partisan effect but not a racial effect."
23 Q.     And what district lines were you referring
24 to with that statement?
25 A.     The two examples given here.  I may have had

Sean P. Trende
September 02, 2022

Page 114

1    more in mind, but the two examples are Travis County,
2    the 37th Congressional District, which contains the
3    most heavily Democratic precincts in the county, not
4    necessarily the most white ones; and the 6th District
5    in Texas which carves out purple and red areas of
6    Dallas County, so those were the two districts I, at
7    least, wrote about.
8    Q.       Were you thinking of any other districts
9    with that sentence?
10           MR. KERCHER:  Object to the form.
11   A.       Well, in general, a good example -- another
12   good example of how there are instances where map
13   drawers created a partisan effect, but not necessarily
14   a racial effect, is the boundary between District 24
15   and districts -- I guess Districts 32 and 33 north of
16   downtown Dallas, so that would have been in my mind.
17   And there may have been others, but that's all I can
18   think of right now, just trying to give two examples.
19   Q.       Were there some congressional district lines
20   that you observed that had a racial effect?
21           MR. KERCHER:  Object to the form.
22   A.       Not that I can recall.  I wasn't asked to
23   examine the racial effects of the maps; I was asked to
24   examine the partisan effects of the maps.
25                           - - -

Page 115

1            And, thereupon, Plaintiff's Exhibit No. 5
2    was marked for purposes of identification.
3                           - - -
4    BY MS. CHAUDHURI:
5    Q.       Mr. Trende, I've handed you what has been
6    marked as Exhibit 5.  Mr. Trende, what did I just hand
7    to you?
8    A.       This is a tweet.
9    Q.       Who drafted the tweet?
10   A.       I wrote the tweet.
11   Q.       When is the tweet dated?
12   A.       August 7, 2019.
13   Q.       And, Mr. Trende, do you have any reason to
14   believe that this is not a true and accurate copy of
15   your tweet?
16   A.       No.
17   Q.       And, Mr. Trende, is your Twitter public?
18   A.       As long as I haven't blocked you, yes.
19   Q.       Mr. Trende, could you please read aloud your
20   tweet.
21   A.       I'm replying to Benjy Sarlin.  And I don't
22   know what Benjy said.  But, "Yeah, that was my
23   thought.  Hispanics in Texas were breaking 70/30 D
24   tops.  So as long as whites were 70/25 Republican, or
25   whatever, it was going to take a long time for the

Page 116

1    state to go D.  But with whites at 65/35 or lower?..."
2    Q.       Mr. Trende, with your tweet, did you mean
3    that 70 percent of Hispanics were voting for
4    Democratic candidates in Texas?
5            MR. KERCHER:  Object to the form.
6    A.       I wouldn't have believed that at the time
7    because we had instances of Hispanics, apparently, who
8    were voting even more heavily Republican even back
9    then.  I think the exit polls had Cornyn carrying them
10   in 2014.
11           You know, one of the things with Twitter is
12   you have a 240-character limit, so you can't really go
13   into a lot of detail, which is why I have that
14   parenthetical "or whatever."  So whatever the specific
15   numbers were.  So my thoughts may have been, and
16   probably were, more complex than you can do in 240
17   characters.
18   Q.       And, Mr. Trende, did you mean that
19   70 percent of white voters were voting for Republican
20   candidates in your tweet?
21           MR. KERCHER:  Object to the form.
22   A.       No, it wasn't supposed to be that specific
23   which is why I have the "or whatever" parenthetical.
24   I don't know the context even of what Benjy was
25   saying.  He might have provided those numbers, for all

Page 117

1    I know.
2            The point was that, as whites leave the
3    Republican Party in Texas as part of the general
4    suburban swing against Republicans, that is going to
5    accelerate the Democratic swing of Texas because --
6    I love the state, but Texas is one giant suburb, at
7    least the populated areas.
8                           - - -
9            And, thereupon, Plaintiff's Exhibit No. 6
10   was marked for purposes of identification.
11                          - - -
12   BY MS. ANDERSON:
13   Q.       Mr. Trende, what did I just hand you?
14   A.       This is "Barack Obama and The New America,
15   The 2012 Election and the Changing Face of Politics"
16   by Larry Sabato.
17   Q.       Were you one of the authors of this book?
18   A.       Yes.
19   Q.       Do you have any reason to believe what
20   I handed you as Exhibit 6 is not a true and accurate
21   excerpt of the copy of your book, "Barack Obama and
22   The New America, The 2012 Election and The Changing
23   Face of Politics"?
24   A.       I do not have any reason not to believe
25   that.

Sean P. Trende
September 02, 2022

Page 118

1  Q.        Could you please turn to Page 157 of your
2  book.  Could you please turn to the second-to-last
3  sentence on page -- of the first full paragraph of
4  Page 157.  The paragraph that beings with, "You can
5  also."  Could you turn to the second-to-the-last
6  sentence in that paragraph and could you please read
7  that out loud for me.
8  A.        So we're skipping over the part where I talk
9  about Republican outreach to Hispanic voters and going
10 straight to, "2004, George W. Bush won nearly half of
11 the Texas Latinos, 49 percent to 50.  Just four years
12 later, Obama would win 63 percent."
13 Q.        Could you please read the beginning of that
14 sentence, starting with "Nevertheless"?
15 A.        That's the previous sentence.
16 Q.        Oh, sorry.  Could you read the sentence
17 previously?
18 A.        "Nevertheless, Latinos in the state have
19 only grown more Democratic as time has gone on,"
20 which was probably true as of 2012 when I wrote this.
21            MR. KERCHER:  Counsel, are these page
22 numbers correct?
23            MS. ANDERSON:  Yes, they are --
24            MR. KERCHER:  Because --
25            MS. ANDERSON:  -- to my knowledge.

Page 119

1            MR. KERCHER:  Because Pages 1, 2, 3, 4, Page
2  5 of Exhibit 6 reflects that Mr. Trende's article
3  begins at Page 157 of this book.  Are you asking
4  Mr. Trende about somebody else's essay?
5            MS. ANDERSON:  I'm asking him about
6  Page 157.
7  BY MS. ANDERSON:
8  Q.        Mr. Trende, were you involved at all in
9  editing this book?
10 A.        No.
11 Q.        You never reviewed the other chapters in
12 this book, Mr. Trende?
13 A.        No.
14 Q.        Okay.  You never -- Okay.
15 A.        No.  I'm -- No.  I doubt if I read any of
16 them.
17            - - -
18            And, thereupon, Plaintiff's Exhibit No. 7
19 was marked for purposes of identification.
20            - - -
21 BY MS. ANDERSON:
22 Q.        Mr. Trende, you have been handed what's been
23 marked as Exhibit 7, correct?
24 A.        Yes.
25 Q.        What is this?

Page 120

1  A.        This is an article for Real Clear Politics
2  titled, "The Case of The Missing White Voters," dated
3  November 8th, 2012.
4  Q.        And who drafted it?
5  A.        I did.
6  Q.        And where was it published?
7  A.        Real Clear Politics.
8  Q.        Do you have any reason to believe this is
9  not an accurate and true copy of the article entitled
10 "The Case of The Missing White Voters"?
11 A.        I don't have a reason to believe one way or
12 the other.
13 Q.        Could you please turn to the fifth paragraph
14 of this article.  Does the fifth paragraph of this
15 article state, "Obviously, the surge in the nonwhite
16 vote is troubling to Republicans who are increasingly
17 almost as reliant upon the white vote to win as
18 Democrats are on the nonwhite vote"; is that correct?
19 A.        I see that as a correct reading.  Yes.
20 Q.        Does the next sentence say, "With the white
21 vote decreasing as a share of the electorate over
22 time, it becomes harder and harder for Republicans to
23 prevail"; is that a correct reading of that?
24 A.        That is a correct reading.
25 Q.        Do you still believe that it's true that

Page 121

1  with the white voting share decreasing as a share of
2  the electorate over time, it becomes harder for
3  Republicans to prevail generally?
4  A.        I'm not as confident as I was in 2012.
5  Q.        I'm not asking you about your confidence
6  level; I'm asking you about if that's still -- if you
7  still believe that to be true; that with the white
8  vote decreasing as a share of the electorate over
9  time, it becomes harder for Republicans to prevail?
10            MR. KERCHER:  Object to the form.  Asked and
11 answered.
12            Not everything has to be a binary.  I'm less
13 confident -- substantially less confident than I was
14 in the past.  We have, for example, since 2012, the
15 minority population continuing to grow, and
16 Republicans took back the Senate in 2014.  They won
17 the Presidency with an abhorrent candidate in 2016.
18 And, in 2020, that candidate had some of the best
19 performances among nonwhite voters in recent history.
20 So there's a lot of things since then that suggest
21 that Republicans weren't as justified in being
22 troubled as it appeared in 2012.
23 Q.        Mr. Trende, is one possible way of making a
24 district more Republican to remove African-American
25 voters from a district?

Sean P. Trende
September 02, 2022

Page 122

1           MR. KERCHER:  Object to the form.
2   A.      It depends who you put back in to compensate
3   for them.  If you are in New York City, I'm guessing
4   there are places where you can probably remove African
5   Americans and replace them with whites who are even
6   more heavily Democratic.
7   Q.      Is one possible way of making a district
8   more Republican to remove African-American voters from
9   a district and put in Anglo-Republican voters?
10          MR. KERCHER:  Object to the form.
11  A.      It would depend how Republican or Democratic
12  those voters you replace the African-American voters
13  with are.
14  Q.      What if they were over 70 percent Republican
15  leaning?
16          MR. KERCHER:  Object to the form.
17  A.      If you take out a group that is, say,
18  70 percent Democratic and replace them with voters who
19  are 70 percent Republican, the district will be made
20  more Republican.
21  Q.      And, Mr. Trende, is one possible way of
22  making a district more Republican to remove Latino
23  voters from a district who vote for Democrats?
24          MR. KERCHER:  Object to the form.
25  A.      It depends on the voting patterns of the

Page 123

1   white voters or -- Well, actually, you didn't specify
2   who you replaced them with.  If you replace them with
3   African-American voters, you make it more Democratic.
4   Q.      Is one possible way of making a district
5   more Republican to remove Latino voters who, for
6   example, have a 70 percent leaning Democratic, and you
7   replace them with white Republicans who vote at
8   70 percent Republican?
9           MR. KERCHER:  Object to the form.
10  A.      That would make the district more
11  Republican.  Yes.
12  Q.      Mr. Trende, is race ever used as a proxy for
13  partisanship in map drawing?
14          MR. KERCHER:  Object to the form.
15  A.      I don't know.  Not in my experience.
16  Q.      So, Mr. Trende, are you aware of
17  circumstances in which partisan information is not
18  available at the sub-precinct level and race is
19  available at the sub-precinct level?  Wouldn't race be
20  a potential proxy for partisanship in that situation?
21          MR. KERCHER:  Object to the form.
22  A.      It would depend on how the minority groups
23  vote and how the white groups vote.
24  Q.      Would race at the precinct level be a proxy
25  for partisanship if the majority of minorities voted

Page 124

1   for Democratic candidates?
2           MR. KERCHER:  Object to the form.
3   A.      Again, not necessarily.  To give you an
4   example from here in Columbus:  German Village is an
5   area, kind of a hip, trendy -- not T-R-E-N-D-E -- area
6   south of the downtown that votes 80 percent
7   Democratic.  So swapping out Hispanic voters in
8   Columbus for residents of German Village would
9   probably make the district more Democratic, not more
10  Republican.  It really just depends on the
11  particulars.
12  Q.      Could you please turn to Page 9 of your
13  report.
14  A.      Page what?
15  Q.      9.  Could you please read the last sentence
16  of the first paragraph.
17  A.      The last of what?
18  Q.      The first paragraph.
19  A.      "Nevertheless, a close examination of the
20  historical context behind the districts, of the
21  districts themselves, and of their political and
22  racial composition clearly demonstrates that they are
23  consistent with districts drawn substantially to
24  improve the political advantage of the Republican
25  Party."

Page 125

1   Q.      So, Mr. Trende, did your examination of the
2   political and racial compositions of the Congressional
3   districts help lead you to the conclusion that the
4   districts were drawn to improve the political
5   advantage of the Republican Party?
6           MR. KERCHER:  Objection to the form.
7   Misstates his testimony.  The report speaks for
8   itself.
9   A.      Among other things.
10  Q.      Would you agree that it's important to look
11  at the racial composition of Congressional districts
12  in examining what factors played a role in the Enacted
13  Congressional Map?
14          MR. KERCHER:  Object to the form.  Misstates
15  his testimony.
16  A.      If you're trying to demonstrate that maps
17  are drawn consistent with an attempt to improve the
18  political advantage of the Republican Party, no, I
19  don't think you have to do that.
20  Q.      Did you look at racial composition of the
21  districts in your report?
22  A.      I don't remember if I looked at racial
23  composition.  It's a 210-page report.  There are
24  certainly precincts that I looked at the racial
25  compositions.  But, again, most of this was looking at

Sean P. Trende
September 02, 2022

Page 126

1  how the politics of the districts change, which you
2  can determine just by looking at vote shares.
3  Q.      Mr. Trende, did you not do a close
4  examination of the racial compositions which is in the
5  sentence -- the last sentence of the first paragraph
6  on Page 9?
7          MR. KERCHER:  Object to the form.
8  A.      Close examination modifies things as a
9  whole.  So close examination of the historical context
10 behind the districts, the districts themselves,
11 political/racial compositions as well.
12         And so, yes, looking carefully at some of
13 the areas that I single out can help shed light on
14 things, but I don't know that, if you're trying to
15 inquire whether things are consistent with the
16 political story, you necessarily have to look at every
17 potential racial angle of the district.
18 Q.      So you didn't look at the racial composition
19 of each Congressional district in your report?
20         MR. KERCHER:  Object to the form.  Asked and
21 answered.
22 A.      I didn't look at every individual district's
23 overall racial composition.  As a matter of fact,
24 I don't even know if I looked at every single
25 district.  I didn't look at 11, for example.  But

Page 127

1  where the examination of the precinct-level things
2  that I was looking at revealed something interesting,
3  I pointed it out.  But if you're trying to demonstrate
4  that something is consistent with the political draw,
5  the political numbers are what's really the most
6  relevant and interesting.
7  Q.      So, Mr. Trende, how much of your report
8  examined the political composition of the
9  Congressional districts versus the racial composition?
10         MR. KERCHER:  Object to the form.
11 A.      I haven't done such an analysis and don't
12 even know where I would begin trying to do that.
13 Q.      Mr. Trende, would it be fair to say that the
14 majority of your report focuses on the political
15 composition of the congressional districts instead of
16 the racial composition?
17         MR. KERCHER:  Same objection.
18         You can answer, if you know.
19 A.      The goal is to -- or the inquiry I was
20 tasked with was whether it was consistent with a
21 political draw; so yes, the emphasis was on the
22 political aspects of the districts.
23 Q.      Mr. Trende, would it be important to look at
24 the history of the treatment of racial groups in
25 examining whether race played a role in the 2021

Page 128

1  Enacted Congressional Map, that that was what you were
2  looking for?
3          MR. KERCHER:  Object to the form.
4  A.      I think that's one of the factors in -- or
5  the legal conclusions.  If you were trying to prove
6  that, you would probably want an expert who does that
7  kind of analysis.  So I guess if you're a plaintiff,
8  you would want someone to do that.
9  Q.      Mr. Trende, could you please turn to Page 40
10 of your report.  Mr. Trende, in the second-to-the-last
11 sentence of the first paragraph, do you say, "The
12 dotplots, however, demonstrate that they do not
13 perfectly sort white residents of the area."
14 A.      That's the second-to-last sentence.  Yes.
15 Q.      Were you referring to figure 25 with that
16 sentence or 24?
17 A.      I believe so, yes.
18 Q.      Which one?
19 A.      I'm sorry.  I thought you were changing your
20 answer -- your question from 23 to 24.
21 Q.      Were you looking at 24?
22 A.      Yes, 24.
23 Q.      And, Mr. Trende, in figure 24, did you use
24 the white total population?
25 A.      I'm sorry.  Explain what you mean by that.

Page 129

1  Q.      What does each dot represent in figure 24?
2  A.      It would be -- a dot is 10 people,
3  I believe.  I would have to look at the code, just as
4  any other dotplots.
5  Q.      So 10 white total population, or 10 voting
6  population?  Or something else?
7  A.      CVAP I think is what I used for the
8  dotplots.
9  Q.      And, Mr. Trende, is it your understanding
10 that map drawers would have had to draw the
11 Congressional map to perfectly align with the white
12 population in order for the conclusion to be made that
13 race played a role in redistricting?
14         MR. KERCHER:  Object to the form.
15 A.      That's not my understanding of the legal
16 standard, but that's something for you all to fight
17 about, I guess.
18 Q.      And, Mr. Trende, did you do a similar
19 dotplot like you did for figure 24 for the
20 African-American population in the DFW area?
21 A.      No.
22 Q.      Mr. Trende, did you do a similar dotplot
23 like in figure 24 for the Latino population in the
24 DFW area?
25 A.      No.

Sean P. Trende
September 02, 2022

Page 130

```
1   Q.        And, Mr. Trende, I believe that you
2   mentioned earlier that the white population in the
3   DFW area votes for Democrats and Republicans.  So why
4   would you expect there to be perfect -- that this map
5   perfectly sort the white residents of that area, given
6   that white residents vote less cohesively?
7            MR. KERCHER:  Object to the form.
8   A.        I wouldn't expect that.  That's my point.
9   Q.        And you don't know whether -- So you didn't
10  do a dotplot of the Latino population of the DFW area
11  so you don't know whether the Latino population would
12  be perfectly sorted with the Enacted Map; is that
13  correct?
14           MR. KERCHER:  Object to form.
15  A.        I think that's in Dr. Duchin's report, but
16  I'm not sure, to which I'm responding.
17  Q.        Mr. Trende, is it true that the white
18  population in Texas votes less cohesively than the
19  African-American population in Texas?
20           MR. KERCHER:  Object to the form.
21  A.        I haven't done that analysis.
22  Q.        And, Mr. Trende, is it true that the white
23  population in Texas votes less cohesively than the
24  Latino population in Texas?
25           MR. KERCHER:  Object to the form.
```

Page 131

```
1   A.        I haven't done the analysis.
2   Q.        Could you please turn to Page 34.  Actually,
3   sorry.  Please turn to Page 208.
4            Could I please turn your attention to the
5   second -- well, to the paragraph that starts with the
6   second paragraph from the bottom.  Could you please
7   start reading that paragraph beginning with the
8   sentence "Again."
9   A.        "Again, this is likely not the case in Texas
10  where rural heavily white precincts vote quite
11  differently from heavy white precincts in less rural
12  areas.  Indeed, a portion of this paper is -- suggests
13  (sic) that this assumption is not warranted.  For
14  example, urban, white, and Hispanic voters are
15  substantially more Democratic than rural white
16  Hispanic voters."
17  Q.        Mr. Trende, how do urban white voters
18  generally vote in Texas?
19           MR. KERCHER:  Object to the form.
20  A.        It would depend on the area, but more
21  Democratic than rural white voters.
22  Q.        What about inner suburban white voters?
23           MR. KERCHER:  Object to the form.
24  A.        Depends on the suburb.
25  Q.        And, Mr. Trende, do urban and suburban white
```

Page 132

```
1   voters in Texas generally vote differently from how
2   rural white voters vote?
3            MR. KERCHER:  Object to the form.
4   A.        That's what the paper suggests.
5   Q.        Do you have any reason to believe that
6   that's not true?
7            MR. KERCHER:  Same objection.
8   A.        No.  If you're going to paint in broad
9   strokes, rural whites in Texas tend to be more
10  Republican than urban and suburban whites.
11  Q.        And, Mr. Trende, do you know where within
12  the DFW area white voters generally vote for
13  Democratic candidates?
14  A.        I couldn't tell you every single place.
15  From my experience in Dallas, a lot of the areas
16  immediately north of downtown and to the east of it
17  have a lot of young liberal voters.  As you get
18  further out, you tend to get more increasingly
19  Republican, but even that's probably changing as
20  places like Garland and Sachse and other places move
21  towards Democrats.  S-A-C-H-S-E.
22  Q.        Mr. Trende, how much time did you spend
23  working on the section of your report that deals with
24  the DFW Congressional districts?
25  A.        I have no idea.
```

Page 133

```
1   Q.        Would you say weeks?  Would you say days?
2   Would you say months?
3   A.        I would say no idea.
4   Q.        How long did you take to prepare your report
5   overall?
6   A.        I don't know.
7   Q.        When were you first asked to work on your
8   report in this case?
9   A.        Sometime in May or June of this year.
10  Q.        Did you begin working immediately then, or
11  did you wait a while after you were first engaged to
12  work on this report -- to work on your report?
13  A.        I don't think I was formally engaged until
14  June.  I think I was first approached May or early
15  June.  I think I started pretty quickly and then had
16  some other things to attend to, but I don't know for
17  sure.
18  Q.        Would you like to take a break, Mr. Trende?
19  A.        No, I'm good.
20  Q.        Okay.  Will you please turn to Page 43 of
21  your report.  Could you please turn to the last
22  sentence on Page 43, which I think was discussed
23  earlier starting with, "But here, the data and history
24  are more consistent with the political story."  Is
25  that an accurate quote from Page 43?
```

Sean P. Trende
September 02, 2022

Page 134

1  A.      Yes.
2  Q.      And you were referring to the DFW
3  Congressional districts with this quote, correct?
4  A.      Yes.
5  Q.      And, Mr. Trende, were you making a
6  conclusion as to the DFW configuration as a whole or
7  any specific Congressional district with this state?
8          MR. KERCHER:  Object to the form.
9  A.      This was with reference to the seven
10 districts that Dr. Duchin had identified because this
11 is in response to Dr. Duchin.
12 Q.      And what history are you referring to?
13 A.      The histories of the districts that are at
14 the beginning of each discussion of the districts.  So
15 the motivation for those sections, there is a line
16 that's tucked into the captions of one of Dr. Duchin's
17 reports, or one of Dr. Duchin's tables, that says
18 something to the effect that the Sixth District
19 sprawls needlessly through counties south of Dallas.
20 And so I think it's important context to know that,
21 with the exception of the awful 1990s map, the
22 districts have -- the Sixth District has generally
23 gone through the rural areas south of Dallas.
24 Q.      Mr. Trende, are you aware that the history
25 of the DFW Congressional configuration includes a

Page 135

1  court finding of intentional racial discrimination in
2  the past decade?
3          MR. KERCHER:  Object to the form.
4  A.      No.
5          MS. ANDERSON:  Why don't we just take a
6  10-minute break.
7          THE WITNESS:  All right.
8          (Recess taken.)
9  BY MS. ANDERSON:
10 Q.      Mr. Trende, how many pages of your report
11 are dedicated to Congressional District 23?
12         MR. KERCHER:  Object to the form.
13 A.      I don't know.
14 Q.      Would it be fair to say that you used two
15 pages to discuss CD 23 specifically?
16         MR. KERCHER:  Same objection.
17 A.      I doubt it.
18 Q.      Why do you doubt it?
19 A.      Because I don't think that's right.
20 Q.      How much time did you spend drafting the
21 pages of your report that relate to Congressional
22 District 23?
23         MR. KERCHER:  Object to the form.
24 A.      I have no clue.
25 Q.      Mr. Trende, would you please turn to Page 98

Page 136

1  of your report.  Mr. Trende, what do the dots on the
2  dotplot that is figure 69 on Page 98 represent?
3  A.      The white population of Congressional
4  districts in Austin/San Antonio area.
5  Q.      Is that the Voting Age Population or the
6  white population?
7  A.      It would be the CVAP, non-Hispanic white
8  population.
9  Q.      Does each dot represent 10 people or
10 100 people?
11 A.      It's whatever I intended to use.
12 Q.      I think you used both.
13 A.      No, I think I was consistent.  So probably
14 10.  You would be able to tell from the code
15 I provided.
16 Q.      Mr. Trende, did you create a dotplot similar
17 to figure 69 for the African-American population?
18 A.      No.  I think there is something that has the
19 African-American and Hispanic population in
20 Dr. Duchin's reports, but I could be wrong.
21         Actually, no.  I don't think she does that
22 for Austin/San Antonio.
23 Q.      And then I take it, Mr. Trende, you did not
24 do a dotplot similar to figure 69 for the Hispanic
25 population?

Page 137

1  A.      I did not.
2  Q.      And then, Mr. Trende, are you aware of a
3  2011 -- or that the 2011 version of Congressional
4  District 23 was found to have been drawn with
5  discriminatory intent by the court?
6          MR. KERCHER:  Object to the form.
7  A.      No, I've never read the Perez v Abbott
8  decision.
9  Q.      Are you aware of it?
10         MR. KERCHER:  Same objection.
11 A.      Yes, I just used its name.  I'm aware of it,
12 but I've never read it, and I don't know the specific
13 findings of it.
14 Q.      But you knew which court decision involved
15 CD 23, correct?
16         MR. KERCHER:  Object to the form.
17 A.      I didn't say it involved CD 23.  But that's
18 the main case coming out of the 2011 map draw that
19 I'm aware of, so I assume that's the decision you're
20 referencing.
21 Q.      Are you aware that in the previous decade
22 before 2011 a court found that a version of
23 Congressional District 23 violated the Voting Rights
24 Act?
25         MR. KERCHER:  Object to the form.

Sean P. Trende
September 02, 2022

Page 138

1  A.      So this is, perhaps, going to sound a little
2  pedantic, but this is how I had it in mind when I
3  wrote this.  25 was the district that was struck down
4  because 25 was no longer a legitimate Voting Rights
5  Act district.  It couldn't offset the loss of 23.  At
6  least that's how I understand LULAC.
7          So my understanding of LULAC is that 25 was
8  the district that was struck down, and everyone agreed
9  that 23 was no longer an opportunity district.
10 Q.      And, Mr. Trende, do you discuss the racial
11 composition of CD 23 in your report?
12 A.      I think so.
13 Q.      Where?
14 A.      So if you look at the tables -- that would
15 be maps on page -- Am I out of order now?  So on
16 Page 199, the simulations based on the precincts in
17 all of the districts, including 23, give insight into
18 the consistency of the plan and its effect.
19         I also thought there was a discussion of the
20 District 20/23 boundary.  But, again, it's a 210-page
21 report so I'm not sure exactly where.  There might not
22 have been.
23 Q.      Mr. Trende, are you aware of whether
24 Hispanic voters in Congressional District 23 tend to
25 vote for Democratic candidates?

Page 139

1  A.      I don't know the specifics of it, especially
2  now.
3  Q.      Did you ever know the specifics of whether
4  Hispanic voters in CD 23 tended to vote Democratic?
5  A.      So that example in 2012, I would have said
6  certainly.
7                       - - -
8          And, thereupon, Plaintiff's Exhibit No. 8
9  was marked for purposes of identification.
10                      - - -
11 BY MS. ANDERSON:
12 Q.      Mr. Trende, the court reporter has handed
13 you what has been marked as Exhibit No. 8.  What is
14 this?
15 A.      This is a tweet.
16 Q.      Who drafted the tweet?
17 A.      I wrote the tweet.  Drafting makes it sound
18 like there is a lot of thought and editing that goes
19 into it.
20 Q.      Sure.
21 A.      There isn't.
22 Q.      What is the date of the tweet?
23 A.      December 4th, 2013.
24 Q.      And, Mr. Trende, do you have any reason to
25 believe that this is not a true and accurate copy of

Page 140

1  your tweet?
2  A.      No.
3  Q.      Mr. Trende, does your tweet say, "Looking at
4  2013 election, dropoff in Hispanic vote potential
5  problem for Ds in Arizona 1, 2, 9; California 3, 24,
6  26, 36; Florida 26; Texas 23"?
7  A.      There's abbreviations for a lot of that.
8  But yeah.
9  Q.      And so, Mr. Trende, would it be fair to say
10 that the preferred candidate of the Hispanics in
11 Congressional District 23 was a Democrat?
12 MR. KERCHER:  Object to the form.
13 A.      Like I said, in 2012, I would have said
14 that.  I guess I still would have said it in 2013.
15 Q.      Would you still say it now?
16 A.      I think I already told you that I don't
17 know.
18                      - - -
19         And, thereupon, Plaintiff's Exhibit No. 9
20 was marked for purposes of identification.
21                      - - -
22 BY MS. ANDERSON:
23 Q.      Mr. Trende, what did I just hand to you?
24 A.      My law school note.
25 Q.      And what is the Law Review article titled?

Page 141

1  A.      "Why Modest Proposals Offer The Best
2  Solutions For Combating Racial Profiling."
3  Q.      Where was the Law Review article published?
4  A.      The Duke Law Journal.
5  Q.      And you drafted this article?
6  A.      Yes.
7  Q.      Do you have any reason to believe that this
8  is not a true and accurate copy of your Law Review
9  article?
10 A.      It appears to be a true and accurate copy of
11 my note.
12 Q.      Of your note?
13 A.      Yes.
14 Q.      Could you please turn to Page 379.
15         Mr. Trende, could you please go to the
16 number 3, "The solution does too little."  Could you
17 please read the first three sentences out loud of that
18 section.
19 A.      "To be sure, the suggestion offered isn't
20 perfect.  It would affect only those cases where a
21 police officer admits to pulling over African
22 Americans due to their race or where the statistics
23 are so compelling that there can simply be no other
24 rational explanation for the stop.  And it may be that
25 the largest effect of the suggested approach would be

Sean P. Trende
September 02, 2022

Page 142

1  to drive racism underground.  Officers may well
2  concoct convincing post hoc rationalizations for their
3  missteps."
4  Q.     So, Mr. Trende, do you believe that
5  decision-makers always admit when they make a decision
6  involving race?
7         MR. KERCHER:  Object to the form.
8  A.     I don't think they would necessarily always
9  do that.  No.
10 Q.     Mr. Trende, do you believe that
11 decision-makers sometimes concoct post hoc
12 rationalizations for decisions involving race?
13        MR. KERCHER:  Object to the form.
14 A.     I'm sure there are instances where they do
15 it.  As I suggest, they may well do it.
16 Q.     And, Mr. Trende, do you believe
17 decision-makers sometimes make decisions involving
18 race, even when the statistics are not so compelling
19 in showing racial intent?
20        MR. KERCHER:  Same objection.
21 A.     Can you ask me that again?
22 Q.     Sure.  Do you believe that decision-makers
23 sometimes make decisions involving race even when
24 statistics are not so compelling in showing racial
25 intent?

Page 143

1         MR. KERCHER:  Object to the form.
2  A.     Do I believe -- Can we break that down
3  because the negative in there is throwing me off given
4  what's written here.  Or phrase it without a negative.
5  Q.     Sure.  Sometimes do decision-makers make
6  decisions that involve race where the statistics
7  aren't strong enough to show that racial intent
8  exists, but there still was race considered in the
9  decision-making process?
10        MR. KERCHER:  Object to the form.
11 A.     I don't know whether that's the case or not.
12 Q.     Could you please explain what you meant by,
13 "To be sure, the suggestion offered isn't perfect.  It
14 would affect only those cases where a police officer
15 admits to pulling over African Americans due to their
16 race or where the statistics are so compelling that
17 there can simply be no other rational explanation"?
18        With that statement, are you saying that
19 sometimes racial profiling occurs even where the
20 statistics are not so compelling, that there's no
21 other rational explanation other than race for the
22 stop?
23        MR. KERCHER:  Object to the form.  Asked and
24 answered.  Vague.
25 A.     I wrote this in the waning days of the

Page 144

1  Clinton Presidency, so I could not tell you what
2  I meant when I wrote it back then.  And this is the
3  conclusion -- This is in the conclusion, so I would
4  probably have to reread the entire article to get the
5  entire context.
6         What I think it says is that you only have
7  cases where police thought this was the solution,
8  which I think was reversed incorporating equal
9  protection norms into the Fourth Amendment definition
10 of reasonableness; that this solution only affects
11 cases with an admission that race played a factor or
12 where there's just overwhelmingly compelling
13 statistics.
14        I don't think it necessarily admits or
15 opines or that I ever had knowledge of whether there
16 are cases that it wouldn't necessarily cover.
17 Q.     Could you please turn to Page 369 of your
18 note.
19 A.     What I would say, to finish that answer, is
20 that I would have wanted it to cover these other
21 situations, and so to the extent those other
22 situations existed, this would be imperfect.
23 Q.     So I'm going to direct you to the paragraph
24 that starts, "With these two steps."  And if you go
25 down to the sentence that begins with, "In other

Page 145

1  words."  Do you see that?
2  A.     Yes.
3  Q.     Okay.  Did you write on Page 369, "In other
4  words, his motivation is simply to enforce the law;
5  the racial categorization is a means rather than an
6  end."
7         Does that accurately reflect the statement
8  that you made on Page 369?
9  A.     Yes.
10 Q.     So is it true, Mr. Trende, that race is
11 sometimes used as a means to accomplish an aim?
12        MR. KERCHER:  Object to the form.
13 A.     I don't think so, because the last -- the
14 preceding sentence that we skipped over talks about
15 "assume a certain scenario."  So I'm discussing a
16 hypothetical.  Again, I wrote this 22 years ago.
17 Q.     Mr. Trende, did you read Dr. Roden's report
18 in this case?
19 A.     I saw it, and looked at portions of it.
20 I don't know that I read every word of it.
21 Q.     Do you plan to offer an opinion on
22 Dr. Roden's report in this case?
23 A.     I don't have plans to offer any particular
24 opinions.  I'll ask the questions that counsel --
25 I'll answer the questions that counsel asks me.

Sean P. Trende
September 02, 2022

Page 146

1                    - - -
2            And, thereupon, Plaintiff's Exhibit No. 10
3    was marked for purposes of identification.
4                    - - -
5    BY MS. ANDERSON:
6    Q.        Mr. Trende, the court reporter has handed
7    you what has been marked as Exhibit 10.  Mr. Trende,
8    what is the document that she just handed you?
9    A.        This is three tweets.
10   Q.        And when is it dated, the first one?
11   A.        December 14th, 2020.
12   Q.        And who drafted the tweet?
13   A.        I wrote the tweet.
14   Q.        And do you have any reason to believe that
15   this is -- to disagree with the fact that this is a
16   true and correct copy of your tweet?
17   A.        No, I don't have any reason to disagree.
18   Q.        And, Mr. Trende, does your tweet say, "Been
19   playing around with Texas maps, and it's pretty easy
20   to draw three new R districts, draw two minority
21   opportunity districts by making 7 and 32
22   minority-majority; make 23 majority-Trump, while
23   keeping around 66 percent Hispanic and make Texas 28
24   heavily Trump while keeping around 66 percent
25   Hispanic."

Page 147

1    A.        That's what it says, yes.
2    Q.        And, Mr. Trende, what data did you use to
3    draw the Constitutional districts that you discuss in
4    this tweet?
5    A.        Data's Redistricting App.
6    Q.        What data did you use in Data's
7    Redistricting App?
8    A.        Whatever Data's Redistricting Map makes
9    available.
10   Q.        Did you use racial data in drawing these
11   Congressional districts referenced in your tweet?
12   A.        I don't know.  There's a subsection of
13   Twitter called "Election Twitter" that likes to draw
14   maps and map out scenarios.  I think I drew a map in
15   Illinois that was, like, 16-1 Democratic, and one in
16   Ohio that it was 13 or 13-2 by taking every precinct
17   along I-71 and linking them together.  So I don't know
18   what I was doing.  This was for my own entertainment.
19   I know it's hard to believe for someone not in my line
20   of work how that could be entertaining, but...
21   Q.        And then, Mr. Trende, what do you mean by
22   your statement that "It's pretty easy" for you to draw
23   two new minority-majority Congressional districts in
24   Texas?
25   A.        That it wasn't difficult to make 7 and 32

Page 148

1    minority-majority, which I don't think they were in
2    the previous iteration.
3    Q.        And, Mr. Trende, did you draw any other
4    minority opportunity districts in Texas?
5    A.        I don't think so.  Again, this is something
6    that was done entirely for my own entertainment, so I
7    don't remember the specifics of it.
8    Q.        So you drew a new minority-majority
9    Congressional district in Harris County, correct?
10   A.        I turned 7 into one.
11   Q.        And what were the boundaries of 7 that you
12   drew?
13   A.        I have no clue.
14   Q.        Do you recall what it looked like?
15   A.        Not even a little bit.  I don't even
16   remember really doing this until you reminded me.
17   Q.        And what was the racial composition of the
18   new minority-majority Congressional district in Harris
19   County?
20   A.        I have no clue.  I did it for my own
21   entertainment.
22   Q.        Did you create -- Was the Hispanic CVAP over
23   50 percent in that district?
24   A.        I honestly have no idea.
25   Q.        And, Mr. Trende, you drew a new

Page 149

1    minority-majority Congressional district in the DFW
2    area, correct?
3    A.        It appears I turned 32 into a
4    minority-majority district.  That should probably --
5    Yeah, that's 32.  That's Olson's office.
6    Q.        And what did that district look like?
7    A.        I don't know.
8    Q.        Do you recall what the boundaries were?
9    A.        No.
10   Q.        What was the racial composition of the DFW
11   Congressional area district that was the new
12   minority-majority district?
13   A.        I have no idea.
14   Q.        Did you look at racial data in drawing the
15   DFW district?
16   A.        I would guess that, since I said it was
17   minority-majority, I would have checked the minority
18   population of it.
19   Q.        Is it also true for the new minority
20   opportunity district that you drew in Harris County?
21   A.        Since I said it was minority-majority, then
22   I would have at least looked at the output of the
23   district to see where it landed.
24            MS. ANDERSON:  Could we have a two-minute
25   break.

Sean P. Trende
September 02, 2022

Page 150

1    (Recess taken.)
2  BY MS. ANDERSON:
3  Q.    Mr. Trende, are there any deposition answers
4  that you wish to change so far?
5  A.    None that I can think of.
6  Q.    Is there anything that you would like to add
7  so far so we can better understand your answers?
8    MR. KERCHER:  Object to the form.
9  A.    Nothing I can think of.
10    MS. ANDERSON:  Pass the witness.
11    MS. PERALES:  I need a minute to change
12  seats so I can get closer to the witness.
13    Can we go off the record, please.
14    (Recess taken.)
15    - - -
16    EXAMINATION
17  BY MS. PERALES:
18  Q.    Good afternoon, Mr. Trende.  My name is Nina
19  Perales; and I represent the League of United Latin
20  American Citizens, LULAC, and other Latino
21  organizations and individuals in Texas.
22    I know it's late in the afternoon, so
23  I apologize in advance if I wear on your patience or
24  the patience of your counsel, but I'll try to be as
25  efficient as possible and not repeat any questions

Page 151

1  that have been asked so far.
2    If you would turn to Exhibit 1, which is
3  your report, and go to Page 6 of that report, please.
4    Here's a question for you:  Have you ever
5  taken a deposition?
6  A.    Yes.
7  Q.    Okay.  So this is the part of the deposition
8  where I point to certain language and ask a couple of
9  questions about it.  In particular, if you would look
10  at the last paragraph on Page 6 titled, Scope of
11  Engagement, would it be correct to say that, first,
12  you describe that you've been retained by the Attorney
13  General of Texas on behalf of Defendants "...to
14  evaluate Texas's Congressional State Senate and State
15  House Districts enacted by the Texas legislature and
16  signed by the State's Governor, Greg Abbott."  And
17  then it goes on from there.  Do you see that language
18  there?
19  A.    Yes.
20  Q.    Okay.  And so my question for you has to do
21  with the last sentence on Page 6.  Is it correct to
22  say that you write in your report, "In the course of
23  this, I respond to points made in the expert reports
24  of Dr. Jay Morgan Kousser, Dr. Moon Duchin,
25  Dr. Christina Morales, and Mr. George Korbel"?  Did I

Page 152

1  read that correctly?
2  A.    I think that's the second-to-last sentence.
3  But yes.
4  Q.    You're absolutely right.  Thank you.
5    And so my question for you -- Well, let's go
6  to Page 7 because there's something very similar on
7  Page 7, if you wouldn't mind.  The second bullet in
8  the Summary of Opinions, did you write there, "The
9  Plaintiffs' alternative maps typically function only
10  by stitching together non-compact minority populations
11  from disparate areas of the region"; is that correct?
12  A.    Yes.
13  Q.    Okay.  Thank you.
14    Did you evaluate the LULAC plaintiffs'
15  alternative maps?
16  A.    I did examine those maps, yes.
17  Q.    You examined them.  Did you provide any
18  discussion in your report of the LULAC plaintiffs'
19  alternative maps?
20  A.    No.  Not directly.
21  Q.    Okay.  Then tell me what you did do.  If it
22  wasn't direct, if it was indirect or otherwise.
23  A.    Well, the dotplots that are provided of the
24  racial composition of the areas can be used to
25  evaluate the Morales or to illustrate the Morales

Page 153

1  LULAC maps as well.  But for a more thorough examining
2  of them, I simply ran out of time.
3  Q.    So you mentioned a moment ago a more
4  thorough examining.  Would it be fair to say that your
5  report does not present any maps that were in the
6  Morales report?
7  A.    That's correct.
8  Q.    And would it be fair to say that your report
9  does not include any analysis of the maps presented in
10  the Morales report?
11  A.    Not directly.
12  Q.    And when you say "not directly," you mean
13  because you provided the dot maps of, for example,
14  population of certain racial groups in certain
15  geographies; is that right?
16  A.    That's correct.
17  Q.    Would it be fair to say that you do not have
18  any analysis in your report that opines on the maps in
19  Dr. Morales's report in light of the dotplots?
20  A.    I'm sorry.  Can you repeat that?
21  Q.    That was a bad question.
22    Would it be fair to say that there is no
23  analysis in your report of your dotplots with the maps
24  presented in Dr. Morales's report?
25    MR. KERCHER:  Object to the form.

Sean P. Trende
September 02, 2022

Page 154

1    You can answer, if you understand.
2    A.      Yeah.  I think there's not, for example, a
3    direct overlay of Dr. Morales's report or maps over
4    the dotplot or a description that way.
5    Q.      Would it be fair to say that you only
6    mentioned Dr. Morales's name twice in your 209-page
7    report?
8            MR. KERCHER:  Object to the form.
9            You can answer.
10   A.      I have to be honest.  I don't know.
11   Q.      Okay.  So we did look at Page 7 a moment
12   ago.  And then before that, we looked at Page 6.
13   Would you agree with me that on Page 6, in the second
14   line from the bottom thereabouts, you say
15   "Dr. Christina Morales"?
16   A.      Yes.
17   Q.      And if you would turn with me to Page 115,
18   under the heading F, Demonstration Minority Districts,
19   do you see the line below that that mentions
20   Drs. Duchin and Morales?
21   A.      Yes.
22   Q.      Are you aware of any other part of your
23   report that mentions Dr. Morales?
24   A.      No.
25   Q.      And I believe we have already covered, there

Page 155

1    is nowhere in your report where you present the maps
2    that were shown in Dr. Morales's report?
3            MR. KERCHER:  Object to the form.
4    A.      That's correct.
5    Q.      So I'll be completely honest.  Here's my
6    dilemma.  I don't know whether you're planning to
7    testify about the maps offered by the LULAC
8    Plaintiffs, so I will ask you simply, sitting here
9    today, do you plan to present any analysis at trial of
10   the maps in Dr. Morales's reports?
11           MR. KERCHER:  Object to the form.
12   A.      And I regrettably cannot answer that
13   directly because, as I've said, I don't have
14   intentions on what I'm going to testify to.  The
15   lawyers will ask me the questions, and I will answer
16   them subject to whatever objections the court rules
17   on.
18   Q.      Understood.  But sitting here today, do you
19   have any knowledge that you will testify on the maps
20   presented in Dr. Morales's report?
21           MR. KERCHER:  Objection to the form.
22   A.      Again, I don't have knowledge one way or the
23   other about the things I'm going to testify to.  That
24   would include Dr. Morales's analysis of the LULAC
25   maps.

Page 156

1    Q.      Do you plan to testify outside the bounds of
2    your report?
3            MR. KERCHER:  Object to the form.
4    A.      I don't have any plans to testify that way,
5    but I don't know the questions I'll be asked and how
6    the court might rule on any objections.
7    Q.      If you do testify regarding the maps
8    presented in Dr. Morales's report, would you agree
9    with me now that that would be testimony outside of
10   the bounds of your reports?
11           MR. KERCHER:  Object to the form.
12   A.      Well, as I've said, I think there are
13   applications of the dotplots to Dr. Morales's apps
14   that could be made.  I don't say that as some sort of
15   a tell, that I think the lawyers are going to ask me
16   about that.  But I think there are ways that they are
17   still relevant to the maps.
18           If my lawyers -- or if the lawyers were -- I
19   don't know if they are my lawyers or not under the new
20   privilege that wasn't around when I was practicing.
21   But as the lawyers for the attorney -- if the lawyers
22   for the Attorney General's Office ask me questions on
23   any subject that I'm able to answer, and the court
24   were not to overrule an objection, I would try to
25   answer them.

Page 157

1    Q.      Understood.
2            However, my question is a little bit
3    different.  You've testified that it's possible to use
4    your dotplots and overlay Dr. Morales's districts from
5    her reports and offer observations or evaluations of
6    that; but you've also testified that you haven't done
7    that in your report.
8            So my question is whether you would agree
9    with me that if you did testify about the
10   relationship, for example, between the dotplots and
11   the boundaries of the maps in Dr. Morales's report,
12   that that would be testimony outside the bounds of
13   your reports?
14           MR. KERCHER:  Object to the form.
15   A.      And I think that would be a legal analysis
16   that you would probably object to vociferously, and I
17   don't know how the court would rule on it.  I don't
18   know if the lawyers for the State would even ask me
19   something to that effect.
20   Q.      Understood.
21           MS. PERALES:  I have to object as
22   nonresponsive.
23   BY MS. PERALES:
24   Q.      I'm asking you for a "yes" or "no," whether
25   you would agree with me that the testimony that I

Sean P. Trende
September 02, 2022

Page 158

1  described, if you were to testify at trial regarding
2  the relationship between the dotplots and the maps
3  presented in Dr. Morales's report would be testimony
4  outside of what you have presented in your report?
5          MR. KERCHER:  Objection to the form.  Asked
6  and answered.
7  A.       I don't know.
8  Q.       When you looked at what you referred to as
9  alternative maps in your report, did you analyze any
10 alternative maps for districts that contained
11 50 percent or more Hispanic Citizen Voting Age
12 Population?
13 A.       As I sit here, I don't know.
14 Q.       On Page 6, you've used language about
15 responding to points made, and then you mentioned
16 Dr. Christina Morales.  Can you tell me what points
17 made by Dr. Christina Morales that you responded to in
18 your report?
19 A.       No.
20 Q.       Going back to Page 115 of your report, just
21 at the top of the page where you mention Dr. Morales
22 evaluating alternative maps for Dallas/Fort Worth,
23 Houston, and southeastern Texas, can you tell me what
24 is southeastern Texas?
25 A.       I think for that -- so East Texas would be a

Page 159

1  region, you know, split basically by east of
2  Fort Worth down to the Gulf Coast.  So southeastern
3  Texas would be something I had in mind distinct from
4  that south and east of Houston down to Corpus Christi.
5  Q.       We might call that "the coastal bend," or at
6  least part of it.  Might not go quite that far north.
7  But I think I understand what you're suggesting:
8  South of Houston, north of Corpus.
9          MR. KERCHER:  Object to the form, if that's
10 a question.
11         MS. PERALES:  It's not.  I'm buying time so
12 I can write a note, Mr. Kercher.
13 BY MS. PERALES:
14 Q.       Did you look at any alternative proposed
15 districts outside of this geographic area,
16 Dallas/Fort Worth, Houston, and southeastern Texas?
17 A.       Yes.
18 Q.       Give me an example of an alternative
19 proposed district that you looked at outside this
20 region.
21 A.       I believe Dr. Duchin offered an alternative
22 proposed district based in Lubbock.
23 Q.       So when you mentioned that on Page 115,
24 that's just the beginning of this section.  But you go
25 on to do other analyses as well; is that right?

Page 160

1  A.       Yes.
2  Q.       Okay.  Would it be correct to say you did
3  not do any analysis of the Enacted State Board of
4  Education Redistricting Plan?
5  A.       Yes.
6  Q.       Would it be correct to say that you did not
7  do any analysis of LULAC plaintiffs' proposed State
8  Board of Education districts?
9  A.       Yes.
10 Q.       Did you review the rebuttal report of
11 Dr. Morales?
12 A.       I think I skimmed it, but I don't know that
13 I read every word of it.
14 Q.       Do you have any opinions about the rebuttal
15 report of Dr. Morales sitting here today?
16 A.       I would have to look at the report, but none
17 that I can think of off the top of my head.
18 Q.       In your report, aside from the two mentions
19 of Dr. Morales's name that we've covered on Page 6 and
20 115, would it be fair to say that you do not discuss
21 the contents of the expert reports of Dr. Morales?
22         MR. KERCHER:  Object to the form.
23 A.       Not directly.  There may be things that bear
24 on it at other points in my report.  But not a direct
25 engagement of it, no.

Page 161

1  Q.       So what parts of your report would bear on
2  the expert reports of Dr. Morales?
3  A.       Well, as I suggested, the dotplots can
4  provide insight about the populations of her maps.
5  But, for example, a large portion of her report is
6  showing, say, the rental rates in the districts; and
7  there's nothing about that.  Her use of the ACS data
8  is not something that I engaged with, which I recall
9  being the lion's share of her report.
10 Q.       So would it be fair to say that, beyond the
11 dotplots provided in your report, there is nothing
12 else in your report that bears on the reports of
13 Dr. Morales?
14         MR. KERCHER:  Object to the form.
15 A.       Well, I don't know exactly how lawyers might
16 want to use some of the testimony or whether it might
17 bear on it once Dr. Morales testifies, or some of the
18 fact witnesses testify.  I can't speculate on any of
19 that.
20         So when you say, Does it bear on it?
21 I can't foreclose them from using it in a particular
22 way, but that the dotplots are the way I can think of
23 that the report might be relevant to Dr. Morales's
24 report.
25 Q.       And I only use the term "bear on" because

Sean P. Trende
September 02, 2022

Page 162

1    I believe you've used the term "bear on."  So I was
2    hoping to use your vocabulary there.
3           So putting aside what lawyers might or might
4    do, is it fair to say then that, from your
5    perspective, the dotplots are what could potentially
6    touch on what is in Dr. Morales's reports?
7           MR. KERCHER:  Object to the form.
8    A.     As I sit here today, that's what I could
9    see.  Yes.
10   Q.     Would you agree with me that the compactness
11   of Enacted Districts in a state shows us what a state
12   considers acceptable for compactness of districts?
13          MR. KERCHER:  Object to the form.
14   A.     At least in some context, yes.
15   Q.     And when you say "some context," what is
16   outside?  What are the contexts outside of my
17   statement?
18   A.     Well, a state is probably right -- it is
19   probably drawing its maps with, if there is any, state
20   constitutional considerations of compactness in mind.
21          There could also be a federal standard for
22   compactness under the Voting Rights Act which wouldn't
23   necessarily have to be conterminous with the state
24   line or the state definition.
25          If the State didn't think a certain area was

Page 163

1    protected by the Voting Rights Act, they might see
2    something as acceptable for compactness that wouldn't
3    be acceptable in the VRA context.
4           Or to use another example, if you were
5    drawing a district in Louisiana, and the State wanted
6    to draw a district across the southern border and up
7    the western border, I would imagine they have no
8    problem with that.
9           But if you wanted to draw it up the eastern
10   border and across the northern border, even with
11   similar degrees of compactness, the State might be
12   weary of that since they would be drawing the district
13   substantially similar to what was struck down by the
14   Supreme Court in the 1990s.  So there are ways that I
15   might think it could be different.
16   Q.     Let's put aside the consideration of race
17   for a moment and attempt to comply or not comply with
18   the Voting Rights Act.  Would you agree with me that
19   the compactness of Enacted Districts that are not
20   majority-minority shows us what the State considers
21   acceptable for compactness generally?
22          MR. KERCHER:  Object to the form.
23   A.     At least to the -- within the boundaries of
24   any state restrictions, yes.
25   Q.     Would you agree with me that when a State

Page 164

1    Enacted District -- let's assume it's not a
2    majority-minority district, even if it's less compact
3    than the average, the State still believes that people
4    in that district share enough common interests to
5    warrant bringing them together in a district, correct?
6           MR. KERCHER:  Object to the form.
7    Speculative.
8    A.     If the State is trying to draw a political
9    gerrymander, they might be trying to do the opposite
10   of that; draw in people who have opposing interests.
11   So I'm not sure I could agree with that.
12   Q.     Is it also possible that a State could draw
13   a district that's less compact than the average
14   because the State does believe that people in that
15   district share enough common interests to be brought
16   together?
17          MR. KERCHER:  Same objection.
18   A.     In an abstract sense, it could be possible.
19   Yes.
20   Q.     Are you familiar with the term "Texas
21   Legislative Council"?
22   A.     No.
23   Q.     Have you relied on in your work in this
24   case, any reports provided by the Texas Legislative
25   Council, also known as the TLC?

Page 165

1    A.     Not that I know of.
2    Q.     Are you aware of the term Red Appel as a
3    redistricting software in Texas?
4    A.     Yes.
5    Q.     Do you know if Red Appel is provided by the
6    Texas Legislative Council?
7           MR. KERCHER:  Object to the form.
8    A.     I don't know.
9    Q.     Are you aware of whether users of Red Appel
10   are able to see compactness scores generated for them
11   by the system?
12          MR. KERCHER:  Same objection.
13   A.     I believe Mr. Korbel suggested that is the
14   case.  I don't know whether it's correct or not.
15   Q.     Do you have any reason to doubt reports or
16   data provided by the Texas Legislative Council on
17   compactness of districts?
18          MR. KERCHER:  Object to the form.
19   A.     I don't know anything about them, so I don't
20   have any reason to believe or disbelieve it.
21   Q.     Would you agree that people who live in the
22   same city can share common interests?
23          MR. KERCHER:  Object to the form.
24   A.     People who live in the same city can share
25   common interests.

Sean P. Trende
September 02, 2022

Page 166

1  Q.        And would you agree with me that people who
2  live in the same county can share common interests?
3         MR. KERCHER:  Same objection.
4  A.        People who live in the same county can share
5  common interests.
6  Q.        It's correct to say that you don't offer any
7  numerical standard by which to evaluate the point at
8  which a majority-minority district's compactness score
9  indicates that it's a racial gerrymander, correct?
10  A.        That's correct.
11  Q.        Other than looking at the dotplot, would it
12  be fair to say that you do not have an objective
13  standard to evaluate whether a minority community is
14  sufficiently compact to meet the Gingles 1 standard?
15         MR. KERCHER:  Object to the form.
16  A.        I think there is no objective standard
17  offered whether you're doing it by district shape or
18  by population.  As I said earlier, this is, as Justice
19  O'Connor put it, an area where appearances matter.
20  Q.        Does compactness depend only on geographic
21  dispersal of a population?  Let me rephrase that.
22         Does compactness of a minority community
23  depend only on geographic dispersal?
24         MR. KERCHER:  Object to the form.
25  A.        No.  So you could have a situation where you

Page 167

1  have a minority community that is a perfect ball in
2  the middle of a district, a perfect center, with no
3  white voters in the middle of it.  It's compact as it
4  could possibly be.  If they were not culturally
5  cohesive, I believe you would still have compactness
6  issues.
7  Q.        And now, let me explore the inverse with
8  you.  Is it also possible that a minority community
9  could not have a compactness issue if they had a lot
10  of cultural cohesion, high cultural cohesion, but were
11  somewhat geographically dispersed?
12         MR. KERCHER:  Object to the form.
13  A.        I wouldn't consider that a compact
14  population, but I don't know what the legal standard
15  is on that is.
16  Q.        So, in your view, compactness for Gingles 1
17  purposes depends both on geographic dispersal and
18  cultural cohesion?
19         MR. KERCHER:  Object to the form.
20  A.        I think, given LULAC, you can have something
21  that a state tries to shoehorn together where groups
22  are dispersed, but they're culturally dissimilar.
23  My understanding of that decision is that that is not
24  enough to satisfy prong one of Gingles.  I don't know
25  Fifth Circuit case law, and I can't think of

Page 168

1  Supreme Court case law that has fleshed out the
2  situation you're describing where you have dispersed
3  minority populations and they are culturally cohesive.
4  I suspect we'll get some insight in that by the end of
5  this Supreme Court term.
6  Q.        So I moved on from that question, and
7  I'm just curious whether, in your view, compactness
8  for Gingles 1 purposes requires that there's a
9  geographic component, a dispersal aspect to this, as
10  well as a cultural cohesiveness aspect.
11         MR. KERCHER:  Same objection.
12  A.        So that's the scenario I was talking about
13  in my last answer.  And, like I said, I don't know.
14  I don't think the Supreme Court has weighed in on that
15  answer, and I don't know Fifth Circuit case law.  But
16  for my just personal opinion, whatever it's worth, if
17  we return to the situation that I outlined earlier in
18  the deposition where you have a square, and the
19  minority population is perfectly dispersed to the
20  corners of the square, I don't think you would satisfy
21  Gingles' population compactness requirements in that
22  scenario.
23  Q.        Is there a relationship in your mind between
24  geographic dispersal and cultural cohesion such that
25  one could balance out the other at least to some

Page 169

1  degree?
2         MR. KERCHER:  Object to the form.
3  A.        That's not something I've considered.
4  Q.        Now, I understood from your earlier
5  testimony that you plotted in your dotplots Citizen
6  Voting Age Population when you were plotting
7  Hispanics; is that correct?
8  A.        That's correct.
9  Q.        Just to be clear, that means that the dots
10  omitted or excluded any Hispanic people who are not
11  U.S. citizens, as well as any Hispanic people under
12  the age of 18, correct?
13  A.        That's correct.
14  Q.        Would you agree with me, then, that if you
15  did plot total population for Hispanics in your
16  dotplots, that it is possible that non-U.S. citizens
17  and children of Hispanic origin could fill in some of
18  the spaces between the dots on your charts?
19         MR. KERCHER:  Object to the form.
20  A.        I don't know.  There may be facts in
21  evidence that exclude that possibility at other points
22  in this case.  I'm not 100 percent sure, but I can
23  imagine, I guess, a scenario.
24  Q.        Do you think that there are places in Texas
25  where children and non-U.S. citizen Hispanics

Sean P. Trende
September 02, 2022

Page 170

1  outnumber the Hispanic Citizen Voting Age Population?
2           MR. KERCHER: Object to the form.
3  A.       I don't know. I can see the scenario where
4  that could be true, but I don't know if it has
5  occurred in practice.
6  Q.       Turn with me, if you would, to Page 102 of
7  your report. If you would look with me at the fourth
8  line of the paragraph titled South Texas. Is it
9  correct to say that you wrote here on this line, "The
10 area moved toward the GOP in 2020"?
11 A.       Yes.
12 Q.       In your paragraph, you mentioned
13 San Antonio, but you also mentioned the border. So
14 when you say south Texas here, do you mean San Antonio
15 and the border region?
16          MR. KERCHER: Object to the form.
17 A.       I'm referring to the districts, and the
18 south Texas districts now reach up to Bexar County.
19 Q.       And in your last answer, when you say
20 "districts," do you mean Congressional Districts?
21 A.       That is correct.
22 Q.       So here, when you say that the area moved
23 toward the GOP in 2020, what election contests do you
24 base that statement on?
25 A.       I'm talking about the Presidential Election.

Page 171

1  Q.       Trump versus Biden; is that correct?
2  A.       That's correct.
3  Q.       Also, on this page, if we look at the very
4  last sentence, is it correct that you wrote, "The
5  districts, as drawn, are consistent with Republicans
6  trying to leverage that emerging strength."
7  A.       Yes.
8  Q.       What do you mean by the term "emerging
9  strength"?
10 A.       That Republicans are performing better in
11 recent elections in south Texas districts than they
12 have previously. I believe in 2012, the 34th District
13 went for Barack Obama by about 20 points. It was a
14 narrowly Joe Biden district in 2020, and then it
15 elected a Republican. So I would consider that
16 emerging strength.
17 Q.       Which districts are you referring to in the
18 sentence that have been drawn to leverage that
19 emerging strength?
20 A.       I would be referring to 15, 28, and then
21 34 would be part of that process; although, 34 is made
22 more Democratic.
23 Q.       Also, didn't you also observe that 28 is
24 made more Democratic?
25 A.       Did I?

Page 172

1  Q.       If you would look with me on Page 107.
2  I just need clarification because it may not be a
3  comment that you're making about the district overall.
4  But I noticed in the paragraph underneath the figures,
5  underneath figure 78, there is a little paragraph
6  there, and the last sentence says, "Changes to the
7  district lines enhance Democratic performance."
8  A.       Where are we? Because 78 is District 34.
9  Q.       No. Page 107.
10 A.       Figure 76.
11 Q.       I'm sorry.
12 A.       That clarifies it. Thank you.
13 Q.       Under figure 76 you have a paragraph -- a
14 little paragraph that says, "Like much of south
15 Texas." And then there is a sentence, if you would
16 read it with me, "Changes to the district's lines
17 enhanced Democratic performance here somewhat. Biden
18 won." Is that a comment about part of the change to
19 the district?
20 A.       No, you're right. Democratic performance
21 here improved by seven-tenths of a percent. I was
22 wrong.
23 Q.       If we go back to Page 102, would it be fair
24 to say then that, when you write that "The districts,
25 as drawn, are consistent with Republicans trying to

Page 173

1  leverage that emerging strength," you were speaking of
2  Congressional District 15?
3  A.       I still don't think that's right. Because
4  as I noted, District 34 is part of that effort, even
5  though it's made more Republican -- Democratic which
6  Republicans may regret now. It is still -- Keeping
7  that district at 53.5 percent Biden keeps it in play
8  for Republicans and it would be part of that strategy.
9  Q.       And so the district you're talking about
10 keeping in play is 28?
11 A.       That would be kept in play by keeping
12 Biden's vote share within a point or two of his
13 national performance.
14 Q.       I understand.
15          So to summarize, 15 is made more Republican
16 as part of the effort to leverage the emerging
17 strength, and 28 is kept in play by maintaining its
18 Biden numbers, and 34 is made more Democratic?
19          MR. KERCHER: Objection to the form.
20 BY MS. PERALES:
21 Q.       Is that correct?
22          MR. KERCHER: Same objection.
23 A.       That is my recollection.
24 Q.       With respect to Congressional District 15,
25 what did Texas redistricters do specifically to make

Sean P. Trende
September 02, 2022

Page 174

1   it more Republican?
2   A.        Well, that is laid out in the full paragraph
3   on Page 104.  It takes in 186,725 residents from the
4   28th; 53,071 residents from the 34th that are around
5   55 percent Trump.  Well, there you go.  Voted
6   55 percent for Trump overall.  It gave 89,000
7   residents to the 28th, and 192,000 to the 34th.
8           The ones going to the 28th were Republican
9   as well.  But the residents going to the 34th were
10  heavily Democratic, making the district on balance
11  more Republican.
12  Q.        You include a figure here of 73 that shows
13  changes to 15 in the southern end of the district; is
14  that right?
15  A.        That's correct.
16  Q.        We don't have a corresponding figure for
17  changes made to the northern end of the district; is
18  that right?
19  A.        I think I did it that way because you can
20  see the changes to the northern end of the district in
21  figure 79.
22  Q.        Figure 79 is District 34?
23  A.        Yeah.  And I think that's where the 15th, at
24  least, takes most of its new residents from in the
25  northern end of the district.  Also 77.

Page 175

1   Q.        Okay.  77 and 79 together give us a picture.
2           Turn, if you would, to Page 195 of your
3   report.  Do you see where you say there, "In the 2021
4   Special Election, Republicans picked up District 118"?
5   That's in the middle paragraph, last sentence.
6   A.        I do see that.
7   Q.        District 118 is a Latino-majority district
8   in Bexar County, correct?
9   A.        I don't know.
10  Q.        Do you view the election of the Republican
11  candidate John Lujan in the 2021 Special Election in
12  House District 118 to be evidence of Latino voters
13  shifting to vote Republican?
14          MR. KERCHER:  Object to the form.
15  A.        I don't think I put anything in there one
16  way or the other.
17  Q.        Does that mean that you have no opinion
18  regarding whether the 2021 Special Election in 118
19  evidences Latino voters shifting to vote Republican?
20  A.        Yes.
21  Q.        Let's go to Page 206 of your report.  Do you
22  see the section heading here in your report, Section
23  8, Recent Polling Data?
24  A.        Yes.
25  Q.        And in your report, you discuss, "A sharp

Page 176

1   shift of Hispanic voters toward the Republican
2   Party."  Do you see that in the third line of the
3   second paragraph?
4   A.        Yes.
5   Q.        So I'm curious about this section of your
6   report.  Were you asked to write this section of your
7   report after you were asked to write the other
8   sections of your report looking at the alternative
9   maps?
10          MR. KERCHER:  Objection.  That's an
11  attorney-client communication.  It's a Rule 26
12  communication.  It's privileged.  I'll instruct the
13  witness not to answer.
14  BY MS. PERALES:
15  Q.        When did you write this Section 8?
16          MR. KERCHER:  Object to the form.
17          You can answer.
18  A.        In the course of writing my report.
19  Q.        Towards the end or toward the beginning?
20  A.        It's Section 8, so it would have been
21  written towards the end.
22  Q.        Well, only if you wrote the report from what
23  we see now as the beginning to the end.  But I'm more
24  curious about the time when you wrote Section 8.  Did
25  you write Section 8 at a time later than the preceding

Page 177

1   sections of your report?
2           MR. KERCHER:  Object to the form.
3   A.        This report was written in order, so that's
4   why I said it's written at the end.  It would be
5   toward the end of the process.
6   Q.        Okay.  So this section which begins on
7   Page 206, and ends on Page 208, you wrote last in
8   terms of the sections of your report; is that right?
9   A.        Yes.
10  Q.        What's the connection between this
11  discussion of Hispanics shifting to the Republican
12  Party and the other observations in your report about
13  how the redistricting plans were drawn?
14          MR. KERCHER:  Object to the form.
15  A.        I don't know.
16  Q.        Is this last section here, Section 8, a
17  continuation of your observations that south Texas
18  Congressional Districts were drawn to leverage the
19  emerging strength of the Hispanic Republican vote?
20          MR. KERCHER:  Object to the form.
21          You can answer.
22  A.        I think it's relevant to it, but I don't
23  know that it's a direct outgrowth of it.
24  Q.        Now, sticking with Page 206 specifically,
25  okay.  Second paragraph, second sentence that begins

Sean P. Trende
September 02, 2022

Page 178

1  with the word, "Specifically," do you see that there?
2  A.        Uh-huh.
3  Q.        So, first of all, before we read it
4  together, after the word "specifically," comma --
5  I'm having a hard time even talking through this --
6  we have the word "one," and then we have the word
7  "one" again.  Should we only have one "one" there?
8  A.        Yes.
9  Q.        And then, as we move along, there's a
10 reference to the 2022 election, and I'm wondering if
11 that was supposed to be the 2020 election.
12 A.        Yes.
13 Q.        Okay.  So then what this sentence means to
14 say, on Page 206, is that, "Specifically, one of the
15 most remarked-upon aspects of the 2020 Election was
16 the sharp shift of Hispanic voters toward the
17 Republican Party."  Would that be right?
18 A.        Yes.
19 Q.        Then you go on to say that, "This occurred
20 nationally.  Although, as described above, it was
21 particularly prominent in the Rio Grande Valley."  Did
22 you write that?
23           MR. KERCHER:  Object to the form.  You
24 skipped a portion of the sentence.
25 BY MS. PERALES:

Page 179

1  Q.        But did you write the words "particularly
2  prominent in the Rio Grande Valley"?
3           MR. KERCHER:  Same objection.
4  A.        Yes.
5  Q.        So then would it be correct to say that this
6  specific discussion of Hispanics voting more for the
7  Republican Party supports your overall opinion that
8  the Texas redistricting plans were drawn to advance
9  Republican interests?
10           MR. KERCHER:  Object to the form.
11 A.        I think you can use it that way, yes.
12 Probably.
13 Q.        Do you know whether Texas redistricters were
14 aware that the south Texas Congressional Districts
15 were Latino majority?
16           MR. KERCHER:  Object to the form.
17 A.        I would speculate that's the case.
18 Q.        Did you have any communications with Texas
19 redistricters and by -- Specifically, I mean
20 legislators or their staff, from, let's say,
21 January 1, 2021, to the present?
22           MR. KERCHER:  Object to the form.
23 A.        Not to my knowledge.
24 Q.        Do you know Adam Fultz?
25 A.        I don't believe so.

Page 180

1  Q.        Do you know who Adam Fultz is?
2  A.        No.
3  Q.        Did you know who drew the 2011 Wisconsin
4  legislative map?
5           MR. KERCHER:  Object to form.
6  A.        The 2011?
7  Q.        Yeah.
8  A.        I thought that was the guy that --
9  Keith Gatte.
10 Q.        How about to the previous round?  Do you
11 know who drew the Wisconsin map?
12           MR. KERCHER:  Same objection.
13 A.        No.
14 Q.        Do you know who was in competition with you
15 for the Virginia Special Master Job?
16           MR. KERCHER:  Object to the form.
17 A.        I don't think -- I don't know if it was a
18 competition, but I'm not sure who was the winner.  But
19 the -- I know in the -- I don't know who the first
20 slate of candidates that were named by the party, the
21 court projected were.  I think, for myself -- For the
22 second round, it was myself, Doug Johnson, and maybe
23 Justin Levitt, but not the one who is a law professor.
24 Q.        Do you know Adam Kincaid?
25 A.        Yes.

Page 181

1  Q.        Have you ever spoken to Adam Kincaid about
2  the Texas redistricting map since, say, January 1 of
3  2021?
4  A.        I don't believe so.
5  Q.        Have you ever heard of Chris Gobert?
6  A.        No.
7  Q.        Do you know what information the
8  redistricters in Texas who drew the state-wide plans
9  had about Hispanics voting either Republican or
10 Democrat when they redrew the plans?
11           MR. KERCHER:  Object to the form.
12 A.        I don't know.
13 Q.        Did you see any documents related to
14 redistricting that were also seen by the redistricters
15 who drew the Texas state-wide plans, to the best of
16 your knowledge?
17           MR. KERCHER:  Object to the form.  Calls for
18 speculation.
19 A.        I don't know.
20 Q.        Let's talk about the statement about the
21 sharp shift of Hispanic voters toward the Republican
22 Party.  What is the evidence that you used to make
23 this statement?
24 A.        Well, the statement is that it's one of the
25 most remarked upon aspects of the 2020 Election, and

Sean P. Trende
September 02, 2022

Page 182

1  so that is certainly my experience from discussions
2  with people who analyze elections.  I have the example
3  of this New York Times article written on it, but
4  I think an awful lot of people were surprised to see
5  Starr, S-T-A-R-R, and Zapata, Z-A-P-A-T-A -- but
6  I'm sure I'm butchering the proper pronunciation of
7  that -- Counties doing what they did.
8  Q.       Okay.  So what I've heard you say is
9  speaking to political observers, The New York Times
10 article and the results for Trump in Starr and Zapata
11 Counties; is that right?
12 A.       Yes.
13 Q.       Now, does The New York Times article address
14 voting by Hispanics in the Rio Grande Valley?
15 A.       I don't know.
16 Q.       You also in your report cite a paper
17 authored, and I'm going to completely butcher this
18 name, Kuriwaki, and then Dr. Ansolabehere and others;
19 is that right?  You have a cite to that article on
20 Page 206; is that right?
21 A.       Yes.
22 Q.       Now, with respect to that article, the
23 authors of the paper did not run Ecological Inference
24 on votes cast by a Spanish surname, correct?
25 A.       That's correct.

Page 183

1  Q.       And for their data, the authors used the
2  2016 and 2020 CCES, which is the Cooperative
3  Congressional Election Study, correct?
4  A.       Correct.
5  Q.       And the CCES is a survey in which
6  individuals self-report their race and their candidate
7  choice; is that correct?
8  A.       Correct.
9  Q.       And the paper that you cite only focuses on
10 the Presidential race of 2016 and then 2020, correct?
11 A.       Correct.
12 Q.       And because it's a survey, there are only
13 about 125 respondents per Congressional District,
14 correct?
15 A.       Correct.
16 Q.       Do you recall that paper saying that there
17 were only 13 voting respondents who are nonwhite on
18 average for each Congressional District?
19 A.       I do not.
20 Q.       And that paper concluded that there was an
21 increase among Hispanics in Texas from 2016 to 2020 in
22 the vote for Trump, correct?
23 A.       I believe that's correct.  Yes.
24 Q.       Now, going over onto Page 207, you list some
25 districts where the paper that you cite says, "Latinos

Page 184

1  and Anglos prefer the same Presidential candidate in
2  2016"; is that right?
3  A.       There are districts where the point
4  estimates are the same for whites.  And Hispanics are
5  almost the same.
6  Q.       So I'd like to talk to you about some
7  districts that are not on this list.  Would you agree
8  with me that Congressional District 15 is not on the
9  list?
10 A.       That's correct.
11 Q.       And Congressional District 15 is in south
12 Texas, correct?
13 A.       Correct.
14 Q.       Congressional District 23 is not on the
15 list, correct?
16 A.       Correct.
17 Q.       And Congressional District 23 spans along
18 the U.S./Mexico border from El Paso to San Antonio,
19 correct?
20 A.       Yes.
21 Q.       Congressional District 28 is not on the
22 list, correct?
23 A.       Correct.
24 Q.       Congressional District 28 is also in south
25 Texas and touches the border, correct?

Page 185

1  A.       Correct.
2  Q.       Congressional District 34 is not on this
3  list, correct?
4  A.       That's right.
5  Q.       Congressional District 34 is in south Texas
6  and also touches the border, correct?
7  A.       Yes.
8  Q.       So excluding Congressional District 16,
9  which is in El Paso, the remaining Texas
10 border-touching districts are not on your list,
11 correct?
12 A.       Correct.
13 Q.       I'd like to talk about the election that you
14 mentioned on Page 206.  But before that, I just want
15 to talk about the very short reference that you had
16 about House District 118 electing a Republican in
17 Bexar County in a special election.  We had talked
18 about that a moment ago.
19          You had talked -- Do you want me to refer
20 you back to that page before I go --
21 A.       No.  If we're talking about the previous
22 section, I thought you were talking about it here, and
23 I was scratching my head.
24 Q.       No.  I just want -- the order in my outline
25 is just to start with District 118 in Bexar County,

Sean P. Trende
September 02, 2022

Page 186

1  the house district, which you mentioned on Page 195 of
2  your report as having elected a Republican in the
3  Special Election.  Would it be fair to say that you
4  didn't do any analysis of the 2021 Special Election in
5  House District 118?
6      A.      Yeah.  That's correct.  And the purpose of
7  that discussion back on 195, or whatever the page was,
8  the purpose of the suggestion was simply to assign a
9  representative -- the party of the representative of
10 the districts, which is different than what appears in
11 the charts since it flipped.  It's a clarification.
12     Q.      I see.  But it is part -- Your discussion on
13 Page 195 is part of a discussion about strengthening
14 the Republican vote in House District 118 from the way
15 you've reported it as a Trump share of 43.07 to a
16 Trump share of 48.61, right?
17     A.      Correct.  And I guess it is consistent in
18 this.  I'm clarifying.  The column is titled Winner,
19 2020 Election, and that's not precise.  It would have
20 been a Democrat, so I clarified it actually flipped in
21 a special election shortly after the general.
22     Q.      But you didn't do any analysis to see who
23 was the Latino-preferred candidate in the 2021 Special
24 Election, correct?
25          MR. KERCHER:  Object to the form.

Page 187

1      A.      That's right.
2      Q.      Okay.  So then, let's go to Page 206.  You
3  talk about Congressional District 15 on Page 206, and
4  you mention there that, in your words, Congressional
5  District 15 almost elected a Latino Republican in
6  2020.  Do you see that?
7      A.      On Page 206?
8      Q.      I'm looking for it.
9      A.      Oh, I see it.  Yes.  Right at the bottom of
10 the second full paragraph.  I've got it.
11     Q.      Yes.  Okay.  So with respect to that race,
12 the 2020 Congressional District 15 General Election,
13 what analysis did you perform of this election
14 contest?
15     A.      I said that it almost elected a Latino
16 Republican in 2020, and then a different district did
17 so in 2022.
18     Q.      Did you determine what percent of the voters
19 who cast ballots in this election were Latino?
20     A.      No.
21     Q.      Did you determine what percent of the voters
22 who cast ballots in this election were Anglo?
23     A.      No.
24     Q.      Did you determine who was the preferred
25 candidate of Latino voters in this election?

Page 188

1      A.      No.
2      Q.      Did you do any analysis of whether voting
3  was racially polarized between Latinos and Anglos in
4  this election?
5      A.      No.
6      Q.      Do you know whether the Latino Republican
7  was the preferred candidate of the Latino voters in
8  this race?
9          MR. KERCHER:  Object to the form.
10          You may answer.
11     A.      No.
12     Q.      Now, also on Page 206, you talk about the
13 2022 Special Election in CD 34.
14     A.      Right.
15     Q.      You mentioned CD 34 did elect a Republican
16 in the 2022 Special Election, yes?
17     A.      Correct.
18     Q.      What analysis did you perform of this
19 election contest?
20     A.      Mayra Flores, who is a Latino Republican,
21 won it in the 2022 Special Election.
22     Q.      Did you determine what percent of the voters
23 who cast ballots in this election were Latino?
24     A.      I did not.
25     Q.      Do you determine what percent of the voters

Page 189

1  who cast ballots in this election were Anglo?
2      A.      I did not.
3      Q.      Were you aware that the turnout for this
4  election in this district was 7 percent?
5          MR. KERCHER:  Object to the form.  Assumes
6  facts not in evidence.
7          You may answer.
8      A.      I don't know what overall turnout was.
9      Q.      Did you determine who was the preferred
10 candidate of Latino voters in this election?
11          MR. KERCHER:  Object to the form.
12     A.      No.  It may be that these two districts were
13 no longer performing by the end of the decade.
14 I don't know if the minority candidate of choice
15 reliably won anymore.
16     Q.      Did you do any analysis to see if voting was
17 racially polarized in this election?
18     A.      No.  Like I said, if someone did and showed
19 that the Democrat was the Latino candidate of choice,
20 I guess I would conclude these districts don't
21 reliably perform anymore.  But I didn't do that
22 analysis.
23     Q.      And then, finally, just to ask the last
24 question, do you know if Mayra Flores was the
25 Latino-preferred candidate?

Sean P. Trende
September 02, 2022

Page 190

1        MR. KERCHER:  Object to the form.
2   A.        I don't know.
3   Q.        Okay.  Also in your report you mention that
4   Donald Trump won Zapata County in the 2020 General
5   Election.  Do you remember that?
6   A.        I do.
7   Q.        Did you examine whether the Republican in
8   the next race down on the ballot, which was U.S.
9   Senate, whether he won in Zapata County?
10  A.        No.  I think Grumbach, G-R-U-M-B-A-C-H, did
11  that and said that Cornyn got 40-some odd percent of
12  the vote, which would still be an historically high
13  vote share for a Republican in that county.  But I
14  didn't look at it at the time.
15  Q.        Did you look at any other results of the
16  2020 General Election in Zapata County, such as for
17  county-level races, like county judge, to see if a
18  Republican had won?
19  A.        I did not.
20  Q.        You also mentioned that Donald Trump almost
21  won in Starr County, correct?
22  A.        Correct.
23  Q.        Did you look to see how the Republican in
24  the next race down on the ballot did?
25  A.        I did not.

Page 191

1   Q.        Did you look at any local races, such as for
2   county judge, to see if the Republican candidate won?
3   A.        I did not.
4   Q.        Would it be correct to say, going back to
5   Zapata County, that if Donald Trump won the county,
6   but John Cornyn didn't, that at least some of those
7   voters were ticket splitting?
8        MR. KERCHER:  Object to the form.
9   A.        You'd have to look at the total number of
10  votes cast to say that because there could just be
11  people who left the race blank.  I don't know.
12  Q.        That's an excellent point.  Let me ask my
13  question again.
14        If Donald Trump won Zapata County, but
15  John Cornyn didn't, this would have to be the result
16  of either ticket splitting or ballot roll-off or some
17  combination?
18        MR. KERCHER:  Same objection.  Incomplete
19  hypothetical.  Foundation.
20        You can answer, if you know.
21  A.        As I sit here, those are the possibilities I
22  could come up with.  There may be more.
23  Q.        And that would -- the same would be true
24  also for Starr County, right?  If John Cornyn
25  underperforms Donald Trump, it's either ticket

Page 192

1   splitting, ballot roll-off or some combination, right?
2        MR. KERCHER:  Same objection.
3        You may answer, if you know.
4   A.        Yes, it's the same answer.  Those are the
5   explanations I could come up with as I sit here.
6   Q.        So it's correct to say, isn't it, that you
7   don't have any statistical evidence of Latino voters
8   shifting their partisan preferences to Republican
9   candidates in elections in south Texas?
10        MR. KERCHER:  Object to the form.
11  A.        I don't think that's true because I think
12  Starr and Zapata Counties are still -- are almost
13  unanimously Hispanic, so it's almost like a homogenous
14  precinct analysis there.
15  Q.        What percent of the voters who cast ballots
16  in the 2020 General in Zapata County were Hispanic?
17        MR. KERCHER:  Object to the form.
18  A.        I don't know.  But I believe the population
19  is something on the order of 96 percent in either that
20  or Starr.  I don't know for sure.
21  Q.        Based on what you saw in Starr and Zapata
22  Counties, is it possible that there was a Trump effect
23  that did not mean that Latino voters preferred other
24  Republican candidates aside from Mr. Trump?
25        MR. KERCHER:  Object to the form.

Page 193

1   A.        That was the careful analysis I think
2   immediately afterwards; that there had been a shift,
3   but perhaps it was Trump-driven.  I think the Special
4   Election in District 34 makes that less likely, given
5   how that district had historically voted.  But I guess
6   it's possible.  We'll know more after this election, I
7   suspect.
8        MR. KERCHER:  Ms. Perales, we've been going
9   for an hour and 15 minutes.  I wanted to check and see
10  whether anyone needed a break.
11        MS. PERALES:  I'm fine for a break at any
12  time that the witness wants to take a break.  It's
13  his --
14        MR. KERCHER:  Mr. Trende, keep going?
15        THE WITNESS:  Do you have a sense of how
16  much longer you're going to go?
17        MS. PERALES:  About 20 more minutes.
18        THE WITNESS:  I can make it 20.
19        MS. PERALES:  Thank you.
20  BY MS. PERALES:
21  Q.        Would it be fair to say that you don't have
22  any either regression or Ecological Inference Analysis
23  that shows that Latinos have shifted their partisan
24  preference either towards or away from Republican
25  candidates in south Texas?

Sean P. Trende
September 02, 2022

Page 194

1        MR. KERCHER:  Object to the form.
2   A.        That is true.  I did not do an Ecological
3   Inference Analysis or an Ecological Regression
4   Analysis.
5   Q.        Would you agree that a candidate, Democrat
6   or Republican, who wants to receive votes from Latino
7   voters has to appeal to issues of importance to
8   Latinos?
9        MR. KERCHER:  Object to the form.
10  A.        So this opens the whole what drives voters
11  discussion.  I think the issue-specific approach can
12  be helpful, but many voters are driven by valence
13  issues; general census of how parties and candidates
14  stand, much more than the intricacies of, you know,
15  what particular Medicaid reform plan you favor.
16  Q.        But Roe versus Wade might be a more
17  prominent issue that could potentially drive voters,
18  for example?
19       MR. KERCHER:  Object to the form.
20  A.        That's correct.
21  Q.        Have you done any analysis of the degree to
22  which Latino voters were voting Republican before the
23  last few years in south Texas?
24       MR. KERCHER:  Object to the form.
25  A.        I think I mentioned that 34th District,

Page 195

1   I believe, was Obama by 20, but I don't know the
2   numbers off the top of my head.  I think I've said
3   that the south Texas districts, if we were talking
4   about 2012, they were a lot more heavily Democratic or
5   more certainly Democratic than they are today.
6   Q.        But did you do any analysis of the Latino
7   voters themselves as opposed to the outcomes in
8   particular districts?  Have you done any analysis of
9   Latino voting patterns and the degree to which Latinos
10  were voting Republican before, say, the past five
11  years?
12       MR. KERCHER:  Object to the form.
13  A.        So going back to before 2017?
14  Q.        Yes.
15  A.        So, for example, the articles that
16  I'm citing talk about how Donald -- how Mr. Trump's
17  margin on the precincts shifted from 2016 to 2020.
18  That would be an analysis of that and the changes in
19  the exit polls during that time period.
20  Q.        And prior to that -- Let's take Mr. Trump
21  out of the picture.  Prior to that, have you done any
22  analysis of the degree to which Latinos vote
23  Republican prior to Mr. Trump's appearance on the
24  scene?
25       MR. KERCHER:  Same objection.

Page 196

1        You can answer.
2   A.        I know that Mr. Romney had had a -- I guess
3   now Senator Romney had an atrocious performance among
4   Hispanics.
5        George W. Bush, there is some dispute about
6   exactly how he did in 2004.  I don't think much of a
7   dispute in Texas.  But I think he has the best
8   performance in modern times for a Presidential
9   candidate.
10       I think I mentioned that I believe Cornyn,
11  at least according to exit polls, carried Hispanic
12  voters in Texas in 2014, or at least came very close.
13  Q.        It's correct to say, isn't it, that, in
14  order to draw districts to leverage Latino voter
15  strength, Texas legislators have to know which
16  candidates are preferred by Latino voters; don't you
17  agree?
18       MR. KERCHER:  Object to the form.  Calls for
19  speculation.
20  A.        To do it effectively, I think you have to
21  know.  But to try, I don't know.
22  Q.        Okay.  And then the inverse.  If the
23  legislators don't know which candidates are preferred
24  by Latino voters, legislators can't say that they are
25  increasing Latino opportunity to elect with any

Page 197

1   certainty, wouldn't you agree?
2        MR. KERCHER:  Same objection.  Calls for
3   speculation.
4   A.        It certainly is more difficult than if you
5   did know.
6   Q.        Would you agree with me that when voting is
7   polarized between Anglos and Latinos, that drawing
8   districts to achieve the election of the
9   Anglo-preferred candidate could result in reducing
10  Latino vote strength?
11       MR. KERCHER:  Objection.  Objection to the
12  form.
13  A.        I can see a scenario where that would be
14  true.  I don't think it's necessarily true.
15  Q.        But if Latinos and Anglos are pretty much
16  the only population groups in the district, it's like
17  a seesaw, isn't it?  If voting is racially polarized
18  and you're drawing the district to increase the
19  chances of the election of the Anglo-preferred
20  candidate, you're necessarily decreasing the chances
21  of the election of the Latino-preferred candidate,
22  aren't you?
23       MR. KERCHER:  Objection to the form.
24  A.        No.
25  Q.        Why not?

Sean P. Trende
September 02, 2022

Page 198

1  A.        Because, as I understand polarization, it is
2  the average preference of the voters in the district
3  and the polarization metric, at least under current
4  Supreme Court guidance, is whether you are on opposite
5  sides of 50 percent.  So a 51/49 district would be
6  polarized.
7        So if you had a district where there is one
8  group of Hispanic voters that voted heavily
9  Republican, a small group, say 30 percent, and
10  70 percent of Hispanic voters voted heavily
11  Democratic, and you had a similar situation with
12  non-Hispanic whites and moved them around, I can
13  envision a situation where you're not necessarily
14  changing things in the way that you would predict.
15  Q.        So in that scenario, if you're moving things
16  around in order to increase the likelihood that Anglos
17  will elect their candidate of choice, aren't you
18  necessarily decreasing the likelihood that Latinos
19  will elect their candidate of choice when voting is
20  racially polarized?
21        MR. KERCHER:  Object to the form.
22  A.        See, I don't know if that's the case.
23  Thinking of my situation -- of my scenario where you
24  have very narrow polarization rates and you have, you
25  know, distinct groups that are 70/30 on each side.

Page 199

1  It's something I would have to noodle on, but it's not
2  something I can agree to off the top of my head.
3  Q.        Have you ever analyzed racially polarized
4  voting as part of your work?
5  A.        Yes.
6  Q.        What methodology did you use?
7  A.        We used Ecological Regression and Ecological
8  Reference.
9  Q.        Did you do that in Virginia?
10  A.        No.
11  Q.        Tell me when you did do it.
12  A.        In Arizona.
13  Q.        Was that in 2021/2022?
14  A.        Yes.
15  Q.        Okay.  And did you analyze racially
16  polarized voting as part of an attempt to comply with
17  the Voting Rights Act?
18        MR. SWEETEN:  I want to make sure this isn't
19  a purely consulting expert situation, or is this
20  something that you were a testifying expert?  Do we
21  need to discuss this?
22        THE WITNESS:  I was just going to respond
23  that Dr. Ansolabehere and I were -- And this
24  disclosed -- were consulting experts.  But I think our
25  names -- our names were disclosed, so I don't mind,

Page 200

1  you know, that much.
2        But we were consulting experts for counsel
3  to the Arizona Independent Redistricting Commission,
4  and I'm just not sure, without them being present --
5  I don't have a problem answering the question.
6  I'm just not sure, without them being present, how far
7  I can go and what's been waived and what hasn't.
8        MS. PERALES:  Can we go off the record?
9        (Discussion off the record.)
10        MS. PERALES:  We're back on the record.
11  BY MS. PERALES:
12  Q.        When you worked in Virginia on the House of
13  Delegates, the State Senate, and the U.S. Congress,
14  did your work involve attempts to achieve compliance
15  with the Voting Rights Act?
16  A.        Yes.  Well, yes.
17  Q.        Would you agree that if you're trying to
18  comply with the Voting Rights Act, it's important to
19  know where minority population is in the area that
20  you're redistricting?
21        MR. KERCHER:  Object to the form.
22  A.        It can certainly be helpful.  I think you
23  can inadvertently comply with the Voting Rights Act.
24  But it can be helpful.
25  Q.        Okay.  Would it be correct to say, if you

Page 201

1  draw a map blind to race, you cannot see where, for
2  example, Latinos are sufficiently numerous and compact
3  to comprise the majority of a new district?
4        MR. KERCHER:  Object to the form.  That's an
5  incomplete hypothetical.  Lack of foundation.
6        Mr. Trende, if you understand the question,
7  and you can answer it, then you may.
8  A.        So I wasn't asked to do anything like that
9  in this case.  But as a hypothetical exercise, I can
10  imagine a situation where you're drawing blind --
11  Let's say you have a -- You're doing Mississippi and
12  you're drawing blind to race, and you draw a district
13  that is anchored along the Mississippi Delta.  You're
14  going to draw an African-American-ability-to-elect
15  district there most likely without doing anything
16  crazy.
17        Or if you draw a district in Brooklyn,
18  you'll draw an African-American-ability-to-elect
19  district there most likely.
20        So I think it is possible to do it without
21  race, but I guess you do it at your own peril.
22  Q.        So that's not exactly my question; whether
23  you can inadvertently draw a minority opportunity
24  district.  My question is whether you agree that, if
25  you draw a map blind to race, you cannot see where

Sean P. Trende
September 02, 2022

Page 202

1  Latinos are sufficiently numerous and compact to
2  comprise the majority of a new district?
3          MR. KERCHER:  Same objection.  Incomplete
4  hypothetical.  Lacks foundation.  It's asked and
5  answered at this point.
6  A.          If you cannot see race, you cannot see race.
7  But that doesn't preclude the possibility that you
8  would fulfill the Voting Rights Act, nevertheless.
9  Q.          But if you cannot see race, you cannot see
10  where the Latino population is present in a new area
11  such that you might have to consider drawing a new
12  Voting Rights Act district.  Would you agree with me?
13         MR. KERCHER:  Same objection.  I would add
14  that it's vague.
15  A.          So it's pretty much the same answer.  It's
16  not something that I was asked to look into in this
17  case.  But as a matter of on-the-spot speculation, if
18  you can't see race, you can't see race; and so you
19  wouldn't be able to see where Hispanic voters live
20  directly.
21         I guess that would -- If you cannot see
22  where Hispanics live, that would include the
23  subsection of that, of -- I can't remember exactly how
24  you worded it.
25  Q.          Okay.  Which parts of Texas would you

Page 203

1  describe yourself as familiar with?
2          MR. KERCHER:  Object to the form.
3  A.          It would depend on the level of familiarity,
4  but most familiar with the Dallas/San Antonio areas.
5  Q.          Have you ever lived in Texas?
6  A.          Yes.
7  Q.          For how long and where?
8  A.          I lived there in San Antonio for three
9  years, and I lived in Dallas for portions of two
10  summers.
11  Q.          How much time have you spent in the
12  Rio Grande Valley?
13  A.          I know we went there when I lived in
14  San Antonio, but not a whole lot.
15  Q.          So just for visits casually?
16  A.          Yes.
17  Q.          Okay.  How much time have you spent in
18  El Paso?
19  A.          I went there for a court hearing.
20  Q.          Less than a day, we'll say?
21  A.          I think that's right.
22  Q.          Just as an aside, that might be increased.
23  Okay.
24         I just have a followup on an exchange that
25  you had with Ms. Anderson about Congressional

Page 204

1  District 23.  I believe in your report you describe
2  Congressional District 23 as being drawn with partisan
3  interests in mind; is that correct?
4  A.          I think that's right.
5  Q.          You mentioned that you hadn't read Abbott
6  versus Perez; is that also right?
7  A.          That's correct.
8  Q.          But are you familiar with the fact that the
9  district court -- And this was not a decision that was
10  ever appealed -- found that there was intentional
11  racial discrimination in the construct of
12  Congressional District 23?
13         MR. KERCHER:  Object to the form.
14  A.          No.  I've never read the Abbott decision --
15  Q.          Have you ever --
16  A.          -- or Perez.
17  Q.          I'm sorry.  I stepped on your answer.
18  A.          That's okay.  I said Abbott and then
19  realized the short form isn't the official name, so I
20  said Perez.
21  Q.          Have you ever heard of "the nudge factor" as
22  a term associated with redistricting?
23         MR. KERCHER:  Object to form.
24  A.          No.
25  Q.          Have you ever heard of the concept in

Page 205

1  redistricting of pushing up the Latino population, but
2  also keeping an eye on the results of the election so
3  that the turnout of Latino voters is too low to elect
4  a preferred candidate?
5          MR. KERCHER:  Object to the form.
6  A.          I have not.
7  Q.          In your tweet, when you were talking about
8  making CD 23 majority Trump, while keeping it at
9  66 percent Hispanic, and making Texas 28 heavily
10  Trump, while keeping it 66 percent Hispanic, were you
11  referring to Hispanic Citizen Voting Age Population or
12  some other number?
13  A.          I don't think redistricting has the CVAP, so
14  it would be VAP.
15  Q.          Have you heard -- Aside from whether or not
16  you read Abbott versus Perez, have you heard anybody
17  say that Texas was found liable for intentional
18  discrimination in CD 23 for keeping certain population
19  numbers in the Latino community above 50 percent, but
20  ensuring or striving to ensure certain political
21  performance for Anglo-preferred candidates?
22         MR. KERCHER:  Objection.  Assumes facts not
23  in evidence.  Lacks foundation.
24  A.          I may well have heard it.  But that is the
25  one -- That is honestly the one case out there that's

Sean P. Trende
September 02, 2022

Page 206

1  kind of like Jarndyce and Jarndyce; it goes on for the
2  entire decade.  I'm just not that familiar with it.
3  Q.     Let's talk about the case before it on
4  CD 23.  You mentioned that you thought that case was
5  largely about Congressional District 25 not being an
6  offset to 23.  Do you recall that testimony?
7  A.     Yes.  That's my understanding of LULAC.
8  Q.     Do you remember the court ruling in LULAC
9  that, in response to the growing participation that
10 threatened the CD 23 Henry Bonilla incumbency, the
11 State divided the cohesive Latino community in Webb
12 County, moving about 100,000 Latinos to District 28,
13 which was already a Latino opportunity district, and
14 leaving the rest in a district where they now have
15 little hope of electing their candidate of choice?
16         MR. KERCHER:  Same objections.
17 A.     Yes.
18 Q.     Do you recall the Supreme Court in LULAC
19 v Perry concluding that the changes to CD 23 bear the
20 mark of intentional discrimination that could give
21 rise to an equal protection violation?
22         MR. KERCHER:  Same objection.
23 A.     I don't.
24 Q.     But would it be fair to say, then, that in
25 your report's discussion of CD 23, you did not take

Page 207

1  into account the possibility that Texas may be going
2  for a three-peat here in CD 23?
3          MR. KERCHER:  Object to the form.
4  A.     Because I am doing my analysis here on
5  whether it is consistent with a political outcome,
6  then, no, I wasn't looking at whether it was a similar
7  tact to what you're representing the Court held in
8  LULAC, or what I take you to be representing as the
9  Court's holding in LULAC.
10         MS. PERALES:  Thank you.  I'll pass the
11 witness.
12         MR. BRACHMAN:  Go off the record.  Take a
13 10-minute break.
14         (Recess taken.)
15              - - -
16             EXAMINATION
17 BY MR. BRACHMAN:
18 Q.     Mr. Trende, welcome back.  My name is
19 Paul Brachman.  I'm a lawyer with the Fair Maps Texas
20 Action Committee.  And like Ms. Perales, I will try
21 not to go over things we've already covered or ask you
22 questions you've already answered.  I'll do my best to
23 be efficient.
24         I believe you testified earlier that you
25 were first approached about your retention in this

Page 208

1  case in May or June, and formally retained in June of
2  this year; is that correct?
3  A.     I believe that's right.
4  Q.     Prior to your retention as an expert in this
5  case, did you discuss the Texas 2021 redistricting
6  process with any past or present members of the Texas
7  Legislature?
8          MR. KERCHER:  Object to the form.
9          You can answer.
10 A.     Not to my knowledge.
11 Q.     Prior to your retention, did you discuss the
12 2021 redistricting process with any past or present
13 members of the Texas Governor's Office?
14         MR. KERCHER:  Object to the form.
15 A.     Not to my knowledge.
16 Q.     Prior to your retention as an expert in this
17 case, did you discuss the Texas 2021 redistricting
18 process with any past or present members of the Texas
19 Office of the Attorney General?
20         MR. KERCHER:  Object to the form.
21 A.     Prior to my retention I would have had
22 preliminary conversations with the attorneys.  But
23 beyond that, no, not to my knowledge.
24 Q.     Okay.  No discussions unrelated to your
25 retention?

Page 209

1  A.     Yes, not to my knowledge.
2  Q.     Okay.  Prior to your retention as an expert
3  in this case, did you discuss the Texas 2021
4  redistricting process with anyone from the law firm of
5  Butler Snow?
6          MR. KERCHER:  Object to the form.
7          You can answer.
8  A.     I have never heard of that law firm, so not
9  to my knowledge.
10 Q.     Okay.  I just want to ask a couple of
11 questions similar to some others you've been asked,
12 but related to my client about the scope of your
13 retention.
14         If you could turn to Exhibit 1, Page 6,
15 please.  I'm focused on the paragraph at the bottom of
16 the page under Scope of Engagement.  I just want to
17 ask you about the second-to-last sentence where you
18 say, "In the course of this, I respond to points made
19 in the expert reports of Dr. Jay Morgan Kousser,
20 Dr. Moon Duchin, Dr. Christina Morales, and
21 Mr. George Korbel."  Do you see that?
22 A.     Yes.
23 Q.     Okay.  You do not say in your expert report
24 that you respond to any points made by
25 Dr. Callingwood; is that correct?

Sean P. Trende
September 02, 2022

Page 210

1  A.      That's correct.
2  Q.      You do not say anywhere in your expert
3  report in this case that you respond to points made by
4  Dr. Spencer; is that correct?
5  A.      Yeah.  I don't even know who these people
6  are.  So yes.
7  Q.      Based on that answer, is it fair to say that
8  you have not reviewed Dr. Callingwood's report?
9  A.      I have not.
10 Q.      Also fair to say you've not reviewed
11 Dr. Spencer's report?
12 A.      I have not.
13 Q.      Okay.  You do not say in your expert report
14 that you respond to points made by Dr. Martinez,
15 correct?
16 A.      That's correct.
17 Q.      Have you reviewed the expert report of
18 Dr. Martinez in this case?
19 A.      I don't believe so.
20 Q.      To your knowledge, have you reviewed any
21 expert reports tendered by or on behalf of the
22 Fair Maps Plaintiffs?
23 A.      If those are all of your experts, then
24 I have not.
25 Q.      I have one more to ask you about.  Have you

Page 211

1  reviewed the expert rebuttal report of Tony Fairfax?
2  A.      Briefly.
3  Q.      Okay.  I don't mean this to be a trick
4  question.  I know it was responding to your report.
5  But just to clarify, for the record, there's nothing
6  in your expert report that responds to Mr. Fairfax's
7  report, correct?
8  A.      There may be points made in it that would be
9  responsive.  But, obviously, it was not written with
10 an ability to see the future and what he would write.
11 So in that sense, no.
12 Q.      So sitting here today, do you intend to
13 offer a report responding to Mr. Fairfax's report?
14        MR. KERCHER: Object to the form.
15 A.      I don't have any intentions to write
16 additional reports sitting here today.
17 Q.      Okay.  Is there anywhere in your report
18 where you analyze the demonstrative maps proffered by
19 the Fair Maps Plaintiffs in this case?
20        MR. KERCHER: Object to the form.
21        You can answer.
22 A.      Not to my knowledge.
23 Q.      Sitting here today, are you aware -- Strike
24 that.
25        Sitting here today, have you reviewed any of

Page 212

1  the demonstrative alternative maps proffered by the
2  Fair Maps Plaintiffs?
3  A.      I may have come across them at the Texas
4  redistricting website, but not that I can recall.
5  Q.      Okay.  And fair to say, based on that
6  answer, that your expert report does not contain any
7  specific analysis of any demonstrative maps proffered
8  by the Fair Maps Plaintiffs in this case?
9  A.      Not to my knowledge.
10 Q.      Now, on Page 7 of your report, Exhibit 1,
11 Section 4, you list the data relied upon in
12 construction of datasets.  Do you see that section?
13 A.      Yes.
14 Q.      And are the materials listed in that section
15 a comprehensive and complete description of all of the
16 materials that you relied upon in forming your
17 opinions in this case?
18        MR. KERCHER: Object to the form.
19        You can answer.
20 A.      I believe so.
21 Q.      Other than materials that are in the public
22 record, you did not consider any draft maps that may
23 have been created as part of the 2021 redistricting
24 process, correct?
25        MR. KERCHER: Object to the form.

Page 213

1         You can answer, if you understand the
2  question.
3  A.      If the -- That is true, assuming that the
4  Morales and Duchin maps are in the public record.
5  Q.      Okay.  Fair enough.
6  A.      I don't know what other maps would be.
7  Q.      Okay.  You have not considered any draft
8  maps drawn by the map drawers who created the Enacted
9  Plan that are not in the public record, correct?
10        MR. KERCHER: Object to the form.
11 A.      Not to my knowledge.
12 Q.      Do you have personal knowledge of the data
13 that the map drawers who created the Enacted Plan
14 considered as part of the map-drawing process?
15        MR. KERCHER: Object to the form.
16 A.      No.
17 Q.      Do you have personal knowledge of what
18 software the map drawers who created the Enacted Plan
19 used in the 2021 redistricting process?
20        MR. KERCHER: Object to the form.  Asked and
21 answered.
22 A.      Yeah.  I think I mentioned, in one of
23 Mr. Korbel's PowerPoints I think it talks about Red
24 Appel.  A-P-P-E-L.  And so that's how I became aware
25 of that.

Sean P. Trende
September 02, 2022

Page 214

1  Q.        Do you have any personal knowledge of what
2  filters or settings in Red Appel the map drawers used
3  in creating the Enacted Plan?
4            MR. KERCHER:  Object to the form.  Asked and
5  answered.
6  A.        I do not.
7  Q.        As part of your work in this case did you
8  interview any individuals who drew the 2021 Enacted
9  Maps?
10           MR. KERCHER:  Object to the form.  Asked and
11 answered.
12 A.        I wasn't asked to do anything like that, so
13 I did not.
14 Q.        I'll ask you about some terminology in your
15 report.  If you'll turn to Page 9 of Exhibit 1,
16 please.  The last sentence of the first paragraph
17 reads, "Nevertheless, close examination of the
18 historical context behind the districts, of the
19 districts themselves, and of their political and
20 racial composition clearly demonstrates that they are
21 consistent with districts drawn to substantially
22 improve the political advantage of the Republican
23 Party."  Did I read that correctly?
24 A.        Yes.
25 Q.        Okay.  What's your definition of "political

Page 215

1  advantage"?
2  A.        The ability of the Republican Party to win
3  seats in the legislature and United States Congress in
4  the State of Texas.
5  Q.        Do you have a definition of a "safe
6  district"?
7            MR. KERCHER:  Object to the form.
8            You can answer.
9  A.        That's something that people quibble over.
10 But, generally speaking, I'm not sure of any
11 districts -- I'm not sure there are more than one or
12 two districts that are less than say 46 percent Trump
13 that Democrats won -- and I mean Trump 2020 -- that
14 Democrats won in the last Congressional race.
15           Of course, if I were doing it, I would be
16 looking forward as well.  If you were trying to draw a
17 map with political advantage, you want that to be a
18 durable advantage so that might bump things down a
19 little bit.
20 Q.        Is there any quantitative expected margin in
21 victory that you used to define a safe district for
22 purposes of your report in this case?
23           MR. KERCHER:  Object to the form.
24 A.        I'm not sure I talk much about what a safe
25 district would be.  It's that Donald Trump's vote

Page 216

1  share in many of these districts is improved, which
2  improves the ability of Republicans to win the
3  district.
4  Q.        So there was no specific numerical
5  improvement that you considered as qualifying as
6  improving the political advantage of the Republican
7  Party?  As long as it improved it by 1 percent, that
8  was sufficient?
9            MR. KERCHER:  Object to the form.
10 A.        I don't know about that.  But when you look
11 at -- What the sentence means is, when you look at the
12 changes, it's clear that these districts, many of
13 which improved Donald Trump's vote share by
14 substantially more than a point, taken as a whole,
15 they improved the political advantage of the
16 Republican Party in the State of Texas.
17 Q.        Focusing specifically on the language from
18 the report that I just read, is there a numerical --
19 I'll withdraw that and I'll ask a better question.
20           Is there a number that you had in mind that
21 correlates with substantially improve the political
22 advantage of the Republican Party?
23           MR. KERCHER:  Object to the form.
24 A.        You know, this game gets played any time an
25 adjective or an adverb gets inserted in a report.  I

Page 217

1  don't know exactly where the threshold is for
2  substantial improvement.  But when you're taking
3  districts that Joe Biden won and turning them into
4  districts that Donald Trump won by 20, I think under
5  any general use of the word, that's a substantial
6  improvement in the political advantage of the
7  Republican Party.
8  Q.        Okay.  Is there any specific number of
9  districts, for purposes of your report in this case,
10 that needed to flip from districts that Biden won to
11 heavy Trump-favorite districts in order to
12 substantially improve the political advantage of the
13 Republican Party?
14           MR. KERCHER:  Same objection.
15 A.        It's the same basis answer.  We can quibble
16 about where that threshold is.  I don't know where
17 stubble turns into a beard, but my co-counsel clearly
18 has a beard; and it's sort of the same thing here.
19           If it were one district in the entire state
20 that it improved by 1 point, I probably wouldn't use
21 the word "substantially."  But I don't think there's
22 any reasonable doubt that the Republican Party's
23 political advantage has been substantially improved as
24 a result of these maps.
25 Q.        That's fair enough.  But as between the

Sean P. Trende
September 02, 2022

Page 218

1  scenario where there's just one district that improves
2  by 1 percent, and the scenario that you observed under
3  the Enacted Plans, you did not pick a specific number
4  of districts in which the Republican advantage needed
5  to increase to qualify as substantial improvement,
6  correct?
7        MR. KERCHER:  Object to the form.  Asked and
8  answered.
9  A.        That's right.  As I said, sometimes it's
10 clear that it's a beard, not stubble.  And that's what
11 we have here.
12 Q.        If you'd turn to Page 209 in your report,
13 please.  And under Conclusion, the first sentence
14 reads, "The Enacted Plans are drawn in such a way that
15 they shore up Republican performance in districts that
16 had wavered by the end of the decade."  Did I read
17 that correctly?
18 A.        Yes.
19 Q.        Okay.  Does "shore up," as it is used in
20 that sentence, have the same meaning as "substantially
21 improve" in the language that we looked at on the
22 prior page?
23 A.        I think it's consistent with "substantial
24 improvement."  But "shoring up" means improving or
25 making stronger.

Page 219

1  Q.        Is it fair to say, based on my last few
2  questions and your last few answers, that there's no
3  specific numerical increase in the expected Republican
4  advantage that you selected before you decided that a
5  district had been shored up?
6        MR. KERCHER:  Object to the form.
7  A.        If Republican performance improves, then it
8  would be shored up.
9  Q.        By any amount, correct?
10 A.        It would have to be net, but yes.
11 Q.        Okay.
12 A.        Or, actually, no.  The way this sentence is
13 phrased, it would have to be at least 1 or at least 2.
14 Q.        Okay.  So at least 2 percentage points?
15 A.        No, at least two districts --
16 Q.        Two districts.  Got it.
17 A.        -- that showed any improvement.  You could
18 write that sentence.  Though, of course, in this
19 situation, it's much more than that.
20 Q.        Is there a specific -- Withdraw that.
21        What does the word "district" -- or rather,
22 what does the phrase "districts that wavered" mean in
23 that sentence?
24 A.        Districts where Republican incumbents had
25 come close to losing or had lost.

Page 220

1  Q.        Okay.  And when you say, "had come close to
2  losing," is there a specific margin that you
3  considered sufficiently close to losing to consider a
4  district wavering?
5        MR. KERCHER:  Object to form.
6  A.        No.
7  Q.        Okay.  Mr. Trende, are you offering the
8  opinion in this case that it was the actual intent of
9  the Texas Legislature to substantially improve the
10 Republican political advantage?
11        MR. KERCHER:  Object to the form.
12        You can answer.
13 A.        No.
14 Q.        Likewise, are you offering the opinion in
15 this case that it was the actual intent of the
16 legislature to shore up wavering Republican districts?
17        MR. KERCHER:  Same objection.
18 A.        No.
19 Q.        Are you offering the opinion in this case
20 that it was the legislature's primary or predominant
21 purpose to improve Republican political advantage?
22        MR. KERCHER:  Object to the form.
23 A.        No.
24 Q.        Is it fair to say that your opinions in this
25 case are based, in part, on a visual inspection of

Page 221

1  figures showing how the lines of the Enacted Plan
2  divide precincts won by Biden from precincts won by
3  Trump in the 2020 Presidential Election?
4        MR. KERCHER:  Object to the form.
5  A.        Yes.
6  Q.        So, for example, if we go to Page 34 and
7  take a look at figure 2, the only election results
8  that are reflected in figure 2 are the 2020
9  Presidential Election results, correct?
10 A.        Correct.
11 Q.        So the coloring there, the red, blue,
12 purple, that does not reflect vote share in any
13 Congressional Election, correct?
14 A.        Correct.
15 Q.        I think you'll agree with me, based on your
16 prior testimony, but would you agree with me that
17 former President Trump is a controversial political
18 figure?
19        MR. KERCHER:  Object to the form.
20 A.        Yes.
21 Q.        And even amongst Republican voters, former
22 President Trump is a controversial figure, correct?
23        MR. KERCHER:  Same objection.
24 A.        Yes.  Well, some Republican voters.
25 Q.        There are voters who are registered

Sean P. Trende
September 02, 2022

Page 222

1  Republicans who are opposed to Mr. Trump and have been
2  throughout his political career, correct?
3        MR. KERCHER:  Object to the form.
4  A.      Yes.  I live next to some of them.
5  Q.      Okay.  You've heard, for example, of "Never
6  Trumpers"?
7        MR. KERCHER:  Same objection.
8  A.      Yes.
9  Q.      And what's your understanding of a Never
10 Trumper?
11       MR. KERCHER:  Same objection.
12 A.      They are Republicans who would never vote
13 for President Trump.
14 Q.      Okay.  So is it fair to say, then, that
15 Mr. Trump's performance is not necessarily predictive
16 of the performance of any other particular Republican
17 candidate for office?
18       MR. KERCHER:  Object to the form.
19 A.      Actually, President Trump's performance is
20 generally pretty predictive of who won.  So, in 2016,
21 I don't think there were any senate states that Trump
22 failed to carry, or that Trump carried that a
23 Republican did not, and vice versa.  That was the
24 first time that happened in history, or at least
25 recent history.

Page 223

1        In 2020, I think the only crossover state
2  was Maine where Susan Collins is a political athlete
3  who kind of does her own thing.  Most of the Biden
4  districts were won by Democrats.  Most of even the
5  swing Trump districts were won by Republicans, so
6  I don't think I can say -- I don't think I can agree
7  with you.
8  Q.      Okay.  Let me ask a more precise question.
9  Is it fair to say that Mr. Trump's level of support in
10 any given precinct is not necessarily predictive of
11 the level of support for other Republican candidates?
12       MR. KERCHER:  Object to the form.
13 A.      There may be precincts that vote for Joe
14 Biden, but voted for other Republicans and vice versa,
15 but it's probably the strongest predictor we have.
16 Q.      If you would turn to Page 140 of your
17 report, please.  Maybe I'll try it with an example.
18 In this page of your report here you're discussing the
19 state's senate districts in Dallas/Fort Worth area,
20 correct?
21 A.      Correct.
22 Q.      And in the second paragraph on this page,
23 you note that, in the 2018 and 2020 elections,
24 Republicans lost two senate seats in the area; the
25 10th in Tarrant County and 16th in Dallas County,

Page 224

1  correct?
2  A.      Yes.
3  Q.      And then you go on to note that Republicans
4  also had a close call in the 8th where the Republican
5  won 51.18 percent of the vote, and the 9th where the
6  senator won with 54.3 percent of the vote, correct?
7        MR. KERCHER:  Object to the form.
8  A.      54.03.
9  Q.      Thank you.  Yeah.  With that correction, is
10 that correct?
11 A.      Yes.
12 Q.      Okay.  And then you note that, in 2020,
13 Trump won just 47.7 percent of the vote in the 8th,
14 and 50.1 percent in the 9th, correct?
15 A.      Correct.
16 Q.      Okay.  So the support for Trump in the
17 8th and 9th state senate districts was lower than the
18 support for Republican senate candidates, correct?
19 A.      Yes.
20 Q.      Is it fair to say that's a phenomenon that
21 could be present in other districts throughout the
22 state?
23       MR. KERCHER:  Object to the form.
24 A.      I haven't looked, but it could be present.
25 I'd also note that the two districts that they did

Page 225

1  lose had even lower Trump vote shares.  So just
2  because something is predictive doesn't mean the
3  cutoff is necessarily exactly at 50 percent.
4  Q.      Okay.
5  A.      In fact, it's almost, I mean, it's almost a
6  1 to 1.  The senator won 54 percent in the 9th and
7  51 percent in the 8th, and Trump -- so that's a
8  3-point difference?
9        Trump won 50.1 percent in the 9th and
10 47.7 percent in the 8th, so 2.4 percent difference.
11 So in regression terms, there would be an intercept,
12 but it would have a pretty tight fit.
13 Q.      There is nevertheless a difference in the
14 level of support, correct?
15 A.      Well, in the level.  But you had asked me if
16 it's predictive.  And it doesn't have to be a
17 one-to-one correspondence for something to be
18 predictive.  It just has to be consistent.
19 Q.      In your report, when you evaluate the extent
20 to which any particular district is shored up, using
21 your terminology, that analysis is based on
22 Mr. Trump's vote share in the 2020 election, correct?
23       MR. KERCHER:  Object to the form.
24 A.      Yes.  Republicans tend to do better in
25 districts where Mr. Trump does better.

Sean P. Trende
September 02, 2022

Page 226

1  Q.        Okay.  Your analysis of whether a district
2  is shored up is not based on the vote share of the
3  Republican candidate who is actually running in, for
4  example, that Congressional District, correct?
5  A.        Well, you can't really do that because the
6  candidate running in the Congressional District, as
7  you add precincts to it, you're adding precincts where
8  that congressional candidate wasn't running.
9  Q.        Okay.
10  A.        You're asking for an impossible analysis.
11  Q.        How about, your analysis of whether a
12  district is shored up is not based on the
13  Republican -- the performance of Republican candidate
14  in any other state-wide office, other than Mr. Trump's
15  performance, correct?
16  A.        That's right.  And if there is a state-wide
17  Republican that has better predictive strength, and if
18  using it would give a different answer, I would be
19  interested to see that analysis.
20  Q.        Okay.  That's not an analysis that you've
21  done in your report, correct?
22  MR. KERCHER:  Object to the form.
23  A.        As far as I know, no one has.  Including
24  myself.
25  Q.        Okay.  And you don't know whether the map

Page 227

1  drawer who created the Enacted Plan considered only
2  Mr. Trump's vote share as you do in your report,
3  correct?
4  MR. KERCHER:  Object to the form.
5  A.        I don't.
6  Q.        Okay.  You can't rule out the possibility
7  that the map drawers who created the Enacted Plan
8  considered other state-wide races, correct?
9  MR. KERCHER:  Object to the form.  Asked and
10  answered several times.
11  A.        I don't know what the map drawers were
12  doing.  All I know is it's consistent with improving
13  Republican performance in the district because
14  Mr. Trump's vote share correlates strongly with
15  Republican performance.
16  Q.        Mr. Trende, do you know whether incumbent
17  legislators were involved in the process of drawing
18  maps that became part of the Enacted Plan?
19  MR. KERCHER:  Object to the form.
20  A.        I do not.
21  Q.        I'll ask you a hypothetical question.
22  Assume that incumbent legislators were involved in the
23  process, would you agree with me that incumbent
24  legislators have an interest in retaining their seats?
25  MR. KERCHER:  Object to the form.

Page 228

1  Incomplete hypothetical.  Lacks foundation.
2  A.        I believe that, generally speaking,
3  candidates for reelection want to win that reelection,
4  so yes.
5  Q.        And you don't know whether incumbent
6  legislators considered historical election results
7  from any particular county or districts as part of the
8  creation of the 2021 Enacted Plan, do you?
9  MR. KERCHER:  Objection.  Asked and
10  answered.  You've asked him several questions, as have
11  previous counsel, about what he knows about what
12  legislators considered during the redistricting
13  processes.  He has testified repeatedly he doesn't
14  know.  Please move on.
15  Mr. Trende, you may answer this question.
16  A.        I still don't know anything about what the
17  legislators were looking at.
18  Q.        Okay.  I'll ask you some questions about
19  some specific districts that you analyzed in your
20  report.
21  Before I do that, I'll ask you another
22  hypothetical.  Assume that minority voters in the
23  state of Texas reliably support Democratic candidates.
24  Do you have that assumption in mind?
25  A.        I heard you.

Page 229

1  Q.        Okay.  With that assumption in mind, is one
2  way to improve the prospects of Republican candidates
3  to dilute the voting strength of minority voters?
4  MR. KERCHER:  Object to the form of the
5  question.  It's an incomplete hypothetical.  Lacks
6  foundation.
7  A.        It would depend on the circumstances of the
8  political -- of the specific districts.  But if you
9  reduced -- under your assumption, if you reduced the
10  minority share of a district and did not replace it
11  with white voters who voted even more heavily
12  Democratic than the minority groups, then it would
13  improve Republican performance.
14  Q.        Okay.  Turn to Page 11 of your report,
15  please.  Figure 2 on Page 11 shows the benchmark
16  verses the Enacted Plan for Texas Congressional
17  District 3, correct?
18  A.        Correct.
19  Q.        The green line represents the Enacted Map
20  and the black line prepares the benchmark map; is that
21  right?
22  A.        Correct.
23  Q.        Okay.  Now, just turning over to the next
24  page, on Page 12, would you say that Congressional
25  District 3, I'm looking at the first line of the

Sean P. Trende
September 02, 2022

Page 230

1  second paragraph, says, "The district gives up 371,209
2  former residents," correct?
3  A.       Correct.
4  Q.       That means the map drawers chose to move
5  those former residents somewhere else, right?
6         MR. KERCHER:  Object to the form.
7  A.       Yes.  Assuming they made the choice.  No
8  need to get into a word game or word battle there.
9  Q.       Sure.  Have you analyzed what the
10 demographic breakdown of those 371,209 voters is?
11 A.       No.
12 Q.       Now, in exchange for those 371,209, there
13 were new voters who were added to CD 3, correct?
14 A.       Correct.
15 Q.       And you did not analyze the demographics of
16 those voters who were added to CD 3, correct?
17 A.       Correct.
18 Q.       Okay.  And the net effect of the change to
19 CD 3 was that it goes from a 49.5 percent Biden to a
20 42.7 percent, correct?
21 A.       Correct.
22 Q.       And that qualifies as shoring up the
23 district, correct?
24 A.       Clearly.
25 Q.       Okay.  For purposes of your report, would

Page 231

1  you consider CD 3 shored up if the expect -- or if the
2  Biden vote share had been reduced to, say,
3  47.5 percent?
4         MR. KERCHER:  Objection.  Calls for
5  speculation.
6  A.       I would still say you shored up Republican
7  strength.  You didn't do -- you didn't do it as
8  strongly or substantially as if you took it down to
9  42.7.  But yeah.
10 Q.       Okay.  And the same -- would the same be
11 true if the Biden vote share was reduced to
12 48.5 percent?
13        MR. KERCHER:  Same objection.
14 A.       You would be shoring up Republican
15 performance in the district.
16 Q.       Okay.  Turning back to Page 11 and looking
17 at figure 2.  Do you know whether the green lines
18 representing the Enacted Plan cut through or divide
19 any minority communities?
20 A.       I do not.
21 Q.       You didn't evaluate that for purposes of
22 your report, correct?
23 A.       That's right.  I wasn't asked to look at the
24 minority outcomes.
25        MR. BRACHMAN:  Okay.  I'll ask the court

Page 232

1  reporter to mark this as Exhibit 11.
2                    - - -
3         And, thereupon, Plaintiff's Exhibit No. 11
4  was marked for purposes of identification.
5                    - - -
6  BY MR. BRACHMAN:
7  Q.       Mr. Trende, what I've handed you is a
8  compilation of maps that were included in the expert
9  rebuttal report of Tony Fairfax.  I'll just first ask
10 you, have you seen these before?
11 A.       I looked through his report, so I would have
12 laid eyes on them.
13 Q.       Okay.  If you would -- There are page
14 numbers down at the bottom sort of centered.  If you
15 would turn to 136, please.  Up at the top of this map,
16 do you see, it says, Texas Congressional Districts
17 2021 Enacted Plan column?
18 A.       Yes.
19 Q.       And in the bottom-right corner, do you see
20 the legend indicates that the green shading is showing
21 AAPI voter CVAP percentage?
22 A.       Yes.
23 Q.       Okay.  Looking at this map, would you agree
24 with me that the western boundary of Congressional
25 District 3 zigzags and divides AAPI communities?

Page 233

1         MR. KERCHER:  Object to the form.
2  A.       Well, it certainly zigzags.  If you want to
3  represent that all these of the shaded areas form an
4  AAPI community, then it would divide those
5  communities.  I don't know that that's the case.
6  I don't know if I put those in tandem in such a way
7  that it sort of suggests that it zigzags in order to
8  divide those communities.
9  Q.       Fair enough.  You would at least agree with
10 me that the western border of Congressional District 3
11 has precincts with percentages greater than 25 percent
12 AAPI voters on the east side and some on the west side
13 of the district -- of the line, correct?
14        MR. KERCHER:  Object to the form.
15 A.       Yeah.  I don't know if it would be better or
16 worse if it segregated them or if it divided them like
17 this; but it does seem to divide them.
18 Q.       Okay.  And you are not offering the opinion
19 that this exact border -- western border of CD 3 was
20 necessary to shore up that district, are you?
21        MR. KERCHER:  Object to the form.
22 A.       There may be other ways to draw it.  I mean,
23 there's almost always hundreds of ways to draw
24 district boundaries.  My only opinion is the way they
25 drew it is consistent with trying to shore up

Sean P. Trende
September 02, 2022

Page 234

1   Republican vote strength.
2   Q.        You haven't analyzed whether it would be
3   possible to produce a roughly 7-point improvement in
4   the Trump 2020 vote share for CD 3 without separating
5   AAPI voters as the western boundary of CD 3 does,
6   right?
7   A.        I haven't looked at that.  No.
8   Q.        Okay.  I'm going to go back to your report,
9   Exhibit 1.  Take a look at Page 19, please.  Figure 8
10  shows Congressional District 6 Benchmark versus
11  Enacted Plan, correct?
12  A.        Correct.
13  Q.        And in your description of CD 6, as you did
14  with CD 3, you note the number of voters who were
15  moved out of the district and the number of voters who
16  were moved in, correct?
17  A.        Correct.
18  Q.        And as with CD 3, you have not analyzed and
19  you're not offering any opinion on the demographics of
20  those voters, correct?
21              MR. KERCHER:  Objection.  Form.
22  A.        I didn't look at the racial demographics of
23  those voters.  No.
24  Q.        And as with CD 3, you don't know whether the
25  green lines for the Enacted Plan for CD 6 cut through

Page 235

1   and/or divide any communities of color, correct?
2              MR. KERCHER:  Same objection.
3   A.        Correct.
4   Q.        Now, turning over to Page 20, you observed
5   that the changes to CD 6 transformed it from a
6   district Trump won by just 3 points to one where he
7   received 62 percent of the two-party vote, correct?
8   A.        Correct.
9   Q.        And that's a 59 percent improvement, right?
10  A.        A what?
11  Q.        A 59 percent improvement?  Oh, no.
12  I'm sorry.  I'm getting my math wrong.
13              Let me ask the question this way.  Is there
14  some lesser amount of improvement that would have
15  qualified as shoring up the district?
16              MR. KERCHER:  Object to the form.
17  A.        I mean, any improvement would be shoring it
18  up.  It might not make it -- it might not shore it up
19  enough to make the legislature or incumbent
20  comfortable in the district, but it would be shoring
21  it up.
22  Q.        Okay.  Take a look back at Exhibit 11, if
23  you would, the collection of maps.  Please look at
24  Page 134.  Do you see this is labeled as Texas
25  Congressional District's 2021 Enacted Plan,

Page 236

1   Dallas/Fort Worth?
2   A.        Yes.
3   Q.        And in the bottom left, I'll call it,
4   there's a legend that indicates that the purple
5   shading on this map represents Latino CVAP percentage.
6   Do you see that?
7   A.        Yes.
8   Q.        Okay.
9   A.        I'm colorblind, so I'll accept your
10  representation that it's purple.  I can make out
11  gradations.
12  Q.        Okay.
13  A.        It looks blue to me.
14  Q.        Okay.  And do you see right next to the
15  legend the indicator for Congressional District 6?
16  A.        Yes.  Down to the bottom right of the
17  legend, yeah.
18  Q.        And you can see the black boundary lines for
19  CD 6?
20  A.        Yeah.
21  Q.        Okay.  And is it fair to say that those
22  lines appear to divide Latino voters in CD 6 from
23  Latino voters in, for example, CD 33?
24              MR. KERCHER:  Object to the form.
25  A.        There are certainly Latino or Hispanic

Page 237

1   voters in CD 33 and in CD 6.  It looks to me like the
2   precincts that are placed into District 6 tend to be
3   less heavily Latino than the ones in 33.
4   Q.        Okay.  And fair to say that the district
5   lines for CD 33, CD 30, CD 32 also divide Latino
6   voters?
7              MR. KERCHER:  Object to the form.  Calls for
8   speculation.  Misstates the previous testimony.
9              You may answer.
10  A.        Looks like there are Hispanic and Latino
11  precincts on either side of the lines for 32, 30, and
12  33.
13  Q.        Okay.  Let's go back to Exhibit 1, please,
14  on Page 28.  At the bottom of Page 28, you observed
15  that CD 30 overall is a district that goes from one
16  where Trump won 19.1 percent of the vote to one where
17  he won 21.3 percent of the vote, correct?
18  A.        Yes.
19  Q.        And that increase constitutes shoring up for
20  purposes of your report, correct?
21  A.        It would be a shoring up of Republican
22  voting strength in that district, although it would be
23  fairly useless.
24  Q.        Okay.  And if you look at the following
25  page, Page 30, where you analyze District 32, and

Sean P. Trende
September 02, 2022

Page 238

1  I'll ask you the same question I've asked previously.
2  You discussed the number of voters who were moved in
3  and out of the district, correct?
4  A.        Correct.
5  Q.        You did not analyze the demographics of
6  those voters, the racial demographics of those voters,
7  correct?
8  A.        Correct.
9  Q.        It's fair to say that any time in your
10  report where you represent the number of voters or
11  number of residents who were moved in or out of the
12  district that you did not analyze the racial
13  demographics of those voters?
14       MR. KERCHER:  Object to the form.
15  A.        Yeah.  I wasn't asked to look at the --
16  I was asked to look at whether this was consistent
17  with political changes, and so the examination of the
18  voters that move in and out was focused on politics.
19  Q.        And is it fair to say that in any figure in
20  your report that analyzes the percentage Biden/Trump
21  vote share, that also includes a representation of the
22  Enacted Map lines, that you did not consider whether
23  the Enacted Map lines divided communities of color?
24       MR. KERCHER:  Object to the form.
25  A.        As I sit here, I can't think of any contrary

Page 239

1  examples.
2  Q.        Okay.  So now looking back at Exhibit 11,
3  Page 134, you're not offering the opinion that the
4  exact district lines reflected on that map were
5  necessary to shore up these districts, are you?
6       MR. KERCHER:  Object to the form.
7       You may answer.
8  A.        There may be other lines that would
9  accomplish the same task and any other task that the
10  legislature wanted to achieve, but I don't know.
11  Q.        It's possible that these districts could
12  have been shored up using district lines that kept
13  greater concentrations of Latino voters by CVAP
14  together in the same district, correct?
15       MR. KERCHER:  Objection.  Calls for
16  speculation.
17  A.        I don't know if it's possible or not.  And
18  I would be more interested in whether they get shored
19  up to the same extent and achieve other legitimate
20  goals of the legislature to the same extent.
21  Q.        Okay.  But under your definition, as we
22  talked about earlier, the 1 percentage point
23  improvement constitutes shoring up, correct?
24  A.        Oh, it does, yes.
25  Q.        Okay.  But you have not analyzed whether it

Page 240

1  was possible to, let's say, shore up these districts
2  at a 1 percent improvement level while also keeping
3  more Latino voters together in the same district,
4  correct?
5       MR. KERCHER:  Objection.  Asked and answered.
6  Objection, compound.  Vague.  Calls for speculation.
7  A.        There may well be ways to improve Republican
8  performance marginally in these districts, if that's
9  what the goal of the legislature was.  But you may be
10  able to do it without any divisions, yes.  I shouldn't
11  say yes, you can.  I assume you can.  I don't know.
12  Q.        Okay.  And you're not offering an opinion
13  one way or the other on that question, correct?
14       MR. KERCHER:  Same objections.  And I'll add
15  asked and answered.
16  A.        No.  My only opinion here is that the maps
17  that were drawn are consistent with a map drawn to
18  improve Republican performance and shore it up.
19  Q.        Staying with Exhibit 11, take a look at --
20  flip back to Page 131, please.  Do you see this map is
21  labeled Texas Congressional District 2021 Enacted
22  Plan, Harris/Fort Bend County?
23  A.        That's correct.
24  Q.        In the lower left there is a legend again
25  that indicates the color of shading reflects AAPI

Page 241

1  voter CVAP percentage.  Do you see that?
2  A.        Yes.
3  Q.        Okay.  And would you agree with me that the
4  lines for Districts 7, 22, and 9 reflected on this map
5  divide areas with or divide AAPI voters in the
6  Fort Bend area?
7       MR. KERCHER:  Object to the form of the
8  question.
9  A.        There are certainly VTDs with AAPI
10  populations in excess of 25.01 percent on both sides
11  of the lines.
12  Q.        Okay.  And to the extent that these district
13  lines shored up Republican advantage in your opinion,
14  you're not offering the opinion that these specific
15  lines were necessary to achieve that result, correct?
16       MR. KERCHER:  Object to the form of the
17  question.  Calls for speculation.  Asked and answered.
18  A.        I'm not offering an opinion about whether
19  there would be alternate lines out there somewhere
20  that would achieve similar -- that would produce
21  similar outcomes.
22  Q.        Okay.  So you can't rule out the possibility
23  that it would -- that it is possible to shore up these
24  districts without dividing AAPI voters in the manner
25  that's reflected in this map, correct?

Sean P. Trende
September 02, 2022

Page 242

1    MR. KERCHER:  Object to the form.
2  Speculative.  Asked and answered.
3  A.    I can't rule out the possibility that there
4  might be another approach out there that would achieve
5  the same shoring up that the legislature did without
6  splitting the precincts, the VTDs, in the way they are
7  here.
8  Q.    Sticking with this exhibit, if you'll turn,
9  please, to Page 152.  I'm sorry.  Exhibit 11.  Do you
10  see that this map is labeled Texas Senate Districts
11  2021 Enacted Plan, Tarrant County?
12  A.    Yes.
13  Q.    In the lower right-hand corner, do you see a
14  legend that indicates that the color shading on this
15  map reflects Latino CVAP percentage?
16  A.    Yes.
17  Q.    Would you agree with me, looking at the
18  lines for Senate Districts 9, 10, and 22, that they
19  divide the Latino CVAP in Tarrant County?
20  A.    I'll agree that there are VTDs with Latino
21  CVAP in excess of 25.01 percent on both sides of the
22  lines that you mentioned.
23  Q.    And to the extent that these district lines
24  result in shoring up of Republican political
25  advantage, you are not offering the opinion that it

Page 243

1  was impossible to achieve that result -- Strike that.
2    You are not offering the opinion that these
3  specific district boundaries were necessary to achieve
4  any shoring up of Republican partisan advantage in
5  these districts, correct?
6    MR. KERCHER:  Object to the form of the
7  question.
8    You may answer.
9  A.    Yeah.  I don't know if other lines would
10  achieve the legislature's goals.
11  Q.    And you can't rule out the possibility that
12  the legislature could have shored up Republican
13  political advantage in Tarrant County with districts
14  that would have kept more of the Latino CVAP together
15  in a single district, correct?
16    MR. KERCHER:  Same objections.
17  A.    Yeah.  I don't know if there's a way to do
18  that that would achieve the legislature's goals and
19  that wouldn't run you -- as with all these maps, it
20  wouldn't run you into some other sort of packing
21  claims, so I don't know.
22  Q.    Okay.  And you're not offering an opinion on
23  that, correct?
24    MR. KERCHER:  Same objections.  Asked and
25  answered.

Page 244

1  A.    That's correct.
2  Q.    Okay.  Staying on Exhibit 11, if you'll turn
3  with me to Page 149, please.  Do you see that this map
4  is labeled Texas Senate District's 2021 Enacted Plan,
5  Fort Bend?
6  A.    Yes.
7  Q.    And in the lower right-hand corner, do you
8  see there is a legend that indicates the colored
9  shading reflects AAPI CVAP percentages?
10  A.    Yes.
11  Q.    Would you agree with me that the boundaries
12  of the Enacted Plan between Senate Districts 13 and 17
13  divide AAPI voters in the Fort Bend area?
14    MR. KERCHER:  Object to the form of the
15  question.
16  A.    I would agree that there are precincts in
17  the Fort Bend area with an AAPI CVAP in excess of
18  .25 on both sides of the lines.
19  Q.    And you're not offering the opinion that
20  these specific boundaries were necessary to shore up
21  any Republican partisan advantage in the Fort Bend
22  area, correct?
23    MR. KERCHER:  Object to the form of the
24  question.  You can answer.
25  A.    I haven't considered whether alternative

Page 245

1  lines would achieve the legislature's goals in a way
2  that wouldn't also run you into a Shaw claim or a
3  packing claim.
4  Q.    And you have not considered whether it would
5  be possible to shore up Republican partisan advantage
6  in Fort Bend senate districts while keeping more of
7  the AAPI voters together in a single district,
8  correct?
9    MR. KERCHER:  Object to the form.
10  A.    I haven't looked to see if alternative lines
11  would keep those groups -- exist that would keep those
12  groups more together that would achieve the
13  legislature's goals while avoiding some other types of
14  lawsuit.
15  Q.    Okay.  Staying on this exhibit, turn to
16  Page 140, please.  Do you see that this map is labeled
17  Texas House Districts 2001 Enacted Plan, Fort Bend?
18  A.    Yes.
19  Q.    And in the lower right-hand corner, do you
20  see there is a legend that indicates the colored
21  shading reflects Latino CVAP in the Fort Bend area?
22  A.    Yes.
23  Q.    Okay.  Looking at this map, would you agree
24  with me that the boundaries of House District 26, the
25  western boundary divides Latino CVAP, Latino voters --

Sean P. Trende
September 02, 2022

Page 246

1  Well, let me put it this way.  Are there areas with
2  greater than 25.1 percent Latino CVAP on both the east
3  and west side of the western boundary at District 26?
4         MR. KERCHER:  Objection to the form of the
5  question.
6  A.     It does appear that way, yes.
7  Q.     Okay.  And does it appear that the western
8  boundary of House District 26, in fact, divides an
9  area right around where it says Fort Bend that has
10  greater than 50 percent Latino CVAP?
11        MR. KERCHER:  Same objections.
12  A.     I can't tell because I can't see the
13  gradations between 40 to 50 and greater than 50.1 in
14  this column.
15  Q.     Fair enough.  So would you agree with me
16  that it divides areas that are at least 40.1 percent
17  CVAP?
18        MR. KERCHER:  Same objection.
19  A.     It does appear that way.
20  Q.     Okay.  And you are not offering the opinion
21  in your report that this specific western boundary of
22  House District 26 was necessary to shore up Republican
23  partisan advantage under the 2001 Enacted Plan,
24  correct?
25        MR. KERCHER:  Object to the form of the

Page 247

1  question.
2  A.     No.  My only opinion is that it's consistent
3  with improving Republican performance.
4  Q.     And you don't know if it would have been
5  possible to improve Republican performance while
6  keeping more of the greater than 40.01 percent Latino
7  CVAP population together in a single district,
8  correct?
9         MR. KERCHER:  Objection to the form the
10  question.
11        You may answer, Mr. Trende.
12  A.     I don't know if there's a way to do that in
13  a way that it used the legislature's goals as well as
14  avoiding some other type of litigation claim.
15  Q.     Okay.
16  A.     I would imagine if the district lines
17  perfectly followed the boundary between white and
18  Hispanic precincts, you would have a field day with
19  that.
20  Q.     Staying on Exhibit 11, turn with me, please,
21  to Page 144.  Do you see that this map is labeled
22  Texas House Districts 2021 Enacted Plan, Bell County?
23  A.     Yes.
24  Q.     Do you see in the lower left-hand side of
25  the map a legend that indicates the colored shading

Page 248

1  reflects Black CVAP percentage?
2  A.     Yes.
3  Q.     And would you agree with me that the western
4  boundaries of House District 55 divides areas with
5  greater than 25.01 percent Black CVAP?
6  A.     Yes.  I'd agree that there are precincts
7  with -- or VTDs with greater than 25.01 percent Black
8  CVAP on both sides of that line.
9  Q.     Okay.  And if you'll flip back one page to
10  Page 143, do you see this as the same map we've been
11  looking at but with place names?
12  A.     Yes.
13  Q.     And would you agree with me that the western
14  district of House District 55 divides Killeen?
15        MR. KERCHER:  Object to the form of the
16  question.
17  A.     Yes.
18  Q.     Okay.  You can put that aside.
19        I believe you testified earlier today, and I
20  don't want to reask you unnecessarily, that you have
21  not considered any of the evidence that's been
22  produced in the fact discovery side of the case?
23  A.     I believe that's correct.
24  Q.     And that would include things like public
25  comments submitted to the redistricting committees,

Page 249

1  correct?
2         MR. KERCHER:  Object to the form of the
3  question.
4  A.     Correct.  I did not consider that.
5  Q.     And it would also consider things like what
6  legislators said to each other when they were debating
7  various redistricting plans, correct?
8         MR. KERCHER:  Same objection.
9  A.     Correct.
10  Q.     So is it fair to say that you do not know
11  the extent to which legislators were on notice that
12  proposed plans divided communities of color?
13        MR. KERCHER:  Objection.  Asked and
14  answered.
15  A.     That's correct.  I don't know anything about
16  what the legislature was told.  And my only opinion is
17  that the maps that were produced are consistent with
18  improving Republican performance.
19  Q.     And that means just the final maps as part
20  of the Enacted Plan, correct?
21        MR. KERCHER:  Object to the form.
22  A.     That's correct.
23  Q.     Did you consider whether maps in any
24  particular area were amended as part of the
25  redistricting process?

Sean P. Trende
September 02, 2022

Page 250

```
1          MR. KERCHER: Object to the form.
2    A.     I did not. I only looked at the final maps.
3  Nothing has changed in the last 10 seconds.
4          MR. BRACHMAN: Okay. Mark this as Exhibit
5  12, please.
6              - - -
7          And, thereupon, Plaintiff's Exhibit No. 12
8  was marked for purposes of identification.
9              - - -
10 BY MR. BRACHMAN:
11   Q.     Mr. Trende, I won't ask you if you
12 considered this, but does this appear to you to be a
13 redistricting plan for Bell County?
14   A.     Bell and Lampases. But yeah.
15   Q.     And in this plan, District 54 includes part
16 of Lampases County and part of Bell County, correct?
17   A.     I think it includes all of Lampases and part
18 of Bell.
19   Q.     Fair enough. And the part of Bell County
20 that's included in this plan, the eastern boundary of
21 District 54 runs along the top of I-14 and just past
22 the I-35 and then comes down to the south, adjacent
23 to -- Looks like that might be State Highway 109. Do
24 you see that?
25   A.     I don't have my readers, so that's a little
```

Page 251

```
1  more detail than I can make out.
2    Q.     Okay. If you'll look back at Exhibit 11
3  that we were just looking at, that's the color-shaded
4  map. You would agree with me that this is a different
5  configuration of the House Districts 55 and 54.
6  What's reflected in Exhibit 12 is a different
7  configuration of House Districts 55 and 54 and what is
8  depicted under the Enacted Plan Map, correct?
9          MR. KERCHER: Object to the form of the
10 question.
11         You may answer.
12   A.     Page 144 of Exhibit 11 is different than
13 Exhibit 12, which is the benchmark plan.
14   Q.     I'm just asking if they are different?
15         MR. KERCHER: Same objection.
16   A.     Yeah. I mean, I --
17   Q.     Do you know whether the boundaries that are
18 reflected in Exhibit 11, the color-shaded map, were
19 created as part of an amendment process during the
20 redistricting process?
21         MR. KERCHER: Object to the form of the
22 question.
23   A.     No. I don't know anything about the
24 history, except that this looks an awful lot like the
25 benchmark plan, which I'm assuming is malapportioned.
```

Page 252

```
1    Q.     And so you did not consider, for example,
2  whether a district formation like what's reflected in
3  Exhibit 12 would have achieved equal apportionment,
4  correct?
5          MR. KERCHER: Object to the form of the
6  question.
7    A.     Yeah. I don't know if you could have kept
8  the benchmark plan here in place without altering it
9  at all.
10   Q.     Okay. And you also don't know whether the
11 district boundaries reflected in Exhibit 12 would have
12 improved -- Well, strike that.
13         You don't know whether it was necessary to
14 draw the western boundaries of District 55 dividing
15 Killeen to shore up Republican partisan advantage in
16 Bell County, do you?
17         MR. KERCHER: Object to the form.
18   A.     I'm not sure.
19   Q.     You're not offering that opinion in your
20 report, correct?
21         MR. KERCHER: Object to the form.
22   A.     That's right. The only opinion I'm offering
23 is that the district lines that were produced are
24 consistent with shoring up Republican voting strength.
25   Q.     And if, during the debate on the House
```

Page 253

```
1  redistricting plan, legislators discussed the fact
2  that the enacted western boundary of District 55 split
3  an African-American community in Killeen, that has no
4  impact on your opinion about the reason the boundary
5  was drawn that way, correct?
6          MR. KERCHER: Object to the form of the
7  question. He's already testified that he didn't rely
8  on any of the legislative history in reaching any of
9  his conclusions. You already have the testimony that
10 you need 15 times on this question.
11         You may answer this question, Mr. Trende.
12   A.     I think you smuggled in an incorrect
13 premise, which is that I'm offering an opinion on the
14 reason for this being drawn. They could have been
15 indifferent to the splitting of the African-American
16 community as a means of trying to achieve their
17 partisan objective, if such existed. But regardless,
18 the opinion that I'm offering is that it is consistent
19 with improving their partisan performance in the area.
20         MR. BRACHMAN: Can we go off the record for
21 two minutes? I'm just going to check my notes. I may
22 be nearly done, Mr. Trende.
23         (Recess taken.)
24 BY MR. BRACHMAN:
25   Q.     We're back on the record. Mr. Trende,
```

Sean P. Trende
September 02, 2022

Page 254

1   I just have a couple more questions for you.
2           Do you recall an article that you wrote in
3   "The Atlantic" about strategic voting choices in
4   primary elections where a voter doesn't expect to
5   win -- doesn't expect their preferred party to win in
6   the election?
7   A.      Yeah.  I co-authored that with
8   Jonathan Robinson.
9   Q.      Is it fair to say that that strategy you
10  described in that article is one of the ways in which
11  primary voting behavior can differ from general
12  election voting behavior?
13          MR. KERCHER:  Objection to form.  Do you
14  have a copy of the exhibit for him to look at?
15          MR. BRACHMAN:  I can get one, if you'd like.
16  BY MR. BRACHMAN:
17  Q.      Would you like a copy of your article?
18  A.      Sure.
19                      - - -
20          And, thereupon, Plaintiff's Exhibit No. 13
21  was marked for purposes of identification.
22                      - - -
23  BY MR. BRACHMAN:
24  Q.      Mr. Trende, do you recognize Exhibit 13 as
25  the article in "The Atlantic" you cowrote titled,

Page 255

1   "When Your Vote Doesn't Matter, Try Switching
2   Ballots"?
3   A.      Yes.
4   Q.      Okay.  And one of the strategies that you
5   and your co-author discuss in this article is a way
6   for voters from the party that are not expected to win
7   the General Election to influence the candidates of
8   the opposing party, correct?
9   A.      Yes.
10  Q.      Okay.
11  A.      We suggest doing that.  I don't know how
12  much people listen to us.
13  Q.      Sure.  And just at a very high level, is
14  that an example of voting behavior in primaries that
15  you would not expect to see in the General Election?
16          MR. KERCHER:  Object to the form of the
17  question.
18  A.      So it depends.  If we're going to go to a
19  very general level, the point is to try to get the
20  winner of the General Election to be closest to your
21  ideal positioning.  So the idea is if you're not going
22  to be able to influence the General, you try to
23  influence the outcome of the General Election via the
24  primary.  It's really the same thing, just in a
25  scenario where your truly preferred candidate can't

Page 256

1   win in the General Election.
2           And one thing for the record, since this is
3   now in the record in a court proceeding that could go
4   into the permanent record, there is an unmentionable
5   term in this article.  I would like to state that we
6   had -- our draft of it called it simply "an
7   unmentionable term," and the editors thought that the
8   term was amusing and put it in.  We acquiesced, but
9   that was not our initial approach.
10  Q.      I was not going to mention the unmentionable
11  term.
12          MS. PERALES:  I want the exhibit.
13  BY MR. BRACHMAN:
14  Q.      Is the strategy that is described with the
15  unmentionable term one reason why the results of
16  Primary Elections may not reflect the -- Well,
17  I'll withdraw that, and I'll ask a different question.
18          Is the strategy that's described in this
19  article something that could influence the winning
20  candidate in the Primary Election?
21          MR. KERCHER:  Object to the form of the
22  question.
23  A.      To the extent that voters from one party
24  attempt to vote in the other party's Primary, it would
25  affect the outcome of the Primary.

Page 257

1   Q.      Okay.  And it could also affect the
2   distribution of votes between competing candidates in
3   the Primary, correct?
4   A.      Yes.
5   Q.      And I'm just going to ask you one final
6   hypothetical.  If you would assume for me that the
7   voters who are voting in the other party's Primary
8   are -- so the voters who are engaged in the
9   unmentionable term are white voters, and the voters in
10  the party Primary that they are voting in are
11  predominantly minority, could the strategy described
12  in this article influence or skew the results of what
13  the minority candidate in the Primary might be?
14          MR. KERCHER:  Object to the form of the
15  question.  It's an incomplete hypothetical and lacks
16  foundation.
17          You may answer, if you can.
18  A.      So to make this a little less abstract
19  because I'm a terrible abstract thinker.  You're
20  talking about a situation where white Republicans, for
21  an example, intervene and vote in a Democratic Primary
22  to try to elect the least electable Democrat, would
23  that skew the minority candidate of choice?  I don't
24  know.  I guess there might be a situation where --
25  I don't think it would skew the minority candidate of

Sean P. Trende
September 02, 2022

Page 258

1  choice, but it could hypothetically skew the white
2  candidate of choice in the Primary.
3  Q.      And it would skew the distribution of votes
4  between Primary candidates, correct?
5          MR. KERCHER:  Same objection.
6  A.      It could, but those voters are nevertheless
7  real and so Primary voters are Primary voters.
8          MR. BRACHMAN:  Mr. Trende, I appreciate your
9  time today.  I will pass the witness.
10                    - - -
11              EXAMINATION
12  BY MR. McCAFFITY:
13  Q.      Mr. Trende, can you hear me?
14  A.      I can.
15  Q.      My name is Sean McCaffity; I represent the
16  Mexican American Legislative Caucus.  I'm going to try
17  to be really brief with you.  Okay?
18  A.      That is a-okay.
19  Q.      I figured it would be.
20          Before we get started, I want to follow up
21  on one thing, though.  I think the tweet that was
22  introduced into evidence as I think Exhibit 10, the
23  December 14th, 2020, tweet.  Do you know what
24  I'm talking about?
25  A.      Yes.

Page 259

1  Q.      All right.  In that tweet, you generally
2  talk about you were "nerding out" and drawing for
3  Texas and said it was possible to draw a map in CD 23
4  while keeping it two-thirds Hispanic and majority
5  Trump, correct?
6  A.      I think that's right.  Yeah.
7  Q.      So why did you tweet about making CD 23
8  majority Trump while keeping it 66 percent Hispanic?
9  A.      Honestly, I understand why you all are
10  gravitating to this tweet.  We have put more thought
11  into this tweet in this deposition than I probably did
12  writing it.  I just wanted to draw a heavily
13  Republican map that, loosely speaking, would seem to
14  satisfy VRA constraints and see if it could be done.
15          The same reason I say you can do a six-way
16  pizza-mander of Travis County, even though it doesn't
17  mean you should.  And to underscore how non-rigorous I
18  was being, one of my reasons you wouldn't necessarily
19  do that is "Oh, come on" reasons.
20  Q.      Okay.  Do you usually tweet about noteworthy
21  political commentary?
22          MR. KERCHER:  Object to the form of the
23  question.
24  A.      I tweet about noteworthy political
25  commentary, but I also tweet for fun.

Page 260

1  Q.      Yeah.  Do you believe there's tension
2  between making CD 3 a majority Trump district and also
3  a majority Hispanic district?
4          MR. KERCHER:  Object to the form.
5  A.      I don't know.  I haven't looked at that.
6  Q.      All right.  Do you know what percent of the
7  Hispanic vote Trump did receive in CD 23 in 2020?
8  A.      I don't think anyone knows that with
9  specificity.  We have estimates of varying value.
10  Q.      Okay.  If you would take your expert report,
11  please, and turn with me to Page 132.  This is the
12  section of the report where you respond directly to
13  some of Dr. Kousser's report, correct?
14  A.      That's correct.
15  Q.      The first sentence on Page 132 says, "Much
16  of the Kousser report is dealt with generally above."
17          In what way or what did you mean when you
18  were trying to refer to the sections above as being
19  responsive to the Kousser report generally?
20  A.      So the Kousser report talks a lot about the
21  ways the districts were constructed.  And so rather
22  than repeating everything that had been written above
23  about the construction of the districts, it just
24  seemed useful to -- it just seemed useful to make the
25  reference.

Page 261

1          The other thing is that, as you may recall,
2  originally there were different due dates for response
3  to Kousser and response to Duchin.
4  Q.      Uh-huh.
5  A.      And so I think the way it was initially
6  constructed was a short-ish response to Kousser.  And
7  then, once we got the extension on Kousser and Duchin,
8  it just got merged in this way.
9  Q.      Okay.  So, generally speaking, when you were
10  talking about the demographic population shifts in and
11  out of districts how the various districts were
12  shifted during the 2021 redistricting cycle, that's
13  what you're referring to when you say, "Much of the
14  Kousser report is dealt with generally above"?
15  A.      That's correct.
16  Q.      All right.  You do not do a specific
17  analysis of the circumstantial evidence of intent,
18  right?
19  A.      That's correct.
20  Q.      You don't do an analysis --
21  A.      Well, except to the extent that something
22  like the simulations would be circumstantial evidence
23  of intent.
24  Q.      Okay.  Fair.  You don't do an analysis of
25  the Arlington Heights factors in your report, correct?

Sean P. Trende
September 02, 2022

Page 262

1    A.        Not directly.  I don't know if any of these
2    analyses would bear on the Arlington Heights factors,
3    but not directly.
4    Q.        You have not endeavored to formulate any
5    specific opinions applying the statistical measures
6    that you put forth in your report to the Arlington
7    Heights framework?
8              MR. KERCHER:  Object to the form of the
9    question.
10             You can answer.
11   A.        Asked that way, I'll agree.
12   Q.        Similarly, you have not endeavored to apply
13   your statistical analysis of the -- that ultimately
14   support your opinion that the redistricting maps were
15   consistent with political outcomes to the Senate
16   factors under Section Two of the Voting Rights Act?
17             MR. KERCHER:  Same objection.
18             You can answer.
19   A.        The way it's phrased, yes, I haven't
20   endeavored to specifically do that.
21   Q.        And your report doesn't outline any opinions
22   on either specific Arlington Heights factors or the
23   Senate factors?
24   A.        That's correct.
25   Q.        You do not do an analysis of the racial

Page 263

1    demographics of the populations that were moved or
2    shifted out of the various districts, correct?
3              MR. KERCHER:  Object to the form.
4    A.        That's correct.
5    Q.        All right.  In this second full paragraph on
6    Page 132, you indicate that Kousser provides evidence
7    that "Texas line drawers reconfigured the electoral
8    districts in a way that safeguarded Texas Republicans'
9    future interest," right?
10   A.        I'm sorry.  Could you refer me to a line
11   number.
12   Q.        It's the last sentence, basically, of the
13   second paragraph.
14   A.        That is what the sentence says.  Yes.
15   Q.        Okay.  So is your essentially general
16   critique of Kousser that his evidence is just
17   consistent as well with a political outcome for the
18   redistricting cycle?
19             MR. KERCHER:  Object to the form of the
20   question.
21   A.        I don't know that that's -- I don't know
22   that that's correct.  All I'm saying right there is,
23   on this point, we agree that Republicans had suffered
24   setbacks and that some of the evidence that
25   Dr. Kousser presents is consistent with political

Page 264

1    outcomes.  So, in that sense, we are on the same page.
2    Q.        All right.  In the next paragraph, the
3    second sentence says, "Where Kousser goes astray is
4    leaping to the conclusion that because in his view,
5    race and politics are intermixed, that they can be
6    treated as the same quantity."  Did I read that right?
7    A.        That's correct.
8    Q.        Why can race and politics not be treated as
9    the same quantity?
10   A.        Because being intermixed is not the same
11   thing as being the same thing.  If you have --
12   Assuming I recall Dr. Kousser's report correctly, and
13   assuming that the correlation is 67 percent between
14   race and politics, those still aren't the same
15   quantity, and there are places where they diverge that
16   can be of interest and illuminate things.
17   Q.        Do you agree that race and partisanship are
18   correlated in Texas generally?
19             MR. KERCHER:  Object to the form of the
20   question.
21   A.        I haven't looked specifically at that, but
22   there is almost certainly some correlation between
23   race and politics in general.
24   Q.        Do you agree that race and party politics
25   are highly correlated in Texas?

Page 265

1              MR. KERCHER:  Same objection.
2    A.        I don't know if .67 -- if that is, in fact,
3    the R square that he recited -- would qualify as
4    strongly or highly correlated; but there would be a
5    fair degree of correlation.  There are certainly some
6    places where the correlation is stronger than others.
7    Q.        Do you agree that race and party politics
8    are inextricably intertwined in Texas?
9              MR. KERCHER:  Object to the form of the
10   question.
11   A.        No.
12   Q.        Why not?
13   A.        Because there are areas specifically in
14   Dallas where you have white voters that are voting
15   very heavily Democratic.
16   Q.        Is that your only basis for why you believe
17   they're not inextricably intertwined?
18   A.        No.  There are areas where Hispanic voters
19   give a fair number of votes to Republican candidates.
20   There are relationships that crop up, but they are not
21   inevitable; and I don't think you can -- you're bound
22   by them in every example.
23   Q.        Do you take issue with any of the social or
24   cultural historical background of Texas and why or how
25   race and politics have become intermixed, whether or

Sean P. Trende
September 02, 2022

Page 266

1  not highly or generally?
2       MR. KERCHER: Object to the form of the
3  question.
4  A.      I don't understand that question.
5  Q.      Have you done any analysis of the social,
6  cultural, or historical facts that have led to the
7  current state of race and politics in Texas to
8  understand why or why not race and party politics in
9  Texas may or may not be interrelated?
10       MR. KERCHER: Object to the form of the
11  question.
12  A.      I did not. I did not do a historical
13  analysis of the development of the Republican and
14  Democratic parties with respect to race in Texas.
15  Q.      Is it fair to say that your critique of
16  Dr. Kousser's conclusion that race and politics are
17  intermixed is based upon anecdotal evidence that, in
18  certain instances, white voters might vote Democratic
19  and, in certain instances, Hispanic voters might vote
20  Republican?
21       MR. KERCHER: Object to the form of the
22  question. Misstates his testimony.
23  A.      I won't agree with the characterization of
24  it as anecdotal, but I will agree that the reason that
25  I disagree with him is because there are areas of

Page 267

1  Texas where white voters do vote Democratic; Travis
2  County and Austin being another example. And some
3  areas where minority voters aren't as overwhelmingly
4  Democratic.
5  Q.      You didn't do any testing or statistical
6  analysis yourself about the correlation between race
7  and party politics in Texas?
8       MR. KERCHER: Object to the form of the
9  question.
10       You can answer.
11  A.      That's correct.
12  Q.      All right. If Dr. Kousser's premise is
13  correct, or the assumption is correct that race and
14  party politics are intertwined, would it be fair to
15  say that your report would also show that the Enacted
16  Maps are "consistent with racially motivated
17  gerrymandering"?
18       MR. KERCHER: Object to the form of the
19  question.
20  A.      That depends on what the law is on the race
21  and politics being intermixed and what judges and
22  courts are supposed to do in that circumstance.
23  Q.      Do you have an understanding of what the
24  current state of the law is on that issue?
25       MR. KERCHER: Object to the form of the

Page 268

1  question.
2  A.      I don't know anything about Fifth Circuit
3  law. My understanding from the Supreme Court is that,
4  if there is a relationship between race and politics,
5  it's not incumbent upon the legislatures to sort them
6  out. That's a Thomas opinion from the '90s.
7  Q.      Is it possible for a map drawer to obtain
8  partisan or political objectives by using race as a
9  factor?
10       MR. KERCHER: Objection. Calls for
11  speculation.
12  A.      Can you ask that again?
13  Q.      Is it possible for a map drawer to obtain
14  partisan or political objectives by using race as a
15  factor?
16       MR. KERCHER: Same objections.
17  A.      I suppose you could, but it wouldn't be as
18  good as using political data.
19  Q.      Is it possible for a map drawer to obtain
20  partisan or political objectives in Texas by using
21  race as a predominant factor?
22       MR. KERCHER: Object to the form of the
23  question. Calls for speculation.
24  A.      I don't know if you would be able to do that
25  because you would have places like Austin where you

Page 269

1  would be drawing -- you maybe would draw a white
2  district and it would end up being heavily Democratic
3  for some of the districts in the Dallas/Fort Worth
4  area. So no, I don't think I can agree with that.
5  Q.      All right. What about if you were only
6  trying to use race in a regional area or in a -- for
7  specific districts as opposed to trying to do it
8  across the board state-wide?
9       MR. KERCHER: Objection. Calls for
10  speculation.
11  A.      I don't know whether it would be possible to
12  do so in areas of Texas.
13  Q.      Why don't you know that? Is it because you
14  didn't do a racially polarized voting analysis?
15  A.      No, it's because I didn't examine every area
16  of Texas to see how maps could be drawn there if I
17  were drawing on the basis of race.
18  Q.      But your report does not rule out that race
19  could be used as a factor in the map-drawing process,
20  just that the maps, as they ultimately were
21  established, were consistent with also political
22  outcomes?
23       MR. KERCHER: Objection, compound.
24  Objection, misstates testimony.
25       You may answer.

Sean P. Trende
September 02, 2022

Page 270

1  A.        The only thing that I am considering is
2  whether the maps are consistent with political
3  outcomes.  Whether that is -- whether that rules out
4  the possibility of race being used is not something
5  I considered.
6  Q.        Okay.  And just because I got an objection
7  to compound, I think you're right about that, but
8  I want to make sure I ask that more cleanly.
9            Your report does not rule out race as a
10  factor used in the map-drawing process?
11  A.        No.  All the report does is show that it's
12  consistent with politics.  There are areas -- there
13  are areas where, you know, white voters are split up
14  among the district on the basis of political voting,
15  but it doesn't cleanly rule out race as a possible
16  factor.
17  Q.        All right.  If you look at Page 132, your
18  last paragraph, where you talk about Kousser ignores
19  the fact that there are multiple instances where
20  district lines were drawn that have a partisan effect
21  but not a racial effect, that's the paragraph I'm
22  talking about.
23            You reference the Sixth District and you
24  say, "The Sixth District is good evidence of the
25  predominance of politics and redistricting.  The

Page 271

1  district now carves out the remaining purple and red
2  areas of Dallas County, optimizing the blue precincts
3  in Districts 30, 32, or 33."
4            Can you explain to me exactly what you're
5  talking about there?  I think I understand generally,
6  but I just want to make sure I understand exactly what
7  you mean.
8  A.        Yeah.  So I'm giving examples of -- and
9  I only give two, but I think earlier we discussed some
10  other ones.  But the Sixth District exists in such a
11  way that it captures all the remaining purple and red
12  areas of Dallas County not put into other districts,
13  which helps create a scenario that I describe in the
14  tables where there's almost no red precincts left in
15  30, 32 -- or I'm sorry.  No Trump-won precincts left
16  in 30, 32, or 33.  That's what I'm referencing.
17  Q.        But you don't look at the racial
18  demographics of those precincts, right?
19  A.        Right.  The Sixth is good evidence of the
20  predominance of politics and redistricting because
21  it's carving out all of the red -- purple and red
22  precincts that's left over in Dallas County.
23  Q.        I mean, could another way to say that it
24  packs blue precincts into 30, 32, and 33?
25            MR. KERCHER:  Object to the form of the

Page 272

1  question.
2  A.        Yeah.  "Packing" is a term of art that is a
3  vague term of art.  That's why I used the term
4  "optimizing" the blue precincts in District 30, 32, or
5  33.
6            MR. McCAFFITY:  Objection.  Nonresponsive.
7  BY MR. McCAFFITY:
8  Q.        Is that another way of saying it, though?
9            MR. KERCHER:  Same objection.
10  A.        I don't know whether that's also packing.
11  I use the term "optimizing" because it's distributing
12  them in the most efficient way and that's the term
13  that I prefer.
14  Q.        You don't know who is distributed in the
15  most efficient way because you didn't look at the
16  racial demographics of those precincts that are put
17  into 30, 32, and 33?
18            MR. KERCHER:  Objection, compound.
19  Objection, asked and answered.
20  A.        As I said, no, I didn't look at the racial
21  makeup of the precincts.  But I do know that almost
22  every red precinct or Trump-won precinct in Dallas
23  County is placed in one of the Republican districts
24  because -- in part because of the way District 6 is
25  drawn.

Page 273

1  Q.        Okay.  And now flip over to Page 19 of your
2  report.  On Page 19, right below the figure, you say,
3  "In the DFW Metroplex itself, see figure 9, the
4  district gains residents by extending into politically
5  marginal portions of Dallas County."  Did I read that
6  right?
7  A.        Yes.
8  Q.        What do you mean by "politically marginal"?
9  A.        Not blue.
10  Q.        Not blue.  Why is that politically marginal?
11  A.        It goes into areas of Dallas County that
12  aren't the heavily blue areas of Dallas County.
13  Q.        Okay.
14  A.        I don't know how to be more specific than
15  that.
16  Q.        So politically -- Well, could you be more
17  specific about it by talking about what you -- from
18  whose margin you're looking at?  You're saying this is
19  politically marginal because they're Republican
20  districts?
21  A.        No.  I am saying it extends into -- the DFW
22  into Dallas County and picks up politically marginal
23  portions and also helps take out whatever is left of
24  the red precincts in Dallas County.
25  Q.        All right.  I think I understand.

Sean P. Trende
September 02, 2022

Page 274

1    Flip to Page 133, which is the second half
2 of your analysis of Dr. Kousser's report.  In the
3 first full paragraph, you talk about a heat map for
4 District 24.
5    A.    Yes.
6    Q.    And you say, if you had looked at that, it
7 would be obvious that the white areas north of Dallas
8 are split almost perfectly along political lines
9 rather than racial lines.  What heat map are you
10 referring to there?
11   A.    Do I refer to a heat map?
12   Q.    Well, you do in the text there.  That's why
13 I'm asking because there's not a citation, and I don't
14 recall seeing it in the statistical information you
15 produced.  I'm trying to understand where you got
16 this.
17   A.    I'm sorry.  I just -- I'm not trying to be
18 disagreeable.  Can you point me to the sentence that
19 has it?
20   Q.    The second full -- Sorry.  The third full
21 sentence of the first full paragraph, 133, it says --
22   A.    Okay.
23   Q.    -- "Had Dr. Kousser provided."
24   A.    I see it now.  I see it.  So I think what
25 I'm referring to there -- what I'm referring to, I

Page 275

1 guess it's a choropleth map and not a heat map as
2 such.  But if you look at figure 25 --
3    Q.    Okay.  What page is that on?
4    A.    Page 40.
5    Q.    Okay.
6    A.    Yeah.  These are -- the colors -- the
7 precincts that are non-Hispanic white plurality are
8 shaded.  So as you can see -- Well, it actually
9 doesn't come out that cleanly on the printout.
10        But on -- In Dallas County, the district
11 lines goes almost perfectly along the red/blue
12 boundary, even though it doesn't go perfectly along
13 the non-Hispanic white boundary.
14   Q.    For CD 6 or 24?
15   A.    I'm sorry.  CD 24.
16   Q.    Okay.  My copy, unfortunately, is not a
17 color copy, so it's harder for me to see.  I wanted to
18 see -- I just wanted to know what you are referring to
19 there, so that helps me.  I appreciate that.
20   A.    Yeah.
21   Q.    And then, in the next paragraph, you talk
22 about -- in the second sentence, you say, "When
23 examining the districts in Austin and Houston on a
24 precinct level, we plainly see mapmakers making
25 choices consistent with a political explanation."

Page 276

1    That's on Page 133.  The second sentence of
2 the last paragraph.
3    A.    Yes, I see that.
4    Q.    So what districts in Austin and Houston are
5 you referring to there?
6    A.    So in the Houston area, I talk about
7 District 7, choices being made on a political basis,
8 consistent with the political basis.
9    Q.    Okay.
10   A.    District 8, I talk about the political
11 effects of the way the map's drawn.
12        District 9, I talk about only to the extent
13 that it's impacted by the way District 7 is drawn.
14        District 14, I talk about the political --
15 or I probably could have skipped it since we aren't
16 talking much about Beaumont, but I talk about the
17 effects in Beaumont.
18        District 22, District 38, and Travis County.
19 I talk about District 10, District 21, District 25,
20 insofar as it's being moved out of Travis County,
21 District 31 and 37.
22   Q.    Okay.  So you're not -- basically, when
23 you're talking about in this paragraph, rebutting
24 Kousser, talking about the Austin and Houston
25 districts being examined on a precinct level, you're

Page 277

1 referring to the analysis earlier in your report for
2 each of the Houston and Austin Congressional Districts
3 where you show how the maps or the populations were
4 shifted in this redistricting cycle?
5    A.    Yes.
6    Q.    Okay.  All right.  Did you have a chance to
7 see the rebuttal report from Dr. Kousser?
8    A.    I did.
9    Q.    All right.  Do you remember -- have you
10 formulated any opinions in response to Dr. Kousser's
11 rebuttal report?
12   A.    Yeah.  I read it and had reactions.
13   Q.    I need to use my time to figure out what
14 your opinions are about that, so why don't you tell me
15 about your reactions to Dr. Kousser's rebuttal report.
16   A.    Off the top of my head, I couldn't do that.
17   Q.    Do you have any recollection of what
18 opinions you formulated in response to his rebuttal
19 report?
20   A.    I'm sorry.  Not in hour eight of the
21 deposition.  Everything is blurred together at this
22 point.
23        MR. McCAFFITY:  Give me one second.  Let's
24 go off the record for a minute and let me find his
25 rebuttal report and see if I can refresh his

Sean P. Trende
September 02, 2022

Page 278

1    recollection on a couple things and then I'll be done.
2          MR. KERCHER:  Okay.
3          (Recess taken.)
4          (Mr. Brachman left the deposition.)
5          MR. McCAFFITY:  Let's go back on the record.
6    BY MR. McCAFFITY:
7    Q.    Mr. Trende, have you been asked to formulate
8    any specific opinions in response to Dr. Kousser's
9    rebuttal report that you intend to offer at trial?
10         MR. KERCHER:  Object to the form of the
11   question.
12         You can answer.
13   A.    I wasn't asked to formulate any specific
14   opinions.
15   Q.    Is there any thesis from his rebuttal
16   opinion that you, sitting here today, that you recall
17   that you disagree with?
18         MR. KERCHER:  Object to the form of the
19   question.
20         You may answer.
21   A.    I remember not being particularly impressed
22   with it.  But I'm being dead honest that, at this
23   point, I don't remember what's in that report.
24         MR. McCAFFITY:  Okay.  All right.
25         Mr. Trende, that's all the questions I have

Page 279

1    for you today.  I appreciate it.
2          I'll pass the witness.
3          THE WITNESS:  Thanks.
4          MR. SWEETEN:  Mr. Rudensky, Mr. Shenton,
5    anyone else have questions?  They are both with Fair
6    Maps.
7          MR. RUDENSKY:  Not from us.
8          MR. SWEETEN:  We'll reserve our questions
9    for the time of trial.  Thank you, all.
10         (Signature not waived.)
11                  - - -
12         And, thereupon, the deposition was concluded
13   at approximately 6:05 p.m.
14                  - - -

Page 280

1    State of Ohio    :
                      SS:
2    County of Franklin:
3          I, SEAN P. TRENDE, do hereby certify that I
4    have read the foregoing transcript of my deposition
5    given on September 2, 2022; that together with the
6    correction page attached hereto noting changes in form
7    or substance, if any, it is true and correct.
8    _____
                    SEAN P. TRENDE
9
10         I do hereby certify that the foregoing
11   transcript of the deposition of SEAN P. TRENDE was
12   submitted to the witness for reading and signing; that
13   after he had stated to the undersigned Notary Public
14   that he had read and examined his deposition, he
15   signed the same in my presence on the _____ day of
16   _____, _____.
17
                    _____
18                  Notary Public
19   My commission expires _____
20                  - - -
21
22
23
24
25

Page 281

1                  CERTIFICATE
2    State of Ohio    :
                      SS:
3    County of Franklin:
4          I, Susan L. Coots, Notary Public in and for
5    the State of Ohio, duly commissioned and qualified,
6    certify that the within named SEAN P. TRENDE was by me
7    duly sworn to testify to the whole truth in the cause
8    aforesaid; that the testimony was taken down by me in
9    stenotypy in the presence of said witness, afterwards
10   transcribed upon a computer; that the foregoing is a
11   true and correct transcript of the testimony given by
12   said witness taken at the time and place in the
13   foregoing caption specified.
14         I certify that I am not a relative,
15   employee, or attorney of any of the parties hereto, or
16   of any attorney or counsel employed by the parties, or
17   financially interested in the action.
18         IN WITNESS WHEREOF, I have set my hand and
19   affixed my seal of office at Columbus, Ohio, on this
20   16th day of September, 2022.
21   _____
                    SUSAN L. COOTS, Notary Public
22                  in and for the State of Ohio and
                    Registered Professional Reporter.
23
24   My Commission Expires January 10, 2025.
25

Sean P. Trende
September 02, 2022

---

## Exhibits

EX 0001 Sean
P.
 Trende 09022
2
  5:11 7:18,22
  95:1 113:17
  151:2 209:14
  212:10
  214:15 234:9
  237:13
EX 0002 Sean
P.
 Trende 09022
2
  5:12 69:13,
  15
EX 0003 Sean
P.
 Trende 09022
2
  5:15 81:20,
  22 98:14
EX 0004 Sean
P.
 Trende 09022
2
  5:17 98:9,
  16,17 99:3
EX 0005 Sean
P.
 Trende 09022
2
  5:19 115:1,6
EX 0006 Sean
P.
 Trende 09022
2
  5:21 117:9,
  20 119:2
EX 0007 Sean
P.
 Trende 09022
2
  5:23 119:18,
  23

EX 0008 Sean
P.
 Trende 09022
2
  6:2 139:8,13
EX 0009 Sean
P.
 Trende 09022
2
  6:4 140:19
EX 0010 Sean
P.
 Trende 09022
2
  6:6 146:2,7
  258:22
EX 0011 Sean
P.
 Trende 09022
2
  6:8 232:1,3
  235:22 239:2
  240:19 242:9
  244:2 247:20
  251:2,12,18
EX 0012 Sean
P.
 Trende 09022
2
  6:10 250:4,
  5,7 251:6,13
  252:3,11
EX 0013 Sean
P.
 Trende 09022
2
  6:12 254:20,
  24

---

### 1

1
  7:18,22 9:11
  16:8,9 47:20
  52:14,21
  53:5,15
  54:15 55:12,
  14 56:6,14

58:1,2 64:9
67:9 68:8,9
73:15,18
95:1 113:17
119:1 140:5
151:2 166:14
167:16 168:8
179:21 181:2
209:14
212:10
214:15 216:7
217:20 218:2
219:13 225:6
234:9 237:13
239:22 240:2
10
  12:9 129:2,5
  136:9,14
  146:2,7
  242:18 250:3
  258:22
  276:19
10-minute
  135:6 207:13
100
  39:6 47:3,9
  48:7,20,22
  77:4,16
  78:15,23,24
  106:21
  136:10
  169:22
100,000
  18:9,11,18,
  19,21 19:11,
  13 41:14
  206:12
101
  106:21
102
  170:6 172:23
104
  174:3
107
  172:1,9
109
  250:23

10:56
  92:5
10th
  223:25
11
  9:8 126:25
  229:14,15
  231:16
  232:1,3
  235:22 239:2
  240:19 242:9
  244:2 247:20
  251:2,12,18
115
  52:5 72:12,
  13 74:11,19
  154:17
  158:20
  159:23
  160:20
116
  59:8,16
117
  59:16
118
  59:16 175:4,
  7,12,18
  185:16,25
  186:5,14
119
  59:16,23
11:00
  92:6
12
  229:24
  250:5,7
  251:6,13
  252:3,11
12.5
  54:7,8,9
12.6
  54:11
125
  183:13
12:45
  92:7 93:2

Sean P. Trende
September 02, 2022

**13**
147:16
183:17
244:12
254:20,24
**13-2**
147:16
**131**
240:20
**132**
113:16,18
260:11,15
263:6 270:17
**133**
112:1,2
274:1,21
276:1
**134**
235:24 239:3
**136**
232:15
**14**
64:25 83:3,9
276:14
**140**
223:16
245:16
**141**
65:1
**143**
248:10
**144**
100:25
247:21
251:12
**145**
98:24 99:4,
9,11 100:14
101:8
**149**
244:3
**14th**
146:11
258:23
**15**
171:20
173:2,15,24

**174**:13
**184**:8,11
**187**:3,5,12
**193**:9 253:10
**152**
242:9
**157**
118:1,4
119:3,6
**15th**
174:23
**16**
185:8
**16-1**
147:15
**16th**
223:25
**17**
111:17
244:12
**18**
169:12
**186,725**
174:3
**19**
234:9 273:1,
2
**19.1**
237:16
**1900s**
46:2
**192,000**
174:7
**195**
175:2 186:1,
7,13
**199**
138:16
**1990s**
47:12 61:10
134:21
163:14

---

**2**

**2**
69:13,15

**93**:1 110:2,3
**119**:1 140:5
**219**:13,14
**221**:7,8
**229**:15
**231**:17
**2.4**
225:10
**20**
46:14 79:9,
11 171:13
193:17,18
195:1 217:4
235:4
**20.1**
67:1,12
**20/23**
138:20
**200-page**
13:7
**2001**
245:17
246:23
**2004**
118:10 196:6
**2010**
99:16 100:12
**2011**
101:6,13
137:3,18,22
180:3,6
**2012**
117:15,22
118:20 120:3
121:4,14,22
139:5 140:13
171:12 195:4
**2013**
139:23
140:4,14
**2014**
116:10
121:16
196:12
**2016**
121:17
183:2,10,21

**184**:2 195:17
**222**:20
**2017**
195:13
**2018**
223:23
**2019**
115:12
**2020**
121:18
146:11
170:10,23
171:14
178:11,15
181:25
183:2,10,21
186:19
187:6,12,16
190:4,16
192:16
195:17
215:13
221:3,8
223:1,23
224:12
225:22 234:4
258:23 260:7
**2021**
127:25
175:3,11,18
179:21 181:3
186:4,23
208:5,12,17
209:3 212:23
213:19 214:8
228:8 232:17
235:25
240:21
242:11 244:4
247:22
261:12
**2021/2022**
199:13
**2022**
93:1 178:10
187:17
188:13,16,21

Sean P. Trende
September 02, 2022

**203**
  66:1,13,16
  70:21 75:3,
  10
**204**
  66:1,16
**206**
  175:21
  177:7,24
  178:14
  182:20
  185:14
  187:2,3,7
  188:12
**207**
  183:24
**208**
  131:3 177:7
**209**
  218:12
**209-page**
  154:6
**21**
  276:19
**21.3**
  237:17
**210-page**
  125:23
  138:20
**22**
  145:16 241:4
  242:18
  276:18
**23**
  96:17 128:20
  135:11,15,22
  137:4,15,17,
  23 138:5,9,
  11,17,24
  139:4 140:6,
  11 146:22
  184:14,17
  204:1,2,12
  205:8,18
  206:4,6,10,
  19,25 207:2
  259:3,7

  260:7
**24**
  29:1 114:14
  128:16,20,
  21,22,23
  129:1,19,23
  140:5 274:4
  275:14,15
**240**
  116:16
**240-character**
  116:12
**25**
  24:12,17
  128:15
  138:3,4,7
  206:5 233:11
  244:18 275:2
  276:19
**25.01**
  241:10
  242:21
  248:5,7
**25.1**
  246:2
**26**
  26:15 27:3,
  5,16 28:5
  31:17 32:3
  33:1 39:21
  140:6 176:11
  245:24
  246:3,8,22
**27**
  26:16 27:8
  28:5,15 29:2
  36:7,9,12
  38:25
**28**
  146:23
  171:20,23
  173:10,17
  184:21,24
  205:9 206:12
  237:14
**28th**
  174:4,7,8

_____

**3**

_____

**3**
  81:20,22
  98:14 119:1
  140:5 141:16
  229:17,25
  230:13,16,19
  231:1 232:25
  233:10,19
  234:4,5,14,
  18,24 235:6
  260:2
**3-point**
  225:8
**30**
  198:9 237:5,
  11,15,25
  271:3,15,16,
  24 272:4,17
**31**
  276:21
**32**
  62:7,19,25
  114:15
  146:21
  147:25
  149:3,5
  237:5,11,25
  271:3,15,16,
  24 272:4,17
**33**
  114:15
  236:23
  237:1,3,5,12
  271:3,16,24
  272:5,17
**33.5**
  68:15,20
  69:9
**34**
  131:2 171:21
  172:8 173:4,
  18 174:22
  185:2,5
  188:13,15
  193:4 221:6

**34th**
  171:12
  174:4,7,9
  194:25
**36**
  140:6
**369**
  144:17
  145:3,8
**37**
  276:21
**371,209**
  230:1,10,12
**379**
  141:14
**37th**
  114:2
**38**
  111:14
  276:18

_____

**4**

_____

**4**
  29:2,5 32:2
  39:10 98:9,
  16,17 99:3
  119:1 212:11
**40**
  42:11 128:9
  246:13 275:4
**40-some**
  190:11
**40.01**
  247:6
**40.1**
  246:16
**41**
  10:12 16:12
**42**
  26:10 31:18
**42.7**
  230:20 231:9
**43**
  26:10 27:8
  28:11 29:22
  35:19 37:1

133:20,22,25
**43.07**
186:15
**45**
28:23 30:14,
16,19 31:6
42:10 43:8,
14 83:25
92:1
**46**
215:12
**47.5**
231:3
**47.7**
224:13
225:10
**48.5**
231:12
**48.61**
186:16
**49**
118:11
**49.5**
230:19
**49.99**
83:24
**4th**
139:23

---

**5**

**5**
38:19 39:1,6
115:1,6
119:2
**50**
42:9 78:15
84:5 118:11
148:23
158:11 198:5
205:19 225:3
246:10,13
**50-percent-**
**plus-1**
67:24 68:2
**50.0001**
83:23 87:13

**50.001**
41:25 42:6,
13 44:17
85:7
**50.1**
67:9 224:14
225:9 246:13
**50.21**
66:24 67:3,
22
**50/50**
78:18
**51**
41:20 225:7
**51.18**
224:5
**51/49**
198:5
**52**
41:22 43:11
**53,071**
174:4
**53.5**
71:7 173:7
**54**
225:6
250:15,21
251:5,7
**54.03**
224:8
**54.3**
224:6
**55**
29:25 30:10,
24 31:4,7
39:15 87:15
174:5,6
248:4,14
251:5,7
252:14 253:2
**59**
235:9,11

---

**6**

**6**
38:19 39:1,7

117:9,20
119:2 151:3,
10,21
154:12,13
158:14
160:19
209:14
234:10,13,25
235:5
236:15,19,22
237:1,2
272:24
275:14
**60**
39:17 84:6,
18 85:4,5
**62**
235:7
**63**
118:12
**65**
55:8
**65/35**
116:1
**66**
146:23,24
205:9,10
259:8
**67**
38:8 264:13
265:2
**69**
136:2,17,24
**6th**
114:4

---

**7**

**7**
9:11,14
28:24 75:13,
23 76:2
115:12
119:18,23
146:21
147:25
148:10,11

152:6,7
154:11 189:4
212:10 241:4
276:7,13
**7-point**
234:3
**70**
46:23 47:1
116:3,19
122:14,18,19
123:6,8
198:10
**70/25**
115:24
**70/30**
46:10,11
115:23
198:25
**70/80**
46:10
**71**
106:20
**72**
106:20
**73**
174:12
**76**
172:10,13
**77**
174:25 175:1
**78**
172:5,8
**79**
174:21,22
175:1
**7th**
98:19

---

**8**

**8**
60:9 139:8,
13 175:23
176:15,20,
24,25 177:16
234:9 276:10

Sean P. Trende
September 02, 2022

80
  124:6
82
  59:16
83
  59:16,19
84
  59:16,19
85
  59:17,19
  64:16
89,000
  174:6
8th
  98:19 120:3
  224:4,13,17
  225:7,10

9

9
  94:25 95:2
  124:12,15
  126:6 140:5,
  19 214:15
  241:4 242:18
  273:3 276:12
90
  12:8 46:13
  48:13
90s
  268:6
96
  192:19
98
  135:25 136:2
99
  105:18,19
  106:1
9th
  224:5,14,17
  225:6,9

A

A-N-S-O
  105:13

a-okay
  258:18
A-P-P-E-L
  213:24
AAPI
  232:21,25
  233:4,12
  234:5 240:25
  241:5,9,24
  244:9,13,17
  245:7
Abbott
  137:7 151:16
  204:5,14,18
  205:16
abbreviations
  140:7
abhorrent
  121:17
ability
  110:16,21
  211:10 215:2
  216:2
able
  15:12 21:13
  70:14,19
  77:20 93:8
  113:8 136:14
  156:23
  165:10
  202:19
  240:10
  255:22
  268:24
above
  29:22 33:12
  39:21,24,25
  40:2 48:17
  178:20
  205:19
  260:16,18,22
  261:14
absolutely
  152:4
abstract
  164:18
  257:18,19

academic
  109:17
accelerate
  117:5
accept
  59:25 73:4
  74:25 75:2
  236:9
acceptable
  162:12
  163:2,3,21
accepted
  47:23 49:7
  50:11,23
  51:12,20
accomplish
  145:11 239:9
account
  77:1 110:4
  207:1
accurate
  76:8,10
  77:3,4 99:4
  106:1 115:14
  117:20 120:9
  133:25
  139:25
  141:8,10
accurately
  93:9,19
  145:7
achieve
  25:20 197:8
  200:14
  239:10,19
  241:15,20
  242:4 243:1,
  3,10,18
  245:1,12
  253:16
achieved
  252:3
acquiesced
  256:8
acronym
  17:19 47:22

across
  163:6,10
  212:3 269:8
ACS
  80:18 161:7
Act
  25:12,14,17,
  20 53:5
  110:1 137:24
  138:5 162:22
  163:1,18
  199:17
  200:15,18,23
  202:8,12
  262:16
Action
  207:20
actual
  12:22 220:8,
  15
Adam
  179:24
  180:1,24
  181:1
add
  150:6 202:13
  226:7 240:14
added
  230:13,16
adding
  226:7
additional
  83:8 211:16
address
  182:13
addressed
  110:6
adjacent
  250:22
adjective
  216:25
admission
  144:11
admit
  142:5
admits
  141:21

Sean P. Trende
September 02, 2022

143:15
144:14
**advance**
150:23 179:8
**advantage**
124:24
125:5,18
214:22
215:1,17,18
216:6,15,22
217:6,12,23
218:4 219:4
220:10,21
241:13
242:25
243:4,13
244:21 245:5
246:23
252:15
**adverb**
216:25
**aerial**
47:6
**affect**
101:25
141:20
143:14
256:25 257:1
**affects**
144:10
**afield**
88:2
**African**
46:10,12
102:23
103:16 122:4
141:21
143:15
**African-american**
121:24
122:8,12
123:3 129:20
130:19
136:17,19
253:3,15

**African-american-ability-to-elect**
201:14,18
**afternoon**
93:1,5
150:18,22
**afterwards**
193:2
**age**
14:19 15:11
79:8,10,14
136:5 158:11
169:6,12
170:1 205:11
**ago**
51:6 145:16
153:3 154:12
185:18
**agree**
15:23 80:6
125:10
154:13 156:8
157:8,25
162:10
163:18,25
164:11
165:21 166:1
169:14 184:7
194:5 196:17
197:1,6
199:2 200:17
201:24
202:12
221:15,16
223:6 227:23
232:23 233:9
241:3
242:17,20
244:11,16
245:23
246:15
248:3,6,13
251:4 262:11
263:23
264:17,24
265:7

266:23,24
269:4
**agreed**
138:8
**aim**
145:11
**Alabama**
53:20 64:13
**Alfred**
82:4 103:14
**algorithm**
12:11 14:17,
24 15:4 20:3
22:3 24:8
47:15
**algorithms**
12:20
**align**
129:11
**allow**
42:22 77:20
86:12
**allows**
14:22
**aloud**
115:19
**alter**
101:1
**altering**
252:8
**alternate**
241:19
**alternative**
24:19 70:2,4
152:9,15,19
158:9,10,22
159:14,18,21
176:8 212:1
244:25
245:10
**Alternatives**
69:23
**amended**
249:24
**amendment**
144:9 251:19

**America**
117:14,22
**American**
8:10 42:25
46:10 103:16
150:20
258:16
**Americans**
46:12,14
102:23 122:5
141:22
143:15
**amount**
64:18 65:2
219:9 235:14
**amusing**
256:8
**analyses**
77:13 103:11
159:25 262:2
**analysis**
9:4 10:6
11:21 22:19
23:22 25:24
37:7 45:15,
17 47:5,19
48:5 49:17
50:6 58:1
62:10 63:7,
13 66:6,9,10
67:4 68:10,
19 69:3
72:21 73:2,
4,6,11,13,
18,19,25
74:5 75:25
77:22 80:11
83:4,5 86:25
89:19 90:6
91:8,11
95:18
103:20,24
104:8,14,22
105:2,10,11
110:25
111:22
127:11 128:7
130:21 131:1

Sean P. Trende
September 02, 2022

153:9,18,23
155:9,24
157:15
160:3,7
186:4,22
187:13
188:2,18
189:16,22
192:14
193:1,22
194:3,4,21
195:6,8,18,
22 207:4
212:7 225:21
226:1,10,11,
19,20
261:17,20,24
262:13,25
266:5,13
267:6 269:14
274:2 277:1
analysts
  78:7,10
analyze
  25:25 26:1
  158:9 182:2
  199:15
  211:18
  230:15
  237:25
  238:5,12
analyzed
  18:21 19:4,7
  84:21 199:3
  228:19 230:9
  234:2,18
  239:25
analyzes
  238:20
analyzing
  18:24 24:24
  28:3
anchored
  201:13
and/or
  235:1
Anderson
  91:23 92:9

93:4,6 98:12
100:2,3,20,
21 108:3
117:12
118:23,25
119:5,7,21
135:5,9
139:11
140:22 146:5
149:24
150:2,10
203:25
anecdotal
  266:17,24
angle
  126:17
Anglo
  187:22 189:1
Anglo-
preferred
  197:9,19
  205:21
Anglo-
republican
  122:9
Anglos
  184:1 188:3
  197:7,15
  198:16
Ansolabehere
  105:13
  182:18
  199:23
answer
  8:22 10:8
  11:10 31:5
  50:17 78:1
  82:11,14
  85:2 88:9,21
  90:23 93:8,
  13,18 100:22
  108:4,6
  109:20
  111:21
  127:18
  128:20
  144:19
  145:25

154:1,9
155:12,15
156:23,25
168:13,15
170:19
176:13,17
177:21
188:10 189:7
191:20
192:3,4
196:1 201:7
202:15
204:17 208:9
209:7 210:7
211:21
212:6,19
213:1 215:8
217:15
220:12
226:18
228:15 237:9
239:7 243:8
244:24
247:11
251:11
253:11
257:17
262:10,18
267:10
269:25
answered
  37:20 111:15
  121:11
  126:21
  143:24 158:6
  202:5 207:22
  213:21
  214:5,11
  218:8 227:10
  228:10
  240:5,15
  241:17 242:2
  243:25
  249:14
  272:19
answering
  46:4 111:8,9
  200:5

answers
  150:3,7
  219:2
Antonio
  96:22,24
  97:3,7,13
  104:17,23,24
  105:3 136:4,
  22 170:13,14
  184:18
  203:4,8,14
Antonio/el
  96:18
anybody
  62:16 205:16
anymore
  189:15,21
anyone
  193:10 209:4
  260:8
apologize
  40:1 82:20
  150:23
App
  147:5,7
apparently
  116:7
appeal
  194:7
appealed
  204:10
appearance
  195:23
appearances
  55:18 64:1
  166:19
appeared
  121:22
appears
  13:8 36:19
  39:9 141:10
  149:3 186:10
Appel
  165:2,5,9
  213:24 214:2
apples
  44:20

Sean P. Trende
September 02, 2022

application
  18:6
applications
  156:13
apply
  262:12
applying
  262:5
apportion
  77:1
apportionment
  252:3
appreciate
  100:17 258:8
  275:19
approach
  13:17,18
  18:12 23:12
  71:23 80:15,
  17 104:22
  141:25
  194:11 242:4
  256:9
approached
  133:14
  207:25
approaches
  12:13 13:16
  18:13 25:11
  47:12 71:24
approximation
  10:17
apps
  156:13
area
  28:12 32:23
  55:17 66:21
  71:4,16
  72:1,3,8
  95:23 96:18
  97:19
  103:17,21
  104:3,11,15,
  17,24 124:5
  128:13
  129:20,24
  130:3,5,10

131:20
132:12 136:4
149:2,11
159:15
162:25
166:19
170:10,22
200:19
202:10
223:19,24
241:6
244:13,17,22
245:21 246:9
249:24
253:19
269:4,6,15
276:6
areas
  89:14 97:18,
  20 105:6,15
  114:5 117:7
  126:13
  131:12
  132:15
  134:23
  152:11,24
  203:4 233:3
  241:5 246:1,
  16 248:4
  265:13,18
  266:25 267:3
  269:12
  270:12,13
  271:2,12
  273:11,12
  274:7
arguable
  110:14,16,21
argue
  35:22
argument
  86:1,4
Arizona
  140:5 199:12
  200:3
Arlington
  261:25
  262:2,6,22

around
  28:23 32:8
  107:3
  146:19,23,24
  156:20 174:4
  198:12,16
  246:9
arrive
  99:17 100:13
art
  40:15 272:2,
  3
article
  49:13,17,18
  105:13 119:2
  120:1,9,14,
  15 140:25
  141:3,5,9
  144:4 182:3,
  10,13,19,22
  254:2,10,17,
  25 255:5
  256:5,19
  257:12
articles
  51:1 195:15
Asian
  59:20 60:10
  103:2
asked
  23:18 33:21
  37:19 49:4
  52:9 74:17
  102:9 111:15
  113:9,13
  114:22,23
  121:10
  126:20 133:7
  143:23 151:1
  156:5 158:5
  176:6,7
  201:8 202:4,
  16 209:11
  213:20
  214:4,10,12
  218:7 225:15
  227:9 228:9,
  10 231:23

238:1,15,16
240:5,15
241:17 242:2
243:24
249:13
262:11
272:19
asking
  65:9 111:19
  119:3,5
  121:5,6
  157:24
  226:10
  251:14
  274:13
asks
  90:22,23
  145:25
aspect
  168:9,10
aspects
  127:22
  178:15
  181:25
assessing
  49:22 63:5
assign
  78:18,25
  79:3 186:8
assigned
  15:2 79:10
assigning
  78:22
associated
  204:22
assume
  78:12 137:19
  145:15 164:1
  227:22
  228:22
  240:11 257:6
Assumes
  97:9 189:5
  205:22
assuming
  69:10 96:13
  213:3 230:7

Sean P. Trende
September 02, 2022

251:25
264:12,13
**assumption**
107:13,17
131:13
228:24
229:1,9
267:13
**astray**
264:3
**athlete**
223:2
**Atlantic**
254:3,25
**atrocious**
196:3
**attempt**
90:16 125:17
163:17
199:16
256:24
**attempting**
13:15
**attempts**
64:24 200:14
**attend**
133:16
**attention**
99:9 131:4
**attorney**
151:12
156:21,22
208:19
**attorney-
client**
176:11
**attorneys**
208:22
**August**
115:12
**Austin**
267:2 268:25
275:23
276:4,24
277:2
**Austin/san**
136:4,22

**authored**
182:17
**authority**
50:23 51:12,
20
**authors**
101:14
117:17
182:23 183:1
**available**
12:18 13:24
34:23 45:25
76:6 79:24
123:18,19
147:9
**average**
164:3,13
183:18 198:2
**averages**
8:25
**avoid**
88:25
**avoiding**
245:13
247:14
**aware**
11:4 45:8
47:25 89:5
95:6,9,23
96:1,4,21
97:2,6 108:9
123:16
134:24
137:2,9,11,
19,21 138:23
154:22
165:2,9
179:14 189:3
211:23
213:24
**awful**
134:21 182:4
251:24

---

**B**

---

**Baby**

101:5
**back**
8:3 17:10
28:10 36:5
45:6 60:11
70:21 72:13
75:21 91:3
92:7 101:13
102:3,13
116:8 121:16
122:2 144:2
158:20
172:23
185:20 186:7
191:4 195:13
200:10
207:18
231:16 234:8
235:22
237:13 239:2
240:20 248:9
251:2 253:25
**backed**
101:17
**background**
265:24
**bad**
73:5 153:21
**balance**
168:25
174:10
**ball**
167:1
**ballot**
190:8,24
191:16 192:1
**ballots**
45:18
187:19,22
188:23 189:1
192:15 255:2
**Barack**
117:14,21
171:13
**barely**
66:24 67:10
**bars**

27:17,20
**base**
170:24
**based**
26:16 29:4,
16 63:22
66:19,20
69:2 77:23
80:11 88:5
138:16
159:22
192:21 210:7
212:5 219:1
220:25
221:15
225:21
226:2,12
266:17
**baseline**
58:9,24
**bases**
61:14
**basically**
18:10 24:24
159:1 263:12
276:22
**basis**
30:5 60:3
217:15
265:16
269:17
270:14
276:7,8
**battle**
230:8
**bear**
94:20 160:23
161:1,17,20,
25 162:1
206:19 262:2
**beard**
217:17,18
218:10
**bears**
161:12
**beating**
83:19

Sean P. Trende
September 02, 2022

beats
  83:17,22
Beaumont
  276:16,17
begin
  96:15 127:12
  133:10
beginning
  37:11 118:13
  131:7 134:14
  159:24
  176:19,23
begins
  119:3 144:25
  177:6,25
behalf
  93:6 151:13
  210:21
behavior
  254:11,12
  255:14
behind
  37:17 124:20
  126:10
  214:18
beings
  34:8 118:4
believe
  11:3 14:12
  15:5 16:8
  28:25 37:5
  38:7 43:2
  49:24 56:14
  62:21 71:18
  76:12 77:10
  94:1 96:7
  97:12 98:16
  99:3,10
  102:14
  115:14
  117:19,24
  120:8,11,25
  121:7 128:17
  129:3 130:1
  132:5 139:25
  141:7 142:4,
  10,16,22
  143:2 146:14

147:19
154:25
159:21 162:1
164:14
165:13,20
167:5 171:12
179:25 181:4
183:23
192:18 195:1
196:10 204:1
207:24 208:3
210:19
212:20 228:2
248:19,23
260:1 265:16
believed
  116:6
believes
  164:3
Bell
  247:22
  250:13,14,
  16,18,19
  252:16
below
  154:19 273:2
Belt
  73:8
benchmark
  229:15,20
  234:10
  251:13,25
  252:8
bend
  47:18 159:5
  240:22 241:6
  244:5,13,17,
  21 245:6,17,
  21 246:9
benefits
  13:20
Benjy
  115:21,22
  116:24
Berra
  47:10
Besides

91:11
best
  16:14,21
  87:25 121:18
  141:1 181:15
  196:7 207:22
better
  41:2 49:1
  52:22 53:3
  58:25 64:13
  150:7 171:10
  216:19
  225:24,25
  226:17
  233:15
Bexar
  170:18 175:8
  185:17,25
biases
  19:16,18
Biden
  30:22,23
  31:6 41:20
  42:2,10,11
  43:10 68:14,
  20 69:9 71:6
  77:23 83:17,
  19,23 171:1,
  14 172:17
  173:7,18
  217:3,10
  221:2 223:3,
  14 230:19
  231:2,11
Biden's
  43:13 83:24
  173:12
Biden/trump
  19:9 238:20
binary
  121:12
bit
  12:22 76:1
  148:15 157:2
  215:19
Bjorn
  101:6

black
  27:17,21,24,
  25 29:12
  32:25 33:2,
  5,10 34:2
  35:11 39:21
  46:25 59:20
  229:20
  236:18
  248:1,5,7
Blacks
  46:21,22
blank
  191:11
blind
  17:4,8 40:9
  201:1,10,12,
  25
blissfully
  37:24
block
  78:14,23,25
  79:1,9,24
  80:20,24
blocked
  115:18
blocks
  78:7,10,15,
  19
blue
  39:21 63:23
  221:11
  236:13
  271:2,24
  272:4 273:9,
  10,12
blurred
  277:21
board
  160:3,8
  269:8
Bonilla
  206:10
book
  49:14,18
  97:25 98:19,
  22,25 99:4,

Sean P. Trende
September 02, 2022

24 100:19,20
101:3,15,22
117:17,21
118:2 119:3,
9,12
border
163:6,7,10
170:13,15
184:18,25
185:6
233:10,19
border-
touching
185:10
bottom
28:11 29:12
33:2,18 78:5
131:6 154:14
187:9 209:15
232:14
236:3,16
237:14
bottom-right
232:19
bound
46:24 47:2
265:21
boundaries
148:11 149:8
157:11
163:23
233:24 243:3
244:11,20
245:24 248:4
251:17
252:11,14
boundary
114:14
138:20
232:24 234:5
236:18
245:25
246:3,8,21
247:17
250:20
253:2,4
275:12,13

bounds
46:3,6,16,19
47:17,18,20
48:14,21
156:1,10
157:12
boxplot
26:11 34:7,
9,10
boxplots
26:9,14
Brachman
207:12,17,19
231:25 232:6
250:4,10
253:20,24
254:15,16,23
256:13 258:8
Brazoria
66:15 70:23,
24,25 73:11,
14
Brazoria's
72:21
break
45:1,3
75:14,15
90:25 91:23
105:14
133:18 135:6
143:2 149:25
193:10,11,12
207:13
breakdown
230:10
breaking
115:23
brief
258:17
Briefly
211:2
bring
39:7 100:1,
19,20
bringing
164:5

broad
8:23 45:13
132:8
broader
48:20 88:25
100:24
101:19
Brooklyn
201:17
brought
164:15
build
42:3
built-in
34:15
bullet
9:16 10:1
152:7
bump
215:18
bunch
18:5 42:13
61:15 86:20
burn-in
18:13
burn-ins
18:16
Bush
118:10 196:5
butcher
182:17
butchering
182:6
Butler
209:5
buying
159:11

―――――――――

C

―――――――――

C-H-E-N
13:18
calculate
62:24
calculation
9:1

California
140:5
call
12:13 13:16
15:10 26:12
27:18,19
51:15 59:12
159:5 224:4
236:3
called
11:4 13:3
18:21,23
46:17 82:14
98:20 147:13
256:6
Callingwood
209:25
Callingwood's
210:8
Calls
89:9 181:17
196:18 197:2
231:4 237:7
239:15 240:6
241:17
268:10,23
269:9
candidate
68:12,18,21
69:7,10
79:11
121:17,18
140:10
175:11 183:6
184:1 186:23
187:25 188:7
189:10,14,
19,25 191:2
194:5 196:9
197:9,20,21
198:17,19
205:4 206:15
222:17
226:3,6,8,13
255:25
256:20
257:13,23,25
258:2

Sean P. Trende
September 02, 2022

candidates
 71:9 103:17
 104:12
 116:4,20
 124:1 132:13
 138:25
 180:20
 192:9,24
 193:25
 194:13
 196:16,23
 205:21
 223:11
 224:18
 228:3,23
 229:2 255:7
 257:2 258:4
 265:19
captions
 134:16
captures
 271:11
care
 105:23
 106:15
 107:12,16,21
cared
 107:23
career
 222:2
careful
 193:1
carefully
 126:12
Carl
 17:21
Carlo
 10:15 12:11
 13:17 18:4,7
Carmen
 59:10,13
 60:10 73:22
Carmine
 59:18
carried
 196:11
 222:22

carry
 222:22
carrying
 116:9
carves
 114:5 271:1
carving
 271:21
case
 14:22 20:23
 21:21 25:9
 34:8 37:24
 53:20 55:21
 56:12,24
 61:17 64:10,
 13 85:24
 88:13 90:19
 104:7 109:24
 110:20,22
 111:4,6,7
 120:2,10
 131:9 133:8
 137:18
 143:11
 145:18,22
 164:24
 165:14
 167:25
 168:1,15
 169:22
 179:17
 198:22 201:9
 202:17
 205:25
 206:3,4
 208:1,5,17
 209:3 210:3,
 18 211:19
 212:8,17
 214:7 215:22
 217:9 220:8,
 15,19,25
 233:5 248:22
cases
 51:16 64:3
 141:20
 143:14
 144:7,11,16

cast
 182:24
 187:19,22
 188:23 189:1
 191:10
 192:15
casually
 203:15
categorizatio
n
 145:5
Caucus
 258:16
CCES
 183:2,5
CD
 96:17 135:15
 137:15,17
 138:11 139:4
 188:13,15
 205:8,18
 206:4,10,19,
 25 207:2
 230:13,16,19
 231:1 233:19
 234:4,5,13,
 14,18,24,25
 235:5
 236:19,22,23
 237:1,5,15
 259:3,7
 260:2,7
 275:14,15
census
 78:7,10,23
 80:3,22,24
 81:6 194:13
center
 35:9 167:2
centered
 232:14
central
 9:3
certain
 12:25 13:25
 14:4,23,25
 20:19 25:6,
 20 26:1,2

 48:17 64:18
 89:5 102:10
 105:5 145:15
 151:8 153:14
 162:25
 205:18,20
 266:18,19
certainly
 51:8 57:22
 64:11 125:24
 139:6 182:1
 195:5 197:4
 200:22 233:2
 236:25 241:9
 264:22 265:5
certainty
 197:1
certified
 7:5
chain
 17:17,21,22
 18:4 22:17
chains
 18:11
challenge
 99:12 100:8
chance
 40:7 42:1
 277:6
chances
 197:19,20
change
 107:5 108:2
 126:1 150:4,
 11 172:18
 230:18
changed
 70:6 101:7
 250:3
changes
 103:25 105:4
 172:6,16
 174:13,17,20
 195:18
 206:19
 216:12 235:5
 238:17

Sean P. Trende
September 02, 2022

changing
  17:12
  117:15,22
  128:19
  132:19
  198:14
chapters
  119:11
characterizat
ion
  266:23
characters
  116:17
charts
  106:20
  169:18
  186:11
Chaudhuri
  7:7,9,21
  23:16 27:2
  45:6,7 62:6
  69:12,18
  75:18,21,22
  81:16,25
  82:17,20,23
  85:16 90:24
  91:3,4,20
  115:4
check
  15:22 193:9
  253:21
checked
  51:6 149:17
Chen
  13:17
children
  169:17,25
choice
  68:12,18,21
  69:7,10
  183:7
  189:14,19
  198:17,19
  206:15 230:7
  257:23
  258:1,2
choices

254:3 275:25
  276:7
choropleth
  275:1
chose
  230:4
Chris
  181:5
Christi
  159:4
Christina
  151:25
  154:15
  158:16,17
  209:20
Circuit
  167:25
  168:15 268:2
circumstance
  109:23
  267:22
circumstances
  50:12 123:17
  229:7
circumstantia
l
  261:17,22
citation
  274:13
cite
  182:16,19
  183:9,25
citing
  195:16
citizen
  14:19 80:23
  106:9 158:11
  169:5,25
  170:1 205:11
citizens
  150:20
  169:11,16
city
  122:3
  165:22,24
civic
  62:17,22

claim
  41:4 63:19
  245:2,3
  247:14
claims
  90:15 243:21
clarification
  172:2 186:11
clarified
  186:20
clarifies
  172:12
clarify
  52:23 54:1
  91:7 211:5
clarifying
  186:18
classify
  8:9
clause/phrase
  106:13
clauses
  106:5
cleanly
  270:8,15
  275:9
clear
  120:1,7
  169:9 216:12
  218:10
clearly
  74:18 124:22
  214:20
  217:17
  230:24
client
  209:12
Clinton
  144:1
close
  20:21,24
  48:22 56:10,
  15 64:7
  87:24 124:19
  126:3,8,9
  196:12
  214:17

219:25
  220:1,3
  224:4
closer
  150:12
closest
  255:20
clue
  135:24
  148:13,20
cluster
  27:13 60:10
clusters
  54:18 60:15
co-author
  255:5
co-authored
  254:7
co-counsel
  217:17
coalition
  67:11
Coast
  159:2
coastal
  159:5
code
  9:23 12:3
  14:8,10,13,
  16 15:7,22
  16:7 17:3,8,
  14 34:5,7
  70:20 77:25
  129:3 136:14
coding
  12:22
cohesion
  167:10,18
  168:24
cohesive
  167:5 168:3
  206:11
cohesively
  130:6,18,23
cohesiveness
  168:10

Sean P. Trende
September 02, 2022

collection
66:25 235:23
Collins
223:2
color
81:18 82:21
235:1 238:23
240:25
242:14
249:12
275:17
color-shaded
251:3,18
colorblind
236:9
colored
244:8 245:20
247:25
colorful
59:9
coloring
221:11
colors
275:6
Columbus
124:4,8
column
27:25 28:23
29:4,13
33:1,3,11,15
39:20,22
186:18
232:17
246:14
columns
27:19 40:1
Combating
141:2
combination
191:17 192:1
combines
67:21
come
8:3 28:10
65:1 87:24
92:7 94:20
102:2 191:22

192:5 212:3
219:25 220:1
259:19 275:9
comes
80:18 109:11
250:22
comfortable
235:20
comma
178:4
command
12:23 14:21
comment
67:5,6,7
172:3,18
commentary
259:21,25
commenting
94:23
comments
248:25
Commission
200:3
Committee
207:20
committees
248:25
common
164:4,15
165:22,25
166:2,5
commonly
55:7
communication
176:11,12
communications
179:18
communities
60:17 61:4,
12,13,25
62:13,18,19
66:4,8
231:19
232:25
233:5,8
235:1 238:23

249:12
community
61:16,23
62:4 166:13,
22 167:1,8
205:19
206:11 233:4
253:3,16
compact
19:25 52:16
53:9 54:17
55:1,4,9,13
56:17 57:6,
23 58:10,14
59:5,7 60:1,
4 63:17
64:17,20
65:6,14,21
71:4,12,15,
25 72:9 74:7
164:2,13
166:14
167:3,13
201:2 202:1
compactness
14:12 15:17,
21 16:6,8,10
22:6,7
53:11,12,14
54:2,20,21,
23 55:7,12,
14 56:5,19
57:5,11,16,
21 58:3,18
62:10,24
63:6 64:8,
21,22 65:3,
25 66:5
67:4,6 68:23
71:17,21
73:10
162:10,12,
20,22 163:2,
11,19,21
165:10,17
166:8,20,22
167:5,9,16
168:7,21

comparator
57:3,16,17
72:17,20
compare
23:5 44:7,12
72:6 84:22
compared
21:16,20
22:7 39:4
42:19 44:4,9
85:13 86:9
compares
58:6
comparing
23:2 44:20
73:25
comparison
75:6 84:25
compelling
141:23
142:18,24
143:16,20
144:12
compensate
122:2
competing
257:2
competition
180:14,18
competitiveness
43:2
compilation
232:8
complete
212:15
completed
50:19
completely
38:20 80:16
107:6 110:9
155:5 182:17
complex
116:16
compliance
200:14

Sean P. Trende
September 02, 2022

comply
  163:17
  199:16
  200:18,23
component
  168:9
components
  62:13
composition
  84:2 124:22
  125:11,20,23
  126:18,23
  127:8,9,15,
  16 138:11
  148:17
  149:10
  152:24
  214:20
compositions
  125:2,25
  126:4,11
compound
  87:3 240:6
  269:23 270:7
  272:18
comprehensive
  212:15
comprise
  60:2 201:3
  202:2
computer
  9:23 10:25
  11:4
conceding
  110:8
concentration
s
  59:20 60:5,7
  61:2 239:13
concept
  13:11 49:9
  61:4 204:25
concepts
  35:6
concerned
  109:10

conclude
  64:19 72:8
  189:20
concluded
  29:16 183:20
concludes
  91:21
concluding
  206:19
conclusion
  88:4,24
  125:3 129:12
  134:6 144:3
  218:13 264:4
  266:16
conclusions
  67:17 88:8,
  17 128:5
  253:9
concoct
  142:2,11
conditional
  107:19
conduct
  11:21 22:18,
  20 45:24
  47:5 62:2
  72:21 73:24
  74:5 80:11
  83:4 91:7
conducted
  88:13
conducting
  63:13 73:2
  108:18
confidence
  9:1 13:22
  121:5
confident
  121:4,13
configuration
  134:6,25
  251:5,7
Congress
  200:13 215:3
congressional
  27:13 30:6

63:10 102:6
108:14
110:21
111:14
112:12
114:2,19
125:2,11,13
126:19
127:9,15
128:1 129:11
132:24
134:3,7,25
135:11,21
136:3 137:3,
23 138:24
140:11
147:11,23
148:9,18
149:1,11
151:14
170:20
173:2,24
177:18
179:14
183:3,13,18
184:8,11,14,
17,21,24
185:2,5,8
187:3,4,12
203:25
204:2,12
206:5 215:14
221:13
226:4,6,8
229:16,24
232:16,24
233:10
234:10
235:25
236:15
240:21 277:2
conjure
  67:14
connected
  60:17,22
connection
  20:6 177:10

consider
  60:21 86:21
  102:4 113:9,
  14 167:13
  171:15
  202:11
  212:22 220:3
  231:1 238:22
  249:4,5,23
  252:1
consideration
  71:5 73:15
  163:16
consideration
s
  86:13,14
  162:20
considered
  20:22,25
  28:7 54:17
  85:21 88:18
  113:1,5
  143:8 169:3
  213:7,14
  216:5 220:3
  227:1,8
  228:6,12
  244:25 245:4
  248:21
  250:12 270:5
considering
  270:1
considers
  162:12
  163:20
consistency
  138:18
consistent
  28:20 37:15
  58:21 88:11,
  22 89:2
  90:4,14,15
  102:11
  108:7,11,21
  109:13
  111:10
  124:23
  125:17

Sean P. Trende
September 02, 2022

126:15
127:4,20
133:24
136:13 171:5
172:25
186:17 207:5
214:21
218:23
225:18
227:12
233:25
238:16
240:17 247:2
249:17
252:24
253:18
262:15
263:17,25
267:16
269:21
270:2,12
275:25 276:8
**consistently**
21:17 71:8
**constitute**
63:17 65:14
**constitutes**
67:1,12
237:19
239:23
**constitutiona
l**
147:3 162:20
**constrained**
48:13
**constraints**
259:14
**construct**
204:11
**constructed**
260:21 261:6
**construction**
9:13 212:12
260:23
**Constructive**
13:17
**consulting**

199:19,24
200:2
**contained**
11:18 158:10
**contains**
19:24 106:8
114:2
**contents**
160:21
**conterminous**
162:23
**contest**
36:24 187:14
188:19
**contests**
170:23
**context**
49:25 50:1,2
63:4,14
99:25 100:24
101:19
106:17
109:16
116:24
124:20 126:9
134:20 144:5
162:14,15
163:3 214:18
**contexts**
9:9 162:16
**contiguity**
14:15
**contiguous**
14:18
**contingency**
101:23
**continuation**
177:17
**continue**
111:19
**continuing**
121:15
**contrary**
238:25
**control**
13:1 16:15,
21 17:1 20:8

24:13,20,23,
25 26:3,5
41:14 42:17
84:16 86:17
87:8,10,17
**controlled**
24:2,6,16
86:6
**controlling**
25:3 35:18
44:15 85:21
87:12
**controversial**
221:17,22
**conversations**
208:22
**Convex**
54:15 55:6
**convincing**
142:2
**convoluted**
59:2,4
**Cooperative**
183:2
**copy**
56:12 81:18
82:18,21
99:4,24
101:1 115:14
117:21 120:9
139:25
141:8,10
146:16
254:14,17
275:16,17
**corner**
54:8,9,11,12
232:19
242:13 244:7
245:19
**corners**
55:3 65:14,
22 168:20
**Cornyn**
116:9 190:11
191:6,15,24
196:10

**Corpus**
159:4,8
**correct**
10:20 15:20
16:4 17:6
19:10 22:19
27:7,15
29:3,15
32:10 52:4,
12 59:22
66:12,17
69:1 75:8
77:6 94:3,7,
13 99:3,18
102:16
118:22
119:23
120:18,19,
23,24 130:13
134:3 137:15
146:16 148:9
149:2
151:11,21
152:11
153:7,16
155:4 160:2,
6 164:5
165:14
166:6,9,10
169:7,8,12,
13 170:9,21
171:1,2,4
173:21
174:15 175:8
179:5
182:24,25
183:3,4,7,8,
10,11,14,15,
22,23
184:10,12,
13,15,16,19,
22,23,25
185:1,3,6,
11,12 186:6,
17,24 188:17
190:21,22
191:4 192:6
194:20
196:13

Sean P. Trende
September 02, 2022

200:25
204:3,7
208:2 209:25
210:1,4,15,
16 211:7
212:24 213:9
218:6 219:9
221:9,10,13,
14,22 222:2
223:20,21
224:1,6,10,
14,15,18
225:14,22
226:4,15,21
227:3,8
229:17,18,22
230:2,3,13,
14,16,17,20,
21,23 231:22
233:13
234:11,12,
16,17,20
235:1,3,7,8
237:17,20
238:3,4,7,8
239:14,23
240:4,13,23
241:15,25
243:5,15,23
244:1,22
245:8 246:24
247:8 248:23
249:1,4,7,9,
15,20,22
250:16 251:8
252:4,20
253:5 255:8
257:3 258:4
259:5
260:13,14
261:15,19,25
262:24
263:2,4,22
264:7
267:11,13
**correction**
224:9
**correctly**

152:1 214:23
218:17
264:12
**correlate**
35:20 41:13
108:23 109:3
**correlated**
36:18 40:5
42:9 84:1
87:6 102:15,
20,21 104:3,
17 105:8
264:18,25
265:4
**correlates**
105:23
106:23
107:11,20
216:21
227:14
**correlation**
38:4 104:5
107:3
264:13,22
265:5,6
267:6
**correspondence**
225:17
**corresponding**
174:16
**cost**
58:16
**Council**
164:21,25
165:6,16
**counsel**
26:24 52:9
82:13,17
90:22,23
94:10,21
118:21
145:24,25
150:24 200:2
228:11
**counties**
134:19
182:7,11

192:12,22
**country**
28:25
**county**
114:1,3,6
148:9,19
149:20
166:2,4
170:18 175:8
185:17,25
190:4,9,13,
16,17,21
191:2,5,14,
24 192:16
206:12
223:25 228:7
240:22
242:11,19
243:13
247:22
250:13,16,19
252:16
259:16 267:2
271:2,12,22
272:23
273:5,11,12,
22,24 275:10
276:18,20
**county-level**
190:17
**couple**
9:8 25:1
71:2 151:8
209:10 254:1
**course**
151:22
176:18
209:18
215:15
219:18
**court**
40:16 53:19
56:4,8,9,23
61:9 72:23
73:4,7,17
74:21,25
98:13 135:1
137:5,14,22

139:12 146:6
155:16
156:6,23
157:17
163:14
168:1,5,14
180:21 198:4
203:19 204:9
206:8,18
207:7 231:25
256:3 268:3
**Court's**
207:9
**courts**
47:23 49:7
50:11 267:22
**cover**
13:23 98:18
144:16,20
**covered**
154:25
160:19
207:21
**cowrote**
254:25
**crazy**
201:16
**create**
30:1,2 31:2,
3 44:1 52:17
53:9 68:11
99:14 100:10
136:16
148:22
271:13
**created**
114:13
212:23
213:8,13,18
227:1,7
251:19
**creates**
43:8
**creating**
43:14,15
214:3
**creation**

Sean P. Trende
September 02, 2022

228:8
creative
  59:9
critical
  99:14 100:10
critique
  52:2,7 66:19
  68:4,7,22
  69:2,5 70:4,
  25 263:16
  266:15
critiqued
  63:11 66:7,
  14 70:3
  74:14
critiques
  52:1 94:2,12
critiquing
  67:20 70:15
crop
  265:20
crosses
  66:24 67:10
crossover
  223:1
crude
  89:18
cultural
  62:12
  167:10,18
  168:10,24
  265:24 266:6
culturally
  167:4,22
  168:3
curious
  168:7 176:5,
  24
current
  198:3 266:7
  267:24
curse
  34:14
cushion
  42:3
cut
  231:18

234:25
cutoff
  65:2 225:3
cutoffs
  55:16
CVAP
  14:19 15:2,
  3,11 19:5
  26:20 27:6
  31:22,24
  32:1,15,20,
  22 33:23
  35:1,4,13
  48:16 67:2,
  13 79:13,15,
  16,20,23
  80:6,11,13,
  18 81:11,13
  86:9,10
  129:7 136:7
  148:22
  205:13
  232:21 236:5
  239:13 241:1
  242:15,19,21
  243:14
  244:9,17
  245:21,25
  246:2,10,17
  247:7 248:1,
  5,8
cycle
  261:12
  263:18 277:4

---

D

Dallas
  41:25 59:18
  89:14 114:6,
  16 132:15
  134:19,23
  203:9 223:25
  265:14
  271:2,12,22
  272:22
  273:5,11,12,
  22,24 274:7

275:10
Dallas/fort
  27:13 30:6
  32:23 44:19
  158:22
  159:16
  223:19 236:1
  269:3
Dallas/san
  203:4
Dan
  51:17
data
  9:6,12,13,
  17,19,25
  10:6,9,10
  28:20 34:17,
  23 38:2 41:1
  43:4 45:15
  46:9 48:18
  66:20 76:6,
  7,10 77:3,4
  79:7,8
  80:18,25
  81:8,14
  133:23
  147:2,6,10
  149:14 161:7
  165:16
  175:23 183:1
  212:11
  213:12
  268:18
Data's
  147:5,6,8
datasets
  77:9 212:12
date
  139:22
dated
  115:11 120:2
  146:10
dates
  261:2
Daubert
  49:24
day

40:19 56:22
  64:25 203:20
  247:18
day-to-day
  8:25 9:5
days
  133:1 143:25
deal
  77:13,21
  100:14
dealing
  70:23
deals
  132:23
dealt
  260:16
  261:14
debate
  252:25
debating
  249:6
decade
  42:3 95:3
  135:2 137:21
  189:13 206:2
  218:16
December
  139:23
  146:11
  258:23
decide
  16:5 35:23
  37:2,4 92:3
  113:14
decided
  219:4
decision
  52:22 53:3,
  19 137:8,14,
  19 142:5
  167:23
  204:9,14
decision-
makers
  142:5,11,17,
  22 143:5

Sean P. Trende
September 02, 2022

decision-
making
  143:9
decisions
  142:12,17,23
  143:6
decrease
  84:6
decreasing
  120:21
  121:1,8
  197:20
  198:18
dedicated
  135:11
Deep
  89:16
default
  17:12,13
Defendants
  151:13
define
  19:19 20:7
  61:20 215:21
defines
  61:25
definition
  22:16 54:16
  57:23 144:9
  162:24
  214:25 215:5
  239:21
degree
  13:22 103:1
  104:5 169:1
  194:21
  195:9,22
  265:5
degrees
  163:11
Delegates
  200:13
Delta
  201:13
Democrat
  46:11,12,15
  69:11 96:9

140:11
181:10
186:20
189:19 194:5
257:22
Democrat-
leaning
  44:6
democratic
  19:8 27:9
  28:5 31:10,
  15 39:8 71:9
  95:16,20
  96:11,14,17
  97:17
  101:12,14
  102:24
  103:8,17
  104:12 114:3
  116:4 117:5
  118:19
  122:6,11,18
  123:3,6
  124:1,7,9
  131:15,21
  132:13
  138:25 139:4
  147:15
  171:22,24
  172:7,17,20
  173:5,18
  174:10
  195:4,5
  198:11
  228:23
  229:12
  257:21
  265:15
  266:14,18
  267:1,4
  269:2
Democrats
  46:24 95:4,
  14,17 96:12
  97:14,19,20
  103:22
  104:25
  120:18

122:23 130:3
132:21
215:13,14
223:4
demographic
  101:25
  230:10
  261:10
demographics
  47:6 107:1
  230:15
  234:19,22
  238:5,6,13
  263:1 271:18
  272:16
demonstrate
  25:10 46:22
  53:8 63:16
  125:16 127:3
  128:12
demonstrates
  124:22
  214:20
demonstrating
  9:3 52:15
  59:6
demonstration
  52:1,3,10
  57:17 59:3
  66:6,11,14
  68:6,7,24
  70:10,24
  71:8,10
  73:21 74:13
  75:7 154:18
demonstrative
  211:18
  212:1,7
Denton-wise
  66:15,18,24
  67:20 73:23
  75:4
depend
  85:19 86:16
  122:11
  123:22
  131:20
  166:20,23

203:3 229:7
dependent
  88:25
depending
  103:3,9
depends
  102:22
  122:2,25
  124:10
  131:24
  167:17
  255:18
  267:20
depicted
  251:8
deposed
  7:11
deposes
  7:5
deposition
  83:16 150:3
  151:5,7
  168:18
  259:11
  277:21
describe
  8:5 45:11
  48:3 95:19
  96:16 151:12
  203:1 204:1
  271:13
described
  158:1 178:20
  254:10
  256:14,18
  257:11
describes
  65:5
describing
  168:2
description
  154:4 212:15
  234:13
descriptive
  8:24
desired
  89:7

Sean P. Trende
September 02, 2022

detail
116:13 251:1
determine
24:15 87:7
111:23 126:2
187:18,21,24
188:22,25
189:9
determining
58:9
developed
10:15 46:2
63:3
development
266:13
develops
64:10
deviates
105:21
106:18
deviations
23:5
DFW
74:18 95:21,
23 96:2,5,8
103:17,21
129:20,24
130:3,10
132:12,24
134:2,6,25
149:1,10,15
273:3,21
differ
254:11
difference
15:12 33:19
54:20 80:5
225:8,10,13
different
16:2 18:6,
18,25 27:9
45:21 55:3
56:24 61:12,
13,14,19,20
65:14 79:4,
17 81:9,13,
15 107:2

157:3 163:15
186:10
187:16
226:18
251:4,6,12,
14 256:17
261:2
differently
131:11 132:1
difficult
35:21 88:3
93:12 108:24
109:3 147:25
197:4
dilemma
155:6
dilute
229:3
direct
88:14 144:23
152:22 154:3
160:24
177:23
directly
10:10 61:21
94:4,8,14,
17,24 108:10
152:20
153:11,12
155:13
160:23
202:20
260:12
262:1,3
disagree
10:18 11:7,
11 72:23
146:15,17
266:25
disagreeable
274:18
disbelieve
165:20
discard
25:19,23
disclaimed
20:4

disclosed
199:24,25
discover
10:4
discovery
85:23 108:8
248:22
discrepancy
80:12
discretion
64:19,23
65:3,11,23
discriminatio
n
135:1 204:11
205:18
206:20
discriminator
y
137:5
discuss
68:6 135:15
138:10 147:3
160:20
175:25
199:21
208:5,11,17
209:3 255:5
discussed
83:15 96:19
133:22 238:2
253:1 271:9
discussing
145:15
223:18
discussion
101:21
134:14
138:19
152:18
177:11 179:6
186:7,12,13
194:11 200:9
206:25
discussions
88:6 182:1
208:24

disentangle
110:22
dismayed
34:14
dismiss
99:12 100:7
disparate
152:11
dispersal
166:21,23
167:17
168:9,24
dispersed
55:11
167:11,22
168:2,19
dispersement
60:20
dispute
23:8,14,21
102:25
196:5,7
disputing
38:2
dissimilar
167:22
distinct
60:15 159:3
198:25
distributed
272:14
distributing
272:11
distribution
13:4,12,14,
19,23 14:1,
2,6 16:18
20:8 21:6,8,
14,24,25
23:6 29:7
33:7,16,19,
22,24 34:3
35:9,14 36:1
38:21,23
40:3 257:2
258:3

Sean P. Trende
September 02, 2022

district
25:12 28:16,
22 29:1,5
30:1,13,17,
18,20,21,22,
23 31:10,24
32:2,16,19,
22 35:1
39:10,12,16
40:8 41:18,
21,25 42:2,
9,10 43:15,
16 46:9
52:17 53:5,
7,10,23,24
54:3,7,9,10,
12,14,20,23,
25 55:8
57:24 58:9
59:4,5,10,
13,18,21
60:1,2,4,6,
18 62:7,19,
25 63:15,18,
22 64:22
65:6,14
66:6,23
67:10,20
68:11,14,17,
20 69:3,4,6,
9 71:3,6,8,
11,12,15,21,
23,24 72:7,
9,22 73:23
74:7 78:17,
24 86:10
87:25 89:17
91:12 107:5
110:9 112:12
113:4,21,23
114:2,4,14,
19 121:24,25
122:7,9,19,
22,23 123:4,
10 124:9
126:17,19,25
134:7,18,22
135:11,22
137:4,23

138:3,5,8,9,
20,24 140:11
148:9,18,23
149:1,4,6,
11,12,15,20,
23 159:19,22
163:5,6,12
164:1,2,4,5,
13,15 166:17
167:2
171:12,14
172:3,7,8,19
173:2,4,7,9,
24 174:10,
13,17,20,22,
25 175:4,7,
12 183:13,18
184:8,11,14,
17,21,24
185:2,5,8,
16,25 186:1,
5,14 187:3,
5,12,16
189:4 193:4,
5 194:25
197:16,18
198:2,5,7
201:3,12,15,
17,19,24
202:2,12
204:1,2,9,12
206:5,12,13,
14 215:6,21,
25 216:3
217:19 218:1
219:5,21
220:4 225:20
226:1,4,6,12
227:13
229:10,17,25
230:1,23
231:15
232:25
233:10,13,
20,24
234:10,15
235:6,15,20
236:15
237:2,4,15,

22,25 238:3,
12 239:4,12,
14 240:3,21
241:12
242:23
243:3,15
245:7,24
246:3,8,22
247:7,16
248:4,14
250:15,21
252:2,11,14,
23 253:2
260:2,3
269:2
270:14,20,
23,24 271:1,
10 272:4,24
273:4 274:4
275:10
276:7,10,12,
13,14,18,19,
21
district's
58:23 126:22
166:8 172:16
235:25 244:4
district-wide
76:7,10,12
77:3
districting
18:8 69:22
113:6
districts
14:18,23,25
22:9 24:12,
14,17 25:6,
14 27:13
29:24 30:7,
9,11,15
31:3,22
32:24 38:19
39:8,14
40:6,20,21,
23 41:6,9,
10,16 42:5,
14 43:9,10,
17,20,25

44:2,18
48:5,25
54:19 55:13
57:6,18,23
58:13,25
59:5 60:8
63:3,10
66:9,11,15
68:17 70:3,
25 71:1,4
72:1,2,8,10,
22 73:21,23,
24,25 74:1,
6,9,13,18
75:1,7 77:13
78:19 83:17,
18,21,22
84:2,17
85:5,6,8,10
86:3,8,9
87:12,21
89:6,13 91:9
102:6 106:8
107:4 110:3,
7,8,10,11,
14,16,21
111:1,14
112:4,17
114:6,8,15
124:20,21,23
125:3,4,11,
21 126:1,10
127:9,15,22
132:24
134:3,10,13,
14,22 136:4
138:17
146:20,21
147:3,11,23
148:4 151:15
154:18 157:4
158:10
159:15 160:8
161:6
162:11,12
163:19
165:17
170:17,18,20
171:5,11,17

Sean P. Trende
September 02, 2022

172:24
177:18
179:14
183:25
184:3,7
185:10
186:10
189:12,20
195:3,8
196:14 197:8
214:18,19,21
215:11,12
216:1,12
217:3,4,9,
10,11 218:4,
15 219:15,
16,22,24
220:16
223:4,5,19
224:17,21,25
225:25
228:7,19
229:8 232:16
239:5,11
240:1,8
241:4,24
242:10,18
243:5,13
244:12
245:6,17
247:22
251:5,7
260:21,23
261:11
263:2,8
269:3,7
271:3,12
272:23
273:20
275:23
276:4,25
277:2

**dive**
7:14
**diverge**
264:15
**diverse**
89:13

**divide**
221:2 231:18
233:4,8,17
235:1 236:22
237:5 241:5
242:19
244:13
**divided**
65:22 206:11
233:16
238:23
249:12
**divides**
232:25
245:25
246:8,16
248:4,14
**dividing**
78:6 241:24
252:14
**divisions**
240:10
**document**
69:19,25
81:17,19
82:1 146:8
**documents**
181:13
**doing**
11:19 17:2
25:4,5 48:22
53:2 89:18
147:18
148:16
166:17 182:7
201:11,15
207:4 215:15
227:12
255:11
**Donald**
28:23 30:9,
12,13,16,18,
24 31:4,6,7
39:15 40:24
41:10,20
42:6 80:22
81:5 87:12
190:4,20

191:5,14,25
195:16
215:25
216:13 217:4
**dot**
27:21,24
28:1 29:12
32:25 33:2,
5,10,15 34:2
35:11 39:21
129:1,2
136:9 153:13
**dotplot**
26:15,16,19
34:20 35:10
60:6 129:19,
22 130:10
136:2,16,24
154:4 166:11
**dotplots**
19:3 26:7,8,
13 34:15
36:6,13
128:12
129:4,8
152:23
153:19,23
156:13
157:4,10
158:2 161:3,
11,22 162:5
169:5,16
**dots**
27:17 33:12
63:23 136:1
169:9,18
**double-blind**
49:14
**doubt**
119:15
135:17,18
165:15
217:22
**Doug**
180:22
**downtown**
114:16 124:6
132:16

**draft**
212:22 213:7
256:6
**drafted**
98:25 115:9
120:4 139:16
141:5 146:12
**drafting**
103:11,14
135:20
139:17
**draw**
16:24 17:1
24:11 41:19,
24 44:14
60:8 67:17
88:11 89:7,
15 110:3
111:11
127:4,21
129:10
137:18
146:20
147:3,13,22
148:3 163:6,
9 164:8,10,
12 196:14
201:1,12,14,
17,18,23,25
215:16
233:22,23
252:14
259:3,12
269:1
**drawer**
227:1 268:7,
13,19
**drawers**
88:6 105:23
106:15,23
107:2,7,10,
12,16,21
108:16
114:13
129:10
213:8,13,18
214:2 227:7,
11 230:4

Sean P. Trende
September 02, 2022

263:7
**drawing**
  16:16 21:4,
  10,14 32:20
  40:9 90:4
  106:24 110:5
  113:6 123:13
  147:10
  149:14
  162:19
  163:5,12
  197:7,18
  201:10,12
  202:11
  227:17 259:2
  269:1,17
**drawn**
  14:23 31:1,2
  38:21 58:21
  84:4 87:15,
  22 102:6
  110:7 111:10
  113:21
  124:23
  125:4,17
  137:4 171:5,
  18 172:25
  177:13,18
  179:8 204:2
  213:8 214:21
  218:14
  240:17
  253:5,14
  269:16
  270:20
  272:25
  276:11,13
**draws**
  18:18,19,21,
  23 19:7
  47:15,16
**drew**
  21:6,9 85:11
  108:13
  147:14
  148:8,12,25
  149:20
  180:3,11

181:8,15
214:8 233:25
**drive**
  142:1 194:17
**driven**
  194:12
**drives**
  194:10
**driving**
  37:17
**dropoff**
  140:4
**drops**
  84:7
**drove**
  86:13 88:5
**Drs**
  53:2 154:20
**drugs**
  93:12
**Ds**
  140:5
**Duchin**
  9:20 10:25
  11:8,12
  17:1,7
  21:11,15
  32:24 38:3
  53:2 58:4,7
  68:20 69:24
  70:5 74:20
  82:5 83:9
  87:11
  134:10,11
  151:24
  154:20
  159:21
  209:20 213:4
  261:3,7
**Duchin's**
  9:22 10:6,
  14,24 23:2,
  9,14 26:9,13
  31:20 32:19
  36:22 52:1,
  3,7 58:5
  66:14,21

68:24 70:23
72:6,9 73:19
74:7 82:24
83:5 84:12,
13 85:11
91:9 130:15
134:16,17
136:20
**due**
  141:22
  143:15 261:2
**Duke**
  141:4
**duly**
  7:4
**durable**
  215:18

———————

**E**

———————

**earlier**
  13:15 15:20
  50:8 56:18
  71:24 72:2,
  12 83:16
  102:14
  108:22 130:2
  133:23
  166:18
  168:17 169:4
  207:24
  239:22
  248:19 271:9
  277:1
**early**
  101:6 133:14
**easier**
  11:2
**east**
  132:16
  158:25
  159:1,4
  233:12 246:2
**eastern**
  163:9 250:20
**easy**
  89:6 146:19

147:22
**ecological**
  45:9,12
  46:5,17
  47:4,14,16,
  17,22 48:9
  182:23
  193:22
  194:2,3
  199:7
**editing**
  119:9 139:18
**editor**
  51:7,8
**editors**
  51:4 256:7
**Education**
  160:4,8
**effect**
  84:1 89:7
  109:2 113:22
  114:13,14,20
  134:18
  138:18
  141:25
  157:19
  192:22
  230:18
  270:20,21
**effectively**
  16:18 64:23
  65:24 196:20
**effectiveness**
  69:3,23 91:8
**effects**
  114:23,24
  276:11,17
**efficient**
  150:25
  207:23
  272:12,15
**effort**
  173:4,16
**EI**
  47:21
**eight**
  111:18

Sean P. Trende
September 02, 2022

277:20
**either**
40:24 56:23
181:9
191:16,25
192:19
193:22,24
237:11
262:22
**El**
96:22,25
104:3,9,11,
15 184:18
185:9 203:18
**elaborate**
38:17
**elect**
68:12,18,21
69:6,9 71:9
110:16,21
188:15
196:25
198:17,19
205:3 257:22
**electable**
257:22
**elected**
171:15 186:2
187:5,15
**electing**
185:16
206:15
**election**
19:9 50:20
51:4,20,24
76:6,7,10
77:2,3,4
103:4
117:15,22
140:4 147:13
170:23,25
175:4,10,11,
18 178:10,
11,15 181:25
183:3
185:13,17
186:3,4,19,
21,24

187:12,13,
19,22,25
188:4,13,16,
19,21,23
189:1,4,10,
17 190:5,16
193:4,6
197:8,19,21
205:2 215:14
221:3,7,9,13
225:22 228:6
254:6,12
255:7,15,20,
23 256:1,20
**elections**
8:11 43:1,2,
5 44:21
45:15,17
51:13 105:4
171:11 182:2
192:9 223:23
254:4 256:16
**electoral**
263:7
**electorate**
100:5 120:21
121:2,8
**eliminated**
65:24
**Ellum**
89:16
**else's**
119:4
**emerging**
101:14
171:6,8,16,
19 173:1,16
177:19
**emphasis**
127:21
**empty**
78:15
**enacted**
25:16,17
27:22 29:5,
23 30:19
31:21 33:6
35:3,10,13

36:1,6,8
37:18 38:20,
23 39:4 41:8
42:19 44:1,
3,7,8,12,15,
16,20 57:2,
5,15,18
58:6,8,13
72:16,19
74:1 85:12
86:10 102:7
105:21
106:7,18,25
125:12 128:1
130:12
151:15 160:3
162:11
163:19 164:1
213:8,13,18
214:3,8
218:3,14
221:1 227:1,
7,18 228:8
229:16,19
231:18
232:17
234:11,25
235:25
238:22,23
240:21
242:11
244:4,12
245:17
246:23
247:22
249:20 251:8
253:2 267:15
**enclosed**
110:10
**end**
40:18 42:2
56:21 64:25
90:25 91:5
145:6 168:4
174:13,17,
20,25
176:19,21,23
177:4,5

189:13
218:16 269:2
**endeavored**
262:4,12,20
**ends**
177:7
**enforce**
145:4
**engaged**
133:11,13
161:8 257:8
**engagement**
62:17,23
151:11
160:25
209:16
**English**
98:19
**enhance**
172:7
**enhanced**
172:17
**Enos's**
94:13,16,20
**ensemble**
12:14 19:13
21:6,9,11,14
23:22 25:25
26:1,21
27:6,10 28:4
29:10 33:17,
25 37:6
38:11,22
39:4,9,19
41:6,14
42:17 84:4,
7,10,12,13,
17 85:4,6,
11,20 86:17
87:22,23
88:2 105:22
106:10,25
107:1
**ensembles**
11:1,13
18:22,23,24
19:4,11 23:9

Sean P. Trende
September 02, 2022

24:24 25:14,
16 26:17
30:8,25 34:6
40:11,18
44:13 87:7
ensure
20:18 21:5,9
25:4 47:19
205:20
ensures
16:17
ensuring
205:20
entertaining
147:20
entertainment
147:18
148:6,21
entire
13:23 37:23
106:17 108:8
144:4,5
206:2 217:19
entirely
78:19 148:6
entitled
120:9
envision
198:13
equal
48:10 144:8
206:21 252:3
equally
65:22
error
22:18,21,25
48:13,21
errors
77:8
essay
119:4
essentially
22:1 263:15
established
65:12 269:21
estimate
76:23 77:15,

21 78:1
80:1,2,4,19,
20
estimated
38:7
estimates
47:9 184:4
260:9
estimating
80:21
estimation
79:25
eval
62:2
evaluate
43:1 62:12
66:5 88:1
151:14
152:14,25
166:7,13
225:19
231:21
evaluates
44:21
evaluating
12:14 43:5
158:22
evaluation
62:3
evaluations
157:5
event
59:6
everybody
92:8
everyone
8:24 138:8
evidence
40:10,11,15
41:4 69:6
89:25 97:10
169:21
175:12
181:22 189:6
192:7 205:23
248:21
258:22

261:17,22
263:6,16,24
266:17
270:24
271:19
evidences
175:19
exact
108:5 109:1
233:19 239:4
exactly
61:11 108:19
138:21
161:15 196:6
201:22
202:23 217:1
225:3 271:4,
6
examination
7:6 93:3
124:19 125:1
126:4,8,9
127:1 150:16
207:16
214:17
238:17
258:11
examine
114:23,24
152:16 190:7
269:15
examined
110:16 127:8
152:17
276:25
examining
110:10
125:12
127:25
153:1,4
275:23
examples
61:16 113:25
114:1,18
239:1 271:8
excellent
53:16,17
191:12

exception
134:21
excerpt
117:21
excess
29:24 30:14,
16 31:4
39:15 47:9
48:6 241:10
242:21
244:17
exchange
203:24
230:12
exclude
169:21
excluded
110:25
169:10
excluding
185:8
exercise
201:9
exhibit
7:16,18,22
69:13,15
81:17,20,22
95:1 98:9,
14,16,17
99:3 113:17
115:1,6
117:9,20
119:2,18,23
139:8,13
140:19
146:2,7
151:2 209:14
212:10
214:15
232:1,3
234:9 235:22
237:13 239:2
240:19
242:8,9
244:2 245:15
247:20
250:4,7
251:2,6,12,

Sean P. Trende
September 02, 2022

```
  13,18 252:3,        21 211:1,6          249:11            40:12 49:21
  11 254:14,          212:6 232:8         256:23            87:7 95:13
  20,24 256:12        260:10              261:21            112:9,22,24
  258:22            expert's             276:12             144:11
exist                73:2              extraordinari        204:21
  39:18 245:11     expertise          ly                    268:9,15,21
existed              8:6,7 51:24         59:2               269:19
  144:22           experts            extreme              270:10,16
  253:17             104:7,20            27:25 29:6       factors
exists               199:24 200:2       33:6,16,21,         14:10 16:15,
  77:11 143:8        210:23             25 35:3 44:8        22 49:24
  271:10           explain              85:13              85:21 86:18
exit                 57:14 61:23      extremely            125:12 128:4
  45:24 116:9        67:7 78:9           57:19 87:24        261:25
  195:19             128:25           extremes             262:2,16,22,
  196:11             143:12 271:4        42:21              23
expect             explained          extremities        facts
  30:2 31:2,12       60:8                54:19              97:10 169:20
  40:20 89:18      explanation        eye                  189:6 205:22
  105:22             24:21 25:11         205:2              266:6
  106:25             41:2 141:24      eyeball             fail
  107:19             143:17,21           34:19              75:1
  130:4,8            275:25           eyeballing         failed
  231:1 254:4,     explanations          63:23              222:22
  5 255:15           24:19 102:5      eyes               fair
expected             192:5               34:9 232:12        23:8,13 29:4
  101:12           expletive                               70:9 103:1
  215:20 219:3       34:10,13                              127:13
  255:6            explore              ───────            135:14 140:9
expects              167:7                 F               153:4,8,17,
  31:23            exponent             ───────            22 154:5
experience           16:9                                  160:20
  34:7 43:5        extending          Face                161:10 162:4
  69:8 123:15        273:4              117:15,23           166:12
  132:15 182:1     extends            faced               172:23 186:3
expert               273:21             110:12             193:21
  7:25 8:9         extension          fact                206:24
  37:5 44:24         261:7              13:24 37:23        207:19
  48:25 50:1       extent               38:14 85:23        210:7,10,22
  58:15 102:10       11:16,19           88:12 90:13        211:19
  103:12,13          24:3 71:5,22       106:2 108:8        212:2,5,8
  109:17 128:6       95:15 96:10        113:20             213:5 217:25
  151:23             97:16 144:21       126:23             219:1 220:24
  160:21 161:2       225:19             146:15             222:14 223:9
  199:19,20          239:19,20          161:18 204:8       224:20 233:9
  208:4,16           241:12             225:5 246:8        236:21 237:4
  209:2,19,23        242:23             248:22 253:1       238:9,19
  210:2,13,17,                          265:2 270:19       246:15
                                      factor
                                        16:25 24:16
```

Sean P. Trende
September 02, 2022

249:10
250:19 254:9
261:24
265:5,19
266:15
267:14
**Fairfax**
211:1 232:9
**Fairfax's**
211:6,13
**fairly**
64:16 237:23
**fall**
38:20 87:22
**falls**
36:1 99:16
100:12
**false**
93:17
**familiar**
13:11 17:17
49:9 50:20
51:3,10,17,
18,21 61:3
164:20
203:1,4
204:8 206:2
**familiarity**
203:3
**family**
12:13
**famously**
55:17
**far**
88:2 150:4,7
151:1 159:6
200:6 226:23
**fashion**
81:3
**favor**
194:15
**feature**
34:15
**features**
38:10 43:20
**federal**
93:17 162:21

**field**
8:5,16 50:23
51:12,20,24
79:5 247:18
**fifth**
120:13,14
167:25
168:15 268:2
**fight**
37:3 56:22
129:16
**figure**
26:15,16,24
27:3,5,8,16
28:5,15 29:2
31:17 32:3
33:1 36:7,9,
11 38:24,25
39:21 59:19
61:11 64:16
65:13 76:25
108:19,20
128:15,23
129:1,19,23
136:2,17,24
172:5,10,13
174:12,16,
21,22 221:7,
8,18,22
229:15
231:17 234:9
238:19
273:2,3
275:2 277:13
**figured**
258:19
**figures**
27:14 59:15,
16,19 106:20
172:4 221:1
**figuring**
81:10
**files**
11:13,14,17,
21
**fill**
169:17

**filter**
25:23 39:13
**filters**
214:2
**final**
57:8 249:19
250:2 257:5
**finally**
71:10 189:23
**find**
34:16 85:12
86:7 106:10
277:24
**finding**
82:21 135:1
**findings**
36:25 137:13
**fine**
193:11
**finish**
74:23 75:11
144:19
**firm**
209:4,8
**first**
7:4,10,16
22:5 28:18
31:18 43:8
46:3 52:23
53:7 71:3,
13,14 75:4
76:5 99:9
101:11
106:5,19
113:18 118:3
124:16,18
126:5 128:11
133:7,11,14
141:17
146:10
151:11 178:3
180:19
207:25
214:16
218:13
222:24
229:25 232:9
260:15

274:3,21
**fit**
225:12
**five**
75:18 195:10
**flatly**
33:24
**fleshed**
168:1
**flip**
217:10
240:20 248:9
273:1 274:1
**flipped**
186:11,20
**Flores**
188:20
189:24
**Florida**
140:6
**focus**
8:10 70:22
**focused**
63:2 82:21
209:15
238:18
**focuses**
127:14 183:9
**focusing**
18:17 216:17
**follow**
32:8 258:20
**followed**
247:17
**following**
237:24
**follows**
7:5
**followup**
203:24
**force**
37:17
**foreclose**
161:21
**forgot**
39:7

Sean P. Trende
September 02, 2022

**forgotten**
98:19
**form**
8:17,21 10:7
11:9 14:11
15:18 16:3
18:1,4 19:22
20:2,13 21:1
22:2,23
23:10,15,24
24:9 26:23
28:8 29:8,
14,19 33:8,
14,20 35:5,
17 36:3,10,
16 37:10,19
38:6,12
39:23 40:14
41:17 42:24
43:22 44:11
49:3,23
50:3,15 51:5
52:8 56:11
58:19 61:16
62:3,8,14,
18,20 63:12,
24 65:19
67:23 70:12,
18 73:16
74:2 77:24
80:8,14
81:12 82:10
83:1,6 85:1,
15 86:15
87:2,19
88:7,19
89:8,22
90:2,9,20
91:10,16
97:9,15
99:23 100:16
102:8,17
103:19,23
104:4,13
105:1,9
106:11
107:9,14,18,
24 108:17,25
109:7,19

110:23 111:5
112:14,25
113:7,12
114:10,21
116:5,21
121:10
122:1,10,16,
24 123:9,14,
21 124:2
125:6,14
126:7,20
127:10 128:3
129:14
130:7,14,20,
25 131:19,23
132:3 134:8
135:3,12,23
137:6,16,25
140:12
142:7,13
143:1,10,23
145:12 150:8
153:25 154:8
155:3,11,21
156:3,11
157:14 158:5
159:9 160:22
161:14
162:7,13
163:22 164:6
165:7,18,23
166:15,24
167:12,19
169:2,19
170:2,16
173:19
175:14
176:16
177:2,14,20
178:23
179:10,16,22
180:5,16
181:11,17
186:25 188:9
189:5,11
190:1 191:8
192:10,17,25
194:1,9,19,
24 195:12

196:18
197:12,23
198:21
200:21 201:4
203:2
204:13,19,23
205:5 207:3
208:8,14,20
209:6
211:14,20
212:18,25
213:10,15,20
214:4,10
215:7,23
216:9,23
218:7 219:6
220:5,11,22
221:4,19
222:3,18
223:12
224:7,23
225:23
226:22
227:4,9,19,
25 229:4
230:6 233:1,
3,14,21
234:21
235:16
236:24 237:7
238:14,24
239:6 241:7,
16 242:1
243:6
244:14,23
245:9 246:4,
25 247:9
248:15
249:2,21
250:1 251:9,
21 252:5,17,
21 253:6
254:13
255:16
256:21
257:14
259:22 260:4
262:8 263:3,
19 264:19

265:9 266:2,
10,21 267:8,
18,25 268:22
271:25
**formally**
133:13 208:1
**formation**
252:2
**formed**
61:13
**forming**
212:16
**formulate**
262:4
**formulated**
277:10,18
**Fort**
159:2 241:6
244:5,13,17,
21 245:6,17,
21 246:9
**forth**
79:12 262:6
**forward**
94:6,16
215:16
**found**
106:20
137:4,22
204:10
205:17
**foundation**
191:19 201:5
202:4 205:23
228:1 229:6
257:16
**four**
9:12 28:14
29:24 31:3
39:14 41:10
54:18 85:4
86:2 87:12
118:11
**fourth**
28:16,22
29:4 30:21
31:10,24

32:1,4,11,
15,19,22
33:1,15
74:10,19
83:20 144:9
170:7
frame
81:14
framed
74:19
framework
262:7
freakish
69:7
freakishly
68:16
freeze
25:6 110:20
freezing
110:7
frequently
47:9 53:24
Friday
93:1
front
52:23 53:4
56:2,3
froze
110:13
fulfill
202:8
full
26:20 74:10,
19 90:18
118:3 174:2
187:10 263:5
274:3,20,21
fully
93:9
Fultz
180:1
Fultzs
179:24
fun
259:25
function
152:9

future
98:1 99:5
211:10 263:9

G

G-I-N-G-L-E-S
53:17
G-R-U-M-B-A-
C-H
190:10
gains
273:4
game
216:24 230:8
Garland
132:20
Gatte
180:9
gave
22:17 47:2
65:20 174:6
gears
102:2
general
10:17 51:13
102:3 114:11
117:3 151:13
186:21
187:12
190:4,16
192:16
194:13
208:19 217:5
254:11
255:7,15,19,
20,22,23
256:1 263:15
264:23
General's
156:22
generally
102:15,23
103:18,22,25
104:11,25
109:5 121:3
131:18

132:1,12
134:22
163:21
215:10
222:20 228:2
259:1
260:16,19
261:9,14
264:18 266:1
271:5
generate
12:12 34:5
generated
13:16 29:7,
10 30:9,11,
13,15 165:10
Generating
9:6
geographic
60:19 61:1
159:15
166:20,23
167:17
168:9,24
geographically
55:10 64:7
167:11
geographies
153:15
George
118:10
151:25 196:5
209:21
German
124:4,8
Gerrychain
11:3 23:12,
19
gerrymander
57:4,20
58:13 59:1
89:21 90:1,8
164:9 166:9
gerrymandering
37:15 42:4

51:14,22
63:4 267:17
gerrymanders
12:15
getting
18:18,19
235:12
giant
117:6
Gingles
52:14,21,22
53:3,4,15,
17,21 55:12,
14 56:2,3,4,
6,8,9,14
58:1,2 64:9
67:9 68:2,8,
9,10 73:15,
18 166:14
167:16,24
168:8
Gingles'
168:21
give
16:1,6 23:11
48:17 49:17
64:24 75:14
77:25 81:19
82:17 88:14
112:8,21,23
113:4 114:18
124:3 138:17
159:18 175:1
206:20
226:18
265:19 271:9
277:23
given
15:1 20:19
34:9 41:21
42:1,8 68:16
80:11 90:13
105:3 113:25
130:5 143:3
167:20 193:4
223:10
giving
93:17 271:8

Sean P. Trende
September 02, 2022

glaze
  34:9
go-to
  12:4,6
goal
  24:12 41:11
  57:5 127:19
  240:9
goals
  24:1,6
  55:12,14
  58:16,21
  239:20
  243:10,18
  245:1,13
  247:13
Gobert
  181:5
goes
  139:18
  151:17 206:1
  230:19
  237:15 264:3
  273:11
  275:11
going
  7:13 32:7,21
  36:18 37:23
  40:7,16
  42:2,11,14
  44:25 47:11
  48:10,13
  73:4 76:25
  77:11 82:13
  84:1,8 85:24
  88:1 91:25
  94:6,16
  102:2,13
  105:14,25
  108:1
  111:16,19
  115:25 117:4
  118:9 132:8
  138:1 144:23
  155:14,23
  156:15
  158:20
  174:8,9

182:17
183:24 191:4
193:8,14,16
195:13
199:22
201:14 207:1
234:8 253:21
255:18,21
256:10 257:5
258:16
good
  7:8 22:1
  40:7 45:18
  51:2 55:16
  57:3,16,17
  58:9 61:8
  72:17,20
  87:8,11 93:5
  114:11,12
  133:19
  150:18
  268:18
  270:24
  271:19
GOP
  99:13 100:9
  170:10,23
government
  69:9 98:1
  99:5
Governor
  151:16
Governor's
  208:13
Grabs
  98:2 99:6
gradations
  236:11
  246:13
grade
  98:19
Grande
  178:21 179:2
  182:14
  203:12
granted
  73:3

graph
  26:22 29:23
gravitating
  259:10
greater
  84:18 233:11
  239:13
  246:2,10,13
  247:6 248:5,
  7
green
  229:19
  231:17
  232:20
  234:25
Greg
  151:16
grew
  95:7,10,23
  96:2,5,22
  97:3,7
Gronke
  51:7
ground
  7:14
group
  40:22 52:16
  53:8,22
  54:1,6,16
  56:16,19
  58:3 63:16
  65:15,22
  67:1 68:13
  101:25
  102:22 103:9
  122:17
  198:8,9
grouping
  65:21
groups
  45:21 55:11
  60:2,4,6
  62:3,17,23
  63:8 64:4,5,
  7,17,20
  66:25 67:11,
  12,21 89:5
  95:15 96:11,

14 97:17
103:8 106:9
123:22,23
127:24
153:14
167:21
197:16
198:25
229:12
245:11,12
grow
  121:15
growing
  95:20 96:17
  99:12 100:8
  206:9
grown
  118:19
growth
  96:8,11
  97:12,22
  98:5 101:24
Grumbach
  190:10
guarantee
  14:22 25:15
guess
  25:6,12
  40:17 46:7
  51:3 81:14
  91:25 94:22
  110:2,15
  114:15 128:7
  129:17
  140:14
  149:16
  169:23
  186:17
  189:20 193:5
  196:2 201:21
  202:21
  257:24 275:1
guessing
  122:3
guidance
  198:4
guidelines
  61:21

Sean P. Trende
September 02, 2022

Gulf
  159:2
guy
  180:8

—————

**H**

—————

half
  101:20
  118:10  274:1
hand
  60:11  98:15
  115:6  117:13
  140:23
handed
  98:13  115:5
  117:20
  119:22
  139:12
  146:6,8
  232:7
handful
  38:14  39:11
  88:1
happened
  222:24
happy
  75:14
hard
  85:25  147:19
  178:5
harder
  120:22
  121:2,9
  275:17
Harris
  148:9,18
  149:20
Harris/fort
  240:22
Hasen
  51:10
hat
  60:13
Hats
  59:11

head
  55:25  60:11
  83:2  105:17
  160:17
  185:23  195:2
  199:2  277:16
heading
  154:18
  175:22
hear
  258:13
heard
  181:5  182:8
  204:21,25
  205:15,16,24
  209:8  222:5
  228:25
hearing
  203:19
heat
  274:3,9,11
  275:1
heavily
  97:17  101:12
  102:24
  112:6,19
  114:3  116:8
  122:6  131:10
  146:24
  174:10  195:4
  198:8,10
  205:9  229:11
  237:3  259:12
  265:15  269:2
  273:12
heavy
  46:25  131:11
  217:11
hedge
  76:11
Heights
  261:25
  262:2,7,22
held
  59:1  207:7
help
  125:3  126:13

helpful
  35:25  41:13
  56:1,13
  110:25
  194:12
  200:22,24
helps
  271:13
  273:23
  275:19
Henry
  206:10
hereinafter
  7:4
high
  167:10
  190:12
  255:13
higher
  13:21  27:24
  31:10,15
  84:5
highly
  19:25  264:25
  265:4  266:1
Highway
  250:23
hip
  124:5
Hispanic
  101:11
  103:2,21
  104:10,24
  118:9  124:7
  131:14,16
  136:19,24
  138:24  139:4
  140:4
  146:23,25
  148:22
  158:11
  169:10,11,17
  170:1  176:1
  177:19
  178:16
  181:21
  192:13,16
  196:11

  198:8,10
  202:19
  205:9,10,11
  236:25
  237:10
  247:18
  259:4,8
  260:3,7
  265:18
  266:19
Hispanics
  115:23
  116:3,7
  140:10
  169:7,15,25
  177:11  179:6
  181:9  182:14
  183:21  184:4
  196:4  202:22
historical
  124:20  126:9
  214:18  228:6
  265:24
  266:6,12
historically
  190:12  193:5
histories
  134:13
history
  28:20  121:19
  127:24
  133:23
  134:12,24
  222:24,25
  251:24  253:8
hoc
  142:2,11
holding
  207:9
home
  100:25
homogenous
  47:25  48:4,
  10,15  49:6
  192:13
hone
  19:2

Sean P. Trende
September 02, 2022

honest
  154:10  155:5
honestly
  148:24
  205:25  259:9
hope
  206:15
hoping
  162:2
hour
  44:25  92:1
  193:9  277:20
hours
  111:18
house
  66:11,14
  70:24  151:15
  175:12
  185:16
  186:1,5,14
  200:12
  245:17,24
  246:8,22
  247:22
  248:4,14
  251:5,7
  252:25
Houston
  158:23
  159:4,8,16
  275:23
  276:4,6,24
  277:2
HPA
  48:4
hub
  79:7
huge
  80:12
Hull
  54:15  55:6
human
  34:8
hundreds
  233:23
hypothesis
  42:22

hypothetical
  145:16
  191:19
  201:5,9
  202:4  227:21
  228:1,22
  229:5  257:6,
  15
hypothetically
  42:15  84:3,
  15  85:9,12
  86:7  89:3
  258:1

_____

        I

I-14
  250:21
I-35
  250:22
I-71
  147:17
I-KNOW-IT-
WHEN-I-SEE-
IT-TYPE
  55:19
idea
  64:13  98:20
  132:25  133:3
  148:24
  149:13
  255:21
ideal
  255:21
ideally
  48:7
identification
  7:19  69:16
  81:23  98:10
  115:2  117:10
  119:19  139:9
  140:20  146:3
  232:4  250:8
  254:21

identified
  134:10
ignorant
  107:6
ignore
  73:19
ignores
  113:20
  270:18
Illinois
  147:15
illuminate
  42:14  43:17
  264:16
illuminative
  43:3
illustrate
  152:25
illustration
  88:14
imagine
  54:3  163:7
  169:23
  201:10
  247:16
Imai
  10:15  20:4
  34:14
immediate
  112:8,21
immediately
  132:16
  133:10  193:2
impact
  59:14  97:22
  98:6  253:4
impacted
  276:13
imperfect
  144:22
implement
  26:4
implemented
  10:16
imply
  81:5

importance
  101:19  194:7
important
  49:21  93:18
  125:10
  127:23
  134:20
  200:18
importantly
  68:19
impossible
  90:11  226:10
  243:1
improve
  124:24
  125:4,17
  214:22
  216:21
  217:12
  218:21
  220:9,21
  229:2,13
  240:7,18
  247:5
improved
  172:21
  216:1,7,13,
  15  217:20,23
  252:12
improvement
  216:5  217:2,
  6  218:5,24
  219:17  234:3
  235:9,11,14,
  17  239:23
  240:2
improves
  216:2  218:1
  219:7
improving
  216:6  218:24
  227:12  247:3
  249:18
  253:19
inadvertently
  40:8  200:23
  201:23

Sean P. Trende
September 02, 2022

include
  43:10 153:9
  155:24
  174:12
  202:22
  248:24
included
  232:8 250:20
includes
  134:25
  238:21
  250:15,17
including
  64:21 79:6
  138:17
  226:23
incomplete
  191:18 201:5
  202:3 228:1
  229:5 257:15
incorporating
  144:8
incorrect
  253:12
incorrectly
  10:22
increase
  112:7,20
  183:21
  197:18
  198:16 218:5
  219:3 237:19
increased
  95:16 203:22
increases
  112:13
increasing
  112:6,11,19
  113:4 196:25
increasingly
  120:16
  132:18
incumbency
  206:10
incumbent
  227:16,22,23
  228:5 235:19

268:5
incumbents
  219:24
Indeed
  131:12
independent
  104:8,22
  200:3
indicate
  263:6
indicates
  166:9 232:20
  236:4 240:25
  242:14 244:8
  245:20
  247:25
indicator
  236:15
indifferent
  107:6 253:15
indirect
  152:22
indirectly
  94:18
individual
  126:22
individuals
  45:19 63:6
  150:21 183:6
  214:8
inevitable
  265:21
inevitably
  55:18
inextricably
  265:8,17
infer
  86:12
inference
  16:25 35:9,
  12 45:9,12
  46:5,18
  47:14,17,22
  48:9 81:2
  112:8,21,23
  113:5 182:23
  193:22 194:3

inferences
  44:14
inferring
  21:24
influence
  255:7,22,23
  256:19
  257:12
information
  34:6,18
  123:17 181:7
  274:14
initial
  20:7 70:7,
  11,16 87:11
  256:9
initially
  261:5
inquire
  126:15
inquiries
  64:21
inquiry
  37:12 63:18
  64:22 89:1
  108:18
  109:12
  127:19
inserted
  216:25
insight
  53:18 138:17
  161:4 168:4
inspection
  220:25
instances
  60:7 113:21
  114:12 116:7
  142:14
  266:18,19
  270:19
instruct
  176:12
intact
  76:20
intend
  40:17 82:8

90:19 211:12
intended
  136:11
intent
  88:15,17,24
  90:21
  108:10,12,
  19,21 137:5
  142:19,25
  143:7 220:8,
  15 261:17,23
intentional
  135:1 204:10
  205:17
  206:20
intentions
  82:12 155:14
  211:15
intercept
  225:11
interest
  47:13 61:4,
  17,23,25
  62:4,19
  66:4,9
  227:24 263:9
  264:16
interested
  34:4,24
  64:11 111:1
  226:19
  239:18
interesting
  127:2,6
interests
  29:17 164:4,
  10,15
  165:22,25
  166:2,5
  179:9 204:3
intermixed
  264:5,10
  265:25
  266:17
  267:21
interpretatio
n

Sean P. Trende
September 02, 2022

23:22 24:4
65:9,10,18
**interrelated**
266:9
**intertwined**
265:8,17
267:14
**intervals**
9:1
**intervene**
257:21
**interview**
214:8
**intricacies**
194:14
**intro**
98:21
**introduce**
69:12 81:16
**introduced**
258:22
**intuitive**
34:17
**invalid**
80:16
**inverse**
167:7 196:22
**investigated**
91:18
**involve**
143:6 200:14
**involved**
119:8
137:14,17
227:17,22
**involves**
9:2
**involving**
142:6,12,17,
23
**issue**
46:8 167:9
194:17
265:23
267:24

**issue-**
**specific**
194:11
**issues**
167:6 194:7,
13
**iteration**
148:2
**iterative**
47:15

—————————

**J**

—————————

**J-O-W-E-I**
13:18
**Jacki**
93:6
**January**
179:21 181:2
**Jarndyce**
206:1
**Jay**
151:24
209:19
**job**
9:8 43:1
180:15
**jobs**
9:9
**Joe**
30:22,23
31:6 41:20
43:13 68:14
71:6 171:14
217:3 223:13
**John**
93:22,25
175:11
191:6,15,24
**Johnson**
180:22
**Jonathan**
254:8
**Journal**
50:21 51:4
141:4

**journals**
50:7
**Jowei**
13:17
**judge**
34:10 37:4
190:17 191:2
**judges**
35:23 267:21
**June**
133:9,14,15
208:1
**junk**
50:4
**Justice**
55:17 61:15
63:25 166:18
**justified**
121:21
**Justin**
180:23

—————————

**K**

—————————

**keep**
9:1 193:14
245:11
**keeping**
146:23,24
173:6,10,11
205:2,8,10,
18 240:2
245:6 247:6
259:4,8
**Keith**
180:9
**kept**
76:20
173:11,17
239:12
243:14 252:7
**Kercher**
8:17,21 10:7
11:9 14:11
15:18 16:3
19:22 20:2,
13 21:1

22:2,23
23:10,15,24
24:9 26:23
28:8 29:8,
14,19 33:8,
14,20 35:5,
17 36:3,10,
16 37:10,19
38:6,12
39:23 40:14
41:17 42:24
43:22 44:11
49:3,23
50:3,15 51:5
52:8 56:11
58:19 62:5,
8,14,20
63:12,24
65:19 67:23
70:12,18
73:16 74:2
75:16 77:24
80:8,14
81:12 82:10,
19,22 83:1,6
85:1,15,18
86:15 87:2,
19 88:7,19
89:8,22
90:2,9,20
91:10,16
97:9,15
99:23 100:16
102:8,17
103:19,23
104:4,13,18
105:1,9
106:2,11
107:9,14,18,
24 108:17,25
109:7,19
110:23
111:5,15
112:14,25
113:7,12
114:10,21
116:5,21
118:21,24
119:1 121:10

122:1,10,16,
24 123:9,14,
21 124:2
125:6,14
126:7,20
127:10,17
128:3 129:14
130:7,14,20,
25 131:19,23
132:3,7
134:8 135:3,
12,16,23
137:6,10,16,
25 140:12
142:7,13,20
143:1,10,23
145:12 150:8
153:25 154:8
155:3,11,21
156:3,11
157:14 158:5
159:9,12
160:22
161:14
162:7,13
163:22
164:6,17
165:7,12,18,
23 166:3,15,
24 167:12,19
168:11
169:2,19
170:2,16
173:19,22
175:14
176:10,16
177:2,14,20
178:23
179:3,10,16,
22 180:5,12,
16 181:11,17
186:25 188:9
189:5,11
190:1 191:8,
18 192:2,10,
17,25 193:8,
14 194:1,9,
19,24
195:12,25

196:18
197:2,11,23
198:21
200:21 201:4
202:3,13
203:2
204:13,23
205:5,22
206:16,22
207:3 208:8,
14,20 209:6
211:14,20
212:18,25
213:10,15,20
214:4,10
215:7,23
216:9,23
217:14 218:7
219:6 220:5,
11,17,22
221:4,19,23
222:3,7,11,
18 223:12
224:7,23
225:23
226:22
227:4,9,19,
25 228:9
229:4 230:6
231:4,13
233:1,14,21
234:21
235:2,16
236:24 237:7
238:14,24
239:6,15
240:5,14
241:7,16
242:1 243:6,
16,24
244:14,23
245:9 246:4,
11,18,25
247:9 248:15
249:2,8,13,
21 250:1
251:9,15,21
252:5,17,21
253:6 254:13

255:16
256:21
257:14 258:5
259:22 260:4
262:8,17
263:3,19
264:19
265:1,9
266:2,10,21
267:8,18,25
268:10,16,22
269:9,23
271:25
272:9,18
**Killeen**
248:14
252:15 253:3
**Kincaid**
180:24 181:1
**kind**
26:4 33:19
47:11,18
48:20 61:10
63:7 73:24
93:12 124:5
128:7 206:1
223:3
**kinds**
8:19
**knew**
89:4 137:14
**know**
8:8 10:22,
23,25 12:3
13:5,7,10
14:5,14 15:1
19:3,20,24,
25 20:11
21:3,18 22:9
23:25 27:20
29:20 35:2,
25 37:21,22
38:8 39:24
40:2,16
41:14,24
42:16 45:12,
19,20 46:11,
12,20 48:12,

24 49:8,15,
16 50:13,19
51:7,13 56:1
57:1 61:24
62:9 63:8
64:15 65:12
67:13 70:6,
13 73:22
75:10 77:9,
15 79:18
80:1,11,16
85:24 86:2,
18,23 87:20
88:2,9,21,23
89:3 90:10
94:8,21
96:19,24,25
100:24,25
103:5,6
105:12,16
106:6 108:7,
13 109:8
113:1,8,11,
13 115:22
116:11,24
117:1 123:15
126:14,24
127:12,18
130:9,11
132:11
133:6,16
134:20
135:13
137:12
139:1,3
140:17
143:11
145:20
147:12,17,19
149:7 150:22
154:10 155:6
156:5,19
157:17,18
158:7,13
159:1 160:12
161:15
165:1,5,8,
14,19
167:14,24

168:13,15
169:20
170:3,4
175:9
177:15,23
179:13,24
180:1,3,11,
14,17,19,24
181:7,12,19
182:15 188:6
189:8,14,24
190:2
191:11,20
192:3,18,20
193:6 194:14
195:1 196:2,
15,21,23
197:5
198:22,25
200:1,19
203:13 210:5
211:4 213:6
216:10,24
217:1,16
226:23,25
227:11,12,16
228:5,14,16
231:17
233:5,6,15
234:24
239:10,17
240:11
243:9,17,21
247:4,12
249:10,15
251:17,23
252:7,10,13
255:11
257:24
258:23
260:5,6
262:1 263:21
265:2 268:2,
24 269:11,13
270:13
272:10,14,21
273:14
275:18

knowing
  89:15
knowledge
  47:21,24
  49:6 61:24
  118:25
  144:15
  155:19,22
  179:23
  181:16
  208:10,15,23
  209:1,9
  210:20
  211:22 212:9
  213:11,12,17
  214:1
known
  164:25
Korbel
  151:25
  165:13
  209:21
Korbel's
  213:23
Kosuke
  10:15
Kousser
  38:7 113:20
  151:24
  209:19
  260:16,19,20
  261:3,6,7,14
  263:6,16,25
  264:3 270:18
  274:23
  276:24 277:7
Kousser's
  260:13
  264:12
  266:16
  267:12 274:2
  277:10,15
Kuriwaki
  182:18

_____

L

labeled
  235:24
  240:21
  242:10 244:4
  245:16
  247:21
Lack
  201:5
lacking
  63:1
lacks
  202:4 205:23
  228:1 229:5
  257:15
laid
  174:2 232:12
Lampases
  250:14,16,17
landed
  149:23
language
  11:4 12:4,6
  151:8,17
  158:14
  216:17
  218:21
laptop
  77:25
large
  9:4 161:5
largely
  206:5
largest
  141:25
Larry
  117:16
late
  150:22
Latin
  150:19
Latino
  59:20 97:22
  98:5 99:12,
  16 100:5,8,

11 122:22
123:5 129:23
130:10,11,24
150:20
175:12,19
179:15
187:5,15,19,
25 188:6,7,
20,23
189:10,19
192:7,23
194:6,22
195:6,9
196:14,16,
24,25 197:10
202:10
205:1,3,19
206:11,13
236:5,22,23,
25 237:3,5,
10 239:13
240:3
242:15,19,20
243:14
245:21,25
246:2,10
247:6
Latino-
majority
  175:7
Latino-
preferred
  186:23
  189:25
  197:21
Latinos
  118:11,18
  183:25 188:3
  193:23 194:8
  195:9,22
  197:7,15
  198:18 201:2
  202:1 206:12
law
  50:21 51:4,
  24 64:10
  140:24,25
  141:3,4,8

Sean P. Trende
September 02, 2022

145:4 167:25
168:1,15
180:23
209:4,8
267:20,24
268:3
lawsuit
    80:23 81:6
    245:14
lawyer
    207:19
lawyers
    8:8 35:22
    67:14 155:15
    156:15,18,
    19,21 157:18
    161:15 162:3
lead
    125:3
League
    150:19
lean
    43:24
leaning
    41:7 44:10
    122:15 123:6
leaping
    264:4
learn
    43:19,21,24,
    25 63:8
leave
    117:2
leaving
    206:14
led
    266:6
left
    26:15,19,25
    191:11 236:3
    240:24
    271:14,15,22
    273:23
left-hand
    247:24
legal
    8:7 37:1,3

40:15 49:25
50:2 56:22
88:24 128:5
129:15
157:15
167:14
legend
    232:20
    236:4,15,17
    240:24
    242:14 244:8
    245:20
    247:25
legislative
    22:7,8
    164:21,24
    165:6,16
    180:4 253:8
    258:16
legislators
    179:20
    196:15,23,24
    227:17,22,24
    228:6,12,17
    249:6,11
    253:1
legislature
    16:16,18,22
    17:2 20:21,
    25 21:4,7
    24:1,11 25:5
    37:8 38:16,
    23 43:7
    85:22 86:18
    87:14,25
    107:22 110:7
    151:15 208:7
    215:3 220:9,
    16 235:19
    239:10,20
    240:9 242:5
    243:12
    249:16
legislature's
    37:17 220:20
    243:10,18
    245:1,13
    247:13

legislatures
    268:5
legitimate
    16:15,21
    138:4 239:19
length
    83:15
lengthy
    47:14
lesser
    235:14
letter
    12:8
level
    22:14 65:17
    69:8 76:7,
    18,25 79:24
    80:20,24
    86:9,10
    121:6
    123:18,19,24
    203:3 223:9,
    11 225:14,15
    240:2
    255:13,19
    275:24
    276:25
leverage
    171:6,18
    173:1,16
    177:18
    196:14
Levitt
    180:23
liable
    205:17
liberal
    132:17
liberals
    89:14
lies
    64:14
life
    8:25 32:8
light
    42:7 126:13
    153:19

likelihood
    198:16,18
likes
    147:13
Likewise
    110:12
    220:14
limit
    9:3 116:12
limiting
    84:10,15
line
    47:18 111:13
    134:15
    147:19
    154:14,19
    162:24
    170:8,9
    176:2
    229:19,20,25
    233:13 248:8
    263:7,10
line-by-line
    111:22
lines
    73:20 101:23
    113:6,21,23
    114:19
    172:7,16
    221:1 231:17
    234:25
    236:18,22
    237:5,11
    238:22,23
    239:4,8,12
    241:4,11,13,
    15,19
    242:18,22,23
    243:9 244:18
    245:1,10
    247:16
    252:23
    270:20
    274:8,9
    275:11
linking
    147:17

Sean P. Trende
September 02, 2022

lion's
  161:9
list
  9:16,17
  183:24
  184:7,9,15,
  22 185:3,10
  212:11
listed
  61:15 212:14
listen
  255:12
literature
  50:25 51:23
  63:2 109:10
litigation
  20:15 109:11
  110:12
  247:14
little
  54:1 65:1
  75:25 77:9
  85:25 103:3
  138:1 141:16
  148:15 157:2
  172:5,14
  206:15
  215:19
  250:25
  257:18
live
  165:21,24
  166:2,4
  202:19,22
  222:4
lived
  89:5 203:5,
  8,9,13
lives
  55:2
living
  44:22 65:13
local
  69:23 191:1
located
  63:22

location
  64:3,4
Logan
  93:22,25
  94:9
Logan's
  94:3,6
long
  13:24 47:12
  92:3 115:18,
  24,25 133:4
  203:7 216:7
long-term
  102:1
longer
  99:17 100:13
  138:4,9
  189:13
  193:16
look
  16:7 22:20
  23:4,18 26:8
  27:16 30:8
  31:18 32:18,
  25 34:4,7
  38:4,10,19
  41:15 42:18
  44:7,16 46:7
  48:5 49:4
  52:11 59:15,
  19 60:5,16,
  24 62:21
  64:3 66:4
  72:14 75:3,5
  78:4,22
  83:18 85:3
  87:6 102:9,
  11 103:10
  125:10,20
  126:16,18,
  22,25 127:23
  129:3 138:14
  149:6,14
  151:9 154:11
  159:14
  160:16 170:7
  171:3 172:1
  190:14,15,23

191:1,9
202:16
216:10,11
221:7 231:23
234:9,22
235:22,23
237:24
238:15,16
240:19 251:2
254:14
270:17
271:17
272:15,20
275:2
looked
  11:17 21:4
  22:1,6 43:19
  51:8 70:10
  73:22 74:6
  89:23,24
  90:3 103:7
  125:22,24
  126:24
  145:19
  148:14
  149:22
  154:12 158:8
  159:19
  218:21
  224:24
  232:11 234:7
  245:10 250:2
  260:5 264:21
  274:6
looking
  16:13 21:23
  26:19 27:5,
  9,12 32:2
  33:1 39:3
  41:1 42:5,13
  43:4,9,16
  46:8 57:21
  60:19 61:1
  64:4 71:16,
  17,18,20
  72:21 75:11
  81:18 83:22
  85:7 109:12

125:25
126:2,12
127:2 128:2,
21 140:3
166:11 176:8
187:8 207:6
215:16
228:17
229:25
231:16
232:23 239:2
242:17
245:23
248:11 251:3
273:18
looks
  71:2 236:13
  237:1,10
  250:23
  251:24
loosely
  259:13
lose
  34:17 225:1
losing
  219:25
  220:2,3
loss
  100:7 138:5
lost
  99:5 219:25
  223:24
lot
  9:4 42:7
  43:5,24 44:1
  45:25 50:4,5
  59:13 89:14
  91:17 116:13
  121:20
  132:15,17
  139:18 140:7
  167:9 182:4
  195:4 203:14
  251:24
  260:20
loud
  112:3 118:7
  141:17

Sean P. Trende
September 02, 2022

Louisiana
    163:5
love
    59:12 117:6
low
    35:3 205:3
Lowenstein
    51:17
lower
    33:10,23
    35:13 46:24
    86:11 224:17
    225:1 240:24
    242:13 244:7
    245:19
    247:24
lower-left
    54:12
lower-right
    54:10
lower?
    116:1
Lubbock
    66:15 68:6,
    7,24 69:3
    73:23 75:4
    91:11 159:22
Lujan
    175:11
LULAC
    62:17,22
    138:6,7
    150:20
    152:14,18
    153:1 155:7,
    24 160:7
    167:20
    206:7,8,18
    207:8,9
lunch
    91:23 92:11

_____

          M

_____

made
    64:12 71:14
    76:6 78:19

104:20
122:19
129:12 145:8
151:23
156:14
158:15,17
171:21,24
173:5,15,18
174:17
209:18,24
210:3,14
211:8 230:7
276:7
main
    101:21
    137:18
Maine
    223:2
maintained
    79:6
maintaining
    173:17
majority
    31:22,24
    32:1,15,20
    35:1 40:19,
    22 52:17
    53:9 60:2
    63:17 76:19
    98:1 99:5
    101:15 106:9
    110:8,14,15
    123:25
    127:14
    179:15 201:3
    202:2 205:8
    259:4,8
    260:2,3
majority-
minority
    163:20 164:2
    166:8
majority-
trump
    146:22
majority/
majority
    32:22

make
    26:25 28:7,
    25 33:19
    65:21 78:12
    93:12 108:1
    109:8 123:3,
    10 124:9
    142:5,17,23
    143:5
    146:22,23
    147:25
    173:25
    181:22
    193:18
    199:18
    235:18,19
    236:10 251:1
    257:18
    260:24 270:8
    271:6
makes
    139:17 147:8
    193:4
makeup
    89:15 107:4
    272:21
makeups
    107:5
making
    107:13,17
    121:23
    122:7,22
    123:4 134:5
    146:21 172:3
    174:10
    205:8,9
    218:25 259:7
    260:2 275:24
malapportione
d
    251:25
Manipulating
    9:6
manner
    241:24
manual
    13:7 15:8

manuals
    13:9
map
    13:25 25:15,
    17 28:6
    29:23 30:19,
    25 31:2
    35:10 39:18
    41:19 58:23
    76:20 83:19
    88:6 102:7
    105:21,23
    106:8,15,18,
    23,25 107:2,
    7,10,12,16,
    21 108:11,
    14,16 114:12
    123:13
    125:13 128:1
    129:10,11
    130:4,12
    134:21
    137:18
    147:8,14
    180:4,11
    181:2 201:1,
    25 213:8,13,
    18 214:2
    215:17
    226:25
    227:7,11
    229:19,20
    230:4
    232:15,23
    236:5
    238:22,23
    239:4
    240:17,20
    241:4,25
    242:10,15
    244:3
    245:16,23
    247:21,25
    248:10
    251:4,8,18
    259:3,13
    268:7,13,19
    274:3,9,11
    275:1

Sean P. Trende
September 02, 2022

map's
  276:11
map-drawing
  213:14
  269:19
  270:10
mapmakers
  29:25 58:15
  89:4 275:24
maps
  9:6 12:12
  13:16 14:3
  16:16,18
  18:8 19:13
  22:7,8 25:19
  27:10 28:6
  32:21 36:23
  37:6,14,18
  38:1,21,22,
  23 39:11,14
  41:8 58:20
  85:6 88:1
  89:7 90:7
  102:11 108:7
  110:5 111:10
  114:23,24
  125:16
  138:15
  146:19
  147:14
  152:9,15,16,
  19 153:1,5,
  9,13,18,23
  154:3 155:1,
  7,10,19,25
  156:7,17
  157:11
  158:2,9,10,
  22 161:4
  162:19 176:9
  207:19
  210:22
  211:18,19
  212:1,2,7,8,
  22 213:4,6,8
  214:9 217:24
  227:18 232:8
  235:23

240:16
243:19
249:17,19,23
250:2 262:14
267:16
269:16,20
270:2 277:3
margin
  48:21 83:20
  195:17
  215:20 220:2
  273:18
marginal
  43:17 273:5,
  8,10,19,22
marginally
  43:25 44:2
  240:8
mark
  7:16 81:20
  206:20 232:1
  250:4
marked
  7:19 69:16
  80:5 81:23
  98:10,14
  115:2,6
  117:10
  119:19,23
  139:9,13
  140:20
  146:3,7
  232:4 250:8
  254:21
markets
  60:25
Markov
  17:21,22
Markov's
  18:4
Martinez
  210:14,18
Maryland
  14:22 25:9,
  19 34:8
  57:22 58:25
  59:4 109:24,
  25

mass
  99:14 100:10
Master
  180:15
masthead
  51:9,23
match
  38:15 87:24
  107:1
materials
  212:14,16,21
math
  235:12
matter
  38:14 55:18
  64:1 92:1
  126:23
  166:19
  202:17 255:1
Mayra
  188:20
  189:24
Mccaffity
  258:12,15
  272:6,7
  277:23
Mccarton
  14:2
MCMC
  17:16,17
  22:11
mean
  16:23,24
  18:3 24:25
  32:16 33:5,
  11 38:17
  44:23 48:7
  49:12 50:24,
  25 51:1 54:2
  61:7 76:9
  78:9 106:14
  116:2,18
  128:25
  147:21
  153:12
  170:14,20
  171:8 175:17

179:19
192:23 211:3
215:13
219:22
225:2,5
233:22
235:17
251:16
259:17
260:17
271:7,23
273:8
meaning
  64:25 108:1
  218:20
meaningful
  48:17
meaningless
  64:24
means
  13:13 18:10
  45:12 48:3
  60:22 61:12
  145:5,11
  169:9 178:13
  216:11
  218:24 230:4
  249:19
  253:16
meant
  38:1 57:14
  143:12 144:2
measured
  53:15
measures
  262:5
media
  60:24
Medicaid
  194:15
medication
  93:11
medium-
  102:1
meet
  55:11,12,14
  64:8 67:21,

24 68:1
166:14
**members**
45:21 208:6,
13,18
**mention**
93:22 158:21
187:4 190:3
256:10
**mentioned**
10:1 13:10
50:8 54:24
82:15 130:2
153:3 154:6
158:15
159:23
170:12,13
185:14 186:1
188:15
190:20
194:25
196:10 204:5
206:4 213:22
242:22
**mentions**
154:19,23
160:18
**merged**
261:8
**method**
12:14 45:9
46:3,6,16,19
47:14,17,18
48:1,14
49:1,6,22
50:9 81:15
**methodologist**
20:17
**methodology**
8:13 9:2
199:6
**methods**
8:15,19
13:21 23:9
47:13
**metric**
48:16 55:5,6
79:20 81:11

198:3
**metrics**
55:15
**Metroplex**
273:3
**Mexican**
258:16
**mid**
46:2
**middle**
58:14 78:17
101:5 167:2,
3 175:5
**Miller**
61:17
**mind**
114:1,16
138:2 152:7
159:3 162:20
168:23
199:25 204:3
216:20
228:24 229:1
**Mine**
26:13
**minorities**
63:22 65:13
123:25
**minority**
19:5 26:20
27:5 28:4
31:22 35:3
40:19,22
48:6,7,11,15
52:16 53:7,
8,22,25
54:6,16
55:2,3,11
56:9,16,19
58:3 60:4,16
62:3,18,25
63:8,16
64:3,4,7
66:25 67:1,
11,21 68:13,
18,21 69:6,
10 71:11,17
95:7,9,12,

15,16 96:1,
4,8,10 97:3,
6,12,16
102:19,22
103:8 106:9
110:8,13,15
121:15
123:22
146:20 148:4
149:17,19
152:10
154:18
166:13,22
167:1,8
168:3,19
189:14
200:19
201:23
228:22
229:3,10,12
231:19,24
257:11,13,
23,25 267:3
**minority-
majority**
146:22
147:23
148:1,8,18
149:1,4,12,
17,21
**minute**
150:11
277:24
**minutes**
75:18 92:1
193:9,17
253:21
**Miranda**
59:10,13,18
73:22
**Miranda's**
60:10
**misleading**
93:18
**Missing**
120:2,10
**Mississippi**
201:11,13

**misstates**
24:10 37:20
43:22 50:15
87:2 88:7
102:17
125:7,14
237:8 266:22
269:24
**missteps**
142:3
**model**
22:12 23:19
**models**
22:15
**modern**
196:8
**Modest**
141:1
**modification**
101:16
**modified**
101:9
**modifies**
126:8
**moment**
153:3 154:11
163:17
185:18
**Monte**
10:15 12:11
13:17 17:21
18:4,7
**months**
133:2
**Moon**
9:20 10:6
151:24
209:20
**Morales**
53:2 151:25
152:25
153:6,10
154:15,20,23
158:16,17,21
160:11,15,21
161:2,13,17
209:20 213:4

Sean P. Trende
September 02, 2022

Morales's
153:19,24
154:3,6
155:2,10,20,
24 156:8,13
157:4,11
158:3 160:19
161:23 162:6
Morgan
151:24
209:19
morning
7:8
motivated
106:24
267:16
motivation
37:8 90:4
134:15 145:4
move
48:19 66:3
68:5 107:3
111:20
132:20 178:9
228:14 230:4
238:18
moved
77:22 97:18
168:6
170:10,22
198:12
234:15,16
238:2,11
263:1 276:20
movement
95:12,17
moving
198:15
206:12
multiple
50:11 61:22
113:21
270:19

─────────

N

─────────

NAACP

7:10 62:17,
22 91:22
name
7:8 51:18
93:5 137:11
150:18 154:6
160:19
182:18
204:19
207:18
258:15
named
180:20
names
199:25
248:11
narrow
198:24
narrowly
171:14
national
173:13
nationally
178:20
nationwide
43:12
naturally
28:13 31:24
32:16 35:1,
7,8 41:22
necessarily
35:25 37:7
55:4 57:3
58:8,24
63:20 67:19
72:5,16,20
73:10,11,14
84:6 90:6
106:25
107:23 113:2
114:4,13
124:3 126:16
142:8
144:14,16
162:23
197:14,20
198:13,18
222:15

223:10 225:3
259:18
necessary
46:4 99:14
100:10
233:20 239:5
241:15 243:3
244:20
246:22
252:13
need
76:22 83:18
86:21 87:8
150:11 172:2
199:21 230:8
253:10
277:13
needed
193:10
217:10 218:4
needlessly
134:19
negative
143:3,4
nerding
259:2
net
219:10
230:18
neutral
29:18 31:9,
14 35:16
42:23
never
37:12 94:9
108:16
119:11,14
137:7,12
204:14 209:8
222:5,9,12
newer
13:20
Nina
150:18
NMI
14:2

non-african
46:14
non-compact
57:19 152:10
non-hispanic
136:7 198:12
275:7,13
non-rigorous
259:17
non-u.s.
169:16,25
nonexclusive
61:19
nonresponsive
157:22 272:6
nonwhite
120:15,18
121:19
183:17
noodle
199:1
normal
34:8 92:6
norms
144:9
north
114:15
132:16
159:6,8
274:7
northern
163:10
174:17,20,25
note
31:19,20
66:23 67:13
68:19 78:23
140:24
141:11,12
144:18
159:12
223:23
224:3,12,25
234:14
noted
67:15 173:4

Sean P. Trende
September 02, 2022

notes
  253:21
noteworthy
  259:20,24
notice
  249:11
noticed
  172:4
noting
  67:19
November
  120:3
nudge
  204:21
number
  14:23,25
  17:25 18:14
  26:25 31:21
  40:19,21,23
  63:17 78:6,
  8,11 80:3
  84:6 86:2
  106:8 141:16
  191:9 205:12
  216:20 217:8
  218:3
  234:14,15
  238:2,10,11
  263:11
  265:19
numbered
  29:2
numbers
  9:4 99:17
  100:12 103:6
  116:15,25
  118:22 127:5
  173:18 195:2
  205:19
  232:14
numeric
  18:1
numerical
  166:7 216:4,
  18 219:3
numerosity
  67:5,7 68:24

numerous
  52:16 53:9
  56:16 63:17
  201:2 202:1

———————

O

———————

O'CONNOR
  55:17 61:15
  63:25 166:19
oath
  93:17
Obama
  117:14,21
  118:12
  171:13 195:1
object
  8:17,21 10:7
  11:9 14:11
  15:18 16:3
  19:22 20:2,
  13 22:2,23
  23:10,15,24
  28:8 29:8,
  14,19 33:8,
  14,20 35:5,
  17 36:10,16
  37:10,19
  38:6,12
  39:23 40:14
  41:17 42:24
  43:22 44:11
  49:3,23
  50:3,15 51:5
  52:8 56:11
  58:19 62:5,
  8,14,20
  63:12,24
  65:19 67:23
  70:12,18
  73:16 74:2
  77:24 80:8,
  14 81:12
  82:10 83:1,6
  85:1,15
  86:15 87:2,
  19 88:7,19
  89:8,22

90:2,9,20
91:10,16
97:9,15
99:23 100:16
102:8,17
103:19,23
104:4,13
105:1,9
106:2,11
107:9,14,18,
24 108:17,25
109:7,19
110:23 111:5
112:14,25
113:7,12
114:10,21
116:5,21
121:10
122:1,10,16,
24 123:9,14,
21 124:2
125:14
126:7,20
127:10 128:3
129:14
130:7,14,20,
25 131:19,23
132:3 134:8
135:3,12,23
137:6,16,25
140:12
142:7,13
143:1,10,23
145:12 150:8
153:25 154:8
155:3,11
156:3,11
157:14,16,21
159:9 160:22
161:14
162:7,13
163:22 164:6
165:7,18,23
166:15,24
167:12,19
169:2,19
170:2,16
175:14
176:16

177:2,14,20
178:23
179:10,16,22
180:5,16
181:11,17
186:25 188:9
189:5,11
190:1 191:8
192:10,17,25
194:1,9,19,
24 195:12
196:18
198:21
200:21 201:4
203:2
204:13,23
205:5 207:3
208:8,14,20
209:6
211:14,20
212:18,25
213:10,15,20
214:4,10
215:7,23
216:9,23
218:7 219:6
220:5,11,22
221:4,19
222:3,18
223:12
224:7,23
225:23
226:22
227:4,9,19,
25 229:4
230:6 233:1,
14,21 235:16
236:24 237:7
238:14,24
239:6 241:7,
16 242:1
243:6
244:14,23
245:9 246:25
248:15
249:2,21
250:1 251:9,
21 252:5,17,
21 253:6

Sean P. Trende
September 02, 2022

255:16
256:21
257:14
259:22 260:4
262:8 263:3,
19 264:19
265:9 266:2,
10,21 267:8,
18,25 268:22
271:25

**objecting**
23:20

**objection**
21:1 24:4,9
26:23 36:3
85:18 104:18
110:13
111:15 125:6
127:17 132:7
135:16
137:10
142:20
155:21
156:24 158:5
164:17
165:12 166:3
168:11
173:19,22
176:10 179:3
180:12
191:18 192:2
195:25
197:2,11,23
202:3,13
205:22
206:22
217:14
220:17
221:23
222:7,11
228:9 231:4,
13 234:21
235:2 239:15
240:5,6
246:4,18
247:9 249:8,
13 251:15
254:13 258:5

262:17 265:1
268:10
269:9,23,24
270:6 272:6,
9,18,19

**objections**
23:12 109:25
155:16 156:6
206:16
240:14
243:16,24
246:11
268:16

**objective**
166:12,16
253:17

**objectives**
268:8,14,20

**observations**
157:5
177:12,17

**observe**
171:23

**observed**
114:20 218:2
235:4 237:14

**observers**
182:9

**obtain**
268:7,13,19

**obvious**
64:16 274:7

**obviously**
32:12 33:23
120:15 211:9

**occurred**
170:5 178:19

**occurrence**
68:16 69:8

**occurring**
31:25 32:16
35:1,8

**occurs**
83:21 143:19

**odd**
22:8 190:11

**offer**
41:3 82:8,13
88:16 90:19,
21 91:14,17
94:5,15
141:1
145:21,23
157:5 166:6
211:13

**offered**
141:19
143:13 155:7
159:21
166:17

**offering**
220:7,14,19
233:18
234:19 239:3
240:12
241:14,18
242:25
243:2,22
244:19
246:20
252:19,22
253:13,18

**office**
76:24 149:5
156:22
208:13,19
222:17
226:14

**officer**
141:21
143:14

**Officers**
142:1

**official**
204:19

**offset**
138:5 206:6

**Ohio**
147:16

**okay**
7:13 8:3,12,
14 9:10
10:5,11
11:20,23

12:1,10,24
13:3,10
14:4,14
15:16 16:1,
5,9 17:3,10,
15,19 18:2,
9,17,20
19:7,15
20:11,20
21:8,12,18,
23 22:17
23:4,13,21
24:5 25:2,22
27:8,16,21,
24 28:3,10
29:16 30:4
31:8,13,16
32:25 33:5
34:1,22
35:24 36:5,
13 37:16
39:1,20
40:10 41:5,
12 42:15
44:23 45:20
46:19 47:21,
25 48:24
49:5 50:8,
13,20 51:3,
25 52:5,6,
11,20 53:11,
25 54:13,22
55:23 56:20
57:10,25
58:11 59:8
60:14,16
61:3,6 62:2
64:6,18
65:8,12
66:18,22
67:16,18
68:3,4,22
69:2 70:2,9,
14,21 71:13
72:2,5,13,
19,25 73:6,9
74:4,12,22,
24 75:9,23
76:4,5 77:2,

Sean P. Trende
September 02, 2022

11,18,20
78:2,4,13
79:3,13,22
80:10 81:9
82:8,15 83:9
84:3,10,16
86:7,22
88:4,16
89:3,20
90:12 91:13,
20 119:14
133:20 145:3
151:7,20
152:13,21
154:11 160:2
175:1 177:6,
25 178:13
182:8 187:2,
11 190:3
196:22
199:15
200:25
202:25
203:17,23
204:18
208:24
209:2,10,23
210:13
211:3,17
212:5 213:5,
7 214:25
217:8 218:19
219:11,14
220:1,7
222:5,14
223:8
224:12,16
225:4 226:1,
9,20,25
227:6 228:18
229:1,14,23
230:18,25
231:10,16,25
232:13,23
233:18 234:8
235:22
236:8,12,14,
21 237:4,13,
24 239:2,21,

25 240:12
241:3,12,22
243:22 244:2
245:15,23
246:7,20
247:15
248:9,18
250:4 251:2
252:10
255:4,10
257:1 258:17
259:20
260:10
261:9,24
263:15 270:6
273:1,13
274:22
275:3,5,16
276:9,22
277:6
**Olson's**
149:5
**omitted**
58:14 169:10
**on-the-spot**
202:17
**once**
161:17 261:7
**one**
13:20 19:6,
13 25:11
27:24 28:14
30:2,13
36:11 45:14,
23 46:1,6
47:13 49:1,
24 59:11
68:15 78:14,
18 89:12
95:13 96:8,
25 97:13
98:21 100:1,
2 101:14,24
109:24 110:9
112:7,20,24
116:11
117:6,17
120:11

121:23
122:7,21
123:4 128:4,
18 134:16,17
146:10
147:15
148:10
155:22
167:24
168:25
175:15
178:6,7,14
180:23
181:24 198:7
205:25
210:25
213:22
215:11
217:19 218:1
226:23 229:1
235:6
237:15,16
240:13 248:9
254:10,15
255:4 256:2,
15,23 257:5
258:21
259:18
272:23
277:23
**one-to-one**
225:17
**ones**
114:4 174:8
237:3 271:10
**opens**
194:10
**opines**
144:15
153:18
**opinion**
48:25 49:20
51:19 56:15,
17 58:15,20
63:21 64:6
84:24 89:20
94:5,15
145:21

168:16
175:17 179:7
220:8,14,19
233:18,24
234:19 239:3
240:12,16
241:13,14,18
242:25
243:2,22
244:19
246:20 247:2
249:16
252:19,22
253:4,13,18
262:14 268:6
**opinions**
49:17 82:9,
12,24 83:10
90:19,21
91:14,17,18
94:10 101:7
145:24 152:8
160:14
212:17
220:24
262:5,21
277:10,14,18
**opportunity**
53:7 68:12
138:9 146:21
148:4 149:20
196:25
201:23
206:13
**opposed**
80:2 86:13
195:7 222:1
269:7
**opposing**
73:2 164:10
255:8
**opposite**
164:9 198:4
**optimizing**
271:2 272:4,
11
**oranges**
44:20

Sean P. Trende
September 02, 2022

order
129:12
138:15 177:3
185:24
192:19
196:14
198:16
217:11 233:7
ordered
30:21
organizations
150:21
origin
169:17
originally
261:2
outcome
108:12,20
207:5 255:23
256:25
263:17
outcomes
14:25 195:7
231:24
241:21
262:15 264:1
269:22 270:3
outgrowth
177:23
outlier
28:1 33:12
36:20,21
40:8,12
outliers
36:7,9,14,
23,24 37:14
38:2 40:6
outline
185:24
262:21
outlined
168:17
outnumber
170:1
output
17:23,25
22:18,21,22

23:3 149:22
outputs
21:16,20,22
23:5,23
outreach
118:9
outside
38:20 50:1
87:22 156:1,
9 157:12
158:4
159:15,19
162:16
outweighs
57:5
overlap
94:21
overlaps
28:6
overlay
154:3 157:4
overrule
156:24
overwhelming
76:19
overwhelmingl
y
41:11 144:12
267:3

---

P

---

p.m.
93:2
package
10:16,19,20
12:17,18
15:9 34:16
packing
243:20 245:3
272:2,10
packs
271:24
page
9:11,14
10:12 16:12
26:10 27:8

28:11 29:22
31:18 35:19
37:1 52:5
59:8,23 60:9
66:1,13
70:21 72:12,
13 74:11,19
75:3,10,13,
23 76:2
83:3,9 94:25
95:2 98:18,
21,23,24
99:4,9,11,
19,25 100:1,
2,14,18,25
101:8,20
105:18,19
106:1 112:1,
2 113:16,18
118:1,3,4,21
119:1,3,6
124:12,14
126:6 128:9
131:2,3
133:20,22,25
135:25 136:2
138:15,16
141:14
144:17
145:3,8
151:3,10,21
152:6,7
154:11,12,
13,17
158:14,20,21
159:23
160:19 170:6
171:3 172:1,
9,23 174:3
175:2,21
177:7,24
178:14
182:20
183:24
185:14,20
186:1,7,13
187:2,3,7
188:12
209:14,16

212:10
214:15
218:12,22
221:6
223:16,18,22
229:14,15,24
231:16
232:13 234:9
235:4,24
237:14,25
239:3 240:20
242:9 244:3
245:16
247:21
248:9,10
251:12
260:11,15
263:6 264:1
270:17
273:1,2
274:1 275:3,
4 276:1
pages
59:16 98:20
106:21 119:1
135:10,15,21
paint
132:8
paper
14:2 20:15
131:12 132:4
182:16,23
183:9,16,20,
25
paragraph
10:13 31:18
56:25 57:9
68:5 70:23
72:15 74:11,
19 76:1 95:2
99:9 113:18
118:3,4,6
120:13,14
124:16,18
126:5 128:11
131:5,6,7
144:23
151:10

Sean P. Trende
September 02, 2022

170:8,12
172:4,5,13,
14  174:2
175:5  176:3
177:25
187:10
209:15
214:16
223:22  230:1
263:5,13
264:2
270:18,21
274:3,21
275:21
276:2,23
**paragraphs**
75:4
**parameter**
14:12,15,16,
20  15:7,13,
21  24:7
**parameters**
12:25  13:4,
12,25  14:5,6
15:23  16:1
17:11,13
20:7,19
21:3,18  25:3
**parent**
20:7
**parenthetical**
116:14,23
**parkland**
78:16
**part**
9:2,5,12
12:12,17
56:5  58:14
76:2  100:14
117:3  118:8
151:7  154:22
159:6  171:21
172:18
173:4,8,16
186:12,13
199:4,16
212:23
213:14  214:7

220:25
227:18  228:7
249:19,24
250:15,16,
17,19  251:19
272:24
**participation**
206:9
**particular**
18:6  24:24
77:13  102:22
108:11
145:23  151:9
161:21
194:15  195:8
222:16
225:20  228:7
249:24
**particulars**
85:20  86:16
124:11
**parties**
194:13
266:14
**partisan**
15:6,10  17:4
24:1,6  26:2
29:17  36:8
38:11  57:4,
20  58:12,16,
21  59:1
89:7,21  90:1
113:22
114:13,24
123:17  192:8
193:23  204:2
243:4  244:21
245:5  246:23
252:15
253:17,19
268:8,14,20
270:20
**partisanship**
24:7  26:3
38:15  40:12,
13  83:18,25
87:23  89:17
102:5,12,14,

15,19
123:13,20,25
264:17
**parts**
82:7,16
161:1  202:25
**party**
17:4,8  29:6
117:3  124:25
125:5,18
176:2  177:12
178:17  179:7
180:20
181:22  186:9
214:23  215:2
216:7,16,22
217:7,13
254:5  255:6,
8  256:23
257:10
264:24  265:7
266:8  267:7,
14
**party's**
217:22
256:24  257:7
**Paso**
96:18,22,25
104:3,9,11,
15  184:18
185:9  203:18
**pass**
150:10
207:10  258:9
**past**
47:20  105:5
121:14  135:2
195:10
208:6,12,18
250:21
**patience**
150:23,24
**patterns**
104:1  122:25
195:9
**Paul**
51:7  207:19

**pedantic**
32:9  138:2
**peer**
49:9,13,21
50:5,19
**peer-reviewed**
50:7,9,10,
14,24
**penalties**
93:17
**people**
40:16  49:2
50:25  61:10,
22  78:15,23
79:6  89:16
101:12,23
129:2  136:9,
10  164:3,10,
14  165:21,24
166:1,4
169:10,11
182:2,4
191:11  210:5
215:9  255:12
**Perales**
150:11,17,19
157:21,23
159:11,13
173:20
176:14
178:25
193:8,11,17,
19,20  200:8,
10,11
207:10,20
256:12
**percent**
12:8,9  26:20
28:4,5,23
29:25  30:10,
14,16,19,24
31:4,6,7
39:6,15,17
41:20,22,25
42:6,10,13
43:8,11,14
44:17  46:10,
13,14,23

Sean P. Trende
September 02, 2022

47:1,3,9
48:7,13,20
54:7,8,9,11
66:24 67:1,
3,9,12,22
68:15 69:9
71:7 77:4
78:24 79:9,
11 83:23,24,
25 84:5,6,18
85:4,5,7
87:13,15
116:3,19
118:11,12
122:14,18,19
123:6,8
124:6
146:23,24
148:23
158:11
169:22
172:21 173:7
174:5,6
187:18,21
188:22,25
189:4 190:11
192:15,19
198:5,9,10
205:9,10,19
215:12 216:7
218:2 224:5,
6,13,14
225:3,6,7,9,
10 230:19,20
231:3,12
233:11
235:7,9,11
237:16,17
240:2 241:10
242:21
246:2,10,16
247:6 248:5,
7 259:8
260:6 264:13
**percentage**
28:24 219:14
232:21 236:5
238:20
239:22 241:1

242:15 248:1
**percentages**
79:4 233:11
244:9
**percentile**
34:2,19
**Perez**
137:7 204:6,
16,20 205:16
**perfect**
130:4 141:20
143:13
167:1,2
**perfectly**
128:13
129:11
130:5,12
168:19
247:17 274:8
275:11,12
**perform**
10:5 25:15,
16 187:13
188:18
189:21
**performance**
25:21 87:16
172:7,17,20
173:13
196:3,8
205:21
218:15 219:7
222:15,16,19
226:13,15
227:13,15
229:13
231:15
240:8,18
247:3,5
249:18
253:19
**performances**
121:19
**performed**
40:25
**performing**
171:10
189:13

**peril**
201:21
**period**
195:19
**permanent**
256:4
**Perry**
100:6 206:19
**personal**
168:16
213:12,17
214:1
**perspective**
19:5,8 99:14
100:9 162:5
**phenomenon**
224:20
**phrase**
13:8 53:6
106:15,16
143:4 219:22
**phrased**
18:3 86:19
219:13
262:19
**phrases**
106:5
**phrasing**
108:5
**physical**
65:6
**pick**
218:3
**picked**
175:4
**picks**
273:22
**picture**
175:1 195:21
**pile**
81:2
**pizza-mander**
259:16
**place**
25:7 105:22
106:22
107:11,20

132:14
248:11 252:8
**places**
52:2 122:4
132:20
169:24
264:15 265:6
268:25
**plainly**
275:24
**plaintiff**
7:9 128:7
**Plaintiff's**
7:18 9:11
69:15 81:22
98:9 115:1
117:9 119:18
139:8 140:19
146:2 232:3
250:7 254:20
**Plaintiffs**
155:8 210:22
211:19
212:2,8
**plaintiffs'**
104:20
152:9,14,18
160:7
**plan**
8:8 18:2
27:22 29:5
31:21 33:6
35:3,13
36:1,8,14
39:4 40:20
42:19 44:1,
3,7,8,12,15,
17,20 57:2,
15,22 58:7,8
66:18 68:6,
8,25 70:24
72:3,16,19
84:24 85:12
89:25 94:5,
15,18 138:18
145:21 155:9
156:1 160:4
194:15

Sean P. Trende
September 02, 2022

213:9,13,18
214:3 221:1
227:1,7,18
228:8 229:16
231:18
232:17
234:11,25
235:25
240:22
242:11
244:4,12
245:17
246:23
247:22
249:20
250:13,15,20
251:8,13,25
252:8 253:1
Plan's
  57:18
planning
  155:6
plans
  18:18,19
  19:25 20:21,
  24 21:4
  29:7,10
  33:7,12,17,
  22,23,25
  35:14 36:7
  38:10,14,15,
  20 41:8
  42:18,20
  44:4,9,16,17
  52:1,3,7,10
  57:17 66:14
  70:10,15
  84:4 87:23
  145:23 156:4
  177:13 179:8
  181:8,10,15
  218:3,14
  249:7,12
play
  173:7,10,11,
  17
played
  125:12

127:25
129:13
144:11
216:24
playing
  146:19
please
  10:22 66:16
  94:25 99:8
  105:18
  112:1,2,3
  113:16,17,19
  115:19
  118:1,2,6,13
  120:13
  124:12,15
  128:9 131:2,
  3,4,6
  133:20,21
  135:25
  141:14,15,17
  143:12
  144:17
  150:13 151:3
  209:15
  214:16
  218:13
  223:17
  228:14
  229:15
  232:15 234:9
  235:23
  237:13
  240:20 242:9
  244:3 245:16
  247:20 250:5
  260:11
plot
  169:15
plotted
  169:5
plotting
  26:21 169:6
plurality
  275:7
point
  36:17 40:4
  44:13 71:14

82:6 117:2
130:8 151:8
166:7 173:12
184:3 191:12
202:5 216:14
217:20
239:22
255:19
263:23
274:18
277:22
pointed
  127:3
points
  9:16 10:1
  28:24 71:3
  91:6 151:23
  158:15,16
  160:24
  169:21
  171:13
  209:18,24
  210:3,14
  211:8 219:14
  235:6
polarization
  69:23 105:16
  198:1,3,24
polarized
  103:11 188:3
  189:17
  197:7,17
  198:6,20
  199:3,16
  269:14
police
  141:21
  143:14 144:7
political
  8:10,13
  12:14 20:17
  28:21 36:20,
  24 37:14,15
  38:2,22 40:6
  63:3 86:14
  88:11 90:4,
  16 107:4
  108:21

109:5,9
110:5,18
111:11
124:21,24
125:2,4,18
126:16
127:4,5,8,
14,21,22
133:24 164:8
182:9 205:20
207:5
214:19,22,25
215:17
216:6,15,21
217:6,12,23
220:10,21
221:17 222:2
223:2 229:8
238:17
242:24
243:13
259:21,24
262:15
263:17,25
268:8,14,18,
20 269:21
270:2,14
274:8 275:25
276:7,8,10,
14
political-
neutral
  30:2
political/
racial
  126:11
politically
  29:18 31:9,
  14 43:17
  89:13 273:4,
  8,10,16,19,
  22
politics
  8:11 25:10
  31:1,3
  35:19,20
  36:18 37:14
  38:5 40:5

Sean P. Trende
September 02, 2022

41:1,13
42:8,12,25
86:6 87:6,9,
10,18 88:3,
5,10,18,23
89:2 101:22
104:2,6,16
105:7,23,24
106:15,23,24
107:2,12,16,
20,21,23
108:7,23,24
109:3,6,13,
16,23 110:22
111:3,9,13,
24 117:15,23
120:1,7
126:1 238:18
264:5,8,14,
23,24 265:7,
25 266:7,8,
16 267:7,14,
21 268:4
270:12,25
271:20
politics-
blind
31:23 32:21
poll
45:24
Polling
175:23
polls
9:1 45:24
116:9 195:19
196:11
Polsby-popper
57:12 58:6
71:19 72:6,7
73:10,13
74:8 75:6
Pooja
7:9
pop
42:11
populated
117:7

population
14:20 15:11
46:23 48:6
54:7,8,10,
11,21 55:2,3
56:9 59:7
60:10,15
71:11,12
78:20,24
79:8,10,14
80:23 89:12
95:7,10,12,
16 96:1,5,22
97:3,7,22
98:5 99:13
100:8 101:12
103:3 106:10
112:13
121:15
128:24
129:5,6,12,
20,23 130:2,
10,11,18,19,
23,24 136:3,
5,6,8,17,19,
25 149:18
153:14
158:12
166:18,21
167:14
168:19,21
169:6,15
170:1 192:18
197:16
200:19
202:10
205:1,11,18
247:7 261:10
populations
62:25 65:25
80:4,7,9,12
152:10 161:4
168:3 241:10
263:1 277:3
portion
29:12 33:2
39:21 131:12
161:5 178:24

portions
145:19 203:9
273:5,23
positioning
255:21
possibilities
191:21
possibility
169:21 202:7
207:1 227:6
241:22 242:3
243:11 270:4
possible
19:16 37:16,
22 47:10
48:21,23
86:19,20,24,
25 90:7,10
113:9,10,14,
15 121:23
122:7,21
123:4 150:25
157:3
164:12,18
167:8 169:16
192:22 193:6
201:20 234:3
239:11,17
240:1 241:23
245:5 247:5
259:3 268:7,
13,19 269:11
270:15
possibly
86:12 109:25
167:4
post
142:2,11
potential
48:20 123:20
126:17 140:4
potentially
86:11 162:5
194:17
Powerpoints
213:23
practice
170:5

practicing
156:20
preceding
60:9 145:14
176:25
precinct
46:7 48:1,5
49:6 75:24
76:6,18,19,
24 78:14
79:1,10
81:11
111:13,23
123:24
147:16
192:14
223:10
272:22
275:24
276:25
precinct-
level
46:9 127:1
precincts
25:13 48:8,
10,11,15
76:20,22
77:5,11,12,
21,22 78:3
79:4 114:3
125:24
131:10,11
138:16
195:17 221:2
223:13 226:7
233:11
237:2,11
242:6 244:16
247:18 248:6
271:2,14,15,
18,22,24
272:4,16,21
273:24 275:7
precise
77:25 186:19
223:8
precision
46:20

Sean P. Trende
September 02, 2022

preclude
  202:7
predict
  198:14
predictive
  222:15,20
  223:10
  225:2,16,18
  226:17
predictor
  223:15
predominance
  270:25
  271:20
predominant
  16:25 24:16
  112:9,22,24
  220:20
  268:21
predominantly
  257:11
predominated
  29:17
preface
  28:19
prefer
  14:24 184:1
  272:13
preference
  193:24 198:2
preferences
  192:8
preferred
  140:10
  187:24 188:7
  189:9 192:23
  196:16,23
  205:4 254:5
  255:25
preliminary
  93:15 208:22
premise
  253:13
  267:12
prepare
  133:4

prepared
  91:14
prepares
  229:20
present
  153:5 155:1,
  9 179:21
  200:4,6
  202:10
  208:6,12,18
  224:21,24
presented
  66:20 104:7
  153:9,24
  155:20 156:8
  158:3,4
presents
  99:13 100:8
  263:25
Presidency
  121:17 144:1
President
  221:17,22
  222:13,19
Presidential
  170:25
  183:10 184:1
  196:8 221:3,
  9
pretty
  22:9 48:14
  56:15 133:15
  146:19
  147:22
  197:15
  202:15
  222:20
  225:12
prevail
  120:23
  121:3,9
previous
  97:18 118:15
  137:21 148:2
  180:10
  185:21
  228:11 237:8

previously
  118:17
  171:12 238:1
primaries
  255:14
primary
  220:20
  254:4,11
  255:24
  256:16,20,
  24,25 257:3,
  7,10,13,21
  258:2,4,7
principles
  58:17
printout
  275:9
prior
  195:20,21,23
  208:4,11,16,
  21 209:2
  218:22
  221:16
privilege
  156:20
privileged
  176:12
probabilistic
  22:12,15
  37:12
probably
  8:9 9:7 12:8
  20:16 42:12
  53:18 56:13
  75:11 91:17
  99:15 100:11
  116:16
  118:20 122:4
  124:9 128:6
  132:19
  136:13 144:4
  149:4 157:16
  162:18,19
  179:12
  217:20
  223:15
  259:11
  276:15

problem
  13:18 45:16,
  18 46:17
  47:8 48:8
  55:15 80:15,
  17 85:7
  99:15 100:10
  104:21 140:5
  163:8 200:5
problematic
  102:1
problems
  45:14
proceeding
  256:3
process
  17:17 18:5,
  14,20 29:18
  30:2 31:8,14
  34:18 35:15
  42:22 79:20
  83:23 86:13
  143:9 171:21
  177:5 208:6,
  12,18 209:4
  212:24
  213:14,19
  227:17,23
  249:25
  251:19,20
  269:19
  270:10
processes
  228:13
produce
  14:25 18:7
  22:4 31:14
  34:17 39:14
  40:5,7 41:9
  46:25 47:9
  79:16 95:17
  234:3 241:20
produced
  34:5 40:18,
  19 41:10
  50:6 248:22
  249:17
  252:23

Sean P. Trende
September 02, 2022

274:15

**produces**
20:18 29:24
30:20,22,23
31:21 47:19
50:24

**producing**
59:3,5

**professor**
180:23

**proffered**
211:18
212:1,7

**profiling**
141:2 143:19

**program**
10:14,25
12:16 15:11

**programming**
12:7

**programs**
18:7

**progressed**
95:3

**project**
79:25

**projected**
180:21

**projection**
101:24

**prominent**
20:16 178:21
179:2 194:17

**prong**
52:14,21
53:5 56:14
67:9 167:24

**pronunciation**
182:6

**proper**
37:4 84:24
182:6

**properties**
18:25 26:1,
2,20 84:22,
23

**property**
24:25

**proposals**
70:4 141:1

**proposed**
59:21 62:7,
19,25 63:10,
14 69:4
70:3,24
71:3,14,23
72:6,22
73:24 74:7,
13 159:14,
19,22 160:7
249:12

**proposes**
74:21

**prospects**
90:17 229:2

**protected**
163:1

**protection**
144:9 206:21

**prove**
128:5

**provide**
152:17 161:4

**provided**
11:12 70:5
100:18
116:25
136:15
152:23
153:13
161:11
164:24
165:5,16
274:23

**provides**
263:6

**proxy**
123:12,20,24

**public**
115:17
212:21
213:4,9
248:24

**publication**
49:19

**published**
51:2 120:6
141:3

**pull**
34:6 38:21
100:25

**pulling**
141:21
143:15

**purely**
199:19

**purple**
114:5 221:12
236:4,10
271:1,11,21

**purpose**
52:6,13,25
53:1 66:5
186:6,8
220:21

**purposes**
7:19 37:2,3
53:15 69:16
81:23 98:10
115:2 117:10
119:19 139:9
140:20 146:3
167:17 168:8
215:22 217:9
230:25
231:21 232:4
237:20 250:8
254:21

**pursued**
58:16

**pursues**
57:4 58:12

**push**
96:12 97:19

**pushes**
39:17

**pushing**
42:9,10
43:13 83:24
205:1

**put**
14:10,19,24
15:7 20:6
21:21 24:7
99:13 100:9
122:2,9
163:16
166:19
175:15 233:6
246:1 248:18
256:8 259:10
262:6 271:12
272:16

**putting**
80:1 162:3

**Python**
11:5,8,13,
14,21 12:1,3

---

**Q**

**qualification**
68:1

**qualified**
235:15

**qualifies**
230:22

**qualify**
67:8 218:5
265:3

**qualifying**
216:5

**quantitative**
215:20

**quantity**
264:6,9,15

**question**
8:23 18:4
27:4 35:2,22
42:17 45:13,
20 46:4
53:16,18
61:8 80:25
84:9 100:17
106:14
108:6,10
111:8,9,17,

Sean P. Trende
September 02, 2022

19,21 128:20
151:4,20
152:5 153:21
157:2,8
159:10 168:6
189:24
191:13 200:5
201:6,22,24
211:4 213:2
216:19 223:8
227:21
228:15 229:5
235:13 238:1
240:13
241:8,17
243:7
244:15,24
246:5 247:1,
10 248:16
249:3
251:10,22
252:6 253:7,
10,11 255:17
256:17,22
257:15
259:23 262:9
263:20
264:20
265:10
266:3,4,11,
22 267:9,19
268:1,23
272:1
**questioner**
  7:10
**questioning**
  91:1,5,21
**questions**
  31:17 82:13
  90:22,23
  93:9,13,16,
  19 145:24,25
  150:25 151:9
  155:15
  156:5,22
  207:22
  209:11 219:2
  228:10,18

254:1
**quibble**
  215:9 217:15
**quickly**
  133:15
**quite**
  12:21 23:25
  131:10 159:6
**quotation**
  56:15
**quote**
  105:25
  133:25 134:3

---

**R**

---

**race**
  16:25 17:4,8
  24:15 35:20
  36:2,18
  37:7,16 38:5
  40:4,9,11,13
  41:12 42:8,
  12 63:9
  83:25 85:13
  87:5,7
  102:13,15
  104:2,6,16
  105:7,23
  106:22
  107:6,11,20
  108:22,24
  109:3,6,16,
  22 110:22
  111:3,9,13,
  24 112:8,21,
  23 113:5
  123:12,18,
  19,24 127:25
  129:13
  141:22
  142:6,12,18,
  23 143:6,8,
  16,21 144:11
  145:10
  163:16
  183:6,10
  187:11 188:8

190:8,24
191:11
201:1,12,21,
25 202:6,9,
18 264:5,8,
14,17,23,24
265:7,25
266:7,8,14,
16 267:6,13,
20 268:4,8,
14,21 269:6,
17,18 270:4,
9,15
**race-**
  31:22 32:21
**race-drawn**
  40:20
**races**
  190:17 191:1
  227:8
**racial**
  36:7,14,20,
  23 38:10
  40:8 41:4
  43:20 57:19
  84:2 86:12
  89:5,15,19,
  21 90:8
  107:1,5
  113:22
  114:14,20,23
  124:22
  125:2,11,20,
  22,24 126:4,
  17,18,23
  127:9,16,24
  135:1 138:10
  141:2
  142:19,24
  143:7,19
  145:5 147:10
  148:17
  149:10,14
  152:24
  153:14 166:9
  204:11
  214:20
  234:22

238:6,12
262:25
270:21
271:17
272:16,20
274:9
**racially**
  35:15 42:21,
  23 44:8
  103:10 188:3
  189:17
  197:17
  198:20
  199:3,15
  267:16
  269:14
**racism**
  142:1
**ran**
  13:23 15:3
  17:3,4,8
  22:17 24:8
  153:2
**random**
  12:12 13:16
**rate**
  22:18
**rates**
  22:21,25
  48:9 161:6
  198:24
**rational**
  141:24
  143:17,21
**rationalizati
ons**
  142:2,12
**raw**
  9:19
**reach**
  67:9 170:18
**reaching**
  253:8
**reactions**
  277:12,15
**read**
  16:13 52:17,

Sean P. Trende
September 02, 2022

24 59:24
66:22 83:7
94:9 101:8
103:6,12,13
106:3,17
112:3 113:17
115:19
118:6,13,16
119:15
124:15
137:7,12
141:17
145:17,20
152:1 160:13
172:16 178:3
204:5,14
205:16
214:23
216:18
218:16 264:6
273:5 277:12
**readers**
39:7 250:25
**reading**
10:18 53:21
99:18 100:18
120:19,23,24
131:7
**reads**
76:5 78:6
214:17
218:14
**real**
120:1,7
258:7
**realized**
204:19
**reask**
248:20
**reason**
11:7,11
76:12 77:10
83:15 93:7
96:8 97:13
99:2 109:18
115:13
117:19,24
120:8,11

132:5 139:24
141:7
146:14,17
165:15,20
253:4,14
256:15
259:15
266:24
**reasonable**
42:1 54:16
71:5 217:22
**reasonablenes
s**
144:10
**reasons**
259:18,19
**rebuttal**
82:25 83:4,5
160:10,14
211:1 232:9
277:7,11,15,
18,25
**rebutting**
276:23
**recall**
9:22 14:9,14
15:3 17:10,
11 55:20
72:12 77:12
101:3 108:5
114:22
148:14 149:8
161:8 183:16
206:6,18
212:4 254:2
261:1 264:12
274:14
**receive**
194:6 260:7
**received**
30:24 34:10
235:7
**recent**
104:1 105:4
121:19
171:11
175:23
222:25

**recess**
45:5 75:20
91:2 92:11
135:8 150:1,
14 207:14
253:23
**recitation**
56:14
**recited**
265:3
**recognize**
7:22 69:19
82:1 254:24
**recollection**
56:4,21
173:23
277:17
**reconfigured**
263:7
**record**
45:6 59:25
61:6 66:3
68:23 75:21
91:3 150:13
200:8,9,10
207:12 211:5
212:22
213:4,9
253:20,25
256:2,3,4
277:24
**red**
29:12 33:2
114:5 165:2,
5,9 213:23
214:2 221:11
271:1,11,14,
21 272:22
273:24
**red/blue**
275:11
**redist**
10:19 12:18
15:9 34:16
**redistricters**
173:25
179:13,19
181:8,14

**redistricting**
10:16,20
18:7 20:15
58:17 61:10,
21 79:7 88:5
129:13
147:5,7,8
160:4 165:3
177:13 179:8
181:2,14
200:3,20
204:22
205:1,13
208:5,12,17
209:4 212:4,
23 213:19
228:12
248:25
249:7,25
250:13
251:20 253:1
261:12
262:14
263:18
270:25
271:20 277:4
**redrew**
181:10
**reduced**
229:9 231:2,
11
**reducing**
197:9
**reelection**
228:3
**refer**
26:24 185:19
260:18
263:10
274:11
**reference**
38:25 52:25
53:22,25
56:19 134:9
178:10
185:15 199:8
260:25
270:23

Sean P. Trende
September 02, 2022

referenced
147:11
references
58:5
referencing
137:20
271:16
referred
13:5 53:24
158:8
referring
27:3,20
28:16 38:24
53:1 58:2
77:5 99:21
101:2
106:19,20
107:8 113:23
128:15
134:2,12
170:17
171:17,20
205:11
261:13
274:10,25
275:18 276:5
277:1
reflect
38:22 145:7
221:12
256:16
reflected
221:8 239:4
241:4,25
251:6,18
252:2,11
reflects
119:2 240:25
242:15 244:9
245:21 248:1
reform
194:15
refresh
277:25
regarding
156:7 158:1
175:18

region
95:21 152:11
159:1,20
170:15
regional
269:6
registered
221:25
regression
9:4 47:4,5,
16,19 193:22
194:3 199:7
225:11
regret
173:6
regrettably
155:12
regular
9:5
regularly
12:5
relate
57:25 135:21
related
35:7 181:13
209:12
relationship
157:10 158:2
168:23 268:4
relationships
265:20
relevant
62:10 73:14,
18 94:10
127:6 156:17
161:23
177:22
reliably
189:15,21
228:23
reliant
120:17
relied
9:13,17 10:2
16:16,22
164:23
212:11,16

rely
9:19 10:14
50:25 253:7
relying
9:22
remainder
110:17
remaining
110:11 185:9
271:1,11
remarked
181:25
remarked-upon
178:15
remember
54:25 55:24
58:5 98:3,4,
7 109:1
125:22
148:7,16
190:5 202:23
206:8 277:9
remind
93:16
reminded
148:16
remove
121:24
122:4,8,22
123:5
renders
53:19
renewed
47:13
rental
161:6
Reock
55:7 64:23
65:5,10
71:16,19
repeat
27:4 39:2
65:16 150:25
153:20
repeatedly
228:13

repeating
260:22
rephrase
84:8 166:21
replace
122:5,12,18
123:2,7
229:10
replaced
123:2
replying
115:21
report
7:25 8:1
9:12 10:4,12
11:2 16:12
19:2,4 22:25
23:1,11,20
26:11 29:21
36:22 52:2,6
58:4,5 59:17
66:2,21
69:22 70:5,
7,11,16,22
74:12 75:11,
24 82:6,9,
16,25 83:4,5
87:11 88:11,
16,19,22
90:14,18
91:15,19
93:23 94:2,
3,6,9,12,13,
16,20,22
95:19 96:16
103:11,13,14
105:12,19
106:18
107:25
108:1,6
109:17
113:17
124:13
125:7,21,23
126:19
127:7,14
128:10
130:15

Sean P. Trende
September 02, 2022

132:23
133:4,8,12,
21 135:10,21
136:1
138:11,21
145:17,22
151:3,22
152:18
153:5,6,8,
10,18,19,23,
24 154:3,7,
23 155:1,2,
20 156:2,8
157:7,11
158:3,4,9,
18,20
160:10,15,
16,18,24
161:1,5,9,
11,12,23,24
170:7 175:3,
21,22,25
176:6,7,8,
18,22 177:1,
3,8,12
182:16 186:2
190:3 204:1
209:23
210:3,8,11,
13,17 211:1,
4,6,7,13,17
212:6,10
214:15
215:22
216:18,25
217:9 218:12
223:17,18
225:19
226:21 227:2
228:20
229:14
230:25
231:22
232:9,11
234:8 237:20
238:10,20
246:21
252:20
260:10,12,

13,16,19,20
261:14,25
262:6,21
264:12
267:15
269:18
270:9,11
273:2 274:2
277:1,7,11,
15,19,25
**report's**
206:25
**reported**
75:6 186:15
**reporter**
98:13 139:12
146:6 232:1
**reports**
82:4 94:22
102:10
103:12
134:17
136:20
151:23
155:10
156:10
157:5,13
160:21
161:2,12
162:6 164:24
165:15
209:19
210:21
211:16
**represent**
7:9 129:1
136:2,9
150:19 233:3
238:10
258:15
**representatio
n**
15:24 236:10
238:21
**representatio
ns**
59:17 104:19

**representativ
e**
20:12,18,20,
23 186:9
**represented**
11:8 29:11
**representing**
207:7,8
231:18
**represents**
27:21 34:2
36:9 59:9
229:19 236:5
**Republican**
24:12,14,17
28:22,24
29:6,9 30:1
39:11 41:6
43:16,25
44:2,10
46:22,25
83:21 84:19
85:10 86:8
90:16 97:23
98:6 112:5,
6,12,18,19
115:24
116:8,19
117:3 118:9
121:24
122:8,11,14,
19,20,22
123:5,8,11
124:10,24
125:5,18
132:10,19
171:15
173:5,15
174:1,8,11
175:10,13,19
176:1
177:11,19
178:17
179:7,9
181:9,21
185:16
186:2,14
187:5,16

188:6,15,20
190:7,13,18,
23 191:2
192:8,24
193:24
194:6,22
195:10,23
198:9 214:22
215:2 216:6,
16,22 217:7,
13,22 218:4,
15 219:3,7,
24 220:10,
16,21
221:21,24
222:16,23
223:11
224:4,18
226:3,13,17
227:13,15
229:2,13
231:6,14
234:1 237:21
240:7,18
241:13
242:24
243:4,12
244:21 245:5
246:22
247:3,5
249:18
252:15,24
259:13
265:19
266:13,20
272:23
273:19
**Republican-
leaning**
41:9,15,21
42:18,20
43:9,15 44:5
**Republicans**
28:12 41:19
117:4
120:16,22
121:3,9,16,
21 123:7

Sean P. Trende
September 02, 2022

130:3 171:5,
10 172:25
173:6,8
175:4 216:2
222:1,12
223:5,14,24
224:3 225:24
257:20
263:23
**Republicans'**
263:8
**require**
48:15
**required**
53:6
**requirement**
53:11 64:8
65:3,25
**requirements**
168:21
**requires**
52:21 65:10,
17 168:8
**reread**
144:4
**residents**
97:18 103:2
124:8 128:13
130:5,6
174:3,4,7,9,
24 230:2,5
238:11 273:4
**respect**
23:9 28:4
30:6 31:1,3
36:2 39:1,
10,25 42:12
45:15,17
74:8 90:15
96:24 173:24
182:22
187:11
266:14
**respond**
101:23
102:10
151:23
199:22

209:18,24
210:3,14
260:12
**responded**
82:7,16
158:17
**respondents**
183:13,17
**responding**
58:4 130:16
158:15
211:4,13
**responds**
211:6
**response**
58:7 82:4
94:23
101:15,16
134:11 206:9
261:2,3,6
277:10,18
**responsive**
211:9 260:19
**rest**
32:8 33:6
106:7 206:14
**restrictions**
163:24
**result**
191:15 197:9
217:24
241:15
242:24 243:1
**results**
23:14 79:17
182:10
190:15 205:2
221:7,9
228:6 256:15
257:12
**retained**
151:12 208:1
**retaining**
227:24
**retention**
207:25
208:4,11,16,

21,25 209:2,
13
**return**
168:17
**revealed**
127:2
**reversed**
144:8
**review**
10:9 11:13,
16,20 49:10,
13,21 50:5,
19 52:9
66:16 69:25
76:1 82:6
140:25
141:3,8
160:10
**reviewed**
11:23 49:14
82:15 88:13
119:11
210:8,10,17,
20 211:1,25
**reviewers**
49:15,16
**Richard**
51:10
**Rick**
100:6
**right**
7:14 9:17
11:25 12:20
15:17 16:2
17:5,17,23
18:11,12,18,
25 19:1,5,9,
12 20:9,10,
22,25 21:19
22:12,13
23:17,23,25
26:16,21,25
27:6,10,11,
14,22 28:1
29:2,13,18
31:11 32:13
36:9,15,17
37:18 38:8

39:22 44:4
48:18,19
50:9 52:3,18
55:4 57:12
59:10,21
64:14,20
65:1,6,7,15
66:8,11,16
67:22,25
68:25 70:17
71:21,22
72:3,4,10
73:15,25
74:3,4,10
75:7 77:5
81:11 84:7
86:1 87:1
90:1,5,8
91:15 114:18
135:7,19
152:4 153:15
159:25
162:18
172:20 173:3
174:14,18
177:8 178:17
182:11,19,20
184:2 185:4
186:16
187:1,9
188:14
191:24 192:1
203:21
204:4,6
208:3 218:9
226:16
229:21 230:5
231:23 234:6
235:9
236:14,16
246:9 252:22
259:1,6
260:6
261:16,18
263:5,9,22
264:2,6
267:12 269:5
270:7,17
271:18,19

Sean P. Trende
September 02, 2022

273:2,6,25
277:6,9
**right-hand**
242:13 244:7
245:19
**Rights**
25:12,14,17,
20 53:5
110:1 137:23
138:4 162:22
163:1,18
199:17
200:15,18,23
202:8,12
262:16
**Rio**
178:21 179:2
182:14
203:12
**rise**
112:8,21,23
113:5 206:21
**risking**
81:1
**river**
78:16
**Robinson**
254:8
**Roden's**
145:17,22
**Roe**
194:16
**Rogan**
94:6
**role**
125:12
127:25
129:13
**roll-off**
191:16 192:1
**Romney**
196:2,3
**ROSENBERG**
92:3
**roughly**
26:9 234:3

**round**
180:10,22
**row**
16:9
**rule**
24:20 37:7,
12 86:23
90:6 156:6
157:17
176:11 227:6
241:22 242:3
243:11
269:18
270:9,15
**rules**
7:14 155:16
270:3
**ruling**
24:18 64:12
206:8
**run**
11:1 17:22
18:9 20:18
22:5 182:23
243:19,20
245:2
**running**
15:14 18:10,
15 226:3,6,8
**runs**
250:21
**rural**
131:10,11,
15,21 132:2,
9 134:23
**Ruy**
101:13,16

---

**S**

---

S-A-C-H-S-E
132:21
S-T-A-R-R
182:5
S-T-A-T-A
12:9

**Sabato**
117:16
**Sachse**
132:20
**safe**
215:5,21,24
**safeguarded**
263:8
**sample**
13:15,22
16:17 19:12,
16,20,24
20:9,11,19,
20,23 22:1,6
**samples**
19:14
**sampling**
13:20 14:3
**San**
96:18,22,24
97:3,7,13
104:17,23,24
105:3
170:13,14
184:18
203:8,14
**Sarlin**
115:21
**satisfy**
52:14 167:24
168:20
259:14
**saying**
24:6 30:5
31:8 35:24
43:20 54:22
58:7 60:3
76:17 84:16
107:22
108:11
112:15,16
116:25
143:18
183:16
263:22 272:8
273:18,21
**says**

7:5 16:14
28:12 29:23
52:13 57:2
59:25 88:11,
22 90:14
99:11 100:4
107:11
134:17 144:6
147:1 172:6,
14 183:25
230:1 232:16
246:9 260:15
263:14 264:3
274:21
**scale**
54:24
**scenario**
87:14
113:10,14
145:15
168:12,22
169:23 170:3
197:13
198:15,23
218:1,2
255:25
271:13
**scenarios**
67:15 147:14
**scene**
195:24
**scholarship**
109:17
**school**
140:24
**science**
8:10 20:17
109:9
**scientists**
109:5
**scope**
90:18 151:10
209:12,16
**score**
54:15,23
55:1,7 64:23
65:5 71:19
166:8

Sean P. Trende
September 02, 2022

scores
  57:12 58:6
  65:10 71:16
  165:10
scratching
  185:23
Sean
  7:3,25
  258:15
seats
  28:13 150:12
  215:3 223:24
  227:24
second
  10:13 16:13
  52:11 66:22
  68:5 71:6
  72:14,15
  95:2 101:18,
  20 105:19,20
  106:12
  131:5,6
  152:7 154:13
  176:3 177:25
  180:22
  187:10
  223:22 230:1
  263:5,13
  264:3 274:1,
  20 275:22
  276:1 277:23
second-most
  20:16
second-to-
last
  72:14 118:2
  128:14 152:2
  209:17
second-to-
the-last
  95:1 118:5
  128:10
seconds
  250:3
secret
  45:18
section
  9:14 110:2,3

132:23
141:18
159:24
175:22
176:5,6,15,
20,24,25
177:6,16
185:22
212:11,12,14
260:12
262:16
sections
  134:15 176:8
  177:1,8
  260:18
see
  9:13 11:17
  13:9 14:8,13
  15:8,9,22
  17:14 21:10
  30:4 33:3
  34:8 39:3
  57:7,8 68:17
  69:5 72:17
  99:10 120:19
  145:1 149:23
  151:17
  154:19 162:9
  163:1 165:10
  170:3 174:20
  175:3,6,22
  176:2,23
  178:1 181:13
  182:4
  186:12,22
  187:6,9
  189:16
  190:17,23
  191:2 193:9
  197:13
  198:22
  201:1,25
  202:6,9,18,
  19,21 209:21
  211:10
  212:12
  226:19
  232:16,19

235:24
236:6,14,18
240:20 241:1
242:10,13
244:3,8
245:10,16,20
246:12
247:21,24
248:10
250:24
255:15
259:14
269:16 273:3
274:24
275:8,17,18,
24 276:3
277:7,25
seeing
  64:11 274:14
seeking
  63:15
sees
  100:23
seesaw
  197:17
segregated
  233:16
selected
  32:24 219:4
self-report
  183:6
senate
  66:6,9
  121:16
  151:14 190:9
  200:13
  222:21
  223:19,24
  224:17,18
  242:10,18
  244:4,12
  245:6
  262:15,23
senator
  196:3 224:6
  225:6
sense
  11:18 19:23

28:7 40:17
55:10 103:7
164:18
193:15
211:11 264:1
sensible
  43:6
sentence
  10:13,18
  16:13 28:12,
  18,19 31:19
  32:4,11
  52:12,24
  53:1 56:17
  57:2,7 58:12
  59:24 66:22
  71:13 72:15
  76:5 78:5
  95:2 99:10,
  11 105:20
  106:3,4,5,7,
  13,17 112:2,
  11 113:18
  114:9 118:3,
  6,14,15,16
  120:20
  124:15 126:5
  128:11,14,16
  131:8 133:22
  144:25
  145:14
  151:21 152:2
  171:4,18
  172:6,15
  175:5 177:25
  178:13,24
  209:17
  214:16
  216:11
  218:13,20
  219:12,18,23
  260:15
  263:12,14
  264:3
  274:18,21
  275:22 276:1
sentences
  32:14 56:18

Sean P. Trende
September 02, 2022

57:7,8 101:1
141:17
**separate**
67:21
**separately**
59:21
**separating**
234:4
**September**
93:1
**Sequential**
10:15 12:11
**series**
18:8
**SESSION**
93:1
**set**
8:3 13:25
14:4,7 15:10
20:21,24
81:14 111:18
**setbacks**
263:24
**Sets**
9:13
**settings**
17:12,13
214:2
**seven**
32:23 134:9
**seven-**
**district**
27:12
**seven-tenths**
172:21
**several**
111:16
227:10
228:10
**shaded**
233:3 275:8
**shading**
232:20 236:5
240:25
242:14 244:9
245:21
247:25

**shakes**
55:25
**shape**
53:23,24
55:2 65:5,6
71:20,21,22,
23 166:17
**shaped**
54:4
**shapes**
63:2
**share**
15:6,10
19:5,8 27:6,
9 29:6 31:7,
11,15 35:13
43:14 46:21
47:1,7 60:24
77:23 78:18
80:21 83:12,
24 84:5,18
100:5 112:7,
12,13,20
113:4 120:21
121:1,8
161:9 164:4,
15 165:22,24
166:2,4
173:12
186:15,16
190:13
216:1,13
221:12
225:22 226:2
227:2,14
229:10
231:2,11
234:4 238:21
**shares**
48:11 126:2
225:1
**sharp**
175:25
178:16
181:21
**Shaw**
63:19 64:2
90:15 245:2

**shed**
126:13
**shift**
176:1 178:16
181:21 193:2
**shifted**
193:23
195:17
261:12 263:2
277:4
**shifting**
175:13,19
177:11 192:8
**shifts**
261:10
**shine**
42:7
**shoehorn**
167:21
**shoot**
21:2
**shore**
90:16
218:15,19
220:16
233:20,25
235:18 239:5
240:1,18
241:23
244:20 245:5
246:22
252:15
**shored**
219:5,8
225:20
226:2,12
231:1,6
239:12,18
241:13
243:12
**shoring**
218:24
230:22
231:14
235:15,17,20
237:19,21
239:23
242:5,24

243:4 252:24
**short**
185:15
204:19
**short-ish**
261:6
**shortly**
186:21
**show**
36:23 37:13,
25 38:1
143:7 267:15
270:11 277:3
**showed**
36:22 189:18
219:17
**showing**
112:4,5,17,
18 142:19,24
161:6 221:1
232:20
**shown**
36:6,14
155:2
**shows**
36:12 38:3
88:17 162:11
163:20
174:12
193:23
229:15
234:10
**sic**
131:13
**side**
42:12 85:23
90:13 198:25
233:12
237:11 246:3
247:24
248:22
**sides**
198:5 241:10
242:21
244:18 248:8
**signed**
151:16

Sean P. Trende
September 02, 2022

significant
  67:4 110:17
significantly
  70:7
similar
  110:13
  129:18,22
  136:16,24
  152:6
  163:11,13
  198:11 207:6
  209:11
  241:20,21
similarities
  21:23
Similarly
  262:12
simple
  78:12
simply
  78:6 110:6
  141:23
  143:17 145:4
  153:2 155:8
  186:8 256:6
simulation
  16:17 18:15
  23:14 31:23
  32:13 104:21
simulations
  15:14 16:14,
  20 18:10
  31:21 32:18,
  19 37:25
  41:15 66:21
  138:16
  261:22
single
  126:13,24
  132:14
  243:15 245:7
  247:7
sit
  10:3 70:19
  77:19 83:2
  158:13 162:8
  191:21 192:5
  238:25

sitting
  14:9 56:2
  91:13 155:8,
  18 160:15
  211:12,16,
  23,25
situation
  35:22 44:21
  49:15 54:14
  123:20
  166:25
  168:2,17
  198:11,13,23
  199:19
  201:10
  219:19
  257:20,24
situations
  18:6 144:21,
  22
six-way
  259:15
Sixth
  134:18,22
  270:23,24
  271:10,19
skew
  89:16 110:4,
  18 257:12,
  23,25 258:1,
  3
skewed
  19:21
skimmed
  160:12
skipped
  145:14
  178:24
  276:15
skipping
  118:8
slate
  180:20
small
  48:14 198:9
smaller
  85:10

SMC
  10:24 12:10,
  20,22,24,25
  13:7 14:7,17
  17:12 18:12,
  15,17 20:3,4
  22:3 50:8
smuggled
  253:12
Snow
  209:5
social
  265:23 266:5
software
  165:3 213:18
solid
  86:8
solidly
  43:15 44:9
  84:19 85:10
solution
  45:23 141:16
  144:7,10
Solutions
  141:2
solve
  85:6
son
  101:5
sort
  35:21 73:17
  108:24
  109:4,13,16,
  22 111:12
  128:13 130:5
  156:14
  217:18
  232:14 233:7
  243:20 268:5
sorted
  130:12
sorting
  109:6 111:3
sought
  28:12
sound
  49:22 50:5

138:1 139:17
sounds
  86:24
south
  124:6
  134:19,23
  159:4,8
  170:8,14,18
  171:11
  172:14
  177:17
  179:14
  184:11,24
  185:5 192:9
  193:25
  194:23 195:3
  250:22
southeastern
  158:23,24
  159:2,16
southern
  163:6 174:13
spaces
  169:18
Spanish
  182:24
spans
  184:17
speak
  62:16
speaking
  42:15 173:1
  182:9 215:10
  228:2 259:13
  261:9
speaks
  88:20 107:25
  125:7
special
  175:4,11,18
  180:15
  185:17
  186:3,4,21,
  23 188:13,
  16,21 193:3
specialty
  8:16

Sean P. Trende
September 02, 2022

specific
  13:8 19:3
  63:18 64:15
  95:18 103:6
  104:8,15,23
  105:2,6
  109:8
  116:14,22
  134:7 137:12
  179:6 212:7
  216:4 217:8
  218:3 219:3,
  20 220:2
  228:19 229:8
  241:14 243:3
  244:20
  246:21
  261:16
  262:5,22
  269:7
  273:14,17
specifically
  8:11 63:14
  80:24 103:7,
  20 135:15
  173:25
  177:24
  178:1,4,14
  179:19
  216:17
  262:20
  264:21
  265:13
specificity
  260:9
specifics
  85:3 139:1,3
  148:7
specify
  13:19 123:1
speculate
  161:18
  179:17
speculation
  89:9 181:18
  196:19 197:3
  202:17 231:5
  237:8 239:16

240:6 241:17
268:11,23
269:10
Speculative
  164:7 242:2
Spencer
  210:4
Spencer's
  210:11
spend
  132:22
  135:20
spent
  203:11,17
split
  75:24 76:22
  77:1,5,11,
  12,21 78:3,
  17 79:4
  159:1 253:2
  270:13 274:8
splitting
  191:7,16
  192:1 242:6
  253:15
spoke
  108:16
spoken
  181:1
spot
  76:21
sprawls
  134:19
spread
  60:7
square
  54:4,23
  65:23
  168:18,20
  265:3
staff
  179:20
stages
  18:14
stand
  17:20 194:14

standard
  23:4 73:3,5
  74:20 75:1,2
  79:5 129:16
  162:21
  166:7,13,14,
  16 167:14
stands
  100:17
Starr
  182:5,10
  190:21
  191:24
  192:12,20,21
start
  105:20 131:7
  185:25
started
  133:15
  258:20
starting
  118:14
  133:23
starts
  31:19 78:5
  131:5 144:24
Stata
  12:9
state
  11:12 35:19
  57:4 58:12
  66:6,9 86:10
  90:17 95:3
  111:23 116:1
  117:6 118:18
  120:15 134:7
  151:14
  157:18
  160:3,7
  162:11,18,
  19,23,24,25
  163:5,11,20,
  24,25 164:3,
  8,12,14
  167:21
  200:13
  206:11 215:4
  216:16

217:19 223:1
224:17,22
228:23
250:23 256:5
266:7 267:24
state's
  27:22 29:5
  33:6 35:2,12
  36:1,6,8,14
  42:19 44:3,
  7,8 57:2
  58:23 72:3,
  7,16,19,22
  74:1,9 84:24
  85:12 89:25
  151:16
  223:19
state-wide
  76:24 181:8,
  15 226:14,16
  227:8 269:8
stated
  37:11
statement
  35:7 58:22
  72:24 99:22
  106:1 107:8,
  23 108:12
  109:9 113:24
  143:18 145:7
  147:22
  162:17
  170:24
  181:20,23,24
states
  61:19 93:6
  110:1 215:3
  222:21
statistical
  8:15,19 10:5
  12:7 192:7
  262:5,13
  267:5 274:14
statistician
  10:21 17:16
statistics
  8:24 37:13
  141:22

Sean P. Trende
September 02, 2022

142:18,24
143:6,16,20
144:13
status
103:1
Staying
240:19 244:2
245:15
247:20
stepped
204:17
stepping
36:5
steps
144:24
sticking
177:24 242:8
stitching
152:10
stochastic
18:5
stop
105:25
141:24
143:22
story
28:21 126:16
133:24
straight
101:22
118:10
straight-line
101:24
strategic
254:3
strategies
255:4
strategy
173:8 254:9
256:14,18
257:11
strength
171:6,9,16,
19 173:1,17
177:19
196:15
197:10

226:17 229:3
231:7 234:1
237:22
252:24
strengthening
186:13
strike
20:22 53:13
73:11,18
211:23 243:1
252:12
striving
205:20
strokes
132:9
strong
67:17 86:4
105:16 143:7
stronger
86:1 218:25
265:6
strongest
223:15
strongly
227:14 231:8
265:4
struck
138:3,8
163:13
struggled
61:11
stubble
217:17
218:10
studies
42:25
study
41:5 48:24
183:3
stuff
86:20 103:6
105:12
sub-precinct
123:18,19
subject
93:17 110:1
155:16

156:23
submission
49:14 50:18
submitted
248:25
subsection
147:12
202:23
subset
41:5 44:4,
13,16,17
84:4,11,22
85:10,13
86:8
subsets
84:16
substance
7:15
substantial
83:20 217:2,
5 218:5,23
substantially
121:13
124:23
131:15
163:13
214:21
216:14,21
217:12,21,23
218:20 220:9
231:8
suburb
117:6 131:24
suburban
117:4
131:22,25
132:10
suburbs
41:25 44:19
95:3,10,13,
17 96:5,8,9,
12,13 97:8,
13,14
successful
111:3
suffered
263:23

sufficient
216:8
sufficiently
24:14,17
52:16 53:8
56:16 63:16
166:14 201:2
202:1 220:3
suggest
121:20
142:15
255:11
suggested
141:25 161:3
165:13
suggesting
68:20 89:1
159:7
suggestion
141:19
143:13 186:8
suggests
131:12 132:4
233:7
suitable
49:18
summarize
173:15
Summary
152:8
summers
203:10
supplement
69:20
supplemental
69:22 70:16
support
89:25 95:20
96:17 223:9,
11 224:16,18
225:14
228:23
262:14
supports
179:7
suppose
41:3 86:19

Sean P. Trende
September 02, 2022

268:17

**supposed**
20:4 22:4
116:22
178:11
267:22

**Supreme**
56:23 61:9
163:14
168:1,5,14
198:4 206:18
268:3

**supression**
51:16

**sure**
15:16 22:9
26:25 27:3
39:6,7 45:2,
4 51:23
55:13 63:4,5
70:8 75:17,
19 103:12,25
130:16
133:17
138:21
139:20
141:19
142:14,22
143:5,13
164:11
169:22
180:18 182:6
192:20
199:18
200:4,6
215:10,11,24
230:9 252:18
254:18
255:13 270:8
271:6

**surge**
120:15

**surname**
182:24

**surprised**
97:1 182:4

**survey**
9:2 183:5,12

**Susan**
223:2

**suspect**
56:22 168:4
193:7

**suspenders**
73:8

**swapping**
124:7

**SWEETEN**
92:5,7
199:18

**swing**
117:4,5
223:5

**switch**
75:12 102:2

**Switching**
255:1

**sworn**
7:4

**swung**
95:4,14 96:9
97:14

**system**
165:11

———————————

**T**

———————————

**T-R-E-N-D-E**
124:5

**table**
83:9,10

**tables**
134:17
138:14
271:14

**tabulation**
77:8

**tact**
207:7

**take**
7:13 25:13
28:12 44:25
45:2 48:12
66:16 75:25
77:1 90:24

91:23,25
98:2 99:6,17
100:13
115:25
122:17
133:4,18
135:5 136:23
193:12
195:20
206:25
207:8,12
221:7 234:9
235:22
240:19
260:10
265:23
273:23

**taken**
45:5 75:20
91:2 92:11
135:8 150:1,
14 151:5
207:14
216:14
253:23

**takes**
174:3,24

**taking**
73:3 107:25
147:16 217:2

**talk**
37:21 45:23
118:8 181:20
184:6
185:13,15
187:3 188:12
195:16 206:3
215:24 259:2
270:18 274:3
275:21
276:6,10,12,
14,16,19

**talked**
56:5 75:5
185:17,19
239:22

**talking**
9:8 52:24

57:11 84:12,
13 101:2
168:12
170:25 173:9
178:5
185:21,22
195:3 205:7
257:20
258:24
261:10
270:22 271:5
273:17
276:16,23,24

**talks**
145:14
213:23
260:20

**tallied**
76:24

**tandem**
233:6

**target**
13:3,11,14
14:1,6 22:21
23:6 25:20

**Tarrant**
223:25
242:11,19
243:13

**task**
239:9

**tasked**
127:20

**technique**
79:25

**Teixeira**
101:13,16

**tell**
12:10 13:12
15:12 28:15
34:1 35:14
42:16 52:6
70:14,20
76:2 85:14
86:11 132:14
136:14 144:1
152:21
156:15

Sean P. Trende
September 02, 2022

158:16,23
199:11
246:12
277:14
**ten**
95:7,10,24
96:2,23
97:4,7
**ten-minute**
45:2
**tend**
31:1 32:22
36:19 40:22
103:8 132:9,
18 138:24
225:24 237:2
**tended**
112:7,20
139:4
**tendered**
210:21
**tendering**
8:8
**tension**
260:1
**term**
8:7 19:19
40:15 59:9
61:7,8
161:25 162:1
164:20 165:2
168:5 171:8
204:22
256:5,7,8,
11,15 257:9
272:2,3,11,
12
**terminated**
62:21
**terminology**
22:19 214:14
225:21
**terms**
40:13 53:24
55:1 57:12
74:8 88:3
177:8 225:11

**terrible**
257:19
**test**
42:22 55:19
**tested**
20:18
**testified**
105:10
157:3,6
207:24
228:13
248:19 253:7
**testifies**
161:17
**testify**
88:10 155:7,
14,19,23
156:1,4,7
157:9 158:1
161:18
**testifying**
88:25 199:20
**testimony**
24:10 37:20,
23 43:23
50:16 87:1,
3,4 88:8,12
93:18 102:18
109:1 125:7,
15 156:9
157:12,25
158:3 161:16
169:5 206:6
221:16 237:8
253:9 266:22
269:24
**testing**
267:5
**tests**
63:5
**Texas**
7:9 20:24
21:3,6 48:25
58:16 61:25
62:17 80:5
91:21 95:14,
18 97:23
98:6 99:21

100:4,15
101:2
102:16,25
103:2 105:7
107:22
111:23 114:5
115:23 116:4
117:3,5,6
118:11
130:18,19,
23,24 131:9,
18 132:1,9
140:6
146:19,23
147:24 148:4
150:21
151:13,15
158:23,24,25
159:3,16
164:20,24
165:3,6,16
169:24
170:8,14,18
171:11
172:15
173:25
177:17
179:8,13,14,
18 181:2,8,
15 183:21
184:12,25
185:5,9
192:9 193:25
194:23 195:3
196:7,12,15
202:25 203:5
205:9,17
207:1,19
208:5,6,13,
17,18 209:3
212:3 215:4
216:16 220:9
228:23
229:16
232:16
235:24
240:21
242:10 244:4
245:17

247:22 259:3
263:7,8
264:18,25
265:8,24
266:7,9,14
267:1,7
268:20
269:12,16
**Texas's**
95:6,9
111:14
151:14
**Texas-
specific**
58:22
**text**
60:9 274:12
**Thank**
8:14 9:10
10:11 19:15
31:16 32:6
91:20 111:25
152:4,13
172:12
193:19
207:10 224:9
**Thanks**
57:10
**theorem**
9:3
**theory**
49:16
**thereabouts**
154:14
**thesis**
101:21
**thing**
25:4,18 37:4
89:12 93:15
217:18 223:3
255:24 256:2
258:21 261:1
264:11 270:1
**things**
9:2 19:6
36:11 37:22
42:7,11 46:1

Sean P. Trende
September 02, 2022

77:9 87:15
90:13 94:19
101:25
116:11
121:20 125:9
126:8,14,15
127:1 133:16
155:23
160:23
198:14,15
207:21
215:18
248:24 249:5
264:16
**think**
10:3 14:21
15:19 22:5
31:5,16 32:4
38:13 39:25
41:1 42:5,13
43:6 47:2
50:10 51:22
54:15,19
58:2,8,25
59:3 61:17
65:20,21
71:18 72:4,
11 73:1
76:11 80:25
81:7 83:13,
16 93:8
101:11
102:25 105:3
109:11
110:24
112:15
114:18 116:9
125:19 128:4
129:7 130:15
133:13,14,
15,22 134:20
135:19
136:12,13,
18,21 138:12
140:16 142:8
144:6,8,14
145:13
147:14
148:1,5

150:5,9
152:2 154:2
156:12,15,16
157:15
158:25 159:7
160:12,17
161:22
162:25
163:15
166:16
167:20,25
168:14,20
169:24 173:3
174:19,23
175:15
177:22
179:11
180:17,21
182:4 190:10
192:11
193:1,3
194:11,25
195:2 196:6,
7,10,20
197:14
199:24
200:22
201:20
203:21 204:4
205:13
213:22,23
217:4,21
218:23
221:15
222:21
223:1,6
238:25
250:17
253:12
257:25
258:21,22
259:6 260:8
261:5 265:21
269:4 270:7
271:5,9
273:25
274:24
**thinker**
257:19

**thinking**
114:8 198:23
**third**
30:17,20
31:19 32:5
39:16 42:10
83:20 99:10
106:12 176:2
274:20
**Thomas**
268:6
**thorough**
153:1,4
**thought**
83:7 91:18
115:23
128:19
138:19
139:18 144:7
180:8 185:22
206:4 256:7
259:10
**thoughts**
116:15
**threatened**
100:7 206:10
**three**
25:6 28:13
30:9 56:18
57:1 107:25
141:17
146:9,20
203:8
**three-peat**
207:2
**threshold**
14:20 15:6
48:6,12,17
64:15 66:25
67:4,10,22,
24 68:2
217:1,16
**threw**
61:9
**throwing**
143:3

**ticket**
191:7,16,25
**tie**
62:13
**ties**
63:8
**tight**
225:12
**time**
7:13 46:2
47:12 66:16
76:1 92:6
115:25 116:6
118:19
120:22
121:2,9
132:22
135:20 153:2
159:11
176:24,25
178:5 190:14
193:12
195:19
203:11,17
216:24
222:24 238:9
258:9 277:13
**times**
18:11 45:25
111:16,17
182:3,9,13
196:8 227:10
253:10
**title**
98:18
**titled**
9:12 120:2
140:25
151:10 170:8
186:18
254:25
**TLC**
164:25
**today**
42:1 56:3
91:13 93:8
155:9,18
160:15 162:8

Sean P. Trende
September 02, 2022

195:5
211:12,16,
23,25 248:19
258:9
**told**
140:16
249:16
**Tony**
211:1 232:9
**top**
29:22 60:13
80:2,18,19,
21 83:2
100:4 105:17
158:21
160:17 195:2
199:2 232:15
250:21
277:16
**topic**
102:3
**topics**
75:12
**tops**
115:24
**total**
43:12 77:12
128:24 129:5
169:15 191:9
**touch**
103:3 162:6
**touches**
184:25 185:6
**tough**
65:1
**traditional**
58:17
**transcript**
32:7
**transformed**
235:5
**translate**
18:2
**transportatio**
**n**
60:22

**Travis**
114:1 259:16
267:1
276:18,20
**treated**
264:6,8
**treatment**
127:24
**trend**
95:20 96:17
99:16 100:12
102:13
**Trende**
7:3,8,25
45:8 75:23
81:19 82:5
93:5,7,22
94:25 95:1,
6,19 96:7,
16,21 97:2,
6,21 98:13,
14 99:2,8
100:14
102:4,14
103:10,16
104:2,16
105:6,19
107:7
108:13,22
109:15
110:19
111:2,12,21
112:10 113:3
115:5,6,13,
17,19 116:2,
18 117:13
119:4,8,12,
22 121:23
122:21
123:12,16
125:1 126:3
127:7,13,23
128:9,10,23
129:9,18,22
130:1,17,22
131:17,25
132:11,22
133:18

134:5,24
135:10,25
136:1,16,23
137:2
138:10,23
139:12,24
140:3,9,23
141:15
142:4,10,16
145:10,17
146:6,7,18
147:2,21
148:3,25
150:3,18
193:14 201:6
207:18 220:7
227:16
228:15 232:7
247:11
250:11
253:11,22,25
254:24
258:8,13
**Trende's**
119:2
**trends**
42:1
**trendy**
124:5
**trial**
82:14 155:9
158:1
**trick**
211:3
**triple**
100:6
**trouble**
12:4
**troubled**
121:22
**troubling**
120:16
**true**
99:3,4 113:3
115:14
117:20
118:20
120:9,25

121:7
130:17,22
132:6 139:25
141:8,10
145:10
146:16
149:19 170:4
191:23
192:11 194:2
197:14 213:3
231:11
**Trump**
28:23 29:24
30:9,12,13,
16,18,24
31:4,6,7
39:15,17
40:24 41:10,
20,25 42:6,
14 44:18
77:23 80:22
81:5 83:17,
19,22 84:5,
18 85:5,7
87:12,15
146:24 171:1
174:5,6
182:10
183:22
186:15,16
190:4,20
191:5,14,25
192:22,24
195:20
205:8,10
215:12,13
217:4 221:3,
17,22 222:1,
13,21,22
223:5
224:13,16
225:1,7,9,25
234:4 235:6
237:16
259:5,8
260:2,7
**Trump's**
195:16,23

Sean P. Trende
September 02, 2022

215:25
216:13
222:15,19
223:9 225:22
226:14
227:2,14
**Trump-driven**
193:3
**Trump-**
**favorite**
217:11
**Trump-won**
86:2 271:15
272:22
**Trumper**
222:10
**Trumpers**
222:6
**truthfully**
93:19
**try**
17:1 41:3,18
88:24 105:14
110:22
111:12
150:24
156:24
196:21
207:20
223:17
255:1,19,22
257:22
258:16
**trying**
16:24 21:5,
8,10 24:11,
13,15,22
25:10 34:25
44:24 65:13
86:22 87:24
101:23
108:19,20
109:13,22
114:18
125:16
126:14
127:3,12
128:5 164:8,

9 171:6
172:25
200:17
215:16
233:25
253:16
260:18
269:6,7
274:15,17
**tucked**
134:16
**turn**
9:11 10:12
16:12 26:10
28:14 52:5
59:8 66:1
70:21 83:3
94:25 97:19
99:8 105:18
112:1,2
113:16
118:1,2,5
120:13
124:12 128:9
131:2,3,4
133:20,21
135:25
141:14
144:17 151:2
154:17 170:6
175:2 209:14
214:15
218:12
223:16
229:14
232:15 242:8
244:2 245:15
247:20
260:11
**turned**
9:20 148:10
149:3
**turning**
58:11 217:3
229:23
231:16 235:4
**turnout**
189:3,8

205:3
**turns**
217:17
**tweet**
115:8,9,10,
11,15,20
116:2,20
139:15,16,
17,22 140:1,
3 146:12,13,
16,18 147:4,
11 205:7
258:21,23
259:1,7,10,
11,20,24,25
**tweets**
146:9
**twice**
154:6
**Twitter**
115:17
116:11
147:13
**two**
22:6 28:13
30:11,15
35:6,21
39:17 40:5
46:1 47:11
56:18,25
57:7,8 75:1,
4 98:20
106:5 110:8,
10 113:25
114:1,6,18
135:14
144:24
146:20
147:23
160:18
173:12
189:12 203:9
215:12
219:15,16
223:24
224:25
253:21
262:16 271:9

**two-minute**
90:25 149:24
**two-party**
68:15 235:7
**two-thirds**
259:4
**type**
64:12 86:24
93:11 247:14
**types**
245:13
**typically**
8:20 12:7
13:3,5 30:22
152:9

---

U

**U.S.**
169:11 190:8
200:13
**U.s./mexico**
184:18
**Uh-huh**
24:22 25:8
37:6 39:5
45:22 49:20
54:5 55:20
60:12 61:18
64:18 78:4,
21 81:4
84:3,20 85:9
87:17 178:2
261:4
**Uh-oh**
34:12
**ultimate**
88:23
**ultimately**
14:5 262:13
269:20
**unanimously**
192:13
**unaware**
37:24
**uncertainty**
22:14 103:1

Sean P. Trende
September 02, 2022

underground
  142:1
underneath
  172:4,5
underperforms
  191:25
underscore
  259:17
understand
  13:6 17:16
  24:23 31:16
  34:25 41:12
  42:16 44:6,
  24 53:2
  68:3,9,10
  75:24 79:23
  84:9,19
  86:22 93:13,
  20 138:6
  150:7 154:1
  159:7 173:14
  198:1 201:6
  213:1 259:9
  266:4,8
  271:5,6
  273:25
  274:15
understandabl
e
  41:23
understanding
  11:24 17:7,9
  22:3 49:2,5
  50:18 52:13,
  20 53:4,12,
  14,21 63:15
  64:12 66:13
  76:15 96:3,6
  97:5,11
  102:24
  104:6,19
  112:10
  129:9,15
  138:7 167:23
  206:7 222:9
  267:23 268:3
understood
  155:18

157:1,20
169:4
undertake
  63:7 79:19
undertaken
  65:4 105:10,
  11
United
  93:6 150:19
  215:3
units
  47:6
universe
  24:13 37:23
  83:25 88:12
  108:8
unmentionable
  256:4,7,10,
  15 257:9
unnecessarily
  248:20
unrelated
  208:24
untrue
  33:22
upper
  47:1
upper-left
  54:8
upper-right
  54:9
urban
  131:14,17,25
  132:10
urge
  73:17
useless
  237:23
user
  13:7,9 15:8
users
  165:9

---

                 V

vague

87:3 89:8
143:24
202:14 240:6
272:3
valence
  194:12
valid
  71:24
Valley
  178:21 179:2
  182:14
  203:12
value
  42:20 79:13
  260:9
VAP
  15:1 48:16
  80:2,6,13
  205:14
variety
  9:9
various
  52:2 249:7
  261:11 263:2
varying
  260:9
verify
  21:13 22:1
versa
  222:23
  223:14
verses
  229:16
version
  137:3,22
versus
  127:9 171:1
  194:16 204:6
  205:16
  234:10
vice
  222:23
  223:14
victory
  215:21
view
  101:1,17

167:16 168:7
175:10 264:4
Village
  124:4,8
violated
  137:23
violation
  206:21
Virginia
  180:15 199:9
  200:12
vis-a-vis
  54:2 68:8,23
  72:22 85:13
visits
  203:15
visual
  220:25
visually
  29:11 34:18
vocabulary
  162:2
vociferously
  157:16
Voinovich
  55:23
vote
  15:6,10 19:8
  27:9 29:6,25
  30:10,14,17,
  19,25 31:4,
  6,11,15
  39:16 41:20,
  22 42:6
  43:11,12,13
  45:21 46:10,
  21 47:1,7
  51:15 68:15
  71:7 78:18
  80:21 83:24
  87:13 97:23
  98:6 99:16
  100:11
  103:17,22
  104:11,25
  120:16,17,
  18,21 121:8

Sean P. Trende
September 02, 2022

122:23
123:7,23
126:2 130:6
131:10,18
132:1,2,12
138:25 139:4
140:4 173:12
175:13,19
177:19
183:22
186:14
190:12,13
195:22
197:10
215:25
216:13
221:12
222:12
223:13
224:5,6,13
225:1,22
226:2 227:2,
14 231:2,11
234:1,4
235:7
237:16,17
238:21 255:1
256:24
257:21 260:7
266:18,19
267:1
**voted**
  45:19 49:2
  123:25 174:5
  193:5 198:8,
  10 223:14
  229:11
**voter**
  196:14
  232:21 241:1
  254:4
**voters**
  59:20 96:13
  103:16,21
  104:10,24
  116:19 118:9
  120:2,10
  121:19,25

122:8,9,12,
18,23 123:1,
3,5 124:7
131:14,16,
17,21,22
132:1,2,12,
17 138:24
139:4 167:3
175:12,19
176:1 178:16
181:21
187:18,21,25
188:7,22,25
189:10 191:7
192:7,15,23
194:7,10,12,
17,22 195:7
196:12,16,24
198:2,8,10
202:19 205:3
221:21,24,25
228:22
229:3,11
230:10,13,16
233:12
234:5,14,15,
20,23
236:22,23
237:1,6
238:2,6,10,
13,18 239:13
240:3 241:5,
24 244:13
245:7,25
255:6 256:23
257:7,8,9
258:6,7
265:14,18
266:18,19
267:1,3
270:13
**votes**
  46:24 76:18,
  20,23 77:1
  78:22,25
  79:11 81:10
  124:6 130:3,
  18,23 182:24
  191:10 194:6

257:2 258:3
265:19
**voting**
  14:19 15:11
  25:12,14,17,
  20 46:12,14,
  21,25 48:9,
  11 53:5
  79:8,9,14
  95:15 96:11
  97:17 102:19
  103:11 104:1
  106:9 110:1
  116:3,8,19
  121:1 122:25
  129:5 136:5
  137:23 138:4
  158:11
  162:22
  163:1,18
  169:6 170:1
  179:6 181:9
  182:14
  183:17 188:2
  189:16
  194:22
  195:9,10
  197:6,17
  198:19
  199:4,16,17
  200:15,18,23
  202:8,12
  205:11 229:3
  237:22
  252:24
  254:3,11,12
  255:14
  257:7,10
  262:16
  265:14
  269:14
  270:14
**VRA**
  63:14 163:3
  259:14
**VTDS**
  241:9 242:6,
  20 248:7

---

**W**

---

**Wade**
  194:16
**wait**
  133:11
**waived**
  200:7
**waning**
  143:25
**want**
  17:1,16 26:8
  42:3,20
  43:10 44:14
  45:2,20
  48:21 51:25
  53:6 57:22
  59:15 75:12,
  15,24 78:18
  84:16 87:4,6
  91:7 92:4
  93:16 128:6,
  8 161:16
  185:14,19,24
  199:18
  209:10,16
  215:17 228:3
  233:2 248:20
  256:12
  258:20 270:8
  271:6
**wanted**
  36:23 55:6
  68:3 84:22
  144:20
  163:5,9
  193:9 239:10
  259:12
  275:17,18
**warrant**
  164:5
**warranted**
  131:13
**wavered**
  218:16
  219:22

Sean P. Trende
September 02, 2022

wavering
    220:4,16
way
    14:17 18:3
    24:18 26:2,4
    34:17 39:21,
    24 40:2 43:6
    46:1 56:5
    60:6,17
    74:20 79:5
    81:10 94:11
    96:25 102:6
    110:6 111:10
    120:11
    121:23
    122:7,21
    123:4 154:4
    155:22 156:4
    161:22
    174:19
    175:16
    179:11
    186:14
    198:14
    218:14
    219:12 229:2
    233:6,24
    235:13
    240:13 242:6
    243:17 245:1
    246:1,6,19
    247:12,13
    253:5 255:5
    260:17
    261:5,8
    262:11,19
    263:8
    271:11,23
    272:8,12,15,
    24 276:11,13
ways
    25:1,6
    61:12,13,20,
    22 105:21
    156:16
    163:14
    233:22,23
    240:7 254:10

    260:21
weakest
    112:5,17
wear
    150:23
weary
    163:12
Webb
    206:11
website
    212:4
weeks
    133:1
weighed
    168:14
weight
    14:24 16:5
    78:7,10
    79:3,8
    81:10,14
weighting
    79:14,19
weights
    16:2
went
    34:11 41:2
    171:13
    203:13,19
west
    233:12 246:3
western
    163:7 232:24
    233:10,19
    234:5 245:25
    246:3,7,21
    248:3,13
    252:14 253:2
Westlaw
    55:22
white
    89:12,14
    96:13 112:6,
    7,13,19,20
    113:4 114:4
    116:19
    120:2,10,17,
    20 121:1,7

    123:1,7,23
    128:13,24
    129:5,11
    130:2,5,6,
    17,22
    131:10,11,
    14,15,17,21,
    22,25 132:2,
    12 136:3,6,7
    167:3 229:11
    247:17
    257:9,20
    258:1 265:14
    266:18 267:1
    269:1 270:13
    274:7 275:7,
    13
whites
    115:24 116:1
    117:2 122:5
    132:9,10
    184:4 198:12
wife
    59:11
win
    28:13,14
    118:12
    120:17 215:2
    216:2 228:3
    254:5 255:6
    256:1
winner
    180:18
    186:18
    255:20
winning
    256:19
wins
    30:14,16
Wisconsin
    180:3,11
withdraw
    216:19
    219:20
    256:17
witness
    8:9 55:25
    75:17,19

    91:25 92:6
    135:7
    150:10,12
    176:13
    193:12,15,18
    199:22
    207:11 258:9
witnesses
    161:18
won
    29:24 30:10,
    18,22 31:4
    39:15 40:24
    41:10,20,22
    42:6 43:10
    68:14 71:6
    80:22 81:6
    118:10
    121:16
    172:18
    188:21
    189:15
    190:4,9,18,
    21 191:2,5,
    14 215:13,14
    217:3,4,10
    221:2 222:20
    223:4,5
    224:5,6,13
    225:6,9
    235:6
    237:16,17
wondering
    178:10
word
    31:19 145:20
    160:13
    178:1,4,6
    217:5,21
    219:21 230:8
worded
    202:24
words
    29:25 31:23
    45:11 59:25
    61:6 107:25
    145:1,4
    179:1 187:4

Sean P. Trende
September 02, 2022

| | | |
|---|---|---|
| **work** | **written** | 243:9,17 |
| 9:5 10:4 | 12:16 14:1 | 250:14 |
| 12:2,22 | 61:21 97:21 | 251:16 252:7 |
| 16:14,21 | 101:4 143:4 | 254:7 259:6 |
| 51:21 83:8 | 176:21 | 260:1 271:8 |
| 92:8 110:19 | 177:3,4 | 272:2 275:6, |
| 111:4 133:7, | 182:3 211:9 | 20 277:12 |
| 12 147:20 | 260:22 | **year** |
| 164:23 199:4 | **wrong** | 101:3 133:9 |
| 200:14 214:7 | 15:20 32:10 | 208:2 |
| **worked** | 33:24 52:12 | **years** |
| 200:12 | 73:1 136:20 | 9:8 95:7,10, |
| **working** | 172:22 | 24 96:2,23 |
| 132:23 | 235:12 | 97:4,7 99:15 |
| 133:10 | **wrote** | 100:11 104:1 |
| **works** | 12:23 16:20 | 118:11 |
| 14:17 22:4 | 49:16 55:17 | 145:16 |
| 24:18 | 57:15 63:25 | 194:23 |
| **world** | 98:4 101:5 | 195:11 203:9 |
| 35:20 36:18 | 114:7 115:10 | **Yogi** |
| 40:4 61:10 | 118:20 138:3 | 47:10 |
| 87:5 | 139:17 | **York** |
| **worries** | 143:25 144:2 | 25:12 110:12 |
| 82:22 | 145:16 | 122:3 182:3, |
| **worse** | 146:13 170:9 | 9,13 |
| 233:16 | 171:4 | **young** |
| **worth** | 176:22,24 | 132:17 |
| 27:13 30:6 | 177:7 254:2 | |
| 32:23 44:19 | | |
| 158:22 | --- | --- |
| 159:2,16 | **Y** | **Z** |
| 168:16 | | |
| 223:19 236:1 | **yeah** | **Z-A-P-A-T-A** |
| 269:3 | 14:21 23:11, | 182:5 |
| **write** | 18 32:12,13 | **Zapata** |
| 8:1 10:14 | 45:2,4 48:4 | 182:5,10 |
| 12:19 145:3 | 51:14 61:22 | 190:4,9,16 |
| 151:22 152:8 | 69:5 74:16 | 191:5,14 |
| 159:12 | 75:19 87:4 | 192:12,16,21 |
| 172:24 | 90:3 96:19 | **zero** |
| 176:6,7,15, | 105:11 | 47:20 |
| 25 178:22 | 115:22 140:8 | **zigzags** |
| 179:1 | 149:5 154:2 | 232:25 |
| 211:10,15 | 174:23 180:7 | 233:2,7 |
| 219:18 | 186:6 210:5 | |
| **writing** | 213:22 224:9 | |
| 57:15 176:18 | 231:9 233:15 | |
| 259:12 | 236:17,20 | |
| | 238:15 | |