# United States District Court
# for the Western District of Texas

## El Paso Division

| | | |
|---|---|---|
| **LEAGUE OF UNITED LATIN AMERICAN CITIZENS,** *et al.*, | § § § § | |
| *Plaintiffs*, | § § | **No. 3:21-CV-259-DCG-JES-JVB** |
| v. | § § | **[Lead Case]** |
| **GREG ABBOTT,** *in his official capacity as Governor of the State of Texas*, ***et al.***, | § § § | |
| *Defendants.* | § | |
| **MEXICAN AMERICAN LEGISLATIVE CAUCUS,** *Texas House of Representatives*, | § § § | |
| *Plaintiff*, | § § | **No. 1:21-CV-988-RP-JES-JVB** |
| v. | § § | **[Consolidated Case]** |
| **STATE OF TEXAS,** ***et al.***, | § § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

Before the Court is the Defendants' motion to dismiss the Mexican American Legislative Caucus's second amended complaint under Federal Rule of Civil Procedure 12(b)(6). Dkt. 396. The Court grants in part and denies in part.

# I.  BACKGROUND[1]

The Mexican American Legislative Caucus ("MALC") alleges that in the third special session of 2021, the 87th Texas Legislature adopted a series of redistricting maps that intentionally discriminated against Hispanic and Latino communities. Dkt. 319 at 1. MALC alleges that the redistricting maps for the Texas House of Representatives, Congressional delegation, and the State Board of Education all reduce or minimize Hispanic and Latino voting strength or otherwise fail to provide an equal opportunity for Hispanic and Latino communities to participate in the political process and elect candidates of their choice. *Id.*

MALC sued the State of Texas, Governor Greg Abbott, and Secretary of State John Scott, bringing claims under Section 2 of the Voting Rights Act of 1965 ("VRA") as well as the Fourteenth and Fifteenth Amendments to the United States Constitution. *Id.* at 1–2. MALC challenges Texas House Plan H2316, Congressional Plan C2193, and State Board of Education ("SBOE") Plan E2106 as violating (1) the Fourteenth and Fifteenth Amendments' protections against intentional racial discrimination; (2) Section 2 of the

---

[1] When hearing a motion to dismiss under Rule 12(b)(6), factual allegations in the complaint must be taken as true and construed favorably to the plaintiff. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). The "facts" in this section are taken from the plaintiff's pleadings.

Voting Rights Act; (3) the Fourteenth Amendment's protections against unconstitutional racial gerrymandering; and (4) the Fourteenth Amendment's "one person-one vote" requirement. *Id.* ¶¶ 265–276.

This Court's opinion issued May 23, 2022, dealt with MALC's First Amended Complaint and the Defendants' first motion to dismiss. *See* Dkt. 307 at 58. All of the Plaintiffs in that omnibus opinion were given fourteen days to amend their complaints in response to that Order. *Id.* at 60. The Defendants now move to dismiss MALC's Section 2 vote-dilution claims and malapportionment claim as raised in its Second Amended Complaint. Dkt. 396.

## II.   LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The claim is facially plausible when the well-pleaded facts allow the court to reasonably infer that the defendant is liable for the alleged conduct. *Id.* "The court does not 'strain to find inferences favorable to the plaintiffs' or 'accept conclusory allegations, unwarranted deductions, or legal conclusions.'" *Vanskiver v. City of Seabrook*, No. CV H-17-3365, 2018 WL 560231, at *2 (S.D. Tex. Jan. 24,

2018) (quoting *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). Naked assertions and formulaic recitals of the elements of the cause of action will not suffice. *Iqbal*, 556 U.S. at 678. Even if the facts are well-pleaded, the court must still determine plausibility. *Id.* at 679.

## III.  ANALYSIS

The Defendants argue that MALC has failed to adequately plead (1) several of its vote-dilution claims brought under *Thornburg v. Gingles*, 478 U.S. 30 (1986); and (2) its malapportionment claim under *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004) (three-judge court). Dkt. 396 at 1.

### A. *Gingles* Claims

MALC brings a vote-dilution claim under Section 2 of the VRA. Dkt. 319 ¶¶ 267–269. Such claims are often called *Gingles* claims after *Thornburg v. Gingles*, 478 U.S. 30 (1986), because that case provides the "framework" for evaluating Section 2 vote-dilution claims. *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam).[2]

#### 1. Governing Law

Section 2 prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement

---

[2] *Gingles* itself involved Section 2 challenges to multimember districts, 478 U.S. at 46, but the Supreme Court later extended the analysis to apply to Section 2 challenges to single-member districts like the ones at issue here. *See Growe v. Emison*, 507 U.S. 25, 40–41 (1993).

of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). That occurs when "the totality of circumstances" shows that a state's "political processes . . . are not equally open to participation by" members of a minority group "in that [they] have less opportunity . . . to participate in the political process and to elect representatives of their choice." *Id*. § 10301(b).

In *Gingles*, the Court "construed" Section 2 to prohibit the "dispersal of a [minority] group's members into districts in which they constitute an ineffective minority of voters." *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) (alteration adopted) (quoting *Gingles*, 478 U.S. at 46 n.11). When "minority and majority voters consistently prefer different candidates" in such districts, "the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters," thus depriving minorities of an equal opportunity to elect representatives of their choice. *Gingles*, 478 U.S. at 48.

A successful *Gingles* claim remedies that situation by undoing the dispersal of minorities. It does so by requiring the state to concentrate them in a new, majority-minority district that will allow the group, usually, to be able to elect its preferred candidates. *See Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality opinion). Such Section 2-required districts are often described as "opportunity districts." *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399,

428–29 (2006); Nicholas O. Stephanopoulos, *The South After* Shelby County, 2013 SUP. CT. REV. 55, 75 n.84 (2013).

    *Gingles* claims are complicated and analytically intensive. To require a state to draw its proposed district, a *Gingles* plaintiff must make two showings. *First*, it must establish three preconditions. *Wis. Legislature*, 142 S. Ct. at 1248. Those preconditions—described below—are necessary to show that the *Gingles* theory describes the proposed district, *see Gingles*, 478 U.S. at 48–49, so each must be met for the claim to succeed, *Harris*, 137 S. Ct. at 1472. *Second*, the plaintiff must show that, under the "totality of circumstances," *Wis. Legislature*, 142 S. Ct. at 1248, the "political process is [not] equally open to minority voters" without the proposed district, *id.* (quoting *Gingles*, 478 U.S. at 79).

    The first precondition is that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. That is "needed to establish that the minority has the potential to elect a representative of its own choice." *Growe*, 507 U.S. at 40. Accordingly, the minority group must be able to constitute a majority by CVAP.[3] *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d

---

[3] Citizen Voting Age Population, or CVAP, is the segment of the population that is, by virtue of age and citizenship, eligible to vote.

848, 852–53 (5th Cir. 1999); *see also LULAC*, 548 U.S. at 428–29 (analyzing CVAP and noting that "only eligible voters affect a group's opportunity to elect candidates"). And the population for which that must be shown is the population in the proposed district. *See Harris*, 137 S. Ct. at 1470; *LULAC*, 548 U.S. at 427–28; *Growe*, 507 U.S. at 40.[4]

The second and third preconditions are often discussed together. The second requires the minority group to be "politically cohesive." *Gingles*, 478 U.S. at 51. The third is that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (citation omitted). Unless both are met, "the challenged districting [does not] thwart[] a distinctive minority vote by submerging it in a larger white voting population." *Growe*, 507 U.S. at 40.

Plaintiffs normally demonstrate minority political cohesion by

---

[4] To satisfy the first *Gingles* precondition, a plaintiff must also allege that its proposed majority-minority district "is consistent with 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022) (quoting *LULAC*, 548 U.S. at 433). "[C]ombining 'discrete communities of interest'—with 'differences in socio-economic status, education, employment, health, and other characteristics'—is impermissible." *Id.* (quoting *LULAC*, 548 U.S. at 432); *see also id.* at 219 (concluding that testimony indicating that proposed alternative district was "culturally compact" supported finding that proposed district "preserve[d] communities of interest"). The Defendants do not challenge whether MALC's proposed majority-minority districts comply with traditional redistricting principles.

showing that "a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56; *see also Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988). That is described as "bloc voting" (just like the third precondition)[5] and typically means that a large majority of the group favors the same candidates.[6] When both minorities and Anglos vote in blocs, courts conclude that voting is "racially polarized"[7] and typically hold that both the second and third preconditions have been met.[8]

Even so, the second and third preconditions are not mirror-image requirements for different racial groups. As relevant here, a *Gingles* plaintiff

---

[5] E.g., *Strickland*, 556 U.S. at 19 (plurality opinion); *Fusilier v. Landry*, 963 F.3d 447, 458 (5th Cir. 2020).

[6] *Compare, e.g.*, *LULAC*, 548 U.S. at 427 (finding "especially severe" bloc voting when roughly 90% of each racial group votes for different candidates), *with, e.g.*, *Strickland*, 556 U.S. at 16 (plurality opinion) (noting "skeptic[ism]" about Anglo bloc voting when 20% of Anglos would need to cross over to satisfy the first *Gingles* precondition); *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (noting that only 22–38% crossover by Anglos and 20–23% crossover by Black voters supported a finding that voting was not racially polarized). The necessary size of the majority, however, is a district-specific inquiry. *See Gingles*, 478 U.S. at 55–56.

[7] *See, e.g.*, *Strickland*, 556 U.S. at 19 (plurality opinion); *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993); *Gingles*, 478 U.S. at 52 n.18; *Fusilier*, 963 F.3d at 458. The existence of racially polarized voting is also one of the factors that *Gingles* highlights as relevant to the totality-of-circumstances inquiry. *See* 478 U.S. at 44–45, 80.

[8] *See, e.g.*, *LULAC*, 548 U.S. at 427; *Gingles*, 478 U.S. at 56; *Fusilier*, 963 F.3d at 458–59; *Campos*, 840 F.2d at 1243; *but see LULAC v. Clements*, 999 F.2d 831, 849–51 (5th Cir. 1993) (en banc) (emphasizing that the plaintiff must still show that the bloc voting is "legally significant").

must show the second precondition for the minority population that would be included in its proposed district. *See Harris*, 137 S. Ct. at 1470; *LULAC*, 548 U.S. at 427; *Growe*, 507 U.S. at 40. By contrast, the third precondition must be established for the *challenged* district. *See Harris*, 137 S. Ct. at 1470; *LULAC*, 548 U.S. at 427; *Growe*, 507 U.S. at 40. Importantly, Fifth Circuit precedent does not preclude a plaintiff from establishing the third precondition even if the challenged district is not majority Anglo by CVAP. *See Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992). Even so, such a plaintiff faces an "obvious, difficult burden" in establishing that situation. *Id.*

One last note. It bears emphasizing that each of these preconditions must be shown on a district-by-district basis. *See Wis. Legislature*, 142 S. Ct. at 1250; *Perez*, 138 S. Ct. at 2332; *LULAC*, 548 U.S. at 437; *Gingles*, 478 U.S. at 59 n.23. Because *Gingles* claims relate to the political experiences of a minority group in a particular location, a "generalized conclusion" cannot adequately answer "'the relevant local question' whether the preconditions would be satisfied as to each district." *Wis. Legislature*, 142 S. Ct. at 1250 (quoting *Harris*, 137 S. Ct. at 1471 n.5).

### 2. Challenged Claims

The Defendants move to dismiss MALC's *Gingles* challenges to House

District 37, House District 90, Congressional District 15, Education District 2, and Education District 3, arguing it has failed to allege facts that, if proven, would satisfy the third *Gingles* precondition. Dkt. 396 at 4.

### i. House District 37

The Defendants argue that MALC fails to allege demographic facts showing that the Latino candidate of choice in HD37 will usually be defeated by bloc Anglo votes. Dkt. 396 at 4. Further, the Defendants say that Anglo voters constitute only 20.3% of the CVAP in the district—compared to 77.8% Hispanic CVAP—making it increasingly implausible that MALC can meet the pleading requirement that Anglo bloc voting will usually cause the Latino-preferred candidate to lose.[9] *Id.*

MALC has alleged the Hispanic CVAP in HD37 is 77.8% with a Spanish Surname Turnout ("SSTO") of 65.8%. *Id.* ¶ 113 (losing 7.9% CVAP and 8.3% SSTO from benchmark HD37). That fact alone does not doom MALC's ability to satisfy the third *Gingles* factor, but it must carry an "obvious, difficult burden." *Salas*, 964 F.2d at 1555. Making the assumptions most favorable to

---

[9] The Court takes judicial notice of data from the Plan H2316, C2193, and E2106 plan packets. These packets are publicly available on the State's Capitol Data Portal website and therefore may be considered in deciding a motion to dismiss. *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) ("In deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record.").

MALC based on the ranges it provided—that 66% of Hispanic voters and only 1% of Anglo and non-Hispanic voters will vote for the Hispanic-preferred candidate—the Court can infer from its calculations that the Anglo-preferred candidate will usually win because of their alleged greater political cohesion and turnout. Under these assumptions,[10] by the Court's arithmetic, Anglo voters can prevail over the Hispanic candidate of choice when their turnout exceeds the SSTO by as little as 9%.[11]

While the Court acknowledges that MALC did not explicitly allege that there was a turnout gap of 9% or greater, it finds such a figure not only reasonable but plausible in light of MALC's allegations that the Defendants purposefully paired high turnout, extreme Anglo bloc voting communities with low-turnout Hispanic communities with less extreme political cohesion. Dkt. 319 ¶ 118. MALC has alleged sufficient facts to satisfy the third

---

[10] The Court, in its calculations, assumes that the Anglo CVAP (20.3%) is joined by the non-Anglo, non-Hispanic CVAP (1.9%) in both its turnout and political cohesion. Given the small CVAP of the non-Anglo, non-Hispanic element, even larger swings in these assumed turnout and bloc voting percentages do not play a large part statistically. The Court uses the most favorable inferences from MALC's complaint for the calculations, using Hispanic political cohesion of 66% and Anglo bloc voting of 99%. Dkt. 319 ¶¶ 115, 117.

[11] As a baseline figure, with turnout equal across all groups, the Hispanic candidate of choice has a presumptive 51.6% share of the vote in spite of a significant HCVAP majority of 77.8%. Even a minor change in the turnout between Latino and Anglo voters results in a dramatic shift in favor of the Anglo candidate of choice.

precondition that Anglo bloc voting causes the Hispanic candidate of choice to "usually" lose.

MALC's allegations—that due to the systematic arrangement of high turnout Anglo bloc voting areas into HD 37, with the packing of the most cohesive bloc of Latinos into HD 38, "it is *possible* for the Anglo minority to control elections in HD 37," Dkt. 319 ¶ 118 (emphasis added)—are sufficient to state a *Gingles* claim. What matters is not that MALC has failed to mechanically allege the key words that Hispanic voters will usually lose to Anglo voters, but rather that it has alleged demographic *facts* that make it plausible that the politically cohesive Hispanic majority will usually lose to the Anglo candidate of choice because of bloc voting. MALC's claim as to HD37 survives.

### ii.    House District 90

The Defendants argue that MALC has failed to allege demographic facts that show the Latino-preferred candidate will usually lose in HD 90. Dkt. 396 at 6. MALC alleges that Latinos have less voting power under the new district, and that HD90 "serves to undermine the ability of Latinos in the area to elect their candidate of choice in primary elections," but, according to Defendants, MALC stops short of alleging demographic facts that make plausible the allegation that the Latino candidate of choice will

actually lose either the primary or general election. Dkt. 319 ¶¶ 123–130. The Defendants further argue that even if MALC could show that the Latino preferred candidate would lose, it still would not be able to state a vote-dilution claim because its allegations focus on the Democratic primary election, where Anglo and Black voters have formed a coalition. Dkt. 396 at 4–5. This coalition is the cause then of a Latino-preferred candidate losing, and not Anglo bloc voting. *Id.*

MALC counters with its general arguments already covered above. It also adds that the 10.2% reduction in Spanish Surname Turnout in HD90, along with the district's historical composition, performance, and legal background, are sufficient to state a *Gingles* claim. Dkt. 469 at 5.

MALC puts the cart before the horse. Before the Court can address the second showing required by *Gingles*—that under the totality of the circumstances the political process is not equally open to minority voters— the preconditions must be met. *See, e.g., Harding v. Dallas Cnty.*, 948 F.3d 302, 308–09 (5th Cir. 2020) ("After meeting the three prongs of *Gingles*, a plaintiff must establish that the 'totality of the circumstances' supports a finding of vote dilution.").

Nevertheless, analyzing what demographic facts MALC has alleged and using the same analysis as discussed above regarding HD37, the result

becomes clear that in spite of a near even split between the Hispanic CVAP (49.2%) and non-Hispanic CVAP (50.8%),[12] even a reasonable increase in voter turnout for non-Hispanic voters of 10%—well within the realm of plausibility given the numerical allegations of depressed Hispanic voter turnout in the areas retained by HD90, Dkt. 319 ¶¶ 124–125—results in defeat for the Latino candidate of choice in a district the plaintiff has alleged was formerly a Latino opportunity district.

In making these calculations, the Court grants all reasonable inferences in favor of the Plaintiff as the non-moving party, acknowledging that because certain demographic facts were not alleged in the complaint—Black voter turnout and political cohesion—we have kept them constant to other background factors to err on the side of statistical consistency. For example, while the Defendants argue that the presence of an Anglo-Black voter coalition defeats MALC's claim because it is the presence of a coalition, and not strictly Anglo bloc voting that defeats the Latino candidate of choice, this argument is not borne out by the data.

In an effort to better understand the demographic facts, the Court analyzed the data under a series of different inferences—i.e., creating a range

---

[12] The Court takes judicial notice of Anglo (30.3%) and Black (18.1%) CVAP numbers from the redistricting plan packets, which are publicly available.

or bracket of possible outcomes based on how the missing data was accounted for. Under the least favorable inferences for the Plaintiff that might be extrapolated from the demographic facts, such as keeping Black voter turnout at 33.4% and political cohesion at 75%—the same as Spanish Surname Turnout and Anglo political cohesion—a positive Anglo turnout differential of just 10% results in an Anglo-Black coalition victory.[13] Under more favorable inferences—more probable bearing in mind that MALC has alleged the strategic pairing of low-turnout Latino communities with high-turnout, highly polarized Anglo communities—the Latino candidate of choice in Democratic primary contests will lose if Anglo and Black voter turnout is greater than SSTO by single digits as small as 3.8%.[14] Granting truly reasonable inferences to the Plaintiff—instead of the cautious ones the Court used to find the thresholds for electoral success in the primary—would

---

[13] The Court's data come from both the Plaintiff's allegations, Dkt. 319 ¶¶ 124–129, and as previously noted, publicly available data from the plan packets establishing Anglo and Black CVAP in HD90. From there, the Court extrapolated the likely range for Black turnout and political cohesion. Once all inputs were established, the Court used simple arithmetic to find the percentage of expected votes for Hispanic and Coalition candidates of choice as variables changed: Anglo turnout differential, Black turnout differential, and Black political cohesion.

[14] In this scenario, Black political cohesion increases to 79% to match Hispanic political cohesion. Even this figure likely underestimates Black political cohesion, as an increase to 85% (a conservative estimate) results in a coalition candidate victory with only an increase in the turnout differential of 1% by Anglo and Black voters.

likely see a turnout differential *much* greater than single digits and resulting in usual and predictable defeat for the Latino candidate of choice.

Given the above, MALC has stated a plausible *Gingles* claim as to HD90 at this stage of the litigation.

### iii.   Congressional District 15

The Defendants next argue that MALC's allegations as to CD15—that the Latino-preferred candidate may lose—are insufficient to plead a *Gingles* claim. Dkt. 396 at 7. MALC alleges that "reconstituted election results indicate that in 4 out of 8 analyzed statewide elections between 2014 and 2020, the Latino candidate of choice would have lost in the enacted CD." Dkt. 319 ¶ 176. Assuming those allegations to be true, the Defendants contend, shows only that the minority candidate of choice is equally likely to win or lose, not that Anglo bloc voting means that the minority candidate will *usually* lose. Dkt. 396 at 7.

MALC responds that it chose a somewhat arbitrary sampling of election results, "unguided by an expert opinion," in CD15 to show that the dilution of Hispanic voting power led to the alleged Hispanic candidate of choice winning only 4 of 8 instead of 8 of 8 elections. Dkt. 469 at 4. MALC argues it could have picked other sets of elections to show a 40% or 30% success rate, but that at the pleading stage its alleged facts, taken together,

make it at least plausible it will be able to show Hispanics do not have an equal opportunity to participate in the political process and elect representatives of their choice in CD15. *Id.* at 4–5.

The substance of MALC's argument is to promise that, if allowed to proceed, it "will ultimately be able to show" facts that might satisfy the third precondition. *Id.* That is not enough. MALC must set forth specific demographic facts that, if proven, would show that the Latino-preferred candidate will usually lose due to Anglo bloc voting. The Court is also hesitant to put too much emphasis on reconstituted election analysis given that MALC has not specified which elections were won or lost, how recent they were, and whether the election results represent an increasing or decreasing strength of Anglo bloc voting. As MALC has not met its pleading burden, its claim is dismissed.

### iv.   Education Districts 2 and 3

The Defendants argue that MALC's allegations as to ED2 and ED3 are defective because they do not allege facts indicating that the Latino candidate of choice will usually lose due to Anglo bloc voting. Dkt. 396 at 6. MALC alleges only that the Hispanic preferred candidate would have lost in 5 of 9 (55%) statewide contests in ED2 and in 2 of 9 (22%) such elections in ED3 using reconstituted election results between 2014 and 2020. Dkt. 319 ¶¶ 188,

190. While 55% is indeed more than 50%, it is still difficult to infer that Hispanic voters in ED2 will suffer "usual and predictable defeat." *LULAC*, 999 F.2d at 888. The inference is especially implausible given MALC's failure to specify the elections it analyzed or to provide information on the district's current demographics.

MALC's general arguments to the contrary, which the Court has already addressed above, are unpersuasive. MALC's only specific argument as to ED2 and ED3, that it has stated a claim to relief when looking at their diminished performance, Dkt. 469 at 5, fails to satisfy the *Gingles* preconditions. MALC's *Gingles* claims for these districts are dismissed.

### B. *Larios* Claim

MALC also asserts that the Defendants have violated the Equal Protection Clause by contravening the "one-person, one-vote" principle. Dkt. 319 ¶¶ 273–276.

#### 1. Governing Law

"The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." *Gray v. Sanders*, 372 U.S. 368, 381 (1963). "Over time, the Supreme Court and lower courts have spoken extensively on this principle, violations of which are justiciable through the Fourteenth

Amendment's Equal Protection Clause." *Perez v. Abbott*, 250 F. Supp. 3d 123, 185 (W.D. Tex. 2017) (quoting *Baker v. Carr*, 369 U.S. 186, 237 (1962)). "In short, the theory behind the principle is that 'the vote of any citizen [must be] approximately equal in weight to that of any other citizen in the State.'" *Id.* (quoting *Reynolds v. Sims*, 377 U.S. 533, 579 (1964)).

The *Reynolds* Court held that "as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." 377 U.S. at 568. *Reynolds* recognized that "[m]athematical exactness or precision is hardly a workable constitutional requirement," and rather than requiring "identical numbers," it asked for "an honest and good faith effort to construct districts, in both houses of [a state's] legislature, as nearly of equal population as is practicable." *Id.* at 577. In *Brown v. Thomson*, 462 U.S. 835 (1983), the Court held that "as a general matter, . . . an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the State." *Id.* at 842–43.

This 10% threshold was challenged in *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004), *aff'd*, 542 U.S. 947 (2004), where the three-judge

court held, in spite of only a 9.98% deviation from population equality, that the state's legislative reapportionment plan violated the one-person-one-vote principle. *Id.* at 1353. The *Larios* Court found the principle of one person, one vote was violated when a reapportionment plan "systematically and intentionally creates population deviations among districts in order to favor one geographic region of a state over another." *Id.* at 1347.

The state legislative plan at issue underpopulated inner-city Atlanta districts and rural south Georgia districts and overpopulated north Georgia suburban districts. *Id.* at 1326. The most underpopulated districts were primarily Democratic-leaning and the most overpopulated districts primarily Republican-leaning. *Id.* The drafters of the plan were overwhelmingly concerned with preserving political power for rural south Georgia and "aided by what they perceived to be a 10% safe harbor . . . intentionally drew the state legislative plans in such a way as to minimize the loss of districts in the southern part of the state." *Id.* at 1329.

The *Larios* Court stated that it could have struck down the reapportionment plan based on its regional favoritism alone, as the Supreme Court has made clear that where an individual lives is "not a legitimate reason for overweighting or diluting the efficacy of his vote," *Id.* at 1342–43 (quoting *Reynolds*, 377 U.S. at 567), but also found relevant that the plans

inappropriately protected Democratic incumbents while pairing Republican incumbents against one another. *Id.* at 1329. Protection of incumbents is one of a number of state policies that, when applied *consistently* and in a *nondiscriminatory* manner, can justify some level of population deviation. *Karcher v. Daggett*, 462 U.S. 725, 740 (1983).[15]

In *Perez v. Abbott*, this Court had occasion to touch on *Larios* claims. 250 F. Supp. 3d 123. Benefitting from additional *Larios* case law, the *Perez* Court announced a standard of review for state legislative plans in these circumstances:

> [T]o succeed on the merits, plaintiffs in one person, one vote cases with population deviations below 10% must show by a preponderance of the evidence that improper considerations predominate in explaining the deviations.

250 F. Supp. 3d at 190 (quoting *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 342 (4th Cir. 2016)). Illegitimate reapportionment factors and "legitimate considerations" are those "identified in *Reynolds* and later cases." *Id.* at 191.

---

[15] Other legitimate criteria include making compact districts, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbents. *Karcher,* 462 U.S. at 740.

### 2. Challenged Plan

MALC alleges that Texas adopted House Plan H2316 to eliminate Latino-majority districts while preserving Anglo districts. H2316 accomplishes this by dramatically over-populating Latino-majority districts and dramatically under-populating surrounding Anglo-majority districts while still coming in under the 10% "safe harbor" deviation limit at 9.98%. Dkt. 319 ¶¶ 275, 258 (Figure 4). Specifically, the configuration and systematic overpopulation of Texas House Districts in El Paso, particularly the consolidation of House Districts 76 and 77, dilutes the voting power of cohesive Latino communities. *Id.* ¶ 275. MALC alleges this is not only an impermissible racial violation of the one-person, one-vote principle but also exhibits an impermissible regional basis in favor of Plains and Panhandle residents over Trans Pecos residents. *Id.* MALC alleges there is no legitimate justification for these extreme and systematic population deviations, and as a result, they violate the Fourteenth Amendment's one-person-one-vote principle. *Id.* ¶¶ 275–76.

The Defendants argue MALC's allegations—that the differences are the result of ethnic and regional bias—are conclusory and insufficient to state a claim under *Larios*. Dkt. 396 at 8. The Defendants contend that nothing in the complaint tends to show that the districts to which MALC points were

treated differently than any other over- or under-populated districts. *Id.* As support, the Defendants point to a number of Hispanic-majority districts that are underpopulated and White-majority districts that are overpopulated. *Id.* The Defendants point out a series of districts north of Harris County that are uniformly majority white and overpopulated,[16] and a series of districts in the lower Rio Grande Valley which are nearly uniformly Latino-majority and underpopulated.[17] *Id.*

MALC counters that it is challenging a specific piece of the House redistricting map for violating the one-person-one-vote principle in West Texas, even though the plan as a whole is within the 10% *de minimis* threshold. Dkt. 469 at 6 (citing *Perez*, 250 F. Supp 3d at 195). Specifically, MALC alleges that systematic overpopulation of districts in El Paso with Hispanic and Latino voters and systematic underpopulation of Anglo voting districts in North and East Texas improperly diluted Hispanic and Latino voting strength in House Districts 74, 75, and 77. Dkt. 469 at 6; *see also* Dkt. 319 ¶ 257. MALC alleges that the "pernicious effect is obvious: minimized

---

[16] Across House Districts 3, 12, 14, 15, 16, 18, 85, and 127, every district has a majority white CVAP, and the average population deviation is + 3.40%. Dkt. 396 at 8.

[17] Across House Districts 35, 36, 37, 38, 39, 40, and 41, every district has a majority HCVAP, and the average population deviation is - 3.54%.

representation for Latinos in the area and maximized representation for Anglos." *Id.* ¶ 259.

MALC also alleges that H2316 avoids eliminating Anglo-majority districts or pairing Anglo incumbents and does so at the expense of Latino voters and by pairing the Latina representatives, and MALC members, from HD 76 and 77. *Id.* ¶ 259. MALC argues that the Defendants' recitation of other over or underpopulated Anglo and Latino districts outside of West Texas is a non-sequitur because MALC is alleging a specific piece of H2316 was the result of illegitimate reapportionment factors—ethnic and regional bias—and not the plan as a whole. Dkt. 469 at 9; *see also* Dkt. 319 ¶ 260 ("By overpopulating those districts in the Trans Pecos region and under populating those of the Plains and Panhandle regions, it shifts the balance of regional representation."). Further, MALC alleges that as a result of these deviations, on average there is one representative for every 202,566 residents in the Trans Pecos region while residents in the Panhandle and Plains regions enjoy a greater 186,791:1 ratio. *Id.* ¶ 260.

Construing the complaint in the light most favorable to the plaintiff, and accepting all well-pleaded factual allegations as true, MALC has alleged a plausible *Larios* claim that the population deviations in Hispanic and Latino districts in West Texas "reflect the predominance of illegitimate

reapportionment factors rather than the 'legitimate considerations' identified by *Reynolds* and later cases." *Perez*, 250 F. Supp. 3d at 191. The court notes that MALC has provided additional details in its second amended complaint, including accounting for HD 53, Dkt. 319 ¶ 258, and more clearly alleging a basis for its regional distinctions, *id.* ¶ 260. Those further allegations are sufficient to clear the low bar of plausibility.

## IV.   CONCLUSION

For the reasons above, the Defendants' motion to dismiss is granted in part and denied in part. Dkt. 396. MALC's *Gingles* claims as to CD15, ED2, and ED3 are dismissed. MALC's *Gingles* claims as to HD37 and HD90 survive. MALC's *Larios* claim survives. Because it has already had the opportunity to amend twice, MALC's request for leave to amend is denied.

**So ORDERED and SIGNED on this 6th day of December 2022.**

_____
**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**

*And on behalf of:*

| | | |
|---|---|---|
| **Jerry E. Smith** | | **Jeffrey V. Brown** |
| **United States Circuit Judge** | *-and-* | **United States District Judge** |
| **U.S. Court of Appeals,** | | **Southern District of Texas** |
| **Fifth Circuit** | | |