# United States District Court
# for the Western District of Texas
## El Paso Division

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> GREG ABBOTT, *in his official capacity as Governor of the State of Texas*, *et al.*, <br><br> *Defendants*. | § § § § § § § § § § § | **No. 3:21-CV-259-DCG-JES-JVB** <br> **[Lead Case]** |
| UNITED STATES OF AMERICA, <br><br> *Plaintiff*, <br><br> v. <br><br> STATE OF TEXAS, *et al.*, <br> *Defendants*. | § § § § § § § § § | **No. 3:21-CV-299-DCG-JES-JVB** <br> **[Consolidated Case]** |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTION TO DISMISS

Before the Court is the Defendants' motion to dismiss the United States' amended complaint under Federal Rule of Civil Procedure 12(b)(6). Dkt. 397. The Court grants in part and denies in part.

## I.   BACKGROUND[1]

The United States alleges that the 87th Texas Legislature enacted redistricting plans for the Texas congressional delegation and the Texas House of Representatives that discriminated against Hispanic and Latino voters. Dkt. 318 ¶¶ 2–4. The United States alleges that the congressional and state House redistricting maps dilute the voting strength of Texas's minority electorate in violation of the Voting Rights Act of 1965 ("VRA"). *Id.* ¶¶ 6–8.

The United States sued the State of Texas and Secretary of State John Scott, bringing claims under Section 2 of the VRA. *Id.* ¶¶ 11–13, 194–200. The United States challenges Texas House Plan H2316 and Congressional Plan C2193.

The Court's opinion of May 23, 2022, dealt with the United States' Original Complaint and the Defendants' first motion to dismiss. *See* Dkt. 307 at 60. In that omnibus opinion, all the Plaintiffs were given fourteen days to amend their complaints. *Id.* The Defendants now move to dismiss the United States' Section 2 vote-dilution claims in its First Amended Complaint. Dkt. 397.

---

[1] When hearing a motion to dismiss under Rule 12(b)(6), factual allegations in the complaint must be taken as true and construed favorably to the plaintiff. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). The facts in this section are taken from the United States' pleadings.

## II.   LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when well-pleaded facts allow the court to reasonably infer that the defendant is liable for the alleged conduct. *Id.* The court does not "strain to find inferences favorable to the plaintiffs" nor does it "accept conclusory allegations, unwarranted deductions, or legal conclusions." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (quoting *Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996); *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001)). Naked assertions and formulaic recitals of the elements of a cause of action will not suffice. *Iqbal*, 556 U.S. at 678. Even if the facts are well-pleaded, the court must still determine plausibility. *Id.* at 679.

## III.   ANALYSIS

The United States brings vote-dilution claims under Section 2 of the VRA. Dkt. 318 ¶¶ 194–200. Such claims are often called *Gingles* claims after *Thornburg v. Gingles*, 478 U.S. 30 (1986), because that case provides the "framework" for evaluating Section 2 vote-dilution claims. *Wis. Legislature*

*v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam).[2] The Defendants argue that the United States has failed to adequately plead its vote-dilution claims as to (1) congressional districts in Harris County, (2) state House District 31, and (3) state house districts in El Paso County and West Texas. Dkt. 397 at 1–2.

### A. Governing Law

Section 2 of the VRA, 52 U.S.C. § 10301, imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013). While Section 2 encompasses claims based on discriminatory intent, a violation can "be established by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 394 n.21, 404 (1991); *see also, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc). Section 2 prohibits vote dilution, such as the use of redistricting plans that "minimize or cancel out the voting strength of racial minorities in the voting population." *Gingles*, 478 U.S. at 47 (cleaned up) (quoting *Burns v. Richardson*, 384 U.S. 73, 88 (1966)).

---

[2] *Gingles* itself involved Section 2 challenges to multimember districts, 478 U.S. at 46, but the Supreme Court later extended the *Gingles* analysis to Section 2 challenges to single-member districts like the ones at issue here in *Growe v. Emison*, 507 U.S. 25, 40–41 (1993).

The language of Section 2 specifically prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). That occurs when "the totality of circumstances" shows that a state's "political processes . . . are not equally open to participation by" members of a minority group "in that [they] have less opportunity . . . to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

In *Gingles*, the Supreme Court "construed" Section 2 to prohibit the "dispersal of [a minority group's members] into districts in which they constitute an ineffective minority of voters." *Cooper v. Harris*, 137 S. Ct. 1455, 1464 (2017) (quoting *Gingles*, 478 U.S. at 46 n.11). When "minority and majority voters consistently prefer different candidates" in such districts, "the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters," thus depriving minorities of an equal opportunity to elect representatives of their choice. *Gingles*, 478 U.S. at 48.

A successful *Gingles* claim undoes the dispersal of minorities by requiring the state to concentrate them in a new, majority-minority district that will allow the group, usually, to be able to elect its preferred candidates. *See Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality opinion). Such

Section 2–required districts are often described as "opportunity districts." *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399, 428–29 (2006); Nicholas O. Stephanopoulos, *The South After* Shelby County, 2013 SUP. CT. REV. 55, 75 n.84 (2013).

*Gingles* claims are complicated and analytically intensive. To require a state to draw a new majority-minority district, a *Gingles* plaintiff must make two showings. *First*, it must establish three preconditions. *Wis. Legislature*, 142 S. Ct. at 1248. Those preconditions are necessary to show that the *Gingles* theory describes the proposed district, *see Gingles*, 478 U.S. at 48–49, so each must be met for the claim to succeed, *Harris*, 137 S. Ct. at 1472. *Second*, the plaintiff must show that, under the "totality of circumstances," *Wis. Legislature*, 142 S. Ct. at 1248, the "political process is [not] equally open to minority voters" without the proposed district, *id.* (quoting *Gingles*, 478 U.S. at 79). Because Defendants' motion focuses on the three preconditions, rather than the totality-of-the-circumstances second prong, the Court discusses them in further detail below.

The first precondition is that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. That is "needed to establish that the minority has the potential to elect a representative of its own choice." *Growe*,

507 U.S. at 40. Accordingly, the minority group must be able to constitute a majority by CVAP.[3] *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 852–53 (5th Cir. 1999); *see also LULAC*, 548 U.S. at 428–29 (analyzing CVAP and noting that "only eligible voters affect a group's opportunity to elect candidates"). Importantly, the plaintiff must show that the minority electorate can constitute a majority in the proposed district. *See Harris*, 137 S. Ct. at 1470; *LULAC*, 548 U.S. at 427–28; *Growe*, 507 U.S. at 40.[4]

The second and third preconditions are often discussed together. The second requires the minority group to be "politically cohesive." *Gingles*, 478 U.S. at 51. The third is that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (citation omitted). Unless both are met, "the challenged

---

[3] Citizen Voting Age Population, or CVAP, is the segment of the population that is, by virtue of age and citizenship, eligible to vote.

[4] To satisfy the first *Gingles* precondition, a plaintiff must also allege that its proposed majority-minority district "is consistent with 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022) (quoting *LULAC*, 548 U.S. at 433). "[C]ombining 'discrete communities of interest'—with 'differences in socio-economic status, education, employment, health, and other characteristics'—is impermissible." *Id.* (quoting *LULAC*, 548 U.S. at 432); *see also id.* at 219 (concluding that testimony indicating that proposed alternative district was "culturally compact" supported finding that proposed district "preserve[d] communities of interest").

districting [does not] thwart[] a distinctive minority vote by submerging it in a larger white voting population." *Growe*, 507 U.S. at 40.

Plaintiffs normally demonstrate minority political cohesion by showing that "a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56; *see also Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988). That is described as "bloc voting" (just like the third precondition)[5] and typically means that a large majority of the group favors the same candidates.[6] When both minorities and Anglos vote in blocs, courts conclude that voting is "racially polarized"[7] and typically hold that both the second and third preconditions have been met.[8]

---

[5] *E.g.*, *Strickland*, 556 U.S. at 19 (plurality opinion); *Fusilier v. Landry*, 963 F.3d 447, 458 (5th Cir. 2020).

[6] *Compare, e.g.*, *LULAC*, 548 U.S. at 427 (finding "especially severe" bloc voting when roughly 90% of each racial group votes for different candidates), *with, e.g.*, *Strickland*, 556 U.S. at 16 (plurality opinion) (noting "skeptic[ism]" about Anglo bloc voting when 20% of Anglos would need to cross over to satisfy the first *Gingles* precondition); *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (noting that only 22-38% crossover by Anglos and 20-23% crossover by Black voters supported a finding that voting was not racially polarized). The necessary degree of bloc voting, however, is a district-specific inquiry. *See Gingles*, 478 U.S. at 55–56.

[7] *See, e.g.*, *Strickland*, 556 U.S. at 19 (plurality opinion); *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993); *Gingles*, 478 U.S. at 52 n.18; *Fusilier*, 963 F.3d at 458. The existence of racially polarized voting is also one of the factors that *Gingles* highlights as relevant to the totality-of-circumstances inquiry. *See* 478 U.S. at 44–45, 80.

[8] *See, e.g.*, *LULAC*, 548 U.S. at 427; *Gingles*, 478 U.S. at 56; *Fusilier*, 963 F.3d at 458–59; *Campos*, 840 F.2d at 1243. *But see LULAC v. Clements*, 999 F.2d

Even so, the second and third preconditions are not mirror-image requirements for different racial groups. As relevant here, a *Gingles* plaintiff must show the second precondition for the minority population that would be included in its *proposed* district. *See Harris*, 137 S. Ct. at 1470; *LULAC*, 548 U.S. at 427; *Growe*, 507 U.S. at 40. In contrast, the third precondition must be established for the *challenged* district. *See Harris*, 137 S. Ct. at 1470; *LULAC*, 548 U.S. at 427; *Growe*, 507 U.S. at 40. Importantly, Fifth Circuit precedent does not preclude a plaintiff from establishing the third precondition even if the challenged district is not majority Anglo by CVAP. *See Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992). Even so, such a plaintiff faces an "obvious, difficult burden" in establishing that situation. *Id.*

One last note. It bears emphasizing that each of these preconditions must be satisfied on a district-by-district basis. *See Wis. Legislature*, 142 S. Ct. at 1250; *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018); *LULAC*, 548 U.S. at 437; *Gingles*, 478 U.S. at 59 n.23. Because *Gingles* claims relate to the political experiences of a minority group in a particular location, a "generalized conclusion" cannot adequately answer "'the relevant local

---

831, 849–51 (5th Cir. 1993) (en banc) (emphasizing that the plaintiff must still show that the bloc voting is "legally significant").

question' whether the preconditions would be satisfied as to each district."
*Wis. Legislature*, 142 S. Ct. at 1250 (quoting *Harris*, 137 S. Ct. at 1471 n.5).
Ultimately, a plaintiff must prove that an "alternative to the districting
decision at issue would . . . enhance the ability of minority voters to elect the
candidates of their choice." *Perez*, 138 S. Ct. at 2332.

### B. Challenged Claims

The Defendants challenge the United States' *Gingles* claims as to
congressional districts in Harris County, state House District 31, and state
house districts in El Paso County and West Texas. Dkt. 397 at 1–2.

#### 1.  Harris County

Under the new map, nine congressional districts are located at least
partially in Harris County: congressional districts 2, 7, 8, 9, 18, 22, 29, 36,
and 38. The United States acknowledges that Latinos can elect their
candidate of choice in CD29 but alleges that Latinos are unable to elect their
candidate of choice in CD2, CD22, CD36, and CD38. Dkt. 318 ¶¶ 98–99. The
United States further alleges that the Harris County districts can be
reconfigured to create a Latino opportunity district in CD38 while
maintaining CD29. *Id.* ¶ 104. Consequently, the United States concludes that
the present configuration violates Section 2 of the VRA.

The Defendants argue that the United States' *Gingles* challenge to Harris County fails for two independent reasons: (1) the United States fails to allege facts that, if proven, would show that the proposed CD29 (or "CD29*") can be maintained as a Latino opportunity district and (2) that the United States fails to allege that the proposed CD38 (or "CD38*") is majority Latino. Dkt. 397 at 3.

### a. CD29* as an Opportunity District

The Defendants contend that the configuration of CD29* is relevant to the question of whether the United States can state a claim as to CD38* because, for *Gingles* claims, "the ultimate question is whether a districting decision dilutes the votes of minority voters." Dkt. 397 at 3 (quoting *Perez*, 138 S. Ct. at 2332). The Defendants argue that to make this showing, a plaintiff must establish the existence of an alternative map that does not eliminate an already-existing opportunity district within the relevant geographic area. *Id.* (citing *Harding v. Dallas County*, 948 F.3d 302, 309–11 (5th Cir. 2020)). Otherwise, in their eyes, the proposal is just substituting one majority-minority district for another. The Defendants would have this Court rule that as a matter of law, that does not "enhance the ability of minority voters to elect the candidates of their choice." *Id.* (quoting *Perez*, 138 S. Ct. at 2332).

The Defendants also argue that the amended complaint fails to allege facts satisfying the first and second *Gingles* preconditions as to CD29*: it does not allege that CD29* has a majority Hispanic CVAP,[9] nor does it allege that Latino voters in CD29* are politically cohesive. Dkt. 397 at 3–4. The Defendants also argue that CD29* is not culturally compact as it combines disparate Houston neighborhoods.[10] *Id.* And, according to Defendants, a plaintiff's proposed district must be culturally compact because "there is no § 2 right to a district that is not reasonably compact." *LULAC*, 548 U.S. at 430.



Figure 1. United States' Proposed Map—Harris County

---

[9] Under the current map, CD29 is 62.2% Hispanic CVAP. Dkt. 397 at 1.

[10] CD29* "begins in the Greater Fifth Ward, extends South into the Second Ward, squeezes North through downtown, continues to Aldine, loops around the Beltway to Jersey Village, then juts West toward Katy." Dkt. 397 at 5.



Figure 2. Current Congressional Districts—Harris County

In response, the United States argues that Section 2 does not require plaintiffs to plead facts establishing the *Gingles* preconditions in existing opportunity districts. Dkt. 472 at 5. Further, the United States contends that because it has not alleged Anglos vote as a bloc to defeat Latino-preferred candidates in CD29*—the third *Gingles* precondition—it makes little sense to require the first and second preconditions be alleged. *Id.* Nevertheless, even if the United States were required to make such factual allegations, it argues, the amended complaint would suffice as it alleges that the Latino community in "Harris County is sufficiently large and geographically compact to constitute a majority in a second single-member district." *Id.* at 6 (quoting Dkt. 318 ¶ 104).

The United States also challenges the Defendants' characterization of CD29* as not culturally compact, as it is situated entirely within Harris

County and a far cry from the districts in *LULAC* that were deemed non-compact because they joined "Austin and Mexican-border communities," across "enormous geographical distance," that were culturally distinct and had different needs. Dkt. 472 at 6–7 (quoting *LULAC*, 548 U.S. at 435). As the United States also alleges facts that support its contention that CD29* is politically cohesive—specifically, that "approximately 85% of Latino voters in Harris County voted for the same candidates" in contested statewide elections between Latino and Anglo candidates from 2014–2020—the United States says it has arguably met the first two *Gingles* preconditions. *Id.* at 8 (citing Dkt. 318 ¶ 100).

The Court agrees with the United States.[11] The substantial Latino CVAP majority in CD29, the map of CD29*, and the Latino CVAP concentrations in the enacted districts from which CD29* draws population are enough to plausibly show that CD29* will retain its Latino CVAP majority. Moreover, in spite of the Defendants' protestations to the contrary, the United States has met its burden in pleading that the Latino population in CD29* is

---

[11] The Court has already held twice that the United States need not plead specific facts as to cultural compactness, so we do not belabor the point here. *See League of United Latin Am. Citizens v. Abbott*, No. 121CV988RPJESJVB, 2022 WL 4727650, at *5 (W.D. Tex. Sept. 30, 2022); *League of United Latin Am. Citizens v. Abbott*, No. 121CV991LYJESJVB, 2022 WL 4597782, at *3 (W.D. Tex. Sept. 29, 2022).

politically cohesive. *See* Dkt. 318 ¶ 100. The United States has plausibly alleged that, in spite of the changes made to create a second opportunity district in CD38*, CD29* will continue to provide Latino voters the opportunity to elect their candidate of choice.

### b. CD38* as Majority-Minority District

The Defendants next argue that the Harris County claim fails because the United States' proposed CD38 is a majority-Latino district only according to the 2016–2020 American Community Survey Data ("ACS"). Dkt. 397 at 5–6 (citing Dkt. 318 ¶ 105 (alleging CD38* is 50.8% Hispanic CVAP)). This data, however, was not available to the Texas Legislature during the redistricting process, so the Legislature instead relied on the 2015–2019 ACS data. *Id.* at 6. Because the Census is only conducted decennially, electoral maps operate under the legal fiction that they remain properly apportioned if they are lawful when drawn. *LULAC*, 548 U.S. at 421. Subsequent population changes, therefore, do not affect an electoral map's legality. To state a valid claim, the Defendants argue, the United States must show that the congressional map was unlawful based on data that was available to the Texas Legislature when it was drawing the map. *Id.*

The United States responds that this assertion has no basis in logic or precedent as discriminatory-results claims may rely on the latest U.S. Census

data. Dkt. 472 at 9. According to the United States, the discriminatory-results test requires a "practical evaluation of past and present reality"; it does not merely question whether a challenged district was discriminatory at its origin. *Id.* at 10 (quoting *Gingles*, 478 U.S. at 65 (citation omitted)); *cf. Rogers v. Lodge*, 458 U.S. 613, 616 (1982) (addressing whether a method of election, though "racially neutral when adopted," was "being *maintained* for invidious purposes" (quotation omitted)). Thus, in the Plaintiff's view, liability turns on the "best available data before th[e] court," not the best available data before the Legislature at enactment. *Id.* (quoting *Perez v. Pasadena Ind. Sch. Dist.*, 958 F. Supp. 1206, 1228–29 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999)).

The Defendants argue that the United States' assertion that binding case law compels the result it seeks is "sleight of hand" as only one case affirmatively determined that it was proper to use data not available to the Legislature at the time of redistricting. Dkt. 514 at 4 (citing *Perez v. Abbott*, 274 F. Supp. 3d 624, 638 n.19 (W.D. Tex. 2017)). And that case, the Defendants argue, has no precedential value because the Supreme Court reversed it, "albeit without reference to the quote at issue here." *Id.* (citing *Perez*, 138 S. Ct. 2305 (2018)).

The Court is not persuaded by the Defendants' arguments. While *Perez* was overturned for other reasons, the rationale of the district court in using evidence that best reflects the population at the time of redistricting, though not available to the Legislature at the time—*i.e.*, the 2016–2020 ACS survey data—is justifiably persuasive. Other courts have found the same logic persuasive in allowing *Gingles* plaintiffs to rely on newer ACS data that was not available to the legislature during redistricting. *See, e.g.*, *Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 732–33 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cnty.*, 601 F. App'x 255 (5th Cir. 2015). The United States' remaining case law, while not explicitly on point, supports the general proposition for which *Perez* and *Rodriguez* stand. *See* Dkt. 472 at 10–11 (collecting cases).

Accordingly, the Court agrees with the United States that it has plausibly alleged CD38* as a majority-minority district. The United States' *Gingles* claim as to Harris County survives.

### 2. State House District 31

The United States alleges that state House District 31 remains majority-minority with a Hispanic CVAP of 64.7% but that longtime representative Ryan Guillen's recent departure to the Republican Party means that Latino voters can no longer elect a representative of their

choice.[12] Dkt. 318 ¶¶ 138, 146. In the only contested election for HD31 between 2014 and 2020, Latino voters preferred the same candidate with over 80% of Latino voters supporting Representative Guillen; only 10% of Anglo voters cast ballots for him. *Id.* ¶ 142.

The Defendants counter that this claim fails for three reasons: (1) the United States has not alleged demographic facts that the Anglo bloc voting will cause the Latino candidate of choice to lose in HD31; (2) the United States has not shown the Latinos in HD31 to be politically cohesive; and (3) the proposed reconfiguration eliminates a Latino-majority district—HD43. Dkt. 397 at 7–9. We agree with Defendants that the United States has not pleaded sufficient facts to allege that Anglo bloc voting will cause the Latino candidate of choice to usually lose in HD31, and we dismiss Plaintiff's claim.

At the motion to dismiss stage, the United States must plead sufficient facts to allow the Court to plausibly infer that the Latino candidate of choice will usually lose the election in the challenged districting of HD31 because of Anglo bloc voting. In its complaint, the United States posits that "[a]lthough Latino voters in former District 31, adopted in 2013, reelected their preferred candidate by a comfortable margin in 2020, the incumbent switched parties

---

[12] Guillen has represented HD31 since 2003, although he was elected from 2002–2020 as a Democrat. In the 2020 general election, Guillen was reelected with over 58% of the vote. Dkt. 318 ¶ 141.

shortly after Governor Abbott signed the 2021 plan into law." Dkt. 318 ¶ 138. Latino Republican Ryan Guillen, who has represented House District 31 since 2003, won 58% of the vote when running as a Democrat in 2020. *Id.* ¶ 141.

The United States, at this stage, must allege that: (1) either Representative Guillen will win the general election but that he is not the Latino candidate of choice; or (2) if Representative Guillen is the Latino candidate of choice, allege he will lose the general election due to Anglo bloc voting. The United States pleaded no facts indicating that Representative Guillen is no longer the Latino candidate of choice. On the contrary, the United States uses statistics from his 2020 election to indicate that a cohesive majority of Latino voters in his district prefer Representative Guillen as a candidate. *Id.* ¶ 142.

As a result, we construe the United States' claim as an allegation that Representative Guillen is the Latino candidate of choice, and he will usually lose the general election due to Anglo bloc voting. But the United States has not shown that such a claim is plausible.

The United States provides no evidence to suggest that Representative Guillen, running as a Republican, will usually be defeated in the challenged districting due to Anglo bloc voting. The burden is on the United States to

allege facts that would allow this Court to infer that though less than 10% of Anglos supported Representative Guillen running as a Democrat in the old HD31, now in the challenged district, those voters would now bloc vote Democrat, or for some other party or an independent candidate, to defeat the Latino candidate of choice for the district. *Id.* ¶ 142. The United States does not provide the data necessary to allow us to reach that conclusion.[13] Accordingly, the United States' claim regarding HD31 is dismissed.

### 3. El Paso County and West Texas state house districts

The United States alleges that state House District 81 denies Latinos the opportunity to elect their candidate of choice. Dkt. 318 ¶¶ 169–70. It contends that Section 2 of the VRA requires six Latino opportunity districts in the region around El Paso County and West Texas—House Districts 74, 75, 77, 78, 79, and 81. *Id.* ¶¶ 156–79. The United States proposes a large-scale reconfiguration of the districts in this area to achieve this result. *Id.*

The Defendants argue this claim should be dismissed for a variety of reasons. *See* Dkt. 397 at 12.

---

[13] The Court does have discretion to take judicial notice that Representative Guillen won his 2022 election in HD31, running as a Republican, against Hispanic Democrat Martha Gutierrez, 71.3% to 28.7%. We do not need to rely on the 2022 election results to dismiss the United States' claim, however.

Because the Court concluded that the United States stated a *Gingles* claim as to the El Paso County and the West Texas state house districts in its omnibus opinion, Dkt. 307 at 50–52, it will not revisit the issue here despite the Defendants' urging.

## IV. CONCLUSION

For the reasons above, the Defendants' motion to dismiss is granted in part and denied in part. Dkt. 397. The United States' *Gingles* claim as to state House District 31 is dismissed. All other claims survive. Because we are on the threshold of trial, leave to amend is denied.

**So ORDERED and SIGNED on this 14th day of December 2022.**

_____
**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**

*And on behalf of:*

| | | |
|---|---|---|
| **Jerry E. Smith** | | **Jeffrey V. Brown** |
| **United States Circuit Judge** | *-and-* | **United States District Judge** |
| **U.S. Court of Appeals,** | | **Southern District of Texas** |
| **Fifth Circuit** | | |