# United States District Court
# for the Western District of Texas

## El Paso Division

| | | |
|---|---|---|
| **LEAGUE OF UNITED LATIN AMERICAN CITIZENS,** *et al.*, | § § § § | |
| *Plaintiffs*, | § § | No. 3:21-CV-259-DCG-JES-JVB |
| **v.** | § § | **[Lead Case]** |
| **GREG ABBOTT,** *in his official capacity as Governor of the State of Texas*, *et al.*, | § § § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART THE DEFENDANTS' MOTION TO DISMISS

Before the Court is the Defendants' motion to dismiss the LULAC Plaintiffs' Third Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Dkt. 398. The Court grants the Motion in part and denies it in part.

## I.   BACKGROUND[1]

The League of United Latin American Citizens ("LULAC"), along with various organizations and individuals (the "LULAC Plaintiffs"), allege that

---

[1] When hearing a motion to dismiss under Rule 12(b)(6), well-pleaded factual allegations in the complaint must be taken as true and construed favorably to the plaintiff. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th

the 87th Texas Legislature approved redistricting plans for the Texas congressional delegation and the Texas House of Representatives, Senate, and State Board of Education ("SBOE") that discriminate against Latino voters—purposefully and in effect—in violation of the Voting Rights Act of 1965 ("VRA") and the Constitution. Dkt. 338 ¶¶ 6–7.

The LULAC Plaintiffs sued Governor Greg Abbott, Secretary of State John Scott, and the State of Texas, bringing claims under both VRA section 2 and the Fourteenth Amendment. *Id.* ¶¶ 1, 115–117. The LULAC Plaintiffs claim that Congressional Plan C2193, Texas House Plan H2316, Senate Plan S2168, and SBOE Plan E2106 violate (1) the Fourteenth Amendment's protections against racial discrimination, (2) the Fourteenth Amendment's protections against unconstitutional population deviations ("*Larios* claims"), and (3) VRA section 2 ("*Gingles* claims"). *Id.* ¶¶ 480–490.

The Defendants now move to dismiss several of the LULAC Plaintiffs based on standing, and otherwise assert that the LULAC Plaintiffs' pleadings fail to state a valid claim for relief. Dkt. 398 at 3.[2]

---

Cir. 1993). The alleged facts in this section are taken from the LULAC Plaintiffs' pleadings. *See generally* Dkt. 338.

[2] Page citations in this Memorandum Opinion and Order refer to the page numbers assigned by the Court's CM/ECF system, not the document's internal pagination.

## II.   LEGAL STANDARD

### A. Rule 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a court must dismiss a case for lack of subject-matter jurisdiction if it "lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Loc. 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)). The party asserting jurisdiction bears the burden of proof. *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). Federal courts have jurisdiction over a claim between parties only if the plaintiff presents an actual case or controversy. *See* U.S. CONST. art. III, § 2, cl. 1; *Okpalobi v. Foster*, 244 F.3d 405, 425 (5th Cir. 2001) (en banc).

"The many doctrines that have fleshed out that 'actual controversy' requirement—standing, mootness, ripeness, political question, and the like— are 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.'" *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 541–42 (5th Cir. 2008) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984), *abrogated in other part by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). When a party challenges standing in a motion to dismiss, the court must "accept as true all material allegations of the complaint and . . . construe the complaint in favor of the complaining

party." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (quoting *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988)).

## B. Rule 12(b)(6)

To survive a motion to dismiss for failure to state a claim, a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when well-pleaded facts allow the court to reasonably infer that the defendant is liable for the alleged conduct. *Id.* The court does not "strain to find inferences favorable to the plaintiffs," *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (quoting *Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996)), nor does it accept "conclusory allegations, unwarranted deductions, or legal conclusions," *id.* Naked assertions and formulaic recitals of the elements of a cause of action will not suffice. *Iqbal*, 556 U.S. at 678. Even if the facts are well-pleaded, the court must still determine whether a plaintiff's claim is plausible. *Id.* at 679.

## III.   ANALYSIS

The Defendants argue that (1) the LULAC Plaintiffs have not demonstrated Article III standing, thus depriving the Court of subject-matter jurisdiction; (2) the Court should dismiss the malapportionment

claim under *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004) (three-judge court), for failure to plausibly allege intentional discrimination; and (3) the Court should dismiss the vote-dilution claims brought under *Thornburg v. Gingles*, 478 U.S. 30 (1986), as failing to meet the required preconditions. Dkt. 398 at 3, 9, 17.

## A. Standing

The Court begins, as it must, with standing. *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 609 (5th Cir. 2017). Standing is a constitutional prerequisite for this Court's jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To demonstrate standing, a plaintiff must show (1) an "injury in fact," (2) a "causal connection between the injury and the conduct complained of," and (3) a likelihood that the injury will be "redressed by a favorable decision." *Id.* at 560–61 (quotations omitted). Standing is assessed plaintiff-by-plaintiff and claim-by-claim, *see In re Gee*, 941 F.3d 153, 170–71 (5th Cir. 2019), though only one plaintiff with standing is needed to bring a particular claim, *Pool v. City of Houston*, 978 F.3d 307, 312 n.7 (5th Cir. 2020). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing, "for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Denning v. Bond*

*Pharmacy, Inc.*, 50 F.4th 445, 450 (5th Cir. 2022) (quoting *In re Deepwater Horizon*, 739 F.3d 790, 799 (5th Cir. 2014)).

The Defendants first challenge the Entity Plaintiffs' standing,[3] arguing their allegations support neither organizational nor associational standing. Dkt. 398 at 3–4. Further, the Defendants argue that the Entity Plaintiffs and the Individual Plaintiffs[4] lack standing to challenge House District 118, in which no Entity Plaintiffs or Individual Plaintiffs reside. *Id.* at 9. The Court addresses each argument in turn.

### 1. Third-Party Standing

The Defendants argue the Entity Plaintiffs have not demonstrated an injury-in-fact. *Id.* at 4. An organization may show injury-in-fact in either of two ways.

*First*, the organization may show that the defendants' acts injured the organization itself. *See NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir.

---

[3] The "Entity Plaintiffs" are LULAC, Southwest Voter Registration Education Project ("SVREP"), Mi Familia Vota, American GI Forum, La Unión Del Pueblo Entero ("LUPE"), Mexican American Bar Association of Texas ("MABA-TX"), Texas Hispanics Organized for Political Education ("Texas HOPE"), William C. Velasquez Institute ("WCVI"), FIEL Houston Inc. ("FIEL"), Texas Association of Latino Administrators and Superintendents ("TALAS"), Proyecto Azteca, Reform Immigration for Texas Alliance ("RITA"), and Workers Defense Project ("WDP").

[4] The "Individual Plaintiffs" are Emelda Menendez, Gilberto Menendez, Jose Olivares, Florinda Chavez, Joey Cardenas, Paulita Sanchez, Jo Ann Acevedo, David Lopez, Diana Martinez Alexander, and Jeandra Ortiz.

2010). That is "organizational standing." *Id.* To establish it, the organization must show that "the defendant's conduct significantly and perceptibly impaired" its activities. *Id.* (internal quotation marks omitted). Such injury must be "far more than simply a setback to the organization's abstract social interests" or costs related to the instant litigation. *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also ACORN v. Fowler*, 178 F.3d 350, 361 n.7 (5th Cir. 1999) ("[S]howing that an organization's mission is in direct conflict with a defendant's conduct is insufficient . . . ."). "[A]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art[icle] III." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 (1976). Put another way, even if an organization incurs some expense because of a defendant's conduct, that expense is not a cognizable Article III injury unless it "detract[s] or differ[s] from its routine activities." *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020) (internal quotation marks and quotation omitted).

*Second*, an organization may assert the standing of its members, insofar as their interests in the suit are "germane to [the organization's] purpose." *OCA-Greater Hous.*, 867 F.3d at 610. That is "associational standing." *Id.* An organization must identify "a specific member" to assert

standing on his behalf. *NAACP*, 626 F.3d at 237. After all, to assess our power to decide a case, this Court must know who was injured and how.

### a. Organizational Standing

The Defendants argue that the Entity Plaintiffs do not state "how the allegedly discriminatory . . . practice is going to impair [their] activities," Dkt. 398 at 4 (alteration in original) (quoting *Galveston Open Gov't Project v. U.S. Dep't of Hous. & Urb. Dev.*, 17 F. Supp. 3d 599, 613 (S.D. Tex. 2014)), as each entity "remain[s] free to conduct the various activities—such as voter registration, organizing get-out-the-vote drives, and hosting voter education forums—that they allege to undertake to further the purpose of the particular organization," *id.* at 5.

The Court agrees with the Defendants that no Entity Plaintiff has adequately pleaded organizational standing. All assert the same boilerplate injury: that Texas's redistricting plans frustrate and impede their core missions and that they will have to expend new and additional resources to meet this challenge. Dkt. 307 at 11–13. LULAC alleges that "[b]ecause of the dilution of the Latino vote, Plans H2316, S2168, C2193[,] and E2106 thwart [its] mission to expand Latino political influence." Dkt. 338 ¶ 12. But "[f]rustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" *Nat'l Treas. Emps. Union v. United States*,

101 F.3d 1423, 1429 (D.C. Cir. 1996) (quotation omitted). Rather, there must be "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitut[ing] far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp.*, 455 U.S. at 379.

No matter how laudable an organization's goal is, it cannot establish "standing simply on the basis of that goal." *Simon*, 426 U.S. at 39–40 (rejecting standing of an organization "dedicated to promoting access of the poor to health services" based on allegations that the challenged law made it harder for the poor to access such services). Even a "showing that an organization's mission is in direct conflict with a defendant's conduct is insufficient, in and of itself, to confer standing on the organization to sue on its own behalf." *ACORN*, 178 F.3d at 361 n.7.

LULAC further alleges that "Plans H2316, S2168, C2193[,] and E2106 will force [it] to divert significant resources from its [get-out-the-vote], voter registration[,] and community education activities, which are central to its mission, in order to counteract the negative effects of the challenged redistricting plans." Dkt. 338 ¶ 12. This Court has already ruled that similar allegations are insufficient to establish standing. *See* Dkt. 307 at 11–12 (disregarding as a "legal conclusion" NAACP's allegation that it "will have to

commit significant time and resources to combatting the effects of these new maps"); *see also id.* at 12 (rejecting MALC's allegations that it "will have to expend resources, including paid staff time, and play defense against policies it opposes" as sufficient for standing (cleaned up)).

Indeed, even if the Entity Plaintiffs "had pleaded facts showing [they] had diverted resources to addressing [the] Defendants' conduct, that could not alone meet [their] burden" because "[m]ere redirection of resources in response to another party's actions does not supply standing; after all, there is 'no legally cognizable interest in not expending resources on behalf of individuals for whom the [Entity Plaintiffs] advocate.'" *Id.* (quoting *Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994) (cleaned up)).

SVREP, for example, alleges that "[a]s a result [of the challenged redistricting plans], SVREP must now expend new and significantly more resources to register and turn out Latino voters discouraged by the absence of an equal opportunity to elect their candidate of choice." Dkt. 338 ¶ 26. SVREP further argues that "some of these resources would otherwise have been spent elsewhere by SVREP[,] and some of these resources will be additional new expenditures SVREP would not have otherwise spent."

Dkt. 477 at 5. That injury is much too abstract to sustain organizational standing. *See, e.g.*, *NAACP*, 626 F.3d at 238–39.

Having to expend more resources to register and turn out "discouraged" Latino voters because of the new maps, Dkt. 338 ¶ 26, for instance, is not comparable to the injury in *OCA-Greater Houston*, 867 F.3d at 612. In *OCA-Greater Houston*, OCA—a voter organization focused on assisting voters at the ballot box who could not read or write English—sued the State, challenging a Texas voting law "imposing a restriction on the interpretation assistance that English-limited voters may receive" at the ballot box.[5] *Id.* at 606. OCA's claimed injury-in-fact was the "additional time and effort spent explaining the Texas provisions at issue to limited English proficient voters because addressing the challenged provisions frustrate[d] and complicate[d] its routine community outreach activities." *Id.* at 610 (internal quotation marks omitted). The Texas provision at issue, which directly frustrated and complicated OCA's mission aimed at limited English-proficiency voters, was quite different than a redistricting plan, which indirectly causes SVREP to reallocate or expend more of its limited resources.

---

[5] The challenged provision, Texas Election Code § 61.033, required an interpreter to be a registered voter of the same county as the voter needing assistance. *OCA-Greater Hous.*, 867 F.3d at 608.

The remaining Entity Plaintiffs have also failed to plead organizational standing. Mi Familia Vota alleges it

> must divert time and funding from its youth development program, community engagement workshops[,] and other educational efforts that further its mission and instead engage in efforts to convince Latinos to participate, despite the discrimination in the challenged redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—not a regular activity of [Mi Familia Vota].

Dkt. 338 ¶ 28. These general allegations fare no better. The Court will not credit naked allegations that do not demonstrate how the Defendants' redistricting plans directly frustrate their mission. *See* Dkt. 307 at 12. In other words, the plans must "significantly and 'perceptibly impair[]'" the Defendants' actual activities, not just their abstract interests (no matter how important) in civic participation, voting rights, and the like. *NAACP*, 626 F.3d at 238 (quoting *Havens Realty Corp.*, 455 U.S. at 379). In contrast to the conduct in *OCA-Greater Houston*, the challenged conduct by the Defendants simply does not regulate the entities' activities in a manner that would supply organizational standing from a concrete and particularized injury-in-fact. *See* Dkt. 307 at 12.

For similar reasons, the remaining Entity Plaintiffs also lack organizational standing: American GI Forum, Dkt. 338 ¶ 30; LUPE, *id.* ¶ 36; MABA-TX, *id.* ¶ 51; Texas HOPE, *id.* ¶ 63; WCVI, *id.* ¶ 72–73; FIEL, *id.* ¶ 75;

TALAS, *id.* ¶ 78; Proyecto Azteca, *id.* ¶ 86–87; RITA, *id.* ¶ 89; and WDP, *id.* ¶ 97.

### b. Associational Standing

The Defendants note that several of the Entity Plaintiffs—SVREP, Mi Familia Vota, WCVI, and Proyecto Azteca have not attempted to establish associational standing. Dkt. 398 at 9. Although FIEL has attempted to establish associational standing, Defendants argue that it has failed to do so because it has not identified any members by name or the districts in which such members reside. *Id.*

The Court agrees that those plaintiffs have not alleged associational standing. And because SVREP, Mi Familia Vota, WCVI, and Proyecto Azteca have failed to demonstrate standing by either third-party standing doctrine—organizational or associational—the Court does not have jurisdiction over their claims.[6] *See* Dkt. 307 at 9. Additionally, FIEL lacks standing because it has failed to identify its members or their injuries, contravening this Court's earlier holding. *See* Dkt. 307 at 14; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009) ("[T]he Court has required plaintiffs claiming [associational] standing to identify members who have suffered the requisite

---

[6] The LULAC Plaintiffs concede that SVREP, Mi Familia Vota, WCVI, and Proyecto Azteca "did not plead that they have members, and thus do not seek to establish associational standing." Dkt. 477 at 4.

harm . . . .”). Although the Court could dismiss SVREP, Mi Familia Vota, WCVI, Proyecto Azteca, and FIEL’s claims without prejudice, it will *sua sponte* grant leave for them to amend their complaint to resolve these pleading issues.

### 2. HD118

Next, the Defendants argue that the LULAC Plaintiffs lack standing to challenge House District 118 because no Entity Plaintiff alleges it has members in that district and none of the Individual Plaintiffs allege they reside there. Dkt. 398 at 9.

LULAC responds that it inadvertently omitted the relevant paragraph describing “LULAC Member J” as a resident of HD118. Dkt. 477 at 7. LULAC argues it named Member J in its sealed filing of Exhibit A, which identified the pseudonymous members by their true names. Dkt. 440.

The Court agrees with LULAC that it has standing to challenge HD118, but it must amend its complaint so that the public filing makes clear the allegations of injury to a particular voter in HD118.

### B. *Larios* Claim

The LULAC Plaintiffs allege that the Defendants have violated the Equal Protection Clause by contravening the principle that “the seats in both houses of a bicameral state legislature [] be apportioned on a population

basis." Dkt. 338 ¶¶ 483–486 (quoting *Reynolds v. Sims*, 377 U.S. 533, 568 (1964) (alteration in original)).

### 1. Governing Law

"The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." *Gray v. Sanders*, 372 U.S. 368, 381 (1963). "Over time, the Supreme Court and lower courts have spoken extensively on this principle, violations of which are justiciable through the Fourteenth Amendment's Equal Protection Clause." *Perez v. Abbott*, 250 F. Supp. 3d 123, 185 (W.D. Tex. 2017) (citing *Baker v. Carr*, 369 U.S. 186, 237 (1962)). "In short, the theory behind the principle is that 'the vote of any citizen [must be] approximately equal in weight to that of any other citizen in the State.'" *Id.* (quoting *Reynolds*, 377 U.S. at 579).

The *Reynolds* Court held that "as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." 377 U.S. at 568. *Reynolds* recognized that "[m]athematical exactness or precision is hardly a workable constitutional requirement," and rather than requiring "identical number[s]," it asked for "an honest and good faith effort to construct

districts, in both houses of [a state's] legislature, as nearly of equal population as is practicable." *Id.* at 577. In *Brown v. Thomson*, the Supreme Court held that "as a general matter, . . . an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the State." 462 U.S. 835, 842–43 (1983) (citations omitted).

This 10% threshold was challenged in *Larios v. Cox*, where the three-judge court held that, despite a mere 9.98% deviation from population equality, the state's legislative reapportionment plan violated the one-person, one-vote principle. 300 F. Supp. 2d 1320, 1353 (N.D. Ga. 2004), *aff'd*, 542 U.S. 947 (2004). The *Larios* court held that a reapportionment plan violates that principle when it "systematically and intentionally creates population deviations among districts in order to favor one geographic region of a state over another." *Id.* at 1347.

The state legislative plan at issue in *Larios* underpopulated inner-city Atlanta districts and rural south Georgia districts and overpopulated north Georgia suburban districts. *Id.* at 1326. The most underpopulated districts were primarily Democratic-leaning, and the most overpopulated districts were primarily Republican-leaning. *Id.* The court found that the drafters of

the plan were overwhelmingly concerned with preserving political power for rural south Georgia and, "aided by what they perceived to be a 10% safe harbor, . . . intentionally drew the state legislative plans in such a way as to minimize the loss of districts in the southern part of the state." *Id.* at 1328.

The *Larios* court stated that it could have struck down the reapportionment plan based on its regional favoritism alone, as the Supreme Court has made clear that where an individual lives is "not a legitimate reason for overweighting or diluting the efficacy of his vote." *Id.* at 1342–43 (quoting *Reynolds*, 377 U.S. at 567). But it also found relevant that the plans inappropriately protected Democratic incumbents while pairing Republican incumbents against one another. *Id.* at 1329. Protection of incumbents is one of several state policies that, when applied *consistently* and in a *nondiscriminatory* manner, can justify some level of population deviation.[7] *Karcher v. Daggett*, 462 U.S. 725, 740 (1983). The redistricting plan in *Larios*, however, was neither consistent nor nondiscriminatory and therefore violated the Equal Protection Clause. *Larios*, 300 F. Supp. 2d at 1352–53.

---

[7] Other legitimate criteria include creating compact districts, respecting municipal boundaries, and preserving the cores of prior districts. *Karcher,* 462 U.S. at 740.

This Court also considered *Larios* claims in *Perez v. Abbott*, in which it announced a standard of review for state legislative plans in these circumstances:

> [T]o succeed on the merits, plaintiffs in one person, one vote cases with population deviations below 10% must show by a preponderance of the evidence that improper considerations predominate in explaining the deviations.

250 F. Supp. 3d at 190 (quoting *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 342 (4th Cir. 2016)). *Reynolds* and later cases identify which reapportionment factors are legitimate considerations and which are not. *Id*. at 191.

### 2. Challenged Plan

The LULAC Plaintiffs allege that the Defendants "systematically overpopulate[d] districts in El Paso County and the Upper Rio Grande area of West Texas (Districts 74, 75, 77, 78, and 79) and underpopulate[d] districts in the Panhandle and original Tom Green County (Districts 69, 71, 72, 81, 82, 83, 84, 86, 87, and 88)" in Texas House Plan H2316. Dkt. 338 ¶ 485. Further, the LULAC Plaintiffs allege that the "over- and under-population of districts in these regions deliberately favors the interests of communities and voters in the Panhandle and original Tom Green County at the expense of communities and voters in El Paso and the Upper Rio Grande area . . . in

violation of the one-person, one-vote" principle of the Fourteenth Amendment. *Id.*

The LULAC Plaintiffs also allege that the Defendants have "over- and under-populated districts in these regions to facilitate creating fewer Latino opportunity districts statewide, and to protect the influence of Anglo voters and to preserve Anglo incumbents." *Id.* ¶ 486. According to the LULAC Plaintiffs, these efforts "purposefully minimize[] Latino voting strength and Latino voters' ability to participate on an equal basis in elections to the State House, both in the specific overpopulated districts and statewide." *Id.* The LULAC Plaintiffs acknowledge the total deviation of H2316 falls within the 10% threshold at 9.98% but insist that the "population deviations between House districts in this region are not supported by any legitimate, consistently applied state policy and are tainted by discrimination." *Id.*

The Defendants argue the LULAC Plaintiffs' allegations are conclusory and insufficient to state a claim under *Larios*. Dkt. 398 at 11–12. Nothing in the complaint, the Defendants contend, tends to show that the districts the LULAC Plaintiffs challenge were treated differently than any other over- or under-populated districts. *Id.* As support, the Defendants point to several Latino-majority districts that are underpopulated and Anglo-majority districts that are overpopulated. *Id.* at 11. They highlight a series of districts

north of Harris County that are uniformly majority Anglo and overpopulated[8] and in the lower Rio Grande Valley that are nearly uniformly Latino-majority and underpopulated.[9] *Id.*

The LULAC Plaintiffs counter that they are challenging a specific piece of the House redistricting map for violating the one-person, one-vote principle in West Texas, even though the plan as a whole is within the 10% *de minimis* threshold. Dkt. 477 at 9–10 (citing *Perez*, 250 F. Supp 3d at 194). Specifically, the LULAC Plaintiffs allege that systematic over-population of districts in El Paso with Latino voters and systematic under-population of Anglo voting districts in the Texas Panhandle improperly diluted Latino voting strength in House Districts 74, 75, 77, 78, and 79. *Id.* at 10–11; *see also* Dkt. 338 ¶¶ 300–301.

The LULAC Plaintiffs argue that they have sufficiently pleaded a *Larios* claim by alleging with specificity the regions favored by malapportionment discrimination and the illegitimate reapportionment factors behind such efforts, namely, to weaken Latino voting strength and to protect Anglo

---

[8] "Across House Districts 3, 12, 14, 15, 16, 18, 85, and 127, every district has a majority Anglo [Anglo Citizen Voting Age Population], and the average population deviation is + 3.40%." Dkt. 398 at 11 n.2.

[9] "Across House Districts 35, 36, 37, 38, 39, 40, and 41, every district has a majority [Latino Citizen Voting Age Population], and the average population deviation is - 3.54%." Dkt. 398 at 11 n.3.

incumbents. Dkt. 477 at 10 (citing Dkt. 338 ¶ 303). Further, the LULAC Plaintiffs allege that

> by overpopulating El Paso County House districts, the drafters of Plan H2316 minimized the number of Latinos [sic] voters "spilled" out of El Paso County who could have been combined with other Latinos in South and West Texas to create districts (including HD31) that offered Latino voters the opportunity to elect their candidate of choice.

*Id.* at 10–11 (citing Dkt. 338 ¶ 303).

As to the plausibility that these population deviations resulted from intentional discrimination, the LULAC Plaintiffs allege that legislators were aware that these over- and under-populated districts weakened Latino voting strength. Dkt. 477 at 11. The LULAC Plaintiffs allege that one legislator warned other legislators of the pernicious effect of these population deviations. *Id.* (citing Dkt. 338 ¶ 306). The LULAC Plaintiffs also allege procedural irregularities that apply specifically to their *Larios* claim, including the lack of interpreters to assist non-English speaking witnesses who wished to testify at any House Redistricting Committee meeting and Chairman Hunter's refusal to allow expert testimony at any public hearing. *Id.* at 11–12 (citing Dkt. 338 ¶ 169).

Construing the complaint in the light most favorable to the plaintiffs and accepting all well-pleaded factual allegations as true, the LULAC Plaintiffs have alleged a plausible *Larios* claim. The LULAC Plaintiffs have

appropriately framed their malapportionment claim as "location-specific" to El Paso, the Upper Rio Grande Valley, the original Tom Green County, and the Panhandle. *See Perez*, 250 F. Supp. 3d at 194 (holding that such challenges "can be plan-wide, location-specific, or both"). They plausibly alleged—through direct and circumstantial evidence—that population deviations in these regions "reflect the predominance of illegitimate reapportionment factors rather than the 'legitimate considerations' identified by *Reynolds* and later cases." *See id.* at 191; *see also* Dkt. 338 ¶¶ 168—169, 171—172, 174—178, 306. These allegations are sufficient to clear the low bar of plausibility.

## C. *Gingles* Claims[10]

The LULAC Plaintiffs also bring a vote-dilution claim under VRA section 2. Dkt. 338 ¶¶ 487–490. Such claims are often called *Gingles* claims after *Thornburg v. Gingles* because that case provides the "framework" for evaluating section 2 vote-dilution claims. *Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam).[11]

---

[10] The Supreme Court recently issued an opinion in *Allen v. Milligan* and upheld the *Gingles* framework. *See generally Allen v. Milligan*, 599 U.S. ----, --- S. Ct. ----, 2023 WL 3872517 (June 8, 2023). *Milligan* does not change this Court's analysis of the LULAC Plaintiffs' *Gingles* claims.

[11] *Gingles* itself involved section 2 challenges to multimember districts, 478 U.S. at 46, but the Supreme Court later extended the analysis to apply to section 2

### 1. Governing Law

Section 2 of the VRA, 52 U.S.C. § 10301, imposes a "permanent, nationwide ban on racial discrimination in voting." *Shelby County v. Holder*, 570 U.S. 529, 557 (2013). While section 2 encompasses claims based on discriminatory intent, a violation can "be established by proof of discriminatory results alone." *Chisom v. Roemer*, 501 U.S. 380, 394 n.21, 404 (1991); *see also, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc). Section 2 prohibits vote dilution, such as the use of redistricting plans that "minimize or cancel out the voting strength of racial [minorities in] the voting population." *Gingles*, 478 U.S. at 47 (alteration in original) (internal citations omitted) (quoting *Burns v. Richardson*, 384 U.S. 73, 88 (1966)).

The language of section 2 specifically prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a). That occurs when "the totality of circumstances" shows that a state's "political processes . . . are not equally open to participation by" members of a

---

challenges to single-member districts like the ones at issue here. *See Growe v. Emison*, 507 U.S. 25, 40–41 (1993).

minority group "in that [they] have less opportunity . . . to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

In *Gingles*, the Supreme Court construed section 2 to prohibit the "dispersal of [a minority group's members] into districts in which they constitute an ineffective minority of voters." *Cooper v. Harris*, 581 U.S. 285, 292 (2017) (quoting *Gingles*, 478 U.S. at 46 n.11). When "minority and majority voters consistently prefer different candidates" in such districts, "the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters," thus depriving minorities of an equal opportunity to elect representatives of their choice. *Gingles*, 478 U.S. at 48.

A successful *Gingles* claim undoes the dispersal of minorities by requiring the state to concentrate them in a new, majority-minority district that will allow the group, usually, to be able to elect its preferred candidates. *See Bartlett v. Strickland*, 556 U.S. 1, 13 (2009) (plurality opinion). Such section 2-required districts are often described as "opportunity districts." *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399, 430 (2006); Nicholas O. Stephanopoulos, *The South After* Shelby County, 2013 SUP. CT. REV. 55, 75 n.84 (2013).

*Gingles* claims are complicated and analytically intensive. To require a state to draw the district as a plaintiff proposes, a *Gingles* plaintiff must make

two showings. *First*, it must establish three preconditions. *Wis. Legislature*, 142 S. Ct. at 1248. Those preconditions are necessary to show that the *Gingles* theory describes the proposed district, *see Gingles*, 478 U.S. at 48–49, so each must be met for the claim to succeed, *Cooper*, 581 U.S. at 305–06. *Second*, the plaintiff must show that, under the "totality of circumstances," the "political process is [not] equally open to minority voters" without the proposed district. *Wis. Legislature*, 142 S. Ct. at 1248 (quoting *Gingles*, 478 U.S. at 79). Because the Defendants' motion focuses on the preconditions, the Court discusses them in further detail below.

The first precondition is that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50. This first condition is "needed to establish that the minority has the potential to elect a representative of its own choice." *Growe*, 507 U.S. at 40. Accordingly, the minority group must be able to constitute a majority by Citizen Voting Age Population ("CVAP") in the proposed district.[12] *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853 (5th Cir. 1999); *see also LULAC*, 548 U.S. at 428–29 (analyzing

---

[12] Citizen Voting Age Population, or CVAP, is the segment of the population that is, by virtue of age and citizenship, eligible to vote.

CVAP and noting that "only eligible voters affect a group's opportunity to elect candidates").[13]

The second and third preconditions are often discussed together. The second requires the minority group to be "politically cohesive." *Gingles*, 478 U.S. at 51. The third is that "the [Anglo] majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* (citation omitted). Unless both are met, "the challenged districting [does not] thwart[] a distinctive minority vote by submerging it in a larger [Anglo] voting population." *Growe*, 507 U.S. at 40.

Plaintiffs usually demonstrate minority political cohesion by showing that "a significant number of minority group members usually vote for the same candidates." *Gingles*, 478 U.S. at 56; *see also Campos v. City of Baytown*, 840 F.2d 1240, 1244 (5th Cir. 1988). That is described as "bloc

---

[13] To satisfy the first *Gingles* precondition, a plaintiff must also allege that its proposed majority-minority district "is consistent with 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022) (per curiam) (quoting *LULAC*, 548 U.S. at 433). "[C]ombining 'discrete communities of interest'—with 'differences in socio-economic status, education, employment, health, and other characteristics'—is impermissible." *Id.* (quoting *LULAC*, 548 U.S. at 432); *see also id.* at 219 (concluding that testimony indicating that proposed alternative district was "culturally compact" supported finding that proposed district "preserve[d] communities of interest").

voting" (just like the third precondition)[14] and typically means that a large majority of the group favors the same candidates.[15] When both minorities and Anglos vote in blocs, courts conclude that voting is "racially polarized"[16] and typically hold that both the second and third preconditions have been met.[17]

Even so, the second and third preconditions are not mirror-image requirements for different racial groups. As relevant here, a *Gingles* plaintiff must show the second precondition for the minority population that would be included in its *proposed* district. *See Harris*, 581 U.S. at 302; *LULAC*, 548

---

[14] *E.g.*, *Strickland*, 556 U.S. at 19 (plurality opinion); *Fusilier v. Landry*, 963 F.3d 447, 458 (5th Cir. 2020).

[15] *Compare LULAC*, 548 U.S. at 427 (finding "especially severe" bloc voting when roughly 90% of each racial group voted for different candidates), *with Strickland*, 556 U.S. at 16 (plurality opinion) (noting "skeptic[ism]" about Anglo bloc voting when 20% of Anglos would need to cross over to satisfy the first *Gingles* precondition); *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (noting that only 22-38% crossover by Anglos and 20-23% crossover by Black voters supported a finding that voting was not racially polarized). The necessary size of the majority, however, is a district-specific inquiry. *See Gingles*, 478 U.S. at 55–56.

[16] *See, e.g.*, *Strickland*, 556 U.S. at 19 (plurality opinion); *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993); *Gingles*, 478 U.S. at 52 n.18; *Fusilier*, 963 F.3d at 458. The existence of racially polarized voting is also one of the factors that *Gingles* highlights as relevant to the totality-of-circumstances inquiry. *See* 478 U.S. at 44–45, 80.

[17] *See, e.g.*, *LULAC*, 548 U.S. at 427; *Gingles*, 478 U.S. at 56; *Fusilier*, 963 F.3d at 458–59; *Campos*, 840 F.2d at 1243. *But see LULAC v. Clements*, 999 F.2d 831, 849–51 (5th Cir. 1993) (en banc) (emphasizing that the plaintiff must still show that the bloc voting is "legally significant").

U.S. at 427; *Growe*, 507 U.S. at 40. In contrast, the third precondition must be established for the *challenged* district. *See Harris*, 581 U.S. at 302; *LULAC*, 548 U.S. at 427; *Growe*, 507 U.S. at 40. Importantly, Fifth Circuit precedent does not preclude a plaintiff from establishing the third precondition even if the challenged district is not majority Anglo by CVAP. *See Salas v. Sw. Tex. Jr. Coll. Dist.*, 964 F.2d 1542, 1555 (5th Cir. 1992). Even so, such a plaintiff faces an "obvious, difficult burden" in establishing that situation. *Id.*

One last note—it bears emphasizing that each of these preconditions must be shown on a district-by-district basis. *See Wis. Legislature*, 142 S. Ct. at 1250; *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018); *LULAC*, 548 U.S. at 437; *Gingles*, 478 U.S. at 59 n.23. Because *Gingles* claims relate to the political experiences of a minority group in a particular location, a "generalized conclusion" cannot adequately answer "'the relevant local question' whether the preconditions would be satisfied as to each district." *Wis. Legislature*, 142 S. Ct. at 1250 (quoting *Harris*, 581 U.S. at 304 n.5). Ultimately, a plaintiff must prove that an "alternative to the districting decision at issue would . . . enhance the ability of minority voters to elect the candidates of their choice." *Perez*, 138 S. Ct. at 2332.

### 2. Challenged Claims

The Defendants challenge the LULAC Plaintiffs' *Gingles* claims as failing to (1) allege that Latino populations in the proposed districts are culturally compact and (2) satisfy the third *Gingles* precondition. Dkt. 398 at 17, 19.

### a. Cultural Compactness

The Defendants argue that, for their *Gingles* claims, "[t]he LULAC Plaintiffs were required to allege specific facts that, if proven, would show that the different [Latino] communities—especially communities separated by large 'geographic distance[s]'—have the same 'needs and interest[s].'" *Id.* at 19 (alteration in original) (quoting *LULAC*, 548 U.S. at 435). Further, the Defendants contend that the LULAC Plaintiffs' proposed districts combine many disparate populations. *Id.* Still, the Defendants say, the LULAC Plaintiffs' allegations fail to explain how those populations are connected other than a shared Latino ethnicity. *Id.* Accordingly, the Defendants ask that the Court dismiss the claims because the allegations relating to all districts "fail to understand that [s]ection 2 is violated only where a 'culturally compact' minority population is dispersed into districts that dilute its ability to elect its candidate of choice." *Id.* at 17. As support, the Defendants point to the LULAC Plaintiffs' allegations, which relate only to *geographical* compactness. S*ee id.* at 18–19 (discussing Dkt. 338 ¶¶ 190–224 (state House

districts), 309–347 (Senate districts), 358–382 (SBOE districts), 393–469 (congressional districts)).

The LULAC Plaintiffs respond that there is no support for the contention that a section 2 complaint must include allegations relating to the cultural compactness of the proposed districts. Dkt. 477 at 14. Moreover, the LULAC Plaintiffs argue that *Gingles* does not mention "cultural compactness" even at the evidentiary stage of a case. *Id.* Further, the LULAC Plaintiffs note that the cases on which the Defendants rely make no mention of the requirement to *plead* "cultural compactness." *Id.* (citing *Robinson v. Ardoin*, 37 F.4th 208, 219 (5th Cir. 2022) (per curiam)). Even *LULAC v. Perry*, 548 U.S. at 435, which the Defendants rely on for their contention that districts can be culturally "noncompact for § 2 purposes," came to the Supreme Court only after the district court tried the case and issued findings of fact. *Id.*

The Court agrees with the LULAC Plaintiffs. We do not interpret *LULAC v. Perry* to require a plaintiff to show cultural compactness *per se*. *See* Dkt. 597 at 8–9. Rather, cultural compactness is a consideration relevant to whether a plaintiff's proposed district is consistent with traditional redistricting principles, such as maintaining communities of interest and traditional boundaries. *See Robinson*, 37 F.4th at 218 (quoting *LULAC*, 548

U.S. at 433). With that in mind, the LULAC Plaintiffs have met their pleading burden regarding the first *Gingles* precondition.

### b. Anglo Bloc Voting

The Defendants next argue that the LULAC Plaintiffs have failed to satisfy the third *Gingles* precondition—that "the [Anglo] majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate" in the challenged district. Dkt. 398 at 19 (quoting Dkt. 307 at 32). The Defendants contend that the LULAC Plaintiffs' allegations are insufficient because they have not alleged demographic facts that, if proven, would show the Latino-preferred candidate will usually lose due to Anglo bloc voting in the following challenged districts: House Districts 31, 37, 90, and 118; Senate District 27; Education District 3; and Congressional Districts 15 and 23. *Id.* at 19–20.

### i.    HD37, HD118, SD27, ED3, CD15, and CD23

First, the Defendants point to the LULAC Plaintiffs' own allegations, in which the LULAC Plaintiffs contend that Latino candidates of choice in past races would have won in HD31, HD37, SD27, and ED3. *Id.* at 20; *see also* Dkt. 338 ¶¶ 233, 253, 346, 380. The Defendants also identified contests in HD37, HD118, CD15, and CD23 where Latino-preferred candidates narrowly lost, which the Defendants say render implausible the assertion that Anglo

bloc voting will usually defeat the Latino-preferred candidates. Dkt. 398 at 20; *see also* Dkt. 338 ¶¶ 253, 291, 443, 459.

The LULAC Plaintiffs respond that they have adequately alleged demographic facts and re-aggregated election results from statewide contests that show Anglo-preferred candidates usually defeat Latino-preferred candidates. Dkt. 477 at 15. Further, the LULAC Plaintiffs argue that a Latino-preferred candidate winning only one of several recent elections does not undermine their contention that Anglo bloc voters *usually* defeat the Latino candidate of choice. *Id.* Moreover, the LULAC Plaintiffs argue that close elections in which Latino-preferred candidates lose by single-digit margins do not undermine their contention that Anglo bloc voting usually defeats the Latino-preferred candidate. *Id.*

The Court agrees with the LULAC Plaintiffs. Whether minority candidates have won elections, or kept past contests close, in these districts is not dispositive. Instead, the "concrete" focus of the third *Gingles* precondition requires the LULAC Plaintiffs to show that "[i]f the state's districting plan takes effect, . . . the voting behavior of the [Anglo] majority cause[s] the relevant minority group's preferred candidate usually to be defeated." *Robinson*, 37 F.4th at 224 (internal quotations marks omitted) (quoting *Covington v. North Carolina*, 316 F.R.D. 117, 171 (M.D. N.C.

2016))). Accepting the Defendants' position would improperly raise the LULAC Plaintiff's pleading requirements. *See Gingles*, 478 U.S. at 75 ("[P]roof that some minority candidates have been elected does not foreclose a § 2 claim."). The Court may "appropriately take account of the circumstances" surrounding recent Latino-preferred candidates' electoral success, but it will not dismiss on those grounds alone. *Id*. at 76. Accordingly, the Defendants' motion on this ground is denied.

### ii.   HD90

The Defendants also argue that the LULAC Plaintiffs failed to allege that the "[Latino]-preferred candidate in past races would win or lose" in the enacted HD90. Dkt. 398 at 20. They are correct. The LULAC Plaintiffs initially assert that "non-Latino voters in HD90 voted as a bloc against the Latino-preferred candidate and . . . will usually defeat Latino voters' preferred candidates in the enacted district." Dkt. 338 ¶ 275. Yet this is nothing more than a "[t]hreadbare recital[] of the elements of the cause of action," which the Court must disregard at this stage. *See Iqbal*, 556 U.S. at 678.

The LULAC Plaintiffs note only one factual allegation—that Latinos cannot elect their preferred candidate because approximately 37% to 39% of Anglo voters selected that candidate in the 2018 and 2020 elections.

Dkt. 338 ¶ 275. This does more harm than good for the LULAC Plaintiffs—such levels of cross-voting indicate that the Latino-preferred candidate would *not* usually be defeated. *See Strickland*, 556 U.S. at 16; *Abrams*, 521 U.S. at 92. Further, the LULAC Plaintiffs do not offer any facts that may explain how HD90 Anglo voters could bloc vote to usually win elections. Given the especially high burden that the LULAC Plaintiffs bear to show that the Anglo minority in HD90 can usually beat the candidates preferred by the Latino majority, they have failed to plausibly allege the third *Gingles* precondition. See *Salas*, 964 F.2d at 1555. The claim is therefore dismissed.

### iii.    HD31

Finally, the LULAC Plaintiffs allege that HD31 continues to be a majority-minority district with a Latino CVAP of 66.7%. Dkt. 338 ¶ 238. They claim that incumbent Representative Ryan Guillen, a Latino candidate, is the Latino-preferred candidate, receiving 75% of Latino votes in the 2020 election but only 8.5% of the Anglo vote. *Id.* ¶ 233. However, he recently switched affiliations and joined the Republican Party. *Id.* ¶ 240.

The Defendants attack claims related to HD31 in detail. Dkt. 398 at 20–22. They argue that the LULAC Plaintiffs do not allege that (1) Latinos will no longer support Representative Guillen because of the party change, (2) Latinos tend to support one party over another in general elections, or

(3) Representative Guillen will likely lose in future elections due to Anglo bloc voting. This Court has already ruled that similar allegations are insufficient to allege that Anglo bloc voting will cause the Latino candidate of choice to usually lose in HD31. Dkt. 675 at 18–20. We see no reason to alter course now.

As the Defendants correctly assert, the LULAC Plaintiffs must allege either that: (1) Guillen will win the general election but that he is not the Latino candidate of choice; or (2) if Guillen is the Latino candidate of choice, he will lose the general election due to Anglo bloc voting. Dkts. 398 at 23; 675 at 19. They have failed to do either. The LULAC Plaintiffs' alleged facts indicate that 75% of Latino votes in Guillen's district prefer him over other candidates. Dkt. 338 ¶ 233. At the same time, the LULAC Plaintiffs do not allege any facts that allow this court to infer that Anglo voters would now bloc vote to defeat the Latino candidate of choice for the district.[18] *Id.* Accordingly, the LULAC Plaintiffs' claim regarding HD31 is dismissed.

*          *          *

Finally, the court must decide whether dismissal is with or without prejudice for the LULAC Plaintiffs' *Gingles* claims related to HD90 and

---

[18] The Court does have discretion to take judicial notice that Representative Guillen won his 2022 election in HD31, running as a Republican, against Latino Democrat Martha Gutierrez, 71.3% to 28.7%. We do not, however, need to rely on the 2022 election results to dismiss the LULAC Plaintiffs' claim.

HD31. Although Rule 15(a) "requires a district court to grant leave to amend 'freely,'" such decisions are "entrusted to the sound discretion of the district court." *U.S. ex rel Gage v. Rolls-Royce N. Am., Inc.*, 760 F. App'x 314, 318 (5th Cir. 2019) (per curiam) (quoting *Quintanilla v. Tex. Television, Inc.*, 139 F.3d 494, 499 (5th Cir. 1998)). Courts should examine five factors when deciding whether to grant a party leave to amend a complaint: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [and] futility of the amendment." *Rosenzweig v. Azurix Corp.*, 332 F. 3d 854, 864 (5th Cir. 2003) (quoting *Forman v. Davis*, 371 U.S. 178, 182 (1962)).

Weighing these factors, dismissal with prejudice is warranted here. The LULAC Plaintiffs have now had three opportunities to amend their complaint. Dkts. 1, 69, 237, 338. At this point, they have had every chance to plead their best case to the Court to survive early dismissal. Additionally, allowing the LULAC Plaintiffs yet another amendment on their deficient *Gingles* claims would be futile, cause undue delay, and unfairly prejudice the Defendants' interests in moving this case along. Accordingly, the Court dismisses these claims with prejudice.

## IV.   CONCLUSION

For the reasons above, the Defendants' motion to dismiss is granted in part and denied in part. Dkt. 398. SVREP, Mi Familia Vota, WCVI, Proyecto Azteca, and FIEL must amend their complaint within fourteen days to address pleading deficiencies related only to standing. The LULAC Plaintiffs must amend their complaint within fourteen days so that the public filing clarifies the allegations of injury to "LULAC Member J" in HD118. The LULAC Plaintiffs' *Gingles* claims regarding HD90 and HD31 are dismissed with prejudice, but the remaining *Gingles* claims survive. The Defendants' motion to dismiss is otherwise denied.

Further amendments by the LULAC Plaintiffs or any remaining party not expressly allowed above are prohibited.

**So ORDERED and SIGNED on this 16th day of June 2023.**


_____
**DAVID C. GUADERRAMA**
**UNITED STATES DISTRICT JUDGE**

*And on behalf of:*

| | | |
|---|---|---|
| **Jerry E. Smith** | | **Jeffrey V. Brown** |
| **United States Circuit Judge** | *-and-* | **United States District Judge** |
| **U.S. Court of Appeals,** | | **Southern District of Texas** |
| **Fifth Circuit** | | |