**FILED**

July 05, 2023

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

BY: _____ MC

DEPUTY

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT, MI FAMILIA VOTA, AMERICAN GI FORUM, LA UNION DEL PUEBLO ENTERO, MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS, TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION, WILLIAM C. VELASQUEZ INSTITUTE, FIEL HOUSTON INC., TEXAS ASSOCIATION OF LATINO ADMINISTRATORS AND SUPERINTENDENTS, PROYECTO AZTECA, REFORM IMMIGRATION FOR TEXAS ALLIANCE, WORKERS DEFENSE PROJECT, EMELDA MENENDEZ, GILBERTO MENENDEZ, JOSE OLIVARES, FLORINDA CHAVEZ, PAULITA SANCHEZ, JO ANN ACEVEDO, DAVID LOPEZ, DIANA MARTINEZ ALEXANDER and JEANDRA ORTIZ, | Case No. 3:21-cv-00259-DCG-JES-JVB |
| *Plaintiffs* | |
| v. | |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas; JOHN SCOTT, in his official capacity as Secretary of the State of Texas; and the STATE OF TEXAS; | |
| *Defendants*. | |

**LULAC PLAINTIFFS' FOURTH AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## TABLE OF CONTENTS

**I. INTRODUCTION** ................................................................................................4

**II. JURISDICTION** ...............................................................................................8

**III. PLAINTIFFS** ...................................................................................................9

**IV. DEFENDANTS** ...............................................................................................84

**V. FACTS** ...............................................................................................................85

    A. Texas's Long History of Discrimination Against Latino Voters ........................85

    B. Texas's 2020 House, Senate, Congressional and SBOE Maps ..........................89

    C. Results of the 2020 Census ..............................................................................90

    D. The Legislature adopts new redistricting plans during a special session called by Defendant Abbott. ..............................................................................................92

    E. Legislative History of the Challenged Plans. ....................................................93

        1. Texas House Plan.......................................................................................93

        2. Texas Senate and SBOE Plans....................................................................94

        3. Congressional Plan.....................................................................................95

    F. The Legislature departed from its normal procedures and normal substantive considerations during redistricting. ......................................................................95

        1. Texas House Plan.......................................................................................98

        2. Texas Senate and SBOE Plans....................................................................99

        3. Congressional Plan...................................................................................100

    G. The Challenged Map for State House of Representatives (Plan H2316).........100

        1. The Texas Legislature Failed to Create Three Additional Latino Opportunity Districts in Plan H2316. ................................................................................................101

            a. Additional Latino Opportunity House District in Northwest Harris County.........101

            b. Additional Latino Opportunity House District in Southeast Harris County.........106

            c. Additional Latino Opportunity House District in Central Texas ..........................111

        2. Plan H2316 Weakens Existing Latino CVAP Majority Districts, Such That They No Longer Afford Latinos the Opportunity to Elect Their Preferred Candidate..................115

            a. House District 31....................................................................................115

            b. House District 37 ...................................................................................120

            c. House District 90....................................................................................125

            d. House District 118 ..................................................................................131

        3. Plan H2316 over- and under-populates House districts in El Paso, the Upper Rio Grande, original Tom Green County (1874) and the Panhandle purposefully to disadvantage voters on the basis of race and region (Larios v. Cox) .............................136

    H. Plan S2168 Dilutes the Voting Strength of Latinos in Texas. .........................138

1. The Texas Legislature Failed to Create At Least Two Additional Latino Opportunity Districts in Plan S2168..........................................................................................139

    a. Additional Latino Opportunity Senate District in South/Central Texas ...............139

    b. Additional Latino Opportunity Senate District in Dallas and Tarrant Counties....144

2. Plan S2168 Weakens SD27, An Existing Latino CVAP Majority District, and Latino Voters Bear an Unequal Burden of the Changes. .............................................................151

I. Plan E2106 Dilutes the Voting Strength of Latinos in Texas............................................155

1. The Texas Legislature Failed to Create An Additional Latino Opportunity District in Plan E2106. ........................................................................................................155

J. Plan C2193 Dilutes the Voting Strength of Latinos in Texas. ........................................160

1. The Texas Legislature Failed to Create At Least Three Additional Latino Opportunity Congressional Districts in Plan C2193. ..........................................................161

    a. Additional Latino Opportunity Congressional District in Harris County .............161

    b. Additional Latino Opportunity Congressional District in Dallas and Tarrant Counties .............................................................................................................167

    c. Additional Latino Opportunity Congressional District in South/Central Texas ....172

2. Plan C2193 Weakens Existing Latino CVAP Majority Districts, Such That They No Longer Afford Latinos the Opportunity to Elect Their Preferred Candidate..................178

    a. CD15 ..........................................................................................................178

    b. CD23 ..........................................................................................................181

K. The Newly Adopted Maps Dilute the Voting Strength of Latinos. ...................................186

**VI. CAUSES OF ACTION**.....................................................................................................188

**VII. REQUEST FOR THREE-JUDGE COURT**....................................................................191

**VIII. ATTORNEY'S FEES**...................................................................................................191

**IX. PRAYER** ...................................................................................................................191

## I.     <u>INTRODUCTION</u>

1. Plaintiffs are individual registered voters and a coalition of organizations that seek—on behalf of themselves and their members—declaratory and injunctive relief to enforce the Fourteenth Amendment to the United States Constitution and the Voting Rights Act of 1965.  Plaintiffs challenge the redistricting plans adopted by the Texas Legislature for the State House, State Senate, Congress and State Board of Education ("SBOE").

2. The 2020 Census reported that Texas's population increased by 3,999,944 since 2010.  As a result, Texas is the only one of the fifty states to have been apportioned two additional seats in the U.S. House of Representatives.

3. Texas also experienced dramatic internal demographic changes. Over the past decade, Latinos constituted 50% of the population increase in Texas, and racial minorities constituted 95% of the population increase in Texas (including persons who identify as being of more than one race).

4. According to the U.S. Census, from 2010 to 2020, the Hispanic population in Texas increased by 1.98 million, and the White Alone Non-Hispanic ("Anglo") population in Texas increased by 187,252.   The ratio of Latino to Anglo population growth over the decade is greater than ten to one.

5. Based on recent demographic trends, the Texas State Data Center estimates that the Latino population of Texas will match the Anglo population in 2021.

6. On October 15, 2021 and October 16, 2021, the 87th Texas Legislature approved redistricting plans for the Texas House, Senate and SBOE.[1]   On October 18, 2021, the 87th Texas

---

[1] The redistricting plans passed by the 87th Texas Legislature on October 15 and 16, 2021 are known as H2316, S2168 and E2106 and are available on the website of the Texas Legislative Council at https://dvr.capitol.texas.gov/.  The congressional redistricting plan adopted by the Senate and the House on

Legislature approved a redistricting plan for Texas congressional districts.  On October 25, 2021, Defendant Abbott signed the redistricting plans for Texas House, Senate, Congress and SBOE.

7. All four statewide redistricting plans enacted in 2021 discriminate—purposefully and in effect—against Latino voters in violation of the federal Voting Rights Act and the U.S. Constitution.  Specifically:

    a.   In the redistricting plan for the Texas House (Plan H2316):

        i.   Defendants failed to create additional Latino citizen voting age majority districts in:

            1.   Northwest Harris County, including portions of HD126,[2] HD138, HD139, HD140, HD145, and HD148 in Plan H2316--and encompassing the geographic area including the neighborhoods of Northside / Northline, Hidden Valley and North Houston.

            2.   Southeast Harris County, including portions of HD129, HD131, HD144, HD145, and HD147 in Plan H2316—and encompassing the geographic area including the neighborhoods of Gulfton, Gulfgate Riverview / Pine Valley, Golfcrest / Bellfort / Reveille and Greater Hobby; and

            3.   Central Texas, including portions of HD17, HD44, HD45, HD48, and HD51 in Plan H2316—and encompassing a geographic area including

---

October 18, 2021, is known as C2193 and is available on the website of the Texas Legislative Council at https://dvr.capitol.texas.gov/.

[2] "HD" refers to a Texas House district, "SD" refers to a Texas Senate district, "CD" refers to a congressional district and "ED" refers to a State Board of Education district.

portions of Caldwell, Guadalupe, Hays and Travis counties;

ii. Defendants purposefully manipulated district boundaries to weaken Latino voting strength, such that Latinos do not have the ability to elect their preferred candidates, in: HD31, HD37, and HD118;

iii. Defendants purposefully manipulated district boundaries on the basis of race and to weaken Latino voting strength in HD90; and

iv. Defendants systematically and deliberately malapportioned districts in West Texas to favor the interests of communities and voters in the Panhandle and original Tom Green County at the expense of communities and voters in El Paso and the Upper Rio Grande area of West Texas, and to favor Anglo voters at the expense of Latino voters—in violation of the U.S. Constitution.

b. In the redistricting plan for Texas Senate (Plan S2168):

i. Defendants failed to create additional Latino citizen voting age majority districts in:

1. the geographic area of Dallas and Tarrant counties, including portions of SD9, SD10, SD12, SD16, SD22, and SD 23 in Plan S2168;

2. South/Central Texas, including portions of SD5, SD14, SD19, SD21, SD25, and SD26 in Plan S2168—encompassing a geographic area including portions of Bastrop, Bexar, Comal, Caldwell, Guadalupe, Hays and Travis counties; and

ii. Defendants manipulated district boundaries in SD27 with the purpose of reducing Latino voting strength and making it more difficult for Latinos to elect their preferred candidates.

6

c. In the redistricting plan for Texas SBOE (Plan E2106):

    i. Defendants failed to create an additional Latino citizen voting age majority district in Harris County, including portions of ED4, ED6, ED7, and ED8 in Plan E2106.

d. In the redistricting plan for Congress (Plan C2193):

    i. Defendants failed to create Latino citizen voting age majority districts in:

        1. the geographic area of Dallas and Tarrant counties, including portions of CD6, CD12, CD24, CD30, CD32, and CD33 in Plan C2193;

        2. Harris County, including portions of CD7, CD8, CD18, CD29, and CD38 in Plan C2193;

        3. South/Central Texas, including portions of CD10, CD15, CD17, CD27, CD35, and CD37 in Plan C2193—encompassing a geographic area including portions of Nueces, San Patricio, Bee, Goliad, Karnes, Gonzales, Caldwell, Bastrop, Travis and Williamson counties; and

        4. the geographic area of enacted CD35 (Plan C2193)

    ii. Defendants purposefully manipulated district boundaries to weaken Latino voting strength, such that Latinos do not have the ability to elect their preferred candidates, in CD23. Defendants also manipulated district boundaries in CD15 with the purpose of reducing Latino voting strength and making it more difficult for Latinos to elect their preferred candidates.

    iii. Despite the fact that Texas was apportioned two new congressional seats in large part because of Latino population growth over the past decade, Defendants created two new Anglo-majority congressional districts -- one

Republican and the other Democrat.

8.  Plaintiffs seek a declaratory judgment that the redistricting plans for the Texas House (Plan H2316), Senate (Plan S2168), SBOE (Plan E2106) and Congress (C2193) violate their civil rights because the plans unlawfully dilute the voting strength of Latinos.  Plaintiffs also seek a declaratory judgment that the newly enacted Texas House redistricting plan (H2316) is unconstitutionally malapportioned.  Plaintiffs further seek a declaratory judgment that the newly enacted redistricting plans H2316, S2168, E2106 and C2193 intentionally discriminate against them on the basis of race and national origin.  Plaintiffs seek a permanent injunction prohibiting the calling, holding, supervising, or certifying of any future Texas House, Senate, Congressional and SBOE elections under the newly enacted redistricting plans.  Plaintiffs further seek the creation of Texas House, Senate, Congressional and SBOE redistricting plans that will not cancel out, minimize or dilute the voting strength of Latino voters in Texas.  Plaintiffs seek an order subjecting Texas to the preclearance requirement of section 5 of the Voting Rights Act under 52 U.S.C. § 10302(c) (section 3(c) of the Voting Rights Act), and Plaintiffs seek costs and attorney's fees.

## II.    JURISDICTION

9.  Jurisdiction is based upon 28 U.S.C. § 1343(3) & (4) and upon 28 U.S.C. § 1331 for causes of action arising from 52 U.S.C. § 10301.  Jurisdiction for Plaintiffs' claim for declaratory relief is based upon 28 U.S.C. §§ 2201 and 2202.  Jurisdiction for Plaintiffs' claims under the Fourteenth Amendment to the U.S. Constitution is based upon 42 U.S.C. § 1983 and 28 U.S.C. § 1331.  Jurisdiction for Plaintiffs' claim for costs and attorney's fees is based upon 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).  Venue is proper in this Court under 28 U.S.C. § 1391(b).

### III.   PLAINTIFFS

10. The plaintiff organizations in this case are members of the Texas Latino Redistricting Task Force, an unincorporated association of individuals and organizations committed to securing fair redistricting plans for Texas.  The Texas Latino Redistricting Task Force is chaired by one of its members and holds meetings at which the member organizations of the Task Force collectively decide how the Task Force will proceed to protect its members' interests.

    a.   LULAC Organizational Standing

11. Plaintiff LEAGUE OF UNITED LATIN AMERICAN CITIZENS ("LULAC") is the largest and oldest civil rights volunteer-based membership organization that empowers Hispanic Americans and builds strong Latino communities.   LULAC has a national office in Washington, D.C. and a membership office in El Paso, Texas, and it is organized under Texas law.  LULAC's mission is to advance the economic condition, educational attainment, political influence, housing, health and civil rights of Hispanic Americans through community-based programs.  LULAC's mission includes achieving full and effective political participation by Latinos.  Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latinos cast effective votes, is critical to fulfilling LULAC's mission because political participation by Latinos secures LULAC's public policy goals.  To promote civic participation in the communities it serves and to expand Latino political influence, LULAC's members, volunteers and paid staff register eligible Latino voters; host voter registration drives; host voter education forums; participate in issue-focused advocacy, including advocating for single member districting systems and fair redistricting plans; conduct census outreach; and conduct voter registration, education, and non-partisan get-out-the-vote campaigns ("GOTV").

12. Plans H2316, S2168, C2193 and E2106 will force LULAC to divert significant resources from its GOTV, voter registration and community education activities, which are central to its mission, in order to counteract the negative effects of the challenged redistricting plans. LULAC has conducted in the past, and will conduct in the future, GOTV activities aimed at increasing the turnout of Latino registered voters with low turnout. Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward). As a result, LULAC must now expend new and significantly more resources to register and turn out Latino voters, particularly those who live in the challenged districts and areas, and who are discouraged by the absence of an equal opportunity to elect their candidate of choice; to do so, LULAC must divert time and funding away from its community education activities that further its mission and instead engage in efforts to convince Latinos to participate, despite the

discrimination in the challenged redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—which is not a regular activity of LULAC. Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, LULAC must spend significantly more resources in an attempt to educate Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged redistricting plans. Because of the dilution of the Latino vote, Plans H2316, S2168, C2193 and E2106 thwart LULAC's mission to expand Latino political influence. Thus, LULAC has organizational standing to challenge the new redistricting plans.

      b.    <u>LULAC Associational Standing</u>

13. LULAC has more than 1,000 LULAC councils nationwide.  LULAC's members pay dues and include Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside, have voted, and intend to vote in the future in areas where, as described below, Defendants could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts through manipulation of their composition to reduce Latino opportunity to elect their candidates of choice.  LULAC members also elect leadership and serve as the organization's leadership.  LULAC members participate in and guide the organization's efforts, both at the local council level, where members regularly meet, and at the organization-wide level each year at the LULAC national convention, when members serving as national delegates convene to discuss issues, set policies, and elect the organization's national leadership.  Thus, LULAC has associational standing to challenge those districts.

14. One example of the harm to LULAC's membership is LULAC Member A.[3] LULAC Member A lives and votes in the Central City area of Corpus Christi.  LULAC Member A is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, LULAC Member A lives in CD27 which has 49.2% HCVAP and is not a Latino opportunity district.  LULAC Member A lives in an area where two or more balanced HCVAP majority districts can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed CD27, where LULAC Member A also lives.   Because LULAC Member A does not live in a Latino majority district that offers the opportunity to elect the Latino preferred candidate, LULAC

---

[3] The names of the members of plaintiff organizations are provided to the Court in Dkt. 440 which is Exhibit A to LULAC Plaintiffs' Third Amended Complaint, filed with the Court under seal.

Member A's vote is diluted.  LULAC Member A is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

15. Another example of the harm to LULAC's membership is LULAC Member B.  LULAC Member B lives and votes in the South Side area of Corpus Christi.  LULAC Member B is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, LULAC Member B lives in CD27 which has 49.2% HCVAP and is not a Latino opportunity district.  LULAC Member B lives in an area where two or more balanced HCVAP majority districts can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed CD27, where LULAC Member B also lives.  Because  LULAC Member B does not live in a Latino majority district that offers the opportunity to elect the Latino preferred candidate, LULAC Member B's vote is diluted.   LULAC Member B is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

16. Another example of the harm to LULAC's membership is LULAC Member C.  LULAC Member C lives and votes in the Bay Area of Corpus Christi.  LULAC Member C is a Latino registered voter and plans to vote again in future elections.  In the challenged plan,  LULAC Member C lives in CD27 which has 49.2% HCVAP and is not a Latino opportunity district.  LULAC Member C lives in an area where two or more balanced HCVAP majority districts can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed CD27, where LULAC Member C also lives.  Because  LULAC Member C does not live in a Latino majority district that offers the opportunity to elect the Latino preferred candidate,  LULAC Member C's vote is diluted.   LULAC Member C is further injured by the changes in the

challenged redistricting plan bearing more heavily on Latino voters than Anglos.

17. Another example of the harm to LULAC's membership is   LULAC Member D.  LULAC Member D lives and votes in the Glenbrook Valley neighborhood in Houston.   LULAC Member D is a Latino registered voter and plans to vote again in future elections.   In the challenged plans, LULAC Member D lives in ED4 and CD9 which have a 39.9% HCVAP and 24.6% HCVAP respectively and are not Latino opportunity districts.  LULAC Member D lives in an area where HCVAP majority districts can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  Examples of such Latino opportunity districts include LULAC Proposed ED6 and CD38, where LULAC Member D also lives. Because LULAC Member D lives in districts where Latino voters are fractured, instead of Latino majority districts that offer the opportunity to elect the Latino preferred candidate, LULAC Member D's vote is diluted.  LULAC Member D is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

18. Another example of the harm to LULAC's membership is LULAC Member E.  LULAC Member E lives and votes in the Idylwood neighborhood in Houston.  LULAC Member E is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, LULAC Member E lives in ED4 which has 39.9% HCVAP and is not a Latino opportunity district.  LULAC Member E lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate. One such example of a Latino opportunity district is LULAC Proposed ED6, where LULAC Member E also lives.   Because LULAC Member E lives in a district where Latino voters are fractured, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, LULAC Member E's vote is diluted.  LULAC Member E is further injured

by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

19. Another example of the harm to LULAC's membership is LULAC Member F.  LULAC Member F lives and votes in the Greater Eastwood neighborhood of Houston.  LULAC Member F is a Latino registered voter and plans to vote again in future elections.  In the challenged plans, LULAC Member F lives in ED4 which has a 39.9% HCVAP and is not a Latino opportunity district.  Member F also lives in CD29, one of several Latino majority districts in the area that contain more Latino voter population than necessary to elect the candidate of choice.  Although the Latino population in Houston is sufficient to create a new Latino HCVAP majority congressional district, such as LULAC Proposed CD38, in which LULAC Member F would live,  LULAC Member F remains in the "packed" configuration. LULAC Member F lives in an area where HCVAP majority districts can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  Examples of such Latino opportunity districts include LULAC Proposed ED6 and CD38, where LULAC Member F also lives.   Because LULAC Member F lives in districts where Latino voters are either fractured or "packed" instead of in Latino majority districts that offer the opportunity to elect the Latino preferred candidate, LULAC Member F's vote is diluted.  LULAC Member F is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

20. Another example of the harm to LULAC's membership is LULAC Member G.  LULAC Member G lives and votes in the Greater Eastwood neighborhood of Houston.  LULAC Member G is a Latino registered voter and plans to vote again in future elections.  In the challenged plans, LULAC Member G lives in ED4 which has a 39.9% HCVAP and is not a

Latino opportunity district.  LULAC Member G also lives in CD29, one of several Latino majority districts in the area that contain more Latino voter population than necessary to elect the candidate of choice.  Although the Latino population in Houston is sufficient to create a new Latino HCVAP majority congressional district, such as LULAC Proposed CD38, in which LULAC Member G would live,  LULAC Member G remains in the "packed" configuration. LULAC Member G lives in an area where HCVAP majority districts can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  Examples of such Latino opportunity districts include LULAC Proposed ED6 and CD38, where LULAC Member G also lives.   Because LULAC Member G lives in districts where Latino voters are either fractured or "packed" instead of  Latino majority districts that offer the opportunity to elect the Latino preferred candidate, LULAC Member G's vote is diluted.  LULAC Member G is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

21. Another example of the harm to LULAC's membership is LULAC Member H.  LULAC Member H lives and votes in the Greater Eastwood neighborhood of Houston.  LULAC Member G is a Latino registered voter and plans to vote again in future elections.   In the challenged plans, LULAC Member H lives in ED4 which has a 39.9% HCVAP and is not a Latino opportunity district.  LULAC Member H also lives in CD29, one of several Latino majority districts in the area that contain more Latino voter population than necessary to elect the candidate of choice.  Although the Latino population in Houston is sufficient to create a new Latino HCVAP majority congressional district, such as LULAC Proposed CD38, in which LULAC Member H would live,  LULAC Member H remains in the "packed" configuration. LULAC Member H lives in an area where HCVAP majority districts can and should be created

that will provide Latino voters the opportunity to elect their preferred candidate.  Examples of such Latino opportunity districts include LULAC Proposed ED6 and CD38, where LULAC Member H also lives.   Because LULAC Member H lives in districts where Latino voters are either fractured or "packed" instead of  Latino majority districts that offer the opportunity to elect the Latino preferred candidate, LULAC Member H's vote is diluted.  LULAC Member H is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

22. Another example of the harm to LULAC's membership is LULAC Member I.  LULAC Member I lives and votes in south central Seguin.  LULAC Member I is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, LULAC Member I lives in HD44 which has 34.3% HCVAP and is not a Latino opportunity district.  LULAC Member I also lives in SD19, one of several Latino majority districts in the area that contain more Latino voter population than necessary to elect the candidate of choice.  Although the Latino population in this part of Texas is sufficient to create a new Latino HCVAP majority senate district, such as LULAC Proposed SD28, in which he would live, LULAC Member I remains in an area where more HCVAP majority districts can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed HD44, where LULAC Member I also lives. Because LULAC Member I also lives in a district where Latino voters are fractured, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, LULAC Member I's vote is diluted.  LULAC Member I is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

23. Another example of the harm to LULAC's membership is LULAC Member J.  LULAC

Member J lives and votes in the Harlandale neighborhood on the South Side of San Antonio. LULAC Member J is a Latino registered voter and plans to vote again in future elections. In the challenged plan, LULAC Member J lives in HD118 which has 55.9% HCVAP but is not a Latino opportunity district. LULAC Member J lives in an area where a Latino opportunity district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate. One such example of a Latino opportunity district is LULAC Proposed HD118, where LULAC Member J also lives. Because LULAC Member J lives in a district where Latino voters are fractured and lack electoral opportunity, instead of a district that offers the opportunity to elect the Latino preferred candidate, LULAC Member J's vote is diluted. LULAC Member J is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

24. LULAC members include Latino registered voters who are injured by Defendants' dilution of Latino voting strength and intentional discrimination, because those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice. Thus, LULAC has associational standing to challenge those districts.

25. LULAC members live in the area of West Texas where, as described below, Defendants overpopulated districts in the newly-enacted Texas House plan to favor the interests of voters in areas of West Texas and the High Plains, Anglo voters and Anglo incumbents over the interests of voters in El Paso and the Upper Rio Grande and Latino voters.

    a.   SVREP Organizational Standing

26. Plaintiff SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT ("SVREP") is

a non-profit and non-partisan organization committed to promoting and increasing the participation of Latinos and other minority communities in the democratic process through voter registration, voter education and voter participation activities.  SVREP does not have members.  SVREP's mission includes achieving full and effective political participation by Latinos.  Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latinos cast effective votes, is critical to fulfilling SVREP's mission because political participation by Latinos secures SVREP's public policy goals.  To effectuate its mission, SVREP conducts voter registration and organizes non-partisan GOTV drives to remind voters of election dates and to inform them about the requirements for voting.  SVREP conducts these activities for federal, state, and local elections in Texas.  Additionally, SVREP trains individuals to become organizers in their own communities, helping them learn how to determine what their community needs and develop the skills to advocate for those needs directly with their elected officials.  SVREP also trains individuals to run for office.  Through its work, SVREP serves, among others, Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those individuals reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latino opportunity to elect their candidates of choice.

27. Since the enactment of the challenged redistricting plans, SVREP has worked directly with Latino voters through its voter registration drives, get out the vote drives, and training of Latinos to organize in their communities and to run for local, non-partisan office.  SVREP conducts these activities in, among other places, the Rio Grande Valley, El Paso, Houston, Dallas-Ft. Worth and San Antonio.  SVREP also conducts high school and community

college voter registration campaigns in geographic areas in Texas with substantial Latino population and works with high school principals and college presidents to register eligible students.

28. SVREP's routine get out the vote activities include contacting Latino voters directly to urge them to vote in upcoming elections.  As part of its mission to increase civic engagement among Latinos, SVREP focuses on new Latino voters and Latino voters who don't always turn out for elections.  These are not high propensity voters and, in SVREP's experience, require multiple contacts before they will turn out to vote.  An important component of SVREP's routine voter turnout activities is phone banking -- a resource-intensive activity in which SVREP staff and supervised volunteers call Latino voters, discuss with them issues of importance to the voters, and encourage the voters to vote.  Often, SVREP must speak with the same voter a second or third time to engage the voter in a conversation about public policy issues of concern to the voter and the importance of turning out in the next election.  These conversations focus on what the Latino voter believes would benefit his or her community and how turning out to vote can secure beneficial changes, such as, for example, increased school funding or better wages.

29. Since the enactment of the challenged redistricting plans, in its phone banking activities SVREP has spoken to voters who are aware that their district boundaries have changed and complain about the loss of the ability to elect their preferred candidate.  In these instances, SVREP staff was required to undertake, and did undertake, a new activity of looking up the new district boundaries and trying to reduce the concerns of the voter about the newly drawn district.  SVREP spends time and resources to educate and reassure voters who are concerned about the new boundaries of their districts because, in SVREP's experience, when voters are

concerned about election information, and worried that their vote will not be effective, the voter is less likely to turn out to vote.

30. After the 2022 general election, SVREP received calls from voters complaining that the voters were unable to elect their candidate of choice because of redistricting.  Again, SVREP staff was required to undertake, and did undertake, a new activity of looking up the new district boundaries and discussing with the voters the changes to the district and the impact of those changes on Latino opportunity to elect.  SVREP staff was required to undertake, and did undertake, a new activity of urging those voters to continue to turn out to vote even when the voters expressed that they felt  their vote had become ineffective as a result of redistricting.

31. As a result of the challenged redistricting plans, which both reduced the number of Latino opportunity to elect districts, and failed to create new Latino opportunity districts, SVREP staff was required to undertake, and did undertake, a new activity of developing new messages for talking with voters during phone banking about the redistricting changes and why Latino voters should still turn out to vote even when the voters feel that redistricting reduced their electoral influence.

32. For example, in the geographic areas of South Texas and the Rio Grande Valley encompassed by CD15 and HD37, and the geographic areas of Bexar County encompassed by HD118, where Latino voting strength was diluted such that the districts no longer offer Latino voters the opportunity to elect their candidate of choice, SVREP staff was required to undertake, and did undertake, a new activity of spending time in phone banking conversations talking with voters about the importance of turning out to vote even if the new version of the district offered less Latino voter influence and even if the voters felt that their

vote "did not count."  These new and different activities included spending more time on the

phone with that particular voter, contacting the voter an additional time to urge the voter to

vote, and adding more phone calls overall to voters in areas where redistricting reduced

Latino electoral influence.

33. The specific new activities that SVREP staff was required to undertake, and did undertake,

including developing different conversation messages for voters during phone banking,

spending more time talking to voters, and spending time in phone banking specifically

addressing the loss and lack of Latino electoral influence in the new redistricting plans, were

different from SVREP's routine activities of speaking with Latino voters about their policy

preferences and how to achieve those preferences through turning out to vote.  SVREP

undertook these new, different and non-routine activities in response to, and in order to

compensate for, the challenged redistricting plans which both failed to provide fair Latino

electoral opportunity and also reduced Latino electoral opportunity in some districts.  *See*

*NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) ("[A]n organization may establish

injury in fact by showing that it had diverted significant resources to counteract the

defendant's conduct[.]").

34. The new activities undertaken by SVREP in response to the challenged redistricting plans

detract from SVREP's routine activities.  *See Tenth St. Residential Ass'n v. City of Dall.*, 968

F.3d 492, 500 (5th Cir. 2020).  The additional time spent in phone banking, talking with

voters about the loss and lack of Latino electoral influence in the new redistricting plans, is

not part of SVREP's routine activities and takes staff resources away from SVREP's routine

voter registration and get out the vote activities.  As a result, SVREP is able to contact and

talk with fewer voters to encourage them to register and turn out to vote. *See OCA-Greater*

*Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017).

35. SVREP's new and different activities, as described above, go "toward mitigating [the

challenged redistricting plans'] real-world impact" on the Latino voters served by SVREP --

voters who require more and different conversations to convince them to turn out to vote in

the challenged redistricting plans. *OCA*, 867 F.3d at 611-12. SVREP is required to

undertake, and does undertake, these new activities to counteract the effects of the challenged

redistricting plans, which fail to provide required Latino electoral opportunity, and directly

cause Latino voters to be less likely to turn out. SVREP engages in the new and different

activities, as described above, to persuade these Latino voters to turn out when the Latino

voters otherwise would not because of the challenged redistricting plans. *See Ass'n of Cmty.*

*Org. for Reform Now v. Fowler*, 178 F.3d 350, 360 (5th Cir. 1999); *see also Scott v.*

*Schedler*, 771 F.3d 831, 837 (5th Cir. 2014); *OCA*, 867 F.3d at 612.

36. The challenged redistricting plans directly and concretely impede the routine activities

SVREP performs in service of its mission, with a "consequent drain on the organization's

resources" which would otherwise be spent reaching more Latino voters, having policy-

related discussions with those voters, and turning more voters out to vote. *See Havens Realty*

*Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *City of Kyle*, 626 F.3d at 238; *OCA*, 867 F.3d at

610, 612. SVREP's new activities "perceptibly impair[]" the organization's other get out the

vote and phone banking activities because SVREP has to redirect its resources toward new

message development and addressing the importance of voting despite the lack of Latino

electoral opportunity -- activities that would not be required in the absence of the challenged

redistricting plans, and activities that cause SVREP to reach fewer Latino voters through

22

their routine community outreach activities.  *OCA*, 867 F.3d at 612 (quoting *Havens*, 455 U.S. at 379).  SVREP plans to increase its phone banking in Houston and El Paso, but contacts fewer voters in these areas than it seeks to contact because of the requirement to persuade voters in areas that have lost Latino electoral opportunity, particularly South Texas, that they should still vote.  In this way, the challenged redistricting plans thwart and "frustrate[]" SVREP's ability to achieve its organizational goals through its routine, day-to-day activities.  *Havens*, 455 U.S. at 379.

37. The requirement that SVREP undertake these new activities, which more than "perceptibly impair[]" SVREP's routine operations, "constitutes far more than simply a setback to the organization's abstract social interests."  *Id.*  The resources are being diverted by SVREP to address the specific consequences of the redistricting maps on Latino voters, and not merely to promote or protect SVREP's general goals of increased Latino civic engagement.  SVREP's injury is not a policy disagreement with the challenged redistricting maps, but instead flows from having to divert organizational resources to undertake new and different activities to counteract the direct effect of the redistricting plans on Latino voters.  *Id.*

38. SVREP does not assert standing based on having undertaken litigation, lobbying or other proceedings but instead "with a view toward . . . mitigating [the redistricting plans'] real-world impact" on the Latino voters SVREP serves.  *OCA*, 867 F.3d at 612.  Similarly, SVREP does not assert standing on the basis of any advocacy on behalf of voters.  The specific activities undertaken by SVREP, as described above, are to meet the direct needs of the Latino voters SVREP serves, and has resulted in a drain of SVREP's resources in order to counteract the effects of the unlawful maps.

39. SVREP does not assert standing based solely on the expenditure or diversion of resources. SVREP makes the specific expenditures and diverts the specific resources described above to counteract the effects of the challenged redistricting plans directly on the Latino voters served by SVREP, and the expenditures and diverted resources detract from SVREP's routine activities.

    a.  <u>MI FAMILIA VOTA Organizational Standing</u>

40. Plaintiff MI FAMILIA VOTA is a national civic engagement organization that unites Latino, immigrant and allied communities to promote social and economic justice. MI FAMILIA VOTA does not have members. MI FAMILIA VOTA's mission includes increasing the power and political representation of the Latino community and achieving full and effective political participation by Latinos. Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latinos cast effective votes, is critical to fulfilling MI FAMILIA VOTA's mission because political participation by Latinos secures MI FAMILIA VOTA's public policy goals. To effectuate its mission, MI FAMILIA VOTA conducts citizenship workshops and voter registration and mobilization drives. Additionally, MI FAMILIA VOTA advocates on all issues impacting the Latino community, including voting rights, immigration, education, health care, workers' rights and racial justice. To further its mission, MI FAMILIA VOTA also hosts programming such as citizenship assistance and youth and community leadership development. For example, in its youth leadership development efforts, MI FAMILIA VOTA educates young Latinos on issues that affect their community, empowers them with the skills and confidence to advocate on those issues, and provides them with opportunities to take action, including by speaking at town halls and canvassing in the community. Additionally, MI FAMIA VOTA's community engagement workshops offer

community members the opportunity to learn how to advocate for their needs through voting and other forms of advocacy.  Through its workshops, MI FAMILIA VOTA also educates Latino community members on assistance on matters such as rental assistance.  MI FAMILIA VOTA conducts its activities with, among others, Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those individuals reside in areas where, as described below, Defendants either could have created an additional Latino majority district but failed to do so, or weakened districts by manipulating their composition to reduce Latino opportunity to elect their candidates of choice.

41. Since the enactment of the challenged redistricting plans, MI FAMILIA VOTA has worked directly with Latino voters to urge them to register and vote in the 2022 General Election and the May 2023 Dallas municipal election.  MI FAMILIA VOTA is also preparing to contact voters to encourage them to register and vote in the upcoming November 2023 Houston municipal election.  In these activities, MI FAMILIA VOTA staff has interacted closely with Latino voters in Harris and Dallas counties, among others.

42. In its voter mobilization activities, MI FAMILIA VOTA has direct and virtual contact with Latino voters through:  door knocking, community events to educate voters, phone banking, operating a hotline for voters with questions about voting, media outreach, and text message banking.

43. For MI FAMILIA VOTA, the election is only the first step in creating a relationship between Latino voters and their elected officials.  In between elections, MI FAMILIA VOTA works directly with Latino voters to connect those voters with their elected officials in order to obtain constituent services and so that the voters can communicate their policy priorities to the officials.

44. As a result of the challenged redistricting plans, the Latino voters served by MI FAMILIA VOTA are less likely to be represented by an elected official whose district contains a majority of Latino voters.  For example, the Harris County area could have gained (but did not) a second Latino majority congressional district as well as two additional Latino majority State House districts and a Latino majority State Board of Education District.  In another example, the Dallas-Ft. Worth area could have gained (but did not) an additional Latino majority congressional district and State Senate district.  Instead, and as a direct result of the challenged redistricting plans, many Latino voters whom MI FAMILIA VOTA serves are represented by officials whose districts are not Latino majority and who are less responsive to Latino voters than representatives of Latino majority districts.

45. In the experience of MI FAMILIA VOTA, fewer election districts in which Latino voters have the opportunity to elect their candidate of choice translates directly into fewer elected officials who prioritize:  meeting with Latino constituents; providing services to Latino constituents; and addressing the policy concerns of Latino constituents.

46. The mission of MI FAMILIA VOTA includes helping Latino voters so that they feel they are being served by their representatives and that they can engage with their elected representatives to obtain constituent services.  When an elected official is less responsive to Latino voters, those voters do not feel connected to their representative.  When an elected official is responsive to Latino voters, and creates strong community relations, there is a mutual partnership between the Latino voters and the elected official.

47. MI FAMILIA VOTA works directly with voters to assist them in creating a mutual partnership with their elected officials.  MI FAMILIA VOTA's services to Latino voters include connecting Latino voters to the staff in the elected official's office, bringing Latino

26

voters to officials' offices, and assisting Latino voters in organizing public meetings with officials.

48. MI FAMILIA VOTA learns of Latino voters' concerns through MI FAMILIA VOTA organizers who conduct get-out-the-vote and issue based campaigns. When MI FAMILIA VOTA is able to assist a voter in obtaining services from the voter's representative, this directly benefits the voter and also fulfills the mission of MI FAMILIA VOTA.

49. MI FAMILIA VOTA has experienced the different priorities of elected officials, depending on whether those elected officials represented a Latino opportunity district or did not as a result of redistricting. For example, during the 2023 Texas Legislative Session, MI FAMILIA VOTA (and the Latino voters it serves) experienced differences in responsiveness of various state legislators. MI FAMILIA VOTA brought Latino voters and residents of Dallas and Houston to the State Capitol in Austin twice during the regular session. The first trip was to assist the voters in meeting with their area delegations. The second trip, which occurred after the bill filing deadline, was to assist voters in meeting with the chairs and members of legislative committees, including elections and education committees. MI FAMILIA VOTA assisted the voters in deciding whom to meet, setting up appointments, and visiting legislative offices.

50. Some legislators who did not represent Latino majority districts were less responsive to the Latino voters served by MI FAMILIA VOTA. Those legislators' offices were less willing to set up appointments to meet with Latino voters and some were unwilling to invite Latino voters into their offices when the voters stopped by for an unscheduled meeting.

51. MI FAMILIA VOTA also experienced less responsiveness of candidates running for office in districts that were not Latino majority as a result of redistricting. During campaign season,

MI FAMILIA VOTA assists Latino voters in organizing in-person and virtual candidate engagement sessions, including assisting the voters in writing questions for the candidates to answer during the events and assisting the voters in inviting and encouraging candidates to appear at the events.  MI FAMILIA VOTA also records candidate engagement sessions and distributes the recordings to more Latino voters.  As part of this effort, it is important to have candidates with various political perspectives and policy preferences appear at the engagement sessions.  Based on their experiences with 2020 candidate engagement sessions, MI FAMILIA VOTA knows that when a district is Latino majority, the candidates are more likely to appear at an event hosted by Latino voters.  MI FAMILIA VOTA expects that in the next general election, candidates are less likely to come to engagement events hosted by Latinos in Latino minority districts (as compared to latino majority districts).

52. The concrete injury to Latino voters of the challenged redistricting plans' failure to create Latino majority districts goes beyond inability to elect the Latino preferred candidate, and includes less responsive candidates and elected officials.  The concrete injury to MI FAMILIA VOTA is that MI FAMILIA VOTA must engage in different activities to assist Latino voters in securing attention and services from officials who are less responsive as a result of redistricting.  As described below, the different activities in which MI FAMILIA VOTA must engage in order to counteract the discriminatory redistricting plans  diverts the resources of MI FAMILIA VOTA and thwarts the mission of MI FAMILIA VOTA.

53. With respect to assisting Latino voters to secure constituent services from less responsive officials, MI FAMILIA VOTA is forced to conduct different activities, which include making repeated follow up calls to a representative's office and making repeated requests for information and assistance for Latino voters.  When a non-responsive official does not

28

communicate with Latino constituents, MI FAMILIA VOTA must engage in these additional activities to assist the voters to secure services.  Further, when an elected official does not provide constituent services to Latino voters, MI FAMILIA VOTA is forced to try to identify alternate resources for the voters in order for the voters to obtain those same services.  This includes MI FAMILIA VOTA researching and contacting other community organizations to get services for the voters including providing information about government programs, casework assistance, and referrals.

54. With respect to assisting Latino voters in communicating their policy concerns to representatives, when the elected official is less responsive, MI FAMILIA VOTA is forced to conduct different activities, which include making repeated attempts to schedule appointments and bringing voters to legislative offices for unscheduled meetings when the official would not schedule an appointment.  With respect to candidates who are less responsive with appearing at community events, it can take many more hours of MI FAMILIA VOTA staff time to repeatedly contact the candidate and urge the candidate to appear at the event.

55. MI FAMILIA VOTA has undertaken these new and different activities to assist Latino voters as a direct result of the challenged redistricting plans and the dearth of election districts in which Latino voters have the opportunity to elect their candidate of choice.  If MI FAMILIA VOTA did not have to undertake these new and different activities of assisting voters in securing attention and services from unresponsive representatives, MI FAMILIA VOTA would be otherwise engaged in its routine activities of conducting field campaigns to register voters, educate voters about voting and encourage voters to turn out, including phone banking and door to door canvassing in Latino neighborhoods.  *See City of Kyle*, 626 F.3d at

238 ("[A]n organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct[.]").

56. Thus, as described above, the new activities undertaken by MI FAMILIA VOTA in response to the challenged redistricting plans differ from and detract from MI FAMILIA VOTA's routine activities. *Tenth St. Residential Ass'n v. City of Dall.*, 968 F.3d 492, 500 (5th Cir. 2020). MI FAMILIA VOTA's new activities, which involve diverting organizational resources into assisting voters with repeatedly contacting unresponsive officials, trying to convince those officials to respond, and securing alternate sources of services, go "toward mitigating [the redistricting plans'] real-world impact" on the Latino voters that MI FAMILIA VOTA assists. *OCA*, 867 F.3d at 611-12. MI FAMILIA VOTA is required to engage in these new and different activities to counteract the effects of the challenged redistricting plans which cause fewer elected officials to respond to Latino voters' requests and concerns, thus leaving MI FAMILIA VOTA to assist the voters in securing the attention and services they need from elected officials. *See Fowler*, 178 F.3d at 360; *see also Scott v. Schedler*, 771 F.3d at 837; *OCA*, 867 F.3d at 612.

57. The challenged redistricting plans, by creating fewer districts in which elected officials are responsive to Latino voters' concerns and need for services, have directly and concretely harmed the routine activities MI FAMILIA VOTA performs in service of its mission, including assisting voters with learning about elections and how to participate in elections, with a "consequent drain on the organization's resources[.]" *Havens*, 455 U.S. at 379; *see also City of Kyle*, 626 F.3d at 238; *OCA-Greater Houston*, 867 F.3d at 610, 612.

58. By forcing MI FAMILIA VOTA to engage in new activities to assist voters in securing attention and services from less responsive elected officials, the challenged redistricting plans

30

regulate MI FAMILIA VOTA's activities and create a "consequent drain on the

organization's resources" that is both concrete and particularized.  *See Havens*, 455 U.S. at

379.

59. The  "additional time and effort spent" by MI FAMILIA VOTA on new activities to assist

Latino voters in securing meetings and services from less responsive elected officials

"frustrates and complicates its routine community outreach activities."  *OCA*, 867 F.3d at 610

.  The new activities force MI FAMILIA VOTA to expend resources that otherwise would

have been spent elsewhere, and MI FAMILIA VOTA's resources would not have been spent

on these new activities, if not for the challenged redistricting plans.  *O*MI FAMILIA

VOTA*CA*, 867 F.3d at 612; *Fowler*, 178 F.3d at 361.  MI FAMILIA VOTA's new activities

"perceptibly impair []" the organization's other community outreach activities because MI

FAMILIA VOTA has to redirect its limited resources toward assisting voters in securing

representatives' attention and services that would not be required without the challenged

redistricting plans, and as a result MI FAMILIA VOTA reaches fewer people through their

routine community outreach activities.  *OCA*, 867 F.3d at 612 (quoting *Havens*, 455 U.S. at

379).  This impairment of MI FAMILIA VOTA's routine activities "constitutes far more than

simply a setback to the organization's abstract social interests."  *Havens*, 455 U.S. at 379.

60. MI FAMILIA VOTA diverts its resources specifically to address the lack of representative

responsiveness caused by the challenged plans' failure to create districts in which Latino

voters have an opportunity to elect their preferred candidates, and not merely to promote MI

FAMILIA VOTA's goals.  MI FAMILIA VOTA does not assert standing based on having

undertaken litigation, lobbying or other proceedings but instead "with a view toward . . .

mitigating [the redistricting plans'] real-world impact on [its] members and the

public." *OCA*, 867 F.3d at 612.  MI FAMILIA VOTA does not assert standing based solely on the expenditure or diversion of resources.  MI FAMILIA VOTA made the specific expenditures and diverted the specific resources described above to counteract the effects of Defendant's conduct on the individuals served by MI FAMILIA VOTA, and the expenditures and diverted resources detract from MI FAMILIA VOTA's ongoing regular activities.

61. MI FAMILIA VOTA does not assert standing on the basis of any advocacy on behalf of the individuals they serve.  The specific activities undertaken and put on hold by MI FAMILIA VOTA, as described above, were to meet the direct needs of its clients, and have resulted in a drain of MI FAMILIA VOTA's resources in order to counteract the effects of the unlawful maps.

   a. GI Forum Organizational Standing

62. Plaintiff AMERICAN GI FORUM ("GI FORUM") is a veterans membership organization dedicated to addressing problems of discrimination and inequities endured by Hispanic veterans.  GI FORUM was founded in Corpus Christi, Texas, and it is organized under Texas law.  In 1998, the U.S. Congress chartered the American GI Forum as a Veteran's Family Organization.  GI FORUM's mission is to provide counseling, referral, job placement, and other related services to both U.S. military veterans and other non-military veterans.  GI FORUM's mission includes achieving full and effective political participation by Latinos.  Promoting civic participation of Latinos, including voter registration and voting, and ensuring Latinos cast effective votes, is critical to fulfilling GI FORUM's mission because political participation by Latinos secures GI FORUM's public policy goals.  To promote civic engagement in the communities it serves and to expand Latino political influence, GI

FORUM's members: conduct know-your-rights discussions and membership meetings; participate in issue-focused advocacy; connect members to social services; and conduct voter registration and education.

63. Plans S2168, C2193 and E2106 will force GI FORUM to divert significant resources from its voter registration, counseling, and job-related services, which are central to its mission, in order to counteract the negative effects of the challenged redistricting plans. GI FORUM has in the past conducted, and in the future will conduct, voter registration activities aimed at increasing voting by Latinos. Because of the reduced number of districts in the enacted plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward). As a result, GI FORUM must now expend new and significantly more resources to register and turn out Latino voters, particularly those who live in the challenged districts and areas, and who are discouraged by the absence of an equal opportunity to elect their candidate of choice; and to do so, GI FORUM must divert time and funding from its counseling, referral and job placement efforts—along with other efforts to connect individuals to social services— that further its mission, and instead must engage in efforts to convince Latinos to participate, despite the discrimination in the new redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—which is not a regular activity of GI FORUM. Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, GI FORUM must spend significantly more resources in an attempt to educate Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged

redistricting plans. Because of the dilution of the Latino vote, the new redistricting plans thwart GI FORUM's mission to expand Latino political influence. Thus, GI FORUM has organizational standing to challenge the new redistricting plans.

     b. GI Forum Associational Standing

64. GI FORUM has membership chapters throughout Texas. GI FORUM's individual members pay dues and elect a national board of directors every year. GI FORUM's members also participate directly in making and implementing decisions to guide the organization's efforts. GI FORUM's members include Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice. Thus, GI FORUM has associational standing to challenge those districts.

65. One example of the harm to GI FORUM's membership is GI FORUM Member A. GI FORUM Member A lives and votes in the far West Side of San Antonio. GI FORUM Member A is a Latino registered voter and plans to vote again in future elections. In the challenged plan, GI FORUM Member A lives in CD23 which, as described below, is not a Latino opportunity district. GI FORUM Member A lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate. One such example of a Latino opportunity district is LULAC Proposed CD23, where GI FORUM Member A also lives. Because GI FORUM Member A lives in a district where Latinos lack electoral opportunity, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, GI FORUM Member A's vote is diluted.

GI FORUM Member A is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

66. Another example of the harm to GI FORUM's membership is GI FORUM Member B.  GI FORUM B lives and votes in Windcrest, a city in the San Antonio metropolitan area.  GI FORUM Member B is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, GI FORUM Member B lives in ED3 where, as described below, Defendants manipulated the district boundaries with the purpose of reducing Latino voting strength and making it more difficult for Latinos to elect their preferred candidates.  GI FORUM Member B lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed ED3, where GI FORUM Member B also lives.  Because GI FORUM Member B lives in a district where Latinos lack electoral opportunity, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, GI FORUM Member B's vote is diluted. GI FORUM Member B is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

67. Another example of the harm to GI FORUM's membership is GI FORUM Member C.  GI FORUM Member C lives and votes in the Wedgwood East neighborhood of Fort Worth.  GI FORUM Member C is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, GI FORUM Member C lives in HD90 where, as described below, Defendants manipulated the district boundaries with the purpose of reducing Latino voting strength and making it more difficult for Latinos to elect their preferred candidates.  GI FORUM Member C lives in an area where an HCVAP majority district can and should be

created that will provide Latino voters the opportunity to elect their preferred candidate. One such example of a Latino opportunity district is LULAC Proposed HD90, where GI FORUM Member C also lives. Because GI FORUM Member C lives in a district where Latinos lack electoral opportunity, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, GI FORUM Member C's vote is diluted. GI FORUM Member C is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

    a. <u>LUPE Organizational Standing</u>

68. Plaintiff LA UNIÓN DEL PUEBLO ENTERO ("LUPE") is a non-partisan traditional membership organization founded by labor rights activists César Chávez and Dolores Huerta. LUPE is headquartered in San Juan, Texas, and it is organized under Texas law. LUPE's mission is to build strong, healthy communities in the Texas Rio Grande Valley through community organizing and civic engagement, and to expand Latino political influence in Texas. LUPE's mission includes achieving full and effective political participation by Latinos. Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latinos cast effective votes, is critical to fulfilling LUPE's mission because political participation by Latinos secures LUPE's public policy goals. To promote civic engagement in the communities it serves and to expand Latino political influence, LUPE's members and paid staff conduct know-your-rights discussions and membership meetings; participate in issue-focused advocacy; campaign to support or oppose nonpartisan ballot measures through in-person canvassing; connect members to social services; conduct census outreach; and conduct voter registration, education, and non-partisan GOTV campaigns.

69. Plans H2316, S2168, C2193 and E2106 will force LUPE to divert significant resources from

its GOTV, voter registration and community education activities, which are central to its mission, in order to counteract the negative effects of the challenged redistricting plans. LUPE has in the past conducted, and in the future will conduct, GOTV activities aimed at increasing the turnout of Latino registered voters with low turnout. Additionally, LUPE has in the past paid, and in the future will pay, employees who, among other duties:  educate voters about upcoming elections; urge the voters to vote; and encourage, offer and deliver assistance to the voters. Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward). As a result, LUPE must now expend new and significantly more resources to register and turn out Latino voters, particularly those discouraged by the absence of an equal opportunity to elect their candidate of choice; and to do so, LUPE must divert time and funding from its community education activities that further its mission, and instead must engage in efforts to convince Latinos to participate, despite the discrimination in the redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—which is not a regular activity of LUPE. Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, LUPE must spend significantly more resources to educate Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged redistricting plans. Because of the dilution of the Latino vote, Plans H2316, S2168, C2193 and E2106 thwart LUPE's mission to expand Latino political influence. Thus, LUPE has organizational standing to challenge the new redistricting plans.

b. <u>LUPE Associational Standing</u>

70. LUPE has more than 8,000 members who reside primarily in Hidalgo, Cameron, Willacy and Starr Counties.   LUPE's individual members pay dues, and members serve as the organization's leadership.

71. LUPE engages its membership to devise and conduct campaigns to achieve the mission of the organization; thus, LUPE members participate and guide the organization's efforts, and implement day-to-day decisions for the organization.   LUPE also hosts regular events and meetings for members.

72. LUPE members include Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or intentionally altered Latino majority districts to reduce Latinos' opportunity to elect their candidates of choice.   Thus, LUPE has associational standing to challenge those districts.

73. One example of the harm to LUPE's membership is LUPE Member A.   LUPE Member A lives and votes in north Mission in Hidalgo County.   LUPE Member A is a Latino registered voter and plans to vote again in future elections.   In the challenged plan, LUPE Member A lives in CD15 which, as described below, is not a Latino opportunity district.   LUPE Member A lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.   One such example of a Latino opportunity district is LULAC Proposed CD15, where LUPE Member A also lives.   Because LUPE Member A lives in a district where Latino voting strength is weakened, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate,

LUPE Member A's vote is diluted.  LUPE Member A is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

74. Another example of the harm to LUPE's membership is LUPE Member B.  LUPE Member B lives and votes in the Las Milpas colonia in Hidalgo County.  LUPE Member B is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, LUPE Member B lives in CD15 which, as described below, is not a Latino opportunity district.  LUPE Member B lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed CD15, where LUPE Member B also lives. Because LUPE Member B lives in a district where Latino voting strength is weakened, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, LUPE Member B's vote is diluted.  LUPE Member B is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

75. Another example of the harm to LUPE's membership is LUPE Member C.  LUPE Member C lives and votes in north Moraida in Roma.  LUPE Member C is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, LUPE Member C lives in HD31 which, as described below, is not a Latino opportunity district.  LUPE Member C lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed HD31, where LUPE Member C also lives.  Because LUPE Member C lives in a district where Latino voting strength is weakened, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, LUPE Member C's vote is diluted.  LUPE Member C is further injured by the changes in the

challenged redistricting plan bearing more heavily on Latino voters than Anglos.

76. Another example of the harm to LUPE's membership is LUPE Member D.  LUPE Member D lives and votes in the far east side of Roma.  LUPE Member D is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, LUPE Member D lives in HD31 which, as described below, is not a Latino opportunity district.  LUPE Member D lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed HD31, where LUPE Member D also lives.  Because LUPE Member D lives in a district where Latino voting strength is weakened, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, LUPE Member D's vote is diluted.  LUPE Member D is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

77. Another example of the harm to LUPE's membership is LUPE Member E.  LUPE Member E lives and votes in La Paloma Ranchettes in Rio Grande City.  LUPE Member E is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, LUPE Member E lives in HD31 which, as described below, is not a Latino opportunity district.  LUPE Member E lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed HD31, where LUPE Member E also lives. Because LUPE Member E lives in a district where Latino voting strength is weakened, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, LUPE Member E's vote is diluted.  LUPE Member E is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

78. Another example of the harm to LUPE's membership is LUPE Member F.  LUPE Member F lives and votes in south Rio Grande City.  LUPE Member F is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, LUPE Member F lives in HD31 which, as described below, is not a Latino opportunity district.  LUPE Member F lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed HD31, where LUPE Member F also lives.  Because LUPE Member F lives in a district where Latino voting strength is weakened, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, LUPE Member F's vote is diluted.  LUPE Member F is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

79. Another example of the harm to LUPE's membership is LUPE Member G.  LUPE Member G lives and votes in central Rio Grande City.  LUPE Member G is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, LUPE Member G lives in HD31 which, as described below, is not a Latino opportunity district.  LUPE Member G lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed HD31, where LUPE Member G also lives.  Because LUPE Member G lives in a district where Latino voting strength is weakened, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, LUPE Member G's vote is diluted.  LUPE Member G is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

80. Another example of the harm to LUPE's membership is LUPE Member H.  LUPE Member H

lives and votes in north central Harlingen.  LUPE Member H is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, LUPE Member H lives in HD37 which, as described below, is not a Latino opportunity district, and SD27 which, as described below, has been altered purposefully to reduce Latino voting strength.  LUPE Member H lives in an area where HCVAP majority districts can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  Examples of such Latino opportunity districts are LULAC Proposed HD37 and Proposed SD27, where LUPE Member H also lives.  Because LUPE Member H lives in districts where Latino voting strength is weakened, instead of Latino majority districts that offer the opportunity to elect the Latino preferred candidate, LUPE Member H's vote is diluted.  LUPE Member H is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

81. Another example of the harm to LUPE's membership is LUPE Member I.  LUPE Member I lives and votes in central Harlingen.  LUPE Member I is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, LUPE Member I lives in HD37 which, as described below, is not a Latino opportunity district, and SD27 which, as described below, has been altered purposefully to reduce Latino voting strength.  LUPE Member I lives in an area where HCVAP majority districts can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  Examples of such Latino opportunity districts are LULAC Proposed HD37 and Proposed SD27, where LUPE Member I also lives.  Because LUPE Member I lives in districts where Latino voting strength is weakened, instead of Latino majority districts that offer the opportunity to elect the Latino preferred candidate, LUPE Member I's vote is diluted.  LUPE Member I is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

42

82. Another example of the harm to LUPE's membership is LUPE Member J.  LUPE Member J lives and votes in central Alamo.  LUPE Member J is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, LUPE Member J lives in SD27 which, as described below, has been altered purposefully to reduce Latino voting strength. LUPE Member J lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed SD27, where LUPE Member J also lives. Because LUPE Member J lives in a district where Latino voting strength is weakened, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, LUPE Member J's vote is diluted.  LUPE Member J is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

   a.  <u>MABA-TX Organizational Standing</u>

83. Plaintiff MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS ("MABA-TX") is a professional association of Latino lawyers located in Texas.  MABA-TX is a membership organization that is organized under Texas law, and members of MABA-TX reside throughout Texas.  MABA-TX's mission includes:  to provide a forum and means for lawyers to promote the social, economic and educational advancement of the people of Texas; to speak on behalf of the Latino community on legal issues affecting the community; to serve the Latino populace as a professional association by providing services, assistance and advice on matters of legal concern to the community; to work through legislation, advocacy and education to accomplish these goals; and to preserve high standards of integrity, honor and professional courtesy among lawyers.  MABA-TX's mission also includes achieving full and effective political participation by Latinos.  Promoting civic participation of Latinos is critical to fulfilling MABA-TX's

mission because political participation by Latinos secures MABA-TX's public policy goals.

84. Plans H2316, S2168, C2193 and E2106 will force MABA-TX to divert significant resources from its community engagement activities—which are central to its mission—in order to counteract the negative effects of the challenged redistricting plans. MABA-TX has in the past worked, and will in the future work, to educate voters about upcoming elections, urge voters to vote and will offer and provide assistance to voters. Because of the reduced number of districts in the enacted plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and statewide, fewer Latinos will register and turn out to vote in the 2022 election (and onward). As a result, MABA-TX must now expend new and significantly more resources to educate and promote participation by Latino voters, particularly those who live in the challenged districts and areas, and who are discouraged by the absence of an equal opportunity to elect their candidate of choice; to do so MABA-TX must divert time and funding from its community engagement activities that further its mission, and instead must engage in efforts to convince Latinos to participate, despite the discrimination in the challenged redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—which is not a regular activity of MABA-TX. Moreover, because fewer Latinos will cast ballots, fewer Latino judges will win elections, resulting in MABA-TX's members practicing before less diverse judges. Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, MABA-TX must spend significantly more resources in an attempt to educate Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged redistricting plans. Because of the dilution of the Latino vote, Plans H2316, S2168, C2193

and E2106 thwart MABA-TX's ability to promote Latino community involvement in legal and legislative issues affecting the community.  Thus, MABA-TX has organizational standing to challenge the new redistricting plans.

      b.  <u>MABA-TX Associational Standing</u>

85. MABA-TX has members throughout the state that register with the organization, pay dues to finance the organization's activities, and attend meetings where they guide the activities of their local chapters.  Members of MABA-TX include Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice.  Thus, MABA-TX has associational standing to challenge those districts.

86. One example of the harm to MABA-TX's membership, by virtue of its local chapter MABA-Dallas, is MABA-TX Member A.  MABA-TX Member A lives and votes in the Piedmont Addition neighborhood in Dallas.  MABA-TX Member A is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, MABA-TX Member A lives in CD30 which has 21.4% HCVAP and is not a Latino opportunity district.  MABA-TX Member A lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed CD37, where MABA-TX Member A also lives.  Because MABA-TX Member A lives in a district where Latino voters are fractured, instead of living in a Latino majority district that offers the opportunity to elect the Latino preferred candidate, MABA-TX Member A's vote is diluted.  MABA-TX Member A is further injured

by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

87. Another example of the harm to MABA-TX's membership, by virtue of its local chapter MABA-Dallas, is MABA-TX Member B.  MABA-TX Member B lives and votes in the Piedmont Addition neighborhood in Dallas.  MABA-TX Member B is a Latino registered voter and plans to vote again in future elections.  In the challenged plans, MABA-TX Member B lives in CD30 and SD23 which have 21.4% HCVAP and 24.7% respectively, and are not Latino opportunity districts.  MABA-TX Member B lives in an area where HCVAP majority districts can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  Examples of Latino opportunity districts include LULAC Proposed CD37 and SD9, where MABA-TX Member B also lives.   Because MABA-TX Member B lives in districts where Latino voters are fractured, instead of Latino majority districts that offer the opportunity to elect the Latino preferred candidate, MABA-TX Member B's vote is diluted. MABA-TX Member B is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

88. Another example of the harm to MABA-TX's membership, by virtue of its local chapter MABA-Dallas, is MABA-TX Member C.  MABA-TX Member C lives and votes in the Fairmount-Southside Historic District neighborhood of Fort Worth.  MABA-TX Member C is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, MABA-TX Member C lives in HD90 which, as described below, is not a Latino opportunity district.  MABA-TX Member C lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed HD90,

46

where MABA-TX Member C also lives.  Because MABA-TX Member C lives in a district where Latino voting strength is weakened, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, MABA-TX Member C's vote is diluted. MABA-TX Member C is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

89. Another example of the harm to MABA-TX's membership, by virtue of its local chapter MABA-Dallas, is MABA-TX Member D.  MABA-TX Member D lives and votes in the City of Farmers Branch.  MABA-TX Member D is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, MABA-TX Member D lives in SD12 which has 13.6% HCVAP and is not a Latino opportunity district.  MABA-TX Member D lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed SD9, where MABA-TX Member D also lives.  Because MABA-TX Member D lives in a district where Latino voters are fractured, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, MABA-TX Member D's vote is diluted.  MABA-TX Member D is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

90. Another example of the harm to MABA-TX's membership, by virtue of its local chapter MABA-El Paso, is MABA-TX Member E.  MABA-TX Member E lives and votes in El Paso County.  MABA-TX Member E is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, MABA-TX Member E lives in Latino majority HD78 which, as described below, is overpopulated compared to Anglo majority House districts in the Panhandle and original Tom Green County (1874).  MABA-TX Member E lives in an area

where House districts can and should be created that are at or closer to the ideal population. One such example of a fairly populated district is LULAC Proposed HD78, where MABA-TX Member E also lives. Because MABA-TX Member E lives in an overpopulated district, MABA-TX Member E's vote is diluted.

91. Another example of the harm to MABA-TX's membership, by virtue of its local chapter MABA-Houston, is MABA-TX Member F. MABA-TX Member F lives and votes in the Southbelt / Ellington neighborhood in Houston. MABA-TX Member F is a Latino registered voter and plans to vote again in future elections. In the challenged plan, MABA-TX Member F lives in HD144, one of several Latino majority districts in the area that contain more Latino voter population than necessary to elect the candidate of choice. Although the Latino population in this part of Harris County is sufficient to create a new Latino HCVAP majority house district, such as LULAC Proposed HD129, in which MABA-TX Member F would live, because of Defendants' redistricting plan, MABA-TX Member F lives in an area where an HCVAP majority district can and should be created that would provide Latino voters an equal opportunity to elect their preferred candidate. MABA-TX Member F is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

92. Another example of the harm to MABA-TX's membership, by virtue of its local chapter MABA-San Antonio, is MABA-TX Member G. MABA-TX Member G lives and votes in the Whisper Hollow neighborhood of San Antonio. MABA-TX Member G is a Latino registered voter and plans to vote again in future elections. In the challenged plan, MABA-TX Member G lives in ED3 which, as described below, has been altered intentionally to reduce Latino voting strength. MABA-TX Member G lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred

candidate. One such example of a Latino opportunity district is LULAC Proposed ED3, where MABA-TX Member G also lives. Because MABA-TX Member G lives in a district where Latino voting strength is weakened, instead of a Latino majority district that offers an equal opportunity to elect the Latino preferred candidate, MABA-TX Member G's vote is diluted. MABA-TX Member G is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

93. One example of the harm to MABA-TX's membership, by virtue of its local chapter MABA-San Antonio, is MABA-TX Member H. MABA-TX Member H lives and votes in the Hollywood Park, a city in the San Antonio metropolitan area. MABA-TX Member H is a Latino registered voter and plans to vote again in future elections. In the challenged plan, MABA-TX Member H lives in ED3 which, as described below, has been altered intentionally to reduce Latino voting strength. MABA-TX Member H lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate. One such example of a Latino opportunity district is LULAC Proposed ED3, where MABA-TX Member H also lives. Because MABA-TX Member H lives in a district where Latino voting strength is weakened, instead of a Latino majority district that offers an equal opportunity to elect the Latino preferred candidate, MABA-TX Member H's vote is diluted. MABA-TX Member H is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

94. One example of the harm to MABA-TX's membership, by virtue of its local chapter MABA-San Antonio, is MABA-TX Member I. MABA-TX Member I lives and votes in the Timberwood Park neighborhood of San Antonio. MABA-TX Member I is a Latino registered voter and plans to vote again in future elections. In the challenged plan, MABA-TX Member

I lives in ED3 which, as described below, has been altered intentionally to reduce Latino voting strength.   MABA-TX Member I lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed ED3, where MABA-TX Member I also lives.  Because MABA-TX Member I lives in a district where Latino voting strength is weakened, instead of a Latino majority district that offers an equal opportunity to elect the Latino preferred candidate, MABA-TX Member I's vote is diluted. MABA-TX Member I is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

a.  <u>TEXAS HOPE Organizational Standing</u>

95. Plaintiff TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION ("TEXAS HOPE") is a non-profit membership organization that seeks to empower Latinos in Texas through civic engagement, civic education and outreach.  TEXAS HOPE's activities include voter registration of Latino citizens, GOTV activities, poll watcher service, administering voter education workshops and legislative advocacy on issues important to the Latino community, including education, voting, rights, immigrants' rights, healthcare and housing.  TEXAS HOPE's mission includes achieving full and effective political participation by Latinos. Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latino cast effective votes, is critical to fulfilling TEXAS HOPE's mission because political participation by Latinos secures TEXAS HOPE's public policy goals.  To promote civic engagement in the communities it serves and to expand Latino political influence, TEXAS HOPE's members conduct know-your-rights discussions; participate in issue-focused advocacy; campaign to support or oppose nonpartisan ballot measures; and conduct voter

registration, education, and non-partisan GOTV.

96. Plans H2316, S2168, C2193 and E2106 will force TEXAS HOPE to divert significant resources from its GOTV, voter registration and community education activities, which are central to its mission, in order to counteract the negative effects of the challenged redistricting plans.   TEXAS HOPE has in the past conducted, and in the future will conduct, GOTV activities aimed at Latino registered voters, educated voters about upcoming elections and urged the voters to vote.   Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward).   As a result, TEXAS HOPE must now expend new and significantly more resources to register and turn out Latino voters, particularly those who live in the challenged districts and areas, and who are discouraged by the absence of an equal opportunity to elect their candidate of choice; to do so TEXAS HOPE must divert time and funding from its community education activities that further its mission, and must instead engage in efforts to convince Latinos to participate, despite the discrimination in the redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—which is not a regular activity of TEXAS HOPE.   Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, TEXAS HOPE must spend significantly more resources in an attempt to educate Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged redistricting plans.   Because of the dilution of the Latino vote, Plans H2316, S2168, C2193 and E2106 thwart TEXAS HOPE's mission to

empower and expand Latino political influence. Thus, TEXAS HOPE has organizational standing to challenge the new redistricting plans.

b. TEXAS HOPE Associational Standing

97. TEXAS HOPE has a board of directors and members who reside throughout Texas. During membership meetings, Texas HOPE members guide the activities of the organization. TEXAS HOPE's members include Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice. Thus, TEXAS HOPE has associational standing to challenge those districts.

98. One example of the harm to Texas HOPE's membership is TX HOPE Member A. TX HOPE Member A lives and votes in the Scenic Bluff neighborhood in Fort Worth. TX HOPE Member A is a Latino registered voter and plans to vote again in future elections. In the challenged plan, TX HOPE Member A lives in CD33 and SD9 which have a 42.8% HCVAP and 20.6% HCVAP respectively and are not Latino opportunity districts. TX HOPE Member A lives in an area where HCVAP majority districts can and should be created that will provide Latino voters the opportunity to elect their preferred candidate. Examples of such Latino opportunity districts include LULAC Proposed CD37 and SD9, where TX HOPE Member A also lives. Because TX HOPE Member A lives in districts where Latino voters are fractured, instead of Latino majority districts that offer the opportunity to elect the Latino preferred candidate, TX HOPE Member A's vote is diluted. TX HOPE Member A is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

99.   Another example of the harm to Texas HOPE's membership is TX HOPE Member B.  TX
      HOPE Member B lives and votes in the Glenbrook Valley neighborhood in Houston.  TX
      HOPE Member B is a Latino registered voter and plans to vote again in future elections.  In
      the challenged plans, TX HOPE Member B lives in ED4 and HD147 which have a 39.9%
      HCVAP and 20.6% HCVAP respectively and are not Latino opportunity districts.  TX HOPE
      Member B lives in an area where HCVAP majority districts can and should be created that will
      provide Latino voters the opportunity to elect their preferred candidate.  Examples of such
      Latino opportunity districts include LULAC Proposed ED6 and HD129, where TX HOPE
      Member B also lives.  Because TX HOPE Member B lives in districts where Latino voters are
      fractured, instead of Latino majority districts that offer the opportunity to elect the Latino
      preferred candidate, TX HOPE Member B's vote is diluted.  TX HOPE Member B is further
      injured by the changes in the challenged redistricting plan bearing more heavily on Latino
      voters than Anglos.

100.  Another example of the harm to Texas HOPE's membership is TX HOPE Member C.  TX
      HOPE Member C lives and votes in the Idylwood neighborhood in Houston.  TX HOPE
      Member C is a Latino registered voter and plans to vote again in future elections.  In the
      challenged plan, TX HOPE Member C lives in ED4 which has 39.9% HCVAP and is not a
      Latino opportunity district.  TX HOPE Member C lives in an area where an HCVAP majority
      district can and should be created that will provide Latino voters the opportunity to elect their
      preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed
      ED6, where TX HOPE Member C also lives.  Because TX HOPE Member C lives in a district
      where Latino voters are fractured, instead of a Latino majority district that offers the
      opportunity to elect the Latino preferred candidate, TX HOPE Member C's vote is diluted.  TX

HOPE Member C is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

101.    Another example of the harm to Texas HOPE's membership is TX HOPE Member D.  TX HOPE Member D lives and votes in the Holly neighborhood in Austin.  TX HOPE Member D is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, TX HOPE Member D lives in SD14 which has 23.3% HCVAP and is not a Latino opportunity district.  TX HOPE Member D lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed SD28, where TX HOPE Member D also lives.   Because TX HOPE Member D lives in a district where Latino voters are fractured, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, TX HOPE Member D's vote is diluted.  TX HOPE Member D is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

102.    Another example of the harm to Texas HOPE's membership is TX HOPE Member E.  TX HOPE Member E lives and votes in El Paso County.  TX HOPE Member E is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, TX HOPE Member E lives in Latino majority HD79 which, as described below, is overpopulated compared to Anglo majority House districts in the Panhandle and original Tom Green County (1874). TX HOPE Member E lives in an area where House districts can and should be created that are at or closer to the ideal population.  One such example of a fairly populated district is LULAC Proposed HD79, where TX HOPE Member E also lives.  Because TX HOPE Member E lives in an overpopulated district, TX HOPE Member E's vote is diluted.

103.    One example of the harm to Texas HOPE's membership is TX HOPE Member F.  TX HOPE Member F lives and votes in the far West Side of San Antonio.  TX HOPE Member F is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, TX HOPE Member F lives in CD23 which, as described below, is not a Latino opportunity district.  TX HOPE Member F lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed CD23, where TX HOPE Member F also lives.  Because TX HOPE Member F lives in a district where Latino voting strength is weakened, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, TX HOPE Member F's vote is diluted.  TX HOPE Member F is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

     a.    WCVI Organizational Standing

104.    Plaintiff WILLIAM C. VELASQUEZ INSTITUTE ("WCVI") is a nonprofit and non-partisan public policy analysis organization that conducts research and works in Latino communities and with local leaders across Texas to increase Latino registration and voter turnout.  WCVI does not have members.  WCVI's mission includes improving the level of political participation for Latinos and other underrepresented communities.  WCVI's mission includes achieving full and effective political participation by Latinos.  Promoting civic participation of Latinos—including voting—and ensuring that Latinos cast effective votes is critical to fulfilling WCVI's mission because political participation by Latinos secures WCVI's public policy goals.  WCVI analyzes and reports on Latino voter registration and participation and uses its research to educate and collaborate with Latino community leaders to increase

Latino political participation. WCVI's areas of research also include environmental justice, election reform, immigration reform, and foreign policy. To effectuate its mission, WCVI conducts its work through research, policy seminars, media campaigns, and community workshops. Through its work, WCVI serves, among others, Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those individuals reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latino opportunity to elect their candidates of choice.

105.    The new redistricting plans for Congress, the House, the Senate, and the SBOE will force WCVI to divert significant resources from research, policy seminars, and community workshops in areas outside of voting rights in order to counteract the discriminatory effects of the challenged redistricting plans on the community members and voters WCVI serves.

106.    WCVI's routine activities include conducting research and organizing policy seminars, media campaigns, and community workshops in the areas of voting rights, environmental justice, election reform, immigration reform, and foreign policy. As part of its mission to achieve full and effective political participation by Latinos, WCVI analyzes and reports on Latino voter registration and participation and uses its research to educate and collaborate with Latino community leaders and other organizations to increase Latino political participation. Promoting civic participation of Latinos–including voting–and ensuring that Latinos cast effective votes is critical to fulfilling WCVI's mission because political participation by Latinos secures WCVI's public policy goals in each of its focus areas, described above.

107.    Latino voters who live in areas where they could have the opportunity to elect candidates of choice, but don't have that opportunity as a result of the challenged redistricting plans, are directly affected by the dilution of their political strength not only in terms of representation but also because they are less likely to feel that their vote counts and are less likely to turn out to vote.  Lower voting rates among Latinos who have been denied an equal opportunity to elect their preferred candidates requires WCVI to expend new and more resources on research, policy seminars, and community workshops to inform community leaders and Latino voters about how the new maps affect Latino voters and to counteract the effects of the redistricting plans on discouraged Latino voters.  WCVI anticipates that it will have to use new resources to educate community leaders and Latino voters regarding the geographic areas in which Latinos are denied the ability to elect their candidate of choice, and therefore which areas will require more effort to ensure Latino political participation.

108.    The new activities that WCVI will be required to undertake, including researching the effect of the challenged maps on Latino voter turnout, educating community leaders and Latino voters on the effect of the challenged maps, and developing policy strategies to counteract the effects of the challenged maps, are different from WCVI's routine activities of researching and developing policies that impact Latinos.  Instead of growing Latino political participation and influence through its routine activities, WCVI will have to focus merely on maintaining current levels of Latino voter turnout and political participation in light of the challenged maps' effect of depressing Latino voter participation.  WCVI anticipates undertaking these new, different and non-routine activities in response to, and in order to compensate for, the challenged redistricting plans, which both fail to provide fair Latino electoral opportunity and also reduce Latino electoral opportunity in some districts.  *See City*

*of Kyle*, 626 F.3d at 238 ("[A]n organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct[.]").

109.    The new activities that must be undertaken by WCVI in response to the challenged redistricting plans will detract from WCVI's routine activities. *See Tenth St.*, 968 F.3d at 500.  WCVI staff will have to put on hold research, policy seminars, and community workshops in areas outside of voting rights in order to counteract the discriminatory effects of the challenged redistricting plans on Latino voters. *See Louisiana ACORN Fair Housing v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000).  As a result, WCVI will be able to develop and achieve fewer of its public policy goals.  WCVI will also have to divert resources to ensure Latino political participation does not lose ground in light of the challenged maps and thus be less able to engage in their routine activities of conducting research and organizing policy seminars, media campaigns, and community workshops in the areas of voting rights, environmental justice, election reform, immigration reform, and foreign policy.  In this way, the challenged redistricting maps have directly and concretely harmed the routine activities WCVI performs in service of its mission.

110.    WCVI's new and different activities, as described above, will go "toward mitigating [the challenged redistricting plans'] real-world impact" of reducing Latino voter turnout. *OCA*, 867 F.3d at 612.  WCVI will have to undertake these new activities to counteract the effects of the challenged redistricting plans.

111.    The challenged redistricting plans directly and concretely impede the routine activities WCVI performs in service of its mission, with a "consequent drain on the organization's resources" which would otherwise be spent conducting research, or holding policy seminars and community workshops in any one of its other focus areas of environmental justice,

58

election reform, immigration reform, and foreign policy.  *See Havens*, 455 U.S. at 379; *City of Kyle*, 626 F.3d at 238; *OCA*, 867 F.3d at 610, 612.  WCVI's anticipated new activities will "perceptibly impair[]" the organization's routine research activities and other research and policy efforts because WCVI will have to redirect its resources toward researching reduced voter turnout among  Latino voters and developing strategies to counteract the challenged maps' negative effects on Latino political participation–activities that would not be required in the absence of the challenged redistricting plans.  *OCA*, 867 F.3d at 612 (quoting *Havens*, 455 U.S. at 379).  In this way, the challenged redistricting plans thwart and "frustrate[]" WCVI's ability to achieve its organizational goals through its routine, day-to-day activities.  *Havens*, 455 U.S. at 379.

112.    The requirement that WCVI undertake these new activities, which will more than "perceptibly impair[]" WCVI's routine operations, "constitutes far more than simply a setback to the organization's abstract social interests."  *Id.*  The resources must be diverted by WCVI to address the specific consequences of the redistricting maps on Latino voters, and not merely to promote or protect WCVI's general goals of increased Latino political participation.  WCVI's injury is not a policy disagreement with the challenged redistricting maps, but instead flows from having to divert organizational resources to undertake new and different activities to counteract the direct effect of the redistricting plans on Latino voters.  *Id.*

113.    WCVI does not assert standing based on having undertaken litigation, lobbying or other proceedings but instead "with a view toward . . . mitigating [the redistricting plans'] real-world impact on [its] members and the public."  *OCA*, 867 F.3d at 612.  WCVI's research is necessary to identify solutions to overcome the detrimental impact of the challenged

redistricting plans on Latino voters.  WCVI is integral in interacting with and educating Latino leaders and organizations to disseminate these solutions.  Similarly, WCVI does not assert standing on the basis of any advocacy on behalf of voters.  The specific activities WCVI will have to undertake, as described above, are to meet the direct needs of Latino voters and the community leaders and organizations WCVI serves, and will result in a drain of WCVI's resources in order to counteract the effects of the unlawful maps.

114.    WCVI does not assert standing based solely on the expenditure or diversion of resources.  WCVI will require the specific expenditures and diverted resources described above to counteract the effects of the challenged redistricting plans directly on Latino voters and WCVI's partnership organizations, and the anticipated expenditures and diverted resources will detract from WCVI's routine activities.

        a.  <u>FIEL Organizational Standing</u>

115.    Plaintiff FIEL Houston Inc. ("FIEL") is a non-profit, non-partisan membership organization in Houston, Texas that is organized under Texas law.  FIEL is an immigrant-led organization that advocates for just laws for immigrant youth and their families, access to higher education for all people regardless of immigration status, and access to justice for the Latino community.  FIEL was born and raised out of the need for civic engagement in support of undocumented students seeking higher education, and it organizes for the betterment of the communities it serves through efforts that include voter registration, civic engagement and other advocacy efforts.  FIEL also provides services such as immigration assistance, financial aid, and education forums.  FIEL's mission includes achieving full and effective political participation by Latinos.  Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latinos cast effective votes, is critical to fulfilling FIEL's mission

because political participation by Latinos secures FIEL's public policy goals.

116.    FIEL conducts voter outreach and provides education to voters in a number of geographic areas negatively affected by redistricting, including the neighborhoods of Northside/Northline, North Houston, the Eastex-Jensen area, the East End, Gulfgate/Riverview/PineValley, Golfcrest/Bellfort/Reveille, and Greater Hobby, as well as the northern Spring Branch area.

117.    Voters with whom FIEL conducts its voter education and get out the vote activities reside in the Houston area, including in geographic areas in which the Texas Legislature could have created additional Latino majority State House districts, a congressional district and a State Board of Education district, but did not in the most recent redistricting.  FIEL fields complaints—including through its door to door canvassing, phone banks, and online forums—from voters who feel discouraged by the lack of opportunities to elect their preferred candidates.  FIEL expends staff resources to respond to voter complaints, including by holding public forums to give voters an opportunity to express their frustrations while simultaneously remaining engaged.  If not for the challenged redistricting plans, FIEL would not need to devote additional staff time to receiving and responding to these voter complaints. *See OCA-Greater Houston*, 867 F.3d at 612.

118.    After the challenged redistricting plans were enacted, many of the Latino voters served by FIEL told FIEL's staff that the voters no longer intended to vote because voting would be a waste of time, including voters who live in geographic areas in which additional Latino majority districts could have been created but were not, for example:   the neighborhoods of Northside/Northline, North Houston, the Eastex-Jensen area, the East End, Gulfgate/Riverview/PineValley, Golfcrest/Bellfort/Reveille, and Greater Hobby, as well as

the northern Spring Branch area.  The voters also complain to FIEL staff that their votes made no difference and their voices are not heard.  Voters also told FIEL staff that they were frustrated about the lack of Latino representation in government and that voters felt that the redistricting plans did not reflect the growing Latino community.

119.    As a result of the challenged redistricting plans, FIEL reallocated its limited resources, devoting a third of its get out the vote resources to encouraging discouraged voters to continue voting.   Now, FIEL must spend more time phone banking, canvassing, organizing, and holding public forums to mitigate the challenged redistricting plans' direct effect of discouraging voters.  In order to persuade Latino voters that they should still participate, FIEL diverts its "resources to getting to the polls those of its supporters who would otherwise be discouraged" by the challenged redistricting "from bothering to vote." *Crawford*, 472 F.3d 949, 951 (7th Cir. 2007) *aff'd, Crawford v. Marion Cnty. Election Bd*. 553 U.S. 181, 189 n.7 (2008) (agreed with standing analysis of 7th Circuit); *see also Louisiana ACORN Fair Housing v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000).   FIEL's  activities go "toward mitigating [the challenged plan's] real-world impact on [FIEL]'s members and the public." *OCA-Greater Houston,* 867 F.3d at 612.

120.    FIEL's get out the vote activities in response to the challenged redistricting plans differ from FIEL's routine activities.  *See City of Kyle*, 626 F.3d at 238.  FIEL would typically focus its outreach on registering new voters and engaging first-time voters.

121.    The diversion of  FIEL's resources detracts from FIEL's ongoing regular activities.  *See Fowler*, 178 F.3d at 360 ("[A]n organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices."); *see also Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014); *OCA-Greater Houston*, 867 F.3d at 612.  The

resources that FIEL has now reallocated to counteract the effects of the redistricting plans would otherwise have been spent on get out the vote activities aimed at registering new voters and engaging first-time voters, not encouraging voters who had decided, as a result of the challenged redistricting plans, to stop voting. *See Tenth St. Residential Ass'n* , 968 F.3d  at  500.  The new activities require FIEL to expend resources to the detriment of FIEL and FIEL's mission.  *See Fowler*, 178 F.3d at 360.

122.    The challenged redistricting plans have therefore directly and concretely impeded FIEL's get out the vote outreach activities, with a "consequent drain on the organization's resources."  *See Havens*, 455 U.S. at 379; *City of Kyle*, 626 F.3d at 238.

123.    FIEL's get out the vote activities in response to the challenged redistricting plans "perceptibly impair[]" FIEL's other community outreach activities because FIEL must redirect its resources toward voter education about the importance of voting.  *OCA-Greater Houston*, 867 F.3d at 612 n.29 (quoting *Havens*, 455 U.S. at 379).  Absent the challenged redistricting plans, the same level of repeat voter interaction and voter reassurance would not be required.  And because FIEL must consequently divert its resources, FIEL reaches fewer people through its routine get out the vote outreach activities.  *Id*.

   a.  <u>TALAS Organizational Standing</u>

124.  Plaintiff   TEXAS   ASSOCIATION   OF   LATINO   ADMINISTRATORS   AND SUPERINTENDENTS ("TALAS") is a non-profit membership organization that advocates for Latino learners' and leaders' growth and advancement in Texas.  TALAS' mission is to provide leadership development, collective impact, advocacy and a proactive voice for Latino and non-Latino leaders passionate about serving the fastest-growing student population in Texas.  TALAS is headquartered in Austin, Texas, and it is organized under Texas law.

TALAS's mission includes achieving full and effective political participation by Latinos. Promoting civic participation of Latinos—including voting—and ensuring that Latinos cast effective votes is critical to fulfilling TALAS's mission because political participation by Latinos secures TALAS's public policy goals.   To promote civic engagement in the communities it serves and to expand Latino political influence, TALAS's members conduct membership meetings; participate in issue-focused advocacy; campaign to support or oppose nonpartisan ballot measures; connect members to legislative updates as well as research studies related to the advancement of the Latino population in Texas public schools.

125.    Plans H2316, S2168, C2193 and E2106 will force TALAS to divert resources from its research and education activities, which are central to its mission, and spend new resources in order to counteract the negative effects of the challenged redistricting plans.  Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward).  As a result, fewer Latinos will cast ballots and fewer Latino candidates of choice will win elections, resulting in fewer Latino educational leaders than there otherwise would be, which will harm the ability of TALAS to achieve its policy goals.  Because of the dilution of the Latino vote, Plans H2316, S2168, C2193 and E2106 thwart TALAS's mission to expand Latino leadership and representation.   Thus, TALAS has organizational standing to challenge the new redistricting plans.

   b.  <u>TALAS Associational Standing</u>

126.    TALAS has nearly 200 Texas members who reside all across the state.  TALAS's members

pay dues, elect leadership, serve as the organization's leadership, finance the organization's activities and participate in the organization's efforts. TALAS members include Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their boundaries to reduce Latinos' opportunity to elect their candidates of choice. Thus, TALAS has associational standing to challenge those districts.

127.    One example of the harm to TALAS' membership is TALAS Member A. TALAS Member A lives and votes in the Kessler neighborhood in Dallas. TALAS Member A is a Latino registered voter and plans to vote again in future elections. In the challenged plan, TALAS Member A lives in CD33 which has 42.8% HCVAP and is not a Latino opportunity district. TALAS Member A lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate. One such example of a Latino opportunity district is LULAC Proposed CD37, where TALAS Member A also lives. Because TALAS Member A lives in a district where Latino voters are fractured, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, TALAS Member A's vote is diluted. TALAS Member A is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

128.    Another example of the harm to TALAS' membership is TALAS Member B. TALAS Member B lives and votes in the Green Tee Terrace neighborhood in Pearland. TALAS Member B is a Latino registered voter and plans to vote again in future elections. In the challenged plan, TALAS Member B lives in HD129 which has 22.9% HCVAP and is not a

Latino opportunity district.  TALAS Member B lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed HD129, where TALAS Member B also lives.   Because TALAS Member B lives in a district where Latino voters are fractured, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, TALAS Member B's vote is diluted. TALAS Member B is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

129.    Another example of the harm to TALAS' membership is TALAS Member C.  TALAS Member C lives and votes in El Paso County.  TALAS Member C is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, TALAS Member C lives in Latino majority HD75 which, as described below, is overpopulated compared to Anglo majority House districts in the Panhandle and original Tom Green County (1874).  TALAS Member C lives in an area where House districts can and should be created that are at or closer to the ideal population.  One such example of a fairly populated district is LULAC Proposed HD75, where TALAS Member C also lives.   Because TALAS Member C lives in an overpopulated district, TALAS Member C's vote is diluted.

130.    Another example of the harm to TALAS' membership is TALAS Member D.  TALAS Member D lives and votes in El Paso County.  TALAS Member D is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, TALAS Member D lives in Latino majority HD77 which, as described below, is overpopulated compared to Anglo majority House districts in the Panhandle and original Tom Green County (1874).  TALAS Member D lives in an area where House districts can and should be created that are at or closer

to the ideal population.  One such example of a fairly populated district is LULAC Proposed HD77, where TALAS Member D also lives.  Because TALAS Member D lives in an overpopulated district, TALAS Member D's vote is diluted.

131.    Another example of the harm to TALAS' membership is TALAS Member E.  TALAS Member E lives and votes in El Paso County.  TALAS Member E is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, TALAS Member E lives in Latino majority HD79 which, as described below, is overpopulated compared to Anglo majority House districts in the Panhandle and original Tom Green County (1874).  TALAS Member E lives in an area where House districts can and should be created that are at or closer to the ideal population.  One such example of a fairly populated district is LULAC Proposed HD79, where TALAS Member E also lives.  Because TALAS Member E lives in an overpopulated district, TALAS Member E's vote is diluted.

    a.    PROYECTO AZTECA Organizational Standing

132.    Plaintiff PROYECTO AZTECA is a non-profit self-help construction company located in San Juan, TX and serves low-income families in colonias and other rural areas in Hidalgo County.  PROYECTO AZTECA does not have members.  PROYECTO AZTECA's mission is to build a more equitable society through affordable and decent homeownership for the families it serves.  PROYECTO AZTECA's mission also includes helping the families it serves increase their civic participation, including by voting.  PROYECTO AZTECA's mission includes achieving full and effective political participation by Latinos.  Promoting civic participation of Latinos—including voting—and ensuring that Latinos cast effective votes is critical to fulfilling PROYECTO AZTECA's mission because political participation by Latinos secures PROYECTO AZTECA's public policy goals.  To effectuate its mission,

PROYECTO AZTECA offers a variety of programs to respond to the housing crisis in Texas' Rio Grande Valley, and has helped to finance and train close to 1,000 families in the construction and first-time ownership of their own homes in over 150 colonias and rural areas. Additionally, PROYECTO AZTECA engages in GOTV efforts, including by phone banking and canvassing families on where to vote and how to cast ballots, and it offers educational opportunities for those families on how to advocate on issues that implicate their home ownership. PROYECTO AZTECA also hosts community roundtables with candidates who are running for office, allowing the families it serves to engage with those candidates on matters such as education, housing, and health care. Further, PROYECTO AZTECA hosts know-your-rights events for the families it serves. PROYECTO AZTECA conducts its activities with, among others, Texas Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those individuals reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice.

133.    Many of PROYECTO AZTECA's clients are voters who currently live in enacted CD15 and lived in benchmark CD15 or CD 34 where they had the opportunity to elect, and did elect, their preferred candidates.

134.    As part of its work, PROYECTO AZTECA assists families in applying for FEMA benefits following wind and storm damage to their homes, such as when a tornado hit the neighborhood of Laguna Heights in Cameron County in May 2023. Frequently, PROYECTO AZTECA works to connect families to their congresspersons for help during the FEMA application process. Many FEMA applications experience delays in processing

68

and assistance from one's member of Congress is an invaluable resource to a homeowner who needs FEMA aid.

135.    PROYECTO AZTECA also assists individuals who are applying for U.S. passports.  U.S. passports are vital to local residents who frequently cross the U.S.-Mexico border for shopping and to visit relatives.  PROYECTO AZTECA also helps clients obtain U.S. passports to use as a second form of identification in home mortgage applications.  When U.S. passport applications are stalled, PROYECTO AZTECA works to connect clients to their congresspersons to help move the U.S. passport application forward.

136.    However, some PROYECTO AZTECA clients in enacted CD15 have complained to PROYECTO AZTECA that they experienced difficulty receiving constituent services from their U.S. representative with respect to pending U.S. passport applications and FEMA applications.

137.    PROYECTO AZTECA clients explain that, unlike their previous U.S. representative, their U.S. representative in enacted CD15 does not send staff into their colonias to provide constituent services to residents.

138.    Now, to assist families in enacted CD15 who experience difficulty in obtaining constituent services from their U.S. representative regarding their pending FEMA applications and U.S. passport applications, PROYECTO AZTECA must devote resources to tasks that are different from PROYECTO AZTECA's routine activities.  Rather than simply connecting a client in CD15 to a responsive U.S. representative to obtain constituent services, PROYECTO AZTECA must now devote significantly more time to assisting the client in obtaining constituent services.  PROYECTO AZTECA must make additional phone calls to the CD15 district office on behalf of the client, send emails to the representative's staff, and

accompany the client to the district office to obtain constituent services regarding the client's pending FEMA applications and U.S. passport applications.   Without the challenged redistricting plans, these additional efforts by PROYECTO AZTECA would not be required.  *See OCA-Greater Houston*, 867 F.3d at 612.

139.   These new activities detract from PROYECTO AZTECA's routine activities.  *See Louisiana ACORN Fair Housing v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000); *City of Kyle*, 626 F.3d at 238; *Tenth St. Residential Ass'n*, 968 F.3d at 500.  When PROYECTO AZTECA staff spends time assisting clients in securing constituent services from their less responsive congressperson in enacted CD15, that staff is not performing the grant writing activities necessary to acquire funding for PROYECTO AZTECA to build more houses.  As a result, PROYECTO AZTECA is building fewer houses than it had prior to the enactment of the challenged redistricting plans.

140.   The challenged redistricting plans have directly and concretely impeded PROYECTO AZTECA's grant writing, which has resulted in decreased funding.  PROYECTO AZTECA needs these funds to fulfill its mission of building affordable and decent homes for the families it serves.  Thus, the challenged redistricting plans have resulted in a "consequent drain on [PROYECTO AZTECA's] resources."  *See Havens*, 455 U.S. at 379; *City of Kyle*, 626 F.3d at 238; *OCA-Greater Houston*, 867 F.3d at 612.

141.   PROYECTO AZTECA has undertaken its new activities assisting clients in obtaining constituent services directly in response to the challenged redistricting plans because PROYECTO AZTECA's clients have asked for and need this assistance. *See City of Kyle*, 626 F.3d at 238.  PROYECTO AZTECA provides assistance to client families in enacted CD 15 experiencing difficulty obtaining constituent services from their U.S. representatives to

"mitigat[e] [the challenged plan's] real-world impact" on PROYECTO AZTECA's client families.  *OCA-Greater Houston*, 867 F.3d at 612.

142.    PROYECTO AZTECA also receives complaints from clients who live in enacted CD15 and have told PROYECTO AZTECA that they now live in a district in which they can no longer elect the  U.S. representative of their choice.  In addition, PROYECTO AZTECA clients who remained in CD15 in the new redistricting plan report concerns that they lost their congressperson of choice because he moved into and ran for office in CD34 in 2022, as a direct result of redistricting.

143.    PROYECTO AZTECA's clients who live in CD15 have also told PROYECTO AZTECA staff that the clients no longer intended to vote because voting would be a waste of time.  These clients also complain that their votes made no difference and their voices are not heard.

144.    In response, PROYECTO AZTECA has been required to hire a consultant to reevaluate PROYECTO AZTECA's get out the vote strategies—including in enacted CD15—in order to overcome voters' frustrations about their diminished influence in elections as a result of the challenged redistricting plans.  *See City of Kyle*, 626 F.3d at 238.  PROYECTO AZTECA would not have hired a consultant to reevaluate its get out the vote strategies if not for the challenged redistricting plans.  *See OCA-Greater Houston*, 867 F.3d at 612.  PROYECTO AZTECA hired the consultant *to counteract the effects* of the challenged redistricting.  *See Fowler*, 178 F.3d at 360 ("[A]n organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices."); *see also Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014); *OCA-Greater Houston*, 867 F.3d at 612.

145.    The hiring of the consultant to evaluate get out the vote strategies in response to the

71

challenged redistricting plans forces PROYECTO AZTECA to expend resources that otherwise would have been spent elsewhere.  Specifically, PROYECTO AZTECA would have spent this money on hiring a consultant to assess and make more effective its grant writing and fundraising program.  PROYECTO AZTECA's resources would not have been spent on get out the vote and other voter education activities, if not for the challenged redistricting plans. *See OCA-Greater Houston, 867 F.3d* at 612; *Fowler*, 178 F.3d at 361.  The hiring of a consultant to evaluate get out the vote strategies in response to the challenged redistricting plans detracts from PROYECTO AZTECA's routine activities. *See Tenth St. Residential Ass'n* at 500.  Hiring a get out the vote consultant to mitigate the effects of the challenged redistricting plans forces PROYECTO AZTECA to expend resources to PROYECTO AZTECA's detriment and to the detriment of its mission, *Fowler*, 178 F.3d at 361.

a.   <u>RITA Organizational Standing</u>

146.   Plaintiff REFORM IMMIGRATION FOR TEXAS ALLIANCE ("RITA") is a Texas statewide coalition of organizations with individual members working to implement community-led advocacy campaigns that engage directly impacted communities and create policy change at the local, state, and national level. RITA works alongside business, religious, and law enforcement leaders to advance immigration reform.  RITA is headquartered in El Paso, Texas, and works to connect Texas communities to share struggles, hopes, and successes; build capacity within immigrant communities to engage and impact policies; share strategies and resources to educate communities; and impact state and national immigration policy through collaboration with diverse sectors at the local, regional, and national levels.  RITA's mission includes achieving full and effective political participation by Latinos.  Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latinos

cast effective votes, is critical to fulfilling RITA's mission because political participation by Latinos secures RITA's public policy goals.  To promote civic engagement in the communities it serves and to expand Latino political influence, RITA's members and paid staff conduct know-your-rights discussions; participate in issue-focused advocacy; campaign to support or oppose nonpartisan ballot measures through in-person canvassing; connect individual members to social services; and conduct voter registration, education, and non-partisan GOTV.

147.   Plans H2316 and C2193 will force RITA to divert significant resources from its GOTV, voter registration and community education activities, which are central to its mission, in order to counteract the negative effects of the challenged redistricting plan.  RITA has in the past conducted, and in the future will conduct, GOTV activities aimed at increasing the turnout of Latino registered voters with low turnout.  Additionally, RITA has in the past paid, and in the future will pay, employees who, among other duties:  educate voters about upcoming elections; urge the voters to vote; and encourage, offer and deliver assistance to the voters.  Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their preferred candidates, and the reduced influence of Latino voters in the challenged districts and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward).  As a result, RITA must now expend new and significantly more resources to register and turn out Latino voters, particularly those who live in the challenged districts and areas, and who are discouraged by the absence of an equal opportunity to elect their candidate of choice; to do so, RITA must divert time and funding from its community education activities that further its mission, and instead must engage in efforts to convince Latinos to participate, despite the discrimination in the challenged redistricting plans, in elections in which they lack they lack

the opportunity to elect their candidate of choice—which is not a regular activity of RITA. Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, RITA must spend significantly more resources in an attempt to educate Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged redistricting plans. Because of the dilution of the Latino vote, Plan C2193 and Plan H2316 thwart RITA's mission to expand Latino political influence. Thus, RITA has organizational standing to challenge the new redistricting plans.

      b. <u>RITA Associational Standing</u>

148.    The organizations in RITA have members throughout the state. RITA's members register with the organization, hold membership meetings and guide and participate in the organization's efforts. RITA's organizational members have individual members who are Texas Latino registered voters injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latino opportunity to elect their candidates of choice. Thus, RITA has associational standing to challenge those districts.

149.    RITA's members also include Latino registered voters who live in the area of West Texas where, as described below, Defendants overpopulated districts in the newly enacted Texas House plan to favor the interests of voters in areas of the Panhandle and original Tom Green County, Anglo voters and Anglo incumbents over the interests of voters in El Paso and the Upper Rio Grande and Latino voters.

150.    One example of the harm to RITA's membership is RITA Member A, a member of the

Border Network for Human Rights. The Border Network for Human Rights is a member of the RITA coalition.  RITA Member A lives and votes in central Del Rio. RITA Member A is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, RITA Member A lives in CD23 which, as described below, is not a Latino opportunity district. RITA Member A lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed CD23 (C2195), where RITA Member A also lives.  Because RITA Member A lives in a district where Latinos lack the opportunity to elect their candidates of choice, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, RITA Member A's vote is diluted. RITA Member A is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

151.    One example of the harm to RITA's membership is RITA Member B, a member of the Border Network for Human Rights. The Border Network for Human Rights is a member of the RITA coalition.   RITA Member B lives and votes in central Sierra Blanca.  RITA Member B is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, RITA Member B lives in CD23 which, as described below, is not a Latino opportunity district. RITA Member B lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed CD23, where RITA Member B also lives.   Because RITA Member B lives in a district where Latinos lack electoral opportunity, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, RITA Member B's vote is diluted.  RITA Member B is further injured by

the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

152.    One example of the harm to RITA's membership is RITA Member C, a member of the Border Network for Human Rights. The Border Network for Human Rights is a member of the RITA coalition.  RITA Member C lives and votes in north Presidio.  RITA Member C is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, RITA Member C lives in CD23 which, as described below, is not a Latino opportunity district. RITA Member C lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  One such example of a Latino opportunity district is LULAC Proposed CD23, where RITA Member C also lives.  Because RITA Member C lives in a district where Latinos lack electoral opportunity, instead of a Latino majority district that offers the opportunity to elect the Latino preferred candidate, RITA Member C's vote is diluted.  RITA Member C is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

153.    Another example of the harm to RITA's membership is RITA Member D.  RITA Member D lives and votes in El Paso County.  RITA Member D is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, RITA Member D lives in Latino majority HD75 which, as described below, is overpopulated compared to Anglo majority House districts in the Panhandle and original Tom Green County (1874).  RITA Member D lives in an area where House districts can and should be created that are at or closer to the ideal population.  One such example of a fairly populated district is LULAC Proposed HD75, where RITA Member D also lives.  Because RITA Member D lives in an overpopulated district,

RITA Member D's vote is diluted.

     a. <u>WDP Organizational Standing</u>

154.   Plaintiff WORKERS DEFENSE PROJECT ("WDP") is a community-led membership organization fighting the injustices against low-wage, immigrant workers in the construction industry. WDP's mission is to empower low-income workers to achieve fair employment through education, direct services, organizing and strategic partnerships. WDP is organized under Texas law with headquarters in Austin, Texas and offices in Houston and Dallas. WDP's mission includes achieving full and effective political participation by Latinos. Promoting civic participation of Latinos, including voter registration and voting, and ensuring that Latinos cast effective votes, is critical to fulfilling WDP's mission because political participation by Latinos secures WDP's public policy goals. To promote civic engagement in the communities it serves and to expand Latino political influence, WDP's members and paid staff conduct know-your-rights discussions and membership meetings; participate in issue-focused advocacy; campaign to support or oppose nonpartisan ballot measures; connect members to social services; and conduct voter registration, education, and non-partisan GOTV.

155.   Plans H2316, S2168, C2193 and E2106 will force WDP to divert significant resources from its GOTV, voter registration and community education activities, which are central to its mission, in order to counteract the negative effects of the challenged redistricting plans. WDP has in the past conducted, and in the future will conduct, GOTV activities aimed at increasing the turnout of Latino registered voters with low turnout. Additionally, WDP has in the past paid, and will in the future pay, employees who, among other duties: educate voters about upcoming elections; and urge the voters to vote. Because of the reduced number of districts in the new redistricting plans in which Latino voters have the opportunity to elect their preferred

candidates, and the reduced influence of Latino voters in the challenged districts and statewide, many Latinos will be discouraged from voting, and fewer Latinos will register and turn out to vote in the 2022 election (and onward).   As a result, WDP must now expend new and significantly more resources to register and turn out Latino voters, particularly those who live in the challenged districts and areas, and who are discouraged by the absence of an equal opportunity to elect their candidate of choice; and to do so, WDP must divert time and funding from its community education activities that further its mission, and must instead engage in efforts to convince Latinos to participate, despite the discrimination in the challenged redistricting plans, in elections in which they lack the opportunity to elect their candidate of choice—which is not a regular activity of WDP.   Additionally, to counteract the loss of and failure to create opportunity for Latino voters both in the challenged districts and statewide, WDP must spend significantly more resources in an attempt to educate Latino voters about the discrimination and increase Latino voter registration and turnout to overcome the unfair advantage afforded to Anglos in the challenged redistricting plans.   Because of the dilution of the Latino vote, Plans H2316, S2168, C2193 and E2106 thwart WDP's mission to expand Latino political influence.   Thus, WDP has organizational standing to challenge the new redistricting plans.

b. <u>WDP Associational Standing</u>

156.   WDP has registered members throughout Texas.   WDP has regular meetings in which members participate and guide the efforts of the organization.   Members also set the priorities for the organization.   WDP's individual members include Latino registered voters who are injured by Defendants' dilution of Latino voting strength, as those members reside in areas where, as described below, Defendants either could have created additional Latino citizen

voting age majority districts but failed to do so, or weakened districts by manipulating their composition to reduce Latinos' opportunity to elect their candidates of choice. Thus, WDP has associational standing to challenge those districts.

157.    One example of the harm to WDP's membership is WDP Member A. WDP Member A lives and votes in the Charleston Gardens neighborhood in Houston. WDP Member A is a Latino registered voter and plans to vote again in future elections. In the challenged plan, WDP Member A lives in HD140, one of several Latino majority districts in the area that contain more Latino voter population than necessary to elect the candidate of choice. Although the Latino population in this part of Harris County is sufficient to create a new Latino HCVAP majority house district, such as LULAC Proposed HD138, in which WDP Member A would live, as a result of Defendants' redistricting plan, WDP Member A lives in an area where an HCVAP majority district can and should be created that would provide Latino voters the opportunity to elect their preferred candidate. WDP Member A lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate. WDP Member A is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

158.    Another example of the harm to WDP's membership is WDP Member B. WDP Member B lives and votes in the Willow Springs neighborhood in Houston. WDP Member B is a Latino registered voter and plans to vote again in future elections. In the challenged plan, WDP Member B lives in HD140, one of several Latino majority districts in the area that contain more Latino voter population than necessary to elect the candidate of choice. Although the Latino population in this part of Texas is sufficient to create a new Latino HCVAP majority house district, such as LULAC Proposed HD138, in which WDP Member B would live, as a

result of Defendants' redistricting plan, WDP Member B lives in an area where an HCVAP majority district can and should be created that would provide Latino voters the opportunity to elect their preferred candidate.  WDP Member B is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

159.    Another example of the harm to WDP's membership is WDP Member C.  WDP Member C lives and votes in the Franklin Park neighborhood in Austin.  WDP Member C is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, WDP Member C lives in SD21, one of several Latino majority districts in the area that contain more Latino voter population than necessary to elect the candidate of choice.  Although the Latino population in this part of Texas is sufficient to create a new Latino HCVAP majority house district, such as LULAC Proposed SD28, in which WDP Member C would live, as a result of Defendants' redistricting plan, WDP Member C lives in an area where an HCVAP majority district can and should be created that would provide Latino voters the opportunity to elect their preferred candidate.  WDP Member C lives in an area where an HCVAP majority district can and should be created that will provide Latino voters the opportunity to elect their preferred candidate.  WDP Member C is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

160.    Another example of the harm to WDP's membership is WDP Member D.  WDP Member D lives and votes in the Franklin Park neighborhood in Austin.  WDP Member D is a Latino registered voter and plans to vote again in future elections.  In the challenged plan, WDP Member D lives in SD21, one of several Latino majority districts in the area whose configuration prevents the creation of an additional Latino opportunity district.  As a result of Defendants' redistricting plan, WDP Member D lives in an area where an HCVAP majority

district can and should be created that would provide Latino voters the opportunity to elect their preferred candidate. WDP Member D is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

161.    Another example of the harm to WDP's membership is WDP Member E. WDP Member E lives and votes in the Montopolis neighborhood in Austin. WDP Member E is a Latino registered voter and plans to vote again in future elections. In the challenged plan, WDP Member E lives in SD21, one of several Latino majority districts in the area that contain more Latino voter population than necessary to elect the candidate of choice. Although the Latino population in this part of Texas is sufficient to create a new Latino HCVAP majority house district, such as LULAC Proposed SD28, in which WDP Member E would live, as a result of Defendants' redistricting plan, WDP Member E lives in an area where an HCVAP majority district can and should be created that would provide Latino voters the opportunity to elect their preferred candidate. WDP Member E is further injured by the changes in the challenged redistricting plan bearing more heavily on Latino voters than Anglos.

a.    Individual Plaintiffs

162.    Plaintiff Emelda Menendez is Latina and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE. She resides in San Antonio, Texas. In Plans H2316, S2168, C2193 and E2106, Plaintiff E. Menendez resides in Texas House District 120, Senate District 19, Congressional District 28 and ED3. As described below, Defendants manipulated the district boundaries of ED3 with the purpose of reducing Latino voting strength and making it more difficult for Latinos to elect their preferred candidates.

163.    Plaintiff Gilberto Menendez is Latino and a registered voter of Texas who voted in the past

and intends to vote in future elections for state house, state senate, congress and SBOE. He resides in San Antonio, Texas. In Plans H2316, S2168, C2193 and E2106, Plaintiff G. Menendez resides in Texas House District 120, Senate District 19, Congressional District 28 and SBOE District 3. As described below, Defendants manipulated the district boundaries of ED3 with the purpose of reducing Latino voting strength and making it more difficult for Latinos to elect their preferred candidates.

164.    Plaintiff Jose Olivares is Latino and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE. He resides in Corpus Christi, Texas. In Plans H2316, S2168, C2193 and E2106, Plaintiff Olivares resides in Texas House District 32, Senate District 20, and Congressional District 27. Plaintiff Olivares is injured by residing in an area in which Defendants should have created an additional Latino citizen voting age majority congressional district but failed to do so.

165.    Plaintiff Florinda Chavez is Latina and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE. She resides in Austin, Texas. In Plans H2316, S2168, C2193 and E2106, Plaintiff Chavez resides in Texas House District 49, Senate District 21, Congressional District 37 and SBOE District 5. In the benchmark plan, Ms. Chavez lived in an HCVAP majority CD35 in which she had the opportunity to elect the Latino candidate of choice. In the enacted plan, Ms. Chavez lives in CD37, which is not a Latino majority district.

166.    Plaintiff Paulita Sanchez is Latina and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE. She resides in New Braunfels, Texas. In Plans H2316, S2168, C2193 and E2106, Plaintiff Sanchez resides in Texas House District 73, Senate District 25, Congressional District 21 and SBOE

District 10.  Plaintiff Sanchez is injured by residing in an area in which Defendants should have created an additional Latino citizen voting age majority Senate district but failed to do so.

167.   Plaintiff Jo Ann Acevedo is Latina and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE.  She resides in New Braunfels, Texas.   In Plans H2316, S2168, C2193 and E2106, Plaintiff Acevedo resides in Texas House District 73, Senate District 25, Congressional District 21 and SBOE District 10.  Plaintiff Acevedo is injured by residing in an area in which Defendants should have created an additional Latino citizen voting age majority Senate district but failed to do so.

168.   Plaintiff David Lopez is Latino and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE.  He resides in Houston, Texas.  In Plans H2316, S2168, C2193 and E2106, Plaintiff Lopez resides in Texas House District 138, Senate District 17, Congressional District 38 and SBOE District 6. Plaintiff Lopez is injured by residing in an area in which Defendants should have created an additional Latino citizen voting age majority congressional district and SBOE district but failed to do so.

169.   Plaintiff Diana Martinez Alexander is Latina and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE. She resides in Houston, Texas.  In Plans H2316, S2168, C2193 and E2106, Plaintiff  Martinez Alexander resides in Texas House District 138, Senate District 15, Congressional District 38 and SBOE District 6.  Plaintiff Martinez is injured by residing in an area in which Defendants should have created an additional Latino citizen voting age majority congressional district but

failed to do so.

170.    Plaintiff Jeandra Ortiz is Latina and a registered voter of Texas who voted in the past and intends to vote in future elections for state house, state senate, congress and SBOE.  She resides in Manor, Texas.  In Plans H2316, S2168, C2193 and E2106, Plaintiff Ortiz resides in Texas House District 46, Senate District 14, Congressional District 35 and SBOE District 5.  Plaintiff Ortiz is injured by residing in a congressional district, CD35, that is no longer majority Latino citizen voting age population in Plan C2193.

171.    The dilution of Latino voting strength statewide in Plans H2316, S2168, C2193 and E2106 has injured all plaintiffs, including members of plaintiff organizations.  The dilution of Latino voting strength in individual districts in Plans H2316, S2168, C2193 and E2106 has injured plaintiffs who reside and vote in those individual districts, including members of plaintiff organizations.

## IV.    DEFENDANTS

172.    Defendant GREGORY W. ("Greg") ABBOTT is the Governor of Texas, and pursuant to Article IV, Section I of the Texas Constitution, is the chief executive officer of the State of Texas.  He is sued in his official capacity.

173.    Defendant JOHN SCOTT is the Secretary of the State of Texas.  Defendant SCOTT is the State's chief election officer and as such is responsible for overseeing the conduct of elections within the State.  He is sued in his official capacity.

174.    Defendant the STATE OF TEXAS is one of the states of the United States of America. Plaintiffs' claims against Defendant STATE OF TEXAS are limited to those arising under Section 2 of the federal Voting Rights Act of 1965.  *See* 52 U.S.C. §§ 10301 and 10310(e).

## V.    FACTS

**A. Texas's Long History of Discrimination Against Latino Voters**

175.    Federal courts, including the Supreme Court, have recognized Texas's long history of discrimination against Latino voters, including in the area of voting.  *See LULAC v. Perry*, 548 U.S. 399, 439 (2006); *see also Bush v. Vera*, 517 U.S. 952, 981 (1994); *Perez v. Abbott*, 253 F. Supp. 3d 864, 888 (W.D. Tex. 2017); *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 708 (S.D. Tex. 2017).  Indeed, as those courts have noted, "the poll tax, an all-white primary system, and restrictive voter registration time periods are" all part of Texas's "minority voting rights history." *LULAC*, 548 U.S. at 439-40 (quotation omitted); *see also Patino*, 230 F. Supp. 3d at 683.  Those courts have also emphasized that "[t]he political, social, and economic legacy of past discrimination for Latinos in Texas . . . hinders their ability to participate effectively in the political process." *Patino*, 230 F. Supp. 3d at 683.

176.    From as early as 1845, the year of Texas's annexation into the United States, the State has suppressed the political participation of Latinos.  Laws prohibited Texans from using the Spanish language and barred Mexican-Americans from serving as election judges.

177.    Decades later, the 1903 Terrell Election Law imposed a poll tax in the State.  Tellingly, the law's sponsor explained that the law was implemented to close "the flood gates for illegal voting as one person could buy up the Mexican and Negro votes."  The poll tax remained in effect for over sixty years in Texas.

178.    A year later, in 1904, the Texas Democratic Executive Committee established a White Man's Primary Association, requiring members to take the following oath:  "I am a white person and a Democrat."  In 1923, the Texas Legislature passed a white primary law, which stated that "in no event shall a negro be eligible to participate in a Democratic party primary

election held in the State of Texas."  One Texas newspaper declared that the white primary "absolutely eliminates the Mexican vote as a factor in nominating county candidates, though we graciously grant the Mexican the privilege of voting for them afterwards."[4]

179.    After the Supreme Court in *Nixon v. Herndon*, 273 U.S. 536 (1927) struck down Texas's white primary law pursuant to the Fourteenth Amendment, Texas enacted another law that authorized political parties to set their own voter qualifications.  Pursuant to that law, the Texas Democratic Party enacted a rule that only white people could vote in its primary.  The Supreme Court struck down that law in 1932, holding that it violated the Fourteenth Amendment.  *See Nixon v. Condon*, 286 U.S. 73, 89 (1932).

180.    In 1918, Texas enacted a law to eliminate interpreters at the polls, and the following year the State enacted a requirement that election officials communicate only in English at polling places.

181.    After the Supreme Court in *Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966) invalidated the poll tax, the first Senate bill of the first Texas legislative session in 1966 required voters to register annually.  In 1971, a federal court invalidated that requirement, as it had disenfranchised over a million Texans who would otherwise have been permitted to vote. *Beare v. Smith*, 321 F. Supp. 1100, 1108 (S.D. Tex. 1971), *aff'd sub nom.  Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974).

182.    Additionally, in the early 1900s, Texas Rangers discouraged Latinos from voting by actively investigating them and intimidating would-be voters, suggesting that they would imprison those voters if they were illiterate.  The mere presence of armed Rangers at polling stations also intimidated Latino voters.

---

[4] David Montejano, Anglos and Mexicans in the Making of Texas, 1836-1986 at p.144 (1986).

183.    As a result of Texas's discriminatory efforts, only 44.4% of Texas Latinos were registered to vote in 1972, whereas 73.4% of Anglos were registered at that time.  *See Patino*, 239 F. Supp. 3d at 683.

184.    In 1975, Texans testified before Congress regarding the discrimination Latinos that faced in the state.  That testimony highlighted that far more Latinos in the state lived below the poverty line than did Anglos, and Latinos experienced far worse educational opportunities.  Those societal effects, the testimony emphasized, were the result of the many discriminatory practices designed by Texas to exclude Latinos from civic engagement.  The testimony emphasized that Anglos continued to intimidate Latino voters at the polls.  For example, Latinos that had registered to vote were not placed on voting lists, election judges selectively and deliberately invalidated ballots cast by Latinos, and officials refused to aid Latino voters who could not read or speak English.  Further, the testimony highlighted that there were widespread economic threats and coercion by Anglos directed at Latino voters, causing Latinos in Texas to fear economic reprisal by Anglos in the community, which resulted in low voter registration and turn out among Latino voters.  Even law enforcement officials harassed and intimidated Latino voters, making excessive and unnecessary appearances at polling places and at times actually threatening Latino voters.

185.    Texas's history of official discrimination in the election process—stretching back to Reconstruction—led to the State's inclusion as a covered jurisdiction when, on September 25, 1975, Section 5 of the Voting Rights Act of 1965 was amended and extended.  *LULAC*, 548 U.S. at 440.  Since then, the Department of Justice has frequently interposed objections against Texas and its subdivisions pursuant to Section 5.  *See id.*

186.    In 2011, the Texas Legislature enacted what at the time was the nation's strictest voter

identification law.   A federal court concluded that, in light of the social and historical conditions that caused unequal opportunities for Black and Latino voters in Texas compared to Anglo voters, the law produced an impermissible discriminatory effect under the Voting Rights Act.  *Veasey v. Perry*, 71 F. Supp. 3d 627, 698 (S.D. Tex. 2014), *aff'd in part, vacated in part, remanded sub nom.  Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015), *on reh'g en banc*, 830 F.3d 216 (5th Cir. 2016).  As the court noted, and the Fifth Circuit affirmed, the law had not by chance disproportionately affected Black and Latino voters; rather, it had "done so by its interaction with the vestiges of past and current discrimination," resulting in the denial or abridgment of the right to vote based on race, color, or membership in a language minority group.  *Id.*

187.    In every redistricting cycle since 1970, either the U.S. Department of Justice or a federal court has concluded that Texas discriminated against Latino voters in violation of the Voting Rights Act of 1965, including in the most recent redistricting cycle.  *Perez*, 253 F. Supp. 3d at 888; *see also Patino*, 230 F. Supp. 3d at 721.

188.    In the 2011 redistricting cycle, the U.S. District Court for the District of Columbia concluded that Texas had discriminated against Latino and other minority voters with the redistricting plans it enacted in 2011 for the Texas House, Texas Senate, and Congress, emphasizing that Texas had enacted at least the Senate and congressional maps with discriminatory purpose,  and accordingly denied preclearance for all three plans.  *Texas v. United States*, 887 F. Supp. 2d 133, 178 (D.D.C. 2012), *vacated and remanded on other grounds*, 570 U.S. 928 (2013).[5]

---

[5] Although the district court opinion was vacated in light of *Shelby County v. Holder*, 570 U.S. 529 (2013), the Fifth Circuit noted that "the opinion was not vacated on the merits and remains factually relevant as a contemporary example of State-sponsored discrimination based on the finding of a three-judge federal court," *Veasey v. Abbott*, 830 F.3d 216, 257 n.54 (5th Cir. 2016) (en banc).

189.    Texas's long history of discrimination against Latinos in voting was accompanied by public and private discrimination against Latinos throughout the state in the areas of education, employment and public accommodations, including segregated schools, juries, housing, restaurants, parks, swimming pools, movie theaters and cemeteries.   The legacy of this discrimination takes the form of lower socioeconomic status experienced by Texas Latinos, as well as lower rates of registration and voting by Latinos compared to Anglos.   The lower rates of education, personal income and political participation by Latinos occurs in the geographic areas where Plaintiffs complain that Texas diluted Latino voting strength in its 2021 statewide redistricting plans:  El Paso and West Texas, South Texas, Central Texas, Harris County and the DFW Metroplex.

**B.  Texas's 2020 House, Senate, Congressional and SBOE Maps**

190.    Texas's congressional and state legislative maps used in the 2020 election were created to remedy findings of minority vote dilution in the previous redistricting cycle.  *See Abbott v. Perez*, 138 S. Ct. 2305, 2316–17, 2330 (2018).

191.    In 2011, Texas enacted Texas House, Senate and SBOE redistricting plans during the 82nd Legislature's regular session.  In a subsequent special session that same year, the Legislature adopted a congressional redistricting plan.   At that time, Texas was required to obtain preclearance under Section 5 of the Voting Rights Act of 1965 before it could implement its redistricting plans; only the enacted SBOE redistricting plan received preclearance and went into effect for the 2012 election.

192.    When Texas failed to secure preclearance for its House, Senate and congressional redistricting plans, the *Perez* court created interim maps for the 2012 election.  In those maps, the *Perez* court redrew certain districts pursuant to instructions from the U.S. Supreme Court.

Both the congressional and Texas House court-drawn redistricting plans departed significantly from the State's 2011 plans and changed at least 8 of the 36 congressional districts and 21 districts in the plan for the Texas House. *Id.* at 2316. In 2017, following trial, the *Perez* court concluded that the State-enacted 2011 State House and congressional plans unlawfully diluted minority voting strength and intentionally discriminated against minority voters. *Perez v. Abbott*, 250 F. Supp. 3d 123, 218-19 (W.D. Tex. 2017); *Perez v. Abbott*, 253 F. Supp. 3d 864, 972 (W.D. Tex. 2017). Texas did not appeal those rulings.

193.     In 2013, Texas enacted the *Perez* court's interim remedial plans, with some changes to the Texas House plan. Following another trial, the *Perez* court concluded that one of those changes by Texas, to House District 90, was an unconstitutional racial gerrymander. The U.S. Supreme Court affirmed that ruling, *id.* at 2334–35, and the *Perez* court redrew House District 90 in May 2019 to remedy the constitutional violation.

194.     Thus, as recently as 2019, a federal court redrew Texas district boundaries to cure racial discrimination. Nevertheless, history repeated itself in the Texas Legislature in 2021.

**C. Results of the 2020 Census**

195.     On March 12, 2020, the U.S. Census Bureau commenced the 2020 Census. The following day, President Donald J. Trump declared the global pandemic COVID-19 a national emergency. As a result of the COVID-19 pandemic, the Census Bureau suspended field operations until July 2020. Despite U.S. Commerce Department Secretary Wilbur Ross's initial support of an extension, the Census Bureau ended its door-to-door operations on October 15, 2020.

196.     On April 26, 2021, the U.S. Secretary of Commerce delivered the 2020 Census state population counts to the President for the purpose of apportioning the seats in the U.S. House

of Representatives.[6]

197.   On August 12, 2021, the U.S. Secretary of Commerce published the Texas redistricting data file.[7]

198.   The redistricting data revealed that the Texas House, Senate, congressional and SBOE districts used in the 2020 election needed to be redrawn.

199.   According to the 2020 Census, the total population of Texas is 29,145,505.  That figure represents a significant increase from a decade ago, when the 2010 Census reported a total population of 25,145,561.  Texas experienced the third-largest percent increase in population of any state in the United States, and it is the only state to gain two congressional seats in the 2020 congressional apportionment.  Beginning with the 2022 election, Texas voters will elect 38 members to the United States House of Representatives.

200.   According to the 2020 Census, the Latino population of Texas is 11,441,717.  Latinos constitute 50% of the total population growth in Texas between 2010 and 2020.  Latinos are now 39.3% of Texas's population, and Anglos are now 39.7% of the state's population (a decrease from 45.3% a decade ago).  The Latino citizen voting age population of Texas is 29.9% of the total citizen voting age population.

201.   The pattern of strong Latino population growth relative to Anglo population growth was consistent across the state.  For example, in Bexar County, the Latino population increased by 184,000, and the Anglo population increased by only 16,609; in Dallas County, the Latino

---

[6] U.S. Census Bureau, "2020 Census Apportionment Results Delivered to the President," available at https://www.census.gov/newsroom/press-releases/2021/2020-census-apportionment-results.html (last visited Oct. 14, 2021).

[7] U.S. Census Bureau, "2020 Census Statistics Highlight Local Population Changes and Nation's Racial and Ethnic Diversity- U.S. Census Bureau Delivers Data for States to Begin Redistricting Efforts," available at https://www.census.gov/newsroom/press-releases/2021/population-changes-nations-diversity.html (last visited Oct. 14, 2021).

population increased by 151,895, and the Anglo population decreased by 59,706; and in Harris County, the Latino population increased by 363,169, and the Anglo population decreased by 40,053.

202.    In the new redistricting maps, the ideal population is: 194,303 for a State House district; 940,178 for a State Senate district; 766,987 for a congressional district; and 1,943,034 for an SBOE district.

**D. The Legislature adopts new redistricting plans during a special session called by Defendant Abbott.**

203.    The Texas Legislature convened its 87th Regular Session on January 12, 2021, and adjourned *sine die* on May 31, 2021.  The Legislature did not enact redistricting plans during this time because the Census Bureau had not yet released the redistricting data file for Texas.

204.    The U.S. Secretary of Commerce published the redistricting data file for Texas on August 12, 2021, more than ten weeks after the close of the Legislature's 87th Regular Session.

205.    On August 31, 2021, in its second special session, the 87th Texas Legislature passed Senate Bill 1, a controversial new law that prohibits certain voting methods adopted during the COVID-19 pandemic (such as 24-hour and drive-thru voting), restricts assistance to limited English proficient and disabled voters, and prohibits certain assistance to mail voters.

206.    On September 7, 2021, Defendant Abbott announced a third special session of the 87th Texas Legislature to address redistricting.  The third special session began on September 20, 2021.

207.    Shortly before the special session on redistricting commenced, on September 16, 2021, Lieutenant Governor Dan Patrick, speaking on a national news broadcast, espoused the Great Replacement theory, a white supremacist tenet that holds that the government seeks to replace Anglos with people of color.  More specifically, Lieutenant Governor Patrick stated that "a

revolution has begun," elaborating that Latino migrants who arrived at the border, "[a]t least in 18 years, even if they all don't become citizens before then and can vote, in 18 years every one of them has two or three children, you're talking about millions and millions and millions of new voters, and they will thank the Democrats and Biden for bringing them here." Lieutenant Governor Patrick added, "Who do you think they are going to vote for?  So this is trying to take over our country without firing a shot.  That is what is happening . . . [T]his is denying us our government that's run by our citizens with illegals who are here, who are gonna take our education, our healthcare."[8]

208.   Following a highly compressed legislative process characterized by departures from normal procedure and substantive considerations, on October 15 and 16, 2021, the Legislature adopted redistricting plans for the Texas House (Plan H2316), Senate (Plan S2168) and SBOE (Plan E2106); on October 18, 2021, the Legislature adopted a redistricting plan for Congress (Plan C2193).  On October 25, 2021, Defendant Abbott signed the redistricting plans that adopted the Texas House, Texas Senate, Congress, and the Texas SBOE.

**E. Legislative History of the Challenged Plans.**

**1. Texas House Plan**

209.   On September 30, 2021, Texas Representative Todd Hunter filed House Bill 1, a redistricting plan for the Texas House.  The presiding officer referred the bill to the House Redistricting Committee the same day.[9]

210.   After the committee held a public hearing on House Bill 1 on October 4, 2021, the next

---

[8] Justin Baragona, *The Daily Beast*, "Texas Lt. Guv spews racist 'Great Replacement' theory on Fox:  'A revolution has begun,'" available at https://www.thedailybeast.com/texas-lt-gov-dan-patrick-spews-racist-great-replacement-theory-on-fox-news (Sept. 17, 2021).

[9] The House Redistricting Committee is also referred to as the "House Committee on Redistricting."

day Representative Hunter introduced a committee substitute for the bill, and the committee voted out the bill the same day.  The committee did not hold a hearing on the substitute bill before voting it out of committee; as a result, there was no opportunity for public testimony on the substitute bill.

211.    On October 12, 2021, the full House heard House Bill 1 on second reading.  On October 13, 2021, the Texas House passed House Bill 1 on the third reading and reported the bill to the Senate.  On October 15, 2021, the Senate Special Committee on Redistricting held a public hearing on House Bill 1 and voted the bill out of committee.  The full Senate passed House Bill 1 that same day and adopted Plan H2316.

**2. Texas Senate and SBOE Plans**

212.    On September 18, 2021, Texas Senator Joan Huffman filed Senate Bill 4, a redistricting plan for the Texas Senate.

213.    On September 20, 2021, Senator Huffman filed Senate Bill 7, a redistricting plan for the SBOE.  That same day, the Lieutenant Governor referred Senate Bills 4 and 7 to the Senate Special Committee on Redistricting, and the committee issued a hearing notice for both bills for September 24, 2021.

214.    However, the evening before the committee held its hearing, Senator Huffman filed a committee substitute for Senate Bill 4.  As a result, most witnesses were deprived of the opportunity to analyze the committee substitute and modify their testimony before the hearing the following day.

215.    On September 24 and 25, 2021, the Senate Special Committee on Redistricting held a public hearing on both bills.  The committee voted out both bills on September 28, 2021.

216.    On October 4, 2021, the Texas Senate passed both bills.

217.     On October 11, 2021, the House Redistricting Committee held a public hearing on both

bills, and that same day, the committee voted out both bills.   On October 15, 2021, the full

House passed Senate Bills 4 and 7, adopting Plans S2168 and E2106, respectively.

**3. Congressional Plan**

218.     On September 27, 2021, Senator Huffman filed Senate Bill 6, a redistricting plan for

congressional districts, and the Lieutenant Governor referred the bill to the Senate Special

Committee on Redistricting.

219.     On September 30, 2021, the Senate Special Committee on Redistricting held a public

hearing on Senate Bill 6 and left it pending.  On October 4, 2021, the Senate Special Committee

on Redistricting held a public hearing on committee amendments for Senate Bill 6 and voted

out a committee substitute. On October 8, 2021, the full Senate passed Senate Bill 6.  That

same day, the House received the bill, and the presiding officer referred it to the House

Redistricting Committee.

220.     On October 13, 2021, the House Redistricting Committee held a public hearing on the bill

and voted it out.

221.     On October 16, 2021, the full House adopted several amendments to Senate Bill 6 and

passed the bill on the second reading.

222.     On October 17, 2021, the House passed the amended version of Senate Bill 6 on the third

reading, and the Senate refused to concur with the amendments.  That same day, Senate Bill 6

was referred to a conference committee, and the Senate and House appointed conferees.

223.     On October 18, 2021, the Legislature adopted Plan C2193.

**F. The Legislature departed from its normal procedures and normal substantive
considerations during redistricting.**

224.     The 87th Texas Legislature's adoption of Plans H2316, S2168, C2193 and E2106 included

departures from normal procedures and departures from normal substantive considerations in redistricting.

225.    For example, both the Texas House Redistricting Committee and the Senate Special Committee on Redistricting offered little advance notice of their hearings on the redistricting bills.  On the night before the Senate Special Committee on Redistricting's hearing on the proposed Senate map, Senator Huffman, the Senate Redistricting Committee Chair, released a committee substitute for Senate Bill 4, and the next day the committee held a hearing on the committee substitute.  On October 4 the Senate voted to suspend the printing rule for the Senate and SBOE plans. The printing rule guarantees that every Senator will receive a paper copy of the bill on their desk to allow for review of the bill. The Senate passed the Senate and SBOE plans on second and third readings the same day the printing rule was suspended. The House Redistricting Committee held a public hearing on the Texas House redistricting map on October 4, 2021 but on October 5, 2021, Representative Hunter, the House Redistricting Committee Chair, introduced a committee substitute for House Bill 1 and took no public testimony.  The committee voted out the committee substitute within 15 minutes.  On October 12, 2021, the House Redistricting Committee provided only 24-hour notice for a public hearing on the proposed congressional redistricting map and allowed only 12 hours for the public to register for virtual testimony.

226.    The House Redistricting Committee did not provide interpreters to assist non-English speaking witnesses who wished or registered to testify at any of the House Redistricting Committee hearings. Those witnesses that needed interpreter assistance had to find their own interpreter to assist them with testimony to the Committee. Chairman Hunter also did not allow for expert witnesses to testify as invited testimony at any of the public hearings, despite a joint

letter to Chairman Hunter from republican and democratic members to allow for this type of testimony. On October 16, 2021, the full House adopted several amendments to the proposed congressional redistricting map and provided no opportunity for public input on the amendments.

227.    Statements from the House and Senate committee chairs reveal departures from the normal and required substantive standards during the redistricting process.  For example, Senator Joan Huffman, who authored the State Senate and SBOE maps and chairs the Senate Redistricting Committee, told lawmakers and the public that the maps were "drawn blind to race."[10]

228.    Similarly, State Representative Todd Hunter, who authored the State House map and chairs the House Redistricting Committee, told lawmakers and the public that the House map created and evaluated majority-minority districts based on voting age population, instead of citizen voting age population, because citizen voting age population data is "not the same [as those] based on census numbers."[11]

229.    These statements by the House and Senate committee chairs constitute significant departures from normal substantive considerations because, in previous redistricting cycles, bill sponsors, redistricting committee chairs and other members of legislative leadership acknowledged the need to examine citizen voting age population, as well as the impact of boundary changes on voters of different races, as integral to the redistricting process and compliance with the federal Voting Rights Act.

---

[10] Acacia Coronado, *Associated Press*, "Texas GOP advances new maps that would tighten slipping grip," available at https://apnews.com/article/austin-texas-race-and-ethnicity-racial-injustice-elections-4a40e921b8cec9449e24ed5adc637d87 (Oct. 17, 2021).

[11] Cassandra Pollock, *Texas Tribune*, "Texas House committee advances proposed map for lower chamber," available at https://www.texastribune.org/2021/10/05/texas-house-redistricting-committee-map/ (Oct. 5, 2021).

230.     Throughout the process, members of the Legislature, civil rights advocates and community members warned the legislative leadership that the proposed plans violated minority voting rights, but the Legislature did not accept amendments that would cure the identified deficiencies.

**1. Texas House Plan**

231.     During its hearing on October 4, 2021, the Texas House Redistricting Committee failed to allow any invited testimony, which provides an opportunity for a legislative committee to hear from subject matter experts.  Additionally, at the beginning of the hearing, Committee Chair Representative Todd Hunter announced that the committee would vote the bill out at the end of the hearing, which foreclosed any possibility that the committee would reevaluate the plan or make changes based on witness testimony.

232.     Chair Hunter also limited his bill layout for House Bill 1 to one hour and did not allow committee members to ask him questions during the bill layout.  Instead, Chair Hunter told committee members that they could submit written questions to him and that he would respond to them either after the hearing or on the House floor.

233.     On October 5, 2021, the House Redistricting Committee reconvened for 15 minutes.  During that time, Chair Hunter introduced a committee substitute for House Bill 1 but did not allow any testimony.  The committee voted out the substitute bill at the end of the hearing.

234.     On October 13, 2021, the House passed House Bill 1.  The House sent the bill to the Senate that same day, and the Lieutenant Governor referred the bill to the Senate Special Committee on Redistricting.  On October 15, 2021, the Senate Special Committee on Redistricting held a public hearing on House Bill 1.  The hearing lasted less than one hour, and the committee voted out the bill at the end of the hearing.

235.    The Senate then suspended a rule for the regular order of business, voting out House Bill 1 the same day.

**2. Texas Senate and SBOE Plans**

236.    On September 20, 2021, the Senate Special Committee on Redistricting issued a hearing notice for Senate Bills 4 and 7, setting a hearing on both bills for September 24, 2021.

237.    Senator Huffman filed a substitute for Senate Bill 4 on September 23, 2021, the night before the hearing.

238.    On September 24 and 25, 2021, the Senate Special Committee on Redistricting held a public hearing on Senate Bill 7 and the committee substitute for Senate Bill 4.  The committee voted out both bills on September 28, 2021.

239.    On October 4, 2021, the full Senate voted to suspend the printing rule for Senate Bills 4 and 7.  That same day, the Senate passed both bills on the second and third readings.

240.    On October 11, 2021, the House Redistricting Committee held a public hearing on Senate Bills 4 and 7.  The committee did not allow for invited testimony on either bill during the hearing, and Committee Chair Hunter limited his bill layout time for each bill to 30 minutes. At the beginning of the hearing, Chair Hunter announced that the committee would vote out both bills at the end of the hearing, and any introduced committee amendments would occur during the hearing.  That same day, the committee voted out both bills.

241.    Chair Hunter's announcements changed normal procedure.  Typically, committees do not hear and vote on bills on the same day, and votes for introduced amendments are set for a later time.  The normal procedure gives the committee members sufficient time to review the amendments before voting on them and the bill.  Thus, because of these changes in procedures, committee members and the public lacked time to review sufficiently the bills and any

proposed amendments.

**3. Congressional Plan**

242.    On October 12, 2021, the House Redistricting Committee issued a notice for a public

hearing on Senate Bill 6, setting the hearing for the very next day.  The committee thus gave

only 24-hours notice of the hearing.  The committee also provided only 12 hours for the public

to register to give virtual testimony at the hearing.

243.    At the public hearing on October 13, 2021, Chair Hunter limited the bill layout to just one

hour.  At the beginning of the hearing, Chair Hunter announced that the committee would vote

out the bill at the end of the hearing and that it would not consider committee amendments

until after public testimony.  The committee did not allow invited testimony.  That same day,

the committee voted out the bill.

**G. The Challenged Map for State House of Representatives (Plan H2316).**

244.    The redistricting plan for the Texas House of Representatives contains 150 districts.

245.    The benchmark House plan included 33 districts with a majority Hispanic citizen voting

age population ("CVAP").

246.    Newly-adopted Plan H2316 reduces the number of Hispanic CVAP majority districts from

33 to 30.

247.    However, the Latino population of Texas is sufficiently numerous and geographically

compact to constitute the majority of the CVAP in at least 35 Texas House districts—or at least

two more Latino opportunity districts than in the benchmark plan and five more than the

enacted Plan H2316.

248.    Thus, at least 35 House districts can be created in Texas that offer Latino voters the

opportunity to elect their candidate of choice.

249.    Despite the dramatic growth of the Latino population in Texas since 2010, the failure of Plan H2316 to create at least three additional Latino citizen voting age majority House districts statewide discriminates against Latino voters both in effect and has the purpose of discriminating against Latinos on the basis of race.

250.    In addition to failing to create new Latino CVAP majority districts where required, redistricters reduced Latino voting strength in four HCVAP majority districts in Plan H2316 such that Latinos either lack the opportunity to elect their candidate of choice or will be unequally burdened in the election process:  HD31, HD37, HD90, and HD118.

251.    Further, Plan H2316 over- and under-populates House districts in El Paso, the Upper Rio Grande, the Panhandle and the area of original Tom Green County purposefully to disadvantage voters on the basis of race and region.

### 1. The Texas Legislature Failed to Create Three Additional Latino Opportunity Districts in Plan H2316.

*a. Additional Latino Opportunity House District in Northwest Harris County*

252.    In Harris County, the Latino population increased by 363,169 over the past decade.  By comparison, the Anglo population in Harris County decreased by 40,053 over that same period.

253.    Within the northwest portion of the county, in the area that includes portions of enacted HD126, HD138, HD139, HD140, HD145, and HD148 (Plan H2316), the Latino population is sufficiently numerous and geographically compact to constitute the majority of the CVAP in at least one additional House district.

254.    The table below shows that there is a sufficient Latino population to create an additional Latino opportunity district, as indicated by the HCVAP figures for each of the districts in Plan H2316 from which the new additional district can be crafted:

| District in Plan H2316 | HCVAP[12] |
|:---:|:---:|
| HD126 | 20.4% |
| HD138 | 27.1% |
| HD139 | 29.0% |
| HD140 | 70.7% |
| HD145 | 54.4% |
| HD148 | 39.4% |

255.   The Latino citizen voting age population in this area is compact and lives in the neighborhoods of Northside / Northline, Hidden Valley and North Houston, among others. Nevertheless Plan H2316 fractures the Latino population and fails to create an additional Latino citizen voting age majority House district in this area.

256.   LULAC Demonstrative District 138 shows one possible version of such a Latino opportunity district:

---

[12] HCVAP figures for districts in Plan H2316 are from the Texas Legislative Council: https://data.capitol.texas.gov/dataset/71af633c-21bf-42cf-ad48-4fe95593a897/resource/f54d7da9-c702-4e0b-a026-ea2e9cef6823/download/planh2316_r119_acs1620_election20g.pdf (last accessed:  June 6, 2022).



257.    LULAC Demonstrative District 138 is more compact than District 148 in Plan H2316.

258.    In this one possible version of such a Latino opportunity district, the HCVAP is 51.5%.

259.    Additionally, Latino voters LULAC Demonstrative District 138 are politically cohesive. Within the geographic area of LULAC Demonstrative District 138, bivariate analysis demonstrates that a large majority of Latino voters support the same candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2018 General - Land Commissioner | Miguel Suazo | 68.4% |
| 2020 General - Supreme Court Place 8 | Gisela Triana | 65.54% |
| 2018 General - Governor | Lupe Valdez | 67.46% |
| 2016 General - Supreme Court Place 5 | Dori Garza | 69.47% |

260.    Further, in Harris County Anglos bloc vote against Latino candidates of choice. Multivariate analysis demonstrates that a large majority of Anglo voters support the candidate who is not preferred by Latino voters, including in the following elections in certain enacted districts that correspond to the proposed new Latino opportunity district in this area.  Because of the existence of minority opportunity districts in the area which are specifically designed to provide minority electoral opportunity, the Anglo bloc vote may not defeat the Latno preferred candidate:

**Enacted HD126 (Plan H2316)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Land Commissioner | Suazo | 26.66% | No |
| 2020 General - Railroad Commissioner | Castaneda | 28.16% | No |

**Enacted HD138 (Plan H2316)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2020 General - Supreme Court | Triana | 21.34% | No |
| 2018 General - Governor | Valdez | 21.14% | No |

**Enacted HD139 (Plan H2316)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2020 General - Railroad Commission | Castaneda | 25.55% | Yes |
| 2018 General - Land Commissioner | Suazo | 23.5% | Yes |

**Enacted HD148 (Plan H2316)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2020 General - Supreme Court | Triana | 26.73% | Yes |
| 2018 General - Governor | Valdez | 38.02% | Yes |

261.    In this area, Anglos vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, or the creation of a remedial minority opportunity district, usually to defeat Latino voters' preferred candidates.

262.    Moreover, the legacy of racial discrimination against Latinos, as described above, has resulted in Latino voters in this area having lower political participation than Anglos. For example, in Harris County, the Latino voter registration rate lags behind the Anglo voter registration rate.

263.    In addition to lower voter registration rates, Latinos in Harris County fare worse than

Anglos in the county along a number of socioeconomic indicators. For example, for every $1.00 of value for a White-owned home in Harris County, Latino-owned homes in Harris County are worth $0.70. Latinos also fare worse than do Whites in Harris County in terms of college graduation rates, median household income and home ownership. The lower socio-economic status of Latinos in Harris County impairs their ability to participate in the electoral process.

264.    The failure to draw an additional Latino majority district in Northwest Harris County in Plan H2316 dilutes Latino voting strength and denies Latinos an equal opportunity to elect their candidates of choice.

**b. Additional Latino Opportunity House District in Southeast Harris County**

265.    Additionally, in southeast Harris County, in the area that includes portions of enacted HD129, HD131, HD144, HD145, and HD147 (Plan H2316), the Latino population is sufficiently numerous and geographically compact to constitute the majority of the CVAP in at least one other additional House district.

266.    The table below shows that there is a sufficiently large Latino population in this area to create an additional Latino opportunity district, as indicated by the HCVAP figures for each of the districts in Plan H2316 from which the new additional district can be crafted:

| District in Plan H2316 | HCVAP |
|---|---|
| HD129 | 22.9% |
| HD131 | 36.5% |
| HD144 | 66.4% |
| HD145 | 54.4% |
| HD147 | 26.4% |

267.    The Latino citizen voting age population in this area is compact and lives in the neighborhoods of Gulfton, Gulfgate Riverview / Pine Valley, Golfcrest / Bellfort / Reveille and Greater Hobby, among others.   Nevertheless Plan H2316 fractures Latino population across the above-mentioned enacted districts and fails to create a Latino citizen voting age majority House district in that area.

268.    LULAC Demonstrative District 129 shows one possible version of such a Latino opportunity district (in thick black outline):



269.    LULAC Demonstrative District 129 is more compact than District 145 in Plan H2316.

270.    In this one possible version of such a Latino opportunity district, the HCVAP is 51.2%

271.    Additionally, Latino voters in this area are politically cohesive.  Within the geographic area of LULAC Demonstrative District 129, bivariate analysis demonstrates that a large majority of Latino voters support the same candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2018 General - Governor | Lupe Valdez | 82.39% |
| 2020 General - Supreme Court Place 8 | Gisela Triana | 66.59% |
| 2018 General - Land Commissioner | Miguel Suazo | 85.62% |

272.    As described above, in Harris County Anglos bloc vote against Latino candidates of choice. In addition, multivariate analysis demonstrates that a large majority of Anglo voters support the candidate who is not preferred by Latino voters, including in the following elections in certain enacted districts that correspond to the proposed new Latino opportunity district in this area.   Because of the existence of minority opportunity districts in the area which are specifically designed to provide minority electoral opportunity, the Anglo bloc vote may not defeat the Latno preferred candidate:

**Enacted HD129 (Plan H2316)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Valdez | 20.05% | No |
| 2018 General - Land Commissioner | Suazo | 23.95% | No |

**Enacted HD131 (Plan H2316)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2020 General - Railroad Commissioner | Castaneda | 42.46% | Yes |
| 2018 General - Land Commissioner | Suazo | 35.19% | Yes |

**Enacted HD144 (Plan H2316)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2020 General - Railroad Commissioner | Castaneda | 15.58% | Yes |
| 2018 General - Governor | Valdez | 16.61% | Yes |

**Enacted HD145 (Plan H2316)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2020 General - Supreme Court | Triana | 48.06% | Yes |
| 2018 General - Land Commissioner | Suazo | 49.83% | Yes |

**Enacted HD147 (Plan H2316)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2020 General - Supreme Court | Triana | 54.13% | Yes |
| 2018 General - Land Commissioner | Suazo | 54.62% | Yes |

273.    In this area, Anglos vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, or the creation of a remedial minority opportunity district, usually to defeat Latino voters' preferred candidates.

274.    Moreover, as described above, the legacy of racial discrimination against Latinos has resulted in Harris County Latino voters in this area having lower political participation than Anglos as well as lower socio-economic status which impairs their ability to participate in the political process.

275.    During the House floor debate on the Harris County State House plan, Representative Anchia complained that "Latino growth in Harris County accounted for the largest portion of the population increase over the entirety of the last decade [and it's] the largest place of Latino growth in the state" but that mapdrawers had lowered Spanish Surname Voter Registration in two existing Latino opportunity districts.

276.    The failure to draw an additional Latino majority district in Southeast Harris County in Plan H2316 dilutes Latino voting strength and denies Latinos an equal opportunity to elect their candidates of choice.

### c. <u>Additional Latino Opportunity House District in Central Texas</u>

277.   The Latino population in Central Texas along the I-35 corridor in Caldwell, Guadalupe, Hays and Travis counties is sufficiently numerous and geographically compact to constitute the majority of Hispanic CVAP in at least one additional House district, in the area that includes enacted HD17, HD44, HD45, HD48, and HD51 (Plan H2316).

278.   The table below shows that there is a sufficiently large Latino population in this area to create an additional Latino opportunity district, as indicated by the HCVAP figures for each of the districts in Plan H2316 from which the new additional district can be crafted:

| District in Plan H2316 | HCVAP |
|:---:|:---:|
| HD17 | 26.7% |
| HD44 | 34.3% |
| HD45 | 38.8% |
| HD48 | 22.5% |
| HD51 | 45.2% |

279.   The Latino citizen voting age population in this area is compact, living primarily in the I-35 corridor between Seguin and Austin, but Plan H2316 fractures Latino population across the above-mentioned enacted districts and fails to create a Latino citizen voting age majority House district in that area.

280.   LULAC Demonstrative District 44 shows one possible version of such a Latino opportunity district (in thick black outline):



281.   LULAC Demonstrative District 44 is as compact or more compact than the average district in the enacted House plan.

282.   In this one possible version of such a Latino opportunity district, the HCVAP is 52.4%

283.   Additionally, Latinos in this area are politically cohesive. Within the geographic area LULAC Demonstrative District 44, bivariate analysis demonstrates that a large majority of Latino voters support the same candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2018 General- Governor | Lupe Valdez | 80.8% |
| 2020 General-Supreme Court | Gisela Triana | 80.76% |
| 2018 General- Land Comm | Miguel Suazo | 77.47% |

284.   Further, in this area Anglos bloc vote against Latino candidates of choice.  Multivariate

analysis demonstrates that a large majority of Anglo voters in portions of this region support the candidate who is not preferred by Latino voters, including in the following elections in certain enacted districts that correspond to the proposed new Latino opportunity district in this area.  Because of the existence of minority opportunity districts in the area, the Anglo bloc vote may not defeat the Latno preferred candidate:

### Enacted HD17 (Plan H2316)

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2020 Supreme Court | Triana | 17.77% | No |
| 2018 General - Land Commissioner | Suazo | 15.77% | No |

### Enacted HD44 (Plan H2316)

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Valdez | 13.45% | No |
| 2018 General - Land Commissioner | Suazo | 9.77% | No |

**Enacted HD45 (Plan H2316)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2020 Supreme Court | Triana | 42.09% | Yes |
| 2018 General - Governor | Valdez | 45.15% | Yes |

**Enacted HD48 (Plan H2316)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2020 General - Railroad Commissioner | Castaneda | 57.13% | Yes |
| 2018 General - Land Commissioner | Suazo | 56.77% | Yes |

**Enacted HD51 (Plan H2316)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Valdez | 80.95% | Yes |
| 2018 General - Land Commissioner | Suazo | 83.91% | Yes |

285.    Moreover, the legacy of racial discrimination against Latinos, as described above, has resulted in Latino voters in this area having lower political participation than Anglos.  For example, in this area, Latino voter registration lags behind Anglo voter registration.

286.    In addition to lower voter registration rates, Latinos in Travis County fare worse than Anglos in the county along a number of socioeconomic indicators.  For example, in Travis County, Latino households are five times more likely than Whites to receive food stamps, Latinos are about half as likely as Whites are to have a bachelor's degree or higher, Latino households earn $0.67 for every $1.00 that White households make, the median value of Latino-owned homes is only $0.70 to every $1 for homes of Whites, and Latinos are more than twice as likely as Whites to lack health insurance.  These socio-economic disparities impede Latino ability to participate in the political process.

287.    During the House floor debate on the State House plan Representative Anchia introduced an amendment that would address several issues and "draw a majority HCVAP district in Travis County" to which Representative Hunter opposed on the basis of pairings. The amendment failed.

288.    The failure to draw an additional Latino majority district in Central Texas in Plan H2316 dilutes Latino voting strength and denies Latinos an equal opportunity to elect their candidates of choice.

## 2. Plan H2316 Weakens Existing Latino CVAP Majority Districts, Such That They No Longer Afford Latinos the Opportunity to Elect Their Preferred Candidate.

### a. House District 31

289.    In the benchmark plan, HD31 extended from Starr County on the U.S. Mexico Border to Atascosa County. HD31's mid-section included Duval, McMullen, and La Salle counties.

290.    Since 2002, Representative Ryan Guillen represented HD31.  In 2020, Guillen defeated an Anglo opponent with 58.4% of the vote. In that election, voting was very polarized; only 8.5% of Anglo voters supported Guillen whereas 75% of Latino voters voted for him.

291.     In the benchmark plan H2100, Latinos in HD31 voted cohesively.  For example, in the 2020 General Election, Latinos in the benchmark version of HD31 gave Texas Supreme Court (Triana) and railroad commissioner (Castañeda) candidates 68.52% and 66.74% of their vote respectively. In the 2018 General Election, Latino voters supported candidates for Land Commissioner (Suazo) and Governor (Valdez) with 75.15% and 70.11% of their vote respectively.

292.    After the 2020 Census, mapdrawers needed to add 18,544 people to HD31 in order to bring the district to the ideal population of 194,303. The addition of Zapata County was sufficient to close the deviation while maintaining Latino voting strength.

293.    However, in crafting Plan H2316, the mapdrawers moved 78,352 people into HD31 and 69,145 out of the district, shifting tens of thousands more constituents than necessary to achieve population equality. For example, the addition of Wilson County to HD31 (population: 49,753) was nearly equivalent to the removal of Atascosa County (population: 48,981) and ended up only adding 772 people of the 18,544 required. Of note, this switch alone decreased the number of registered Latino voters in the district by 5,138 and eligible Latino voters by 6,640.

294.    The addition of Wilson, Karnes, and Zapata counties manipulated the electorate to reduce the number of Latino voters and their turnout. For example, in Zapata County, where Latino voters compose 86.85% of the registered voters, Latino voters cast fewer than half of the ballots

in the 2020 general election at 45.89%. Similarly, in the 2018 general election, Latino voters had a turnout rate of 38.2% compared to the non-Latino rate of 58.66%.

295.    As a result of mapdrawers' changes to HD31, the percent of Latino citizen voting age population in HD31 decreased 77.3% to 66.7%.  The proportion of votes cast by Latinos in HD31 decreased from 68.7% to 56.3%. In numerical terms, votes cast by Latinos in HD31 increased by 603 and votes cast by non-Latinos in HD31 increased by 12,176.

296.    Under the enacted map, it is much harder to elect the Latino candidate of choice. For example, in the 2018 general election for land commissioner, the vote share of the Latino candidate of choice (Suazo) decreased from 50.73 to 42.70 between the benchmark and enacted maps for HD31. Given the high level of racially polarized voting, reducing the proportion of votes cast by Latinos in HD31 from 68.7% to 56.3%, results in Latinos being unable to elect their candidate of choice absent almost perfect cohesion.

297.    Three weeks after Governor Abbott signed the enacted House plan into law, Representative Guillen switched political parties after nearly 20 years as a Democrat.

298.    As demonstrated by the benchmark and enacted configurations of HD31, Latinos are sufficiently numerous and compact to constitute the HCVAP majority in HD31.  LULAC Plaintiffs' demonstrative repaired HD31 similarly demonstrates that Latinos can comprise the majority of CVAP in a district that provides Latino voters the opportunity to elect their preferred candidate.



299.    Also as described above, voting is racially polarized in HD31 (both in the benchmark and

enacted).  LULAC Plaintiffs' demonstrative HD31 similarly contains Latino voters who vote

cohesively in large majorities.  Within the geographic area of the proposed repaired version of

HD31, bivariate analysis demonstrates that a large majority of Latino voters support the same

candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2020 General Supreme Court Seat 8 | Triana | 68.7% |
| 2018 General Governor | Valdez | 72.19% |
| 2018 General - Land Commissioner | Suazo | 69.65% |

300.    Further, Anglos in this area vote sufficiently as a bloc to enable them, in the absence of

special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino

voters' preferred candidates.  Within enacted HD31, multivariate analysis demonstrates that a

118

large majority of Anglo voters support the candidate who is not preferred by Latino voters, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2020 General Supreme Court Seat 8 | Triana | 5.76% |
| 2018 General Governor | Valdez | 4.08% |
| 2018 General - Land Commissioner | Suazo | 4.98% |

301.     The Anglo bloc vote usually overcomes the Latino bloc vote in enacted HD31, such that the Latino candidate of choice loses.  For example, in the 2020 Supreme Court Seat 8 general election race, within enacted HD31, the Latino candidate of choice Gisela Triana loses, receiving only 39.89% of the total vote, as a result of Anglo bloc voting overcoming Latino bloc voting.  In another example, in the 2018 gubernatorial general election in enacted HD31, the Latino candidate of choice Lupe Valdez loses, receiving only 40.2% of the total vote, as a result of Anglo bloc voting overcoming Latino bloc voting.  Thus, in the current districting, Anglos vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.

302.     Further, Plan H2316 fractures the Latino population so that Latino voters are assigned to other districts outside of the enacted version of HD31.

303.     In addition, Latinos in South Texas bear the effects of past discrimination which manifests itself in lower voter registration and turnout among Latinos, including in the Rio Grande Valley of Texas, where HD31 is based, and as described above.  For example, within Starr County, Latinos have a per capita income that is 67% of the per capita income of Anglos in the county.

Latinos in Starr County also experience higher levels of poverty and unemployment than do Anglos in the county.  In Live Oak County, the per capita income disparity is even more stark: whereas Latinos in the county have a per capita income of $13,561, Anglos have a per capita income of $30,744.  Latinos in Live Oak County also experience higher levels of poverty and of limited English proficiency than do Anglos in the county.  These socioeconomic disparities impede Latinos' ability to participate equally in the political process.

304.    During the House floor debate on the State House plan, Representative Anchia introduced an amendment (Plan H2207) that highlighted several areas of concern in CSHB1 and said that the plan draws HD74, HD80, and HD31 so that the Latino constituencies in the majority of South and West Texas would not be able to consistently elect their candidate of their choice. He said, "Further, the current map dilutes voting power for individuals in HD80 and HD31 by pairing heavily Latino counties where there is a significant preference for certain candidates of choice with more Anglo, higher turnout counties that do not support the same candidates." Representative Hunter opposed the amendment on the basis that it broke the county line rule and pairs members despite the fact that the CSHB1 also broke the county line rule and paired members. The amendment failed.

### b. House District 37

305.    In the benchmark, HD37 is wholly contained in Cameron County on the U.S. Mexico Border. HD37 has a long history of electing the Latino candidate of choice.  From 1991 to 2019, Rene Oliveira held the seat for HD37.  In 2018, Alex Dominguez defeated Rene Oliveria in a runoff election.

306.    Newly enacted Plan H2316 draws Willacy County and new portions of Cameron County into HD37.  Adding Willacy County to HD37 brings a large group of Latino voters to the district with historically low voter turnout rates.  After the Legislature enacted H2316 the

incumbent in HD37, Representative Dominguez, announced he would run for a different office.

307.    In the benchmark HD37, Latinos voted cohesively.  For example, in the 2018 general election, Lupe Valdez received 73% of Latino support in her race for Governor.  In the 2018 race for Land Commissioner, Miguel Suazo captured 75% of Latino support.  In the 2020 Supreme Court Seat 8 race, Gisela Triana received 75% of Latino Support.  In the 2020 race for Railroad Commissioner, Chrysta Castaneda received 69% of Latino support.

308.    The 2020 Census showed that HD37 needed 32,426 to meet the new ideal population. Instead of simply adding that population, mapdrawers moved 138,560 people into HD37 and 115,545 out of the district, shifting tens of thousands more constituents than necessary to achieve population equality.

309.    As a result of mapdrawers changes to HD37, the proportion of votes cast by Latinos in HD37 decreased from 74.1% to 65.8%.  In numerical terms, votes cast by Latinos in HD37 in the 2020 general election increased by 3,326 and votes cast by non-Latinos in HD37 increased by 7,438.

310.    As a result of this movement of geography into and out of HD37, Latino preferred candidates receive far fewer votes.  For example, in the benchmark plan, Latino-preferred candidate for the 2018 Supreme Court Seat 8, Grisela Triana, received 62.37% of the vote in HD37, but received only 52.50% of the vote in Plan H2316.  In the 2018 Governor's race, Latino-preferred candidate Lupe Valdez received 58.08% of the vote in benchmark HD118 but only 45.08% of the vote in the benchmark plan.  In the 2018 land commissioner's race, Latino-preferred candidate Miguel Suazo received 60.13% of the vote in benchmark HD37, but received only 48.5% of the vote in enacted HD37.

311.    Accordingly, Plan H2316 no longer affords Latinos in HD37 the opportunity to elect the candidate of their choice.

312.    As demonstrated by the benchmark and enacted configurations of HD37, Latinos are sufficiently numerous and compact to constitute the HCVAP majority in HD37.

313.    In HD37, Latinos are sufficiently numerous and compact to comprise the citizen voting age population majority.   In benchmark HD37, the HCVAP was 85.70%.   In a proposed repaired version of HD37, the HCVAP is 86.6%.   The Latino community in a proposed repaired version of HD37 is compact and lives in Cameron and Willacy County in the Rio Grande Valley.  LULAC Plaintiffs' demonstrative repaired HD37 similarly demonstrates that Latinos can comprise the majority of CVAP in a district that provides Latino voters the opportunity to elect their preferred candidate.



314.    Additionally, Latino voters in this area are politically cohesive.  Within the geographic area of the proposed repaired version of HD37, bivariate analysis demonstrates that a large majority

of Latino voters support the same candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2020 Supreme Court Seat 8 | Triana | 62.82% |
| 2018 Governor | Valdez | 67.96% |
| 2018 General - Land Commissioner | Suazo | 69.65% |

315.    Further, Anglos in this area vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.  Within enacted HD37, multivariate analysis demonstrates that a large majority of Anglo voters support the candidate who is not preferred by Latino voters, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2020 Supreme Court Seat 8 | Triana | 32.46% |
| 2018 Governor | Valdez | 17.94% |
| 2018 General - Land Commissioner | Suazo | 22.8% |

316.    The Anglo bloc vote usually overcomes the Latino bloc vote in enacted HD37, such that the Latino candidate of choice loses.  For example, in the 2018 Governor's Race in enacted HD37, the Latino candidate of choice Lupe Valdez loses, receiving only 45.08% of the total vote, as a result of Anglo bloc voting overcoming Latino bloc voting.  As another example, in the 2018 land commissioner's race, in enacted HD37, the Latino candidate of choice Miguel Suazo loses, receiving only 48.5%% of the total vote, as a result of Anglo bloc voting

overcoming Latino bloc voting.  Thus, in the current districting, Anglos vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.

317.    Further, Plan H2316 fractures the Latino population so that Latino voters are assigned to other districts outside of the enacted version of HD37.

318.    Moreover, the legacy of racial discrimination against Latinos, as described above, has resulted in Latino voters in this area having lower political participation than non-Latinos.  For example, although Latino citizens of voting age made up 77.70% of the population in benchmark HD37, Latinos cast only 65.80% of ballots in the district in the 2020 general election because Latino voter registration lags behind Anglo voter registration in this area.

319.    In addition to lower voter registration rates, Latinos in Willacy County fare worse than Anglos in the county along a number of socioeconomic indicators.  In Willacy County, Anglo residents' per capita income ($31,599) is nearly double the per capita income of Latinos. Latino unemployment in Willacy County is more than 4.5 times higher than Anglo unemployment (11.2% vs. 2.5%), and while 88.7% of Anglos in the county graduated from high school, only 67.3% of Latinos did so.

320.    In addition, Latinos in South Texas, including in HD37, bear the effects of past discrimination which manifests itself in lower voter registration and turnout among Latinos.

321.    During the House Redistricting Committee hearing on the State House plan, Representative Guillen, a Latino committee member whose district is in South Texas, offered an amendment on behalf of all of the Rio Grande Valley delegation members. All of the Rio Grande Valley delegation members are Latino. The amendment only affected the districts of the Valley delegation members and all of the delegation members agreed on the amendment. The amendment did not change the minority composition or partisanship of the districts and relied on Hispanic CVAP data. Representative Murr

objected to the amendment despite all of the delegation members' approval. When Representative Anchia asked Representative Murr why he opposed the amendment, Representative Murr said that he did not have to provide a reason. Representative Anchia noted that the Committee adopted, with very little discussion and without objections, amendments from other delegations, including for Collin County. Chairman Hunter and Representative Murr opposed the amendment without additional rationale. The amendment failed.

322.   During the House floor debate on the State House plan, Representative Lozano, whose district is not in the Rio Grande Valley, introduced an amendment (Plan H2261) that would affect House districts 35, 37, 38, which are three districts in the Rio Grande Valley. He filed the amendment ten minutes before the deadline and did not consult with any of the Representatives for those three districts. Representative Lozano is not a member of the Valley delegation.  Representative Dominguez, the representative for HD37, asked Representative Lozano to consider an hour recess so the Valley delegation could meet with him but Representative Lozano refused. The amendment drew the home of Representative Dominguez out of HD37. Representative Lozano could not point to any testimony during the House Redistricting Committee hearing from Cameron County residents that asked for the changes made in his map and refused to pull down his amendment despite objections from the Rio Grande Valley delegation. The amendment was adopted.

### c. House District 90

323.   HD90 is located in central Tarrant County and currently represented by Ramon Romero, who is Latino.  In recent years, elections in HD90 have been marred by racial tension, and the United States Supreme Court found that the previous iteration of HD90 was an unconstitutional racial gerrymander. *See Abbott v. Perez*, 138 S.Ct. 2305 (2018). The district's previous incumbent, Lon Burnam, had crafted and achieved passage of the racial gerrymander in 2013.

324.    During the 2014 Democratic primary for HD90, which was racially polarized, Burnam's

campaign targeted Romero, his opponent, with racially discriminatory messaging capitalizing

on the district's racial polarization.   For example, Burnam created a Spanish language

telemarketing campaign that claimed Romero's campaign workers were stealing voters' ballots

and Burnam's campaign mailed flyers accusing Romero of collusion with the Latin Kings

criminal gang.   Later on, in 2018, the United States Supreme Court held that the 2013 Texas

district map had been an unconstitutional racial gerrymander.   Romero, who was the Latino-

preferred candidate in the 2014 Democratic primary, defeated Burnam in that primary by 110

votes and ultimately won the general election.

325.    Latinos voted cohesively in the benchmark HD90.   For example, Miguel Suazo was the

Latino-preferred candidate in the 2018 general election for Land Commissioner, and 85% of

Latino voters in HD90 voted for him.   Similarly, Lupe Valdez was the Latino-preferred

candidate in the 2018 general election for Texas Governor, and 86% of the Latino voters cast

their ballots for her.

326.    The 2020 Census showed that the population of HD90 in the benchmark plan was 169,606

people.   To bring HD90 to the ideal population of 194,303, mapdrawers needed to add just

24,697 people to the district.   However, in redrawing HD90, mapdrawers made numerous,

unnecessary population shifts that decreased the proportion of Latino voters in Plan H2316.

327.    For example, mapdrawers removed Sansom Park from the northwest corner of HD90,

shifting 7,083 registered voters and 1,852 Spanish-surnamed registered voters out of the

district.   Meanwhile, HD90 took in 6,594 registered voters from HD93, HD95, and HD96, only

960 of whom had Spanish surnames.   Multiple Texas House members offered amendments

that provided the population increase HD90 needed without making such extraneous changes,

such as Plan H2198 by Representative Chris Turner and Plan H2224 by Representative Rafael Anchia. Both of these plans avoided the unnecessary population shifts present in Plan H2316—such as the removal of Sansom Park from HD90.

328.    In crafting Plan H2316, mapdrawers moved a total of 46,937 people into HD90 and 14,164 people out of the district, shifting tens of thousands more constituents than necessary to achieve population equality. As drawn in Plan H2316, HD90 gained a net of 32,773 people, overpopulating the district by 8,076 people.

329.    By adding areas with disproportionately fewer Latinos to the district, mapdrawers reduced the Spanish surnamed voter registration in HD90 from 50.8% under the benchmark plan to 41.8% under Plan H2316. The changes to HD90, particularly the loss of Latino voting strength and increase in non-Latino voting strength, returns the district to a situation similar to 2013-2014 and makes HD90 vulnerable once again to racially polarized primary elections which threaten the ability of Latino voters to nominate their preferred candidate.

330.    In HD90, Latinos are sufficiently numerous and compact to comprise the citizen voting age population majority. In benchmark HD90, Latinos already constituted a CVAP majority, and LULAC's demonstration of a proposed repaired version of HD90, the HCVAP is 53%. LULAC Plaintiffs' demonstrative repaired HD90 similarly demonstrates that Latinos can comprise the majority of CVAP in a district that provides Latino voters the opportunity to elect their preferred candidate.



331.    Additionally, Latino voters in this area are politically cohesive.  Within the geographic area

of the proposed repaired version of HD90, bivariate analysis demonstrates that a large majority

of Latino voters support the same candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2020 Supreme Court Seat 8 | Triana | 79.74% |
| 2018 General Election - Governor | Valdez | 84.74% |
| 2018 General - Land Commissioner | Suazo | 83.35% |

332.    Further, as demonstrated in the 2014 and 2012 Democratic primary elections for HD90,

non-Latino voters in HD90 voted as a bloc against the Latino-preferred candidate and, in the

absence of special circumstances, such as a Latino candidate running unopposed, will usually

defeat Latino voters' preferred candidates in the enacted district.  Within enacted HD90, multivariate analysis demonstrates that a large majority of Anglo voters support the candidate who is not preferred by Latino voters, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2020 Supreme Court Seat 8 | Triana | 37.73% |
| 2018 Governor | Valdez | 39.25% |
| 2018 General - Land Commissioner | Suazo | 37.1% |

333.    Further, Plan H2316 fractures the Latino population such that Latino voters are assigned to other districts outside of the enacted version of HD90.

334.    Moreover, the legacy of racial discrimination against Latinos, as described above, has resulted in Latino voters in this area having lower political participation than non-Latinos.  For example, in this geographic area, the Latino voter registration rate lags behind the Anglo voter registration rate.

335.    In addition to lower voter registration rates, Latinos in Tarrant County fare worse than Anglos in the counties along a number of socioeconomic indicators.  For example, in Tarrant County, for every $1.00 of value for a White-owned home, Latino-owned homes in the county are worth $0.76.  Latinos also fare worse than do Whites in Tarrant County in terms of college graduation rates, median household income and home ownership.  The lower socio-economic status of Latinos in Tarrant County impairs their ability to participate in the electoral process.

336.    During the House floor debate on the State House plan, Representative Anchia laid out an amendment to strike the enacting clause of the bill and explained that Representative Hunter's map "reduces the Spanish Surname Voter Registration, the Hispanic Voting Age Population, and the Hispanic Citizen Voting Age Population by all three of those metrics at the rate of about 10 percent, respectively, in HD90 in Tarrant County." He went on to say, "I will reiterate just for the record that HD90 was subject to prolonged and successful litigation during the last redistricting cycle during which the United States Supreme Court held that this body intentionally and unconstitutionally discriminated against Latino voters." Representative Hunter informed the members that the amendment would "end the bill" and he later voted against the amendment. The amendment failed.

337.    During the House floor debate on Representative Anchia's amendment Representative Turner asked Representative Anchia if he agrees that it "is a real problem for Latino voters in Tarrant County" that CSHB1 appeared to retrogress the district by lowering the Hispanic CVAP to around 48 percent and the SSVR to around 40 percent. Representative Anchia said, "I do and that's another district that is among the most problematic in this map. Literally, a court in 2017—keep in mind we had multiple iterations of a house map. In 2011, it was found to be intentionally discriminatory. We came back in 2013. There was another lawsuit in 2013 that was decided in, I believe, 2017, and . . . So the court has literally drawn this district, and yet the underlying map retrogresses the Hispanic community, including historic communities of interest, in Tarrant County by reducing the Citizen Voting Age Population and Voting Age Population of District 90."

338.    During the House floor debate on the State House plan, Representative Anchia laid out an amendment (Plan H2224) that identified likely Voting Rights Act and constitutional concerns

in Tarrant County and would have fixed the loss of Latino voting strength in HD90. "[I]t seems inconceivable to once again attack the Latino voters in District 90." Representative Anchia closed with, "So members, this does demonstrate that you can keep performing Latino districts in House District 90 . . . Those districts are protected by Section 2 of the Voting Rights Act and should not have been disturbed by CSHB1 in its current form. Therefore, I ask you to adopt this amendment and preserve those traditionally Hispanic districts so that Latino voters in those districts can elect the candidate of their choice." Representative Hunter opposed the amendment on the basis of pairings. The amendment failed.

339.     During the House floor debate on the State House plan, Representative Chris Turner introduced an amendment (Plan H2198) that only affected Tarrant County and ensured that the district remained above 50 percent HCVAP.  Chairman Hunter voted against the amendment and the amendment failed.

   **d. House District 118**

340.     HD118 is located in south Bexar county.  Historically HD118 elected Latino candidates of choice.  Joe Farias represented HD118 from 2006 to 2015. Farias' resignation in 2015 prompted a special election for HD118.  Representative John Lujan won a special election in 2016 with low voter turnout, garnering 52.4% of only 3,589 votes cast, but later that year, in the general election, Lujan lost to former state Rep. Tomas Uresti.

341.     The resignation of Rep. Leo Pacheco in August 2021 prompted another special election for HD118.  On November 2, 2021 John Lujan won the seat by 286 votes in another low turnout election.

342.     The redistricting plan voted out of the House Redistricting Committee left HD118 largely unchanged and reflected the plan agreed upon by representatives from Bexar County.

However, during the House floor debate, Representative Jacey Jetton of Fort Bend County offered an amendment that reshaped HD 118. The Bexar County delegation consists of ten members; seven of the members are Latino, one is African American, and two are white. The two white members of the Bexar County delegation voted in favor of the amendment and the rest voted against (with the exception of one member, Representative Lujan, who was not present).   Nevertheless, the House adopted Jetton's amendment over the Bexar County members' objection, resulting in the enacted version of HD118.

343.   In the benchmark plan, Latinos voted cohesively in large majorities.  For example, in the 2014 Lieutenant Governor's race, Leticica Van De Putte, received 86.63% of Latino support. In the 2016 election for Supreme Court Seat 7, Gina Benavides received 88.66% of Latino support.  Latino preferred candidates routinely garner more than 75% of the Latino vote in general elections in HD118.

344.   Mapdrawers crafted HD 118 to weaken the district in Plan H2316, with the goal of protecting now-incumbent Rep. John Lujan who is not Latino preferred.   By shifting communities with high-turnout Latino voters out of HD118, and replacing them with communities of low-turnout Latino voters and higher percentages of Anglos voters, Plan H2316 renders ineffective a historically Latino stronghold.

345.   The total population for benchmark HD118 was 185,915 -- a deviation from the new ideal population of only 8,388 people.  Nevertheless, in crafting Plan H2316, mapdrawers moved 59,375 people into HD118 and 42,045 out of the district, shifting almost a hundred thousand more constituents than necessary to achieve population equality.

346.   As a result of map drawers' changes to HD 118, the percentage of HCVAP decreased from 67.5% to 55.9%.  The number of Spanish surname registered voters (SSVR) decreased from

60.40% to 48.50%. Mapdrawers reduced the Latino vote share (SSTO) by 11.8 percentage points, from 55.70% to 43.90%.

347. The Legislature's changes to HD118 echo changes to 117 in the previous redistricting cycle that were found by the court in that case to have been intentionally discriminatory. *Perez v. Abbott*, 250 F. Supp. 3d 123 (W.D. Tex. 2017). In that previous round of redistricting, mapdrawers impermissibly focused on race by moving low-turnout Hispanic voters into HD117. *Id.*

348. As a result of this manipulation, enacted HD118 significantly decreases votes for Latino preferred candidates. For example, in the benchmark plan, Latino-preferred candidate for the 2018 Supreme Court Seat 8, Grisela Triana, received 55.7% of the vote in HD118, but she receives only 49.3% of the vote in Plan H2316. As another example, in the 2018 Governor's race, Latino-preferred candidate, Lupe Valdez received 52.61% of the vote in benchmark HD118, under the benchmark plan but loses under the enacted version, with 45.6% of the vote. In the 2018 land commissioner's race, Latino-preferred candidate Miguel Suazo received 54.13% in benchmark HD118, but loses under the enacted plan with 46.5% of the vote.

349. Accordingly, Plan H2316 no longer affords Latinos in HD118 the opportunity to elect the candidate of their choice.

350. In HD118, Latinos are sufficiently numerous and compact to comprise the citizen voting age population majority. In benchmark HD118, the HCVAP was 67.50%. In a proposed repaired version of HD118, the HCVAP is 71.3%. LULAC Plaintiffs' demonstrative repaired HD118 similarly demonstrates that Latinos can comprise the majority of CVAP in a district that provides Latino voters the opportunity to elect their preferred candidate.



351.   Additionally, Latino voters in this area are politically cohesive.  Within the geographic area

of  the  proposed  repaired  version  of  HD118,  bivariate  analysis  demonstrates  that  a  large

majority of Latino voters support the same candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2020 Supreme Court Seat 8 | Triana | 81.46% |
| 2018 General Election - Governor | Valdez | 80.47% |
| 2018 General - Land Commissioner | Suazo | 82.4% |

352.   Further, Anglos in this area vote sufficiently as a bloc to enable them, in the absence of

special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino

voters' preferred candidates.  Within enacted HD118, multivariate analysis demonstrates that

a large majority of Anglo voters support the candidate who is not preferred by Latino voters, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2020 Supreme Court Seat 8 | Triana | 15.12% |
| 2018 Governor | Valdez | 8.03% |
| 2018 General - Land Commissioner | Suazo | 7.35% |

353.    The Anglo bloc vote usually overcomes the Latino bloc vote in enacted HD118, such that the Latino candidate of choice loses.  For example, in  2018 Supreme Court Seat 8  enacted HD118, the Latino candidate of choice (Grisela Triana) loses, receiving only 49.3% of the total vote, as a result of Anglo bloc voting overcoming Latino bloc voting.  As another example, in the 2018 Governor's race  in enacted HD118, the Latino candidate of choice Lupe Valdez loses, receiving only 45.6% of the total vote, as a result of Anglo bloc voting overcoming Latino bloc voting.  Thus, in the current districting, Anglos vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.

354.    Further, Plan H2316 fractures the Latino population such that Latino voters are assigned to other districts outside of the enacted version of HD118.

355.    Moreover, the legacy of racial discrimination against Latinos, as described above, has resulted in Latino voters in this area having lower political participation than non-Latinos.  For example, although Latino citizens of voting age made up 55.90% of the population in benchmark HD118, Latinos cast only 43.90%% of ballots in the district in the 2020 general

election because Latino voter registration lags behind Anglo voter registration in this area.

356.     In addition, Latinos in Bexar County bear the effects of past discrimination which manifests itself in lower voter registration and turnout among Latinos.  For example, for every $1.00 of value for a White-owned home in Bexar County, Latino-owned homes in  Bexar County are worth $0.66.  Latinos in Bexar County lag behind Whites in percent college graduates, median household income and percent with health insurance.  The socioeconomic disparities experienced by Latinos in Bexar County impede their ability to participate in the political process.

### 3. Plan H2316 over- and under-populates House districts in El Paso, the Upper Rio Grande, original Tom Green County (1874) and the Panhandle purposefully to disadvantage voters on the basis of race and region (*Larios v. Cox*)

357.     Plan H2316 overpopulates districts in El Paso County and the Upper Rio Grande area of West Texas as follows:

HD74 (+8,936)

HD75 (+6,202)

HD77 (+9,618)

HD78 (+9,483)

HD79 (+7,076)

358.     At the same time, in the region of the Texas Panhandle, and extending south to include the area of original Tom Green County (1874), Plan H2316 under-populates districts as follows:

HD69 (-8,785)

HD71 (-2,986)

HD72 (-7,882)

HD81 (-9,633)

136

HD82 (-6,627)

HD83 (-8,334)

HD84 (-6,779)

HD86 (-8,995)

HD87 (-6,855)

HD88 (-8,244)

359.    Defendants' systematic and deliberate over- and under-population of districts in these regions deliberately favors the interests of communities and voters in the Texas Panhandle, and extending south to include the area of original Tom Green County, at the expense of communities and voters in El Paso and the Upper Rio Grande area of West Texas.

360.    Although an overall population deviation of +/-10% is presumptively constitutional, here mappers relied on "illegitimate reapportionment factors." *Harris v. Arizona Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016).  Defendants over- and under-populated districts in these regions purposefully to weaken Latino voting strength, and to protect Anglo incumbents. By overpopulating El Paso County House districts, the drafters of H2316 minimized the number of Latinos voters "spilled" out of El Paso County who could have been combined with other Latinos in South and West Texas to create districts (including HD31) that offered Latnio voters the opportunity to elect their candidate of choice.

361.    There is no numerical or legal reason supporting the population deviations across the House districts identified above.  The crafters of H2316 were required to spill excess population out of El Paso County in any event and legitimate considerations would have led to the creation of effective Latino HCVAP from El Paso to the Gulf Coast.  However, drafters of H2316 chose instead to preserve Anglo incumbencies by under-populating districts to the north and over-

populating House districts in El Paso County and the Upper Rio Grande.

362.    Defendants' over- and under-population of districts in these regions purposefully minimizes Latino voting strength and Latino voters' ability to participate on an equal basis in elections to the State House, both in the specific overpopulated districts and statewide.

363.    During the House floor debate on the State House plan Representative Anchia argued that "this proposal will systematically overpopulate at the higher end of the deviation for El Paso districts, diluting the votes of those individuals[.]"

364.    Within a total (or "top to bottom"[13]) deviation of 9.98%, drafters of H2316 deliberately favored Anglo voters over Latino voters for the purpose of preserving Anglo voting influence and Anglo incumbency, and preventing the creation of House districts in which Latino voters have the opportunity to elect their candidate of choice—even as the rate of Anglo population growth in this part of the state lags behind that of Latino population growth.  The population deviations between the House districts in this region are illegitimate, not supported by any legitimate, consistently applied state policy and are tainted by discrimination.

**H. Plan S2168 Dilutes the Voting Strength of Latinos in Texas.**

365.    The benchmark Senate plan contains 31 Senate districts, seven of which contain a majority Hispanic CVAP.  Plan S2168 maintains the same number of Senate districts that contain a majority Hispanic CVAP.

366.    However, the Latino population of Texas is sufficiently numerous and geographically compact to comprise the majority of the CVAP in at least 9 Senate districts—or at least two additional Latino citizen voting age majority Senate districts compared to the benchmark map.

---

[13] To calculate the "top to bottom deviation" of a plan, courts (1) determine the percentage difference between the population of the largest-populated district and the ideal population for a district, (2) determine the percentage difference between the population of the smallest-populated district and the ideal population for a district, and then (3) add those values together.

367.   Despite the dramatic growth of the Latino population in Texas since 2010, the failure of Plan S2168 to create two additional Latino citizen voting age majority Senate districts statewide discriminates against Latino voters both in effect and with the purpose of discriminating against Latinos on the basis of race.

368.   In addition to failing to create two additional Latino citizen voting age majority districts where required, redistricters reduced Latino voting strength in one HCVAP majority district in Plan S2168 (SD27) such that Latinos will be unequally burdened in the election process.

**1. The Texas Legislature Failed to Create At Least Two Additional Latino Opportunity Districts in Plan S2168.**

**a. Additional Latino Opportunity Senate District in South/Central Texas**

369.   First, in South/Central Texas, between San Antonio and Austin along the I-35 corridor—including the geographic area including portions of Bastrop, Bexar, Caldwell, Comal, Guadalupe, Hays and Travis Counties—the Latino population is sufficiently numerous and geographically compact to constitute the majority of the CVAP in at least one additional Latino majority Senate district, in the area that includes portions of enacted SD5, SD14, SD19, SD21, SD25 and SD26 (Plan S2168).

370.   The table below shows that there is a sufficiently large population of Latinos in this area to create an additional Latino opportunity district, as indicated by the HCVAP figures for each of the districts in Plan S2168 from which the new additional district can be crafted:

| District in Plan S2168 | HCVAP[14] |
|---|---|
| SD5 | 18.8% |
| SD14 | 23.3% |

---

[14] HCVAP figures for districts in Plan S2168 are from the Texas Legislative Council: https://data.capitol.texas.gov/dataset/70836384-f10c-423d-a36e-748d7e000872/resource/7ed63ad0-458a-4182-bd7e-0b61a0b46648/download/plans2168_r119_acs1620_election20g.pdf (last accessed:  June 6, 2022).

| SD19 | 62.8% |
|------|-------|
| SD21 | 61.6% |
| SD25 | 24.4% |
| SD26 | 62.3% |

371.    The Latino citizen voting age population in this area is compact, living primarily in the I-35 corridor between San Antonio and Austin, but is fractured across the above-mentioned enacted districts instead of being included in one district.  As a result, Plan S2168 fails to create an additional Latino citizen voting age majority Senate district in this area.

372.    Plan S2177 displays one possible version of such a Latino majority district (LULAC Demonstrative District 28, in thick black outline):



373.    LULAC Demonstrative District 28 in Plan S2177 is more compact than District 19 in Plan S2168.

374.    In this one possible version of such a Latino opportunity district, the HCVAP is 51.7%.

375.    Additionally, Latinos in this area are politically cohesive.   Within the geographic area of

LULAC Demonstrative District 28, bivariate analysis demonstrates that a large majority of

Latino voters support the same candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2018 General - Governor | Lupe Valdez | 77.73% |
| 2020 General - Supreme Court Place 8 | Gisela Triana | 78.24% |
| 2018 General - Land Commissioner | Miguel Suazo | 82% |

376.    Further, Anglos in this area vote sufficiently as a bloc to enable them, in the absence of

special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino

voters' preferred candidates.   Within the geographic area comprised of these enacted districts,

multivariate analysis demonstrates that a large majority of Anglo voters support the candidate

who is not preferred by Latino voters, including in the following elections in the enacted

districts that correspond to the proposed new Latino opportunity district in this area:

**Enacted SD5 (Plan S2168)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Valdez | 18.34 | No |
| 2018 General - Land Commissioner | Suazo | 18.8 | No |

**Enacted SD14 (Plan S2168)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Valdez | 63.4 | Yes |
| 2018 General - Land Commissioner | Suazo | 60.8 | Yes |

**Enacted SD19 (Plan S2168)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Valdez | 9.48 | Yes |
| 2018 General - Land Commissioner | Suazo | 11.24 | Yes |

**Enacted SD21 (Plan S2168)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Valdez | 42.56 | Yes |
| 2018 General - Land Commissioner | Suazo | 43.03 | Yes |

**Enacted SD25 (Plan S2168)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Valdez | 24.39 | No |
| 2018 General - Land Commissioner | Suazo | 21.95 | No |

**Enacted SD26 (Plan S2168)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Valdez | 25.57 | Yes |
| 2018 General - Land Commissioner | Suazo | 25.37 | Yes |

377.   The Anglo bloc vote overcame the Latino bloc vote in those districts, such that the Latino candidate of choice lost, including in the elections listed in the preceding paragraph.  Thus, within the enacted districts from  which a proposed additional Latino majority district can be created, Anglos vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.

378.   Moreover, the legacy of racial discrimination against Latinos, as described above, has resulted in Latino voters in this area having lower political participation than Anglos.  For

example, in this geographic area, the Latino voter registration rate lags behind the Anglo voter registration rate.

379.     In addition to lower voter registration rates, Latinos in this area fare worse than do Anglos along a number of socioeconomic indicators.  For example, in Bexar County, for every $1.00 of value for a White-owned home, Latino-owned homes in Bexar County are worth $0.66. Latinos also fare worse than do Whites in Bexar County in terms of college graduation rates, median household income and home ownership.  As another example, and as described above, the legacy of racial discrimination against Latinos has resulted in Travis County Latino voters having lower political participation than Anglos as well as lower socio-economic status which impairs their ability to participate in the political process.  The lower socio-economic status of Latinos in the area where a new HCVAP majority senate district can be created impairs their ability to participate in the electoral process.

380.     During the House floor debate on the Senate plan Representative Anchia informed Representative Hunter that publicly submitted maps S2162, S2161 and S2125 demonstrated that it was possible to "draw either one or two additional opportunity districts in the South Texas/Bexar County area."  Although Chairman Hunter agreed that Texas has an obligation to comply with the Voting Rights Act, the Legislature did not create an HCVAP majority district in this area.

381.     The failure to draw an additional Latino majority district in Central Texas in Plan S2168 dilutes Latino voting strength and denies Latinos an equal opportunity to participate in the political process and to elect their candidates of choice.

### b. Additional Latino Opportunity Senate District in Dallas and Tarrant Counties

382.     In the Dallas/Ft. Worth Metroplex, the Latino population is sufficiently numerous and

geographically compact to constitute the majority of the CVAP in at least one additional Latino majority Senate district, in the area that includes portions of enacted SD9, SD10, SD12, SD16, SD22, and SD23 (Plan S2168).

383.   The table below shows that there is a sufficiently large population of Latino voters who live in this area to create an additional Latino opportunity district, as indicated by the HCVAP figures for each of the districts in Plan S2168 from which the new additional district can be crafted:

| District in Plan S2168 | HCVAP |
|:---:|:---:|
| SD9 | 20.6% |
| SD10 | 18.5% |
| SD12 | 13.6% |
| SD16 | 30.0% |
| SD22 | 17.5% |
| SD23 | 24.7% |

384.   The Latino citizen voting age population in this area is compact, living in the neighborhoods and cities of Pleasant Grove, Oak Cliff, Cockrell Hill, Farmers Branch and South Irving in Dallas County and the Northside and Poly neighborhoods in Ft. Worth in Tarrant County.  However, this Latino population is fractured across the above-mentioned enacted districts instead of being included in one district.  Plan S2168 fails to create an additional Latino citizen voting age majority Senate district in this area.

385.   Plan S2177 displays one possible version of such a Latino opportunity district (LULAC Demonstrative District 9, in thick black outline):



386.    The Latino citizen voting age population in this area is compact, living in the neighborhoods and cities of Pleasant Grove, Oak Cliff, Cockrell Hill, Farmers Branch and South Irving in Dallas County and the Northside and Poly neighborhoods in Ft. Worth in Tarrant County, but is fractured across the above-mentioned enacted districts instead of being included in one district.

387.    LULAC Demonstrative District 9 in Plan S2177 encompasses a compact Latino population while also accommodating SD23, a Black opportunity district.

388.    In this one possible version of such a Latino opportunity district, the HCVAP is 50.2%.

389.    Additionally, Latinos in this area are politically cohesive.   Within the geographic area of LULAC Demonstrative District 9, bivariate analysis demonstrates that a large majority of Latino voters support the same candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2020 General - Supreme Court Place 8 | Gisela Triana | 80.01% |
| 2018 General - Land Commissioner | Miguel Suazo | 83.74% |
| 2018 General - Governor | Lupe Valdez | 84.2% |

390.    Further, Anglos in this area vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.  Within the geographic area comprised of these enacted districts, multivariate analysis demonstrates that a large majority of Anglo voters support the candidate who is not preferred by Latino voters, including in the following elections in the enacted districts that correspond to the proposed new Latino opportunity district in this area:

**Enacted SD9 (Plan S2168)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Valdez | 18.74 | No |
| 2018 General - Land Commissioner | Suazo | 19.41 | No |

147

**Enacted SD10 (Plan S2168)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Valdez | 11.68 | No |
| 2018 General - Land Commissioner | Suazo | 11.52 | No |

**Enacted SD12 (Plan S2168)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Valdez | 17.38 | No |
| 2018 General - Land Commissioner | Suazo | 17.57 | No |

**Enacted SD16 (Plan S2168)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Valdez | 34.93 | Yes |
| 2018 General - Land Commissioner | Suazo | 32.7 | Yes |

**Enacted SD22 (Plan S2168)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Valdez | 8.51 | No |
| 2018 General - Land Commissioner | Suazo | 8.52 | No |

**Enacted SD23 (Plan S2168)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Valdez | 41.02 | Yes |
| 2018 General - Land Commissioner | Suazo | 37.81 | Yes |

391.    The Anglo bloc vote overcame the Latino bloc vote in those districts, such that the Latino candidate of choice lost, including in the elections listed in the preceding paragraph.  Thus, within the enacted districts from which a proposed additional Latino majority district can be created, Anglos vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.

392.    Moreover, the legacy of racial discrimination against Latinos, as described above, has resulted in Latino voters in this area having lower political participation than Anglos.  For example, in Dallas and Tarrant Counties, the Latino voter registration rate lags behind the

Anglo voter registration rate.

393.    In addition to lower voter registration rates, Latinos in Dallas and Tarrant Counties fare worse than Anglos in the counties along a number of socioeconomic indicators.  For example, in Dallas County, for every $1.00 of value for a White-owned home, Latino-owned homes in the county are worth $0.58.  Latinos also fare worse than do Whites in Dallas County in terms of college graduation rates, median household income and home ownership.  Similarly, Latinos lag behind Whites in Tarrant County.  For example, in Tarrant County, for every $1.00 of value for a White-owned home, Latino-owned homes in the county are worth $0.76.  Latinos also fare worse than do Whites in Tarrant County in terms of college graduation rates, median household income and home ownership.  The lower socio-economic status of Latinos in Dallas and Tarrant Counties impairs their ability to participate in the electoral process.

394.    During the House floor debate on the Senate plan, Representative Anchia asked Representative Hunter to confirm that the proposed Senate map does not create a new Latino opportunity district "despite the fact that Latinos accounted for nearly half of the entire growth in the state last decade" to which Representative Hunter responded that he could not confirm. Representative Anchia mentioned public maps S2162, S2161 and S2125 and said, "These plans demonstrate that it's possible to draw Latino opportunity district in Dallas and Tarrant County." Representative Anchia asked Representative Hunter if he or his staff had analyzed whether the Voting Rights Act required the drawing of these additional districts to which Representative Hunter replied, "I can tell you that we've looked at some of the aspects, but I can't confirm the specifics."

395.    The failure to draw an additional Latino majority district in Dallas and Tarrant counties in Plan S2168 dilutes Latino voting strength and denies Latinos an equal opportunity to

participate in the political process and to elect their candidates of choice.

**2. Plan S2168 Weakens Latino Voting Strength in SD27, An Existing Latino CVAP Majority District, and Latino Voters Bear an Unequal Burden of the Changes.**

396.    In the benchmark plan, SD27 encompasses Cameron County and a portion of Hidalgo County in the south and ends in Kleberg County to the north.

397.    SD27 has a long history of electing Latino representatives.  Latino incumbent Senator Eddie Lucio held Texas's 27th for 30 years prior to redistricting in 2021.  Following the 2021 redistricting, Senator Lucio announced he would not seek reelection.

398.    Historically, in the benchmark version of SD27, Latinos have voted cohesively for their candidates of choice.  For example, in the 2016 general election for Supreme Court Place 5, Dori Garza received an estimated 84.67% of Latino support; in the 2018 general election for Governor, Lupe Valdez received an estimated 72.78% of Latino support; and in the 2020 general election for Supreme Court Place 5 Gisela Triana received an estimated 72.3% of Latino support.   Similarly, in the 2016 Republican primary for Supreme Court Place 9, Eva Guzman received an estimated 77% of Latino support.

399.    The 2020 Census showed that SD27 in the benchmark plan was underpopulated by 108,504.   In other words, to bring SD27 to the ideal population of 940,178, mapdrawers needed to add 108,504 to the district.

400.    Instead, in crafting Plan S2168, the mapdrawers moved 169,981 people into SD27 and 79,504 people out of the district, shifting tens of thousands more constituents than necessary to achieve population equality.

401.    The enacted district introduces a large bloc of Anglo voters to the district from Bee, Nueces, and San Patricio Counties.

402.     Mappers also removed a portion of Hidalgo county from SD27.  Eliminating the Pharr, San Juan, Alamo (PSJA) area extending east to Mercedes eliminates a bloc of 80% Spanish-surname registered voters.   These changes reduce the percentage of Spanish-surname registered voters in the district and the share of votes cast by Latinos.   In numerical terms, votes cast by Latinos in SD27 increased by 9,331 and votes cast by non-Latinos in SD27 increased by 35,444.

403.     The enacted district boundaries also decrease the votes received by Latino preferred candidates in SD27.    In the benchmark plan, for example, Latino-preferred candidate for Governor, Lupe Valdez, received 57.72% of the vote in SD27, but in Plan S2168, carries only 50.7% of the vote.   In the benchmark plan, Latino-preferred candidate for Land Commissioner, Miguel Suazo, received 60.16% of the vote in SD27, but in Plan S2168 carries only 51.3% of the vote.   The changes to SD27 are borne unequally by Latinos in the district as their ability to elect their preferred candidates is seriously undermined.

404.     As demonstrated by the benchmark and enacted configurations of SD27, Latinos are sufficiently numerous and compact to constitute the HCVAP majority in SD27.  Latinos live in the counties along the Gulf Coast, from Cameron to Refugio and constitute the majority of CVAP in the benchmark and enacted SD27.

405.     Additionally, Latino voters in this area are politically cohesive.   Within the geographic area of the proposed repaired version of SD27, bivariate analysis demonstrates that a large majority of Latino voters support the same candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2020 General - Texas Supreme Court | Triana | 73.46% |
| 2018 General - Governor | Valdez | 74.71% |
| 2018 General - Land Commissioner | Suazo | 78.35% |

406.    Further, Anglos in this area vote sufficiently as a bloc to enable them, in the absence of

special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino

voters' preferred candidates.  Within enacted SD27, multivariate analysis demonstrates that a

large majority of Anglo voters support the candidate who is not preferred by Latino voters,

including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2020 General - Texas Supreme Court | Triana | 21.2% |
| 2018 General - Governor | Valdez | 13.76% |
| 2018 General - Land Commissioner | Suazo | 12.44% |

407.    The Anglo bloc vote usually overcomes the Latino bloc vote in enacted SD27, such that

the Latino candidate of choice loses.  For example, in the 2020 Railroad Commissioner general

election in enacted SD27, the Latino candidate of choice Chrysta Castaneda loses, receiving

only 43.4% of the total vote, as a result of Anglo bloc voting overcoming Latino bloc voting.

408.    Further, Plan S2168 fractures the Latino population so that Latino voters are assigned to

other districts outside of the enacted version of SD27.

409.    Moreover, the legacy of racial discrimination against Latinos, as described above, has

        resulted in Latino voters in this area having lower political participation than Anglos.   In this

410.    The benchmark SBOE plan contains area, the Latino voter registration rate lags behind the

        Anglo voter registration rate.

411.    In addition to lower voter registration rates, Latinos in Cameron County fare worse than

        Anglos in the county along a number of socioeconomic indicators.   For example, in Hidalgo

        County among native-born citizens between 25-54 years of age, despite being employed at

        nearly the same rate as non-Latinos, 17.8% of Latinos live in poverty, as opposed to 11.8% of

        non-Latinos.   The per capita income for Latinos in Hidalgo County ($16,572) is approximately

        half the per capita income for Anglos ($32,780).

412.    In addition, Latinos in South Texas bear the effects of past discrimination which appear in

        lower voter registration and turnout among Latinos.  Latinos in Cameron and Hidalgo County

        also have lower rates (when compared to Whites in those same counties) of college graduation,

        median household income and health insurance.  The lower socio-economic status of Latinos

        impedes their ability to participate equally in the political process.

413.    During the House Redistricting Committee hearing on the Senate plan, Representative

        Hunter laid out the Senate plan and said there were "seven majority-minority Hispanic voting

        age population districts, HVAP as it's sometimes called, and the districts are 6, 19, 20, 21, 26,

        27 and 29."  He also said regarding the Senate, "They've put in their analysis, and we have

        received their bill and I'm going to presume they followed their procedures and done

        everything they're supposed to do."  Representative Hunter was asked by Representative Chris

        Turner if it is "possible to draw something blind to race but then also provide a list of districts

where – you know, delineating which ones are majority-minority or minority coalition districts?" Representative Hunter said he was unable to answer that question.

**I.      Plan E2106 Dilutes the Voting Strength of Latinos in Texas.**

414.    15 SBOE districts, three of which contain a majority Hispanic CVAP.  Plan E2106 maintains the same number of SBOE districts with a majority Hispanic CVAP.

415.    The Latino population of Texas is sufficiently numerous and geographically compact to comprise the majority of the CVAP in at least 4 SBOE districts—or at least one additional Latino citizen voting age majority SBOE district compared to the benchmark map.

416.    Despite the dramatic growth of the Latino population in Texas since 2010, the failure of Plan E2106 to create an additional Latino citizen voting age majority SBOE district discriminates against Latino voters both in effect and with the purpose of discriminating against Latinos on the basis of race.

417.    In addition to failing to create a new Latino HCVAP majority district where required, Plan E2106 manipulates the district boundaries of ED3—a district in South Texas—with the purpose of reducing Latino voting strength and limiting Latino electoral opportunity in ED3.

**1. The Texas Legislature Failed to Create An Additional Latino Opportunity District in Plan E2106.**

418.    In Harris County, the Latino population is sufficiently numerous and geographically compact to constitute the majority of the CVAP in an SBOE district, including portions of enacted ED4, ED6, ED7 and ED8 (Plan E2106).

419.    The table below shows that there is a sufficiently large population of Latino voters who live in this area to create an additional Latino opportunity district, as indicated by the HCVAP figures for each of the districts in Plan E2106 from which the new additional district can be crafted:

| District in Plan E2106 | HCVAP[15] |
|:---:|:---:|
| ED4 | 39.9% |
| ED6 | 20.7% |
| ED7 | 17.7% |
| ED8 | 23.8% |

420.   The Latino citizen voting age population in this area is compact, living within established neighborhoods and cities inside Harris County, but is fractured across the above-mentioned enacted districts instead of being included in one district.  As a result, Plan E2106 fails to create a Latino citizen voting age majority district in that area.

421.   Plan E2130 displays one possible version of such a Latino opportunity district (LULAC Demonstrative District 6, in thick black outline):

[15] HCVAP figures for districts in Plan E2106 are from the Texas Legislative Council: https://data.capitol.texas.gov/dataset/ad1ae979-6df9-4322-98cf-6771cc67f02d/resource/ea28cdf3-575d-42fc-b9dc-e5ee1e36e9c7/download/plane2106_r119_acs1620_election20g.pdf (last accessed:  June 6, 2022).



422.    LULAC Demonstrative District 6 in Plan E2130 encompasses a compact Latino population while at the same time accommodates a Black opportunity district:  ED4.

423.    In this one possible version of such a Latino opportunity district, the HCVAP is 50.3%

424.    Additionally, Latinos in this area are politically cohesive.   Within the geographic area of LULAC Demonstrative District 6, bivariate analysis demonstrates that a large majority of Latino voters support the same candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2018 General-Land Comm | Miguel Sauzo | 73% |
| 2018 General-Governor | Lupe Valdez | 72.34% |
| 2020 General-Supreme Court | Gisela Triana | 66.09% |

425.    Further, Anglos in this area vote sufficiently as a bloc to enable them, in the absence of

special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates. Within the geographic area comprised of these enacted districts, multivariate analysis demonstrates that a large majority of Anglo voters support the candidate who is not preferred by Latino voters, including in the following elections in the enacted districts that correspond to the proposed new Latino opportunity district in this area:

**Enacted ED4 (Plan E2106)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General-Governor | Lupe Valdez | 34.57% | Yes |
| 2018 General-Land Commissioner | Miguel Suazo | 37.04% | Yes |

**Enacted ED6 (Plan E2106)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General-Governor | Lupe Valdez | 21.45% | No |
| 2018 General-Land Commissioner | Miguel Suazo | 22.3% | No |

**Enacted ED7 (Plan E2106)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General-Governor | Lupe Valdez | 8.32% | No |
| 2018 General-Land Commissioner | Miguel Suazo | 9.85% | No |

**Enacted ED8 (Plan E2106)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General-Governor | Lupe Valdez | 9.1% | No |
| 2018 General-Land Commissioner | Miguel Suazo | 9.53% | No |

426.    The Anglo bloc vote overcame the Latino bloc vote in those districts (except ED4 which is a minority opportunity district), such that the Latino candidate of choice lost, including in the elections listed in the preceding paragraph.  Thus, within enacted districts from which a proposed additional Latino majority district can be created, Anglos vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.

427.    Moreover, the legacy of racial discrimination against Latinos, as described above, has resulted in Latino voters in Harris County having lower political participation than Anglos.

159

428.    In addition to lower voter registration rates, and as described above, Latinos in Harris County fare worse than Anglos in the county along a number of socioeconomic indicators. The lower socio-economic status of Latinos in Harris County impairs their ability to participate equally in the electoral process.

429.    During the House floor debate on the SBOE plan Representative Anchia asked Representative Hunter if Representative Hunter's analysis of the map showed if it was possible or required by the VRA to draw a majority HCVAP district in Harris County while also drawing an African American opportunity district in Harris County. Representative Hunter said he could not answer that and relied on the information from the Senate.

The failure to draw an additional Latino majority district in Harris County in Plan E2106 dilutes Latino voting strength and denies Latinos an equal opportunity to elect their candidates of choice.

**J. Plan C2193 Dilutes the Voting Strength of Latinos in Texas.**

430.    The benchmark congressional plan contains a total of 36 congressional districts, eight of which contain a majority Hispanic CVAP.  Plan C2193 contains a total of 38 congressional districts, seven of which contain a majority HCVAP.

431.    The significant growth of the Latino population in Texas since 2010 allowed Texas to gain one, if not both, of its two new congressional districts.  Despite the growth of the Latino population over the past decade, Plan C2193 dilutes Latino voting strength, reduces the number of Hispanic CVAP majority congressional districts, and fails to create any additional Hispanic CVAP majority congressional districts.

432.    The Latino population of Texas is sufficiently numerous and geographically compact to comprise the majority of the CVAP in at least three additional congressional districts compared

to the benchmark maps.  The failure of Plan C2193 to create at least three additional Latino citizen voting age majority congressional districts statewide discriminates against Latinos on the basis of race.

433.    In addition to failing to create new Latino CVAP majority districts where required, redistricters reduced Latino voting strength in two HCVAP  majority districts in Plan C2193, such that Latinos either lack the opportunity to elect their candidate of choice or will be unequally burdened in the election process.

## 1. The Texas Legislature Failed to Create At Least Three Additional Latino Opportunity Congressional Districts in Plan C2193.

### a. Additional Latino Opportunity Congressional District in Harris County

434.    In Harris County, the Latino population is sufficiently numerous and geographically compact to comprise the majority of the CVAP in at least one additional Latino majority congressional district, in the area that includes portions of enacted CD7, CD8, CD18, CD29 and CD38 (Plan C2193).

435.    The table below shows that there is a sufficiently large population of Latino voters who live in this area to create an additional Latino opportunity district, as indicated by the HCVAP figures for each of the districts in Plan C2193 from which the new additional district can be crafted:

| District in Plan C2193 | HCVAP[16] |
|---|---|
| CD7 | 21.2% |
| CD8 | 21.8% |
| CD18 | 29.1% |

[16] HCVAP figures for districts in Plan C2193 are from the Texas Legislative Council: https://data.capitol.texas.gov/dataset/b806b39a-4bab-4103-a66a-9c99bcaba490/resource/b3bc5a6b-dddd-4528-a779-b1b32a221a57/download/planc2193_r119_acs1620_election20g.pdf (last accessed:  June 6, 2022).

| CD29 | 64.6% |
|------|-------|
| CD38 | 18.6% |

436.  The Latino citizen voting age population in this area is compact, living in various neighborhoods from Northside Houston and to the west, but is fractured across the above-mentioned enacted districts instead of being included in one district. Thus Plan C2193 fails to create an additional Latino majority congressional district in this area.

437.  Plan C2195 displays one possible version of such a Latino opportunity district (LULAC Demonstrative District 38, in thick black outline):



438.  LULAC Demonstrative District 38 in Plan C2195 is more compact than District 33 and District 35 in Plan C2193.

439.  In this one possible version of such a Latino opportunity district, the HCVAP is 51.7.%

440.    Additionally, Latino voters in this area are politically cohesive.  Within the geographic area

of LULAC Demonstrative District 38, bivariate analysis demonstrates that a large majority of

Latino voters support the same candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2018 General-Land Comm | Miguel Sauzo | 76.94% |
| 2018 General-Governor | Lupe Valdez | 74.05% |
| 2020 General-Supreme Court | Gisela Triana | 70.31% |

441.    Further, within the geographic area comprised of these enacted districts, Anglos in this area

vote as a bloc against the Latino preferred candidate.  Within the geographic area comprised

of these enacted districts, multivariate analysis demonstrates that a large majority of Anglo

voters support the candidate who is not preferred by Latino voters, including in the following

elections in the enacted districts that correspond to the proposed new Latino opportunity

district in this area:

**Enacted CD7 (Plan C2193)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Lupe Valdez | 43.45% | Yes |
| 2018 General - Land Commissioner | Miguel Suazo | 47.98% | Yes |

163

**Enacted CD8 (Plan C2193)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Lupe Valdez | 6.55% | No |
| 2018 General - Land Commissioner | Miguel Suazo | 7.38% | No |

**Enacted CD18 (Plan C2193)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2020 General - Supreme Court | Gisela Triana | 36.15% | Yes |
| 2020 General Railroad Commissioner | Chrysta Castaneda | 40.1% | Yes |

**Enacted CD29 (Plan C2193)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Lupe Valdez | 48.03% | Yes |

| 2018 General - Land Commissioner | Miguel Suazo | 47.32% | Yes |

**Enacted CD38 (Plan C2193)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2020 General - Supreme Court | Gisela Triana | 24.77% | No |
| 2018 General - Land Commissioner | Miguel Suazo | 21.62% | No |

442.   The Anglo bloc vote overcame the Latino bloc vote in those districts, such that the Latino candidate of choice lost, including in the elections listed in the preceding paragraph.  Thus, within the enacted districts from which a proposed additional Latino majority district can be created, Anglos vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.

443.   Moreover, the legacy of racial discrimination against Latinos, as described above, has resulted in Latino voters in this area having lower political participation than Anglos.  For example, in Harris County, the Latino voter registration rate lags behind the Anglo voter registration rate.

444.   In addition to lower voter registration rates, and as described above, Latinos in Harris County fare worse than Anglos in the county along a number of socioeconomic indicators.

The lower socio-economic status of Latinos in Harris County impairs their ability to participate in the electoral process.

445.     During the House floor debate on the Congressional plan, Representative Anchia laid out an amendment and explained that two majority HCVAP districts could be drawn in Harris County. He stated, "Harris County, for example, Latinos only form a majority in one district despite a 21.7 percent increase in the Latino population over the decade and despite this community now making up 43 percent of the total county population. It's actually possible to draw two majority Hispanic Citizen Voting Age Population districts as required by Section 2 while still providing the same level of representation to other minority groups in Harris and nearby Fort Bend County. So what we see in Harris County is excessive packing, particularly in Congressional District 29, and cracking between Congressional Districts 8 and 38, while pairing them with Anglo voters to dilute Latino voting power."

446.     During the debate on the same amendment, Representative Morales Shaw asked if the map drew a new congressional district in Harris County to which Representative Morrison said, "The senate drew the map, and it was all legal and done correctly. And that is the map that we have on the floor." Representative Anchia's amendment failed.

447.     During the lay out of an amendment Representative Anchia stated, "The bottom line is that you give these communities that were responsible for all the growth in this state, or at least 50 percent of all the growth in this state, the ability to together elect the candidate of their choice. Again, it may not be a Latino candidate and there are plenty of examples where that does not exist, right? But you can't rely on this growth, import two new congressional districts, and then shut the community out and reduce the number of districts that are reflected in the map."

448.     Representative Morrison who spoke in opposition to Representative Anchia's amendment

urged the members to vote no. The amendment failed.

449.    The failure to draw an additional Latino majority district in Harris County in Plan C2193 dilutes Latino voting strength and denies Latinos an equal opportunity to elect their candidates of choice.

**b. Additional Latino Opportunity Congressional District in Dallas and Tarrant Counties**

450.    In the Dallas-Ft. Worth area, the Latino population is sufficiently numerous and geographically compact to comprise the majority of the CVAP in a congressional district, in the area that includes portions of enacted CD6, CD12, CD24, CD25, CD30, CD32, and CD33 (Plan C2193).

451.    The table below shows that there is a sufficiently large population of Latino voters who live in this area to create an additional Latino opportunity district, as indicated by the HCVAP figures for each of the districts in Plan C2193 from which the new additional district can be crafted:

| District in Plan C2193 | HCVAP |
|---|---|
| CD6 | 21.3% |
| CD12 | 17.6% |
| CD24 | 11.9% |
| CD25 | 15.3% |
| CD30 | 21.4% |
| CD32 | 21.0% |
| CD33 | 42.8% |

452.    The Latino citizen voting age population in this area is compact, living in the neighborhoods and cities of Pleasant Grove, Oak Cliff, Cockrell Hill, Farmers Branch and

South Irving in Dallas County and the Northside and Poly neighborhoods in Ft. Worth in Tarrant County, but is fractured across the above-mentioned enacted districts instead of being included in one district.

453.    However, Plan C2193 fails to create an additional Latino citizen voting age majority congressional district in this area.

454.    Plan C2195 displays one possible version of such a Latino opportunity district (LULAC Demonstrative District 37, in thick black line):



455.    LULAC Demonstrative District 37 in Plan C2195 encompasses a compact Latino population while also accommodating CD30, a Black opportunity district, and CD33, a minority coalition district.

456.    In this one possible version of such a Latino opportunity district, the HCVAP is 52.5%.

457.    Additionally, Latino voters in this area are politically cohesive.  Within the geographic area

168

of LULAC Demonstrative District 37, bivariate analysis demonstrates that a large majority of Latino voters support the same candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2018 General-Governor | Lupe Valdez | 85.72% |
| 2018 General-Land Comm | Miguel Suazo | 85.5% |
| 2020 General-Supreme Court | Gisela Triana | 80.69% |

458.    Further, within the geographic area comprised of these enacted districts, Anglos in this area vote as a bloc against the Latino preferred candidate.  Within the geographic area comprised of these enacted districts, multivariate analysis demonstrates that a large majority of Anglo voters support the candidate who is not preferred by Latino voters, including in the following elections in the enacted districts that correspond to the proposed new Latino opportunity district in this area[17]:

**Enacted CD6 (Plan C2193)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2020 General - Supreme Court | Gisela Triana | 9.18% | No |
| 2018 General - Land Commissioner | Miguel Suazo | 7.58% | No |

---

[17] Analysis of enacted CD25 omitted because there is no population in the overlap area.

169

**Enacted CD12 (Plan C2193)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Lupe Valdez | 17.78% | No |
| 2018 General - Land Commissioner | Miguel Suazo | 18.17% | No |

**Enacted CD24 (Plan C2193)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Lupe Valdez | 22.69% | No |
| 2018 General - Land Commissioner | Miguel Suazo | 21.64% | No |

**Enacted CD30 (Plan C2193)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2020 General Railroad Commissioner | Chrysta Castaneda | 37.84 | Yes |

170

| 2018 General - Governor | Lupe Valdez | 40.77% | Yes |
|---|---|---|---|

### Enacted CD32 (Plan C2193)

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General - Governor | Lupe Valdez | 34.9% | Yes |
| 2018 General - Land Commissioner | Miguel Suazo | 34.75% | Yes |

### Enacted CD33 (Plan C2193)

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2020 General - Supreme Court | Gisela Triana | 40.27% | Yes |
| 2018 General - Governor | Lupe Valdez | 35.47% | Yes |

459.    The Anglo bloc vote overcame the Latino bloc vote in those districts, such that the Latino

candidate of choice lost, including in the elections listed in the preceding paragraph.  Thus,

within the enacted districts from which a proposed additional Latino majority district can be

created, Anglos vote sufficiently as a bloc to enable them, in the absence of special

circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters'

preferred candidates.

460.    Moreover, the legacy of racial discrimination against Latinos, as described above, has resulted in Latino voters in Dallas and Tarrant counties having lower political participation than Anglos.  For example, in both counties, the Latino voter registration rate lags behind the Anglo voter registration rate.

461.    In addition to lower voter registration rates, and as described above, Latinos in Dallas and Tarrant Counties fare worse than Anglos in the county along a number of socioeconomic indicators.  The lower socio-economic status of Latinos in Dallas and Tarrant Counties impairs their ability to participate in the electoral process.

462.    During the House floor debate on the Congressional plan Representative Anchia said, "[o]ne of the two new congressional districts in our state has been drawn in Tarrant County and inexplicably does not permit Latinos to elect the candidate of their choice."  Representative Turner also said the Gingles test shows that a new district could have been drawn in North Texas, specifically in Dallas and Tarrant Counties.

463.    Representative Turner filed an amendment (C2163) that drew a new minority opportunity district in Dallas County and parts of Tarrant County with over 50 percent HCVAP "while maintaining the 33rd District and 32nd District as minority opportunity districts." Representative Murphy spoke in opposition to the amendment based on pairings and the fact there was no public input on the amendment. The amendment failed.

464.    The failure to draw an additional Latino majority district in Dallas and Tarrant counties in Plan C2193 dilutes Latino voting strength and denies Latinos an equal opportunity to participate in the political process and to elect their candidates of choice.

### c. Additional Latino Opportunity Congressional District in South/Central Texas

465.    In South/Central Texas, in an area including Nueces, San Patricio, Bee, Goliad, Karnes,

172

Gonzales, Caldwell, Bastrop, Travis and Williamson counties, the Latino population is sufficiently numerous and geographically compact to comprise the majority of the CVAP in an additional congressional district, in the area that includes portions of enacted CD10, CD15, CD17, CD27, CD35, and CD37 (Plan C2193).

466.   The table below shows that there is a sufficiently large population of Latinos in this area to create an additional Latino opportunity district, as indicated by the HCVAP figures for each of the districts in Plan C2193 from which the new additional district can be crafted:

| District in Plan C2193 | HCVAP |
|---|---|
| CD10 | 17.0% |
| CD15 | 74.5% |
| CD17 | 17.4% |
| CD27 | 49.2% |
| CD35 | 47.8% |
| CD37 | 22.2% |

467.   The Latino citizen voting age population in this area is compact, living in the counties of South and Central Texas north of Nueces County, but is fractured across the above-mentioned enacted districts instead of being included in one district.  Thus Plan C2193 fails to create an additional Latino citizen voting age majority congressional district in that area.

468.   Plan C2195 displays one possible version of such a Latino opportunity district (LULAC Demonstrative District 27, in thick black line):



469.    LULAC Demonstrative District 27 in Plan C2195 is more compact than District 15 in Plan C2193.

470.    In this one possible version of such a Latino opportunity district, the HCVAP is 50.4%.

471.    Additionally, Latino voters in this area are politically cohesive.  Within the geographic area of LULAC Demonstrative District 27, bivariate analysis demonstrates that a large majority of Latino voters support the same candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2020 General-Supreme Court | Gisela Triana | 73.46% |
| 2018 General-Governor | Lupe Valdez | 74.05% |
| 2018 General-Land Comm | Miguel Suazo | 78.35% |

472.    Further, within the geographic area comprised of these enacted districts, Anglos in this area vote as a bloc against the Latino preferred candidate.  Within the geographic area comprised of these enacted districts, multivariate analysis demonstrates that a large majority of Anglo voters support the candidate who is not preferred by Latino voters, including in the following elections in the enacted districts that correspond to the proposed new Latino opportunity district in this area:

**Enacted CD10 (Plan C2193)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General- Land Commissioner | Miguel Suazo | 22.32% | No |
| 2018 General- Governor | Lupe Valdez | 21.84% | No |

**Enacted CD15 (Plan C2193)**

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General- Land Commissioner | Miguel Suazo | 6.35% | Yes |

| 2018 General-Governor | Lupe Valdez | 6.18% | Yes |
|---|---|---|---|

## Enacted CD27 (Plan C2193)

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General- Land Commissioner | Miguel Suazo | 7.51% | No |
| 2018 General-Governor | Lupe Valdez | 7.83% | No |

## Enacted CD35 (Plan C2193)

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General- Land Commissioner | Miguel Suazo | 54.46% | Yes |
| 2018 General-Governor | Lupe Valdez | 57.58% | Yes |

## Enacted CD37 (Plan C2193)

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice | Did the Latino Candidate of Choice Win? |
|---|---|---|---|
| 2018 General- Land Commissioner | Miguel Suazo | 64.59% | Yes |
| 2018 General-Governor | Lupe Valdez | 65.09% | Yes |

473.   The Anglo bloc vote overcame the Latino bloc vote in those districts, such that the Latino candidate of choice lost, including in the elections listed in the preceding paragraph.  Thus, within the geographic area comprised of the current districting in the area in which a proposed additional Latino majority district can be created, Anglos vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.

474.   Moreover, the legacy of racial discrimination against Latinos, as described above, has resulted in Latino voters in this area having lower political participation than Anglos.  For example, in Travis County, the Latino voter registration rate lags behind the Anglo voter registration rate.

475.   In addition to lower voter registration rates, and as also described above, Latinos in Travis County fare worse than Anglos in the county along a number of socioeconomic indicators. These socio-economic disparities impede Latino ability to participate in the political process

476.   During the Senate floor debate on the Congressional map Senator Menendez asked Senator Huffman how there was not a new minority opportunity seat with 95 percent of the growth being from the minority community. Senator Huffman said, "[t]he maps were drawn -- drawn blind to race. Once they were drawn, they were checked for compliance. We -- we were assured that all the existing minority opportunity districts, whether they be Black or Latino, were going to perform as such, and we saw no evidence -- no strong basis in evidence that a new minority opportunity district should be drawn in the -- in the new maps."

477.   The failure to draw an additional Latino majority district in Central Texas in Plan C2193 dilutes Latino voting strength and denies Latinos an equal opportunity to elect their candidates

of choice.

## 2. Plan C2193 Weakens Existing Latino CVAP Majority Districts, Such That They No Longer Afford Latinos the Opportunity to Elect Their Preferred Candidate.

### a. CD15

478.   In the benchmark plan CD15 encompassed much of Hidalgo County in the south and ended in Guadalupe County in the north.  For over 50 years this district has elected and reelected Latino candidates of choice (1964-1997 Rep.  Eligio "Kika" de la Garza; 1997-2017 Rep. Rubén Hinojosa; 2017-present Vicente Gonzalez).  The enacted maps drew incumbent Vicente Gonzalez out of CD15.

479.   In benchmark CD15, Latinos voted cohesively for their candidates of choice. For example, in the 2016 general Supreme Court Place 5 election, Dori Garza received an estimated 78.73% of Latino support; in the 2018 general Gubernatorial election, Lupe Valdez received an estimated 67.54% of Latino support; and in the 2020 general Supreme Court Place 5 election, Gisela Triana received an estimated 66.39% of Latino support.

480.   The 2020 Census showed that CD15 in the benchmark plan (C2100) was overpopulated by 40,715.  In other words, to bring CD15 to the ideal population of 766,987, mapdrawers required removing 40,715 from the district.

481.   Instead, in crafting Plan C2193, the mapdrawers moved 239,796 people into CD15 and 280,511 people out of the district, shifting hundreds of thousands more constituents than necessary to achieve population equality.

482.   The movement of voters in and out of CD15 nudged the turnout rate among Latino voters in the district down from 54.10% to 53.73%.   The changes also pushed down the number of votes received by Latino preferred candidates.  In the benchmark plan, for example, Latino-

preferred candidate for Supreme Court Place 8, Gisela Triana, received 51.3% of the vote in CD15, but in Plan C2193 she loses the election, carrying only 49.6% of the vote. Similarly, in the benchmark plan, Latino-preferred candidate for Governor, Lupe Valdez, received 51.3% of the vote in CD15, but loses the election in CD15 in Plan C2193, carrying only 49.5% of the vote.

483.   As a result of the changes to CD15, Latino voters no longer have the opportunity to elect their preferred candidate in that district.

484.   As described above, Latinos are sufficiently numerous and compact to comprise the citizen voting age population majority in CD15. In benchmark CD15, the HCVAP was 74.70%. In a proposed repaired version of CD15 (Plan C2195), the HCVAP is 78%.

485.   Additionally, Latino voters in this area are politically cohesive. Within the geographic area of the proposed repaired version of CD15, bivariate analysis demonstrates that a large majority of Latino voters support the same candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2018 General - Governor | Valdez | 75.36% |
| 2018 General - Land Commissioner | Suazo | 77.67% |
| 2020 Supreme Court Place 8 (General) | Triana | 71.55% |

486.   Further, Anglos in this area vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates. Within enacted CD15, multivariate analysis demonstrates that a large majority of Anglo voters support the candidate who is not preferred by Latino voters,

including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2018 General - Governor | Valdez | 8.87% |
| 2018 General - Land Commissioner | Suazo | 8.09% |
| 2020 Supreme Court Place 8 (General) | Triana | 11.18% |

487. The Anglo bloc vote usually overcomes the Latino vote in enacted CD15, such that the Latino candidate of choice loses. Thus, in the current districting, Anglos vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.

488. Plan C2193 fractures the Latino population in CD15 in part by packing more Latino voters into CD34 than is necessary to elect the Latino preferred candidate in CD34. Although the two districts are adjacent to each other, mappers chose to create a lopsided allocation of Latino population with the intent that Latinos not be able to elect their preferred candidate in CD15.

489. Moreover, the legacy of racial discrimination against Latinos, as described above, has resulted in Latino voters in this area having lower political participation than Anglos. In addition to lower voter registration rates, Latinos in Hidalgo County fare worse than Anglos in the county along a number of socioeconomic indicators. For example, in Hidalgo County among native-born citizens between 25-54 years of age, the Latino population graduates college at less than half the rate of non-Latinos. Further, among the same group, there are far more Latinos in Hidalgo County living in poverty–15.6%–as opposed to non-Latinos–2.6%. The per capita income for Latinos in Hidalgo County ($16,572) is approximately half the per

capita income for Anglos ($32,780).  The lower socio-economic status of Latinos in this area impairs their ability to participate in the electoral process.

490.    During the Senate Redistricting Committee hearing on the Congressional plan Senator Hinojosa told Senator Huffman, "Some of the inquiries and questions I received from South Texas on these two congressional districts think that there was a cracking, if you will, of Congressional District 15 by taking on more non-minority voters up in the northern part and then taking the Hispanics out of the southern part of Congressional District 15 and moving those into Congressional District 34 and packing that district with Hispanics that were taken away from Congressional District 15." Senator Huffman responded, "[t]he maps were drawn blind to race. So adjustments were made for population, sometimes for partisan shading and so forth. But those were the priorities that we used, and we've been advised that the maps are legally compliant."

491.    During the Senate floor debate on the Congressional plan Senator Gutierrez questioned Senator Huffman about certain changes in CD15 and CD23 that make those districts more Republican. Senator Huffman stated that "all the districts that you see before you, that they are in compliance with the Voting Rights Act, and I believe that CD15 will continue to perform as a Hispanic opportunity district."

### b. CD23

492.    CD23 is a large West Texas district.  In the benchmark plan, Latino voters were narrowly unable to elect their candidate of choice.  In 2014, William Hurd defeated the Latino-preferred candidate, Pete Gallego, by 2.1%. In 2016, Hurd defeated Gallego again, but by only 1.3%.  In 2018, the Latino-preferred candidate, Gina Ortiz Jones, narrowly lost to Hurd with a vote difference of 0.5%.  In 2020, the Latino-preferred candidate—again, Ortiz Jones—lost to Tony

Gonzales with a margin of 5%.  In order to bolster CD23 for the Anglo-preferred candidate, mapdrawers intentionally altered the boundaries of CD23.

493.     Under the benchmark plan, Latino voters in CD23 voted cohesively and in large majorities, including in the elections described above. In another example, in the 2014 general election for Texas Supreme Court seat 7, Gina Benavidez captured 85.74% of the Latino vote.

494.     The 2020 Census showed that CD23 in the benchmark plan was overpopulated by 67,662 people.  In order to bring CD23 to the ideal population of 766,987, mapdrawers only needed to remove 67,662 people from the district.

495.     Instead, in crafting Plan C2193, the mapdrawers moved 133,373 people into CD23 and 201,035 out of the district, shifting tens of thousands more constituents than necessary to achieve population equality.

496.     In Plan C2193, the mapdrawers moved areas into CD23 in which Latinos cast a lower proportion of ballots when compared to the areas moved out of CD23.  The challenged redistricting plan also split 15 voting precincts to assign population into and out of CD23 at a level of geography where race, but not political characteristics, is available.  Through the use of these precinct splits, mappers further reduced Latino voting strength in CD23.

497.     As a result of mapdrawers' changes to CD23 under Plan C2193, the percent of Hispanic citizen voting age population decreased from 63.6% to 58.1%.  The percentage of registered voters with Spanish Surnames decreased from 54.7% to 49.7%.  The proportion of votes cast by Latinos in CD23 decreased from 47.8% to 42.9%.  In numerical terms, votes cast by Latinos in CD23 decreased by 18,246 and votes cast by non-Latinos in CD23 increased by 9,611.

498.     In the enacted version of CD23, Latino-preferred candidates receive fewer votes than in the benchmark plan.  In the 2020 general election, Supreme Court seat 8 candidate Gisela Triana captured 47.88% of the overall vote in the benchmark CD23, but only 44.7% in the

enacted version of CD23.  In the 2018 general election, gubernatorial candidate Guadalupe Valdez received 45.7% of the overall vote in benchmark CD23, but only 42.2% in the enacted version of CD23.  Also in 2018, Land Commissioner candidate Miguel Suazo captured 46.3% of the overall vote in the benchmark CD23, but only 42.6% in the enacted version of CD23.

499.   Enacted CD23 (Plan C2193) is not a Latino opportunity district and compared to the benchmark CD23, it reduces the number of Latino voters casting ballots in elections.

500.   As discussed above, in CD23, Latinos are sufficiently numerous and compact to comprise the citizen voting age population majority.  Latinos are the CVAP majority in the benchmark and enacted versions of CD23.

501.   Additionally, Latino voters in this area are politically cohesive.  Within the geographic area of the proposed repaired version of CD23 (Plan C2195), bivariate analysis demonstrates that a large majority of Latino voters support the same candidate, including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Latinos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2018 General Election - Governor | Valdez | 79.36% |
| 2018 General Election - Land Commissioner | Suazo | 81.66% |
| 2020 General Election - Supreme Court seat 8 | Triana | 74.89% |

502.   Further, Anglos in this area vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.  Within enacted CD23, multivariate analysis demonstrates that a large majority of Anglo voters support the candidate who is not preferred by Latino voters,

including in the following elections:

| Election | Latino Candidate of Choice | Approximate Percent of Anglos Who Voted for the Latino Candidate of Choice |
|---|---|---|
| 2018 General Election - Governor | Valdez | 11.22% |
| 2018 General Election - Land Commissioner | Suazo | 10.62% |
| 2020 General Election - Supreme Court seat 8 | Triana | 15.08% |

503.    The Anglo bloc vote usually overcomes the Latino bloc vote in enacted CD23, such that the Latino candidate of choice loses.  For example, in the 2018 general election for Governor in enacted CD23, the Latino candidate of choice (Valdez) loses, receiving only 45.7% of the total vote, as a result of Anglo bloc voting overcoming Latino bloc voting.  As another example, in the 2020 general election for Railroad Commissioner in enacted CD23, the Latino candidate of choice (Castaneda) loses, receiving only 47.1%, as a result of Anglo bloc voting overcoming Latino bloc voting.  Thus, in the current districting, Anglos vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.

504.    Further, Plan C2195 fractures the Latino population so that Latino voters are assigned to other districts outside of the enacted version of CD23.

505.    Moreover, the legacy of racial discrimination against Latinos, as described above, has resulted in Latino voters in this area having lower political participation than non-Latinos.  For example, although Latino citizens of voting age made up a greater percentage of the CVAP in benchmark CD23, Latinos cast only 42.9% of ballots in the district in the 2020 general election

because Latino voter participation lags behind Anglo voter participation in this area.

506.   Additionally, in addition to the socioeconomic disparities described above in South Texas and Bexar County, Latinos in El Paso County fare worse than Anglos in the county along a number of socioeconomic indicators.  The per capita income for Latinos in El Paso County ($19,650) is less than half the per capita income for Anglos ($38,656).  Among native-born Latino citizens in El Paso County aged 25-54, 25.5% were college graduates as of 2019, compared to 46.7% of Anglos; Latino households in El Paso County earned a median income of $58,790 in 2019, compared to Anglo households' median income of $63,639; and Latino households received food stamps at nearly quadruple the rate of Anglo households (22.8% vs. 6.3%).

507.   During the House floor debate on the Congressional map Representative Anchia laid out an amendment (Plan C2167) and stated that Congressional District 23 "is drawn to dilute Latino voting power by selectively choosing areas with lower Spanish Surname Voter Registration and turnout and bringing in high Anglo turnout." He also said, " Federal courts found this practice illegal last decade and redrew CD23 in 2011, and we are going back, essentially, to what that federal court redraw was. The district only survived a mid-decade review on the grounds that it was a competitive district with over 55 percent Spanish Surname Voter Registration, and SB6 would lower that rate all the way down to 49.4, almost a six percent decrease." Representative Anchia warned, "So that not only raises the spectre of a likely Voting Rights Act violation, but given that the exact same thing was done last cycle, it raises an inference of intentional discrimination for having ignored the caution that the federal court provided this body." Representative Morrison expressed opposition to the amendment

185

and said, "The senate drew the map, and it was all legal and done correctly. And that is the map that we have on the floor." The amendment failed.

*In Crafting CD35 in Plan C2193, Mapdrawers Manipulated Precincts Into and Out of the District Based on Race*

508. In South/Central Texas, in an area along the I-35 corridor from Bexar to Travis counties, the Latino population is sufficiently numerous and geographically compact to comprise the majority of the CVAP in a congressional district. The benchmark congressional redistricting plan continued such a district: CD35. However, Plan C2193 fails to create a Latino citizen voting age majority congressional district there.

509. At the start of the redistricting process, benchmark CD35 was overpopulated by 65,409. However, instead of simply removing that number of people from the district, mappers moved 261,552 people into the district and 326,961 people out the district -- disrupting far many more constituents than was necessary to achieve population equality.

510. The mappers moved greater numbers of Latino voters out of CD35 than in, dropping the HCVAP to 47.8% and the Spanish surnamed registered voters to 36%. As a result of the changes to CD35, the proportion of votes cast by Latinos in the district in the 2020 General Election dropped from 39% to 33%.

511. The mappers did not reduce Latino voting strength in CD35 for the purpose of creating a new Latino opportunity congressional district, although that could have been done. Instead, the mappers shed Latino voters (and diminished Latino voting strength) in CD35 as part of a cracking and packing effort that also resulted in reducing Latino political strength in CDs 15 and 23.

**K. The Newly Adopted Maps Dilute the Voting Strength of Latinos.**

512. Latinos in Texas are politically cohesive, including in the geographic areas described above

in which Defendants either failed to create Latino citizen voting age majority districts or weakened existing Latino citizen voting age majority districts.

513.    Anglos in Texas—including in the geographic areas described above in which Defendants either failed to create Latino citizen voting age majority districts or weakened existing Latino citizen voting age majority districts—vote sufficiently as a bloc to enable them, in the absence of special circumstances, such as a Latino candidate running unopposed, usually to defeat Latino voters' preferred candidates.

514.    As noted, there has been a long history of discrimination against Latinos in Texas. *See LULAC*, 548 U.S. at 439-40.  That discrimination included the poll tax, an all-white primary system, restrictive voter registration time periods, refusal to register Latino voters, intimidation by Anglos of Latino voters at the polls, segregated public accommodations and school and employment discrimination.

515.    Latinos bear the present effects of that discrimination in the form of lower socio-economic status and lower rates of political participation.  Indeed, educational achievement and earnings for Latinos lag far behind Anglos in the state, and the Latino registration and voter turnout rates remain below that of Anglos in Texas.  Moreover, Latinos remain underrepresented in federal, state, and local elected positions.

516.    In the new redistricting plans, Latinos do not constitute the majority in a number of districts proportional to their population, falling well below that figure.

517.    Plans H2316, S2168, C2193 and E2106 interact with social and historical conditions to cause an inequality in the opportunity of Latino voters to elect representatives of their choice as compared to Anglo voters.  Because these factors are present, Plans H2316, S2168, C2193 and E2106 have the effect of diluting Latino voting strength statewide and in the specific

187

geographic areas and districts described above.

518.    Plans H2316, S2168, C2193 and E2106 also discriminate against Latino voters statewide, and in the specific geographic areas and districts described above, by intentionally manipulating district boundaries to reduce Latino voting strength such that Latinos either lose political strength or cannot elect their candidates of choice, and by making improper and excessive use of race in redistricting.

## VI. CAUSES OF ACTION

### COUNT 1

*Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution*
*(racial discrimination)*

519.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

520.    Texas House Plan H2316, Senate Plan S2168, Congressional Plan C2193 and SBOE Plan E2106 purposefully discriminate against Plaintiffs and other Latinos on the basis of race and national origin in violation of the 14th Amendment to the U.S. Constitution.

521.    Defendants purposefully discriminated against Latinos in Plan H2316 by failing to create new Latino citizen voting age majority districts in Harris County and Central Texas; by weakening Latino voting strength in HD31, HD37, HD90 and HD118; and by creating malapportioned House districts in West Texas.  Defendants further purposefully discriminated against Latinos in Plan S2168 by failing to create new Latino citizen voting age majority districts in Dallas-Ft. Worth and South/Central Texas, and by weakening Latino voting strength in SD27.  Defendants further purposefully discriminated against Latinos in Plan E2106 by failing to create a new Latino citizen voting age majority district in Harris County. Defendants further purposefully discriminated against Latinos in Plan C2193 by failing to create Latino citizen voting age majority districts in Harris County, Dallas-Ft. Worth and

South/Central Texas, and by weakening Latino voting strength in CD15 and CD23.

## COUNT 2

*Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution*
*(unconstitutional population deviations)*

522.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

523.   The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution "requires that the seats in both houses of a bicameral state legislature [] be apportioned on a population basis." *Reynolds v. Sims*, 377 U.S. 533, 568 (1964).

524.   In Texas House Plan H2316, Defendants systematically overpopulate districts in El Paso County and the Upper Rio Grande area of West Texas (Districts 74, 75, 77, 78, and 79) and underpopulate districts in the Panhandle and original Tom Green County (Districts 69, 71, 72, 81, 82, 83, 84, 86, 87, and 88).  Defendants' over- and under-population of districts in these regions deliberately favors the interests of communities and voters in the Panhandle and original Tom Green County at the expense of communities and voters in El Paso and the Upper Rio Grande area of West Texas in violation of the one person, one vote principle of the Fourteenth Amendment of the United States Constitution.

525.   Defendants also over- and under-populated districts in these regions to facilitate creating fewer Latino opportunity districts statewide, and to protect the influence of Anglo voters and to preserve Anglo incumbents.  Defendants' over- and under-population of districts in these regions purposefully minimizes Latino voting strength and Latino voters' ability to participate on an equal basis in elections to the State House, both in the specific overpopulated districts and statewide.  Within a total (or "top to bottom") deviation of 9.98%, Defendants deliberately favored Anglo voters over Latino voters and thwarted the creation of House districts in which Latino voters have the opportunity to elect their candidate of choice—even as the rate of Anglo

population growth in West Texas lags behind that of Latino population growth.  The population deviations between House districts in this region are not supported by any legitimate, consistently applied state policy and are tainted by discrimination; thus, they cannot withstand constitutional scrutiny.  The systematic under- and over-population of districts in this regions based on race violates the one person, one vote principle of the Fourteenth Amendment of the United States Constitution.

## **COUNT 3**

### *Section 2 of the Voting Rights Act*

526.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

527.   Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, applies nationwide and prohibits voting practices and procedures that result in the denial or abridgement of the right of any citizen to vote on account of race, color or membership in a language minority group. Section 2 is a permanent provision of the federal Voting Rights Act.

528.   Texas House Plan H2316, Senate Plan S2168, Congressional Plan C2193 and SBOE Plan E2106 result in a denial or abridgment of the right to vote of individual plaintiffs and organizational plaintiffs' members on account of their race, color or ethnicity by having the intent and effect of canceling out or minimizing their voting strength as Latinos in Texas. Texas House Plan H2316, Senate Plan S2168, Congressional Plan C2193 and SBOE Plan E2106 do not afford individual plaintiffs and organizational plaintiffs' members an equal opportunity to participate in the political process and to elect representatives of their choice, and deny individual plaintiffs and organizational plaintiffs' members the right to vote in elections without distinction of race, color or previous condition of servitude in violation of 52 U.S.C. § 10301.

190

529.    In Plan H2316, Defendants discriminated against Latinos in effect and purposefully by failing to create new Latino citizen voting age majority districts in Northwest Harris County, Southeast Harris County and Central Texas, and Defendants discriminated purposefully against Latinos by weakening Latino voting strength in HD31, HD37, HD90 and HD118 and by creating malapportioned House districts in West Texas.   In Plan S2168, Defendants discriminated against Latinos in effect and purposefully by failing to create new Latino citizen voting age majority districts in Dallas-Ft. Worth and South/Central Texas, and Defendants discriminated purposefully against Latinos by weakening Latino voting strength in SD27.   In Plan E2106, Defendants discriminated against Latinos in effect and purposefully by failing to create a new Latino citizen voting age majority district in Harris County.   In Plan C2193, Defendants discriminated purposefully and in effect against Latinos by failing to create Latino citizen voting age majority districts in Harris County, Dallas-Ft. Worth and South/Central Texas, and by weakening Latino voting strength in CD23 and CD15.

## VII.  **REQUEST FOR THREE-JUDGE COURT**

530.    Plaintiffs request a three-judge trial court pursuant to 28 U.S.C. § 2284.

## VIII.  **ATTORNEY'S FEES**

531.    In accordance with 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e), Plaintiffs are entitled to recover reasonable attorney's fees, expenses and costs.

## IX.  **PRAYER**

532.    WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that this Court:

(a)  assume jurisdiction of this action and request a three-judge panel pursuant to 28 U.S.C. § 2284;

(b)  issue a declaratory judgment finding that the Texas House Plan H2316, Senate Plan

S2168, Congressional Plan C2193 and SBOE Plan E2106 illegally and unconstitutionally dilute the voting strength of Latino voters in Texas and are unlawful, null and void;

(c) issue a declaratory judgment finding that the newly-adopted Texas House Plan H2316 is unconstitutionally malapportioned;

(d) permanently enjoin Defendants from calling, holding, supervising or certifying any elections under Texas House Plan H2316, Senate Plan S2168, Congressional Plan C2193 and SBOE Plan E2106.  Plaintiffs have no adequate remedy at law other than the judicial relief sought herein, and unless the Defendants are enjoined from using Texas House Plan H2316, Senate Plan S2168, Congressional Plan C2193 and SBOE Plan E2106, individual plaintiffs and organizational plaintiffs' members will be irreparably harmed by the continued violation of their statutory and constitutional rights;

(e) pursuant to 52 U.S.C. § 10302(c), issue an order requiring Texas to preclear its election changes during the ten-year period following the issuance of such order;

(f) set a reasonable deadline for state authorities to enact or adopt redistricting plans for Texas House, Senate, Congress and SBOE that do not dilute, cancel out or minimize the voting strength of Latino voters;

(g) if state authorities fail to enact or adopt valid redistricting plans by the Court's deadline, order new redistricting plans for Texas House, Senate, Congress and SBOE that do not dilute, cancel out or minimize the voting strength of Latino voters;

(h) adjudge all costs against Defendants, including reasonable attorney's fees;

(i) retain jurisdiction to render any and all further orders that this Court may; and

(j)  grant any and all further relief to which Plaintiffs may show themselves to be entitled.

DATED: June 30, 2023                    Respectfully submitted,

                                        MEXICAN AMERICAN LEGAL DEFENSE
                                        AND EDUCATIONAL FUND

                                        */s/ Nina Perales*
                                        Nina Perales
                                        Texas Bar No. 24005046
                                        Fátima Menendez
                                        Texas Bar No. 24090260
                                        Kenneth Parreno
                                        Massachusetts Bar No. 705747
                                        110 Broadway, Suite 300
                                        San Antonio, TX 78205
                                        (210) 224-5476
                                        FAX (210) 224-5382


## Certificate of Service

        The undersigned counsel hereby certifies that she has electronically lodged a true and correct copy of the above and foregoing in accordance with the Electronic Case Files System of the Western District of Texas on the 30th day of June 2023.


                                        */s/ Nina Perales*
                                        Nina Perales