**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **LEAGUE OF UNITED LATIN** | § | |
| **AMERICAN CITIZENS,** *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | **EP-21-CV-00259-DCG-JES-JVB** |
| | § | **[Lead Case]** |
| **EDDIE BERNICE JOHNSON,** *et al.*, | § | |
| | § | **&** |
| *Plaintiff-Intervenors*, | § | |
| **v.** | § | **All Consolidated Cases** |
| | § | |
| **GREG ABBOTT,** *in his official capacity as* | § | |
| *Governor of the State of Texas*, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

**OPINION DISSENTING FROM MEMORANDUM OPINION AND ORDER**
**(ECF No. 746)**

DAVID C. GUADERRAMA, Senior District Judge, dissenting:

What follows is my respectful dissent from the panel's December 21, 2023 Memorandum Opinion and Order on legislative privilege issues (ECF No. 746).[1]  The panel unanimously agreed to release the majority's opinion before this dissent was ready so that the case could proceed in the meantime.[2]  I greatly appreciate the flexibility, patience, and collegiality that my colleagues on the panel have displayed towards me while they've waited for me to finish drafting this dissent, and I sincerely thank them for it.

\*       \*       \*

Although the Texas Legislature's reasons for drawing the State's electoral maps the way it did are one of the central issues in this redistricting case,[3] the Texas Legislators nevertheless insist that the state legislative privilege forbids Plaintiffs from obtaining documents bearing

---

[1] *See League of United Latin Am. Citizens v. Abbott*, No. 3:21-CV-00259, 2023 WL 8880313 (W.D. Tex. Dec. 21, 2023) [hereinafter *Majority Op.*].

An interlocutory appeal of the majority's Memorandum Opinion and Order is currently pending before the Fifth Circuit.  *See* Notice of Appeal, *League of United Latin Am. Citizens v. Abbott*, No. 24-50128 (5th Cir. Feb. 27, 2024).  However, because this dissenting opinion doesn't substantively modify the order currently on appeal, but instead merely explains my reasons for disagreeing with it, the pending interlocutory appeal doesn't divest us of jurisdiction to release the dissent.  *See Coastal Corp. v. Tex. E. Corp.*, 869 F.2d 817, 820 (5th Cir. 1989) (explaining that although a district court "lacks jurisdiction to tamper in any way with [an] order . . . on interlocutory appeal," the district court may still take actions that "preserve the status quo of the case as it [sits] before the court of appeals" (cleaned up)); *cf. In re Chevron Corp.*, 749 F. Supp. 2d 170, 174–75, 178–79 (S.D.N.Y. 2010) (suggesting that if a district court "rule[s] on [a discovery motion] by summary order, indicating that a full opinion [will] follow," but the losing party then appeals that summary order before the district court releases its full opinion, then the pending interlocutory appeal doesn't divest the district court of jurisdiction to issue the full opinion so long as it merely "expand[s] on the reasoning underlying the" order without "alter[ing] the order in any respect"), *aff'd sub nom. Lago Agrio Pls. v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010).

[2] *See Majority Op.*, 2023 WL 8880313, at \*1 n.1.

[3] *See, e.g.*, *Favors v. Cuomo*, 285 F.R.D. 187, 219 (E.D.N.Y. 2012) [hereinafter *Favors I*] ("[T]he motives and considerations behind the [redistricting plans], to a large degree, *are* the case." (cleaned up) (emphasis added) (quoting *Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections*, No. 11 C 5065, 2011 WL 4837508, at \*7 (N.D. Ill. Oct. 12, 2011))); *see also infra* Section I.

directly on the Legislature's "intent and motive in enacting the redistricting legislation" at issue here.[4]  The Legislators base that bold contention on the Fifth Circuit's recent decision in *La Union del Pueblo Entero v. Abbott (Hughes)*,[5] which held that "even when constitutional rights are at stake," and even when a plaintiff claims that a state passed a law for racially discriminatory reasons, the legislative privilege presumptively bars that plaintiff from obtaining documents directly probative of whether the state legislature passed that law with discriminatory intent.[6]

*Hughes* is a published Fifth Circuit opinion,[7] and courts in this Circuit are usually bound to follow such opinions.[8]  But *Hughes* isn't the only published Fifth Circuit case on point.  Just a few years before *Hughes*, the Fifth Circuit ruled in *Jefferson Community Health Care Centers, Inc. v. Jefferson Parish Government* that the state legislative privilege "must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing

---

[4] State Defs.' & Legis. Subpoena Recipients' Suppl. Br., ECF No. 731, at 7.

All page citations to docket entries in this dissenting opinion refer to the page numbers assigned by the Court's CM/ECF system, rather than the document's internal pagination.

[5] *See id.* at 4 (arguing that *Hughes* "rejected the primary argument that all Plaintiffs press here— that legislative privilege must yield in cases alleging racially discriminatory intent and violations of the Constitution and Voting Rights Act [("VRA")] brought by the United States and dozens of plaintiffs" (cleaned up) (quoting *La Union del Pueblo Entero v. Abbott (Hughes)*, 68 F.4th 228, 232, 237–38 (5th Cir. 2023) [hereinafter *Hughes 5th Cir. Op.*])).

[6] *See Hughes 5th Cir. Op.*, 68 F.4th at 238; *see also id.* ("[C]ourts are not to facilitate an expedition seeking to uncover a legislator's subjective intent in drafting, supporting, or opposing proposed or enacted legislation.").

[7] *See id.* at 231.

[8] *See, e.g.*, *ODonnell v. Salgado*, 913 F.3d 479, 482 (5th Cir. 2019) ("[P]ublished [Fifth Circuit] opinions[] bind[] the district courts in this circuit.").

all rational means for ascertaining the truth."[9]  Were we to "strictly construe[]" the state

legislative privilege as *Jefferson Community* commands,[10] much of the information that the

Legislators claim is privileged would in fact be discoverable.[11]

      The Legislators nonetheless insist that *Hughes* governs the legislative privilege analysis,

not *Jefferson Community*.[12]  That's exactly backwards.  Under the Fifth Circuit's "Rule of

Orderliness," "to the extent that a more recent case" (*Hughes*) "contradicts an older case"

(*Jefferson Community*), "the newer language has no effect."[13]  So, to the extent *Hughes* and

*Jefferson Community* are irreconcilable, this panel is bound to follow *Jefferson Community*, not

*Hughes*.[14]  Because the panel does the opposite,[15] I respectfully dissent.

# I.    Proving Intentional Discrimination in a Redistricting Case

      Among other causes of action, Plaintiffs claim that the Texas Legislature intentionally

discriminated on the basis of race and national origin when it drew the State's electoral maps in

the latest redistricting cycle.[16]  To prevail on their intentional discrimination claims, Plaintiffs

---

[9] *See Jefferson Cmty. Health Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615, 624 (5th Cir. 2017) (quoting *Perez v. Perry*, No. 5:11-CV-360, 2014 WL 106927, at *1 (W.D. Tex. Jan. 8, 2014)).

[10] *See id.* (quoting *Perez*, 2014 WL 106927, at *1).

[11] *Contra* State Defs.' & Legis. Subpoena Recipients' Suppl. Br. at 6 (insisting that "[t]he legislative privilege categorically bars the disclosure of" all documents that "concern actions that occurred within the sphere of legitimate legislative activity" (cleaned up) (quoting *Hughes 5th Cir. Op.*, 68 F.4th at 235)).

[12] *See id.* at 4.

[13] *See, e.g.*, *Arnold v. U.S. Dep't Interior*, 213 F.3d 193, 196 n.4 (5th Cir. 2000).

[14] *See infra* Section III.

[15] *See Majority Op.*, 2023 WL 8880313, at *1 ("*Hughes* governs our discussion of the legislative privilege's scope, not *Jefferson*.").

[16] *See, e.g.*, LULAC Pls.' 4th Am. Compl., ECF No. 714, at 188; U.S.'s Mot. Enforce 3d-Party Subpoenas, ECF No. 351, at 2.

will need to prove just that: *intent* to discriminate.[17]  It won't suffice to show that the redistricting

plan merely has a racially disparate *effect*[18] (although evidence of such an effect would of course

be relevant).[19]  Nor can Plaintiffs meet their burden by showing that the Legislature was merely

*aware* that the plan had a racially disparate effect.[20]  Plaintiffs must instead prove that the Texas

---

[17] *See infra* note 21 and accompanying text.

[18] *See, e.g.*, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) ("[E]ven if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose."); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977) [hereinafter *Arlington Heights S. Ct. Op.*] ("[O]fficial action will not be held unconstitutional solely because it results in a racially disproportionate impact.").

Admittedly, some of Plaintiffs' other claims don't require proof of discriminatory intent.  Besides their intentional discrimination claims, the Plaintiffs also assert claims under Section 2 of the VRA, *see, e.g.*, LULAC Pls.' 4th Am. Compl. at 190–91, which "can 'be proved by showing discriminatory effect alone,'" *e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc) [hereinafter *Veasey En Banc Op.*] (quoting *Thornburg v. Gingles*, 478 U.S. 30, 35 (1986)).

If Plaintiffs were raising discriminatory effect claims *alone*, the Legislators might have a stronger argument that this Court should limit discovery regarding the Legislature's intent.  *See In re N.D. Legis. Assembly*, 70 F.4th 460, 465 (8th Cir. 2023) ("[Because the plaintiffs in this case are asserting claims under VRA § 2 alone, this] case does not . . . turn on legislative intent.  A claim under § 2 of the [VRA] does not depend on whether the disputed legislative districts were adopted with the intent to discriminate against minority voters, for the statute repudiated an 'intent test.'  Any exception to legislative privilege that might be available in a case that is based on a legislature's alleged intent is thus inapplicable." (cleaned up)).

Here, however, Plaintiffs are pursuing discriminatory effect claims *as well as* discriminatory intent claims.  The fact that Plaintiffs are asserting the former thus shouldn't foreclose them from also seeking evidence to support the latter.  *See, e.g.*, *United States v. Irvin*, 127 F.R.D. 169, 170–71, 174 (C.D. Cal. 1989) (even though VRA § 2 gives plaintiffs "the option of proving *either* discriminatory intent *or* discriminatory result[s]," that did not relieve legislators of the obligation to "respond to deposition questions . . . concerning the intent with which the [legislature] adopted [the enacted redistricting] plan and rejected certain alternatives").

[19] *See Arlington Heights S. Ct. Op.*, 429 U.S. at 266 ("The impact of the official action whether it 'bears more heavily on one race than another' may provide an important starting point.  Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976))).

[20] *See, e.g.*, *Feeney*, 442 U.S. at 279 ("'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences.").

Legislature "selected or reaffirmed a particular course of action at least in part '*because of*,' not merely 'in spite of,' its adverse effects upon an identifiable group."[21]

The very nature of Plaintiffs' claims thus requires them (and us) to probe the Texas Legislature's motivations for designing the electoral map the way it did.[22]  Put more bluntly, "the motives and considerations behind the [challenged redistricting plans] *are* the case."[23]

As the Fifth Circuit has observed, however, "[p]roving the motivation behind official action" is "'a problematic undertaking' and 'a hazardous matter.'"[24]  Besides the inherent difficulty of proving a legislature's private, subjective intentions *via* external, objective proof,[25] litigants challenging redistricting plans must also overcome the presumption that legislatures draft and enact legislation—including redistricting legislation—in good faith.[26]

---

[21] *See id.* (emphasis added).

*But see id.* at 279 n.25 ("This is not to say that the inevitability or foreseeability of consequences of a neutral rule has no bearing upon the existence of discriminatory intent.  Certainly, when the adverse consequences of a law upon an identifiable group are . . . inevitable . . . a strong inference that the adverse effects were desired can reasonably be drawn.").

[22] *See, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 603, 605 (2018) (remarking that "the intent of the . . . Legislature" is "what matters" when a plaintiff alleges that a redistricting plan "was enacted with discriminatory intent"); *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d 323, 337 (E.D. Va. 2015) ("[J]udicial inquiry into legislative intent is specifically contemplated as part of the resolution of the core issue that [redistricting] cases present.").

[23] *Favors I*, 285 F.R.D. at 219 (cleaned up) (emphasis added) (quoting *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *7).

[24] *See Fusilier v. Landry*, 963 F.3d 447, 464 (5th Cir. 2020) (first quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985); then quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)).

[25] *See, e.g.*, *Feeney*, 442 U.S. at 279 n.24 ("Proof of discriminatory intent must necessarily usually rely on objective factors . . . .").

[26] *See, e.g.*, *Abbott*, 585 U.S. at 605 (noting that the plaintiff bears the "burden to overcome the presumption of legislative good faith and show that the . . . [l]egislature acted with invidious intent"); *Prejean v. Foster*, 227 F.3d 504, 509 (5th Cir. 2000) ("Given the presumption of the legislature's good faith in redistricting, showing that a redistricting plan intentionally discriminates is not ordinarily an easy task.").

Thus, as the Supreme Court recognized in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, "[d]etermining whether invidious discriminatory purpose was a motivating factor" for a legislative act "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."[27]  Direct evidence, on one hand, "is evidence that would prove discriminatory intent without reliance on inference or presumption."[28]  "Such evidence essentially requires an admission by the decision-maker that the decision-maker's actions were based upon the prohibited animus."[29]  Circumstantial evidence, by contrast, is that which "allows a factfinder to draw a reasonable *inference* that discrimination occurred."[30]

To be sure, plaintiffs don't necessarily *need* direct evidence to prevail on an intentional discrimination claim; circumstantial evidence alone can sometimes suffice.[31]  Binding Fifth

---

[27] 429 U.S. at 266; *see also infra* Section II.C.2.a.i (analyzing *Arlington Heights* in greater depth).

[28] *Cf., e.g.*, *Harper v. Fulton County*, 748 F.3d 761, 765 (7th Cir. 2014) (quoting *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 824 (7th Cir. 2011)) (defining "direct evidence" in the employment discrimination context); *see also Veasey En Banc Op.*, 830 F.3d at 236 n.20 (opining that although "employment discrimination cases are not directly supportive" in the voting rights context, "they are analogous" nonetheless).

[29] *Cf., e.g.*, *Harper*, 748 F.3d at 765 (cleaned up) (quoting *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 548 (7th Cir. 2011), *abrogated on other grounds*, *Young v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015)).

[30] *Cf., e.g.*, *Bondurant v. Air Line Pilots Ass'n, Int'l*, 679 F.3d 386, 394 (6th Cir. 2012) (defining the term in the employment discrimination context) (cleaned up) (emphasis added) (quoting *Geiger v. Tower Auto.*, 579 F.3d 614, 626 (6th Cir. 2009)).

[31] *See, e.g.*, *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999) ("[A]ppellees' evidence tends to support an inference that the State drew its district lines with an impermissible racial motive—even though they presented no direct evidence of intent."); *Veasey En Banc Op.*, 830 F.3d at 235 ("[A]lthough the record does not contain *direct* evidence that the Texas Legislature passed [a voter ID law] with a racially invidious purpose, this does not mean there is no evidence that supports a finding of discriminatory intent. '[D]iscriminatory intent need not be proved by direct evidence.'" (quoting *Rogers v. Lodge*, 458 U.S. 613, 618 (1982))); *Mich. State A. Philip Randolph Inst. v. Johnson*, No. 16-cv-11844, 2018 WL 1465767, at *5 (E.D. Mich. Jan. 4, 2018) ("[W]hile testimony and other communications reflecting a legislator's stated

Circuit precedent holds, however, that "direct evidence of discriminatory intent must be prioritized over circumstantial evidence" in redistricting cases.[32]  So, all else being equal, a plaintiff basing an intentional discrimination claim on circumstantial evidence alone is in a worse position.[33]

Thus, to have a fair chance to satisfy their heavy evidentiary burdens, plaintiffs challenging redistricting plans must have a meaningful opportunity to examine the plan's legislative record—including "contemporaneous statements by members of the decisionmaking body, minutes of its meetings, or reports"—for direct evidence of discriminatory intent.[34] *Arlington Heights* explicitly contemplates that such evidence "may be highly relevant" and is therefore a "subject[] of proper inquiry" in intentional discrimination cases.[35]

Obviously, though, direct evidence of discriminatory intent is rarely accessible in the public domain.  Whereas, in darker chapters of our nation's history, it wasn't uncommon for lawmakers to announce publicly that they passed a law for racially discriminatory reasons,[36] a legislator in this century would have to be uncommonly brazen or obtuse to broadcast in the

---

motivation might be the most direct form of evidence of discriminatory intent, it is not necessary to sustain a claim under the Equal Protection Clause or [VRA].").

[32] *Fusilier*, 963 F.3d at 464.

[33] *See, e.g.*, *Benisek v. Lamone*, 241 F. Supp. 3d 566, 576 (D. Md. 2017) (opining that publicly-available legislative records, while "valuable," are "not a substitute for the ability to depose a witness and obtain *direct* evidence of motive and intent" in redistricting cases).

[34] *See Arlington Heights S. Ct. Op.*, 429 U.S. at 268.

[35] *See id.*

[36] *See, e.g.*, *Hunter*, 471 U.S. at 229 (recounting that the President of the Alabama Constitutional Convention of 1901 "stated in his opening address" that the Convention's purpose was "to establish white supremacy in th[e] State" (quoting 1 OFFICIAL PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF ALABAMA, May 21st, 1901 to September 3rd, 1901, p. 8 (1940))).

legislative record that he and his colleagues purposefully drew an electoral map to diminish a racial group's voting power.[37]

So, if direct evidence of discriminatory intent *does* exist in any particular case, the plaintiff probably won't find it in the public record; it's probably hiding in the legislators' internal communications and actions.[38]  For exactly that reason, the Plaintiffs here are seeking nonpublic evidence that could reveal the private motivations underlying Texas's redistricting plans.[39]

But even though that evidence would be uniquely probative of whether the Texas Legislature intentionally discriminated against voters of color,[40] that's exactly the evidence that

---

[37] *See, e.g.*, *Hunt*, 526 U.S. at 553 ("Outright admissions of impermissible racial motivation are infrequent and plaintiffs often must rely upon other evidence."); *Nashville Student Org. Comm. v. Hargett*, 123 F. Supp. 3d 967, 970 (M.D. Tenn. 2015) ("[A]s numerous district courts have stated, the practical reality is that officials seldom, if ever, announce that they are pursuing a course of action because of an invidious discriminatory intent (as opposed to a legitimate policy reason).").

[38] *See, e.g.*, *Veasey v. Perry*, No. 2:13-CV-193, 2014 WL 1340077, at *2–3 (S.D. Tex. Apr. 3, 2014) [hereinafter *Veasey Dist. Ct. Op.*] (concluding that because state legislators "seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority," litigants challenging a Texas voting law weren't limited to "publicly available sources (*e.g.*, public debates, legislative history, and floor speeches) to establish [their] discriminatory intent claim," but instead could obtain discovery regarding "what the individual legislators said amongst each other"); *N.C. State Conf. of the NAACP v. McCrory*, No. 1:13CV658, 2014 WL 12526799, at *2 (M.D.N.C. Nov. 20, 2014) (noting that "courts often look to legislative evidence outside the formal legislative record" "in [VRA] cases"), *objections overruled*, 2015 WL 12683665 (M.D.N.C. Feb. 4, 2015) [hereinafter *McCrory*].

[39] *See, e.g.*, U.S.'s Mot. Enforce 3d-Party Subpoenas at 4, 13 (seeking "documents reflecting the State Legislators' contemporaneous thoughts and motivations in drafting and enacting" the challenged redistricting legislation, "includ[ing] draft legislation and legislative communications" (cleaned up)); LULAC Pls.' Mot. Compel 3d-Party Subpoenas *Duces Tecum*, ECF No. 447, at 6 (seeking "[d]raft redistricting plans, the data used in drafting those plans, Respondents' communications (especially with map-drawers) and other legislative materials" because they may "bear directly on whether 'invidious discriminatory purpose was a motivating factor'" in the redistricting process (quoting *Arlington Heights S. Ct. Op.*, 429 U.S. at 266)).

[40] *See, e.g.*, *Cano v. Davis*, 193 F. Supp. 2d 1177, 1182 (C.D. Cal. 2002) (Reinhardt, J., concurring in part and dissenting in part) ("When a plaintiff must prove discriminatory intent on the part of a legislature, the statements of legislators involved in the process, especially leaders and committee chairmen, as well as the authors of the legislation involved, may in some instances be the best available

the Texas Legislators say Plaintiffs can't get.[41]  The Legislators insist that the "state legislative privilege" doctrine "squarely foreclose[s]" Plaintiffs from obtaining any evidence bearing on "the legislators' intent and motive in enacting the redistricting legislation."[42]

If the Legislators are right that the legislative privilege categorically bars litigants from lifting the legislative rug to check for evidence of discriminatory intent hiding underneath, then it's unclear how litigants and courts are realistically supposed to perform the vitally important task of ferreting out and eradicating schemes to intentionally suppress a racial group's voting power.[43]  To require plaintiffs to introduce proof of a legislature's motivations—while simultaneously barring them from discovering the evidence that is most probative of those motivations—effectively forces such plaintiffs "to litigate these important cases with one hand tied behind their backs."[44]

---

evidence as to legislative motive. . . . Motive is often most easily discovered by examining the unguarded acts and statements of those who would otherwise attempt to conceal evidence of discriminatory intent."); *Benisek*, 241 F. Supp. 3d at 576 (remarking that "conversations between and among legislators" could "be the most probative evidence of intent" in a redistricting case "because they relate to moments when unconstitutional intent may have infected the legislative process").

[41] *See generally* State Defs.' & Legis. Subpoena Recipients' Suppl. Br.

[42] *Id.* at 7.

[43] *Cf., e.g.*, *Pernell v. Fla. Bd. of Governors of the State Univ.*, 84 F.4th 1339, 1354 (11th Cir. 2023) (Jill Pryor, J., dissenting) (opining in a different but analogous context that barring plaintiffs asserting racial discrimination claims from obtaining "discovery into legislative acts or the motivation for actual performance of legislative acts" "forces a whole category of plaintiffs, tasked with an already difficult standard of proof, to make their cases without the tools ordinarily available to civil litigants").

[44] *See id.* at 1346.

*See also, e.g.*, *S.C. State Conf. of the NAACP v. McMaster*, 584 F. Supp. 3d 152, 164 (D.S.C. 2022) (remarking that plaintiffs challenging redistricting plans as racially discriminatory "cannot be expected to make th[at] showing in the dark"—that is, without "documents and communications which may demonstrate discriminatory intent by legislators or their key agents").

*See also Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 305 (D. Md. 1992) (opinion of Murnaghan, J. & Motz, J.) (opining that, because Congress and the Supreme Court have chosen to give federal courts jurisdiction to review state redistricting plans, federal courts must

More concerningly, if the state legislative privilege flatly forbade litigants from obtaining nonpublic evidence of discriminatory intent, then state legislators could potentially commit intentional discrimination with impunity—so long as they didn't carelessly let their unlawful motives slip into the public legislative record.[45]  Such a privilege would thereby contravene the usual rule that evidentiary privileges cannot be "used as a 'cloak for illegal . . . behavior.'"[46]

---

provide litigants a meaningful opportunity to prevail on such challenges, as opposed to creating "bright line" evidentiary privileges that "bar virtually all discovery of relevant facts").

[45] *See, e.g.*, *Angelicare, LLC v. St. Bernard Parish*, No. 17-7360, 2018 WL 1172947, at *9 (E.D. La. Mar. 6, 2018) (noting the "concern that the legislative privilege could be used to allow legislators to hide evidence of discriminatory intent"); *Citizens Union of N.Y.C. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124, 167 (S.D.N.Y. 2017) ("[I]n discrimination cases like . . . redistricting and voting rights cases . . . evidence needed to demonstrate invidious or discriminatory motives or self-dealing may not be available from sources other than individual legislators; indeed, the legislator may have actively attempted to hide evidence of self-dealing or unlawful motives."); *Harris v. Ariz. Indep. Redistricting Comm'n*, 993 F. Supp. 2d 1042, 1070–71 (D. Ariz. 2014) ("In the event that plaintiffs' [redistricting] claims have merit, and that the commissioners were motivated by an impermissible purpose, the commissioners would likely have kept out of the public record evidence making that purpose apparent.").

[46] *Cf., e.g.*, *Smith v. Powder Mountain, LLC*, No. 08-cv-80820, 2009 WL 10698489, at *7 (S.D. Fla. Nov. 9, 2009) (quoting *In re Grand Jury Proc.*, 680 F.2d 1026, 1028 (5th Cir. Unit A 1982)) (discussing the attorney-client privilege).

*See also, e.g.*, *In re Grand Jury Proc.*, 604 F.2d 798, 802 (3d Cir. 1979) (remarking that the work product privilege would be "perverted if it [could be] used to further illegal activities"); *Waters v. U.S. Capitol Police Bd.*, 218 F.R.D. 323, 324 (D.D.C. 2003) (opining that the deliberative process privilege should not "thwart discovery of information in a case in which a plaintiff challenges governmental action as discriminatory").

## II.     The State Legislative Privilege's Proper Scope

However, binding Supreme Court and Fifth Circuit precedent don't support the Legislators' absolutist conception of the state legislative privilege—quite the opposite.  To understand why that's so, though, one must first understand the critical differences between four related but distinct legal doctrines:

(1)     *Federal* Legislative *Immunity*;

(2)     Federal Legislative *Privilege*;

(3)     *State* Legislative Immunity; and

(4)     State Legislative *Privilege*.

For the reasons explained below, although the first three of those four doctrines categorically prohibit inquiries into a legislature's motives and intent, the state legislative privilege imposes no such absolute bar.[47]

---

[47] *See infra* Sections II.A–C.

## A.    The Distinction Between Legislative Privilege and Legislative Immunity

Federal Judges and Justices have occasionally used the phrase "legislative privilege" as a single catch-all term to refer to two distinct concepts:

> (1)    A legislator's *privilege* to *withhold* documents, testimony, and other evidence from *discovery* (and, ultimately, from public disclosure at trial); and
>
> (2)    A legislator's *immunity* from *suit, prosecution, and liability* for their legislative acts.[48]

As illustrated below, though, that terminological looseness has led some courts to conflate those two doctrines in ways that obscure their critical differences.[49]  To better illuminate those important distinctions, some courts use the phrase "legislative *privilege*" to refer only to the first of those two concepts,[50] and the term "legislative *immunity*" to refer exclusively the second.[51]  This dissenting opinion will do the same.

---

[48] *See, e.g.*, *Am. Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th 76, 86 n.6 (1st Cir. 2021) ("The terms 'immunity' and 'privilege' have at times been used interchangeably."); *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 95 (S.D.N.Y.) (opining that although legislative immunity and legislative privilege are "[c]losely related" and "often discussed interchangeably," there are "key difference[s]" between the two doctrines), *aff'd*, 293 F. Supp. 2d 302 (S.D.N.Y. 2003).

    *See also, e.g.*, *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (referring to "[t]he *privilege* of absolute [legislative] *immunity*" (emphases added)); *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951) (discussing "[t]he *privilege* of legislators to be free from *arrest or civil process* for what they do or say in legislative proceedings" (emphases added)); *United States v. Johnson*, 383 U.S. 169, 179 (1966) ("In *Tenney v. Brandhove*, at issue was whether legislative *privilege* protected a member of the California Legislature against a *suit* brought under the Civil Rights statute . . . . (emphases added) (citations omitted)); *Gravel v. United States*, 408 U.S. 606, 626 (1972) (referring to "*immunity . . . from testifying*" (emphases added)); *N.D. Legis. Assembly*, 70 F.4th at 463 (remarking that legislative "*privilege* . . . protects legislators from *suit or* discovery" (emphases added)).

[49] *See infra* Sections II.C.2.c, II.C.2.f.ii.

[50] *See, e.g.*, *Glowgower v. Bybee-Fields*, No. 3:21-CV-00012, 2022 WL 4042412, at *8 (E.D. Ky. Sept. 2, 2022) ("In a motion to compel, where questions of discovery are at issue, the relevant question is whether the legislative *privilege*—not legislative *immunity*—applies."); *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *7 ("The legislative *privilege* does *not* shield lawmakers from being *sued*, but rather protects them from *producing documents* in certain cases." (emphases added)).

### B.       Federal Legislators and the Federal Speech or Debate Clause

After disentangling legislative *immunity* from legislative *privilege*, the next step is to determine their respective scopes.[52]  For the following reasons, whereas *federal* legislative immunity and privilege are roughly coextensive,[53] the legislative privilege that *state* legislators enjoy is much narrower than state legislative *immunity*.[54]

### 1.       Federal Legislative Immunity

Members of the U.S. Congress possess broad legislative immunity by virtue of the U.S. Constitution's Speech or Debate Clause,[55] which provides that

> Senators and Representatives . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and return from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.[56]

---

[51] *See, e.g.*, *Alviti*, 14 F.4th at 86 n.6 ("[F]ollowing the Supreme Court's lead[,] . . . we use 'immunity' only when discussing potential liability and 'privilege' only when referring to evidentiary issues."); *Lindley v. Life Invs. Ins. Co. Am.*, No. 08-CV-379, 2009 WL 2245565, at *3 (N.D. Okla. July 24, 2009) (observing that although the two terms are sometimes "used interchangeably," "legislators' immunity from suit is [generally] referred to as 'legislative immunity,'" while "the evidentiary privilege accorded legislators is referred to as the 'legislative privilege'").

[52] *See, e.g.*, *Bethune-Hill*, 114 F. Supp. 3d at 331 ("[I]t is important to identify how legislative immunity and legislative privilege differ between federal and state legislators as to the source of the privileges, their purpose, and the degree of their protection.").

[53] *See infra* Section II.B.

[54] *See infra* Section II.C.

[55] *See, e.g.*, *Supreme Court of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 731 (1980) ("[T]he Speech or Debate Clause immunizes Congressmen from suits for either prospective relief or damages." (citing *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502–03 (1975))).

[56] U.S. CONST. art. I, § 6, cl. 1.

To "[e]nsure that the legislative function may be performed independently without fear of outside interference,"[57] the Speech or Debate Clause shields Congresspersons not just "from the *consequences* of litigation's results"—such as monetary liability—"but also from the *burden of defending* themselves" from such suits in the first place.[58]  In that respect, federal legislative immunity is very broad.[59]

### a.   *Eastland*

So, to illustrate, in *Eastland v. U.S. Servicemen's Fund*, a Subcommittee of the U.S. Senate subpoenaed a bank for information about a nonprofit organization.[60]  The organization then sued several Members of that Subcommittee in an attempt to stop them from enforcing the subpoena.[61]

The Supreme Court ruled that the Speech or Debate Clause gave the Senators "complete immunity" from the organization's lawsuit.[62]  The Court opined that the Clause serves two purposes:

---

[57] *Supreme Court of Virginia*, 446 U.S. at 731.

[58] *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967) (emphases added).

[59] *See, e.g.*, *Eastland*, 421 U.S. at 501 ("Without exception, our cases have read the Speech or Debate Clause broadly to effectuate its purposes.").

*But see, e.g.*, *Hughes v. Tarrant County*, 948 F.2d 918, 920 (5th Cir. 1991) ("Not all actions taken by an official with legislative duties . . . are protected by absolute immunity—only those duties that are functionally legislative.").

[60] 421 U.S. at 494.

[61] *Id.* at 495–96.

[62] *Id.* at 507.

(1)    preserving the constitutional separation of powers between Congress and the Executive and Judicial Branches of the federal government;[63] and

(2)    safeguarding legislative independence by shielding legislators from litigation that could divert their attention from[64]—and deter them from faithfully performing[65]—their legislative duties.

Reasoning that courts must "read the Speech or Debate Clause broadly to effectuate" those dual purposes, the *Eastland* Court held that so long as a federal legislator is acting "within the sphere of legitimate legislative activity," "the Speech or Debate Clause is an absolute bar" to lawsuits based on those activities.[66]  Because the Subcommittee had issued the challenged subpoena pursuant to a congressional investigation regarding matters within the Subcommittee's jurisdiction, the Senators were conducting "legitimate legislative activit[ies]"—and, thus, the Speech or Debate Clause immunized the Senators from the organization's suit.[67]

The Supreme Court reached that conclusion even though the organization claimed that the Subcommittee was conducting the investigation not for a valid legislative purpose, but rather to deter the organization's members from exercising their constitutional rights.[68]  The Court opined that when "determining the legitimacy of a congressional act" for federal legislative

---

[63] *Id.* at 502.

[64] *See id.* at 503 ("Just as a criminal prosecution infringes upon the independence which the [Speech or Debate] Clause is designed to preserve, a private civil action, whether for an injunction or damages, creates a distraction and forces Members [of Congress] to divert their time, energy, and attention from their legislative tasks to defend the litigation.  Private civil actions also may be used to delay and disrupt the legislative function.").

[65] *See id.* at 502 ("[T]he 'central role' of the [Speech or Debate] Clause is 'to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary.'" (quoting *Gravel*, 408 U.S. at 617)).

[66] *Id.* at 501–03 (quoting *Doe v. McMillan*, 412 U.S. 306, 312–13 (1973) [hereinafter *McMillan*]).

[67] *See id.* at 504–06.

[68] *See id.* at 508–11.

immunity purposes, courts should "not look to the motives alleged to have prompted" the challenged action.[69]  The Court reasoned that if a "mere allegation that a valid legislative act was undertaken for an unworthy purpose" could "lift the protection of the [Speech or Debate] Clause, then the Clause simply would not provide the protection historically undergirding it"[70]—*i.e.*, would not safeguard legislative independence and the constitutional separation of powers.[71]  The Court thus concluded that federal legislators "are immune from liability for their actions within the 'legislative sphere'"—even if "their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes."[72]

Thus, *Eastland*'s most important takeaway is that for the purposes of determining whether a plaintiff may *sue* a *federal* legislator, courts should not inquire into that legislator's motives and intent.[73]  "[T]he Speech or Debate Clause protects against inquiry into" not just "*acts* that occur in the regular course of the legislative process," but also "the *motivation* for those acts."[74]

---

[69] *Id.* at 508.

[70] *Id.* at 508–09.

[71] *See supra* notes 63–65 and accompanying text.

[72] *Eastland*, 421 U.S. at 510 (first quoting *Gravel*, 408 U.S. at 624–25; then quoting *McMillan*, 412 U.S. at 312–13).

[73] *Id.* at 508–10.

[74] *Id.* at 508 (quoting *United States v. Brewster*, 408 U.S. 501, 525 (1972)).

b.    *Brewster*

That's not to say, of course, that the Speech or Debate Clause gives federal legislators *carte blanche* to break laws with impunity.[75]  So long as "the Government's case does not rely on legislative acts or the motivation for legislative acts," "a Member of Congress may [still] be prosecuted" for violations of federal law.[76]

In *United States v. Brewster*, for example, the Supreme Court ruled that the Government could prosecute a former U.S. Senator for bribery because "[t]aking a bribe is . . . not, by any conceivable interpretation, an act performed as a part of or even incidental to the role of a legislator."[77]  Thus, at least under the specific facts of *Brewster*, "no inquiry into legislative acts or motivation for legislative acts [was] necessary for the Government" to prove its case—and, as a consequence, the prosecution could proceed.[78]

---

[75] *See, e.g.*, *Bethune-Hill*, 114 F. Supp. 3d at 332 ("Of course, this does not mean that federal legislators are immune from criminal or civil law in any general sense.  Rather, the [Speech or Debate] Clause means that legislative activities may not constitute a basis for liability, either as the predicate of the cause of action or as evidence in support thereof." (citations omitted)); *Brewster*, 408 U.S. at 516 (emphasizing that the Speech or Debate Clause does not "make Members of Congress super-citizens, immune from criminal responsibility").

[76] *Brewster*, 408 U.S. at 512.

*See also id.* (defining a "legislative act" as "an act generally done in Congress in relation to the business before it"—*i.e.*, "things generally said or done in the House or the Senate in the performance of official duties"); *id.* at 512–13 (identifying acts that "are political in nature rather than legislative" and therefore don't enjoy "the protection afforded by the Speech or Debate Clause").

*But see id.* at 529 n.18 (leaving undecided whether "an inquiry that probe[d] into legislative acts or the motivation for legislative acts" would violate the Speech or Debate Clause "if Congress specifically authorize[d] such" an inquiry "in a narrowly drawn statute").

[77] *Id.* at 526.

[78] *Id.* at 525.

*But see infra* Section II.B.2.a (explaining that even when the Speech or Debate Clause doesn't prohibit the Government from *prosecuting* a federal legislator, it may still bar the Government from *introducing certain evidence* at the Congressperson's criminal trial).

### 2.      Federal Legislative Privilege

Besides legislative *immunity*, the Speech or Debate Clause also grants federal legislators a legislative *privilege* that confers three distinct protections.[79]

*First*, the Clause confers an *evidentiary* privilege.[80]  A Congressperson's legislative acts "may not be introduced into evidence even when the government seeks to punish [that legislator] for non-legislative acts."[81]

*Second*, the Clause provides at least some "protection against the *compelled disclosure of documents*."[82]  Generally speaking, neither the U.S. Government nor a private litigant may "force Members to hand over documentary evidence of [their legislative] acts."[83]

*Third*, the Clause provides "a *testimonial* privilege" that typically bars litigants from "forc[ing] a Member [of the U.S. Congress] to testify about legislative acts."[84]  Federal legislators enjoy that testimonial privilege "regardless of the Member's subjective motives" for taking the legislative act in question.[85]

---

[79] *See, e.g.*, *In re Sealed Case*, 80 F.4th 355, 365 (D.C. Cir. 2023).

[80] *See, e.g.*, *id.*

[81] *Id.* (citing *Johnson*, 383 U.S. at 176–77).

[82] *E.g.*, *id.* (emphasis added).

[83] *E.g.*, *id.* (citing *United States v. Hubbell*, 530 U.S. 27, 40 (2000)).

[84] *E.g.*, *id.* (emphasis added) (citing *Gravel*, 408 U.S. at 616).

[85] *E.g.*, *id.* (citing *Tenney*, 341 U.S. at 377).

###### a.        *Helstoski*

*United States v. Helstoski* illustrates the first of those three components of the federal legislative privilege—*i.e.*, the Speech or Debate Clause's prohibition against *introducing certain evidence* of a Congressperson's legislative activities in a judicial proceeding.[86]

The defendant in *Helstoski* was a former Congressperson whom the federal government charged with bribery.[87]  Although the Supreme Court reaffirmed *Brewster*'s holding that the federal legislative *immunity* doctrine didn't bar the Government from *prosecuting* the Congressperson,[88] it also held that the federal legislative *privilege* barred the Government from *introducing evidence* of the Congressperson's "past legislative acts" at his criminal trial.[89]  The Court reasoned that the Speech or Debate Clause "protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts"—and thereby "precludes any showing" in a judicial proceeding "of how a [federal] legislator acted, voted, or decided."[90]

---

[86] *See generally* 442 U.S. 477 (1979).

[87] *See id.* at 479.

[88] *See id.* at 487–88 (quoting *Brewster*, 408 U.S. at 512); *see also supra* Section II.B.1.b (analyzing *Brewster* in depth).

[89] *See* 442 U.S. at 487–89.

*But see id.* at 489–90 (reasoning that the Government could still introduce evidence of the Congressperson's "[p]romises . . . to perform an act in the *future*" because such promises "are not legislative acts" protected by the Speech or Debate Clause).

[90] *Id.* at 489 (quoting *Brewster*, 408 U.S. at 525, 527).

Thus, just as *Eastland* demonstrates that federal legislative *immunity* bars courts from scrutinizing federal legislators' motives for the purposes of determining whether they're immune *from suit or liability*,[91] *Helstoski* establishes that the federal legislative *privilege* may likewise bar litigants from *introducing evidence* bearing on the motivations underlying a Congressperson's legislative acts.[92]

### b.   *Gravel*

Whereas *Helstoski* elucidates the federal legislative privilege's *evidentiary* component, the Supreme Court's decision in *Gravel v. United States* bears on the privilege's other two components—*i.e.*, whether and when a Congressperson may resist demands to *disclose information* or *provide compulsory testimony* regarding his or her legislative activities.[93]

*Gravel* involved a U.S. Senator who read extensively from a top-secret Defense Department study at a congressional subcommittee meeting.[94]  The Senator then placed the study in the public legislative record and arranged for publishers to publicly disseminate it.[95]

The federal government convened a grand jury to investigate whether the Senator's actions violated federal law.[96]  In furtherance of that investigation, the Government subpoenaed one of the Senator's aides to testify before the grand jury.[97]  The Senator moved to quash the

---

[91] *See supra* Section II.B.1.a.

[92] *See* 442 U.S. at 489.

[93] *See generally* 408 U.S. at 608–29.

[94] *Id.* at 609.

[95] *Id.* at 608–10.

[96] *Id.* at 608.

[97] *Id.* at 608–10.

subpoena, arguing that requiring his aide to appear and testify would violate the Speech or Debate Clause.[98]

In a passage that will become increasingly important below,[99] the Supreme Court deemed it "incontrovertible" that the Senator could "not be made to answer—either in terms of questions or in terms of defending himself from prosecution—for the events that occurred at the subcommittee meeting."[100]  The Court therefore held that compelling the Senator—or, by extension, his aides—to answer questions about the subcommittee hearing in a criminal proceeding would "impinge upon or threaten the legislative process" and thereby contravene the federal legislative privilege.[101]

### C.      State Legislators and Federal Common Law

As the foregoing discussion demonstrates, the Speech or Debate Clause gives federal legislators immunity and privilege in roughly equal measure.  By its plain terms, though, the federal Speech or Debate Clause applies to *federal* legislators *only*—it *doesn't* apply to *state*

---

[98] *Id.*

[99] *See infra* note 534 and accompanying text.

[100] 408 U.S. at 615–16.

[101] *Id.* at 616, 622.

legislators.[102]  Thus, the U.S. Constitution doesn't *itself* confer any immunity or privilege upon state lawmakers.[103]

### 1.      State Legislative Immunity

Nevertheless, as a matter of federal *common* law (rather than *constitutional* law), state legislators enjoy an immunity from suit and liability comparable to that which federal legislators possess under the Speech or Debate Clause.[104]  Like federal legislative immunity, state legislative immunity is very broad; indeed, the Supreme Court has repeatedly described it as "absolute."[105]

### a.      *Tenney*

To illustrate, the plaintiff in a case called *Tenney v. Brandhove* alleged that certain members of the California Legislature had conducted an investigation not "for a legislative purpose," but rather "to intimidate and silence [him] and deter and prevent him from effectively

---

[102] *See, e.g.*, *United States v. Gillock*, 445 U.S. 360, 366 n.5 (1980) (noting that, "by its terms," "the Federal Speech or Debate Clause . . . applies only to 'Senators and Representatives'" of the U.S. Congress, not to "state legislators"); *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 404 (1979) ("The Speech or Debate Clause of the United States Constitution is [not] applicable to the members of state legislatures . . . .").

Although many *state* constitutions contain analogues to the federal Speech or Debate Clause, those state constitutional protections don't apply where a plaintiff is raising claims in a federal court that arise exclusively under federal law.  *See, e.g.*, *Favors I*, 285 F.R.D. at 208.

[103] *See, e.g.*, *Gillock*, 445 U.S. at 366 n.5; *Lake Country Estates*, 440 U.S. at 404.

[104] *See, e.g.*, *Supreme Court of Virginia*, 446 U.S. at 732–33 ("[S]tate legislators enjoy common-law immunity from liability for their legislative acts, an immunity that is similar in origin and rationale to that afforded Congressmen under the Speech or Debate Clause. . . . [W]e generally have equated the legislative immunity to which state legislators are entitled . . . to that accorded Congressmen under the Constitution." (citations omitted)).

[105] *See, e.g.*, *Bogan*, 523 U.S. at 54; *Supreme Court of Virginia*, 446 U.S. at 733–34.

exercising his constitutional rights."[106]  Based on those allegations, the plaintiff sued those state legislators for monetary damages.[107]

Even though the Speech or Debate Clause didn't itself offer the state legislators any protection from the plaintiff's suit,[108] the Supreme Court nonetheless ruled that they enjoyed immunity from the plaintiff's claims under the common law.[109]  Invoking the same sorts of legislative independence concerns that animate the Speech or Debate Clause,[110] the Court explained that "the principle that the legislature must be free to speak and act without fear of criminal and civil liability" had a long historical pedigree.[111]  The Court therefore concluded that so long as state legislators are "acting in the sphere of legitimate legislative activity"—that is, so long as they're "acting in a field where legislators traditionally have power to act"—they aren't subject to civil liability for their conduct.[112]  So, because the plaintiff in *Tenney* was trying to hold state legislators liable for their investigative activities, and because such investigations "are an established part of representative government," the Supreme Court ruled that the state legislators were immune from the plaintiff's suit.[113]

---

[106] 341 U.S. at 369–71.

[107] *Id.* at 371.

[108] Although *Tenney* mentions the federal Speech or Debate Clause at various points, *see id.* at 372–73, the Supreme Court subsequently "made clear that [*Tenney*'s] holding was grounded on its interpretation of federal common law, not on the Speech or Debate Clause," *Gillock*, 445 U.S. at 372 n.10 (citing *Lake Country Estates*, 440 U.S. at 404).

[109] *See id.* at 372–79.

[110] *See supra* notes 64–65 and accompanying text.

[111] *See* 341 U.S. at 372–76.

[112] *Id.* at 376, 379.

[113] *Id.* at 377–78.

The *Tenney* Court reached that conclusion even though the plaintiff had accused the legislators of conducting their investigations for "an unworthy purpose."[114]  The Court opined that state legislative immunity "would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives."[115]  The Court therefore remarked that it is "not consonant with our scheme of government for a court to inquire into the motives of legislators."[116]

The major takeaway from *Tenney* is that the *state* legislative immunity doctrine forbids courts from scrutinizing state lawmakers' motives for the purposes of determining whether they're immune from suit or liability[117]—just like the *federal* legislative immunity doctrine does for Members of the U.S. Congress.[118]

It's critical to emphasize, however, that *Tenney* was a state legislative *immunity* case, *not* a state legislative *privilege* case.[119]  The plaintiff in *Tenney* wasn't trying to obtain documents or

---

[114] *See id.* at 377.

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *See supra* Section II.B.1.

[119] *See* 341 U.S. at 377 ("Legislators are *immune* from deterrents to the uninhibited discharge of their legislative duty . . . ." (emphasis added)).

*See also, e.g.*, *Loesel v. City of Frankenmuth*, No. 08-11131, 2010 WL 456931, at *6 (E.D. Mich. Feb. 4, 2010) ("*Tenney* . . . addressed immunity from suit, not an evidentiary privilege that would prevent a state legislator from testifying at a deposition or trial."); *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't Health & Rehab. Servs.*, 164 F.R.D. 257, 262 (N.D. Fla. 1995) ("*Tenney* concerned only immunity from suit, not a state legislative evidentiary privilege."); *Whitford v. Gill*, 331 F.R.D. 375, 378 (W.D. Wis.) ("*Tenney* was not about a privilege against testifying or complying with discovery requests, which [are] less burdensome and intrusive than being a defendant in a lawsuit."), *vacated on other grounds*, 2019 WL 4571109 (7th Cir. 2019).

compel testimony from the legislator defendants; nor was he trying to introduce evidence of protected legislative activities into the record of a judicial proceeding.[120]  Instead, he was trying to hold legislators liable for monetary damages.[121]

Thus, for reasons that will become increasingly clear below, *Tenney*'s proclamation that it's "not consonant with our scheme of government for a court to inquire into the motives of legislators"[122] only categorically prohibits courts from inquiring into legislative motives for the purposes of determining whether a state legislator is *immune from suit or liability*.[123]  *Tenney doesn't* categorically prohibit litigants from merely *obtaining evidence* bearing on state legislature's motives—especially where those motives are a key issue in the case.[124]

That remains true even though the *Tenney* Court used the word "privilege" several times in its opinion.[125]  Context makes clear that the Court (perhaps imprecisely) was using "privilege" as a generic shorthand to refer to *immunity from suit and liability*, as opposed to a privilege against complying with demands for *documentary or testimonial evidence*.[126]

---

[120] *See* 341 U.S. at 369–79.

[121] *See id.* at 371.

[122] *See id.* at 377.

[123] *See infra* Section II.C.2.a.

[124] *See infra* Section II.C.2.a.

[125] *See, e.g.*, 341 U.S. at 373 ("The reason for the *privilege* is clear." (emphasis added)); *id.* at 377 ("The claim of an unworthy privilege does not destroy the *privilege*." (emphasis added)); *id.* at 378 ("We have only considered the scope of the *privilege* as applied to the facts of the present case." (emphasis added)).

[126] *See, e.g.*, *id.* at 372–77 (discussing the historical antecedents of "[t]he *privilege* of legislators to be free *from arrest or civil process* for what they do or say in legislative proceedings" (emphases

b.     *Bogan*

The Supreme Court expanded upon *Tenney*'s holdings when it decided *Bogan v. Scott-Harris* several decades later.[127]  The plaintiff in *Bogan* sued various local[128] legislators for eliminating her position as the administrator of a city agency—a decision that, according to the plaintiff, the legislators allegedly based on "racial animus and a desire to retaliate against her for exercising her First Amendment rights."[129]

The Court reaffirmed *Tenney*'s holding that, at least for the purposes of determining whether a legislator is immune from suit, "it simply is 'not consonant with our scheme of government for a court to inquire into the motives of legislators.'"[130]  Thus, even though the plaintiff in *Bogan* had accused the lawmakers of making legislative decisions for racially discriminatory reasons, the lawmakers were nevertheless "entitled to absolute legislative immunity" from the plaintiff's claims.[131]  Thus, for the purposes of this dissent, the most important takeaway from *Bogan* is that state legislators remain immune from suit and liability

---

added)); *id.* at 377 ("The *privilege* would be of little value if [legislators] could be subjected to . . . the hazard of a *judgment against them* based upon a jury's speculation as to motives." (emphases added)).

See also supra Section II.A (noting that courts have occasionally used the term "privilege" as a catch-all term to refer to both legislative immunity and the legislative privilege).

[127] *See* 523 U.S. at 48–56.

[128] *Bogan* also held that local lawmakers enjoy legislative immunity to the same degree as their state counterparts.  *See id.* at 49.  This dissent will therefore use the term "state legislative immunity" as a shorthand for "state *and local* legislative immunity."

[129] *Id.* at 47.

[130] *Id.* at 55 (quoting *Tenney*, 341 U.S. at 377); *see also id.* at 54 (reaffirming *Tenney*'s admonition that "[t]he privilege of absolute immunity 'would be of little value if legislators could be subjected to the cost and inconvenience and distractions of trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives'" (cleaned up) (quoting *Tenney*, 341 U.S. at 377)).

[131] *Id.* at 56 n.6.

even when a plaintiff accuses them of exercising their legislative powers in racially discriminatory ways.[132]

Here too, though, it's critical to emphasize that *Bogan*—like *Tenney*—was a legislative *immunity* case, *not* a legislative *privilege* case.[133]  The issue in *Bogan* wasn't whether the plaintiff could obtain *documents or testimony* from non-party legislators; it was instead whether the plaintiff could *hold legislators liable* for their legislative acts.[134]  And that remains true even though the *Bogan* Court twice used the word "privilege" as a generic shorthand for "[t]he privilege *of absolute immunity*."[135]

Thus, for reasons explained below, *Bogan*'s admonition that it's "not consonant with our scheme of government for a court to inquire" into whether state lawmakers took legislative acts for racially discriminatory reasons means only that plaintiffs can't *hold those lawmakers liable* based on their motivations.[136]  It doesn't—and can't—mean that courts may never inquire whether a state legislature intentionally discriminated on the basis of race when it passed a law, or that litigants may never obtain evidence bearing directly on that question.[137]

---

[132] *See id.* at 47–55.

[133] *See, e.g., id.* at 46 ("[L]egislators are entitled to absolute *immunity* from *civil liability* for their legislative activities." (emphases added)).

[134] *See id.* at 46–56; *see also, e.g.*, *Rodriguez*, 280 F. Supp. 2d at 95 (identifying *Bogan* as a legislative immunity case rather than a legislative privilege case).

[135] *See* 523 U.S. at 54; *see also id.* at 48 (describing "[t]he principle that legislators are *absolutely immune* from *liability* for their legislative activities" as a "*privilege*" that has "long been recognized in Anglo-American law" (emphases added)).

[136] *See infra* Section II.C.2.a.

[137] *See infra* Section II.C.2.a.

### 2.    State Legislative Privilege

That finally brings us to the state legislative *privilege*—the only one of the four doctrines at issue in our case.  The privilege offers state legislators[138] at least some protection "from compelled disclosure of documentary and testimonial evidence with respect to actions within the scope of legitimate legislative activity."[139]

Like state legislative *immunity*, state legislative *privilege* is a creation of federal common law, rather than a constitutional guarantee under the federal Speech or Debate Clause.[140]  The privilege thus applies in federal question cases by virtue of Federal Rule of Evidence 501,[141] which provides (with exceptions not relevant here) that "[t]he common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege" in the federal courts.[142]

Notably, *municipal* legislators also enjoy a legislative privilege to the same extent as their state counterparts.[143]  The Fifth Circuit has therefore used the term "state legislative privilege" as a shorthand for "state *and local* legislative privilege," and has frequently cited municipal

---

[138] At least in some circumstances, legislative *staffers* enjoy the state legislative privilege's protections as well.  *See, e.g.*, *Page v. Va. State Bd. of Elections*, 15 F. Supp. 3d 657, 664 (E.D. Va. 2014).

[139] *Favors I*, 285 F.R.D. at 209; *see also, e.g.*, *League of Women Voters of Mich. v. Johnson*, No. 17-14148, 2018 WL 2335805, at *3 (E.D. Mich. May 23, 2018).

[140] *E.g.*, *Hughes 5th Cir. Op.*, 68 F.4th at 235.

[141] *E.g.*, *id.* ("Legislative privilege is an evidentiary privilege governed by federal common law, as applied through Rule 501 of the Federal Rules of Evidence." (cleaned up) (quoting *Jefferson Cmty.*, 849 F.3d at 624)).

[142] FED. R. EVID. 501.

[143] *See, e.g.*, *McDonough v. City of Portland*, No. 2:15-cv-153, 2015 WL 12683663, at *1 (D. Me. Dec. 31, 2015) (stating that "a municipal lawmaker may invoke a legislative privilege" under "federal common law" just like a state lawmaker can, and that the privilege is "qualified" no matter whether it's "invoked by a state or municipal lawmaker").

legislative privilege cases for propositions about the state legislative privilege (and *vice versa*).[144] This dissent will therefore treat the state and local legislative privilege—and cases applying each—as effectively interchangeable.

Critically, however, while the *municipal* and state legislative privileges are effectively coextensive, the *federal* and state legislative privileges are not.[145]  Unlike state legislative *immunity*—which is comparable in scope to *federal* legislative immunity and is therefore relatively broad[146]—the state legislative *privilege* is significantly narrower than both state legislative *immunity* and the *federal* legislative privilege.[147]

### a.      Supreme Court Precedent

To understand why that's so, one must first trace the state legislative privilege's historical development.

### i.      *Arlington Heights*

The starting point is *Arlington Heights*.  The plaintiffs there sued a village for denying a rezoning request that would have authorized the plaintiffs to build low- and moderate-income multifamily housing on a parcel of land.[148]  The plaintiffs claimed that the Village's decision was

---

[144] *See, e.g.*, *League of United Latin Am. Citizens v. Abbott*, No. 22-50407, 2022 WL 2713263, at *1–2 (5th Cir. May 20, 2022) [hereinafter *LULAC 5th Cir. Op.*] (citing case involving *municipal* legislators (namely *Jefferson Community*, 849 F.3d at 624) for the proposition that "the *state* legislative privilege is not absolute"); *Jefferson Cmty.*, 849 F.3d at 624 (applying "the legislative privilege for *state* lawmakers" to a legislative privilege claim by *municipal* councilmembers (emphasis added) (quoting *Perez*, 2014 WL 106927, at *2)).

[145] *See infra* Section II.C.2.a.

[146] *See supra* Section II.C.1.

[147] *See infra* Section II.C.2.a.

[148] *See* 429 U.S. at 254.

racially discriminatory, and thus that it violated the Fourteenth Amendment's Equal Protection Clause.[149]

As noted above,[150] *Arlington Heights* explains that "[d]etermining whether invidious discriminatory purpose was a motivating factor" for a governmental action "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."[151]  Among other pertinent considerations,[152] the challenged decision's "legislative . . . history may be highly relevant" to the question of whether the legislature acted with discriminatory intent—"especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."[153]

More importantly for our purposes, however, *Arlington Heights* also holds that plaintiffs seeking evidence of discriminatory motives in a state or local statute's legislative history aren't necessarily limited to statements in the public legislative record.[154]  To the contrary, *Arlington Heights* explicitly states that "[i]n some extraordinary instances," state and municipal lawmakers "might be called to the stand at trial to testify concerning the purpose of the [challenged] action."[155]  *Arlington Heights* thereby indicates that, in at least some circumstances, the state

---

[149] *See id.*

*See also* U.S. CONST. amend. XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws.").

[150] *See supra* Section I.

[151] 429 U.S. at 266.

[152] *See id.* at 266–68.

[153] *Id.* at 268.

[154] *See id.*

[155] *Id.*

legislative privilege won't shield a legislator from the obligation to testify in a federal judicial proceeding about the motives underlying a legislative enactment.[156]

*Arlington Heights* therefore necessarily implies that the prohibition against scrutinizing legislative motives for *federal* legislative privilege purposes doesn't apply with equal force in the *state* legislative privilege context.  As discussed, the *federal* legislative privilege shields federal lawmakers from "inquir[ies] into acts that occur in the regular course of the legislative process *and into the motivation for those acts*."[157]  *Arlington Heights*, however, demonstrates that when evaluating "whether invidious discriminatory purpose was a motivating factor" behind a *state or local* legislative enactment,[158] the state legislative privilege doesn't categorically forbid litigants from calling lawmakers "to the stand at trial to testify concerning the purpose of the [challenged] action."[159]

 By the same token, *Arlington Heights* also teaches that the state legislative *immunity* doctrine's absolute bar against scrutinizing legislative motives isn't directly transferrable to the state legislative *privilege* context either.  *Bogan* and *Tenney*, as the reader will recall, hold that when determining whether a state legislator enjoys "[a]bsolute legislative *immunity*" from suit and liability for "actions taken 'in the sphere of legitimate legislative activity,'" courts shouldn't examine that legislator's "motive or intent."[160]  That's because "absolute immunity 'would be of

---

[156] *See id.*

[157] *See Helstoski*, 442 U.S. at 489 (emphasis added) (quoting *Brewster*, 408 U.S. at 512); *see also supra* Section II.B.2.

[158] *See* 429 U.S. at 266.

[159] *See id.* at 268.

[160] *See Bogan*, 523 U.S. at 54 (emphasis added) (quoting *Tenney*, 341 U.S. at 376); *see also supra* Section II.C.1.

little value of legislators could be subjected to . . . the hazard of a *judgment* against them based upon a jury's speculation as to motives.'"[161]

But that doesn't mean that courts may *never* inquire into a state legislature's motives or intent.  That's because *Arlington Heights* explicitly states that "[p]roof of racially discriminatory intent or purpose" is in fact "*required* to show a violation of the Equal Protection Clause."[162] *Arlington Heights* thus establishes that so long as a litigant isn't trying to *sue* or hold a state legislator individually *liable* for her legislative acts—that is, so long as that litigant isn't trying to overcome a state lawmaker's legislative *immunity*—the state legislative *privilege* doesn't necessarily bar that litigant from calling a *nonparty* state legislator "to the stand at trial to testify concerning the purpose of [a legislative] action."[163]  Accordingly, many District Judges— including judges presiding over redistricting cases—have cited *Arlington Heights* for the proposition that the state legislative privilege doesn't categorically shield state legislators from the obligation to produce documents or provide testimony regarding the motivations underlying a legislative enactment.[164]

That's not to say, of course, that the state legislative privilege is toothless, or that state legislators must provide involuntary testimony or disclose internal legislative documents whenever a litigant demands it.  To the contrary, *Arlington Heights* explicitly acknowledges "that

---

[161] *Bogan*, 523 U.S. at 54 (emphasis added) (quoting *Tenney*, 341 U.S. at 377).

[162] 429 U.S. at 265 (emphasis added).

[163] *Id.* at 268.

[164] *See, e.g.*, *Rodriguez*, 280 F. Supp. 2d at 95–96 (redistricting case citing *Arlington Heights* for the proposition that "notwithstanding their immunity from suit, legislators may, at times, be called upon to produce documents or testify at depositions"); *Marylanders*, 144 F.R.D. at 304 (opinion of Murnaghan, J. & Motz, J.) (redistricting case citing *Arlington Heights* for the proposition that the state legislative privilege "does not . . . necessarily prohibit judicial inquiry into legislative motive where the challenged legislative action is alleged to have violated an overriding, free-standing public policy").

judicial inquiries into legislative . . . motivation represent a substantial intrusion into the workings of other branches of government," and that "[p]lacing a [state legislator] on the stand is therefore 'usually to be avoided.'"[165]  Thus, while *Arlington Heights* contemplates that state lawmakers "might be called to the stand at trial to testify concerning the purpose of [an] official action" in "*extraordinary* instances," the case also cautions that "such testimony frequently will be barred by privilege" in the mine run of cases.[166]  Still, even with those caveats, *Arlington Heights* explicitly contemplates that, in some nonzero number of cases, the legislative privilege won't relieve a state legislator of the obligation to provide compelled testimony regarding the motives underlying a state law.[167]

Indeed, the trial court in *Arlington Heights* *itself* let the plaintiffs obtain discovery from legislators and call at least one legislator to the stand at trial—though, admittedly, one might draw competing inferences from that fact given the case's peculiar procedural posture.  As noted, the plaintiffs in *Arlington Heights* alleged that the Village's denial of their rezoning request was racially discriminatory, and therefore violated the Fourteenth Amendment's Equal Protection Clause.[168]  At the time *Arlington Heights* proceeded to trial, however, the Supreme Court hadn't yet decided *Washington v. Davis*,[169] which held that a plaintiff must prove racially discriminatory *intent*—and not merely a racially disproportionate *impact*—to prevail on an Equal Protection

---

[165] 429 U.S. at 268 n.18 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)).

[166] *See id.* at 268 (emphasis added).

[167] *See id.*

[168] *Metro. Hous. Dev. Corp. v. Village of Arlington Heights*, 517 F.2d 409, 410, 412 (7th Cir. 1975) [hereinafter *Arlington Heights 7th Cir. Op.*], *rev'd*, *Arlington Heights S. Ct. Op.*, 429 U.S. 252.

[169] 426 U.S. 229.

Clause claim.[170]  Thus, as existing Circuit-level precedent then permitted,[171] the *Arlington Heights* plaintiffs litigated their case "on the . . . theory that the Village's refusal to rezone carried a racially discriminatory *effect* and was, without more, unconstitutional."[172]

By the time the case reached the Supreme Court, however, *Davis* had become binding precedent—which foreclosed the *Arlington Heights* plaintiffs from relying exclusively on discriminatory effect like they did in the district court.[173]  The plaintiffs therefore needed to change their theory of the case midstream and argue that the municipality had acted with discriminatory *intent*.[174]

The problem, of course, was that the evidentiary record that the plaintiffs had developed at trial focused almost exclusively on whether the municipality's action had a discriminatory *effect*.[175]  Because the plaintiffs had "repeated[ly] insist[ed] that it was effect and not motivation which would make out a constitutional violation," the district court largely forbade the plaintiffs

---

[170] *Arlington Heights S. Ct. Op.*, 429 U.S. at 264–65, 268 ("Our decision last Term in *Washington v. Davis* made it clear that official action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. . . . This case was tried in the District Court and reviewed in the Court of Appeals before our decision in *Washington v. Davis* . . . ." (citations omitted)).

[171] *See Metro. Hous. Dev. Corp. v. Village of Arlington Heights*, 373 F. Supp. 208, 210 (N.D. Ill. 1974) [hereinafter *Arlington Heights Dist. Ct. Op.*] ("The crucial fact question . . . is whether the *result* of the defendant trustees' action caused racial discrimination.  As [the Seventh Circuit had previously held in a case preceding *Washington v. Davis*], *motives are irrelevant* if the *effect* is illegal." (emphases added) (citing *Gautreaux v. Romney*, 448 F.2d 731, 738 (7th Cir. 1971))), *rev'd*, *Arlington Heights 7th Cir. Op.*, 517 F.2d 409, *rev'd*, *Arlington Heights S. Ct. Op.*, 429 U.S. 252; *Arlington Heights 7th Cir. Op.*, 517 F.2d at 413 ("*Regardless of the Village Board's motivation*, if this alleged discriminatory *effect* exists, the decision violates the Equal Protection Clause unless the Village can justify it by showing a compelling interest." (emphases added) (citing *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1963))).

[172] *Arlington Heights S. Ct. Op.*, 429 U.S. at 268 (emphasis added).

[173] *See id.* at 268, 270 n.20.

[174] *See id.* at 264–65.

[175] *Id.* at 268, 270 n.20.

from "questioning Board members about their motivation at the time they cast their votes."[176]
Consequently, the trial record contained "no direct evidence by which to determine the [local
legislators'] motives or mental processes."[177]  Nor did the trial record contain other evidence of
intent that would have sufficed to support an intentional discrimination finding.[178]

The plaintiffs thus needed to convince the Supreme Court that they never had a fair
chance to obtain and introduce evidence of the Village's intent.  They therefore complained to the
Supreme Court that the trial court had "unduly limited their efforts to prove that the Village
Board acted for discriminatory purposes" by forbidding them from "questioning Board members
about their motivation at the time they cast their votes."[179]

The Supreme Court ruled, however, that it "was not improper" for the trial court to
"forb[id] questioning Board members about their motivation[s]" because the plaintiffs had
"repeated[ly] insiste[d]" at trial "that it was *effect*"—"and not motivation"—"which would make
out a constitutional violation."[180]  At the same time, though, the Supreme Court suggested that if
the plaintiffs *hadn't* "repeated[ly] insist[ed]" on trying the suit as a discriminatory effect case,
"*an inquiry into motivation would otherwise have been proper*."[181]  That potentially suggests
that, notwithstanding the Court's warning just two footnotes earlier that "[p]lacing a

---

[176] *Id.* at 270 n.20.

[177] *Arlington Heights 7th Cir. Op.*, 517 F.2d at 210.

[178] *See Arlington Heights S. Ct. Op.*, 429 U.S. at 270 (ultimately concluding that the plaintiffs "failed to carry their burden of proving that discriminatory purpose was a motivating factor in the Village's decision").

[179] *Id.* at 270 n.20.

[180] *Id.* (emphasis added)

[181] *See id.* (emphasis added).

decisionmaker on the stand" is "*usually* to be avoided,"[182] the Court nonetheless believed that the intentional racial discrimination claims in *Arlington Heights* might have presented an appropriate circumstance to let the plaintiffs question the lawmakers about their motivations if the plaintiffs had instead argued that intent (rather than effect) was what mattered.[183]

The Supreme Court further suggested that part of the reason why it was acceptable for the district court to "forb[id] questioning Board members about their motivation at the time they cast their votes" was because the plaintiffs "were allowed, both during the discovery phase and at trial, to question Board members fully about *materials and information available to them at the time of [the challenged zoning] decision*"—a fact the Supreme Court noted without any apparent disapproval.[184] The fact that the *Arlington Heights* Court apparently "endorsed the plaintiff[s'] questioning of Board members 'about materials and information available to them at the time of decision'" therefore arguably "suggests that the Court did not view the Board members' privilege as absolute."[185]

Besides letting the *Arlington Heights* plaintiffs ask legislators certain questions during *discovery*, the trial court also let the plaintiffs "call[] one member of the Village Board to the stand at *trial*."[186] Notably, when the Supreme Court mentioned that fact in its opinion, it didn't suggest that the trial court's decision to do so was in any way inconsistent with the Court's pronouncement just a few pages earlier that "[p]lacing a decisionmaker on the stand is

---

[182] *See id.* at 268 n.18 (emphasis added) (quoting *Volpe*, 401 U.S. at 420).

[183] *See id.* at 270 n.20.

[184] *See id.* (emphases added).

[185] *See Benisek*, 241 F. Supp. 3d at 574 n.8 (quoting *Arlington Heights S. Ct. Op.*, 429 U.S. at 270 n.20).

[186] *Arlington Heights S. Ct. Op.*, 429 U.S. at 270 (emphasis added).

. . . 'usually to be avoided.'"[187]  Instead, the Court merely analyzed whether anything in the Board member's testimony "support[ed] an inference of invidious purpose."[188]

Thus, while it's admittedly hazardous to read too much into *Arlington Heights* either way,[189] the case arguably implies that the intentional discrimination claims at issue in *Arlington Heights* may have presented exactly the sort of "extraordinary instances" in which the legislative privilege yields.[190]  Coming at it from the other direction, if the Supreme Court thought that *Arlington Heights* *wasn't* an "extraordinary" case, and that the trial court therefore breached the legislative privilege by letting the plaintiffs question the lawmakers during discovery and at trial, then the Supreme Court presumably would have chided the trial court for contravening the general principle that such questioning is "usually to be avoided."[191]  But the Supreme Court didn't do that; it instead dispassionately assessed whether anything in the legislator's "testimony support[ed] an inference of invidious purpose."[192]  Likewise, if the Supreme Court thought that the legislative privilege categorically barred the *Arlington Heights* plaintiffs from questioning lawmakers about their motives, the Court presumably wouldn't have suggested in a footnote that

---

[187] *See id.* at 268 n.18; *see also id.* at 268 (opining that such testimony "frequently will be barred by privilege").

[188] *See id.* at 270.

*See also Benisek*, 241 F. Supp. 3d at 574 n.8 (inferring from that fact that "*Arlington Heights* counsels against recognizing an absolute privilege" in redistricting cases).

[189] *See Kay v. City of Rancho Palos Verdes*, No. CV 02-03922, 2003 WL 25294710, at *10 n.3 (C.D. Cal. Oct. 10, 2003) ("A footnote in *Arlington Heights* shows that the local legislators there were deposed about their consideration of the allegedly racist zoning law that was the focus of the case, although the holding does not directly address whether privilege might have barred the taking of those depositions in the first place." (citing *Arlington Heights S. Ct. Op.*, 429 U.S. at 270 n.20)).

[190] *See Arlington Heights S. Ct. Op.*, 429 U.S. at 268.

[191] *See id.* at 268 n.18.

[192] *See id.* at 270.

"an inquiry into motivation would otherwise have been proper" if the plaintiffs hadn't insisted on litigating their suit as a discriminatory effect case.[193]

Arlington Heights also arguably implies that even in those intentional discrimination cases where it's appropriate to prohibit plaintiffs from directly questioning legislators "about their *motivation* at the time they cast their votes," the court still should at least let the plaintiffs question legislators "about *materials and information* available to them at the time of [the challenged] decision" "both during the discovery phase and at trial."[194]

But even if the reader disagrees with that reading of *Arlington Heights*, and instead believes that the opinion doesn't imply anything either way about whether the plaintiffs' intentional racial discrimination claims presented the sort of "extraordinary instances" in which the state legislative privilege yields,[195] one thing remains indisputable: *Arlington Heights* expressly and unequivocally holds that there are at least *some* intentional discrimination cases where plaintiffs may call state legislators "to the stand at trial to testify concerning the purpose of [an] official action" notwithstanding the state legislative privilege.[196]  Even though "[p]lacing a

---

[193] *See id.* at 270 n.20.

[194] *See id.* (emphases added).

*Contra Majority Op.*, 2023 WL 8880313, at *3 (failing to acknowledge that footnote from *Arlington Heights*, and (perhaps for that reason) reaching the opposite conclusions that (1) "[t]he legislative privilege protects the possession, preparation, or review of factual information when disclosure would inevitably reveal the legislator's deliberations" and (2) "material the legislator obtained, or declined to obtain, in the decision-making process is privileged too insofar as it is sought from the legislator" (quoting *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) [hereinafter *1997 Sealed Case*])).

[195] *See Dyas v. City of Fairhope*, No. 08-0232, 2009 WL 3151879, at *9 n.9 (S.D. Ala. Sept. 24, 2009) (reaching the contrary conclusion that "the *Arlington Heights* Court did not approve, much less require, the pretrial examination of the legislators that occurred in that case," but instead "simply stated that, given the degree of that [pretrial] discovery, the trial court did not unduly restrict the plaintiffs' case by precluding them from questioning the legislators at trial about their motivations").

[196] *Arlington Heights S. Ct. Op.*, 429 U.S. at 268.

decisionmaker on the stand is . . . *usually* to be avoided" because it "represent[s] a substantial intrusion into the workings of other branches of government,"[197] *Arlington Heights* nonetheless contemplates a subset of "extraordinary" cases in which the privilege won't foreclose litigants from obtaining testimonial or documentary evidence from state legislatures.[198]

### ii. *Trammel*

The Supreme Court's decision in *Trammel v. United States* further confirms the state legislative privilege's comparatively narrow scope.[199]  Although *Trammel* wasn't a state legislative privilege case *per se*,[200] its holdings about common law evidentiary privileges more generally belie the Texas Legislators' notion that the state legislative privilege is as expansive as they claim.[201]  In relevant part, *Trammel* states that because "[t]estimonial exclusionary rules and privileges contravene the fundamental principle that the public has a right to every man's evidence," such privileges "must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth."[202]

---

[197] *Id.* at 268 n.18 (cleaned up) (emphasis added) (quoting *Volpe*, 401 U.S. at 420).

[198] *See id.* at 268.

[199] 445 U.S. 40 (1980).

[200] The issue in *Trammel* was "whether an accused may invoke the privilege against adverse spousal testimony so as to exclude the voluntary testimony of his wife" in a criminal proceeding.  *Id.* at 41–42.

[201] *Compare* State Defs.' & Legis. Subpoena Recipients' Suppl. Br. at 3 (urging us to reject "Plaintiffs' arguments that the legislative privilege should be strictly construed"), *with Trammel*, 445 U.S. at 50 ("Testimonial exclusionary rules and privileges . . . must be strictly construed . . . .").

[202] 445 U.S. at 50 (cleaned up) (first quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950); then quoting *Elkins v. United States*, 364 U.S. 206, 234 (1960) (Frankfurter, J., dissenting)).

Many lower courts—including courts presiding over redistricting cases—have understood *Trammel*'s disfavor towards common-law testimonial privileges more generally to apply to the common-law state legislative privilege specifically.[203]  In other words, courts have routinely cited *Trammel* for the proposition that the state legislative privilege—like other evidentiary privileges—"must be strictly construed," and that it therefore applies only in the unusual circumstance in which "permitting a refusal to testify or excluding relevant evidence" would promote some overriding "public good."[204]

### iii.   *Gillock*

Just a few weeks after *Trammel*, the Supreme decided *United States v. Gillock*, which further confirms that the state legislative privilege yields in several circumstances in which the *federal* legislative privilege and state legislative *immunity* do not.[205]

---

[203] *See infra* note 204.

[204] *See Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *7 (citing the above-quoted passage from *Trammel* to support the conclusion that "non-party state lawmakers" did not enjoy an "absolute" privilege under the federal common law "that protects them from producing documents in federal redistricting cases").

*See also Nashville Student Org. Comm.*, 123 F. Supp. 3d at 969 ("In cases involving constitutional challenges related to voting rights, the vast majority of federal courts have found that the federal common law also affords state legislators only a qualified (*i.e.*, not absolute) legislative privilege against having to provide records or testimony concerning their legislative activity.  Indeed, many of these courts have indicated that *the legislative privilege, like all evidentiary privileges, must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth*." (emphasis added) (cleaned up) (citations omitted)).

*See also, e.g.*, *Rodriguez*, 280 F. Supp. 2d at 94 (another redistricting case citing *Trammel* for the proposition that the state legislative privilege must be strictly construed); *Page*, 15 F. Supp. 3d at 660 (similar); *Favors I*, 285 F.R.D. at 209 (similar); *Perez*, 2014 WL 106927, at *1 (similar); *Benisek*, 241 F. Supp. 3d at 574 (similar).

*See also, e.g.*, *Fla. Ass'n*, 164 F.R.D. at 261–62 (non-redistricting case citing *Trammel* for a similar purpose); *In re Grand Jury*, 821 F.2d 946, 955 (3d Cir. 1987) (same).

[205] *See generally* 445 U.S. 360.

The defendant in *Gillock* was a state senator whom the federal government accused of exploiting his legislative office to obtain bribes and other ill-gotten gains.[206]  The defendant moved to forbid the Government from introducing any "evidence relating to his legislative activities" at his criminal trial.[207]

The Supreme Court first noted that if the defendant had instead been a *federal* legislator, the Speech or Debate Clause would have rendered much of that evidence inadmissible.[208]  As the Court had previously ruled in *Helstoski*, the Speech or Debate Clause shields federal legislators "against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts"—and, thus, "precludes any showing of how a [federal] legislator acted, voted, or decided."[209]  "Under that standard," much of the evidence that the prosecution sought to introduce at Gillock's criminal trial—namely, "evidence of [his] participation in . . . state senate committee hearings and his votes and speeches on the floor"—"would be privileged and hence inadmissible."[210]

Again, though, the Speech or Debate Clause *doesn't* apply to *state* legislators.[211]  Gillock therefore couldn't invoke the Clause to shield his legislative activities from scrutiny.[212]  Thus, he

---

[206] *Id.* at 362.

[207] *Id.* at 362–65.

[208] *See id.* at 366–67.

[209] *Helstoski*, 442 U.S. at 489 (cleaned up) (quoting *Brewster*, 408 U.S. at 525, 527); *see also supra* Section II.B.2.a (discussing *Helstoski* in depth).

[210] *Gillock*, 445 U.S. at 367.

[211] *See supra* notes 102–103 and accompanying text.

[212] *Gillock*, 445 U.S. at 366 n.5 ("Gillock makes no claim that state legislators are entitled to the benefits of the Federal Speech or Debate Clause, which by its terms applies only to 'Senators and Representatives.'" (citing *Lake Country Estates*, 440 U.S. at 404)); *id.* at 374 ("The Federal Speech or

instead urged the Supreme Court to recognize a *common-law* evidentiary privilege for state legislators comparable to the *constitutional* privilege that federal legislators enjoy.[213]

The Court declined to do so.[214]  Citing *Eastland*, the Court reiterated that "[t]wo interrelated rationales underlie the [federal] Speech or Debate Clause:"

(1)     preserving the separation of powers between the three branches of the federal government; and

(2)     promoting legislative independence.[215]

The Court determined that the first of those two rationales—the federal separation of powers—didn't support an analogous privilege for state legislators.[216]  The Court reasoned that whereas the U.S. Constitution designates *Congress* as a separate and coequal branch of the *federal* government, "federal interference in the *state* legislative process is not on the same constitutional footing" because "federal enactments . . . prevail over competing state exercises of power" under the Constitution's Supremacy Clause.[217]  Thus, the Court opined, "under our

---

Debate Clause, of course, is a limitation on the Federal Executive, but by its terms is confined to federal legislators.").

[213] *Id.* at 366, 368.

[214] *See id.* at 368–74.

[215] *Id.* at 369 (citing *Eastland*, 421 U.S. at 502–03); *see also supra* notes 63–65 and accompanying text.

[216] 445 U.S. at 370.

[217] *Id.* (emphasis added).

*See also* U.S. CONST. art. VI, cl. 2 (the Constitution's Supremacy Clause, which provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

federal structure, we do not have the struggles for power between the federal and state systems such as" those that "inspired the need for the Speech or Debate Clause."[218]

That left the second possible rationale for the defendant's proposed privilege: legislative independence.[219]  "[R]el[ying] heavily on *Tenney*['s]" pronouncement that state legislative *immunity* is a necessary bulwark against "disruption of the state legislative process," the defendant urged the Court to adopt an *evidentiary privilege* of comparable breadth to avoid "interference with the functioning of state legislators."[220]

However, the Court did "not read [*Tenney*] as broadly" as the defendant would have preferred.[221]  For one thing, whereas the issue in *Tenney* "was whether state legislators were *immune* from civil *suits* for alleged violations of civil rights," the issue in *Gillock* was whether to "recognize a legislative *privilege* barring the introduction of *evidence* of the legislative acts of a state legislator."[222]  In other words, *Tenney* was a state legislative *immunity* case, while *Gillock* was a state legislative *privilege* case.[223]  That distinction mattered, the *Gillock* Court reasoned, because whereas subjecting a state legislator to *suit and liability* for his legislative acts creates an obvious "potential for disruption of the state legislative process," merely admitting a state legislator's acts into *evidence* may have a comparatively "minimal impact on the exercise of his

---

[218] 445 U.S. at 370.

[219] *See id.* at 369, 371–73.

[220] *Id.* at 369, 371–72; *see also supra* Section II.C.1.a (discussing *Tenney* in depth).

[221] *See* 445 U.S. at 372.

[222] *Compare id.* at 371 (emphases added), *with id.* at 361–62 (emphases added).

[223] *See, e.g.*, *Loesel*, 2010 WL 456931, at *6 ("*Tenney* . . . addressed immunity from suit, not an evidentiary privilege that would prevent a state legislator from testifying at a deposition or trial.").

legislative function."[224]  That is, the legislative interference concerns that justify granting state

legislators absolute *immunity* aren't necessarily as weighty when the question isn't whether to let

a litigant *sue* a state legislator, but instead whether to let that litigant introduce *evidence* of

legislative acts.[225]  Thus, absent a constitutional provision like the Speech or Debate Clause

requiring courts to give state legislators immunity and privilege in roughly equal measure,[226] the

*Gillock* Court declined to recognize "an evidentiary privilege for state legislators for their

legislative acts" that would provide "only speculative benefit to the state legislative process."[227]

   The Supreme Court also distinguished *Tenney* on the additional ground that "*Tenney* was

a *civil* action brought by a *private* plaintiff to vindicate *private* rights," whereas *Gillock* was a

*criminal* action brought by *the federal government.*[228]  The Court reasoned that it's acceptable to

prohibit private plaintiffs from bringing *civil* suits against state legislators—even state legislators

who do illegal things—because "federal *criminal* liability [remains] a restraining factor on the

---

[224] *Compare* 445 U.S. at 371, *with id.* at 373.

[225] *See id.* at 371–73; *see also, e.g.*, *Loesel*, 2010 WL 456931, at *6 ("Undoubtedly, interference with the legislative process is greater when a state legislator is called upon to defend him or herself against a lawsuit, than when he or she is merely called upon to testify in a civil case.").

[226] *See Gillock*, 445 U.S. at 374 (emphasizing that "[t]he Federal Speech or Debate Clause" is "by its terms . . . confined to federal legislators").

   *See also, e.g.*, *Tohono O'odham Nation v. Ducey*, No. CV-15-01135, 2016 WL 3402391, at *6 (D. Ariz. June 21, 2016) (noting that because state legislative privilege "is not a Constitutional imperative like federal legislative immunity," "courts generally have found that" the state legislative privilege "should surrender when opposed by significant countervailing interests"); *Bethune-Hill*, 114 F. Supp. 3d at 334 (explaining that because the state legislative privilege is "not founded on the United States Constitution, but rather [is] based on an interpretation of the federal common law," the state legislative privilege "is necessarily abrogated when [it] is incompatible with federal statutory law").

[227] 445 U.S. at 373.

[228] *Id.* at 372 (emphases added).

conduct of state officials."[229]   Thus, the Court opined, "in protecting the independence of state legislators, *Tenney* and subsequent cases on official immunity have drawn the line at civil actions."[230]

The Court therefore held that "although principles of comity command careful consideration," "comity yields" when "important federal interests are at stake, as in the enforcement of federal criminal statutes."[231]   Because adopting the defendant's proposed evidentiary privilege would "handicap[] proof of the relevant facts" in the criminal case while providing "only speculative benefit to the state legislative process," the Court "discern[ed] no basis" for recognizing the defendant's proposed "judicially created limitation" on the admissibility of evidence.[232]   The Court therefore held that the state legislative privilege didn't bar prosecutors from introducing evidence of the defendant's legislative acts at his criminal trial.[233]

*Gillock* thereby establishes that the *state* legislative privilege isn't as broad as its *federal* counterpart;[234] nor is the state legislative *privilege* as broad as state legislative *immunity*.[235]

---

[229] *Id.* (emphasis added).

[230] *Id.* at 373.

[231] *Id.*

[232] *Id.* at 373–74.

[233] *See id.* at 366–74.

[234] *See id.* at 366–67 (emphasizing that "much of the evidence" that the Supreme Court deemed non-privileged in *Gillock* "would [have been] inadmissible" if the Court had accepted the defendant's invitation to "recognize an evidentiary privilege" for state legislators "similar in scope to" federal legislative immunity under "the Federal Speech or Debate Clause").

[235] *See id.* at 371 ("Gillock relies heavily on *Tenney* . . . where this Court was cognizant of the potential for disruption of the state legislative process.  The issue there, however, was whether state legislators were *immune* from civil suits . . . ." (emphasis added) (citation omitted)).

Whereas the Speech or Debate Clause flatly prohibits "inquir[ies] into . . . the motivation for" *federal* lawmakers' legislative acts,[236] and whereas *Tenney* establishes that common-law *immunity* broadly forbids courts from "inquir[ing] into the motives of [state] legislators" for the purposes of determining whether they're subject to *suit and liability*,[237] *Gillock* demonstrates that, in at least some cases, litigants may introduce *evidence* of a state legislator's motivations in a federal judicial proceeding.[238]

Still, *Gillock* doesn't answer two critical questions—at least not expressly.  First, to what extent do *Gillock*'s teachings about the state legislative privilege's unavailability in federal *criminal* cases carry over to *civil* cases?[239]  One might, after all, interpret *Gillock*'s statement that "*Tenney* and subsequent cases on official *immunity* have drawn the line at civil actions"[240] to imply that *Gillock* draws a similar "line at civil actions" for state legislative *privilege* purposes.[241]  To that end, a few lower courts have held—or at least strongly suggested—that

---

[236] *See id.* at 366–67 (quoting *Brewster*, 408 U.S. at 525); *see also supra* Section II.B.

[237] *See Tenney*, 341 U.S. at 377; *see also supra* Section II.C.1.a.

[238] *See Gillock*, 445 U.S. at 366–67 (explaining that although the Speech or Debate Clause would have categorically forbidden any "inquiry into . . . the motivation for" the defendant's legislative acts if he had been a "Member[] of Congress," there is no "comparable evidentiary privilege for state legislators in federal prosecutions" (quoting *Brewster*, 408 U.S. at 525)).

[239] *See, e.g.*, *Plain Loc. Sch. Dist. Bd. of Educ. v. DeWine*, 464 F. Supp. 3d 915, 920 (S.D. Ohio 2020) (remarking that *Gillock* "left open the question of when a State legislator can invoke the common-law evidentiary legislative privilege in a federal civil case"); *Kay*, 2003 WL 25294710, at *11 ("It is clear that the [state legislative] privilege is sharply curtailed in *criminal* cases . . . But the authorities are split over whether (a) the qualification announced in *Gillock* is limited to criminal actions, and thus that the legislative privilege is absolute in civil cases, or (b) a balancing test should always apply, so that plaintiffs alleging serious, albeit civil, wrongs, sometimes may obtain legislators' and staff members' testimony." (citations omitted)).

[240] *See* 445 U.S. at 373 (emphasis added).

[241] *See, e.g.*, *Lee v. Va. State Bd. of Elections*, No. 3:15CV357, 2015 WL 9461505, at *5 (E.D. Va. Dec. 23, 2015) [hereinafter *Va. State Bd. of Elections*] (remarking that *Gillock* "seemed to limit its holding

*Gillock*'s limitations on the state legislative privilege are restricted to the criminal context, and have little to no bearing in civil cases.[242]

But far more courts have rejected that cramped reading of *Gillock*,[243] and rightly so. After all, if the Supreme Court thought that the state legislative privilege never yields in civil cases, it wouldn't have said just three years earlier in *Arlington Heights* that state legislators "might be called to the stand at trial to testify concerning the purpose of [an] official action" in "extraordinary" civil cases involving allegations of discriminatory intent.[244]  Moreover, by stating the state legislative privilege yields "where important federal interests are at stake, *as in*

---

. . . to criminal matters, stating explicitly that '*Tenney* and subsequent cases on official immunity have drawn the line at civil actions'" (quoting *Gillock*, 445 U.S. at 373)).

[242] *See, e.g.*, *Pernell*, 84 F.4th at 1344 ("[T]he district court decided that the exception to the legislative privilege extends beyond the circumstances identified in *Gillock* to include the facts of this [civil] case . . . . This extension was erroneous.  The Supreme Court has never expanded the *Gillock* exception beyond criminal cases.  For purposes of the legislative privilege, there is a fundamental difference between civil actions by private plaintiffs and criminal prosecutions by the federal government.  Although the legislative privilege does not presumptively apply in the latter type of case, the presumption otherwise holds firm.  And it is insurmountable in private civil actions under section 1983." (cleaned up)); *Va. State Bd. of Elections*, 2015 WL 9461505, at *5.

[243] *See, e.g.*, *McMaster*, 584 F. Supp. 3d at 162 & n.4 ("Senate Defendants attempt to limit *Gillock* to its facts (or at best, to federal criminal prosecutions), arguing '*Gillock* was a criminal prosecution brought by the federal government, not a civil action brought by a private plaintiff.'  This argument misses the forest for the trees. . . . It is not the simple distinction between 'criminal' and 'civil' cases which determines the availability of [the state legislative] evidentiary privilege, but rather, the importance of the federally created public rights at issue.  And when cherished and constitutionally rooted public rights are at stake, legislative evidentiary privileges must yield. . . . Numerous circuit and district courts [have] reached a similar interpretation of *Gillock* . . . ." (cleaned up)); *Mich. State*, 2018 WL 1465767, at *4 ("The state legislators in this matter would have this court interpret [*Gillock*] to mean that state legislators enjoy an absolute evidentiary legislative privilege except when they are faced with criminal prosecution.  To the contrary, the precedent suggests that state legislators enjoy only a qualified legislative privilege against having to provide records or testimony concerning their legislative activity, which can be overcome in extraordinary circumstances, *e.g.*, where important federal interests are at stake." (citations omitted)); *Kay*, 2003 WL 25294710, at *11–14 (rejecting the argument that "the qualification announced in *Gillock* is limited to criminal actions," and instead holding "that plaintiffs alleging serious, albeit civil, wrongs, sometimes may obtain legislators' and staff members' testimony").

[244] *See Arlington Heights S. Ct. Op.*, 429 U.S. at 268.

the enforcement of federal criminal statutes"[245]—as opposed to just saying that the privilege

yields "*in criminal cases*"—*Gillock* implies that federal criminal prosecutions are *just one*

*example* of a case in which the state legislative privilege yields, not the single solitary exception.

      *Gillock* therefore suggests that when a litigant seeks discovery from a state legislator in a

federal civil case, the court shouldn't prohibit that discovery outright just because the case isn't a

criminal prosecution.  Instead, the court must assess whether the civil case implicates "important

federal interests" comparable in gravity to those at issue in federal criminal cases.[246]  If so, then

the state legislative privilege must yield.[247]

      The other question that *Gillock* doesn't explicitly answer is whether or how *Gillock*'s

pronouncements about the state legislative privilege's *evidentiary* aspect apply to the privilege's

*documentary nondisclosure* and *testimonial* aspects.[248]  The issue in *Gillock*, after all, was

whether the Government could *introduce evidence* of the defendant's legislative activities that

was *already in the Government's possession*.[249]  But what if a litigant isn't merely seeking to

---

[245] *See Gillock*, 445 U.S. at 373 (emphasis added).

[246] *See id.*

    *See also, e.g.*, *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *6 (concluding that "[v]oting rights cases" are "akin to criminal prosecutions" for the purposes of *Gillock*'s "important federal interests" exception because "although brought by private parties," they "seek to vindicate public rights" (quoting *Gillock*, 445 U.S. at 373)).

[247] *See Gillock*, 445 U.S. at 373.

[248] *See supra* notes 80–85 and accompanying text (discussing the legislative privilege's three distinct components).

[249] *See Gillock*, 445 U.S. at 361–62 ("We granted certiorari to [decide] whether the federal courts . . . should recognize a legislative privilege barring the *introduction of evidence* of the legislative acts of a state legislator . . . ." (emphasis added)).

    *See also, e.g., id.* at 365 (noting that the Government intended to "offer evidence that Gillock introduced reciprocity legislation in the senate and that he arranged for the introduction of a similar bill in the house"); *id.* (noting that the Government "further proposed to introduce statements made by Gillock on the floor of the senate in support of the bill"); *id.* (noting that the Government "intended to prove that

*introduce evidence* into the judicial record, but is instead demanding that a state legislator *locate and produce nonpublic documents*?  The latter is more intrusive and distracting—and, thus, poses a greater potential threat to legislative independence.

And what if, besides demanding that a state legislator turn over *existing* evidence, a litigant also wants to compel that legislator to create *new* evidence by testifying involuntarily at a deposition or at trial?  Such demands for *testimonial* evidence may divert legislators' attention from their legislative duties and intrude on legislative prerogatives even more than demands for *documentary* evidence.[250]

One must therefore interpret *Gillock*'s remark that "denial of a privilege to a state legislator" has only a "minimal impact on the exercise of his legislative function"[251] in a way that doesn't contradict *Arlington Heights*'s competing admonition that compelling a legislator to testify about her motives at trial or a deposition is "usually to be avoided" because it "represent[s] a substantial intrusion into" the legislative process.[252]  At the same time, though,

---

. . . Gillock moved to override the Governor's veto of the legislation, and stated that it would introduce into evidence any and all statements made by Gillock on the floor of the senate in support of his motion to override").

[250] *Cf., e.g.*, *In re B&C KB Holding GmbH*, No. 23-MC-6, 2023 WL 5974634, at *8 (W.D. Wis. Sept. 14, 2023) (remarking in a different context that "[r]equiring [a person] to sit for a deposition imposes a significantly greater burden . . . in terms of time and money than merely searching [one's] files for documents").

*See also Favors v. Cuomo*, No. 11-CV-5632, 2013 WL 11319831, at *15 (E.D.N.Y. Feb. 8, 2013) [hereinafter *Favors II*] ("[R]esponses to interrogatories are more akin to testimony than to disclosure of pre-existing documents.  In only the rarest of circumstances will courts compel testimony from legislators asserting legislative privilege.  Because interrogatories, like testimony, seek after-the-fact accounts of and explanations for the deliberative decisionmaking process, interrogatories served on legislators should, at a minimum, be subject to an even more exacting balancing test than are document demands." (citations omitted)).

[251] *See Gillock*, 445 U.S. at 373.

[252] *See Arlington Heights S. Ct. Op.*, 429 U.S. at 268 n.18 (quoting *Volpe*, 401 U.S. at 420).

one must also give effect to *Arlington Heights*'s equally important caveat that even though

compulsory legislative testimony is "*usually* to be avoided," state legislators might nonetheless

"be called to the stand at trial to testify concerning the purpose of [an] official action" in

"*extraordinary* instances."[253]

The most faithful way to give full effect to *Gillock* and *Arlington Heights* alike is to

conceive of state legislative privilege as a sliding scale, such that the level of protection varies

based on:

(1)     the extent to which any particular demand for nonpublic legislative
        evidence—be it documentary or testimonial—would disrupt the legislative
        process and threaten legislative independence, counterbalanced against

(2)     the importance of the interests that the litigant seeks to vindicate.[254]

So, on one end of the spectrum, the state legislative privilege will seldom preclude

litigants from merely *introducing evidence* of legislative activities into a judicial record, because

*Gillock* explicitly states that introducing such evidence has a comparatively "minimal impact on

the exercise of [the] legislative function."[255]  Interpreting *Gillock* that way also honors *Trammel*'s

admonition that common-law privileges "contravene the fundamental principle that the public

has a right to every man's evidence," and therefore must "be strictly construed and accepted only

to [a] very limited extent."[256]

---

[253] *See id.* at 268 & n.18 (emphases added).

[254] *See, e.g.*, *Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 764 (S.D. Tex. Apr. 29, 2011) ("The Court finds it appropriate, to determine whether any evidentiary privilege applies in a particular civil context, to apply the balance of interests articulated in *Gillock*.  Accordingly, the Court will weigh the federal interests at stake against the potential harm to the state legislative process.").

[255] *See* 445 U.S. at 373.

[256] *See Trammel*, 445 U.S. at 50 (cleaned up) (first quoting *Bryan*, 339 U.S. at 331; then quoting *Elkins*, 364 U.S. at 234 (Frankfurter, J., dissenting)); *see also supra* Section II.C.2.a.ii (analyzing *Trammel* in depth).

On the opposite end of the spectrum, litigants who seek to compel state legislators to *testify at trial or a deposition* "frequently will be barred by privilege," as *Arlington Heights* teaches that direct "inquiries into legislative . . . motivation represent a substantial intrusion into" the state legislative process that should "usually . . . be avoided."[257]  But that doesn't mean that legislative testimony is completely off limits.  Read together, *Arlington Heights* and *Gillock* establish that in "extraordinary instances"[258]—*i.e.*, not just in criminal cases, but also in civil cases "where important federal interests are at stake"—the state legislative privilege "yields" to demands for legislative testimony.[259]

Between those poles are motions to compel legislators to produce nonpublic *documents*. At least in some cases, overriding federal interests may justify such intrusions into the legislative domain.[260]

Furthermore, because requiring legislators to produce *documents* is less intrusive than forcing legislators to sit for *depositions* or testify at *trial*,[261] there may be cases where balancing the competing interests at stake leads a court to forbid *testimonial* discovery but permit

---

[257] *See* 429 U.S. at 268 & n.18 (quoting *Volpe*, 401 U.S. at 420).

[258] *See id.* at 268.

[259] *See Gillock*, 445 U.S. at 373.

[260] *See, e.g.*, *Favors II*, 2013 WL 11319831, at *12 (concluding, after applying "a balancing approach" of the sort advocated here, that certain documents could "not be withheld on the basis of the legislative privilege").

[261] *See, e.g.*, *Bethune-Hill*, 114 F. Supp. 3d at 342 ("[A] request for documents is less burdensome than a request for testimony."); *McMaster*, 584 F. Supp. 3d at 165 (similar).

*But see ACORN v. County of Nassau*, No. 05-CV-2301, 2009 WL 2923435, at *4 n.3 (E.D.N.Y. Sept. 10, 2009) (reaching the opposite conclusion that there's "no reason why documents evincing legislative intent should be more discoverable than deposition testimony reflecting the same, as both implicate the same interests").

*documentary* discovery.[262]  After all, once a court has ordered a legislature to turn over documents evidencing its internal activities, deposing individual legislators about those very same activities might be duplicative—and, thus, not warrant the comparatively greater intrusion.[263]  Where, by contrast, no contemporaneous documentation of a particular legislative act exists, deposing the legislators might be both necessary and appropriate.[264]

---

[262] *See, e.g.*, *Doe v. Nebraska*, 788 F. Supp. 2d 975, 984 (D. Neb.) [hereinafter *Nebraska*] (emphasizing that even in cases in which state legislators are "protected from testifying," they "are not necessarily exempted from producing documents"), *objections denied*, 2011 WL 2413359 (D. Neb. June 15, 2011).

[263] *See, e.g.*, *City of Greensboro v. Guilford Cnty. Bd. of Elections*, No. 1:15cv559, 2016 WL 11660626, at *7 (M.D.N.C. Dec. 20, 2016) ("[T]he Court declines to order Senator Wade to be deposed. . . . [T]he cost and inconvenience of deposition testimony and distractions of a trial would be far more burdensome than any benefit from such testimony, particularly in light of the documents that Legislative Respondents are ordered to produce. . . . The Court finds that prohibiting deposition testimony but requiring Legislative Respondents to produce certain documents strikes the appropriate balance between protecting the legislative process and the need to ensure that Individual Plaintiffs' constitutional rights are not violated." (cleaned up)).

*Cf. Favors I*, 2013 WL 11319831, at *15 (concluding that the plaintiffs' need to propound interrogatories "question[ing] individual legislators . . . about their motives"—which were "more akin to testimony than to disclosure of pre-existing documents" and therefore were "subject to an even more exacting balancing test than are document demands"—was "reduced in light of the Court's rulings allowing disclosure of certain categories of pre-existing documents relevant to the plaintiffs' claims").

[264] *See, e.g.*, *Nashville Student Org. Comm.*, 123 F. Supp. 3d at 971 ("Here, several legislators claim to have no private records concerning the challenged Voter ID provision, and the [state legislature] routinely deletes its members' electronically stored information.  Particularly given the dearth of available documentary evidence outside of the legislative history, additional relevant information may come from the legislators themselves.").

To sum up, *Gillock* stands for the following propositions that should guide our analysis here.  First, **the common-law-based <u>state</u> legislative privilege is <u>significantly narrower</u> than the constitutionally-based <u>federal</u> legislative privilege**.[265]  That must be so, or else the Supreme Court wouldn't have emphasized that the evidence that the Government sought to introduce in *Gillock* would have been inadmissible if the federal legislative privilege applied instead of its state analogue.[266]

Second, the *reason* why the state legislative privilege is narrower than its federal counterpart is because **the policy rationales that undergird the <u>federal</u> legislative privilege <u>don't</u> apply to <u>state</u> legislators to the same extent**.[267]  *Gillock* explicitly holds that the separation-of-powers rationale doesn't apply to state legislators at all.[268]  And the other rationale—the need to

---

[265] *See Gillock*, 445 U.S. at 369–73.

*See also, e.g.*, *Harding v. County of Dallas*, No. 3:15-CV-0131, 2016 WL 7426127, at *2 (N.D. Tex. Dec. 23, 2016) ("[T]he Supreme Court ruled in *Gillock* that, in contrast to the privilege enjoyed by federal legislators, there is no absolute 'evidentiary privilege for state legislators for their legislative acts.'" (quoting *Gillock*, 445 U.S. at 373)); *Alviti*, 14 F.4th at 87 ("Assertions of legislative . . . privilege by state lawmakers stand on different footing [than privilege assertions by federal lawmakers].  For starters, they are governed by federal common law rather than the Speech or Debate Clause, which by its terms applies only to federal legislators.  And the common-law legislative . . . privilege [is] less protective than [its] constitutional counterpart[]." (citations omitted)).

[266] *See Gillock*, 445 U.S. at 366–67 (1980); *see also supra* notes 208–212 and accompanying text.

[267] *See Gillock*, 445 U.S. at 369–73.

[268] *See id.* at 370–71.

*See also, e.g.*, *Supreme Court of Virginia*, 446 U.S. at 733 ("[T]he separation-of-powers doctrine justifies a broader privilege for Congressmen than for state legislators in criminal actions." (citing *Gillock*, 445 U.S. at 370)); *Alviti*, 14 F.4th at 87 (emphasizing that "the common-law legislative . . . privilege" that state lawmakers enjoy is "less protective" than the federal legislative privilege "because the separation-of-powers rationale underpinning the Speech or Debate Clause does not apply when it is a state lawmaker claiming legislative . . . privilege" (citing *Gillock*, 445 U.S. at 366–67, 370, 372–73)); *Fla. Ass'n*, 164 F.R.D. at 267 ("[T]he separation of powers interest at stake with respect to the federal Speech or Debate Clause is not at issue in this case [involving state legislative staff].  That is

- 54 -

avoid "disruption of the state legislative process"—doesn't by itself justify an absolute (rather than qualified) privilege for state legislators.[269]

It follows from those propositions that ***judges should be wary about relying on <u>federal</u> legislative privilege cases when determining whether the <u>state</u> legislative privilege applies*** because the two doctrines have different policy justifications—and, thus, different scopes.[270]

---

purely an issue of the relationship of the federal judiciary to Congress, and does not arise here.  *Gillock* . . . h[as] made it clear that the Supremacy Clause overrides any notion that this interest applies.").

    *See also supra* notes 216–218 and accompanying text.

[269] *See Gillock*, 445 U.S. at 371; *see also id.* at 373 ("[A]lthough principles of comity command careful consideration, our cases disclose that where important federal interests are at stake, . . . comity yields.").

    *See also, e.g.*, *Bethune-Hill*, 114 F. Supp. 3d at 335 (explaining that "[t]he authorities do not establish" that a state legislator's "interest in being free from the distraction of compulsory process" is by itself "sufficient to justify an *absolute* legislative privilege in instances where a state legislator is not personally threatened with liability and an exercise of the privilege would frustrate the execution of federal laws protecting vital public rights;" "[i]n such situations, a privilege will still apply, but it will be qualified and subject to balancing in the face of great evidentiary need" (citations omitted)).

[270] *See, e.g.*, *Nebraska*, 788 F. Supp. 2d at 985–86 (concluding that case law "involv[ing] subpoenas to *federal* lawmakers" was "not applicable" in case "involving a *state* governmental body" (emphases added)); *Fla. Ass'n*, 164 F.R.D. at 266 ("[T]he Speech or Debate Clause does not apply at all to state and local legislators.  Thus, this court should follow the path which was blazed in *Gillock* to determine whether a federal common law privilege for state legislators exists, rather than look to precedent founded entirely upon the full scope of the Speech or Debate Clause."); *Jackson Mun. Airport Auth. v. Bryant*, No. 3:16-cv-246, 2017 WL 6520967, at *5, *7–8 (S.D. Miss. Dec. 19, 2017) (emphasizing that "jurisprudence on the Speech and [sic] Debate Clause, *i.e.*, cases involving members of Congress, is distinct from federal common law relating to the limited legislative privilege afforded state legislators"), *aff'd in part, rev'd in part, and remanded sub nom.*, *Jackson Mun. Airport Auth. v. Harkins*, 67 F.4th 678 (5th Cir.), *withdrawn and superseded by* No. 21-60312, 2023 WL 5522213 (5th Cir.), *vacated, reh'g en banc granted*, 78 F.4th 844 (5th Cir. 2023), *appeal dismissed as moot*, --- F.4th ----, 2024 WL 1394246 (5th Cir. Apr. 2, 2024) (en banc).

*Gillock*'s third major takeaway is that **the policy reason for giving <u>state</u> legislators expansive <u>immunity</u>**—namely, to preserve legislative independence by shielding state lawmakers from distractions that could divert them from their important legislative duties—**_doesn't justify giving state legislators a <u>privilege</u> of equal breadth_**.[271]  That's because requiring a state legislator to *defend himself from a civil lawsuit* based on his legislative activities would create an obvious "potential for disruption of the state legislative process,"[272] but forcing a *nonparty* state legislator to merely comply with *discovery demands* doesn't necessarily pose the same risk.[273]

Thus, just as *Gillock* counsels against uncritically citing *federal* legislative privilege cases for propositions regarding the *state* legislative privilege's scope, **judges should be equally wary about citing state legislative <u>immunity</u> cases (like Tenney *and* Bogan***) for propositions about the state legislative <u>privilege</u>**.[274]  After all, if the Supreme Court's state legislative immunity precedents were seamlessly transferrable to the legislative privilege context, *Gillock* wouldn't have taken pains to distinguish itself from *Tenney* on the ground that *Tenney* was an immunity case.[275]  Thus, even though *Tenney* broadly prohibits courts from examining state legislators'

---

[271] *See Gillock*, 445 U.S. at 371–73.

[272] *See id.* at 371–72 (citing *Tenney*, 341 U.S. at 372, 376).

[273] *See id.* at 373 (opining "that denial of a privilege to a state legislator may have" only a "minimal impact on the exercise of his legislative function").

[274] *See id.* at 372 ("Although *Tenney* reflects this Court's sensitivity to interference with the functioning of state legislators, we do not read that opinion as broadly as Gillock would have us.").

*See also, e.g.*, *Mich. State*, 2018 WL 1465767, at *5 ("[T]he state legislators in this case would have the court disregard the decisions of its sister courts in favor of the Supreme Court's decisions in *Tenney* and *Gillock*.  But *Tenney* dealt primarily with legislative immunity from suit, not a legislative evidentiary privilege.  And as discussed above, *Gillock* is suggestive of a qualified legislative privilege that can be overcome where important federal interests are at stake." (citations omitted)).

[275] *See Gillock*, 445 U.S. at 371–73 ("Gillock relies heavily on *Tenney* . . . where this Court was cognizant of the potential for disruption of the state legislative process.  The issue there, however, was

motivations for the purposes of determining whether those legislators are immune from *suit, damages, or injunctive relief*,[276] it doesn't follow that litigants may never obtain *evidence* of a state legislature's motivations in cases where the plaintiff isn't seeking legal or equitable relief against individual state legislator defendants.[277]

---

whether state legislators were *immune* from civil suits for alleged violations of civil rights . . . ." (emphasis added)).

[276] *See Tenney*, 341 U.S. at 377 (opining that "[t]he claim of an unworthy purpose does not destroy" state legislative immunity, as immunity "would be of little value if [state legislators] could be subjected to the cost and inconvenience and distractions of a *trial* upon a conclusion of the pleader, or to the hazard of a *judgment* against them based upon a jury's speculation as to motives" (emphases added)); *see also supra* Section II.C.1.a.

[277] *See, e.g.*, *Page*, 15 F. Supp. 3d at 665 ("[State legislative] immunity . . . does not . . . necessarily prohibit judicial inquiry into legislative motive where the challenged legislative action is alleged to have violated an overriding, free-standing public policy. . . . Here, there is an overriding, free-standing public policy reflected in the Equal Protection Clause of the federal Constitution and the [VRA]. Both parties have placed squarely into issue the legislative motive in enacting the redistricting legislation. . . . [I]t is, therefore, appropriate to permit the discovery of documents . . . ." (cleaned up) (quoting *Marylanders*, 144 F.R.D. at 304 (opinion of Murnaghan, J. & Motz, J.))); *Rodriguez*, 280 F. Supp. 2d at 100 (explaining that a state legislator may sometimes "be required to disgorge documents or provide other information" even if that legislator is immune from suit and liability).

There's admittedly a counterargument to the conclusion that judges should avoid relying on state legislative immunity cases like *Tenney* in the state legislative privilege context: The Supreme Court itself cited *Tenney* when discussing the state legislative privilege in *Arlington Heights*. *See Arlington Heights S. Ct. Op.*, 429 U.S. at 268 ("In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by *privilege*." (emphasis added) (citing *Tenney*, 341 U.S. at 376)).

At least one lower court has inferred from *Arlington Heights*'s citation to *Tenney* that courts may import *Tenney*'s holdings regarding the impropriety of scrutinizing legislative motives for legislative *immunity* purposes into the legislative *privilege* context. *See Common Cause Fla. v. Byrd*, 674 F. Supp. 3d 1097, 1103 n.2 (N.D. Fla. 2023) ("*Tenney* held that defendant legislators were *immune* from civil liability for their legislative acts, and Plaintiffs thus question *Tenney*'s usefulness [in this legislative *privilege* case]. But . . . the Supreme Court itself . . . recognized [in *Arlington Heights*] that *Tenney* is instructive on a legislator's evidentiary privilege." (emphasis added) (cleaned up)); *see also id.* at 1103 (citing *Tenney* for the proposition that the state legislative privilege bars "requests for information about the motives for legislative votes and legislative enactments . . . even when . . . there are allegations of improper or unlawful motives" (cleaned up)).

Still, it's a mistake to interpret *Arlington Heights*'s citation to *Tenney* to mean that *Tenney*'s categorical prohibition against scrutinizing legislative motives in the *immunity* context applies equally to the *privilege* context. If it did, the *Arlington Heights* Court wouldn't have said in the exact same sentence that, notwithstanding the legislative privilege, there remain "extraordinary instances" in which state

*Gillock*'s final (and most important) takeaway is that **the state legislative _privilege_ "_yields_" _not just_ in criminal cases, _but also_ in _civil_ cases "_where important federal interests are at stake._"**[278] So, when a litigant demands evidence from a state legislator in a civil case, a court mustn't quash that demand summarily just because the suit isn't a criminal prosecution.[279]

---

legislators "might be called to the stand at trial to testify concerning the purpose of [an] official action." *See Arlington Heights S. Ct. Op.*, 429 U.S. at 268 (citing *Tenney*, 341 U.S. 367).

In any event, the *Gillock* Court confirmed just three years after *Arlington Heights* that *Tenney*'s teachings don't automatically carry over to the legislative privilege context. *See Gillock*, 445 U.S. at 371–72, 374 ("[The defendant] relies heavily on *Tenney* . . . where this Court was cognizant of the potential for disruption of the state legislative process. The issue there, however, was whether state legislators were *immune* from civil suits . . . . Although *Tenney* reflects this Court's sensitivity to interference with the functioning of state legislators, we do not read that opinion as broadly as Gillock would have us. . . . [W]e discern no basis in these circumstances for a judicially created limitation [on the admissibility of evidence] that handicaps proof of the relevant facts." (emphasis added)).

Thus, *Arlington Heights*'s citation to *Tenney* doesn't imply that courts may take *Tenney*'s teachings regarding state legislative immunity and transplant them uncritically into the state legislative privilege context. *See, e.g.*, *Loesel*, 2010 WL 456931, at *6 ("While Defendant places significant emphasis on the Court's holding in *Tenney*, the Court there addressed immunity from suit, not an evidentiary privilege that would prevent a state legislator from testifying at a deposition or trial. . . . Given the *Gillock* Court's tolerance of the fact that 'the lack of an evidentiary privilege for a state legislator might conceivably influence his conduct while in the legislature,' Defendant has not explained why this Court should extend the immunity from suit to an evidentiary privilege." (quoting *Gillock*, 445 U.S. at 371)).

[278] *See Gillock*, 445 U.S. at 373.

*See also, e.g.*, *McMaster*, 584 F. Supp. 3d at 162 ("The thrust of *Gillock* is that official privilege is not without limit. When in conflict, the weighty federal interests embedded in the Constitution and laws of this nation require these privileges to yield. . . . It is not the simple distinction between 'criminal' and 'civil' cases which determines the availability of this evidentiary privilege, but rather, the importance of the federally created public rights at issue. And when cherished and constitutionally rooted public rights are at stake, legislative evidentiary privileges must yield.").

[279] *See, e.g.*, *Page*, 15 F. Supp. 3d at 665 ("[T]he argument that legislative privilege is an impenetrable shield that completely insulates any disclosure of documents is not tenable." (cleaned up)).

Instead, the court must weigh the risk of legislative interference and intrusion that the discovery request poses against the importance of the issues at stake.[280]

### b.   District Court Cases

At least until recently,[281] that's exactly how most lower courts interpreted *Arlington Heights*, *Trammel*, and *Gillock*.  That is, most lower courts understood the Supreme Court's legislative privilege precedents to hold

(1)   that the *state* legislative *privilege* is narrower than both the *federal* legislative privilege and state legislative *immunity*;

(2)   that the state legislative privilege is subject to a balancing test that weighs the risk of legislative interference against the federal interests at stake; and

(3)   that, as a consequence, the privilege doesn't categorically bar litigants from obtaining documentary and testimonial discovery from state legislatures in important civil cases[282]—a category that includes redistricting cases.[283]

---

[280] *See Gillock*, 445 U.S. at 373.

*See also, e.g.*, *Benisek*, 241 F. Supp. 3d at 574 (noting that *Gillock* "clearly repudiat[es]" any notion that the state legislative privilege is "absolute," and confirming that courts considering "whether legislative privilege protects a state legislative actor from discovery" must "balance the significance of the federal interests at stake against the intrusion of the discovery sought and its possible chilling effect on legislative action"); *Favors I*, 285 F.R.D. at 209 ("To determine whether the [state] legislative privilege precludes disclosure, a court must balance the interests of the party seeking the evidence against the interests of the individual claiming the privilege.").

[281] *But see infra* Section II.C.2.c.

[282] *See, e.g.*, *Favors I*, 285 F.R.D. at 214 (noting "the clear weight of authority holding that the [state] legislative privilege is qualified and subject to a judicial balancing test"); *NAACP v. E. Ramapo Cent. Sch. Dist.*, No. 17 Civ. 8943, 2018 WL 11260468, at *4 (S.D.N.Y. Apr. 27, 2018) ("Unlike legislative immunity, . . . the legislative privilege is not absolute.  'Thus, courts have indicated that, notwithstanding their immunity from suit, legislators may, at times, be called upon to produce documents or testify at depositions.'" (citations omitted) (quoting *Rodriguez*, 280 F. Supp. 2d at 95)).

[283] *See, e.g.*, *Pulte Home Corp. v. Montgomery County*, No. 14-3955, 2017 WL 2361167, at *3 n.6 (D. Md. May 31, 2017) ("Numerous courts have held that the legislative privilege must yield to discovery in redistricting litigation.").

*See also infra* note 296 (listing numerous redistricting cases in which courts have let plaintiffs obtain at least some discovery from legislative entities).

### i.      *Rodriguez*

Take, for instance, the Southern District of New York's 2003 opinion in *Rodriguez v. Pataki*.[284]  The plaintiffs there—like the Plaintiffs here—challenged a redistricting plan as intentionally discriminatory.[285]  In an attempt to obtain evidence to prove their claim, the plaintiffs moved to compel the state legislature to produce "all documents relating to the analysis and process employed by the defendants in developing the [challenged] redistricting plans" and answer interrogatories concerning those same topics.[286]  The legislators tried to resist that discovery on legislative privilege grounds.[287]

The court first emphasized that although state legislative *immunity* and state legislative *privilege* are "closely related" and "often discussed interchangeably," "there is one key difference": unlike state legislative immunity, state "[l]egislative privilege . . . is not absolute."[288] To the contrary, held the *Rodriguez* court, the state legislative privilege "is, at best, one which is qualified."[289]  Citing the aforementioned passage from *Arlington Heights* indicating that, in "extraordinary instances," legislators "might be called to the stand at trial to testify concerning the purpose of [an] official action," the *Rodriguez* court concluded that state legislators "may, at

---

[284] 280 F. Supp. 2d 89.

[285] *Id.* at 91, 93.

[286] *Id.* at 92.

[287] *Id.*

[288] *Id.* at 95.

[289] *Id.* at 100 (citing *Grand Jury*, 821 F.2d at 957).

times, be called upon to produce documents or testify at depositions" "notwithstanding their immunity from suit."[290]

The court then explained that, to determine "whether and to what extent the privilege should be honored" in any particular case, courts "must balance the extent to which production of the information sought would chill the [state legislature's] deliberations concerning such important matters as redistricting against any other factors favoring disclosure."[291]  The court therefore devised a multifactor analytical framework for weighing those competing interests.[292]  The court articulated five factors relevant to that inquiry:

    (1)    "the relevance of the evidence sought to be protected;"

    (2)    "the availability of other evidence;"

    (3)    "the 'seriousness' of the litigation and the issues involved;"

    (4)    "the role of the government in the litigation;" and

    (5)    "the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable."[293]

---

[290] *Id.* at 95 (quoting *Arlington Heights S. Ct. Op.*, 429 U.S. at 268); *see also id.* at 100 (citing the same passage from *Arlington Heights* to support the proposition that "even if the legislator[s] had asserted legislative immunity as a defense, and the Court had concluded that they were protected by its mantle," they still might "be required to disgorge documents or provide other information").

[291] *Id.* at 100.

[292] *See id.* at 101.

[293] *Id.* (quoting *In re Franklin Nat'l Bank Sec. Litig.*, 478 F. Supp. 577, 583 (E.D.N.Y. 1979)).

### ii.  District Court Cases Adopting *Rodriguez*'s Five-Factor Balancing Test

The overwhelming majority of district courts subsequently adopted *Rodriguez*'s five-factor balancing test for evaluating state legislative privilege claims in redistricting[294] and non-redistricting cases alike.[295]

---

[294] *See, e.g.*, *Bethune-Hill*, 114 F. Supp. at 337 (observing that "[m]ost courts that have conducted [a state legislative] privilege analysis in the redistricting context have employed [*Rodriguez*'s] five-factor balancing test"); *Benisek*, 241 F. Supp. 3d at 575–77 ("[C]ourts ruling on claims of legislative privilege in redistricting cases have frequently adopted a five-factor standard that facilitates case-by-case evaluation of the competing interests at stake."); *Whitford*, 331 F.R.D. at 379 ("The other courts that have applied a qualified privilege to gerrymandering claims have balanced five factors . . . . We will take this approach . . . .").

[295] *See, e.g.*, *Angelicare*, 2018 WL 1172947, at *8; *McDonough*, 2015 WL 12683663, at *2, *6 (D. Me. Dec. 31, 2015); *Nashville Student Org. Comm.*, 123 F. Supp. 3d at 970; *McCrory*, 2015 WL 12683665, at *4; *BBC Baymeadows, LLC v. City of Ridgeland*, No. 3:14CV676, 2015 WL 5943250, at *5 (S.D. Miss. Oct. 13, 2015); *Veasey Dist. Ct. Op.*, 2014 WL 1340077, at *2.

*But see infra* Section II.C.2.b.iv (noting that a minority of district courts have rejected *Rodriguez*'s balancing approach, but explaining why those decisions are unpersuasive).

A few courts in other Circuits have adopted a variant of the *Rodriguez* framework that replaces the fifth factor with a slightly different one: "the purpose of the privilege (*i.e.*, the extent to which the discovery would impede legislative action regarding communications between and among legislators)." *See, e.g.*, *Canaan Christian Church v. Montgomery County*, 335 F. Supp. 3d 758, 767 (D. Md. 2018) (noting that split of authority and adopting the latter formulation); *Bethune-Hill*, 114 F. Supp. at 338–39, 341–42 (adopting the alternate formulation of the fifth factor because (at least in the *Bethune-Hill* court's view) it better shields legislatures from "the distraction of compulsory process").

District Courts in the Fifth Circuit generally haven't adopted that alternative formulation, however.  *See, e.g.*, *Veasey Dist. Ct. Op.*, 2014 WL 1340077, at *2; *Perez*, 2014 WL 106921, at *2.

Nor did this panel adopt that alternative formulation the last time it considered legislative privilege issues in this case.  *See League of United Latin Am. Citizens v. Abbott*, No. 3:21-CV-00259, 2022 WL 2921793, at *4 (W.D. Tex. July 25, 2022) [hereinafter *LULAC Doc. Subpoena Op.*] (this panel's prior legislative privilege opinion), *vacated and remanded*, No. 22-50662, 2023 WL 4697109 (5th Cir. July 18, 2023) [hereinafter *LULAC Remand Order*]; *see also* Section II.C.2.e.iii (discussing our prior legislative privilege opinion in depth).

Still other courts conceive of the state legislative privilege as a subspecies of the *deliberative process* privilege, rather than as a freestanding privilege in its own right.  *See Grand Jury*, 821 F.2d at 958 (pre-*Rodriguez* Circuit-level case "refus[ing] to recognize" even "a qualified privilege" for state legislators, but leaving open "the possibility [that] a more narrowly tailored privilege for confidential deliberative communications" might exist); *Irvin*, 127 F.R.D. at 170–74 (pre-*Rodriguez* redistricting case concluding that "there exists a federal common law privilege protecting the deliberative processes of local legislators" and adopting an eight-factor standard that overlaps only partially with *Rodriguez*'s five-factor

Moreover, most courts applying the *Rodriguez* factors in redistricting cases have given plaintiffs at least *some* access to internal legislative materials or legislative testimony bearing on the state legislature's intent.[296]  These Courts have generally concluded that even though "judicial inquiries into legislative . . . motivation" are "*usually* to be avoided" under *Arlington Heights*,[297] redistricting challenges fall within the "extraordinary instances"/"important federal interests" exception to the state legislative privilege that *Arlington Heights* and *Gillock* explicitly

---

test); *Fla. Ass'n*, 164 F.R.D. at 267–28 ("[I]f any privilege should be recognized in this case [involving attempts to depose state legislative staff], it should be a 'deliberative process privilege' . . . . [T]hese deponents do not have a privilege or immunity from attendance at a deposition.").  *But see Bethune-Hill*, 114 F. Supp. 3d at 336 (opining that "[a]lthough some courts analyze the propriety of disclosure or testimony under the deliberative process privilege rather than the legislative privilege, the privilege accorded to legislators is qualified all the same based on the important federal interests at play and the quintessentially public nature of the right").

[296] *See, e.g.*, *Benisek*, 241 F. Supp. 3d at 575–77 (concluding after applying the *Rodriguez* factors "that [the state] legislative privilege d[id] not protect conversations and other communications between and among legislators"); *McMaster*, 584 F. Supp. 3d at 161, 163–66 ("Because each [*Rodriguez*] factor weighs in favor of at least some degree of disclosure [here], the court rejects Defendants' broad conception of the legislative privilege, and orders Defendants to produce requested documents, communications, and information which are relevant to the broad issue of legislative motivation in the enactment of [the challenged redistricting plan]."); *League of Women Voters of Mich.*, 2018 WL 2335805, at *5 ("This Court finds that application of the five factors developed in *Rodriguez* suggest that Plaintiffs' need for the documents and communications requested in the subpoenas is sufficient to overcome the legislative privilege."); *Harris*, 993 F. Supp. 2d at 1068–71 (concluding after analyzing the *Rodriguez* factors that the state legislative privilege didn't forbid the plaintiffs from deposing and obtaining documents from members of an independent redistricting commission); *Whitford*, 331 F.R.D. at 377–82 (applying the *Rodriguez* factors and concluding that the plaintiffs were "entitled to depose [the Wisconsin State Assembly Speaker] and to receive responses to some but not all of their requests for production").

*But see, e.g.*, *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *9–10 (concluding that although the state legislative privilege "does *not* protect *facts or information* available to lawmakers at the time of their decision[s]" on redistricting issues, it *does* "shield[] from disclosure pre-decisional, non-factual communications that contain *opinions, recommendations or advice* about public policies or possible legislation," including "information concerning the *motives, objectives*, plans, reports and/or procedures used by lawmakers to draw the [challenged] map" (emphases added)); *Hall v. Louisiana*, No. 12-657, 2014 WL 1652791, at *10–11 (M.D. La. Apr. 23, 2014) (reaching similar conclusion).

[297] *See Arlington Heights S. Ct. Op.*, 429 U.S. at 268 n.18 (emphasis added) (quoting *Volpe*, 401 U.S. at 420).

contemplate.[298]  "[R]edistricting cases and voting rights cases are 'extraordinary,'" these courts have reasoned, partly because they involve allegations of legislative "self-dealing that deprives, or threatens to deprive, the electorate of the power of their vote to act as a check on legislators,"[299] and partly "because judicial inquiry into legislative intent is specifically contemplated as part of the resolution of the core issue that such cases present."[300]

Courts applying the *Rodriguez* framework the redistricting context have generally proceeded as follows.  Beginning with *Rodriguez*'s first factor ("the relevance of the evidence sought to be protected"),[301] courts have usually concluded that when a plaintiff challenges a redistricting plan as intentionally discriminatory, nonpublic evidence bearing on the state legislature's motivations is more than just *relevant*—it's potentially the most critical evidence in the entire case.[302]  Courts have therefore opined that "[r]edistricting litigation presents a

---

[298] *See, e.g.*, *Harris*, 993 F. Supp. 2d at 1070 ("[T]he Supreme Court . . . held [in *Gillock*] that comity can be trumped by 'important federal interests.'  The federal government has a strong interest in securing the equal protection of voting rights guaranteed by the Constitution, an interest that can require the comity interests underlying legislative privilege to yield." (quoting *Gillock*, 445 U.S. at 373)); *Whitford*, 331 F.R.D. at 377 ("We acknowledge that a sitting legislator is not subject to civil process in any but the most exceptional circumstances.  But this is an exceptional case that raises important federal questions about the constitutionality of Wisconsin's plan for electing members of the [state legislature]. . . . Under these circumstances, the qualified legislative privilege to which [the Wisconsin State Assembly Speaker] is entitled must yield to the important federal interests implicated by plaintiffs' claims.").

[299] *Citizens Union*, 269 F. Supp. 3d at 168.

*See also, e.g.*, *Bethune-Hill*, 114 F. Supp. 3d at 337 (opining that redistricting cases present exactly the sort of "extraordinary instance" that *Arlington Heights* contemplates because "the natural corrective mechanisms built into our republican system of government offer little check upon the very real threat of 'legislative self-entrenchment'" (quoting Christopher Asta, Note, *Developing a Speech or Debate Clause Framework for Redistricting Litigation*, 89 N.Y.U. L. REV. 238, 264 (2014))).

[300] *E.g.*, *Bethune-Hill*, 114 F. Supp. 3d at 337.

[301] *See Rodriguez*, 280 F. Supp. 2d at 101 (quoting *Franklin*, 478 F. Supp. at 583).

[302] *See, e.g.*, *Bethune-Hill*, 114 F. Supp. 3d at 339–40 ("Unlike other cases, where the . . . legislative privilege may be employed to prevent the government's decision-making process from being swept up unnecessarily into the public domain, this is a case where the decisionmaking process *is*

---

particularly appropriate circumstance for qualifying the state legislative privilege because judicial inquiry into legislative intent is specifically contemplated as part of the resolution of the core issue that such cases present."[303]

Courts have likewise generally concluded that *Rodriguez*'s second factor ("the availability of other evidence") favors disclosure in redistricting cases too.[304]  Although these courts have acknowledged that plaintiffs can base intentional racial discrimination claims on

---

the case. . . . Given the centrality of the legislative purpose inquiry to Plaintiff's claim . . . the evidence sought is clearly relevant, and thus [the first *Rodriguez*] factor weighs in favor of disclosure." (cleaned up) (emphasis added)); *McMaster*, 584 F. Supp. 3d at 163 ("The evidence sought by Plaintiffs is highly relevant to the intentional discrimination claims at the heart of the complaint, because the Legislature's decision making process itself *is* the case.  It is undisputed that Equal Protection cases require proof of discriminatory intent, and documents containing the opinions and subjective beliefs of legislators or their key advisors are relevant to the broader inquiry into legislative intent and the possibility of racially motivated decisions that were not adequately tailored to a compelling government interest." (cleaned up) (emphasis added)); *Benisek*, 241 F. Supp. 3d at 575 ("[T]he plaintiffs must prove that in redrawing a district's boundaries, the legislature and its mapmakers were motivated by *a specific intent* to burden the supporters of a particular political party.  Thus, in seeking to depose the witnesses who were involved in drawing the map, the plaintiffs are clearly seeking evidence necessary to prove this specific intent." (cleaned up)); *Harris*, 993 F. Supp. 2d at 1070 ("Because what motivated the Commission to deviate from equal district populations is at the heart of this litigation, evidence bearing on what justifies these deviations is highly relevant.").

But see, e.g., *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *2–4, 8 (concluding that although information concerning the mapdrawers' "motives [and] objectives" was "relevant," it was "not central to the outcome of th[e] case" because "plaintiffs need not offer direct evidence of discriminatory intent" to prevail in a redistricting case); *Hall*, 2014 WL 1652791, at *9 (reaching similar conclusion).

But see *supra* Section I (explaining that although it's possible for plaintiffs to prove intentional discrimination by circumstantial evidence alone, relegating a plaintiff to circumstantial evidence makes it significantly harder to successfully prove intentional discrimination).

[303] *See, e.g.*, *Bethune-Hill*, 114 F. Supp. 3d at 337; *City of Greensboro*, 2016 WL 11660626, at *4.

[304] *See, e.g.*, *Bethune-Hill*, 114 F. Supp. 3d at 340–41; *League of Women Voters of Mich.*, 2018 WL 2335805, at *5; *Rodriguez*, 280 F. Supp. 2d at 102.

But see, e.g., *Hall*, 2014 WL 1652791, at *8 (concluding that the second *Rodriguez* factor "weigh[ed] against disclosure" because the plaintiffs already had access to various "matters of public record"); *Contreras v. Ill. State Bd. of Elections*, No. 21-CV-3139, 2021 WL 7709552, at *5 (N.D. Ill. Oct. 14, 2021) (concluding "that the second balancing factor . . . weigh[ed] against disclos[ing]" auto-saved, incomplete, interim drafts of redistricting maps because the plaintiffs "already ha[d] access to a great deal of [other] evidence regarding the drafting process").

circumstantial evidence collected from *public* sources (as opposed to internal legislative

documents and compelled legislative testimony),[305] most courts have nonetheless concluded that

there's no "substitute for the ability to depose a witness and obtain *direct* evidence of motive and

intent."[306]  These courts have reasoned that in the redistricting context, "no other evidence [may]

be as probative of an unlawful legislative motive" as "documents, information, and

communications between legislators and their staff regarding the circumstances surrounding the

---

[305] *See, e.g.*, *Bethune-Hill*, 114 F. Supp. 3d at 340–41 ("Direct evidence of discriminatory intent is not necessary to prevail.  Courts may infer discriminatory intent from a variety of circumstantial factors. . . . For evidentiary purposes, Plaintiffs may resort to various sources of information, including special interest group position papers, press releases, newspaper articles, census reports, registered voter data and election returns, etc." (cleaned up)); *Page*, 15 F. Supp. 3d at 667 ("[The witness] correctly points out that plaintiffs are generally entitled to rely on circumstantial factors such as district shape, racial bloc voting, low minority registration, and minority retrogression when litigating redistricting decisions."); *League of Women Voters of Mich.*, 2018 WL 2335805, at *5 ("A considerable amount of material relating to the redistricting process is publicly available, including testimony regarding the redistricting process that took place in the public forum, public statements, analyses, amendments, bills, and other information regarding the legislation and its historical context.").

 *See also supra* Section I.

[306] *McMaster*, 584 F. Supp. 3d at 164 (quoting *Benisek*, 241 F. Supp. 3d at 576).

 *See also, e.g.*, *Favors I*, 285 F.R.D. at 219 ("[W]hile [the state's redistricting task force] has indeed produced substantial material on its website—including maps, analyses, data, and memoranda—such evidence may provide only part of the story.  To the extent that the information sought by the plaintiffs relates to non-public, confidential deliberations that occurred within [the task force] or one of the partisan . . . redistricting offices, or between legislators, their staffs, and retained experts, such information likely cannot be obtained by other means."); *Bethune-Hill*, 114 F. Supp. 3d at 341 ("[T]he availability of alternate evidence does not render the evidence sought [from the legislature] here irrelevant by any measure. . . . [T]he availability of alternate evidence will only supplement—not supplant—the evidence sought by the Plaintiffs.  Plaintiffs need not confine their proof to circumstantial evidence.  The real proof is what was in the contemporaneous record in the redistricting process." (cleaned up)); *Page*, 15 F. Supp. 3d at 667 (similar).

 *See also supra* Section I.

 *But see Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *8 (reaching the opposite conclusion that "the availability of other evidence favor[ed] non-disclosure" in redistricting case because the plaintiffs "already ha[d] considerable information at their fingertips" as "a matter of public record," including "public hearing minutes, special interest group position papers, statements made by lawmakers during debate, committee reports, press releases, newspaper articles, census reports, registered voter data and election returns").

enactment of" the redistricting legislation "and legislators' motivation[s] for the enactment."[307]

Furthermore, "given the practical reality that officials seldom, if ever, announce on the record

that they are pursuing a particular course of action because of their desire to discriminate against

a racial minority," courts have generally reasoned that plaintiffs asserting intentional

discrimination claims shouldn't be relegated to relying exclusively on evidence to the public

legislative record.[308]

    As for *Rodriguez*'s third factor—"the 'seriousness' of the litigation and the issues

involved"[309]—courts have typically agreed "that racial and malapportionment claims in

redistricting cases 'raise serious charges about the fairness and impartiality of some of the central

institutions of our state government,'" which "counsel[s] in favor of allowing discovery."[310]

Courts have further reasoned that "[t]he federal government has a strong interest in securing the

---

[307] *See, e.g.*, *McMaster*, 584 F. Supp. 3d 152, at 164 (cleaned up).

[308] *See Bethune-Hill*, 114 F. Supp. 3d at 341 (quoting *Veasey Dist. Ct. Op.*, 2014 WL 1340077, at *3).

    *See also, e.g.*, *McMaster*, 584 F. Supp. 3d 164 ("[D]irect evidence of discriminatory intent is, for obvious reasons, often difficult to obtain."); *City of Greensboro*, 2016 WL 11660626, at *5; *League of Women Voters of Mich.*, 2018 WL 2335805, at *5.

    *See also supra* Section I.

[309] *See Rodriguez*, 280 F. Supp. 2d at 101 (quoting *Franklin*, 478 F. Supp. at 583).

[310] *See Favors I*, 285 F.R.D. at 219 (quoting *Rodriguez*, 280 F. Supp. 2d at 102).

    *See also, e.g.*, *McMaster*, 584 F. Supp. 3d at 165 ("[E]very redistricting case litigated in the federal courts demonstrates that at some juncture, state interests give way when they conflict with the constitutionally guaranteed fundamental right to vote free from racial discrimination.  The third factor thus weighs in favor of disclosure."); *Bethune-Hill*, 114 F. Supp. 3d at 341 ("Courts have readily recognized the 'seriousness of the litigation' in racial gerrymandering cases." (quoting *Page*, 15 F. Supp. 3d at 667)); *City of Greensboro*, 2016 WL 11660626, at *5 (concluding that *Rodriguez*'s third factor "weigh[ed] in favor of disclosure" because "the right to vote is fundamental").

equal protection of voting rights guaranteed by the Constitution, an interest that can require the comity interests underlying legislative privilege to yield."[311]

Most courts have likewise determined that *Rodriguez*'s fourth factor—"the role of the government in the litigation"[312]—favors disclosure in redistricting cases because the entity from which the plaintiff seeks discovery—*i.e.*, the state legislature—is the very same entity that enacted the allegedly discriminatory plan.[313]  Courts have further reasoned that "the legislative privilege ought to yield to [p]laintiffs' attempt to enforce a substantial public right" in redistricting litigation because "the legisla*ture*—rather than [individual] legisla*tors*—are the target of the remedy" that the plaintiffs seek in such cases.[314]

---

[311] *See, e.g.*, *Harris*, 993 F. Supp. 2d at 1070.

In fact, some courts have concluded that the third factor favors disclosure in redistricting cases even when the federal government *isn't* a party to the case—*i.e.*, when the plaintiffs are all private parties. *See, e.g.*, *Page*, 15 F. Supp. 3d at 667 ("Additionally, although this redistricting suit is not brought on behalf of the United States, there can be no question that it raises serious charges about the fairness and impartiality of some of the central institutions of our state government.  The Court finds that the nature of the claims in this action weigh strongly in favor of document disclosure." (cleaned up) (quoting *Rodriguez*, 280 F. Supp. 2d at 102)).

[312] *See Rodriguez*, 280 F. Supp. 2d at 101 (quoting *Franklin*, 478 F. Supp. at 583).

[313] *See McMaster*, 584 F. Supp. 3d at 165 ("[T]he fourth factor looks to the role of the Legislature in effecting the alleged constitutional violations in the case.  It is undisputed that the [state legislature] enacted the district maps at issue.").

*See also, e.g.*, *Favors I*, 285 F.R.D. at 219–20 ("[T]he state government's role in the instant litigation is direct, and the motives and considerations behind the [redistricting p]lans, to a large degree, *are* the issue.  Hence, the fourth factor also weighs against issuance of a protective order." (cleaned up) (emphasis added)); *City of Greensboro*, 2016 WL 11660626, at *5 ("As to the role of the government, the subjective decision-making process of the legislature is at the core of the Plaintiffs' claims, thus the legislature's direct role in the litigation supports overcoming the privilege." (cleaned up) (first quoting *Page*, 15 F. Supp. 3d at 666; then quoting *Bethune-Hill*, 114 F. Supp. 3d at 341)).

[314] *See McMaster*, 584 F. Supp. 3d at 165 (emphases added) (quoting *Bethune-Hill*, 114 F. Supp. 3d at 341).

*See also, e.g.*, *Benisek*, 241 F. Supp. 3d at 576 ("Application of the fourth factor—consideration of the role of the State as compared to that of individual legislators—also weighs in favor of the plaintiffs. When individual legislators are the targets of litigation, the possibility of their suffering individualized consequences can significantly increase the need for legislative privilege.  But here, the witnesses have no

On the opposite side of the ledger, most courts have readily acknowledged that the fifth *Rodriguez* factor—"the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable"[315]—usually weighs *against* permitting legislative discovery in redistricting cases.[316]  Courts have recognized that "present and future legislators and their staff" may undesirably "refrain from engaging in the frank and candid deliberation about, and analysis of, proposed legislation" if plaintiffs "are granted access to state legislators' private communications with other legislators, committee members, or their staff regarding the introduction, consideration, or passage of" legislation.[317]

---

personal stake in the litigation and face no direct adverse consequences if the plaintiffs prevail.  The plaintiffs have brought their suit not against individual state legislators but against the State's agents who are, in their official capacity, responsible for the electoral process in Maryland, and the adverse impact on the individual legislators is minimal."); *Whitford*, 331 F.R.D. at 379 ("[The fourth *Rodriguez*] factor relates to whether the lawsuit potentially subjects the legislator to personal liability.  In this case, as in any gerrymandering case, the answer is no." (citation omitted)).

[315] *See Rodriguez*, 280 F. Supp. 2d at 101 (quoting *Franklin*, 478 F. Supp. at 583).

[316] *See Hall*, 2014 WL 1652791, at *10 ("The fifth factor weighs against disclosure.  Courts have long recognized that disclosure of confidential documents and communications concerning intimate legislative activities should be avoided. . . . [I]nquiries regarding the specific motives of individual legislators, or advice and recommendations used by those legislators to support their decision, will encourage timidity and hamper the legislative process." (citations omitted)).

*See also, e.g.*, *League of Women Voters of Mich.*, 2018 WL 2335805, at *5; *Harding*, 2016 WL 7426127, at *6, *13; *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *8; *Contreras*, 2021 WL 7709552, at *5–6.

[317] *See League of Women Voters of Mich.*, 2018 WL 2335805, at *5 (cleaned up) (quoting *Mich. State*, 2018 WL 1465767, at *7).

*See also, e.g.*, *Benisek*, 241 F. Supp. 3d at 576 ("There is a good deal of force to the witnesses' argument that questioning legislators about the conversations in which they engaged as they redrew legislative districts strikes at 'the very core' of that protected by the legislative privilege and can tend to undermine the legislators' ability to speak freely and thereby chill a key aspect of the state legislative process."); *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *9 ("In the redistricting context, full public disclosure would hinder the ability of party leaders to synthesize competing interests of constituents, special interest groups and lawmakers, and draw a map that has enough support to become law.").

Nevertheless, courts applying the *Rodriguez* framework in redistricting cases have also generally concluded that the fifth factor doesn't outweigh the other four.[318]  Courts have reasoned that although forcing legislators to disclose their conversations about the development and enactment of a redistricting plan amounts to a substantial intrusion into the legislative domain, such "conversations could also be the most probative evidence of [discriminatory] intent . . . because they relate to moments when unconstitutional intent may have infected the legislative process."[319]  Thus, courts have frequently "conclude[d] that 'comity [to state legislatures] yields'" in the redistricting context "[b]ecause of the importance of the federal interests at stake," and because "evidence of . . . conversations and other communications between and among legislators" "may be crucial to the[] vindication" of those paramount federal interests.[320]

That's not to say, of course, that courts adopting *Rodriguez*'s five-factor framework have treated redistricting lawsuits as a license to ransack legislative offices for hidden evidence of discriminatory intent.[321]  To the contrary, courts have recognized that "the extent to which

---

[318] *See, e.g.*, *League of Women Voters of Mich.*, 2018 WL 2335805, at *5 (concluding that even though "[t]he fifth [*Rodriguez*] factor weigh[ed] in favor of quashing the" plaintiffs' discovery demands, the plaintiffs' "need for the documents and communications requested" was nevertheless "sufficient to overcome the legislative privilege").

[319] *See, e.g.*, *Benisek*, 241 F. Supp. 3d at 576.

[320] *See, e.g.*, *id.* at 576–77 (quoting *Gillock*, 445 U.S. at 373).

[321] *See, e.g.*, *Favors II*, 2013 WL 11319831, at *15 ("[T]his Court declines to effectively render the legislative privilege a nullity by granting the plaintiffs unfettered access to all materials 'relating to' redistricting."); *Favors I*, 285 F.R.D. at 220 ("It is not sufficient to argue . . . that because redistricting presents a unique legislative situation, allowing discovery here will not weaken the legislative privilege in other areas of public policy and debate within the legislative branch." (citations omitted)).

*Cf. Citizens Union*, 269 F. Supp. 3d at 167 & n.16 (opining that even in "the extraordinary circumstance where discovery into the legislative decisionmaking process" is "relevant because intent is an element of the claim or otherwise important to establishing the claim" (such as in redistricting cases),

inquiry into" internal legislative affairs is permissible in any particular case "should correspond with the degree to which the intrusion is absolutely necessary."[322]

To that end, courts applying the *Rodriguez* test in redistricting cases haven't always given plaintiffs as much legislative discovery as they wanted.  For instance, a few courts have let plaintiffs obtain internal legislative *documents* bearing on the legislature's intent, but prohibited them from also *deposing* legislators about their intent.[323]  *Rodriguez* itself, meanwhile, only let the plaintiffs obtain discovery from a redistricting task force consisting of both legislators and non-legislators;[324] the court forbade the plaintiffs from also taking the more intrusive step of "seek[ing] information concerning the *actual deliberations* of the Legislature—or individual legislators—which took place *outside*" that task force, or that occurred "*after* the proposed redistricting plan reached the floor of the Legislature."[325]  Other courts, meanwhile, have

_____

"discovery . . . into legislative motives and predecisional documents still must be narrowly tailored," and "only limited intrusion into legislative motives . . . may be permitted").

[322] *See, e.g.*, *City of Greensboro*, 2016 WL 11660626, at *7 (quoting *Veasey Dist. Ct. Op.*, 2014 WL 1340077, at *3).

[323] *See, e.g.*, *id.* ("The Court finds that the cost and inconvenience of deposition testimony . . . would be far more burdensome than any benefit from such testimony, *particularly in light of the documents that Legislative Respondents are ordered to produce. . . . [P]rohibiting deposition testimony but requiring Legislative Respondents to produce certain documents* strikes the appropriate balance between protecting the legislative process and the need to ensure that Individual Plaintiffs' constitutional rights are not violated." (cleaned up) (emphases added)).

*See also supra* note 263 and accompanying text (explaining how it may be duplicative (and therefore improper) to let plaintiffs depose legislators about legislative activities when those plaintiffs have already obtained documents evidencing those same activities).

*But see, e.g.*, *Whitford*, 331 F.R.D. at 377–82 (letting redistricting plaintiffs not just depose the Wisconsin State Assembly Speaker, but also obtain much of the documentary discovery they demanded).

[324] *See Rodriguez*, 280 F. Supp. 2d at 92, 101–03.

[325] *Id.* at 103 (emphases added); *see also id.* at 104.

*Cf. Marylanders*, 144 F.R.D. at 304–05 (opinion of Murnaghan, J. & Motz, J.) (pre-*Rodriguez* case letting plaintiffs depose *non*-legislator members of redistricting advisory committee about the committee's deliberations, but "flatly prohibit[ing]" plaintiffs from deposing *legislators* about "any action

performed an *in camera* inspection to assess document by document whether the plaintiffs' need for any particular piece of evidence outweighed the threat to legislative independence.[326]

The point, though, is that most courts considering redistricting challenges have let plaintiffs obtain at least *some* evidence of the legislature's intent that wasn't already accessible in the public legislative record—as opposed to treating the state legislative privilege as an absolute bar to such discovery.[327]  Because—as discussed—Federal Rule of Evidence 501 commands federal courts to apply common law privileges (including the state legislative privilege) the same way they've been "interpreted by United States courts in the light of reason and experience,"[328] the fact that most courts have adopted *Rodriguez*'s five-factor balancing test and authorized at least some legislative discovery in redistricting cases strongly suggests that other courts should do the same.[329]

Finally, *Rodriguez*'s interest-balancing approach also has the added benefit that it faithfully comports with *Trammel*'s admonition "that legislative privilege, like all evidentiary

---

which they took after the redistricting legislation reached the floor of the" legislature "because of the direct intrusion of such discovery into the legislative process").

[326] *See, e.g.*, *Favors I*, 285 F.R.D. at 220–21 ("[W]hile the five factors here generally support overcoming the privilege, the threat of inhibiting legislative deliberations hangs in the air.  Consequently, the prudent course is for the Court to perform an analysis of the allegedly privileged documents, *in camera*, prior to ruling as to the specific documents (or categories of documents) over which the privilege has been invoked.  It is only in this way that the Court can make the contextual investigation necessary to weigh the claim of privilege against the need for disclosure, and to determine whether the defendants have established the requisite good cause to justify the issuance of a protective order." (citations omitted)); *Favors II*, 2013 WL 11319831, at *12–15 (concluding after performing that *in camera* review that the state legislative privilege yielded as to some documents and communications but not others).

[327] *See supra* note 296 and accompanying text.

[328] *See* FED. R. EVID. P. 501; *see also supra* notes 141–142 and accompanying text.

[329] *See, e.g.*, *Pernell*, 84 F.4th at 1355 (Jill Pryor, J., dissenting) (opining that using "the same balancing test to evaluate claims of legislative privilege" that "district courts in numerous other cases" have adopted is most "consistent with Rule 501's command to interpret privileges in light of judicial experience"); *see also supra* notes 294, 296, and accompanying text.

privileges, applies 'only to the very limited extent that a public good transcends the normally predominant principle of utilizing all rational means for ascertaining truth.'"[330]

### iii.    *Perez*

One example of a redistricting case adopting *Rodriguez*'s balancing approach—and one that's particularly important here because the Fifth Circuit ultimately adopted several of its holdings in a published (and therefore precedential) opinion[331]—is the Western District of Texas's opinion in *Perez v. Perry*.[332]

The plaintiffs in *Perez* attacked the electoral maps that the Texas Legislature enacted in the previous decennial redistricting cycle as intentionally discriminatory.[333]   The plaintiffs therefore sought to depose various Texas Legislators and their staffers in the hopes of obtaining evidence of discriminatory intent.[334]

Although the Legislators insisted that the state legislative privilege categorically barred the plaintiffs from conducting those depositions, a three-judge panel of this Court disagreed.[335]

---

[330] *See, e.g.*, *Benisek*, 241 F. Supp. 3d at 574–75 (quoting *Trammel*, 445 U.S. at 50); *see also supra* Section II.C.2.a.ii (discussing *Trammel* in depth).

[331] *See infra* Section II.C.2.d (explaining how the Fifth Circuit's published opinion in *Jefferson Community* elevated several of *Perez*'s holdings to the status of binding Fifth Circuit precedent).

[332] *See* 2014 WL 106927.

[333] *See, e.g.*, *Abbott*, 585 U.S. at 584–85 (Supreme Court's subsequent opinion in *Perez*).

[334] *See* 2014 WL 106927, at *1.

[335] *See id.* at *1–3.

However, the panel left open the possibility that it might ultimately sustain legislative privilege objections to *specific deposition questions*.  *See id.* at *1, *3 ("[T]he deponent may choose not to answer specific questions, citing the privilege.  In that event, Plaintiffs may thereafter file a motion to compel and the Court will thereafter determine whether the privilege . . . is outweighed by a compelling, competing interest."); *see also Perez v. Perry*, No. 5:11-CV-360, 2014 WL 12479575, at *1 (W.D. Tex. July 11, 2014) (subsequently concluding that plaintiff-intervenor failed to "me[et] its burden of establishing that

The panel first adopted *Rodriguez*'s conclusion that, to comport with *Trammel*, the state legislative privilege "must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth."[336] Having agreed that the privilege is subject to those significant restrictions, the *Perez* panel likewise adopted *Rodriguez*'s conclusion that unlike state legislative *immunity*—which "is absolute"—"the legislative *privilege* for state lawmakers is, 'at best, one which is qualified.'"[337] Finally, the *Perez* court adopted *Rodriguez*'s five-factor balancing test for determining whether the state legislative privilege applied to any particular discovery demand.[338]

### iv.    District Court Cases Adopting Other Approaches

The foregoing discussion demonstrates that "the clear weight of authority hold[s] that the legislative privilege is qualified and subject to a judicial balancing test" in civil cases—including redistricting cases.[339]  Still, that authority isn't unanimous.[340]  A minority of district courts have adopted a more absolutist view of the state legislative privilege that categorically forecloses

---

the factors outlined in *Rodriguez* . . . weigh[ed] in favor of" compelling Chairman of the Texas House Redistricting Committee to answer certain deposition questions (citation omitted)).

[336] 2014 WL 106927, at *1 (cleaned up) (citing *Rodriguez*, 280 F. Supp. 2d at 93–94); *see also Trammel*, 445 U.S. at 50.  *See also supra* Section II.C.2.a.ii (analyzing *Trammel* in depth).

[337] 2014 WL 106927, at *2 (emphases added) (quoting *Rodriguez*, 280 F. Supp. 2d at 95, 100).

[338] *See id.* (citing *Rodriguez*, 280 F. Supp. 2d at 95, 101).

[339] *Favors I*, 285 F.R.D. at 213–17; *see also supra* Section II.C.2.b.ii–iii.

[340] *See, e.g.*, *Cave v. Thurston*, No. 4:18-cv-00342, 2021 WL 4936185, at *4 (E.D. Ark. Oct. 22, 2021) (observing that "courts that have addressed the [state legislative] privilege" have "not agree[d] on its scope"); *Hobart*, 784 F. Supp. 2d at 764 (noting that while some "courts have held that, in civil cases, [the state legislative] privilege must be qualified, not absolute, and must therefore depend on a balancing of the legitimate interests on both sides," other "courts have applied an absolute evidentiary privilege in civil cases" (cleaned up)).

litigants from obtaining discovery regarding legislative motives in civil cases—even when the legislature's intent is a critical element of the plaintiff's claim.[341]  However, many of the courts that adopted that expansive view of the state legislative privilege based their conclusions on erroneous premises[342]—often without analyzing (or even mentioning) governing Supreme Court precedents like *Gillock* and *Arlington Heights*.[343]

---

[341] *See, e.g.*, *Favors I*, 285 F.R.D. at 213 (noting that a "slim minority of . . . cases have analyzed the [state] legislative privilege under principles governing legislative immunity" rather than "recogniz[ing] a qualified legislative privilege" that "balance[s] the parties' competing interests"); *Bryant*, 2017 WL 6520967, at *5 n.8 (acknowledging "that some courts examining state legislator legislative privilege have found that the privilege is absolute and indistinguishable from the doctrine of legislative immunity," but observing that such cases are "heavily outnumbered by others finding that the privilege is qualified and distinct from legislative immunity").

*See also, e.g.*, *Dyas*, 2009 WL 3151879, at *9 ("[T]he [state legislative] privilege prevents a litigant from deposing an unwilling legislator to probe for evidence with which to support the litigant's challenge to a legislative decision as improperly motivated, procedurally defective or otherwise infirm. . . . [A] litigant cannot ask a legislator questions directly or indirectly probing corporate or individual intent (including, without limitation, questions concerning information considered or made known to the deponent or other legislators; questions concerning the *Arlington Heights* considerations [for determining whether an invidious discriminatory purpose motivated a legislative decision] or others like them; and questions concerning comments made by or to any legislator or group of legislators, before or after enactment).  Similarly, a litigant cannot ask a legislator questions directly or indirectly probing the sequence of events leading to the legislative decision (including, without limitation, questions touching on procedure or timing).  This list is not exhaustive but merely illustrative.").

*Cf. Texas v. Holder*, No. 12-128, 2012 WL 13070060, at *1–2 & n.2 (D.D.C. June 5, 2012) (determining that non-redistricting VRA case wasn't sufficiently "extraordinary" to warrant compelling legislators "to reveal [the] subjective motivations" underlying the challenged voting law, but preserving the possibility that the privilege might yield in a different voting rights case).

[342] *See infra* note 364; *see also supra* Section II.C.2.a.iii (identifying and cautioning against those analytical traps).

[343] *See infra* note 365; *see also supra* Section II.C.2.a.iii (analyzing *Gillock* in depth); Section II.C.2.a.i (analyzing *Arlington Heights* in depth).

Take, for instance, *Cunningham v. Chapel Hill, ISD*.[344]  In that case, local lawmakers reorganized a school district's maintenance department to eliminate the plaintiff's position as the department's director.[345]  The plaintiff accused the district of eliminating his position in retaliation for comments he made about the district's superintendent.[346]  Accordingly, the plaintiff sought to depose the lawmakers about their true motivations for reorganizing the department.[347]

Without analyzing (or even mentioning) the aforementioned persuasive authorities subjecting the state legislative privilege to a five-factor balancing test,[348] the *Cunningham* court held that the legislative privilege flatly prohibited the plaintiff from deposing the lawmakers about their motivations.[349]  At each step of its analysis, however, the court made case-dispositive analytical errors.

For instance, the court began its analysis by asserting that "[t]he Supreme Court has unequivocally interpreted the *Speech and [sic] Debate Clause* to provide an absolute legislative immunity from liability . . . for state, regional, and local legislators."[350]  As noted above, though,

---

[344] *See* 438 F. Supp. 2d 718 (E.D. Tex. 2006).

[345] *See id.* at 719.

[346] *See id.*

[347] *See id.* at 719–20 ("Cunningham bases his argument on the premise that one of the elements of his cause of action requires him to prove that his speech was a substantial and motivating factor behind the [School] Board's decisions.  Cunningham contends that he cannot prove this element without deposing [the Board's] trustees regarding the Board's motivations for making these decisions.").

[348] *See id.* at 719–24 & nn.1–5; *see also supra* Sections II.C.2.b.i–ii.

[349] *See* 438 F. Supp. 2d at 723–24.

*But see id.* (nevertheless allowing the plaintiff to depose the lawmakers about actions "that occurred *outside* the sphere of legitimate legislative activities" (emphasis added)).

[350] *See id.* at 720 (emphasis added) (citing *Bogan*, 523 U.S. at 53–54).

the opposite is true.[351]  The Supreme Court has in fact held unequivocally that "[t]he Speech or Debate Clause of the United States Constitution is *no more applicable* to the members of state legislatures than to the members of" a regional legislative body.[352]

The *Cunningham* court's mistaken premise that the Speech or Debate Clause applies to state and federal legislators alike led the court to erroneously conclude that state and local legislators enjoy an absolute privilege from compulsory testimony to the same extent as their federal counterparts.[353]  Because "the Speech and [sic] Debate Clause prevent[s] the questioning of *congressman* [sic] with regard to their legislative activities,"[354] the court inferred that the Clause likewise protects *local* legislators "from having to testify about actions taken in the sphere of legitimate legislative activity."[355]  Because "the rationales for according absolute *immunity* to federal, state, and regional legislators apply with equal force to local legislators," the court reasoned "that the rationales for applying the testimonial *privilege* to federal . . . legislators apply with equal force to local legislators" too.[356]

---

[351] *See supra* notes 102–103 and accompanying text.

[352] *See Lake Country Estates*, 440 U.S. at 404 (emphasis added); *see also Gillock*, 445 U.S. at 366 n.5 (noting that, "by its terms," "the Federal Speech or Debate Clause . . . applies only to 'Senators and Representatives'" of the U.S. Congress, not to "state legislators").

[353] *See* 438 F. Supp. 2d at 722.

[354] *See id.* (emphasis added) (citing *Gravel*, 408 U.S. at 616).

[355] *Id.*; *see also id.* at 723 ("The testimonial privilege is an inherent aspect of the legislative immunity that applies to local legislators under the Speech and [sic] Debate Clause of the United States Constitution.").

[356] *See id.* at 722 (emphases added) (quoting *Bogan*, 523 U.S. at 52).

Again, though, binding Supreme Court precedent refutes the premise "that the rationales for applying the testimonial privilege to federal . . . legislators apply with equal force to [state and] local legislators."[357]  *Gillock*—which *Cunningham* neither cites nor analyzes[358]— unequivocally states that one of the "[t]wo interrelated rationales [that] underlie the Speech or Debate Clause"—specifically, the federal separation of powers—"gives *no support* to the grant of a privilege to state" or local legislators because states and localities aren't coequal branches of the federal government, and because the Constitution makes federal laws supreme over state and local laws.[359]

The *Cunningham* court did at least acknowledge *Arlington Heights*'s holding that state and local legislators "might be called to the stand at trial to testify concerning the purpose of [an] official action" in "extraordinary instances."[360]  But the court stopped short of analyzing whether *Cunningham* was one of those "extraordinary" cases.[361]  Nor did the *Cunningham* court follow (or even acknowledge) *Gillock*'s command to balance the "federal interests . . . at stake" against "principles of comity" to determine whether the legislative privilege should yield under *Cunningham*'s specific facts.[362]

---

[357] *Contra id.*

[358] *See id.* at 719–24 & nn.1–5.

[359] *See Gillock*, 445 U.S. at 369–71; *see also supra* Section II.C.2.a.iii.

[360] *See* 438 F. Supp. 2d at 721–22 (quoting *Arlington Heights S. Ct. Op.*, 429 U.S. at 268); *see also supra* Section II.C.2.a.i.

[361] *See* 438 F. Supp. 2d at 721–22 (observing merely that *Arlington Heights* "did not identify what might constitute an 'extraordinary' instance").

[362] *Compare Gillock*, 445 U.S. at 373, *with Cunningham*, 438 F. Supp. 2d at 719–24 & nn.1–5.

That's not to imply that the legislative privilege should have yielded under the facts of *Cunningham*, or that *Cunningham* was an "extraordinary" case within the meaning of *Arlington Heights*. It just means that the *Cunningham* court should have performed the interest balancing that *Gillock*

Thus, to the extent *Cunningham* holds that state and local legislators are absolutely "protected by the testimonial privilege from having to testify about actions taken in the sphere of legitimate legislative activity,"[363] it is unpersuasive.  And, to the extent other district courts have reached similar conclusions based on other analytical errors[364] or without citing or analyzing the relevant Supreme Court authorities,[365] they're unpersuasive too.

---

requires, rather than summarily treating the state legislative privilege as an outright bar to discovery regarding the lawmakers' motives.

[363] *See* 438 F. Supp. 2d at 722.

[364] *See, e.g.*, *Miles-Un-Ltd., Inc. v. Town of New Shoreham*, 917 F. Supp. 91, 98 (D.N.H. 1996) (treating the state legislative privilege and state legislative immunity as effectively coterminous).  *But see supra* Section II.C.2.a (explaining why it's erroneous to do so).

*Cf. Dyas*, 2009 WL 3151879, at *2 & n.3, *6–10 (treating the legislative privilege as effectively coextensive with state legislative immunity—and refusing to even "consider[] . . . th[e] line of authority" holding that "a balancing of interests is required before deciding whether a testimonial privilege exists"—because the plaintiffs didn't "challenge the proposition that the testimonial privilege exists whenever the immunity exists").  *But cf. Ochoa-Salgado v. Garland*, 5 F.4th 615, 619–20 (5th Cir. 2021) (remarking in a different context that "where a party concedes an issue" and a court "relies on that concession[] without further analysis," that court "does not give the issue reasoned consideration" (emphasis omitted)).

*Cf. Puente Ariz. v. Arpaio*, 314 F.R.D. 664, 670 (D. Ariz. 2016) (declining to follow *Rodriguez* on the ground that the Second Circuit "abrogated *Rodriguez*" in a case called *Almonte v. City of Long Beach*).  *But see Bryant*, 2017 WL 6520967, at *8 ("The *Puente Arizona* court . . . found that *Rodriguez* was no longer good law, and had been abrogated by the Second Circuit in *Almonte*.  *Almonte* does not, however, appear to have abrogated *Rodriguez*, and this Court can find no other opinion which held similarly.  In fact, earlier this year and ten years after the *Almonte* decision, the Fifth Circuit cited *Rodriguez* favorably in [the *Jefferson Community* case discussed below], and, thus, found *Rodriguez* to be good law." (citations omitted)); *id.* at *8 n.9 ("*Almonte* did not address *Rodriguez* or the issue of legislative privilege.  Instead, *Almonte* exclusively concerned legislative immunity.  And courts in the Second Circuit continue to cite *Rodriguez* as good law . . . ." (citations omitted)); *see also Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007) ("[T]he [district court's] denial of legislative *immunity* was incorrect as a matter of law and must therefore be reversed." (emphasis added)).

[365] *See Hum. Res. Rsch. & Mgmt. Grp., Inc. v. County of Suffolk*, No. CV 03-3777, 2008 WL 11449404, at *1 (E.D.N.Y. Apr. 17, 2008) (declaring (without analyzing or mentioning *Arlington Heights* or *Gillock*) that the state legislative privilege categorically "prevent[s] inquiry into the motivation behind legislative acts" and thereby forecloses litigants from obtaining "testimony regarding the reasons why legislators acted as they did"); *I.B.I.D. Assocs. Ltd. P'ship v. Gauthier*, No. 2:22-cv-00954, 2022 WL 1524973, at *1–3 (E.D. Pa. May 13, 2022) (proclaiming (also without analyzing or mentioning *Arlington Heights* or *Gillock*) that "courts do not look behind the curtain to consider the process that brought about a legislative enactment"); *Villareal v. Dallas County*, No. 3:11-cv-2233, 2011 WL 4850258, at *1–3 (N.D. Tex. Sept. 20, 2011) (concluding (also without analyzing or mentioning *Arlington Heights* or *Gillock*) that

### c.    Contrary Circuit Authorities

The foregoing discussion demonstrates that most federal *district* courts have adopted a qualified conception of the state legislative privilege that balances the competing interests at stake and thereby accords fully with Supreme Court precedent.[366]  Recently, however, a small but increasing number of federal *circuit* courts have started adopting a more absolutist conception of the privilege that categorically bars plaintiffs—including plaintiffs raising redistricting challenges—from obtaining nonpublic evidence of legislative intent.[367]  Many of those Circuit-

---

"any attempt to depose" legislators "must be precluded by law"); *Simpson v. City of Hampton*, 166 F.R.D. 16, 17–19 (E.D. Va. Apr. 16, 1996) (ruling (also without citing *Arlington Heights* or *Gillock*) that although the plaintiffs "could undertake to prove the [defendant city] council intended to discriminate, . . . their undertaking [could] not include the use of the council's personal notes and files").

*See also Kay*, 2003 WL 25294710, at *13 (observing that many "[o]f the cases recognizing an absolute legislative privilege against giving testimony" do not "mention[] *Gillock*").

[366] *See supra* Section II.C.2.b.i–iii.

[367] *See, e.g.*, *N.D. Legis. Assembly*, 70 F.4th at 463 (proclaiming that the legislative privilege "is an absolute bar to interference" with state legislatures, no matter "[t]he degree of intrusion" (cleaned up)); *In re Hubbard*, 803 F.3d 1298, 1310 (11th Cir. 2015) (declaring without qualification that the state legislative privilege "applies with full force against requests for information about the motives for legislative votes and legislative enactments"); *Pernell*, 84 F.4th at 1334 (holding that the state legislative privilege "is insurmountable in private civil actions under" the federal civil rights statute); *EEOC v. Wash. Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011) (suggesting without qualification that if "the [federal government] or private plaintiffs sought to compel information from legislative actors about their legislative activities," those legislative actors "would not need to comply" (citing *Burtnick v. McLean*, 76 F.3d 611, 613 (4th Cir. 1996))); *Lee v. City of Los Angeles*, 908 F.3d 1175, 1181, 1186–88 (9th Cir. 2018) [hereinafter *Lee*] (holding that the legislative privilege barred the plaintiffs from deposing local lawmakers about "any legislative acts, motivations, or deliberations pertaining to . . . [a] redistricting ordinance" they were challenging as intentionally discriminatory).

*But cf. Alviti*, 14 F.4th at 81–82, 88–90 (Circuit-level case holding that "proof of the subjective intent of state lawmakers [was] unlikely to be significant enough . . . to warrant setting aside the privilege" in a Dormant Commerce Clause case where the law's *effects* would matter far more than the legislature's *intent*, but leaving open "the possibility that there might be" some other category of "private civil case in which" the state legislative privilege "must be set to one side because the case turns so heavily on subjective motive or purpose"); *Grand Jury*, 821 F.2d at 958 (pre-*Rodriguez* Circuit-level case "refus[ing] to recognize" even "a qualified privilege" for state legislators, but leaving open "the possibility [that] a more narrowly tailored privilege for confidential deliberative communications" might exist).

level cases misapply or misinterpret Supreme Court precedent by overlooking the critical

differences between immunity and privilege and between state and federal legislators.[368]

Moreover, by rejecting the weight of persuasive authority following *Gillock*'s command to

balance the threat to legislative independence against the requested discovery's importance[369]—

or, in some cases, by ignoring that authority entirely[370]—those cases contravene Federal Rule of

---

[368] *See, e.g.*, *Lee*, 908 F.3d at 1181, 1187 ("While *Tenney*'s holding rested upon a finding of immunity, its logic supports extending the corollary legislative privilege from compulsory testimony to state and local officials as well. . . . The rationale for the privilege—to allow duly elected legislators to discharge their duties without concern of adverse consequences outside the ballot box—applies equally to federal, state, and local officials."); *N.D. Legis. Assembly*, 70 F.4th at 463 ("State legislators enjoy a privilege under the federal common law that largely approximates the protections afforded to federal legislators under the Speech or Debate Clause of the Constitution. . . . In civil litigation, there is no reason to conclude that state legislators and their aides are entitled to lesser protection than their peers in Washington." (cleaned up)).

*Compare Hubbard*, 803 F.3d at 1310 & n.11 (relying on federal legislative privilege and state legislative immunity cases for propositions about the state legislative privilege), *with Bryant*, 2017 WL 6520967, at *9 n.10 (criticizing *Hubbard* for "not recogniz[ing the] distinction between the concepts of legislative privilege, legislative immunity, and the Speech and [sic] Debate Clause as applied to state legislators").

 *See also supra* Section II.C.2.a (explaining why it's hazardous to import principles from the *federal* legislative privilege and state legislative *immunity* contexts into the *state* legislative *privilege* context).

[369] *See N.D. Legis. Assembly*, 70 F.4th at 465 ("*Arlington Heights* does not support the use of a five-factor balancing test in lieu of the ordinary rule that inquiry into legislative conduct is strictly barred by the privilege."); *Pernell*, 84 F.4th at 1344 ("[W]e are reluctant to adopt a manipulable balancing test . . . that links the derogation of the legislative privilege to a subjective judgment of the case's importance.").

[370] *See, e.g.*, *Hubbard*, 803 F.3d at 1301–15 & nn.1–15 (failing to acknowledge *Rodriguez* or any of the numerous cases adopting its five-factor test).

*Compare Lee*, 908 F.3d at 1178–88 nn.1–12 (redistricting case failing to acknowledge the substantial body of authority adopting and applying *Rodriguez*'s balancing test in the redistricting context), *with Whitford*, 331 F.R.D. at 378 ("[T]he persuasive force of *Lee* is limited because . . . the court did not acknowledge any of the cases from other courts discussing the unique nature of gerrymandering claims.").

*But see supra* Section II.C.2.b.i–iii (identifying numerous cases adopting just such a balancing test).

Evidence 501's command to apply common law privileges the way they've been "interpreted by United States courts in the light of reason and experience."[371]

An illustrative example of such a case—and one that bears heavily on the analysis below[372]—is the Ninth Circuit's decision in *Lee v. City of Los Angeles*.[373]  The plaintiffs in *Lee*— just like the Plaintiffs in our case—challenged a redistricting plan as intentionally discriminatory.[374]  The district court issued a protective order barring the plaintiffs from "questioning [the lawmakers] regarding any legislative acts, motivations, or deliberations pertaining to the . . . redistricting ordinance."[375]

On appeal, the Ninth Circuit ruled "that the district court properly denied discovery on the ground of legislative privilege."[376]  In reaching that conclusion, however, the Ninth Circuit committed several analytical errors.

---

[371] *See* FED. R. EVID. P. 501; *see also supra* notes 141–142, 328–329, and accompanying text.

*Cf., e.g., In re Grand Jury Matters*, 751 F.2d 13, 18 (1st Cir. 1984) (opining in a different context that "[j]udges may not . . . create new privileges or enlarge or distort existing ones").

[372] *See infra* Section II.C.2.f.ii (explaining how the Fifth Circuit cited *Lee* favorably in a later legislative privilege case called *Hughes*).

[373] 908 F.3d 1175.

[374] *See id.* at 1178.

[375] *Id.* at 1181.

[376] *Id.* at 1188.

First, the Ninth Circuit relied heavily on state and federal legislative *immunity* cases like *Tenney*, *Bogan*, and *Eastland* to support propositions about the state legislative *privilege*.[377]  As the reader will recall, *Tenney* holds that state legislators enjoy *immunity* from suit and liability under the *common law* to the same extent that federal legislators enjoy immunity under the *Speech or Debate Clause*.[378]  Although the Ninth Circuit expressly recognized that "*Tenney*'s holding rested upon a finding of immunity" rather than privilege, it nonetheless reasoned that *Tenney* "support[ed] extending the corollary legislative *privilege from compulsory testimony*" that federal legislators possess "to state and local officials as well."[379]  The Ninth Circuit reached that conclusion even though it fully recognized that one of the twin rationales that undergird the *federal* legislative privilege—namely, preserving the constitutional separation of powers—doesn't apply to state legislators.[380]  The court reasoned that the other rationale for the federal

---

[377] *See id.* at 1187–88.

*See also supra* Section II.C.1 (analyzing *Tenney* and *Bogan* in depth); Section II.B.1.a (analyzing *Eastland* in depth).

*But see supra* Section II.C.2.a (explaining why it's hazardous to cite state and federal legislative immunity cases for propositions about the state legislative privilege).

[378] *See, e.g.*, *Supreme Court of Virginia*, 446 U.S. at 732 (explaining that *Tenney* stands for the proposition that "state legislators enjoy common-law immunity from liability for their legislative acts" that is "similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause").

[379] *See* 908 F.3d at 1187 (emphasis added).

[380] *See id.* at 1187 n.11 ("We recognize, however, that certain . . . concerns addressed by the legislative privilege are specific to federal legislators, such as the separation of powers principles that undergird the Speech and [sic] Debate Clause of the Constitution." (citing *Gillock*, 445 U.S. at 370, 372 n.10)).

*See also Gillock*, 445 U.S. at 369–70 ("Two interrelated rationales underlie the Speech or Debate Clause . . . . The first rationale, resting solely on the separation of powers doctrine, gives no support to the grant of a privilege to state legislators . . . .").

*See also supra* notes 216–218 and accompanying text.

legislative privilege—"the need to insure legislative independence"[381]—alone justified recognizing a state legislative privilege of comparable breadth.[382] "Like their federal counterparts," the Ninth Circuit opined, "state and local officials undoubtedly share an interest minimizing the distraction of diverting their time, energy, and attention from their legislative tasks to defend the litigation."[383] Thus, asserted the Ninth Circuit, "[t]he rationale for the privilege—to allow duly elected legislators to discharge their public duties without concern of adverse consequences outside the ballot box—applies equally to federal, state, and local officials."[384]

The problem with that reasoning is that the Supreme Court considered and rejected that very argument in *Gillock*.[385] Just like the *Lee* court,[386] the defendant in *Gillock* "relie[d] heavily on *Tenney*" to support his position that "the need to [e]nsure legislative independence" warranted recognizing a common-law privilege for state legislators equivalent to the privilege that federal legislators enjoy under the Speech or Debate Clause.[387] Yet the *Gillock* Court held that the concerns about "disruption of the state legislative process" noted in *Tenney* didn't alone justify creating the defendant's proposed privilege.[388] That's partly because, compared to a denial of

---

[381] *See Gillock*, 445 U.S. at 371; *see also supra* notes 64–65 and accompanying text.

[382] *See* 908 F.3d at 1187.

[383] *Id.* (cleaned up) (quoting *Eastland*, 421 U.S. at 503).

[384] *Id.*

[385] *See Gillock*, 445 U.S. at 371–73; *see also supra* Section II.C.2.a.iii.

[386] *See* 908 F.3d at 1186–87 (citing *Tenney*, 341 U.S. at 369, 373–75, 378–79).

[387] *See Gillock*, 445 U.S. at 368, 371.

[388] *See id.* at 371–73; *see also id.* at 372 ("Although *Tenney* reflects this Court's sensitivity to interference with the functioning of state legislators, we do not read that opinion as broadly as Gillock would have us.").

state legislative "*immun[ity]* from civil suits," the mere "denial of a *privilege* to a state legislator" may have a comparatively "minimal impact on the exercise of his legislative function."[389]  Thus, the Supreme Court concluded, the "recognition of an evidentiary privilege for state legislators for their legislative acts" would confer "only speculative benefit to the state legislative process."[390]

 *Lee* doesn't reckon with—or even acknowledge—that passage from *Gillock*.[391]  Thus, to the extent *Lee* suggests that legislative independence concerns, by themselves, "support[] extending the . . . legislative privilege from compulsory testimony" that federal legislators enjoy "to state and local officials as well,"[392] it's inconsistent with binding Supreme Court precedent.

 The Ninth Circuit did at least acknowledge *Arlington Heights*'s holding that, in "extraordinary instances," the state legislative privilege "must yield to the need for a decision maker's testimony."[393]  The court nonetheless concluded, however, that the intentional racial discrimination claims that the plaintiffs asserted in *Lee* weren't "extraordinary" enough to overcome the privilege.[394]

---

[389] *See id.* at 371, 373 (emphases added).

[390] *See id.* at 373.

[391] *Compare id.* at 371–73, *with Lee*, 908 F.3d at 1187 nn.10–11 (citing *Gillock*, but for other propositions).

[392] *See Lee*, 908 F.3d at 1187.

[393] *See id.* at 1187–88 (quoting *Arlington Heights S. Ct. Op.*, 429 U.S. at 268 & n.18).

[394] *See id.* at 1188.

The Ninth Circuit reached that conclusion even though it conceded "that claims of racial gerrymandering involve serious allegations."[395]  The court also recognized that it was prohibiting the plaintiffs from questioning the legislators about the core issue in the case: namely, whether "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district."[396]  The court reasoned, however, that "*Arlington Heights* itself also involved an equal protection claim alleging racial discrimination—putting the government's intent directly at issue—but nonetheless suggested that such a claim was not, in and of itself, within the subset of 'extraordinary instances' that might justify an exception to the privilege."[397]

But *Arlington Heights doesn't* suggest that "an equal protection claim alleging racial discrimination" that places "the government's intent directly at issue" does "not, in and of itself," qualify for the "extraordinary instances" exception to the privilege.[398]  If anything, *Arlington Heights* suggests the contrary.  As discussed, *Arlington Heights* explicitly states in a footnote that "an inquiry into" the legislators' "motivation at the time they cast their votes" might "*otherwise have been proper*" if the plaintiffs hadn't "repeated[ly] insist[ed] that it was effect and not motivation which would make out a constitutional violation."[399]  Yet *Lee* neither analyzes nor

---

[395] *Id.*

[396] *Compare id.* at 1182 (quoting *Cooper v. Harris*, 581 U.S. 285, 291 (2017)), *and id.* at 1188 (acknowledging that the plaintiffs' claims "directly implicate[d] the government's intent"), *with id.* at 1181 (affirming the district court's decision to "prohibit[] [the p]laintiffs from questioning City officials regarding [their] . . . motivations").

[397] *Id.* at 1188 (quoting *Arlington Heights S. Ct. Op.*, 429 U.S. at 268).

[398] *Contra id.* (quoting *Arlington Heights S. Ct. Op.*, 429 U.S. at 268).

[399] *See* 429 U.S. at 270 n.20 (emphasis added); *see also supra* Section II.C.2.a.i.

acknowledges that footnote.[400]  Nor does *Lee* reckon with (or even mention) the fact that the plaintiffs in *Arlington Heights* "*were* allowed, both during the discovery phase and at trial, to question Board members fully about materials and information available to them at the time of decision"—without any apparent disapproval from the Supreme Court.[401]  It was therefore a mistake for *Lee* to read *Arlington Heights* to imply that racial discrimination claims that directly implicate a legislature's intent don't suffice to overcome the privilege.

Finally, *Lee* is also flawed for the additional reason that fails to reconcile itself with (or even mention) the Supreme Court's binding holding in *Trammel*.[402]  As noted, *Trammel* establishes that "[t]estimonial exclusionary rules and privileges"—including the legislative privilege that the Ninth Circuit invoked to bar the deposition testimony in *Lee*—"contravene the fundamental principle that the public has a right to every man's evidence," and such privileges must therefore "be strictly construed and accepted only to [a] very limited extent."[403]  There's nothing "strict" or "limited" about a testimonial privilege that categorically bars litigants from obtaining evidence of legislative intent in redistricting cases where the legislature's intent is the central issue.[404]  For those reasons, *Lee*—like other cases adopting a similarly expansive view of the state legislative privilege—is unpersuasive.

---

[400] *See* 908 F.3d at 1187–88.

[401] *Compare Arlington Heights S. Ct. Op.*, 429 U.S. at 270 n.20 (emphasis added), *with Lee*, 908 F.3d at 1187–88.

[402] *See generally* 908 F.3d at 1178–88.

[403] *Trammel*, 445 U.S. at 50 (cleaned up) (first quoting *Bryan*, 339 U.S. at 331; then quoting *Elkins*, 364 U.S. at 234 (Frankfurter, J., dissenting)); *see also supra* Section II.C.2.a.ii.

[404] *Contra Lee*, 908 F.3d at 1188 (concluding that "claims of racial gerrymandering" don't "justify an exception to the [state legislative] privilege" even though such claims "involve serious allegations" that "put[] the government's intent directly at issue").

### d.     *Jefferson Community*

At least at first, though, the Fifth Circuit remained on the doctrinally defensible side of that growing judicial divide.  In a case called *Jefferson Community Health Care Centers, Inc. v. Jefferson Parish Government*,[405] the Fifth Circuit espoused the qualified conception of the state legislative privilege that the majority of courts had adopted,[406] as opposed to the absolutist view that only a handful of courts had then embraced.[407]

The plaintiff in *Jefferson Community* was a nonprofit organization that administered medical services to residents of a Louisiana parish.[408]  The Parish initially let the plaintiff occupy several facilities that the Parish owned so it could provide healthcare to the Parish's residents.[409]

Eventually, however, the Parish passed legislative resolutions evicting the plaintiff from each of the Parish's facilities.[410]  The plaintiff alleged that the Parish enacted those resolutions for an improper reason—namely, because the plaintiff wouldn't "allow one of the [Parish's]

---

[405] *See* 849 F.3d at 624.

[406] *See supra* Section II.C.2.b.i–iii.

[407] *See supra* Sections II.C.2.b.iv and II.C.2.c.

[408] 849 F.3d at 619.

A "parish" is a Louisianan municipal unit roughly equivalent to what other states might call a "county."  *See, e.g.*, *In re Banks*, No. 17-10456, 2018 WL 735351, at *5 n.8 (Bankr. W.D. La.), *aff'd sub nom.*, *Law Solutions Chi. LLC v. U.S. Tr.*, 592 B.R. 624 (W.D. La. 2018), *aff'd*, 770 F. App'x 168 (5th Cir. 2019).

[409] 849 F.3d at 619–20.

[410] *Id.* at 619–21.

councilmembers to unlawfully influence [the plaintiff's] affairs."[411]  The plaintiff therefore sued the Parish to stop the eviction.[412]

The Parish argued that, for the plaintiff to ultimately prevail, it would need to conduct discovery regarding the "thought processes and motivations underlying the [Parish] Council's decision to enact the resolutions."[413]  Much like the Legislators in our case,[414] however, the Parish insisted that the legislative privilege would categorically bar the plaintiff from probing "the councilmembers' motivations and thought processes."[415]  The Parish therefore contended that the plaintiff had no way to obtain the evidence it needed to win the case—and, thus, that the plaintiff's claim was "so devoid of merit that it fail[ed] to present a federal question" over which the court could exercise subject matter jurisdiction.[416]

The Fifth Circuit unanimously disagreed.[417]  The Fifth Circuit first adopted *Perez*'s holding that "[w]hile the common-law legislative *immunity* for state legislators is absolute, the legislative *privilege* for state lawmakers is, at best, one which is qualified."[418]  Then, echoing

---

[411] *Id.* at 619.

[412] *Id.*

[413] Appellant's Original Br. at 32–33, *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, No. 16-30875 (5th Cir. Sept. 19, 2016), ECF No. 59-1 [hereinafter *Jefferson Cmty. Appellants' Br.*]

[414] *See, e.g.*, State Defs.' & Legis. Subpoena Recipients' Suppl. Br. at 7 (contending that the state legislative privilege "squarely foreclose[s]" Plaintiffs from obtaining any "documents from the legislators to support their disputed allegations regarding the legislators' intent and motive in enacting" the redistricting plans at issue here).

[415] *Jefferson Cmty. Appellants' Br.* at 32–33.

[416] *Id.*

[417] *See* 849 F.3d at 624.

[418] *See id.* (emphases added) (quoting *Perez*, 2014 WL 106927, at *2); *see also supra* Section II.C.2.b.iii (discussing *Perez* at length).

*Trammel*,[419] the Fifth Circuit likewise adopted *Perez*'s holding that the state legislative privilege "must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth."[420]

By adopting that narrow conception of the state legislative privilege, the *Jefferson Community* court necessarily rejected the Parish's argument that the privilege categorically "foreclose[d any] inquiry into" the "thought processes and motivations underlying the [Parish's] decision to enact the resolutions at issue."[421]

In the alternative, however, the Fifth Circuit also held that "*even assuming* that the councilmembers' reasons for passing the resolutions *[we]re* privileged in the sense that they [could not] be directly compelled to disclose them," the court still wouldn't dismiss the claim in its entirety as the Parish requested, because an "evidentiary privilege cannot bar the adjudication of a claim."[422]

District Courts in this Circuit generally interpreted *Jefferson Community* to stand for the proposition that the state legislative privilege is not an impenetrable bulwark against discovery, but instead requires courts to balance the competing interests on both sides.[423]  Moreover,

---

[419] *See supra* Section II.C.2.a.ii.

[420] *See* 849 F.3d at 624 (quoting *Perez*, 2014 WL 106927, at *1).

[421] *Compare Jefferson Cmty. Appellants' Br.* at 33, *with Jefferson Cmty.*, 849 F.3d at 624.  *See also infra* Section III.C (further developing that argument).

[422] 849 F.3d at 624 (emphases added); *see also infra* Section III.D (discussing *Jefferson Community*'s alternative holdings in greater depth and explaining why they have precedential force).

[423] *See, e.g.*, *TitleMax Tex., Inc. v. City of Dallas*, No. 3:21-cv-1040, 2022 WL 326566, at *4–5 (N.D. Tex. Feb. 3, 2022) (reading *Jefferson Community* to "embrace[] the qualified approach" to the state legislative privilege, whereby the privilege's applicability "in civil cases . . . depend[s] on a balancing of the legitimate interests on both sides" (first quoting *Hobart*, 784 F. Supp. 2d at 763–64; then citing

although *Jefferson Community* didn't explicitly decide whether to adopt *Rodriguez*'s five-factor

test for performing that interest balancing,[424] courts in this Circuit generally inferred from the

fact that *Jefferson Community* adopted *Perez*'s articulation of the governing legal standards to

mean that the Fifth Circuit also approved *Perez*'s decision to adopt *Rodriguez*'s multifactor

balancing framework.[425]  Thus, between the date the Fifth Circuit decided *Jefferson Community*

and the date it decided the *Hughes* case discussed below,[426] courts in this Circuit generally

followed *Perez*'s example and applied *Rodriguez*'s five-factor balancing framework when

adjudicating state legislative privilege claims.[427]

---

*Jefferson Cmty.*, 849 F.3d at 624)); *Bryant*, 2017 WL 6520967, at *6 (citing *Jefferson Community* for the proposition that "[t]he Fifth Circuit has held that the [state] legislative privilege is . . . limited in scope").

[424] *See* 849 F.3d at 624; *see also* Section II.C.2.b.i (analyzing *Rodriguez* in depth).

[425] *See, e.g.*, *Bryant*, 2017 WL 6520967, at *6 (observing that *Jefferson Community* "cited . . . [a] case[] stemming from" *Rodriguez* (*i.e.*, *Perez*) "as providing the relevant analysis and law" (citing *Jefferson Cmty.*, 849 F.3d at 624)); *id.* at *7 (inferring from the fact that *Jefferson Community* "favorably cited and quoted from *Perez* with regard to the qualified nature of the [state legislative] privilege in general" that the *Jefferson Community* court implicitly approved *Perez*'s other legal conclusions as well); *id.* at *8 ("[T]he Fifth Circuit cited *Rodriguez* favorably in *Jefferson*, and, thus, found *Rodriguez* to be good law.").

*See also supra* Section II.C.2.b.iii (discussing *Perez* in greater depth, including how *Perez* adopted *Rodriguez*'s five-factor balancing test).

[426] *See infra* Section II.C.2.f.ii.

[427] *See TitleMax*, 2022 WL 326566, at *5 ("'Courts in the Fifth Circuit examining the extent to which state legislative privilege is qualified have cited *Rodriguez*, or cases stemming from it, as providing the relevant analysis and law' and 'have adopted the five *Rodriguez* factors in determining whether legislative privilege applies.'" (quoting *Bryant*, 2017 WL 6520967, at *6)).

 *See also, e.g.*, *Petteway v. Galveston County*, No. 3:22-cv-00057, 2023 WL 3452065, at *7–8 (S.D. Tex. May 15, 2023) (adopting the *Rodriguez* factors); *Angelicare*, 2018 WL 1172947, at *8–9 (same); *La Union del Pueblo Entero v. Abbott*, No. 5:21-CV-00844, 2022 WL 1667687, at *2 (W.D. Tex. May 25, 2022) [hereinafter *Hughes Dist. Ct. Op.*] (same).

*But see Shreveport Chapter #237 of United Daughters of the Confederacy v. Caddo Par. Comm'n*, No. 17-1346, 2018 WL 1973283, at *3–4 (W.D. La. Apr. 26, 2018) (post-*Jefferson Community* legislative privilege case appearing to implicitly reject *Rodriguez*'s five-factor balancing test, albeit without analyzing or mentioning *Jefferson Community*).

### e.     The Instant Case

In fact, this very panel applied *Jefferson Community* to reject the Texas Legislators'

absolutist conception of the state legislative privilege at an earlier stage of this very case, and the

Fifth Circuit confirmed that we were on the right track.

### i.     Our Legislative Deposition Order

Back in 2022, the Plaintiffs in this case issued deposition subpoenas to various Texas

Representatives.[428]  Arguing that the state legislative privilege barred Plaintiffs from questioning

them about "the Legislators' motive or intent," the Representatives moved to quash the

subpoenas.[429]

We unanimously denied the Representatives' motion.[430]  We readily acknowledged that,

under *Tenney* and *Bogan*, "state legislators enjoy broad *immunity from suit* for actions they take

during the course of their legislative duties."[431]  But because "the questions confronting this

Court [we]re ones of state legislative *privilege*, *not* immunity," we concluded that *Tenney* and

*Bogan*'s holdings granting absolute immunity to state legislators didn't control our legislative

privilege determinations.[432]

---

[428] *See League of United Latin Am. Citizens v. Abbott*, No. 3:21-CV-00259, 2022 WL 1570858, at *1 (W.D. Tex. May 18, 2022) [hereinafter *LULAC Dep. Subpoena Op.*].

[429] *Id.* at *1–2.

[430] *Id.* at *1, *3.

[431] *See id.* at *1 (emphasis added) (first citing *Tenney*, 341 U.S. at 372–78; then citing *Bogan*, 523 U.S. at 54–55); *see also supra* Sections II.C.1.a–b (discussing *Tenney* and *Bogan* in greater depth).

[432] *See* 2022 WL 1570858, at *1 (emphasis added); *see also supra* Section II.C.2.a (explaining why courts shouldn't rely on state legislative *immunity* cases like *Tenney* and *Bogan* for propositions about the state legislative *privilege*).

To the contrary, we explained, the state legislative privilege "is not coextensive with state legislative immunity."[433]  Quoting directly from *Jefferson Community* while also citing *Gillock*, we reiterated that the state legislative privilege "is, at best, one which is qualified."[434]  We therefore held—again quoting directly from *Jefferson Community* while also echoing *Trammel*— that the state legislative privilege "must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence" would serve "a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth."[435]  Thus, in setting out the applicable legal standard governing the Legislators' privilege assertions, we followed Supreme Court precedent and then-existing Fifth Circuit precedent to the letter.

We then applied that standard to the facts of the case by following *Gillock*'s command to balance "the need to [e]nsure legislative independence" against the importance of the "federal interests at stake" here.[436]  Quoting the portion of *Gillock* stating that the mere "denial of a privilege to a state legislator" has a relatively "minimal impact on the exercise of his legislative function," we reasoned that "the burden of having to sit for a deposition" did not "outweigh[] the relevant information the United States and private Plaintiffs [might] obtain" from the Texas

---

[433] *See* 2022 WL 1570858, at *2 (first citing *Jefferson Cmty.*, 849 F.3d at 624; then citing *Rodriguez*, 280 F. Supp. 2d at 94–104).

[434] *See id.* at *1 (first quoting *Jefferson Cmty.*, 849 F.3d at 624; then citing *Gillock*, 445 U.S. at 373); *see also supra* Section II.C.2.d (discussing *Jefferson Community*); Section II.C.2.a.iii (discussing *Gillock*).

[435] *See* 2022 WL 1570858, at *1 (quoting *Jefferson Cmty.*, 849 F.3d at 624); *see also supra* Section II.C.2.a.ii (discussing *Trammel*).

[436] *Compare Gillock*, 445 U.S. at 371, 373, *with LULAC Dep. Subpoena Op.*, 2022 WL 1570858, at *2.

Representatives.[437]  We therefore ordered the parties to "proceed with [the] depositions,"[438] and informed them that only if a legislator "invoke[d] legislative privilege in response to particular questions" would we then perform the context-specific task of determining whether the privilege shielded any particular piece of information.[439]

### ii.        The Fifth Circuit's Opinion Denying a Stay

The Fifth Circuit validated our conclusions when, just two days later, it rejected the Legislators' request to stay our legislative privilege order pending appeal.[440]  Citing *Jefferson Community* and *Gillock*, the Fifth Circuit first agreed that "[b]oth [the Fifth Circuit] and the Supreme Court have confirmed that the state legislative privilege is not absolute."[441]  Then, citing the passage of *Arlington Heights* contemplating that lawmakers "might be called to the stand at trial to testify concerning the purpose of [an] official action," the Fifth Circuit further

---

[437] *See* 2022 WL 1570858, at *2 (quoting *Gillock*, 445 U.S. at 373).

[438] *Id.* at *3.

[439] *Id.*; *see also id.* at *1 ("At this juncture, the Court is not positioned to rule on what information may or may not be the subject of state legislative privilege.  Whether state legislative privilege attaches is fact- and context-specific; for the purposes of depositions, it depends on the question being posed.  Here, no questions have been asked, and no answers given.  Suffice it to say, the privilege is not so broad as to compel the Court to quash the deposition subpoenas [entirely] . . . ." (cleaned up)); *id.* at *3 ("[N]othing in this Order should be construed as deciding any issue of state legislative privilege.  The Court will be better positioned to make decisions on state legislative privilege if the issue comes more squarely before the Court—that is, if the Court is presented with specific questions and specific invocations of state legislative privilege.").

[440] *See LULAC 5th Cir. Op.*, 2022 WL 2713263, at *1–2.

Because the Fifth Circuit didn't publish its opinion denying a stay in our case, *see id.* at *1, that opinion didn't bind the Fifth Circuit panel that decided the *Hughes* case discussed below, *see* 5TH CIR. R. 47.5.4 (providing (with limited exceptions) that "[u]npublished [Fifth Circuit] opinions issued on or after January 1, 1996, are not precedent"); *see also infra* Section II.C.2.f.ii (analyzing *Hughes*).  *But see infra* Section III (explaining that the *Hughes* panel was at least required to follow *Jefferson Community*).

[441] 2022 WL 2713263, at *1 (first citing *Jefferson Cmty.*, 849 F.3d at 624; then citing *Gillock*, 445 U.S. at 361).

remarked that "[t]he state legislative privilege . . . must not be used as a cudgel . . . to prevent the discovery of the truth in cases where the federal interests at stake outweigh the interests protected by the privilege."[442]  Opining that we had "carefully considered the issue of legislative privilege *and neutrally followed the law of this circuit*," the Fifth Circuit declined the Legislator's request to stay the depositions pending appeal.[443]

### iii.    Our Documentary Discovery Order

Encouraged by the Fifth Circuit's assurance that we were correctly applying the governing law, we followed a similar approach when we granted the United States' motion to enforce subpoenas for legislative documents.[444]  Heeding *Arlington Heights*'s cautionary command that "judicial inquiries into legislative motivation" will "frequently" (but not always) "be barred by privilege,"[445] we readily acknowledged that the state legislative privilege sometimes protects "documents or information that contains or involves opinions, motives, recommendations or advice about legislative decisions between legislators or between legislators and their staff."[446]  Quoting from *Jefferson Community*, however, we emphasized that unlike the "absolute" "common-law legislative *immunity* for state legislators," "the legislative *privilege* for

---

[442] *Id.* at *2 (citing *Arlington Heights S. Ct. Op.*, 429 U.S. at 268).

[443] *Id.* at *1 & n.2 (emphasis added).

The Supreme Court likewise declined to stay the depositions, albeit without comment.  *See Guillen v. League of United Latin Am. Citizens*, 142 S. Ct. 2773 (2022) ("Application for stay presented to Justice Alito and by him referred to the Court denied.").

[444] *See LULAC Doc. Subpoena Op.*, 2022 WL 2921793, at *1–15.

[445] *See Arlington Heights S. Ct. Op.*, 429 U.S. at 268 & n.18 (1977); *see also supra* Section II.C.2.a.i (analyzing *Arlington Heights* in depth).

[446] *See* 2022 WL 2921793, at *2 (quoting *Bryant*, 2017 WL 6520967, at *7).

state lawmakers is, at best, one which is qualified."[447]  We therefore chided the Legislators for relying on immunity caselaw for propositions about the state legislative privilege.[448]

Quoting directly from the portion of *Perez* that *Jefferson Community* adopted verbatim,[449] we then reiterated that the "[l]egislative privilege 'must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.'"[450]  Then, heeding *Jefferson Community*'s signal that *Perez* correctly articulated the legal standards that govern state legislative privilege claims,[451] we followed *Perez*'s lead and adopted *Rodriguez*'s five-factor balancing test.[452]

The Texas Legislators resisted our attempts to follow *Jefferson Community*.[453]  They insisted that the Fifth Circuit had no "occasion to explore the scope of the legislative privilege" in *Jefferson Community*,[454] as the panel had concluded that the state legislative privilege couldn't "bar the adjudication of [the plaintiff's] claim" no matter whether "the councilmembers' reasons

---

[447] *See id.* (emphases added) (quoting *Jefferson Cmty.*, 849 F.3d at 624).

[448] *See id.* at *4 ("[T]he case law the Legislators lean on—which uniformly addresses immunity, not privilege—is not persuasive.").

*See also supra* Section II.C.2.a.iii (explaining why it's hazardous to cite state legislative immunity cases for propositions about the state legislative privilege).

[449] *See Jefferson Cmty.*, 849 F.3d at 624 (quoting *Perez*, 2014 WL 106927, at *1).

[450] *See* 2022 WL 2921793, at *2 (quoting *Perez*, 2014 WL 106927, at *1).

[451] *See supra* note 425 and accompanying text.

[452] *See* 2022 WL 2921793, at *4.

[453] *See id.* at *3.

[454] Resp. U.S.'s Mot. Enforce 3d-Party Subpoenas *Duces Tecum*, ECF No. 379, at 14.

- 96 -

for passing the resolutions [were] privileged" as the Parish argued.[455]  Thus, the Legislators

contended, *Jefferson Community*'s entire discussion of the privilege's scope—including its

language describing the privilege as a "qualified" one that must be "strictly construed"—was

nonbinding dicta.[456]  Predicting that the then-pending appeal in *Hughes* might "clarify the ground

rules for legislative privilege in the Fifth Circuit, beyond the [putative] dicta generally describing

the nature of the privilege in *Jefferson Community*," the Legislators urged us to hold the United

States's motion in abeyance until *Hughes* came down.[457]

    We refused.[458]  In a passage presaging the conclusions below,[459] we explained that

*Jefferson Community*'s pronouncements about the state legislative privilege's narrowness weren't

nonbinding dicta, but instead were alternative holdings, which "are binding in this [C]ircuit."[460]

Because "[o]ne panel of [the Fifth Circuit] cannot overrule the decision of another panel,"[461] we

---

[455] *See Jefferson Cmty.*, 849 F.3d at 624.

[456] *See* Resp. U.S.'s Mot. Enforce 3d-Party Subpoenas *Duces Tecum* at 12, 13 n.6, 14 (quoting *Jefferson Cmty.*, 849 F.3d at 624).

[457] *See* 2022 WL 2921793, at *3; *see also infra* Section II.C.2.f.ii (discussing *Hughes* in depth).

[458] *See* 2022 WL 2921793, at *3.

[459] *See infra* Section III.

[460] *See* 2022 WL 2921793, at *3 (cleaned up) (quoting *Jaco v. Garland*, 24 F.4th 395, 406 n.5 (5th Cir. 2021)).

[461] *See id.* (quoting *Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997)).

    *See also infra* Section III (analyzing the "Rule of Orderliness," which forbids one Fifth Circuit panel from overruling another Fifth Circuit panel's published opinion).

reasoned that there was nothing the panel could say in *Hughes* that would contradict *Jefferson Community*—and, thus, no reason for us to leave the United States's motion undecided.[462]

Having satisfied ourselves that we were applying the right legal standard, we weighed the five *Rodriguez* factors and determined that "that the overall balance . . . weigh[ed] in favor of disclosure" of the documents the United States sought.[463]  Our analysis essentially mirrored that of the above-cited cases authorizing at least some amount of legislative discovery in redistricting cases.[464]

Our application of the state legislative privilege to the United States's document requests thus comported fully with binding Supreme Court and Fifth Circuit precedent as it then existed.[465]  Thus, when the Legislators appealed our document privilege order to the Fifth Circuit,[466] we had no reason to expect anything other than an affirmation similar to that the Fifth Circuit gave us when it confirmed that we had "carefully considered the issue of legislative privilege and neutrally followed the law of this circuit" in our deposition subpoena order.[467]

---

[462] *See* 2022 WL 2921793, at *3 (expressing doubt that the *Hughes* panel was "likely to depart from *Jefferson Community*").

*But see infra* Section II.C.2.f.ii (noting ways in which *Hughes* did in fact depart from *Jefferson Community*).

[463] *See* 2022 WL 2921793, at *4–6.

[464] *See id.*; *see also supra* Section II.C.2.b.ii.

[465] *See supra* Sections II.C.2.a & d.

[466] *See* Notice Appeal, ECF No. 479.

[467] *See LULAC 5th Cir. Op.*, 2022 WL 2713263, at *1 n.2; *see also supra* Section II.C.2.e.ii.

*See also LULAC Doc. Subpoena Op.*, 2022 WL 2921793, at *3 (predicting that the *Hughes* panel was not "likely to depart from *Jefferson Community*").

f.       *Hughes*

But things didn't go as expected.  The Fifth Circuit stayed our order compelling the Legislators to produce the requested documents,[468] and it held the appeal of that order in abeyance pending its decision in *Hughes*.[469]  The *Hughes* panel then adopted an absolutist conception of the state legislative privilege that is difficult to square with *Jefferson Community*'s qualified approach.[470]

i.       **The District Court's Order**

As background, *Hughes* was also a voting rights case (though not a redistricting case).[471]  Like the Plaintiffs here, the plaintiffs in *Hughes* challenged a Texas voting law as intentionally discriminatory.[472]  Also like the Plaintiffs in our case, the *Hughes* plaintiffs subpoenaed various Texas legislators—who weren't named as defendants and therefore faced no liability risk of their own[473]—for nonpublic documents and communications bearing on whether the Legislature

---

[468] Order at 11, *League of United Latin Am. Citizens v. Abbott (Patrick)*, No. 22-50662 (5th Cir. July 27, 2022), ECF No. 30-2.

[469] Order at 11, *League of United Latin Am. Citizens v. Abbott (Patrick)*, No. 22-50662 (5th Cir. Sept. 15, 2022), ECF No. 77-2.

[470] *See* 68 F.4th at 231–40; *see also infra* Section II.C.2.f.ii.

[471] *See Hughes Dist. Ct. Op.*, 2022 WL 1667687, at *1 ("This action arises out of an omnibus voting bill, Senate Bill 1 ('S.B. 1'), [that] the State of Texas enacted on August 31, 2021."); *see also Hughes 5th Cir. Op.*, 68 F.4th at 231–32 (explaining that S.B. 1 "relates to voter registration, voting by mail, poll watchers, and other aspects of election integrity and security").

[472] *See Hughes Dist. Ct. Op.*, 2022 WL 1667687, at *1 ("Plaintiffs claim, *inter alia*, that the Texas Legislature enacted S.B. 1 with the intent to discriminate against certain racial minorities . . . .").

[473] *See Hughes 5th Cir. Op.*, 68 F.4th at 232 (identifying the legislators as "non-part[ies]").

passed the law for discriminatory reasons.[474]  The legislators resisted those subpoenas on legislative privilege grounds.[475]

The District Court ordered the legislators to produce most of the documents that the *Hughes* plaintiffs demanded.[476]  Its analysis was very similar to that which our panel employed in our documentary discovery opinion discussed above.[477]  Citing *Gillock* and *Jefferson Community*, the District Court first emphasized that "the privilege accorded to state legislators is qualified."[478]  Quoting verbatim from *Jefferson Community* (and thereby echoing *Trammel*), the District Court then restated that the state legislative privilege "must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth."[479]  Then, in accordance with *Jefferson Community*'s implicit signal that *Rodriguez*'s balancing framework provides the appropriate legal standard for evaluating state legislative privilege claims,[480] the District Court adopted and applied

---

[474] *See Hughes Dist. Ct. Op.*, 2022 WL 1667687, at *1 ("Plaintiffs served third-party subpoenas to the legislative sponsors of S.B. 1 . . . [seeking] documents and communications from the State Legislators concerning claims of criminal conduct in Texas elections, the anticipated effects of S.B. 1, and communications with third-party organizations concerning S.B. 1.").

[475] *See id.* at *1–8.

[476] *See id.* at *8.

[477] *Compare id.* at *2–7, *with LULAC Doc. Subpoena Op.*, 2022 WL 2921793, at *2–6.  *See also supra* Section II.C.2.e.iii.

[478] *See Hughes Dist. Ct. Op.*, 2022 WL 1667687, at *2 (first citing *Gillock*, 445 U.S. at 373; then citing *Jefferson Cmty.*, 849 F.3d at 624).

[479] *See id.* (citing *Jefferson Cmty.*, 849 F.3d at 624).

[480] *See supra* note 425 and accompanying text.

*Rodriguez*'s five-factor test.[481]  After balancing those factors, the District Court concluded that the "important federal interest[]" in "protecting the fundamental right to vote . . . outweigh[ed] any chill to the legislature's deliberations" that the requested discovery might inflict.[482] Accordingly, the court ruled that the legislative privilege yielded to the plaintiffs' document requests.[483]

To support their contrary argument that the state legislative privilege foreclosed the requested discovery, the legislators "rel[ied] on numerous authorities construing the *federal* Constitution's Speech [or] Debate Clause and *federal* legislative *immunity*."[484]  But because—as discussed above[485]—"the Supreme Court has made it clear that the Speech [or] Debate Clause does not apply to state legislators," the District Court correctly concluded that cases involving federal rather than state legislators were "unpersuasive in this context."[486]

### ii.     The Fifth Circuit Panel's Opinion

Even though the District Court's order in *Hughes* scrupulously followed binding Supreme Court and Fifth Circuit precedent as it then existed,[487] a panel of the Fifth Circuit nonetheless reversed it.[488]  Relying heavily on state legislative *immunity* cases like *Tenney* and *Bogan* and

---

[481] *See Hughes Dist. Ct. Op.*, 2022 WL 1667687, at *2–7 (citing *Rodriguez*, 280 F. Supp. 2d at 101).

[482] *See id.* at *7.

[483] *See id.*

[484] *See id.* at *3–4, *5 n.4 (emphases added) (listing various Speech or Debate Clause cases that the legislators in *Hughes* urged the District Court to follow).

[485] *See supra* notes 102–103 and accompanying text.

[486] *See Hughes Dist. Ct. Op.*, 2022 WL 1667687, at *3 (citing *Gillock*, 445 U.S. at 374).

[487] *See supra* Section II.C.2.a.

[488] *See Hughes 5th Cir. Op.*, 68 F.4th at 231, 240.

*federal* legislative privilege cases like *Helstoski* and *Gravel*,[489] the *Hughes* panel declared that the state legislative privilege forbids courts from "facilitat[ing] an expedition seeking to uncover a legislator's subjective intent in drafting, supporting, or opposing proposed or enacted legislation."[490]  Because the *Hughes* plaintiffs were seeking "documents concerning the legislative process and [the] subjective thoughts and motives" underlying the challenged voting law, the panel concluded that the state legislative privilege barred the requested discovery.[491]

The panel also determined that *Hughes* wasn't "one of those 'extraordinary instances' in which the legislative privilege must 'yield'" under *Arlington Heights* and *Gillock*.[492]  Even though the panel recognized that "constitutional rights [we]re at stake," it nonetheless concluded that the federal interests at issue in *Hughes* weren't "important" enough to overcome the privilege.[493]  The panel reasoned that there was also "an 'important federal interest' at stake" in *Tenney*—namely, "the vindication of civil rights"[494]—and yet the *Tenney* Court ruled that state

---

[489] *See id.* at 235–40 & nn. 39–40, 48, 50–52, 60–72.

*See also supra* Section II.C.1 (discussing *Tenney* and *Bogan*); Section II.B.2 (discussing *Helstoski* and *Gravel*).

[490] *Hughes 5th Cir. Op.*, 68 F.4th at 238.

[491] *See id.* at 240.

[492] *See id.* at 237 (cleaned up) (first quoting *Arlington Heights S. Ct. Op.*, 429 U.S. at 268; then quoting *Gillock*, 445 U.S. at 373).

*See also supra* Section II.C.2.a.i (discussing *Arlington Heights*); Section II.C.2.a.iii (discussing *Gillock*).

[493] *See Hughes 5th Cir. Op.*, 68 F.4th at 238.

[494] *See id.* at 239 (cleaned up).

*See also Tenney*, 341 U.S. at 371 (recounting that the plaintiff in *Tenney* had alleged that the defendant legislators had "prevent[ed] him from effectively exercising his constitutional rights").

legislative immunity "did not yield to those interests."[495]  "By the same token," the panel

reasoned, the state legislative *privilege* likewise "preclude[d] the compelled discovery of

*documents* pertaining to the state legislative process that" the plaintiffs sought in *Hughes*.[496]

Nor, in the panel's view, did the fact that the plaintiffs in *Hughes* were raising

"allegations involving racial animus" make the case "extraordinary."[497]  The *Hughes* panel

reasoned that the plaintiff in *Bogan* had also alleged that the defendants had acted "out of racial

animus," and yet the Supreme Court nevertheless held that the defendants "were absolutely

immune from" the plaintiff's suit.[498]

Nor, the panel concluded, did the fact that the plaintiffs were specifically accusing the

Texas Legislature of passing a racially discriminatory *voting* law make the case

"extraordinary."[499]  The panel noted that the plaintiffs in *Lee* had also raised "serious allegations"

that unlawful racial considerations were "the overriding motivation behind" a voting law, and yet

the Ninth Circuit nevertheless "held that the legislative privilege applied."[500]

Although the *Hughes* panel was required to follow the Fifth Circuit's prior published

opinion in *Jefferson Community*,[501] *Hughes* is difficult to square with *Jefferson Community* in

several respects.  For instance, whereas *Jefferson Community* says that the state legislative

---

[495] *See Hughes 5th Cir. Op.*, 68 F.4th at 239.

[496] *See id.* at 239–40 (emphases added).

[497] *See id.* at 238.

[498] *See id.* at 238–39 (cleaned up) (quoting *Bogan*, 523 U.S. at 47).

[499] *See id.* at 239 (citing *Lee*, 908 F.3d at 1183, 1187–88).

[500] *See id.* (cleaned up) (quoting *Lee*, 908 F.3d at 1183, 1188); *see also supra* Section II.C.2.c (analyzing *Lee* in depth).

[501] *See infra* Section III (discussing the "Rule of Orderliness," which requires Fifth Circuit panels to follow published opinions issued by earlier Fifth Circuit panels).

privilege "must be *strictly construed* and accepted only to [a] *very limited extent*,"[502] *Hughes* says "that the legislative privilege's scope is necessarily *broad*."[503]  Likewise, even though *Jefferson Community* necessarily rejected the Parish's argument that the "legislative privilege . . . foreclose[s] [any] inquiry into [legislators'] motivations and thought processes,"[504] *Hughes* nevertheless holds "that state legislators can[not] be compelled to produce documents concerning the legislative process and a legislator's thoughts and motives."[505]

To be fair, *Hughes* did at least acknowledge and quote *Jefferson Community*'s language stating that "the legislative privilege is 'qualified.'"[506]  However, its quotation from *Jefferson Community* omitted crucial language from the opinion.  Here's a side-by-side comparison of the relevant passages from both opinions, with the critical differences highlighted in bold:

---

[502] *See Jefferson Cmty.*, 849 F.3d at 624 (emphases added) (quoting *Perez*, 2014 WL 106927, at *1).

[503] *See Hughes 5th Cir. Op.*, 68 F.4th at 236.

[504] *Compare Jefferson Cmty. Appellants' Br.* at 33 (making that argument), *with Jefferson Cmty.*, 849 F.3d at 624 (adopting a much narrower conception of the state legislative privilege).

*See also infra* Section III.C (further developing the argument that *Jefferson Community* necessarily rejected the Parish's argument that the state legislative privilege categorically forecloses inquiries into legislative motive and intent).

[505] *See Hughes 5th Cir. Op.*, 68 F.4th at 240.

[506] *See id.* at 236 (quoting *Jefferson Cmty.*, 849 F.3d at 624).

| Jefferson Community | Hughes |
|---|---|
| "This privilege 'must be **strictly construed** and accepted **only to the very limited extent** that **permitting a refusal** to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.'"[507] | "[T]he legislative privilege is 'qualified' by **exceptions** that serve 'the normally predominant principle of utilizing all rational means for ascertaining the truth.'"[508] |

*Hughes*'s quotation to *Jefferson Community* thus excludes *Jefferson Community*'s "strictly construed" and "very limited extent" language entirely.[509]  *Hughes* also reverses the quoted sentence's thrust: whereas *Jefferson Community* suggests that the state legislative privilege shields evidence *only when* some countervailing "public good" justifies *withholding* that evidence, *Hughes* creates the opposite impression that *Jefferson Community* said that the privilege *shields* evidence unless some *exception* justifies *disclosing* that evidence.[510]

    *Hughes* does also acknowledge and quote the portion of *Jefferson Community* stating that whereas "the common-law legislative immunity for state legislators is absolute, the legislative privilege for state lawmakers is, at beast, one which is qualified."[511]  *Hughes* nevertheless concludes, however, that that language "provides no support for the idea that state legislators can be compelled to produce documents concerning the legislative process and a legislator's

---

[507] *Jefferson Cmty.*, 849 F.3d at 624 (quoting *Perez*, 2014 WL 106927, at *1).

[508] *See Hughes 5th Cir. Op.*, 68 F.4th at 236 (quoting *Jefferson Cmty.*, 849 F.3d at 624).

[509] *See id.* (quoting *Jefferson Cmty.*, 849 F.3d at 624).

[510] *Compare Jefferson Cmty.*, 849 F.3d at 624 (quoting *Perez*, 2014 WL 106927, at *1), *with Hughes 5th Cir. Op.*, 68 F.4th at 236 (quoting *Jefferson Cmty.*, 849 F.3d at 624).

[511] *See Hughes 5th Cir. Op.*, 68 F.4th at 240 (quoting *Jefferson Cmty.*, 849 F.3d at 624).

subjective thoughts and motives."[512]  That is so, the *Hughes* panel reasoned, because the

legislators in *Jefferson Community* were specifically trying to use the privilege to "*bar the*

*adjudication* of" the plaintiff's "claim for injunctive relief."[513]  Thus, the *Hughes* court

concluded, *Jefferson Community* "held only that a claim for injunctive relief could proceed"—it

"says nothing about cases" in which a litigant subpoenas a state legislator for documents

evidencing the legislature's intent.[514]

The problem with that conclusion, however, is that *Jefferson Community*'s statement that

the state legislative "privilege cannot bar the adjudication of a claim" isn't the case's only

binding holding.[515]  As discussed at length below,[516] *Jefferson Community*'s more general

pronouncements that the state legislative privilege is "qualified," "strictly construed," and "very

limited" are also binding holdings that the *Hughes* court was bound to follow.[517]  *Hughes*'s

attempt to limit *Jefferson Community* to its specific facts therefore can't rob *Jefferson*

---

[512] *See id.* (emphases added) (quoting *Jefferson Cmty.*, 68 F.4th at 624).

[513] *See id.* (emphasis added) (quoting *Jefferson Cmty.*, 68 F.4th at 624).

*See also Jefferson Cmty. Appellants' Br.* at 33 ("[L]egislative privilege . . . foreclose[s] [any] inquiry into the councilmembers' motivations and thought processes, and therefore preclude any claim based on those facets of the legislative process.  [The plaintiff]'s putative claim . . . seeking injunctive relief against the Parish based on . . . the Parish Council's reasons for enacting the resolutions is [therefore] so devoid of merit that it fails to present a federal question . . . . Accordingly, the District Court lacked jurisdiction over [Plaintiff's] claim.").

[514] 68 F.4th at 240.

[515] *See Jefferson Cmty.*, 68 F.4th at 624.

[516] *See infra* Section III.D.

[517] *See Jefferson Cmty.*, 68 F.4th at 624 (quoting *Perez*, 2014 WL 106927, at *1–2).

*Community*'s more general pronouncements about the state legislative privilege's narrowness of their precedential force.[518]

*Hughes* further misapplied applicable precedent by relying heavily on state legislative *immunity* and *federal* legislative privilege precedents to support propositions about the *state* legislative *privilege*[519]—even as the court explicitly acknowledged that the three doctrines aren't coextensive.[520]  The court first reasoned that it was permissible to rely on *federal* legislative *privilege* cases because "the legislative privilege that protects state lawmakers 'is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause.'"[521]  That "similar in origin and rationale" language comes from the U.S. Supreme Court's opinion in *Supreme Court of Virginia*,[522] a state legislative *immunity* opinion cited at various points throughout this dissent.[523]

---

[518] *See infra* Section III.D–E.

[519] *See Hughes 5th Cir. Op.*, 68 F.4th at 237 (liberally "drawing on caselaw involving . . . the Constitution's Speech or Debate Clause or legislative immunity . . . even though [*Hughes*] involve[d] a privilege from disclosure rather than an immunity from suit or liability").

*But see supra* Section II.C.2.a.iii (emphasizing the differences between state legislative privilege on one hand and federal legislative privilege and state legislative immunity on the other, and explaining why it's hazardous to rely on precedents involving the latter in cases involving the former).

[520] *See Hughes 5th Cir. Op.*, 68 F.4th at 237 (recognizing that "the privilege for state lawmakers has more exceptions" than its federal analogue); *id.* (drawing "on caselaw involving . . . legislative immunity (rather than legislative privilege)" despite recognizing that "the parallel between [the two doctrines] may not run to the horizon").

[521] *See id.* (quoting *Supreme Court of Virginia*, 446 U.S. at 732).

[522] *See id.* (emphasis added) (quoting *Supreme Court of Virginia*, 446 U.S. at 732).

[523] *See Supreme Court of Virginia*, 446 U.S. at 721 ("This case raises questions of whether [certain state actors] are officially *immune from suit* . . . ." (emphasis added)); *see also supra* notes 55, 57, 104–105, 268, 378, and accompanying text.

Here too, however, *Hughes*'s quotation from *Supreme Court of Virginia* omitted critical language from the Supreme Court's opinion.  Here are the relevant sentences from *Supreme Court of Virginia* and *Hughes* side by side, with the critical differences again highlighted in bold:

| Supreme Court of Virginia | Hughes |
|---|---|
| "We have also recognized that state legislators enjoy common-law ***immunity from liability*** for their legislative acts, an ***immunity*** that is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause."[524] | "[T]he legislative ***privilege*** that protects state lawmakers 'is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause.'"[525] |

By omitting the word "immunity" from that quotation and replacing it with "privilege," *Hughes* creates the misimpression that *Supreme Court of Virginia* said that federal and state legislative *privilege* are "similar in origin and rationale."[526]

If anything, though, *Supreme Court of Virginia* says the opposite.  In a portion of *Supreme Court of Virginia* that *Hughes* doesn't acknowledge,[527] the Supreme Court stated that even though it has "equated the legislative *immunity* to which state legislators are entitled . . . to that accorded Congressmen under the Constitution," "[t]he separation-of-powers doctrine justifies a broader *privilege* for Congressmen than for state legislators" (at least "in criminal

---

[524] *Supreme Court of Virginia*, 446 U.S. at 732 (emphases added).

[525] *See Hughes 5th Cir. Op.*, 68 F.4th at 237 (emphasis added) (quoting *Supreme Court of Virginia*, 446 U.S. at 732).

[526] *See id.* ("The legislative *privilege* that protects state lawmakers 'is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause.'" (emphasis added) (quoting *Supreme Court of Virginia*, 446 U.S. at 732)).

[527] *See id.* at 237 & n.49.

actions").[528]  *Supreme Court of Virginia* therefore doesn't support *Hughes*'s conclusion that it's permissible to "draw[] on caselaw involving . . . the Constitution's Speech or Debate Clause" when determining the state legislative privilege's scope.[529]

*Hughes*'s conclusion that it's appropriate to "draw[] on caselaw involving . . . legislative *immunity*" to determine the state legislative *privilege*'s scope was likewise flawed.[530]  The *Hughes* panel asserted that it could rely on immunity caselaw because "the Supreme Court has often analyzed" immunity and privilege issues "in parallel."[531]  "Both concepts," the panel reasoned, "involve the core question whether a lawmaker may 'be made to answer—either in terms of questions *or* in terms of defending from prosecution.'"[532]

The *Hughes* panel provided only one example of the Supreme Court analyzing immunity and privilege issues "in parallel":[533] the aforementioned passage of *Gravel v. United States* remarking that a federal legislator could "not be made to answer—*either* in terms of *questions* or in terms of *defending himself from prosecution*—for . . . events that occurred at [a] subcommittee meeting."[534]  The reason why that passage analyzes immunity and privilege "in parallel," however, was because *Gravel* was a *federal* legislative privilege case under the *Speech or Debate*

---

[528] *See Supreme Court of Virginia*, 446 U.S. at 733 (emphases added) (citing *Gillock*, 445 U.S. 360).

[529] *Contra Hughes 5th Cir. Op.*, 68 F.4th at 237 & n.49.

[530] *Contra id.* at 237.

[531] *Hughes 5th Cir. Op.*, 68 F.4th at 237 (cleaned up) (emphases added) (citing *Gravel*, 408 U.S. at 616).

[532] *Id.* (cleaned up) (quoting *Gravel*, 408 U.S. at 616).

[533] *See id.* at 237 & nn.51–52 (cleaned up) (citing *Gravel*, 408 U.S. at 616).

[534] *See Gravel*, 408 U.S. at 616 (emphases added); *see also supra* notes 99–100 and accompanying text (discussing that passage).

*Clause*[535]—which, as discussed, gives federal legislators an "absolute" immunity and an "absolute" privilege alike.[536]  In other words, the Supreme Court discussed privilege and immunity "in parallel" in *Gravel* because there was no reason for the Court to differentiate between them; the federal legislative privilege and federal legislative immunity are effectively coterminous.

Again, though, the Supreme Court has squarely held that the Speech or Debate Clause applies to *federal legislators only*—it *doesn't* apply to *state* legislators.[537]  Moreover, *Gillock* demonstrates that the Speech or Debate Clause protects evidence that the common-law state legislative privilege does not.[538]  Thus, the fact that *Gravel* analyzed *federal* immunity and privilege "in parallel" doesn't mean that courts should do the same with *state* immunity and privilege.[539]  If anything, the opposite is true.[540]

Proceeding from the mistaken premise that courts may freely transplant state legislative *immunity* principles into the state legislative *privilege* context, *Hughes* adopted a version of *Arlington Heights* and *Gillock*'s "extraordinary instances"/"important federal interests" exception

---

[535] *See Gravel*, 408 U.S. at 609.

[536] *See, e.g.*, *Sealed Case*, 80 F.4th at 365 ("If a [federal legislator's] act qualifies as legislative under *Gravel*, the privilege applies and the Clause confers three 'absolute' protections.  First, the privilege includes immunity from suit . . . . Second, the privilege includes an evidentiary privilege . . . . Third, the privilege encompasses a testimonial privilege . . . ." (citations omitted)); *see also supra* Section II.B.

[537] *E.g.*, *Lake Country Estates*, 440 U.S. at 404 ("The Speech or Debate Clause of the United States Constitution is no more applicable to the members of state legislatures than to the members of [a regional decisionmaking body]."); *see also supra* notes 102–103 and accompanying text.

[538] *See Gillock*, 445 U.S. at 366 ("It is clear that were we to recognize an evidentiary privilege similar in scope to the Federal Speech or Debate Clause, much of the evidence at issue here would be inadmissible."); *see also supra* Section II.C.2.a.iii.

[539] *Contra Hughes 5th Cir. Op.*, 68 F.4th at 237.

[540] *See supra* Section II.C.2.a.iii.

that is so narrow that, practically speaking, no civil case could ever satisfy it.  The *Hughes* panel concluded that the Supreme Court's state legislative *immunity* rulings in *Tenney* and *Bogan* indicate that the state legislative *privilege* also forbids litigants from obtaining evidence bearing on legislators' "subjective intent in drafting, supporting, or opposing proposed or enacted legislation"—even when that intent is the central question in the case.[541]  Based largely on *Tenney*'s statement that it's "not consonant with our scheme of government for a court to inquire into the motives of legislators," *Hughes* suggests that any "court proceeding that probes legislators' subjective intent in the legislative process" poses "a 'deterrent to the uninhibited discharge of their legislative duty'" that courts should eliminate.[542]

But *Tenney* and *Bogan*'s proclamations that litigants can't hold state legislators *liable* based on their subjective motives can't possibly mean that courts may never scrutinize the motivations underlying state legislation *at all*, or that litigants may never *obtain evidence* from legislators that bears on those motivations.[543]  After all, if the state legislative privilege categorically forbade courts from "prob[ing] legislators' subjective intent in the legislative process" as *Hughes* seems to imply,[544] the Supreme Court wouldn't have reaffirmed in *Arlington Heights* that "[p]roof of racially discriminatory intent or purpose" is in fact *required* to show a

---

[541] *See* 68 F.4th at 238 (quoting *Tenney*, 341 U.S. at 374, 377); *see also id.* at 238–39 (citing *Bogan*, 523 U.S. at 47–49, 53, for the proposition that "[e]ven for allegations involving racial animus . . . the Supreme Court has held that the legislative privilege stands fast").

[542] *See id.* at 238 (quoting *Tenney*, 341 U.S. at 377).

[543] *See, e.g.*, *Pernell*, 84 F.4th at 1353 (Jill Pryor, J., dissenting) ("Although as a general matter it is 'not consonant with our scheme of government for a court to inquire into the motives of legislators,' such an inquiry is exactly what a disparate impact claim requires." (quoting *Tenney*, 341 U.S. at 377)); *id.* at 1357 n.14 (criticizing *Hughes* for resting "on the flawed premise that because state legislators hold *immunity* from *liability* . . . under *Tenney*, they must also hold an absolute *privilege* against *third party discovery*" (emphases added)).

[544] *See* 68 F.4th at 238.

violation of the Equal Protection Clause."[545]  Nor would *Arlington Heights* have explicitly stated that—notwithstanding the state legislative privilege—legislators might nonetheless "be called to the stand at trial to testify concerning the purpose of the official action" in at least some intentional racial discrimination cases.[546]  And if state legislators may never "be compelled to produce documents concerning the legislative process and a legislator's subjective thoughts and motives" as *Hughes* suggests,[547] *Arlington Heights* wouldn't have stated that "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports" are in fact "subjects of proper inquiry in determining whether racially discriminatory intent existed."[548]  Yet *Hughes* doesn't analyze those aspects of *Arlington Heights* (beyond merely restating *Arlington Heights*'s holding that the state legislative privilege yields in "extraordinary instances").[549]

Supreme Court precedent therefore belies *Hughes*'s assertion that "the legislative *privilege* stands fast" even in cases involving "allegations [of] racial animus."[550]  Read together, *Tenney*, *Bogan*, and *Arlington Heights* establish that it's legislative *immunity* that "stands fast" when a plaintiff accuses a State of intentional racial discrimination—*not* legislative *privilege*.[551]

---

[545] *See Arlington Heights S. Ct. Op.*, 429 U.S. at 265 (emphasis added); *see also supra* Section II.C.2.a.i.

[546] *See Arlington Heights S. Ct. Op.*, 429 U.S. at 268 (emphasis added).

[547] *Contra* 68 F.4th at 240.

[548] *See Arlington Heights S. Ct. Op.*, 429 U.S. at 268 (emphasis added).

[549] *See Hughes 5th Cir. Op.*, 68 F.4th at 237–38 & nn.53 & 59 (quoting *Arlington Heights S. Ct. Op.*, 429 U.S. at 268).

[550] *Contra id.* at 238 (emphasis added).

[551] *See supra* Sections II.C.1 and II.C.2.a.i.

After all, were *Hughes* correct that the state legislative privilege categorically prohibits litigants from "seeking to uncover a legislator's subjective intent in drafting, supporting, or opposing proposed or enacted legislation,"[552] it's unclear how any plaintiff could ever obtain the requisite evidence to prove intentional racial discrimination in the redistricting context.[553]  As discussed, the Texas Legislature's "subjective intent in drafting [and] supporting" the challenged electoral maps is the core factual question that our panel must answer in this case.[554]

Yet *Hughes* implies that the state legislative privilege in fact *bars* litigants from obtaining such evidence.  As noted, *Hughes* cited *Lee* as an example of a case that, in the panel's view, correctly applied the state legislative privilege to bar discovery.[555]  And, to reiterate, the Ninth Circuit barred the *Lee* plaintiffs "from questioning [local lawmakers] regarding any legislative acts, motivations, or deliberations pertaining to the . . . redistricting ordinance" they were challenging.[556]  *Hughes*'s favorable citation to *Lee* thereby suggests that the panel believed "that the legislative privilege stands fast" in redistricting cases.[557]

---

[552] *Contra Hughes 5th Cir. Op.*, 68 F.4th at 238.

[553] *Cf. Pernell*, 84 F.4th at 1354 n.12 (Jill Pryor, J., dissenting) (noting in a different but analogous context that barring "documentary discovery against [state] legislators" may leave "no other route . . . available" for plaintiffs raising intentional discrimination challenges "to discover evidence to test their claims").

[554] *See supra* Section I.

[555] *See* 68 F.4th at 239 (citing *Lee*, 908 F.3d at 1183, 1187–88).

[556] *See Lee*, 908 F.3d at 1181, 1188.

[557] *See* 68 F.4th at 238–39 (citing *Lee*, 908 F.3d at 1183, 1187–88).

*See also Majority Op.*, 2023 WL 8880313, at *7–9 (agreeing that *Lee* establishes that "claims of racial gerrymandering brought by private plaintiffs" don't qualify for *Arlington Heights*'s "extraordinary civil cases" exception, and concluding that *Hughes* likewise implies that redistricting claims brought by the United States aren't "extraordinary" either); *Miss. State Conf. of the NAACP v. State Bd. of Election Comm'rs*, No. 3:22-cv-734, 2023 WL 8360075, at *4 (S.D. Miss. Dec. 1, 2023) (post-*Hughes* redistricting

If, as *Hughes* and *Lee* suggest, cases in which a plaintiff claims that a state purposefully redesigned its electoral system to rob racial minorities of their voting power aren't "extraordinary,"[558] it's hard to imagine civil case *would* qualify.[559]  *Hughes* offers no examples of civil cases that are sufficiently "extraordinary" to overcome the privilege.[560]  Nor does *Hughes*

---

case reading *Hughes* to "indicate[] that a challenge to election laws under the Constitution and the [VRA] does not rise to th[e] level of an" "extraordinary" civil case in which the state legislative privilege yields).

[558] *See Hughes 5th Cir. Op.*, 68 F.4th at 239; *Lee*, 908 F.3d at 1187–88.

To be sure, some courts have interpreted *Lee* more narrowly.  One court, for example, reads *Lee* not to "hold that a gerrymandering claim can *never* overcome legislative privilege," but instead to hold that the *Lee* plaintiffs *failed to assemble a sufficient "factual record"* that would "justify[] the substantial intrusion into the legislative process" that their requested discovery would have created.  *See Whitford*, 331 F.R.D. at 378 (emphases added) (quoting *Lee*, 908 F.3d at 1188).

In fact, the Fifth Circuit appeared to espouse that narrower interpretation of *Lee* in its unpublished (and therefore non-binding) opinion denying a stay in the instant case.  *See LULAC 5th Cir. Op.*, 2022 WL 2713263, at *1 n.2 (emphasis added) (suggesting that *Lee* merely "rejected [the] plaintiffs' request for a 'categorical exception' to the privilege" that would apply whenever a litigant asserts a constitutional claim that directly implicates a state's legislature's intent, and that *Lee* specifically "bas[ed] its holding on th[e] case's 'factual record'" (quoting *Lee*, 908 F.3d at 1188)); *see also* Section II.C.2.e.ii.

*Hughes*, however, implicitly rejects that narrower reading of *Lee*.  *See* 68 F.4th at 239 (citing *Lee*, 908 F.3d at 1183, 1187–88).  Nothing in *Hughes* suggests that *Lee* would have come out differently if the plaintiffs had merely assembled a stronger factual record.  *See id.* (citing *Lee*, 908 F.3d at 1183, 1187–88).  To the contrary, *Hughes* reads *Lee* to hold that "the legislative privilege stands fast" even when a litigant "contend[s] that race was . . . the overriding motivation behind the redrawing of a [jurisdiction's] voting district boundaries."  *See id.* at 238–39 (cleaned up) (quoting *Lee*, 908 F.3d at 1183, 1188).

[559] *See, e.g., Bethune-Hill*, 114 F. Supp. 3d at 337 (opining that redistricting cases are exactly the sort of "extraordinary instance" contemplated by *Arlington Heights* because "the natural corrective mechanisms built into our republican system of government offer little check upon the very real threat of 'legislative self-entrenchment'" (quoting Asta, *supra* note 299, at 264)).

*Cf. In re Landry*, 83 F.4th 300, 307 (5th Cir. 2023) (remarking in a different context that "[r]edistricting litigation . . . is not ordinary litigation").

*See also* U.S.'s Suppl. Opening Br., ECF No. 722, at 11 ("'Extraordinary civil cases' cannot be an empty category; if any civil case is extraordinary, it is this one." (cleaned up)); U.S.'s Suppl. Reply Br., ECF No. 734, at 6 ("If this case is not extraordinary, no civil case could ever be under the Legislators' logic.").

[560] *See Hughes 5th Cir. Op.*, 68 F.4th at 237–40.

offer lower courts any concrete guidance regarding how to evaluate whether any particular civil case qualifies as "extraordinary."[561]

 *Hughes*'s favorable citation to *Lee* as an example of a case in which the state legislative privilege shouldn't yield is also confounding for an additional reason: it sends mixed signals when considered alongside *Jefferson Community*. As discussed, *Jefferson Community* adopted several holdings from *another* redistricting case—specifically, *Perez*—as the Fifth Circuit's own.[562] The *Jefferson Community* panel presumably wouldn't have given *Perez* its imprimatur if it thought that *Perez* had applied the wrong legal standard or reached the wrong result. *Jefferson Community* thereby signals that courts in this Circuit should follow *Perez*—and, by extension, its adoption of *Rodriguez*'s five-factor balancing framework—when adjudicating state legislative privilege claims in redistricting cases.[563]

 But whereas *Perez* holds that courts considering whether to let plaintiffs in redistricting cases depose state legislators should balance the serious federal interests at stake against the countervailing interest in promoting legislative independence,[564] *Lee* suggests that legislative

---

[561] *See id.* at 239 (suggesting merely that, to qualify as "extraordinary," a civil case must be "closer on the continuum of legislative immunity and privilege" to "the criminal prosecution under federal law at issue in *Gillock*" than "the suits . . . at issue in *Tenney* and *Bogan*").

 *See also Majority Op.*, 2023 WL 8880313, at *7 (remarking that although *Hughes* "provides examples of what an extraordinary civil case is *not*," it tells us "much less about" what *does* count "as an extraordinary civil case" (emphasis added)).

[562] *See Jefferson Cmty.*, 849 F.3d at 624 (citing *Perez*, 2014 WL 106927, at *1–2).

[563] *See Bryant*, 2017 WL 6520967, at *6 (noting that *Jefferson Community* identified *Perez* "as providing the relevant analysis and law"); *id.* at *7 (inferring from the fact that *Jefferson Community* "favorably cited and quoted from *Perez* with regard to the qualified nature of the [state legislative] privilege in general" that the Fifth Circuit implicitly approved *Perez*'s other legal conclusions); *id.* at *8 ("[T]he Fifth Circuit cited *Rodriguez* favorably in *Jefferson*, and, thus, found *Rodriguez* to be good law."); *see also supra* note 425 and accompanying text.

[564] *See Perez*, 2014 WL 106927, at *2 ("To determine whether the legislative privilege precludes disclosure, a court must balance the interests of the party seeking the evidence against the interests of the

independence concerns *always* trump the federal interests at stake in redistricting cases.[565] Because two different Fifth Circuit panels have issued published, precedential opinions approving contradictory aspects of those two seemingly irreconcilable authorities, it's unclear which of those cases the Fifth Circuit wants lower courts to consult for guidance when deciding legislative privilege issues in redistricting cases.

Finally, even though *Hughes* expressly recognizes that the state legislative privilege "is an evidentiary privilege governed by federal common law, as applied through Rule 501 of the Federal Rules of Evidence,"[566] *Hughes* doesn't obey (or even mention) Rule 501's command to apply evidentiary privileges (including the state legislative privilege) the way they've been "interpreted by United States courts in the light of reason and experience."[567]  As discussed, most United States courts applying the state legislative privilege "in the light of reason and experience" have adopted *Rodriguez*'s five-factor balancing test.[568]  So, to the extent that *Hughes*

---

individual claiming the privilege.  The court in *Rodriguez* identified five factors to aid in this determination . . . ." (citations omitted)).

[565] *See Lee*, 908 F.3d at 1188 ("We recognize that claims of racial gerrymandering involve serious allegations . . . . But the factual record in this case falls short of justifying the substantial intrusion into the legislative process. . . . *Arlington Heights* itself also involved an equal protection claim alleging racial discrimination—putting the government's intent directly at issue—but nonetheless suggested that such a claim was not, in and of itself, within the subset of 'extraordinary instances' that might justify an exception to the privilege.  Without sufficient grounds to distinguish those circumstances from the case at hand, we conclude that the district court properly denied discovery on the ground of legislative privilege." (cleaned up)).

[566] *See Hughes 5th Cir. Op.*, 68 F.4th at 235 (cleaned up) (quoting *Jefferson Cmty.*, 68 F.4th at 624).

[567] *Compare* FED. R. EVID. 501, *with Hughes 5th Cir. Op.*, 68 F.4th at 235–40.  *See also supra* notes 102–103 and accompanying text.

[568] *See supra* Section II.C.2.b.i–iii.

doesn't follow the substantial weight of authority adopting that balancing test,[569] *Hughes*

contravenes Rule 501.[570]

### III.   *Jefferson Community*, *Hughes*, **and the Rule of Orderliness**

Shortly after the Fifth Circuit released *Hughes*, it vacated our order overruling the Texas

Legislators' objections to the United States's document subpoenas and remanded with

instructions to reconsider those objections in light of *Hughes*.[571]   That is the task our panel must

now perform.

I of course don't believe that my respectful disagreement with *Hughes* gives this Court

any license to disregard it.   Judges in this Circuit must follow published Fifth Circuit opinions as

faithfully as possible—even ones with which they disagree.[572]   Thus, if *Hughes* were the only

binding precedent on point, I'd set aside my reservations and follow *Hughes* unhesitatingly.

But *Hughes* isn't the only published Fifth Circuit case on point.   *Jefferson Community* is

also a precedential Fifth Circuit decision that this panel must follow as faithfully as possible.[573]

---

[569] *See Hughes 5th Cir. Op.*, 68 F.4th at 235–40.

*See also Miss. State Conf.*, 2023 WL 8360075, at *3–4 (inferring from the fact that *Hughes* "made no reference to the *Rodriguez* analysis" that *Hughes* "implicitly rejected" *Rodriguez*'s five-factor balancing test).

[570] *See, e.g.*, *Pernell*, 84 F.4th at 1355 (Jill Pryor, J., dissenting) (opining that using "the same balancing test to evaluate claims of legislative privilege" that "district courts in numerous other cases" have adopted is most "consistent with Rule 501's command to interpret privileges in light of judicial experience"); *see also supra* notes 328–329 and accompanying text.

[571] *See LULAC Remand Order*, 2023 WL 4697109, at *1.

[572] *See, e.g.*, *Garcia v. Limon*, No. 1:19-cv-120, 2019 WL 7494398, at *5 (S.D. Tex. Nov. 4, 2019) ("Under the rule of orderliness, when the Fifth Circuit issues a decision which directly resolves a legal question, district courts 'may not overrule the decision, right or wrong.'" (quoting *Lyda Swinerton Builders, Inc. v. Okla. Sur. Co.*, 903 F.3d 435, 455 (5th Cir. 2018))), *report and recommendation accepted by* 2020 WL 76248 (S.D. Tex. Jan. 7, 2020).

[573] *See Jefferson Cmty.*, 849 F.3d at 619.

- 117 -

That presents our panel with a conundrum.  How can we honor *Hughes*'s pronouncement that "the legislative privilege's scope is necessarily *broad*" while simultaneously heeding *Jefferson Community*'s instruction that the privilege is "*very limited*?'"[574]  How can we follow *Hughes*'s holding that "state legislators [cannot] be compelled to produce documents concerning the legislative process and a legislator's subjective thoughts and motives"[575] when the Parish made that very argument in *Jefferson Community* and the Fifth Circuit didn't accept it?[576]  How is *Hughes*'s instruction that privilege and immunity should be "analyzed in parallel" consistent with *Jefferson Community*'s competing instruction that whereas "the common-law legislative *immunity* for state legislators is absolute, the legislative *privilege* for state lawmakers is, at best, one which is qualified"?[577]  How could *Hughes*'s assertion "that the legislative privilege stands fast" even when the plaintiff raises "allegations involving racial animus"[578] be true if *Perez*— whose legal conclusions *Jefferson Community* explicitly adopted[579]—held that the state

---

[574] *Compare Hughes 5th Cir. Op.*, 68 F.4th at 236 (emphasis added), *with Jefferson Cmty.*, 849 F.3d at 624 (emphasis added) (quoting *Perez*, 2014 WL 106927, at *1).

[575] *See Hughes 5th Cir. Op.*, 68 F.4th at 240.

[576] *Compare Jefferson Cmty. Appellants' Br.* at 32–33 ("Discovery on [the plaintiff's] claim necessarily would involve attempts by [the plaintiff] to delve into the privileged thought processes and motivations underlying the Council's decision to enact the resolutions at issue.  But legislative privilege . . . foreclose[s] such an inquiry into the councilmembers' motivations and thought processes . . . ."), *with Jefferson Cmty.*, 849 F.3d at 624 (adopting a much narrower conception of the state legislative privilege).

[577] *Compare Hughes 5th Cir. Op.*, 68 F.4th at 237, *with Jefferson Cmty.*, 849 F.3d at 624 (emphases added) (quoting *Perez*, 2014 WL 106927, at *2).

[578] *See Hughes 5th Cir. Op.*, 68 F.4th at 238.

[579] *See Jefferson Cmty.*, 849 F.3d at 624 (quoting *Perez*, 2014 WL 106927, at *1–2).

*See also Bryant*, 2017 WL 6520967, at *6 (noting that *Jefferson Community* treated *Perez* "as providing the relevant analysis and law" (citing *Jefferson Cmty.*, 849 F.3d at 624)); *id.* at *7 (emphasizing that *Jefferson Community* "favorably cited and quoted from *Perez* with regard to the qualified nature of the [state legislative] privilege in general").

legislative privilege *doesn't* necessarily "stand fast" in cases involving allegations of racial animus?[580] And how could it simultaneously be true that

(1) *Perez* correctly held that plaintiffs may *sometimes* question state legislators about their motives in redistricting cases (as *Jefferson Community* implies);[581] and

(2) *Lee* correctly held that plaintiffs may *never* question state legislators about their motives in redistricting cases (as *Hughes* implies)?[582]

### A.   The Rule of Orderliness Requires This Panel to Follow *Jefferson Community* to the Extent it's Inconsistent with *Hughes*

The Fifth Circuit's Rule of Orderliness supplies the way out of that predicament. Because, with limited exceptions that don't apply here, one Fifth Circuit panel can't overrule another Fifth Circuit panel's published decision, the *Hughes* panel was required to follow *Jefferson Community*.[583] Thus, to the extent language in the newer case (*Hughes*) contradicts

---

[580] *See Abbott*, 585 U.S. at 603 (noting that the plaintiffs in *Perez* were "claim[ing] that a state law was enacted with [racially] discriminatory intent"); *Perez*, 2014 WL 106927, at *2 (holding that the state legislative privilege doesn't preclude discovery where "the interests of the party seeking . . . evidence" of racially discriminatory intent outweighs "the interests of the individual claiming the privilege"); *see also supra* Section II.C.2.b.iii.

[581] *See Perez*, 2014 WL 106927, at *1–3 (ordering state legislators to sit for depositions); *see also Jefferson Cmty.*, 849 F.3d at 624 (favorably citing *Perez* and adopting several of its holdings).

*See also Bryant*, 2017 WL 6520967, at *6–7 (inferring from the fact that *Jefferson Community* "favorably cited and quoted from *Perez* with regard to the qualified nature of the [state legislative] privilege in general" that the *Jefferson Community* panel agreed that *Perez* correctly "provid[ed] the relevant analysis and law").

[582] *See Lee*, 908 F.3d at 1188 (concluding that plaintiffs' "claims of racial gerrymandering" weren't "within the subset of 'extraordinary instances' that might justify an exception to the [state legislative] privilege" under *Arlington Heights* (quoting *Arlington Heights S. Ct. Op.*, 429 U.S. at 268)); *see also Hughes*, 68 F.4th at 239 (approving *Lee*'s conclusions).

[583] *See, e.g.*, *PHI Grp., Inc. v. Zurich Am. Ins. Co.*, 58 F.4th 838, 842 n.3 (5th Cir. 2023) ("The rule of orderliness means 'one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court.'" (quoting *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008))); *Van Staden v. St. Martin*, 664 F.3d 56, 58 n.3 (5th Cir. 2011) (noting that a published Fifth Circuit decision "may be overruled only by [the Fifth Circuit] sitting en banc or by the Supreme Court").

language in the older case (*Jefferson Community*), the Rule of Orderliness provides that "the newer language has no effect."[584]  Because the "rule of orderliness is 'strict and rigidly applied,'"[585] we must follow *Jefferson Community* instead of *Hughes* to the extent they conflict.[586]

**B.    *Jefferson Community*'s Pronouncements About the State Legislative Privilege are Binding Holdings (Rather Than Non-Binding Dicta) Because They're Explications of the Governing Rules of Law**

That said, the Rule of Orderliness only requires courts to follow an earlier Fifth Circuit case's *holdings*; it *doesn't* require courts to follow an earlier case's *dicta*.[587]  The first step, therefore, is to determine which of *Jefferson Community*'s statements regarding the legislative privilege's scope and applicability are binding holdings that govern over contrary language in *Hughes*, and which (if any) are nonbinding dicta.

"A statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding."[588]  "A statement is *not* dictum," however, "if it is necessary to the result *or constitutes an explication of the governing rules of law*."[589]  Thus, "the

---

[584] *See, e.g.*, *Arnold*, 213 F.3d at 196 n.4 ("[U]nder the rule of orderliness, to the extent that a more recent case contradicts an older case, the newer language has no effect.").

[585] *Ruiz-Perez v. Garland*, 49 F.4th 972, 976 (5th Cir. 2022) (quoting *Bonvillian Mar. Serv., Inc. v. Pellegrin (In re Bonvillian Mar. Serv., Inc.)*, 19 F.4th 787, 792 (5th Cir. 2021)).

[586] *See, e.g.*, *Arnold*, 213 F.3d at 196 n.4.

[587] *E.g.*, *Netsphere, Inc. v. Baron*, 799 F.3d 327, 333 (5th Cir. 2015) ("While it is well-established in this circuit that one panel of this Court may not overrule another, that rule does not apply to dicta." (cleaned up) (quoting *United States v. Segura*, 747 F.3d 323, 328 (5th Cir. 2014))).

[588] *E.g.*, *id.* (quoting *Segura*, 747 F.3d at 328).

[589] *E.g.*, *id.* (quoting *Segura*, 747 F.3d at 328).

principle of *stare decisis* directs" courts "to adhere *not only* to the *holdings* of" published Fifth Circuit cases, "but *also* to their *explications of the governing rules of law*."[590]

The question, then, is this:  Is *Jefferson Community*'s statement that the state legislative privilege "cannot bar the adjudication of a claim"[591] the case's only binding holding, as the *Hughes* panel apparently believed?[592]  Or is *Jefferson Community*'s pronouncement that the state legislative privilege "must be strictly construed and accepted only to [a] very limited extent"[593] *also* a binding holding that the Fifth Circuit was required to follow in *Hughes* (and that we're required to follow now)?

The answer?  The latter.  A statement in a published Fifth Circuit opinion that sets forth the legal standard that courts should apply when considering a particular issue is "an explication of the governing rules of law"—and, thus, a binding holding.[594]  The passage of *Jefferson*

---

[590] *E.g.*, *Gochicoa v. Johnson*, 238 F.3d 278, 286 n.11 (5th Cir. 2000) (emphases added) (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996)).

[591] *See Jefferson Cmty.*, 849 F.3d at 624.

[592] *See Hughes 5th Cir. Op.*, 68 F.4th at 240 (asserting that *Jefferson Community* "held only that a claim for injunctive relief could proceed," and "sa[id] nothing" about whether "state legislators can be compelled to produce documents concerning the legislative process and a legislator's subjective thoughts and motives").

[593] *See Jefferson Cmty.*, 849 F.3d at 624 (quoting *Perez*, 2014 WL 106927, at *1).

[594] *See, e.g.*, *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 47 F.4th 408, 420 n.3 (5th Cir. 2022) (footnote of prior Fifth Circuit opinion "explicat[ing] the legal standard necessary to correct noncompliance" with environmental laws was "not dictum" because it "constitute[d] an explication of the governing rules of law" (cleaned up) (quoting *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir.), *opinion corrected on denial of reh'g en banc*, 380 F.3d 231 (5th Cir. 2004))), *reh'g en banc granted*, 61 F.4th 1012 (5th Cir. 2023); *Douglass v. Nippon Yusen Kabushiki Kaisha*, 996 F.3d 289, 298 (5th Cir. 2021) (prior Fifth Circuit opinion's "references to [a Supreme Court case] and its general jurisdiction test" were "explications of the governing rules of law" that bound subsequent Fifth Circuit panels (cleaned up) (quoting *Int'l Truck*, 372 F.3d at 721)), *on reh'g en banc*, 46 F.4th 226 (5th Cir. 2022); *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 758 F.3d 693, 701–02 (5th Cir. 2014) (portion of prior Fifth Circuit opinion "discuss[ing] the applicable standard" and selecting one of "two possible tests advocated by the parties" was an "explication[] of the governing rules of law" that bound subsequent

- 121 -

*Community* instructing courts in this Circuit how they should "construe[]" the state legislative privilege and when they should "accept[]" it articulates the legal standards governing state legislative privilege claims.[595]  That passage is therefore "an explication of the governing rules of law" that the *Hughes* court was bound to follow.[596]

    *Hughes* nevertheless contradicts that binding holding by disregarding *Jefferson Community*'s "strictly construed" and "very limited" language[597] and by articulating a "broad" conception of the state legislative privilege that bears little resemblance to the "limited" privilege

---

Fifth Circuit panels (quoting *Gochicoa*, 238 F.3d at 286 n.11)), *on reh'g en banc*, 783 F.3d 266 (5th Cir. 2015).

    *See also, e.g.*, *Hairston v. Groneolsky*, No. 07-5487, 2008 WL 630041, at *3 (D.N.J.) (explaining that "a lower court is bound by" a "higher court's choice of legal standard or test," "not simply to the result alone" (cleaned up) (quoting *Planned Parenthood Se. of Pa. v. Casey*, 947 F.2d 682, 691–92 (3d Cir. 1991), *aff'd in part and rev'd in part on other grounds*, 505 U.S. 833 (1992))), *aff'd*, 313 F. App'x 490 (3d Cir. 2008).

    [595] *See Jefferson Cmty.*, 849 F.3d at 624 (quoting *Perez*, 2014 WL 106927, at *1).

    [596] *See, e.g.*, *Netsphere*, 799 F.3d at 333 (emphases added) (quoting *Segura*, 747 F.3d at 328).

    *See also* Private Pls.' Reply, ECF No. 735, at 2 (arguing (correctly) that "*Hughes* did not—and could not—disturb Supreme Court precedent or the Fifth Circuit's statements that the privilege is qualified and must be strictly construed").

    [597] *Compare Jefferson Cmty.*, 849 F.3d at 624 ("[The state legislative] privilege '*must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify to excluding relevant evidence has a public good transcending* the normally predominant principle of utilizing all rational means for ascertaining the truth." (emphasis added) (quoting *Perez*, 2014 WL 106927, at *1)), *with Hughes 5th Cir. Op.*, 68 F.4th at 236 ("[T]he legislative privilege is "qualified" by *exceptions* that serve 'the normally predominant principle of utilizing all rational means for ascertaining the truth.'" (emphasis added) (quoting *Jefferson Cmty.*, 849 F.3d at 624)).

    *See also supra* Section II.C.2.f.ii.

that *Jefferson Community* espouses.[598]  The Rule of Orderliness therefore requires us to follow *Jefferson Community* to *Hughes*'s exclusion.[599]

### C. *Jefferson Community*'s Implicit Conclusion that the State Legislative Privilege Doesn't Categorically Bar Inquiries into Legislative Motivation Likewise Has Precedential Effect

While it's indisputable *that Jefferson Community* says the state legislative privilege is "qualified," "strictly construed," and "very limited," it's less obvious *why Jefferson Community* says that.[600]  One would ordinarily expect that, after articulating the legal standards that govern state legislative privilege claims, the *Jefferson Community* panel would have then explained *how* those standards applied to the facts of the case.  For instance, the court might have followed its explication of the applicable law with a concluding sentence like: "Because we conclude that allowing the Parish councilmembers to shield their reasons for passing the challenged resolutions wouldn't serve a 'public good' that transcends 'the normally predominant principle of utilizing all means for ascertaining the truth,' the 'qualified' state legislative privilege doesn't categorically bar the plaintiff from inquiring into the Parish's motivations."  Had the *Jefferson Community* panel done something like that, it'd be more immediately evident why the Fifth Circuit had bothered to articulate the governing legal standard and adopt *Perez*'s holdings in the first place.

---

[598] *Compare Hughes 5th Cir. Op.*, 68 F.4th at 236 ("[T]he legislative privilege's scope is necessarily broad."), *with Jefferson Cmty.*, 849 F.3d at 624 ("Th[e] privilege 'must be strictly construed and accepted only to [a] very limited extent . . . .'" (quoting *Perez*, 2014 WL 106927, at *1)).

*See also supra* Section II.C.2.f.ii.

[599] *See, e.g.*, *Arnold*, 213 F.3d at 196 n.4.

[600] *See Jefferson Cmty.*, 849 F.3d at 624 (quoting *Perez*, 2014 WL 106927, at *1–2).

But *Jefferson Community* didn't do that.[601]  Instead, immediately after proclaiming that "the legislative privilege for state lawmakers" is "qualified," "strictly construed," and "very limited,"[602] the Fifth Circuit jumped straight to opining that, "[a]t any rate, even assuming that the councilmember's reasons for passing the resolutions are privileged in the sense that they cannot be directly compelled to disclose them, this evidentiary privilege cannot bar the adjudication of a claim."[603]

From that absence of a sentence explicitly applying *Jefferson Community*'s narrow conception of the state legislative privilege to the case's specific facts, *Hughes* infers that *Jefferson Community*'s more general pronouncements about the state legislative privilege are throwaways that courts may disregard.[604]  Without mentioning *Jefferson Community*'s explicit admonition that the state legislative privilege "must be strictly construed and accepted only to [a] very limited extent,"[605] *Hughes* proclaims that *Jefferson Community* "said *only* that '[a]t any rate, even assuming that the councilmembers' reasons for passing the resolutions are privileged in the sense that they cannot be directly compelled to disclose them, this evidentiary privilege cannot bar the adjudication of a claim.'"[606]  The *Hughes* panel therefore declared that *Jefferson*

---

[601] *See id.*

[602] *See id.* (quoting *Perez*, 2014 WL 106927, at *1–2).

[603] *See id.*

[604] *See Hughes 5th Cir. Op.*, 68 F.4th at 240 ("Plaintiffs' reliance on *Jefferson Community* . . . is misplaced.  That decision stated that '[w]hile the common-law legislative immunity for state legislators is absolute, the legislative privilege for state lawmakers is, at best, one which is qualified.  But that case provides no support for the idea that state legislators can be compelled to produce documents concerning the legislative process and a legislator's subjective thoughts and motives.").

[605] *Compare Jefferson Cmty.*, 849 F.3d at 624 (quoting *Perez*, 2014 WL 106927, at *1–2), *with Hughes 5th Cir. Op.*, 68 F.4th at 240.

[606] *See Hughes 5th Cir. Op.*, 68 F.4th at 240 (emphasis added) (quoting *Jefferson Cmty.*, 849 F.3d at 624).

*Community* "held *only* that a claim for injunctive relief could proceed," and thereby "sa[id] nothing about cases" in which litigants seek evidence bearing on a state legislature's motives for passing an allegedly discriminatory law.[607]

But if, as *Hughes* asserts, *Jefferson Community* "held only that a claim for injunctive relief could proceed" and "sa[id] nothing" about the state legislative privilege's applicability more generally,[608] then the *Jefferson Community* panel would have had no reason to emphasize the privilege's "qualified," "strictly construed," and "very limited" nature.[609]  In other words, if *Jefferson Community* stood merely for the mundane proposition that the state legislative privilege "cannot bar the adjudication of a claim,"[610] the Fifth Circuit could have just said that by itself, and that would have sufficed to resolve the issue.  *Jefferson Community*'s more general pronouncements about the state legislative privilege's narrowness must therefore serve *some* purpose in the analysis, or else the court would have omitted them.

That purpose becomes clear when one reviews the appellate briefs.  As discussed, the Parish urged the *Jefferson Community* panel to adopt an expansive conception of the state legislative privilege that categorically "foreclose[s] . . . an[y] inquiry into the councilmembers' motivations and thought processes."[611]  In other words, the Parish (unsuccessfully) asked the

---

[607] *See id.* (emphasis added).

[608] *Contra id.*

[609] *See Jefferson Cmty.*, 849 F.3d at 624 (quoting *Perez*, 2014 WL 106927, at *1–2).

[610] *Contra Hughes 5th Cir. Op.*, 68 F.4th at 240 (quoting *Jefferson Cmty.*, 849 F.3d at 624).

[611] *See Jefferson Cmty. Appellants' Br.* at 32–33; *see also supra* Section II.C.2.d.

*Jefferson Community* panel to adopt the exact same absolutist conception of the state legislative privilege that *Hughes* ultimately espoused six years later.[612]

By declaring instead that the state legislative privilege is "qualified," "strictly construed," and "very limited,"[613] *Jefferson Community* necessarily refuted the Parish's premise that the state legislative privilege categorically forbade the plaintiff from "delv[ing] into the . . . thought processes and motivations underlying the [Parish]'s decision to enact the resolutions at issue."[614] *Jefferson Community* thus rejected the very same conception of the privilege that the Fifth Circuit would later adopt in *Hughes*.[615]

Thus, while the court admittedly could have said so more clearly, the entire reason why the *Jefferson Community* panel adopted *Perez*'s narrow conception of the state legislative privilege appears to have been to disabuse the Parish of its notion that state and local legislators' thoughts and motives are completely off limits.[616]  So even though *Jefferson Community* doesn't say *expressly* that the state legislative privilege doesn't necessarily "foreclose . . . inquir[ies]" into the "thought processes and motivations underlying [a state legislature's] decision to enact" a particular law,[617] the case necessarily stands for that proposition.[618]

---

[612] *See Hughes 5th Cir. Op.*, 68 F.4th at 240 (opining that state legislators cannot "be compelled to produce documents concerning . . . a legislator's subjective thoughts and motives").

[613] *See Jefferson Cmty.*, 849 F.3d at 624.

[614] *Contra Jefferson Cmty. Appellants' Br.* at 32–33.

[615] *See supra* note 612 and accompanying text.

[616] *Compare Jefferson Cmty.*, 849 F.3d at 624, *with Jefferson Cmty. Appellants' Br.* at 32–33.

[617] *Contra Jefferson Cmty. Appellants' Br.* at 33.

[618] *See Jefferson Cmty.*, 849 F.3d at 624.

The *Hughes* panel was required to follow that implicit conclusion.  "The rule of orderliness applies as equally to a panel's implicit reasoning as it does to its express holdings."[619] Thus, "an earlier panel decision binds" a later panel even if the earlier case "does not explicitly address arguments presented to the later panel."[620]  So, to the extent *Hughes* asserts that *Jefferson Community* "provides no support for the idea that state legislators can be compelled to produce

---

[619] *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 400 n.28 (5th Cir. 2022).

There are of course instances in which implicit conclusions in published Fifth Circuit opinions *don't* have precedential effect.  For instance, suppose—counterfactually—that the Parish *hadn't* argued in *Jefferson Community* that the "legislative privilege . . . foreclose[d] . . . inquir[ies] into the councilmembers' motivations and thought processes."  *Contra Jefferson Cmty. Appellants' Br.* at 33.  One couldn't then infer from *Jefferson Community*'s pronouncement that the state legislative privilege is "qualified," "strictly construed," and "very limited" that the Fifth Circuit took any position on whether the privilege bars inquiries into a state legislature's motives, because there'd be no reason to think that the panel had ever given the issue reasoned consideration.  *Cf., e.g.*, *Richardson v. Tex. Sec'y State*, 978 F.3d 220, 229 n.15 (5th Cir. 2020) ("Even if our previous decision 'implicitly' relied on the presence of a cognizable interest, that assumption is not binding if the adverse party 'did not challenge' and 'we did not consider' that issue." (quoting *Thomas v. Tex. Dep't Crim. Just.*, 297 F.3d 361, 370 n.11 (5th Cir. 2002))).

But the Parish *did* expressly "raise[] [the] issue" of whether the state legislative privilege categorically bars inquiries into legislative motivation, and the *Jefferson Community* panel evidently "g[ave] that issue reasoned consideration." *Cf. Ochoa-Salgado*, 5 F.4th at 619 (emphases omitted).  Consequently, "[t]he rule of orderliness applies as equally to" *Jefferson Community*'s "implicit reasoning as it does to its express holdings."  *See Newman*, 23 F.4th at 400 n.28.

[620] *United States v. Berry*, 951 F.3d 632, 636 (5th Cir. 2020).

Although some pre-*Berry* opinions state that the Fifth Circuit hasn't yet decided whether "a panel is bound by a prior panel's holding if the prior panel did not consider or address a potentially dispositive argument made before the later panel," *see, e.g.*, *United States v. Juarez-Martinez*, 738 F. App'x 823, 825 n.2 (5th Cir. 2018), the *Berry* court took a firm position on that question when it concluded in 2020 that "an earlier panel decision binds even if that panel's opinion does not explicitly address arguments presented to the later panel," *see Berry*, 951 F.3d at 636.

To the extent one of the Fifth Circuit's <u>post</u>-*Berry* opinions suggests that the issue still remains open in the Fifth Circuit—without citing *Berry* or otherwise acknowledging that *Berry* decided that issue several months earlier—*see Richardson*, 978 F.3d at 229 n.15, we must follow *Berry* under the Rule of Orderliness, *see Arnold*, 213 F.3d at 196 n.4.

documents concerning the legislative process and a legislator's subjective thoughts and motives," we must follow *Jefferson Community*'s necessary implication to the contrary.[621]

### D. *Jefferson Community*'s Pronouncements About the State Legislative Privilege are Binding Alternative Holdings

Further undermining *Hughes*'s assertion that *Jefferson Community* "held only that a claim for injunctive relief could proceed" and "sa[id] nothing about cases" in which litigants seek evidence of "a legislator's subjective thoughts and motives"[622] is the fact that when a published Fifth Circuit opinion contains alternative holdings, both holdings are binding; neither constitutes non-binding dicta.[623]

To illustrate, suppose that the Fifth Circuit issues a published opinion holding that some legal proposition—let's call it "Legal Proposition X"—defeats the appellant's appeal.  Suppose also, however, that in the next paragraph of that very same opinion, the Fifth Circuit then says: "*Even assuming* for the sake of argument that Legal Proposition X were *false*, the appellant would *still* lose, because Legal Proposition *Y* is true."  In that circumstance, the phrase "even assuming"[624] would signal that the Fifth Circuit had determined that Legal Proposition X and

---

[621] *Contra Hughes 5th Cir. Op.*, 68 F.4th at 240.

[622] *Contra id.*

[623] *See, e.g.*, *Mejia-Alvarenga v. Garland*, 95 F.4th 319, 326 n.2 (5th Cir. 2024) ("Alternative holdings are not dicta and are binding in this circuit." (citing *Texas v. United States*, 809 F.3d 134, 178 n.158 (5th Cir. 2015), *aff'd by an equally divided Court*, 579 U.S. 547 (2016))).

[624] Of course, the phrase "even assuming" isn't the *only* way the Fifth Circuit might signify that a legal proposition is a binding alternative holding.  *See, e.g.*, *United States v. Wallace*, 964 F.3d 386, 389–90 (5th Cir. 2020) (identifying examples of the Fifth Circuit "signaling an alternative holding" with phrases like "even were" and "even if," as well as several examples of the Fifth Circuit stating outright that a portion of an opinion was an "alternative holding" and "not dicta").

Nor does textual material following a phrase like "even assuming" *always* constitutes a binding alternative holding.  *See, e.g.*, *Moreland v. Fed. Bureau of Prisons*, 431 F.3d 180, 185 (5th Cir. 2005) (analysis of nonjurisdictional issue following the phrase "[e]ven if we were to assume arguendo that we have subject-matter jurisdiction" "was dicta" and "not an alternative holding because it could not support

Legal Proposition Y were *both* true, and that *either* proposition *by itself* would have sufficed to defeat the appellant's claim.[625]  Both propositions would therefore be alternative holdings, and both would thus have binding precedential effect for Rule of Orderliness purposes.[626]

As we explicitly determined the last time this issue was before us,[627] that's exactly how *Jefferson Community* proceeds.[628]  To refute the Parish's argument that the councilmembers' "reasons for passing the [challenged] resolutions were privileged," the Fifth Circuit first decided that "the legislative privilege for state [and local] lawmakers is . . . one which is qualified," "very limited," and "strictly construed."[629]  Only *after* rejecting the Parish's contention that its "reasons for passing the [challenged] resolutions were privileged" did the court then conclude that, "*even assuming*" counterfactually "that the councilmembers' reasons for passing the resolutions *[we]re*

_____

the actual judgment in that case, which was dismissal for lack of subject-matter jurisdiction rather than an affirmance of the district court's judgment").

[625] *Compare United States v. Rose*, 587 F.3d 695, 705, 706 n.9 (5th Cir. 2009), *abrogated in non-relevant part by Rehaif v. United States*, 139 S. Ct. 2191 (2019) ("Rose claims that . . . 18 U.S.C. § 924(a)(2)[] requires proof that he knowingly violated 18 U.S.C. § 922(g) . . . . While it may be true that § 924(a)(2) applies a *mens rea* requirement, Rose was not sentenced under that provision.  Rather, he was sentenced under § 924(e)(1), which contains no such requirement. . . . *Even assuming arguendo* that the 'knowingly' requirement in § 924(a)(2) applied [to § 924(e)(1)], there would be no corresponding impact on the elements of a crime listed in § 922(g)(1)." (cleaned up) (emphasis added)), *with United States v. Potts*, 644 F.3d 233, 237 (5th Cir. 2011) ("[In *Rose*], the defendant raised the same argument as Potts does here, but we rejected it because the defendant had not been sentenced under § 924(e)(1), which does not contain a 'knowingly' requirement.  *We went on, however, to state that even assuming arguendo* that the 'knowingly' requirement in § 924(a)(2) applied [to § 924(e)(1)], there would be no corresponding impact on the elements of a crime listed in § 922(g)(1).  *That statement in Rose was not mere dictum; rather, it was an alternate holding that carries the force of precedent.*" (cleaned up) (emphases added)).

[626] *See, e.g.*, *Potts*, 644 F.3d at 237.

[627] *See LULAC Doc. Subpoena Op.*, 2022 WL 2921793, at *3 (rejecting the Legislators' argument "that the discussion of state legislative privilege in *Jefferson Community*" was "mere dicta" because "alternative holdings are not dicta and are binding in this circuit" (cleaned up) (quoting *Jaco*, 24 F.4th at 406 n.5)); *see also supra* Section II.C.2.e.iii.

[628] *See Jefferson Cmty.*, 849 F.3d at 624.

[629] *See id.* (quoting *Perez*, 2014 WL 106927, at *1–2); *see also supra* Section II.C.2.d.

privileged," the state legislative privilege still could not "bar the adjudication of [the plaintiff's] claim."[630]  Thus, the portion of *Jefferson Community* that precedes the phrase "even assuming" is just as much a binding alternate holding as the portion that comes after.[631]

After all, if the *Jefferson Community* panel believed—as *Hughes* would later hold—that state legislators can't "be compelled to produce documents concerning the legislative process and a legislator's subjective thoughts and motives,"[632] then the panel would have had no reason to merely "*assum[e]* that the councilmembers' reasons for passing the resolutions [we]re privileged in the sense that they [could not] be directly compelled to disclose them."[633]  (After all, there's no reason to "assume" something that one knows to be true.)  The *Jefferson Community* panel could then have instead just said that the state legislative privilege "cannot bar the adjudication of a claim" and been done with it—without saying a word about the privilege being "qualified," "very limited," or "strictly construed."[634]

Thus, the reading of *Jefferson Community* that gives full effect to every portion of the opinion is that the Fifth Circuit held *both*

(1)     "that the councilmembers' reasons for passing the resolutions" were *not* "privileged" as the Parish asserted, *<u>and</u>*

(2)     that the Parish would have lost "*even assuming*" that they were.[635]

---

[630] *See Jefferson Cmty.*, 849 F.3d at 624 (emphases added).

[631] *See, e.g.*, *Potts*, 644 F.3d at 237.

[632] *Contra Hughes 5th Cir. Op.*, 68 F.4th at 240.

[633] *See Jefferson Cmty.*, 849 F.3d at 624 (emphasis added).

[634] *Contra id.* (quoting *Perez*, 2014 WL 106927, at *1–2).

[635] *See id.*

*Jefferson Community*'s explicit and implicit conclusions about the state legislative privilege's scope therefore aren't mere dicta as *Hughes* suggests.[636]  They're instead alternative holdings, either of which would have sufficed by themselves to defeat the Parish's legislative privilege arguments.  The *Hughes* court was therefore bound to follow both of those holdings, and so are we.[637]

### E.   *Hughes* Didn't Successfully Reconcile Itself with *Jefferson Community*

Of course, if *Hughes* <u>*successfully*</u> reconciled itself with *Jefferson Community*, we'd be bound to follow *Hughes* to the extent there remained any lingering doctrinal tension between the two opinions.[638]  But *Hughes* simply doesn't address the language in *Jefferson Community* that forecloses *Hughes*'s legal conclusions.[639]  Again, *Hughes* doesn't mention *Jefferson Community*'s holding that the state legislative privilege "must be strictly construed"—and, as a consequence, *Hughes* makes no attempt to explain how its expansive rulings "strictly construe"

---

[636] *Contra Hughes 5th Cir. Op.*, 68 F.4th at 240.

[637] *See, e.g.*, *Mejia-Alvarenga*, 95 F.4th at 326 n.2.

[638] *See Odle v. Flores*, 899 F.3d 342, 343 (5th Cir. 2017) ("[The appellee] asserts that [the Fifth Circuit's prior opinion in] *Sommers* is contrary to prior opinions of this Court and must be disregarded under the rule of orderliness.  But *Sommers* reconciled those supposedly problematic cases, and [the appellee]'s arguments amount to a request that we second-guess *Sommers*.  *That* the rule of orderliness prohibits." (citations omitted)); *see also Sommers v. Bank of Am., N.A.*, 835 F.3d 509, 513 n.5 (5th Cir. 2016) (identifying dispositive differences between the facts of *Sommers* and those of the earlier Fifth Circuit cases that the appellee later cited in *Odle*).

[639] *Cf. Thompson v. Dall. City Att'y's Off.*, 913 F.3d 464, 467–68 (5th Cir. 2019) ("It would be one thing had [the Fifth Circuit panel that decided an earlier case called *Henson*] attempted to explain (however implausibly) why [a binding Supreme Court case named *McCurry*] was inapt.  But instead of distinguishing *McCurry*, the panel disregarded it . . . . As *Henson* turns a blind eye to *McCurry*, *Henson*'s holding is irreconcilable, and thus inoperative, and has been since it was decided.").

Admittedly, this argument would be stronger if *Hughes* hadn't acknowledged *Jefferson Community at all* (as opposed to acknowledging only *parts* of it).  *See id.* at 467 ("Oddly, *Henson* never discusses *McCurry*.  More oddly, *Henson* never even acknowledges *McCurry*.").

the privilege in conformance with binding precedent.[640]  Nor does *Hughes* attempt to explain

how its holdings obey *Jefferson Community*'s command that the state legislative privilege must

be "accepted only to the very limited extent that permitting a refusal to testify or excluding

relevant evidence" serves some paramount "public good"—*Hughes* just omits that language

from its quotations.[641]  Applying *Hughes* to bar the discovery that Plaintiffs seek here would

therefore require us to disregard substantial portions of an earlier binding Fifth Circuit opinion

and thereby disobey the Rule of Orderliness.[642]

---

[640] *Compare Hughes 5th Cir. Op.*, 68 F.4th at 231–40, *with Jefferson Cmty.*, 849 F.3d at 624 (quoting *Perez*, 2014 WL 106927, at *1).  *See also supra* Section II.C.2.f.ii.

[641] *Compare Jefferson Cmty.*, 849 F.3d at 624 (quoting *Perez*, 2014 WL 106927, at *1), *with Hughes 5th Cir. Op.*, 68 F.4th at 236 ("Instead, like other privileges, the legislative privilege is 'qualified' by exceptions that serve 'the normally predominant principle of utilizing all rational means for ascertaining the truth.'" (quoting *Jefferson Cmty.*, 849 F.3d at 624)).  *See also supra* Section II.C.2.f.ii.

[642] After our panel issued its Memorandum Opinion and Order, but before this dissenting opinion was ready, the Fifth Circuit released another published opinion analyzing legislative privilege in a case called *Bettencourt.  See also La Union del Pueblo Entero v. Abbott (Bettencourt)*, 93 F.4th 310 (5th Cir. 2024).  *Bettencourt* mirrors *Hughes*'s conclusion that civil cases raising "constitutional or statutory claim[s] involving racial animus" "are not extraordinary" enough to overcome the state legislative privilege.  *Id.* at 324–25.

However, *Bettencourt* doesn't analyze how its conclusions (or *Hughes*'s conclusions) are consistent with *Jefferson Community* under the Rule of Orderliness.  *See id.* at 313–25 & nn.1–24.  Indeed, *Bettencourt* doesn't mention *Jefferson Community* at all.  *See id.*

Thus, just as our panel must follow *Jefferson Community* to the extent it's inconsistent with *Hughes*, we must likewise follow *Jefferson Community* to the extent it's inconsistent with *Bettencourt*.  *See, e.g.*, *Arnold*, 213 F.3d at 196 n.4 ("[T]o the extent that a more recent case contradicts an older case, the newer language has no effect.").

IV.     **The Proper Approach Under the Rule of Orderliness**

We should therefore discharge our mandate to reexamine our prior order overruling the Texas Legislators' privilege objections to the United States's documentary discovery demands as follows.[643]  The Rule of Orderliness requires us to adhere to *Jefferson Community*'s qualified approach to the state legislative privilege, rather than *Hughes*'s absolutist approach.[644]  We must therefore obey *Jefferson Community*'s command to "strictly construe[]" the state legislative privilege and "accept[] [it] only to the very limited extent that permitting a refusal to testify or excluding relevant evidence" in this case would have "a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth."[645]

We must likewise follow *Jefferson Community*'s implicit conclusion that the state legislative privilege doesn't categorically bar discovery regarding the Texas Legislature's "reasons for passing" the challenged redistricting plans[646]—as opposed to *Hughes*'s contrary holding that state legislators cannot "be compelled to produce documents concerning the legislative process and a legislator's subjective thoughts and motives" even when a plaintiff raises "allegations involving racial animus."[647]

---

[643] *See LULAC Remand Order*, 2023 WL 4697109, at *1 (vacating our document subpoena order "in light of . . . *Hughes*" and remanding for further proceedings).

[644] *See supra* Section III.

[645] *See Jefferson Cmty.*, 849 F.3d at 624 (emphasis added) (quoting *Perez*, 2014 WL 106927, at *1).

[646] *See id.*; *see also supra* Section III.C.

[647] *Contra Hughes 5th Cir. Op.*, 68 F.4th at 238, 240.

We should also follow *Jefferson Community*'s signal that *Perez* supplies the correct legal standard for adjudicating state legislative privilege claims in redistricting cases.[648]  Thus, just like we did when this issue was last before us,[649] we should use *Rodriguez* and *Perez*'s five-factor balancing framework to weigh "the interests of the party seeking the evidence against the interests of the individual claiming the privilege."[650]  As we previously determined, the balance of those factors favors disclosure here, so we should order the Legislators to produce the same documents we previously commanded them to produce.[651]

At the absolute minimum, irrespective of whether we let the *private* Plaintiffs in this case obtain their requested discovery,[652] we should at least let the *federal government*, as a sovereign entity charged with the responsibility to enforce federal laws, obtain documents bearing on whether the State of Texas violated those laws.[653]

---

[648] *See Jefferson Cmty.*, 849 F.3d at 624 (citing *Perez*, 2014 WL 106927, at *1–2); *see also supra* note 425 and accompanying text.

[649] *See supra* Section II.C.2.e.iii.

[650] *See Perez*, 2014 WL 106927, at *2; *see also supra* Section II.C.2.b.iii (analyzing *Perez*); Section III.C.2.b.i (analyzing *Rodriguez*).

*Cf. MC Trilogy Tex., LLC v. City of Heath*, No. 3:22-CV-2154, 2024 WL 346512, at *4 (N.D. Tex. Jan. 29, 2024) (continuing to employ *Rodriguez*'s five-factor balancing framework notwithstanding *Hughes* (albeit without explicitly performing a Rule of Orderliness analysis)).

[651] *See LULAC Doc. Subpoena Op.*, 2022 WL 2921793, at *13–14; *see also supra* Section II.C.2.b.ii.

[652] *See Majority Op.*, 2023 WL 8880313, at *6 ("[T]he legislative privilege does not yield for the private plaintiffs in this case.").

[653] *Cf., e.g.*, *Alviti*, 14 F.4th at 88 (concluding that private party's civil suit didn't implicate federal interests sufficiently "important" to overcome the state legislative privilege in part because the federal government wasn't a party to the case).

*But see Page*, 15 F. Supp. 3d at 667 (concluding that "the nature of the claims in" a redistricting case "weigh[ed] strongly in favor of document disclosure," even though the suit was "not brought on behalf of the United States" (quoting *Rodriguez*, 280 F. Supp. 2d at 102)).

- 134 -

Because the majority's Memorandum Opinion and Order doesn't proceed in that fashion,[654] I respectfully **DISSENT**.

## V.        A Call for Clarity

Cases like this one raise serious concerns that the absolutist conception of the state legislative privilege that more and more federal Circuits are adopting may effectively enable state legislatures to conceal evidence of discriminatory intent behind an impenetrable wall,[655] and thereby prevent litigants from vindicating the statutory and constitutional rights that form the backbone of our democracy.[656]

But this case also raises more technical concerns about doctrinal consistency and predictability. As the foregoing discussion illustrates, the state legislative privilege caselaw is in a state of disarray.[657] On one end of the continuum are courts flatly declaring that the privilege is completely "insurmountable in private civil [rights] actions."[658] On the opposite end are courts suggesting that the privilege doesn't protect internal legislative documents at all.[659] Between

---

[654] *See generally Majority Op.*, 2023 WL 8880313.

[655] That's not to imply that any members of this panel think anything either way about whether the documents that the Legislators are withholding in this case contain evidence of intentional racial discrimination. It's merely to say that Plaintiffs should have a chance to look at those documents and determine that for themselves.

[656] *See supra* Section I.

[657] *See, e.g., Cave*, 2021 WL 4936185, at *4 (observing that "courts that have addressed the [state legislative] privilege" have "not agree[d] on its scope").

[658] *See Pernell*, 84 F.4th at 1344.

[659] *See Miles-Un-Ltd.*, 917 F. Supp. at 100 ("Although the doctrine of legislative immunity [sic] does apply in the personal testimony realm, the immunity does not extend to certain types of documentation requests. Accordingly, a defendant will be required to produce, at the request of a plaintiff, any documents that were prepared by a committee during the course of its deliberations." (first citing *Corporacion Insular de Seguros v. Garcia*, 709 F. Supp. 288, 297 (D.P.R. 1989); then citing *Marylanders*, 144 F.R.D. at 302 n.20 (opinion of Smalkin, J.))).

- 135 -

those two poles, courts have reached a wide range of results.[660]  And even different panels of the *same Circuit* have reached contradictory conclusions about the state legislative privilege's coverage, as *Jefferson Community* and *Hughes* demonstrate.[661]

Lower courts considering state legislative privilege issues would therefore benefit greatly from settled Supreme Court or Fifth Circuit precedent answering questions like:

(1)      What characteristics make a civil case sufficiently "extraordinary" to justify calling state legislators "to the stand at trial to testify concerning the purpose of [an] official action?"[662]

---

[660] *Compare, e.g.*, *Benisek*, 241 F. Supp. 3d at 576 (redistricting case letting plaintiffs "depose [state legislators] and obtain direct evidence of motive and intent" (emphasis omitted)), *with, e.g.*, *Comm. for a Fair & Balanced Map*, 2011 WL 4837508, at *10 (forbidding plaintiffs from obtaining "information concerning the motives[] [and] objectives" underlying a redistricting plan, but letting plaintiffs obtain "facts or information available to lawmakers at the time of their decision"), *with, e.g.*, *Majority Op.*, 2023 WL 8880313, at *3 ("The [state] legislative privilege protects the possession, preparation, or review of factual information when disclosure would invariably reveal the legislator's deliberations." (cleaned up) (quoting *1997 Sealed Case*, 121 F.3d at 737)).

[661] *See supra* Sections II.C.2.d and II.C.2.f.ii.

[662] *See Arlington Heights S. Ct. Op.*, 429 U.S. at 268; *see also Gillock*, 445 U.S. at 373 (holding that the state legislative privilege "yields" "where important federal interests are at stake").

*See also Trombetta v. Bd. of Educ., Proviso Twp. High Sch. Dist. 209*, No. 02 C 5895, 2004 WL 868265, at *5 (N.D. Ill. Apr. 22, 2004) ("*Arlington Heights* . . . says only that in some extraordinary instances the members of a legislative body might be called to the stand at trial to testify concerning the purpose of the official action . . . [I]t does not describe the circumstances in which such testimony is or is not appropriate . . . ." (cleaned up) (quoting *Arlington Heights S. Ct. Op.*, 429 U.S. at 268)); *Majority Op.*, 2023 WL 8880313, at *7 (opining that although "[c]aselaw provides examples of what an extraordinary civil case is *not*," "we know much less about what *[does]* count[] as an extraordinary civil case" (emphasis added)).

*Compare, e.g.*, *Bethune-Hill*, 114 F. Supp. 3d at 337 (reasoning that cases in which a plaintiff attacks a redistricting plan as racially discriminatory are "extraordinary" under *Arlington Heights*), *with, e.g.*, *Bettencourt*, 93 F.4th at 325 (concluding that voting rights case in which plaintiffs accused the Texas Legislature of enacting a law "with an intent to discriminate against racial minorities" was not "extraordinary" because it did not "implicate any important federal interest *beyond* constitutional or statutory claims of racial animus").

(2)   How should lower courts reconcile *Tenney*'s pronouncement that it's "not consonant with our scheme of government for a court to inquire into the motives of legislators"[663] with Supreme Court precedent holding that courts *must* inquire into the motives of legislators in intentional discrimination cases?[664]

(3)   Do concerns about interference with state legislators apply with equal force when a litigant isn't trying to *sue* a state legislator, but is instead merely seeking to *depose* a *nonparty* legislator (or is demanding that a nonparty legislator *produce nonpublic documents and communications*)?[665]

(4)   Given that the U.S. Constitution's Speech or Debate Clause only protects *federal* legislators,[666] and given that the policy rationales that justify a broad *federal* legislative privilege don't apply equally to *state* legislators,[667] to what extent does the *state* legislative privilege overlap with its *federal* counterpart?[668]

---

[663] *See Tenney*, 341 U.S. at 377; *see also supra* Section II.C.1.

[664] *See, e.g.*, *Hunt*, 526 U.S. at 547 (1999) ("[A]ppellees . . . were required to prove that [the challenged district] was drawn with an impermissible racial motive . . . .").

*See also Pernell*, 84 F.4th at 1353 (Jill Pryor, J., dissenting) ("Although as a general matter it is 'not consonant with our scheme of government for a court to inquire into the motives of legislators,' such an inquiry is exactly what a disparate impact claim requires." (quoting *Tenney*, 341 U.S. at 377)).

[665] *Compare, e.g.*, *Gillock*, 445 U.S. at 371–73 (suggesting that whereas courts must be especially "sensitiv[e] to" the risk of "interference with the functioning of state legislators" when "a private plaintiff" *sues* a state legislator "to vindicate private rights," the mere "denial of a *privilege* to a state legislator may have" only a "minimal impact on the exercise of his legislative function" (emphasis added)), *and Loesel*, 2010 WL 456931, at *6 ("Undoubtedly, interference with the legislative process is greater when a state legislator is called upon to defend him or herself against a lawsuit, than when he or she is merely called upon to testify in a civil case."), *with, e.g.*, *Hubbard*, 803 F.3d at 1310 (holding that "the privilege extends to discovery requests[] even when the lawmaker is not a named party to the suit" because "complying with such requests detracts from the performance of official duties").

[666] *See supra* notes 102–103 and accompanying text.

[667] *See, e.g.*, *Gillock*, 445 U.S. at 369–70 (explaining that the separation of powers rationale that "underlie[s] the Speech or Debate Clause" "gives no support to the grant of a privilege to state legislators"); *see also supra* Section II.C.2.a.iii.

[668] *Compare, e.g.*, *Hubbard*, 803 F.3d at 1310 & n.11 (concluding that it's proper to rely on federal legislative privilege cases for propositions about the state legislative privilege because "state lawmakers possess a legislative privilege that is 'similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause'" (quoting *Supreme Court of Virginia*, 446 U.S. at 732)), *with, e.g.*, *Bryant*, 2017 WL 6520967, at *9 n.10 ("*Hubbard* does not recognize a distinction

Until a higher tribunal answers those questions, however, judges in this Circuit will just have to do their best to address those issues themselves.

   **SIGNED this 30th day of April 2024.**

_____

**DAVID C. GUADERRAMA**
**SENIOR U.S. DISTRICT JUDGE**

---

between the concepts of legislative privilege, legislative immunity, and the Speech and [sic] Debate Clause as applied to state legislators.").