# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § | |
| *Plaintiffs,* | § | |
| v. | § | Case No. 3:21-cv-00259 |
| | § | [Lead Case] |
| | § | |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § | |

———————

| | | |
|---|---|---|
| FAIR MAPS TEXAS ACTION COMMITTEE, *et al.*, | § § § | |
| *Plaintiffs,* | § | |
| v. | § | Case No. 1:21-cv-01038 |
| | § | [Consolidated Case] |
| | § | |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § | |

## MOTION TO DISMISS
## THE FAIR MAPS PLAINTIFFS' SUPPLEMENTAL COMPLAINT

# Table of Contents

Introduction ................................................................................................................. 1

Argument .................................................................................................................... 2

    I.    Plaintiffs' Allegations do not Overcome the Presumption of Good Faith as to the Legislature's Most Recent Enactment ......................................................................... 2

        A.    The burden of proving discriminatory intent lies with Plaintiffs, and allegations of historical discrimination do not suffice ....................................................................... 2

        B.    Plaintiffs' supplemental complaint fails to allege discriminatory intent on the part of the 88th Legislature ................................................................................................ 3

    II.    The Voting Rights Act Protects the Ability of a Minority, not a Coalition of Minorities, to Elect its Preferred Candidate .................................................................................. 7

        A.    *Campos* was flawed statutory interpretation ............................................................ 9

            1.    The plain text of Section 2(b) cannot support coalition claims ................................. 9

            2.    Coalition claims are incompatible with historic and statutory context .................... 10

            3.    Congressional silence does not alter the analysis .................................................. 12

        B.    This case demonstrates why *Campos* was wrongly decided ....................................... 13

            1.    Coalition claims dilute minority votes ................................................................. 13

            2.    Both experience and the facts alleged here demonstrate how coalition districts emphasize race-based distinctions among voter. ............................................................. 14

            3.    Coalition claims create needless, resource intensive litigation ............................... 17

        C.    The view of Section 2 that *Campos* endorsed raises serious constitutional questions. ... 18

Conclusion ................................................................................................................ 21

Certificate of Conference ...................................................................................... 22

## Introduction

The Supreme Court has left "no doubt" about who carries the burden of proof—and, by extension, the burden of pleading—on Plaintiffs' intentional discrimination claims. *Abbott v. Perez*, 585 U.S. 579, 605 (2018). Texas's 88th Legislature enjoys a strong presumption of good faith, meaning that Plaintiffs must plausibly allege and affirmatively demonstrate invidious intent. Defendants are under no obligation to somehow prove its absence. *Id.* at 603. And because "past discrimination cannot, in the manner of original sin, condemn government action that is not itself unlawful," *id.* (quoting *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 74 (1980) (alteration omitted)), Plaintiffs cannot rely on allegations about a predecessor assembly to meet their burden, *id.* at 605. Yet that is precisely what Plaintiffs have attempted in their recently filed supplemental complaint. *See* ECF 777.

Although discriminatory intent is not an element of Plaintiffs' vote dilution claims, they should also be dismissed either as presenting nonjusticiable political questions or because Plaintiffs have not alleged facts that would, if proven, establish that the districts drawn by the 88th Legislature render the voting process "not equally open to participation by members of *a class* of [protected] citizens." 52 U.S.C. § 10301(b) (emphasis added). They have instead alleged only that current maps prevent a *coalition* of protected groups from banding together "to elect representatives of their choice." *Id.* Such claims are effectively nonjusticiable partisan gerrymandering claims dressed up as racial gerrymandering claims. As Judge Higginbotham explained over thirty years ago, the Fifth Circuit's decision in *Campos v. City of Baytown*, 840 F.2d 1240 (5th Cir. 1988), which allowed such claims, was a "disturbing reading of a uniquely important statute" supported by "no authority" and "no reasoning." 849 F.2d 943, 944–45 (5th Cir. 1988) (per curiam) (Higginbotham, J., dissenting from denial of rehearing).

The en banc Fifth Circuit recently heard argument on whether to revisit so-called coalition claims. *See Petteway v. Galveston Cnty.,* 86 F.4th 1146 (5th Cir. 2023) (per curiam). Regardless of how *Petteway* is decided, adjudication of Plaintiffs' claims would raise grave constitutional concerns. But should the en banc court abandon the erroneous *Campos* decision, Plaintiffs' Section

2 claims cannot prevail even as a statutory matter. Plaintiffs are demanding that the Texas legislature adopt—or, rather, that this Court impose—electoral districts that give an upper hand to political cohorts with no shared history of discrimination. The Constitution does not permit the courts to engage in such an exercise. And Section 2 was never meant to guarantee minorities "the maximum possible point of power" in elections. *Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994). It addresses a "special wrong"—"when a minority group has 50 percent or more of the voting population and could constitute a compact voting majority but, despite racially polarized bloc voting, that group is not put into a district." *Bartlett v. Strickland*, 556 U.S. 1, 19 (2009). That "special wrong" is simply not implicated by Plaintiffs' allegations.

## ARGUMENT

## I.   Plaintiffs' Allegations do not Overcome the Presumption of Good Faith as to the Legislature's Most Recent Enactment.

### A.   The burden of proving discriminatory intent lies with Plaintiffs, and allegations of historical discrimination do not suffice.

"Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger, not the State." *Perez*, 585 U.S. at 603. As the Supreme Court reiterated just last week, this rule carries special force in the redistricting context—not only because the "Constitution entrusts state legislatures with the primary responsibility for drawing congressional districts," *Alexander v. S.C. Conf. of NAACP*, No. 22-807, slip op. at 1 (May 23, 2024), but also because it is difficult, if not impossible, to disentangle race from "the complex interplay of forces that enter a legislature's redistricting calculus." *Id.* at 2 (quoting *Miller*, 515 U.S. at 915); *cf. id.* at 4 (Thomas, J., concurring in part) (opining that racial gerrymandering claims are nonjusticiable because they "ask courts to reverse-engineer the [legislature's] purpose").

Above all, "the 'good faith of the state legislature must be presumed.'" *Perez*, 585 U.S. at 603 (quoting *Miller*, 515 U.S. at 915 (alteration omitted)). And courts must "draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, *supra*, slip op. at 5. Plaintiffs may not meet their burden by

2

stacking inference upon inference or alleging conduct consistent with both discrimination and lawful behavior. Nor is it adequate to allege that a state legislature considered race—as currently interpreted, federal law requires that race be taken into account. *Id.* at 3. *Cf. Miller*, 515 U.S. at 916 (explaining that though state legislatures are "almost always . . . aware of racial demographics . . . it does not follow that race predominates in the redistricting process"). The plaintiff must "find evidence sufficient to show that race was the overriding factor causing neutral considerations to be cast aside." *Id.* at 3 (quoting *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 190 (2017)).

To meet their burden, Plaintiffs may look to the "'historical background' of a legislative enactment" as "'one evidentiary source' relevant to the question of intent." *Perez*, 585 U.S. at 603–04 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)). But historical discrimination alone does not suffice. *Id.* at 604. What matters is the intent of the enacting legislature, and allegations about a previous legislature's supposed mal-intent cannot be imputed onto a successive lawmaking body in the absence of some direct evidence that the enacting legislature was infected by the former legislature's discriminatory animus.

### B.   Plaintiffs' supplemental complaint fails to allege discriminatory intent on the part of the 88th Legislature.

The State Defendants deny that the allegations in Plaintiffs' second amended complaint were ever sufficient to state a claim that the 87th Legislature acted with the intent to discriminate. *See* ECF 502 at 66. But that question was mooted by the 88th Legislature's recent ratification of the resulting districts, *see* ECF 777 at 3, and *Perez* leaves "no doubt" that Plaintiffs' allegations about the 87th Legislature's intent are insufficient to satisfy Plaintiffs' burden to adequately allege discriminatory intent on the part of the 88th Legislature, 585 U.S. at 605.

As Plaintiffs' recently filed supplemental complaint acknowledges, the 88th Legislature reconsidered, ratified, and approved for ongoing use the 87th Legislature's plans in an effort to dispel concerns about the plans' compliance with Article 3, Section 28 of the Texas Constitution, which requires the Texas Legislature to apportion state legislative districts in the "first *regular*

session" after publication of the results of the federal census. ECF 777 at 3 (quoting Tex. Const. art. 3, § 28 (emphasis added)). The 87th Legislature enacted House Plan 2316 and Senate Plan 2168 in a third *special* session called by Governor Abbot following the U.S. Secretary of Commerce's belated release of Texas redistricting data. *Id.* The legislative proceedings that followed were necessarily truncated in an effort to meet the impending election cycle, and the expedited nature of those proceedings formed the basis of most of Plaintiffs' allegations regarding the 87th Legislature's motives. *See generally* ECF 502 at 22–28.

Even if expedited proceedings could establish discriminatory intent on the part of the 87th Legislature (they can't), the 87th Legislature's subjective motivations cannot be imputed to the 88th Legislature. Plaintiffs spuriously assert that the 88th Legislature "adopted in full" the 87th Legislature's "history and rational for House Plan 2316 and Senate Plan 2168." Dkt. 777 at 7. But their only basis for that assertion is the 88th Legislature's decision to include portions of the record from the 87th Legislature's deliberations into the House and Senate Journals of the 88th Legislature. *Id.* at 4, 5 & n.3. That just acknowledges the obvious: the 88th Legislature was aware of the 87th Legislature's proceedings and took those proceedings into account when deciding whether to ratify their plans.

That the Senate (but not the House) unanimously voted to include a statement to this effect alongside its version of the journal addendum, *see id.* at 4, is apropos of nothing. The statement reads: "The remarks from the previous senate are germane to the consideration of S.B. 375 and provide a more thorough explanation of the rationale for adopting the districts contained in the original redistricting plan." S.J. of Tex., 88th Leg., R.S. at A-2 (2023), *available at* https://tinyurl.com/yc4bwxkf. Plaintiffs have not pointed to any "remarks from the previous senate" showing discriminatory intent. Regardless, to label something "germane" is far from an endorsement. Otherwise, the statement would not have been unanimously adopted. Leaving aside that the senate maps were far from unanimously adopted, no lawmaker would be so imprudent as to adopt each and every "remark[] from the previous senate." *Cf. Biden v. Nebraska*, 143 S. Ct. 2355, 2379 (2023) (Barrett, J., concurring) (explaining that "[c]ontext . . . includes common

sense"). The Court should not indulge Plaintiffs' gambit to transform an obscure journal comment—passed with unanimity emblematic of pro forma legislative housekeeping—into the *éminence grise* of an entire legislative body.

Plaintiffs' only other allegations as to the 88th Legislature's intent are that it declined to cure the 87th Legislature's maps of what Plaintiffs have alleged *but not proven* to be racial gerrymandering. *See* ECF 777 at 4–7. These allegations ignore that the 87th Legislature risked a *state* constitutional violation by redistricting during a special session precisely to avoid "violat[ing] the U.S. Constitution and thus open[ing] the State to malapportionment challenges under federal law." *Abbott v. Mexican Am. Legislative Caucus, Tex. House of Representatives*, 647 S.W.3d 681, 701 (Tex. 2022). The 88th Legislature's purpose in ratifying the 87th Legislature's districting decisions was to comply with the state constitution's requirement that redistricting must occur during the "first *regular* session" after the decennial census, *id.* at 702–03—not to mention an undertaking the Attorney General made to the Texas Supreme Court, *id.* at 707 (Hecht, C.J., dissenting) ("The State assures us that the 88th Legislature will discharge that obligation in its regular session in early 2023, well before the 2024 election cycle."). That the 88th Legislature was aware of this lawsuit is undeniable. That it chose not to respond, however, does nothing to prove the otherwise unproven (and entirely unfounded) racial bias alleged in the lawsuit. *Cf. Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (holding that the required intent is not mere "volition" or "awareness of consequences"). That is particularly true given that, by definition, everyone voting on the bill was an incumbent based on the existing map. And "incumbency protection" is understood to be one of several "traditional race-neutral districting principals." *Black Caucus v. Alabama*, 575 U.S. 254, 271 (2015).

To be sure, this fact distinguishes the present case from *Perez*, which expressly noted that it was not "a case in which a law originally enacted with discriminatory intent is later reenacted by a different legislature." 585 U.S. at 604. But at least here, where we know why readoption occurred, that is a distinction without a difference. As with the 2014 Legislature's intent in *Perez*, we need not speculate about the "overriding factor" motivating the 88th Legislature. *Alexander*,

*supra*, slip op. at 5 (quoting *Bethune-Hill*, 580 U.S. at 190). In *Perez*, the 2013 legislature "wanted to bring the litigation about the State's districting plans to an end as expeditiously as possible." 585 U.S. at 608. Here, the 88th Legislature wanted to get out in front of any potential state-law challenge if it were to fail to comply with Article 3, Section 28 of the Texas Constitution. Race was thus not the "predominant factor motivating the legislature's decision." *Alexander*, *supra*, slip op. at 2 (quoting *Miller*, 515 U.S. at 916).

Finally, any assertion that it was incumbent on the 88th Legislature to "cure" putative discriminatory animus on the part of the 87th Legislature was expressly rejected by *Perez*. *Id*. at 605. The 88th legislature was under no "obligation of proving that [it] had experienced a true 'change of heart' and had 'engage[d] in a deliberative process to ensure that the" plans it ratified had been cured of invidious intent. *Id*. To hold otherwise would have been to reverse the burden of proof based on the alleged animus of a predecessor legislative body rather than direct and circumstantial evidence of the enacting Legislature's intent. *Id*. at 607.

\*     \*     \*

Plaintiffs are attempting to accomplish what *Perez* squarely foreclosed. The Court should reject the ploy. We know why the 88th Legislature ratified the 87th Legislature's plans—their motive was state constitutional fidelity, not entrenched animus that is barred by *both* the state and federal constitutions. And it would be "fundamental legal error" to require an enacting legislature to demonstrate that it had "'cured' the unlawful intent" of a previous lawmaking body. *Id*. at 584. Absent proof of intentional discrimination, Plaintiffs are left with their Section 2 claim, which "turns on the presence of discriminatory effects, not discriminatory intent." *Allen v. Milligan*, 599 U.S. 1, 25 (2023). But Plaintiffs' Section 2 claim fails for the distinct reason that it relies on an atextual, unworkable, and likely unconstitutional reading of the VRA.

## II.   The Voting Rights Act Protects the Ability of a Minority, not a Coalition of Minorities, to Elect its Preferred Candidate.[1]

"[I]n an unbroken line of decisions stretching four decades," *Id.* at 38, the Supreme Court has examined compliance with Section 2 of the Voting Rights Act under the multi-factor test first announced in *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). But it has consistently stopped short of allowing people of different races, ethnicities, or languages to insist that their collective vote is being diluted. *Bartlett*, 556 U.S. at 19; *Growe v. Emison*, 507 U.S. 25, 40–41 (1993). Acting in the immediate aftermath of *Gingles*, the Fifth Circuit has not been so cautious. *See Campos*, 840 F.2d at 1241. "[C]it[ing] no authority and offer[ing] no reasoning to support its fiat," the *Campos* decision held that "'nothing in the law . . . prevents . . . plaintiffs from identifying [a] protected aggrieved minority to include both Blacks and Hispanics.'" 849 F.2d at 944–45 (Higginbotham, J., dissenting from denial of rehearing) (quoting panel opinion).

As Judge Higginbotham explained over thirty years ago, *Campos* reached the wrong result because it "ask[ed] the wrong question." *Id.* at 945. "A statutory claim cannot find its support in the absence of prohibitions," so the operative question was not (as *Campos* posited) whether Section 2 "intended to *prohibit* such coalitions," but whether Congress acted to "*protect* those coalitions." *Id.* The plain text of Section 2, history, precedent, and the canon of constitutional avoidance provide one resounding answer: No. The text of the Voting Rights Act, as interpreted

---

[1] Defendants recognize that a "three-judge court is bound by apposite decisions of the Court of appeals for its circuit." *Russell v. Hathaway*, 423 F. Supp. 833, 835 (N.D. Tex. 1976) (three-judge panel). *But see* Joshua A. Douglas & Michael Solimine, *Precedent, Three-Judge District Courts, and the Law of Democracy*, 107 Geo. L.J. 413, 452 (2018) (arguing that three-judge courts are not bound by circuit precedent). For that reason, Defendants also recognize that, at present, this panel is bound by the Fifth Circuit's conclusion that Section 2 provides a private right of action, *Vote.org v. Callanen*, 89 F.4th 459, 475 (5th Cir. 2023), and that coalition claims are cognizable in such an action, *Campos*, F.2d at 1241. Defendants include their arguments regarding coalition districts here because oral argument was held in *Petteway v. Galveston Cnty.*, 86 F.4th 1146 (5th Cir. 2023), on May 15, and an opinion may issue while this motion is pending. Defendants expressly reserve the right, however, to argue that both *Campos* and *Vote.org* were wrong and should be revisited in an appropriate forum.

by *Gingles*, aims to protect the collective voting power of a cohesive class of voters with a shared history of discrimination. Yet under *Campos*, a plaintiff minority group need not belong to any class as that term would ordinarily be understood by members of a legislative body. And as for cohesion, all that is required is that plaintiffs can define a coalition of minorities whose political interests might—however briefly—align to elect a candidate of their mutual choice. 840 F.2d at 1244–45. Rather than reducing discrimination because of race or language, this interpretation of Section 2 permits coalitions that encourage the very same race-based decision-making that Section 2 was enacted to eradicate. It also effectively asks this Court to engage in partisan gerrymandering by another name—a process that was thought permissible when *Campos* was decided but has now *twice* been declared to present a nonjusticiable political question. *Alexander*, *supra*, slip op. at 16; *Rucho v. Common Cause*, 588 U.S. 684, 718 (2019).

That has been the effect of coalition claims in Texas. Texas redistricting litigation is notoriously complicated as plaintiffs embroil courts like this one in deciding whether, when, which, and to what extent minorities should be grouped or split, all to protect partisan interests, not combat racial animus. Litigation regarding the 2010 redistricting cycle did not finally end until September 2019[2]—just in time for the next redistricting cycle to begin. Once again, in this litigation the State is facing claims that various districts should be redrawn to facilitate "districts where coalitions of minority voters could together elect candidates of their choice." ECF 502 at 65. Neither state actors nor federal courts have any business making such blatantly race-based decisions to serve such facially partisan goals. After all, "[e]liminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* (*SFFA*), 600 U.S. 181, 206 (2023).

---

[2] Redistricting History: 2010, Texas Redistricting, https://redistricting.capitol.texas.gov/ history.

A.    *Campos* was flawed statutory interpretation.

1.        The plain text of Section 2(b) cannot support coalition claims.

The Supreme Court has repeatedly reaffirmed that "[t]he preeminent canon of statutory interpretation requires us to 'presume that the legislature says in a statute what it means and means in a statute what it says.'" *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (alteration omitted)). This imperative is magnified when "federal law overrides the usual constitutional balance of federal and state powers," *Bond v. United States*, 572 U.S. 844, 858 (2014) (quotation marks omitted), or abuts the limits of Congress's constitutional authority, *e.g.*, *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 546 (1992) (Scalia, J., concurring in part).

Although Section 2 indisputably places limits on the States' traditional power to set electoral lines, nothing in its text makes it "unmistakably clear" that Congress intended to compel the creation of coalition districts. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)). Section 2 has been amended on numerous occasions over the last 50 years, but its mandate remains the same: to "prohibit[] any practice or procedure that, 'interact[ing] with social and historical conditions,' impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters." *Voinovich v. Quilter*, 507 U.S. 146, 153 (1993) (first alteration added) (quoting *Gingles*, 478 U.S. at 47). A "violation" of this mandate "is established if, based on the totality of circumstances," a voting process is "not equally open to participation by members of a class of citizens protected by subsection (a) in that *its members* have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b) (emphasis added).

By homing in on the ability of the members of *a* protected class—rather than a coalition of protected class*es*—to elect a preferred candidate, Congress limited the circumstances in which a violation can be deemed established to those in which a particular protected group is denied the opportunity to form a majority. The failure to create a district in which two or more classes could

9

band together to elect their preferred candidate does not suffice. "[T]he central element necessary to establish a violation is a showing that '*its* members have less opportunity than other members of the electorate' . . . not that '*their* members have less opportunity.'" *Nixon v. Kent County*, 76 F.3d 1381, 1386 (6th Cir. 1996) (en banc) (quoting 52 U.S.C. § 10301(b)). As Judge Jones observed, Congress could have "chosen explicitly to protect minority coalitions . . . by defining the 'results' test [of subsection (b)] in terms of protected *classes* of citizens." *LULAC v. Clements*, 999 F.2d 831, 894 (5th Cir. 1993) (en banc) (Jones, J., concurring). But "[i]t did not." *Id.*

This conclusion is reinforced by Congress's declaration that "[t]he extent to which members of *a protected class* have been elected" is "one circumstance which may be considered." 52 U.S.C. § 10301(b) (emphasis added). "[I]f Congress had intended to authorize coalition suits, the phrase would more naturally read: '[t]he extent to which members of the *protected classes* have been elected.'" *Nixon*, 76 F.3d at 1387.

In reaching the opposite conclusion, *Campos* noted that "[t]here is nothing in the law that prevents the plaintiffs from identifying the protected aggrieved minority to include both blacks and Hispanics," 840 F.2d at 1244, and that "[t]he key is the minority group as a whole," *id*. at 1245. But, as Judge Higginbotham aptly put it, a statutory claim for affirmative relief "cannot find its support in the *absence* of prohibitions," *Campos*, 849 F.2d at 945 (Higginbotham, J., dissenting from denial of rehearing) (emphasis added), particularly when the claim seeks to "[p]lay[] with the structure of local government in an effort to channel political factions," *id*.

### 2.    Coalition claims are incompatible with historic and statutory context.

"Context is a primary determinant of meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012). "To strip a word from its context is to strip that word of its meaning." *Nebraska*, 143 S. Ct. at 2378 (Barrett, J., concurring). A statute should therefore be read in both "its statutory and historical context." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001).

History could not be clearer: Congress enacted Section 2 to combat invidious

discrimination against identified (and identifiable) minority groups—not to allow minority parties to obtain from the courts what they were denied at the ballot box. Each expansion of Section 2's reach has involved specific groups that Congress determined are entitled to special protection from disenfranchisement based on past discrimination. *Nixon*, 76 F.3d at 1390. At the time of its passage, Section 2 was primarily meant as "protective legislation for disenfranchised African Americans in the Deep South." *Nixon*, 76 F.3d at 1389 (citing Angelo N. Ancheta & Kathryn K. Imahara, *Multi-Ethnic Voting Rights: Redefining Vote Dilution in Communities of Color*, 27 U.S.F. L. Rev. 815, 815 & n.2 (1993)). It has since been expanded to also protect language minorities as well as persons of Spanish, American Indian, Asian, and Alaskan dissent. *Clements*, 999 F.2d at 894 (Jones, J., concurring).[3] The coalitions of such groups created by plaintiffs for purposes of an election year or litigation, however, are accompanied by no similar congressional finding of past discrimination.

Where an election district could be drawn in which a single class of protected minority voters could form a majority, a legislature's failure to draw that district is said to constitute a "discernible wrong that is not subject to [a] high degree of speculation and prediction." *Bartlett*, 556 U.S. at 18-19. Where no one protected group could make up a majority of the voting population in any district, by contrast, all that can be said—absent "allegations of intentional and wrongful conduct"—is that the protected groups have "the same opportunity to elect their candidate as any other political group with the same relative voting strength." *Id*. at 20. And "minority voters are not immune from the obligation to pull, haul, and trade to find common political ground." *De Grandy*, 512 U.S. at 1020.

As Judge Higginbotham has shown, coalition claims make a hopeless muddle of the first *Gingles* condition because they "risk[] that ephemeral political alliances having little or no

---

[3] Redistricting litigation relies on self-reported census data. U.S. Census Bureau, *About the Topic of Race* (Mar. 1, 2022). Because the census permits people to report more than one race to indicate their racial mixture, an individual of both African and Hispanic dissent could be grouped with *either* Hispanics or African Americans to make out a vote-dilution claim under Section 2. Such individuals would thus be protected from racial animus towards either group.

necessary connection to discrimination" on the grounds specified by Congress "will be confused with cohesive political units joined by a common disability of chronic bigotry." *LULAC v. Midland ISD*, 812 F.2d 1494, 1504 (5th Cir. 1987) (Higginbotham, J., dissenting), *vacated on reh'g on other ground*, 829 F.2d 546 (5th Cir. 1987) (per curiam). "A group tied by overlapping political agendas but not tied by the same statutory disability is," after all, "no more than a political alliance or coalition." *Campos*, 849 F.2d at 945 (Higginbotham, J., dissenting from denial of rehearing). And "the remedy afforded to the coalition may easily cross the line from protecting minorities against racial discrimination to the prohibited, and possibly unconstitutional, goal of mandating proportional representation." *Clements*, 999 F.2d at 896 (Jones, J., concurring).

### 3. Congressional silence does not alter the analysis.

The Supreme Court has sometimes read congressional reenactment of a statute to suggest acquiescence to a settled judicial interpretation of the statute's meaning. *See e.g.*, *Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 338 (1988). That principle is inapplicable here for two reasons. *First*, Congress has not revisited Section 2 since *Campos*, and the Supreme Court has also said that when "Congress has not comprehensively revised a statutory scheme but has made only isolated amendments . . . [i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of [a court's] statutory interpretation." *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001) (internal quotation marks omitted); *accord AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 81 (2021).

*Second*, recognition of coalition claims is far from settled. Congress's silence may just as well be understood to acquiesce in the judgment of circuits that read Section 2 to be *in*consistent with coalition claims. *Cf. Reading Law* at 325 (explaining that the Prior-Construction Canon applies when "the uniform weight of authority is significant enough that the bar can justifiably regard the point as settled law"). Though some circuits have assumed that coalition claims are cognizable, the two circuits to have directly confronted the issue since *Campos* have declined to follow *Campos* based on the text and purpose of the Voting Rights Act.

The en banc Sixth Circuit rejected coalition claims in *Nixon v. Kent County*, concluding that "[e]ven the most cursory examination reveals that § 2 of the Voting Rights Act does not mention minority coalitions, either expressly or conceptually." 76 F.3d at 1386. Instead, the court explained, the text of Section 2 "consistently speaks of a 'class' in the singular" and "protects a citizen's right to vote from infringement because of, or 'on account of,' that *individual's* race or color or membership in a protected language minority." *Id.* Moreover, subsection (b), which describes the proof necessary to establish a violation, requires a showing "that the political processes . . . are not equally open to participation by members of *a class* of citizens protected by subsection (a)." *Id.* at 1385. The *Nixon* court further noted potential practical and constitutional problems with interpreting Section 2 to include coalition claims, which "provide minority groups with a political advantage not recognized by our form of government, and not authorized by the constitutional and statutory underpinnings of that structure." *Id.* at 1392; *see also id.* at 1391–92.

Although it arrived by a different road, the Fourth Circuit also rejected multiracial claims as completely divorced from Section 2's purpose of combating invidious discrimination. *See Hall*, 385 F.3d at 430. The Hall court explained that "[a]ny claim that the voting strength of a minority group has been 'diluted' must be measured against some reasonable benchmark of 'undiluted' minority voting strength," such as "[t]he electoral ability of [the] group concentrated within a hypothetical single-member district." *Id.* at 428–29. A baseline that instead established vote dilution based on the possibility that group could form political alliances with other groups "would transform the Voting Rights Act from a law that removes disadvantages based on race, into one that creates advantages for political coalitions that are not so defined." *Id.* at 431.

**B.** **This case demonstrates why *Campos* was wrongly decided.**

**1.** **Coalition claims dilute minority votes.**

Members of the Fifth Circuit have warned that coalition claims might actually "limit the protections of the Voting Rights Act" by disqualifying from Section 2 relief the very groups it is meant to protect. *Campos*, 849 F.2d at 945 (Higginbotham, J., dissenting from denial of rehearing). For example, in a statutory scheme allowing for coalition claims, a group of Hispanics may be

unable to prove that other Hispanic voters were improperly excluded from their district if sufficient African Americans were included to bring the total potential minority-coalition population above 50%. *See Clements*, 999 F.2d at 896 (Jones, J., concurring); Rick G. Strange, *Application of Voting Rights Act to Communities Containing Two or More Minority Groups-When Is the Whole Greater Than the Sum of the Parts?*, 20 Tex. Tech L. Rev. 95, 124 & n.195-97 (1989).

The very act of combining disparate races into one voting bloc entails prioritizing the interests of a coalition of minorities over those of disparate minority groups—even though, for example, Black and Hispanic voters may prefer different candidates from the same political party. Frank Newport, *Race, Ethnicity Split Democratic Vote Patterns*, Gallup (Jan. 31, 2008), http://tinyurl.com/Gallup2008. Thus, minority coalitions increase the risk that "members of one of the minority groups will increase their opportunity to participate in the political process at the expense of members of the other minority group." *LULAC v. Clements*, 986 F.2d 728, 785 n.43 (5th Cir. 1993).

Governmental bodies can also point to minority coalitions as a defense to claims that they have diluted the votes of a single minority group. A legislator could "pack" minorities into one district and provide evidence that this district is a minority coalition district and thus satisfies Section 2. *Nixon*, 76 F.3d at 1391 (citing *Campos*, 849 F.2d at 946 (Higginbotham, J., dissenting from denial of rehearing)). But that process submerges the interests of the individual groups. *See id*. It also threatens vote dilution when particular minorities are at odds with the minority coalition.

### 2. Both experience and the facts alleged here demonstrate how coalition districts emphasize race-based distinctions among voters.

Experience—including the facts alleged both in the supplemental complaint and the consolidated cases—demonstrates that these are not idle concerns. By aligning voters with differing racial and ethnic backgrounds—as well as different experiences of past and present-day discrimination—the *Campos* standard elides non-racial distinctions in favor of race-based stereotypes. Take, for example, the NAACP's effort to maintain a putative coalition among African Americans, Hispanics, and Asians in SD 10 in Tarrant County. ECF 646 ¶¶ 257–58, 276–

77. The second amended complaint at issue here add Pacific Islanders to the category of "Asians," and seeks coalition districts in several metropolitan areas. ECF 777 ¶ 21 (incorporating ECF 502 (seeking coalition districts in *at least* Fort Bend, Bell, and Collin counties)).

True, *Campos* requires coalition plaintiffs to prove that "the minority group together votes in a cohesive manner for the minority candidate." *Campos*, 840 F.2d at 1245. But that is hardly an antidote to racial stereotyping. The SD 10 plaintiffs claim that they are cohesive largely based on their agreement in the 2016 and 2020 presidential elections. *See* ECF 646 ¶¶ 257–58, 276–77. And the Fair Maps plaintiffs appear to be relying on data from the 2020 presidential election. ECF 502 ¶¶ 134, 146, 157. "The mere fact that 'members of a racial group tend to prefer the same candidates' is not license to treat that correlation as an absolute truth." *Alexander*, *supra*, slip op. at 62 (Thomas, J., concurring in part). That is even more apparent here where the alleged coalitions are made up of groups with vastly different cultural, linguistic, religious, and economic backgrounds. To the contrary, the only thing such reasoning demonstrates is that coalition districts are either (1) based on a form of disparate-impact theory that is non-cognizable under the Fourteenth Amendment, and any law passed to enforce it, *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 372 (2001); or (2) an effort "to sidestep [the Supreme Court's] holding in *Rucho* that partisan-gerrymandering claims are not justiciable in federal court," *Alexander*, *supra*, slip op. at 26.

Whatever the situation in 1965, modern demographic data reflects that it is no safer to lump together all members of a race for purposes of evaluating voting under the Fifteenth Amendment (or Voting Rights Act) than it is to do so for any of these other purposes. For example, although "Hispanics generally have more positive attitudes toward the Democratic Party than the Republican Party," within that group there are fairly sharp differences across religions and countries of origin. Jens Manuel Krogstad et al., *Hispanics' views of the U.S. political parties*, Pew Research Center (Sept. 29, 2022), http://tinyurl.com/PewHispanic2022. So too with Asian Americans. Katherine Schaeffer, *Asian voters in the U.S. tend to be Democratic, but Vietnamese American voters are an exception*, Pew Research Center (May 25, 2023), http://tinyurl.com/Pew

Asian2023. Even when racial groups share a political party and will ultimately vote together in the general election, they may prefer different primary candidates. A 2008 study showed that black Democrats preferred Barack Obama to Hilary Clinton, while Clinton was preferred by Hispanic voters by a margin of almost 30 points. Newport, *supra*, http://tinyurl.com/Gallup2008.

These differences are playing out in Texas elections. The Fair Maps plaintiffs, like others in this consolidated litigation, allege that, per the 2020 census, the vast majority of Texas's growth over the past 10 years has been from communities of color. *E.g.*, ECF 502 ("[N]on-white voters made up over 80% of Texas's growth in CVAP, with over half of the increase coming from the Latino community alone"); ECF 646 ¶ 2 ("Texas's 3,999,944 new residents were almost all Black, Hispanic, and Asian"). But while pundits have for years heralded a change in political fortunes favoring Democrats to coincide with this demographic shift, the reality has been more complicated. *Cf. Alexander*, *supra*, slip op. at 23 (Thomas, J., concurring in part) (criticizing a district court's redistricting decision "that securing the rights of Hispanic voters required replacing some of those voters with non-Hispanic Democrats" as symptomatic of the kind of "race-obsessed jurisprudence" that "'balkanize[s] us into competing racial factions'"). "The long-anticipated purpling of Republican Texas that was supposed to come as more Latinos joined the electorate was certainly nowhere in evidence on Election Day" in 2020, for example. Weiyi Cai & Ford Fessenden, *Immigrant Neighborhoods Shifted Red as the Country Chose Blue*, N.Y. (Dec. 20, 2020), http://tinyurl.com/2du4kkzz. Indeed, one of the most remarked-upon aspects of the 2020 election was the swing of Hispanic voters toward the Republican Party. *Id*. "Across Texas, the red shifts were most pronounced in precincts with the highest proportion of Latinos." *Id*. And heavily Hispanic districts along the southern border gave Donald Trump his second-most sizable gains— between ten and thirty points—compared to the 2016 election, as illustrated by the New York Times figure attached as Appendix A.

The Supreme Court has long rejected the assumption that "members of the same racial group—regardless of their age, education, economic status, or the community in which they live— think alike, share the same political interests, and will prefer the same candidates at the polls."

*Schuette v. Coal. to Def. Affirmative Action*, 572 U.S. 291, 308 (2014) (quoting *Shaw v. Reno*, 509 U.S. 630, 647 (1993)). Coalition claims compound that fraught assumption by applying it across racial groups.

### 3.    Coalition claims create needless, resource intensive litigation.

The complications arising from minority-coalition claims also engender increased litigation—as again this litigation demonstrates. The tension between separate minorities and minority coalitions forces courts like this one to step in and mediate between them. That is, as *Nixon* explained, "[i]f district lines are drawn pursuant to a plan to enhance the political impact of minorities separately, the plan faces potential challenge by a coalition of minorities claiming that greater influence could have been achieved had the minorities been 'lumped' together." *Id.* But if "the lines are drawn to accommodate all minorities together, the plan faces potential challenge by an individual minority group on the ground that its influence could have been enhanced had it been treated separately." *Id.* The end result is a "puzzle which is impossible to solve," and one which forces "courts and legislatures . . . to 'choose' between protected groups when drawing district lines." *Id.* This turns the purpose of the VRA—designed to get government out of the business of choosing racial winners and losers—on its head.

In addition, courts can expect the number of potential plaintiffs to continue increasing because any district could be challenged not simply by the minority group with the greatest chance of satisfying the traditional *Gingles* test, but any minority group that believes it could have formed a coalition of minorities but for the way the districts were drawn by the legislature. *See* Strange, supra, at 113.

Other than lawyers, few benefit from such litigation. It is beyond peradventure that "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy," which is undermined by "[c]ourt orders affecting elections," which "can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam). Moreover, "[t]he least

representative branch must take care when it reforms the most representative branch" lest it undermine the faith of the public in the courts themselves. Strange, *supra*, at 125 & n.202 (quoting *Marshall v. Edwards*, 582 F.2d 927, 934 (5th Cir. 1978)). The more that federal courts insert themselves into insoluble policy debates regarding which racial groups have the most in common, the greater those risks become—particularly when the exercise is undertaken without explicit authorization from Congress.

### C. The view of Section 2 that *Campos* endorsed raises serious constitutional questions.

Coalition suits raise at least two serious constitutional concerns, one going to the power of Congress to enact Section 2 as envisioned by Plaintiffs, the other going to the power of the courts to adjudicate their claims.

*First*, Section 2 is already at or outside the outer bounds of when the Constitution permits Congress—or a State—to legislate based on race. The Supreme Court "ha[s] time and again forcefully rejected the notion that government actors may intentionally allocate preference to those 'who may have little in common with one another but the color of their skin.'" *SFFA*, 600 U.S. at 220. But that is precisely what Section 2 encourages: In the name of protecting the ability of minority voters to act collectively, "Section 2 itself 'demands consideration of race.'" *Allen*, 599 U.S. at 30–31 (quoting *Perez*, 138 S. Ct. at 2315). Indeed, just last year, the Supreme Court reaffirmed that "the question whether additional majority-minority districts can be drawn . . . involves a 'quintessentially race-conscious calculus.'" *Id.* at 31 (quoting *DeGrandy*, 512 U.S. at 1020).

Courts have permitted Section 2 to stand where other supposedly benign race-based legislation could not because "the Voting Rights Act is premised upon congressional 'findings' that each of the protected minorities is, or has been, the subject of pervasive discrimination and exclusion from the electoral process." *Nixon*, 76 F.3d at 1390. But they have acknowledged the "concern" that the Act "may impermissibly elevate race in the allocation of political power within the States." *Allen*, 599 U.S. at 41–42. For good reason: "[t]he government can plainly remedy a

race-based injury that it has inflicted," but the remedies it selects "must be meant to further a colorblind government, not perpetuate racial consciousness." *SFFA*, 600 U.S. at 249 (Thomas, J., concurring) (citing *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 505 (1989)). Moreover, because the Act "imposes current burdens," it must be "justified by current needs." *Shelby County v. Holder*, 570 U.S. 529, 536 (2013). The congressional findings underlying traditional Section 2 claims have not been revisited since 1982, leaving an open question whether "the authority to conduct race-based redistricting [can] extend indefinitely into the future." *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring) (reserving the issue).

Coalition claims constitute a step backward, rather than forward, on the road to equality. Courts should eschew an interpretation of Section 2 that excludes just one race from its protective sweep and does not justify that exclusion with any compelling interest in remedying past discrimination. Traditional Section 2 claims are at least supported by Congressional findings. But coalition claims exacerbate the constitutional concerns inherent in Section 2 because "[a] coalition of protected minorities is a group of citizens about which Congress has not made a specific finding of discrimination." *Nixon*, 76 F.3d at 1391. Here we have a government benefit—not unlike a public drinking fountain—that for no discernable reason is made available to all racial groups but one. Over time, Congress has extended VRA protections to multiple individual groups; by aggregating those protections, coalitions wield the VRA as a newfound instrument of discrimination.

*Second*, in addition to raising questions about the authority of Congress, coalition districts push the outer boundaries of Article III. As Judge Higginbotham explained in 1988, coalition districts are effectively a form of partisan gerrymandering: "[i]f a minority group lacks a common race or ethnicity, cohesion must rely principally on shared values, socio-economic factors, and coalition formation." *Campos*, 849 F.2d at 945 (Higginbotham, J., dissenting from denial of rehearing) (quoting *Midland ISD*, 812 F.2d at 1504). And the "easiest and most likely alliance for a group of minority voters is one with a political party." *Bartlett*, 556 U.S. at 22. Since *Campos*, the Supreme Court has unequivocally held that, when pleaded as a separate claim, partisan gerrymandering presents a nonjusticiable political question. *Rucho*, 588 U.S. at 718. Thus, by

19

asserting that Section 2 protects coalition districts, Plaintiffs ask courts to arrogate power the Constitution does not provide.

*     *     *

Last term Justice Kavanaugh forecast his agreement with Justices Thomas, Gorsuch, and Barrett that "even if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future." *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring) (citing a section of Justice Thomas's dissenting opinion joined by Justices Gorsuch and Barrett). The continued vitality of traditional Section 2 claims is thus unclear. But what is clear is that today's federal courts should not extend Section 2 beyond its textual and historical foundation to judicially "transform[] the Voting Rights Act from a statute that levels the playing field for all races to one that forcibly advances contrived interest-group coalitions of racial or ethnic minorities." *Clements*, 999 F.2d at 894 (Jones, J., concurring). Nor may it do so in a way that ignores the limits of justiciability under the political-question doctrine. Because Plaintiffs' Section 2 claim relies on such coalitions, it should be dismissed either under Rule 12(b)(6) for failure to state a claim or Rule 12(b)(1) for presenting a non-justiciable political question.

### Conclusion

Defendants respectfully move for dismissal of the Fair Maps Plaintiffs' supplemental complaint.

Date: May 28, 2024

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

/s/ Ryan G. Kercher
RYAN G. KERCHER
Deputy Chief, Special Litigation Division
Tex. State Bar No. 24060998

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal
Strategy

Kathleen T. Hunker
Special Counsel
Tex. State Bar No. 24118415

Ryan D. Walters
Chief, Special Litigation Division

William D. Wassdorf
Deputy Chief, General Litigation Division
Tex. State Bar No. 24103022

Lanora C. Pettit
Principal Deputy Solicitor General
Tex. State Bar No. 24115221

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
(512) 463-2100
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
will.wassdorf@oag.texas.gov
lanora.pettit@oag.texas.gov
drew.mackenzie@oag.texas.gov

J. Andrew Mackenzie
Assistant Attorney General
Tex. State Bar No. 24138286

COUNSEL FOR STATE DEFENDANTS

**CERTIFICATE OF CONFERENCE**

I hereby certify that on May 28, 2024, I conferred with all counsel by email, and none were opposed to this motion.

/s/ Ryan G. Kercher
RYAN G. KERCHER

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 28, 2024, and that all counsel of record were served by CM/ECF.

/s/ Ryan G. Kercher
RYAN G. KERCHER

**Appendix A**



SWeiyi Cai & Ford Fessenden, *Immigrant Neighborhoods Shifted Red as the Country Chose Blue*, N.Y. (Dec. 20, 2020), http://tinyurl.com/2du4kkzz.