**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT et al.,<br><br>*Defendants*. | Civil Action No. 3:21-cv-00259<br>(Lead Case) |
| FAIR MAPS TEXAS ACTION COMMITTEE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT et al.,<br><br>*Defendants*. | Civil Action No. 3:21-cv-01038<br>(Consolidated Case) |

**FAIR MAPS PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS SUPPLEMENTAL COMPLAINT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................... 1

ARGUMENT .......................................................................................................................... 4

I.     Plaintiffs have adequately pleaded discriminatory intent by the Texas Legislature........... 4

II.    Section 2 of the Voting Rights Act protects minority voters from racial vote dilution without imposing a single-race requirement. .................................................................. 9

    A.    Defendants' motion is foreclosed by the law of the case....................................... 9

    B.    The text, structure, and history of Section 2 do not support a single-race requirement for alleging racial vote dilution. ...................................................... 10

    C.    Defendants' remaining arguments are unavailing. ............................................... 15

CONCLUSION...................................................................................................................... 20

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott v. Perez,*
    585 U.S. 579 (2018)..............................................................................................2, 7, 8

*Ala. Legis. Black Caucus,*
    575 U.S. 254 (2015)....................................................................................................4

*Ala. Legis. Black Caucus,*
    988 F. Supp. 3d 1285 (M.D. Ala. 2013) ..................................................................10

*Alexander v. S.C. State Conf. of the NAACP,*
    No. 22-807, slip op. (May 23, 2024)......................................................................4, 7

*Allen v. Milligan,*
    599 U.S. 1 (2023).............................................................................................. *passim*

*Arnold v. Williams,*
    979 F.3d 262 (5th Cir. 2020) ......................................................................................6

*Bartlett v. Strickland,*
    556 U.S. 1, 3, 12-20 (2009) ......................................................................................15

*Brewer v. Ham,*
    876 F.2d 448 (5th Cir. 1989) ....................................................................................16

*United States v. Brown,*
    494 F. Supp. 2d 440 (S.D. Miss. 2007).....................................................................19

*Chisom v. Roemer,*
    501 U.S. 380 (1991)..................................................................................................13

*Christianson v. Colt Indus. Operating Corp.,*
    486 U.S. 800 (1988)....................................................................................................9

*Coal. for Educ. in Dist. One v. Bd. of Elections of City of New York,*
    495 F.2d 1090 (2d Cir. 1974)....................................................................................12

*de la O v. Housing Authority of City of El Paso,*
    417 F.3d 495 (5th Cir. 2005) ....................................................................................18

*Ga. State Conf. of the NAACP v. Georgia,*
    269 F. Supp. 3d 1266 (N.D. Ga. 2017) .....................................................................10

*Graves v. Barnes*,
378 F. Supp. 640 (W.D. Tex. 1974)...................................................................14

*Graves v. Barnes*,
408 F. Supp. 1050 (W.D. Tex. 1976)................................................................14

*Growe v. Emison*,
507 U.S. 25 (1993).............................................................................................17

*Hall v. Virginia*,
385 F.3d 421 (4th Cir. 2004) ............................................................................15

*Harding v. Cty of Dallas*,
336 F. Supp. 3d 677 (N.D. Tex. 2018) ..............................................................19

*Holloway v. City of Va. Beach*,
531 F. Supp. 3d 1015 (E.D. Va. 2021) ..............................................................15

*Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*,
892 F.3d 719 (5th Cir. 2018) ..............................................................................4

*Jones v. City of Lubbock*,
640 F.2d 777, 777 (5th Cir. 1981) .....................................................................14

*Jones v. Lubbock*,
727 F.2d 364 (5th Cir. 1984) .............................................................................15

*Keyes v. Sch. Dist. No. 1*,
413 U.S. 189 (1973)...........................................................................................12

*League of United Latin Am. Citizens, Council No. 4386 v.*
*Midland Indep. Sch. Dist.*,
812 F.2d 1494 (5th Cir. 1987) ..........................................................................17

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
999 F.2d 831 (5th Cir. 1993) ............................................................................17

*Lindquist v. City of Pasadena*,
669 F.3d 225 (5th Cir. 2012) ..............................................................................9

*Loughrin v. United States*,
573 U.S. 351 (2014)...........................................................................................11

*Nixon v. Condon*,
286 U.S. 73 (1932).............................................................................................12

*Petteway v. Galveston County*,
86 F.4th 1146 (5th Cir. 2023) ......................................................................3, 10

iii

*Reno v. Bossier Parish Sch. Bd.*,
    520 U.S. 471 (1997)................................................................................4

*S.C. State Conf. of the NAACP v. Alexander*,
    649 F. Supp. 3d 177 (D.S.C. 2023)..........................................................7

*United States v. Scroggins*,
    599 F.3d 433 (5th Cir. 2010) ..................................................................19

*Students for Fair Admission v. President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)...............................................................................18

*United Jewish Organizations of Williamsburgh, Inc. v. Carey*,
    430 U.S. 144 (1977)...............................................................................12

*Veasey v. Abbott*,
    888 F.3d 792 (5th Cir. 2018) ....................................................................8

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)................................................................................4

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989)...............................................................................12

*Wilson v. Birnberg*,
    667 F.3d 591 (5th Cir. 2012) ....................................................................6

**Statutes**

28 U.S.C. § 1253 .......................................................................................10

52 U.S.C. §§ 10301(a) .........................................................................11, 19

52 U.S.C. § 10301(b) ................................................................................11

52 U.S.C. § 10303(f)(3) .......................................................................11, 14

**Other Authorities**

Black's Law Dictionary (11th Ed. 2019)......................................................11

H.R. Rep. No. 439, 89th Cong., 1st Sess. (1965) .........................................13

S. Rep. No. 417, 97th Cong., 2d Sess. (1982) .............................................14

S. Rep. No. 295, 95th Cong., 1st Sess. (1975).............................................13

## INTRODUCTION

Defendants' Motion to Dismiss the Fair Maps Plaintiffs' Supplemental Complaint, Dkt. 779 ("Mot."), should be denied. The Supplemental Complaint does nothing more than add additional facts that bolster causes of action this Court has already held are sufficient to survive a motion to dismiss. And Defendants' motion otherwise repeats legal arguments that this Court has previously rejected.

Fair Maps Plaintiffs filed their Second Amended Complaint ("SAC") on August 3, 2022, challenging certain State House, State Senate, and Congressional districts adopted by the 87th Texas Legislature in House Plan 2316, Senate Plan 2168, and Congressional Plan 2193. Dkt. 502 ¶¶ 178–88 (Plaintiffs' Second Amended Complaint). Plaintiffs alleged that the challenged districts were enacted with discriminatory intent and racially gerrymandered in violation of the U.S. Constitution, and also alleged that the challenged districts impermissibly dilute the voting rights of coalitions of Black, Latino, and Asian American and Pacific Islander ("AAPI") voters in violation of Section 2 of the Voting Rights Act ("VRA"). Defendants moved to dismiss the Section 2 claims, claiming that Plaintiffs lacked standing and arguing that the SAC did not adequately plead facts necessary to show the *Gingles* preconditions. Dkt. 401. The Court denied the motion. Dkt. 591. But Defendants did *not* move to dismiss the SAC on the theory that coalition claims are not cognizable under Section 2, or move to dismiss the constitutional gerrymandering and intent claims pleaded in the SAC. For good reason. This Court had previously rejected, as foreclosed by Fifth Circuit precedent, any argument that Section 2 does not protect coalitions of minority voters. *See* Dkt. 307 at 40, 42 (reiterating that "'coalitions can satisfy the first *Gingles* condition' under *Campos*" (quoting Dkt. 144)). And this Court had also previously held that Plaintiffs' gerrymandering and intentional discrimination claims were plausibly alleged at the motion to dismiss stage. Dkt. 307 at 51–56.

1

After Plaintiffs filed their SAC, the 88th Texas Legislature ratified the same maps that had been enacted by the 87th Legislature and challenged in the SAC. Plaintiffs thereafter filed a Supplemental Complaint, consistent with Federal Rule of Civil Procedure 15(d), setting forth those additional facts. Dkt. 777 (Plaintiffs' Supplemental Complaint). The Supplemental Complaint did not alter the substance of Plaintiffs' legal claims.

Nonetheless, Defendants have taken the filing of Plaintiffs' Supplemental Complaint as occasion to relitigate arguments that this Court has considered and rejected several times over. *See, e.g.*, Dkt. 58; Dkt. 144 at 3–4, 6–7; Dkt. 307 at 6–7, 27, 40–42, 52–54. Defendants contend that they are entitled to resurrect their challenges to Plaintiffs' intentional discrimination and gerrymandering claims because the Supplemental Complaint shows that the 88th Legislature's purpose in ratifying the challenged maps was to comply with the administrative requirements of the Texas Constitution. Mot. at 2–6. That argument fails. This Court has already held that Plaintiffs sufficiently alleged that the 87th Legislature engaged in intentional discrimination and racial gerrymandering. Dkt. 307 at 54–56. And the Supplemental Complaint alleges that the 88th Legislature ratified the same challenged maps based on the same legislative record *and* with full knowledge that the maps "would impair the voting rights of Black, Latino, and AAPI voters." Dkt. 777 ¶¶ 9, 15, 20. The improper intent of the 87th Legislature is relevant because it "naturally give[s] rise to . . . inferences regarding the intent of the" 88th Legislature that rubber-stamped the same maps. *Abbott v. Perez*, 585 U.S. 579, 607 (2018). And the 88th Legislature's decision to intentionally and knowingly perpetuate the discriminatory effects of those maps, over objections and (partially) curative amendments from their colleagues, provides an additional basis to infer improper intent. In other words, since the last time the Court rejected Defendants' attempts to

dismiss Plaintiffs' intentional discrimination and gerrymandering claims, Plaintiffs' allegations have only become stronger.

Defendants' arguments for dismissing Plaintiffs' Section 2 claims have nothing whatsoever to do with the facts alleged in Plaintiffs' Supplemental Complaint. Rather, Defendants spend fully two-thirds of their motion asking this Court to reverse its prior holding that coalition claims are cognizable under Section 2, either because a decision from the Fifth Circuit addressing that question "may issue," Mot. at 7 n.1 (referencing oral argument in *Petteway v. Galveston County*, 86 F.4th 1146 (5th Cir. 2023)), or because abiding by Fifth Circuit precedent recognizing such claims would "raise[] serious constitutional questions," *id.* at 18. The Court should not tolerate such gamesmanship. The parties can address the impact of the Fifth Circuit's decision in *Petteway* once the Court of Appeals has made its decision. At this juncture, as Defendants grudgingly acknowledge—and as this Court has repeatedly held—Plaintiffs' Section 2 claims are cognizable. Mot. at 7 n.1; Dkt. 307 at 40, 42.  In any event, Defendants are wrong on the merits. The text, purpose, and history of Section 2 all confirm that it protects minority voters without imposing a single-race requirement when they experience a common discrimination on the basis of race. And that commonsense interpretation of Section 2, which the Fifth Circuit has recognized for decades, does not turn the statute into an improper tool of discrimination against white voters nor draw courts into adjudicating nonjusticiable partisan gerrymandering claims. Mot. at 18–20. To the contrary, the VRA protects *all* voters when they face discrimination on the basis of race. And the long-standing *Gingles* factors ensure that Section 2 provides a remedy for racial, rather than political, discrimination.

For these reasons, the Court should deny Defendants' motion.

**ARGUMENT**

**I.     Plaintiffs have adequately pleaded discriminatory intent by the Texas Legislature.**

The Supreme Court has long held that Plaintiffs may plead intentional discrimination on the basis of circumstantial proof, such as the discriminatory impact of the challenged law, historical background, departure from normal procedure, and legislative history. *See Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 488–89 (1997); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Plaintiffs may rely on similar allegations to plead, for the purposes of a racial gerrymandering claim, that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). Notably, intentional vote dilution and racial gerrymandering claims are "analytically distinct": gerrymandering claims require plaintiffs to show racial predominance, while discriminatory intent and vote dilution claims require showing "that the State 'enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities.'" *Alexander v. S.C. State Conf. of the NAACP*, No. 22-807, slip op. at 34 (May 23, 2024) (quoting *Miller*, 515 U.S. at 911). In all events, at the motion to dismiss stage, the pleadings are accepted as true and, when viewed in the light most favorable to Plaintiffs, need only "raise a right to relief above the speculative level." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Consistent with these standards, this Court has already rejected Defendants' challenges to Plaintiffs' intentional discrimination claims. *See, e.g.*, Dkt. 307 at 29 (rejecting arguments to dismiss United States' intent claims because "difficulty of proving discriminatory intent does not mean that, at the pleading stage, plaintiffs must present an airtight case or negate alternative

4

theories" (citing Dkt. 144 at 6–7)); *id.* at 52–54. As this Court has explained, "historical events are a potential basis for inferring discriminatory intent"; "the immediately preceding redistricting cycle is not so far removed from the present"; and Plaintiffs have made "thorough allegations about the legislative history" that are "sufficient to state a claim." *Id.* at 54–55.

Plaintiffs' factual allegations in support of their intentional discrimination and gerrymandering claims are as strong as they were when the Court last held them sufficient to state a claim. In their Second Amended Complaint, Plaintiffs detailed Texas's extensive history of racial discrimination in redistricting, Dkt. 502 ¶¶ 50–60, as well as the legislative history behind the challenged maps and the legislature's departure from usual procedure. Dkt. 502 ¶¶ 65–66, 69–90. Plaintiffs also identified racially gerrymandered districts and provided alternative district plans. Dkt. 502 ¶¶ 91–169. This Court found those specific and "thorough" allegations sufficient to plausibly allege discriminatory intent and racial gerrymandering. *See* Dkt. 307 at 54–55.[1]

The Supplemental Complaint adds specific and thorough allegations about the 2023 regular session of the 88th Legislature, Dkt. 777 ¶¶ 7–18, detailing a basis for finding that it acted with discriminatory intent:

> The legislators who passed HB 1000 and SB 375 adopted in full the 2021 legislative history and rationale for House Plan 2316 and Senate Plan 2168, despite being presented with evidence that continued use of those plans would impair the voting rights of Black, Latino, and AAPI voters. Accordingly, the intent, drafting, and circumstances of these plans' original enactment in 2021 remain relevant to the Texas Legislature's discriminatory intent, its use of race as a predominating redistricting criteria, and its failure to justify use of race or discriminatory districts through a compelling government interest. The ratification of Senate Plan 2168 and House Plan 2316 in 2023 does not remove the discriminatory taint in these plans; to the contrary, the Texas Legislature's failure to ameliorate the known harm in these plans further supports that the discriminatory impact of these plans was intended.

---

[1] This is particularly true for Plaintiffs' challenge to the Congressional plan, since the 88th Legislature only ratified state legislative plans and no further legislative history relevant to the Congressional plan is at issue in the Supplemental Complaint.

Dkt. 777 ¶ 20; *see also id.* ¶¶ 9, 15. Together, these detailed allegations, combined with the allegations regarding the 87th Legislature, only bolster Plaintiffs' claims for intentional discrimination and racial gerrymandering by the Texas Legislature. *See* Dkt. 502 ¶¶ 183, 186–87 (setting forth enumerated claims); Dkt. 777 ¶ 23 (incorporating enumerated claims by reference).

Defendants' arguments to the contrary are baseless and easily refuted:

*1.* As before, Plaintiffs' intentional discrimination claims are made no less plausible by the Defendants' alternative explanations for the enactment of the challenged plans. Mot. at 5–6. As this Court previously explained, even if Defendants' explanations "are themselves plausible," they do not "render Plaintiffs' allegations implausible." *See* Dkt. 144 at 7; *see also Arnold v. Williams*, 979 F.3d 262, 268–69 (5th Cir. 2020) ("At the 12(b)(6) stage of litigation, it is inappropriate for a district court to weigh the strength of the allegations."); *Wilson v. Birnberg*, 667 F.3d 591, 600 (5th Cir. 2012) ("At this [motion to dismiss] stage, [Defendant]'s rebuttals must be ignored and [Plaintiff]'s assertions taken as true.").

*2.* As before, Plaintiffs are not required at the pleading stage to demonstrate evidentiary proof to overcome the presumption of good faith. Mot. at 2–3. Overcoming that presumption remains an evidentiary burden appropriate only after discovery. *See* Dkt. 144 at 6 ("Plaintiffs are not required to produce a 'smoking gun,' especially not in their initial complaint, to make a plausible allegation of racial intent."); Dkt. 307 at 53 ("[I]t is not yet necessary for Plaintiffs to demonstrate that the Texas legislature more likely than not acted with discriminatory intent.").

The recent decision in *Alexander* has not changed—and indeed, did not even address—this pleading standard. To the contrary, that decision reviewed a lower court's findings of fact and conclusions of law following an eight-day trial, at which point the plaintiffs held the burden of proof and persuasion. *See S.C. State Conf. of the NAACP v. Alexander*, 649 F. Supp. 3d 177, 183

(D.S.C. 2023). And the Supreme Court was careful to note that it "kept the door open" to the use of circumstantial facts of the sort that Plaintiffs plead here. *Alexander*, No. 22-807, slip op at 4.

*3.* Defendants alternatively contend that dismissal is required under *Abbott v. Perez*, 585 U.S. 579 (2018), *see* Mot. at 4–6, but that argument is backwards. *Perez* (like *Alexander*) discussed evidentiary and not pleading standards, and actually underscores the continued relevance of the 87th Legislature's actions to the constitutionality of the challenged plans. For one, the Court in *Perez* specifically affirmed that a former legislature's intent is relevant "to the extent that [it] naturally give[s] rise to—or tend[s] to refute—inferences regarding the intent of the [enacting] Legislature" and "must be weighed together with any other direct and circumstantial evidence of that Legislature's intent." *Perez*, 585 U.S. at 603–07. Here, Plaintiffs sufficiently alleged that the 87th Legislature engaged in intentional discrimination and racial gerrymandering. That conduct remains relevant. As this Court previously recognized, "the immediately preceding redistricting cycle is not so far removed from the present," Dkt. 307 at 54; it follows that the "immediately preceding" Legislature is even less removed. Moreover, Plaintiffs plausibly allege that the 88th Legislature knowingly perpetuated the discriminatory effects of the maps drawn by their predecessors, over objections from their colleagues. Dkt. 777 ¶¶ 9, 15, 20. That is independent evidence of the 88th Legislature's intent and improper motives.

*Perez* is also distinguishable on its facts. There, the legislature enacted maps developed by a *federal court* pursuant to instructions from the Supreme Court "not to incorporate . . . any legal defects." 585 U.S. at 604. The *Perez* Court specifically noted that those facts separated the case from a situation "in which a law originally enacted with discriminatory intent is later reenacted by a different legislature" without altering the underlying intent. *Id.* (citing *Hunter v. Underwood*, 471 U.S. 222 (1985)). The *Hunter* decision cited in *Perez* is more analogous to the facts alleged here.

In *Hunter*, the Supreme Court struck down a criminal disenfranchisement provision of the Alabama Constitution that was adopted with discriminatory intent in 1901, despite the fact that the provision had been "pruned" over time. 471 U.S. at 228–230, 232–33. As the *Perez* Court explained, those subsequent changes "did not alter the intent with which the article, including the parts that remained, had been adopted." 585 U.S. at 604. Rather, subsequent changes to laws must be "substantial" and constitute "meaningful alterations" to cut off discriminatory intent. *Veasey v. Abbott*, 888 F.3d 792, 802 (5th Cir. 2018) (citing *Cotton v. Fordice*, 157 F.3d 388, 391–92 (5th Cir. 1998) and *Chen v. City of Houston*, 206 F.3d 502, 521 (5th Cir. 2000)).

The facts alleged here are even more extreme than those in *Hunter*: The 88th Legislature did not undertake redistricting itself or draw district lines with new criteria, nor did it amend the current plans to ameliorate the widespread discriminatory impact of the enacted maps. Instead, it relied upon and fully adopted the prior legislative history, ratifying the prior considerations used to draw the challenged districts, and ratified those existing plans without modification. *See generally* Dkt. 777 ¶¶ 3–20. And the 88th Legislature did so despite being on notice that the reenacted maps would dilute minority voting rights. *Id.* ¶¶ 9, 15, 20. Those facts confirm, rather than refute, the improper intent and motivations that Plaintiffs sufficiently alleged in the SAC.

*4.* At base, Defendants' theory is that a legislature may pass a law motivated by discriminatory intent—even expressly so—as long as the same law is reenacted in a different legislative session, with at least some alternative explanation. Such a rule would allow lawmakers to commit constitutional violations with impunity. Neither Supreme Court precedent nor common sense supports Defendants' shell game approach to analyzing claims of intentional discrimination.

Plaintiffs have pleaded with thorough specificity the 87th and 88th Legislatures' actions in drawing, adopting, and ratifying state legislative plans. The legislative history behind the plans,

along with their discriminatory impact, further make plausible (and evidence adduced in discovery will prove) that they were enacted with race predominating and with the intent to minimize and cancel out minority voter power as a motivating purpose. Defendants' motion should be denied.

## II. Section 2 of the Voting Rights Act protects minority voters from racial vote dilution without imposing a single-race requirement.

### A. Defendants' motion is foreclosed by the law of the case.

This panel has already denied Defendants' repeated attacks on Plaintiffs' ability to bring claims under Section 2 the Voting Rights Act on behalf of minority voters of more than one race. *See* Dkt. 144 at 3–4; Dkt. 307 at 40–42. Accordingly, Defendants' renewed attack should be rejected under the law of the case doctrine, which "posits that when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." *Lindquist v. City of Pasadena*, 669 F.3d 225, 238 (5th Cir. 2012) (internal quotations omitted). To be sure, "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance," but "as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983)).[2]

Defendants themselves recognize that, at this time, it would be inappropriate to revisit this Court's prior decision that Plaintiffs' claims are cognizable. *See* Mot. at 7 n.1 ("Defendants also recognize that, at present, this panel is bound by the Fifth Circuit's conclusion that . . . coalition claims are cognizable in such an action[.]"). Nevertheless, they devote the majority of their motion to repeating arguments that have been made and rejected in this litigation, *see* Dkt. 144 at 3–4 and

---

[2] For the same reason, this Court should not revisit its prior decisions that there is a private right of action under Section 2, despite Defendants' suggestions to the contrary (Mot. at 7 n.1). *See* Dkt. 58; Dkt. 307 at 27.

Dkt. 307 at 40–42, because the legal basis for coalition claims is currently being considered by the *en banc* Fifth Circuit in *Petteway v. Galveston County*, 86 F.4th 1146 (5th Cir. 2023), and a decision in that case "may issue while this motion is pending." Mot. at 7 n.1.

The parties can brief the effect of *Petteway* once there is a final decision in that case. That briefing could also address the predicate question of whether this Court is bound by *Petteway*, which Defendants appear to recognize is open to reasonable debate. *See* Mot. at 7 n.1 (citing Joshua A. Douglas & Michael E. Solimine, *Precedent, Three-Judge District Courts, and the Law of Democracy*, 107 Geo. L.J. 413, 452 (2018)); *see also* 28 U.S.C. § 1253; *Ga. State Conf. of the NAACP v. Georgia*, 269 F. Supp. 3d 1266, 1278 n.7 (N.D. Ga. 2017); *Ala. Legis. Black Caucus v. Alabama*, 988 F. Supp. 2d 1285, 1342 n.13 (M.D. Ala. 2013). But there is no reason for this Court to expend its resources now on an issue it has already decided.

### B. The text, structure, and history of Section 2 do not support a single-race requirement for alleging racial vote dilution.

Defendants have improperly asked this Court to revisit a settled issue of law, and the Court should thus decline to reach the merits of their arguments challenging coalition claims. But even if this Court were to consider Defendants' arguments at this juncture, it should reject them. Plaintiffs briefly address them here to explain why Defendants' arguments fail on the merits, even though they are not properly considered at this time. In short, the text, structure, and history of the VRA all confirm that Section 2 protects minority voters of different racial backgrounds where, as here, they suffer a common harm of racial vote dilution.

*1.* The text and structure unambiguously show that Section 2 protects minority voters from racial vote dilution without imposing a single-race requirement. Section 2 protects "[i]ndividuals," *Allen v. Milligan*, 599 U.S. 1, 25 (2023), not "protected groups," Mot. at 1, 9, 11, by prohibiting governments from imposing any voting practice that "results in a denial or abridgement of the right

of *any citizen* of the United States to vote on account of race or color, or in contravention of [protections for language minorities]." 52 U.S.C. §§ 10301(a) (emphasis added). There is no textual basis for limiting the protections of Section 2 only to instances where individuals of a single race are subjected to discriminatory vote dilution. To the contrary, a violation of Section 2 is established if "members of a class of citizens protected by subsection (a) . . . have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

Nothing in the statutory text limits a "class of citizens" protected from discrimination "on account of race or color," to a class comprised of only one race (or color) of voters. Rather, what binds affected voters in the "class" is the common fact that their voting rights have been diluted on account of race. Congress could have, but did not, prohibit discrimination against a "*single racial group*" or "class of citizens *of a single race*." The absence of such a limitation is striking, because elsewhere the VRA does limit certain protections explicitly. *See* 52 U.S.C. § 10303(f)(3) (emphases added) (limiting language minority protections to jurisdictions where "more than five per centum of the citizens of voting age residing in such State or political subdivision are members of a *single language minority*") (emphasis added). "[W]hen Congress includes particular language in one section of a statute but omits it in another," Congress presumptively "intended a difference in meaning." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (internal quotations and citations omitted). No single-race limitation is set forth in Section 2(b).

Instead, the term "class" chosen by Congress has the ordinary meaning of a "group of people . . . that have common characteristics or attributes," Black's Law Dictionary (11th Ed. 2019), and that common characteristic is expressly provided in Section 2(b)'s text: "citizens protected by subsection (a)." Thus, a class of citizens protected by subsection (a) means a class of

citizens who assert a shared protection against ancestry-based discrimination. This understanding of "class" aligns with the legal understanding of "class" at the time of Section 2's drafting, with a class consisting of individuals who had "questions of law or fact common to the class" in asserting claims of common harm. *See* Fed. R. Civ. P. 23(a) (1976 Edition v.8 Titles 28-31 388, as amended January 1, 1977). For these reasons, the Court should reject Defendants' argument that use of a singular "class" supports a single-race requirement. Mot. at 9–10.

Just as a "Whites Only" sign discriminates against nonwhite individuals on the basis of race *regardless of their particular race*, a statute may discriminate against racial minority voters on the basis of race when it dilutes their voting rights relative to racial majority voters. This understanding of racial discrimination was well established under federal law, even before Section 2's enactment. *See, e.g.*, *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 647, 658 (1989) (recognizing a "class of nonwhite cannery workers" and ordering the lower court to require "a demonstration that specific elements of the petitioners' hiring process have a significantly disparate impact on nonwhites"), *superseded by statute on other grounds as stated in Smith v. City of Jackson*, 544 U.S. 228, 240 (2005); *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 150 & n.5 (1977) (classifying Puerto Rican and Black citizens as a minority group protected under VRA § 5 and using "nonwhite" to refer to them collectively); *Keyes v. Sch. Dist. No. 1*, 413 U.S. 189, 198 (1973) (holding that Black and Hispanic students, despite being "of different origins, . . . suffer identical discrimination in treatment when compared with the treatment afforded Anglo students"); *Nixon v. Condon*, 286 U.S. 73, 83 (1932) (sustaining right of action where petitioner was "[b]arred from voting at a primary . . . for the sole reason that his color is not white"); *see also Coal. for Educ. in Dist. One v. Bd. of Elections of City of New York*, 495 F.2d

12

1090, 1091 (2d Cir. 1974) (pre-1975 amendment case recognizing a challenge by "black, Hispanic and Chinese" voters under the VRA and Fourteenth Amendment).

"Congress enacted the Voting Rights Act of 1965 for the broad remedial purpose of ridding the country of racial discrimination in voting," and it "should be interpreted in a manner that provides the broadest possible scope in combating racial discrimination." *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (cleaned up). Defendants' cramped reading of Section 2 would undermine that "broad remedial purpose" and should be rejected now, just as it was by the Fifth Circuit decades ago in *Campos*.

*2.* Defendants' interpretation of Section 2 is also belied by the VRA's legislative history, which underscores that Congress intended to effectuate broad protections against ancestry-based discrimination for individual citizens. The VRA was "designed primarily to enforce the 15th amendment to the Constitution of the United States." H.R. Rep. No. 493, 89th Cong., 1st Sess. (1965), 1965 U.S.C.C.A.N. at 2437. In pre-1982 amendments, Congress repeatedly acknowledged the common discriminatory harm inflicted on voters of more than one racial or ethnic group in a given jurisdiction, and sought to combat those common harms through the VRA. For example, the 1975 Senate Report notes that "[e]lection law changes which *dilute minority political power* in Texas are widespread" and that a three-judge panel had ruled that multimember districts in Bexar and Dallas counties "unconstitutionally diluted and otherwise cancelled the voting strength of *Mexican Americans and blacks*." S. Rep. No. 295, 94th Cong., 1st Sess. (1975), 1975 U.S.C.C.A.N. at 791–94 (emphases added) (citing *White v. Regester*, 412 U.S. 755 (1973)). Yet Congress did not enact any express provision limiting minority voters of different racial groups from asserting rights under Section 2, despite including other express limitations in other parts of

the VRA in the 1975 amendments affording additional protections to language minority voters. 52 U.S.C. §10303(f)(3).

The 1982 Amendment, clarifying that violations under Section 2 can be shown through discriminatory effects alone, followed the same trend of expanding the VRA's protections without prohibiting different minority groups from jointly challenging discriminatory electoral practices. Congress amended Section 2 to "make clear that proof of discriminatory intent is not required to establish a violation of Section 2" and thereby "restor[ed] the legal standards . . . which applied in voting discrimination claims prior to the litigation involved in *Mobile v. Bolden*." S. Rep. No. 417, 97th Cong., 2d Sess. at 2 (1982). In codifying the pre-*Bolden* standard from *White v. Regester*, Congress drew from a line of cases that itself included joint claims by Black and Latino voters in Tarrant County. *See Graves v. Barnes*, 378 F. Supp. 640, 644–48 (W.D. Tex. 1974), *vacated on other grounds*, *White v. Regester*, 422 U.S. 935 (1975); *see also Graves v. Barnes*, 408 F. Supp. 1050, 1052 (W.D. Tex. 1976) (adopting a remedial Black and Latino majority district, which the Supreme Court left in place), *stay denied sub. nom. Escalante v. Briscoe*, 424 U.S. 937 (1976).

In doing so, Congress repeatedly referred to minority voters collectively, observing that a results test would "permit plaintiffs to prove violations by showing that *minority voters* were denied an equal chance to participate in the political process." S. Rep. No. 417, 97th Cong., 2d Sess. at 16 (1982) (emphasis added); *see also, id.* at 27, 33. The Senate Judiciary Committee's Report also indicates that Congress was aware that voters from different racial/ethnic groups were jointly challenging racial vote dilution. The 1982 Senate Report cites to the Supreme Court's decision in *Wright v. Rockefeller*, in which plaintiffs alleged vote dilution on behalf of Black and Puerto Rican voters. *See id.* at 19 n.60 (citing *Wright v. Rockefeller*, 376 U.S. 52 (1964)). It also cites to *Jones v. Lubbock*, which dealt with claims by a coalition of "Black and Mexican American

citizens." *See id.* at 26 (citing 640 F.2d 777, 777 (5th Cir. 1981) (Goldberg, J., concurring)); *see also Jones v. Lubbock*, 727 F.2d 364, 383–86 (5th Cir. 1984) (affirming the post-remand finding that the coalition of Black and Mexican-American voters had proven their case under the amended Section 2). Despite this awareness, Congress did not add a single-race qualifier when utilizing the term "class" in its amendments.

Taken together, the legislative history thus shows Congress was aware of and intended to protect the ability of voters of more than one racial identity to jointly challenge, and obtain remedy for, voting structures that cause racial vote dilution against minority voters.

**C. Defendants' remaining arguments are unavailing.**

Defendants' other arguments for a single-race requirement must fail.

*1. Bartlett v. Strickland* does not support a single-race requirement. In *Bartlett*, a plurality of the Supreme Court held that Section 2 does not require "crossover" districts "in which minority voters make up less than a majority of the voting-age population" and rely on majority cross-over voters to elect a candidate of choice. 556 U.S. 1, 3, 12–20 (2009) (plurality).[3] The *Bartlett* plurality took great care to make clear it was not addressing minority coalition claims, *id*. at 13–14, and its reasoning does not apply to claims brought by a cohesive group of minority voters of different racial identities. Crossover claims were rejected due to (*i*) a concern that requiring such districts would result in protecting mere political alliances (contravening Section 2's mandate to remedy only racial harms); (*ii*) administrability concerns; and (*iii*) "tension with the third *Gingles* requirement that the majority votes as a bloc to defeat minority-preferred candidates." *Id.* at 14–

---

[3] Contrary to Defendants' statement, Mot. at 13, the Fourth Circuit's decision in *Hall v. Virginia*, 385 F.3d 421 (4th Cir. 2004), likewise dealt with majority crossover districts, *not* minority coalition districts. *See Holloway v. City of Va. Beach*, 531 F. Supp. 3d 1015, 1052–53 (E.D. Va. 2021) (observing that the Fourth Circuit did not "foreclose minority coalitions"), *vacated as moot*, 42 F.4th 266 (4th Cir. 2022).

18. Minority coalition claims, by contrast, do not raise those concerns, and are consistent with the *Bartlett* plurality's preference for a bright-line test: "Do *minorities* make up more than 50 percent of the voting-age population in the relevant geographic area?" *Id.* at 18 (emphasis added). Plaintiffs' claims do not require any difficult-to-administer speculation about future majority crossover voting and therefore also do not create tension with the third *Gingles* condition of majority bloc voting. Likewise, the *Gingles* preconditions and the totality-of-the-circumstances analysis sufficiently ensures that successful Section 2 claims are tied to racial, rather than political, harms. *See, e.g.*, *Allen*, 599 U.S. at 18–19 (explaining that the *Gingles* III inquiry, for example, "'establish[es] that the challenged districting thwarts a distinctive minority vote' *at least plausibly on account of race*" (emphasis added, quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)).

*2.* Defendants' arguments that claims brought by minority voters of different racial identities "dilute minority votes" or "prioritiz[e] the interests of a coalition of minorities over those of disparate minority groups," Mot. at 13–14, are both factually unsubstantiated and overlook how the *Gingles* preconditions apply. Where individuals within different minority groups regularly vote differently from one another, they will be unable to adequately plead or prove cohesion and thus cannot satisfy *Gingles* II. *See, e.g.*, *Brewer v. Ham*, 876 F.2d 448, 453 (5th Cir. 1989). Likewise, under *Gingles* I, "[c]ombining discrete communities of interest—with differences in socio-economic status, education, employment, health, and other characteristics—is impermissible." *See* Dkt. 591 at 8 (quoting *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022)). In other words, it is only when coalitions of different minority groups are cohesive that their collective voting rights are protected from dilution by a majority that otherwise votes against them.

The existing Section 2 framework appropriately respects the need to avoid insidious racial stereotypes and assumptions, instead requiring an "intensely local appraisal." *Allen*, 599 U.S. at

19 (*quoting Thornburg v. Gingles*, 478 U.S. 30, 79 (1986)). Even if harmed voters are all identified as a single race, they are still never *assumed* to be politically cohesive; plaintiffs must instead prove this fact in the specific region or proposed district. *See, e.g.*, *Growe*, 507 U.S. at 41. Nor are majority voters *assumed* to engage in bloc voting because of their racial identity, and plaintiffs must further show that polarization thwarts minority opportunity "at least plausibly on account of race." *Allen*, 599 U.S. at 19. Just the same, the question of whether a given coalition can succeed on a Section 2 claim is "treated . . . as a question of fact, allowing aggregation of different minority groups" for *Gingles* I "where the evidence suggests that they are politically cohesive." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 864 (5th Cir. 1993). This approach recognizes the inherent possibility that, in any given jurisdiction, "the prejudice of the majority is not narrowly focused" against merely one racial group. *League of United Latin Am. Citizens, Council No. 4386 v. Midland Indep. Sch. Dist.*, 812 F.2d 1494, 1500 (5th Cir. 1987), *vacated on other grounds*, 829 F.2d 546 (5th Cir. 1987) (en banc).

*3.* In attempting to cast Plaintiffs' minority coalitions as either mere political alliances or grounded in racial stereotypes, Defendants raise numerous evidentiary arguments as to the extent of cohesion among the Latino, AAPI, and Black coalitions alleged by Plaintiffs. Mot. 15–16. Defendants will have their chance to attempt to prove that Plaintiffs' coalitions are not cohesive. For now, however, Plaintiffs have met their burden under Rule 12(b)(6)—as this Court has already held. Dkt. 591 at 10–14.[4]

---

[4] Defendants warn that continuing to recognize minority vote dilution claims without a single-race requirement will inure only to the benefit of lawyers. But Defendants' concerns about "increased litigation," Mot. at 17, have not been borne out by experience within the Fifth Circuit, where such claims have been long recognized and yet relatively rarely litigated.

*4.* Defendants conclude by arguing that *Campos*'s interpretation of Section 2 "raises serious constitutional questions." Mot. at 18. The seriousness of these questions, however, is belied by the superficial treatment given to them in Defendants' motion. Defendants' arguments are nothing more than an attempt to convince this Court to ignore decades of Section 2 precedent based on selective quotations from a handful of inapposite cases and nonbinding opinions.

Defendants' first "constitutional concern" relates to Congress's authority to "legislate based on race." Mot. at 18. Defendants' citation to *Students for Fair Admission v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023), suggests that they believe coalition claims may implicate equal protection concerns under the Fourteenth Amendment. Mot. at 18. But in the very same paragraph, Defendants also cite the Supreme Court's decision in *Allen v. Milligan*, in which the Court expressly rejected Alabama's arguments that Section 2 exceeds Congress's remedial authority under the Fifteenth Amendment. *Allen*, 599 U.S. at 41.[5] Defendants have thus failed to develop this argument. *See, e.g.*, *de la O v. Housing Authority of City of El Paso*, 417 F.3d 495, 501 (5th Cir. 2005) (noting that "perfunctory and conclusional assertion[s]" in a brief are insufficient because "[j]udges are not like pigs, hunting for truffles buried in briefs") (internal quotations omitted), *abrogated in part on unrelated grounds by Reagan Nat'l Adver. of Austin v. Austin*, 972 F.3d 696, 703 (2020).[6]

---

[5] Defendants' heavy reliance on Justice Kavanaugh's concurring opinion in *Allen* to suggest that there is an "open question" regarding "the continued vitality" of Section 2 claims, Mot. at 19, 20, fails. Justice Kavanaugh *joined* the portion of the majority opinion pointing to four decades of precedent "authoriz[ing] race-based redistricting as a remedy" for violations of Section 2 and rejecting "Alabama's arguments that § 2 as interpreted in *Gingles* exceeds the remedial authority of Congress." *Allen*, 599 U.S. at 41.

[6] A generous interpretation of Defendants' argument is that they are encouraging this Court to rely on the canon of constitutional avoidance in interpreting Section 2. But Defendants fail to develop this argument and do not explain why application of that canon would be appropriate here, which it is not. *See United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) ("It is not enough to

Defendants maintain that interpreting Section 2 to authorize multiracial coalition claims, as the Fifth Circuit has for years, would "exclude[] just one race from its protective sweep," thereby allowing coalitions to "wield the VRA as a newfound instrument of discrimination." Mot. at 19. Defendants cite no authority for this proposition and are simply incorrect that interpreting Section 2 as the Fifth Circuit did in *Campos* would exclude any racial group from the protections of Section 2. To the contrary, Section 2 expressly prohibits the "denial or abridgement of the right to vote of *any* citizen of the United States" if that denial or abridgement is "on account of race or color. . . ." 52 U.S.C. § 10301(a) (emphasis added); *see, e.g.*, *United States v. Brown*, 494 F. Supp. 2d 440, 445 (S.D. Miss. 2007) (explaining that "Section 2 was intended to protect the rights of *all* voters, regardless of race" and concluding that defendants intentionally discriminated against white voters in violation of Section 2 (emphasis in original)), *aff'd*, 561 F.3d 420 (5th Cir. 2009); *see also Harding v. Cty of Dallas*, 336 F. Supp. 3d 677, 695 & n.2 (N.D. Tex. 2018) (analyzing vote dilution claim brought by "Caucasian, non-Hispanic" plaintiffs under *Gingles* framework and concluding that the claim failed because the plaintiffs did not prove "that the minority group (*i.e.*, Anglos) 'has the potential to elect' . . . the Anglo candidate of choice, in a possible second commissioner district" (quoting *Cooper v. Harris*, 581 U.S. 285, 302 (2007)), *aff'd*, 948 F.3d 302 (5th Cir. 2020)).

Defendants argue that interpreting Section 2 to allow claims by minority voters of more than one race is akin to providing a "government benefit—not unlike a public drinking fountain." Mot. at 19. That bizarre argument fundamentally mistakes the nature of a Section 2 remedy. The Voting Rights Act is a prophylactic statute designed to effectuate the promise of the Fifteenth Amendment and "forever 'banish the blight of racial discrimination in voting.'" *Allen*, 599 U.S. at

---

merely mention or allude to a legal theory. . . . [M]erely intimating an argument is not the same as pressing it." (citations and internal quotation marks omitted)).

10 (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966)). Pursuing those ends sometimes requires race-based redistricting as a *remedy* for a Section 2 violation. *Id.* at 41; *see also id.* at 45 (Kavanaugh, J., concurring). But Section 2's race-based remedies do not "benefit" one race of voters to others' exclusion. They are available only to plaintiffs who have satisfied the three *Gingles* preconditions and demonstrated that, under the totality of the circumstances, the political process is not equally open. *Allen*, 599 U.S. at 18. Far from receiving a "benefit," plaintiffs who secure a race-based remedy under Section 2 must first demonstrate that they suffered a race-based harm that requires redressing.

Defendants finally argue that coalition districts are simply a form of partisan gerrymandering that presents a nonjusticiable political question. Mot. at 19–20. But this Court has already rejected that argument on multiple occasions. *See* Dkt. 307 at 40 (citing Dkt. 144 at 4). There is no reason to revisit those rulings.

*     *     *

In sum, absent any change in controlling law, the Court need not—and should not—revisit its prior ruling that Plaintiffs' Section 2 claims are cognizable under Fifth Circuit precedent. If *Petteway* changes the legal landscape, the Court should consider the decision's impact on this case based on full briefing directly addressing the application of the Fifth Circuit's holding—not Defendants' speculation about what the *en banc* court may or may not decide.

<b><u>CONCLUSION</u></b>

For the reasons stated above, Defendants' motion to dismiss should be denied.

Date: June 18, 2024

Respectfully submitted,

*/s/ Hilary Harris Klein*

David A. Donatti
TX Bar No. 24097612
Ashley Harris
Texas Bar No. 24078344
Thomas Buser-Clancy
Texas Bar No. 24123238
ACLU FOUNDATION OF TEXAS, INC.
PO Box 8306
Houston, TX 77288
Tel: (713) 942-8146
Fax: (713) 942-8966
ddonnati@aclutx.org
aharris@aclutx.org
tbuser-clancy@aclutx.org

Yurij Rudensky*
NY State Bar No. 5798210
BRENNAN CENTER FOR JUSTICE AT NYU
SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
Tel: (646) 292-8310
Fax: (212) 463-7308
rudenskyy@brennan.law.nyu.edu

Hilary Harris Klein*
NC. State Bar No. 53711
Mitchell Brown*
NC. State Bar No. 56122
SOUTHERN COALITION FOR SOCIAL JUSTICE
5517 Durham Chapel Hill Blvd.
Durham, NC 27707
Telephone: 919-323-3380
Fax: 919-323-3942
hilaryhklein@scsj.org
mitchellbrown@scsj.org

Jerry Vattamala*
NY State Bar No. 4426458
Susana Lorenzo-Giguere*
NY State Bar No. 2428688
Patrick Stegemoeller*
NY State Bar No. 5819982
ASIAN AMERICAN LEGAL DEFENSE AND
EDUCATION FUND
99 Hudson Street, 12th Floor
New York, NY 10013
jvattamala@aaldef.org
slorenzo-giguere@aaldef.org
pstegemoeller@aaldef.org

Paul D. Brachman*
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
2001 K Street NW
Washington, DC 20006
pbrachman@paulweiss.com
202-223-7440

*Admitted pro hac vice
ATTORNEYS FOR FAIR MAPS PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 18, 2024, the foregoing document and exhibit were served on counsel of record via the Court's CM/ECF system.

<u>*/s/ Hilary Harris Klein*</u>
Hilary Harris Klein