UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br><br> *Plaintiffs*, <br><br> EDDIE BERNICE JOHNSON, *et al.*, <br><br> *Plaintiff-Intervenors*, <br><br> v. <br><br> GREG ABBOTT, in his official capacity as Governor of the State of Texas, *et al.*, <br><br> *Defendants*. | EP-21-CV-00259-DCG-JES-JVB <br> [Lead Case] <br><br> & <br><br> All Consolidated Cases |

**MEMORANDUM OPINION AND ORDER**

The United States and a legion of private plaintiffs have alleged that the redistricting plans enacted by Texas following the 2020 census violate the Voting Rights Act ("VRA"), 52 U.S.C. § 10301, and the United States Constitution.

Before this Court are Texas's motions to dismiss the Fair Maps plaintiffs' and the Bacy[1] plaintiffs' respective Supplemental Complaints. *See*

---

[1] Formerly the "Abuabara" plaintiffs. Plaintiff Rosalinda Ramos Abuabara moved to dismiss her claims on July 9, 2024. The remaining "Abuabara Plaintiffs"—now the "Bacy Plaintiffs"—continue to pursue the claims in their Third Amended Complaint (ECF No. 613) and Supplemental Complaint (ECF No. 765). *See* ECF No. 795.

1

ECF No. 779 (Fair Maps); ECF No. 785 (Bacy).[2]  At the time the plaintiffs sued Texas, and at the time that Texas filed its motions to dismiss, this court reviewed claims brought under Section 2 of the VRA under the legal framework established by *Campos v. City of Baytown, Tex.*, 840 F.2d 1240 (5th Cir. 1988), *overruled by Petteway v. Galveston Cnty.*, 111 F.4th 596 (5th Cir. 2024) (en banc).  *Campos* held that Section 2 of the VRA authorized "coalitions of racial and language minorities to claim vote dilution in legislative redistricting." *Petteway*, 111 F.4th at 599.  Bacy and Fair Maps's Complaints reflect that legal standard.[3]

The en banc Fifth Circuit has since overturned *Campos*, holding that "Section 2 does not require political subdivisions to draw precinct lines for the electoral benefit of distinct minority groups that share political preferences but lack the cementing force of race or ethnicity." *Petteway*, 111 F.4th at 614.  At this Court's direction, *see* ECF No. 810, the parties have submitted supplemental briefing to address the effect of *Petteway* on Texas's motions to dismiss.[4]  Texas moves to dismiss the plaintiffs' Section 2 claims under either Federal Rule of Civil Procedure 12(b)(1) for presenting a non-justiciable political question or under Rule 12(b)(6) for failure to state claim.[5]

For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Texas's motions to dismiss.  The claims subject to dismissal are dismissed without prejudice, and we grant leave to Bacy and Fair Maps to amend the entirety of their operative Complaints to clarify which of their claims comply with *Petteway*.[6]

---

[2] For simplicity, the Court refers to each group of plaintiffs as "Bacy" and, separately, "Fair Maps."  The Court refers to both groups collectively as "the plaintiffs."

[3] *See, e.g.*, ECF No. 765 ¶ 14; ECF No. 777 ¶ 18.

[4] *See* ECF Nos. 814, 815, 816, 823, 824, 827.

[5] *See* ECF No. 779 at 19–20; ECF No. 785 at 14–15.

[6] Judge Guaderrama respectfully dissents from portions of this Memorandum Opinion and Order and will soon issue an opinion concurring in part and dissenting in part.  The panel unanimously agrees to release the majority opinion by itself now, so that the case may proceed while Judge Guaderrama drafts his opinion.

I. Standards of Review

Rule 12(b)(1) allows parties to move to dismiss an action for lack of subject-matter jurisdiction. FED. R. CIV. P. 12(b)(1).  "The concept of justiciability, as embodied in the political question doctrine, expresses the jurisdictional limitations imposed upon federal courts by the 'case or controversy' requirement of Article III." *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 948 (5th Cir. 2011) (cleaned up).  In the context of voting rights claims, courts are "not responsible for vindicating generalized partisan preferences" because a court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Rucho v. Common Cause*, 588 U.S. 684, 709 (2019) (citation omitted).  As a result, partisan gerrymandering claims present nonjusticiable political questions.  *Id.*[7]

Rule 12(b)(6) allows parties to move to dismiss an action for failure to state a claim. FED. R. CIV. P. 12(b)(6).  To survive a 12(b)(6) motion, a plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when well-pleaded facts allow the court reasonably to infer that the defendant is liable for the alleged conduct.  *Id.*  "But we do not 'presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement.'" *Johnson v. Harris Cnty.*, 83 F.4th 941, 945 (5th Cir. 2023) (quoting *Armstrong v. Ashley*, 60 F.4th 262, 269 (5th Cir. 2023)).

II. The Parties' Contentions

Texas observes that the plaintiffs rely on coalitions of racial or ethnic minorities.  It avers that such coalitions do not give rise to viable vote-dilution claims under Section 2 of the Voting Rights Act for two reasons.  First, such

---

[7] Texas asks this court to apply this nonjusticiability standard to the plaintiffs' race-based coalition claims to the extent that such claims are effectively political gerrymandering claims. *See* ECF No. 779 at 19–20; ECF No. 785 at 14–15.

claims present "nonjusticiable political questions" by asking the court to "impose . . . electoral districts that give an upper hand to political cohorts with no shared history of discrimination."[8] Second, such claims fail to allege facts "that would, if proven, establish that the districts drawn by the 88th Legislature render the voting process 'not equally open to participation by members of a class of [protected] citizens.'"[9] *Petteway* speaks directly to this second argument and is the basis of the Court's analysis of Texas's motions to dismiss the plaintiffs' coalition-based vote-dilution claims.

Separate from the legal challenges Texas raises about the plaintiffs' coalition-based vote-dilution claims post-*Petteway*, Texas moves to dismiss Fair Maps's discriminatory intent claim. Texas avers that Fair Maps failed sufficiently to allege that the 88th Legislature acted with discriminatory intent in violation of the Fourteenth and Fifteenth Amendments when it ratified the challenged districts. *See* ECF No. 779 at 3–6.

The plaintiffs resist those conclusions. Bacy first asserts that Texas's motion to dismiss is untimely and therefore procedurally improper. *See* ECF No. 789 at 4–7. Next, the plaintiffs posit that coalition districts are cognizable under Section 2 of the VRA. *See* ECF No. 788 at 9–19; ECF No. 789 at 3–4.[10] Bacy also argues that its claims do not rely on coalition districts. *See* ECF No. 789 at 7–8. Lastly, Fair Maps responds that its existing allegations sufficiently plead discriminatory intent. *See* ECF No. 788 at 4–9.

### III. Procedural Propriety of Texas's Motions

Texas moves to dismiss under Rule 12(b)(1) for "lack of subject matter jurisdiction" and under Rule 12(b)(6) for failure to state a claim. Fed. R. Civ. P. 12(b)(1), (6). Because Bacy posits that Texas's motion to dismiss is untimely, *see* ECF No. 789 at 4–7, the Court considers the motion's procedural propriety under each rule in turn.

---

[8]   ECF No. 779 at 1–2; *see* ECF No. 785 at 1.
[9]   ECF No. 779 at 1 (quoting 52 U.S.C. § 10301(b)) (alteration in original); *see* ECF No. 785 at 1.
[10]  As noted above, those filings were submitted pre-*Petteway*, when the Fifth Circuit still recognized Section 2 claims that relied on coalitions of racial minorities.

4

Texas's motions seek dismissal under Rule 12(b)(1) because, according to Texas, both plaintiffs' Complaints "present[] a non-justiciable political question."[11] Texas argues that the plaintiffs' race-based coalition claims are functionally equivalent to partisan gerrymandering claims, which are nonjusticiable political questions under *Rucho*. 588 U.S. at 709. "Because the political question doctrine is jurisdictional, we address it first."[12] Because "[a] court must dismiss [an] action" if it "determines at any time that it lacks subject-matter jurisdiction," FED. R. CIV. P. 12(h)(3), Texas's motion to dismiss under Rule 12(b)(1) is not untimely.

But the Court declines to find that race-based coalition claims are necessarily nonjusticiable political questions at this stage and, accordingly, rejects Texas's attempt to dismiss the plaintiffs' claims under Rule 12(b)(1). Although the en banc Fifth Circuit in *Petteway* observes minority coalition claims may raise "quintessentially political" questions like those "raised by political gerrymandering," the en banc Fifth Circuit did not base its invalidation of minority coalition claims on nonjusticiability grounds. *Petteway*, 111 F.4th at 611–12.[13] Accordingly, this Court declines to dismiss the plaintiffs' race-based coalition claims on those grounds.

Texas also seeks dismissal under Rule 12(b)(6). Bacy asserts that Texas's motion to dismiss is untimely and therefore procedurally improper

---

[11] *See* ECF No. 785 at 14; ECF No. 779 at 1–2 (averring that coalition district claims present "nonjusticiable political questions" by asking the court to "impose . . . electoral districts that give an upper hand to political cohorts with no shared history of discrimination").

[12] *Spectrum Stores*, 632 F.3d at 943; *see also Howery v. Allstate Ins. Co.*, 243 F.3d 912, 919 (5th Cir. 2001) (noting that "federal courts must address jurisdictional questions whenever they are raised"). Moreover, Rule 12(b)(1) dismissals are *not* waivable. *See* FED. R. CIV. P. 12(h)(1) ("A party waives any defense listed in Rule 12(b)(2)–(5) . . . .").

[13] Further, the "quintessentially political" claims that the *Petteway* court deemed "not susceptible of judicial decisionmaking" were "minority *coalition* claims." *Petteway*, 111 F.4th at 611–12 (emphasis added). As discussed below, while the plaintiffs' coalition-based claims must be dismissed post-*Petteway*, the plaintiffs' claims are cognizable—and thus can survive dismissal—to the extent that they allege Section 2 violations against distinct racial minorities. *See generally Allen v. Milligan*, 599 U.S. 1, 17–19 (2023).

because Bacy perceives that the motion's "real target" is "[its] . . . Third Amended Complaint," which Texas answered back in 2022. ECF No. 789 at 5 (citations omitted). Furthermore, Bacy notes that Texas's motion was filed 56 days after the Supplemental Complaint's filing. In Bacy's view, the motion should have been due, at most, within "21 days after filing of the Supplemental Complaint." *Id.* at 6.

A 12(b)(6) motion generally cannot be filed after an answer has been submitted. *See* FED. R. CIV. P. 12(b). But because Rule 12(h)(2) provides that "[a] defense of failure to state a claim upon which relief can be granted" may be advanced in a motion for judgment on the pleadings under Rule 12(c), we will treat Texas's motions as if they had been styled a 12(c) motion. *See generally Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). "This distinction is purely formal, because we review this 12(c) motion under the standard that governs 12(b)(6) motions." *Id.*[14] We thus find Texas's motions timely, as styled under 12(c), and proceed to the motions' merits.[15]

## IV. Discriminatory Effect Claims

Texas contends that coalition-district vote-dilution claims are not cognizable under Section 2 of the VRA.[16] Texas's position has been bolstered by *Petteway*, in which the en banc Fifth Circuit held that "Section 2 of the [VRA] does not authorize separately protected minority groups to aggregate their populations for purposes of a vote dilution claim." 111 F.4th at 603. As the court explained, such coalition-minority claims are, *inter alia*, "inconsistent with the text of Section 2," "inconsistent with Supreme Court

---

[14] *Accord Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 n.8 (5th Cir. 2002) ("Rule 12(b)(6) decisions appropriately guide the application of Rule 12(c) because the standards for deciding motions under both rules are the same."). Because we consider Texas's Rule 12(b)(6) motion as a Rule 12(c) motion for judgment on the pleadings, we reject Fair Maps's contention that we should not address the application of *Petteway* at this stage of the litigation. *See* ECF No. 816 at 1–3.

[15] Texas does not oppose this recharacterization. *See* ECF No. 797 at 5.

[16] Specifically, Texas posits that such claims (1) find no support in Section 2's text; (2) clash with historic and statutory context; (3) exacerbate minority-vote dilution and race-based distinctions; and (4) create inefficiencies by incentivizing needless, resource-intensive litigation. *See* ECF No. 779 at 7–22; ECF No. 785 at 2–13.

cases rejecting similar 'sub-majority' vote dilution claims," and in "tension with the proviso against proportional representation and with the purposes of the [VRA]." *Id.* Thus, "Section 2 does not require political subdivisions to draw precinct lines for the electoral benefit of distinct minority groups that share political preferences but lack the cementing force of race or ethnicity." *Id.* at 614.

As we have recognized at a prior stage in this litigation, we are bound by the decisions of the Fifth Circuit. *League of United Latin Am. Citizens v. Abbott*, 604 F. Supp. 3d 463, 492–93 (W.D. Tex. 2022).[17] We adhere to that decision under the law of the case doctrine.[18] So the question is which of the Bacy and Fair Maps claims survive *Petteway*.[19]

### A. Bacy

Only one Bacy claim clearly warrants dismissal at this stage. Bacy acknowledges that its challenge to the Texas House map in Tarrant County "depend[s] on a coalition district" as it "turns on the allegation that an additional majority Black and Latino House district could be drawn." ECF No. 789 at 7–8 (citing ECF No. 613 ¶ 193); *see also* ECF No. 814 at 1. That challenge is unsustainable post-*Petteway*, as it "circumvent[s] the majority-minority requirement by forming a political coalition composed of distinct racial groups." 111 F.4th at 611. Dismissal of that challenge is proper.

---

[17] ECF No. 307 at 27–28.
[18] *Contra* the suggestion of Fair Maps, it is not "an open question whether this Court is even bound by *Petteway*." ECF No. 816 at 2. "The law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *U.S. v. O'Keefe*, 169 F.3d 281, 283 (5th Cir. 1999) (cleaned up). While this court "has the power to revisit prior decisions of its own . . . courts should be loath to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Id.* (quotation omitted). Our prior decision that we are bound by rulings of the Fifth Circuit was not clearly erroneous or unjust, so we decline to depart from that decision now. *See also Russell v. Hathaway*, 423 F. Supp. 833, 835 (N.D. Tex. 1976) (three-judge panel) (recognizing that a "three-judge court is bound by apposite decisions of the Court of Appeals for its circuit").
[19] We do not here address the claims brought by the Brooks plaintiffs, the Intervenor plaintiffs, or the NAACP plaintiffs.

7

The remainder of Bacy's challenges, however, could potentially survive *Petteway*. To be sure, Bacy acknowledges that both Counts in its Supplemental Complaint expressly allege theories of vote-dilution based on coalition districts. *See* ECF No. 789 at 7–8. Count One alleges, *inter alia*, that "the Dallas-Fort Worth and Houston metropolitan areas" could each "allow for an additional [congressional] district . . . in which Black and Latino eligible voters are, *together*, a majority of eligible voters." ECF No. 613 ¶ 253 (emphasis added). Count Two similarly alleges that Section 2 requires the creation of "an additional Texas House district in Tarrant County in which Black and Latino Texans *together* have a reasonable opportunity to elect their candidates of choice." *Id.* ¶ 263 (emphasis added).

But for those claims, coalition-based districts were included as "alternative, coalition demonstrative districts." ECF No. 789 at 7. Indeed, Bacy also alleged that "additional, majority-Latino . . . district[s] could be drawn." *Id.*[20] So while "alternative . . . demonstrative districts" reliant on coalitions of disparate racial groups do Bacy no good post-*Petteway*, Bacy's claims survive dismissal to the extent that they plausibly allege that a single racial or ethnic group can constitute a majority in the proposed district. *See Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 853 (5th Cir. 1999). Bacy is allowed to plead in the alternative, and where "a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2).

That said, even Bacy's alternative challenges also appear heavily reliant on coalition claims. Take, for instance, the allegations regarding Senate Bill 6 CD25. Most of the allegations supporting that challenge are mixed-race coalition allegations that are impermissible under *Petteway*. *See, e.g.*, ECF No. 613 at 33 (accusing Texas of "cracking predominantly Black *and* Latino portions of Tarrant County"); *id.* at 34 (alleging that "White

---

[20] *See, e.g.*, ECF No. 613 ¶ 206 (proposing the creation of "a [House] district in which 52 percent of eligible voters are Latino" in Harris County). *See also* ECF No. 789 at 7 ("With respect to each of [the challenged] regions, the operative complaint alleges—and shows, with maps—that additional, majority Latino citizen-voting-age population congressional districts could be drawn." (citation omitted)).

8

voters in Enacted CD25 consistently vote as a bloc in opposition to Black *and* Latino voters' preferred candidates"); *id.* at 35 (proposing "a 58.1 percent Black *and* Latino district"); *id.* (proposing "a 53.1 percent Black *and* Latino district") (emphases added). We draw all inferences in Bacy's favor at the motion to dismiss stage, but we emphasize that by declining to dismiss Bacy's claims at this stage, we do not hold that those claims will satisfy *Petteway*.

We accordingly grant in party and deny in part Texas's motion to dismiss Bacy's Complaint, and grant Bacy leave to amend the Complaint to clarify which claims, alternative or otherwise, clearly survive *Petteway*.

B.   *Fair Maps*

We apply the same rationale to Fair Maps's claims. Count One of Fair Maps's Supplemental Complaint[21] alleges that "Defendants violated Section 2 by failing to create minority opportunity districts, *including coalition districts*, in Harris and/or Fort Bend Counties in Plans H2316, S2168, and C2198; the Dallas-Fort Worth area in Plan C2198; Collin County in Plan H2316; Bell County in Plan H2316; and Tarrant County in Plan S2168." ECF No. 502 ¶ 180 (emphasis added). Any of Fair Maps's challenges to these plans that rely on coalitions of minority voters must be dismissed.

We start with Fair Maps's challenge to the Texas House plans. *See id.* at 28–43. Fair Maps alleges violations in Fort Bend, Bell, and Collin Counties. Its challenge to the Texas House map in Bell County alleges that "a majority Black district" could have been drawn "in House District 54." *Id.* ¶ 110. So Fair Maps's challenge to the Bell County House map could survive dismissal to the extent that the black residents of Bell County alone could constitute a Citizen Voting Age Population ("CVAP") majority. But the proposed District 54 mentioned in Paragraph 110 is an alternative plan that failed in the legislature. Fair Maps's proposed alternative District 54 is only 35.1% black. *See id.* at 37. That proposed District 54 only becomes a majority-minority District (64.6%) after aggregating a coalition of Latino voters (22.1%), black voters (35.1%), and Asian voters (4.7%). *Id.* Because this

---

[21] Fair Maps incorporates by reference its Second Amended Complaint. *See* ECF No. 777 ¶¶ 21–22; *see also* ECF No. 502.

9

proposal is unsustainable post-*Petteway*, it must be dismissed.

Fair Maps's challenges to the Fort Bend and Collin Counties also must be dismissed. All those claims fail post-*Petteway* because none of the demonstrative districts for those counties contains a sufficiently large number of a single racial or ethnic group. *See id.* at 33 (Fort Bend) and 42 (Collin).

We turn to Fair Maps's challenge to the Texas Senate map. *See id.* at 43–53. Fair Maps alleges violations in Fort Bend and Tarrant Counties. Fair Maps posits that enacted District 13 in Fort Bend County "purposefully cracked the AAPI community into Senate Districts 13, 17, and 18" and thus "impermissibly dilute[d] the voting power of minority voters." *Id.* at ¶ 132, 135. But Fair Maps's demonstrative districts for Fort Bend County only show one district composed of a majority of one minority group—District 13. Enacted District 13 is *already* drawn as a majority-minority district. *See id.* at 44. So the enacted configuration does not disperse a minority group's members "into districts in which they constitute an ineffective minority of voters." *Cooper v. Harris*, 581 U.S. 285, 292 (2017) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986)). And Fair Maps's other proposed Fort Bend majority-minority district—District 17—impermissibly relies on coalitions of racial minorities post-*Petteway*. *See* ECF No. 502 at 48.

Fair Maps's Tarrant County claim fares no better. Fair Maps's main charge is that "the proposed map for Senate District 10 significantly reduced the minority population in what was previously a *coalition district*." ECF No. 502 ¶ 141 (emphasis added). But none of the demonstrative senate districts that Fair Maps provides contains a sufficiently large number of a single racial or ethnic group. *See id.* at 52.

Fair Maps's challenge to the Congressional Redistricting Plan C2193 also fails. Again, none of the demonstrative congressional districts that Fair Maps provides contains a sufficiently large number of a single racial or ethnic group. *See id.* at 57 (Harris-Fort Bend Counties) and 61 (Dallas-Fort Worth).

In sum, all Fair Maps's arguments rely on coalitional claims that are

10

not supportable post-*Petteway*. So Fair Maps's Complaint must be dismissed unless it can show that the challenged maps result from "discriminatory intent," which "form[s] an independent basis for liability." *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020). We turn to that question now.

### V. Discriminatory Intent Claims

Texas seeks dismissal of Fair Maps's discriminatory intent claim, averring that it has failed to overcome the presumption of good faith. *See* ECF No. 779 at 2–6.[22] Because Fair Maps has met its burden at the pleading stage, we deny Texas's motion to dismiss Fair Maps's discriminatory intent claim.

During the pendency of this case, the 88th Legislature "reconsidered, ratified, and approved" the challenged plans originally enacted by the 87th Legislature. *Id.* at 3. According to Texas, that ratification fatally wounds Fair Maps's claim, as any discriminatory intent "on the part of the 87th Legislature . . . cannot be imputed to the 88th Legislature." *Id.* at 4.

Fair Maps characterizes Texas's argument as a "shell game approach" that "would allow lawmakers to commit constitutional violations with impunity" because it would permit the enactment of "a law motivated by discriminatory intent—even expressly so—as long as the same law is reenacted in a different legislative session, with at least some alternative explanation." ECF No. 788 at 8. Fair Maps notes that (1) "alternative explanations for the enactment of the challenged plans" do not furnish a basis for dismissal and (2) it need not "demonstrate evidentiary proof to overcome the presumption of good faith." *Id.* at 6–7.

"[A]s we have noted previously, the difficulty of proving discriminatory intent does not mean that, at the pleading stage, plaintiffs must present an airtight case or negate alternative theories." ECF No. 307 at 29 (citing ECF No. 144 at 6–7). Again, "as noted previously, it is not yet necessary for Plaintiffs to demonstrate that the Texas legislature more likely than not acted with discriminatory intent. It is sufficient for Plaintiffs to point

---

[22] The Bacy plaintiffs do not raise constitutional intentional discrimination claims.

11

to circumstantial evidence, such as procedural irregularities or apparent subterfuge, from which discriminatory intent can plausibly be inferred." *Id.* at 53. The "historical background" of a legislative enactment is "one evidentiary source" relevant to the question of intent. *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 267 (1977).

Texas avers that, as in *Abbott v. Perez*, the plaintiffs have asked the court to infer animus because the state legislature "willfully ignored those who pointed out deficiencies" in their plan. 585 U.S. 579, 611 (2018) (cleaned up); ECF No. 794 at 4. In *Perez*, in Texas's telling, the Supreme Court refused to infer animus "because of direct and circumstantial evidence of an alternative explanation for why the Legislature did not accede to those objections," and here, Texas continues, "there is similarly an alternative explanation." ECF No. 794 at 4. Namely, that the "88th Legislature sought to avoid violating the Texas Constitution by failing to create state legislative districts during the first regular session following the decennial census." *Id.*[23]

But *Perez* is of no help to Texas at this stage of litigation. There, the Court specifically said that it was not "a case in which a law originally enacted with discriminatory intent is later reenacted by a different legislature." 585 U.S. at 604. But that is exactly what *this* case is, at least according to Fair Maps's pleadings, which we accept as true at the motion to dismiss stage.[24]

Further, we already rejected Texas's previous motion to dismiss Fair

---

[23] Prior to the 88th Legislature's adoption of the challenged maps, the 87th Legislature enacted House Plan 2316, Senate Plan 2168, and Congressional Plan 2193 in a third special session. *See* ECF No. 777 ¶ 3. Two Texas lawmakers then sued in state court, contending that the passage of state legislative plans in a *special* session violated Article 3, Section 28 of the Texas Constitution, which requires the Texas Legislature to apportion state legislative districts in "the first *regular* session" after publication of the results of the federal Census. Tex. Const. art. 3, § 28 (emphasis added). *See* ECF No. 777 ¶ 5. Texas thus argues that the 88th Legislature's intent in adopting the challenged maps was constitutional compliance, not discrimination. *See* ECF No. 794 at 4.

[24] *See, e.g.*, ECF No. 788 at 5 ("The Supplemental Complaint adds specific and thorough allegations about the 2023 regular session of the 88th Legislature, [ECF No.] 777 ¶¶ 7–18, detailing a basis for finding that it acted with discriminatory intent[.]").

12

Maps's discriminatory intent challenge to House Plan 2316, Senate Plan 2168, and Congressional Plan 2193. *See* ECF No. 307 at 54–55. As we wrote then, the Fair Maps plaintiffs "make thorough allegations about the legislative history of the various plans, including discussions of the plans' racial impacts," and although they "face a heavy evidentiary burden to prove discriminatory intent," their "allegations are sufficient to state a claim." *Id.* at 54–55. That Fair Maps now challenges HB 1000 and SB 375 and not HP 2316 and SP 2168 is a distinction without a legally significant difference. The plans are the same, and Fair Maps plausibly alleges that the 88th Legislature adopted the rationale of the 87th. *See* ECF No. 777 ¶ 20.

Although we once again "acknowledge that Plaintiffs face a difficult task in overcoming the presumption of legislative good faith and proving discriminatory intent, . . . that does not itself make their allegations implausible." ECF No. 307 at 55. Texas's motion to dismiss Fair Maps' discriminatory intent claim is denied.

\*   \*   \*   \*   \*

To sum up: We deny Texas's motion to dismiss most of Bacy's Section 2 claims; we grant only Texas's motion to dismiss Bacy's Tarrant County House District claim. We dismiss that claim without prejudice. We also grant Texas's motion to dismiss all Fair Maps's discriminatory effect claims. We dismiss those claims without prejudice as well.[25] We deny Texas's motion to dismiss Fair Maps's discriminatory intent claim. Finally, we grant leave to Bacy and Fair Maps to amend the entirety of their Complaints to heed the standard announced in *Petteway*.

Accordingly, the Court **ORDERS** that Texas's motions to dismiss Bacy's and Fair Maps's respective Supplemental Complaints, *see* ECF No. 779; ECF No. 785, are **GRANTED IN PART** and **DENIED IN**

---

[25] "[F]ive considerations" guide our decision "whether to grant a party leave to amend a complaint: 1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment. Absent any of these factors, the leave sought should be freely given." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) (cleaned up). None of those factors is present here.

13

**PART.** The Court **GRANTS LEAVE** to Fair Maps and Bacy to amend their Complaints pursuant to FED. R. CIV. P. 15(a)(2). The Court **ORDERS** Bacy and Fair Maps to file their amended Complaints by **Monday, March 3, 2025.**

      So **ORDERED** and **SIGNED** this 21st day of February 2025.

                                        _____

                                        **JERRY E. SMITH**
                                        **UNITED STATES CIRCUIT JUDGE**

*And on behalf of:*

      **Jeffrey V. Brown**
   **United States District Judge**
    **Southern District of Texas**

14