## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., | Civil Action |
| Plaintiffs | |
| v. | Lead Case No.: 3:21-CV-00259-DCG-JES-JVB |
| GREG ABBOTT, et al., | |
| Defendants. | |
| CECILIA GONZALES, AGUSTIN LOREDO, JANA LYNNE SANCHEZ, JERRY SHAFER, DEBBIE LYNN SOLIS; | |
| Plaintiffs, | Consolidated Case No.: 1:21-CV-00965-RP-JES-JVB |
| v. | |
| JANE NELSON, in her official capacity as Texas Secretary of State, and GREGORY WAYNE ABBOTT, in his official capacity as the Governor of Texas; | |
| Defendants. | |

## FOURTH AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Cecilia Gonzales, Agustin Loredo, Jana Lynne Sanchez, Jerry Shafer, and Debbie

Lynn Solis file this Complaint for Declaratory and Injunctive Relief against Defendants Jane

Nelson in her capacity as Texas Secretary of State and Gregory Wayne Abbott in his capacity as

Governor of the State of Texas, and allege as follows:

1.      Plaintiffs bring this voting rights action to challenge Texas Senate Bill 6, which establishes new congressional districts for Texas based on the 2020 census, on the grounds that they violate Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, because they strategically crack and pack Latino voters in Texas. Senate Bill 6 dilute the voting power of Texas's Latino community to ensure that white Texans, who now make up less than 40 percent of Texas's population, nevertheless form a majority of eligible voters in more than 60 percent of Texas's congressional districts and nearly 60 percent of Texas's House districts.

2.      Ninety-five percent of Texas's population growth between 2010 and 2020 came from communities of color. The Latino community grew fastest of all. As a direct result of this growth, Texas was apportioned two additional congressional seats.

3.      Yet Senate Bill 6 appropriates those additional congressional districts—and more—for white Texans. By doing so, Senate Bill 6 allows white Texans to choose representatives for congressional seats that exist only because of population growth in the Latino community. Senate Bill 6 does so by packing and cracking Latino voters along racial lines to ensure that the growing Latino population will not translate to increased political influence.

4.      Section 2 of the Voting Rights Act prohibits this absurd result. There is widespread racially polarized voting in Texas. Latino Voters across the state consistently and cohesively favor particular candidates for office, but those candidates are repeatedly defeated as a result of bloc voting by white Texans.

5.      Senate Bill 6 improperly cracks and packs Latino voters in convoluted districts in the Dallas–Fort Worth and Houston metropolitan areas, to avoid creating an additional district in each metropolitan area in which a majority of eligible voters are Latino.

6.    Latino voters in Texas have suffered from a long history of marginalization and discrimination, including, as here, the dilution of their voting strength through redistricting. Latino Texans now make up almost as large a proportion of Texas's population as white Texans, yet they have been systematically denied an equal opportunity to elect representatives of their choice. The result is a persistent neglect of their needs and concerns. As evidenced by an array of factors, such as the history of racial discrimination in voting, the perpetuation of racial appeals in Texas elections, and the socio-economic effects of decades of discrimination against Latino Texans that hinder their ability to participate effectively in the political process, Texas's failure to create additional districts in Dallas–Fort Worth and Houston in which a majority of eligible voters are Latino has resulted in the dilution of Latino voting strength in violation of Section 2.

7.    Accordingly, Plaintiffs seek an order (i) declaring that Senate Bill 6 violates Section 2 of the Voting Rights Act; (ii) enjoining Defendants from conducting future elections under Senate Bill 6; (iii) ordering a congressional redistricting plan that includes additional districts in Dallas–Fort Worth and Houston in which Latino Texans have a reasonable opportunity to elect their representatives of choice; and (iv) providing such additional relief as is appropriate.

## JURISDICTION AND VENUE

8.    Plaintiffs bring this action under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and 42 U.S.C. § 1983.

9.    This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under the laws of the United States and involve the assertion of deprivation, under color of state law, of rights under federal law.

10.    This Court has personal jurisdiction over Defendants, who reside in Texas and are sued in their official capacities, pursuant to Fed. R. Civ. P. 4(k)(1)(A).

11.     Venue is proper in this Court and this Division under 28 U.S.C. §§ 124(d)(1) and 1391(b) because a substantial part of the events that give rise to Plaintiffs' claims occurred in this judicial district.

12.     This Court has the authority to enter declaratory and injunctive relief under Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202.

## PARTIES

13.     Plaintiff Cecilia Gonzales is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Arlington, in Tarrant County. Under Senate Bill 6, she resides in Texas's 25th congressional district ("CD25"). Ms. Gonzales intends to vote in future congressional elections in CD25, or in any other districts in which she is eligible to vote.

14.     Plaintiff Agustin Loredo is a Latino citizen of the United States and of the State of Texas, a registered voter, and a resident of Baytown, in Harris County. Under Senate Bill 6, he resides in Texas's 36th congressional district ("CD36"). Mr. Loredo intends to vote in future congressional elections in CD36 or in any other districts in which he is eligible to vote.

15.     Plaintiff Jana Lynne Sanchez is a Latina citizen of the United States and of the State of Texas, and a registered voter eligible to vote in Fort Worth, in Tarrant County. Under Senate Bill 6, she is eligible to vote in Texas's 33rd congressional district ("CD33"). Ms. Sanchez intends to vote in future congressional elections in CD33, or in any other district in which she is eligible to vote.

16.     Plaintiff Jerry Shafer is a Latino citizen of the United States and of the State of Texas, a registered voter, and a resident of Baytown, in Harris County. Under Senate Bill 6, he resides in CD36. Mr. Shafer intends to vote in future congressional elections in CD36 or in any other districts in which he is eligible to vote.

17.    Plaintiff Debbie Lynn Solis is a Latina citizen of the United States and of the State of Texas, a registered voter, and a resident of Dallas, in Dallas County. Under Senate Bill 6, she resides in Texas's 33rd congressional district ("CD33"). Ms. Solis intends to vote in future congressional elections in CD33, or in any other district in which she is eligible to vote.

18.    Defendant Jane Nelson is sued in her official capacity as the Secretary of State of Texas. As Secretary of State, Ms. Nelson serves as Texas's Chief Election Officer. Tex. Elec. Code § 31.001(a). As "the chief election officer of the state," *id.*, Ms. Nelson is required to "obtain and maintain uniformity in the application, operation, and interpretation of" Texas's election laws, including by issuing directives and instructions to all state and local authorities having duties in the administration of these laws, *id.* § 31.003. Ms. Nelson is further empowered to remedy voting rights violations by ordering any official to correct conduct that "impedes the free exercise of a citizen's voting rights." *Id.* § 31.005(b). Ms. Nelson prescribes the form that individuals must complete for a place on a political party's general primary ballot, *see id.* §§ 141.031, 172.021-.024. And political parties who wish to hold a primary must deliver written notice to the Secretary of State noting their intent to hold a primary election, *id.* § 172.002, and the party chairs must certify to the Secretary of State the name of each candidate who has qualified for placement on the general primary election ballot, *id.* § 172.028. The Secretary of State also serves as the filing authority for independent candidates for federal office, including members of Congress. *See id.* § 142.005. Finally, the adopted redistricting plans are filed with the Secretary of State to ensure that elections are conducted in accordance with those plans.

19.    Defendant Gregory Wayne Abbott is sued in his official capacity as the Governor of the State of Texas. Under Texas's election laws, Governor Abbott "shall order . . . each general election for . . . members of the United States Congress" by proclamation. Tex. Elec. Code § 3.003.

## LEGAL BACKGROUND

20.    Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" Thus, in addition to prohibiting practices that deny outright the exercise of the right to vote, Section 2 prohibits vote dilution. A violation of Section 2 is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by [minority voters] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b).

21.    The dilution of voting strength "may be caused by the dispersal of [members of a racial or ethnic group] into districts in which they constitute an ineffective minority of voters or from the concentration of [members of that group] into districts where they constitute an excessive majority." *Thornburg v. Gingles*, 478 U.S. 30, 46 n.11 (1986).

22.    The United States Supreme Court, in *Thornburg v. Gingles*, identified three necessary preconditions ("the *Gingles* preconditions") for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51.

23.    Once all three preconditions are established, the statute directs courts to consider whether, under the totality of the circumstances, members of a racial group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b). The Senate Report on the 1982 amendments to the Voting Rights Act identifies several non-exclusive factors that courts should consider when

determining if, under the totality of the circumstances in a jurisdiction, the operation of the electoral device being challenged results in a violation of Section 2.

24.    These Senate factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet-voting; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

25.    The Senate Report itself and the cases interpreting it have made clear that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. No. 97-417, at 29 (1982)); *see also id.* ("The statute explicitly calls for a 'totality-of-the circumstances' approach and the Senate Report indicates that no particular factor is an indispensable element of a dilution claim.").

## FACTUAL ALLEGATIONS

### A.  The 2020 Census

26.    On April 26, 2021, the U.S. Census Bureau announced that based on the 2020 decennial census, Texas would gain two additional seats in the United States House of Representatives. On August 12, the Census Bureau then released the detailed population and

demographic data needed to draw new congressional districts. The Census Bureau's data revealed that Texas's population grew by nearly four million people between 2010 and 2020.

27.     Texas's growth came overwhelmingly from communities of color. Texas's white population grew by just 187,252 between 2010 and 2020. In contrast, Texas's Latino population grew by 1,980,796; Texas's Asian population grew by 613,092; and Texas's Black population grew by 557,887. The number of Texans identifying as members of multiple races also grew significantly. In all, non-white Texans accounted for 95 percent of Texas' population growth from 2010 to 2020, and Latinos accounted for more than half of that growth. Latino Texans now make up just under 40 percent of Texas's population—only half a percentage point less than white Texans. Had it not been for the growth in its communities of color, Texas likely would have lost congressional seats instead of gaining them.

28.     Communities of color also grew significantly in their share of Texas's voting-age population. More than 36 percent of voting-age Texans are now Latino—an increase of almost three percentage points since 2010. Only 43 percent of Texas's voting age population is now white—a decrease of more than 6 percentage points since 2010.

29.     The 2020 census did not collect citizenship information. Based on the Census Bureau's 2015-2019 American Community Survey ("ACS"), Texas's citizen voting age population was 29.9 percent Latino, 13.1 percent Black, 3.7 percent Asian, and 51.6 percent white. Based on the 2016-2020 ACS, Texas's citizen voting age population was 30.5 percent Latino, 13 percent Black, 3.8 percent Asian, and 50.8 percent white.

## B. The Redistricting Process

30.     Senate Bill 6 is the direct result of the Texas Legislature's failure to meaningfully engage with voters and abdication of its map-drawing responsibility to outside interests.

31. After a lengthy delay due to the coronavirus pandemic, the Texas Legislature began collecting public input on the redistricting process in January 2021.

32. From January to March 2021, the Senate Special Committee on Redistricting, led by Republican Senator Joan Huffman, heard public testimony during a series of hearings with a regional focus. Each hearing was held over the Zoom two-way video conferencing platform.

33. Although taking testimony remotely might as a matter of first impression appear to open the opportunity to give testimony to a greater number of people, the process was entirely inaccessible to many Texans. Not only did all but one of the twelve hearings held in those three months take place on weekdays during regular work hours—precluding working Texans from testifying unless they took time off work to do so—only Texans with a computer or other device with an internet connection and video/audio capability, such as a smartphone or tablet, were able to participate in the hearings. Witnesses were required to have both audio and video capabilities in order to provide virtual testimony. And those who did not have access to such a personal device were advised—in the middle of a global pandemic that prohibited in-person regional hearings—to visit their local public library.

34. The Senate held four additional virtual hearings in September 2021.

35. On September 7, 2021, Governor Abbott announced a third special session of the Texas Legislature, commencing on September 20, for the purpose of redrawing legislative and congressional districts in accordance with the results of the 2020 census. One week later, on September 27, Senator Joan Huffman released congressional Plan 2101—the first proposed congressional district map, which later became Senate Bill 6, and scheduled a public hearing on it three days later.

36.     On September 30, 2021, Senate Bill 6 was considered by the Special Committee on Redistricting. The Committee considered invited and in-person public testimony.

37.     During the September 30 hearing, Senator Huffman admitted that Plan 2101, the base map for Senate Bill 6, was drawn not by any Texas legislator or their staff but by the State's Republican congressional delegation's lawyer, indicating that the public testimony was nothing more than a perfunctory formality.

38.     When asked by Senator John Whitmire about the fact that Plan 2101 paired two Houston Democrats in Harris County in the same district, Senator Huffman admitted that this plan had been provided to her by the Texas Republican congressional delegation. After Senator Huffman received the plan, she made "some changes," and those changes were incorporated into Plan 2101 before she introduced it as Senate Bill 6.

39.     On October 4, 2021, the Senate Special Committee on Redistricting met to consider Senate Bill 6. After a public hearing in which witnesses were overwhelmingly opposed to the plan, the committee reported it favorably with minor amendments in the Dallas–Fort Worth Area.

40.     On October 8, 2021, the full Senate considered Senate Bill 6. Senate Bill 6 was amended to make minor changes to the border between CD6 and CD17 in East Texas. All other amendments that were offered failed. Senate Bill 6 then passed out of the Senate on party lines by a vote of 18-13.

41.     Senate Bill 6 then moved to the Texas House.

42.     Like the Senate, prior to the consideration of Senate Bill 6, the House had held a series of virtual hearings for the purpose of considering public testimony on the redistricting process.

43.     And, like the Senate, the process for providing public input during the map drawing process was held entirely online and almost entirely during the work week, all but ensuring the process was inaccessible for most Texans.

44.     And, like the Senate, the individuals responsible for redrawing the congressional maps did not directly receive or respond to public comments and criticisms during these hearings.

45.     On September 29, 2021, just after Plan 2101 became public, the Texas Tribune reported that Adam Foltz, a Republican lawyer and political operative who had previously played a key role in another state's redistricting process described by federal judges as "needlessly secret," had been hired by the House Redistricting Committee. Despite being paid by the non-partisan Texas Legislative Council, Foltz was reporting directly to the Chair of the House Redistricting Committee, Representative Todd Hunter.

46.     Foltz's work was entirely separate from the House Redistricting Committee's public facing work and, until the Texas Tribune's story broke, at least one Democratic member of the Committee was unaware of Foltz's involvement in the process.

47.     The House process for considering Senate Bill 6 allowed for only limited public testimony. Senate Bill 6 was received by the House on October 8, 2021, and referred to the House's Redistricting Committee that same day. The Committee sat on the bill for five days until October 13, 2021, when they noticed a hearing for October 14, 2021—the very next day.

48.     Despite the less than 24 hours' notice that was provided for the hearing, 94 Texans testified before the House Redistricting Committee—93 of them opposed Senate Bill 6. Nonetheless, later that same day the House Redistricting Committee met again and passed Senate Bill 6 along a party line vote.

49.     On Saturday, October 16, the full House considered Senate Bill 6. The House considered a total of twenty-six amendments, of which five were adopted. Those amendments kept the general outline of Senate Bill 6 the same but made relatively minor changes in numerous counties and districts. The House rejected proposed amendments that would have created additional majority-minority districts. Early in the morning on Sunday, October 17, the House then voted 79 to 56 to pass Senate Bill 6 as amended.

50.     The Senate refused to concur in the House's amendments to Senate Bill 6, and a conference committee was immediately appointed. Less than 24 hours after the House version of Senate Bill 6 was adopted, on the evening of October 17, the conference committee issued a report. The conference committee report adopted some of the House's amendments, rejected others, and made several other changes.

51.     Representative Todd Hunter, the Chair of the House Redistricting Committee, described the conference committee as a "casual discussion," explaining that the House "showed deference to the Senate. They took the lead and I agreed."

52.     On October 18, 2021, both the House and Senate passed the conference committee report, sending Senate Bill 6 to the Governor.

53.     Governor Abbott signed Senate Bill 6 on October 25, 2021.

**C. Ecological Regression and Ecological Inference Analysis**

54.     Section 2 of the Voting Rights Act requires plaintiffs to establish, among other things, that the relevant minority group is politically cohesive and that the majority group votes as a bloc to prevent the minority group from electing its candidates of choice.

55.     Election results do not report the race or ethnicity of the voters who supported each candidate, but social scientists have developed statistical techniques to enable them to infer the

political preferences of racial and ethnic groups from the precinct-level results of past elections. Two such techniques are "ecological regression" and "ecological inference." Using ecological regression and ecological inference analysis, it is possible to reliably estimate the vote shares that candidates received from particular racial and ethnic groups in past elections. Moreover, because ecological regression and ecological inference analysis rely upon precinct-level results, it is possible to estimate such vote shares in hypothetical districts, in addition to actual historical districts.

56.    Ecological regression and ecological inference analysis are accepted, reliable means by which plaintiffs in Section 2 cases may meet their burden of showing that minority groups are politically cohesive and that majority groups vote as a bloc to prevent the minority groups from electing their candidates of choice. *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 52–53 (1986); *Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 759 (S.D. Tex. 2013).

**D.  Senate Bill 6**

57.    Senate Bill 6 creates significant problems in the Dallas–Fort Worth and Houston metropolitan areas, where Senate Bill 6 packs and cracks Latino voters to reduce the number of districts in which they have an opportunity to elect their candidates of choice.

**1.  Dallas–Fort Worth**

58.    Senate Bill 6 carves up Dallas and Tarrant Counties, the core of the diverse Dallas–Fort Worth metropolitan area, among nine extraordinarily convoluted congressional districts. Latino voters do not make up a majority in any of these districts, and they have a reasonable opportunity to elect their candidates of choice in just three of them: CD30, CD32, and CD33. Latino voters elsewhere in the area are cracked among six predominantly rural districts in which such voters are unable to elect their candidates of choice. These districts are CD5, CD6, CD12, CD24, CD25, and CD26.

59.     Plaintiffs specifically challenge the configurations of Enacted CD25 and Enacted CD33, but remedying the problems with those districts would require changes to other districts in Dallas and Tarrant Counties.

### a. CD25

60.     Enacted CD25 is a predominantly white and rural congressional district with an arm that stretches into parts of central Tarrant County with a substantial Latino population. Nearly 70 percent of Enacted CD25's voting-eligible population is white.

61.     By cracking predominantly Latino portions of Tarrant County and placing those voters in overwhelmingly white, rural Enacted CD25, Senate Bill 6 dilutes the votes of Enacted CD25's Latino residents, including Plaintiff Cecilia Gonzales, and impairs their ability to elect their candidates of choice.

62.     White voters in Enacted CD25 consistently vote as a bloc in opposition to Latino voters' preferred candidates. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Enacted CD25 shows that 86 percent of white voters in Enacted CD25 voted in opposition to the candidates that 78 percent of Latino voters in the district favor.

63.     As Plaintiffs' Demonstration Map 2 shows, Latino voters in Dallas and Tarrant Counties are sufficiently numerous and compact to allow the creation of an additional, majority-Latino voting-eligible-population district in the area. Demonstration Map 2 creates Proposed CD12 as a new, majority-Latino district without eliminating any existing districts in which Latino voters have an opportunity to elect their candidates of choice:



64.     Demonstration Map 2 remedies the cracking of Plaintiff Cecilia Gonzales's vote by placing her in Proposed CD33, which remains a district in which, Latino voters, although not a majority, have a reasonable opportunity to elect their candidate of choice.

**b. CD33**

65.     Enacted CD33 stretches from Fort Worth to downtown Dallas. Among the voters in CD33 are Plaintiffs Jana Lynne Sanchez and Debbie Lynn Solis.

66.     White voters in Enacted CD33 do not vote as a bloc in opposition to Latino voters' preferred candidates. But ecological inference analysis shows that white voters in surrounding districts do engage in such bloc voting, including in Enacted CD6 (88 percent in opposition to Latinos' favored candidates), Enacted CD12 (78 percent in opposition to Latinos' favored candidates), Enacted CD24 (70 percent in opposition to Latinos' favored candidates), and Enacted CD25 (86 percent in opposition to Latinos' favored candidates).

67.     Under Plaintiffs' Demonstration Map 2, Plaintiffs Jana Lynne Sanchez and Debbie Lynn Solis would each reside in Proposed CD12, a majority-Latino district in which 52.4 percent of eligible voters are Latino. As explained below, Latino voters in proposed CD12 are politically cohesive and may elect their candidates of choice.

      **c.  CD12**

68.    Enacted CD12 is a predominantly white congressional district (67.2 percent of the voting-eligible population) in Parker and Tarrant Counties.

69.    White voters in Enacted CD12 consistently vote as a bloc in opposition to Latino voters' preferred candidates. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Enacted CD12 shows that 78 percent of white voters in Enacted CD12 voted in opposition to the candidates that 77 percent of Latino voters in the district favor.

70.    None of the Plaintiffs live in Enacted CD12. But Plaintiffs Jana Lynne Sanchez and Debbie Lynn Solis live in Enacted CD33, immediately east of CD12.

71.    Under Plaintiffs' Demonstration Map 2, Plaintiffs Jana Lynne Sanchez and Debbie Lynn Solis would each reside in Proposed CD12.

72.    Proposed CD12 in Demonstration Map 2 is a majority Latino district in Dallas and Tarrant Counties. In Demonstration Map 2, 52.4 percent of Proposed CD12's voting eligible population is Latino.

73.    Latino voters in Demonstration Map 2's Proposed CD12 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Demonstration Map 2's Proposed CD12 shows that 89 percent of Latino voters in the district support Democratic Party candidates in general elections. Demonstration Map 2's Proposed CD12 would allow those voters, including Plaintiffs Jana Lynne Sanchez and Debbie Lynn Solis, the opportunity to elect their candidates of choice while reducing the cracking of other Latino voters, including Plaintiff Cecilia Gonzales.

### 2.  Houston

74.    Harris County is the largest county in Texas. Senate Bill 6 separates it into eight congressional districts.

75.    Latino voters are able to elect their candidates of choice in five of those congressional districts—CD7, CD8, CD9, CD18, and CD29.

76.    In the other three—CD2, CD36, and CD38—a white majority votes as a bloc to defeat Latino candidates of choice. This configuration deprives Latino voters in CD2, CD36, and CD38 of the opportunity to elect their candidates of choice, while diluting the votes of Latino voters in CD29, a packed district that is nearly 65 percent Latino.

77.    Plaintiffs specifically challenge the configurations of CD29, CD36, and CD38, but remedying the problems with those districts would require changes to other districts in Harris County.

### a.  CD29

78.    Senate Bill 6 is able to draw three majority-white districts in the diverse Harris County area principally via its configuration of CD29, an extraordinarily non-compact district which both (a) cracks compact Latino communities in southeast Harris County between CD29 and the predominantly white and rural CD36, and then (b) captures a separate, dense triangle of Latino voters north of Houston and places it in CD29. Such a configuration is unnecessary and improper.

79.    White voters in Enacted CD29 do not vote as a bloc in opposition to Latino voters' preferred candidates. But ecological inference analysis shows that white voters in surrounding districts do engage in such bloc voting, including in Enacted CD2 (81 percent in opposition to Latinos' favored candidates), Enacted CD22 (82 percent in opposition to Latinos' favored candidates), Enacted CD36 (88 percent in opposition to Latinos' favored candidates), and Enacted CD38 (77 percent in opposition to Latinos' favored candidates). By packing a supermajority of

Latino voters into Enacted CD29, Senate Bill 6 dilutes those voters' votes while leaving other Latino voters in the Harris County area, including Plaintiffs Jerry Shafer and Agustin Loredo, exposed to white bloc voting against their candidates of choice.

80.     Plaintiffs' Demonstration Map 2 shows that Enacted CD29 could be split into two different districts, Proposed CD29 and Proposed CD38, each of which has a majority–Latino voting-eligible population.

81.     In Demonstration Map 2, Proposed CD38 combines the easternmost portions of Enacted CD29 with the westernmost portions of Enacted CD36, into a new district—Proposed CD38—in which Latinos make up a majority (53 percent) of eligible voters. As explained below, Latino voters in the second demonstration map's Proposed CD38, including Plaintiffs Jerry Shafer and Agustin Loredo, are politically cohesive.



82.     Many of the remaining portions of Enacted CD29 are included in Demonstration Map 2's Proposed CD29, a district in central and western Harris County in which 51.4 percent of eligible voters are Latino.

83.     Latino voters in Demonstration Map 2's Proposed CD29 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Demonstration Map 2's Proposed CD29 shows that 86 percent of Latino voters in the district support Democratic Party candidates in general elections. Demonstration Map 2's Proposed CD29 would still allow those voters the opportunity to elect their candidates of choice without having their votes diluted by residing in a packed district.

84.     By unpacking enacted CD29, Plaintiffs' Demonstration Map 2 would make it possible to place plaintiffs Jerry Shafer and Agustin Loredo—who currently reside in majority-white Enacted CD36—in Proposed CD38, a new majority Latino district in which they would have an opportunity to elect their candidate of choice.

### b.  CD36

85.     Enacted CD36 is a predominantly white and rural district that cracks predominantly Latino areas in southeastern Harris County, including Baytown, where Plaintiffs Jerry Schafer and Agustin Loredo live, into a large district stretching all the way to the Louisiana border.

86.     White voters in Enacted CD36 consistently vote as a bloc in opposition to Latino voters' preferred candidates. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Enacted CD36 shows that 88 percent of white voters in Enacted CD36 voted in opposition to the candidates that 78 percent of Latino voters in the district favor.

87.     As explained above, Plaintiffs' first demonstration map shows that the southwestern-most portions of Enacted CD36 may be combined with the southeastern portions of

Enacted CD29 to form the first demonstration map's Proposed CD38, a compact, majority-Latino district in southeastern Harris County.

88.     Plaintiffs' Demonstration Map 2 combines the southwestern-most portions of Enacted CD36 with the southeastern portions of Enacted CD29 to form the second demonstration map's Proposed CD38, a compact, majority-Latino district in southeastern Harris County.

89.     As explained below, Latino voters in the second demonstration map's Proposed CD38, including Plaintiffs Jerry Shafer and Agustin Loredo, are politically cohesive.

c.  **CD38**

90.     Enacted CD38 is a congressional district in western Harris County in which 61.4 percent of eligible voters are white.

91.     White voters in Enacted CD38 consistently vote as a bloc in opposition to Latino voters' preferred candidates. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within Enacted CD38 shows that 77 percent of white voters in Enacted CD38 voted in opposition to the candidates that 65 percent of Latino voters in the district favor.

92.     Proposed CD38 in Plaintiffs' Demonstration Map 2 is a compact district in southeastern Harris County in which a majority (53%) of eligible voters are Latino.

93.     Latino voters in the second demonstration map's Proposed CD38 are politically cohesive. Ecological inference analysis based on precinct-level results from past elections in the geographic area that is included within the second demonstration map's Proposed CD38 shows that 83 percent of Latino voters in the district support Democratic Party candidates in general elections. The second demonstration map's Proposed CD38 would allow those voters, including Plaintiffs Agustin Loredo and Jerry Shafer, the opportunity to elect their candidates of choice.

### E. Racial Polarization

94.     As courts have long recognized, voting in nearly every region of Texas is severely racially polarized. *See Veasey v. Abbott*, 830 F.3d 216, 258 (5th Cir. 2016) (en banc) (noting State's failure to contest evidence that "racially polarized voting exists throughout Texas"); *Perez v. Abbott* ("*Perez I*"), 250 F. Supp. 3d 123, 180 (W.D. Tex. 2017) (three-judge panel) (noting "the existence of racially polarized voting throughout Texas").

95.     Latino voters across Texas cohesively vote for the same candidates. For example, ecological regression analysis suggests that in the 2020 presidential election, more than 70 percent of Latino voters statewide supported President Biden, the Latino candidate of choice. Similarly, in the 2018 governor's race, more than 70 percent of Latino voters supported candidate Lupe Valdez, the Latino candidate of choice. In contrast, non-Hispanic white voters in Texas consistently vote as a bloc to defeat those candidates, with just 15 percent of white Texas voters supporting President Biden and just 10 percent of white Texas voters supporting Lupe Valdez.

96.     In the sections above, Plaintiffs have made specific allegations about racially polarized voting in the specific enacted and proposed districts at issue in their claims.

97.     The racially polarized voting patterns in Texas are driven in significant part by attitudes about race and ethnicity. Members of Texas's two major political parties exhibit sharp disagreements over issues relating to race and ethnicity. Members of the Democratic Party—which Latino voters in the state overwhelmingly prefer—are significantly more likely to view Texas's voting laws as racially discriminatory, support removing Confederate monuments from public spaces, oppose immediate deportation of undocumented immigrants, and support comprehensive immigration reform with a pathway to citizenship than members of the Republican Party, which white voters overwhelmingly prefer.

98.    In 2008, the Cooperative Congressional Election Study found that *60 percent* of Texas Republicans supported re-imposing a literacy test for voting, compared to just 24 percent of the state's Democrats.

**F.  Texas's History of Discrimination**

99.    Texas's attempts to dilute the Latino vote through redistricting are nothing new. This is simply the latest iteration of centuries-long efforts by Texas officials to suppress non-white political participation.

100.    "Texas has a long, well-documented history of discrimination that has touched upon the rights of Blacks and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history." *Patino v. City of Pasadena*, 230 F. Supp. 3d 667, 682–83 (S.D. Tex. 2017) (quoting *League of United Latin Am. Citizens v. Perry* ("*LULAC*"), 548 U.S. 399, 439–40 (2006)); *see also Perez v. Abbott* ("*Perez II*"), 253 F. Supp. 3d 864, 888, 906 (W.D. Tex. 2017) (three-judge panel noting that "Texas's history of official discrimination touching on the right of Hispanics to register, vote, and otherwise to participate in the democratic process is well documented").

101.    Texas's ongoing history of voting discrimination against minorities has deep historical roots. In 1866, Texas prohibited freed slaves from voting and holding office. After Reconstruction-era policies expanded ballot access, Texas systematically fought to suppress minority voting rights.

102.    In the decades before white Texans coalesced around the Republican Party, white Texans dominated the Democratic Party—and stopped Latino voters from participating in its primaries. This was particularly problematic because the historic Democratic Party so dominated

the State's politics into the mid-twentieth century that no other party was even relevant. By 1923, Texas had passed a law explicitly providing that "in no event shall a negro participate in a Democratic primary in the State of Texas and declaring ballots cast by negroes as void." S.B. 44, 38th Leg., 2d Sess. (Tex. 1923). After the U.S. Supreme Court invalidated that law, Texas maneuvered around the ruling by allowing political parties to set their own qualifications, after which Black and Latino voters were immediately barred from political participation once again.

103.    Texas further engaged in systematic disenfranchisement of Latino voters by capitalizing on language barriers and literacy disparities, going so far as to prohibit anyone from assisting "illiterate" individuals or non-English speakers at the polls. These restrictions remained in place until federal court intervention in 1970.

104.    Texas also used a poll tax to disenfranchise Latino voters, who were significantly more likely to be living in poverty. This significantly depressed Latino registration and turnout throughout much of the twentieth century.

105.    After the Voting Rights Act of 1965 increased registration rates among Latino Texans, the State quickly legislated counteractive measures. The following year, Texas enacted a law requiring that every voter reregister each year, a measure intended to mimic the poll tax's burden on minority voters. After a federal court found this annual-registration requirement unconstitutional, *see Beare v. Smith*, 321 F. Supp. 1100, 1101–02 (S.D. Tex. 1971) (three-judge panel), *aff'd sub nom. Beare v. Briscoe*, 498 F.2d 244 (5th Cir. 1974), Texas purged Latino voters from its rolls by requiring all voters in the State to reregister before voting in future elections. These and other tactics against Latino voters eventually led Congress to include Texas as a covered state under Section 5 of the Voting Rights Act in 1975.

106.    While Texas's efforts to limit Latino voters' access to the franchise have a long and shameful heritage, they are by no means a thing of the past. The State continues to lead the nation in efforts to suppress minority political participation.

107.    A 2018 study by the U.S. Commission on Civil Rights found that Texas had "the highest number of recent [Voting Rights Act] violations in the nation." U.S. Comm'n on C.R., *An Assessment of Minority Voting Rights Access in the United States* 74 (2018). In every redistricting cycle since 1970, a federal court has ruled at least once that the State violated the Voting Rights Act or the U.S. Constitution during the redistricting process.

108.    In 2006, the U.S. Supreme Court held that the State had enacted a congressional map that unlawfully diluted the voting strength of Latino voters in West Texas in direct response to those voters' growing political power. *See LULAC*, 548 U.S. at 436–42. These actions "b[ore] the mark of intentional discrimination that could give rise to an equal protection violation." *Id.* at 440.

109.    During the 2010 redistricting cycle, federal courts found that Texas had intentionally diluted Latino voting strength in crafting new congressional and state legislative maps. *See Perez II*, 253 F. Supp. 3d at 949–62; *Perez I*, 250 F. Supp. 3d at 145–80 (W.D. Tex. 2017); *Texas v. United States*, 887 F. Supp. 2d 133, 159–66, 177–78 (D.D.C. 2012) (three-judge panel), *vacated and remanded on other grounds*, 570 U.S. 928 (2013). A three-judge court "found that the Texas Legislature intentionally discriminated in 2011 in numerous and significant ways" during the last decennial redistricting, and the Supreme Court "never addressed or in any way called into question [that court's] findings as to the Legislature's discriminatory purpose in enacting the 2011 plans." *Perez v. Abbott*, 390 F. Supp. 3d 803, 811–12 (W.D. Tex. 2019).

110.    In 2016, an en banc panel of the U.S. Court of Appeals for the Fifth Circuit concluded that there was evidence that Texas's 2011 law requiring photo identification for voters was motivated by a discriminatory purpose. *See Veasey*, 830 F.3d at 225, 234–43. The Fifth Circuit further "conclude[d] that the district court did not clearly err in determining that [the photo identification law] ha[d] a discriminatory effect on minorities' voting rights in violation of Section 2 of the Voting Rights Act." *Id.* at 265.

111.    Texas also uses the enormous power of its criminal justice system to suppress minority political participation. Since Attorney General Paxton took office in 2015, at least 72 percent of the prosecutions brought by his Election Integrity Unit have been against Black and Latino individuals—who make up just over 50 percent of the State's population.

112.    Because the rules governing voter registration and ballot casting can be confusing, the threat of criminal prosecution for violating such rules significantly deters eligible voters from participating in the political process. The severe racial and ethnic disparities in Texas's election-related prosecutions thus intimidate Latino voters against participating in the State's elections.

113.    Attorney General Paxton has not been alone in intimidating Latino voters. In 2019, former Acting Secretary of State David Whitley issued an advisory decision to county registrars claiming to have a list of 95,000 noncitizens who were unlawfully registered to vote. The list was rife with errors, particularly because it failed to account for noncitizens who had since become naturalized. A federal judge called Secretary Whitley's actions in this incident "ham-handed and threatening" and lamented that these actions stoked "fear and anxiety" among the State's minority population and "intimidate[d] the least powerful among us." *Tex. League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-74-FB, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019).

114.    In addition to the threat of criminal prosecution, Latino Texans routinely face intimidation and misinformation at the polls.

115.    Dallas County's former elections administrator stated in 2018 that the severity and intensity of voter harassment and intimidation had reached levels she had not seen in her 30 years of service.

116.    The 2020 election was no better. On the first day of early voting at a Dallas polling place, an older white man falsely told a long line of mostly Black and Latino voters that they would not be allowed to vote if they were not inside the building by the time the polls closed.

117.    At a different Dallas polling location, supporters of former president Trump blared messages aimed at Latino voters while one of them told the voters that he sends people to the morgue.

118.    On October 29, cars and military-style trucks gathered in the parking lot of a Fort Bend polling place with loudspeakers, bullhorns, and a coffin.

119.    Incidents of Trump supporters engaging in similar intimidating behavior were reported in Tarrant, Montgomery, and Harris Counties.

120.    And just a few years ago, the Texas Legislature re-doubled its efforts to make it more difficult for Latino Texans to vote, enacting an omnibus voter suppression bill that burdens voters, restricts access to the franchise, and targets the very measures that communities of color disproportionately relied on to increase voter turnout in 2020 and other recent elections. *See generally* SB 1, 87th Leg., 2d Called Sess. (Tex. 2021). Disturbingly, SB 1 even empowered partisan poll watchers to employ voter intimidation tactics by granting them increased freedom in the polling place while limiting the oversight powers of election workers.

### G.  Use of Racial Appeals in Political Campaigns

121.    Political campaigns in Texas commonly resort to racial appeals that rely on stereotypes. During the 2018 campaign for the U.S. Senate, Senator Cruz ran ads capitalizing on fears founded on the stereotype that Latino immigrants are violent criminals and mocked his opponent's call for an investigation into the police shooting of an unarmed Black man in the man's own apartment.

122.    In support of former congressman Pete Olson, who was facing a challenge by Sri Preston Kulkarni in 2018, the Fort Bend County Republican Party circulated an advertisement depicting Ganesha, a Hindu deity, asking, "Would you worship a donkey or an elephant? The choice is yours."

123.    That same year, former congressman Pete Sessions claimed that his Black opponent, former congressman Colin Allred, wanted to legalize crack cocaine, and ran a digital ad placing Congressman Allred's name over a picture of a dark-skinned hand clasping a white woman's mouth.

124.    Local campaigns have also included racial appeals. For example, Vic Cunningham, a white candidate for Dallas County Commissioner in 2018, explained to the *Dallas Morning News* that he believed it would be "Christian" only if his children married a person "that's Caucasian."

125.    Race played an enormous role in the 2020 election, fueled in significant part by police killings of Black Americans like George Floyd and Breonna Taylor. In Texas, Republican officials publicly mocked the worldwide outrage and protests that these killings provoked. One county Republican chair posted a Martin Luther King Jr. quote on a background with a banana. Other county Republican chairs spread false conspiracy theories on social media suggesting that George Floyd's murder was staged in an effort to limit Black support for former president Trump

and that the protesters demanding racial justice nationwide were being paid by George Soros. Taking these blatantly false assertions a step further, Republican Agriculture Commissioner Sid Miller publicly stated that Soros was starting a "race war."

126.    During the 2020 U.S. Senate race, Republican incumbent John Cornyn engaged in several racial appeals. He nicknamed potential opponent Royce West, who is Black, "Restful Royce"—a clear reference to a longstanding racist stereotype.

127.    Senator Cornyn also publicly blamed China's "culture" for the coronavirus outbreak, playing into the same racial appeals used by former president Trump and other Republicans, who, for example, referred to the pandemic as the "Kung-Flu." An Asian American studies expert called this language "textbook racist discourse."

128.    And, just a few years ago, a Republican candidate in the State's special congressional election for CD6 outright declared that she did not want Chinese immigrants in the United States.

## H. Ongoing Effects of Texas's History of Discrimination

129.    The long history of discrimination against Latino Texans has produced stark disparities between the everyday lives of Latino and white Texans. Latino Texans make up a disproportionate number of individuals living in poverty. According to the U.S. Census Bureau's 2019 American Community Survey ("ACS") 5-Year Estimate, 8.4 percent of white Texans lived below the poverty line, compared to 20.7 percent of Latino Texans.

130.    Disparities also exist in the areas of employment and income. According to the 2019 5-year ACS Estimate, the median income among non-Latino white Texan households ($75,879) was significantly higher than that among Latino Texan households ($49,260). And

according to a 2018 study by the Economic Policy Institute, non-white Texans had a significantly lower unemployment rate (3.9 percent) than Latino Texans (4.5 percent).

131.    Low-income voters face a number of hurdles to voter participation including working multiple jobs, working during polling place hours, lack of access to childcare, lack of access to transportation, and higher rates of illness and disability. All of these hurdles make it more difficult for poor and low-income voters to participate effectively in the political process.

### I.    Extent to Which Latino Texans Have Been Elected to Public Office

132.    The ongoing disparities in minority political participation are also reflected by the fact that Latino lawmakers are underrepresented in the State's elected offices. As of the original filing of this case, while Latino Texans constituted more than 36 percent of Texas's voting-age population and nearly 30 percent of its citizen voting-age population, just two of Texas's twenty-seven statewide elected State officials were Latino. Less than 20 percent of the seats in Texas's delegation to the U.S. House of Representatives, and less than 25 percent of the seats in the Texas Senate and Texas House were held by Latino lawmakers. At the local level, many communities with large Latino populations lack any minority representation at all.

**CLAIMS FOR RELIEF**

**COUNT I**

**SECTION 2 OF THE VOTING RIGHTS ACT AND 42 U.S.C. § 1983 – SENATE BILL 6**

133.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

134.    Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race, color, or membership in a language minority group. 52 U.S.C. § 10301(a).

29

135.    The district boundaries created by Senate Bill 6 combine to "crack" and "pack" Latino Texans, resulting in the dilution of the electoral strength of the state's Latino residents, in violation of Section 2 of the Voting Rights Act.

136.    Latino voters in the Dallas–Fort Worth and Houston metropolitan areas are sufficiently numerous and geographically compact to allow for an additional district in each of the Dallas–Fort Worth and Houston areas in which a majority of eligible voters are Latino.

137.    In sum, under Section 2 of the Voting Rights Act, the Texas legislature was required to create two additional districts—one each in the Dallas–Fort Worth and Houston areas—in which Latino Texans have a reasonable opportunity to elect their candidates of choice. Not one of these additional districts would reduce the number of districts in their respective regions or in the enacted map as a whole in which Latino voters are able to elect candidates of their choice.

138.    Latino voters in Dallas–Fort Worth and Houston are politically cohesive, and elections in the state reveal a clear pattern of racially polarized voting that allows the bloc of white voters usually to defeat minority-preferred candidates.

139.    The totality of the circumstances establishes that the congressional map established by Senate Bill 6 has the effect of denying Latino voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

140.    By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs' rights guaranteed to them by Section 2 of the Voting Rights Act and enforceable under the Voting Rights Act and 42 U.S.C. § 1983. Defendants will continue to violate those rights absent relief granted by this Court.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a. Declare that Senate Bill 6 violates Section 2 of the Voting Rights Act.

b. Order the adoption of a valid congressional redistricting plan that includes:

    i. An additional district in the Dallas–Fort Worth metropolitan area in which Latino voters have a reasonable opportunity to elect their candidates of choice, without reducing the number of districts currently in the region in which Latino voters are able to elect their candidates of choice; and

    ii. An additional district in the Houston metropolitan area, in which Latino voters have a reasonable opportunity to elect their candidates of choice, without reducing the number of districts currently in the region in which Latino voters are able to elect their candidates of choice.

c. Enjoin Defendants, as well as their agents and successors in office, from enforcing or giving any effect to the boundaries of the congressional districts as drawn in Senate Bill 6, including an injunction barring Defendants from conducting any further congressional elections under the current map.

d. Hold hearings, consider briefing and evidence, and otherwise take actions necessary to determine and order a valid plan for new congressional districts in the State of Texas; and

e. Grant such other or further relief the Court deems to be appropriate, including but not limited to an award of Plaintiffs' attorneys' fees and reasonable costs.


Dated: March 3, 2025

                            Respectfully submitted,

                            */s/ David R. Fox*

Renea Hicks                       Abha Khanna*

Attorney at Law                 **ELIAS LAW GROUP LLP**

Texas Bar No. 09580400         1700 Seventh Ave, Suite 2100

                             Seattle, WA 98101

Law Office of Max Renea Hicks    Telephone: (206) 656-0177

P.O. Box 303187
Austin, Texas 78703-0504
(512) 480-8231
rhicks@renea-hicks.com

akhanna@elias.law

David R. Fox*
Richard A. Medina*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
dfox@elias.law
rmedina@elias.law

*Counsel for Plaintiffs*

*Admitted Pro Hac Vice*