# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS EL PASO DIVISION

| | | |
|---|---|---|
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF REPRESENTATIVES, SERGIO MORA, BOBBIE GARZA-HERNANDEZ | § § § § § | |
| Plaintiffs | § § | |
| | § § | Civil Action No. 3:21-cv-00259-DCG-JES-JVB |
| v. | § § | [Lead Case] |
| STATE OF TEXAS, GREG ABBOTT, GOVERNOR OF THE STATE OF TEXAS, in his official capacity, and JANE NELSON, SECRETARY OF STATE OF TEXAS, in her official capacity | § § § § § § | 3:21-cv-00988-DCG-JES-JVB [Consolidated Case] |
| Defendants | § | |

## PLAINTIFF MALC'S THIRD AMENDED COMPLAINT

Texas has adopted redistricting plans for the Texas House of Representatives and the Texas delegation to the United States House of Representatives. In keeping with a long history of legal violations in the redistricting process, these plans discriminate on the basis of race and impermissibly dilute the vote of Latino populations. While the United States Supreme Court declined to permit federal courts to police partisan gerrymandering because redistricting is, by its nature, inherently political, the Court did not give state legislatures a license to racially discriminate or dilute minority voting power under the guise of mere partisanship. In places where racially polarized voting is the norm, there is a long-standing history of discrimination, and as racially tinged political speech is increasingly on the rise, it is particularly important to ensure the courts have the ability to review plans for impermissible vote dilution and potentially invidious discrimination. Texas has violated the Equal Protection Clause of the Fourteenth and Fifteenth Amendments of the United States Constitution and Section 2 of the Voting Rights Act

consistently every decade when drawing new maps. This redistricting suit is brought to redress once again Texas's sordid pattern of racial discrimination in redistricting.

Plaintiff requests declaratory and injunctive relief against Defendants in regard to the redistricting plans adopted by the State of Texas for the Texas House of Representatives (Plan H2316) and the United States House of Representatives (Plan C2193) (collectively, "the Plans").

Plaintiff seeks declaratory relief declaring that the Plans were drawn and adopted with the purpose of discriminating on the basis of race in violation of the Fifteenth Amendment and the Equal Protection Clause of the Fourteenth Amendment; that certain districts within the plan, detailed in the ensuing paragraphs, violate Section 2 of the Voting Rights Act on the grounds that they impermissibly dilute the voting power of Latinos and Spanish speakers; that certain districts, detailed in the ensuing paragraphs, manipulate population deviations for impermissible ends, in violation of the Fourteenth Amendment; and that certain districts, detailed in the ensuing paragraphs, constitute an impermissible racial gerrymander on the grounds that race was a predominant factor in their drawing without a sufficiently compelling governmental interest to justify making it such. Plaintiff further seeks injunctive relief to prevent the use of the Plans in upcoming elections.

Population growth in the State over the last decade was overwhelmingly non-Anglo, with communities of color accounting for approximately 95% of the growth in the whole state. In particular, Latinos accounted for approximately 49.5% of all population growth in the state. As a result, Texas gained two additional Congressional seats—the only state in the nation to do so. As a natural consequence of this growth, new Latino and minority opportunity districts could and should have been included in the redistricting plans adopted by the Legislature. The plans adopted by the State not only failed to increase Latino and minority opportunities for representation, they

actually decreased them while increasing the number of districts in which Anglos form a majority of the eligible voter population. This turns the concept of representative democracy on its head. These plans were developed to minimize and limit Latino and minority electoral opportunities and dilute the voting strength of Latino and minority voters.

Latinos, and to an even greater extent Spanish-speaking Latinos, still face phenomenal barriers to equal participation and feel the effects of past and present official discrimination. The Plans further dilute the opportunities for Latinos and the Spanish speaking community to participate in the political process and elect candidates of their choice on the same basis as Anglo citizens, and therefore violate Section 2 of the Voting Rights Act.

The Plans share common tactics for disenfranchising Latino and Spanish speaking voters. For example, they strategically pair areas which grapple with low turnout rates, as a result of historical and current socio-economic conditions, barriers to participation, and discrimination, with areas that have extremely high and extremely polarized Anglo bloc voting to create districts that are nominally majority-minority but do not perform to elect candidates of choice for minority voters. Some districts are overly packed, unnecessarily wasting votes, while other districts crack communities and dilute their voting power. The extent to which each of the Plans goes to avoid creating new electoral opportunities for communities of color, despite these communities accounting for 95% of the growth in the state, is prima facie evident in the shape of certain districts.

Plaintiff also brings this action challenging the plan adopted for Texas House districts (Plan H2316) because the plan strategically employs population variances between districts to gain a racial advantage, in violation of the Fourteenth Amendment.

The shape of many of the districts in the Plans are unexplainable on grounds other than race, and the Legislature at times explicitly centered race in its redistricting decisions. Because

the Legislature drew many of these districts to minimize minority opportunities rather than to comply with the Voting Rights Act, the use of race as a predominant factor in their drawing constitutes an impermissible racial gerrymander.

## PARTIES

1.    Plaintiff, Mexican American Legislative Caucus, Texas House of Representatives (hereinafter MALC), is the nation's oldest and largest Latino legislative caucus.  MALC is a non-profit organization established to serve the members of the Texas House of Representatives and their staff in matters of interest to the Mexican American community of Texas, in order to form a strong and cohesive voice on those matters in the legislative process, including redistricting. MALC's mission includes maintaining and expanding Latino representation across elected offices in Texas. MALC strives to raise the level of Latino engagement in Texas government and politics through policy, education, outreach, organizing, and advocacy.

2.    MALC membership is composed predominantly of sitting Texas State Representatives who are either (a) of Mexican-American descent or (b) whose legislative district includes not less than 50 percent Hispanic/Latino total population, as reflected in the demographic research and redistricting records of the Texas Legislative Council, and who are confirmed by a vote of two-thirds of the Caucus. Every Texas State Representative who has identified themselves as being of Latino descent is a member of MALC, and historically almost every State Representative of Latino descent has joined MALC. It is more than likely that if there were additional majority Latino Texas House districts in which Latino voters were able to elect their candidates of choice, there would be more MALC members.

3.    MALC is financed by its members through dues and fundraising activities. By having fewer Latino opportunity districts than is warranted under the Voting Rights Act and United States

Constitution, Plan H2316 directly injures MALC financially as an organization because it has fewer dues paying members and fewer members who fundraise on its behalf. Thus, as a direct result of Plan H2316's discriminatory effects, MALC tangibly has fewer resources than it would otherwise have.

4.      MALC has one or more members who reside in the challenged districts and who have had their ability to elect representatives of their choice injured on account of being Latino and/or being part of the Spanish-speaking community in the affected areas. MALC members representing the challenged districts will have their ability to successfully gain election hindered if the Plans go into effect. MALC members will face increased difficulty advocating for their legislative platforms and raising the level of Latino engagement in Texas government if Latino representation in the Texas Legislature is diminished.

5.      MALC members in challenged districts include:

      a.   Rep. Eddie Morales, who resides in Maverick County, in CD 23, and is the incumbent State Representative for HD 74. Rep. Morales is a registered voter in Maverick County. He usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

      b.   Rep. Mary González, who resides in El Paso County, in CD 23, and is the incumbent State Representative for HD 75. Rep. González is a registered voter in El Paso County. She usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

      c.   Rep. Claudia Ordaz-Perez, who resides in El Paso County, in CD 16, and is the incumbent State Representative for HD 79. Rep. Ordaz-Perez is a registered voter in El Paso County. She usually votes for the Latino preferred candidate in primary

and general elections and intends to continue doing so in upcoming elections.

d.  Rep. Joe Moody, who resides in El Paso County, in CD 16, and is the incumbent State Representative for HD 78. Rep. Moody is a registered voter in El Paso County. He usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

e.  Rep. Vince Perez, who resides in El Paso County and is the incumbent State Representative for HD 77. Rep. Perez is a registered voter in El Paso County. He usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

f.  Rep. Ramon Romero, who resides in Tarrant County, in CD 33, and is the incumbent State Representative for HD 90. Rep. Romero is a registered voter in Tarrant County. He usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections. Rep. Romero is the current Chairman of the Mexican American Legislative Caucus.

g.  Rep. Rafael Anchía, who resides in Dallas County, in CD 33, and is the incumbent State Representative for HD 103. Rep. Anchía is a registered voter in Dallas County. He usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

h.  Rep. Armando Walle, who resides in Harris County, in CD 29, and is the incumbent State Representative for HD 140. Rep. Walle is a registered voter in Harris County. He usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections. Further, under the adopted plan for the Texas House of Representatives, HD 140 overly packs Latinos and

could be unpacked to form the basis for an additional Latino opportunity district in Harris County (a reconstituted HD 138 in MALC's alternative proposal described in later sections). As a Latino who has been packed into a district, Rep. Walle has standing to pursue a Section 2 claim for an additional Latino opportunity district in the geographic area around his residence. *See, e.g.*, *Perez v. Abbott*, 267 F. Supp. 3d 750, 774 (W.D. Tex. 2017), *aff'd in part, rev'd in part and remanded*, 138 S. Ct. 2305, 201 L. Ed. 2d 714 (2018) (upholding the standing of MALC to challenge the alleged insufficient number of Latino opportunity districts Nueces County-area districts based on the standing of Rep. Abel Herrero who would have continued to reside in HD 34) ("[T]his Court . . . holds that plaintiffs who reside in a reasonably compact area that could support an additional minority opportunity district have standing to pursue § 2 claims, even if they currently reside in an opportunity district.").

i.  Rep. Christina Morales, who resides in Harris County, in CD 18, and is the incumbent State Representative for HD 145. Rep. Morales is a registered voter in Harris County. She usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

j.  Rep. Penny Morales Shaw, who resides in Harris County, in CD 18, and is the incumbent State Representative for HD 148. Rep. Morales Shaw is a registered voter in Harris County. She usually votes for the Latino preferred candidate in primary and general elections and intends to continue doing so in upcoming elections.

k.  Sergio Mora is an individual registered voter in Webb County, Texas. He resides in Texas House District 80. He usually votes for the Latino-preferred candidate in primary and

general elections and intends to continue doing so. Under MALC's alternative proposal for the Texas House of Representatives, he would live in a reconstituted House District 74.

l.  Bobbie Garza-Hernandez is an individual registered voter in Hays County, Texas. She currently resides in Texas House District 45. Under MALC's alternative proposal for the Texas House of Representatives, she would reside in an additional new Latino opportunity Texas House District (a reconstituted HD 17). She usually votes for the Latino-preferred candidate in primary and general elections and intends to continue doing so.

6.  Defendant State of Texas is a political subdivision covered under the provisions of the Voting Rights Act and responsible for the actions of its officials with regard to state-wide redistricting.

7.  Defendant Greg Abbott is the Governor of the State of Texas. Pursuant to Article Four, Section 1 of the Texas Constitution, he is the chief executive officer of the Defendant State of Texas. His duties include ordering the elections for state offices and the United States House of Representatives. He is sued in his official capacity. He may be served at the Office of the Governor, State Insurance Building, 1100 San Jacinto, Austin, Texas 78701.

8.  Defendant Jane Nelson is sued in her official capacity as the Secretary of State of Texas. Ms. Nelson is the current Texas Secretary of State, successor to John Scott, the previous Secretary of State and chief election officer appointed by Governor Greg Abbott on October 21, 2021. The Secretary of State is the chief election officer of this state. She supervises elections and has constitutional and statutory duties associated with redistricting and apportionment, including advising election authorities on boundaries of districts, setting election deadlines for new districts, and enforcement of certain election rules and laws. He is sued in his official capacity.

## JURISDICTION AND VENUE

**9.**     Plaintiff's Complaint arises under the United States Constitution and federal statutes. This Court has jurisdiction over this action under 28 U.S.C §§ 1331, 1343(a)(3) and (5), and 1988.

**10.**     Venue is proper in this Court pursuant to 28 U.S.C § 1391(b).

**11.**     Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C §§ 2201 and 2202.

## FACTS

**A. The 2020 Census revealed dramatic growth of the Latino population in Texas, but nevertheless still produced an undercount of Latinos and Spanish speakers.**

**12.**     On August 12, 2021, the United States Department of Commerce and the United States Census Bureau released to the State of Texas the population data gathered during the 2020 decennial Census. The information released to the State of Texas showed the population of Texas had increased by about 15.9%—from 25,145,561 in 2010 to 29,145,505 in 2020.  Overall, Texans of color accounted for 95% of the state's population growth.

**13.**     According to the 2020 Census, the Hispanic population of Texas grew to 11,441,717 from 9,460,921 in the 2010 Census. This was an increase of about 20.9%. Moreover, according to the 2020 Census, Hispanic growth accounted for about 49.5% of the overall growth of Texas.

**14.**     Texas gained the most residents of any state since 2010, and its Hispanic population is now nearly as large as the non-Hispanic white population, with just half a percentage point separating them. Non-Hispanic white Texans now make up just 39.8% of the state's population – down from 45% in 2010. Meanwhile, the share of Hispanic Texans has grown to 39.3%. Indeed, Texas gained nearly 11 Hispanic residents for every additional white resident since 2010. The total population numbers released to the State of Texas by the Census Bureau were used as the measure for population for purposes of the Plans.

**15.**     Historically, there has never been a completely accurate census in the United States.

Moreover, the undercount of population has affected racial and ethnic minorities more than whites. That is, while various groups and individuals have not been counted from time to time, among certain groups, *e.g.* Blacks and Latinos, the level of undercount has consistently been more severe than with Anglos. This disparate impact of the undercount is often referred to as the "differential undercount." Generally, American censuses result in more accurate counts for Anglos than they do for racial and ethnic minorities. *See* National Research Council, "Modernizing the U.S. Census" 32, 33 (Barry Edmonston & Charles Schutze eds., 1995).

16.    The Census Bureau has recognized that in Texas, certain populations are more difficult to count than other populations. For example, people in poorer urban communities are harder to count, as are people who live in poor suburban unincorporated subdivisions primarily located along the Texas-Mexican border in areas often referred to as "colonias." In Texas, this means an undercount of racial and ethnic minorities.

17.    Language barriers exacerbate undercounts. As a result, areas with low Limited English Proficiency, including those areas along the Texas-Mexico border, are not accurately reflected in official Census data. The Texas Demographic Center—the official body tasked with conducting demographic work on behalf of the State of Texas—has acknowledged a likely undercount in Latino communities in Texas, and particularly those along the border.

18.    For example, Congressional District 23 had a Census self-response rate of 57.2%, lower than Texas's state average self-response rate of 62.8%. Within the currently existing CD-23 boundaries, self-response rates varied greatly. The predominantly Anglo census tracts of CD-23 in Bexar County had self-response rates on average above 70%. Conversely, heavily Latino areas along the border had average rates below 40%, with some areas having rates in the teens. Self-response to the Census was particularly important this decade due to the limitations the COVID-

19 pandemic placed on in-person enumeration.

**19.**    Despite repeated warnings about the likely impact of not investing in Census complete count efforts, the State of Texas was one of only three states to not form a complete count committee or appropriate state funding to facilitate a complete count. This had the predictable result of exacerbating an undercount in the state.

**20.**    As a natural result of using data which incorporates an undercount, there is a built-in vulnerability to diluting the voting power of Latinos along the border or in urban counties because more outside populations must be added in to equalize the population totals in those districts.

**21.**    The fact that border-based districts started from an undercounted baseline, thus making them more susceptible to dilution, is well-known to Texas legislators and third-party map drawers. Representatives of the Texas Demographic Center and others repeatedly addressed likely undercounts in public hearings at the legislature in advance of the release of Census results.

**B.  Texas has a long and notorious history of discriminating when drawing district lines.**

**22.**    "[I]n every redistricting cycle since 1970, Texas has been found to have violated the Voting Rights Act with racially gerrymandered districts." *Veasey v. Abbott*, 830 F.3d 216, 240 (5th Cir. 2016) (citing *Veasey v. Perry*, 71 F. Supp. 3d 627, 636 & n.23 (W.D. Tex. 2014) (collecting cases)); Expert Report of Dr. Allan J. Lichtman at 19, *Perez v. Abbott*, No. 5:11-cv-00360-OLG (W.D. Tex. May 26, 2017), ("Lichtman Report").

**23.**    In 2006, the U.S. Supreme Court held that Texas had violated the Voting Rights Act by attempting to redraw a congressional district in order to reduce the voting strength of Latino voters. The Court found that the Legislature's action "bears the mark of intentional discrimination that could give rise to an equal protection violation." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006). "In response, Texas sought to undermine [the Supreme] Court's

order by curtailing early voting in the district but was blocked by an action to enforce the § 5 preclearance requirement." *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 574 (2013) (Ginsburg, J., dissenting); *see* Order, *League of United Latin American Citizens v. Texas, No.* 06–cv–1046 (W.D. Tex. Dec. 8, 2006), ECF No. 8.

24.     In the 2011 cycle, another federal court found that Texas created redistricting plans with a discriminatory purpose. *See Texas v. United States*, 887 F. Supp. 2d 133, 159-66 (D.D.C. 2012), *vacated and remanded on other grounds*, 570 U.S. 928 (2013).

25.     In 2018, the U.S. Supreme Court found that the Texas Legislature had unconstitutionally racially gerrymandered a Texas House of Representatives district in 2013. *See Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018).

26.     During the 87th Regular Session of the Texas Legislature, Senator Joan Huffman (Chair of the Texas Senate Select Committee on Redistricting) introduced a plan to reorganize the state's appellate judicial courts. After recent electoral successes by minority candidates and minority candidates of choice, the Bill, SB 11, would have cut the number of effective minority opportunity seats by over 20%, from 50% (still underrepresented from a proportional basis) all the way down to 28.5%. After public outcry from both civil rights organizations and members of the state judiciary, Senator Huffman eventually pulled down the Bill.

**C. The sequence of events leading to the enactment of Congressional District Plan C2193 bears the indicia of intentional discrimination.**

**1. Pre-map release hearings were mere lip service to deliberative democracy because there was neither updated Census data nor map proposals to review, and ultimately the Texas Legislature ignored all comments and data gathered.**

27.     At various points in 2019, 2020, and early 2021, the Texas House of Representatives Redistricting Committee (the House Committee) and the Texas Senate Special Committee on Redistricting (the Senate Committee) held hearings to receive public comments on the

prospective 2021 redistricting process.

28.    These pre-map field hearings were a strategy employed last redistricting cycle by the Legislature, and a federal court commented that, because they occurred prior to the release of Census data and the release of proposed maps, they "were of limited usefulness in terms of obtaining meaningful public input for legislators, and there is little indication that the . . . Legislature or the map drawers paid much attention to the public testimony received at these hearings." *Perez v. Abbott*, 253 F. Supp. 3d 864, 960 (W.D. Tex. 2017); *see also Perez v. Abbott*, 390 F. Supp. 3d 803, 821 n.14 (W.D. Tex. 2019) ("[The Legislature] had hearings before a census map was released—census data was released. So that was of no value to anybody.").

29.    The most common theme from public testimony during these pre-map hearings was that the public wanted more transparency and fairness in the process, and increased opportunities for input and participation once maps had actually been produced, in order to have a meaningful chance to weigh in on the proposed maps. Approximately two hundred and thirty (230) individuals testified at a hearing that they wished for a transparent and open redistricting process, with approximately one hundred and twelve (112) specifically asking for public hearings on maps with ample time to review the maps before they were voted on. Additionally, hundreds of written comments were submitted voicing these same demands.

30.    Over fifty (50) civil rights and community organizations wrote to the House and Senate Committees to demand a fair and transparent process. Specific demands included a minimum of five (5) days' notice before any hearing; to hold at least five (5) hearings on each map to correspond to the five (5) general geographic regions of the state; and to provide individuals with multiple options for participating a hearing.

31.    Despite these pleas for transparency and input, the Legislature reverted to the same process

it used when passing maps in 2011—one which was marked by "[t]he exclusion of minority member and public input despite the minority population growth, the misleading information, the secrecy and closed process, and the rushed process." *Perez v. Abbott*, 253 F. Supp. 3d 864, 961 (W.D. Tex. 2017).

> **2.    The adoption of Plan C2193 was irregular, truncated, and designed to eliminate transparency and deliberation.**

**32.**    Senator Joan Huffman, the Chair of the Senate Committee, filed Senate Bill 6 ("SB 6") on September 27, 2021. That same day it was referred to the Senate Committee.

**33.**    Just after 2:00 p.m. on September 27, 2021, the Senate Committee posted a notice for a single hearing on SB 6 to be held on September 30, 2021 at 9:00 a.m. This provided members of the public with only sixty-seven (67) hours, less than three days, to review and analyze the map and make arrangements to be in Austin in person at the Capitol at 9:00 a.m. on a Thursday.

**34.**    Sixty (60) individuals testified or registered in opposition to SB 6; only one (1) individual testified or registered in favor of the Bill.

**35.**    Individuals testified at length on the negative impacts SB 6 (at that time Plan C2101) would have on minority communities across the state, providing specific information on demographic and community impacts to demonstrate that the map split apart communities of color, diminished the voting strength of Latinos, and failed to draw any new Latino or minority opportunity districts despite communities of color accounting for 95% of the growth in the State. They critiqued the fact that, despite gaining two Congressional seats entirely on the back of minority growth in the state, SB 6 created two new Anglo majority districts—one majority Anglo Democratic district, and one majority Anglo Republican district.

**36.**    At the hearing, Senator Huffman indicated that she would hold a separate hearing to consider committee amendments from members of the Senate Committee, vote on those

amendments, and vote on the map as a whole.

**37.**     The Senate Committee posted a notice at approximately 8 p.m. on September 30, 2021 for the hearing on committee amendments to be held on October 4, 2021 at 9 a.m. The one and only hearing in the House Committee on the proposed Texas House of Representatives map (HB 1) was scheduled for the exact same time.

**38.**     At the hearing, twenty-three (23) individuals once again testified in opposition to the Bill as a whole, and zero (0) individuals testified in favor of it.

**39.**     Senator Zaffirini offered a committee amendment (Plan C2109) which only affected the boundaries between CD 16 (fully contained in El Paso) and CD 23 and would have raised the 2020 and 2018 Spanish Surname Voter Registration levels to above 50% (50.3% and 50.7% respectively). This amendment was opposed by the Chair, Sen. Huffman, and voted down by the committee.

**40.**     Senator Zaffirini offered another similar amendment (Plan C2110) which made even fewer changes between CD 16 and CD 23, but which would have raised the SSVR in CD 23 to 50.0% in 2020 and 50.5% in 2018. Chair Huffman opposed the amendment, and it too was voted down.

**41.**     Ensuring that public testimony from that day could not be incorporated into the map, the Senate Committee voted out the committee substitute for SB 6 that same day, with no minority Senator voting in favor of it.

**42.**     On October 8, 2021, the Texas Senate suspended Rule 7.12 of the Texas Senate Rules in order to consider SB 6 on the Senate floor without printing of the Committee Report on the bill.

**43.**     Multiple amendments were offered on the Senate floor which would have ameliorated the dilution of Latino voting strength in the proposed plan, yet none were accepted despite being supported by every minority Senator.

44.    The Senate passed the Committee Substitute for SB 6 through on second reading with every minority Senator opposing the Bill.

45.    To bypass the Texas Constitutional rule that bills be read on three separate days, the Senate adjourned for one minute at 2:27 p.m. on October 8, 2021, then reconvened at 2:28 p.m. to begin a "new legislative day." The Senate then proceeded to engross CSSB 6 and send it to the House on that same day, where it was referred to the House Committee.

46.    After repeatedly implying that the House would not take up consideration of a Congressional map until after Texas House and Texas Senate maps had been passed, the House Committee, chaired by Representative Todd Hunter, abruptly posted at 9:41 a.m. on October 12, 2021 notice for a hearing on the Senate's Congressional proposal to be held at 10:00 a.m. the next day.

47.    No advance notice of this hearing was given to minority members of the House Committee, and it was posted on the same day the House was debating HB 1 (the proposed map for the Texas House of Representatives) on the House floor.

48.    If an individual was diligently monitoring the legislature for any posting of notice for a hearing, they would have only had 24 hours and 19 minutes notice of the House Committee hearing on Congressional maps. The House offered an option to register to testify virtually; however, there was only a twelve (12) hour window to register from the time the notice was posted. In addition, the option to register and testify virtually was not feasible for many minority communities across the state who continue to be on the far end of the digital divide.

49.    Individuals who needed language interpretation assistance at the House hearing were only provided an eight-hour window to request assistance. At least one individual who needed interpretation assistance was unable to participate in the hearing because they missed the window

for requesting assistance.

50.    No instructions or timeline was provided for members of the House Committee to submit proposed amendments, and no information was provided on whether there would be any votes in Committee.

51.    Despite only having twenty-four hours' notice, ninety-three (93) individuals testified or registered in opposition to SB 6 at the House Committee hearing. Only one (1) individual testified or registered in favor of the Bill.

52.    As he had done in hearings and on the floor when describing the Texas House and Texas Senate redistricting plans, Chair Hunter highlighted the demographic effects of the Bill—minimizing its discriminatory impact—by inaccurately basing his assessment of minority opportunity districts on Voting Age Population ("VAP"), despite it having been repeatedly pointed out that Citizen Voting Age Population ("CVAP"), particularly for Latino communities, is a more indicative measure and preferred by courts. In his layout of all redistricting plans (Congressional, Senate, House, State Board of Education) both in Committee and on the Floor, Chair Hunter made the number of majority minority VAP districts a centerpiece of his presentation.

53.    At the hearing, Chair Hunter announced that he would not be allowing members to offer any committee amendments, and that they would vote the Bill out that same day.

54.    CSSB 6 was voted out of the House Committee in the evening on the same day it was heard, ensuring that public testimony could not be incorporated.

55.    Despite acknowledgment, including by Representatives from both political parties in private conversations and debate on the Texas House floor, that the map and public testimony on the map revealed potential legal problems, no amendments were accepted on the House floor

which would have mitigated these issues.

**56.** It was openly acknowledged that the way the map split apart Asian American and Pacific Islander communities in Fort Bend County was problematic. Amendments were offered which would have alleviated this problem, yet none were accepted.

**57.** Multiple amendments were offered which would have ameliorated the retrogression of Latino voting power in CD 23 as well, but none were accepted.

**58.** Amendments which would have drawn new additional Latino opportunity districts, to reflect that Latinos were the major driving force behind the growth of the state, were similarly rejected. When questioned on the floor as to why he opposed this specific effort, Representative Jetton of House District 26—one of the Representatives who took a lead on redistricting debates—offered a scant defense of his position, repeatedly stating that he was "not advised" on the needs of north Texas Latino communities of interest.

**59.** Obviously pretextual reasons for opposing the creation of new opportunity districts were proffered on the House floor. For instance, an amendment which would have created a new Latino majority Congressional district in Dallas was opposed on the basis that it slightly lowered the non-Anglo population in an adjacent district. When it was rebutted that this was the natural result of creating an entirely new minority opportunity district, the response was "not advised."

**60.** Unfortunately, this kind of short and frivolous defense in opposition to these ameliorating amendments was common throughout both the House Committee and Floor proceedings during the deliberation of SB 6.

**61.** Conversely, amendments that furthered the political ambitions of members of the body received extended consideration time, and favorable passage. For example, over an hour was spent on Representative Toth's amendment that drew his residence out of CD 2—represented by

Congressman Dan Crenshaw—and into CD 8—a soon-to-be open congressional seat. Such consideration was not given to amendments that sought to remedy the intentional dilution of minority votes across the state.

62.     Early in the midnight hours of October 17, 2021, the House passed SB 6 on third reading. Taking issue with various changes made by the House to SB 6, the Senate did not concur. Just before 1:50 am that evening, a conference committee was appointed to adjust the differences between the upper and lower chambers on the Bill.

63.     In a departure from ordinary procedure, the House granted the request of the Senate for the appointment of a conference committee on SB 6 after the House had recessed pending administrative matters and after the members had left the floor. While it is not unusual for the House to stand in recess pending administrative matters, generally on bills of this nature, motions to grant a conference committee and to appoint conferees is done with the membership present because members may want to object to the granting of the Senate's request for a conference committee. The appointment of a conference can include important substantive components, such as instructions on how far the committee can veer from the House's engrossed legislation. Here, however, members did not have that opportunity because the conference committee at issue was appointed when members were not present.

64.     The conference report contained changes that were not present in either the Senate or House passed version of SB 6. This deviation from permitted legislative procedure gave rise to a point of order against further consideration of the conference committee report on SB 6 under Rule 13, Section 9(d)(1) of the House rules on the grounds that the conferees exceeded their authority without permission.

65.     Specifically, Representative Anchía noted that the structure of CD 20 was the same in both

the Senate and House versions of SB 6 and, thus, was not a matter of disagreement between the two houses, as the House Rules require. Indeed, the report's swap of territory between CD 35 and CD 20 to resolve disagreement over the latter was not permitted under the rule because it was not "essential to the effective resolving of the matter in disagreement."

66.     Representative Anchía pointed out that Senator Huffman had already explicitly stated on the Senate floor during the layout of the SB 6 conference committee report that the changes made between CD 35 and CD 20 were made at the behest of a Member of the Texas House of Representatives so that his residence could be in a particular district. Therefore, these were new, distinct changes to the map requiring permission by resolution under Rule 13, Section 9(f) of the Texas House Rules.

67.     The Texas House Parliamentarian overruled this point of order, pretextually relying on a single sixty-year old instance from U.S. House of Representative debates to justify ignoring proceedings on the Senate floor, while ignoring the hard evidence that the changes in the conference committee report were not essential to resolving a disagreement between plans, as explicitly required in the House Rule governing redistricting conference committee reports.

68.     Upon adoption of the conference committee report by both Houses, the report was then sent to the Governor's office.

### 3.     The adoption of Plan H2316 was also irregular, truncated, and designed to eliminate transparency and deliberation.

69.     The efforts of the Texas Legislature to circumvent debate and maintain a shadowy veil over the origins of the proposed map for the House Districts were similarly problematic. Indeed, it appears that the leadership of the Texas House of Representatives worked to ensure a swift and non-deliberative process that essentially rubber-stamped maps drawn in secret.

70.     Although redistricting data was not loaded into the Texas Legislature's map system until

September 1, 2021, Chair Hunter sent a letter to members of the House on September 9, 2021 informing them that they had only ten (10) days to submit any proposed maps to the House Committee for consideration.

**71.**     Plaintiff MALC, along with the Texas Legislative Black Caucus and the Texas Legislative Study Group sent a letter requesting more time to work with members on proposed maps. This request was ignored.

**72.**     While still telling some members of the Texas House that no map existed yet, Chairman Hunter began privately showing portions of the map to members on Wednesday, September 29, 2021.

**73.**     Chairman Todd Hunter then publicly revealed his proposed map for redistricting the Texas House on Thursday, September 30, 2021, with the release of House Bill 1 ("HB 1"). At the same time, Chairman Hunter posted a public notice to hear public testimony on the following Monday, October 4, 2021 at 9:00 a.m. Chairman Hunter required all proposed amendments to HB 1 by members of the Committee be delivered by 12:00 p.m. on October 4, 2021, leaving members of the Committee who had no prior knowledge of the maps with grossly insufficient time to analyze the map and prepare amendments.

**74.**     On Friday, October 1, 2021, members of the House Committee who belong to the Mexican American Legislative Caucus and Texas Legislative Black Caucus sent a letter to Chair Hunter in response to the arbitrary committee amendment deadline. Through this letter, these members requested an October 11, 2021 committee amendment deadline and an opportunity to allow for invited testimony to provide voting rights experts sufficient time to analyze the proposed maps.

**75.**     Chair Hunter denied both requests. It is extremely common practice to allow members of the Committee to invite expert witnesses, who traditionally testify first and are not bound by the

same time limitations imposed on other witnesses. For instance, the Senate Committee allowed invited testifiers from the Mexican American Legal Defense and Education Fund, the Texas NAACP, LULAC, and the Brennan Center.

76. After only three calendar days' notice, only one of which was a business day, the House Committee held a sole public hearing to discuss and deliberate HB 1. In addition to not allowing invited testimony, the House Committee did not even have state resource witnesses from the Texas Legislative Conference or the Office of the Attorney General available to answer questions—an almost unheard-of departure from ordinary committee proceedings, especially for a bill of this magnitude.

77. Repeated inquiries were made from minority members of the Committee to clarify the timeline on which amendments would be considered and voted on, yet the Committee provided no concrete information.

78. At the hearing, in another extraordinary move, the entire layout of the Bill—including the author's presentation and all questions from other members—was limited to only one hour. The author, Chair Hunter, did not allow several of the Latino and African-American members of the Committee to ask any questions at all despite their requests to do so, yet every Anglo member of the Committee, regardless of partisanship, who sought to ask questions was able to do so.

79. After public testimony, Chair Hunter forced members to vote on committee amendments (which had just been distributed hours before) and the Bill itself as part of the same hearing. Given the importance and magnitude of the legislation, this time frame for passage of the proposed Bill was unnecessarily and irregularly truncated.

80. When an African-American member of the Committee objected to this procedure, on the grounds that there had been insufficient time to review the amendments, these objections were

ignored. Then, remarkably, when a non-controversial amendment from a Latino member of the Committee which would have only made minor agreed-to changes to a few predominantly Latino districts was offered, Chairman Hunter refused to support the amendment on the grounds that there had been insufficient time to review its impacts.

81.     The Texas House of Representatives Calendars Committee set HB 1 for floor consideration on October 12, 2021 and required all amendments to be filed by 6:00 p.m. on Sunday, October 10, 2021. Again, given the importance and magnitude of the legislation, the time to provide meaningful review and amendments to the legislation was unnecessarily and irregularly truncated.

82.     On October 12, 2021, the Texas House of Representatives again truncated debate and deliberation over HB 1. Chairman Hunter only allowed one hour for his layout of the proposed maps for the Texas House and truncated debate by refusing to answer questions beyond that time period in any reasonable manner. A majority of the Legislature voted down minority members' motions for additional extensions of time. Further, instead of recessing so that deliberation could occur during normal working hours, the House leadership ensured that HB 1 was passed under the cover of darkness and voted on at approximately 3:40 a.m. in the morning on October 13, 2021. HB 1 passed the Texas House and adopted Plan H2316.

83.     On information and belief, certain legislators representing minority opportunity districts were pressured into voting for Plan H2316 with implications that their districts would be negatively impacted if they did not do so.

84.     The Texas Senate received HB 1 that same day and the Bill was scheduled for a public hearing on October 15, 2021. True to form, the Senate committee voted HB 1 out the same day it heard public testimony and again suspended the body's institutional rules—adopted to ensure

transparency and effective deliberation—to ensure expedited passage of HB 1 on that same day.

**D.     The Plans dilute Latino voting strength across multiple regions and districts.**

85.     Despite Latinos accounting for a full half of all growth in the State, the adopted State House and Congressional all boldly reduce Latino representation across the state, denying Latinos an equal opportunity to participate in the political process and elect candidates of their choice. The systematic dilution of voting power in certain regions, particularly when taken together with current and historical barriers to participation, also specifically burden Spanish-language communities and deny Latinos an equal opportunity to elect candidates of their choice.

86.     On top of simply not creating a fair number of majority Latino-voter districts, the Legislature also repeated a tactic from the last redistricting cycle in which it kept certain districts as facially majority Latino but undermined their Latino voting strength by pairing the Latino regions with areas of extreme Anglo bloc voting. This allows for situations in which a minority Anglo bloc is able to control a majority Latino district despite Latinos still being strongly cohesive. For example, consider a hypothetical district in which there are 100 voters who turnout, and 60% of those voters are Latino and 40% are Anglo. If Latinos vote cohesively at a rate of 75% (3-to-1), that's 45 votes for the Latino-preferred candidate and 15 votes for the Anglo-preferred candidate. If Anglos bloc vote against the Latino-preferred candidate at a rate of 90%, that's 36 votes for the Anglo-preferred candidate and only 4 votes for the Latino-preferred candidate. So, even though the district is 60% Latino turnout and there is a minimum of 3-to-1 polarization in either direction, the Anglo-preferred candidate still wins with 51 votes. On top of this, when one accounts for disparate registration and turnout rates that are the result of continued barriers to participation, it is very possible to create nominally HCVAP majority districts in which Latinos are not able to elect the candidate of their choice, and the Legislature did so in numerous

instances.

    **1. House of Representatives Redistricting Plan H2136 has discriminatory effects.**

        **a. The configuration and systemic overpopulation of Texas House districts in El Paso, in particular the consolidation of House Districts 76 and 77, dilutes the voting power of cohesive Latino communities and eliminates a performing Latino opportunity district in violation of the Voting Rights Act.**

**87.**    Under the benchmark plan, El Paso County contains five whole districts within its boundaries.

**88.**    Every El Paso district in the benchmark is a performing Latino opportunity district, with Hispanic Citizen Voting Age Population ("HCVAP") percentages, Spanish Surname Voter Registration ("SSVR") percentages from the 2020 General Election, and Spanish Surname Turnout ("SSTO") (the percentage of the overall turnout attributable to individuals with Spanish surnames) percentages from the 2020 General Election as represented below:

| DISTRICT | HCVAP | SSVR | SSTO |
|---|---|---|---|
| 75 | 89.4% | 76.6% | 75.9% |
| 76 | 85.8% | 79.7% | 80.1% |
| 77 | 73.3% | 62.4% | 60.7% |
| 78 | 65.4% | 53.2% | 52.7% |
| 79 | 79.2% | 69.5% | 70.6% |

**89.**    Plan H2316 entirely removes HD 76 from El Paso and moves it to Fort Bend County where it has numbers less than 20% in all three of the measures of Latino voting power listed above.

**90.**    This wholesale removal of an effective and longstanding Latino opportunity district cannot be justified.

91.    The population of El Paso county divided by the ideal district size for Texas House districts (194,303) indicates that El Paso County on its own has enough population for 4.46 ideal sized districts, meaning that ideally (and under a strict construction of the Texas Constitution's own county line rule, Texas Const. Art. III § 26—which rule must yield to federal law but which otherwise controls), it should have at least four whole districts and comprise roughly half (89,379 total population) of a fifth district. Yet, the Legislature systematically deprived El Pasoans of representation in a fifth partial district.

92.    The Texas Legislature jumped through hoops and over hurdles to avoid giving Latinos in El Paso equal representation in the State House.

93.    In particular, H2316 under-populates to the extreme every single Anglo majority district in West Texas (average district is underpopulated down to -4.1% below ideal), while it overpopulates Latino majority districts to the extreme (average district size is overpopulated up to +4.3% above ideal). The pernicious effect is obvious: minimized representation for Latinos in the area and maximized representation for Anglos. H2316 avoids eliminating Anglo majority districts or pairing incumbent Anglo representatives and does so at the expense of Latino opportunity.

94.    Alternative configurations, such as the one in MALC's proposal shown in Fig. 1 below, exist and were presented to the legislature, which would maintain four seats wholly contained within El Paso and have an additional fifth seat anchored with at least half of its population in El Paso. Such a district would necessarily not extend all the way into Maverick County (roughly 500 miles away).



Figure 1. MALC alternative El Paso House District with HD 76 back in El Paso.

**95.** Such a configuration is the natural result of not systematically overpopulating each of the El Paso districts. Under the adopted House Plan, El Paso districts are overpopulated at an average of + 4.2%, with each individual district being overpopulated. Under the MALC proposal, the average deviation is much lower, at - 1.2%, with three districts being underpopulated and two being overpopulated.

| Adopted District | Deviation | Proposed District | Deviation |
|---|---|---|---|
| 75 | + 3.2% | 75 | + 0.8% |
| 77 | + 5.0% | 76 | - 1.3% |

| 78 | + 4.9% | 77 | - 1.4% |
| 79 | + 3.6% | 78 | - 0.8% |
|  |  | 79 | + 0.4% |

**96.** El Paso is a cohesive Latino community with identifiable communities of interest. Plan H2316 deprives these communities of equal representation.

**97.** Latinos in the reconstituted HD 76 vote cohesively for the same candidates. Ecological inference indicates that Latinos in the district would vote for the same candidates at levels between 70% and 85%.

**98.** Anglos in the reconstituted HD 76, and in the regions comprising the affected districts in the enacted plan, block vote against the Latino preferred-candidates at levels over 80%.

**99.** Based on reconstituted statewide election results from elections between 2014 and 2020, Latinos in the proposed HD 76 would be able to elect the candidate of their choice in every election.

**100.** The net result of placing HD 76 back in El Paso County is one additional majority HCVAP district in the region in which Latinos are able to overcome Anglo bloc voting to elect the candidate of their choice.

**101.**

> **b. The arrangement of House districts in Harris County does not provide Latinos in the area with an equal opportunity to participate in the electoral process and elect candidates of their choice.**

**102.** Under the benchmark plan, there are five (5) districts in Harris County which consistently perform to elect the Latino candidate of choice in primary and general elections, four (4) of which

have majority HCVAP populations.

**103.**   According to the 2020 Census, there are 2,034,709 Latinos in Harris County, comprising 43% of the total population, and 29.9% of the citizen voting age population.

**104.**   Latinos accounted for 21.7% of the growth in Harris County over the last decade.

**105.**   Harris County is large enough to contain either 24 or 25 Texas House districts entirely within its boundaries. It currently contains 24, and the Legislature chose to leave that unchanged this decade. That means that, if one were working on a strictly proportional basis, Latinos should comprise a majority of the citizen voting age population in no fewer than 7 districts.

**106.**   Indeed, Latinos in Harris County are sufficiently numerous and geographically compact to form a majority of the citizen voting age population in at least six (6) districts in the center of the County, as demonstrated in the map below:



Figure 4. Six majority HCVAP districts in Harris County, compared to 4 in the adopted plan.

**107.**   Taken together, these districts would be somewhat more compact than the adopted districts:

| District | ADOPTED HCVAP% (2020 ACS) | ALT. HCVAP% (2020 ACS) | ADOPTED AREA RUBBER BAND | ALT. AREA RUBBER BAND | ADOPTED PERIMETER TO AREA | ALT. PERIMETER TO AREA |
|---|---|---|---|---|---|---|
| 138 | 27.1% | 54.9% | .570 | .663 | .157 | .192 |
| 140 | 70.7% | 57.7% | .851 | .552 | .385 | .174 |
| 143 | 63.9% | 63.4% | .506 | .664 | .139 | .161 |
| 144 | 66.4% | 69.1% | .555 | .599 | .197 | .171 |

| 145 | 54.4% | 59.7% | .473 | .561 | .122 | .162 |
| 148 | 39.4% | 50.1% | .439 | .390 | .088 | .092 |

**108.**    Rather than drawing a new Latino opportunity district, or even preserving existing ones, Plan H2316 actually took a step backwards and dramatically reduced Latino voting strength in two districts which had been serving to elect Latino candidates of choice.

**109.**    Under the benchmark plan, HD 145 was 61.3% HCVAP (2019 ACS); had 2020 General Election SSVR of 53.9%; 2020 General Election SSTO of 50.4%; 2020 Democratic Primary SSVR of 54.4%; and 2020 Democratic Primary SSTO of 46.4%.

**110.**    Under Plan H2316, HD 145 was drawn to be 55.7% HCVAP (-5.6) (2019 ACS); would have had 2020 General Election SSVR of 45.3% (-8.6); 2020 General Election SSTO of 39.3% (-11.1); 2020 Democratic Primary SSVR of 46.3% (-8.1); and 2020 Democratic Primary SSTO of 32.6% (-13.8).

**111.**    Under the benchmark plan, HD 148 was 45.5% HCVAP (2019 ACS); had 2020 General Election SSVR of 36.1%; 2020 General Election SSTO of 30.1%; 2020 Democratic Primary SSVR of 36.9%; and 2020 Democratic Primary SSTO of 25.8%.

**112.**    Under Plan H2316, HD 148 was drawn to be 37.7% HCVAP (-7.8) (2019 ACS); would have had 2020 General Election SSVR of 32.4% (-3.7); 2020 General Election SSTO of 28.9% (-1.2); 2020 Democratic Primary SSVR of 32.4% (-4.5); and 2020 Democratic Primary SSTO of 26.0% (+.2).

**113.**    Additional alternative plans exist which would have 5 majority CVAP districts (one new district) while maintaining HD 148 as the near-majority HCVAP functional Latino opportunity district that it was in the benchmark:



Figure 5. Alternative 5 HCAP majority plus HD 148 maintained at benchmark 45.5% level.

**114.**    Latinos vote cohesively in either the 5 or the 6 majority HCVAP proposed alternative plans. Ecological inference indicates that between 60% and 80% of Latinos vote for the same candidates in statewide general elections, with an average around 70%.

**115.**    Anglos in the enacted House districts that cover the same regions vote as a bloc against the Latino candidates of choice. Ecological inference indicates that Anglos in these districts in the same elections voted at rates of between 70 and 85%  against the Latino candidates of choice, with an average just under 80%.

**116.**    Anglos in the adopted HD 138 bloc vote to defeat the Latino candidate of choice in that district. Reconstituted election results for statewide contests indicate that the Anglo-preferred

candidate would have defeated the Latino-preferred candidate in that district in every general election cycle in the last decade.

**117.** The configuration of Texas House districts in Harris County under Plan H2316 does not provide Latinos in the county with an equal opportunity to participate in the political process and elect candidates of their choice for the Texas House. The Voting Rights Act requires drawing additional majority HCVAP districts in Harris County.

> **c. An additional Latino opportunity districts should be drawn in Central Texas in lieu of the existing HD 17.**

**118.** Latinos in Central Texas are sufficiently numerous and geographically compact to comprise a majority of the eligible voter population in two single member districts as shown in the map below:



Figure 6. Two Central Texas HCVAP majority districts.

**119.** Alternatively, Latinos can constitute a majority in one more compact district:



Figure 7. One majority HCVAP district in Central Texas.

**120.** Currently there is no majority HCVAP district in the geographic area represented in Figures 6 and 7.

**121.** Latinos vote cohesively in the proposed districts, with ecological inference indicating that around an average of 70% of Latinos voted for the same candidates in statewide general elections between 2014 and 2020.

**122.** Anglos in the current HD 17 vote as a bloc to consistently defeat the Latino candidate of choice. Ecological inference indicates that between 75% and 95% of Anglos bloc voted to defeat the Latino candidate of choice in reconstituted statewide election results in every general election between 2014 and 2020.

## 2. Congressional Districts Plan C2193 is discriminatory.

### a. The Voting Rights Act requires drawing a Latino opportunity district in the DFW Metroplex.

**123.** Latinos accounted for over 50% of the growth in Dallas and Tarrant Counties in the last

decade. Despite this, Plan C2193 gives no new representation to Latinos in the area. Instead, it goes to extreme lengths to crack Latino communities in the area. CD 6, for example, slices down the middle of Arlington and cuts in half cohesive Latino communities in Grand Prairie and Irving, taking portions of these communities and pairing them with distant rural counties as far East as Cherokee County. Meanwhile, CD 33 cuts through Irving and winds all the way around CD 6 to come back into Grand Prairie, slicing through Latino communities along the way.

124.    Latinos in Dallas and Tarrant County are sufficiently numerous and compact to constitute a majority of the eligible voter population in a new district while maintaining the current Dallas and Tarrant anchored congressional districts which exist. Plans were presented to the Legislature which would have done so, but they were not adopted. *See, e.g.*, Plan C2163, available at https://dvr.capitol.texas.gov/Congress/51/PLANC2163; Plan C2167 available at https://dvr.capitol.texas.gov/Congress/51/PLANC2167.

125.    Ecological inference based on statewide general election results between 2014 and 2020 indicates that Anglos in the enacted CD 6 bloc vote at rates above 90% against Latino candidates of choice. CD 6 takes a large swath of Latino communities and draws them together with distant rural, Anglo voters. Reconstituted election results indicate that the Anglo bloc voting is sufficient to defeat the Latino candidate of choice in the district in every election cycle.

126.    Ecological inference based on the same election results indicates that Latinos in a new Latino opportunity district in the region would vote cohesively at a rate of over 75% for the same candidates.

### b. The Voting Rights Act requires drawing an additional Latino opportunity district in Harris County.

127.    The current configuration of Congressional districts in Harris County artificially and unnecessarily packs Latino voters into CD 29 (62.2% HCVAP), while the rest of the Latino communities in Harris County are split between numerous districts. Given voting patterns in the County, CD 29 would continue to perform to elect the Latino candidate of choice in primary and general elections with less of a concentration of Latino voters.



Figure 10. The two high Spanish Surname Turnout regions (green) of Harris County
packed together in adopted CD 29.

**128.**      Latinos in Harris County are sufficiently numerous and geographically compact to form a

majority of the eligible voter population in a second district wholly contained within Harris County. Plans

were presented to the Legislature which would have done so, but they were not adopted.



Figure 11. CDs 29 and 38 are both majority HCVAP.

**129.** Ecological inference based on statewide general election results between 2014 and 2020 indicates that Anglos in the enacted CD 38, which is not majority HCVAP, bloc vote at rates above 75% against Latino candidates of choice. Reconstituted election results for those years indicate that the Anglo bloc vote was sufficient to defeat the Latino preferred candidate of choice in every election cycle.

**130.** Ecological inference based on the same election results indicates that Latinos in a new Latino opportunity district in the region would vote cohesively at a rate of over 75% for the same candidates.

**E. Under the Totality of the Circumstances, The Political Process Is Not Equally Open to Latinos and Spanish Speakers, and Intentional Racial Discrimination Is Evident.**

**1. Latinos are under-represented in the Texas House, Texas Senate, and Texas Congressional Delegation both in the benchmark plans and the newly enrolled plans.**

**131.** Latinos make up approximately 30% of the Citizen Voting Age Population (CVAP) in

Texas.

132.     Under Plan C2193, Latinos would only comprise a majority of the CVAP in 7 out of 38 districts (18.4%), falling over 4 seats short of proportional representation.

133.     Under the recently enacted plan for the Texas House of Representatives, Latinos would only comprise a majority of the CVAP in 30 out of 150 districts (20%), falling 15 seats short of proportional representation.

134.     Under the recently enacted plan for the Texas State Senate, Latinos would only comprise a majority of the CVAP in 7 out of 31 districts (22.6%), falling over 2 seats short of proportional representation.

135.     Under the recently enacted plan for the Texas State Board of Education, Latinos would only comprise a majority of the CVAP in 3 out of 15 districts (20%), falling over 1 seat short of proportional representation.

136.     It is geographically possible for Latinos to comprise a reasonably compact majority of the CVAP in at least 10 Congressional Districts, 43 Texas House Districts, 9 Texas Senate Districts, and 4 State Board of Education Districts.

137.     On the whole, this severe and systematic under-representation has the effect of denying Latinos an equal opportunity as Anglos to engage in the political process and suggests an intent to produce such an effect.

138.     While reducing Latino and Spanish language opportunities for representation, both Plan C2193 and Plan E2106 increase the number of Anglo majority Democratic districts.

   **2.  Texas has a long and unfortunate history of intentional discrimination and Voting Rights Act violations, and continues to enforce laws and administer elections in ways that deprive Latinos and Spanish speakers of an equal opportunity to participate.**

139.     In addition to the redistricting-specific violations detailed in Paragraphs 86-169 above,

official racial discrimination in the electoral process in Texas dates back to the formation of the State.

**140.** In the early Republic, Mexicans were prohibited from organizing political rallies or serving as election judges. Lichtman Report, *supra* at 9.

**141.** "After the Civil War, in 1866, an all-white constitutional convention prohibited freed slaves from voting, holding office, or serving on juries." *Id.* at 18.

**142.** Texas instituted post-Reconstruction Jim Crow laws such as the poll tax, racial gerrymandering, restrictive voter registration laws, and the all-white Democratic primary, to prevent minorities from participating in the political process. *Id.* The U.S. Supreme Court struck down Texas's white primaries as violations of the Fifteenth Amendment in *Nixon v. Herndon*, 273 U.S. 536 (1927), and *Smith v. Allwright*, 321 U.S. 649 (1944).

**143.** In the 1964 election, Republican operatives circulated false information in Black neighborhoods in Houston indicating that authorities could arrest voters who had an outstanding parking ticket or traffic conviction. Lichtman Report at 18-19. Similar tactics were deployed throughout the decades in South Texas to discourage Latinos from voting. *See* Texas Civil Rights Project, *Opening the Floodgates for Racial Intimidation, Disenfranchisement, and Violence by Expanding Poll Watcher Authority* (2018), https://txcivilrights.org/wp-content/uploads/2021/05/TCRP-Poll-Watcher-Report.pdf.

**144.** After Texas's poll tax was struck down as unconstitutional in 1966, Texas passed a new law requiring voters to re-register every year. The law had a substantial disenfranchising effect on minority voters and was struck down as unconstitutional in 1974. *Beare v. Briscoe*, 498 F.2d 244, 247–48 (5th Cir. 1974).

**145.** A federal court found that the 2011 Texas Legislature passed SB14, a voter ID law, with

racially discriminatory intent. *See Veasey v. Perry*, 71 F. Supp. 3d 627, 702-03 (W.D. Tex. 2014) ("*Veasey I*"); *Veasey v. Abbott*, 249 F. Supp. 3d 868, 875-76 (S.D. Tex. 2017) ("*Veasey III*"). SB14 has been deemed among the most restrictive voter ID laws in the country.

146. "Minorities continue to have to overcome fear and intimidation when they vote," including in-person harassment at the polls to suppress minority participation. *Veasey I* at 71 F. Supp. 3d at 636-37; *see also Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 783 (S.D. Tex. 2013) (describing poll workers being hostile to Latinos, depriving them of the opportunity to bring an assistant with them, and requiring them to show driver's licenses to vote even before Texas made that a legal requirement).

147. In 2016, the Fifth Circuit held that a Texas law limiting who could provide foreign-language voters with assistance violated the Voting Rights Act. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017).

148. Numerous counties in CD 23 and throughout the state have failed to provide adequate Spanish language voting materials and information, in apparent violation of the Voting Rights Act, including at least as recently as 2016.

149. In 2019, the Texas Secretary of State attempted to purge nearly 100,000 registered voters from the voter rolls despite being made aware that the process for identifying voters for removal targeted eligible voters who were naturalized citizens. *Tex. League of United Latin Am. Citizens v. Whitley,* CV SA-19-CA-074-FB, 2019 WL 7938511, at *2 (W.D. Tex. Feb. 27, 2019). The individuals who were affected by this attempted purge were overwhelmingly non-Anglo, and mostly of Latino origin. A court had to enjoin the State from proceeding with this purge, *id.*, and ultimately the State settled the matter.

150. Since the end of preclearance under the Voting Rights Act, Texas has led the nation in

polling place closures. During the 2020 General Election, a Bexar County District Court Judge enjoined the County from further closing polling places because "the additional closure of polling locations in 2020 will negatively impact African American and Hispanic voters in those precincts." Order, *Texas Organizing Project v. Callanen*, NO. 2020-CI-19387 (Bexar County 45th Judicial District October 13, 2020).

151.    During the 87th Regular and Special Sessions, the Legislature repeatedly tried, and ultimately after much debate and controversy succeeded, in passing a new law, S.B. 1, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021). S.B. 1 imposes numerous restrictions on the right to vote in spite of demonstrably disparate impacts on communities of color and foreign language voters. These new measures include making the process for receiving language assistance for in person and mail ballot voting significantly more onerous, restricting who can provide language assistance for voters, eliminating voting practices which have been disproportionately utilized by minority voters, such as extended hours and drive-thru voting, severely limiting Sunday voting hours which would curtail the historical African American practice of post-church "souls to the polls" mobilization, increasing the authority of poll watchers to interfere with voters and the election process despite evidence of racial targeting and intimidation. There is pending litigation over the Bill.

### 3. The Texas Legislature is not redistricting in a vacuum, and the racial dynamics of modern political appeals villainizing Latinos, and intimidation tactics meant to discourage their participation, have proliferated in recent years.

152.    Increasingly in recent years, politics have become racialized, particularly when it comes to communities which have large immigrant populations—namely Latino and AAPI communities. Although immigration debates naturally have a racial and ethnic component, the political messaging around the issues has unnecessarily inflamed racial resentment, such as using stock

imagery of brown-skinned individuals with tattoos or in rafts to raise the specter of an "illegal invasion."

153.    Lieutenant Governor Dan Patrick has repeatedly publicly echoed a white supremacist conspiracy theory, "the Great Replacement theory," that non-Anglo undocumented immigrants are being ushered into the United States so that they can eventually help Democrats win elections.

154.    Then-candidate Donald Trump infamously started his campaign with comments which were widely regarded as stirring up anti-Latino sentiment, stating: "When Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with us [sic]. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people."

155.    Then-candidate Trump argued in 2016 that Judge Gonzalo Curiel — who was overseeing a lawsuit involving one of Donald Trump's business ventures — should recuse himself from the case because of his Mexican heritage and membership in a Latino lawyers association, implying that Latinos and immigrants are one and the same and incapable of unbiased legal reasoning.

156.    President Trump tweeted that several minority members of Congress — Reps. Alexandria Ocasio-Cortez (D-NY), Ayanna Pressley (D-MA), Ilhan Omar (D-MN), and Rashida Tlaib (D-MI) — are "from countries whose governments are a complete and total catastrophe" and that they should "go back" to those countries. This echoed a common racist trope of saying that Black and Brown people, particularly immigrants, should go back to their countries of origin. Three of the four members of Congress whom Trump targeted were born in the US.

157.    October 16, 2018 America First Action sponsored a Facebook ad alleging that candidate Colin Allred "is essentially extending an open invitation to not only the 11 million illegal immigrants already in the United States, but also to those who haven't gotten here, yet." The ad

featured stock images of Brown-skinned individuals in rafts, equating Latinos with an illegal invasion of the country.

158.    September 19, 2018 Ted Cruz posted a video on Twitter that highlighted three undocumented immigrants from Latin America who were convicted of violent crimes, but no immigrants from any other regions or races.

159.    In the 2020 race for Galveston County Tax Assessor, one candidate sent a mailer with a stock image of a Latino man with a tattooed face and tattooed bare chest, standing arms crossed. The words accompanying the photo are meant to create fear about the man and what he represents: "Texans can thank Cheryl Johnson for having illegal immigrants vote in this November's Election!"

160.    A paid social media ad from the Donald Trump war room account featured stock photos of brown-skinned men with tattoos and the phrase "I'm on Team Joe," villainizing Latinos and implying that Latino gang members support Joe Biden.

161.    President Trump called the SARS-CoV-2 coronavirus the "Chinese virus" and "kung flu" — racist terms that tap into xenophobia.

162.    Texas Congressman Jodey Arrington posted a paid social media ad calling to hold China accountable for coronavirus.

163.    Members of the Texas Senate called into question a research paper on the Coronavirus because its co-authors included two individuals with Asian surnames, despite the fact that they were affiliated with Texas A&M University.

164.    Texas Agriculture Commissioner Sid Miller has been repeatedly noted as posting anti-Semitic tropes on social media.

165.    Not only has this rhetoric led to racial polarization in the electorate, it has led to actual

physical violence against Latinos, Asians, and non-English speakers, and been openly lauded by white supremacists. Richard Spencer, a leader of the alt-right movement and the 2017 Charlottesville Unite the Right rally which ended in violence, has stated: "There is no question that Charlottesville wouldn't have occurred without Trump. It really was because of his campaign and this new potential for a nationalist candidate who was resonating with the public in a very intense way. The alt-right found something in Trump. He changed the paradigm and made this kind of public presence of the alt-right possible."

166.    David Duke, a former Ku Klux Klan leader, who participated in the Charlottesville rally, called the rally a "turning point" for his own movement, which seeks to "fulfill the promises of Donald Trump."

167.    On August 3, 2019, a man from Allen, Texas drove to El Paso for the express purpose of killing Latinos and proceeded to kill 23 and injure 23 others. The shooter, echoing the same Great Replacement theory referenced above, wrote prior to the shooting: "The heavy Hispanic population in Texas will make us a Democrat stronghold," he wrote. "Losing Texas and a few other states with heavy Hispanic population to the Democrats is all it would take for them to win nearly every presidential election."

168.    Incidents of Anti-Asian violence have proliferated in the last two years. In Texas, these have included stabbings and vandalism.

169.    Latino and foreign-language voters have faced intimidation and baseless challenges to their voter registrations at the polls in recent years, including poll watchers and third-parties questioning Latino and Asian-appearing voters and attempting to investigate their identification documents.

170.    In the 2018 General Election, the Fort Bend Republican Party published an ad in the India Herald in advance of the local Hindu community's annual festival.  It featured the Hindu god

Ganesha, who is depicted in the form of an elephant, and reads, "Would you worship an elephant or a donkey?"

171.    October 16, 2018, America First Action sponsored a Facebook ad against candidate Colin Allred, claiming that he did not support the Second Amendment.  The ad includes a picture of a white woman with a hand over her face appearing to belong to a person of color. Representative Allred's name appears above the image. Another picture shows a white woman engaged in target practice with a handgun, with Representative Pete Sessions's name above it.

172.    The Miami Herald reported that the National Republican Congressional Committee appeared to have darkened a photograph of NFL quarterback Colin Kaepernick that it had purchased from the Herald, which it then disseminated in a fundraising mailer.

173.    Most recently, Texas Lieutenant Governor Dan Patrick made headlines for stating that African Americans were disproportionately responsible for the spread of Coronavirus and equating African Americans with Democrats in order to then blame the spread on Democrats.

### 4. The Texas legislature applied traditional redistricting principles unequally -- employing them only when it was useful to protect the interests of Anglo majority communities and incumbents.

174.    Amendments offered on the grounds of preserving communities of interest were accepted when the communities being protected were Anglo majority, but similar concerns about splitting minority communities were ignored. For example, an amendment to Plan H2316 was accepted in the House Committee on the grounds that it preserved the communities of Belton and Temple in Bell County—both majority Anglo—yet when amendments were offered which would have preserved both the Belton/Temple communities and the majority minority community of Killeen in Western Bell County, the amendments were not accepted.

175.    When an amendment was offered by a legislator which would have created new minority

opportunity districts but affected other members' districts without their consent, those amendments were rejected on the grounds that they affected other members' districts. When amendments were offered which weakened minority opportunity districts and affected other members' districts without their consent, those amendments were accepted over the objections of the affected members.

176.    Population deviations in Plan H2316 were severely manipulated in West Texas to overpopulate every Latino opportunity district and under populate every Anglo controlled district, as detailed in Paragraphs 87-102 above. These deviation manipulations are particularly egregious when one takes into account how prison populations are counted in Texas. Despite not counting prisoners as residents of their prison facility for any other legal purpose—for instance redistricting of county and local political subdivisions, voter registration, residence for taxation purposes— Texas still counts prisoners at their facility for purposes of allocating population in the redistricting context. The Texas prison population is disproportionately non-Anglo. On information and belief, at least 3 Anglo majority West Texas districts would not be large enough to fall within the acceptable population deviation were it not for their sizable non-voting, majority minority prison populations.

177.    Texas's County Line Rule, articulated in Article III Section 26 of the Texas Constitution, was used as a reason to object to amendments which would have created new minority opportunity districts. Yet Plan H2316 itself breaks county lines 19 times and clearly violates the plain language of the County Line Rule in splitting Cameron County in two different directions.

178.    As detailed in Paragraph 77 above, minority members' concerns about insufficient time to review amendments were ignored, yet their own amendments were rejected on the grounds that there had been insufficient time to review them.

**G.    The Legislature made race a predominant factor in the drawing of certain districts without a good faith effort to comply with the Voting Rights Act and without any other compelling governmental interest.**

179.    Comparing district boundaries with demographic patterns in the regions, it is evident that the shape and composition of the Texas House and Congressional districts in Harris County, and the Congressional districts in the DFW metroplex are inexplicable except on the grounds of race. Other criteria, including compactness, respect for political subdivision boundaries and other communities of interest, partisanship, and incumbency cannot account for the configuration of these districts.

180.    Chairman Hunter repeatedly centered race in his explanations of proposed plans, but used inappropriate metrics in his assessment of their effects on minority communities. In his Committee layout of the Bill, he opened by stating:

> My view is that the correct analysis in reviewing majority-minority districts is to look at African-American and Hispanic VAP, voting age population, which shows that the plan, as we call it, actually creates a new African-American districts, and 2 new Hispanic HVAP districts from the benchmark. . . . Some summary points: There's 3 new, under my bill, majority minority districts. There are 38 majority minority hvap, Hispanic, districts versus 36 under the benchmark, that's plus 2. . . . then we have 2 majority minority African American districts versus 1 under the benchmark. and by the way, hd 111, an African American majority district, it was 50.4% bvap and due to the 2020 census, dropped to 47%. the bill before you has brought it back to 54.7%.

181.    Again in closing, he stated: "summary: 4 new majority minority districts, 3 Hispanic, 1 African-American."

182.    Then again on the House floor, Chair Hunter repeatedly emphasized the creation of new VAP majority minority districts and the propriety of considering VAP without being able to discuss details of any consideration of electoral performance or other substantive analysis. He did this for both his own House plan as well as the Congressional and SBOE plans which originated in the Senate.

**183.**    Amendments were offered, and in some cases accepted, on the explicit grounds that they made districts hit certain arbitrary racial metrics without substantive analysis of if doing so was relevant to a Voting Rights Act violation.

**184.**    Amendments were rejected if they crossed certain arbitrary thresholds—for instance, lowering BVAP below 50%—without any substantive analysis of if the Voting Rights Act required maintaining these particular demographic metrics.

**185.**    On information and belief, certain legislators from Harris County centered racial considerations in their drawing of proposed districts and amendments to Plan H2316, openly discussing these matters with other members of the delegation and House leadership, specifically focusing on the level of Anglo voting age population in particular districts which did not have Voting Rights Act implications.

**186.**    The unusual shape of Congressional District 29 when overlaid on top of a demographic map of Harris County necessarily raises the inference that race (specifically packing all of the Latinos into one district) was a predominant factor in its drawing:



Figure 17. The two concentrations of Latino voters in Harris County are connected by a thin curve.

Such a concentration of Latinos into a single district is not necessitated by compliance with

the Voting Rights Act.

**187.** The shapes and interplay of Congressional Districts 6 and 33 are also inexplicable except

on the grounds of race and were specifically drawn around certain racial groups.

**188.** An amendment which would have created a new, Voting Rights Act-compliant Latino

opportunity district in Dallas County was rejected on the grounds that it lowered the Latino

population in the non-majority HCVAP CD 33. No substantive analysis was provided as to why

creating a new Latino majority district in Dallas County at the expense of slightly reducing the

Latino population in CD 33 presented a problem under the Voting Rights Act.

**H.    Plan H2316 manipulates population deviations for impermissible ends.**

**189.** During the 2011 redistricting cycle, the three-judge court held that the population deviation

patterns within a localized region can violate the one person one vote principle if they are

unexplainable by legitimate reasons. *Perez v. Abbott*, 250 F. Supp. 3d 123, 195 (W.D. Tex. 2017) ("In sum, if a plaintiff characterizes his one person, one vote claim as a challenge to an entire plan with an overall deviation of less than 10%, the geographic nature of that claim is plan-wide. On the other hand, if a plaintiff characterizes his one person, one vote claim as a challenge to a specific piece within an entire plan with an overall deviation of less than 10%, the geographic nature of that claim is limited to that specific piece of the plan. Both are valid legal theories for challenging a plan, and both claims can be made together.").

190.    As represented in the graph below, H2316 under-populates to the extreme every single Anglo majority district in West Texas (average district is underpopulated down to -4.1% below ideal), while it overpopulates Latino majority districts to the extreme (average district size is overpopulated up to +4.3% above ideal).



191.    Adding HD 53, a predominantly Anglo CVAP district, into the calculation does not

dramatically alter this assessment. As an initial matter, the densest population concentrations in HD 53 are more accurately characterized as being in the Texas Hill Country, rather than West Texas – with Kerr, Bandera, Medina, and Llano County being the largest counties in the district – and the incumbent representative lives in the Eastern half of the district. But setting that aside, even with HD 53 added in, Anglo districts in West Texas would still be underpopulated by an average of 3.15%. This represents a systemic effort to dramatically alter the voting power of citizens in approximately 10% of the Texas House of Representatives in a way that directly favors Anglo voters and directly disadvantages Latino voters.

192.    The pernicious effect is obvious: minimized representation for Latinos in the area and maximized representation for Anglos. H2316 avoids eliminating Anglo majority districts or pairing incumbent Anglo representatives and does so at the expense of Latino voters and by pairing the Latina representatives, and MALC members from HD 76 and HD 77.

193.    Further, the grouping is not arbitrary because it represents an impermissible regional bias that clearly also advantages one ethnic group over the other. By overpopulating those districts in the Trans Pecos region and under populating those of the Plains and Panhandle regions, it shifts the balance of regional representation in the Texas House of Representatives and ensures the Anlgo dominated Plains and Panhandle regions have a greater representative share of the State. Put bluntly, residents of the Plains and Panhandle regions of West Texas are favored over those of the Trans Pecos region. On average, there is one representative for every 202,566 residents in the Trans Pecos region, compared to one representative for every 186,791 residents in the Plains and the Panhandle. This equates to residents of the Plains and Panhandle having 8.4% more representation power than residents of the Trans Pecos region on a per district basis.

194.    Taken together, these regions represent nearly a third of the geography of Texas.



**195.**    The systematic over-population of Latino districts in El Paso further allows HD 74 to stretch all the way from Maverick County into El Paso. Had the Legislature not over-populated all of these House districts, Maverick County, which has a total population of 57,887 that is 94.9% Hispanic, would need to be added into a South Texas House District. Doing so would have prevented the Legislature from diluting the Latino voting power of either or both House Districts 80 and 31. In the enacted map, the Spanish Surname Turnout in each of House District 80 and 31 is reduced by roughly 10%. Based on reconstituted election results and ecological inference analysis, the enacted HD 31 would no longer consistently elect the candidate of choice for the Latino community in the area.

**196.**    As described in the preceding sections, the manipulation of population deviations in these regions interplays with other socio-economic factors, including dramatically lower census

participation rates and the disparate impact of how prison populations are counted, such that the actual effect on residents of these regions is actually far greater than even the official census numbers indicate.

197.    As in 2011, this regional systematic bias offends the one person one vote principle and cannot be justified by traditional redistricting principles.

I.    **The Texas Legislature's 2023 Ratification of the 2021 State Legislative Maps.**

198.    In 2023, the Texas Legislature – to comply with a provision of the Texas Constitution that redistricting occur in the first *regular* session following receipt of the Census data – passed House Bill 1000 (state house) and Senate Bill 375 (state senate) through which the Legislature "ratified" the maps enacted in 2021.

199.    H.B. 1000 provides that the districts used to elect members in 2022 established by H.B. 1 of the 87th Legislature, 3rd Called Session 2021 known as Plan H2316 was "ratified and adopted as the districts used to elect members of the Texas House of Representatives."  The bill does not contain any legal description of districts nor purport to repeal, amend, or supersede the H.B.1 that enacted Plan H2316.

200.    As such, Plan H2316 remains in place today and was expressly identified and ratified as the permanent plans by the 2023 Legislature in H.B. 1000. Plaintiffs' complaint challenges Plan H2316 as adopted in 2021 and as ratified as a continuation of the districts set forth in the 2023 legislature. The actions and intent of the 2021 legislature were ratified and adopted as those of the 2023 legislature when it adopted the same map on a rubber-stamp basis. The 2021 legislature's discriminatory intent in configuring congressional districts is not amerliorated by the 2023 legislature's ratification bills. A knowing ratification of known discriminatory effects is further evidence of discriminatory intent.

## V. Legal Claims

### Count I
### (as to Defendants Abbott and Nelson)
*Intentional Racial Discrimination Violating the Fourteenth and Fifteenth Amendments to the United States Constitution*

**201.**     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**202.**     Texas House Plan H2316 and Congressional Plan C2193 were enacted with the intent to discriminate on the basis of race and national origin, and has a discriminatory effect on that basis.

### Count II
### (as to all Defendants)
*Violations of Section 2 of the Voting Rights Act – Discriminatory Results Claims*

**203.**     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**204.**     Plaintiff's cause of action arises under Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and as enforced or made applicable by and through 52 U.S.C. § 10301 *et seq.* and/or 42 U.S.C. § 1983. Defendants are in violation of the Voting Rights Act because they: have failed to provide sufficient Latino and minority opportunity districts in Texas House Plan H2316 and Congressional Plan C2193 in the face of racial bloc voting; employed redistricting gerrymandering techniques such as packing and cracking of minority communities to limit and avoid drawing Latino and minority opportunity districts; used redistricting criteria, such as the "whole county" rule inconsistently and as an unjustifiable pretext to limit and avoid drawing Latino and minority opportunity districts; manipulated population deviations and leveraged a known undercount to further reduce electoral opportunities. Defendants' elimination and weakening of existing districts, failure to draw additional Latino and minority opportunity districts, use of racial gerrymandering techniques, pretextual and inconsistent use of traditional redistricting criteria, and manipulation of population data collectively results in a violation of Plaintiff's rights as secured by Section 2 of the Voting Rights Act, 42 U.S.C. § 1973. Taken together with the totality

of the circumstances, Texas House Plan H2316 and Congressional Plan C2193 do not afford plaintiff's members an equal opportunity to participate in the political process and to elect representatives of their choice, and deny plaintiff's members the right to vote in elections without distinction of race, color, or membership in a language minority group.

### Count III
### (as to Defendants Abbott and Nelson)
*Unconstitutional Racial Gerrymandering in Violation of the Fourteenth Amendment to the United States Constitution*

**205.**    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**206.**    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution bars racial gerrymandering, or the "intentional[] assigning [of] citizens to a district on the basis of race without sufficient justification." *Shaw v. Reno*, 509 U.S. 630 (1993). Texas House Plan H2316 and Congressional Plan 2193 violate these principles because race was a predominant factor in drawing the districts described above. Despite some members of the Legislature proclaiming that race was not a factor in the drawing of any redistricting maps, race appears to be the only factor that can explain many of the redistricting outcomes. When the Legislature explicitly relied on race in redistricting, it often did so under an incorrect legal understanding.

**207.**    In numerous instances, Texas violates traditional redistricting guidelines—such as compactness, contiguity, and preservation of political subdivisions and communities of interest— and the only explanation can be based on race.

### Count IV
### (as Defendants Abbott and Nelson)
*Violation of the Fourteenth Amendment's One Person-One Vote Requirement*

**208.**    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**209.**    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution "requires that the seats in both houses of a bicameral state legislature [] be apportioned on a

population basis." *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). Although, in the context of state legislative districts, traditionally a deviation of up to 10% from the most underpopulated to the most overpopulated district has been afforded a presumption of constitutional validity, these deviations cannot be leveraged for impermissible purposes, including racial or even mere partisan advantages. *See Cox v. Larios*, 542 U.S. 947 (2004).

210.     House Plan H2316 has a total or "top to bottom" deviation of 9.98%. Defendants achieved this deviation by dramatically over-populating Latino majority districts and dramatically under-populating surrounding Anglo majority districts to eliminate Latino majority districts while preserving Anglo districts. Specifically, the configuration and systematic overpopulation of Texas House Districts in El Paso, in particular the consolidation of House Districts 76 and 77, dilutes the voting power of cohesive Latino communities. This manipulation of population also exhibits an impermissible regional bias in favor of Plains and Panhandle residents over Trans Pecos residents. There is no legitimate justification for these extreme and systematic population deviations.

211.     The deviations in the Western third of the state in House Plan H2316 violate the one person, one vote principle of the Fourteenth Amendment of the U.S. Constitution.

## VI. Prayer for Relief

**WHEREFORE**, Plaintiff respectfully requests that this Court:

    a.  Declare that Plan H2316, as adopted and ratified in House Bill 1000 in 2023, unlawfully dilutes minorities' voting rights, through intentional discrimination in violation the Fourteenth Amendment and the Fifteenth Amendment;

    b.  Declare that Congressional Plan C2193, as adopted in Senate Bill 6 unlawfully dilutes minorities' voting rights, through intentional discrimination in violation, of the Fourteenth Amendment and the Fifteenth Amendment;

c.   Declare that Plan H2316, as adopted and ratified in House Bill 1000 in 2023, violates the Fourteenth Amendment's one person-one vote principle by manipulating population deviations for impermissible purposes as described in this Complaint;

d.   Declare that Plan H2316, as adopted and ratified in House Bill 1000 in 2023, and Congressional Plan C2193, as adopted in Senate Bill 6, violate the Fourteenth and Fifteenth Amendment by making race a predominant factor in the drawing of certain districts without a compelling justification for doing so;

e.   Declare that Plan H2316 and Plan C2193 violates the discriminatory results prong of Section 2 of the Voting Rights Act by failing to draw additional House districts in El Paso, Harris County, and Central Texas, and congressional districts in the Dallas/Fort-Worth area and Houston area in which Latino voters can elect candidates of their choice;

f.   Permanently enjoin Defendants from calling, holding, supervising or certifying any elections under Texas House Plan H2316 and Congressional Plan C2193. Plaintiff has no adequate remedy at law other than the judicial relief sought herein, and unless the Defendants are enjoined from using the foregoing plans, plaintiff and plaintiff's members will be irreparably harmed by the continued violation of their statutory and constitutional rights;

g.

h.   Set a reasonable deadline for state authorities to enact or adopt redistrict plans for Texas House and Congress that do not dilute, cancel out, or minimize the voting strength of Latino voters;

i.    If state authorities fail to enact or adopt valid redistricting plans by the Court's deadline, order new redistricting plans for Texas House and Congress that do not dilute, cancel out or minimize the voting strength of Latino voters;

j.    Adjudge all costs against Defendants, including reasonable attorneys' fees, and award Plaintiff their costs and reasonable attorneys' fees pursuant to Fed. R. Civ. P. 54, 42 U.S.C. § 1988, and 52 U.S.C. § 10310(e);

k.    Retain jurisdiction to render any and all further orders that this Court may enter; and

l.    Grant any and all further relief to which Plaintiff may show itself to be entitled.

Dated: March 20, 2025.

Respectfully submitted,

SOMMERMAN, MCCAFFITY,
QUESADA &GEISLER, L.L.P.

*/s/ George (Tex) Quesada*
_____
George (Tex) Quesada
State Bar No. 16427750
Email:  quesada@textrial.com

Sean J. McCaffity
State Bar No. 24013122
Email:  smccaffity@textrial.com

3811 Turtle Creek Boulevard, Suite 1400
Dallas, Texas  75219-4461
214/720-0720 (Telephone)
214/720-0184 (Facsimile)

-and-

Joaquin Gonzalez
Texas Bar No. 24109935
1055 Sutton Dr.
San Antonio, TX  78228

jgonzalez@malc.org

***ATTORNEYS FOR PLAINTIFFS***

## CERTIFICATE OF SERVICE

The undersigned that the foregoing Second Amended Complaint was filed and served via

ECF notice and e-mail on March 20, 2025

  */s/ Sean J. McCaffity* _____
Sean J. McCaffity