**THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>     *Plaintiffs,*<br><br>EDDIE BERNICE JOHNSON, *et al.*,<br>     *Plaintiff-Intervenors,*<br><br>V.<br><br>GREG ABBOTT, *et al.*,<br>     *Defendants.* | EP-21-cv-00259-DCG-JES-JVB<br>[Lead Case] |

## MOTION TO EXCLUDE EXPERT REPORTS AND TESTIMONY

Defendants the State of Texas; Greg Abbott, in his official capacity as Governor of Texas; Jane Nelson, in her official capacity as Secretary of State; and Dave Nelson, in his official capacity as Deputy Secretary of State (collectively, "State Defendants"), move the Court to exclude: (1) the March 31, 2025 Supplemental Report,[1] the April 16, 2025 Revised Supplemental Report, and the April 23, 2025 Errata Report of Dr. Jacob M. Grumbach; and (2) the March 31, 2025 Expert Report of Dr. Tye Rush, for failure to meet the minimum standards set out in Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 26. In addition, State Defendants move to conditionally exclude the March 31, 2025 Declaration of Dr. Matt A. Barreto and Michael B. Rios until State Defendants can confirm at deposition that Dr. Barreto and his coauthor conducted their own analysis of Dr. Rush's data in accordance with Federal Rule of Evidence 702 and did not simply adopt Dr. Rush's findings without first verifying them as accurate and correct.

### INTRODUCTION

It was only two months ago that this Court directed the parties to work efficiently towards a May 21, 2025, trial date. In deference to the Court's order and in recognition of the complicated logistics inherent to this case, State Defendants have sought to streamline litigation proceedings,

---

[1] Dr. Grumbach referred to the Supplemental Report as the March 31, 2025 report, Ex. 1, Grumbach Dep. at 9:3–7, it was served that day, all parties have referred to it as such, and that date is used in this Motion. The report is, however, dated March 30, 2025.

including the presentation of expert testimony at trial. Unfortunately, it has become apparent that Plaintiffs and their designated experts have repaid State Defendants' flexibility by cutting corners and submitting academically lax expert testimony, which Plaintiffs now seek to insulate from cross-examination and review.

By their own admission, multiple Plaintiffs' experts obtained their data from counsel instead of primary sources. Although that itself is not a violation of Rule 26, these Plaintiffs' experts then failed to verify the veracity and completeness of that data, which fatally undermines the reliability of their analysis. Dr. Jacob Grumbach, for example, whether by simple error or inaccurate data provided by counsel, bases his conclusions on election data that violates his own data selection guidelines. This results in a sampling error that manages to be both underinclusive and overinclusive. Moreover, because this methodological flaw undergirds his entire analysis, none of his conclusions escape the shadow of his error. The Grumbach reports come nowhere near requisite standard for expert testimony provided in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

Had the problems with Plaintiffs' expert reports ended there, State Defendants simply would have highlighted defects in the assumptions and methodologies of Plaintiffs' experts during cross examination. But not only have Plaintiffs' experts compromised their academic autonomy through their data collection methods, but Plaintiffs have created an elaborate shell game whereby one expert witness will reference the expert findings of an unavailable expert witness—not for the purposes of their own report—but so that Plaintiffs can benefit from the findings without ever presenting at trial the person who actually conducted the analysis. For example, despite only being designated by Brooks Plaintiffs, Dr. Rush offers opinions about claims and districts unrelated to those Plaintiffs, and purports to have "revived" the testimony of the now-retired Dr. Henry Flores without ever conducting thorough review of Dr. Flores' work or engaging in a single case-specific communication with Dr. Flores. Dr. Rush also partially based his conclusions on the report of Dr. Barreto—who himself based his conclusions at least partly on the work of Dr. Rush. When Defendants attempted to flesh out the bases for Dr. Rush's conclusory expert report through deposition

testimony, Dr. Rush simply stonewalled—providing unresponsive and uninformative deposition testimony falling well short of the Rule 26 disclosure standard for pretrial discovery.

Nothing about this arrangement aligns with the standards that govern expert witnesses. The Federal Rules only permit expert witnesses to opine on the facts of the case when their testimony "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Testimony is not reliable when the witness merely regurgitates another person's report rather than conducts their own analysis using sound principles and methods. The other problem with this strategy is that it also threatens to prejudice State Defendants. State Defendants agreed to limit motion practice and admit the expert reports of testifying witness on the understanding that State Defendants would have the opportunity for cross examination. Laundering one expert's opinions through another violates the spirit of that agreement by shielding from scrutiny the person who actually performed the analysis.

State Defendants spoke truly at the March 5, 2025, hearing when State Defendants stated that they did not intend to file any sort of *Daubert* motion. But Plaintiffs' conduct has forced State Defendants' hands. Plaintiffs cannot be allowed to screen off their experts' flawed methodology from cross-examination by having another expert speak on their behalf.

STANDARD OF REVIEW

Federal Rule of Evidence 702 provides the general criteria for determining the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if *the proponent demonstrates to the court that it is more likely than not that*:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is based on reliable principles and methods; and
> (d) The expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (emphasis added). Under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, expert testimony is admissible only if the proponent demonstrates by a preponderance of the evidence that: (1) the expert is qualified; (2) the expert testimony is relevant to the suit; and (3) the expert

testimony is reliable. *See Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 989 (5th Cir. 1997). "The proponent need not prove that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." *Moore*, 151 F.3d at 276.

Federal Rule of Civil Procedure 26 provides that witnesses "retained or specially employed to provide expert testimony" must include in their expert reports, *inter alia*, a "complete statement of all opinions the witness will express and the basis and reasons for them; the facts or data considered by the witness in forming them; [and] any exhibits that will be used to summarize or support them." Fed. R. Civ. P. 26(a)(2)(B). The purpose of this rule "is to provide an opposing party with fair notice of the content of the experts' testimony; without the requisite information, [it] is greatly prejudiced because it is left unaware of the testimony each expert plans to offer." *Torres v. City of San Antonio*, 2014 WL 7339122, at *2 (W.D. Tex. Dec. 23, 2014). Insufficient notice leaves a party unable to "prepare to rebut the testimony" and therefore at a comparative disadvantage. *Id.* Failure to provide proper notice of expert testimony gives rise to a commensurate and predictable consequence—the offending party "is not allowed to use that information . . . to supply evidence on a motion . . . or at a trial, unless the failure was substantially justified or is harmless." *In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 372 (5th Cir. 2016) (quoting Fed. R. Civ. P. 37(c)(1)).

ARGUMENT

## I.    Dr. Jacob M. Grumbach

LULAC expert Dr. Jacob M. Grumbach issued three reports during the 2025 discovery period. He issued a supplemental report on March 31, 2025. He then issued a revised supplemental report ("Revised Report") on April 16, 2025, nine days before the close of discovery, to reflect LULAC Plaintiffs' revisions to the geographic boundaries of some of their proposed districts. Ex. 1, Grumbach Dep. at 240:21–241:9. The April 16 report was otherwise substantially the same as the

March report.[2] Dr. Grumbach then issued an April 23, 2025 "errata" report to correct errors in the April 15, 2025 report,[3] two days before close of discovery.[4]

State Defendants deposed Dr. Grumbach on April 25, 2025.[5] Ex. 1. The deposition centered around Dr. Grumbach's Revised Report, which analyzed two types of elections: endogenous elections (those that took place entirely within the challenged districts) featuring one or more Latino candidates[6] and "racially contested exogenous elections." Racially contested exogenous elections, as used in Dr. Grumbach's report, are those that were not geographically limited to challenged districts, but included voters from within the challenged districts, and pitted a Latino candidate against a non-Latino candidate.[7]

The Revised Report contains four conclusions, each derived from Dr. Grumbach's "Average District Analysis." Ex. 1 at 101:22–103:18. For this analysis, Dr. Grumbach reviewed precinct-level data from LULAC's demonstrative districts and either the enacted districts or benchmark districts. He then analyzed how those districts would have performed for Latino candidates of choice against one of two groups of past elections.[8] These elections are listed on two tables in the Revised Report—one table for exogenous elections and another for endogenous elections—a total of 52 elections.

---

[2] Dr. Grumbach testified that he had no conclusions in the March 31, 2025, that were separate from his conclusions in the April 16, 2025 report. Ex. 1 at 57:18–58:20. The errors in the April report are also present in the March report; the March report had one additional error in Table 1—the incorrect inclusion of g22 TarrantCoDistJudgeD323.

[3] The errors were identified by State Defendant's expert Dr. John Alford in his April 16, 2025, Supplemental Rebuttal Expert Report.

[4] State Defendants were first provided the errata report by MALDEF attorneys during the April 25, 2025 deposition due to an alleged technical error. Ex. 1 at 90:11–98:3.

[5] His deposition was previously scheduled for April 17, 2025, one of the available deposition dates provided by LULAC, but was rescheduled after Dr. Grumbach became unavailable.

[6] Although not defined in the Revised Report, Dr. Grumbach defined "endogenous elections" at his April 25, 2025, deposition to be elections for the enacted districts of CD15, HD37, HD118, and SD27, that occurred from 2022–2024, and that involved at least one Latino candidate. *See* Ex. 1 at 16:21–25 (defining "endogenous election" as "an election for the specific seats that occupy the districts that are being contested legally"); *Id.* at 19:17–22 ("My sample frame there was any endogenous election with a Latino candidate running. So I am confident that they all have at least one Latino candidate, but there may be one or more elections between all Latino candidates in the endogenous election sample frame.").

[7] *See* Ex. 1 at 17:1–4 ("Exogenous elections are elections in other statewide or district-based geographies that cover the voters that are within the endogenous district boundaries."); *Id.* at 19:4–11 (clarifying that "racially contested elections" are only those that "involve candidates from different racial backgrounds contesting an election").

[8] Depicted on Table 1 and Table 13 of the Revised Report.

Out of 52 listed elections, Dr. Grumbach made 22 errors of over-inclusion and under-inclusion.

| Elections Dr. Grumbach Should Not Have Included, But Did (6): | Elections Dr. Grumbach Should Have Included, But Did Not (16): | |
|---|---|---|
| Table 1 (6) | Table 1 (4) | Table 13 (12) |
| g24 Court of Criminal Appeals 7 | p22 Dem Attorney General | p22 Dem HD37 |
| g24 Court of Criminal Appeals 8 | p22 Dem Comptroller | p22 Dem RO HD37 |
| g24 Court of Criminal Appeals P.Judge | p22 Dem Land Commissioner | p24 Dem HD37p24 Dem RO HD37 |
| g24 Supreme Court Place 2 | p22 Rep Attorney General | p22 Dem CD15 |
| g24 Supreme Court Place 4 | | p22 Rep CD15 |
| g24 Supreme Court Place 6 | | p24 Dem CD15 |
| | | p24 Rep CD15 |
| | | p24 Dem HD 118 |
| | | p22 Dem SD27 |
| | | p22 Dem RO SD27 |
| | | p22 Rep SD27 |

## A.    Each of Dr. Grumbach's Conclusions is Based on At Least Ten Errors.

### 1.    Table 1

State Defendants became aware of mistakes in Table 1, because of odd omissions in the listed group of primary elections. In Texas, runoff elections "occur when you have more than two candidates running and none of them gets a majority of the vote. Top two vote getters move on to the runoff" (emphasis omitted).[9] State Defendants noticed that while Dr. Grumbach included both the 2018 Democratic primary and primary runoff for Governor (indicated below in green), he omitted the primary election in four other runoffs (indicated below in red in the right column). Dr. Grumbach testified that Table 1 was meant to include both primary and primary runoff elections that contained at least one Latino candidate and one non-Latino candidate. Ex. 1 at 195:16–196:6. When presented with election data on the missing primaries, Dr. Grumbach confirmed that the 2022 Democratic Attorney General primary, 2022 Democratic Comptroller primary, 2022

---

[9] TEXAS SECRETARY OF STATE – ELECTIONS DIVISION, *Runoff Elections, Second Elections, and Recounts*, (Dec. 20, 2024), https://www.sos.state.tx.us/elections/forms/seminar/2024/36th/runoff-elections-second-elections-and-recounts.pdf.

Democratic Land Commissioner primary, and 2022 Republican Attorney General primary should have been included in Table 1 but were not. Ex. 1 at 196:7–200:2.

**Table 1: Racially Contested Exogenous Elections in Relevant Districts (2014–2024)**

| General Elections | Primary Elections |
|---|---|
| g14 Land Commissioner | p14Dem Governor |
| g14 Lieutenant Governor | p14Rep Comptroller |
| g14 Supreme Court Place 7 | p14Rep Governor |
| g16 Supreme Court Place 5 | p14Rep Land Commission |
| g16 Supreme Court Place 9 | p14Rep US Senate |
| g18 Governor | p16Rep President |
| g18 Land Commissioner | p16Rep Railroad Commission |
| g18 US Senate | p16Rep Supreme Court Place 9 |
| g20 Railroad Commission | p18Dem Governor |
| g20 Supreme Court Place 8 | p18Dem Land Commission |
| g22 Attorney General | p18Dem US Senate |
| g22 Governor | p18DemRO Governor |
| g22 Supreme Court Place 5 | p18Rep Railroad Commission |
| g22 Supreme Court Place 9 | p20Dem Railroad Commission |
| g24 Court of Criminal Appeals 7 | p20Dem Supreme Court Place 8 |
| g24 Court of Criminal Appeals 8 | p22DemRO Attorney General |
| g24 Court of Criminal Appeals P.Judge | p22DemRO Comptroller |
| g24 President | p22DemRO Land Commissioner |
| g24 Railroad Commission | p22RepRO Attorney General |
| g24 Supreme Court Place 2 | |
| g24 Supreme Court Place 4 | |
| g24 Supreme Court Place 6 | |
| g24 US Senate | |

Review of the remaining elections in Table 1 indicated that six 2024 Texas judicial general elections did not contain a Latino candidate and should not have been included on this list (indicated in red in the left column above). At the deposition, Dr. Grumbach was shown Ballotpedia color printouts of the judicial races, which include the candidates' first names and surnames, their pictures, and the election result. Ex. 1 at 203:1–216:18. Defendants also directed Dr. Grumbach to review Google search results of the candidates with the following formula: [Candidate Name] [Judicial seat sought] Latino or Hispanic. *Id.* Dr. Grumbach admitted that nothing in his review of the Ballotpedia results or Google searches indicated the candidates were Latino. *Id.* Overall, Dr. Grumbach listed 42 elections in Table 1 and made ten errors: the six Texas judicial elections

that were incorrectly included and the four 2022 primary elections that were incorrectly excluded: "I got the data and I did an attempt to validate that these were racially contested elections, and if this is the case, then I missed some as racially contested and/or included erroneously ones that were not racially contested." Ex. 1 at 218:15-22.

Dr. Grumbach's Revised Report then used the Table 1 list of elections in Tables 2–10 and 12 to "analyze racially polarized voting" in LULAC Plaintiffs' demonstrative district to the enacted districts or the benchmark districts. Ex. 1 at 219:22–222:12. For example, Table 9 (below) analyzes how LULAC's Demonstrative Senate District 25—as compared to "the Enacted Districts that geographically overlap it"—would perform in the past elections that are listed in Table 1. The support for the Latino candidate choice number is an *average* of how that district would have performed across all elections in the sample. "For each Demonstrative District, I present Latinos' and non-Latinos' average level of support for Latino candidates of choice across racially contested exogenous elections over the past decade." Because the elections that Dr. Grumbach used were different than those that he should have used, his results are based on insufficient facts and data and are therefore unreliable.

| Demonstrative District and Overlapping Enacted Districts | Support for Latino Candidates of Choice Among Latino Voters | Support for Latino Candidates of Choice Among Non- Latino Voters | Latino Candidate of Choice Wins | Latino CVAP % |
|---|---|---|---|---|
| | | | | |
| **DEMO SD 25** | ███ | ███ | █ of 42 | 50.1 |
| | (███████) | (███████) | | |
| | | | | |
| SD 5 | | ███ | █ of 42 | 20.5 |
| | | (██████) | | |
| | | | | |
| SD 14 | | ███ | █ of 42 | 24.3 |
| | | (███████) | | |
| | | | | |
| SD 19 | | ███ | █ of 42 | 60.8 |
| | | (███████) | | |
| | | | | |

| SD 21 | | ████ | █ of 44 | 60.2 |
|---|---|---|---|---|
| | | (████████) | | |
| SD 25 | | ████ | █ of 42 | 25.1 |
| | | (█████████) | | |
| SD 26 | | ████ | █ of 42 | 61.9 |
| | | (████████) | | |

The scale of the error is greater in Table 11. Table 11 is calculated in the same manner as Tables 2–10 and 12. However, whereas Tables 2–10 and 12 use all 42 elections shown in Table 1, Table 11 instead uses "all 17 exogenous racially contested elections since 2022." All ten errors in Table 1 are among that group of elections.

| | Support for Latino Candidates of Choice Among Latino Voters | Support for Latino Candidates of Choice Among Non-Latino Voters | Latino Candidate of Choice Wins | Latino CVAP % |
|---|---|---|---|---|
| CD 15 | ████ | ████ | █ of 17 (since 2022) | 78.0 |
| | (███████) | (███████) | | |
| HD 118 | ████ | ████ | █ of 17 (since 2022) | 71.30 |
| | (████████) | (███████) | | |
| HD 37 | ████ | ████ | █ of 17 (since 2022) | 86.60 |
| | (████████) | (███████) | | |
| SD 27 | ████ | ████ | █ of 17 (since 2022) | 50.30 |
| | (███████) | (███████) | | |

The same number of errors has thus been concentrated into a smaller sample. Because Dr. Grumbach averaged the results across the different elections, the higher error rate means the results in Table 11 are even less reliable than in Tables 2–10 and 12.

## 2. Table 13

Dr. Grumbach's error rate is highest in his analysis of endogenous elections. The elections included in that analysis appear in Table 13. Dr. Grumbach testified that Table 13 was to include all endogenous elections with at least one Latino candidate held in 2022–2024 for the following

Districts: CD15, HD 118, HD37, and SD 27.[10] Just as in Table 1, Table 13 included a primary runoff election, without including the associated primary.

**Table 13: Endogenous Elections in Enacted Districts Challenged as Weakened**

| General Elections | Primary Elections |
|---|---|
| g22 CD15 | p22 DemRO CD 15 |
| g22 HD118 | p22 Rep HD 37 |
| g22 HD37 | |
| g22 SD27 | |
| g24 CD15 | |
| g24 HD118 | |
| g24 HD37 | |
| g24 SD27 | |

State Defendants' review indicated that, while all ten elections listed in Table 13 were appropriately included, the total number of elections that should have been included was 22. That means that Dr. Grumbach left off 12 of the 22 elections that should have been on Table 13 and included in his analysis of endogenous elections. Dr. Grumbach confirmed in his deposition that the 12 additional elections meet the criteria for inclusion, but that he left them off Table 13. Ex. 1 at 225:18-233:4. Dr. Grumbach's conclusions about the endogenous elections are therefore based off analysis that omitted 55% of the relevant elections.

### 3.  MALDEF May Have Supplied Incomplete Data to its Expert.

Dr. Grumbach testified that the election data was provided to him by LULAC Plaintiffs' counsel MALDEF, from a set of elections that MALDEF identified. Ex. 1 at 236:1–11. Dr. Grumbach confirmed that he did analyze all data that MALDEF provided to him. *Id.* at 195:7–9, 242:22–243:9.

MALDEF provided two main data transfers to Dr. Grumbach—one on April 19, 2022 (prior to the 2022 General Election), and the second on March 22, 2025 (containing data from the 2022–2024 elections). *Id.* at 193:15–194:16. Dr. Grumbach testified that he reviewed both data transfers for accuracy, but that review did not catch the discrepancies in the data discussed above. *See supra* at I.A.1–2; Ex. 1 at 194:17–195:9. Dr. Grumbach also received from MALDEF "crosswalk data for

---

[10] Ex. 1 at 224:6-225:24.

three revised demo[nstration] districts" on April 10, 2025, and April 14, 2025. Ex. 1 at 70:18–22. It is unclear whether MALDEF provided Dr. Grumbach with complete data, since Dr. Grumbach testified that he "consistently asked for and want to analyze all racially contested statewide general or exogenous elections," and "[a]bsolutely" would have analyzed the election contests omitted from his report had that data been provided by MALDEF. Ex. 1 at 241:23–244:12. Regardless of whether the improper inclusions and omissions in Dr. Grumbach's report are primarily attributable to MALDEF or to Dr. Grumbach himself, it is clear that Dr. Grumbach did not conduct a careful review of the election data that was—or should have been—analyzed in his report.

**B.    The Revised Report is Not Based on Sufficient Data, is Not Reliable, and Should be Excluded.**

The analysis in every single table in the Revised Report is based on at least ten errors and the analysis of endogenous elections is based on twelve errors. Dr. Grumbach's "Average District Analysis" produces in each table district results that are an average of that district's theoretical performance in the past elections. Because Dr. Grumbach analyzed the wrong elections, his conclusions are not based on sufficient facts or data, and his analysis is unreliable. As a result, Dr. Grumbach's April 16, 2025 Revised Supplemental Report, and the March 31, 2025 report that is substantially the same, should be excluded.

**C.    Dr. Grumbach's April 23, 2025 "Errata" Should Be Excluded Because It Also Relies on the Incorrect Election List in Table 1 of the Revised Report.**

In his "Errata", Dr. Grumbach says "The previous version of the Appendix file *Exogenous Elections.xlsx* provided incorrect EI results due to a coding error. I deeply regret this error, and I thank Dr. Alford for pointing out in his April 16 Report that some sort of coding error may have occurred." The error that State Defendant's expert Dr. John Alford identified in his April 16, 2025, Supplemental Rebuttal Expert Report at FN1, related to the 2022 runoff elections for Attorney General. In those two-person races, Dr. Grumbach identified as the winner in multiple districts the candidate who had lost both Latino and non-Latino voters—an impossible result, which Dr. Grumbach did not catch. *Id.* at 8–10. Dr. Grumbach claimed that he fixed this error, Ex. 1 at 91:1–7, which is present in both his March 31, 2025 and April 16, 2025 reports. Accompanying his

April 23, 2025 Errata, however, Dr. Grumbach produced an updated *Exogenous Elections.xlsx* Appendix file, "Grumbach errata_Exogenous Elections by District (Corrected)." A review of that file shows that Dr. Grumbach uses the same exogenous elections in the Errata to conduct his analysis as he does in Table 1 of the March 31, 2025 and April 16, 2025 reports. *See* Ex. 2.[11] Even setting aside Dr. Grumbach's coding error, the same data errors and unreliability exist here as in the March 31, 2025 and April 16, 2025 reports. *See supra* at I.A.1, I.B. By violating his own data selection guidelines through the improper inclusion and omission of elections, this "Errata" still produces results that are unreliable.

Rule 702(d) requires that an expert's opinion "reflect a reliable application of the principles and methods to the facts of the case." Dr. Grumbach has three swing-and-misses in his 2025 reports. All three 2025 reports rely on exogenous election data that includes ten errors of over-inclusion or under-inclusion. *See supra* at I.A.1, I.B., and I.C. The March 31, 2025 and April 16, 2025 reports also rely on endogenous election data with twelve errors of under-inclusion. *See supra* at I.A.2, I.B. The "coding error," where Dr. Grumbach did not notice that he had identified as winner in numerous districts the candidate who was opposed by both Latino and non-Latino voters (i.e., all voters), also shows that Dr. Grumbach has failed to reliably apply his methods to the already-compromised data. The coding error appears in both the March 31, 2025 and April 16, 2025 reports. *See supra* at I.C. Based on the avalanche of errors, there is no reason for the Court to assume that Dr. Grumbach's "correction" of the coding error, which State Defendants did not receive until the last afternoon of discovery, is now producing correct results. *See* FN 3. In the election at issue in the Errata, Dr. Grumbach has produced three different results in the three reports. If he were allowed to produce another report, that would be the fourth distinct set of results arising from the same election analysis. Dr. Grumbach's 2025 reports cannot meet the Rule 702 standard, in

---

[11] Grumbach errata_Exogenous Elections by District (Corrected) is a 376-page document. The elections names repeat as they are applied to numerous benchmark, demonstrative, and enacted districts. Pp. 6–8 is a sampling, from Benchmark HD118 and Benchmark HD37, to show that the same mistakes in the March 31, 2025 and April 16, 2025 reports repeat in the April 23, 2025 Errata. The candidate of choice analysis is blacked-out.

application of method or reliability. The Court should exclude Dr. Grumbach's three 2025 reports and any data he relied upon.

## II.    Dr. Tye Rush

Dr. Rush signed and submitted his eleven-page expert report in this case (the "Rush Report") on March 31, 2025. He was presented for deposition on the day before the close of discovery, April 24, 2025. Dr. Rush was designated as an expert witness only by the Brooks Plaintiffs. ECF No. 906. The Brooks Plaintiffs' March 31, 2025, designation of Dr. Rush stated only that "Dr. Rush will testify regarding the report and file materials served contemporaneously herewith." *Id.* at 2.

### A.    Dr. Rush Should Not Be Allowed to Offer Opinions at Trial Unrelated to the Claims of the Parties Who Designated Him.

The thirteen Brooks Plaintiffs filed their Fourth Amended Complaint for Declaratory and Injunctive Relief on March 12, 2025. ECF No. 876. According to their Complaint, the Brooks Plaintiffs reside in Tarrant County, Dallas County, Harris County, Bexar County, and Bell Counties of Texas. Their claims in this case relate only to the following districts in which one or more of the Brooks Plaintiffs reside:

- Texas Senate District 10 in Tarrant County and counties to the west and south of Tarrant County;
- Texas Congressional Districts in Tarrant and Dallas Counties;
- Texas Congressional Districts in the Houston Area;
- Texas State House District 118 in Bexar County; and
- Texas House Districts 54 and 55 in Bell County.

*Id.* at ¶¶ 68, 174, 178, 230, 239.

The Rush Report does not refer to Texas Senate District 10 or to any Texas House Districts in Bell County, Texas. However, the Rush Report opines about several districts irrelevant to the claims of the Brooks Plaintiffs: Texas Congressional District 15, Texas Senate District 27, and Texas House District 37, all in far south Texas. According to their Complaint, none of the Brooks Plaintiffs live in or anywhere near Texas Congressional District 15 (which stretches from Hidalgo County to Guadalupe County); Texas Senate District 27 (from Cameron County north to Nueces County); and Texas House District 37 (covering Cameron and Willacy Counties). Not surprisingly, the Brooks Plaintiffs' Complaint includes no allegations whatsoever about any of those south Texas

Districts. Accordingly, (a) the Rush Report opinions related to those south Texas Districts are irrelevant and immaterial to the claims of the Brooks Plaintiffs and inadmissible under Federal Rule of Evidence 702 and (b) any trial testimony by Dr. Rush related to any of those south Texas Districts should be excluded.

### B. Dr. Rush Should be Precluded from Parroting the Superseded Report and Testimony of Dr. Henry Flores, Who Will Not Appear at Trial.

Dr. Henry Flores was designated as a potential expert witness in this case by the LULAC Plaintiffs, not by the Brooks Plaintiffs. *See* ECF No. 305 (LULAC expert designations) at 2; *but see* ECF No. 301 (Brooks expert designations) at 1–2. Dr. Flores submitted his initial expert report in this case on May 20, 2022. Then, Dr. Flores submitted a June 15, 2022 "Supplemental and Amended Expert Report of Dr. Henry Flores." At Dr. Flores' August 1, 2022 deposition in this case, State Defendants inquired of him solely regarding his June 15, 2022 Supplemental and Amended Report. Dr. Flores has since retired; is no longer designated as an expert witness by any party; and is not expected to testify at trial.

Dr. Rush's report nevertheless includes his review of Dr. Flores' May 20, 2022 expert report, Ex. 3 at 26:14–19, and purports to "revive[] Dr. Flores' analysis for CD15, HD 118, HD37, and SD 27."[12] Thus, plaintiffs other than the Brooks Plaintiffs apparently seek to use Dr. Rush to advance their claims even though they did not designate Dr. Rush as an expert on their behalf. Perhaps that is why Dr. Matt Barreto mistakenly referred to Dr. Rush recently as the "mapping expert for the MALDEF plaintiffs." "March 2025 Declaration of Dr. Matt A. Barreto and Michael B. Rios, MPP" at Para. 54.

At his April 24, 2025 deposition, Dr. Rush testified regarding his review of Dr. Flores' superseded May 20, 2022 Report. Ex. 3 at 26:14–27:8. He did not mention Dr. Flores' Supplemental and Amended Report in his deposition or in the Rush Report. Dr. Rush also confirmed that he is

---

[12] Those are the four districts related to LULAC Plaintiffs' (MALDEF) Equal Protection Clause and VRA § 2 claims. *See supra* at I.A.2 regarding the analysis performed on those four districts by LULAC-designated expert Dr. Grumbach. Of those four districts, Brooks Plaintiffs only have a VRA § 2 claim related to HD118.

"certain" that he has not communicated with Dr. Flores in connection with this case. *Id.* at 25:23–26:13. Dr. Flores had no part in preparing or reviewing the Rush Report. *See id.* at 15:17–17:7, 25:23–26:13.

It appears that this is a ploy by other plaintiffs to have Dr. Rush simply adopt an otherwise inadmissible expert report of Dr. Flores, who will not testify at trial. In substance, Dr. Rush merely read and agreed with Dr. Flores' May 20, 2022 Report. That three-year-old Flores report is hearsay that is not admissible into evidence at trial. It will not be supported by testimony of its author. Defendants will have no opportunity at trial to cross-examine the author of the report, Dr. Flores, regarding his work, reasoning, or opinions.

Further, Dr. Rush did not review (and seemed unaware of) the Supplemental and Amended Expert Report of Dr. Flores submitted *after* the May 20, 2022 report that Dr. Rush *did* review. To state the obvious, it does not comport with reasonable professional standards to neglect to review the readily available supplemented and amended version of a work upon which one relies as the basis of his expert opinion, and instead review only a superseded version of that work. Yet that is what Dr. Rush did. For these reasons, Dr. Rush should be precluded from offering opinions and trial testimony in this case based on the work of Dr. Henry Flores.

### C.    The Rush Report and Trial Testimony Should Be Excluded because of His Failure to Provide Reasonable Discovery.

The Federal Rules of Civil Procedure require that expert witnesses provide reasonable pretrial discovery to opposing parties as to the opinions to be offered by the expert witness, and the reasons and methodology that make them reliable. Dr. Rush failed to provide such reasonable discovery. His expert report and trial testimony in this case therefore should be excluded.

First, the 11-page Rush Report (including Appendices) was bare-bones and conclusory. Federal Rule of Civil Procedure 26(a)(2)(B) requires more. It requires a "written report" that "must contain . . . a complete statement of all opinions the witness will express and *the basis and the reasons for them*," as well as the "*facts or data considered by the witness* in forming them." Fed. R. Civ. P. 26(a)(2)(B) (emphasis added).

State Defendants sought strenuously to fill in the gaps in Dr. Rush's report at his deposition on April 24. However, Dr. Rush could not or would not provide substantive answers to questions about the bases and reasons for his opinions. Instead, he repeatedly stated that he could not answer such questions "off the top of my head" or without referring to his "files" or "materials." *See, e.g., Ex.* 3, Rush Dep. at 45:1–6, 46:6–19, 57:3–11, 58:13–59:7, 69:3–70:3, 73:6–80:11, 81:3–82:23, 85:17–88:1, 89:7–92:25, 94:25–95:23, 98:4–102:20, 103:10–104:17, 107:6–109:6, 112:7–116:8, 121:21–122:5, 128:8–14, 131:2–12, 134:3–136:7, 144:4–145:19, 146:24–147:8. For obvious practical reasons, Dr. Rush did not take the time to consult these voluminous materials—which comprise thousands of pages of data—to answer question after question during the course of his deposition. So he simply failed to provide substantive deposition answers dozens of times.

For example, Dr. Rush asserted in the Rush Report that he would provide testimony regarding districts in proposed plan C2163, "including describing the geography that makes up the plan as well as its other characteristics including the historical and expected electoral performance in the plan." But when State Defendants' counsel inquired at his deposition regarding these specific topics, Dr. Rush repeatedly stated that he could not provide such information, at least without a far too time-consuming review of his file materials between each question and answer.

Q    Okay. I'm trying to get an idea about what you're going to testify to at trial. And you're saying in your report you're going to testify about describing the geography of Plan C263. And I'd like to know what you plan to testify about in that regard specifically relating to Plan C263?

A.    Can you ask the question or let me know what the question is, then?

Q    Yeah. What is the information that you have regarding the geography of proposed Plan C263 that you could describe at trial in your testimony?

A    I could describe anything about the shape of the district. I could stuff about the city's census designated places, things like that, anything would be descriptive about the district and what's included in it.

Q    Okay. Can you tell me any of that information today?

A    I'm having trouble answering that because off the – you're asking me off the top of my head. But I – I can tell you what's on the map. I have the maps and the appendices from the TLC website and stuff like, so it depends on what I'm asked about the geography. I can opine on that and talk about that at trial.

Q    But you can't do so today?

[Objection]

A    I – I don't have the specifics about what I could be asked right now or at trial or what those descriptions could be or could look like.

Q    Okay. You also say in the same subparagraph that you expect to give testimony about the historical and expected electoral performance specifically of the proposed CD29 under plan C2163. What information can you give me about the historical and expected electoral performance specifically of proposed CD29 under plan C2163?

A    Again, it's -- it's difficult to answer the hypothetical questions. So we've foreshadowed forward. But I imagine it could be anything about performance, anything from other experts, anything from the TLC's reports about the performance of those districts in elections or anything about elections. So that seems well within the purview. But, again, it depends on what I'm asked.

Q    Well, tell me what you know today on that subject if anything?

A    I – so I know what's in my report. I can – I have what's in the appendices. But off the top of my head, the questions doesn't seem really specific to a piece of information or are not asking me to draw a conclusions or something. So I'm struggling to answer the question, It seems to be more of a hypothetical that I don't think I'm not grasping.

Ex. 3 at 111:24–114:3.

Dr. Rush's conclusory 11-page expert report and his unresponsive and uninformative deposition testimony about the bases and reasons for his conclusions amount to a failure to provide adequate discovery of Dr. Rush's expert report and opinions under the Federal Rules. The Court therefore should not admit Dr. Rush's expert report into evidence at trial and should not allow him to testify as an expert witness at trial.

## III.    Dr. Matt Barreto

On May 1, 2025, the State Defendants are scheduled to depose Dr. Mark Barreto. The State Defendants intend to supplement this section of this motion promptly following that deposition.

Dr. Barreto and Plaintiffs' counsel Chad Dunn are the co-founders of UCLA's Voting Rights Project, which as one of its core missions, trains social science students to serve as expert witnesses in litigation such as this redistricting case. UCLA VOTING RIGHTS PROJECT, https://vrp.ucla.edu/about/ (last visited Apr. 28, 2025) ("The UCLA VRP was founded by Dr. Matt A. Barreto [] and Chad W. Dunn [] to address three significant and overlooked gaps in the voting rights field: training newly graduated lawyers and social science expert witnesses . . . .").

Dr. Barreto has testified many times on behalf of challengers to redistricting plans in jurisdictions across the nation, and Defendants do not contest that Dr. Barreto's experience qualifies him as an expert witness.

That said, there is ample basis to question whether and to what extent Dr. Barreto is actually the sole author of his expert reports in this case. Any parts of those reports that were authored by others should be excluded and Dr. Barreto should not be allowed to testify at trial about them. Similarly, there is reason to question whether Dr. Barreto may have contributed to or influenced the proffered expert report of Dr. Tye Rush in this case.

Dr. Tye Rush has a long and close history with Dr. Barreto. Rush was a Teaching Assistant to Dr. Barreto in 2021. Ex. 3 at 41:21–24. Dr. Barreto served as Dr. Rush's supervisor in 2016, when Dr. Rush was a Predoctoral Fellow at UCLA. Dr. Barreto was also Dr. Rush's supervisor from 2017 to 2018, during Dr. Rush's period as a Research Fellow at the UCLA Latino Policy and Politics Initiative. Ex. 4 at 1.

In 2023, Dr. Rush received his Ph.D. in Political Science from UCLA. Dr. Barreto was the Chairman of Dr. Rush's Doctoral Committee; other committee members included Plaintiffs' attorneys Chad Dunn, and Plaintiffs' expert witness Loren Collingwood. Barreto, Rush, Collingwood, and Dunn have co-authored several works together.

From 2018 to today, Dr. Rush has held the position of "Senior Policy Fellow" of the UCLA Voting Rights Project that Dr. Barreto and Chad Dunn founded to train expert witness in litigation like this case. Ex. 3 at 33:3–7; *but see* Ex. 5 at 4 (2025 Curriculum Vitae, "Research Experience . . . 2018–2023 Senior Policy Fellow, Voting Rights Project").

However, the intermingling of Dr. Barreto's and Dr. Rush's professional relationship does not stop there. On a curriculum vitae that predates completion of his 2023 Ph.D., Dr. Rush claims writing credits for the following publications:

> 3. Black Voters Matter v. Raffensperger. (2020) *Expert Report of Matt Barreto* on behalf of UCLA Voting Rights Project – Challenging Postage Requirement. US District Court for the Northern District of Georgia Atlanta Division. https://acluga.org/black-voters-matter-v-raffensperger/

    4. Black Voters Matter v. Raffensperger. (2020) *Expert Report of Matt Barreto* on be-
half of UCLA Voting Rights Project – Challenging Voting Burdens at Polling Loca-
tions. US District Court for the Northern District of Georgia Atlanta Division.
https://acluga.org/black-voters-matter-v-raffensperger/

Ex. 4 at 2 ("Public Policy and Legal Writing").

    In this case, it appears that Dr. Rush may have co-authored or otherwise collaborated on one or more expert reports that Dr. Barreto submitted only in his own name. In his April 24, 2025, deposition in this case, Dr. Rush provided inconsistent and unclear answers as to whether he had first submitted his own report and then reviewed Dr. Barreto's expert report, or reviewed Dr. Barreto's work and then submitted his own report.

    Dr. Rush first testified that he had read Dr. Barreto's expert report in this case before Dr. Rush submitted his own expert report. He testified his purpose in reading Dr. Barreto's expert report was "to look at the districts I was asked to opine on." Ex. 3 at 32:1–13. Dr. Rush also testified that his review of Dr. Barreto's expert report influenced or contributed to Dr. Rush's expert report in this case. Ex. 3 at 50:10–51:1. Dr. Rush further discussed his reliance on Dr. Barreto's analysis of electoral performance in his report. Ex. 3 at 83:11–85:1. Dr. Rush later testified about information he had "looked up" in Dr. Barreto's report. Ex. 3 at 135:19–136:7. *See also* Ex. 3 at 82:7–23 (Dr. Rush has knowledge regarding subject of question from his review of Barreto Report); 144:4–24 ("Dr. Barreto's report I read he [sic] opines on that").

    Dr. Rush also admitted it was "possible" that he had done a review, critique, or analysis of Dr. Barreto's expert report or maps or plans in that report:

> Q    Have you done any review, critique or analysis of any of the maps or plans discussed in Dr. Barreto's reports in this case?
>
> A    It's possible. I'd reviewed his report and looked through that. I – without having it in front of me, I'm not exactly sure again what that entails.

Rush Dep. at 156:24–25, 157:1–6.

    Dr. Rush also was "hazy" about just how and when he had consulted Dr. Barreto's expert report in this case.

> Q    Okay. In your expert report, do you know where you refer to the report of Dr. Barreto?

A    Not off the top of my head, no.

Q    But you did consult that report and it is part of your – what you considered in coming up with your expert opinions?

A    It's a little hazy for me whether I read the report before or after. I might have misstated that . . . .

Rush Dep. at 87:17–24.

Dr. Barreto, however, was clear in stating that he reviewed Dr. Rush's analysis *before* Barreto finalized his own "March 2025 Declaration of Dr. Matt A. Barreto and Michael B. Rios, MPP" signed on March 31, 2025:

> I have also been provided and reviewed numerous TLC reports attached and included within the Report of Dr. Tye Rush submitted this same date
>
> . . . .
>
> I have also had occasion to review the analysis by Dr. Tye Rush, mapping expert for the MALDEF Plaintiffs and I concur with his analysis with respect to HD 118 in Bexar County. Our analysis confirms what Dr. Rush also reports: that a Hispanic opportunity district existed prior to the most recent redistricting, and that this current map H2316 dilutes Hispanic voting strength in HD 118.

*Id*. at Paras. 10, 54.

The Court, as well as Defendants, are entitled to know *all* of the authors of the expert reports that are offered into evidence at trial and whether the expert opinions offered at trial are independent professional products or the result of undisclosed collaboration or collusion. Defendants request that the Court defer reviewing the expert reports of Dr. Barreto and Dr. Rush until the Defendants can take Dr. Barreto's deposition and further disclose to this Court the facts regarding the research and preparation of those reports.

## CONCLUSION

State Defendants respectfully ask this Court to exclude from trial evidence the March 31, 2025, April 16, 2025, and April 23, 2025 reports of Dr. Jacob M. Grumbach, and the March 31, 2025 expert report of Dr. Tye Rush. In addition, State Defendants ask that this Court conditionally exclude Dr. Barreto's March 31, 2025, declaration until State Defendants can probe the reliability of his report.

April 30, 2025

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

Respectfully submitted,

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division
Tex. State Bar No. 24060998

KATHLEEN T. HUNKER
Deputy Chief, Special Litigation Division
Tex. State Bar No. 24118415

WILLIAM D. WASSDORF
Deputy Chief, General Litigation Division
Tex. State Bar No. 24103022

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Tel.: (512) 463-2100
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
will.wassdorf@oag.texas.gov

## CERTIFICATE OF CONFERENCE

I certify that on April 30, 2025, State Defendants conferred via email with counsel for the Plaintiffs and informed Plaintiffs that we would assume they were opposed to the motion, but that they could indicate if they were unopposed.

*/s/ Ryan G. Kercher*
RYAN G. KERCHER

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on April 30, 2025 and that all counsel of record were served by CM/ECF.

*/s/ Ryan G. Kercher*
RYAN G. KERCHER