# Exhibit 1

Excerpts from the Deposition of
Dr. Jacob Grumbach
April 25, 2025

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

LEAGUE OF UNITED LATIN      )
AMERICAN CITIZENS, ET AL,   )
                            )
            Plaintiffs,     )
                            )   CIVIL ACTION NO.:
VS.                         )   3:21-CV-00259-DCG-JES-JVB
                            )   [Lead Case]
GREG ABBOTT, ET AL,         )
                            )
            Defendants.     )
                            )

---------------------------------

REMOTE ORAL DEPOSITION OF

DR. JACOB GRUMBACH

APRIL 25, 2025

---------------------------------

REMOTE ORAL DEPOSITION OF DR. JACOB GRUMBACH,

produced as a witness at the instance of the

DEFENDANT, and duly sworn, was taken in the

above-styled and numbered cause on April 25, 2025,

from 11:02 a.m. to 7:39 p.m., via Zoom

teleconference, before Vanessa J. Theisen, CSR in and

for the State of Texas, and RPR, reported by machine

shorthand, pursuant to the Federal Rules of Civil

Procedure and any provisions stated on the record or

attached hereto.

1   documents unless we have an issue with the Zoom.

2       A.  Understood.

3       **Q.  Okay.  And how many reports have you**

4   **prepared in this matter?**

5       A.  Overall, in 2022, I believe there were four

6   separate reports I prepared; then prepared a

7   March 31st report and an April 16th report in 2025.

8       **Q.  And you prepared two reports recently,**

9   **correct?**

10      A.  That's correct, as well as an errata report,

11  I should also mention.

12      **Q.  And what was the nature of that report, the**

13  **errata?**

14      A.  The errata was due to the discovery of a

15  coding error I had made in analyses.  I fixed that

16  coding error and provided the corrected estimates.

17      **Q.  And of the two reports that you prepared**

18  **recently, one was the March 31st, 2025, report.  Is**

19  **that correct?**

20      A.  That's correct.

21      **Q.  And the second was a, was it, April 16th**

22  **report?**

23      A.  That's the date, I believe, yes.

24      **Q.  The April report was an update of the March**

25  **report.  Is that right?**

Dr. Jacob Grumbach - 4/25/2025

16

1  as well?

2             THE WITNESS:  Sorry about that.  "Given

3  my sample frame."

4             THE REPORTER:  Thank you.

5      Q.  (BY MR. BERG)  And what was the timeframe of

6  your report?

7      A.  This covers elections from 2014 through

8  2024.

9             In the endogenous elections, those cover

10  2022 and 2024 because those are the elections that

11  involve the specific endogenous districts being

12  challenged rather than their earlier geographic forms

13  in the previous redistricting cycle.

14      Q.  So for exogenous elections, you included

15  elections for 2020 -- I'm sorry -- 2014 and 2024.  Is

16  that correct?

17      A.  That's correct.

18      Q.  And then endogenous, you included 2022 to

19  2024.  Is that correct?

20      A.  That's correct.

21      Q.  What is the difference between an endogenous

22  election and exogenous election?

23      A.  An endogenous election is an election for

24  the specific seats that occupy the districts that are

25  being contested legally.

1              Exogenous elections are elections in

2    other statewide or district-based geographies that

3    cover the voters that are within the endogenous

4    district boundaries.

5         Q.  We talked a little bit about ecological

6    inference.  Did you use iterative EI in this report?

7         A.  Can you tell me what you mean by "iterative

8    EI"?

9         Q.  Did you run your results more than once?

10        A.  Oh, in a -- that's not my understanding of

11   "iterative" in the statistical sense, but I ran my

12   analyses more than once to check them and so forth.

13        Q.  Approximately how many times did you run

14   your results to check them?

15        A.  Running in full across this -- these --

16   between getting the data in late March and now, I

17   probably ran ten small runs of subsets as well as

18   potentially five full runs of all the elections.

19        Q.  Among the elections listed here, did you

20   come across any elections that fit these categories

21   that you did not include in the report?

22        A.  No.  My goal, again, was to find all -- all

23   racially contested exogenous statewide elections

24   since 2014 and all endogenous elections since 2022.

25              And, as I said, this involves looking

1    1,000 EI estimates involved in my report across many

2    districts and elections.  I looked at those estimates

3    and checked them many, many times.

4        Q.  You talked about how racially contested

5    elections would be a Latino running against a

6    non-Latino.  How did you treat elections where there

7    were two candidates and both were Latino?

8        A.  Right.  I did not include those as racially

9    contested elections because they don't involve

10   candidates from different racial backgrounds

11   contesting an election.

12       Q.  And the endogenous elections, the ten

13   endogenous elections, it doesn't mention in your

14   report that those are racially contested, but is that

15   your understanding that those ten are all racially

16   contested?

17       A.  No.  My sample frame there was any

18   endogenous election with a Latino candidate running.

19   So I am confident that they all have at least one

20   Latino candidate, but there may be one or more

21   elections between all Latino candidates in the

22   endogenous election sample frame.

23       Q.  So every endogenous election you analyzed

24   had at least one Latino candidate, correct?

25       A.  That's correct.

57

1    whether legislators used partisanship in drawing maps

2    in 2021 or 2023?

3        A.  Again, there is no legislative intent that I

4    analyze or look into it as any part of my reports.

5        Q.  And let's go to page 4 of your report,

6    Qualifications.

7        A.  Yes, sir.

8        Q.  Perhaps we should have gone straight there,

9    but here we are.

10              In the first paragraph you talk about

11   how this report is a revised version of your

12   March 31st, 2025, report, correct?

13       A.  Yes, sir.

14       Q.  Generally, why did you revise that report?

15       A.  I revised the report, as I say there,

16   because the plaintiffs revised their geographic

17   boundaries of some of their proposed districts.

18       Q.  Are you making any expert conclusions about

19   the challenged districts that are in the March 2025

20   report and not this report?

21       A.  Am I -- can you repeat the question?  Sorry.

22       Q.  Are you making any expert conclusions about

23   the districts LULAC is challenging that are in the

24   March 2025 report but not in this report?

25       A.  No, my conclusions are generally consistent

1    across these reports.

2    Q.  So no separate conclusions in the March 2025

3    report, correct?

4    A.  If I recall correctly, the conclusions I

5    draw about cohesive voting in -- Latino cohesive

6    voting in demonstrative districts and non-Latino bloc

7    voting in enacted districts as well as non-Latino

8    bloc voting in challenged districts are generally

9    consistent across those reports.

10    Q.  Okay.  There was one conclusion which I

11    think related to the districts you were being asked

12    to analyze that was slightly different, so --

13                    (Simultaneous talking.)

14    A.  Understood.  I did not understand that as a

15    different conclusion, but rather a different district

16    sample.

17                    Yes, I removed -- in this April 16th

18    report, removed references and analyses related to

19    districts that are no longer being challenged by the

20    plaintiffs.

21    Q.  Perfect.

22    A.  Thanks.

23    Q.  You are currently a professor at the

24    University of California Berkeley, correct?

25    A.  Yes, sir.  Go Bears.

Dr. Jacob Grumbach - 4/25/2025

70

1    Q.  -- from MALDEF, correct?

2    A.  Correct.

3    Q.  And it says you received data on

4 demonstrative new districts and demonstrative

5 repaired districts on June 8th, 2022, correct?

6    A.  "I received a list of which electoral

7 precincts are located within LULAC's Demonstrative

8 Districts that are Demonstrative New Districts and

9 Demonstrative Repaired Districts from MALDEF on

10 June 8th, 2022."  Thank you.

11    Q.  And did you verify that data?

12    A.  Like the other data I received, yes, I

13 validated it, first by opening and looking visually

14 at the spreadsheets of data, and then by sort of

15 loading those datasets and using them in analyses and

16 attempting to ensure that those analyses functioned

17 correctly.

18    Q.  And did you also validate the crosswalk data

19 that you received on April 10th, 2025 and April 14th,

20 2025?

21    A.  I similarly did that.  That was for

22 crosswalk data for three revised demo districts.

23    Q.  Then, skipping ahead to the paragraph on

24 page 5 that starts with, "Most importantly," talking

25 about SSVC.  So SSVC versus SSVR, how does that

1    Q.  -- 6 and 7.

2    A.  Thank you for taking me through that.  Sorry

3    for the wild goose chase.

4            THE REPORTER:  Yes, and I need you guys

5    to talk one at a time, please.  Y'all are starting to

6    talk over each other.  I can't get either one of you

7    when you do that.

8            THE WITNESS:  Sorry, Ms. Theisen.

9            MR. BERG:  I apologize.

10            THE REPORTER:  That's okay.

11    Q.  (BY MR. BERG)  So we're currently in the

12    April 2025 report, which says that among voters in

13    Demonstrative Congress District 27, Maldonado won --

14    would have won 72 percent of the Latino vote and

15    36 percent of the non-Latino vote.

16            And in the March report, it had said

17    that at the bottom of page 4, top of page 5,

18    Maldonado would have won 77 percent of the vote and

19    35 percent of the non-Latino vote.

20            The question is:  Why did the analysis

21    change so that Maldonado would have lost 5 percent of

22    the Latino vote and gained 1 percent of the

23    Latino [sic] vote between March and April?

24    A.  So as I mentioned in my errata, which I am

25    sorry for its -- the timing of it being close to this

1    deposition -- those earlier estimates in both of

2    those earlier reports were from the Exogenous

3    Elections.xlsx appendix file, which was -- had

4    incorrect results due to a coding error.

5                I then fixed it and rewrote those

6    corrected estimates in the errata and redid the

7    figure there.  I extremely regret the coding error,

8    and I'm glad I fixed it, and I thank Dr. Alford for

9    sort of noting in one report that there may be some

10    issue, that it's -- you know, I deeply regret that

11    error.

12                The current estimates in the errata are

13    correct.  But, regardless, the point -- the takeaway

14    point is in every single one of these estimates,

15    whether it's the March 31st report, April 16th

16    report, or the errata, the conclusions are not any

17    different.

18                I observed cohesive Latino voting for

19    Maldonado.  I observed non-Latino bloc voting against

20    Maldonado and that Maldonado would not win the

21    election in enacted CD27 but would be the winner

22    within demonstrative CD27.

23                MR. BERG:  Can we go off the record,

24    please?

25                THE REPORTER:  Yes.  Off the record at

Dr. Jacob Grumbach - 4/25/2025

92

 1  1:39.

 2              (Recess 1:39 p.m. to 1:50 p.m.)

 3      Q.  (BY MR. BERG)  Dr. Grumbach, before we went

 4  off the record, you mentioned an errata report?

 5      A.  That's right.

 6      Q.  Is that the same as the April report or

 7  different?

 8      A.  It's different from this April report we're

 9  looking at.  It's a one-page errata with an attached

10  corrected Exogenous Elections.xlsx appendix file.

11      Q.  And are -- did you provide this to your

12  counsel?

13      A.  Yes, I did.

14      Q.  And do you know if your counsel provided it

15  to State defendants?

16      A.  They told me they did, yes.

17              MS. HULETT:  Yes, we did.

18      Q.  (BY MR. BERG)  And counsel is there with you

19  right now?

20              MS. HULETT:  Yes, I'm here.  This is

21  Denise.

22              Yes, we provided it yesterday morning.

23  It's a one-page exhibit with the exogenous elections

24  appendix attached because some of those were changed.

25              I can forward you that email as soon as

1    I find it.

2                    MR. BERG:  Yes, if you could forward me

3    the email sending the errata --

4                    MS. HULETT:  I will.

5                    MR. BERG:  -- report to us.  You have my

6    email presumably?

7                    THE WITNESS:  Do you have Zachary Berg's

8    email?

9                    MS. HULETT:  What?

10                   MR. BERG:  Do you have my email?

11                   THE WITNESS:  So you can send it

12   directly, I guess.

13                   MS. HULETT:  I'm still looking for it.

14   Hang on.  Okay.  So this is -- no, wrong day.

15   Wednesday, Thursday.

16                   Yeah, we sent it to 32 people.  So,

17   unfortunately, I guess, you weren't one of them.

18                   MR. BERG:  Well, was it someone at

19   Texas --

20                   MS. HULETT:  Oh, yeah.

21                   MR. BERG:  -- dot gov?

22                   MS. HULETT:  Absolutely.  So it's --

23   what's your email?

24                   MR. BERG:  Zachary.Berg@oag.Texas.gov.

25                   MS. HULETT:  OAG-dot-Texas-dot-gov or

1  slash?

2              MR. BERG:  Period.

3              MS. HULETT:  Period.  Did you get it?

4              MR. BERG:  Not yet.

5              MS. HULETT:  I think I got the address

6  wrong.  Let me get it off of the --

7              MR. BERG:  Z as in zebra.  A as in

8  apple.  C as in Charlie.  H as in Henry.

9              MS. HULETT:  Yeah, I think I got the

10  Zachary Berg.  I may just have the ending wrong.

11              MR. BERG:  At OAG.

12              MS. HULETT:  Uh-huh.

13              MR. BERG:  Dot Texas dot gov.

14              MS. HULETT:  Yep.  That's where I sent

15  it.

16              THE WITNESS:  Sometimes they take a

17  second with attachments and stuff.

18              MS. HULETT:  Yeah.

19              THE WITNESS:  It's not in your outbox?

20              MS. HULETT:  No, it didn't bounce back,

21  and it shows sent.

22              THE WITNESS:  Okay.

23              MR. BERG:  While I'm waiting for it to

24  come through, can you tell me who at the AG's office

25  it was sent to?

```
 1                    MS. HULETT:  It was sent to Ryan
 2  Kercher, Will Wassdorf, Kathleen Hunker --
 3                    THE REPORTER:  Do you want all this on
 4  the record?
 5                    MR. BERG:  Yes.
 6                    THE REPORTER:  Okay.  I'm going to need
 7  a copy to get all the spellings of the names.
 8                    Okay.  Go ahead, please.
 9                    MS. HULETT:  How do you want that copy?
10                    THE WITNESS:  Just keep saying them.
11                    MS. HULETT:  Okay.  Ryan Kercher, Will
12  Wassdorf, W-A-S-S-D-O-R-F.  Kathleen Hunker,
13  H-U-N-K-E-R.  And then there's some gmail and ymail.
14  I'm not sure.  And then you, Zachary.Berg.oag.texas.gov,
15  Zachary Rhines, Mark Csoros, Kyle Tebo, David Bryant,
16  and then one -- Munera, maybe, M-U-N-E-R-A.
17                    MR. BERG:  Munera.
18                    MS. HULETT:  And then Ali Thorburn.
19  Those are the ones with oag.texas.gov addresses,
20  including Zachary Berg.
21                    MR. BERG:  And what date -- what time
22  was it sent yesterday?
23                    MS. HULETT:  7:25 a.m. in the morning.
24                    MR. BERG:  I don't have it.  I've
25  confirmed with Kathleen Hunker and Ryan Kercher; they
```

Dr. Jacob Grumbach - 4/25/2025

96

1   don't have it either.

2            MS. HUNKER:  This is Kathleen Hunker

3   from the Texas Attorney General's Office.  I'm sorry

4   to intrude on the deposition, only I did hear about

5   the question over the errata sheet.  I can confirm,

6   after checking with David Bryant, also with Ryan

7   Kercher, who is our lead counsel, and myself, who has

8   been counsel on this case for four years, we have not

9   received this particular email.

10           I do not know why, but it has not -- it

11  has not been brought to our attention through email

12  correspondence.

13           MS. HULETT:  Okay.  I just forwarded it

14  to you.  Did you get it?  I just forwarded it to

15  Zach.

16           MR. BERG:  I have not received it.

17           MS. HULETT:  That's very strange.

18           MR. BERG:  That's a word for it, yes.

19           MS. HULETT:  That's very strange.  You

20  know, there must be some internal --

21           MR. BERG:  Let's go off the record,

22  please.

23           THE REPORTER:  Off the record at 1:58.

24           (Recess 1:58 p.m. to 2:54 p.m.)

25      Q.  (BY MR. BERG)  Dr. Grumbach, when we went

1  **off the record, we were talking about an errata**

2  **report, correct?**

3      A.   That's correct.

4      **Q.   Let me share my screen.   Can you see my**

5  **screen, Dr. Grumbach?**

6      A.   Yes, sir.

7      **Q.   Can you see what is displayed on my screen?**

8      A.   It says, "Expert Report:   Errata to

9  Exogenous Elections Appendix."

10      **Q.   And that is dated April 23rd, 2025, correct?**

11      A.   Correct.

12              MR. BERG:   And before we get into this,

13  I would like to ask counsel on the record to please

14  provide the State defendants through Box so we have a

15  copy.

16              MS. HULETT:   I'm sorry.   You want me to

17  what?

18              MR. BERG:   Would you please drop the

19  errata report to us through Box, please.

20              MS. HULETT:   I did.   Oh, through Box?

21              MR. BERG:   Yes.

22              MS. HULETT:   I can't do it from here.   I

23  can ask them to do it in San Antonio.

24              MR. BERG:   Understood.

25              MS. HULETT:   And I'll do that right now.

 1          MR. BERG:  Including the original email,

 2  please, for our records.

 3          MS. HULETT:  Okay.  Sent.

 4      Q.  (BY MR. BERG)  So Dr. Grumbach, if I

 5  continue on to page 2 of this errata report --

 6      A.  Yes.

 7      Q.  -- from April 23rd, you explain that this

 8  report was produced in response to an inadvertent

 9  coding error.  Would you briefly cover the background

10  for this report?

11      A.  Yes, sir.  I noted in Dr. Alford's

12  April 16th report, he pointed out that some either EI

13  estimates or the election winners corresponding to

14  them seemed potentially off.

15          I then went through those estimates and

16  my code very thoroughly, and I did eventually -- it

17  took me a while to find, but essentially a one-word

18  reference to a data object within the statistical

19  program R was mis-referenced in calling up data by

20  district and then election to erroneously not load

21  the complete precinct sets for district elections.

22          I found that error, corrected it, reran

23  those analyses, and provided the corrected results,

24  and I'm -- it's -- I just deeply regret the error as

25  well and appreciate it being pointed out.

1          And this election was one of the 42

2    exogenous elections used to run all your -- or a

3    majority of your district analyses.

4          How can you confidently state that this

5    change does not affect those analyses?

6        A.   This change affected the analyses that went

7    into that Exogenous Elections.xlsx file.  I know that

8    because the actual structure of the code is those

9    election by election within district analyses were

10   run in a part of this code file and -- that referred

11   to elections modeling.

12          I had a separate code file for the

13   overall average district-based support across

14   multiple elections for Latino candidates of choice.

15   So that was not affected, and the section on

16   endogenous elections comes later in the code file and

17   is not affected by this coding error.

18          The coding error is specific to calling

19   up specifically the data for election-by-election EI

20   analysis that produced that Exogenous Elections.xlsx

21   file.

22       Q.   So let me try to summarize for my own

23   clarification, and correct me where I'm wrong.

24          There was two processes.  The error was

25   in one processes that only affected that election.

Dr. Jacob Grumbach - 4/25/2025

102

1    And there was a second processes of the 42 elections

2    that you ran the district numbers against that was

3    unaffected.  Is that correct?

4          A.  Generally.

5                I'll restate this.  There's a portion of

6    the code that does the election-by-election analysis

7    that was affected by this coding error.  And the rest

8    of the coding, including the district overall

9    election numbers, was not.  And I've -- you know,

10   therefore I reran the analyses to provide the

11   corrected results.

12         Q.  You said that the process with the district

13   overall numbers was unaffected, correct?

14         A.  That's correct.

15         Q.  Is there a more proper name for that

16   district overall numbers process?

17         A.  No.

18         Q.  A name or something?

19         A.  Just -- I call them -- if we pull up my

20   other report, I believe I called them average Latino

21   and non-Latino support for Latino candidates of

22   choice by district as opposed to election-by-election

23   analyses.  But we can together decide to put a proper

24   name on it for shorthand.

25         Q.  So the part that was unaffected you call the

1  **average Latino support?**

2      A.  I called it in this sentence the average

3  Latino and non-Latino support for Latino candidates

4  of choice in demo districts as well as average

5  non-Latino support for the Latino candidates of

6  choice in overlapping enacted districts.  But we

7  should find a quicker name for this so we can

8  remember what we're talking about.

9      **Q.  It was a long one.  So average Latino and**

10  **non-Latino support for --**

11      A.  Latino candidates of choice.  We can call

12  this something like average district analysis or

13  district-based analysis as opposed to

14  election-by-election analysis.  Perhaps that would be

15  a quick way of describing it.

16      **Q.  Is it all right if I call it average**

17  **district analysis?**

18      A.  Sure.  I'm happy with that.

19      **Q.  So the average district analysis is**

20  **unaffected by this coding error which occurred in**

21  **another process.  Is that correct?**

22      A.  That's correct, yeah.  And that was

23  something I checked for.

24      **Q.  And this document relates to exogenous**

25  **elections.  I wanted -- we talked earlier about**

1   would have chosen a different --

2        A.  Same.  Same here.

3        Q.  What I'm asking is if there is no Latino --

4   if the Latinos are not voting cohesively, can

5   non-Latinos fail GINGLES 3?

6        A.  So I would say -- I would hesitate to make a

7   legal designation on this question as a political

8   scientist, but in my political science expertise, I

9   would say that a Latino candidate of choice is

10  defined as the candidate who gets the most votes from

11  Latinos that may or may not be cohesive voting in

12  different contexts.  And that is a separate question

13  from whether non-Latinos vote as a bloc against that

14  Latino candidate of choice.

15       Q.  Let's go back to Table 1, now that we've

16  laid the ground.

17            So the -- we talked a little about where

18  you got your data, and some about -- it sounded like

19  most of the data you got from MALDEF counsel.  Some

20  of the identification of candidates' race was done by

21  you and maybe some by MALDEF.

22            Could you talk more about how that

23  process worked?

24       A.  Sure.

25            In 2022, I received precinct-level vote

Dr. Jacob Grumbach - 4/25/2025

194

1   share data as well as crosswalks of how precincts or

2   VTBs fit into different district boundaries; did some

3   analyses back in 2022.

4            Then in 2025, the plaintiffs' counsel

5   reached out again and said, you know, "This case is

6   moving forward.  We would like -- you know, the Court

7   needs to know these questions.  Please write a

8   report," and provided data for the 2022 and 2024

9   election cycles on those same types of data:

10  Crosswalk data and election returns data at the

11  precinct level.

12           Along the way, the counsel provided the

13  list of elections that were -- involved Latino

14  candidates and non-Latino candidates within there.

15  So they essentially provided data on racially

16  contested elections.

17           And then I worked to verify, to the

18  extent I could, the veracity of -- that these

19  elections are racially contested.

20  **Q.  Sorry, I missed -- I must have cut out a**

21  **second there.**

22           **Someone provided you the data and then**

23  **you verified.  Who provided the data on the race?**

24  A.  So in MALDEF's election returns data set,

25  they provided data on racially contested elections

Dr. Jacob Grumbach - 4/25/2025

195

1    involving at least one Latino and at least one

2    non-Latino candidate.  And then on my own, I

3    visionally inspected these candidate names, looked up

4    information on the internet to try to gain some

5    qualitative understanding of these electoral contexts

6    and whether candidates were Latino or not.

7        **Q.  So MALDEF provided the data, and then you --**

8    **you reviewed the data to confirm the accuracy?**

9        A.  Correct.

10        Q.  I had a question on the primary elections.

11    And let me open the document.

12        A.  Sure.

13        Q.  All right.  Actually, we'll just skip -- I

14    think we can show by logic, but if not, we can find

15    the document.

16             **So my question is, the 2018 Democratic**

17    **primary for governor --**

18        A.  Yes.

19        **Q.  -- here is listed and also the Democratic**

20    **runoff for governor is also listed.  So you would**

21    **include both the primary and the runoff, correct?**

22        A.  Yes.  Both of those are separate elections

23    where Texans expressed their preferences at the

24    ballot box on separate occasions on a separate choice

25    set, and, therefore, they're both analyzed, yeah.

1      Q.  All right.  And because a primary runoff

2   would be racially contested, that is have at least --

3   or have a Latino and a non-Latino necessarily, the

4   primary would also be racially contested.  Is that

5   correct?

6      A.  That's correct.

7      Q.  So my question was there are four elections

8   listed that are runoffs, but the primaries aren't

9   included.  Those four elections are the 2022

10   Democratic runoff for attorney general, the 2022

11   Democratic runoff for comptroller, the 2022

12   Democratic runoff for land commissioner, and the 2022

13   Republican runoff for attorney general.

14           The primary elections should be included

15   on this list as well, right?

16      A.  I am not sure, but, given this logic of

17   runoff candidates must have been in the earlier

18   primary election and that means that earlier primary

19   election was racially contested, I would like to

20   check those primary elections.  But if that is the

21   case, those would be elections I would like to

22   analyze under this sample frame.

23      Q.  So I've pulled up -- the top you see from

24   BallotPedia.  We have the Texas Gubernatorial

25   election 2018, Democratic primary.  And so this is

1    what we talked about where this is listed on your

2    report, correct, the 2018 Democratic primary for

3    governor?

4         A.   Would you please go back to my report?

5    Sorry about that.

6         Q.   Yeah, sorry.

7         A.   No, it's my own bad memory, I guess.

8              Yes, thank you very much.

9         Q.   And then Lupe Valdez, presumably Latino?

10        A.   Presumably, correct.

11        Q.   Latino?

12        A.   Presumably Latino, you're right.

13        Q.   And then Lupe Valdez also in the primary

14   runoff, correct?

15        A.   Correct.

16        Q.   And you list the runoff as well, correct?

17        A.   (No response.)

18        Q.   The Democratic primary runoff, Rochelle

19   Garza, I believe, is Latino or Latina.

20        A.   That's my understanding.

21        Q.   And you -- what was that, attorney general?

22   So, yeah, you list that election on your report,

23   correct?

24        A.   Correct.

25        Q.   The primary, which also involved Rochelle

1    Garza and a non-Latino, does not appear on your

2    report, correct?

3        A.   That appears to be true.

4        Q.   Moving on to the 2022 comptroller.

5            The primary runoff, which you list on

6    your report, includes Janet Dudding and Angel Vega?

7        A.   Correct.

8        Q.   Angel Vega also appearing with Janet Dudding

9    in the 2022 Democratic primary for Texas comptroller,

10   correct?

11       A.   Correct.

12       Q.   And that election is not listed on this

13   list, correct?

14       A.   That's correct.

15       Q.   So going to the 2022 Democratic runoff for

16   land commissioner, we have Jay Kleberg, no relation,

17   and Sandragrace Martinez.  And you include that

18   election on your report, correct?

19       A.   Correct.

20       Q.   However, the primary election, which also

21   includes those two individuals, Sandragrace Martinez

22   and Jay Kleberg, the 2022 Democratic primary for land

23   commissioner, does not appear on your report,

24   correct?

25       A.   Correct.  At least in this Table, I should

1    say.  I want to make sure I also did not analyze that

2    and put them in the results.

3        Q.  The last runoff you list on your report is

4    the 2022 Republican runoff for governor, correct?

5        A.  Correct.

6        Q.  Another Bush election.  We have Ken Paxton,

7    my employer for disclosure purposes, versus George P.

8    Bush.  And you list that on your report, correct?

9        A.  Correct.

10       Q.  However, Ken Paxton and George P. Bush,

11   along with Eva Guzman, appear as candidates in the

12   2022 Republican primary election for attorney

13   general, correct?

14       A.  Correct.

15       Q.  And that report should have been included --

16   that election also should have been included in your

17   report, correct?

18       A.  Given my sample frame of racially contested

19   statewide elections, yes, I would like to include

20   those primary elections in this analysis.

21       Q.  So you would agree that there are four

22   elections not listed here that qualify for the

23   parameters of the elections you've selected?

24       A.  Given what you have presented me, it seems

25   likely that there are four racially contested

1    statewide elections that I would like to include,

2    given this sample frame, yes.

3                    MR. BERG:  I'm going to drop that in the

4    chat and mark that PDF with the elections that are

5    and are not included on Table 1 of your report as

6    Defendants' Exhibit 6 [sic].

7                    (Exhibit 7 marked.)

8        Q.  So in addition to the four primary elections

9    that appear to be missing, I have a question --

10   questions about a few of the general elections.

11                   First, I would like to ask you,

12   generally, about the 2022 governor's race.

13                   Let me bring up a document.

14                   THE REPORTER:  Mr. Berg, we already had

15   an Exhibit 6.  So that last --

16                   MR. BERG:  Thank you.

17                   THE REPORTER:  -- exhibit that you

18   dropped in the chat will be Exhibit 7.

19       Q.  (BY MR. BERG)  Can you see the election on

20   my screen, Doctor?

21       A.  I have the report with that Table

22   highlighted and the -- I'm sorry.

23       Q.  Re-sharing the screen.

24       A.  Great.

25       Q.  Do you see the elections on my screen now?

1    Q.  Going back to your report, Doctor, Table 1,

2  general elections, the -- we agree that all of the

3  general elections listed on this Table should include

4  at least one Latino and one non-Latino, correct?

5    A.  That was my goal for this exogenous election

6  sample frame, yes.  A racially contested election as

7  defined in this case as being at least one Latino and

8  at least one non-Latino candidate on the ballot.

9    Q.  So one of the elections you list, Court of

10  Criminal Appeals, Place 7 for the 2024 general

11  election.  Do you see that?

12    A.  Yes.

13    Q.  If you go to this document, we have -- you

14  will see it's also from BallotPedia, correct?

15    A.  Yes.

16    Q.  And it shows the general election for

17  Place 7 of the Texas Court of Criminal Appeals,

18  correct?

19    A.  Yes, Court of Criminal Appeals, Place 7.

20    Q.  And the two candidates' names are Gina

21  Parker and Nancy Mulder.  Is that correct?

22    A.  Correct.

23    Q.  Are you aware of whether either of these

24  women are Latina?

25    A.  Off the top of my head, I cannot recall.

1    Q.  We'll go to the next page.  You will see

2  this is a Google chat with the search terms "Gina

3  Parker Texas Court of Criminal Appeals Latino or

4  Hispanic."

5            Did I read that correctly?

6    A.  Yes.

7    Q.  And I represent to you that all of these --

8  or almost all of these search results show that the

9  word "Latino" or "Hispanic" returns no hits.  Is that

10  correct?

11    A.  That appears to be what you're showing me.

12  I would like to do my own searching for a confident

13  answer to this question.  But it's in your search

14  that -- you're describing your search results

15  accurately.

16    Q.  If you go to page 5, "Nancy Mulder Texas

17  Court of Criminal Appeals Latino or Hispanic."

18            Do you see that?

19    A.  Yes.

20    Q.  And, likewise, Nancy Mulder --

21    A.  I'm seeing this, yes.

22            THE REPORTER:  Someone just joined via

23  telephone, and it's causing an echo.  I'm going to

24  see if I can mute them.

25            THE WITNESS:  Yeah, it's that telephone.

Dr. Jacob Grumbach - 4/25/2025

205

1          THE REPORTER:  Yeah.  Okay.  I think I

2  muted them.

3      Q.  (BY MR. BERG)  But, Doctor, you see Nancy

4  Mulder --

5      A.  Yes.

6      Q.  -- not returning any results for Latino or

7  Hispanic, correct?

8      A.  I'm seeing that.  Typically, when I Google

9  even a non-Latino person's name and the word "Latino"

10  or "Hispanic," it returns something, even like, you

11  know, particularly for a statewide electoral

12  candidate.  What -- that may not describe them as

13  Latino, but I'm slightly confused by the Google

14  results you're showing me.  But I would like to do my

15  own searches to confirm this.

16      Q.  You would agree that none of the search

17  terms show either of the candidates talking about any

18  Latino heritage they may have?

19      A.  Again, they're -- this is hard to draw

20  conclusions from what you're showing me, but I am

21  taking your assertion that neither of these

22  candidates is Latino, and, therefore, this is not a

23  racially contested election.

24          That is something I would like to

25  confirm, and if that is true, I would be happy to

Dr. Jacob Grumbach - 4/25/2025

206

1   exclude that.

2              My goal is to get an accurate sample

3   frame and to estimate Latino and non-Latino support

4   for candidates of choice in racially contested

5   elections.  And if this was, indeed, not racially

6   contested, then it's worth excluding, given the

7   sample frame.

8       Q.  As we sit here, do you have any reason to

9   believe that Gina Parker or Nancy Mulder are Latina?

10      A.  I would say I don't have evidence in my head

11  of either of them being Latina, and I don't have, I

12  think, amazing evidence of them not being Latina

13  either.  So I would like to confirm this, and if I

14  can confirm this confidently, then I'll exclude this

15  from the sample frame.

16      Q.  If we go back to your Table 1, which is

17  page 14 of your April 16th, 2025 report, Court of

18  Criminal Appeals, Place 8, general election for 2024

19  is listed.  Do you see that?

20      A.  Yes.

21      Q.  And you see at the top we have listed Texas

22  Court of Criminal Appeals elections from BallotPedia,

23  Place 8, general election, held November 5th, 2024,

24  between Lee Finley and Chika Anyiam.

25              Do you see that?

1        A.  I see that.  Thank you.

2        Q.  Do you know whether either of these

3   candidates is Latino?

4        A.  I don't know.

5        Q.  Similarly, here are Google results for Lee

6   Finley, Texas Court of Criminal Appeals, which

7   returned -- or most of these appear to not return

8   either Latino or Hispanic.

9             Likewise, starting on page 12, running

10  to page 13, Chika Anyiam listed with missing Latino

11  or Hispanic.

12            You would agree that none of those

13  election pages or Google results suggest that either

14  of the candidates for the 2024 general election of

15  Court of Criminal Appeals Place 8 is Latino?

16       A.  Similarly to the one we just talked about,

17  did not find evidence of these candidates being

18  Latino or Hispanic.  I would like to confirm this on

19  my own more systematically, and if that's the case,

20  exclude them from the analysis, given that it's not a

21  racially contested election between a Latino and a

22  non-Latino candidate.

23       Q.  You would agree that, when we reviewed the

24  slides of the 2022 governor's race and the 2024

25  president's race, you did not have any difficulty

1    identifying the Latino candidates?

2        A.  No, I did not have difficulty in identifying

3    very likely to be Latino candidates.

4        Q.  Moving on, the general election 2024 for

5    Court of Criminal Appeals, Presiding Judge, you agree

6    that's listed on Table 1 of your report?

7        A.  Yes.

8        Q.  Going to page 15 of the document, you would

9    agree this is a printout from BallotPedia, Texas

10   Court of Criminal Appeals Elections, Presiding Judge,

11   general election held November 5, 2024, between David

12   Schenck and Holly Taylor.

13           Did I read that correctly?

14       A.  Yes.

15       Q.  Similarly, the next two pages, 16 and 17,

16   contain Google searches for David Schenck Texas Court

17   of Criminal Appeals Latino or Hispanic.  The Google

18   results indicate missing Latino and Hispanic for the

19   majority of these.  Would you agree?

20       A.  Yes.

21       Q.  On pages 19 and 20, you will see a Google

22   search for Holly Taylor, Texas Court of Criminal

23   Appeals Latino or Hispanic and that the search

24   results are returning missing Latino, Hispanic, one

25   or both, for almost all of these results?

1      A.  Again, I don't find this especially helpful

2   evidence, you know, given somebody else's Google

3   search printout, but I would like to review these

4   more systematically, and if they are not racially

5   contested elections with a Latino candidate in them,

6   then exclude them from analyses.

7      Q.  We are back on Table 1 of your report,

8   general elections column.  2024, general election,

9   Supreme Court of Texas, Place 2.

10          Going to the other document, page 22,

11   printout from BallotPedia, Texas Supreme Court

12   Elections 2024, Place 2, general election held

13   November 5, 2024, between Jimmy Blacklock, who was

14   recently appointed Chief Justice of the Supreme Court

15   of Texas, and DeSean Jones.

16          Did I read that correctly?

17      A.  Yes.

18      Q.  Do Jimmy Blacklock or DeSean Jones, on

19   initial review, appear to be Latino?

20      A.  I would say a usual characteristic of a

21   Spanish surname is not there, which makes it

22   difficult to assess without doing a bit more digging.

23      Q.  From pages 23, 24 of this document, you see

24   a Google search, Jimmy Blacklock Texas Supreme Court

25   Latino or Hispanic.  You will see that Google has

1  indicated that the terms Latino or Hispanic are

2  missing from -- one or both terms are missing from

3  these results, talking about Jimmy Blacklock.

4              You would agree that was an accurate

5  description of that Google search as it is depicted?

6      A.  Yes, as depicted.

7              I, again, hesitate at the use of

8  screenshots of Google results for a number of reasons

9  to do this determination, but you're describing the

10  screenshots accurately, yes.

11      Q.  Starting on page 26 to 27, Google search

12  DeSean Jones Texas Supreme Court Latino or Hispanic.

13  Google indicates that the terms "Latino" and

14  "Hispanic" are missing.

15              Is that an accurate description of that

16  search result?

17      A.  Accurate description of this PDF you're

18  showing, yeah.

19      Q.  Going back to your report, Table 1, General

20  Elections, 2024 General Election, Texas Supreme

21  Court, Place 4.  You agree that's listed on your list

22  of racially contested exogenous elections?

23      A.  Yes.

24      Q.  Going to the other document, page 29, it's a

25  printout from BallotPedia, Texas Supreme Court

1  Elections 2024, Place 4, held on November 5th, 2024,

2  between John Devine and Christine Weems.  Is that

3  correct?

4      A.  Yes.

5      Q.  Do either candidate have a Spanish surname

6  or visually appear to be Latino?

7      A.  Visually, I can't assess from this as it

8  stands, and I hesitate on legal record to just try to

9  be eyeballing people's racial backgrounds from a head

10  shot.

11              (Zoom interruption.)

12              MR. BERG:  Can we go off the record,

13  please?

14              THE REPORTER:  Off the record at 6:20.

15              (Brief pause.)

16              THE REPORTER:  Back on the record at

17  6:20.

18      Q.  (BY MR. BERG)  Dr. Grumbach, we are on

19  page 30 of this document, Google search John Devine

20  Texas Supreme Court Latino or a Hispanic.  Google has

21  indicated that the terms "Latino" or "Hispanic" are

22  missing from most of these search results.

23              You would agree that this is what the

24  PDF shows?

25      A.  That appears to be what the PDF showed, yes.

1      Q.  We're now on pages 33 of 34 of the document.

2  Google search Christine Weems Texas Supreme Court

3  Latino or Hispanic.  Google results with Google

4  indicating that the term "Latino" or "Hispanic" are

5  missing.

6            Is that an accurate description of the

7  PDF as it appears?

8      A.  Accurate description of that PDF.

9            Again, I would like to do my own

10  assessment more systematically to determine whether

11  these elections are racially contested with at least

12  one Latino candidate.

13     Q.  Going back to your report, Table 1, still on

14  page 14, General Elections, 2024, General Election

15  Texas Supreme Court, Place 6, you'll agree that

16  election is on your list of racially contested

17  exogenous general elections?

18     A.  Yes.

19     Q.  Going to the other document, page 36, we

20  have a printout from BallotPedia, Texas Supreme Court

21  Elections 2024, Place 6, held November 5th, 2024,

22  with three candidates:  Jane Bland, Bonnie Lee

23  Goldstein, and David Roberson.

24            Did I read that correctly?

25     A.  Yes.

Dr. Jacob Grumbach - 4/25/2025

213

1    Q.  Would you agree that none of the candidates

2    have a Spanish surname and that you are unable to

3    identify them physically as Latino?

4    A.  I would not make a determination on physical

5    appearance using these circular profile pictures --

6    or what should we call them?  They do not have

7    Spanish surnames.

8    Q.  And you would agree that there is nothing on

9    this page that indicates necessarily that they are

10   Latino?

11   A.  I would say nothing sticks out to me as

12   signalling Latino heritage on this page.

13           Again, on my own computer, could pull up

14   these photos and zoom them in and maybe make an

15   assessment of a signal of ethnic background, but I

16   would say in this current situation, no.

17   Q.  Why don't we try -- would you like me to

18   zoom in a little more?

19   A.  Sure.  I think it's going to be hard on this

20   split-screen zoom.  And also I would say, you know,

21   Latinos can look -- have a variety of physical

22   phenotypes as well.

23   Q.  Certainly.

24           But you would agree there's nothing

25   about these three in particular that makes you

1    identify them as Latino?

2        A.   No, nothing is jumping out at me as one of

3    these is Latino.

4        Q.   Continuing on the same document, it's a

5    Google search:  Jane Bland Texas Supreme Court Latino

6    or Hispanic.

7                Do you see that Google has indicated the

8    terms "Latino" or "Hispanic" are missing?  You will

9    agree that's what the PDF shows?

10       A.   I agree that's what this PDF says, yes.

11       Q.   Starting page 41 of the same document,

12   Bonnie Lee Goldstein Texas Supreme Court Latino or

13   Hispanic Google search.  Google has indicated that

14   terms "Latino" or "Hispanic" are missing for most of

15   these search terms.  Would you agree?

16       A.   Yes.

17       Q.   Starting at page 44, Google search, David

18   Roberson Texas Supreme Court Latino or Hispanic.  PDF

19   indicates that Google is missing the terms "Latino"

20   and "Hispanic."  Would you agree?

21       A.   I would consider that similar to the other

22   Google results PDFs you've shown me.

23       Q.   I'm going attach the document of judicial

24   elections with the election results and the Google

25   searches as Defendants' Exhibit 9.

1          (Exhibit 9 marked.)

2      **Q.  Dr. Grumbach, would you agree that the slide**

3  **show of elections and Google searches indicated the**

4  **following elections:  2024 General Election Criminal**

5  **Appeals, Place 7; General Election 2024 Court of**

6  **Criminal Appeals, Place 8; General Election 2024**

7  **Court of Criminal Appeals, Presiding Judge; General**

8  **Election 2024 Texas Supreme Court, Place 2; General**

9  **Election 2024 Texas Supreme Court, Place 4; and**

10  **General Election 2024 Supreme Court, Place 6?**

11      A.  What was the question about those?

12      **Q.  Would you agree that those six elections are**

13  **the elections that you just reviewed on this document**

14  **which defendants have marked as Exhibit 9?**

15      A.  Those are the elections that in Exhibit 9

16  you showed me BallotPedia results and corresponding

17  Google searches that you've done.

18      **Q.  Would you agree that, having reviewed**

19  **Table 1, it is likely that there are four primary**

20  **elections that have been omitted and six general**

21  **elections that were included that perhaps should have**

22  **been omitted?**

23      A.  I think it's plausible that, given my sample

24  frame of racially contested statewide elections, I

25  would want to add in additional primary elections and

1   potentially remove at least one criminal court and

2   supreme court 2024 general election, if I'm able to

3   confirm that these candidates are -- or these

4   elections are not racially contested with a Latino

5   candidate.

6                And that is something I appreciate and

7   am happy to do in pursuit of answering this question.

8        Q.  I will represent to you that in Table 1 you

9   list 24 racially contested exogenous general

10  elections and that you just reviewed 6 of the 24,

11  which suggest that it was not a racially exogenous

12  election.  That would be -- would you agree that

13  would be a 25 percent error rate?

14       A.  Hypothetically, if those six elections are

15  not racially contested, of 24 general elections,

16  that's 25 percent -- that's a smaller percent of the

17  total body of elections, but of 24 general elections,

18  6 is 25 percent.

19       Q.  And if the whole Table consists of 42

20  elections and there are 24 general elections, that

21  would mean there are 18 primary elections listed,

22  correct?

23       A.  I believe that math is correct.

24       Q.  Would you agree with me that what I've shown

25  you suggests that, instead of 18, there should be 24

1      A.  I wouldn't say I would want to -- you know,

2   because if this hypothetical is the case, that there

3   was erroneous inclusion of some election and

4   erroneous exclusion, then an error rate is not a very

5   clear metric because of both omission, erroneous

6   inclusion in this hypothetical.

7            So I think it would be most effective,

8   as a social scientist would say, or political

9   scientist, they would write -- you know, in this

10  hypothetical they would write, "Six elections were

11  erroneously included in this sample.  Four elections

12  were erroneously excluded in the sample.  If this

13  hypothetical is true, out of a total of, you know,

14  sample of the 42 elections."

15      **Q.  How do you explain the potential that out of**

16  **a sample of 42 you made 10 errors?  How does that**

17  **happen?**

18      A.  Yeah, I -- I got the data and I did an

19  attempt to validate that these were racially

20  contested elections, and if this is the case, then I

21  missed some as racially contested and/or included

22  erroneously ones that were not racially contested.

23      **Q.  Given that, why should the three-judge panel**

24  **rely on any of your data or conclusions?**

25      A.  I think these -- if these ones that were

1  included turn out to not be racially contested, they

2  still provide important information about Latinos and

3  non-Latinos vote choice.

4          So, as I said, racially contested

5  elections are -- tend to be more probative.  But that

6  doesn't mean nonracially contested elections are not

7  probative at all.  So I think -- you know, if this

8  turns out to be the case, then with that caveat, I

9  think the information is very valuable to the Court,

10  in my opinion, on Latino and non-Latino vote choice.

11          And beyond that, I would say if we

12  believe that racially contested elections are more

13  likely to show evidence of racially polarized voting,

14  then this would essentially understate the extent of

15  racially polarized voting by including greater

16  numbers of nonracially contested elections than

17  should be included in this hypothetical.

18      Q.  You previously testified that you were

19  provided the data that these were the appropriate

20  elections by MALDEF.  Is that correct?

21      A.  That's correct.

22      Q.  This Table 1 on page 14, this analysis goes

23  to other tables in your report, correct?

24      A.  These elections are analyzed in other parts

25  of the report, yes.

1    **Q.  In fact, you use election data from these**
2    **elections to project how plaintiffs' demonstrative**
3    **districts would perform, correct?**
4       A.  That's correct.  That's in the
5    district-based analyses that includes these exogenous
6    elections in calculating the rates of Latino support
7    for Latino candidates of choice in demonstrative
8    districts.
9       **Q.  Would you agree that you included -- you**
10   **used that data from Table 1 in Table 2?**
11      A.  Can you show me Table 2?
12      **Q.  Yes.**
13      A.  Yes, the data from elections listed in
14   Table 1 is used for the estimates -- the EI estimates
15   in Table 2.
16      **Q.  Would you agree that you used the**
17   **information in Table 1 for estimates in Table 3**
18   **Demonstrative CD 27?**
19      A.  Yes.  Those elections are used in all of
20   these analyses of exogenous elections by demo
21   districts in this section of results.
22      **Q.  Would you agree that you used the**
23   **information from Table 4 [sic] in your analysis for**
24   **Table 4 Demonstrative CD38?**
25      A.  I used the elections listed in Table 1,

Dr. Jacob Grumbach - 4/25/2025

221

1    those corresponding data, for the results in Table 4.

2        Q.  Would you agree you used the data from

3    Table 1 in Table 5 Demonstrative HD 44?

4        A.  Data from elections in Table 1 is used in

5    the EI analyses that produced the results in Table 5.

6        Q.  Would you agree that you used the data from

7    Table 1 in Table 6, which is titled Demonstrative

8    HD 129?

9        A.  Similarly, I used data from the elections

10   listed in Table 1 for the EI estimates presented in

11   Table 6.

12       Q.  Would you agree that you used data from

13   elections in Table 1 for your estimates in Table 7,

14   Demonstrative HD 138?

15       A.  I used the data from the elections listed in

16   Table 1 to produce the EI results presented in

17   Table 7.

18       Q.  Would you agree that you used the data from

19   Table 1 for your election estimates in Table 8,

20   Demonstrative SD 9?

21       A.  I used data from the elections listed in

22   Table 1 to produce the EI estimates in Table 8.

23       Q.  Would agree that you used data from Table 1

24   in your data and election estimates for Table 9,

25   Demonstrative SD 25?

Dr. Jacob Grumbach - 4/25/2025

222

1      A.  I used data from elections listed in Table 1

2  to produce the results in Table 9.

3      **Q.  Would you agree that you used data from**

4  **Table 1 for your work in Table 10, Demonstrative**

5  **ED 6?**

6      A.  I used data from the elections listed in

7  Table 1 to produce the EI results listed in Table 10.

8      **Q.  Would you agree that you used the data from**

9  **Table 1 in your estimates for Table 12 -- oh -- yeah,**

10  **Table 12?**

11      A.  Yes, I used data from elections listed in

12  Table 1 to produce the EI results listed in Table 12.

13      **Q.  You would agree with me that that only**

14  **leaves Table 11 and Table 13 as tables where you did**

15  **not use the Table 1 data?**

16      A.  I would need to double-check this, but that

17  sounds plausible.

18      **Q.  Would you like to review and go through it**

19  **again?**

20      A.  Not all of those, but I would be -- just

21  wanted to make sure there's not additional tables at

22  the end or something.  Just your question about

23  whether these were the only tables is my question

24  here.

25              Table 13.  Then, of course, I have the

Dr. Jacob Grumbach - 4/25/2025

224

1    point says, "Non-Latino bloc voting prevents the

2    Latino candidate of choice from winning the election

3    in a majority of endogenous elections."

4              Did I read that correctly?

5       A.   Yes.

6       Q.   And the analysis that goes with that

7    conclusion appears on pages 27 and the top of

8    page 28, is that correct, of your report?

9       A.   It also draws on the specific EI results in

10   the endogenous elections appendix file.

11      Q.   How did you pick these ten elections?

12      A.   These were elections in which at least one

13   Latino candidate ran in the districts being

14   challenged in this case.

15      Q.   For the 2022 and 2024 elections?

16      A.   Yes.  Those election cycles, because those

17   are the elections within the district geographies

18   being challenged in the 2021 redistricting cycle.

19      Q.   Where did you obtain this data from?

20      A.   I also obtained this data from MALDEF.

21      Q.   Did you verify that data when you received

22   it?

23      A.   I similarly spot-checked this data, yes, to

24   validate it.

25      Q.   You spot-checked it similar to your

1  spot-checking on Table 1.  Is that your answer?

2      A.  Similarly, in general, I inspected the

3  plausibility of aggregate statistics, inspected the

4  data files, and looked on my own at -- to get a sense

5  of whether candidates were Latino in these elections.

6      Q.  And it was your determination to your best

7  ability that these were the only 10 elections that

8  applied to this criteria?

9      A.  My attempted sample frame was all elections

10  in these challenged districts for the endogenous

11  seats whose district boundaries are being contested

12  in this case.  That was my goal with this sample

13  frame.

14      Q.  And within those criteria, as you sit here,

15  is it your understanding that this is a complete

16  list?

17      A.  It was my -- that was my intention.

18      Q.  Let me share another document.

19          You would agree, Doctor, that

20  Table 13 is a collection of ten election results

21  across four districts, Congressional District 15,

22  House District 118, House District 37, and Senate

23  District 27.  Is that correct?

24      A.  Agreed, yes.

25      Q.  Page 1 of this document is a printout from

1    BallotPedia for Texas' 15th Congressional District,

2    and this printout depicts the Republican primary

3    election held on March 1st, 2022, correct?

4         A.   Correct.

5         Q.   And you would agree that this primary

6    election includes a Latino candidate, correct?

7         A.   It appears so.

8              THE REPORTER:   Did you say, "It appears

9    so"?

10             THE WITNESS:   Yes, thank you.

11             THE REPORTER:   Thank you.

12             THE WITNESS:   Sorry for talking over.

13        Q.   (BY MR. BERG)  If we go back to your report

14   on endogenous elections, Table 13 on page 27, do you

15   see where -- whether your -- list of elections

16   includes the 2022 Republican primary for the 15th

17   Congressional District?

18        A.   It does not appear in this Table.

19        Q.   Going back to the document, page 2

20   Democratic primary election, another printout from

21   BallotPedia, Texas' 15th Congressional District.

22   This was a primary election held March 1st, 2022.  Do

23   you identify any Latino or Latina candidates on this

24   list?

25        A.   I do.

1      Q.  Going back to your report, page 27, do you

2  see whether your Table 13 includes the 2022

3  Democratic primary election for the 15th

4  Congressional District?

5      A.  It does not include that.

6      Q.  Going to the third page of the document,

7  2022 Democratic primary runoff from BallotPedia,

8  Michelle Vallejo, would you agree that your report

9  does include this election, the 2022 Democratic

10  primary runoff in CD 15?

11      A.  I see that it does include this.

12      Q.  Going back to the document, we are on

13  page 5.  We have a printout from BallotPedia for

14  Texas' 15th Congressional District Republican primary

15  election held March 5th, 2024.

16          Can you identify any Latina candidates

17  on this list?

18      A.  I believe Monica De La Cruz is Latina.

19      Q.  Does your report include, amongst its list

20  of endogenous elections, the 2022 Republican primary

21  for Texas Congressional District 15?

22      A.  It does not.

23      Q.  Going back to the document, we are on

24  page 6, printout from BallotPedia, 2024 Democratic

25  primary election for the 15th Congressional District

1    held on March 5th, 2024.

2              Can you identify any Latina candidates

3    in this election?

4        A.  Yes, I can.

5        Q.  You would agree with me, however, that the

6    2024 primary election for the Democrats in CD 15 is

7    not listed on your report, correct?

8        A.  That's correct.

9        Q.  Going back to the document, we are on page 8.

10   This is a printout from BallotPedia, Texas House of

11   Representatives District 37 Democratic primary

12   election held March 1st, 2022.

13             Can you identify any Latino candidates

14   in this election?

15       A.  Yes.

16       Q.  You would agree with me that the 2022

17   primary election for Democrats in Texas House

18   District 37 is not listed on your list of endogenous

19   elections, correct?

20       A.  Correct.

21       Q.  Going back to the other document, we have a

22   printout on page 9 from BallotPedia, Texas House of

23   Representatives District 37 held May 24th, 2022.

24             Can you identify any Latino candidates

25   in this election?

1          A.  Yes, I can.

2          Q.  Does the Democratic primary in 2022 for

3    Texas House District 37 appear in your report?

4          A.  No, it does not.

5          Q.  Going back to the other document, we are now

6    on page 12.  We have a printout of BallotPedia from

7    the Democratic primary election in the Texas House of

8    Representatives District 37 held on March 5th, 2024.

9                    Can you identify any Latino candidates

10   in this election?

11         A.  Yes, I can.

12         Q.  Does the 2022 Democratic primary election

13   from House District 37 appear on your report?

14         A.  No, it does not.

15         Q.  Going back to the other document, this is a

16   printout from BallotPedia, Texas House of

17   Representatives District 37 Democratic primary runoff

18   election.

19                    Can you identify a Latino candidate in

20   this race?

21         A.  Yes, I can.

22         Q.  Does the 2022 Democratic primary runoff for

23   House District 37 appear in your report?

24         A.  It does not.

25         Q.  Going back to the other document, we are on

Dr. Jacob Grumbach - 4/25/2025

230

```
 1   page 15, we have a printout from BallotPedia, Texas
 2   House of Representatives District 118 Democratic
 3   primary.
 4                   Can you identify a Latina or Latino
 5   candidate?
 6        A.   Yes, I can.
 7        Q.   Is the 2024 Texas House of Representatives
 8   District 118 Democratic primary listed on your
 9   report?
10        A.   No, it is not.
11        Q.   Going back to the other document, we are now
12   on page 18.  We have a printout from BallotPedia,
13   Texas State Senate District 27 Democratic primary
14   election.
15                   Can you identify a Latina or a Latino
16   candidate?
17        A.   Yes, I can.
18        Q.   Back on page 27 of your report.  Amongst
19   your list of endogenous elections, is there included
20   the 2022 Democratic primary election for Texas Senate
21   District 27?
22        A.   No.
23        Q.   Going back to the other document, we are on
24   page 19.  We have a printout from BallotPedia, Texas
25   State Senate District 27 Democratic primary runoff
```

1  held May 24th, 2022.

2            Can you identify a Latina candidate in

3  this election?

4       A.  Yes, I can.

5       Q.  Is the 2022 Democratic primary runoff for

6  Texas Senate District 27 listed on your Table 13

7  endogenous elections?

8       A.  No, it is not.

9       Q.  Going back to the document, we are on

10  page 21.  We have a printout of BallotPedia, Texas

11  State Senate District 27 Republican primary election.

12            Can you identify a Latino candidate in

13  this election?

14       A.  Yes, I can.

15       Q.  Is there listed on your Table 13, Endogenous

16  Elections, the Republican primary election in 2022

17  from Texas State Senate District 27?

18       A.  No, it is not.

19       Q.  Dr. Grumbach, you will agree that Table 13,

20  which lists endogenous report -- elections in your

21  report contains 10 elections, correct?

22       A.  Table 13 contains -- lists 10 elections,

23  that's correct.

24       Q.  I will represent to you that you have

25  identified 12 elections -- 12 endogenous elections

1   which meet your criteria for inclusion on this list

2   but were left off.

3           They're as follows:  2024 Republican

4   primary election for the 15th Congressional District;

5   2024 Democratic primary election for the 15th

6   Congressional District; 2022 Republican primary

7   election for the 15th Congressional District; 2022

8   Democratic primary election for the U.S. Texas

9   district, that's Texas District 15; 2022 Democratic

10  primary election for Texas House of Representatives,

11  House Seat 37; 2022 Democratic primary runoff

12  election for Texas House of Representatives District

13  37; Democratic primary election 2024 for Texas House

14  of Representatives District 37; 2024 Democratic

15  primary runoff election for Texas House of

16  Representatives District 37; 2024 Democratic primary

17  election for Texas House of Representatives District

18  18 -- District 118; 2022 Democratic primary election

19  for Texas State Senate District 27; 2022 Democratic

20  primary runoff election from Texas -- for Texas State

21  Senate District 27; and the Republican primary

22  election for 2022 for Texas State Senate District 27.

23          Doctor, can you confirm that none of

24  those 12 elections are included on your list of

25  endogenous elections in the enacted districts

1  challenged as weakened?

2     A.  I can confirm those 12 elections are not

3  listed in my list of endogenous elections in this

4  Table, that's right.

5     Q.  Previously we reviewed Table 1 and how

6  Table 1's data was used in Tables 2 through 10 and

7  12.

8           We have now identified that your list of

9  10 endogenous elections in Table 13 is missing 12

10  elections, which would qualify, by your own criteria.

11  Why should the three-court panel accept your data and

12  conclusions based on that data in this matter?

13     A.  It's my understanding from reviewing other

14  expert reports that I have the most comprehensive

15  list of elections that I analyze in EI and that I

16  believe this information is very valuable to the

17  Court.

18           I estimate Latino and non-Latino support

19  for Latino candidates of choice across a large number

20  of elections.  In the exogenous appendix file, for

21  example, we can look election by election, which

22  allows one to, you know, look at any specific

23  election in Latino and non-Latino support.  And I

24  believe the -- you know, large-scale nature of these

25  analyses should be of use to the Court.

1      **Q.  Did MALDEF identify the elections that you**

2  **were to analyze?**

3      A.  MALDEF provided data and helped to identify

4  racially contested exogenous elections and endogenous

5  elections with a Latino candidate in them.

6      **Q.  That sort of sounded like a "yes."  Was it a**

7  **"yes"?**

8      A.  They did -- it is my goal to create the most

9  comprehensive data set of racially contested

10  statewide exogenous elections as well as endogenous

11  elections with a Latino candidate in them.

12      **Q.  What guidance did MALDEF provide regarding**

13  **which elections should be reviewed?**

14              MS. HULETT:  Objection.  Calls for

15  intrusion on our attorney -- on our consultation.

16              MR. BERG:  The assumptions that you

17  provide to the witness, to your expert witness, as

18  long as he's a testifying expert, are not protected

19  by attorney-client privilege.

20              MS. HULETT:  Right.  I think he's

21  telling you what information we provided him, what

22  data we provided them, and that -- but our

23  discussions about that data and what he's going to

24  analyze and not analyze are not part of the data we

25  provided.  And he already told you that he requested

1          THE WITNESS:  Okay.

2      Q.  (BY MR. BERG)  Dr. Grumbach, I would like to

3  point you to page 4 of your report under

4  Qualifications.  We discussed this earlier.

5              The first paragraph reads, "This report

6  is a revised version of my March 31st, 2025 report.

7  I revised the report because the plaintiffs revised

8  the geographic boundaries of some of their proposed

9  districts.  In their revision, the revised districts

10  are HD 129 in H2326, SD 25 in S2180, and CD 27 in

11  C2197.  I also removed references to Benchmark

12  districts that plaintiffs no longer challenge,

13  provided this Qualifications section, and fixed

14  typos."

15              Dr. Grumbach, did MALDEF tell you what

16  elections to analyze?

17      A.  Not specifically.  I asked for racially

18  contested exogenous elections.  I was provided data.

19  I attempted to analyze all statewide racially

20  contested elections during that relevant time period.

21      Q.  You revised your March 31st, 2025 report.

22  I'll represent to you it appears to overlap with

23  LULAC plaintiffs filing an amended complaint.

24              How did you know to issue a revised

25  report to your March 31st, 2025 report?

Dr. Jacob Grumbach - 4/25/2025

241

1      A.  Yes.  Plaintiffs' counsel contacted me and

2   said, "Demonstrative district boundaries have changed

3   and there are some changes to weakened claims, so

4   update the report."

5            And I said, "That sounds like the right

6   idea for the questions the Court is interested in."

7   Latino cohesive voting in demonstrative districts,

8   it's important to have the updated district

9   boundaries for that analysis.

10     **Q.  When you asked MALDEF for data, did you ask**

11  **for only racially contested elections or all election**

12  **data?**

13     A.  I asked for racially contested elections.

14     **Q.  How did the endogenous elections, many of**

15  **which are not racially contested elections, come to**

16  **be in your possession?**

17     A.  Apologies.  I, on endogenous elections,

18  asked for any relevant endogenous elections with

19  Latino candidates, as in any endogenous seats

20  being -- whose district boundaries are being

21  contested under those current geographies with Latino

22  candidates running.

23     **Q.  When you asked for racially contested**

24  **elections, did you ask for some racially contested**

25  **elections or all racially contested elections?**

1    A.  No, I consistently asked for and want to

2    analyze all racially contested statewide general or

3    exogenous elections.

4    **Q.  And I believe you testified or we went over**

5    **it at length, page 14, Table 1 of your report.  There**

6    **were four racially contested elections that were left**

7    **off the report.**

8    **Were those four elections provided to**

9    **you by MALDEF?**

10    A.  I would have to check.  I am not sure right

11    now.

12    **Q.  You would have to check because you're not**

13    **sure whether they provided complete data?**

14    A.  I would like to see if those elections are

15    in any data I have or not.  But, as I've said, my

16    goal was to analyze any and all racially contested

17    statewide elections over this time period.

18    **Q.  Since it was your goal to analyze any and**

19    **all elections of those type, I'm assuming that's the**

20    **data you asked for?**

21    A.  Yes.

22    **Q.  Did you analyze data from all the racially**

23    **contested elections that you received from MALDEF?**

24    A.  Yes, that's my understanding.  I will check

25    my own data, but it is my understanding.  I would

1    absolutely not leave out an election.  I want to

2    know -- as a social scientist, I want to know the

3    answers to these questions, and I want more elections

4    into my sample that are contained within that sample

5    frame.  That is absolutely my goal.

6              And, as I've said throughout this

7    deposition, I want the chance to -- if any elections

8    were omitted that are covered in the sample frame, I

9    would like to analyze them and include them.

10         **Q.  Why didn't you analyze them and include them**

11   **in one of your -- any one of your reports in this**

12   **case?**

13         A.  I may have overlooked them.

14         **Q.  Did MALDEF send you data from any races that**

15   **you chose not to analyze?**

16         A.  There were some non-statewide elections that

17   I chose not to analyze in the data, I believe, that

18   were exogenous but not statewide.

19         **Q.  Did you decide not to analyze the elections**

20   **that are omitted from Tables 1 and 13?**

21         A.  If by "omitted" you mean exogenous statewide

22   racially contested elections, I wanted to analyze all

23   of them over the 2014 to 2024 period.  That was my

24   absolute goal.

25         **Q.  And, likewise, the endogenous elections on**

1  **Table 13, it was your desire to analyze all elections**

2  **that fit your criteria?**

3      A.  That's correct.

4      Q.  If MALDEF had sent you data from any of the

5  excluded races that we discussed, would you have

6  analyzed them in your report?

7      A.  Absolutely.  Unless there's some sort of

8  error that I made through overlooking.  There is

9  absolutely no intent on my part to leave out any

10 racially contested statewide exogenous election or

11 endogenous election featuring Latino candidates over

12 the relevant time periods.

13             MR. BERG:  While I'm thinking about it,

14 I'm going to drop into the chat as Exhibit 10 the

15 PDF of the endogenous elections including the 12

16 elections which were omitted from Table 13.

17             (Exhibit 10 marked.)

18             MR. BERG:  Vanessa, let's go off the

19 record, please.

20             THE REPORTER:  Off the record at 7:29.

21             (Recess 7:29 p.m. to 7:39 p.m.)

22             THE REPORTER:  Back on the record at

23 7:39.

24             MR. BERG:  At this time State defendants

25 are going to hold open what remaining time we have so

# Exhibit 2

Excerpt* from "Grumbach errata
Exogenous Elections by District (Corrected)"
April 2025

[*pp. 6–8, redacted]

| | | | |
|---|---|---|---|
| Benchmark HD 118 | p18 Dem Gov | | |
| Benchmark HD 118 | p18 Dem LandComm | | |
| Benchmark HD 118 | p18 Dem USSen | | |
| Benchmark HD 118 | p18 DemRO Gov | | |
| Benchmark HD 118 | p18 Rep RRComm1 | | |
| Benchmark HD 118 | p20 Dem RRComm1 | | |
| Benchmark HD 118 | p20 Dem SupCt8 | | |
| Benchmark HD 118 | p22 DemRO ATG | | |
| Benchmark HD 118 | p22 DemRO Compt | | |
| Benchmark HD 118 | p22 DemRO LandComm | | |
| Benchmark HD 118 | p22 RepRO ATG | | |
| Benchmark HD 37 | g14 LandComm | | |
| Benchmark HD 37 | g14 LtGov VanDePutte | | |
| Benchmark HD 37 | g14 SupCt7 | | |

Benchmark HD 37    g16 SupCt5

Benchmark HD 37    g16 SupCt9

Benchmark HD 37    g18 Gov

Benchmark HD 37    g18 LandComm

Benchmark HD 37    g18 USSen

Benchmark HD 37    g20 RRComm1

Benchmark HD 37    g20 SupCt8

Benchmark HD 37    g22 ATG

Benchmark HD 37    g22 GOV

Benchmark HD 37    g22 SupCt5

Benchmark HD 37    g22 SupCt9

Benchmark HD 37    g24 CrimCtApp7

Benchmark HD 37    g24 CrimCtApp8

Benchmark HD 37    g24 CrimCtAppPresJudge

Benchmark HD 37    g24 Pres

| Benchmark HD 37 | g24 RRComm1 ███ | | |
| Benchmark HD 37 | g24 SupCt2 ███ | | |
| Benchmark HD 37 | g24 SupCt4 ███ | | |
| Benchmark HD 37 | g24 SupCt6 ███ | | |
| Benchmark HD 37 | g24 USS ███ | | |
| Benchmark HD 37 | p14 Dem Gov ███ | | |
| Benchmark HD 37 | p14 Rep Compt T ███ | | |
| Benchmark HD 37 | p14 Rep Gov ███ | | |
| Benchmark HD 37 | p14 Rep LandComm ███ | | |
| Benchmark HD 37 | p14 Rep USSen ███ | | |
| Benchmark HD 37 | p16 Rep Pres ███ | | |
| Benchmark HD 37 | p16 Rep RRComm1 ███ | | |
| Benchmark HD 37 | p16 Rep SupCt9 ███ | | |
| Benchmark HD 37 | p18 Dem Gov ███ | | |
| Benchmark HD 37 | p18 Dem LandComm ███ | | |

# Exhibit 3

Deposition of Dr. Tye Rush
April 24, 2025

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

LEAGUE OF UNITED LATIN        )
AMERICA CITIZENS, ET AL.,     )
        Plaintiffs,     )
                 )
                 ) CASE NO.
VS.                           ) 3:21-CV-00259-DCG-JES-
                 ) JVB
                 )
GREG ABBOTT, ET AL.,          )
        Defendants     )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

REMOTE ORAL DEPOSITION OF EXPERT WITNESS

TYE RUSH, M.D.

APRIL 24, 2025

(REPORTED REMOTELY)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

       REMOTE ORAL DEPOSITION OF EXPERT WITNESS, TYE

RUSH, M.D., produced as a witness at the instance of the

Defendants, and duly sworn, was taken in the

above-styled and numbered cause on April 24, 2025, from

11:04 a.m. to 5:34 p.m., before Ashley Cason, RSR, CSR,

RPR, in and for the State of Texas, and Notary Public

for the State of Texas, reported by machine shorthand,

with the witness located in San Diego, California,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record.

```
 1                    REMOTE APPEARANCES

 2   For the Plaintiffs:

 3         MOLLY DANAHY
           BRAZIL & DUNN, LLP
 4         PO Box 51,
           Helena, Montana 59624
 5         (406) 616-3058
           danahy.molly@gmail.com
 6
     For the Defendants:
 7
           DAVID BRYANT
 8         OFFICE OF THE ATTORNEY GENERAL
           P.O. Box 12548 (MC-009)
 9         Austin, Texas 78711
           (512) 463-2100
10         david.bryant@oag.texas.gov

11
     Also Present:
12
           WADE JOHNSON
13         MARLIN DAVID ROLLINS-BOYD
           GARY BLEDSOE
14         MARK SCOROS
           ZAC RHINES
15

16   Reported by:

17         ASHLEY CASON, RSR, CSR, RPR

18

19

20

21

22

23

24

25
```

INDEX

                                                        PAGE

Appearances

WITNESS: TYE RUSH

Examination by DAVID BRYANT............    5

Signature and Changes.......................    161

Reporter's Certificate......................    163

```
 1                         EXHIBITS

 2   NUMBER    DESCRIPTION                          PAGE

 3   Exhibit 1 .................................... 28
              Dr. Rush CV
 4
     Exhibit 2 .................................... 49
 5            Dr. Rush Report

 6   Exhibit 3 .................................... 52
              Dr. Rush CV2
 7
     Exhibit 4 .................................... 70
 8            C2163 Map Packet

 9   Exhibit 5 .................................... 93
              C2163 CD 37 Map
10
     Exhibit 6 .................................... 97
11            Enacted CD 37 Map

12   Exhibit 7 .................................... 105
              C2193 Map Packet
13
     Exhibit 8 .................................... 116
14            Enacted HD 118 Map

15   Exhibit 9 .................................... 126
              Rep Lujan Reelection News Article
16
     Exhibit 10.................................... 136
17            CD 15 Election Results

18   Exhibit 11.................................... 140
              SD 27 Map
19
     Exhibit 12.................................... 146
20            SD 27 Election Results Map

21   Exhibit 13.................................... 150
              HD 37 Map
22
     Exhibit 14.................................... 152
23            Rep Lopez Bio

24

25
```

1    (All parties present have hereby waived the necessity of

2     the reading of the statements by the court reporter as

3              required by Rule 30(b)(5).)

4                          TYE RUSH,

5      having been first duly sworn, testified as follows:

6                        EXAMINATION

7    BY MR. BRYANT:

8        **Q.  Dr. Rush, my name is David Bryant.  I'm one of**

9    **the attorneys for the defendants in this case.  I'm**

10   **employed by the office of the attorney general of Texas.**

11   **Could you tell me a little bit about your deposition**

12   **experience?**

13       A.  Yeah.  I -- I've been deposed before.

14       **Q.  Well, do you remember how many times or has it**

15   **gotten beyond counting?**

16       A.  Oh, no.  Just a couple of times.

17       **Q.  Okay.  All right.  Is it fair for me to -- to**

18   **proceed on the basis that you understand the rules of**

19   **depositions and that you will get any advice that you**

20   **may need from attorneys representing you or -- and/or**

21   **your -- the plaintiffs you are an expert witness for**

22   **today?**

23       A.  I would appreciate a bit of a rundown in case

24   things have changed or whatever else.

25       **Q.  Okay.  And I don't think they've changed too**

1    much, but I'll be happy to do that.  You are under oath

2    just as if you were in a courtroom testifying, and

3    therefore you have an obligation to be truthful and as

4    complete as the question requires.

5              If you have any questions about what I'm

6    asking, please stop and get them clarified because I

7    don't want to ask one question and you've answered a

8    different one because I didn't express myself clearly or

9    there was some other problem in communication.  So if

10   you don't understand the question, please stop me and --

11   and get me to clarify it.  If you don't, I'm going to

12   assume that you -- that you do understand the question.

13             Feel free at any time to take breaks.  It's

14   not an endurance contest.  And whenever you're -- you

15   may feel that you need to take a break for any reason

16   other than in the middle of a question before you answer

17   it, just call a break and we'll accommodate that.

18             When I ask a question, sometimes you will

19   know what the question is going to be before I finish

20   it, but please let me go ahead and finish the question

21   before you start answering it because otherwise the

22   written record of what is said will be confusing or

23   maybe even inaccurate.  So I'll talk, you talk, and

24   let's not talk over each other.

25             I am also confident that there will be

1  times when you use terms or language that I'm not sure

2  what that exactly means or means to you, and I'll be

3  asking you to clarify those.  And we'll appreciate you

4  doing that to the extent that you possibly can.

5           Any other questions before we move on?

6      A.  No.  Nothing.

7      Q.  Okay.  If questions come up, feel free to ask

8  either your attorney or me, and we'll try to make this

9  as -- as clean and communicative a deposition as

10  possible.

11           You're here today as an expert witness.  In

12  what instances prior to today have you served as an

13  expert witness in litigation?  And I want to include not

14  just times that you may have testified in a court but

15  other instances in which you've been retained as a

16  potential expert witness in litigation.

17      A.  Yeah.  So I list those on the bottom of my CV.

18  I should be able to more comprehensively tell you the --

19  each instance if I am able to look at that.

20      Q.  Okay.  And I will -- I'll ask you some

21  questions about that.

22           To the best of your knowledge, is your CV

23  up to date with respect to all of your expert witness

24  assignments?

25      A.  I believe so, yes.

1    **Q.  Okay.  Is every instance in which you have**
2    **served as an expert witness a case that involved**
3    **redistricting?**
4    A.  I'm not 100 percent sure on that.  But most of
5    them have been.
6    **Q.  Okay.  And in every instance in which you**
7    **served as an expert witness in a redistricting case,**
8    **have your opinions been offered against whatever**
9    **governmental entity it was that had done the**
10   **redistricting?**
11   A.  I -- I'm not sure how to answer that because I
12   was asked to look at things and give an opinion.  And it
13   didn't -- to me didn't strike me as for or against any
14   party.
15   **Q.  Okay.  In terms of parties who asked you to**
16   **serve as an expert or expert witness, is it correct that**
17   **in each instance that was not a governmental entity that**
18   **had done redistricting?**
19   A.  Is -- can I ask a clarifying question?
20   **Q.  Sure.**
21   A.  Is this just in litigation matters or legal
22   matters?
23   **Q.  I'm asking about litigation matters.**
24   A.  Thank you.  Yeah.  So it's always been for --
25   to the best of my knowledge it's been on plaintiff ask.

1    Q.  Okay.  You're -- you've always acted in those

2  litigation matters on behalf of somebody challenging

3  some redistricting plan that some governmental entity

4  has enacted?

5    A.  I believe so.

6    Q.  Okay.  Now, you've been designated as an expert

7  witness by what we refer to as the Brooks plaintiffs in

8  this case.  Is it correct that you haven't been

9  designated as an expert by any other plaintiffs or

10  parties in this case other than the Brooks plaintiffs?

11    A.  I'm not sure exactly who the plaintiffs are

12  and -- and like the -- the list of different parties

13  involved.  So I'm not sure that I can answer that.

14    Q.  Okay.  Do you know if you have been designated

15  as an expert witness by anybody other than the Brooks

16  plaintiffs or is that not clear to you?

17    A.  It's not clear to me unless I had, like, an

18  exhaustive list or something like that.

19    Q.  Okay.  Are you familiar with the term the

20  Brooks plaintiffs?

21    A.  I'm not.

22    Q.  Okay.  Have you ever seen a complaint or a list

23  of claims by the Brooks plaintiffs in this case?

24    A.  I believe I -- I believe I've seen the claims.

25    Q.  Okay.  And do you know what Texas districts the

1    Brooks plaintiffs are complaining about in this

2    litigation?

3        A.  I'm not 100 percent sure on that.

4        Q.  Is it fair to say that you have not, to your

5    knowledge, been retained or designated as an expert by

6    the Mexican American legal defense and education fund in

7    this case?

8        A.  Could you explain what you mean or restate what

9    you mean by retained?

10       Q.  Okay.  Typically in litigation, some parties to

11   litigation select people that they would like to serve

12   as expert witnesses on their behalf.  And one of the

13   things that they file and advise the other side about

14   is, okay, here are going to be our expert witnesses.

15            And so, for example, LULAC is a plaintiff

16   in this case.  They served what's referred to sometimes

17   as a witness designation or expert designation and

18   listed the different people who they expect to call as a

19   witness to support their claims.

20            And so my question is whether or not you

21   know of any party other than the Brooks plaintiffs,

22   specifically MALDEF, Mexican American legal defense and

23   education fund -- do you know if they have designated

24   you as an expert witness?

25       A.  I'm not aware of that information.

1     Q.  Okay.  And if you haven't been retained or

2  designated as an expert witness by the League of United

3  Latin American Citizens or LULAC; is that right?

4     A.  I'm not aware of that.

5     Q.  Okay.  And you haven't been retained or

6  designated as an expert witness by the NAACP, have you?

7     A.  I'm not aware of that.

8     Q.  Okay.  Have you seen a designation that was

9  filed by the Brooks plaintiffs in this case on

10  March 31st, 2025, that names you?

11     A.  I -- I do believe I've seen that email, yes.

12     Q.  Okay.  And I'll tell you that in document

13  number 906 filed on March 31st, 2025, it states, quote,

14  Dr. Rush will testify regarding the report and file

15  materials -- served contemporaneously herewith.

16           So is it correct that what you're going to

17  testify about in this case is the expert report that you

18  wrote and the file materials that were provided along

19  with that expert report?

20     A.  It depends on what I'm asked in between now and

21  the trial.

22     Q.  Do you have any current intention to testify on

23  anything that is not in your expert report or the

24  contemporaneously filed materials?

25     A.  It depends on the questions that I'm asked to

1    opine on.

2        Q.  Do you have any opinions today other than those

3    that are set forth in your expert report pertaining to

4    this case in any way?

5        A.  I'm not aware of anything outside the scope of

6    the report so far.

7        Q.  Okay.  Have you talked with anyone about

8    questions you may be asked at trial in this case that

9    will elicit information or opinions that are not in your

10    expert report in this case?

11        A.  Could you clarify what you mean by --

12        Q.  I'll -- I'll be -- I'll try to.  I understand

13    that you're going to testify at trial about the

14    substance that is in your report.  Do you, today, expect

15    anybody to ask you about anything else at trial that's

16    not in your expert report?

17        A.  I -- I don't have any expectations about that.

18    But like I said, it just depends on what I'm asked to

19    opine on.

20        Q.  Do you have any -- have you had any

21    conversations with anybody about what you may be asked

22    at trial to opine on that is outside the scope of your

23    expert report?

24        A.  I have not.

25        Q.  Your expert report in this case is dated

1    March 31st, 2025.  Do you recall that?

2        A.  That sounds correct.

3        Q.  Okay.  That's the only expert report that you

4    have written or made in connection with this case?

5        A.  Yes.  That's the only one that's been filed.

6        Q.  And does it fully and accurately state all of

7    the expert opinions that you have related to this matter

8    as of today?

9        A.  As of today, I believe so, yes.

10       Q.  Do you have any expectation that you are going

11   to do any additional work or arrive at any additional

12   opinions between today and the time you testify at

13   trial?

14       A.  It depends on -- on what I'm asked in between

15   now and then to do.

16       Q.  Do you have any expectation that anybody's

17   going to ask you to do additional work between now and

18   the time you testify at trial?

19       A.  I -- I'm not sure.  They could.  They could

20   also just choose to keep -- keep things how they are.

21       Q.  Okay.  And when you refer to they, who are you

22   referring to?

23       A.  The lawyers in this matter.

24       Q.  Okay.  And what lawyers have you communicated

25   with in the course of doing your expert work and

1    preparing your expert opinions in this case?

2        A.  I believe Mr. Dunn.

3        Q.  Anyone else?

4        A.  Ms. Wakanin.

5        Q.  Okay.  And have you communicated with any

6    nonlawyers regarding your work in this case or the --

7    your expert report to this point?

8        A.  Yes.

9        Q.  Who would be those people who are not lawyers

10   with whom you've communicated about your work in this

11   case?

12       A.  I have a research assistant who I communicated

13   with.

14       Q.  Okay.  What's your research assistant's name?

15       A.  Ananya Hariharan.

16       Q.  And by whom is she employed?

17       A.  She's a PhD candidate.

18       Q.  At what school or university?

19       A.  At UCLA.

20       Q.  Okay.  Have you communicated with anyone else

21   regarding your work or your expert report in this case

22   who's not a lawyer?

23       A.  Yes.

24       Q.  Who?

25       A.  I talked to Matt Barreto.

1     Q.  And is there anybody else besides your research

2  assistant and Dr. Barreto?

3     A.  No.

4     Q.  On how many occasions have you communicated

5  with Dr. Barreto regarding your work in this case or

6  your expert opinions and report?

7     A.  Just one time.

8     Q.  When was that?

9     A.  Earlier this week.

10     Q.  And what was the substance of that discussion

11  or communication?

12     A.  Just the logistics of the trial.

13     Q.  Did you -- have you ever discussed with

14  Dr. Barreto any of the substance of your work or expert

15  opinions in this case?

16     A.  No.

17     Q.  Did anyone contribute to or coauthor the expert

18  report that you submitted in this case?

19     A.  The expert report are my opinions.  And I

20  signed off on them.

21     Q.  Okay.  And I understand that answer.  My

22  question's a little different.  Did anybody else write

23  part of it?

24     A.  I don't believe so.

25     Q.  Did anyone else besides yourself coauthor or

1   contribute to the expert report that you submitted?

2       A.  Yes.

3       Q.  Who is that?

4       A.  I had a research assistant, Ananya, who I

5   mentioned earlier.

6       Q.  Okay.  Anyone else?

7       A.  Yes.

8       Q.  Who?

9       A.  I believe the lawyers had access to -- to that

10  document, too.

11      Q.  Okay.  And did they contribute to the expert

12  report that you submitted?

13      A.  Yes.

14      Q.  Did they write any of the expert report that

15  you submitted in this case?

16      A.  No.  I believe it was just reading through and

17  edits.

18      Q.  Could you describe generally -- I don't want to

19  get into specifics, but could you describe generally the

20  extent of the editing that the attorneys did to your

21  expert report that you submitted in this case?

22      A.  Not -- not very extensive at all.  I'm not able

23  to recall specific details about it, but they did have

24  access to it.

25      Q.  What lawyers were those who did that editing of

1    your expert report?

2        A.  I'm not sure all who had access to it.  But I

3    believe Mr. Dunn did it.

4        Q.  And so would it be fair to say that -- that

5    Mr. Dunn contributed some language to your expert report

6    in this case?

7        A.  It's possible, yes.

8        Q.  Now, I just want to go over at a high level

9    some of the expert opinions that are set forth in your

10   expert report submitted in this case.  We'll go into

11   them in more depth later in the deposition.  Is it

12   correct that you offer an opinion regarding a proposed

13   congressional district 37 in the -- in Dallas and

14   Tarrant Counties of Texas?

15       A.  I don't have the document in front of me.  But

16   that sounds right.

17       Q.  Okay.  And I believe that you opine in your

18   report that that provides a districting configuration,

19   plan 2163, where Latinos are sufficiently large and

20   geographically compact to constitute a majority in an

21   additional single member district without disturbing

22   other Latino opportunity districts.

23              Is that part of your opinion in this case?

24       A.  I have no reason to doubt that that's read from

25   my report, what you just read.  But I would have to see

1  it to be able to confirm.

2      Q.  Okay.  We will -- we will certainly see it.

3          Now, am I correct in understanding you're

4  not an attorney yourself?

5      A.  Correct.

6      Q.  And so you would not call any of your opinions

7  in this case legal opinions?

8      A.  Right.

9      Q.  In your work in this case, did you review any

10 of the legislative history of redistricting plans that

11 were considered or adopted by the Texas Legislature in

12 2021 or 2023?

13     A.  Yes.

14     Q.  What did you review in that regard?

15     A.  I'm not sure of an exhaustive list.  But I had

16 access to the TLC website and looked through different

17 plans.

18     Q.  Okay.  And so is there any way I can tell from

19 looking at your expert opinion in this case or the file

20 materials submitted therewith what you looked at that

21 was part of the legislative history of redistricting

22 plans considered or adopted by the Texas Legislature in

23 2021 or 2023?

24     A.  I believe I list all of the plans that I was

25 asked to opine on.

1        Q.  Okay.  When I ask you about the legislative

2   history, I'll try to be a little more specific.  Did you

3   look at any of the transcripts of any hearings that the

4   legislature had relating to redistricting in Texas in

5   2021 or 2023?

6        A.  Off of the top of my head, I'm not exactly

7   sure.

8        Q.  Okay.  Did you do any videos of any of the

9   activities of the legislators in Texas in connection

10  with the redistricting plans that were considered or

11  adopted in 2021 or 2023?

12       A.  No, I don't believe so.

13       Q.  Have you read or reviewed any of the

14  depositions in this case?

15       A.  No, I have not.

16       Q.  Is it fair to say that you have no expert

17  opinions related to whether the Texas Legislature

18  discriminated in its 2021 or 2023 redistricting plans

19  against African-Americans?

20       A.  My opinion so far has been summarized in the

21  report.

22       Q.  Okay.  And I didn't see any reference to that

23  subject in your report, so I want to be sure that I --

24  since those file materials are pretty extensive that

25  you -- that you have no opinions in this case that you

1  have discussed in your expert report or file materials

2  relating to whether or not the redistricting plans

3  adopted by the Texas Legislature in 2021 and 2023

4  discriminated in any way against African-Americans; is

5  that correct?

6      A.  I don't believe I opined on that in the report,

7  no.

8      Q.  Okay.  And you don't have any expert opinions

9  on that subject as you sit here today?

10      A.  Not at the moment.

11      Q.  Do you have any expert opinions as to whether

12  or not the Texas Legislature intentionally discriminated

13  in either the 2021 or 2023 redistricting plans against

14  Latinos?

15      A.  I believe I opine on that in the report.

16      Q.  What do you recall you put in your report as

17  your opinion on that subject?

18      A.  I'd have to take a look at it to be able to get

19  that straight on the record and provide the court with

20  accurate info.

21      Q.  Okay.  We will look at it.  You don't have any

22  expert, do you, on whether the Texas Legislature in its

23  2021 or 2023 redistricting plans violated the U.S.

24  constitution?

25      A.  I don't believe I was asked to opine on the

1    constitution.

2        Q.  And you don't have any opinions on that subject

3    that are part of your work in this case?

4        A.  The way the question is asked, I -- I'm not

5    really understanding.

6        Q.  Okay.  My review of your expert report shows

7    that you focused on several districts and you expressed

8    some views on particular districts and changes that were

9    made in those districts from one plan to another, but I

10   didn't see any overall opinions related to whether or

11   not anything the Texas Legislature did in 2021 or 2023

12   violated the U.S. constitution.  I want to be sure that

13   I didn't miss something and that you don't have any

14   expert opinions on that subject.

15       A.  I believe the report contains information

16   and -- and my opinion on the maps and the underlying

17   data that I'm not sure I can answer a legal opinion --

18       Q.  Okay.

19       A.  -- on the question.

20       Q.  And you didn't express any legal opinions in

21   your expert report in this case, right?

22       A.  I don't believe so.

23       Q.  Okay.  And so similarly if you -- we talked

24   about the Voting Rights Act.  You don't express any

25   expert opinions and don't have any regarding whether or

Tye Rush - 4/24/2025

22

1    not anything the Texas Legislature did in '21 or 2023

2    violated the Voting Rights Act; is that right?

3        A.  I believe that the information that I provide

4    can answer to that.  But explicitly, I'm not -- I'm not

5    sure that I offered any legal opinions like that.

6        Q.  I don't think you did, but I want to confirm

7    that with you.  It's not my opinion that matters; it's

8    yours.  So can you confirm that you do not have and did

9    not express in your expert report any expert opinions

10   regarding Texas compliance or violation with the Voting

11   Rights Act?

12       A.  I believe that what I provided and the opinions

13   that I've had speak to that.  But I haven't -- I'm not

14   sure that I've answered a legal -- made a legal

15   conclusion or answered a legal question.

16       Q.  Yeah.  I'm not -- I'm not aware of your expert

17   opinion even mentioning the Voting Rights Act; is that

18   correct?  Is that your recollection as well?

19       A.  I'd have to see the report in front of me.  But

20   that -- that sounds correct.

21       Q.  Okay.  Now, is it correct that all of your work

22   in this case and your expert opinions in your expert

23   report pertain to specific districts rather than the

24   statewide plans enacted by the Texas Legislature for

25   redistricting in 2021 or 2023?

1   A.  I'm not sure of the distinction.

2   Q.  Okay.  Did you -- did you express any expert

3   opinions or arrive at any overall conclusions about the

4   statewide maps adopted by the Texas Legislature in

5   redistricting in 2021 or 2023?

6   A.  I believe the maps are part of the statewide

7   plan.  So I'm not sure that I'm either understanding the

8   question or what the distinction you're making is.

9   Q.  Okay.  We'll go into this more when we get into

10  the specifics of your expert report.

11          Do you have any knowledge or information as

12  to the extent, if any, to which the decisions of the

13  Texas Legislature in 2021 and 2023 redistricting were

14  based on partisan considerations, namely how to benefit

15  one party or another in redistricting?

16  A.  I'm not sure.  I -- I don't believe I was asked

17  to opine on partisanship at all.

18  Q.  And is it fair to say that you didn't do any

19  work to examine whether or not to some extent decisions

20  were made by the Texas Legislature in 2021 or 2023

21  redistricting based on partisan considerations?

22  A.  I don't believe I've seen any information on

23  partisan considerations.

24  Q.  Okay.  So, for example, one of the districts

25  that you discuss in your report is house district 118 in

1  southern Bexar County.  Do you recall that?

2      A.  That sounds right.  That sounds like in my

3  report.

4      Q.  Okay.  And am I correct in understanding that

5  in doing your work on that, you did not consider whether

6  or not any of the changes you discuss may have been

7  motivated by partisan considerations?

8      A.  I don't believe I looked into all of the

9  motivations behind it.

10     Q.  Okay.  So is it correct that you did not

11  consider whether or not the changes described in your

12  expert report may have been based on partisan

13  considerations?

14     A.  I'm not -- I'm not sure -- I don't believe

15  anything in my report speaks to partisanship.

16     Q.  I agree.  It doesn't.  And I just want to be

17  sure that it's not something that you looked at and may

18  have left out of your report.  My understanding -- and

19  I'd like for you to confirm or -- or if it's incorrect,

20  so advise me -- that you didn't consider partisanship at

21  all in your work in this case?

22     A.  I've looked through report packets and things

23  like that on the TLC website.  And so I had access to

24  that type of information, but I don't believe I made any

25  conclusions on partisanship.

1    Q.  Did you consider in your work in any way

2  whether some of the decisions the Texas Legislature made

3  in 2021 or 2023 may have been motivated by a desire to

4  protect incumbents?

5    A.  I believe I was made aware of the redistricting

6  criteria.  And if that was included, then I would have

7  looked at that.

8    Q.  Okay.  Did you come to any conclusions about

9  whether or not the Texas Legislature in fact made

10  decisions motivated in part by a desire to protect

11  incumbents in any of the districts that are discussed in

12  your expert report?

13    A.  In the redistricting criteria, I'm aware of

14  that.  But specifically I'm not exactly sure which

15  criterias were considered and to what weight.

16    Q.  And part of your expert report in this case

17  refers to the work of Dr. Henry Flores.  Do you recall

18  that?

19    A.  I believe so, yes.

20    Q.  Okay.  Have you ever met or otherwise

21  communicated with Dr. Henry Flores?

22    A.  I believe so.

23    Q.  And is it certain that you have not

24  communicated with Dr. Henry Flores regarding your work

25  in this case?

 1      A.  I'm certain that I've not communicated with him

 2  in this case.

 3      **Q.  Okay.  And is it correct, then, that you have**

 4  **never communicated with Dr. Flores about his expert**

 5  **report in this case?**

 6      A.  I've -- I've never communicated with him about

 7  my report.

 8      **Q.  Well, my question is about whether you**

 9  **communicated with him about his report.**

10      A.  I've never communicated with him about this

11  matter.

12      **Q.  Okay.**

13      A.  So I have not about his report.

14      **Q.  Thanks.  Now, in doing your work in this case,**

15  **what exactly did you do with respect to**

16  **Dr. Henry Flores' May 20th, 2022, expert opinion in this**

17  **case?**

18      A.  I was asked to look at his report and review

19  it.

20      **Q.  Okay.  And as part of that review, what steps**

21  **did you take?**

22      A.  I -- so I reviewed his report.  I looked

23  through some of the conclusions and evidence that he had

24  and -- and formed an opinion on that.

25      **Q.  Did you check any of the data that he used to**

1    support his report back in May of 2022?

2        A.  I did.

3        Q.  What did you do?

4        A.  I believe I looked at the TLC data and the

5    things that were available there.

6        Q.  Did you discuss Dr. Flores' report in your work

7    in this case with anyone else?

8        A.  No.

9        Q.  Dr. Rush, have you ever lived in Texas?

10       A.  I have not.

11       Q.  Have you ever spent any time in the

12   geographical areas of Texas that are the subjects of

13   your expert report in this case?

14       A.  Yes.

15       Q.  Which ones?

16       A.  I believe I've spent some time in Dallas, some

17   time in San Antonio, El Paso and Houston.  Yeah.

18       Q.  Okay.  Have you ever, for example, been in what

19   is referred to in your report as house district 118 in

20   the southern extremity part of Bexar County?

21       A.  I don't believe so, no.

22       Q.  Now, I'd like to mark as Exhibit 1 to your

23   deposition your resume or the resume that was submitted

24   to the defendants in this case.  And if my capable

25   colleague Mr. Csoros can bring that up where we can both

```
 1   see it, that would be great.

 2                  (Exhibit Number 1 was marked.)

 3                  MR. CSOROS:  Dr. Rush, can you see in the

 4   chat where I just posted a link to the Adobe Acrobat

 5   document?

 6                  THE WITNESS:  I do.  Is it -- is it okay if

 7   I open this on a second screen or --

 8                  MR. CSOROS:  That should be fine.

 9                  MR. BRYANT:  Fine with me.

10       Q.  (BY MR. BRYANT)  And, Dr. Rush, can you see

11   what's been marked or what I have referred to as

12   Exhibit 1 to your deposition?

13       A.  I have not.  I am being prompted to log in.

14       Q.  Okay.

15       A.  I don't believe I'm able to access it.  It's

16   asking me for a login that I do not have on Adobe

17   Acrobat.

18       Q.  Okay.  Let's go ahead and I'll ask some

19   questions about it.  I bet you know your resume pretty

20   well.

21                  MS. DANAHY:  Let me just pull it up on the

22   screen here --

23                  MR. BRYANT:  Sure.

24                  MS. DANAHY:  -- so he can see what you're

25   looking at.
```

```
 1                    Mr. Csoros, are you able to screen share
 2   that?
 3                    MR. CSOROS:  Yes.  Just give me one second
 4   there.
 5                    MS. DANAHY:  Okay.
 6                    MR. BRYANT:  And, Mark, if you'd like to
 7   take a break, just let us know.
 8        A.  I was just able to access it.
 9        Q.  (BY MR. BRYANT)  Great.
10        A.  I have it opened.
11                    MR. BRYANT:  Can other folks access that
12   document?
13                    MS. DANAHY:  I have it as well.
14                    MR. BRYANT:  You have it as well?  Okay.
15        Q.  (BY MR. BRYANT)  I believe Exhibit 1 actually
16   includes two resumes for you that are either identical
17   or very similar.  Do you see that?
18        A.  I only see the one in the link.
19        Q.  Can you see multiple pages or only the first
20   page?
21        A.  I'm able to scroll through it to page 4.
22        Q.  Okay.  So that's page 4.  Is there page 5 that
23   is marked 1 of 3 at the bottom?
24        A.  No.  I don't have access to anything --
25        Q.  Okay.
```

1       A.   -- except the first four pages.

2       **Q.  All right.  That's fine.  Is Exhibit 1 a copy**

3  **of your resume?**

4       A.   If this is Exhibit 1, yes.

5       **Q.  And is it complete as of today to the best of**

6  **your knowledge?**

7       A.   Can I take a second to look through it?

8       **Q.  Absolutely.**

9            MS. DANAHY:  While he's doing that, I'll

10  just note that the file name says Exhibit 2, so it might

11  be a little confusing.

12           MR. BRYANT:  It's marked Exhibit 2?

13           MS. DANAHY:  The file name is, but I

14  understand this is Exhibit 1.  I just wanted to put that

15  on the record in case there's any confusion.

16           MR. BRYANT:  Thank you.

17       A.   I may need someone else to open this because

18  I -- I don't see any of that other information.  I just

19  see the PDF and can scroll through.

20       **Q.  (BY MR. BRYANT)  Okay.  Do you -- you do**

21  **recognize this as a resume for Tye Rush?**

22       A.   Yes.  I see what -- what I'm looking at is --

23  is my CV, yes.

24       **Q.  And do you know of any corrections that need to**

25  **be made -- made to this document to make it accurate as**

1  of today?

2      A.  I believe so, yes.

3      Q.  What would those be?

4      A.  I believe one of my publications had come out

5  and passed first view, so there should be a citation

6  change there.  I had a publication that received an

7  issue designation, so I should -- that should change

8  with the page number.  I believe this is complete.

9      Q.  Okay.  Thank you.  Now, first page of what I

10 refer to as Exhibit 1, your resume, indicates that you

11 received in 2023 a PhD in political science from UCLA;

12 is that right?

13     A.  That's correct.

14     Q.  And you list people who are on your committee.

15 Could you explain for somebody who is not familiar with

16 that process what that means?

17     A.  Yes.  So it's a group of people who officially

18 advise on your dissertation project, provide feedback,

19 that type of thing.

20     Q.  Okay.  And the chairman of that committee was

21 Dr. Matthew A. Barreto?

22     A.  Yes.

23     Q.  And one of the members of that committee was

24 Dr. Loren Collingwood?

25     A.  Yes.

1    Q.  That right?  And are you aware that both

2    Dr. Barreto and Dr. Collingwood are also serving as

3    expert witnesses for various plaintiffs in this case?

4    A.  I -- I'm aware that Dr. Barreto was because I

5    read through his report, but not Dr. Collingwood.

6    Q.  Okay.  When did you read through Dr. Barreto's

7    report in this case?

8    A.  I reference it in the -- the report that I

9    compiled.  And so I would have read it before then.

10    Q.  Okay.  And what was your purpose in -- in

11    reviewing Dr. Barreto's expert report in this case?

12    A.  I believe I was generally asked to look at the

13    districts I was asked to opine on.

14    Q.  And then the last person who is listed as a

15    member of your PhD committee is Chad Dunn, esquire.  Is

16    that the Mr. Dunn that you've already referred to in

17    your testimony today?

18    A.  Yes.

19    Q.  And is he the primary attorney who selected you

20    to serve as an expert witness in this case?

21    A.  I'm not sure what the selection process was or

22    what's going on on their side.  But I was -- he did ask

23    me.

24    Q.  He asked him to serve as an expert witness in

25    this case?

```
 1       A.  Yes.

 2       Q.  Okay.  Did you -- strike that.

 3           Do you have a relationship with the UCLA

 4  Voting Rights Project as a senior policy fellow?

 5       A.  Yes.

 6       Q.  And have you had that relationship since 2018?

 7       A.  I believe so since it was formed, yes.

 8       Q.  And is your supervisor in that work

 9  Dr. Barreto?

10       A.  It depends.

11       Q.  Is your supervisor in that work at least some

12  of the time Dr. Barreto?

13       A.  So I wouldn't characterize it as supervisor.

14  It's -- it's not the same way that it would play out in

15  your normal workplace in, like, corporate America or a

16  clerk job or anything like that.

17       Q.  So you would think that referring to

18  Dr. Barreto as your supervisor in connection with the

19  UCLA Voting Rights Project would not be accurate?

20       A.  Correct.

21       Q.  Do you know who the founders of the UCLA Voting

22  Rights Project were?

23       A.  I believe so, yes.

24       Q.  Who were they?

25       A.  I believe Dr. Barreto and Mr. Dunn.
```

1    Q.   And is one of the purposes of the UCLA Voting

2    Rights Project to train people to be expert witnesses in

3    litigation like this?

4    A.   Maybe.

5    Q.   You're not sure?

6    A.   I'm -- I'm not sure what the purposes are

7    exactly.  That's outside of the scope of my role.

8    Q.   It's outside of your scope -- the scope of your

9    role in this case or outside the scope of your role with

10   the UCLA Voting Rights Project?

11   A.   With the UCLA Voting Rights Project.

12   Q.   Okay.  What is your role with the UCLA Voting

13   Rights Project?

14   A.   A researcher.

15   Q.   Okay.  And as part of that role, have you done

16   and do you do research related to redistricting

17   litigation?

18   A.   Yes.

19   Q.   How are you compensated, if at all, by the UCLA

20   Voting Rights Project?

21   A.   I do not receive any compensation from the

22   Voting Rights Project.

23   Q.   Are you compensated in any way for your work on

24   behalf of or at the direction of the UCLA Voting Rights

25   Project?

 1      A.  I'm not compensated by the UCLA Voting Rights

 2  Project at all.

 3      **Q.  I understand that answer.  My question is, if**

 4  **not by the UCLA Voting Rights Project, are you**

 5  **compensated by somebody else for your work as a**

 6  **researcher at the UCLA Voting Rights Project?**

 7      A.  I'm not compensated for that role by anybody.

 8      **Q.  Why do you do that work?**

 9      A.  It's research.  And research is in the purview

10  of my -- of my degree, my job.

11      **Q.  Okay.  What's -- what is the current job that**

12  **you have that you're referring to?**

13      A.  I'm a president's postdoctoral fellow at UC San

14  Diego.  So I -- I do research.

15      **Q.  Okay.  Did you work in -- from June 2018 to**

16  **June 2019 as a voting rights research consultant or**

17  **something for these Latino decisions?**

18      A.  Can I take a second to scroll to which line

19  you're looking at?

20      **Q.  Sure.  And actually I'm not asking you**

21  **questions from Exhibit 1.  I'm asking you from --**

22  **questions from another resume.  And I'll be happy to put**

23  **that up for you if you want.  But just based on your**

24  **memory, can you recall that or not?**

25      A.  Could you ask the question again?

Tye Rush - 4/24/2025

36

```
 1         Q.   Okay.  Do you recall working from June 2018 to
 2    June 2019 as a voting rights research consultant for
 3    Latino decisions in Los Angeles?
 4         A.   I believe so, yes.
 5         Q.   Okay.
 6         A.   I also see that on the exhibit in front of me.
 7         Q.   Okay.  And was your supervisor in that work
 8    also Dr. Barreto?
 9         A.   Yes.
10         Q.   Do you recall working from September 2017 to
11    2018 as a research fellow at the UCLA Latino policy and
12    politics initiative?
13         A.   Can you repeat the dates?
14         Q.   Sure.  2017 to 2018.
15         A.   That sounds right, yes.
16         Q.   And was Dr. Barreto also your supervisor in
17    that work?
18         A.   I believe he might have been, yes.
19         Q.   Do you recall working from June 2016 to
20    September 2016 as a predoctoral fellow at UCLA in
21    political science referred to as the race, ethnicity and
22    politics subfield?
23         A.   Can I correct something from the record?
24         Q.   Sure.
25         A.   I believe from the last question that it was --
```

1    that supervisor was actually Sonja, the director of

2    LPPI.

3        Q.  Okay.  So your testimony is that upon

4    recollection it was not Dr. Barreto?

5        A.  I believe so.  So I -- I have worked with

6    Dr. Barreto.  But I -- from my memory, I remember the

7    person asking and directing projects was the director.

8        Q.  Okay.  And we're referring to your work as a

9    research fellow from September 2017 to 2018?

10       A.  I believe so, from LPPI.

11       Q.  Okay.  LPPI, referring to Latino policy and

12   politics initiative?

13       A.  Correct.

14       Q.  Okay.  Now back to your work as a predoctoral

15   fellow in -- from June to September 2016, I asked you

16   whether or not you worked during that period at UCLA

17   political science relating to race, ethnicity and

18   politics subfield.

19       A.  I believe I was the -- given a predoctoral

20   award to cultivate some research from the subfield, yes.

21       Q.  And was your supervisor in that work

22   Dr. Barreto?

23       A.  I believe he advised me, yes.

24       Q.  Have you been a coauthor with Dr. Barreto on

25   various publications?

 1      A.  Yes.

 2      Q.  Have you been a coauthor with Chad Dunn on

 3  various publications?

 4      A.  I'm not sure any of our publications were

 5  published.

 6      Q.  Okay.  Whether they were published or not, have

 7  you coauthored works with Chad Dunn?

 8      A.  I have coauthored work with him, yes.

 9      Q.  Okay.  And have you also coauthored works with

10  Loren Collingwood?

11      A.  Yes.

12      Q.  Are you the author of a work, whether or not

13  it's completed, entitled Jim Crow and a Brooks brothers

14  suit, what motivates state legislatures to act on voter

15  ID bills?

16      A.  I believe so, yes.

17      Q.  Have you completed that work?

18      A.  I have not.

19      Q.  Okay.  Now looking at page 2 of Exhibit 1, do

20  you see a section that is referred to as public policy

21  and legal writing?

22      A.  I believe the document I have in front of me is

23  marked as Exhibit 2, so I'm just -- I want to make sure

24  that that was -- that this is Exhibit 1.

25      Q.  I tell you what.  Why don't we take a break?  I

Tye Rush - 4/24/2025

39

1  **want to be sure that the document that I'm asking you**

2  **questions from is properly marked and is visible to you.**

3  **So if we could -- we've been going about an hour --**

4  **let's take a ten-minute break.**

5                MS. DANAHY:  That sounds good.

6                (Recess taken 12:05 p.m. to 12:19 p.m.)

7                MS. DANAHY:  Can I just make a

8  clarification for the record before we jump in, which is

9  I just want -- because there's some confusion about what

10 documents are what.  The document that was provided to

11 Dr. Rush and myself was a document entitled Exhibit 2, I

12 think CVRush.pdf.  And so that's what I understand to

13 have been marked as Exhibit 1.  Is that the document

14 that will be provided to the court reporter as

15 Exhibit 1?

16                MR. BRYANT:  Okay.

17                MR. CSOROS:  Yes, ma'am.  I've sent a

18 second link in that chat, and that remains Exhibit 1,

19 what we've been calling Exhibit 1 but was marked Exhibit

20 2.  I'm about to put a second one in the chat, and

21 that's going to be our -- our second exhibit for today.

22                MS. DANAHY:  And so the only difference

23 between the link that you just sent and the previous one

24 is that the -- it's the same file, it's just been

25 renamed as Exhibit 1 instead of Exhibit 2; is that

1  right?

2            MR. CSOROS:  That's correct.

3            MS. DANAHY:  Okay.  Great.  I just wanted

4  to make sure we're all on the same page looking at the

5  same document.

6            MR. BRYANT:  I share that goal.  And at the

7  same time I'll tell you that I think we're going to have

8  a second resume for Dr. Rush that is slightly different

9  that will -- we'll be using in minutes to come.

10       **Q.  (BY MR. BRYANT)  Dr. Rush, did you do any work**

11  **in connection with a case in Georgia called Black Voters**

12  **Matter versus Raffensperger?**

13       A.  I believe so, yes.

14       **Q.  Okay.  And what do you recall that you did in**

15  **connection with that case?**

16       A.  I believe there was the UCLA Voting Rights

17  Project authored a report or something of that nature.

18       **Q.  And what was your role in that?**

19       A.  I did some research for that project.

20       **Q.  Okay.  Did you write any of the expert report**

21  **in that case?**

22       A.  I'm not exactly sure if it's an expert report

23  or what exactly the matter was.  But I did for that

24  project coauthor.

25       **Q.  You coauthored whatever was submitted on behalf**

1   of the UCLA Voting Rights Project in that case?

2       A.  I want to get this accurate for the record.

3   And I -- I don't recall from five years ago exactly what

4   was happening, but I -- I did some research for the

5   project.

6       Q.  Okay.  And who did you work with on that

7   project?

8       A.  That would have been whoever volunteered for

9   the project or whoever wanted to participate.  So I

10  don't have an exhaustive list.

11      Q.  Okay.  Have you ever listed on your resume an

12  expert report of Dr. Barreto in that case?

13      A.  It's possible.

14      Q.  So what was -- if so what -- strike that.

15          Have you told me all that you can recall

16  about why you listed an expert report of Dr. Barreto on

17  your resume?

18      A.  I -- I believe that my resume, my CV, lists the

19  research experience that I can recall.  So that would be

20  listed on my resume.

21      Q.  Did you serve as a teaching assistant to

22  Dr. Barreto in 2021 in a course called U.S. Latino

23  politics?

24      A.  I believe so, yes.

25      Q.  Have you actually testified in court in any

1   cases before?

2       A.  Yes.

3       Q.  Which ones?

4       A.  I believe it was the trial in Galveston.  But

5   I'm not sure what the title of that litigation was or

6   that matter.

7       Q.  You recall it being referred to as Petteway?

8       A.  I believe so.

9       Q.  Okay.  Any others?

10      A.  None at trial.

11      Q.  Okay.  When were you retained to provide expert

12  work and services in this case?

13      A.  I'm not sure of the exact date, but fairly

14  recently.

15      Q.  What's your best estimate?

16      A.  Maybe a couple months ago.

17      Q.  Okay.  Your expert report's dated March 31st,

18  2025.  How long before that date were you retained in

19  this case?

20      A.  I -- I don't have the date off the top of my

21  head or have access to that right now.  But my best

22  estimate is a couple months before that, a month or so.

23      Q.  A month or a couple of months, do you -- can

24  you -- which one of those is more accurate?

25      A.  I -- I'm not sure.  That's why I'm splitting

1    the difference.

2        Q.  And who do you recall approaching you to retain

3    you at that time?

4        A.  I believe I -- I talked to Mr. Dunn.

5        Q.  How have you been or are you going to be

6    compensated for your work in this case?

7        A.  Yes.

8        Q.  How?  Could you explain what the basis of the

9    compensation is?

10       A.  I'm not sure I understand the question.

11       Q.  Are you being compensated on an hourly basis or

12   on some project basis or some other way?

13       A.  I believe it's listed in my report.  So if I

14   can look at that, I can recall the rate and all that.

15       Q.  Okay.  You don't recall as you sit here

16   without -- without referring to your report?

17       A.  I believe it's an hourly basis.  But to get

18   things right for record, I would have to see that.

19       Q.  Okay.  Do you recall how many hours

20   approximately you worked on the case up until the time

21   you signed your report?

22       A.  I don't recall the exact number, no.

23       Q.  What's your best estimate?

24       A.  I'm not really comfortable providing an

25   estimate.  But if I can -- I can probably give a window

1  somewhere between --

2      Q.  Give me the best you can.

3      A.  Somewhere above 40 hours.

4      Q.  Are you working on this case in any way for the

5  UCLA Voting Rights Project?

6      A.  No.

7      Q.  Who do you understand is actually compensating

8  you for your work on this project or case?

9      A.  I -- I don't have an understanding of where the

10  lawyers would like to do that.  But I understand that

11  I'm being compensated.

12      Q.  Have you been -- actually received compensation

13  to date or is it to come?

14      A.  No, I have not issued an invoice.

15      Q.  Okay.  You are acting as an expert witness for

16  what I've referred to and generally refer to as the

17  Brooks plaintiffs.  Do you know any of their names?

18      A.  Off the top of my head, no.

19      Q.  Have you ever met or communicated with any of

20  the Brooks plaintiffs?

21      A.  I don't believe so.  But I don't know their

22  names.

23      Q.  When you were retained on this case, what

24  specifically were you asked to do?

25      A.  I was asked to evaluate map plans.

```
 1        Q.  Were you given any specific map plans to
 2   evaluate at that time?
 3        A.  Yes.
 4        Q.  Which ones?
 5        A.  I don't have the list in front of me.  But I
 6   believe I list them in the report.
 7        Q.  Okay.  Are there any map plans that you were
 8   asked to do work on that you ultimately did not list in
 9   your report?
10        A.  I don't believe so.  I think that's the
11   exhaustive list.
12        Q.  Okay.  And were you asked to evaluate map plans
13   with -- and rendered any particular types of opinions
14   related to the map plans?
15        A.  I believe I was asked to opine on maps and
16   districts, yes.
17        Q.  Okay.  And were you asked to opine on any
18   particular aspects or issues with respect to maps and
19   districts?
20        A.  I believe I was asked to evaluate them to look
21   at the underlying data from TLC and that source and to
22   make an opinion based on that or to render an opinion.
23        Q.  Okay.  And my question -- this is not very
24   grammatical -- but an opinion as to what?
25        A.  About the mapping plans.
```

1    Q.  About what -- what issues related to the

2 mapping plans?

3    A.  I believe that the -- the opinions I issued

4 were about the -- the composition of the maps, their

5 shapes, things like that.

6    Q.  And you also -- your expert report discusses

7 Latino opportunity districts.  What does that term mean

8 to you?

9    A.  There's a precise definition.  So it doesn't --

10 I don't have access to the definition off the top of my

11 head, but to the best of my knowledge it's a district

12 where Latinos have the opportunity to elect their

13 candidate of choice.

14    Q.  And in the work that you were asked to do in

15 connection with this case, was it entirely with respect

16 to evaluating map plans as they relate to Latinos as

17 opposed to other racial or ethnic groups?

18    A.  I believe so.  But I would have to refer to my

19 report for that.

20    Q.  Okay.  Did Mr. Dunn or other attorneys for the

21 Brooks plaintiffs provide you with any data in

22 connection with your work in this case other than the

23 names of some map plans?

24    A.  I believe all the data that I had looked at was

25 on the TLC website.

1    Q.  Okay.  Does that mean that -- that counsel

2  didn't provide you with any data that you used in

3  connection with your work in this case?  You got it

4  directly from a TLC website?

5    A.  All the data comes from the TLC website.

6    Q.  Was it provided to you by counsel, though, is

7  my question?

8    A.  I opened the TLC website and was able to

9  download those things.

10    Q.  So the answer is, no, counsel did not provide

11  me with the data that I used in my work in this case?

12    A.  I believe so.  All the data is housed at the

13  TLC website.

14    Q.  What data did you refer to in doing your work

15  in this case other than data from the TLC website?

16    A.  I believe the only data that I used was from

17  the TLC website.

18    Q.  Did you consult any -- strike that.

19        Did you do any research in connection with

20  your work in this case other than reviewing data from

21  the TLC website?

22    A.  The -- the materials that I had -- I think I'm

23  misunderstanding the question because you're referring

24  to data.

25    Q.  Okay.  If you can explain more, I'll try to

1 make a clearer question.

2     A.  Yeah.  The only data that I used came from the

3 TLC website.

4     Q.  Okay.  And were there different types of data

5 that you obtained from the TLC website in connection

6 with your work in this case?

7     A.  I'm not sure I'm understanding the question

8 because of the use of data isn't -- your use of data

9 isn't generally categorized in types like that.

10     Q.  Okay.  In your work in this case, did you

11 consider in any way any election results from 2024?

12     A.  I believe so.

13     Q.  What did you do in that regard?

14     A.  I believe I -- I used data from the TLC

15 website.

16     Q.  And what specifically was the data regarding

17 2024 elections that you used in your work in this case?

18     A.  I summarize it in my report.  So if I can look

19 at that, I can tell you.

20     Q.  Okay.  Let's go ahead and -- and put Dr. Rush's

21 expert report up so that we can all see it.

22             MS. DANAHY:  Sorry.  I was leaning back.  I

23 was just asking if you're introducing that as an

24 exhibit.

25             MR. BRYANT:  Yes, I am.  We'll mark this as

```
 1   exhibit -- the next one, which I believe is 3.
 2                MS. DANAHY:  Thank you.
 3                (Exhibit Number 2 was marked.)
 4                MS. DANAHY:  By my account we only have the
 5   CV and this exhibit right now.
 6        Q.  (BY MR. BRYANT)  Okay.  Dr. Rush, can you see a
 7   copy of this expert report?
 8        A.  I do.  I followed the link, and it appears to
 9   be a copy of my report, yes.
10        Q.  Okay.  And if you can look through Exhibit 3 to
11   the back, do you see the signature page with your
12   signature on it?
13        A.  I do see that on the last page.
14        Q.  Okay.  I had asked you a previous question
15   about your use of 2024 election results in your work in
16   this case.  And I believe you indicated that if you
17   could see your report, you could point that out to me.
18   Could you now do so?
19        A.  Yes.  There is a table directly above that in
20   between point 39 and point 38.  There are a couple of
21   tables.  And I believe in -- in parts of those, it
22   references the 2024 election, so that would have been
23   the -- where the election data was.
24        Q.  Okay.  And you -- in that material toward the
25   end of your report, you also refer to election result
```

 1   data from 2020 and 2022; is that correct?

 2       A.   That looks right, yes.

 3       Q.   Okay.  Other than the information that is

 4   included in your report, did you consider information

 5   from the 2024 election results in any other way in your

 6   work in this case?

 7       A.   Yes.

 8       Q.   Other than as reflected in those tables?

 9       A.   Yes.

10       Q.   How did you consider 2024 results in your work

11   beyond what's reflected in the tables?

12       A.   I believe that I saw something about that in

13   the -- in Dr. Barreto's report that I read through.

14       Q.   Okay.  And do you recall what it -- what it

15   was?

16       A.   I can speak generally.  I think that it was

17   about -- it was a performance analysis or something

18   along that nature.

19       Q.   Okay.  Other than seeing that information in

20   Dr. Barreto's report, did it in any way influence or

21   contribute to any of your expert opinions in this case?

22       A.   Yes.

23       Q.   Could you explain how?

24       A.   I believe in this report whenever I express an

25   opinion about performance, I reference the report it

1  came from or the data that it came from.

2      Q.  Okay.  Now, looking at Exhibit 3, your expert

3  report, paragraph 7?

4            MS. DANAHY:  Again, we're on Exhibit 2 of

5  the expert report, not Exhibit 3.

6            MR. BRYANT:  I'm sorry.  Expert report is

7  Exhibit 2?

8            MS. DANAHY:  Yeah.  We only had the one CV

9  that was introduced.  You said you might introduce a

10  second one, but we never as far as I know introduced

11  that or looked at that document.

12            MR. BRYANT:  Okay.  Mark can we -- do you

13  have that available to pull up?

14            MR. CSOROS:  Which one?  Currently the

15  expert report is pulled up as Exhibit 2.  We can also

16  pull up his alternative CV as Exhibit Number 3.

17            MR. BRYANT:  Okay.  Let's do that so we can

18  end the confusion that I have created, I hope.

19            MR. CSOROS:  What I just put in the chat

20  now is the second version of Dr. Rush's CV, which we're

21  calling Exhibit 3.

22      Q.  (BY MR. BRYANT)  Okay.  Dr. Rush, could you

23  look at what has been marked as or referred to as

24  Exhibit 3 and identify it for us so that we all know

25  what it is?

1          (Exhibit Number 3 was marked.)

2          A.  Unfortunately, it's marked as Exhibit 2.  So I

3     -- I do see an older version of my CV in there.

4          **Q.  (BY MR. BRYANT)  Okay.  Is that a -- is that a**

5     **CV that you authored and -- and posted somewhere**

6     **sometime before the one that is marked as Exhibit 1?**

7          A.  Yes.  It has an expected PhD completion date,

8     so this would have been before.

9          **Q.  Okay.  And that one is now Exhibit 3, and your**

10    **expert report is Exhibit 2.  Is that the way you**

11    **understand it?**

12         A.  I believe so.  But it's still marked in the

13    title of the document as Exhibit 2, the CV is.

14         **Q.  Okay.  I'll try to be as clear as I can about**

15    **it.  I want to ask you questions about your expert**

16    **report at this point.  And I understand that to be**

17    **Exhibit 2, and ask you to look at paragraph 7 on the**

18    **first page of your expert report.  Tell me when -- when**

19    **you see that.**

20         A.  I see it.

21         **Q.  Okay.  And it says, quote, The plaintiffs in**

22    **this suit requested that I evaluate/analyze**

23    **demonstrative plans that were both considered for the**

24    **Texas State house and Texas congressional map and the**

25    **enacted plans for the Texas State house and Texas**

1  congressional map for compliance with traditional

2  redistricting principles, compliance with the standards

3  set forth in Gingles I and whether the demonstrative

4  districts subordinated traditional districting

5  principles to racial considerations, unquote.

6           Have I accurately read paragraph 7?

7      A.  I read along and that was accurate.

8      Q.  And does paragraph 7 accurately and completely

9  state what you were asked to do in your work in this

10 case?

11     A.  At that point, yes.

12     Q.  Is there -- when you say at that point, what

13 point are you referring to?

14     A.  At the point of submitting this that I

15 understand that to be the accurate scope of the work.

16     Q.  Okay.  And the -- the date of submitting this

17 was March 31st, 2025?

18     A.  Correct.

19     Q.  Have you been asked to do any additional work

20 since then that is not described in paragraph 7?

21     A.  I have not.

22     Q.  Okay.  You used the term demonstrative plans.

23 Could you explain for somebody who is not familiar with

24 that term what that means to you?

25     A.  Yes.  That would refer to maps that are drawn

1 but not adopted.

2     Q.  Okay.  And is it your understanding that every

3 demonstrative plan discussed in your expert report was

4 in fact considered by the Texas Senate in 2021 in its

5 redistricting efforts?

6     A.  I'm aware that these -- some of the plans would

7 have been considered.

8     Q.  Okay.  Which ones?

9     A.  I don't believe I have an exhaustive list.  But

10 anything in this report that is not marked as enacted or

11 benchmark would probably refer to those plans.

12     Q.  Do you have any knowledge as to what, if any,

13 demonstrative plans were considered by the Texas

14 Legislature in its redistricting work in 2023?

15     A.  I -- I was able to look on the TLC website.

16 And it looks like they considered a whole slew of plans.

17     Q.  And did those include all of those that are

18 referred to in your expert report?

19     A.  Yes.

20     Q.  So all of -- your testimony is that all of

21 those plans referred to in your expert report were

22 considered by the Texas Legislature in 2023?

23     A.  No.  I -- I misunderstood.  I -- I'm not sure

24 which ones on the TLC website were considered or not,

25 but I'm aware that some were considered.

Tye Rush - 4/24/2025

55

1      Q.  In 2023?

2      A.  I don't have the exact dates.  So, no, I don't

3  know that.

4      Q.  Okay.  And could you explain specifically what

5  you did to evaluate and analyze -- strike that.

6              What was -- what was your methodology for

7  analyzing demonstrative plans for compliance with

8  traditional redistricting principles?

9      A.  Yes.  So I looked at the data from the TLC

10 website for each of those plans and evaluated that.

11     Q.  And my explanation is, what was your process in

12 determining whether or not you believed that a

13 particular plan complied with traditional redistricting

14 principles?

15     A.  I would have combed through the underlying

16 data, things like compactness, things like population

17 demographics, total population, things like that to

18 assess the balance of those principles.

19     Q.  Okay.  Anything else besides those that --

20 factors that you just listed?

21     A.  Yes.

22     Q.  What?

23     A.  I would have -- beyond looking at the

24 underlying data, I would have looked at reports from the

25 TLC website as well.

1    Q.  Report of what?

2    A.  It depends.  I had access to different types of

3    reports in the TLC website, so things like -- things

4    like the shading maps, stuff like that.

5    Q.  And the map shading that you're referring to

6    would show you what types of information?

7    A.  It could -- it's a way to express something in

8    the data for the maps, yes.

9    Q.  Yeah.  And my -- my question is:  What is the

10    specific something that you determined from the shading

11    of the maps that you refer to in your work in this case?

12    A.  I believed I looked at CVAP shading, reports on

13    that.

14    Q.  Okay.  For somebody who's not familiar with

15    that terminology, what do you mean by CVAP shading?

16    A.  Yeah.  So CVAP is citizen voting age

17    population.  It includes everyone who is a citizen above

18    the age of 18, and often this data is expressed as a

19    CVAP total.  Sometimes it's by race.  And using those

20    numbers, you can shade a map to varying degrees that

21    express percentages of CVAP, even for subgroups and so

22    on.  And so I had access to those reports.

23    Q.  Okay.  Is the shading that you're referring to

24    referred to as racial shading or shading that provides

25    information as to particular racial or ethnic groups

1  within districts?

2       A.  I believe so, yes.

3       Q.  There are other types of shading, I believe.

4  Did you consult or -- or review or analyze any other

5  types of shading other than racial or ethnics shading in

6  your work in this case?

7       A.  I believe I looked at several different types

8  of reports in maps.  But I can't recall off the top of

9  my head exactly which of those were shading and an

10  extensive list.  But I believe I refer to those in this

11  report or attach them to the appendix of the report.

12       Q.  Okay.  And what methodology did you use to

13  analyze data to determine compactness of a district?

14       A.  The compactness scores would have been in the

15  TLC reports.

16       Q.  You also stated that you analyzed the various

17  demonstrative plans for, quote, compliance with the

18  standards set forth in Gingles I.  Could you explain the

19  methodology that you used for that purpose in your work

20  in this case?

21       A.  Yes.  So I would have been assessing the

22  demographic breakdown of the different mapping plans to

23  assess whether they meet that Gingles I threshold or the

24  extent to which they do.

25       Q.  And the Gingles I threshold that you're

1   referring to is what?

2       A.  It's colloquially referred to as 50 percent

3   plus 1.

4       Q.  Okay.  For somebody who is not familiar with

5   that, could you explain what that means in -- as applied

6   to your work?

7       A.  As applied to my work, it would be the

8   demographic composition of a district, looking at that

9   and the Gingles I plank or -- or criteria refers to the

10  minority groups' demographics in a district.  And so

11  that would refer to in this case in this report to

12  Latino population.

13      Q.  Okay.  Your expert report in paragraph 7 also

14  indicates that you were asked to analyze, quote, whether

15  the demonstrative districts subordinated traditional

16  districting principles to racial considerations.

17              How did you -- what was your methodology

18  for doing that?

19      A.  Yeah.  So I -- I looked at the traditional

20  redistricting principles.  I would have looked at

21  different data from the TLC website that I had access to

22  through there to assess things like compactness, things

23  like total population, stuff like that.

24      Q.  Any -- what else would be included in stuff

25  like that?  I'm trying to get as complete a list as I

1  can of -- of how you did that work.

2      A.  So it could -- if you pull up the traditional

3  redistricting criteria or follow the footnote that I

4  provided on that, it lists different criteria, which I

5  can't recall off the top of my head.  But if I had

6  access to that part of my report, I would be able to

7  walk you through some of it.

8      Q.  Okay.  In paragraph 9 of your report, it

9  states, quote, The data referenced, analyzed and

10  considered in this report derived from the United States

11  Census Bureau and the Texas legislative counsel, or TLC.

12  You had not mentioned the census bureau -- did you --

13  before in your testimony today.  What did you do to

14  access information from the United States Census Bureau

15  in connection with your work in this case?

16      A.  I believe on point number 8 I reference the

17  redistricting software that I had access to.  So I would

18  have loaded in the maps.  And that's when I would have

19  seen things like data from the census bureau.

20      Q.  Okay.  Anything else?

21      A.  Off the top of my head, that's all that I can

22  recall.

23      Q.  Okay.  Let's talk for a second about plan

24  C2163.  Are you familiar with that one?

25      A.  I am -- I am not familiar with any specific

1  plan.  But I am happy to follow along to whatever

2  section.

3      Q.  Okay.  Plan C2163 is referred to on the second

4  page of your expert report under A1.  Do you see that?

5      A.  I -- in the document you provided, I do not see

6  A1.  But if you could direct me --

7      Q.  Okay.  Do you -- do you see a heading called

8  Texas congressional plans?

9      A.  I do right under that, yes.

10     Q.  Okay.  And then, right under that is A

11  referring to the Dallas/Fort Worth area.  And I said 1.

12  It's I.

13     A.  Oh.

14     Q.  Plan C2163.

15     A.  I do see that.

16     Q.  Do you have any recollection at all about what

17  plan C2163 is?

18     A.  If I can just take a second to read through to

19  refresh, I can answer that.

20     Q.  Sure.  Take your time.

21     A.  Okay.  I've read it.

22     Q.  Okay.  You now recall plan C2163 that's

23  discussed in your expert report?

24     A.  I do see that, yes.

25     Q.  Okay.  Do you know whether or not that plan,

1  C2163, was ever voted on by the Texas House of

2  Representatives or the Texas Senate?

3       A.  I'm not aware what the votes were or anything

4  like that outside of the actual enacted plan.

5       Q.  Okay.  Now, someone has told you, I believe,

6  that plan C2163 was somehow considered by the Texas

7  Legislature in 2021; is that right?

8       A.  I believe so.  But I can't recall off the top

9  of my head if -- if that specific information was said

10  to me.

11       Q.  Okay.  So you don't know as you sit here today

12  whether or not plan C2163 was ever considered in any way

13  by the Texas Legislature in 2021?

14       A.  Off of the top of my head and on the record,

15  I'm not precisely sure.

16       Q.  Okay.  And would that also be true for 2023?

17       A.  I believe so.

18       Q.  Okay.  Is it fair to say then that you have no

19  knowledge or information as to why the Texas Legislature

20  in 2021 enacted a different plan for congressional

21  districting in Texas?

22       A.  I'm -- I'm trying to follow along with the

23  question and I -- I'm not understanding.

24       Q.  Let me -- let me try again.

25            Okay.  I understand that you don't know

Tye Rush - 4/24/2025

62

1   really whether the Texas Legislature considered plan

2   C2163 in 2021, but you know that the Texas Legislature

3   enacted a different plan; is that right?

4       A.  I only know for sure that the enacted plan was

5   considered because it was enacted.

6       Q.  Okay.  And you don't know why the Texas

7   Legislature enacted a different congressional plan than

8   the one you analyzed in your expert report, which was

9   plan C2163?

10      A.  I was not --

11      Q.  Is that correct?

12      A.  I was not given testimony, hearing --

13  information from hearings or any transcripts or anything

14  like that with a justification.

15      Q.  Okay.  And I want -- don't want to limit the

16  possible sources of your knowledge to hearings and

17  transcripts.  Is it correct that you have no knowledge

18  as to why the Texas Legislature enacted a different plan

19  than C2163 in 2021 for its congressional districts?

20      A.  I -- I have not been provided with information

21  from any source where I am made aware of what exactly

22  the thinking was behind the Texas legislatures adapting

23  that -- adopting that.

24      Q.  Okay.  That's close to an answer for my

25  question.  Is it fair to say that you don't know why the

1    Texas Legislature adopted the congressional plan that it

2    adopted in 2021?

3         A.  I'm having trouble with the characterization.

4    And I just want to get this precise for the record.  But

5    my understanding is that in my analysis, I would be able

6    to see the things that compact this.  And so one that

7    they would have considered in my analysis or can opine

8    on that -- I can issue opinions about that, but I'm

9    not -- I have not received information stating that this

10   is the exact reason why they have chosen to go another

11   direction or chosen a specific map.

12        Q.  Okay.  In paragraph 10 of your expert report,

13   there is a reference to plan C2913.  You see that?

14        A.  I will scroll down to that.  Which --

15        Q.  Paragraph 10.

16        A.  10?

17        Q.  It's above where we were just looking under the

18   heading data.

19        A.  I'm -- just give me a second to look through.

20        Q.  Sure.

21        A.  2193 is what you said?

22        Q.  Yes, sir.

23        A.  I do see that, yes.

24        Q.  Okay.  Do you know anything about that plan?

25   Do you know what that plan was?

```
 1        A.  Yes.
 2        Q.  What do you know about it?
 3        A.  I believe I -- I list what I know in the
 4   report.  I've looked at data from the TLC website
 5   reports on it on all of these maps and so on.  So I've
 6   heard at different times.  I'm made aware about the
 7   plan.
 8        Q.  Okay.  Do you know whether plan C2193 was the
 9   plan that the Texas Legislature enacted for its
10   congressional districts in 2021?
11        A.  I believe I list what the enacted plan is in
12   this report.
13        Q.  Okay.  But as you sit here today, you don't
14   know?
15        A.  I would like to get those precise for the
16   record and provide accurate information.  So if you can
17   give me a second to read through the report, I can
18   express an opinion on that.
19        Q.  I'd be happy to do that.  And if you want to
20   take a break to read the report, that's fine too.
21   Whatever you would prefer.
22        A.  I'm happy to look through it and then provide
23   you with the answer.
24        Q.  Okay.
25        A.  Okay.
```

1      Q.  Okay.  Based on your review of your expert

2  report, were you able to determine what -- whether plan

3  C2193 is the plan that the Texas Legislature enacted for

4  its congressional districts in 2021?

5      A.  I'm not precisely sure about the year.  But if

6  you scroll through the report, I opine on Dr. Flores'

7  report about that plan.

8      Q.  Okay.  And do you have an understanding that's

9  the one that the Texas Legislature adopted for its

10  congressional districts?

11      A.  I am, yes.

12      Q.  Okay.  And so if the enacted plan is C2193, do

13  you have either any general or specific information as

14  to why the Texas Legislature chose to enact plan C2193

15  as opposed to plan C2163?

16      A.  I was not provided any information about the

17  reasoning that they had voted to adopt that.

18      Q.  And based on all your work, you still have no

19  other information on that subject?

20          MS. DANAHY:  Objection.  I believe that

21  mischaracterizes the testimony.

22      A.  I have access to all the information on these

23  mapping plans from the TLC website.  And I was asked to

24  review mapping plans to look at things like compactness,

25  compliance -- compactness, the Gingles I, precondition

1  and so on, criteria from the traditional redistricting

2  principles.  And so I do have access to information and

3  data that can probably -- can speak to the results of

4  the map, but I do not have any first-hand account of why

5  they adopted a certain plan over another.

6       Q.  I believe that's correct.  Do you have any

7  second- or third-hand basis to determine why the Texas

8  Legislature enacted plan C2193 rather than plan C2163?

9           In other words, I know that you didn't talk

10  to the legislatures, but I'm asking whether you have any

11  other information that would tell you why the Texas

12  Legislature chose to enact one plan rather than another?

13       A.  I'm aware of the -- the claims for this -- this

14  matter, this legal matter.  And I'm aware that -- that

15  there's information that speaks to that, that I have not

16  been provided with any first-hand information, no.

17       Q.  Your expert report in paragraph 10 also refers

18  to the plan designated as C2167.  Do you recall or are

19  you familiar with that plan?

20       A.  I see that in the report C2167, yes.

21       Q.  Are you familiar with that plan or would you

22  have to go back and review it to know anything about it?

23       A.  For C2167, I would have to review it to refresh

24  my memory.

25       Q.  Okay.  Do you know anything about how plan 2163

1    came into being or who prepared it?

2        A.   No.  I'm not aware of who prepared it.

3        Q.   Do you have any information as to the purposes

4    of the -- whoever paper it?  In other words, why was it

5    prepared?

6        A.   I'm sure that in the information I looked at on

7    the TLC website, it probably -- there was probably

8    information about that.  But off the top of my head, I

9    do not know exactly who prepared it.

10       Q.   My question was not so much prepared it but

11   what the purposes of preparing it were.  Do you have any

12   information on that?

13       A.   I don't believe -- I believe so.

14       Q.   Okay.  Do you know whether or not one of the

15   purposes in preparing plan C2163 was to maximize the

16   number of potential Latino congressional districts in

17   Texas?

18       A.   I don't have any information on the purpose

19   behind it.

20       Q.   If I ask the same question with respect to plan

21   C2167, is it also true that you don't have any

22   information as to who prepared that plan?

23       A.   I believe so.

24       Q.   And is it also true that with respect to plan

25   C2167, you have no knowledge as to the purposes of

1   whoever prepared that plan?

2       A.  Not off the top of my head, no.

3       Q.  And you don't know whether or not plan C2167

4   was prepared with the motivation to create as many

5   majority Latino congressional districts in Texas as

6   possible?

7       A.  I'm not aware of the purpose behind that being

8   that.

9       Q.  Okay.  In your expert report, you discuss that

10  plan C2163 would include a proposed Texas congressional

11  district 37.  Do you recall that?

12      A.  I believe I opine on that CD 37.

13      Q.  Okay.  And are you aware that up till the

14  redistricting in Texas in 2021, Texas had only 36

15  congressional districts?

16      A.  I'm vaguely aware that Texas received more

17  congressional representation.

18      Q.  Okay.  And so this proposed congressional

19  district 37 would be a new congressional district that

20  did not exist prior to 2020?

21      A.  Potentially.

22      Q.  And do you know what the Texas Legislature in

23  fact created as congressional district 37 in its plan

24  C2193 that it actually enacted and is in effect today?

25      A.  Is there a way that you can rephrase that and

 1  kind of summarize?  There are different bits of it and I

 2  just want to be accurate.

 3       **Q.  Okay.  Sure.  I'll try to -- try to be clear.**

 4  **Do you know where congressional district 37 in Texas is**

 5  **today pursuant to the plan enacted by the Texas**

 6  **Legislature in 2021?**

 7       A.  I believe I show that in this report or I

 8  provide it that the files are on the TLC website in the

 9  appendix.

10       **Q.  Okay.  Do you know?**

11       A.  Not off the top of my head, no.

12       **Q.  Okay.  Do you know whether or not the choice**

13  **made by the Texas Legislature in 2021 as to the**

14  **placement of the additional congressional district 37 in**

15  **fact resulted in an additional Latino congressional**

16  **district in Texas?  And by that I mean congressional**

17  **district that had 50 percent or more Latino voters.**

18       A.  Is this the enacted plan that you're referring

19  to?

20       **Q.  Yes, sir.**

21       A.  Off the top of my head without, you know,

22  looking at the tables and things like that, I'm not able

23  to answer that a yes or a no.

24       **Q.  Do you know what part of the state of Texas**

25  **current congressional district 37 is located in?**

```
 1        A.  I believe in the section of my report, it's in

 2   the DFW area.  But I -- again, I would have to pull up

 3   the map to be able to point that out for you.

 4        Q.  Okay.

 5                MR. BRYANT:  Mark, can we pull up the map

 6   of plan C2163?

 7                MR. CSOROS:  Yes.  I'm going to go ahead

 8   and share my screen for this one.

 9                MS. DANAHY:  And are you introducing this

10   as an exhibit?

11                MR. BRYANT:  Yes.  That would appear to

12   be 4.

13                MS. DANAHY:  I believe that's right.

14                (Exhibit Number 4 was marked.)

15                MR. CSOROS:  Can everybody see what's up on

16   my screen?

17                THE WITNESS:  I can -- I can see it now,

18   yes.

19        Q.  (BY MR. BRYANT)  Okay.  Dr. Rush, in the upper

20   right-hand corner of what we will refer to as Exhibit 4,

21   which is now on the screen, and entitled U.S.

22   congressional districts proposed plan, plan C2163, do

23   you see the proposed configuration of congressional

24   districts in Tarrant and Dallas County, Texas?

25        A.  It is really small.  But in that -- if you can
```

1   zoom in to the part that you're looking at or referring

2   to, I can read a little bit better or see the writing.

3   I do see that on the right side of the document zoomed

4   in that there's a 37.

5        Q.  Okay.

6             MR. BRYANT:  And, Mark, do you think that's

7   the best we can do, which is better than the, you know,

8   first view of it?

9             MR. CSOROS:  No.  We can find the specific

10  bits for the two counties that it covers.

11            MR. BRYANT:  Okay.

12       Q.  (BY MR. BRYANT)  Does the proposed district 37,

13  Dr. Rush, appear in green on Exhibit 4?

14       A.  I do see a green district with a 37 on it, yes.

15       Q.  Okay.  And is that the configuration of the

16  district that's the subject of your discussion in your

17  expert report regarding Dallas/Fort Worth congressional

18  districts?

19       A.  I believe so.  That 2163 heading on this

20  document matches the mapping plan that I'm referring to,

21  and I also see the district number and the counties

22  right there, yes.

23       Q.  Okay.  Do you have any estimate as to how far

24  that proposed congressional district 37 would stretch

25  from west to east?

1    A.  I do not have an estimate for you.

2    **Q.  Okay.  Do you see that there is -- that it**

3 **stretches from the western side of Tarrant County to the**

4 **eastern side of Dallas County?**

5    A.  I do see it, yes.

6    **Q.  And do you see that there's an arm of that**

7 **proposed congressional district 37 that juts north in**

8 **Dallas County almost to the county line?**

9    A.  I believe I can make out the -- the

10 configuration of the district, yes.

11    **Q.  And -- and that configuration includes what I**

12 **just described?**

13    A.  That sounds accurate, yes.

14    **Q.  Okay.  And would you agree that of all of the**

15 **proposed congressional districts on plan 2163 in Tarrant**

16 **or Dallas County that proposed congressional district 37**

17 **is the least compact?**

18    A.  I -- just by looking at it, I'm not sure about

19 that.  I would have to look at the compactness scores to

20 offer that opinion.

21    **Q.  Okay.  You can't -- you can't have an opinion**

22 **on that just based on your visual inspection of**

23 **Exhibit 4?**

24    A.  Well, since the -- since compactness scores are

25 a mathematical answer, without seeing that data and

1   understanding which compactness scores I'm looking at, I

2   can't do those calculations in my head.

3       **Q.  Do you -- would you agree that this is a**

4   **irregularly shaped proposed congressional district?**

5       A.  No.

6       **Q.  Do you have any knowledge as to anything**

7   **that -- as to whether or not people who live on the**

8   **western side of Tarrant County have a community of**

9   **interest with the people in proposed congressional**

10  **district 37 on the southeast side of Dallas County?**

11      A.  They could.  It depends.

12      **Q.  Do you know whether they do or don't?**

13      A.  Off of the top of my head, there are -- there

14  are things like, you know, they live in the same state,

15  have the same governor.  I'm not sure what the other

16  mapping plans -- who the other mapping plans group up,

17  but if they share a different district in the house --

18  in the state house and the senate -- state senate in

19  the -- in any of the other elected offices, then there

20  may be some commonality.  I'm not sure what industries

21  are similar across them, so I just -- I don't have

22  enough information looking at this in front of me to

23  assess that.

24      **Q.  Okay.  In part of your work in this case, did**

25  **you consider whether or not you needed to do any work to**

1    determine if there's a community -- community of

2    interest between people in the varying arms of proposed

3    congressional district 37?

4         A.  I don't believe I was asked to do that.

5         Q.  And you didn't think you needed to do it in

6    order to render an opinion about whether proposed

7    congressional district 37 complies with traditional

8    redistricting principles?

9         A.  I believe that in looking at the traditional

10   redistricting principles, communities of interest could

11   have been something that was considered.  And so I would

12   have come across information looking through the TLC

13   website, reading through those reports that speak to

14   that.  But off the top of my head, I can't recall

15   exactly what those were.

16        Q.  Do you recall whether you reached any

17   conclusions as to whether or not the voters in the

18   different peninsulas of proposed congressional district

19   37 share any community of interest, other than things

20   like they have the same governor and they live in the

21   same state?

22        A.  I don't believe that I come acrossed -- or I

23   don't believe I can point to a single piece of

24   information that speaks to that.  But I'm aware that --

25   that they may share interests beyond what I see.

1      Q.  Can you describe any of the interest that you

2  believe they may share other than those that you

3  mentioned, like it is possible that they have similar

4  representatives in other governmental bodies?

5      A.  It's possible that they share interest over

6  things like environmental concerns.  If there's a

7  highway that -- or an interstate that links them, they

8  may have an interest in state infrastructure.  There's

9  just a different -- a whole slew of things that they can

10  share -- can share the -- the same interest in, but I'm

11  not aware of an exhaustive list or I can't provide that

12  off the top of my head right now, no.

13      Q.  Okay.  Do you know whether there's a

14  substantial river that runs through Tarrant and Dallas

15  Counties?

16      A.  That's possible.  It wouldn't surprise me, but

17  I'm not -- if I'm looking at this set of -- of PDFs, I'm

18  not -- that doesn't refresh my recollection, nor can I

19  point that out.

20      Q.  And you -- you don't have any personal

21  knowledge of that yourself, right?

22      A.  It's possible.  I looked at maps with different

23  base maps.  So things that would have showed satellite

24  imagery and whatnot.  It's just I can't recall it off

25  the top of my head.  And looking at this doesn't really

1  help with that.

2      Q.  Okay.  Is it fair to say that you have no idea

3  why whoever created plan C2163 configured proposed

4  congressional district 37 the way it is configured in

5  plan 261 -- 2163?

6      A.  I don't believe that's fair.  I'm answering

7  that off the top of my head.  And looking at this, I'm

8  not able to find that information to recall or point to.

9      Q.  Okay.  Let's look at your expert report again

10  under that subpart A Dallas/Fort Worth area.  But let's

11  look at subpart Roman numeral IV.  Do you see that?

12      A.  Can you repeat that?  I'm sorry.

13      Q.  Sure.  I think we were looking previously at

14  the heading Texas congressional plans?

15      A.  Got that.

16      Q.  And A -- subpart A under that.  And then there

17  are a series of Roman numerals in small letters.  And so

18  I want to direct you to Roman numeral IV.

19      A.  I can see that on my screen, yes.

20      Q.  Okay.  And it states, quote, I will provide

21  testimony of the layout of C2163 including describing

22  the geography that makes up the plan as well as its

23  other characteristics including the historical and

24  expected electoral performance of districts in the plan.

25  I will describe the plan's compactness in district shape

1    **characteristics.**

2              **Could you tell me what you see as the**

3    **geography of proposed congressional district 37 in plan**

4    **2163?  How would you describe that geography?**

5         A.  Just very basically I would describe that --

6    the geography of it as a district that expands across

7    Dallas and Tarrant County.

8         **Q.  So that's all the testimony you would expect to**

9    **give on that subject?**

10        A.  No.

11        **Q.  What else would you testify to?**

12             MS. DANAHY:  Hold on one second.  Just to

13   get my objection, that mischaracterizes the testimony.

14             Go ahead.

15        A.  I'm able to or can talk -- can speak about the

16   configuration of the map.  Some of those characteristics

17   that you pointed out, the edges of the map, the

18   underlying cities, census designated places, things like

19   that.

20        **Q.  (BY MR. BRYANT)  Okay.  What do you know about**

21   **those?**

22        A.  Off the top of my head and looking at this

23   exhibit, there really isn't access to that information.

24   It is just a very basic map showing the shading and

25   where the districts are.

 1       Q.  Okay.  So without doing -- as you sit here

 2   today, you can't tell me anything more about the

 3   geography of proposed congressional district 37 in plan

 4   2163 beyond what you've already told me?

 5               MS. DANAHY:  Objection; mischaracterizes

 6   the testimony.

 7       A.  In doing -- conducting my analysis and forming

 8   my opinions, I had access to the actual maps, things

 9   like District Viewer, Esri and so on.  And so I am able

10   to speak to that.  I just can't recall all of that

11   information off of the top of my head right now.

12       Q.  (BY MR. BRYANT)  Okay.  Just tell me what you

13   do recall.

14       A.  I believe I recall looking at the maps for

15   landmarks.

16       Q.  Have you completed your answer?

17       A.  So that was one thing that I looked at.

18       Q.  Have you told me all that you -- that you know

19   or that you recall as you sit here?

20       A.  I'm happy to answer whatever questions.  But

21   I'm just -- I'm responding to the prompt.

22       Q.  Okay.  And my question is:  Have you told me

23   all that you know or recall on the subject of the

24   geography of the proposed district --

25       A.  No.

1      Q.   -- as you sit here?

2      A.   I don't believe that's everything, no.

3      Q.   Okay.  What else is there?

4      A.   Things like -- like I mentioned before, census

5   designated places, county subdivisions, things like

6   that.

7      Q.   Do you recall any more specifics as you sit

8   here?

9      A.   It's hard to recall everything off the top of

10   my head.  But I believe that anything that you would

11   have seen on a map I would have had access to and can

12   describe that configuration if I had access to that map.

13      Q.   Okay.  As you look at this map in the Dallas

14   County portion of it, do you see that there's a portion

15   of proposed congressional district 37 that is almost

16   completely surrounded by proposed congressional district

17   30?

18      A.   I see district 30.

19      Q.   And do you see that there's a portion of -- in

20   green that is barely corrected to the rest of proposed

21   congressional district 37?

22      A.   I'm not sure that I would characterize that as

23   barely.  But from this level of zoom on a PDF, it

24   appears a little bit more narrow than other spots.

25      Q.   And do you have any information or knowledge as

1  to why the proposed congressional district 37 includes

2  an area that's almost completely surrounded by

3  congressional --

4      A.  Again, I'm just trying to get things right for

5  the record.  I don't know that I would -- I wouldn't

6  categorize it as almost completely surrounded.  If you

7  look across the map, I'm sure you'll see other

8  configurations that might meet that description.  But I

9  do see what you're pointing at, and I don't have off the

10 top of my head any specific information about what --

11 why that configuration is there.

12     Q.  I think we've been going an additional hour

13 plus.  Would anyone like to take a break?

14              MS. DANAHY:  I think that sounds great.

15     A.  Yes.

16              MR. BRYANT:  Okay.  Let's take a ten-minute

17 break.

18              (Recess taken 1:35 p.m. to 1:48 p.m.)

19     Q.  (BY MR. BRYANT)  Dr. Rush, looking again at the

20 same portion of your expert report that we looked at

21 before the break, one of the things that you said is

22 that you would provide testimony about the historical

23 and expected electoral performance of districts in plan

24 2163.

25              What do you plan to testify about in that

1    regard?

2        A.  It depends on what I'm asked.

3        **Q.  Well, what -- what information do you have on**

4    **the historical and expected electoral performance of,**

5    **for example, proposed congressional district 37 in plan**

6    **216 -- C2163?**

7        A.  I believe that the TLC website has a list -- a

8    separate page for all elections and provides information

9    like that.  So it could be anything about that

10   potentially.

11       **Q.  Okay.  But as you sit here, do you have any**

12   **information on the historical and expected electoral**

13   **performance of proposed congressional district 37 in**

14   **plan C2163?**

15       A.  I believe I do have that information.

16       **Q.  What do you -- please give it to me.**

17       A.  I -- I think that in the appendix or the

18   appendices I provided access or I provided the data I

19   had access to through TLC.  So that could include things

20   like electoral results.  TLC also lists the data set for

21   results by VTD and so on and provides reports on that.

22   So it depends on what I'm asked.  But I imagine if I'm

23   asked to opine on that, then that would be the purview.

24       **Q.  Okay.  Let me see if I understand.  You don't**

25   **have any information on that subject as you sit here,**

1  right?

2            MS. DANAHY:  Objection; mischaracterizes

3  the testimony.

4        A.  I -- I believe I have access to all of that

5  information through the appendix through the TLC website

6  and so on.

7        Q.  (BY MR. BRYANT)  Yeah.  But I'm asking about

8  just what we're doing here today, without you going and

9  doing research from TLC, do you have any knowledge or

10  information on that subject today?

11       A.  Yes.

12       Q.  What is it?

13       A.  I have knowledge through my review of the

14  Flores report and through my review -- that Dr. Barreto

15  report.  So I do have that.

16       Q.  Okay.  Please tell me what you know today of

17  the historical and electoral performance of proposed

18  congressional district 37 in plan C2163.

19       A.  I'm -- I'm happy to scroll down in this report

20  to the tables below, which I believe can provide some

21  information on that.  But without pulling up those

22  reports and looking through them, I can't off the top of

23  my head list everything.

24       Q.  Okay.  I see the tables at the end of your

25  report, and they refer to HD 118, HD37, SD27, CD15.  I

1    **don't see any information in there about proposed**

2    **congressional district 37.  Is there any information in**

3    **your actual report about the historical or projected**

4    **electoral performance of proposed congressional district**

5    **37 in plan C2163?**

6         A.  I believe in the body of it, I think that --

7    I'm not sure.  But if you give me a second to reskim

8    through it, I can answer that question.

9         **Q.  Okay.  Please take the time you need.**

10        A.  Okay.

11        **Q.  Okay.  Please provide that information.**

12        A.  I believe bullet point 6, so it would be I,

13   references for district 37, a line in there about

14   district performance or districts in which candidates

15   can elect -- or sorry -- Latino voters can elect their

16   candidates of choice.

17             And so in the appendix for this I expect

18   for there to be information on district performance

19   and -- or electoral performance.  And I did reference

20   Dr. Barreto's report.  And I believe -- I'm not sure off

21   the top of my head, but I believe that he provides an

22   analysis about that.

23        **Q.  Okay.  What language from your report were you**

24   **just referring to?**

25        A.  I'm happy to -- I -- so I'm looking at bullet

1  point 6 of that same section you were pointing to.

2      **Q.  Okay.  This VI --**

3      A.  The other -- yes.

4      **Q.  Okay.  And it says, quote, Plan C2163 creates a**

5  **Latino CVAP majority district in Dallas/Fort Worth, DFW,**

6  **district 37 while maintaining the existing districts in**

7  **which Latino voters can elect their candidates of**

8  **choice.**

9          **Is that the language that you're referring**

10  **to?**

11      A.  That's the language that I'm referring to about

12  the information I have access to on electoral

13  performance, yes.

14      **Q.  Okay.  And that is all you can tell me today**

15  **about the historical and expected electoral performance**

16  **for proposed congressional district 37 in plan C2163?**

17          MS. DANAHY:  Objection; it mischaracterizes

18  the testimony.

19      A.  That line refers to the other districts or some

20  other districts in that plan.  But I -- in this report I

21  also submitted that appendix.  And so there should be

22  electoral performance or information on elections in

23  that.  And I also --

24      **Q.  (BY MR. BRYANT)  Yeah.  I'm just --**

25      A.  I also had access to Dr. Barreto's report.  And

1  so I -- I have access to that.

2      **Q.  Okay.  And -- and I was just asking you about**

3  **what you know and can talk about today.  Have you told**

4  **me everything in that regard as to the historical and**

5  **expected electoral performance of proposed congressional**

6  **district 37 in plan C2163?**

7      A.  I believe -- I'm struggling with the question

8  because it sounds like you're asking me a hypothetical

9  if -- I'm not sure if you're asking me a hypothetical or

10  you're asking for me to answer something about the

11  electoral performance.

12      **Q.  Here's -- I want to be very clear about it.**

13  **I'm just asking you about what you said in your report.**

14  **You said that you will provide testimony that includes**

15  **the historical and expected electoral performance of**

16  **districts in plan C2163.**

17          **And I'm asking you what, if any,**

18  **information you have today on that subject as to**

19  **proposed congressional district 37.**

20          MS. DANAHY:  Objection; misstates the

21  answer.

22      A.  I'm saying I have access to that information.

23  It was provided in the appendix.  I have access to the

24  TLC website and Dr. Barreto's report.  So if this is a

25  question about what information I have, that's the stuff

 1  that I have access to off the top of my head that I can

 2  recall.

 3      Q.  (BY MR. BRYANT)  To be 100 percent clear, I'm

 4  not asking what you have access to.  I'm asking what you

 5  know, what you can tell me because the purpose of the

 6  deposition is for me to find out what you know and will

 7  testify about.  If -- if you have any information,

 8  please give it to me now.

 9      A.  I would have to look at those sources if you

10  were asking me questions about them.

11      Q.  Okay.  Now, the language that you just

12  referenced in subpart 6 or VI states that plan C2163

13  creates a Latino CVAP majority district, district 37,

14  while maintaining the existing districts in which Latino

15  voters can elect their candidates of choice.

16          What districts are those existing districts

17  in which Latino voters can elect their candidates of

18  choice?

19      A.  So in -- I believe that in that section I'm

20  referring to the electoral data in the appendix or in

21  TLC.  So off the top of my head, without looking

22  through, I can't name every single district.  But if I'm

23  asked to opine on any specifics, then I could.

24      Q.  Which ones can you name today?

25      A.  Off the top of my head, nothing outside of the

 1    report.

 2        Q.   There's nothing in the report that specifies

 3    what you're referring to as the existing districts in

 4    which Latino voters can elect their candidates of

 5    choice.

 6             Can you name any existing districts that

 7    you refer to in subpart 6 or VI?

 8        A.   It's not general practice in social science to

 9    memorize labels for districts and things like that as a

10    form of expertise or, you know, to offer an opinion.

11    Normally we look at the underlying data.  We're able to

12    identify which districts perform for the Latino

13    candidate, which ones might be -- meet that Gingles

14    threshold and so on.  So without having access to that

15    right now off of the top of my head, I -- I can't answer

16    that.

17        Q.   Okay.  In your expert report, do you know where

18    you refer to the report of Dr. Barreto?

19        A.   Not off the top of my head, no.

20        Q.   But you did consult that report and it is part

21    of your -- what you considered in coming up with your

22    expert opinions?

23        A.   It's a little hazy for me whether I read the

24    report before or after.  I might have misstated that.

25    If it's -- if I read it before, I definitely wrote in

1    the report that I had consulted it.

2        Q.  Okay.  In your expert report, you use the term

3    Latino; is that correct?

4        A.  I believe so, yes.

5        Q.  How do you -- how would you define or how do

6    you define Latino or who is a Latino?

7        A.  I don't define that at all.

8        Q.  Okay.  You used the term.  Are you using

9    somebody else's definition?

10       A.  I am.  The census bureau has years' worth of

11   data, years' worth of decisions that goes into that.  So

12   I'm leaning in on them to provide that.

13       Q.  Do you know what -- can you either state or

14   summarize the definition of Latino as used by the census

15   bureau and in turn used by you in your expert report?

16       A.  I believe they actually used the word Hispanic

17   and categorized things based on that.  But to my

18   knowledge, those terms are interchangeable.

19       Q.  Okay.  And so that was another question I was

20   going to ask you, which was:  In your report and in your

21   work, are the terms Hispanic and Latino synonymous or

22   interchangeable?

23       A.  In my work, I understand them to be closely

24   related to the point where in my purview it's been

25   interchangeable.  But I'm sure that there are people

 1   doing qualitative research or other things about

 2   identity where they could answer that better.

 3       **Q.  Well, I just want to know how you're using**

 4   **those terms.  And is -- if I understand it correctly,**

 5   **you use them interchangeably or as synonyms?**

 6       A.  I do as the census bureau's definition --

 7       **Q.  Okay.  Now, back to the census bureau's**

 8   **definition.  Can you lay that out for me or summarize it**

 9   **for me?**

10       A.  I don't have the exacts off the top of my head.

11   But generally it usually refers to people of Spanish

12   descent.

13       **Q.  Okay.  So generally that would mean that if you**

14   **have any Spanish ancestors, you're considered Latino?**

15       A.  It could.

16       **Q.  Okay.  And similarly if you have any ancestors**

17   **from Latin America or the Spanish-speaking countries of**

18   **Central America or South America, is that included as**

19   **Latino?**

20       A.  It's possible.  I don't have the specific

21   article or -- or scholarship to cite that, but it's

22   possible.

23       **Q.  Okay.  And is the term Spanish surname**

24   **synonymous with Latino or Hispanic?**

25       A.  I believe that Spanish surname is the

1  designation for a branch of last names.

2      Q.  And what's its relationship to the term Latino?

3      A.  It could be used to indicate people who may

4  identify as Latino or who have -- who may have ancestry.

5      Q.  And, in fact, in all of your work, you use

6  statistics that in some way refer to Spanish surnames,

7  right?

8      A.  I believe I use what the TLC website does.  So

9  that sounds right, if that's what they use.

10      Q.  Okay.  Would you agree that there are people

11  who have Spanish surnames who are not Latino in the

12  sense of having Spanish or Central or South American

13  ancestry?

14      A.  They could.  It's possible.

15      Q.  And would you agree that there are people who

16  do have Spanish or Central or South American ancestry

17  who don't have Spanish surnames?

18      A.  It's possible.

19      Q.  And therefore would you say that looking at

20  statistics about Spanish surname people is not a perfect

21  proxy for who is Latino or Hispanic?

22      A.  I would not agree to that, no.

23      Q.  Okay.  You think that using the term Spanish

24  surname is a perfect proxy, i.e., it describes everyone

25  who is Latino or Hispanic?

1    A.  No.  That's not what I'm saying.

2    **Q.  Okay.  Please explain.**

3    A.  The research on Spanish surnames and the use of

4    that to identify specific voters' heritage, ethnicity is

5    pretty strong that aggregating that stuff up eliminates

6    the types of errors you refer to and balance it out.  So

7    at the aggregate level, it's -- the research is showing

8    that it's pretty accurate.

9    **Q.  Okay.  What research is that?**

10   A.  Off the top of my head, I can't name any.  But

11   if you go to Google Scholar and search BISG, Bayesian

12   inform surname -- I'm not sure off the top of my head

13   what the G stands for, but I think that it's -- refers

14   to geography.  But if you search into that vein in

15   political science, there are a ton of new studies about

16   that.

17   **Q.  Okay.  And so if you get a statistic for**

18   **Spanish surnames, how accurate is it in identifying**

19   **Latinos as you define them?  50 percent, 90 percent,**

20   **99.99 percent?  What is it?**

21   A.  I can't say that off the top of my head.  I

22   don't have that research in front of me.

23   **Q.  Okay.  Do you have any estimate?**

24   A.  No.

25   **Q.  Is it fair to say that you don't know the**

1   extent of the inaccuracy that is involved in using

2   Spanish surnames as an indicator of who is or who is not

3   Latino?

4        A.   No, that's not fair.

5        Q.   Okay.  Then explain what you do know about how

6   accurate it is or isn't.

7        A.   My read of the literature is that it is fairly

8   accurate in aggregating up to higher levels of

9   geography.  It becomes even more accurate accounting for

10  the overcount that you're explaining and then the

11  undercount based on people with those surnames who are

12  not Hispanic or Latino and people without those who

13  might be.  So the research is fairly clear in political

14  science.  There is a consensus that it is really -- it

15  is accurate.  And even aggregating it up to things like

16  districts, it becomes more accurate.

17       Q.   And if I heard you correctly, it is your belief

18  that it is, quote, fairly accurate, unquote.

19            Can you give me any more specificity as to

20  how accurate or inaccurate you think using Spanish

21  surnames is for determining the number of Latinos in a

22  district such as HD 118 in Bexar County, Texas?

23       A.   Off the top of my head, without doing a

24  literature review, no.  But as I referred to it before,

25  my read on the literature is that it's fairly accurate.

 1      Q.  Okay.  Why don't we take a break for lunch?

 2              (Recess taken 2:10 p.m. to 3:12 p.m.)

 3      Q.  (BY MR. BRYANT)  Okay, Dr. Rush.  Before the

 4  break, we had talked about proposed CD 37 in plan C2163,

 5  and we looked at a somewhat small map of it.

 6              MR. BRYANT:  Mr. Csoros, do you have a more

 7  blown-up map that we can make visible to everybody else?

 8      A.  It should be up on the screen.  Can everybody

 9  see that?

10              MR. BRYANT:  Yes.  And so should we mark

11  this as Exhibit Number 5?  Is that the right number?

12              MS. DANAHY:  Yes.

13              (Exhibit Number 5 was marked.)

14      Q.  (BY MR. BRYANT)  Okay.  Dr. Rush, can you see

15  that Exhibit 5?

16      A.  I can, yes.

17      Q.  Okay.  Is this the -- does this appear to be

18  the proposed or include the proposed congressional

19  district number 37 --

20      A.  Yes.

21      Q.  -- as described in plan C2163?

22      A.  I believe so.  I see the -- the label on it,

23  too.

24      Q.  Okay.  And we had talked about that portion of

25  the proposed CD 37 in eastern Dallas County that is --

1    appears to be largely surrounded by congressional

2    district 30 in that plan.  Do you see that area?

3        A.  Are you referring to the -- the blue shading,

4    so the district 30?  Yeah, I see that.

5        Q.  Yeah.  The blue shading is proposed district

6    CD30, and the proposed CD 37 extends over to the east so

7    that proposed CD30 largely surrounds the easternmost

8    portion of proposed CD 37.  And as I recall before the

9    break, we had some discussion about whether that small

10   connector is small or not.  Had the mapmaker taken that

11   easternmost of proposed CD 37 and included it in CD30,

12   would both the proposed CD30 and the proposed CD 37 be

13   more compact than is shown in Exhibit 5?

14       A.  I'm not precisely sure because it's a

15   hypothetical and I don't have access right now to the

16   underlying data on compactness to say for sure how it

17   changes.

18       Q.  Okay.  Is it still your testimony that you

19   regard -- or is it your testimony that you regard

20   proposed CD 37 in plan C2163 as a compact district?

21       A.  I believe I draw the conclusion in my report

22   that it's -- it adheres to a traditional redistricting

23   cite, which would be that they are also reasonably

24   exact.

25       Q.  Okay.  And so it's your testimony that proposed

1  CD 37 is reasonably compact?

2      A.  In my analysis, it -- I drew the conclusion

3  after looking at the information that it did appear to

4  me to be reasonably compact.

5      Q.  And you stand behind that conclusion today?

6      A.  I would add that it's at least as compact as

7  the enacted plan across the conclusions that I drew.

8      Q.  And how did you determine that?

9      A.  By analyzing, looking at the compactness scores

10  and accounting for that.

11      Q.  And when you compare to the enacted plan, were

12  you comparing it to any particular congressional

13  district in the enacted plan, plan C2193?

14      A.  I -- you know, off the top of my head, I'm not

15  sure what the comparison was.  As you said, the labels

16  have changed.  There have been congressional districts

17  redrawn or new -- new congressional district labels.

18  And those things -- those -- like CD 37, parts of it may

19  be from an existing district, which would have come in

20  the benchmark map.  So it's not entirely a brand-new

21  district.  There are comparison points.  But I believe

22  that in looking at the information, I determined it was

23  reasonably compact.

24      Q.  It being proposed CD 37?  I just want to be

25  sure I know what your -- when you use the word it, it's

1  clear what you're referring to.

2      A.  Yes.  Across the districts that I looked at in

3  this plan, I looked at the compactness scores, analyzed

4  that and believe they adhere to traditional

5  redistricting principles, which includes reasonable

6  compactness --

7      **Q.  Okay.**

8      A.  -- balancing that.

9      **Q.  And so specifically, again, your testimony is**

10 **that proposed CD 37 as shown in Exhibit 5 is reasonably**

11 **compact in your opinion?**

12          MS. DANAHY:  Objection; that

13 mischaracterizes the testimony and is asked and

14 answered.

15     A.  I came to the conclusion in my report after

16 reading this or looking at the data and analyzing the

17 extent to which it adheres to traditional redistricting

18 principles that it is reasonably compact.

19     **Q.  (BY MR. BRYANT)  Thank you.  Okay.  I mentioned**

20 **a little bit earlier today the congressional district 37**

21 **that the Texas Legislature in fact enacted in 2021,**

22 **which was referred to as plan C2193.**

23          MR. BRYANT:  Mr. Csoros, can you show us

24 all a depiction of the congressional district 37 in

25 Texas as enacted in plan C193?

```
 1                    MS. DANAHY:  And, again, are we introducing
 2   this as an exhibit at this point?
 3                    MR. BRYANT:  As what?
 4                    MS. DANAHY:  Is this going to be an
 5   exhibit?
 6                    MR. BRYANT:  Yes.  This is -- let's mark
 7   this or refer to this as Exhibit 6.
 8                    (Exhibit Number 6 was marked.)
 9                    MR. CSOROS:  Dr. Rush, can you see that up
10   on your screen there?
11                    THE WITNESS:  I can.  I see the PDF.
12        Q.  (BY MR. BRYANT)  Okay.  Have you -- have you
13   seen this congressional district 37 as enacted in plan
14   C2193 before?
15        A.  I believe if it's listed in my report then it
16   would have been something that I had looked at.
17        Q.  Well, plan C2193 is listed in your report.  I
18   don't think there's any discussion in your report of
19   plan -- of CD 37 in that plan specifically.  So I'm just
20   asking you whether you have seen this CD 37 in the
21   enacted plan before right now.
22        A.  As I said before, I had access to the TLC
23   website.  I looked at different map plans.  The ones
24   that I was asked to opine on are in there.  So it's
25   possible that I looked at other ones, I listed this, and
```

1  I did look at this one in order to -- in order to have

2  written that in my report then I must have looked at

3  this, yes.

4      Q.  Okay.  As you sit here today, do you recall

5  having looked at CD 37 as it was enacted by the Texas

6  Legislature in plan C2193 before today?

7      A.  From the top of my head if it's not written in

8  a summary in my report, I'm not exactly sure what the

9  analysis yielded or what things look like.  But I

10  believe that I had access to this map and seen it.

11     Q.  Okay.  Are you familiar with Travis County,

12  Texas?

13     A.  Vaguely, yes.

14     Q.  Okay.  And is this -- the CD 37 that the Texas

15  Legislature enacted in 2021, a large majority located in

16  Travis County, Texas?

17     A.  As I look at the PDF, it looks -- it looks like

18  37.  Yeah.  That -- that looks correct.

19     Q.  Okay.  And do you know who was the Hispanic

20  candidate of choice in CD 37 as enacted in the year

21  2022?

22     A.  I can't recall that off the top of my head, no.

23     Q.  Do you know who was the Hispanic candidate of

24  choice in CD 37 as enacted in plan C2193 in 2024?

25     A.  I believe I read through the Barreto report.

 1  And he has an analysis about this, but I'm vague on the

 2  details.  So off the top of my head, no.

 3      **Q.  Do you know who was elected to congress in CD**

 4  **37 as enacted in 2022?**

 5      A.  Without having that report or information in

 6  front of me off the top of my head, I can't recall.

 7      **Q.  Is it fair then to say that you don't know**

 8  **whether the Hispanic candidate of choice was in fact**

 9  **elected in CD 37 as enacted in the year 2022?**

10          MS. DANAHY:  Objection; that

11  mischaracterizes the testimony.

12      A.  I can't recall that off the top of my head.

13  And that's what I'm saying.

14      **Q.  (BY MR. BRYANT)  Okay.  And do you know who was**

15  **elected to congress in CD 37 as enacted in 2024?**

16      A.  I don't have the information in front of me.  I

17  don't have the Barreto report or anything like that, so

18  I can't off the top of my head recall.

19      **Q.  Since you don't know who was elected and you**

20  **don't know who was the Hispanic candidate of choice in**

21  **CD 37 as enacted in 2024, is it fair to say you don't**

22  **know whether the Hispanic candidate of choice was**

23  **actually elected in CD 37 in 2024?**

24      A.  I -- I believe that you're mischaracterizing my

25  testimony and what I'm saying.  I'm -- all I'm saying is

1    that off the top of my head I can't recall that.

2         Q.  Okay.  And whether you call it off the top of

3    my head or -- I'm sure you prepared for your deposition

4    today.  Did you do so?

5         A.  I did prepare.

6         Q.  Okay.  And was proper -- part of your

7    preparation assessing who actually won in the enacted

8    Texas CD 37 for 2022 or 2024?

9         A.  Off the top of my head, it is -- I believe that

10   I had read a report that was germane to this.  I think

11   that it was the Barreto report.  I had read that a

12   couple of days ago.  And when I combed through that

13   report, I would have been looking for things like

14   whether they were elected or not just to learn that

15   knowledge and make sure I -- I was aware of that.  But I

16   did not prepare with specific candidate names.

17        Q.  Okay.  And therefore is it fair to say that you

18   don't know whether or not the Hispanic candidate of

19   choice was elected in 2024 in CD 37 as enacted by the

20   Texas Legislature?

21        A.  I can't recall off the top of my head, no.

22        Q.  Okay.  Also on this exhibit --

23             MR. BRYANT:  This is 6, right?

24             MS. DANAHY:  That sounds right to me.

25             MR. BRYANT:  Okay.

1       Q.  (BY MR. BRYANT)  There's indicated a

2   congressional district 35.  Do you see that in blue?

3       A.  I see it on the exhibit you're showing, yes.

4       Q.  Okay.  Are you familiar at all with Texas

5   congressional district 35 as enacted in plan C2193?

6       A.  Whatever familiarity I have with it would be in

7   my report.  So I'd have to look at that and make sure.

8       Q.  Okay.  Do you know what the Hispanic candidate

9   of choice in Texas CD35 was in either '22 -- 2022 or

10  2024?

11      A.  I can't recall who it was off the top of my

12  head.

13      Q.  And do you know whether or not the Hispanic

14  candidate of choice in CD35 was elected to congress in

15  2022, 2024 or both?

16      A.  Not off the top of my head.  But if you would

17  pull up that report, I'm happy to show you.

18      Q.  And do you know who was elected in Texas CD35

19  in 2022 or 2024?

20      A.  Not off the top of my head, no.

21      Q.  Do you know whether Texas CD35 as enacted by

22  the Texas Legislature was a district with a majority of

23  Latino voters?

24      A.  I believe all my opinions about that are in my

25  report.  So I'd have to go refer back to my report to

 1  answer --

 2      Q.  Okay.

 3      A.  -- straight for the record.

 4      Q.  But you don't know without going back into

 5  your -- your appendices?

 6      A.  I don't have everything in my report memorized

 7  off the top of my head.  So, yes, I'm asking that --

 8  this information is contained in my report.  And if it

 9  is, then I would be able to tell you, but not off the

10  top of my head.

11      Q.  Are you familiar with a congressman named

12  Gregorio Casar?

13      A.  I can't recall names right off the top of my

14  head like that, no.

15      Q.  Do you know whether or not the Texas

16  legislature's decision to adopt plan C2193 resulted in

17  the first Latino ever to be elected to congress in

18  Travis County, Texas?

19      A.  Again, I would refer to my report.  Off the top

20  of my head, I can't recall that.

21      Q.  Is it fair to say that in the proposed CD 37

22  that is discussed in your opinion that would be located

23  in Dallas and Tarrant County, Texas, it would create a

24  Latino opportunity district and that the decisions made

25  by the Texas Legislature with respect to CD 37 and 35,

 1  in fact, accomplished that objective of creating a

 2  Latino opportunity district?

 3      A.  I'm really sorry, but you had multiple

 4  compounds in there.  And I --

 5      Q.  Okay.  I'll be happy to break it down?

 6      A.  Yeah.

 7          MS. DANAHY:  I object to lack of

 8  foundation.

 9          MR. BRYANT:  Okay.

10      Q.  (BY MR. BRYANT)  You stated in your opinion

11  that proposed CD 37 in plan 2163 would, in your

12  judgment, create a Latino opportunity district that met

13  traditional redistricting principles, right?

14      A.  I don't have that in front of me.  But if you

15  can put that exhibit up or post the link again, then I

16  could open that and get to the bottom of that for you.

17      Q.  Okay.  I'm just asking about what your opinion

18  is, if you -- if you know what your opinion is as to

19  whether the proposed CD 37 in plan 2163 was something

20  that you believed would create a Latino opportunity

21  district that met traditional redistricting principles.

22  Was that part of your opinion and conclusion?

23      A.  And I'm happy as the person under oath to get

24  that precisely correct for the court and provide the

25  most complete information.  And I do not have that

1   report in front of me.  I'm happy to answer it, but

2   you're asking me to recall off the top of my head, and

3   I'm unable to do that right now.

4        Q.  Okay.  And do you know whether or not the Texas

5   Legislature in fact accomplished that in CD35 and 37 as

6   enacted, namely creating a Latino opportunity district

7   where none existed in a way that complies with

8   traditional redistricting principles?

9        A.  My conclusions are in my report and the

10  information needed is in that appendix.  So off the top

11  of my head, you're asking me to recall things without

12  giving me access to those, and I just want to get the

13  record right for the court.

14       Q.  Okay.  And you -- you don't know the answer

15  without going back and looking at other things?

16       A.  I don't know how to testify under oath to the

17  veracity of something without being able to verify it.

18       Q.  Okay.  Let go ahead and look at the proposed

19  district 29 in plan 2163 in Harris County.

20              MR. CSOROS:  Can everyone see that?

21              MR. BRYANT:  Yes.  Is that -- can you blow

22  that up as big as you can?

23              MR. CSOROS:  Yes.

24              MR. BRYANT:  And I know there's a limit.

25  Okay.  What we have in front of us is part of which

1  exhibit, Mark?

2              MS. DANAHY:  I don't think we've marked

3  this one.  Is this Exhibit 7?

4              MR. BRYANT:  Okay.  Do you see --

5              MS. DANAHY:  Is this -- that was a

6  question.  Is this Exhibit 7?  Are we marking this as

7  Exhibit 7?

8              MR. BRYANT:  I'm happy to do so if we

9  haven't previously marked it.

10              (Exhibit Number 7 was marked.)

11      **Q.  (BY MR. BRYANT)  This is again just a statewide**

12  **map of plan C2163, which we did see before.**

13              MS. DANAHY:  This is the enacted plan,

14  right?

15              MR. BRYANT:  No.  This is the proposed --

16  that is the subject, I believe, of Dr. Rush's opinion.

17              MS. DANAHY:  Okay.  So I'm looking at the

18  exhibit label on the top of this, and it says C2193 --

19              MR. BRYANT:  Okay.

20              MS. DANAHY:  -- so I think those are

21  different maps.  I think that's why we're -- we're

22  getting -- and getting kind of confused.

23              MR. BRYANT:  Okay.

24              MS. DANAHY:  There's a lot of numbers and a

25  lot of districts, so I think --

 1                    MR. BRYANT:  I agree.

 2                    MS. DANAHY:  We can look --

 3                    MR. BRYANT:  And so -- and so, Mark, I

 4    think what we want to look at is the proposed plan 2163.

 5                    MR. CSOROS:  Okay.  2163.  Does everyone

 6    see that one?

 7                    MR. BRYANT:  Yes.  Okay.  And let's -- and

 8    we have previously marked that one as what exhibit?

 9                    MR. CSOROS:  It's Exhibit 4.  This is

10    previously marked as Exhibit 4.  Can everyone see on the

11    screen?

12                    MR. BRYANT:  Okay.

13        Q.  (BY MR. BRYANT)  So we're looking at Exhibit 4.

14    It includes a statewide map, but we're focusing now on

15    Harris County.  Dr. Rush, can you see that proposed

16    congressional district 29 in Harris County?

17        A.  I do see that.

18        Q.  And you can see that it's in light green?

19        A.  I can see the light green, yes.

20        Q.  Okay.  Is that the proposed CD29 that is

21    discussed in your expert report under B, Houston area?

22        A.  It could be.  If I had access to that report to

23    verify it, it could be.

24                    MS. DANAHY:  Can we just show the report

25    when we're asking him questions about that?  I think the

1  issue is he's looking at the screen and the screen is

2  only showing one thing.  But if we look at what his

3  report says, it will be helpful to have that up as well.

4          MR. BRYANT:  Okay.  Well, we'll go back to

5  that.

6      Q.  (BY MR. BRYANT)  Let me just ask you a question

7  or two about this.  Do you have any -- any opinion as to

8  whether or not proposed CD29 as shown on Exhibit 4 is a

9  reasonably compact district?

10     A.  Probably.

11     Q.  You probably have an opinion or you probably

12  believe it is?

13     A.  I probably have an opinion.

14     Q.  Okay.  What is your opinion?

15     A.  I don't have my report in front of me or

16  anything like that that I had relied on for those

17  opinions in drawing those conclusions to state that

18  accurately for the record.

19     Q.  Okay.  Do you know anything about the geography

20  of proposed CD29 as shown on Exhibit 4 other than it's

21  in Harris County?

22     A.  What I know is in my report.  And the

23  information I relied on is in the appendix and on the

24  TLC website.

25     Q.  And without looking back through your reports,

Tye Rush - 4/24/2025

108

1    you know nothing?

2                   MS. DANAHY:  Objection; that --

3                   MR. BRYANT:  On that subject?

4                   MS. DANAHY:  -- mischaracterizes the

5    testimony and is argumentative.

6        A.  I probably have an opinion on it that I listed

7    in the report.  Off the top of my head, though, you're

8    asking me to recall that for the record without

9    providing me that.  So I'm trying to be helpful and I'm

10   trying to get it right as well.

11       Q.  (BY MR. BRYANT)  Yeah.  I'm not trying to do

12   anything other than find out what, if anything, you know

13   without -- as you sit here and testify today because

14   this is the only day I get to ask you questions at least

15   prior to trial, and I'd like to know what you know

16   today.

17                   What, if anything, do you know about the

18   geography of proposed CD29 as shown on Exhibit 4?

19       A.  I'm happy to answer that.  But this isn't

20   really how social science works.  It's outside of the

21   norm.  So I'd love to get a copy of my report in front

22   of me and the appendices and answer that for you, but

23   I -- I just don't have that.

24       Q.  Okay.  And without it, you can't answer?

25       A.  I can answer.  But I -- I'm under oath right

 1   now.  And this is for the record, and so I just want to

 2   provide the court with the most accurate information.

 3   And so rather than guessing or, you know, haphazardly

 4   say anything I'm asking you that without having that in

 5   front of me, I'm not able to recall that off the top of

 6   my head.

 7       **Q.  Okay.  And I certainly don't want you to guess**

 8   **or speculate.**

 9               MR. BRYANT:  Okay.  Mark, can we look at a

10   copy of Dr. Rush's report?  Okay.

11               MR. CSOROS:  You see it up on the screen?

12               THE WITNESS:  I see the top of the report,

13   yes.

14       **Q.  (BY MR. BRYANT)  Okay.  Let's look at the third**

15   **page of that report, which is under B, Houston area.**

16   **And I want you to take whatever time you need to review**

17   **that portion of your report -- expert report regarding**

18   **the Houston area and then I want to ask you some**

19   **questions about it.**

20       A.  Yeah.  I'd love to see it in context, but I'm

21   only able to read what you have on the screen.

22               MR. CSOROS:  Would you prefer that I resend

23   the link so that you see the entirety of the report?

24               THE WITNESS:  Yes.  That would be really

25   helpful.

 1              MR. BRYANT:  I'm fine with that if -- if

 2    you are, Molly.

 3              MS. DANAHY:  Yeah.  That will be helpful.

 4    I will note I think, though, in Guzman any of the

 5    appendices or underlying data, it just includes the

 6    report, so...

 7              MR. BRYANT:  Okay.  Do you want to take a

 8    five- or ten-minute break to give Dr. Rush plenty of

 9    time to review it?

10              MS. DANAHY:  I think it depends on what

11    you're asking him to review.  Are you asking him to

12    review the report that is being put up and --

13              MR. BRYANT:  I asked him to review the

14    portion of his expert report regarding the Houston area.

15              MS. DANAHY:  Yeah.

16              MR. BRYANT:  Although he's welcome to

17    review anything else in his report as well.

18              MS. DANAHY:  Did we get the link?

19              Dr. Rush, do you have the report?

20              THE WITNESS:  I do.  I have it open.  Sorry

21    about that.

22              MS. DANAHY:  No worries.  Do you want to

23    just let us know when you've had a chance to review the

24    section on Houston?

25              THE WITNESS:  Yeah.  I can just read

 1   through it and let you know.

 2                 MS. DANAHY:  Thank you.

 3      A.  Okay.  I've been able to read through it, that

 4   section.

 5      Q.  (BY MR. BRYANT)  Okay.  Yeah.  In the

 6   subsection B of your expert report regarding Houston

 7   area, you describe a proposed district 29; is that

 8   right?

 9      A.  Yes.  It's under one of the subheadings in

10   there.

11      Q.  Yes.  And do you have any information about the

12   geography of that proposed CD29 in plan 2163?

13      A.  Could you -- could you define or help me

14   understand what you mean by any information?

15      Q.  Yeah.  For example, in subsection 4 you say, I

16   will provide testimony of the layout of C2163 including

17   describing the geography that makes up the plan.

18              And so proposed CD29 is part of that plan

19   C2163.  And I'm asking you what information you have

20   regarding the geography of that proposed district.

21      A.  I -- in my report I have conclusions that I

22   drew about it as well as in the appendix I have

23   information about the geography.

24      Q.  Okay.  I'm trying to get an idea about what

25   you're going to testify to at trial.  And you're saying

1  in your expert report you're going to testify about

2  describing the geography of plan C2163.  And I'd like to

3  know what you plan to testify about in that regard

4  specifically relating to proposed CD29.

5      A.  Can you ask the question or let me know what

6  the question is, then?

7      Q.  Yeah.  What is the information that you have

8  regarding the geography of proposed CD29 in plan C2163

9  that you could describe at trial in your testimony?

10     A.  I could describe anything about the shape of

11  the district.  I could stuff about the city's census

12  designated places, things like that, anything that would

13  be descriptive about the district and what's included in

14  it.

15     Q.  Okay.  Can you tell me any of that information

16  today?

17     A.  I'm having trouble answering that because off

18  the -- you're asking me off the top of my head.  But

19  I -- I can tell you what's on the map.  I have the maps

20  and the appendices from the TLC website and stuff like,

21  so it depends on what I'm asked about the geography.  I

22  can opine on that and talk about that at the trial.

23     Q.  But you can't do so today?

24          MS. DANAHY:  Objection; mischaracterizes

25  his testimony.

1          You can -- you can answer.

2      A.  I -- I don't have the specifics about what I

3  could be asked at trial right now or what those

4  descriptions could be or could look like.

5      **Q.  (BY MR. BRYANT)  Okay.  You also say in the**

6  **same subparagraph that you expect to give testimony**

7  **about the historical and expected electoral performance**

8  **of districts in plan 2163.  What information can you**

9  **give me about the historical and electoral performance**

10  **specifically of proposed CD29 under plan C2163?**

11     A.  Again, it's -- it's difficult to answer the

12  hypothetical questions.  So we're foreshadowed forward.

13  But I can imagine it could be anything about

14  performance, anything from other experts' reports,

15  anything from the TLC's reports about the performance of

16  those districts in elections or anything about

17  elections.  So that to me seems like all well within the

18  purview.  But, again, it depends on what I'm asked.

19     **Q.  Well, tell me what you know today on that**

20  **subject, if anything?**

21     A.  I -- so I have what's in my report.  I can -- I

22  have what's in my report.  I have what's in the

23  appendices.  But off the top of my head, the questions

24  don't really seem specific to a piece of information or

25  are not asking me to draw a conclusion or something.  So

1  I'm struggling to answer the question.  It seems to be

2  more of a hypothetical that I don't think I'm not

3  grasping.

4      Q.  Okay.  You have just reviewed the portion of

5  your expert report that discusses congressional

6  districts under plans C2163, including specifically

7  proposed plan 29, CD29, and I'm just asking you since

8  you say you're going to testify about it at trial what

9  you know about it today in terms of historical or

10  expected electoral performance of that district or

11  proposed district, CD29.

12      A.  Yeah.  I mean, I'm -- I'm qualified to look at

13  and read performance analyses and to comb through that

14  electoral type of data, candidate choice, things like

15  that.  Off the top of my head, it -- it seems like you

16  are asking me what conclusions I've come to.

17          And -- and all of my conclusions are -- so

18  far are in this report.  I'm happy to -- I could be

19  asked anything about -- in this purview in the trial

20  and -- and I haven't been right now.  But I'm happy

21  to -- I could be asked about electoral performance,

22  things like that that I have listed.

23      Q.  Yeah.  There's -- there's nothing whatsoever in

24  the report itself about the expected or historical

25  performance of proposed CD29.  And yet you say in your

1  expert report that you're going to testify about it at

2  trial.  Being prepared for that, I need to know what you

3  know on that subject.  And I don't seem to be able to

4  get you tell me what you know or that you don't know

5  anything.  Is that -- can you help me understand what

6  you do know about -- today about the expected or

7  historical performance -- electoral performance of

8  proposed CD29?

9       A.  Sure.  I don't have any -- any specific

10  expectations.  I could be asked to look at a performance

11  analysis.  I could be asked to look at electoral

12  information results.  I could be asked to look at

13  elections within districts.  There is a list of things

14  that I could be asked to look at and to opine on and

15  offer opinions.  As of right now I have not been asked

16  to -- to draw conclusions from that.  So I'm just trying

17  to provide you that information accurately.

18       Q.  Okay.  And I -- I understand that you can't

19  predict exactly what you're going to be asked at trial.

20  I'm not asking you to predict it.  I'm just asking you

21  what you know on that subject, if anything, today on the

22  historical or expected electoral performance of proposed

23  CD29.

24            Do you know anything about that you can

25  tell me today?

1      A.  I believe whatever I have on that is in the

2  appendix under the reports.  So that would speak to

3  that.

4      **Q.  Okay.  And are you referring me to that because**

5  **you don't know, as you sit here, any of that**

6  **information?**

7      A.  I can't recall off the top of my head that

8  information.

9      **Q.  Okay.  Let's --**

10             MR. BRYANT:  Mark, if we could bring up

11  Texas house plan HD 118.

12             MR. CSOROS:  All right.  Can everyone see

13  that?  Unfortunately, it's not in color.

14      **Q.  (BY MR. BRYANT)  Okay.  Let's give this an**

15  **exhibit designation.**

16             MS. DANAHY:  Are we on 8?

17             MR. BRYANT:  8?

18             MS. DANAHY:  I believe.

19             (Exhibit Number 8 was marked.)

20      **Q.  (BY MR. BRYANT)  And, Dr. Rush, could you**

21  **identify Exhibit 8 for us?**

22      A.  Sure.  I see a heading that says house district

23  118.  I see the TLC logo on the other side.  I see the

24  Texas legislature's insignia.  And then on the bottom

25  right I see what looks like plan H2316.

1    Q.  Okay.  Do you know what plan H2316 is?

2    A.  I believe so, yes.

3    Q.  What is that?

4    A.  I believe that in my report -- I believe I

5    looked at different versions of 118 in this area.  But I

6    guess off the top of my head, I -- I can't recall if

7    this is the enacted or one of the proposed or one of the

8    demonstrative or the benchmark.

9    Q.  Okay.  Do you know -- can you provide any

10    information about the differences, if any, between house

11    district 118 as enacted by the Texas Legislature in 2021

12    and the proposed house district 118 that you describe in

13    your expert report as part of plan H2176?

14    A.  Yes, I can.

15    Q.  Okay.  Could you describe those generally?

16    A.  It's a pretty open-ended question.  But in my

17    report, I come to conclusions, I believe even

18    referencing this from the Flores report.  I did an

19    analysis with that.

20    Q.  Okay.  And I'm glad you asked -- you said that

21    because it appears to me that in your expert report, you

22    do an evaluation of HD 118 and that Dr. Flores also did

23    an evaluation of HD 118; is that right?

24    A.  I'm not exactly sure.  So I had looked at -- I

25    reviewed his report and then checked his findings.  And

1  I believe that there's a section in my report that

2  separately -- where I address this district, but I'm not

3  sure the specifics of where -- in what context.

4      Q.  Okay.  In your expert report at subpart 5 or

5  Roman numeral small V, you say, quote, Plan H2716

6  includes a Latino opportunity district in Bexar County

7  house district 118.  This district's above the

8  50 percent plus 1 Gingles I threshold as shown in the

9  attached reports.

10         Do you know whether or not HD 118 as

11  actually enacted by the Texas Legislature in 2021 is

12  also a Latino opportunity district as you use that term

13  in your expert report?

14      A.  There's a couple things here:  One, are you

15  asking me to refer to my report?

16      Q.  You are welcome to, but I'm not asking you to

17  refer to your report if you can answer the question

18  without doing so.  But --

19      A.  As I've -- this is -- I believe I'm looking at

20  a different plan in that subheading than you were

21  looking at then.  This looks like 2316, and the

22  subheading that you had listed was details 2176.

23      Q.  Exactly.  And my understanding, which is not

24  relevant -- it's yours that matters -- is that there is

25  a house district 118 that was enacted as part of plan

1  **2316.  And there's a proposed house district 118 that is**

2  **part of plan H2176 that you opine about in your expert**

3  **report.**

4     **And so my question -- another way to ask my**

5  **question is:  Isn't it true that both the proposed HD**

6  **118 in plan 2176 and the actual enacted HD 118 in plan**

7  **2316 are both Latino opportunity districts as you use**

8  **that term?**

9     MS. DANAHY:  I'm going to object to lack of

10  foundation.  The exhibit that we're looking at, which I

11  believe you said, doesn't have any information that

12  could answer that question.  And so I'm just a little --

13  I'm a little lost.  I really don't mean to interrupt,

14  but I'm a little lost on how we're looking at the plan

15  that he described in the report and this plan that's on

16  the page -- that's on the screen.

17     MR. BRYANT:  Okay.

18   **Q.  (BY MR. BRYANT)  Dr. Rush, can you answer the**

19  **question?  Aren't both the -- of the proposed plans and**

20  **enacted plan Latino opportunity districts?**

21   A.  I believe that if I had the -- I listed in the

22  report my conclusions about the proposed one.  So that

23  would be 2176, I believe.  And in that context, that

24  does reach the Gingles threshold in my analysis.  I

25  found it to be 50 percent plus 1 in Latino CVAP.  But I

1    don't currently in front of me have in the appendix

2    information on district -- house district 118 from 2316.

3         Q.  Okay.  In your expert report at paragraph 18,

4    this is the portion where you reviewed Dr. Flores'

5    analysis.  You stated, quote, The changes to HD 118 make

6    it such that while the district remains majority Latino

7    on its face, the ability for Latinos to elect their

8    candidates of choice has been diluted.

9              Do you recall that opinion you expressed in

10   your expert report?

11        A.  I'm reading -- I followed along under bullet

12   point 18.  And, yes, that's what it says.

13        Q.  Okay.  And so this -- if this exhibit from

14   C2316 is the enacted house district 118, it's your

15   opinion that it remains majority Latino; is that right?

16        A.  I believe it -- what I had written was that on

17   its face it -- it appears majority Latino.

18        Q.  Okay.  And then your conclusion is, quote, The

19   ability for Latinos to elect their candidates of choice

20   has been diluted.

21              What do you mean by the term diluted there?

22        A.  I believe this is referring to -- I had looked

23   at different data points that are in the appendices and

24   other experts' reports.  And I believe this refers to

25   the performance analyses or something of that nature

1 on -- or racially polarized voting that I had looked at.

2     **Q.  Okay.  I'm asking you about just the meaning of**

3 **the term diluted as you use it in your expert report.**

4 **Can you explain what you mean by that?**

5     A.  Yeah.  So I agree with Dr. Flores'

6 observations.  So he does an in/out analysis showing the

7 changes between the two, and I include those conclusions

8 right under those bullet points.

9     **Q.  (BY MR. BRYANT)  Okay.  And my question is:**

10 **What -- what do you both mean when you use the term**

11 **diluted?**

12     A.  Well, that refers to looking at the Spanish

13 surname voter registration and information like that,

14 HCVAP, changes to that.

15     **Q.  What do you mean by the term diluted?  What**

16 **does diluted mean to you?**

17     A.  Reduced.

18     **Q.  Okay.  And if it's reduced even by a tiny**

19 **amount, would you say it is fair to say it's diluted?**

20     A.  It depends on the context.  But it's possible.

21     **Q.  Okay.  So, for example, if there were a**

22 **district in which there was a 99 percent chance of**

23 **electing a Latino and there are changes made that reduce**

24 **it to 98, would it be fair to say that that change meant**

25 **the ability for Latinos to elect their candidates of**

1  **choice has been diluted?**

2      A.  It depends on the context, other underlying

3  information.  This is asking me to draw a professional

4  opinion in social science.  And so I just don't have all

5  the facts of that case to be able to answer that.

6      **Q.  I thought that you said that if there is a**

7  **reduction, that means that there has been dilution?**

8              MS. DANAHY:  Objection; mischaracterizes --

9      **Q.  (BY MR. BRYANT)  Is that right?**

10             MS. DANAHY:  Mischaracterizes his

11  testimony.

12     A.  I'm -- I'm referring to that in/out changes in

13  Dr. Flores' analysis specifically as it pertains to the

14  SSVR and HCVAP and changes to that.

15     **Q.  (BY MR. BRYANT)  I'm not asking you about this**

16  **particular instance right now.  I'm just asking you in**

17  **general.  As you use the term dilution, is any reduction**

18  **in the chances of electing a Hispanic candidate of**

19  **choice a dilution?**

20     A.  It's possible.

21     **Q.  Okay.  Do you know any actual electoral results**

22  **for house district 118 from 2018 forward in any**

23  **election?**

24     A.  I believe I looked at the reports that pertain

25  to that.

Tye Rush - 4/24/2025

123

1      Q.  And what were those results?

2      A.  I can't recall them off the top of my head.

3      Q.  Do you know who represents house district 118

4  in Texas?

5      A.  Not off the top of my head.  I can't recall

6  that, no.

7      Q.  Do you know anything about the election results

8  in 2024 for house district 118 in Texas?

9      A.  Again, for the electoral outcomes, I'm sure

10  I've read them across different reports.  But off the

11  top of my head, no.

12      Q.  Do you know whether or not a Latino has ever

13  been elected in house district 118?

14      A.  I can't recall that off the top of my head.

15      Q.  Do you know whether or not --

16           MS. DANAHY:  Hold on one second.  I just

17  want to make my objection on the record.

18           Objection; that was vague.  Are you

19  referring to enacted 118 or any election in the history

20  of Texas in the districts --

21           MR. BRYANT:  Well, obviously nobody could

22  be elected in a proposed district that was not enacted.

23  So I am -- I am asking about the actual districts.

24      Q.  (BY MR. BRYANT)  Do you know that a Latino was

25  elected in house district 118 in 2024?

1       A.  Off the top of my head, I don't know that.

2       **Q.  Do you know that the candidate -- that the**

3  **successful candidate defeated in 2024 was also a Latino?**

4       A.  Off the top of my head, I don't have access to

5  that to recall.

6       **Q.  Did you know that both of the candidates**

7  **nominated by the Republican and Democratic parties in**

8  **house district 118 in 2022 were Latinos?**

9       A.  Off the top of my head, no, I don't have that

10  information on recall.

11      **Q.  Do you know that a Latino has been elected in**

12  **house district 118 as enacted in every election from**

13  **2018 forward till today?**

14      A.  Off the top of my head, I don't recall who was

15  elected.

16      **Q.  Okay.  Would it be relevant for you to know who**

17  **has been elected in the district both before and after**

18  **the current plan 2316 was enacted in order to express an**

19  **opinion as to whether or not the ability for Latinos to**

20  **elect their candidate of choice in house district 118**

21  **has been diluted?**

22      A.  Not necessarily.

23      **Q.  Could you explain why not?**

24      A.  Well, sometimes a Latino candidate can be the

25  candidate of choice.  A performance analysis would show

1  that, a RPV analysis.  Sometimes the Latino candidate

2  isn't the candidate of choice.  And so without specifics

3  on all of this looking at the performance analysis, I

4  can't -- it just depends on the underlying facts.

5      **Q.  Do you have any opinion as to whether or not**

6  **Latino voters in house district 118 as enacted in 2021**

7  **are able to elect the Latino candidate of choice in that**

8  **district?**

9      A.  I do.

10      **Q.  And what's your opinion?**

11      A.  My opinions in my report in reviewing the

12  Flores report and corroborating what he says, I look at

13  his in/out analysis.  And it does appear that the

14  necessary component has been reduced, which is Spanish

15  surname voting.  And some of those changes may put into

16  question the ability to elect a candidate of choice.

17      **Q.  And it is your testimony that what has in fact**

18  **happened is not relevant?**

19          MS. DANAHY:  Objection; mischaracterizes

20  the testimony.

21      A.  That's not what I'm saying.

22      **Q.  (BY MR. BRYANT)  Okay.**

23          MR. BRYANT:  Mark, could you bring up the

24  information on the actual results in house district 118

25  as enacted?

1          Let's call this, what, 9?

2               MS. DANAHY:  That sounds right to me.

3     Q.  (BY MR. BRYANT)  We'll call this Exhibit 9.

4               (Exhibit Number 9 was marked.)

5     Q.  (BY MR. BRYANT)  And this appears to be a Texas

6  Public Radio article dated November 6, 2024, entitled

7  Republican John Lujan is reelected in close Texas house

8  district 118 race.

9               Have you ever seen this document before,

10 Dr. Rush?

11    A.  I've not seen this article.

12    Q.  Have you ever seen any other information

13 regarding the Texas house district 118 race in 2024?

14    A.  I believe so.

15    Q.  And what do you believe you have seen?

16    A.  My vague recollection from the other reports is

17 that I think I had read -- when I had read the Barreto

18 report -- the Dr. Barreto report that he opined on this

19 and showed the performance analysis and detailed that.

20    Q.  Other than that, have you either obtained or

21 sought any information about the Texas house district

22 118 race in 2024?

23    A.  I believe the election results are updated on

24 TLC.  And I vaguely remember or recall that in the

25 reports.

1    Q.  Do you have any reason to believe -- to doubt

2  that John Lujan is a Latino?

3    A.  I have no reason to doubt he is who he says he

4  is.

5    Q.  Well, I don't know who he says he is.  My

6  question is:  Do you have any reason to doubt that he's

7  a Latino?

8    A.  I don't -- I don't have any expert opinion on

9  that.

10    Q.  I'm not asking about expert opinions.  I'm just

11  asking about, do you have any reason to doubt that

12  John Lujan, as described in this article, is a Latino?

13    A.  I don't believe I have any opinion on that.

14    Q.  Okay.  Could we look at the first part of the

15  body of that article that's Exhibit 9?

16         Okay.  And it says that, Lujan defeated

17  Democratic challenger Kristian Carranza with 51.7 of the

18  vote.

19         Do you have any reason to doubt that

20  Democratic challenger Kristian Carranza is a Latina?

21    A.  I have no opinion about the identities of the

22  candidates.

23    Q.  Okay.

24         MR. BRYANT:  Can we go ahead and -- Mark,

25  do you have another exhibit that shows the historical

 1   results going back a few elections in Texas house

 2   district 118?

 3              MR. CSOROS:  I don't believe we have one at

 4   this point.  We can get one together I believe if

 5   necessary.

 6              MR. BRYANT:  It's okay.  I know everybody's

 7   ready to proceed.

 8       **Q.  (BY MR. BRYANT)  The next district that is**

 9   **discussed in your expert report after Texas house**

10   **district 118 is Texas CD15.  Do you recall having**

11   **opinions about Texas congressional district 15?**

12       A.  I don't recall off the top of my head.  But if

13   you let me know where it is in the report, I can look at

14   that.

15       **Q.  Okay.  That is at -- begins at paragraph 19 in**

16   **your expert report.**

17       A.  Okay.  So right under what we were just looking

18   at?

19       **Q.  Exactly.  It's the next one.  And so take**

20   **whatever time you need to review your expert report as**

21   **it pertains to Texas congressional district 15.**

22       A.  Will do.  Thank you.

23              Okay.  I've read through that section.

24       **Q.  Okay.  And in this analysis, you were referring**

25   **not to a -- what we have referred to as a proposed plan**

1    but to something called the benchmark plan.  Could you

2    explain what a benchmark plan is?

3        A.  Sure.  Just generally the benchmark plan is --

4    it can be the plan in place from a prior redistricting

5    cycle.  So it's just a comparison point for proposed

6    plans.

7        Q.  Okay.  And in your expert report beginning at

8    paragraph 19, when you refer to the benchmark plan, is

9    that the plan that was in place prior to redistricting

10   or something else?

11       A.  I believe it's right there in the figure that

12   comes from Dr. Flores' report.  So that C2100 would

13   refer to whatever plan, whether that was enacted last

14   cycle, whether that was enacted in 2021 or so on would

15   give you that information.

16       Q.  Okay.  Did you bother to determine which of

17   those it was?  Or did you just go with whatever plan

18   Dr. Flores was using, but you don't know for sure what

19   it is?

20              MS. DANAHY:  Objection; mischaracterizes

21   his testimony and is argumentative.

22       A.  Sorry.  The benchmark plans, it's my

23   understanding on TLC that they're labeled accordingly.

24   So while there are all these other proposed plans like

25   C2193, it would be something with a round number, a

 1  couple zeros at the end.  And so looking through TLC's

 2  website, it lets you filter for enacted plans, proposed

 3  plans.  There's even a tab for the LULAC exhibits.  And

 4  so I was able to look through that stuff and -- before

 5  writing this report.  And specifically this section, I

 6  would have verified those things with that information.

 7      Q.  Okay.  So we're talking about the plan that was

 8  referred to in your expert report as C2100.  Can you

 9  tell me whether or not that was the congressional

10  districting plan that was in effect in Texas immediately

11  prior to redistricting or not?

12              MS. DANAHY:  I'm sorry.  Are you referring

13  to H2100?  Are we talking about house districts or --

14              MR. BRYANT:  I'm talking about C2100

15  because we're talking about CD15.

16              MS. DANAHY:  Okay.  I'm just lost in the

17  report.  That was my --

18              MR. BRYANT:  Well, on the previous page

19  there's a reference to -- to H2100.

20              MS. DANAHY:  I see.  I was looking at the

21  wrong table.  Thank you.  I'm -- thank you.

22              MR. BRYANT:  No problem at all.

23      Q.  (BY MR. BRYANT)  So, Dr. Rush, do you recall my

24  question?

25      A.  I believe you asked if I had verified that plan

1  number.

2      Q.  I'm asking whether you know what C2100, also

3  referred to as the benchmark plan, actually was?

4      A.  I believe that it was a previously enacted

5  plan.

6      Q.  And was it the plan that was in effect

7  immediately prior to Texas congressional redistricting

8  in 2021?

9      A.  Because there were several cycles of

10  redistricting, I'm not off the top of my head able to

11  confirm that information.  But I would have come across

12  it in the TLC reports and checked that.

13      Q.  Okay.  In paragraph 25 in your expert report,

14  it states, quote, The changes to CD15 make it such that

15  while the district remains majority Latino on its face,

16  the ability for Latinos to elect their candidates of

17  choice has been minimized.

18          Is that your opinion?

19      A.  Yes.  So I confirmed Dr. Flores' analysis and

20  reviewed that.  And with the changes that he detailed

21  that I write here, I came to the conclusion it had been

22  minimized.

23      Q.  Okay.  And what do you mean by the term

24  minimized in your expert report?

25      A.  Reduced.

1     **Q.  Is it the same or different as your use of the**

2    **term diluted?**

3     A.  It's so -- I'm not sure if this is a question

4    about precise language.  Could you clarify that's what

5    you're asking?

6     **Q.  I'm happy to try to clarify it.  We discussed**

7    **earlier in your testimony you used the term diluted, and**

8    **you told me it just means reduced and that if it's**

9    **reduced a lot or reduced a little, it could be referred**

10   **to as diluted; is that fair?**

11        MS. DANAHY:  Objection; mischaracterizes

12   the testimony.

13        Go ahead, Dr. Rush.

14    A.  I believe in both instances it's -- they're

15   just synonyms for made smaller.

16     **Q.  (BY MR. BRYANT)  Okay.  So that would apply**

17   **also to minimize or does that have a different meaning?**

18    A.  It could, yes.  They're synonyms.

19     **Q.  Okay.  So if -- again, I gave you the example.**

20   **If the chances of electing a Latino candidate of choice**

21   **was reduced from 99 to 98, would it be fair to say that**

22   **it had been minimized?**

23    A.  It's possible.  It depends on the underlying

24   facts.

25     **Q.  Okay.  You would not say, would you, that the**

1    changes of CD 15 made it such that the ability for

2    Latinos to elect their candidates of choice was minimal?

3         A.  I believe that minimal is not a synonym for --

4    to have made smaller.  It's something else and I have no

5    opinion about that.

6         Q.  Okay.  I would use minimal to mean very small.

7    Is that the way you use that term?

8         A.  I don't believe that I used minimal.

9         Q.  Okay.  Do you have any opinion as to whether or

10   not CD 15, as enacted by the Texas Legislature in 2021,

11   allows Latinos to elect your candidates of choice?

12        A.  And my opinions are in the report in reviewing

13   Dr. Flores' analysis.  It appears that some key

14   ingredients or key things that would opine to that or

15   help me draw that conclusion are things like Spanish

16   surname, voter registration or things like Hispanic

17   CVAP.  So I draw that conclusion in my analysis.

18        Q.  Okay.  But you can clarify something for me.  I

19   understand your analysis and your conclusion to be that

20   the differences between the benchmark C2100 and CD 15,

21   as enacted in some way, makes smaller or reduce or

22   minimize the ability of Latinos elect their candidate of

23   choice.  Is that fair?

24        A.  I believe so.  So Spanish surname voter

25   registration, changes to the geography reflect that the

1  resulting district was -- had lower Spanish surname

2  voter registration and lower CVAP.

3      **Q.  Okay.  And do you have an opinion as to whether**

4  **even after those changes, Latinos in CD 15 are still**

5  **able to elect their candidate of choice?**

6      A.  Not off the top of my head.  But I believe that

7  was detailed in the Barreto report and would have seen

8  some information on the TLC's website and data in that.

9      **Q.  As part of your work in this case, did you do**

10 **any investigation as to any actual election results in**

11 **Texas CD 15?**

12     A.  No.  I didn't independently do a performance

13 analysis.

14     **Q.  Do you know who was elected congress -- to**

15 **congress in CD 15 in 2024?**

16     A.  I believe you just showed me.

17     **Q.  No.  I was talking about HD 118 then.**

18     A.  Okay.

19     **Q.  Do you know who was elected in 2024 in CD 15?**

20     A.  Not off the top of my head.

21     **Q.  Do you know who any of the candidates were for**

22 **congress in CD 15 in 2024?**

23     A.  I can't recall them off the top of my head.

24     **Q.  Do you know who any of the candidates for**

25 **congress in CD 15 were in 2022?**

1    A.  No, I can't recall them.

2    Q.  Do you know whether a Latino candidate was

3   elected to congress in CD 15 in 2022, 2024 or both?

4    A.  I can't recall whether or not a Latino

5   candidate was elected.  But I believe the -- the

6   information to opine on that would have been if they

7   were a candidate of choice.

8    Q.  Okay.  We've used that term Latino or Hispanic

9   candidate of choice in your testimony and in your

10   report.  What exactly does that mean to you?

11    A.  There's an analysis to determine who a minority

12   preferred candidate is.  So you would have to run the

13   numbers and see if there is racial block voting or block

14   voting and who the candidate that the minority group

15   prefers, who they're more likely to vote for, who they

16   spread more vote share over.  And of course there's

17   crossover voting, except in extreme circumstances.  But

18   that would indicate who the candidate of choice is.

19    Q.  Do you know who the candidate of choice was in

20   any election in CD 15?

21    A.  Not off the top of my head, no.

22    Q.  And I gather that you did not feel that it was

23   necessary to do that analysis and determine what the

24   Latino -- Latino candidate of choice was in CD 15 in

25   order to arrive at your expert opinions in this case; is

1    that right?

2        A.  I had access to different reports, different

3    information.  And I believe that I had looked that up

4    on -- in -- in Dr. Barreto's report.  So it is not my

5    opinion or testimony that -- I didn't think it was

6    relevant.  I'm just telling you off the top of my head I

7    can't recall it.

8        Q.  Okay.

9            MR. BRYANT:  Mark, do you have the

10   information or exhibit as to who actually has been

11   elected in CD 15 under the plan enacted by the Texas

12   Legislature in 2021?

13       Q.  (BY MR. BRYANT)  Okay.  Do you see that

14   exhibit?  This will be Exhibit 10.

15            (Exhibit Number 10 was marked.)

16       A.  I do see, it looks like election results.  It

17   doesn't say the exact district, but I see 2022, and some

18   names and some vote totals.

19       Q.  (BY MR. BRYANT)  Okay.  Do you recognize any of

20   those names?

21       A.  I don't believe I recognize the names.

22       Q.  Okay.  Do you have any reason to believe that

23   Monica De La Cruz is not a Latino?

24       A.  I have no -- no professional or otherwise

25   opinion on their identities.

1     **Q.  And do you have any reason to believe that**

2  **Michelle Vallejo is not a Latino?**

3     A.  I have no professional opinion or personal

4  opinion about the identity of these folks.

5     **Q.  Okay.  If -- I'll represent to you that these**

6  **are election results for CD 15, as enacted by the Texas**

7  **Legislature.  If Monica De La Cruz and Michelle Vallejo**

8  **are Latina, does it appear to you that approximately**

9  **98 percent of the votes for congress in 2022 in CD 15**

10  **were cast for Latina candidates?**

11     A.  Are you totalling up the percentages from De La

12  Cruz and Vallejo?

13     **Q.  Yes.**

14     A.  Those appear the total to the number that you

15  gave.

16     **Q.  Okay.  And assuming for a second that that**

17  **information is correct, would you still believe that the**

18  **ability for Latinos to elect their candidates of choice**

19  **in CD 15 have been minimized?**

20     A.  I have no information on the block voting,

21  whether there's block voting to the extent to which

22  there's block voting or who Latino -- the HCVAP or

23  whatever metric for Latino or Hispanic, I have no

24  ability to verify what this information -- what the

25  block voting looks like to understand who the candidate

1  of choice is.  So I can't answer whether or not -- I

2  can't answer the question very accurately, no.

3      **Q.  Okay.  Is it fair to say that simply by looking**

4  **at these 2022 election results, they would not cause you**

5  **to doubt your expressed opinion in your -- paragraph 25**

6  **of your expert report that CD 15 is enacted, minimizes**

7  **the ability for Latinos to elect their candidates of**

8  **choice?**

9      A.  I don't believe this speaks to that at all or

10 provides any information relevant.

11     **Q.  Okay.  Let's look at the 2024 results just**

12 **below that on Exhibit 10.  Looks like the same two**

13 **candidates.  And if these results are correct, which I**

14 **have no reason to doubt, would it be correct to say that**

15 **100 percent of the votes were cast for either Monica De**

16 **La Cruz or Michelle Vallejo?**

17     A.  I believe just looking at this that there are

18 only two candidates.  And without a qualified write-in

19 or anything like that or any other extraneous

20 information, it -- I -- I'm having trouble answering the

21 question.  But it looks like all votes were cast for

22 either candidate.

23     **Q.  Okay.  And looking at these results under**

24 **enacted CD 15 for 2022 and 2024, would you still**

25 **maintain your opinion set forth in paragraph 25 of your**

1 expert report that in CD 15, quote, The ability for

2 Latinos to elect their candidates of choice have been

3 minimized, unquote?

4      A.  This tells me absolutely zero information about

5 the candidate of choice.  There's no RPV or performance

6 analysis in this whatsoever.  This isn't social science.

7 This wouldn't be the norm for drawing conclusions for

8 social science either.

9      Q.  Okay.  Let's look at Texas State Senate

10 district 27, which is discussed in your expert report

11 beginning at paragraph 26.  Could you take a moment to

12 review your expert report as it pertains to Texas State

13 Senate district court 27?  And I'll ask Mark while

14 you're doing that to bring up a map of Texas State

15 Senate district 27.

16      A.  Is there time for a short break?

17           MR. BRYANT:  Absolutely.  Let's take a ten

18 minute break.

19           (Recess taken 4:40 p.m. to 4:51 p.m.)

20      Q.  (BY MR. BRYANT)  Dr. Rush, did you get a chance

21 to review the portion of your expert report that

22 pertains to the Texas Senate district 27?

23      A.  You know what, I had gotten tea and used the

24 restroom and forgot to read that part --

25      Q.  Okay.

```
 1        A.  -- so I apologize.
 2        Q.  Why don't you take a moment to do that.  It
 3   begins at paragraph 26.
 4              MR. BRYANT:  And, Mark, I'll ask if you can
 5   put up a map of Texas State Senate district 27.
 6              THE REPORTER:  Is this Exhibit 11?
 7              MR. BRYANT:  Yes.
 8              (Exhibit Number 11 was marked.)
 9        A.  Okay.  I've read through to 31.
10        Q.  (BY MR. BRYANT)  Okay.  Did you express an
11   opinion in your expert report about senate district 27?
12        A.  Yes, I believe so.
13        Q.  Are any of the Brooks plaintiffs, who you were
14   acting as an expert for, did they have any residents or
15   other relative interest in Texas Senate district 27?
16        A.  Could you repeat that?  I'm sorry.
17        Q.  Right.  Are -- first of all, are any of the
18   Brooks plaintiffs, who designated you as an expert in
19   this case, are they residents of Texas Senate district
20   27?
21        A.  I'm not sure about where they live exactly.
22        Q.  Okay.  And if you're not sure whether they have
23   any connection with Texas Senate district 27, why did
24   you analyze and provide opinions about Texas Senate
25   district 27?
```

1    A.  I analyzed the districts that I was asked to;

2   and likewise, I'm not aware of any -- where the

3   plaintiffs live in other districts.

4    **Q.  So Mr. Dunn asked you to analyze and arrive at**

5   **and express opinions about Texas Senate district 27?**

6    A.  I'm not exactly sure if it was Mr. Dunn or one

7   of the other lawyers who I've been in contact with.  But

8   the plaintiff's lawyers asked me to look at that, yes.

9    **Q.  And specifically was it one of the lawyers for**

10  **the Brooks plaintiffs who asked you to examine or**

11  **analyze Texas Senate district 27?**

12   A.  I'm not privy to the distinctions between whose

13  lawyers belong to who and so on.  I just know that the

14  people who ask me if I'd be able to deliver an expert

15  opinion and who had asked for me to opine on this, asked

16  for me to look at this district in the Flores report.

17   **Q.  Okay.  And who asked you to look at any of the**

18  **districts other than Mr. Dunn?**

19   A.  I believe it was Mr. Dunn, but I'm not 100

20  percent sure right now.

21   **Q.  Who -- who besides Mr. Dunn asked you to**

22  **examine any districts in connection with this case?**

23   A.  I didn't -- I believe it was just him that was

24  asking, but again, I can't recall the specifics about

25  that conversation about these districts.

1    Q.  Okay.

2    A.  I believe it was Mr. Dunn.

3    Q.  Looking at paragraph 27 of your expert report,

4  it begins, quote, Despite the benchmark SD 27, having a

5  population of 831,674, which was 108,504, under the

6  ideal population, 169,981 people were moved into the

7  district and 79,504 people were moved out of the enacted

8  SD 27.

9         There's a reference there to a benchmark SD

10  27.  Do you know whether the benchmark SD 27 was from

11  the plan in effect immediately prior to the 2021

12  redistricting or to some other benchmark?

13    A.  I'm -- I'm not 100 percent sure, but I know

14  that it's marked S2100, so I'm not sure when that was

15  enacted, but that was the benchmark plan I was operating

16  on.

17    Q.  Okay.  Looking at paragraph 28, it states,

18  quote, The enacted SD 27 changed from 80.5 percent in

19  the benchmark plan to 72.8 percent in the enacted map.

20         What does that refer to?  Can you explain

21  that?

22    A.  Yeah.  I believe that bit -- and I should add

23  the language in there, so it's clear, but refers to

24  either SSVR, which is the Spanish surname voter

25  registration or the HCVAP, but I'm almost sure that it's

1   the former.

2        Q.   Okay.

3        A.   But I'll be happy to -- yeah.

4        Q.   It would be fair to say it's not made clear in

5   paragraph 28 which one it is?

6        A.   I didn't put SSVR, so I can -- I can definitely

7   clarify that.

8        Q.   You can clarify that some time in the future?

9        A.   Yeah.  I'm happy to make that clear.

10       Q.   Okay.  And on paragraph 31, you state, quote,

11  SD 27 appears to remain a majority Latino district, but

12  the removal high turnout SSVR VTDs minimized Hispanic

13  voters' opportunity to elect a candidate of choice,

14  unquote.

15            Is that a accurate statement of your

16  opinion expressed in paragraph 31?

17       A.   Yes.  You read verbatim from the exhibit marked

18  as my report on bullet point 31.

19       Q.   Okay.  And as you use the term, minimized, do

20  you mean that in the same sense we discussed earlier,

21  namely it just means it reduced it to some extent?

22       A.   Yes, reduced.

23       Q.   And it doesn't imply it's a small, medium or

24  large reduction?

25       A.   That's not immediately clear in the conclusion,

1  but looking at the reference to the data prior, you can

2  see the extent of it.  That tells what you the magnitude

3  is.

4      Q.  Okay.  Do you have an opinion as to whether or

5  not the Latino voters of Texas State Senate district 27,

6  as enacted by the Texas Legislature in 2021, have or do

7  not have the ability to elect their candidate of choice?

8      A.  I believe I -- I speak to that opinion here,

9  the conclusion I drew was with those changes, it reduces

10  the -- reduces the opportunity, yes.

11     Q.  Right.  And I'm asking you whether even after,

12  and assuming there was a reduction, do you have any

13  opinion as to whether or not they're still able to elect

14  the Latino candidate of choice in Texas State Senate

15  district 27 as enacted?

16     A.  I believe, again, referring the --

17  Dr. Barreto's report I read he opines on that.  And I

18  can't recall off the top of my head.  But as it stands,

19  I have not -- I can't recall off the top of my head if

20  it elects or not.

21     Q.  Okay.  So I assume you don't know who has been

22  elected in Texas State Senate district 20 -- 27 in 2024

23  or 2022; is that right?

24     A.  Not off the top of my head, that's correct.

25     Q.  And you don't know whether either or both of

1  the major candidates for Texas State Senate district 27

2  or were Latino or not?

3      A.  I'm not sure how that's relevant to if they're

4  a candidate of choice or not.

5      **Q.  Whether or not you deem it relevant, do you**

6  **know?**

7      A.  Off the top of my head, no.

8      **Q.  Do you have any reason to believe that under**

9  **enacted Texas State Senate district 27, do you have any**

10 **reason to doubt that Latinos who comprise the majority**

11 **of the population of that district have the ability to**

12 **elect their candidate of choice?**

13     A.  I don't have that information in front of me,

14 primarily the performance analysis that would show the

15 block voting and the extent to which its possible.  But

16 the conclusions that I drew in this report, I believe

17 the that possibilities less because of the changes

18 in-out report in terms of Spanish surname, voter

19 registration and turnout.

20             MR. BRYANT:  Okay.  Mark, can you bring up

21 the next exhibit, I think it will be 12, that describes

22 the actual election results in Texas Senate district 27?

23             MR. CSOROS:  Can everybody see that on the

24 screen?

25             MR. BRYANT:  Yes, please.

```
1              THE WITNESS:  Yes.

2              (Exhibit Number 12 was marked.)

3       Q.  (BY MR. BRYANT)  Okay.  Really in page

4  Exhibit 12, that indicates that in the election in 2024,

5  the Republican candidate was Adam Hinojosa and the

6  democratic candidate was Morgan LaMantia who was the

7  incumbent and that Senator Hinojosa won by a relatively

8  modest amount.  Do you have any reason to believe that

9  either Candidate Hinojosa or Candidate LaMantia are

10 Latino?

11      A.  I have no opinion about the identities of

12 these.

13      Q.  And if these results that show in Exhibit 12

14 are correct, is it the case that approximately 97 and a

15 half percent of the votes in 2024 in Texas Senate

16 district 27 were cast for Mr. Hinojosa or Mr. --

17 Ms. LaMantia?

18      A.  Just looking at this Wikipedia article, I'm

19 going to take the leap that this is accurate and

20 well-sourced, but it still doesn't show me about block

21 vote or anything like that.  So I have -- this

22 doesn't -- I have no reason to doubt the identities of

23 these candidates, but I don't have an opinion on that.

24      Q.  Well, my question was not about block voting.

25 My question was about whether these results are
```

1  accurate, 97 and a half percent of the votes in that

2  district in 2024 were cast for Latino candidates.  Do

3  you have any reason to doubt that?

4      A.  I mean, I haven't verified myself whether or

5  not they're Latino.  I have no reason to doubt that.  It

6  does look like of the top two candidates, they receive

7  the percentage of the vote share combined that you had

8  stated.

9      Q.  Okay.

10     A.  Yeah.

11     Q.  And you see the election results for 2022 as

12  well, right?

13     A.  I believe so, right under.

14     Q.  Okay.  And is it correct that 100 percent of

15  the votes in Texas State Senate district 2022, as

16  enacted by the Texas Legislature in 2021, were cast for

17  Latino candidates?

18     A.  Again, I have nothing here to verify.  I'm sure

19  what you're saying is true about their identity, and I

20  have no reason about that.  Just looking at what you're

21  showing me, it just shows that 100 percent of the vote

22  went to either of the top two candidates.

23     Q.  And assuming this information is correct, would

24  you still maintain the opinion that the Hispanic voter's

25  opportunity to elect a candidate of choice in Texas

1  Senate district 27 has been minimized by the changes the

2  Texas Legislature made in the final enacted Texas Senate

3  district 27?

4      A.  Yes.  I maintain that opinion.  And this

5  doesn't opine on that at all.  It isn't really relevant.

6  It doesn't show any of the demographic voting patterns,

7  anything about RPV block voting, anything like that to

8  make that assessment.  So I've been shown nothing to --

9  that seems germane to the analysis I would need to do to

10 change that opinion or confer with this information.

11     Q.  Okay.  Did you also in your work --

12             MS. DANAHY:  Mr. Bryant, can I ask a quick

13 clarifying question?  I'm noticing these exhibits, we're

14 looking at a page of several exhibits --

15             THE REPORTER:  Your audio is not coming

16 through clear.

17             MR. BRYANT:  I'm having a hard time

18 understanding you.

19             MS. DANAHY:  Is that better?  Can you hear,

20 me?

21             MR. BRYANT:  I think so.  You can --

22             MS. DANAHY:  I think I have to be really

23 close to the microphone.  I was saying with this one and

24 the SD 27 results, we were looking at one or two pages

25 in a longer document.  I just want to be sure the full

1    document would be in the record since we didn't have a

2    chance to review it.

3                MR. BRYANT:  Okay.  Whatever has been

4    placed on the screen and referred to as the exhibit,

5    will be the exhibit.

6                MS. DANAHY:  All nine pages of this one?

7                MR. BRYANT:  Are you saying that you want

8    to look at it?

9                MS. DANAHY:  No.  I'm just saying since

10   we're not looking at the whole document -- I just want

11   to make sure the full document is in the record since

12   you're showing this nine-page document.

13               MR. BRYANT:  Okay.  And you'll have an

14   opportunity to ask him about any parts of the documents

15   that you want.

16         **Q.  (BY MR. BRYANT)  Okay.  Let's talk about Texas**

17   **house district 37.  That's the subject of your analysis**

18   **and opinions as well; is that right?**

19         A.  I believe so, following the section you just

20   had me looking at.

21         **Q.  Okay.  And I think you began discussing that**

22   **one at paragraph 32.**

23               MR. BRYANT:  Mark, could you please bring

24   up as Exhibit 13, a map of Texas house district 37 as

25   enacted?

1    MR. CSOROS:  Should be on the screen.  You

2    should be able to see it.

3                  MR. BRYANT:  Okay.

4    **Q.  (BY MR. BRYANT)  Dr. Rush, can you identify**

5    **Exhibit 13 as a map of the house district 37 as enacted**

6    **by the Texas Legislature in 2021?**

7    A.  I'm still reviewing the section you just had me

8    looking at in my report, so if you give me about

9    30 seconds or so --

10   **Q.  Sure.**

11   A.  -- I'll be able to return my attention.  Thank

12   you.

13                  Okay.  I've read through that.

14   **Q.  Okay.  Can you identify Exhibit 13 as a map of**

15   **house district 37, as enacted by the Texas Legislature**

16   **in 2021?**

17                  (Exhibit Number 13 was marked.)

18   A.  I see on the bottom right-hand corner that it's

19   labeled plan H2316.  So I see that -- the TLC logo

20   again, Texas legislature's logo.  And I do see it's

21   labeled house district 37.  So it appears to be the

22   enacted plan.

23   **Q.  (BY MR. BRYANT)  Okay.  And this is one of the**

24   **districts that Dr. Flores analyzed and at -- you then**

25   **analyzed Dr. Flores' analysis.  Is that fair?**

 1          A.  I reviewed his analysis and offered my opinions

 2     about it.

 3          **Q.  Okay.  And is one of your opinions regarding**

 4     **house district 37 set forth at paragraph 37 of your**

 5     **expert report?**

 6          A.  I'm sorry.  Is there -- I missed the question.

 7          **Q.  Yeah.  That was a question.  But I'll ask it**

 8     **again, hopefully more clearly.**

 9               **Paragraph 37 of your expert report states,**

10     **While HD 37 appears to remain a majority Latino**

11     **district, the increase in non-SSVR minimizes Hispanic**

12     **voters' opportunity to elect a candidate of choice,**

13     **unquote.**

14               **Is that your opinion?**

15          A.  Yes, that is my opinion.

16          **Q.  And in expressing that opinion, are you using**

17     **the term minimize in the same way that you have in your**

18     **other opinions, namely to simply indicate some**

19     **reduction?**

20          A.  Yes.  Indicating that it reduces.

21          **Q.  Okay.  And do you have any knowledge as to the**

22     **actual election results in either 2024 or 2022 in house**

23     **district 37, as enacted by the Texas Legislature?**

24          A.  I don't have any recalled -- of the results.

25          **Q.  And do you have any knowledge as to whether any**

1    or all of the candidates in house district 37, since

2    2021, have been Latino?

3        A.  I can't recall that, no.

4        Q.  Okay.

5            MR. BRYANT:  Mark, could you please bring

6    up the exhibit that you have regarding the election

7    results in Texas house district 37?

8            MR. CSOROS:  Does everyone see this on the

9    Exhibit 14?

10           (Exhibit Number 14 was marked.)

11       Q.  (BY MR. BRYANT)  Okay.  This is Exhibit 14.

12   This document indicates that Janie Lopez was elected in

13   house district 37 in November 2022.  Do you have any

14   reason to doubt the accuracy of that?

15       A.  No, sir.

16       Q.  Do you have any reason to doubt that Janie

17   Lopez is Latino?

18       A.  I have absolutely no information or reason to

19   refute that, no.

20           MR BRYNT:  And, Mark, if you could scroll

21   down to any information on that Exhibit 14 related to

22   the 2024 results, if any?

23           MR. CSOROS:  I don't see that we have it in

24   this one.

25           MR. BRYANT:  Okay.

Q.  (BY MR. BRYANT)  Is it fair to say that the election of a Latino candidate to a district after the enactment of Texas house district 37, by the Texas Legislature in 2021, is irrelevant to you with respect to your opinion as to the ability of Latinos to elect their candidates of choice in that district?

A.  This was a little bit of compound question.  Is there any way you can break that up?

Q.  Sure.  I think you expressed this opinion earlier about other districts.  Is it your position that whether or not Latino candidates have actually been elected in Texas house district 37 after 2021 redistricting is irrelevant to your opinion that you express in paragraph 37, regarding the minimization of Hispanic voters' opportunity to elect a candidate of choice?

A.  I don't have enough information here to identify a candidate of choice or even Latino population there.

Q.  Okay.  And that's true even if only Latino candidates ran for election in house district 37 as enacted by the Texas Legislature?

A.  The information they would need for -- to make that assessment would be the RPV analysis; some look at block voting and who the candidates of choice were for

 1   the minority group.

 2        Q.  Okay.  I want to ask you to look in your expert

 3   report back at that portion of your report in Texas

 4   congressional plans.  It's the second page of your

 5   expert report that discusses a Dallas/Fort Worth area.

 6        A.  I have bullet point eight, Dallas/Fort Worth.

 7        Q.  Exactly.  Now turn the page and look at

 8   subpoint seven or VII.  Do you have that in front of

 9   you?

10        A.  Yes, I can read that.

11        Q.  You state, I will provide similar testimony of

12   the characteristics of the other maps included in my

13   appendices.  I will also review the maps and plans

14   submitted by other experts and parties in this case and

15   provide my opinions on those plans, if asked.

16                  Do you have any expectation that any other

17   experts -- strike that.

18                  Do you have any expectation that you will

19   be asked questions about the maps or plans of other

20   experts in this case?

21        A.  I could be.  It's possible.

22        Q.  Well, my question is not whether it's possible,

23   but whether you have any expectation that you will be?

24        A.  I mean, it's -- you're asking me to guess

25   future concerns.  I don't know what people are asking or

1   what is needed or whatever.  I just know whenever I'm

2   asked to opine on something, that that's something that

3   could be in the realm of the possibility.

4       Q.  Okay.  You state in that paragraph that you

5   will also review the maps and plans submitted by other

6   experts and parties of this case.  Do you have any plans

7   to do so?

8       A.  It depends on if I'm asked, but at the moment,

9   I don't have any outstanding plans.

10      Q.  Okay.  I want to state on the record that the

11  defendants will object vehemently to you testifying at

12  trial on any subjects that are not in your expert report

13  and as to which we have not had a chance to ask you

14  questions and take discovery.

15              Similarly, you made a similar statement,

16  didn't you, at subparagraph 10 or X under B, Houston

17  area, do you see that on the next page of your expert

18  report?

19      A.  I can scroll there and let you know.  I see

20  subbullet X.  And, yes, I see that.

21      Q.  Okay.  And do you have any plans to or have you

22  already reviewed any maps or plans submitted by other

23  experts or parties in this case?

24      A.  I believe all the plans that I've been asked to

25  opine on and that I had asked to been -- asked to have

1    an opinion on or issue an opinion on are included in the

2    appendices and written in the report.  I don't believe I

3    was asked about anything outside of that, but I can't

4    recall off the top of my head.

5        **Q.  Have you been asked to or have you, in fact,**

6    **reviewed any maps or plans discussed by Dr. Barreto in**

7    **his expert report or reports?**

8        A.  I reviewed his report, but I'm not sure the

9    context you mean.

10        **Q.  Have you been asked to do any work with respect**

11    **to that report, any kind of review or critique or**

12    **analysis as to Dr. Barreto's report or any maps or**

13    **reports discussed therein?**

14                MS. DANAHY:  Objection; vague.  Presumably

15    Dr. Barreto --

16                THE REPORTER:  I'm not getting that.

17                MS. DANAHY:  I'm sorry.  I will lean in.

18                Objection that it's vague to the extent

19    there's overlap between the plans discussed by

20    Dr. Rush's report and Dr. Barreto's.

21                MR. BRYANT:  You can go ahead and answer.

22        A.  I think I lost track of the question in that

23    objection.

24        **Q.  (BY MR. BRYANT)  Okay.  My question is:  Have**

25    **you done any review, critique or analysis of any of the**

1  maps or plans discussed in Dr. Barreto's expert reports

2  in this case?

3            MS. DANAHY:  Same objection.

4      A.  It's possible.  I'd reviewed his report and

5  looked through that.  I -- without having it in front of

6  me, I'm not exactly sure again what that entails.

7      Q.  (BY MR. BRYANT)  Okay.  For the record, again,

8  defendants will object to your testifying as to anything

9  that was not encompassed within your own expert report

10 and analysis and that we haven't had a chance to ask you

11 about in your deposition.

12           Let's look down to the Texas house plans

13 part A in paragraph 7 or VII.  Do you see a similar set

14 of verbiage regarding the Texas house plans in that

15 subparagraph?

16     A.  Yes, I see that.

17     Q.  Okay.  Do you -- have you in fact reviewed or

18 do you expect to review any maps or plans submitted by

19 other experts or parties to this case between now and

20 the time you testify at trial?

21     A.  I would expect so, if I were asked.  Presently,

22 I haven't been asked, but it's possible.

23     Q.  So if somebody asks you next week, you would do

24 that?

25     A.  It depends on what's happening between now and

1  the trial.  And it's possible that I could be asked

2  that, and that's within the realm of ---over.

3      **Q.  Okay.  And, again, I want to note for the**

4  **record the defendants will strongly object to that or to**

5  **you doing any further work on this case or developing**

6  **new opinions or revising your opinions between now and**

7  **trial in a manner that would deprive us of the ability**

8  **to see them in your reports and to depose you about**

9  **them.**

10          MR. BRYANT:  Let's take a quick break and

11  hopefully we can finish up.

12          (Recess taken 5:26 p.m. to 5:30 p.m.)

13      **Q.  (BY MR. BRYANT)  Dr. Rush, is it fair to say**

14  **that you have no expert opinion that Texas or the Texas**

15  **Legislature violated any laws in enacting the**

16  **redistricting plans that it enacted in 2021?**

17      A.  I'm -- I don't have a legal background, so I --

18  I'm not able to, right now, offer any legal analysis

19  that opines to that, so I don't have any opinion on

20  that.

21      **Q.  Okay.  So you don't have any opinion that Texas**

22  **violated the law?**

23          MS. DANAHY:  Asked and answered.

24      A.  I don't have an opinion to -- speaking to the

25  extent to which the maps that legislature adheres to

1  law.

2      Q.  (BY MR. BRYANT)  Okay.  Do you agree that if

3  the Texas Legislature decided to put its additional

4  congressional districts that were added as a result of

5  the 2020 census, in one part of the state, it inevitably

6  effects the districts and other parts of the state?

7              MS. DANAHY:  Objection; lack of foundation.

8      A.  I'm -- I would have to weigh the information to

9  be able to answer that and offer an opinion.

10     Q.  (BY MR. BRYANT)  So based on the evidence that

11  we have seen in this deposition, Texas made a decision

12  to put one of the two new congressional districts that

13  it was allowed district 37 in -- mostly in Travis

14  County.  Do you recall that map?

15             MS. DANAHY:  I'm going to object just to

16  the extent that it misstates the record, and I believe

17  assumes facts not in evidence.  I think the only thing

18  he saw was that in the enacted plan, the district is

19  numbered 37.

20             MR. BRYANT:  Dr. Rush, you can answer.

21     A.  I saw from one of the exhibits that there is a

22  map about Travis County.

23     Q.  (BY MR. BRYANT)  And did you see, also, that

24  Texas in its enacted congressional plan placed a new

25  congressional district 37 mostly in Travis County?

1          MS. DANAHY:  Same objection as before.

2          You can answer, Dr. Rush.

3      A.  The only thing I can really verify from looking

4  at that is that the label is new.  I have no idea if 36

5  became 37 or so on, or what was in what district, so I

6  don't have enough information to offer an opinion about

7  that.

8      **Q.  And you didn't do?**

9          THE REPORTER:  Mr. Bryant, can we go off

10  the record?

11          (Pause in the proceedings.)

12          MR. BRYANT:  I pass the witness.

13          MS. DANAHY:  I don't have anything for

14  Dr. Rush.

15          MR. BRYANT:  Dr. Rush, thank you very much

16  for all of your patience and testimony today, and I hope

17  we'll see you -- get to meet in person in El Paso soon.

18          THE WITNESS:  Thank you.  Thank you,

19  Scoros, thank you, Ashley.

20          THE REPORTER:  Ms. Danahy, do you need to

21  order a copy the transcript?

22          MS. DANAHY:  I do, yes.  And I think we

23  just want a regular transcript, but I will let you know

24  if we need something quicker and we'll also read and

25  sign.

1

2    (Proceedings concluded at 5:34 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CHANGES AND SIGNATURE

2    WITNESS NAME: TYE RUSH  DATE: APRIL 24, 2025

3    Reason Codes:  (1) to clarify the record; (2) to conform

4    to the facts; (3) to correct a transcription error;

5    (4) others (Please explain)

6    PAGE  LINE  CHANGE                    REASON CODE

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   Signature: _____ Date: _____

1                  ACKNOWLEDGMENT OF DEPONENT

2

3        I, TYE RUSH, do hereby certify that I have read the

4   foregoing pages and that the same is a correct

5   transcription of the answers given by me to the

6   questions therein propounded, except for the corrections

7   or changes in form or substance, if any, noted on the

8   attached errata page.

9

10

11

12        _____

                TYE RUSH                DATE
13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                    EL PASO DIVISION

 3
      LEAGUE OF UNITED LATIN        )
 4    AMERICA CITIZENS, ET AL.,     )
                  Plaintiffs,       )
 5                                  )
                                    ) CASE NO.
 6    VS.                           ) 3:21-CV-00259-DCG-JES-
                                    ) JVB
 7                                  )
      GREG ABBOTT, ET AL.,          )
 8                Defendants        )

 9    *******************************************************

10                 REPORTER'S CERIFICATION

11                DEPOSITION OF TYE RUSH

12                     APRIL 24, 2025

13    *******************************************************

14          I, Ashley Cason, RSR, CSR, RPR, and Notary

15    Public, in and for the State of Texas, hereby certify to

16    the following:

17          That the witness, TYE RUSH, was duly sworn by

18    the officer and that the transcript of the oral

19    deposition is a true record of the testimony given by

20    the witness;

21          That the original deposition was delivered to

22    MOLLY DANAHY, Custodial Attorney;

23          That a copy of this certificate was served on

24    all parties and/or the witness shown herein on

25    _____.
```

1          I further certify that pursuant to FRCP No.

2    30(f)(i), the signature of the deponent:

3            was requested by the deponent or a party

4    before the completion of the deposition and that the

5    signature is to be returned within 30 days from date of

6    receipt of the transcript.  If returned, the attached

7    Changes and Signature page contains any changes and the

8    reasons therefor;

9          I further certify that I am neither counsel

10   for, related to, nor employed by any of the parties or

11   attorneys in the action in which this proceeding was

12   taken.  Further, I am not a relative or employee of any

13   attorney on record in this case, nor am I financially or

14   otherwise interested in the outcome of the action.

15          Certified to by me this 28th of April, 2025.

16

17

18   _____
     Ashley Cason, Texas CSR No. 10732
19   Expiration Date 09/30/2026
     RSR, RPR No. 989070
20   INTEGRITY LEGAL SUPPORT SOLUTIONS
     Firm Registration No. 528
21   9901 Brodie Lane, Suite 160-400
     Austin, Texas 78748
22   512-320-8690

23

24

25

# Exhibit 4

Tye Rush Curriculum Vitae,
(prior to 2023 Ph.D.)

# Tye Rush

| | | |
|---|---|---|
| CONTACT INFORMATION | 4289 Bunche Hall<br>Los Angeles, CA 90095 | trush001@ucla.edu<br>www.tyerush.com |

**EDUCATION**  **University of California, Los Angeles**, Los Angeles, CA

Ph.D., Political Science, *expected* 2023
Committee: Dr. Matthew A. Barreto (Chair), Dr. Natalie Masuoka, Dr. Lorrie Frasure, Dr. Loren Collingwood, and Chad Dunn, Esquire
Dissertation: *Staying in Power: The Origins of Voter ID Laws and Their Role in Electoral Strategy Today*

C. Phil, Political Science Summer 2020

Master of Arts, Political Science Fall 2019

**University of California, Riverside**, Riverside, CA

B.A., Political Science, June 2016

Magna Cum Laude

**RESEARCH EXPERIENCE**

**Senior Policy Fellow**  September 2018 to Present
UCLA Voting Rights Project
University of California, Los Angeles
Supervisor: Matt Barreto, Ph.D.

**Redistricting and Voting Fellow**  June 2019 to October 2019
Supervisor: Kathay Feng, J.D.
Common Cause
Los Angeles, CA

**Voting Rights Research Consultant**  June 2018 to June 2019
Supervisor: Matt Barreto, Ph.D.
Latino Decisions
Los Angeles, CA

**Research Fellow**  September 2017 to 2018
UCLA Latino Policy and Politics Initiative
University of California, Los Angeles
Supervisor: Matt Barreto, Ph.D.

**Predoctoral Fellow**  June 2016 to September 2016
UCLA Political Science: Race, Ethnicity, and Politics Subfield
University of California, Los Angeles
Supervisor: Matt Barreto, Ph.D.

**Research Intern**  March 2016 to July 2016
Supervisor: Michael Cohen, Ph.D.
Cohen Research Group
Washington, D.C.

**Research Assistant**  September 2015 to March 2016
Supervisor: Loren Collingwood, Ph.D.
University of California, Riverside

**PUBLICATIONS**

1. Lemi, D. C., Osorio, M., and Rush, Tye (2020). Introducing People Of Color Also Know Stuff. PS: Political Science Politics, 53(1), 140-141.

**WORKING PAPERS & PROJECTS**

1. Rush, Tye. "Jim Crow in a Brooks Brothers Suit: What Motivates State Legislators to Act on Voter ID Bills." *(Working paper)*.
 - UCLA Bunche Center Rising to the Challenge Graduate Research Award, 2022

2. Rush, Tye. "Listen to Me When I'm Talking to You: The Impact of the 26th Amendment on Representation in Congress." *(Working paper)*.

3. Rush, Tye. "Estimating the Effects of Strict Voter ID Laws at the County Level." *(Working paper).*

4. Rush, Tye, Matt Barreto, Chad Dunn, and Michael Rios. "How Framing Effects Impact Vote-By-Mail Uptake Among Communities of Color." *(Working paper).*
   - Russell Sage Foundation Presidential Authority Grant (Matt Barreto and Chad Dunn) , 2020

5. Collingwood, Loren, Bryan Wilcox-Archuleta, Matt Barreto, and Tye Rush. "Who Nominates? Racial Polarization at the Nominating Petition Stage." *(Working paper).*

6. Barreto, Matt, Tye Rush, Jonathan Collins, and Greg Leslie. "The Effects of Racial Efficacy on African American Voter Enthusiasm." *(Working paper).*

PUBLIC POLICY AND LEGAL WRITING

1. Portugal et al. v. Franklin County. (2022) Expert Report of Tye Rush on behalf of UCLA Voting Rights Project – Challenging Districting Rules and Proposed Maps. U.S. District Court for the Eastern District of Washington. https://latino.ucla.edu/research/violation-of-the-washington-voting-rights-act-of-2018/

2. "Vote Choice of Latino Voters in the 2020 Presidential Election." (2021) with the UCLA Latino Policy and Politics Initiative.

3. Black Voters Matter v. Raffensperger. (2020) Expert Report of Matt Barreto on behalf of UCLA Voting Rights Project – Challenging Postage Requirement. US District Court for the Northern District of Georgia Atlanta Division. https://acluga.org/black-voters-matter-v-raffensperger/

4. Black Voters Matter v. Raffensperger. (2020) Expert Report of Matt Barreto on behalf of UCLA Voting Rights Project – Challenging Voting Burdens at Polling Locations. US District Court for the Northern District of Georgia Atlanta Division. https://acluga.org/black-voters-matter-v-raffensperger/

5. "Protecting Public Health in the 2020 Elections." (2020) with the UCLA Voting Rights Project, Voting Rights Lab, and Union of Concerned Scientists Center for Science and Democracy.

6. "Protecting Democracy: Implementing Equal and Safe Access to the Ballot Box During a Global Pandemic." (2020) with the UCLA Voting Rights Project.

7. "Implementing and Assessing Automatic Voter Registration: Lessons Learned and Policy Recommendations to Improve Voter Registration in the U.S." (2020) with the UCLA Voting Rights Project.

8. "Debunking the Myth of Voter Fraud in Mail Ballots." (2020) with the UCLA Voting Rights Project, University of New Mexico Center for Social Policy, and Union of Concerned Scientists.

9. "Age Discrimination in Voting at Home.." (2020) with UCLA Voting Rights Project, Equal Citizens, Vote At Home, and The Andrew Goodman Foundation.

10. "Whitewashing Representation: How Using Citizenship Data to Gerrymander Will Undermine Our Democracy." (2019) with Common Cause Educational Fund.

AWARDS & HONORS

External Awards
- CBC Spouses Education Scholarship, Congressional Black Caucus Foundation — 2022–2023
- Princeton Dissertation Scholar, Princeton University: Bobst Center for Peace and Justice — 2022
- Dissertation Fellow, Ford Foundation — 2021–2022 (Deferred)
- President's Pre-Professoriate Fellow, University of California Office of the President — 2021–2022
- Travel Grant, Class and Inequality Section of APSA — 2021
- Lee Ann Fujii Travel Grant, APSA — 2020, 2021, 2022
- Research Fellow at the Institute on Inequality and Democracy at UCLA Luskin — 2019–2020
- Minority Fellow, American Political Science Association — 2017–2018
- Travel Grant, American Political Science Association — 2017
- MFP Travel Grant, APSA — 2017
- Graduate Fellowship Award, BLU Educational Foundation — 2016

University of California, Los Angeles
- UCLA Rising to the Challenge Graduate Summer Research Fellowship — 2022
- Graduate Council Diversity Fellowship — 2020
- Political Psychology Pre-Doctoral Research Fellowship — 2019
- Graduate Summer Research Mentorship Award (2nd) — 2018
- Political Psychology Fellowship — 2017
- Graduate Summer Research Mentorship Award — 2017
- Eugene V. Cota-Robles Graduate Fellowship — 2016
- Race, Ethnicity, and Politics Pre-Doctoral Summer Fellowship — 2016

University of California, Riverside
- Political Science Academic Excellence Award — 2016
- Rosemary Schraer Memorial Scholarship — 2015
- Mellon Advancing Intercultural Studies Seminar Fellowship — 2015

## TEACHING

| | |
|---|---|
| Careers in Political Science, Instructor | Summer 2022 |
| Election Law and Voting Rights, Instructor | Summer 2020, Summer 2021 |
| U.S. Latino Politics, Matt Barreto, Ph.D. | Spring 2021 |
| Intro to American Politics, Lynn Vavreck, Ph.D. | Winter 2019 |
| Intro to American Politics, Tom Schwartz, Ph.D. | Fall 2018 |
| World Politics, Joslyn Barnhart, Ph.D. | Spring 2018 |
| Introduction to Data Analysis, Jesse Acevedo, Ph.D. | Winter 2018 |
| Politics of American Suburbanization, Lorrie Frasure-Yokley, Ph.D. | Fall 2017 |

## SERVICE AND MENTORSHIP

**Board Member** — February 2019 to Present
People of Color Also Know Stuff
POCexperts.org

**Lab Organizer** — June 2018 to June 2020
Race, Ethnicity, and Immigration Lab
University of California, Los Angeles

**McNair Program Graduate Student Mentor** — March 2019 to June 2020
Academic Advancement Program
University of California, Los Angeles

**Graduate Student Mentor** — October 2020 to Present
Black Educator Pipeline (BEP)
BLU Educational Foundation

## CONFERENCE PARTICIPATION

- Politics of Race, Immigration, and Ethnicity Consortium (2015, 2017, 2019)
- American Political Science Association (2018, 2019)
- Western Political Science Association (2018, 2019)
- Midwest Political Science Association (2018, 2020)
- National Conference of Black Political Scientists (NCOBPS) (2018, 2020)
- Mellon Advancing Intercultural Studies Capstone Conference (2016)

## MEMBERSHIP

- American Political Science Association (APSA)
- National Conference of Black Political Scientists (NCOBPS)
- Western Political Science Association (WPSA)
- Midwestern Political Science Association (MPSA)

## COMPUTER SKILLS

R, Stata, LaTeX, Markdown, Maptitude, Wordpress, ArcGIS, and qGIS

# Exhibit 5

Dr. Tye Rush Curriculum Vitae
2025

# Tye Rush

Email: tarush[at]ucsd[dot]edu                              Website: www[dot]tyerush[dot]com

Department of Political Science
University of California, San Diego
Social Sciences Building 301
9500 Gilman Drive, #0521
La Jolla, CA 92093-0521

## Academic Employment and Affiliations

2023-2025   *University of California President's Postdoctoral Fellow (PPFP)*
Department of Political Science, University of California, San Diego
*Postdoctoral Fellow*, Black Studies Project, UCSD
*Postdoctoral Affiliate*, Yankelovich Center for Social Science Research, UCSD
*Postdoctoral Affiliate*, Race and Ethnic Politics Lab, UCSD

2023-   *Research Affiliate*, Voting Rights Project, UCSD

## Education

2023   PhD in Political Science, University of California, Los Angeles
      *Committee:*     Dr. Matthew A. Barreto (Chair), Dr. Natalie Masuoka, Dr. Lorrie Frasure,
                    Dr. Loren Collingwood, and Chad Dunn, Esquire
      *Dissertation:*   *The Majority Rules: The Origins of Voter ID Laws and Their Role in Electoral Strategy Today*

2019   MA in Political Science, University of California, Los Angeles

2016   BA in Political Science/Public Service, University of California, Riverside

## Publications

### Journal articles

2025   4. *Rush, Tye*, Chelsea Jones, Michael Herndon, and Matt Barreto (2025). "Catalysts of Insurrection: How White Racial Antipathy Influenced Beliefs of Voter Fraud and Support for the January 6th Insurrection." *The Journal of Race, Ethnicity, and Politics*, 1–21.

2024   3. *Rush, Tye*, Samuel Hall, and Matt Barreto (2024). "The Importance of Counting All Immigrants for Apportionment and Redistricting." *UC Law Journal*, 75(6), 1667-1692.

2023   2. Leslie, Greg, *Tye Rush*, Jonathan Collins, and Matt Barreto (2023). "The Effects of Racial Efficacy on African American Voter Enthusiasm." *Politics, Groups, and Identities*, 12(4), 782-805.

2020   1. Lemi, Danielle Casarez, Maricruz Osorio, and *Tye Rush* (2020). "Introducing People Of Color Also Know Stuff." *PS: Political Science & Politics*, 53(1), 140-141.

### Under Review

1. Uribe, Laura, Kailen Aldridge, Thad Kousser, Kyshan Nichols-Smith, and *Tye Rush*. "The Racial Gap over Trust in Elections (and how to close it)." *(Revise & Resubmit)*.

### In Preparation

6. Laura Uribe, Kailen Aldridge, David Dablo, Thad Kousser, Jennifer L. Merolla, and *Tye Rush*. "The Determinants of Race and Ethnicity in Trust in Elections" *(Working project)*.

5. Rush, Tye. "Jim Crow in a Brooks Brothers Suit: What Motivates State Legislators to Act on Voter ID Bills." *(Working paper)*.
  • UCLA Bunche Center Rising to the Challenge Graduate Research Award, 2022

4. Rush, Tye. "Rock the Roll-Call Vote: The Impact of the 26th Amendment on Representation in Congress." *(Working paper)*.

3. Rush, Tye. "Estimating the Effects of Strict Voter ID Laws at the County Level." *(Working paper)*.

2. Rush, Tye, Matt Barreto, Chad Dunn, and Michael Rios. "How Framing Effects Impact Vote-By-Mail Uptake Among Communities of Color." *(Working paper)*.
• Russell Sage Foundation Presidential Authority Grant (Matt Barreto and Chad Dunn), 2020

1. Collingwood, Loren, Bryan Wilcox-Archuleta, Matt Barreto, and Tye Rush. "Who Nominates? Racial Polarization at the Nominating Petition Stage." *(Working paper)*.

PUBLIC POLICY AND LEGAL WRITING

2022    10. Portugal et al. v. Franklin County. (2022) Expert Report of Tye Rush on behalf of UCLA Voting Rights Project – Challenging Districting Rules and Proposed Maps. U.S. District Court for the Eastern District of Washington. https://latino.ucla.edu/research/violation-of-the-washington-voting-rights-act-of-2018/

2021    9. "Vote Choice of Latino Voters in the 2020 Presidential Election." (2021) with the UCLA Latino Policy and Politics Initiative.

2020    8. Black Voters Matter v. Raffensperger. (2020) Expert Report of Matt Barreto on behalf of UCLA Voting Rights Project – Challenging Postage Requirement. US District Court for the Northern District of Georgia Atlanta Division. https://acluga.org/black-voters-matter-v-raffensperger/

7. Black Voters Matter v. Raffensperger. (2020) Expert Report of Matt Barreto on behalf of UCLA Voting Rights Project – Challenging Voting Burdens at Polling Locations. US District Court for the Northern District of Georgia Atlanta Division. https://acluga.org/black-voters-matter-v-raffensperger/

6. "Protecting Public Health in the 2020 Elections." (2020) with the UCLA Voting Rights Project, Voting Rights Lab, and Union of Concerned Scientists Center for Science and Democracy.

5. "Protecting Democracy: Implementing Equal and Safe Access to the Ballot Box During a Global Pandemic." (2020) with the UCLA Voting Rights Project.

4. "Implementing and Assessing Automatic Voter Registration: Lessons Learned and Policy Recommendations to Improve Voter Registration in the U.S." (2020) with the UCLA Voting Rights Project.

3. "Debunking the Myth of Voter Fraud in Mail Ballots." (2020) with the UCLA Voting Rights Project, University of New Mexico Center for Social Policy, and Union of Concerned Scientists.

2. "Age Discrimination in Voting at Home.." (2020) with UCLA Voting Rights Project, Equal Citizens, Vote At Home, and The Andrew Goodman Foundation.

2019    1. "Whitewashing Representation: How Using Citizenship Data to Gerrymander Will Undermine Our Democracy." (2019) with Common Cause Educational Fund.

# Invited Talks

2024    Claremont Graduate University, Tuesday Talks Series
2023    University of California, Riverside, Political Science Speakers Series
        University of California, Merced, Understanding Politics Seminar Series
2022    University of Texas LBJ School of Public Policy, Policy Talks Series

# Awards and Honors

2023    President's Postdoctoral Fellowship Program, University of California Office of the President
2022    CBC Spouses Education Scholarship, Congressional Black Caucus Foundation
        Princeton Dissertation Scholar, Bobst Center for Peace and Justice at Princeton University

|      | Rising to the Challenge Graduate Summer Research Fellowship, UCLA |
|------|------------------------------------------------------------------|
|      | Lee Ann Fujii Travel Grant, American Political Science Association (3rd) |
| 2021 | Dissertation Fellow, Ford Foundation (Deferred) |
|      | President's Pre-Professoriate Fellow, University of California Office of the President |
|      | Travel Grant, Class and Inequality Section, American Political Science Association |
|      | Lee Ann Fujii Travel Grant, American Political Science Association (2nd) |
| 2020 | Lee Ann Fujii Travel Grant, American Political Science Association |
|      | Graduate Council Diversity Fellowship, UCLA |
| 2019 | Research Fellow at the Institute on Inequality and Democracy, UCLA Luskin School of Public Affairs |
|      | Political Psychology Pre-Doctoral Research Fellowship, UCLA |
| 2018 | Graduate Summer Research Mentorship Award (2nd), UCLA |
| 2017 | Minority Fellow, American Political Science Association |
|      | Travel Grant, American Political Science Association |
|      | MFP Travel Grant, APSA |
|      | Political Psychology Fellowship, UCLA |
|      | Graduate Summer Research Mentorship Award, UCLA |
| 2016 | Graduate Fellowship Award, BLU Educational Foundation |
|      | Eugene V. Cota-Robles Graduate Fellowship, UCLA |
|      | Race, Ethnicity, and Politics Pre-Doctoral Summer Fellowship, UCLA |
|      | Political Science Academic Excellence Award, UC Riverside |
| 2015 | Rosemary Schraer Memorial Scholarship, UC Riverside |
|      | Mellon Advancing Intercultural Studies Seminar Fellowship, UC Riverside |

## Teaching

### Instructor

| 2022 | Careers in Political Science, UCLA |
|------|------------------------------------|
| 2021 | Election Law and Voting Rights, UCLA |
| 2020 | Election Law and Voting Rights, UCLA |

### Teaching Assistant

| 2021 | U.S. Latino Politics, UCLA, Matt Barreto |
|------|------------------------------------------|
| 2019 | Intro to American Politics, UCLA, Lynn Vavreck |
| 2018 | Intro to American Politics, UCLA, Tom Schwartz |
|      | World Politics, UCLA, Joslyn Barnhart |
|      | Introduction to Data Analysis, UCLA, Jesse Acevedo |
| 2017 | Politics of American Suburbanization, UCLA, Lorrie Frasure-Yokley |

## Service and Mentorship

| 2024-     | Committee Member, First Generation Scholars Committee, Western Political Science Association |
|-----------|---------------------------------------------------------------------------------------------|
| 2018-     | Reviewer for *Journal of Politics, Political Research Quarterly, Journal of Race, Ethnicity, and Politics, Politics, Groups, and Identities* |
| 2019-2024 | Board Member, People of Color Also Know Stuff (POCexperts.org) |
| 2020-2021 | Graduate Student Mentor, Black Educator Pipeline (BEP), BLU Educational Foundation |
| 2019-2020 | McNair Program Graduate Student Mentor, Academic Advancement Program, UCLA |
| 2018-2020 | Lab Organizer, Race, Ethnicity, and Immigration (REI) Lab, UCLA |

## Conference Participation

| 2024 | American Political Science Association |
|------|---------------------------------------|
|      | Brennan Center for Justice at NYU School of Law's "The Racial Turnout Gap in the 21st Century" Convening |
|      | Election Science, Administration, & Research Conference |
|      | Politics of Race, Immigration, and Ethnicity Consortium |
| 2023 | Southern Political Science Association |
| 2020 | Midwest Political Science Association |
| 2019 | American Political Science Association |

|      |                                                             |
|------|-------------------------------------------------------------|
|      | National Conference of Black Political Scientists (NCOBPS)  |
|      | Politics of Race, Immigration, and Ethnicity Consortium     |
|      | Western Political Science Association                       |
| 2018 | American Political Science Association                      |
|      | Midwest Political Science Association                       |
|      | National Conference of Black Political Scientists (NCOBPS)  |
|      | Western Political Science Association                       |
| 2017 | Politics of Race, Immigration, and Ethnicity Consortium     |
| 2015 | Politics of Race, Immigration, and Ethnicity Consortium     |

## Research Experience

| | |
|------|-----------------------------------------------------------------------|
| 2023-2025 | Postdoctoral Affiliate, Yankelovich Center for Social Science Research, UCSD |
| 2018-2023 | Senior Policy Fellow, UCLA Voting Rights Project |
| 2019 | Redistricting and Voting Fellow, Common Cause, Los Angeles, CA |
| 2018-2019 | Voting Rights Research Consultant, Latino Decisions, Los Angeles, CA |
| 2017-2018 | Research Fellow, UCLA Latino Policy and Politics Initiative |
| 2016 | Predoctoral Fellow, UCLA Political Science: Race, Ethnicity, and Politics Subfield |
| 2016 | Research InternCohen Research Group, Washington, D.C. |
| 2015-2016 | Research Assistant, Loren Collingwood, Ph.D, University of California, Riverside |

## Membership

American Political Science Association (APSA)
Midwestern Political Science Association (MPSA)
National Conference of Black Political Scientists (NCOBPS)
Southern Political Science Association (SPSA)
Western Political Science Association (WPSA)

## Consulting

| | |
|------|-----------------------------------------------------------------------|
| 2023 | 4. New Mexico, 2023, Navajo Nation et al. v. San Juan County, Expert for plaintiffs related to redistricting. |
|      | 3. Texas, 2023, Petteway et al. v. Galveston County, Expert for plaintiffs related to redistricting. |
| 2022 | 2. Washington, 2022, Portugal et al. v. Franklin County, Expert for plaintiffs related to redistricting. |
| 2021 | 1. California, 2021, Consulting expert for Evitarus Inc. in regarding redistricting in Los Angeles City Council. |

## Computer Skills

R, Stata, LaTeX, Markdown, Maptitude, Wordpress, ArcGIS, and qGIS.

4