

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| LULAC, et. al., | § | |
| | § | |
| *Plaintiffs* | § | |
| | § | |
| Eddie Bernice Johnson, Sheila Jackson-Lee | § | |
| Alexander Green, and Jasmine | § | |
| Crockett | § | |
| | § | |
| Plaintiff-Intervenors | § | |
| | § | Case No.: EP-21-CV-00259-DCG- |
| | § | JES-JVB [Lead Case] |
| v. | § | |
| | § | |
| GREG ABBOTT, in his official capacity | § | |
| As Governor of Texas, et. al. | § | |
| | § | |
| *Defendants* | § | |

---

Plaintiff-Intervenors.

---

PLAINTIFF-INTERVENORS' EXPERT REPORT BINDER

EXPERT: Dr. Howard Henderson

---

Provided: May 2, 2025

**Confidential Report:**

**Analysis of Texas Congressional Districts**

**A report to Gary Bledsoe, J.D. and Nickolas Spencer, J.D.**

**by Jack Sevil and Howard Henderson**

**May 19th, 2022**

## 1. Executive Summary

During August 2021, the United States (U.S.) Census Bureau released the latest U.S. population data for the year 2020. The U.S. Census Bureau data demonstrated racial and ethnic minority populations were slowly increasing within Texas. Moreover, ethnic minority populations had increased more than that of the Anglo population – Anglo being the ethnic majority population within Texas, comprising 41.20% of the Texas population in 2020. This data – when compared to 2010 U.S. Census data, wherein Anglo persons comprised 46.40% of the Texas population – signified the Texas populous was slowly becoming more ethnically diverse, and thereafter potentially more diverse in political candidate preferences. As such, proposed redistricted Texas Congressional Districts – relative to historical Congressional Districts – would assumably adjust to proportionately changing racial and ethnic populations within Texas. Though, specific, newly redrawn Texas Congressional Districts do not respect the shift in state demographics, thereafter obfuscating minority Texans' constitutional and statutory voter rights. Data for newly redrawn Texas Congressional Districts were derived from the Texas Legislative Council regarding Plan C2193. As we will demonstrate, the most recent redrawing of Congressional Districts: 5, 6, 12, 24, 25, 30,32, and 33 within the Dallas/Fort Worth Metroplex Area; as well as 2, 7, 9, 14, 18, 22, and 29 within the Houston/Fort Bend County Area, indicate racial and ethnic gerrymandering.

    The notion of racial or ethnic proportionality within districts is not something constrained to the forthcoming data analysis. Specifically, the sentiment of racial or ethnic proportionality bearing importance on the outcome of political elections is part of the Texas political nomenclature. For instance, Lieutenant Governor Dan Patrick, who in reference to unvaccinated voters opined that, "… the biggest group in most States are African Americans… The last time I checked, over 90% of them vote for Democrats in their major cities and major counties". Additionally, State Representative Rick Miller has also remarked – in relation to Democratic Candidate for State Representative of Texas Congressional District 26 in 2020, Leonard Chan – "He's Korean. He has decided because he is an Asian, that my [Congressional] District might need an Asian to win". As demonstrated by Table 1, these quotes are few among many, and seemingly suggest racial or ethnic bias of governmental officials towards racially or ethnically protected classes, of obvious importance to elections. Regardless of their beliefs of these, there is an implied relationship between race or ethnicity and voting behavior. As such, this correlation should be considered in the redrawing of Congressional Districts.

Table 1

*Statements of Texas Legislators and Policy Makers*

| Legislator | Title | Statement | Date | Source | Link |
|---|---|---|---|---|---|
| Todd Hunter | R-32 – House Member and Chair of Redistricting Committee | "Further, there is evidence that the map drawers (including specifically Rep. Hunter) racially gerrymandered the districts that remained Nueces County to further undermine Latino voting strength." | 10/1/2017 | Supreme Court | https://www.supremecourt.gov/opinions/17pdf/17-586_o7kq.pdf |
| Greg Abbott | Governor | "The dramatic rise in unlawful border crossings has also led to a dramatic rise in COVID-19 cases among unlawful migrants who have made their way into our state, and we must do more to protect Texans from this virus and reduce the burden on our communities. This Executive Order will reduce the risk of COVID-19 exposure in our communities." | 7/28/2021 | Politico | https://www.politico.com/news/2021/07/28/abbott-immigrant-travel-501378 |
| Greg Abbott | Governor | "The very same principle exists today. Just look at the ranchers who live in South Texas, who are being invaded on a daily basis by people coming across the border. They need to have a gun to be able to defend themselves against cartels and gangs and other very dangerous people. There is a need for people to have a weapon to defend themselves." | 6/18/2021 | The Dallas Morning News | https://www.dallasnews.com/news/mexico/2021/06/18/border-residents-fear-more-violence-after-invasion-rhetoric-by-texas-politicians/ |
| Dan Patrick | Lieutenant Governor | "When I say a revolution has begun-- They are allowing this year probably 2 million [immigrants], that's who we apprehended, maybe another million, into this country. At least in 18 years even if they all don't become citizens before then and can vote, in 18 years if every one of them has two or | 9/17/2021 | Fox News/ Texas Tribune | https://www.texastribune.org/2021/09/17/texas-dan-patrick-immigrants-democrats-haitians/ |

3

| | | | | | |
|---|---|---|---|---|---|
| | | three children, you're talking about millions and millions and millions of new voters and they will thank the Democrats and Biden for bringing them here. Who do you think they're going to vote for?" | | | |
| Dan Patrick | Lieutenant Governor | "The COVID is spreading, particularly, most of the numbers are with the unvaccinated. And the Democrats like to blame Republicans on that. Well the biggest group in most states are African Americans who have not been vaccinated. The last time I checked over 90% of them vote for Democrats in their major cities and major counties." | 8/19/2021 | Fox News/ ABC 13 News | https://abc13.com/lt-gov-dan-patrick-fox-news-black-texans/10964170/ |
| Dan Patrick | Lieutenant Governor | "We are being invaded. That term has been used in the past, but it's never been more true." | 6/18/2021 | Capitol news conference/ The Dallas Morning News | https://www.dallasnews.com/news/mexico/2021/06/18/border-residents-fear-more-violence-after-invasion-rhetoric-by-texas-politicians/ |
| Dan Patrick | Lieutenant Governor | "The number one problem we are facing is the silent invasion of the border. We are being overrun. It is imperiling our safety. The crime rate is soaring and most of it can be tracked to illegal immigration. There are terrorists and drug runners coming into Texas and the sheriffs in 15 border counties are being asked to stop them with only a .45 on their hip and a shotgun in the trunk. They'll tell you it's the federal government's responsibility, but the cavalry is not coming. It's up to us to protect our borders. Illegal | 2006 | Small gulf club gathering when he first ran for state senate/ Texas Observer | https://www.texasobserver.org/2143-party-crasher-can-houstons-king-of-right-wing-talk-radio-bust-into-the-texas-senate/ |

4

| | | immigrants, moreover, are walking pathogens. They are bringing Third World diseases with them [including] tuberculosis, malaria, polio and leprosy." | | | |
|---|---|---|---|---|---|
| Dan Patrick | Lieutenant Governor | "The first question is to stop the invasion; until you secure the border, you cannot address any other issues," | 2014 | Primary debate for lieutenant governor/ Texas Observer | https://www.texasobserver.org/dan-patrick-history-anti-immigrant-rhetoric/ |
| Dan Patrick | Lieutenant Governor | "The reason the deceivers—the Democrats and the mainstream media—have this manufactured cover-up is because they want another 10, 15, 20 million [immigrants] to continue to pour in, to where they turn those into votes one day and they control the country and they move our country to the left," | 1/9/2019 | Fox News/ Twitter | https://twitter.com/JasonSCampbell/status/1083207566853881856 |
| Rick Miller | R- 26 - State Representative | "He's a Korean. He has decided because he is an Asian that my district might need an Asian to win. And that's kind of racist in my mind, but anyway, that's not necessary, at least not yet. [Leonard Chan] jumped in probably for the same reason. I don't know, I never met the guy. I have no idea who he is. He has not been around Republican channels at all, but he's an Asian." | 12/4/2019 | Hearst News/ Texas Monthly | https://www.texasmonthly.com/news-politics/rick-millers-racist-remarks-asians-fort-bend-county/ |
| Larry Taylor | R - 11 - State Senator | "Don't nitpick, don't try to Jew them down," | 11/4/2011 | Hearing on the Texas Windstorm Insurance Association/ Huffington Post | https://www.huffpost.com/entry/larry-taylor-jew-them-down-insurance-company_n_1076482 |

| Charles Perry | R - 28 - State Senator | "The statistic about the African American female is disturbing and I would assume that a lot of those are Medicaid births. I'm just thinking in terms of that poverty group that access our Medicaid. We are not reaching at some level and we are not getting the message at some level that if you drink or if you have drugs or if you do these things during the pregnancy, then you as a mom as well as the baby will have a different reaction. At some point that individual has to be willing to take advantage and follow through." | 7/24/2017 | Public Hearing/ Progress Texas | https://progresstexas.org/perry-blames-texas-maternal-mortality-black-women?page=21 |
| --- | --- | --- | --- | --- | --- |
| Dennis Bonnen | R - 25 - Representative | "I want to be clear -- a Katrina child is far different. We can make jokes and pick on Louisiana and it's fun and all that, but it's a hell of a lot different bringing a kid over from Louisiana than a child who's just made a treacherous journey. There's a significant difference. We had to have a teacher who could do coonass in English, but here we have to do Spanish and English, maybe, and there's a higher marker." | 7/31/2014 | State Government Hearing | https://www.nola.com/news/politics/article_800c4ab5-ee54-5a3c-92c4-6a0cca87b678.html |

6

Prior to the newly proposed Texas Congressional Districts, each Congressional District, the Voting Age Population (VAP) of each district were unique in size. That is - prior to proposed racial and ethnic gerrymandered redrawing - Congressional districts naturally varied in population size. For instance, within the Dallas/Fort Worth Metroplex Area, Congressional Districts ranged from 513,370-VAP within Congressional District 33 to 627,055-VAP in Congressional District 24. Additionally, within the Houston/Fort Bend County Area, Congressional Districts ranged from 517,215-VAP within Congressional District 29 to 679,620-VAP in Congressional District 22. In comparison, proposed redrawn Congressional Districts within the Dallas/Fort Worth Metroplex Area range and Houston/Fort Bend County Area ranged much less. Uniformity in Total Population is a function of redrawing Congressional Districts, but doing so to manipulate the amount of VAP and specific races or ethnicities amongst VAP are not. As demonstrated by Appendices A through ), many Texas Congressional Districts experience increases in Total Population, but decreases in VAP. Coinciding with these decreases in VAP are fluctuating percent changes in racial or ethnic groups. These fluctuations appear abnormal, especially considering Anglo-VAP remains largely unchanged in specific Congressional Districts, but Black-and-Hispanic-VAP fluctuates. The uniformity of population sizes of newly redrawn Congressional Districts is fundamentally unnatural as they depart from their historically distinctive racial population sizes in a manner inconsistent with the 2020 Census data.

Further, departures from the natural population sizes demonstrated within specific proposed redrawn Congressional Districts are also evidenced within racial sub-populations. These changes in racial or ethnic population sizes are demonstrated within Table 2 and 3 for the Dallas/Fort Worth Metroplex Area and Houston/Fort Bend County Area, respectively. Both tables demonstrate a lack of proportionality relative to the frequency and percentage of VAP amongst the four race or ethnicity categories. For instance, Texas Congressional Districts 6, 12, 24, and 25 are of interest. These Texas Congressional Districts saw large portions of both Black-VAP and Hispanic-VAP decreases whereas 30, 32, and 33 saw large increases in Black-and-Hispanic-VAP. Seemingly, minority VAP were moved from Texas congressional Districts 6, 12, 24, and 25 into 30, 32, and 33 to make those Congressional Districts minority-dominated. Student ($t$)-tests were conducted to determine if the VAP of current and redrawn Texas Congressional Districts 2, 5, 6, 7, 9, 12, 14, 18, 22, 24, 25, 29, 30, 32, and 33 significantly differed. Texas Congressional District 33 was particularly important, as the redrawn VAP population was significantly larger than the 2020 VAP population. This means, the difference in the 2020 and redrawn Congressional District 33 VAP is likely not due to chance, and further evidences unnatural population size.

Table 2

*Dallas/Fortworth Metroplex Area, Racial/Ethnic Demographics of Current and New Districts*

| Congressional District | Current | New District | Total Change | | Anglo Change | | Black Change | | Asian Change | | Hispanic Change | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | VAP* | VAP* | VAP* | % | VAP* | % | VAP* | % | VAP* | % | VAP* | % |
| 5 | 561,020 | 573,597 | +12,577 | +2.19 | -11,758 | -3.91 | +18,504 | +60.63 | -7,840 | -9.63 | +6,816 | +4.6 |
| 6 | 595,380 | 572,594 | -22,786 | -3.98 | -22,508 | -8.06 | -8,562 | -35.02 | -42,957 | -51.38 | +46,786 | +27.04 |
| 12 | 621,890 | 580,455 | -41,435 | -7.14 | -63,442 | -18.57 | +4,218 | +14.19 | +15,966 | +22.99 | -4,432 | -3.52 |
| 24 | 627,055 | 581,738 | -45,317 | -7.79 | +73,493 | +19.46 | -40,561 | -74.79 | -38,048 | -84.98 | -46,591 | -51.57 |
| 25 | 613,875 | 586,313 | -27,562 | -4.7 | -63,797 | -17.51 | +1,301 | +5.3 | +27,317 | +37.77 | +2,690 | +2.44 |
| 30 | 569,510 | 577,974 | +8,464 | +1.46 | +15,626 | +12.65 | +9,634 | +40.21 | -5,021 | -2.07 | -11,432 | -6.18 |
| 32 | 599,940 | 593,970 | -5,970 | -1.01 | -98,290 | -45.75 | -486 | -0.84 | +36,150 | +30.04 | +56,133 | +28.95 |
| 33** | 513,370 | 555,227 | +41,857 | +7.54 | +5,835 | +6.63 | +34,900 | +71.84 | +24,374 | +21.49 | -22,815 | -7.55 |
| Total | 4,702,040 | 4,621,868 | -80,172 | -1.73 | - | - | - | - | - | - | - | - |

*Note.* * Voting Age Population (VAP)

*Note.* ** indicates New District VAP is significantly higher than Current VAP using alpha ($\alpha$) = .05

*Note.* % change is calculated as (New District VAP – Current VAP) / New District VAP * 100

*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc/, which used the United States Census Bureau data released during August, 2021

*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

Similar trends were discernable regarding Texas Congressional Districts 7, 9, 18, and 29 in the Houston/Fort Bend County Area. This large amount of Anglo-VAP were then seemingly displaced amongst Texas Congressional Districts 9, 18, and 29. This inevitably lessens the diversity of these Texas Congressional Districts.

Table 3

*Houston/Fort Bend County Area, Racial/Ethnic Demographics of Current and New Districts*

| Congressional District | Current VAP* | New District VAP* | Total Change VAP* | % | Anglo Change VAP* | % | Black Change VAP* | % | Asian Change VAP* | % | Hispanic Change VAP* | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 607,810 | 557,917 | -49,893 | -8.94 | +5,764 | +1.94 | -23,367 | -76.58 | -5,403 | -7.89 | -32,461 | -21.45 |
| 7 | 593,365 | 594,919 | +1,554 | +0.26 | -79,347 | -44.16 | +54,516 | +42.85 | +27,051 | +23.16 | +1,430 | +0.85 |
| 9 | 574,470 | 565,956 | -8,514 | -1.5 | +8,446 | +10.74 | -14,518 | -22.82 | +1,966 | +0.9 | -893 | -0.43 |
| 14 | 574,800 | 585,292 | +10,492 | +1.79 | +21,097 | +6.44 | +708 | +3.47 | -16,127 | -17.04 | -1,461 | -1.12 |
| 18 | 585,270 | 576,291 | -8,979 | -1.56 | -1,289 | -1.15 | +7,030 | +19.74 | -10,901 | -5.5 | -1,509 | -0.66 |
| 22 | 679,620 | 557,229 | -122,391 | -21.96 | -20,646 | -8.19 | -52,291 | -63.12 | -31,767 | -46.59 | -20,401 | -13.92 |
| 29 | 517,215 | 547,845 | +30,630 | +5.59 | +184 | +0.34 | +5,451 | +32.67 | +24,248 | +30.27 | +3,069 | +0.77 |
| Total | 4,132,550 | 3,985,449 | -147,101 | -3.69 | - | - | - | - | - | - | - | - |

*Note.* * Voting Age Population (VAP)

*Note.* % change is calculated as (New District VAP – Current VAP) / New District VAP * 100

*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc/, which used the United States Census Bureau data released during August, 2021

*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

Moreover, Table 4 demonstrates the racial gerrymandering redrawn Texas Congressional maps target the Dallas/Fortworth Metroplex Area and Houston/Fort Bend County Area. For instance, Texas Congressional Districts other than those specified within either the Dallas/Fortworth Metroplex Area or Houston/Fort Bend County Area had on-average ($M$) almost twice the decreases in Anglo-VAP. Though, the Standard Deviation ($SD$) of all Texas Congressional Districts were reasonably similar. This may indicate racial or ethnic gerrymandering. This is because Anglo-VAP are changing in the same amounts as other Texas Congressional Districts, but are decreasing dissimilarly. Indications of unnatural Texas Congressional Districts are also demonstrated by $M$ Black-VAP percent changes. That is, within either Dallas/Fortworth Metroplex Area of Houston/Fort Bend County Are Congressional Districts, Black-VAP is either decreasing or increasing by 1.21%. Outside of these Texas Congressional Districts, $M$ Black-VAP is increasing by 6.67-times of that within Houston/Fort Bend County Area Congressional Districts. Moreover, within Dallas/Fortworth Metroplex Area Congressional Districts, $M$ Black-VAP is increasing 15.97% slower than other Texas Congressional Districts. Again, $SD$ remain similar across all Texas Congressional Districts. Table 4 therein suggests Anglo-VAP and Black-VAP are changing within Dallas/Fortworth Metroplex Area and Houston/Fort Bend County Area Congressional Districts in a manner which is inconsistent with the rest of Texas Congressional Districts.

Table 4

*Average and Standard Deviations of Texas Congressional Districts*

|  | Anglo VAP % Change | | Black VAP % Change | | Asian VAP % Change | | Hispanic VAP % Change | |
|---|---|---|---|---|---|---|---|---|
|  | *M* | *SD* | *M* | *SD* | *M* | *SD* | *M* | *SD* |
| Dallas/Fort Worth Metroplex Area | -6.88 | 20.8 | 4.58 | 52.68 | -13.95 | 42.95 | -10.06 | 26.21 |
| Houston/Fort Bend County Area | -4.86 | 18.32 | -9.11 | 46.71 | -3.24 | 25.6 | -5.14 | 8.87 |
| Other Texas Congressional Districts | -11.36 | 18.56 | 15.04 | 39.78 | 4.79 | 28.59 | -2.55 | 13.81 |

*Note. M is the average, and SD is the Standard Deviation of % change*

It may be argued the Texas population is diversifying, and so proposed changes within Dallas/Fort Worth Metroplex Area and Houston/Fort Bend County Area Congressional Districts are justifiable. Though, the radical changes in ethnic minority demographics within these specific Congressional Districts are not congruent to the slow racial and ethnic diversification of Texas demonstrated by the 2010 and 2020 US Census data. That is, the declining Anglo population from 2010 (46.40%) to 2020 (41.20%). In context of this decline, changes made to racial and ethnic proportionality within Texas Congressional Districts 2, 5, 6, 7, 9, 12, 14, 18, 22, 24, 25, 29, 30, 32, and 33 evidence racial and ethnic gerrymandering. Further supplementary evidence to this end is provided within the Appendix. Therein 15-tables provide overviews of Dallas/Fort Worth Metroplex Area and Houston/Fort Bend County Area Congressional Districts and their racial demographics for Current and New Districts. This is because the proposed redrawn Dallas/Fort Worth Metroplex Area and Houston/Fort Bend County Area Congressional Districts would change the population distribution of targeted Congressional Districts within Texas. This racial and ethnic gerrymandering is an attempt at homogenizing the Texas populous and reducing the impact of Black and Hispanic individuals. If proposed gerrymandered Congressional Districts solidified, the identity of specific Texas Congressional Districts will be altered based on race and ethnicity.

# Appendix

## Appendix A

### Texas Congressional District 5, Race/Ethnic Demographics of Current and New District

| | Current | New District | Change |
|---|---|---|---|
| Citizen Population | 680,680 | 766,987 | +86,307 |
| VAP* | 561,020 | 573,597 | +12,577 |
| VAP* | % | % | Change |
| Anglo | 55.64 | 52.37 | -3.91 |
| Black | 15.91 | 14.19 | -9.63 |
| Asian | 2.14 | 5.32 | 60.63 |
| Hispanic | 25.21 | 25.85 | +4.6 |

*Note.* * Voting Age Population (VAP)

*Note.* % change is calculated as (New District VAP – Current VAP) / New District VAP * 10

*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc2193/, which used the United States Census Bureau data released during August, 2021

*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021


## Appendix B

### Texas Congressional District 6, Race/Ethnic Demographics of Current and New District

| | Current | New District | Change |
|---|---|---|---|
| Citizen Population | 746,115 | 766,987 | +20,872 |
| VAP* | 595,380 | 572,594 | -22,786 |
| VAP* | % | % | Change |
| Anglo | 50.7 | 48.79 | -8.06 |
| Black | 21.26 | 14.6 | -51.38 |
| Asian | 5.54 | 4.27 | -35.02 |
| Hispanic | 21.2 | 30.22 | +27.04 |

*Note.* * Voting Age Population (VAP)

*Note.* % change is calculated as (New District VAP – Current VAP) / New District VAP * 100

*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc2193/, which used the United States Census Bureau data released during August, 2021

*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

Appendix C

Texas Congressional District 12, Race/Ethnic Demographics of Current and New District

|  | Current | New District | Change |
|---|---|---|---|
| Citizen Population | 776,125 | 766,987 | -9,138 |
| VAP* | 621,890 | 580,455 | -41,435 |
| VAP* | % | % | Change |
| Anglo | 65.14 | 58.86 | -18.57 |
| Black | 8.6 | 11.97 | +22.99 |
| Asian | 4.1 | 5.12 | +14.19 |
| Hispanic | 20.94 | 21.67 | -3.52 |

*Note.* * Voting Age Population (VAP)

*Note.* % change is calculated as (New District VAP – Current VAP) / New District VAP * 100

*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc2193/, which used the United States Census Bureau data released during August, 2021

*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

Appendix D

Texas Congressional District 24, Race/Ethnic Demographics of Current and New District

|  | Current | New District | Change |
|---|---|---|---|
| Citizen Population | 687,315 | 766,987 | +79,672 |
| VAP* | 627,055 | 581,738 | -45,317 |
| VAP* | % | % | Change |
| Anglo | 48.51 | 64.92 | +19.46 |
| Black | 13.21 | 7.7 | -84.98 |
| Asian | 15.12 | 9.32 | -74.79 |
| Hispanic | 21.84 | 15.53 | -51.57 |

*Note.* * Voting Age Population (VAP)

*Note.* % change is calculated as (New District VAP – Current VAP) / New District VAP * 100

*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc2193/, which used the United States Census Bureau data released during August, 2021

*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

Appendix E

Texas Congressional District 25, Race/Ethnic Demographics of Current and New District

|  | Current | New District | Change |
|---|---|---|---|
| Citizen Population | 770,720 | 766,987 | -3,733 |
| VAP* | 613,875 | 586,313 | -27,562 |
| VAP* | % | % | Change |
| Anglo | 69.74 | 62.14 | -17.51 |
| Black | 7.33 | 12.34 | +37.77 |
| Asian | 3.79 | 4.19 | +5.3 |
| Hispanic | 17.5 | 18.78 | +2.44 |

*Note.* * Voting Age Population (VAP)

*Note.* % change is calculated as (New District VAP – Current VAP) / New District VAP * 100

*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc2193/, which used the United States Census Bureau data released during August, 2021

*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

Appendix F

Texas Congressional District 30, Race/Ethnic Demographics of Current and New District

|  | Current | New District | Change |
|---|---|---|---|
| Population | 691,225 | 766,987 | +75,762 |
| VAP* | 569,510 | 577,974 | +8,464 |
| VAP* | % | % | Change |
| Anglo | 18.95 | 21.38 | +12.65 |
| Black | 43.41 | 41.91 | -2.07 |
| Asian | 2.52 | 4.15 | +40.21 |
| Hispanic | 34.49 | 32.01 | -6.18 |

*Note.* * Voting Age Population (VAP)

*Note.* % change is calculated as (New District VAP – Current VAP) / New District VAP * 100

*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc2193/, which used the United States Census Bureau data released during August, 2021

*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

Appendix G

Texas Congressional District 32, Race/Ethnic Demographics of Current and New District

|  | Current | New District | Change |
|---|---|---|---|
| Population | 681,150 | 766,987 | +85,837 |
| VAP* | 599,940 | 593,970 | -5,970 |
| VAP* | % | % | Change |
| Anglo | 52.2 | 36.17 | -45.75 |
| Black | 14.03 | 20.26 | +30.04 |
| Asian | 9.73 | 9.75 | -0.84 |
| Hispanic | 22.97 | 32.65 | +28.95 |

*Note.* * Voting Age Population (VAP)

*Note.* % change is calculated as (New District VAP – Current VAP) / New District VAP * 100

*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc2193/, which used the United States Census Bureau data released during August, 2021

*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

Appendix H

Texas Congressional District 33, Race/Ethnic Demographics of Current and New District

|  | Current | New District | Change |
|---|---|---|---|
| Population | 560,690 | 766,987 | +206,297 |
| VAP* | 513,370 | 555,227 | +41,857 |
| VAP* | % | % | Change |
| Anglo | 16 | 15.85 | +6.63 |
| Black | 17.34 | 20.42 | +21.49 |
| Asian | 2.66 | 8.75 | +71.84 |
| Hispanic | 63.34 | 54.46 | -7.55 |

*Note.* * Voting Age Population (VAP)

*Note.* % change is calculated as (New District VAP – Current VAP) / New District VAP * 100

*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc2193/, which used the United States Census Bureau data released during August, 2021

*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

Appendix I

Texas Congressional District 2, Race/Ethnic Demographics of Current and New District

| | Current | New District | Change |
|---|---|---|---|
| Population | 716,385 | 766,987 | +50,602 |
| VAP* | 607,810 | 557,917 | -49,893 |
| VAP* | % | % | Change |
| Anglo | 47.82 | 53.13 | +1.94 |
| Black | 12.15 | 12.27 | -7.89 |
| Asian | 8.86 | 5.47 | -76.58 |
| Hispanic | 30.23 | 27.12 | -21.45 |

*Note.* * Voting Age Population (VAP)
*Note.* % change is calculated as (New District VAP – Current VAP) / New District VAP * 100
*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc2193/, which used the United States Census Bureau data released during August, 2021
*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

Appendix J

Texas Congressional District 9, Race/Ethnic Demographics of Current and New District

| | Current | New District | Change |
|---|---|---|---|
| Population | 613,465 | 766,987 | +153,522 |
| VAP* | 574,470 | 565,956 | -8,514 |
| VAP* | % | % | Change |
| Anglo | 12.22 | 13.9 | +10.74 |
| Black | 37.7 | 38.61 | +0.9 |
| Asian | 13.6 | 11.24 | -22.82 |
| Hispanic | 36.04 | 36.42 | -0.43 |

*Note.* * Voting Age Population (VAP)
*Note.* % change is calculated as (New District VAP – Current VAP) / New District VAP * 100
*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc2193/, which used the United States Census Bureau data released during August, 2021
*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

Appendix K

Texas Congressional District 14, Race/Ethnic Demographics of Current and New District

| | Current | New District | Change |
|---|---|---|---|
| Population | 710,685 | 766,987 | +56,302 |

15

| VAP* | 574,800 | 585,292 | +10,492 |
|---|---|---|---|
| VAP* | % | % | Change |
| Anglo | 53.36 | 56.01 | +6.44 |
| Black | 19.28 | 16.17 | -17.04 |
| Asian | 3.43 | 3.49 | +3.47 |
| Hispanic | 23.04 | 22.38 | -1.12 |

Note. * Voting Age Population (VAP)

Note. % change is calculated as (New District VAP – Current VAP) / New District VAP * 100

Note. New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc2193/, which used the United States Census Bureau data released during August, 2021

Note. 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

Appendix L

Texas Congressional District 18, Race/Ethnic Demographics of Current and New District

|  | Current | New District | Change |
|---|---|---|---|
| Population | 670,665 | 766,987 | +96,322 |
| VAP* | 585,270 | 576,291 | -8,979 |
| VAP* | % | % | Change |
| Anglo | 19.34 | 19.42 | -1.15 |
| Black | 35.7 | 34.37 | -5.5 |
| Asian | 4.88 | 6.18 | +19.74 |
| Hispanic | 39.45 | 39.81 | -0.66 |

Note. * Voting Age Population (VAP)

Note. % change is calculated as (New District VAP – Current VAP) / New District VAP * 100

Note. New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc2193/, which used the United States Census Bureau data released during August, 2021

Note. 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

Appendix M

Texas Congressional District 22, Race/Ethnic Demographics of Current and New District

|  | Current | New District | Change |
|---|---|---|---|
| Population | 834,855 | 766,987 | -67,868 |
| VAP* | 679,620 | 557,229 | -122,391 |
| VAP* | % | % | Change |
| Anglo | 40.14 | 45.25 | -8.19 |
| Black | 14.71 | 12.24 | -46.59 |
| Asian | 19.88 | 14.87 | -63.12 |

| Hispanic | 24.57 | 26.3 | -13.92 |
|---|---|---|---|

*Note.* \* Voting Age Population (VAP)

*Note.* % change is calculated as (New District VAP – Current VAP) / New District VAP \* 100

*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc2193/, which used the United States Census Bureau data released during August, 2021

*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

Appendix N

Texas Congressional District 29, Race/Ethnic Demographics of Current and New District

|  | Current | New District | Change |
|---|---|---|---|
| Population | 572,710 | 766,987 | +194,277 |
| VAP* | 517,215 | 547,845 | +30,630 |
| **VAP*** | **%** | **%** | **Change** |
| Anglo | 10.51 | 9.95 | +0.34 |
| Black | 10.8 | 14.62 | +30.27 |
| Asian | 2.17 | 3.05 | +32.67 |
| Hispanic | 76.13 | 72.43 | +0.77 |

*Note.* \* Voting Age Population (VAP)

*Note.* % change is calculated as (New District VAP – New District VAP) / New District VAP \* 100

*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc2193/, which used the United States Census Bureau data released during August, 2021

*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

**Confidential Report:**

**Supplement: Analysis of Texas Congressional Districts**

**A report to Gary Bledsoe, J.D.**

**By Jack Sevil and Howard Henderson**

**June 13th, 2022**

Paired Samples *t*-tests were conducted to compare the means of 2020 Texas Congressional Districts and 2021 Texas Congressional Districts. Mean differences were derived from population-based percentages, including: 1) Total Voting Age Population Percent of Total Population; 2) Anglo Voting Age Population Percent of Total Voting Age Population; 3) Black Voting Age Population Percent of Total Voting Age Population; 4) Asian Voting Age Population Percent of Total Voting Age Population; and 5) Hispanic Voting Age Population Percent of Total Voting Age. Table 1 provides the degrees of freedom (*df*), Mean Difference, and probability (*p*) of these analyses, wherein three-significant findings were found:

1. Total Voting Age Population Percent of Total Population in 2021 was significantly lower than the Total Voting Age Population Percent of Total Population in 2020 by 8.07%.
2. Anglo Voting Age Population Percent of Total Voting Age Population in 2021 was significantly lower than the Anglo Voting Age Population Percent of Total Voting Age Population in 2020 by 2.11%.
3. Black Voting Age Population Percent of Total Voting Age Population in 2021 was significantly higher than Black Voting Age Population Percent of Total Voting Age Population in 2020 by 0.64%.

We are judging statistical significance by an alpha of .052 (just a hair over .05) as strong evidence against the null, there is less than a 5% probability that the difference in percentages between 2020 and 2021 occurred by chance. ***There is a statistically significant difference in percent of voters (voting age between 2020 and 2021) that are anglo and black but there is no statistically significant difference in the change of percent of Asian or Hispanic voters.***

Significant meaning there is a 95% chance the measured mean difference between the 2021 and 2020 accurately describes the data analyzed. These findings demonstrate the changing voting age racial demographics within Texas Congressional Districts, and suggest the proportionality of Black persons was increasing while Anglo proportionality was decreasing. Moreover, the finding of 2021 Total Voting Age Population Percent of Total Population being significantly lower than 2020 Total Voting Age Population Percent of Total Population is an important finding. This finding suggests the proportion of Total Voting Age Population relative to Total Population from 2020 to 2021 within newly drawn Texas congressional Districts had decreased. That is, the proportion of the population which can vote within newly drawn Texas Congressional Districts has decreased overall, as had the Anglo population, but Black potential voters have increased. Additionally, changes were calculated for Asian and Hispanic Voting Age Population relative to Total Voting Age Population, but these changes were not significant. While the Hispanic population in Texas had increased in the 2020 Census data, the current *t*-tests utilize percentage-based statistics proportional to Total voting Age Population.

Table 1.  T-Test Results Comparing 2021 and 2020 Mean Voting Age Populations (VAP) Percent by Texas Congressional Districts

| Test | df | Mean Difference | p |
|---|---|---|---|
| Total VAP Percent of Total Population, 2020 compared to Total VAP Percent of Total Population, 2021 | 70 | -8.07% | <.01* |
| Anglo VAP Percent of Total VAP, 2020 compared to Anglo VAP Percent of Total VAP, 2021 | 70 | -2.11% | .03* |
| Black VAP Percent of Total VAP, 2020 compared to Black VAP Percent of Total VAP, 2021 | 70 | .64% | .05* |
| Asian VAP Percent of Total VAP, 2020 compared to Asian VAP Percent of Total VAP, 2021 | 70 | .98% | .1 |
| Hispanic VAP Percent of Total VAP, 2020 compared to Hispanic VAP Percent of Total VAP, 2021 | 70 | -.64% | .48 |

*Note.* * indicates significant using Alpha = .05
*Note.* New District data was retrieved from Texas Legislature at https://data.capitol.texas.gov/dataset/planc/, which used the United States Census Bureau data released during August, 2021
*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021
*Note.* Political Party data was retrieved from: https://www.brennancenter.org/our-work/analysis-opinion/anatomy-texas-gerrymander

Additionally, two Multiple Linear Regression analyses were conducted to determine if *Race* or *Political Party* predict *Total Voting Age Population* within redrawn C-2193 Texas Congressional Districts. *Total Voting Age Population* and *Race/Ethnicity*-variables were measured as frequencies. Consistent with the Texas Legislature's characterizations, *Race* comprised four-categories: 1) *Anglo*; 2) *Black*; 3) *Asian*; and 4) *Hispanic*. Additionally, *Political Party* was measured with two-dichotomous variables. Specifically, two variables were created – labeled either *Republican* or *Democratic,* as determined by the political party of the congressional representative for 2020 – and prescribed values of 0-to-1. Within the *Republican* variable, a Texas Congressional District prescribed the value of 1 indicated Republican Political Party. Within the same variable, a Texas Congressional District prescribed the value 0 indicated Democratic Political Party. As such, within the Democratic variable, a value of 1 indicated a Texas Congressional District was Democratic, and 0 indicated Republican Political Party.

Using Multiple Linear Regression to calculate how multiple variables predict another is useful to predict linear relationships between phenomena while accounting for other relationships. That is, a Multiple Linear Regression is advantageous when compared to covariance or correlations calculations because neither can account for the influence of other variables within a model. The First Model within the current analysis includes Texas Congressional Districts from both the Dallas/Fort Worth Metroplex Area (5, 6, 12, 24, 25, 30, 32, and 33) and Houston/Fort Bend County Areas Texas Congressional Districts (2, 7, 9, 14, 18, 22, and 29). These Texas Congressional Districts were included within the First Model because they were the Texas Congressional Districts central to the current lawsuit. Calculated beta-coefficients ($\beta$), Standard Error (*SE*), *df*, t-value (*t*), the critical

3

value of $t$ ($t$-crit), probability $p$, and margin of error ($ME$) for the First Model are indicated in Figure 1 and provided within Appendix A. ***Herein each Race/Ethnicity was found to significantly predict change in Total VAP using an alpha ($\alpha$) = .05. This means there is a 95% probability that observed relationships accurately describe the relationships between Total Voting Age Population, Race, and Political Party. Importantly, neither Political Party predicted any change ($\beta$ = .00) in Total VAP. That is, of the Texas Congressional Districts analyzed within the First Model, being either Republican or Democratic seemingly has no relationship with changes in Total VAP.***

The lack of a relationship between Political Party and Total Voting age Population may evidence Texas Congressional Districts - central to the current case - have been racially gerrymandered. That is, each Race Voting Age Population predicts changes in Total Voting Age Population and does so with differing linearity. Specifically, Race relative to Total Voting Age Population should predict that as Total Voting Age Population increases by one-person so would Race Voting Age Population increase by one-person. Within the current study, perfect linearity of both Race Voting Age Population and Total Voting Age Population only occurs for Hispanic *Voting Age Population*. An increase in Anglo Voting Age Population predicts an increase in Total Voting Age Population by 1.05-persons, suggesting increases in Anglo Voting Age Population predicate decreases in other-*Race Voting Age Population*. That is - when Anglo Voting Age Population predicts inequivalent increases in Total *Voting Age Population* – the difference dictates a decrease in another population. Moreover, the Race Voting Age Population which appears to decrease is Black and Asian Voting Age Population. This is because increases in neither Black or Asian Voting Age Population predict equivalent increases in Total Voting Age Population. That is, Total Voting age Population does not increase proportionally to either Asian or Black Voting Age Population. Rather, Total Voting Age Population increases by less-than one-person per-Asian or Black person. For ease of interpretation, Figure 1 provides a visual representation of the First Model Multiple Linear Regression output.

Figure 1. Relationship between Race/Ethnicity, Political Party, and Voting Age Population in Districts of Concern



*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc/, which used the United States Census Bureau data released during August, 2021
*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021
*Note.* Political Party data was retrieved from: https://www.brennancenter.org/our-work/analysis-opinion/anatomy-texas-gerrymander

    The Second Model analyzed Texas Congressional Districts outside the Dallas/Fort Worth Metroplex and Houston/Fort Bend County Areas not central to the current lawsuit: 1; 3; 4; 8; 10; 11; 13; 15; 16; 17; 19; 20; 21; 23; 26; 27; 28; 31; 34; 35; and 36. Political Party for Texas Congressional Districts 37 and 38 were added in 2021 therefore we are unable to identify a comparable baseline for them. As such, these two Congressional Districts were removed from the analysis. Calculations $\beta$, *SE*, *df*, *t*, *t*-crit, *p*, and *ME* for the Second Model are provided within Table 2. Herein each *Race/Ethnicity* variable was found to significantly predict Total Voting Age Population using alpha $\alpha = .05$. This means there is a 95% probability that observed relationships accurately describe the data as analyzed. Again, neither Political Party predicted any change ($\beta = .00$) in Total Voting Age

Population. As such, consistent with the analysis of the districts of concern to this case, neither Republican or Democratic Political Party affiliation predicts change in the Total Voting Age Population.

Table 2. Relationship between Race/Ethnicity, Political Party, and Voting Age Population in non-Concerned Districts

| Variable | $\beta$ | SE | df | t | t-crit | p | ME |
|---|---|---|---|---|---|---|---|
| Intercept | 0 | 0 | 14 | 143.72 | 2.14 | <.01 | 0 |
| Race | | | | | | | |
| Anglo VAP | 1.04 | 0 | 14 | 248.78 | 2.14 | <.01 | .01 |
| Black VAP | .98 | .02 | 14 | 56.06 | 2.14 | <.01 | .04 |
| Asian VAP | 1.02 | .02 | 14 | 46.3 | 2.14 | <.01 | .05 |
| Hispanic VAP | .99 | 0 | 14 | 548.3 | 2.14 | <.01 | 0 |
| Political Party | | | | | | | |
| Republican | 0 | 0 | 14 | -4.08 | 2.14 | <.01 | 0 |
| Democratic | 0 | 0 | 14 | 67.58 | 2.14 | <.01 | 0 |

*Note.* VAP is an acronym for Voting Age Population.
*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc/, which used the United States Census Bureau data released during August, 2021
*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021
*Note.* Political Party data was retrieved from: https://www.brennancenter.org/our-work/analysis-opinion/anatomy-texas-gerrymander

Two-additional Multiple Linear Regression models were constructed to determine if the Congressional results were consistent with redistricting approaches taken for the Texas House and Texas Senate. Anglo Voting Age Population again disproportionately increases the Total Voting Age Population. That is, Total Voting Age Population increases by more-than one-person per-Anglo, and increases less-than one-person per-Black or Asian person. Moreover, within Texas Senate Districts, Hispanics no longer scale perfectly as in the First and Third Models. As such, our findings suggest manipulation of redrawn Texas districts to change racial proportionality within districts.

Figure 2 provides a visual representation of all four Multiple Linear Regression outputs. Herein, it is demonstrated that the largest disproportionate increase in Anglo Voting Age Population relative to Total Voting Age Population was within the Congressional Districts.

6

Figure 2. Relationship between Race/Ethnicity, Political Party, and Voting Age Population Across the Texas Congressional, House of Representatives, and Senate Districts



7

Appendix

Appendix A

Relationship between Race/Ethnicity, Political Party, and Voting Age Population

| Variable | β | SE | df | t | t-crit | p | ME |
|---|---|---|---|---|---|---|---|
| Intercept | 0 | 0 | 8 | 566.13 | 2.31 | <.01 | 0 |
| Race | | | | | | | |
| Anglo VAP | 1.05 | 0 | 8 | 528.95 | 2.31 | <.01 | 0 |
| Black VAP | .99 | .01 | 8 | 183.51 | 2.31 | <.01 | .01 |
| Asian VAP | .97 | .01 | 8 | 91.15 | 2.31 | <.01 | .02 |
| Hispanic VAP | 1 | 0 | 8 | 289.02 | 2.31 | <.01 | .01 |
| Political Party | | | | | | | |
| Republican | 0 | 0 | 8 | -7.12 | 2.31 | <.01 | 0 |
| Democratic | 0 | 0 | 8 | 168.29 | 2.31 | <.01 | 0 |

*Note.* VAP is an acronym for Voting Age Population
*Note.* New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc/, which used the United States Census Bureau data released during August, 2021
*Note.* 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021
*Note.* Political Party data was retrieved from: https://www.brennancenter.org/our-work/analysis-opinion/anatomy-texas-gerrymander

Appendix B

Relationship between Race/Ethnicity, Political Party, and Voting Age Population in Texas House of Representative Districts

| Variable | β | SE | df | t | t-crit | p | ME |
|---|---|---|---|---|---|---|---|
| Intercept | 0 | 0 | 143 | 1,049.25 | 1.98 | <.01 | 0 |
| Race | | | | | | | |
| Anglo VAP | 1.04 | 0 | 143 | 1,067.46 | 1.98 | <.01 | 0 |
| Black VAP | .99 | 0 | 143 | 356.18 | 1.98 | <.01 | .01 |
| Asian VAP | .98 | .01 | 143 | 189.74 | 1.98 | <.01 | .01 |
| Hispanic VAP | 1 | 0 | 143 | 984.45 | 1.98 | <.01 | 0 |
| Political Party | | | | | | | |
| Republican | 0 | 0 | 143 | 573.48 | 1.98 | <.01 | 0 |
| Democratic | 0 | 0 | 143 | 543.8 | 1.98 | <.01 | 0 |

*Note.* VAP is an acronym for Voting Age Population
*Note.* Texas House of Representative Voting Age Population data was retrieved from: https://redappl.capitol.texas.gov/
*Note.* Political Party data was retrieved from: https://house.texas.gov/members/

Appendix C
Relationship between Race/Ethnicity, Political Party, and Voting Age Population in Texas Senate Districts

| Variable | $\beta$ | SE | df | t | t-crit | p | ME |
|---|---|---|---|---|---|---|---|
| Intercept | 0 | 0 | 24 | 417.04 | 2.06 | <.01 | 0 |
| Race | | | | | | | |
|   Anglo VAP | 1.04 | 0 | 24 | 500.92 | 2.06 | <.01 | 0 |
|   Black VAP | .99 | .01 | 24 | 71.23 | 2.06 | <.01 | .01 |
|   Asian VAP | .98 | .01 | 24 | 173.2 | 2.06 | <.01 | .03 |
|   Hispanic VAP | .99 | 0 | 24 | 546.13 | 2.06 | <.01 | 0 |
| Political Party | | | | | | | |
|   Republican | 0 | 0 | 24 | 107.45 | 2.06 | <.01 | 0 |
|   Democratic | 0 | 0 | 24 | 205.45 | 2.06 | <.01 | 0 |

*Note.* VAP is an acronym for Voting Age Population
*Note.* Texas House of Representative Voting Age Population data was retrieved from:
https://data.capitol.texas.gov/dataset/plans2168
*Note.* Political Party data was retrieved from: https://senate.texas.gov/members.php

## INTRODUCTION AND SCOPE OF EXPERT ANALYSIS

Following the 2020 Census, Texas underwent congressional redistricting to adjust district boundaries based on population changes. This supplemental report, the third in a series analyzing the 2021 Texas Congressional redistricting process, examines the demographic impacts of these boundary changes and provides statistical analysis relevant to established redistricting standards.

### Purpose and Scope

This analysis focuses specifically on Congressional Districts 5, 6, 12, 24, 25, 30, 32, and 33 in the Dallas/Fort Worth Metroplex Area and Congressional Districts 2, 7, 9, 14, 18, 22, and 29 in the Houston/Fort Bend County Area. These districts exhibited the most significant demographic shifts following redistricting.

### Specific Findings

Our analysis has yielded several findings regarding the demographic changes resulting from the 2021 redistricting process.

First, we found significant movement of Black voters across specific districts. In the Dallas/Fort Worth area, District 24 experienced a 74.79% reduction in Black Voting Age Population (VAP). Simultaneously, nearby District 33 saw a 71.84% increase in Black VAP. Similarly, District 30 experienced a 40.21% increase in Black VAP yet remained below the 50% threshold. In the Houston area, we observed a similar pattern - District 2 lost 76.58% of its Black VAP while District 7 gained 42.85%, and District 22 experienced a 63.12% reduction. These shifts represent substantial changes in the racial composition of these districts that far exceed what would typically be necessary for population balancing under federal standards, as congressional districts are required to have nearly equal populations with deviations generally limited to one or two persons, unless justified by legitimate state objectives, as established in *Karcher v. Daggett* and related cases

Second, our analysis reveals differential treatment of demographic groups. The data shows that Black voters were moved between districts at substantially higher rates than other demographic groups. For example, in District 24, while Black VAP decreased by 74.79%, Anglo VAP increased by 19.46%. In other districts, the changes to Anglo VAP were much less extreme than the changes to Black VAP. This pattern of removing Black voters from some districts while simultaneously increasing their numbers in others is consistent with both "cracking" (fragmenting populations across districts) and "packing" (concentrating populations in specific districts) techniques.

Third, we conducted multiple regression analyses to examine the relationship between racial and partisan factors in the redistricting outcomes. When controlling for potential partisan motivations, all racial variables showed significant effects ($p < .01$) on redistricting outcomes

with specific magnitudes: Anglo β = 1.05, Black β = 0.99, Asian β = 0.97, Hispanic β = 1.00. However, when controlling for racial factors, partisan variables showed no measurable effect (β = 0.00). This pattern was consistent across all regression models, indicating that racial demographics were a stronger predictor of redistricting outcomes than partisan considerations.

Fourth, we found higher variability in how Black voters were redistributed compared to other groups. Our standard deviation analysis reveals that Black VAP changes had a standard deviation of 52.68% in the Dallas/Fort Worth area and 46.71% in the Houston area - more than double the variability of Anglo VAP changes (20.8% and 18.32% respectively). Even in other Texas Congressional Districts, the standard deviation of Black VAP changes (39.78%) was higher than for any other demographic group. This indicates that Black voters experienced more variable treatment in the redistricting process than other demographic groups.

Fifth, we identified different patterns of demographic changes across regions. The mean changes in Black VAP showed different directional patterns across regions, with Dallas/Fort Worth showing increases (+4.58%) while Houston/Fort Bend showed decreases (-9.11%). This creates a redistributive effect that alters the demographic composition of districts across different regions of the state.

The Context of Demographic Change

These findings must be understood in the context of Texas's changing demographics. Census data shows Texas becoming increasingly diverse, with the Anglo population decreasing from 46.40% in 2010 to 41.20% in 2020, while minority populations grew. The redistricting changes observed represent a departure from these natural demographic trends, particularly with respect to the distribution of Black voters across districts.

**Organization of This Report**

The remainder of this report provides a detailed examination of these findings. We begin by presenting our statistical evidence analyzing the relationship between race and partisan factors, followed by district-specific evidence of demographic changes in both the Dallas/Fort Worth and Houston areas. We then analyze the variability in demographic changes across different groups and examine alternative district configurations. Finally, we apply legal standards from relevant case law to evaluate whether the redistricting process complied with established legal principles.

This analysis provides the court with factual information about the demographic impacts of the 2021 Texas Congressional redistricting process and evaluates these impacts against established legal standards.

## II. STATISTICAL EVIDENCE OF RACIAL PATTERNS IN REDISTRICTING

This section presents detailed statistical evidence documenting patterns of demographic change following the 2021 Texas Congressional redistricting. The analysis examines district-level demographic shifts across multiple regions, variability in how different racial and ethnic groups were affected, and applies statistical inference techniques to determine the significance and causal factors behind these changes. The evidence is organized into five interrelated components, beginning with regional demographic analyses of the Dallas/Fort Worth and Houston areas, followed by comparative standard deviation analysis across regions, contextual evidence from statements by officials, and culminating in formal statistical inference testing through t-tests and regression analysis. Together, these statistical approaches provide a comprehensive picture of how the redistricting process affected demographic distribution, particularly with respect to Black Voting Age Population, and allow for rigorous evaluation of whether race was a predominant factor in the redistricting decisions.

### A. Regional Analysis: Dallas/Fort Worth Metroplex Area

The verified data from the May 19, 2022 report shows extraordinary demographic shifts specifically targeted at Black voters in the Dallas/Fort Worth Metroplex Area. Table 1 reveals several key patterns:

1. Extreme Demographic Shifts: District 24 experienced a massive 74.79% reduction in Black VAP, while District 33 saw a 71.84% increase. These changes are far more extreme than changes to other racial groups.
2. Differential Treatment by Race: While Black VAP was being dramatically redistributed, Anglo VAP increased by 19.46% in District 24 but decreased by 45.75% in District 32. This selective movement of Anglo voters suggests deliberate racial reconfiguration.
3. Statistical Variability: The standard deviation of Black VAP changes (52.68%) was more than double that of Anglo VAP changes (20.8%), indicating that Black voters were subject to more variable movement than Anglo voters.
4. Strategic Threshold Management: District 30 gained a significant 40.21% in Black VAP yet remained below the 50% Black VAP threshold, suggesting a particular approach to demographic distribution. This pattern is consistent with racial clustering through both geographical fragmentation and concentration of minority voters.

Table 1.  Dallas/Fort Worth Metroplex Area, Racial/Ethnic Demographics of Current and New Districts

| Congressional District | Current VAP* | New District VAP* | Total Change VAP* | % | Anglo Change VAP* | % | Black Change VAP* | % |
|---|---|---|---|---|---|---|---|---|
| 5 | 561,020 | 573,597 | 12,577 | 2.19 | -11,758 | -3.91 | 18,504 | 60.63 |
| 6 | 595,380 | 572,594 | -22,786 | -3.98 | -22,508 | -8.06 | -8,562 | -35.02 |
| 12 | 621,890 | 580,455 | -41,435 | -7.14 | -63,442 | -18.57 | 4,218 | 14.19 |
| 24 | 627,055 | 581,738 | -45,317 | -7.79 | 73,493 | 19.46 | 40,561 | -74.79 |
| 25 | 613,875 | 586,313 | -27,562 | -4.7 | -63,797 | -17.51 | 1,301 | 5.3 |
| 30 | 569,510 | 577,974 | 8,464 | 1.46 | 15,626 | 12.65 | 9,634 | 40.21 |
| 32 | 599,940 | 593,970 | -5,970 | -1.01 | -98,290 | -45.75 | -486 | -0.84 |
| 33** | 513,370 | 555,227 | 41,857 | 7.54 | 5,835 | 6.63 | 34,900 | 71.84 |
| Total | 4,702,040 | 4,621,868 | -80,172 | -1.73 | - | - | - | - |

*Note: VAP is an acronym for Voting Age Population
**Note: New District VAP is significantly higher than Current VAP using alpha (α)= .05

## B. Regional Analysis: Houston/Fort Bend County Area

Similar patterns of racial manipulation are evident in the Houston/Fort Bend County Area. Key findings seen in Table 2 include:

1.  Extreme Racial Targeting: District 2 experienced a remarkable 76.58% reduction in Black VAP, the most extreme change among all districts analyzed.
2.  Demographic Replacement Patterns: District 7 saw a 42.85% increase in Black VAP alongside a 44.16% decrease in Anglo VAP, suggesting a deliberate effort to replace Anglo voters with Black voters in this district.
3.  Disproportionate Minority Reduction: District 22's Black VAP was reduced by 63.12% and Asian VAP by 46.59%, while Anglo VAP decreased by only 8.19%, indicating that minority voters were specifically targeted for removal.
4.  Demonstration of Alternatives: In contrast to the extreme changes in other districts, District 14 saw minimal racial shifts (Black VAP +3.47%), demonstrating that large demographic changes were not necessary for population balancing.

Table 2.  Houston/Fort Bend County Area, Racial/Ethnic Demographics of Current and New Districts

| Congressional District | Current VAP* | New District VAP* | Total Change VAP* | % | Anglo Change VAP* | % | Black Change VAP* | % |
|---|---|---|---|---|---|---|---|---|
| 2 | 607,810 | 557,917 | -49,893 | -8.94 | 5,764 | 1.94 | -23,367 | -76.58 |
| 7 | 593,365 | 594,919 | 1,554 | 0.26 | -79,347 | -44.16 | 54,516 | 42.85 |
| 9 | 574,470 | 565,956 | -8,514 | -1.50 | 8,446 | 10.74 | -14,518 | -22.82 |
| 14 | 574,800 | 585,292 | 10,492 | 1.79 | 21,097 | 6.44 | 708 | 3.47 |
| 18 | 585,270 | 576,291 | -8,979 | -1.56 | -1,289 | -1.15 | 7,030 | 19.74 |
| 22 | 679,620 | 557,229 | -122,391 | 21.96 | -20,646 | -8.19 | -52,291 | -63.12 |
| 29 | 517,215 | 547,845 | 30,630 | 5.59 | 184 | 0.34 | 5,451 | 32.67 |
| Total | 4,132,550 | 3,985,449 | -147,101 | -3.69 | - | - | - | - |

*Note: VAP is an acronym for Voting Age Population

### C. Comparative Statistical Analysis: Variability Across Demographic Groups

The verified data includes a standard deviation analysis that highlights the disproportionate variability in how Black voters were treated across Texas.

1.  Disproportionate Variability: Table 3 shows that the standard deviation of Black VAP changes was substantially higher in the Dallas/Fort Worth (52.68%) and Houston/Fort Bend (46.71%) areas compared to other demographic groups. This statistical metric is particularly important because standard deviation measures inconsistency in treatment. The fact that Black VAP changes had a standard deviation more than 2.5 times higher than Anglo VAP changes (20.8% and 18.32% respectively) demonstrates a statistically anomalous pattern, in other words, unlikely to have occurred by random chance. This level of variability cannot be explained by natural demographic shifts, traditional redistricting principles, or partisan considerations, especially given our regression analysis showing zero partisan effect when controlling for race.
2.  Statewide Pattern: Even in "Other Texas Congressional Districts," the standard deviation of Black VAP changes (39.78%) was higher than for any other demographic group, suggesting a statewide pattern of targeting Black voters.
3.  Coordinated Regional Approaches: The mean changes in Black VAP showed different directional patterns across regions, with Dallas/Fort Worth showing increases (+4.58%) while Houston/Fort Bend showed decreases (-9.11%), indicating a coordinated pattern of racial clustering across regions.
4.  Statistical Evidence of Clustering: This combination of high variability and coordinated directional changes across districts provides evidence of a systematic approach to demographic redistribution. The pattern of simultaneously decreasing Black population in some districts while increasing it in others creates a notable clustering effect.

Table 3.  Average and Standard Deviations of Texas Congressional Districts

|  | Anglo VAP % Change | | Black VAP % Change | | Asian VAP % Change | | Hispanic VAP % Change | |
|---|---|---|---|---|---|---|---|---|
|  | M | SD | M | SD | M | SD | M | SD |
| Dallas/Fort Worth Metroplex Area | -6.88 | 20.8 | 4.58 | 52.68 | -13.95 | 42.95 | -10.06 | 26.21 |
| Houston/Fort Bend County Area | -4.86 | 18.32 | -9.11 | 46.71 | -3.24 | 25.6 | -5.14 | 8.87 |
| Other Texas Congressional Districts | -11.36 | 18.56 | 15.04 | 39.78 | 4.79 | 28.59 | -2.55 | 13.81 |

Note. M is the average, and SD is the Standard Deviation of % change

## D. Contextual Evidence of Racial Considerations in Texas Redistricting

The 2021 redistricting process occurred against a backdrop of targeted legislative actions that disproportionately impacted minority communities, particularly Black voters. Governor Greg Abbott's inflammatory rhetoric further underscores the racial tensions surrounding legislative actions, as evidenced by his January 5, 2024 statement to The Texas Tribune: "The only thing that we're not doing is we're not shooting people who come across the border, because of course, the Biden administration would charge us with murder." This statement reveals a pattern of dehumanizing discourse toward minority communities.

Senate Bill 1 (SB 1), passed in September 2021, imposed significant barriers to voting that predominantly affected minority communities, including restricting drive-thru voting, limiting early voting hours, and imposing new ID requirements for mail ballots. These measures created additional obstacles for voters of color, effectively limiting their electoral participation. The systematic nature of these actions is comprehensively documented in Table 4: 'Legislative Actions Targeting Minority Communities in Texas (2021-2024)', which catalogs the coordinated legislative and rhetorical efforts to marginalize minority communities during this period.

Simultaneously, House Bills 3979 and Senate Bill 3 restricted discussions of race, racism, and historical inequities in public education, effectively constraining comprehensive racial discourse and understanding. These legislative actions, combined with the redistricting process, revealed a systematic approach to limiting minority political representation and participation.

Legislative statements further demonstrated an explicit awareness of racial dynamics in voting patterns. Lieutenant Governor Dan Patrick's comments directly acknowledged the political alignment of Black voters, noting that "over 90% of African Americans vote for Democrats in their major cities and major counties." State Representative Rick Miller's remarks about racial representation underscored the racial calculus inherent in district design.

This pattern of legislation targeting both voting rights and racial discourse provides important contextual evidence for understanding the redistricting process and evaluating whether race was a predominant consideration in drawing district boundaries. Minority legislators, including members of the Black Legislative Caucus, meticulously documented the potential harm from these coordinated legislative actions, revealing a pattern of systematic suppression that extended beyond individual bills.

The redistricting process, viewed in this broader legislative context, appears not as an isolated event but as part of a coordinated effort to reshape political representation in ways that systematically disadvantaged minority communities, particularly Black voters.

Table 4. Legislative Actions Targeting Minority Communities in Texas (2021–2024)



| Bill | Topic | Intent | Status | Link |
|---|---|---|---|---|
| SB 1 | Voting Restrictions | "SB 1 imposes severe voting restrictions, including limits on early voting, drive-thru voting, and mail-in ballots—methods disproportionately used by Black and other voters of color. It also increases the power of partisan poll watchers and criminalizes actions by election officials that could obstruct them, creating an environment of voter intimidation." | "Passed and signed into law by Governor Greg Abbott on September 1, 2021. It went into effect three months later but has faced multiple legal challenges." | ACLU TX: https://www.aclutx.org/en/2021-texas-legislature-what-changed-texans ; Lawyers' Committee for Civil Rights Under Law: https://www.lawyerscommittee.org/texas-sb-1-discriminates-against-voters-of-color/ ; ACLU: https://www.aclu.org/press-releases/victory-in-lawsuit-against-texas-anti-voter-law-s-b-1 ; Texas Tribune: https://www.texastribune.org/2021/09/01/texas-voting-bill-greg-abbott/ |
| SB 4 | Immigration Enforcement and Racial Profiling Concerns | "SB 4 mandates state judges to order deportations, even when federal law might allow asylum or humanitarian protections. Critics argue this will lead to racial profiling and disproportionately funnel Black and Brown Texans into the criminal justice system." | "Passed in 2023 and signed into law. However, its implementation has been blocked intermittently due to ongoing federal court challenges, including a recent block in March 2024." | ACLU TX: https://www.aclu.org/en/press-releases/federal-court-blocks-extreme-texas-legislation-sb-4-would-overstep-federal ; https://www.aclutx.org/en/know-your-rights/know-your-rights-under-texas-deportation-scheme-sb4 ; Texas Tribune: https://www.texastribune.org/2024/03/18/texas-sb-4-immigration-arrest-law/ |
| HB 3979 & SB 3 | Educational Censorship | "These bills restrict how race, slavery, and systemic racism are taught in schools. They prohibit discussion of controversial topics unless presented without political bias and ban teaching materials like the 1619 Project, which centers Black Americans' contributions to U.S. history. This limits students' understanding of racial injustice." | "Both bills were passed and signed into law in 2021. They are currently in effect, restricting how race and systemic racism can be taught in Texas schools." | Texas Tribune: https://www.texastribune.org/2021/12/02/texas-critical-race-theory-law/ ; https://www.texastribune.org/2021/09/02/texas-race-history-schools/ |
| HB 2127 | "Death Star" Bill | "Known as the "Death Star" bill, HB 2127 preempts local pro-worker ordinances such as mandated water breaks for construction workers. This disproportionately harms Black workers in physically demanding jobs during extreme heat conditions." | "Passed in 2023 and signed into law. It is currently in effect, preempting local ordinances that provide worker protections." | Texas AFT: https://www.texasaft.org/uncategorized/legislative-round-up-bad-bills-going-into-effect-2/ |
| SB 6 | Cash Bail System Reform | "SB 6 exacerbates disparities in the bail system by requiring cash bail for certain offenses, disproportionately affecting low-income individuals—many of whom are Black—and increasing pretrial incarceration rates." | "Passed and signed into law in 2021. It is currently in effect, requiring cash bail for certain offenses." | ACLU TX: https://www.aclutx.org/en/2021-texas-legislature-what-changed-texans |
| SB 12 | DEI | "Prohibits DEI offices, mandatory DEI training, and programs promoting differential treatment based on race, ethnicity, gender identity, or sexual orientation in K-12 public schools. If enacted, it would take effect on September 1, 2025." | "Passed by the Texas Senate on March 21, 2025. It is now under consideration in the Texas House of Representatives, referred to the House Committee on Public Education." | Texas Border Business: https://texasborderbusiness.com/texas-senate-passes-bill-to-ban-dei-programs-in-k-12-public-schools/ ; Texas Tribune: https://www.texastribune.org/2025/02/24/texas-dei-public-schools-k12/ |
| HB 4040 | DEI | "Bans DEI practices in school districts, including policies influencing hiring based on race or gender and training programs referencing race or ethnicity. Violations could result in fines up to $1 million and loss of state funding for a fiscal year." | "Introduced on March 7, 2025; currently awaiting committee assignment in the Texas House." | LegiScan: https://legiscan.com/TX/text/HB4040/id/3158345 ; The Dallas Express: https://dallasexpress.com/education/texas-house-bill-4040-a-bold-move-to-ban-dei-in-public-schools/ |
| SB 2946 | DEI | "Prohibits public institutions of higher education from offering programs or courses in DEI studies." | "Filed on March 14, 2025; currently in the early stages of legislative progression." | LegiScan: https://legiscan.com/TX/bill/SB2946/2025 |

## E. Statistical Inference Analysis: T-Tests and Regression Models

The analysis thus far has focused on descriptive statistics documenting the patterns and magnitudes of demographic changes across districts. This section presents more sophisticated statistical analyses that test the significance of these changes and systematically isolate the

relative influence of racial and partisan factors on redistricting outcomes. These inferential statistical methods allow for movement beyond merely describing what happened to evaluating the statistical significance of the changes and identifying their most likely causal factors.

Two complementary statistical approaches were employed: t-tests to determine whether observed demographic changes were statistically significant (rather than due to random variation), and multiple regression analysis to measure the relative influence of racial versus partisan considerations while controlling for potentially confounding variables. Together, these analyses provide rigorous statistical evidence regarding both the significance and causation of the demographic shifts documented in previous sections.

### T-Test Comparisons of Demographic Changes

The June 13, 2022 report included t-test analyses comparing 2020 and 2021 mean Voting Age Population percentages across Texas Congressional Districts. These tests, shown in Table 5, reveal statistically significant changes in several demographic categories:

- Total VAP showed a significant 8.07% decrease ($p < .01$)
- Anglo VAP percentage decreased by 2.11% ($p = .03$)
- Black VAP percentage increased by 0.64% ($p = .05$)

These t-test results establish that the demographic changes following redistricting were statistically significant and not due to random variation, particularly for Total VAP, Anglo VAP, and Black VAP.

Table 5.  T-Test Results Comparing 2021 and 2020 Mean Voting Age Populations (VAP) Percent by Texas Congressional Districts

| Test | df | Mean Difference | p |
|---|---|---|---|
| Total VAP Percent of Total Population, 2020 compared to Total VAP Percent of Total Population, 2021 | 70 | -8.07% | <.01* |
| Anglo VAP Percent of Total VAP, 2020 compared to Anglo VAP Percent of Total VAP, 2021 | 70 | -2.11% | .03* |
| Black VAP Percent of Total VAP, 2020 compared to Black VAP Percent of Total VAP, 2021 | 70 | 0.64% | .05* |
| Asian VAP Percent of Total VAP, 2020 compared to Asian VAP Percent of Total VAP, 2021 | 70 | 0.98% | 0.1 |
| Hispanic VAP Percent of Total VAP, 2020 compared to Hispanic VAP Percent of Total VAP, 2021 | 70 | -0.64% | 0.48 |

*Note: * indicates significant using Alpha = .05

**Regression Analysis: Isolating Racial and Partisan Factors**

The June 13, 2022 report also included multiple regression analyses that rigorously differentiated between racial and partisan motivations in the redistricting process. This statistical approach controlled for potential partisan effects while measuring racial impacts.

When controlling for potential partisan motivations, all racial variables showed significant effects ($p < .01$) on redistricting outcomes with different magnitudes:

- Anglo VAP: $\beta = 1.05$
- Black VAP: $\beta = 0.99$
- Asian VAP: $\beta = 0.97$
- Hispanic VAP: $\beta = 1.00$

Critically, when controlling for racial factors, partisan variables showed precisely zero effect ($\beta = 0.00$). This pattern was consistent across all four regression models analyzed in the June 13, 2022 report, demonstrating that the racial effects were systematic and intentional, not incidental or limited to a few districts.

Table 6. Relationship between Race/Ethnicity, Political Party, and Voting Age Population

| Variable | $\beta$ | SE | df | t | t-crit | p | ME |
|---|---|---|---|---|---|---|---|
| Intercept | 0 | 0 | 8 | 566.13 | 2.31 | <0.01 | 0 |
| Race | | | | | | | |
| Anglo VAP | 1.05 | 0 | 8 | 528.95 | 2.31 | <0.01 | 0 |
| Black VAP | 0.99 | 0.01 | 8 | 183.51 | 2.31 | <0.01 | 0.01 |
| Asian VAP | 0.97 | 0.01 | 8 | 91.15 | 2.31 | <0.01 | 0.02 |
| Hispanic VAP | 1 | 0 | 8 | 289.02 | 2.31 | <0.01 | 0.01 |
| Political Party | | | | | | | |
| Republican | 0 | 0 | 8 | -7.12 | 2.31 | <0.01 | 0 |
| Democratic | 0 | 0 | 8 | 168.29 | 2.31 | <0.01 | 0 |

*Note: VAP is an acronym for Voting Age Population
Note. VAP is an acronym for Voting Age Population
Note. New District data was retrieved from: https://data.capitol.texas.gov/dataset/planc/, which used the United States Census Bureau data released during August, 2021
Note. 2020 data was retrieved from: https://redistrictingdatahub.org/dataset/texas-116th-congressional-district-VAP-data-2020/, which used the United States Census Bureau data released during August, 2021

Note. Political Party data was retrieved from: https://www.brennancenter.org/our-work/analysis-opinion/anatomy-texas-gerrymander

## III. ANALYSIS OF STATISTICAL EVIDENCE UNDER ESTABLISHED LEGAL FRAMEWORKS

The Supreme Court in Village of Arlington Heights established several factors for determining when racial discrimination is a motivating factor in government decision-making. The Court recognized that while disproportionate racial impact alone is not determinative, it can serve as an important starting point, especially when the pattern is stark. We apply these factors to the verifiable statistical evidence presented in our previous reports:

1. Impact on Demographics: The statistical evidence presented in Tables 1 and 2 demonstrates significant demographic changes affecting Black voters. Black VAP decreased by 76.58% in District 2, 74.79% in District 24, and 63.12% in District 22, while simultaneously increasing by 71.84% in District 33, 42.85% in District 7, and 40.21% in District 30. This impact far exceeds changes to any other demographic group, with Anglo VAP changes generally more moderate (maximum change of -45.75% in District 32). As shown in our standard deviation analysis in Table 4, the variability in Black VAP changes (52.68% in Dallas/Fort Worth and 46.71% in Houston) was more than double that of other demographic groups, further demonstrating the distinctive pattern of demographic manipulation.

2. Historical Background: While a comprehensive historical analysis is beyond the scope of this statistical report, it's relevant to note that the 2021 redistricting occurred against a backdrop of demographic change in Texas. As noted in our original report, the Anglo population in Texas decreased from 46.40% in 2010 to 41.20% in 2020, while minority populations grew. Rather than reflecting this gradual demographic shift, the redistricting created dramatic concentration and dispersal of Black voters in specific districts.

3. Substantive Departures from Normal Factors: The magnitude of racial demographic shifts (up to ±76%) far exceeds what would be necessary for legitimate population balancing, which typically requires adjustments of only 5-7%. Our t-test results (Table 5) and regression analysis (Table 6) demonstrate that race was the predominant factor in redistricting decisions, with racial variables showing significant effects ($p < .01$) while partisan variables showed zero effect ($\beta = 0.00$). Arlington Heights specifically recognizes that substantive departures from normal decision-making factors can be evidence that improper purposes played a role.

4. Administrative History: As documented in our May 19, 2022 report, statements by Texas officials provide context for understanding the redistricting process. Lieutenant Governor Dan Patrick stated: "... the biggest group in most States are African Americans... The last time I checked, over 90% of them vote for Democrats in their major cities and major counties." State Representative Rick Miller remarked about an Asian candidate: "He's Korean. He has decided because he is an Asian, that my [Congressional] District might need an Asian to win." These statements demonstrate awareness among officials of the relationship between race and voting patterns. Arlington Heights notes that legislative or administrative history, especially contemporary statements by officials, may be highly relevant in showing discriminatory intent.

The coordinated regional pattern of changes we identified—with Dallas/Fort Worth showing Black VAP increases (+4.58%) while Houston/Fort Bend showing decreases (-9.11%)—further

supports the conclusion that these were not isolated incidents but rather part of a systematic approach to demographic redistribution. This statistical evidence satisfies established requirements for showing that race was a motivating factor in the redistricting process.

## IV. EVALUATION OF STATISTICAL PATTERNS IN REDISTRICTING OUTCOMES

In Alexander v. South Carolina NAACP, the Supreme Court established that plaintiffs must overcome a presumption of legislative good faith in redistricting cases. This requires demonstrating that race was the "dominant and controlling" factor that motivated the legislature's decision to place "a significant number of voters within or without a particular district." The Court emphasized that plaintiffs must present direct or circumstantial evidence of racial intent that is sufficiently strong to overcome this presumption.

The presumption of legislative good faith is particularly important in redistricting cases, as courts generally defer to legislative judgment on matters of district design. However, this presumption is rebuttable when statistical evidence demonstrates patterns that cannot be reasonably explained by neutral redistricting principles. Our analysis provides such evidence by documenting demographic shifts that are statistically improbable under good faith redistricting scenarios. The surgical precision with which Black VAP was reduced in some districts while simultaneously increased in others—often by margins exceeding 70%—creates a pattern that defies legitimate justification. These coordinated demographic shifts across regions, combined with regression analysis showing zero partisan effect when controlling for race, provide compelling evidence that overcomes the presumption of *legislative good faith*. As the Supreme Court noted in Cooper v. Harris, when racial considerations predominate to the extent shown in our analysis, the good faith presumption yields to the constitutional imperative that race not be the controlling rationale for district boundaries.

The statistical evidence presented in our reports meets this heightened standard in several ways:

1. Statistical Patterns: The statistical patterns revealed in the standard deviation analysis presented in Table 4 are notable. Black VAP changes had a standard deviation of 52.68% in the Dallas/Fort Worth area and 46.71% in the Houston/Fort Bend area—more than double the variability of any other demographic group. This extraordinary variability suggests a distinct approach to redistricting with respect to Black voters and creates a measurable pattern of racial clustering. The standard deviation analysis provides particularly compelling statistical evidence because it measures the consistency with which different demographic groups were treated in the redistricting process. If redistricting had been driven by partisan considerations or traditional redistricting principles, we would expect to see relatively similar levels of variability across demographic groups. Instead, we observe that Black voters were subjected to dramatically more variable treatment than any other group. This statistical fingerprint of targeted demographic manipulation is especially significant given our regression analysis showing zero partisan effect ($\beta = 0.00$) when controlling for race.
2. Race Subordinated Traditional Principles: The regression analysis in Table 6 conclusively demonstrates that racial factors, not partisan or other considerations, drove redistricting decisions. When controlling for racial variables, partisan variables showed

precisely zero effect (β = 0.00), while racial variables showed significant effects (Anglo β = 1.05, Black β = 0.99, Asian β = 0.97, Hispanic β = 1.00). This statistical separation of racial from partisan effects provides compelling evidence that race was the predominant factor in the redistricting process. This addresses Alexander's requirement for "direct evidence of intent" by providing statistical proof that race, not partisanship, was the dominant factor.

3. Surgical Precision of Racial Sorting: The data in Tables 1 and 2 reveals a pattern of surgical precision in the movement of Black voters. In the Dallas/Fort Worth area, Black VAP was reduced by 74.79% in District 24 while increased by 71.84% in District 33. In the Houston area, Black VAP was reduced by 76.58% in District 2 while increased by 42.85% in District 7. This precision in racial sorting—moving Black voters from some districts to others—cannot be explained by legitimate redistricting considerations. Alexander recognized that such evidence of "racial predominance" can overcome the presumption of good faith.

4. Coordinated Pattern Across Regions: Table 3 shows that the mean changes in Black VAP followed different directional patterns across regions, with Dallas/Fort Worth showing increases (+4.58%) while Houston/Fort Bend showed decreases (-9.11%). This coordinated pattern suggests a strategic redistribution of Black voters across regions that cannot be explained by natural population shifts or legitimate redistricting needs. This type of direct evidence of racial targeting addresses Alexander's requirement for concrete evidence of racial motivation. The t-tests presented in Table 5 further support this conclusion, showing statistically significant changes in the proportion of voting-age population relative to total population, with particular impact on Black and Anglo VAP. These statistical patterns demonstrate that the redistricting process was driven by racial considerations, not legitimate redistricting principles.

## V. CONCLUSION: IMPLICATIONS OF STATISTICAL FINDINGS

The data from our May 19, 2022 and June 13, 2022 reports presents comprehensive statistical evidence regarding the 2021 Texas Congressional redistricting process. The evidence demonstrates patterns that are difficult to explain by reference to traditional redistricting principles.

First, the demographic analyses in Tables 1 and 2 reveal substantial changes affecting Black voters across multiple districts. Black VAP decreased by 76.58% in District 2, 74.79% in District 24, and 63.12% in District 22, while simultaneously increasing by 71.84% in District 33, 42.85% in District 7, and 40.21% in District 30. These district-level findings establish the concrete demographic impact of redistricting and demonstrate shifts far exceeding what would be necessary for legitimate population balancing.

Second, the standard deviation analysis in Table 3 quantifies the variability in demographic changes, revealing that Black voters experienced substantially more inconsistent treatment (SD = 52.68% in Dallas/Fort Worth, 46.71% in Houston) than other demographic groups. This variability—more than double that of Anglo voters—provides statistical evidence of differential treatment and suggests a systematic pattern of racial clustering rather than neutral application of redistricting principles.

Third, the t-test results in Table 5 establish the statistical significance of these demographic changes (p = .05 for Black VAP), confirming that the observed patterns represent genuine shifts rather than random variations. This statistical validation strengthens the evidentiary value of the demographic patterns identified in our analysis.

Fourth, our regression analyses in Table 6 provide the most powerful evidence by statistically isolating race as the dominant factor in redistricting decisions. When controlling for partisan effects, racial variables showed significant impacts (β = 0.97-1.05, p < .01) on redistricting outcomes, while partisan variables, when controlling for racial factors, showed no measurable effect (β = 0.00). This statistical separation between racial and partisan factors directly addresses the central legal question of whether race was the "dominant and controlling" consideration.

The statistical patterns identified in our analysis are particularly compelling because they directly address the key legal distinction between racial and partisan motivation. The standard deviation of Black VAP changes—more than 2.5 times higher than for Anglo voters—creates a statistical fingerprint of differential treatment. The contrasting regional patterns (increases in Dallas/Fort Worth, decreases in Houston/Fort Bend) further indicate a coordinated approach to racial redistribution that cannot be explained by partisan considerations, especially given our regression analysis showing zero partisan effect when controlling for race. This statistical evidence establishes that race was the predominant factor in the redistricting decisions affecting these districts.

The collective power of these multiple statistical approaches demonstrates a pattern where Black voters were both fragmented across some districts and concentrated in others within the Dallas/Fort Worth Metroplex and Houston/Fort Bend County areas. This racial clustering has significant implications for voting power in these specific regions. While the districts' demographic shifts occurred in a context where Texas was becoming more diverse overall (with the Anglo population decreasing from 46.40% in 2010 to 41.20% in 2020), the changes in Black VAP in Districts 2, 5, 6, 7, 9, 12, 14, 18, 22, 24, 25, 29, 30, 32, and 33 far exceeded what would be necessary for population balancing. The contrast between the minimal adjustments needed to achieve population balance and the actual demographic shifts documented in Tables 1 and 2 (up to ±76%) warrants further consideration. This pattern of racial clustering in these specific districts—both fragmenting and concentrating Black voters—creates a redistricting outcome with significant implications for electoral representation in these regions.

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| LULAC, et. al., | § | |
| | § | |
| *Plaintiffs* | § | |
| | § | |
| Eddie Bernice Johnson, Sheila Jackson-Lee | § | |
| Alexander Green, and Jasmine | § | |
| Crockett | § | |
| | § | |
| Plaintiff-Intervenors | § | |
| | § | Case No.: EP-21-CV-00259-DCG- |
| | § | JES-JVB [Lead Case] |
| v. | § | |
| | § | |
| GREG ABBOTT, in his official capacity | § | |
| As Governor of Texas, et. al. | § | |
| | § | |
| *Defendants* | § | |

---

Plaintiff-Intervenors.

---

## PLAINTIFF-INTERVENORS' EXPERT REPORT BINDER

EXPERT: George Korbel

---

Provided: May 2, 2025

# Expert Report

February 28, 2014

To:     David Richards, Jose Garza and Luis Vera

From:   George Korbel

re:     *Perez v Perry* etc.

          At your request I have looked at the at the Texas House redistricting plan

currently in effect known as H358. I have also looked at the current Congressional District plan

C 235. In the case of the State House of Representatives you asked me to look in particular at

West Texas, Central Texas, Dallas County, Tarrant County and Fort Bend Jackson and Wharton

Counties. In the case of Congress you asked me to look at South and Southwest Texas and the

Dallas Tarrant area. I have filed an earlier Expert Report in this matter. In particular you

requested that I look at the so called White, Senate or *Gingles* factors and the enhancing

elements that are suggested.

You should consider this as my preliminary analysis or expert report.  It is subject to changes

based on information developed during the process of discovery including my review of any

expert's reports provided by Defendant's experts.


***Gingles*** I Standard

          The fundamental question in a section 2 vote dilution case such as this  is whether, as a

result of the redistricting minority voters " have an equal opportunity to **participate** in the

political processes **and to elect candidates of their choice.**" ***Thornburg v. Gingles***, 478 U.S. 30,

-1-

106 S. Ct. 2752, 2763, 92 L. Ed. 2d 25 (1986).  (Emphasis added)  Section 2 of the Voting

Rights Act, 42 U.S.C. § 1973, as amended, provides that:

> (a) No voting qualification or prerequisite to voting or standard, practice, or
> procedure shall be imposed or applied by any State or political subdivision in a
> manner which results in a denial or abridgement of the right of any citizen of the
> United States to vote on account of race or color. . . .
>
> (b) A violation of subsection (a) of this section is established if, based on the
> totality of circumstances, it is shown that the political processes leading to
> nomination or election in the State or political subdivision are not equally open to
> participation by members of a class of citizens . . . in that its members have less
> opportunity than other members of the electorate to participate in the political
> process and to elect representatives of their choice. The extent to which members
> of a protected class have been elected to office in the State or political
> subdivision is one circumstance which may be considered: ***Provided***, that nothing
> in this section establishes a right to have members of a protected class elected in
> numbers equal to their proportion of the population.

42 U.S.C. § 1973 (emphasis in original).

In ***Gingles*** (supra), the Supreme Court held that the use of a voting procedure would not

impede "the ability of minority voters to elect representatives of their choice" unless there is a

White bloc voting majority that would "usually be able to defeat candidates supported by a

politically cohesive, geographically insular minority group." 106 S. Ct. at 2765. This test has

been broken into three parts:

> first that the group is sufficiently large and geographically compact to constitute a
> majority in a single member district; second, that it is politically cohesive and
> third, that the white majority votes sufficiently as a bloc to enable it usually to
> defeat the minority's preferred candidate.

***Growe v. Emison***, 507 U.S. 25, 113 S. Ct. 1075, 1084, 122 L. Ed. 2d 388 (1993) (emphasis
added); see also ***Gingles***, 106 S. Ct. at 2766-67; ***Clark v. Calhoun County, Miss***., 88 F.3d 1393,
1395 (5th Cir. 1996).


**1. Sufficiently large and geographically compact to constitute a majority in a single
member district**

**The test used to determine if the Gingles Districts are " sufficiently large."**

The test that I use is the ability to draw districts that fit within the deviation plan of H358. If a the minority community is sufficiently concentrated that they comprise more than half of the Citizen Voting Age Population (CVAP) of a District would that would fit within the deviation range I consider it "sufficiently large.:

**The test used to determine "geographic compactness."**

**A. The test used to determine if the *Gingles* Districts are " sufficiently large."**

The test I use is to determine size is to ask the question does the deviation of the district fit within  the deviation plan of H358. If a plan can be drawn in which the minority Community would constitute more than half of the Citizen Voting Age Population (CVAP) of a District would fit within the deviation range of an existing plan or within the range of other plans approved by the Courts then I consider it "sufficiently large."

**B. The test used to determine whether districts are "geographic compactness."**

The Courts do not seem to have set out a test of compactness. I employ a comparison test. A district will be considered to be geographically compact based on the three definitions of compactness that are available in the State redistricting software (Redappl).

Although there many tests for compactness that have been determined over the years, the state included  three in the RedAppl software these are :

> Area Rubber Band
> Perimeter to area
> Population rubber band

I asked the Legislative Council prepare a excel spreadsheet of the three test scores by each of the districts in plan H358. Then I took the spreadsheet and added the three scores together for each district thus creating a fourth measure. [1]/

I sorted the districts in Plan H358 by each of the four compactness scores. I then could take each *Gingles* district and compare the four compactness scores with the current plan.

I consider a **Gingles** districts to be "very compact" if all four of the scores fit within the range of scores for the current plan (h358). I judge a district as "geographically compact" if at least one of the scores fits within the range of current plan (h358). I do this because the three compactness scores measure different things. It is not uncommon for a district to be highly compact under one or two of the tests and much less compact under the other tests. Each of the House **Gingles** Districts I have determined to be "highly compact."

I have prepared a series of *Gingles* demonstration plans for South Texas Congressional. Each of these maps meets the Hispanic CVAP Standards and Districts are within the range of compactness of the other plans in the Congressional Districts. In the earlier hearings LULAC and the NAACP also presented public plans that deal with the Dallas and Tarrant County districts.

I have also prepared a series plug in House maps for several areas of the state. These include
  1. The Midland Ector mix (Districts 81-82)
  2. The Bell Lampasas mix (Districts 54 and 55)
  3. The Fort Bend Wharton and Jackson mix (Districts
  4. The McLennan Brazos mix.(Districts
  5. The Tarrant County mix
  6. The Dallas County mix

---

[1]/ I could do this because the scoring on each test is from 0 to 1.0. The higher the level of compactness the higher the score.

7. Harris Mix

Additional maps are being worked on currently for districts in the Nueces County mix and the

Lubbock County mix.   At present the Perez Plaintiffs are relying on the *Gingles* Demonstration

districts that have been made public by the Mexican American Legislative Caucus

For your convenience I attach these maps and relevant citizenship data.  In each of these

maps minorities make up a Citizen Voting Age Population (CVAP) majority.  2/  The maps are

created so that they can pug into the existing state House plan without disturbing any other

district (s).

Each of the *Gingles* Demonstration districts are both compact and contiguous.   I have

prepared the *Gingles* Demonstration plans using the 2010 voting precincts but each could easily

be modified to fit the 2013 precincts.

Once again these plans are for demonstration purposes as required by *Gingles I*.   A plan

which was intended to be used for elections might well be changed in a number of ways to fit

local contingencies or procedural issues.   If the current House Plan is found to violate Section 2

of the Federal Voting Rights Act a Court has the equitable power to design a remedy.   I have

testified in several cases and participated in negotiations between the parties to reach agreed

redistricting plan.   In my experience in most cases a final remedy plan adopted by the court is the

result of such negotiations.

---

2/  In all of these plans minority voters also make up a majority of the Population and the Voting
Age Population.

West Texas Districts 81 and 82 (Midland Ector Mix)

This mix involves 9 counties[3]/ with a total population of 332,918 persons. Over the past decade, the Anglo population in this 9 county area declined by 8,498 while the minority population grew by over 46,000. Hispanics comprised 43,281 (94.0%) of the minority growth. In the earlier considerations of this matter, a *Gingles* demonstration district was proposed by the MALC Plaintiffs which reached a 50% Hispanic CVAP majority. It required the slight rearranging of other West Texas Districts.

At this point we have new data on Citizen Voting Age Population (CVAP) which represents essentially the CVAP population in 2010. At this point a geographically compact district can be drawn which involves only House Districts 81 and 82. This map has been made public as the Perez Plaintiffs map H360. Map H360 cuts only 1 2010 VTD . This cut is very minor involving only a few people. It would be possible to cut no VTDs however the map would be slightly less compact. As drawn in this demonstration or *Gingle* district, House District 81 is more than 50% Hispanic CVAP and is almost 60% minority CVAP. All that has to be done is to combine the Southside of Midland and Odessa. The district has essentially the same compactness scores contained in the current plan.

BELL AND LAMPASAS COUNTIES (Districts 54 and 55)
This is a two county mix that produces 2 districts. The population of the two counties is 329,912. Anglos make up less than half of the population.

Under the Benchmark plan this mix included not only Bell and Lampasas but also Burnet

-6-

County. Since this area is growing significantly faster than the state rate, Burnet County was

removed. This left District 54 with a population of 153, 702. Had the State added only 12,000

persons to District 54, it would have fit within the deviation range of H358. Instead the state

removes 32,903 persons (from the city of Killeen). On the map, the area removed looks small

but represents 20% of the population of a House District. **Significantly that small area was**

**more than two thirds minority**.


After removing those 32,903 primarily minority persons from District 54, the State turned

around and added 46,937 persons who had not been in the district before. **This area added was**

**almost two thirds Anglo.**

In the adopted plan instead of leaving Killeen whole in District 54, the State essentially

gerrymandered the minority population by unnecessarily fragmenting the city and minority

population. Once again, had Killeen been left intact it would have been slightly smaller than a

House District. If you add that part of Fort Hood which is in Bell County [4]/ as well as a small

population from Harker Heights a small city which adjoins Killeen, a district essentially draws

itself which is more than 50% Black and Hispanic CVAP. Plaintiffs have offered Public Plans

364 and 365 which are drawn in a slightly different manner. In both plans Killeen is maintained

intact [5]and District 54 has a CVAP population of more than 50% Black and Hispanic. In each

---

[3]/ Midland, Ector, Andrews, Crane, Dawson, Martin, Upton, Ward and Winkler.

[4]/ Fort Hood is divided between Bell and Coryell counties.

[5]/ Actually, the City of Killeen has a number of small fingers with no population that extend out
highways. Finger annexations are used by Cities in Texas to maintain extraterritorial
jurisdiction. In these two plans have removed those finger annexations. In some areas the
Census geography does not allow the connection of some of these areas. It would however be
possible to include them in District 54 but this would require a definition that is not based on

case the districts in the benchmark plan and the *Gingles* Demonstration plans are in the same range of compactness and within the same deviation range as in the current plan.

It is significant that in this mix the fastest growing area is Killeen. Instead of leaving it in a single district as in the Benchmark plan, the state chose to split Killeen. With Killeen whole, it is almost impossible to create a district without a majority minority CVAP.

As with the District 81 and 82 *Gingles* Demonstration districts, this *Gingles* plan for House Districts 54 and 55 could be plugged into the current plan without any effect on any other district state wide.

Plaintiffs also have another plan which is in the process of being made public with part of Fort Hood that is in adjoining Coryell county (District 59) with Killeen and the balance of Fort Hood which is in Bell County. In my view this would be the most logical way to do it if one was paying attention to communities of interest. It would also be a plug in district and would affect only 3 House Districts.

**The McLennan Brazos Mix** (Districts 14 56 and 57) McLennan, Brazos, Falls, Limestone and Robertson Counties

The Benchmark Plan for Districts 56 and 57 including McLennan County is much the same as it was when the plan was originally drawn in 1975 by the Federal Courts Order in *Graves* III. As such it has elected the minority candidate of choice from its creation up until the 2010 elections

census geography.

when the minority candidate of choice was defeated.

Under the benchmark District 56 was maintained entirely in McLennan County. That part of District 57 which is in McLennan County comprised over half of an ideal district. It was heavily minority and most of those minority persons were in the City of Waco. Under the Benchmark plan, this heavily minority area from McLennan County was added to four smaller counties (Falls, Robertson, Leon and Madison ), These four Counties to which it was attached were only 38% minority population. Under this Configuration the minority consistently elected their candidates of choice.

After the 2010 census the McLennan County Mix was radically altered. Leon and Madison Counties were removed and Limestone and parts of Brazos County were added.

The adopted House plan splits the minority population that was in District 57 and adds it to District 56. The plan reduces the minority concentration in District 57 and instead of being a District where the minority community was able to elect the representative of their choice it became a District where the minority preferred candidate was very unlikely to be elected.

The *Gingles* Demonstration Plan offered by the Plaintiffs essentially takes that part of District 57 that was in the Benchmark plan and adds it to Limestone Falls, and Robertson and a part pf Brazos County and that produces a 50% plus CVAP district. Again these 3 Districts could be plugged into H358 without affecting any of the other Districts in the plan.

**The Fort Bend Wharton Jackson Mix**.

Under the Benchmark plan were three Districts (26, 27 and 28) in Fort Bend and Wharton Counties. Under this plan, one district (27) elected a minority candidate. It essentially connected that part of Fort Bend County which includes the portion of the City of Houston in

-9-

Fort Bend County with the heavily minority area around the City of Rosenberg. Since this is one of the fastest growing areas in the state, all of these three districts were significantly over populated. District 27 was the most overpopulated at more than 225,000 and almost 75% of the District was minority.

Under the 2010 Census information, by adding Jackson County, it is possible to create 4 House Districts in the three county area.

During the decade 2000-2010, although there was Anglo growth, it was primarily minority growth that produced then new District 85.

In drawing these 4 districts the Anglo population in District 26 (which was trending heavily minority) was increased by making the District significantly less compact. Then the Black percentage in District 27 which had consistently elected a minority was increased. This was accomplished by adding minorities from Benchmark 27 and removing the heavily Hispanic areas in and around Rosenberg.

The heavily Hispanic areas around Rosenberg were then attached to Anglo dominated rural Wharton and Jackson Counties.

As a result of this effort, even though the population in these three Counties is over half minority and even though the minority growth was larger than that of the Anglos, only one District was drawn which will likely produce minority candidates of choice.

**Harris and Dallas**

In Harris and Dallas Counties, minority residents comprise over half of the population and in each county, the Anglo population declined over the past decade. All growth came from the minority residents of these two counties. It is significant that had the minority population grown at the same rate as the Anglo population the Dallas County it would have lost an additional 2 to three districts. Harris County would have lost as many as 4 more districts. In spite of this, minority representation remained essentially the same as it was in the benchmark plan.

Dallas County has a lightening bolt district 105 which includes a wrap around district 104. It begins the split in the Dallas minority community much like the lightening bolt district in the Congressional part of this case. Then the balance of the minority community and the fast growing areas of the Northern and East Central parts of the county divide minority community. If one eliminates the lightening bolt the Dallas *Gingles* Districts in the Perez Plaintiffs plan are fairly simple to draw.

**District 101** has contained virtually the entire city of Mesquite, in Dallas County, since single member districts were ordered in the 1970s. The minority growth in the area for the past decade has been significant. Under the benchmark District 101 had elected their candidate of choice, Robert Miklos, in 2008 and it was carried by President Obama, Rick Noriega running for the Senate and other minority candidates of choice. Under the plan on submission, the City of Mesquite was split up and the district number even moved to another county.

Heavily minority precincts in south Mesquite and Balch Springs (pcts. 1314, 3402, 3410, 3308, 3404 and 3408) were packed into HD 110 (over 90% combined minority).

The remainder of heavily minority precincts in south Mesquite (Pcts. 3407, 3409, 3400, 3314, 3313, 3317 and 3405) were diffused by submersion into HD 113, an Anglo controlled district anchored by the affluent lakeside community of Rowlett on the north and the rural Anglo community of Seagoville in the south.

Other emerging minority growth areas in Mesquite (numerous pcts) were diffused into a radically reconfigured HD 107, Anglo controlled and anchored by north Mesquite Anglos and the affluent White Rock Lake area of Dallas.

Finally, three north Mesquite minority precincts (1304, 1308 and 1309) were packed into HD 100 (80% combined minority) and the dissection was complete.

**District 105 located experienced a drop in the Anglo Voting Age population to less than 40%** . Several minority candidates of choice were successful in including the President and Rick Norriega.

Precinct splits took a long finger of heavily Hispanic blocks (now pcts. 4653, 4654 and 4659) to be packed into HD 103 A clear "lightning bolt" reached down into the former HD 106 to add concentrations of Anglo voters.

A bizarre hook from Hispanic majority HD 104 reached around the lightning bolt to pack in Black voters (pct. 4513) to keep them out of HD 105.

Finally, politically potent Black precincts (Pcts. 4628, 4632 and 4648) were removed from north Irving to be submerged in Anglo controlled HD 115.

**During the past decade the minority community in District 102** which is generally located in Dallas and Garland, increased to a minority majority.  Several minority candidates of choice were successful.   In the House plan before the Court, the politically active old African-American community of Hamilton Park (Pct. 1003) was removed to Anglo controlled HD 114 along with pct. 1041.

Other heavily minority precincts in Garland and North Dallas (pcts. 1038, 1042 and 1707) were removed to HD 112, another Anglo controlled district anchored in Richardson.

Finally, numerous Anglo precincts were added from Richardson (pcts. 2500, 2503, 2504, 2505, 2506, 2507, 1502, 1503, 1504, 2513, and 2514). No minority candidates of choice carried this new configuration.

In Tarrant County, although the Anglo population grew slightly, the minority population provided the lion's share of the decade growth.  Had the minority population grown at the same rate as the Anglo population, the County would have lost at least one House seat.  Nevertheless the number of districts in which minority voters would be able to elect the representatives of choice has also remained constant.

Tarrant County also has a Fish Hook district, HD 93, which runs from the heavily Anglo Northwestern part of the County to the mid cities area which has become heavily minority and appears to be continuing to so grow.   District 93 plucks several heavily minority precincts from the mid cities area and ties them in with the Suburban northern portion of the county.  When one eliminates this Fish Hook, the *Gingles* districts can be drawn.

Benchmark House District 93 included parts of Arlington and Grand Prairie and by 2010 the Anglo Voting Age Population had dropped to less than 40%.  Minority voters successfully elected their

candidate of choice, Paula Pierson, in 2006 and 2008. Obama, Noriega, White and other minority

favorites easily carried the district.

In both H283 and H358 the state packed much of the HD 93 minority population into the new HD 101 (a

district that is 75% combined minority, B+H+O) and then employed another lightning bolts stretching

across the county to connect a portion of the mid cities area to suburban Tarrant County.

**Nueces County and Surrounding Counties**

As the record of this case clearly indicates, Nueces County has consistently maintained two

Hispanic majority HCVAP districts. In fact in the benchmark plan prior to 2011 redistricting,

the Nueces County districts included two HCVAP district contained entirely within Nueces

County and a third district that combined Nueces and Aransas Counties.

As mentioned above, I have reviewed putative *Gingles* districts for the Nueces County area as

well.   These districting plans, developed by MALC, include two majority Hispanic Citizen

Voting Age population districts in the Nueces County area, either by combining population from

Kleberg County or San Patricio County into the mix. These plans can be found on the Texas

Legislative Council web cite and are identified as Plans H329, H111, H205. In addition this

Court developed a plan that meets this criteria as well in its first interim plan, H298. These

districts have essentially the same compactness scores contained in  the current benchmark plan.

**2. Politically Cohesive Minority Community**

I have not been asked to handle this part of the case. However from the earlier testimony there is
clear evidence of minority voter cohesion in each of the areas discussed in this Report.

**3. Racial polarization**

Again I have not been asked to look at racially polarized voting and others have testified
on that matter in earlier hearings.   All of the studies which have been done so far in this case

-14-

have indicated that the White or Anglo community usually votes for Anglo or White Candidates over minority Candidates. In each of the areas where a ***Gingles*** Districts are proposed, this polarization appears to be sufficiently large to usually defeat the minority preferred candidates.

> A white bloc vote that normally will defeat the combined strength of minority votes plus white "crossover" votes is said to be legally significant white bloc voting. ***Gingles*** at 50-51. If these conditions are not present, then the challenged electoral practice cannot be considered as the cause of the minority's inability to elect its preferred candidates. ***Id***. at 50.

***Sanchez v. Bond***, 875 F.2d 1488, 1492 (10th Cir., 1989)


Sometimes, terms such polarization have charged connotations. However, in this analysis, Plaintiffs need not prove why polarization takes place only that it does. This is because Section 2 of the Federal Voting Rights Act directs that it is the effect and not the cause that is important.

## Totality of the Circumstances

If the ***Gingles*** three-part threshold is met, plaintiffs have been directed to show that under the "totality of the circumstances," minority voters do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters. (footnote omitted)(emphasis added) S.Rep. at 28, U.S. Code Cong. & Admin. News 1982, p.206. See also ***Clark***, 88 F.3d at 1396 ("it will be only the very unusual case in which the plaintiffs can establish the existence of the three ***Gingles*** factors but still have failed to establish a violation of § 2 under the totality of the circumstances"), and in the Senate Report of the 1982 Amendments to the Act. ***Jenkins v. Red Clay Consol. School Dist. Bd. of Educ.***, 4 F3d 1106, 1116 (3d Cir. 1993) (While it would be a highly unusual case in which a plaintiff successfully proved the existence of the three ***Gingles*** factors and still failed to establish a violation I cannot rule out that possibility entirely.) See also ***Baird v. Consolidated City of Indianapolis***, 976 F.2d 357, 359 (7th Cir.1992), cert denied, 113 S.Ct.2334, 124 L.Ed.2d 246 (1993)

I will proceed to look at the *White/Zimmer*/Senate factors with the considerations set out in *Clark*, *Baird* and *Jenkins*.

**The Factors**

In *Gingles* the Supreme Court held that the dilutive effect of Anglo Block voting can be intensified by a number of factors including "the presence or absence of other potentially dilutive electoral devices such as the majority vote requirement, designated posts, and prohibitions against bullet [single shot] voting..." 478 U.S. at 56. These aggravating matters, variously referred to as *White, Zimmer* or Senate factors. *Holder v. Hall*, 512 U.S. 874, 954 (U.S., 1994) The 1981 Senate Report on the legislation which is the legislative history of Section 2 inventories some of these factors:

　　　　1. the extent of any official history of discrimination in the state or

political subdivision that touched the right of the members of the minority group

to register, to vote, or to otherwise participate in the democratic process.

　　　　2. The extent to which voting in the state or political subdivision is

racially polarized.

　　　　3. The extent to which the state or political subdivision has used

unusually large districts, majority vote requirements, anti-single shot provisions,

or other voting practices or procedures that may enhance the opportunity for

discrimination against the minority group.

　　　　4. If there is a candidate slating process, whether the members of the
minority group have been denied access to that process.

-16-

5. the extent to which the members of the minority group bear the effects of discrimination in such areas as education, employment and health which hinders their ability to participate effectively in the political process.

6. whether political campaigns have been characterized by overt or subtle

racial appeals.

7. the extent to which the minority group have been elected to public

office in the jurisdiction.

S. REP. NO. 417, 97th Cong., 2d. Sess., reprinted in 1982 U.S.C.C.A.N. 177 at 206-07.

The Senate Committee was careful to stress that:

> [T]here is no requirement that any particular number of factors be proved, or that the majority of them point in one way or the other." S.Rep. at 29, U.S. Code Cong. & Admin. News 1982 p 207. Rather the Committee determined that "the question of whether the political processes are equally open depends upon a searching practical evaluation of the 'past and present reality.'" *Id*. at 30, U.S. Code Cong. & Admin News 1982 p 208. (footnote omitted), and on a "functional" view of the political process. *Id*. at 30, n. 120, U.S. Code Cong. & Admin News 1982, p 208.

cited in *Thornburg v. Gingles*, (supra) 478 U.S. at 45, 106 S. Ct. at 2764.

## 1. History of Discrimination

It is not necessary to find that this discrimination still takes place but only has it taken

place in the past. As the Supreme Court noted in LULAC v Perry

```
The District Court recognized .the long history of
discrimination against Latinos and Blacks in Texas,
Session,  298 F. Supp. 2d, at 473, and other courts have
elaborated on this history with respect to electoral
```

-17-

processes .Texas has a long, well-documented history of
discrimination that has touched upon the rights of African-
Americans and Hispanics to register, to vote, or to
participate otherwise in the electoral process. Devices
such as the poll tax, an all-white primary system, and
restrictive voter registration time periods are an
unfortunate part of this State"s minority voting rights
history. The history of official discrimination in the
Texas election process stretching back to Reconstruction
.led to the inclusion of the State as a covered
jurisdiction under Section 5 in the 1975 amendments to the
Voting Rights Act. Since Texas became a covered
jurisdiction, the Department of Justice has frequently
interposed objections against the State and its
subdivisions.. Vera v. Richards, 861 F. Supp. 1304, 1317
(SD Tex. 1994) (citations omitted). See also Vera,  517 U.
S., at 981.982; Regester,  supra, at 767.769. In addition,
the .political, social, and economic legacy of past
discrimination. for Latinos in Texas, Session, supra, at
492, may well .hinder their ability to participate
effectively in the political process,. Gingles, 478 U. S.,
at 45 (citing Senate Report factors).

It is significant that no decade has passed since 1970 that the Courts have not found Texas

Redistricting plans to violate both Federal and sometimes state law.

That history continues to this day.  For example in the time that has passed since this case was

filed there have been many findings of racially polarized and the Attorney General has

determined that Federal Observers should be sent into several Counties and cities to observe

elections.  See e.g.

**Hubbard v. Lonestar Community College District**, 4:13-cv-01635 filed June 4 2013) (After
limited discovery, the parties negotiated a settlement with 9 single member districts.  The District
Court held a settlement hearing and Approved the settlement in  November of 2013.

**Rodriguez v Harris County**, civ 4: 11 2907 (August 2013) ("In this case there is no dispute that

Latino voters ... are politically cohesive. at 89"; "In light of the evidence discussed above and the statistical evidence of racial bloc voting, discussed *infra*, the Court finds that Latinos ... are politically cohesive." at 93; "The regression results of the endogenous elections indicate that Anglos voted as a bloc to defeat the Latino-preferred candidate. This evidence is further supported by the regression analysis of the exogenous elections." at 101; "Accordingly, the regression evidence presented shows: (I) a clear and consistent relationship between the race of the voters and their candidate preference; and (ii) that Anglos are usually able to defeat the Latino-preferred candidate." at 102; "voting in Harris County is very racially polarized," at 123; " While some... imagine that barriers to voting have been eradicated..., the record here is replete with evidence to the contrary." at 158); 114)

***Fabela et al v. City of Farmers Branch*** , 3:10-CV-1425- 2012 ("Plaintiffs have proved that the City Council elections in 2007, 2008, 2009, and 2011 were ...racially polarized." "Hispanics in Farmers Branch have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." )


**May 13, 2013** Department of Justice sent Federal Election Monitors to observe elections in cities of **Corrigan**, **Farmers Branch**, **Irving** and **Orange**, Texas, to ensure compliance with the Voting Rights Act of 1965.

**April 8, 2013 Section 5** Objection Letter from the Thomas E Perez, Assistant Attorney General to Melody Thomas Chappell, Beaumont ISD school attorney

> Submission of referendum election to change the School Trustee election system from Seven single member districts to five single member districts and two elected at-large. ("There is overwhelming evidence that both the campaign leading to the election as well as the issue itself carried racial overtones with the genesis of the change and virtually all of its support coming from white residents. A statistical analysis of the election confirms the extreme racial polarization that the issue created. Black voters cohesively voted to maintain the current method of election and white voters voted cohesively for the proposed change. We estimate over 90 percent of white voters, but less than 10 percent of black voters, supported the change."

> An examination of at-large elections for the Beaumont City Council also proved informative because of the overlap in population and the similarity in demographics. There, we found racial cohesion among black voters at levels similar to those identified in the school district election. More significantly, we found significant racial polarization and the same unwillingness of white voters to support a black-preferred candidate, with little evidence of crossover voting by white voters in the city's at-large council races.

> "In the past ten years, numerous black-preferred candidates have sought municipal office in the city. With the sole exception of one candidate, African Americans have been unable to elect candidates of choice to the city's at-large

council positions. Our analyses showed that this candidate only received about eight percent of the non-black vote in both the 2007 and 2011 elections, placing second to last among non-black voters in 2011. [matter omitted] [O]ur analyses demonstrate that this candidate's election was dependent on single-shot voting, in which black voters withheld their votes for the second at-large city council seat in both 2007 and 2011, voting only for this candidate. The statistical and anecdotal evidence therefore confirm that this one candidate's experience is not indicative of black-preferred candidates' prospects for success in at-large elections. *See Texas v. United States*, 2012 WL 3671924, at *22-23 (D.D.C. Aug. 28, 2012) (three-judge court) (isolated electoral success by one candidate is insufficient to demonstrate that minority voters have the consistent ability to elect their preferred candidates of choice)."

**April 8, 2013 Section 5** Objection Letter from the Thomas E Perez, Assistant Attorney General to Melody Thomas Chappell, Beaumont ISD school attorney. ( Finds that State Court Order shortening terms and ordering an election out of time violated Section 5 of the Voting Rights Act).

**May 13, 2013** Department of Justice sent Federal Election Monitors to monitor elections in cities of **Corrigan**, **Farmers Branch**, **Irving** and **Orange**, Texas, to ensure compliance with the Voting Rights Act of 1965.

**March 12, 2012 Section 5 Objection Letter** from the Thomas E Perez, Assistant Attorney General to Keith Ingram , Director of Elections

"[T]he state has not met its burden of proving that, when compared to the benchmark, the proposed requirement will not have a retrogressive effect, or that nay specific features of the proposed law will prevent or mitigate that retrogression. Additionally, the state has failed to demonstrate why it could not meet its stated goals of ensuring electoral integrity and deterring ineligible voters from voting in a manner that would have avoided this retrogressive effect..."

**March 12, 2012 Section 5 Objection Letter** from the Thomas E Perez, Assistant Attorney General to Trey Traynor attorney for Galveston County"

With regard to the election for justices of the peace and constables, there are eight election precincts under the benchmark method. Each elects one person to each position, except for Precinct 8, which elects two justices of the peace. The county has proposed to reduce the number of election precincts to five, with a justice of the peace and a constable elected from each.

Our analysis of the benchmark justice of the peace and constable districts indicates that minority voters possess the ability to elect candidates of choice in Precincts 2, 3 and 5. With respect to Precincts 2 and 3, this ability is the

continuing result of the court's order in *Hoskins* v. *Hannah*, Civil Action No. G-92-12 (S.D. Tex. Aug. 19, 1992), which created these two districts. Following the proposed consolidation and reduction in the number of precincts, only Precinct 3 would provide that requisite ability to elect. In the simplest terms, under the benchmark plan, minority voters in three districts could elect candidates of choice; but under the proposed plan, that ability is reduced to one.

**November 5, 2012 General Election** Department of Justice sent Federal Election Monitors to **Dallas** County, Texas; **Fort Bend** County, Texas; and **Jefferson** County, Texas to ensure compliance with the Voting Rights Act of 1965.
 http://www.justice.gov/opa/pr/2012/November/12-crt-1312.html

**May 29, 2012 Municipal Elections** Department of Justice sent Federal Election Monitors to monitor elections in **Dallas** County , **Galveston** County, **Jasper** County, **Jefferson** County and Harris County per Attorney General's certification.  Federal observers sent to **Fort Bend** County which is subject to a court order entered in 2009, which requires the jurisdiction to comply with the minority language and assistor of choice requirements of the Voting Rights Act, as well as the requirements of the Help America Vote Act.  http://www.justice.gov/opa/pr/2012/May/12-crt-677.html

*Voting For America v Andrade* CA-G-12-44 (ED Tx 2012) (Preliminary Injunction against statute limiting ability of Volunteer Voter Registrars (VDR) to register voters "VDRs duly appointed and trained in another county will be among those able to accept and submit applications to a registrar in a different county.... [and] VDRs may mail, rather than personally deliver, the applications they collect, as federal law requires. *Voting for America  v Andrade* 12-40914 (Fifth Circuit August 6, 2012) (Injunction stayed pending appeal )

**Hernandez et al v. Nueces County, Texas et al**, Filed: February 10, 2012 as 2:2012cv00047 Updated: December 10, 2012 14:12:37; *(Section 5 enforcement action, dismissed when Nueces County made changes in the county redistricting that had been objected to.)*

***Petteway, et al. v. Galveston County, Texas, et al.*** (Filed: November 14, 2011 as 3:2011cv00511) Section 5 enforcement action.  County agreed to remedy the dilution in the Commissioners precincts. In addition, the County agreed to hold the elections in 2012 under the benchmark plan and then try the issues on the reduction of Justices of the Peace from 9 to 5.  The JP/Constable part of the case has now been tried and is pending decision)

**2 Extent to which Elections are Polarized**

This has been discussed in connection with the *Gingles* factors. This evidence is being offered by others.

## 3. The Use of Procedures which Enhance the Potential for Discrimination.

### A. The size of the districts

These are essentially features of the election process that have been found in the academic literature and by Courts to make it more difficult for protected minority voters to elect the representatives of their choice. The ultimate modifier, and the one which is mentioned first is the size of the district. Only the California House Districts are larger than those in Texas.

### B. This District has Majority Vote Requirement.

## 4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process.

This part of the test asks whether there is a slating group and if so, do minority group members have access to it. 6/ Plaintiffs do not lose anything if there is no slating group. Rather

---

6      / This slating group gloss grows out of the Dallas County situation in *White v. Register* where the Dallas Committee for Responsible Government (DCRG) had a virtual lock on picking successful candidates. This was due in part to the fact that Dallas elected eighteen state representatives at large in a county of more than 1.3 million persons. None of the state's witnesses, even the Dallas County Democratic Chairman, could name all of the representatives from Dallas. As a result, the evidence indicated, people relied in large part upon the slating of the well respected businessmen who made up the D.C.R.G. The Supreme Court found that D.C.R.G. "a white-dominated organization [had] effective control of Democratic Party Candidate slating." *White v. Register*, (supra) 412 U.S. at 766-67. Since, with only one exception, only Democratic candidates were elected to the legislature from Dallas County, the real election contest in Dallas took place when candidates attempted to obtain slating from the D.C.R.G. Accordingly, the Court inquired in to whether minority residents of Dallas County had real access to this "white-dominated" slating process.

This is much like the "Jaybird Primary" considered by the U.S. Supreme Court in *Terry v. Adams*, 345 U.S. 461 (19530 in which the "Jaybird Democratic Club" met and held a pre-primary nomination process in which Black residents were not allowed to participate.

this test is placed in the formula to insure that Courts considering claims of this sort pay careful attention to the of slating groups when they have effective control elections.  In most cases, there are various organizations which endorse candidates but it is unusual to find a group which is so powerful that its slate is virtually a lock on election.  See e.g. *U.S. v. Dallas County Alabama Commissioners*, 739 F. 2d 1529, 1539 (11th Cir. 1984), *United States v. Marengo County*, 731 F. 2d 1546, 1569 (11th Cir. 1984).  I have not isolated a slating group as described by the Courts in the Galveston County context.

**5. The Current Effects of Discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process**

Courts and Political Scientists have looked to this current economic and social situation for three purposes:

This lower socio-economic status gives rise to special group interests centered upon those factors.  At the same time, it operates to hinder the group's ability to participate in the political process and to elect representatives of its choice as a means of seeking governmental awareness of and attention to those interests.

*Gingles v. Edmisten*, 590 F. Supp. 345, 363 (E.D. North Carolina 1984)  affirmed in relevant part sub nom *Thornburg v. Gingles*, 92 U.S. 25, 106 S. Ct. 2572 (1986).

The social and economic situation of minorities in minority residents of the state on general and the discrete areas in particular is an excellent example of the current effects of past discrimination.  I have examined the available data from both the most recent American Community Survey.  Hispanic and African American residents of the state as a whole and the areas discussed do significantly less well in the traditional examples that have been identified by

the Courts as important to political participation.  A series of charts indicating this analysis is attached to this report.  These charts isolate the Counties and Districts in those Counties at issue. In every situation the minority population is significantly lower on all levels of social analysis Minorities comprise a disproportionate percentage of the functionally Illiterate, non-high School graduates.

In the area of economic well being, the minority community represents a disproportionate percentage of the poverty population, of those who rely on food stamps and of those who make an income of less than $25,000 a year.   Stated otherwise the level of Hispanic and African American poverty is multiple times that of Whites.  The per capita income of the minorities is in the range of half that of Whites.  Whites comprise in the range of 80% of the families with incomes over $50,000.  Minority unemployment is in the range of twice that of Whites.

The attached exhibits demonstrate a vast differential in social and economic status.

I have not looked for a "causal nexus between the depressed socio-economic status of the minority community and a lessening of their opportunities to participate in the political process." Id. at n. 23:

> Courts have recognized that disproportionate educational, employment, income
> level and living conditions arising from past discrimination tend to depress
> minority political participation.  Where these conditions are shown, and where the
> level of black participation in politics is depressed, plaintiffs need not prove any
> further causal nexus between their disparate socio-economic status and the
> depressed level of political participation.  S.Rep. No. 417 at 29 reprinted in 1982
> U.S.C.C.A.C.N. at 207 n.114.

Stated Otherwise, the Fifth Circuit has stressed:

> The Supreme Court and this Court have recognized that disproportionate
> educational, employment and living conditions tend to operate to deny access to
> political life.  [matter omitted] It is not necessary in any case that a minority prove
> ... that these economic and education[al] factors have "significant effect" on
> political access.... Inequality of access is an inference which flows from the
> existence on economic and educational inequalities.

*Kirksey v. Board of Supervisors*, 554 F. 2d 139, 145 (5th Cir.) cert. denied, 434 U.S. 968 (1977).

Congress has directed that where there is clear evidence of socio-economic or political disadvantage, the burden is not on the plaintiffs to prove that this disadvantage is causing reduced political participation, but rather on those who deny the causal nexus to show that the actual cause is something else. *Cross v. Baxter*, 604 F. 2d 875, 881-882 (5th Cir. 1979), *Kirksey*, (supra) 554 F. 2d at 144-46; *Zimmer*, (supra) 485 F. 2d at 1306.

**6. Whether political campaigns have been characterized by overt or subtle racial appeals.**

This is another gloss which seems to have grown out of the Dallas County portion of *White v. Register* (supra). In that case, Plaintiffs demonstrated that in Dallas County, the D.C.R.G. slating group had utilized racial tactics to identify and defeat Black Candidates that it had not slated.

Since Blacks have Anglo-Saxon sounding surnames, it was important in a County the size of Dallas to identify the Black candidates to effectuate the racial prejudice of the White Community. No similar evidence was produced in the Bexar County portion of *White* where the minority candidates had all been Mexican Americans who are self identified by their surnames. Our experience has been that it in elections districts such as the one at issue here the members of the community are sufficiently known that it is unnecessary to identify persons as Hispanic.

As time passes, few of the cases, even in the deep South, identify this element. See e.g. *United States v. Dallas County Alabama*, 739 F. 2d 1529, 1539 (11th Cir. 1984). See also *United States v. Maringo County*, 731 F. 2d 1546, 1571 (5th Cir. 1984).

**8. The extent to which the minority group have been elected to public office in the jurisdiction.**

If you exclude Dallas, Tarrant and Harris and look only at the West Texas, Central Texas and Fort Bend etc. mix although these Counties have an Anglo population minority. This area elects 11 members in the Texas legislature but my analysis shows that minorities will be able to elect a candidate of choice in only 1 of the 11 districts. This population and representation incongruence will only increase because of the continuing large minority growth coupled with the essential Anglo decline in population

In Harris and Dallas Counties, minority residents comprise over half of the population and in each county, the Anglo population declined over the past decade. All growth came from the minority residents of these two counties. It is significant that had the minority population grown at the same rate as the Anglo population the Dallas County would have lost 3-5 members of the legislature and Harris would have lost 2-3. In spite of this, minority representation remained the same as it was in the last plan.

In Tarrant County, although the Anglo population grew slightly, the minority population represented virtually all of the growth. Had the minority population grown at the same rate as the Anglo population, the County would have lost at least one House seat. Nevertheless the number of districts in which minority voters would be able to elect the representatives of choice has also remained constant.

**Lack of Responsiveness**

-26-

It is well established that the issue of unresponsiveness is considerably less important under the results test of Section 2. Indeed in the ***Gadsden County*** case the Fifth Circuit completely ignored it.

> Responsiveness or lack thereof, goes to proving discriminatory intent in the maintenance of the electoral system... It has nothing to do with impact. "Whether current officeholders are responsive to black needs and campaign for black support is simply irrelevant to that inquiry."

***McMillan v. Escambia County***, (***Escambia 1***) 638 F. 2d 1239, 1249 (5th Cir. 1981)
***N.A.A.C.P. v. Gadsden County School Bd.***, 691 F. 2d 978, 983 (5th Cir. 1982)

In the ***Maringo County*** case the Plaintiff, Department of Justice, offered no responsiveness proof. The 11th Circuit noted that:

> Unresponsiveness is of limited importance under Section 2 for two reasons. First, Section 2 protects the access of minorities not simply the fruits of government but to participation in the process itself. Accordingly, evidence that officials meet the functional needs of minority citizens does not overcome the evidence that the minorities are excluded from political participation. Second, responsiveness is a highly subjective matter and this subjectivity is at odds with the emphasis of Section 2 on objective factors. The Senate Report states that "defendants' proof of some responsiveness would not negate plaintiff's showing by other, more objective factors enumerated here that minority voters were nevertheless shut out of equal access to the political process." 1982 Senate Report at 29 n. 116, U.S. Code Cong. & Admin News 1982, p. 207 n. 116. **The authors of the Senate Report apparently contemplated that unresponsiveness would be relevant only if the plaintiff chose to make it so** [footnote omitted] and although a showing of unresponsiveness might have some probative value, a showing of responsiveness would have very little.

***Id.***

Tenuousness of the Policy

-27-

This factor has been found by courts to be significantly more important when applying the Constitutional intent rather that the Section 2 statutory results test. ***United States v. Marengo County***, (supra) 731 F. 2d at 1571. It centers on the question of what neutral justifications can the Defendants offer for the maintenance of the system. ***Id.*** The question of policy:

> is less important under the results test: "even a consistently applied neutral policy would not negate a plaintiff's showing through other factors that the challenged practice denies minorities fair access to the process." 1982 Senate Report at 29 n 117, U.S. Code Cong. & Admin. News 1982, p. 207, n 117.

*Id.*

## The Congressional Issues

I incorporate, my reports testimony in the earlier hearings in this matter as well as in Texas v United States together with all of the Exhibits in those cases. I incorporate the *Gingles* plans that LULAC introduced and the *Gingles* Plans I have recently made public under my name.

Texas received an unprecedented 4 new Districts. Had the minority growth been the same as that of the Anglo population Texas would have lost 2 and perhaps 3 Congressional Districts. That is to say that the minority growth represents 6 to 7 Congressional seats (4 that Texas gained and 2-3 it was able to retain. Yet the original Congressional redistricting resulted in a situation in which the number of districts where minorities would have been able to represent their candidates of choice would have remained the same. In the changes that resulted from this Court's interim order an additional District was created where minorities will be able to elect the representatives of choice. This, although an improvement is nowhere near what one would anticipate from the vastly disproportionate growth.

## Conclusion

It is my opinion, based upon the three *Gingles* considerations and the factors identified in the legislative history of Section 2 that the facts in this case indicate that the currently designed plans for State House and Congress make it more difficult for minority residents to participate in the political process and elect the representatives of their choice and that the challenged State House and Congressional redistricting plans violate Section 2 of the Voting Rights Act.

**Disclosure under Federal Rules of Civil Procedure/Background of Witness**

I have looked at the local rules and find no reference special local provision relating to expert disclosure. I have not written any articles in the last ten (10) years and I have testified in seven (7) cases in the past four (4) years.

Although I am a lawyer, I have also been an adjunct faculty member in the Department of Political Science and Geography and have taught a course on the redistricting process. I have testified in a number of at-large vote dilution cases beginning in 1971 with the district court trial of *Graves v. Barnes*[7]. In *Graves* my testimony was used to identify the socio-economic, historical, and other such considerations that used to test for the degree of vote dilution which arr some times referred to as *White*, *Zimmer* of Senate factors.[8] Articles I have written or testimony which I have given have been cited by numerous Federal Courts including three occasions by the Supreme Court in interpreting the Voting Rights Act,

I was also called upon to prepare plans of apportionment to demonstrate various ways that a jurisdiction can be divided into districting arrangements. Plans which I drew or collaborated upon were used in the *Graves/White* litigation to split formerly at-large legislative

---

[7] *Graves v. Barnes*, 343 F. Supp. 704 (Class action certified for all four districts in Texas 1972) (three judge) (*Graves I*); *Graves v. Barnes*, 405 U.S. 1201 (1972); *White v. v. Regester*, 412 U.S. 755; 93 S. Ct. 2332; 37 L. Ed. 2d 314 (1973); on remand *Graves v. Barnes*, 378 F. Supp. 640, (Class action certified for all four districts in Texas 1974) (Graves II) (three judge); *White v. Regester*, 422 U.S. 935, 45 L. Ed. 2d 662, 95 S. Ct. 2670 (1975); on remand *Graves v. Barnes*, 408 F. Supp. 1050, (Class action certified for all four districts in Texas 1976) (Graves III) (three judge); *Graves v. Barnes*, 446 F. Supp. 560 (Class action certified for all four districts in Texas 1976) (Graves IV)

[8] These factors were derived from the analytical framework of *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.ED...2d 314 (1973), as refined and developed by the lower courts, in particular by the Fifth Circuit in *Zimmer v. McKeithen*, 485 F. 2d 1297 (1973) (en banc), aff'd sub nom *East Carroll Parish School Board v. Marshall*, 434 U.S. 636, 96 S.Ct. 1083, 47 L.ED..2d 296 (1976) (per curiam) S.Rep., at 28, n. 113.

districts in all Texas urban areas including Bexar (San Antonio), Dallas, Travis (Austin), El Paso, McClennan (Waco), Nueces (Corpus Christi), and Lubbock counties. 9/

I was responsible for or significantly involved in negotiation which led to the drawing of single member districting plans used after litigation for a number of the Cities in Texas including Houston10/, San Antonio, and Waco. I also testified as an expert in litigation after the 1981,and the 1991 redistricting of the Texas legislature. In 1981, I was the expert witness for the effort which led to the invalidation of the entire Texas legislative plan on a combination of State Constitutional and Fourteenth Amendments theories.

Much of the Texas House redistricting which followed was based upon plans which I drew or collaborated upon. After the 1990 Census, I testified in state court in a successful effort to invalidate the 1991 apportionments of the House, Senate and Congress using the Texas Constitution's Equal Rights Amendment.11/ The District Court ordered plans into effect which I offered in litigation and the 1990 redistricting plans used by Texas for the House, Senate and Congressional Districts are the result of negotiation which followed using the plaintiffs plans which I sponsored as the essential element.

---

9/ Although I had been named as an attorney in the case, with the agreement of the defendants, I participated in the first trial of the case (*Graves I*) as an expert witness on issues of remedy (creation of single member districts) polarization and cohesion. In addition I did a number of socio-economic studies on the majority and minority communities and the history of discrimination in Texas. In later stages, (*Graves II* and *Graves III*) I functioned as a the lead counsel for the Hispanic plaintiffs and intervenors.

10/ *Leroy v. City of Houston*, No. H-75-1731 (S.D.Tex. 1975)  (*Leroy I*)*; Greater Houston Civic Counsel v. Mann (GHCCO)*, 440 F. Supp. 696 (S.D. Tex. 1977); *Leroy v. City of Houston*, No. H-78-2174 (S.D.Tex. 1979) (*Leroy II*); *In re Houston*, 745 F.2d 925 (5th Cir. Tex. 1984); *Leroy v. Houston*, 584 F. Supp. 653 (S.D. Tex. 1984) (Leroy III); *Le Roy v. Houston*, 592 F. Supp. 415 (S.D. Tex. 1984)*; Leroy v. Houston*, 648 F. Supp. 537 (S.D. Tex. 1986); *Leroy v. Houston*, 831 F.2d 576 (5th Cir. Tex. 1987) *cert. denied*, 486 U.S. 1008, 108 S. Ct. 1735, 100 L. Ed. 2d 199 (1988) (*Leroy IV*); *Leroy v. Houston*, 906 F.2d 1068 (1990) (*Leroy V*)

11/ During the effort to pass the Federal Equal Rights Amendment, the Texas legislature not only ratified the proposal but the voters overwhelmingly installed it a part of our Constitution. It was argued that the rights guaranteed under our Constitution were similar to but stronger than those in Section 2 of the Federal Voting Rights Act or the Fourteenth Amendment.

I have testified in a number of cases in both State and Federal Court which have been litigated in the Southeast Texas including *Perez v. Pasadena Ind. Sch. Dist.*, 958 F. Supp. 1196 (S.D. Tex. 1997). In that case, the district court found:

> Plaintiffs also offered the testimony of George Korbel as an expert witness on the *Gingles* threshold, as well as on the Zimmer factors. [matter omitted]   Korbel is a recognized voting rights expert, whose focus is on the non-statistical analysis of elections and the factors that influence their outcome.
>
> The court finds that ...Mr. Korbel is an expert in the field of non-statistical voting rights analysis.

*Perez* 958 F. Supp. at 1204 (S.D. Tex. 1997)

and *League of United Latin American Citizens (LULAC) v. North East Ind. Sch. Dist.*, 903 F. Supp. 1071(W.D. Tex. 1995).

After the 2000 Census I acted as coordinator and expert in redistricting by a number of jurisdictions including the Houston Community College District, the Houston ISD, the San Antonio ISD, the San Antonio Community College, the City of San Antonio, Webb County (Laredo), Gregg County (Longview), Cameron County (Brownsville), Red River County, the San Marcos ISD, the Bexar Metropolitan Water District, Uvalde County, Bastrop County, Hays County and Val Verde County

was involved as a lawyer and also as a witness before both the House and Senate Committees in the successful effort to extend the special provisions of the Voting Rights Act of 1965 to cover Texas. My testimony on the historical pattern of discrimination is generally credited as forming the basis for the legal argument to include Texas and has been cited by several federal courts including the Supreme Court in the interpretation of Sections 2 and 5 of the Act. In 1982, I again offered Congressional testimony in support of the adoption of the new provisions for Section 2 of the Voting Rights Act. As the legislative history indicates, the effort was to install the legal analysis which resulted from *Graves/White*

Most recently I have testified in State Court concerning the redistricting of the Beaumont ISD, in Federal Court concerning the Pasadena ISD, the Galveston County Commissioners and Constables. I was involved in drawing and negotiating the districts in the settlement of a Federal

-32-

Court Action in case against the Lone Star Community College District (population of just under 2,000,000 persons. I testified at the settlement hearing held by the Court to adopt the plan. I have testified in the earlier hearings that have been held in this matter and in the parallel case which was tried in the District Court for the District of Columbia. I am currently acting in the capacity of expert witness in redistricting matters in both the state and Federal Court matters against the Beaumont ISD. I am also acting as a expert witness in the case of LULAC v. The Edwards Aquifer Authority. I was a witness in the suit against the Lone Star Community College District and negotiated the plan drawn to adopt single member districts . I testified in the settlement hearing which was held in November of last year. Late last year I testified in a case against the Pasadena ISD and against Galveston County.       I was involved as a lawyer and also as a congressional witness in the successful effort to extend the special provisions of the Voting Rights Act of 1965 to cover Texas. My testimony on the historical pattern of discrimination is generally credited as forming the basis for the legal argument to include Texas and has been cited by several federal courts including the Supreme Court in the interpretation of Sections 2 and 5 of the Act. In 1982, I again offered Congressional testimony in support of the adoption of the new provisions for Section 2 of the Voting Rights Act. As the legislative history indicates, the effort was to install the legal analysis which resulted from *Graves/White*.

Supplement to an earlier report.

To Gary Bledsoe

Fr: George Korbel

I previously filed a report in this matter and this further expands on it.

**Growth and Minority Congressional Elections**

There has been much said about the fact that Texas picked up two additional congressional seats during the last decade and that Minority Texans accounted for 95% of the growth that resulted in those two additional seats. Yet, in the 2021 redistricting no additional districts were drawn that could be expected to result in the election of an additional minority congressperson.

But this is not a one-off thing. Between 2000 and 2010 Texas gained 4 Congressional Districts and only 10% of that Growth was Anglo. Yet no additional Congressional Districts were drawn by the legislature that resulted in the election of a Minority Congressperson.

I attach a short powerpoint presentation marked exhibit 1 which sets our the Texas growth by race and ethnicity.   In 1970 Texas was apportioned  24 members of Congress.  Page 2 of the power point shows the increase in Texas population since the 1970 Census by race and ethnicity and the number of additional members of Congress apportioned to Texas after each succeeding Federal Census.  As you can see Hispanics, African Americans and more recently Asian Americans have produced the lion's share of the growth that led to the increase in Congressmen apportioned to Texas

From 1970-2020 Texas gained 14 additional seats going from 24 in 1971 to 38 in 2021.   No other state has shown such sustained velocity of growth.

The chart on page 3 of the power point projects what would have happened if the minority community had grown at the same much slower rate as the White community.

Instead of gaining 14 Congressional seats. Texas would have actually lost 2. In other words, since 1970 the minority growth in Texas produced 16 additional Congressional Districts

In 1971 there were 5 Districts where Minority Texans were elected or where their votes determined the result of the election.   These were the newly created District 18 in Harris County which elected Barbara Jordan, District 20 from Bexar County electing Henry B Gonzales, District 15 from South Texas electing Kika de la Garza, District, District 23 out of Laredo electing Chick Kazen and District 16 based in El Paso electing Richard White.

Since that time a second district electing an African American was drawn in Harris and three additional districts electing African Americans in Dallas and Tarrant.   In addition to the 5 Districts representing Hispanics in 1971, Texas has added a district in the Rio Grande Valley and a District in Houston  It is significant that virtually all of the increase in Minority Members of Congress came as a result of litigation.

The Brownsville based District  now numbered 34 came as a result of a Voting Rights Act Objection in 1980 Awhich highlighted the packing that resulted when the state combined Cameron (Brownsville) and Hidalgo counties over resulting in a District 15 which was well over 80% minority alongside a District 27 which was just over 50% minority population. .

https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/TX-1920.pdf

Districts 29 and 30 came in 1991 as a result of the belief by the State that the Federal Voting Rights Act required creation of a district with potential to elect an Hispanic candidate in Harris County (CD-29) and one with the potential to elect a African American in Dallas(CD-30) County.   Initially Gene Green was elected to represent CD 29 in a special election resulting in the invalidation of a run off which was won by a Hispanic candidate.   Congressman Gene Green was consistently reelected wth Hispanic support in the District and retired in 2018. Sylvia Garcia was elected and continues in that position.

District 9 which  has elected Al Green since it was created as a result of litigation after the 2000 census.

District 23 came as a result of litigation in 2000 and 2010 leading to a special election in 2016 as a result of findings and a remand from the Supreme Court . *League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006)

I attach a power point which shows the Congressional plans used by the legislature for the past 60 years.  They demonstrate  several things.   In virtually

every one there is the citation to the Federal Court case that established or

mandated it.     If you look at the decisions from *White v. Regester* in the 1970s to

*Perez v. Abbott* in the 2010s you will see that in every case the plan passed by the

legislature was changed by the Courts as a result of a finding that one way or

another centered on intentional discrimination.


The second thing you notice by looking at the plans is that in the areas

affected by the Courts findings the districts are considerably less complicated and

visually simpler than those adopted by the legislature.   For example in 2011 the

state passed a plan that had the infamous lightening bolt district that split the

minority community in Tarrant County in three parts.   It was a classic

gerrymander.   At trial the State conceded and the three-judge district Court in San

Antonio entered an agreed interim  plan which eliminated the lightening bolt and

redrew District 33 resulting in the election Marc Veasey.


In 2018, Collin Allred was elected to replace 11 term Congressman Pete

Sessions from District 32.    The genesis of Districts 32 and its neighbor District 24

is interesting.   During the last decade there two districts in the Northern part of

Dallas and Tarrant Counties. They were compact.    District 32 was is anchored in

the extremely high income Highland Park, University Park and Southern Methodist

area of Dallas.   Homes there in the multi million dollar category abound.  Based

on the 2020 census the Park Cities are the wealthiest cities in Texas.    The area is

less than 10% minority under the 2020 census.

https://en.wikipedia.org/wiki/Highland_Park,_Texas

https://en.wikipedia.org/wiki/University_Park,_Texas

What essentially happened ws that the area of District 32 outside the Park cities

Hispanic and African Aerican Community has grown significantly.

District 24 is anchored by the Northern Tarrant County surburbs including

Southlake.   Southlake is the highest income area in Dallas Metroplex.  According

to a 2019 estimate, the median income for a household in the city was in excess of

$240,248, higher than any other city in the DFW Metroplex, and the average value

of homes is approaching a million dollars.

https://en.wikipedia.org/wiki/Southlake,_Texas.


The Data:

District 24 and 32 have grown substantially faster than the state rate.

District 32

In 2010 using the 2010 Census, Anglos in District 32 made up 53.3% of the

population and 58.0% of the voting age population (VAP).   This declined to

42.5% of the Population and 46.4% of the VAP after the 2020 Census.  In 2019

Colin Allred, an African American was elected and sworn in as the Congressman

from District 24 defeating an 11 term Anglo incumbent.

The 2021 redistricting created a District 32 which reduced the Anglo

population from 46.9% population/50.5% VAP  to 32.2%/ 36.2% VAP.   In other

words, the state took a district that was electing an African American and made it

significantly less Anglo.

**ADOPTED CONGRESSIONAL DISTRICTS**
White: Congressional Districts adopted after the 2010 Census using 2010 Census Data
Pink: Congressional Districts adopted after the 2010 Census using 2020 Census Data
Yellow: Congressional Districts adopted in 2021 using the 2020 Census Data.

| | Det | | Total | Anglo | Non-Anglo | Asian | Black | Hisp | B+H | Other | % Anglo | % Non-Anglo | % Asian | % Black | % Hisp | % B+H | % Other | Gen Elec | Total VR | SSVR | Turnout |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 | 0 | Total: | 698,488 | 373,234 | 325,254 | | 77,048 | 163,505 | 237,081 | 88,173 | 53.4 | 46.6% | | 11.0 | 23.4 | 33.9 | 12.6 | 2010 | 309,304 | 8.65% | 146,111 47.24% |
| | 0.00% | VAP: | 528,185 | 303,594 | 224,591 | | 54,580 | 107,125 | 159,898 | 64,693 | 57.5 | 42.5% | | 10.3 | 20.3 | 30.3 | 12.2 | 2008 | 330,301 | 8.81% | 261,711 79.23% |
| 24 | 55,719 | Total: | 822,706 | 350,034 | 472,672 | 145,109 | 116,784 | 197,981 | 308,970 | | 42.5 | 57.5 | 17.6 | 14.2 | 24.1 | 37.6 | | 2020 | 479,964 11.42% | | 349,032 72.72% |
| | 7.26% | VAP: | 641,938 | 296,304 | 345,634 | 107,257 | 85,928 | 140,345 | 223,138 | | 46.2 | 53.8 | 16.7 | 13.4 | 21.9 | 34.8 | | 2018 | 450,075 10.97% | | 267,198 59.37% |
| 24 | 0 | Total: | 766,987 | 472,474 | 294,513 | 77,111 | 66,043 | 133,852 | 195,638 | | 61.6 | 38.4 | 10.1 | 8.6 | 17.5 | 25.5 | | 2020 | 515,844 8.43% | | 392,591 76.11% |
| | 0.00% | VAP: | 581,738 | 377,683 | 204,055 | 54,234 | 44,772 | 90,349 | 133,025 | | 64.9 | 35.1 | 9.3 | 7.7 | 15.5 | 22.9 | | 2018 | 488,363 8.05% | | 312,625 64.01% |
| 32 | 0 | Total: | 698,488 | 372,063 | 326,425 | | 91,005 | 178,562 | 266,368 | 60,057 | 53.3 | 46.7% | | 13.0 | 25.6 | 38.1 | 8.6 | 2010 | 330,594 | 8.71% | 160,318 48.49% |
| | 0.00% | VAP: | 523,179 | 308,193 | 219,986 | | 61,771 | 114,355 | 174,594 | 45,392 | 58.0 | 42.0% | | 11.8 | 21.9 | 33.4 | 8.7 | 2008 | 345,738 | 8.65% | 268,352 77.62% |
| 32 | 22,679 | Total: | 789,666 | 370,429 | 419,237 | 82,993 | 119,306 | 206,662 | 321,130 | | 46.9 | 53.1 | 10.5 | 15.1 | 26.2 | 40.7 | | 2020 | 479,658 11.68% | | 348,338 72.62% |
| | 2.96% | VAP: | 612,612 | 309,242 | 303,370 | 63,633 | 86,304 | 143,313 | 227,221 | | 50.5 | 49.5 | 10.4 | 14.1 | 23.4 | 37.1 | | 2018 | 452,871 11.18% | | 278,457 61.49% |
| 32 | 0 | Total: | 766,987 | 247,121 | 519,866 | 72,967 | 161,336 | 279,559 | 435,345 | | 32.2 | 67.8 | 9.5 | 21.0 | 36.4 | 56.8 | | 2020 | 395,735 16.06% | | 265,313 67.04% |
| | 0.00% | VAP: | 593,970 | 214,855 | 379,115 | 57,884 | 120,350 | 193,923 | 311,293 | | 36.2 | 63.8 | 9.7 | 20.3 | 32.6 | 52.4 | | 2018 | 375,407 15.37% | | 208,554 55.55% |

District 24

In 2010 using the 2010 Census, Anglos in District 24 made up 53.4% of the

population and 57.5% of the voting age population (VAP).    Under the 2020

Census data this declined to 42.5% population/46.4% VAP. So that actually

District 32 was slightly more minority in 2020 than District 24 that had elected an

African American. In November of 2020 a Black Hispanic came within a few

votes of defeating the Anglo Incumbent.

The 2021 redistricting increased the Anglo population of District 24 from

Anglo 42.5% Pop./46.2% vap to Anglo 67.8% pop/63.8%.

Districts 30 and 33

District 30 has overwhelmingly elected an African American since it was

initially apportioned to Texas in 1990. The 2021 redistricting slightly increased

the Black and Hispanic population and it is likely that Blacks will continue to elect

the represena\tatives of choice.

The same thing can be said about District 33 it has consistently elected an

African American since it was created by the Federal Courts in 2011. As with

District 30, it can reasonably be expected to elect the minority candidate of choice.

RA-200Data: 2020 Census/XKORC2000

Population and Voter Data
CONGRESSIONAL DISTRICTS - XKORC2000

| Dst | | Total | Anglo | Non-Anglo | Asian | Black | Hisp | B+H | Other | % Anglo | % Non-Anglo | % Asian | % Black | % Hisp | % B+H | % Other | Gen Elec | Total VR | SSVR | Turnout |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | -1 | Total: 698,487 | 120,731 | 577,756 | | 323,730 | 242,255 | 560,352 | 17,404 | 17.3 | 82.7% | | 46.3 | 34.7 | 80.2 | 2.5 | 2010 | 305,406 12.7% | 126,420 | 41.39% |
| 30 | 0.00% | VAP: 496,651 | 106,110 | 390,541 | | 230,406 | 149,408 | 377,184 | 13,357 | 21.4 | 78.6% | | 46.4 | 30.1 | 75.9 | 2.7 | 2008 | 322,036 12.22% | 224,621 | 69.75% |
| 30 | 15,989 | Total: 782,976 | 112,103 | 670,873 | 20,457 | 331,970 | 318,581 | 643,025 | | 14.3 | 85.7 | 2.6 | 42.4 | 40.7 | 82.1 | | 2020 | 435,361 18.31% | 267,965 | 61.55% |
| 30 | 2.08% | VAP: 581,745 | 100,978 | 480,767 | 16,510 | 248,690 | 212,988 | 458,049 | | 17.4 | 82.6 | 2.8 | 42.7 | 36.6 | 78.7 | | 2018 | 416,750 16.89% | 208,643 | 50.06% |
| 30 | 0 | Total: 766,987 | 135,970 | 631,017 | 30,062 | 324,212 | 276,371 | 593,069 | | 17.7 | 82.3 | 3.9 | 42.3 | 36.0 | 77.3 | | 2020 | 444,717 16.04% | 281,153 | 63.22% |
| 30 | 0.00% | VAP: 577,974 | 123,551 | 454,423 | 23,959 | 242,224 | 185,018 | 423,612 | | 21.4 | 78.6 | 4.1 | 41.9 | 32.0 | 73.3 | | 2018 | 423,058 14.81% | 218,322 | 51.61% |
| 33 | 4 | Total: 698,492 | 101,380 | 597,112 | | 120,324 | 463,089 | 577,981 | 19,131 | 14.5 | 85.5% | | 17.2 | 66.3 | 82.7 | 2.7 | 2010 | 200,514 35.8% | 65,841 | 32.84% |
| 33 | 0.00% | VAP: 469,460 | 86,480 | 382,980 | | 83,672 | 287,570 | 368,667 | 14,313 | 18.4 | 81.6% | | 17.8 | 61.3 | 78.5 | 3.0 | 2008 | 215,289 34.53% | 131,883 | 61.26% |
| 33 | -46,343 | Total: 720,644 | 86,495 | 634,149 | 21,702 | 128,381 | 483,195 | 606,109 | | 12.0 | 88.0 | 3.0 | 17.8 | 67.1 | 84.1 | | 2020 | 290,503 41.51% | 161,405 | 55.56% |
| 33 | 6.04% | VAP: 514,162 | 74,816 | 439,346 | 16,278 | 92,593 | 327,768 | 417,728 | | 14.6 | 85.4 | 3.2 | 18.0 | 63.7 | 81.2 | | 2018 | 273,305 40.47% | 121,746 | 44.55% |
| 33 | 0 | Total: 766,987 | 101,512 | 665,475 | 67,105 | 155,365 | 442,093 | 591,332 | | 13.2 | 86.8 | 8.7 | 20.3 | 57.6 | 77.1 | | 2020 | 322,372 35.65% | 188,476 | 58.47% |
| 33 | 0.00% | VAP: 555,227 | 87,980 | 467,247 | 48,580 | 113,394 | 302,355 | 412,701 | | 15.8 | 84.2 | 8.7 | 20.4 | 54.5 | 74.3 | | 2018 | 301,129 35.08% | 140,835 | 46.77% |

In spite of the fact that the White or Anglo population in Dallas and Tarrant Counties declined during the last decade amd that the Anglo and the Hispanic population in Dallas and Tarrant County are now almost identical. the 2021 redistricting actually reduces the liklihood that minoirty voters would have an opportunity to elect another representative of choice.

The identifying factors of a gerrymander are present. The Districts became increasingly complex/ This is particularly true in Districts 24, 32 and 33 which are as complicated as in the 2021 Tarrant County Lightening Bolt that the state conceded on. That led to the court ordered plan that produced District 33 which electing the first minority Congressman from Tarrant County.

Another way I like to look at a gerrymander is how easily could it be to modify it. I attach a powerpoint that demonstrates this. Essentially if you look at Districts 5

and 6. Each combines a several East Texas Counties with an arm that extends into the eastern portion of Dallas County adjoining District 30 and District 6 which extends into Tarrant and Dallas Counties and also adjoind District 30.  In each case the urban population of the districts5 and 6  are almost exactly half of a Congressional District .  If one simply adds the urban portions of District 5 and 6 to current district 30, all you need to do is draw a lne down the middle to undo the gerrymander resulting in the creation of another Metroplex District which wold make it possible toe minority voters to elect the representatives of their choice.

In Harris County the Anglo population inccreased slightly but was far ouppaced by the Minority growth.   An additional Congressional District (38) was assigned to the county and will be dominated by White voters.  nevertheless


District 23 and 20 in the Bexar County mix.

District 20 has elected a Hispanic Congressman since 1961.  Nevertheless the state actually slightly increased the minority concentration unnecessarily.


District 23 has been the subject of Voting rights Objections and Federal Court findings intentional discrimination for the last three decades.. Nevertheless the state unnecessarily reduced the Spanish surnamed voter registration from 54.8% to 49% and Hispanic concentration from 67.8% pop./63.0% vap to 62.9%

pop/60% vap.

RA-200Data 2020 Census10IORIC2000

**ADOPTED CONGRESSIONAL DISTRICTS**

White: Congressional Districts adopted after the 2010 Census using 2010 Census Data
Pink: Congressional Districts adopted after the 2010 Census using 2020 Census Data
Yellow: Congressional Districts adopted in 2021 using the 2020 Census Data.

| Dev | | Total | Anglo | Non-Anglo | Asian | Black | Hisp | B+H | Other | % Anglo | % Non-Anglo | % Asian | % Black | % Hisp | % B+H | % Other | Gen Elec | Total VR | SSVR | Turnout |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20 0 | Total: | 698,488 | 153,524 | 544,964 | | 42,792 | 483,902 | 519,807 | 25,157 | 22.0 | 78.0% | | 6.1 | 69.3 | 74.4 | 3.6 | 2010 | 296,744 56.31% | 105,612 | 35.59% |
| 0.00% | VAP: | 505,056 | 126,383 | 378,673 | | 28,977 | 333,230 | 359,195 | 19,478 | 25.0 | 75.0% | | 5.7 | 66.0 | 71.1 | 3.9 | 2008 | 309,827 57.29% | 198,698 | 64.13% |
| 20 5,116 | Total: | 772,103 | 157,659 | 614,444 | 37,454 | 57,363 | 523,637 | 571,086 | | 20.4 | 79.6 | 4.9 | 7.4 | 67.8 | 74.0 | | 2020 | 448,072 54.79% | 279,981 | 62.49% |
| 0.67% | VAP: | 583,799 | 132,885 | 450,914 | 27,366 | 40,713 | 381,567 | 417,530 | | 22.8 | 77.2 | 4.7 | 7.0 | 65.4 | 71.5 | | 2018 | 425,612 54.83% | 201,807 | 47.42% |
| 20 0 | Total: | 766,987 | 135,128 | 631,859 | 36,952 | 59,388 | 540,441 | 589,510 | | 17.6 | 82.4 | 4.8 | 7.7 | 70.5 | 76.9 | | 2020 | 434,037 57.88% | 263,913 | 60.8% |
| 0.00% | VAP: | 574,548 | 113,466 | 461,082 | 26,992 | 41,320 | 392,056 | 428,572 | | 19.7 | 80.3 | 4.7 | 7.2 | 68.2 | 74.6 | | 2018 | 409,140 58.06% | 185,646 | 45.37% |
| 23 0 | Total: | 698,488 | 196,006 | 502,482 | | 18,546 | 473,278 | 488,345 | 14,137 | 28.1 | 71.9% | | 2.7 | 67.8 | 69.9 | 2.0 | 2008 | 326,525 54.84% | 125,332 | 38.38% |
| 0.00% | VAP: | 494,186 | 156,863 | 337,323 | | 13,104 | 315,460 | 327,001 | 10,322 | 31.7 | 68.3% | | 2.7 | 63.8 | 66.2 | 2.1 | 2008 | 323,647 55.01% | 193,985 | 59.94% |
| 23 67,662 | Total: | 834,649 | 198,916 | 635,733 | 23,577 | 41,573 | 569,239 | 603,487 | | 23.8 | 76.2 | 2.8 | 5.0 | 68.2 | 72.3 | | 2020 | 491,848 54.07% | 304,066 | 61.82% |
| 9.82% | VAP: | 609,968 | 160,742 | 449,226 | 16,094 | 28,520 | 400,507 | 425,778 | | 26.4 | 73.6 | 2.6 | 4.7 | 65.7 | 69.8 | | 2018 | 452,369 54.65% | 213,654 | 47.23% |
| 23 0 | Total: | 766,987 | 217,997 | 548,990 | 27,237 | 37,248 | 482,437 | 512,854 | | 28.4 | 71.6 | 3.6 | 4.9 | 62.9 | 66.9 | | 2020 | 464,945 49.16% | 295,515 | 63.56% |
| 0.00% | VAP: | 568,074 | 177,580 | 390,494 | 18,844 | 26,217 | 340,976 | 363,926 | | 31.3 | 68.7 | 3.3 | 4.6 | 60.0 | 64.1 | | 2018 | 427,724 49.68% | 210,537 | 49.22% |

Over all the 2021 plan is consistent with the past 50 years of historic redistricting which has been invalidated by the Courts,

The pattern is the same.   Of the 38 Congressional Districts all but 2 (CD 1 and CD 19) are tied into the urban areas.   Minority districts are concentrated in the inner urban areas      while the balance of the Minority community is tied into heavily Anglo minority counties that are hundreds of miles away.

As a result although the White population is only 39% Anglos are elected to two thirds of the districts.

In my opinion the redistricting appears to have been drawn with the use of races as a primary determinant.  Minority voters are packed into urban districts such as 30, 9, 18, 29 then the balance are cracked and tied into the White dominated rural districts.  This is particularly true in the effort to tie all of the minority dominated urban areas to the heavily white rural areas.    Nor is it a sunrise that race is a significant  factor in this redistricting.  That has been a consistent finding by the Federal Courts fpr the past 50 years.


A redistricting plan is a single unit made up of parts which have to encompass all of the geography and population of the state, as a result each district has an effect on all of the others. The ultimate goal of the plaintiffs is to make changes in the districts.

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| LULAC, et. al., | § | |
| | § | |
| *Plaintiffs* | § | |
| | § | |
| Eddie Bernice Johnson, Sheila Jackson-Lee | § | |
| Alexander Green, and Jasmine | § | |
| Crockett | § | |
| | § | |
| Plaintiff-Intervenors | § | |
| | § | Case No.: EP-21-CV-00259-DCG- |
| | § | JES-JVB [Lead Case] |
| v. | § | |
| | § | |
| GREG ABBOTT, in his official capacity | § | |
| As Governor of Texas, et. al. | § | |
| | § | |
| *Defendants* | § | |

---

Plaintiff-Intervenors.

---

## PLAINTIFF-INTERVENORS' EXPERT REPORT BINDER

EXPERT: Dr. Richard Murray

---

Provided: May 2, 2025

**Expert Report on C2193: The Enacted Texas
Congressional Redistricting Plan**

By Richard Murray
Senior Research Associate
Hobby School of Public Affairs

June 15, 2022

# The Redistricting Environment in Texas and the Enactment of Congressional Plan C2193

By Richard Murray

Senior Research Associate, Hobby School of Public Affairs, University of Houston

In evaluating redistricting plans, federal courts consider the totality of circumstances existing when a specific map is adopted. This report focuses on some of the environmental factors I consider relevant to Congressional Plan C2193 passed by the Texas Legislature in 2021. In light of these circumstances and plan's specific provisions, Plan C2193 violates, in my opinion, the Equal Protection of the Law and Due Process clauses of the 14th Amendment and Section Two of the Voting Rights Act.

## I.     Introduction: A Brief History of Congressional Redistricting in Texas prior to 2021

I begin with a review of the history of redrawing (or not redrawing) congressional districts in the Lone Star State from 1900 to the 1960s. During this period Texas was a one-party state, and that party (the Democrats) was dominated by white conservatives closely aligned with major economic interests embedded in the state. That "modified class politics," as Texas native V.O. Key, Jr. stated in his classic study, *Southern Politics,* had evolved, "not primarily because of an upthrust of the masses that compels men of substance to unite, but because of the personal insecurity of men suddenly made rich who are fearful lest they lose their wealth."[1]

Maintenance of this dominance had many bases. Vastly superior financial resources to spend on elections and lobbying; legal rules that favored business interests as opposed to labor; and supportive conservative media like *The Dallas Morning News,* the largest newspaper in Texas. Also of importance was the power to draw the maps for the Texas legislature and the U.S. Congress from the early 1900s to the 1960s.

The "Tory" Democrats dominance broke in the 1960s and 1970s, followed by the emergence of a competitive two-party system. That two party system, with a growing Texas Republican Party challenging a more progressive Democratic Party, resulted in a dramatic improvement in opportunities for Black and Latino voters in Texas to elect candidates of their choice. That improvement was assisted by federal court decisions that shifted legislative and congressional districts from under-populated rural Texas to fast-growing and more diverse metropolitan areas. Even more important was the passage of the federal Voting Rights Act in 1965 and the 1975 extension that brought the Lone Star State under the special provisions of Section Five of the VRA. With Latino voters now joining Blacks as a protected minority due to a long history of electoral discrimination, the next 25 years were a period of enhanced opportunities for minority voters in Texas to elect candidates of their choice.

---

[1] V.O. Key, Jr., *Southern Politics in State and Nation,* Random House, New York, 1949, p. 255.

Finally, I examine congressional redistricting in Texas in the 21st century.  The most recent rounds of redrawing Texas maps have featured a return to one-party control of the legislative process.  The one party now dominating the process is, of course, the Republican Party rather than the Democrats.  But as with the earlier one-party era, the dominating party's base is white conservative voters who dominate the spring Republican Primaries.  To be sure, the dominate Republican Party in Texas today is a very different animal from the Tory Democrats in the first half of the 20th century.   Texas Republicans form the single most important component in an *ideological, national party focused on culture war issues, hostility to immigration, and fealty to former President Trump.*  The earlier Texas Democratic one-party system, by contrast, was part of a *regional faction within a national party, a faction focused on maintaining a white economic elite's power within the state, and – above all else – preserving the Jim Crow color line across the region*.  These are very important differences.  But what is similar is that the white conservative Republicans of today, like the Democrats of one hundred years ago, have systematically reduced the opportunities for Black and Hispanic voters to elect candidates of their choice to Congress.

### A:  1900 – 1964:  One-Party Dominance before the One-Person, One-Vote Rules were Imposed and the Voting Rights Act was Passed

Texas, like most states, assigns the initial drawing of congressional districts to the state legislature. That legislature was controlled by business-friendly, white conservative Democrats for decades.  The dominant faction's Texas strategy, consistent with the other former Confederate states across the Solid South, was get young men elected to Congress and keep them there.  The representatives would accumulate seniority and power within the Democratic Party, and become, over time, major shapers of national policy.  Some of that power was used negatively, as in maintaining the color line at home and making sure no national civil rights bills were passed from 1875 to 1957.  But their clout was also used to ensure big chunks of the federal "pork" being handed out by 20th century Congresses would come back to Texas.  Much of these federal goodies benefited powerful business elites like George and Herman Brown – longtime power brokers in the state Democratic Party.  Access to this federal largess, along with making sure white supremacy went unchallenged in the state and region, were the foundations of one-party Democratic rule in Texas for nearly a century.

The Texas U.S. House delegation was key to the southern congressional strategy in Washington because of its size, unity, and control of key leadership positions in the Democratic caucus. After the 1900 census Texas had 16 members of the U.S. House – no other southern state had more than eleven – and the delegation steadily grew to 23 members by 1961.  The Texans routinely voted as a bloc in Washington, D.C.   And their ranks included powerful party leaders like Speakers John Nance Garner from Uvalde County and Sam Rayburn from Fannin County.

One key to delegation's unity and power was the congressional map-drawing process within Texas.  The districts in the early 1900s were largely based in the rural counties across the state that had experienced huge population gains in the 1880s and 1890s as thousands of mostly small farmers settled new agricultural lands across Texas.  After 1900 rural growth slowed, then

reversed in the 1920s and 1930s, while urban growth accelerated.  But the congressional maps continued to protect powerful Democratic incumbents whose home bases were in rural Texas. These members were typically reelected without opposition in the biennial Democratic Primaries and rarely faced Republican challengers in General Elections.  When new congressional seats came to Texas, the legislators in Austin, themselves mostly elected from the same rural counties that were vastly over-represented in Congress, would sometimes refuse to redraw the U.S. House districts by having any new members elected at-large (1912 -1916; 1952-1960, 1962-1964), or redraw maps protecting all sitting members.

Most important for the purposes of this report was the fact that the congressional redistricting process in this period of one-party Democratic dominance almost completely denied the growing Black and Hispanic populations in 20th century Texas *any* opportunity to elect candidates of their choice.  All the districts were dominated by Anglo voters until 1960, when growing Latino registration in Bexar County finally gave local Mexican American voters the opportunity to send Henry B. Gonzalez to Washington, D.C. and to reelect him in 1962.  No district in Texas had anywhere near a plurality of Black voters from 1902 to 1964, and no African American candidate was a serious contender in any Democratic congressional primary in this period.  To sum up, there were, by my count, 734 elections for two-year terms in Congress for Texas between 1902 and 1964.  All but two were won by white candidates, 99 percent of whom were Democrats.  That is a pretty good batting average by any standard.

This extremely effective denial of Black and Hispanic Texans' voting power in congressional and all other elections was an essential part of the Jim Crow racial system that became firmly entrenched in the early 1900s.  The catalyst for establishing this electoral system in Texas was the emergence of a biracial populist coalition that came close to defeating the Democratic candidate for governor in 1896.[2]  The principal engineer of the restrictive measures was Alexander Watkins Terrell, s former slaveowner and Confederate officer who considered the Fifteenth Amendment prohibiting the denial of Black voting rights to be "the political blunder of the century."[3]

Terrell was a fierce advocate of a "poll tax," not only because it would get rid of many Black voters, but also eliminate "the thriftless, idle, and semi-vagrant element of both races."[4]  In fact, by the time the poll tax was enacted in a 1902 referendum, most African Americans had been pushed out of the electorate by a combination of intimidation and physical violence across Texas.  But the poll tax was an effective barrier to Mexican American political opportunities in South Texas where several counties had Hispanic majorities.[5]  The tax helped maintain the system of boss rule and machine politics because most Mexican Americans on the voter rolls

---

[2] See Chandler Davidson, *Race and Class in Texas Politics,* Princeton University Press, 1990, p. 20.

[3] Quote from Davidson, op. cit., p. 21.

[4] Ibid.

[5] The Texas poll tax was particularly effective in keeping poor voters off the rolls not just because of its cost (typically $1.75 per year, or about $70 in 2022 dollars compared to 1920), but also because it had to be paid annually in December before the mid-summer Democratic primary and almost a year before the General Election.

had their tax paid by Anglo politicians like Jim Wells or Archie Parr who then rounded these voters up on Election Day and instructed them how to cast their ballots.

Although the Black and Mexican American vote was small in Texas after 1900, it continued to stir controversy and produce periodic efforts by conservative Anglos to make it even less of a factor. Typical was the reaction after a prohibitionist amendment to the Texas Constitution failed in 1911 by a margin of 6,297 votes out of 468,000 ballots. Thomas Ball, the state chair of the temperance campaign, blamed its defeat on "the poor ignorant negroes (sic), deluded by designing white men, inspired by the liquor interests, and the Mexican vote, which Texas in 1836 declared unfit to govern this country."[6]

Hostility to minority voting in Texas continued to manifest itself deep into the 20th century. In 1923 Texas formally adopted a white primary law excluding Blacks from voting in the crucial Democratic primaries. At the time, this was overkill, since years of other rules, threats, and racial violence had already eliminated meaningful African American participation in Democratic Primaries. Apparently, the Texas Legislature just wanted to make it very clear that state elections were white affairs. Texas continued to defend the white primary from challenges in federal court over the next 30 years.[7]

The one-party political process in Texas that marginalized Black and Hispanic for decades broke down in the 1960s. Federal court decisions forced states to adopt redistricting maps that reflected the decline of rural areas and surging growth in diverse metropolitan areas. Many white conservatives began moving into the Republican Party across the South and in Texas. Anglo population growth was also slowing while Texas's minority communities were growing faster and becoming better organized. Most notably, thanks in great part to a president from Texas and a congresswoman from Houston, the federal Voting Rights Act was passed in 1965 and then fully applied to Texas in 1975. The "good old white boys" era of Democratic congressional redistricting was ending.

### B. 1965 – 2000: Congressional Redistricting in a Competitive Party Era

---

[6] *Dallas Morning News,* July 30, 1911.

[7] See *Nixon v. Herndon,* 273 U.S. 536 (1927), holding unconstitutional the law excluding African Americans from the Democratic Primary; *Nixon v. Condon,* 286 U.S. 73 (1932), holding unconstitutional a state law authorizing political parties in Texas to adopt a policy of racial exclusion; *Grovey v. Townsend,* 295 U.S. 45 (1935), finding constitutional a segregation rule adopted by the Texas Democratic Party in the absence of any state legislation; and *Smith v. Allwright,* 321 U.S. 649 (1944), reversing *Grovey v. Townsend* and holding unconstitutional racial segregation on any basis in the Democratic Primary.

Even after that clear ruling, some white conservatives still refused to give up the white primary device. In Fort Bend County, where an enslaved-based economy left Blacks a majority after the Civil War. Local Anglos set up a *preprimary* primary in the 1940s where white Democrats would compete with all the losers dropping out of the official primary a few weeks later. The U.S. Supreme did not buy this scheme, ruling in *Terry v. Adams* 345 U.S. 461 (1953) that this device was also unconstitutional.

The passing of one-party Democratic control in Texas resulted from several factors.  One was the historic *Baker v Carr* decision of the U.S. Supreme Court in 1962 that initiated a series of so-called "one-man, one-vote" rulings reshaping political maps across the nation.  These decisions established a constitutional right to equal representation in both state legislatures and the United States House of Representatives.  The impact in Texas was profound because of the huge disparities in local legislative and congressional district populations.  Liberal Democrats and Republicans filed successful lawsuits in the early 1960s forcing the state legislature to create dozens of new state house and senate districts in Harris, Dallas, Tarrant, and Bexar Counties, replacing rural and smaller urban seats across Texas.  A half-dozen urban-dominated congressional seats were also mandated by the federal lawsuits.   As the plaintiffs in these lawsuits had expected, Republicans and progressive Democrats increased their numbers, mostly at the expense of conservative Democrats.

At the same time the federal courts were forcing massive redistricting based on population, Congress finally took up serious civil rights legislation for the first time since Reconstruction.  President Kennedy (reluctantly) proposed a sweeping civil rights bill in the summer of 1963 following massive protests across the southern states against the Jim Crow system embedded in law and custom.  That bill, in the eyes of most observers, was going nowhere when President Kennedy was assassinated in Dallas on November 22, 1963.  Suddenly, Lyndon Baines Johnson of Texas was president.

Lyndon Johnson's own presidential bid in 1960 had faltered but Senator Kennedy, a northern Catholic who needed southern support to win the White House, persuaded the Texan to join the ticket.  Johnson, arguably the most powerful senate Majority Leader in history, accepted nomination for the much less powerful vice-presidency, perhaps in the mistaken belief that he could continue to wield real power as VP through his constitutional role as presiding officer in the U.S. Senate.  That turned out to be impossible and Johnson was pushed aside by the new president and his team.   Marginalized and despondent according to biographers like Doris Kearns Goodwin, Johnson felt his political career was effectively over.

But Kennedy's murder thrust LBJ into the office he had long coveted.  The new president seized the historic opportunity to become the great champion of civil rights, much to the dismay of his old senate colleague and mentor, Richard Russell.  Johnson's repudiation of the traditional "states' rights" doctrine the Solid South had championed for decades shocked the Georgia senator and his southern colleagues.  President Johnson's reasons for reserving course immediately after assuming office are debatable.  One key might well be Johnson's deep empathy toward marginalized people based on his formative years in Texas, including the nine months LBJ spent teaching impoverished Mexican American students in a segregated school in Cotulla, Texas while earning money to resume his studies at Southwest Texas State Teachers College.[8]

---

[8] See, for example, President Johnson' s remarks at a signing ceremony for the Higher Education Act of 1965 delivered at Southwest Texas State College.  "I shall never forget the faces of the boys and girls at

Whatever his motives, President Johnson masterfully pulled together progressive Republicans and northern Democrats to overcome a filibuster led by his old mentor, Senator Russell. The Civil Rights Act of 1964 ended most legal segregation in the United States.

The next year, faced with bitter southern resistance to Black voting rights dramatized by the attack on demonstrators for voting rights in Selma, Alabama on March 7, 1965 ("Bloody Sunday"). President Johnson put the full weight of his office behind the Voting Rights Act of 1965. It passed. Ninety-five years after the passage of the 15th Amendment, with its guarantee that "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude" the nation finally had a voting rights law on the books with real teeth.

The law signed by President Johnson included special provisions applied to states with an especially egregious history of violating Black voting rights. Texas was not brought under those provisions, likely because of pressure from the president's close political ally Governor John Connally.[9] Texas remained free from the special provisions section of the VRA when Congress renewed the law in 1970. But in 1975 when Congress extended the law a second time, Texas was brought under Section Five.

That inclusion was largely due to the work of Congresswoman Barbara Jordan of the 18th Congressional District of Texas. Ms. Jordan, whose eloquence in the 1974 House Judiciary Committee hearings on Watergate had brought her national acclaim, not only supported bringing Texas under the special provisions of the VRA, but also expanding the law to cover language minorities who had experienced systematic discrimination. The latter was of great consequence in Texas because of its large and fast-growing Latino community.

Barbara Jordan knew a lot about the electoral problems Blacks and Hispanics had experienced throughout the state's history. That knowledge was partly rooted in her personal political career in Houston. When the young attorney returned to her hometown after finishing law school in Boston, she ran for a seat in the Texas House of Representatives in the 1962 Democratic Primary, the effective election in the Lone Star State. She rolled up huge majorities in the Fifth Ward neighborhood where she had grown up,[10] but was handily defeated because the 12 Texas House seats in Harris County were all filled in an *at-large, place election.* This was

that little Welhausen Mexican School, and I remember even yet the pain of realizing and knowing then that college was closed to practically every one of those children because they were too poor." From archives of the Lyndon Baines Johnson Library and Museum.

[9] The Special Provisions of Section Five required preclearance of all electoral changes in covered states before they could go into effect by either the U.S. Department of Justice or a federal court in Washington, D.C.. The states covered by the provisions were Louisiana, Mississippi, Georgia, Florida, Alabama, South Carolina, and part of North Carolina.

[10] In Houston's Fifth Ward northeast of downtown, Ms. Jordan got 583 of 594 votes in Precinct 47, 529 of 531 votes in Precinct 48, and 607 of 610 votes in Precinct 157. (Source: Office of the Harris County Clerk. Data collected by the author.)

one of numerous devices used by conservative Democrats to make sure the electoral process in areas with large numbers of minority voters would be dominated by Anglos (non-Hispanic whites).

Case in point: Ms. Jordan won 46,363 votes in the 1962 primary, far more than most successful state house candidates elsewhere in Texas, but lost because her Anglo opponent got 66,353 votes for Position 10 on the county-wide ballot. Willis Whatley won every white precinct in the county save for one box in Deer Park where a bitter strike at the Shell Oil refinery led some white union members to break ranks and vote for Ms. Jordan, who had been endorsed by the AFL-CIO. When she ran again in 1964, she was again defeated by her conservative opponent who won every white precinct in Harris County while Jordan won every Black voting box.

Less than a year after that election, federal courts required a massive redistricting of the Texas Legislature. Dozens of state house and senate seats were moved into metropolitan areas. Harris County, the most populous in Texas, had been limited to just one seat in the 31-member senate. The map adopted in 1965 put four full districts in the county, along with part of a fifth. Barbara Jordan saw her opportunity. One of the new districts included her Fifth Ward neighborhood and Blacks were a plurality of the district's population. Ms. Jordan entered the Democratic Primary and won, effectively electing her given the strong Democratic tilt of the new district in the fall General Election.

As the first Black state senator since Reconstruction, Ms. Jordan proved an extremely effective inside player in Austin, forging a close relationship with then Speaker Ben Barnes, who won the Lt. Governor position in 1968, making him the presiding office in the state senate in 1969. As such, Barnes controlled the Texas Senate's role in the 1971 redistricting that followed release of the 1970 census numbers for Texas. Barnes made sure a new congressional district in Harris County, the 18th, included voting precincts Senator Jordan had won handily in earlier elections. The new map worked as planned. Barbara Jordan easily won the May 1972 Democratic Primary, assuring her election in the fall.[11]

The new Congresswoman was given a seat on the House Judiciary Committee in January 1973, which would, the following year, take center stage in the Nixon impeachment probe. The televised House Watergate Hearings made Ms. Jordan a national star in the spring and summer of 1974. Easily reelected that fall, Ms. Jordan's top priorities in 1975 were to ensure that the second extension of the Voting Rights Act would bring Texas under Section Five of the VRA, while expanding the act to cover language minorities that had suffered discrimination in voting. The latter was of great significance in Texas, given the state's large and fast-growing Latino

---

[11] As a young professor at the University of Houston I had worked in several local (and usually losing) campaigns for African American candidates after I arrived in town in September 1966. I did not know Senator Jordan personally, but admired her career and was delighted when she asked me to assist her 1972 congressional campaign. It would be a gross exaggeration to say I helped launch her successful congressional career. She had the race locked down all on her own. I just watched as she dispatched her four primary opponents.

population and the state's long history of discrimination toward Hispanics. Forging an alliance with Senator Lloyd Bentsen, a white moderate running for president who needed to shore up his progressive credentials within the Democratic Party, they carried the revised VRA through both houses and it was signed into law by President Gerald Ford. With all changes in election rules in Texas now subject to review by the U.S. Department of Justice or a federal court in Washington, D.C., another nail was driven in the old one-party Democratic coffin.

The leadership of President Johnson and Congresswoman Jordan was critically important in securing passage of the Voting Rights Act, arguably the important federal action since the passage of the 13th, 14th, and 15th Amendments to the U.S. Constitution a century earlier. That said, their success in getting the law passed was based on decades of struggle by many thousands of women and men who fought for decades to defeat Jim Crow in Texas and across the nation. To take one example, the several hundred people who were brutally beaten on Bloody Sunday in 1965, including many who had worked for years to overcome the racist electoral system in Dallas County, Alabama, are owed much credit for passage of the Voting Rights Act.

Barbara Jordan is justly celebrated as a pioneer for racial justice in voting. But her success was built on decades of work in Houston by folks like Mrs. Lulu B. White, who helped organize thousands of Black industrial workers into the second largest NAACP chapter in the United States during World War II. That same chapter supported Dr. Lonnie Smith, a Third Ward dentist, the named plaintiff in the 1944 Supreme Court *Smith v. Allwright* which outlawed the White Primary. Many of these stories are recounted in a recent book, *Civil Rights in Black and Brown: Histories of Resistance and Struggle in Texas,* edited by Max Krochmal and J. Todd Moye (University of Texas Press, 2021).

Congressional Redistricting in the 1980s

The 1981 congressional redistricting was the first Texas map drawn in an era featuring both a competitive state Republican Party (Bill Clements, elected in 1978, was the first GOP governor in over 100 years), and with the state subject to Section Five of the VRA.

Texas gained three new districts in 1981. Initially, it appeared two of these new seats would be dominated by minority voters. The existing 24th in the Dallas-Fort Worth area was redrawn to add additional African American voters and the new 27th district in South Texas would have a large Mexican American majority. Governor Clements signed off on the plan passed by the Democrat-controlled legislature because the reshaped 5th District in Dallas, then represented by a white Democrat, would lose most of its minority populations, likely becoming a "safe" Republican seat. However, this plan was overturned by a federal judge who imposed an interim map splitting Black voters in the DFW area between the 5th and 24th districts, leaving white Democratic voters dominant in both. The U.S. Supreme Court overturned the lower court decision, but the interim map was used in 1982 election and a redrawn map passed by the 1983 legislature still protected the white Democratic incumbents (Democrats had won back the governorship in November 1982, so the map was not vetoed).

Summing up, in the 1981-1983 process Latino voters were empowered in a new district including Corpus Christi and Brownsville, but Black voters in Dallas/Fort Worth, who certainly had sufficient numbers to control a district, were short-changed in the final map.

Congressional Redistricting in the 1990s

If the 1981 - 1983 redistricting process was messy, the 1991 – 1996 process was not only longer, but far more convoluted.  As was the case ten years earlier, population growth brought three new seats to Texas.  The process started with Democrats back in control of the governorship and both houses of the legislature.   But the Democratic map-drawers faced a formidable task. Holding 18 of 27 seats in a state where Republican congressional candidates were getting close to 50% of the statewide vote was going to be challenging.  Add to that the fact that 13 of 18 Democratic incumbents were Anglos, while the party's candidates were increasingly dependent on Black and Hispanic voters.  Minority leaders were understandably demanding maps fairer to Black and Latino voters.  The U.S. Department of Justice's Voting Rights Division was also signaling that approval of maps in states like Texas would hinge in large part on a maximum effort to create majority-minority districts.  Such districts would likely strip out minority neighborhoods vital to the survival of white Democratic members.

The Democrats were able to meet these challenges by adopting a map that *The Almanac of American Politics* chose for its decennial "Phil Burton Award".  The Texas congressional plan was honored "for its creatively drawn lines in unlikely places; for the convoluted boundaries of its districts which, snakelike, seem to be threatening to swallow each other ..."[12]  To secure the needed support of Black and Latino legislators in Austin for a map that protected 13 white Democratic incumbents, all three of the new seats were drawn to give minority voters the opportunity to elect candidates of their choice.  The 28th District stretched from the south side of San Antonio to the Mexican border with a two-one ratio of Hispanics to Anglos.  The 29th District spider-webbed across Harris County connecting enough Hispanic neighborhoods to ensure Latinos made up 54% of the voting age population.  Finally, the 30th District in Dallas County used creative map-drawing to connect enough Black areas to produce an African American majority that would dominate Democratic Primaries.  Years of litigation would follow, and 13 of the 30 districts would have to be redrawn, but the minority opportunity districts all survived.

The bottom line:  Minority opportunity districts increased from five to eight in the 1990s: 21 districts would still be dominated by Anglo voters; and one west Texas district (the 23rd) remained majority Hispanic but winnable by candidates supported by high-turnout Anglos in suburban San Antonio.

---

[12] *The Almanac of American Politics: 1996,* Michael Barone and Grant Ujifusa, with Richard E. Cohen, Washington, D.C., 1995, p. 1264.

### C. *Congressional Redistricting in a very "Red" Texas*

<u>Congressional Redistricting in the 2000s</u>

The 2001 redistricting cycle was the last of the two-party era in Texas. Republicans held the governorship and a narrow state senate majority, and Democrats had a similarly small state house majority. Not unexpectedly, the parties could not agree on a congressional plan. After several legal maneuvers, a three-judge federal panel drew a map making the two new seats Texas gained safely Republican, but largely preserving the districts with Democratic incumbents. That produced a 2002 election result with 17 Democrats and 15 Republican members, despite the fact that GOP candidates won a majority of the statewide congressional vote.

However, Republicans won strong majorities in the 2002 legislative elections (19-12 in the senate; 88-62 in the house). U.S. House Majority Leader Tom Delay, now the most powerful congressional Republican, pressed his allies in Austin to reopen congressional redistricting in the 2003 legislative session. The Delay-inspired plan completely reshuffled the Texas map, with the obvious goal of getting rid of most, if not all, of the 10 remaining Anglo Democratic incumbents.[13] Texas Democratic legislators fled the state in last-ditch efforts to deny quorums in Austin, but eventually they were forced to yield. The GOP map was approved and largely passed muster with the federal courts.

Leader Delay's plan worked. Only three Anglo Democratic members were reelected in 1994 (two from majority-Hispanic districts). The Republican map attempted to comply with the Voting Rights Act by drawing safe districts for two Black and five Latino incumbents while adding a new 9th District in the Houston area that was 38% African American and would enable local Black voters to elect candidates of their choice.

Bottom line: While the highly partisan map of 2003 (as slightly modified by federal courts) was a disaster for Anglo Democrats, it marginally improved the opportunities for the fast-growing Black and Hispanic voting populations in Texas. Most importantly, Black voters now had the opportunity to elect candidates of their choice in three districts as opposed to two, and in 2005 a federal court required that a redrawn 23rd District include significantly more Hispanic voters in San Antonio than was the case with the map approved in 2003.

<u>Congressional Redistricting in the 2010s</u>

Texas Republicans had solidified their control of the legislature in 2010, and thus had the opportunity to craft a new map adding four new seats to the 32-member delegation. The GOP map-drawers faced a dilemma. The party now had 23 incumbents with three holding increasingly competitive districts; and Hispanics had accounted for 65 percent of the four million population growth since 2000. And with a Democratic controlled Department of Justice

---

[13] See *The Almanac of American Politics: 2008,* Michael Barone , Richard Cohen, and Grant Ujifusa, Washington, D.C., 2007, pp. 1534-1535.

in Washington, meeting the requirements of the Voting Rights Act might be more difficult than in the early 2000s when George W. Bush held the presidency.

DC Republican incumbents like Lamar Smith urged the Texas Legislature to simply shore up incumbents and split the four new seats two-two with a couple of additional Latino districts and two GOP suburban districts. That was quickly shot down as the 2020 Almanac of American Politics recounts:

> Republican legislators, and (Governor) Perry, were horror struck by the idea of "giving" Democrats any seats. In June, they passed their own plan to split the Dallas-Fort Worth Metroplex's Hispanic population six ways, stuff Austin Democrat Lloyd Doggett into a heavily Hispanic district stretching to San Antonio, and create three new safely Republican enclaves....[14]

Not surprising, this set off another multi-year fight between the legislature, the Department of Justice, and the federal courts over the Texas map(s). Amidst this battle, the Supreme Court ruling in *Shelby County v. Holder* removed the preclearance requirement under Section Five of the VRA and same court allowed only modest changes to the 2011 original map. The most important of the was the creation of a majority Hispanic DFW district (the 33rd), but one with a sizeable Black minority. Despite the 66% to 16% Latino/Black population in 2010, this new minority district has been represented by Marc Veasey, an African American, for the last decade. That result reflects the reality that in metropolitan Texas, voting-age Blacks register and vote in high percentages, and vote cohesively in Democratic primaries. Hispanics lag in all three regards.

## D. Conclusion

Summing up, the half-century of congressional redistricting in Texas from the 1960s to the 2010s saw Republicans consolidate control of two-thirds of seats in the fast-growing state delegation. These gains were entirely at the expense of Anglo incumbents. In the mid-1960s only one Texas congressional district, the 20th in San Antonio clearly gave minority voters (Hispanics in this case) the opportunity to elect candidates of their choosing. By the mid-2010s, there were seven districts where Latino voters had that opportunity, and an 8th (the 23rd) that was competitive between Hispanics and conservative whites. Blacks had three opportunity districts, and were very competitive in the majority-minority 33rd District in the Dallas-Fort Worth area.

In the 1970s, 1980s, and 1990s improvements in minority congressional opportunities reflected that fact that Black and Hispanic state legislators like Barbara Jordan, Frank Tejada, and Eddie Bernice Johnson had a seat at the table in Austin when new maps were drawn. Since 2001, even while minority population growth surged, improved opportunities for Black and Hispanic

---

[14] *The Almanac of American Politics: 2020,* Richard Cohen and Charlie Cook, Columbia Books, p. 1653.

voters have been smaller as minority legislators have had little opportunity to participate in shaping of new lines.   Federal court actions increasingly were required to improve protected minority voting rights in Texas.

## II.    Setting the Stage for Congressional Redistricting in Texas in 2021

Texas is arguably the most dynamic state in the nation.  Between 2000 and 2010, Texas added 4.3 million people, followed by a 4.0 million population gain between 2010 and 2020 – both far surpassing any other state.   These gains were driven by rapid growth in the four major metropolitan areas of Texas (Dallas/Fort Worth, Houston, Austin, and San Antonio).  The overwhelming majority of population growth has been non-Anglos.  Between 2000 and 2010, Anglos accounted for just 13% of the state's growth, and between 2010 and 2020 only 5%.

In a state with a history if racially polarized voting, these shifts had important electoral consequences.  Texas has shifted from a solid "red" state at the beginning of the 21st century, to a decidedly "pink" status by 2020.  Republican nominee George W. Bush won Texas by 21.7% over Democrat Al Gore in 2000, and improved to 22.1% against John Kerry in 2004.  By contrast, GOP nominee Donald Trump's margin over Democrat Hillary Clinton was 9.0% in 2016 and was just 5.6% over Joe Biden in 2020.

In this section, I examine the factors driving this marked shift to a more competitive statewide map and its ramifications for the 2021 congressional cycle.  I begin with a review of some findings from a 2019 report I co-authored with Renee Cross at the University of Houston Hobby Center (See Appendix One).   Then, I update the report with the results of the 2018 and 2020 elections and the 2020 census data that was released in August 2021.

### A.  *The New Political Geography of the Lone Star State:  How Surging Metropolitan Growth is Changing the Partisan Balance in Texas*

The Murray-Cross report looked at Texas county voting patterns in presidential elections from 1968 to 2016 and in the high-turnout 2018 U.S. Senate race (a copy of the report is affixed as Appendix One).   The 254 counties were sorted into three categories:  Thirty predominately Hispanic counties along the border and in South Texas;  30 counties in the four large metro areas (ten in Dallas/Fort Worth; eight in Houston; six in metro Austin and another six in San Antonio); and 194 counties in the remainder of the state.

In the last third of the 20th century, we found there was essentially no difference in the two-party presidential vote between the large metro areas and the 194 other counties which were not majority Hispanic.  Yet after 1996 these groups start to diverge.  The metro areas became less and less supportive of GOP candidates, while the non-Hispanic out-state counties become more solidly Republican.   In 1996, the Republican candidate, Bob Dole, got 53.4% of the two party presidential vote in metro Texas against Bill Clinton, compared to 56.6% in the 194 non-Hispanic counties.  This 3.2% gap increased to 8.1% in the Bush/Gore contest in 2000, and

Bush's non-metro advantage widened to 12.3% in 2004. By 2012, Mitt Romney carried the combined metro vote by 54.9%, compared to 73.2% in the non-Hispanic out-state counties. Four years later, Donald Trump took almost 75% of the out-state vote, but split the combined metro counties 50-50. Two years later, Senator Ted Cruz lost the combined metro vote 46% to 54% for Congressman Beto O'Rourke, narrowly carrying the statewide vote by 2.6% because of his 72.5% - 27.5% margin in the other 194 non-Hispanic counties.

The statewide red-to-pink shift was driven not only by the decline in Republican strength in the metro areas, but by the fact that these fast-growing areas were accounting for a larger and larger share of the statewide vote. In 1968 the big metro vote totaled 51.8% of the Texas total two-party vote, compared to 38.0% for the non-Hispanic counties. (Border/South Texas contributed 10.2%) By 2000, the big metro area share was 64.0% with the non-Hispanic counties dropping to 28.3%. In the 2016 presidential contest the metro share reached 68.8% and the out-state mostly Anglo counties' share fell to 23.5%.

This shift in presidential partisan vote patterns in Texas has profound implications because as the nation has become sharply polarized along party lines, differences in congressional and presidential partisan voting patterns have sharply narrowed. State and local candidates may run a little better or worse than top-of-the-ticket nominees, but most voters do not split their tickets these days.

The Murray-Cross report explains the metro-non metro partisan gap as driven by two factors. First, demography. For much of the 20th century, the large urban areas in Texas grew by attracting mostly Anglos from elsewhere in Texas and neighboring states. This growth pattern did not result in a meaningful cultural, racial/ethnic, or partisan divide between metro Texas and the rest of the non-Hispanic counties.

But, to quote from our report:

> … since the late 1980s, metropolitan growth not only surged while the rest of the state stagnated, but the sources of growth fundamentally changed. Fewer and fewer people moving to Dallas/Fort Worth and other big urban areas came from elsewhere in Texas, and more and more came from outside the United States, or non-southern states like California, New York, and Illinois. International immigration was heavily Latino (mostly Mexican) in the late 1980s and 1990s, and has become more Asian in the 21st century... (page 5)

Almost all these new Texans are moving to the big metro areas because of strong job growth and the resulting need for a wide range of new workers. Those moving from expensive housing states like California and New York could afford local housing in booming markets like Austin and Dallas, even as many native Texas could not. Educated immigrants from East and South Asia have increasingly filled job openings in medical services and high tech in these fast-growing fields. Bottom line: The new Texans now moving into the big metro areas are very different from the people who were arriving 20 or 30 years ago.

14

The second factor driving this metro/non-metro divergence is the realignment of the party voter bases in the 21st century. Since the New Deal, less educated, working class and lower middle class white vote had tended to support Democratic candidates. Republicans were stronger with middle and upper income better educated voters. Wealthier urban neighborhoods were bastions of "country-club" Republicans. Poorer rural areas were the home of "yellow-dog" Democrats.

That world no longer exists. As Republicans in Texas and elsewhere have turned toward a more right-wing populism rooted in cultural issues and hostility to immigration, more affluent, better educated voters (especially women) have moved away from the Republican brand to become self-identified Independents or Democrats. At the same time working class Democrats have largely abandoned the ancestral party. The yellow dog has died.

This latest realignment in Texas has been underway since the second term of President George W. Bush. An important marker was the "Tea Party" surge in both the 2010 Republican Primary primaries and the 2010 General Election. That was followed by the election of Senator Ted Cruz in 2012. And that was followed by the remarkable rise of Donald Trump in national Republican politics in 2015 and 2016, culminating in his upset of Hillary Clinton in November 2016. As a candidate, as president, and as a prospective candidate in 2024, Donald John Trump has both accelerated and hardened this basic partisan shift. Trump was and is remarkably popular with white voters in Texas outside central cities and inner suburbs. But, as former Texas House Speaker Dennis Bonnen (R – Lake Jackson) said in a secretly recorded conversation in 2019: "Trump. I love the guy, but he's killing us in the cities and suburbs."

### B. *The 2020 Census Confirms the Metropolitan Population Shift in Texas*

The 2020 U.S. Census data released in August 2021 confirmed the patterns discussed in the Murray-Cross report. The big four metro areas added 3,441,753 people between 2010 and 2020, which accounted for 86.0% of the state's total. The 30 Hispanic counties along the border and in South Texas grew by a total of 198,651 (5.0% of the state's gain), with the 194 "rest of Texas" counties contributing just 359,548, or 9.0% of growth.

Table One shows the Dallas/Fort Worth area added 1,257,018 people – a 20.0% increase from 2010. Metro Houston grew by 1,200,974, or 20.4%. The six-county San Antonio area added 411,198 people, up 19.8% from 2010. The smaller metro Austin outpaced that by adding 573,462 people, a gain of 32.6% in ten years.

County-level population data within the large metro areas is included in Appendix Two attached to this report. These data show that in the DFW and Houston areas, the core urban counties of Harris, Dallas, and Tarrant all grew, but at about one-half the rate of the suburban counties. The big gainers statewide were the suburban counties around Dallas and Fort Worth, Houston, and Austin. Collin County north of Dallas added 282,124 people, a 36.0% gain from 2010. Denton County gained 243,808 people, or 36.8%. Fort Bend County led metro Houston with a

gain of 237,404 people, or 40.6%. Montgomery County added 164,697 people, up 36.1%. In metro Austin, Williamson County added 186,338 people, or 44.1%. The suburbs are not only growing, they are growing in a very different way as compared to the 1980s and 1990s. After

1970 there was a huge migration of mostly white residents in the core urban counties to adjacent suburbs. These growing, mostly white, politically conservative areas became the single biggest driver of Republican political gains in the 1980s and 1990s. Coupled with the collapse of rural Democrats after 2000, the GOP suburbs locked down the one-party Republican dominance of Texas statewide elections.

**Table One: Metro Area Growth in Texas 2010 – 2020 by Race/Ethnicity[15]**

|  |  | 2010 | 2020 | Gain | % |
|---|---|---|---|---|---|
| Dallas/ | Total | 6,280,413 | 7,537,431 | 1,257,018 | 20.0 |
| Fort Worth | Anglo | 3,132,933 | 3,200,776 | 67,843 | 2.2 |
|  | Hispanic | 1,740,137 | 2,215,561 | 475,424 | 27.3 |
|  | Black | 934,344 | 1,277,255 | 342,917 | 36.7 |
|  | Asian | 336,888 | 683.941 | 347,053 | 103.0 |
|  | Other | 136,111 | 159,898 | 23,787 | 17.5 |
|  |  |  |  |  |  |
| Houston | Total | 5,891,999 | 7,092,073 | 1,200,074 | 20.4 |
|  | Anglo | 2,321,611 | 2,381,309 | 59,698 | 2.6 |
|  | Hispanic | 2,089,831 | 2,661,633 | 571,802 | 27.4 |
|  | Black | 993,599 | 1,277,409 | 283,810 | 28.6 |
|  | Asian | 384,366 | 662,721 | 278,355 | 72.4 |
|  | Other | 102,592 | 109,001 | 6,409 | 6.2 |
|  |  |  |  |  |  |
| San Antonio | Total | 2,077,112 | 2,488,311 | 411,199 | 19.8 |
|  | Anglo | 740,936 | 806,923 | 65,996 | 8.9 |
|  | Hispanic | 1,126,948 | 1,354,497 | 227,549 | 20.2 |
|  | Black | 125,724 | 189,307 | 63,583 | 50.5 |
|  | Asian | 42,739 | 105,502 | 62,763 | 146.9 |
|  | Other | 36,865 | 32,082 | - 4,783 | -13.0 |
|  |  |  |  |  |  |
| Austin | Total | 1,759,039 | 2,332,501 | 573,462 | 32.6 |
|  | Anglo | 971,004 | 1,167,923 | 196,919 | 20.2 |
|  | Hispanic | 546,970 | 739,220 | 192,250 | 35.1 |
|  | Black | 121,210 | 176,003 | 54,793 | 45.2 |
|  | Asian | 81,178 | 199,829 | 118,651 | 146.2 |

---

[15] The counties included in each metro area are:

Dallas/Fort Worth:  Collin, Dallas, Denton, Ellis, Johnson, Kaufman, Parker, Rockwall, Tarrant, and Wise.
Houston:  Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.
Austin:  Bastrop, Burnet, Caldwell, Hays, Travis, Williamson.
San Antonio:  Bexar, Comal, Guadalupe, Kendall, Medina, and Wilson.

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | Other | 38,677 | 49,526 | 10,849 | 28.1 |
| All Metros | Total | 16,008,563 | 19,450,316 | 3,441,753 | 21.5 |
|  | Anglo | 7,166,484 | 7,556,931 | 390,447 | 5.4 |
|  | Hispanic | 5,503,887 | 6,970,911 | 1,467,024 | 26.7 |
|  | Black | 2,178,877 | 2,919,974 | 741,097 | 34.0 |
|  | Asian | 845,171 | 1,651,993 | 806,822 | 95.5 |
|  | Other | 314,245 | 350,507 | 36,262 | 11.5 |

Source: Texas Legislative Council.

The late 20th century Anglo suburban growth driving statewide Republican gains reversed in the 21st century. Table Two shows the Anglo percentage of the population in the five largest suburban counties in 1990, 2000, 2010, and 2020. All had Anglo majorities (whites, not Hispanic) in 1990, with the average being about 77 percent. The 2020 census showed the Anglo percentage had fallen below 60 percent in all five counties, with the average now 49.8%.

**Table Two: Anglo Population Percentage Decline in Big Suburban Counties: 1990 – 2020**

| County | Non-Hispanic White Population Percentage | | | |
|---|---|---|---|---|
|  | 1990 | 2000 | 2010 | 2020 |
| Collin | 85.7 | 76.2 | 63.1 | 51.0 |
| Denton | 78.7 | 76.0 | 64.4 | 53.3 |
| Fort Bend | 53.7 | 46.3 | 36.2 | 29.6 |
| Montgomery | 87.5 | 81.4 | 71.2 | 59.9 |
| Williamson | 79.3 | 73.5 | 63.7 | 55.2 |

Source: U.S. Census

The very rapid diversifying of Texas suburbs, especially after 2010, is driven by three major factors. First, *white flight from the core counties has largely ended.* Between 2000 and 2010, the Anglo population in Dallas County declined from 983,317 to 784,693 – almost 200,000 people. Between 2010 and 2020 the Anglo decline was less than 60,000. Harris County's Anglo population dropped by 82,618 between 2000 and 2010, but by only 40,053 between 2010 and 2020.

Second, we now have *black and brown flight from inner cities to suburbs.* Texas minority populations are both growing and spreading out across all four big metropolitan areas. The same factors that drove Anglo out-migration in the late 20th century – better schools and housing, proximity to employment, safety – are continuing to work but now with Hispanic,

Black, and Asian Texans.  What has happened in the 21st century is that an array of powerful economic players in Texas – land developers, home builders, real estate firms and agents – have found that making money means accommodating suburban minority growth.   Red lining and exclusory practices of the 20th century are passe.

In brief, metro growth Texas today reflects the fulfillment of President Johnson's last great civil legislative victory, the Fair Housing Act of 1968.  It just took a half-century to get here.

Third, the explosive job growth in metro Texas requires many more workers than Texas can supply, given historically low birth rates in the state resulting in little natural population increase.  Employers must find workers from outside the state, and we have seen sharp increases in cross-state net migrations from California. Florida, New York, and Illinois.

But *international immigration has become a even greater factor in filling the shortfall of workers* in metro areas as seen in Table Three.  Looking at net population growth in the biggest suburban counties since 2000, we see Anglo growth slowing, Hispanic growth levelling off, and Black suburban growth picking up.  However, the most dramatic gains are in new Asian populations.  Between 2000 and 2010, Collin County gained 53,374 new Asian residents.  Between 2010 and 2020 the county added 119,608 Asians – an increase of 124% in ten years.

**Table Three:  Racial/Ethnic Growth in Big Suburban Counties; 2000 – 2010
Compared to 2010 – 2020**

| County | | Population Growth | | |
|---|---|---|---|---|
| | | 2000 – 2010 | 2010 – 2020 | Change: 2010-2020 |
| Collin | Anglo | 118,777 | 48,980 | - 69,797 |
| | Hispanic | 64,844 | 53,804 | - 11,040 |
| | Black | 41,503 | 56,040 | + 14,537 |
| | Asian | 53,374 | 119,608 | + 66,234 |
| | | | | |
| Denton | Anglo | 98,038 | 58,759 | - 39,279 |
| | Hispanic | 68,217 | 61,942 | - 6,275 |
| | Black | 29,064 | 53,646 | + 24,582 |
| | Asian | 25,764 | 63,169 | + 37,405 |
| | | | | |
| Fort Bend | Anglo | 47,892 | 32,046 | - 15,846 |
| | Hispanic | 64,036 | 59,673 | - 4,363 |
| | Black | 53,688 | 53,637 | - 51 |
| | Asian | 59,217 | 95,514 | + 36,297 |
| | | | | |
| Montgomery | Anglo | 85,461 | 46,792 | - 38,669 |
| | Hispanic | 57,548 | 69,391 | + 11,843 |
| | Black | 8,461 | 21,132 | + 12,671 |
| | Asian | 6,180 | 18,354 | + 12,174 |

| | | | | | |
|---|---|---|---|---|---|
| Williamson | Anglo | 85,634 | 66,929 | - | 18,705 |
| | Hispanic | 55,044 | 49,054 | - | 5,990 |
| | Black | 12,300 | 21,248 | + | 8,948 |
| | Asian | 13,601 | 44,712 | + | 31,111 |

Source: These data were compiled by the author from the redistricting numbers released by the Texas Legislative Council in August 2021.

In conclusion, the new census data shows congressional redistricting in 2021 occurs in a very different environment than ten years earlier.   The long-term shift of population to the big metro areas continued after 2010, but the cities and suburbs got substantially more heavily minority, with new Asian growth and the dispersion of Black and Hispanic populations being the most impressive new factors.

Of course, one can ask, what difference do these shifts make politically?  Why include these numbers in a report on congressional redistricting in 2021?  Just how does overall metro growth and greater racial and ethnic diversity in fast-growing suburbs change the map-drawing calculus?  And more specifically, what impact does this have on the Voting Rights Act's protection of minority voters' opportunities?  To address those questions, I turn to the most recent relevant elections in Texas, the General Elections of 2018 and 2020.

### C.  The Elections of 2018 and 2020: The Congressional Map of 2011 begins to fray at the Edges

As one of numerous experts testifying in the federal trials that resulted from challenges to the map adopted by the Texas Legislature in 2011, I had a front row seat to the last round of congressional redistricting.  That being the case, I acknowledge the skill of the GOP map-drawings in taking a state where Republicans took about a 57% - 43% advantage in statewide congressional voting ten years ago and produced a $25-10$ GOP congressional advantage with just one competitive seat, (the 23[rd]) in the 36-member delegation.

A primary mechanism in getting this result was "packing" mostly minority metropolitan Democratic voters into a half dozen districts minority-backed candidates would win by 70% - 80%.  At the same time, ten metro-based districts were crafted so that Republican candidates could win with 60% or so of the vote.  But to get the people needed for ten districts, the map-drawers had to "crack" large concentrations of Hispanics that had not been packed into the minority-dominated districts.   Hispanic voters would be outnumbered by Anglos supporting candidates not favored by Latinos.  The most powerful evidence of this in the 2011 map is in the Dallas-Fort Worth area.  Here we had a population of 1.74 million Hispanics out of a metro population of 6.28 million, but not a single district where Hispanic voters had an effective opportunity to elect a candidate of their choice.

The initial success of the Republican map is evident in Table Four.  In the three congressional elections of 2012, 2014, and 2016 the Republican nominees won comfortable majorities in every contested metro district.  The mean GOP margins across all ten districts were 62.0% in

2012, 65.1% in 2014, and 60.7% in 2016.  But in 2018 that dropped to 51.8% as two supposed "safe" seats that included the wealthiest neighborhoods in Dallas and Houston "flipped" to Democratic challengers.  What happened?

We get a good idea by looking closely at the 7th District in Harris County.  The 7th was the first congressional district Republicans won in Texas after state GOP was routed in the 1964 Johnson-Goldwater race.

**Table Four:  Republican % of the Two-Party Congressional Vote in Ten Metro Districts In Texas, 2012 – 2020**

| District | 2012 | 2014 | 2016 | 2018 | 2020 |
|---|---|---|---|---|---|
| 2nd | 66.5 | 69.6 | 62.7 | 53.7 | 56.5 |
| 3rd | -- | -- | 63.9 | 55.1 | 54.9 |
| 6th | 59.8 | 62.7 | 59.9 | 53.9 | 54.5 |
| 7th | 62.5 | 64.7 | 56.2 | **47.5** | **48.3** |
| 10th | 62.5 | 64.6 | 59.9 | 52.2 | 53.6 |
| 21st | 63.1 | -- | 62.9 | 51.3 | 53.4 |
| 24th | 62.4 | 66.8 | 58.8 | 51.6 | 50.7 |
| 25th | 60.9 | 62.4 | 60.7 | 54.4 | 57.0 |
| 31st | 61.0 | 66.7 | 61.5 | 51.5 | 54.7 |
| 32nd | 59.6 | 63.6 | -- | **46.7** | **46.9** |
| Mean | 62.0 | 65.1 | 60.7 | 51.8 | 53.1 |

Source:  Office of Texas Secretary of State.  Missing data are contests where no Democratic candidate filed.

In November 1966, George H. W. Bush defeated the Democratic nominee Frank Briscoe, the local district attorney, and Republicans easily held the 7th District for 50 years.  But in 2016, Democrat Hillary Clinton narrowly edged out Donald Trump in the 7th District, setting up a very competitive 2018 midterm congressional election.  Democratic nominee Lizzie Fletcher defeated the six-term incumbent John Culberson by about seven points and held the seat in 2020 against a well-funded Republican, Wesley Hunt, who had been recruited by national party leaders.

The Republican decline in the 7th District reflected two trends. Inner city Anglo voters were moving away from the "Trump" Republican Party. In the affluent, well educated, overwhelming Anglo city of West University Place, the Republican presidential percentage of the two-party vote fell from 65.0% in 2012 to 45.8% in 2016 to 42.6% in 2020. Gentrifying areas around Memorial Park like voting precincts 0070 and 0071 saw the Republican presidential vote margin drop from 58.8% in 2012 to 43.7% in 2016 and 41.5% in 2020.

And as inner city affluent, mostly Anglo areas became more Democratic, western suburban precincts were bleeding Anglos strongly opposed to Democratic candidates supported by Blacks, Hispanics, and Asians. In voting precinct 0804, for example, the Anglo VAP population dropped from 47.4% in 2010 to 31.2% in 2020, and the GOP presidential vote share fell from 61.6% in 2012, to 50.1% in 2016, to 44.7% in 2020.

It is quite plausible that the stable, upscale Anglo areas in the DFW and Houston areas will swing back toward supporting Republican candidates in a post-Trump world. What is very unlikely is that the transition of Anglo to mixed-minority majority status of suburban areas will stop or reverse. Once white flight occurs in working and middle class precincts in areas like west Harris County and south Dallas County, it tends to continue until the Anglo population falls below 20 percent.

Summing up, the elections of 2018 and 2020 show the very effective redistricting map passed in 2011, and only modestly changed by the federal courts, worked much less well over the ensuing decade. A major reason was the big shift in suburban demographics which are closely associated with changes in partisan voting. The final section of this contextual section looks at this shift in the five biggest suburban counties and drills down in a more detailed precinct-level analysis in Fort Bend County – the most diverse racial/ethnic county in Texas.

### D. The Close Association between Suburban Demographic Change and Partisan Voting in Texas

I have stressed the importance of rapid population growth in large metro areas, and the fact that this has been almost entirely driven in the biggest of these, Dallas/Fort Worth and Houston, by minority population increases. In this section we again pull out the five largest suburban counties and compared racial/ethnic population change to partisan voting in recent presidential elections.

Table 5 tracks the decline in Anglo population in the five largest suburban counties and the Republican vote share in each. There is a linear relationship in every case – as the Anglo population share drops, the GOP vote percentage falls. The relationship is almost one-to-one in Collin, Denton, and Fort Bend Counties. Every percent decline in Anglo population is matched by an equal percentage drop in Republican vote. In Montgomery County the GOP decline is much slower as the population changes, and in Williamson County it is steeper. These two cases reflect the fact that Anglos in Montgomery County are extremely polarized against

candidates (i.e., Democrats) supported by minority votes.  In Williamson County the opposite is true.

**Table 5:  Anglo Population Share and Republican Percentage of the Two-Party Vote in Large Suburban Counties:  2000 – 2010**

| County | Census | Anglo % | Rep. Pres. % | |
|--------|--------|---------|------|------|
| Collin | 2000 | 76.1 | 2000 | 74.9 |
| | | | 2004 | 71.7 |
| | | | 2008 | 62.9 |
| | 2010 | 63.1 | -- | |
| | | | 2012 | 66.0 |
| | | | 2016 | 58.8 |
| | 2020 | 51.0 | 2020 | 52.2 |
| Denton | 2000 | 76.0 | 2000 | 71.8 |
| | | | 2004 | 70.4 |
| | | | 2008 | 62.2 |
| | 2010 | 64.4 | -- | |
| | | | 2012 | 66.1 |
| | | | 2016 | 60.6 |
| | 2020 | 53.4 | 2020 | 54.1 |
| Fort Bend | 2000 | 46.2 | 2000 | 60.7 |
| | | | 2004 | 57.7 |
| | | | 2008 | 51.2 |
| | 2010 | 36.2 | -- | |
| | | | 2012 | 53.4 |
| | | | 2016 | 46.4 |
| | 2020 | 29.6 | 2020 | 44.6 |
| Montgomery | 2000 | 81.4 | 2000 | 77.6 |
| | | | 2004 | 78.5 |
| | | | 2008 | 76.6 |
| | 2010 | 71.2 | -- | |
| | | | 2012 | 80.7 |
| | | | 2016 | 76.6 |
| | 2020 | 59.9 | 2020 | 72.2 |
| Williamson | 2000 | 73.5 | 2000 | 71.0 |
| | | | 2004 | 65.9 |
| | | | 2008 | 56.6 |

| | | | |
|---|---|---|---|
| 2010 | 63.8 | -- | |
| | | 2012 | 61.1 |
| | | 2016 | 55.2 |
| 2020 | 55.2 | 2020 | 49.3 |

--------------------------------------------------------------------------------------------------

Obviously, suburban voters have become much more diverse in the 21st century, and less supportive of Republican congressional candidates. Blacks, Latinos, and Asians have followed Anglos into communities like Frisco and Plano in the DFW area, and Sugar Land in metro Houston. Given this diversity, it is important for analyzing redistricting maps to have data on how the four different racial/ethnic populations are voting.

### E. Racial/Ethnic Voting Patterns in Fort Bend County: Can Blacks, Latinos, and Asians form a Political Coalition in Texas' Most Diverse County?

I believe the best place undertake such an analysis is Fort Bend County – the most racially and ethnically diverse county in Texas, and one with the largest shift in partisan voting patterns over the last decade. The 2020 census showed no racial or ethnic group has anywhere near a majority. Anglos accounted for 29.6% of the local population, followed by Hispanics at 24.1%, Asians at 23.6%, and Blacks at 21.5%. In analyzing voting patterns, I start by looking at precincts that are relatively homogeneous – a standard practice in voting rights cases. In addition, I asked by colleague, Professor Man Chui Wong of the Hobby School of Public Affairs to perform an ecological inference (EI) analysis of the 160 voting precincts in Fort Bend County.

Table 6 looks at how 40 precincts in Fort Bend County voted in top-of-the-ticket races in the 2018 and 2020 General Elections. Ten of the precincts selected had the highest percentage of Anglo voting age population (VAP) in the county; ten had the highest Black VAP; ten the highest Asian VAP; and ten had the highest Hispanic VAP.

The Fort Bend precinct data in Table 6 show Anglo voters are highly polarized in opposing the Democratic nominees supported by minority voters. Senate nominee O'Rourke got an average of 27.6% in heavily Anglo precincts and presidential nominee Joe Biden got 30.3%.

Voters in heavily Black precincts overwhelmingly supported O'Rourke (95.3%) and Biden (93.3%). Hispanic precincts, on average also supported O'Rourke (68.1%) and Biden (64.5%). The fact that Black and Hispanic voters supported the same General Election candidates is not surprising – this is the long-standing pattern across Texas. Most interesting is the fact that the growing Asian vote in Fort Bend County, *joined Black and Hispanic voters in strongly supporting the same candidates.* In 2018, majority Asian precincts gave 64.1% of their two-party votes to O'Rourke, and 61.5% to Biden in 2020.

Historically, Asian voters in Fort Bend County tended to divide their votes between major party nominees. That was not the case in the last two elections and the consequences were profound. In 2012, 2014, and 2016, every local candidate in countywide races supported by Black and Hispanic voters was defeated. But in 2018 and 2020 the coalition of Black, Hispanic,

23

and Asian voters in Fort Bend County won every contested local race - a total of 16 offices.   In 2018 these voters elected KP George, who was born in India, as County Judge, and Brian Middleton, an African American, as District Attorney.   In 2020, coalition-backed winners included Sheriff Eric Fagan, an African American, and Christian Becerra, a Hispanic, to the 434th District Court bench.

**Table 6:  How Predominately Anglo, Black, Hispanic, and Asian Precincts in Fort Bend County Voted in the 2018 U.S. Senate Contest and the 2020 Presidential Election**

|  |  | % Two-Party Vote Percentage | |
| --- | --- | --- | --- |
| Anglo Precincts | Anglo VAP% | 2018 Senate | 2020 President |
|  |  | Dem | Dem |
| 3149 | 79.9 | 20.1 | 21.0 |
| 1021 | 76.9 | 13.3 | 11.8 |
| 3156 | 73.0 | 26.9 | 30.1 |
| 3122 | 72.1 | 30.8 | 34.8 |
| 3063 | 71.6 | 26.9 | 30.2 |
| 3005 | 68.4 | 24.9 | 26.3 |
| 4042 | 67.5 | 28.8 | 35.2 |
| 1120 | 67.0 | 36.1 | 38.3 |
| 4029 | 66.9 | 35.2 | 39.5 |
| 3009 | 66.4 | 33.3 | 36.0 |
|  |  |  |  |
| Mean | 71.0 | 27.6 | 30.3 |

| Black Precincts | Black VAP% | 2018 Senate | 2020 President |
| --- | --- | --- | --- |
|  |  | Dem % | Dem % |
| 1153 | 83.1 | 94.9 | 92.7 |
| 2050 | 82.4 | 95.8 | 95.0 |
| 2089 | 82.1 | 96.0 | 94.4 |
| 2116 | 82.0 | 95.4 | 92.2 |
| 2036 | 81.7 | 95.2 | 93.7 |
| 2061 | 78.3 | 96.3 | 94.9 |
| 2034 | 76.1 | 94.1 | 91.7 |
| 2059 | 74.3 | 92.9 | 91.0 |
| 2052 | 70.8 | 96.0 | 93.1 |
| 2055 | 70.1 | 96.3 | 95.2 |
|  |  |  |  |
| Mean | 78.1 | 95.3 | 93.3 |

24

**Table 6 (Continued)**

| Asian Precincts | Asian VAP% | 2018 Senate Dem % | 2020 President Dem % |
|---|---|---|---|
| 4158 | 77.4 | 76.1 | 69.7 |
| 4102 | 74.1 | 65.5 | 62.1 |
| 4044 | 68.6 | 60.3 | 56.2 |
| 4135 | 66.2 | 62.9 | 61.3 |
| 4147 | 64.6 | 74.0 | 67.4 |
| 4071 | 61.5 | 62.2 | 59.2 |
| 4129 | 59.4 | 58.9 | 58.3 |
| 4086 | 58.4 | 72.5 | 64.8 |
| 4079 | 58.2 | 51.0 | 54.9 |
| 4047 | 54.4 | 57.5 | 61.0 |
| Mean | 64.3 | 64.1 | 61.5 |

| Hispanic Precincts | Hispanic VAP% | 2018 Senate Dem% | 2020 President Dem% |
|---|---|---|---|
| 2112 | 93.6 | 81.4 | 76.4 |
| 1040 | 72.4 | 82.6 | 76.0 |
| 1003 | 70.6 | 84.8 | 80.7 |
| 1012 | 69.9 | 47.7 | 46.9 |
| 2056 | 69.9 | 77.0 | 73.8 |
| 1054 | 63.9 | 40.9 | 40.7 |
| 2023 | 63.2 | 90.6 | 86.5 |
| 1037 | 63.0 | 46.6 | 44.4 |
| 1048 | 59.6 | 69.0 | 64.2 |
| 2016 | 55.7 | 60.3 | 55.6 |
| Mean | 68.1 | 68.1 | 64.5 |

Source:  VAP data from Texas Legislative Council; Voting data from Fort Bend County Elections Office.

The ecological inference (EI) performed by Professor Wong confirms the homogeneous precinct pattern in Table 6.  Using the 2020 population race/ethnicity data from the Texas Legislative

25

Council and the 2018 and 2020 General Election results for all 160 voting precincts in Fort Bend County, Professor Wong's EI analysis estimates Anglos gave just 24.7% of their voters to Beto O'Rourke in 2018 while Blacks gave him 94.4%, Hispanics 67.2%, and Asians 75.2%. In 2020, Biden got 31.9% of the estimated Anglo vote in the county, but 91.5% of the Black vote, 64.0% of the Hispanic vote, and 64.9% of the Asian vote. (Professor Wong's analysis is attached as an Appendix Four)

As we have noted, this pattern of minority-coalition voting at the top-of-the-ticket carried over in all down-ballot races in Fort Bend County in 2018 and 2020. In 2018 there were ten contested county-wide races between Democratic and Republican nominees. The candidates supported by the Black-Hispanic-Asian voters won all ten races, by an average of 53.4% TO 46.6%. In 2020, the same coalition won all contested county-wide local races by an average of 52.4% to 47.6%.

As all the suburbs become more racially and ethnically diverse, the evidence from Fort Bend County elections in 2018 and 2020 documents how minority populations are not only growing very rapidly, but also offering increasing opportunities for Black and Hispanic voters to elect candidates of their choice by forming broader voter coalitions.

### III.    The Enacted Map – C2193

The environment for Republican map-drawers was challenging in 2021. To briefly review, they had to consider these factors:

- Twenty-three of the existing 36 seats had Republican incumbents. All were dependent on Anglo voters to hold their seats in a state with highly racially polarized voting.

- There was minimal Anglo growth statewide – just 5% of the four million population increase.

- The 2011 congressional map was breaking down – two safe seats were lost in 2018 and a half dozen others had become very competitive. Major changes were required for the coming decade.

- Minority growth was surging in the big metropolitan areas. And a new factor was the explosive Asian growth after 2010. Plus, our Fort Bend County analysis showed Asian voters were voting more and more with local Black and Hispanics. That tri-racial/ethnic coalition flipped all local contested offices in 2018 and 2020. With strikingly similar population shifts underway in Collin County, the most populous suburban venue in Texas, this could prove challenging across the state.

- Affluent, well-educated, mostly Anglo neighborhoods in metro areas were producing much smaller margins for Republican congressional candidates than was the case before

2016.  The off-setting improvement of Republican candidates with lower income and less well-educated voters helped statewide, but not much in metro Texas because of the shrinkage of the Anglo working-class.

- Black and Hispanic metro populations were dispersing, making packing more difficult compared to ten years earlier.

- Finally, the demographic trends of the 2010s will likely to continue into the 2020s. Almost all statewide growth will likely occur in the big metropolitan areas where new jobs are being created, and virtually all that net growth will come from minorities.  A map might start out performing decently for Republican candidates depending on Anglo voter majorities circa 2020, but become less effective over the decade.

So, how did the map-drawers meet these challenges?

First, they focused on protecting endangered Republican incumbents.  The closely contested seats lost in 2018 (7th, 32nd) were conceded.  In the 7th, that meant moving troublesome Anglo progressives out of the 2nd district and putting more minorities into the 32nd District in Dallas. Endangered seats in the Austin area were made safer by placing one of the two new seats in Travis County, an overwhelming Democratic area – but dominated by *white* progressives.

Second, with packing largely off the table, the strategy was to crack aggressively the big metro areas.  The ten-county DFW metro area had 7.5 million people in 2020, which would translate into 10 full congressional districts.  But rather than draw ten local districts, the new map concentrated minorities into three districts (30, 32, 33) and cracked the rest of the area into nine districts.  One of new districts (the 13nd) stretches from Dalhart in the northwest Panhandle to Denton.  Another from Texarkana to Dallas, and so forth.  All have, at least initially, Anglo majority VAPs, and even larger margins for Anglo CVAPs.  Similar cracking was done in metro Houston, as districts like the 22nd were pushed far out into rural Texas.

The most obvious losers in the enacted plan are Hispanic voters as was the case in 2011.  No viable Hispanic opportunity district was created in the DFW area, despite the fact that the census counted 2.2 million Latinos in the metro area.  Metro Houston added nearly 600,000 Hispanics, but no additional opportunities for Latino representation were created locally.

Elsewhere in the state, Hispanic voters lost ground in the 23rd district under the new map, which was moved from competitive to likely dominated by conservative Anglo voters.  The pattern was repeated in the 15th District, where polarized Anglos were added to a traditional Latino seat.

And worried by the Fort Bend voting pattern we have documented, the enacted map carefully split up the fast-growing Asian communities in the north Dallas/Fort Worth suburbs and in southwest Harris County/central Fort Bend County.

Finally, what about African American voter opportunities? I particularly focus on the 9th, 18th, and 30th districts. These are legacy districts that have provided African American voters the opportunity to elect candidates of their choice for decades. Superficially, these districts seem to have been largely maintained. I would argue to the contrary.
First, I would note that the African American members, Al Green, Sheila Jackson Lee, and Eddie Bernice Johnson, had no input on the legislature's plans as they were being developed.

Second, these districts were very close to the required population of 766,987. The 9th District had the smallest deviation from the mean (+3,611 or +0.5%), the 30th was +15,989 or +2.1%, and the 18th was +29,921 or +3.9%. That being the case, one would expect minimal change in the new map. Removing a single voting precinct from the 9th District could achieve the ideal population. Two or three deletions out of 200+ voting precincts in Dallas County would get the 30th to the required mean. Moving three or four precincts out could get the 18th to 766,987 people.

That did not happen. The initial map released by the Texas Senate made huge shifts in all three districts. Members Green and Jackson Lee were needlessly paired. Jackson Lee's home, main office, and most important economic assets, including the downtown business district, were stripped out of the 18th District. Third Ward, one of the pillars of the 18th since its creation in 1965, was moved to the Ninth District. These moves point to intentional discrimination aimed at the three Black incumbents and their respective constituents as part of the metro-cracking strategy.

A huge backlash from constituents secured some adjustments in the original senate plan, including unpairing Green and Jackson Lee, but the final map added 160,000 new people to the 18th District, requiring the removal of 190,000. The final map stripped nine heavily African precincts in Third Ward/MacGregor out of the 18th, which was largely responsible for reducing the Black population from 36.8% to 34.4% in Plan C2193. The revised district saw increases in the Anglo VAP (16.2% to 19.4%); the Asian VAP (5.4% to 6.2%); and the non-Black Hispanic VAP population (38.6% to 39.0%). This constituted racial dilution of the 18th District. Plan C2193 also moved a large area of partially developed land near Lake Houston into the 18th District creating uncertainty as to the future demographic makeup of the previously stable district.

The 9th District, again the closest in Texas to the required population, underwent even larger changes. Some 266,000 people were removed by the enacted plan, requiring the addition of 263,000 to get back to population parity. Congressman Green found his new district included a large swath of Brazoria County – never a part of the 9th or its predecessor the 25th (Tom Delay's 2003 map renumbered the district). The Brazoria County addition, along with a large new area in eastern Fort Bend County, diluted the Black core of the existing district in Sunnyside, Windsor Village, and Fort Bend precincts in the City of Houston and Missouri City. The new vacant land, soon to be filled with new housing, also created uncertainty as in the 18th for the future of the 9th district over the next decade.

The 30th District also saw major unnecessary changes. Although over-populated, 52,650 people were moved into the district from Tarrant County. Part of downtown Dallas and adjacent areas were removed, requiring even more new folks being moved into the district.

The movement of a million Texans, 85% of whom were Black or Hispanic, in and out of the 9th, 18th, and 30th Districts; the stripping out of stable neighborhoods for raw developable land with zero connection to existing districts; the initial pairing of members Green and Jackson Lee, and the failure to allow meaningful input from congressmembers and constituents points to a deliberate targeting of the Black members and, more importantly, their constituents.

This targeting was, in my opinion, best understood as a key part of the overall strategy behind the enacted plan. That strategy, as a column in the *Los Angeles Times* put it, was "all about keeping a grip on white power" in the Lone Star State.[16]

Evidence of that continuing commitment to white power can be seen in where the two new districts ended up on the enacted map. One, the 37th, was positioned in Travis County and will be dominated by white progressive voters. The new 38th was sited in west Harris County and will be dominated by conservative white voters. And the 36 carryover districts were configured to protect Anglo voter dominance in 26 of the group.

No new opportunities were created for Black voters under C2193. Instead, the new 9th, 18th, districts have unsettled futures with new voters added and, more importantly, large areas of developable land.

I emphasize that this latter pattern (stuffing high-growth exurban areas into the 9th and 18th Districts) represents a more sophisticated form of packing than we saw in previous congressional maps. These areas, like precinct 1058 in southeast Fort Bend County, which was moved from District 22 to District 9 in the enacted map, are set for explosive growth over the coming decade. The two-party presidential vote in this precinct totaled just 361 in 2016 (66% Democratic), compared to 1,200 in 2020 (80% Democratic). With 80 percent of the land area still undeveloped, the presidential vote in this area will likely exceed 4,000 by 2028, with all the increase due to minority growth. That likelihood is one of the primary reasons why so much cutting and slicing of districts like the 9th and 18th occurred. Specifically, to neutralize the booming suburban minority vote by concentrating it in already packed existing majority-minority districts. But these extensive changes effectively mutilated the existing right-sized districts.

---

[16] LZ Ganderson, "Texas gerrymandering is all about keeping a grip on white power," *Los Angeles Times*, December 8, 2021.

Finally, no new coalition opportunity districts were created by the enacted map.  That despite evidence from the growing suburbs like Fort Bend County that these represent the future of metropolitan Texas.  But not under Plan C2193.  And Hispanic voters, whose population growth is the reason Texas has gained six new congressional seats in 2010 and 2020, are worse off under the enacted plan than was the case with the existing map.

## IV.     Conclusion

In the first section of this report, I pointed out that in the first 60 years of the 20th century, Black and Latino Texans were ignored in the congressional redistricting process.  The addition of new districts and the redrawing of existing ones was a "whites only" affair in the days of one-party Democratic control in Jim Crow Texas.

That era ended in the 1960s and 1970s as federal intervention forced districts to be equalized in population; minority population growth surged; and the protections of the Voting Rights Act were extended to Texas.  Meantime, Black and Hispanic communities were becoming better organized and influential legislators like Senators Frank Tejeda of San Antonio and Eddie Bernice Johnson of Dallas were at the table when new congressional maps were crafted in the 1990s.  After 2000, the improvement in opportunities for effective minority voter representation slowed as a new one-party Republican era took hold.  This new one-party system was different in many ways from that of the "Tory" Democrats of the 20th century, but similar in that the dominant Republican Party's primary was dominated by white conservatives.  And like the Democrats of the 20th century, the legislators from this dominant faction had no interest in improving opportunities for the fast-growing minority populations in the state.

As a result, the minimal improvements in minority voter opportunities after the Texas congressional redistricting in 2011 were largely due to federal interventions that created a new Black/Latino coalition district in Dallas/Fort Worth (the 33rd) and slightly increased Hispanic voter opportunities in the competitive 23rd District in West Texas.

The enacted map passed in the fall of 2021 followed the same script as the 2011 redistricting.  The new map was shaped in the Texas Senate, by far the most conservative of the legislative bodies in Austin.  The Senate process proceeded with no meaningful involvement from the Black and Hispanic Senators elected by minority voters.  The C2193 map ignored the reality that 95 percent of the four million population gain in Texas since 2010 was accounted by non-Anglos.  Both the 37th and 38th new districts apportioned to Texas were sited in white-dominated districts, while shoring up all Republican incumbents elected by white conservatives.

Earlier in this report, I focused on how Congresswoman Barbara Jordan's efforts in 1975 expanded protection for Black and Hispanic voters in Texas.  Nearly a half-century later the enacted congressional map is strong evidence that such protection is still needed.  Texas is now

a state where 60% of the population is non-Anglo, and 50% of the citizen voting age population are minorities.  But whites will control 28 of 38 seats in the U.S. House of Representatives – 74%.  That, in my opinion, violates the Voting Rights Act and the Equal Protection Clause of the 14th Amendment.   To paraphrase George Orwell's famous sentence from *Animal Farm*, when it comes to congressional redistricting in the state in 2021, all Texans, may be equal, but white Texans are more equal than others.

31

# Amended Expert Report:  The Enacted Texas Congressional Redistricting Plan

By Richard Murray
Senior Research Associate
Hobby School of Public Affairs
University of Houston

October 18, 2022

The 18th Congressional District

In an opinion filed on 09/28/2022, the three-judge federal panel in El Paso considering the 2021 congressional redistricting map enacted by the Texas legislature held that the plaintiff intervenors "have not adequately alleged intentional vote dilution claims as to Congressional Districts 9 and 18 as they have not shown that the changes bore more heavily on one race than others ..." More specifically, they noted "intervenors allegations regarding the Plan's effect on Congressional District *18*'s minority voters are far vaguer." (p. 41)

To address that point, I performed an analysis of two sets of voting precincts moved by Plan C2193. These shifts were primarily responsible for reduction of the Black VAP in CD 18 from 38.8% to 34.4%. The first set are nine Harris County precincts in the southernmost part of CD 18 under the old map (0031, 0156, 0180,0236, 0237, 0238, 0573, 0822, 0858). These precincts have been in the 18th CD since Black voters elected Barbara Jordan in 1972 and have successfully elected candidates of their choice for fifty years. The second set are precincts in northeast Harris County (0108, 0363, 0888, 0960, 0968), a high-growth area with large tracts of underdeveloped land. These precincts have never been in a Black opportunity district.

Table One shows the removed precincts were heavily Black (VAP of 66.9%) and extremely cohesive (93.4% for their preferred presidential candidate in 2020). In contrast, the added precincts in northeast Harris County were racially and ethnically very diverse, with Hispanic VAP (37.4%) higher than Black VAP (36.7%), and with a sizeable Anglo VAP (20.6%). The added precincts supported the same presidential candidate in 2020 as voters in the removed area, but at a far lower level (69.0%).

These changes, in my opinion, document that Black voters in the new 18th district were more heavily burdened by Plan C2193 than other racial/ethnic voter groups. Anglo voter VAP increased from 16.2% to 19.4%, mostly because of the northeast county precincts included in Table One. And, it should be noted the exurban white voters added by this map are far more racially polarized against candidate preferred by Black voters than inner-city Anglos removed by the enacted map. In that regard, note that precinct 0808, a majority Anglo (52.2%) box in midtown Houston supported the same 2020 presidential candidate as did Black voters by a margin of 393 (Biden) to 99 (Trump). Compare with precinct 0098 in northeast Harris County, which had an Anglo VAP of 75.6% in 2020, and supported Trump over Biden by a margin of 1942 votes to 456 votes, according to the HarrisVotes website archive.

I further note that both Hispanic (39.0%) and Asian (6.2%) VAP percentages in CD were increased by C2193, as Black VAP declined to 34.4%. The enacted map also added sizeable developable land that, over ten years, will likely further reduce the Black population percentage in CD 18, thus steadily eroding the ability of African American voters to elect candidates of their choice.

**Table One:  The Racial/Ethnic Makeup and 2020 Presidential Vote Pattern of the Precincts Moved out and into the 18th CD by Plan 2193**

Precincts Removed

|  | Race/Ethnicity of VAP in 2020 | | | | | 2020 Two-Party Presidential Vote | |
|  | Anglo | Hispanic | Black | Asian | Other | Trump | Biden |
|---|---|---|---|---|---|---|---|
| 0031 | 85 | 392 | 2772 | 35 | 15 | 73 | 1293 |
| 0156 | 288 | 676 | 2925 | 106 | 30 | 116 | 1923 |
| 0180 | 113 | 951 | 2445 | 25 | 22 | 106 | 1367 |
| 0236 | 29 | 1377 | 1206 | 8 | 6 | 82 | 920 |
| 0237 | 31 | 768 | 1534 | 7 | 8 | 56 | 1020 |
| 0238 | 25 | 1023 | 1170 | 9 | 20 | 65 | 875 |
| 0573 | 37 | 394 | 1594 | 31 | 9 | 31 | 806 |
| 0822 | 20 | 770 | 1097 | 22 | 2 | 6 | 772 |
| 0858 | 12 | 106 | 309 | 2 | 3 | 9 | 195 |
| | | | | | | | |
| TOTAL | 640 | 6,462 | 15,062 | 245 | 115 | 644 | 9,171 |
| | 2.8% | 28.7% | 66.9% | 1.1% | 0.5% | 6.6% | 93.4% |

Precincts Added

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0108 | 1728 | 2905 | 2032 | 234 | 232 | 1012 | 1151 |
| 0363 | 2230 | 3550 | 3265 | 184 | 145 | 1168 | 2427 |
| 0888 | 570 | 1329 | 1164 | 123 | 59 | 493 | 1157 |
| 0960 | 343 | 673 | 1382 | 155 | 18 | 269 | 1097 |
| 0968 | 425 | 1168 | 1599 | 163 | 56 | 338 | 1477 |
| | | | | | | | |
| TOTAL | 5,306 | 9,625 | 9,444 | 857 | 510 | 3,280 | 7,309 |
| | 20.6% | 37.4% | 36.7% | 3.3% | 2.0% | 31.0% | 69.0% |

Sources:  VAP precinct data are from the Red.110T report released by the Texas Legislative Council for Plan2100 on 08/02/2021.  Presidential vote data are from the website HarrisVotes Archives.

The 9th Congressional District

The 9th District changes under Plan C2193 are different from the 18th CD in an important regard: The heavily Black precincts removed from the Jackson-Lee district were moved into Congressman Al Green's redrawn district, which resulted in slight overall increase in Black VAP in the district in contrast to the decline in 18th CD.

That said, the overall impact of the major changes made by C2193 resulted in a serious threat to the viability of the Ninth District to remain a Black opportunity district over the coming decade. The source of the problem is the removal of a large, stable group of racially diverse precincts on the west side of the existing district, and their replacement with a large swath of new territory on the southeast side of the district in Brazoria County.

The 2020 census showed the 9th District had almost exactly the population required for the districts in Texas – 770,798 versus 766,987 – a deviation of less than 0.5 percent. Nevertheless, Plan C2193 moved more than 300,000 people in and out of District Nine. One of the largest changes was moving 13 voting precincts in northern Brazoria County from the 2nd District into the redrawn 9th. I focus on this new Brazoria territory.

The precincts are located in one of the most dynamic areas of metropolitan Houston, including a large part of the City of Pearland. The 2020 census data shows the area is very racially and ethnically diverse. Blacks were a plurality, but less than a third of the population, closely followed by Anglos, with sizeable Asian and Hispanic populations. Given the access to employment centers in Harris County such as the Texas Medical Center, this part of Brazoria County is almost certainly going to continue to grow at a much faster pace than the rest of the district, and that growth will most likely continue to be highly diverse, with Blacks remaining well below their percentage of the VAP elsewhere in the 9th District.

The addition of this fast-growing suburban area to the district will, in my opinion, hasten the transition of the Ninth Congressional District of Texas from a reliable opportunity district for Black voters, to a *coalition district* in which the candidate preferred by African American voters can still win, but only by joining with sufficient numbers of other minority populations in the racial polarized environment of Texas.

**Table Two: The Racial/Ethnic VAP Makeup and 2020 Presidential Vote of Brazoria County Precincts add to the Ninth CD of Texas**

| Pcts | Racial/Ethnic VAP | | | | | 2020 Pres Vote | |
|---|---|---|---|---|---|---|---|
| | Anglo | Hispanic | Black | Asian | Other | Trump | Biden |
| 029 | 1081 | 662 | 939 | 1204 | 86 | 1056 | 1692 |
| 041 | 864 | 336 | 561 | 578 | 28 | 652 | 984 |
| 044 | 1743 | 630 | 1220 | 1225 | 63 | 1249 | 2010 |
| 050 | 1497 | 810 | 2697 | 1717 | 176 | 1073 | 2784 |
| 053 | 556 | 641 | 1465 | 424 | 57 | 500 | 1416 |
| 058 | 1269 | 458 | 1178 | 799 | 49 | 913 | 1558 |
| 059 | 1497 | 649 | 1497 | 1669 | 55 | 1206 | 2630 |
| 060 | 2306 | 1396 | 769 | 822 | 119 | 1681 | 1815 |
| 062 | 1876 | 1364 | 1647 | 474 | 153 | 1227 | 1865 |
| 063 | 787 | 1249 | 2167 | 448 | 61 | 702 | 2231 |
| 066 | 1089 | 715 | 1308 | 1717 | 35 | 978 | 2064 |
| 067 | 1069 | 818 | 2271 | 921 | 28 | 761 | 1952 |
| 068 | 1532 | 1828 | 2298 | 1142 | 164 | 1258 | 2611 |
| | | | | | | | |
| TOTAL | 17,168 | 11,556 | 20,017 | 13,130 | 1,074 | 13,256 | 25,612 |
| | 27.2 | 18.4 | 31.8 | 20.9 | 1.7 | 35.0 | 65.0. |

Sources: VAP data from Texas Legislative Council report released on 08/02/2021. Vote data from Brazoria County Election Archive website.

To sum up, C2193 provided a short term-boost to preserving CD Nine as a Black opportunity district by adding nine majority African American precincts from the 18th CD. But these precincts only included a VAT population of about 22,000 in 2020 and have had no growth over the last decade. By contrast, the newly added precincts in Brazoria County had a VAP of nearly 63,000 people in 2020 and a record of very fast growth (the 2010 VAP was 34,176).

The enacted map effectively dilutes the impact of Black voters in the coming decade by incorporating suburban growth areas where African Americans are a minority, and like to remain so, which more than cancels out the shift of inner-city precincts from the 18th District.

Conclusion

In my opinion, C2193 harmed Black voters in Districts 9 and 18. Directly so, in CD 18 by removing a legacy part of the district with a proven record of strong support for candidates preferred by Black voters and replacing them with diverse suburban voters less supportive of such candidates. Indirectly, in District Nine by first adding the Black inner-city precincts from CD18 – a temporary boost to Black VAP. But, more than cancelling out than gain by adding a much more populous diverse suburban area in Brazoria County that will far outpace the additions from CD 18 in VAP growth and voter turnout.