**Barreto Reply to Alford - July 27, 2022**

1. Pursuant to 28 U.S.C. section 1746, I, Matt Barreto, declare as follows:

2. My name is Matt Barreto, and I am currently Professor of Political Science and Chicana/o Studies at the University of California, Los Angeles.  I was appointed Full Professor with tenure at UCLA in 2015.  Prior to that I was a tenured professor of Political Science at the University of Washington from 2005 to 2014.  At UCLA I am the faculty director of the Voting Rights Project in the Luskin School of Public Affairs and I teach a year-long course on the Voting Rights Act (VRA), focusing specifically on social science statistical analysis, demographics and voting patterns, and mapping analysis that are relevant in VRA expert reports. I have written expert reports and been qualified as an expert witness more than three dozen times in Federal and State voting rights and civil rights cases, including many times in the state of Texas.  I have published peer-reviewed, social science articles specifically about minority voting patterns, racially polarized voting, and have co-authored a software package (eiCompare) specifically for use in understanding racial voting patterns in VRA cases.  I have been retained as an expert consultant by counties across the state of Texas to advise them on racial voting patterns as they relate to VRA compliance during redistricting. As an expert witness in VRA lawsuits, I have testified dozens of times and my testimony has been relied on by courts to find in favor of both plaintiffs and defendants. My CV is already on file with the court in this case, most recently attached to my May 20, 2022 report.

3. I have also published books and articles specifically about the intersection of partisanship, ideology and racially polarized voting. My 2013 book, Change They Can't Believe In was published by Princeton University Press and was about the inherent connectedness between partisanship and racial attitudes in America today, and won the American Political Science Association award for best book on the topic of racial and ethnic politics.

4. I submitted an expert report in this matter on May 20, 2022 and then a supplement on June 15, 2022. Before that I submitted an expert report in November 2021 and a rebuttal report in January 19, 2022, and gave expert testimony in this court in January 2022, which the court found reliable and credible.  I am continuing to rely on my earlier reports and testimony in this case.

5. I have now read the July 18, 2022 report by Dr. John Alford and am prepared to rebut his opinions, methodology and conclusions.

6. Throughout his report Dr. Alford admits that racially polarized voting is prevalent across the state of Texas. Indeed, he has come to this conclusion many times in his own previous analysis of voting patterns in Texas. However, in his recent report he argues that general elections are less relevant because they are influenced by partisanship not race; and second that primary elections should be given more weight instead of general elections. This argument is not consistent with generally accepted social science analysis nor methodology when it comes to studying racially polarized voting – a topic that is widely published in social science journals and has a well documented research design and methodology.

7. In this rebuttal I first outline the accepted social science methodology and approach to studying racially polarized voting (Section 1). Second, I respond directly to Dr. Alford's claims about primary elections, showing that while he is wrong to center his focus on primary elections, recent primary elections nevertheless support the conclusion that Black and Hispanic voters are politically cohesive(Section 2).

**Section 1: Bivariate racial analysis as the Social Science standard in Ecological Inference**

8. The examination of racially polarized quite simply asks whether or not voters of different racial or ethnic groups prefer different candidates. It does not ask social scientists to determine *why* they voted for a candidate, and it does not ask social scientists to include other factors like educational attainment, age, or partisanship, such as in a multiple variable regression. To the contrary, when determining racially polarized voting the social science literature has pointed directly to a bivariate relationship between vote choice and the race or ethnicity of voters. Because accurate exit polls often do not exist outside of statewide elections for President, Governor or the U.S. Senate, the courts and the field of political science has relied on precinct level analysis as accurate for determining how groups voted by race or ethnicity.

9. To be clear, in his report of July 18, 2022 Dr. Alford does not conduct any statistical analysis to prove that partisanship, not race, is driving vote preference. Rather, he simply states the obvious, that general elections are partisan in nature. This observation does not stand in for statistical analysis disproving the racially polarized voting results. Throughout his report he merely states that general elections are partisan, and he suggests that basic bivariate regression with candidate choice and race of voters is not sufficient to prove racially polarized voting. The implication of Dr. Alford's opinion is that researchers need to conduct multiple variable regression to somehow control for other factors and prove that race or racial attitudes are related to voting patterns. However, simply making this assertion does not prove anything and it goes against decades of published social science scholarship which suggests bivariate ecological inference

2

    models should be used to make findings of racially polarized voting, even in partisan general elections.

10. Dr. M.V. Hood, tenured professor at the University of Georgia who has studied racially polarized voting in Texas and has been an expert witness in multiple lawsuits in the state of Texas–including as an expert *for* the State of Texas–has published a social science article laying out the appropriate and correct way to conduct racially polarized voting analysis, in his opinion. In his article, he explains that researchers need to obtain precinct data with candidate vote choice and racial/ethnic data and nothing more. He writes: "This type of analysis derives inferences about individual-level voting preferences from aggregate-level data— typically precincts or VTDs (voting districts), which are the smallest geographic areas for which election return data are generally reported. Racial/ethnic data must then be matched to such election precincts in order to produce estimates of voting behavior based on these characteristics[1]."

11. Dr. Hood goes on to specifically cite ecological inference (King's EI) as a court approved methodology that should be used to determine vote choice by race or ethnicity: "The courts have recognized several different statistical methods for deriving inferences about individual-level voting preferences from aggregate-level data. They include homogenous precinct analysis, ecological regression (sometimes referred to as Goodman's double regression), and ecological inference (EI) (King, 1997).[2]"

12. To determine whether or not there is racially polarized voting, Hood explains that analysts examine the results of the bivariate EI models to see which candidate was favored by racial minorities. Throughout his entire article, he never instructs the analyst to consider partisanship or other factors: "Having derived estimates of vote choice by race/ethnicity, the analyst can bring that evidence to bear on the second Gingles prong. Again, one way to operationalize political cohesion is to determine for each contest analyzed if there is a clear candidate of choice for voters of the racial/ethnic group in question. Specifically, did the vote share from the minority voting bloc reach a simple majority for any of the candidates in the race? For example, if one's estimates show that 54.0 percent of black voters supported the black candidate in a particular election contest, that estimate reveals a clear candidate of choice among black voters. At this juncture, the analyst must categorize each contest according to the presence or absence of a clear candidate of choice among the minority group of interest.[3]"

---

[1] Hood, M.V., Peter Morrison and Thomas Bryan. 2017. "From Legal Theory to Practical Application: A How-to for Performing Vote Dilution Analyses." Social Science Quarterly. Page 11
[2] Ibid, page 12
[3] Ibid, page 12

13. In the Oxford Handbook of Political Methodology, Tam Cho and Maski published a chapter specifically about ecological inference and racially polarized voting. In the chapter, meant to be instructive to political scientists seeking to study racially polarized voting in the legal context, the authors explain that the *only* data necessary is vote choice and race. They write, "because U.S. elections employ the secret ballot, individual vote choices are unknown. Election returns, however, are reported at the precinct level, and aggregate individual racial categorizations can usually be obtained and merged with the voting data. Hence, for any given precinct, the available data include how many votes each candidate received as well as the precinct's racial composition[4]"

14. In fact, in a table explaining how racially polarized voting analysis should be properly implemented, the authors use Black versus White votes for a Democratic or Republican candidate and explain that scholars can use this example, and the bivariate method to determine if "race is a factor associated with vote choice.[5]" So even in the face of election contests featuring a Democrat and Republican candidate, the authors of the Oxford Handbook of Political Methodology instruct social scientists to run a bivariate ecological regression using candidate vote choice and race within a precinct to draw conclusions about whether or not race is a factor influencing voting.

15. More evidence supporting this approach can be found in a paper published in the Proceedings of the National Academy of Sciences. In this comprehensive review of methods for racially polarized voting Dr. Schuessler explains that precinct data on race and candidate vote are the only necessary variables, making no mention at all of partisanship. He writes, "consider an electoral precinct with a population of black and white voters. Available to the researcher are both the precinct's racial composition and precinct-level aggregate turnout rates in elections. Given the secret nature of voting, however, an unobservable quantity of interest is turnout among these racial groups[6]" Dr. Schuessler goes on to review different approaches to studying racially polarized voting methodology and the use of ecological inference to provide estimates of vote choice by race, concluding by recognizing the value and importance of ecological inference bivariate race models, writing: "it is not premature to note that this estimation procedure to date represents the most dramatic advance in researchers' abilities to draw microlevel inferences from aggregate-level data. Perhaps more importantly still, its general

---

[4] Tam Cho, Wendy and Charles Maski. "Chapter 22: Cross-leve/Ecological Inference." The Oxford Handbook of Political Methodology." Page 3.
[5] Ibid, page 9.
[6] Schuessler, Alexander. 1999. "Ecological Inference." Proceedings of the National Academy of Sciences. 96(Sept). Page 10578.

approach—combining statistical and deterministic means—has set a new methodological direction for ecological inference[7]"

16. In a more recent paper about ecological inference methodology, published in <u>Sociological Methods & Research</u>, the authors describe the necessary data for racially polarized voting analysis as "precinct-level data on candidate vote distribution, as well as the racial demographics of the voting population in each precinct, and the total number of ballots cast.[8]"

17. In an article summarizing how to run ecological inference for vote dilution analysis, published in the statistical software journal, <u>The R Journal</u> (2016), Collingwood et al. explain what variables are needed to accurately run EI: "This dataset includes all the necessary variables to run the code in the eiCompare package. The first column is "precinct", which essentially operates as a unique identifier. The second column, "totvote", is the total number of votes cast within the precinct. Columns three and four are the two racial groups of whom we seek to determine their mean voting preference. The rest of the columns are the percent of the total vote for each respective candidate[9]"

18. Indeed across multiple academic papers published on the topic of racially polarized voting and ecological inference the conclusion of all social scientists is that the only relevant variables to determine if voting can be characterized as racially polarized is candidate vote choice and race or ethnicity of voters in each precinct[10]. No article calls for an analysis of the role of partisanship, or that general election contests are not relevant because of partisanship. The simple question social scientists and the courts

---

[7] Ibid. Page 10581

[8] Barreto, Matt, Loren Collingwood, Sergio Garcia-Rios and Kassra AR Oskooii. 2022. "Estimating Candidate Support in Voting Rights Acts Cases: Comparing Iterative EI and EI-RxC Methods." Sociological Methods & Research. 51(1). Page 278

[9] Collingwood, Loren, Kassra Oskooii, Sergio Garcia-Rios, and Matt Barreto. 2016. "eiCompare: Comparing Ecological Inference Estimates across EI and EI:RxC" The R Journal. 8(2). Page 95

[10] B. Grofman and M. A. Barreto. A reply to Zax's (2002) critique of Grofman and Migalski (1988) double-equation approaches to ecological inference when the independent variable is misspecified. Sociological Methods & Research, 37(4):599–617, 2009

G. King. A solution to the ecological inference problem, 1997.

G. Owen and B. Grofman. Estimating the likelihood of fallacious ecological inference: linear ecological regression in the presence of context effects. Political Geography, 16(8):675–690, 1997.

O. Rosen, W. Jiang, G. King, and M. A. Tanner. Bayesian and frequentist inference for ecological inference: The R×C case. Statistica Neerlandica, 55(2):134–156, 2001

J. D. Greiner and K. M. Quinn. R× c ecological inference: bounds, correlations, flexibility and transparency of assumptions. Journal of the Royal Statistical Society: Series A (Statistics in Society), 172(1):67–81, 2009.

C. Adolph and G. King. Analyzing second-stage ecological regressions: Comment on Herron and Shotts. Political Analysis, 11(1):65–76, 2003.

Imai, Kosuke, and Kabir Khanna. 2016. "Improving Ecological Inference by Predicting Individual Ethnicity from Voter Registration Records." Political Analaysis. 24(2).

are trying to answer is do different groups vote differently, and is that pattern correlated with the race and ethnicity of the voters in the studied precincts.

19. To deviate from this standard and to attempt to add alternative explanations for the vote patterns ignores more than 50 years of established social science published research, and legal precedent on the concept of racially polarized voting. If Black residents vote strongly in favor of a candidate, and Anglo residents vote strongly against the Black-favored candidate, it does not matter whether this is due to religious commitment, economic or class issues, or political partisanship. What matters is that Black voters have a preferred candidate whom they wish to represent them in elected office, and a districting scheme has been set up that dilutes their vote by denying them an opportunity to elect a candidate of their choice. It does not matter why, we are only concerned with whether or not Black or Hispanic voters have preferred candidates and Anglo voters support or oppose these candidates.

20. Finally, Dr. Alford ignores a lengthy section of my report of May 20, 2022, in which I outline the clear and consistent finding in the social science literature that partisanship and partisan vote choice is largely influenced by race and racial attitudes (see paragraphs 37-49) as well as my June 15, 2022 report which calls attention to the strong connection between partisanship and racial attitudes (see paragraph 15). Even if the court were to conclude that partisanship is *one factor* associated with voting patterns, the science demonstrates that race and racial attitudes have a direct and large influence on these voting patterns, resulting in a clear finding of racially polarized voting across a multitude of elections in the state of Texas.

**Section 2: Analysis of Primary Elections**

21. In my previous reports I included analysis of primary voting patterns (Barreto report January 19, 2022, paragraphs 4-11; Barreto report May 20, 2022, paragraphs 31, 32, 36; Barreto report June 15, 2022, page 23 ). As this court has asked social scientists to consider primary elections, I continue to do so in this report. In this section I also offer direct rebuttal to the statements and opinions in Dr. Alford's July 18, 2022 report.

22. First, in an attempt to distract from the overwhelming evidence of racially polarized voting in general elections, Dr. Alford attempts to put an overemphasis on primary elections which is unfounded. Primary elections are most relevant when the district being scrutinized is already known to regularly vote Democratic or Republican, but plaintiffs allege that the composition of primary voters has diluted minority influence. There, examining whether a group of minority voters is cohesive in the primary election but faces Anglo block voting against their interest can be relevant.

6

23. In my report of May 20, 2022, paragraph 36, I examined primary election voting patterns between Hispanic and Anglo voters in Tarrant County Democratic primary elections and concluded that Hispanics were cohesive for their candidates of choice, and that Anglos generally voted against Hispanic candidates of choice.

**Tarrant County Ecological Inference Candidate Choice Estimates – Dem Primary**

| | | King's EI | | RxC | |
|---|---|---|---|---|---|
| | | Hispanic | Anglo | Hispanic | Anglo |
| 2018 Gov | White | 6.7 | 35.4 | 11.7 | 34.3 |
| | Valdez | 65.2 | 46.7 | 69.7 | 48.0 |
| | Other | 17.6 | 14.9 | 18.6 | 17.7 |
| 2018 Sen | Hernandez | 42.5 | 8.8 | 50.5 | 10.4 |
| | O'Rourke | 34.6 | 85.7 | 35.5 | 85.0 |
| | Other | 34.1 | 3.4 | 14.0 | 4.6 |
| 2020 RR | Alonzo | 52.7 | 14.4 | 51.5 | 16.7 |
| | Castaneda | 15.5 | 40.4 | 22.6 | 41.5 |
| | Stone | 5.7 | 33.3 | 9.0 | 26.5 |
| | Watson | 20.0 | 16.6 | 16.8 | 15.3 |
| 2020 Sen | Hegar | 4.4 | 32.4 | 3.6 | 32.7 |
| | West | 19.2 | 9.4 | 14.1 | 9.8 |
| | Latino combined | 37.4 | 25.2 | 43.0 | 26.1 |
| | Other | 33.7 | 33.3 | 39.4 | 31.4 |
| 2022 Comp | Duddling | 33.2 | 60.3 | 31.9 | 60.8 |
| | Mahoney | 18.7 | 17.8 | 10.8 | 12.8 |
| | Vega | 48.1 | 21.9 | 44.3 | 18.0 |
| 2022 Land | Lange | 30.8 | 16.4 | 43.4 | 15.5 |
| | Suh | 12.7 | 31.0 | 8.8 | 31.1 |
| | Kleberg | 11.8 | 32.7 | 7.6 | 34.0 |
| | Martinez | 44.6 | 20.0 | 43.3 | 13.8 |

24. In my report of June 15, 2022, page 23, I examined primary election voting patterns between Hispanic and Anglo voters in House District 90, Democratic primary elections and concluded that Hispanics were cohesive for their candidates of choice, and that Anglos generally voted against Hispanic candidates of choice.

### Enacted Map: House District 90 – RPV Democratic Primary

| Election | Candidate | Year | King's EI Anglo | King's EI Hispanic | EI RxC Anglo | EI RxC Hispanic | King's EI SSTO | EI RxC SSTO |
|---|---|---|---|---|---|---|---|---|
| Gubernatorial | Davis | 2014P | 99.2 | 82.5 | 96.6 | 83.2 | 73.8 | 72.6 |
| Gubernatorial | Madrigal | 2014P | 0.9 | 17.6 | 3.4 | 16.9 | 26.1 | 27.4 |
| Land Comm | Suazo | 2018P | 68.8 | 71.2 | 65.2 | 73.3 | 87.9 | 88.3 |
| Land Comm | Morgan | 2018P | 31.1 | 28.8 | 34.8 | 26.7 | 11.6 | 11.7 |
| Gubernatorial | White | 2018P | 27.5 | 11.2 | 27.5 | 11.6 | 8.3 | 9.2 |
| Gubernatorial | Valdez | 2018P | 45.1 | 68.5 | 47.2 | 66.3 | 82.9 | 80.8 |
| Gubernatorial | Other | 2018P | 21.3 | 24.4 | 25.3 | 22.1 | 8.9 | 10 |
| Senate | Hernandez | 2018P | 11 | 35.1 | 9.6 | 36.2 | 43.4 | 44.9 |
| Senate | O'Rourke | 2018P | 77.8 | 48.5 | 80.2 | 46.7 | 53.9 | 51.4 |
| Senate | Other | 2018P | 12.1 | 15.9 | 10.2 | 17.1 | 0.9 | 3.7 |
| Railroad Comm | Alonzo | 2020P | 13.5 | 50.9 | 13.9 | 50.9 | 66.9 | 66 |
| Railroad Comm | Castaneda | 2020P | 36.9 | 21.5 | 38.2 | 20.8 | 23.9 | 24 |
| Railroad Comm | Stone | 2020P | 29.4 | 10.1 | 29.9 | 9.9 | 2.5 | 3.9 |
| Railroad Comm | Watson | 2020P | 15.5 | 19.5 | 18 | 18.4 | 5.1 | 6.1 |
| Senate | Hegar | 2020P | 23.7 | 5.3 | 27 | 3.6 | 3.6 | 4.7 |
| Senate | West | 2020P | 24 | 21.6 | 26.5 | 19.8 | 1.2 | 3.5 |
| Senate | Latinos | 2020P | 20.3 | 40.1 | 21.9 | 39.1 | 59.6 | 58.2 |
| Senate | Other | 2020P | 30.6 | 33.7 | 24.5 | 37.5 | 35.3 | 14.4 |
| Atty General | Fields | 2022P | 15.8 | 19.6 | 15 | 20.3 | 14.7 | 16.2 |
| Atty General | Garza | 2022P | 36.4 | 37.6 | 34.5 | 38.6 | 61.6 | 60 |
| Atty General | Merritt | 2022P | 22.9 | 31.7 | 27.7 | 28.8 | 7.5 | 11 |
| Atty General | Other | 2022P | 23.3 | 11.7 | 22.8 | 12.3 | 12.8 | 5.1 |
| Comptroller | Duddling | 2022P | 63 | 34.9 | 60.5 | 36 | 17.2 | 18.3 |
| Comptroller | Mahoney | 2022P | 18.5 | 19 | 18.3 | 19.4 | 5.6 | 10.4 |
| Comptroller | Vega | 2022P | 20.6 | 45.6 | 21.2 | 44.6 | 73.2 | 71.4 |
| Railroad Comm | Lange | 2022P | 5.8 | 44.7 | 21.3 | 34.4 | 15.6 | 19 |
| Railroad Comm | Suh | 2022P | 29.6 | 13.2 | 29.9 | 12.9 | 7 | 10 |
| Railroad Comm | Kleberg | 2022P | 28.3 | 11.8 | 30.1 | 10.5 | 5.6 | 8.2 |
| Railroad Comm | Martinez | 2022P | 18.5 | 42.3 | 18.7 | 42.1 | 63.5 | 62.8 |

25. In my report of January 19, 2022 I examined primary voting patterns related to SD10 and concluded that Black and Hispanic voters in Tarrant County, SD10 precincts are cohesive when examining a contested primary election between a Black and Hispanic candidate. Looking at the 2018 primary election between Veasey and Quintanilla the analysis concluded that both Black and Hispanic voters preferred Mr. Veasey as shown in Table 2 of my January 19, 2022 report:

**Table 2: Veasey vs. Quintanilla 2018 primary**
Ecological regression results - Tarrant precincts only (n=131)

|              | Veasey | Quintanilla |
|--------------|--------|-------------|
| Latino vote  | 56.39  | 43.61       |
| Black vote   | 99.45  | 0.55        |
| Anglo vote   | 74.47  | 25.53       |

Homogenous precincts – top 40 precincts that are 70% or more Latino
Average Veasey vote: 61.46

Homogenous precincts – top 21 precincts that are 50% or more Black
Average Veasey vote: 91.06

26. In his report, Dr. Alford acknowledges that various of plaintiffs' experts have examined primary elections, but he criticizes those assessments. For example, Dr. Alford criticizes Dr. Duchin's analysis of primary elections in her proposed version of SD 10 in which minority voters would constitute a majority of the electorate. He reports that Dr. Duchin's EI analysis shows that a majority of Black and Hispanic voters supported the same candidates in 9 of 13 analyzed primaries (69% of analyzed primaries). He opines that Black and Hispanic voters are not cohesive if they do not each support a candidate with 60% or more. This is flawed, particularly with respect to primary elections in which more than two candidates are running. In fact, in some of the primary elections in Dr. Duchin's proposed SD10, Black and Hispanic voters cast nearly the precise percentage of votes for a candidate, yet Dr. Alford counterintuitively contends they are not cohesive. For example, in the 2018 Comptroller Primary, Dr. Alford reports that Dr. Duchin found that 54.5% of Black voters and 57.7% of Hispanic voters cast their votes for Tim Mahoney. Yet Dr. Alford concludes that Black and Latino voters lacked political cohesion in this election. That makes no sense–they cast their ballots in nearly the *precise same way* in the election. Black and Hispanic voters have already demonstrated political cohesion by choosing the same primary election in which to vote. If a majority of each group then support the same candidate–in some cases by nearly the same vote share–how can they be said to lack cohesive views? To the extent primary elections are even relevant to

9

ascertaining political cohesion in the context of a coalition, then the only data points that should point toward a *lack* of cohesion are those in which Black and Latino voters are *clearly* polarized against one another. It makes no sense to consider a near uniform vote share for a candidate by Black and Latino voters as evidence that the two groups disagree politically.

27. New election data from the 2022 primary and runoff elections in Texas was obtained from the Texas Legislative Council and merged with race and ethnicity also from TLC similar to my analysis in previous reports. The 2022 primary data shows further evidence of Black and Hispanic primary cohesion with both groups demonstrating a preference for Beto O'Rourke for Governor (versus Joy Diaz and Michael Cooper), and Rochelle Garza for Attorney General (versus Joe Jaworski). Further, in a repeat contest for the 33rd Congressional District, both Black and Hispanic voters favored Marc Veasey in his primary against Quintanilla. The data below is limited to those precincts contained in Brooks Plaintiffs' proposed configuration of SD10 in Plan S2134:

|            |           | King's EI |       | EI RxC   |       |
|------------|-----------|-----------|-------|----------|-------|
| Candidate  | Election  | Hispanic  | Black | Hispanic | Black |
| Jaworski   | AG Runoff | 19.2      | 20.4  | 27.9     | 37.3  |
| Garza      | AG Runoff | 80.7      | 79.5  | 72.1     | 62.7  |
| Quintanilla| CD-33     | 29.1      | 9.8   | 27.1     | 5.4   |
| Veasey     | CD-33     | 70.8      | 90.1  | 72.9     | 94.6  |
| O'Rourke   | Governor  | 89.7      | 90.2  | 92.8     | 91.0  |
| Cooper     | Governor  | 0.2       | 0.4   | 2.6      | 6.5   |
| Diaz       | Governor  | 0.3       | 0.8   | 3.6      | 1.2   |
| Others     | Governor  | 5.6       | 3.8   | 1.0      | 1.3   |

28. I have also looked at local elections in Fort Worth for mayor and Arlington City Council that are nested within SD10 in proposed Plan S2134[11]. These elections are nonpartisan, and thus where racial polarization is present, it cannot plausibly be

---

[11] This local data was downloaded from the Tarrant County elections website.

10

explained by partisanship. In the Fort Worth mayoral elections reported below, candidate Peoples is Black and candidates Parker and Price are white. In the Arlington city council race, candidate Woolridge is Black and candidate Hibbs is white. In each election, Black and Hispanic voters are strongly cohesive in support of the Black nonpartisan candidate, while Anglo voters are strongly cohesive in support of the white nonpartisan candidate. This illustrates that it is race, not partisanship, that is driving the different voting choices between minority voters and Anglo voters in proposed SD10, and that Black and Hispanic voters are strongly cohesive in their political choices.

| Candidate | Election | King's EI | | | EI RxC | | |
|---|---|---|---|---|---|---|---|
| | | Anglo | Hispanic | Black | Anglo | Hispanic | Black |
| Parker | Ft. Worth Mayor 2021 General | 49.3 | 15.2 | 9.9 | 47.6 | 14.7 | 4.8 |
| Peoples | Ft. Worth Mayor 2021 General | 9.8 | 58.0 | 80.2 | 7.4 | 53.5 | 85.9 |
| Byrd | Ft. Worth Mayor 2021 General | 23.2 | 6.0 | 0.9 | 23.0 | 5.7 | 5.4 |
| Other | Ft. Worth Mayor 2021 General | 25 | 21.8 | 6.6 | 22.0 | 26.0 | 3.9 |
| Parker | Ft. Worth Mayor 2021 Runoff | 82.5 | 23.2 | 14.1 | 85.7 | 18.9 | 6.6 |
| Peoples | Ft. Worth Mayor 2021 Runoff | 17.5 | 76.9 | 86.4 | 14.3 | 81.1 | 93.4 |
| Price | Ft. Worth Mayor 2019 General | 84.8 | 39.0 | 11.1 | 82.3 | 36.2 | 18.5 |
| Peoples | Ft. Worth Mayor 2019 General | 13.7 | 57.8 | 87.0 | 16.4 | 61.4 | 79.4 |

11

| Candidate | Election | | | | | |
|---|---|---|---|---|---|---|
| Other | Ft. Worth Mayor 2019 General | 2.4 | 2.7 | 0.1 | 1.3 | 2.4 | 2.0 |
| Hibbs | Arlington Council 2020 General | 78.7 | 33.3 | 11.7 | 77.7 | 36.6 | 10.1 |
| Woolridge | Arlington Council 2020 General | 21.5 | 66.4 | 87.8 | 22.3 | 63.4 | 89.9 |

29. Finally, I have analyzed voting patterns in additional Democratic primary elections in 2016 and 2018, confined to voting precincts in SD10 proposed plan S2134. These results continue to demonstrate that Black and Hispanic voters are cohesive in their vote choice in primary elections.

|  |  | King's EI | | EI RxC | |
|---|---|---|---|---|---|
| Candidate | Election | Hispanic | Black | Hispanic | Black |
| Clinton | Pres. Primary 2016 | 74.5 | 91.9 | 69.2 | 93.1 |
| Sanders | Pres. Primary 2016 | 25.1 | 8.2 | 30.8 | 6.9 |
| Valdez | Gov. Primary 2018 Runoff | 82.4 | 79.7 | 79.3 | 61.1 |
| White | Gov. Primary 2018 Runoff | 17.6 | 20.5 | 20.7 | 38.9 |

30. In addition to SD10, I have also examined voting patterns in primary elections in House District 54 in Bell County. In recent primary elections in 2022, Black and Hispanic voters have demonstrated clear cohesion by voting in favor of the same Democratic primary candidates. Beyond this, looking at the same elections in 2016 and 2018 as I examined in SD10, Black and Hispanic voters in HD54 demonstrate political cohesiveness in Democratic primary contests, voting in favor of the same candidates.

12

|  |  | King's EI | | EI RxC | |
| --- | --- | --- | --- | --- | --- |
| Candidate | Election | Hispanic | Black | Hispanic | Black |
| Jaworski | AG Runoff | 0.9 | 0.8 | 23.8 | 11.6 |
| Garza | AG Runoff | 97 | 99.1 | 76.2 | 88.4 |
| O'Rourke | Governor | 97.8 | 99.8 | 92.9 | 94.5 |
| Cooper | Governor | 0.5 | 0.7 | 2.9 | 2.9 |
| Diaz | Governor | 1.5 | 0.5 | 3.3 | 1.6 |
| Others | Governor | 0.9 | 0.3 | 0.9 | 1.0 |

|  |  | King's EI | | EI RxC | |
| --- | --- | --- | --- | --- | --- |
| Candidate | Election | Hispanic | Black | Hispanic | Black |
| Clinton | Pres. Primary 2016 | 88.9 | 99.8 | 79.0 | 89.5 |
| Sanders | Pres. Primary 2016 | 10.4 | 0.2 | 21.0 | 10.5 |
| Valdez | Gov. Primary 2018 Runoff | 67.9 | 68.9 | 50.6 | 65.4 |
| White | Gov. Primary 2018 Runoff | 31.5 | 31.5 | 49.4 | 34.6 |

31. Finally, the same standard of "majority" support to determine a candidate of choice often used in two-candidate general or runoff elections should not apply to multi-candidate primary elections because the vote is often more fractured making it difficult for any one candidate to achieve a simple majority. Thus, in a multi-candidate primary, we are mostly concerned with which candidate received the most votes and was the top vote getter for each racial group, even if they did not win over 50%, they can still be determined to be the most preferred candidate. Even the Texas primary system recognizes candidates who receive below 50% as preferred, as the top two vote getters advance on to a runoff if no candidate receives a majority.

32. Next, primary elections typically have very low turnout and are not representative of the full electorate in the state of Texas. Dr. Alford agreed with this assessment during his testimony in court in January 2022. He stated "if you're starting from the broader set of voters in a November general election, the voters of the Democratic primary are not only – not a representative sample. They're not even representative. They're Democrats." Indeed, Dr. Alford concluded that "ultimately the general elections are informed about what will happen to the racial groups preferred candidates in the broader election setting" and later Dr. Alford agreed that voters in the general election were *less partisan* stating "but the general electorate is typically less partisan, less efficacious, less politically motivated." In his own testimony in January 2022, Dr. Alford agreed that primary elections are not representative of the ultimate general elections in November, that they have lower turnout and different types of voters, and that general elections are actually characterized by less partisan and less politically motivated voters. I made this argument in my January 19, 2022 report (paragraphs 4-5) and again in my May 20, 2022 report (paragraphs 31-32) but Dr. Alford never offered any reasoning or evidence why low turnout elections with non-representative pools of voters are more relevant than general elections.

33. An analysis of primary turnout rates in two key districts, Senate District 10 and House District 54 in Brooks plaintiffs proposed maps (S2134 and H2216), reveals that primary elections are not the critical elections to examine. For this analysis, I downloaded voter turnout data from Texas Legislative Council at the precinct level for Democratic and Republican primaries and for November general elections for each year from 2012 to 2020. This data was merged with TLC data for race and ethnicity to create turnout estimates within SD10 and HD54.

**Estimated Voter Turnout by Voting Age Population by Race, Senate District 10**

| Election | Year | Anglo | Hispanic | Black |
|---|---|---|---|---|
| Higher rate in General | 2020 | 261% | 189% | 221% |
| General | 2020 | 79.2 | 39.2 | 67.7 |
| Republican Primary | 2020 | 24.9 | 5.8 | 5.1 |
| Democratic Primary | 2020 | 5.5 | 14.9 | 25.6 |
| Share in Dem primary | 2020 | 18.1 | 72.0 | 83.4 |

| | | | | |
|---|---|---|---|---|
| Higher rate in General | 2018 | 288% | 193% | 289% |
| General | 2018 | 65.6 | 31.8 | 50.9 |
| Republican Primary | 2018 | 20.2 | 6.5 | 6 |
| Democratic Primary | 2018 | 2.6 | 10 | 11.6 |
| Share in Dem primary | 2018 | 11.4 | 60.6 | 65.9 |
| Higher rate in General | 2016 | 167% | 177% | 185% |
| General | 2016 | 72.1 | 37.5 | 58.8 |
| Republican Primary | 2016 | 40.2 | 5 | 7.7 |
| Democratic Primary | 2016 | 2.9 | 16.2 | 24 |
| Share in Dem primary | 2016 | 6.7 | 76.4 | 75.7 |
| Higher rate in General | 2014 | 204% | 108% | 198% |
| General | 2014 | 45.5 | 16.3 | 43.1 |
| Republican Primary | 2014 | 19.9 | 6 | 7.5 |
| Democratic Primary | 2014 | 2.4 | 9.1 | 14.3 |
| Share in Dem primary | 2014 | 10.8 | 60.3 | 65.6 |
| Higher rate in General | 2012 | 306% | 241% | 303% |
| General | 2012 | 73.2 | 43.3 | 81.5 |
| Republican Primary | 2012 | 21 | 7.4 | 9 |
| Democratic Primary | 2012 | 2.9 | 10.6 | 17.9 |
| Share in Dem primary | 2012 | 12.1 | 58.9 | 66.5 |

34. In Senate District 10, all racial groups, Black, Hispanic and Anglo have two or three times lower voter turnout in primary elections than general elections. For example, in

15

Tarrant County in 2020 838,968 votes were cast in the November general election compared to 158,046 in the March 2020 Democratic primary and 128,316 in the March 2020 Republican primary. These primary voters represent a very small slice of the ultimate group of voters which comes forward to select their district representatives in the November general. Combined, the 286,362 Democrats and Republicans who voted in the primary represent just 34% of the larger electorate which turned out in the November general election. Thus, we should not over-emphasize the importance of these elections.

35. We can also discern clear racial patterns of primary participation by understanding the percentage of Anglo, Black and Hispanic voters who participated in either the Republican or Democratic primary. When focusing on just those who vote in a primary, in every instance a clear majority of Black and Hispanic voters elect to vote in the Democratic primary, while a clear majority of Anglos elect to vote in the Republican primary. This information alone is evidence of the racial correlation to partisanship in Texas.

36. These same patterns are evident in House District 54 in Bell County where voter participation is significantly lower in primary elections as compared to general elections. Bell County overall tells a similar story to Tarrant where 128,035 total votes were cast in November 2020 however just 18,305 people voted in the Democratic primary in March 2020 and 22,924 in the Republican primary. Combined, less than one-third of the total voters in the general election participated in the primary. And looking at HD54, when Black and Latino voters do participate, a clear majority vote in the Democratic primary, as compared to Anglos where a clear majority vote in the Republican primary.

| **Election** | **Year** | **Anglo** | **Hispanic** | **Black** |
| --- | --- | --- | --- | --- |
| Higher rate in General | 2020 | 337% | 218% | 460% |
| General | 2020 | 74.1 | 39.9 | 47.4 |
| Republican Primary | 2020 | 15.8 | 7.5 | 4 |
| Democratic Primary | 2020 | 6.2 | 10.8 | 6.3 |
| Share in Dem primary | 2020 | 28.2 | 59.0 | 61.2 |
| Higher rate in General | 2018 | 297% | 270% | 405% |

| | | | | |
|---|---|---|---|---|
| General | 2018 | 60 | 33.7 | 23.5 |
| Republican Primary | 2018 | 18 | 4.7 | 2.6 |
| Democratic Primary | 2018 | 2.2 | 7.8 | 3.2 |
| Share in Dem primary | 2018 | 10.9 | 62.4 | 55.2 |
| Higher rate in General | 2016 | 210% | 226% | 342% |
| General | 2016 | 66 | 40.7 | 32.5 |
| Republican Primary | 2016 | 27.5 | 6.4 | 3.9 |
| Democratic Primary | 2016 | 3.9 | 11.6 | 5.6 |
| Share in Dem primary | 2016 | 12.4 | 64.4 | 58.9 |
| Higher rate in General | 2014 | 264% | 211% | 227% |
| General | 2014 | 35.7 | 21.9 | 10.9 |
| Republican Primary | 2014 | 11.4 | 3.3 | 1.5 |
| Democratic Primary | 2014 | 2.1 | 7.1 | 3.3 |
| Share in Dem primary | 2014 | 15.6 | 68.3 | 68.8 |
| Higher rate in General | 2012 | 352% | 333% | 912% |
| General | 2012 | 65.9 | 39.3 | 47.4 |
| Republican Primary | 2012 | 16.9 | 3.1 | 1.9 |
| Democratic Primary | 2012 | 1.8 | 8.7 | 3.3 |
| Share in Dem primary | 2012 | 9.6 | 73.7 | 63.5 |

37. To prove the argument that Black and Hispanic voters are not cohesive in primaries, Dr. Alford needs to demonstrate that the voters who were NOT cohesive in the primary (i.e. Hispanics who voted for Quintanilla instead of Veasey), abandoned the eventual

17

nominee and switched candidates, or skipped the general election altogether. In fact, neither of these outcomes held true. To the contrary, Hispanics who voted in the Democratic primary against Veasey also turned out to vote in November in favor of Veasey, and they were joined by nearly three times *more* voters who chose to vote in the November general for the first time–expressing their first and only preference for Congressman Veasey. Indeed, if one summed the number of Hispanic voters whose first choice was Quintanilla and the number whose first choice was Veasey, the latter greatly exceeds the former. Dr. Alford has not demonstrated anywhere that a lack of cohesion in the primary casts doubts on cohesion in the general.

38. Beyond the evidence of voter turnout and cohesiveness outlined above, we can also draw conclusions about the relevance of primary elections and the interconnectedness of partisanship and race in Texas by looking at contested Republican primaries since 2014. In that time, there have been 122 candidates who have run in a contested statewide Republican primary.. Of those 122 candidates, 107 outwardly present as Anglo (87.7%), 12 outwardly present as Hispanic (9.8%), 1 outwardly presents as African-American (0.8%), and 2 were undertinminable (1.6%). Out of the 34 candidates who went on to win the Republican nomination in a contested statewide primary, 31 are Anglo (91.2%) while 3 are Hispanic (8.8%%) and none are of some other race or ethnicity. Thus when Republican primary voters in Texas are choosing who they want to represent the party, they are overwhelmingly nominating Anglo candidates at a rate of over 90% in a state in which Anglos now comprise less than 40% of the population. These Republican primary voting patterns translate into the racial makeup of districted officeholders as well. Of the 85 Republicans in the Texas House of Representatives, only 5 (5.9%) are outwardly identifiable as non-Anglo; of the 18 Republicans in the Texas Senate, 0 (0%) are; and of the 10 Republicans on the State Board of Education, 0 (0%) are.

39. In addition to assessing the candidates, we can consider the voter participation rates in Republican primaries versus Democratic primaries in recent years in Texas. According to data obtained from TLC, 7.8% of voters in the 2020 Republican primary were of Spanish surname, while 26.1% of voters in the Democratic primary were of Spanish surname. When looking at all ballots cast by Spanish surname voters in the 2020 primary, 77.8% were in the Democratic primary compared to 22.2% in the Republican primary. In 2018 when Republican primary turnout was much higher than Democrats, a similarly large disparity was reported. Among all votes cast in the Republican primary in 2018 just 6.7% were Spanish surnames while 29.4% were Spanish surnames in the Democratic primary. When looking at all ballots cast by Spanish surname voters in the 2018 primary, 75.3% were in the Democratic primary and 24.7% in the Republican primary.

18

40. The very occasional success of non-Anglo Republicans in a General Election does not undercut the link between race and voting behavior. Social science literature has shown that even Anglos with racially biased views will support a non-Anglo candidate who adopts ideological stances that are viewed as inconsistent with minority preferences.[12] Minority candidates use "racial distancing" to appeal to conservative Anglo voters,[13] and conservative Anglo voters may actually prefer the occasional conservative minority candidate as a form of "moral credentialing" in order to avoid perceptions of racism.[14]

41. The logical conclusion is that partisanship and primary participation in Texas is inextricably linked to race and ethnicity, with the Republican candidates chosen overwhelmingly by Anglos, and nominating 90% or more Anglo candidates, and with Democratic candidates being chosen overwhelmingly by non-Anglo voters, who combined make up a clear majority of Democratic voters in Texas.

42. Thus, attempts to portray voting as *only* partisan and not racially completely ignores the realities of partisanship and race in Texas politics today. Indeed, extensive political science studies have been published on this topic and demonstrated that racial attitudes and racial identity are indeed driving forces in partisanship and candidate vote choice. In effect, Dr. Alford is attempting to "hide" the racial effect of vote choice behind partisanship, using methods and reasoning that are not supported by the social science scholarship on this very topic.

43. In preparing this report there were some data that was not yet produced, or readily available by Defendants, and as more data does become available, or new elections results are posted, I will provide additional data and analysis of population statistics and election results to supplement this report.

44. I declare under penalty of perjury that the foregoing is true to the best of my personal knowledge.

July 27, 2022

_Matt A. Barreto_

Dr. Matt A. Barreto

---

[12] Christopher F. Karpowitz, Tyson King-Meadows, J. Quin Monson, and Jeremy C. Pope, What Leads Racially Resentful Voters to Choose Black Candidates?, The Journal of Politics Volume 83, Number 1 January 2021; Jefferson, Hakeem and Tessler, Michael. 2021. "Why White Voters With Racist Views Often Still Support Black Republicans." FiveThirthyEight.Com.

[13] Stephens-Dougan, LaFleur. 2020. Race to the Bottom: How Racial Appeals Work in American Politics. University of Chicago Press.

[14] Bradley-Geist, Jill C., King, Eden B., Skorinko, Jeanine, Hebl, Michelle R., and McKenna, Casey. 2010. Moral Credentialing by Association: The Importance of Choice and Relationship Closeness. Personality and Social Psychology Bulletin, 36(11), 1564–1575.