**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS EL PASO DIVISION**

| | | |
|---|---|---|
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF REPRESENTATIVES, SERGIO MORA, BOBBIE GARZA-HERNANDEZ | § § § § § | |
| Plaintiffs | § § | Civil Action No. |
| | § | 3:21-cv-00259-DCG-JES-JVB |
| v. | § § | [Lead Case] |
| STATE OF TEXAS, GREG ABBOTT, GOVERNOR OF THE | § § | 3:21-cv-00988-DCG-JES-JVB |
| STATE OF TEXAS, in his official capacity, and JOHN SCOTT, | § § | [Consolidated Case] |
| SECRETARY OF STATE OF TEXAS, in his official capacity | § § | |
| Defendants | § | |

**REBUTTAL EXPERT REPORT OF J. MORGAN KOUSSER ON BEHALF OF MEXICAN AMERICAN LEGISLATIVE CAUCUS AND BROOKS PLAINTIFFS**

August 8, 2022

# Response to Trende Report

1. This is a response to Sean Trende's July 23, 2022 report.

2. Three principal deficiencies undermine Mr. Trende's conclusion that partisan intentions, and only partisan intentions, underlay all the decisions of those who drew redistricting maps in Texas in 2021. First, he abjures his scholarly responsibility as a social scientist to test hypotheses fairly against each other. His presentation of data is systematically biased in favor of his stated conclusion in ways large and small. Second, he neglects to lay out the causal reasoning behind his conclusion or to consider other interpretations that would be consistent with the evidence that he presents. Third, he ignores all but one of the factors in the well-established *Arlington Heights* framework for examining whether the framers of a policy were motivated by race.[1] While Mr. Trende devotes only two pages of his 209-page document to my report, I will consider most of his report, leaving discussions of racially polarized voting, as well as simulated and demonstration districting plans to other experts.

## I.    Bias

3. If Mr. Trende had wished to afford an equal opportunity to the hypothesis that an intent to discriminate against Black, Latino, and Asian-American people lay behind the decisions on where to draw lines, he would have included figures on the racial composition of areas moved in and out of districts by the redistricting authorities, not just their partisan proclivities. His treatment of CD 6 on pp. 17-20 of his report, is typical. In 23 short sentences, he mentions the names of parties or candidates 23 times, but never those of any racial groups. In his 33-page discussion of the congressional districts in the Dallas-Fort Worth Metroplex, race is not mentioned in the first 28 pages, and then it is dismissed on the basis of one short paragraph about one map and a confusing summary discussion of Prof. Duchin's simulations.

4. Suppose that, instead, every time that Mr. Trende discussed changes in each district, he had inserted the racial, rather than the partisan composition of areas moved into or out of districts, as Prof. Henry Flores did in his report for MALDEF in this case, or that he had included both racial and partisan figures. Surely the reader's impression of Mr. Trende's report would have been different. Ethnic minorities comprised 66% of the population of Dallas and Tarrant Counties in 2000[2], and race pervaded the politics of the region and particularly the redistricting strategies of the Republican Party, as the legal challenges to the 2011 and later rearrangements of districts made clear. Mr. Trende's strategy is to overwhelm readers with repetitions of facts about partisanship, evidently hoping that they will overlook the fact that the people shuffled from district to district had racial, as well as partisan identities.

5. Even in small details of his presentation, Mr. Trende focuses attention away from racial matters. In his multi-colored single-district maps, such as that for CD33, p. 32, for instance, Mr. Trende shades only by semi-deciles from 40% to 60% for Biden, instead of using ten decile shadings, as Prof. Duchin did, which would spotlight the concentrations of the more heavily

---

[1] *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-68 (1977).
[2] https://www.census.gov/library/stories/state-by-state/texas-population-change-between-census-decade.html.

Democratic minority areas and increase the contrast to the overwhelmingly white, much more pro-Trump communities. If he had wanted to conduct a fair test of a racial intention hypothesis, he would have presented two fully-shaded ten-decile maps for each district, one by race and one by party. If he had done so, the reader would likely have been struck by their resemblance to each other. That would have suggested, as I argued in my report, that race and party are so tightly intertwined in contemporary Texas that it distorts reality to separate them, and that those who performed the redistricting of the representative bodies patently did not do so.

6. Employing the magician's tactic of attempting to focus the attention of the audience elsewhere, Mr. Trende also packs his discussion with quaint descriptions of changes in each district's personality, as it were, as the districts meandered across the Texas landscape, often for decades. Thus, CD3, born in East Texas, "moved" to the Metroplex, and "followed" the growing population into Collin County.[3] CD 5 is "the traditional home of the modern Republican Party of Texas."[4] "The 12th Congressional District was the 'sister' district to the 5th" before population equality became the law.[5] "… the 24th District does not have a lengthy pedigree, moving from Dallas in the 1970s into rural areas in the 1990s, and into the suburbs in 2004.[6] The 25th district migrated from Houston to Austin to South Texas before being radically redrawn in 2021.[7] While noting that the 30th district, created in 1991, was declared a "racial gerrymander," Trende does not mention that it is an effective Black district or that its creator and sole occupant through 2022, Rep. Eddie Bernice Johnson, is Black.[8] It is apparently important to leave out some details.

7. CD2 "has traveled across Texas a bit," moving from rural East Texas to the Houston suburbs, adding deeply Republican areas in Williamson County in 2021. CD9 "was represented by the legendary Jack Brooks for decades, until his stunning defeat in the 1994 election," after which it redeployed from Beaumont and Port Jefferson to southern Houston, "where it has resided ever since." While finding these older details notable, Trende does not mention that since 2004, the district has been an effective Black district, or that the incumbent, Al Green, whom he does mention, is Black.[9] CD14 "has steadily migrated up the Gulf Coast" from Corpus Christi to the Houston suburbs.[10] In a departure from his silence about racial matters that is striking because it is so unusual, Trende does note that CD18 has elected African-American representatives since 1972. While pointing to the stark pro-Democratic trend in elections in CD22 since 2012, Trende does not mention the nearly 11 percentage-point decline in CD22's white citizen voting-age population over the decade or that the district's "anchor" in Fort Bend County placed it in perhaps the most racially diverse county in the country.[11] Nor does he remark on the fact that

---

[3] Trende Report, at 10.
[4] *Id.*, at 13.
[5] *Id.*, at 21.
[6] *Id.*, at 24.
[7] *Id.*, at 27.
[8] *Id.,* at 28.
[9] *Id.*, at 53.
[10] *Id.*, at 55.
[11] *Id.*, at 59-60.

CD29 has been a majority or near-majority Latino district since 1992, though he does take the time to describe its shape as resembling "a baby dragon still in its egg."[12]

8. While perhaps appropriate for entries in *The Almanac of American Politics*, the 2014 edition of which Mr. Trende co-authored,[13] such details, which usually begin, in Trende's account, with the 1981 redistricting, have nothing to do with determining the motives behind the 2021 redistricting. If this were serious history, rather than playful antiquarianism, it would have included discussions of the redistricting litigation that took place at least once a decade since the 1960s and that often focused on the racial motives behind the lines, especially the lawsuits that began in 2011, which had such strong parallels to the current case.[14]

9. On the contrary, Trende's district snapshots serve merely to distract from a systematic investigation of intent by discussing only partisanship *per se*, not anything that might underly partisan choices. While his descriptions of the often-dramatic shifts toward the Democratic Party after 2014 do set the stage for the wholesale reshaping of politically marginal districts by the 2021 redistricting, Trende makes no effort to account for these shifts, reinforcing by incessant repetition his apparent view that politics is disconnected from society or policy, floating above society in its own sphere. Partisanship is simply a given, an unmoved mover, and any consequences of actions taken for partisan reasons are so irrelevant that they need no mention. To Mr. Trende, partisanship seems to be something you're born with, and race perhaps a choice, rather than the other way around.

10. The University of Chicago economist Donald McCloskey had a slogan – "Put Your Thesis at Risk" – imprinted on a rubber stamp, and he would imprint the slogan on the first page of every paper distributed in the economic history workshop that he superintended. Since I talked at his workshop 40 years ago, this slogan has always seemed to me to capture the ethic of social scientific inquiry in a sentence. In contrast, Mr. Trende's rhetorical strategy is to overwhelm readers with a discussion of one side of the controversy, distract them with irrelevant details, and largely omit any discussion of the opposing thesis.

11. In the 9 of 105 his pages on the enacted congressional districts in which Mr. Trende does purport to test racial against partisan explanations for the shapes of districts, his tests are simplistic and biased.[15] Consider Figures 23-25, pp. 38-40.[16] First, these figures show only the four central, two-thirds minority,[17] counties of Dallas, Tarrant, Denton, and Collin, not the many much more predominantly white exurban and rural counties that represented the extensions that kept most of the urban congressional districts at least temporarily safe for the Republican Party. Mr. Trende minimizes the racial component of the redistricting by excluding from his summary maps the whitest segments of the districts. Second, even within the four-county region, Trende

---

[12] *Id.*, at 63.

[13] *Id.*, at 2.

[14] See my initial report at 21-30.

[15] The sections of Trende's report that treat Houston-area congressional districts, pp. 72-74, and San Antonio/Austin, pp. 97-99, closely parallel those on his DFW districts, and the same critique as for DFW applies.

[16] The reader will be spared parallel analyses that could be conducted of Mr. Trende's treatment of congressional and State House districts in other areas of the state, but the observations and conclusions would be similar.

[17] https://www.census.gov/library/stories/state-by-state/texas-population-change-between-census-decade.html.

minimizes the contrasts between areas by dividing them into only two categories – pro- and anti-Trump precincts, or plurality-white and plurality-nonwhite precincts. Third, in Tables 1-3, pp. 35-37, and similar tables throughout his report, Trende divides precincts into two categories (majority Biden/majority Trump), and then counts the number of precincts – not voters – in each category in each congressional district. Why collapse into just two categories, and why count precincts? Precincts don't vote; voters do. And again, by focusing on "Trump precincts" and "Biden precincts," instead of areas with different ethnic compositions, Trende seeks to reinforce his partisan thesis by refusing to consider evidence that might support a racial intent thesis.

12. The practice of making inferences about society and politics through maps is more than a century old. In 1913, Arthur C. Cole's classic *The Whig Party in the South* featured 10-shaded fold-out maps on sufficiently thin paper that they could be overlaid and compared to trace correlations between political outcomes and socioeconomic characteristics of each county. It is ironic that in the computer age, we are asked to accept mere divisions into two categories, and no direct comparisons with socioeconomic traits such as race. Again, more variegated maps would spotlight more heavily minority and more heavily white precincts than the simpler maps, allowing racial factors the chance to stand out as they should in a socioeconomically complex metropolitan area.

13. Figure 24 again distorts the data by choosing how to display it. Even though he had data on all racial groups, which could have been displayed by a multi-shaded precinct map, he chose to use dots representing 100 whites across the 4-county area. But obviously, other people (the "dotless," we may call them) reside in the counties, and the overall population density no doubt varies widely across four very socioeconomically-diverse counties. There could be precincts containing many dots where many more of the dotless actually lived, or areas containing few dots where there were few people of any race. The point is that Trende actually had much richer data, but he chose not to display them in a way that would capture the rich patterns of complex urban environments and allow more warranted inferences about the patterns of race and district boundaries.

14. Figure 25 segregates out plurality-minority precincts, which he colors white, from plurality-white precincts, which he tints blue if carried by Biden and red if carried by Trump, to form a sort of Rorschach ink-blot, from which Trende triumphantly concludes that "Democratic voters went into the three Democratic districts regardless of their race."[18] As in the two previous figures, one notes that Trende needlessly collapses data into two few categories. A plurality white precinct might be from 26 to 100% white. Trump's percentage might have been from 51 to 100% in precincts that Trump won. And large numbers of mostly-white rural and exurban voters play no role here, because they are excluded from the picture.

15. The reader may stare at the inkblot without being able to distinguish the precinct boundaries, and because of Trende's collapsing of the data, may be unsure about what conclusions to draw. But even as the data is presented, it is notable that two of the three majority-Democratic districts, 30 and 33, are largely white in Figure 25, which means that they are overwhelmingly majority-

---

[18] Trende Report, at 40.

4

ethnic minority districts. And the other majority-Democratic district, 32, has large swatches of white-shading, and is, in fact, majority-minority in population. Mr. Trende could have presented a summary table giving the racial percentages of the DFW districts, such as Table 1, below. If he had, the reader would have been more easily able to interpret the Figure 25 inkblot, including the portions of the districts excluded from the map.

16. The most obvious facts to be drawn from a comparison of Table 1 and Figure 25 are that the DFW congressional districts were meticulously segregated by race and that the partisan and ethnic complexions of the districts are closely correlated. In a metropolitan area that is two-thirds non-white, the redistricting authorities managed to carve out and/or extend 11 districts such that 8 of the 11 were at least 62% non-Hispanic white in citizen voting-age population, all of which voted at least 55.5% in favor of Donald J. Trump in 2020. Although Mr. Trende wants the reader to concentrate on the plurality-Non-Hispanic white precincts where Biden got a majority and which were included in districts 30, 32, and 33, those are minor details compared to the most glaring facts. And as pointed out above, a plurality-Non-Hispanic white precinct might be nearly 75% minority; some of the blue areas included in districts 30, 32, and 33 might well be majority-minority. Mr. Trende has missed the forest by concentrating on a line of short bushes. The reader should not be fooled.

5

**Table 1:  Non-Hispanic White and Trump 2020 Percentages in the Enacted Congressional Districts Wholly or Partly Contained in the Dallas-Ft. Worth Metroplex**

| District | % White CVAP[19] | % Trump |
|:---:|:---:|:---:|
| **Majority-Trump Districts** | | |
| 3 | 69.3 | 56.3 |
| 4 | 73.5 | 62.2 |
| 5 | 62.1 | 60.6 |
| 13 | 69.5 | 71.9 |
| 26 | 70 | 58.5 |
| 12 | 67.2 | 58.2 |
| 24 | 73.2 | 55.5 |
| 25 | 69 | 64.9 |
| **Majority-Biden Districts** | | |
| 30 | 25.6 | 21 |
| 32 | 46.9 | 32.7 |
| 33 | 24.7 | 24.4 |

17. Mr. Trende and I agree that Republican fortunes deteriorated over the decade before the 2021 redistricting in a series of districts that became marginal or even fell to Democratic candidates,[20] and that increasing Republican voting strength in those marginal districts was a major goal of the redistricting.[21]  But he does not ask why Democrats surged or what the major explanation for the surge – the growth of minority ethnic percentages in the suburbs of major metropolitan areas -- suggested to the redistricters about how to counter that surge.[22]  There were, of course, still white Democrats in Texas, especially in Austin, but also, less thickly, in cities and suburbs throughout the state.  But there were not sufficient concentrations of white Democrats in most marginal districts for the redistricters to be able to shore up Republican control by shifting white Democrats to other districts.  Racially polarized voting was sufficiently strong in Texas that Republican redistricters had no choice but to employ race as the most reliable index of partisan proclivities.

18. Figures 1-4 below demonstrate the extremely close connections between race and partisanship in the redistricting of the two largest bodies redistricted, Congress and the Texas House.  Figure 1 compares changes between the baseline districts (H 2100) and those in the plan enacted in 2021 (H 2316) in the percentage of non-Hispanic white CVAP and the percentage for Donald Trump in 2020.  It includes only those districts in which the Trump percentage in the baseline districts was between 60% and 40% -- the relatively marginal districts on which the

---

[19] CVAP stands for citizen voting-age population.
[20] E.g., Trende Report, at 9.
[21] E.g., id., at 17-20.
[22] See my report, at 30-35, 41-45, 60-62.  Trende does note the suburban trend, e.g., at 17, but neglects to connect it with ethnic change.

redistricters concentrated their changes.  The districts are ordered from left to right by the percentage for Trump in 2020 in the baseline plan.  Changes in the white CVAP percentage are in blue, while changes in the Trump percentage are in red.  The district numbers are on the horizontal line and the changes in both percentages, on the vertical line.  There are 58 districts in the marginal or near-marginal category.[23]

19. Unlike, say, Mr. Trende's Figure 25, Figures 1-4 lead clearly to an inexorable conclusion: redistricters could index race by party or party by race.  Either would lead to extremely similar district lines.  It was as simple as switching the variable names on the shading on the RedAppl computer or in any other redistricting software package, something that could be done by a consultant, a lawyer, a legislator, or a member of a legislative staff.  With very few exceptions, the blue and red lines go in the same direction and often have quite similar magnitudes.  Objective evidence of intent based on district lines does not allow one to distinguish race from party.

---

[23] I used a broad definition of "marginal" because several districts that had begun the decade of the 2010s with Republican percentages of over 55% ended up very much closer or even with Democratic majorities in 2021.  I assumed that the redistricters, who were no doubt keen observers of political trends, made that observation.  But restricting the category of marginal to 45-55% does not change the picture in the graphs appreciably.

**Figure 1: State House: Line Graph of Changes in White CVAP % and Trump % from Baseline to Enacted Plan (for districts between 40% and 60% Trump in Baseline)**



20. Figure 2 displays a scatterplot of the same data as in Figure 1, demonstrating again how close the connections were between redistricting changes in the two variables, the percentage of non-Hispanic white CVAP and the percentage for Trump. Obviously, those who planned the redistricting not only knew how strongly race and party were correlated in Texas, but that to achieve their end of shoring up the party that was almost entirely dependent on white votes,[24] they had to draw districts that discriminated against people of color.[25] Mr. Trende's

---

[24] See my report, at 39, where I calculate from a survey that 80% of Republican identifiers were non-Hispanic whites.

[25] An $R^2$ of .734 is very high for social science. The perhaps more familiar correlation coefficient is 0.857.

interpretation would have the reader focus on the few deviations from the regression line, not the dominant trend.

**Figure 2:  State House:  Scatterplot of Changes in White CVAP % and Trump % from Baseline to Enacted Plan (for districts between 40% and 60% Trump in Baseline)**



$R^2$ = .734

21. Figures 3 and 4 parallel Figures 1 and 2, using data for congressional districts from the Baseline (C2100) and the plan enacted in 2021 (C2193).  In only 2 of the 18 congressional districts did changes in the percentage of white adult males go in a different direction than changes in the % for Trump.  In two others, the extent of the changes in the two indices differed. In both the line and scatter plots, race and party are quite closely correlated in the vast majority of the changes in the districts.[26]  These 2-4 cases and the creation of a white-majority Democratic

---

[26] Again, an $R^2$ of .647 represents a correlation coefficient of 0.804, another very high correlation for social science data.

congressional district in Austin, which I pointed out in my initial report was the most strongly Democratic county in the state, account for what Mr. Trende calls the "multiple instances where district lines were drawn that have a partisan effect, but not a racial effect."[27]  Egregiously distorting the results presented in my initial report, Mr. Trende summarizes my conclusions by saying that I "assert[] the existence of *some* level of racial and political correlations in *some* places in Texas."[28]  On the contrary, I demonstrate the correlations with data and other evidence, not just "assert," and I treat trends throughout the state in the racially and political marginal districts that even Mr. Trende agrees were the focus of the redistricting.  For Mr. Trende, the exceptions swallow the rule, and small details about shifts of individual precincts are more important than overall patterns of political outcomes and their racial correlates.  This is evidently why he never gives summary tables or graphs, which would provide deeper insights into the overall strategies of the redistricting authorities.

---

[27] Trende Report, at 132.
[28] Trende Report, at 132, emphasis added.

**Figure 3:  Congress:  Line Graph of Changes in White CVAP % and Trump % from Baseline to Enacted Plan (districts from 40%-60% Trump in Baseline)**



**Figure 4:  Congress:  Scatterplot of Changes in White CVAP % and Trump % from Baseline to Enacted Plan (for districts between 40% and 60% Trump in Baseline)**



$R^2 = .647$

## II.    Causal Reasoning

22. Besides distorting the facts about the 2021 redistricting and the evidence presented by other experts, Mr. Trende never lays out the reasoning behind his approach.  It is possible that courts may rule that partisan motives for passing redistricting or other election laws legally excuse all other motives and responsibilities.[29]  This may explain why Mr. Trende seems to assert that partisan goals legally excuse states from following such "traditional districting principles" as compactness.  "If a state pursues a partisan gerrymander, (and its partisan goals outweigh

---

[29] That is perhaps one interpretation of the direction signaled by the Supreme Court in *Rucho v. Common Cause*, No. 18-422, 588 U.S. ___ (2019).

compactness goals), then its enacted districts may not be very compact,"[30] he states, without any legal or other citations. Such a decision would not only potentially throw out all constraints on gerrymandering, but it would also mean that the higher the correlation between race and party, the less likely it would be for courts to find racial discrimination, so that when the correlation between the two was perfect, there could be no finding of racial discrimination at all. During the Jim Crow era, the fact that white supremacist Democrats planned and succeeded in disfranchising some white Republicans and Populists, even though the primary targets of literacy tests, poll taxes, secret ballot laws, and similar provisions were Black,[31] would relieve them of any racial taint. Jim Crow would be expunged from the history books by definition, and racial gerrymandering would cease to exist legally.

23. But such a conclusion would be based on a legal, not a social scientific judgment. A social scientist examining this question would have to justify her decision to "control" for partisanship before leaving any remaining variance in a relationship between race and district configurations or other political outcomes to be explained solely by race. Mr. Trende makes no effort to explain or justify his decision to treat partisanship as primary and race as a sort of afterthought, as if redistricters had said "We only considered maximizing the gains of our party. What a surprise to discover that the district lines that we drew just happened to track patterns of racial geography!" The kinds of causal diagrams that political scientists sometimes employ might provide some clarification about Mr. Trende's implicit model of causation compared to other possible models.

24. Figure 5 represents an attempt to expose the assumptions that Mr. Trende left implicit. In this figure, a text box encloses a variable, a one-sided arrow indicates the direction of causation if one variable solely produces another, and a two-sided arrow indicates that two variables are jointly related to each other, with causal priority undetermined. Panel A seeks to capture the implicit model that Trende employs. By paying only very limited attention to variables other than partisanship, instead of examining possible relationships between race, partisanship, and district lines, Trende stacks the deck against finding racial intent by fiat, not reason. It is a simplistic, biased model, employed to reach a preordained conclusion. Panel B is Trende's caricature of my initial report, as if I thought that race was wholly determinative of partisanship, instead of just very highly correlated with it. There were some concentrations of white Democrats and possibly some of Latino Republicans[32] that were large enough to make placing them in or excluding them from certain districts worthwhile for partisan Republican redistricters.

---

[30] Trende Report at 115.

[31] Kousser, *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910* (New Haven, Connecticut: Yale University Press, 1974), 250, 257-59.

[32] The lopsided estimates of Latino voting for Democrats in general elections in specific congressional and Texas House districts contained in the Barreto and Ansolabehere reports suggests that it would have been difficult to put together enough reliably Republican Latinos to help shift more than a very few marginal districts to the Republicans. It is significant to note in this regard that Mr. Trende did not present any analysis of the transfer of Latino Republicans from district to district in his report, though he did highlight concentrations of white Democrats. This suggests that though he celebrated what he characterized as "the sharp shift of Hispanic voters toward the Republican Party" in the 2020 election (Trende Report, at 206), he did not believe that redistricters sought to manipulate Latino Republican areas to assist their party in winning more seats for the Party.

But as my initial report and this report repeatedly stress, these were minor exceptions to the general rule.

25. Panel C views race as causally prior to partisanship, but sees both as interacting to produce district lines.  In this model, one is born a member of a particular race, racial identity determines partisan identity in the overwhelming number of cases in contemporary Texas, and partisan Republican redistricters use racial identity as the best index of partisanship, though in a few instances, they are able to differentiate between clumps of non-conformists and more conventional partisans of each group.  Panel D strips race of causal priority, but sees both race and partisan factors as jointly related and having independent effects on the district lines.  Either Panels C or D would allow race and partisanship to be important factors in the redistricting lines, but describe them as too closely associated to allow one to be described as "predominant."  The concept of predominance makes no sense with such highly correlated variables.  Both models C and D are more open to falsification than those in Panels A and B, an important criterion in science,[33] both are more sophisticated, and both Panels C and D fit the data better than the two less flexible models.

---

[33] Classically, the falsificationist view is represented by Karl Popper's 1934 book *The Logic of Scientific Discovery*.

### Figure 5: Four Causal Diagrams Connecting Race, Partisanship, and Redistricting

#### A. Implicit Trende Model



#### B. Race Wholly Explains Partisanship

#### C. Race and Partisanship Interact



#### D. Race and Partisanship Interact and Jointly Cause District Lines



15

### III.   Ignoring other Evidence of Intent

26. There are other reasons than deference to the Supreme Court for why courts and expert witnesses considering questions of racial intent usually pay attention to the "*Arlington Heights* factors."  They provide a good guide to analyzing evidence on the question of intent that judges and social scientists have always used and continue to use.[34]  Unlike Mr. Trende's biased, simplistic, deterministic approach, they allow for a fairer and more comprehensive evaluation of a range of evidence.  Without explanation, Mr. Trende ignores the vast majority of the *Arlington Heights* factors, focusing entirely on small changes in individual district lines.  It is worthwhile here to present a brief summary of what he excludes and to point out the relevance of the excluded evidence to the issue of whether or not the 2021 Texas redistricting was motivated by a racial purpose.

27. Racial discrimination has pervaded Texas history from slavery to the present.  Partisans in Texas were racially polarized during Reconstruction, white and Democratic supremacy were congruent with other during the Post-Reconstruction and Jim Crow periods and, after a reshuffling of the partisan policy positions with the passage of Civil Rights and Voting Rights Acts in the 1960s led by a Texan, Lyndon Baines Johnson, racial/partisan polarization reemerged.  The classic white primary, multimember district, and poll tax cases concerned the Lone Star State.  From 1957 through 2020, nearly a quarter of the nation's successful minority voting rights cases, Section 5 objections and more information requests, and settlements of such cases originated in Texas – 67% more than in any other state.  Every statewide redistricting in Texas since the 1960s has been contested in court, often successfully, and almost always involving racial motives.  In 2011, discovery in a redistricting case exposed in words the Republican strategy of extracting  racially minority areas in the big cities and joining them with the non-Hispanic white suburbs and countryside that maps made so apparent.[35]  To discriminate by party, the redistricters had to discriminate by race, and the effects of the district lines were to make it more difficult than it would have been with racially fair districts for minorities to elect candidates of their choice.

28. Mr. Trende acts as if this history did not exist.  If he had put the 2021 redistricting into that context, his casual dismissal of racial intentions would have appeared even more egregious.

29. He does note the decline in Republican fortunes in numerous districts after 2014, though he presents no summary figures, just scattered discussions of individual districts.  But because he does not inquire <u>why</u> the decline occurred, he is able to ignore the decadal growth of ethnic

---

[34] For a fuller treatment of the *Arlington Heights* factors, see Kousser, *Colorblind Injustice:  Minority Voting Rights and the Undoing of the Second Reconstruction* (Chapel Hill, North Carolina:  University of North Carolina Press, 1999), at 347-58.  In a dissertation completed 6 years and published 3 years before *Arlington Heights*, which concentrates on race and politics, I examined all of the factors (the historical background, the sequence of events, departures from the normal sequence, legislative and administrative history, impact, and statements by decisionmakers) as *Arlington Heights* advises should be looked to.  Kousser, *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880-1910* (New Haven, Connecticut:  Yale Univ. Press, 1974).

[35] See my initial report, at 11-30.

minority percentages in those same districts,[36] a correlational pattern that common sense suggests would have led 2021 redistricters to realize that their principal goal must be to "whiten" the marginally-non-Hispanic white, marginally-Republican districts.  As many graphs in my reports for this case show, that is exactly what they did.  And he completely ignores the statewide and areal demographic revolutions within Texas.  In 1980, Texas was about two-thirds non-Hispanic white; by 2020, Latinos had almost surpassed the state's non-Hispanic white percentage.  Texas had become majority-minority by 2010.  Does Mr. Trende imagine that redistricters ignored demographic facts that seemed to be on the tip of every activist's, Democratic legislator's, and metropolitan editorial board's tongue in 2021?  It is only by ignoring them that he can come to the conclusions of his report.

30. Why wouldn't the suburbanizing minorities take on the partisan proclivities of the areas they moved to, instead of changing the political status quo in the burbs?  Republican culture wars and explicitly ethnic appeals, such as Lt. Gov. Dan Patrick's 2021 version of the "Great Replacement Theory" that Democrats were purposely allowing undocumented persons to immigrate in order to increase a Democratic voting bloc and "take over our country without firing a shot" probably did not attract first- or second-generation minority votes, wherever those people lived.  There were stark differences between Republican and Democratic voters on a whole range of racially-freighted issues:  police brutality, the extent of discrimination against Blacks and whites, whether immigration was good or bad for the country, an English-only amendment, Confederate monuments, ethnic studies courses, and the treatment of race and immigration in social studies courses, to name a few.[37]  Only by ignoring all of this and much more possible evidence can Mr. Trende avoid the conclusion that racial issues and identities are fundamental to voters' and leaders' partisan identities – not some incidental statistical artifact.

31. Mr. Trende completely overlooks the institutional process of redistricting, as if some secretive *deus ex machina* had imposed all the lines by *ukase* – something perhaps not far from the truth.  In determining the intentions of the redistricters, however, courts and scholars have usually placed considerable weight on whether minority legislators and activists and the general public were allowed to take meaningful part in the process,[38] on what legal and ethical theories the redistricters adduced to justify their work,[39] on how much attention they paid to "traditional districting principles,"[40] and whether the rhetorical defenses that the public spokespersons for the redistricters were credible or suggestive of other motives.[41]  They have sometimes catalogued

---

[36] See my initial report, at 30-35.  The minority shift to the suburbs has been widely noted.  From 1990 to 2020, the percentage of Asian Americans living in the suburbs grew from 53.4% to 63.1%, of Latinos, from 49.5% to 61.4%, and of Blacks from 36.6% to 54.3%.  Rice University political scientist Robert M. Stein specifically concluded that the shift away from Republicans in Texas after 2010 "was largely driven by the changing demography of the state."  Thomas B. Edsall, "Red and Blue America Will Never Be the Same," *New York Times*, July 27, 2022, https://www.nytimes.com/2022/07/27/opinion/trump-red-blue-america.html?searchResultPosition=1.
[37] See my initial report, at 40-43.
[38] E.g., *Perez v. Abbott*, 253 F. Supp. 3d 864, 961-62 (W.D. Tex. 2017) (three-judge court).
[39] E.g., *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 435 (2006) (rejecting the State's theory that the creation of a new ineffective Latino majority district could offset the destruction of an existing effective district).
[40] E.g., *Shaw v. Reno*, 509 U.S. 630, 642 (1993).
[41] E.g., *Bush v. Vera*, 517 U.S. 952, 966-67 (1996) (rejecting State's defense against a racial gerrymandering claim on the grounds that it had not gathered evidence of communities of interest before drawing CD30).

proposed alternative plans and rationales as a way to throw light on the goals of the major players.[42]  But Mr. Trende fails to consider any of the facts about these issues in the 2021 Texas redistricting:

- the secret hiring of a partisan redistricting expert whose Wisconsin redistricting plans in 2011 had been found violative of Section 2 of the Voting Rights Act, and the contention by the House Redistricting Committee Chair that he knew nothing about the Wisconsin racial discrimination case before hiring the expert;
- the secretive plan-drawing that excluded minorities and shunted all the considerations of race by the planners offstage;
- the refusal by the redistricting leaders in the Legislature to make available at public hearings the consultants or lawyers who had advised on the plans;
- the truncated, rushed hearings that effectively prevented the public and legislators from even knowing what the plans were until the last minute and that therefore stifled public debate;
- the refusal to articulate legal rationales for the districts publicly or to answer the myriad contested legal questions about redistricting standards involved in distributing power in the nation's second largest state for a decade;
- the public refusal of the redistricters to comply with the "traditional redistricting principle" of compactness;
- the ludicrous claim to have ignored racial considerations made by legislators who, during debates, could cite the racial compositions of districts seemingly from memory;
- and rejected amendments as suggestive of the framers' intentions.[43]

32. Mr. Trende also completely ignores the debates in hearings and on the floor of the legislative houses in this redistricting round.  If he had paid any attention to them, he might have had to explain why, if the sponsors of the redistricting plans were motivated almost entirely by partisanship, they barely mentioned that motive in the hearings and floor debates.  As I pointed out through quotations in my original report, Sen. Huffman and Rep. Hunter read almost exactly the same statements during the debates laying out their "priorities and objectives."  They mentioned 10 priorities.  "Addressing partisan considerations" ranked number 8 on the list.  And the first time that Sen. Huffman announced her "goals and priorities," she did not even mention partisan goals at all.[44]  If the legislators were as single-mindedly focused on increasing the Republicans' power as Mr. Trende claims, and if they believed partisan motives were legally unassailable, why were they so reticent about expressing that intention?  If Mr. Trende had even touched lightly on the *Arlington Heights* factors, he would have had to face the contradiction

---

[42] E.g., *Shaw v. Hunt*, 517 U.S. 899, 937 (1996) (Stevens, J., dissenting) (contending that Democrats' rejection of Republican plans for two majority-minority districts casts doubt on the view that Democrats' plans were motivated by race).

[43] See my initial report at 46-60.

[44] See my initial report at 54.

between his statistical analysis and the sponsors' down-playing of the motive that he attributed to them.

33. It is disingenuous for Mr. Trende to claim that "a thorough analysis of the statewide maps" shows that "they effectively maximize Republican performance, rather than racial performance," for he never produces such a statewide analysis, only a "more granular analysis" of individual districts, in which he overwhelmingly concentrates on showing partisan changes without comparing them to racial changes at all.[45]  Nowhere does he directly compare changes in racial and partisan percentages from the benchmark to the enacted plans for the whole state, as in Figures 10, 17, and 34-36 of my initial report or, for the most ethnically and politically marginal districts, as in Figures 1-4 of this one.  Never does he investigate whether the deliberate underpopulation of majority-non-Hispanic white and overpopulation of Latino-majority House districts might support the case for a racial motive for the redistricting.

34. From *White v. Regester*[46] on, judges have put great emphasis in "intent" cases on "impact," and Justice Powell did in *Arlington Heights*, as well.  Not Mr. Trende, who does not mention it. Why, in a report focusing on how important race was, compared to party, in motivating the redistricters, would he ignore the impact of the districting schemes on racial groups?  Surely a social scientist putting his thesis at risk would not do so.  The obvious reason is that it would put his conclusion at risk of being falsified.[47]

## IV.  Conclusion

35. Mr. Trende's research design, which assumed, without argued justification, that partisan motives should be considered first, with racial motives relegated to explaining anything left over after partisanship had had its turn, predetermined his conclusion.  That violated a key ethical command of social science.  His strategy of presentation, again without argued justification, buried the reader in pages and pages of statistics about partisanship while hiding, much less equally treating, facts about the racial characteristics of shifts from district to district accomplished by the 2021 redistricting.  It also ladled in historical trivia and cute names for district shapes, apparently to distract the reader from the central topic of the intentions of the redistricters.

36. Mr. Trende's summary maps and tables were confusing and incomplete, minimizing the racial and political contrasts by collapsing the data into too few categories and failing to include the almost entirely white rural and exurban sections of districts that began in cities.   In his multi-district inkblots, he attempted to direct the reader's attention away from the segregated pattern of majority-minority districts, on the one hand, and overwhelmingly non-Hispanic white districts, on the other, to the relatively narrow bands of probably racially mixed areas between them. What he never did was to compare and contrast multi-district summaries of the racial and

---

[45] Trende Report, at 133.

[46] 412 U.S. 755, 769 (1973).

[47] See my initial report, at 101-05.

partisan changes in the racially and politically marginal districts that he admitted were the chief focus of the redistricting agents.  If he had, he would have found some variation of what I presented in numerous graphs in my initial report and this one.

37. His design excluded the qualitative and quantitative information standard in investigations of the intent of political/legal changes in voting rights cases and in scholarly studies of such changes.  Including this information in this instance would have undermined his conclusion, so he ignored it.

38. Every facet of Mr. Trende's paper was designed to reach a preset conclusion.  I offer to the court my effort to demonstrate that fact and hope that it will consider it in deciding how much weight to give to Mr. Trende's report.

*Acknowledgment*
*I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.*
*My compensation is not contingent on my opinions in, nor the outcome of, this case.*
*Date: August 8, 2022*

J. Morgan Kousser