# Exhibit D

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS EL PASO DIVISION**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of the State of Texas, *et al.*,<br><br>*Defendants*. | CIVIL ACTION NO. 3:21-cv-00259-DCG-JES-JVB [Consolidated Action: Lead Case] |

# EXPERT REPORT OF MONICA MUÑOZ MARTINEZ ON BEHALF OF FAIR MAPS TEXAS PLAINTIFFS

# TABLE OF CONTENTS


I. Summary of Report ..... 1

II. Senate Factor 1: There Is a Pervasive History of Official Voting Related Discrimination in Texas that Disenfranchised Non-White Voters in Texas and Continues to Do So Today ..... 3

A. Anglo Colonization Inspired by White Supremacy Set the Foundation for Restricting the Franchise ..... 3

B. Non-White Voting Discrimination (1836-1861) ..... 5

C. Non-White Voting Discrimination (1861-1876) ..... 9

D. Non-White Voting Discrimination During the "Jim Crow" Era (1876-1965) ..... 12

1. Disenfranchisement of African-American Voters ..... 12

2. Challenges to the White Primary Thwarted ..... 17

3. Disenfranchisement of Voters of Mexican Descent ..... 22

4. Disenfranchisement of AAPI Voters ..... 28

5. The Overall Effect of the Jim Crow Era on Non-White Voters ..... 32

E. Non-White Voting Discrimination Post-Voting Rights Act of 1965 ..... 38

F. Non-White Voting Discrimination Post Shelby County v. Holder (2013) ..... 41

1. Intimidation and Disenfranchisement Continues After *Shelby County* v. *Holder*, Chilling Voter Participation ..... 41

2. Racial Gerrymandering and Voter Suppression Laws ..... 45

III. Senate Factor 5: Discrimination Against Non-White Voters In Areas Outside of Voting Has Had a Profound Effect on Them, and Hinders Their Ability to Participate Effectively in the Political Process ..... 51

A. Anti-Immigrant Rhetoric Has a Chilling Effect on Political Participation ..... 52

B. Hate Crimes Targeting Asian American and Pacific Islanders Have Had a Chilling Effect on Voting ..... 56

C. Hate Crimes Targeting African Americans Have Had a Chilling Effect on Political Participation ..... 59

D. Discrimination in Education Has Depressed Non-White Voter's Political Participation .......... 61

E. Income Inequality Restricts African American, Latino, and AAPI Voters' Ability to Participate in the Political Process and As a Result Politicians Are Less Responsive to Their Needs .......... 66

F. Disparities in Health Outcomes Lead to a Depression in Non-White Voter Participation .......... 68

G. Geographical Isolation and Crumbling Infrastructure Has Also Led to Depression in Non-White Voter Participation .......... 71

IV. Senate Factor 6: The Use of Racial Appeals in Political Campaigns .......... 73

V. Senate Factor 7: The Extent to Which Members of the Minority Group Have Been Elected to Public Offices in the Jurisdiction .......... 82

VI. Conclusion .......... 87

Bibliography .......... 88

Curriculum Vitae .......... 113

My name is Dr. Monica Muñoz Martinez and I am an associate professor of History at the University of Texas at Austin. I received my PhD and MA from Yale University and my AB from Brown University. I offer courses in U.S. history, Texas history, Latinx studies, borderlands history, women and gender studies, public history, civil rights history and race relations. My research has been funded by the MacArthur Foundation, the Mellon Foundation, the Andrew Carnegie Foundation, the Institute for Citizens and Scholars, the Recovering U.S. Hispanic Literature Heritage Project, the Brown University Office of the Vice President for Research, and the Texas State Historical Association. In 2017, I was selected for the prestigious Andrew Carnegie Fellows Program. In 2021 I was also named a MacArthur Foundation Fellow and I have served as a Distinguished Lecturer for the Organization of American Historians.

My first book, *The Injustice Never Leaves You: Anti-Mexican Violence in Texas* (Harvard University Press Sept. 2018), received six book awards from flagship historical associations including the American Historical Association, the Organization of American Historians, the Western History Association, and the National Association for Chicana & Chicano Studies Tejas Foco.

I am also a founding member of the educational non-profit, Refusing to Forget, which commemorates the history of racial violence in Texas and the contributions of civil rights pioneers. Refusing to Forget helped developed an award-winning exhibit with the Bullock Texas State History Museum that marked the first time a cultural institution acknowledged state responsibility for a period of racial terror in the twentieth century. The non-profit has received awards from the Organization of American Historians and American Historical Association and funding from Humanities Texas and the National Endowment for the Humanities. I have collaborated with the Texas Historical Commission to secure four state historical markers along the U.S.-Mexico border. I have also worked as a historical consultant for the Smithsonian's National Museum of American History and numerous documentaries.

I was retained by Fair Maps Texas Action Committee, OCA-Greater Houston, the North Texas Chapter of the Asian Pacific Islander American Public Affairs Association, Emgage, Khanay Turner, Angela Rainey, Austin Ruiz, Aya Eneli, Sofia Sheikh, Jennifer Cazares, Niloufar Hafizi, Lakshmi Ramakrishnan, Amatulla Contractor, Deborah Chen, Arthur Resa, and Anand Krishnaswamy (collectively, the "Fair Maps Plaintiffs") in this case to examine the history of voting discrimination in Texas against African-American voters, Asian-American and Pacific Islander (AAPI) voters, and Latino voters. I was also retained to examine how other types of discrimination against racial and ethnic voters depress their political participation. I am being compensated at a rate of $250 per hour for my work on this case. My compensation is not contingent on the opinions I express in this report or in any subsequent testimony, or on the outcome of this litigation. I understand that discovery is ongoing, and I reserve the right to supplement or amend this report.

## I. Summary of Report

As a historian of Texas history and race relations in the state, I consulted published histories and historical records in preparing this report. I reviewed histories written by professional historians that were peer-reviewed and published by accredited academic presses. I also analyzed relevant primary source documentation that includes state and federal legislative records, legal records, newspapers, and testimonies. I also reviewed the complaint in this case. From my research and analysis it is my opinion that:

- There is widespread evidence that from 1836 until today there is an unbroken history of Texas officials making clear and intentional efforts to discriminate against racial and ethnic minorities in the state, including in redistricting. Since delegates to the 1836 Convention hastily drafted the Constitution of the Republic of Texas, Texas officials have actively worked to restrict the franchise. The Texas Constitutions of 1836, 1845, 1861, 1866, 1869, and 1876 all included sections that restrict the franchise of non-white voters. In the 146 years that followed the Texas Convention of 1876, Texas legislators adopted amendments and statutes to disenfranchise racial and ethnic voters.

- History shows that when voting was made newly accessible to racial and ethnic groups that had previously been denied the franchise, there were coordinated efforts by Texas officials to prevent these groups from full participation. Efforts to restrict access to the ballot followed the signing of the Treaty of Guadalupe Hidalgo in 1848, the passage of the 14th and 15th Amendments, the passage of the Voting Rights Act of 1965, and the 1970, the 1975, the 1982, and the 2006 Amendments to the Voting Rights Act. This continues to this day with the introduction of new laws that were introduced after *Shelby County v. Holder*, such as limiting the number of polling locations, moving polling locations, and imposing ID requirements.

- African-American voters, Latino voters, and AAPI voters have all been disparately disenfranchised or disparately impacted by coordinated efforts to stem the tide of racial and ethnic voting power in Texas.

- There is an insidious pattern of white backlash to increases in racial and ethnic voting power, specifically following landmark U.S. Supreme Court decisions like *Nixon v. Herndon* (1927), *Nixon v. Condon* (1932), *Smith v. Allwright* (1944), and *Terry v. Adams* (1953), which led to the elimination of certain tenets of discrimination in voting. In response to these rulings, political subdivisions and political organizations adopted policies and procedures to circumvent those rulings and disenfranchised racial and ethnic voters by other means.

- This history of official voting-related discrimination is a crucial piece of a much larger history of discrimination in Texas that worked to create a society that was unequal and that targeted racial and ethnic minorities. Other forms of discrimination such as discrimination via anti-immigrant sentiments, income inequality, geographical isolation, and discrimination in education and health outcomes, have led to depression in non-white political participation, and in concert with voting-related discrimination, these forms of discrimination disadvantage and depress political participation by racial and ethnic minority voters. This depression in political participation came through explicit laws and policies that prevent racial and ethnic minorities from serving as elected officials, and implicitly through the collective impact of discrimination in many different areas. The impact of discrimination is still felt today, as racial and ethnic voters are many times unable to elect their candidates of choice, candidates who will make decisions that shape their daily lives and who will be responsive to the needs of their communities.

## II. Senate Factor 1[1]: There Is a Pervasive History of Official Voting Related Discrimination in Texas that Disenfranchised Non-White Voters in Texas and Continues to Do So Today

### *A. Anglo Colonization Inspired by White Supremacy Set the Foundation for Restricting the Franchise*

The history of official racial discrimination and disenfranchisement takes shape around the contested creation of Texas and efforts for economic and political control by new Anglo settlers.[2] In 1821, Mexico gained its independence from Spain. But within 40 years of independence, a tangled series of conflicts—the Texas Revolution (1836) and the U.S.–Mexico War (1846–1848)—resulted in the United States acquiring half of Mexico's territory. As a result, the political border of the region now known as Texas was continually shifting.[3]

In this era, white men popularly referred to as the "founding fathers" of Texas showed racial animus, expressed white supremacist views, maintained a commitment to the institution of slavery and to subordinating people they believed were racially inferior to white Texans.[4] Native American nations, especially the Comanche, continued to contest outside governance— Spanish, Mexican, Texan, and ultimately American—in the region. Anglo migration into the region meant that settlers had to interact with Native Americans and Mexicans, two groups that struggled throughout the nineteenth century to maintain their place in the region as the colonial powers shifted.[5]

These constructed and changing boundaries required constant surveillance and enforcement. In 1823, Stephen F. Austin, an early Anglo settler who lived in the region soon to be Texas, organized a small group of men, called rangers, to protect settlers and their property. After Texas claimed independence from Mexico in 1836, these men worked to ensure that Anglo settlers succeeded in the new Republic of Texas.[6] That success, however, came at the expense of groups identified as enemies. The Texas Rangers were described as a "fighting force" created by Anglo

---

[1] S. Rep. No. 97-417, 97th Cong., 2d Sess. (1982), pages 28-29.

[2] This section draws from the introduction of my book *The Injustice Never Leaves You: Anti-Mexican Violence in Texas* (2018) and was also shared in a congressional testimony in 2019. *See* Monica Muñoz Martinez, testimony, U.S. House Committee on the Judiciary Subcommittee on Immigration and Citizenship, *Oversight of the Trump Administration Border Policies and the Relationship Between Anti-Immigrant Rhetoric and Domestic Terrorism* (Sep. 6, 2019), https://www.congress.gov/116/meeting/house/109889/witnesses/HHRG-116-JU01-Wstate-MunozMartinezM-20190906.pdf.

[3] Raul Ramos, Beyond the Alamo: Forging Mexican Ethnicity in San Antonio, 1821-1861 (University of North Carolina Press 2010); Omar Valerio-Jiménez, River of Hope: Forging Identity and Nation in the Rio Grande Borderlands(Duke University Press, 2012).

[4] Andrew J. Torget, Seeds of Empire: Cotton, Slavery, and the Transformation of the Texas Borderlands, 1800-1850 (Chapel Hill: University of North Carolina Press, 2015); Randolph B. Campbell, An Empire for Slavery: The Peculiar Institution in Texas, 1821–1865 (Baton Rouge: Louisiana State University Press, 1989); Daina Ramey Berry, The Price for Their Pound of Flesh : the Value of the Enslaved, from Womb to Grave, in the Building of a Nation (Beacon Press, 2017); Gregg Cantrell, Stephen F. Austin Empresario of Texas (Texas State Historical Association, 2016).

[5] 4Pekka Hämäläinen, *The Comanche Empire* (New Haven: Yale University Press, 2008); Juliana Barr, *Pease Came in the Form of a Woman: Indians and Spaniards in the Texas Borderlands* (Chapel Hill: University of North Carolina Press, 2007); Gary Clayton Anderson, *The Conquest of Texas: Ethnic Cleansing in the Promised Land, 1820-1875* (University of Oklahoma Press, 2005).

[6] Raul Ramos, *Beyond the Alamo: Forging Mexican Ethnicity in San Antonio, 1821-1861* (University of North Carolina Press, 2010).

settlers to fight in the ongoing war for racial supremacy, battling Mexican landowners and indigenous nations, including the Tonkawa, Lipan Apache, Waco, Karankawa, Kiowa, and Comanche. The Texas Rangers targeted both the "Indian warrior" and the Mexican "vaquero" or "cowboy" as enemies of white supremacy.[7]

Of the Indigenous peoples fighting for their own survival, Texas' Second President Mirabeau B. Lamar, described them as "the sanguinary savage" and called on the Texas Congress to support "the prosecution of an exterminating war upon their warriors; which will admit of no compromise and have no termination except in their total extinction or total expulsion."[8] Historians have reflected on the violent and deadly consequences of Lamar's order. Some called it genocidal violence enacted by the Texas Rangers. Others described it as "ethnic cleansing." Reflecting on the aftermath, historian Gary Clayton Anderson wrote, "[t]he legacy of Lamar's war would carry Texas into new decades of violence; the lessons learned by the rangers, the glories of their 'victories,' the fireside stories told of them, and the trophies—human scalps especially—that they brought back only solidified the Texas creed, further entrenching their hatred for people of color."[9]

Stephen F. Austin has also been recognized by historians as doing more than any other individual to establish slavery in Mexican Texas.[10] Austin several times said that he morally objected to the institution of slavery, but he considered slavery an economic necessity. Historian Andrew J. Torget wrote, "[k]nowing that slavery was, for his potential colonists, inseparable from the cotton economy, Austin wrote the institution into every aspect of his colonial enterprise." Austin was also clear on his thoughts of "free Negroes," whom he equated to Satan entering Eden. He wrote, "Satan entered the sacred garden in the shape of a serpent—if he is allowed to enter Texas in the shape of negroes it will share the fate of Eden."[11]

Austin's Rangers also helped preserve a slave-based agriculture by violently policing enslaved African men and women. During the state's long history of chattel slavery, the Rangers tracked and punished enslaved people trying to cross the Rio Grande to freedom in Mexico. Rangers frequently broke the neutrality laws between Texas and Mexico, and later the U.S. and Mexico, that forbade their trips across the border.[12] They also terrorized ethnic Mexicans accused

---

[7] Pekka Hämäläinen, *The Comanche Empire* (New Haven: Yale University Press, 2008); Juliana Barr, Peace Came in the Form of a Woman: Indians and Spaniards in the Texas Borderlands (Chapel Hill: University of North Carolina Press, 2007); Gary Clayton Anderson, *The Conquest of Texas: Ethnic Cleansing in the Promised Land, 1820-1875* (University of Oklahoma Press, 2005); Maria Josefina Saldaña, *Indian Given: Racial Geographies across Mexico and the United States* (Durham, NC: Duke University Press, 2016) 7; Walter Prescott Webb, *The Texas Rangers: A Century of Frontier Defense* (Austin: University of Texas Press, 1995),); Karl Jacoby, *Shadows at Dawn: An Apache Massacre and the Violence of History* (New York: Penguin, 2008); Ned Blackhawk, *Violence over the Land: Indians and Empires in the Early American West* (Cambridge, MA: Harvard University Press, 2008).

[8] Mirabeau B. Lamar, Speech to the Texas Congress (Dec. 20, 1838), https://www.tsl.texas.gov/exhibits/indian/war/lamar-speech-1838.html.

[9] Gary Clayton Anderson, The Conquest of Texas: Ethnic Cleansing in the Promised Land, 1820-1875 (University of Oklahoma Press, 2005) 194.

[10] Randolph Campbell, An Empire for Slavery, The Peculiar Institution in Texas, 1821–1865 (1989) 32.

[11] Andrew J. Torget, *Seeds of Empire: Cotton, Slavery, and the Transformation of the Texas Borderlands, 1800-1850* (Chapel Hill: University of North Carolina Press, 2015), 154; Greg Cantrell, Stephen F. Austin: Empresario of Texas (Austin: Texas State Historical Association, 2016). *See* documents digitized by the Texas Slavery Project http://www.texasslaveryproject.org/ (Stephen F. Austin to Ellis, et. al., June 16, 1830, AP, 3: 422; Stephen F. Austin to S. Rhoads Fisher, June 17, 1830, AP, 3:427).

[12] Alice Baumgartner, South to Freedom: Runaway Slaves to Mexico and the Road to the Civil War (Basic Books, 2020).

of harboring runaway slaves.[13] Texas Rangers also policed the Texas-Mexico border during the era of Chinese exclusion to apprehend Asian migrants crossing into the United States via the southern border.[14]

Texas Rangers blurred the lines between enforcing state laws, practicing vigilantism, and inciting racial terror. Historians now view the Texas Rangers as the first prominent Western vigilantes to be endowed with legal authority.[15] The most frequent complaints of Texas Rangers abusing their power came through what some referred to as "la ley de fugas," or the law of flight or escape. Under this morbid legal regime, Rangers released prisoners and ordered them to run. Officers then proceeded to shoot the prisoner while in flight, later filing reports that they had killed the prisoner to prevent escape or because the prisoner resisted arrest.[16]

As early as 1870, a newspaper editor from west Texas reported disgust at the frequency with which Texas Rangers used the expressions that they shot and killed a prisoner while attempting to escape, or that they killed someone for resisting arrest. The editorial alleged that these expressions had dire resonances "that are fast coming to have a melancholy and terrible significance to the people of Western Texas. They furnish the brief epitaph to the scores who have fallen and are falling victims to the ignorance, the arrogance, or the brutality of those charged with the execution of the law." [17] In the twentieth century Texas Rangers would become tools of state-sanctioned violence and intimidation against non-white voters.

*B. Non-White Voting Discrimination (1836-1861)*

The "fighting force" of Texas Rangers was charged with making real the society prescribed by Texas constitutions, including racial and ethnic disenfranchisement. The 1836 Constitution established citizenship for any persons who resided in Texas on the day of its Declaration of Independence, but explicitly restricted "Africans, the descendants of Africans, and Indians," from citizenship.[18] The 1836 Constitution also excepted enslaved persons and "free negroes and Indians" from population counts of free citizens to calculate the number of senators and representatives to the state legislature.[19]

When Texas joined the United States as a state, the Constitution of 1845 excluded people of African descent and Indigenous populations from voting. Article III Section 2 provided: "all free male persons over the age of twenty-one years (Indians not taxed, Africans, and descendants of Africans, excepted,) who shall have resided six months in Texas immediately preceding the acceptance of this Constitution by the Congress of the United States, shall be deemed qualified electors."[20]

---

[13] Robert Perkinson, *Texas Tough: The Rise of America's Prison Empire* 52–55 (New York: Picador, 2010).
[14] Erika Lee, At America's Gates: Chinese Immigration During the Exclusion Era, 1882-1943 (Durham: University of North Carolina Press, 2003).
[15] Linda Gordon, *The Great Arizona Orphan Abduction* 262, 266 (Cambridge, MA: Harvard University Press, 1999); Kelly Lytle Hernández, *Migra! A History of the U.S. Border Patrol* (Berkeley: University of California Press, 2010).
[16] Monica Muñoz Martinez, The Injustice Never Leaves You: Anti-Mexican Violence in Texas (Cambridge: Harvard University Press, 2018).
[17] As quoted in Webb, *The Texas Rangers*, 227; editorial in the *Victoria Advocate* reprinted in the *Austin Daily Republican*, October 10, 1870.
[18] TEX. CONST. (1836) General Provisions, § 10.
[19] TEX. CONST. (1836) art. I, § 7.
[20] TEX. CONST. (1845) art. III, § 2.

From the start of colonization into Texas, through its many phases into statehood in 1845, and to the end of the Civil War, slave codes were instituted in law to protect the institution of slavery and to regulate movement and daily life of Africans and African descended people in the state.[21] The preliminary provisions that were adopted between the State of Coahuila and Texas in 1827 explicitly prohibited the introduction of slaves into the Texas territory.[22] These provisions were confirmed under the Law of Colonization of the State of Coahuila and Texas in 1827.[23] To encourage further colonization of Texas, and to generate agriculture and economic growth, the Congress of the State of Coahuila and Texas issued a decree on May 5, 1828, allowing foreigners to immigrate with their "servants and day laborers," therefore allowing white slave owners from other parts of Texas entry into Texas.[24] Within this period there are 15 known codes that prohibit slave owning in Texas until the decree on May 5, 1828, which was effectively a loop hole for Texas slave owners.

The Declaration of the Texas Republic committed slavery into law. Texans believed that the mere presence of free African Americans in Texas alone was a threat to the institution of slavery.[25] In the General Council of the Republic of Texas on January 1, 1836, a new law was passed to prohibit any "free [N]egro or mulatto" from entering Texas, and any who were caught doing so would be sold into slavery, with the proceeds going to the government.[26] The Journals of the Convention at Washington, which convened on March 9, 1836, strengthened the institution of slavery in the Republic of Texas. The journals included provisions to exclude enslaved people from full citizenship and committed slaves bonded to service for life.[27] These five provisional conditions were rewritten into the Constitution of the Republic of Texas of 1836.[28]

In the early days of the Texas Republic between 1836 and 1845, a series of further clarifications on the regulations and movement of slaves and free African-American people living in Texas were instituted through acts and in revision to the Constitution of Texas in 1845. These 42 additional acts and revisions regulated tax that was to be collected for owning slaves as property and prohibiting all men, women, and families of African descent from entering Texas.[29]

---

[21] Campbell found that Texans generally copied the legislative practices of older slave states and Texas judges regularly cited decisions made in other states when deciding cases involving slavery in Texas. Randolph Campbell, *An Empire for Slavery, The Peculiar Institution in Texas, 1821–1865* (1989) 96.

[22] Decree No. 18, September 15, 1827, reprinted in H.P.N. Gammel, *The Laws of Texas, 1822-1897*, 12 vols. (Austin, TX: Gammel Book Co., 1898), 1:188-189.

[23] Translation of the General Law of Colonization, No. 72, August 18, 1824, reprinted in H.P.N. Gammel, The Laws of Texas, 1822-1897, 12 vols., (Austin: Gammel Book Co., 1898), 1:97-98.

[24] Decree No. 56, May 5, 1928, reprinted in H.P.N. Gammel, *The Laws of Texas, 1822-1897*, 12 vols. (Austin, TX: Gammel BooK Co., 1898), 1: 103.
Decree No. 18, September 15, 1827, reprinted in H.P.N. Gammel, The Laws of Texas, 1822-1897, 12 vols., (Austin: Gammel Book Co., 1898), 1:188-189.

[25] Randolph Campbell, An Empire for Slavery, The Peculiar Institution in Texas, 1821–1865 (1989) 97.

[26] Journal of the Proceedings of the General Council of the Republic of Texas, January 1, 1836, reprinted in H.P.H. Gammel, The Laws of Texas, 1822-1897, 12 vols., (Austin: Gammel Book Co., 1898), 1:720-722.

[27] Journals of the Convention of the Free, Sovereign, and Independent People of Texas, in General Convention, Assembled, reprinted in H.P.N. Gammel, The Laws of Texas, 1822-1897, Volume 1 (Austin, TX: The Gammel Book Company, 1898), 872.

[28] Tex. Const. (1836), General Provisions, § 9 Section 10.

[29] *See e.g.*, An Act, May 24, 1838, reprinted in H.P.N. Gammel, The Laws of Texas, 1822-1897, 12 vols., (Austin: Gammel Book Co., 1898), 1:1512-1515.,.;AN ACT, February 5, 1840, reprinted in H.P.N. Gammel, The Laws of Texas, 1822-1897, 12 vols., (Austin: Gammel Book Co., 1898), 2:325-327.

Additionally, the procedures for apprehending runaway slaves were established, including the stipulation that all free persons of color entering the state would be auctioned into slavery.[30]

As Texas entered statehood to the United States and established its Constitution of 1845 and its subsequent revisions through 1866, it furthered the precedent of chattel slavery in addition to restricting the movement of enslaved people. Of the thirteen additional acts in this period, additional provisions were made to continue chattel slavery in Texas.[31] The 1836, 1845, and 1866 Constitutions thus protected the institution of chattel slavery and restricted the rights of enslaved people even in bondage. These constitutions enshrined the belief in Anglo racial superiority to people of African descent, Indigenous populations, and non-citizens residing in Texas. For example, an Act passed by the Texas Congress on January 15, 1839 made it a felony to assist runaway slaves and imposed a fine of up to $1,000 and a year in jail for the offense.[32] This law was also broadened to include that simply concealing fugitives or advising or aiding enslaved people seeking freedom was an offense.[33] White Texans also became increasingly hysterical over the thought of slave uprisings and a possible alliance between Mexicans and enslaved people. This was guided, in part, because the Mexican government had abolished slavery, but also because white supremacists believed "Mexican" blood had been infused with "African" blood. Stephen F. Austin, for example, described Mexicans as a "mongrel Spanish-Indian and negro race, against civilization and the Anglo American race."[34]

The Texas Declaration of Independence described the Mexican people as "…unfit to be free, and incapable of self government," and planted the seeds that grew into public perceptions that Mexicans were inherently a threat to democracy and unworthy of citizenship.[35] Although the 1836 and 1845 Constitutions did not explicitly restrict former Mexican citizens from Texas citizenship or from voting, former Mexican citizens found their rights restricted under the new government, their votes and voices ineffective, and anti-Mexican sentiment running rampant. Historian Arnoldo De Leon explained, "[p]romoters of Texas independence described Mexicans as rapists, threatened that white women and children and 'helpless innocent children' would be given up 'to the dire pollution and massacre of the barbarians'... The haunting prospect of being

---

[30] AN ACT, February 5, 1840, reprinted in H.P.N.. Gammel, The Laws of Texas, 1822-1897, 12 vols., (Austin: Gammel Book Co., 1898), 2:325-327. For a list of all acts and laws relating to slavery and taxation in Texas, see the digital exhibit by historian Andrew Torget "The Laws of Texas," *Texas Slavery Project*, http://www.texasslaveryproject.org/sources/LawsOfTexas/index.php. Additional provisions regulating the movement of enslaved and free people of color can be found at "Constitutions of Texas, 1824-1976," Tarlton Law Library, https://tarlton.law.utexas.edu/constitutions/timeline. Historians that documented the effort to escape slavery via Mexico see Alice Baumgartner, *South to Freedom: Runaway Slaves to Mexico and the Road to the Civil War* (New York: Basic Books, 2020); Karl Jacoby, *The Strange Career of William Ellis: the Texas Slave Who Became a Mexican Millionaire (*New York: W.W. Norton & Company, 2016).

[31] TEX. CONST. (1845), art. VIII, § 1.

[32] An Act, January 15, 1839, reprinted in H.P.N. Gammel, The Laws of Texas, 1822-1897, 12 vols., (Austin: Gammel Book Co., 1898), 2:46-47. http://texinfo.library.unt.edu/lawsoftexas.**Error! Hyperlink reference not valid.**

[33] Randolph Campbell, An Empire for Slavery, The Peculiar Institution in Texas, 1821–1865 (1989) 102.

[34] Arnoldo De León, The Called them Greasers: Anglo Attitudes Toward Mexicans in Texas, 1821-1900 (Austin: University of Texas Press, 1983) 12.

[35] Texas Declaration of Independence, Mar. 2, 1836, in H. P. N. Gammel, The Laws of Texas, 1822-1897, 12 vols., (Austin: Gammel Book Co., 1898) 1: 1066.

ruled by such people indefinitely explains in part the Texan movement for independence in 1836."[36]

After 1836, Mexicans were described by firebrands as alarmingly savage, degenerate, half-civilized, and barbarous for committing massacres and atrocities like at the Alamo.[37] The belief that Mexicans were racially inferior and had tainted blood was widespread.[38] Many of the Mexican citizens who resided in Texas on the day of its Declaration of Independence from Mexico fought alongside Anglo Texans in the Texas Revolution. Despite these sacrifices, Anglos who had migrated from U.S. southern and northern states brought with them ideals of white supremacy that considered Mexicans a racially inferior people. Under the Texas flag, Anglos insisted on a new code of social relations that subjugated Texans of Mexican descent, even those who could trace their belonging back to Spanish land grants.[39]

The city of San Antonio had been managed by Spanish *alcaldes* (Spanish for magistrate or mayor) from 1731 until 1821. After Mexican independence from Spain, Mexican *alcaldes* managed San Antonio from 1821 until 1836, the year of Texas's Independence from Mexico. Texas Revolutionary Juan Seguín served in the Texas Senate from 1837 until 1840 and as Mayor of San Antonio briefly from 1841 to 1842.[40] But by the mid-nineteenth century, Texans of Mexican descent, who identified as Tejanos, not Mexicans, were confronted by Anglos who worked to subordinate their social, cultural, economic, and political influence. Juan Seguín was unwavering in his defense of Tejano rights after the Texas Revolution. He himself was accused of being disloyal to Texas and fled to Mexico in 1842 to escape threats by mob violence.[41]

In 1858 Seguín lamented, "A victim to the wickedness of a few men whose false pretenses were favored because of their origin and recent domination over the country, a foreigner in my native land, could I stoically be expected to endure their outrages and insults? Crushed by sorrow, convinced that only my death would satisfy my enemies, I sought shelter among those against whom I had fought. I separated from my country, parents, family, relatives and friends and, what was more, from the institutions on behalf of which I had drawn my sword with an earnest wish to see Texas free and happy."[42] It would be nearly 150 years before another Texan of Mexican descent, Henry Cisneros, was elected mayor of San Antonio in 1981.[43]

Anxieties about "blood purity" were rampant in this era and used to justify white supremacy. During the U.S.-Mexico War (1846 – 1848), U.S. Congressmen opposed annexing

[36] De León, The Called them Greasers, 10-11.
[37] De León, *The Called them Greasers*, 11.
[38] Arnoldo De León, They Called Them Greasers: Anglo Attitudes Toward Mexicans in Texas, 1821-1900 (Austin: University of Texas Press, 1983) 7, 11.
[39] Raul Ramos, Beyond the Alamo: Forging Mexican Ethnicity in San Antonio, 1821-1861, University of North Carolina Press, 2010; Jesus F. de la Teja, ed., A Revolution Remembered: The Memoirs and Correspondence of Juan N. Seguín, (Austin, Tex: State House Press, 1991).
[40] Raul Ramos, Beyond the Alamo: Forging Mexican Ethnicity in San Antonio, 1821-1861 (University of North Carolina Press, 2010); Jesus F. de la Teja, ed., A Revolution Remembered: The Memoirs and Correspondence of Juan N. Seguín (Austin, Tex: State House Press, 1991).
[41] Raul Ramos, Beyond the Alamo: Forging Mexican Ethnicity in San Antonio, 1821-1861, University of North Carolina Press, 2010.
[42] Jesus F. de la Teja, ed., A Revolution Remembered: The Memoirs and Correspondence of Juan N. Seguín, (Austin, Tex: State House Press, 1991), 73-74.
[43] David Montejano, Anglos and Mexicans *in the Making of Texas, 1836–1986* (Austin: University of Texas Press, 1987) 293.

Mexican territory because it included Mexican people. John C. Calhoun, then a U.S. Senator from California, protested incorporating a "mixed-race" population into the Union. He bombastically exclaimed, "I protest against such a union as that! Ours, sir, is the Government of a white race. The great misfortunes of Spanish America are to be traced to a fatal error of placing the colored races on an equality with the white race . . . Are we to associate ourselves as equals, companions, and fellow-citizens, the Indians and mixed race of Mexico? Sir, I should consider such a thing as fatal to our institutions . . . We make a great mistake, sir, when we suppose that all people are capable of self-government."[44]

In 1848, the United States ratified the Treaty of Guadalupe Hidalgo to end the U.S.-Mexico war. Mexico ceded almost half of its territory to the United States, extending the U.S. boundaries westward by over 525,000 square miles. This territory included parts of Texas, New Mexico, Colorado, Arizona, California, Nevada, and Utah.[45] Daily life changed for Mexicans in the newly ceded territory. They were given a choice to move to Mexico with their belongings or to become citizens of the United States. Mexicans that stayed and naturalized were not granted the privileges or rights of naturalized citizens. Historian Ernesto Chavez wrote, "[d]espite their quasi-citizenship status, Mexican Americans had the potential to become citizens, a fact that stood in stark contrast to the condition of African Americans and Native Americans, who would not gain this advantage until 1868 and 1887, respectively. By allowing Mexicans to become citizens, the Senate in effect made them white (for legal purposes), since under the provisions of the Naturalization Act of 1790 only whites could become citizens. This was an unstable whiteness, of course, with contingencies, and Mexican Americans would constantly have to fight to secure their rights."[46]

### *C. Non-White Voting Discrimination (1861-1876)*

Texas Black Codes were first enacted in the General Law Section of the Ordinances of the Convention of 1866. These Black Codes repealed many of the former Slave Codes from 1862 and 1863, but they also placed new restrictions on the rights of formerly enslaved men and women.[47] The Black Codes, which were passed and enacted between October 26 and November 13, 1866, established rights, exceptions, and exclusions for newly freedmen and "persons of color," who were defined by the codes as persons having greater than one-eighth African descendancy.[48] These codes ensured that African Americans were restricted from participating in the judicial system and elections. African Americans were prohibited from serving on juries, holding public office, or

---

[44] John C. Calhoun, speech during the "All Mexico Movement," debate on January 4, 1848. Full speech reproduced in Ernesto Chavez, *The U.S. War with Mexico: A Brief History with Documents* (Boston, MA: Bedford/St. Martins, 2008) 18-20.

[45] The Treaty of Guadalupe Hidalgo, Educator Resources, National Archives, https://www.archives.gov/education/lessons/guadalupe-hidalgo#background (last reviewed June 2, 2021); Ernesto Chavez, *The U.S. War with Mexico: A Brief History with Documents* (Boston, MA: Bedford/St. Martins 2008).

[46] Ernesto Chavez, *The U.S. War with Mexico: A Brief History with Documents*, (Boston, MA: Bedford/St. Martins) 2008, 26.

[47] General Laws, ch. VIII, §1-2, reprinted in H.P.N. Gammel, The Laws of Texas, 5:976–77. The following acts were repealed: An Act to provide for the disposition of runaway slaves, approved April 8th, 1861; An Act. to define the offence of inciting insurrection, or insubordination of slaves, in certain cases, and to prescribe the punishment therefor, approved March 5th, 1863; An Act to provide against the hostile invasion of the State of Texas by persons of color, Approved March 6th, 1863; An Act to prevent slaves from exercising pretended ownership over property, approved March 26th, 1864; and An Act prohibiting owners or employers of slaves from placing them in charge of farms or stock ranches, detached or removed from the house or place of residence of the owner or employer, approved January 11th, 1862.

[48] *Id.* ch. LXXIII, §1, reprinted in H.P.N. Gammel, The Laws of Texas, 5:988.

voting in any State, county or municipal election. These codes also established a code of criminal appeals that excluded "persons of color" from testifying in court against other persons of color.[49] Being excluded from the judicial system had especially devastating consequences as the Black Codes enacted vagrancy laws and established a code of criminal procedure for violation of these laws. A vagrant, defined under these acts, was any person who appeared to be without work or perceived as being idle.[50] Youth and juvenile vagrants faced a set of punishment including being assigned to a labor apprenticeship.[51] Black Codes also mandated municipal authorities regulate vagrant labor, and that vagrants who refused to work should be bound to lodging in jail with regulated food and water.[52] The labor convicts were considered to be employees of the state or county in physically demanding jobs such as building railroads, cutting and laying tiles, mining iron, lead or copper, working in iron foundries, and agricultural labor.[53] The labor laws that were passed clearly favored the employers.[54]

The Federal government established the Freedmen's Bureau in 1865 to ensure that African Americans could exercise their new rights, including voting.[55] Freedmen's Bureau agents in Texas worried about the future of voting rights in the state. An agent in Belton, Texas, explained that African Americans maintained a "well-grounded fear" that they would not be allowed to vote "unless sustained by the military."[56] In 1868, the last year that the Freedmen's Bureau maintained agents in Texas, another agent noted that planters were driving African Americans that had voted from their farms. The agent reported, "Already some planters are saying to them, you went and voted God damn you! Now lets [sic] see what the Yankees can do for you."[57]

In 1870 the adoption of the Fifteenth Amendment to the United States Constitution prohibited the United States and states from disenfranchising voters "on account of race, color, or previous condition of servitude." African Americans in Texas quickly exercised this new access to the ballot and actively participated in the democratic process. They registered to vote, participated in political affairs, and were elected to political positions. From the late 1860s until the 1890s, Texas voters elected 52 African Americans to serve either as Constitutional Convention delegates or as members of the state legislature; 36 were elected in the 1870s.[58] African American

---

[49] *Id.* ch. LIX, §1, reprinted in H.P.N. Gammel, The Laws of Texas, 5:977.
[50] *Id.* ch.. CXI, § 1, reprinted in H.P.N. Gammel, The Laws of Texas, 5:1020-21.
[51] *Id.* ch. XCI, § 9.
[52] *Id.* § 8.
[53] *Id.* ch. CLIII. § 5, reprinted in H.P.N. Gammel, The Laws of Texas, 5:1111.
[54] Barr, *Black Texans*, 56.
[55] Barr, *Black Texans*, 54. Some African Americans who worked for the Freedmen's Bureau in Texas, like George Ruby of Galveston, Jeremiah Hamilton of Bastrop, and Richard Allen of Houston, later became delegates and state legislators. See the biographies of these 52 early leaders in the exhibit, "Forever Free: Nineteenth Century African American Legislators and Constitutional Convention Delegates of Texas" 2015 created by the Texas State Library and Archives Commission. https://www.tsl.texas.gov/exhibits/forever/biographies/page1.html.
[56] William Carrigan, The Making of a Lynching Culture: Violence and Vigilantism in Central Texas, 1836-1916 (Chicago: University of Illinois Press, 2004) 124.
[57] Quoted in Randolph Campbell, *Grass-Roots Reconstruction in Texas,1865-1880* (Baton Rouge: Louisiana State Press, 1997) 177.
[58] J. Mason Brewer, *Negro Legislators of Texas and their* Descendants: a History of the Negro in Texas Politics from Reconstruction to Disenfranchisement, (Dallas: Mathis Publishing Company, 1935). See the biographies of these 52 early leaders in the exhibit, "Forever Free: Nineteenth Century African American Legislators and Constitutional Convention Delegates of Texas" 2015 created by the Texas State Library and Archives Commission. https://www.tsl.texas.gov/exhibits/forever/biographies/page1.html.

men voted and helped Republicans maintain political power at the state level and locally in central and east Texas counties. Republicans in Texas were met with a "storm of opposition."[59]

White supremacists that were still enraged by the emancipation of enslaved people became committed to eliminating African Americans' voting rights and purging African American elected officials. African American legislators faced radical violence and harassment. They were frequently accused of fraud or incompetence, with little evidence to support those claims, as a means for removal.[60] Some white elected officials refused to serve with African Americans and the state legislature went so far as to deny seats to three African Americans in contested elections for, as one historian put it, "questionable reasons."[61] In Navarro County, a white mob murdered an African American because he participated in politics by working as the county's registrar.[62] Organized efforts to intimidate voters came largely from areas with majority African American populations in east Texas. Opposition to African American voting grew in these counties in response not only to the size of the African American population, but more specifically because during and after Reconstruction African Americans exercised their right to vote, helping Republican's maintain control of state and local politics. They also elected Republican African American officials into office.[63]

There was a swift backlash against this new enfranchisement of African American voters, as white men's committees formed with the express purpose of ousting African Americans from local, county, and state politics. They did so through fraud, intimidation, murder, and restricting membership in Democratic organizations to white citizens only.[64] In 1875, white Democrats called for a new constitutional convention namely so that they could amend and undo the protections for African-American voters in the 1869 Constitution constructed by a Republican Congress that endorsed Reconstruction era protections for formerly enslaved African Americans.[65] It is important to note that the Democratic and Republican parties were aligned in a different manner during this period of time, until the Southern Strategy in the 1970's, mainly along racial/ethnic lines.[66]

An example of the long road ahead for non-white voters was exemplified by the introduction of the poll tax in the 1876 Texas Constitution, as part of a ruthless campaign to disenfranchise African Americans by passing new laws. The 1876 Constitution gave the state legislature the right to impose a poll tax, but it did not mandate a poll tax.[67] A poll tax was seen as a tool that would disenfranchise the vast majority of African American and Mexican Americans who were primarily relegated to a class of wage laborers and could not spare the expense.[68] White men's organizations and local election officials frequently used the accusations of fraud and

---

[59] Carrigan, The Making of Lynching Culture, 124.
[60] Barr, Reconstruction to Reform, 194.
[61] Barr, Reconstruction to Reform, 194.
[62] Carrigan, The Making of Lynching Culture, 125.
[63] Clark Hine, *Black Victory*, 71-72; J. Mason Brewer, *Negro Legislators of Texas and their* Descendants: a History of the Negro in Texas Politics from Reconstruction to Disenfranchisement (Dallas: Mathis Publishing Company, 1935).
[64] Clark Hine, *Black Victory*, 71-72.
[65] Barr, *Black Texans*, 70-71.
[66] Ferrel Guillory, *From Nixon to Trump*, Southern Strategy, Southern Cultures, https://www.southerncultures.org/article/southern-strategy-from-nixon-to-trump/ (last visited May 18, 2022).
[67] TEX. CONST. (1876) art. VIII, § 1.
[68] Clark Hine, Black Victory, 66, 79, 80; Buenger, *The Path to A Modern South*, 89.

corrupted elections to support poll taxes even when there were no cases of fraud in their counties.[69] Cities like Houston and Beaumont adopted poll taxes for local elections.[70] Supporters of the poll tax continued to call for strict enforcement, criminal penalties for violations, and ever more prohibitive measures.

### D. *Non-White Voting Discrimination During the "Jim Crow" Era (1876-1965)*

#### 1. Disenfranchisement of African-American Voters

White supremacists continued to use racial violence to intimidate African American voters in Texas in the last decades of the nineteenth century. Historian Walter Buenger wrote that in this era, "the increased frequency and awful ferocity of lynchings after 1887 signaled that racism had hit a new plateau. Lynching and reform wrapped together."[71]

In 1887 prohibitionists blamed the African American vote for defeating their bill. They joined white supremacists who called for suppressing the African American vote to "purify" elections, but they added a moralistic appeal. Walter Buenger found prohibitionists that warned that African Americans refused to listen to logic and when imbibing alcohol they would become, "still more contemptible and still more akin to the brute."[72] These dehumanizing diatribes described African Americans as a threat to white homes and families. Prohibitionists' racist fearmongering fueled more violence. Buenger wrote, "in white minds those words and phrases justified the torch and rope, election fraud, and assassination. Little wonder that long before the erection of legal barriers to black voting, the influence of the black voting bloc waned."[73]

There are too many cases of violence and intimidation during this era to enumerate here. African American voters suffered from white supremacist terror in Harrison, Leon, Montgomery, Colorado, Dewitt, Waller, Fort Bend, Matagorda, Brazoria, Wharton, Marion, Bell, Milam, and Grimes counties. In Washington County, white residents placed a coffin with the names of four African American leaders on display in 1879, Democrats tossed Republican ballots, and in 1884 and 1886 white masked men seized boxes and shot and killed African American election judges.[74]

In 1896 in Robertson County, white residents refused to allow an African American to take office as county commissioner. Scott Field, later a Democratic Congressman reflected, "[i]t was then that the white man's primary was established. Few white men went unarmed on election day. The courthouse at Franklin was lined with about forty Winchester rifles, and no Negro votes were cast there. O.D. Cannon was credited with having stood at the election booth room door with his six shooter preventing Negroes from voting."[75] Field continued to recount a longer record of violence by County Judge O.D. Cannon whom he described as a "staunch Democrat who helped to take control of politics from the radicals and the Negroes." [76] He killed three white men and one

[69] Barr, Reconstruction to Reform, 207.
[70] Barr, *Black Texans*, 80; Barr, "The Impact of Race in Judicial Districts," 437.
[71] Buenger, The Path to A Modern South, 4.
[72] *Id*.
[73] Buenger, *The Path to A Modern South*, 4; *Clarksville Standard*, July 14, 1887, 2.
[74] Barr, *Reconstruction to Reform*, 197; Frank Spindler, "Concerning Hempstead and Waller County," *Southwestern Historical Quarterly* 59, no. 4 (April 1959): 458.
[75] As quoted in *Barr*, *Reconstruction to Reform*, 199, 200; Richard Denny Parker, *Historical Recollections of Robertson County, Texas*, Nona Clement Parker, ed., 48-49.
[76] As quoted in Barr, *Reconstruction to Reform*, 200; Richard Denny Parker, *Historical Recollections of Robertson County, Texas*, Nona Clement Parker, ed., 48-49.

African American during his tenure as county judge from 1890 to 1900. One victim, Harriel Geiger, was shot and killed in cold blood in Cannon's courtroom in 1886.[77]

Harriel "Hal" G. Geiger was born in South Carolina around 1840 and went on to be elected to the state legislature in 1878 and 1881.[78] As a legislator, Geiger "served on the Roads, Bridges, and Ferries Committee, criticized the convict lease system, and opposed the poll tax."[79] After serving in the legislature, Geiger remained active in politics, even running for sheriff in 1884. He also opened a law practice.[80]

Geiger was an example of an African American, formerly enslaved, who became educated, involved in politics, and who became a Texas legislator. Moreover, he would not yield to intimidation. In 1886, Geiger represented a client in court before Judge O.D. Cannon. The judge accused Geiger of making an "insolent remark" and swiftly shot him five times, killing him in the courtroom.[81] Geiger's violent murder was an act of intimidation. Recounting these events later, Field crudely remarked on the impact of his murder, "[t]hat was the end of Negro rule in Robertson County. Legislation replaced force, and quiet was restored. *White supremacy was back*."[82]

By the end of the nineteenth century, the Democratic party had successfully supplanted Republican rule through force, fraud, and violence. White supremacists in the Democratic party committed to the total disenfranchisement of African Americans to hold on to political power and to preserve a strict racial hierarchy. Locally, white supremacists formed white men's committees that both intimidated African Americans and restricted them from political participation.[83]

Former confederate states popularly adopted direct primaries in the 1890s that established dates for electing nominees, drafting party platforms, and other voting procedures. Southern states subsequently passed legislation granting political parties the right to establish membership qualifications and thus the right to exclude African Americans from membership.[84] In Texas, the African American population was smaller than other Southern states, but it was concentrated in about 80 counties in the southeast, a pattern that grew largely from the history of slavery.[85] In the 1890s about 100,000 African Americans voted in elections.[86]

Local white primaries were especially active in Texas counties like Grimes, Marion, Wharton, Harrison, and Fort Bend, where African Americans were a numerical majority or where they were a statistically significant portion of the voting population.[87]

---

[77] Barr, *Reconstruction to Reform*, 200.
[78] Paul M. Lucko, "Geiger, Harriel G.," *Handbook of Texas Online*, https://www.tshaonline.org/handbook/entries/geiger-harriel-g.
[79] *Id.*
[80] *Id.*
[81] Barr, *Reconstruction to Reform*, 200.
[82] Emphasis added. As quoted in Barr, *Reconstruction to Reform*, 200; Richard Denny Parker, *Historical Recollections of Robertson County, Texas*, Nona Clement Parker, ed., 48-49.
[83] Barr, *Reconstruction to Reform*, 194-200.
[84] South Carolina was an early adopter of the direct primary in 1896 and southern states followed suit: Arkansas in 1897, Georgia in 1898, Kentucky and Texas in 1903, Louisiana in 1906, Oklahoma in 1907, Virginia in 1913, and North Carolina in 1915. Clark Hine, *Black Victory*, 70.
[85] Clark Hine, Black Victory, 71.
[86] Barr, *Black Texans*, 80.
[87] Clark Hine, *Black Victory*, 71.

By 1910 the African American population rose to nearly 700,000, approximately 18% of the total state population.[88] Darlene Clark Hine, historian of the white primary in Texas, wrote, "The degree of concentration varied: in 14 counties [B]lacks were a majority. The four counties with the largest concentration of [B]lacks (over 60 percent) were Fort Bend, Harrison, Marion, and Matagorda. From this area came the chief opposition to [B]lack voting."[89]

White men's committees alleged that African American leaders and politicians were corrupting elections by buying votes. For example, in Marion County, local residents in the town of Jefferson organized a Vigilance Committee—a sanctioned white mob—for the purpose of "putting a stop to the buying of elections."[90] With the moral rhetoric of "purifying" elections, Jefferson's residents mob intimidated African Americans by threatening them with physical violence, interrupting African American political meetings, and threatening meeting participants with violence if they did not disband. In 1897 in Marion County, local white elites assassinated two African American leaders after they refused to stay out of politics.[91]

In 1946, a historian sympathetic to the white mobs' actions, and who called organized African American voting "evil," wrote of the Jefferson mob's practices, "If any negro was recalcitrant, he was escorted to his home and warned of what might happen to him if he chose further to disregard their advice. Two uncooperative bosses were killed at Jefferson by unknown persons as an aftermath of this development."[92] Supporters of white supremacist efforts to eliminate the African American vote ignored the many examples of white ballot-box stuffing, fraud, violence, and intimidation of African American voters in the era.[93]

In Marion County, racist violence targeting African American politicians, strategists, and voters preceded election reforms, with the same goal of disenfranchising African American voters. In the Spring of 1898, over 400 white men of Marion County met in the Jefferson courthouse to organize the Citizen's White Primary.[94] The meeting called to order by Davis Biggs, a veteran of the Civil War, aimed to end all "corruption by use of Negro votes in elections."[95] The White Citizens Primary operated in Marion County from 1898 until at least 1946. The historian writing about this in 1946 was brazen in his support for the White Citizens Primary and proudly wrote of its success. He wrote, "the candidate selected in the White Primary has never been opposed in the following general election."[96]

---

[88] Clark Hine, *Black Victory*, 71.
[89] Clark Hine, *Black Victory*, 71.
[90] J.A.R Moseley, "The Citizens White Primary of Marion County." *Southwestern Historical Quarterly* 49, no. 4 (April 1946) 524.
[91] Buenger, *Path to a Modern South*, 4; J.A.R Moseley, "The Citizens White Primary of Marion County." *Southwestern Historical Quarterly* 49, no. 4 (April 1946) 524-525. Judge T. D. Rowell of Jefferson, the only known survivor of the group was reportedly proud of the part he played in the "movement seeking to purify the elections of the county." *Id.* at 524-525.
[92] Moseley, "Citizens White Primary," 524-525.
[93] Buenger, *Path to a Modern South*, 4 Walter Buenger wrote, "In a classic example of blaming the victim instead of the real criminal, whites moved to eliminate the black vote by any means possible."
[94] J.A.R Moseley, "The Citizens White Primary of Marion County." *Southwestern Historical Quarterly* 49, no. 4 (April 1946) 526, 527.
[95] J.A.R Moseley, "The Citizens White Primary of Marion County." *Southwestern Historical Quarterly* 49, no. 4 (April 1946) 526
[96] J.A.R Moseley, "The Citizens White Primary of Marion County." *Southwestern Historical Quarterly* 49, no. 4 (April 1946) 541.

Although the white-only primary is generally understood as a measure to disenfranchise African Americans, in counties and towns where local officials refused to consider ethnic Mexicans to be white, voters of Mexican descent were also prevented from voting in primaries. In Dimmit County, for example, the railroad reached the county in 1910 and 1911. Over the span of a few years land use changed from primarily ranching to farming. With that development of farmland came a reliance on Mexican farm labor, and so Mexican Americans and Mexican nationals were recruited to work. By 1915, Anglos were less than half the population.[97] Dimmit County residents were insistent on limiting Mexican American voting power. In 1914, they created the White Man's Primary Association. The *Carrizo Springs Javelin* reported in 1914 that the primary "Absolutely eliminates the Mexican vote as a factor in nominating county candidates, though we graciously grant the Mexican the privilege of voting for them afterwards."[98]

Locally organized white primaries were only part of a larger strategy used to disenfranchise African Americans. In 1901, Texas legislators approved S.J.R.3, a bill that would amend Article VI, Section 2, of the Texas Constitution to require all voters to pay a poll tax.[99] On November 4, 1902, Texas voters approved S.J.R. 3, requiring all persons to pay a poll tax prior to voting and keep the receipt to prove they paid their poll tax.[100] If a voter misplaced their tax receipt, they were able to vote by making an affidavit before an officer "authorized to administer oaths that such tax receipt has been lost."[101]

Legislators that introduced the poll tax expressed their intent to disenfranchise people they deemed unworthy of voting. They did so under the pretense of "purifying" the vote. Judge Alexander W. Terrell, a former Confederate general, worked for decades after reconstruction as a State legislator to restrict access to the ballot for Texans of Mexican descent and African Americans whom he believed were unworthy of the right to vote, first sponsoring legislation that would restrict the franchise in 1879.[102] In 1902, Terrell continued to make public claims for the need to pass election reforms to purify the ballot. He was quoted by the *Austin Statesman* as describing an alleged race problem that started with the abolishment of slavery, "[w]hen the Civil War was ended a race problem was before us," he suggested, "and in order to keep the white man on top we did many things that nothing but the plea of necessity could excuse."[103]

Terrell accused African Americans of corrupting elections by "selling" their votes. He supported legislation that in addition to requiring a poll tax, would also make it a crime for someone to pay the poll tax of someone else. "Our white race is greatly to blame for corrupt practices in dealing with the negro's vote. Reckless and bad men have too long trafficked with

[97] Montejano, *Anglos and Mexicans*, 144.
[98] *Carrizo Springs Javelin*, June 12, 1914.
[99] Election Details, S.J.R. 3, 27th R.S., Texas Legislative Reference Library, https://lrl.texas.gov/legis/billsearch/amendmentdetails.cfm?legSession=27-0&billtypeDetail=SJR&billNumberDetail=3&billSuffixDetail=&amendmentID=31.
[100] *Id.*
[101] S.J.R. 3, *General Laws of Texas*, 27th Legislature, Reg. Session, 323, https://lrl.texas.gov/legis/billsearch/amendmentdetails.cfm?legSession=27-0&billtypeDetail=SJR&billNumberDetail=3&billSuffixDetail=&amendmentID=31https://lrl.texas.gov/scanned/sessionLaws/27-0/SJR_3.pdf.**Error! Hyperlink reference not valid.**
[102] Lewis L. Gould, *Alexander Watkins Terrell: Civil War Soldier, Texas Lawmaker, American Diplomat* (Austin: University of Texas Press, 2004).
[103] "Judge A.W. Terrell: On Corrupt Elections, Poll Tax and Purity of the Ballot," *Austin Statesman*, August 22, 1902, 6.

money for that vote, and now they are corrupting the poor white vote. The time has come (if it ever will come) to appeal to the negro's reason and to make him choose between voting a clean ballot and being clothed with a striped jacket in the penitentiary if he sells his vote. We must either make him vote on an unbought ballot or deport him or slay him, for free government cannot last with a depraved ballot."[104]

Terrell was an ardent white supremacist who, with his like-minded peers, gestured to unrealized desires to deport African Americans after the passage of the Thirteenth Amendment.[105] Representative Alexander Terrell cloaked his racist desires to "deport him or slay him" in rhetoric about preserving democracy and purifying the ballot box. He wasn't alone in this effort. But the poll tax was not enough for Terrell; one of the leading architects of Jim Crow era disenfranchisement was only getting started.

From 1903 to 1908, Texas legislators passed a suite of laws known as the Terrell election laws.[106] The 1903 election law outlined the specific period when poll taxes had to be paid--between October 1st and February 1st of the following year--more than nine months in advance of elections in November.[107] Voters were also required to have either a poll tax receipt or a certificate of exemption from the poll tax.[108] Advocates for the law believed that both Mexican American and African American voters would fail to pay their poll tax so far in advance or that they would lose their receipts. Paying a poll tax or applying for exemptions also created another layer of bureaucracy where local officials could intervene, confuse, and intimidate voters.[109]

The Terrell election laws also included criminal penalties for violating election laws. Any persons found guilty of a misdemeanor under the act for violating its provisions were, "subject to a fine of not less than $200 no more than $500, or sentenced to hard labor on the public roads of the county in which the offense was committed for any period of time not more than one year, or to both such punishments." Any person found to "sell, pledge, loan or deposit his poll tax receipt or certificate of exemption for money or any other thing of value, or any person found purchasing, borrowing, or obtaining possession of a poll tax receipt or certificate of exception shall be deemed guilty of a misdemeanor.[110] Punishment for some violations were even more severe. If any person

---

[104] "Judge A.W. Terrell: On Corrupt Elections, Poll Tax and Purity of the Ballot," *Austin Statesman*, August 22, 1902, 6.

[105] In a recent biography Lewis L. Gould described Terrell's impact in this way, "His reformist impulse for white Texans expanded opportunity and produced constructive results; his belief that black Texans should not be part of state politics made him one of the leading exponents of white supremacy." Lewis L. Gould, *Alexander Watkins Terrell: Civil War Soldier, Texas Lawmaker, American Diplomat* (Austin: University of Texas Press, 2004) 88. Gould found that Terrell's racism did not "mellow" with time. In 1908 Terrell wrote, "No climate could give a white man a skull almost as thick as a buffalo's, convert his straight hair into kinky wool, or impart the repulsive odor that makes the Negro a disagreeable bed fellow." Gould, *Alexander Watkins Terrell*, 149; Alexander W. Terrell, "The Negro," Terrell Papers Box 2H17.

[106] See *The Terrell Election Law: Embracing all amendments to date*. Secretary of State, W. R. Davie, 1908 (Austin, TX: Von Boekmann Jones, Co., Printers, 1908).

[107] Texas – 28th Legislature, Regular and 1st Called Sessions, General and Special Laws: 135; Appendix B, *House Journal*, March 31, 1903, 1174, https://lrl.texas.gov/scanned/Housejournals/28/03311903_64_1141.pdf.

[108] The poll tax receipt included an exhaustive amount of information about the voters, including their name, residence, age, race, length of time in residence in Texas, length of time of residence in county, occupancy, and more. Texas – 28th Legislature, Regular and 1st Called Sessions, General and Special Laws: 135; Appendix B, *House Journal*, March 31, 1903, p. 1174, https://lrl.texas.gov/scanned/Housejournals/28/03311903_64_1141.pdf.

[109] Montejano, *Anglos and Mexicans*, 143.

[110] Texas – 28th Legislature, Regular and 1st Called Sessions, General and Special Laws: 135; Appendix B, *House Journal*, March 31, 1903, 1188 §127, https://lrl.texas.gov/scanned/Housejournals/28/03311903_64_1141.pdf.

made a false affidavit that he lost his poll tax receipt or his certificate of exemption, they could be punished by imprisonment in the penitentiary for three to five years. [111]

By criminalizing voting violations, these laws had the dual effect of intimidating African-American and Mexican-American voters and sanctioning the involvement of law enforcement officials. Texas Rangers and local law enforcement would play a key role throughout the twentieth century in intimidating voters by investigating alleged fraud or elections violations and with threats of arresting African Americans and Mexican Americans for voting violations.

Poll taxes, voter intimidation, and other election reforms meant to disenfranchise non-white voters, however, did not eradicate African American or Mexican American voting. By the turn of the twentieth century the state of Texas was a one-party system, and general elections had the effect of being merely a formality for certifying the election of Democratic candidates.[112] In practice, restricting access to the Democratic primary elections was tantamount to disenfranchisement. Soon, white only primaries became a practice across the state and in the Democratic party.[113]

In 1903, the Terrell election laws established a state direct primary system.[114] In 1904 the State Democratic Executive Committee approved a practice by the White Man's Primary Association and encouraged county Democratic committees to require primary voters to affirm, "I am a white person and a Democrat" before voting. In 1905 the state legislature amended the state statute to allow County Democratic Committee chairmen to establish voting qualifications, thus approving the use of all-white primaries.[115]

Cumulatively, poll taxes, the Terrell election laws, the white primary, and continued racist intimidation had a devastating impact on the African American franchise, and the franchise of voters of Mexican descent. By 1906 only approximately 5,000 African Americans voted in elections, a dramatic drop from approximately 100,000 voting in the 1890s.[116] In counties with cities that also adopted white primaries and poll taxes for local elections there were also severe declines in African American voting. In Jefferson County, for example, Black voter registration declined from 1,000 in 1902 to only 200 by 1906.[117] In 1923, the Texas legislature enacted a law which declared "In no event shall a negro be eligible to participate in a Democratic party primary election held in the State of Texas, and should a negro vote in a Democratic primary election, such ballot shall be void and election officials shall not count the same."[118]

2. Challenges to the White Primary Thwarted

Despite the history of racist violence, intimidation, and laws and policies to prevent African Americans from voting, African-American voters persisted in their effort to access the ballot and participate fully in democracy. African Americans with financial independence could pay poll

[111] *Id.* §122.
[112] Clark Hine, *Black Victory*, 200.
[113] Clark Hine, *Black Victory*, 171, 243.
[114] O. Douglas Weeks, Election Laws, Texas State Historical Association, https://www.tshaonline.org/handbook/entries/election-laws (updated July 19, 2016).
[115] Montejano, *Anglos and Mexicans*, 143; Barr, "The Impact of Race in Shaping in Judicial Districts," 437; H.B. 8 (1905).
[116] Barr, *Black Texans*, 80.
[117] Barr, *Black Texans*, 80; Barr, "The Impact of Race in Shaping in Judicial Districts," 437.
[118] Montejano, *Anglos and Mexicans*, 146 – 147.

taxes and they were not at the mercy of Anglo employers who often threatened African American employees not to vote. For example, as noted above, various counties introduced "all-white primaries," but in 1923 it went beyond individual counties as the State of Texas passed a law that specifically excluded African-American voters from the primary process.[119] The various voter suppression laws had a cumulative effect, creating intentional barriers to the ballot box for racial and ethnic voters at every turn.

Lawrence A. Nixon was an African-American physician living in El Paso who had regularly voted in Democratic primaries and general elections.[120] Nixon's regular voter participation changed after legislators passed the 1923 white primary statute.[121] On July 26, 1924, Nixon was not allowed to vote in the Democratic primary to nominate a senator and representatives in Congress, the State Legislature, and other offices.[122] With the help of the local El Paso NAACP chapter, he was able to secure aid by the national NAACP to sue the state of Texas.[123] In 1927, the U.S. Supreme Court unanimously decided in *Nixon v. Herndon* that the Texas statute violated the Fourteenth Amendment on the grounds that the law denied African Americans "the equal protection of the laws."[124] Justice Oliver Wendell Holmes delivered the decision writing, "[w]e find it unnecessary to consider the Fifteenth Amendment, because it seems to us hard to imagine a more direct and obvious infringement of the Fourteenth. That Amendment, while it applies to all, was passed, as we know, with a special intent to protect the blacks from discrimination against them."[125]

The Texas legislature was swift in its response to the Court's decision. In 1927, the legislature repealed the statute declaring that no African Americans could vote in a Democratic party primary. They substituted a new statute that provided the Executive Committee of political parties to prescribe membership qualifications and who could participate in primaries. The statute read, "every political party in the State through its State Executive Committee shall have the power to prescribe the qualifications of its own members and shall in its own way determine who shall be qualified to vote or otherwise participate in such political party…."[126] Acting under this statute the Democratic Party Executive Committee adopted a resolution that only white Democrats should participate in the primary elections, excluding African Americans.[127] Implicit in this statute was also the exclusion of Latino and AAPI voters.

Lawrence A. Nixon again tried to vote in the Democratic primary in July 1928, but was denied a ballot. Nixon was again the lead plaintiff in a lawsuit filed by the NAACP, *Nixon v. Condon*.[128] The lawsuit highlighted the importance of access to voting in the Democratic primary and petitioner argued that "[i]n States such as Texas, where the primary election is in a real sense the only true election, the vote at the final election is merely a formal flourish…in so far as state

---

[119] Acts 1923, 38th 2nd C.S.,ch. 32, General Laws of Texas, https://lrl.texas.gov/legis/billsearch/billdetails.cfm?billFileID=215045&from=advancedsearch.
[120] Clark Hine, *Black Victory*, 113-114.
[121] Clark Hine, *Black Victory*, 113-114.
[122] *Nixon* v. *Herndon*, 273 U.S. 536 (1927).
[123] *Nixon* v. *Herndon*, 273 U.S. 536 (1927).
[124] *Id.* at 541.
[125] *Id.* at 540-41.
[126] *Nixon v. Condon*, 286 U.S. 73, 82 (1932).
[127] *Id.*
[128] *Id.*

elections are concerned, there is only one political party."[129] Even if Nixon had been able to vote in the general election, the petitioner claimed, "his right to vote would have been abridged."[130]

The U.S. Supreme Court ruled in *Nixon* v. *Condon* (1932) that the executive committee of the Texas Democratic party were "[d]elegates of the state's power," who had "discharged their official functions in such a way as to discriminate invidiously between white citizens and black."[131] Thus Black voters were still denied equal protection of the laws by the State of Texas. Justice Benjamin Cardozo wrote the majority opinion in a 5 to 4 decision, concluding that"[t]he Fourteenth Amendment, adopted as it was with special solicitude for the equal protection of members of the Negro race, lays a duty upon the court to level by its judgment these barriers of color."[132] However, the Court also suggested it possible, but ultimately declined to resolve the question, whether the Texas Democratic Party Convention could determine the qualifications for voting, even though the executive committee could not (because the convention was the true representative body of the Democratic party of the state of Texas),[133] leaving the door open for further discrimination.

The Court's decision was narrow. The majority opinion included a finding that the "inherent power" of a State political party to determine its membership "resides in the state convention." But, the Court noted,"[t]o [the executive] committee the statute here in controversy has attempted to confide authority to determine of its own motion the requisites of party membership and in so doing to speak for the party as a whole. Never has a state convention made declaration of a will to bar Negroes of the State from admission to the party ranks . . .Whatever power of exclusion has been exercised by the members of the committee has come to them, therefore, not as the delegates of the party, but as the delegates of the state…Power so intrenched is statutory, not inherent. If the State had not conferred it, there would be hardly color of right to give a basis for its exercise." [134]

The Texas press and Texas Democrats quickly interpreted the court opinion to mean that while the Executive Committee could not prescribe membership qualifications, the State Convention could. The Wichita Falls Record News wrote an article titled, "White Primary Law Held Void, Decision Gives Texas Loop Hole to Bar Negroes."[135] This loophole, they believed, could allow the Democratic Party to maintain a white primary barring African Americans from voting in the primary.

Prior to the Democratic Convention, Democratic leadership openly expressed confidence they would be able to take action to retain the white primary.[136] William O. Huggins, the chair of the Harris County Democratic Executive Committee and editor of the *Houston Chronicle*, presented a plan at the Democratic Convention to disenfranchise African American voters and maintain the white primary.[137] The "Huggins Plan," as it was called, advocated for the repeal of

---

[129] Argument for Petitioner, *Nixon* v. *Condon*, 286 U.S at 78.
[130] *Id.*
[131] *Condon*, 286 U.S. at 89.
[132] *Id.*
[133] *Id.* at 84-85.
[134] *Id.* at 85.
[135] "White Primary Law Held Void, Decision Gives Texas Loop Hole to Bar Negroes" Wichita Falls Record News May 3, 1932 p 2.
[136] "Repeal Plank Defeat Seen," Fort Worth Star-Telegram, May 24, 1932, at 2.
[137] Clark Hine, *Black Victory*, 181.

the state statute that allowed the Democratic Executive Committee to decide party membership qualifications and instead called for the State Convention to adopt a new restrictive measure. Just weeks after the Supreme Court ruling in *Nixon v. Condon*, the State Democratic Convention adopted the following resolution: "Be it resolved that all white citizens of the State of Texas who are qualified to vote under the constitution and laws of the state shall be eligible to membership in the Democratic party and, as such, entitled to participate in its deliberations."[138] African American voters in Bexar, Grayson, Tarrant, and Jefferson Counties requested injunctions against the resolution, but they were denied by lower courts and dismissed by the Texas Supreme Court.[139]

The white primary continued in Texas after *Nixon v. Herndon* and *Nixon v. Condon*. Another lawsuit to challenge the white primary, *Grovey v. Townsend* (1935), extended the lifespan of the white primary.[140] The court held that the Texas Democratic Party's white-only primary was constitutional because, among other things, the Court was "not prepared to hold that in Texas the state convention of a party has become a mere instrumentality or agency for expressing the voice or will of the state."[141]It wasn't until 1944, more than 20 years after the Texas legislature passed the first state statute to establish the white primary in 1923, that the U.S. Supreme Court held in *Smith v. Allwright* (1944) that the Texas Democratic Party white primary was unconstitutional.[142]

Lonnie E. Smith, an African American voter in Harris County had been denied the right to vote in the primary and sued the county election official S.S. Allwright. Thurgood Marshall represented Smith and argued for NAACP Legal Defense Fund that the Texas Democratic Party primary system allowed white officials to structurally control the politics of the one-party primary.[143] The Court's opinion written by Justice Stanley F. Reed found that restricting the primary to white Texans violated the Fifteenth Amendment to the U.S. Constitution.[144] The Court overruled *Grovey v. Townsend* (1935) and found state action under the Fifteenth Amendment as the "statutory system for the selection of party nominees . . . makes the party which is required to follow these legislative directions an agency of the state in so far as it determines the participants in a primary election."[145] Thus, the Court applied "the well established principle of the Fifteenth Amendment, forbidding the abridgement by a state of a citizen's right to vote."[146]

Voting rights advocates have rightly celebrated *Smith v. Allwright* as a landmark decision. Thurgood Marshall considered the ruling to be especially important because, in contrast to previous decisions, the *Smith v. Allwright* opinion was "so clear and free of ambiguity." The ruling also signaled to African-American voters that their right to participate in primaries was constitutionally protected. With this new confidence, African American voter registration in Southern states improved significantly following *Smith v. Allwright*. By 1948 an estimated 700,000 to 800,000 African Americans voters registered in the South. The numbers of registered voters

---

[138] Darlene Clark Hine, "The Elusive Ballot: The Black Struggle Against the Texas Democratic White Primary, 1932-1945." *Southwestern Historical Quarterly*, vol. 81, no. 4(Austin: Texas State Historical Association, 1978) 375; *Smith v. Allwright* 321 U.S. 649 (1944).
[139] Hines, Elusive Ballot, 376-377.
[140] Grovey v. Townsend, 295 U.S. 45 (1935).
[141] Id. at 54.
[142] *Smith*, 321 U.S. at 666.
[143] Clark Hine, "The Elusive Ballot," 375; *Smith v. Allwright* 321 U.S. 649 (1944).
[144] *Id.*
[145] *Id.* at 663.
[146] *Id.* at 666.

continued to climb. By 1952, an estimated 1 million African Americans registered to vote in the South.[147]

Those registration numbers, however, only tell part of the story. Despite the landmark ruling in *Smith v. Allwright*, in Texas, local officials were adamant about denying African Americans the right to vote in primaries. [148] In counties like Fort Bend, the white primary continued for nearly a decade longer. In Fort Bend, African Americans outnumbered whites about four to one and they had elected more African Americans to office than any other county from 1868 until 1888.[149] In 1889, a political organization called the Jaybird Democratic Association, or the Jaybird Party, was created with the clear intent to rid Fort Bend County of Republican political influence that gained control during Reconstruction. African American voters in Fort Bend County had supported Republican candidates in the 1880s and 1890s. White residents in Fort Bend saw eliminating the African American vote as tantamount to eliminating the Republican party. On October 3, 1889, a mass meeting was held in Richmond where a committee drafted a constitution for an association of white voters of Fort Bend County to control political affairs. At a second meeting on October 22, 1899, nearly 450 white men signed the membership roll for the newly formed Jaybird Democratic Organization.[150]

The Jaybird association continued to rule in Fort Bend politics for more than half a century until the U.S. Supreme Court ruled in *Terry et al v. Adams et al*. (1952) in the last of the white primary cases. In the 1952 opinion the court ruled that the Jaybird Association was more than a private club and that excluding African Americans violated the Fifteenth Amendment. Darlene Clark Hine, preeminent historian of the white primary in Texas, wrote of the decision, "[t]hus sounded the death knell of the Democratic white primary."[151]

In 1981 when Barbara Jordan, former member of the U.S. House of Representatives, testified at a hearing to extend the Voting Rights Act, she spoke passionately of the importance of Section 5 preclearance for protecting Texas voters. To make her point she reflected on the decades long battle to end the white primary in Texas. She opined, "I thought we learned that case-by-case litigation failed to provide a speedy and effective remedy for voting rights denials. I thought we learned from the Supreme Court that the present preclearance provision was constitutional because the case-by-case approach proved ineffective when met with obstructionist tactics. I though we learned that in voting rights cases, that to delay a remedy is to deny a remedy. And that continues to be the case. In 1924, a [B]lack citizen named Nixon attempted to vote in a Texas primary election. He was refused. It wasn't until 30 years and six Supreme Court decisions later that [B]lacks in Texas could vote in the Democratic primary—in any primary election in Texas, Mr. Nixon, that plaintiff, never did vote."[152]

---

[147] Steven F. Lawson, *Black Ballots: Voting Rights in the South 1944-1969*, (1976) 46; Clark Hine, *Black Victory*, 249; Editorial, "116,000 Georgia Registrants," The Crisis (July 1946).
[148] Clark Hine, Black Victory, 78, 79.
[149] Clark Hine, Black Victory, 78.
[150] Pauline Yelderman, "Jaybird-Woodpecker War," *Handbook of Texas Online*, https://www.tshaonline.org/handbook/entries/jaybird-woodpecker-war.
[151] Darlene Clark Hine, "The Elusive Ballot: The Black Struggle against the Texas Democratic White Primary, 1932-1945," *Southwestern Historical Quarterly*, Apr 1978, Vol 81, No 4, 391.
[152] 1868 (1982) Extension of the Voting Rights Act: hearings before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, House of Representatives, Ninety-seventh Congress, first session, May 6, 7, 13, 19, 20, 27, 28, June 3, 5, 10, 12, 16, 17, 18, 23, 24, 25, and July 13, 1981.

### 3. Disenfranchisement of Voters of Mexican Descent

During Reconstruction and the period following the passage of the 14th and 15th Amendments, Americans of Mexican descent were fighting for the ability to exercise their rights as United States citizens, but encountered many roadblocks. For example, Anglo politicians in Bexar County went so far as to challenge the legal standing of a Mexican national living in San Antonio who tried to naturalize on the grounds that he was not white. In May 1896, Ricardo Rodriguez applied for United States citizenship. Rodriguez had lived in San Antonio for ten years and decided to naturalize. Two San Antonio politicians T. J. McMinn and Jack Evans opposed Mexicans naturalizing as U.S. citizens in large part because it granted these new citizens voting rights. They also argued that an 1872 federal statute specified that only Caucasians and Africans could become citizens and they argued that Rodriguez was neither.[153]

Federal District Judge Thomas S. Maxey, who was born in Mississippi and had served in the Confederate Army before entering the University of Mississippi, ruled on May 3, 1897 that Rodriguez was eligible for U.S. citizenship. Judge Maxey asserted that since 1836, both "the Republic of Texas and the United States" had "conferred upon Mexicans the rights and privileges of American citizenship . . . by various collective acts of naturalization."[154] He pointed to both the 1836 and 1845 Constitutions. In addition, he cited Article VIII of the Treaty of Guadalupe Hidalgo of 1848 that allowed for the conferral of American citizenship on Mexicans who continued to live in the territory ceded to the United States after the U.S.-Mexico War. He added, "the conclusion forces itself upon the mind that citizens of Mexico are eligible to American citizenship, and may be individually naturalized by complying with the provisions of our laws."."[155] Although McMinn and Evans acknowledged in their arguments that both "Caucasians" and "Africans" could become citizens, as noted above African American voters in Texas were met with violence and intimidation as soon as they were granted access to the franchise.

Despite this ruling, outside of the courtroom, for most Anglos the difference between Americans of Mexican descent and a Mexican "alien" that migrated to Texas was a matter of semantics. By the turn of the twentieth century, Mexican Americans were no longer a land-owning class, and their rights were slowly stripped by what historians describe as Juan Crow laws.[156]

New American property laws and taxation ignored Mexican property rights under the 1848 Treaty of Guadalupe Hidalgo. The treaty culminated in a sweeping reorganization of Anglo–Mexican relations in Texas.[157] Taxation, court-ordered surveys of land boundaries, and challenges to the validity of Spanish land grants saw Mexican landowners depleting their cash to pay legal

---

[153] *In re Ricardo Rodriguez*, 81 F. 337 (W. D. Tex. 1897).
[154] *Id.* at 350.
[155] *Id.*
[156] Montejano, *Anglos and Mexicans,* 106–109.
[157] For more on the American property laws and the denial of property rights of Mexicans throughout the southwestern United States, see Richard White, *"It's Your Misfortune and None of My Own": A New History of the American West* (New York: Norton, 1993); Patricia Nelson Limerick, *Legacy of Conquest: The Unbroken Past of the American West* (New York: Norton, 1987); Montejano, *Anglos and Mexicans*; David Weber, ed., *Foreigners in Their Native Land: Historical Roots of Mexican Americans* (Albuquerque: University of New Mexico Press, 1973); Maria Montoya, *Translating Property: The Maxwell Land Grant and Conflict over Land in the American West, 1840 to 1920* (Berkeley: University of California Press, 2002); Audrey Smedley, *Race in North America: Origin and Evolution of a Worldview* (Boulder, CO: Westview Press, 2007).

fees.[158] This agricultural revolution brought skyrocketing land values and inspired outside land developers and commercial farmers to migrate to south Texas. Historian David Montejano explains that land promoters worked to "convert pastures into plow fields" and so helped replace ranching with farming. Montejano describes this as "one of the most phenomenal land movements in the history of the United States."[159]

Media coverage portrayed south Texas as having infinite economic potential that was wasted in the hands of inferior Mexican Americans. Yet, employers relied on Mexican wage labor to cultivate the land for the coming agricultural revolution. Teams of men and boys cleared dense countryside of mesquite trees and cacti covered in barbs and thorns, which choked the landscape and made farming difficult. Rows of crops soon replaced brush country.[160] Ethnic Mexicans in the Southwest found themselves assigned as manual agricultural labor in this new economy, giving rise to the popular Mexican saying "*con el alambre vino el hambre"*— with the barbed wire came hunger.[161]

New Anglo settlers transformed the social and political landscape as well as the physical one. The newcomers disenfranchised Mexican Americans and minimized their social, economic, or political influence. Despite their legal status as citizens and their long history in the region, Anglo settlers did not believe Mexican Americans deserved the rights and privileges of Americans. They insisted on a new code of social relations, which in turn initiated a new racial order. They passed Jim Crow segregation laws that prohibited interracial marriages and racially segregated neighborhoods, schools, churches, and restaurants.

New Anglo arrivals described Mexican Americans as ignorant and unfit for participation in elections. They accused politicians that courted the Mexican vote of "bossism" and their tactics as "herding Mexicans" to the ballot box. Political practices such as speaking Spanish at polls or having Mexican American election judges were derided as illegal or corrupt. When Mexican Americans participated in or organized political rallies, they were condemned as illegal activities. These tactics that described political organizing as corrupt and described the "Mexican vote" as tainting the purity of elections echoed the rhetoric used by Texans in east Texas counties with large

---

[158] When landowners came up short on paying taxes or private debts, county sheriffs and county courts would coordinate auctions at which thousands of acres could be purchased for less than a penny an acre. Texas laws targeted Mexican property owners in the state. Walter Prescott Webb wrote that Mexicans became "victimized by the law" in their person and property. Webb, *The Texas Rangers: A Century of Frontier Defense* (Austin: University of Texas Press, 1995), 175–176; Montejano, *Anglos and Mexicans,* 51–53.

[159] By the 1920s, the number of farms increased dramatically while their size decreased. Land developers recruited Anglo buyers from the Mississippi Valley to settle in the region and take part in the "farm revolution." In Hidalgo County, for example, the 1910 census records showed 677 farms averaging 969.5 acres, but by 1930 the numbers jumped to 4,327 farms averaging 126.9 acres. Successful recruitment efforts resulted in rapid population growth in the region as well. In the early 1900s the population in deep south Texas counties totaled 79,934, but by 1920 the population rose to 159,842, and in 1930 the number doubled to 322,845. With the completion of the railroad in 1904, produce grown in south Texas could be shipped from Brownsville to Corpus Christi and on to national markets via the Missouri-Pacific railroad system. By 1907 the railway hauled approximately 500 carloads of farm products daily. A new wave of Anglo migration came to the Texas–Mexico border region. Montejano, *Anglos and Mexicans*, 106–109.

[160] Elliott Young, *Catarino Garza's Revolution on the Texas–Mexico Border* (Durham, NC: Duke University Press, 2004), 7, 209-211, 215.

[161] Richard R. Flores, *Remembering the Alamo: Memory, Modernity, and the Master Symbol* (Austin: University of Texas Press, 2002), 46; Gerarldo Cadava argues convincingly that the border continued to remain permeable through the mid-twentieth century. Cadava, Standing on Common Ground: The Making of a Sunbelt Borderland (Cambridge, MA: Harvard University Press, 2013).

African American populations that claimed their efforts to disenfranchise African Americans were in the name of "purifying" the ballot box.[162]

Joseph O. Boehmer, a Democrat from Eagle Pass, worked as a newspaper publisher and was elected as a Texas state legislator in 1911. He organized a convention in Del Rio, Texas in February of 1912 with the goal of "consider[ing] means for eliminating the illiterate voter in Texas." In his call for a convention, Boehmer alleged that existing election laws allowed an undesirable class of voters to cast their ballot. He proposed amendments that would "produce a more enlightened citizenship, and to a large extent reduce the possibility of vote-buying, while at the same time eliminating the foreign illiterate vote of the State."[163] By illiterate he meant non-English speaking.

Out of the Del Rio convention grew the Ballot Purification League and a group of legislators that committed to "purifying" the ballot box. Boehmer was joined by other news writers that cast Texans of Mexican descent as perpetually foreign, as un-American, and unworthy of voting rights. In Carrizo Springs, the local newspaper demeaned local residents of Mexican descent as a, "class of foreigners who claim American citizenship but who are as ignorant of things American as the mule." Likening Mexicans to animals, the author argued that Texans of Mexican descent were unworthy of the ballot and that even their claims to U.S. citizenship should be questioned.[164]

A year later, one editorialist in the *Galveston Daily News* expressed sympathy for Boehmer's efforts and underscored some of the racist and xenophobic ideas about voting corruption that Boehmer's supporters often embraced. They wrote: "ignorant aliens who never will be citizens of the United States and who could not even speak the English language, swaggered up to the polls and cast the vote that should have been mine."[165]

In 1913, Representative Boehmer introduced H.B. 245 which proposed amending the state civil statutes and penal code to place restrictions on assisting voters who did not have physical disabilities. Although the language of the bill was race neutral and did not explicitly mention language, Boehmer freely admitted that the aim of H.B. 245, known as the Boehmer Bill, was to disenfranchise voters of Mexican descent. The *Dallas Morning News* reported that "the purpose [of H.B. 245] expressed by the author is to disqualify the Mexicans of the Western and Lower Rio Grande counties, who are said to vote, in blocks, ballots prepared for them."[166] The Boehmer Bill passed and was sent to the Governor Colquitt to be signed into law, but Colquitt, who counted on support amongst voters of Mexican descent, ultimately vetoed the law. [167]

Texas Democrats continued to further restrict the franchise using other strategies to dilute the Mexican vote. In southwestern counties where Texans of Mexican descent continued to have political, cultural and economic influence, Anglo Texans grew impatient. In Starr County for

---

[162] Montejano, Anglos and Mexicans, 130.
[163] *Austin Statesman*, January 16, 1912.
[164] *Carrizo Springs Javeline*, August 5, 1911.
[165] The Legislature," *Galveston Daily News*, September 25, 1912, 6; "The Illiterate Vote," *Austin Statesman*, January 16, 1912, 4; "Wants Convention to Better the Suffrage," *San Antonio Light*, January 16, 1912, 3; "Purity of the Ballot," *Galveston Daily News*, February 28, 1912, 6; "Ballot Purification League Will Convene," *San Antonio Light*, April 10, 1912, 5; "Campaign for Pure Ballot to be Made," *San Antonio Light*, February 17, 1912, 1.
[166] "Election Amendment Goes Through House," *Dallas Morning News*, March 9, 1913, 10.
[167] O.B. Colquitt Veto, H.B. 245, April 19, 1913, Texas Legislative Reference Library, https://lrl.texas.gov/scanned/vetoes/33/hb245.html.

example, Ed C. Lasater challenged Manuel Guerra for political control. Guerra was a banker, rancher, and leading Democratic politician. His family could trace their place in the region back to Spanish land grants in 1767. In 1894 he was elected to the Starr County Commissioners Court and his family continued to be influential in politics for the next decade. In 1900 Republican Edward Cunningham Lasater organized with a growing movement of Anglo farmers and businessmen to oust Guerra, but they were unsuccessful. Violence and conflict continued in Starr County until ultimately Lasater prevailed in 1911 when the Texas legislature carved out the best land of Starr County for grazing and farming and created Brooks County, effectively drawing a new political subdivision to diminish Guerra's political power and secure white supremacy by gaining political control.[168]

In 1913, Representative D.W. Glasscock helped pass legislation to create Jim Hogg County to help his constituents "get out from under the domination of the Mexican vote at the other end of the county that rested upon the Rio Grande." From 1910 – 1921, counties in south Texas with majority Mexican electorates were subdivided from 7 counties into 13 counties by creating 6 new political subdivisions.[169]

During the World War I era, nativists fanned the flames of anti-immigrant sentiment and called for "Americanization" campaigns. Texas legislators made strident efforts to disenfranchise non-English voters and newly naturalized citizens in an effort to further "purify" the ballot box. In 1918, legislators passed laws mandating that teachers in Texas could only use English for curriculum or instruction.[170] These laws were ironic considering the history of Texas. For example, Democratic Representative William Madden Fly, the primary author of H.B. 128, "[r]elating to requiring teachers in the public free schools to conduct school work in the English language exclusively," was from Gonzales, a town named in 1825 for Rafael Gonzales, the Mexican governor of Coahuila and Texas.[171] But Fly represented an era of elected officials committed to creating a segregated society that disenfranchised non-white Texans and restricted who was considered Texan. He followed in the footsteps of his father George Washington Lafayette Fly, a Confederate officer and a Texas legislator.[172]

Legislators also passed a law that prevented the state from publishing laws in any language other than English.[173] That law had the effect of making it challenging for non-English speaking Texans to understand new changes in the laws and election reforms. These English-only laws also created a mechanism for enforcement and punishment. For example, any teacher or school

---

[168] Montejano, *Anglos and Mexicans*, 139-140; Evan Anders, "Guerra, Manuel," *Handbook of Texas Online*, https://www.tshaonline.org/handbook/entries/guerra-manuel.
[169] Montejano, *Anglos and Mexicans*, 139-140.
[170] "English Language Bill Is Signed," *Austin Statesman*, April 3, 1918, 3.
[171] Acts 1918, 35th 4th C.S., ch. 80, *General Laws of Texas*.
[172] "William Madden Fly," *Legislative Reference Library of Texas*, https://lrl.texas.gov/legeLeaders/members/memberdisplay.cfm?memberID=2242; Betty D. Fly and Craig H. Roell, "Fly, George Washington Lafayette (1835-1905)," *Handbook of Texas Online*, https://www.tshaonline.org/handbook/entries/fly-george-washington-lafayette.
[173] Jose Roberto Juarez, Jr., *The American Tradition of Language Rights: The Forgotten Right to Government in a Known Tongue*, 13(2) Law and Ineq. 443 (1995), 597597; Act of Aug. 7, 1919, ch. 84, 1919 Tex. Gen. Laws 303-08.

administrator found violating the law could be charged with a misdemeanor.[174] Further, these English-only laws had the impact of casting non-English speakers as unworthy of voting rights, access to a quality education, and portraying people that spoke Spanish and German as un-American and potentially disloyal. In 1918 legislators passed English-only inspired election reforms. A law eliminated the use of interpreters at voting polls and stipulated that no naturalized citizens could receive assistance from an election judge unless they had been citizens for twenty-one years.[175] By not allowing any aid for newly naturalized citizens until twenty-one years after they became citizens, this law had the impact of disenfranchising newly naturalized citizens who were otherwise eligible to vote but might have questions about the process, filling out ballots, or because they might be non-English speakers. The election reform also had the impact of charging election officials to treat naturalized citizens differently than they treated other voters. This opened the door for intimidation and harassment by election officials that profiled Mexican Americans as newly naturalized.

In 1919, the legislature again tried to reduce access to the ballot for people that spoke Spanish by amending and passing a statute to provide that election officials could not use any language other than English to aid voters or in performing their duties and that voters had to explain in English how they wished to vote. They went further and made it a misdemeanor for election officials to provide aid in any language other than English. Officials found in violation of the law would be subject to a fine between $200 and $500 or confinement in the county jail for between two months and a year, or both.[176] Restricting the availability of interpreters had the effect of disenfranchising Spanish-speakers who were otherwise eligible to vote.

These tactics to disenfranchise Spanish-speaking voters had been utilized in earlier historical periods, and as will be explained below, have been used in more recent history. To circumvent the rights of Tejanos to vote, political organizations passed resolutions to restrict their franchise based not on race, but on ethnic characteristics like language. For example, in 1866 the Tom Green County Democratic Convention passed a resolution that "no party be allowed to vote in the convention who cannot speak the United States language."[177] Although there was not an official "United States language" in 1866, the convention delegates used the resolution to expel eligible voters that spoke Spanish, not English.

In addition, to prevent Mexican migrants that had recently naturalized, the legislators utilized a law that prevented assistance if you had not been a U.S. citizen for 21 years.[178] Legislators who supported the legislation targeted a potential voting bloc between Texans of Mexican descent who would have increased voting power if recently naturalized migrants from

---

[174] Jose Roberto Juarez, Jr., *The American Tradition of Language Rights: The Forgotten Right to Government in a Known Tongue*, 13(2) Law and Ineq. 443 (1995) 591-592; Act of Apr. 3, 1918, ch. 80, § 2, 1918 Tex. Gen. Laws 170; Tax. PENAL CODE art. 293 (1925) (repealed 1969). See Act of June 21, 1969, ch. 889, § 51.203, § 2(b), 1969 Tex. Gen. Laws 2735, 3025 (repealing Tex. Penal Code art. 293); Tex. Penal Code art. 288 (1925) (repealed 1969).

[175] Montejano, Anglos and Mexicans, 143; Jose Roberto Juarez, Jr., *The American Tradition of Language Rights: The Forgotten Right to Government in a Known Tongue*, 13(2) Law and Ineq. 443 (1995), 595; Barr, "Texas Politics" p 244-248; Glasscock v. Parr, p 1040; Act of Mar. 23, 1918, ch. 30, § 2, 1918, Tex. Gen. Laws 54. The act made assistance to a voter a misdemeanor.

[176] Jose Roberto Juarez, Jr., *The American Tradition of Language Rights: The Forgotten Right to Government in a Known Tongue*, 13(2) Law and Ineq. 443 (1995) 596; Act of Mar. 13, 1919, ch. 55, § 1, 1919 Tex. Gen. Laws 95; Act of Mar. 13, 1919, ch. 55, § 2, 1919 Tex. Gen. Laws 95; Tex. Penal Code: arts. 224 and 225 (1925).

[177] De León, *They Called them Greasers*, 59.

[178] Act of Mar. 23, 1918, ch. 30, § 2, 1918, Tex. Gen. Laws 54.

Mexico could vote. During the decade between 1910 and 1920, historians estimate that as many as 1 million Mexican refugees migrated into the United States to flee the violence of the ongoing civil war in Mexico. Although many refugees soon returned to Mexico, the number of ethnic Mexicans in the United States tripled during the decade of the 1910s.[179]

By the end of the decade, most of Representative Boehmer's goals for disenfranchising Spanish-speaking voters, newly naturalized voters, and Mexican Americans had been realized. But laws on the books were not enough to assuage Anglo politicians that wanted to intimidate Mexican American voters. Counties in southwest Texas with large populations of Mexican Americans continued to bemoan the impact of the "Mexican vote" in elections.[180] English-only election laws were quickly used to intimidate Spanish-speaking voters. In Nueces County, where ethnic Mexicans were a sizeable portion of the eligible voting population, Texas Rangers traveled to Kingsville and Corpus Christi to intimidate voters before the 1918 primary elections, threatening that if they voted and could not speak and write in English they would be arrested and placed in the penitentiary.[181] The legislation coupled with voter intimidation were successful in curbing voter turnout. Attorney Marshall Hicks testified that Mexican Americans in the towns were terrorized. He described Texas Ranger Captain Hanson personally entering people's homes to intimidate them. Hicks pointed to the discrimination he witnessed and explained that behavior would not be tolerated if Rangers were entering Anglo homes to intimidate voters. He asked, "I wondered if they could do that in the old country where I was born, Cherokee, or where I practiced law, Wood [County], ...Invade the sanctity of the home and call men up to answer questions of this kind and you tell me that they did that and these men willingly answered them? No, I tell you. No there was a spirit of terrorism among those Mexican people spread by the action of the Rangers...Now, that terrorism among these people spread here and there. It undoubtedly had great effect upon the general election. It had unusual effect in some parts of the district." [182] During the general election in 1918 fewer than 70 eligible ethnic Mexicans voted in Nueces County.[183]

Senator Archie Parr also addressed the mistreatment of Mexican American voters in a testimony in 1919 and pointed to the contradictions of Mexican Americans serving in World War I, but being denied the right to vote in U.S. elections. "The gentleman who has just spoken here has had a good deal to say about the Mexican vote. It seems that he thinks they ought not to be counted at all. I want to say for the Twenty-third Senatorial District that eighty percent of the men who have gone to war are Mexicans...It is not right to say that you must go to war, and fight for your country and die but you have no right to vote or that your vote shall not be counted. In the county of Duval about 90 percent of those that went to the war are Mexicans...Now when the opposition come to you and tell you they do not want Mexicans votes, they are telling you something that is not true. They went out and tried to get every Mexican vote they could and I went out and tried to get them all and I got more votes than he did and that is all that is the matter

---

[179] *See* Mario T. García, *Desert Immigrants: The Mexicans of El Paso, 1880–1920* (New Haven, CT: Yale University Press, 1981); Johnson, *Revolution in Texas,* 59.
[180] Montejano, *Anglos and Mexicans*, 146 – 147;
[181] Jose Roberto Juarez, Jr., *The American Tradition of Language Rights: The Forgotten Right to Government in a Known Tongue*, 13(2) Law and Ineq. 443 (1995) 595.
[182] Montejano, *Anglos and Mexicans*, 146 – 147; Marshall Hicks testimony, Glasscock v. Parr Senate Investigation Supplement to Journal 1919 Vol 4, 1034-1035.
[183] Jose Roberto Juarez, Jr., *The American Tradition of Language Rights: The Forgotten Right to Government in a Known Tongue*, 13(2) Law and Ineq. 443 (1995) 595–96.

with them. My majority is more than his and the votes ought to be counted. I thank you for your time."[184]

These laws were also used as a mechanism that allowed politicians to invalidate votes by voters that spoke Spanish. In 1923, a judge disqualified votes cast by electors that received assistance in Spanish, finding them in violation of Texas election codes. The judge parroted language used by the sponsors of English-only election laws when he explained that aiding Spanish speaking voters in Spanish violated a statute "enacted to purify the ballot box of Texas."[185] This language of purifying the ballot box would be used throughout the twentieth century and even in recent legislative sessions.[186] These Jim Crow era laws targeting non-English speakers and newly naturalized voters continued to disenfranchise naturalized voters, Latino voters, and AAPI voters well into the twenty-first century, as this report will later discuss.

4. Disenfranchisement of AAPI Voters

Anti-Asian sentiment and disenfranchisement has deep roots in the Reconstruction era of Texas history. During the Civil War, the Republican Congress passed legislation to prevent southern plantation owners from replacing their enslaved African American workers with what was known as "coolie" labor – indentured and exploited workers generally from China or India that are different than general Chinese laborers.[187] Southerners believed that Chinese workers were a racially distinct, cheap, and controllable labor force, and as a result, the image of Chinese labor became conflated with a mythical, racist, stereotype of a mechanical "coolie" slave. In reality, the working conditions of the Chinese laborers were, indeed, terrible, but so-called "coolie" laborers were contract laborers with some degree of agency. Scholar Kornel Chang similarly concludes that "the 'coolie' was not so much a person or thing as an ideational construct that simultaneously expressed and projected Euro-American imperial visions, myths, and fantasies."[188] Still, the circulation of the "coolie" imaginary marked Asian laborers as "other"—a mark that allowed for a rhetorical slippage between that of the "Chinese" laborer with the "coolie" laborer across much of the 19th century. It is this misreading of Chinese labor with "coolie" labor that fueled anti-Chinese immigration campaigns throughout much of the South, and further decimated working conditions for Asian immigrants.

The Texas Constitution of 1869 is a prime example from this era, and openly outlawed the "[i]mportations of persons 'under the name of coolies,' or any other name or designation, or the adoption of any system of 'peonage,' whereby the helpless and unfortunate may be reduced to practical bondage, shall never be authorized, or tolerated by laws of the State; and neither slavery nor involuntary servitude, except as a punishment for a crime, whereof the party shall have been duly convicted, shall ever exist in the State."[189]

---

[184] Senator Parr testimony, Glasscock v. Parr Senate Investigation Supplement to Journal 1919 Vol 4, 1052.
[185] Jose Roberto Juarez, Jr., *The American Tradition of Language Rights: The Forgotten Right to Government in a Known Tongue*, 13(2) Law and Ineq. 443 (1995), 595; *Huff v. Duffield*, 251 S.W. 298, 301 (Tex. Civ. App. 1923).).
[186] Hanna Knowles, "A Texas bill drew ire for saying it would preserve 'purity of the ballot box.' Here's the phrase's history." *Washington Post* May 9, 2021.
[187] Kornel Chang, "Coolie," in *Keywords for Asian American Studies*, edited by Cathy J. Schlund-Vials, et al., (New York: New York University Press, 2015).
[188] *Id.*
[189] Texas Constitution of 1869 Article 1, Section 22.

Two decades later, in 1882, Congress passed the Chinese Exclusion Act to target Chinese immigrants and restrict their migration to the United States. This was the first U.S. immigration policy that identified a race and class for limited legal entry and ineligibility for citizenship. Historian Moon Ho Jung wrote, "While marking the origination of the modern immigration system, Chinese exclusion also signified the culmination of preceding debates over the slave trade and slavery, debates that had turned the attention of proslavery and antislavery Americans not only to Africa and the U.S. South but also to Asia and the Caribbean."[190] Poised at a historical juncture, with the nation fast-approaching a new century, legislators perceived immigration as a critical threat to a vision of a white homogenous national population. Again, the stereotyped image of the "unassimilable" coolie was weaponized.

Almost as soon as the Chinese laborers arrived, white planters and farmers in the south began to recruit Chinese workers away from the railroad and into agricultural labor. The railroad continued to import Chinese laborers, but they were also recruited to stay and work in western Texas cities like El Paso. In October 1881 the *El Paso Herald* reported that "eight carloads of Chinamen passed through the town of Trinidad, Texas headed for the "railroad front in Texas."[191] Entrepreneurial Chinese also moved to Texas and opened restaurants, laundry businesses, boardinghouses, barbershops, and doctors' offices. [192] By 1890 newspapers reported that El Paso was becoming "the Chinese Mecca of the southwest." It did not take long for Anglos to raise alarm about the threat of displacement. Some cried out, "Are the Caucassians [sic] to be overwhelmed by the Mongolian Heathen?" [193]

Further, in Texas, border towns like El Paso became sites where Chinese exclusion was enforced. Historians believe the first Chinese residents in Texas were a group of approximately 250 contract laborers that arrived in Calvert in Robertson County in 1870 to work on the Houston and Texas Central Railroad. The movement of Chinese laborers westward meant that more Chinese worked in Texas than in eastern cities like New York during this era. Historian Julian Lim estimates that there were more Chinese in Calvert than there were in the whole state of New York at that time.[194]

Over time, more Anti-Asian rhetoric was concretized into law. Anglo residents in El Paso called for city ordinances to segregate Chinese and force them into a concentrated part of town, but systemic segregation did not materialize. Instead, historian Julian Lim found that, "rather than passing any local legislation to strip Chinese immigrants of their rights or influence, local nativists turned to the national infrastructure for anti-Chinese restrictions, and called on the federal government to aid them in policing the Chinese in their midst. From the 1890s to 1910, the federal government obliged, sending more resources down to the border."[195] Texas Rangers also joined in policing Asian migrants.[196]

---

[190] *See* Moon-Ho Jung, "Outlawing "Coolies": Race, Nation, and Empire in the Age of Emancipation," American Quarterly 57, No. 3 (Sep., 2005): 678.

[191] Julian Lim, Porous Borders: Multiracial Migrations and the Law in the U.S.-Mexico Borderlands, 68.

[192] Julian Lim, *Porous Borders: Multiracial Migrations and the Law in the U.S. Mexico Borderlands* (Chapel Hill, NC: University of North Carolina Press, 2017), 95.

[193] Lim, *Porous Borders*, 69.

[194] Lim, *Porous Borders*, 68.

[195] Lim, *Porous Borders*, 96.

[196] Erika Lee, *At America's Gates: Chinese Immigration During the Exclusion Era, 1882–1943*. (Chapel Hill: University of North Carolina Press, 2004), 184.

In September 1892, an announcement was made that all Chinese laborers residing in El Paso would have to apply for certificates of residence under the Geary Act approved May 5, 1892. At first Chinese residents in El Paso rejected the legality of the registration law, but when the U.S. Supreme Court ruled in *Fong Yue Ting v. United States* (1893) that the Geary Act was legal, residents started to register. Federal agents (including inspectors, bureaucrats, prosecutors, and judges) soon poured into El Paso to enforce the Chinese Exclusion Act.[197]

On February 17, 1892, U.S. customs inspector George Duval noticed two men crossing the international bridge between El Paso, Texas and Ciudad Juárez, Chihuahua. Duval thought the pair looked suspicious and stopped them for questioning. In a panic one man threw open his Mexican blanket and Duval recognized that he was a "Chinaman." The man, Ah Lee, was charged "with being a Chinese person unlawfully within the United States of America."[198] Enforcing laws that deemed Chinese as ineligible for citizenship in the U.S. had the impact of shaping longstanding anti-Asian sentiment in Texas that impacted their ability to participate in the political process throughout the twentieth century and into the twenty-first century.

The 1924 Immigration Act would build upon the Chinese Exclusion Act, thereby excluding from entry into the United States any alien who by virtue of race or nationality was "ineligible for citizenship." As a result, most Asians could neither immigrate nor become naturalized in the United States. Once deemed ineligible to the rights of citizenship, Asian immigrants were subsequently barred from the right to vote and legally disenfranchised.[199]

State-specific Alien Land Laws further prohibited Asian immigrants from purchasing land. Asians were deemed "aliens ineligible for citizenship" and barred from immigrating to the United States. Alien Land Laws further barred Asian immigrants from land ownership. Such nativist policies signaled—both legally and materially—that people of Asian descent were coded outside the bounds of citizenship. In Texas, exclusionary alien land laws were in effect from 1892 until 1965.[200] The impact of these restrictive policies further fueled anti-Asian rhetoric, and created the false narrative that Asian immigrants were somehow immoral or inferior and ineligible of citizenship and voting rights. The 1924 Immigration Act's underlying nativist currents would not be revised until 1952.[201]

Americans of Asian descent continued to suffer discrimination fueled by anti-Asian sentiment. In 1898, the Supreme Court ruled in *United States v. Wong Kim Ark* that the Fourteenth Amendment granted birthright citizenship to any persons born in the United States regardless of their race or the status of their parents.[202] But the status of Asian Americans born in the United States was constantly under attack in the 20th century. In 1913 and in 1923, U.S. politicians

[197] Erika Lee, *At America's Gates*, 225.

[198] Lim, *Porous Borders*, 95. Historian Erika Lee wrote that during Chinese Exclusion Chinese migrants tried entering the United States through Canada and Mexico borders. El Paso continued to be a point of attempted crossings for Chinese migrants in the 1900s. Erika Lee, *At America's Gates*, 143-144.

[199] Mae M. Ngai, *Impossible Subjects : Illegal Aliens and the Making of Modern America*. (Princeton University Press, 2004), 21-41; Erika Lee "The "Yellow Peril" and Asian Exclusion in the Americas" *Pacific Historical Review 76, No.4 (2006);* 537-562. doi:https://doi.org/10.1525/phr.2007.76.4.537.

[200] "Alien Land Law," Texas State Historical Association, https://www.tshaonline.org/handbook/entries/alien-land-law.

[201] Mae M. Ngai, *Impossible Subjects : Illegal Aliens and the Making of Modern America*. (Princeton University Press, 2004), 21-41; Erika Lee "The "Yellow Peril" and Asian Exclusion in the Americas" *Pacific Historical Review 76, No.4 (2006);* 537-562. doi:https://doi.org/10.1525/phr.2007.76.4.537.

[202] *United States* v. *Wong Kim Ark*, 169 U.S. 649 (1898).

introduced bills in Congress designed to disenfranchise Chinese Americans.[203] Section 3 of the 1922 Cable Act revoked the citizenship of women who married "aliens ineligible for citizenship."[204] The law primarily targeted Asian American women who married Asian immigrant men. Women lost their citizenship, rights to own property, the right to vote, and the right to travel freely. In Austin, Francis Moreno, a Mexican American woman lost her citizenship when she married Joe Sing, who was born in China in 1860 and came to the United States around 1890. The act was amended and finally repealed in 1936, allowing her citizenship to be reinstated.[205] In contrast, the law stipulated that any woman who lost her U.S. citizenship because she married an alien that was eligible for citizenship in the U.S., could naturalize.[206]

Chinese Americans continued to suffer from policing, suspicion, and discrimination. In the 1930s Chinese Americans expressed a sense of alienation and that they were citizens in name only. One described their position, "I speak fluent English, and have the American mind. I feel that I am more American than Chinese. I am an American citizen by birth, having the title for all rights, but they treat me as if I were a foreigner. They have many restrictions against us."[207]

Following the Japanese bombing of Pearl Harbor in WWII, anti-Asian rhetoric reached a new crescendo in the United States. On February 19, 1942, President Franklin Delano Roosevelt signed Executive Order 9066, authorizing the forced removal of over 120,000 Japanese and Japanese Americans living in designated "exclusion zones" within the United States to WRA incarceration camps, internment camps, or immigration detention stations scattered across the country. Although the state of Texas was outside the juridical bounds of the official "exclusion zone," many Issei, or first-generation Japanese men and women, were removed from their homes in the West and sent to camps within Texas. In addition, many Japanese deported from Latin America to the United States during World War II were incarcerated in Texas; the INS sent Latin American Issei men to the internment camp at Kennedy, married couples to the camp at Seagoville, and families with children to the camp at Crystal City, Texas.[208]

Nearly fifty years after the conclusion of World War II, President Ronald Reagan signed a hard-fought appropriation bill, allotting 20,000 dollars to all survivors of Japanese American incarceration as a form of redress. The Congressional report defending the bill argued that the forced incarceration of Japanese Americans was a "black spot" on the American conscience, and the result of blatant "race prejudice, war hysteria and a failure of political leadership."[209]

The bill was the first official recognition of the fact that Japanese American incarceration had not been a matter of "military necessity," as official statements in the 1940s held. While the

---

[203] Erika Lee, *At America's Gates*, 210.

[204] An Act Relative to the naturalization and citizenship of married women – 42 Stat. 1021, 67th Congress, Sess. II, Chap. 411, sec. 3, September 22, 1922.

[205] "Pioneers from the East: First Chinese Families in Austin," Austin History Center; Sing Family Papers, Austin History Center, https://library.austintexas.gov/ahc/sing-family.

[206] An Act Relative to the naturalization and citizenship of married women – 42 Stat. 1021, 67th Congress, Sess. II, Chap. 411, sec. 4, September 22, 1922.

[207] Quoted in Erika Lee, *At America's Gates*, 239.

[208] Tetsuden Kashima, Judgment Without Trial: Japanese American Imprisonment during World War II . Seattle: University of Washington Press, 2003; "Crystal City," https://encyclopedia.densho.org/Crystal_City_(detention_facility.).

[209] Commission on Wartime Relocation and Internment of Civilians, Personal Justice Denied: Report of the Commission on Wartime Relocation and Internment of Civilians, 2nd ed. (Washington D.C.: Government Printing Office, 1982).

redress bill was heralded by many members of the Japanese American community as a necessary step towards justice, others argued that the bill did little to alter the entrenched, xenophobic state structures that led to the mass incarceration.[210] Further, the incarcerated ethnic Japanese from Latin America—again, incarcerated at Kennedy, Crystal City, and Seagoville— were excluded from the Redress bill.

5. The Overall Effect of the Jim Crow Era on Non-White Voters

The white primary in Texas is perhaps the most widely known example of a tenacious commitment by some white Texans to find any means to disenfranchise non-white voters. Following each Supreme Court ruling, Texas officials searched for loopholes or policies to circumvent the restrictions on the white primary. With each white primary that was held, non-white voters were reminded that in Texas the franchise was not a right enjoyed by all. Generations of Texans grew up under these racist election policies. When the white primary was ruled unconstitutional in all its forms, finally, in 1952, the franchise was still not available to all. During the last decades of the Jim Crow era in Texas, non-white voters continued to experience voting related discrimination from the poll tax, voter intimidation, and the use of at-large elections.

In 1952, Mexican American voters and organizers in Crystal City, Texas suffered fierce backlash from Anglo employers, city officials and law enforcement for increased voting by Latino voters. Three members of the Bexar County Democratic Coalition who traveled to Crystal City to help organize voters were greeted by Texas Rangers. Local officials had called in support from Texas Rangers, the state police force that had a long history of intimidating non-white voters. Texas Ranger Captain Alfred Young Allee, who had a reputation of abuse and violence, traveled to Crystal City and intimidated and beat labor organizers and Mexican American advocates that educated voters in the region.[211] Captain Allee's views of the civil rights movement to desegregate schools, to end labor exploitation, and to gain voting rights in Texas were clear. He explained to a reporter of the *New York Times*, "This civil rights…That's the doggondest business I ever heard of."[212]

Henry Muñoz later remembered that Allee personally threatened Muñoz, visiting him at night and taking him into the woods for a beating, often threatening to kill him. "I could almost set my watch by what time he'd come in," Muñoz recalled, "I [knew that] at 12:15 at night he'd be there and take me out forty or fifty miles in the woods and give me all kinds of hell."[213]

When Mexican American candidates visited city council to file for office, the clerk refused to give them the needed forms to file. When Mexican American candidates and their supporters put signs up in town, they were torn down at night. To try and stifle political organizing meetings that were gaining in attendance and frequency, the city also placed the town under a curfew, but the curfew only applied to Mexican American residents. Employers also discouraged employees from voting or being involved in local organizing. At the Del Monte spinach packinghouse three Mexican American workers were fired for simply wearing campaign buttons to work. The night before the election on April 2, 1963, Cal-Pack put up a notice that on election day workers had to

---

[210] Lawson Fusao Inada, Only What We Could Carry: The Japanese American Internment Experience (Berkeley, Calif.: Heyday Books, 2000); Seattle: University of Washington Press, 1997), 182; Roger Daniels and Eric Foner. Prisoners Without Trial: Japanese Americans In World War II. New York: Hill and Wang, 1993.
[211] Krochmal, *Blue Texas*, 296-298.
[212] John Kifner, "Texas Ranger Not a Hero to All," New York Times, March 23, 1970.
[213] As cited in Krochmal, *Blue Texas*, 296.

work overtime starting at 5am until 9pm at night.[214] Farmers that managed farm labor in the fields likewise told workers that instead of being paid 50 cents an hour they would be paid 1 dollar an hour, if they stayed passed 8pm. Keeping workers for longer working hours on election day would have made it impossible for workers to vote before polling locations closed. Despite these efforts, on election day all five Mexican American candidates for city council had prevailed.[215]

This victory was met with continued backlash. One of the candidates who had missed work on election day to get out the vote was fired from his job at the Economart. Another new councilman had his salary cut in half. The Texas Rangers, including Captain Allee, stayed in Crystal City long after the election and stalked the new councilmen. [216] Juan Cornejo, who headed the local Teamsters union and worked as an employee at the city's Del Monte spinach packinghouse, and who helped lead the poll tax drive, was elected as Mayor of Crystal City. Captain Allee personally assaulted Mayor Cornejo, even after the new mayor made personal appeals to then Governor Connally to remove the Rangers from Crystal City. The Rangers only withdrew after Senator Yarborough sent an appeal to U.S. attorney general Robert F. Kennedy and the FBI arrived to investigate.[217]

Years after Texas Ranger Allee intimidated voters in Crystal City, he engaged in police brutality to suppress a strike by farm workers in Starr County. In 1966 and 1967, Mexican American farmworkers attempted to unionize in the lower Rio Grande Valley, but they were subjected to persistent harassment and violence by local growers and by local law enforcement. In May 1967, Reverend Edgar Krueger and Magdaleno Dimas were taken into custody by Texas Rangers. In a gross form of intimidation, as a train passed, the Rangers held Krueger and Dimas's bodies so that their faces were only inches from the train. Weeks later Rangers beat Dimas and another union organizer Benito Rodriguez so severely during their arrest that Dimas was hospitalized for four days with a brain concussion. X-rays revealed that he had been struck so hard on the back "that his spine was curved out of shape." [218] Rodriguez had cuts and bruises on his head, jaw, back, and arm and one finger was broken and his nail had been torn off. Francisco Medrano and other organizers sued Allee and other Texas Rangers. The court granted an injunction against a "variety of unlawful practices," including police intimidation.[219]

Texas Rangers had a longer history with undermining civil rights efforts in Texas. Civil rights pioneers who worked to end racial violence by Texas Rangers faced daunting barriers. State Representative José Tomás Canales, the sole Mexican American elected to state office in 1919, suffered death threats and intimidation by law enforcement for leading an investigation into abuse by Texas Rangers, including police abuse, murdering prisoners in custody, organizing massacres, and intimidating voters.[220]

[214] Krochmal, *Blue Texas*, 298, 300.
[215] Krochmal, *Blue Texas*, 298, 300.
[216] Krochmal, *Blue Texas*, 296-298.
[217] Krochmal, *Blue Texas*, 301-302.
[218] *Allee v. Medrano*, 416 U.S. 802, 807 (1974).
[219] *Id.* at 802, 804–05.
[220] José T. Canales, introduction of charges, "Proceeding of the Joint Committee of the Senate and the House in the Investigation of the Texas State Ranger Force," Adjutant General Records, Texas State Archives, Austin, Texas; Telegram from Adjutant General Harley to Ranger Frank Hamer, December 23, 1918, submitted to evidence for "Proceedings."

The decade between 1910 and 1920 was a period of racial terror. Mushrooming nativist sentiment shaped how Anglo Americans viewed both ethnic Mexicans and the U.S.-Mexico border, inspiring calls for violent policing. Hundreds of people were murdered—men, women, and children. People who witnessed this era frequently referred to it as La Matanza, the massacre.[221] Simply put, this was an era of state sanctioned racial violence. In 1919, U.S. Congressman Claude Hudspeth of West Texas described hordes of Mexican bandits just south of the border as an ever-present threat. He publicly justified state police officers shooting Mexicans on sight. He testified under oath, "You have got to kill those Mexicans when you find them, or they will kill you…"[222]

But politicians went beyond rhetoric. They militarized the border. Mexican revolutionaries were seen as a threat to Anglo control and American capital. Residents worried that the revolution to overthrow the Porfirio Díaz dictatorship, to redistribute land, and to reclaim natural resources from foreign owned mining companies in Mexico could spill across the border and threaten Anglo property or even U.S. control in the Southwest.[223] As conflicts between federal and revolutionary soldiers reached the northern Mexico border, Texas Governor Oscar Colquitt dispatched over 1,000 state militiamen and the Texas National Guard to appease El Paso and Brownsville residents. By 1916 the Wilson administration had deployed approximately 100,000 National Guard troops to the U.S.-Mexico border between Yuma, Arizona, and Brownsville, Texas. The Texas legislature budgeted to hire more state police. In 1915 the state police included only 25 Rangers. By 1919, nearly 1,350 Rangers policed the state.[224]

During this era, local law enforcement, Texas Rangers (who held investigative jurisdiction across Texas), U.S. soldiers, and vigilantes alike were able to act with impunity. In 1915, Texas governor James Ferguson ordered the state police to "clean out the nest" near the border with Mexico of ethnic Mexicans and he openly offered his pardoning power to Texas Rangers who committed crimes. Rangers profiled any ethnic Mexican as a Mexican bandit, made arrests, and then left prisoners vulnerable to mobs. Vigilante groups formed with euphemistic names, like "Home Guard" and "Law and Justice League," inflicting fear and violence.[225]

Representative Canales introduced state legislation that aimed to reform the state police force by reducing its size, increasing agent salaries, and placing agents under bond. House Bill 5, or the Canales Bill as it was known, called for an extensive investigation into Ranger conduct going back to the peak of anti-Mexican violence in 1915 and sought to document acts of extralegal violence by the state police, including intimidating voters at the behest of governors and murdering Mexican American elected officials, like Antonio Longoria of Hidalgo County.[226] In the span of

---

[221] The following history is detailed in my book: Monica Muñoz Martinez, *The Injustice Never Leaves You: Anti-Mexican Violence in Texas* (Cambridge, MA: Harvard University Press, 2018).
[222] Martinez, *The Injustice Never Leaves You*, 209.
[223] Benjamin Heber Johnson, *Revolution in Texas: How a Forgotten Rebellion and Its Bloody Suppression Turned Mexicans into Americans* (New Haven, CT: Yale University Press, 2003).
[224] Martinez, *The Injustice Never Leaves You*, 19.
[225] Martinez, *The Injustice Never Leaves You*, 87-88; Monica Muñoz Martinez, testimony, U.S. House Committee on the Judiciary Subcommittee on Immigration and Citizenship, "Oversight of the Trump Administration Border Policies and the Relationship Between Anti-Immigrant Rhetoric and Domestic Terrorism," September 6, 2019. https://www.congress.gov/116/meeting/house/109889/witnesses/HHRG-116-JU01-Wstate-MunozMartinezM-20190906.pdf.
[226] For more on the murder of Antonio Longoria, *see* Martinez, chapter 2, *The Injustice Never Leaves You*.

two weeks, 83 witnesses testified. The transcriptions for the hearings resulted in three volumes totaling nearly 1,600 pages, currently preserved by the Texas State Archives.[227]

The Texas Ranger investigation ended in late February 1919, but unsurprisingly, racial tensions continued. The NAACP grew alarmed at the increasingly brutal lynchings in Texas. Moreover, the NAACP documented the wide-spread lynching culture and abuse by local and state police toward anti-lynching activists trying to curb the practice. In 1918, the NAACP released a list of the top ten states with the highest rates of lynching since 1889. Texas was listed third with 335 victims, behind Georgia and Mississippi. [228] In 1918 alone, the NAACP recorded eleven lynchings in Texas, second only to Georgia, where mobs claimed nineteen victims. The summer of 1919 also proved tumultuous around the nation, as racial conflicts erupted in places like Elaine, Arkansas, and Omaha, Nebraska. Approximately thirty riots nationwide were reported. This led to the months from May to October 1919 being called the Red Summer.[229]

In July the east Texas town of Longview erupted in conflict as an Anglo mob terrorized African American residents, burning homes and attempting to lynch prominent African American citizens. Longview had recently demonstrated a dark reputation for policing interracial relationships with violence, when on June 17, 1919, a white mob removed Lemuel Walters from the Gregg County Jail and lynched him for allegedly having a relationship with a white woman from nearby Kilgore.[230] On July 12, the local sheriff, E. M. Meredith, instigated more violence when he shot and killed Marion Bush, father-in-law of the local black physician who also helped organize African American farmers. Anticipating a backlash, the town mayor requested an additional 150 guardsmen from Governor Hobby. When the additional guardsmen arrived, they placed the town under martial law.[231]

The death of Marion Bush brought calls to curb police violence. Early in August 1919, Governor Hobby directed Texas Rangers to investigate the local branches of the NAACP, under the charge that the organization might be circulating Bolshevik propaganda. The agents' effort to help the governor and slow NAACP progress proved successful. The Rangers found no ties to communism, but they claimed that the NAACP branches did not have the proper state charters.

[227] José T. Canales, introduction of charges, "Proceeding of the Joint Committee of the Senate and the House in the Investigation of the Texas State Ranger Force," Adjutant General Records, Texas State Archives, Austin, Texas.
[228] *Tenth Annual Report of the National Association for the Advancement of Colored People for the year 1919*, 14–15. New York, NY: NAACP; NAACP (National Association for the Advancement of Colored People). 1919. Thirty years of lynching in the United States, 1889–1918, 7. New York, NY: NAACP.
[229] *Tenth Annual Report of the National Association for the Advancement of Colored People for the year 1919*. New York, NY: NAACP; Monica Muñoz Martinez, *The Injustice Never Leaves You: Anti-Mexican Violence in Texas*, (Cambridge: Harvard University Press, 2018) 176, 179, 181, 219–222.
[230] Tenth Annual Report of the National Association for the Advancement of Colored People for the Year 1919, 92; Kenneth R. Durham, "The Longview Race Riot of 1919," East Texas Historical Journal 18 (1980): 13–24; "More Troops Ordered Sent to Longview," Dallas Morning News, July 13, 1919; "Gregg County Now under Martial Law," Dallas Morning News, July 14, 1919; "16 White Men under Arrest at Longview," Dallas Morning News, July 15, 1919; "Longview Blacks Held in County Jail in Austin," Austin American, July 17, 1919; "More Race Riots Break Out Now at Longview," Austin American, July 13, 1919.
[231] "Gregg County Now under Martial Law," Dallas Morning News, July 14, 1919; Monica Muñoz Martinez, The Injustice Never Leaves You: Anti-Mexican Violence in Texas, (Cambridge: Harvard University Press, 2018) 216–218.

The Rangers argued that NAACP chapters were advocating racial equality and had incited racial tensions in Texas and pressured the branches in Texas to disband.[232]

Texas Governor Hobby himself met the NAACP with open hostility. On August 21, John R. Shillady, the National Secretary of the NAACP, traveled to Austin to meet with state authorities. Upon his arrival in Austin on August 21, Shillady was hauled before County Judge Dave J. Pickle in the Travis County Court.[233] Pickle warned the NAACP secretary to leave the state. Shillady stayed and held a meeting with local residents. Upon returning to his hotel, Judge Pickle, Constable Charles Hamby, and Ben Pierce accosted and severely beat the NAACP secretary, forced him onto a train, and threatened him not to get off until he was outside of Texas.[234] "Rather than denouncing the participation of members of the court and local police in beating Shillady, the governor rebuked the NAACP for interfering in state matters in a telegram: 'Shillady was the only offender in connection with the matter referred to in your telegram and he was punished before your inquiry came. Your organization can contribute more to the advancement of both races by keeping your representatives and their propaganda out of this State than in any other way.'"[235] The agents of the state who sought to dismantle the growing strength of the NAACP in Texas did their work well. By the end of 1921, all but seven of the original thirty-three NAACP branches in Texas had disbanded.[236]

Contrary to popular notions that mob violence took place at the hands of marginal populations under the cloak of night, in Texas violent crimes took place in broad daylight, with witnesses, and were carried out by prominent citizens. Indeed, the governor himself, as well as a variety of men charged with upholding the law, played key roles in creating a climate of fear. Rather than help turn the tide, authorities turned a blind eye to the Texas tradition of state-sanctioned violence. The frequency with which victims were taken from police custody and lynched highlights the role of local and state police in allowing acts of vigilantism to occur. It also provides the deeper history of the forces that have shaped the long-standing mistrust of local and state police by racial minorities.[237]

This violence and hostility from both the Texas Rangers and other Texas Government officials intimidated non-white voters and prevented them from being able to vote for candidates of choice who would be responsive to the needs of their community and to see their humanity. In

---

[232] Mark Robert Schneider, *We Return Fighting: The Civil Rights Movement in the Age of Jazz* (Boston: Northeastern University Press, 2002), 30–34.
[233] Pamphlet, "Mobbing of John R. Shillady," National Association for the Advancement of Colored People, 1919; "Texas Judge Whips John R. Shillady," *New York Times*, August 23, 1919; Schneider, *We Return Fighting*, 30-34.
[234] Pamphlet, "Mobbing of John R. Shillady," National Association for the Advancement of Colored People, 1919; "Texas Judge Whips John R. Shillady," *New York Times*, August 23, 1919; Schneider, *We Return Fighting*, 30-34.
[235] *Oversight of the Trump Administration's Border Policies and the Relationship Between Anti-Immigrant Phetoric and Domestic Terrorism, Hearing Before the Committee on the Judiciary Subcommittee on the Immigration and Citizenship*, 116th Cong. 14 (2019) (written statement of Monica Muñoz Martinez (quoting Mob Attack on the Association's Secretary, Tenth Annual Report of the National Association for the Advancement of Colored People for the year 1919, at 58. New York, NY: NAACP)), https://docs.house.gov/meetings/JU/JU01/20190906/109889/HHRG-116-JU01-Wstate-MunozMartinezM-20190906.pdf.
[236] Mark Robert Schneider, *"We Return Fighting": The Civil Rights Movement in the Jazz Age* 32 (2001);Steven A. Reich, Soldiers of Democracy: Black Texans and the Fight for Citizenship, 1917–1921, 82 *Journal of American History* 4, 1478–1502( Mar. 1996); Monica Muñoz Martinez, The Injustice Never Leaves You: Anti-Mexican Violence in Texas 176, 179, 181, 219–22.
[237] *See id.*

addition to violence around voting, throughout the Jim Crow era of Texas, the poll tax continued to be used as an obstacle for non-white voters. In Texas, voters were required to pay a poll tax for state and local elections for more than 60 years. Even after 1964 when Congress ratified the 24th Amendment to the U.S. Constitution to prohibit the use of poll taxes in federal elections.[238] In Texas, voters continued to have to pay a poll tax for local and state elections until 1966, when the U.S. Supreme Court held that the use of poll taxes in state elections violated the 14th Amendment because like race, creed or color, wealth "is not germane to one's ability to participate intelligently in the electoral process. Lines drawn on the bases of wealth or property, like those of races, are traditionally disfavored."[239]

Abolishing the poll tax marked a monumental shift in the voting cultures in Texas.[240] For decades the poll tax was used as a bureaucratic weapon to discourage poor non-white voters and to intimidate those that sacrificed, saved, and did pay their poll taxes. In 1962 in Crystal City, for example, a coalition of organized labor, activists from the Political Association of Spanish-Speaking Organizations (PASO), high school student organizers, and working-class Mexican Americans had a successful public education campaign to encourage Mexican Americans to pay their poll taxes and to vote. The poll tax drive aimed to wake the "sleeping giant" of eligible Mexican Americans who had never voted. In the rural agrarian town of Crystal City, most Mexican Americans were working class and they had to make tremendous sacrifice to pay the $1.75 poll tax. Residents had also experienced discrimination and were even discouraged from employers not to become politically active much less vote. Most were also not familiar with the deadlines for paying poll taxes and registering to vote. The grassroots public education campaign was successful. By the time the campaign closed, organizers netted 1,129 Spanish-surnamed voters on the local registration rolls while only 542 Anglos paid their poll taxes. Mexican American voters had a 2-1 margin in their favor. Although this was still only a fraction of the 10,000 residents of Crystal City, the registration drive had the potential to allow the Mexican American residents to vote for the first time for representatives that could represent their needs.[241]

During this period of time, African-American, AAPI, and Latino people were not only violently victimized, but they were also silenced. Non-white voters were intentionally shut out of the political process, whether it was by violence, poll taxes, intimidation, or the inability to cast a ballot. This systemic racism and oppression set the tone for current voter suppression and oppression of non-white voters. Sadly, some of the brutal tactics used during this period are being used today to diminish and depressing the voting power of non-white voters.

---

[238] U.S. CONST. amend. XXIV, § 1. The Amendment guarantees that the right to vote in federal elections "shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.".

[239] *Harper* v. *Virginia Board of Elections*, 383 U.S. 663, 668 (1966) (internal citation omitted).

[240] The poll tax was repealed in 1966 with the passage of H.J.R. 13 during the 59th legislative session (1965) and its approval by voters on November 8, 1966. 58.6 percent of voters approved. H.J.R. 13, 59th R.S. (1965); Election Details, H.J.R. 13, 59th R.S., Texas Legislative Reference Library.

[241] Max Krochmal, Blue Texas*: The Making of a Multiracial Democratic Coalition in the Civil Rights Era* 293–95 (2016). An estimated 8,000 residents in Crystal City were farm workers who performed "stoop labor" in an era before the short-handle hoe (known as *el cortito*) before it was outlawed in 1975. Short-Handled Hoe, 1950s and 1960s, National Museum of American History (last visited May 19, 2022), https://americanhistory.si.edu/collections/search/object/nmah_1352222.

### *E. Non-White Voting Discrimination Post-Voting Rights Act of 1965*

In 1975, the United States Congress extended the protections of the Voting Rights Act of 1965 to include protections for language minorities in addition to the requirement that jurisdictions with less than 50 percent of eligible voters registered in 1972 would be required to have any election reforms pre-cleared by the federal government. Congress passed various coverage formulas during every reauthorization except for 1982 and 2006.[242] The VRA also included a language minority provision, Section 203, that states that counties are required to provide bilingual election information if more than 5 percent of the population or 10,000 voting age citizens, belong to a language minority, have depressed literacy rates, and do not speak English well.

Texas initially rejected the federal government's extension of the Voting Rights Act to cover language minorities and filed a suit challenging the extension. Justice Thurgood Marshall delivered the opinion of the U.S. Supreme Court in *Briscoe* v. *Bell*, 432 U.S. 404 (1977), ruling that as part of the 1975 amendments to the Voting Rights Act Congress extended the Act's protections to cover language minorities—defined as citizens living in environments where the dominant language is not English. Language minorities in this case were persons identified as American Indian, Asian American, Alaska Native, or Spanish heritage. The extension, Marshall wrote, was included after "extensive hearings that there was overwhelming evidence showing the 'ingenuity and prevalence of discriminatory practices that have been used to dilute the voting strength and otherwise affect the voting rights of language minorities."[243] "Concern was particularly expressed over the plight of Mexican American citizens in Texas, a State that had not been covered by the 1965 Act."[244] "This case arises out of Texas' efforts to prevent application of the 1975 amendments to it."[245]

The Supreme Court dismissed the complaint, citing Section 4 (b) of the Voting Rights Act, and explaining that Congress "could hardly prohibit judicial review in more explicit terms."[246] In the opinion, Justice Marshall went to great lengths to quote from the Voting Rights Act and to discuss Congress' intentional and purposeful drafting of the Act and its amendment in 1975. He quoted Congress's conceiving the VRA as a stern and powerful remedy for "an insidious and pervasive evil which has been perpetuated in certain parts of our country."[247] He wrote, "The stringent remedial provisions of the Act were based on Congress's finding that 'case-by-case litigation was inadequate to combat widespread and persistent discrimination in voting, because of the inordinate amount of time and energy required to overcome the obstructionist tactics invariably encountered…."[248]

Justice Marshall cited *South Carolina v. Katzenbach* and *Morris v. Gressette Post* for the proposition that "there can be no question that in attacking the pervasive evils and tenacious

[242] *Coverage Under the Special Provisions of the Voting Rights Act*, United States Department of Justice (Nov. 29, 2021), https://www.justice.gov/crt/about-section-5-voting-rights-act.
[243] *Briscoe* v. *Bell*, 432 U.S. 404, 405 (1977) (quotation marks and internal citations omitted).
[244] *Id.* at 405–06.
[245] *Id.* Vilma S. Martinez, who testified during the Congressional hearing in 1970 and exposed the long history of disenfranchisement suffered by Mexican Americans and language minorities, had to advocate again for language minority voters in Texas. She and lawyers for Mexican American Legal Defense Education Fund filed an amicus brief in the case. Briscoe v. Bell, 432 U.S. 404 (1977).
[246] *Briscoe*, 432 U.S. at 409.
[247] *Id.* at 410.
[248] *Id.*

defenders of discrimination, Congress acted within its 'power to enforce' the Fourteenth and Fifteenth Amendment 'by appropriate legislation." When enacting the VRA and its amendments.[249]

By filing the lawsuit to avoid Congress' intention to include Texas under the purview of the VRA, the state showed itself again to be a "tenacious defender" of voting discrimination. This voting discrimination extended into the redistricting context as described in subsection (f)(ii) of this section. Since 1970, Texas has consistently had its maps overturned or not precleared because the maps discriminated against non-white voters.[250]

By 2006, Texas led the nation in multiple categories of voting discrimination, including Section 5 violations and Section 2 challenges.[251] From 1976 until 2006 the DOJ issued 201 Section 5 objections to proposed electoral changes in Texas. Of those objections, 53 percent (107) occurred after the 1982 reauthorization of Section 5. In other words, in Texas the state did not progress or have less violations over time, the number of Section 5 violations slightly increased.[252] Section 5 also had a strong deterrent effect in Texas. In the case of 366 submitted voting changes between 1982 and 2006, the DOJ issued "More Information Requests," which had a deterrent effect and resulted in those voting changes were either being withdrawn, altered, or abandoned.[253] The Section 5 objections between 1982 and 2006 prevented discriminatory voting changes such as redistricting, changes to election rules, polling locations, and the method of electing officials, that would have disproportionately impacted non-white voters. The 97 local objections affected nearly 30 percent of Texas's counties where 71.8 percent of the state's non-white voting age population lives.

DOJ objections intervened to prevent voting procedure changes that would have depressed nonwhite voter turnout. For example, in 2006, the DOJ objected to discriminatory reduction of polling places in North Harris Montgomery Community College District in Harris and Montgomery County. The DOJ found that that under the proposed change District elections and ISD elections would be held separately, so voters would have to travel to two separate polling locations. Additionally, instead of 84 polling locations, the plan proposed only 12 polling locations for a geographic area well over 1,000 square miles with over 540,000 registered voters. The review found that the 12 polling locations were "remarkably uneven: the site with the smallest proportion of minority voters will serve 6,500 voters, while the most heavily minority site (79.2% black and Hispanic) will serve over 67,000 voters."[254]

Counties in Texas also made changes in voting procedures without submitting changes to the DOJ for preclearance. For example, in 2003, MALDEF sued Bexar County after the county announced that five early voting polling places that served predominantly Latino neighborhoods in the West Side of San Antonio would be closed. The West Side of San Antonio would have no

---

[249] *Id.* at 414.
[250] *See Veasey v. Abbott*, 830 F.3d 216, 240 (5th Cir. 2016) (en banc) (discussing history of challenges to redistricting plans).
[251] Nina Perales, Luis Figueroa, and Criselda Rivas, "Voting Rights in Texas: 1982 – 2006" Review of Law and Social Justice, Vol 17:2, 714.
[252] Perales, Figueroa, and Rivas, "Voting Rights in Texas: 1982 – 2006," 729.
[253] Perales, Figueroa, and Rivas, "Voting Rights in Texas: 1982 – 2006," 730-731.
[254] *See* Letter from Wan J. Kim, Assistant Attorney Gen., Department of Justice, to Renee Smith Byas, Vice Chancellor and Gen. Counsel, N. Harris Montgomery Cmty. Coll. Dist. (May 5, 2006), *available at* http://www.usdoj.gov/crt/voting/sec_5/pdfs/l_050506.pdf.

early voting locations, which would have suppressed the Latino vote. Bexar County did not submit the proposed polling place closures to DOJ for preclearance and MALDEF brought a suit against Bexar Count.[255] Closing traditional polling places in minority communities can have the impact of confusing voters and depressing turnout.

Of the 107 DOJ Section 5 objections filed between 1982 and 2006, 57 percent (61) of those objections were related to redistricting plans proposed at the state, county, city, school district, and community college district levels. Objections included minority vote dilution in the form of "fracturing" or "cracking" non-white voters or "packing" to concentrate non-white voters into districts.[256]

More evidence of the need for federal oversight to protect language minority voting rights in Texas was quickly revealed in 1979 when the Federal Election Commission released a study that found election officials in Harris County made insufficient efforts to meet the requirements set forth under the bilingual provisions of the Voting Rights Act. The study found "[r]egistration of language minorities and the availability of bilingual personnel at polling places are an exception rather than the rule. In addition, printed materials and voting publicity are rarely made available for language minorities. Overall, the political participation of language minorities has been largely ignored. This may be due to the attitude of most election officials who consider the bilingual needs of such persons 'very casually,' if at all."[257]

Sadly, voting related discrimination experienced by language minorities in Texas is still not a thing of the past. In October of 2014, Mallika Das attempted to vote in a Williamson County primary. Das, as an English-limited voter, brought her son with her to the polling location to act as her interpreter. A Texas election official did not allow Das's son to act as her interpreter citing a Texas law that provided that English-limited Texas voters may select an interpreter to aid them outside the ballot box, but the interpreter must be "a registered voter of the county in which the voter needing the interpreter resides." Das was allowed to vote, but without the help of her son, even though he was a student registered to vote in neighboring Travis County. Without the help of her interpreter and her limited understanding of English, Das was not able to complete her ballot and did not vote.[258]

The Asian American Legal Defense and Education Fund (AALDEF) filed the lawsuit *OCA-Greater Houston v. State of Texas* for Das and other plaintiffs. The Fifth Circuit ruled that the "the limitation on voter choice expressed in Tex. Elec. Code § 61.033 impermissibly narrowed the right guaranteed by Section 208 of the VRA."[259] In 2016 Williamson County agreed to settle the suit and assured that anyone except for an employer or union official can act as a translator for a voter. This victory for protecting the voting rights of English-limited voters in Texas, however, may have been short-lived.

---

[255] Miguel Hernandez Chapter of the Am. GI Forum v. Bexar County, No. SA-04-CA-181- FB (W.D. Tex. Aug. 27, 2003).
[256] Perales, Figueroa, and Rivas, "Voting Rights in Texas: 1982 – 2006," 732, 734.
[257] *The* State of Civil Rights: *1979*, A Report of the United States *Commission on Civil Rights*, United States Commission on Civil Rights (Jan. 1980), https://www.ojp.gov/pdffiles1/Digitization/65093NCJRS.pdf.
[258] *OCA-Greater Houston* v. *Texas*, 867 F.3d 604, 608–09 (5th Cir. 2017).
[259] *Id.* at 615.

In 2018, there were 88 counties in Texas that fall under the VRA's Section 203 provision that requires counties to provide bilingual education information.[260] "Among those counties, Harris County has the most language minority groups in need of election information in Spanish, Chinese, and Vietnamese."[261] In 2021 during the 87th legislative Regular Session, the Texas Legislature again amended Texas Election Code § 61.033 to restrict eligible interpreters: an interpreter "(1) may be any person other than the voter's employer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs; and (2) if appointed to serve as an interpreter by an election officer, must be a registered voter of the county in which the voter needing the interpreter resides or a registered voter of an adjacent county."[262] The Voting Rights Act does not contain the latter limitation.

### *F. Non-White Voting Discrimination Post Shelby County v. Holder (2013)*

#### 1. Intimidation and Disenfranchisement Continues After *Shelby County* v. *Holder*, Chilling Voter Participation

One specific form of intimidation in Texas is the prosecution of people for innocent mistakes of voting while they are ineligible, disproportionately chilling the voting power of African Americans, Latinos, and Asian American Pacific Islanders who might be confused about more recent election reforms and worry that they too would be severely punished for mistakes.

In 2017, Rosa Maria Ortega was sentenced to eight years in prison for voting in the 2012 and 2014 elections. Ortega had permanent residency status but was unaware that she was not eligible to vote. In 2014 Ortega moved to Tarrant County and when she registered to vote she incorrectly marked that she was a U.S. citizen on her application. In 2019, after serving just over nine-months in prison, Ortega was released on parole. After being paroled she was placed in ICE custody and faces deportation. The case was covered in the national press, with headlines like, "Texas woman sentenced to eight years for illegal voting paroled, faces deportation."[263] According to Ortega's lawyer, Clark Birdsall, Tarrant County District Attorney Sharen Wilson thwarted a plea agreement that would have dismissed the charges against Ortega and potentially prevented her from deportation.[264]

While politicians that have warned about voter fraud accused Democrats of fraudulent schemes, Ortega casted votes for Republicans, including Ken Paxton, in 2012 and 2014. Ortega's vote would not have changed the outcome of the election. Despite this, rather than simply removing Ortega's ballot from final tallies and creating more public education campaigns, she was

---

[260] The Texas Advisory Committee to the U.S. Commission on Civil Rights, *Voting Rights in Texas* 2, (July 2018), https://www.usccr.gov/files/pubs/2018/07-23-TX-Voting-Rights.pdf.
[261] *Id.*
[262] Tex. Elec. Code § 61.033.
[263] Gus Garcia-Roberts, Texas woman sentenced to eight years for illegal voting paroled, faces deportation, *USA Today* (Feb. 22, 2020), https://www.usatoday.com/story/news/2020/02/21/rosa-maria-ortega-texas-woman-sentenced-8-years-illegal-voting-paroled-and-faces-deportation/4798922002/; Michael Wines, Illegal Voting Gets Texas Woman 8 Years in Prison, and Certain Deportation, *New York Times* (Feb. 10, 2017), https://www.nytimes.com/2017/02/10/us/illegal-voting-gets-texas-woman-8-years-in-prison-and-certain-deportation.html.
[264] Gus Garcia-Roberts, *Texas woman sentenced to eight years for illegal voting paroled, faces deportation*, USA Today (Feb. 22, 2020), https://www.usatoday.com/story/news/2020/02/21/rosa-maria-ortega-texas-woman-sentenced-8-years-illegal-voting-paroled-and-faces-deportation/4798922002/.

prosecuted, imprisoned, and now faces deportation.[265] By criminalizing Ortega's misunderstanding and voting in error, she was used as a rallying cry by authorities trying to showcase examples of "fraud." Ortega's prosecution, imprisonment, and potential deportation has the impact of intimidating Latino voters and newly naturalized voters who see a Latina being harshly punished for a mistake.[266] Domingo Garcia, President of the League of United Latin American Citizens stated, "[h]er prosecution was a coordinated effort by Attorney General Paxton to suppress minority voters . . . The clear intent was to intimidate them into thinking, 'If I vote, I might get in trouble like that lady.'" [267]

Latino voters have recently received messages from politicians that they are not trusted voters and that they may be targeted for prosecution. In January 2019, Texas Secretary of State David Whitley instructed Texas counties to examine a list of around 95,000 registered voters whose eligibility was in question based on their citizenship status. This list included the names of naturalized citizens, including Julieta Garibay who immigrated from Mexico and is a naturalized U.S. citizen. Julie Hilberg of Poteet was also on the list. Hilberg became a U.S. Citizen at a naturalization ceremony in Bexar County on April 16, 2015 and immediately after the ceremony completed a voter registration form.[268] When the Texas Attorney General issued a public statement announcing that non-citizens were registered to vote and threatened criminal prosecution, Hilberg, who was an eligible voter, described feeling intimidated. "This was very intimidating, and I felt vulnerable and scared." The Atascosa County Election Administrator checked for Hilberg and confirmed that she was on the list provided by the Secretary of State.[269]

Groups including League of United Latin American Citizens, the Mexican American Legal Defense and Education Fund, and the American Civil Liberties Union questioned the methods used to compile the list of 95,000 names and warned the potential voter purge had the effect of targeting naturalized citizens. Legal suits were quickly filed. Following the controversy surrounding the attempted voter purge, Whitley failed to gain confirmation from the state legislature, and he resigned at the close of 2019. In February 2020, a federal judge instructed the state to temporarily halt the voting purge, and in April, the state of Texas agreed to settle the case *LULAC et. al.* v. *Whitley* and pay $450,000 for attorney fees.[270]

Whitley may have resigned, and the state may have settled the case, but the public statements issued by Attorney General Ken Paxton alleging that large numbers of non-citizens have been voting had the impact of threatening and intimidating eligible voters, like Garibay and Hilberg. In addition, it also has the effect of charging election officials to cast suspicion on naturalized citizens seeking to exercise their right to vote as U.S. citizens.

In addition to intimidating Latino and newly-naturalized citizens, prosecuting cases of alleged voter fraud have also been used to intimidate African American voters like Crystal Mason

---

[265] *Id.*
[266] *Id.*
[267] *Id.*
[268] Julie Hilberg, *I've Been a U.S. Citizen Since 2015. My State is Threatening to Purge Me From the Rolls*, Campaign Legal Center (Feb. 4, 2019), https://campaignlegal.org/story/ive-been-us-citizen-2015-my-state-threatening-purge-me-rolls.
[269] *Id.*
[270] James Barragán, Civil rights group sues Texas over order to investigate potential noncitizen voters with flawed data, *Dallas Morning News* (Feb. 2, 2019); Mary Tuma, Austin Resident Named in Texas Voter Purge Debacle, Files Suit, *Austin Chronicle* (Feb. 5, 2019); Ashley Lopez, Texas Voting Chief Who Led Botched Voter Purge Resigns, *NPR* (May 28, 2019).

and Hervis Rogers. In 2018, Crystal Mason was found guilty of voting illegally in Tarrant County in the 2016 election because when she voted she was on parole, which the state argued, made her ineligible to vote. Mason argued that she did not know she was ineligible to vote, that she was not informed by her parole officer, or at the polling place when she attempted to vote. In fact, after she arrived at her polling location, Mason discovered that her name was not on the voter rolls. A 16-year-old election worker provided Mason with a provisional ballot, which was later thrown out. Mason was forced to return to prison in 2018 and was released in May of 2019. Since then, she has been working to appeal her conviction.[271]

Mason's case is also complicated by the personal dynamics–the election worker who helped her to fill out the provisional ballot was a 16-year-old neighbor, and the election judge who reported Mason was Mason's neighbor but he claimed he did not know that Mason had been recently released from prison. Mason also revealed that, although her relationship with these neighbors had been friendly, she had faced harassment and been the target of racial slurs from other members of her predominantly white, suburban neighborhood.[272]

Crystal Mason's vote was not counted, and yet, the local District Attorney who prosecuted Mason sought the maximum punishment for Mason, who submitted a provisional ballot with the aid of election workers. This severe prosecution has the impact of intimidating African American voters and voters who are confused about election codes and whether or not they have met the standard for "fully discharged the person's sentence" and whether paying fees is a part of that standard. Voting rights advocates have pointed to the requirement for formerly incarcerated people to pay all fees before voting as a modern-day poll tax.[273] Moreover, Mason's own experience with harassment and discrimination in Tarrant County is a reminder to all non-white voters and especially to African American voters that they are not seen as equals or worthy of the ballot by some Americans today. This has the impact of chilling voter participation for non-white voters in places like Tarrant County that worry they might be prosecuted for voting mistakes.[274]

Immediately following her legal case in 2018, Mason stated, "I don't think I'll ever vote again…That's being honest. I'll never vote again."[275] Crystal Mason's daughter, Taylor was also impacted by her mother's prosecution. Taylor remained politically active by volunteering with the Beto O'Rourke Senate campaign, but was too scared to vote herself. Attorney Hani Mirza of the Texas Civil Rights Project worried that the Mason's reaction would be reflected in other Texas voters: "What concerned us the most was the gradual criminalization of regular voting

---

[271] Vann R. Newkirk II, When the Myth of Voter Fraud Comes for You, *The Atlantic* (Dec. 14, 2021); Lauren Lantry & Cheyenne Haslett, Texas woman faces jail time after being convicted of voting illegally while on supervised release in 2016, *ABC News* (June 19, 2021); Michael Murney, Years of Harassment Led Up to Neighbors Reporting Crystal Mason for Illegal Voting, She Says, *Dallas Observer* (Oct. 5, 2021).

[272] Emma Platoff & Alexa Ura, Crystal Mason's ballot was never counted. Will she still serve five years in prison for illegally voting?, *Texas Tribune* (Sep. 17, 2019); Alexa Ura, Texas Court of Criminal Appeals will review Crystal Mason's controversial illegal-voting conviction, *Texas Tribune* (Mar. 31, 2021).

[273] Can't Pay, Can't Vote: A National Study on the Modern Poll Tax 4, Civil Rights Clinic, Georgetown Law (2019), https://campaignlegal.org/sites/default/files/2019-07/CLC_CPCV_Report_Final_0.pdf .

[274] Meagan Flynn, *Texas woman sentenced to 5 years in prison for voting while on probation*, Texas Tribune (Mar. 30, 2018), https://www.texastribune.org/2018/03/30/texas-woman-sentenced-5-years-prison-voting-while-probation/;; Sam Levine, Texas Made An Example Out Of Crystal Mason—For Trying to Vote, *Huffpost* (July 29, 2019), https://www.huffpost.com/entry/crystal-mason-prison-sentence_n_5d3b04e8e4b0c31569e9fb94.

[275] Meagan Flynn, *Texas woman sentenced to 5 years in prison for voting while on probation*, Texas Tribune (Mar. 30, 2018), https://www.texastribune.org/2018/03/30/texas-woman-sentenced-5-years-prison-voting-while-probation/.

activity...We believe this trend is only going to severely chill voting to the point where we need to step in as voting rights experts."[276] On May 11, 2022, the Texas Court of Criminal Appeals ruled that the Texas Court of Appeals must reconsider its ruling upholding Ms. Mason's sentence, stating that the Court of Appeals erred in not considering whether Ms. Mason had actual knowledge that she was ineligible to vote.[277]

Hervis Rogers gained national notoriety on Super Tuesday in 2020 for being the last voter in line at a polling place at Texas Southern University in Houston.[278] Rogers and others with him in line suffered impossibly long wait times at this polling location in Harris County.[279] Rogers waited for six hours to cast his ballot.[280] Rogers' experience was covered in the media as an example of voter suppression and unequal access to voting for communities of color in Texas. But Rogers was celebrated for his fortitude and for not being deterred by the long wait times. Just over a year later, Rogers was arrested on charges of voting illegally in the Democratic Primary in 2020 and his bail was set at $100,000.[281] The Bail Project posted Rogers' bail in July of 2021, shortly after his arrest, but his case is still pending.[282]

Mason and Rogers are just two of an estimated 5 million[283] Americans that are currently ineligible to vote due to Subsection 4 of Texas Election Code § 11.002, which stipulates that a "qualified voter" is a person who has not been fully convicted of a felony or, if so convicted, has fully discharged the person's sentence, including any term of incarceration, parole, or supervision, or completed a period of probation or been pardoned or otherwise released from the resulting disability to vote.

According to a study published by the Sentencing Project, in 2016, 495,928 people in Texas, or 2.45% of the total voting age population, were disenfranchised as a result of this section of the election code.[284] That same study found that 147,727 African Americans in Texas, or 6.17% of the voting age population of African Americans in Texas, are disenfranchised because of the current election code.[285]

Arresting and prosecuting Mason and Rogers for violating an election code that disproportionately disenfranchises African Americans also has the impact of intimidating voters and suppressing the Black vote. This is especially true in counties like Tarrant and Harris with

---

[276] Sam Levine, *Texas Made An Example Out Of Crystal Mason—For Trying to Vote*, Huffpost (July 29, 2019), https://www.huffpost.com/entry/crystal-mason-prison-sentence_n_5d3b04e8e4b0c31569e9fb94.
[277] Sam Levine, *Texas court ordered to reconsider decision to uphold prison sentence for woman who voted*, The Guardian (May 11, 2022), https://www.theguardian.com/us-news/2022/may/11/texas-must-reconsider-decision-uphold-prison-sentence-crystal-mason-vote-2016.
[278] William Cummings, "'I wasn't going to let anything stop me': Texas voter waits six hours to vote on Super Tuesday," March 5, 2020. USA Today.
[279] *Id.*
[280] *Id.*
[281] "A Houston Man Is Arrested For Alleged Illegal Voting As Texas GOP Seeks Tighter Laws," *NPR*, July 9, 2021; Amy Gardner, "A Texas man was arrested on charges that he voted in the 2020 Democratic primary while on parole. He could face as much as 20 years in prison," *Texas Tribune*, July 11, 2021; Mitchell Brown, "Opinion: Arrested for voting? Hervis Rogers and the case against disappearing our voters," *Houston Chronicle*, July 15, 2021.
[282] *Id.*
[283] "Locked Out 2020: Estimates of People Denied Voting Rights Due to a Felony Conviction" The Sentencing Project, October 30, 2020 https://www.sentencingproject.org/publications/locked-out-2020-estimates-of-people-denied-voting-rights-due-to-a-felony-conviction/.
[284] "Expanding the Vote, Two Decades of Felony Disenfranchisement Reform" The Sentencing Project, 2018
[285] *Id.*

longstanding traditions of attempting to disenfranchise African Americans and long histories of severe prosecutions and sentencing for African American voting violations that in no way threaten the integrity of an election.

2. Racial Gerrymandering and Voter Suppression Laws

Texas has a pervasive history of racial gerrymandering. Writing about Texas voting related discrimination, historian Carol Anderson wrote, "[t]he racial gerrymandering in Texas is so institutionalized that, frankly, it has the aura of the apartheid era's 'white minority rule.'[286] In the Lone Star State, whites are 45% of the state's population, but control 70% of the congressional districts. The disparity is even more obvious in the Dallas-Fort Worth area, where whites are only 20 percent of the population but have 80 percent of the congressional seats."[287]

In 2016, an en banc Fifth Circuit noted, as part of Texas's contemporaneous history of voter discrimination, that, in every redistricting cycle since 1970, when Texas had to submit redistricting maps for preclearance, Texas maps have been found to have violated the Voting Rights Act by racially gerrymandering districts to dilute, pack, or crack non-white voters (including African-American, Latino, and AAPI voters).[288] The court also noted that Texas is the only state with a consistent record of DOJ objections to statewide plans between 1980 and 2016.[289] This record shows that Texas legislators have consistently, as in the past, responded to DOJ objections or court rulings by passing legislation or drawing maps that attempt to achieve the same results of voter suppression, but which are tailored to circumvent federal oversight or court rulings.

For example, the 2010 Census indicated that Texas's population had grown by 4.3 million new residents.[290] As a result, Texas gained four additional seats in Congress.[291] That 20.6 percent growth was fueled by Latino and African American population growth, but the Texas Legislature awarded three of the four new seats that resulted from minority population growth to white Republican districts.[292] In 2011, a three-judge court found that two of Texas's 2011 redistricting plans violated the Voting Rights Act.[293]

Texas also passed stringent voter ID laws that were initially blocked by Section 5 of the Voting Rights Act.[294] When Texas sued to contest the decision, a three-judge panel unanimously

---

[286] Carol Anderson, *One Person, No Vote: How Voter Suppression Is Destroying Our Democracy.* Bloomsbury Publishing, 2018) 108.
[287] *Id.*
[288] See *Veasey v. Abbott*, 830 F.3d 216, 240 (5th Cir. 2016) (en banc); *see also Veasey v. Perry*, 71 F.Supp.3d 627, 636 n.23 (S.D. Tex. 2014) (citing LULAC v. Perry, 548 U.S. 399 (2006); *Bush v. Vera*, 517 U.S. 952 (1996); *Upham v. Seamon*, 456 U.S. 37 (1982); *White v. Weiser*, 412 U.S. 783 (1973); *White v. Regester*, 412 U.S. 755 (1973)). "While the Supreme Court eliminated the formula for the preclearance requirement in *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612 (2013), prior to that opinion, a three-judge court had found that two of Texas's 2011 redistricting plans violated the Voting Rights Act." *Id.* (citing Texas v. United States, 887 F. Supp. 2d 133 (D.D.C. 2012), vacated and remanded on other grounds, 133 S. Ct. 2885 (2013)).
[289] *Veasey v. Abbott*, 830 F.3d at 240.
[290] Ari Berman, "Texas's Redistricting Maps and Voter-ID Law Intentionally Discriminated Against Minority Voters," *The Nation*, March 13, 2017; Michael Li, "A Redistricting Case About More Than Redistricting," July 18, 2014 *Texas Tribune*.
[291] *Id.*
[292] *Id.*; Michael Li, "A Redistricting Case About More Than Redistricting," July 21, 2014 *Texas Tribune*.
[293] *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012) (*vacated and remanded on other grounds*, 133 S. Ct. 2885 (2013)).
[294] Texas v. Eric Holder Civil Action No. 12-cv-128 (DST, RMC, RLW) (2012).

ruled that the law would impose "strict, unforgiving burdens" on poor and minority voters with many having to pay to travel as many as 200 to 250 miles to then pay fees for required ID.[295] In July 2011, Texas Governor Rick Perry signed SB 14, a law which drastically restricted the forms of acceptable IDs voters had to present to cast a ballot. The law required voters to use an unexpired photo ID from a list of acceptable documents. Noticeably absent from this list were student IDs and Veterans Administration cards.[296] Texas filed a federal lawsuit for preclearance to enforce this new law, but it was initially blocked by Section 5 of the Voting Rights Act.[297] However, following the *Shelby County* ruling, the law went into effect.[298] Within hours of that Supreme Court decision, then Texas Attorney General Greg Abbott released a statement, "[w]ith today's decision, the State's voter ID law will take effect immediately. Redistricting maps passed by the Legislature may also take effect without approval from the federal government."[299]

In the wake of the *Shelby County* decision, the fate of voting rights for African American, Latino, and Asian American and Pacific Islander voters was a top concern for the DOJ. At a speech in June 2013, U.S. Attorney General Eric Holder explained, "Based on the evidence of intentional racial discrimination that was presented last year in the redistricting case, *Texas v. Holder* — as well as the history of pervasive voting-related discrimination against racial minorities that the Supreme Court itself has recognized — we believe that the State of Texas should be required to go through a preclearance process whenever it changes its voting laws and practices."[300] He also cited the recent *Perez v. Texas* decision in which the court cited the Voting Rights Act in blocking a Texas congressional map that would have discriminated against Latino voters. In the opinion the court ruled that the parties "provided more evidence of discriminatory intent than we have space, or need, to address here.'"[301]

Texas' Voter ID law has had devastating effects on non-white voters. Ari Berman writes in his book, Give Us the Ballot: "Despite a high-profile governor's race between the Republican Greg Abbott and the Democrat Wendy Davis [in 2014], voter turnout dropped by 270,000 votes, compared with 2010. Only 28 percent of eligible voters went to the polls, the second-lowest turnout rate in the country."[302]

Voters like Margarito Lara who is 80 years old was born at home rather than a hospital and did not receive a birth certificate. Without a birth certificate, he lost his right to vote. When asked how he felt about not being able to vote under the SB14 voting law he expressed that he felt, sorry that [he] can't vote [because] it's very important when you vote."[303]

---

[295] *Id.*; see also Sari Horowitz, "More than half a million registered Texans don't have the right ID to vote on Super Tuesday," February 29, 2016, Washington Post.
[296] *Veasey v. Perry*, 71 F.Supp.3d 627, 658 (S.D. Tex. 2014).
[297] Texas Secretary of State John B. Scott, "Senate Bill 14 Denied Judicial Preclearance by Federal Court", August 30, 2012, https://www.sos.state.tx.us/about/newsreleases/2012/083012.shtml.
[298] *Veasey v. Perry*, 71 F.Supp.3d at 684.
[299] "Statement by Texas Attorney General Greg Abbott" June 25, 2013. https://perma.cc/SL53-AFSG Organizations like the Campaign Legal Center and the NAACP Legal Defense Fund filed suit against the State of Texas in August of 2013, following the *Shelby County* decision. *See Veasey* v. *Perry* 71 F.Supp.3d 627 (S.D. Tex. 2014).
[300] Ross Ramsey and Julian Aguilar, "Justice Department Seeks to Restore Voting Law Restrictions on Texas," July 25, 2013, Texas Tribune.
[301] *Id.*
[302] Ari Berman, *Give us the Ballot*, 311.
[303] "Cases and Actions: *Veasey* v. *Abbott*," Campaign Legal Center, April 13, 2021.

In August 2013, the NAACP Legal Defense Fund and the Department of Justice filed a suit against the State of Texas. The lead plaintiff in the case, 86-year-old Floyd Carrier, served in the United States Army during the Korean War.[304] Carrier used his Veterans Administration Card as his primary ID, but the 2011 voter ID law made Veterans Administration cards ineligible.[305]

In October 2014, U.S. District Judge Nelva Gonzales Ramos ruled that SB 14 violated the Voting Rights Act and barred its enforcement. The Fifth Circuit ultimately upheld the law, but Judge Ramos' ruling importantly recalled the searing pattern of voting related discrimination that continues today: "This history describes not only a penchant for discrimination in Texas with respect to voting, but it exhibits a recalcitrance that has persisted over generations despite the repeated interventions of the federal government and its courts on behalf of minority citizens. In each instance, the Texas legislature relied on the justification that its measures were necessary to combat voter fraud."[306]

In 2016, former Attorney General Eric Holder described the Voter ID law as a "poll tax" and in 2016 a federal court in Texas found that 608,470 voters did not have the voter ID required to vote.[307] Applying for identification is expensive when considering the fees and time it takes to file for an ID, and for people that live in rural areas without access to public transportation, they may need to travel over 150 miles to reach the nearest office to apply for an ID needed to vote.[308] In 2017, the ACLU estimated that approximately 21 million Americans, roughly 11 percent of the population, did not have government issued photo identification.[309] Up to 25 percent of African Americans were believed to be without official photo identification.[310]

In 2018, the Texas Advisory Committee to the U.S. Commission on Civil Rights submitted an advisory memorandum on voting rights in Texas. The committee reported that testimony from stakeholders indicated "considerable confusion regarding elections administration, including confusion about the voter ID law and provisional ballot procedures." The committee reported that in the 2016 election there was widespread confusion surrounding voter ID requirements and that voters were not consistently informed about "reasonable impediment" exception to the ID law, or offered provisional ballots. They also found heard testimony that some voters were also improperly turned away by misinformed poll workers. In addition, the report pointed out that the 2017 version of the ID law included "intimidating criminal sanctions associated with incorrectly executing the affidavit necessary to claim the 'reasonable impediment' exception to the ID law and stakeholders are concerned that this will deter voters who in fact fall under the ID law's exceptions from casting a ballot."[311]

The magnitude of Texas's voting discrimination has been enormous, and continues until recent times. In 2021, Republican state representatives sponsored a voting bill that claimed to be

---

[304] Carol Anderson, "The Republican Approach to Voter Fraud: Lie", NYTimes, Sep. 8, 2018.
[305] *Id.*
[306] *Veasey v. Perry* 71 F. Supp. 3d at 636.
[307] *Veasey v. Peery,* 71 F.Supp.3d at 699; Sari Horowitz, "More than half a million registered Texans don't have the right ID to vote on Super Tuesday," February 29, 2016, Washington Post. Legal experts agree the Voter ID law is a modern day poll tax. See Valencia Richardson, "Voting While Poor: Reviving the 24th Amendment and Eliminating the Modern-Day Poll Tax," *Georgetown Journal on Poverty, Law, and Policy* Vol XXVII, No. 3, Spring 2020
[308] *See Texas v. Eric Holder, Civil Actio*n No. 12-cv-128 (DST, RMC, RLW (2012).
[309] "Fact Sheet on Voter ID Laws," American Civil Liberties Union, May 2017.
[310] *Id.*
[311] "Voting Rights in Texas: An Advisory Memorandum of the Texas Advisory Committee to the U.S. Commission on Civil Rights," July 2018, 10.

motivated by an effort to "punish fraud and maintain the 'purity of the ballot box,' as instructed by the Texas Constitution", as one Washington Post article put it.[312] During the questioning of the sponsor, state Representative Rafael Anchía asked state Representative Briscoe Cain if he knew the history behind that provision in the Constitution.[313] Cain was not able to provide an answer.[314] Representative Anchía went on to explain that during the Jim Crow era lawmakers that passed legislation to segregate African Americans and Mexican Americans cloaked these efforts in language strikingly similar to elected officials' rhetoric today, describing their efforts as trying to "purify" the ballot box from potential fraud by African American and Mexican American voters.[315] Representative Cain said he "was not" aware of any kind of malicious intent in the use of that term.[316]

The House passed amendments removing "purity of the ballot box" from the language, but just as race neutral legislation in the past had the impact of disenfranchising African American, Latino, and AAPI voters, the current district maps and the recent election reforms passed by the same legislature will diminish the power of non-white voters, or those that are unable to navigate new obstacles to the ballot box.[317]

In October 2021, Texas enacted SB 1, without language related to "purity of the ballot box," but civil rights organizations like the NAACP Legal Defense Fund, the Mexican American Legal Defense and Education Fund, and ACLU filed suits on the grounds that election reforms will create new challenges and suppress non-white voters.[318] The new law included changes to the process for applying for a mail-in-ballot that led to confusion and rejected applications. In Texas counties with the largest populations, the state rejected approximately 10 percent of applications for mail-in-ballots (about 12,000 rejected applications).[319] The law also added new identification requirements to absentee ballots, which added additional confusion for voters and led election officials to worry about ballots being rejected in the 2022 primary.[320] These concerns were warranted. In the March 1, 2022 primary election, the first election under the new voting law, Texas election officials rejected nearly 25,000 mail-in-ballots (12.4 percent) of the nearly 200,000 absentee ballots cast.[321] A New York Times review of election data found that mail-in ballots that were rejected in the March state primary election disproportionately affected African American voters in Harris County.[322] The study found that in Harris County African American voters were "44 percent more likely to have [mail-in] ballots rejected than heavily white areas."[323] Harris

---

[312] Hanna Knowles, "A Texas bill drew ire for saying it would preserve 'purity of the ballot box.' Here's the phrase's history." *Washington Post*, May 9, 2021.
[313] *Id.*
[314] *Id.*
[315] *Id.*
[316] *Id.*
[317] *Id.*
[318] Election Integrity Protection Act of 2021., https://capitol.texas.gov/tlodocs/872/billtext/pdf/SB00001F.pdf#navpanes=0.
[319] Nick Corasaniti, "Texas Voting Law Leads to Jump in Ballot Application Rejections", NY Times, February 18, 2022.
[320] *Id.*
[321] Of the 198,947 Texans mailed in a ballot, 24,636 ballots were rejected, a rejection rate of 12.4 percent. Niki Griswold, "Nearly 25,000 mail-in ballots were rejected in the Texas primary, state officials say," USA Today, April 6, 2022.
[322] Nick Corasaniti, "Mail Ballot Rejections Surge in Texas, With Signs of a Race Gap," New York Times, March 18, 2022.
[323] *Id.*

County election officials analyzed rejection rates in the top 30 ZIP codes with the majority of ballot rejections. They found that Black residents made up the largest racial group in six of the nine ZIP codes with the most ballot rejections in the county. The *New York Times* review found, "The thousands of ballot rejections, and the racial disparity in rejections in Harris County, provided the clearest evidence yet that the major voting law passed last year by the Republican-controlled Texas Legislature has prevented significant numbers of people from voting."[324]

SB 1 also prohibited the use of 24-hour voting locations and "drive through" voting created to help curb long lines and provide protections for voters during the coronavirus pandemic.[325] These provisions impact the majority of Harris County registered voters that chose to vote early in-person or through mail-in-ballot. In 2020 in Harris County, 1.3 million people cast their ballot early in-person, 177,000 mailed their ballot, and over 200,000 voted in-person on Election Day.[326]

SB 1 also included provisions that could intimidate voters by forcing persons providing assistance to voters to fill out paperwork disclosing their relationship to the voter, reciting an expanded oath stating that they did not "pressure or coerce" the voter into choosing them for assistance.[327] Anyone found to have violated that oath would be charged with perjury.[328] SB 1 also includes a provision that could lead to election judges that prevent poll watchers from harassing voters to facing criminal penalties.[329] A lawsuit filed by the NAACP Legal Defense Fund argues that since the Texas Election Code contains specific provisions designed to protect voters from interference or harassment, the new law puts election judges in a compromising situation where they could incur criminal penalties for fulfilling their duties to protect voters.[330]

Republican leaders in federal and state offices have been candid about the need to suppress voter turnout to remain competitive.[331] Texas Attorney General Ken Paxton took credit for Trump's second win in Texas in 2020. He pointed to the effort that prevented Harris County from sending out unsolicited mail ballot applications. Paxton said that had this not happened, Texas would have joined Arizona and Georgia in flipping to blue. Paxton said, "We would've been in the same boat. We would've been one of those battleground states that were counting voters in Harris County for three days, and Donald Trump would've lost the election." [332]

---

[324] *Id.*
[325] S.B.1 Section 3.09 (eliminating 24-hour voting locations by restricting voting times from 6 a.m. to 10 p.m.); S.B.1. Section 3.04 (eliminating drive-thru voting by largely prohibiting voting from inside a motor vehicle).
[326] Testimony of Sherrilyn Ifill, President and Director-Counsel, NAACP Legal Defense and Education Fund, Submitted to the United States House of Representatives Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights, and Civil Liberties, hearing entitled, "Voter Suppression and Continuing Threats to Democracy," January 20, 2022.
[327] S.B.1. Section 6.04.
[328] *Id.*
[329] S.B.1. Section 3.19; "Senate Bill 1 FAQ," Harris County Election Division, https://www.harrisvotes.com/FAQ/SB1FAQ.
[330] Compl. for Decl. and Injunctive Relief, Houston Justice v. Abbott, No. 5:21-cv-00848 (W.D. Tex. Sept. 7, 2021), ECF No. 1.
[331] Aaron Blake, "Republicans keep admitting that voter ID helps them win, for some reason," April 7, 2016 *Washington Post*; see also Christopher John Farley, "GOP's Don Yelton Resigns After 'Lazy Blacks' Remark on 'Daily Show'" October 26, 2013, *The Wall Street Journal*; Aaron Blake, "The GOP's increasingly blunt argument: It needs voting restrictions to win," June 14, 2021 *Washington Post.*
[332] Aaron Blake, "The GOP's increasingly blunt argument: It needs voting restrictions to win," June 14, 2021 *Washington Post.*

At a hearing for the U.S. House Judiciary Committee Subcommittee on the Constitution, Civil Rights, and Civil Liberties in January 2022, Sherrilyn Ifill, then President and Director-Counsel of the NAACP Legal Defense and Education Fund (LDF) testified on the present crisis for voting rights and cited Texas' history of racial gerrymandering and SB 1. She expressed the urgent need for Congress to pass federal legislation to fully restore the Voting Rights Act of 1965, set minimum standards for accessing the ballot, protect election workers, and combat the subversion of free and fair elections. In her written testimony she wrote, "[i]n 2021, we saw a repeat of history—a steady drip of old poison in new bottles…The purpose of the raft of 2021 voter suppression laws, the discriminatory redistricting process, and the efforts to sabotage election results is to prevent people of color from ever again asserting their full voice and power."[333]

In Texas, the poison of voting related discrimination targeting African American, Asian American and Pacific Islanders, and Latinos has manifested in different strategies or different "bottles," but the poison has consistently infected voting in Texas from 1836 until today. With respect to redistricting and the poison of race-based choices in drawing electoral districts, that poison has been specifically present in every redistricting cycle since 1970.

Between 2010 and 2020 non-white populations growth fueled Texas' population growth. The population grew from 25.1 million in 2010 to 29.1 million in 2020.[334] Of the total nearly 4-million-person population growth, Latinos accounted for 49.5 percent of the population growth (grew from 9.5 million to 11.4 million).[335] Before the 2021 redistricting plan, 33 of the state's 150 State House of Representative districts were opportunity districts for Latinos with a majority of the population being Latino citizens of voting-age.[336] Despite the growth of the Latino population between 2010 and 2020, the 2021 redistricting plan reduced the number of Latino opportunity districts to 30.[337]

The redistricting plan also split AAPI communities in Harris and Fort Bend counties.[338] High population Asian American counties, such as Fort Bend, located south of Houston, known as Congressional District-22, were redrawn in a way that would "dilute" the impact of Asian American voters.[339] According to the 2020 census, the AAPI community is the fastest growing racial or ethnic group in Texas.[340] AAPI Texans accounted for 623,029 of the 4 million-person population growth (AAPI population grew from 950,000 in 2010 to nearly 1.6 million in 2020). Nearly 1 in 5 new Texans are AAPI.[341]

---

[333] Testimony of Sherrilyn Ifill, President and Director-Counsel, NAACP Legal Defense and Education Fund, Submitted to the United States House of Representatives Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights, and Civil Liberties, hearing entitled, "Voter Suppression and Continuing Threats to Democracy," January 20, 2022.

[334] "2020 Census Profiles Texas" at 2, National Association of Latino Elected and Appointed Officials (NALEO) Educational Fund (2020).

[335] *Id.*

[336] "2022 Texas Primary Election Profile" at 3, NALEO (2022), https://naleo.org/COMMS/PRA/2022/2022-TX-Profile.pdf.

[337] *Id.*

[338] Neelam Bohra, "Congressional gerrymandering by Texas Republicans cut out the hear of Houston's Asian community," November 22, 2021,Texas Tribune.

[339] *Id.*

[340] *Id.*

[341] *Id.;* "Asian Americans groups file a legal challenge to Texas' redistricting plans" December 31, 2021. *National Public Radio, https://www.npr.org/2021/12/31/1069538919/asians-lose-voting-power-in-texas.*

On November 6, 2018, in Tarrant County, a multiracial coalition of Latino, African American, and AAPI voters elected Beverly Powell to the Texas State Senate District 10.[342] Powell defeated an incumbent Konni Burton who once told a crowd at a Hispanic community civic breakfast that she co-authored SB 4 because Texas needed to end "sanctuary cities" and that the state should target for deportation "people who come over here to harm us."[343] The local Latino community leaders at the event pushed back and were critical of more targeted policing.[344] During the election in 2017, Powell noted that Burton's ardent partisanship "runs counter to the needs of her district."[345]

In Powell's inaugural year as a state senator, SD 10 had a white majority of 54% voters, with 20% Hispanic, 21% Black voters, and 2% Asian. The 2020 census data showed that SD10 was 46.9% White, 19.8% Black, 32.2% Hispanic, 4.7% Asian, and 1% Native American or Pacific Islander.[346] In 2022, Powell ran unchallenged in the Democratic primary, yet by April 2022 she had exited the race explaining that the 2021 redistricting eliminated her chances at being reelected. She explained, "[e]lection prospects for any candidate who relies on a diverse voter coalition will be thwarted." Powell won the 2018 election because of a "coalition of diverse voters" which has, for decades, increased its Black, Latino and Asian American population.[347] Under the new redistricting of SD 10 for the 2022 election, the voting demographics have changed to 62% white, 18% African American, 17% Latino, and less than 1% Asian or other races.[348]

The Princeton Gerrymandering Project, affiliated with Princeton University, gave the Texas 2021 Final Congressional Plan a score of "F" for partisan fairness; "C" for competitive fairness, and "F," for geographic fairness.[349] The 2021 redistricting cycle is consistent with the long history of gerrymandering that targets non-white voters to undermine their voting power and will prevent them from electing officials that can represent their interests.

The recent history of voting discrimination against non-white voters, both independently and collectively as coalitions, is troubling, and as I stated above, is consistent with Texas's long history of targeting non-white voters. Coalitions that were built to elect candidates that would be responsive to the needs of the various communities within them have been severed, or severely weakened, bringing into question whether these communities will be silenced.

## III. Senate Factor 5: Discrimination Against Non-White Voters In Areas Outside of Voting Has Had a Profound Effect on Them, and Hinders Their Ability to Participate Effectively in the Political Process

Non-white voters in Texas have all been discriminated against in similar manners, and thus they are affected in many of the same ways. As described above, the State of Texas has historically

---

342 James Barragan, "'Unwinnable race': State Sen. Beverly Powell of Burleson ends reelection bid, citing redrawn political map", Texas Tribune, April 6, 2022.
343 Bud Kennedy, "A Weird Week for Konni Burton ends with chorizo and criticism," February 11, 2017 Fort Worth Star-Telegram.
344 *Id.*
345 Anna Tinsley. "Wedding bells, jail cells." Fort Worth Star Telegram. 11 June, 2017.
346 "Texas State Senate District 10, 2020 Census." *Ballotpedia*.
347 James Barragán, "Unwinnable Race."
348 Carla Astudillo, et al. "Texas Has New Political Maps. See Which Districts Your Home Is in.", The Texas Tribune, Oct. 22, 2021.
349 "Texas 2021 Redistricting Report Card," Princeton Gerrymandering Project, https://gerrymander.princeton.edu/redistricting-report-card?planId=recL5EF85h0ILukMA.

operated under the theory that non-white voters should not only be unseen, but also unheard. Many laws were passed with the explicit intent to discriminate against non-white people. While other laws may have been race-neutral, they had a discriminatory impact on non-white people and voters. Regardless, non-white people in Texas bear the effects of decades of discrimination in various areas as described below, and one of the effects of this discrimination is a depression in political participation due to violent intimidation, income inequality, geographic isolation, crumbling infrastructure, and discrimination within the Texas educational system.

In 2022, more than 11.4 million Latinos (39 percent of the state's total population of 29.1 million) lived in Texas.[350] As of September 2021, only 4.2 million were registered to vote, but Latinos account for approximately 27 percent of all registered voters in the state (15.6 million).[351] The NALEO Education Fund projects that less than half of Texas Latino registered voters will cast ballots in 2022 midterm elections (nearly 1.8 million).[352]

### *A. Anti-Immigrant Rhetoric Has a Chilling Effect on Political Participation*

Anti-Mexican and general anti-immigrant racist rhetoric used by politicians has had a devastating impact on the lives of refugees and migrants, specifically Latino and AAPI communities in Texas. Politicians casting a humanitarian crisis as a threat to the security of Texans, for example, inflamed militia groups to start patrolling the border with semi-automatic rifles, inspired by calls by politicians to "defend" the border.[353] These militias mirrored earlier performances by the Ku Klux Klan in the 1970s. On October 27, 1977, David Duke, then a twenty-seven-year-old Grand Dragon of the Ku Klux Klan, held a press conference to announce the "Klan Border Watch." Duke said, "[w]e will be here as long as it takes to meet the response of the illegal alien problem."[354]

Decades later more militias, like the Minuteman Project, harassed and intimidated people crossing the border through vigilante enforcement, but they also targeted Latinos already living in the United States, specifically Texas.[355] In May 2009 members of the "Minutemen American Defense" militia, dressed in clothing that made them look like law enforcement, woke a sleeping family in a trailer in Arivaca, Arizona and demanded entry.[356] The militia members shot husband and wife Raul Flores Jr. and Gina Gonzalez before they also shot and killed their 9-year-old daughter, Brisenia Ylianna Flores.[357] Raul Flores and Brisenia both died, but Gina Gonzalez survived her wounds.[358] In 2011, Gonzalez relived the horror of that night when she testified in

---

[350] NALEO, "Texas Primary Election Profile", at 7.
[351] *Id.*, at 9.
[352] *Id.*, at 10.
[353] Vanda Felbab-Brown & Elisa Norio, "What border vigilantes taught US right-wing armed groups", Brookings, March 12, 2021, https://www.brookings.edu/articles/what-border-vigilantes-taught-us-right-wing-armed-groups/; Kolten Parker, "Anti-Government Citizen Militia Group want to 'secure the border' in Texas," San Antonio Express News, July 7, 2014; "Texas Militias Plan to Patrol the Border Near Laredo," KUT NPR, July 7, 2014.
[354] Chavez, "Fear of White Replacement," 186-187; Kathleen Belew, *Bring the War Home*, 20, 34, 38, 43-44; "Klan's Border Watch Begin," Dessert Sun, October 27, 1977.
[355] Jesse McKinley and Malia Wollan, "New Border Fear: Violence by a Rogue Militia," *New York Times* June 26, 2009.
[356] Nicholas Riccardi, "Mother describes border vigilante killings in Arizona," January 25, 2011, *Los Angeles Times*.
[357] *Id.*
[358] *Id.*

the trial of the militia members.[359] She recalled her daughter begging not to be killed before she was shot.[360]

According to the FBI, anti-Latino hate crimes rose from 430 in 2017, to 485 in 2018, to 527 in 2019.[361] In 2019, the FBI reported that anti-immigrant sentiments had become a top perceived threat fueling hate crimes.[362] In August 2019, one white supremacist motivated to "defend" Texas from the "invasion" of Latinos drove 600 miles to El Paso to massacre 23 innocent shoppers at a Walmart in 2019, and to wound 23 more.[363] The El Paso massacre was a horrific hate-crime by a white supremacist that spewed anti-immigrant and anti-Latinx views. He entered a crowded Walmart with a semi-automatic weapon, deliberately targeting individuals who looked ethnically Mexican.[364] Before committing the massacre, the shooter had repeatedly decried a Hispanic "invasion" of Texas and warned that growing numbers could lead to political clout that would lead to Hispanics to "take control of their local and state government" and change "policy to better suit their needs."[365]

His act of terror was a deliberate effort to inflict fear in the Latino community and to prevent Latino voters from electing officials who represent their needs, because from his white supremacist viewpoint, Latino voters were a threat to his interests. Twenty-three people were murdered: Jordan Anchondo, Andre Anchondo, David Johnson, Javier Amir Rodriguez, Angie Englisbee, Arturo Benavides, Elsa Mendoza Marquez, Leonardo Campos, Maribel Loya, Juan Velazquez, Gloria Irma Marquez, Maria Eugenia Legarreta Rothe, Sara Ester Regalado, Adolfo Cerros Hernandez, Margie Reckard, Ivan Filiberto Manzano, Jorge Calvillo Garcia, Maria Flores, Raul Flores, Alexander Hoffman, Teresa Sanchez, and Guillermo "Memo" Garcia.[366]

This same rhetoric of an "invasion" spewed by the shooter at El Paso has been used widely by Texas politicians. In 2014, then Senator, and now Texas Lieutenant Governor Dan Patrick decried an "invasion" of immigrants. More recently, he stoked fear that these "invaders" would

---

[359] *Id.*

[360] *Id.*

[361] Michael Balsamo, "Hate crimes in US reach highest level in more than a decade, according to an FBI report: 'Reminder that we have much work to do'," *Chicago Tribune*, November 16, 2020, https://www.chicagotribune.com/nation-world/ct-nw-us-hate-crime-fbi-report-20201116-7zb6af73fbhipcc5z56unuk4ce-story.html.

[362] Suzanne Gamboa and the Associated Press, "Rise in reports of hate crimes against Latinos pushes overall number to 11-year high," *NBC News* November 16, 2020.

[363] "Two Years After Deadly El Paso Attack, Anti-Latino and Anti-Immigrant Hate and Extremism Persist", Anti-Defamation League, August 2, 2021, https://www.adl.org/blog/two-years-after-deadly-el-paso-attack-anti-latino-and-anti-immigrant-hate-and-extremism.

[364] Ed Lavandera & Jason Hanna, "El Paso suspect told police he was targeting Mexicans, affidavit says", CNN, August 9, 2019.

[365] Anti-Defamation League, https://www.adl.org/blog/two-years-after-deadly-el-paso-attack-anti-latino-and-anti-immigrant-hate-and-extremism.

[366] Nick Siano, "El Paso shooting victims identified: See the full list of names", El Paso Times, August 5, 2019, https://www.elpasotimes.com/story/news/2019/08/05/el-paso-shooting-victims-identified-see-the-names-walmart-texas-tx/1927961001/; Simon Romero and Nicholas Bogel-Burroughs, "El Paso Shooting: Massacre That Killed 20 Being Investigated as Domestic Terrorism," *New York Times*, August 4, 2019, https://www.nytimes.com/2019/08/04/us/el-paso-shooting-updates.html; Manny Fernandez and Sarah Murvosh, "Soccer Coach in El Paso Shooting Dies 9 Months Later," *New York Times*, April 27, 2020: https://www.nytimes.com/2020/04/27/us/el-paso-shooting-guillermo-memo-garcia.html

result in "millions" of immigrants voting that would "take over our country."[367] Patrick was widely condemned for circulating the "great replacement theory," a racist conspiracy theory that warns of a liberal scheme to allow nonwhite immigrants to replace a white American majority for political control.[368] This has had a chilling effect on Latino voters and other naturalized voters (specifically Latino and AAPI) because they are being intimidated and their elected officials are not being responsive to the needs of their communities. As noted above, as of September 2021, only 27% of the Latino population in Texas is registered to vote, and of those voters only half are projected to actually vote in 2022.[369]

In years past, non-white voters have formed coalitions to elect representatives that meet their needs and reflect their community's priorities. However, during the 2017 legislative session, anti-immigrant and xenophobic rhetoric was widely circulating by elected officials, in media interviews and on the House floor. On the last day of the regular legislative session in May 2017, hundreds of largely Latino protesters gathered at the Capitol to show their support for immigrant communities and to show their disapproval for SB 4, the anti-immigrant bill passed and signed by Governor Abbott.[370] SB 4 required local cities and counties to cooperate with federal immigration authorities by detaining people suspected of being in the country illegally.[371] It also banned local entities from passing "sanctuary" policies that would ban local police from asking people questions about immigration status.[372] Opponents of the law expressed fear that the law would lead to increased racial profiling and intimidation of Latinos in Texas. Republican state Rep Matt Rinaldi inflamed tensions on the House floor when he reportedly walked up to Latino Democrats and said, "I'm glad I just called ICE to have all these people deported."[373] Multiple state representatives confirmed this happened.[374] Rep Rinaldi later reported that he was threatened and bullied, but video shot at the time showed Republicans and Democrats pushing each other and Rinaldi later explained in a statement that he had admitted to threatening to "put a bullet" in a colleagues' head, but that he was speaking in "self defense."[375]

Representative Rinaldi's comments showed politicians that perceived any Latinos as undocumented and targets for deportation, rather than constituents with needs and that deserve representation in elected offices. Representative Ramon Romero of Fort Worth explained that Rinaldi was an example of what opponents of the law feared would happen: racial profiling. "Matt Rinaldi gave the perfect example of why there's a problem with SB 4," Rep. Romero said, "Matt Rinaldi looked into the gallery and saw Hispanic people and automatically assumed they were

---

[367] Greg Sargent, "A Texas Republican's vile rant shows 'great replacement' is becoming GOP dogma," Washington Post September 17, 2021; "Invasion Remarks Fuel Heated Debate in a GOP Race" New York Times February 7, 2014. https://www.nytimes.com/2014/02/07/us/invasion-remarks-fuel-a-heated-debate-in-a-gop-race.html.

[368] Sargent, Washington Post September 17, 2021; Philip Bump, "The irony of Elise Stefanick and Texas's lieutenant governor amplifying white replacement theory," Washington Post September 17, 2021; Dan Primack and Russell Contreras, "A racist conspiracy theory goes mainstream," Axios September 29, 2021.

[369] NALEO, "Texas Primary Election Profile", at 7.

[370] Mary Huber, "Hundreds protest SB 4 on final day of 85th Legislature", Austin American-Statesman, May 29, 2017.

[371] *Id.*

[372] *Id.*

[373] Matthew Watkins et al., "Republican lawmaker: I called immigration authorities on Capitol protesters", The Texas Tribune, May 29, 2017.

[374] *Id.*

[375] *Id.*

undocumented. He racially profiled every single person that was in the gallery today. He created the scenario that so many of us fear."[376]

The comments from Rinaldi were an example of an elected official weaponizing ICE to intimidate and suppress Texans from participating in political protests and using their First Amendment rights to share their views with elected representatives. Moreover, this is a law that has the effect of making Latinos, Asian American and Pacific Islanders, or anyone non-white person who could be profiled as an immigrant fearful of interactions with law enforcement. Xenophobic laws and operations, like SB 4 (2017) and the more recent drug interdiction effort, Operation Lonestar, described below, do not reflect the majority of Texas voters' interests regarding immigration.

Only U.S. citizens can vote, but political rhetoric has increasingly raised a false alarm that increased migration would lead to illegal voting, or that migrants and refugees are coming to the United States with the intention of illegally voting. The vote purge of 2019, described above, which targeted naturalized citizens registered to vote is just one example of politicians promoting this dangerous rhetoric by publicly attempting to purge, intimidate, and suppress Latino and naturalized voters.

With respect to the AAPI community, elected officials have also utilized a similar anti-immigrant tone. In 2009, State Representative Betty Brown made racist remarks during a hearing regarding Voter ID laws. Ramey Ko, representative of the Organization of Chinese Americans, testified to the House Elections Committee and explained the challenges that Asian Americans face in voting and in obtaining identification.[377] Namely, he warned that because their legal transliterated names are often different from the common names they use on official forms, AAPI voters would be disenfranchised if Voter ID laws nullified their voter registration due to these inconsistencies.[378] Representative Brown was dismissive of Ko's testimony and went so far as to suggest that the problem was not the Voter ID laws in Texas, but instead that Asian Americans don't have "American" names. She admonished: "[r]ather than everyone here having to learn Chinese — I understand it's a rather difficult language — do you think that it would behoove you and your citizens to adopt a name that we could deal with more readily here?…Can't you see that this is something that would make it a lot easier for you and the people who are poll workers if you could adopt a name just for identification purposes that's easier for Americans to deal with?"[379]

Representative Brown's comments echo the nativist rhetoric from over a century ago that led to Americanization campaigns targeting immigrants and non-English speaking Texans. These comments also echo the anti-Asian sentiment that led to the exclusion of Asian migrants into the United States for more than half a century and to the racially motivated internment of Japanese Americans during World War II. These comments are a disheartening example of the kinds of discrimination and intolerance impacting Asian Americans and Pacific Islanders. It is also shows that some elected officials distinguish between AAPI residents and "Americans" and that elected officials continue to have narrow views and go so far as to restrict voting rights and other civil rights to those with anglophone names. These comments made in the context of Voter ID laws

---

[376] *Id.*
[377] R. G. Ratcliff, "Texas lawmaker suggests Asians adopt easier names," Houston Chronicle, April 8, 2009.
[378] *Id.*
[379] *Id.*

which courts eventually found to be discriminatory, exhibit a dual layer of voter suppression and voting discrimination, all with the aim of limiting political participation by non-white voters.

In 2018, a report on voting rights in Texas by the Texas Advisory Committee found that poll workers are "not given adequate training and have significant discretion that can have discriminatory consequences."[380] The report indicated that "[i]nstances of discrimination, disparate treatment, and hostility at polling locations were reported by several stakeholders" and that there was "little or no recourse or accountability for mistakes or discriminatory conduct by poll workers."[381] The report further found that "discriminatory treatment appeared to be the result of poll worker discretion or misinformation."[382] The report also acknowledged that there was no "easily accessible way to gather statewide data about how many Texans experience discrimination or problems at the polls", nor is there a mechanism to track "how many people are turned away without being offered a provisional ballot."[383]

When asked by Democratic colleagues to issue an apology, Brown refused. A spokesperson for Brown instead said that Brown was not making racially motivated comments.[384] Brown's brazen refusal to apologize in the wake of heinous comments is just one example of politicians using rhetoric that alienates AAPI voters.

### *B. Hate Crimes Targeting Asian American and Pacific Islanders Have Had a Chilling Effect on Voting*

The COVID-19 pandemic stoked anti-Asian sentiment resulting in unprecedented levels of hate crimes. In 2020 anti-Asian hate crimes increased by an alarming 124 percent compared to the year before.[385] The Center for the Study of Hate and Extremism at California State University in San Bernardino released a frightening study that in 2021 anti-Asian hate crimes increased 339 percent compared to 2020.[386] The surge fueled an overall "11 percent increase in suspected hate crimes reported to police across a dozen of America's largest cities."[387] John C. Yang, president and executive director of the nonprofit civil rights group Asian Americans Advancing Justice (AAJC) described the rise in hate crimes as pandemic-fueled racism. "Reports of increased anti-Asian hate in 2021 are, sadly, not a surprise," he said, "[a]gain, our communities are still under attack and we must continue our efforts to address anti-Asian hate."[388]

Organizations like STOP AAPI Hate have documented thousands of hate incidents are likely missing from the FBI data. The group reported that it received over 9,000 firsthand complaints between March 19, 2020 and June 30, 2021.[389] STOP AAPI Hate tracked 103 anti-Asian racist incidents in Texas between March 2020 and March 2021, including the stabbing of a

---

[380] "Voting Rights in Texas: An Advisory Memorandum of the Texas Advisory Committee to the U.S. Commission on Civil Rights," July 2018, 10.
[381] *Id.* at 11.
[382] *Id.* at 10.
[383] *Id.*
[384] R. G. Ratcliff, "Texas lawmaker suggests Asians adopt easier names," April 8, 2009 Houston Chronicle.
[385] Kimmy Yam, "Anti-Asian hate crimes increased 339 percent nationwide last year, report says" NBC News, Feb 14, 2022.
[386] *Id.*
[387] *Id.*
[388] *Id.*
[389] Aggie J. Yellow Horse et al., "Stop AAPI Hate National Report," https://stopaapihate.org/wp-content/uploads/2021/08/Stop-AAPI-Hate-National-Report-Final.pdf.

native of Myanmar and his two sons by a shopper in a Midland Sam's Club who accused them of spreading the coronavirus.[390]

A string of recent shootings targeting Asian American owned businesses in the Dallas area are being investigated as hate crimes. On April 2 and May 10, 2022, Asian American businesses were targeted by a drive-by shooting; thankfully, no one was physically injured.[391] On May 12, 2022, a shooter entered a salon in Dallas' Koreatown and opened fire, injuring three people.[392] Salon co-owner Chang Hye Jin told reporters she was so traumatized by the shooting she does not know when the salon will reopen.[393] She believed the event was motivated by hate.[394] Dallas Police Chief Eddie Garcia believed also believed the shootings were motivated by hate and notified the FBI.[395]

A Pew Research Center study found that 58 percent of Asian Americans said people more commonly expressed racist views towards them after the pandemic began.[396] A May 2020 report released by Leading Asian Americans United For Change and The Asian American Foundation showed that more Americans blame Asian Americans for COVID-19 than at the height of the pandemic in 2021.[397] This violence against the AAPI communities has had a chilling effect on voters because they are intimidated about speaking out about issues that affect their communities, and elected officials are not being responsive to the needs of their communities.

The needs of the AAPI community continue to be underserved by elected officials. When Asian American members of the U.S. House of Representatives introduced a resolution condemning the massacre in Atlanta, Georgia that left six Asian American women dead, almost every Texas Republican voted against the resolution, including Fort Bend County's U.S. Representative Troy Nehls.[398] During a U.S. House Judiciary Committee hearing to discuss discrimination two days after the Atlanta massacre, U.S. Representative Chip Roy of Austin used the hearing to denounce the Chinese government, called the Chinese Communist Party "patently evil" and blaming the country for the coronavirus pandemic.[399] When Roy finally came around to condemning the violence in Atlanta, he did so with an inflammatory remark that summoned Texas' long history of mob violence and lynchings. He said, "I think there's an old saying in Texas about—find all the rope in Texas and get a tall oak tree. You know we take justice very seriously and we ought to do that, round up the bad guys."[400] U.S. Representative Ted Lieu reminded Roy

---

[390] Russell Jeung et al., "Stop AAPI Hate National Report, 3/19/20-2/28/21", Stop AAPI Hate, https://stopaapihate.org/wp-content/uploads/2021/05/Stop-AAPI-Hate-Report-National-210316.pdf; Terry Tang, "As virus-era attacks on Asians rise, past victims look back," Associated Press March 2, 2021.

[391] Dennis Romero and Tony Lee, "Dallas salon owner believes shooting a hate crime 'He didn't even demand money. He just came in to shoot people.'" NBC News May 13, 2022.

[392] *Id.*

[393] *Id.*

[394] *Id.*

[395] *Id.*

[396] Neil G. Ruiz, Juliana Menasce Horowitz, and Christine Tamir, "Many Black and Asian Americans say they have experienced discrimination amid the COVID-19 Outbreak," Pew Research Center, July 1, 2020. https://www.pewresearch.org/social-trends/2020/07/01/many-black-and-asian-americans-say-they-have-experienced-discrimination-amid-the-covid-19-outbreak/.

[397] Tat Bellamy-Walker, "More people now incorrectly blame Asian Americans for COVID than at height of pandemic," NBC News, May 5, 2022.

[398] Roll Call 149, H. Res. 275, May 19, 2021.

[399] *Id.*

[400] *Id.*

that the largest mass lynching in U.S. history was against Chinese immigrants.[401] Representative Lieu point out that Asian Americans have also suffered from mob violence and that Roy's racist rhetoric was a distraction from the urgent need to stop anti-Asian hate crimes, not embolden vigilante violence.[402]

Political organizations engaging with the AAPI community hear stories of hate crimes that have been described as overwhelming. For example, South Asian Americans for Voter Empowerment (SAAVETX) is a grassroots voter registration organization that formed after learning that that less than 50 percent of Asian Americans in Texas voted in 2016.[403] In November 2016, 58.5 percent of the Asian American voting age population was registered to vote, and only 47.3 percent of the Asian American voting age population actually voted in November 2016.[404] Per the organization's website, the founders of SAAVETX became inspired to educate the public and register eligible voters that had not been exposed to voter registration, were not familiar with the political process, and had not been encouraged to vote.[405] Through SAAVETX's efforts, South Asian voter turnout increased to 60 percent in 2018 and 75 percent in 2020.[406] In November 2020, 63.5 of Asian Americans of voting age were registered to vote, and 58.7 percent of Asian Americans of voting age voted in November 2020.[407]

In their work, SAAVETX organizers pointed out that during voter registration drives they began to hear stories of hate crimes that became overwhelming and recognized that elected officials were not meeting their needs.[408]

Grassroots organizations working in outreach and education to encourage voter participation are doing more than responding to the failure of elected officials to meet the needs of AAPI Texas voters. In Texas, these organizations have an additional challenge of overcoming derogatory rhetoric from elected officials and political pundits. One only needs to look at the wrongful erasure of newly naturalized citizens' names from voting rolls, and the suppression of their political participation by intimidation, harassment, and hate crimes.

---

[401] *Id.* Representative Lieu referenced a largely forgotten history of anti-Chinese mob violence in the United States. The most well-known is the Rock Springs massacre in Wyoming Territory in 1885, when a white mob massacred at least 28 Chinese miners and drove out several hundred from the mining camp. During the peak of anti-Asian mob violence in the mid-nineteenth century white mobs formed to force Chinese residents to leave approximately 70. For more comprehensive study of anti-Asian violence see Beth Lew Williams, *The Chinese Must Go: Violence, Exclusion, and the Making of the Alien in America*, (Cambridge: Harvard University Press, 2018).

[402] *Id.*

[403] "History and Team", South Asian Americans for Voter Empowerment, https://saavetx.org/about-saave-texas.

[404] Kaiser Family Foundation, "Voting and Voter Registration as a Share of the Voter Population, by Race/Ethnicity 2016," https://www.kff.org/other/state-indicator/voting-and-voter-registration-as-a-share-of-the-voter-population-by-raceethnicity/?currentTimeframe=2&selectedRows=%7B%22states%22:%7B%22texas%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[405] "History and Team", https://saavetx.org/about-saave-texas.

[406] *Id.*

[407] Kaiser Family Foundation, "Voting and Voter Registration as a Share of the Voter Population, by Race/Ethnicity 2020," https://www.kff.org/other/state-indicator/voting-and-voter-registration-as-a-share-of-the-voter-population-by-raceethnicity/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[408] "History and Team", https://saavetx.org/about-saave-texas.

### C. *Hate Crimes Targeting African Americans Have Had a Chilling Effect on Political Participation*

In 2009 Congress passed a hate crimes prevention act as a rider to the National Defense Authorization Act for Fiscal Year 2010.[409] The act was named for Matthew Shepard and James Byrd Jr., two victims of hate crimes. Matthew Shepard was a gay student who was targeted and brutally beaten to death in Wyoming in 1998.[410] James Byrd Jr. was an African American man targeted by white supremacists and murdered in the east Texas town of Jasper in 1998.[411] In Jasper, racial tensions continued after the horrific hate crime. Years later, two African American city council members in Jasper lead an effort to name a "highly-qualified African American" as the police chief in Jasper.[412] Shortly thereafter, those two city council members were removed from their district seats through an at-large recall election.[413] This example was understood by a district judge as "demonstrating Texas' racially charged communities, the power of the polls, and the use of election devices to defeat the interests of the minority population is, unfortunately, no aberration."[414]

In 2020 hate crimes rose to the highest level in 12 years in the United States, but the spike followed a recent uptrend in hate crimes.[415] Nearly 62 percent were motivated by bias against race, ethnicity or ancestry.[416] In Texas, 70.1 percent of hate crimes were motivated by bias against race, ethnicity, or ancestry.[417] In Texas, 35 percent of hate crimes motivated by racial bias targeted African Americans.[418]

Hate crimes "targeting people because of their race increased more than any other category between 2019 and 2020."[419] African American communities continue to be the most targeted group in racially-targeted hate crimes.[420] Reported hate crimes targeting African Americans rose from 1,972 in 2019 to 2,755 in 2020. [421] A Pew Research Center study found that 38 percent of African Americans and 39 percent of Asian Americans had experienced racial discrimination since the pandemic.[422]

---

[409] "Mathew Shepard and James Byrd, Jr. Hate Crimes Prevention Act," Legal Information Institute, Cornell Law School https://www.law.cornell.edu/wex/matthew_shepard_and_james_byrd_jr_hate_crimes_prevention_act (link to Act).
[410] *Id.*
[411] *Id.*
[412] *Veasey*, 71 F.Supp.3d at 633.
[413] *Id.*
[414] *Id.*
[415] "FBI Reports Hate Crimes at Highest Level in 12 Years," September 9, 2021, Equal Justice Initiative.
[416] *Id.*
[417] "Facts on Texas Hate Crime Incidents 2020 ," Department of Justice Hate Crimes, https://www.justice.gov/hatecrimes/state-specific-information/texas
[418] "FBI Reports Hate Crimes at Highest Level in 12 Years," Equal Justice Initiative; U.S. Federal Bureau of Investigations, FBI Hate Crime Data for Texas, 2020 https://crime-data-explorer.fr.cloud.gov/pages/explorer/crime/hate-crime.
[419] "FBI Reports Hate Crimes at Highest Level in 12 Years," Equal Justice Initiative;
[420] *Id.*
[421] *Id.*; U.S. Federal Bureau of Investigations, FBI Hate Crime Data for Texas, 2020 https://crime-data-explorer.fr.cloud.gov/pages/explorer/crime/hate-crime.
[422] Neil G. Ruiz, Juliana Menasce Horowitz, and Christine Tamir, "Many Black and Asian Americans say they have experienced discrimination amid the COVID-19 Outbreak," Pew Research Center July 1, 2020

In February 2020, four racially motivated violent extremists were arrested in Arizona, Florida, Texas, and Washington for conspiracy to threaten and intimidate journalists who are Jewish or journalists of color.[423] Intimidation continues to impact African Americans in Texas who have witnessed horrific massacres across the country. In 2015 a self-proclaimed white supremacist massacred African Americans in a prayer group at the Mother Emanuel AME Church in Charleston, SC to start a "race war."[424] As recently as May 14, 2022, a self-proclaimed white supremacist motivated by the great replacement conspiracy theory drove to Buffalo, NY to massacre African Americans.[425] He murdered 10 people at a grocery store.[426] The FBI is investigating the massacre as a hate crime and a case of racially motivated violent extremism.[427]

The white supremacist "great replacement" conspiracy has resulted in extremists targeting immigrant, Latino, African American, AAPI, Muslim, and Jewish communities in the United States, Canada, and in New Zealand.[428] Kathleen Belew, historian of white power movements in the United States wrot,e "The mass shootings of Black grocery shoppers in Buffalo, New York on Saturday follows a string of similar attacks. Gunmen have targeted worshippers at synagogues and mosques and temples and Bible study; they have opened fire on summer camps and people at festivals. We know the names of these places: Charleston; El Paso; Poway; Pittsburgh; Oak Creek; Christchurch, New Zealand."[429] Belew writes that the white-power activists who targeted non-white populations wrote about their motivations and outlined a coherent political ideology. "And in the United States," she writes, "they have been backed by a broad social movement that our legislators have failed to condemn, that our court system has failed to prosecute, and that our society has not stopped."[430]

As discussed below in considering Senate factor 6, the use of "great replacement" rhetoric by Texas officials in campaigns to make racial appeals intimidates non-white voters, suppresses political participation, and, frighteningly, emboldens white supremacists.[431] Despite the alarming rates of hate crimes in Texas targeting African American, Latino, and AAPI communities, the Texas 2020 GOP platform calls for the repeal of hate crime laws (#109).[432] This is an example of

---

https://www.pewresearch.org/social-trends/2020/07/01/many-black-and-asian-americans-say-they-have-experienced-discrimination-amid-the-covid-19-outbreak/.

[423] "Arrests in four states of racially motivated violent extremists targeting journalists and activists," Department of Justice, U.S. Attorney's Office, Eastern District of Washington February 26, 2020.

[424] "Justice Department Announces Multi-Million Dollar Civil Settlement to Principle in Mother Emanuel Charleston Church Mass Shooting," Department of Justice, Office of Public Affairs, October 28, 2021 https://www.justice.gov/opa/pr/justice-department-announces-multi-million-dollar-civil-settlement-principle-mother-emanuel.

[425] Dustin Jones, "What is the 'great replacement' and how is it tied to the Buffalo shooting suspect?", NPR, May 16, 2022, https://www.npr.org/2022/05/16/1099034094/what-is-the-great-replacement-theory.

[426] Christina Maxouris and Phil Gast, "The Buffalo supermarket massacre is the latest mass shooting authorities say was motivated by hate. Here are others," CNN May 16, 2022.

[427] *Id*. For more on the history of white power extremism and see Kathleen Belew, Bring the War Home: The White Power Movement and Paramilitary America (Cambridge: Harvard University Press, 2018).

[428] Kathleen Belew, "White Power, White Violence: A manifesto is not something to be ignored; it's a playbook for the next attack," *The Atlantic*, May 16, 2022.

[429] *Id.*

[430] *Id*. See also Kathleen Belew and Ramon A. Gutierrez, A Field Guide to White Supremacy (Berkeley: University of California Press, 2021).

[431] Heidi Pérez-Moreno and James Barragán, "Critics denounce Greg Abbott and Dan Patrick's 'invasion' rhetoric on immigration, saying it will incite violence," Texas Tribune, June 17, 2021.

[432] Texas GOP 2020 Platform https://texasgop.org/platform/.

how the majority party in the Texas Legislature intends to make it more difficult for non-white people to not only live in Texas, but to survive in Texas.

In November 2016, 73.1 percent of voting-eligible African Americans registered to vote and 57.2 percent of those voting eligible African Americans voted.[433] In November 2016, 55.5 percent of Latino voting age population were registered to vote, and only 40.5 percent of the Latino voting age population voted in the November 2016 election.[434] In November 2020, 70 percent of voting-eligible African Americans were registered to vote, and 60 percent voted.[435] In November 2020, 63.2 percent of the Latino voting age population were registered to vote, and 53.1 percent of Latino voting population voted in November 2020.[436]

*D. Discrimination in Education Has Depressed Non-White Voter's Political Participation*

In 2015, award winning education scholar Dr. Richard Valencia published a comprehensive study of the achievement gap for African American and Mexican American students in Texas.[437] He found that across all categories, there exists a racialized pattern where white students consistently outperform children of color by significant margins. Mexican American and African American students have a few percentage differences across all measures, but overall his study demonstrates their similarities to each other and their similarities relative to whites. The achievement gap, he shows, is "persistent and pervasive in nature." African-Americans and Mexican Americans have had to fight for a fair and equitable education for a long time, for example, desegregation of Texas schools, only came to be because parents and students sued school districts in cities and towns cities and towns including Uvalde, Fort Worth, Austin, El Paso, Corpus Christi, Waco, Lubbock, Midland, and Del Rio.[438] Students also suffered from racial discrimination targeting English language learners, ranging from corporal punishment for speaking Spanish in schools, to Mexican American plaintiffs filing eight cases, from 1872 to 1989, in their attempt to gain and maintain access to bilingual education. And yet, Latino, African American, and AAPI voters continue to face discrimination in education, and this discrimination has had the effect of depressing political participation.

As late as 2006, Preston Hollow Elementary School, a public school in an upper-income neighborhood of Dallas, was found to be segregating Latino students and Anglo students.[439] Preston Hollow is in a primarily Anglo neighborhood, but the student body is "predominantly

---

[433] KFF, "Voting and Voter Registration as a Share of the Voter Population, by Race/Ethnicity 2016."
[434] *Id.*
[435] *Id.*
[436] *Id.*
[437] Dr. Valencia studied achievement gaps in spelling, test results, the Standard Achievement Test, Texas' standardized test results, reading scores on the National Assessment for Educational Progress, student grade retention, school holding power, enrollment in gifted and talented programs, degrees awarded in higher education (bachelor's, master's, and doctorate degrees), and GRE scores. Richard R. Valencia, *Students of Color and the Achievement Gap: Systemic Challenges, Systemic Transformations* (2015 Routledge Press).
[438] Morales v. Shannon (1975); Flax v. Potts (1983); Flax v. Potts (1983); Alvarado v. El Paso ISD, 593 F.2d 577 (5th Cir. 1979); Cisneros v. Corpus Christi ISD, 467 F.2d 142 (5th Cir. 1972) (en banc.); Arvizu v. Waco ISD, 495 F.2d 499 (5th Cir. 1974); United States v. Texas Education Agency (Lubbock ISD), 600 F.2d 518 (5th Cir. 1979); United States v. State of Texas (San Felipe de Rio Consolidated ISD), 324 F. Supp 24 (E.D. Tex 1971); United States v. State of Texas (Gregory-Portland ISD), F. Supp — (E.D. Tex 1980; United States v. State of Texas (Bilingual Education) F. Supp - (E.D. Tex 1981); United States v. Texas (Civil Action 5281, Jan 9 1981).
[439] *Santamaria v. Dallas Independent School District*¸2006 WL 3350194 at *53 (Nov. 16, 2006).

Latino."[440] The 2005 – 2006 academic year enrollment was approximately 18 percent Anglo, 66 percent Latino, 14 percent African American, and 2 percent Asian American and Pacific Islander.[441] The Mexican American Legal Defense Fund filed suit in federal court against the Dallas Independent School District and the Preston Hollow Elementary School Principal Teresa Parker alleging that the defendants had segregated and discriminated against Latino school children and violated their civil rights.[442] Latino parents in the district alleged that Preston Hollow illegally used English as a Second Language (ESL) classrooms to segregate Latino students from Anglo students, even when Latino students were proficient in English and some had even been tested in English and classified as "gifted and talented."[443] The segregation also expanded beyond the classroom. Latino students were segregated from Anglo students in art, music and physical education, and were grouped in classrooms in separate hallways, leading students being denied the opportunity to learn in integrated classrooms, which contributes to a sense of inferiority.[444]

U.S. District Judge Sam A. Lindsay ruled that Principal Teresa Parker segregated minority students on the basis of their race in violation of the U.S. constitution by operating, in effect, a private school within a public school for the Anglo students. In the lengthy opinion, Judge Lindsay criticized the defendant's defense, explaining: "[t]he court is baffled that in this day and age, Defendants are relying on what is, essentially, a 'separate but equal' argument." The judge ordered that the elementary school immediately stop segregating students and ordered the Principal to pay punitive damages to the injured students.[445]

In 2013, in the Hempstead Independent School District, located about 50 miles north of Houston, Texas, a school principal banned students from speaking Spanish. The small school district had a slight majority of Mexican American and Latino students from other national origins and only one middle school. On November 12, 2013, Hempstead Middle School principal Amy Lacey announced, over the school intercom, that students were prohibited from speaking Spanish, effective forthwith, on the campus. Lacey was first placed on administrative leave in December 2013 for her actions, the school board decided in March 2014 not to renew her contract at the end of AY 2013-2014. But students reported that the announcement gave teachers a hall pass to discriminate, and that firing Lacey did not get to the discrimination experienced by Spanish-speaking students, the real "root of the problem."[446] This was reminiscent of the same policies historically put in place to prevent Latino students from speaking Spanish, in attempt to diminish their culture and personhood.[447]

---

440 *Id.* at *6.
441 *Id.*
442 *Id.* at *1.
443 *Id.* at *2.
444 *Id.* at *3-4.
445 *Santamaria v. Dallas Independent School District* (2006) "MALDEF wins ruling striking down racial segregation case in Dallas Elementary School," MALDEF.
446 Valencia, *Students of Color and the Achievement Gap*, 207; "Principle forbids students from speaking Spanish," AP News, December 3, 2013; "Texas Students say Principal Tried to Ban them from Speaking Spanish" December 3, 2013 Kens 5 Staff Kens5.com.
447 Annie Webb Blanton, the State Superintendent of Public Instruction from 1919 to 1923 was a fierce advocate for English-only instruction and schooling. As the state superintendent, Blanton cultivated a climate of hostility towards Spanish-speaking children that would have grave impacts on generations of students in Texas. She publicly expressed hostility to Spanish-speaking children and parents. For example, she wrote, "If you desire to be one with us, stay, and we welcome you; but if you wish to preserve, in our state, the language and the customs of another

These two examples are tied to the anti-immigrant rhetoric that has been front and center in Texas for so long, rhetoric that has had a chilling effect on Latino political participation. If Latino voters were able to vote without fear of intimidation or violence, and they were also able to elect their candidates of choice from districts that fairly represent their interests, then they could vote for elected officials that are responsive to the needs of their communities, and these anti-Spanish language provisions and school segregation may not have occurred. These educational policies and anti-immigrant rhetoric are intertwined, ultimately depressing Latino political participation.

African-American students have also had to deal with a long history of school segregation and racial discrimination in education, for example, in the wake of *Brown v. Board of Education* (1954), Texas officials and local residents organized to maintain a segregated society. In 1957 Governor Shivers called a special session of the state legislature with the objectives of passing bills that would preserve the rights and responsibilities of our State and local government and to authorize "the school board having jurisdiction to close any school at which it finds that peace and order cannot be maintained without resort to military force or occupation."[448] The legislature passed three special session bills (S.B.1; S.B.2; S.B.15) to support school boards and local authorities that committed to maintaining segregated schools. S.B.2, for example, authorized the Texas Attorney General to assist School Boards in any defense of lawsuits in a Federal Court.

Due to the depression of African-American political participation, African Americans have historically not been able to elect their candidates of choice, and thus elected officials have not been as responsive to the needs of their communities. Recent incidents have shown this non-responsiveness. Racial incidents involving students in the Carroll Independent School District in Southlake and Aledo School districts (in 2018 and 2019 respectively) led parents to raise the alarm at the failure of the school district to address racism and intimidation suffered by African American students.[449] In 2020, the Carroll School District adopted the Cultural Competency Action Plan (CCAP), a plan that was reviewed during a two year period with parents, students, and faculty that would provide diversity and inclusion training and resources for all faculty, staff, and students in the school district.[450] Parents formed the political action committee "Southlake Families" and denounced the diversity plan as designed to "fix a problem that doesn't exist."[451] Southlake Families funded a parent, Kristen Garcia, in her lawsuit against the Carroll ISD over the CCAP, which led Judge Josh Burgess of the 153rd District Court in Tarrant County to impose a temporary restraining order on the district which halted progress of the plan.[452] Ultimately the plan was rejected by the school board in a 4-1 vote, three of which were newly elected officials who were

land, you have no right to do this…You must go back to the country which you prize so highly, and rear your children there." Carlos Kevin Blanton, The Strange Career of Bilingual Education in Texas.

448 "Proclamation by the Governor," Journal of the House of Representatives of the Second Called Session of the 55th Legislature of the State of Texas, held November 13, 1957.

449 Mike Hixenbaugh, "A viral video forced a wealthy Texas suburb to confront racism. A 'silent majority' fought back," NBC News, January 22, 2021, updated February 24, 2021.

450 Draft: Carroll ISD Cultural Competence Action Plan, August 3, 2020. https://www.southlakecarroll.edu/cms/lib/TX02219131/Centricity/Domain/97/Cultural%20Competence%20Action%20Plan%20DRAFT%20-%20July%209%202020.pdf

451 Mike Hixenbaugh, *A viral video forced a wealthy Texas suburb to confront racism. A 'silent majority' fought back*, NBC News (Feb. 24, 2021).

452 *Kristin Garcia* vs. Carroll Independent School District Board of Trustees, et al. CAUSE NO. 153-319405-20. In the District Court of Tarrant County, 153rd District Court.

sponsored and endorsed by the PAC Southlake Families.[453] The rejection of the plan shows, yet again that, elected officials are not responsive to the needs of the African-American community and African-American voting power is not strong enough to overcome the voting power of white voters, especially when white voters are able to more readily create political action committees and form coalitions with other like-minded voters. The same thing is currently happening in Texas around the May 7, 2022 primary, with neighborhood PACs being formed to oppose diversity efforts by school boards.[454] The voices of African-American voters and parents is being drowned out by white voters who have more time and resources at their disposal to shape the future of education in Texas.

This depression in political participation is further exacerbated because Texas Schools are not adequately preparing students to vote despite policies to the contrary, and this disproportionately negatively effects Latino and African-American students, who as of 2020, make up the majority of Texas students.[455] Texas law has required high schools to register eligible student voters at least twice a school year since 1985.[456] In 2017, it was reported that as few as 14% of public high schools had requested the voter registration forms as required by law, noting that many principals were not aware of the procedures written in the 1985 law to appoint a deputy registrar to register youth voters enrolled in their schools.[457] Through advocacy of the Texas Civil Rights Project and the Children's Defense Fund, voter registration of youth voters increased to 38% in 2019.[458] This is a direct example of non-white young voters' political participation being depressed, because they are not being given the information that they need from their schools.

Part of the mission of The Children's Defense Fund is to fight against youth voter suppression before students leave school by graduation or drop out.[459] According to the Intercultural Development Research Association (IDRA), Texas is failing to graduate "one out of every five students – which translates to losing 10 students per hour."[460] In 2019-2020, Texas "lost 86,789 students" to drop out,[461] and in 2017-2018 there were 94,767 total students.[462] It is noted that schools are "twice as likely to lose Hispanic students and Black students before they

[453] William Joy, *Carroll ISD rejects long-debated diversity plan in new lawsuit settlement*, WFAA, (Dec. 21, 2021), https://www.wfaa.com/article/news/education/schools/southlake-carroll-isd-rejects-long-debated-diversity-plan-in-new-lawsuit-settlement/287-c36a4bc6-b6ee-4097-a7dc-9db62ea5bf4c.

[454] Mike Hixenbaugh, *Culture wars over race and sexuality are dominating Texas school board elections*, NBC News (May 3, 2022), https://www.nbcnews.com/news/us-news/texas-school-board-elections-race-sexuality-rcna26977.

[455] *Snapshot 2020: State Totals*, Texas Education Agency, https://rptsvr1.tea.texas.gov/perfreport/snapshot/2020/state.html.

[456] Tex. Elec. Code § 13.046.

[457] Beth Stevens et al., *The High School Vote: How Texas fails to engage the next generation of voters*, Texas Civil Rights Project (Sep. 19, 2017), https://www.lawyerscommittee.org/high-school-vote-texas-fails-engage-next-generation-voters/.

[458] Maggie Stern, Jo Deprang & Irene Gomez, *The Kids Are Not The Problem: Promoting Civic Empowerment in Texas' Youth When Participation is Revolutionary*, Children's Defense Fund – Texas 21 (2019), https://cdftexas.org/wp-content/uploads/sites/8/2019/12/The-Kids-Are-Not-the-Problem.pdf.

[459] *Id.* at 1.1.

[460] *Attrition and Dropout Rates in Texas*, Intercultural Development Research Association (Feb. 7, 2022), https://www.idra.org/research_articles/attrition-dropout-rates-texas/#:~:text=Texas%20is%20failing%20to%20graduate,86%2C789%20students%20in%202019%2D20.

[461] *Id.*

[462] Download Graphics from Texas Public School Attrition Study, 2017-18, Intercultural Development Research Association (last visited May 19, 2022),https://www.idra.org/resource-center/download-graphics/.

graduate."[463] During the 2017-2018 period African American and Latino students were twice as likely as white students to drop out. Nearly 13,000 (24 percent) of African American students dropped out and over 61,000 (27 percent) of Latinos dropped out.[464] As of 2016-2017, only 86.1% of African American, 87.7% Latino students and 75.5% of bilingual students earned a high school diploma compared to 93.6% of white students in Texas.[465] 95.8% of AAPI students earned a high school diploma, but education levels also vary widely among Asian Americans and Pacific Islanders in Texas.[466] For example, nationwide in 2015, 72%of Asian Americans from India had at least a bachelor's degree, but only 9% of Bhutanese Americans had a bachelor's degree.[467] 2020 marked the first time that high school completion rates were equal to or higher than 90% for white, African American, and Asian American and Pacific Islander students.

The Children's Defense Fund seeks to encouraged youth to register to vote at school and try to educate youth prior to graduation or drop out.[468] This organization exists, in part, because schools and registrars are routinely ignoring their duty to provide these services to students, the majority of which are minority students, depresses their political participation.[469] The Children's Defense Fund reports that if young people are not registered to vote at school, youth voters face suppression from Voter ID laws, noting that they "pose a higher burden to new voters and groups with lower socioeconomic status."[470] In 1979, the Supreme Court in *Symm v. United States* affirmed the United States District Court for the Southern District of Texas's finding that Waller County had violated the 26th Amendment by forcing students to pay property taxes in order to vote at Prairie View University, a historically black college. [471] Despite that ruling, in 2004, the county's district attorney Oliver S. Kitzman claimed that students at Prairie View were not residents and could not vote.[472] Students marched in protest prompting Kitzman to rescind his statements.[473] Again in 2018, Christy Eason, a local elections administrator in Waller County, claimed that thousands of students registered with an on-campus address, and were required to

[463] *Id.*
[464] *Id.*
[465] *State High School Graduation Rates*, Independent Development Research Association, https://public.tableau.com/app/profile/idra/viz/StateHighSchoolGraduationRates/StateHighSchoolGraduationRates (last updated Mar. 27, 2022).
[466] *Id.*
[467] Rakesh Kochhar & Anthony Cilluffo, *Income Inequality in the U.S. is Rising Most Rapidly Among Asians*, Pew Research Center (July 12, 2018), https://www.pewresearch.org/social-trends/2018/07/12/income-inequality-in-the-u-s-is-rising-most-rapidly-among-asians/. The Pew report points to the Immigration Act of 1990 that "sought to increase the inflow of skilled immigrants" coinciding with the technology boom in the United States. New migrants from India migrated through the H-1B visa program, increasing the wave of AAPI immigrants employed in high-skilled occupations. These skilled immigrants have economic security that other AAPI communities, like Cambodian refugees, for example, do not. *See* Eric Tang, *Unsettled: Cambodian Refugees in New York City* (2015).
[468] Maggie Stern, Jo Deprang & Irene Gomez, *The Kids Are Not The Problem: Promoting Civic Empowerment in Texas' Youth When Participation is Revolutionary*, Children's Defense Fund – Texas (2019), https://cdftexas.org/wp-content/uploads/sites/8/2019/12/The-Kids-Are-Not-the-Problem.pdf.
[469] *Id.* at 21–23.
[470] *Id.* at 5.
[471] 439 U.S. 1105 (1979).
[472] Matt Zdun, *Prairie View A&M University's voter registration issues are resolved, but voting barriers remain*, *Texas Tribune* (Oct. 16, 2018), https://www.texastribune.org/2018/10/16/Prairie-View-voter-registration/.
[473] *Id.*

complete a change-of-address form before voting.[474] Later, Texas Secretary of State Rolando Pablos announced that no change-of-address form would be required before casting a vote.[475]

### *E. Income Inequality Restricts African American, Latino, and AAPI Voters' Ability to Participate in the Political Process and As a Result Politicians Are Less Responsive to Their Needs*

A recent Pew Research Center report shows that income inequality, the measure of the economic gap between the rich and the poor, has risen steadily in the United States since the 1970s and has increased more rapidly in recent decades.[476] Income inequality in the United States is also higher than among other G7 countries.[477] "Income gaps across racial and ethnic groups persist" in the United States and in the cases of African Americans, the gaps are wider than they were in the 1970s.[478] "In 2016, [African Americans] at the 90th percentile of their distribution earned 68% as much as whites at their 90th percentile, the same as in 1970."[479] At the median income level, African Americans "earned 65% as much as whites in 2016," up slightly from 59% in 1970.[480] Lower-income African Americans also "slightly" closed the gap "from 47%in 1970 to 54%in 2016," but those gaps are still staggering.[481]

In 2015, there were 56.5 million Latinos in the United States, or 17.6 percent of the total population.[482] The income gap for Latinos increased "at all income levels."[483] "Thus, lower-, middle-, and upper-income [Latinos] all lost ground to their white counterparts from 1970 to 2016."[484] "[Latinos] earned 65%as much as whites in 2016 compared to 74%in 1970."[485]

In 2016, Asian American and Pacific Islanders displaced African Americans "as the most economically divided" group in the United States.[486] "From 1970 to 2016, the gap in the standard

---

[474] *Id.*
[475] *Id.*
[476] *See, e.g.*, Rakesh Kochhar & Anthony Cilluffo, *Income Inequality in the U.S. is Rising Most Rapidly Among Asians*, Pew Research Center (July 12, 2018), https://www.pewresearch.org/social-trends/2018/07/12/income-inequality-in-the-u-s-is-rising-most-rapidly-among-asians/; Rakesh Kochhar & Anthony Cilluffo, *Key Findings on the Rise in Income Inequality within America's Racial and Ethnic Groups*, Pew Research Center (July 12, 2018), https://www.pewresearch.org/fact-tank/2018/07/12/key-findings-on-the-rise-in-income-inequality-within-americas-racial-and-ethnic-groups/.
[477] Facundo Alvaredo et al., *World Inequality Report* 5–6, World Inequality Lab (2018), https://wir2018.wid.world/files/download/wir2018-summary-english.pdf.
[478] Rakesh Kochhar & Anthony Cilluffo, *Key Findings on the Rise in Income Inequality within America's Racial and Ethnic Groups*, Pew Research Center (July 12, 2018), https://www.pewresearch.org/fact-tank/2018/07/12/key-findings-on-the-rise-in-income-inequality-within-americas-racial-and-ethnic-groups/.
[479] *Id.*
[480] *Id.*
[481] *Id.*
[482] Antonio Flores et al., *2015, Hispanic Population in the United States Statistical Portrait*, Pew Research Center September 18, 2017 https://www.pewresearch.org/hispanic/2017/09/18/2015-statistical-information-on-hispanics-in-united-states-current-data/.
[483] Rakesh Kochhar & Anthony Cilluffo, *Key Findings on the Rise in Income Inequality within America's Racial and Ethnic Groups*, Pew Research Center (July 12, 2018), https://www.pewresearch.org/fact-tank/2018/07/12/key-findings-on-the-rise-in-income-inequality-within-americas-racial-and-ethnic-groups/.
[484] Rakesh Kochhar & Anthony Cilluffo, *Income Inequality in the U.S. is Rising Most Rapidly Among Asians*, Pew Research Center (July 12, 2018), https://www.pewresearch.org/social-trends/2018/07/12/income-inequality-in-the-u-s-is-rising-most-rapidly-among-asians/.
[485] *Id.*
[486] *Id.*

living between Asians near the top and bottom of the income ladder nearly doubled."[487] The same Pew Research Center Report showed that

> The distribution of income among Asians transformed from being one of the most equal to being the most unequal among America's major racial ethnic groups. While Asians overall rank as the highest earning racial and ethnic group in the U.S., it is not a status shared by all Asians: From 1970 to 2016, the gains in income for lower-income Asians trailed well behind the gains for their counterparts in other groups.[488]

Income inequality has social and economic consequences, and non-white people disproportionately experience these consequences.[489] "People at the lower rungs of the income ladder may experience diminished economic opportunity and mobility and have less political influence."[490] Income inequality also leads to segregation because a person's choices of where they live is limited by the size of their budget. Thus, people with lower income of all races and ethnicities are forced to live with other people who are similarly situated. This overall income inequality hinders their ability to build coalitions with other voters and to wield political power, which has a negative effect on their ability to shape policy and to elect candidates that will be responsive to the needs of their communities. As noted in the last section, white parents are able to create and fund PACs that will oppose diversity measures in schools and will oppose critical race theory being taught in schools, and historically, low-income parents have not had the ability to do that, and subsequently the power of their vote and voice is diminished.[491]

Sociologists and political scientists have shown that the consequences of economic inequality are far reaching and can be reinforced in subsequent generations. In a 2007 study, Katheryn M. Neckerman and Florencia Torche investigated the causes and consequences of income inequality.[492] They found that the potential consequences range from education, health, generational inequality, and political power. They write that these growing disparities, "could also occur through the political process, for instance if low-income constituents lose the political voice to advocate for policies that improve their lives."[493] Sociologists and political scientists have also found that in the United States politicians are more responsive to their affluent constituents than

---

487 *Id.*

488 *Id.*

489 Vasquez Heilig, et al.,, *Nearly 50 Years Post-Jim Crow: Persisting and Expansive School Segregation for African American, Latina/o, and ELL Students in Texas*, 45 Education and Urban Society 5, 609–32 (May 1, 2013); Carl Allsup, *The American G.I. Forum: Origins and Evolution* (1982); Robert A. Calvert & Arnoldo De León, *The History of Texas* (1990); Mario T. García, *Desert Immigrants: The Mexicans of El Paso, 1880–1920* (1981); David Montejano, *Anglos and Mexicans in the Making of Texas, 1836–1986* (1987); Merline Pitre, *In Struggle Against Jim Crow: Lulu B. White and the NAACP, 1900–1957* (2010); James Smallwood, *Time of Hope, Time of Despair: Black Texans during Reconstruction* (1981); Guadalupe San Miguel, Jr., *"Let All of Them Take Heed": Mexican Americans and the Campaign for Educational Equality in Texas* (1987).

490 Rakesh Kochhar & Anthony Cilluffo, *Income Inequality in the U.S. is Rising Most Rapidly Among Asians*, Pew Research Center (July 12, 2018), https://www.pewresearch.org/social-trends/2018/07/12/income-inequality-in-the-u-s-is-rising-most-rapidly-among-asians/.

491 *See* Mike Hixenbaugh, *Culture wars over race and sexuality are dominating Texas school board elections*, NBC News (May 3, 2022), https://www.nbcnews.com/news/us-news/texas-school-board-elections-race-sexuality-rcna26977?fbclid=IwAR31h1JPEKX1smdk-z2Mcg1ttdKMgtxtfE_mbjYOfcV4AN-WFGPP0jJgRe0.

492 Katheryn Neckerman & Florencia Torche, *Inequality: Causes and Consequences*, 33 Annual Review of Sociology 335, 340 (Aug. 11, 2007).

493 *Id.*

to the middle class or the poor.[494] Income inequality and differences in political participation have partially explained this pattern. People with higher income have the means, time, and are more likely than low-income people to vote, donate, protest, and lobby for their interests.[495] This is not true for low-income voters in Texas that may not have jobs that can accommodate long waiting times to vote, that might not have the means of transportation to polling locations, and that do not have discretionary funds to donate to political campaigns or have lobbyists represent their interests.

Studies also have found that the decline of unions and other organizations that have represented the needs of low-income workers has resulted in less lobbying to advocate for policies that can benefit low-income workers. Another contributing factor identified is the rising polarization and growing importance of donations in political campaigns. As a result, politicians have become more responsive to their political base and less responsive to the priorities of their constituents.[496] Overall, Neckerman and Torche find, "there is little evidence that rising economic inequality will spur a countervailing political movement for redistribution; it appears more likely that politics will sustain and reinforce economic inequality."[497]

In Texas, as stated above, there is an income gap between white people and non-white people, and similar to the national trends around income inequality in the United States and the effects of income inequality, non-white voters' political participation is not only depressed, but also devalued. According to the *2020 American Community Survey of Poverty Status in the Past 12 Months*, a study conducted by the U.S. Census Bureau, non-white people make up the majority of the population living below the poverty line in Texas.[498] In 2020 an estimated 18.7%of African Americans, 15.7%of American Indians, 10%of Asian Americans, 17.4%of Native Hawaiian and Pacific Islanders, 19.7%of Latinos, and 15.7%of Texans that identified as two or more races lived below the poverty line.[499] In contrast, only 8.3% of white Texans live below the poverty line.[500] Thus, non-white people take the brunt of the negative effects of income equality on political participation.

### *F. Disparities in Health Outcomes Lead to a Depression in Non-White Voter Participation*

In 2019 the UT Southwestern Medical Center released a study of life expectancy in Texas.[501] The report found that "[l]ife expectancy was longest – 97.0 years – in the 78634 ZIP code in Hutto, Texas (near Austin) and was shortest – 66.7 years – in the 76104 ZIP code in Fort

---

494 Larry M. Bartles, *Economic inequality and political representations*, The Unsustainable American State (Lawrence Jacobs & Desmond King eds., 2009).

495 Katheryn Neckerman & Florencia Torche, *Inequality: Causes and Consequences*, 33 Annual Review of Sociology 335, 345 (Aug. 11, 2007); Lawrence Jacobs & Theda. Skocpol, *Inequality and American Democracy: What We Know and What We Need to Learn* (2005).

496 Katheryn Neckerman & Florencia Torche, *Inequality: Causes and Consequences*, 33 Annual Review of Sociology 335, 345 (Aug. 11, 2007).

497 *Id.*

498 American Community Survey, *S1701 Poverty Status in the Past 12 Months – Texas*, United States Census Bureau (2020), https://data.census.gov/cedsci/table?t=Poverty&g=0400000US48&tid=ACSST5Y2020.S1701.

499 *Id.*

500 *Id.*

501 Data Summary & Technical Report, *Life Expectancy at Birth in Communities Across Texas: 2005-2014*, UT Southwestern Medical Center, UT Health (2019), https://www.texashealthmaps.com/Life-expectancy-in-Texas-2005-2014.pdf; *Life Expectancy by ZIP Code in Texas*, UT Southwestern Medical Center, UT Health (last visited May 18, 2022), https://www.texashealthmaps.com/lfex.

Worth."[502] The report also found that life expectancy is strongly associated with poverty. "Those living in ZIP codes with less than 5 percent poverty lived an average of 82.4 years, whereas those living in ZIP codes with more than 20 percent poverty lived an average of 76.4 years.[503] ZIP code 76104 in Fort Worth which is majority minority, the ZIP code with the lowest life expectancy in the state, is currently in SD 10. [504] At 66.7 years life expectancy, residents in that area have a life expectancy that is more than ten years younger than the national average.[505] This has an obvious effect on non-white voter participation. Given that non-white people statistically have shorter lifespans in this ZIP code, they will not have the same voting power as white voters. If non-white people in this ZIP code and other ZIP codes where there is a large proportion of non-white people had access to better healthcare, they would have longer life spans and their voting power would not decrease as drastically.[506]

The population of ZIP code 76104 is 33% African American and 44% Latino.[507] This ZIP code includes the Historic Southside, Morningside, and Hillside neighborhoods. In 2019 the federal poverty level was $25,750 earned income for a family of four. According to data from that year, a total of 45 percent of the households in the ZIP code bring in less than $25,750 a year.[508] About 1,200 households in 2018 brought in less than $10,000.[509] The low life expectancy is shocking, considering that the zip code includes Fort Worth's medical district, with five hospitals and hundreds of medical offices.

The Fort Worth Star-Telegram interviewed more than 50 residents, interviewed experts in public health and analyzed death records of 396 deaths between 2005 and 2014.[510] The study found that despite the proximity to these medical facilities, residents do not have access to health care because they lack transportation to reach these facilities, they do not have health care, and lack awareness of the programs or how to access help.[511] The primary barrier for many is I-35W, which runs north-south through the zip code and separates neighborhoods on the east side from the

---

[502] Newsroom, *New Interactive map first to show life expectancy of Texans by ZIP code, race, and gender*, UT Southwestern Medical Center (Feb. 27, 2019), https://www.utsouthwestern.edu/newsroom/articles/year-2019/life-expectancy-texas-zipcode.html.

[503] *Id.*

[504] The population break down for ZIP code 76104 includes 44%Latino, 33%African American, 19% white and 2%Asian. American Community Survey, *Census Reporter – 76104 ZIP Code*, United States Census Bureau (2020), http://censusreporter.org/profiles/86000US76104-76104/.

[505] Data Summary & Technical Report, *Life Expectancy at Birth in Communities Across Texas: 2005-2014*, UT Southwestern Medical Center, UT Health (2019), https://www.texashealthmaps.com/Life-expectancy-in-Texas-2005-2014.pdf; Newsroom, *New Interactive map first to show life expectancy of Texans by ZIP code, race, and gender*, UT Southwestern Medical Center (Feb. 27, 2019), https://www.utsouthwestern.edu/newsroom/articles/year-2019/life-expectancy-texas-zipcode.html.

[506] Additional public health studies also found the impact of racial residential segregation in Houston and breast cancer rates and self-rated health. *See* Sandi L. Pruitt et al., *Residential Racial Segregation and Mortality Among Black, White, and Hispanic Urban Breast Cancer Patients in Texas, 1995 to 2009*,. 121 Cancer 11, 1845–855 (Feb. 11, 2015), https://doi.org/10.1002/cncr.29282; Kathryn Freeman Anderson & Lindsay Oncken, *Racial Residential Segregation, Perceived Neighborhood Conditions, and Self-Rated Health: The Case of Houston, Texas*, 35 Sociological Forum 2, 393–418 (Feb. 28, 2020), https://doi.org/10.1111/socf.12587.

[507] American Community Survey, *Census Reporter – 76104 ZIP Code*, United States Census Bureau (2020), http://censusreporter.org/profiles/86000US76104-76104/.

[508] Nichole Manna, *No doctors, no grocers, no help. Death comes early in these Fort Worth Neighborhoods*, Fort Worth Star-Telegram (Apr. 15, 2021), https://www.star-telegram.com/news/local/fort-worth/article244137362.html.

[509] *Id.*

[510] *Id.*

[511] *Id.*

medical district on the west side.[512] Although residents are in the same zip code, "the highway is a wall that blocks people there from quality health care."[513] There are no pharmacies, no urgent care centers or clinics in the three neighborhoods.[514]

Residents also described that the neighborhoods had changed drastically from decades of neglect.[515] Bob Ray Sanders, a lifelong resident of 76104 explained that education, transportation, and criminal justice reform were all lacking in the neighborhoods.[516] When the city passed large bond packages, "little trickled down to those residents," he explained.[517] Residents also live in what is known as a "food desert" where there is "a lack of grocery stores," lack of available fresh produce, and instead people shop at corner stores with packaged and canned foods.[518]

Bob Ray Sanders explained the lack of health care and healthy food: "Black people there were obviously at the end of the food chain in terms of health care . . . People living in that area were not supplied with opportunities to have better health. There's a lack of grocery stores, and you couldn't even walk down your street safely because of a lack of sidewalks. All those things affect overall health."[519]

This ZIP code (76104) was also "among the hardest hit in Tarrant County in the number of coronavirus cases per capita."[520] African Americans make up 16% of the population, but 19% of the COVID-19 deaths."[521] Residents in these neighborhoods also didn't have access to coronavirus testing as these "sites were opened within clinics" and there were no clinics in the neighborhoods, and no testing sites opened in the neighborhoods.[522]

State Representative Bernice Johnson of Dallas "said that no one should be surprised about the data."[523] Representative Johnson pointed to Texas' refusal to participate in the Affordable Care Act Medicaid expansion directly impacted the health of African American residents.[524] In September 2020, "the University of North Texas Health Science Center at Fort Worth announced that they received a portion of a $12 million national award to help connect minority communities with public health information" and they planned to include neighborhoods in 76104.[525] This is good news, but residents deserve more than a partial one-time award. These residents have suffered from "decades of neglect" and lack of basic resources, even sidewalks to allow people to walk safely, to get food, much less to have the ability to vote.[526]

These health disparities underscore a lack of responsiveness of government officials to the needs of these communities, and if non-white voters were able to participate in the electoral process

---

[512] *Id.*
[513] *Id.*
[514] *Id.*
[515] *Id.*
[516] *Id.*
[517] *Id.*
[518] *Id.*
[519] Nichole Manna, *No doctors, no grocers, no help. Death comes early in these Fort Worth Neighborhoods*, Fort Worth Star-Telegram (Apr. 15, 2021), https://www.star-telegram.com/news/local/fort-worth/article244137362.html.
[520] *Id.*
[521] *Id.*
[522] *Id.*
[523] *Id.*
[524] *Id.*
[525] *Id.*
[526] *Id.*

in a more efficient and effective manner, some of these disparities may not exist. A specific example of how the disparities in health outcomes directly affected many non-white voters' ability to cast their ballot occurred in October 2020 when Governor Abbott issued a proclamation ordering counties to limit ballot drop-off locations to one per county. This disproportionately impacted lower-income, disabled voters, voters at higher-risk for complications from COVID-19, and voters in counties with large populations, like those living in Dallas and Houston.[527] Many non-white voters fit into several of these categories, and thus the health disparities between non-white voters and white voters, meant that these voters were more at risk of having long-term effects of COVID-19 just by voting, thus limiting ballot drop off boxes, forced voters to make a choice between their health or their vote.[528]

### *G. Geographical Isolation and Crumbling Infrastructure Has Also Led to Depression in Non-White Voter Participation*

As described above, people who live in ZIP Code 76104 have the lowest life expectancy[529] and the ZIP Code is majority minority, but they also have a difficult time casting a ballot. For Fort Worth residents living in ZIP code 76104 who wanted to participate in early voting in April and May 2022, there is only one early voting polling location for approximately 17,650 residents.[530] The poll is located at the Southside Community Center at 959 East Rosedale Street which is between Historic Southside and Hillside neighborhoods.[531] For residents living in Morningside, this polling location is almost three miles away. It would take two buses to arrive for those with limited mobility, or approximately 45 minutes of walking (if the roads are safe for pedestrian travel). For residents living in the northern section of the ZIP Code 76104, it may take up to three buses or 25 minutes of walking (if the roads are safe for pedestrian travel). In addition to the difficulty to reach the polling location, the early voting location closes at 7pm,[532] which does not give adequate time for working adults who rely on public transportation to return home and who might then have another long commute to the polling location.

On Election Day for the Texas primary runoff on May 24, 2022, residents of ZIP Code 76104 have 2 polling locations: Southside Community Center at 959 East Rosedale Street and Fire Station Community Center at 1601 Lipscomb Street.[533] For voters living in Morningside the Fire Station Community Center is still out of reach. A Morningside voter would have to take two buses

---

527 *See* Brief of *Amicus Curiae* Disability Rights Organizations In Support of Temporary Restraining Order, Temporary Injunction, And Permanent Injunction, *Anti-Defamation League Austin, Southwest, and Texoma Regions, et al.*, v. *Abbot*, Case No. D-1-GN-20-005550 (Travis Cty. Dist. Ct. Oct. 12, 2020), https://media.disabilityrightstx.org/wp-content/uploads/2020/10/13140859/State-Court-Amicus-Brief-Mail-In-Ballot-Lawsuit.pdf.
528 *Id.* at 2.
529 Newsroom, *New Interactive map first to show life expectancy of Texans by ZIP code, race, and gender*, UT Southwestern Medical Center (Feb. 27, 2019), https://www.utsouthwestern.edu/newsroom/articles/year-2019/life-expectancy-texas-zipcode.html.
530 *Early Voting By Personal Appearance Days and Hours*, Tarrant County Early Voting (May 7, 2022), https://www.tarrantcounty.com/content/dam/main/elections/2022/en22/locations/EN22_EV_Sched.pdf; American Community Survey, *Census Reporter – 76104 ZIP Code*, United States Census Bureau (2020), http://censusreporter.org/profiles/86000US76104-76104/.
531 *Id.*
532 *Id.*
533 *Republican and Democratic Primary Runoff Elections, May 24, 2022*, Tarrant County (last visited May 20, 2022), https://www.tarrantcounty.com/content/dam/main/elections/2022/pr22/locations/PR22_Vote_Center_Locations.pdf.

or walk 40 minutes to the Fire Station polling location. As research has shown, pedestrians do not cross I-35 for urgently needed healthcare due to lack of transportation and ability to make the trip on foot or through public transportation.[534] Placing the location on the west side of the interstate is tantamount to barring these residents on the east side of I-35 from voting at that location. For residents that live in Historic Southside, there are no public buses that make stops in their neighborhood.[535] For residents living in Morningside, this polling location is almost three miles away. It would take two buses to arrive for those with limited mobility, or approximately 45 minutes of walking (if the roads are safe for pedestrian travel).

For the most economically vulnerable, a lack of sidewalks makes the ability to walk to access food, health care, school, other basic civil services, and polling locations dangerous. For example, Dallas has one of the highest traffic fatality rates in the United States and since 2010, traffic deaths in the city have increased by 80 percent.[536] "Dallas has a $2 billion backlog of crumbling or missing sidewalks, only about $15 million in [the 2021]budget to start tackling the problem."[537] Dallas has more than 4,000 miles of sidewalk, but almost half of those miles are damaged.[538] City officials also say that more than 2,000 miles of sidewalk needs to be built to serve the needs of low-income neighborhoods that have suffered from decades of neglect and infrastructure disinvestment.[539] In these neighborhoods, sidewalks are not just used for jogging or walking dogs, but as one report showed, "they're a transportation artery."[540] "And sidewalks are key to supporting health, accessibility, and pedestrian safety."[541] In the predominantly Latino neighborhood of Bachman Lake, the median household income is about $30,000 and many families do not have access to a car.[542] One resident Vega explained, "[a] sidewalk may not mean much for people who have money. But in reality we don't have the money to do it ourselves."[543]According to Vega, "[i]t is dangerous and when you have children with special needs it is difficult to control them. And you need the sidewalk to feel more safe."[544] When asked about Dallas's Sidewalk Master Plan, Vega explained she did not know about the plan.[545] Currently, city council members are in conflict about how to use available city funds.[546] The current Sidewalk Master Plan divides the funding for the 14 council districts, but some council

[534] *See, e.g.*, Nichole Manna, *No doctors, no grocers, no help. Death comes early in these Fort Worth Neighborhoods*, Fort Worth Star-Telegram (Apr. 15, 2021), https://www.star-telegram.com/news/local/fort-worth/article244137362.html.
[535] *See Trinity Metro System Map*, Trinity Metro (last visited May 18, 2022), https://ridetrinitymetro.org/wp-content/uploads/2022/04/Web_TM_SysMap_220417.pdf
[536] Alejandra Martinez, *Can a Dallas plan overcome the sidewalk gap between low-income and affluent neighborhoods?*, KERA (Apr. 6, 2022), https://www.texasstandard.org/stories/can-a-dallas-plan-overcome-the-sidewalk-gap-between-low-income-and-affluent-neighborhoods/.
[537] Ken Kalthoff, *The $2 Billion Sidewalk Problem in Dallas*, NBC DFW (Nov. 18, 2021), https://www.nbcdfw.com/news/local/the-2-billion-sidewalk-problem-in-dallas/2820071/.
[538] Alejandra Martinez, *Can a Dallas plan overcome the sidewalk gap between low-income and affluent neighborhoods?*, KERA (Apr. 6, 2022), https://www.texasstandard.org/stories/can-a-dallas-plan-overcome-the-sidewalk-gap-between-low-income-and-affluent-neighborhoods/.
[539] *Id.*
[540] *Id.*
[541] *Id.*
[542] *Id.*
[543] *Id.*
[544] *Id.*
[545] *Id.*
[546] *Id.*

members argue "the plan is not equitable."[547] Council Member Carolyn King Arnold explained that the politics in "the city hall chambers often get in the way of talking about Dallas' history of systemic racism."[548] She believes wealthy districts should share resources with underserved districts.[549] She said, "[y]ou [wealthier districts] are really fat, you're overweight with resources – it's time to share with your other brothers and sisters who have been starving to death for many, many years. So you're going to have to take some food out of that plate and put it on someone else's plate."[550]

For voters in the Bachman Lake neighborhood, in Dallas, the travel to polling locations can be prohibitive. For example, there are currently no early voting polling locations for voters in the Bachman Lake ZIP code 75220.[551] For voters that want to travel to the nearest polling location in a neighboring ZIP code, 75299, there are no bus lines that will take them from their home in Bachman Lake to the early voting location at Marsh Lane Baptist Church location (10716 Marsh Lane). Walking to the Marsh Lane Baptist Church location would take residents over an hour, at a minimum. For residents living in the north Bachman Lake neighborhood that want to travel to the Grauwyler Recreation Center polling location at7780 Harry Hines Blvd, they would have a three-mile journey on foot (about an hour and a half or two buses). As recent reporting shows Bachman Lake is not a pedestrian friendly, so these walking estimates are modest.

Trouble accessing polling locations in Texas is not surprising. After the Supreme Court ruling in *Shelby County* v. *Holder*, hundreds of polling locations closed in Texas before the 2016 presidential election. This was "significantly more both in number and percentage than any other state."[552] A 2018 report on voting rights in Texas by the Texas Advisory Committee to the U.S. Commission on Civil Rights also found polling locations and voting procedures that had been denied under VRA preclearance because the Department of Justice found them to be discriminatory for African American and Latino voters were implemented after *Shelby County v. Holder*.[553] The report also found "that polling locations are sometimes located in intimidating locations such as a sheriff's office or other law enforcement offices that may discourage marginalized communities from voting."[554] Moreover, the state Texas Election Code changed following *Shelby County v. Holder* to require only 72-hour notice for polling location changes.[555] For residents that do not have personal transportation, these last-minute changes disproportionately impact voters that rely on public transportation or walk to polling locations.

## IV. Senate Factor 6: The Use of Racial Appeals in Political Campaigns

Texas politicians have a long history of using racist rhetoric and calling for brutal border policing to win political points. In the 1800s, Stephen F. Austin—historically revered as the founding father of Texas and credited with establishing the Texas Rangers—referred to Mexicans

---

[547] *Id.*
[548] *Id.*
[549] *Id.*
[550] *Id.*
[551] *Upcoming Elections Information*, Dallas County Elections (last visited May 19, 2022), https://www.dallascountyvotes.org/upcoming-election-information/.
[552] The Texas Advisory Committee to the U.S. Commission on Civil Rights, *Voting Rights in Texas* 4–5, ( July 2018), https://www.usccr.gov/files/pubs/2018/07-23-TX-Voting-Rights.pdf.
[553] *Id.* at 9.
[554] *Id.*
[555] *Id.*

as a barbaric mongrel race that waged a war against Anglo American civilization.[556] Texas Congressman Claude B. Hudspeth, under oath, endorsed the use of mob violence and police shooting Mexicans on sight in 1919, "[y]ou have got to kill those Mexicans when you find them, or they will kill you."[557] He later helped establish the U.S. Border Patrol in 1924.[558] Another U.S. Congressman from Texas, John C. Box joined eugenicists in calling Mexicans an inferior race. Box described Mexicans as peons, "a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians . . . into that was fused much negro slave blood."[559] He called for strict immigration quotas and border policing to protect white America from "further degradation or change through mongrelization."[560] Congressman Box in 1926 co-sponsored a bill to limit Mexican immigration to preserve a "desirable character of citizenship" which he believed would "be violated by increasing the Mexican population of this country."[561]

The Texas GOP 2020 platform includes calls for xenophobic policy that have roots in the 1920s eugenic era of nativist and xenophobic immigration policies that aimed to restrict even legal migration and to control the population growth of non-white populations.[562] The 2020 GOP platform called for the elimination of birthright citizenship (paragraph 73 and paragraph 293), making English the "official language" of the United States (paragraph 77), and abolishing amnesty (paragraph 294) and the Refugee Resettlement Program (paragraph 292).[563]

More recently, Texas politicians refueled xenophobia by misrepresenting a humanitarian crisis on the border as a threat to national security. They recycled threats of an "invasion."[564] In the 21st century more politicians in Texas adopted this political strategy by proving they were tough on border security.[565] This had devastating consequences on people seeking asylum from Mexico, Central America, and other Latin American countries.

The Marshall Project and the Texas Tribune found that both Governors Rick Perry and Greg Abbott launched "border security" initiatives that coincided during re-election season, or

---

[556] Kelly Lytle Hernandez, *Migra!: A History of the U.S. Border Patrol* 28 (2010).
[557] *Id.*
[558] *Id.*
[559] *Id.* (quoting *Seasonal Agricultural Laborers from Mexico: Hearing Before the H. Comm. on Immigration and Naturalization*, 69th Cong., 124 (1926) (statement of John C. Box, Congressman from Texas).
[560] *Id.* (quoting *Seasonal Agricultural Laborers from Mexico: Hearing Before the H. Comm. on Immigration and Naturalization*, 69th Cong., 124 (1926) (statement of John C. Box, Congressman from Texas).
[561] *Id.* (quoting *Seasonal Agricultural Laborers from Mexico: Hearing Before the H. Comm. on Immigration and Naturalization*, 69th *Cong*., 124 (1926) (statement of John C. Box, Congressman from Texas).
[562] *Compare Report of 2020 Platform & Resolutions Committee*, Texas GOP (2020), https://texasgop.org/platform/, *with* Alexandra Minna Stern, *Eugenic Nation: Faults and Frontiers of Better Breeding in Modern America*, (2005), *and* Leo Chavez, *Anchor Babies and the Challenge of Birthright Citizenship*, (2017), *and* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law that Kept Two Generations of Jews, Italians, and other Immigrants out of America* (2019).
[563] *Report of 2020 Platform & Resolutions Committee*, Texas GOP (2020), https://texasgop.org/platform/.
[564] Heidi Pérez-Moreno and James Barragán, "Critics denounce Greg Abbott and Dan Patrick's 'invasion' rhetoric on immigration, saying it will incite violence," *Texas Tribune* June 17, 2021.
[565] Terri Langford & Jay Root, *Lawmakers Question Perry's Funding of National Guard at Border*, Texas Tribune (Aug. 5, 2014), https://www.texastribune.org/2014/08/05/lawmakers-question-perrys-funding-guard-border/; Peggy Fikac, et al., *Perry to send 1,000 Texas Guard troops to South Texas border*, My San Antonio (July 20, 2014), https://www.mysanantonio.com/news/local/article/Perry-to-send-1-000-Texas-Guard-troops-to-South-5634627.php.

while they were aiming for a higher elected office.[566] In October 2005, Governor Rick Perry launched Operation Linebacker, a border initiative that would allegedly protect Texans from terrorist groups like al-Qaeda and alleged that they could smuggle "weapons of mass destruction" across the Texas-Mexico border. Without evidence to support these claims, he went on to claim Texans were at risk. Perry committed $10 million to the operation. Echoing rhetoric that had been used by Ku Klux Klan grand dragon David Duke decades earlier, Perry said, "[t]he state of Texas cannot wait for the federal government to implement needed border security measures." During his reelection campaign, Governor Perry highlighted his border security efforts and continued to stoke fear.[567] This type of anti-Muslim rhetoric was also used by local elected officials, like Beth Van Duyne, former mayor of Irving, who used anti-Muslim rhetoric to push for an "anti-sharia law" bill in 2015, which had the impact of intimidating Muslim voters.[568] Van Duyne is now a Congresswoman from Texas's 24th Congressional District.[569] In 2013, Representative Louie Gohmert, the Congressman from Texas's First District also used this rhetoric and was quoted as saying that "radical Islamists" are being "trained to act like Hispanic[s]" and cross the U.S.-Mexico border.[570]

In 2014 the United Nations High Commissioner for Refugees detailed concerns for thousands of children who had arrived in the United States.[571] The Commissioner found that 58 percent of the 404 children they interviewed were fleeing regional violence, gang extortion, abuse at home or recruitment and exploitation by the criminal industry of human smuggling.[572] The report recommended increased staffing and mandatory training "on the basic norms and principles of international human rights and refugee law, including the fundamental principles of nondiscriminatory treatment, best interests of the child, non-refoulement, family unity, due process of law and non-detention or other restriction of liberty."[573]

Rather than heed the calls of the United Nations High Commissioner for Refugees, then-Gov. Rick Perry portrayed increasing numbers of unaccompanied minors as a threat and warned

---

[566] Lomi Kriel, et al., *Texans Spend Billions on Border Operations. What Do They Get in Return?*, The Marshall Project (Apr. 18, 2022), https://www.themarshallproject.org/2022/04/18/texas-border-operations-abbott-taxpayer-history.

[567] Clay Robinson, *Perry vows 'vigorous' re-election campaign*, Houston Chronicle (Dec. 20, 2005), https://www.chron.com/news/houston-texas/article/Perry-vows-vigorous-re-election-campaign-1564198.php.

[568] Olga Khazan, *The New Face of Trumpism in Texas*, Atlantic (Apr. 17, 2021), https://www.theatlantic.com/politics/archive/2021/04/beth-van-duyne-texas-congress-trump/618558/.

[569] *See Congresswoman Beth Van Duyne* (last visited May 19, 2022), https://vanduyne.house.gov.

[570] Luke Johnson, *Louie Gohmert: Radical Islamists Being Trained To 'Act Like Hispanic'*, HuffPost (Apr. 17, 2013), https://www.huffpost.com/entry/louie-gohmert-radical-islamist_n_3100254.

[571] Sonia Nazario, *The Children of the Drug Wars: A Refugee Crisis Not an Immigrant Crisis*, New York Times (July 11, 2014), https://www.nytimes.com/2014/07/13/opinion/sunday/a-refugee-crisis-not-an-immigration-crisis.html.

[572] United Nations High Commissioner for Refugees, *Children on the Run* 13 (2014), https://www.unhcr.org/en-us/about-us/background/56fc266f4/children-on-the-run-full-report.html.

[573] For children coming from El Salvador and Mexico the percentages of children in need of protection were as high as 72% and 64% respectively. *Id.* at 9, 11; *see also* Maddie Oatman, *Are the Kids Showing Up at the Border Really Refugees?*, Mother Jones (July 17, 2014), https://www.motherjones.com/politics/2014/07/are-kids-showing-border-really-refugees/; Sonia Nazario, *The Children of the Drug Wars: A Refugee Crisis Not an Immigrant Crisis*, New York Times (July 11, 2014), https://www.nytimes.com/2014/07/13/opinion/sunday/a-refugee-crisis-not-an-immigration-crisis.html.

Texans, "our citizens are under assault."[574] He sent 1,000 Texas National Guard troops to militarize the border.[575] The Texas Department of Public Safety director Steven McCraw spoke of a surge in "cartel members, criminals and terrorists" crossing into the United States.[576] This gross mischaracterization of the humanitarian crisis sowed public support for imprisoning children. When Texas lawyers raised alarms of the inhumane conditions of children detained in these private prisons, Americans failed a humanitarian litmus test. That tolerance for imprisoning children, arguably, laid the groundwork for the Family Separation policy under the Trump Administration that doctors have referred to as state-sanctioned child abuse.[577]

Governor Perry and McCraw's rhetoric came despite resistance from politicians that represented south Texas counties, like State Senator Juan "Chuy" Hinojosa. Senator Hinojosa made a public plea for sane discussion: "[m]y position is that we do not need to militarize the border."[578] The senator requested aid for local law enforcement agents to feed and provide health checkups for children crossing into south Texas, and money to reimburse local communities that offered to house and care for the crossing immigrants. Despite these requests, the governor instead redirected $38 million in the Department of Public Safety budget to fortify the border.[579] These funds were in addition to the $1.3 million dollars DPS already spent each week policing the border.[580]

These disparaging stereotypes and threats of "invasions" resurged when Donald J. Trump launched his first election campaign arguing that a border wall was needed because "[w]hen Mexico sends its people, they're not sending their best . . . They're bringing drugs. They're bringing crime. They're rapists."[581] Although he had mastered racist rhetoric, it is unclear if Trump

---

[574] Jay Root, "Perry Sending Guard Troops to the Border," Texas Tribune (July 21, 2014), https://www.texastribune.org/2014/07/21/perry-activate-1000-guard-troops/.

[575] Terri Langford & Jay Root, *Lawmakers Question Perry's Funding of National Guard at Border*, Texas Tribune (Aug. 5, 2014), https://www.texastribune.org/2014/08/05/lawmakers-question-perrys-funding-guard-border/; Peggy Fikac, et al., *Perry to send 1,000 Texas Guard troops to South Texas border*, My San Antonio (July 20, 2014), https://www.mysanantonio.com/news/local/article/Perry-to-send-1-000-Texas-Guard-troops-to-South-5634627.php.

[576] Eli Okun, *Aide: Perry Chose Best Option on National Guard Funding*, Texas Tribune (Aug. 5, 2014), https://www.texastribune.org/2014/08/05/gov-office-defends-national-guard-deployment-fundi/.

[577] Catherine E. Shoichet, *Doctors saw immigrant kids separated from their parents. Now they're trying to stop it*, CNN (June 19, 2018), https://www.cnn.com/2018/06/14/health/immigrant-family-separation-doctors/index.html; American Psychiatric Association, *Children Separated at Borders Amounts to 'State-Sanctioned Child Abuse,' Says American Psychiatric Association President*, San Diego Psychiatric Society (Feb. 27, 2019), https://www.sandiegopsychiatricsociety.org/uncategorized/children-separated-at-border-amounts-to-state-sanctioned-child-abuse-says-american-psychiatric-association-president.

[578] Press Release, S*enator Hinojosa's Statement on Governor Perry's Announcement to Deploy 1,000 National Guard*, Senator Juan "Chuy" Hinojosa: District 20 (July 21, 2014), https://senate.texas.gov/press.php?id=20-20140721; Peggy Fikac, et al., *Perry to send 1,000 Texas Guard troops to South Texas border*, My San Antonio (July 20, 2014), https://www.mysanantonio.com/news/local/article/Perry-to-send-1-000-Texas-Guard-troops-to-South-5634627.php.

[579] *Perry uses $38M to add National Guard on Border*, AP News (Aug. 2, 2014), https://apnews.com/article/918648c461734946afb9951f3870a4f2.

[580] *Id.*

[581] Michelle Ye Hee Lee, *Donald Trump's false comments connecting Mexican immigrants and crime*, Washington Post (July 8, 2015), https://www.washingtonpost.com/news/fact-checker/wp/2015/07/08/donald-trumps-false-comments-connecting-mexican-immigrants-and-crime/; *see also* Suzanne Gamboa, *Rise in reports of hate crimes against Latinos pushes overall number to 11-year high*, NBC News (Nov. 16, 2020), https://www.nbcnews.com/news/latino/rise-hate-crimes-against-latinos-pushes-overall-number-highest-over-n1247932.

understood how closely he adopted language from a century before. But, members of his cabinet had publicly praised racist and xenophobic immigration policies created in that era, namely the 1924 Immigration Act that was designed by eugenicists and endorsed by the Ku Klux Klan.[582]

Doctors, lawyers, religious leaders, and teachers had raised alarms of the devastating effects of inhumane immigration detention and deportation policies, which had compounded over decades. But during the Trump Administration, El Paso was used as a staging ground to advance a white nationalist immigration agenda. In May 2018, to drum up support for "The Wall," Trump ramped up his racist rhetoric, baselessly claiming that, "[y]ou wouldn't believe how bad these people are," crossing the border. He infamously corrected himself: "[t]hese aren't people. These are animals."[583]

In pithy lines, Trump managed to dehumanize all people of Mexican descent, reviving language and tactics that white supremacists have used for centuries. El Paso was selected to pilot the inhumane family separation policy that eventually removed nearly 5,500 children from their guardians.[584] The children ranged in age from teenagers to newborns, some taken from their mothers while they were still nursing.[585]

When news of this policy broke and images of children being hurried into windowless vans to be transported by bus and by plane to undisclosed locations circulated, the people of El Paso, heartbroken by what was taking place in their hometown, responded with protests, and offered to provide refuge for the children. When reports leaked that separated babies were negligently left in soiled diapers while under the care of Border Patrol facilities, residents donated clean diapers, formula, and toys for the children, but the Border Patrol agents refused to allow their distribution.[586] When news broke of children being imprisoned in a tent city in nearby Tornillo, elected officials from El Paso, like Texas State Senator José Rodríguez, called for accountability.[587] Linda Rivas, Executive Director of Las Americas Immigration Advocacy Center described the experiences of 2018 and 2019 as a series of attacks on El Paso.[588]

This anti-immigrant sentiment was not solely perpetrated by the former President, but also by elected officials in Texas. The *Texas Tribune* obtained a copy of a two-page fundraising mailer dated August 2, 2019, just a day before the El Paso massacre, in which Governor Abbott used alarmist terms about the need to "DEFEND" Texas at the southern border and also linked the threat

---

[582] Adam Serwer, *Jeff Session's Unqualified Praise for a 1924 Immigration Law*, Atlantic (Jan. 10, 2017), https://www.theatlantic.com/politics/archive/2017/01/jeff-sessions-1924-immigration/512591/.

[583] Gregory Korte & Alan Gomez, *Trump ramps up rhetoric on undocumented immigrants: 'These aren't people. These are animals'*, USA Today (May 16, 2018), https://www.usatoday.com/story/news/politics/2018/05/16/trump-immigrants-animals-mexico-democrats-sanctuary-cities/617252002/.

[584] *See Family separation – a timeline*, Southern Poverty Law Center, (Mar. 23, 2022), https://www.splcenter.org/news/2022/03/23/family-separation-timeline.

[585] *Id.*

[586] Alex Samuels *People want to donate diapers and toys to children at Border Patrol facilities in Texas. They're being turned away*, Texas Tribune (June 24, 2019).

[587] *Rodriguez Blasts Trump administration's decision to set up "tent city" in Tornillo*, KRWG Here and Now (June 15, 2018), https://www.krwg.org/regional/2018-06-15/rodriguez-blasts-trump-administrations-decision-to-set-up-a-tent-city-in-tornillo.

[588] Alex Samuels *People want to donate diapers and toys to children at Border Patrol facilities in Texas. They're being turned away*, Texas Tribune (June 24, 2019), https://www.texastribune.org/2019/06/24/texas-border-facility-donations-turned-away/; Claudia Tristán, *It was fueled by hate and bigotry': one year on from the El Paso shooting*, The Guardian (Aug. 3, 2020), https://www.theguardian.com/us-news/2020/aug/03/el-paso-shooting-texas-one-year-anniversary.

of migration as a Democratic strategy to "turn Texas blue."[589] The mailer warned, "[i]f they can do it in California, they can do it in Texas—if we let them…Unless you and I want liberals to succeed in their plan to transform Texas—and our entire country—through illegal immigration, this is a message we MUST send."[590] The very next day, on August 3, a white supremacist drove 600 miles to commit the El Paso massacre.[591]

In Governor Abbott's 2022 reelection campaign he also claimed that Operation Lone Star caught nearly 900 pounds of fentanyl.[592] In reality, the figure cited in the campaign flyer included pounds of fentanyl seizures across the state, "only about 160 pounds were seized in the 63 counties that the state included as a part of [Operation Lone Star]."[593] "El Paso County accounted for all but 12" of the 160 pounds, but the county did not sign on to Operation Lonestar, so they "did not receive extra resources as a part of the program."[594]

Last summer Democratic elected officials, like U.S. Representative Veronica Escobar from El Paso, condemned Governor Abbott for again describing immigrants crossing the border as an "invasion," reminding the governor that the language was dangerous and mirrored language the El Paso shooter used two years ago.[595] Rep. Escobar warned Abbott in a tweet, "[i]f people die again, blood will be on your hands."[596] State Representative Joe Moody of El Paso said, "State leaders disavowed this kind of language after that racially motivated massacre, but now that the bodies are cold, here we go again . . . There are not invaders here, only people."[597]

As recently as April 30, 2022, Governor Abbott was weighing "whether to invoke actual war powers" by "officially declaring an 'invasion' to comply with a clause in the U.S. Constitution" that forbids states from engaging in war except when "actually invaded."[598] Given that most Americans have access to nearly 24 hour news coverage of the Russian invasion of Ukraine, declaring that Texas is being "invaded" by migrants and asylum seekers, men, women, and child civilians, it doesn't pass a common sense test. Yet, as explained above, these racial appeals have a dire impact on non-white voter intimidation, victims of hate crimes, and mistreatment by law enforcement and CBP. Sociologists and political scientists have shown that for the last 50 years budgets to police and the military have swelled astronomically.[599] Despite

---

589 Alexa Ura, *State leaders are looking for solutions after El Paso. Texas Latinos say they can start by changing the words they use*, Texas Tribune (Aug. 22, 2019), **Error! Hyperlink reference not valid.**https://www.texastribune.org/2019/08/22/what-hispanic-texans-want-texas-lawmakers-after-el-paso-shooting/.
590 *Id.*
591 *Id.*
592 Lomi Kriel, et al., *Reality Check: 7 Times Texas Leaders Misled the Public About Operation Lone Star*, Marshall Project (Apr. 27, 2022), https://www.themarshallproject.org/2022/04/27/reality-check-seven-times-texas-leaders-misled-the-public-about-operation-lone-star.
593 *Id.*
594 *Id.*
595 Heidi Pérez-Moreno & James Barragán, *Critics denounce Greg Abbott and Dan Patrick's 'invasion' rhetoric on immigration, saying it will incite violence*, Texas Tribune (June 17, 2021), https://www.texastribune.org/2021/06/17/greg-abbott-dan-patrick-el-paso-invasion-immigration/.
596 *Id.*
597 *Id.*
598 J. David Goodman & Edgar Sandoval, *Abbott Threatens to Declare an 'Invasion' as Migrant Numbers Climb*, New York Times (Apr. 30, 2022), https://www.nytimes.com/2022/04/30/us/texas-border-abbott.html.
599 Douglas S. Massey, et a., *Beyond Smoke and Mirrors: Mexican Immigration in an Era of Economic Integration* (2003);; Douglas S. Massey & Magaly Sánchez, *Brokered Boundaries: Creating Immigrant Identity in Anti-Immigrant Times* (2012);; Leo R. Chavez, *Covering Immigration: Popular Images and the Politics of the Nation* (2001); Leo R. Chavez, *The Latino Threat: Constructing Citizens, Immigrants, and the Natio*n (2013).

increased spending and the militarization of the border, these costs do not reduce patterns of migration. Instead, campaigns that stoke fear with press conferences at the U.S.-Mexico border are political theater that rely on deep seated racial appeals to fears of demographic and political displacement.

Governor Abbott has been widely criticized for showing cruelty continuing to target unaccompanied minors in federal custody. In 2021 he issued a declaration order that revoked the childcare licenses of facilities in Texas housing unaccompanied migrant children on behalf of the federal government.[600] These continued attacks are racial appeals to voters with anti-immigrant sentiment. In May 2020 Governor Abbott used another dog whistle when he expressed interest in challenging the 1984 Supreme Court ruling *Plyler* v. *Doe*, which struck down a Texas law that denied state funding to education undocumented children in Texas public schools. During a radio interview he said, "I think we will resurrect that case and challenge the issue again, because the expenses are extraordinary and the times are different than when *Plyler* versus *Doe* was issued many decades ago."[601]

Governor Abbott's most recent threatening words have the impact twin impact of intimidating immigrants in Texas and misrepresenting undocumented people as a drain on public resources. In reality, "[i]mmigrant-led households in [Texas] paid $26.3 billion in federal taxes and $12.3 billion in state and local taxes in 2018."[602] Undocumented immigrants alone "paid an estimated $2.6 billion in federal taxes and $1.6 billion in state and local taxes in 2018."[603] Texans "in immigrant-led households had $112.8 billion" in after-tax income in 2018.[604] Immigrant entrepreneurs also "accounted for 29 percent of all self-employed Texas residents in 2018," generating a staggering "$10.8 billion in business income."[605] In the Houston, Baytown, Sugar Land metropolitan area, immigrant entrepreneurs accounted for 51 percent of business owners.[606] Moreover, politicians use rhetoric that casts undocumented people as a separate population is inaccurate. In 2020 an estimated 2 million Texans lived in mixed-status families, meaning at least one family member was undocumented.[607] In other words, 2 million Texans live in homes that hear these threatening words and are forced to consider how their daily actions my put a loved one at risk. The impact on eligible voters living with an undocumented family member may result in suppressed political participation.

---

600 Tessa Stuart, *4,000 Migrant Kids Are Now in Limbo Due to Texas Governor's Order*, Rolling Stone (June 2, 2021), https://www.rollingstone.com/politics/politics-news/greg-abbott-texas-order-migrant-kids-shelters-1174981/; Uriel Garcia, *Dozens of Texas facilities housing child migrants to operate without licenses amid fight between Gov. Greg Abbott and Biden Administration*, Texas Tribune (Aug. 11, 2021), https://www.texastribune.org/2021/08/10/texas-child-migrant-facilities-licenses/.

601 Niki Griswold, *Abbot says Texas could 'resurrect' SCOTUS case requiring states to educate all kids*, Austin American Statesman (May 4, 2022), https://www.statesman.com/story/news/2022/05/04/gov-greg-abbott-supreme-court-case-requiring-education-undocumented-children/9652463002/.

602 Fact Sheet, Immigrants in Texas, American Immigration Council (Aug. 6, 2020), https://www.americanimmigrationcouncil.org/research/immigrants-in-texas.

603 *Id.*

604 *Id.*

605 *Id.*

606 *Id.*

607 Julián Aguilar, *As Congress weighs a new coronavirus aid bill, will US citizens from mixed-status families get left out again?*, Texas Tribune (Sep. 10, 2020), https://www.texastribune.org/2020/09/10/coronavirus-texas-congress-aid-bill-undocumented-mixed-status/.

Texas United States Senator John Cornyn also made racial appeals in 2020 when he blamed the coronavirus pandemic on China. In a filmed interview he told reporters, "People eat bats and snakes and dogs and things like that," he continued, "[t]hese viruses are transmitted from the animal to the people, and that's why China has been the source of a lot of these viruses like SARS, like MERS, and the Swine Flu." [608] Senator Cornyn also incorrectly told reporters that swine flu and MERS originated in China. "According to the Centers for Disease Control and Prevention, swine flu was first detected in the United States in 2009," and MERS was "first identified in Jordan in 2012."[609] When pushed by reporters on his rhetoric and for re-circulating debunked myths, he double down and continued to blame China.[610] Senator Cornyn's remarks were widely seen as race-baiting. The National Council of Asian Americans and Pacific Islanders replied to Senator Cornyn in a tweet that, "there are over [one million] Asian Americans in your state. These are wildly irresponsible comments when anti asian [sic] crimes are on the rise."[611]

Senator Ted Cruz also used racist rhetoric on his podcast when discussing the coronavirus in 2020. He too recirculated debunked myths that the outbreak began in Wuhan province when a woman ate bat soup. Senator Cruz's podcast was released as the number of infections in Texas were rising and fear of the spread was widespread. One reporter noted that in the context of a rising infection rates, anti-Chinese rhetoric was, "unleashing widespread fear and, in some instances, outright xenophobia and anti-Chinese sentiment among the nation's leaders."[612] Dr. Yuan Shu, Director of the Asian Studies Program at Texas Tech University said that renaming the coronavirus "China virus" and circulating de-bunked myths is "textbook racist discourse." Shu continued stating that, "[t]he renaming will have broader meanings and implications for Asians and Asian Americans in the country and around the globe. This gesture will fuel a new wave of crimes and stigmatizes an entire racial group."

Despite the public criticism that Senator Cornyn faced, GOP candidates incorporated these racial appeals in their political campaigns. In April 2020, Kathaleen Wall ran political ads for her Republican primary race for U.S. House Texas District 22 (of which Fort Bend was a part) and in the ad a menacing voice said, "China poisoned our people" and commended President Trump for calling the coronavirus the "China virus."[613] This inflammatory rhetoric was also used at campaign events. Walls' ads ran on local television in the 22nd District, a district that in 2020 was home to more Asian Americans than any other district.[614] Nearly 20 percent of the constituents in the

---

[608] Alex Samuels, *U.S. Sen John Cornyn draws rebuke for blaming coronavirus on China*, Texas Tribune (Mar. 18, 2020), https://www.texastribune.org/2020/03/18/john-cornyn-texas-coronavirus-china/.

[609] *Id.*

[610] Nicholas Wu, *GOP senator says China 'to blame' for coronavirus spread because of 'culture where people eat bats and snakes and dogs,'* USA Today (Mar. 18, 2020), https://www.usatoday.com/story/news/politics/2020/03/18/coronavirus-sen-john-cornyn-says-chinese-eating-bats-spread-virus/2869342001/.

[611] *Id.*

[612] 4Alex Samuels, *As coronavirus spreads, some Asian Americans worry their leaders' language stokes a stigma*, (March 23, 2020), https://www.texastribune.org/2020/03/23/texas-politicians-coronavirus-language-could-stoke-stigma/.

[613] Patrick Svitek, *Candidate jolts battleground congressional race with ad blasting China for coronavirus*, Texas Tribune (Apr. 2, 2020), *https://www.texastribune.org/2020/04/02/texas-congressional-candidate-kathaleen-wall-blames-china-coronavirus/;* Christopher Hooks, *Seeking to Represent Sugar Land, Kathaleen Wall Decides to Run Against China*, Texas Monthly (Apr. 7, 2020), https://www.texasmonthly.com/news-politics/kathaleen-wall-ad-coronavirus-china/.

[614] Mary Louise Kelly, All Things Considered, *Asian American groups file a legal challenge to Texas' redistricting plans*, NPR (Dec. 31, 2021), https://www.npr.org/2021/12/31/1069538919/asians-lose-voting-power-in-texas.

district were Asian American Pacific Islander.[615] *Texas Monthly* reported on the ad with the headline, "Kathaleen Wall is all over local TV, thanks to her ads"[616] Asian American and Pacific Islanders in the area had been insulted previously in 2018 when the Fort Bend Republican Party paid for an ad in a local newspaper read by the South Asian community with a picture of Ganesh Chaturthi, a Hindu festival. The ad showed a picture of a Hindu deity with the head of an elephant and asked readers, "[w]ould you worship a donkey or an elephant? The choice is yours."[617] The Hindu American Foundation called on the Fort Bend Republican Party to apologize and explained, "equating Hindus' veneration of the Lord Ganesha with choosing a political party based on its animal symbol - is problematic and offensive."[618]

The Fort Bend GOP issued a statement apologizing, but this was just one example of many of elected officials offending, rather than representing the interests of Asian American and Pacific Islanders in Texas. In 2018, a state representative Pete Olson from District 22 referred to his Democratic opponent Sri Preston Kulkarni as an "Indo-American who is a carpetbagger."[619] This reference to Kulkarni with the pejorative term carpetbagger, a term used to intimidate Americans from the North that moved to formerly confederate states during Reconstruction after the civil war was very offensive. "Carpetbaggers" were smeared by their contemporaries, and by historians well into the 1950s, as corrupt and dishonest and they were met with violence.[620] Fueling this Reconstruction era dog whistle with 21st century xenophobia is a call that would be understood by residents in the district as labeling Kulkarni as representing a larger unwanted presence and even someone who should be intimidated and made to feel unwelcome. When Kulkarni ran for State Representative in 2018, he described the need for elected officials that meet the needs of residents in District 22, "[y]ou look at the population or look around at the area and you see our diversity. But then you see our leaders here . . . For a district that is 60% minority to never have had any minority representing them, there is something off there."[621]

In 2019 state representative Rick Miller had to retire rather than run for reelection after he told reporter at the *Houston Chronicle* that his primary opponents were running because they were "Asian."[622] Miller reduced Jacey Jetton, former chairman of the Fort Bend GOP, to his race by summing up his opponent as, "He's a Korean."[623] He described his second primary opponent, Leonard Chang, a Houston Fire Department analyst, as someone who was not active in

---

[615] American Community Survey, *Census Reporter – Congressional District 22, TX*, United States Census Bureau (2020), https://censusreporter.org/profiles/50000US4822-congressional-district-22-tx/.

[616] Peter Holley, *Kathaleen Wall is all over local TV, Thanks to her Ads. In the Real World, She's Harder to Find, Texas Monthly* (July 9, 2020), https://www.texasmonthly.com/news-politics/kathaleen-wall-hard-to-find/.

[617] *Hindu group offended by GOP ad: 'Would you worship a donkey or an elephant?'*, ABC 13 (Sep. 19, 2018), https://abc13.com/hindu-gop-republican-ganesha/4285736/.

[618] *Id.*

[619] Christopher Hooks, *Seeking to Represent Sugar Land, Kathaleen Wall Decides to Run Against China*, Texas Monthly (Apr. 7, 2020), https://www.texasmonthly.com/news-politics/kathaleen-wall-ad-coronavirus-china/; Christopher Hooks, "Houston's Indian American Community Showed Its Strength at the Modi Rally," *Texas Monthly* September 23, 2019.

[620] Campbell, Carpetbagger Rule in Reconstruction Texas: An Enduring Myth, 97 Southwestern Historical Quarterly 4 (Apr. 1994).

[621] Dan Merica, *'We don't have representation:' This Texas Democrat is counting on the Asian vote*, CNN (Oct. 12, 2018),https://www.cnn.com/2018/10/12/politics/democrats-go-offense-suburban-districts/index.html.

[622] Andrea Zelinski, *Fort Bend lawmaker said primary foes are running because they're 'Asian'*, Houston Chronicle (Dec. 2, 2019), https://www.houstonchronicle.com/politics/texas/article/Fort-Bend-lawmaker-said-primary-foes-are-running-14876929.php.

[623] *Id.*

"Republican channels at all," and continued, "but he's an Asian."[624] Miller went on to allege the opponents were only running because of the growing Asian population in District 22, not because they were interested in serving the public, which was "racist" in his mind.[625]

The toll of racist rhetoric circulated by politicians in powerful positions and by candidates making racial appeals has the impact of exhausting communities, alienating them from their elected officials, and discouraging political participation. Elected officials campaign rhetoric preys on people's racial sensibilities in an effort to prioritize whiteness and cast non-whiteness as a threat to democracy, society, and culture.

## V. Senate Factor 7: The Extent to Which Members of the Minority Group Have Been Elected to Public Offices in the Jurisdiction

African Americans, Latinos, and AAPI voters have struggled to elect members of those minority groups to public office. History also shows that when voters succeed in electing members from minority groups, those successes were met with further efforts to undermine voting power.

Henry B. González, was a Democratic representative from San Antonio and the first Mexican American elected to the Texas Senate.[626] His presence in representing racial minorities in the state was quickly realized in May 1957 when he and Texas Representative Abraham Kazen led a record-breaking 36-hour filibuster in protest of a H.B. 231, a bill that proposed a series of laws attempting to subvert the U.S. Supreme Court decision in *Brown* v. *Board* 1954.[627] The grassroots movement that helped elect González was a sign of Mexican American, African American, and white working class coalition voting that would meet continued suppression efforts for decades to come.[628]

In 1976 the City of San Antonio was notified by the U.S. Department of Justice that their actions to annex twenty-three territories adjoining the city on February 2, 1972 violated Section 5 of the Voting Rights Acts of 1975. These challenges were made on the grounds that the annexations "systematically diluted" the Mexican American vote "by the at-large election structure" and did not comply with the requirement to obtain the requisite determination by the U.S. District Court or make a submission to the Attorney General.[629] In 1975, the population of San Antonio was over 772,719 and Mexican Americans held a near majority of the population from 1955-1975.[630] During this period, only 3 of the 27 elected officials were Mexican

---

[624] *Id.*
[625] *Id.*
[626] Martin Donell Kohout, Biography, *González, Henry Barbosa (1916–2000)*, Handbook of Texas, (Feb. 15, 2020), https://www.tshaonline.org/handbook/entries/gonzalez-henry-barbosa; *Henry B. González, Hispanic Americans in Congress, 1822-1995*, United States Library of Congress (last visited May 19, 2022), https://www.loc.gov/rr/hispanic/congress/gonzalez.html.
[627] Max Krochmal, Blue Texas: The Making of a Multiracial Democratic Coalition in the Civil Rights Era 158 (2016); Raymond Brooks, Filibuster Due in Senate On School Segregation, Austin Statesman (May 1, 1957); Dave Cheavens, Senate Approves Bill As Filibuster Stopped: Gonzalez and Kazen Wind Up Talkathon, Austin Statesman (May 3, 1957); Price Signs Filibustered Race Bills: Thinks They're Constitutional, Austin Statesman (May 24, 1957).
[628] Max Krochmal, *Blue Texas: The Making of a Multiracial Democratic Coalition in the Civil Rights Era* 158 (2016).
[629] Charles L. Cotrell & R. Michael Stevens, *The 1975 Voting Rights Act and San Antonio, Texas: Toward a Federal Guarantee of a Republican Form of Local Government*, 8 Publius 1, 84–85 (1978).
[630] *Id.*

Americans.[631] The low representation was due in large part to an Anglo political organization, the Good Government League (GGL). The GGL only lost three times in this twenty year span to opponents outside of the GGL.[632]

On January 15, 1977, the voters of San Antonio accepted the remedy suggested by the U.S. Attorney General and adopted a ten-member district council, with the mayor being elected at-large. In the following election of April 1977, five Mexican Americans were elected to San Antonio's City Council for the first time and seven were elected from areas that previously had no representation in the previous two decades.[633] One Mexican American representative elected in 1977 to the City Council, Henry Cisneros, ran and won again in the subsequent elections of 1979 and was elected Mayor of San Antonio in 1981. Cisneros later served as the Secretary for Housing and Urban Development under President Bill Clinton's administration.[634] This increase in Mexican-American representation in Texas also was evident between 1964 to 1980, as the number of Mexican American state legislators increased from 6 to 25, and the number of county commissioners and judges also increased from 72 in 1973 to 105 in 1984.[635]

Other cities similarly saw changes in representation after defeating at-large elections.[636] In Houston, after voters passed a referendum that eliminated the at-large elections for city council, in November 1979 voters elected three new minority council members for the first time-two African American and one Latino.[637] In 1993 Dr. Martha Wong won a run-off election and was the first Asian American elected to the Houston City Council. After serving six years on the city council, she ran a successful campaign and became the first Asian American woman elected to the Texas House of Representatives in 2003. She represented House District 134 for two terms and has remained active in politics since then, supporting other Asian American candidates running for local offices.[638] In 2004, in Harrison County, a coalition of African American, Latino, and AAPI voters successfully elected Hubert Vo, the first Vietnamese American to the state house of representatives. Vo's campaign appealed to constituents in House District 149, which is one of the most diverse districts in the state, allowing him to unseat an incumbent of twenty-two years.[639] Representative Vo's district HD 149 was targeted during the 2011 redistricting in order to dilute the AAPI, African American, and Latino voting bloc. This redistricting plan was denied Section 5 preclearance on the grounds that the plan had a racially discriminatory purpose. The decision later had to be vacated in the wake of *Shelby* v. *Holder* decision that eliminated the Section 5

---

[631] *Id.*
[632] *Id.*
[633] *Id.* at 87.
[634] Interview with Henry Cisneros, William J. Clinton Presidential History Project, Miller Center, University of Virginia (Nov. 21, 2005). Cisneros was first elected in 1975 running as a Mexican American Representative for the GGL. David Montejano, Anglos and Mexicans in the Making of Texas, 1836-1986, at 293 (1987).
[635] *Id.*
[636] In 1979, Austin voters increased the city council from 8 members, elected at large, to 14 members, 9 to be elected from single member districts and 5 to be elected at large. This became known as the 9-5 plan. The at-large election continued until 2014, when Austin voters selected a 10-1 voting plan, which included ten single-member districts for the city council and a mayor elected at-large. Max Krochman & Todd Moye, *Civil Rights in Black and Brown: Histories of Resistance and Struggle in Texas* 300-302 (2021).
[637] Election Administration Report, vol. 9, no. 16 (August 15, 1979);
Max Krochmal, *Blue Texas: The Making of a Multiracial Democratic Coalition in the Civil Rights Era* 405 (2016).
[638] Gwendolyn Knapp, *How Martha Wong Went from Teacher to Politician*, Houstonia Magazine (Oct. 13, 2020), https://www.houstoniamag.com/news-and-city-life/2020/10/asian-american-martha-wong-houston-city-council.
[639] Michael King, *Naked City: V for Vo and Victory*, Austin Chronicle (Nov. 12, 2004), https://www.austinchronicle.com/news/2004-11-12/237308/.

preclearance provisions. The 2020 Houston City Council has 8 white members, 6 African-American members, and 2 Latino members. In 2022, the Houston's population in was 45 percent Latino, but the city council only had 1 Latino. The League of United Latin American Citizens plans to file a lawsuit to challenge the current system that elects 5 of 11 city council seats at-large.[640]

Austin was likely the last major Texas city to maintain the at-large voting. In 1953, Austin reaffirmed the at-large system of voting when it revised the city charter. The voting system made it harder for Mexican Americans and African Americans to elect representatives to city council who were only able to elect one African American and one Mexican American through a gentlemen's agreement between business leaders in Austin. In Austin, minority voting power was suppressed by at-large elections until 2014.[641] Efforts to pass this election reform required a diverse coalition. Under the new system in 2014 Austin voters elected one African American and three Mexican Americans to office as part of an almost entirely new city council, including Delia Garza, the first Mexican American woman in the history of the Austin City Council. Political science professor Peck Young explained, "[t]his is the most diverse coalition I've seen for any city election, and I've been involved in city politics since 1969…This was a grass-roots, citizen-driven effort from the beginning."[642]

Dallas began running at-large elections in 1930, an effort led by an elite white Dallas organization, the Citizen's Charter Association (CCA).[643] With the efforts of civil rights organizers and black voting organizations, like the Negro Chamber of Commerce (1932) and the Progressive Voter's League (1936), helped over seven thousand African Americans to register to vote in for the 1937 municipal election forcing Anglo and Ku Klux Klan members in leadership to face a "unified black electorate."[644] However, the efforts by these organizations did have lasting effects, but it was not until 1974 that Dallas was forced to eliminate the at-large system due to a court ruling in *Lipscomb v. Wise*. While the intent of this ruling was to allow a more democratic voting process in Dallas, the city responded by imposing residency requirements in each of the single-member districts which worked to disenfranchise African American and Mexican American voters, who were concentrated in specific neighborhoods in Dallas.[645] More recently, the Latino voting power prevailed in 2018 and elected a city council with five Latino representatives.[646] "The opportunity districts have finally had that opportunity filled," said Dallas ISD trustee Miguel Solis, "[t]here has been tremendous advancement in making our city reflect the political and demographic shifts that have been occurring."[647] Yet, the Latino voter turnout was still baffling

[640] Olivia P. Tallet, "Latino leaders plan lawsuit to change 'gross' underrepresentation in Houston City Council," *Houston Chronicle* January 25, 2022.
[641] Max Krochman & Todd Moye, *Civil Rights in Black and Brown: Histories of Resistance and Struggle in Texas* 301, 302 (2021).
[642] Max Krochman & Todd Moye, Civil Rights in Black and Brown: Histories of Resistance and Struggle in Texas 301 (2021).
[643] *Id.*
[644] *Id.*
[645] *Id.*
[646] Gromer Jeffers Jr., *Hispanics get more political clout in Dallas, North Texas as new young leaders emerge*, Dallas Morning News (June 17, 2019), https://www.dallasnews.com/news/politics/2019/06/17/hispanics-get-more-political-clout-in-dallas-north-texas-as-new-younger-leaders-emerge/.
[647] *Id.*

low for municipal elections. Of the 77,300 registered Latino voters in the city, only about 7 percent cast ballots in the 2018 election.[648]

A 2018 report on voting rights by the Texas Advisory Committee to the U.S. Commission on Civil Rights found that Texas ranked 44th in the nation in voter registration rates. That low disparate registration rate, they found, is at least partially due to the State's restrictions on third-party voter registration activities, such as voter registration drives.[649] The report also cited widespread confusion and misinformation among citizens about voter registration, that state voter registration procedures are not compliant with the National Voter Registration Act (NVRA), and that that there are specific barriers to registration for young voters. The report cited that for the 2016 general election, only 48 percent of Texans ages 18 to 24 were registered to vote, 7 percentage points lower than the national average rate for eligible voters.[650]

Following the *Shelby County* v. *Holder* Supreme Court decision, at-large elections returned to some Texas communities. For example, the city of Pasadena changed city council elections to adopt at-large elections, a change from the district election methods the city previously used. Latino residents sued the city and in 2017 a court found that the change to at-large elections had been intentionally discriminatory against Latino voters to dilute their voting strength.[651]

A 2022 report from the National Association of Latino Elected and Appointed Officials (NALEO) Educational Fund found that between 1996 and 2021, the number of Latinos serving in elected office grew from 1,689 to 2,808 (a 66 percent increase).[652] In 2021, the vast majority of elected officials (98 percent) served at the local level (county, municipal, school board, judicial and law enforcement and special district officials).[653] In 1996 Texans elected 5 Latinos to the U.S. House of Representatives. In 2021, there were 7 Latinos elected from Texas to the U.S. House of Representatives.[654] The number of Latinos elected to the state house also increased from 1996 to 2021. In 1996, 33 Latinos served as State Legislators, in 2021 there were 45 Latino State Legislators.[655] However, even though there have been increases in the number of Latino elected officials generally, the proportion of Latino elected officials still is not proportional to the percentage of the Latino population in Texas.

Moreover, the 2018 Texas Advisory Committee report on voting rights found that low Latino voter registration may be associated with apathy as a result of not having adequate representation among elected representatives. They found, for instance, more than 1.3 million Latinos in Texas live in cities or counties with no Latino representation on their city council or commissioners' court.[656]

---

648 *Id.*
649 The Texas Advisory Committee to the U.S. Commission on Civil Rights, *Voting Rights in Texas* 5, (July 2018), https://www.usccr.gov/files/pubs/2018/07-23-TX-Voting-Rights.pdf.
650 *Id.* at 6–9.
651 *Patino* v. *City of Pasadena*, 230 F.Supp.3d 667 (S.D. Tex. 2017).
652 National Association of Latino Elected and Appointed Officials, *2022 Primary Election Profile Texas* 11 (2022), https://naleo.org/COMMS/PRA/2022/2022-TX-Profile.pdf.
653 *Id.*
654 *Id.*
655 *Id.*
656 The Texas Advisory Committee to the U.S. Commission on Civil Rights, *Voting Rights in Texas* 7, ( July 2018), https://www.usccr.gov/files/pubs/2018/07-23-TX-Voting-Rights.pdf.

Local school board elections that are ostensibly nonpartisan are increasingly being politicized in Texas. According to a review of financial disclosures, an infusion of money is being funneled into local races. One topic fueling these politicized campaigns is the effort to push back on diversity and inclusion initiatives in different school districts. These campaigns have taken a racist tone.

In Fort Bend County, Orjanel Lewis, an African American woman running for school board became a target smear campaign that used racial appeals to undermine her candidacy. Lewis told a local newspaper that she believed the school district did not do enough to "treat all students with equal respect, dignity, and educational opportunities."[657] Lewis' words were distorted by a conservative activists group that created a video accusing Lewis of wanting to teach that some kids "are oppressors."[658] Community members also circulated digital flyers that were designed to look like candidate questionnaires. The flyers falsely claimed that Lewis supported a racial quota system to get more African American students into Advanced Placement courses and giving students "easy access to porn," which seemed to reference Lewis' opposition to attempts to ban books.[659] This kind of smear campaign draws on the racist conspiracy theories that nonwhite citizens are trying to replace white citizens from political, social, and cultural influence. Lewis is a first-time candidate and expressed her concern at these egregious tactics. "My concern is, when you use this kind of language, when you equate your political opponents to pedophiles, you are not only distracting from real and important issues, you are putting us in danger. You are inciting a mob to want to attack us, and I just think that its wholly unnecessary." [660] In the context of rising anti-Black hate crimes as discussed earlier in this report, Lewis' fears are not unwarranted.

Lewis explained that she decided to run for office after a white school board member in a nearby school district implied during public comments that hiring more African American teachers would lead to higher student dropout rates. The school board member ran on an anti-critical race theory platform, and Lewis worried campaigns to target diversity and inclusion efforts might gain a foothold in Fort Bend County.[661] For example, the district recently implemented policies with the goal of reducing racial disparities in student discipline and academic outcomes. Eighty-five percent of Fort Bend ISD's students are Black, AAPI, and Latino, and 15 percent are white. In the final days of the campaign, Lewis received messages calling her an anti-gay slur, the N-word, and one message encouraged her to, "[k]ill yourself." Lewis lost the school board election.[662]

The Patriot Mobile Action PAC, run by a cellphone company that advertises to Christian conservatives, spent $500,000 backing 11 school board candidates in suburbs surrounding Fort Worth to "protect our children" and "keep critical race theory out of the classrooms."[663] Ten

---

[657] Mike Hixenbaugh, *Culture wars over race and sexuality are dominating Texas school board elections*, NBC News (May 3, 2022), https://www.nbcnews.com/news/us-news/texas-school-board-elections-race-sexuality-rcna26977.

[658] *Id.*

[659] *Id.*

[660] *Id.*

[661] Mike Hixenbaugh, *For one Black school board candidate in Texas, Election Day ends with prayers, slurs, and a razor-thin result*, NBC News (May 9, 2022), https://www.nbcnews.com/news/us-news/black-womans-campaign-school-board-texas-rcna27969.

[662] *Id.*

[663] *Id.;* Abby Church, *Candidates backed by Conservative PACs dominate school board races in Fort Worth suburbs*, Fort Worth Star-Telegram (May 8, 2022), https://www.star-telegram.com/news/politics-government/election/article261190752.html.

candidates won their elections in May 2022 and one advanced to a June runoff. The candidates were also endorsed by the True Texas Project, which grew out of the NE Tarrant Tea Party and was recently labeled an anti-government extremist group by the Southern Poverty Law Center.[664]

## VI. Conclusion

The historical record that shows Texas officials have consistently used voting laws to restrict the franchise of African American, Latino, and AAPI voters, and employed other means, including racial violence and other forms of discrimination, to limit the political impact of non-white voters. These patterns of discrimination are not a thing of the past. The racial appeals being used today to justify modern voting laws are strikingly similar to the racist appeals used by the white supremacists 100 years ago who passed Jim Crow and Juan Crow laws and who sanctioned a long period of racial terror in Texas. Today, just as in the past, a rise in vigilante violence mirrors discrimination in policy and in election reforms. History shows that when racism and discrimination are not confronted, they continue to shape policy and politics, and non-white Texans will be negatively impacted for generations. It is my opinion that official voting-related discrimination in Texas is not a thing of the past, but a recurring pattern with non-white voters as its target. When non-white voters are prevented from electing candidates of their choice, separately or in coalition with one another, as they have historically been, the political power of these groups is diluted and government officials are less responsive to the needs and concerns of these groups.

Dr. Monica Muñoz Martinez

May 20, 2022

[664] Emily Brindley, *Tarrant County-based True Texas Project added to nationalist list of extremist groups*, Fort Worth Star-Telegram (Mar. 25, 2022), https://www.star-telegram.com/news/local/fort-worth/article259725010.html.

**Bibliography**

Abella, Rodolfo, Joanne Urrutia, and Aleksandr Shneyderman. "An Examination of the Validity of English-Language Achievement Test Scores in an English Language Learner Population." *Bilingual Research Journal* 29, no. 1 (April 1, 2005): 127–44.

Aguilar, Julián. "As Congress weighs a new coronavirus aid bill, will US citizens from mixed-status families get left out again?" *Texas Tribune*, September 10, 2020.

Allred, Collin. "Voter Suppression: How the Texas GOP 'Packed and Cracked' Districts to Dilute Minorities' Voters Rights," *Dallas Morning News.* July 21, 2017.

Allsup, Carl. *The American G.I. Forum: Origins and Evolution*. University of Texas Center for Mexican American Studies Monograph. 6, Austin, 1982.

Anderson, Carol. *White Rage: the Unspoken Truth of Our Racial Divide.* Bloomsbury, 2016.

Anderson, Carol. *One Person, No Vote: How Voter Suppression Is Destroying Our Democracy*. Bloomsbury Publishing, 2018.

Anderson, Gary Clayton. *Conquest of Texas: Ethnic Cleansing in the Promise Land, 1820-1875*. Norman, OK: University of Oklahoma Press, 2005.

Astudillo, Carla, Mandi Cai and Kally Huang. "Texas Has New Political Maps. See Which Districts Your Home Is in." *The Texas Tribune*. October 22, 2021.

Balsamo, Michael. "Hate crimes in US reach highest level in more than a decade, according to an FBI report: 'Reminder that we have much work to do.'" *Chicago Tribune*, November 16, 2020.

Barr, Alwyn. *Black Texans: a History of African Americans in Texas, 1528-1995 / by Alwyn Barr*. 2nd ed., University of Oklahoma Press, 1996.

Barr, Alwyn. "The Impact of Race in Shaping Judicial Districts, 1876-1907." *Southwestern Historical Quarterly* 108, no. 4 (April 2005): 423-439.

Barr, Alwyn. *Reconstruction to Reform: Texas Politics, 1876-1906.* Austin, TX: University of Texas Press, 1971.

Barr, Juliana. *Peace Came in the Form of a Women: Indians and Spaniards in the Texas Borderlands*. Chapel Hill, NC: University of North Carolina Press, 2007.

Barragán, James. "Civil Rights Groups Sues Texas Over Order to Investigate Potential Noncitizen Voters with Flawed Data." *Dallas Morning News.* February 2, 2019.

Barragán, James. 'Unwinnable Race': State Sen. Beverly Powell of Burleson Ends Reelection Bid, Citing Redrawn Political Map." *The Texas Tribune*. April 6, 2022.

Bartles, Larry M. "Economic inequality and political representations," The Unsustainable American State, eds Lawrence Jacobs and Desmond King. Oxford, 2009.

Baumgartner, Alice. *South to Freedom: Runaway Slaves to Mexico and the Road to the Civil War*. Basic Books, 2020.

Behnken, Brian D. *Fighting Their Own Battles Mexican Americans, African Americans, and the Struggle for Civil Rights in Texas*. Chapel Hill: University of North Carolina Press, 2011.

Belew, Kathleen. "White Power, White Violence: A manifesto is not something to be ignored; it's a playbook for the next attack," *The Atlantic*, May 16, 2022.

Bellamy-Walker, Tat. "More people now incorrectly blame Asian Americans for COVID than at height of pandemic," *NBC News.* May 5, 2022.

Berman, Ari. *Give us the Ballot: The Modern Struggle for Voting Rights in America.* Farrar, Straus and Giroux, 2015.

Berman, Ari. "Texas's Redistricting Maps and Voter-ID Law Intentionally Discriminated Against Minority Voters." *The Nation*, March 13, 2017.

Berman, Ari. "Courts Have Blocked Three Discriminatory Texas Voting Laws in Eight Days." *Mother Jones.* August 24, 2017.

Berry, Daina Ramey. *The Price for Their Pound of Flesh: the Value of the Enslaved, from Womb to Grave, in the Building of a Nation.* Beacon Press, 2017.

Blackhawk, Ned. *Violence over the Land: Indians and Empires in the Early American West*. Cambridge, MA: Harvard University Press, 2008.

Blake, Aaron. "Republicans keep admitting that voter ID helps them win, for some reason" *Washington Post*. April 7, 2016.

Blake, Aaron. "The GOP's increasingly blunt argument: It needs voting restrictions to win." *The Washington Post.* June 14, 2021.

Blanton, Carlos Kevin. *The Strange Career of Bilingual Education in Texas*. Texas A & M Press, 2007.

Blanton, Carlos Kevin and George I. Sánchez. *The Long Fight for Mexican American Integration. New Haven*. Yale University Press, 2015.

Blanton, Carlos Kevin. *The Strange Career of Bilingual Education in Texas, 1836-1981*. Texas A&M University Press, 2004.

Bohra, Neelam. "Congressional gerrymandering by Texas Republicans cut out the heart of Houston's Asian community." *Texas Tribune*. November 22, 2021.

Brewer, J. Mason. *Negro Legislators of Texas and their Descendants: A History of the Negro in Texas Politics from Reconstruction to Disenfranchisement*. Dallas, TX: Mathis Publishing Company, 1935.

Brindley, Emily. "Tarrant County-based True Texas Project added to nationalist list of extremist groups." *Fort Worth Star-Telegram*, March 25, 2022.

Brown, Mitchell. "Opinion: Arrested for voting? Hervis Rogers and the case against disappearing our voters." *Houston Chronicle*. July 15, 2021.

Buenger, Walter L. *The Path to a Modern South: Northeast Texas Between Reconstruction and the Great Depression*. Austin, TX: University of Texas Press, 2001.

Bump, Philip. "The irony of Elise Stefanick and Texas's lieutenant governor amplifying white replacement theory." *The Washington Post.* September 17, 2021.

Cadava, Geraldo. *Standing on Common Ground: The Making of a Sunbelt Borderland*. Cambridge, MA: Harvard University Press, 2013.

Calvert, Robert and Arnoldo De León, *The History of Texas*. Arlington Heights, Illinois: Harlan Davidson, 1990.

Campbell, Randolph B. *An Empire for Slavery: The Peculiar Institution in Texas, 1821-1865*. Baton Rouge, LA: Louisiana State University Press, 1989.

Campbell, Randolph B. "Carpetbagger Rule in Reconstruction Texas: An Enduring Myth." *Southwestern Historical Quarterly* 97, no 4 (April 1994): 587-596.

Campbell, Randolph B. Grass-Roots *Reconstruction in Texas,1865-1880*. Baton Rouge: Louisiana State Press, 1997.

Campbell, Randolph B. *Sam Houston and the American Southwest*. New York: Harper Collins, 1993.

Campbell, Randolph B. *A Southern Community in Crisis : Harrison County, Texas 1850-1880*. Austin, TX: Texas State Historical Association, 2016.

Cantrell, Greg, *Stephen F. Austin: Empresario of Texas*. Austin: Texas State Historical Association, 2016.

Cardoso, Lawrence A. *Mexican Emigration to the United States, 1897-1931: Socio-Economic Patterns.* Tucson: University of Arizona Press, 1980.

Carrigan, William D., and Clive Webb. *Forgotten Dead: Mob Violence Against Mexicans in the United States, 1848-1928*. New York: Oxford University Press, 2013.

Carrigan, William D. *The Making of a Lynching Culture: Violence and Vigilantism in Central Texas, 1836-1916.* University of Illinois Press, 2004.

Carroll, Patrick James. *Felix Longoria's Wake: Bereavement, Racism, and the Rise of Mexican American Activism*. Austin: University of Texas Press, 2003.

Chang, Jeff. *Who We Be: The Colorization of America*. New York: St. Martin's Press, 2014.

Chavez, Ernesto. *The U.S. War with Mexico: A Brief History with Documents*. Boston, MA: Bedford/St. Martins, 2008.

Chavez, Leo R. *Anchor Babies and the Challenge of Birthright Citizenship.* Redwood City, CA: Stanford University Press, 2017.

Chavez, Leo. *Covering Immigration: Popular Images and the Politics of the Nation*. Berkeley, CA: University of California Press, 2001.

Chavez, Leo. *The Latino Threat: Constructing Citizens, Immigrants, and the Nation*. Stanford, CA: Stanford University Press, 2013.

Children's Defense Fund of Texas. *"The Kids Are Not The Problem,"* Children's Defense Fund, 2019.

Chung, Jean and Kevin Muhitch. “Voting Rights in the Era of Mass Incarceration: A Primer.” The Sentencing Project. July 2021.

Church, Abby. “Candidates backed by Conservative PACs dominate school board races in Fort Worth suburbs.” *For Worth Star-Telegram*, May 8, 2022.

Cisneros, Henry, oral interview by Russel Riley. November 21, 2005. William J. Clinton Presidential History Project, Miller Center, University of Virginia.

Corasaniti, Nick. “Mail ballot rejections surge in Texas with signs of a race gap.” *New York Times*. March 18, 2022.

Cotrell, Charles L., and R. Michael Stevens. “The 1975 Voting Rights Act and San Antonio, Texas: Toward a Federal Guarantee of a Republican Form of Local Government.” *Publius* 8, no. 1 (1978): 84-87.

Cummings, William. “’I wasn’t going to let anything stop me:” Texas voter waits six hours to vote on Super Tuesday.” *USA Today*. March 5, 2020.

Daniels, Roger and Eric Foner. *Prisoners Without Trial: Japanese Americans In World War II*. New York: Hill and Wang, 1993.

De Genova, Nicholas. *Latino Crossings: Mexicans, Puerto Ricans, and the Politics of Race and Citizenship*. New York; London: Routledge, 2003.

De León, Arnoldo. *They Called Them Greasers: Anglo Attitudes Toward Mexicans in Texas, 1821-1900*. Austin, TX: University of Texas Press, 1983.

Diamond, Sara. “Right-Wing Politics and the Anti-Immigration Cause.*” In Immigration: A Civil Rights Issue for the Americas*, edited by Susanne Jonas and Suzie Dod Thomas, 175–189. Wilmington: Scholarly Resources, 1999.

Durham, Kenneth R. “The Longview Race Riot of 1919.” *East Texas Historical Journal* 18 (1980): 13-24.

Equal Justice Initiative. “FBI Reports Hate Crimes at Highest Level in 12 Years.” September 9, 2021.

Farley, Christopher John. “GOP’s Don Yelton Resigns After ‘Lazy Blacks’ Remark on ‘Daily Show.’” *The Washington Street Journal*. October 26, 2013.

FBI's Uniform Crime Reporting (UCR) Program. “2020 Hate Crime Incidents for Texas.” The United States Department of Justice.

Fernandez, Manny and Sarah Murvosh. "Soccer Coach in El Paso Shooting Dies 9 Months Later," *New York Times*, April 27, 2020.

Flores, Richard R. *Remembering the Alamo: Memory, Modernity, and the Master Symbol*. Austin, TX: University of Texas Press, 2002.

Flynn, Meagan. "Texas Woman Sentenced to 5 Years in Prison for Voting While on Probation." *Texas Tribune*. March 30, 2018.

Foley, Neil. *The White Scourge Mexicans, Blacks, and Poor Whites in Texas Cotton Culture*. Berkeley: University of California Press, 1997.

Gamboa, Suzanne and the Associated Press, "Rise in reports of hate crimes against Latinos pushes overall number to 11-year high." *NBC News.* November 16, 2020.

Gammel, H.N.P. *The Laws of Texas, 1822-1897*. Austin, TX: Gammel Book Co., 1898.

García, Mario. *Desert Immigrants: The Mexicans of El Paso, 1880–1920*. New Haven: Yale University Press, 1981.

Gardner, Amy. "A Texas man was arrested on charges that he voted in the 2020 Democratic primary while on parole. He could face as much as 20 years in prison," *Texas Tribune*, July 11, 2021.

Gómez, Laura E. *Manifest Destinies: The Making of the Mexican American Race*. New York: New York University, 2007.

Gonzales-Day, Ken. *Lynching in the West: 1850-1935*. Durham, NC: Duke University Press, 2006.

Gordon, Linda. *The Great Arizona Orphan Abduction*. Cambridge: Harvard University Press, 2018.

Gould, Lewis L. *Alexander Watkins Terrell: Civil War Soldier, Texas Lawmaker, American Diplomat*. Austin, TX: University of Texas Press, 2004.

Griswold, Niki. "Nearly 25,000 mail-in ballots were rejected in the Texas primary, state officials say," *Austin American Statesman*. April 6, 2022.

Guillermo, Emil. "Texas County Settles Suit Over Voter Translator Requirements." *NBC News*, April 22, 2016.

Haney-López, Ian. *Racism On Trial: The Chicano Fight For Justice*. Cambridge: Belknap, 2004.

Haney-López, Ian. *Dog Whistle Politics: How Coded Racial Appeals Have Reinvented Racism and Wrecked the Middle Class*. New York: Oxford University Press, 2014.

Hämäläinen, Pekka. *The Comanche Empire.* Yale University Press, 2008.

Hernandez, Kelly Lytle. *Migra!: A History of the U.S. Border Patrol*. Berkeley: University of California Press, 2010.

"Hindu group offended by GOP ad." *ABC 13 News*, September 19, 2018.

Hine, Darlene Clark, *Black Victory: The Rise and Fall of the White Primary in Texas*. Columbia, MO: University of Missouri Press, 2003.

Hine, Darlene Clark. "The Elusive Ballot: The Black Struggle against the Texas Democratic White Primary, 1932-1945," *Southwestern Historical Quarterly* 81, no. 4 (April 1978): 371-392.

Hixenbaugh, Mike. "Culture wars over race and sexuality are dominating Texas school board elections." *NBC News*, May 3, 2022.

Hixenbaugh, Mike. "For one Black school board candidate in Texas, Election Day ends with prayers, slurs, and a razor-thin result." *NBC News*, May 9, 2022.

Holley, Peter. "Kathaleen Wall is all over local TV, Thanks to her Ads. In the Real World, She's Harder to Find." *Texas Monthly*, July 9, 2020.

Hook, Christopher. "Seeking to Represent Sugar Land, Kathaleen Wall Decides to Run Against China," *Texas Monthly*, April 7, 2020.

Horowitz, Sari. "More than half a million registered Texans don't have the right ID to vote on Super Tuesday." *Washington Post*. February 29, 2016.

Inada, Lawson Fusao. *Only What We Could Carry: The Japanese American Internment Experience*. Seattle: University of Washington Press, 1997.

Hixenbaugh, Mike. "A viral video forced a wealthy Texas suburb to confront racism. A 'silent majority' fought back," *NBC News*. January 22, 2021, updated February 24, 2021.

Hixenbaugh, Mike. "Culture Wars over race and sexuality are dominating Texas school board elections," *NBC News*, May 3, 2022.

Inda, Jonathan Xavier. *Targeting Immigrants: Government, Technology, and Ethics*. Oxford: Blackwell Pub, 2006.

Jacobs, Lawrence R., and Theda Skocpol, eds. *Inequality and American Democracy: What We Know and What We Need to Learn.* Russell Sage, 2005.

Jacoby, Karl. *Shadows at Dawn: An Apache Massacre and the Violence of History*. New York: Penguin, 2008.

Jacoby, Karl. *The Strange Career of William Ellis: the Texas Slave Who Became a Mexican Millionaire*. W.W. Norton & Company, 2016.

Jeffers, Gromer, Jr., "Hispanics get more political clout in Dallas, North Texas as new young leaders emerge." *Dallas Morning News*, June 17, 2019.

Johnson, Luke. "Louie Gohmert: Radical Islamists Being Trained To 'Act Like Hispanic.'" *HuffPost*, April 17, 2013.

Joy, William. "Carroll ISD rejects long-debated diversity plan in new lawsuit settlement," *ABC News/ WFAA.* December 21, 2021.

Johnson, Benjamin Heber. Revolution in Texas: How a Forgotten Rebellion and Its Bloody Suppression Turned Mexicans into Americans. New Haven: Yale University Press, 2003.

Juarez, Jr. and Jose Roberto. "The American Tradition of Language Rights: The Forgotten Right to Government in a Known Tongue." Law and Inquiry 13, no. 2 (December 1995): 447-643.

Jung, Moon-Ho. "Outlawing 'Coolies': Race, Nation, and Empire in the Age of Emancipation." *American Quarterly* 57, no. 3 (September 2005): 677-701.

.

Jones, Jacqueline and Peter H. Wood, Thomas Borstelmann, and Vicki L. Ruiz, eds. *Created Equal: A Social and Political History of the United States*, Volume II, From 1865. New York: Longman Press, 2003.

Kaiser Family Foundation. "Voting and Voter Registration as a Share of the Voter Population, by Race/Ethnicity." November 2016.

Kaiser Family Foundation. "Voting and Voter Registration as a Share of the Voter Population, by Race/Ethnicity." November 2020.

Kashima, Tetsuden. *Judgment Without Trial: Japanese American Imprisonment during World War II*. Seattle: University of Washington Press, 2003.

Kalthoff, Ken. "The $2 Billion Sidewalk Problem in Dallas," *NBCDFW*, November 5, 20201.

Kennedy, Bud. "A Weird Week for Konni Burton ends with chorizo and criticism." *Fort Worth Star-Telegram*. February 11, 2017.

Khazan, Olga. "The New Face of Trumpism in Texas." *The Atlantic*, April 17, 2021.

King, Michael. "Naked City: V for Vo and Victory," *Austin Chronicle*, November 12, 2004.

Knapp, Gwendolyn. "How Martha Wong Went from Teacher to Politician." *Houstonia Magazine*, October 13, 2020.

Knowles, Hanna. "A Texas bill drew ire for saying it would preserve 'purity of the ballot box.' Here's the phrase's history," *Washington Post*, May 9, 2021.

Krochmal, Max. *Blue Texas: The Making of a Multiracial Democratic Coalition in the Civil Rights Era*. Chapel Hill, NC: University of North Carolina Press, 2016.

Krochmal, Max and J. Todd Moye. *Civil Rights in Black and Brown: Histories of Resistance and Struggle in Texas*. Austin, TX: University of Texas Press, 2021.

Lantry, Lauren and Cheyenne Haslett. "Texas Woman Faces Jail Time After Being Convicted of Voting Illegally While on Supervised Release in 2016." *ABC News*. June 19, 2021.

Lawson, Steven F. *Black Ballots: Voting Rights in the South, 1944-1969*. Lexington Books, 1976.

Lee, Erika. *At America's Gates: Chinese Immigration During the Exclusion Era, 1882-1943*. Chapel Hill, NC: University of North Carolina Press, 2003.

Lee, Erika. "The 'Yellow Peril' and Asian Exclusion in the Americas." *Pacific Historical Review* 76, no. 4 (2006): 537-562.

Levario, Miguel Antonio. *Militarizing the Border: When Mexicans Became the Enemy*. College Station: Texas A&M University Press, 2012.

Levine, Sam. "Texas Made An Example Out Of Crystal Mason—For Trying to Vote," *Huffpost*, July 29, 2019.

Levine, Sam. "Texas Court Ordered to Reconsider Decision to Uphold Prison Sentence for Woman Who Voted." *The Guardian*. May 11, 2022.

Li, Michael. "A Redistricting Case About More Than Redistricting." *Texas Tribune*. July 18, 2014.

Lim, Julian. *Porous Borders: Multiracial Migrations and the Law in the U.S.-Mexico Borderlands*. Chapel Hill, NC: University of North Carolina Press, 2017.

Limerick, Patricia Nelson. *Legacy of Conquest: The Unbroken Past of the American West*. New York: Norton, 1987.

Livingston, Abby. "U.S. Rep Chip Roy rebuked after using hearing on violence against Asian Americans to attack China on coronavirus." *Texas Tribune*. March 18, 2021.

Lopez, Ashley. "Texas Voting Chief Who Led Botched Voter Purge Resigns." *NPR*. May 28, 2019.

Massey, Douglas S., Jorge Durand, and Nolan J. Malone. *Beyond Smoke and Mirrors: Mexican Immigration in an Era of Economic Integration*. New York: Russell Sage Foundation, 2003.

Massey, Douglas S. and Magaly Sánchez. *Broken Boundaries: Creating Immigrant Identity in Anti-Immigrant Times*. New York: Russell Sage Foundation, 2021.

Manna, Nichole. "No doctors, no grocers, no help. Death comes early in these Fort Worth Neighborhoods," *Fort Worth Star-Telegram*, April 15, 2021.

Martinez, Alejandra. "Can a Dallas plan overcome the sidewalk gap between low-income and affluent neighborhoods," *KERA News Radio*, April 6, 2022.

Martinez, Monica Muñoz. *The Injustice Never Leaves You: Anti-Mexican Violence in Texas*. Cambridge, MA: Harvard University Press, 2018.

Maxouris, Christina and Phil Gast. "The Buffalo supermarket massacre is the latest mass shooting authorities say was motivated by hate. Here are others," *CNN*, May 16, 2022

McGirk, Jan. "Mexico Asks UN for Help to Stop Ranch 'Posses' Hunting Migrants." *The Independent*, May 20, 2000.

McKinley, Jesse and Malia Wollan. "New Border Fear: Violence by a Rogue Militia." *New York Times*. June 26, 2009.

McVeigh, Rory. *The Rise of the Ku Klux Klan: Right-Wing Movements and National Politics*. Minneapolis: University of Minnesota Press, 2009.

Menchaca, Martha. *Naturalizing Mexican Immigrants: A Texas History*. Austin: University of Texas Press, 2011.

Menchaca, Martha. *Recovering History, Constructing Race the Indian, Black, and White Roots of Mexican Americans*. Austin: University of Texas Press, 2001.

Merica, Dan. "'We don't have representation': This Texas Democrat is counting on the Asian vote." *CNN*, October 12, 2018.

*Mobbing of John R. Shillady*. New York: National Association for the Advancement of Colored People, 1919.

Molina, Natalia. *How Race Is Made in America: Immigration, Citizenship, and the Historical Power of Racial Scripts*. Berkeley: University of California Press, 2013.

Montejano, David. *Anglos and Mexicans in the Making of Texas, 1836-1986*. Austin, TX: University of Texas Press, 1987.

Montoya, Maria. *Translating Property: The Maxwell Land Grant and Conflict over Land in the American West, 1840 to 1920*. Berkeley, CA: University of California Press, 2002.

Moseley, J.A.R. "The Citizens White Primary of Marion County." *Southwestern Historical Quarterly* 49, no. 4 (April 1946): 524-531.

Murney, Michael. "Years of Harassment Led Up to Neighbors Reporting Crystal Mason for Illegal Voting, She Says." *Dallas Observer* October 5, 2021.

Neckerman, Kathleen and Falencia Torche, "Inequality: Causes and Consequences" *Annual Review of Sociology*, vol. 33, no. 1, 2007, pp. 335–57,

Ngai, Mae M. "The Strange Career of the Illegal Alien: Immigration Restriction and Deportation Policy in the United States, 1921-1965." *Law & History Review* 21, no. 1 (2003): 69–107.

Ngai, Mae M. *Impossible Subjects: Illegal Aliens and the Making of Modern America. Politics and Society in Twentieth-Century America*. Princeton, N.J.: Princeton University Press, 2004.

Newkirk II, Vann R. "When the Myth of Voter Fraud Comes for You." *The Atlantic*. December 14, 2021.

Okrent, Daniel, *The Guarded Gate: Bigotry, Eugenics, and the Law that Kept Two Generations of Jews, Italians, and other Immigrants out of America*. New York: Scribner, 2019.

Omi, Michael. *Racial Formation in the United States: From the 1960s to the 1990s*. New York: Routledge, 1994.

Ramírez Berg, Charles. *Latino Images in Film: Stereotypes, Subversion and Resistance*. Austin: University of Texas, 2002.

Parker, Richard Denny. *Historical Recollections of Robertson County, Texas*. Houston, TX: Anson Jones Press, 1955.

Pascoe, Peggy. *What Comes Naturally: Miscegenation Law and the Making of Race in America*. Oxford ; New York: Oxford University Press, 2009.

Perales, Nina, Luis Figueroa, and Criselda Rivas. "Voting Rights in Texas: 1982 – 2006." *Review of Law and Social Justice,* Vol 17:2, 714.

Pérez-Moreno, Heidi and James Barragán, "Critics denounce Greg Abbott and Dan Patrick's 'invasion' rhetoric on immigration, saying it will incite violence," *Texas Tribune*, June 17, 2021.

Perkinson, Robert. *Texas Tough: The Rise of America's Prison Empire*. New York: Picador, 2010.

Pitre, Merline. *In Struggle Against Jim Crow: Lulu B. White and the NAACP, 1900–1957*. College Station: Texas A&M University Press, 2010.

Platoff, Emma, and Alexa Ura. "Crystal Mason's Ballot Was Never Counted. Will She Still Serve Five Years in Prison for Illegally Voting?" *Texas Tribune*. September 17, 2019.

Primack, Dan and Russell Contreras. "A racist conspiracy theory goes mainstream," *Axios.* September 29, 2021.

Ramos, Raul. *Beyond the Alamo: Forging Mexican Ethnicity in San Antonio, 1821-1861*. Chapel Hill, NC: University of North Carolina Press, 2010.

Ramsey, Ross and Julian Aguilar, "Justice Department Seeks to Restore Voting Law Restrictions on Texas." *Texas Tribune*. July 25, 2013.

Ratcliff, R. G. “Texas lawmaker suggests Asians adopt easier names.” *Houston Chronicle.* April 8, 2009.

Reich, Steven, “Soldiers of Democracy: Black Texans and the Fight for Citizenship, 1917–1921.” *Journal of American History* 82, no. 4 (1996): 1478-1502.

Riccardi, Nicholas. “Mother describes border vigilante killings in Arizona,” *Los Angeles Times*. January 25, 2011.

Richardson, Valencia. “Voting White Poor: Reviving the 24th Amendment and Eliminating the Modern-Day Poll Tax,” *Georgetown Journal on Poverty, Law, and Policy* Vol. 27, No. 3, Spring 2020.

Rice, Jenn and Paul Debenedetto. “A Houston Man Is Arrested For Alleged Illegal Voting As Texas GOP Seeks Tighter Laws.” *NPR.* July 9, 2021.

Robinson, Clay. “Perry vows ‘vigorous’ re-election campaign.” *Houston Chronicle*, December 20, 2005.

Romero, Dennis and Tony Lee. “Dallas salon owner believes shooting a hate crime ‘He didn’t even demand money. He just came in to shoot people.’” *NBC News.* May 13, 2022.

Romero, Simon and Nicholas Bogel-Burroughs, “El Paso Shooting: Massacre That Killed 20 Being Investigated as Domestic Terrorism,” *New York Times,* August 4, 2019.

Rosales, Francisco A. *Pobre Raza!: Violence, Justice, and Mobilization among México Lindo Immigrants, 1900-1936*. Austin: University of Texas Press, 1999.

Saldaña, Maria Josefina. *Indian Given: Racial Geographies across Mexico and the United States*. Durham, NC: Duke University Press, 2016.

Samuels, Alex. “As coronavirus spreads, some Asian Americans worry their leaders’ language stokes a stigma.” *Texas Tribune,* March 23, 2020.

San Miguel, Jr., Guadalupe. *"Let All of Them Take Heed": Mexican Americans and the Campaign for Educational Equality in Texas*. Austin: University of Texas Press, 1987.

Sánchez, George J. “Face the Nation: Race, Immigration, and the Rise of Nativism in Late Twentieth Century America.” *International Migration Review* 31, no. 4 (Winter 1997): 1009–1030.

Sandos, James. *Rebellion in the Borderlands: Anarchism and the Plan de San Diego*. Norman: University of Oklahoma Press, 1992.

Sargent, Greg. "A Texas Republican's vile rant shows 'great replacement' is becoming GOP dogma." *The Washington Post.* September 17, 2021.

Schlund-Vials, Cathy J., K. Scott Wong, and Linda Trinh Võ. *Keywords for Asian American Studies*. New York: New York University Press, 2015.

Schneider, Mark Robert, *We Return Fighting: The Civil Rights Movement in the Age of Jazz.* Boston, MA: Northeastern University Press, 2002.

Schneider, Andrew. "Asian Americans groups file a legal challenge to Texas' redistricting plans." *National Public Radio.* December 31, 2021.

Smallwood, James. *Time of Hope, Time of Despair: Black Texans during Reconstruction*. London: Kennikat, 1981.

Smedley, Audrey. *Race in North America: Origin and Evolution of a Worldview*. Boulder, CO: Westview Press, 2007.

Spindler, Frank. "Concerning Hempstead and Waller County." *Southwestern Historical Quarterly* 59, no. 4 (April 1956): 455-472.

St. John, Rachel C. *Line in the Sand: A History of the Western U.S.-Mexico Border*. *America in the World*. Princeton: Princeton University Press, 2011.

Stern, Alexandra Minna. *Eugenic Nation Faults and Frontiers of Better Breeding in Modern America.* Berkeley, CA: University of California Press, 2005.

Svitek, Patrick. "Candidate jolts battleground congressional race with ad blasting China for coronavirus." *Texas Tribune*, April 2, 2020.

Tang, Terry. "As virus-era attacks on Asians rise, past victims look back." *Associated Press.* March 2, 2021.

*Tenth Annual Report of the National Association for the Advancement of Colored People for the Year 1919.* New York: National Association for the Advancement of Colored People, 1919.

Teja, Jesus Francisco de la. *A Revolution Remembered: The Memoirs and Correspondence of Juan N. Seguín*. Austin, TX: State House Press, 1991.

*Thirty Years of Lynching in the United States, 1889-1918*. New York: NAACP, 1919.

Tinsley, Anna. “Wedding bells, jail cells.” *Fort Worth Star Telegram.* June 11, 2017.

Torget, Andrew J. *Seeds of Empire: Cotton, Slavery, and the Transformation of the Texas Borderlands, 1800-1850*. Chapel Hill, NC: University of North Carolina Press, 2015.

Tuma, Mary. “Austin Resident Named in Texas Voter Purge Debacle, Files Suit.” *Austin Chronicle*, February 5, 2019.

United States Commission on Civil Rights. “Voting Rights in Texas: An Advisory Memorandum of the Texas Advisory Committee to the U.S. Commission on Civil Rights,” July 2018.

United States Commission on Civil Rights. *The Excluded Student: Educational Practices Affecting Mexican Americans in the Southwest.* Washington, D.C.: U.S. Govt. Print. Office, 1972.

United States Commission on Civil Rights. *State of Civil Rights: A Report of the United States.* Washington, D.C.: Government Printing Office, 1979.

United States Commission on Civil Rights. “Voting Rights in Texas: An Advisory Memorandum of the Texas Advisory Committee to the U.S. Commission on Civil Rights.” July 2018.

United States Department of Justice. “Arrests in four states of racially motivated violent extremists targeting journalists and activists,” Department of Justice, U.S. Attorney’s Office, Eastern District of Washington February 26, 2020.

United States Department of Justice. “Justice Department Announces Multi-Million Dollar Civil Settlement to Principle in Mother Emanuel Charleston Church Mass Shooting,” Department of Justice, Office of Public Affairs, October 28, 2021.

Ura, Alexa and Morgan Smith. “Invasion Remarks Fuel Heated Debate in a GOP Race.” *New York Times.* February 7, 2014.

Ura, Alexa. “Texas Court of Criminal Appeals will Review Crystal Mason’s Controversial Illegal-Voting Conviction.” *Texas Tribune*. March 31, 2021.

Valencia, Richard R. *Students of Color and the Achievement Gap: Systemic Challenges, Systemic Transformations*. Routledge Press, 2015.

Valerio-Jiménez, Omar S. et al. *River of Hope Forging Identity and Nation in the Rio Grande Borderlands.* Duke University Press, 2012.

Vasquez Heilig, Julian and Jennifer Jellison Holme. “Nearly 50 Years Post-Jim Crow: Persisting and Expansive School Segregation for African American, Latina/o, and ELL Students in Texas.” *Education and Urban Society* 45.5 (2013): 609–632.

Webb, Walter Prescott. *The Texas Rangers: A Century of Frontier Defense*. Austin, TX: University of Texas Press, 1995.

Weber, David, editor. *Foreigners in Their Native Land: Historical Roots of Mexican Americans*. Albuquerque, NM: University of New Mexico Press, 1973.

White, Richard. *“It’s Your Misfortune and None of My Own”: A New History of the American West*. New York: Norton, 1993.

Williams, Beth Lew. *The Chinese Must Go: Violence, Exclusion, and the Making of the Alien in America*. Cambridge: Harvard University Press, 2018.

Winant, Howard. *Racial Conditions: Politics, Theory, Comparisons*. Minneapolis: University of Minnesota Press, 1994.

Wu, Nicholas. “GOP senator says China ‘to blame’ for coronavirus spread because of ‘culture where people eat bats and snakes and dogs.’” *USA Today*, March 18, 2020.

Yam, Kimmy. “Anti-Asian hate crimes increased 339 percent nationwide last year, report says.” *NBC News*. February 14, 2022.

Young, Elliott. *Catarino Garza’s Revolution on the Texas-Mexico Border*. Durham, NC: Duke University Press, 2004.

Zdun, Matt. “Prairie View A&M University’s voter registration issues are resolved, but voting barriers remain,” *Texas Tribune*, October 16, 2018.

Zelinski, Andrea. “Fort Bend lawmaker said primary foes are running because they’re ‘Asian.’” *Houston Chronicle*, December 3, 2019.

Archival Collections

Adjutant General Records, Texas State Library and Archives Commission, Austin, Texas
Sing Family Papers, Austin History Center, Austin, Texas

Court Cases:

*Abbott v. Anti-Defamation League Austin*, No. 03-20-00498-CV (Tex. App. Oct. 23, 2020)

*Allee v. Medrano*, 416 U.S. 802 (1974).

*Alvarado v El Paso* ISD, 593 F.2d 577 (5th Cir. 1979).

*Arvizu v Waco ISD,* 495 F.2d 499 (5th Cir. 1974).
Brief for *Abbott v. Anti-Defamation League Austin* as Amicus Curiae, No. 03-20-00498-CV (Tex. App. Oct. 23, 2020).

*Briscoe v Bell*, 432 U.S. 404 (1977).

*Cisneros v Corpus Christi ISD*, 467 F.2d 142 (5th Cir. 1972) (en banc.)

*Flax v. Potts*, 725 F. Supp. 322 (N.D. Tex. 1989)

*Glasscock v Parr,* Senate Investigation Supplement to Journal 1919 Vol 4, 1052.

*Grovey v. Townsend*, 295 U.S. 45 (1935).

*Harper v. Virginia Board of Elections*, 383 U.S. 663 (1966).

*Kristin Garcia vs. Carroll Independent School District Board of Trustees, et al.* CAUSE NO. 153-319405-20. In the District Court of Tarrant County, 153rd District Court.

*Nixon v. Condon*, 286 U.S. 73 (1932).

*Nixon v. Herndon*, 273 U.S. 536 (1927).

*Miguel Hernandez Chapter of the Am. GI Forum v. Bexar County,* No. SA-04-CA-181- FB (W.D. Tex. Aug. 27, 2003).

*Morales v. Shannon,* CAUSE NO. DR-70-CA-14 (W.D. Tex. Aug. 9, 2007)

*Patino v. City of Pasadena* 230 F. Supp. 3d 667 (S.D. Tex. 2017).

In re Rocardo Rodriguez 81 F. 337 (1897).

*Santamaria v. Dallas Independent School District,* Civil Action No. 3:06-CV-692-L (N.D. Tex. May. 16, 2006)

*Smith v. Allwright*, 321 U.S. 649 (1944).

*Symm v. United States*, 439 U.S. 1105 (1979)

*United States v Texas,* (Civil Action 5281, Jan 9 1981)

*United States v State of Texas*, (Gregory-Portland ISD), F. Supp — (E.D. Tex 1980)

*United States v State of Texas,* (Bilingual Education) F. Supp - (E.D. Tex 1981)

*United States v Texas Education Agency* (Lubbock ISD), 600 F.2d 518 (5th Cir. 1979)

*United States v State of Texas* (San Felipe de Rio Consolidated ISD), 324 F. Supp 24 (E.D. Tex 1971)

*United States v. Wong Kim Ark*, 169 U.S. 649 (1898)

*Veasey v. Abbott*, 830 F.3d 216, 240 (5th Cir. 2016) (en banc)

*OCA-Greater Houston v State of Texas* (2017) No. 16-51126

<u>Government Documents</u>

Martinez, Monica Muñoz. Testimony Before the U.S. House Committee of the Judiciary Subcommittee on Immigration and Citizenship Hearing on “Oversight of the Trump Administration Border Policies and the Relationship Between Anti-Immigrant Rhetoric and Domestic Terrorism.” September 6, 2019. https://www.congress.gov/116/meeting/house/109889/witnesses/HHRG-116-JU01-Wstate-MunozMartinezM-20190906.pdf.

Commission on Wartime Relocation and Internment of Civilians, Personal Justice Denied: Report of the Commission on Wartime Relocation and Internment of Civilians, 2nd ed., Washington D.C.: Government Printing Office, 1982

Election Administration Report, vol. 9, no. 16 (August 15, 1979).

Extension of the Voting Rights Act: hearings before the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, House of Representatives, Ninety-seventh Congress, first session, May 6, 7, 13, 19, 20, 27, 28, June 3, 5, 10, 12, 16, 17, 18, 23, 24, 25, and July 13, 1981.

Office of Public Affairs."Justice Department Announces Multi-Million Dollar Civil Settlement in Principle in Mother Emanuel Charleston Church Mass Shooting." *The United States Department of Justice.* October 28, 2021.

*The Terrell Election Law: Embracing all amendments to date*. Secretary of State, W. R. Davie, 1908 (Austin, TX: Von Boekmann Jones, Co., Printers, 1908).

Testimony of Sherrilyn Ifill, President and Director-Counsel, NAACP Legal Defense and Education Fund, Submitted to the United States House of Representatives Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights, and Civil Liberties, hearing entitled, "Voter Suppression and Continuing Threats to Democracy," (January 20, 2022) (Sherrilyn Ifill, President and Director-Counsel, NAACP Legal Defense and Education Fund)

Texas Legislature. *General and Special Laws of the State of Texas Passed By the Regular Session of the Fifty-Fifth Legislature*. Austin, TX: Published under the authority of the State of Texas, 1957. https://texashistory.unt.edu/ark:/67531/metapth221758/.

*Proclamation by the Governor*. Journal of the House of Representatives of the Second Called Session of the 55th Legislature of the State of Texas, held November 13, 1957 (statement made by Price Daniel, Sr).

"The State of Civil Rights: 1979," United States Commission on Civil Rights (1980).

Texas Election Laws of 1985, 69th Leg., Sec. 13.046. Ch. 211, Sec. 1, eff. Jan. 1, 1986.

Texas Election Law Amended by Acts of 1991, 72nd Leg., ch. 279, Sec. 1, eff. Sept. 1, 199.

Texas Election Acts 1995, 74th Leg., ch. 797, Sec. 4, eff. Sept. 1, 1995.

Texas Election Acts 1997, 75th Leg., ch. 864, Sec. 8, eff. Sept. 1, 1997.

*Report of the Legal and Legislative Subcommittee of the Texas Advisory Committee on Segregation in the Public Schools, September 1, 1956.* Austin, Tex: s. n., 1956.

U.S. Federal Bureau of Investigations. FBI Hate Crime Data for Texas, 2020

Periodicals

*Austin Chronicle*
*Austin Daily Republican*
*Austin Statesman*
*Carrizo Springs Javelin*
*Clarksville Standard*
*The Crisis*
*Dallas Morning News*
*Fort Worth Star-Telegram*
*Galveston Daily News*
*The Guardian*
*Houston Chronicle*
*San Antonio Express*
*San Antonio Light*
*San Antonio Express News*
*Texas Tribune*
*USA Today*
*Victoria Advocate*
*Washington Post*
*Wichita Falls Record News*

State Constitutions

*The Constitution, as Amended, and Ordinances of the Convention of 1866, Together with the Proclamation of Governor Declaring the Ratification of the Amendments to the Constitution, and the General Laws of the Regular Session of the Eleventh Legislature of the State of Texas*. Austin, TX: Printed at the Gazette office, by Jo. Walker, state printer. 1866. Winker-Friend 1534.

"Constitution of the Republic of Texas." *Laws of the Republic of Texas, in Two Volumes*. Houston, TX: Printed at the Office of the Telegraph, 1838, vol. 1, pp. 9-25. Streeter 275.

*The Constitution of the Confederate States of America, the Ordinances of the Texas Convention, and an Address to the People of Texas: Printed by Order of the Convention of the Senate*. Austin, TX: Printed by John Marshall, state printer, 1861. Winkler-Friend 189.

*Constitution of the State of Texas, Adopted by the Constitutional Convention, Begun and Held at the City of Austin, on the Sixth Day of September, 1875. Official.* Galveston: Printed at the "News" Steam Book and Job Establishment. [1875.] Winkler-Friend 3638.

*Constitution of the State of Texas, Adopted by the Constitutional Convention Convened under the Reconstruction Acts of Congress Passed March 2, 1867, and the Acts Supplementary thereto; to be Submitted for Ratification or Rejection at an Election to Take Place on the FIrst Monday of July, 1869.* Austin, Texas: Printed at the Daily Republican Office. 1869. Winkler-Friend 2121.

*Constitution of the State of Texas, adopted in Convention, at the City of Austin 1845*. Austin, TX: Printed at the Office of the 'New Era', 1845.

*Laws and Decrees of the State of Coahuila and Texas, in Spanish and English: to Which Is Added the Constitution of Said State*. Trans. J.P. Kimball. Houston, TX: Telegraph Power Press, 1839, pp. 313-342. Streeter 310.

**Websites Accessed:**

"About Section 5 of the Voting Rights Act." U.S. Department of Justice, Civil Rights Division, November 29, 2021. https://www.justice.gov/crt/about-section-5-voting-rights-act

"Alien Land Law." *Handbook of Texas Online*. https://www.tshaonline.org/handbook/entries/alien-land-law.

Anders, Evan. "Guerra, Manuel." *Handbook of Texas Online*. https://www.tshaonline.org/handbook/entries/guerra-manuel.

American Immigration Council. "Immigrants in Texas Fact Sheet." August 6, 2020. https://www.americanimmigrationcouncil.org/research/immigrants-in-texas.

*Ballotpedia*. Texas State Senate District 10, 2020 Census. Web Archive. https://ballotpedia.org/Texas_State_Senate_District_10

Representative Beth Van Duyne U.S. House Website. https://vanduyne.house.gov/.

Campaign Legal Center. "Cases and Actions: Veasey v Abbott." Updated April 13, 2021. https://campaignlegal.org/cases-actions/veasey-v-abbott

Carroll ISD Cultural Competence Action Plan (Draft). August 3, 2020. https://www.southlakecarroll.edu/cms/lib/TX02219131/Centricity/Domain/97/Cultural%20Competence%20Action%20Plan%20DRAFT%20-%20July%209%202020.pdf

Census Reporter. "Congressional District 22, TX." https://censusreporter.org/profiles/50000US4822-congressional-district-22-tx/.

Center for Disease Control and Prevention. "Food Deserts in Texas: 2005" and "Social Impacts" created by Brittany Bailey, Michelle Cash, Crystal Guest: Institute for Environmental Spatial Analysis, Gainesville State College, accessed April 2, 2022. https://www.cdc.gov/dhdsp/maps/gisx/mapgallery/tx_food_deserts.html

Civil Rights Clinic Georgetown Law. "Can't Pay, Can't Vote: A National Study on the Modern Poll Tax." July 25, 2019. https://campaignlegal.org/sites/default/files/2019-07/CLC_CPCV_Report_Final_0.pdf

"Crystal City (detention facility)." *Densho Encyclopedia*. https://encyclopedia.densho.org/Crystal%20City%20(detention%20facility).

Flores, Antonio and Gustavo Lopez, Jynnah Radford, "2015, Hispanic Population in the United States," Pew Research Center. September 18, 2017. https://www.pewresearch.org/hispanic/2017/09/18/2015-statistical-information-on-hispanics-in-united-states-current-data/

Fly, Betty D. and Craig H. Roell. "Fly, George Washington Lafayette (1835-1905)." *Handbook of Texas Online*. https://www.tshaonline.org/handbook/entries/fly-george-washington-lafayette

Guillory, Ferrel. "From Nixon to Trump." *Southern Cultures*. https://www.southerncultures.org/article/southern-strategy-from-nixon-to-trump/

"Henry B. González." *Library of Congress*. https://www.loc.gov/rr/hispanic/congress/gonzalez.html

Interactive map, "Life Expectancy by ZIP Code in Texas" https://www.texashealthmaps.com/lfex

Intercultural Development Research Association (IDRA), "Attrition and Dropout Rates in Texas," IDRA Dashboard, 2018. https://www.idra.org/research_articles/attrition-dropout-rates-texas/

Intercultural Development Research Association (IDRA), "Attrition Study," IDRA Dashboard, 2018. https://www.idra.org/resource-center/download-graphics/

Intercultural Development Research Association (IDRA), “State High School Graduation Rates,” IDRA Dashboard, 2018. https://public.tableau.com/app/profile/idra/viz/StateHighSchoolGraduationRates/StateHighSchoolGraduationRates

Kaiser Family Foundation, “Voting and Voter Registration as a Share of the Voter Population, by Race/Ethnicity 2016,” https://www.kff.org/other/state-indicator/voting-and-voter-registration-as-a-share-of-the-voter-population-by-raceethnicity/?currentTimeframe=2&selectedRows=%7B%22states%22:%7B%22texas%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D

Kohout, Martin Donell. “González, Henry Barbosa.” *Handbook of Texas Online*. Accessed April 25, 2022. https://www.tshaonline.org/handbook/entries/gonzalez-henry-barbosa.

Kochhar, Rakesh and Anthony Cilluffo, “Income Inequality in the US is Rising Most Rapidly Among Asians,” July 12, 2018, Pew Research Center. https://www.pewresearch.org/social-trends/2018/07/12/income-inequality-in-the-u-s-is-rising-most-rapidly-among-asians/

Kochhar, Rakesh and Anthony Cilluffo, “Key Findings on the Rise in Income Inequality within America’s Racial and Ethnic Groups,” July 12, 2018, Pew Research Center. https://www.pewresearch.org/fact-tank/2018/07/12/key-findings-on-the-rise-in-income-inequality-within-americas-racial-and-ethnic-groups/

Legal Information Institute. “Mathew Shepard and James Byrd, Jr. Hate Crimes Prevention Act.” Cornell Law School. July 2021. https://www.law.cornell.edu/wex/matthew_shepard_and_james_byrd_jr_hate_crimes_prevention_act

Lucko, Paul M. “Geiger, Harriel G.” *Handbook of Texas Online*. Accessed April 7, 2022. https://www.tshaonline.org/handbook/entries/geiger-harriel-g

National Association of Latino Elected and Appointed Officials (NALEO). “2022 Primary Election Profile: Texas.” https://naleo.org/COMMS/PRA/2022/2022-TX-Profile.pdf

Princeton Gerrymandering Project. “Texas 2021 Final Congressional Plan C1293.” February 1, 2022. https://gerrymander.princeton.edu/redistricting-report-card?planId=recL5EF85h0ILukMA

Ruiz, Neil G., Juliana Menasce Horowitz and Christine Tamir. "Many Black and Asian Americans say they have experienced discrimination amid the COVID-19 Outbreak," *Pew Research Center*. July 1, 2020. https://www.pewresearch.org/social-trends/2020/07/01/many-black-and-asian-americans-say-they-have-experienced-discrimination-amid-the-covid-19-outbreak/

"Short Handle Hoe, 1950s and 1960s." *Smithsonian National Museum of American History*. https://americanhistory.si.edu/collections/search/object/nmah_1352222.

Stevens, Beth and Brendan Downes, Mimi Marziani, Cassandra Champion. *The High School Vote: How Texas fails to engage the next generation of voters*, The Texas Civil Rights Project, (September 2017). https://texascivilrightsproject.org/wp-content/uploads/2018/02/HSVR-Report.pdf

Tarrant County Voter Lookup: *https://gisit.tarrantcounty.com/TCVL/*

Tarrant County Early Voting Locations: *https://www.tarrantcounty.com/content/dam/main/elections/2022/en22/locations/EN22_EV_Sched.pdf*

Texas GOP 2020 Platform. https://texasgop.org/platform/.

The Attorney General of Texas. "Statement by Texas Attorney General Greg Abbot" June 25, 2013. https://perma.cc/SL53-AFSG.

United States Census Bureau (2020). "*American Community Survey 5-year estimates*," Census Reporter Profile for Zip Code 7610. http://censusreporter.org/profiles/86000US76104-76104

University of Texas Southwestern Medical Center. "Life Expectancy at Birth in Communities Across Texas: 2005 – 2014." UT Health, 2019. https://www.texashealthmaps.com/Life-expectancy-in-Texas-2005-2014.pdf

University of Texas Southwestern Medical Center. "New Interactive map first to show life expectancy of Texans by ZIP code, race, and gender," UT Health, 2019. https://www.utsouthwestern.edu/newsroom/articles/year-2019/life-expectancy-texas-zipcode.html

Yelderman, Pauline. "Jaybird-Woodpecker War." *Handbook of Texas Online*. https://www.tshaonline.org/handbook/entries/jaybird-woodpecker-war.

Yellow Horse, Aggie J., Russell Jeung, Richard Lim, Boaz Tang, Megan Im, Lauryn Higashiyama, Layla Schweng, and Mikayla Chen. "Stop AAPI Hate National Report." March 19, 2020 - June 30, 2021. https://stopaapihate.org/wp-content/uploads/2021/08/Stop-AAPI-Hate-National-Report-Final.pdf

***All other documents cited in this report.***

**Appendix**

Curriculum Vitae

**Monica Muñoz Martinez, PhD**
Associate Professor, Department of History,
University of Texas at Austin
monica.martinez1@austin.utexas.edu

**Education**

| | |
|---|---|
| 2012 | Ph.D., Yale University, Department of American Studies |
| 2010 | M. Phil., Yale University, Department of American Studies |
| 2008 | M.A., Yale University, Department of American Studies |
| 2006 | A.B., Brown University, Ethnic Studies (Honors) and American Civilization |

**Professional appointments**

| | |
|---|---|
| 2020-present | Associate Professor of History, University of Texas at Austin |
| 2016-2020 | Stanley J. Bernstein ’65 P ’02 Assistant Professor of American Studies & Ethnic Studies, Brown University |
| 2014-2020 | Faculty Fellow John Nicholas Brown Center for Public Humanities, Brown University |
| 2014-2016 | Assistant Professor of American Studies & Ethnic Studies, Brown University |
| 2012-2014 | Postdoctoral Fellow, Center for Mexican American Studies, University of Texas at Austin |

**Publications**

*The Injustice Never Leaves You: Anti-Mexican Violence in Texas* (Harvard University Press, September 2018)

- 2018 Lawrence Levine Award, Organization of American Historians
- 2018 Best Non-Fiction Book Award, National Association Chicano Chicana Studies -Tejas Foco
- 2019 Caughey Western History Prize, Western History Association 2019
- 2019 Robert G. Athearn Award, Western History Association 2019
- 2019 Maria Elena Martinez Award, American History Association Conference on Latin American History
- Texas Book Award for best fiction, nonfiction, or art book about Texas from 2016-2018, TCU Press & Friends of TCU library
- 2018 Finalist for Frederick Jackson Turner Award, Organization of American Historians

**Refereed journal articles & book chapters**

"Histories of the Present: Violence and Policing on the U.S.-Mexico Border" *American Quarterly* Volume 74, Number 3 (September 2022) (forthcoming)

"El Paso in Mourning" in *After Life: A Collective History of Redemption in Pandemic America* Haymarket Books (October 2022) (forthcoming)

"Lives, Not Metadata: Recovery Methods for Digital Histories of Racial Violence," *ANNALS of the American Academy of Political and Social Science* – Special Issue: *Legacies of Racial Violence: Clarifying and Addressing the Presence of the Past*. Spring 2021 DOI: 10.1177/00027162211014424

"Racial Violence in the West," *The Journal of the Gilded Age and Progressive Era*, Vol 20, Issue 1, January 2021 pp 114-21. Special Forum: *Lynching in the New South A Quarter of a Century Later*. doi:10.1017/S1537781420000535

"Racial Forgetting and Present History: Remembering Violence in Monuments, Museums, and Markers," *Doing Public Humanities* (New York: Routledge Press, 2020)

"The Injustice Never Leaves You: Anti-Mexican Violence in Texas" *Race in America: A Reader* (Cambridge, MA: Harvard University Press, 2020) https://www.hup.harvard.edu/features/racism-in-america/9780674251656-Harvard-University-Press-Racism-in-America-A-Reader.pdf

"Mapping Segregated Histories of Racial Violence." *American Quarterly* Volume 70, No. 3 (September 2018): 657 – 663.

"Recuperating Histories of Violence in the Americas: Vernacular History-Making on the U.S.-Mexico Border." *American Quarterly* Volume 66, No. 3 (September 2014): 661-689.

- Awarded the Constance M. Rourke Prize, American Studies Association for best article published in *American Quarterly* in any given year.

"Indemnities for State Murder: The U.S.-Mexico General Claims Commission of 1923." *Social Text* Periscope: Going Into Debt, (September 2011) https://socialtextjournal.org/periscope_article/indemnity_for_state_murder/
Respondents: David Graeber and Richard Dienst.

**Co-authored book chapters**

with Trinidad Gonzales, Benjamin Johnson, "Refusing to Forget: A Brief History" in *Reverberations of Racial Violence : Critical Reflections on the History of the Border* Edited by Sonia Hernández and John Morán González. Austin: University of Texas Press, 2021.

**Exhibits**

*Bullock Texas State History Museum, Austin, Texas*
Curator/historian consultant, "Life and Death on the Border, 1910 - 1920" 2016;

- Awarded the Leadership in History Award of Merit by the American Association for State and Local History.

*Smithsonian's National Museum of American History*
Historian Consultant, "Girlhood (It's Complicated)" June 2020-2025
https://www.si.edu/exhibitions/girlhood-its-complicated-event-exhib-6376

*John Nicholas Brown Center, Carriage House, Brown University*
Co-Curator, "Intimacy & Isolation in Providence: Oral Histories in Changing Space," 2005
Co-Curator, "Educating Change: Latina Activism & the Struggle for Educational Equity" 2005
*Co-Curator, "Wobblies!: Traveling Wobbly Show,"* Rhode Island Historical Society 2005

**Digital Exhibits**

Faculty Advisor with Robert Lee for student exhibit, "Resistance and Solidarity" 2017
https://blogs.brown.edu/amst-1700d-s01-fall-2016/
Faculty Advisor, "Forgotten Histories of the US-Mexico Border" 2016
https://blogs.brown.edu/amst-1700d-s01-fall-2015/
Faculty Advisor, "Remembering Race at Brown" (2015)
https://blogs.brown.edu/ethn-0790d-s01/
Co-Curator, "Educating Change: Latina Activism & the Struggle for Educational Equity" 2005 http://brown.edu/Research/Coachella/

**Book Reviews**

*Seeking Inalienable Rights: Texans and Their Quest for Justice*. Edited by Debra A. Reid. (College Station: Texas A&M University Press, 2009). In *Louisiana History* Fall 2010.

*Corridors of Migration: The Odyssey of Mexican Laborers*, 1600-1933. By Rodolfo F. Acuña. (Tucson: University of Arizona Press, 2007). In *Western Historical Quarterly* Summer 2009.

**Encyclopedia Entries**

*Handbook of Texas Online*, Monica Muñoz Martinez, "Porvenir Massacre 1918," 2019. Published by the Texas State Historical Association.
https://tshaonline.org/handbook/online/articles/jcp02

**Op-Eds and Public Writing**

"To fix our abusive border policies, first we must face our history," *Houston Chronicle*, October 17, 2021

"The Push for Lesson-Burning in Texas Classrooms Comes as No Shock to Those in the Long Fight for Mexican American Studies," *Women's Media Center* July 20, 2021

"15 Unsung Moments From American History That Historians Say You Should Know About." Contributor. *Time Magazine*, June 28, 1919

"The Highwaymen Whitewashes Frank Hamer and the Texas Rangers" *Washington Post*, March 31, 2019

"Border Fears" *Lapham's Quarterly*, October 25, 2018

"History Teaches Us Not To Reduce Policing Standards" *Los Angeles Review of Books*, May 4, 2017

"Mapping Segregated Histories of Racial Violence" *Beyond the Page: American Quarterly* Digital Platform (September 2018)

"Refusing to Forget" *Process: a Blog for American History*, Organization of American Historians, May 3, 2016

"Vernacular History Making on the US-Mexico Border," *American Quarterly: Beyond the Page*, September 2014

**Co-authored public writing**

with Ben Johnson, Sonia Hernández, John Morán González, Trinidad Gonzales, "Trumps Pardon of Arpaio repeats a Tragic History" *Refusing to Forget Blog* Sept 8, 2017

with Elena Shih, "Unpacking the Umbrella Movement: Brown Public Humanities in Hong Kong" *Public Humanities Blog* March 5, 2015

**Publications/Exhibitions in Progress**

**Books in progress**

*Race Laws in Texas: from 1836 until Today* (In Progress)

*Looking for Lost Humanity: Five Lives that Unsettle American Memories of US History* (In Progress)

*Time Does Not Heal All Wounds: Restorative Justice in the United States* (In Progress)

**Digital Projects in progress**

*Mapping Violence: Racial Terror in Texas 1900-1930* (Digital Publication - In Progress) https://mappingviolence.com/
Documentation for technical components available on GitHub: https://github.com/mappingviolence

Website companion project for Refusing to Forget: https://refusingtoforget.org/

**Refereed Journal Articles in progress**

From 'Out of the Shadows' of the *Corrido*: Remembering and Forgetting Gender Violence in the US-Mexico Borderlands" (In Progress)

**Exhibition Catalogue in Progress**

*Life and Death on the Border: Exhibiting State Sanctioned Racial Violence for Public Audiences* (In Progress – Proposal to Verso Books 2020)

**Encyclopedia Entries in Progress**

*Handbook of Texas Online*, Monica Muñoz Martinez, "Morales v. Shannon," Forthcoming 2019. Published by the Texas State Historical Association.

*Handbook of Texas Online*, Monica Muñoz Martinez, "Tejano Lynchings," Forthcoming 2019. Published by the Texas State Historical Association.

**Research Grants**

Crossing Latinidades Collaborative, Cross-institutional and Comparative Research Working Groups in Latino Humanities Studies Grant Competition, 2022-2025 ($310,000) Awarded for "Race Laws in the U.S. Southwest"

American Historical Association's Grants to Sustain and Advance the Work of Historical Organizations Program, 2022-2024 ($71,000) Awarded to Refusing to Forget

National Endowment for the Humanities Collaborative Grant, 2017-2019 ($65,000) Awarded to Refusing to Forget

Carnegie Foundation Faculty Fellowship, 2017-2019 ($200,000) for "New Narratives for Reckoning with Histories of Violence."

Research SEED Award, Office of Vice President for Research, Brown University, 2016 ($50,000) for *Mapping Violence*

Karen T. Romer Undergraduate Teaching Research Award, Summer/Fall 2016 ($29,000)

Carlos E. Castañeda Postdoctoral Fellowship, Center for Mexican American Studies University of Texas at Austin, 2012-2014

Humanities Texas, National Endowment for the Humanities, Texas Humanities Grant, July 2014

Texas State Historical Association, Catarino & Evangelina Hernández Research Fellowship, 2013

Woodrow Wilson National Fellowships Foundation, MMUF Dissertation Writing Fellowship, 2011 - 2012

Yale University, Cleanth Brooks Dissertation Writing Fellowship, American Studies, 2010 - 2011

SSRC-Mellon Mays Dissertation Development Grant, 2011

Yale Research Initiative on the History of Sexuality Conference Grant, 2011
Yale Howard Lamar Center for Study of Frontiers & Borders Fellow, 2010 - 2011
Yale Macmillan Center, Program in Agrarian Studies, Graduate Student Award, 2010
Recovering the U.S. Hispanic Literary Heritage Project, Texas Grant, 2010
Pacific Coast Branch-American Historian Association Presidents' Award, 2010
Woodrow Wilson MMUF Travel and Research Fellow, 2010
SSRC-Mellon Mays Proposal Writing Development Seminar, 2009
SSRC-Mellon Mays Pre-doctoral Research Development Grant, 2008
Center for Study of Race & Ethnicity, Brown University Thesis Research Award, 2005

**a. Proposals Submitted but not Funded**

Kellogg Foundation Racial Equity 2030 Grant 2021
National Endowment for the Humanities Digital Projects for the Public Grant 2015

**b. Declined**

Woodrow Wilson National Fellowships Foundation, Career Enhancement Fellowship, 2017
University of California President's Postdoctoral Fellowship, History Department, University of California, San Diego, 2012
University of Illinois Chancellor's Postdoctoral Fellowship, Department of Latina/Latino Studies, University of Illinois, Urbana-Champaign, 2012
Rutgers University Presidential Fellowship, Department of Latino and Hispanic Caribbean Studies, Rutgers University, 2012
Arizona State University, Comparative Border Studies Fellowship, 2012

**Honors**

MacArthur Foundation Fellow, 2021 – 2026
Organization of American Historians Distinguished Lecturer, 2017-present
Organization of American Historians Friend of History, awarded to Refusing to Forget 2021
NBC News "Latino 20," recognizing the 20 celebrities, CEOs, activists, and scholars using their voice and talent to empower Latino communities, 2019.
Herbert Feis Award to Refusing to Forget for distinguished contributions to public history, American History Association, 2019.
Texas Book Award for best nonfiction, fiction, photography, or art book awarded by the TCU Mary Couts Burnett Library and TCU Press, 2019
Caughey Western History Prize for most distinguished book on American west, Western History Association, 2019.
Robert G. Athearn Award for best book on 20th century American west, Western History Association, 2019.
Lawrence Levine Award for Best Book in Cultural History, Organization of American Historians, 2019.
Best Non-Fiction Book Award, National Association of Chicano Chicana Studies -Tejas Foco, 2019.

Finalist for Frederick Jackson Turner Award for Best First Book, Organization of American Historians, 2019.
Brown University Research Achievement Award, Sponsored by the Office of the President and the Provost, 2019.
Autry Public History Prize (awarded to Refusing to Forget), Western History Association, 2017.
Nathalie Rutherford Pierrepont '07 Prize for Leadership, Career Advising and Motivation, Brown University CareerLAB, 2017.
Leadership in History Award of Merit for "Life and Death on the Border, 1910-1920," American Association for State and Local History, 2016.
Constance M. Rourke Prize for Best Article Published in *American Quarterly*, American Studies Association, 2015.
Best Dissertation Award, National Association of Chicano/a Studies Tejas Foco, 2012.
Liza Cariaga-Lo Award for Diversity in Scholarship and Service, Yale University, 2010.

**Public Humanities**

**Refusing to Forget**
Founding member of Refusing to Forget, a non-profit organization that works to memorialize histories of racial violence in Texas. www.refusingtoforget.org

**State Historical Markers, Texas Historical Commission**
Porvenir Massacre, Presidio County (Unveiled November 2018)
Bazán and Longoria Murders, Hidalgo County (Unveiled November 2018)
Jovita Idar, Webb County (Unveiled June 2017)
La Matanza, Cameron County (Unveiled October 2017)

**Conference**
*Reverberations of Memory, Violence, and History: The Centennial of the 1919 Canales Investigation*, Bullock Texas State History Museum, Austin, January 2019. Funded by the National Endowment for the Humanities Collaborative Grant, 2017-2019 ($65,000)

**Public Events**
"Resilience en el Valle: Remembering Bazán and Longoria and Reckoning with a Century of State Sponsored Violence" October 27 – November 3, 2018
Historical Marker Unveiling Ceremony, Nov 3
Symposium – University of Texas Rio Grande Valley, Brownsville, Nov 3
Panel of historians; Panel of descendants; High School Student Research Presentations; Public Discussion of Mexican American Studies in K-12
"Library Harvest Days" UTRGV Brownsville, Special Collections Library, Nov 3
Mexican American Studies Student Research Presentation, UTRGV Nov 2
Art Exhibition and Poetry Reading – Hinovations Gallery, McAllen, Nov 2
Oral History Workshop – Dr. Monica Muñoz Martinez, UTRGV Edinburg, Nov 2
Book Readings, Edinburg Public Library, Dr. Monica Muñoz Martinez & Dr. Christopher Carmona, Nov 1

"History of La Matanza," UTRGV Brownsville, Dr. Trinidad Gonzalez, Oct 27

"Porvenir Massacre Historical Commemoration" Magoffin Home State Historic Site, Texas Historical Commission, El Paso, Sept 1, 2018

Speeches by Monica Muñoz Martinez, descendants of the Porvenir Massacre (Arlinda Valencia and Seth Van Matre), Texas State Senator José Rodriguez, Texas School Board Member Georgina Cecilia Peréz, Magoffin Home Director Jeff Harris, Benediction by Father Arturo Banuelos, & musical performances

"Resilience en el Valle: Remembering La Matanza of 1915" Oct 7 – 14, 2017

Historical Marker Unveiling, Oct 14
Symposium – University of Texas Rio Grande Valley, Edinburg, Oct 14
Panel of historians; Panel of Fiction Authors; High School Student Research Presentations; Musical Performance of *corridos*
"Library Harvest Days" UTRGV Edinburg, Special Collections Library, Oct 14
Oral History Workshop – Dr. Monica Muñoz Martinez, UTRGV Edinburg, Oct 13
Poetry Reading -- El Hueso de Fraile, Brownsville, Oct 13
Art Exhibition – Brownsville Museum of Fine Arts, Oct 12
"La Matanza," Mission Historical Museum, Dr. Trinidad Gonzalez, Oct 7

**Collaborative Digital Public Humanities**

**1919 Texas Ranger Investigation @1919TXRangerInv**
Co-Curated with Dr. Annette Rodriguez (UNC American Studies)
Live tweeting the 1919 Texas Ranger Investigation a centennial later. Commemorating efforts to end police abuse and racial violence. Bringing historical documents out of the archive and into public dialogue.

**Television and Radio**

NPR, Latino USA, "The Lone Legislator," June 2020
NPR, Here and Now with Tonya Mosley, "The History of Anti-Latino Violence in the U.S." Nov 2019
MSNBC, The Beat with Ari Melber "Hate Crime Experts: Crimes Spike Around Trump's Election, Rhetoric," Aug 2019
NPR, The Takeaway with Tanzina Vega "Erased from Public Memory': The History of Anti-Latino Violence in the US" Aug 2019
NPR, On Point with David Folkenflik, "Domestic Terrorism in Wake of Weekend Mass Shootings" Aug 2019
C-SPAN, Book TV, "The Injustice Never Leaves You: San Antonio Book Festival," April 2019
NPR, WNYC The Brian Lehrer Show, "The History Behind the Border Crisis," July 12, 2018,
TPR, Fronteras with Norma Martinez, "Massacre in a West Texas Border Town" Sept 21,

2018, Selected as a "*Fronteras* Best of 2018"
TPR, Fronteras with Norma Martinez, "Anti-Mexican Violence in West Texas" Sept 21, 2018
TPR, Think with Krys Boyd, "Mobs vs. Mexicans In Texas History" *Think* with Krys Boyd, Oct 2018
TPR, Texas Standard, "New Book Investigates History of State Violence against Ethnic Mexicans" Sept 7, 2018
TPR, West Texas Talk with Diana Nguyen, "Remembering The Porvenir Massacre" Nov 2018,

**Media Interviews**

Sydney Trent, "In Texas, a struggle to memorialize a lynching as resistance grows to teaching historical racism," *Washington Post*, June 2021

Isabella Zou, "What is Critical Race Theory? Explaining the discipline that Texas' governor wants to 'abolish'" *Texas Tribune* June 2021

Jeremy Blackman, Brittany Brito, "Historians decry Texas bill that would restrict school lessons on race, racism," *Houston Chronicle*, May 2021

Gabriel Vidal, "Historians, parents say Texas bill limiting instruction about race hurts students," CBS Austin, May 2021

Channon Hodge, "Burned from the land: How 60 years of racial violence shaped America," CNN May 2021

Suzanne Gamboa, "'White Supremacy' was behind child separations – and Trump officials went along, critics say," *NBC News* August 2020

Tim Murphy, "A Century Ago, One Lawmaker Went After the Most Powerful Cops in Texas. Then They Went After Him." *Mother Jones* July 2020

Suzanne Gamboa, "A Removed Statue dredges up racism against Blacks, Latinos in Texas Ranger history," *NBC News* June 2020

Ovetta Wiggins, "Maryland House Speaker Says Board 'Missed the Point' Over Her Objection to 1964 Civil War Plaque" *Washington Post* October 2019

Nuria Marquez Martinez, "What the Border's History of Racist Violence Tells Us About the El Paso Shooting," *Mother Jones* August 2019

Raul Reyes, "'Porvenir, Texas' Details Massacre of Mexican Americans by US soldiers, Rangers," *NBC News* September 2019

Jasmine Aguilera "'I Cry All the Time.' A Century After 15 Mexican Men and Boys Were Massacred in Texas, Their Descendants Want Recognition," *Time Magazine* September 2019

Ryan Devereaux, "From El Paso to the War on Terror, Dangers of Historical Amnesia," *The Intercept*, August 2019

Russell Contreras, "El Paso, with deep Mexican American Past, Rallies Amid Pain," *Associated Press*, August 2019

Rosa Flores and Michael Krupa, "The El Paso Shooting is exactly what Descendants of the 1915 Massacre at the US-Mexico Border Warned About," *CNN* August 2019

Russell Contreras and Cedar Attansario, "Mexican Americans Feared Racial Terror from 1910 – 1920," *Associated Press* August 2019

Rosa Flores and Lauren Cook, "Their Ancestors Were Slain a Century Ago Along the US-Mexico Border. They Say Now is the Time to Retell the Horror," *CNN* July 2019

Ryan Devereaux, "The Bloody History of Borders and Militias Runs Deep—And Law Enforcement Is Part of It" *The Intercept* April 2019

"100 years later Anti-Mexican Violence Still Casts a Shadow on Texas " Michael Barnes *Austin Statesman: Austin 360* April 2019

Michelle Garcia, "The Border Wall Isn't Just a Dividing Line—It's a Monument Against Racial Progress," *The Guardian*, April 2019

Simon Romero, "Lynch Mobs Killed Latinos Across the West. Descendants Want it Known." *New York Times*, March 2019

--Translated and printed in Spanish as "La Historia de los Mexicanos que fueron linchados en el Oeste estadounidense," *The New York Times*, March 2019,

--Reprinted as "Lynching in the West: Unwritten Violence Against Mexican Americans," *Independent*, March 2019

Ben Railton, "Considering History: The Role of Women in the Lynching Epidemic" *Saturday Evening Post*, March 2019

"Refusing to Forget: Monica Muñoz Martinez Uncovers America's History at the Border" Andrew W. Mellon Foundation, November 2018

Daniel Blue Tyx, "Who Writes History? The Fight to Commemorate a Massacre by the Texas Rangers" *Texas Observer*, November 2018, (available as Audio Story)

Augusta Dell'Omo, "Violent Policing of the Texas Border," *Not Even Past: 15 Minute History*, January 11, 2019

Nashwa Bawab, "A Century After the Porvenir Massacre, Remembering One of Texas' Darkest Days," *Texas Observer*, January 31, 2018

"The Crisis on the Border you Didn't Learn about in School" *Mother Jones*, December 29, 2018

Gabriel Klapholz, "Former grad student talks racial violence in Texas" *Yale Daily News*, November 7, 2018

JW McNay, "Author Talks Race, History" *The Collegian*, October 2018

Michelle Garcia, "The Border and the American Imagination: Part I," *The Baffler*, July 2, 2018

Michael Barnes, "Texas has History of Family Separations, Deportations," *Austin American-Statesman*, June 21, 2018

Beth Lew Williams, "Memorializing African-American lynching victims is past due, but it must only be a start," *Washington Post*, May 13, 2018

**Refusing to Forget in the Media**

"'True Justice' Explores Lawyer Who Defends Death Row Inmates," *Washington Post* June 24, 2019
"Two old Texas Rangers have their Faults But are Still Fun to Watch," *Houston Chronicle* April 5, 2019
"Mexicans and Mexican Americans the 'forgotten dead' in Texas History," *San Antonio Express-News* February 23, 2019
"A Century After the Porvenir Massacre, Remembering One of Texas' Darkest Days," *Texas Observer* January 31, 2018
"History of Racism Against Mexican-Americans Clouds Texas Immigration Law," *NBC News* June 3, 2017
"Bandit Era Victims Remembered*," Valley Morning Star* November 5, 2017
"Texas Finally Marks the Matanza (Massacre) of 1915," *The Valley Times* October 17, 2017
"State Historical Marker for 'La Matanza, 1915' To Be Unveiled," *Rio Grande Guardian* October 14, 2017
"Scholars Receive NEH Grant for Historical Project on State-Led Violence," *The Monitor* August 4, 2017.
"America's Lost History of Border Violence," *Slate* May 5, 2016
"1910-1920. Vida y Muerte en La Frontera," *El Mañana* January 22, 2016
"Effects of Century-Old Murders Still Felt in Texas," *The Guardian* January 22, 2016
"Exhibit on Rio Grande Valley's Violent History," *The Monitor* January 17, 2016
"Exhibit to Shed Light on Mexican-American Murders," *Houston Chronicle* February 5, 2016
"Blood and Betrayal in the Southwest," *Latino USA* National Public Radio, February 17, 2016
"Texas Finally Acknowledges Rangers Killed Hundreds of Latinos," *Latina Magazine* February 3, 2016
"1910-1920. Vida y Muerte en la Frontera," *El Mañana* January 24, 2016
"Exhibit Explores Texas Rangers' Violence in Hispanic S. Texas," *San Antonio Express-News* January 31, 2016
"Museum Exhibit Explores Border's Bloody Past," *El Paso Times* January 16, 2016
"Handling History: Scholars Focus on Violent Chapter From Texas' Past," *Austin Statesman* April 6, 2015
"Scholars Work to Tell a Dark Chapter in Texas History," *Reporting Texas* April 5, 2015
"Just a Century Ago: The War Against Mexican Americans in South Texas," *Somos en Escrito* October 28, 2015
"The Borderlands War, 1915-1920," *Not Even Past: 15 Minute History* October 7, 2015

**Invited Lectures / Speeches**

Columbia University, Center for the Study of Ethnicity and Race, April 2022
"Nuevos Caminos: Latinx History in the 21st Century"
University of Houston, XVI Recovering the US Hispanic Literary Heritage Conference, April 2022
Keynote: "Histories to Inspire a Better Future"

University of Kansas, Hall Center for the Humanities, March 2022
"A Conversation with Dr. Monica Muñoz Martinez"
University of Texas at San Antonio, John L Nau III Conference on Texas History, March 2022
Inaugural Keynote Address: "Racial Justice and Policing in Texas."
Michael and Susan Dell Foundation, May 2021
"Forgotten History of Mexican Americans: A Reflection on Cinco de Mayo"
Institute of European Studies, University of California, Berkeley, October 2020
"Rethinking Health and Power During Times of Crisis" – for virtual panel series "Racism in History and Context"
University of Texas at Austin, Division of Diversity and Community Engagement, October 2020
"Un Recuerdo Brutal: A History of Racial Violence in Texas"
University of Arkansas, J. William Fulbright College of Arts & Sciences, October 2020
"Anti-Mexican Violence in the 20th Century: Historical Lessons for Today"
Ford Foundation and Border Network for Human Rights, January 2020
"Historical Roots and Contemporary Manifestations of Border Violence"
Social Science Research Council, Mellon Regional Lecture Series, October 2019
"Histories of Anti-Mexican Violence: Political Rhetoric & Cultures of Impunity"
Mexican Capital Legal Assistance Program, American defense attorneys meeting, October 2019
"Cultures of Impunity: Extralegal Violence and Racial Profiling of Latinx Communities"
Columbia University, History Department Grad Seminar, October 2019
"Methods for Recovering Histories of Racial Violence"
Texas Book Festival, Austin, TX, October 2019
"Writers' League of Texas: Obsessed with Texas"
"True Texas History: Uncovering Hidden Stories of Injustice"
Dartmouth University, History Department, October 2019
"The Injustice Never Leaves You: Anti-Mexican Violence in Texas"
US House Judiciary Subcommittee on Immigration and Citizenship, September 2019
Field Hearing Expert Testimony, "Oversight of the Trump Administration's Border Policies and the Relationship Between Anti-Immigrant Rhetoric and Domestic Terrorism"
University of Northern Colorado, William Hewit Educators Institute, June 2019
Keynote lecture: "The Injustice Never Leaves You: Anti-Mexican Violence in Texas"
Lectures for public school teachers: 19th Century Immigration History; 20th Century Immigration History; History of the US-Mexico Border; Forgotten Histories of Amnesty
University of California at San Diego, History Department, May 2019
"The Injustice Never Leaves You: Anti-Mexican Violence in Texas"
"Mapping Violence: Methods of Recovery and the Ethics of Display"
University of California at Riverside, English Department, May 2019
"The Injustice Never Leaves You: Anti-Mexican Violence in Texas"
Graduate Colloquium Research Seminar "Methods in Digital Recovery for the Humanities"
San Antonio Book Festival, San Antonio, TX, April 2019
"The Weight of History: American Memories of Racial Violence"
Book Woman, Austin, Texas, April, 2019
"The Injustice Never Leaves You: Anti-Mexican Violence in Texas"
University of California, Berkeley, Institute for the Study of Societal Issues, March 2019
"Lives, not Metadata: Possibilities and Limits of Mapping Violence"
Malvern Books, Austin, TX, March 2019
"Borderless: Conversations on Art, Action, & Justice"

San Antonio Public Library, Forest Hills library, San Antonio, TX, February 2019
“The Injustice Never Leaves You: Anti-Mexican Violence in Texas”
Diversity in Literary Voices - Book Festival, Austin, TX, February 2019
“Power, History, and Memory: Recovering Histories of Violence in Texas”
Bullock Texas State History Museum, Austin, TX, January 2019
Keynote Plenary: “Reverberations of Memory, Violence, & History”
Princeton University, Comparative Memory and Justice Symposium, November 2018
“Intersecting Legacies: The Holocaust and Racial Injustice in America”
Yale University, Ethnicity, Race and Migration, New Haven, CT, November 2018
“The Injustice Never Leaves You: Anti-Mexican Violence in Texas”
Texas State Historical Marker Unveiling, Edinburg, TX, November 2018
“Double Murder of Jesus Bazán and Antonio Longoria: Disavowed Histories of Loss”
Dustin Sekula Memorial Library, Edinburg, TX, November 2018
“The Injustice Never Leaves You: Anti-Mexican Violence in Texas”
University of Texas, Rio Grande Valley, Edinburg, TX, November 2018
“Methods for Recovering Marginalized Histories in Texas”
University of Texas, Rio Grande Valley, Special Collections, Edinburg, TX, November 2018
“Recovery, Preservation Inspiration: Oral History Methods/Training”
University of Texas, Austin, TX, November 2018
“The Injustice Never Leaves You: Anti-Mexican Violence in Texas”
Boston Book Festival, Boston, MA, October 2018
“America’s Original Sin: Racism”
University of Alabama, Tuscaloosa, AL, October 2018
Rose Gladney Lecture on Justice and Social Change “The Injustice Never Leaves You: Anti-Mexican Violence in Texas”
University of North Texas, Denton, TX, October 2018
“The Injustice Never Leaves You: Anti-Mexican Violence in Texas”
Southwestern University, Cultural and Historical Advocacy Team, Georgetown, TX, October 2018
Keynote Address: Courageous Conversations on Race and Ethnicity - “The Injustice Never Leaves You: Anti-Mexican Violence in Texas”
Racial Violence Hub, University of California, Los Angeles, CA, September 2018
Keynote Address: “Transnational Roots/Routes of Gendered Racial Violence”
NULab & Digital Scholarship Group, Northeastern University, Boston, MA, September 2018
Keynote Address: “Lives are not Metadata”
Autry Museum of the American West, Los Angeles, CA, September 2018
“The Injustice Never Leaves You: Anti-Mexican Violence in Texas”
Texas State Historical Marker Unveiling, El Paso, TX, September 2018
“Porvenir Massacre: Denial of Justice in the Texas Borderlands”
University of Illinois at Urbana Champagne, University 150th Anniversary Symposia, April 2018
“Death by Policing: Race, State Violence, and the Possibility of Justice”
Yale University, Public Humanities and Department of American Studies, March 2018
“Reckoning with Histories of Violence in the Midst of Border Killings”
University of Texas, Austin, Benson Latin American Studies and Collections Library, January 2018
“Segregated Histories: Mapping Racial Violence in Texas”
Porvenir Massacre Centennial Memorial, State Capital, Austin, TX, January 2018
“Historical Significance and Lasting Legacies”
Northeastern University School of Law, NULab, Boston, MA, January 2018
“The Digital Record: The Promises and Perils of Digitally Documenting Historic Racial Violence”

Northeastern University School of Law, Civil Rights& Restorative Justice Project, January 2018
"Digital Collections on Racial Violence in the US"
University of Michigan, Eisenberg Institute for Historical Studies, January 2018
4th annual lecture for Martin Luther King Jr. Symposium: 50 Years After His Assassination
"Unfinished Work of Civil Rights Activism on the US-Mexico Border"
Smithsonian's National Museum of American History, November 2017
"1919: Race Wars, Eugenics, and Women's Suffrage"
University of San Diego, Department of History, November 2017
"Recovering Histories of Violence: Where the Archive and the Digital Humanities Meet"
University of Texas Rio Grande Valley, Brownsville, TX, October 2017
"History Harvest: Methods for Recovering Histories of Violence"
Texas State Historical Marker Unveiling, Brownsville, TX, October 2017
"Historical Significance of *La Matanza*, 1915"
Department of History, Florida International University, Miami, FL, September 2016
"Mapping Violence: Possibilities and Limits of Digital Projects for Reckoning with Histories of Violence"
Bancroft Seminar, University of California at Berkeley, Berkeley, CA, May 2016
"Inherited Loss: Reckoning with Anti-Mexican Violence"
Columbia University Center for Oral History, New York, NY, March 2016
"Reckoning with 100 Years of Violence on the US/Mexico Border: Methods for Developing a Public Dialogue"
Columbia University Oral History Master of Arts Program, New York, NY, March 2016
"Oral History and Interdisciplinary Methods for Critical Studies of Race, Gender, and Sexuality"
Bob Bullock Texas State History Museum, Austin, TX, January 2016
"Refusing to Forget: Histories of Anti-Mexican Violence in Texas"
Institute for Collaborative Research, Queens University, Belfast, October 2015
"Mapping and Memorializing State Violence in the Americas"
Center for the Study of Race and Ethnicity in American, Brown University, November 2015
"Regimes of Racial Violence in Texas"
John Nicholas Brown Center for Public Humanities, Brown University, April 2015
"Along the Digital Frontier: Mapping & Memorializing Violence"
Chinese University of Hong Kong, January 2015
"Public Humanities: State of the Field"
Bob Bullock Texas State History Museum, Austin, TX, June 2014
"The KKK in Texas: Ongoing Legacies" Social Justice Series Lectures
David Winton Bell Gallery, Brown University, Providence, RI, October 2013
"Reckoning with Visual Legacies of Anti-Mexican Violence"
Histories of Violence: War and Memory, Symposium at Northwestern University, May 2013
"Symposium Introductory Remarks"
Nettie Lee Benson Latin American Collection, University of Texas at Austin, April 2013
"Searching for Gendered Perspectives at the Benson: A Historical Appraisal"
Department of Ethnic Studies at the University of California, San Diego, January 2013
"Widows the Politics of Mourning: Writing Histories of Violence"
Department of History at the University of Texas, Austin, January 2013
"Anonymity in the Archive: Violence & the US-Mexico Borderlands"
Department of History at the University of California, Santa Cruz, January 2013
"Widows the Politics of Mourning: Writing Histories of Violence"
Institute for Recruitment of Teachers, Philips Academy, Andover, MA, July 2012
"Histories of Violence on the U.S.-Mexico Border"

Rutgers University, History Department,March 2012
"Border Bandits: State Violence & Vigilantism in Texas, 1910-20"
The Berkshire Conference of Women Historians, Amherst, MA, June 2011
"New Directions in Chicana History: A Plenary in Honor of Vicki Ruiz"
Program in Agrarian Studies, Graduate Student Series, New Haven, CT May 2010
"Securing Property: Barbed Wire and the Texas Rangers"
Texas A&M University at Corpus Christi, History Department, October 2010
"Witnessing Tejanas: Survival, Action, and Resistance to Racial Violence in Texas,"

**Papers Read**

Hunter College, City of New York City, Virtual, April 2021
Public Humanities and the Future of the Democratic Commons
"Reckoning with Monuments and Public Commemoration"
Western History Association, Virtual, October 2020
"Memory and Civil Rights Among African American and Latinx Activists"
National Council Public Humanities, Hartford, CT, March 2019
"Methods for Presenting Histories of Violence to the Public."
Organization of American Historians, Philadelphia, PA, April 2019
"20th Century Mexican American Activists: Political Biographies of Gender & Leadership."
American Studies Association, Atlanta, GA, November 2018
"Mapping Segregated Histories: Racial Violence in Texas."
Organization of American Historians, Sacramento, CA, April 2018
"On the Digital Frontier."
Stellenbosch University, Cape Town, South Africa, December 2018
Recognition, Reparation, Reconciliation: Light & Shadow of Historical Trauma
Panel: "Histories of Racial Violence in the US: Digital Collaboration and Dissemination."
American Studies Association, Chicago, IL, November 2017
"Reckoning with Histories of Violence: Methods and Best Practices."
Western History Association, San Diego, CA November 2017
"Historians and Public History."
National Humanities Conference, Boston, MA, October 2017
"Collaboration Gives Memory New Voice."
Organization of American Historians, New Orleans, LA, April 2017
"Teaching Histories of Violence."
Southern Historical Association, FL, November 2016
"Reckoning with Histories of Racial Violence: Trauma, Memory, & the Archive."
American Studies Association, Denver, CO, November 2016
"Public Humanities at Home/Not at Home: American Studies Inside & Outside the Academy."
Latina/o Studies Association, Pasadena, CA, July 2016
"Historians are Publishing, But Who's Reading?: Engaging the Public Humanities."
Organization of American Historians, Providence, RI, April 2016
"Avoiding Blunders in the Classroom: Best Practices for Teaching Histories of Violence."
American Studies Association, Toronto, Canada, October 2015
"New Directions in Latina/o Scholarship."
John Nicholas Brown Center for Public Humanities, Brown University, September 2015
The New Tours Conference: Innovation in Place Based Story-telling

"Visualizing State Violence: Mapping Racial Violence in the Borderlands."
Texas State Historical Association, Corpus Christi, TX, March 2015
"A Century Later: Old Memories and New Interpretations of the 1915-1919."
American Studies Association, Los Angeles, CA, November 2014
"American Empire & Its Objects of Desire: Mutilated Bodies as Art & Artifact."
Organization of American Historians, Atlanta, GA, April 2014
"Histories of Violence: State Violence, Ethical Pedagogies, and Responsible Telling."
Newberry Seminar in Borderlands & Latino Studies Conference, Chicago, IL, April 2014
"'Inherited Loss': Reckoning with Anti-Mexican Violence, 1910- Present."
Harrington Faculty Fellow Symposium, University of Texas, Austin, February 2014
"Pushing Borders: Extending Mexican, US, & Chicano Historiographies."
American Studies Association, Washington DC, November 2013
"Beyond the Logic of Debt, Toward an Ethics of Collective Dissent."
Organization of American Historians, San Francisco, CA, April 2013
"Borderline Memories: Remembering Histories of the U.S.-Mexico Borderlands."
American Studies Association, San Juan, Puerto Rico, November 2012
"Fear and Loathing in the Archives: Field Notes on Histories of Violence."
Western History Association, Denver, CO, October 2012
"The Sanguinary Record of Cotulla, TX: Mexican Widow Indemnities."
Western Association of Women Historians, Berkeley, CA, May 2012
"Policing Texas Property: Mexican Widows and Vigilante Lynchings."
Rutgers University, Center for Race and Ethnicity, Newark, NJ, April 2012
"Vigilantism, Race, and the State."
American Studies Association, Baltimore, MD, October 2011
"Witnessing, Violence, & the (Im)Possibilities of Reparations."
*Voz Latina* Symposium, Princeton University, Princeton, NJ, October 2011
"Border Bandits: Myth of the Texas Rangers & U.S-Mexico Border Security."
American Historical Association, Pacific Coast Branch Seattle, WA, August 2011
"'Why Make More Orphans?': Gender and the Politics of Silence and Survival."
National Association of Chicano/Chicana Studies, McAllen, TX, February 2011
"Unquantifiable Life: Tejana Widow Indemnities & the U.S.-Mexico General Claims Commission of 1923."
American Historical Association, Pacific Coast Branch, Santa Clara, CA, August 2010
"Narrating Gendered Silence: Racial Violence in the Early 20th Century Texas."
Association for Cultural Studies, Crossroads for Cultural Studies Conference Lingnan University, Hong Kong, June 2010
"Technologies of Security."
The Humanities Institute at Stony Brook University, Voices in Cultural Studies Series, Stony Brook, NY, April 2010
"Tools of Discipline: Photography, Barbed Wire, & Texas Rangers."
Yale University Women, Gender, and Sexuality Studies Working Group, December 2009
"Tejana Witnesses to Racial Violence in Early 20th Century Texas."
American Studies Association National Conference, Philadelphia, PA, October 2007
"Importing Nationalism: Mexican Escuelitas & Performing Citizenship in Texas."
Mellon Mays Annual Graduate Student Conference, New York, NY, June 2006
"Chicana Legacies of Collaboration and Leadership in Uvalde, TX."
Oral History Association National Conference, Providence, RI, November 2005
"MAPA: Women's Activism in the 1970 Uvalde School Walkout."

**Service**

**Service to the University**

Department of History, University of Texas at Austin

Provost's Early Career Postdoctoral Fellowship, Department Hiring Committee Co-Chair, 2022
Lathrop Prize Committee, 2021
Provost Faculty Recruitment Hiring Program, Department Hiring Committee, 2021

*Department of American Studies, Brown University*

PhD Graduate Admissions Committee, 2015, 2016, 2019
Tam Tran Memorial Lecture Committee, 2017 – 2020
MA in Public Humanities Admissions Committee, 2019
Department Curriculum Committee, 2014 – 2017
Public Humanities Undergraduate Curriculum Committee, 2015-2017
US Latino Studies Initiative Committee, 2014-2017
Ethnic Studies Concentration Advisor, 2014-2016
Ethnic Studies Curriculum Revision Committee, 2014-2016
Delegate to New England Consortium for Public Humanities, 2015, 2016
Presidential Postdoctoral Fellow Selection Committee, 2015
Ethnic Studies Thesis Award Committee, 2015
American Studies Thesis Award Committee, 2015
Faculty Liaison for the Sheridan Center for Teaching, 2014-2015
Faculty Delegate for Brown University & Chinese University Hong Kong Collaboration, 2015

*Brown University*
Undergraduate Teaching and Research Assistant Selection Committee, 2019
Information Technology Advisory Board, 2017 - Present
.5 Graduation Commencement Faculty Speaker, December 2018
First Year Advising, 2015 – 2017
Undocumented Student Advisory Board, 2016-2017
Transformative Conversations @ Brown Planning Committee, 2015
Office of Diversity National Diversity Summit Documentary Committee, 2015
Transformative Conversations @ Brown Faculty & Staff Facilitator Training, 2015
Transformative Conversations @ Brown Faculty and Administrative Leader Workshop Facilitator, 2015

*University of Texas at Austin*

Mexican American Studies Curriculum Committee, 2012-2013
Carlos E. Castañeda Postdoctoral Fellow Selection Committee, 2012-2013

*Yale University*

Public Humanities Initiative at Yale, Steering Committee, 2008-2012
Graduate Teaching Center Graduate Fellow, 2009-2011
Public Humanities Initiative at Yale Research Associate, 2007-2010
Office for Diversity and Equal Opportunity Fellow, 2007-2009
Mellon Mays- Edward Bouchet Fellowship Admissions Committee, 2008-2010
Mellon Mays- Edward Bouchet Fellowship Advisory Board, 2006-2010

**Service to the Profession**

Social Science Research Council-Mellon Mays Graduate Initiatives Program, Planning and Advisory Committee (PAC), 2018-2023
Recovering the US Hispanic Literary Heritage, Board of Advisors, 2019-2022
Organization of American Historians, Conference Program Committee, 2022-2023
Andrew W. Mellon Foundation, expert consultation for the National Museum of American Latino (NMAL) February – March 2021
Organization of American Historians Lawrence W. Levine Book Award Committee, 2021
Organization of American Historians, Executive Director Search Committee, 2019
Manuscript Evaluator, *University of Texas Press*, 2019
Manuscript Evaluator, *American Quarterly*, 2017
Manuscript Evaluator, *Radical History Review*, 2017
Organization of American Historians, Committee on Committees, 2015 – 2017
National Association for Chicana Chicano Studies Tejas Foco, Best Dissertation Committee, 2014
American Studies Association, Toronto, Panelist for ASA Student Committee on Job Market Interviews, October 2015
American Studies Association, Los Angeles, CA, ASA Student Committee, "Demystifying Fellowship and Grant Applications" *Audience*: graduate students applying for research grants and completion writing fellowships, November 2014
American Studies Association, San Juan, Puerto Rico, ASA Student Committee, "Mock Job Talk Workshop Facilitator" *Audience*: advanced graduate students on academic job market, November 2012

**Teaching**

**Courses**

The University of Texas at Austin
Mexican Americans in the United States (2021, 2022)
Introduction to Public History (2021, 2022)
Mapping Racial Violence in Texas (2021)
Brown University
Mapping Violence (2020)
Introduction to Public Humanities (2019)
Introduction to Latinx History (2014, 2017, 2020)
Reading and Righting Histories of Violence (2016, 2019)

Introduction to American Studies: Graduate Seminar (2015, 2016)
Race and Remembering (2014, 2015, 2016)
Senior Seminar in Ethnic Studies (2016, 2017)
The University of Texas at Austin, Center for Mexican American Studies
Introduction to Cultural Studies (2012, 2013)

**Guest Lectures on Campus**

*Brown University*
Department of Africana Studies, *Black Student Protest from Jim Crow to the Present*
"Archives and Radical Recovery" March 2017
Department of American Studies, *La Frontera* First Year Seminar
"Constructed Borders" March 2017
Department of American Studies, Introduction to American/Ethnic Studies
"Border Violence" September 2016
Department of American Studies, Introduction to American/Ethnic Studies
"Histories of Constructing the US-Mexico Border" October 2015
Department of American Studies, Introduction to American/Ethnic Studies
"Feminist Research Methods in Ethnic Studies," November 2014

*University of Texas at Austin*
Department of Mexican American and Latino Studies
"The Injustice Never Leaves You: Methods of Historical Recovery," September 2018
Department of American Studies
"Racial and Gender Violence in Texas," November 2013
Department of American Studies
"Vernacular Histories and Methods of Histories of Violence," October 2012

*Yale University*
Department of American Studies, Introduction to Ethnicity, Race and Migration,
"Decolonizing the Mind: Rethinking Public Education," April 2009

**Community Engagements At Brown University**

Brown Center for Students of Color, August 2017, 2016, 2015
*Panelist*: Third World Transition Program Faculty Panel
Leadership Alliance, July 2017
Lecture: "Navigating Academia: Research, Advising, and Public Service"
First Generation College and Low Income Student Center, March 2016
*Workshop*: Developing Honors Thesis Proposals
Brown Center for Students of Color, November 2015
*Keynote speaker*: Latinx Ivy League Conference
Mellon Mays Undergraduate Fellowship Commencement, March 2015
*Alumni Lecture*: "From MMUF to Mellon + PhD"
Department of American Studies, May 2015
"A Global Public Humanities? Reflections on the CUHK and JNBC Umbrella Collaboration"

Brown Center for Students of Color, Hispanic Heritage Series, November 2014
*Panelist*: "Latino Success Stories"
Department of American Studies, September 2014
*Workshop*: Crafting Job Market Cover Letters
Mellon Mays Undergraduate Fellowship, May 2014
*Commencement Address*: "Leveraging a PhD for Social Change"
Yale University, Department of American Studies, April 2013
*Workshop*: Preparing for the Academic Job Market
Latino/a Alumni Committee Annual Gala, May 2008
*Keynote Speaker*: "Lessons to Teach: Latinos/as in Higher Education"
Pembroke Club – Swear Center Fund Raiser, April 2006
*Guest Speaker*: Addressed Pembroke alumni organization on behalf of Brown University Swearer Center discussing importance of undergraduate research,
Brown University Corporation Board Member Dinner, October 2005
*Guest Speaker*: Highlighted the importance of funding undergraduate research

**Community Engagements – Diversity and Inclusion**

Mellon Mays Graduate Student Conference – Columbia University, June 2019
Conference organizer
Workshop facilitator: "Thriving First Year of Graduate School"
Chair: "Coming Home: Migration & Nationalism in the US & South Africa"
Mellon Mays Graduate Student Conference – Columbia University, June 2018
Conference organizer
Workshop facilitator: "ABD Candidates: Thriving in Graduate School"
Chair: "Claiming Space: Race, Citizenship, and Belonging in the Borderlands"
Institute for Recruitment of Teachers - Philips Academy at Andover, July 2011
"Gender and the Politics of Performance: Seminars, Research, & Mentoring in Graduate School"
"Graduate Seminars: Skills for Being an Effective and Confident Participant"
"Reading Across Disciplines: Strategies for Critical Reading"
*Audience*: undergraduate applicants to graduate school
Institute for Recruitment of Teachers - Philips Academy at Andover, July 2009/2010
"'When Keeping it Real Goes Wrong': Navigating Power Dynamics in Graduate School"
*Audience*: undergraduate applicants to graduate school
Institute for Recruitment of Teachers - Philips Academy at Andover, July 2008/2007
"Surviving and Thriving: Overcoming Obstacles in First Years of Graduate School"
*Audience*: undergraduate applicants to graduate school
Texas A&M University at Corpus Christi History Graduate Students, October 2010
Writing History: Methods, Archives, and Dissertations"
*Audience*: graduate students enrolled in History Graduate Program
Graduate Teaching Center, Yale University, January 2010
"Fundamentals of Teaching in the Humanities: Four Part Series"
*Audience*: Graduate Teaching Fellows, Postdoctoral Fellows, and Faculty

Teaching Day at Yale University, New Haven, CT

*Lecture*: "Advice for First Year Teachers at Yale," September 2009

Graduate Teaching Center, Yale University, October 2009/January 2010

"Diversity in the Classroom: Strategies for Teaching Controversial Topics"

"Diversity in the Classroom: Panel Discussion with Educators"

"Diversity in the Classroom: Classroom Scenarios"

*Audience*: Graduate Teaching Fellows, Post-Doctoral Fellows, and Faculty

Graduate Teaching Center, Yale University, September 2009

"Fundamentals of Teaching in Political Science: Three Part Series"

*Audience*: Political Science Graduate Fellows, Post-Doctoral Fellows, & Faculty

Office of Diversity and Equal Opportunity, Yale University, February/October 2009

"Jumping the Hurdles: Passing Qualifying Exams in the Humanities"

*Audience*: graduate students at Yale