Attachment 6

**EXPERT REPORT OF ALLAN J. LICHTMAN**

***Voto Latino et al. v. Scott et al.*, Case No. 1:21-cv-00965 (W.D. Tex.)**

## I.    Statement of Purpose

I have been retained by the plaintiffs to offer my opinions on the "Senate Factors" detailed in a report that accompanied the 1982 renewal of the Voting Rights Act (the "VRA") by the United States Senate Committee on the Judiciary as applied to the redistricting plans adopted by Texas in 2021. These factors are relevant in determining whether an election standard, practice, or procedure viewed in light of the "totality of the circumstances" violates Section 2 of the Voting Rights Act.

My analyses and opinions in this litigation are based on historical, political, and statistical information gathered and reviewed in my capacity as an expert in political history, political analysis, and historical and statistical methodology. The report is not intended to provide any legal opinions. My fee in this matter is $600 per hour. No part of my compensation is dependent upon the conclusions that I reach or the opinions that I offer.

## II.    Summary of Opinions

After an analysis based on my experience and the evidence, methodology, and analysis, I have reached the following opinions:

1. Texas has a long and continuous history of significant, official voter discrimination.

2. Voting is highly polarized along racial lines in the state.

3. Texas has unusually large and heavily populated election districts.

4. The effects of historical and ongoing discrimination in voting, education, and law enforcement are manifest in substantial racial disparities in income, unemployment, wealth, welfare dependence, home ownership, educational attainment and performance, the availability of vehicles, and health indicators. In turn, these socioeconomic disparities

manifest in lower turnout for minorities than for Anglos in Texas.[1]

5.  Texas Republican politics is rife with racially-charged, overt, and discriminatory political appeals.

6.  Minorities are substantially underrepresented among elected officials in Texas, including its congressional delegation.

7.  Elected officials in Texas have demonstrated a lack of responsiveness to the particularized needs of minorities in critical policies on voting, health care, education, law enforcement, and immigration.

8.  The policy rationale for the 2021 Texas congressional redistricting plan (C2193) and Texas house redistricting plan (Plan H2316) is tenuous as it fails to reflect the growing and shifting population of the state.

9.  As gauged by the Senate factors, this totality of circumstances shows that there are substantial structural barriers in Texas that impede the ability of minorities to participate fully in the political process and elect candidates of their choice.

10.  These many impediments magnify the discriminatory effects on minorities of the 2021 Texas congressional and house redistricting plans.

## III.    Qualifications

This study draws on my experience in political history, political analysis, historical and statistical methodology, and my expertise in voting rights litigation. I am a Distinguished Professor of History at American University in Washington, D.C., where I have been employed for 48 years. Formerly, I served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University. I received my B.A. in History from Brandeis University in

---

[1] Unless otherwise indicated, the term "Anglo" and "White" are used interchangeably to refer to non-Hispanic whites.

1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data.

As referenced in my attached curriculum vitae, I have written numerous scholarly works on quantitative methodology in the social sciences, including the use of quantitative and qualitative methods to conduct contemporary and historical studies and the application of social science analysis to civil rights issues. My most recent books from 2017 to 2021 examine the history and current status of voting rights in America.

I have worked as a consulting or testifying witness for both plaintiffs and defendants in more than 100 voting and civil rights cases, providing testimony on many issues, including the Senate Factors. My work includes cases for the United States Department of Justice and cases for many civil rights organizations. I have also worked as a consulting or testifying expert numerous times for state and local jurisdictions. My work in Texas includes *Texas v. United States*, No. 1:11-cv-1303-RMC-TBG-BAH (D.D.C. 2012), *Perez v. Perry*, No. 5:11-cv-360-OLG (W.D. Tex. 2011), and *Harding v. Cnty of Dall.*, 336 F. Supp. 3d 677, No. 3:15-cv-131-D (N.D. Tex. 2018). And significantly, retired Associate Justice Anthony Kennedy authoritatively cited my statistical analysis in his majority opinion in *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006).

## IV.    Senate Factors Analysis

In a report that accompanied the 1982 renewal of the Voting Rights Act, the Senate Committee on the Judiciary set forth several "Senate Factors" for courts to consider when assessing whether, under the totality of circumstances, an electoral system interacts with social and historical conditions to cause an inequality in the political process.[2] These factors are:

---

[2] *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986) (quoting S. Rep. No. 97-417, at 28-29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206-07).

- **Factor 1**: The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process;

- **Factor 2**: The extent to which voting in the elections of the state or political subdivision is racially polarized;

- **Factor 3**: The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

- **Factor 4**: If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

- **Factor 5**: The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

- **Factor 6**: Whether political campaigns have been characterized by overt or subtle racial appeals; and

- **Factor 7**: The extent to which members of the minority group have been elected to public office in the jurisdiction.

The Judiciary Committee also noted that the court could consider additional factors such as:

- **Factor 8**: Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

- **Factor 9:** Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.[3]

As noted below, an examination of these factors reveals that all factors except the fourth are present in Texas. Each factor is discussed separately below.

**Factor 1: History of Official Voting-Related Discrimination**

Texas has a long and continuing history of discrimination against minorities—most notably

---

[3] S. Rep. No. 97-417, at 28-29 (1982).

Black and Hispanic Texans—in elections and voting. This history has been recognized by federal courts, including, for example, *LULAC v. Perry*, 548 U.S. 399, 439 (2006) (recognizing that Texas has a "long history of discrimination against Latinos and Blacks" and noting that "other courts have elaborated on this history with respect to electoral processes"),  *Veasey v. Abbott*, 830 F.3d 216, 264 (5th Cir. 2016) (en banc), cert. denied (noting that "the district court held that SB 14 acted in concert with current and historical conditions of discrimination to diminish African Americans' and Hispanics' ability to participate in the political process."), and *Perez v. Abbott*, 253 F. Supp. 3d 864, 959 (W.D. Tex. 2017) (recognizing that Texas has a pattern of enacting "restrictive and discriminatory voting laws . . . in response to a perception of increased voting power by emerging demographic groups.").

As demonstrated below, racial discrimination in voting by the state of Texas began before those decisions and has persisted since.

### A.  Pre-Twenty-First Century Discrimination Against Minority Texans

Texas has a long-standing history of engaging in systemic discrimination to limit the ability of Black and Hispanic Texans to participate fully in the political process and to elect their candidates of choice. In 1845, Texas prohibited people of Mexican descent from organizing political rallies or serving as election judges. Years later, during the period of Reconstruction following the Civil War, African Americans were enfranchised. In response, Texas actively moved to limit the ability of African Americans to exercise their newfound political rights. In 1866, an all-White Texas constitutional convention prohibited freed slaves from voting, holding office, or serving on juries. And, after Reconstruction, Anglo-dominated Texas governments established a rigid system of Jim Crow discrimination against African American and Hispanic Texans.

Under Jim Crow, African American and Hispanic Texans were subjected to discrimination

in all facets of life, including in schools, healthcare, transportation, employment, and through the criminal justice system. Texas also sharply curtailed African American and Hispanic political rights through seemingly race-neutral laws like the poll tax and the literacy test, which officials administered in only English to prevent Hispanics from voting. Texas further suppressed the minority vote by purging voter rolls and the closing of polling places – two practices that persist today.

To assure Anglo domination of the electorate, Texas retained an all-White primary system from 1895 to 1944. In 1927, the U.S. Supreme Court struck down the Texas all-White primary as a violation of the Equal Protection Clause of the Fourteenth Amendment. In response, Texas quickly revised its law in a way that enabled the Democratic Party to stipulate that "all white Democrats . . . and none other" shall participate in its primaries. In 1932, the Court invalidated the new law, and the Legislature passed yet another White primary statute to evade this decision. Texas abandoned its White primary after being compelled to do so by the 1944 U.S. Supreme Court case of *Smith v. Allwright*.

In 1972, the Raza Unida Party, formed by Mexican-American activists, won 6% of the vote for Governor. One year later, Texas changed its law to only pay for the primaries of political parties that won more than 20% of the vote in the last election. When federal courts blocked that law as discriminatory, Texas purged the voter rolls of all registered voters and required everyone who wanted to vote to re-register.

As a result of Texas's long history of discrimination in voting, in 1975, Congress covered Texas under Section 5 of the Voting Rights Act, which required preclearance by the U.S. Department of Justice or a federal court for all changes in voting practices and procedures, including voting requirements and redistricting. In each redistricting cycle since 1980 – the first in

which Texas was covered under Section 5 – the United States Department of Justice (DOJ) has objected to or intervened in litigation to block at least one of Texas's statewide redistricting plans for Congress or the state Legislature. These objections were based on the finding that Texas did not show these plans lacked discriminatory intent or effect. Texas, which has had more preclearance objections than any other state, is the only state with this consistent record of DOJ intervention against statewide redistricting plans.

### B. Modern Discrimination Against Minority Texans

Racial discrimination in Texas is not limited to its early history. The ongoing official discrimination in voting has continued through 2021 and is the primary focus of this examination of Senate Factor 1.

In 2011, Texas enacted the most restrictive photo identification law in the nation at that time. Every court that has reviewed this act has found that it discriminates against minority voting opportunities in Texas. These rulings include a 3-0 decision by the District Court of the District of Columbia (prior to the U.S. Supreme Court's nullifying Section 5 of the Voting Rights Act),[4] a decision by the Southern District of Texas,[5] a 3-0 decision by a panel of the Fifth Circuit,[6] and a 9-6 *en banc* decision by the Fifth Circuit.[7]

As discussed above, the lower court found that Texas had intentionally discriminated against minorities in adopting its voter photo identification law. In 2016, an en banc panel of the U.S. Court of Appeals for the Fifth Circuit found that Texas's voter photo identification law "*itself* caused minorities to disproportionately lack the documentation that is required to vote by dictating

---

[4] *Texas v. Holder*, 888 F. Supp. 2d 113 (D.D.C. 2012).
[5] *Veasey v. Perry*, 71 F. Supp. 3d 627 (S.D. Tex. 2014).
[6] *Veasey v. Abbott*, 796 F.3d 487 (5th Cir. 2015).
[7] *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc).

that the documents and IDs required would be those that minorities disproportionately lack."[8] The Fifth Circuit continued: "We cannot ignore that in passing SB 14, the Legislature carefully selected the types of IDs that would be required to vote. In doing so, the Legislature selected IDs that minorities disproportionately do not possess and excluded IDs that minorities possess in greater numbers, without providing sufficient justification for those choices."[9]

With respect to intentional discrimination, the Court found that, in sum, "although some of the evidence on which the district court relied was infirm, there remains evidence to support a finding that the cloak of ballot integrity could be hiding a more invidious purpose."[10] The Court remanded the issue of discriminatory intent to the district court which again found that Texas had adopted its voter photo identification law with the intent to discriminate against minorities.[11] However, the issue became moot after Texas modified the law to include the option to present alternative identification and sign a reasonable impediment declaration for failing to obtain an authorized form of identification.[12]

In 2017, the Texas Legislature eliminated the option for straight-ticket or one-punch voting for all elected offices in Texas, almost entirely along party lines. That option had existed since 1911. The ban has a disproportionate impact on large urban counties like Dallas and Harris, with predominantly minority populations. The ballots in such counties could have as many as 65 to 100 contests on the ballot.[13] An analysis by retired Professor Stefan Haag of Austin Community College, who has been studying straight-ticket voting ("STV") for many years, and William R. Young, Director of the college's Center for Public Policy and Political Studies, documents the

---

[8] *Id.* at 264 n. 61.
[9] *Id.*
[10] *Id.* at 241.
[11] Order on Claim of Discriminatory Purpose, *Veasey v. Abbott,* Civ. Action No. 2:13-CV-193, (S.D. Tex. April 10, 2017), ECF No. 1023.
[12] Order at 3, *Veasey v. Abbott*, 888 F.3d 792 (5th Cir. 2018), No. 17-40884, 2018 WL 1995517.
[13] 05/05/2017 Texas Legislative Session at 5:18-6:2; 72:17-19.

differential impact of the ban. They found that in Harris County – the most populous county in the state, with 4.8 million persons – the five "precincts with the largest percentage of African American voters" had a "straight- ticket vote [that] was 82.6% of the total vote." Also, "in the five Harris County precincts with the largest percentage of Hispanic voters, the straight-ticket vote constituted 78.1% of the total vote."[14] Haag and Young concluded that "straight-ticket voting is more common among racial and ethnic minorities and in urban areas."[15]

In January 2019, the Texas Secretary of State's office issued Election Advisory 2019-02, which promised to dispatch to county voter registrars "actionable information" regarding more than 95,000 potential instances in which non-citizens had registered to vote. The Secretary directed county registrars to send letters to these voters warning that their registration could be purged for a lack of citizenship. However, this list was fundamentally flawed: it did not account for prior non-citizens who had obtained their citizenship before registering to vote. Only after the League of United Latin American Citizens ("LULAC") filed a voting rights lawsuit did Secretary of State David Whitley agree to a settlement under which he would "rescind Election Advisory 2019-02 and advise county voter registrars and elections administrators to take no further action on any data files that the Secretary of State sent them in connection with Election Advisory 2019-02."[16]

In recent years, Texas has also taken additional steps to make voting less accessible by closing numerous polling places, especially in heavily minority areas. According to a study by the Leadership Conference on Civil and Human Rights, Texas closed 750 polling places between 2012

---

[14] Stefan Haag & William R. Young, Studies of Political Statistics: The Effects of Eliminating Straight-Ticket Voting in Texas, Report # 15, Austin Community College Center for Public Policy and Political Studies 2-3 (August 2019), at 2.
[15] Id. at 19.
[16] Settlement Agreement at 4, Tex. League of United Latin Am. Citizens v. Whitley, No. SA-19-CA-074-FB (W.D. Tex. 2019), https://www.aclutx.org/sites/default/files/4-25-10_voter_purge_settlement_agreement.pdf.

and 2018, by far the most in the nation.[17] While many of these closures were in conjunction with the adoption of voting centers, many hundreds of polling places were still closed without a conversion to voting centers, including in counties with substantial minority populations. The report notes that voters in counties that still hold precinct-style elections have 250 fewer voting locations than in 2012.[18]

The report further notes that "Nueces County, which is 63% Latino . . . has closed 37 polling places in its shift to vote centers — going from 121 voting locations in 2012 to 84 in 2018. This reduction occurred while the county also failed to provide voting information in Spanish during the 2016 election, a violation of its still-binding commitment under the VRA."[19] Facing South noted that "[o]f those 750 shuttered polling places, [542] were in counties that gained the most black and Hispanic residents in that time."[20] Beth Stevens, Director of the Voting Rights Program at the Texas Civil Rights Project, noted that closures pose "a real barrier" to voting:

> "Voters often don't hear that a beloved polling location near their home has closed until Election Day, forcing them to make disruptive changes on the spur of the moment to work schedules, childcare plans, and transportation arrangements. Even when they do hear about it ahead of time, voters may have to have to choose between going to a new polling place significantly further away and working enough hours that day to put food on the table — an impossible choice that no one should ever have to face. And it's a choice that usually falls on the most vulnerable voters, thereby reinforcing existing power structures and sending a message to these voters that they are less important than others in the eyes of their government."[21]

Hispanic and Black Texans are disproportionately represented among these "vulnerable voters." As discussed further below, due to the history of discrimination outlined above, these groups have,

---

[17] Leadership Conf. Educ. Fund, Democracy Diverted (Sept. 2019), http://civilrightsdocs.info/pdf/reports/Democracy-Diverted.pdf (last accessed May 19, 2022).
[18] *Id.* at 27.
[19] *Id.* at 28.
[20] Sue Sturgis, INSTITUTE INDEX: Behind The Long Lines That Plagued The Texas Primary, Facing South, (Mar. 9, 2020), https://www.facingsouth.org/2020/03/institute-index-behind-long-lines-plagued-texas-primary (last accessed May 19, 2022).
[21] Democracy Diverted at 27.

on average, substantially less economic resources than Anglo Texans and substantially lower levels of educational attainment.

### C. Discrimination Against Minority Texans in the Redistricting Process

In the redistricting that followed the 2010 Census, Texas was the only state in the union to have any one of its redistricting plans fail to achieve preclearance under Section 5 of the Voting Rights Act.[22] All three of Texas's redistricting plans – Congress, the State House, and the State Senate – failed to achieve preclearance.[23] To avoid a Section 5 objection, Texas sought a declaratory judgment in its favor on the plans from the D.C. District Court. The D.C. Court denied preclearance for all three plans and found that Texas intentionally discriminated against minority voters in its congressional and state Senate plans.[24] In particular, the Court found that the congressional plan had the intent and effect of discriminating against voters in the Dallas-Fort Worth area (DFW), despite significant minority population growth in the area. Although minorities constituted 55% of the voting-age population in Dallas County and 37% of the voting-age population in Tarrant County, Texas's proposed congressional plan would have had ten districts "converge in the area" to create a single majority-minority district. This was achieved through the creation of bizarrely shaped districts that fractured minority populations into Anglo-dominated districts and by concentrating "a large part of Dallas County's minority population into enacted CD 30," the one existing majority-minority district. The court noted that "the Congressional Plan runs down the center of Tarrant County in an exaggerated 'lightning bolt'" shape, which "divides

---

[22] Ibid; United States Department of Justice, "Section 5 Objection Letters," https://www.justice.gov/crt/section-5-objection-letters.

[23] Ballotpedia, "State Legislative and Congressional Redistricting After the 2010 Census," https://ballotpedia.org/State_Legislative_and_Congressional_Redistricting_after_the_2010_Census; Enrique Rangel, "Federal Court Strikes Down Texas' Redistricting Plans," Lubbock Avalanche-Journal, 28 August 2012, https://www.lubbockonline.com/story/news/state/2012/08/29/federal-court-strikes-down-texas-redistricting-plans/15134615007/.

[24] *Texas v. United States*, 887 F.Supp. 2d 133, 159, 166 (D.D.C. 2012), *vacated and remanded*, 570 U.S. 928 (2013).

two significant minority communities[.]"[25] Although Section 5 is no longer operative, and this decision was vacated, the substance of the findings is relevant to assessing official discrimination in voting by the state of Texas.

A 2017 decision by the three-judge court in *Perez* v. *Abbott* found that the state of Texas's 2011 congressional plan had the intent and effect of discriminating against minority voters in the DFW area. The Court found that "CD30 demonstrates a classic racial gerrymandering technique of packing minority voters into CD30 to waste their votes, while moving Anglos into neighboring districts to increase their Republican performance."[26] The Court further found that "race was used as a proxy for political affiliation," and that it "was done intentionally to dilute minority voting strength."[27] The Court additionally recognized the intent and effect of cracking as well as packing minority communities in DFW: "the bizarre shapes and the numerous split precincts, which indicate the use of racial data, support an inference that the mapdrawers intentionally used racial criteria to split the minority population."[28] Ultimately, the *Perez* court concluded, "While there is certainly an overlap between cracking and packing Democrats and cracking and packing minorities, the Court finds that Plaintiffs have satisfied their burden of showing that intentional minority vote dilution was a motivating factor in the drawing of district lines in DFW and that mapdrawers intentionally diluted minority voting strength in order to gain partisan advantage."[29]

The court then established interim remedial plans for Congress and the State House (after a compromise had been reached on the State Senate plan). It then redrew its plans after the U.S. Supreme Court ruled that the initial remedial plans did not give sufficient deference to the

---

[25] *Id*., "App. to the Mem. Opinion," at 221.
[26] *Perez*, 253 F. Supp. 3d at 953.
[27] *Id*.
[28] *Id*.
[29] *Id*. at 949.

decisions of the Texas state legislature. Texas officially adopted the interim, more deferential plans in 2013. Again, the court found that adoption of the 2013 plans continued Texas's intentional discrimination against minorities. However, the U.S. Supreme Court overturned the ruling on the 2013 plans. Still, it did not overturn the finding of intentional discrimination regarding the 2011 plans that Texas had adopted of its own volition without court compulsion.[30]

### D. Discrimination Against Minority Texans in Recent Elections

In 2020, prior to the general election and during a deadly pandemic, Texas Governor Greg Abbott issued an executive order— eventually upheld by the State Supreme Court after being struck down by an intermediate appeals court—limiting each county in the state to a single drop box location for the delivery of absentee votes.[31] Majority-minority Harris County, which has 3.5 million residents of voting age, opened 12 drop box locations before the executive order. However, following the issuance of the executive order, it reduced to only one drop box location – the same number of boxes as predominantly Anglo King County, which has fewer than 200 residents of voting age. Notwithstanding the significant reduction in drop box locations,  Governor Abbott extended early voting by one week because of the pandemic.[32]

After Joe Biden defeated Donald Trump in the 2020 presidential election, Republicans in Texas used unsupported allegations about voter fraud to justify the enactment of Senate Bill 1 (SB 1), one of the most restrictive voter laws in the country, during its most recent legislative session. The same Legislature that enacted the congressional redistricting plan along party lines also enacted this restrictive law along party lines. It did so despite evidence that voter fraud in Texas

---

[30] *Abbott v. Perez,* 585 U.S. ___ (2018).
[31] Jolie McCullough, "Texas counties will be allowed only one drop-off location for mail-in ballots, state Supreme Court rules," Texas Tribune, 27 October 2020, https://www.texastribune.org/2020/10/27/texas-voting-elections-mail-in-drop-off/.
[32] Eric Bradner and Diane Gallagher, "Texas Legislature Sends Voting Restrictions Bill to Governor Abbott's Desk," CNN (Aug. 31, 2021, 5:47 PM), https://www.cnn.com/2021/08/31/politics/texas-voting-bill/index.html.

was vanishingly small and inconsequential. After spending approximately 22,000 hours looking for fraud in 2020, the Attorney General's office discovered only 16 probable cases.[33] There are nearly 17 million registered voters in Texas and Texas voters cast more than 11 million ballots in 2020.[34] Nevertheless, the criminalization of voting and potential referrals to the Attorney General could chill voting by minorities who have been the target of prosecutions for alleged voter fraud.[35]

SB 1 imposes disparate burdens on minorities and establishes mechanisms that may be used by individuals to intimidate minorities and discourage their voting.[36] For example, SB 1 expands access to partisan poll watchers,[37] a tool that has been used to intimidate Black and Hispanic voters. In April 2021, the non-partisan group Common Cause released a recording that outlined the "Harris County Republican Party Election Integrity Program." The presentation by a Republican County Precinct Chair called for the recruitment of a 10,000 person "Election Integrity Brigade" for Harris County. The goal was to recruit and train 1,041 election judges, 2,812 election clerks, and 6,219 poll watchers. If the program achieved only a fraction of this goal, it would greatly expand the Republican presence of just 118 partisan poll watchers during early and election day voting in the presidential general election of 2020.[38]

The program seeks to recruit people from the suburbs to work in the predominantly-

---

[33] Taylor Goldenstin, "Ken Paxton's Beefed-Up Fruad Unit Closed 16 Minor Cases," 21 December 2021, *Houston Chronicle*, https://www.houstonchronicle.com/politics/texas/article/Ken-Paxton-s-beefed-up-2020-voter-fraud-unit-15820210.php.

[34] Jane C. Timm, "Texas GOP Launches Avalanche of Bills to Curtail Voting," NBC News, (Mar. 15, 2021, 5:01 AM), https://www.nbcnews.com/politics/elections/texas-gop-launches-avalanche-bills-curtail-voting-n1260747.

[35] Ashley Lopez, "A Texas Bill Would Make More Voting Crimes. Dems Say Mistakes May Put Voter in Jail," CNN, (Aug. 4, 2021, 7:42 AM), https://www.npr.org/2021/08/03/1024108240/texas-voting-bill-would-add-criminal-penalties-such-as-helping-others-vote.

[36] Texas Legislature Online, S. B. No. 1, https://capitol.texas.gov/tlodocs/871/billtext/pdf/sb00001i.pdf (last accessed May 19, 2022).

[37] *Id.*, at 13-15.

[38] Taylor Goldenstein, Video Shows GOP Targeting Houston Minority Communities With Poll Watcher 'Brigade,'" Houston Chronicle, (Apr. 15, 2021, 9:25 AM), https://www.houstonchronicle.com/politics/texas/article/Video-shows-GOP-targeting-Houston-minority-16089177.php, includes map . Recording at https://vimeo.com/534438337?utm_campaign=5370367&utm_source=affiliate&utm_channel=affiliate&cjevent=ba7e1f9e7d2711ec80b4083b0a82b836&clickid=ba7e1f9e7d2711ec80b4083b0a82b836.

minority neighborhoods of the county. The speaker explained, "[w]e've got to get folks in these suburbs out here that have, you know, a lot of Republican folks that got to have the courage" to work in the heavily minority precincts of Houston.[39] He continued to claim falsely that minority areas are rife with fraud at the polls. If "we don't do that, this fraud down in here is really going to continue," he added, using an interactive map to circle city precincts.[40] He stressed that the purpose of training was to enable Republican poll watchers to "stand their ground if debating with an election judge."[41] As a result of SB 1 giving partisan poll watchers greater access to polling places,[42] challenging election judges will be much easier than before. To support the program, the speaker noted that a Republican donor had previously provided a limited amount of funds to pay poll watchers and raised the prospect of additional fund raising. The media extensively covered the recording and Common Cause discussed it at a hearing of the Senate Committee on State Affairs.[43]

SB 1 also requires the matching of registration rolls with citizen data, a fraught process that Texas botched in 2019.[44] Although the wording of SB 1 is consistent with the settlement agreement, verifying citizenship is an inherently difficult and error-prone task. The libertarian CATO Institute studied detainers issued by Immigration and Customs Enforcement (ICE) to alleged illegal, deportable immigrants in Travis County, Texas. A study by the CATO Institute found that "[f]rom October 2005 to August 2017, 814 targets of ICE detainers in Travis County— 3.3 percent of all requests—claimed U.S. citizenship and presented officers with a Social Security

---

[39] Ibid.
[40] Ibid.
[41] Ibid.
[42] Ibid.
[43] *Id*., 16463, Senate Committee on State Affairs, 01:12:18.
[44] *Id*., S. B. 1, at 3.

number (SSN)."[45] CATO additionally found that [t]he rate of wrongful detainer issuances in Travis County implies that ICE targeted at least 3,506 U.S. citizens in Texas."[46]

SB 1 also targets absentee voting. Absentee voters must now provide the number on either their driver's license, election identification certificate, or personal identification card issued by the Department of Public Safety. Alternatively, a voter may provide the last four digits of their Social Security number on both their absentee ballot application form and again on their ballot return envelope. Voters who have not been issued one of the beforementioned numbers may inform the appropriate election official that they do not have the required information by filing a statement. Absentee ballots can be rejected if the voter's information on the ballot does not match the voter's information on the registration rolls. While there are cure provisions if notified in time,[47] this provision of SB 1 nevertheless imposes disparate burdens on minority Texans who are less likely than Anglos to have access to required documents, and more likely to have lower educational levels and fewer economic resources, and, in the case of Hispanics, less English proficiency.

The 2022 Texas primaries were the first statewide elections held under these new absentee voting requirements. The new requirements produced a surge in rejected absentee ballots. According to the Texas Secretary of State, officials rejected 24,636 mail-in ballots for a rejection rate of approximately 12.4% or one of every eight voters who attempted to cast an absentee ballot in the 2022 primary elections. This rejection rate does not consider potential absentee voters who may have been deterred by the new requirements and not voted. The 2022 primary rejection rate

---

[45] David J. Bier, " U.S. Citizens Targeted by ICE: U.S. Citizens Target/ed by Immigration and Customs Enforcement in Texas, CATO Institute, 29 August 2018, https://www.cato.org/publications/immigration-research-policy-brief/us-citizens-targeted-ice-us-citizens-targeted.
[46] Ibid.
[47] *Id*., S.B. No. 1, at 19-22.

was *more than 12 times* higher than the 2020 general election rejection rate when turnout was much higher.[48]

Moreover, the elimination of drive-in voting under SB 1[49] attacks with surgical precision a procedure used in Harris County to facilitate voting in the 2020 general election. Harris is the most populous county in the state, with a citizen voting age population of 2.8 million and a minority CVAP percentage of 62.3% compared to the statewide CVAP percentage of **50%.** The General Assembly abolished this option for voters after courts rejected Republican efforts to invalidate around 127,000 drive-in votes cast in Harris County. SB 1 also targets 24-hour voting, another mechanism used to facilitate voting in Harris County in the 2020 general election. Some 8,000 voters used this option.[50]

A study by the Texas Civil Rights Projects compared all early voters in Harris County and found that minorities comprised a disproportionate share of voters using the drive-in and after-hours options.[51] The Rice University post-election survey of drive-through voting confirms this finding.[52]

SB 1 includes some minor mitigating elements that will have minimal effect on minority voter opportunities, especially when weighed against the significant impediments analyzed above. The legislation requires early voting clerks in counties with populations of 55,000 or more to

---

[48] Alexa Ura, "More Than 12% of Mail-In Ballots Were Rejected in Texas Under New GOP Voting Rules, Final Tally Shows," *Texas Tribune*, (Apr. 6, 2022, 2:00 PM), https://www.texastribune.org/2022/04/06/texas-mail-in-ballot-rejection-voting/.

[49] *Id*., S.B. No 1, at 11.

[50] Abigail Rosenthal, "The Texas GOP is Still Furious About Harris County's Drive-thru Voting," *Chron*, ( Mar. 15, 2021, 11:13 AM), https://www.chron.com/politics/article/texas-drive-thru-voting-senate-bill-7-election-16026395.php; Testimony on SB 1 By: Emily Eby, Staff Attorney, Texas Civil Rights Project Texas Senate State Affairs Committee (July 10, 2021), https://txcivilrights.org/wp-content/uploads/2021/07/TCRP-Testimony-on-SB-1.pdf.

[51] Testimony on SB 1 By: Emily Eby, Staff Attorney, Texas Civil Rights Project, Texas Senate State Affairs Committee (July 10, 2021), https://txcivilrights.org/wp-content/uploads/2021/07/TCRP-Testimony-on-SB-1.pdf.

[52] Source: "The Rice University Post-2020 Election Survey of Harris County Voters," https://mreece13.github.io/dtv-harris-2021/cross-tabs.html#method-of-voting.

conduct at least twelve hours of early voting on the last Saturday of the early voting period (between the hours of 6 a.m. and 10 p.m.), but only requires a minimum of six hours of early voting on the last Sunday of the early voting period (between the hours of 9 a.m. and 10 p.m.). This was previously a requirement for counties with 100,000 persons or more. However, this change will benefit the predominantly Anglo counties included in the population range of 55,000 to 100,000.

Unsurprisingly, the Republican-controlled Texas Legislature that adopted S.B. 1 declined to enact bills that would have expanded access to the ballot,[53] despite Texas having turnout rates that are below the national average and their claim to be committed to making it "easy to vote."

Even before the adoption of SB 1, Texas ranked last among the states in access to registration and voting, according to a study published in *Election Law Journal: Rules, Politics, and Policy* that drew upon more than 30 indicators of access to registration and voting. As demonstrated in **Compilation 1**, the higher the Cost of Voting Index (COVI), the more difficult it is to register and vote in a state.[54] Texas had COVI index of 1.29 compared to .05 for the median state. Its COVI was 32% higher than the next highest state of Georgia, with a COVI index of .98.[55]

A 2018 study also showed that Texas trailed most other states in registration and voting rates. The study found that "[b]ased on figures from the 2016 general election, the state ranked 44th in voter registration and 47th in voter turnout among the 50 states and the District of Columbia."[56] Texas's turnout record did not significantly improve in the 2020 election, where it finished 45th in turnout among the 50 states and the District of Columbia.[57] The study found that,

---

[53] For example, the Texas Legislature failed to adopt the following bills: 2 H.B. 213, 2 H.B. 214, 2 S.B. 71, 2 H.B. 215, 2 H.B. 224, 2 S.B. 52, 2 S.B.67, 2 S.B. 57, 2 S.B. 74, and 2 H.B. 49.
[54] *See* App. A at 1.
[55]Michael J. Pomante II and Quan Li, "Cost of Voting in the American States," Election Law Journal: Rules, Politics, and Policy, (2020) 19, fig. 1.
[56] Jay Jennings, Emily Einsohn Bhandari, "2018 Texas Civic Health Index," University of Texas at Austin, Annette Strauss Institute for Civic Life, National Conference on Citizenship, and RGK Center for Philanthropy and Community Service, p. 4, https://moody.utexas.edu/sites/default/files/2018-Texas_Civic_Health_Index.pdf.
[57] United States Election Project, "2020 General Election Turnout Rates," http://www.electproject.org/2020g.

consistent with the results of scholarly research, lower registration and turnout rates correlated closely in Texas with lower levels of educational attainment.[58] Lower levels of educational attainment also closely correlate with race in Texas, as demonstrated in the examination of Factor 5 below. As indicated in **Table 7**, 94.4% of Anglo Texans 25 years or older are high school graduates compared to 91.4% of Blacks and 68.3% of Hispanics.[59] In addition, 39.4% of Anglos are college graduates compared to 26.0% of Blacks and 16.1% of Hispanics. Among Hispanics, 28.1% do not speak English very well. As further shown under Senate Factor 5, the turnout rates of minorities in Texas lag well behind Anglo rates.

In addition to SB 1, the Texas Legislature passed several other voter restriction bills during their legislative session. Like the literacy test and poll tax, these bills do not explicitly mention race. Still, like the restrictions under SB 1, the hurdles placed in these bills fall most heavily on minority voters with lower income, education, and command of English[60]

In recent years, the Texas Legislature has rejected numerous bills to expand access to the ballot. According to a study by Let America Vote, in just the last few years, for example, the Texas Legislature rejected legislation that would "expand early voting (HB 1237, HB 2627), restore straight ticket voting (HB 740, SB 359), establish no-excuse early voting by mail (HB 325, SB 164), authorize voter registration at polling places (SB 102, SB 276, HB 1138), establish automatic voter registration (HB 140), restore the right to vote to people with felony convictions if they are

---

[58] Jay Jennings, Emily Einsohn Bhandari, "2018 Texas Civic Health Index," University of Texas at Austin, Annette Strauss Institute for Civic Life, National Conference on Citizenship, and RGK Center for Philanthropy and Community Service, pp. 4-5, https://moody.utexas.edu/sites/default/files/2018-Texas_Civic_Health_Index.pdf.
[59] *See* App. A. at 11.
[60] *See e.g.* S.B. 1111, (prohibits establishing residence "for the purpose of influencing the outcome of a certain election," and targets students and homeless voters by prohibiting individuals from registering to vote using a previous address that they do not physically inhabit); H.B. 3107 (requires an original wet-ink signature on registration forms); S.B. 1113 (allows the Secretary of State to withhold state funds from registrars who do not regularly purge voter rolls); H.B. 3920 (limits who can request an absentee ballot); H.B. 2283 (limits donations to election administrators).

not incarcerated for that offense (HB 1419), establish an independent redistricting commission (SJR 56), and create a Texas Voting Rights Act (HB 2429).[61]

The Texas Legislature has rejected efforts to facilitate access to the ballot despite majority public support for opening Texas's difficult voter registration and electoral systems. As shown in **Table 1**, by wide margins of 74% to 87% in favor, Texans support extending early voting, allowing early voting to be open on two weekends, and increasing voter locations on election day.[62] By smaller majorities, ranging from 50.5% to 58.5% in favor, Texans support having alternate secure ballot return sites, allowing persons to register on election day, and automatically registering all citizens of voting age. Instead, the Texas Legislature has enacted laws to restrict access to the ballot.

**Factor 2: The Extent to Which Voting in Texas is Racially Polarized**

Racially polarized voting exists when Anglo voters and minority voters cohesively vote for competing candidates. A pattern of racially polarized voting exists when such polarization extends beyond a single election or a few elections. The extent of polarization is measured by the degree of difference in the voting patterns of Anglos and minorities. Courts have found substantial racially polarized voting in Texas.[63]

I have previously opined—through reports and testimony to court findings—on racially polarized voting in Texas. I was not asked to re-assess quantitatively the existence of racially polarized voting in Texas for this report. In general, my research has shown that the deep divide between Anglos and minorities on party voting in Texas – Anglos strongly Republican and

---

[61] Chris de Laubenfelds, State-by-State Voting Legislation Analysis 2019, Texas Let America Vote, https://www.letamericavote.org/2019-voting-legislation/.

[62] *See* App. A at 2.

[63] *See e.g. LULAC v. Perry*, 548 U.S. 399, 439 (2006); *Perez v. Abbott*, 253 F. Supp. 3d 864, 959 (W.D. Tex. 2017); *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc); *Veasey v. Perry*, 71 F. Supp. 3d 627 (S.D. Tex. 2014).

minorities strongly Democratic. For example, my 2020 report in *Sylvia Bruni v. Ruth Hughes* noted that for statewide Texas elections from 2014 to 2018, the differential between Anglo and Black voting for Democratic candidates was 74.2% and the differential between Anglo and Hispanic voting for Democratic candidates was 53.5%.[64]

Party labels by themselves do not motivate racially polarized voting. In fact, from the late nineteenth century through much of twentieth century, Blacks in the South voted Republican, and whites voted Democratic. These historic alignments, as well the current alignments, result substantially from the infusion of race into party. Simply put, to the extent that racial voting aligns along party lines, race not party is the driving causal mechanism.

As stated above, during the Reconstruction period, Blacks across the South had the opportunity to vote and hold political office. During this period, Blacks in the South voted and identified overwhelmingly with the Republican Party—the party of Abraham Lincoln and of Reconstruction. Most white southerners in turn voted and identified with Democrats. In 1869 Congress sought to guarantee Black male voting rights with the passage of the Fifteenth Amendment that prohibited the states from denying the right to vote "on account of race, color, or previous condition of servitude." The Amendment passed the U.S. House and Senate with only Republicans and no Democrats voting in the affirmative.[65]

Blacks in the South expected that the amendment would assure their continued suffrage rights. Instead, what happened was "the return to power of the Democrats in the southern states

---

[64] United States District Court for the Southern District of Texas, Laredo Division, *Sylvia Bruni v. Ruth Hughs*, Civil Action No. 5:20-cv-35, Expert Report of Allan J. Lichtman, 30 March 2020, at 62.
[65] A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774-1875, Congressional Globe, House of Representative, 40th Congress, 3rd Session, 25 February 1869, pp. 1563-1564, http://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=087/llcg087.db&recNum=62, http://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=087/llcg087.db&recNum=63; A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774-1875, Congressional Globe, Senate, 40th Congress, 3rd Session, 26 February 1869, pp. 1641, http://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=087/llcg087.db&recNum=140.

and the U.S. House of Representatives, the Republican retreat from Reconstruction, and the resurgence of Jim Crow, with its inventive and unjust measures designed to deny Blacks the vote on grounds other than "race, color, or previous condition of servitude."[66]

The enactment of the Voting Rights Act of 1965 sparked the beginning of a political revolution in Texas as elsewhere in the South. For the first time since Reconstruction, Blacks had broad opportunities to register and vote and to elect candidates of their choice to public office. Through the late twentieth and early twenty-first centuries, the parties reversed their traditional roles in the state with Democrats now associated with racial values, policies, and attitudes appealing to Blacks and Republicans the reverse. As in the earlier period, party identification is conjoined with race, although party labels had come to mean the opposite of what they once were.[67]

The conjoining of party and race in Texas is demonstrated both by the policy positions held by Democratic and Republican officeholders and by the race-related attitudes and beliefs of rank-and-file Democratic and Republican voters.

As indicated in **Table 2 and Chart 1,** between 2017 and 2018 all Republican members of the Texas congressional delegation received very low scores on the NAACP Civil Rights Federal Legislative Report Card.[68] The NAACP scorecard is based on more than 30 votes in the U.S. Senate and House, respectively, that the organization deems relevant to assessing the "civil rights voting patterns" of members in each state's delegation.[69] As shown in **Table 2,** the highest score

---

[66] Hugh Davis, "We Will Be Satisfied with Nothing Less: The Black Struggle for Equal Rights in the North during Reconstruction" (Ithaca, NY: Cornell University Press, 2011), p. 71.
[67] On the conjoining of race and party in recent years see, for example, Bruce E. Cain and Emily R. Zhang, "Blurred Lines: Conjoined Polarization and Voting Rights," Ohio State Law Journal, 77 (2016): 867-904; Edward G. Carmines & James A. Stimson, Issue Evolution: Race and the Transformation of American Politics, (Princeton University Press: 1989), 27–58; Michael L. Rosino and Matthew W. Hughey "Who's Invited to the (Political) Party: Race and Party Politics in the USA," Ethnic and Racial Studies, 39 (2016): 325-332; "Old Times There Are Not Forgotten: Race and Partisan Realignment in the Contemporary South," American Journal of Political Science, 49 (2005): 572-688.
[68] *See* App. A at 3-4.
[69] NAACP Civil Rights Federal Legislative Report Card,  https://naacp.org/sites/default/files/documents/115th-Final-Report-Card.pdf

for any Republican (22%) is 37 percentage points below the lowest score for any Democrat (59%).[70] On average, Republican members score 9%, while Democratic members score more than ten times higher at 91%.[71]

Fundamental differences in race-related issues also emerge for rank-and-file Texas registered voters who identify as Republicans and Democrats. As shown in **Table 3 and Chart 2**, only 21.8% of self-identified Texas Republican registered voters agree that "White people in the U.S. have certain advantages because of the color of their skin."[72] This result compares to 87.8% agreement among self-identified Democrats for a difference of 66 percentage points and 303 percent.[73] Just 16.6% of Republicans agree that "generations of slavery and discrimination have created conditions that make it difficult for Blacks to work their way out of the lower class," compared with 78.1% of self-identified Democrats.[74] And only 32.7% of Republicans disagree that "racial problems in the U.S. are rare, isolated situations," compared with 83.2% of Democrats.[75]

**Factor 3: The Extent to Which the State or Political Subdivision Has Used Voting Practices or Procedures That Tend to Enhance the Opportunity for Discrimination Against the Minority Group, Such as Unusually Large Election Districts, Majority-Vote Requirements, and Prohibitions Against Bullet Voting**

Texas elects the largest number of public officials statewide of any state in America. These 29 statewide elected officials include two U.S. Senators, nine executive officers, nine justices of the State Supreme Court, and nine judges of the State Court of Criminal Appeals. Candidates for these positions must compete in a state that is the second-largest (after Alaska) and the second most populous (after California). Texas's land area and population put a premium on the financial

---

[70] *See* App. A at 3.
[71] Ibid.
[72] *Id.* at 5-6.
[73] Ibid.
[74] Ibid.
[75] Ibid.

resources needed for statewide direct mail, social media advertisements, radio and television spots, and political organizing. Such resources are much more prevalent in the Anglo community than in the African American and Hispanic communities.

Texas also has extensive and populous legislative districts. Texas law partitions each county into four single-member Commission districts. By keeping the number of Commission districts low, Texas maintains districts that are large in area and heavily populated. For example, in Brewster County, the average land area of each district is 1,546 square miles. In Pecos County, the average land area of each district is 1,191 square miles. **Table 4** reports data for large, diverse counties.[76] In Harris County, the average land area of each commissioner district is 426 square miles, and the average population is 1.2 million.[77] In Dallas County, the average land area is 218 square miles, and the average population is 653,385.[78] In Tarrant County, the average land area for commissioner districts is 216 square miles, and the average population is 527,660.[79] In Bexar County, the average land area is 310 square miles, and the average population is 502,331.[80] And in Travis County, the average land area for a district is 248 square miles, and the average population is 322,547.[81]

Texas State Senate districts are also heavily populated and, in many cases, quite large in area. Although Texas is this country's second-largest state in area and population, it has only 31 state senators. The average population of a State Senate district in Texas is 940,178, the most populous legislative districts in the nation. Texas also has extensive districts in terms of area,

---

[76] *See* App. A at 8.
[77] "Land Area: Texas Counties," http://www.texascounties.net/statistics/landarea.htm; Population data from 2020 U.S. Census, https://public.tableau.com/app/profile/us.census.bureau/viz/2020CensusPopulationandHousingMap/County?:showVizHome=no&STATE%20NAME%20(cb%202020%20us%20county%20500k.shp)=Texas.
[78] Ibid.
[79] Ibid.
[80] Ibid.
[81] Ibid.

including half a dozen districts that encompass more than 15,000 square miles. For example, State Senate District 19 is 35,384.9 square miles; Senate District 28 is 48,451.9 square miles; Senate District 31 is 36,486 square miles; Senate District 29 is 15,515.7 square miles; Senate District 3 is 15,594.9; and Senate District 21 is 17,127 square miles.

As further indicated in **Table 4**, four of the five most populous counties in Texas, with heavily populated and large county Commissioner and State Senate districts, are all majority-minority in their voting age population.[82] The remaining county, Travis, is 49.2% minority.[83] As indicated above, ballots are especially long in these counties, ranging from 65 to 100 contests.

**Factor 4: If There Is a Candidate Slating Process, Whether the Members of the Minority Group Have Been Denied Access to That Process**

This factor does not apply to recent elections in Texas, which have not typically experienced formal slating process by the political parties.

**Factor 5: The Extent to Which Minority Group Members Bear the Effects of Past Discrimination in Areas Such as Education, Employment, and Health, Which Hinder Their Ability to Participate Effectively in The Political Process**

The persistent effects of discrimination in Texas are evident in the lower-than-average socio-economic status of Hispanic and African American Texans when compared to Anglo Texans, particularly in the areas of education, income, unemployment, and health care. These socio-economic disparities are directly related to an ongoing history of official discrimination in Texas. This discrimination not only involves voting, as explained above, but extends to other important policies as well.

**A. Educational Disparities**

Until the Supreme Court's 1954 decision in *Brown v. Board of Education*, Texas

---

[82] *See* App. A at 8.
[83] Ibid.

maintained a segregated public education system. Schools for African American children were significantly underfunded compared to schools for Anglo children. Since *Brown*, Texas has long resisted efforts to desegregate its schools. In 1970, U.S. District Court Judge William Wayne Justice placed the entire state of Texas under a desegregation order. Only in 2010 did the court release most districts from this order. As late as 2017, three Texas school districts remained under a court order: Longview, San Angelo and Garland.[84] This official discrimination has negatively impacted generations of minority students.

Texas law and policy perpetuates inadequate education funding for public schools, furthering inequities between Anglos and minorities. A 2019 state-by-state study by the Education Law Center graded Texas an F for school funding, a D for funding effort relative to state wealth, and a D for equity in funding distribution.[85] For the level of funding for public schools, the study found that Texas ranked eleventh from the bottom among states.[86] For funding effort, the study found that Texas ranked fourteenth from the bottom among states.[87] The study also found that Texas ranks twelfth from the bottom among states in the equitable distribution of funds to high poverty areas.[88] Poverty levels are closely correlated with race in Texas, as shown in **Table 5** above. The poverty rate for Anglos in Texas is 8.0% compared to 18.9% for Blacks and 18.7% for Hispanics.[89]

Minority students in the Texas public school system also experience substantial disparities in school discipline. As shown in **Table 8 and Chart 4**, in the 2015-2016 school year, Anglo

---

[84] Aliyya Swaby and Alexa Ura, "It took this Texas school district 48 years to desegregate. Now, some fear a return to the past," Chalkbeat, 29 November 2018, https://www.chalkbeat.org/2018/11/29/21106328/it-took-this-texas-school-district-48-years-to-desegregate-now-some-fear-a-return-to-the-past.
[85] Danielle Farrie, Robert Kim, and David G. Sciarra, "Making the Grade 2019," Education Law Center, https://edlawcenter.org/assets/Making-the-Grade/Making%20the%20Grade%202019.pdf.
[86] Ibid.
[87] Ibid.
[88] Ibid.
[89] *See* App. A at 9.

students in the Texas public school system lost 7 out of 100 days of schooling due to suspensions, compared to 44 lost days for Black students and 15 lost days for Hispanic students.[90] The minority to Anglo lost days ratio was 6.3 to 1 for Black students and 2.1 to 1 for Hispanic students.[91] Additional data in **Table 8 and Chart 5** shows that for the 2019-2020 school year, 2.8% of Anglo students were suspended, compared to 13.4% of Black students and 5.2% of Hispanic students.[92] The minority to Anglo suspensions ratio was 4.8 to 1 for Black students and 1.9 to 1 for Hispanic students.

School suspensions have markedly detrimental effects on young people. Two Columbia University professors studied the impact of school suspensions when controlling for "how students who are suspended differ from those who are not suspended."[93] The researchers noted that "Studies have not shown that suspension improves student behavior or increases school safety."[94] To the contrary, in their controlled study, they found "that suspended students had weaker attendance, course completion rates, and standardized test scores; were more likely to drop out; and were less likely to graduate within 4, 5, or 6 years."[95] The researchers additionally connect racial disparities in school suspensions with racial disparities in involvement with the criminal justice system: "Exclusionary discipline predicts juvenile court referrals (Nicholson-Crotty et al. 2009), and just as they are disproportionately represented in school suspension rates, African Americans, males, and those with special needs are also over-represented among those arrested and incarcerated both as juveniles and as adults."[96] They conclude that "exclusionary school discipline practices are a

---

[90] *Id*. at 12-13.
[91] Ibid.
[92] *Id*. at 12, 14.
[93] Elizabeth M. Chu and Douglas D. Ready, "Exclusion and Urban Public High Schools: Short- and Long-Term Consequences of School Suspensions," American Journal of Education, 124 (2018) at 480, 482-484.
[94] *Id*. at 483.
[95] *Id*. at 479.
[96] *Id*. at 483.

clear link" to what is termed "the school-to-prison pipeline."[97]

The researchers link both disparities in discipline and educational attainment to socio-economic disparities across generations:

> "Although important in their own right, the associations among school disciplinary actions, juvenile arrests, and adult incarceration have tremendous implications for the intergenerational transfer of opportunity in American life (Kirk and Sampson 2013), given the strong links between educational attainment and subsequent social and economic adult outcomes (Goldin and Katz 2008). Considered from a macro perspective, these disciplinary pipelines are likely an important mechanism in the maintenance of social hierarchies across generations."[98]

The ultimate authority over education lies with the state. The General Assembly sets the state aid for education and the funding formulas that have earned Texas the F and D grades documented above. And the Texas Education Agency (TEA), headed by a Secretary of Education appointed by the Governor, "is the state agency that oversees primary and secondary public education."[99]

## B. Economic Disparities

Black and Latino Texans make up the disproportionate number of individuals living in poverty in the state. 18.1% of Black Texans and 18.7% of Hispanic Texans live in poverty as compared to 8% of Anglo Texans.[100] Disparities also exist in the areas of income and employment. **Table 5** shows that the median household income for Anglo Texans is $78,905 as compared to $47,814 for Black Texans and $52,010 for Hispanic Texans.[101] Likewise, the unemployment rate of Black Texans (6.9%) is nearly double the unemployment rate of Anglo Texans (3.7%).[102] As a result of these disparities, Black and Hispanic Texans are also less likely to have an available

---

[97] *Id.* at 483-484.
[98] *Id.* at 484.
[99] Texas Education Agency, "About TEA," https://tea.texas.gov/about-tea.
[100] *See* App. A at 9.
[101] Ibid.
[102] Ibid.

vehicle which makes it more difficult for them to participate in the electoral process.[103] For example, as stated above, between 2012 and 2018 Texas closed 750 polling places and many closed without the conversion to voting centers. The overwhelming majority of closed polling places were in counties with large numbers of Black and Hispanic residents. As a result, Black and Hispanic voters must travel further to their polling place. This is particularly difficult for Black and Hispanic voters who do not have an available or reliable vehicle.

These disparities also impact overall voter turnout.[104] As shown in **Table 12 and Chart 8**, non-Anglos who, according to the latest 2019 U.S. Census American Community Survey comprise essentially half of the state's citizen voting age population,[105] account for only 40% of the 2020 presidential turnout, compared to a 60% share for Anglos. This disparity exists despite efforts in Texas during the 2020 election to facilitate voting opportunities in large, diverse urban counties such as Harris County.

Similar disparities in turnout emerge in the U.S. Census, Current Population Survey of Voting and Registration in the November 2020 election in Texas. As shown in **Table 13** and **Chart 9**, 72% of the Anglo CVAP reported voting in 2020.[106] This Anglo rate compares to a 53.1%

---

[103] Ibid.

[104] On the relationship between turnout and lower socio-economic standing see, for example, *Id*., Jennings, and Bhandari, "2018 Texas Civic Health Index;" Sidney Verba, Kay Lehman Schlozman, and Henry E. Brady, Voice and Equality: Civic Voluntarism in American Politics (Harvard University Press,1995); D. Sunshine Hillygus, "The Missing Link: Exploring the Relationship Between Higher Education and Political Engagement," (2005) Political Behavior, 27, 25-47; Michael Parkin & Frances Zlotnick, "English Proficiency and Latino Participation in U.S. Elections," Politics and Policy (2011) 39, 515-37; Pew Research Center, The Party of Non-Voters (2014), http://www.peoplepress.org/2014/10/31/the-party-of-nonvoters-2/; Jan E. Leighley and Jonathan Nagler, Who Votes Now? Demographic Issues, Inequality and Turnout in the United States (Princeton University Press, 2013); Randall Akee, et al., "Family Income and the Intergenerational Transmission of Voting Behavior: Evidence from an Income Intervention," National Bureau of Economic Research, Working Paper 24770 (2018).

[105] American Community Survey, 2019, https://data.census.gov/cedsci/table?q=S2901%3A%20CITIZEN,%20VOTING-AGE%20POPULATION%20BY%20SELECTED%20CHARACTERISTICS&g=0400000US48&tid=ACSST1Y2019.S2901&hidePreview=true.

[106] *See* App. A at 19, 21.

turnout rate for the Hispanic CVAP, for a difference of 18.9 percentage points and 25.1 percent.[107]
It compares to a 60.8% turnout rate for the Black CVAP for a difference of 11.2 percentage points
and 15.6 percent.[108]

During the 2020 general election, Texas lagged behind most states in overall voter
turnout.[109] Despite an Anglo turnout rate of 72% - which exceeded the national average of 70.9%
- Texas ranked 7th from the bottom amongst all states for voter turnout.[110] This lagging turnout
rate is entirely due to relatively low Black and Hispanic turnout.[111]

A lack of resources for minorities in Texas also impacts their ability to fully participate in
the political process and elect candidates of their choice in other ways. Minorities have less
resources than whites to contribute to political campaigns and organizations, engage in the
lobbying of public officials, or finance the media campaigns needed statewide and in Texas' large
electoral districts.

### C. Health Disparities

Minority Texans also experience inequity in access to health insurance and health
outcomes. As noted in **Table 6**, Black and Hispanic Texans are less likely to have private health
insurance as compared to Anglo Texans.[112] And they are more likely to have no health insurance
at all, compared to Anglo Texans.[113] As a result of higher rates of unemployment and lower
incomes amongst Black and Hispanic Texans, Black and Hispanic Texans are more likely to forgo

---

[107] Ibid.
[108] Ibid.
[109] United States Elections Project, "2020 November General Election Turnout Rates,"
http://www.electproject.org/2020g.
[110] Ibid.
[111] Current Population Survey, "Voting and Registration in the Election of November 2020," Table 4b,
https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-585.html.
[112] *See* App. A at 10.
[113] Ibid.

health care services all together due to costs.[114] These disparities directly translate into disparities in overall health status – as noted in **Table 6**, 15.9% of Anglos have poor or fair health status as compared to 20.7% of Black Texans and 22.9% of Hispanic Texans.[115]

Health problems directly impact one's ability to participate fully in the political process. For example, poor health may make it more difficult for a voter to wait in line to vote and also may makes it more difficult for a voter to travel to a polling place, especially if that polling place is a far distance.

### D. Disparities in the Criminal Justice System

According to 2019 data, the incarceration rate in Texas was 0.72 percent of its adult population, which was about a third higher than the national rate of 0.55 percent. This elevated overall incarceration rate means that racial disparities in incarceration rates, particularly for Black residents, are particularly harmful in Texas. As shown in **Table 9 and Chart 6**, the 2019 Anglo incarceration rate in Texas was 0.56% per adult compared to 1.94% per adult for Blacks and 0.66% per adult for Hispanics.[116] The ratio of minority to Anglo incarceration rates is 3.4 to 1 for Blacks and 1.2 to 1 for Hispanics. Given that nearly all prisoners are male, this data demonstrates that about 1 out of 25 Black adult males in Texas is incarcerated. Racial disparities hold for placement into juvenile custody. As per **Table 10** and **Chart 7**, a study of Black/Anglo disparities in youth placement rates in Texas found that the Black placement rate of 345 per 100,000 age-eligible youth was 4.7 times higher than the Anglo placement rate of 74 per 100,000.[117] The author of the study cited in Table 10 found that between 2015 and 2019 the racial gap in juvenile placements in Texas increased by 5%, the seventh-largest increase in the nation. In 40 states, the racial gap decreased.

---

[114] Ibid.
[115] Ibid.
[116] *Id.* at 15-16.
[117] *See* App. A at 15, 17.

Nationally the racial gap decreased by nearly 20%.

These disparities hold true for prosecutions brought by Attorney General Paxton's Election Integrity Unit. Since Attorney General Paxton took office in 2015, at least 72% of the prosecutions brought by the Election Integrity Unit have been against Black and Hispanic individuals,[118] despite Black and Hispanic Texans comprising just over 50 percent of Texas's population.

The record of police traffic stops by race in large Texas jurisdictions provides evidence of racial profiling for Black motorists who are more readily identified by appearance than Hispanics. As indicated in **Table 11**, disparities between the percent of Blacks in the adult population and among traffic stops range from 35% to 116%, with a mean disparity of 78%.[119] Recent reports directly document racism among law enforcement officers in several Texas jurisdictions, including Austin, Dallas County, and Dennison County. According to a June 2019 report in *Texas Monthly*, "Police officers in Dallas and Denison have been caught making and circulating bigoted posts on social media, often advocating for the use of deadly violence against the citizens they are paid to protect and serve."[120] Many of the posts "are disturbingly violent, and often target African Americans, activists, Hispanics, immigrants, Muslims, LGBT people, and women."[121]

In Fall 2019, Austin Assistant Police Chief Justin Newsom "quit the same day someone filed an anonymous complaint accusing him of using racial slurs to refer to Black officers, a fellow assistant chief who was Black, a Black city council member, and even Barack Obama when the president landed in Austin."[122] Later, other complaints about racism within the department –

---

[118] ACLU, "Voters of Color Appear to be Most Frequest Targets of Texas Attorney General Ken Paxton's Election Integrity Unit," 24 March 2021, https://www.aclutx.org/en/press-releases/voters-color-appear-be-most-frequent-targets-attorney-general-ken-paxtons-election.
[119] *See* App. A at 18.
[120] Leif Reigstad, "North Texas Cops Caught Being Racist Online," Texas Monthly,  7 June 2019, https://www.texasmonthly.com/politics/north-texas-cops-caught-sharing-racist-facebook-posts/.
[121] *See* Plain View Project Online, https://www.plainviewproject.org/.
[122] Michael Barajas, "A Top Cop Accused of Racism Forces Austin to Confront Bias in Law Enforcement," Texas

including a complaint filed against another assistant police chief – emerged. The issue was serious enough that Austin city council members said, "the fallout from Newsom's resignation had shaken their faith in the department."[123] The members unanimously ordered an audit of the department's cadet training materials and an outside investigation "to root out 'racism and other discriminatory attitudes, training, protocols, or procedures'" at the Department.[124] According to the complaint with the City's Office of Police Monitor, the department's leaders, including Police Chief Brian Manley, "were made aware of AC Newsom using the extremely derogatory term 'nigger' and failed to report it for investigation or review."[125]

The state of Texas has the authority to punish police misconduct and enforce state law against racial profiling. However, the state's enforcement system has long been broken and functions ineffectively. The statewide regulatory agency, the Texas Commission on Law Enforcement (TCOLE) lacks the information and authority for enforcement of police violations or effective officer training. The 2020-2021 Staff Report of the state Legislature's bipartisan Sunset Advisory Commission on the TOCLE concluded that "Texas' approach to law enforcement regulation no longer meets the needs of the state."[126] It found that TCOLE "sets minimum licensing and training standards for law enforcement personnel and enforces compliance with them. Meanwhile, local law enforcement agencies set their own standards of professional conduct and disciplinary policies, as well as additional training requirements for their employees."[127] This

---

Observer, 19 August 2019, 6 December 2019, https://www.texasobserver.org/a-top-cop-accused-of-racism-forces-austin-to-confront-bias-in-law-enforcement/.
[123] Ibid.
[124] Ibid.
[125] Ibid.
[126] Sunset Advisory Commission, Texas Commission on Law Enforcement, "2020-2021 Staff Report," November 2020, p. 1, https://www.sunset.texas.gov/public/uploads/files/reports/Texas%20Commission%20on%20Law%20Enforcement%20Staff%20Report_11-6-20.pdf.
[127] Ibid.

"bifurcated regulatory model from 1970 has not kept pace with these changes, and can no longer ensure the conduct, training, transparency, and accountability the public expects of law enforcement in 2020. The Sunset review found the state's regulatory approach has resulted in a fragmented, outdated system with poor accountability, lack of statewide standards, and inadequate training."[128]

The Advisory Commission concluded that "while Texas has a continuing need to regulate law enforcement, the state's current regulation is, by and large, toothless."[129] A study by KXAN found that from 2015 to 2020, TCOLE had "accepted 444 voluntary permanent license surrenders, [by law enforcement personnel] which is a lifetime ban from working in law enforcement."[130] In contrast, "During that five-year span, Georgia's Peace Officer Standards and Training Council revoked 3,648 peace officers' licenses. Georgia's lawmakers, unlike lawmakers in Texas, granted its POST the power to suspend and revoke licenses for less than a criminal conviction."[131] Texas currently has 139,673 law enforcement employees, compared to 57,641 for Georgia.[132] Adjusting for the number of officers, the Georgia to Texas ratio of suspensions is 20 to 1.

In her analysis of studies on the impact of law enforcement on Black Americans, Professor Elizabeth Hinton of Harvard University found that "Discriminatory criminal justice policies and practices" are based on a history of discrimination.[133] "Racial disparities in the criminal justice system have deep roots in American history and penal policy. In the South, following

---

[128] Ibid.
[129] Ibid.
[130] Jody Barr, "Texas Police Reform Bill Killed by its Own Author, KXAN, (Mar. 12, 2021, 6:57 PM), https://www.kxan.com/news/texas-politics/texas-police-reform-bill-killed-by-its-own-author/.
[131] Ibid.
[132] World Population Review, "Police Officers 2021 by State," https://worldpopulationreview.com/state-rankings/police-officers-by-state.
[133] Elizabeth Hinton, "An Unjust Burden: The Disparate Treatment of Black Americans in the Criminal Justice System," Vera Institute of Justice, May 2018, p. 2, https://www.vera.org/downloads/publications/for-the-record-unjust-burden-racial-disparities.pdf.

Emancipation, black Americans were specific targets[.]"[134] Historically, "Black Codes, vagrancy laws, and convict leasing …were used to continue post-slavery control over newly-freed people."[135]  Current "racial disparities are no accident, but rather are rooted in a history of oppression and discriminatory decision making that have deliberately targeted black people and helped create an inaccurate picture of crime that deceptively links them with criminality."[136] Moreover, "[t]hey are compounded by the racial biases that research has shown to exist in individual actors across the criminal justice system—from police and prosecutors to judges and juries—that lead to disproportionate levels of stops, searches, arrests, and pretrial detention for black people, as well as harsher plea bargaining and sentencing outcomes compared to similarly situated white people."[137]

In turn, disparities in law enforcement create a vicious cycle that perpetuates socio-economic disparities and more involvement in criminal justice. Professor Hinton concludes:

> "[T]here is no evidence that these widely disproportionate rates of criminal justice contact, and incarceration are making us safer. To the contrary, studies have shown that concentrated incarceration in poor communities erodes community resources and may actually increase crime. The disproportionate racial impact of certain laws and policies, as well as biased decision making by justice system actors, leads to higher rates of arrest and incarceration in low-income communities of color which, in turn, increases economic strain, further reduces income, and stifles wealth creation."[138]

**Factor 6: The Use of Overt or Subtle Racial Appeals in Political Campaigns**

Texas politics is rife with racially charged, overt discriminatory advocacy. This pattern of advocacy demonstrates how Republican candidtaes associate racially discriminatory appeals with advancing their political fortunes. The racial advocacy is not from the Jim Crow era of Texas

---

[134] *Id.* at 2.
[135] *Id.* at 1.
[136] *Id.* at 2.
[137] *Id.*
[138] *Id.* at 10.

politics, but from the last fifteen years, and primarily from the 2020 election cycle. What follows is not fringe advocacy: it includes Republican candidates and members of the state Legislature and Congress and officials of the Republican Party.

Two weeks before the general election of 2006, Republican Tony Goolsby, an incumbent state representative from District 102, claimed his Democratic opponent, Harriett Miller, had committed voter fraud when the pair ran against each other two years earlier. The basis for this explosive charge was that she had received large numbers of votes in a heavily African American precinct,[139] hardly unusual for a Democratic candidate. The Goolsby campaign sent out mailers claiming that Miller was under investigation for voter fraud (despite no charges ever being filed).[140] Anonymous mailers warned voters that they could face jail time if they committed voter fraud, a standard tactic for suppression of the Black and Hispanic vote.[141]

In 2014, then-Attorney General Greg Abbott, the leading candidate for the Republican nomination for Governor, invited rock performer, Ted Nugent to join him as a featured guest on a campaign tour. At the time, Nugent was well-known for his bigoted anti-minority tirades. Nugent had called President Obama a "subhuman mongrel" and a "chimpanzee," terms used by white supremacists to characterize African Americans during the eras of slavery, segregation, and Jim Crow.[142] Nugent also said that African Americans could not "honestly celebrate the legacy of Dr. King" until they "admit to the self-inflicted destructo-derby they are waging." Of allegedly armed undocumented immigrants, Nugent said, "I'd like to shoot them dead."[143] Nugent also said that

---

[139] Richard Whittaker, "Hard Fight '04, Dirty Fight '06, Court Fight '07," Austin Chronicle, (Oct. 17, 2007, 2:59 PM), https://www.austinchronicle.com/daily/news/2007-10-17/551741/.
[140] Ibid,; *see* Art Levine, "House Panel Launches Probe: Did FBI Ignore Threats To Jail Black Voters?" Huffington Post, (Apr. 9, 2008, 5:12 AM), http://www.huffpost.com/entry/house-panel-launches-prob_b_94263.
[141] Ibid.
[142] Justin Sink, "Nugent: Obama a 'Subhuman Mongrel,'" The Hill, (Jan. 22 2014, 5:04 PM), https://thehill.com/video/administration/196156-nugent-obama-a-subhuman-mongrel.
[143] Timothy Johnson, "20 Inflammatory Comments from State of the Union Invitee Ted Nugent," Media Matters,  11

"[i]f Barack Obama becomes the president in November, I will either be dead or in jail by this time next year," which prompted a visit from Secret Service agents.[144] Despite all of these statements, now-Governor Abbott chose Nugent to be a prominent face of his campaign.[145]

Governor Abbott is not the only statewide Texas leader to associate himself closely with Ted Nugent. Sid Miller, a former Republican member of the Texas House and ultimately successful Republican candidate for Agriculture Commissioner, appointed Nugent the Treasurer of his campaign in 2014.[146] Instead of distancing himself from Nugent's racist statements, Miller embraced them. As Miller's spokesman stated: "[w]e are not going to do anything to distance ourselves from Ted Nugent," and that "[i]f we had concerns about some of the things that Mr. Nugent has said or done, we wouldn't have reached out to him and asked him to become involved in our campaign on such a high level."[147] Miller continues to spread stereotypes connecting minorities and violence while in office. In 2017, for example, he disseminated a false claim that three hunters had been shot by Mexican immigrants, playing on the stereotype that Hispanics are violent and dangerous.[148]

---

February 2013, https://www.mediamatters.org/national-rifle-association/20-inflammatory-comments-state-union-invitee-ted-nugent?redirect_source=/research/2013/02/11/20-inflammatory-comments-from-state-of-the-unio/192618; Timothy Johnson, "Ted Nugent Proposes Treating Undocumented Immigrants "Like Indentured Servants," Media Matters, 13 May 2013, https://www.mediamatters.org/national-rifle-association/ted-nugent-proposes-treating-undocumented-immigrants-indentured-servants.

[144] David A. Grahma, "Quote of the Day: Ted Nugent Threatens Barack Obama," The Atlantic, 17 April 2012, https://www.theatlantic.com/politics/archive/2012/04/quote-of-the-day-ted-nugent-threatens-barack-obama/256025/; see Ted Nugent, "What Would Dr. King Say About Black Culture?" WND, 15 January 2014, https://www.wnd.com/2014/01/what-would-dr-king-say-about-black-culture/.

[145] ABC News, "Ted Nugent Rocks Texas Campaign for GOP's Greg Abbott," 18 February 2014, http://abcnews.go.com/blogs/politics/2014/02/ted-nugent-rocks-texas-campaign-for-gops-greg-abbott/; New York Daily News, "Crowd Protests Nugent Concert," 6 August 2013, http://www.nydailynews.com/news/national/ted-nugentprotesters-target-new-haven-club-article-1.1419543.

[146] Ben Kamisar, "Agriculture Commissioner Candidate Stands by Ted Nugent," Dallas Morning News, 19 February 2014, https://www.dallasnews.com/news/politics/2014/02/19/agriculture-commissioner-candidate-stands-by-ted-nugent/.

[147] Ibid.

[148] Brett Barrouquere, "Fake News? That Didn't Stop Sid Miller From Spreading It," Houston Chronicle, 15 January 2017, https://www.chron.com/news/houston-texas/texas/article/Fake-news-That-didn-t-stop-Sid-Miller-from-10859067.php.

Chris Mapp, a candidate for U.S. Senate in the 2014 Republican primary, told the Dallas Morning News editorial board that ranchers should be allowed to shoot anyone illegally crossing the border onto their land. He referred to such individuals as "wetbacks." When asked about the term, he explained that he believed using such language is "normal as breathing air in South Texas."[149]

When running for re-election in 2014, Republican State Representative Debbie Riddle, from District 150 said that foreigners and Middle Easterners are coming to the U.S. to deliver "terror anchorbabies," and told an American student with a Middle Eastern name to move to Afghanistan.[150] Representative Riddle also told her primary opponent Tony Noun—who is of Middle Eastern descent and had lived in the district for 25 years — "[y]ou need to go back to your country and run a campaign."[151]

In a 2018 campaign ad, Republican U.S. Senator Ted Cruz associated his Democratic opponent with murderous illegal immigrants. The ad featured a picture of a Hispanic man with the caption, "Suspect in **killing** of San Francisco woman had been **deported five times**."[152] The ad did not mention that the "suspect" had been acquitted of the murder in 2017.[153]

In 2018, a PAC supporting Representative Pete Sessions in CD32, ran a digital ad with his African American opponent's name over a picture of a darkened hand over the mouth of an Anglo woman (Figure 1). Sessions also accused his opponent of proposing to legalize crack cocaine, a

[149] Kolton Parker, "South Texas Senate Hopeful Slammed for Racial Slur," San Antonio Express, 21 February 2014, https://www.mysanantonio.com/news/local/article/South-Texas-Senate-hopeful-slammed-for-racial-slur-5255976.php.
[150] Christopher Hooks, "Primary Madness: Down Ballot Roundup," The Texas Observer, 24 February 2014, https://www.texasobserver.org/primary-madness-ballot-roundup/.
[151] Ibid.
[152] Campaign Legal Center, "Race in Our Politics: A Catalogue of Campaign Materials," https://campaignlegal.org/race-our-politics-catalog-campaign-materials.
[153] Ibid.; Daniel Arkin and Corky Siemaszko, "Shooting of Kathryn Stienle: San Francisco Pier Killing Found Not Guilty of Murder, NBC News, 30 November 2017, https://www.nbcnews.com/news/us-news/jose-ines-garcia-zarate-san-francisco-pier-killing-suspect-found-n823351.

drug that plays a significant role in stereotypes about African Americans.

**FIGURE 1**

**PETE SESSIONS AD AGAINST COLIN ALLRED**



During the 2020 campaigns in Texas, prominent Republicans, including county party chairpersons and one statewide elected official, made overt racial appeals that denigrated and demeaned Black people, the most loyal Democrats in Texas. Keith Nielsen, the GOP chairperson-elect in Harris County, Texas's most populous county, posted an image on Facebook that showed a Martin Luther King Jr. quote — "Injustice anywhere is a threat to justice everywhere" — on a background with a banana (Figure 2). The juxtaposition of Martin Luther King Jr. and a banana reprise one of the oldest and most offensive racial slurs: equating Black people with monkeys. Despite being condemned by some prominent state leaders, Nielsen still assumed his position as the GOP Chair of the state's most populous county.

**FIGURE 2**
**KEITH NIELSEN, CHAIR-ELECT, HARRIS COUNTY REPUBLICAN PARTY,**
**FACEBOOK POST**



In late-May 2020, Sue Piner, Chair of the Comal County Republican Party, posted a grim picture of billionaire George Soros, a Holocaust survivor, with the following captions in capitals

(Figure 3):[154] I PAY WHITE COPS TO MURDER BLACK PEOPLE. AND THEN I PAY BLACK PEOPLE TO RIOT BECAUSE RACE WARS KEEP THE SHEEP IN LINE.

**FIGURE 3**
**SUE PINER, COMAL COUNTY GOP CHAIR, POST ON GEORGE SOROS**
**AND BLACK CRIMINALS**



Cynthis Brehm, Chair of the Bexar County Republican Party, put out a Facebook post entitled, "George Floyd – A Staged Event?"[155] (Figure 4) She wrote, "I think there is at the very least the 'possibility' that this was a filmed public execution of a black man by a white cop, with the purpose of creating racial tensions." Jim Kaelin, the Chair of the Nueces County Republican party, placed the same post on Facebook. He called it an "interesting perspective."

---

[154] Patrick Svitek, "Five Texas GOP County Leaders Share Racist Facebook Posts, Including One Juxtaposing an MLK Quote With a Banana," The Texas Tribune, 4 June 2020, https://www.texastribune.org/2020/06/04/texas-greg-abbott-bexar-GOP-conspiracy/; Patrick Svitek, "Despite Promising to Step Aside After Racist Facebook Post, Keith Nielsen Becomes Harris County GOP Chair," The Texas Tribune, 3 August 2020, https://www.texastribune.org/2020/08/03/keith-nielsen-harris-county/.

[155] Karina Kling, "Governor Abbott Calls for Bexar County GOP Chair to Resign After Floating George Floyd Conspiracy Theory," Spectrum News, 4 June 2020, https://spectrumlocalnews.com/tx/austin/news/2020/06/04/gov--abbott-calls-for-bexar-county-gop-chair-to-resign-after-floating-george-floyd-conspiracy-theory-.

Similarly, Lee Lester, the Republican Party Chair of Harrison County, perpetuated the conspiracy theory. He recirculated it as "[f]ood for thought" in a party Facebook group. Lester wrote, "Food for thought: Copied from a post by a retired TX Ranger and ex-Sheriff: This article was sent to me by a state police investigator. I thought I would share it with you for your consideration."[156]

Cindy Weatherby, the Republican Party Chair of Reagan County, shared a post with 21 "puzzling questions" about Floyd's death, including, "[c]an someone really not breathe when someone kneels on his neck and is the victim really able to speak for considerable periods of time if he can't breathe?" and "[w]hy did the kneeling officer appear completely cool and calm, as if he was posing for the camera?"[157]

---

[156] Ibid., Wyndi Veigel, "Harrison County GOP Chair Called Out on Controversial Post," The Marshall News Messenger, 11 June 2020, https://www.marshallnewsmessenger.com/news/harrison-county-gop-chair-called-out-on-controversial-post/article_d5a8d39a-a789-11ea-8d6a-0b32be52a127.html.
[157] Naomi Andu, Clare Proctor and Miguel Gutierrez Jr., "Conspiracy Theories and Racist Memes: How a Dozen Texas GOP County Chairs Caused Turmoil Within the Party," The Texas Tribune, 5 June 2020, https://www.texastribune.org/2020/06/05/texas-gop-chairs-racist-george-floyd/.

**FIGURE 4**
**CYNTHIA BREHM, CHAIR BEXAR COUNTY REPUBLICAN PARTY,**
**FACEBOOK POST**



Agriculture Commissioner Sid Miller during the 2020 campaign, posted a picture of George Soros (Figure 5), with the following caption: "CLIMATE CHANGE DIDN'T WORK. IMPEACHMENT DIDN'T WORK. THE VIRUS DIDN'T WORK. START THE RACE WAR." "The man is pure evil!" his post said.

**FIGURE 5**
**SID MILLER ON GEORGE SOROS AND RACE WAR**



Lynne Teinert, the Republican Party Chair of Shackelford County, shared a picture of Soros with a similar text: "The pandemic isn't working. Start the racial wars."[158] A fake flyer circulated in Texas sought to associate Soros, Black people, and Democrats with violence (Figure 6). The circular has a picture of a dangerous masked man next to a Black power symbol. It reads: "Get paid to be a… Professional Anarchist! Get paid up to $200/Direct Action! Remember, Direct Action Gets The Goods. Contact your local Open Society Foundation Branch." It says funded by George Soros and lists the Thurston County Democrats as contacts. Republican Party Chairs, Doug Sanford (Freestone County), Russell Hayter (Hays County), and Jaime Durham (Foard County) shared the flyer. The flyer is fabricated, nothing in it is true.[159] These posts portray Soros as an

---

[158] Ibid.
[159] Reuters Staff, "Fact Check: A Flyer Showing a Job Listing to Become a 'professional anarchist," Reuters, 5 June 2020, https://www.reuters.com/article/uk-factcheck-fake-flyer-anarchist-soros/fact-check-fake-flyer-showing-a-job-listing-to-become-a-professional-anarchist-idUSKBN23926L; Naomi Andu, Clare Proctor And Miguel Gutierrez Jr., "Conspiracy Theories and Racist Memes. How a Dozen Texas GOP County Chairs Caused Turmoil

evil Jewish manipulator who pays off Black people to do his bidden and instigate a race war in America.

### FIGURE 6
### FALSE ADVERTISEMENT CIRCULATED BY REPUBLICAN PARTY CHAIRS
### IN TEXAS



Governor Greg Abbott and other prominent Texas Republicans denounced the racial appeals by Republican officials – except Commissioner Sid Miller – and, in some cases, called for resignations. But no Republican was held accountable. Neilson slid into his position as Harris County Republican Chairperson, and all other chairpersons maintained their positions. Miller kept his job as Agriculture Commissioner and is running for reelection in 2022. So, Republicans in Texas had it both ways – they had racial appeals to their anti-minority base and verbal wrist-tapping to assuage more tolerant voters.

---

Within the Party," Texas Tribune, 20 June 2020, https://www.texastribune.org/2020/06/05/texas-gop-chairs-racist-george-floyd/.

In his 2022 primary campaign for governor, Republican candidate Don Huffines, a former state senator, charged that "Governor Abbot's state agencies are denying medical treatment to White and Asian Texans because of their race. This is Critical Race Theory in action and it has not place in Texas . . . When I am governor, I will eradicate Marxist CRT in our state."[160]

In her 2020 congressional campaign in CD32, Republican Genevieve Collins charged that the incumbent Democratic Representative Colin Allred was giving away $6,000 to each illegal immigrant in the United States.[161]

In April 2021, Sery Kim, a Republican candidate in a special election for Congress to replace the late Republican Representative Jim Wright, said of potential Chinese immigrants, "I don't want them here at all. They steal our intellectual property, they give us coronavirus, they don't hold themselves accountable."[162] She added, "And quite frankly, I can say that because I'm Korean."[163] An unapologetic Kim argued that she was speaking out against the Chinese Communist Party, although her remarks were directed against immigrants. She blamed the "liberal media" for the controversy her comments provoked, and said she "will not back down from speaking the truth" about the party.[164] At a time of rising hate crimes against Asians, the two other Republican Korean-American women in Congress withdrew their endorsement of Kim.[165]

In the 2020 campaign for Congressional District 24, the Republican Leadership Fund ran an ad against Democratic candidate Candace Valenzuela, who would be the first Afro-Latina to serve in the Texas congressional delegation. The ad accused her of endangering Texas families

---

[160] GOP Ad Tracker, http://gopadtracker.com/index.php/node/3158.
[161] America's Voice, 2020 Ad Watch, http://2020adwatch.com/index.php/node/685.
[162] Patrick Svitek, GOP Candidate in Texas Special Election Loses Prominent Supporters After Racist Comment on Chinese Immigrants, KXAN, 4 April 2021, https://www.kxan.com/news/texas-politics/gop-candidate-in-texas-special-election-loses-prominent-supporters-after-racist-comment-on-chinese-immigrants/.
[163] Ibid.
[164] Ibid.
[165] Ibid.

and featured a dark, menacing hooded figure. It included a dour, blackened picture of Valenzuela (Figure 7).

**FIGURE 7**
**REPUBLICAN CONGRESSIONAL LEADERSHIP FUND AND NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE (NRCC) ADS AGAINST DEMOCRATIC CONGRESSIONAL CANDIDATE CANDACE VALENZUELA, CONGRESSIONAL DISTRICT 24**



A 2016 study published in *Public Opinion Quarterly* examined Republican attack ads against Barack Obama in 2008 that showed him to be darker than he really was. The researchers found that "a subtle darkness manipulation is sufficient to activate the most negative stereotypes about Blacks—even when the candidate is a famous counter-stereotypical exemplar—Barack Obama."[166] Further, "darker images are used in a way that complements ad content and shows that doing so can negatively affect how individuals evaluate candidates and think about politics."[167]

In her 2020 Republican campaign for state representative for District 59, Shelby Slawson posted a picture of shirtless young, tattooed Hispanic-looking men, implying that they belonged to an immigrant gang. Behind them stood a phalanx of masked men in black brandishing semi-automatic rifles. She wrote in the caption in capitals about her opponent in the Republican primary, incumbent Gary Sheffield: "FEET TO THE FIRE: SHEFFIELD VOTED TO MAKE SANCTUARY CITY BAN WORTHLESS" (Figure 8).[168] The ad falsely associates Latino (supposedly illegal) immigrants with violent crime and her opponent with condoning it.

In 2020, Galveston County Tax Assessor, Jackie Peden, in her primary campaign against Cheryl Johnson ran an ad that falsely accused Johnson of deliberately registering illegal aliens to vote in the county. Like the Slawson ad, the inflammatory racial appeal of this ad featured a fierce-looking, tattooed young Latino-looking man (Figure 9).[169]

---

[166] Solomon Messing, Maria Jabon, and Ethan Plaut Bias in the Flesh," Public Opinion Quarterly, 80 (2016). pp. 44-45.
[167] Ibid.
[168] Ibid., America's Voice, 2020 Ad Watch https://2020adwatch.com/index.php/taxonomy/term/16?page=12.
[169] America's Voice, 2020 Ad Watch, http://2020adwatch.com/taxonomy/term/176?page=0.

**FIGURE 8**
**SHELBY SLAWSON ANTI-LATINO IMMIGRANT AD**

 **Shelby Slawson for Texas**
Sponsored · Paid for by **Slawson For Texas**

FEET TO THE FIRE: SHEFFIELD VOTED TO MAKE SANCTUARY
CITY BAN WORTHLESS

The long-term incumbent wants you to think he's tough on the
border. But he's not. PROOF:

When the Sanctuary City Ban (SB4) came before the house on...



Shelby Slawson for Texas                              Learn More

## FIGURE 9

**2020 Galveston County Tax Assessor Election, Republican candidate Jackie Peden ad against Democratic incumbent Cheryl Johnson**



The common depictions in Texas Republicans' ads of seemingly dangerous and threatening Latino immigrants are not isolated examples. They are part of an "immigrant threat narrative" that Republicans have exploited across the nation. A 2012 study by Professor Xia Wang of Arizona State University found that "although the weight of evidence suggests that immigration does not cause more crime, this finding has not, it seems, affected public perceptions of immigrant criminality because public opinion about immigrants seems to be driven more by stereotype than by empirical fact." Professor Wang found that "the perceived size of undocumented immigrants is likely to prompt perceptions of undocumented immigrants as a criminal threat for native respondents." The researcher also linked this perceived immigrant threat to "the media and politicians who desire to restrict immigration have portrayed undocumented immigrants as undeserving criminals." [170] In contradiction to this threat narrative, a study by the CATO Institute found "that in Texas, in 2019, illegal immigrants were 37.1 percent less likely to be convicted of a crime than native-born Americans and legal immigrants were about 57.2 percent less likely to be convicted of a crime than native-born Americans." [171]

In pursuit of this threat narrative to frighten voters with racial stereotypes, Republicans across the country have used similar or the same stock photos of fierce shirtless and tattooed, young Hispanic men as in Texas. Compare, for example, the photo in Jackie Peden's Texas campaign (Figure 9) ad with the photos from Republican ads in New York and California (Figures 10 and 11). [172]

---

[170] Xia Wang, Undocumented Immigrants as Perceived Criminal Threat: A Test of the Minority Threat Perspective," *Criminology*, 50 (2012), at. 744,763.
[171] Alex Nowrasteh, "Criminal Immigrants in Texas in 2019: Illegal Immigrant Conviction Rates and Arrest Rates for Homicide, Sex Crimes, Larceny, and Other Crimes," *Cato Institute*, 11 May 2021, https://www.cato.org/immigration-research-policy-brief/criminal-immigrants-texas-2019.
[172] Campaign Legal Center, "Race in our Politics: A Catalogue of Campaign Materials, https://campaignlegal.org/race-our-politics-catalog-campaign-materials; America's Voice, 2020 Ad Watch, http://2020adwatch.com/.

**FIGURE 10**
**REPUBLICAN PARTY AD AGAINST NASSAU CO. DEMOCRATIC EXECUTIVE,**
**LAURA CURRAN, 2017**



**FIGURE 11**
**MIKE CARGILE, REPUBLICAN CANDIDATE FOR CONGRESSIONAL DISTRICT 35, AD AGAINST DEMOCRAT NORMA TORRES CALIFORNIA, 2020**

MS-13 commits shocking acts of violence to instill fear, including machete attacks, executions, gang rape, human trafficking, and more. Their motto is to "kill, rape, control."

But to Nancy Pelosi? She referred to MS-13 saying, "we are all God's children ... we respect the dignity and worth of every person."

Norma Torres is cut from the same cloth. It's time we fire Norma Torres from Congress.



The immigrant threat narrative includes false claims the undocumented immigrants are spreading COVID-19 in American communities. In a March 2021 ad, U.S. Representative Ronny Jackson charged that "Slapping an OPEN sign on the border during a global pandemic is NOT the answer. Dems want you to stay home & be scared of COVID, while allowing illegal aliens to spread it in our communities."[173] Similarly, in March 2021, Governor Abbot charged that, "The Biden administration has been releasing immigrants in South Texas that have been exposing Texans to COVID. Some of those people have been put on buses, taking that COVID to other

---

[173] GOP Ad Tracker, http://gopadtracker.com/index.php/node/1491.

states in the United States."[174]

In October 2021, CNN host Dana Bash asked Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases, "Are immigrants a major reason why COVID-19 is spreading in the U.S.?" Dr. Fauci responded, "No, absolutely not, Dana. I mean, if you just look at the data and look at the people who have gotten infected, look at the people who are in the hospital, look at the people who've died, this is not driven by immigrants. This is the problem within our country, the same way it's a problem with other countries throughout the world."[175] Dr. Michele Heisler, Medical Director at Physicians for Human Rights and a Professor of Internal Medicine and Public Health at the University of Michigan, agreed saying, "As Dr. Fauci emphasized, there is no epidemiological evidence that migrants at the U.S. southern border are driving the spread of the delta variant or earlier variants that cause COVID-19."[176]

In another recent example of a racial appeal, Governor Abbott issued an attack ad against reelection opponent, Beto O'Rourke in late October 2021. CNN's fact checker, Daniel Dale scrutinized the ad and described the many ways in which it altered or doctored O'Rourke's words to appeal to racial fears:

> "The ad's first deceptive edit deleted key O'Rourke words to make it sound like he had issued a broad, unreserved endorsement of Black Lives Matter activists for bringing attention to the idea of defunding the police. O'Rourke's actual words were narrower: he praised the activists for bringing attention to the idea of defunding 'line items that have overmilitarized our police.'
>
> The second deceptive edit deleted key words to make it sound like O'Rourke had called for 'dismantling' police departments, end of story. He had actually called for dismantling 'and rebuilding' departments in 'some necessary cases.'

---

[174] Noah Higgins-Dunn, "Texas Gov. Abbot Blames COVID Spread on Immigrants, Criticizes Biden's 'Neanderthal' Comment," *CNBC*, 12 March 2021, https://www.cnbc.com/2021/03/04/texas-gov-abbott-blames-covid-spread-on-immigrants-criticizes-bidens-neanderthal-comment-.html.

[175] Robert Farley, "Migrants are not Responsible for Latest COVID-19 Surge," *Factcheck.org*, 12 October 2021, https://www.factcheck.org/2021/10/scicheck-migrants-not-responsible-for-latest-covid-19-surge/.

[176] Ibid.

The third deceptive edit was especially egregious. This one mashed together phrases from three different O'Rourke sentences. The stitch job made it sound like an O'Rourke comment about the importance of Black Lives Matter activism, and how it is part of a tradition of civil rights activism, was a comment about the importance of defunding the police and dismantling police departments.

For emotional effect, the ad juxtaposed O'Rourke's altered words with a series of video clips of rioting and looting."[177] (Figure 12)

**FIGURE 12**
**FROM ABBOTT ANTI-O'ROURKE AD, OCTOBER 2O21**



---

[177] Daniel Dale, "Fact Check: Greg Abbott Attack Ad Deceptively Alters Beto O'Rourke's Comments on Policing," CNN, 23 November 2021, https://www.cnn.com/2021/11/23/politics/fact-check-abbott-ad-orourke-defund-police/index.html.

By engaging in explicit and subtle racial appeals capitalizing on racial and ethnic stereotypes, candidates for office in Texas exploit race and ethnicity to influence voters'choices at the polls.

**Factor 7: The Extent to Which Members of the Minority Group Have Been Elected to Public Office in the Jurisdiction.**

As indicated in **Table 14** and **Chart 10**, minorities are underrepresented among elected officials in Texas.[178] Based on the latest U.S. Census data, minorities are 49.9% of CVAP as indicated above, yet, among all 29 statewide elected positions, only four are held by minorities. Of Texas's 36 seats in the U.S. House of Representatives, only 12 are held by minorities. Of 181 state legislative seats, only 69 are occupied by minorities. Nearly all minorities in the Texas U.S. congressional delegation and the State Legislature are Democrats and were elected in majority-minority districts. There is one Republican minority member in the U.S. Congress and just five Republican minorities in the state legislature.[179]

---

[178] *See* App. A at 22-23.
[179] United States Congressional Delegations From Texas, https://ballotpedia.org/United_States_congressional_delegations_from_Texas, Texas State Executive Offices, https://ballotpedia.org/Texas_state_executive_offices; Alexa Ura and Carla Astudillo, "In 2021 White Men Are Still Overrepresented in the Texas Legislature, *Texas Tribune*, 11 January 2021, https://apps.texastribune.org/features/2020/2021-texas-legislature-representation/.

My analysis should not be read to suggest that any group is guaranteed proportional representation, but it uses CVAP as a gauge of minority versus Anglo representation. CVAP is a conservative measure. If the voting age population (VAP) was used, the seats versus population gap would be much wider. Minorities comprise 56.8% of Texas VAP, compared to 49.9% of CVAP.[180]

**Factor 8: Whether There Is a Significant Lack of Responsiveness on the Part of Elected Officials to the Particularized Needs of the Members of the Minority Group**

Elected officials in Texas have demonstrated a lack of responsiveness to the particularized needs of African Americans and Hispanics in the areas of health care, education, immigration, and crisis response. As a result, disparities in these areas persist and hinder Black and Hispanic Texans's political participation and overall advancement.

### A. Health Care

As discussed above, African Americans and Hispanics in Texas are much less likely than Anglos to have health insurance coverage. Yet, Texas is one of only 12 states that has failed to adopt the Medicaid expansion that has been available for many years under the Affordable Care Act. Medicaid expansion would be of particular importance for African Americans and Hispanics, because coverage is based upon income at 138% of the poverty level.[181] And, as indicated above, due to the history of discrimination in Texas, African Americans and Hispanics have, on average, lower incomes than Anglos and are far more likely to live in poverty.

A study that compared Texas with states that had adopted Medicaid expansion found that expansion substantially improved health care and outcomes:

---

[180] United States Census Bureau, https://data.census.gov/cedsci/table?q=citizen%20voting%20age%20population%20texas%20whites%20not%20hispanic&tid=DECENNIALPL2020.P4 (last accessed May 19, 2022).
[181] Kaiser Family Foundation, "Status of State Action on the Medicaid Expansion Decision," 5 November 2021, https://www.kff.org/medicaid/issue-brief/status-of-state-medicaid-expansion-decisions-interactive-map/.

- Expansion was associated with significantly increased access to primary care;

- Fewer skipped medications due to cost;

- Reduced out-of-pocket spending;

- Reduced likelihood of emergency department visits;

- Increased outpatient visits;

- Increased screening for diabetes, glucose testing among patients with diabetes, and regular care for chronic conditions; and

- Quality of care ratings improved significantly, as did the share of adults reporting excellent health.[182]

A review of studies on racial disparities in health care concluded that "[t]ogether these findings illustrate that Medicaid expansion has contributed to reductions in longstanding racial disparities in health coverage."[183] The review warned, however, that Medicaid expansion by itself is not sufficient: "As such, the findings point to the importance of ongoing efforts to address health disparities considering a broad array of factors within and outside the heath sector, including historic and ongoing racism and discrimination."[184]

As indicated in **Table 15** and **Chart 11** Texas's deficiency in providing health care is manifest in substantial differences between the state and the nation in minorities lacking health insurance.[185] The percentage of uninsured Hispanics in Texas is 10.6 percentage points and 58.3%

---

[182] Benjamin D. Sommers, et al., "Changes in Utilization and Health Among Low-Income Adults After Medicaid Expansion or Expanded Private Insurance," Journal of Internal Medicine, (2016), 1501.

[183] Madeline Guth, Samantha Artiga, and Olivia Pham, "The Effects of the ACA Medicaid Expansion on Racial Disparities in Health and Health Care," Kaiser Family Foundation, 30 September 2020, https://www.kff.org/medicaid/issue-brief/effects-of-the-aca-medicaid-expansion-on-racial-disparities-in-health-and-health-care/.

[184] Ibid.

[185] *See* App. A at 24-25.

higher than the percentage of uninsured Hispanics nationwide.[186] The percent of uninsured Blacks in Texas is 4.6 percentage points and 45.5% higher than the percentage of uninsured Blacks nationwide.[187]

As further indicated in **Table 16** and **Chart 12**, a 2021 survey found that an overwhelming percentage of Hispanics and Blacks in Texas support expanding Medicaid and positively view the program. For Hispanics, 75% have a favorable view of Medicaid and 82% favor its expansion in the state.[188] For Blacks, 84% have a favorable view of Medicaid and 84% favor its expansion in the state.[189] Even Anglos have a favorable view of Medicaid and support its expansion although by smaller percentages than minorities. For Anglos, 62% have a favorable view of Medicaid and 55% favor its expansion in the state.[190] For survey respondents, 69% have a favorable view of Medicaid and 69% favor its expansion in the state.[191]

### B. Education

Support for public education is significant for Hispanics and African Americans, who are disproportionately dependent on public schools. As shown in **Table 17**, according to Texas's 2018-19 enrollment statistics, minorities comprise 72.6% of public school enrollments.[192] Nonetheless, as indicated above, the Education Law Center graded Texas an F for school funding, a D for funding effort relative to state wealth, and a D for equity in funding distribution. Consistent with the much higher socio-economic standing of Anglos as compared to minorities in Texas, the percentage of Anglo pupils in private schools is more than double their percentage in public schools. According to a 2020 study by Private School Review, Anglo children comprised 60% of

---

[186] *Id.* at 24.
[187] *Id.*
[188] *See* App. A at 26-27.
[189] *Id.*
[190] *Id.*
[191] *Id.*
[192] *See* App. A at 28.

private school enrollment in Texas, compared to 27% for public school enrollment. (Chart 13).[193]

## C. Immigration

In 2017, Texas adopted SB4, the most stringent anti-immigration law in the nation. This law authorizes police, including college campus police, to question the immigration status of anyone they detain or arrest, including persons detained for minor traffic infractions. Under penalty of fines, imprisonment, or removal from office, it requires police chiefs and sheriffs to honor requests for deportation by Immigration and Customs Enforcement (ICE). Under threats of jail time or fines, local elected and appointed officials could not "adopt, enforce, or endorse" policies under which the entity "prohibit[ed] or materially limit[ed]" immigration enforcement.[194]

The Texas Police Chiefs Association—and the police chiefs of Texas's major cities with large populations of Hispanics—opposed SB 4, as did every major Hispanic organization in the state. The Mexican-American Legal Defense and Education Fund (MALDEF), the Texas Organizing Project Education Fund (TOPEF), the Texas League of United Latin American Citizens (LULAC), Texas Association of Chicanos in Higher Education (TACHE), the Workers Defense Fund, and the La Union Del Pueblo Entero (LUPE) have all initiated lawsuits challenging the law. They have been joined by the cities of Austin, Dallas, El Cenizo, El Paso, Houston, Laredo, and San Antonio, and by El Paso County, Maverick County, and Travis County.[195] As noted above, the CATO study documented that such ICE detainers have mistakenly snared substantial numbers of U.S. citizens in Texas.

In August 2017, Chief U.S. District Judge Orlando L. Garcia of the San Antonio U.S.

---

[193] Private School Review, Average Private School Minority Enrollment 2021, https://www.privateschoolreview.com/average-diversity-minority-stats/national-data.
[194] Enrolled Version, S.B. No. 4, https://capitol.texas.gov/tlodocs/85R/billtext/pdf/SB00004F.pdf.
[195] Anna Núñez, Immigration 101: What is SB 4, Texas' Immigration Law? America's Voice, 21 March 2018, https://americasvoice.org/blog/sb4-texas-immigration-law/.

District Court temporarily enjoined most of the law. The Fifth Circuit then lifted the injunction blocking most of the law from taking place. The Circuit Court then upheld nearly all of SB 4, save for the endorse provision as applied to elected officials. However, the Circuit Court left open a door for challengers to SB 4 to bring additional claims based on the enforcement of the law. Litigation continued.[196]

For law enforcement, Senate Factor 5 documents the disparate negative impact on minorities and the lack of responsiveness by the state in its failure to adopt an effective system for controlling racial profiling and police misconduct.

### D.  Response to COVID-19

In Texas, COVID-19 has disproportionately impacted Hispanics and Blacks. According to state compilations, among cases where the race is known, Hispanics account for 43% of cases compared to 39.3% of the population and Blacks account for 17.2% compared to 11.4% of the population.[197] An October 2021 University of Texas/Texas Tribune Poll (UT/TT) of 1,200 registered voters found that 66% of Blacks and 52% of Hispanics believed that COVID-19 was "a significant crisis," compared to 34% of Anglos.[198]

Rather than acting affirmatively to combat the pandemic, Governor Abbott has defied science by banning mask mandates by all state entities, including local and state government facilities, health care facilities, and private businesses.[199] A scientific study published in the *Proceedings of the National Academy of Sciences of the United States of America*, one of the

[196] MALDEF Expands Challenge to Texas (SB 4) Anti-Sanctuary Cities Law," 17 December 2019, https://www.maldef.org/2019/12/maldef-expands-challenge-to-texas-sb4-sanctuary-cities-law/.
[197] Texas Department of State Health Services, "COVID-19 Cases by Demographics," Updated 19 November 2021, https://dshs.texas.gov/coronavirus/AdditionalData.aspx.
[198] University of Texas/Texas Tribune Poll, Texas Statewide Survey October 2021, https://static.texastribune.org/media/files/7e993e10b2ed8c05eefdb117907d6feb/ut-tt-2021-11-crosstabs.pdf. The poll included a sample of 1,200 registered voters in Texas.
[199] Paul LeBlanc, "Texas Governor Bans COVID-19 Mask Mandates by any Employer in the State," CNN, 11 October 2021, https://www.cnn.com/2021/10/11/politics/texas-vaccine-mandate-greg-abbott/index.html.

world's premier scientific journals, concluded that "[t]he preponderance of evidence indicates that mask wearing reduces transmissibility per contact by reducing transmission of infected respiratory particles in both laboratory and clinical contexts."[200] It found that "public mask wearing is most effective at reducing spread of the virus when compliance is high," and recommended "that public officials and governments strongly encourage the use of widespread face masks in public, including the use of appropriate regulation."[201]

The people of Texas disagree with the Governor's ban on mask mandates, most notably minorities. The October 2021 UTT/TT poll found that 57% of respondents support "requiring people to wear masks in indoor public spaces," including 47% of Anglos, 84% of Blacks, and 66% of Hispanics. There is also a deep racial divide on how effectively poll respondents believe Governor Abbott has responded to the pandemic in Texas. According to the poll, 52% of Anglos "approve of how Greg Abbott has handled the response to the coronavirus/COVID-19, compared to 19% of Blacks and 32% of Hispanics."[202]

### E.  Response to Electrical Grid Failure

The Arctic cold front that swept through Texas in February 2021 left millions without power and lacking water, food, and transportation. Minority communities were hit especially hard. "Whether it's flooding from severe weather events like hurricanes or it's something like this severe cold, the history of our response to disasters is that these [minority] communities are hit first and have to suffer the longest," said Robert Bullard, Distinguished Professor of Urban Planning and Environmental Policy at Texas Southern University.[203]  Texas had ignored earlier warnings about

---

[200] Jeremy Howard, et al., "An Evidence Review of Face Masks Against COVID-19" PNAS, (January 2021), at 118(4).
[201] Ibid.
[202] Ibid.
[203] James Dobbins and Hiroko Tabuchi, "Texas Blackouts Hit Minority Neighborhoods Particular Hard," New York Times, 18 February 2021, https://www.nytimes.com/2021/02/16/climate/texas-blackout-storm-minorities.html.

the vulnerability of its electric grid and inadequate preparation for a potential disaster.[204] According to the October 2021 UTT/TT poll, 51% of Anglos approved of how Governor Abbott "handled the response to the winter storm and its effects," compared to 20% of Blacks and 28% of Hispanics.

Overall, polling data shows deep racial disparities in views on the Texas state government. According to the October 2021 UTT/TT poll, 61% of Anglos agreed that "[g]enerally speaking, the way state government runs in Texas serves as a good model for other states to follow?" However, only 27% of Blacks and 38% of Hispanics agreed.[205]

**Factor 9: Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.**

Texas has no legitimate justification for its failure to create additional majority-minority districts in the post-2020 redistricting process. The 2020 census showed that, since 2010, Texas's population grew by nearly 4 million people, 95% of which came from communities of color. Hispanic Texans accounted for half of that growth. As a result of the considerable growth, Texas was apportioned two additional congressional seats. However, the enacted house and congressional maps do not account for this growth. Texas was widely criticized for failing to represent that minorities accounted for 95% of the population growth that accorded Texas two additional seats.[206] And the maps' proponents were unable to offer any justification for why the maps were drawn without accounting for the dramatic increase in Texas's minority population.

---

[204] FERC, NERC and Regional Entity Staff Report, The February 2021 Cold Weather Outages in Texas and the South Central United States, 16 November 2021, https://www.ferc.gov/media/february-2021-cold-weather-outages-texas-and-south-central-united-states-ferc-nerc-and. FERC is the Federal Energy Regulatory Commission and NERC is the North American Electric Reliability Corporation.
[205] Ibid.
[206] *See e.g.* James Barragan and Alexa Ura, "Lawmakers send to Gov. Greg Abbott new political maps that would further solidify the GOP's grip on the Texas Legislature," The Texas Tribune, 15 October 2021, https://www.texastribune.org/2021/10/15/texas-legislature-redistricting/.

## V.    Conclusion

Every Senate Factor examined in this report, with the exception of slating, applies with significant force to the state of Texas. These factors are not isolated circumstances, but they are intertwined to present substantial impediments to minority political participation and the election of preferred candidates. Texas's long history of voting discrimination against minorities is ongoing.

* * *

I reserve the right to supplement this and other reports in light of additional facts, testimony and/or materials that may come to light. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

-------------------------------------------------------

Allan J. Lichtman

**Dated: May 20, 2022**

# APPENDIX TO EXPERT REPORT

## APPENDIX A

## Senate Factor 1

### COMPILATION 1

### RANKING OF THE STATES ON COST OF VOTING (COVI) THE HIGHER THE COVI THE MORE DIFFICULT IS ACCESS TO REGISTRATION AND VOTING

(Scot Schraufnagel, Michael J. Pomante II and Quan Li, "Cost of Voting in the American States," *Election Law Journal: Rules, Politics, and Policy*, 2020, 19(4), Figure 1.)



## Senate Factor 2

### TABLE 1

### TEXAS, SUPPORT FOR VOTER REFORMS TO EXPAND VOTER ACCESS

| QUERY | STRONGLY SUPPORT | SOMEWHAT SUPPORT | SUM | OPPOSE |
|---|---|---|---|---|
| Extend early voting locations by one week* | 53% | 21% | 74% | 22% |
| | | | | |
| Allow early voting locations to be open two weekends * | 62% | 18% | 80% | 18% |
| | | | | |
| Increasing voter locations on Election Day * | 70% | 17% | 87% | 10% |
| | | | | |
| Have alternate secure ballot return sites * | 35% | 22% | 57% | 34% |
| | | | | |
| Allow people to register on Election Day** | 29.0% | 21.5% | 50.5% | 49.5% |
| | | | | |
| Automatically register all citizens over 18 to vote ** | 45.0% | 13.5% | 58.5% | 41.5% |
| | | | | |

* Ragnar Research Partners, "Voting and Election Issues, Texas," July, 2021, https://static1.squarespace.com/static/5ab92d8f266c071e567dd752/t/60e3b5b6df051a4991308d96/1625535926613/Ragnar+Research+%7C+Secure+Democracy+July+2021+TX+Poll.pdf;
**Survey of the Performance of American Elections, 2020, https://electionlab.mit.edu/research/projects/survey-performance-american-elections; Dallas Morning News, UT Tyler Poll, September, 2021, https://www.uttyler.edu/politicalscience/files/dmn-uttylersept2021rv.pdf

**TABLE 2**

**NAACP CIVIL RIGHTS FEDERAL LEGISLATIVE REPORT CARD SCORES, U.S. HOUSE OF REPRESENTATIVES, REPUBLICAN & DEMOCRATS, TEXAS, 2017-2018**

| REPUBLICAN MEMBER | NAACP SCORE | DEMOCRATIC MEMBER | NAACP SCORE |
|---|---|---|---|
| | | | |
| Louie Gohmert | 16% | Al Green | 100% |
| Ted Poe | 13% | Vincente Gonzalez | 84% |
| Sam Johnson | 3% | Beto O'Rourke | 94% |
| John Ratcliffe | 3% | Sheila Jackson Lee | 100% |
| John Hensarling | 6% | Joaquin Castro | 100% |
| Joe L. Barton | 6% | Henry Cuellar | 59% |
| John Culberson | 9% | Gene Green | 91% |
| Kevin Brady | 9% | Eddie Bernice Johnson | 97% |
| Michael McCaul | 13% | Marc Veasey | 97% |
| K. Michael Conaway | 9% | Filemon Vela | 81% |
| Kay Granger | 9% | Lloyd Doggett | 97% |
| Mac Thornberry | 9% | | |
| Randy Weber | 6% | | |
| Bill Flores | 9% | | |
| Jody C. Arrington | 9% | | |
| Lamar Smith | 9% | | |
| Pete Olson | 9% | | |
| Will Hurd | 22% | | |
| Kenny Marchant | 6% | | |
| Roger Williams | 9% | | |
| Michael Burgess | 9% | | |
| John Carter | 6% | | |
| Pete Sessions | 9% | | |
| Brian Babin | 3% | | |
| | | | |
| AVERAGE | 9% | | 91% |
| Source: NAACP Civil Rights Federal Legislative Report Card, U.S. House Of Representatives, Texas, 2017-2018. https://naacp.org/sites/default/files/documents/115th-Final-Report-Card.pdf. | | | |

**CHART 1**

**NAACP CIVIL RIGHTS FEDERAL LEGISLATIVE REPORT CARD SCORES, U.S. HOUSE OF REPRESENTATIVES. REPUBLICANS & DEMOCRATS, TEXAS, 2017-2018, FROM TABLE 2**



**TABLE 3**

**POSITIONS ON RACIAL ISSUES, % REPUBLICANS AGREE OR DISAGREE IN TEXAS COMPARED TO % DEMOCRATS AGREE OR DISAGREE IN TEXAS**

| Question | Republican % Agree | Democrats % Agree | Difference Percentage Points | Difference Percent |
|---|---|---|---|---|
| White people in the U.S. have certain advantages because of the color of their skin. | 21.8% | 87.8% | +66.0 PTS | +303% |
|  |  |  |  |  |
| Generations of slavery and discrimination have created conditions that make it difficult for blacks to work their way out of the lower class. | 16.6% | 78.1% | +61.5 PTS | +370% |
| **Question** | **Republican % Disagree** | **Democrats % Disagree** | **Difference Percentage Points** | **Difference Percent** |
|  |  |  |  |  |
| Racial problems in the U.S. are rare, isolated situations. | 32.7% | 83.2% | +50.5 PTS | +154% |
|  |  |  |  |  |
| Irish, Italians, Jewish and many other minorities overcame prejudice and worked their way up. Blacks should do the same without any special favors. | 21.8% | 81.1% | +59.3 PTS | +272% |
|  |  |  |  |  |

N=3,554. All differences are statistically significant well beyond the most stringent levels in social science.
Source: Cooperative Congressional Election Study (CCES), 2020, https://cces.gov.harvard.edu/.

**CHART 2**
**POSITIONS ON RACIAL ISSUES, % REPUBLICANS IN TEXAS COMPARED TO %**
**DEMOCRATS AGREE, FROM TABLE 3**



**CHART 3**

**POSITIONS ON RACIAL ISSUES, % REPUBLICANS IN TEXAS DISAGREE
COMPARED TO % DEMOCRATS DISAGREE IN TEXAS, FROM TABLE 3**



**Senate Factor 4**

**TABLE 4**

**VOTING AGE POPULATION AND DEMOGRAPHIC COMPOSITION OF FIVE MOST POPULOUS COUNTIES IN TEXAS**

| County | Land Area | Voting Age Population | % Anglo | % Black | % Hispanic | % Minority |
|--------|-----------|----------------------|---------|---------|------------|------------|
| Harris | 1,704 sq. miles | 3,519,584 | 30.6% | 19.1% | 39.9% | 69.4% |
| Dallas | 871 sq. miles | 1,972,588 | 31.6% | 22.1% | 36.6% | 68.4% |
| Tarrant | 864 sq. miles | 1,574,086 | 46.9% | 17.0% | 26.3% | 53.1% |
| Bexar | 1,240 sq. miles | 1,512,388 | 29.5% | 7.9% | 56.5% | 70.5% |
| Travis | 990 sq. miles | 1,016, 490 | 50.8% | 8.0% | 29.7% | 49.2% |
| Source: 2020 Census, Population 18 Years and Older, Texas. | | | | | | |

**Senate Factor 5**

### TABLE 5

### ECONOMIC INDICATORS BY RACE, TEXAS

| MEASURE | BLACK | HISPANIC | ANGLO |
|---|---|---|---|
| | | | |
| MEDIAN HOUSEHOLD INCOME* | $47,814 | $52,010 | $78,905 |
| | | | |
| PER CAPITA INCOME* | $24,958 | $20,401 | $44,953 |
| | | | |
| UNEMPLOYMENT RATE* | 6.9% | 4.5% | 3.7% |
| | | | |
| FOOD STAMP RECIPIENT* | 18.9% | 16.5% | 5.4% |
| | | | |
| POVERTY RATE, PERSONS* | 18.1% | 18.7% | 8.0% |
| | | | |
| HOUSEHOLD ASSET POVERTY RATE** | 35.1% | 28.5% | 17.% |
| | | | |
| HOUSEHOLD LIQUID ASSET POVERTY RATE** | 51.6% | 57.4% | 31.5% |
| | | | |
| NET WORTH OF HOUSEHOLDS** | NA | $36,500 | $151,080 |
| | | | |
| HOUSEHOLDS, NO BANK ACCOUNT** | 19.0% | 16.1% | 2.8% |
| | | | |
| HOME OWNERSHIP RATE | 39.9% | 57.7% | 70.5% |
| | | | |
| NO VEHICLES AVAILABLE | 10.9% | 5.6% | 3.8% |
| Sources: * U.S. Census American Community Survey, 2019; ** Prosperity Now Scorecard, 12 September 2021, https://scorecard.prosperitynow.org/.[1] | | | |

**TABLE 6**

**HEALTH INDICATORS BY RACE, TEXAS**

| MEASURE | BLACK | HISPANIC | ANGLO |
|---|---|---|---|
| | | | |
| PERCENT WITH PRIVATE HEALTH INSURANCE | 59.9% | 46.8% | 74.6% |
| | | | |
| PERCENT WITH NO HEALTH INSURANCE | 14.6% | 28.6% | 10.6% |
| | | | |
| FORGO HEALTH CARE DUE TO COSTS | 16.0% | 22.8% | 12.8% |
| | | | |
| POOR OR FAIR HEALTH STATUS | 20.7% | 22.9% | 15.9% |
| | | | |
| LIFE EXPECTANCY | 74.8 | 79.5 | 78.2 |
| | | | |
| % LOW WEIGHT BIRTHS | 13.4% | 7.5% | 7.5% |
| | | | |
| INFANT MORTALITY | 10.0% | 5.1% | 4.5% |
| Source: Texas Department of State Health Services, Vital Statistics, Annual Report, 2014, https://www.dshs.texas.gov/chs/vstat/vs14/anrpt.aspx; US Census, American Community Survey, 2017. | | | |

**TABLE 7**

**EDUCATIONAL MEASURES BY RACE, TEXAS 2019 US CENSUS, AMERICAN COMMUNITY SURVEY**

| MEASURE | BLACK | HISPANIC | ANGLO |
|---|---|---|---|
| | | | |
| HIGH SCHOOL GRADUATES AGE 25+ * | 91.4% | 68.3% | 94.4% |
| | | | |
| BACHELOR'S DEGREE OR MORE AGE 25+ * | 26.0% | 16.1% | 39.4% |
| | | | |
| SPEAK ENGLISH LESS THAN "VERY WELL" * | 2.2% | 28.1% | 1.2% |
| | | | |
| PERCENT AT OR ABOVE BASIC 8TH GRADE READING ** | 47% | 62% | 80% |
| | | | |
| PERCENT AT OR ABOVE BASIC 8TH GRADE MATH ** | 52% | 63% | 80% |
| | | | |
| HIGH SCHOOL DROPOUT RATE 2013-2017 *** | 4.3% | 5.7% | 10.2% |
| | | | |
| | | | |

* US CENSUS, American Community Survey, 2019;

National Center for Educational Statistics, Texas, Reading, 2019, https://nces.ed.gov/nationsreportcard/subject/publications/stt2019/pdf/2020014TX8.pdf; National Center for Educational Statistics, Texas, Mathematics, 2019, https://nces.ed.gov/nationsreportcard/subject/publications/stt2019/pdf/2020013TX8.pdf; National Center for Educational Statistics, "Trends in High School Dropout and Completion Rates in the United States: 2019," p. 48, https://nces.ed.gov/pubs2020/2020117.pdf

**TABLE 8**

**RACIAL DISPARITIES IN PUBLIC K-12 SCHOOL DISCIPLINE, TEXAS, 2015-2016 SCHOOL YEAR**

| DAYS LOST PER 100 STUDENTS, OUT-OF-SCHOOL SUSPENSIONS, 2015-2016* | | |
|---|---|---|
| **BLACK STUDENTS** | **HISPANIC STUDENTS** | **ANGLO STUDENTS** |
| | | |
| 44 DAYS | 15 DAYS | 7 DAYS |
| RATIO OF LOST DAYS MINORITY TO ANGLO | | |
| **BLACK STUDENTS** | **HISPANIC STUDENTS** | **ANGLO STUDENTS** |
| | | |
| 6.3 TO 1 | 2.1 TO 1 | NA |
| PERCENT OF STUDENTS WITH OUT-OF-SCHOOL SUSPENSIONS, 2019-2020 | | |
| **BLACK STUDENTS** | **HISPANIC STUDENTS** | **ANGLO STUDENTS** |
| 13.4% | 5.2% | 2.8% |
| RATIO OF MINORITY TO ANGLO SUSPENSION RATE | | |
| 4.8 TO 1 | 1.9 TO 1 | NA |

Daniel J. Losen And Amir Whitaker, Joint Report By The Center For Civil Rights Remedies Of UCLA's Civil Rights Project And The American Civil Liberties Union Of Southern California, "11 Million Days Lost: Race, Discipline and Safety at U.S. Public Schools," Part 1, https://www.aclu.org/sites/default/files/field_document/final_11-million-days_ucla_aclu.pdf. ** Texas Education Agency, "Public School Enrollment 2019-2020," https://tea.texas.gov/sites/default/files/enroll_2019-20.pdfand, and "Disciplinary Summary," https://rptsvr1.tea.texas.gov/cgi/sas/broker?_service=marykay&_program=adhoc.download_stati c_summary.sas&district=&agg_level=STATE&referrer=Download_State_Summaries.html&test _flag=&_debug=0&school_yr=20&report_type=html&Download_State_Summary=Next.

**CHART 4**

**LOST SCHOOL DAYS DUE TO SUSPENSION BY RACE TEXAS, K-12 PUBLIC SCHOOLS, FROM TABLE 8**



**CHART 5**

**PERCENT OF STUDENTS WITH OUT OF SCHOOL SUSPENSIONS BY RACE
TEXAS, K-12 PUBLIC SCHOOLS, FROM TABLE 8**



**TABLE 9**
**INCARCERATION RATES BY RACE, TEXAS**

| STATISTIC | ANGLO | BLACK | HISPANIC | BLACK RATIO TO ANGLO | HISPANIC RATIO TO ANGLO |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| **INCARCERATION RATE PER ADULT** | **.56%** | **1.9%** | **.65%** | **3.4 TO 1** | **1.2 TO 1** |
|  |  |  |  |  |  |

| Source: E. Ann Carson, "Prisoners in 2019," U.S. Department of Justice, Bureau of Justice Statistics, October 2020, pp. 4, 36; U.S. Census, 2020, https://data.census.gov/cedsci/table?q=VOTING%20AGE%20POPULATION%20TEXAS%20NOT%20HISPANIC&tid=DECENNIALPL2020.P4. |
|---|

**TABLE 10**

**BLACK/ANGLO DISPARITIES IN JUVENILE DETENTION PLACEMENTS, TEXAS, 2019**

| BLACK PLACEMENT RATE PER 100,000 | ANGLO PLACEMENT RATE PER 100,000 | BLACK TO ANGLO RATIO |
|---|---|---|
|  |  |  |
| **345** | **74** | **4.7 TO 1** |

| Source: Josh Rovner, "Black Disparities in Youth Incarceration," The Sentencing Project, 12 July 2021, p. 1, https://www.sentencingproject.org/publications/black-disparities-youth-incarceration/, p. 2. |
|---|

**CHART 6**

**INCARCERATION RATES BY RACE, TEXAS, FROM TABLE 9**



**CHART 7**

**JUVENILE PLACEMENT RATE FOR ANGLOS AND BLACKS, TEXAS, FROM TABLE 10**



TABLE 11

**RACIAL PROFILING IN TEXAS, 2020 TRAFFIC STOPS FOR BLACKS, 6 CITIES WITH 500,000+ POPULATION**

| CITY | % NH BLACK 18+ POPULATION % | % BLACK TRAFFIC STOPS | PERCENTAGE POINT DIFFERENCE | PERCENT DIFFERENCE |
|------|------|------|------|------|
| | | | | |
| HOUSTON | 20.3% | 38.4% | +18.1 PTS | +89% |
| | | | | |
| SAN ANTONIO | 6.7% | 11.6% | +4.9 PTS | +73% |
| | | | | |
| DALLAS | 23.0% | 39.7% | +16.7 PTS | +73% |
| | | | | |
| AUSTIN | 6.9% | 14.9% | +8.0 PTS | +116% |
| | | | | |
| FORT WORTH | 19.0% | 25.6% | +6.6 PTS | +35% |
| | | | | |
| EL PASO | 3.2% | 5.8% | +2.6 PTS | +81% |
| | | | | |
| Source: Texas Commission on Law Enforcement, 2020 Racial Profiling Report, https://www.tcole.texas.gov/content/racial-profiling-reports. | | | | |

**Senate Factor 6**

TABLE 12

**TURNOUT DISPARITIES BETWEEN ANGLOS AND MINORITIES, PRESIDENTIAL ELECTION OF 2020**

| MINORITY % OF CVAP | MINORITY % OF TURNOUT EXIT POLL 2020 | DIFFERENCE |
|------|------|------|
| 49.9% | 40% | -9.9 PERCENTAGE PTS |
| | | |
| ANGLO % OF CVAP | ANGLO % OF TURNOUT EXIT POLL 2020 | DIFFERENCE |
| 50.1% | 60% | +9.9 PERCENTAGE PTS |
| | | |
| Source: CNN Exit Poll, Texas, https://www.cnn.com/election/2020/exit-polls/president/texas. N=4,768. | | |

**TABLE 13**

**ANGLO, HISPANIC, AND BLACK, CITIZEN VOTING AGE POPULATION (CVAP) TURNOUT %, TEXAS 2020 PRESIDENTIAL ELECTION**

| ANGLO % OF CVAP VOTING | HISPANIC % OF CVAP VOTING | DIFFERENCE WITH ANGLOS | BLACK % OF CVAP VOTING | DIFFERENCE WITH ANGLOS |
|---|---|---|---|---|
| | | | | |
| 72.0% | 53.1% | -18.1 PERCENTAGE PTS -25.1% | 60.8% | -11.2 PERCENTAGE PTS -15.6% |
| | | | | |
| Source: Current Population Survey, "Voting and Registration in the Election of November 2020," Table 4b, https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-585.html. N=21,485. | | | | |

**CHART 8**

**TURNOUT DISPARITIES BETWEEN ANGLOS AND MINORITIES, % IN CVAP COMPARED TO % IN 2020 PRESIDENTIAL ELECTORATE, FROM TABLE 12**



**CHART 9**

**TURNOUT RATES BY RACE, TEXAS, 2020 PRESIDENTIAL ELECTION, FROM TABLE 13**



Senate Factor 7

TABLE 14

ANGLO AND MINORITY REPRESENTATION AMONG TEXAS ELECTED
OFFICIALS

| MINORITY ELECTED OFFICIALS | | | | |
|---|---|---|---|---|
| Public Office | % of Office Holders | CVAP | Percentage Point Shortfall | Shortfall # of Positions |
| | | | | |
| State Executive Officials | 11.1% (1 of 9) | 49.9% | --38.8% | -3.5 |
| | | | | |
| Supreme Court | 11.1% (1 of 9) | 49.9% | -38.8% | -3.5 |
| | | | | |
| Ct of Criminal Appeals | 11.1% (1 of 9) | 49.9% | -38.8% | -3.5 |
| | | | | |
| US Senate | 50% (1 of 2) | 49.9% | +0.1% | 0 |
| | | | | |
| All Elected Statewide | 13.8% (4 of 29) | 49.9% | -36.1% | -10.5 |
| | | | | |
| US Congress | 33.3% (12 of 36) | 49.9% | -16.6% | -6.0 |
| | | | | |
| State Legislature | 32.5% (69 of 212) | 49.9% | --17.4% | -36.9 |
| | | | | |

Sources: Texas Courts, https://www.txcourts.gov/supreme/about-the-court/, https://www.txcourts.gov/cca; Ballotpedia, United States Congressional Delegations From Texas, https://ballotpedia.org/United_States_congressional_delegations_from_Texas, Texas State Executive Offices, https://ballotpedia.org/Texas_state_executive_offices; Alexa Ura and Carla Astudillo, "In 2021 White Men Are Still Overrepresented in the Texas Legislature, Texas *Tribune*, 11 January2021, https://apps.texastribune.org/features/2020/2021-texas-legislature-representation/; Texas State House of Representatives, Members," https://house.texas.gov/members/; "The Texas State Senate, Members" https://senate.texas.gov/members.php.

**CHART 10**

**ANGLO AND MINORITY REPRESENTATION AMONG TEXAS ELECTED
OFFICIALS, FROM TABLE 14**



**Senate Factor 8**

**TABLE 15**
**DISPARITIES BETWEEN TEXAS AND THE NATION IN MINORITIES LACKING HEALTH INSURANCE**

| HISPANICS WITH NO HEALTH INSURANCE NATION | HISPANICS WITH NO HEALTH INSURANCE TEXAS | DIFFERENCE | BLACKS WITH NO HEALTH INSURANCE NATION | BLACKS WITH NO HEALTH INSURANCE TEXAS | DIFFERENCE |
|---|---|---|---|---|---|
| | | | | | |
| 18.7% | 28.6% | **+10.9 PERCENTAGE PTS +58.3%** | 10.1% | 14.7% | **+4.6 PERCENTAGE PTS + 45.5%** |
| | | | | | |
| Source: U.S. Census, American Community Survey, 2019. | | | | | |

**CHART 11**
**DISPARITIES BETWEEN TEXAS AND THE NATION IN MINORITIES LACKING**
**HEALTH INSURANCE, FROM TABLE 15**



TABLE 16

TEXAS RESIDENTS' VIEWS ON MEDICAID, BY RACE

| QUERY | YES | NO | DON'T KNOW |
|---|---|---|---|
| **ALL RESPONDENTS** | | | |
| | | | |
| **Expand Medicaid** | **69%** | **27%** | 4% |
| **Favorable View of Medicaid** | **69%** | **23%** | 8% |
| **ANGLO RESPONDENTS** | | | |
| | | | |
| **Expand Medicaid** | **55%** | **41%** | 4% |
| **Favorable View of Medicaid** | **62%** | **27%** | 11% |
| **BLACK RESPONDENTS** | | | |
| | | | |
| **Expand Medicaid** | **84%** | **15%** | 1% |
| **Favorable View of Medicaid** | **84%** | **14%** | 2% |
| **HISPANIC RESPONDENTS** | | | |
| | | | |
| **Expand Medicaid** | **82%** | **16%** | 2% |
| **Favorable View of Medicaid** | **75%** | **18%** | 7% |
| N = 1,204 Adults. Source: "Texas Residents Views on Health Care Priorities," March 2021, SSRS Survey for Episcopal Health Foundation, November-December 2020, https://www.episcopalhealth.org/wp-content/uploads/2021/03/Texas-Residents-Views-on-Health-Policy-2020-FINAL.pdf. | | | |

**CHART 12**

**TEXAS RESIDENTS' VIEWS ON MEDICAID, BY RACE, FROM TABLE 16**



**TABLE 17**

**ENROLLMENT IN TEXAS PUBLIC SCHOOLS 2018-2019, BY RACE**

| Racial Group | Number | Percentage |
|---|---|---|
| All | 5,431,910 | 100% |
| | | |
| Hispanic | 2,854,590 | 52.6% |
| | | |
| African American | 685,775 | 12.6% |
| | | |
| Hispanic + African American | 3,540,365 | 65.2% |
| | | |
| Multiracial | 129,904 | 2.4% |
| | | |
| Asian | 242,657 | 4.5% |
| | | |
| Other | 28,685 | 0.5% |
| | | |
| Anglo | 1,490,299 | 27.4% |
| | | |
| All Minorities | 3,941,611 | 72.6% |
| | | |
| Source: "Enrollment in Texas Public Schools 2018-2019," Table 1, https://tea.texas.gov/sites/default/files/enroll_2018-19.pdf. | | |

**CHART 13**

**COMPARISON OF ANGLO ENROLLMENT IN PUBLIC VERSUS PRIVATE K-12 SCHOOLS IN TEXAS, FROM TABLE 16, FN. 2016**



## APPENDIX B

**Curriculum Vitae**

Allan J. Lichtman
9219 Villa Dr.
Bethesda, MD 20817

(240) 498-8738 h
(202) 885-2411 o

**EDUCATION**

BA, Brandeis University, Phi Beta Kappa, Magna Cum Laude, 1967

PhD, Harvard University, Graduate Prize Fellow, 1973

**PROFESSIONAL EXPERIENCE**

Teaching Fellow, American History, Harvard University, 1969-73

Instructor, Brandeis University, 1970, quantitative history.

Assistant Professor of History, American University, 1973-1977

Associate Professor of History, American University, 1977-1978

Professor of History, American University, 1979 –

Distinguished Professor, 2011 -

Expert witness in more than 90 redistricting, voting rights and civil rights cases

Associate Dean for Faculty and Curricular Development, College of Arts & Sciences, The American University 1985-1987

Chair, Department of History, American University, 1997- 2001

Regular political analyst for CNN Headline News, 2003-2006

**HONORS AND AWARDS**

Outstanding Teacher, College of Arts and Sciences, 1975-76

Outstanding Scholar, College of Arts and Sciences, 1978-79

1

Outstanding Scholar, The American University, 1982-83

Outstanding Scholar/Teacher, The American University, 1992-93 (Highest University faculty award)

Sherman Fairchild Distinguished Visiting Scholar, California Institute of Technology, 1980-81

American University summer research grant, 1978 & 1982

Chamber of Commerce, Outstanding Young Men of America 1979-80

Graduate Student Council, American University, Faculty Award, 1982

Top Speaker Award, National Convention of the International Platform Association, 1983, 1984, 1987

National Age Group Champion (30-34) 3000-meter steeplechase 1979

Eastern Region Age Group Champion (30-34) 1500 meter run 1979

Defeated twenty opponents on nationally syndicated quiz show, TIC TAC DOUGH, 1981

Listing in Marquis, WHO'S WHO IN THE AMERICA AND WHO'S WHO IN THE WORLD

McDonnell Foundation, Prediction of Complex Systems ($50,000, three years), 2003-2005

Organization of American Historians, Distinguished Lecturer, 2004 -

Selected by the Teaching Company as one of America's Super Star Teachers."

Associate Editor, International Journal of Operations Research and Information Systems, 2008 -

Keynote Speaker, International Forecasting Summit, 2007 and 2008

Cited authoritatively by United States Supreme Court in statewide Texas Congressional redistricting case *LULAC v. Perry* (2006)

Interviews nominated by the Associated Press for the Edward R. Murrow Award for broadcasting excellence.

WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT: Finalist for the 2008 National Book Critics Circle Award in general nonfiction.

Elected Member, PEN American Center, 2009

Appointed Distinguished Professor, 2011

2

FDR AND THE JEWS: Designated for Belknap Imprint of the Harvard University Press, reserved for works of special distinction and lasting value; *New York Times* editors' choice book for 2013, submitted for Pulitzer Prize 2013, winner of Tikkun Olam Award for Holocaust Studies, winner of National Jewish Book Award in American Jewish Studies, finalist for Los Angeles Times Book Award in History.

THE CASE FOR IMPEACHMENT: Independent bookstore bestseller, Amazon.com bestseller in several academic categories, *Newsweek*, best new book releases, April 18, 2017.

Winner of the Alfred Nelson Marquis Life Time Achievement Award for top 5% of persons included in Marquis WHO'S WHO, 2018.

Listed by rise.global as # 85 among 100 most influential geopolitical experts in the world.

**SCHOLARSHIP**

A. Books

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Chapel Hill: University of North Carolina Press, 1979)

PREJUDICE AND THE OLD POLITICS: THE PRESIDENTIAL ELECTION OF 1928 (Lanham, MD: Lexington Books, 2000), reprint of 1979 edition with new introduction.

HISTORIANS AND THE LIVING PAST: THE THEORY AND PRACTICE OF HISTORICAL STUDY (Arlington Heights, Ill.: Harlan Davidson, Inc., 1978, with Valerie French)

ECOLOGICAL INFERENCE (Sage Series in Quantitative Applications in the Social Sciences, 1978, with Laura Irwin Langbein)

YOUR FAMILY HISTORY: HOW TO USE ORAL HISTORY, PERSONAL FAMILY ARCHIVES, AND PUBLIC DOCUMENTS TO DISCOVER YOUR HERITAGE (New York: Random House, 1978)

KIN AND COMMUNITIES: FAMILIES IN AMERICA (edited, Washington, D. C.: Smithsonian Press, 1979, with Joan Challinor)

THE THIRTEEN KEYS TO THE PRESIDENCY (Lanham: Madison Books, 1990, with Ken DeCell)

THE KEYS TO THE WHITE HOUSE, 1996 EDITION (Lanham: Madison Books, 1996)

THE KEYS TO THE WHITE HOUSE, (Lanham: Lexington Books Edition, 2000)

THE KEYS TO THE WHITE HOUSE, POST-2004 EDITION (Lanham: Lexington Books

3

Edition, 2005)

THE KEYS TO THE WHITE HOUSE, 2008 EDITION (Lanham: Rowman & Littlefield, 2008)

WHITE PROTESTANT NATION: THE RISE OF THE AMERICAN CONSERVATIVE MOVEMENT (New York: Grove/Atlantic Press, 2008)

THE KEYS TO THE WHITE HOUSE, 2012 EDITION (2012, Lanham: Rowman & Littlefield)

FDR AND THE JEWS, (Cambridge: Harvard University Press, Belknap Imprint, 2013, with Richard Breitman).

THE KEYS TO THE WHITE HOUSE, 2016 EDITION (Lanham: Rowman & Littlefield)

THE CASE FOR IMPEACHMENT (HarperCollins, April 2017, updated paperback January 2018)

THE EMBATTLED VOTE IN AMERICA: FROM THE FOUNDING TO THE PRESENT (Harvard University Press, 2018)

REPEAL THE SECOND AMENDMENT: THE CASE FOR A SAFER AMERICA (St. Martin's Press, 2020)

THE KEYS TO THE WHITE HOUSE, 2020 EDITION (Lanham: Rowman & Littlefield, 2020)

THIRTEEN CRACKS: CLOSING DEMOCRACIES LOOPHOLES ((Lanham: Rowman & Littlefield, 2021)


Monographs:

"Report on the Implications for Minority Voter Opportunities if Corrected census Data Had Been Used for the Post-1990 Redistricting: States With The Largest Numerical Undercount," UNITED STATES CENSUS MONITORING BOARD, January 2001

"Report on the Racial Impact of the Rejection of Ballots Cast in the 2000 Presidential Election in the State of Florida," and "Supplemental Report," in VOTING IRREGULARITIES IN FLORIDA DURING THE 2000 PRESIDENTIAL ELECTION, United States Commission on Civil Rights, June 2001

B. Scholarly Articles

"The Federal Assault Against Voting Discrimination in the Deep South, 1957-1967," JOURNAL OF NEGRO HISTORY (Oct. 1969) REF

"Executive Enforcement of Voting Rights, 1957-60," in Terrence Goggin and John Seidel, eds.,

POLITICS AMERICAN STYLE (1971)

"Correlation, Regression, and the Ecological Fallacy: A Critique," JOURNAL OF INTERDISCIPLINARY HISTORY (Winter 1974) REF

"Critical Election Theory and the Reality of American Presidential Politics, 1916-1940," AMERICAN HISTORICAL REVIEW (April 1976) REF

"Across the Great Divide: Inferring Individual Behavior From Aggregate Data," POLITICAL METHODOLOGY (with Laura Irwin, Fall 1976) REF

"Regression vs. Homogeneous Units: A Specification Analysis," SOCIAL SCIENCE HISTORY (Winter 1978) REF

"Language Games, Social Science, and Public Policy: The Case of the Family," in Harold Wallach, ed., APPROACHES TO CHILD AND FAMILY POLICY (Washington, D. C.: American Association for the Advancement of Science, 1981)

"Pattern Recognition Applied to Presidential Elections in the United States, 1860-1980: The Role of Integral Social, Economic, and Political Traits," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCE (with V. I. Keilis-Borok, November 1981) REF

"The End of Realignment Theory? Toward a New Research Program for American Political History," HISTORICAL METHODS (Fall 1982)

"Kinship and Family in American History," in National Council for Social Studies Bulletin, UNITED STATES HISTORY IN THE 1980s (1982)

"Modeling the Past: The Specification of Functional Form," JOURNAL OF INTERDISCIPLINARY HISTORY (with Ivy Broder, Winter 1983) REF

"Political Realignment and `Ethnocultural` Voting in Late Nineteenth Century America," JOURNAL OF SOCIAL HISTORY (March 1983) REF

"The `New Political History:`Some Statistical Questions Answered," SOCIAL SCIENCE HISTORY (with J. Morgan Kousser, August 1983) REF

"Personal Family History: A Bridge to the Past," PROLOGUE (Spring 1984)

"Geography as Destiny," REVIEWS IN AMERICAN HISTORY (September 1985)

"Civil Rights Law: High Court Decision on Voting Act Helps to Remove Minority Barriers," NATIONAL LAW JOURNAL (with Gerald Hebert, November 10, 1986).

"Tommy The Cork: The Secret World of Washington`s First Modern Lobbyist," WASHINGTON MONTHLY (February 1987).

"Discriminatory Election Systems and the Political Cohesion Doctrine," NATIONAL LAW JOURNAL (with Gerald Hebert, Oct. 5, 1987)

"Aggregate-Level Analysis of American Midterm Senatorial Election Results, 1974-1986," PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES (Dec. 1989, with Volodia Keilis-Borok) REF

"Black/White Voter Registration Disparities in Mississippi: Legal and Methodological Issues in Challenging Bureau of Census Data," JOURNAL OF LAW AND POLITICS (Spring, 1991, with Samuel Issacharoff) REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," NATIONAL BLACK LAW JOURNAL (1991)

"Passing the Test: Ecological Regression in the Los Angeles County Case and Beyond," EVALUATION REVIEW (December 1991) REF

Understanding and Prediction of Large Unstable Systems in the Absence of Basic Equations," PROCEEDINGS OF THE INTERNATIONAL SYMPOSIUM ON CONCEPTUAL TOOLS FOR UNDERSTANDING NATURE (with V. I. Keilis-Borok, Trieste, Italy, 1991).

"The Self-Organization of American Society in Presidential and Senatorial Elections," in Yu. Krautsov, ed., THE LIMITS OF PREDICTABILITY (with V.I. Keilis-Borok, Nauka, Moscow, 1992).

"'They Endured:' The Democratic Party in the 1920s," in Ira Foreman, ed., DEMOCRATS AND THE AMERICAN IDEA: A BICENTENNIAL APPRAISAL (1992).

"A General Theory of Vote Dilution," LA RAZA (with Gerald Hebert) 6 (1993). REF

"Adjusting Census Data for Reapportionment: The Independent Role of the States," JOURNAL OF LITIGATION (December 1993, with Samuel Issacharoff)

"The Keys to the White House: Who Will be the Next American President?," SOCIAL EDUCATION  60 (1996)

"The Rise of Big Government: Not As Simple As It Seems," REVIEWS IN AMERICAN HISTORY 26 (1998)

"The Keys to Election 2000," SOCIAL EDUCATION (Nov/Dec. 1999)

"The Keys to the White House 2000," NATIONAL FORUM (Winter 2000)

 "What Really Happened in Florida's 2000 Presidential Election," JOURNAL OF LEGAL STUDIES (January 2003) REF

"The Keys to Election 2004," SOCIAL EDUCATION (January 2004)

"History: Social Science Applications," ENCYCLOPEDIA OF SOCIAL MEASUREMENT (Elseveir, 2006)

"The Keys to the White House: Forecast for 2008," SPECIAL FEATURE, *FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 3 (February 2006), 5-9 with response: J. Scott Armstrong and Alfred G. Cuzan, "Index Methods for Forecasting: An Application to the American Presidential Elections."

"The Keys to the White House: Updated Forecast for 2008," *FORESIGHT; THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING* 7 (Fall 2007)

"The Keys to the White House: Prediction for 2008," SOCIAL EDUCATION (January 2008)

"The Keys to the White House: An Index Forecast for 2008," INTERNATIONAL JOURNAL OF FORECASTING 4 (April-June 2008) REF

"The Updated Version of the Keys," SOCIAL EDUCATION (October 2008)

"Extreme Events in Socio-Economic and Political Complex Systems, Predictability of," ENCYCLOPEDIA OF COMPLEXITY AND SYSTEMS SCIENCE (Springer, 2009, with Vladimir Keilis-Borok & Alexandre Soloviev)

"The Keys to the White House:  A Preliminary Forecast for 2012" INTERNATIONAL JOURNAL OF INFORMATION SYSTEMS & SOCIAL CHANGE (Jan.-March 2010) REF

 "The Keys to the White House:  Forecast for 2012," FORESIGHT: THE INTERNATIONAL JOURNAL OF APPLIED FORECASTING (Summer 2010)

"The Keys to the White House: Prediction for 2012," SOCIAL EDUCATION (March 2012)

"The Keys to the White House: Prediction for 2016," SOCIAL EDUCATION (February 2016)

"The Keys to the White House," SOCIAL EDUCATION (October 2016)

"The Keys to the White House: Forecast for 2016," WORLD FINANCIAL REVIEW (January-February 2016)

"Barack Obama" in James M. Banner, Jr., ed., PRESIDENTIAL MISCONDUCT: FROM GEORGE WASHINGTON TO TODAY (New Press, 2019)

"The 2020 Presidential Election: How the Keys Are Pointing**,"** SOCIAL EDUCATION, Jan./Feb. 2020.

"The Keys to the White House: Forecast for 2020," HARVARD DATA SCIENCE REVIEW (Oct. 2020) REF

"The Alternative-Justification Affirmative: A New Case Form," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Charles Garvin and Jerome Corsi, Fall 1973) REF

"The Alternative-Justification Case Revisited: A Critique of Goodnight, Balthrop and Parsons, `The Substance of Inherency,`" JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Jerome Corsi, Spring 1975) REF

"A General Theory of the Counterplan," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1975) REF

"The Logic of Policy Dispute," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Spring 1980) REF

"Policy Dispute and Paradigm Evaluation," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (with Daniel Rohrer, Fall 1982) REF

"New Paradigms For Academic Debate," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (Fall 1985) REF

"Competing Models of the Debate Process," JOURNAL OF THE AMERICAN FORENSIC ASSOCIATION (Winter 1986) REF

"The Role of the Criteria Case in the Conceptual Framework of Academic Debate," in Donald Terry, ed., MODERN DEBATE CASE TECHNIQUES (with Daniel Rohrer, 1970)

"Decision Rules for Policy Debate," and "Debate as a Comparison of Policy Systems," in Robert 2, ed., THE NEW DEBATE: READINGS IN CONTEMPORARY DEBATE THEORY (with Daniel Rohrer, 1975)

"A Systems Approach to Presumption and Burden of Proof;" "The Role of Empirical Evidence in Debate;" and "A General Theory of the Counterplan," in David Thomas, ed., ADVANCED DEBATE: READINGS IN THEORY, PRACTICE, AND TEACHING (with Daniel Rohrer, 1975)

"Decision Rules in Policy Debate;" "The Debate Resolution;" "Affirmative Case Approaches;" "A General Theory of the Counterplan;" "The Role of Empirical Evidence in Debate;" and "Policy Systems Analysis in Debate," in David Thomas, ed., ADVANCED DEBATE (revised edition, with Daniel Rohrer and Jerome Corsi, 1979)

C. Selected Popular Articles

8

"Presidency By The Book," POLITICS TODAY (November 1979) Reprinted:
LOS ANGELES TIMES

"The Grand Old Ploys," NEW YORK TIMES
Op Ed (July 18, 1980)

"The New Prohibitionism," THE CHRISTIAN CENTURY (October 29, 1980)

"Which Party Really Wants to `Get Government Off Our Backs`?" CHRISTIAN SCIENCE
MONITOR Opinion Page (December 2, 1980)

"Do Americans Really Want `Coolidge Prosperity` Again?" CHRISTIAN SCIENCE MONITOR
Opinion Page (August 19, 1981)

"Chipping Away at Civil Rights," CHRISTIAN SCIENCE MONITOR Opinion Page (February
17, 1982)

"How to Bet in 1984.  A Presidential Election Guide," WASHINGTONIAN MAGAZINE
(April 1982) Reprinted: THE CHICAGO TRIBUNE

"The Mirage of Efficiency," CHRISTIAN SCIENCE MONITOR Opinion Page (October 6,
1982)

"For RIFs, It Should Be RIP," LOS ANGELES TIMES Opinion Page (January 25, 1983)

"The Patronage Monster, Con`t." WASHINGTON POST Free For All Page (March 16, 1983)

"A Strong Rights Unit," NEW YORK TIMES Op Ed Page (June 19, 1983)

"Abusing the Public Till," LOS ANGELES TIMES Opinion Page (July 26, 1983)

The First Gender Gap," CHRISTIAN SCIENCE MONITOR Opinion Page (August 16, 1983)

"Is Reagan A Sure Thing?" FT. LAUDERDALE NEWS Outlook Section (February 5, 1984)

"The Keys to the American Presidency: Predicting the Next Election," TALENT (Summer 1984)

"GOP: Winning the Political Battle for `88," CHRISTIAN SCIENCE MONITOR, Opinion Page,
(December 27, 1984)

"The Return of `Benign Neglect`," WASHINGTON POST, Free For All,
(May 25, 1985)

"Selma Revisited: A Quiet Revolution," CHRISTIAN SCIENCE MONITOR, Opinion Page,
(April 1, 1986)

"Democrats Take Over the Senate" THE WASHINGTONIAN (November 1986; article by Ken DeCell on Lichtman`s advance predictions that the Democrats would recapture the Senate in 1986)

"Welcome War?" THE BALTIMORE EVENING SUN, Opinion Page, (July 15, 1987)

"How to Bet in 1988," WASHINGTONIAN (May 1988; advance prediction of George Bush's 1988 victory)

"President Bill?," WASHINGTONIAN (October 1992; advance prediction of Bill Clinton's 1992 victory)

"Don't be Talked Out of Boldness," CHRISTIAN SCIENCE MONITOR, Opinion Page (with Jesse Jackson, November 9, 1992)

"Defending the Second Reconstruction," CHRISTIAN SCIENCE MONITOR, Opinion Page (April 8, 1994)

"Quotas Aren't The Issue," NEW YORK TIMES, Op Ed Page (December 7, 1994)

"History According to Newt," WASHINGTON MONTHLY (May, 1995)

"A Ballot on Democracy," WASHINGTON POST Op Ed (November 1, 1998)

"The Theory of Counting Heads vs. One, Two, Three," CHRISTIAN SCIENCE MONITOR Op Ed (June 22, 1999)

"Race Was Big Factor in Ballot Rejection, BALTIMORE SUN Op Ed (March 5, 2002)

"Why is George Bush President?" NATIONAL CATHOLIC REPORTER (Dec. 19, 2003)

"In Plain Sight: With the Public Distracted, George W. Bush is Building a Big Government of the Right," NEWSDAY, (August 7, 2005)

 "Why Obama is Colorblind and McCain is Ageless," JEWISH DAILY FORWARD (June 26, 2008)

"Splintered Conservatives McCain," POLITICO ( June 24, 2008)

"Will Obama be a Smith or a Kennedy," NATIONAL CATHOLIC REPORTER (October 17, 2008)

10

"What Obama Should Do Now," POLITICO (Jan. 22, 2010)

"Why Democrats Need Hillary Clinton in 2016," THE HILL, June 11, 2014

"How Corporations Buy Our Government," THE HILL, July 1, 2014

"Who Rules America," THE HILL, August 12, 2014

"The End of Civil Discourse?" THE HILL, September 10, 2014

"Pass the Ache Act and Stop Destroying Appalachia?" THE HILL, October 28, 2014

"Democrats Have No One to Blame But Themselves,' THE HILL, November 7, 2014

"Donald Trump's Best Friend: Bernie Sanders," THE HILL March 10, 2016

"Trump Had One Thing Right About Abortion," THE HILL, April 1, 2016

"What is so Progressive About Sanders' Old-Fashioned Protectionism," April 7, 2016

"Sanders is Only Helping Trump by Staying in Race," THE HILL, June 30, 2016

"7 Pieces of Advice for Hillary Clinton," THE HILL, July 25, 2016

"Donald Trump's Call For Russia To Hack Hillary Clinton's Email Is A New Low For American Politics — And Maybe A Crime, NEW YORK DAILY NEWS, July 27, 2016

"Here's the Big Speech Clinton Needs to Make," THE HILL, September 9, 2016

"The Real Story Behind Trump's Tax Returns," THE HILL, October 3, 2016

"Trump is Establishment No Matter What He Says," THE HILL, October 12, 2016

"Trump Brings the Big Lie About Voter Fraud," THE HILL, October 19, 2016

"How a New Clinton Presidency Will Change American Politics Forever," THE HILL, October 22, 2016

"The Media is Rigging the Election by Reporting WikiLeaks Emails," THE HILL, October 26, 2016

"Why James Comey Must Resign Now," THE HILL, November 3, 2016

"Why Trump is Vulnerable to Impeachment," USA TODAY, April 18, 2017

11

"Donald Trump Meet the Real Andrew Jackson," THE HILL, May 5, 2017

"Why Does Trump's Voter Fraud Commission Really Wants Your Personal Voter Information,"

THE HILL, August 3, 2017

"Trump is a Lot Closer to Being Impeached, TIME.COM, November 2, 2017

"American Democracy Could be at Risk in the 2018 Elections," VICE December 20, 2017

"We are One Tantrum Away From Accidental War With North Korea," THE HILL, January 25,

2018

"Democrats Can't Survive on Anti-Trumpism Alone," TIME.COM, January 28, 2018

"Don't Expect the Mueller Investigation to End Anytime Soon," VICE March 21, 2018

"President Trump Faces Political Disaster if he Tries to Fire Mueller," THE HILL April 5, 2018

"Framers Fail: Voting is a Basic Right But They Didn't Guarantee it in the Constitution," USA
TODAY, September 26, 2018

Suppressing Voting Rights is as Old as the Republic, But the Tactics Change," ZOCALO,
October 8, 2018

"Voter Fraud Isn't a Problem in America. Low Turnout Is," WASHINGTON POST, Made for
History, October 22, 2018

"Here are five ways a Democratic US House might try to impeach Donald Trump," LONDON
SCHOOL OF ECONOMICS, US CENTRE, October 26, 2018.

"The Midterm Results Will Reveal What Drives Voters: A Love or Hate of Trump," THE
GUARDIAN, November 5, 2018

"Unless Democrats Find a 2020 Candidate Like Beto O'Rourke, Trump May Well Be Set to Win"
THE DAILY CALLER, November 7, 2018

"Why Nancy Pelosi Should be the Next Speaker, FORTUNE, November 27, 2018

"Its Well Past Time to Restructure the U.S. Senate," DAILY CALLER, December 4, 2018

"The Seven Crucial Takeaways From William Barr's Confirmation Hearings," SPECTATOR
USA, January 16, 2019

"Did Democrats Forfeit, 2020" THE HILL March 14, 2019

"Barr's 'Summary' Of The Mueller Report Hardly Vindicates Trump," DAILY CALLER, March 25, 2019

"Collusion and Obstruction by Trump remain Open Questions after Attorney General's "Summary" of the Mueller Report," ARTSFORUM, March 26, 2019

"21 Questions for Robert Mueller," THE HILL, April 24, 2019

With U.S. Representative Al Green, "Congress Has a Duty to go Through With the Impeachment and Trial of Donald Trump," THE HILL, May 17, 2019

"If Democrats Want to Beat Trump, They Need to Take off the Gloves in the Primary," GQ, June 26, 2019

 "Why Impeachment Of William Sulzer Is Solid Precedent For Donald Trump," THE HILL, September 9, 2019

"Not Futile To Impeach," NY DAILY NEWS, September 25, 2019

"Why Impeachment Favors Democrats In The Election," THE HILL, September 28, 2019

"If Trump is Impeached, Pence Should Go Too," TPM, October 7, 2019

"Time to Stop Talking 'Quid Pro Quo," and Start Looking at Actual Crimes," THE HILL, November 13, 2019

"Of all the Presidential Impeachment Inquiries, This is the One That Transcends Politics the Most," POLITICO, November 16, 2019

"Bill Barr's Dangerous Celebration of Unchecked Presidential Power, NEW YORK DAILY NEWS, November 25, 2019

"What Trump Really Wanted From Ukraine Was Not About Enemies," THE HILL, November 25, 2019

"Pelosi, Schiff Should Take More Time If They Want A Successful Impeachment Effort," DAILY CALLER, November 29, 2019

"It's Our Political System, Not Impeachment, That Is Broken. And Only Politics Can Fix It," POLITICO, December 6, 2019

"The 2010s Were the Decade That Brought Democracy to the Breaking Point," TPM, December 23, 2019

"Will Roberts Call Balls and Strikes at the Impeachment Trial," THE HILL, December 30, 2019

"The Bill Clinton Trial Cannot Serve as the Model for the Donald Trump Trial," THE HILL, January 8, 2020

"What Law Did Donald Trump Break?" THE HILL, January 23, 2020

"The Flawed Case of Alan Dershowitz," THE HILL, January 30, 2020

"What Will the History Books Say About This Impeachment," POLITICO, February 5, 2020

"Why Bernie Sanders is Electable," THE HILL, February 24, 2020

"The Ugly History of Trump's Looting/Shooting Threat," NEW YORK DAILY NEWS, May 29, 2020

"What Joe Biden Must do Now," THE HILL, June 10, 2020

"Bad Economies do not Threaten Lives," (with Sam Lichtman), THE HILL, July 6, 2020

"He Predicted Trump's Win in 2016: Now He's Ready to Call 2020," NEW YORK TIMES VIDEO, August 5, 2020

"Time to Jettison Horse Race Polls," THE HILL, November 19, 2020

"Here is the Smoking Gun Evidence to Back Impeachment of Donald Trump," THE HILL, February 8, 2021.

"There's No Constitutional Question: The Senate Can Try Trump," NEW YORK DAILY NEWS, February 8, 2021

Bi-weekly column, THE MONTGOMERY JOURNAL, GAZETTE 1990 - 2013

Election-year column, REUTERS NEWS SERVICE 1996 & 2000

Contributor: THE HILL, 2014-present

D. Video Publication

"Great American Presidents," The Teaching Company, 2000.

**TEACHING**

Ongoing Courses

The History of the U. S. I & II, The Emergence of Modern America, The U. S. in the Twentieth Century, United States Economic History, Historiography, Major Seminar in History, Graduate

Research Seminar, Colloquium in U. S. History Since 1865, The American Dream, The Urban-Technological Era, Senior Seminar in American Studies, Seminar in Human Communication.

New Courses: Taught for the first time at The American University

Quantification in History, Women in Twentieth Century American Politics, Women in Twentieth Century America, Historians and the Living Past (a course designed to introduce students to the excitement and relevance of historical study), Historians and the Living Past for Honors Students, How to Think: Critical Analysis in the Social Sciences, Pivotal Years of American Politics, Government and the Citizen (Honors Program), Introduction to Historical Quantification, Public Policy in U. S. History, Honors Seminar in U.S. Presidential Elections, America's Presidential Elections, What Is America?, Honors Seminar on FDR, Jews, and the Holocaust, The Modern American Presidency, Voting and Elections in America, American Conservatism.
.

## TELEVISION APPEARANCES

More than 1,000 instances of political commentary on NBC, CBS, ABC, CNN, C-SPAN, FOX, MSNBC, BBC, CBC, CTV, NPR, VOA, and numerous other broadcasting outlets internationally, including Japanese, Russian, Chinese, German, French, Irish, Austrian, Australian, Russian, Swedish, Danish, Dutch, and Middle Eastern television.

Regular political commentary for NBC News Nightside.

Regular political commentary for Voice of America and USIA.

Regular political commentary for America's Talking Cable Network.

Regular political commentary for the Canadian Broadcasting System.

Regular political commentary for CNN, Headline News

Consultant and on-air commentator for NBC special productions video project on the history of the American presidency.

CBS New Consultant, 1998 and 1999

Featured appearances on several History Channel specials including *The Nuclear Football* and *The President's Book of Secrets*.

## RADIO SHOWS

I have participated in many thousands of radio interview and talk shows broadcast nationwide, in

foreign nations, and in cities such as Washington, D. C., New York, Atlanta, Chicago, Los Angeles and Detroit. My appearances include the Voice of America, National Public Radio, and well as all major commercial radio networks.

**PRESS CITATIONS**

I have been cited many hundreds of times on public affairs in the leading newspapers and magazines worldwide. These include, among many others,

*New York Times, Washington Post, USA Today, Los Angeles Times, Wall Street Journal, Miami Herald, Washington Times, St. Louis Post Dispatch, Christian Science Monitor, Philadelphia Inquirer, Time, Newsweek, Business Week, Le Monde, Globe and Mail, Yomuiri Shimbun, Die Welt, El Mundo, and South China Post,* among others.

**SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: UNITED STATES**

Invited participant and speaker, Bostick Conference on Fogel and Engerman`s TIME ON THE CROSS, University of South Carolina, November 1-2, 1974

"Critical Election Theory and the Presidential Election of 1928," Annual Meeting of the American Historical Association, December 1974

"A Psychological Model of American Nativism," Bloomsberg State Historical Conference, April 1975

"Methodology for Aggregating Data in Education Research," National Institute of Education, Symposium on Methodology, July 1975, with Laura Irwin

Featured Speaker, The Joint Washington State Bicentennial Conference on Family History, October 1975

Featured Speaker, The Santa Barbara Conference on Family History, May 1976

Chair, The Smithsonian Institution and the American University Conference on Techniques for Studying Historical and Contemporary Families, June 1976

Panel Chair, Sixth International Smithsonian Symposium on Kin and Communities in America, June 1977

"The uses of History for Policy Analysis," invited lecture, Federal Interagency Panel on Early Childhood Research, October 1977

Invited participant, Conference on "Child Development within the Family - Evolving New Research Approaches," Interagency Panel of the Federal Government for Research and

Development on Adolescence, June 1978

Commentator on papers in argumentation, Annual Meeting of the Speech Communication Association, November 1978

Commentator on papers on family policy, Annual Meeting of the American Association for the Advancement of Science, Jan. 1979

"Phenomenology, History, and Social Science," Graduate Colloquium of the Department of Philosophy," The American University, March 1979

"Comparing Tests for Aggregation Bias: Party Realignments of the 1930`s," Annual Meeting of the Midwest Political Science Association March 1979, with Laura Irwin Langbein

"Party Loyalty and Progressive Politics: Quantitative Analysis of the Vote for President in 1912," Annual Meeting of the Organization of American Historians, April 1979, with Jack Lord II

"Policy Systems Debate: A Reaffirmation," Annual Meeting of the Speech Communication Association, November 1979

"Personal Family History: Toward a Unified Approach," Invited Paper, World Conference on Records, Salt Lake City, August 1980

"Crisis at the Archives: The Acquisition, Preservation, and Dissemination of Public Documents," Annual Meeting of the Speech Communication Association, November 1980

"Recruitment, Conversion, and Political Realignment in America: 1888- 1940," Social Science Seminar, California Institute of Technology, April 1980

"Toward a Situational Logic of American Presidential Elections," Annual Meeting of the Speech Communication Association, November 1981

"Political Realignment in American History," Annual Meeting of the Social Science History Association, October 1981

"Critical Elections in Historical Perspective: the 1890s and the 1930s," Annual Meeting of the Social Science History Association, November 1982

Commentator for Papers on the use of Census data for historical research, Annual Meeting of the Organization of American Historians, April 1983

"Thirteen Keys to the Presidency: How to Predict the Next Election," Featured Presentation, Annual Conference of the International Platform Association, August 1983, Received a Top Speaker Award

"Paradigms for Academic Debate," Annual Meeting of the Speech Communication Association, November 1983

Local Arrangements Chair, Annual Convention of the Social Science History Association, October 1983

"Forecasting the Next Election," Featured Speaker, Annual Convention of the American Feed Manufacturers Association, May 1984

Featured Speaker, "The Ferraro Nomination," Annual Convention of The International Platform Association, August 1984, Top Speaker Award

"Forecasting the 1984 Election," Annual Convention of the Social Science History Association Oct. 1984,

Featured Speaker, "The Keys to the Presidency," Meeting of Women in Government Relations October 1984

Featured Speaker, "The Presidential Election of 1988," Convention of the American Association of Political Consultants, December 1986

Featured Speaker, "The Presidential Election of 1988," Convention of the Senior Executive Service of the United States, July 1987

Commentary on Papers on Voting Rights, Annual Meeting of the American Political Science Association, September 1987.

Commentary on Papers on Ecological Inference, Annual Meeting of the Social Science History Association, November 1987.

Featured Speaker: "Expert Witnesses in Federal Voting Rights Cases," National Conference on Voting Rights, November 1987.

Featured Speaker: "The Quantitative Analysis of Electoral Data," NAACP National Conference on Voting Rights and School Desegregation, July 1988.

Panel Chair, "Quantitative Analysis of the New Deal Realignment," Annual Meeting of the Social Science History Association, Nov. 1989.

Keynote Speaker, Convocation of Lake Forest College, Nov. 1989.

Featured Speaker, The American University-Smithsonian Institution Conference on the Voting Rights Act, April 1990

Panel Speaker, Voting Rights Conference of the Lawyer's Committee for Civil Rights Under

Law, April 1990

Panel Speaker, Voting Rights Conference of the NAACP, July 1990

Panel Speaker, Voting Rights Conference of Stetson University, April 1991

Panel Chair, Annual Meeting of the Organization of American Historians, April, 1992

Panel Speaker, Symposium on "Lessons from 200 Years of Democratic Party History, Center for National Policy, May 1992

Olin Memorial Lecture, U.S. Naval Academy, October 1992

Commentator, Annual Meeting of the Organization of American Historians, April, 1993

Panel presentation, Conference on Indian Law, National Bar Association, April 1993

Feature Presentation, Black Political Science Association, Norfolk State University, June 1993

Feature Presentation, Southern Regional Council Conference, Atlanta Georgia, November, 1994

Master of Ceremonies and Speaker, State of the County Brunch, Montgomery County, February, 1996

Feature Presentation, Predicting The Next Presidential Election, Freedom's Foundation Seminar on the American Presidency, August 1996

Feature Presentation, Predicting The Next Presidential Election, Salisbury State College, October 1996

Feature Presentation on the Keys to the White House, Dirksen Center, Peoria, Illinois, August, 2000

Feature Presentation on American Political History, Regional Conference of the Organization of American Historians, August 2000

Testimony Presented Before the United States Commission on Civil Rights Regarding Voting Systems and Voting Rights, January 2001

Testimony Presented Before the United States House of Representatives, Judiciary Committee, Subcommittee on the Constitution, February 2001

Testimony Presented Before the United States Senate, Government Operations Committee, Regarding Racial Differentials in Ballot Rejection Rates in the Florida Presidential Election, June 2001

19

Testimony Presented Before the Texas State Senate Redistricting Committee, Congressional Redistricting, July 2003

Testimony Presented Before the Texas State House Redistricting Committee, Congressional Redistricting, July 2003

American University Honors Program Tea Talk on the Election, September 2004

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, June 2006.

Feature Presentation, The Keys to the White House, International Symposium on Forecasting, New York, June 2007.

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia, 2007-2013

Feature Presentation, Forecasting 2008, Annual Meeting of the American Political Science Association, Chicago, August 2007

Keynote Speaker, International Forecasting Summit, Orlando, Florida, February 2008.

Feature Presentation on the Keys to the White House, Senior Executive's Service, Washington, DC, June 2008

Feature Presentation, American Political History, Rockford Illinois School District, July 2008

American University Honors Program Tea Talk on the Election, September 2008

Featured Lecture, Keys to the White House, American Association for the Advancement of Science, Washington, DC, September 2008

Keynote Speaker, International Forecasting Summit, Boston, September 2008

Keynote Lecture, Hubert Humphrey Fellows, Arlington, Virginia October 2008

Featured Lectures, Keys to the White, Oklahoma Central and East Central Universities, October 2008

Bishop C. C. McCabe Lecture, "Seven Days until Tomorrow" American University, October 28, 2008

Featured Lecture, WHITE PROTESTANT NATION, Eisenhower Institute, December 2008

American University Faculty on the Road Lecture, "Election 2008: What Happened and Why?" Boston, February 2009

Critic Meets Author Session on WHITE PROTESTANT NATION, Social Science History Association, November 2009

American University Faculty on the Road Lecture, "The Keys for 2012" Chicago, April 2010

Keynote Speaker, Hubert Humphrey Fellows, Arlington, Virginia October, 2010, 2011

Panel Participant, Search for Common Ground, Washington, DC, April 2011

Presentation, The Keys to the White House, International Symposium on Forecasting, June 2012

**SELECTED CONFERENCES, PRESENTATIONS, & LECTURES: INTERNATIONAL**

Featured Speaker, World Conference on Disarmament, Moscow, Russia, November 1986

Delegation Head, Delegation of Washington Area Scholars to Taiwan, Presented Paper on the promotion of democracy based on the American experience, July 1993

Lecture Series, American History, Doshisha University, Kyoto, Japan, December 2000

Lectures and Political Consultation, Nairobi, Kenya, for RFK Memorial Institute, October 2002

Featured Lectures, US Department of State, Scotland and England, including Oxford University, University of Edinburg, and Chatham House, June 2004

Keynote Speech, American University in Cairo, October 2004

Feature Presentation on the Keys to the White House, University of Munich, June 2008

Featured Lectures, US Department of State, Russia, Ukraine, Slovenia, Austria, and Romania, 2008-2010

Paper Presentation, Fourth International Conference on Interdisciplinary Social Science, Athens, Greece, July 2009

Featured Lectures, US Department of State, India, Korea, and Belgium 2012

Panel Speaker, Economic Forun, Krynica, Poland, 2013

**DEPARTMENTAL AND UNIVERSITY SERVICE**

Department of History Council 1973 -

Undergraduate Committee, Department of History 1973-1977

Chair Undergraduate Committee, Department of History 1984-1985

Graduate Committee, Department of History, 1978-1984

Freshman Advisor, 1973-1979

First Year Module in Human Communications, 1977-1979

University Committee on Fellowships and Awards 1976-1978

University Senate 1978-1979, 1984-1985

University Senate Parliamentarian and Executive Board 1978-1979

Founding Director, American University Honors Program, 1977-1979

Chair, College of Arts and Sciences Budget Committee 1977-1978, 1982-1984

University Grievance Committee, 1984-1985

Member, University Honors Committee 1981-1982

College of Arts and Sciences Curriculum Committee 1981-1982

Jewish Studies Advisory Board, 1982-1984

Mellon Grant Executive Board, College of Arts & Sciences, 1982-1983

Chair, College of Arts and Sciences Faculty Colloquium, 1983

Chair, College of Arts and Sciences Task Force on the Department
of Performing Arts, 1984-1985

Local Arrangements Chair, National Convention of the Social
Science History Association, 1983

Chair, Rank & Tenure Committee of the Department of History,
1981-1982, 1984-1985

Board Member, Center for Congressional and Presidential Studies, The American University,
1988-1989

Chair, Graduate Committee, Department of History, 1989 - 1991

Chair, Distinguished Professor Search Committee 1991

Member, College of Arts & Sciences Associate Dean Search Committee, 1991

Board Member, The American University Press, 1991-1995

Chair, Subcommittee on Demographic Change, The American University Committee on Middle States Accreditation Review 1992-1994

Member, Dean's Committee on Curriculum Change, College of Arts and Sciences 1992-1993

Member, Dean's Committee on Teaching, College of Arts and Sciences 1992

Co-Chair, Department of History Graduate Committee, 1994-1995

Vice-Chair, College of Arts & Sciences Educational Policy Committee, 1994-1995

Elected Member, University Provost Search Committee, 1995-1996

Chair, Search Committee for British and European Historian, Department of History, 1996

Department Chair, 1999-2001

CAS Research Committee, 2006-2007

University Budget and Benefits Committee, 2008

Chair, Personnel Committee, Department of History, 2010-11, 2012-13

Chair, Term Faculty Search Committee, Department of History, 2011

**OTHER POSITIONS**

Director of Forensics, Brandeis University, 1968-71

Director of Forensics, Harvard University, 1971-72

Chair, New York-New England Debate Committee, 1970-71

Historical consultant to the Kin and Communities Program of the Smithsonian Institution 1974-1979

Along with general advisory duties, this position has involved the following activities:

    1.  directing a national conference on techniques for studying historical and contemporary families held at the Smithsonian in June 1976.
    2. chairing a public session at the Smithsonian on how to do the history of one's own family.
    3. helping to direct the Sixth International Smithsonian Symposium on Kin and

Communities in America (June 1977).
    4. editing the volume of essays from the symposium.

Consultant to John Anderson campaign for president, 1980.

I researched and wrote a study on "Restrictive Ballot Laws and Third-Force Presidential
Candidates." This document was a major component of Anderson's legal arguments against
restrictive ballot laws that ultimately prevailed in the Supreme Court (Anderson v. Celebreeze
1983).  According to Anderson's attorney: "the basis for the majority's decision echoes the
themes you incorporated in your original historical piece we filed in the District Court."

Statistical Consultant to the George Washington University Program of Policy Studies in Science
and Technology, 1983

I advised researchers at the Policy Studies Program on the application of pattern recognition
techniques to their work on the recovery of communities from the effects of such natural
disasters as earthquakes and floods.

Consultant to the New York City Charter Revision Commission, 2000-2006

I analyzed the implications of non-partisan elections for voting rights issues for the Charter
Revision Commissions appointed by mayors Rudy Giuliani and Michael Bloomberg.

24

## ADDENDUM TO CURRICULUM VITAE

### Table of Cases as Litigation Expert

**CASES 2015-2022**

- <u>In The Matter Of 2022 Legislative Districting Of The State Of Maryland</u> (Maryland Court of Appeals), 2022

- <u>Szeliga v. Lamone</u> (Maryland Circuit Court, Anne Arundel County), 2022

- <u>LULAC v. Pate</u> (Iowa District Court, Johnson County), 2021

- <u>McConchie v. Illinois State Board of Elections</u> (U.S. District Court, Illinois), 2021

- <u>City of South Miami v. DeSantis</u> (U.S. District Court for the Southern District of Florida), 2020

- <u>Bruni v. Hughs</u> (U.S. District Court for the Southern District of Texas), 2020

- <u>NAACP v. Cooper</u> (U.S. District Court for the Middle District of North Carolina), 2019

- <u>Jason Gonzales v. Michael J. Madigan</u> (U.S. District Court for the Northern District of Illinois), 2019

- <u>Anne Harding v. County of Dallas,</u> (U.S. District Court for the Northern District of Texas), 2018

- <u>Pico Neighborhood Association v. Santa Monica</u> (State Superior Court, California), 2018

- <u>Benisek v. Lamone,</u> (U.S. District Court, Maryland), 2017

- <u>Arizona Democratic Party v. Reagan</u> (U.S. District Court, Arizona), 2017

- <u>Perez v. Abbott</u> (U.S. District Court for the Western District of Texas), 2017

- <u>Terrebonne Parish NAACP v. Jindal</u> (U.S. District Court for the Middle District of Louisiana), 2017

25

- <u>Feldman v. Arizona Secretary of State</u> (U.S. District Court for the District of Arizona), 2016, 2017

- <u>Covington v. North Carolina</u> (U. S. District Court Middle District of North Carolina) 2016

- <u>One Wisconsin Institute v. Nichols</u> (United States District Court for the Western District of Wisconsin) 2016

- <u>Lee v. Virginia State Board of Elections</u> (United States District Court for the Eastern District of Virginia) 2016

- <u>League of Women Voters v. Detzner,</u> (Circuit Court for the Second Judicial Circuit, Leon County, Florida) 2015

- <u>North Carolina State Conference of the NAACP v. McCrory</u> (U. S. District Court Middle District of North Carolina) 2015