# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF REPRESENTATIVES, SERGIO MORA, BOBBIE GARZA-HERNANDEZ, | § § § § | |
| | § | |
| Plaintiffs | § | |
| | § | Civil Action No. |
| | § | 3:21-cv-00259-DCG-JES-JVB |
| v. | § | [Lead Case] |
| | § | |
| STATE OF TEXAS, *et al.* | § | |
| | § | 3:21-cv-00988-DCG-JES-JVB |
| | § | [Consolidated Case] |
| Defendants. | § | |

## <u>PRE-TRIAL BRIEF OF MEXICAN AMERICAN LEGISLATIVE CAUCUS</u>

# Table of Contents

I.      OVERVIEW OF MALC'S CLAIMS......................................................…..1

II.     INTENTIONAL DISCRIMINATION CLAIMS (FOURTEENTH AND
        FIFTEENTH AMENDMENTS)…………....................................................…..2

        A.      Legal Standard………………………………………………….……..2

        B.      Evidence Supporting Intentional Discrimination…………………………….2

                1.      Historical Background…………………………………………………2

                2.      Sequence of Events & Departures from Normal Procedures…………….3

                3.      Legislative/Administrative History and Statements by Decisionmakers….3

                4.      Impact and Pattern of District Lines………………………………….4

        C.      Conclusion on Intentional Discrimination………………………………...4

III.    VOTE DILUTION CLAIMS (SECTION 2 OF THE VOTING RIGHTS ACT)…………4

        A.      Legal Standard…..………………………………………………...……5

                1.      Size and Compactness……………………………………………….5

                2.      Political Cohesion…………………………………………………….5

                3.      Majority Bloc Voting………………………………………………….5

        B.      Challenged Districts and Supporting Evidence…..………………………….5

                1.      Failure to Create New Opportunity Districts…………………………...6

        C.      Totality of the Circumstances (Section 2)………………………………..16

IV.     MALAPPORTIONMENT CLAIMS (FOURTEENTH AMENDMENT –
        ONE PERSON, ONE VOTE)……………………………………………………17

        A.      Legal Standard……………………………………………………….…17

        B.      Challenged Districts/Areas and Supporting Evidence…………………………..18

        C.      Expert Evidence Supporting Malapportionment Claim…………………………18

**TABLE OF AUTHORITIES**

*Cases*

*Abbott v. Perez*, 585 U.S. 579, 610-12 (2018).………………………………………………..2

*Cox v. Larios*, 542 U.S. 947 (2004).…………………………………………………………..17

*Gingles*, 478 U.S. at 45-46……………………………………………………………5, 6, 16

*Reynolds v. Sims*, 377 U.S. 533, 565-66 (1964).……………………………………………18

*Thornburg v. Gingles*, 478 U.S. 30, 50 (1986).…………………………………………….…5

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
429 U.S. 252, 265-68 (1977).…………………………………………………………………..2

*White v. Regester*, 412 U.S. 755 (1973).……………………………………………………..5

*Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973).…………………………………….5


*Statutes*

42 U.S.C. § 1973.……………………………………………………………………………..1

52 U.S.C. § 10301.…………………………………………………………………………….5

Plaintiff Mexican American Legislative Caucus ("MALC"), the nation's oldest and largest Latino legislative caucus, brings this action challenging the redistricting plans adopted by the 87th Texas Legislature in its third special session of 2021 for the Texas House of Representatives (Plan H2316) and the United States House of Representatives (Plan C2193). These challenges are brought under Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, and the Fourteenth and Fifteenth Amendments to the United States Constitution. MALC alleges these plans were drawn and adopted with the purpose of discriminating on the basis of race and ethnicity, dilute the voting power of Latinos and Spanish speakers, fail to provide sufficient minority opportunity districts, and employ population variances and gerrymandering techniques to achieve a racial advantage. This brief outlines MALC's specific claims, the relevant legal standards, and highlights evidence supporting these claims based on the public record and expert reports. MALC incorporates by reference evidence admitted during the forthcoming trial herein and reserves the right to file additional briefing or proposed Findings of Fact and Conclusions of Law consistent with the evidence adduced at trial.

## I. OVERVIEW OF MALC'S CLAIMS

MALC asserts claims under the U.S. Constitution and the Voting Rights Act, specifically challenging the redistricting plans on the following grounds:

1. **Intentional Discrimination:** The plans were enacted with a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments and Voting Rights Act.

2. **Vote Dilution (Effects-Based):** The plans result in the abridgement of the right to vote on account of race or color, violating Section 2 of the Voting Rights Act.

3. **Malapportionment:** The plans violate the Fourteenth Amendment's "one person-one vote" requirement through the strategic use of population variances.

## II. INTENTIONAL DISCRIMINATION CLAIMS (FOURTEENTH AND FIFTEENTH AMENDMENTS)

MALC challenges House Plan H2316 and Congressional Plan C2193 as having been drawn and adopted with discriminatory intent.

### A. Legal Standard

To establish a violation of the Fourteenth or Fifteenth Amendment, Plaintiffs must prove that the challenged action was taken with a **discriminatory purpose**. A racially discriminatory purpose is a motivating factor in the decision, not merely that the decision has a racially disparate impact. Proof of discriminatory intent often relies on objective factors and circumstantial evidence. The Supreme Court's decision in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-68 (1977), provides a framework for analyzing discriminatory intent, considering factors such as the historical background, the sequence of events, departures from normal procedures, legislative or administrative history, and the impact of the challenged action.

While there is a presumption of legislative good faith, plaintiffs can overcome this burden with sufficient evidence, including circumstantial evidence. *See Abbott v. Perez*, 585 U.S. 579, 610-12 (2018).

### B. Evidence Supporting Intentional Discrimination

Drawing on the *Arlington Heights* framework, the evidence in this case supports a finding of discriminatory intent behind the challenged plans:

1. **Historical Background:** Texas has a history of voting legislation characterized by "reluctant acquiescence to federal court orders." This history includes past instances of vote dilution challenges and a variety of abuses such as racial gerrymanders, discriminatory election laws, and last-minute changes to polling places. *See* Expert Report of Morgan Kousser ("Kousser Report") at 6 (**MALC Exhibit 14**) ("Does history suggest that the usual assumption of legislative good faith ought to be rejected in this instance? Yes."). The

imposition of new laws in reaction to growing minority activism is also part of this history. *Id.* at 30-31 (discussing reaction to 2018 elections and minority activism and turnout).

2. **Sequence of Events & Departures from Normal Procedures:** The redistricting process in 2021 involved significant departures from typical procedures, restricting opportunities for input and transparency.

   o Minority legislators were **excluded from decision-making** about redistricting in its initial phases. Given the time-crunch created as a result of delayed census results, the inclusion of minority decision-makers in early drafts, decisions, and iterations of redistricting proposals was even more essential. *Id.* at 50-51.

   o Democrats and the public were given a **highly restricted opportunity to respond** to the proposed plans. The Republican majority created the plans at a distance and largely in secret and then ran them through truncated processes that merely paid lip service to the Texas Open Meetings Act and actual legislative deliberation. *Id.* at 46-47, 52-53.

   o In the House, only **one committee hearing** was held after plans were introduced, with just three days' notice. *Id.* at 52.

   o Requests for experts on redistricting and voting rights to testify, as well as witnesses from state agencies, were **denied**. *Id.* at 53.

   o Minority members were **unaware of crucial deadlines** like the cutoff for proposing amendments. *Id.* at 52-53.

   o Requests for **more time to debate and consider** the plans were denied. *Id.*

   o Republicans, but **not Democrats, were shown a draft** of House Plan H2316 before its introduction. *Id.* at 51-52.

   o House proceedings involved **unusual conduct**, such as severely limited time for plan layout, requiring written questions from committee members, and adopting amendments without readily available data or legal analysis, often in the middle of the night. *Id.* at 53

   o Amendments offered by minority legislators were **routinely rejected**, while those offered by Anglo members were accepted. Amendments were voted down without argument or explanation. *Id.*

3. **Legislative/Administrative History and Statements by Decisionmakers:** Statements and actions by those involved in the process indicate race was a significant consideration.

   o Mapdrawers were **conscious of race and lauded their efforts to create Hispanic Voting Age Population Districts**, but simultaneously denied ever actually looking at race during the process. This inconsistency in position lacks credibility and is indicative of "race based" decisions as opposed to honest mapdrawing. *Id.* at 54-57.

   o Legislators adopted a strategy of concealing and hiding their methodology and processes in map drawing behind evidentiary privileges and refused to provide an explanation for their actions when asked under oath. *Id.* at 57-58.

   o An operative, Adam Foltz, involved in drafting plans, had a history in Wisconsin where his role in a secretive redistricting process was criticized by a federal court.

Foltz largely refused to testify about the specific principles and data he used in drawing maps. Instead, he adopted a consultant's messaging theme that the maps in the Texas House were "member driven," despite the fact that Democratic members of the House were not able to participate in the initial drafting of the maps. *Id.* at 51-52.

4. **Impact and Pattern of District Lines:** The resulting maps demonstrate an adverse impact on minority voters and feature patterns consistent with discriminatory intent.

   o The plans resulted in a **systematic underpopulating** of rural West Texas districts compared to El Paso districts. This disproportionately impacted Latino voters in El Paso by requiring more voters per representative, thus diluting their electoral power. *Id.* at 78-90.
   o The plan **avoided eliminating Anglo-majority districts** or pairing Anglo incumbents, instead pairing Latina representatives from El Paso (HDs 76 and 77). *Id.* at 86.
   o Rejected amendments, primarily proposed by minority legislators, and supported by minority representatives, demonstrated that **alternative plans were feasible** that could have created significantly more minority opportunity districts (e.g., Anchia Amendment 5 proposing to increase Hispanic CVAP majority HDs from 30 to 43) or preserved existing ones. The rejection of these alternatives, without explanation, supports the inference that minimizing minority opportunities was intentional. *Id.* at 58.
   o Specific examples include the division of the African-American community in Killeen, which prevented the creation of a Black and Latino majority district advocated by Rep. Yvonne Davis. This amendment, like others proposed by minority legislators, failed. *Id.* at 59.
   o The division of the performing minority coalition district HD 65 in Denton County, increasing the Anglo CVAP, and reversing city splits also points to adverse impacts on minority voting strength. *Id.*

**C. Conclusion on Intentional Discrimination**

The cumulative evidence—the historical context, the secretive and non-inclusive process, the statements and actions of mapdrawers and legislative leadership, and the disparate impact and patterns within the maps, coupled with the rejection of non-discriminatory alternatives—demonstrates that discriminatory intent was a motivating factor in the creation and adoption of House Plan H2316 and Congressional Plan C2193 in violation of the Fourteenth and Fifteenth Amendments.

**III. VOTE DILUTION CLAIMS (SECTION 2 OF THE VOTING RIGHTS ACT)**

MALC alleges that Texas House Plan H2316 and Congressional Plan C2193 violate Section 2 of the Voting Rights Act impermissibly diluting the voting power of Latinos and Spanish speakers and failing to provide sufficient minority opportunity districts.

## A. Legal Standard

Section 2 prohibits voting practices that result in minority voters having "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301. This is an **effects-based test**; discriminatory intent is not required to prove a Section 2 violation. For vote dilution claims involving single-member districts, plaintiffs typically must satisfy the three threshold conditions established in *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986), for each challenged district or proposed opportunity district:

1. **Size and Compactness:** The minority group must be "sufficiently large and geographically compact to constitute a majority of the eligible voter population in a reasonably configured single-member district." Eligible voter population is often assessed using Citizen Voting-Age Population (CVAP). *Id.* at 46-51.

2. **Political Cohesion:** The minority group must be **politically cohesive**, meaning its members tend to vote similarly. *Id.*

3. **Majority Bloc Voting:** The **majority** (usually Anglo) must vote sufficiently as a bloc to enable it **usually to defeat** the minority group's preferred candidate. *Id.* This must be shown in the challenged district.

These preconditions must be demonstrated on a district-by-district basis. If these conditions are met, the court then considers the "totality of the circumstances" to determine if vote dilution exists, often considering factors derived from *White v. Regester*, 412 U.S. 755 (1973), and *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir. 1973), (the "Senate factors"). *See Gingles*, 478 U.S. at 45-46.

## B. Challenged Districts and Supporting Evidence

MALC asserts numerous *Gingles* claims regarding existing districts and the failure to create new opportunity districts.

1. **Failure to Create New Opportunity Districts:** Defendants violated Section 2 by failing to create additional minority opportunity districts in specific areas.

## Dallas-Fort Worth Area Congressional Claim

- o **Proposed Location:** Additional Hispanic-majority Texas Congressional Districts in the Dallas-Fort Worth.

- o ***Gingles* Preconditions & Evidence (for these potential districts):**
  - ▪ **Size & Compactness:** Plaintiffs must identify a *specific* location within the alleged area and provide demographic data (CVAP) showing that the minority group (or coalition) is large enough and geographically compact enough to form a majority in a *reasonably configured* district consistent with traditional principles.

MALC has proposed demonstration districts to provide a Congressional minority-opportunity district in the Dallas-Fort Worth area. Proposed Map C2163 shows an alternative configuration of the Dallas-Fort Worth congressional districts from the enacted plan as follows:



Plan C2163, Joint Exhibit __.[1]

---

[1]     At the time of filing the final Joint Exhibit List was incomplete in that the exhibits had not been ordered, numbered and marked. Thus, MALC left the joint exhibit number intentionally blank so as to not create confusion

▪ **Political Cohesion:** Evidence of political cohesion for the minority group(s) in the specific geographic area proposed for the new district is required.

Cohesion analysis shows that across all districts analyzed, Hispanic voters in plaintiffs' demonstration districts continue a pattern of majority cohesiveness in 2022 and 2024 elections. Elections from 2014 to 2020 already clearly demonstrated such cohesiveness among Hispanic voters in demonstration districts, and data from recent elections in 2022 and 2024 confirms this trend. *See* Expert Report of Matt Barreto dated March 2025 at 12 (MALC Exhibit 18).

Cohesion analysis from the 2014 and 2020 elections showed statistically significant cohesion in the proposed maps that would reflect a potential minority opportunity congressional district that should have been drawn in the Dallas-Fort Worth region. For example, Dr. Barreto reports methodologically sound and statistically significant cohesion in Maps C2163 and C2167:

Similar results showing statistically significant cohesion for the proposed maps in C2163 and

| District | Elections | Race data | EI | Groups | Result |
|----------|-----------|-----------|-----|--------|--------|
| Congressional District 37 (C2163) | 14G (2), 16G, 18G (4), 20G (2) | VAP, SSTO | King's EI, RxC | Hispanic, Black | Statistically sig. cohesion |
| Congressional District 15 (C2167) | 14G (2), 16G, 18G (4), 20G (2) | VAP, SSTO | King's EI, RxC | Hispanic | Statistically sig. cohesion |
| Congressional District 23 (C2167) | 14G (2), 16G, 18G (4), 20G (2) | VAP, SSTO | King's EI, RxC | Hispanic | Statistically sig. cohesion |
| Congressional District 29 (C2167) | 14G (2), 16G, 18G (4), 20G (2) | VAP, SSTO | King's EI, RxC | Hispanic | Statistically sig. cohesion |
| Congressional District 38 (C2167) | 14G (2), 16G, 18G (4), 20G (2) | VAP, SSTO | King's EI, RxC | Hispanic | Statistically sig. cohesion |

C2167 occurred in the 2022 and 2024 elections. *See* Expert Report of Matt Barreto dated March 2025 at 12 and App. A (MALC Exhibit 18).

---

once the list is finalized and exhibit stickers have been placed on the documents. The referenced exhibits, however, all appear on the joint exhibit list and MALC will provide to the Court the final exhibit numbers, if the Court desires.

Further, using Bayesian Improved Surname Geocoding (BISG) it is possible to obtain probabilistic estimates of each voter's race in the voter file, which can be used to estimate turnout by race across precinct. *See* Expert Report of Matt Barreto dated April 2025 at 4 (MALC Exhibit 19). Based on BISG-informed ecological inference, "across elections analyzed for 2022 and 2024 there is a clear, consistent and statistically significant pattern of racially polarized voting" across Texas. *Id.* MALC's "proposed alternative plans reveal strong patterns of Hispanic cohesion such that they would have an opportunity to elect candidates of choice." *Id.*

- **Majority Bloc Voting:** Evidence of majority bloc voting sufficient to usually defeat the minority preferred candidate *in the existing districts* where the minority voters reside (and from which the new district would be drawn) is required.

Using vote history for 2022 and 2024 and the BISG method, regions across Texas with sizable populations of both Anglo and minority voters, ecological inference models point to a clear pattern of racially polarized voting. Hispanic voters demonstrate unified and cohesive voting, siding for the same candidates of choice in the 2022 and 2024 elections in Texas. In contrast, Anglo voters tend to bloc vote against minority candidates of choice. *See* Expert Report of Matt Barreto dated April 2025 at App, *passim* (MALC Exhibit 19).

Racially polarized voting dispersion plots on the enacted overlaid on the enacted Dallas-Fort Worth congressional map show the stark polarization that exists and the mapdrawers predilection and apparent intent to pair Hispanic voters with large groups of Anglo bloc voters diluting the voting power of Hispanics:



### Harris County Congressional Claim

- o **Proposed Location:** Additional Hispanic-majority Texas Congressional Districts in Harris County.

- o *Gingles* **Preconditions & Evidence (for these potential districts):**

    - ▪ **Size & Compactness.**

Alternative maps were proposed that would have reconfigured the Harris County region to provide a minority opportunity congressional district. The proposed demonstrative map for Harris County is also found in Plan C2167 and would reveal an alternative Harris County congressional map as follows:



Plan C2167, Joint Exhibit __.

- **Political Cohesion.**

Cohesion analysis shows that across all districts analyzed, Hispanic voters in plaintiffs' demonstration districts continue a pattern of majority cohesiveness in 2022 and 2024 elections. Elections from 2014 to 2020 already clearly demonstrated such cohesiveness among Hispanic voters in demonstration districts, and data from recent elections in 2022 and 2024 confirms this trend. *See* Expert Report of Matt Barreto dated March 2025 at 12 (MALC Exhibit 18). Cohesion analysis from the 2014 and 2020 elections showed statistically significant cohesion in the proposed maps that would reflect a potential minority opportunity congressional district that should have been drawn in the Harris County region. Dr. Barreto reports methodologically sound and statistically significant cohesion for Harris County regions in Plan C2167. *See supra.*

- **Majority Bloc Voting.**

Again, using vote history for 2022 and 2024 and the BISG method, regions across Texas with sizable populations of both Anglo and minority voters, ecological inference models point to a clear pattern of racially polarized voting. *See supra.* Anglo voters bloc vote against minority

candidates of choice. *See* Expert Report of Matt Barreto dated April 2025 at App. (MALC Exhibit 19).

**El Paso County House District Claim**

- o **Proposed Location:** Additional Hispanic-majority Texas House Districts in El Paso region.

- o *Gingles* **Preconditions & Evidence (for these potential districts):**

  - ▪ **Size & Compactness.**

MALC has proposed alternative districts that would be sufficiently large and compact to provide Hispanic minority group an opportunity to form five performing HCVAP districts in and including El Paso County. MALC-3 is a map that demonstrates the ability to keep five minority districts in El Paso:



  - ▪ **Political Cohesion and Majority Bloc Voting.**

Similar to the results noted above, the same patterns of Hispanic cohesion and Anglo bloc voting are visible across the El Paso region and West Texas. In El Paso County, the Hispanic vote was diluted by removing an entire Hispanic performing State House district (HD76) and packing and overpopulating the remaining State House districts with high-density Hispanic VTDs. The

stark dilutive effect is apparent when overlaying both the benchmark H2100 district boundaries as well as the enacted H2316 boundaries on a racially polarized voting dispersion plot map:



Figure 5. El Paso County, Texas RPV Dispersion Plot with enacted State House boundaries
Support for Garza by VTD

The RPV Dispersion Plot paints a picture of where the high density Hispanic or Anglo parts of a jurisdiction are, and where each candidate was preferred or opposed. Rather than report a single average estimate of candidate support such as EI models, the RPV Dispersion Plots presents a localized appraisal of racial voting patterns, which allows the court to discern where a candidate was most, or least, preferred. It also unmistakably informs how the racially discriminatory and dilutive effects of the current maps operate in practice to cordon off Hispanic voters into less opportunities to elect candidates of choice.

## Harris County House Districts Claim

- o **Proposed Location:** Additional Hispanic-majority Texas House Districts in Harris County.

- o *Gingles* **Preconditions & Evidence (for these potential districts):**

  - ▪ **Size & Compactness.**

MALC has proposed alternative districts that would be sufficiently large and compact to provide Hispanic minority group an opportunity to form five or six performing HCVAP districts. The enacted maps dilute the Hispanic vote in at least two Harris County districts. House District 145 went from a HCVAP of 62.8% to 54.4% and House District 148 went from HCVAP 44.9% to 39.4%. Barreto Expert Report May 2022 at 5-6. MALC-5 is a map that shows five majority HCVAP districts in Harris County and increases House District 148's HCVAP to from 44.9% to 48.4%. *See* Red 116 TLC Report Romeh2035//MALC-5 Report Pkg at 26, Joint Exhibit ___.



Alternatively, MALC-2 is a map that demonstrates five performing HCVAP districts and maintains House District 148 at the benchmark HCVAP level of 45.5%:



*See* Red 116 TLC Report Romeh2035//MALC-2 Report Pkg Exh. at 26, Joint Exhibit ___.

▪ **Political Cohesion and Majority Bloc Voting.**

Based on the foregoing maps and the cohesion and racially polarized voting data analyzed and that will be presented to the Court, "the Hispanic population is sufficiently large and geographically compact enough to form a majority of voters and elect its candidate of choice in an additional Texas House district in Harris County while maintaining the Hispanic voting strength in House Districts 145 and 148, unlike the adopted plan which draws no new Hispanic opportunity district and also significantly dilutes the Hispanic population in HDs 145 and 148." *See* Expert Report of Matt Barreto dated May 2022 at 19 (MALC Exhibit 16)

**Central Texas House District Claim**

- o **Proposed Location:** Additional Hispanic-majority Texas House District in the Central Texas region.

- o *Gingles* **Preconditions & Evidence (for these potential districts):**

  - ▪ **Size & Compactness.**

Here, MALC has proposed a map configuration that satisfies the criteria for size and compactness. MALC-1 is a demonstrative district that would satisfy the Voting Rights Act and demonstrates that two majority HCVAP districts could be drawn in the region, whereas none exist presently.



Under this configuration, two districts with majority HCVAP of 51.1% and 51.5% could be drawn in the region. *See* Red 119 TLC Report Romeh2035//MALC-1 Report Pkg at 41, Joint Exhibit ___.

In addition, it is also possible to draw a single HCVAP majority district in the Central Texas region. MALC-6 is a demonstrative map showing an additional single central Texas district:



> ▪ **Political Cohesion and Majority Bloc Voting.**

The Hispanic population is also sufficiently large and geographically compact enough to form a majority of voters and elect its candidate of choice in an additional Texas House district in Central Texas. *See* Expert Report of Barreto dated May 2022 at 19 (MALC Exhibit 16). A redrawn map that would provide an opportunity district in central Texas as above would provide a district with a majority Hispanic CVAP of approximately 54%. *See* Red 116 TLC Report Romeh2035//MALC-6 Report Pkg at 9, Joint Exhibit ___. In contrast, the enacted plan has two central Texas districts, House District 17 and 51, which have significant less Hispanic CVAP of 29.5% and 43%, respectively. *See* Red 116 TLC Report for Plan H2316 at 1-2, Joint Exhibit ___.

Based on statistical data analysis, it is likely that Hispanic CVAP voters would perform and elect candidates of their choice. For example, using the Garza/Paxton Attorney General race in 2024 in redrawn HD 17, Dr. Barreto calculates ecological inference rates showing clear cohesiveness amongst the Hispanic citizen voting age populace:

| Attorney General | Paxton | 35.76 | 30.45 |
|---|---|---|---|
| | Garza | 63.95 | 69.55 |

## C. Totality of the Circumstances (Section 2)

If the *Gingles* preconditions are met for a challenged district or a proposed opportunity district, the court must consider whether, under the totality of the circumstances, minority voters have an equal opportunity to participate and elect candidates. Evidence relevant to the "Senate factors" is considered, including:

- History of official discrimination touching the right to vote.
- Extent to which voting is racially polarized.
- Use of unusually large election districts, anti-single shot voting provisions, or other voting practices or procedures that may enhance the opportunity for discrimination.
- Denial of access to candidate slating processes. (Note: This factor may be less relevant today).
- Extent to which minority group members bear the effects of discrimination in areas like education, employment, and health, which hinder their ability to participate effectively.
- Whether political campaigns have been characterized by overt or subtle racial appeals.
- Extent to which members of the minority group have been elected to public office.
- Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the minority group.
- Whether the policy underlying the voting practice is tenuous.

**Evidence from sources related to Totality of Circumstances:**

- History of discrimination and reluctant acquiescence to federal court orders.

- Racially polarized voting in Texas.

- Discriminatory election laws and practices historically used.

- Ongoing discrimination in healthcare and education with local effects.

- Changing political conditions, including Latino population growth and Republican dominance.

- Lack of responsiveness demonstrated by the exclusion of minority legislators and rejection of their proposed amendments during the redistricting process.

Additionally, while some totality of circumstances factors are supported by general evidence (history, polarized voting, socioeconomic effects), specific evidence linking these factors to the challenged districts and demonstrating how they hinder the ability of minority voters to participate and elect candidates of choice in those specific districts strengthens the claims. Plaintiffs' experts Dr. Kousser, Dr. Lichtman, and Dr. Fraga will testify as to the totality of circumstances Senate Factors, providing expert analysis and evidence demonstrating the presence of the factors courts consider in assessing whether vote dilution is present. Plaintiffs' lay witnesses will likewise testify based upon their personal knowledge of relevant Senate Factor evidence and the districts for which they reside or represent.

## IV.    MALAPPORTIONMENT CLAIMS (FOURTEENTH AMENDMENT - ONE PERSON, ONE VOTE)

MALC alleges that Texas House Plan H2316 violates the Fourteenth Amendment's one person-one vote requirement through the strategic and systematic use of population variances.

### A. Legal Standard

The Equal Protection Clause requires districts within a legislative plan to have substantially equal populations. While small deviations are permissible, particularly in state legislative plans where a total deviation under 10% is generally presumed valid, such deviations can still be challenged if they are systematically and intentionally created to favor one group or region over another and are not justified by legitimate state policies (a *Larios* claim). *Cox v. Larios*, 542 U.S. 947 (2004). Federal courts have considered population disparities, especially if systematically

related to racial concentrations, as evidence of racial discrimination. *See Reynolds v. Sims*, 377 U.S. 533, 565-66 (1964) (noting regionalism is an impermissible basis for population deviations).

**B. Challenged Districts/Areas and Supporting Evidence**

MALC specifically challenges the systematic overpopulation of districts in El Paso County compared to the underpopulation in rural West Texas/Panhandle areas in House Plan H2316, arguing this violates the one person-one vote principle despite the overall plan being within the 10% deviation threshold. MALC identified HDs 74, 75, 77, 78, and 79 in El Paso as systematically overpopulated.

- **Claim:** House Plan H2316's population deviations in West Texas violate the one person-one vote principle because they systematically disadvantage Latino voters in El Paso.

- **Evidence:**

  o Plan H2316 resulted in **systematic underpopulation in rural West Texas** while districts in El Paso were at the higher end of the deviation range.

  o This pattern has the effect of **diluting the electoral power of Latinos in El Paso**.

  o El Paso districts (HDs 74, 75, 77, 78, 79) had a significantly higher population per representative ratio (195,745:1) compared to rural West Texas/Panhandle districts (e.g., HD 88) (186,791:1).

  o MALC alleges this pattern was designed to **avoid eliminating Anglo-majority districts** or pairing Anglo incumbents, doing so at the expense of Latino voters and by pairing Latina representatives in El Paso.

  o The court noted that population disparities systematically related to racial concentrations can be evidence of discrimination.

**C. Expert Evidence Supporting Malapportionment Claim**

The evidence at trial will show that the observed population deviations in West Texas were systematic, intentional, and motivated by a desire to favor one group or region (impliedly, Anglo/rural) over another (Latino/El Paso). Further, these deviations are *not* justified by legitimate, consistently applied state policies. *See* Kousser Report at 78-92 (MALC Exhibit 14).

Respectfully submitted,

SOMMERMAN, MCCAFFITY, QUESADA
&GEISLER, L.L.P.

*/s/ Sean J. McCaffity*

George (Tex) Quesada
State Bar No. 16427750
Email: quesada@textrial.com
Sean J. McCaffity
State Bar No. 24013122
Email: smccaffity@textrial.com
3811 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219-4461
214-720-0720 (Telephone)
214-720-0184 (Facsimile)

-and-

Joaquin Gonzalez
Texas Bar No. 24109935
1055 Sutton Dr.
San Antonio, TX 78228
jgonzalez@malc.org

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Pre-Trial Brief was filed and

served via the Court's electronic filing system on May 14, 2025.

*/s/ Sean J. McCaffity*
Sean J. McCaffity

Pre-Trial Brief of Mexican American Legislative Caucus - 19