UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GREG ABBOTT, et al., <br><br> Defendants. | Civil Action <br><br> Lead Case No.: <br>    3:21-CV-00259-DCG-JES-JVB |
| CECILIA GONZALES, et al., <br><br> Plaintiffs, <br><br> v. <br><br> JANE NELSON, et al., <br><br> Defendants. | Consolidated Case No.: <br>    1:21-CV-00965-DCG-JES-JVB |

**GONZALES PLAINTIFFS' PRETRIAL BRIEF**

The Gonzales Plaintiffs[1] challenge Texas's failure to draw two additional Hispanic-opportunity congressional districts—one in Harris County and one in the Dallas–Fort Worth Metroplex—as a violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301. The Gonzales Plaintiffs bring only an "'effects' claim," and not one focused on direct evidence of discriminatory intent. *Abbott v. Perez*, 585 U.S. 579, 614 (2018). In support of their claims, the Gonzales Plaintiffs

---

[1] The Gonzales Plaintiffs are individual voters Cecilia Gonzales, Agustin Loredo, Jana Lynne Sanchez, Jerry Shafer, and Debbie Lynn Solis. The Gonzales Plaintiffs were previously referred to as the "Bacy Plaintiffs," the "Abuabara Plaintiffs," and the "Voto Latino Plaintiffs"—the names have shifted as the Gonzales Plaintiffs' claims have narrowed.

will show that the three *Gingles* preconditions are satisfied in both regions, and that under the totality of the circumstances, the configuration of congressional districts in Harris County and Dallas–Fort Worth dilutes Hispanic voters' votes. *Id.* Many of the relevant facts about these relatively narrow claims are likely to be undisputed.

## BACKGROUND

Texas has experienced extraordinary population growth for the last three decades, concentrated in its diverse urban areas. But decade after decade, its Legislature has drawn redistricting plans that dilute the voting power of the State's growing racial and ethnic minority groups. Texas's history in this regard is singular. There is an unbroken pattern across the three decades before this one.

The 1990 census revealed growth, "largely in urban minority populations, that entitled Texas to three additional congressional seats." *Bush v. Vera*, 517 U.S. 952, 956–57 (1996). The Supreme Court held in 1996 that three of the congressional districts Texas enacted that decade were unconstitutional racial gerrymanders. *Id.* at 957. Texas gained another two congressional seats in the 2000 census, due to continued strong population growth in Dallas and Harris Counties. *See Balderas v. Texas*, No. 6:01CV158, 2001 WL 36403750, at *2 (E.D. Tex. Nov. 14, 2021) (three-judge court), *aff'd*, 536 U.S. 919 (2002). The Supreme Court held that the congressional plan Texas enacted that decade—to replace an initial, court-drawn plan—violated Section 2 of the VRA by diluting the voting power of the State's Latino citizens—taking "away the Latinos' opportunity because Latinos were about to exercise it." *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 440 (2006) ("*LULAC*"). Texas gained four more congressional seats in 2010, based almost entirely on growth in Hispanic, Black, and Asian populations. *See Texas v. United States*, 887 F. Supp. 2d 133, 156 (D.D.C. 2012) (three-judge panel), *vacated*, 570 U.S. 928 (2013) (remanding for reconsideration in light of *Shelby County v. Holder*, 570 U.S. 529 (2013)).

2

And Texas was the only state in the nation to have each of its redistricting plans fail to achieve preclearance under Section 5 of the Voting Rights Act (VRA) that cycle, with the court explaining that "the representation gap" for Black and Hispanic communities in Texas had "increased" as a result of the congressional plan that Texas enacted. *See id.* at 133, 158.

This decade is no different. Texas was apportioned two more congressional seats after the 2020 census, making it the only state to gain more than one. The population growth that led to that additional apportionment was again attributable almost entirely to the growth in racial and ethnic minority groups, which accounted for 95% of Texas's four million additional residents. But for this exceptional growth in Texas's minority population, Texas would have *lost* congressional seats. And the strong growth in Texas's minority groups decade after decade has led to a profound change in Texas's electorate. In 2010, 58% of the state's citizen voting-age population (CVAP) was white. By 2020, that number had shrunk to just 51%, a bare majority. Over that same period, Texas's Hispanic CVAP grew by nearly 2 million and now makes up nearly 31% of the electorate statewide.

On October 25, 2021, Governor Abbott signed Senate Bill 6, which enacted new congressional districts based on the 2020 census. The Gonzales Plaintiffs filed suit that same day, and on November 19, 2021, their case was consolidated with other cases pending before this three-judge court. *See* ECF No. 16. In their operative Fourth Amended Complaint, ECF No. 863, the Gonzales Plaintiffs allege that Texas violated Section 2 by failing to draw additional Hispanic opportunity congressional districts in Harris County and Dallas–Fort Worth.

## THE GONZALES PLAINTIFFS

The Gonzales Plaintiffs are five Hispanic Texas voters—three in Dallas–Fort Worth, and two in Harris County. One or more of the Gonzales Plaintiffs may testify, but to streamline proceedings, the Court will hear from most of them by declarations that will establish their

standing. The Gonzales Plaintiffs will show that they are (a) Hispanic Texas voters, (b) who are eligible to vote in districts where their votes have been diluted by Texas's failure to draw additional Hispanic-majority districts.

Agustin Loredo and Jerry Shafer live in Baytown, a diverse city with a substantial Hispanic population that has been separated from the rest of Harris County and cracked into Congressional District 36, a largely rural, majority-Anglo district that stretches to the Louisiana border. Cecilia Gonzales lives in Arlington, in Tarrant County, in a thin appendage of overwhelmingly rural Congressional District 25. And Jana Sanchez and Debbie Solis are eligible voters in Congressional District 33—in Fort Worth and Dallas, respectively—a sprawling and particularly non-compact district with a design that prevents an additional majority-Hispanic district from being drawn in the area.

## THE *GINGLES* PRECONDITIONS

The Gonzales Plaintiffs' Section 2 challenges to the congressional districts in Dallas–Fort Worth and Harris County are governed by "the three-part framework developed in [the Supreme Court's] decision in *Thornburg v. Gingles*, 478 U.S. 130 (1986)." *Allen v. Milligan*, 599 U.S. 1, 17 (2023). That framework requires the Gonzales Plaintiffs to satisfy three "preconditions" to relief:

1. "The 'minority group must be sufficiently large and [geographically] compact to constitute the majority in a reasonably configured district.'" *Id.* at 18 (alteration in original) (quoting *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 402 (2022)).

2. The minority group must be "politically cohesive." *Id.* (quoting *Gingles*, 478 U.S. at 51).

3. The "white majority" must "vote[] sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Id.* (ellipsis in original) (quoting *Gingles*, 478 U.S. at 51).

4

In prior decisions in this case, this Court has explained that the first and second preconditions must be met with respect to a proposed district offered by the plaintiff, while the third precondition must be met by the enacted districts that the plaintiff challenges. *See* ECF No. 307 at 31–32.

The Gonzales Plaintiffs will satisfy the *Gingles* preconditions through the testimony of Dr. Stephen Ansolabehere of Harvard University, a longtime expert in the field of electoral politics and redistricting. Dr. Ansolabehere is a recognized leader in this field whose testimony was relied upon in litigation regarding Texas redistricting in the 2010 redistricting cycle, among many other cases. *See Texas v. United States*, 887 F. Supp. 2d at 141 (relying "heavily" on Dr. Ansolabehere's analysis, finding his "methodologies sound" and "conclusions helpful" to the court). The Gonzales Plaintiffs expect the accuracy of Dr. Ansolabehere's work to be largely undisputed—Defendants' expert Dr. John Alford relied on Dr. Ansolabehere's quantitative analysis in his own work in this case—although Defendants will no doubt contest what conclusions should be drawn from Dr. Ansolabehere's results.

    A.    **Harris County**

Dr. Ansolabehere will offer a demonstration map showing that, in Harris County, an additional majority-Hispanic CVAP district—Demonstrative CD 38—can be drawn in which Hispanic voters have the opportunity to elect their candidates of choice. Instead of drawing this district, Dr. Ansolabehere will explain, Texas packed many Harris County Hispanic voters into Enacted CD 29 while cracking others into Enacted CD 36, where Gonzales Plaintiffs Agustin Loredo and Jerry Shafer reside and are unable to elect their candidates of choice. If Demonstrative CD 38 were enacted, Loredo and Shafer would be eligible to vote there instead.

Dr. Ansolabehere will show that Demonstrative CD 38 is 52.7% Hispanic CVAP, and that it is reasonably compact and drawn to comply with traditional redistricting principles. In fact, Demonstrative CD 38's area dispersion (Reock) compactness score—0.52—is better than any

district in the Enacted Map. A comparison of the Enacted Districts and Demonstrative Districts in Harris County is shown below:



Dr. Ansolabehere will explain that a significant majority of Hispanic voters (83%) in Demonstrative CD 38 prefer the same candidate, demonstrating political cohesion. And Dr. Ansolabehere will show that Hispanic citizens—including Loredo and Shafer—would have a reliable opportunity to elect their candidate of choice in this district.

Dr. Ansolabehere will also show that creating Demonstrative CD 38 would not compromise the ability of other Hispanic voters to elect their candidate of choice in the surrounding districts. In particular, while Congressional District 29 changes some, it remains a majority-Hispanic CVAP district (51.5% Hispanic CVAP) in which Hispanic voters are able to elect their candidates of choice. Demonstrative CD 29 is also reasonably compact: it has nearly the same compactness scores as Enacted CD 29, and it is much more compact than some of the majority-minority districts elsewhere in the Enacted Map and in maps from prior decades.

Ecological inference reveals that a significant majority of Hispanic voters in Demonstrative CD 29 (87%) prefer the same candidate, demonstrating political cohesion. Dr. Ansolabehere will show that an analysis of election outcomes confirms that Hispanic citizens would retain a reliable opportunity to elect their candidate of choice in this district, just as they do in Enacted CD 29.

Finally, Dr. Ansolabehere will show that, in the absence of Demonstrative CD 38, Hispanic citizens' votes are diluted and wasted in the Enacted Map. In particular, Enacted CD 36—the district running from Harris County to the Louisiana border—is a majority-white CVAP district in which a significant majority of whites (88%) vote in opposition to the candidates preferred by a significant majority of Hispanic voters (77%), resulting in a district in which the white majority votes as a sufficient bloc to consistently defeat Hispanic-supported candidates, including the candidates favored by Loredo and Shafer.

### B. Dallas–Fort Worth

Dr. Ansolabehere will also show that an additional, majority-Hispanic CVAP district (Demonstrative CD 12) can be drawn in Dallas–Fort Worth in which Hispanic voters have the opportunity to elect their candidate of choice. Instead of drawing such a district, the State carved up Dallas and Tarrant Counties such that Hispanic voters do not make up a majority in any of the districts there. The State did so by cracking many Dallas–Fort Worth Hispanic voters among six predominantly rural districts, including Enacted CD 6 and Enacted CD 25, where Plaintiff Cecilia Gonzales currently resides and is unable to elect her candidate of choice. *See Harding v. Cnty. of Dallas, Texas*, 948 F.3d 302, 307 (5th Cir. 2020) (holding it is "enough" for standing in a Section 2 case that "each voter resides in a district where their vote has been cracked or packed"). As Dr. Ansolabehere will show, the State's enacted districts in this area are highly non-compact. Although Enacted CD 6 and Enacted CD 25 are primarily rural districts, both have appendages that reach

into Dallas and Tarrant Counties, carving into the sides of Enacted CD 33, which is the least compact district in the Enacted Map and drawn such that it functionally precludes the drawing of an additional, majority-Hispanic district.

As Dr. Ansolabehere will show, Demonstrative CD 12 is a 53.3% Hispanic CVAP district that respects traditional districting criteria. In particular, the demonstration map substantially improves the overall compactness of the Dallas–Fort Worth congressional districts, by simplifying multiple highly non-compact districts in the Enacted Map. Demonstrative CD 12 itself is significantly more compact in its perimeter dispersion (Polsby-Popper) than Enacted CD 33, which is the most comparable district in the Enacted Map. And Demonstrative CDs 6, 24, 25, 32, and 33 are more compact on every measure as compared to the existing districts. A comparison of the Enacted Districts and Demonstrative Districts in Dallas–Fort Worth is shown below:



Dr. Ansolabehere will also show that a significant majority of Hispanic voters (89%) in Demonstrative CD 12 prefer the same candidate, demonstrating political cohesion. And Dr. Ansolabehere will show that an analysis of election outcomes demonstrates that Hispanic citizens would have a reliable opportunity to elect their candidates of choice in this district. That includes Plaintiffs Jana Sanchez and Debbie Solis, both of whom would be eligible voters in Demonstrative CD 12. *See Perez v. Abbott*, 267 F. Supp. 3d 750, 774 (W.D. Tex. 2017) ("[P]laintiffs who reside in a reasonably compact area that could support an additional minority opportunity district have standing to pursue § 2 claims, even if they currently reside in an opportunity district."), *aff'd in part, rev'd in part on other grounds*, 585 U.S. 579 (2018).

Importantly, Dr. Ansolabehere's demonstration map creates this majority-Hispanic opportunity district without compromising the number of existing districts in which minority voters have the opportunity to elect their candidate of choice. Congressional District 33, for example, remains a district in which minority voters can elect their candidate of choice, even while becoming meaningfully more compact than its predecessor. This more compact district allows additional Hispanic voters—including Plaintiff Cecilia Gonzales—an opportunity to elect their candidate of choice. *See* ECF No. 307, at 16–17, 19 (plaintiffs have standing if they "would exit a district that dilutes their votes" under a proposed map, such that "defendants' failure to create a minority opportunity district directly injured" them and they would "benefit from the drawing of additional minority opportunity districts").

Dr. Ansolabehere will show that, in the absence of Demonstrative CD 12, Hispanic citizens' votes are diluted and wasted in the Enacted Map. Specifically, Dr. Ansolabehere will show that the enacted map cracks Hispanic voters across several predominantly rural districts in the region. This includes, in particular, Enacted CD 25, a majority white CVAP district in which

a significant majority of whites (86%) vote in opposition to the candidate preferred by a significant majority of Hispanic voters (78%), resulting in a district in which the white majority votes sufficiently as a bloc to consistently defeat Hispanic-supported candidates. Hispanic voters are also cracked into Enacted CD 6, a majority white CVAP district in which a significant majority of whites (87%) vote in opposition to the candidate preferred by a significant majority of Hispanic voters (84%), resulting in a district in which the white majority votes sufficiently as a bloc to consistently defeat Hispanic-supported candidates.

## TOTALITY OF THE CIRCUMSTANCES

Although the *Gingles* preconditions are not the end of the inquiry, the Fifth Circuit has recognized that "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances." *Clark v. Calhoun Cnty., Miss.*, 21 F.3d 92, 97 (5th Cir. 1994) (citing *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Ed.*, 4 F.3d 1103, 1135 (3d Cir. 1993)). Here, the totality of the circumstances establishes that the Enacted Map has the effect of denying Hispanic voters an equal opportunity to participate in the political process and to elect candidates of their choice, in violation of Section 2.

To help this Court consider the totality of the circumstances, the Gonzales Plaintiffs will put forward the testimony of Dr. Allan Lichtman, a professor of American History and expert in voting rights. Dr. Lichtman has served as an expert witness in dozens of voting and civil rights cases for both plaintiffs and defendants, and his work was cited by the majority in *LULAC v. Perry*, 548 U.S. 399 (2006), in concluding that Texas diluted the power of Hispanic voters in violation of Section 2 of the VRA in that decade's congressional plan.

Dr. Lichtman will offer an analysis of the Senate Factors this Court considers when weighing whether, under the totality of the circumstances, an electoral system interacts with social and historical conditions to cause an inequality in the political process. Although Dr. Lichtman will address the Senate Factors in more detail in his testimony, the Gonzales Plaintiffs will highlight just a few here. In considering Senate Factor 1, the State's history of discrimination in the voting process, Dr. Lichtman will testify that Texas has a long, well-documented history of discrimination in the voting process that has continued through the modern era. For instance, during the nearly 50 years in which Texas was subject to preclearance under Section 5 of the Voting Rights Act, Texas had more preclearance objections from the Department of Justice than any other state. And in every redistricting cycle since 1980, the Department of Justice has objected to or intervened in litigation to block Texas's redistricting plans because they have discriminated against minority voters. In the last round of redistricting following the 2010 census, Texas was the only state that failed to preclear its redistricting plans under Section 5. This is not ancient history; it is a pattern, decade after decade. Beyond redistricting, Dr. Lichtman will also show that, once Texas was no longer subject to preclearance, Texas immediately took the opportunity to enact discriminatory voting laws again and again.

Although Dr. Ansolabehere will primarily testify to Senate Factor 2—the existence of racially polarized voting throughout the State—Dr. Lichtman will help demonstrate how racially polarized voting in Texas is driven significantly by attitudes about race, contrary to what Texas claims. And on Senate Factor 5, the extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, Dr. Lichtman will show that significant racial disparities in education, poverty, and health outcomes remain between whites

and Hispanics in Texas, all of which make it more difficult for Hispanic voters to participate effectively in the political process.

An additional factor this Court may consider in weighing the totality of the circumstances is proportionality, "comparing the percentage of total districts that are Latino opportunity districts with the Latino share of the citizen voting-age population" on a statewide basis. *LULAC*, 548 U.S. at 436. As Dr. Ansolabehere will show, Hispanic citizens make up 30.5% of the state's citizen voting age population, and yet only 15.7% of the state's congressional districts are Hispanic-majority opportunity districts. If this Court ordered two additional Hispanic opportunity districts, that percentage would rise to 21% of the state's congressional districts—still far from their proportional representation in Texas, but a meaningful gain for the State's Hispanic citizens' ability to effectively participate in the political process.

## CONCLUSION

This Court should find the Gonzales Plaintiffs established each of the *Gingles* preconditions for the districts they challenge in both Houston and Dallas–Fort Worth and that they have shown the totality of the circumstances demonstrate that the political process is not equally open to Texas's Hispanic citizens. The Court should therefore hold that SB 6 violates Section 2 of the VRA. As a remedy, the Court should order the State to draw two additional Hispanic opportunity districts, one in in Houston and one in the Dallas–Fort Worth Metroplex, in addition to the state's existing minority opportunity districts.

| | |
|---|---|
| Dated: May 14, 2025 | Respectfully submitted, |
| | |
| Renea Hicks | */s/ David R. Fox* |
| Attorney at Law | |
| Texas Bar No. 09580400 | David R. Fox* |
| Law Office of Max Renea Hicks | Richard A. Medina* |
| P.O. Box 303187 | **ELIAS LAW GROUP LLP** |
| Austin, Texas 78703-0504 | 250 Massachusetts Ave. NW, Suite 400 |
| (512) 480-8231 | Washington, D.C. 20001 |
| rhicks@renea-hicks.com | Telephone: (202) 968-4490 |
| | dfox@elias.law |
| | rmedina@elias.law |
| | |
| | Abha Khanna* |
| | **ELIAS LAW GROUP LLP** |
| | 1700 Seventh Ave, Suite 2100 |
| | Seattle, WA 98101 |
| | Telephone: (206) 656-0177 |
| | akhanna@elias.law |
| | |
| | Counsel for Gonzales Plaintiffs |
| | |
| | *Admitted pro hac vice |

13

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 14, 2025, and that all counsel of record were served by CM/ECF.

*/s/ David R. Fox*