# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

|  |  |
|---|---|
| LULAC, *et al.*,<br><br>　　　　　*Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of Texas, *et al.*,<br><br>　　　　　*Defendants*. | Case No. 3:21-CV-00259-DCG-JES-JVB<br>[Lead Case] |

## BROOKS PLAINTIFFS' PRETRIAL BRIEF

## INTRODUCTION

Brooks Plaintiffs have live claims challenging four regions in Texas's redistricting maps about which they will proffer testimony and documentary evidence at trial: (1) Section 2 vote dilution in the Houston congressional districts for failure to create an additional Latino majority district beyond the existing districts in which Latino voters have an opportunity to elect their candidates of choice, (2) Section 2 vote dilution in the Dallas-Fort Worth ("DFW") congressional districts for failure to create a Latino majority district beyond the existing districts in which Latino voters have an opportunity to elect their candidates of choice, (3) Section 2 vote dilution in the configuration of HD118 in Bexar County, and (4) intentional discrimination and racial gerrymandering in violation of Section 2 and the Fourteenth and Fifteenth Amendments with respect to the dismantling of SD10 in Tarrant County. Brooks Plaintiffs provide an overview of the testimony and evidence in support of their DFW and Houston congressional claims and their HD118 claim in this brief.

Brooks Plaintiffs have already elicited substantial testimony and proffered documentary evidence (admitted Brooks Plaintiffs' Exhibits 1-106) during the preliminary injunction hearing on their SD10 claims. That evidence is part of the record, *see* Fed. R. Civ. P. 65(a)(2), and cognizant of the time they were already afforded by the Court, Brooks Plaintiffs will avoid duplicating their presentation regarding SD10 at the upcoming trial. They will, however, provide some additional testimony regarding SD10 in an efficient manner. Moreover, Brooks Plaintiffs discuss *infra* Part IV several issues on which they respectfully believe the Court erred in its preliminary injunction decision. Brooks Plaintiffs discuss those issues here to inform the Court's consideration of their SD10 claims at final judgment and to ensure that these issues are preserved for any subsequent appeal.

1

**ARGUMENT**

**I.    The configuration of Harris County congressional districts violates Section 2.**

Brooks Plaintiffs, together with other consolidated Plaintiffs alleging the same claim,[1] will

prove at trial that the 2021 Enacted Plan—as ratified by the 2023 Legislature ("Enacted Plan")—

violates Section 2 in its configuration of Harris County congressional districts. This is so because

an additional Latino opportunity district can be drawn that satisfies all three *Gingles* preconditions

and the totality of circumstances show that vote dilution is occurring.

Dr. Tye Rush will testify regarding the first *Gingles* precondition. He will testify that

demonstrative plan C2163, ECF No. 929-2 (Brooks Ex. 107,108, 109 110) creates demonstrative

CD29 and CD38 in which Latinos form the majority of eligible voters.

Dr. Rush will testify that demonstrative CD29 and CD38 comply with traditional

redistricting criteria, including compactness and county splits, at least as well as the Enacted Plan.

He will testify as a result that demonstrative CD29 and CD38 do not subordinate traditional

districting principles to racial considerations. He will likewise provide testimony that

demonstrative CD29 and CD38 would perform electorally to elect Latino voters' candidates of

choice.

Dr. Matt Barreto will testify regarding the second and third *Gingles* preconditions. He will

testify regarding various methodologies to evaluate racially polarized voting, including Baysian

Improved Surname Geocoding ("BISG"), which improves upon traditional ecological inference

---

[1] Several Plaintiff groups, including Brooks, LULAC, and Gonzales, have the same Section 2
claim regarding the DFW and Houston area congressional districts. Likewise, Brooks and LULAC
Plaintiffs both assert a Section 2 claim regarding HD118. Because the cases are consolidated and,
in an effort to avoid duplicative testimony, Plaintiffs intend to coordinate their evidentiary
presentation and rely at times on each other's lay and expert witnesses. This is how prior Texas
consolidated statewide redistricting cases have been tried and will promote judicial economy.

analysis for estimating voting patterns by using additional data sources—both Census surname data and Census block-level racial demographics—to provide a more accurate probability assessment of a voter's race or ethnicity. BISG has been credited as a reliable methodology for assessing the race and ethnicity of voters who turn out to participate in Texas elections. *See Petteway v. Galveston County*, 698 F. Supp. 3d 952, 975-76 (S.D. Tex. 2023), *rev'd on other grounds*, 111 F.4th 596 (5th Cir. 2024) (en banc) ("The court finds that BISG is a reliable methodology for assessing racially polarized voting patterns."). Dr. Barreto will testify that Latino voters in demonstrative CD29 and CD38 are politically cohesive across a range of tested elections and that their candidate choices are polarized in opposition to those candidates supported by Anglo voters in the district. For example, in the 2022 and 2024 elections, Latino voters were cohesive in demonstrative CD29, providing between 59% and 72% of their votes to the same candidates across 13 elections. ECF No. 929-2, Brooks Ex. 224 (Rebuttal Report of Dr. Matt A. Barreto) at 19. Likewise, in demonstrative CD38, Latino voters were cohesive, providing between 59% and 74% of their votes to the same candidates across 13 elections. ECF No. 929-2, Brooks Ex. 224 (Rebuttal Report of Dr. Matt A. Barreto) at 21. Plaintiffs' experts will also testify that Anglo voters bloc vote to usually defeat Latino-preferred candidates in more Harris County congressional districts in the Enacted Plan than in demonstrative Plan C2163—demonstrating the presence of the third *Gingles* precondition. *See, e.g.*, Ex. ECF No. 929-2, Brooks Ex. 221 (Expert Report of Dr. Matt. A. Barreto) at 21; ECF No. 934, Gonzales Ex. 10 (Addendum to the Second Supplemental Report of Dr. Stephen Ansolabehere, April 28, 2025) at Table 6A.

Plaintiffs' experts Drs. Kousser, Lichtman, Fraga, Tijerina, Saenz, and Morales will testify as to the totality of circumstances Senate Factors, providing expert analysis and evidence demonstrating the presence of the factors courts consider in assessing whether vote dilution is

present. Plaintiffs' Harris County-area lay witnesses will likewise testify based upon their personal knowledge of relevant Senate Factor evidence.

## II.    The configuration of DFW congressional districts violates Section 2.

Brooks Plaintiffs, together with other consolidated Plaintiffs alleging the same claim, will prove at trial that the Enacted Plan violates Section 2 in its configuration of DFW congressional districts. This is so because an additional Latino opportunity district can be drawn that satisfies all three *Gingles* preconditions and the totality of circumstances show that vote dilution is occurring.

Dr. Tye Rush will testify regarding the first *Gingles* precondition. He will testify that demonstrative plan C2163, ECF No. 929-2, (Brooks Ex. 107,108, 109 110) creates demonstrative CD37 in which Latinos form the majority of eligible voters.

Dr. Rush will testify that demonstrative CD37 complies with traditional redistricting criteria, including compactness and county splits, at least as well as the Enacted Plan. He will testify as a result that demonstrative CD37 does not subordinate traditional districting principles to racial considerations. He will likewise provide testimony that demonstrative CD37 would perform electorally to elect Latino voters' candidates of choice.

Dr. Matt Barreto will testify regarding the second and third *Gingles* preconditions. He will testify regarding various methodologies to evaluate racially polarized voting, including BISG. Dr. Barreto will testify that Latino voters in demonstrative CD37 are politically cohesive across a range of tested elections and that their candidate choices are polarized in opposition to those candidates supported by Anglo voters in the district. For example, in the 2022 and 2024 elections, Latino voters were extremely cohesive in demonstrative CD37, providing over 90% of their votes to the same candidates across 13 elections. ECF No. 929-2, Brooks Ex. 224 (Rebuttal Report of Dr. Matt A. Barreto) at 20. Plaintiffs' experts will also testify that Anglo voters bloc vote to usually

defeat Latino-preferred candidates in more DFW congressional districts in the Enacted Plan than in demonstrative Plan C2163—demonstrating the presence of the third *Gingles* precondition. *See, e.g.*, ECF No. 929-2, Brooks Ex. 221 (Expert Report of Dr. Matt A. Barreto) at 21 & 29; ECF No. 934, Gonzales Ex. 9 (Second Supplemental Report of Dr. Stephen Ansolabehere, March 31, 2025) ¶ 14; ECF No. 934, Gonzales Ex. 10 (Addendum to Second Supplemental Report of Dr. Stepehen Ansolabehere, April 28, 2025) Table 6A.

Plaintiffs' experts Drs. Kousser, Lichtman, Fraga, Tijerina, Saenz, and Morales will testify as to the totality of circumstances Senate Factors, providing expert analysis and evidence demonstrating the presence of the factors courts consider in assessing whether vote dilution is present. Plaintiffs' DFW-area lay witnesses will likewise testify based upon their personal knowledge of relevant Senate Factor evidence.

### III.    The configuration of HD118 violates Section 2.

Brooks Plaintiffs and LULAC Plaintiffs will prove at trial that the configuration of HD118 in the Enacted Plan violates Section 2. This is so because the boundaries of HD118 were modified in the 2021 redistricting, and ratified by the legislature in 2023, in a way that reduced the Latino population of the district so that they no longer form an effective majority of voters in the district. As a result, Latino preferred candidates now lose HD118, including in the two endogenous contests conducted in the district since it was adopted.

Dr. Rush will testify regarding the first *Gingles* precondition that an alternative configuration of HD118 is possible, in demonstrative plan H2176, in which Latino voters comprise 64.4% of the citizen voting age population. ECF No. 929-2, Brooks Ex. 130 (H2176 Red-116).

Dr. Rush will testify that demonstrative HD118 complies with traditional redistricting criteria, including compactness and county splits, at least as well as the Enacted Plan. He will

testify as a result that demonstrative HD118 does not subordinate traditional districting principles to racial considerations. He will likewise provide testimony that demonstrative HD118 would perform electorally to elect Latino voters' candidates of choice.

Dr. Rush will testify to how the Enacted Plan reduced HD118's Spanish Surname Registered Voters ("SSVR") from 60.4% to 48.5% and its Spanish Surname Voter Registration Turnout ("SSVRTO") from 55.7% to 43.9%. ECF No. 929-2, Brooks Ex. 226 (Expert Report of Dr. Tye Rush Report) at 5. As a result—although the Enacted Plan's version of HD118 has a majority HCVAP, it lacks an effective majority of Hispanic *voters*. Courts recognize that districts may be majority minority by population yet nevertheless dilute minority voting strength because of factors like disparate voter turnout rates. *See, e.g.*, *Perez v. Abbott*, 253 F. Supp. 3d 864, 880 (W.D. Tex. 2017) ("[T]he existence of a majority HCVAP in a district does not, standing alone, establish that the district provides Latino an opportunity to elect, nor does it prove non-dilution"); *Pope v. Cnty. of Albany*, 687 F.3d 565, 575 n.8 (2d Cir. 2012) ("[T]he law allows plaintiffs to challenge legislatively created bare majority-minority districts on the ground that they do not present the 'real electoral opportunity' protected by Section 2.") (internal quotations omitted); *Mo. State Conference of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 934 (8th Cir. 2018) ("[M]inority voters do not lose VRA protection simply because they represent a bare majority within the district."); *Kingman Park Civic Ass'n v. Williams*, 384 F.3d 1033, 1041 (D.C. Cir. 2003); *Monroe v. City of Woodville*, 881 F.2d 1327, 1333 (5th Cir. 1989). Likewise, the Supreme Court has recognized that it is "possible for a citizen voting-age majority to lack real electoral opportunity." *LULAC v. Perry*, 548 U.S. 399, 428 (2006). Dr. Barreto will testify that the Enacted Plan made surgical changes to HD118 to purposefully select for inclusion precincts that would appear Hispanic but would have low Hispanic turnout and exclude Hispanic precincts with

6

high Hispanic turnout. ECF No. 929-2, Brooks Ex. 223 (Supplemental Report of Dr. Matt A. Barreto) at 21.

This manipulation of the Latino precincts included and excluded from a district is a familiar tactic in Texas redistricting—and one courts have had no trouble invalidating as violative of Section 2. In *LULAC*, 548 U.S. at 438-42, the Supreme Court held that the then-extant version of Texas CD23 violated Section 2 because the legislature removed from the district Latino voters who had become the most politically active in favor of those who were less likely to vote— maintaining a bare Latino majority but not one that was politically effective, *id.* at 440. "This bears the mark of intentional discrimination . . . . The State not only made fruitless the Latinos' mobilization efforts but also acted against those Latinos who were becoming most politically active . . . ." *Id.* The *LULAC* Court avoided reaching the constitutional question of a Fourteenth Amendment violation because of that intentional discrimination by instead finding a Section 2 violation. *Id.*

Moreover, in the 2011 round of redistricting, this tactic became known as the "nudge factor"—where areas are added that "help pull the district's Total Hispanic Pop and Hispanic CVAPs up to majority status, but leave the Spanish Surname RV [registered voters] and TO [turnout] the lowest." *Perez v. Perry*, No. SA-11-CV-360, 2017 WL 962686, at *10-11 (W.D. Tex. Mar. 10, 2017). The court found this tactic with respect to the 2011 version of HD117 in Bexar County—a neighbor of HD118—to be intentionally discriminatory. *See Perez v. Abbott*, 250 F. Supp. 3d 123, 148-49 (W.D. Tex. 2017). Assessing this "nudge factor" claim, the court observed that "[t]he final configuration of HD117 includes a very large gap between HCVAP and SSVR of 13.7 points, well beyond any gap in any other House district. . . . Considering all the evidence, the

Court finds that the mapdrawers intentionally drew HD117 with 50.1% SSVR but with lower performance for Latinos by manipulating Latino population and turnout." *Id.* at 148.

Here, the Enacted Plan's configuration of HD118 bears the same mark of intentional discrimination (a relevant consideration under the Senate Factors)—the intentional manipulation of included and excluded precincts to maximize the appearance of a Latino majority population while simultaneously minimizes the number of actual Latino voters in the district. As in *Perez*, there is a large gap between the districts HCVAP of 57.8%, *see* ECF No. 929-2, Brooks Ex. 124 (Plan H2316 RED-116), and its SSVR of 48.5% and SSVRTO of 43.9%. Dr. Barreto will testify that this surgical and intentional decision making created the appearance of a Hispanic opportunity district while ensuring that the district would not actually perform as such.

Dr. Barreto will also testify regarding the second and third *Gingles* preconditions. He will testify regarding various methodologies to evaluate racially polarized voting, including BISG. Dr. Barreto will testify that Latino voters in demonstrative HD118 are politically cohesive across a range of tested elections and that their candidate choices are polarized in opposition to those candidates supported by Anglo voters in the district. For example, in the 2022 and 2024 elections, Latino voters were extremely cohesive in demonstrative CD37, providing between 62% and 74% of their votes to the same candidates across 13 elections. ECF No. 929-2, Brooks Ex. 224 (Rebuttal Report of Dr. Matt A. Barreto) at 22. Plaintiffs' experts will also testify that Anglo voters bloc vote to usually defeat Latino-preferred candidates in the Enacted Plan's version of HD118— demonstrating the presence of the third *Gingles* precondition. *Compare* ECF No. 929-2, Brooks Ex. 223 (Supplemental Report of Dr. Matt A. Barreto) at 9 *with* ECF No. 929-2, Brooks Ex. 124.

Plaintiffs' experts Drs. Kousser, Lichtman, Fraga, Tijerina, Saenz, and Morales will testify as to the totality of circumstances Senate Factors, providing expert analysis and evidence

demonstrating the presence of the factors courts consider in assessing whether vote dilution is present. Plaintiffs' Bexar County-area lay witnesses will likewise testify based upon their personal knowledge of relevant Senate Factor evidence.

**IV.    The dismantling of SD10 was intentionally discriminatory in violation of Section 2 and the Fourteenth and Fifteenth Amendments and was a racial gerrymander in violation of the Fourteenth Amendment.**

The dismantling of SD10 was intentionally discriminatory and a racial gerrymander. Brooks Plaintiffs will present limited additional testimony regarding SD10, but do not intend to duplicate the extensive evidentiary record that was already created during the preliminary injunction proceeding. *See* Fed. R. Civ. P. 65(a)(2). But Brooks Plaintiffs address here several issues on which they respectfully believe the Court erred in its preliminary injunction decision that Brooks Plaintiffs believe should result in the Court deciding in their favor at this stage.

**A.    The Court should not consider legislators' public statements that the map was drawn blind to race or that partisanship was a consideration.**

The Court should not consider the public statements regarding legislative purpose by Senator Huffman, Rep. Hunter, their staff, including the assertion that the maps were drawn blind to race. The Court extensively relied upon these statements in issuing its preliminary injunction decision, but the Court subsequently sustained Defendants' invocation of legislative privilege on the topic of legislative purpose—including by deeming as privileged answers to questions posed at Senator Huffman's deposition asking her to explain what these public statements meant. *See* ECF No. 963. Although the Court has indicated that it intends to admit all evidence subject to trial objections, Brooks Plaintiffs note that they object to the Court's admission of these public statements. Having succeeded in invoking legislative privilege to block the admission of testimony and evidence on the same topic, Defendants cannot be permitted to proffer selectively released and self-serving public statements (that would otherwise have been privileged) of legislators regarding

their purpose in configuring SD10. Either the topic of legislative purpose is privileged or it is not. The Court cannot allow Defendants to use it as both a shield and sword. *See Singleton v. Merrill*, 576 F. Supp. 3d 931, 941 (N.D. Ala. 2021); *In re Itron, Inc.*, 883 F.3d 553, 558 (5th Cir. 2018); *Powell v. Ridge*, 247 F.3d 520, 525 (3d Cir. 2001).

The Court relied extensively on these public assertions by Senator Huffman and others in issuing its preliminary injunction decision yet subsequently allowed Defendants to shield from admission at trial their legislative purpose. It would be manifestly unjust for the Court to credit these self-serving public statements at final judgment, given the Court's subsequent privilege ruling.

**B.    The Court applied the wrong legal standard by importing the *Shaw* "racial predominance" standard into its intentional discrimination analysis.**

The Court applied the wrong legal standard by importing the *Shaw* "racial predominance" standard into its intentional discrimination analysis. Intentional vote dilution claims and racial gerrymandering claims are "analytically distinct." *Miller v. Johnson*, 515 U.S. 900, 911 (1995) (quotation marks omitted). "Whereas a vote dilution claim alleges that the State has enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities," a racial gerrymandering claim alleges that race predominated in the sorting of voters—even absent a nefarious purpose. *Id.* Plaintiffs claiming intentional discrimination need not "prove that the challenged action rested solely on racially discriminatory purposes" or that racial vote dilution was "the 'dominant' or 'primary'" purpose. *Arlington Heights*, 429 U.S. at 265. Rather, racial vote dilution is unlawful if it "was *a* motivating factor." *Arlington Heights*, 429 U.S. at 265 (emphasis added). By contrast, a racial gerrymander need not entail any nefarious motivation—indeed, a mistaken belief that race must be excessively considered to *avoid* racial vote dilution can trigger liability. *See, e.g., Cooper v. Harris*, 137 S. Ct.

1455, 1472 (2017). Because the use of race in this manner is not motivated by invidious intent and given that "[a] legislature 'will almost always be aware of racial demographics' during redistricting," *id.* at 1487 (quoting *Miller*, 515 U.S. at 916), a plaintiff claiming a racial gerrymander must show that race was "the *predominant* factor motivating the legislature's districting decision," such that the legislature "subordinated other factors . . . to racial considerations." *Id.* at 1464 (internal quotation marks omitted) (emphasis in original).

The Court erred in its legal analysis of the extensive evidence of involvement in race in the process of redistricting SD10—something the Court identified in detail in its factual findings. The Court reasoned that no inference of discrimination could be drawn from evidence of "full[] aware[ness] of race in the[] redistricting" of SD10 because this Court in *Miller* explained that "[r]edistricting legislatures will . . . almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process." ECF No. 258 at 37 (quoting *Miller*, 515 U.S. at 916). But *Miller* was a racial gerrymandering case, and *predominance* is not the relevant question in an intentional discrimination inquiry. In the context of intentional discrimination, the court's task is not to deploy *Arlington Heights* to determine if race predominated, but rather to determine whether the sequence of events and other factors create an inference that racial vote dilution "was *a* motivating factor," regardless of whether it was a "dominant or primary" purpose. *Arlington Heights*, 429 U.S. at 265 (internal quotation marks omitted) (emphasis added).

Moreover, the Supreme Court has explained that where "the adverse consequences of a law upon an identifiable group" are clear, "a *strong inference* that the adverse effects were desired can reasonably be drawn. *Feeney*, 442 U.S. at 279 n.25 (emphasis added). It is difficult to conceive of a case in which the adverse consequences of legislative action on minorities could be more clear. The same scheme was invalidated last decade. Senator Huffman and the mapdrawer were both

intimately involved then and now. The district's demographics were no secret. Senator Powell corresponded with all 181 Texas legislators, imbedding a map of the cracked minority population in the first paragraph of her email. Brooks Ex. 6 ¶ 25. Instead of drawing the "strong inference" that the clear "adverse effects were desired," *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 n.25 (1979)—even if as just one of several motivating factors—the Court concluded that such an inference could not be drawn unless race "predominates in the redistricting process." ECF No. 258 at 37. That was legal error.

### C. The Court erred in attributing the legislature's procedural departures to COVID.

The Court erred in attributing the legislature's procedural departures solely to COVID-caused Census data delays. "Departures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 267.

First, the Court cited the Supreme Court's *Abbot v. Perez* decision, premised upon the Texas legislature's alleged good intention in enacting the 2013 redistricting map because it had originally been ordered by a court, to show how innocuous reasons may explain a rushed process. ECF No. 258 at 38. But *Perez* does not support the Court's conclusion. Here, the legislature dismantled benchmark SD10—the exact court-approved interim plan the 2013 Legislature had enacted to remedy the judicial finding of intentional discrimination—and reverted to the 2011 approach of cracking apart Tarrant County's minority population. In doing so, the legislature *ignored*—rather than implemented—multiple federal court rulings regarding SD10 specifically and Tarrant County redistricting generally. If *adopting* a court-ordered plan aimed at remedying intentional discrimination suggests the absence of discriminatory intent, then surely *rejecting* that same plan in favor of the scheme held to be intentionally discriminatory in the first place "naturally

gives rise to . . . .inferences regarding the [discriminatory] intent of the [2021] Legislature." *Perez*, 138 S. Ct. at 2327.

Moreover, doing so in an atypically rushed process worsens that inference, particularly because Representative Hunter and all house members received from Senator Powell maps, analysis, and data showing the discriminatory cracking of SD10's minority population before the house began its consideration of senate plan. Brooks Ex. 6 ¶¶ 30-31. Armed with that information, Representative Hunter did nothing to respond or engage with it; he instead opened the house hearing by saying "I'm going to always be positive, and I'm going to always be constructive. . . . And I'm going to presume [the senate] followed their procedure and done everything they are supposed to do." P.I. Hearing Vol. 5, 34:4-9, Jan. 26, 2022. Then he announced for the first time the bill would clear the committee that same day so amendments (including any in response to the day's public testimony) would have to be submitted that day. P.I. Hearing Vol. 5, 40;19-21, Jan. 26, 2022.

The Court erred by concluding that COVID fully explained the procedural irregularities. First, the legislature enacted a law providing for "several different scenarios" with adjusted candidate filing deadlines and primary election dates in the event multiple special sessions were needed to complete the redistricting process. P.I. Hearing Vol. 5,68:1- 69:25, Jan. 26, 2022; Tex. Elec. Code § 41.0075. Contrary to the Court's conclusion, the legislature itself ensured it would not be "pressed for time" and required to resort to procedural shortcuts because of COVID-delayed Census data. ECF No. 258 at 39. But once the attention on SD10 sharpened, the legislature abandoned the timeline it had prepared and instead rushed the process. Second, there is no record evidence that the COVID-related Census delay actually explained the procedural departures. For example, Representative Turner offered unrebutted testimony there was time in the special session

for more than one day of house consideration of the senate plan. P.I. Hearing Vol. 5, 69:14-23,

Jan. 26, 2022. And there is no record evidence to suggest that COVID delays explained the refusal

to permit resource or expert witnesses to testify.

### D.    The Court erred in assessing the evidentiary value of the alternative maps.

The Court erred in assessing the evidentiary value of the alternative maps plaintiffs

proffered. In *Cooper v. Harris* and in *Alexander v. South Carolina State Conference of the NAACP*,

602 U.S. 1 (2024), the Supreme Court emphasized the powerful nature of alternative maps

evidence in disproving a defense that partisanship rather than race explains a map's lines.

> [A]n alternative districting plan . . . can serve as *key evidence* in a race-versus-politics
> dispute. One, often *highly persuasive* way to disprove a State's contention that politics
> drove a district's lines is to show that the legislature had the capacity to accomplish all
> its partisan goals without moving so many members of a minority group into the district.
> If you were *really* sorting by political behavior instead of skin color (so the argument
> goes) you would have done—or, at least, could just as well have done—*this*. Such
> would-have, could-have, and (to round out the set) should-have arguments are a familiar
> means of undermining a claim than an action was based on a permissible, rather than a
> prohibited, ground.

*Cooper*, 581 U.S. 285, 317-18 (2017) (first and second emphasis added); *id.* at 322 (noting that

such an alternative map "could carry the day" even where other evidence was "meager"). The

dissenting justices would have *required* the proffer of an alternative map (in racial gerrymandering

cases) where voting was racially polarized. Justice Alito characterized the proffer of an alternative

map as "a logical response to the difficult problem of distinguishing between racial and political

motivations when race and political party preference closely correlate." *Id.* at 334. Moreover, the

dissent explained that the proffer of an alternative map was a "sound" approach for plaintiffs to

overcome their "burdens of production and persuasion," and the "presumption that the plan was

drawn for constitutionally permissible reasons." *Id.* at 336. In *Alexander*, Justice Alito's view

became the majority holding. 602 U.S. at 34.

Plaintiffs proffered such alternative maps here. ECF No. 258 at 44; Brooks Ex. 45, 70-99, 101. Those maps show how a legislature motivated by partisan gain would have targeted SD14 by splitting Austin into five strongly Republican senate districts rather than targeting SD10. Indeed, the *Perez* three-judge court explicitly blessed this path in 2017: "The Legislature could have simply divided Travis County and Austin Democrats among five Republican districts." *Perez*, 253 F. Supp. 3d at 897; *id.* at 985-86 (Smith, J., dissenting) (noting that "fragmenting Travis County into relatively harmless parts" was permissible partisan gerrymandering that stands in "stark contrast" to "packing and cracking" minorities in DFW); *id.* at 986 (Smith, J., dissenting) ("In terms of what redistricting law requires, the differences between DFW and Travis County[] are dramatic."). The 2021 senate mapdrawer—Anna Mackin—was counsel of record for Texas in the *Perez* case in which the court made those statements. ECF No. 258 at 34-35.

Like the enacted plan, Plaintiffs' alternative maps contain nineteen safe Republican seats (of a total of thirty-one). Brooks Ex. 45 at 4-5. Indeed, Plaintiffs' alternative maps *improve* on Republican performance by retaining a competitive seat (SD10) in addition to the nineteen safe Republican seats. *Id.* In addition, the alternative plans "ensure that the weakest Republican seat is slightly safer" than in the enacted plan. ECF No. 258 at 44-45. The alternative maps satisfy Senator Huffman's stated goal of achieving an overall population deviation below 6% (beating the enacted plan on that score). *E.g.*, Brooks Ex. 93. And the alternative maps largely follow the remainder of the enacted plan's boundaries, with the median district retaining 91.9% of the population assigned to it in the enacted plan. Brooks Ex. 98. Plaintiffs' alternative plans are thus "comparably consistent with traditional districting principles," *Cooper*, 137 S. Ct. at 1480 (quoting *Easley v. Cromartie*, 532 U.S. 234, 258 (2001)), to the enacted plan, except without replicating the discriminatory scheme to dismantle SD10.

15

The Court erred in dismissing this evidence. The Court reasoned that "SD 14 itself is 51.9% minority by total population, less than the 61.5% of benchmark SD 10, but still enough that cracking the district would produce about as clear a discriminatory effect." ECF No. 258 at 46. From this, the Court concluded that if "cracking SD 14 would have fulfilled Defendants' partisan goals just as well as cracking SD 10, then surely they would have cracked *both* districts." ECF No. 258 at 46 (emphasis in original). Likewise, the Court reasoned that "a racially motivated legislature might also have cracked both SD 14 and SD 10." *Id.*

The Court additionally noted that "it is easy to hypothesize countless legally innocuous reasons why the Texas Legislature might have preserved SD 14," including that SD10's "partisan reversals might have made it a more obvious target," the legislature "might have wanted SD 14 to function as a vote sink," the legislature "might have feared political fallout from destroying a longstanding Democratic bastion," and saving SD 14 may even have respected traditional districting criteria—Plaintiffs' version of that district is about as unnaturally shaped as is the current SD 10." ECF No. 258 at 47. For these reasons, the court concluded that it was "reluctant to draw any inference of discriminatory intent from Plaintiff's alternative maps." *Id.* These conclusions are erroneous.

First, the point of the exercise is to test what a legislature *not* considering race would do. If Senator Huffman and her staff were not considering race, they would be unaware of SD14's demographic profile. But they *would* be aware of the federal court orders—which they personally received as either a lawyer in the litigation or a redistricting committee member—approving of the cracking of Austin as a partisan gerrymander and disapproving of dismantling SD10 and cracking DFW minorities.

Second, the Court's supposition that both a partisan- and racially-motivated legislature "surely would have cracked both districts," ECF No. 258 at 46, has no basis in the record evidence. There is nothing in the record to suggest that it is *possible* to crack both SD10 and SD14 while still retaining Republican performance in the surrounding districts, complying with the VRA in neighboring districts, and satisfying the legislature's other redistricting objectives. Defendants offered no evidence, nor argued to the Court, that both districts could actually be cracked. A comparison of Plaintiffs' alternative maps and the enacted map illustrates the flaw in the Court's logic: converting SD14 to a Republican district requires assigning counties to the Austin-based districts (SDs 5, 14, 18, 24, and 25) that overlap with counties the legislature assigned to either SD10 or neighboring districts to facilitate its dismantling of SD10. *Compare, e.g.*, Brooks Ex. 56 *with* Brooks Ex. 92.

Third, the Court's various conclusions cannot be reconciled. The Court's overarching conclusion was that the legislature cracked SD10 for partisan reasons. ECF No. 258 at 47. Yet the Court dismissed Plaintiffs' alternative maps because it concluded that a partisan-motivated legislature would have cracked both SD14 and SD10—something the legislature did not do. And the Court also concluded that the legislature may have avoided cracking SD14 out of fear of being accused of partisan gerrymandering. ECF No. 258 at 47-48. This rationale is not compatible.

Finally, the Court's observation that Brooks Plaintiffs' alternative version of SD14 is similar in shape to the legislature's enacted version of SD10 *bolsters* the evidentiary value of the alternative maps. Plaintiffs' task was to produce maps with "comparably consistent" adherence to traditional districting principles as the enacted plan. *Cooper*, 137 S. Ct. at 1480 (quotation marks and citation omitted). The Court's contrary conclusion from the maps' similarity—based upon an

unsupported supposition that the legislature had some special concern about compactness of SD14 that it did not share with respect to SD10—is legally erroneous.

### E.    The Court erred in concluding that the presumption of good faith applies to a legislature it found to have acted in bad faith.

The Court erred by concluding that the presumption of good faith may apply despite concluding that the legislature acted in bad faith. The Court concluded that Senator Huffman's "stated reasons for redrawing SD 10 were, at best, highly incomplete and, at worst, disingenuous." ECF No. 258 at 50. It observed that Senator Huffman "insisted that SD10 had to be redrawn because '[the committee] believed [it] needed population," but that "SD 10 did not need population, and Senator Huffman smirked as she claimed it did." ECF No. 258 at 49; *see also id.* at 42 ("It certainly is not true that the district itself 'needed population,' and Senator Huffman's smirk suggests that she may well have known as much."). The Court noted that "Defendants now insist that partisanship was a major part of her motivation, but Senator Huffman did not give that impression on the senate floor. Of the three times she listed her redistricting criteria, partisanship made the list only once." ECF No 258 at 49. Moreover, the Court explained that when asked by Senator Powell to explain which redistricting criteria "led to the extension of SD 10 into several rural counties, Senator Huffman evasively (and unconvincingly) answered, 'All of them.'" *Id.*

Having watched the videos of Senator Huffman's answers and demeanor during the legislative debate and having observed her answers and demeanor at during her testimony in court, the Court concluded that her conduct "may constitute 'bad faith' in the colloquial sense." ECF No. 258 at 51. Yet, the Court concluded that the presumption of good faith may not be overcome without "direct[] support[] [for] the proposition that Senator Huffman and her colleagues acted from *racial* motives." ECF No. 258 at 50 (emphasis in original). The Court erred in two ways.

18

First, "direct" evidence of racially discriminatory intent is not required to *prove* the claim, let alone to rebut the presumption of good faith. *See Rogers v. Lodge*, 458 U.S. 613, 618 (1982). Indeed, as Justice Alito explained in his *Cooper* dissent—a point on which the majority did not disagree—alternative maps like those proffered by Plaintiffs are a "sound" way to "overcome the strong presumption that the plan was drawn for constitutionally permissible reasons." 581 U.S. at 336 (Alito, J., dissenting).

Second, when a redistricting plan's sponsor is found to advance "disingenuous," "highly incomplete, and "certainly [] not true" explanations for her actions—delivered with a "smirk"—such that her conduct constitutes "bad faith in the colloquial sense," then—at the very least—her good faith should no longer be presumed. A contrary rule would be dangerous. Twice in the past decade the Supreme Court has issued landmark decisions shrinking available legal protections related to redistricting. First, in *Shelby County*, the Court facially invalidated the Section 5 coverage formula, while simultaneously emphasizing that the decision "in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2," 570 U.S. at 557, and that "injunctive relief is available in appropriate cases to block voting laws from going into effect," *id.* at 537. Second, the Supreme Court closed its doors to partisan gerrymandering claims in *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019), while noting that claims against plans that "discriminate on the basis of race" remain justiciable, *id.* at 2497.

The practical effect of these two decisions in states like Texas where voting is racially polarized is that the legislature is now incentivized to dilute minority voting strength and defend itself as motivated by partisanship. Twin judge-made rules—the presumption of legislative good faith and legislative privilege—work in tandem to further insulate states from liability for discrimination.

If the Supreme Court's promise that racial discrimination remains unlawful is to have any practical meaning, then a legislature that openly lies about its motivation for a law cannot be presumed to have acted in good faith. Especially not when it changes its story in court to conveniently match the one motivation—partisan gerrymandering—for which the Supreme Court has closed the courthouse doors. Indeed, Defendants struggled to even settle on their litigation story. Asked by her own lawyer at the preliminary injunction hearing whether she recalled being asked at her deposition (mere days earlier) whether she had engaged in partisan gerrymandering, Senator Huffman responded yes—but that she *could not remember what answer she had given*. P.I. Hearing Vol. 7 at 38. This bizarre exchange followed: "Q. Perhaps I can refresh your recollection?" A. "I wish you would." Q. I'm going to end that line of questioning prematurely." *Id.* Perhaps her counsel decided against displaying the transcript of her deposition on the Court's enlarged display monitor to refresh Senator Huffman's recollection because doing so would reveal that defense counsel had to be asked by counsel for Brooks Plaintiffs to stop emphatically nodding his head yes and no—and remarkably refused—as Senator Huffman was asked deposition questions about whether she had engaged in partisan gerrymandering. *See* ECF No. 164-1 at 26. This episode aptly illustrates the absurdity of applying a presumption of good faith in this case. A legislature that openly lies about relying on neutral bases while enacting discriminatory maps, unveils a purported partisan motivation for the first time as a defense in court, and blocks plaintiffs from obtaining contemporaneous legislative evidence to undermine that motivation through the assertion of privilege, does not operate in good faith.

A contrary rule renders protections against intentional racial vote dilution entirely hollow.

## CONCLUSION

The Court should rule for Brooks Plaintiffs on all their claims.

20

May 14, 2025                                        Respectfully submitted,

                                                   */s/ Chad W. Dunn*
                                                   Chad W. Dunn (Tex. Bar No. 24036507)
                                                   Brazil & Dunn
                                                   4407 Bee Caves Road
                                                   Building 1, Ste. 111
                                                   Austin, TX 78746
                                                   (512) 717-9822
                                                   chad@brazilanddunn.com

                                                   */s/ Mark P. Gaber*
                                                   Mark P. Gaber*
                                                   Mark P. Gaber PLLC
                                                   P.O. Box 34481
                                                   Washington, DC 20043
                                                   (715) 482-4066
                                                   mark@markgaber.com

                                                   Jesse Gaines* (Tex. Bar. No. 07570800)
                                                   P.O. Box 50093
                                                   Fort Worth, TX 76105
                                                   817-714-9988
                                                   gainesjesse@ymail.com

                                                   Molly E. Danahy*
                                                   P.O. Box 51
                                                   Helena, MT 59624
                                                   (406) 616-3058
                                                   danahy.molly@gmail.com

                                                   Sonni Waknin*
                                                   10300 Venice Blvd. # 204
                                                   Culver City, CA 90232
                                                   732-610-1283
                                                   sonniwaknin@gmail.com

                                                   *admitted *pro hac vice*

                                                   *Counsel for Brooks Plaintiffs*