# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | § § § | |
| *Plaintiffs,* | § | Case No. 3:21-cv-00259 |
| V. | § | [Lead Case] |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § § | |
| TEXAS STATE CONFERENCE OF THE NAACP, | § § § | |
| *Plaintiff,* | § | Case No. 1:21-cv-01006 |
| V. | § | [Consolidated Case] |
| | § | |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § § | |

## PRETRIAL BRIEF OF TEXAS NAACP PLAINTIFFS

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

I.    INTRODUCTION............................................................................................... 1

II.   STATEMENT OF FACTS................................................................................... 3

III.  TEXAS NAACP PLAINTIFF'S TESTIMONY AT TRIAL SUPPORTS A FINDING OF INTENTIONAL DISCRIMINATION.................................................................. 5

    A.    Arlington Heights Factor #1: Discriminatory Effect ................................. 5

        1.    Mapmakers' Changes to the Exemplar Districts in the Enacted Plan are Indicia of Discriminatory Intent. ................................................................. 6

            a.    CD 6 (Dallas & Tarrant counties) ................................................. 6

            b.    CD 24 (Dallas County).................................................................. 6

            c.    SD 9 (Tarrant County) ................................................................... 7

            d.    SD 10 (Tarrant County) ................................................................ 7

            e.    HD 96 (Tarrant County)................................................................ 7

            f.    HD 112 (Dallas County) ............................................................... 7

            g.    CD 22 (Harris & Fort Bend counties) ........................................... 8

            h.    SD 15 (Harris County) .................................................................. 9

            i.    SD 17 (Harris & Fort Bend counties) ........................................... 9

            j.    HD 25/HD 29 (Brazoria County) .................................................. 9

            k.    HD 65 (Denton & Wise counties)................................................ 10

            l.    HD 126 (Harris County) ............................................................. 10

            m.    HD 132 (Harris County) ............................................................. 10

            n.    HD 54 (Bell County)................................................................... 11

        2.    The Legislature's Changes to the Exemplar Districts Cannot be Explained Away as Mere Partisanship.................................................................... 11

    B.   Arlington Heights Factor # 2: Historical Background of the Decision .......................... 12

    C.   Senate Factors Analysis.................................................................. 13

IV.  CONCLUSION ................................................................................................. 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. South Carolina State Conference of the NAACP*,
   602 U.S. 1 (2024)....................................................................................................12

*McCleskey v. Kemp*,
   481 U.S. 279 (1980)...............................................................................................13

*Perez v. Abbott*,
   253 F.Supp.3d 864 (W.D. Tex. 2017)..................................................................12

*U.S. v. Brown*,
   561 F.3d 420 (5th Cir. 2009) .............................................................................4, 13

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp*.,
   429 U.S. 252 (1977).................................................................................. *passim*

**Statutes**

Voting Rights Act § 2 ...............................................................................................14

## I.   INTRODUCTION

The Texas NAACP Plaintiffs have alleged that in drawing CD 6, CD 24, SD 9, SD 10, HD 96, HD 112, CD 22, SD 15, SD 17, HD 25, HD 29, HD 65, HD 126, HD 132, and HD 54 in its 2021 redistricting plan, the Texas Legislature intentionally diluted the voting power of minority voters.  Plaintiff can sustain this claim of intentional discrimination "merely by establishing that race was part of Defendants' redistricting calculus." ("Brooks PI Order") at 20, Dkt. 258.

This Court in May 2022 denied the motion of the Brooks Plaintiffs for a Preliminary Injunction on their claim of intentional discrimination as to the drawing of SD10.  The principal issue addressed in this pretrial brief is why, despite that ruling, the Court should find that the Legislature engaged in intentional discrimination when drawing the districts the Texas NAACP Plaintiffs challenge. The answer is that the Texas NAACP will present substantial evidence not previously before the Court establishing intentional discrimination.

In *Village of Arlington Heights v. Metropolitan Housing Dev. Corp*., 429 U.S. 252 (1977), the Supreme Court described the types of evidence that could support a finding of intentional discrimination.   The factors described were not a checklist.  In fact, the Court made clear that, "Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. . . . The evidentiary inquiry is then relatively easy. But such cases are rare."  429 U.S. at 266 (citations and footnote omitted).  Suppose, for example, that mapmakers could draw legislative districts that varied house-to-house, only excluding residences with Black people.  Such a pattern would show intentional discrimination.

Although the hypothetical may be extreme, so are the gerrymanders that Plaintiff challenges, presenting the rare case where the State's clear pattern of conduct is "unexplainable on

1

grounds other than race. 429 U.S. at 266. The testimony of Dr. Moon Duchin, Professor of Mathematics and Senior Fellow at Tufts University will show that the Legislature's line-drawing specifically targeted minority voters, that it violated the traditional norms used in redistricting, and that the discrimination *cannot* be explained away by partisanship.

The Legislature cracked concentrated populations of Black and other voters of color to create the exemplar districts in the Enacted Plan across six areas of interest: Dallas and Tarrant counties (CD 6, CD 24, SD 9, SD 10, HD 96, and HD 112); Harris and Fort Bend counties (CD 22, SD 15, and SD 17); Brazoria County (HD 25 and HD 29); Denton and Wise counties (HD 65); Harris County (HD 126 and HD 132); and Bell County (HD 54). The Legislature also packed these communities of voters into neighboring districts with coalition CVAP at or above 60% and flouted traditional redistricting principles. Most of the population growth in Texas is attributable to voters of color, but they *lost* seats in the Enacted Plan. In several instances, as voters of color approached or achieved a majority-CVAP level in an existing district, the Plan knocked them back down to levels that left them unable to elect candidates of choice in the exemplar districts.

Dr. Duchin's analysis addressed the Court's prior finding that the Brooks plaintiffs had not disentangled partisanship and race in their challenge to the configuration of SD 10. In each of the 15 exemplar districts the NAACP challenges, Dr. Duchin conducted an ensemble analysis, a computational technique that built 100,000 randomized districting plans using traditional neutral redistricting principles—without use of race data. In each district, she then compared the Enacted Plan to the subset of the alternative maps that met or exceeded the partisan advantage in the Enacted Plan. The percentage of minority voters in the districts the Legislature drew was still below [96%-99%] of the race-neutral alternative plans that took partisanship into account. Standing alone, this evidence would establish intentional discrimination.

The evidence, though, does not stand alone. The testimony of Dr. Monica Munoz Martinez, Associate Professor of History at the University of Texas at Austin, will catalogue the history of discrimination in voting against Black and other voters of color deemed relevant in *Arlington Heights* to the determination of intentional discrimination. She will also testify as to relevant Senate Factors indicating discriminatory intent such as: the extent to which Black and other voters of color in Texas bear the burden of discrimination in other contexts and how it hinders their ability to participate in the political process (Senate Factor 5); the use of racial appeals in political campaigns (Senate Factor 6); and the extent to which Black and other voters of color have been elected to public offices in Texas (Senate Factor 7). S*ee U.S. v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009).

The Texas NAACP will rely on evidence adduced by other plaintiffs regarding aspects of the legislative history of the Enacted Plan and procedural irregularities that support the inference of intentional discrimination.

## II.    STATEMENT OF FACTS

Early in the 2021 redistricting cycle, on October 10, 2019, the House Redistricting Committee held a public hearing in Dallas, TX. Then-Chair Phil King stated there that, "the objective in redistricting and redrawing those lines is first and foremost to balance the population, to equalize the population, and that's done to accommodate this idea that's in the Constitution of One Person One Vote." October 10, 2019 House of Representatives Public Hearing on 2021 Legislative Redistricting Process and Census Data at 4:23-5:2. Chair King also emphasized the need to recognize communities of interest in the redistricting process. *Id*. at 5:14-6:6. At this and subsequent sessions, Dr. Lila Valencia from the State Demographer's office and Dr. Lloyd Potter, Texas State Demographer and the Director of the Texas Demographic Center provided committee

members with race/ethnicity data on projected population growth at the county level in this meeting, a second House of Representatives public hearing on October 22, 2019, and a Senate Select Committee meeting on October 29, 2019. Both representatives stated the biggest increases in population growth from African Americans, Latinos, and Asian Americans. *Id.* at 31:17-33:20 (Dr. Potter); October 22, 2019 House of Representatives Public Hearing on 2021 Legislative Redistricting Process and Census Data at 23:2-26:17 (Dr. Valencia); October 29, 2019 Texas Senate Select Committee on Redistricting at 95:15-96:5, 96:17-97:2 (Dr. Potter).

The Senate Special Committee on Redistricting and House of Representatives heard public testimony about the redistricting process from January to March 2021 in regional hearings conducted by Zoom. During a March 13, 2021 Senate Special Committee on Redistricting hearing, Dr. Potter provided members with a table and map of information on population change by race and ethnicity for each county that a senate district was in. 87th Senate Special Committee on Redistricting – All Regions - March 13, 2021 at 4.

The coronavirus pandemic in 2020 delayed publication of the results of the Census until August 2021, months after the end of the regular legislative session. Shortly thereafter, Defendant Abbott issued a proclamation on September 7, 2021, announcing a third special session beginning on September 20, 2021 regarding reapportionment for the Texas House of Representatives, Texas Senate, the State Board of Education, and the United States House of Representatives. On September 13, 2021, Dr. Potter provided members of the Texas House of Representative Redistricting Committee with data regarding population change by race and ethnicity in all 254 counties in the state. *Id.* at 13. Each of the three challenged plans (Congressional Plan C2101, State House Plan H2316, and State Senate Plan SB 4) was released and passed into law within the thirty-

4

day session, despite concerns from the public and even some Legislators about the compressed schedule and effect of the proposed districts on communities of color.

## III.    TEXAS NAACP PLAINTIFF'S TESTIMONY AT TRIAL SUPPORTS A FINDING OF INTENTIONAL DISCRIMINATION.

Courts engage in a sensitive inquiry of direct and circumstantial evidence in considering whether a defendant acted with discriminatory intent in violation of the Constitution. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). These *Arlington Heights* factors are not individual requirements that must be met to establish discriminatory intent, but rather reflect categories of potentially probative evidence, weighed in accord with the nature and strength of the particular facts. The factors are: discriminatory effect ("whether [the impact of the official action] bears more heavily on one race than another"); the historical background of the decision; the specific sequence of events leading up to the challenged decision; departures from the normal procedural sequence; and statements made by members of the decision-making body. *Id.* at 266-68. Texas NAACP will proffer testimony as to the first two *Arlington Heights* factors.   Evidence proffered by other Consolidated Plaintiffs' groups, including but not limited to live testimony, expert reports, and trial exhibits, also will shed light on these and the other *Arlington Heights* factors.

### A.    Arlington Heights Factor #1: Discriminatory Effect

This Court previously found that the redrawing of SD 10 "'bears more heavily on one race than another.'" Brooks PI Order at 32-34, quoting *Arlington Heights*, 429 U.S. at 266 (1977). Plaintiffs' evidence demonstrates the same as to the other districts they challenge. Marshalling her 10+ years of experience in analyzing Census data and redistricting plans, as well as demography, Dr. Duchin will testify that mapmakers adopted plans that disadvantaged voters of color in multiple ways. She demonstrates that these disadvantages cannot be explained by partisanship.

1.     **Mapmakers' Changes to the Exemplar Districts in the Enacted Plan are Indicia of Discriminatory Intent.**

As noted, the Legislature concentrated populations of Black and other voters of color to create the exemplar districts in the Enacted Plan across six areas of interest (Dallas and Tarrant counties, Harris and Fort Bend counties, Brazoria County, Denton and Wise counties, Harris County, and Bell County), packed these communities of voters into neighboring districts with coalition CVAP at or above 60%, and violated traditional redistricting principles. Included below is an overview of the changes made.

*a.  CD 6 (Dallas & Tarrant counties)*

The Legislature's design cracks an area with a significant share of Black and other voters of color in southeast Tarrant and northwest Dallas County across multiple districts, excluding precincts with high populations of Black voters. Notably, BVAP dropped in the district from 20.7% to 13.5%. When compared to the 100,000 neutral ensemble plans run by Dr. Duchin, the coalition CVAP in CD 6 is in the 4th percentile of all plans.

*b.  CD 24 (Dallas County)*

The newly-drawn district connects predominantly white communities in Tarrant County to other white-majority areas in northern Dallas County, splitting cities and precincts and avoiding communities of Black and other voters of color such that the neighboring districts are packed. The coalition CVAP in CD 24 decreased from 40.8% to 25.5%. This 15.3% decrease in coalition CVAP is greater than the measure of partisan advantage, a decrease of 9.1% of the Biden share of the 2020 election vote in the Enacted District.

### c. SD 9 (Tarrant County)

Mapmakers split the City of Fort Worth between SD 9 and SD 10, decreasing the coalition CVAP from 44.4% to 35%. This 9.4% decrease in coalition CVAP is greater than the measure of partisan advantage, a decrease of 5.8% of the Biden share of the vote in the district.

### d. SD 10 (Tarrant County)

The district, formerly contained entirely in Tarrant County in the Benchmark Plan, now includes seven lower-density counties that collectively dilute the presence of Black and other voters of color. Notably, the Northeast/Northside neighborhoods of Fort Worth and the Southeast/Sycamore neighborhoods—previously in the Benchmark SD 10 and predominantly CVAP areas—are now split between SD 9 and SD 10 in the Enacted Map. The coalition CVAP decreased from 47.1% to 38.1%, whereas Dr. Duchin shows that it is possible to draw a majority-coalition district at 56.13% coalition CVAP. When compared to the 100,000 neutral ensemble plans run by Dr. Duchin, the coalition CVAP in SD 10 is in the 0th percentile of all plans, lower than nearly every one of the ensemble plans.

### e. HD 96 (Tarrant County)

Mapmakers removed areas previously included in the Benchmark Plan and divides these areas across HD 90, HD 95, HD 97, and HD 101. In some districts, these changes result in coalition CVAP shares over 65%. The coalition CVAP decreased from 44.4% to 36.1% coalition CVAP. The 8.3% decrease in coalition CVAP is greater than the measure of partisan advantage, a decrease of 5.6% of the Biden share of the vote in the district.

### f. HD 112 (Dallas County)

The newly drawn district includes some of the most heavily white precincts in the northeast outer boundary of Dallas County, while also cracking the population of Asian voters in Garland,

Sachse, and Rowlett across three districts (HD 112, HD 102, and HD 113). HD 112 was previously

a majority-coalition CVAP district at 51.8% in the Benchmark Plan but has now dropped to 33.3%

coalition CVAP in the Enacted Plan. This 15.8% decrease in coalition CVAP is three times greater

than the measure of partisan advantage, a decrease of less than 5% of the Biden share of the votes

in the district.

### g. CD 22 (Harris & Fort Bend counties)

The Enacted Plan splits diverse cities such as Sugar Land, Manvel, and Pearland, which

previously were kept whole in the Benchmark Plan. The boundary between CD 22 and CD 7 splits

precincts in Sugar Land, and the boundary between CD 22 and CD 9 was "surgically drawn" with

respect to Black voters, placing many of the precincts with the largest voters from Fort Bend and

Brazoria counties in CD 9. The minority-populated areas removed from the Benchmark CD 22 are

split across five districts (CDs 7, 9, 14, 29, and 36), which are either packed at over 60% coalition

share or cracked at under 40% share.

The Legislature needlessly changed the boundaries of CD 22 because its prior

configuration in the Benchmark Plan of Wharton, Matagorda, and Fort Bend is larger than the

population needed for one congressional district. Splitting Brazoria and Harris counties was not

required to achieve population balance in this district. The Legislature decreased what was once a

majority-coalition CVAP district at 54.7% to 46.09%, denying minority voters an opportunity to

elect a candidate of choice.

Dr. Duchin's ensemble analysis indicates that the coalition CVAP of CD 22 is "lower than

nearly every one of the 100,000 comparators" in her simulations in the 0th percentile of all

ensemble plans.

### h.  SD 15 (Harris County)

SD 15 is a non-compact, arch shaped district that includes part of Houston proper and wraps around exurban Houston, splitting the population of Hispanic voters in neighboring SD 6 from other voters of color in the district. SD 6 is packed at 82% coalition CVAP. These two districts are the least compact districts in the cluster Dr. Duchin analyzed (SDs 6, 13, 15, 17, and 18) at a score of 0.07 by the Polsby-Popper metric.

### i.  SD 17 (Harris & Fort Bend counties)

The newly enacted SD 17 extends in an "antler shape" into Fort Bend, Harris, and Waller counties. These "antlers" split Sugar Land and crack other areas with significant concentrations of voters of color. The Legislature decreased what was nearly a majority-coalition CVAP district of 48.4% in the Benchmark Plan to 42.96% in the Enacted Plan. Dr. Duchin's analysis demonstrates that the Legislature could have made this a majority-coalition CVAP district at 57.29%.

### j.  HD 25/HD 29 (Brazoria County)

Brazoria County is made up of HD 25 and HD 29. The boundary that divides the two districts splits precincts along the length of the county while cracking Hispanic and Black communities in the cities of Pearland, Manvel, Iowa Colony, Richwood, and Freeport. The coalition CVAP of HD 25 is 46.98% and 45.85% for HD 29.

Dr. Duchin's ensemble analysis indicates that while the vast majority of neutral alternative plans in Brazoria County would include a majority-coalition CVAP district, the state's plan does not do so and is in the 1st percentile of all 100,000 plans in the ensemble.

### k.  *HD 65 (Denton & Wise counties)*

Newly enacted HD 65 is a very narrow district, stretching across Denton County from east to west. In doing so, HD 65 dilutes communities of color in the southeastern part of the county, where it is part of the cracking of Lewisville/Carrollton across three districts.

The Benchmark Plan, located in the southeastern corner of Denton County, was compact and comprised of a near-majority of Black, Latino, and Asian voters at approximately 45% coalition CVAP. The coalition CVAP dropped noticeably to 34.88% in the Enacted Plan, particularly in light of Democrat Michelle Beckley's election in 2018 and re-election in 2020 with strong support from voters of color.

Dr. Duchin's ensemble analysis indicates that the coalition CVAP of HD 65 is in the 0th percentile of all 100,000 generated ensemble plans and is an extreme outlier in its racial statistics, even when controlling for partisanship.

### l.  *HD 126 (Harris County)*

The areas removed from the Benchmark Plan had a 77% coalition CVAP share and were packed into neighboring districts HD 139 and HD 148, both with roughly 70-80% coalition CVAP share. The coalition CVAP dropped from 55.6% in the Benchmark Plan to 44.9% in the Enacted Plan.

### m.  *HD 132 (Harris County)*

Enacted HD 132, which includes parts of Houston and Waller, lost areas with significant concentrations of Black and Latino voters that were included in the Benchmark Plan. These areas were packed into neighboring districts HD 135 and HD 149, both with roughly 70-80% coalition CVAP share. The Legislature's changes resulted in a decrease in coalition CVAP from 53.6% at the time of redistricting to 41%.

*n.  HD 54 (Bell County)*

The Legislature reconfigured HD 54 and HD 55 by drawing the districts such that HD 54 completely surrounds HD 55 in a "highly unconventional donut-hole configuration." Although Bell County is nearly 50-50 white and coalition CVAP, HD 54 needlessly cuts through Killeen, a plurality-Black city, and splits precincts only there and in no other part of the county. The City of Killeen is large enough to anchor its own House district with a population of 153,095 in comparison to the ideal House district size of 194,303. The Legislature's changes decreased what was squarely a majority-coalition CVAP district at 53.4% to a marginally majority-coalition CVAP district at 50.6%.

### 2.    The Legislature's Changes to the Exemplar Districts Cannot be Explained Away as Mere Partisanship.

Dr. Duchin's analysis provides evidence that the Court did not have when it found that the Brooks plaintiffs had not disentangled partisanship and race in their challenge to the configuration of SD 10. In each of the fifteen (15) exemplar districts the NAACP challenges, Dr. Duchin created 100,000 randomized districting plans using traditional neutral redistricting principles—without use of race. In each district, she then compared the Enacted Plan to the subset of the alternative maps that met or exceeded the partisan advantage in the Enacted Plan. The percentage of minority voters was still below 96%-99% of the Enacted Plan. Partisanship thus does not explain the extreme disadvantages suffered by minority voters.

Dr. Duchin also calculated changes in the Biden share of votes from the 2020 election as a measurement of partisanship. Each district she identified has a larger decrease in the coalition CVAP than the decrease in the Biden votes, despite the strong overlap between race and political affiliation in Texas.

11

If the Legislators were seeking partisan advantage, Dr. Duchin's analyses show that they used race as a proxy. This method, the Supreme Court has made clear, is unconstitutional. *Alexander v. South Carolina State Conference of the NAACP*, 602 U.S. 1, 82 (2024), quoting *Cooper v. Harris*, 581 U.S. 285, 309 n. 7 (2017). Mapmakers also split precincts in majority-minority areas in several districts, raising the alarm on the use of race because political data does not exist at the block level, but racial data does. This contradicts Defendants' arguments that the Legislature did not use race data to fashion the districts. *See Perez v. Abbott*, 253 F.Supp.3d 864, 952-53 (W.D. Tex. 2017).

Texas NAACP members will also testify as to how the Enacted Plans conflict with existing communities of interest, as well as how the current legislators fail to address issues of importance to Black and other voters of color. This testimony will show that mapmakers' cracking and packing of districts violated the criteria that Defendants allege the state followed.

### B. Arlington Heights Factor # 2: Historical Background of the Decision

The evidence regarding the discriminatory effect of the Legislature's line-drawing conclusively demonstrates intentional discrimination. Review of other *Arlington Heights* factors confirms the racially discriminatory intent in the redistricting process.

This Court previously determined that "it is evident that history favors an inference of discriminatory intent." Brooks PI Order at 34. The Court will hear testimony from Dr. Monica Munoz Martinez regarding the pervasive history of official discrimination related to voting in Texas from 1836 to the present, with an emphasis on recent caselaw and statutory schemes that disproportionately affect Black and other voters of color. *See McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1980) (finding that historical evidence must be "reasonably contemporaneous with the challenged decision.")

### C.      Senate Factors Analysis

In addition to the *Arlington Heights* factors, courts routinely consider the Senate Factors

analysis used in the VRA § 2 context as additional circumstantial evidence of discriminatory intent.

*Brown*, supra at 433. Dr. Martinez will offer testimony on Senate Factor 5 (the extent to which

minority group members bear the effects of discrimination in areas such as education, employment

and health, which hinder their ability to participate effectively in the process), Senate Factor 6 (the

use of overt or subtle racial appeals in political campaigns, and Senate Factor 7 (the extent to which

members of the minority group have been elected to public office in the jurisdiction.

Regarding Senate Factor 5, Dr. Martinez will testify as to recent increases in hate crimes

against African American, Latino, and Asian Americans and how anti-immigrant rhetoric by Texas

state and Congressional representatives has a chilling effect on political participation. She will

discuss gaps in achievement between white students and African American and Mexican American

students, along with other instances of discrimination in education. She will also provide testimony

of the income gap across racial and ethnic groups, the effect of lower income levels on political

influence, and Census data supporting that non-white people in Texas make up the majority of

Texans living below the poverty line. Finally, the Court will hear testimony regarding disparities

in health outcomes and how geographic isolation and crumbling infrastructure negatively impact

political participation for Black and other voters of color.

As to Senate Factor 6, Dr. Martinez will testify about the history of racialized rhetoric and

border policing by state officials since the 1800s, as well as recent examples of Texas state and

Congressional legislators openly espousing anti-immigrant sentiments and stereotypes in

advocating for state policy initiatives, on the floor in Congress, and in campaign advertisements.

On Senate Factor 7, Dr. Martinez will provide testimony regarding the positive effect of shifts away from at-large voting systems to single-member district systems for minority elected officials at the local level in Texas. She will also discuss how politicized campaigns have affected local school board elections.

Taken together, this testimony offers further indicia of discriminatory intent by Defendants.

## IV.    Conclusion

The evidence that Plaintiff Texas NAACP intends to present to the Court will show that the State's House, Senate, and Congressional maps intentionally discriminate against Black and other voters of color in violation of the 14th Amendment and Section 2 of the Voting Rights Act, precluding Black Texans and other voters of color from having a full and fair opportunity to participate in the political process without their votes being diluted. These unlawful maps must be enjoined by the Court.

Dated: May 14, 2025

Respectfully submitted,

*/s/ Lindsey B. Cohan*
Lindsey B. Cohan
Texas Bar No. 24083903
DECHERT LLP
515 Congress Avenue, Suite 1400
Austin, TX 78701
(512) 394-3000
*lindsey.cohan@dechert.com*

14

David Rollins-Boyd*
Jennifer Nwachukwu*
Jeremy Lewis*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street, Suite 900
Washington, DC 20005
(202) 662-8600
*drollins-boyd@lawyerscommittee.org*
*jnwachukwu@lawyerscommittee.org*
*jlewis@lawyerscommittee.org*

Neil Steiner*
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
*neil.steiner@dechert.com*

Robert Notzon
Texas Bar No. 00797934
THE LAW OFFICE OF ROBERT NOTZON
1502 West Avenue
Austin, Texas 78701
(512) 474-7563
*robert@notzonlaw.com*

Gary Bledsoe
Texas Bar No. 02476500
THE BLEDSOE LAW FIRM PLLC
6633 Highway 290 East #208
Austin, Texas 78723-1157
(512) 322-9992
*gbledsoe@thebledsoelawfirm.com*
*Attorney only as to Texas NAACP's claims*
*related to Texas state senate and state house*
*plans*

Anthony P. Ashton*
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
*aashton@naacpnet.org*

Janette M. Louard
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
*jlouard@naacpnet.org*
*Attorneys appearing of counsel*

*Admitted pro hac vice*.

*ATTORNEYS FOR THE TEXAS STATE
CONFERENCE OF NAACP*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a copy of the foregoing was served on counsel of record via the Court's ECF system on May 14, 2025.

<u>*/s/ Lindsey B. Cohan*</u>
Lindsey B. Cohan
*Counsel for Plaintiff Texas NAACP*
