**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | |
| *Plaintiffs*, | CIVIL ACTION NO. |
| | 3:21-cv-00259-DCG-JES-JVB |
| v. | [Lead Case] |
| | & |
| GREG ABBOTT, in his official capacity as Governor of the State of Texas, *et al.*, | All Consolidated Cases |
| *Defendants*. | |

## LULAC PLAINTIFFS' PRETRIAL BRIEF

**TABLE OF CONTENTS**

TABLE OF CONTENTS…………………………..……………………………………………i

TABLE OF AUTHORITIES……………………...…………………………………………ii

I.     INTRODUCTION…………………………………………………...……………………..1

II.    LEGAL FRAMEWORK…………………………………………………………………2

       A.  Section 2 of the Voting Rights Act……………………………………………3

       B.  Unconstitutional Racial Gerrymandering (*Shaw v. Reno*)……………………………8

       C.  Unconstitutionally Disadvantaging Voters of a Particular Race………………..…….....9

       D.  Unconstitutional Malapportionment………………………………………………....11

III.   LULAC PLAINTIFFS' CHALLENGES TO THE ENACTED REDISTRICTING
       PLANS……………………………………………………………………………………12

       A.  State House of Representatives (H2316)……………………………………….....12

             1.   Central Texas (Demo HD44) (Enacted HD17, HD44, HD45, HD48,
                  and HD51)……………………………………………………………......13

             2.   Northwest Harris County (Demo HD138) (Enacted HD126,
                  HD138, HD139, HD140, HD145, and HD148)……………………....……..14

             3.   Weakening of HD118 (Demo HD118) (Enacted HD118)…………....…………15

             4.   Malapportionment in the State House Plan………………………………16

       B.  Congress (C2193)………………………………………………………………...17

             1.   Additional Latino Opportunity Congressional District in Harris County
                  (Demo CD38) (Enacted CD7, CD8, CD18, CD29, and CD38)……………...18

             2.   Additional Latino Opportunity Congressional District in Dallas and Tarrant
                  Counties (Demo CD6) (Enacted CD6, CD12, CD24, CD30,
                  CD32, and CD33…………………………………………………….……19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Perez,*
  585 U.S. 579 (2018) ...................................................................................... 5, 12

*Adarand Constructors, Inc. v. Peña,*
  515 U.S. 200 (1995) ........................................................................................... 11

*Alabama Legislative Black Caucus v. Alabama,*
  575 U.S. 254 (2015) ........................................................................................... 11

*Alexander v. S.C. State Conference of the NAACP,*
  602 U.S. 1 (2024) ............................................................................................... 11

*Allen v. Milligan,*
  599 U.S. 1 (2023) ............................................................................... 6, 9, 10, 22

*Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977) ...................................................................................... 12, 13

*Bush v. Vera,*
  517 U.S. 952 (1996) ............................................................................................. 6

*Campos v. City of Baytown,*
  840 F. 2d 1240 (5th Cir. 1988) ........................................................................... 7

*Cano v. Davis,*
  211 F. Supp. 2d 1208 (C.D. Cal. 2002) ............................................................ 10

*Chisom v. Roemer,*
  501 U.S. 380 (1991) ............................................................................................. 6

*City of Mobile, Ala. v. Bolden,*
  446 U.S. 55 (1980) ........................................................................................ 11, 12

*Clark v. Calhoun County, Miss.,*
  21 F.3d 92 (5th Cir. 1994) ................................................................................... 7

*Clark v. Calhoun County, Miss.,*
  88 F.3d 1393 (5th Cir. 1996) ............................................................................... 9

*Collins v. City of Norfolk,*
  816 F. 2d 932 (4th Cir. 1987) ............................................................................. 7

*Cooper v. Harris,*
  581 U.S. 285 (2017) ........................................................................................... 12

*E. Jefferson Coal. for Leadership & Dev. v. Parish of Jefferson,*
  926 F.2d 487 (5th Cir. 1991) ............................................................................... 6

*Garza v. County of Los Angeles,*
  756 F. Supp. 1298 (C.D. Cal. 1990) ............................................................ 11, 13

*Garza v. County of Los Angeles,*
  918 F.2d 763 (9th Cir. 1990) ........................................................................ 12, 13

*Gomez v. City of Watsonville,*
  863 F.2d 1407 (9th Cir. 1988) ............................................................................. 7

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.,*
  4 F.3d 1103 (3d Cir. 1993) .................................................................................. 7

*Johnson v. DeGrandy*,
   512 U.S. 997 (1994) ............................................................... 7, 10
*Kirksey v. Bd. of Supervisors*,
   528 F.2d 139 (5th Cir. 1977) ................................................... 9
*Larios v. Cox*,
   300 F.Supp.2d 1320 (N.D.Ga.).............................................. 14
*League of United Latin Am. Citizens v. Perry*,
   548 U.S. 399 (2006) ......................................................... Passim
*LULAC v. Clements*,
   999 F.2d 831 (5th Cir. 1993) ................................................... 9
*Miller v. Johnson*,
   515 U.S. 900 (1995) ........................................................ 11, 12
*Perez v. Abbott*,
   253 F. Supp. 3d 864 (W.D. Tex. 2017) ................................. 10
*Reynolds v. Sims*,
   377 U.S. 533 (1964) ........................................................ 14, 15
*Rogers v. Lodge*,
   458 U.S. 613 (1982) ............................................................... 12
*Roman v. Sincock*,
   377 U.S. 695 (1964) ............................................................... 14
*Session v. Perry*,
   298 F.Supp.2d 451 (E.D. Tex. 2004)...................................... 9
*Shaw v. Reno*,
   509 U.S. 630 (1993) ............................................................... 11
*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ......................................................... Passim
*Vera v. Richards*,
   861 F. Supp. 1304.................................................................. 10
*Whitcomb v. Chavis*,
   403 U.S., 124 (1971) ............................................................. 12
*White v. Regester*,
   412 U.S. 755 (1973) ............................................................... 9

Statutes

42 U.S.C. § 1973 ...................................................................... 12
52 U.S.C. § 10301 ..................................................................... 6

Other Authorities

1982 U.S.C.C.A.N. 177 .............................................................. 8
S. Rep. No. 97-417..................................................................... 8

Plaintiffs the League of United Latin American Citizens, *et al*.[1] ("LULAC Plaintiffs") file this Pretrial Brief pursuant to the Court's Pretrial Scheduling Order. Doc. 880.

## I.    INTRODUCTION

According to the U.S. Census, from 2010 to 2020, the Hispanic population in Texas increased by 1.98 million, and the White Alone Non-Hispanic ("Anglo") population in Texas increased by 187,252. The ratio of Latino to Anglo population growth over the decade was greater than ten to one. Based on total population growth of 3,999,944, Texas was the only one of the fifty states to have been apportioned two additional seats in the U.S. House of Representatives.

The pattern of strong Latino population growth relative to Anglo population growth was consistent across the state. For example, in Harris County, the Latino population increased by 363,169, and the Anglo population decreased by 40,053.

Despite the significant overall growth of the Latino population compared to the Anglo population, and the internal demographic shifts in favor of Latinos in areas such as the Dallas-Ft. Worth Metroplex and Harris County, Defendants *reduced* the number of Latino majority districts in both the congressional and State House redistricting plans.

In the State House redistricting plan, Defendants reduced the total number of Hispanic citizen voting age ("CVAP") majority districts from 33 to 30 and created no new Hispanic CVAP majority State House districts. Defendants also reduced the Latino voting strength in HD118 such that Latinos no longer have an equal opportunity to elect their candidate of choice and will be

---

[1] LULAC Plaintiffs are: LULAC, Southwest Voter Registration Education Project, Mi Familia Vota, American GI Forum, La Union Del Pueblo Entero, Mexican American Bar Association of Texas, Texas Hispanics Organized or Political Education, William C. Velasquez Institute, FIEL Houston Inc., Texas Association of Latino Administrators and Superintendents, Proyecto Azteca, Reform Immigration for Texas Alliance, Workers Defense Project, Jose Olivares, Paulita Sanchez, Jo Ann Acevedo, David Lopez, and Diana Martinez Alexander.

unequally burdened in the election process. Defendants' failure to create at least two additional Hispanic CVAP majority State House districts, and weakening of Latino voting strength in HD118, discriminates against Latino voters both in effect and intent in violation of the federal Voting Rights Act ("VRA") and the Fourteenth Amendment to the U.S. Constitution.

Furthermore, Defendants' State House redistricting plan over- and under-populates districts in El Paso, the Upper Rio Grande, the Panhandle and the area of original Tom Green County purposefully to disadvantage voters on the basis of race and region in violation of the VRA and the Fourteenth Amendment to the U.S. Constitution.

In the congressional redistricting plan, although the significant growth of the Latino population in Texas allowed Texas to gain one, if not both, of its two new congressional districts, Defendants crafted a new map that reduced the number of Hispanic CVAP majority congressional districts, and failed to create any new Hispanic CVAP majority congressional districts. And despite Latino population growth outstripping Anglo population growth statewide, Defendants crafted Texas's two new congressional districts with Anglo majorities – one Democratic and the other Republican in partisan composition.

Only a few years before Texas enacted the current redistricting plans, the U.S. Supreme Court held that Texas intentionally discriminated against Latino voters by creating an impermissible racial gerrymander in Tarrant County. *Abbott v. Perez*, 585 U.S. 579, 622 (2018). And in the redistricting cycle before that one, Texas violated Section 2 of the VRA by weakening Latino voting strength in West Texas. *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 439 (2006) ("The changes to District 23 undermined the progress of a racial group that has been subject to significant voting-related discrimination and that was becoming increasingly politically active and cohesive."). In these cases, the Supreme Court concluded that the evidence

2

before it showed that Texas intentionally discriminated on the basis of race against Latino voters, *Abbott*, 585 U.S. at 622, or that Texas's redistricting "bears the mark of intentional discrimination that could give rise to an equal protection violation."  *League of United Latin Am. Citizens*, 548 U.S. at 440.

Instead of heeding the Supreme Court's rulings, in 2021 Defendants again crafted districts with the purpose and effect of diluting Latino voting strength.

## II.    LEGAL FRAMEWORK

### A.    Section 2 of the Voting Rights Act

Section 2 of the VRA prohibits voting qualifications, prerequisites to voting, and voting standards, practices, or procedures that result in the denial or abridgement of the right of any citizen to vote on account of race, color or membership in a language minority group.  52 U.S.C. § 10301. Plaintiffs need not prove discriminatory intent to prevail on this claim.  *Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991) (to prevail on a Section 2 claim, Plaintiffs can "either prove [discriminatory] intent, or, alternatively, must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process").

To prove an "effects" claim under Section 2, a plaintiff must first satisfy the three preconditions established by *Thornburg v. Gingles*, 478 U.S. 30 (1986).  The plaintiff must prove:

1. The minority group is sufficiently large and geographically compact to constitute a majority in a single-member district;
2. The minority group is politically cohesive; and
3. The white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, to defeat the minority's preferred candidate.

*Gingles* at 50–51; *see also Allen v. Milligan*, 599 U.S. 1, 19 (2023) ("*Gingles* has governed our Voting Rights Act jurisprudence since it was decided 37 years ago. Congress has never disturbed our understanding of § 2 as *Gingles* construed it.").

With respect to the first precondition, the compactness inquiry "refers to the compactness of the minority population, not to the compactness of the contested district." *Perry*, 548 U.S. at 433 (*quoting Bush v. Vera*, 517 U.S. 952, 997 (1996) (Kennedy, J., concurring)).

With respect to the second and third preconditions, minority cohesion and white bloc voting, in practice, the two inquiries merge into the concept of racially polarized voting. *See, e.g. E. Jefferson Coal. for Leadership & Dev. v. Parish of Jefferson*, 926 F.2d 487, 493 (5th Cir. 1991).

Racially polarized voting is a practical inquiry into whether racial voting patterns impede the election of minority-preferred candidates. Thus, the Supreme Court noted in *Gingles*, "[i]f the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests." *Gingles*, 478 U.S. at 51. Similarly, the standard for white bloc voting is whether "the white majority votes *sufficiently as a bloc* to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate." *Id.* (emphasis added) (internal citations omitted).

In the *Gingles* analysis, political cohesion is judged "primarily on the basis of the voting preferences expressed in actual elections." *Gomez v. City of Watsonville*, 863 F.2d 1407, 1415 (9th Cir. 1988). Evidence of racially polarized voting "establishes both cohesiveness of the minority group and the power of white bloc voting to defeat the minority's candidates." *Id.* at 1415 (quoting *Collins v. City of Norfolk*, 816 F. 2d 932, 935 (4th Cir. 1987)) (internal quotation marks

4

omitted). Whether Latinos are cohesive is not a question to be determined "prior to and apart from a study of polarized voting." *Campos v. City of Baytown*, 840 F. 2d 1240, 1244 (5th Cir. 1988).

Establishing the three *Gingles* preconditions is necessary but not sufficient to prove a Voting Rights Act violation. *See Johnson v. DeGrandy*, 512 U.S. 997, 1011 (1994). A plaintiff who demonstrates the three preconditions must also show, under the "totality of circumstances," that the political process is not "equally open" to minority voters. *Gingles* at 45–46. However, "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of the circumstances." *Clark v. Calhoun County, Miss.*, 21 F.3d 92, 97 (5th Cir. 1994) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ*., 4 F.3d 1103, 1135 (3d Cir. 1993)).

In addition to the *Gingles* preconditions, the court may also examine the factors enumerated in the Senate Judiciary Committee Report to Section 2 and adopted by the Supreme Court in *Gingles*, to determine whether, under the totality of the circumstances, the challenged practice or structure results in a lack of equal opportunity for Latinos to participate in the political process and to elect candidates of their choice. *Gingles,* 473 U.S. at 36, 37, 43-45; S. Rᴇᴘ. No. 97-417, at 28–29 (1982), reprinted in 1982 U.S.C.C.A.N. 177, 206–07.[2]

---

[2] These factors include, but are not limited to:

(1)     the extent of any history of official discrimination in the state or political subdivision affecting the right of a member of a minority group to register, vote, or participate in the democratic process;

(2)     the extent to which voting in government elections is racially polarized;

(3)     the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group (for example, unusually large election districts, majority vote requirements, prohibitions against bullet voting);

(4)     exclusion of minorities from a candidate slating process;

There is no requirement that all seven factors be met or that "any particular number of factors be proved, or that a majority of them point one way or the other." S. REP. at 29. "The courts ordinarily have not used these factors . . . as a mechanical 'point counting' device . . . Rather, the provision requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is, in the language of *Fortson* and *Burns*, 'minimized or canceled out.'" *Id.* at 29 n.118. The Court in *Gingles* explained that the Senate factors must be applied with an eye toward a "practical evaluation of the 'past and present reality' and on a 'functional' view of the political process." *Gingles*, 478 U.S. at 45, *quoting* S. Rep. at 30 n. 120 (internal citations omitted); *see also Allen* 599 U.S. at 19.

Because "courts have recognized that disproportionate educational, employment, income levels and living conditions arising from past discrimination tend to depress minority political participation, . . . plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation." S. REP. at 29 n.114 (citing *White v. Regester*, 412 U.S. 755, 768 (1973) and *Kirksey v. Bd. of Supervisors*, 528 F.2d 139, 145 (5th Cir. 1977)); *see also Clark v. Calhoun County, Miss.*, 88 F.3d 1393,1399 (5th Cir. 1996);

---

(5)    the extent to which minority group members in the state or political subdivision bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

(6)    the use of overt or subtle racial appeals in political campaigns;

(7)    the extent to which minorities have been elected to public office in the jurisdiction.

Additional factors are: "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs" of the minority group and "whether the policy underlying the . . . use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." S. REP. at 29; *see also Gingles*, 478 U.S. at 48 n.15.

*LULAC v. Clements*, 999 F.2d 831, 867 (5th Cir. 1993) (noting Senate Report does not "insist[] upon a causal nexus between socioeconomic status and depressed participation").

In *LULAC v. Perry*, the Supreme Court noted that the "'the long history of discrimination against Latinos and Blacks in Texas' . . . may well 'hinder their ability to participate effectively in the political process'" and concluded that Texas violated Section 2 under the totality of the circumstances. *Perry*, 548 U.S. at 439-40, 442 (quoting *Session v. Perry,* 298 F.Supp.2d 451, 473, 492 (E.D. Tex. 2004) and *Gingles,* 478 U.S. at 45).

The Supreme Court explained:

> Texas has a long, well-documented history of discrimination that has touched upon the rights of African-Americans and Hispanics to register, to vote, or to participate otherwise in the electoral process. Devices such as the poll tax, an all-white primary system, and the restrictive voter registration time periods are an unfortunate part of this State's minority voting rights history. The history of official discrimination in the Texas election process—stretching back to Reconstruction—led to the inclusion of the state as a covered jurisdiction under Section 5 in the 1975 amendments to the Voting Rights Act. Since Texas became a covered jurisdiction, the Department of Justice has frequently interposed objections against the State and its subdivisions.

*Perry*, 548 U.S. at 439-40 (2006), *quoting Vera v. Richards*, 861 F. Supp. 1304, 1317 S.D.Tex.1994); *see also Allen* 599 U.S. at 22 (noting that state's "extensive history of repugnant racial and voting-related discrimination").

A state can illegally dilute minority vote strength through fracturing or packing, *i.e.*, "dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *Gingles*, 478 U.S. at 46, n.11.

Finally, whether or not Latinos constitute the majority in a number of districts proportional to their population "is a relevant fact in the totality of circumstances." *Johnson v. De Grandy*, 512

U.S. 997, 1000 (1994). In Texas, Latinos constitute 31.27% of the citizen voting age population. Under this measure, Latino proportionality would be reached if 12 congressional districts, out of a total of 38, contained a Hispanic CVAP majority. On the House side, proportionality would be reached if 46 districts, out of a total of 150, contained a Hispanic CVAP majority.

Section 2 of the VRA also prohibits intentional vote dilution, although "the level of proof of dilutive effects required in a § 2 intentional vote dilution claim is less clear." *Perez v. Abbott*, 253 F. Supp. 3d 864, 943 (W.D. Tex. 2017). Although "where invidious intent exists in a vote dilution case, it may be appropriate to relax the first or even second of the *Gingles* pre-conditions, as well as to consider intent in connection with the 'totality of the circumstances' inquiry . . . plaintiffs in vote dilution cases must still show a practical effect on the minority group's ability to elect representatives of choice[.]" *Cano v. Davis*, 211 F. Supp. 2d 1208, 1249–50 (C.D. Cal. 2002), *aff'd*, 537 U.S. 1100 (2003).

B.     Unconstitutional Racial Gerrymandering (*Shaw v. Reno*)

The Fourteenth Amendment forbids intentional racial discrimination in legislative line-drawing. *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 66 (1980). Although typically courts defer to legislative redistricting, that deference is overcome by evidence of race-based decision making. *Miller v. Johnson*, 515 U.S. 900, 915 (1995) (*quoting Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 218 (1995)), *Garza v. County of Los Angeles*, 756 F. Supp. 1298, 1349 (C.D. Cal. 1990).

There are two distinct claims of intentional discrimination in redistricting. The first challenges the use of race as a basis for separating voters into districts and was first recognized in *Shaw v. Reno*, 509 U.S. 630 (1993). *See also Miller*, 515 U.S. at 911. The second claim of intentional discrimination targets actions "disadvantaging voters of a particular race," and is

"analytically distinct" from claims under the *Shaw v. Reno* line of cases. *Miller*, 515 U.S. at 911 (distinguishing the two types of claims).

A *Shaw*-type racial gerrymandering claim is "that race was improperly used in the drawing of the boundaries of one or more specific electoral districts." *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015). The plaintiff's evidentiary burden is "to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motiving the legislature's decision to place a significant number of voters within or without a particular district." *Id*. at 266. In other words, "if a legislature gives race a predominant role in redistricting decisions, the resulting map is subjected to strict scrutiny and may be held unconstitutional." *Alexander v. S.C. State Conference of the NAACP*, 602 U.S. 1, 6 (2024).

Thus, although courts assessing racial gerrymandering claims "start with a presumption that the legislature acted in good faith[,]" states violate the 14th Amendment when their new district boundaries "move[] Latinos into the district to bring the Latino population" to a particular racial target without "good reasons to believe that this was necessary to satisfy § 2 of the VRA." *Abbott*, 585 U.S. at 620; *see also Cooper v. Harris*, 581 U.S. 285, 304 (2017).

C.    Unconstitutionally Disadvantaging Voters of a Particular Race

A non-*Shaw* claim of intentional discrimination in redistricting asserts that the jurisdiction "enacted a particular voting scheme as a purposeful device 'to minimize or cancel out the voting potential of racial or ethnic minorities'" *Miller*, 515 U.S. at 911 (quoting *City of Mobile v. Bolden*, 446 U.S. 55 (1980) *superseded in part by statute on other grounds* by 42 U.S.C. § 1973; *see also Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (redistricting plan violates the Fourteenth Amendment if "'conceived or operated as purposeful device to further racial discrimination' by minimizing,

canceling out or diluting the voting strength of racial elements in the voting population.'") (quoting *Whitcomb v. Chavis*, 403 U.S., 124, 149 (1971)); *Garza v. County of Los Angeles*, 918 F.2d 763 (9th Cir. 1990) (same).

For example, states intentionally discriminate when they "t[ake] away the Latinos' opportunity because Latinos were about to exercise it." *Perry,* 548 U.S. at 440.

Courts have long recognized that public decision making bodies, like the State of Texas, can have more than one motive when enacting a statute. *See Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265 (1977) ("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one.").

The Court in *Arlington Heights* continued:

> In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

*Id.* at 265-266.

In *Arlington Heights*, the Supreme Court explained that when determining whether racially discriminatory intent or purpose is a motivating factor behind an official action, a court must make "a sensitive inquiry into such circumstantial and direct evidence as may be available." *Id.* at 266.

The Court explained further that, in addition to direct evidence, circumstantial evidence of discriminatory intent includes:

- the impact of the official action, *i.e.* whether it "bears more heavily on one race than another" and whether "a clear pattern, unexplainable on grounds other than race emerges from the effect of the state action even when the governing legislation appears neutral on its face;"

10

- the historical background of the decision;
- the specific sequence of events leading up to the challenged decision;
- departures from the normal procedural sequence;
- substantive departures, "particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached;" and
- The legislative or administrative history, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports.

*Id*. at 266-68.

When a state acts to disadvantage voters of a particular racial group, the State's actions are unlawful even if the State can point to additional, purportedly non-racial purposes. *See Perry*, 548 U.S. at 441; *Garza v. County of L.A.*, 756 F. Supp. 1298, 1349 (C.D. Cal. 1990) *aff'd*, 918 F.2d 763 (9th Cir. 1990) ("racial discrimination is not just another competing consideration.") (citing *Arlington Heights,* 429 U.S. at 265 (1977)).

Impermissible discrimination against minority voters includes, for example, creating a bare Latino majority district in which Latinos lack an equal opportunity to elect their candidate of choice. *Perry*, 548 U.S. at 440, 428 (recognizing that "it may be possible for a citizen voting-age majority to lack real electoral opportunity").

D.    Unconstitutional Malapportionment

The Fourteenth Amendment's Equal Protection Clause protects voters from disparate treatment not only on the basis of race, but also on the basis of the geographic region in which they live.  As a result, redistricters may not use population deviations to discriminate on the basis of geographic region.  *Larios v. Cox*, 300 F.Supp.2d 1320 (N.D.Ga.) (per curiam), *summarily aff'd*, 542 U.S. 947 (2004).  In that case, the U.S. Supreme Court summarily affirmed a three-judge panel decision that Georgia's legislative reapportionment plans, which deviated from population

equality by a total of 9.98%, violated the one person, one vote principle of the Fourteenth

Amendment.  The trial court concluded that Georgia redistricters systematically underpopulated:

> the rural areas [that] have been slowly but continuously losing their political
> influence, particularly in the state legislature, because of their proportional loss of
> seats. . . . In an unambiguous attempt to hold onto as much of that political power
> as they could, and aided by what they perceived to be a 10% safe harbor, the plans'
> drafters intentionally drew the state legislative plans in such a way as to minimize
> the loss of districts in the southern part of the state.

*Id.* at 1328.

Although redistricters may create districts with population deviations in order to keep

counties whole, for example, "where population deviations are not supported by such legitimate

interests but, rather, are tainted by arbitrariness or discrimination, they cannot withstand

constitutional scrutiny."  *Id*. at 1338 (*citing Roman v. Sincock*, 377 U.S. 695, 710 (1964)); *see also*

*Reynolds v. Sims*, 377 U.S. 533, 579 (1964) (explaining that the "overriding objective" of

districting "must be substantial equality of population among the various districts" and that

deviations from the equal-population principle are permissible only if "incident to the effectuation

of a rational state policy").

Accordingly, redistricting violates the Fourteenth Amendment when racial groups have

been fenced out of the political process and their voting strength purposefully diluted, and also

when redistricters create population deviations to disadvantage minority voters or voters who live

in a particular region of the state.  *See Reynolds*, 377 U.S. at 566 ("Diluting the weight of votes

because of place of residence impairs basic constitutional rights under the Fourteenth Amendment

just as much as invidious discriminations based upon factors such as race[.]").

## III.    LULAC PLAINTIFFS' CHALLENGES TO THE ENACTED REDISTRICTING PLANS

A.    State House of Representatives (H2316)

The enacted State House redistricting plan created 30 Hispanic CVAP majority districts—three fewer than existed in the benchmark. In addition to reducing Latino voting strength through the reduction in Hispanic CVAP majority districts, Texas failed to create additional Hispanic CVAP majority districts that are required under the VRA. Defendants' failure to create the required number of Latino citizen voting age majority State House districts violates the effects and intent standards of Section 2 of the VRA and violates the Fourteenth Amendment to the U.S. Constitution.

The Court will hear that the Latino community in the areas of LULAC demonstrative districts HD44 and HD138 is sufficiently large and compact to constitute the majority of additional districts in the State House redistricting plan. The same is true for the similar (but differently-numbered) demonstrative HD17 in MALC's H2327 and H2331, and for the Harris County demonstrative House districts in MALC's H2328 and H2330. The Court will also hear that Latinos vote cohesively within Plaintiffs' demonstrative House districts, and that Anglos bloc vote usually to defeat the Latino-preferred candidates in the enacted districts that overlap with Plaintiffs' demonstrative House districts.

The Court will also hear that application of the *Arlington Heights* factors to the State's enactment of H2316 demonstrates that Defendants' failure to create additional Latino majority districts in its House redistricting plan was motivated by intent to dilute Latino voting strength in violation of the Fourteenth Amendment and Section 2.

    1. Central Texas (Demo HD44) (Enacted HD17, HD44, HD45, HD48, and HD51)

In Central Texas, Defendants should have but did not create a Latino majority district along the I-35 corridor and including portions of Guadalupe, Caldwell, Hays and Travis counties. LULAC Plaintiffs' demonstrative HD44 shows one such district. Demonstrative HD44 has a

Hispanic CVAP of 51.0% (ACS23) and encompasses a compact Latino population in this geographic area.



2. Northwest Harris County (Demo HD138) (Enacted HD126, HD138, HD139, HD140, HD145, and HD148)

In Northwest Harris County, Defendants should have but did not create a Latino majority district encompassing the geographic area including the neighborhoods of Northside / Northline, Hidden Valley and North Houston. LULAC Plaintiffs' demonstrative HD138 shows one such district. Demonstrative HD138 has a Hispanic CVAP of 54.5% (ACS23) and encompasses a compact Latino population in this geographic area.

14

3. Weakening of HD118 (Demo HD118) (Enacted HD118)

The Court will hear that Defendants discriminated, in effect and purposefully, against Latinos on the basis of race, by diluting Latino voting strength in HD118 in violation of the 14th Amendment and Section 2 of the VRA. As a result of map drawers' changes to HD118, the percentage of Spanish surname registered voters (SSVR) decreased from 60.40% to 48.1% and the share of votes cast by Latinos in the district dropped from 55.70% to 43.90%. In enacted HD118, Defendants also assigned Latino voters into and out of HD118 because of their race and acted expressly to limit the voting power of Latinos.

The Court will hear that in HD118, Latinos have been and continue to be sufficiently numerous and compact to comprise the citizen voting age population majority. In benchmark HD118, the Hispanic CVAP was 67.50%. In a proposed repaired version of HD118, the Hispanic CVAP is 71.3%. LULAC Plaintiffs' demonstrative repaired HD118 similarly demonstrates that Latinos can comprise the majority of CVAP in a district that provides Latino voters an equal opportunity to elect their preferred candidate. The Court will also hear that in LULAC Plaintiffs' demonstrative repaired HD118, Latinos vote cohesively and Anglos bloc vote to defeat Latino-

15

preferred candidates in the enacted districts that contribute geography to LULAC Plaintiffs' demonstrative repaired HD118.



4. Malapportionment in the State House Plan

The Court will hear that in H2316, Defendants purposefully and systematically overpopulated districts in El Paso County and the Upper Rio Grande area of West Texas (Districts 74, 75, 77, 78, and 79) and underpopulated districts in the Panhandle and original Tom Green County (Districts 69, 71, 72, 81, 82, 83, 84, 86, 87, and 88). Defendants' over- and under-population of districts in these regions deliberately favors the interests of communities and voters in the Panhandle and original Tom Green County at the expense of communities and voters in El Paso and the Upper Rio Grande area of West Texas in violation of the one person, one vote guarantees of the Fourteenth Amendment of the United States Constitution. *See e.g.*, LULAC Demonstrative plan H2326 and MALC demonstrative plan 2329.

The Court will also hear that Defendants' over- and under-population of districts in these regions facilitated creating fewer Latino opportunity districts statewide and/or reduced Latino voting strength in existing Latino majority districts. The over- and under-population of districts in these regions also protected the influence of Anglo voters and preserved Anglo incumbents in

16

violation of the one person, one vote guarantees of the Fourteenth Amendment of the United States Constitution as well as the guarantee, regardless of race, of the equal protection of laws, and in violation of Section 2 of the VRA (intent). Defendants' over- and under-population of districts in these regions purposefully minimized Latino voting strength and Latino voters' ability to participate on an equal basis in elections to the State House, both in the specific overpopulated districts and statewide—even as the rate of Anglo population growth lags behind that of Latino population growth statewide and in West Texas. The Court will hear that population deviations between House districts in this region are not supported by any legitimate, consistently applied state policy and are tainted by discrimination; thus, they cannot withstand constitutional scrutiny. *See e.g.*, LULAC demonstrative plan H2326 and MALC demonstrative plan H2329.



B.    Congress (C2193)

The enacted congressional redistricting plan created 7 Hispanic CVAP majority districts—one fewer than existed in the benchmark, and fails to create additional Hispanic CVAP majority districts that are required under the VRA. Defendants' failure to create the required number of

Hispanic CVAP majority congressional districts violates the effects and intent standards of Section 2 of the VRA and violates the Fourteenth Amendment to the U.S. Constitution.

1. Additional Latino Opportunity Congressional District in Harris County (Demo CD38) (Enacted CD7, CD8, CD18, CD29, and CD38)

In Harris County, Defendants should have but did not create a Latino majority district encompassing the geographic area that includes North and Northwest Houston. LULAC Plaintiffs' demonstrative CD38 shows one such district. Demonstrative CD38 has a Hispanic CVAP of 52.0% (ACS23) and encompasses a compact Latino population in this geographic area.



2. Additional Latino Opportunity Congressional District in Dallas and Tarrant Counties (Demo CD6) (Enacted CD6, CD12, CD24, CD30, CD32, and CD33

In the Dallas-Ft. Worth Metroplex, Defendants should have but did not create a Latino majority district. LULAC Plaintiffs' demonstrative CD6 shows one such district. Demonstrative CD6 has a Hispanic CVAP of 53.5% (ACS23) and encompasses a compact Latino population in this geographic area.



C.    Facts Related to Both State House and Congressional Redistricting Plans

In support of the Senate Factors analysis under Section 2 of the VRA, Dr. Andres Tijerina, an historian and expert in Texas Mexican American history, will testify that there exists a long history of discrimination against Latinos in Texas and that Latinos bear the effects of that discrimination. Much of that discrimination, including the poll tax, other official discrimination in voting, segregated public facilities, segregated schools and employment discrimination, has been experienced by Latino voters still living today.

The legacy of historical discrimination persists today in the form of lower socio- economic status for Latinos in Texas. Dr. Rogelio Saenz, a demographer and specialist in Latino population studies, will testify that even among U.S.-born Latinos living in Texas, Latino educational achievement and earnings lag behind Anglos. Dr. Bernard Fraga will present data showing that Latino voting rates remain below that of Anglos in Texas. In addition, the Court will hear from lay witnesses about their personal experiences with discrimination against Latinos in Texas.

The Court will also hear that, with respect to proportionality under the Section 2 totality of circumstances evaluation, even with the two additional Hispanic CVAP majority State House districts that LULAC Plaintiffs claim are required under Section 2, the total number of Hispanic

19

CVAP majority State House districts would not come close to proportionality. In the congressional redistricting plan, even with the two additional Hispanic CVAP majority congressional districts that LULAC Plaintiffs claim are required under Section 2, the total number of Hispanic CVAP majority congressional districts would not come close to proportionality. *Allen v. Milligan*, 599 U.S. 1, 26 (2023) ("[P]roperly applied, the *Gingles* framework itself imposes meaningful constraints on proportionality, as our decisions have frequently demonstrated.").

Dated: May 15, 2025                      Respectfully submitted,

                                         */s/ Nina Perales*
                                         Nina Perales
                                         Julia Longoria
                                         Sabrina Rodriguez
                                         Mexican American Legal Defense and Educational
                                         Fund (MALDEF)
                                         110 Broadway Street, Suite 300
                                         San Antonio, TX 78205
                                         (210) 224-5476
                                         Fax: (210) 224-5382
                                         nperales@maldef.org
                                         jlongoria@maldef.org
                                         srodriguez@maldef.org

                                         Ernest I. Herrera
                                         Mexican American Legal Defense and Educational
                                         Fund (MALDEF)
                                         634 S. Spring Street, 9th Floor
                                         Los Angeles, CA  90014
                                         (210) 629-2512
                                         eherrera@maldef.org

                                         Andrea E. Senteno*
                                         Mexican American Legal Defense and Educational
                                         Fund (MALDEF)
                                         1016 16th Street, Suite 100
                                         Washington, DC  20036
                                         (202) 293-2828
                                         Asenteno@maldef.org

20

Khrystan N. Policarpio*
Mexican American Legal Defense and Educational
Fund (MALDEF)
1512 14th Street
Sacramento, CA  95814
(916) 444-3031
kpolicarpio@maldef.org


*Admitted *pro hac vice*

*Counsel for LULAC Plaintiffs*


## CERTIFICATE OF SERVICE

I certify that on May 15, 2025, a true and accurate copy of the foregoing document was

served via email to all counsel of record.

*/s/ Nina Perales*
Nina Perales

21