# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

LEAGUE OF UNITED LATIN AMERICAN
CITIZENS, *et al.*,
                    *Plaintiffs,*


ALEXANDER GREEN, *et al.*,
                    *Plaintiff-Intervenors,*

V.

GREG ABBOTT, *et al.*,
                    *Defendants.*

3-21-cv-00259-DCG-JES-JVB
[Lead Case]

&

All Consolidated Cases

---

### STATE DEFENDANTS' OPENING BRIEF

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................. ii

I. The Texas Legislature Bears the Primary Responsibility for Reapportioning Texas's Statewide Maps. ................................................................... 3

II. Unprecedented Circumstances Compressed the Texas's Redistricting Timeframe. ....................................................................................... 5

III. Despite the Difficulties, the Texas Legislature Successfully Passed Four Statewide Maps, All While Giving the Public and Officeholders an Opportunity to be Heard. ................................................................................ 7

IV. Texas Drew Maps Based on Partisanship and Valid Redistricting Principles, Not Race. ........................................................................................ 8

    A. The Legislature Ratified the Operative Maps in 2023 to Comply with Article III, Section 28 of the Texas Constitution. ................................... 8

    B. Plaintiffs Have Not Produced Alternative Maps Showing that a Rational Legislature Would Have Drawn a Map with Different Racial Configurations. ...................................................................... 10

    C. Any Circumstantial Evidence is Better Explained by Partisanship. ..................... 11

    D. The Legislature Also Had Navigate the Demands of One-Person, One-Vote. .................................................................................. 12

V. The Evidence will Show that the Enacted Maps Comply with the Voting Rights Act. ........................................................................................... 13

    A. Bexar County ................................................................................ 13

    B. Central Texas ............................................................................... 14

    C. Dallas/Fort Worth Metroplex .......................................................... 14

    D. El Paso Region ............................................................................. 16

    E. Greater Houston Area .................................................................... 16

VI. Population Deviations Reflect Texas's Good Faith Effort to Address Asymmetrical Growth throughout the State. ............................................. 18

Conclusion ........................................................................................................ 20

Certificate of Service ......................................................................................... 23

Certificate of Compliance ................................................................................. 23

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Abbott v. Perez,*
    585 U.S. 579 (2018) ......................................................................................................3, 9

*Alexander v. S.C. State Conf. of the NAACP,*
    602 U.S. 1 (2024) ......................................................................................................passim

*Allen v. Milligan,*
    599 U.S. 1 (2023) ...............................................................................................................4

*Brnovich v. Democratic Nat'l Comm.,*
    594 U.S. 647 (2021) ......................................................................................................3, 4

*Cooper v. Harris,*
    581 U.S. 285 (2017) ....................................................................................................4, 12

*Cotton v. Fordice,*
    157 F.3d 388 (5th Cir. 1998) ............................................................................................9

Cox v. Larios, 542 U.S. 947 (2004) ...........................................................................................5

*Easley v. Cromartie,*
    532 U.S. 234 (2001) .........................................................................................................10

*Harding v. Cty. of Dallas,*
    948 F.3d 302 (5th Cir. 2020) ............................................................................................4

*Harness v. Watson,*
    47 F.4th 296 (5th Cir. 2022) (en banc) ........................................................................9, 10

*Harris v. Ariz. Indep. Redistricting Comm'n,*
    578 U.S. 253 (2016) .....................................................................................................5, 18

*Johnson v. De Grandy,*
    512 U.S. 997 (1994) .............................................................................................5, 17, 18

*Larios v. Cox,*
    300 F. Supp. 2d 1320 (N.D. Ga. 2004) ...........................................................................5

*LULAC v. Perry,*
    548 U.S. 399 (2006) ...........................................................................................................5

*Miller v. Johnson,*
    515 U.S. 900 (1995) ...................................................................................................3, 4, 10

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979) ...........................................................................................................3

*Reynolds v. Sims,*
    377 U.S. 533 (1964) .....................................................................................................5, 20

*Rucho v. Common Cause,*
    588 U.S. 684 (2019) ...........................................................................................................5

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) .......................................................................................................4, 5

### Constitutional Provisions

Const. art I, § IV ...............................................................................................................3

Tex. Const. art. 3, § 28 ...................................................................................................9

Tex. Const. Art. I § 26 ...................................................................................................14

## Statutes

42 U.S.C. § 1973 .......................................................................................................4, 5

52 U.S.C.S. § 10301(b) ...............................................................................................13

Tex. Educ. Code § 28.002(8)(A) ...................................................................................1

Tex. Educ. Code § 28.002(h-2)(12) ...............................................................................1

Tex. Educ. Code § 28.002(h-2)(7) .................................................................................1

Tex. Educ. Code § 28.002(h-2)(8)(F) .............................................................................1

Tex. Educ. Code § 28.002(h-2)(9)(A) .............................................................................1

Tex. Educ. Code § 28.002(I) ..........................................................................................1

## Other Authorities

Alex Ura and Carla Astudillo, *As the share of white Texans continues to shrink, the Legislature remains mostly white and male,*
    THE TEXAS TRIBUNE (Jan 11, 2023), https://www.texastribune.org/2023/01/11/2023-texas-legislature-representation/ ...................................................................................................2

Aneeta Mathur-Ashton, *The Changing Face of the 119th Congress,*
    U.S. NEWS (Jan. 13, 2025), https://www.usnews.com/news/national-news/articles/2025-01-13/whats-the-gender-race-and-religious-makeup of-the-current-congress. ...........................2

C.S. LEWIS, SCREWTAPE PROPOSES A TOAST (1959) ...................................................2

> But supposing that the world has become "filled up," so to speak, with liberal democracies, such that there exist no tyranny and oppression worthy of the name against which to struggle? Experience suggests that if men cannot struggle on behalf of a just cause because that just cause was victorious in an earlier generation, then they will struggle *against* the just cause… for they cannot imagine living in a world without struggle. And if the greater part of the world in which they live is characterized by peaceful and prosperous liberal democracy, then they will struggle *against* that peace and prosperity, and against democracy.
>
> - Francis Fukuyama, *The End of History and the Last Man*

The history of America's constitutional promise is filled with struggle. For long periods, the country seemed to make no progress in its fight for equality under the law, and when progress came, its pace could be painfully slow, arrested, and even reversed. Yet, progress we have.

This trial will end just 53 days shy of the 60th anniversary of the VRA's signing. The voting rights landscape is much changed since then. In Texas, gone are the days when schoolteachers taught students to disbelieve their lying eyes about the causes of the Civil War and insisted the "War Between the States" was about state sovereignty. Instead, by law, Texas public school children learn civics based on the heroism of MLK, the contributions of Cesar Chavez, and a full understanding of the injustice of slavery and Jim Crow. Tex. Educ. Code §§ 28.002(h-2)(7), (8)(A) and (I). Indeed, that same law requires Texas students to learn about the Fourteenth and Fifteenth Amendment, the VRA, and the work of the League of United Latin American Citizens, Plaintiff in this very suit. *Id.* at §§ 28.002(h-2)(8)(F), (9)(A), and (12).

Likewise, voting in Texas is more open than ever. Texas was the first state to introduce early voting. Whether voting early or on Election Day, Texas voters may vote at any voting location in their county, rather than just the precinct in which they live. Texas law protects employees who wish to vote, offering up to two hours' time off to vote during early voting or on Election Day. Voters with disabilities may vote curbside, or by mail; voters aged 65 and over can likewise vote by mail. Those who vote by mail have the option of mailing their ballot, of course, but can also deliver the ballot in person. Voter registration in Texas is easy, too. Some 85% of Texas voters register at the DMV when obtaining or renewing their drivers' license.

Texas's Legislature is also quite diverse. To understand that diversity, first consider the U.S. Congress. Forty years ago, minorities comprised just one percent of the U.S. Congress.[1] Today, the U.S. Congress is 26% nonwhite, including 11.5% Black and 8% Hispanic.[2] Texas's Legislature is far more diverse: whereas Congress is 26% nonwhite, Texas's 2023 Legislature was 26% *Hispanic*, 10.5% Black (just two members short of perfect proportionality), and 3 Asian American members shy of proportionality.[3] In all, the Texas Legislature in 2023 was 40% nonwhite.[4] For context, it was 43% female.[5] This comparison is particularly stark since women won the franchise with the Nineteenth Amendment's 1920 ratification, while minorities continued their struggle for voting equality for decades longer. Also, Texas's U.S. Senate delegation is 50% Hispanic.

In short, every Texas voter has the opportunity to create a political coalition.

These voting rights advancements should dampen neither our memory of the past nor our vigilance in the present—but our zealous fight for equality cannot blind us to the success of voting rights in Texas. Otherwise, reflexive recriminations dilute equality by grading every political act on a racial rubric. That rubric renders us less pluralistic both in our consideration of disparity's causes and in affording opportunities without regard to race.

"[S]uspicion often creates what it suspects."[6] Plaintiffs insist that only racial discrimination explains the challenged districts and offer as evidence only a racial rubric. But the world is not so monochromatic. Redistricting is fundamentally a self-interested project, which is to say, a political one. Texas's 181 legislators each carry their own plans to keep or grow power for their constituents,

---

[1] Aneeta Mathur-Ashton, *The Changing Face of the 119th Congress*, U.S. NEWS (Jan. 13, 2025), https://www.usnews.com/news/national-news/articles/2025-01-13/whats-the-gender-race-and-religious-makeup-of-the-current-congress.

[2] *Id.*

[3] Alex Ura and Carla Astudillo, *As the share of white Texans continues to shrink, the Legislature remains mostly white and male,* THE TEXAS TRIBUNE (Jan 11, 2023), https://www.texastribune.org/2023/01/11/2023-texas-legislature-representation/.

[4] *Id.*

[5] *Id.* The Court will note these data are from 2023. That is because they are drawn from the Texas Tribune. In 2021, the Tribune published a demographic profile of the Texas Legislature. In 2023, it did the same thing, finding the Legislature had become less white in the intervening biennium. In 2025, the Tribune did not publish a demographic profile of the Texas Legislature.

[6] C.S. LEWIS, SCREWTAPE PROPOSES A TOAST (1959).

their party, and themselves. This economy of interests and attendant negotiations both private and public, bounded by statutory and constitutional regimes, is a quintessentially American political struggle—which is to say, a democratic one. The results of that struggle are entitled to a powerful presumption of good faith. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 11 (2024)

## I. The Texas Legislature Bears the Primary Responsibility for Reapportioning Texas's Statewide Maps.

The Court's analysis should begin with the states' constitutional mandate to reapportion, and the controlling legal principles in this case. The Constitution mandates reapportionment of congressional House seats following each decennial census. U.S. Const. art I, § II (mandating reapportionment after a decennial census). The "Constitution entrusts state legislatures with the primary responsibility for drawing congressional districts, and redistricting is an inescapably political enterprise." *Alexander*, 602 U.S. at 6 (2024); *see also* U.S. Const. art I, § IV (delegating the "Times, Places, and Manner of holding Elections" to State legislatures). The difficulty of reapportionment lies in its complex balance of competing interests. *Miller v. Johnson*, 515 U.S. 900, 915 (1995). As such, "the good faith of a state legislature must be presumed." *Id.*

When bringing intentional discrimination claims against a legislature, it is "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Abbott v. Perez*, 585 U.S. 579, 605 (2018) . Such intent is not mere "volition" or "awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). It requires a legislature to have passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* Intentional discrimination requires a multi-factor analysis that includes a showing that the alleged harm of the challenged law falls predominantly on the subject minority, consideration of relevant legislative history, and the sequence of events leading up to the passing of the law at issue. *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687–88 (2021).

Racial gerrymandering claims further require plaintiffs show race was "'the predominant factor motivating' the redistricting process and 'subordinat[ing] traditional race-neutral districting

principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests[.]'" *Harding v. Cty. of Dallas*, 948 F.3d 302, 313 (5th Cir. 2020) (quoting *Miller*, 515 U.S. at 911). It is not sufficient to show a loose correlative relationship between party affiliation and race. *See Brnovich*, 594 U.S. at 689 . Rather, a plaintiff must disentangle race and partisanship. *Alexander*, 602 U.S. at 6. This includes, "among other things, ruling out the competing explanation that political considerations dominated the legislature's redistricting efforts." *Id.* at 9–10. Plaintiffs must produce "an alternative map showing that a rational legislature sincerely driven by its professed partisan goals *would have drawn* a different map with greater racial balance." *Id*. at 10 (emphasis added). A plaintiff's failure to submit an alternative map should be interpreted by a district court as "an implicit concession that the plaintiff cannot draw a map that undermines the legislature's defense that the redistricting lines were 'based on a permissible, rather than prohibited ground.'" *Id.* at 35 (citing *Cooper v. Harris*, 581 U.S. 285, 317 (2017))).

The burden is similarly high for plaintiffs alleging violations of Section 2 of the Voting Rights Act. To prevail on a *Gingles* claim, plaintiffs must first show (1) the minority group is sufficiently large and geographically compact to constitute a majority in a reasonably configured district, (2) the minority group is politically cohesive, and (3) the white majority votes sufficiently as a block to defeat the minority's preferred candidate." *Allen v. Milligan*, 599 U.S. 1, 18 (2023). But proving the *Gingles* factors is far from the end of plaintiffs' burden. They must show, under the totality of the circumstances, the political process is not equally open to minority voters such that they are unable to participate in the electoral process and elect a representative of their choice. *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986); 42 U.S.C. § 1973. This analysis is "'peculiarly dependent' on the facts of each case and requires a "searching practical evaluation of the past *and present* reality." *Id.* (emphasis added). While a history of voting-related discrimination is one factor to consider, other relevant factors include whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the area, the extent to which elected officials are responsive to the particularized needs of members of the minority

groups, and the extent to which members of the minority group have been elected to public office in the jurisdiction. *LULAC v. Perry*, 548 U.S. 399, 426 (2006); *Johnson v. De Grandy*, 512 U.S. 997, 1000, 1010 n.9 (1994). *Gingles* factors notwithstanding, plaintiffs must carry their totality of the circumstances burden to prove a Section 2 violation. *See Gingles*, 478 U.S. at 79; 42 U.S.C. § 1973.

A plaintiff's burden when bringing a claim under *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004), is similarly weighty. Where, as here, a state legislature's total population deviation is below 10%, a plaintiff cannot rely on numbers alone to show that the one person, one vote principle has been violated. *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 255–56 (2016). Instead, Plaintiffs must "show that it is more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors rather than the 'legitimate considerations'" such as compactness, contiguity, maintaining political subdivisions, or preserving the cores of prior districts. *Harris*, 578 U.S. at 259 (quoting *Reynolds v. Sims*, 377 U.S. 533, 579 (1964)). Today, a plaintiff's burden is even more difficult to bear because—unlike when the Court decided *Larios* and *Harris*—plaintiffs cannot rely on partisanship as an impermissible legislative consideration. *See Rucho v. Common Cause*, 588 U.S. 684, 711 (2019) (holding that partisan gerrymandering claims are nonjusticiable).

## II. Unprecedented Circumstances Compressed the Texas's Redistricting Timeframe.

The 87th Legislature undertook its constitutional duty to redraw the State's electoral maps with some added handicaps: a late release of census data, threats from disgruntled members, and the then-unfolding COVID-19 pandemic. Prior to the COVID outbreak, the Committees had embarked on a circuit of public hearings scheduled across Texas, soliciting input from constituents and educating members; the ensuing declarations of federal and state emergencies curtailed in-person outreach. In addition, the pandemic delayed the release of census data. Unable to begin until mid-September—months after regular session had adjourned—but facing a November deadline, the 2021 redistricting cycle was compressed into a single special session.

In an ordinary year, redistricting begins during the regular session. The United States Census Bureau has a statutory obligation to provide the results of the decennial census to state

governments on or before April 1. But the Census Bureau's delay in releasing the 2020 census results prevented the Legislature from taking up redistricting at the appointed time. Legislators had to wait until August 14 for census data to be made available to state officials and waited another thirty-three days for the Census to make that data usable for redistricting software. Texas must finish redistricting in time for the subsequent year's primary elections, held in March. State law sets a November deadline for candidates to file applications with the Texas Secretary of State.

Complicating matters further, a cohort of 51 Democratic Representatives shut down the House by departing the State en masse. This deprived the House of the constitutionally mandated quorum necessary to conduct official business. The House sat for 38 unproductive days until a handful of relenting Democrats ended their self-imposed exile. Most of the truant members did not return until after the end of the first special session, and most refused to disavow further quorum breaks. Thus, House and Senate leadership resolved to leverage members' incentive to participate in the redrawing of their own districts by ensuring SBOE and Congressional redistricting was taken up simultaneously with House and Senate redistricting, rather than calling for a fourth session. Legislators would draw all four maps in one thirty-day period.

Further incentivizing alacrity, on September 1 Senators Roland Gutierrez and Sarah Eckhardt filed a lawsuit against the Governor and Secretary of State, asserting the Legislature would not be able to redistrict in time for the 2022 elections and requesting that a three-judge court take over redistricting from the Legislature. The Gutierrez lawsuit argued that the Legislature's likely failure would lead to the 2022 election being conducted under outdated, malapportioned maps. By threatening to divest the Legislature of its authority over redistricting and drawing attention to the real risk that Texas could enter 2022 with malapportioned districts, the Gutierrez lawsuit heightened the need for the Legislature to finish new maps expeditiously. If the Legislature did not enact maps, it would lose the opportunity to do so.

### III. Despite the Difficulties, the Texas Legislature Successfully Passed Four Statewide Maps, All While Giving the Public and Officeholders an Opportunity to be Heard.

In the face of these challenges, the Legislature went to work drawing maps while simultaneously considering input from legislators and constituents. Texas had grown significantly and asymmetrically since the 2010 census, further complicating the redistricting Gordian knot of preserving Legislative interests and complying with traditional redistricting principles.

Prior to the release of the official census data, the Redistricting Committees held hearings across the state, soliciting input from a wide variety of citizens and interest groups. Many were held remotely due to the COVID-19 pandemic. The evidence will show, in fact, that the Legislature conducted over forty public hearings across the state to collect input on the new maps beginning in January of 2021, and that this number of hearings is strikingly similar to the numbers held in previous redistricting cycles. While the hearings did not take place in-person, they nevertheless provided constituents ample opportunity to voice their opinion and concerns. This process continued through the Third Special Session, during which both legislators and the public drew maps that they believed would benefit the state and the electoral process. Legislators were invited to introduce amendments that they thought important, and each was given due consideration.

The evidence will show that Senator Royce West introduced an amendment to modify the Senate map to include desired changes to his district in the Dallas/Fort Worth area. The evidence will also show the Legislature adopted and passed the amendment. This was not a rarity—legislators of both parties introduced amendments that would alter the final maps. Both chambers of the Legislature held hearings and floor debates on the maps. During these hearings, members and the public alike voiced their opinions on Texas's redistricting plan. In fact, the Legislature specifically civil rights groups such as LULAC to voice their opinions through testimony.

The task of drawing maps in thirty days was herculean. But through hard work, difficult debate, and public input, Texas passed four constitutionally, statutorily, and politically cohesive maps.

## IV. Texas Drew Maps Based on Partisanship and Valid Redistricting Principles, Not Race.

The Texas Legislature drew the maps blind to race. The redistricting lawmakers did not mince words: they intended to design maps that advanced partisan interests and other traditional redistricting principles. The legislative record, offered as part of the joint exhibits, is replete with bipartisan acknowledgement of the Legislature's partisan motivations for drawing districts. Sen. Huffman and Rep. Landgraf will identify where the legislative record demonstrates that neither chamber considered racial data when devising the enacted maps. The "[o]ne thing" they "never had was racial shading." Sen. Floor Debate Trans. Oct. 4, 2021 at 16:3–4. State Defendants' expert, Sean Trende, will testify that his analysis demonstrates that the enacted districts are better explained by partisanship rather than race. Sen. Huffman and Rep. Landgraf will also highlight how the legislative record shows how unlike previous cycles, the Legislature largely walled itself off from VRA-mandated, race-based analyses by delegating them to outside counsel—eliminating the possibility that racial data could impermissibly taint the Legislature's decisions.

On this record, Plaintiffs cannot show that the Legislature acted with a discriminatory purpose, much less that race predominated the redistricting process. Despite four years of litigation, Plaintiffs have identified no direct evidence that contradicts this robust record. Plaintiffs' case instead rests on circumstantial evidence. Although the Supreme Court has "kept the door open" for such claims, overcoming the presumption of good faith "with circumstantial evidence alone . . . is much more difficult." *Alexander*, 602 U.S. at 8. The Supreme Court has "never invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence." *Id.*

### A. The Legislature Ratified the Operative Maps in 2023 to Comply with Article III, Section 28 of the Texas Constitution.

*First*, as Plaintiffs acknowledge in their amended complaints and stipulated facts, the Texas Legislature ratified the state House and Senate maps in 2023. The evidence will show the Legislature's purpose in doing so was to comply with the Article III, Section 28 of the Texas Constitution, not discriminate on the basis of race. According to the Texas Constitution, "[t]he Legislature shall, at its *first regular session* after the publication of each United States decennial

census, apportion the state into senatorial and representative districts . . . ." Tex. Const. art. 3, § 28 (emphasis added). Because the Census Bureau failed to release the census data on time, the 87th Texas Legislature did not have the opportunity enact new district lines before the regular session adjourned. This discrepancy cast a shadow of uncertainty over the long-term legality of the House and Senate maps, which the next Legislature needed to resolve.

In light of the Legislature's ratification, Plaintiffs are unable to meet their evidentiary burden. As the Supreme Court explained in *Abbott v. Perez*, although the "'historical background' of a legislative enactment" may act as "'one evidentiary source' relevant to the question of intent," 585 U.S. 579, 603–04 (2018) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)), historical discrimination alone does not suffice. *Id.* at 604. What matters is the intent of the enacting legislature—in this case, the Legislature that met in 2023. Because of this, Plaintiffs argue that the 88th Legislature "adopted in full" the 87th Legislature's "history and rationale for House Plan 2316 and Senate Plan 2168." ECF 987 ¶ 244. But that spurious assertion has no basis in fact or law. The legislative record at most acknowledges that the legislators who convened in 2023 were aware of the 87th Legislature's proceedings and took those proceedings into account when deciding whether to ratify their plans. It does not establish that those lawmakers shared their predecessors' motives. Nor can Plaintiffs establish that lawmakers ratified the plan as pretense.

Plaintiffs' failure to tie the 88th Legislature to an improper purpose is fatal to Plaintiffs intent claims. According to the Supreme Court, the intent of one legislature is not automatically transferred like "original sin" to the next. *Perez*, 585 U.S. at 603. Even a formal "finding of past discrimination" does not eliminate the "presumption of legislative good faith" from subsequent legislatures absent some direct evidence that the enacting legislature was infected by the former legislature's discriminatory animus. *Id.* The Fifth Circuit has likewise rejected precisely the sort of "'sins of the father' contention" upon which Plaintiffs' intent-related claims rest. *See Harness v. Watson*, 47 F.4th 296, 304 (5th Cir. 2022) (en banc); *see also Cotton v. Fordice*, 157 F.3d 388, 391–92 (5th Cir. 1998) (calling a judicial pronouncement of past discrimination intent "irrelevant" in light of reenactment). Instead, the Fifth Circuit held that the "the decisive legal question is the

9

intent of the legislature that enacted *the most recent version* of an originally tainted law." *Harness*, 47 F.4th at 306 (emphasis added). This Court should find the same here.

### B. Plaintiffs Have Not Produced Alternative Maps Showing that a Rational Legislature Would Have Drawn a Map with Different Racial Configurations.

*Second*, it is well established that "racial identification is highly correlated with political affiliation." *Easley v. Cromartie*, 532 U.S. 234, 243 (2001). As a consequence, "partisan and racial gerrymanders 'are capable of yielding similar oddities in a district's boundaries'" even when they are drawn with different data, for different ends. *Alexander*, 602 U.S. at 9. To avoid unnecessary intrusions into what the Supreme Court has called "the most vital of local functions," *Miller,* 515 U.S. at 915, courts must start with a presumption of good faith that directs the courts "to draw [an] inference that cuts in the legislature's favor whenever the evidence could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10. It is up to the "party challenging a map's constitutionality [to] disentangle race and politics if it wishes to prove that the legislature was motivated by race as opposed to partisanship" and defeat the presumption. *Id.* at 6.

To defeat that presumption, the plaintiff must present an alternative map that controls for the same redistricting principles pursued by the legislature and achieves greater racial balance. *Id.* at 34. Plaintiffs' demonstration maps fail to satisfy that criterion. Almost none of the plans depict a statewide map. The plans instead illustrate Plaintiffs' preferred configuration for one or more districts and provide no information on how these changes would affect neighboring districts or statewide deviation numbers. What's more, the demonstration plans fail to account the for the Legislature's priorities; indeed, most of the alternative maps would reduce Republican advantage, making them incompatible with the Legislature's partisan goals. Then, there is the matter of county lines. The Texas Constitution only permits House districts to break a county line when necessary to comply with one-person, one-vote. Demonstration plans for LULAC and MALC propose districts in Central Texas that cobble together bits and pieces of multiple counties. Had the Legislature done the same, the plan not only would have violated state law, but the county line breaks likely would have been cited as evidence of a racial gerrymander.

None of Plaintiffs' demonstration maps suggest a rational legislature "sincerely driven by its professed partisan goals," would have drawn the maps differently. *Alexander*, 602 U.S. at 10. Plaintiffs' intent claims should therefore be dismissed. As per *Alexander*, if challengers fail to produce a suitable substitute map, then courts are to treat that failure as "an implicit concession that the plaintiff cannot draw a map that undermines the legislature's defense[.]" *Id.* at 35. This adverse inference "packs a wallop" and "may be dispositive in many, if not most, cases" unless a party has "direct evidence or some extraordinarily powerful circumstantial evidence." *Id.* at 35, 36. As explained above, Plaintiffs have no such evidence. *See supra* at 7–8. Their case-in-chief depends entirely on circumstantial evidence—all of which can be explained by partisanship or some other neutral principle. *See infra* at 11–12.

### C. Any Circumstantial Evidence is Better Explained by Partisanship.

*Third*, not only have Plaintiffs failed to produce a suitable alternative map, as specified in *Alexander* and *Cromartie*, but their retained experts either ignore partisanship or fail to give it adequate weight when assessing possible explanations for the Legislature's decisions. Had they done so, it would have been apparent that partisanship offers a better explanation. Dr. J. Morgan Kouser represents a good example of this. He concedes in his initial report that Republicans "had a lot of shuffling to do in the 2021 redistricting if it was to maintain its majorities"; nevertheless, he assumes, without justification, that because race and politics can overlap, the two characteristics can be treated as the same quantity. Dr. Moon Duchin, likewise, concludes that race predominated over traditional redistricting principles after comparing the enacted Congressional, Senate, and House maps to a set of demonstration plans that she created. Her simulations, however, assume that partisan considerations played no role in the map making process. Her analysis therefore cannot distinguish between race and partisanship when the two coincide.

In both instances, experts for the Plaintiffs treated race as a proxy for party identification, but as the trial will show, there is no evidence in the legislative record that the Texas Legislature did the same. It bears repeating that because race and politics are highly correlated, Plaintiffs have the "formidable task" of "disentangl[ing] race from politics and prov[ing] that the former drove a

district's lines" not the latter. *Cooper v. Harris*, 581 U.S. 285, 308 (2017). It is not enough to establish that race may be one of several explanations behind the placement of district lines; nor is it enough to assume that lawmakers share the Plaintiffs' experts' priors. At trial, State Defendants' expert Sean Trende will show why. Unlike Plaintiffs' experts, Dr. Trende does control for partisanship, and his findings demonstrate that partisanship is a far stronger predictor of the composition of a new district than racial demographics. Indeed, "there are multiple instances where district lines were drawn that have a partisan effect, but not a racial effect." Moreover, race and politics do not perfectly align. As Dr. Trende will explain, it makes little sense for the Legislature to rely on racial data when it had access to partisan shading. Plaintiffs, once again, have not met their burden.

### D. The Legislature Also Had Navigate the Demands of One-Person, One-Vote.

*Fourth*, Plaintiffs ignore the constraints that Texas's rapid but asymmetrical population growth imposed on the Legislature. Although Texas gained population, the increase was concentrated in a handful of pockets surrounding Texas's major cities. The vast majority of Texas's land area saw a decline in their relative share of the state's total population. Because of this disparity, the Legislature had to make significant changes to district configurations if it was to comply with the demands of one-person, one-vote—oftentimes balancing the need to equalize population with other traditional redistricting principles. For example, following the U.S. Census, Bell County was assigned two full districts for the first time in its history. Because of population distribution, the district lines separating HD 54 and HD 55 needed to run through at least one of Bell County's largest major cities, splitting a community of interest. In El Paso County, slow growth compelled the Legislature to reduce the number of House seats from five to four. *See infra* at 15–16, 18–19. As a consequence of mathematical necessity—not of racial considerations—the enacted plan paired two incumbents from the El Paso area. By omitting the realities of population change from their assessment, Plaintiffs omit these realities of uneven population change and geographical limitations, and so tell only part of the story.

## V. The Evidence will Show that the Enacted Maps Comply with the Voting Rights Act.

Section 2 of the Voting Rights Act requires States to draw electoral districts enabling a political process that is "equally open to participation" by all citizens, regardless of race and color. 52 U.S.C.S. § 10301(b). Electoral districts may not be drawn so that citizens of one race or color "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* In this case, the evidence will demonstrate that Texas's electoral districts were based upon traditional districting criteria and enable a political process which is equally open to all citizens regardless of race and color. Lines were drawn in light of asymmetrical growth throughout the state, properly weighting both dynamic and static regions. The evidence will demonstrate that the political process in Texas is equally open, and that protected classes have an equal opportunity to elect candidates of their choice. In many of the challenged regions, minority groups have proportional representation in their elected officials. Further, political cohesion is lessening both among minority voters and white (Anglo) voters, lessening concerns of one class regularly defeating another. In light of all the evidence, Plaintiffs fail to carry their burden under the Supreme Court's three-part test and to overcome the presumption of legislative good faith. Certainly, Plaintiffs cannot show, under the totality of circumstances, that the political process is not equally open to minority voters.

### A. Bexar County

Latinos in Bexar County continue to have a fair and equal opportunity to elect their candidate of choice. **HD 118:** The boundary lines for HD 118 were drawn by the Bexar County delegation. Rep. Philip Cortez, a Latino Democrat, proposed the initial configuration. Other members of the delegation then negotiated changes until they agreed on a consensus map. To improve his election chances, Rep. Cortez moved likely Democrat voters from HD 118 into HD 117. Although the shift made HD 118 more competitive, the record will establish that Latinos remain the dominant political force in the district, with a HCVAP of 58.8 percent. An examination of exogenous elections in the district shows that Anglo voters do not vote sufficiently as a bloc to regularly defeat Latino candidates of choice. The district still performs. In addition, the record will show that

current officer holder Rep. John Lujan, a Latino Republican, has deep ties to the district and is responsive to the needs and concerns of the Latino community.

### B. Central Texas

Plaintiffs' proposal for an additional Latino-majority district in Central Texas does not satisfy *Gingles*. Even if it had, Plaintiffs cannot win on the totality of circumstances. **HD17, HD 44:** LULAC and MALC both propose creating an additional Latino House district in central Texas that starts in southeast Travis County and continues south along the east side of I-35. At trial, Defendants will identify at least three problems with this claim. *First*, in each proposed district, HCVAP hovers at or just above 51 percent. *See* H2326, H2327. The evidence, however, will demonstrate that in this instance, a bare majority HCVAP is not sufficiently large enough to satisfy the first *Gingles* factor because of the lack of cohesion among Latino voters and lower turnout rates. *Second*, Latino voters within the proposed district already have the opportunity to elect their candidate of choice. By stitching them together into a single district, the proposed districts would unnecessarily pack Latinos and reduce their voting power. *Third,* neither district conforms to traditional redistricting principles. Not only do they break apart communities of interest, including the cities of Lockhart, Kyle, San Marcos, and New Braunfels, but the districts make no attempt abide by the Texas Constitution's "county line rule." *See* Tex. Const. Art. I § 26. Accordingly, the proposed districts represent an impermissible racial gerrymander since race would be the only explanation for its shape. The Legislature could not have drawn the districts as proposed without violating the state and federal constitutions.

### C. Dallas/Fort Worth Metroplex

Plaintiffs raise a VRA claim against both the Senate and Congressional maps. Neither succeeds because Plaintiffs failed to meet the three *Gingles* factors. Even if they had, the totality of circumstance demonstrates that minority voters have equal and fair opportunity to influence elections. The Senate map claim fails for the additional reason that it relies on a racial coalition. **SD 10:** The evidence will show that that under the benchmark and enacted Senate plans, SD 10 was an Anglo-majority CVAP district. Even if the demographics have since changed, no one racial

14

group is sufficiently large and geographically compact enough to constitute a majority, meaning that Plaintiffs' claim falls short of the first *Gingles* factor. That fact should end the analysis, but Plaintiffs struggle satisfying the second and third factors as well. The expert reports submitted by Plaintiffs' experts do not establish that minority groups within SD 10 are politically cohesive; nor do they establish in their reports that the White-majority votes sufficiently as a bloc to defeat the minority's preferred candidate. However, even if these conditions were met, the totality of circumstances disfavor a Section 2 claim, as minority voters have ample opportunity to participate and influence elections. This is evinced, in part, by the number of the number of minority candidates who have won elections as well as the responsiveness of elected officials to minority concerns.

**Congressional Delegation**: Multiple Plaintiffs contend that the Legislature should have drawn an additional Latino-majority district. However, as Plaintiffs' demonstration plans show, the Latino population is not sufficiently large and geographically compact enough to constitute a majority absent dramatic departures from traditional redistricting principles. In each demonstration plan, *See* C 2200, C 2198, the proposed district anchors its population in Dallas County, then extends a narrow appendage into Tarrant County that wraps its arms around select Latino communities. Not only do the proposed districts break up communities of interest, but the districts' usual twists and turns can only be explained by race. Furthermore, by reconfiguring the neighboring congressional districts, the demonstration plans unnecessarily pack Black voters into an already performing opportunity district, diminishing their voting power. The proposed districts therefore would constitute a racial gerrymander if done by the Legislature. What's more, there is insufficient evidence that Latinos and other minority voters are politically cohesive, and even if they were Plaintiffs' experts fail to establish in their reports that the White-majority votes sufficiently as a bloc to defeat the minority's preferred candidate. Indeed, State Defendants' expert Dr. Sean Trende found that that vast majority of Latino residents in the proposed district already live and vote in a district under the enacted map where they can elect their candidate of choice.

### D.  El Paso Region

All of the House districts in the El Paso Region are performing Latino-opportunity districts.

**HD 74–HD 79:** Slow population growth in the El Paso Region compared to the rest of Texas made it mathematically impossible to maintain five House districts wholly contained within El Paso County. In addition, given El Paso's geographic location, the only way for the affected House districts to "pick up" additional population was to expand eastward. Faced with the twin limitations of mathematics and geography, the map drawers reached a reasonable compromise that would satisfy the Legislature's redistricting criteria and comply with one-person, one-vote. That solution maintained five majority-Hispanic House districts within in El Paso, with one of those districts (HD 74) stretching eastward to include ten other sparsely populated counties. The evidence at trial will show each district has a majority HCVAP and that none of these changes preclude Latino residents from electing their candidate of choice.

### E.  Greater Houston Area

Plaintiffs raise VRA claims against both the House and Congressional maps. The former fails because Plaintiffs' proposed configuration, *inter alia*, does not satisfy the first *Gingles* factor. The latter fails because minority voters already have the opportunity to elect their candidate of choice.

**House Configuration:** The Greater Houston Area experienced one of the largest surges in population over the last decade. Although Latinos represented a significant portion of this increase, some of the House districts in Harris County with the greatest concentration of Latinos lagged behind the state's growth rate. HD 138, HD 140, HD 143, HD 144, HD 145, and HD 148 all started below the ideal district size—three even had negative deviations in the double-digits. Because of this asymmetrical population growth, the creation of an additional Latino-majority district is not as straightforward as Plaintiffs contend. The map drawer would need to repopulate existing Latino districts first, which does not leave enough Latino voters for the remaining districts to satisfy *Gingles*, as Plaintiffs' demonstration plans show. In LULAC's demonstration plan H2326, only four of the proposed districts have an HCVAP above 50 percent. That is the same number as the enacted map. Presumably, LULAC intends to rely on proposed HD 145 and HD 148 to act as

coalition districts, but coalition districts no longer sustain a VRA claim. MALC's plans H2328 and H2330 create five districts that are above 50 percent HCVAP. But here, the evidence will show that lower turnout rates and lack of cohesion among Latino voters make a bare majority insufficient to meet the *Gingles* standard. Plaintiffs, again, would need to rely on coalition voters.

There are at least two other problems with this VRA claim. *First*, Plaintiffs have not met their burden to establish political cohesion or that the white majority votes as a bloc to regularly defeat the Latino candidate of choice. To the contrary, the record will demonstrate that Latinos represent the dominant political force in almost all the challenged districts. An examination of endogenous and exogenous elections in the districts show that Latinos regularly elect their candidate of choice and that the five of the six districts at issue are represented by Latino Democrats. Plaintiffs' demonstration plans appear to aim not for VRA compliance, but for elimination of the sole Republican district in the configuration and maximalization of Latino voting strength. The VRA demands neither. *De Grandy*, 512 U.S. at 1017. *Second*, Plaintiffs' proposed districts are not remotely compact, nor do they reflect a reasonable district in scope. Instead, they are racially gerrymandered, pulling strategically dense Hispanic populations from across the Harris County area to establish a racial majority of Hispanic voters, while disregarding or otherwise failing to adequately comply with traditional redistricting principles.

**CD 29, CD 36, CD 38:** The evidence will show that the enacted map provides Latinos in Harris County with an equal, if not amplified, opportunity to elect their congressional candidate of choice. According to Plaintiff's expert Dr. Stephen Ansolabehere, Harris County has an HVCAP of 26.5 percent. At the same time, his ecological inference analyses demonstrate that candidates preferred by Latino voters won the 2024 U.S. House election in five of the nine congressional districts wholly or partly in Harris County under the enacted plan—or 55.6 percent of congressional districts in the region. Even among the congressional districts Plaintiffs challenge, Latino voters come out ahead. Dr. Ansolabehere's analysis also shows that Latino candidates won in two out of three: CD 29 and CD 38. Not only is this evidence that Plaintiffs fail the third *Gingles* factor, but it indicates that Plaintiffs' proposals advance a maximalist approach to Latino voting

strength, which is not required under the VRA. *See De Grandy*, 512 U.S. at 1017. Furthermore, Plaintiffs have not met the third *Gingles* factor. According to Dr. Ansolabehere, a majority of Hispanic voters chose Republican candidates in at least two congressional districts—CD 22 and CD 38—indicating that Latino voters are not politically cohesive. Lastly, even if Plaintiffs could satisfy *Gingles*—and they cannot—they still fail under the totality of circumstances.

## VI. Population Deviations Reflect Texas's Good Faith Effort to Address Asymmetrical Growth throughout the State.

Plaintiffs do not contest that the enacted House plan has a total population of deviation 9.98% between districts. Accordingly, the enacted map carries a presumption of constitutionality, which Plaintiffs can only rebut by showing that the top-to-bottom deviation "reflects the predominance of illegitimate reapportionment factors rather than the 'legitimate considerations' referred to in *Reynolds* and later cases." *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016). The facts, however, do not support such a conclusion. Texas's population grew unevenly across the state leading up to the 2020 Census, with most areas gaining population, but some—namely, West Texas and the Rio Grande Valley—growing much more slowly than other parts of the state. To account for this change, the Legislature had to move two House districts in the contested regions farther east towards Texas's population centers. Specifically, it relocated HD 76 from El Paso County to Fort Bend County, and it repositioned HD 68 from the Panhandle eastward.

Even though both regions lost a House district, Plaintiffs contend in their operative complaints that by moving HD 76, the Legislature (1) exhibited impermissible regional bias in favor of the Panhandle, and (2) systematically diluted Latino voting strength in favor of Anglo voters. Neither conclusory statement holds up under close analysis.

El Paso County could no longer sustain five full House districts. If Texas was to comply with one-person, one vote, then the fifth district would need to pick up additional population outside the county lines, which Plaintiffs and their witnesses acknowledge. Their complaint instead seems to focus on the specific configuration that the Legislature chose for HD 74, which is anchored in the Upper Rio Grande area rather than El Paso County's urban core. That decision does not

amount to impermissible regional bias. The new district lines merely reflect the eastward shift of Texas's population, as well as the relatively few options the Legislature had when finding population in a remote corner of the state. The other problem with Plaintiffs' argument is that it isolates only two areas. In any plan, there are some districts that have a total population above the ideal district size while others fall below it. The question is not whether the deviation between the two areas exists but whether the Legislature systematically and arbitrarily singled out specific regions of the state for disparate treatment. Plaintiffs cannot meet this burden.

Turning to Plaintiffs' assertion of racial bias, the factual record developed during discovery does not establish systematic underpopulation of Latino-majority districts and systematic overpopulation of Anglo-majority districts. The Rio Grande Valley saw disproportionately slower growth than the rest of the State, similar to the Panhandle and El Paso County. Nevertheless, the Legislature was able to maintain a seven-seat configuration in the RGV by taking advantage of population increases farther up the Gulf Coast and adding Willacy County into the mix—an option that the Legislature did not have in El Paso County. As a result of this innovation, Latino-heavy House districts in the Rio Grande Valley (i.e., HD 36, HD 37, HD 38, HD 39, and HD 40) have negative deviations comparable to the Panhandle. Meanwhile, many of the Anglo-majority districts north of and around Harris County (i.e., HD 3, HD 12, HD 15, and HD 18) have positive deviations comparable to that of El Paso County. In addition, neither Anglos nor Republicans benefited from the Legislature's decision to reconfigure the House districts in El Paso County. Voters in the newly situated HD 76 elected Rep. Suleman Lalani, a South-East Asian Democrat, while voters in HD 74 elected Rep. Eddie Morales, a Latino Democrat from Eagle Pass.

At bottom, Plaintiffs' purported *Larios* claims simply air a political grievance born of the diminished influence of underpopulated areas of the State. Underpopulation forced the Legislature to make tough choices about how to reconfigure part of the State while balancing considerations like retention of core constituencies, keeping communities of interest intact, limiting incumbent pairings, and complying with the Texas and U.S. Constitutions, among other interests. The enacted plan constitutes the Legislature's good-faith solution. El Paso County simply could not

sustain five full House seats following the decennial census without subjecting the State to an Equal Protection Clause claim and claims of regional bias. *See Reynolds v. Sims*, 377 U.S. 533, 562 (1964).

## CONCLUSION

Texas has successfully reapportioned four maps in accordance with the byzantine and often conflicting constitutional, statutory, demographic, geographical, and political requirements necessary to enact lawful voting districts. Plaintiffs offer a story of innuendo and conspiracy to challenge the hard-fought accomplishment of the State's maps, but their evidence undermines their claims. Plaintiffs dwell on how much of Texas's population growth in the last decade and a half consisted of minorities, but the oppressed do not flee to their oppressors. Texas is a cultural and economic wonder drawing denizens of real oppression to Texas's jobs, business-friendly economy, and family-friendly culture. Deprived of any direct evidence of discriminatory intent, Plaintiffs instead insist that partisanship is simply a proxy for race—effectively conceding their burden to disentangle the two. And their maps run roughshod over basic redistricting principles, contorting across counties into pools of minority population.

The instant dispute is a far cry from *Gomillion v. Lightfoot*, where the district left out 400 Black voters, and just five within; or *Reynolds v. Sims*, where Alabama allocated one state senator to the 15,417 residents of one county, and one state senator to the more than 600,000 residents of another county. Nor yet is this Texas in 2011, when the first federal court to see the maps immediately found wrongdoing. Despite relying on racially discriminatory history, Plaintiffs miss how that history elucidates the present case: both houses of a once-secessionist state hired outside counsel and experts to ensure VRA compliance without polluting their mapdrawing with racial considerations.

Plaintiffs have blinded themselves to the very progress they seek, and reflexively struggle against maps that simply leave them politically disappointed. Where the VRA and Civil War Amendments once sought to remove the effect of race from voting, Plaintiffs insist the Court adjudicate this voting rights case on solely racial terms. In the wake of American civil rights progress, Plaintiffs now fight against the political order wrought by civil rights victories: a diverse

legislature struggling toward political compromise in compliance with the Voting Rights Act and the Fourteenth and Fifteenth Amendments.

Date: May 15, 2025

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL OF
TEXAS
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Phone: (512) 936-1700
Fax: (512) 457-4410
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
william.wassdorf@oag.texas.gov
david.bryant@oag.texas.gov
zachary.rhines@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov
ali.thorburn@oag.texas.gov
kyle.tebo@oag.texas.gov
mark.csoros@oag.texas.gov

Respectfully submitted,

*/s/ Ryan G. Kercher*

RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

KATHLEEN T. HUNKER
Deputy Chief, Special Litigation Division
Texas Bar No. 24118415

WILLIAM D. WASSDORF
Deputy Chief, General Litigation Division
Texas Bar No. 24103022

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

ZACHARY L. RHINES
Special Counsel
Texas Bar No. 24116957

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ZACHARY W. BERG
Special Counsel
Texas Bar No. 24107706

ALI M. THORBURN
Assistant Attorney General
Texas Bar No. 24125064

KYLE S. TEBO
Special Counsel
Texas Bar No. 24137691

MARK A. CSOROS
Assistant Attorney General
Texas Bar No. 24142814

COUNSEL FOR STATE DEFENDANTS

22

### CERTIFICATE OF SERVICE

I certify that on May 15, 2025, a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF).

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division

### CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 7,723 words.

This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Equity Text A font, size 12.

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division