UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LULAC, et. al., | )( |
| | )( |
| *Plaintiffs* | )( |
| | )( |
| Eddie Bernice Johnson, Sheila Jackson-Lee Alexander Green, and Jasmine Crockett | )( |
| | )( |
| *Plaintiff-Intervenors* | )) |
| | )( |
| v. | )(  Case No.: 3-21-CV-00259-DCG-JES-JVB [Lead Case] |
| | )( |
| GREG ABBOTT, in his official capacity As Governor of Texas, et. al. | )( |
| | )( |
| *Defendants* | )( |

**CONGRESSIONAL INTERVENORS' FIRST AMENDED PRETRIAL BRIEF**
**INTRODUCTION**

Congressional Intervenors Alexander Green, and Jasmine Crockett (jointly "Congressional Intervenors") respectfully submit this pretrial brief in support of their claims challenging Texas's 2021 congressional redistricting plan (Plan C2193) as violating the Fourteenth and Fifteenth Amendments to the United States Constitution. Previously Congresswoman Eddie Bernice Johnson and Sheila Jackson Lee were also intervenors but both are now deceased. Congresswoman Johnson, Jackson-Lee, and Crocket as well as Congressman Green all sent written communications to try and preserve the Districts. Congressman Green and Congresswoman Jackson Le went so far as to appear at the Legislature. The evidence will show that the Texas Legislature engaged in intentional racial discrimination and racial gerrymandering in the drawing of Congressional Districts 9, 18, and 30, resulting in the dilution of minority voting strength and the subordination of traditional redistricting principles to racial considerations. It will also be clear from the evidence

1

presented that the discrimination against African-Americans was not due to party affiliation or inclination but instead was due to race.

As detailed below, the evidence will demonstrate that Plan C2193 was enacted with discriminatory intent, that the legislators knew of and intended the discriminatory effect on Black and Latino voters, and that it constitutes an unconstitutional racial gerrymander. The statistical evidence, expert testimony, and contemporaneous statements by officials will establish that race was the predominant factor motivating the Texas Legislature's decisions regarding the placement of voters within and without these districts.

## STATEMENT OF FACTS

### A. Background and Procedural History

Following the 2020 Census, Texas gained two congressional seats, increasing its delegation from 36 to 38 members. Despite the fact that 95% of Texas's population growth came from communities of color, with the Latino population alone accounting for approximately 52% of that growth, the Legislature failed to create any new minority opportunity districts. Instead, the Legislature engaged in unnecessary surgery on existing minority opportunity districts, including Congressional Districts 9, 18, and 30. The State has admitted that each of these districts is a protected African-American Ability to Elect district, as have recent courts. Paragraph 44 of Defendant's Answer to Intervenor's Second Amended Complaint admits as much by quoting *Texas v. United States* to state, "The parties have provided more evidence of discriminatory intent than we have space, or need, to address here." 887 F. Supp. 2d 133, 162 n.32 (D.D.C. 2012). Indeed, in ECF 225 at 1, Defendants' adopt Intervenors quote that "Congressional Districts 9, 18, and 30 are all minority opportunity districts."

2

Texas received the Census Bureau detailed population data for redistricting purposes on August 12, 2021. The Texas Constitution requires that redistricting take place the first regular Legislative Session after the decennial census, but in this case redistricting did not occur because the State decided that the detailed population data was needed. The Governor called a Special Session of the Texas Legislature for State legislative, Congressional, and State Board of Education for redistricting purposes. That special session started on September 20, 2021. Other topics for consideration during that session were border security, election integrity, social media censorship, Article X funding, and family violence. The Legislature adopted the State Senate and State Board of Education Maps on October 15th, the House of Representatives Map on October 16th and the Congressional Map on October 19th. 6 days after adoption of the Congressional Map it was signed into law by the Governor. LULAC filed an action to challenge the maps on October 18th and a number of other groups followed thereafter and the cases were consolidated on December 10, 2021. The Congressional Intervenors subsequently intervened in the case after the cases were consolidated.

On October 19, 2022, Congressional Intervenors filed their Second Amended Complaint alleging that Plan C2193 violates the Fourteenth and Fifteenth Amendments to the United States Constitution, alleging both intentional discrimination claims and racial gerrymandering claims. The Court previously determined that Congressional Intervenors have standing to challenge the redistricting of CD 9, 18, and 30 as voters, and as incumbent legislators or legislative candidates for racial gerrymandering and intentional vote dilution claims.

**B. The Challenged Districts**

1. **Congressional Districts 9 and 18 in Harris/Fort Bend.**

Congressional District 18 has been an African-American opportunity district for 50 years, since Barbara Jordan was first elected in 1972. Prior to redistricting, CD 18 was only slightly overpopulated (3.9% or 29,921 people above the ideal district size). Despite this minimal deviation, the Legislature made dramatic and unnecessary changes to the district.

As Dr. Richard Murray's expert report demonstrates, the Legislature removed nine heavily Black precincts from the southernmost part of CD 18 (precincts 0031, 0156, 0180, 0236, 0237, 0238, 0573, 0822, and 0858), which had been part of the district for decades. These precincts had a Black VAP of 66.9% and were extremely cohesive, with 93.4% supporting the same presidential candidate in 2020. The Legislature replaced these precincts with five racially mixed precincts from northeast Harris County (0108, 0363, 0888, 0960, and 0968), which had a much lower Black VAP (36.7%) and included high-growth areas with unpredictable future demographics.

These changes reduced the Black VAP in CD 18 from 38.8% to 34.4%, while increasing Anglo VAP from 16.2% to 19.4%. The changes also removed important economic engines from the district, including parts of the Downtown Business District, Texas Southern University, and the University of Houston.



**Congressional District 9**. Congressional District 9 has been an African-American opportunity district for nearly 30 years. Prior to redistricting, CD 9 was almost perfectly sized, with only 3,811 people (0.49%) above the ideal district size. Despite this minimal deviation, the Legislature made dramatic changes to the district.

While the enacted plan superficially increased Black VAP in CD 9 by adding the heavily Black precincts removed from CD 18, Dr. Murray's analysis shows that this increase is likely to be ephemeral. The Legislature also added 13 fast-growing, racially diverse precincts from northern Brazoria County, including parts of the City of Pearland, where Black voters constitute less than a third of the population. As Dr. Murray explains, these areas are likely to grow much faster than the inner-city precincts added from CD 18, resulting in a steady dilution of Black voting strength over the decade. Expert George Korbel called it the "chicken district."

The Eighteenth Congressional District as currently known came into existence as an African-American ability to elect district after *White v. Regester*. 412 U.S. 755 (1973). It initially elected

Congresswoman Barbara Jordan who then joined with LULAC and other groups in Texas to obtain the application of Section 5 of the Voting Rights Act to Texas. The 9th Congressional District as an African-American ability to elect district occurred in the 2003 round of redistricting.



### 3. Congressional District 30

Congressional District 30 has been an African-American opportunity district since its creation. Prior to redistricting, CD 30 was only 2% overpopulated. Despite this minimal deviation, the Legislature made significant changes to the district, removing areas with significant Black populations and adding areas with different demographic profiles. CD 30 has an Area Rubber Band score of 0.750, reflecting its irregular shape that resembles "an amoeba with tentacles that reach out in every direction, presumably to collect as many black voters as possible." CD30 became an African-American ability to elect district in the 1990's as a result of litigation led by Congresswoman Eddie Bernice Johnson. The 3 Judge panel in Texas in the 2011 round found that the State engaged in illegal vote dilution in its drawing of the district in the official State Plan

C2185. The State has chosen to follow a very similar route this time, despite that decision. Ironically, in this case the current Representative for the Texas 30th Congressional is Jasmine Crockett, who was a member of the 87th Texas Legislature in 2021 and served as a State House Member in 2021. She put forth a map for the district would have avoided the cracking and packing and that would have continue the basic core of the district forward, but the intent to discriminate was dominate so her attempts were unsuccessful.



The 2011 Redistricting round dealt with the same actions from the state on this same district. The Court held that CD 30 was a result of packing and cracking. *Perez v. Texas,* 891 F.Supp.2d 808 (2012).

**C. What We Must Prove in an Intentional Discrimination Claim**. Background on Proof of Intentional Discrimination. As the courts indicated recently in *Merrill v. Milligan* (142 S. Ct. 879 (2022)), courts employ a framework established in *Village of Arlington Heights v. Metropolitan Housing Development Corp*. to determine if there is intentional discrimination. This inquiry involves a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available" *Veasey v. Abbott*, 830 F.3d 216 (2016). "This framework includes five nonexhaustive

factors: (1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history." *Id*. In *Milligan*, the components of their intentional discrimination finding included: (a) defying the United States Supreme Court order that it draw a minority opportunity district; (b) public statements by legislators and state officials: (c) legislative strategies; (d) the secret drafting of findings; and the foreseeability of the disparate impact on African-Americans and the existence of some of the Senate Factors (history of discrimination, racial polarization, use of voting procedures to disenfranchise minorities, exclusion of minorities from slates, current effects of discrimination in education, employment and health that negatively impact political participation, overt racial appeals, extent to which minorities are elected). In this case we expect the evidence will be similar, though there was no outright defiance of the United States Supreme Court.

The evidence presented should include proof of a secret drawing of the base map C2101, the pairing of Congresspersons Green and Jackson-Lee, rigid new and different rules that made it more difficult to modify a leadership proposed map, the awareness of the disparate impact of the map because of the vigorous floor and committee work of African American, Latino, Asian and White legislators. In addition, though they were advised of the importance of not transgressing on the rights of minorities by the Texas Legislative Council they drew maps without input from minority lawmakers or, allegedly, any consciousness of race.

New impediments were even placed on the floor debate in the House that were highly unusual and in fact were suspect. On the Senate side, they proceeded with an exceptionally quick timeline and would not even give minority lawmakers an opportunity to draft and present alternative maps. Senator West made such a request because he was on the Redistricting

Committee but contracted covid. This request was denied. Senator West joined with Senator Miles to request more time to submit a map. Congressman Green and Congresswoman Jackson Lee drew up their desired map, C2131, but it could not be considered by either House because of the Rules. A small fix that unpaired them was at least accepted. And about this time, the Lieutenant Governor responded to a question about a covid problem in Texas, and responded that as far as he knew only Blacks had a problem and as they had not voted for him this was a problem for those who they voted for. This seems consistent with the disregard of the advice of the Texas Legislative Council because it would have meant helping Black voters.

**D. What We Need to Prove a Racial Gerrymandering Claim.** It is not necessary to prove intent in order to prove a claim of racial gerrymandering. *Alabama Black Caucus v. State of Alabama*, 575 U.S. 254, 2015, *Shaw v. Reno*, 509 U.S. 630 (1993), *Cooper v. Harris* 581 U.S. 285 (2017). The harm in these cases is classifying voters by race without adequate justification. Where race predominates, the Constitution is offended. In *Alabama Black Caucus,* the Court made it clear that you do not need to show racial gerrymandering in the whole map, only the challenged districts. There were 2 such districts in that case. In this case the chicken district in CD9 and the amoeba district in CD30 clearly are Shaw type districts. Race predominated in the movement of voters.

**E. Statistical Evidence of Racial Gerrymandering**

1. Importantly, since Congresswoman Jordan, LULAC and others achieved the application of Section 5 to Texas, our State redistricting process has led to findings of discrimination against African Americans and/or Latinos in every single decade, without regard to whether Democrats or Republicans were in power. As they did this last decade, the State of Texas claims that the discrimination found in the maps and data against African Americans and Latinos can be explained by their general partisan affiliation. In this case, Dr. Howard

Henderson performed a statistical analysis to determine whether race or partisanship played a role in the drafting of the map. He further performed other statistical analyses to confirm the findings. provides compelling evidence that race was the predominant factor in drawing the challenged districts. Importantly, the Texas Legislative Council has acknowledged that the Census is required to provide total and voting age population by race and ethnicity. Citizenship was not included in the forms for the 2020 census.

2. Dr. Henderson's conducted an analysis of how voters were moved around or changed in the new map and investigated whether Party or Race, neither or both, was a motivating factor. Henderson's analysis shows extreme movements for Black voters statewide, much more than any other group, and even more extreme movement in Harris/Fort Bend and DFW. Dr. Henderson performed a standard deviation analysis to understand these extreme movements and they tell a clear story. The standard deviation analysis shows that Black VAP changes had a standard deviation of 52.68 in the Dallas-Fort Worth area and 46.71 in the Houston area (39.5 statewide). This standard deviation can stand alone to show that the movement of Black voters was clearly not random. In addition, he wanted to see if the movement of other voters was similar but found that they were much lower. For example, the figure for African Americans is more than double the variability of Anglo VAP changes (20.8 and 18.32 respectively). This indicates that Black voters experienced more variable treatment in the redistricting process than other demographic groups.

3. **Multiple Regression Analysis**. Dr. Henderson performed a multiple regression analysis. Multiple regression analyses demonstrate that when controlling for potential partisan motivations, all racial variables showed significant effects (p<.01) on redistricting outcomes. However, when controlling for racial factors, partisan variables showed no measurable effect

10

(0.00). This pattern was consistent across all regression models, indicating that racial demographics were a stronger predictor of redistricting outcomes than partisan considerations.

Dr. Henderson sought to determine if party affiliation or leaning might be an explanation for these excessive changes.

4. **Extreme Demographic Shifts**: To understand what occurred with CD30, it is to understand what occurred in the nearby and neighboring districts that were connected with its racial gerrymander. The data shows extraordinary demographic shifts specifically targeting Black voters. For example, in the Dallas-Fort Worth area, District 24 experienced a 74.79% reduction in Black VAP. In the Houston area, District 2 experienced a 76.58% reduction in Black VAP.

5. **Differential Treatment by Race**: The data reveals that Black voters were moved between districts at substantially higher rates than other demographic groups. For instance, in District 24, while Black VAP decreased by 74.79%, Anglo VAP increased by 19.46%.

6. **Statistical Variability**: Dr. Henderson's standard deviation analysis shows that Black VAP changes had a standard deviation of 52.68 in the Dallas-Fort Worth area and 46.71 in the Houston area-more than double the variability of Anglo VAP changes (20.8 and 18.32 respectively). This indicates that Black voters experienced more variable treatment in the redistricting process than other demographic groups.

7. **Regression Analysis Proves that Partisanship Played No Statistical Role in Determining Districts**: Multiple regression analyses demonstrate that when controlling for potential partisan motivations, all racial variables showed significant effects (p<.01) on redistricting outcomes. However, when controlling for racial factors, partisan variables showed no

measurable effect (0.00). This pattern was consistent across all regression models, indicating that racial demographics were a stronger predictor of redistricting outcomes than partisan considerations.

### F. Procedural Irregularities

The redistricting process was marked by numerous procedural irregularities that further support an inference of discriminatory intent:

1. The Senate Committee on Redistricting refused to accept any amendment for consideration that was not agreed to by every Congressperson affected by the change.

2. The Senate Congressional redistricting bill conference committee was discriminatorily constituted.

3. The Senate refused to hear virtual testimony on the redistricting bill, even though minority communities in Texas were disproportionately impacted by the COVID-19 pandemic.

4. On the day the House Redistricting Map for the Texas House of Representatives was to be considered, the Chairman of the House Redistricting Committee made a surprise announcement that the House would have a hearing on a Congressional Plan in 48 hours and that the Senate Map would provide the base map for this process.

5. During the House debate on the Congressional Map, Intervenor Crockett and others were required to deliver proposed amendments to designated Representatives who would take them to a room for review by lawyers before they could be offered.

## CONCLUSION

For the reasons set forth above, Congressional Intervenors respectfully request that the Court find that Plan C2193 violates Section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution, and order appropriate remedial relief.

Dated May 15, 2025

                         Respectfully submitted,

                         /s/ Gary Bledsoe

                         The Bledsoe Law Firm PLLC
                         State Bar No. 02476500
                         6633 Highway 290 East #208
                         Austin, Texas 78723-1157
                         Telephone: 512-322-9992
                         Fax: 512-322-0840
                         gbledsoe@thebledsoelawfirm.com

                         Nickolas A. Spencer, J.D., MA.
                         Attorney and Counselor at Law
                         Spencer & Associates, PLLC
                         808 Travis Street, Suite 100
                         Houston, TX 77002
                         nas@naslegal.com
                         713-863-1409

                         Attorneys for Plaintiff-Intervenors Eddie Bernice Johnson, Sheila Jackson-Lee, Alexander Green and Jasmine Crockett

## CERTIFICATE OF SERVICE

I certify that on May 15, 2025, a true and correct copy of Plaintiff-Intervenors' Response to the Defendants Motion to Dismiss was delivered via the Federal Court ECF system.

/s/Gary L. Bledsoe_____
Gary L. Bledsoe