UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* § § § § *Plaintiffs,* § V. § GREG ABBOTT, *et al.*, § § *Defendants.* § § | | Case No. 3:21-cv-00259 [Lead Case] |
| TEXAS STATE CONFERENCE OF THE NAACP, § § § *Plaintiff,* § V. § § GREG ABBOTT, *et al.*, § § *Defendants.* § § | | Case No. 1:21-cv-01006 [Consolidated Case] |

**PLAINTIFF TEXAS NAACP'S RESPONSE TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

When orally presenting its motion for judgment as a matter of law,[1] Defendants set forth four bases for challenging Plaintiff Texas NAACP's claims: (1) "intent claims are not cognizable under Section 2 of the VRA"; (2) coalition claims cannot form the basis of a "VRA intent claim"; (3) Texas NAACP "failed to disentangle race and politics," as required to prove intentional discrimination claims under . . . the Fourteenth [Amendment]"; and (4) Texas NAACP was required to "present a statewide map that simultaneously achieves" the Legislature's partisan and Texas NAACP's minority representation goals.[2]  6/7/25 Tr. at 123:22-129:10.

These arguments, however, misconstrue recent U.S. Supreme Court and Fifth Circuit case law, and ignore the robust record laid out before the Court in Plaintiffs' case-in-chief.  Not only does Section 2 authorize discriminatory intent claims, but Texas NAACP met its burden to prove that the Legislature acted with discriminatory intent in enacting the congressional, house, and senate maps (the "Enacted Plans")—both under Section 2 and the Fourteenth Amendment.  As Texas NAACP's expert, Dr. Moon Duchin, testified at trial, statistical analysis demonstrates that the lines drawn by the Legislature cannot be explained by factors other than race, including partisanship.  To the contrary, the evidence shows that the dilution of the minority vote in Texas far outpaced any partisan advantage achieved through the Enacted Plans, and that the Legislature would have achieved the same partisan result—or an even better partisan result—had it not resorted to race-based line-drawing and intentionally discriminated against Texas minority voters.

I. **Discriminatory Intent Claims Are Legally Cognizable Under Section 2**

This Court already rejected Defendants' contention that Section 2 precludes claims based

---

[1] Texas NAACP incorporates by reference the legal standard governing Defendants' motion as set out in Co-Plaintiffs' briefing and, to the extent applicable, the legal arguments asserted by Co-Plaintiffs relating to these four bases of Defendants' motion.

[2] Defendants' motion was also directed at Fifteenth Amendment claims, however, Texas NAACP does not assert any such claims and therefore does not address that argument in its response.

on discriminatory intent. As this Court previously held, the Fifth Circuit recognizes **both** discriminatory intent and effects claims under the VRA. *See LULAC v. Abbott*, 604 F. Supp. 3d 463, 492-93 (W.D. Tex. 2022); *see also LULAC v. Abbott*, 2022 WL 17683191, at *2 (W.D. Tex. Dec. 14, 2022) ("While Section 2 encompasses claims based on discriminatory intent, a violation can be established by proof of discriminatory results alone." (internal quotation marks omitted)). As explained in *McMillan v. Escambia Cnty., Fla.*, in amending Section 2, Congress intended "that fulfilling **either** the more restrictive intent test or the results test would be sufficient to show a violation of section 2." 748 F.2d 1037, 1046 (5th Cir. 1984) (emphasis in original); *see also United States v. Brown*, 561 F.3d 420, 432 (5th Cir. 2009) (holding that a Section 2 claim may be established through a showing that the challenged voting law was "undertaken with an **intent** to discriminate **or** . . . produce[s] discriminatory results" (emphasis added)).

Defendants are wrong that the Supreme Court's holding in *Milligan* somehow bars intentional discrimination claims under Section 2. *See* 6/7/25 Tr. at 124:25-125:3. To the contrary: just as the Fifth Circuit did in *McMillan*, the Supreme Court in *Milligan* noted that prior to its amendment in 1982, Section 2 of the VRA "prohibit[ed] States from acting with a 'racially discriminatory motivation' or an 'invidious purpose,'" but did "not prohibit laws that [were] discriminatory only in effect." *Allen v. Milligan*, 599 U.S. 1, 11 (2023) (quoting *City of Mobile v. Bolden*, 466 U.S. 55 at 61-65 (1980)). By allowing discriminatory effects claims under Section 2, Congress sought to "broaden" Section 2 to encompass both intent- and effects-based claims, not limit Section 2 to effects claims only. *Milligan*, 599 U.S. at 12. Defendants rely on *Milligan*'s statement that "§ 2 turns on the presence of discriminatory effects, not discriminatory intent," *see* 6/7/25 Tr. at 125:4-6 (quoting *Milligan*, 599 U.S. at 25), but the Court there was unremarkably affirming that Section 2 provides for both effects **and** intent claims. *Milligan*, 599 U.S. at 25

2

(finding that Section 2 does "not . . . connote any *required* purpose of racial discrimination" (emphasis added) (internal quotation marks omitted).

Thus, this Court's prior reasoning in rejecting Defendants' invitation to limit Section 2 to discriminatory effects claims remains just as sound today.

## II.     *Petteway* Does Not Implicate Texas NAACP's Section 2 Intent Claim

Defendants seek to dismiss certain Section 2 intent claims because they are based on "coalition districts."  6/8/25 Tr. at 125:14-16.[3]  To the extent Defendants direct its challenge at Texas NAACP's Section 2 intentional discrimination claim, it misconstrues Texas NAACP's remaining Section 2 claim and the Fifth Circuit's ruling in *Petteway v. Galveston Cnty*., 111 F.4th 596 (5th Cir. 2024).

Texas NAACP does not dispute that *Petteway* found that Section 2 "effects" claims are foreclosed when based on coalition districts.  But Texas NAACP did not assert such a Section 2 effects claim at trial as the Court dismissed those claims prior to trial following *Petteway*.  See Dkt. 896 at 2.

Texas NAACP's Section 2 intent claims, however, remain undisturbed as the Fifth Circuit did not consider such claims in *Petteway*.  The *Petteway* trial court declined to reach the plaintiffs' Section 2 *intent* claim, finding that they had already met their burden on their Section 2 *effects* claim because the plan "denie[d] Black and Latino voters an equal opportunity to participate in the political process."  *Petteway v. Galveston Cnty.*, 698 F. Supp. 3d 952, 1018 (S.D. Tex. 2023).  On appeal, the Fifth Circuit considered only the trial court's ruling as to the Section 2 *effects* claim, as evidenced by its holding, which rested on the statutory language of Section 2(b) and the inability of coalition claims to satisfy the *Gingles* preconditions.  111 F.4th at 604-07, 608-11.  Section 2(b)

---

[3] At oral argument, Defendants did not identify the plaintiff to which this argument was directed.

3

applies only to discriminatory effects claims, and, as this Court previously recognized, the *Gingles* preconditions go to "discriminatory effect," not "intentional-vote-dilution" claims. *LULAC v. Abbott*, 601 F. Supp. 3d 147, 162-63 (W.D. Tex. 2022). In fact, the Fifth Circuit in *Petteway* remanded plaintiffs' "intentional discrimination" claims, and those claims remain live. 111 F.4th at 614.[4] Thus, *Petteway* does not preclude or otherwise affect Texas NAACP's Section 2 intentional discrimination claims.

Indeed, the evidence adduced at trial by Texas NAACP that the Legislature surgically drew districts to exclude or include minority populations is precisely the type of evidence that the courts have acknowledged is appropriate in assessing Section 2 discriminatory intent claims. *See, e.g.*, *United States v. Brown*, 494 F. Supp. 2d 440, 448 (S.D. Miss. 2007), aff'd, 561 F.3d 420 (5th Cir. 2009) (noting that "[c]ircumstantial evidence of discriminatory intent" may include evidence of "starkly differential racial impact"). For instance, in *Veasey v. Abbott*, the Fifth Circuit pointed to evidence that the challenged law was passed by the Legislature in the "wake of a seismic demographic shift" in the minority population in Texas and the Legislature ignored the "likely disproportionate effect of the law on minorities" as probative of the issue of discriminatory intent in analyzing Section 2 claims. 830 F.3d 216, 236, 241 (5th Cir. 2016). While it is the "rare" case where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of [] state action [that] appears neutral on its face," *Vill. of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977), as explained more fully below, ***this*** is the rare case. The probability of the Enacted Plans having been drawn without regard to race and without the intent

---

[4] Following remand, the *Petteway* plaintiffs moved for entry of judgment on their Section 2 intent claims. *See Petteway v. Galveston*, No. 3:22-cv-57 (Dkt. 288) (Sept. 26, 2024). That motion is pending before the trial court.

4

to discriminate against minority Texas voters is quite literally one out of tens, if not hundreds, of thousands, that is, hundredths or thousandths of a percent. *See supra* Section III.

Finally, even if the Court were to find that Texas NAACP's Section 2 intentional discrimination claims must be dismissed as a result of *Petteway*, nothing in *Petteway* constrains this Court's consideration of this same evidence of the enormously disproportionate impact on minority voters, whether as a single racial group or across racial groups, in support of Texas NAACP's constitutional intentional discrimination claims.

### III.    Texas NAACP Disentangled Race From Politics

Texas NAACP does not dispute that, following the Supreme Court's ruling in *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1 (2024), to prevail on its intentional discrimination claims, it "must disentangle race and politics . . . to prove that the legislature was motivated by race as opposed to partisanship." *Id.* at 1233. Texas NAACP has met its burden to show that race rather than partisanship motivated the districts produced by the Enacted Plans.

Indeed, even prior to *Alexander*, Texas NAACP undertook this evidentiary burden and presented the findings of its expert, Dr. Moon Duchin, that partisanship could not explain the discriminatory maps enacted by the Legislature. At trial, Dr. Duchin testified that one of her "primary" goals in conducting the analyses reflected in the series of reports she produced in 2022[5] was to determine "whether partisan goals could explain what is observed in terms of the demographic changes" reflected in the Enacted Plans. 5/31/25 Tr. at 10:14-12:22.

As Dr. Duchin explained in her initial report, for each of the eight district "clusters" that form the basis of Texas NAACP's claims, she generated a sample (or, "ensemble") of 100,000

---

[5] Each of Dr. Duchin's three 2022 reports have been admitted into evidence. *See* PL_TXNAACP 136 (5/23/22 Corrected Report); PL_TXNAACP 137 (6/20/22 Supplemental Report); PL_TXNAACP 138 (8/1/22 Rebuttal Report).

5

alternative plans as a comparator to the Enacted Plans. PL_TXNAACP 136 at 35; 5/31/25 Tr. at 36:25-37:9. She then compared the minority CVAP of the Enacted Plans to the minority CVAP in each of the 100,000 alternative plans. PL_TXNAACP 136 at 35. In each of the eight clusters she analyzed, the Enacted Plan showed evidence of cracking and/or packing consistent with a racial motivation in individual districts.

For example, within Congressional Cluster 1 (Dallas & Tarrant Counties), Dr. Duchin found the "packing" of minority votes within one of the districts, determining that 99% of the 100,000 alternative plans in the ensemble reflected 72% or lower minority CVAP, while the Enacted Plan had 75% minority CVAP. 5/31/25 Tr. at 45:24-47:1; *see also* PL_TXNAACP 173 at 1. And in analyzing Senate Cluster 1 (Dallas County), Dr. Duchin found "cracking" of minority votes, determining that not a *single* plan in the 100,000 alternative plans in the ensemble produced a minority CVAP as low as the Enacted Plan. 5/31/25 Tr. at 47:5-20; PL_TXNAACP 173 at 1.

Dr. Duchin similarly observed evidence of packing and cracking along racial lines in each of the six other clusters she analyzed. For instance,

- Congressional Cluster 2 (Harris & Fort Bend Counties): Dr. Duchin observed a "[h]ighly unusual pattern consistent with packing and cracking." 5/31/25 Tr. at 49:14-24; *see* PL_TXNAACP 173 at 2.

- House Cluster 1 (Tarrant County): Dr. Duchin found "clear indicia of packing and . . . cracking." *Id.* at 48:1-9; *see* PL_TXNAACP 173 at 3.

- House Cluster 2 (Dallas County): Dr. Duchin observed "[p]acking and cracking." 5/31/25 Tr. at 48:16-49:49:2; *see* PL_TXNAACP 173 at 4.

- House Cluster 3 (Denton & Wise Counties): Dr. Duchin found that minority CVAP did not fall below 40% in any of the 100,000 ensemble plans, but the Enacted Plan reduced minority CVAP to 36%. *See* 5/31/25 Tr. at 50:10-22 & PL_TXNAACP 173 at 5.

- House Cluster 5 (Brazoria County): Dr. Duchin determined that a majority-minority district was created in 80% to 90% of the 100,000 ensemble plans, but that the Enacted Plans failed to do so which was "statistically unlikely if you weren't using race to do so." 5/31/25 Tr. at 51:6-23.

6

- Senate Cluster 2 (Harris & Fort Bend Counties): Dr. Duchin observed "packing" and "cracking," noting that "it's actually quite hard to get [minority CVAP] below 50 percent, and yet that's how the [Enacted Plan] came out." 5/31/25 Tr. at 49:25-50:5; *see* PL_TXNAACP 173 at 8.

In support of her contention that partisanship could not explain the decision to pack and crack these districts along racial lines, Dr. Duchin offered district-specific evidence to show that the change in minority demographics far outpaced the change in partisanship. For example, Dr. Duchin testified that the State's changes to CD-24 in Congressional Cluster 1 resulted in a drop in minority voting population of 15.3%, but a drop in the Democrat (Biden) vote share of only 9.1%. *See* 5/31/25 Tr. at 11:2-12:10; PL_TXNAACP 136 at 36. And in HD-112 in House Cluster 2, the minority CVAP dropped by 18.5%, but resulted in a partisan shift of less than 5%. *See* 5/31/25 Tr. at 24:21-25:4; PL_TXNAACP 136 at 50.

Following the submission of her initial and supplemental reports, Dr. Duchin produced a rebuttal report, which undertook additional analyses to address the contention of Defendants' expert, Dr. Sean Trende, that "the reason for the extreme outlying racial statistics is the pursuit of Republican advantage." PL_TXNAACP 138 at 13. To do so, Dr. Duchin examined only those maps produced as part of the 100,000 ensemble plans that had "at least as much partisan advantage" as the Enacted Plans. *Id*.; 5/31/25 Tr. at 54:16-55:9. As Dr. Duchin explained, if partisanship were to explain the racial characteristics of the Enacted Plans, one would expect to see that the Enacted Plans had minority CVAP consistent with 40% to 50% of the "partisan" ensemble plans. 5/31/25 Tr. at 57:18-58:14. Dr. Duchin's results, however, confirmed that the extreme racial impacts of the Enacted Plans were outliers even as compared to the "partisan" ensemble plans.

By way of example, Dr. Duchin reviewed the 12,427 plans generated in her ensemble that were at least as Trump-favoring as the Enacted Plans for Congressional Cluster 1 (Dallas & Tarrant

7

Counties). PL_TXNAACP 138 at 14; 5/31/25 Tr. at 56:4-13. Dr. Duchin found that in CD-6 and CD-12 (both within Congressional Cluster 1), only 3.7% and 1.55%, respectively, of the 12,427 "partisan" ensemble plans had minority CVAP as low as that of the Enacted Plans. 5/31/25 Tr. at 56:18-57:17; PL_TXNAACP 138 at 14. And in looking at Congressional Cluster 2 (Harris & Fort Bend Counties), only .06% of more than 74,000 of the "partisan" ensemble plans had a minority CVAP as low as that of the Enacted Plans. PL_TXNAACP 138 at 14; 5/31/25 Tr. at 57:18-59:14. In other words, in only 44 of the 74,000 "partisan" maps generated by Dr. Duchin did minority CVAP drop as low as that of the Enacted Plans. *Id*. Based on her analysis, Dr. Duchin concluded that, "[n]o matter which way Republican advantage is sliced, . . . partisanship does not explain the extremely low coalition share" in the clusters analyzed. PL_TXNAACP 138 at 14; *see* 5/31/25 Tr. at 60:11-17 ("My conclusion is that this shows us pretty clearly that race was used . . . and it was used in a manner that's dilutive in a way that is not explained by party goals.").[6] Dr. Duchin's finding thus explicitly disentangled partisanship and race. That finding applies for both Texas NAACP's Section 2 and constitutional claims.

**IV.     Texas NAACP Provided Thousands of Alternative Maps**

In the face of the overwhelming evidence that race predominated over, or at a minimum, was used as a proxy for, partisanship as *Alexander* demands, Defendants complain that "*Alexander* requires Plaintiffs [to] present a statewide map that simultaneously achieves the political goals of

---

[6] Dr. Duchin addressed the concern raised in *Alexander* as to why map drawers would have used "racial data . . . as a proxy for partisan data," despite having access to partisan data. 601 U.S. at 1243-43. At trial, Dr. Duchin testified that the Texas Legislative Council, which provided the relevant data to the Legislature, used "precinct-level electoral data," and then "proportionally prorated" that data to the census block level. 5/31/25 Tr. at 52:8-59:15. Because racial data is readily available on the "block level," it is more "fine-grained" than the electoral data. *Id*.

8

the Legislature and Plaintiffs' minority representation goals," and the Texas NAACP failed to do so. 6/7/25 Tr. at 127:15-19. This is wrong as a matter of law and conflict with the record.

As an initial matter, *Alexander* did not involve Section 2 claims such as Texas NAACP's here. Moreover, even insofar as *Alexander* is applicable to Texas NAACP's constitutional claims, nowhere in *Alexander* did the Court find that the plaintiff was required to produce a "statewide" map as Defendants claim here. Instead, the *Alexander* Court found that a plaintiff raising a constitutional intentional discrimination claim should, when relying on circumstantial evidence, produce "an alternative map showing that a rational legislature sincerely driven by its professed partisan goals would have drawn a different pay with greater racial balance." 602 U.S. at 34.

That is precisely what Texas NAACP—through Dr. Duchin—did here. In the data underlying her reports, Dr. Duchin provided thousands of alternative maps for each Congressional cluster, including, as discussed, alternative maps that achieved the same or better partisan result as the Enacted Plans. *See* PL_TXNAACP 138 at 13-14 (discussing plans provided as part of the ensemble analysis that "have *at least as many districts* where Trump beats Biden" and those "where at least as many districts were won by Republicans across [] 19 general election contests).[7] As Dr. Duchin explained, the ensemble plans that she produced were drawn in "clusters" such that the ensembles "cover[] exactly the same terrain" as the Enacted Plans. PL_TXNAACP 138 at 9; *see also* PL_TXNAACP 136 at 11. The purpose of providing "cluster" ensembles to cover the same terrain as the Legislature's Enacted Plans was two-fold: (1) they provide deference to the choices made by the Legislature in terms of the area that should be covered by a set of districts,

---

[7] Certain of the maps produced by Dr. Duchin's ensemble analysis are depicted in Dr. Duchin's reports. But as Dr. Duchin testified, the underlying data necessary to regenerate all of the ensemble maps within map-drawing software programs was provided to Defendants. 5/31/25 Tr. at 54:6-15.

9

and (2) the maps can be assessed and adopted without causing "ripple" effects across the entire State should the Court find that only certain of the districts violate Section 2 and the constitution.

Thus, though the alternative, equally partisan maps were submitted as separate groups of maps, nothing in *Alexander* requires that a plaintiff submit a single, alternative map.[8] To the contrary, Dr. Duchin's alternative maps more closely adhere to *Alexander*'s instruction that there is a "presumption of legislative good faith," 602 U.S. at 10, such that any remedy should be directed at only those clusters where the Legislature's decisions were motivated by race.

Moreover, despite Defendants' argument otherwise, Dr. Duchin's ensemble analysis did consider and apply traditional redistricting principles. *See* 6/8/25 Tr. at 128:1-7. Those traditional principles included the "geographical constraints," "contiguity and compactness," and the "legislature's partisan interests" identified in *Alexander* as relevant to an intentional discrimination analysis. 601 U.S. at 24-25. By generating cluster maps limited to the terrain covered by the Enacted Plans, Dr. Duchin's "district generation algorithm enforce[d] contiguity, place[d] a high weight on compactness, and prioritize[d] the intactness of counties and county subdivisions." PL_TXNAACP 136 at 35. And, as discussed, Dr. Duchin's analysis ***did*** consider the legislature's partisan interests, which included a sub-analysis of only those ensemble districts that performed as well or better for Republicans as the Enacted Plans—a sub-analysis that revealed that the Enacted Plans are "an extreme outlier in [their] racial statistics, even controlling for partisanship." PL_TXNAACP 138 at 14.

For the foregoing reasons, Defendants' motion should be denied.

---

[8] While *Alexander* criticized one of plaintiff's experts for producing "thousands of maps," the basis of that criticism was not the quantity of the maps, but rather the failure to produce any map that "achieved the legislature's partisan goal." 601 U.S. at 18. As discussed herein, Dr. Duchin submitted thousands of maps that *did* achieve the Legislature's partisan goals.

Dated: June 9, 2025

        Respectfully submitted,

        */s/ Lindsey B. Cohan*
        Lindsey B. Cohan
        Texas Bar No. 24083903
        DECHERT LLP
        515 Congress Avenue, Suite 1400
        Austin, TX 78701
        (512) 394-3000
        *lindsey.cohan@dechert.com*

        David Rollins-Boyd*
        Jennifer Nwachukwu*
        Jeremy Lewis*
        LAWYERS' COMMITTEE FOR
        CIVIL RIGHTS UNDER LAW
        1500 K Street, Suite 900
        Washington, DC 20005
        (202) 662-8600
        *drollins-boyd@lawyerscommittee.org*
        *jnwachukwu@lawyerscommittee.org*
        *jlewis@lawyerscommittee.org*

        Neil Steiner*
        DECHERT LLP
        1095 Avenue of the Americas
        New York, NY 10036
        (212) 698-3822
        *neil.steiner@dechert.com*

        Robert Notzon
        Texas Bar No. 00797934
        THE LAW OFFICE OF ROBERT NOTZON
        1502 West Avenue
        Austin, Texas 78701
        (512) 474-7563
        *robert@notzonlaw.com*

        Carroll Rhodes*
        LAW OFFICES OF CARROLL RHODES
        P.O. Box 588
        Hazlehurst, MS 39083

Gary Bledsoe
Texas Bar No. 02476500
THE BLEDSOE LAW FIRM PLLC
6633 Highway 290 East #208
Austin, Texas 78723-1157
(512) 322-9992
*gbledsoe@thebledsoelawfirm.com*
*Attorney only as to Texas NAACP's claims related to Texas state senate and state house plans*

Anthony P. Ashton*
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
*aashton@naacpnet.org*

Janette M. Louard
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
*jlouard@naacpnet.org*
*Attorneys appearing of counsel*

*Admitted *pro hac vice*.

*ATTORNEYS FOR THE TEXAS STATE CONFERENCE OF NAACP*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on counsel of record via the Court's ECF system on June 9, 2025.

*/s/ Lindsey B. Cohan*
Lindsey B. Cohan
*Counsel for Plaintiff Texas NAACP*