UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LULAC, *et al.*,<br><br>    *Plaintiffs,*<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of Texas, *et al.*,<br><br>    *Defendants.* | Case No.: 21-CV-00259-DCG-JES-JVB<br>[Lead Case] |

**BROOKS PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR
JUDGMENT AS A MATTER OF LAW**

The Court should deny Defendants' motion for judgment as a matter of law. In an oral motion in Court during trial on Saturday, June 7, 2025, Defendants contended that (1) the Fifteenth Amendment does not prohibit intentional vote dilution and that those claims should thus be dismissed, (2) that Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301, prohibits only discriminatory effects, not intentional discrimination, and alternatively that it does not prohibit intentional discrimination if a single race of voters do not constitute the majority of eligible voters in the district, and (3) that Plaintiffs "other intentional discrimination claims under the Fourteenth and Fifteenth Amendments" fail because they have not sufficiently "disentangl[ed] race and politics." June 7, 2025 Morning Session Rough Trial Tr. at 126. Defendants' motion should be denied.[1]

## ARGUMENT

### I. The Fifteenth Amendment prohibits intentional vote dilution.

The Fifteenth Amendment prohibits the denial or abridgement of the right to vote on account of race or color. U.S. Const. amend. XV. As a textual matter, intentionally diluting the rights to vote on account of race, by definition, abridges the right to vote by reducing the effect of an individual's vote when compared to the votes of their fellow citizens. *See id.* Although the Supreme Court has never expressly held that the Fifteenth Amendment applies to intentional vote dilution claims, *see Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 n.3 (2000) ("*Reno II*"), it has consistently addressed such claims as deriving under either the "Fourteenth or Fifteenth Amendments," *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481 (1997) ("*Reno I*"); *see also Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality op.) (stating that intentional vote dilution that destroys a performing crossover district "would raise serious questions under both the

---

[1] Brooks Plaintiffs join in the arguments made by the other Plaintiffs' groups as well.

Fourteenth and Fifteenth Amendments.") (citing *Reno I*). Similarly, the Fifth Circuit has explained, in a vote dilution case, that "[a]n election practice violates Section 2 and the Fourteenth and Fifteenth Amendments if it is undertaken and maintained for a discriminatory purpose." *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020).[2] This Court should apply a straightforward reading of the text of the Fifteenth Amendment and find, consistent with precedent, that Plaintiffs' intentional vote dilution claims are cognizable under the Fifteenth Amendment. *See id*.; *see also Washington v. Finlay*, 664 F.2d 913, 919 (4th Cir. 1981) ("Claims of racially discriminatory vote dilution exist under both the Fifteenth Amendment and the Equal Protection Clause of the Fourteenth Amendment).

Moreover, the Supreme Court has expressly held that Section 2 of the Voting Rights Act, which contains the same language prohibiting the denial or abridgment of the right to vote as the Fifteenth Amendment, extends to vote dilution. *See Allen v. Milligan*, 599 U.S. 1, 41 (2023). It would be anomalous to read the identical text as having broader meaning under Section 2 than it does under the statute's authorizing constitutional provision. *Cf. id*. Nor would it make sense to find that the Fifteenth Amendment authorizes a remedy for vote dilution but not a claim against it. *See id.* (holding that the Fifteenth Amendment authorizes race-based redistricting as a remedy for vote-dilution claims.).

Regardless, although this Court has acknowledged the lack of clarity in the case law, it has already found that the same analytical framework for intentional vote dilution applies regardless of whether a claim is brought under the Fourteenth or Fifteenth Amendments. *See LULAC v. Abbott*, 601 F. Supp. 3d 147, 160 & n.4 (W.D. Tex. 2022). Under the law of the case, the Court

---

[2] Previously, the Fifth Circuit had misinterpreted *Reno II,* stating in dicta that the court there held that vote dilution claims are not cognizable under the Fifteenth Amendment. *See Prejean v. Foster*, 227 F.2d 504, 519 (5th Cir. 2000).

2

need not reach the question of whether the Fifteenth Amendment prohibits intentional vote dilution on account of race because Plaintiffs pled their claims under both the Fourteenth and Fifteenth Amendment. *See id*. The Court should therefore avoid reaching this unnecessary constitutional question. *See Faulk v. Union Pacific R. Co.*, 449 Fed. Appx. 357, 363 (5th Cir. 2011) ("It is a basic tenet of American jurisprudence that courts avoid reaching constitutional questions in advance of the necessity of deciding them.") (internal citations and quotation marks omitted).

**II.     Section 2 prohibits intentional vote dilution**

    **A.     Section 2 applies to both intent and effects claims.**

Section 2 applies to both intent and effects claims. The State contends that by expanding Section 2's reach in 1982 to prohibit discriminatory effects, it somehow eliminated from its scope discriminatory intent. Not so.

First, the Supreme Court has said as much, quoting the Senate Report to the 1982 amendment:

> The amendment to the language of Section 2 is designed to make clear that plaintiffs need not prove a discriminatory purpose in the adoption or maintenance of the challenged system or practice in order to establish a violation Plaintiffs must *either prove intent, or, alternatively,* must show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process.

*Chisom v. Roemer*, 501 U.S. 380, 394 n.21 (1991) (quoting S. Rep. No. 97-417 at 27 (1982)) (emphasis added); *see also Brnovich v. Democratic Nat'l Comm*., 141 S. Ct. 2321, 2334, 2348-49 (2021) (analyzing Section 2 intent claim). The Fifth Circuit has likewise said the same. *See Seastruck v. Burns*, 772 F.2d 143, 149 & n15 (5th Cir. 1985) (stating, in the context of Section 2, that "[d]iscriminatory intent of itself will normally render a plan illegal"); *see also Veasey v. Abbott*, 830 F.3d 216, 229-243 (5th Cir. 2016) (en banc) (analyzing Section 2 intent claim).

3

*Milligan* did not change this, as Defendants suggested in their oral motion. *Milligan* adjudicated a discriminatory effects claim regarding Alabama's congressional map. It is no surprise then that it spoke about the discriminatory effects test under Section 2. Nothing in *Milligan* says that discriminatory intent is somehow outside the statute's scope.

      **B.**    **Intentional discrimination violates Section 2 regardless of whether a *Gingles* 1 majority is shown.**

Intentional discrimination violates Section 2 of the Voting Rights Act regardless of whether a particular minority group or coalition of minority groups can comprise a majority of eligible voters in a single member district. In *Bartlett v. Strickland*, the Court held that plaintiffs bringing a discriminatory results claim under Section 2 must show the possibility of an alternative majority minority district, but the Court specified that its "holding does not apply to cases in which there is intentional discrimination against a racial minority." 556 U.S. 1, 20 (2009) (plurality op.); *see also id.* ("[E]vidence of intentional discrimination tends to suggest that the jurisdiction is not providing an equal opportunity to minority voters to elect the representative of their choice, and it is therefore unnecessary to consider the majority-minority requirement before proceeding to the ultimate totality of circumstances analysis" (internal quotation marks omitted)); *Garza v. County of Los Angeles*, 918 F.2d 763, 769 (9th Cir. 1990) (holding that *Gingles* 1 precondition only requires showing of majority-minority district in absence of showing of intentional discrimination); *Perez v. Abbott*, 253 F. Supp. 3d 864, 944 (W.D. Tex. 2017) (rejecting argument that statutory Section 2 intentional discrimination claims require satisfying first *Gingles* prong); *Comm. for a Fair & Balanced Map v. Ill. Bd. of Elections*, No. 1:11-CV-5065, 2011 WL 5185567, at *4 (N.D. Ill. Nov. 1, 2011) ("[T]he first *Gingles* factor is appropriately relaxed when intentional discrimination is shown . . . ."). If the Courts finds intentional discrimination, the first *Gingles* precondition is irrelevant to a Section 2 *intent* claim.

4

The Fifth Circuit's *Petteway* decision—which was about whether voters from more than one racial or ethnic group could be aggregated for purposes of the first *Gingles* precondition in an *effects only* case—thus has no bearing on the question. If a State or political subdivision intentionally discriminates against Black voters Latino voters, either in combination or discretely, is irrelevant whether (1) either group could be a majority of eligible voters in a district or (2) they vote cohesively.

### III.   Plaintiffs have satisfied their burden to prove their Fourteenth and Fifteenth Amendment racial gerrymandering and intentional discrimination claims.

Plaintiffs have satisfied their burden to prove their Fourteenth and Fifteenth Amendment racial gerrymandering and intentional discrimination claims. To start, it is not clear from Defendants' oral motion what they even sought to contend in this regard. Counsel for the state repeatedly referred to "intentional discrimination" claims, but then focused nearly the entire presentation on the alternative maps requirement that governs *racial gerrymandering* cases.

#### A.   *Alexander*'s "alternative maps" requirement—and the requirement to disentangle race and partisanship—apply only to racial gerrymandering claims.

The requirement to produce alternative maps—and the requirement to disentangle race and partisanship—apply only to racial gerrymandering claims.[3] In *Alexander v. South Carolina State Conference of the NAACP*, the Supreme Court held—in a *racial gerrymandering* case—that a plaintiff must produce an comparable alternative map that satisfies the state's political objectives without the challenged racial effect to avoid an adverse inference.

> By showing that a rational legislature, driven only by its professed mapmaking criteria, could have produced a different map with greater racial balance, . . . an

---

[3] Alternative map evidence can be useful evidence for intentional discrimination claims, as this Court acknowledged in considering the Brooks Plaintiffs' preliminary injunction motion, but because such claims do not require showing that race *predominated*—alternative maps are merely optional evidence.

> alternative map can perform the critical task of distinguishing between racial and political motivations when race and partisanship are closely entwined. For that reason, we have said that when all plaintiffs can muster is 'meager direct evidence of a racial gerrymander,' only [an alternative] ma[p] of that kind' can 'carry the day.'"

602 U.S. 1, 34-35 (2024) (*quoting Cooper v. Harris*, 581 U.S. 285, 322 (2017) (cleaned up).

*Alexander* does not apply this rule to intentional discrimination claims, instead it specifically noted that such claims are "analytically distinct" from racial gerrymandering claims. *Id.* at 38-39. Intentional vote dilution turns on whether a map has the purpose and effect of diluting minority voting strength. *Id.*

Unlike racial gerrymandering claims, where race must be proven to have been the *predominant* purpose motivating the placement of voters into our out of the challenged sitrict, "'racial discrimination need only be one purpose, and not even a primary purpose,' of an official action for a violation to occur." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (*en banc*) (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)). "[D]iscriminatory intent need not be proved by direct evidence." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982). Rather, "direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of [the legislature's] actions may be considered." *Brown*, 561 F.3d at 433. As the *en banc* Fifth Circuit has explained,

> [i]n this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence. To require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions. This approach would ignore the reality that neutral reasons can and do mask racial intent, a fact we have recognized in other contexts that allow for circumstantial evidence.

*Veasey*, 830 F.3d at 230.

6

This distinction makes sense. Racial gerrymandering can occur even in the absence of an illicit motive so long as race is the predominant consideration. On the other hand, *no amount* of intentional racial discrimination is permissible. For this reason, while plaintiffs face a burden of disentangling race and partisanship in a racial gerrymandering case where they must prove a predominant racial purpose, that burden does not arise in an intentional discrimination case. Even if partisanship is the predominant purpose behind the design of a map, it can still be intentionally discriminatory of racial vote dilution was *a*—even a minor—purpose behind the map's design, as the en banc Fifth Circuit has held. *Veasey*, 830 F.3d at 230.

### B. Plaintiffs have satisfied their evidentiary burden.

Plaintiffs proffered the necessary evidence to demonstrate intentional discrimination and racial gerrymandering for their claims regarding Senate District 10 (SD 10) and HD 118.

***SD10.*** First, this Court has already determined that the Brooks Plaintiffs have already satisfied two of the *Arlington Heights* factors with respect to SD 10. In the preliminary injunction ruling, the Court stated that "Plaintiffs likely will demonstrate that the action they challenge produces a discriminatory effect." *See League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 164 (W.D. Tex. 2022). This is because it is "apparent that the cracking of the district bears more heavily on Black and Hispanic voters." *Id* at 169.

Plaintiffs have also provided evidence that historical context and/or recent history suggests discriminatory intent. The Brooks Plaintiffs' testimony at trial demonstrated that Senator Huffman was provided the 2011 legal decision regarding the illegal redrawing of Senate District 10 previously. Rough Draft Trial Tr., May 23, 2025, AM Session at 45:16-21. Senator Huffman must have known about this legal decision because she was a member of the redistricting committee that was assigned to restore the benchmark configuration of SD 10 in 2013 to ensure that it

7

complied with the Voting Rights Act and the U.S. Constitution. Brooks Ex. 1, ¶¶ 4-9. Senator Huffman, as a committee member, knew that voting in Texas and Tarrant County is racially polarized. This evidence provided at trial is in addition to the evidence this Court has already weighed during the preliminary injunction. This Court has opined that "Plaintiffs will likely show that historical evidence weighs in favor of an inference of discriminatory intent" in part due "to the most recent redistricting cycle and, most damningly, the 2012 decision holding that, among other violations, Texas had engaged in intentional vote dilution by redrawing SD 10 in a manner similar to that adopted in SB 4." *Id.* at 170; Brooks Ex. 25 at 1.

Plaintiffs have show, that there were procedural and substantive departures from normal procedure. Testimony at trial demonstrated that the Attorney General's office, which was advising Senator Huffman on the drawing of the Texas Senate map, generated a detailed racial voting analysis—including analyzing turnout by race—within the benchmark SD 10 during the redistricting process. *See* Rough Draft Trial Tr. May 23, 2025, at 52:12-56:6. This analysis was dated around the same time that substantial changes were made to greatly expand the draft version of the district deep into rural Anglo territory. Senator Huffman declared that her compliance checks by the Attorney's General office were only delivered orally and were not in written form. Brooks Ex. 228 at 47; Joint Ex. 4232 at 91:4-14 ("Senator Eckhardt: When you received this legal advice from the Attorney's General's Office, was it in a written format or briefing. Senator Huffman: It was all verbal. Senator Eckhardt: All verbal? Senator Huffman: Yes."). Additionally, evidence at trial showed that the legislature disregarded traditional redistricting principles, excluded minority members from decision-making, and restricted the ability to provide commentary on the maps. *See e.g.* Brooks Ex. 228 at 46-53. *See also* June 4, 2025, Rough Draft Transcript PM Session at 71-72

(Testimony from Representative Anchia regarding indifference by the 87th Legislature to the concerns and needs of the minority populations

The explanations provided by Senator Huffman and her staff with respect to the new configuration of SD 10 are pretextual. While Senator Huffman asserted on the Senate floor that SD 10 was reconfigured because of population deviation concerns, evidence demonstrates that SD 10 was within ideal population. *See* Rough Draft Trial Tr. May 23, 2025, at 48:21-49:2, *Id.* at 49:14-16. Brooks Ex. 32 at 2. Instead, testimony at trial shows that Senator Huffman and her staff wanted to add the *right* population to dilute Black and Latino voters' ability to elect their candidates of choice. *See* Rough Draft Trial Tr. May 23, 2025, at 49:17-23. Further, this Court found "it likely that the redrawing was necessary for the sake of population equalization—it certainly is not true that the district itself 'needed population,' and Senator Huffman's smirk suggests that she may well have known as much." *League of United Latin Am. Citizens*, 601 F. Supp. 3d at 175.

Moreover, the Brooks Plaintiffs have proffered alternative maps that show that the legislature could have achieved its purported partisan goals without the racial effect of dismantling SD10. Brooks Exs. 45, 70-99. *Defendants' expert* Dr. Trende confirmed that the metric used to draw these maps—a 10-point margin of victory in the same number of Republican districts as the enacted map—is precisely what would allow an inference of discriminatory intent.

Lastly, Dr. Trende's testimony on June 9, 2025, demonstrated that the map drawers were intentionally discriminatory in drawing SD 10. While Senator Huffman has claimed multiple times that she drew the Enacted SD 10 blind to race, Dr. Trende's analysis in his report showed that the Enacted SD 10 has a lower minority CVAP than **99.96%** of his **100,000** computer simulated maps

9

that were drawn to be compact and contiguous without consideration of race. *See* Rough Draft Trial Tr. June 9, 2025, PM (pages forthcoming); Defendants Ex. 8 at 147.

*HD 118.* The Books and LULAC Plaintiffs have provided evidence at trial that the drawing of HD 118 was intentionally discriminatory and/or a racial gerrymander. Plaintiffs' expert Dr. Barreto testified that his analysis of HD 118 showed "that the map drawers were attempting to keep this as a majority Hispanic district so that it could be called a majority Hispanic, perhaps even VRA district, and keeping it as the citizenship being above 50 percent Hispanic, but changing so that it no longer performs for that majority Hispanic candidate of choice. A majority of Hispanics, over 70 percent, have a cohesive candidate of choice. It was not Mr. Paxton." Rough Draft Trial Tr. May 30, 2025, 53:3-11. Dr. Barreto further demonstrated that the map drawers of HD 118 were trading areas on the basis of race because they are under-preforming voting tabulation districts for Hispanic candidates of choice, but also have enough Hispanic population to keep HD 118 looking as if it was a Latino opportunity district. *See* Rough Draft Trial Tr. May 30, 2025, 53:11-56:11. Likewise, Dr. Trende testified that HD118 could have been made more Republican, but that doing so would have lowered its Hispanic CVAP to roughly 47%. Dr. Barreto's testimony and Brooks Plaintiff Exhibit 248 shows that if a map drawer only had partisan shading available the precincts included in HD 118 would have been excluded. *See* Rough Draft Trial Tr. May 30, 2025, PM at 96:12- 101:22.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

10

June 9, 2025                                         Respectfully submitted,


                                                     /s/ Chad W. Dunn
                                                     Chad W. Dunn (Tex. Bar No. 24036507)
                                                     Brazil & Dunn
                                                     4407 Bee Caves Road
                                                     Building 1, Ste. 111
                                                     Austin, TX 78746
                                                     (512) 717-9822
                                                     chad@brazilanddunn.com

                                                     /s/ Mark P. Gaber
                                                     Mark P. Gaber*
                                                     Mark P. Gaber PLLC
                                                     P.O. Box 34481
                                                     Washington, DC 20043
                                                     (715) 482-4066
                                                     mark@markgaber.com

                                                     Jesse Gaines* (Tex. Bar. No. 07570800)
                                                     P.O. Box 50093
                                                     Fort Worth, TX 76105
                                                     817-714-9988
                                                     gainesjesse@ymail.com

                                                     Molly E. Danahy*
                                                     P.O. Box 51
                                                     Helena, MT 59624
                                                     (406) 616-3058
                                                     danahy.molly@gmail.com

                                                     Sonni Waknin*
                                                     10300 Venice Blvd. # 204
                                                     Culver City, CA 90232
                                                     732-610-1283
                                                     sonniwaknin@gmail.com


                                                     *Admitted *pro hac vice*

                                                     *Counsel for Brooks Plaintiffs*

11

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all counsel of record on June 9, 2025.

*Chad W. Dunn*
Chad W. Dunn
