UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LULAC, et. al., | § § § | |
| *Plaintiffs* | § § | |
| Alexander Green, and Jasmine Crockett | § § § § | |
| Plaintiff-Intervenors | § § § | Case No.: 3-21-CV-00259-DCG-JES-JVB [Lead Case] |
| v. | § § § | |
| GREG ABBOTT, in his official capacity As Governor of Texas, et. al. | § § § § | |
| *Defendants* | § | |

# PLAINTIFF-INTERVENORS' RESPONSE TO DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

## I. LEGAL STANDARD AND ELEMENTS

### A. Standard for Motion for Judgment as a Matter of Law

A motion for judgment as a matter of law asks the court to enter a judgment based on the conclusion that no reasonable jury could reach a different conclusion. F.R.C.P. 50. The motion is made before the case is submitted to the jury but after a party has been fully heard on the issue, arguing that whatever evidence exists for finding for the opposing party is legally insufficient. *Id*. The standard requires the court to view all evidence in the light most favorable to the non-moving party.

Plaintiff Intervenors note that of Defendants' Motion, only their third point impacts the Intervenors claims. In any event, Plaintiff Intervenors incorporate by reference the arguments and submission of all other Plaintiffs.

### B. Elements of Plaintiff-Intervenors' Remaining Claims

### 1. Intentional Discrimination Under the Fourteenth and Fifteenth Amendments

Intentional discrimination claims under the Fourteenth and Fifteenth Amendments require plaintiffs to show that race was a predominating factor in the challenged redistricting decisions. *Bush v. Vera*, 517 U.S. 952 (1996). Under the Arlington Heights framework, courts examine a number of factors, including the impact of the decision, historical background, specific sequence of events, and departures from normal procedures to determine discriminatory intent. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

From the outset, it is important to note that State Defendants in ECF 225 at 1, adopt Intervenors quote that "Congressional Districts 9, 18, and 30 are all minority opportunity districts."

Dr. Murray stated in his report that "whites will control 28 of 38 seats in the U.S. House of Representatives – 74%." Intervenor Plaintiff Exhibit 24, Pg. 31. Dr. Murray further testified on cross that direct evidence of intentional discrimination was plain. "Well, I would say the initial, released maps -- and I don't know if that number is 2101, but -- that paired Congress Members Jackson Lee and Congress Member Al Green was very powerful direct evidence." Rough Draft- Day 12 PM, pg. 63 Lines 19-23.

## II. DEFENDANTS' MOTION MUST BE DENIED BECAUSE SUFFICIENT EVIDENCE SUPPORTS CLAIMS

### A. Overwhelming Evidence Supports Intentional Discrimination Claims

The trial record contains extensive direct and circumstantial evidence of intentional discrimination under the Fourteenth and Fifteenth Amendments that easily satisfies

the demanding standard for judgment as a matter of law. To resolve this question, Courts conduct a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available" *Veasey v. Abbott*, 830 F.3d 216 (2016).

### 1. Direct Admissions and Testimony of Discriminatory Intent

Multiple witnesses provided direct testimony of intentional discrimination. Commissioner Travillion testified: "Q. In this lawsuit, Texas NAACP alleges that the State legislature intentionally discriminated against Black Texans in enacting these maps. Is that correct? A. Yes." [05-23-25-Trial-Morning-Session_Rough.pdf, Page 13, Lines 23-25 to Page 14, Lines 1-3]. He further testified that "the Texas NAACP believe[s] that race was used as a proxy for partisanship" [05-23-25-Trial-Morning-Session_Rough.pdf, Page 16, Lines 17-19] and that "race still is a huge factor in the way that districts have been drawn" [05-23-25-Trial-Morning-Session_Rough.pdf, Page 17, Lines 17-20].

Garry Jones testified specifically about Senate District 10, stating "I believe she intentionally discriminated against minorities in Senate District 10" [05-23-25-Trial-Morning-Session_Rough.pdf, Page 59, Lines 24-25 to Page 60, Line 1]. Dr. Murray's expert testimony concluded that both the Dallas-Fort Worth and Houston areas resulted from "intentional discrimination" [Rough-Draft-Day-12-PM-Session-6-6-25.pdf, Page 53, Lines 7-11].

### 2. Systematic Exclusion of Minority Legislators

The evidence demonstrates a deliberate pattern of excluding African American and Latino legislators from the redistricting process. Representative Reynolds testified that the 2021 process was "not very Democratic, meaning that it allowed for member input" contrasting with 2011 when there was a "more inclusive process with respect to the members" [Rough-Draft-Day-12-PM-Session-6-6-25.pdf, Page 15, Lines 8-

3

13]. The Legislative Black Caucus "were shut out of the process in 2021, versus 2011 it was more inclusive" [Rough-Draft-Day-12-PM-Session-6-6-25.pdf, Page 15, Lines 21-24].

Chair Nicole Collier was denied participation in redistricting committee hearings. When she "attempted to" participate, "the chair denied her that ability" and "she was not allowed to participate on the questioning, input of the witnesses when it came to the testimony" [Rough-Draft-Day-12-PM-Session-6-6-25.pdf, Page 16, Lines 14-20].

### 3. Procedural Irregularities Evidencing Discriminatory Intent

Representative Crockett's testimony revealed numerous procedural departures from established practice. The Congressional bill was "rammed through" [05-23-25-Trial-Morning-Session_Rough.pdf, Page 123, Lines 1-25]. Members were required to submit "amendment[s] to an amendment" rather than standard procedures [06-07-25-Morning1_PP-SCOPED-RUFF.pdf, Page 143, Lines 1-25]. The timeline was compressed despite available time extending "until Decemberish" [05-23-25-Trial-Morning-Session_Rough.pdf, Page 122, Lines 1-25].

### 4. Surgical Precision Targeting Minority Communities

The evidence shows unnecessary and surgical changes to optimally-sized districts. Congressional District 9 was "only 3,611 persons above the optimum number" yet received massive population transfers. Representative Reynolds testified these were "maps that had already been drawn and that they just wanted us to go along with what was already decided" [Rough-Draft-Day-12-PM-Session-6-6-25.pdf, Page 15, Lines 10-12].

Expert Moon Duchen of the NAACP provided extensive testimony in support of our claim of intentional discrimination. She specifically discussed: (a) submerging urban

and minority voters in district where they could not elect their candidates of choice: (b) submerging diverse populations by mering them with rural counties; (c) the configuration of House districts avoids diverse areas with precision: (d) after creating ensembles of districting plans Dr. Duchen concluded these were outliers; (e) the plans had a number of examples of both packing and cracking; and (g) even when accounting for partisan goals, the racial skew remains significant. Duchin says that race was a significant factor in redistricting, as evidenced by the demographic changes in districts. Duchen says race was used and it was used in a "dilutive" way.

Dr. Murray says cracking is splitting minority populations to reduce their electoral voting power. He testified that packing was difficult now because of minority growth in suburbs, and that in order to avoid the mistakes made in 2011 when 2 seats failed to survive the decade, a new strategy was devised that involved cracking minorities out of the urban and suburban areas to join them with whites who would be able to prevent minorities from being able to elect the candidate of their choice. Murray testified that in the Dallas-Fort Worth Metroplex, the strategy was to put as many minorities as possible in Congressional Districts 30, 32 and 33, and then crack the remaining areas of the 10 county metroplex into 9 other districts where the white rural populations would prevent minority candidates from being able to elect their candidate of choice. He provided many examples of many districts where he observed cracking to dilute minority voting strength in both the DFW and Houston Fort Bend Metroplexes. He indicated that the 9th and 30th were both the victim of illegal vote dilution based on his analysis and were both parts of wider area schemes to dilute minority votes.

In the Metroplex, he indicated that about 1.5 million non-minority voters with high levels of registration and voting with a history of being polarized to the minority

community, were joined with the Metroplex minorities to negatively impact their voting strength. Murray also talked about the decision to craft 2 new Congressional districts for whites—democratic ones in Austin and Republican ones in Houston—was an example of intentional discrimination, as was the pairing of Congressman Alexander Green and Sheila Jackson Lee. He further added that the major and unnecessary surgery to the 9th, 18th and 30th was further evidence of discrimination. In addition, he noted how white dominance was manifested in how a white Democratic Congressperson was treated more favorably than the African-American Congresspersons in the 9th and 18th.

Beyond the foregoing, Dr. Henderson's analysis made it clear that race was involved, but to begin with just the numbers alone absent the interpretation support our claims or contentions. He states, he "found significant movement of Black voters across specific districts." Intervenor Plaintiff's Exhibit 29. Next, he notes his "analysis reveals differential treatment of demographic groups. The data shows that Black voters were moved between districts at substantially higher rates than other demographic groups." *Id*. Most notably, Dr. Henderson notes that "when controlling for racial factors, partisan variables showed no measurable effect (ß = 0.00). This pattern was consistent across all regression models, indicating that racial demographics were a stronger predictor of redistricting outcomes than partisan considerations." *Id*.

## II. DEFENDANTS VIOLATION OF SECTION 2 IN FAILING TO CONSIDER RACE IS EVIDENCE OF INTENTIONAL DISCRIMINATION

The State Defendants' principal defense is that they did not consider race in the drawing of Plan C2193. Senator Huffman testified repeatedly to this effect and the Joint Exhibit list is rife with videos and transcripts confirming this defense. This

defense is literally incredible given the mountain of other evidence disproving it. But taking the State at its word, for the sake of argument, this theory is not a defense. It is an admission. Settled case law requires states to assess compliance with the Voting Rights Act. Indeed, Chief Justice Roberts has stated that "Section 2 itself demands consideration of race." *Allen v. Milligan*, 599 U.S. 1, 24 (2023). The State Defendants' fevered assurances that they did not do so constitute powerful evidence of intentional discrimination. All the more so when the statistical evidence proves this 'defense' to be untruthful.

## IV. DEFENDANTS CANNOT OVERCOME THE CLEAR ERROR STANDARD

Even if defendants could identify conflicting evidence, "where there are multiple permissible views of the evidence the factfinder's choice controls" under Rule 52(a)'s clear error standard. The evidence of discriminatory intent and racial predominance is so overwhelming that any contrary finding would constitute clear error.

The procedural violations alone—excluding minority legislators, implementing gate-keeping rules, rushing the process, and presenting pre-drawn maps—provide sufficient evidence of discriminatory intent under the Fourteenth and Fifteenth Amendments. When combined with the statistical evidence of racial predominance and the unnecessary surgical precision applied to optimally-sized minority districts, the evidence overwhelmingly supports both claims.

## III. CONCLUSION

Defendants' motion for judgment as a matter of law must be denied. The trial record contains extensive direct and circumstantial evidence supporting both intentional discrimination claims under the Fourteenth and Fifteenth Amendments and racial gerrymandering claims regarding Congressional Districts 9 and 30. Multiple

witnesses testified to discriminatory intent, expert analysis confirmed racial predominance over political considerations, and the legislative record demonstrates systematic exclusion of minority participation. This evidence easily satisfies the demanding standard for surviving judgment as a matter of law and requires submission to the jury for final determination.

Respectfully Submitted,

By: /s/ Gary Bledsoe

Gary L. Bledsoe
State Bar No. 02476500
The Bledsoe Law Firm, PLLC
6633 Highway 290 East #208
Austin, Texas 78723-1157
Telephone: 512-322-9992
Fax: 512-322-0840
gbledsoe@thebledsoelawfirm.com

/s/ Robert Notzon

Robert Notzon

The Law Office of Robert Notzon
Texas Bar No. 00797934

1502 West Avenue

Austin, Texas 78701
Robert@NotzonLaw.com
(512) 474-7563

(512) 852-4788 facsimile

**Attorneys for Plaintiff-Intervenors Alexander Green, and Jasmine Crockett**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on June 9th, 2025, in accordance with the Federal Rules of Civil Procedure on all parties registered on ECF this case via the Court's electronic filing system:

/s/ Robert Notzon
Robert Notzon