UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GREG ABBOTT, et al.,<br><br>Defendants. | Civil Action<br><br>Lead Case No.:<br>    3:21-CV-00259-DCG-JES-JVB |
| CECILIA GONZALES, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>JANE NELSON, et al.,<br><br>Defendants. | Consolidated Case No.:<br>    1:21-CV-00965-DCG-JES-JVB |

**GONZALES PLAINTIFFS' POST-TRIAL EXECUTIVE SUMMARY**

Pursuant to the Court's June 16 Order, ECF No. 1098, the Gonzales Plaintiffs—Cecilia Gonzales, Agustin Loredo, Jana Lynne Sanchez, Jerry Shafer, and Debbie Lynn Solis—provide this "executive summary" of the specific relief they seek and the reason they are entitled to it.

### THE RELIEF THE GONZALES PLAINTIFFS SEEK

The Gonzales Plaintiffs seek an order declaring that Texas's congressional redistricting map violates Section 2 of the Voting Rights Act and enjoining the use of Texas's congressional districts for future elections because they do not include:

1. An additional district in the Harris County metropolitan area in which Latino voters have a reasonable opportunity to elect their candidates of choice, without reducing the number of districts currently in the region in which Latino voters are able to elect their candidates of choice; and

2. An additional district in the Dallas–Fort Worth metropolitan area in which Latino voters have a reasonable opportunity to elect their candidates of choice, without reducing the number of districts currently in the region in which Latino voters are able to elect their candidates of choice.

The Texas Legislature should be given an opportunity to enact a lawful plan that includes the additional Latino-opportunity districts in Harris County and Dallas–Fort Worth that the Voting Rights Act requires. *See McDaniel v. Sanchez*, 452 U.S. 130, 150 n.30 (1981); *Robinson v. Ardoin*, 86 F.4th 574, 600–01 (5th Cir. 2023). If the Texas Legislature does not promptly enact such a plan, the Court should adopt one itself. *See McDaniel*, 452 U.S. at 150 n.30. In either event, a lawful congressional plan should be in place in time for the 2026 congressional election cycle.[1]

### WHY THE GONZALES PLAINTIFFS ARE ENTITLED TO THAT RELIEF

The Gonzales Plaintiffs are entitled to the relief they seek because they have standing, they meet each of the *Gingles* preconditions, and the totality of the circumstances supports relief.

---

[1] The candidate filing deadline for the primary is December 8, 2025, although the Court has remedial authority to alter election deadlines if necessary to redress violations of federal law. *See, e.g.*, *Vera v. Bush*, 933 F. Supp. 1341, 1352–53 (S.D. Texas 1996).

1

### A. The Gonzales Plaintiffs have standing.

The Gonzales Plaintiffs have standing to bring their claims. Each of the five individual plaintiffs is a Latino registered voter who is eligible to vote in a challenged district. *See* Joint Stips. of Fact, ¶¶ 1–5, ECF No. 978 ("Joint Stips."); Gonzales Exs. 1–5. In Dallas–Fort Worth, Cecilia Gonzales resides in CD25, Debbie Lynn Solis resides in CD33, and Jana Lynne Sanchez is eligible to vote in CD33. Joint Stips. ¶¶ 1, 3, 5; Gonzales Exs. 1, 3, 5. In Harris County, Agustin Loredo and Jerry Shafer reside in CD36. Joint Stips. ¶¶ 2, 4; Gonzales Exs. 2, 4. These plaintiffs "have standing to challenge vote dilution in their home districts." Mem. Op. & Order Granting in Part & Denying in Part Defs.' Mots. to Dismiss at 23 (May 23, 2022), ECF No. 307.

### B. The Gonzales Plaintiffs meet the *Gingles* preconditions.

The Gonzales Plaintiffs' Section 2 challenges to the congressional districts in Harris County and Dallas–Fort Worth are governed by "the three-part framework developed in [the Supreme Court's] decision in *Thornburg v. Gingles*, 478 U.S. 130 (1986)." *Allen v. Milligan*, 599 U.S. 1, 17 (2023). That framework requires the Gonzales Plaintiffs to satisfy three "preconditions":

1. "[T]he 'minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district.'" *Id.* at 18 (alteration in original) (quoting *Wis. Legis. v. Wis. Elections Comm'n*, 595 U.S. 398, 402 (2022)).

2. The minority group must be "politically cohesive." *Id.* (quoting *Gingles*, 478 U.S. at 51).

3. The "white majority" must "vote[] sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Id.* (ellipsis in original) (quoting *Gingles*, 478 U.S. at 51).

In prior decisions in this case, this Court has explained that the first and second preconditions must be met with respect to a demonstration district offered by the plaintiff, while the third precondition must be met in the enacted districts that the plaintiff challenges. *See* ECF No. 307 at 31–32.

2

1. ***Gingles* 1: Latino voters are a sufficiently large and geographically compact group to form CVAP majorities of additional, reasonably configured districts in Harris County and Dallas–Fort Worth.**

The Gonzales Plaintiffs met the first *Gingles* precondition by showing, through the testimony of Dr. Stephen Ansolabehere and undisputed joint exhibits generated by the Texas Legislative Council, that it is possible to draw additional, reasonably configured Latino-majority districts in Harris County and Dallas-Fort Worth. Gonzales Plaintiffs' demonstration plan C2198 illustrates the districts that could be drawn in both regions. *See* Jt. Ex. 1315 at 7, 10, 15, 19 (TLC-generated maps); Jt. Ex. 1231 (TLC-generated ACS '19 –'23 Hispanic Population Profile); Jt. Ex. 1227 (TLC-generated ACS '15 –'19 Hispanic Population Profile); Gonzales Ex. 6 at 42, 44 (Dr. Ansolabehere's maps); Gonzales Ex. 9 at 10 (Dr. Ansolabehere's population analysis). It is undisputed that these districts are of equal population and that they could be adopted without making changes elsewhere in the state. Joint Stips. ¶ 92; Tr. Day 5 PM at 159:10–17.

**Harris County**: Demonstration CD38 is an additional, reasonably configured majority-Latino district in Southeastern Harris County. Under the 2019 to 2023 ACS, Demonstration CD38's voting-eligible population is more than 52% Latino. Jt. Ex. 1231; Gonzales Ex. 9 at 10. Demonstration CD38 is geographically compact—more compact in Reock area dispersion than any district in the enacted plan, and among the most compact districts in Polsby-Popper perimeter dispersion. Gonzales Ex. 6 at 80. And as Plaintiff Agustin Loredo testified, Demonstration CD38 unites blue-collar Latino communities in Baytown, Pasadena, and South Houston that have similar cultural and economic interests, including interests related to the oil and gas processing industries that dominate the area's economy. Tr. Day 9 AM at 127:2–139:15 (Loredo). By uniting these communities, Demonstration CD38 corrects the enacted plan's cracking of Baytown and parts of Pasadena into enacted CD36, a rural, majority-Anglo district stretching to the Louisiana border. *Id.* at 138:22–144:22 (Loredo); Jt. Ex. 1048 at 16, 33.

Moreover, Demonstration CD38 can be drawn without compromising existing Latino opportunity districts. In particular, CD29 remains a majority-Latino voting-eligible district in the demonstration map. *See* Jt. Ex 1231; Gonzales Ex. 9 at 10. Demonstration CD29 also remains reasonably compact—slightly less compact than enacted CD29, but still more compact on all measures than multiple districts in the enacted plan. *See* Gonzales Ex. 6 at 80. And, as testimony by Cesar Espinosa, Angelica Razo, Diana Martinez Alexander, and Maida Guillen established, Demonstration CD29 unites communities with similar cultural and economic interests. Tr. Day 1 PM at 99:19–126:2 (Espinosa); *id.* at 161:7–163:25 (Razo); Tr. Day 2 AM at 17:13–21:6, 27:25–29:17 (Razo); *id.* at 57:5–66:24 (Martinez Alexander); Tr. Day 7 AM at 106:10–114:24 (Guillen).

**Dallas–Fort Worth**: Demonstration CD12 is an additional, reasonably configured majority-Latino district in Dallas and Tarrant Counties. Under the 2019 to 2023 ACS, Demonstration CD12's voting-eligible population is more than 51% Latino. Jt. Ex. 1231; Gonzales Ex. 9 at 10. Demonstration CD12 is more compact in Reock area dispersion than enacted CD35, and more compact in Polsby-Popper perimeter dispersion than enacted CD33, showing that Demonstration CD12 meets the legislature's standard for compactness. *See* Gonzales Ex. 6 at 80. And, as testimony by Rep. Rafael Anchía, Rep. Ramon Romero, and others establishes, Demonstration CD12 unites communities with similar cultural and economic interests. Tr. Day 10 PM at 135:20–142:6 (Anchía); Tr. Day 11 PM at 45:7–53:1 (Romero). Demonstration CD12 can be drawn without compromising the ability of Latino voters to elect their candidates of choice in existing districts, including CD33, which remains a majority Black-and-Latino district in the demonstration map, Jt. Ex. 1227; Gonzales Ex. 9 at 10, while becoming substantially more compact, Gonzales Ex. 6 at 80.

      2.      ***Gingles* 2: Latino voters in the relevant districts are politically cohesive.**

The Gonzales Plaintiffs met the second *Gingles* precondition with undisputed evidence from Dr. Ansolabehere that Latino voters in the demonstration districts cohesively support the same candidates. This Court has explained that plaintiffs "must show the second precondition for the minority population that would be included in [the] proposed district." ECF No. 307 at 33. The Gonzales Plaintiffs did just that, by showing that between 80% and 89% of Latino voters in Demonstration CD12, CD29, CD33, and CD38 supported Democratic Party candidates across statewide elections from 2016 to 2024. Gonzales Ex. 9 at 13. Defense expert Dr. John Alford agreed that these results show political cohesion among Latino voters in those demonstration districts. Tr. Day 15 AM at 153:14–155:5 (Alford). The second precondition is therefore met.

      3.      ***Gingles* 3: The Anglo majority votes sufficiently as a bloc to defeat Latinos' preferred candidates in the relevant enacted districts.**

The Gonzales Plaintiffs met the third *Gingles* precondition with undisputed evidence from Dr. Ansolabehere that Anglo voters in the relevant enacted districts vote as a bloc to defeat Latino voters' preferred candidates. "[T]he third precondition must be established for the *challenged* districting." ECF No. 307 at 33. And the Gonzales Plaintiffs established it by showing that 86% of Anglo voters in enacted CD25, where Plaintiff Cecilia Gonzales lives, and 88% of Anglo voters in enacted CD36, where Plaintiffs Agustin Loredo and Jerry Shafer live, vote in opposition to Latino-preferred candidates. Gonzales Ex. 9 at 12. The Gonzales Plaintiffs further showed that as a result of this bloc voting, Latino-preferred candidates are consistently defeated in those districts. *Id.* at 14; Gonzales Ex. 10 at 2. The third precondition is therefore met as well.

    **C.**    **The totality of the circumstances supports relief.**

The Fifth Circuit has recognized that "it will be only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a

5

violation of § 2 under the totality of circumstances." *Clark v. Calhoun Cnty., Miss.*, 21 F.3d 92, 97 (5th Cir. 1994) (citing *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Ed.*, 4 F.3d 1103, 1135 (3d Cir. 1993)). Here, the totality of the circumstances supports relief. Relevant circumstances include:

**History of Discrimination**. Testimony from Dr. Lichtman and others established Texas's long history of racial discrimination in voting. For instance, during the nearly 50 years in which Texas was subject to preclearance under Section 5 of the Voting Rights Act, Texas had more preclearance objections from the Department of Justice than any other state. Gonzales Ex. 11 at 8. And in every redistricting cycle since 1980, the Department of Justice has objected to or intervened in litigation to block Texas's redistricting plans because they have discriminated against minority voters. *Id.* at 7–8. In the last round of redistricting following the 2010 census, Texas was the only state that failed to preclear any of its redistricting plans under Section 5. *Id.* at 12. Beyond redistricting, Dr. Lichtman also explained that, once Texas was no longer subject to preclearance, Texas immediately took the opportunity to enact discriminatory voting laws again and again. *Id.* at 8–20. And as both Dr. Lichtman and others observed, this recent history is merely a continuation of Texas's pattern of official discrimination dating back to the state's early history. *Id.* at 6–7; *see generally* LULAC Ex. 4 (report of Dr. Tijerina); TXNAACP Ex. 139 (report of Dr. Martinez).

**Racially Polarized Voting**. Elections in the relevant areas of Texas exhibit clear racially polarized voting. It is undisputed that Latino and Anglo voters exhibit polarized voting in the areas at issue, with large majorities of Latino voters supporting candidates that large majorities of Anglo voters oppose. Gonzales Ex. 9 at 12; Tr. Day 15 AM at 152:5–155:5 (Alford). The only dispute is the *cause* of this polarization, with Defendant's expert Dr. John Alford insisting that it has nothing to do with candidates' race or ethnicity. Tr. Day 15 AM at 125:2–7 (Alford). But the evidence Dr. Alford cites shows no such thing.

6

Many of the elections Dr. Alford analyzed were not racially contested and show nothing about voters' preferences regarding candidate race. *Id.* at 166:14–167:5; Tr. Day 15 PM at 10:23–11:21 (Alford). Even Dr. Alford's deficient analysis shows that Latino voters support Latino Democratic candidates at consistently higher rates than they support Anglo Democratic candidates, and that in racially contested elections, Anglo voters support Anglo Democratic candidates at higher rates than they support Latino Democratic candidates. *Id.* at 21:13–22; Gonzales Ex. 8 at 5–7. And zooming out, all seven of the Latino-majority congressional districts are represented by Latino members of Congress, from both political parties, while twenty-one out of twenty-two Anglo-majority districts are represented by Anglo members of Congress, also from both political parties. Tr. Day 15 PM at 23:9–24:15.

Dr. Alford offered no non-racial explanation for these stark patterns, nor any evidence to explain what, other than race, accounts for the undisputed fact that Latino and Anglo voters in the relevant parts of Texas vote so differently. *Id.* at 15:24–26:7. Just as the court found in *Robinson v. Ardoin*, Dr. Alford's analysis in this case "border[s] on *ipse dixit*" and is "unsupported by meaningful substantive analysis." 605 F. Supp. 3d 759, 840 (M.D. La. 2022). It does nothing to undermine the clear evidence of racially polarized voting.

**Effects of Discrimination**. Testimony from Dr. Lichtman and others showed that Latino communities in Texas continue to suffer from the effects of past discrimination, including in areas such as health, education, and economic outcomes. Latino Texans overall suffer from substantial disparities in school discipline and educational attainment, as compared to their Anglo counterparts. Gonzales Ex. 11 at 27–29; Tr. Day 6 PM at 80:5–83:1, 83:15–85:20 (Lichtman); *see also* LULAC Ex. 2 at 8 (supplemental report of Dr. Saenz). They are also more likely to have worse health outcomes and healthcare access than Anglo Texans. Gonzales Ex. 11 at 31–32; Tr.

7

Day 6 PM at 89:21–92:1 (Lichtman); LULAC Ex. 2 at 8. And, relatedly, Latino Texans overall find themselves at a significant economic disadvantage compared to Anglo Texans. Gonzales Ex. 11 at 29-31; Tr. Day 6 PM at 86:14–89:18 (Lichtman); LULAC Ex. 2 at 8–9.

**Racial Appeals**. The record reflects multiple racial appeals in recent Texas elections. Dr. Lichtman identified several examples depicting Black and Latino Texans as dangerous and threatening. Gonzales Ex. 11 at 37–52; Tr. Day 6 PM at 96:13–103:12 (Lichtman). These include a former candidate for statewide office who used a racial slur to refer to Latino immigrants. Gonzales Ex. 11 at 39. Echoing these themes, Representative Romero testified about campaign literature circulated in his district during his campaign for the state house, associating him with gang violence, and a local newspaper referring to him and others as the "Mexican Mafia." Tr. Day 11 PM at 31:9–37:8 (Romero); LULAC Ex. 141. Michael Evans testified about the extent racial issues permeated his election as the first Black mayor of Mansfield, in Tarrant County, including advertisements containing darkened images of Evans similar to those identified by Dr. Lichtman involving other candidates. Tr. Day 7 AM 38:15–39:15, 49:16–55:11, 58:8–61:13 (Evans); Gonzales Ex. 11 at 47–49 (discussing history of darkened images in political advertisements).

**Elections to Public Office**. Outside of majority-minority districts, Latino Texans are dramatically underrepresented in public office in Texas. While minorities make up nearly fifty percent of Texas's voting-eligible population, they hold only four of Texas's twenty-nine statewide elected positions. Gonzales Ex. 11 at 57. Minorities, including Latinos, are also significantly underrepresented compared to their share of the population in Texas's congressional delegation and its state Legislature. *Id.* While Latino Texans comprise nearly a third of Texas's CVAP, they form an effective majority in only 6 of Texas's 38 congressional districts—roughly 16 percent. Gonzales Ex. 6 at 64–65. *Cf. Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994) (whether "minority

voters form effective voting majorities in a number of districts roughly proportional to the minority voters' respective shares in the voting-age population" is "a relevant fact in the totality of circumstances"). Even with the two additional majority-Latino districts in Gonzales demonstration plan C2198, Latino voters would still fall short of such proportionality, forming a majority in roughly 21 percent of congressional districts. Where Latinos have had electoral success in Texas, it has nearly always been in majority-Latino districts. *Id.*; Tr. Day 15 PM. at 23:9–24:15 (Alford).

**Responsiveness.** Testimony from multiple Texas voters established that the often rural, Anglo representatives who represent substantial cracked Latino populations under the enacted plans are not responsive to the Latino community's needs. *See, e.g.*, Tr. Day 9 AM at 145:14–19 (Loredo) (testifying that he has never seen his congressman at community events and never met him); Tr. Day 7 AM at 90:3–91:7 (Martinez); *id.* at 118:20–119:24 (Guillen).

**Tenuousness.** Texas has offered no substantial justification for the challenged districts. Texas's own lawyers describe them as "advanc[ing] partisan interests." ECF No. 986 at 8. The primary map-drawer testified unequivocally that his objective in Dallas–Fort Worth "was to create three heavily Democratic districts and then try to shore up the other Republicans around it," and to "[p]rotect[] the many incumbent Republicans that lived in and around DFW." Tr. Day 7 PM at 118:14–20, 119:3–6 (Kincaid). Similarly, in Harris County, he sought to "create four heavily Democratic districts . . . and then create a new Republican-leaning district" that served "Republican voters in western Harris County." *Id.* at 126:23–127:7, 127:17–23. Texas's own expert, Dr. Sean Trende, characterized the congressional plan as "drawn to substantially improve the political advantage of the Republican Party," Def. Ex. 8 at 9, and as a "political gerrymander plain as punch," Tr. Day 14 AM at 94:8–10. (Dr. Trende also explained that drawing some heavily

9

Democratic districts is a feature of such a gerrymander, not a bug, because it "free[s] up Republicans to put into these districts they're trying to save." Tr. Day 14 AM at 100:2–7).

This explicitly partisan motivation is the *only* legislative purpose supported by any record evidence in this case. While Texas alluded at points to the *possibility* of other communities of interest, Tr. Day 6 AM at 123:5–13, Texas offered no evidence that the challenged districts serve particular communities of interest that would be divided by the demonstration plans. *Cf. Allen*, 599 U.S. at 20–21 (discussing and rejecting Alabama's argument that the challenged map served an important interest in uniting the "Gulf Coast region"); *Robinson*, 605 F. Supp. 3d at 829 (similar as to Louisiana's military installations, Acadiana region, and major cities and suburbs).

Texas's failure to show that the challenged districts are anything more than a partisan gerrymander leaves Texas without any substantial justification for drawing the plans as it did. Explicitly partisan gerrymandering may not be justiciable in federal court, but it remains "'incompatible with democratic principles'" and "leads to results that reasonably seem unjust." *Rucho v. Common Cause*, 588 U.S. 684, 713 (2019) (quoting *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 791 (2015)). The Texas legislature's desire to advantage its favored political party provides no substantial justification for the drawing of districts that have the effect of diluting Latino voters' votes in violation of Section 2 of the Voting Rights Act.

## CONCLUSION

The Court should declare Texas's congressional map a violation of Section 2 of the Voting Rights Act, enjoin the use of Texas's congressional districts, give the Texas Legislature an opportunity to enact a lawful replacement plan that includes additional Latino-opportunity districts in Dallas–Fort Worth and Harris County, and order the adoption of a lawful map including such districts if the Texas Legislature does not promptly enact one in time for the 2026 election cycle.

Dated: June 30, 2025

Renea Hicks
Attorney at Law
Texas Bar No. 09580400
Law Office of Max Renea Hicks
P.O. Box 303187
Austin, Texas 78703-0504
(512) 480-8231
rhicks@renea-hicks.com

Respectfully submitted,

*/s/ David R. Fox*

David R. Fox*
Richard A. Medina*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
dfox@elias.law
rmedina@elias.law

Abha Khanna*
**ELIAS LAW GROUP LLP**
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
akhanna@elias.law

Counsel for Gonzales Plaintiffs

*Admitted pro hac vice

12

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically under seal (via CM/ECF) on June 30, 2025, and that all counsel of record were served by email with a copy of this filing, including attachments, on June 30, 2025.

/s/ David R. Fox