UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF REPRESENTATIVES, SERGIO MORA, BOBBIE GARZA-HERNANDEZ, | § § § § § | |
| Plaintiffs | § § § § | Civil Action No. 3:21-cv-00259-DCG-JES-JVB [Lead Case] |
| v. | § § | |
| STATE OF TEXAS, *et al.* | § § § | 3:21-cv-00988-DCG-JES-JVB [Consolidated Case] |
| Defendants. | § | |

**MALC'S POST-TRIAL EXECUTIVE SUMMARY BRIEF**

Plaintiff Mexican American Legislative Caucus ("MALC") files this Executive Summary pursuant to the Court's June 16, 2025 Order (ECF No. 1098). MALC requests the Court enter any declarations of law necessary to support a finding that the redistricting maps for the Texas House of Representatives (Plan H2316) and the U.S. House of Representatives (Plan C2193), passed in the 87th Legislature and rubber-stamped in the 88th Legislature, are unlawful under the U.S. Constitution and Section 2 of the Voting Rights Act. This includes declaring that Plan H2316 and Plan C2193 violate the Equal Protection Clause of the U.S. Constitution by manipulating the apportionment of Texas House district populations to disadvantage Hispanic and regional minority interests in El Paso, violate the Fourteenth and Fifteenth Amendments of the U.S. Constitution by intentionally discriminating against Hispanic minorities, and violate the discriminatory results

prong of Section 2 of the Voting Rights Act.[1] This brief summarizes the basis for MALC's entitlement to relief.

**A.  Plan H2316 unconstitutionally manipulates population deviations to disadvantage Hispanic and regional interests in El Paso County and favor Anglo rural interests in West Texas.**

Population deviations between districts may be challenged as unconstitutional malapportionment if the deviations are systematically and intentionally created to favor one group or region over another and are not justified by legitimate state policies. *Cox v. Larios*, 542 U.S. 947 (2004). In enacting Plan H2316, Texas favored Anglo and rural interests in low population West Texas districts systematically over Hispanic interests in El Paso County and, accordingly, Plan H2316 should be declared discriminatorily malapportioned.

The evidence[2] supporting MALC's malapportionment claim was extensive and supports a finding that the Texas Legislature more likely than not preferred West Texas Anglo interests over El Paso Hispanic interests without any legitimate sate policy interest, including:

- Plan H2316 resulted in systematic underpopulation in rural West Texas while districts in El Paso were systematically overpopulated. *See* **MALC Ex. 14** (Expert Report of Kousser) at 87-90; **Joint Exhibit ("JX") 2255** (Plan H2316 Red 100 Report) at 12-13 and 13-15; **JX 2577** (MALC-3 Demonstrative Map) at 5 (showing non-discriminatory deviations); **Trial Tr. 65:2-10, June 6, 2025 AM** ("[T]hey moved the four districts that were left in El Paso County almost to the top end of permissible deviation."). El Paso districts (HDs 74, 75, 77, 78, 79) had a significantly higher population per representative ratio (195,745:1) compared to rural West Texas/Panhandle districts (e.g., HD 88) (186,791:1). *See id.* and **JX 4150** (Demographers Report dated Sept. 13, 2021); **Trial Tr. 158:10-25 June 4, 2025 AM**.

---

[1] MALC also requests injunctive relief to enjoin the continued use of the complained-of maps in their current configurations and a reasonable remedial process that leads to timely adoption of plans that remedy the constitutional and statutory violations. Finally, MALC would request its reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).
[2] Citations are to the trial testimony are to the rough transcripts provided to the parties during the course of the trial. As the Court knows, the cited evidence is not exhaustive and is not intended to be an exhaustive basis of the evidence supporting MALC's claims. *See* Order Requiring Executive Summary at 1 (the Court "will not bind the parties to their executive-summary briefing.").

- This systematic pattern has the effect of diluting the electoral power of Hispanic in El Paso. *See* **JX 4238** (October 12, 2021 Floor Debate) at S9-S13, S56-64; **Trial Tr. 65:11-66:1 June 6, 2025 AM**; **Trial Tr.88:6-14 June 4, 2025 PM** (describing Latina pairing in El Paso as unnecessary); **Trial Tr. 82-95, 92-93 May 30, 2025 AM** (describing effect of overpopulating El Paso).

- This deviation pattern was designed to avoid eliminating Anglo-majority districts or pairing Anglo incumbents, at the expense of Hispanic voters and by pairing Latina representatives in El Paso. *See* **JX 4238** at S56-64; **Trial Tr. at 43:5-44:10, 41:1-4 June 11, 2025 AM** ("Q:…it was done pretty systematically…A:…that's correct.").

- The State of Texas offered no rational explanation or basis that would justify this pattern and it was explicitly inconsistent with the stated rationale of the map-drawers that areas experiencing relative higher population growth rates would receive more representation. *See* **Trial Tr. 66:2-67:6 June 6, 2025 AM** (describing how El Paso County was treated differently than other "urban magnets" provided as an excuse for the pairing of two Latinas in El Paso); J**X 4238** at S56-64; **Trial Tr. 147:9-148:16 June 4, 2025 PM** (stating that the Texas legislature lets racial bias creep into its processes).

- The evidence also established the State of Texas could have satisfied their so-called partisan goals without unnecessarily over-populating El Paso County in a discriminatory fashion. *See* **Trial Tr. 114:1-16 June 4, 2025 PM** (describing the drawing of Republican minority opportunity districts in West Texas through MALC demonstration map).

B. **Plan H2316 violates Section 2 of the Voting Rights Act in Harris County and the Central Texas region in the Hays/Caldwell County area.**

    1. **Harris County.**

MALC demonstrative maps, Plans H2328 and H2330 (referred to as MALC-2 and MALC-5 in Dr. Barreto's reports), show it is possible to draw an additional one or two HCVAP majority districts in Harris County that satisfy *Gingles I*. *See* **JX 2574** (MALC-2 Map); **JX 2575** at 26 (MALC-2 Report Package); **JX 2578** (MALC-5 Map); JX 2579 at 26 (MALC-5 Report Package); *see also* **MALC Ex. 16** (Barreto Expert Report May 2022) at 5-6; **Trial Tr. 93-95 May 30, 2025 AM**. Based on the demonstration maps admitted and the cohesion and racially polarized voting data analyzed offered at trial, "the Hispanic population is sufficiently large and geographically compact enough to form a majority of voters and elect its candidate of choice in an additional Texas House district in Harris County while maintaining the Hispanic voting strength in House Districts

145 and 148, unlike the adopted plan which draws no new Hispanic opportunity district and also significantly dilutes the Hispanic population in HDs 145 and 148." **MALC Ex. 16** at 19 (Barreto Expert Report May 2022).

There is also legally significant racially polarized voting, satisfying *Gingles II* and *III,* including cohesive voting in Plaintiffs' demonstrative districts and Anglo bloc voting in the challenged districts and throughout Harris County. *See* **Trial Tr. 30:20-25 May 30, 2025 AM** ("statistically significant racially polarized voting in every geography that we analyzed in every election"); 95-96 (all MALC demonstrative districts cohesive); *see also* **MALC Ex. 18** at App. 10,, 17, 24-27, and 28-32 (Barreto Expert Report April 2025).

2.  **Central Texas.**

MALC's demonstrative maps, Plan H2327 and Plan H2331 (referred to as MALC-1 and MALC-6 in Dr. Barreto's reports), show it is possible to draw an additional one or two HCVAP majority districts in Central Texas that satisfy *Gingles I.* **JX 2572** (MALC-1 Demonstration Map); **JX 2573** (MALC-1 TLC Report Package); **JX 2580** (MALC-6 Demonstration Map); **JX 2581** at 9 (MALC-6 TLC Report Package); *see also* **MALC Ex. 16** at 19 (Barreto Expert Report May 2022 Report). In contrast, the enacted plan has two central Texas districts, House District 17 and 51, which have significant less Hispanic CVAP of 29.5% and 43%, respectively. *See* **JX 2240** at 1-2 (Plan H2316 Red 116 Report).

There is also legally significant racially polarized voting, satisfying *Gingles II* and *III*, including cohesive voting in Plaintiffs' demonstrative districts and Anglo bloc voting in the challenged districts. *See* **MALC Ex. 16** at 2, 19, and 28 (Barreto Expert Report May 2022); **MALC Ex. 18** at App. 1, 23-24, and 33 (Barreto Expert Report April 2025).

### C. Plan C2193 violates Section 2 of the Voting Rights Act.

#### 1. Dallas-Fort Worth.

Demonstrative Plan C2163 shows it is possible to draw a HCVAP majority district in Dallas-Fort Worth that satisfies *Gingles I*. *See* **JX 515** (Plan C2163 Demo Map); **JX 516** (Plan C2163 Map Report Package); **JX 523** (Plan C2163 Red 116 2023 ACS data).

There is also legally significant racially polarized voting, satisfying *Gingles II* and *III*, including cohesive voting in Plaintiffs' demonstrative districts and Anglo bloc voting in the challenged districts and throughout the DFW metroplex. MALC established Hispanic cohesion in its proposed Congressional District 37 as an alternative to Plan C2193's configuration. *See* **MALC Ex. 18** at 12 (Barreto Report dated March 2025). Based on BISG-informed ecological inference, "across elections analyzed for 2022 and 2024 there is a clear, consistent and statistically significant pattern of racially polarized voting" across Texas. *See* **MALC Ex. 19** at 4 (Expert Report of Matt Barreto dated April 2025). MALC also established clear evidence of majority bloc voting sufficient to usually defeat the minority preferred candidate *in the existing districts* where the minority voters reside (and from which the new district would be drawn) as required. *Id.* at 2. Racially polarized voting dispersion plots overlaid on the enacted Dallas-Fort Worth congressional map showed the stark polarization that exists and the intent to pair Hispanic voters with large groups of Anglo bloc voters diluting the Hispanic voting power. *See* **MALC Ex. 18** at 19 (Barreto Expert Report March 2025).

#### 2. Harris County.

Demonstrative Plan C2167 shows it is possible to draw an additional HCVAP majority district in Harris County that satisfies *Gingles I*. **JX 809** at 19 (Plan C2167 Demo Map); **JX 706** (Plan C2167 2023 ACS data); **JX 810** (Plan C2167 Map Report Package).

MALC established legally significant racially polarized voting, satisfying *Gingles II* and *III*, including cohesive voting in Plaintiffs' demonstrative districts and Anglo bloc voting in the challenged districts and throughout Harris County. *See* **MALC Ex. 16** at 2, 28 (May 2022 Barreto Expert Report); **MALC Ex. 18** at 12 (March 2025 Barreto Expert Report) (finding cohesion in Harris County). Again, using vote history for 2022 and 2024 and the BISG method, regions across Texas with sizable populations of both Anglo and minority voters, ecological inference models point to a clear pattern of racially polarized voting and Anglo bloc voting. *See id.*; **MALC Ex. 19** at 2-4, 12-13 and App. A (Barreto Expert Report April 2025).

### D. Largely uncontested "totality of the circumstances" evidence.

If the *Gingles* preconditions are met for a challenged district or a proposed opportunity district, the court must consider whether, under the totality of the circumstances, minority voters have an equal opportunity to participate and elect candidates. Here, the evidence supporting a finding that the "totality of circumstances" points to discriminatory results is substantial.

- History of discrimination and reluctant acquiescence to federal court orders. *See* **MALC Ex. 14** at 12-30 (Dr. Kousser Report); **Trial Tr. 90:7-15, 91:18-92:16, 93:3-94:9, 94:10-95:3 May 27, 2025 PM**.

- Racially polarized voting exists in Texas. *See* **MALC Exs. 16-19** at (Barreto Expert Reports); *see also* **Trial Tr. 97:24-98:23 May 27, 2025 PM** (discussing race driving partisanship and close correlation in Texas) and **104:13-105:12** (discussing Rep. Hunter's awareness of racially polarized voting and racial considerations); **Trial Tr. 65:1-69:1 May 28, 2025 PM** (discussing existence of RPV in Texas).

- Ongoing discrimination in healthcare and education with local effects. **MALC Ex 14** at 36, App 1-17; **Trial Tr. 37:21-38:2 May 28, 2025 PM** (noting applicability of Senate Factors generally) and **76-79, 81-83, 90-92** (discussing healthcare and education discrimination); **Trial Tr. 17:21-19:20 June 5, 2025 AM** (Rep. Anchia testifying concerning socioeconomic disparities).

- Changing political conditions, including Hispanic population growth and Republican dominance. JX 4150 at 5 (Texas Demographer Report); **MALC Ex. 1**4 at 30-34, 41-44; **Trial Tr. 96:18-97:20, 99:15-100:12**.

- Lack of responsiveness demonstrated by the exclusion of minority legislators and rejection of their proposed amendments during the redistricting process. **MALC Ex. 14** at 57-60; **Trial Tr. 100:17-102:11, 103:24-104:105:12 May 27, 2025 PM**.

- Racial appeals in political campaigns. *See* **Trial Tr. 106:7-16 May 28, 2025 PM**; **Trial Tr. 31-36 June 5, 2025 PM** (testimony of Chair Romero describing personal experience with racist appeals in localized campaigns).

E.   **Defendant's experts do not alter the analysis.**

Notably, the State of Texas did not present compelling contrary expert opinion to rebut these findings. Defendant's expert Dr. Sean Trende did not opine on minority cohesion or racial polarization at all, and offered no opinions on the size or compactness of any proposed demonstration map. *See* **Trial Tr. 146:8-13 June 9, 2025 PM**. Dr. Trende admitted on cross-examination that he understood that a map achieving partisan goals could be drawn if only race was used to draw the map because of the close correlation between race and partisanship in Texas. *Id.* at **149:10-150:18**. He also admitted that his methodology and opinions only showed that the maps were consistent with partisan effects, but did not rule out race as a potential factor in drawing those maps. *Id.* at **16:13-23, 141:16-142:11**. Accordingly, his opinions are largely irrelevant.

The State of Texas also offered Dr. John Alford to rebut the Plaintiffs' experts' findings of racially polarized voting. Dr Alford's testimony is not sufficiently credible or specific to satisfactorily explain away clear evidence of Texas's racially polarized voting. *See* **Trial Tr. 110-149 June 10, 2025 PM**. Dr. Alford admitted he has never published any academic work on how to control for partisanship in racially polarized voting analysis. *See id.* at **38:17-39:1**. Dr. Alford also admitted he purposefully did not attempt to control for partisanship in his racially polarized voting analysis. *Id.* at **40:1-8**. Dr. Alford also admitted he did no work and expressed no opinions about any of the circumstantial evidence of discriminatory intent. *See id.* at **50-52**. Finally, Dr.

Alford conceded previous courts had found his approach and methodology unsound and improper, yet he did nothing to change his approach for this case. *Id.* at **47:8-14**.

The State of Texas offered no expert opinion evidence challenging the existence of the *Gingles I, II* and *III* factors, no expert testimony rebutting the evidence of discriminatory effects under Section 2 of the Voting Rights Act, and no expert testimony rebutting the circumstantial intent opinions of Plaintiffs' experts in this case.

**F.    MALC also established it is more likely than not that the Texas Legislature acted with a racially discriminatory purpose as a motivating factor.**

The Supreme Court's decision in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-68 (1977), provides the framework for analyzing discriminatory intent, considering factors such as the historical background, the sequence of events, departures from normal procedures, legislative or administrative history, and the impact of the challenged action.[3] Drawing on the *Arlington Heights* framework, the evidence in this case supports a finding of discriminatory intent behind the challenged plans:

1. **Historical Background:** Texas has a history of voting legislation characterized by "reluctant acquiescence to federal court orders." This history includes past instances of vote dilution challenges and a variety of abuses such as racial gerrymanders, discriminatory election laws, and last-minute changes to polling places. *See* **MALC Ex. 14** at 6 (Expert Report of Morgan Kousser)[4]. The imposition of new laws in reaction to growing minority

---

[3] Citing *Alexander v. South Carolina State Conf. of the NAACP*, 602 U.S. 1, 3435 (2024), Defendants argue that Plaintiffs must show the State could have achieved partisan goals in an alternative map that had a less significant racial impact. *See* ECF 1082 at 6. That statement, however, arose only in the context of *Shaw*-type racial gerrymandering claims. In those cases, the burden is to prove that race ***was the predominant factor in the legislature's districting decisions***, and there is no need to prove a discriminatory effect. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995); *Cooper v. Harris*, 581 U.S. 285, 291 (2017). That standard differs from claims alleging invidious racial discrimination under the Equal Protection Clause, where courts look to the framework set forth in *Arlington Heights*. Under this framework, a plaintiff need only show that ***race was a motivating factor, not the sole or predominant one***. *See Perez v. Abbott*, 253 F. Supp. 3d 864, 945 (W.D. Tex. 2017) ("Plaintiffs correctly note their burden is not to prove that race was the sole decision-making factor or motivation, and that discriminatory purpose need only be 'a motivating factor.'"). Accordingly, the alternative-map burden discussed in *Alexander* does not apply to intentional discrimination claims brought under *Arlington Heights*, where the central inquiry is the presence of a discriminatory intent coupled with a discriminatory effect, not whether race ***predominated over other considerations***.

[4] Each of Dr. Kousser's findings and opinions were also supported throughout the trial during the testimony of Reps. Anchia, Romero, and Moody as well as the various video clips of the House proceedings shown. *See e.g.,* **JX 4238** (October 12 floor debate) and **JX 4267, JX 4270,, JX 4271** (video clips of bill layouts and floor debates). For ease of

activism is also part of this history. *Id.* at 30-31 (discussing reaction to 2018 elections and minority activism and turnout).

2. **Sequence of Events & Departures from Normal Procedures:** The redistricting process in 2021 involved significant departures from typical procedures, restricting opportunities for input and transparency.

    - Minority legislators were excluded from decision-making about redistricting in its initial phases. Given the time-crunch created resulting from delayed census results, the inclusion of minority decision-makers in early drafts, decisions, and iterations of redistricting proposals was even more essential. *Id.* at 50-51.
    - Democrats and the public were given a highly restricted opportunity to respond to the proposed plans. The Republican majority created the plans at a distance and largely in secret and then ran them through truncated processes. *Id.* at 46-47, 52-53.
    - In the House, only one committee hearing was held after plans were introduced, with just three days' notice. *Id.* at 52.
    - Requests by minority committee members for experts on redistricting and voting rights to testify, as well as witnesses from state agencies, were denied. *Id.* at 53.
    - Minority members were not informed of crucial deadlines like the cutoff for proposing amendments. *Id.* at 52-53.
    - Requests for more time to debate and consider the plans were denied. *Id.*
    - Republicans, but not Democrats, were shown a draft of House Plan H2316 before its introduction. *Id.* at 51-52.
    - House proceedings involved unusual conduct, such as severely limited time for plan layout, requiring written questions from committee members, and adopting amendments without readily available data or legal analysis, often in the middle of the night. *Id.* at 53
    - Amendments offered by minority legislators were routinely rejected, while those offered by Anglo members were accepted. Amendments were voted down without argument or explanation. *Id.*

3. **Legislative/Administrative History and Statements by Decisionmakers:** Statements and actions by those involved in the process indicate race was a significant consideration.

    - Map drawers were conscious of race and lauded their efforts to create Hispanic Voting Age Population Districts, but simultaneously denied ever actually looking at race during the process. This inconsistency in position lacks credibility and is indicative of "race based" decisions. *Id.* at 54-57.
    - Legislators adopted a strategy of concealing and hiding their methodology and processes in map drawing behind evidentiary privileges and refused to provide an explanation for their actions when asked under oath. *Id.* at 57-58.
    - An operative involved in drafting plans, Adam Foltz, had a similar history in Wisconsin where his role in a secretive redistricting process was criticized by a

---

reference, MALC primarily cites to Kousser's report here as a concise collection of the circumstantial evidence, but the testimonial record is replete with corroborating evidence of circumstantial evidence.

federal court. Foltz largely refused to testify about the specific principles and data he used in drawing maps. Instead, he adopted a consultant's messaging theme that the maps in the Texas House were "member driven," even though Democratic members of the House unable to participate in the initial drafting of the maps. *Id.* at 51-52.

4. **Impact and Pattern of District Lines:** The resulting maps demonstrate an adverse impact on minority voters and feature patterns consistent with discriminatory intent.

    o The plans resulted in a systematic under-populating of rural West Texas districts compared to El Paso districts. This disproportionately impacted Hispanic voters in El Paso by requiring more voters per representative, thus diluting their electoral power. *Id.* at 78-90.
    o The plan avoided eliminating Anglo-majority districts or pairing Anglo incumbents, instead pairing Latina representatives from El Paso (HDs 76 and 77). *Id.* at 86.
    o Rejected amendments, primarily proposed by minority legislators, and supported by minority representatives, demonstrated that alternative plans were feasible that could have created significantly more minority opportunity districts (e.g., Anchia Amendment 5 proposing to increase Hispanic CVAP majority HDs from 30 to 43) or preserved existing ones. The rejection of these alternatives, without explanation, supports the inference that minimizing minority opportunities was intentional. *Id.* at 58.

## CONCLUSION

MALC submitted sufficient evidence to satisfy its burden and entitle it to the relief requested. The balance of qualified expert opinion clearly established the *Gingles I, II and III* factors, there was largely no contravention of the *Gingles* "totality of the circumstances" analysis, and there was no contrary expert opinion on the issue of circumstantial evidence of intent. The testimony from minority legislators, such as Speaker Moody, Chairman Anchia, and Chairman Romero, about the unique "departures" of this redistricting process, coupled with the gross inconsistency between the Hispanic population growth in Texas compared to the diluted legislative representation was stark and compelling. The Court should find Plan H2316 and C2193 unconstitutional and violative of the Voting Rights Act.

Respectfully submitted,

SOMMERMAN, MCCAFFITY, QUESADA &GEISLER, L.L.P.

*/s/ Sean J. McCaffity*
_____
George (Tex) Quesada
State Bar No. 16427750
Email:  quesada@textrial.com

Sean J. McCaffity
State Bar No. 24013122
Email:  smccaffity@textrial.com

3811 Turtle Creek Boulevard, Suite 1400
Dallas, Texas  75219-4461
214/720-0720 (Telephone)
214/720-0184 (Facsimile)

-and-

Joaquin Gonzalez
Texas Bar No. 24109935
1055 Sutton Dr.
San Antonio, TX  78228
jgonzalez@malc.org

**ATTORNEYS FOR PLAINTIFF MALC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed electronically via the Court's electronic filing system (CM/ECF) on June 30, 2025.

*/s/ Sean J. McCaffity*_____
Sean J. McCaffity