**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

|  |  |
|---|---|
| LULAC, *et al.*,<br><br>       *Plaintiffs,*<br><br>v.<br><br>GREG ABBOTT, in his official capacity as Governor of Texas, *et al.*,<br><br>       *Defendants.* | Case No.: 3:21-CV-00259-DCG-JES-JVB<br>[Lead Case]<br><br>**Brooks Plaintiffs' Executive Summary** |

**BROOKS PLAINTIFFS' EXECUTIVE SUMMARY**

This Court should grant judgment to the Brooks' Plaintiffs on all claims. Plaintiffs demonstrated that all three *Gingles* preconditions are met in Texas House District 118 (HD 118) and in the congressional districts that cover the Houston metroplex and Dallas-Fort Worth areas (DFW) and that based on the totality of the circumstances, Hispanic voters in these areas have less opportunity to elect their candidates of choice. The Court should therefore enter judgment for Brooks Plaintiffs on their Section 2 claims under the Voting Rights Act (VRA). Additionally, the trial record shows that Senate District 10 (SD 10) was intentionally dismantled to prevent minority voters from electing their candidate of choice to the Texas Senate, and that race predominated in drawing the new SD 10. The Court should enter judgment for Brooks Plaintiffs on all claims.

**ARGUMENT**

I.     **Plaintiffs proved their Section 2 of the Voting Rights Act claims.**

A.     **House District 118**

Plaintiffs demonstrated that enacted HD 118 violates Section 2 of the Voting Rights Act.

First, *Gingles* I is met. Latinos in HD 118 are "sufficiently large and geographically compact to constitute a majority in a single-member district." *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). Plaintiffs satisfy *Gingles* I by drawing illustrative majority-minority districts "to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)). The trial record establishes that it is possible, under plan H2326, to draw a Latino majority district with a Hispanic CVAP of 71.3% that would allow Latinos to elect candidates of their choice. Because the Hispanic CVAP in HD 118 under plan H2326 is over the 50+1% threshold, *Gingles* I is satisfied. Moreover, HD 118 is reasonably configured—indeed, it

is more compact than the enacted map's version of HD 118. *Compare* JX 2322 at 3 (Enacted Map HD 118 compactness scores .554 and .151) *with* JX 2523 at 3 (Plan H2326 HD 118 compactness scores .668 and .192); *see Milligan*, 599 U.S. at 18 ("[A] district will be reasonably configured, our cases explain, if it comports with traditional districting criteria, such as being contiguous and reasonably compact.").

Next, voting in HD 118 is racially polarized.[1] Under *Gingles* II, a plaintiff must show that "a significant number of minority group members usually vote for the same candidates." *Gingles,* 478 U.S. at 56. Latinos in HD 118 are cohesive. The Brooks Plaintiffs' expert, Dr. Matt Barreto, demonstrated through thousands of models that in over six election cycles and 24 individual election races, 70% of Latinos cohesively for their preferred candidates. Brooks Ex. 221 at 29; Brooks Ex. 224 at 9. This was true in endogenous elections, in which Latinos supported HD 118 candidates Caranza and Ramirez at about a 2-to-1 margin and in exogenous elections for statewide office. *See* Brooks Ex. 224 at 9.

Additionally, Anglo voters in HD 118 are similarly cohesive and "vote[] sufficiently as a bloc to enable [them] … [to] usually to defeat the minority's preferred candidate" in HD 118. *Milligan,* 143 S. Ct. at 1503 (quoting *Gingles*, 478 U.S. at 50). Thus, *Gingles* III is satisfied. In the same elections analyzed by Dr. Barreto, white voters supported different candidates than Latino voters and supported their preferred candidates at above 75%. Brooks Ex. 221at 29; Brooks Ex. 224 at 9. Moreover, white voting strength operates to block Latino preferred candidates, such that they usually lose. In both endogenous election contests for HD 118, the Latino preferred candidates Caranza and Ramirez, lost to the white preferred candidate. *See* Brooks Ex. 224 at 9. White voters successful bloc vote against Latino preferred candidates in the enacted HD 118 in

---

[1] Plaintiffs' experts' analysis and results on racially polarized voting are not disputed by Defendants. *See* Trial Tr. AM (June 10, 2025), 113:19-114:1.

thirteen out of twenty-two exogenous elections. *See e.g.,* Brooks Ex. 221, 222, 223, 224, 240, 241, 242, 243, 244, 245.

Further, Defendants have failed to provide any evidence that show that a race-neutral alternative exists for racially divergent voting patterns. In the Fifth Circuit, after Plaintiffs present statistical evidence showing a racially divergent voting pattern, the burden shifts to Defendants to show that there is a race-neutral explanation for the racially divergent voting pattern. *See Teague v. Attala Cnty., Miss.*, 92 F.3d 283, 290 (5th Cir. 1996); *Lopez v. Abbott*, 339 F. Supp. 3d 589, 604 (S.D. Tex. 2018); *Clark v. Calhoun Cnty.* (*Clark II*)*,* 88 F.3d 1393, 1397 (5th Cir. 1996).   In "proving up the *Gingles* factors," the burden is not on Plaintiffs to prove racial animus in the electorate. *Teague*, 92 F.3d at 290. Defendants have failed to present any reliable or methodologically sound evidence sufficient to dispute that Anglo bloc voting "thwarts" cohesive Latino voters in HD 118 for reasons wholly unconnected to race. Defendants' expert Dr. Alford did not provide any of his own analysis controlling for partisanship. Trial Tr. PM (June 10, 2025) at 39:11-22. He did not provide any analysis or evidence of other race-neutral explanations for racially divergent voting patterns. *Id.* at 40:7-8; 41: 21-42:11 (Dr. Alford "I am not trying to do an analysis—an independent analysis of this issue."). Dr. Alford stated that he has never seen anyone control for partisanship while conducting a racially polarized voting analysis and "purposefully did not perform that analysis" himself. *Id.* at 39:15-8. Dr. Alford's allegations that partisanship drive polarization is not based on any analysis he conducted, but mere speculation. *Id.* at 42:3- 43:19. In the absence of any reliable methodology or independent analysis, the Court should not credit Dr. Alford's testimony. But even if it affords any weight to that testimony, the sparse and unreliable evidence Defendants introduced is insufficient to establish that the racially divergent voting patterns in HD 118 and Texas at large can be explained wholly by race-neutral considerations.

Plaintiffs also demonstrated that under a totality of the circumstances Latinos in HD 118 do not have an equal opportunity to elect their candidates of choice. *Gingles*, 478 U.S. at 45. First, the policy underlying Texas's drawing of HD 118 is tenuous. In drawing HD 118, map drawers utilized the nudge factor: they lowered the HCVAP in HD 118, lowered the Spanish Surname Registered Voters from 59.3% to 47.6%, and drastically lowered the Spanish Surname Turnout from 55.7% to 43.9%. *See* Brooks Ex. 221 at 5. Analysis of HD 118 showed that map drawers were trading areas based on race because they chose under-preforming VTDs for Hispanic candidates of choice that were still majority Hispanic to keep the district majority HCVAP. *See* Brooks Ex. 248; Trial Tr. May 30, 2025, 53:11-56:11. Partisan considerations offered by the State as a justification cannot explain HD 118's configuration. Testimony at trial showed that if a map drawer only had partisan shading available the precincts included in HD 118 would have been excluded. *See* Trial Tr. May 30, 2025, PM at 96:12- 101:22; Brooks Ex. 248. *Defendants' expert* Dr. Trende testified that HD 118 could have been made more Republican, but that doing so would have lowered its Hispanic CVAP to roughly 47% which would on its face indicate that the map drawers were retrogressing HD 118. Trial Tr. PM (June 9, 2025) 72:4-18; Brooks Ex. 249. Map drawers took a Goldilocks approach to HD 118—endeavoring to make it as Republican as possible while maintaining a mirage of Latino opportunity.

Additionally, there is a history of official discrimination against Latinos in Bexar County, including in voting. In the last redistricting cycle, map drawers also utilized the nudge factor in Bexar County to dilute Latino voting strength, in violation of Section 2 of the VRA and the United States Constitution. *See Perez v. Abbott,* 250 F. Supp. 3d 123, 146 (W.D. Tex. 2017). This redistricting cycle, map drawers ran back the same play—intentionally diluting Latino votes in Bexar county by maintaining a majority Latino district while replacing high performing Hispanic districts with underperforming, low turnout, low Hispanic registration districts. As the Supreme

Court held with respect to similar facts regarding CD 23 in *LULAC v. Perry*, "[t]his bears the mark of intentional discrimination." 548 U.S. 399, 440 (2006). Latinos in Bexar County also bear the effects of discrimination in various socioeconomic categories, including college graduation rates, median household income, percent in poverty, lack health insurance, and have a lower median home value than their Anglo counterparts. Brooks Ex. 228 at ¶ 173-175; LULAC Ex. 2 at 9-10.

The Court should find that HD 118 dilutes Latino voting strength while creating a façade of a Latino opportunity district in violation of Section 2 of the VRA.

B.      **Congressional Plan**

Plaintiffs established that Section 2 VRA requires an additional HCVAP majority district in the Houston and DFW areas.

First, Brooks' Plaintiffs plan C2163 satisfies *Gingles* I by creating Latino majority CVAP districts that satisfy the *Gingles* I threshold. *See* JX. 627.  Plan C2163 creates two majority HCVAP congressional districts in the Houston area, CDs 29 (50.7% HCVAP) and 38 (50.9% HCVAP), and creates an additional majority HCVAP majority district in Dallas/Fort Worth (DFW), District 37 (51.4% HCVAP). The new majority HCVAP districts in Plan C2163 comport with traditional redistricting criteria, such as being contiguous and containing equal population. ECF No. 978 at ¶¶ 96-97; Trial Tr. PM (June 4, 2025) 134:20-142:7 (Representative Anchia explaining that the demonstrative districts in Plan C2163 respect natural boundaries along the I-30 and connect communities in the DFW area on the basis of socioeconomic, religious, and employment). Because Plaintiffs' demonstrative map crafts additional HCVAP districts that are over the 50% threshold and comport with traditional redistricting principles, *Gingles* I is satisfied.

Second, Brook's Plaintiffs established *Gingles* II and III for both Houston and DFW.

Plaintiffs established that Latinos in the Houston area are politically cohesive. In over 22

different election contests in six different election cycles, Latino voters in the Houston Metroplex and congressional districts in and around Houston cohesively voted for the same candidates on average at over 70%. Brooks Ex. 221 at 38; Brooks Ex. 223 at 41-43, 56-58; Brooks Ex. 224 at 12, 17. Anglo voters in the Houston Metroplex are similarly cohesive and Anglo bloc voting usually defeats Latino voters' ability to elect their candidates of choice. *Id.*

Plaintiffs also demonstrated that Latino voters in the DFW area are politically cohesive and vote for preferred candidates. Across all models and data sources, the results consistently show that Latino voters in CD 32, CD 33, and the DFW area demonstrate high levels of political cohesion, with political cohesion ranging from 75% to 80%. *See* Brooks Ex. 223 at 10; Brooks Ex. 224 at 14, 15; Brooks Ex. 223 at 47-51. Plaintiffs also demonstrated that Anglo bloc voting usually defeats Latino voters' ability to elect their candidates of choice in the Dallas-Fort Worth region. *See* Brooks Ex. 224 at 2, Brooks Exp. 224 at 14-15; Brooks Ex. 223 at 47-51; Brooks Ex. 221 at 2, 34-36. Further, participation in political primaries demonstrates that race drives of polarization. While "7.8% of voters in the 2020 Republican primary were of Spanish surname… 26.1% of voters in the Democratic primary were of Spanish surname. When looking at all ballots cast by Spanish surname voters in the 2020 primary, 77.8% were in the Democratic primary compared to 22.2% in the Republican primary." Brooks Ex. 222 at 18, ¶ 39. Defendants did not provide any evidence to show that a race-neutral alternative explains the polarization in voting. *See Supra*, 3; Teague, 92 F.3d at 290.

The undisputed evidence in the record demonstrates that, under the totality of the circumstances, Latinos do not have an equal opportunity to elect their candidates of choice to Congress. *See Gingles*, 478 U.S. at 43. There is a long history of racial discrimination in voting in Texas targeting Latinos. *See e.g.* LULAC Ex. 4 (Expert Report of Dr. Andres Tijerina); Trial Tr. AM (May 21, 2025) 35:13-37:2. The history of racial discrimination continues to present day.

Brooks Ex. 228 at ¶¶ 29-55, 170-172. Racial appeals are common in political campaigns, including in 2025. Trial Tr. AM (May 29, 2025) 58:12-62:23 (Mayor Michael Evans of Mansfield explaining that multiple political ads from his opponent showed him with "tattoos on [his] face," and a separate flyer showed him "pulling the rug out from under children," all of whom "were White children with blonde hair."); Trial Tr. PM (May 21, 2025) 40:14-41:11 (Political campaign mailers calling Latino State Representative Romero part of the Latin King's gang and using racial stereotypes). Latinos in Houston and DFW area bear the effects of discrimination—Latinos are less likely to have college degrees, be insured, and more likely to receive food stamps. Brooks Ex. 228 at ¶¶ 173-175; LULAC Ex. 2 at 10. Witnesses testified that Latinos in the Houston area deal with flooding, natural disasters, and suffer from food insecurity. *See* Trial Tr. AM (May 22, 2025) 71:1-23. These socioeconomic disadvantages for Latinos are both contemporaneous and historical. Brooks Ex. 228 at ¶¶ 173-175; LULAC Ex. 2 at 11-13. As a result, Hispanic voter turnout is about 25% lower than non-Hispanic Texans in both Houston and DFW. *See* LULAC Ex. 1 at 8.

Additionally, the policy choices underlying the drawing of the congressional map are tenuous because the State's purported policy of drawing race blind could not have resulted in the configuration of the congressional map. Defendant's expert Dr. Sean Trende testified that with respect to the Houston congressional map, a map drawn in a race-neutral manner would produce five majority-minority congressional districts rather than the four that are in the Houston area in the enacted plan. Trial Tr. PM (June 9, 2025) 55:1-15.

As such, Plaintiffs are entitled to judgment on their Section 2 claims and ask this Court to draw additional Latinos CVAP majority congressional districts in the Houston and DFW areas.

## II.    Plaintiffs are entitled to judgment with respect to Senate District 10.

Plaintiffs are entitled to judgment on their intentional discrimination and racial gerrymandering claims regarding SD 10 because race was a "motivating factor" in the adoption

of SD 10. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Plaintiffs may prove an intentional discrimination claim through "direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of [the legislature's] actions." *Brown*, 561 F.3d at 433. *See also Veasey*, 830 F.3d at 235-6.

First, this Court has already determined that the Brooks Plaintiffs satisfied two of the *Arlington Heights* factors with respect to SD 10: that the configuration of the enacted SD 10 produces a discriminatory effect and that the historical context suggests discriminatory intent. *See League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 176 (W.D. Tex. 2022). Nothing in the trial record contradicts these findings.

Second, trial testimony revealed that during the redistricting process the Texas Attorney General's office generated detailed racial voting pattern analysis and racial turnout data regarding SD 10 at the same time in which they were advising Sen. Huffman about its configuration and just at the same time that Sen. Huffman was altering her proposed plan to expand SD 10 further into further into rural, Anglo counties. *See* Defendants Exhibit 392; Trial Tr. AM (May 23, 2025) 50:17-51:17. Indeed, prior to the meeting between Senator Huffman and Senator Powell, the Texas Attorney General's office, who represented Senator Huffman during the redistricting process, determined who the candidates of choice were for Anglo, Hispanic, and Black voters within SD 10, *see* Trial Tr. AM (May 23, 2025) 50:8-16; Defendants Exhibit 392; Trial Tr. AM (May 23, 2025) 50:17-51:17. The evidence also establishes that Sen. Huffman configured the new SD 10 such that those candidates would lose. This evidence—discussed by a witness for the first time at trial—vitiates Defendants' "race blind" contention with respect to SD 10.

Senator Huffman also changed her testimony multiple times about her meeting with Senator Powell where Senator Huffman went over the racial composition of SD 10. On the senate floor, Senator Huffman said she was "completely honest" in recounting that she "turned [the

maps] over flat and [] said 'I will not look at this.'" Brooks Ex. 41 at A-17. She did not repeat this emphatic claim at trial and instead testified that she handed the documents back to Senator Powell—strikingly different than her senate floor description. Trial Tr. PM (June 7, 2025) 128:5-11. Garry Jones also expressly contradicted Senator Huffman's account of this meeting. Mr. Jones attended the meeting and testified that Senator Huffman reviewed the racial data related to SD 10 rather than immediately turning it over and refusing to look. *See* Trial Tr. AM (May 23, 2025) 47:5-47:20. Senator Huffman's shifting story about how she handled racial data with respect to SD 10 is precisely the type of race-focused evidence that should overcome the presumption of good faith. Sen. Huffman also provided shifting testimony regarding her understanding of court rulings related to intentional discrimination in the configuration of SD 10, admitting at trial that she was aware of these rulings when she drew the enacted SD 10. Trial Tr. AM (June 10, 2025) 48:19-49:5-9. Sen. Huffman should be presumed to have intended that effect. *See Personnel Admn'r of Mass. v. Feeney*, 442 U.S. 256, 279 n.25 (1979) (courts may draw "a strong inference" that the Legislature intends the adverse consequences of its actions).

Senator Huffman's claim that she drew SD 10 race blind is statistically impossible. *Defendants' expert* Dr. Trende's analysis in his report showed that the Enacted SD 10 has a lower minority CVAP than **99.96%** of his **100,000** computer simulated maps that were drawn to be compact and contiguous without consideration of race. *See* Rough Draft Trial Tr. PM (June 9, 2025) 46:9-13; Defendants Ex. 8 at 147. Moreover, Senator Huffman's partisan gerrymandering defense should be disregarded. Senator Huffman has only brought up partisanship as a defense for the configuration of SD 10 at trial because her original public defense of SD 10's configuration—that the district needed population—was found by this Court to be untruthful during the preliminary injunction. *League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 179 (W.D. Tex. 2022) ("Plaintiffs have put forth substantial evidence that Senator Huffman

was particularly less than forthright in explaining why she had redrawn SD 10 as she had."). Senator Huffman only *twice* mentioned partisanship in the public record of the 2021 process; she *never* specifically said SD 10 was drawn as a partisan gerrymander. Any contrary trial testimony should be disregarded given the Court's treatment of Senator Huffman's legislative privilege assertion.

Plaintiffs also provided evidence that there were procedural and substantive departures from the normal procedure, that the sequence of events leading up to the adoption of SD 10 demonstrate intention discrimination, and that map drawer's reasonings for the configuration of SD 10 were pretextual. *See* Rough Draft Trial Tr. May 23, 2025, at 52:12-56:6; Brooks Ex. 228 at 46-53; JX 4232 at 91:4-14. With respect to Plaintiffs' racial gerrymandering claims, Plaintiffs provided four alternative mapping proposals in which the alleged partisanship goals could have been met without cracking SD 10. Brooks Ex. 70, 76, 84, 92. Plaintiffs' pretrial brief explains why the Court's analysis of these alternative maps in its preliminary injunction ruling was legally and factually erroneous.

## CONCLUSION

The Court should enjoin further implementation of the infirm aspects of all three maps and schedule remedial proceedings that ensure VRA-complaint versions of HD 118 and congressional districts in Houston and DFW and restore SD 10 to its benchmark configuration.

June 30, 2025                                     Respectfully submitted,

                                                  */s/ Chad W. Dunn*
                                                  Chad W. Dunn (Tex. Bar No. 24036507)
                                                  Brazil & Dunn
                                                  1900 Pearl Street
                                                  Austin, Texas 78705
                                                  (512) 717-9822
                                                  chad@brazilanddunn.com

                                                  */s/ Mark P. Gaber*
                                                  Mark P. Gaber*

Mark P. Gaber PLLC
P.O. Box 34481
Washington, DC 20043
(715) 482-4066
mark@markgaber.com

Jesse Gaines* (Tex. Bar. No. 07570800)
P.O. Box 50093
Fort Worth, TX 76105
817-714-9988
gainesjesse@ymail.com

Molly E. Danahy*
P.O. Box 51
Helena, MT 59624
(406) 616-3058
danahy.molly@gmail.com

Sonni Waknin*
10300 Venice Blvd. # 204
Culver City, CA 90232
732-610-1283
sonniwaknin@gmail.com

*admitted *pro hac vice*

*Counsel for Brooks Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on counsel of record on June 30, 2025 via the Court's

CM/ECF system.

/s/ Chad W. Dunn
Chad W. Dunn

11