UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LULAC, et. al., | )( |
| *Plaintiffs* | )( |
| Eddie Bernice Johnson, Sheila Jackson-Lee Alexander Green, and Jasmine Crockett | )( |
| *Plaintiff-Intervenors* | )( |
| v. | )(  Case No.: EP-21-CV-00259-DCG-JES-JVB [Lead Case] |
| GREG ABBOTT, in his official capacity As Governor of Texas, et. al. | )( |
| *Defendants* | )( |

# Executive Summary

**The Relief Requested**

The Congressional Intervenors move the Court for a declaration that the Texas Legislature, in adopting Plan C2193, intentionally discriminated against African-American and Hispanic citizen. The Intervenors further request a finding that race was the dominant factor in the map's creation, rendering it an unconstitutional racial gerrymander. Ultimately, Intervenors seek to have the Court enjoin the use of the 9th and 30th Congressional Districts and the associated regional Districts impacted by the illegal acts of the Texas Legislature as proven in this trial.

Intervenors respectfully request that the Court reverse the dilution of African-American voting power in the 9th Congressional District and the surrounding Harris-Fort Bend area. Similarly, Intervenors ask the Court to undo the weakening of the African-American vote in the 30th Congressional District and the greater DFW Metroplex.

1

Intervenors propose concrete remedies: substitute the illegally drawn CD30 in Plan C2193 with the version drawn in an alternative map, C2177, and replace the illegal CD9 with the version from Plan C2131. These changes would eliminate the regional gerrymanders connected to these districts. Intervenors also ask the Court to consider any necessary conforming changes, such as restoring the historic configuration of CD18 and/or creating a new Latino opportunity district.

Intervenors further request Section 3(c) relief under the Voting Rights Act. This powerful remedy would require Texas to submit any proposed voting or redistricting changes to the Court for review and approval. This judicial oversight would remain in place until Texas can prove it has finally ceased its long history of racial discrimination in redistricting.

At bottom, this case revolves around the harm to the Intervenors and their respective Congressional Districts. Dr. Murray testified that the changes to Congressional District 9 will transition from being an African American opportunity district to becoming a coalition district. PDF: 06-6-25-PM, pg 46, lines 1-11. Murray testified that C2131 is an appropriate plan for the area since 9 and 18 only needed minor changes, and that the proposed plan was in compliance with the Voting Rights Act and Constitution. 06-6-25-PM, 47-48, lines 4-25, 1-16. Dr. Murray described in great detail the harm to CD 9 and how that harm was bound up in the resultant harm to CD 18. For example, CD 9 received precincts 0031, 0156, 0180,0236, 0237, 0238, 0573, 0822, and 0858 from CD 18 which separated communities of interest that had been together since 1972. Intervenors Exhibit 25, Pg. 2.

Murray testified that CD30 was diluted, evidenced by including voters from another county, adding 50,000 new voters and the splitting off downtown from the district and that it was evidence of that continuing commitment to 'White power." 06-6-25-PM, pg 49-52, lines 8-25, 1-25,1-25,1-3. Dr Murray further notes that C2193 "the new map concentrated minorities into three districts

(30, 32, 33) and cracked the rest of the area into nine districts. One of new districts (the 13nd) stretches from Dalhart in the northwest Panhandle to Denton. Another from Texarkana to Dallas, and so forth. All have, at least initially, Anglo majority VAPs, and even larger margins for Anglo CVAPs. Similar cracking was done in metro Houston, as districts like the 22nd were pushed far out into rural Texas." Intervenor Plaintiffs 24, Pg. 27.

**Under *Arlington Heights*, Defendants Committed Intentional Discrimination**

State Defendants, particularly Senator Joan Huffman, have built their case on the claim that they drew Plan C2193 "blind to race." This is hardly credible considering the mountain of evidence showing race was not only considered but predominated. But more importantly, a purposeful refusal to consider race is not a defense, but an admission of guilt. As the Supreme Court has made clear, Section 2 of the Voting Rights Act "demands consideration of race." *Allen v. Milligan*, 599 U.S. 1, 23 (2023) (internal citations omitted). Purposefully ignoring the commands of the Voting Rights Act to harm minorities in redistricting constitutes intentional racial discrimination." Claiming that some secret process existed, performed by some unknown person using unknown methodology does not constitute an appropriate review of race to ensure that minority rights are protected as was evidenced by the map produced.

The evidence admitted at trial unequivocally establishes that Plan C2193 was enacted with racially discriminatory intent. Following the framework from *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), it lays out the factors that reveal the true motivation behind the map. To prove a violation under this standard, a plaintiff must demonstrate that the discriminatory purpose was the motivating factor in the decision. *Id*. Courts consider the following factors in deciding such cases: the historical background of the decision; the specific sequence of events leading up to the challenged decision; departures from the normal

procedural sequence; substantive departures from typical decision-making; the legislative or administrative history; including contemporary statements by members of the decision-making body. *Id*.

As will be demonstrated, Intervenors have shown all of the above.

**Evidence of Discriminatory Intent**

The discriminatory impact of the plan on African-American and Hispanic voters is severe and was proven with compelling evidence. In summary, Intervenors have shown that 28 of the 38 seats in Texas are controlled by white voters, that CD 9 and CD 18 were treated differently than CD 7, that the two new seats Texas received are controlled by white democrats and republicans, that Congressman Green and Congresswoman Jackson-Lee were paired despite the Defendants' purported goal of avoiding incumbent pairing, and the refusal to permit input in the maps by African- American Congresspersons, failure to consider race in redistricting, and refusal to create any new minority opportunity districts. Expert Murray says this and other evidence of white power commitment in the map support his conclusion of intentional discrimination, including providing the 37 and 38th Congressional Districts to white voters. 06-6-25-PM, Pgs. 52-53, Lines 4-25, 1-7.

Expert Murray's testimony and report were compelling on how "whites will control 28 of 38 seats in the U.S. House of Representatives – 74%. That, in my opinion, violates the Voting Rights Act and the Equal Protection Clause of the 14th Amendment." Intervenors Plaintiffs 24, Pg. 31. 06-6-25-PM, Pg. 52, Lines 4-22). Elected officials, including Crockett and West, testified directly about the racially detrimental aspects of Plan C2193 on these minority groups. 05-23-25-AM, pg 117, Lines 13-20). This testimony was supported by a wealth of data, including Census figures, expert reports from Duchin and Henderson, and heartfelt testimony from Congresspersons,

4

including a video of Congressman Green's plea to the State House Redistricting Committee before the plan's illegal adoption. 05-27-25-AM, pg 51-69).

Expert Henderson's four-step analysis of voting age population changes revealed numbers so extreme that they pointed directly to intentional racial motives. Henderson was asked to review the changes of voting age population between districts, examine the differences between groups, and weigh the relationship between the variables such as race and party. 06-07-25-AM, pg 50 lines 12-23). He testified that the various statistical tests must be read in conjunction to understand the full picture and to see if any one test undermines another. 06-07-25-AM, pgs 51-52 lines 12-25, 1-6). After completing his analysis, Henderson stated he was able to conclude that it was an intentional decision to move the minority population in the manner they were moved. 06-07-25-AM, pg 54 lines 14-18.

In his first step, analyzing the movement of voters as shown in Exhibit 28 Table 2, Henderson found suspicious movement in numerous districts, including Congressional Districts 24, 7, 22, and 29. 06-07-25-AM, pgs 54-57 line21-25, 1-25, 1-25, 1-6). He then examined the standard deviations of these population shifts to see if they were unique or looked "sort of suspicious." 06-07-25-AM, pgs 57-58 lines 12-25, 1-13). Henderson testified that once you move past two standard deviations, it tells you something is happening that is intentional and not natural. Across the state, the standard deviation numbers were much higher than 2, indicating systemic and intentional targeting. 06-07-25-AM, pg 59-60 lines 3-25, 1). Indeed, while the statewide Standard Deviation is 39.78, in Dallas/Fort Worth it is 52.68 and in Houston it is 46.71. Intervenors Exhibit 29, Pg. 2. Similar problematic changes were made in the key districts at the heart of the lawsuit: Congressional Districts 9, 18, and 30. 06-07-25-AM, pgs 63-64 lines 18-25, 1-17.

Henderson's analysis included a multilinear regression which allows one to take multiple variables and determine which had the greatest impact on the changes to voting age population. 06-07-25-AM, pg 62 lines 1-22. He analyzed whether the changes were statistically significant and not due to chance. 06-07-25-AM, pg 65-66 lines 7-25, 1-7. When he tested whether race or party was predictive of the change in total VAP, he found there was a 95 percent probability that the observed changes are explained by race, and that party has "no relationship." 06-07-25-AM, pg 66-67 lines 14-25, 1-14. Henderson concluded that "race has everything to do with the redrawing of the maps". 06-07-25-AM, pg 83 lines 4-8. He explained that the reason partisanship appeared to have no effect was not that it was entirely absent as a motive, but because race so clearly predominated. 06-07-25-AM, pg 119-120 lines 22-25, 1-7.

**Departures from Normal Procedure**

The legislative process itself was a significant departure from normal procedure. The Governor called a Special Session that began on September 20th, a full seven days before any congressional map was shown to the public and ten days before the bill was formally laid out. This created a manufactured time crunch that was then used as an excuse to deny input and amendments from minority legislators, who were faced with rules that were "impossible" to comply with. Senator West and Representatives Reynolds testified to these procedural irregularities. 06-6-25-PM, Pgs. 19, Lines 1-25. Senator Huffman instituted new, restrictive procedures that limited Senators' ability to participate.

The legislative and administrative history reveals a process shrouded in secrecy and devoid of accountability. Senator Huffman admitted that her sole contact for ensuring the map complied with the Constitution and the Voting Rights Act was Chris Hilton from the Attorney General's Office. Yet, she did not know what experience he had in redistricting (06-10-25-AM, pgs 62, lines 9-25),

who was on his team (06-10-25-AM, pg 63, lines 1-6), how much time they spent on their analysis (06-10-25-AM, pgs 63-64, lines 13-25, 1-4), what kinds of tests they used, if any documents were generated, or even what software they used (06-10-25-AM, pgs 65, lines 4-10, 11-21). She decided not even to use the Texas Legislative Council, the nonpartisan body designed to provide legal and technical guidance to the legislature on this very issue. *See* 323.006 (8) and (9) TX. GOV. CODE

Both Senator West and Congresswoman Crockett, a map drawer herself, testified that one cannot comply with the Legislative Council's own guidance to avoid discrimination without considering race. 05-23-25-AM, pgs 121-122, lines 19-25, 1-2; 06-05-25-AM, pg 87 lines 2-22).

The timeline of events further demonstrates the procedural irregularities. The map was not made public until a week into the special session. No amendments were permitted in the House Committee. In the House, Congresswoman Crockett testified to an extra layer of bureaucracy for congressional map amendments not present for other maps, requiring pre-filing of amendments (maps) and, bizarrely, getting separate permission from someone in a "back room" and from every Congressperson who would be impacted by the change. 05-23-25-AM, pg 111-113, lines 12-25, 1-25, 1-18. In the Senate, Senator Huffman laid out the bill on September 30th, (10 days into the 30-day session), and demanded that any amendments be submitted within 24 hours, a nearly impossible task. 06-10-25-AM, pg 67, lines 11-21).

This rushed process was entirely unnecessary and unjustified. Senator West testified that the legislature had already passed a law allowing election dates to be changed if maps were not ready in time. 06-05-25-AM, pg 91 lines 20-25). He testified that it appeared to him there was an attack on the 18th and 30th Congressional districts and his request for time to prepare amendments, a courtesy historically granted, was denied. 06-05-25-AM, pg 92-93, lines 16-25, 1-14).

**Historical Background and the Totality of Circumstances**

All this occurred against a historical backdrop of discrimination. West testified that the Legislature has increasingly passed laws to limit the authority of local officials after minorities began winning those positions, citing laws against teaching critical race theory and the infamous voting bill, SB1, as examples of this new wave of anti-minority legislation. 06-05-25-AM, pgs 99-100, lines 7-25, 1-25; 06-05-25-AM, pg 103-104, lines 1-25, 1-5).

The totality of these circumstances points to one conclusion. Texas has a long history of discrimination that continues to affect minority voters. (Intervenors Exhibit 24, Pg. 2). Voting is intensely racially polarized. (Intervenors Exhibit 24, Pgs. 13, 26). Socioeconomic disparities persist, hindering political participation. 06-6-25-PM, Pgs. 98-99, Lines 25, 1-5. And the Legislature has shown a profound lack of responsiveness to the needs of its minority communities, refusing to create new opportunity districts despite massive minority population growth, while ignoring pleas from Black members of Congress to stop the dismantling of their districts. 05-27-25-AM, Pg. 29, Lines 8-10). Senator Huffman acknowledged receiving letters from Congresspersons Jackson-Lee, Green, and Eddie Bernice Johnson, but remembered nothing about them or any subsequent discussions. 06-10-25-AM, pg 70-71, lines 6-25, 1-4; 06-10-25-AM, pgs 82-83, lines 24-25, 1-10).

**Claim 2: An Unconstitutional Racial Gerrymander**

Beyond the evidence of discriminatory intent, Intervenors make a second claim: Plan C2193 is an unconstitutional racial gerrymander. Under *Shaw v. Reno*, 509 U.S. 630 (1993), and *Miller v. Johnson*, 515 U.S. 900 (1995), a redistricting plan is subject to strict scrutiny if race was the predominant factor motivating the legislature's decisions. The evidence for this is overwhelming. The challenged districts have bizarre shapes that defy traditional principles.

Dr. Henderson's statistical analysis again provides compelling evidence, showing that racial variables had significant effects on the map while partisan variables had no measurable effect when controlling for race. (Intervenors Exhibit 29, Pgs. 2, 7, 12, and 13; 06-07-25-AM, Pg. 68, Lines 9-15). Expert Dr. Moon Duchin's ensemble analysis showed the adopted plan was a statistical outlier, concluding that the configuration was "statistically quite unlikely if you weren't using race…" 05-31-25-AM, Pg. 51, Lines 22-23. She noted a pattern of reducing minority CVAP just below 50 percent and characterized the state's actions as "fairly aggressively avoiding the creation of a majority coalition district." 05-31-25-AM, Pg. 36, Lines 5-7. Expert Dr. Barreto also neatly demonstrated how partisanship was used to obscure racial motivations. 05-30-25-PM, Pgs. 98, Lines 6-14.

To achieve these racial goals, the Legislature subordinated all traditional redistricting principles. It cracked historic communities like the Third Ward and MacGregor areas of Houston, splitting them between districts for the first time since 1973. 05-27-25-AM, Pg. 54, Lines 8-10. This "unnecessary surgery," as testified to by numerous community leaders and elected officials, demonstrates that race, and nothing else, was the driving force. It's important to note that even Defendants' expert declined to opine that Republican partisan gain was the motive for C2193.[1]

## Conclusion: A Cohesive Narrative of Discrimination

When viewed in its totality, the evidence tells a single, cohesive story. It is a story of a legislature that, armed with precise demographic data, operated through a rushed and secretive process designed to sideline minority voices. It is a story supported by irrefutable statistical proof from multiple independent experts, all of whom concluded that race, not politics, was the

---

[1] "And I just want to be clear. You are not offering an opinion that Republican partisan gain was the legislative motive behind the map drawing, correct?
A. Yeah. The opinion is that it's consistent with that. And so --
Q. Okay."

9

predominant factor driving the surgical dissection of minority communities. This narrative is further reinforced by the blatant disregard for traditional, race-neutral redistricting principles and the state's long, documented history of discriminating against its citizens of color. The bizarrely shaped districts are not an accident; they are the result of a deliberate effort to crack and pack minority voters, diluting their strength and denying them an equal opportunity to participate in the political process, in direct violation of the Constitution and the Voting Rights Act.

Respectfully Submitted,

Gary L. Bledsoe
State Bar No. 02476500
The Bledsoe Law Firm, PLLC
6633 Highway 290 East #208
Austin, Texas 78723-1157
Telephone: 512-322-9992
Fax: 512-322-0840
gbledsoe@thebledsoelawfirm.com

By: */s/ Robert Notzon*
Robert Notzon
The Law Office of Robert
Notzon Texas Bar No. 00797934
1502 West Avenue
Austin, Texas 78701
Robert@NotzonLaw.com
(512) 474-7563
(512) 852-4788 facsimile

**Attorneys for Plaintiff-Intervenors Alexander Green, and Jasmine Crockett**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on June 30th, 2025, in accordance with the Federal Rules of Civil Procedure on all parties registered on ECF this case via the Court's electronic filing system:

*/s/ Robert Notzon*
Robert Notzon