# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | § § § | |
| *Plaintiffs,* | § | Case No. 3:21-cv- |
| V. | § | 00259 [Lead |
| | § | Case] |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § | |
| TEXAS STATE CONFERENCE OF THE NAACP, | § § § | |
| *Plaintiff,* | § | Case No. 1:21-cv- |
| V. | § | 01006 [Consolidated |
| | § | Case] |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § | |

## PLAINTIFF TEXAS NAACP'S POST-TRIAL EXECUTIVE SUMMARY

In its pretrial brief, Texas State Conference of the NAACP ("Texas NAACP") explained how it would establish that the redistricting plans enacted for the state senate (S2168), state house (H2316), and Congress (C2193) (the "Enacted Plans") intentionally discriminated against Texas voters of color, including Black voters, in violation of Article I of the Fourteenth Amendment to the United States Constitution and the intent prong of Section 2 of the Voting Rights Act of 1965. At trial, Texas NAACP and Consolidated Plaintiffs elicited direct and circumstantial evidence satisfying each *Arlington Heights* factor that guides this Court's analysis of a claim of intentional discrimination, including both expert and lay witness testimony.[1]  The evidence overwhelmingly demonstrates that the Enacted Plans are the rare case where the State's clear pattern of conduct is "unexplainable on grounds other than race."  *Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 266 (1997).

Specifically, and as foretold in its pretrial brief, Texas NAACP through its expert, Dr. Moon Duchin, demonstrated that the cracking and packing of exemplar districts in six areas of interest cannot be explained on any basis other than race, including partisanship: Dallas and Tarrant Counties (CD 6, CD 24, SD 9, SD 10, HD 96, and HD 112); Harris and Fort Bend Counties (CD 22, SD 15, and SD 17); Brazoria County (HD 25 and HD 29); Denton and Wise Counties (HD 65); Harris County (HD 126 and HD 132); and Bell County (HD 54) ("Exemplar Districts"). PL_TXNAACP Ex. 136 at 35-36, 42, 49, 50; 39, 46; 54; 51; 60; 56.  To the contrary, Dr. Duchin's testimony demonstrated that the Legislature could have achieved a better partisan result had it not relied on race in drawing the Enacted Plans.

Dr. Duchin's conclusions do not stand in a vacuum.  Indeed, her findings of race-based

---

[1] Texas NAACP incorporates by reference to the extent applicable, the facts asserted by Co-Plaintiffs relating to the *Arlington Heights* factors as well as the stipulated facts of the parties submitted to the Court on May 14, 2025 (ECF No. 978).

map drawing are entirely consistent with and bolstered by additional expert and lay testimony presented by Texas NAACP and other Plaintiffs at trial. That evidence established Texas's deep history of discrimination, particularly in the space of voting rights, the extraordinary procedural departures that occurred in the passage of the Enacted Plans, and the detrimental effects suffered by minority communities of interest in Texas as a result of the Enacted Plans.

### A.    Dr. Duchin's Analysis Conclusively Demonstrates that the Enacted Plans are Race-Based and Cannot Be Explained by Partisanship

As discussed, Dr. Duchin's testimony established that the Enacted Plans specifically targeted Black and other voters of color in a manner that could not be explained by partisanship because they are extreme racial outliers even among Republican- or Trump-leaning maps. *See* 5/31/25 AM Tr. at 10:14-12:22, 24:21-25:4, 36:25-37:9, 45:24-47, 54:16-55:9, 57:18-59:14, 60:11-17. Dr. Duchin undertook multiple levels of analysis, including visual and demographic assessments of how the Legislature moved—that, is "cracked" and "packed"—minority voters in and between districts. As discussed further below, her ensemble analyses showed the Enacted Plans to be extreme outliers in terms of racial impact compared to 100,000 race-neutral plans generated according to traditional redistricting principles, and sub-analyses of her initial ensemble analyses showed the Enacted Plans remained extreme outliers, even after accounting for partisanship. *See* PL_TXNAACP Ex. 136 at 35-61 and PL_TXNAACP Ex. 138.

Dr. Duchin's visual and demographic analyses of the challenged districts in the Enacted Plans evaluated the changes to the district boundaries and the movement of voters of color in and out of the challenged districts. *See* PL_TXNAACP Ex. 136 at 35-61; 5/30/25 PM Tr. at 134:11-18. These analyses revealed multiple districts in which existing districts with rising populations of voters of color were intentionally carved up to stymie the ability of these voters of color to elect candidates of their choice. *See, e.g.*, PL_TXNAACP Ex. 136 at 39, 50; 5/31/25 AM Tr. at 11:19-

12:10, 24:2-25:4, 32:1-32:14. As Dr. Duchin explained, as voters of color approached or achieved a majority-CVAP level in these districts that would have allowed them to elect candidates of their choice, the Enacted Plans surgically excised voters of color to cut—in many instances, drastically—the minority CVAP share. *Id*. This was achieved by "cracking" and "packing" populations of Black and other voters of color: the Enacted Plans took voters of color from districts where they were approaching a performing majority-CVAP share of 40 to 60% and drew them into districts where a majority-minority CVAP had already been achieved and piling on additional minority voters only served to pack an already unnaturally high and performing minority CVAP share to the detriment of their voting power. *See* PL_TXNAACP Ex. 136 at 35-36; PL_TXNAACP Ex.162-173; 5/31/2025 AM Tr. at 11:19-12:10, 24:2-25:4, 32:1-32:14.

For example, Dr. Duchin testified that Congressional District 22 had grown to 54.7% minority CVAP, but the Enacted Plan "split" the minority population "over five districts," with each of those districts having a minority CVAP of "over 60 percent or under 40 percent." 5/31/25 AM Tr. at 27:23-28:12. Similarly, in Congressional District 6, the minority urban population from Dallas and Tarrant Counties was combined with distant, white, rural populations to dilute minority voting strength. As Dr. Duchin explained, the newly-created Congressional District 6 "pick[s] up" diverse populations in the urban areas of Tarrant and Dallas County and "submerges" them in largely White, rural counties" with the "net effect" of "a district that is not likely to produce an opportunity to elect for the minority voters." 5/30/25 PM Tr. at 146:7-147:4. Dr. Duchin testified that she engaged in the same analysis for each of the eight district clusters comprising the Exemplar Districts, and that in each cluster, she found similar patterns of cracking and packing voters of color in the configuration of the Enacted Plans. 5/30/25 PM Tr. at 148:4-10; PL_TXNAACP Ex. 136 at 35-61.

As explained more fully in Texas NAACP's Response to Defendants' Motion for Judgment as a Matter of Law, Dr. Duchin then tested these observations of cracking and packing by generating an ensemble of 100,000 alternative districting plans for each cluster by using traditional, race-neutral redistricting principles as comparators to the Enacted Plans. PL_TXNAACP Ex. 136 at 35; 5/31/25 AM Tr. at 36:25-37:9; ECF 1078 at 5-7. For each of the clusters analyzed, Dr. Duchin found that the Enacted Plan was so extreme in its coalition CVAP outcomes, that a similar CVAP percentage was reproduced only a handful of times (or never) in the 100,000 alternative maps. *See* PL_TXNAACP Ex. 138

Critically, Dr. Duchin's analysis also provides unrebutted evidence that partisanship does not explain the share of minority voters in the selected districts. PL_TXNAACP 138 at 14. Dr. Duchin testified that she used the 2020 Presidential Election data to compare the change in partisanship to the change in minority/coalition CVAP in the new districts to assess whether partisan goals could explain these changes. *See, e.g.* PL_TXNAACP 136 at 36; PL_TXNAACP 138 at 14; 5/31/25 AM Tr. at 12:11-22. Remarkably, in each of the districts analyzed, Dr. Duchin found that the decrease in the coalition CVAP was greater (often significantly) than the decrease in the Democrat/Biden share of the vote, despite the strong overlap between race and political affiliation in Texas. *Id.* For instance,

- Congressional District 24: Coalition CVAP "decreased from 40.8% to 25.5%, a difference of 15.3 percentage points," but "the Biden share of the district drops by only 9.1 percentage points." PL_TX NAACP 136 at 36; 5/31/25 AM Tr. at 11:19-12:10.

- Senate District 9: Coalition CVAP was "pared back from 44.4% to 35%," while "the Biden share fell by only 5.8 percentage points." PL_TXNAACP 136 at 42.

- House District 96: Coalition CVAP decreased by 8.3%, but there was only a decrease of "5.6% Biden share." PL_TXNAACP 136 at 49.

- House District 112:  Coalition CVAP dropped "18.5 percentage points" whereas "the Biden support share drops by under 5 points."  PL_TXNAACP 136 at 50; 5/31/25 AM Tr. at 24:2-25:4.

- House District 126:  Coalition CVAP "dropped from 55.6% share to 44.9%, a much more pronounced shift than its partisan balance."  PL_TXNAACP 136 at 60; 5/31/25 AM Tr. at 32:1-32:14.

In response to Dr. Trende's assertion that partisanship could explain these changes, Dr. Duchin conducted sub-analyses of her original ensembles of 100,000 alternative plans, restricting her review to only equally "partisan" alternative plans generated in the ensemble using two separate metrics:  (1) alternative maps where at least as many districts would be won by Trump as in the Enacted Plan ("at least as Trump-favoring"), and (2) alternative maps where the Republican candidate would have won at least as many races across 19 general elections as in the Enacted Plan ("at least as Republican-favoring").  5/31/25 AM Tr. at 52:21-56:3; PL_TXNAACP Ex. 138 at 13. Dr. Duchin explained that if partisanship explained the racial characteristics of the Enacted Plans, one would expect the minority CVAP of the Enacted Plans to be consistent with 40% to 50% of the "partisan" ensemble plans.  5/31/25 AM Tr. at 57:18-58:14.  Dr. Duchin's results, however, confirmed that the extreme minority CVAP results in the Enacted Plans were outliers even as compared to the "partisan" ensemble plans, with the Enacted Plans exceeding the minority CVAP results in 96%-99% of the alternative partisan-advantaged plans.  *See* PL_TXNAACP Ex. 138 at 12-13.  In other words, even in the tens (if not hundreds) of thousands of maps that performed the same as *or better* for Republicans/Trump, only 1% to 4% had as extreme minority CVAP results as the Enacted Plans.

For example, Dr. Duchin found that in Congressional Districts 6 and 12 (both within Congressional Cluster 1), only 3.7% and 1.55%, respectively, of the 12,427 "partisan" ensemble plans had minority CVAP as low as that of the Enacted Plans. 5/31/25 AM Tr. at 56:18-57:17;

PL_TXNAACP Ex. 138 at 14.  In Congressional Cluster 2 (Harris & Fort Bend Counties), only 0.06% of more than 74,000 of the "partisan" ensemble plans—that is, only 45 plans—had a minority CVAP as low as the Enacted Plans.  PL_TXNAACP Ex. 138 at 14; 5/31/25 AM Tr. at 57:18-59:14.

Based on these analyses, Dr. Duchin concluded that "[n]o matter which way Republican advantage is sliced, . . . partisanship does not explain the extremely low coalition share" in the clusters analyzed.  PL_TXNAACP Ex. 138 at 14; *see* 5/31/25 AM Tr. at 60:11-17 ("My conclusion is that this shows us pretty clearly that race was used . . . and it was used in a manner that's dilutive in a way that is not explained by party goals.").  Dr. Duchin's testimony thus explicitly disentangles partisanship and race. And tellingly, those findings were never rebutted by Defendants at trial.  *See* 6/9/25 PM Tr. at 5:14-6:5, 100:9-102:2, 112:1-116:1 (Testimony of State's expert Dr. Sean Trende noting that, although he reviewed Dr. Duchin's findings in her rebuttal report, he did no additional work before to address her findings, either prior to his deposition or in his 2025 supplemental reports).

At a minimum, if the Legislators were seeking partisan advantage, Dr. Duchin's analyses show that they used race as a proxy, which the Supreme Court has made clear is unconstitutional. *Alexander v. South Carolina State Conference of the NAACP*, 602 U.S. 1, 82 (2024) (quoting *Cooper v. Harris*, 581 U.S. 285, 309 n. 7 (2017)).[2]

**B.    Lay Witness Testimony Corroborates Dr. Duchin's Findings**

Other witnesses' testimony corroborates Dr. Duchin's findings that communities of color were intentionally dismantled and divided between districts to the detriment of those communities.

---

[2] Dr. Duchin also explained why map drawers would have used racial data as a proxy for partisanship, noting that the partisanship data provided to the Legislature was not as refined as the racial data available from the Census.  5/31/25 AM Tr. at 52:8-59:15.

Congresswoman Jasmine Crockett testified that for Congressional District 6, extracting heavily minority communities from Tarrant and Dallas Counties and combining them with majority white voters from rural counties made little sense other than if the intent was to dilute the minority vote:

> [T]he best way to describe this is, if you think about a pizza, and on the inside of the pizza you got a bunch of sausage, and on the outside of the pizza you got a bunch of pineapples. People that don't like pineapple pizza probably do not want that slice of pizza to have sausages. And that's what we have here, is that literally the diversity, for the most part, is contained within the DFW Metroplex. These other areas lack diversity. And so you know, I don't see -- besides the racial component, I don't see what a vast majority of these districts have in common with the people that are within the Metroplex.

5/23/25 AM Tr. at 105:18-106:17.

Dr. Sharon Middlebrooks, the Dallas NAACP president and a real estate broker knowledgeable of the area's demographics, testified that Congressional Districts 6 and 24 and House District 112 in the Enacted Plans, split communities of interest. Black Texans now have to cross district lines to engage with communities that share their interests, as a significant portion of those Black voters' new districts have entirely distinct and often disparate interests given the differing racial and geographic makeup, among others differences. *See* 6/5/25 AM Tr. at 169:15-171:3; 6/5/25 PM Tr. at 5:18–21:21. Similarly, Houston NAACP branch president Bishop James Dixon testified about the characteristics of the Black community in the Houston area, including the areas in Senate Districts 15 and 17, which were split as a result of the Enacted Plans. *See* 5/27/25 AM Tr. at 124-139; 5/27/25 PM Tr. at 7-27. Bishop Dixon's discussion of historic Black communities in the Harris County area, along with the testimony of Dr. Middlebrooks and Congresswoman Crockett about Dallas County, provide evidence of how Black communities were divided in violation of traditional redistricting principles.

### C. Additional Lay & Expert Testimony Supports a Finding of Intentional Discrimination

Standing alone, the evidence regarding the discriminatory effect of the Legislature's line-

drawing proves intentional discrimination. That evidence, however, does not stand alone. Other *Arlington Heights* factors confirm discriminatory intent, including Texas's history of voting discrimination (which this Court has previously acknowledged), as well as material and extreme departures from the ordinary legislative process in the passage of the Enacted Plans. *Arlington Heights*, 429 U.S. at 266-68.

As this Court previously determined, "it is evident that history favors an inference of discriminatory intent." ECF 258 at 34. Plaintiffs' expert Dr. Monica Muñoz Martinez confirmed the Court's prior finding, testifying to the pervasive history of voting-related discrimination in Texas starting in 1836, focusing on recent caselaw and statutory schemes that disproportionately affect Black and other voters of color. 6/4/25 AM Tr. at 36:23-53:5; PL_TXNAACP Ex. 139 at 3-51. Moreover, Dr. Martinez also opined on the Senate Factors, which are routinely considered by courts assessing intentional discrimination claims. *See U.S. v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). Specifically, Dr. Martinez's testimony directly supports findings with respect to Senate Factor 5 (the extent to which minority group members bear the effects of discrimination in areas such as education, employment and health, which hinder their ability to participate effectively in the process), Senate Factor 6 (the use of overt or subtle racial appeals in political campaigns, and Senate Factor 7 (the extent to which members of the minority group have been elected to public office in the jurisdiction. *See* PL_TXNAACP Ex. 139 at 51-86; 6/4/25 AM Tr. at 53:6-66:17.

In addition to Dr. Martinez, Linda Lewis, co-chair of Texas NAACP's political action committee, described recent examples of discrimination, intimidation, and disenfranchisement experienced by Black voters in Texas over the past 15 years, including (1) county officials using the threat of law enforcement by moving polling places to a jail and conducting warrant "round ups" around elections, 5/29/25 AM Tr. at 143:4-144:6; (2) a poll worker directing a Black voter to

8

"vote somewhere else where the Black voters are voting," 5/29/25 AM Tr. at 138:7-138:22; (3) a poll worker telling a Black voter they couldn't vote in a primary because they "couldn't possibly live" in the area, 5/29/25 AM Tr. at 140:17-141:5; (4) election workers not counting the ballot of a 106-year-old Black voter, 5/29/25 AM Tr. at 139:1-139:19; (5) a truck flying a confederate flag driving past a polling place where Black voters vote, 5/29/25 AM Tr. at 136:20-137:9; (6) doxing and harassment of a Black election judge leading to her retirement, 5/29/25 AM Tr. at 144:7-145:12; and (7) flyers with false election dates posted in Black neighborhoods, 5/29/25 AM Tr. at 139:24-140:8. This evidence confirms, as this Court found, that Texas's history favors an inference of discriminatory intent. *See* ECF 258 at 34.

In addition to Texas's history of discrimination, there was also extensive testimony at trial as to departures from the ordinary legislative process. Specifically, Dr. J. Morgan Kousser identified significant substantive and procedural departures in the redistricting process in 2021. While the 2021 redistricting process occurred against the backdrop of the COVID-19 pandemic and within the confines of a special session of the Legislature, Dr. Kousser testified that these factors alone do not explain the Legislature's procedural departures. *See* Brooks Ex. 228 at 50; 6/5/25 AM Tr. at 85:11-87:22; 6/5/25 AM Tr. at 89:16-91:19; 95:2–7. For example, instead of allowing minority decision-makers to have a voice in early drafts, decisions, and versions of redistricting plans, Dr. Kousser found that the Legislature excluded minority legislators from the decision-making process. *See* Brooks Ex. 228 at 50, 52. According to Dr. Kousser, "[n]ot only were Democrats in general and minority legislators in particular excluded from the process of framing districts; they and the public were provided only a highly restricted opportunity to respond to the Republican plans." *Id.* at 52. Additionally, Dr. Kousser noted that (1) requests for access to experts to testify were denied, (2) requests for extensions of debates were denied, and (3) timelines

for offering comments and amendments were truncated abnormally.  *See* Brooks Ex. 228 at 51-53.

Despite Defendants' claims to the contrary, COVID does not explain these departures, because as Senator West testified, the Legislature passed a law allowing the Secretary of State to adjust the election deadlines if necessary.  And the Legislature could have returned for another special session, which, even if not a preferred option, undercuts the notion that the exclusionary process was unavoidable.  *See* 6/5/25 AM Tr. at 91:20-25; 127: 23- 128:1; *see also* 6/11/25 AM Tr. 45:5-18 (Rep. Landgraf confirming that when a bill has been considered in a special session, legislators can work from the latest version of that bill in starting a new session).

Testimony elicited from Senator Joan Huffman and Representative Brooks Landgraf on cross-examination confirmed that, instead of an open process where critical information was shared, redistricting here was secretive and remained so, with much of the process shielded by claims of privilege, barring inquiry into the Legislature's avowals that race was not considered in the drawing of the Enacted Plans.  *See* Brooks Ex. 228 at 6-47, 52-53; 6/9/25 PM Tr. at 160-194; 6/10/25 AM Tr. at 98-105; 6/11/25 AM Tr. at 9-11.

Taken together, the evidence presented by Texas NAACP and other Consolidated Plaintiffs regarding the history of discrimination in Texas, the substantive departures in the redistricting process, the events leading to and Legislative history of the redistricting process, and the extreme effects of the Enacted Plans show discriminatory intent by Defendants in violation of the 14th Amendment and Section 2 of the Voting Rights Act.  The Court should enjoin these unlawful maps and order the legislature to redraw the challenged districts.

Dated: June 30, 2025

Respectfully submitted,

*/s/ Lindsey B. Cohan*
Lindsey B. Cohan
Texas Bar No. 24083903
DECHERT LLP
515 Congress Avenue, Suite 1400
Austin, TX 78701
(512) 394-3000
lindsey.cohan@dechert.com

David Rollins-Boyd*
Jennifer Nwachukwu*
Jeremy Lewis*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street, Suite 900
Washington, DC 20005
(202) 662-8600
drollins-boyd@lawyerscommittee.org
jnwachukwu@lawyerscommittee.org
jlewis@lawyerscommittee.org

Neil Steiner*
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com

Carroll Rhodes*
LAW OFFICES OF CARROLL RHODES
P.O. Box 588
Hazlehurst, MS 39083

Anthony P. Ashton*
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive

11

Baltimore, MD 21215
(410) 580-577
*aashton@naacpnet.org*

Janette M. Louard
NAACP OFFICE OF THE GENERAL COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
*jlouard@naacpnet.org*
*Attorneys appearing of counsel*

*Admitted pro hac vice.*

*ATTORNEYS FOR THE TEXAS STATE
CONFERENCE OF NAACP*

Robert Notzon
Texas Bar No. 00797934
THE LAW OFFICE OF ROBERT NOTZON
1502 West Avenue
Austin, Texas 78701
(512) 474-7563
*robert@notzonlaw.com*

Gary Bledsoe
Texas Bar No. 02476500
THE BLEDSOE LAW FIRM PLLC
6633 Highway 290 East #208
Austin,              Texas              78723-1157
 (512)                                  322-9992
*gbledsoe@thebledsoelawfirm.com*

*Attorney only as to Texas NAACP's claims
related to Texas state senate and state house
plans*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served on counsel of record via the Court's ECF system on June 30, 2025.

_/s/ Lindsey B. Cohan_
Lindsey B. Cohan
*Counsel for Plaintiff Texas NAACP*