IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br> *Plaintiffs,* <br><br> ALEXANDER GREEN AND JASMINE CROCKETT, <br> *Plaintiff-Intervenors,* <br><br> v. <br><br> GREG ABBOTT, *et al.*, <br> *Defendants.* | EP-21-cv-00259-DCG-JES-JVB <br><br> [Lead Case] <br><br> & <br><br> All Consolidated Cases |

**STATE DEFENDANTS' RESPONSE TO PLAINTIFF-INTERVENORS' EXECUTIVE SUMMARY**

Defendants Greg Abbott, in his official capacity as Governor of Texas, Jane Nelson in her official capacity as Secretary of State of Texas, Dave Nelson, in his official capacity as Deputy Secretary of State, and the State of Texas file this response to Congressional Intervenors' ("Intervenors") Executive Summary (ECF 1111), and would show the Court as follows:

**I.    Texas Legislature has a presumption of good faith.**

At the outset, Intervenors misrepresent the evidence required to prove claims that the Texas Legislature intentionally discriminated against minorities when drafting the Congressional maps.[1]

When bringing intentional discrimination claims against a legislature, it is "plaintiffs' burden to overcome the presumption of legislative good faith and show that the [Texas] Legislature acted with invidious intent." *Abbott v. Perez*, 585 U.S. 579, 605 (2018). Such intent is not mere "volition"

---

[1] Intervenors allege four counts of intentional racial discrimination under 42 U.S.C. § 1983 and Section 3(c) of the Voting Rights Action. *See* ECF 619 at 25–27 (Intervenors' 2nd Am. Compl.). The Court reiterated that "intervenors cannot pursue a standalone claim under VRA § 3(c) because it's 'a *remedy* for violations of the Fourteenth and Fifteenth Amendments, rather than a freestanding cause of action.'" ECF 972 at 2. Thus, Intervenors have not raised and lack the right to bring a claim under Section 2 of the VRA.

or "awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). It requires a legislature to have passed a law "because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

Racial gerrymandering claims further require plaintiffs show race was "'the predominant factor motivating' the redistricting process and 'subordinat[ing] traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests[.]'" *Harding v. Cty. of Dallas*, 948 F.3d 302, 313 (5th Cir. 2020) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). It is not sufficient to show a loose correlative relationship between party affiliation and race. *See Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689 (2021). Rather, a plaintiff must disentangle race and partisanship. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024).

Intervenors' reliance on contested, conclusory, and often irrelevant circumstantial evidence that does not come close to meeting the heavy burden of proving intentional discrimination.

## II. There is no direct evidence of intentional discrimination.

No Plaintiff offers direct evidence of intentional discrimination. And Intervenors fail to provide even a molehill of circumstantial evidence, much less a "mountain." Indeed, Plaintiff's witnesses acknowledge that there are no statements made by the map drawers showing discriminatory intent. Tr. 6/5/25 PM 23:10–24.

Yet, Intervenors summarily claim there is this "mountain of evidence" that maps were not drawn blind to race. ECF 1111 at 3. Intervenors then argue that if the Texas Legislature in fact failed to consider race as claimed, that too is an admission of guilt under the Voting Rights Act ("VRA"). *Id.* Under Intervenors' non-sensical theory, the Texas Legislature would be left in a no-win situation no matter if race was or was not considered.

What the evidence does show, as noted below, is that the Texas Legislature utilized a process to comply with the mandates of both the Constitution and the VRA whereby maps were drawn race blind (in compliance with the strictures of the Fourteenth Amendment) followed by an independent legal review of each map to determine compliance with the VRA prior to any vote on

such maps. This thoughtful process demonstrates the Legislature's studious commitment to protecting the statutory and constitutional rights of Texas voters.

### A. Priorities considered when drafting the Congressional maps.

In crafting proposed maps, Chairwoman Huffman testified that the Senate Redistricting Committee considered redistricting priorities and objectives, including complying with the Constitution and VRA and requirement to equalize district populations based on 2020 Census. Tr. 6/7/25 PM 23:23–24:24. The evidence demonstrates that the Texas Legislature consulted partisan data, but never racial data. Tr. 6/7/25 PM 96:9–25, 99:6–20.

### B. Congressional maps were drawn race blind.

The Legislature went to great lengths to avoid drawing maps based on race. Chairwoman Huffman consistently testified during the redistricting process and at trial that the Congressional maps were drawn blind to race end-to-end. Tr. 6/7/25 48:23–49:12; 99:6–20. The starting point, a proposed map drawn by the Delegation for United States Representatives (the "Delegation") provided to the Texas House and Senate Redistricting Committees, was drawn blind to race. Tr. 6/7/25 PM 26:1–27:7, 35:3–14, 55:3–11. From there, Chairwoman Huffman's original proposed Plan C2101, as well as all subsequent maps drafted by Chairwoman Huffman were drawn blind to race. Tr. 6/7/25 26:1–27:7, 55:3–11.

### C. All maps went through an independent legal compliance check.

Because Chairwoman Huffman was committed to complying with the Constitution and the VRA, all maps up for vote underwent a legal compliance check. Tr. 6/7/25 PM 26:1–30:9, 34:11-22, 55:5–11. Accordingly, the Texas Legislature commissioned a thorough legal review of all maps—including any proposed amendments, and demonstration maps put to a vote—throughout redistricting deliberations. Tr. 6/7/25 PM 47:19–50:9.

### III. Intervenors' circumstantial evidence is weak.

Intervenors' case necessarily rests on circumstantial evidence. Although the Supreme Court has "kept the door open" for such claims, overcoming the presumption of good faith "with circumstantial evidence alone . . . is much more difficult." *Alexander*, 602 U.S. at 8. The Supreme

Court has "never invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence." *Id.*

The circumstantial evidence on which Intervenors rely is conclusory and often irrelevant, coming nowhere close to meeting their heavy burden to prove intentional discrimination.

### A. Intervenors complain about irrelevant Congressional districts.

Most of the Intervenors' so-called "mountain" of evidence pertains to Congressional districts that are not challenged and therefore irrelevant to the claims at issue. Rather than focusing on CD 9 and CD 30, much of Intervenors' Executive Summary addresses unsupported and conclusory accusations regarding other Congressional districts. For example, Intervenors insist that the Texas Legislature somehow treated CD 18 treated differently than CD 7, refused to create any additional minority opportunity districts, and gave CD 37 and CD 38 white voters. ECF 1111 at 4. Further, Intervenors argue there was clearly racial intent because whites control 28 of 38 Congressional seats. *Id.*

Intervenors also continue to make allegations regarding CD 18, despite the Court dismissing all claims related to CD 18 prior to trial. *See* Order Granting Mot. Dismiss, ECF 972 at 1.[2] For example, Intervenors ask the Court to restore a historic configuration of CD 18. ECF 1111 at 2. Similarly, Intervenors claim "problematic changes were made in the key districts at the heart of the lawsuit: Congressional Districts 9, 18, and 30." *Id.* at 5.

### B. The inadvertent pairing of incumbents, which the Legislature remedied, does not support Intervenors' claims.

Underscoring Intervenors' straw-grasping, they assert that Congressman Green's and Congresswoman Jackson Lee's pairing in an early proposed map is evidence of discriminatory intent. However, this early pairing issue was an unintentional oversight, as the drawer of that map used commercial redistricting software containing no incumbent member addresses. Tr. 6/7/25 PM 30:10–31:5; 6/9/25 AM 51:2–13. And even though members of Congress are not required to

---

[2] Intervenors attempt to challenge CD 18, despite the Court's explicit Order (ECF 972) and subsequent Notice (ECF 992) that Intervenors cannot pursue a challenge to CD 18 and Intervenors' clarification that they understood the same (ECF 1004).

live in their district, Chairwoman Huffman expressed her dedication to reviewing any amendments to fix this issue. Tr. 6/7/25 PM 31:6–31:15. Indeed, Chairwoman Huffman proposed her own amendment to remedy the error but learned that the Democratic caucus and Senator Miles did not agree with her proposal and the amendment would fail. Tr. 6/7/25 PM 60:12–62:1; Tr. 6/9/25 AM 23:3–11. As a result, Chairwoman Huffman withdrew her amendment. Tr. 6/7/25 PM 61:12–23.

Nevertheless, this pairing issue was mooted as the Texas Legislature ultimately adopted an amendment drawing Congresswoman Jackson Lee back into CD 18 in a way that met the Legislature's partisan goals and complied with the law. Tr. 6/7/25 PM 61:25–62:1. Senator West confirmed that in the enacted congressional map Representatives Sheila Jackson Lee and Al Green were unpaired, resolving any concern about that issue. Tr. 6/5/25 AM 145:14–20.

It is hard to see how an inadvertent pairing issue that was resolved prior to the passage of the Congressional map provides any support for Intervenors intentional discrimination claims.

C. **Texas citizens, civil rights groups, and all members of the Texas Legislature actively participated throughout the redistricting process.**

Even prior to the release of the official census data, the Redistricting Committees held hearings across the state, soliciting input from a wide variety of citizens and interest groups. Tr. 6/7/25 PM 5:16–24. The first hearing was held on October 29, 2019, to solicit testimony on redistricting. Tr. 6/7/25 AM 159:19–160:15. While subsequent field hearings[3] were cancelled due to COVID-19 pandemic, Chairwoman Huffman sent letter to various groups that COVID-19 would not stand in the way of fair, legal, and open legislative redistricting process during the upcoming session and that alternatives to in-person hearings would be implemented. Tr. 6/7/25 AM 161:4–162:5, 164:1–164:16.

In response to various civil rights groups' concerns about being heard on redistricting, the Senate adopted Senate Resolution 4—a set of rules by which the redistricting committee would proceed, including for the allowance of virtual testimony—which passed unanimously. Tr. 6/7/25

---

[3] Field hearings are hearings held in various parts of the State to receive public input on how the maps should be drawn for the upcoming redistricting cycle. Tr. 6/7/25 AM 159:1–6.

AM 169:7–174:8, 176:2–8, 81:1–11. In addition, the Legislature established an online, publicly-available portal allowing anyone to submit letters, exhibits, maps, or other such materials to the Texas Legislature during the redistricting process. Tr. 6/7/25 AM 164:17–167:18. Following SR4, the Senate Redistricting Committee scheduled regional hearings that were live and streamed all-around Texas. Tr. 6/7/25 PM 5:17–6:23. Civil rights groups, such as Texas NAACP, attended these regional meetings. Tr. 5/22/25 PM 152:13–153:19.

When the official and complete census data arrived in September 2021, Chairwoman Huffman sent letter to civil rights groups alerting them of the data's availability. Tr. 6/7/25 PM 12:3–9, 14:12–16:15. An additional five hearings were held after census data was release but before maps were drawn where witnesses could testify via teleconference. Tr. 6/7/25 PM 16:19–18:1. Chairwoman Huffman continually encouraged Democratic members to contact her and send proposals. Not one member of the Democratic caucus sent Chairwoman Huffman any proposed maps until after the first map became public, and even then, Democrats offered only amendments. Tr. 6/7/25 PM 53:25–54:24.

At the September 30, 2021, hearing when Chairwoman Huffman first introduced the maps, she explained that the Senate Redistricting Committee was open to suggestions from all members. Tr. 6/7/25 PM 24:20–24. Later, at the October 4, 2021, hearing, Chairwoman Huffman reiterated that this was an opportunity for the committee and the public to discuss and consider proposed amendments. Tr. 6/7/25 PM 42:11–44:24. Throughout the process, all amendments offered regarding the Congressional redistricting were considered. Tr. 6/7/25 PM 44:22–24; 48:11–22. Additionally, every proposed map that was put through the portal website or came in through the committee process was reviewed. Tr. 6/7/25 PM 53:8–15.

Contrary to Intervenors' assertions, the evidence shows that the redistricting process was open and transparent.

**D. Expert testimony does not support Intervenors' claims.**

Intervenors' expert testimony fails to consider partisanship and other principles as an explanation on how the Congressional maps were drawn.

Dr. Henderson ignores the stated redistricting principles used by the Texas Legislature in his analysis, such as not pairing incumbents, and partisan advantage. Dr. Henderson claims to have performed a regression analysis to compare racial versus partisanship changes but admits he would need to do more analysis to determine whether race or another redistricting criteria more accurately predicted the way a district was drawn. Tr. 6/7/25 AM 95:12–19. He did not, for example, consider whether prevention of paired incumbents more accurately predicts how the maps were drawn. Tr. 6/7/25 AM 95:20–25. And, remarkably, Dr. Henderson testified that his calculations reveal zero measurable partisan effects. Tr. 6/7/25 AM 110:9–16.

Intervenors also cite Dr. Henderson's conclusory testimony that only intentional discrimination could explain the movement of minority populations among districts in the new congressional map.[4] ECF 1111 at 5. However, Dr. Henderson himself admits that he did not prepare an intent analysis in this case. Tr. 6/7/25 AM 91:22–25.

Dr. Duchin used a robot to conclude that race predominated over traditional redistricting principles. She compared the enacted Congressional maps to a set of demonstration plans that she created. Her robot, however, assumes that partisan considerations played no role in the map making process. Tr. 5/31/25 AM 53:16–20, 54:16–22, 104:5–9, 106:6–9. Her analysis therefore cannot distinguish between race and partisanship when the two coincide.

If Drs. Duchin's and Henderson's conclusion were true, it would mean that the 181 partisans of the Texas Legislature drew maps that completely ignored their political fortunes. Of course, this contradicts the Texas Legislature's stated objective, to draw maps considering partisanship. Notably, Intervenor experts failed even to consider that CD 9 and CD 30 were drawn for partisan purposes while meeting other stated redistricting principles, including compliance with the Constitution and VRA.

Dr. Trende, State Defendants' expert, testified that closer analysis demonstrates that partisanship, rather than race, better explains Texas's maps. Tr. 6/9/25 AM 92:8–93:13. Unlike

---

[4] Intervenors' Executive Summary also relies on irrelevant districts – CD 24, CD 7, and CD 22—which Henderson claims had suspicious movements. ECF 1111 at 5.

Plaintiffs' experts, Dr. Trende does control for partisanship, and his findings demonstrate that partisanship is a far stronger predictor of the composition of a new district than racial demographics. Tr. 6/9/25 AM 92:8–93:13; 144:21–145:7; 6/9/25 PM 5:23–6:5, 23:21–25.

There have been two major election cycles since Texas's maps took effect and Intervenors are unable to identify a candidate of their choice who did not get elected. The actual election results in CD 9 and CD 30 contradict the Intervenors' claims and the opinions their experts. Intervenor expert Dr. Murray summarily claims CD 9 was transitioned from an African American opportunity district to a coalition district. ECF 1111 at 5. However, CD 9 has continued to elect Congressman Al Green under enacted maps. Tr. 5/23/25 AM 155:2–157:20. Expert testimony regarding CD 30 is also unpersuasive. Following redistricting, CD 30—formerly represented by the late Representative Eddie Bernice Johnson—is now represented by another African American female Democrat, Congresswoman Jasmine Crockett. Tr. 5/23/25 PM 11:11–12:7. Intervenors therefore lack any cognizable injury in fact to support their claims

Moreover, during redistricting, then-Representative Eddie Bernice Johnson expressed no concerns about her district to Senator West. Tr. 6/5/25 AM 146:14–147:20. The enacted map maintained CD 30, which satisfied Senator West's preference that the district look as close as possible to its historical configuration. Tr. 6/5/25 AM 146:14–147:20. Senator West did not have concerns about CD 30 despite voting against the congressional map on the Senate floor. Tr. 6/5/25 AM 146:14–147:20.

### E.  The redistricting special session was necessary.

The 87th Legislature undertook its constitutional duty to redraw the State's electoral maps with some added handicaps: a late release of census data, threats from disgruntled members, and the then-unfolding COVID-19 pandemic. In an ordinary year, redistricting begins during the regular session. The United States Census Bureau has a statutory obligation to provide the results of the decennial census to state governments on or before April 1. But the Census Bureau's delay in releasing the 2020 census results prevented the Legislature from taking up redistricting until after the regular session ended. Legislators had to wait until August 14 for census data to be made

available to state officials and waited another thirty-three days for the Census to make that data usable for redistricting software. Texas must finish redistricting in time for the subsequent year's primary elections, held in March. State law sets a November deadline for candidates to file applications with the Texas Secretary of State.

Keith Ingram, the Elections Director at Secretary of State in Texas for 11 years and during two redistricting cycles testified regarding the issues that result when primaries are postponed due to maps not being ready in time for candidate filing, such as was the case during the last redistricting cycle in 2011. Tr. 6/6/25 PM 149:15–151:19. Ingram noted that public office candidates must file by the second Monday in December; and, if there is no map, they cannot start campaigning because they do not know their district lines. Tr. 6/6/25 PM 152:18–154:9. This also causes voter confusion, as it is unclear when and for whom they should vote. Ingram agreed that, based on his experience, the Texas Legislature should attempt to finalize maps as quickly as possible to eliminate voter confusion and chaos. Tr. 6/6/25 PM 154:20–25.

Complicating matters further, a cohort of 51 Democratic Representatives shut down the House by departing the State en masse. This deprived the House of the constitutionally mandated quorum necessary to conduct official business. The House sat for 38 unproductive days until a handful of relenting Democrats ended their self-imposed exile. Most of the truant members did not return until after the end of the first special session, and most refused to disavow further quorum breaks. Tr. 6/5/25 AM 127:18–22 (quorum was only reestablished in mid-August). In fact, the quorum break prevented a public hearing on redistricting. Tr. 5/23/25 AM 147:12–150:10

There were real threats of additional quorum breaks to hinder the redistricting process. Congresswoman Crockett testified that she favored maintaining the quorum break by remaining in Washington, D.C. and that she only returned once she knew a quorum had established in the House. Tr. 5/23/25 AM 141:9–11, 143:1–3. Thus, there was no guarantee that Congresswoman Crockett and her other House Democrats would not break quorum again. Tr. 5/23/25 AM 143:4–6. Congresswoman Crockett testified that she and her Democratic colleagues were willing and able to break quorum again if necessary. Tr. 5/23/25 AM 145:10–12; 146:4–6; 146:24–147:2 (indicating

she "as an individual of one" expressed a willingness to break quorum during the redistricting process). Representative Minjarez testified that quorum was not restored until August 19th and was in favor of continuing to break quorum. Tr. 5/23/25 PM 134:5–10.

With the real ongoing threat that members might defect again, the Texas Legislature necessarily wanted to pass all redistricting maps while they had a quorum.

## CONCLUSION

Intervenors fail to provide evidence to overcome the presumption that the Texas Legislature acted in good faith during the redistricting process. *See Abbott*, 585 U.S. at 605. Intervenors provide no direct evidence of intentional discrimination. Rather, the direct evidence shows that the Texas legislature went to great lengths to not consider race when drawing the maps and to ensure each map obtained an independent review for legal compliance prior to voting.

The Intervenors' circumstantial evidence is conclusory, often irrelevant and fails to account for the possibility that the maps were drawn using the Texas Legislature's stated partisanship principles. Indeed, the redistricting lawmakers did not mince words: they intended to design maps that advanced partisan interests and other traditional redistricting principles. Tr. 6/7/25 PM 96:9–25, 99:6–20

With no evidence to support their claims, Intervenors proclaim that Texas has a long history racial discrimination. However, Intervenors miss how that history influenced the Texas Legislature's approach in the present case—both houses hired outside counsel and experts to ensure Constitutional and VRA compliance without polluting their map drawing with racial considerations. This thoughtful process resulted in the passage of a Congressional map that allowed the election of a more diverse Texas Congressional delegation. Tr. 6/7/25 PM 66:5–19.

Date: July 16, 2025

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Phone: (512) 936-1700
Fax: (512) 457-4410
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
william.wassdorf@oag.texas.gov
david.bryant@oag.texas.gov
zachary.rhines@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov
ali.thorburn@oag.texas.gov
kyle.tebo@oag.texas.gov
mark.csoros@oag.texas.gov

Respectfully submitted,

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

KATHLEEN T. HUNKER
Deputy Chief, Special Litigation Division
Texas Bar No. 24118415

WILLIAM D. WASSDORF
Deputy Chief, General Litigation Division
Texas Bar No. 24103022

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

ZACHARY L. RHINES
Special Counsel
Texas Bar No. 24116957

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ZACHARY W. BERG
Special Counsel
Texas Bar No. 24107706

ALI M. THORBURN
Assistant Attorney General
Texas Bar No. 24125064

KYLE S. TEBO
Special Counsel
Texas Bar No. 24137691

MARK A. CSOROS
Assistant Attorney General
Texas Bar No. 24142814

COUNSEL FOR STATE DEFENDANTS

## CERTIFICATE OF SERVICE

  I certify that on July 16, 2025, a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF).

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division