IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § | |
| *Plaintiffs,* | § § | Case No. 3:21-cv-00259-DCG-JES-JVB [Lead Case] |
| v. | § § | & |
| GREG ABBOTT, *et al.*, | § § | All Consolidated Cases |
| *Defendants.* | § | |

**STATE DEFENDANTS' RESPONSE TO THE GONZALES PLAINTIFFS'**
**EXECUTIVE SUMMARY**

Defendants Greg Abbott, in his official capacity as Governor of Texas, Jane Nelson, in her official capacity as Secretary of State of Texas, Dave Nelson, in his official capacity as Deputy Secretary of State, and the State of Texas file this response in opposition to the *Gonzales Plaintiffs' Executive Summary* (ECF 1108), and would respectfully show as follows:

## BACKGROUND

Plaintiffs allege that Texas' enacted congressional map after redistricting violates Section 2 of the Voting Rights Act. They seek an additional two congressional districts—one in the Dallas-Fort Worth area ("DFW") and one in southeast Harris County—be drawn to create Hispanic-majority districts. While not entirely clear, it appears that the Plaintiffs' demonstrative Harris County district ("Gonz. CD-38") is meant to replace the enacted CD-38, while the demonstrative DFW district, ("Gonz. CD-12") affects the surrounding districts 5, 12, 24, 25, 30, 32, and 33, but would not replace the enacted CD-37 located roughly along I-35 south of Austin.[1] Plaintiffs' drew their proposed demonstrative districts with predominantly racial intent, placed them in lower-growth

---

[1] As shown below, both of the new, enacted congressional districts under redistricting produced districts: (1) in the areas of highest population growth in the state; and (2) allowed Hispanic voters in two affected districts to elect their candidates of choice. Tr. 6/7/2025 PM 62:2–64:3, 65:11–66:19.  Plaintiffs presumably object because CD-38's admitted candidate of choice is an African-American Republican. *Id.* 66:8-10. While couched in terms of a racial challenge, Plaintiffs' motives are clearly partisan.

1

areas than the enacted districts, and fail to make the requisite showing for drawing minority opportunity districts.

Additionally, Plaintiffs have attempted to reverse the burden of proof on their Section 2 claims, claiming that defense expert Dr. Alford's analysis was "deficient" and criticizing the districts he studied in his reports and that he essentially has not disproven a claim of racial polarization. *See* ECF 1108 at 7. But this is a tacit admission that Plaintiffs' claims fail. First, Dr. Alford did not "choose" the elections and districts that he studied in this case, but only performed additional analysis on the elections already chosen and analyzed by the Plaintiffs' own experts. *E.g.*, Tr. 6/10/25 PM 113:3–114:1. He did this because partisanship and politics were confounding variables in determining whether there was racially polarized voting as alleged by Plaintiff, and the Plaintiffs' expert made no effort to disaggregate those confounding variables as part of his work. Tr. 6/10/25AM 130:4–131:2; Tr. 6/10/25 PM 59:15–60:2.[2]

From his report (Defs. Ex. 3, p.13): "[T]he most important point of these tables is not that they prove that voting isn't racially polarized. The key point is that they don't provide any evidence that voting is racially polarized." Dr. Alford was consistent on this point throughout trial. He was asked to determine whether the Plaintiffs' retained experts had shown racial polarization under *Gingles*, and testified that:

(1) No Plaintiffs' expert made an effort—at all—to separate partisanship from race;
(2) None made a causal analysis related to partisanship; and
(3) Failing to do so makes it impossible to dismiss partisanship as the cause of the statistics noted by the experts.

Tr. 6/10/25 AM 130:4–131:2; Tr. 6/10/25 PM 59:15–60:2; Tr. 6/10/25 AM 129:1–130:1; *see also* Tr. 6/9/25 PM 124:20–125:19 and 127:22–128:11. Without disaggregating partisan polarization from racial, Plaintiffs fail to meet their *Gingles* burden.

---

[2] Plaintiffs attempted the same criticism of Dr. Alford at trial, ignoring the difference between the old Section 5 defense burden to disaggregate partisanship from race, and the law post-*Shelby County v. Holder*, 570 U.S. 529 (2013), where the burden is precisely the opposite. *See* Tr. 6/10/25 PM 57:23–58:16 (testifying most of cases he was questioned on during cross were older, Section 5 cases under different burden of proof). *Id*. at 673.

## ARGUMENT AND AUTHORITIES

### A. Standard (Plaintiffs' Summary Incomplete)

*Gingles* does not mandate a proportional number of majority-minority districts when looking at minority voting population. *E.g.*, *Bush v. Vera*, 517 U. S. 952 at 979 (1996) (plurality opinion); *Thornburg v. Gingles*, 478 U. S. 30, 50 (1985). If it did, states would be forced to group together geographically dispersed minority voters into unusually shaped districts,[3] without concern for traditional districting criteria such as respecting the boundaries of political subdivisions. *Gingles* and the Supreme Court decisions that followed have flatly rejected that approach. *See*, *e.g.*, *Vera*, 517 U. S. at 979; *Miller v. Johnson*, 515 U. S. 900, 912–13 (1995).

To succeed in proving a Section 2 violation under *Gingles*, plaintiffs must therefore satisfy three "preconditions." First, the "minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district." *Allen v. Milligan*, 599 U.S. 1, 18 (2023); *Gingles*, 478 U. S. at 46–51 (1985). A district will be reasonably configured if it comports with traditional districting criteria. *Allen*, 599 U.S. at 18; *see Alabama Legislative Black Caucus v. Alabama*, 575 U. S. 254, 272 (2015). Second, the minority group must be able to show that it is politically cohesive. *Gingles*, 478 U. S., at 51. And third, "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate." *Id*. This third precondition, focused on racially polarized voting, should establish that the challenged districting thwarts a distinctive minority vote <u>because of race</u>. *See Growe v. Emison*, 507 U. S. 25, 40 (1993) (emphasis added).

Finally, a plaintiff who demonstrates the three preconditions must also show, under the "totality of circumstances," that the political process is not "equally open" to minority voters. *Id*. at 45–46; *see also id*. at 36–38.

---

[3] Such as Plaintiffs' Gonz. CD-12.

### B. Gonzales District 12 Insufficient

Plaintiffs have proposed Gonz. CD-12, a district that stretches narrowly from the eastern side of Dallas to two arms circling Fort Worth, while also sending appendages north and south at irregular intervals to reach out and capture areas of Hispanic population.



*Figure 1*: Plaintiffs' Proposed CD-12. Gonz. Ex. 6, p. 44; Jt. Ex. 1231. It is PLAN H2198.

#### 1. Gonz. CD-12 Drawn on Basis of Race

The DFW area, as a whole, has a 22% Hispanic CVAP. Tr. 5/28/25 AM 102:19–103:2; Gonzales Ex. 9, p.2. Despite this, Plaintiffs managed to produce a demonstrative district with a majority Hispanic voting age population by intentionally connecting disparate areas and neighborhoods through almost uninhabited stretches in Arlington and Tarrant County. *See* Jt. Ex. 1231; Tr. 5/30/25 PM 63:4-65:10; 66:1-67:1 (identical district); MALC Ex. 18 (Hispanic "heat map"). A basic requirement of the *Gingles* 1 analysis is that the maps should not contain tentacles, appendages, or obvious irregularities that function only to reach racial groups. *See Allen*, 599 U.S. at 20. Gonz. CD-12 is an obvious effort at using race first and foremost in attempting to draw a map, with no regard to respecting existing political subdivisions or core preservation. This proposed district is therefore equivalent to the impermissible district in *Shaw I*—concentrating a dispersed minority population in one district to maximize a minority's population while ignoring political subdivisions and compactness is not permitted. *Shaw v. Reno*, 509 U. S. 630, 647 (1993).

Plaintiffs drew the district predominantly on racial grounds; this is simply not allowed. *E.g.*, *Allen*, 599 U.S. at 30 (Kavanaugh, J. concurring).

Race may not be "the predominant factor in drawing district lines unless [there is] a compelling reason." *Allen*, 599 U.S. at 31 (Kavanaugh, J. concurring) (quoting *Cooper v. Harris*, 581 U. S. 285, 291 (2017)). Race predominates in the drawing of district lines when "race-neutral considerations [come] into play only after the race-based decision had been made." *Allen*, 599 U.S. at 31 (Kavanaugh, J., concurring) (quoting *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U. S. 178, 189 (2017). That may occur where "race for its own sake is the overriding reason for choosing one map over others." *Bethune-Hill*, 580 U. S. at 190.

Section 2 has never required the adoption of districts that violate traditional redistricting principles. *E.g.*, *Allen*, 599 U.S. 29–30. Its exacting requirements—based on the principle that it is the states that should handle the political process of redistricting—limit judicial intervention to "those instances of intensive racial politics" where the "excessive role [of race] in the electoral process . . . den[ies] minority voters equal opportunity to participate." *Allen*, 599 U.S. at 29–30.

### 2. <u>Gonz. CD-12 Not Drawn on Accepted Principles</u>

While Dr. Ansolobehere used the maps from Plan 2163 as his baseline, he had no idea who drew them. Tr. 5/28/25 AM 86:13–20. Also, Plaintiffs instructed him to make sure the districts were drawn so that a Gonzalez plaintiff would be placed into them. Tr. 5/28/25 AM 88:11—19. He did not consider the traditional principles of core conservation, communities of interest, or incumbent pairing. Tr. 5/28/25 AM 90:20–92:10. However, Gonzales' counsel instructed him to add incumbent protection to the maps, <u>but only to protect minority candidates, and not any Anglo incumbents</u>. *Id.* This further shows the racial motives of Plaintiffs in proposing Gonz. CD-12. Dr. Ansolobehere also admitted that the demonstrative district was less compact than the enacted CD-12. Tr. 5/28/25 AM 95: 8–11.

### 3. <u>No Showing of Racially Polarized Voting</u>

Plaintiffs have the burden to show racially polarized voting; as shown above, they have failed to do so. No Plaintiffs' expert in this case has even attempted to disaggregate partisan voting from

racial voting. Tr. 6/10/25 AM 130:4–131:2; Tr. 6/10/25 PM 59:15–60:2. Dr. Ansolobehere, in fact, admitted that he also did not try to control for other confounding variables for his analysis – including sex, religion, urban/rural differences, political issues, or party. Tr. 5/28/25 AM 114:9–115:10. He, like Plaintiffs' other experts, has no way to exclude any of those factors and cannot show causation without such analysis.

Dr. Alford, on the other hand, using the districts and elections selected by Plaintiffs' experts for their reports, showed that there was no indication that voting behavior in those districts was tied to the race of the candidate involved. Tr. 6/10/25 AM 125:2–15. While white voters tended to vote Republican, they voted their party choice regardless of the candidate's race. *Id.*; Tr. 6/10/25 AM 125:16–126:6. Likewise, party affiliation for Hispanics and Anglos—facts not examined by Dr. Ansolobehere or Plaintiffs' other experts—explained voting patterns as well or better than racial guesses. Tr. 6/10/25 AM 127:22–128:9.

The elections studied in this case—chosen by Plaintiffs' experts—showed conclusively that there are stable levels of support along party lines, regardless of the race of the candidate; this applies to all voters, including Hispanics. Tr. 6/10/25 AM 55:13–56:23. Plaintiffs have not, and cannot, disaggregate racial polarization from partisan polarization.

    **4. Demonstrative District Not Shown to Actually Elect Candidate of Choice**

Plaintiffs' Gonz. CD-12, despite all of the work done to connect every Hispanic neighborhood from far east Dallas to western Fort Worth, plus seemingly random areas north and south, only managed to create a district with a Hispanic CVAP of 53.3 percent. There is no showing that this percentage would actually make a district that would allow the election of the Hispanic voters' candidate of choice. *See Bethune-Hill*, 580 U.S. at 196 (approving a choice to use a minimum of 55% for minority voters).

6

## C. Gonzales Demonstrative District 38 Insufficient

### 1. <u>Gonz. Dist. 38 is Questionable to Replace Performing District</u>

Plaintiffs drew Gonz. CD-38 to replace the enacted CD-38:



*Figure 2*: Proposed Gonz. CD-38. Gonz. Ex. 6, p. 42; Jt. Ex. 1231. It is PLAN 2198.

This proposed district would replace the enacted CD-38. As admitted by Plaintiffs' expert, the enacted CD-38 actually did elect the candidate of choice Hispanic voters in 2022 and 2024. Tr. 5/28/25 AM 61:5–9.[4] Plaintiffs therefore propose to replace a proven district that elected a Hispanic candidate of choice and replace it with another—depriving the voters in the enacted CD-38 their choice of representative.

Even with Plaintiffs trading Hispanic voters into a new proposed district Gonz. CD-38, that district is only 52.7% Hispanic CVAP. Tr. 5/28/25 AM 7:8–18. Plaintiffs offered no analysis or evidence that such a slim majority would perform as a minority opportunity district. Likewise, the district from which that Gonz. CD-38 took Hispanic, Gonz. CD-29, had its own Hispanic population lowered to a bare 51.5% Hispanic CVAP threshold. Tr. 5/28/25 AM 7:19–25. The evidence leaves an open question as to whether Plaintiffs demonstration map draws two non-performing minority-majority districts at the expense of CD-38, a district that has twice elected the Hispanic candidate of choice.

---

[4] As shown by the citations, Dr. Ansolobehere testified twice at trial that the enacted CD-38 did in fact elect the Hispanic voters' candidate of choice, Republican Wesley Hunt. He also once hedged on this answer, saying that the voting was close—and that Hunt was a Republican.

### 2. Gonz. CD-38 Not Drawn on Accepted Principles

As noted above, part of Dr. Ansolobehere's project was to make sure a Gonzalez plaintiff lived in each demonstrative district. Tr. 5/28/25 AM 88:11–19. He did not consider the traditional principles of core conservation, communities of interest, or incumbent pairing. Tr. 5/28/25 AM 90:20–92:10. However, Gonzales' counsel instructed him to add incumbent protection to the maps—but only to protect minority candidates. *Id*.

### 3. Demonstrative Map Creates Polarization Under Plaintiffs' Definition

Dr. Ansolobehere testified that the enacted maps for districts 9, 18, and 33—those in the county—were **not** racially polarized districts in the enacted map, even by his own definition. Tr. 5/28/25 AM 110:4–111:4. Changes to the area required to draw Gonz. CD-38 actually increased polarization to the extent that the demonstration map turned the those three districts into polarized districts under his definition, and simultaneously increased the polarization of the other districts in the county at the same time. Tr. 5/28/25 AM 108:16–111:15.

### 4. No Showing of Racially Polarized Voting

The analysis for the Gonz. CD-12 applies equally to Gonz. 32. *See above*. Dr. Alford found the data on partisan voting applied to every Congressional district reviewed, and there was no indication that voting behavior is tied to race. Tr. 6/10/25 AM 131:2–11 and 125:2–15.

### D. Totality of Circumstances Do Not Show EITHER District Is Proper

Despite Plaintiffs claims being couched in terms of increasing minority representation because those populations grew the fastest from 2010–2020, neither of Plaintiffs' proposed districts are placed in the areas of the largest growth—such as the two enacted districts 37 and 38 drawn by the Texas Legislature. This is presumably because the largest gains were not in the urban areas where Plaintiffs demand new districts be placed—while the enacted maps do place districts where the population growth is highest,[5] the non-urban Hispanic population does not vote as reliably for Democrats. *See* Tr. 5/21/25 PM 77:1—11; *see also* Tr. 6/9/25 114:9–8:23.

---

[5] *See* Defs. Ex. 526 (population density map).

- **The extent of any history of official discrimination in the state affecting the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process/election of minorities.**

Reaching back far enough, there are certainly historical facts showing discrimination in voting. However, in the DFW area, three of the eight congressional districts elected the Hispanic preferred candidate. Tr. 5/28/25 AM 98:24–99:5. This number is more than the proportional Hispanic population in the area. Tr. 5/28/25 AM 103:19–104:5. Likewise, one of the current sitting Senators from Texas is Hispanic. As of 2023, 40% of the Texas House was minority represented; that is last date the Texas Tribune provided such data, but it is known more minority representatives have been elected since then. Tr. 5/29/25 AM 22:8–23.

- **The extent to which voting in the elections of the state or political subdivision is racially polarized.**

This has been dealt with expansively above. Plaintiffs have wholly failed to produce any evidence to disaggregate any of the potential confounding factors listed above.

- **The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.**

- **If there is a candidate slating process, whether the members of the minority group have been denied access to that process.**

Neither of these factors have been alleged to be at issue.

- **The extent to which members of the minority group in the state bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.**

Plaintiffs have made allegations here, but again have made conclusory allegations without adequate investigation. No effort was made to separate out statistics for recent immigrants, first generation vs. second or third generation citizens, English-speaking, age, and related factors. Tr. 5/22/25 122:4-124:24, 129:12-130:5, 131:8-10, 131:24-132:15, 133:20-134:2. Voting in Texas is also allowed early, at any precinct, and with Spanish language ballots.

- **Whether political campaigns have been characterized by overt or subtle racial appeals.**

Plaintiffs have attempted to identify racial appeals, but those associated with campaigns:

(1) may not have originated with the campaign, showing only that an anonymous person made a racist statement; (2) if from a campaign, have been soundly condemned; and (3) are not successful.

Examples from Dr. Lichtman's (Plaintiffs' retained expert) report:
- Pete Sessions campaign – statements unsuccessful, as Allred won. Tr. 5/29/25 AM 12:13–21 and 13:9–11.
- Nelson School Board campaign – statements rejected and condemned. Tr. 5/29/25 AM 13:14–14:11.[6]

These types of incidents are not shown to be part of a real pattern, but are sporadic and isolated events. Everyone had admitted that racism cannot be wholly eliminated by a state Legislature, and the current law does not hold the state to such a standard.

Moreover, Plaintiffs' claimed "subtle" racial appeals appear to largely be partisan arguments in valid policy debates—alleging that any concerns about the border or crime, for example, is almost automatically racist. Tr. 5/29/25 AM 18:11-14 and 20:13-18. This claim is made about the border, despite the fact that Hispanic voters trended towards the Republican party in counties near the border because—and not despite—of the Republican position on border issues. Tr. 5/29/25 AM 24:7–15.

## CONCLUSION

Plaintiffs, under Section 2 of the VRA, have the burden of proof, and they have not met it. Their proposed maps are drawn specifically on the basis of race – including incumbent protection for <u>only</u> minority representatives, they are not drawn using traditional redistricting criteria, and are not even shown to be productive for minority representation. In drawing these districts, Plaintiffs ignore the areas of largest growth in the state—the entire reason for adding two districts—and deprive the Hispanic voters in the enacted CD-38 their candidate of choice.

Gonzales Plaintiffs' requested order should be denied in all things.

---

[6] Interestingly, Dr. Lichtman argues that condemning racist appeals or statements is just more evidence that Republicans are racists, even if the candidate at fault is forced to resign or drop from the race. Tr. 5/29/25 AM 14:5–24. Failing to condemn a racist statement, of course, is *also* further evidence of racism for Dr. Lichtman. *Id.* at 14:21–25. This does not appear to be an entirely fair standard (*cf.* "Kafka-esque").

<div style="display: flex;">
<div>

Date: July 16, 2025

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Phone: (512) 936-1700
Fax: (512) 457-4410
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
william.wassdorf@oag.texas.gov
david.bryant@oag.texas.gov
zachary.rhines@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov
ali.thorburn@oag.texas.gov
kyle.tebo@oag.texas.gov
mark.csoros@oag.texas.gov

</div>
<div>

Respectfully submitted,

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

KATHLEEN T. HUNKER
Deputy Chief, Special Litigation Division
Texas Bar No. 24118415

WILLIAM D. WASSDORF
Deputy Chief, General Litigation Division
Texas Bar No. 24103022

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

ZACHARY L. RHINES
Special Counsel
Texas Bar No. 24116957

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ZACHARY W. BERG
Special Counsel
Texas Bar No. 24107706

ALI M. THORBURN
Assistant Attorney General
Texas Bar No. 24125064

KYLE S. TEBO
Special Counsel
Texas Bar No. 24137691

MARK A. CSOROS
Assistant Attorney General
Texas Bar No. 24142814

COUNSEL FOR STATE DEFENDANTS

</div>
</div>

## CERTIFICATE OF SERVICE

      I certify that on July 16, 2025, a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF).

                                                 */s/ Ryan G. Kercher*
                                                 RYAN G. KERCHER
                                                 Chief, Special Litigation Division