IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § | |
| *Plaintiffs,* | § § | Case No. 3:21-cv-00259-DCG-JES-JVB [Lead Case] |
| v. | § § | & |
| GREG ABBOTT, *et al.*, | § § | All Consolidated Cases |
| *Defendants.* | § | |

**STATE DEFENDANTS' RESPONSE TO MEXICAN AMERICAN LEGISLATIVE CAUCUS'S EXECUTIVE SUMMARY**

Defendants Greg Abbott, in his official capacity as Governor of Texas, Jane Nelson in her official capacity as Secretary of State of Texas, Dave Nelson, in his official capacity as Deputy Secretary of State, and the State of Texas file this response in opposition to MALC's executive summary (ECF 1109), setting out specific relief requested.

**I. Texas allocated populations amongst districts in Plan H2316 pursuant to traditional redistricting principles and partisan advantage.**

The enacted Texas House map, Plan H2316, has a total population deviation of 9.98% between districts. The Supreme Court has made clear that "an apportionment plan with a maximum population deviation under 10%" falls within a category of "minor deviations from mathematical equality among state legislative districts [that] are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Brown v. Thomson*, 462 U.S. 835, 842 (1983). MALC's reliance on *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004), is unavailing because the Supreme Court has never adopted its reasoning and, to the extent that it did, such a claim is no longer valid. *See Rucho v. Common Cause*, 588 U.S. 684 (2019) (holding that partisan gerrymandering claims present political questions and are nonjusticiable).

To the extent that this Court finds a *Larios* claim is valid, a plaintiff bears the burden of

1

showing that "it is more probable than not that a deviation of less than 10% reflects the predominance of illegal reapportionment factors rather than the legitimate considerations such as compactness, contiguity, maintaining political subdivisions, or preserving the cores of prior districts." *Harris v. Arizona Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016). The evidence at trial showed that MALC failed to meet this burden.

MALC failed to show that the Texas legislature preferred West Texas Anglo interests to El Paso Hispanic interests when drawing the House map, including:

- MALC's expert, Dr. Matthew Barreto, admits in his testimony and report that Texas's population growth was uneven by geography and race. Tr. 5/30/25 AM 114:2–13.

- The geographic areas around El Paso lost population. El Paso itself did not gain population as much as Harris County, south Tarrant County, or Dallas/Fort Worth. Tr. 6/5/25 AM, 38:17–39:6; *see also* Defs. Ex. 326 (state House districts' population deviation map).

- Chairman Anchia's primary intent when drawing demonstration maps was to maximize Hispanic voter count in various districts, and he kept the racial shading function turned on while drawing maps. When preparing demonstration maps, Chairman Anchia did not speak with incumbents, ignored communities of interest, and sought to maximize the Hispanic vote while ignoring other considerations. Tr. 6/5/25 AM 29:16–22; 55:3–16.

- MALC demonstration plan H2207 is a map of 57 districts, not a statewide map. El Paso was divided into four districts, despite a request to divide it into five districts. Tr. 6/5/25 AM, 31:1–32:8.

- Demonstration plan H2207 paired 8 incumbents, was only discussed with El Paso MALC members, did not account for ripple effects across the statewide map, communities of interest, county lines, or splitting cities; Chairman Anchia admitted that the legislature must consider additional factors when drawing a statewide map. Tr. 6/5/25 AM 32:18–35:7; 36:5–37:13.

- Demonstration plan H2224 is a partial map of 68 districts that pairs incumbents in 4 districts; it doesn't consider effects on the statewide map, communities of interest, county lines, splitting cities, or splitting voting precincts, and was drawn using racial shading to maximize racial voting. MALC focused on keeping seven districts in the Rio Grande Valley, and to do that it was necessary to redraw 68 districts; the map left El Paso blank. State map drawers have to weigh multiple redistricting principles that the demonstration map does not consider. Tr. 6/5/25 AM 41:7–46:3.

- H2249 is a statewide demonstration map that paired 73 incumbents, did not consider the county line rule, keeping districts in the same place, keeping districts centered in the same city, splitting cities, or splitting districts. The map systematically underpopulated districts throughout the state, within the 10% deviation. Chairman Anchia presented the map and then withdrew it. Tr. 6/5/25 AM, 50:1–52:20

- Chairman Anchia admitted it would be impermissible for the Legislature to draw maps as he had, ignoring traditional redistricting criteria and focusing primarily on race. Tr. 6/5/25 AM 76:15–77:10.

II. **Plan H2316 complies with Section 2 of the Voting Rights Act in both Harris County and Central Texas.**

MALC's Section 2 claims fail because its proposed House districts do not satisfy the *Gingles* preconditions. Furthermore, Latinos in the Harris County and Central Texas areas are able to elect candidates of their choice, and voters have elected Latino candidates to the House under the enacted House map.

The evidence shows that Harris County experienced an increase in population over the decade leading up to the 2020 census, including an increase in the Hispanic population. *See* Defs. Ex. 326 (state House districts population deviation from ideal map). However, growth in the Harris County areas most densely populated by Hispanics did not keep pace with Texas's total population. *See* Tr. 6/5/25 PM, 117:11–18 (Rep. Christina Morales testified that the population deviation map of Harris County showing that the House districts with the most negative population deviations are in the southeastern part of the county accurately reflects her knowledge of the county); *see also* Defs. Ex. 326 (state House districts population deviation from ideal map). The populations of HD 145 and HD 148 were below the ideal district size, *id.*, and it was necessary to add population to those districts. *See, e.g.*, Tr. 6/5/25 PM, 120:1–4 (Rep. Morales knew that the census numbers meant that her district would have to take on additional population).

MALC's demonstration maps, Plans H2327 and H2331, propose adding at least one additional Latino-majority House district in Central Texas. Yet Plan H2327's proposed HD 17 shatters the county line rule and is only 49.6% Hispanic CVAP. Tr. 5/30/25 AM, 146:4–148:6. Proposed HD 51 in Plan H2327 is only 49.7% Hispanic CVAP; furthermore, Latino voters in enacted HD 51 have the opportunity to elect their candidate of choice and have elected Lulu Flores, a Hispanic Democrat. Tr. 5/30/25 AM, 148:9–15. Plan H2331's proposed HD 17 has a Hispanic CVAP of 51.7%; this percentage is within the margin of error, and Dr. Barreto did not analyze whether the proposed district would in fact have a Hispanic majority. Tr. 5/30/25 AM,

3

150:22–151:9. Furthermore, Dr. Barreto failed to disentangle partisan data from racial data and his performance analysis ignored *Gingles*. Tr. 5/30/25 AM, 156:1–21 (Dr. Barreto just tallied results to see who won a particular district); 163:13–23 (Dr. Barreto's racially polarized voting models and data cannot disentangle racial data from partisan data, even though doing so might be possible with the right type of data).

MALC's demonstration maps show districts that do not follow traditional redistricting principles. They are racially gerrymandered, not compact, split communities of interest, and disregard the county line rule. *See* Tex. Const. art. I § 26. MALC's only goal when drawing maps was maximizing the Latino vote, while ignoring traditional redistricting principles. *See, e.g.*, Tr. 6/5/25 AM, 76:15–77:10. Under the VRA and the Constitution, the Texas Legislature cannot, and did not, draw such racially-focused maps. *Johnson v. DeGrandy*, 512 U.S. 997, 1017 (1994).

### III. Plan C2193 complies with Section 2 of the Voting Rights Act in both DFW and Greater Harris County.

MALC argues that Texas should have drawn an additional Hispanic-majority congressional district in the Dallas-Fort Worth area. However, MALC's demonstration plan C2163 fails to show that the Hispanic population is sufficiently large or compact to be a majority in demonstration CD 37 without flagrantly disregarding traditional redistricting principles. The demonstration district ignores those principles in pursuit of a racial gerrymander. *See* Tr. 5/30/25 PM, 75:1–76:4 (demonstration CD 33 is located in an underpopulated area of the map). It would be impermissible for the Legislature draw maps like MALC, which primarily focus on race. *See* Tr. 6/5/25 AM, 76:15–77:10.

The same argument applies to demonstration Plan C2167, which MALC argues demonstrates that an additional HCVAP majority district could be drawn in Harris County. Plaintiff failed to establish the three *Gingles* preconditions were met and drew its demonstration maps to maximize Hispanic voting strength. *See* Tr. 6/5/25 AM, 76:15–77:10; *see DeGrandy*, 512 U.S. at 1017.

### IV. The evidence of the totality of circumstances cuts heavily in favor of State Defendants.

The Court need only evaluate the "totality of the circumstances" surrounding whether

4

minority voters have access to the franchise if a plaintiff satisfies all three *Gingles* factors. Plaintiffs have not done so here. Nevertheless, the overwhelming evidence presented at trial shows that minority voters in Texas have ample and equal opportunity to participate in the electoral process.

- Texas pioneered no-excuse early voting, becoming the first state to enact a policy whereby registered voters could vote prior to elections regardless of circumstance. Tr. 6/6/25 PM 136:16–137:10. As presently implemented, early voting permits voters to vote beginning approximately two weeks before the election and helps all Texas voters access the franchise. Tr. 6/6/25 PM 137:11–17, 138:22–139:8.

- For individuals who are permitted to vote by mail, Texas employs annual ballot by mail procedures. Voters who are eligible may submit a request in January of election year to receive all of their mail ballots throughout the year. Tr. 6/6/25 PM 104:14–20. This system helps the elderly and disabled of all races, statuses, and creeds to access the franchise. Tr. 6/6/25 PM 140:23–141:2.

- Voters in many counties, including the most populous counties in Texas, may vote at any polling location in their respective counties of residence. This helps make voting more convenient and hassle-free for the 85% of voters who reside in counties that employ countywide polling. Tr. 6/6/25 141:16–142:25.

- The Help America Vote Act is a federal law mandating that states take certain actions to help disabled voters vote in federal elections. Texas has adopted the HAVA requirements for state elections. Tr. 6/6/25 PM 143:20–25. Texas also has laws and procedures beyond the HAVA requirements that aid disabled voters. Tr. 6/6/25 PM 144:4–17.

- Texas assists voters who speak languages other than English. Bilingual ballots are required in all Texas counties. Tr. 6/6/25 PM 144:24–25. Certain counties are required to print election materials in other languages as well. Tr. 6/6/25 PM 145:14–22. Any voter may use an interpreter of his or her choice to aid them in the voting process. Tr. 6/6/25 PM 145:2–7.

- Voter identification is required in Texas. But the requirements for voter identification are flexible based on the circumstances of the individual voter. Voters can use seven different forms of identification to vote. If a voter does not have any of those seven forms of identification, he or she may utilize an affidavit and other government documents to prove his identity and vote. Tr. 6/6/25 PM 146:8–17.

- To serve as a poll worker, one need only satisfy certain baseline requirements. Otherwise, anybody can serve as a poll worker regardless of race, ethnicity, creed, or any other characteristic. Tr. 6/11/25 AM 63:22–64:17.

- Ethnic minorities participate in all aspects of elections, from county election administrators to poll workers. In fact, the county judges and election administrators of some of the largest counties are racial or ethnic minorities. Tr. 6/11/25 AM 64:18–65:24.

V. **State Defendants' expert testimony rebuts Plaintiffs' claims.**

In a challenge to state redistricting maps, the Plaintiffs bear the burden to show that Texas maps violate applicable law. *See Abbott v. Perez*, 585 U.S. 579, 605 (2018); *Allen v. Milligan*, 599 U.S. 1, 18 (2023). Here, State Defendants presented the testimony and reports of two expert witnesses—Dr. Sean Trende and Dr. John Alford—each of whom presented an abundance of evidence rebutting Plaintiffs' claims.

Dr. Trende's testimony and expert reports show evidence that defeats Plaintiffs' claims. Plaintiffs bemoan that Dr. Trende did not testify to several different issues that they feel are important. ECF 1109 at 7. But Dr. Trende shows that the drawing of each map, when considering traditional redistricting factors, could be drawn simply by considering partisan effects. Tr. 6/9/25 AM at 149:10–150:18. Put simply, partisan considerations lie at the heart of State Defendants' motivations, and the maps all but prove this.

Similarly, Dr. Alford rebutted Plaintiffs' claims. For the purposes of analysis, Dr. Alford took each assumption made by Plaintiffs' experts as true. Tr. 6/10/25 AM 113:13–18. He did not dispute Plaintiffs' experts' analysis or methodology. Tr. 6/10/25 AM 113:23–114:1. He noted, however, that Plaintiffs' experts used varied definitions of the term "racially polarized voting." Tr. 6/10/25 AM 119:6–16, 120:9–121:16, 121:21–25. He next analyzed whether Plaintiffs' experts could disentangle racially polarized voting from politically polarized voting. Tr. 6/10/25 AM 125:5–7, 126:14–19. Dr. Alford found that Dr. Ansolabehere failed to perform any control analysis whereby to examine whether Dr. Ansolabehere's analysis could exclude partisanship as a basis for Texas's maps. Tr. 6/10/25 AM 129:1–12. Importantly, Dr. Alford testified that the Hispanic community in Texas has tended to vote more Republican in recent elections, thus weakening Plaintiffs' claims that Hispanics vote as a block. Tr. 6/10/25 AM 141:8–146:4.

VI. **MALC fails to meet its burden to show race-based discrimination in the drawing of Texas's electoral districts.**

The factors set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), are crucial to the Court's determination of discriminatory intent in

6

map-drawing. Based on the *Arlington Heights* factors, MALC Plaintiffs have not adequately shown discriminatory intent on behalf of the Texas Legislature, and thus their claims fail.

### A. Historical Background

The evidence offered by the Plaintiffs for the purposes of showing a history of racial discriminatory is far too removed from the situation in Texas in 2026 to justify the Court giving that evidence much, if any weight. Dr. Alan Lichtman's analysis of historical discrimination in Texas goes back well into the mid-nineteenth century. Tr. 5/28/25 PM 126:18–21. His most prominent point is that, in 1866, despite black voters being granted access to the franchise, Texas sought to limit that enfranchisement. Tr. 5/28/25 PM 127:1–14. But these examples of discrimination occurred well over one hundred years prior to the enactment of the challenged maps, at a time where Napoleon III led the Second French Empire, and Prussia and the Kingdom of Italy united in a war against Habsburg Austria. Tr. 5/28/25 PM 127:20–128:11. He also testified to the last all-white primary in Texas, which occurred in 1944, over eighty years prior. Tr. 5/28/25 PM 128:12–25. In much the same vein, Dr. Martinez speaks to events related to racial discrimination in 1821—a good two-hundred years before the maps were drawn. Tr. 6/4/25 AM 67:7–24. Dr. Kousser's testimony regarding racially discriminatory events in the early 1900s is similarly unconvincing as it was, again, over one hundred years prior to the enactment of the maps. Tr. 5/27/25 PM 121:22–122:14. And last, none of the discriminatory actions mentioned in the report of Dr. Tijerina had existed for more than sixty years. Tr. 5/27/25 AM 11:9–13:5.

Indeed, Plaintiffs' evidence of recent, relevant historical discrimination is all but scant conjecture. Mansfield Mayor Michael Evans offered testimony of a racially charged post in a recent mayoral election. But that post was not connected to in any way to the campaign of Julie Short (his opponent), Tr. 5/29/25 AM 77:11–20, and the voters outright rejected this racial appeal to elect Mayor Evans, Tr. 5/29/25 AM 78:20–79:7. Rep. Romero faced a similar issue with the "Mexican Mafia" flyer distributed by a democratic opponent, and the voters also rejected that racial appeal and elected Rep. Romero. Tr. 6/5/25 PM 56:20-57:4. And when Candidate Rick Miller made racial appeals to voters in his campaign against then-Representative Jetton, those comments were

outright rejected by Republicans, including Governor Abbott, and Miller was forced to drop out of the race. Tr. 6/4/25 AM 119:16–120–4.

Put into perspective, ethnic and racial minorities have had significant representation in Texas in recent years, *see* Tr. 6/10/25 AM 65:4–18, and that trend is growing. This, combined with Plaintiffs' scant evidence, defeats Plaintiffs' argument. And the totality of the circumstances factors, referenced above, also play a significant part in showing how, in the recent past, Texas has rejected racial discrimination in elections and election practices.

### B. Sequence of Events and Departure from Normal Procedure

Due in large part to the COVID-19 pandemic, the Legislature conducted an efficient redistricting process, accomplishing its redistricting goals in a single special session. But this Legislature did not deny participation to any legislator or any citizen who wished to participate in the process.

- The House Redistricting Committee was composed of a diverse group of legislators, including Democrats, and racial or ethnic minorities. For example, Sen. Rafael Anchia, a Hispanic Democrat, sat on the House Redistricting Committee. Tr. 6/10/25 AM 65:4–18.

- Electoral maps rely on data from the most recent U.S. Census. The census data is typically released in April of the year following the census. Tr. 6/10/25 AM 67:9–14. This normally provides the Legislature with sixty days to create new maps. Tr. 6/10/25 AM 68:4–11.

- The House Redistricting Committee started meeting well before the census data came out. They held hearings that included substantial public testimony. This continued through the 2021 Regular Legislative Session. The House Committee conducted approximately 14 hearings, and had about 400 witnesses testify. Tr. 6/10/25 AM 68:12–81:14.

### C. Legislative/Administrative History and Statements by Decisionmakers

The legislators who spearheaded the redistricting process repeatedly announced their intentions to draw maps that furthered their partisan goals and accounted for other traditional redistricting principles. Evidence of the legislature's partisan goals when drawing electoral districts abounds. *See, e.g.*, Tr. 06/07/25 PM, 22:11–25:5 (Senator Huffman described her goals of addressing partisan considerations and other traditional redistricting principles regarding the Congressional map) 33:10–24 (same goals regarding all electoral maps); Jt. Ex. 4259; Defs. Ex. 568; Jt. Ex. 5265; Defs. Ex. 551; Tr. 06/07/25 PM, 79:4–80:25; 132:4–139:8 (same goals regarding the

8

Senate map); Jt. Ex. 4232; Jt. Ex. 4262; Tr. 06/07/25 PM 170:17–173:1 (same goals in 2023); Jt. Ex. 4284; Defs. Ex. 565; Jt . Ex. 4286; Defs. Ex. 556; Tr. 06/07/25 PM 176:12–179:1; Jt. Ex. 3405; Tr. 06/10/25 PM, 81:19–83:21 (Representative Landgraf testified that the House used political performance and other traditional redistricting principles when considering maps). Neither the House nor the Senate considered racial data when drawing the enacted maps. *See, e.g.*, Tr. 06/07/25 PM 33:25–34:7 (racial data was not considered during the drawing of the maps). The legislature sent the maps to outside counsel to ensure the maps complied with the VRA, keeping the legislators blind to race. *See, e.g.*, Tr. 06/07/25 PM 34:8–22.

MALC failed to show that race predominated during the redistricting process, that the legislature enacted the maps with racially discriminatory intent, and failed to overcome the presumption of good faith to which Texas is entitled. The Supreme Court has "never invalidated an electoral map" in a case in which the plaintiffs "failed to adduce any direct evidence," and this Court should not do so here. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 8 (2024).

### D. Impact and Pattern of District Lines

Plaintiffs' contentions regarding the nature of the district lines in the El Paso region are patently false. Given the proportional population growth throughout the State in the decade prior to redistricting, the Legislature did all it could to ensure that the maps maintained a relatively equal population while complying with traditional redistricting principles. For example, the proportionally small population growth in El Paso County, compared to the rest of Texas, made it functionally impossible to create five House districts within El Paso County. Tr. 6/10/25 AM 89:21–90:3. And because five districts entirely contained within the county were impossible, the fifth district that touched El Paso County needed to be extended eastward into Hudspeth County—the only county that borders El Paso County. Tr. 6/10/25 AM 91:1–23.

While Texas strove to honor the County Line Rule, Plaintiffs made a point to break the County Line Rule in many of their proposed maps. Chairman Anchia, for example, proposed Plan H2133 without speaking to any affected members about this map. Tr. 6/5/25 AM 53:19–55:2. This map paired 45 incumbents and blatantly violated the County Line Rule on several occasions.

9

Tr. 6/5/25 AM 53:19-55:2. Plan H2224, similarly, pays little to no attention to its effect on the statewide map. It splits cities and disregards the county lines to forward Plaintiffs' redistricting objectives.

Moreover, the El Paso region's electoral results show no evidence of racial intent or bias. While HD 74, as enacted, currently extends into Hudspeth County and several other counties in West and Southwest Texas, that district is represented by a Hispanic Democrat, Eddie Morales of Maverick County. While Representative Joe Moody proposed an amendment that drew Rep. Morales into his benchmark district, HD80, that proposed amendment was introduced simply to strengthen the political power of El Paso County. Tr. 6/6/25 AM 107:4-109:8. And while the amendments of some minority members were rejected, others were accepted. Chairman Anchia proposed amendments that became part of the final maps. Tr. 6/5/25 AM 49:4-11.

Further, the pairing of Rep. Ordaz and Rep. Ortega is of little consequence. Rep. Ortega did not run for reelection in 2024, Tr. 6/6/25 AM 95:15-17, and Rep. Ordaz moved into HD 79, Tr. 6/6/25 AM 95:18-24. Since the county could not support five full districts, and due in part to the low population deviation in the El Paso area, a pairing of *some* incumbent was all but unavoidable. *See* Jt. Ex. 2071 (Chairman Anchia's proposal pairing incumbents Rep. Eddie Morales and Rep. Ryan Guillen—both Latino House members).

## VII. Conclusion

Plaintiffs' claims do not pass muster. The evidence shows that the challenged districts were passed for partisan advantages, not racial reasons. And these same challenged districts do not violate Section 2 of the Voting Rights Act. Even if the Court were to reach the "totality of the circumstances" test under *Gingles*, Plaintiffs' claims fare no better. Defendants' experts have soundly rebutted the testimony of Plaintiffs' experts, showing that Plaintiffs have not disentangled racial voting trends from partisan voting trends, just as the evidence offered by Defendants rebuts the Plaintiffs' evidence related to the relevant Senate Factors.

Date: July 16, 2025

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Phone: (512) 936-1700
Fax: (512) 457-4410
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
william.wassdorf@oag.texas.gov
david.bryant@oag.texas.gov
zachary.rhines@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov
ali.thorburn@oag.texas.gov
kyle.tebo@oag.texas.gov
mark.csoros@oag.texas.gov

Respectfully submitted,

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

KATHLEEN T. HUNKER
Deputy Chief, Special Litigation Division
Texas Bar No. 24118415

WILLIAM D. WASSDORF
Deputy Chief, General Litigation Division
Texas Bar No. 24103022

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

ZACHARY L. RHINES
Special Counsel
Texas Bar No. 24116957

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ZACHARY W. BERG
Special Counsel
Texas Bar No. 24107706

ALI M. THORBURN
Assistant Attorney General
Texas Bar No. 24125064

KYLE S. TEBO
Special Counsel
Texas Bar No. 24137691

MARK A. CSOROS
Assistant Attorney General
Texas Bar No. 24142814

COUNSEL FOR STATE DEFENDANTS

## CERTIFICATE OF SERVICE

    I certify that on July 16, 2025, a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF).

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division