IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, <br> *Plaintiffs,* <br> v. <br> GREG ABBOTT, *et al.*, <br> *Defendants.* | § § § § § § § § § | Case No. 3:21-cv-00259-DCG-JES-JVB <br> [Lead Case] <br> & <br> All Consolidated Cases |

**STATE DEFENDANTS' RESPONSE TO TEXAS NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE'S EXECUTIVE SUMMARY (ECF 1113)**

Plaintiff Texas State Conference of the NAACP argues that the Texas Legislature intentionally discriminated against "Texas voters of color" by enacting S2168, H2316 and C2193. *See* ECF 1113 at 2. NAACP challenges these plans without direct evidence of discriminatory intent and does not meet its burden to overcome the "starting presumption that the legislature acted in good faith." *Alexander v. S.C. St. Conf. NAACP*, 602 U.S. 1, 10 (2024).

NAACP presents its theory of the case under two causes of action, "the intent prong" of § 2 of the Voting Rights Act and the Equal Protection Clause following the generic approach outlined by *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68 (1997). ECF 1113 at 1, 8. Plaintiff has not developed its theory under § 2—neither in its pleadings nor elsewhere. This means that Plaintiff has not clarified what it understands the elements of a successful statutory intent claim to be. Consequently, Plaintiff has not explained how the record shows that Texas has violated § 2.

More importantly, Congress's 1982 amendments to the VRA foreclosed the viability of an intent claim under § 2. *See Allen v. Milligan*, 599 U.S. 1, 25 (2023) ("§ 2 turns on the presence of discriminatory effects, not discriminatory intent."). Prior to amendment, proof of discriminatory purpose was required under § 2, *Mobile v. Bolden*, 446 U.S. 55, 61–65 (1980), but Congress's

1

insertion of "Subsection (b) abrogated *Bolden*'s holding as to Section 2 by adopting the 'results test.'" *Petteway v. Galveston Cty.*, 111 F.4th 596, 601 (5th Cir. 2024). Going forward, subsection (b) set the standard of proof in terms of the impact of state action—"the political processes leading to nomination or election" must be shown to provide protected citizens "less opportunity than other members of the electorate." 52 U.S.C.A. § 10301(b). Likewise, subsection (a) was rewritten to prohibit "voting qualification[s] . . . imposed by any State . . . *in a manner which results in* a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C.A. § 10301(a) (emphasis added); *Milligan*, 599 U.S. at 13 (describing the addition "in a manner which results" as "the effects test that *Mobile*'s detractors sought"). The statute's text does not reveal a separate intent prong; instead, it authorizes a single right of action that requires proof of discriminatory impact.

Separately, "[t]he Voting Rights Act lists only one plaintiff who can enforce § 2: the Attorney General." *Ark. St. Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1208 (8th Cir. 2023) (analyzing 52 U.S.C. § 10308(d)). "Any mention of private plaintiffs or private remedies [] is missing." *Id.* at 1210. Therefore, even if NAACP were to present a case that met the standards of § 2, the Voting Rights Act does not supply them, or the other private plaintiffs in this case, a right to sue. *Id.* at 1208–13.

Shirking these issues, NAACP sticks to the *Arlington Heights* framework. Under that precedent, five "non-exhaustive factors guide courts in determining whether a particular decision was made with a discriminatory intent: (1) the discriminatory impact of the official action; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged action; (4) substantive and procedural departures from the normal-decision making process; and (5) contemporaneous viewpoints expressed by the decisionmakers." *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020) (citation omitted).

Plaintiff begins with the testimony of Dr. Duchin purporting to show the Enacted Maps' discriminatory impact. *See* ECF 1113 at 3–7. Plaintiff continues with lay testimony that expresses discontent with the maps' impact on black Texans in Houston and Dallas, *see id.* at 7–8, and

finishes with citations to a range of testimony regarding factors (2)–(4). *See id.* at 8–11. Plaintiff maintains a telling silence regarding legislative history, the fifth of *Arlington Heights*' factors.

1) **Because Dr. Duchin's testimony does not show racial effects out of proportion with partisanship, NAACP has not shown that Texas's maps have a discriminatory impact.**

NAACP argues that Dr. Duchin's trial testimony and report show "patterns of cracking and packing voters of color" in the limited number of districts she examined. ECF 1113 at 4; *see also id.* at 3. As this Court has recognized, "given that race and partisanship correlate" in the redistricting context, a finding of discriminatory impact requires proof that racial effects were disproportional to partisan effects. ECF 258 at 32–33. Racial effects that can be attributed to partisanship do not "give[] rise to discriminatory effect of constitutional dimensions." *Id.* at 33. Plaintiff contends Dr. Duchin adequately disentangled race from partisanship, ECF 1113 at 4, leading them to conclude that the maps' racial effects constitute a discriminatory racial impact that strengthens an inference of discriminatory intent. However, Dr. Duchin's attempts to separate race from partisanship—both her assessment of election results and her map-drawing "robot"— are deeply flawed and yield to Dr. Trende's testimony that the maps are consistent with partisan motivations. Because partisan interest explains demographic changes in the districts that NAACP challenges, *Arlington Heights*' first factor favors Defendants.

Dr. Duchin's first try at disaggregating race and politics was a simple comparison of changes in "minority/coalition CVAP" in the newly enacted districts with changes in partisan performance. ECF 1113 at 5 (citing TXNAACP Ex. 136 at 36; TXNAACP Ex. 138 at 14; Tr. 5/31/25 AM 12:11–22). This approach revealed that, in terms of raw numbers, decreases in coalition CVAP exceeded decreases in Democratic performance in many enacted districts. *See* Tr. 5/31/25 AM 12:11–22.

However, Dr. Trende made clear that an unsophisticated comparison between racial and electoral numbers does not sufficiently separate race and partisanship. *See* Tr. 6/9/25 AM 92:8–93:13; Defs. Ex. 10 at 22–23. The correlation between race and partisanship is less than 100%, meaning changes in a district's partisan performance tend to be smaller than changes in racial

3

composition. *Id.* Dr. Trende succinctly explained this at trial: "it's not surprising that you might move, say, a 67 percent Biden precinct that ends up being 100 percent Hispanic. Because minority groups don't vote uniformly for a party." Tr. 6/9/25 AM 137:4–7. Accordingly, the observation that racial effects were numerically larger than changes to partisan performance does not by itself support an inference of discriminatory intent.

For her second bid to distinguish race and partisanship, Dr. Duchin created an algorithm that compared the Enacted Maps with a sample set of 100,000 alternatives. In conducting this "ensemble analysis," Dr. Duchin generated her sample set by controlling for a number of traditional redistricting criteria, including compactness, population, and her own haphazard approximation of Texas's County Line Rule. TXNAACP Ex. 136 at 35, 64; Tr. 5/31/25 AM 36:25–37:9. She then compared the demographic characteristics of the challenged enacted districts against this ensemble set and found that the Enacted Maps were more racially polarized than all but a small subset of the ensembles. TXNAACP Ex. 136 at 35.

But this "test is flawed in its fundamentals." *Allen v. Milligan*, 599 U.S. 1, 35 (2023) (rejecting the credibility of Dr. Duchin's ensemble analysis). Dr. Duchin admitted that her ensemble "robot" did not account for "partisan information," Tr. 5/31/25 AM 104:5–9; 53:18–20, or protection for incumbency. Tr. 5/31/25 AM 101:11–13. The Legislature, however, included these as essential criteria in its redistricting calculus. *See* Tr. 6/7/25 PM 25:6–33:24; Tr. 6/10/25 PM 81:15–84:6.

Conversely, the districting criteria that Dr. Duchin did use did not feature as prominently in the map-drawers' considerations. Dr. Duchin's robot enforced a 1% range of deviation from the ideal population benchmark. TXNAACP Ex. 136 at 64. This is by turns stricter than the 5% under-or-over the Legislature allowed for the House and Senate plans but more permissive than the exactitude the Legislature achieved for the congressional map. Additionally, Dr. Duchin acknowledged that her robot selected for compactness much more strictly than the Legislature. Tr. 5/31/25 AM 92:2–4. Similarly, Dr. Duchin did not interpret the County Line Rule in the same

4

manner as the Legislature. *Compare* TXNAACP Ex. 136 at 64 *to* Defs. Ex. 305 at 11; *see also* Tr. 6/10/25 83:15–21.

Because Dr. Duchin's algorithm did not input the Legislature's major redistricting goals, it did not generate a sample set comprised of genuine alternatives. As a result, her ensembles do not furnish a valid class of comparators for the Enacted Maps. *See Milligan*, 599 U.S. at 34. For the same reason, NAACP's demonstrative districts—drawn using the same discrepant criteria—do not provide "a substitute map that shows how the State could have achieved its legitimate political objectives while producing significantly greater racial balance." *Alexander*, 602 U.S. at 34.

The drawbacks of Dr. Duchin's ensemble analysis are not limited to choosing the wrong redistricting principles. The ensemble methodology necessarily leaves out the myriad decisions to alter district boundaries for hyper-specific reasons that cannot be captured by general redistricting criteria. For example, Rep. Moody testified that Midland County has always been drawn into Rep. Craddick's district, Tr. 6/6/25 AM 126:17–127:10, and Rep. Landgraf explained that the House amended SB 4 to keep "two landmarks" related to African American heritage in CD 18. Tr. 6/10/25 PM 110:23–111:11. Dr. Duchin acknowledged that legislators sometimes draw districts for idiosyncratic reasons that her model did not capture. Tr. 5/31/25 AM 62:11–24. She also testified that her ensembles incorporated communities of interest only to the extent that community-related information was embedded in census county subdivisions. Tr. 5/31/25 AM 65:5–21; 66:5–9. As a result, her ensembles do not reflect legislators' understandings of local communities of interest when these diverge from the census makers'. *Id.* In Rep. Moody's words, "the nuance of the Texas House is probably lost on" a "map-drawing robot from Boston." Tr. 6/6/25 AM 127:11–14.

Dr. Duchin's partisan "sub-analysis" does not improve the picture. She only compared the State's maps against the most partisan-performing alternatives selected from her original sample set. Tr. 5/31/25 AM 52:21–56:3. She did not create a new set of 100,000 alternative maps by adjusting her algorithm to control for partisan performance. Tr. 5/31/25 AM 104:5–9. Because Dr. Duchin's ensemble set does not reflect the Legislature's redistricting principles, her sub-

5

analysis of that same, unrepresentative set cannot establish any conclusions about the Enacted Maps.

Moreover, Dr. Trende met Dr. Duchin on her own ground and performed an ensemble analysis focused exclusively on demographics and partisanship that demonstrated that the partisanship of the Enacted Maps explains their racial polarization. Dr. Trende produced an ensemble sample with the same range of racial characteristics as that generated by Dr. Duchin. Defs. Ex. 8 at 40–41; Tr. 6/9/25 AM 121:4–125:21. However, unlike Dr. Duchin's ensembles, Dr. Trende's were not limited by criteria other than race and partisanship. Defs. Ex. 8 at 40–41. Accordingly, Dr. Trende's ensemble analysis squarely measured partisan performance against racial makeup. When compared with these ensembles Dr. Trende found that the Enacted Maps performed for Republican candidates better than the median ensemble map for all districts Dr. Duchin studied. Defs. Ex. 8 at 42–43, 73–74, 99–101, 112–14, 147–48, 156–57.

Dr. Trende also testified that partisan motivations alone explain the allocation of white voters. *See* Tr. 6/9/25 AM at 116:10–21, 134:6–135:14. His report found that white majority and plurality precincts that voted for Biden in the 2020 general election were drawn into Democrat-performing districts across the State, while white precincts that were Trump-voting were placed in Republican districts. Defs. Ex. 8 at 37–40, 72, 155, 177, 182. This starkly partisan assortment of white voters implies that the maps were drawn for political ends, not to advantage white voting power.

Finally, the districts that NAACP challenges now perform better for Republicans. The Enacted Maps flipped HD 65 (Denton and Wise Counties) and SD 10 (Dallas and Tarrant) from Democrat to Republican held districts. Overall, in the districts that NAACP challenges, the Legislature improved Republicans' margin in all districts where they had been competitive under the benchmark plan. By drawing GOP voters into these districts legislators necessarily drew Democrat voters out, strengthening the Democratic vote share in adjacent districts. The result is a map that is more politically polarized and "drawn in such a way that they shore up Republican

performance." Defs. Ex. 8 at 209. That partisan effect, not concomitant racial effects, speaks to the Legislature's intent.

**2) Lay testimony did not present evidence of discriminatory impact.**

NAACP next cites to testimony by Congresswoman Jasmine Crockett, Sharon Middlebrooks, and James Dixon about the effects on black voters in the Houston and Dallas metros. None of these witnesses offered direct evidence of discriminatory intent. *See* Tr. 5/27/25 PM 28:2–15; Tr. 6/5/25 PM 23:10–24. Instead, they testified that the Enacted Maps severed various communities of interest, *see e.g.*, Tr. 5/27/25 PM 8:10–10:18.

Their testimony does not evince a "clear pattern, unexplainable on grounds other than race." *Arlington Heights*, 429 U.S. at 266. *First*, none of the lay testimony NAACP cites shows that minority voters have suffered a dilution of their voting power. *Second*, that lay testimony does not support a finding that the Enacted Maps severed minority communities more often than white communities. Redistricting inevitably divides cities, townships and neighborhoods. The mere fact that *some* black communities were split is not by itself evidence of discriminatory impact.

**3) The historical background of Texas's redistricting shows progress towards voting rights.**

NAACP relies on the testimony of Dr. Martinez to argue that Texas's "pervasive history of voting-related discrimination" suggests discriminatory intent. However, historical evidence must be "reasonably contemporaneous with the challenged decision." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). Dr. Martinez focuses on the era of Texas history prior to the enactment of the VRA in 1965. TXNAACP Ex. 139; Tr. 6/4/25 AM 68:14–17. For the post-VRA era, despite her contrary narrative framing, Dr. Martinez's research charts a course of voting rights progress in Texas. She records that the rate of VRA enforcement actions precipitously declined from 16 per year between 1976 and 1982 to 4.5 per year between 1982 and 2006. *Id.* at 73:22–74:11. Likewise, her examples of problematic voting regulations improve from instances of poll booth violence in the early 1900s to allegations of "discriminatory reduction" of poll booth places in 2006. TXNAACP Ex. 139 at 14, 39. Dr. Martinez's other new-century examples do not even allege

genuine racial discrimination. *See e.g., id.* at 44–54 (citing prosecution of ineligible voters and enactment of lawful voter ID and ballot regulations as examples of discrimination).

Linda Lewis related seven incidents that Plaintiff describes as "recent examples of discrimination…experienced by Black voters in Texas over the past 15 years." ECF 1113 at 9. However, Ms. Lewis' testimony either indicates that she did not personally witness these incidents, *see* Tr. 5/29/25 AM 137:16–20; 147:24–148:9, or concedes that she does not know they were motivated by racial animus. *See id.* at 147:1–23. Ms. Lewis also testified that she had been appointed as McLellan County election commissioner, *id.* at 148:23–150:9, showing that local elections do not bar participation by black voters.

**4) Procedural Departures are explained by unprecedented circumstances.**

Plaintiff overlooks the pressures that the COVID-19 pandemic, the 2021 quorum break, and the unprecedented delay in the release of census data placed on the Legislature. These hardships made departures from previous redistricting practices inevitable. The census delay meant that legislators could not begin districting until September and that deliberation would be confined to the 30 days of a special session. Tr. 6/10/25 PM 78:4–25. The proximity of the November deadlines for candidate filing did not leave time for an additional special session. *Id.* at 79:15–80:11; Defs. Ex. 69. Senior Secretary of State officials testified that disruptions to the November deadlines would jeopardize the orderliness of Texas elections. *See e.g.*, Tr. 6/6/25 PM 149:15–153:9. Accordingly, the Legislature was left with less than two months to fulfill its constitutional redistricting obligations and had to undertake that duty expeditiously.

Adding to these pressures, Congresswoman Crockett agreed that "there was no guarantee that [she] and [] other House Democrats would not break quorum again" Tr. 5/23/25 AM 143:44–6, and that she had been willing to walk out of the Third Special Session. *Id.* at 145:10–12.

Even so, the Legislature made the best of a bad situation. The House and Senate Committees held numerous public hearings before and throughout 2021. *See* Tr. 6/7/25 AM 158:5–166:4; Tr. 6/10/25 PM 68:25–71:4. During floor remarks, Rep. Hunter stated the House Committee conducted "about 14 hearings with almost 400 or so witnesses." *Id.* at 71:5–72:17.

Senator Huffman testified that the Senate Committee invited a plethora of voting rights advocates, experts, and citizens' groups to testify at these hearings. Tr. 6/7/25 AM 166:5–167:7; Defs. Exs. 34, 35. Indeed, the president of the Texas NAACP numbered among the invitees. Defs. Ex. 45; *see also* Tr. 6/7/25 PM 73:10-74:2.

Instead of attributing departures from previous redistricting practices to the obvious hardships faced by the Legislature, NAACP relies on Dr. Kousser's assertion that "Democrats and minority legislators . . . [were] excluded from the process of framing districts." Brooks Ex. 228 at 52. This is rebutted by Rep. Hunter's and Sen. Huffman's solicitation of member proposals, *see* Tr. 6/7/25 PM 77:9–78:8; Tr. 6/10/25 PM 84:14–25; Defs. Ex. 67, and the numerous minority Democrat members who gave testimony at trial concerning their participation in the redistricting process. Rep. Landgraf also testified that successful amendments were brought by both Republicans and Democrats, and by both Anglo and minority members. Tr. 6/10/25 PM at 109:2–8; *see also id.* at 103:17–108:22 (Rep. Landgraf giving examples of successful minority-sponsored amendments).

The extenuating circumstances that beset the 2021 redistricting process provide by far the more parsimonious explanation for the Legislature's departure from customary practices.

**5) Legislative history shows that redistricting was driven by racially-neutral motives.**

Sen. Huffman and Rep. Landgraf respectively testified that the Senate and House pursued legitimate redistricting goals. Tr. 6/7/25 PM 25:6–33:24, 79:4–80:25; Tr. 6/10/25 PM 81:15–84:6. This accords with Chair Hunter's introductory statement to the House Committee outlining the principles that he had followed drafting HB 1. Tr. 6/4/25 PM 20:8–33:6. Sen. Huffman testified that she did not examine racial shading when drafting the senate and congressional maps, *see e.g.*, Tr. 6/7/25 PM 95:12–99:20, but that she did use partisan data. *Id.* at 99:17–20, 132:6–138:16. Floor statements made to explain successful amendments focused on race-neutral concerns. *See e.g.* Jt. Ex. 4238 at 68–71 (Brazoria County House delegation both rejecting racially-charged, failed amendment to HD 25 and HD 29 and endorsing race-neutral, successful amendment).

9

Testimony admitted at trial evinces a partisan basis for many of the specific districts that NAACP challenges. For example, Adam Kincaid testified that he honored requests by incumbents to make CD 6 and CD 24 more Republican. Tr. 5/29/25 PM 54:11–59:5, 79:15–82:18, 82:19–85:3. He also redrew CD 22 to keep it a solidly Republican-performing district. *Id.* at 114:22–116:5. Sen. West testified that SD 10 was redrawn to favor Republicans. Tr. 6/5/25 AM 141:1–142:7; 142:25–143:21. Likewise, when directly asked, Sen. Huffman answered that her purpose in drawing SD 10 was "to effectuate a partisan gerrymander." 6/10/25 AM at 52:4–6.

Conversely, the legislative record is bereft of any direct evidence of discriminatory intent. Indeed, when questioned about his review of the legislative history, Dr. Kousser conceded that he found no overt evidence of racially discriminatory intent. Tr. 5/27/25 PM 131:12–134:6. Perhaps because of this absence, Plaintiff has left the fifth *Arlington Heights* factor untouched. Because the legislative record attests to the race-blind motives behind the Enacted Maps, this factor weighs strongly against an inference of discriminatory intent.

## CONCLUSION

The *Arlington Heights* analysis calls for a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," 429 U.S. at 266, rather than a mechanistic tabulation of the enumerated factors. Plaintiff offers no direct evidence of intent and principally relies on Dr. Duchin's statistical techniques to argue the maps have a racial impact that cannot be attributed to partisan motives. That evidence, as well as Plaintiff's evidence regarding the historical background and procedural departures, is outweighed by a univocal legislative record, sound reasons for procedural departures, contemporary progress, and clear partisan effects.

Date: July 16, 2025

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Phone: (512) 936-1700
Fax: (512) 457-4410
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
william.wassdorf@oag.texas.gov
david.bryant@oag.texas.gov
zachary.rhines@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov
ali.thorburn@oag.texas.gov
kyle.tebo@oag.texas.gov
mark.csoros@oag.texas.gov

Respectfully submitted,

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

KATHLEEN T. HUNKER
Deputy Chief, Special Litigation Division
Texas Bar No. 24118415

WILLIAM D. WASSDORF
Deputy Chief, General Litigation Division
Texas Bar No. 24103022

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

ZACHARY L. RHINES
Special Counsel
Texas Bar No. 24116957

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ZACHARY W. BERG
Special Counsel
Texas Bar No. 24107706

ALI M. THORBURN
Assistant Attorney General
Texas Bar No. 24125064

KYLE S. TEBO
Special Counsel
Texas Bar No. 24137691

MARK A. CSOROS
Assistant Attorney General
Texas Bar No. 24142814

COUNSEL FOR STATE DEFENDANTS

## CERTIFICATE OF SERVICE

    I certify that on July 16, 2025, a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF).

                                          */s/ Ryan G. Kercher*
                                          RYAN G. KERCHER
                                          Chief, Special Litigation Division