IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § | |
| *Plaintiffs,* | § § | Case No. 3:21-cv-00259-DCG-JES-JVV [Lead Case] |
| v. | § § | & |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § § | All Consolidated Cases |

**STATE DEFENDANTS' RESPONSE TO LEAGUE OF UNITED LATIN AMERICAN CITIZENS' EXECUTIVE SUMMARY**

Defendants Greg Abbott, in his official capacity as Governor of Texas, Jane Nelson in her official capacity as Secretary of State of Texas, Dave Nelson, in his official capacity as Deputy Secretary of State, and the State of Texas file this response in opposition to LULAC's Executive Summary (ECF 1112), setting out specific relief requested.

**I.  Plaintiffs espouse inconsistent and contradictory HCVAP standards.**

When drawing their own districts, LULAC Plaintiffs prefer a bare-minimum metric for Hispanic opportunity districts; when the Legislature draws districts, however, LULAC Plaintiffs abandon this relaxed approach and insist the Legislature's failure to draw more heavily Hispanic districts is either a "façade district" or racially-motivated cracking.

LULAC Plaintiffs' demonstration districts pull from a grab bag of assorted HCVAP totals, none of which guarantee performing Hispanic opportunity districts. Variously, LULAC Plaintiffs' proposed districts feature HCVAP totals—calculated by 2019–23 ACS estimates—of 51.0%, 51.8%, 54.5%, 52.0%, and 53.5%.[1] ECF 1112 at 2–3. LULAC Plaintiffs insist these demonstration districts

---

[1] LULAC Plaintiffs also, seemingly, endorse a raft of alternative demonstrative districts authored by fellow Plaintiff groups. *See* ECF 1112 at 3-4 (referencing MALC demonstrative House Districts in Central Texas and Harris County, a Gonzales, Brooks, and MALC demonstrative Congressional Districts in Harris County, and a Brooks demonstration Congressional District in North Texas). The "Specific Relief Requested by LULAC Plaintiffs" does not specifically ask that this Court order relief along the lines of LULAC's—instead of some other Plaintiffs'—demonstrative districts. *Id.* at 1-2. But because Defendants presume that LULAC's preferred relief would align with LULAC-created demonstration districts, Defendants address only those districts in this Summary.

1

meet the *Gingles* preconditions, yet provide no evidence that the proposed districts would perform as opportunity districts with bare Hispanic majorities.

Elsewhere, however, LULAC Plaintiffs apply a much stricter analytical standard. LULAC Plaintiffs insist that enacted HD 118, despite remaining a majority-HCVAP district, "no longer offers Latino voters an equal opportunity to elect the Latino-preferred candidate." *Id*. at 4. Plaintiffs even suggest "the fact that a district is majority–HCVAP does not, standing alone, qualify it as a Latino opportunity district, and Plaintiffs may attempt to prove that it lacks 'real electoral opportunity.'" *Id.* (citing *Perez v. Abbott*, 250 F. Supp. 3d 123, 133–34 (W.D. Tex. 2017)). But using LULAC's own preferred ACS year range, the enacted HD 118 has an HCVAP of 57.8%; each of LULAC's demonstrative districts have HCVAP totals between 3.3 and 6.8 percentage points lower. Jt. Ex. 2240 at 4. Plaintiffs cannot maintain that HD 118 is an insufficiently majority-minority façade district and simultaneously proffer substantially lower HCVAP totals for their own demonstration districts. Plaintiffs' districts must withstand the same analytical rigor that Plaintiffs apply to the enacted map. By that standard, they fail.

## II. Plaintiffs have not proven racially polarized Hispanic voting.

Similarly, LULAC Plaintiffs cannot merely rely on expert assertions of racially polarized voting without grappling with the underlying weaknesses in those experts' analyses. Plaintiff's experts, Drs. Matt Barreto and Stephen Ansolabehere, did in fact testify they found racially polarized voting in Texas. But partisan voting is a confounding variable that clouds racial polarization analyses, and Plaintiffs' experts made no effort to disaggregate that confounding variable. Tr. 6/10/25 AM 129:1–130:8; PM 60:1–2 ("[Plaintiff's experts] have not made any attempt to disentangle race and partisanship."). Without controlling for the partisanship variable, Plaintiffs and their experts can make no sound claim that voting is polarized on the axis of race and not on the axis of partisanship.

## III. Plaintiffs fail under the totality of the circumstances test.

LULAC Plaintiffs, and their historical experts, correctly point out that racial discrimination is an ineluctable facet of history. But as even Plaintiffs' expert Dr. Andrés Tijerina admitted, the discriminatory practices that once characterized Texas's treatment of its minority citizens—

dispossession of lands, white primaries, restrictive racial covenants, the poll tax—"have not existed in Texas for the last 60 years." Tr. 5/27/25 AM 10:12–13:9. Accordingly, Dr. Tijerina could locate no empirical evidence that "the history of discrimination against Latinos in Texas hinders the abilities of such Latinos in Texas in the 2020s to participate effectively in the Democratic process." *Id.* at 13:24–14:1. Likewise, Dr. Rogelio Saenz admitted that his data "do not establish a causal link" between past discrimination and present "disparate socioeconomic outcomes of Latinos in Texas." Tr. 5/27/25 PM 17:4–7. Dr. Bernard Fraga—the only Plaintiffs' expert to assert a causal link between past discrimination and any current lack of Latino political opportunity—only reviewed "already-published literature to inform" his opinion as to causality, conducted no surveys of Texas voters, and did not interview "any individuals to determine their reasons for choosing not to turn out to vote in a particular election." *Id.* at 73:11–21.

The inescapable fact of historical discrimination does not mean that minority Texans cannot now fully participate in the political process. Today, more than a quarter of the Texas Legislature is Hispanic, which Dr. Tijerina acknowledged is evidence indicating "that Latinos today have a very substantial ability to participate effectively in the political process in Texas." Tr. 5/27/25 AM 15:15–16:2. Linda Lewis—one of the first African American election administrators appointed in Texas—testified that Dyana Limon-Mercado, a Hispanic woman, oversees elections in Travis County. Tr. 5/29/25 AM 151:7–152:7. Texas takes pains to ensure election access—pioneering policies like no-excuse early voting that "helps all Texas voters," Tr. 6/6/25 PM 136:12–137:10, 138:22–24, translating all election materials into Spanish, *id.* at 145:8–10, and working directly with local election officials and members of the public with the aim that every eligible "voter is able to vote without being turned away," Tr. 6/11/25 PM 70:9–72:5. The Texas that once restricted access to the franchise on racial lines bears no resemblance to the Texas of 2025, and does not weigh against the lawfulness of Texas's current electoral maps.

Similarly, Plaintiffs' marshalling of isolated instances of arguable racial appeals does not inveigh against Defendants. Senate Factor 6 weighs "whether political campaigns have been characterized by overt or subtle racial appeals." S. REP. 97-417, 29, 1982 U.S.C.C.A.N. 177, 206.

3

It does not weigh singular, decade-old implications of gang affiliation that were roundly rejected by voters. *See* Tr. 5/21/25 AM 24:21–25:6; PM 53:1–9. It also does not weigh race-neutral, artistic renditions of faceless, shadowy, hooded figures that were sponsored by outside Political Action Committees. *See* Gonzales Ex. 11 at 48, Figure 7; Tr. 5/29/25 AM 16:4–18:14.

**IV. Plaintiffs have not proven racial intent.**

As with their Senate Factors analysis, the LULAC Plaintiffs prosecute their intentional discrimination claims as though Texas were suspended in the amber of yesteryear. Notwithstanding all available evidence from *this* redistricting cycle, Plaintiffs resurrect the motivations of the 78th and 83rd Texas Legislatures and ascribe them to the 87th Legislature. ECF 1112 at 6 (*citing Abbott v. Perez*, 585 U.S. 579 (2018); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006)). Plaintiffs' *ipse dixit* does not overcome the "starting presumption that the legislature acted in good faith." *Alexander v. S.C. State Conference of the NAACP*, 602 U.S. 1, 10 (2024). It does not overcome Dr. Sean Trende's expert testimony that partisanship, not race, is the best available explanation for the makeup of Texas's electoral maps. *See* Tr. 6/9/25 AM 92:17–93:13, 93:19–94:10, 100:8–20, 176:3–177:11. And it does not overcome the testimony of legislative witnesses like Chairwoman Joan Huffman—who "said over and over and over and over and over and over again that partisan considerations were among the many criteria that she used in coming up with the maps" and that race played no role in the process. Tr. 6/10/25 AM 53:9–11; Tr. 6/7/25 28:13–18, 29:7–12, 31:16-23, 34:3–7.

**V. Plaintiffs are not entitled to relief on any of the challenged districts.**

    **1. Plaintiffs' Demonstrative HD 44 does not comport with law.**

Though LULAC Plaintiffs also assert an intent claim regarding Texas's "Failure to Create [an] Additional Latino CVAP Majority District" in Central Texas, ECF 982-1, LULAC's Executive Summary focuses on the effects of such a "failure." But Plaintiffs' Demonstrative HD 44, far from illustrating the potential for such a district, underscores why the Legislature could not undertake—and this Court should not order—its creation. First, LULAC's Demonstrative HD 44 encompasses portions of Caldwell, Guadalupe, Hays, and Travis Counties, violating the

4

"county line rule." Tr. 5/28/25 PM 14:3–18; LULAC Ex. 143 (Plan H2326); *see* Tr. 6/4/25 PM 82:1–14 (explaining the County Line Rule). In addition, Demonstrative HD 44 cracks communities of interest, separating parts of the cities of Seguin, San Marcos, Kyle, Lockhart, and Austin that would remain united if LULAC's map adhered to the County Line Rule and do remain united under the enacted map. Tr. 5/28/25 PM 14:25–15:17, 16:4–17:20; *Compare* Jt. Ex. 2266 (Plan H2136 (enacted map)) *with* LULAC Ex. 143.

Demonstrative HD 44 is so manifestly contrary to Texas law and traditional redistricting principles that no rational Texas Legislature could have drawn it. *See Alexander*, 602 U.S. at 8. Such a district could be formed only if the map drawers "subordinated traditional race-neutral districting principles . . . to racial considerations." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (quoting *Miller v. Johnson,* 515 U.S. 900, 916 (1995) (O'Connor, J., concurring)). Such a draw would clearly violate the Fourteenth Amendment and the Supreme Court's "dedicated belief" that "the Constitution is color blind." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 204 (2023) (internal citations omitted). Yet, LULAC asserts that to prevent the deleterious racial effects barred by § 2 of the VRA, Texas mapdrawers must abjure the colorblind principles of our constitutional order. No mapmaker can both account for race, as LULAC asserts that the VRA requires, and draw blind to race as the Constitution requires.

Moreover, shoehorning the Texas Legislature into this Sophie's Choice between a violation of a federal statute and the federal constitution undermines the distinct but interrelated state sovereignty and separation of powers principles that undergird redistricting. The Supreme Court has long recognized "the importance in our federal system of each State's sovereign interest in implementing its redistricting plan." *Bush v. Vera*, 517 U.S. 952, 978 (1996). "[I]t is the domain of the States, and not the federal courts, to conduct apportionment in the first place," *Voinovich v. Quilter,* 507 U.S. 146, 156 (1993), which is why "[f]ederal-court review of districting legislation represents a serious intrusion on the most vital of local functions," *Miller v. Johnson*, 515 U.S. at 915. Accordingly, courts should, wherever possible, avoid "the impossible task of extirpating politics from what are the essentially political processes of the sovereign States," *Gaffney v.*

5

*Cummings*, 412 U.S. 735, 754 (1973), and "must be wary of plaintiffs who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." *Alexander*, 602 U.S. at 11 (internal quotations omitted). Forcing the Texas Legislature to sail an impossible route between the Scylla of VRA violations on one hand and the Charybdis of Fourteenth Amendment violations on the other invites challenges from disgruntled litigants who can be assured of a cause of action no matter what course the Legislature charts.

   2. **Plaintiff's Demonstrative HD 138 ignores redistricting realities.**

Here, again, LULAC Plaintiffs subsume traditional redistricting principles, the nuances of Texas politics, and objective population mathematics to their desired racial outcomes. Plaintiffs' Demonstrative HD 138 modifies a portion of central Harris County that experienced relative population loss in comparison with the state generally and the northwest portion of Harris County especially. Defs. Ex. 326. But rather than shifting their Demonstrative HD 138 north and west to capture areas of growth, LULAC Plaintiffs shift the district further east, taking in territory from HD 140—a district that, as of the 2020 census, was underpopulated by 8.6%. *Id.*; LULAC Ex. 143. In consequence, LULAC Plaintiffs had to stretch their Demonstrative HD 140 northwards, into HD 141. LULAC Ex. 143. HD 141 is represented by Senfronia Thompson—"Ms. T"—an African American legislator who is a Dean of the Texas House of Representatives and is so widely respected that maps interfering with her district—had any been proposed during a legislative session—would be "dead on arrival in the House." Tr. 6/10/25 PM 102:24-103:16. LULAC's proposed changes to the Harris County map simply do not comport with the demographic realities and political nuances inherent to the Texas redistricting process. Tr. 6/6/25 AM 126:1-127:14.

   3. **Enacted HD 118 is the result of political compromise and population shifts.**

The 2020 Census determined that population shifts had left Bexar County with slightly to moderately underpopulated districts in the central, eastern, and southern portions of the County and two dramatically overpopulated districts—HD 122 by 24.3% and HD 117 by 40.8%—in the western and northern portions of the County. Defs. Ex. 326. Substantial modifications needed to be—and were—made to get the House districts in Bexar County back within the population

deviation limits. Tr. 6/10/25 99:24-101:13. HD 118, in particular, needed to "acquire more population, in order for it to be a compliant district." *Id.* at 99:16–100:8, 100:25-101:13.

Those modifications resulted from the collaborative—and partisan—efforts of the sitting State Representatives from Bexar County, who "worked as a delegation together to come to a consensus map" that was then "dropped into the statewide bill." Tr. 5/23/25 PM 85:9–13; 105:18–19. This delegation, notably, was missing a member—Representative Leo Pacheco, who represented HD 118 during the 86th and part of the 87th Texas legislature, but resigned before the start of the 2021 redistricting. Tr. 5/23/25 PM 36:12–14; 73:3–74:13. Because there was no sitting Representative for HD 118 "it fell to the other members of the Bexar County delegation . . . to care for the voters and the boundary lines of 118" during redistricting. Tr. 5/23/25 PM 145:9–13.

It was this delegation, faced with the challenge of dramatically reworking Bexar County's House Districts to account for immense population swings, that drew the initial consensus map of the County. The delegation decided to "split up the community of Harlandale," Tr. 5/23/25 PM 144:16–18, much in the same way that it had been split prior to the 2021 redistricting, *see* Lujan 6/23/22 Dep. 113:10–15. Following release of the statewide map, the Bexar County delegation engaged in sustained political horse-trading, shoring up the politically vulnerable HD 117 with an influx of reliably Democratic voters, Tr. 5/23/25 PM 146:14–19; 147:4–23, and swapping neighborhoods among and between Representatives, Tr. 5/23/25 PM 117:19–120:7.

LULAC Plaintiffs describe this process in apocalyptic terms, as a "fracturing" of historic neighborhoods and a shadowy plot to undermine Latino voting strength. ECF 1112 at 6-9. In reality, the process of creating the Bexar County House map in general, and HD 118 in particular, is a sterling example of democratically state elected officials grappling with the challenges of demographic shifts through the essential, political, redistricting process. This process worked: HD 118 is a majority-Hispanic district that in 2022 and 2024 performed to elect John Lujan, a Hispanic Republican who is a lifelong resident of San Antonio's South Side and southern Bexar County. *See* Tr. 5/23/25 PM 67:15–20, 69:25-71:13; *see* Lujan 6/23/22 Dep. 28:22–31:1.

7

### 4. Texas's geography and population flux explain regional variances.

LULAC Plaintiffs assert that population variances between the House Districts in El Paso County and those in the rest of Western Texas impermissibly favor one portion of the state, in violation of *Larios v. Cox*. 300 F. Supp. 2d 1320 (N.D. Ga. 2004) (*aff'd* Cox. v. Larios, 542 U.S. 947 (2004)). To the extent that this Court finds that such a *Larios* claim is valid, Plaintiffs bear the burden of showing that "it is more probable than not that a deviation of less than 10% reflects the predominance of illegal reapportionment factors rather than the legitimate considerations such as compactness, contiguity, maintaining political subdivisions, or preserving the cores of prior districts." *Harris v. Arizona Indep. Redistricting Comm'n*, 578 U.S. 253, 259 (2016). Plaintiffs fail that burden. The makeup of El Paso County's House districts is explained by population fluctuations and the County's unique geography, not by any malignant legislative intent.

The House mapdrawers understood that maintaining five House Districts wholly contained in El Paso County was impossible. Tr. 6/10/25 PM 89:21–90:3, 90:8-92:24. As House Speaker Pro Tempore Joe Moody—a member of the House Redistricting Committee and the leader of the El Paso delegation—stated on the House floor, the population of El Paso County is 865,657 and the ideal population for a House District following the 2020 census is 194,303. Jt. Ex. 4238 at S83; *see* Tr. 6/10/25 PM 65:2-18 (listing Committee membership). Even with the maximum allowable deviations from the ideal district size, El Paso County still has too few residents to sustain five districts and too many residents to be accommodated with just four.[2] In consequence, the map drawers were compelled to draw four full districts fully contained in El Paso County, and one partially contained in El Paso County but deriving the remaining needed population from outside the County.

But the twin constraints of El Paso's geography and the County Line Rule hamper this course of action. Because El Paso County is in the far west corner of Texas, with Mexico to the

---

[2] The lowest-possible population for a House District (-4.9% deviation from ideal) is 184,783. Five of these smallest-possible, maximally overpopulated districts would contain 923,915 people, more than the total population of El Paso County. On the other hand, four of the largest-possible, most underpopulated (+4.9% deviation from ideal) districts would still need to pick up an additional 126,525 people.

south and New Mexico to the west and north, the only way to pick up additional population for a district originating in El Paso County is to go eastward. Tr. 6/10/25 PM 90:8-92:24. Eastward, there is only one county—Hudspeth—that is contiguous with El Paso County. Hudspeth County acts like a stopper; there is no other county that a district originating in El Paso County could go into. *Id*. And Hudspeth County, like many of the deeply rural West Texas counties, is sparsely populated, meaning that once a district originating in El Paso County begins picking up additional counties, it must pick up a lot of counties to reach an acceptable population count. *Id*.

So that is what the Texas Legislature did. The enacted design of El Paso County's four-and-a-half district arrangement was drawn—at least in part—by Speaker Moody, a member of the House Redistricting Committee and the leader of the El Paso delegation. Tr. 6/6/25 AM 118:18-119:1; Jt. Ex. 4238 at S88 (adopting Floor Amendment 23). Certainly, representatives in rural western Texas sought to maximize voting strength for their region. Tr. 6/10/25 PM 145:15–146:9. Speaker Moody did the same, admitting that his (ultimately defeated) Floor Amendment 22 aimed "to maintain, essentially, as much voting strength as we can within [El Paso] county." Jt. Ex. 4238 at S83, S88. The enacted map is a negotiated and debated political solution reached by duly elected political actors. Tr. 6/10/25 PM 93:9-94:8, 104:8-106:4; *see* Jt. Ex. 4305, p.88.

5. **Plaintiff's Demonstrative CD 38 does not meet the *Alexander* standard.**

LULAC's Demonstrative CD 38 is a part of LULAC's Plan C2200, a partial Congressional map that does not meet the standard for an alternative map laid out in *Alexander*. 602 U.S. at 35. That LULAC Plaintiffs do not meet this standard is unsurprising. CD 38 is one of two new congressional districts reapportioned to Texas as a result of the 2020 Census. Demonstrative CD 38 is placed not in the high-growth portions of western Harris County where enacted CD 38 is located, but instead in the relatively low- or negative-growth central Harris County, where LULAC finds the additional Hispanic votes it needs. LULAC Ex. 118; Defs. Ex. 526. Since congressional districts tolerate almost no deviation from perfect proportionality, *e.g.*, *see Tennant v. Jefferson County Commission*, 567 U.S. 758, 760 (2012), the ripple effects of placing one of Texas's two new congressional districts in a low-growth portion of the state would be enormous. LULAC Plaintiffs

9

simply sidestep the gauntlet laid down by *Alexander* by refusing to grapple with those effects.

Moreover, LULAC Plaintiffs ignore that enacted CD 38 is already performing to elect the Hispanic candidate of choice. Plaintiffs' own expert, Dr. Stephen Ansolabehere, acknowledged in his second supplemental report that the "candidate[] preferred by Hispanic voters won the 2024 US House election in . . . CD-38," Gonzales Ex. 9 at ¶ 28, and confirmed this finding on direct examination, Tr. 5/28/25 AM 61:5–9. The candidate that won the 2024 House election in CD 38 is the sitting officeholder, Republican Congressman Wesley Hunt—who is African American. Tr. 6/7/2025 PM 62:2–64:3, 65:11–66:19. Not only would enactment of LULAC's demonstrative CD 38 require a total reworking of Texas's congressional map, it would undermine the existing ability of Hispanic voters in enacted CD 38 to elect their chosen candidate.

**6. Plaintiff's Demonstrative CD 6 is an impermissible racial draw.**

LULAC Plaintiffs ask this Court to judicially impose a map that would be impossible for any legislature to draw. The Dallas-Fort Worth Metroplex has only a 22% Hispanic CVAP. Tr. 5/28/25 AM 102:19–103:2. Yet from this threadbare cloth, Plaintiffs stitch together a ragged Hispanic-majority district by connecting disparate areas and neighborhoods via nearly uninhabited isthmuses in Arlington and Tarrant County—one of which is just a set of railroad tracks. Ex. LULAC Map C2200. It is a basic requirement of the *Gingles* 1 analysis that a proposed map should not contain tentacles, appendages, or obvious irregularities that function only to reach racial groups. *See Allen v. Milligan*, 599 U.S. 1, 20 (2023). Likewise, a legislature cannot "concentrate[] a dispersed minority population in a single district by disregarding traditional districting principles such as compactness, contiguity, and respect for political subdivisions." *Shaw v. Reno*, 509 U. S. 630, 647 (1993). To do so on the basis of race is to "engage[] in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" *Miller v. Johnson*, 515 U.S. at 911–12 (quoting *Shaw*, 509 U.S. at 647). Because LULAC's Demonstrative CD 6 could not have been lawfully enacted by the Texas Legislature, Defendants request that this Court refuse to judicially impose it.

<div style="display: flex;">

<div>

Date: July 16, 2025

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Phone: (512) 936-1700
Fax: (512) 457-4410
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
william.wassdorf@oag.texas.gov
david.bryant@oag.texas.gov
zachary.rhines@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov
ali.thorburn@oag.texas.gov
kyle.tebo@oag.texas.gov
mark.csoros@oag.texas.gov

</div>

<div>

Respectfully submitted,

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

KATHLEEN T. HUNKER
Deputy Chief, Special Litigation Division
Texas Bar No. 24118415

WILLIAM D. WASSDORF
Deputy Chief, General Litigation Division
Texas Bar No. 24103022

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

ZACHARY L. RHINES
Special Counsel
Texas Bar No. 24116957

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ZACHARY W. BERG
Special Counsel
Texas Bar No. 24107706

ALI M. THORBURN
Assistant Attorney General
Texas Bar No. 24125064

KYLE S. TEBO
Special Counsel
Texas Bar No. 24137691

MARK A. CSOROS
Assistant Attorney General
Texas Bar No. 24142814

COUNSEL FOR STATE DEFENDANTS

</div>

</div>

## CERTIFICATE OF SERVICE

    I certify that on July 16, 2025, a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF).

<div style="text-align:right">

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division

</div>