IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.*, | § § § | |
| *Plaintiffs,* | § | Case No. 3:21-cv-00259-DCG-JES-JVB |
| | § | [Lead Case] |
| v. | § | |
| GREG ABBOTT, *et al.*, | § | & |
| *Defendants.* | § | All Consolidated Cases |

---

**STATE DEFENDANTS' RESPONSE TO THE BROOKS PLAINTIFFS' EXECUTIVE SUMMARY**

---

## I. Brooks Plaintiffs Failed to Establish a Voting Rights Act Violation.

This Court should reject Brooks Plaintiffs' VRA Section 2 claims against both the State House map and the Congressional map. Not only have Brooks Plaintiffs have failed to satisfy all three *Gingles* factors for each district, but the totality of the circumstances shows that minorities—Latinos in particular—have an equal opportunity to participate in the electoral process.

### A. State House Map

House District 118 is a working majority-minority district that was drawn by the Bexar County delegation and other minority members of the Texas House. The record shows that the district lines were chosen largely for partisan reasons.[1] The objections Brooks Plaintiffs raise in this lawsuit are similarly motivated. According to the trial record, the sitting House member for HD118, Leo Pacheco, resigned in the months preceding redistricting. Tr. 5/23/23 PM 73:3–23; 74:11–13, 144:19–145:13. In consequence, when Chairman Todd Hunter—the head of the House Redistricting Committee—invited each delegation to prepare proposed maps of their "legislative area," Defs. Ex. 64, there was no incumbent present in HD118 to protest modifications to the district. Tr. 5/23/2025 PM 145:3–13. Plaintiffs' witness Representative Ina Minjarez testified that Representative Phillip Cortez, a Latino Democrat, moved likely Democrat voters from HD118 into his district HD117 and into Rep. Minjarez's former district HD124. Tr. 5/23/25 PM 146:14–147:23. Rep. Cortez's district was competitive in the previous decade, "flipping back and forth between Republican and Democrat." *Id*. 147:4–19. Following redistricting, HD117 became a safer Democratic seat; HD118, in contrast, became a still-competitive but more Republican district.

The current officeholder of HD118 is Representative John Lujan. He was first elected in a special election in 2016 and again in November 2021 under the benchmark plan. Tr. 5/23/25 PM 68:4–

---

[1] In addition to partisan consideration, the decision to push HD118 into south-west Bexar County was driven by population changes. Census data revealed that eastern and central Bexar County had lost population relative to the state while the western areas grew substantially. Tr. 6/10/2025 PM 99:16–23; Defs. Ex. 326. This left HD118 with a slight negative deviation from the ideal district size, while HD117, located up and down the western county line had a positive deviation of 40.8%. Defs. Ex. 326. To satisfy the Fourteenth Amendment's one-person, one-vote principle, HD117 had to lose population and because of the county line rule, it had to look east. HD118 shared a large border with HD117, Tr. 6/10/2025 PM 99:24–100:24, so the decision was to have HD118 move west to pick up additional population. *Id.* 100:25–101:13.

70:6. Then, after reapportionment, he won two general elections by a close margin. *See* Tr. 5/23/25 PM 70:25-71:4; Tr. 5/24/25 AM 78:7–14. Rep. Lujan is Latino. Tr. 5/23/25 PM 68:7–10. However, Rep. Lujan is also a Republican, and therein lies the complaint. *See*, *e.g.* Tr. 5/23/25 PM 148:16–19. Before redistricting, HD118 was viewed as being "traditionally Democratic." *Id.* Under the new configuration, a particularly strong Republican candidate, like Rep. Lujan,[2] has an opportunity to pull off a hard-won victory in the general election. *See id.* 148:20–149:1–4. In *Rucho v. Common Cause*, the Supreme Court eliminated political gerrymandering claims as a pathway for judicial relief. 588 U.S. 684, 718 (2019). Accordingly, there is a temptation for "losers in the redistricting process" to reframe their partisan grievances in terms of race in order "to obtain in court what they could not achieve in the political arena." *Cooper v. Harris*, 581 U.S. 285, 335 (2017) (Alito, J. concurring in part). That is what Brooks Plaintiffs have done here.

Despite the changed district lines, Latinos still dominate the political landscape in HD118. Not only do Latinos make up the vast majority of candidates, *see* Tr. 5/23/25 PM 67:15–71:10; Tr. 5/24/24 AM 70:19–74:21, but Latinos constitute the largest racial voting group in the district. Defs. Ex. 2240 at 4. According to the latest red-116 report from District Viewer, HD118 remains majority HCVAP at 57.8%. *Id.* Candidates must therefore court Latino support if they are to win the district. *Cf.* Tr. 5/24/24 AM 75:7–11. Nevertheless, Brooks Plaintiffs contend that it was possible for the Legislature to draw a different Latino majority district with a HCVAP of 71.3%. They argue that the Legislature violated the VRA because Latinos' political power in HD118 could have been greater. *See* ECF 1110 at 1–5; *but see Johnson v. De Grandy*, 512 U.S. 997, 1017 (1994) (holding that the "[f]ailure to maximize cannot be the measure of § 2.").

As an initial matter, Brooks Plaintiffs' claims rely on a double standard. On the one hand,

---

[2] Rep. Lujan's success must be understood in the context of his background and connections to HD118. He is a lifelong resident of southern Bexar County. Lujan Dep. 6/23/25 29:12–30:5. He worked with the Bexar County Sheriff's Office for over six years; he then spent 25 years with the San Antonio Fire Department before retiring. *Id.* 30:19–32:1. His father and brother are both ministers at nearby churches and helped him cultivate support and volunteers. *Id.* 44:21–25; 73:20–74:6. He had already won two special elections under the old map and so had both name recognition and incumbency. He also had proved responsive to the needs of HD118's residents by focusing on education and eliminating a tire dump that was public nuisance. *See*, *e.g.*, *id.* 34:16:-35:2;52:6–20.

Brooks Plaintiffs argue that 57.8% HCVAP is not a sufficient margin for Latinos to elect their candidate of choice. ECF 1110 at 1. On the other hand, Brooks Plaintiffs cite alternative maps with districts as low as 50.9% HCVAP (Greater Houston) and 51.4% HCVAP (DFW) as evidence that the VRA requires additional Latino-majority congressional districts. ECF 1110 at 5. Stated bluntly, Brooks Plaintiffs appear to be taking the anti-Goldilocks approach—no matter the HCVAP, the Legislature is never right. To smooth over the rough edges of this argument, Brooks Plaintiffs suggest the Legislature employed a "nudge factor." However, unlike the last redistricting cycle, Brooks Plaintiffs offer no direct evidence that the map drawers changed HD118 in response to race-specific statistics, such as SSRV or SSTO. To the contrary, according to the trial record, minority House members drafted each of the amendments to Bexar County adopted by the Legislature. *See, e.g.*, Tr. 5/23/25 PM 153:3–154:18. The record also shows that the chief concerns in each instance were partisanship, incumbency, or some other neutral principle. Tr. 5/23/25 PM 150:5–8.

Brooks Plaintiffs also have a *Gingles* II and III problem. The data show that Anglo voters do *not* "vote[] sufficiently as a bloc . . . [to] usually defeat the minority's preferred candidate." *Allen v. Milligan*, 599 U.S. 1, 143 (2023). Election results show the Latino candidate of choice[3] won about forty percent of exogenous state-wide races in the 2022 and 2024 general elections. Defs. Ex. 2272, 2276; *see also* ECF 1110 at 2–3 (noting the preferred Latino candidate won 13 out of 22 exogenous elections). On cross examination, Plaintiffs' expert Dr. Matt Barreto admitted Latino cohesion was generally lower in the races where the preferred Latino candidate lost. Tr. 5/30/25 PM 13:2–14:5. Accordingly, in 2022, "[a]bout half the time Hispanic candidates of choice won and half the time they lost." Tr. 5/30/25 PM 15:4–11. When voting cohesion dipped in 2024, Latinos were less politically successful. *Id.* 16:22–17:12.

The Supreme Court has held time and again that "[t]he ultimate right of § 2 is equality of opportunity, not a guarantee of electoral success for minority-preferred candidates of whatever

---

[3] "Latino candidate of choice" herein refers to the candidate so designated by Brooks Plaintiffs' expert Dr. Barreto. This highlights the deficiencies in Brooks Plaintiffs' claims. State Defendants in no way adopt or admit Dr. Barreto's conclusions and reserve the right to challenge them as the evidence and law allow.

race." *De Grandy*, 512 U.S. at 1014. After all, nothing in the VRA exempts a minority group from going through the rigmarole of building a winning political coalition. On that front, HD118 succeeds. Latinos have the same opportunity as other voters to elect their preferred candidates—but they also bear the same risks: their coalition may fray, or simply lose to an unusually strong opponent. It just so happens that the Republican candidate in 2022 and 2024 is a lifelong resident of South Bexar County, who was able to leverage his local connections for a win. The totality of the circumstances also cuts in favor of State Defendants. Analyses of the Senate Factors can be found in State Defendants' responses to LULAC Plaintiffs and MALC Plaintiffs, who also brought VRA claims on behalf of Latino Texans. ECF 1124; ECF 1122.

### B. Congressional Map

Brooks Plaintiffs contend that that the Legislature should have drawn two additional Latino-majority congressional districts in the DFW and the Greater Houston areas. However, instead of proposing districts where the population grew most, like the Legislature did with CD37 and CD38, *see* Tr. 5/30/25 76:24-77:4, Brooks Plaintiffs attempt to gerrymander seats into localities that saw their share of the state population decline or stagnate, Defs. Ex. 326, 526. Brooks Plaintiffs thus struggle to satisfy *Gingles* I. Furthermore, evidence shows that Latinos in both regions are not cohesive and in any event, have an equal opportunity to elect their preferred candidate given the size of their population. Not only do these facts preclude Brooks Plaintiffs from satisfying *Gingles* II and III, but proportionality informs the Court's totality of the circumstances analysis. *De Grandy*, 512 U.S. at 1000. When combined with State Defendants' other evidence related to the Senate Factors, Brooks Plaintiffs fail to show that Latinos lack equal access to the political process.

To prevent unnecessary redundancy, State Defendants address the *Gingles* Factors below and direct the Court to State Defendants' responses to LULAC Plaintiffs' and Gonzales Plaintiffs' executive summaries. ECF 1124; ECF 1121.

**1. DFW**: The evidence shows that Latino population is not sufficiently large and geographically compact DFW to constitute a majority absent dramatic departures from traditional redistricting principles that can only be explained by race. *See Allen*, 599 U.S. at 18. In Brooks Plaintiffs'

alternative map, C2163, proposed CD37 anchors its population in Dallas County, then extends a narrow appendage into Tarrant County that wraps its arms around select Latino communities. Not only do the proposed districts break up communities of interest, but the districts' usual twists and turns impermissibly rely on race. As evidence, compare Dr. Barreto's heat map with Brooks Plaintiffs proposed CD37. *Compare* MALC Ex.18 at 94, *with* Brooks Ex.107 at 1, 8, 26. The boundary lines plainly track pockets of Latino population (shown in green), while ignoring areas with lower Latino concentrations. The Legislature could not adopt such a map without incurring a *Shaw* claim.

Brooks Plaintiffs' second threshold problem is that White majorities do not vote sufficiently as a bloc to defeat Latinos' preferred candidate in the challenged region. State Defendants' expert Dr. Sean Trende found that the vast majority of Latino residents in the proposed district already live and vote in an enacted district that elects their candidate of choice. Defs. Ex. 10 at 1-2; Tr. 6/9/25 AM 160:1–25. Indeed, Hispanic candidates of choice in DFW congressional elections are elected at a rate more than proportionate to the Hispanic population in DFW. *See* Gonzales Ex. 9 at 9, 14 (showing the Hispanic candidate of choice wins 100% of the time in 37.5% of the Congressional districts in the DFW enacted map while Hispanics make up only 22% of the citizen voting age DFW population).

**2. <u>Greater Houston</u>**: The Latino population in Greater Houston, meanwhile, is not sufficiently large or geographically compact under *Gingles* I in proposed CD38. Brooks Plaintiffs' proposed district has an HCVAP of 50.9%. Although that constitutes a bare majority, under the standard advocated for by Brooks Plaintiffs in their HD118 claim, 50.9 % does not provide a sufficient margin to ensure that Latinos can elect their candidate of choice. In addition, according to Plaintiff's expert Dr. Stephen Ansolabehere, Harris County has an HVCAP of 26.5%. Gonzales Ex. 9 § 23. At the same time, his ecological inference analyses demonstrate that candidates preferred by Latino voters won the 2024 U.S. House election in five of the nine congressional districts wholly or partly within Harris County under the enacted plan—or 55.6% of congressional districts in the region. *Id.* § 28. This includes enacted CD38, which Brooks Plaintiffs' alternative plan cracks. *Id.*; Tr. 5/28/25 AM 61:5–9. As Dr. Ansolabehere explains, the candidate receiving majority support

in CD38 (accord, CD22) was the Republican candidate. *Id.* § 27. Brooks Plaintiffs have not established that these voters could elect their candidate of choice under the proposed alternative.

## II. Brooks Plaintiffs Failed to Establish that the Legislature Acted with Discriminatory Intent.

This Court should reject Brooks Plaintiffs' intentional discrimination and racial gerrymandering claims regarding Senate District 10 and reaffirm its previous finding that the *Arlington Heights* factors disfavor liability. *See* ECF 258 at 52. This Court had the opportunity to preview the evidence underlying Brooks Plaintiffs' constitutional challenge to SD10 at the preliminary injunction hearing in 2022. After careful consideration, it held that while Plaintiffs likely met two *Arlington Heights* factors—*i.e.*, discriminatory effect and historical context—"the circumstances surrounding the passage of SB 4 [were] uniformly innocuous, at least from the standpoint of discriminatory intent." *Id.* Accordingly, the Court held that Brooks Plaintiffs failed to meet their burden, even before taking the presumption of good faith into account. *Id.* at 52–53.

None of the facts cited in Brooks Plaintiffs' Executive Summary alter the Court's finding. Despite protracted litigation, cumulating in a four-week trial, Brooks Plaintiffs identified no direct evidence that Chairwoman Huffman or other Texas lawmakers considered race when drafting SD10. The reason for this is simple: the evidence does not exist. The Texas Legislature drew the maps blind to race. *See, e.g.*, Tr. 6/10/2025 AM 96:9–97:11. Chairwoman Huffman understood Supreme Court precedent to bar states from making race-based redistricting decisions. Tr. 6/7/25 PM 92:1–95:11. She thus eschewed racial data and isolated her office from VRA-mandated, race-based compliance checks by delegating them to outside counsel. *See e.g.*, Tr. 6/7/25 PM 95:12–99:20. In a similar vein, Rep. Landgraf testified that the Texas House pursued race-neutral redistricting goals. Tr. 6/10/25 PM 81:15–84:6.

The legislative record corroborates Chairwoman Huffman's testimony. She informed other Senate offices that reapportionment would be conducted blind to race. Tr. 6/7/25 PM 99:3-20. She then reaffirmed that policy at each committee hearing and floor debate as well as on cross examination. *See e.g.,* Tr. 6/7/25 PM 99:6–20; Tr. 6/10/25 AM 83:22–84:3. She never faltered

from her assertion that race neither informed nor motivated her office's decisions. Plaintiffs' expert Dr. J. Morgan Kousser acknowledged the Chairwoman's consistency in his report and on cross examination. Tr. 5/27/25 PM 134:24–135:11. Dr. Kousser noted that during the September 24 and September 28 Senate Redistricting Committee Hearings and the October 4 Senate Floor Debate, which concerned the Senate map, Chairwoman Huffman stated that she drew the maps blind to race least 25 times. Tr. 5/27/25 PM 135:3-5. He was unable to find "any forthright admissions of racial motives by proponents of the redistricting plans." Brooks Ex. 228 at 55.

Chairwoman Huffman offered expanded testimony on other *Arlington Heights* factors as well; this testimony, backed by the legislative record, further vindicates this Court's prior finding that Texas did not discriminate on the basis of race when enacting SD10.

*First*, the Chairwoman offered greater context about alleged procedural and substantive departures. She explained that the Senate Redistricting Committee had begun its pre-census hearings in October 2019 in expectation that the Committee would adhere to ordinary timelines and practices. Tr. 6/7/25 AM 159:15–160:8. Then, once the pandemic hit, the Committee had to cancel in person hearings, but it found alternatives that would permit voter participation. An online portal was established in October 2020, allowing voters to submit comments directly to the Committee, including proposed maps. Jt. Ex. 3987; Tr. 6/7/25 AM 164:17–25. The Senate also authorized the Committee to host virtual public hearings. Tr. 6/7/25 AM 172:20–176:1. Although Texas's reapportionment occurred in a condensed thirty-day special session resulting from the delayed census, combined with pressing election deadlines, *see* Tr. 6/7/25 11:14-12:14; Tr. 6/6/25 PM 149:15–153:9; Defs. Ex. 69, the Legislature mitigated the impact of this change by holding post-census public hearings during the Second Special Session, before the initial map could be filed. Tr. 6/7/25 PM 16:19-17:17. At each obstacle, the Legislature worked to maintain public participation.

*Second*, the Chairwoman testified about the sequence of events leading to S.B.4's passage and the effort that she and her staff took to solicit input, not only from underserved populations, but also the Chairwoman's Democrat and minority colleagues. To maximize participation, Chairwoman Huffman directed her office to contact voting and civil rights groups to publicize the

hearings and invite community leaders to testify. *See, e.g.,* Tr. 6/7/25 AM 166:8–167:5; Tr. 6/7/25 PM 14:12–16:15. In multiple instances, her office hired translators or coordinated with community groups to have translation services available on site. Tr. 6/7/25 PM 7:18–10:14. The Chairwoman then continued these efforts after the census data was released. The Committee scheduled five additional hearings to gather input before any district lines were drawn, Tr. 6/7/25 PM 16:16–17:17, and had two hearings after the Senate map was proposed but before any action was taken, Tr. 6/7/25 PM 72:9–73:9. The Committee invited minority advocacy groups and leaders to testify about the proposed map. Tr. 6/7/25 PM 73:10–75:10.

Members of the public and lawmakers received adequate notice of hearings and amendments. As the Chairwoman explained on direct, notification deadlines were stipulated in SR4, which the Senate adopted *unanimously* in January 2021. Tr. 6/7/25 AM 170:9–172:15, 176:2–4. Not only did SR4 increase the notice requirement "over and above what is required in the Senate rules," Defs. Ex. 24 at 2, but the Committee strove to exceed the deadlines whenever possible. Tr. 6/7/25 AM 170:9–24. The Senate met these deadlines throughout the special session. Tr. 6/7/2025 AM 171:2–5; Tr. 6/7/2025 PM 80:1–11. Chairwoman Huffman also made it a point to be responsive to her colleagues. She offered individual meetings with senators both before and after the map was drawn. Tr. 6/7/25 PM 76:10–78:8. She answered extensive questioning in committee and on the Senate floor, *see e.g.*, Tr. 6/7/25 at 25:6-12, and worked with other Senators to accommodate and resolve their requests and concerns, Tr. 6/7/25 PM 37:3-39:6, 77:9-78:8, 86:1-88:4. Multiple legislators complimented Chairwoman Huffman and her staff on their accessibility and transparency. *See e.g.,* Tr. 6/7/25 PM at 32:22-33:4, 39:7-41:3. As a result, Democrat and minority members made significant contributions to the final map—including amendments adopted into law. Tr. 6/7/25 PM 150:8–19, 153:15–154:11, 156:23–157:4, 160:11–161:3; *see also* Defs. Ex. 387.

Brooks Plaintiffs offer no response to these facts—only insinuations. Specifically, Brooks Plaintiffs claim that a racial voting pattern analysis created by the TXAG Office evinces discriminatory intent. ECF 1110 at 9. However, Chairwoman Huffman testified that she did not receive any documents or analyses from the TXAG Office—only verbal advice related to VRA compliance—and

Brooks Plaintiffs tendered no evidence that Chairwoman Huffman reviewed the document or was informed of its contents. Tr. 5/23/25 AM 72:2-14. Their argument instead is that the TXAG Office generated the analysis around the same time that Chairwoman Huffman introduced her committee substitute. ECF 1110 at 9. Brooks Plaintiffs seem to be arguing a constitutional violation occurs whenever counsel for map drawers examine district-specific racial data. The VRA, however, mandates the creation of minority opportunity districts if certain conditions are met, which necessitates at least some race-based analysis. *See Milligan*, 599 U.S. at 30. If Texas is liable even when the Chairwoman walled herself off from racial data, then the VRA has created a no-win situation for states and is unconstitutional as interpreted because it invites the federal judiciary to intrude on states' vital legislative functions. *Cf. City. of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

In addition, Brooks Plaintiffs claim that Chairwoman Huffman changed her testimony, but the factual record developed during the Third Special Session and in the course of this litigation belies this accusation. *First*, Chairwoman Huffman has consistently stated that she did not review the documents Senator Beverly Powell handed her at their meeting once the Chairwoman realized the documents contained racial data. Tr. 6/7/25 PM 126:2–128:11. Brooks Plaintiffs gripe because four years hence, the Chairwoman used slightly different terms to describe the encounter. However, the substance of her testimony remains unchanged. Tr. 6/7/25 PM 128:12–14. The egregious conduct instead came from Sen. Powell and her staffer Garry Jones who deliberately sought to inject race into the process and poison the well to save Sen. Powell's district from what everyone knew was a partisan draw. Tr. 5/23/25 AM 61:4-17, 63:1-4, 68:9-24; Tr. 6/7/25 PM 137:10–138:16.

*Second*, both State Defendants and Chairwoman Huffman have asserted from the beginning that the Legislature changed SD10's configuration to make it more Republican.[4] This defense took center stage at the preliminary injunction hearing, *see, e.g.*, PI Tr. Vol 6 81:18–83:2, 95:2–99:21; PI Defs. Ex. 34 at 10–12, and permeates the legislative record. *See, e.g.*, Jt. Ex. 4232 15:24-16:4; 16:18-

---

[4] In contrast to Chairwoman Huffman, Senator Powell relied on racial data when drawing and promoting her amendments. Adopting them would have exposed the Legislature to potential liability. Tr. 6/7/25 139:14-140:7, 141:10-142:18.

20; 18:9-10; 77:24-25. In fact, Chairwoman Huffman testified about additional examples from the legislative record that explained the political motivations behind the draw. Senators Powell and Royce West, for example, noted on the Senate floor that Representative Phil King of Parker County had announced his intention to run in the new SD10. Tr. 6/7/2025 PM 136:23-137:5; *see also* Jt. Ex. 4232 125:21-127:25. Lt. Gov. Dan Patrick, who endorsed Rep. King's state Senate bid, was present for the drawing of SD10. Tr. 6/7/2025 PM 137:6-8. Sen. King has now won SD10 twice. Tr. 6/7/2025 137:7-8. The enacted map therefore successfully shifted a competitive district into a reliable Republican seat.

On this record, Brooks Plaintiffs have not shown by a preponderance of the evidence that the Legislature acted with discriminatory intent. The sequence of events, legislative history, and procedural and substantive departures all come out in State Defendants' favor. Moreover, State Defendants introduced additional historical context about the Legislature's increasing diversity,[5] *see*, *e.g.*, Tr. 6/4/25 AM 112:18–113:6, and commitment to improving voting access that mitigates, if not fully cancels out, any adverse inference against the Legislature. *See. e.g.* Tr. 6/6/2025 PM 136:12–149:11; 6/11/2025 AM 66:1–67:7. Accordingly, this Court should reject Brooks Plaintiffs' claims and find in favor of State Defendants. It need not address the presumption of good faith. However, should the Court do so, that too counsels against granting Brooks Plaintiffs' relief. Overcoming the presumption of good faith "with circumstantial evidence alone . . . is much more difficult." *Alexander*, 602 U.S. at 8. Although the Supreme Court has "kept the door open," the Supreme Court has "never invalidated an electoral map in a case in which the plaintiff failed to adduce any direct evidence." *Id.* Given the paucity of new evidence raised at trial, Brooks Plaintiffs should not be the lone exception.

---

[5] The Legislature made it a point to have the Senate and House Redistricting Committees reflect the diversity of its members and constituents. Accordingly, each committee was bipartisan and made up of individuals belonging to ethnic and racial minorities. *See* Defs. Ex. 215; Tr. 6/7/25 AM 155:2–12. These individuals occupied leadership positions and in many cases, voted in favor of the challenged map. *See* Jt. Ex. 4172 at 1–3 (showing Senators Hinojosa, Lucio, and Zaffirini voting in favor of Senate map).

Date: July 16, 2025

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL OF
TEXAS
Special Litigation Division
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Phone: (512) 936-1700
Fax: (512) 457-4410
ryan.kercher@oag.texas.gov
kathleen.hunker@oag.texas.gov
william.wassdorf@oag.texas.gov
david.bryant@oag.texas.gov
zachary.rhines@oag.texas.gov
munera.al-fuhaid@oag.texas.gov
zachary.berg@oag.texas.gov
ali.thorburn@oag.texas.gov
kyle.tebo@oag.texas.gov
mark.csoros@oag.texas.gov

Respectfully submitted,

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

KATHLEEN T. HUNKER
Deputy Chief, Special Litigation Division
Texas Bar No. 24118415

WILLIAM D. WASSDORF
Deputy Chief, General Litigation Division
Texas Bar No. 24103022

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

ZACHARY L. RHINES
Special Counsel
Texas Bar No. 24116957

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ZACHARY W. BERG
Special Counsel
Texas Bar No. 24107706

ALI M. THORBURN
Assistant Attorney General
Texas Bar No. 24125064

KYLE S. TEBO
Special Counsel
Texas Bar No. 24137691

MARK A. CSOROS
Assistant Attorney General
Texas Bar No. 24142814

COUNSEL FOR STATE DEFENDANTS

## CERTIFICATE OF SERVICE

I certify that on July 16, 2025, a true and accurate copy of the foregoing document was filed and served electronically (via CM/ECF).

*/s/ Ryan G. Kercher*
RYAN G. KERCHER
Chief, Special Litigation Division