# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

|  |  |
|---|---|
| LULAC, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>GREG ABBOTT, in his official capacity as<br>Governor of Texas, *et al.*,<br><br>    *Defendants*. | Case No. 3:21-CV-00259-DCG-JES-JVB<br>[Lead Case] |

# BROOKS, LULAC, AND MALC PLAINTIFFS' *JOINT* MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 2

I.    The State contends the 2021 congressional map was drawn blind to race. ........................ 2

II.   United States Department of Justice demands that Texas redraw congressional districts on account of their racial composition. ........................................................................... 3

III.  Governor Abbott calls special session to redraw congressional map on account of race ... 4

IV.  The legislature redraws the congressional map on account of race. ................................... 7

    A.   Plan C2308 ............................................................................................................. 9

    B.   Plan C2331 ........................................................................................................... 18

    C.   Plan C2333 ........................................................................................................... 18

    D.   Floor Debate ......................................................................................................... 19

ARGUMENT ..................................................................................................................... 22

I.    Plaintiffs are likely to succeed on their intentional racial vote dilution claims. .............. 22

    A.   The direct evidence of intentional racial vote dilution is conclusive in this case. ......... 25

    B.   The *Arlington Heights* factors support a finding of intentional racial vote dilution ..... 32

II.   Plaintiffs are likely to succeed on their racial gerrymandering claims. ........................... 35

    A.   CDs 18, 30, and 33 are unconstitutional racial gerrymanders. ..................................... 38

    B.   CDs 9 and 35 are unconstitutional racial gerrymanders. .............................................. 40

    C.   CD 27 is an unconstitutional racial gerrymander. ........................................................ 41

III.  Plaintiffs will be irreparably harmed if Plan C2333 is not enjoined ................................. 42

IV.  The balance of equities weights in favor of an injunction. ................................................ 43

CONCLUSION .................................................................................................................. 44

CERTIFICATE OF SERVICE ......................................................................................... 46

## INTRODUCTION

So much for race blindness. Just after trial ended, during which the State and its witnesses vigorously defended the 2021 congressional map as configured with *no* consideration of race, the Chief of the United States Department of Justice's Civil Rights Division sent the Governor and Attorney General a letter announcing that DOJ had researched the racial composition of Texas's congressional districts, objected to any that were not single-race majority, and demanded that these districts be dismantled, saying that the law somehow required this race-based redraw of districts drawn blind to race in order to cure "racial gerrymandering." That is head-spinning. One might have expected this slapdash, error-infused letter to be summarily and loudly dismissed by the Governor. But no.

Instead, Governor Abbott seized on it, called for a special session on redistricting expressly to address the letter's "constitutional concerns." He then went on television repeatedly saying that the multiracial majority districts needed to be eliminated—the very districts he defended in this case as drawn blind to race—and that the new map would create a host of single-race majority districts.

Legislators loudly proclaimed this race-based goal during the legislative process, and the resulting map does exactly what the DOJ letter demands, reducing from nine to four the number of districts lacking a single-race majority in the map and decimating Black and Latino electoral opportunities in the process.

The map is egregiously unconstitutional under the Fourteenth and Fifteenth Amendments and must be swiftly blocked from taking effect.

## FACTUAL BACKGROUND[1]

**I.      The State contends the 2021 congressional map was drawn blind to race.**

Senator Huffman, who chaired the Senate Redistricting Committee in 2021 and was chiefly responsible for passage of the congressional map, testified that "the congressional delegation's map was drawn blind to race, as my maps have been." Rough Draft Tr. 6/7/2025 Afternoon at 27:3-7; *id.* at 28:10-18 (Senator Huffman, on Senate floor, stating that the congressional map "was drawn race blind. Any work we did on it was race blind. But they have been determined to be compliant under the Voting Rights Act"); *id.* at 28:25-29:12 (stating that Congressman Green's (CD-9) and Congresswoman Lee's (CD-18) districts were "dr[a]w[n] . . . race blind. And after they were drawn, we sent them for a compliance, and they were determined – the map was determined to comply with the Voting Rights Act"); *id.* at 29:23-30:9 (same); *id.* at 33:25-34:7 (Senator Huffman testifying that congressional map was drawn blind to race and "racial data was not considered at all during the drawing of the maps").

During the proceedings in this Court, the key witnesses likewise testified that no racial considerations went into drawing the 2021 map. Adam Kincaid, who drew the congressional map, testified repeatedly that he did not consider race or VRA compliance in drawing the map. *See, e.g.*, Rough Draft Tr. 5/29/2025 Afternoon at 28:11-18 (Adam Kincaid, testifying he did not view racial data in drawing congressional map); *id.* at 74:18-75:5 (same); *id.* at 75:9-21 (same, testifying that he did not use racial information at Chris Gober's direction); *id.* at 91:14-92:3 (Adam Kincaid testifying: "I can only reiterate again that these maps were drawn with political data and no racial data, and . . . one thing I did want to say more precisely . . . was I didn't do a . . . VRA analysis . .

---

[1] Plaintiffs will present additional testimony and evidence at the preliminary injunction hearing beyond what is presented in this written submission.

. because that was not something I was hired by Chris to do."). Mr. Kincaid expressly denied considering race in the drawing of the Dallas-Fort Worth congressional districts, which include CD-33. *Id.* at 118:25-119:6 (in response to whether there was "any affirmative effort to maintain minority voting strength" in DFW districts, testifying "I did not do any analysis on – on that in that area. So my objective with DFW was to create three heavily Democratic districts and then try to shore up the other Republicans around it").

Chris Gober, who advised the Republican congressional delegation and retained Adam Kincaid to draw the congressional map, testified that race played no part in the configuration of the congressional districts and that if any consideration of VRA compliance was to be done, it would have to be *after* the configuration of the congressional districts. *See, e.g.*, Rough Draft Tr. 5/24/2025 Morning at 29:23-30-22 ("I informed them that we were going to draw the map without the use of racial data in our system" and "without the use of racial data in the system, there was no way to ensure compliance with the Voting Rights Act with 100 percent certainty"); *id.* at 34:13-22 ("I can say, as a matter of public – non-privileged public record, we did not use racial data in order to draw the unified map."); *id.* at 35:11-13 ("[D]uring the actual drawing process per non-privileged information, we didn't use racial data to draw the unified map."); *id.* at 36:3-38:13 (same); *id.* at 41:3-11 (testifying that "the Unified Congressional Map was drawn entirely without the use of racial data").

## II.    United States Department of Justice demands that Texas redraw congressional districts on account of their racial composition.

On July 7, 2025, Harmeet K. Dhillon, the Assistant Attorney General for the Civil Rights Division of the United States Department of Justice ("DOJ"), along with Michael E. Gates, the Deputy Assistant Attorney General for the Civil Rights Division, sent a letter to Governor Greg Abbott and Attorney General Ken Paxton contending that several Texas congressional districts

were unconstitutional racial gerrymanders and threatening legal action if Texas did not dismantle the districts. Brooks Ex. 253 (DOJ Letter). Specifically, the letter asserted that "Congressional Districts TX-09, TX-18, TX-29 and TX-33 currently constitute unconstitutional 'coalition districts' and we urge the State of Texas to rectify these race-based considerations from these specific districts." *Id.* at 1.

The letter continued, stating that "[i]t is the position of this Department that several Texas Congressional Districts constitute unconstitutional racial gerrymanders, under the logic and reasoning of *Petteway*. Specifically, the record indicates that TX-09 and TX-18 sort Houston voters along strict racial lines to create two coalition seats, while creating TX 29, a majority Hispanic district." *Id.* at 2. 9. "Additionally," the letter continued, "TX-33 is another racially-based coalition district that resulted from a federal court order years ago, yet the Texas Legislature drew TX-33 on the same lines in the 2021 redistricting. Therefore, TX-33 remains as a coalition district." *Id.* at 2. 10. The letter states that "the State's interest when configuring these districts was to comply with Fifth Circuit precedent prior to the 2024 *Petteway* decision, that interest no longer exists. Post-*Petteway*, the Congressional Districts at issue are nothing more than vestiges of an unconstitutional racially based gerrymandering past, which must be abandoned, and must be corrected by Texas." *Id.* 11. Although the letter was dated July 7, 2025, it demanded a response by July 7, 2025, and threatened that "[i]f the State of Texas fails to rectify the racial gerrymandering of TX-09, TX-18, TX-29 and TX-33, the Attorney General reserves the right to seek legal action against the State, including without limitation under the 14th Amendment." *Id.*

## III. Governor Abbott calls special session to redraw congressional map on account of race.

On July 9, 2025, Governor Abbott signed a Proclamation calling for a special session of the Legislature. Among the topics on the Call was "[l]egislation that provides a revised

4

congressional redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice." Brooks Ex. 254 (1st Proclamation). Given the voluminous testimony from the State's witnesses—and the litigation defense by, *inter alia*, Governor Abbott—that the 2021 map was drawn blind to race, Attorney General Paxton responded to Ms. Dhillon on July 11, 2025, rejecting her allegation of racial gerrymandering. In the letter, Attorney General Paxton said "[h]ad the Texas legislature felt compelled under pre-*Petteway* strictures to create coalition districts, the basis for such decisions—as you say—"no longer exists." However, my office has just completed a four-week trial against various plaintiff groups concerning the constitutionality of Texas's congressional districts . . . . **The evidence at that trial was clear and unequivocal: the Texas legislature did not pass race-based electoral districts for any of those three political maps**." Brooks Ex. 255 (AG Letter) (emphasis in original).

Notwithstanding Attorney General Paxton's letter and *his own legal defense* as a Defendant in this case, Governor Abbott proceeded to give public interviews demanding that congressional districts that were drawn blind to race and just *happened* to end up being multiracial with no single race as a majority of voters be dismantled *because of their racial composition.* For example, in a July 22, 2025, television interview with Fox 4 Dallas-Fort Worth, Governor Abbott stated his purpose for including congressional redistricting on his Special Session Call: "Since the last time we did redistricting, the law has changed. In a lawsuit that was filed by Democrats, and the decision came out last year, it says that coalition districts are no longer required. *And so we want to make sure that we have maps that don't impose coalition districts* . . . ."[2] In response to a question regarding the fact that the State—including himself as a Defendant in this case—defended the

---

[2] Brooks Ex. 325 (Abbott on THC, redistricting & the special session at 3:16, Fox 4 Dallas-Fort Worth, https://www.youtube.com/watch?v=PHsYs0NTPTY (emphasis added)).

2021 map in court, Governor Abbott said: "The map that was drawn was drawn before this recent court decision that said coalition districts were not required and the map I believe as drawn could be upheld. That said, we are no longer compelled to have coalition districts and as a result we can draw maps, not have coalition districts, and through that process maximizing [sic] the ability of Texans to elect their candidates of choice."[3]

In an August 7, 2025 interview with Joe Pags, posted on Governor Abbott's Youtube channel, Governor Abbott said: "Texas is no longer required to have what are called coalition districts. And as a result, *we're able to take the people who were in those coalition districts, and make sure they're gonna be in districts that really represent the voting preference of those people who live here in Texas.*"[4] He continued, saying "We saw the aftermath of the Trump election, that an overwhelming number of Hispanics, and Blacks, as well as others, chose to vote for Trump. Four of the five districts we're going to create are predominantly Hispanic districts that they're going to be voting for Republicans as opposed to Democrats."[5] He continued, saying "We're creating four new Hispanic oriented districts that are gonna vote Republican. And Joe – something else that is going to happen in this process and that is the consolidation of what is known as the Barbara Jordan district over in the Houston area. A Black woman who served there for a long time – they've been begging to protect her district and that's exactly what we're doing." *Id.*

In other words, Governor Abbott's, the legislature's, and the State's position is that the 2021 congressional districts were drawn without regard to race. That race-neutral process yielded a number of districts that unintentionally turned out to be multiracial—*i.e.*, no single racial group

---

[3] *Id.*

[4] Brooks Ex. 326 (Governor Abbott Talks Democrat Desperation on the Joe Pags Show, Aug. 7, 2025, https://www.youtube.com/watch?app=desktop&v=kubKVtdGgBA (emphasis added)).

[5] *Id.*

comprised a majority of their eligible voters. Four years and two election cycles later, DOJ researched the racial composition of Texas's congressional districts and objected to Texas's congressional districts account of their racial composition. Governor Abbott, learning of those districts' racial makeup, called a special session of the legislature to dismantle those districts on account of their racial composition, telling a reporter he wanted multiracial majority districts eliminated from the state's congressional map to block the Black and Latino voters of those districts from coalescing to elect their preferred candidates and instead to have new districts where the statewide majority's preferred candidates are elected.

## IV.    The legislature redraws the congressional map on account of race.

As DOJ and Governor Abbott directed, the legislature redrew the congressional map on account of race, openly explaining its goal to eliminate multiracial "coalition" districts, to increase the percentage of Black voters to a 50%+1 racial target in two districts (while eliminating other districts from which Black members of Congress had been elected), and to radically reconfigure two effective Latino opportunity districts so that they would just exceed a 50%+1 Hispanic citizen voting age population target but not likely perform to elect Latino preferred candidates.

During early committee hearings before a map was released, both the House and Senate Redistricting Committee Chairs invited Ms. Dhillon, who sent the DOJ letter, to testify regarding the assertions in her letter. Brooks Ex. 256 (Vasut Letter); Brooks Ex. 257 (King Letter). She did not respond, other than via an "out of office" auto-response received by House Committee Chair Cody Vasut.[6]

---

[6]  Brooks Ex. 309 (House Redistricting Committee Hr'g at 29:14 (Aug. 1, 2025), https://house.texas.gov/videos/22418).

Although she did not respond to official requests to testify about her claims, Ms. Dhillon conducted several television interviews in early August and posted videos taking credit for researching the racial composition of Texas's congressional districts and causing Texas to redistrict on that basis. For example, on August 6, 2025, Ms. Dhillon posted on her official DOJ X.com account a TV interview she did with "Real America's Voice" about her letter to Governor Abbott and Attorney General Paxton. She said "we took a look at Texas and we found that four of their districts in Texas are comprised of these so-called coalition districts. In other words, to get to a special minority district you have to add together multiple minorities or count on a certain percentage of a crossover white vote . . . . And so we wrote to Texas telling them that . . . their districts are not in compliance with the federal voting rights laws and so they needed to take action to fix them. That is what triggered the Texas . . . Governor to call the legislature into session to put new maps together."[7] On August 8, 2025, Ms. Dhillon posted a "highlights of the week" video on her official X.com account, noting the 60th anniversary of the Voting Rights Act. She said: "That kind of takes us into the first big project that we did this week that was in the news, which is our involvement in the Texas redistricting that is happening now. We sent a letter last month in July to Texas, noting that under a Fifth Circuit precedent that was passed in 2024, several of Texas's districts are no longer legal under Voting Rights Act analysis because they constitute illegal coalition districts. And so, that caused the Texas legislature to be called into session by the Governor . . . ."[8] On August 9, 2025, Ms. Dhillon posted video of a television interview she did on her official X.com account, saying that DOJ took issue with four of Texas's congressional

---

[7]   Brooks   Ex.   322   (X.com,   @AAGHarmeetDhillon,   Aug.   6,   2025   6:00   PM, https://x.com/AAGDhillon/status/1953214706199458078).

[8]   Brooks   Ex.   323   (X.com,   @AAGHarmeetDhillon,   Aug.   8,   2025,   6:39   PM, https://x.com/AAGDhillon/status/1953949095238009285).

districts with "multiple minority groups" constituting a majority of their voters, contending that this state of events was illegal. "So we told Texas it's in violation of federal law, and Texas needs to fix that. To its credit, Texas has responded to that call by calling a special session of the legislature that's required for redistricting . . . ."[9]

Both the House and Senate conducted public hearings on the *topic* of congressional redistricting in late July 2025, but no proposed map was publicly released until Wednesday July 30, 2025.

### A.    Plan C2308

On July 30, 2025, Republican Representative Todd Hunter, who chaired the House redistricting committee during the 2021 cycle, introduced Plan C2308 as HB 4. The map and accompanying reports are available on the Texas Legislative Council's District Viewer site.[10] The bill was laid out at an August 1, 2025, House redistricting committee meeting.[11]

Plan C2308 does precisely what DOJ and Governor Abbott demanded and more. It eliminates multiracial majority "coalition" districts across the State and eliminates at least two Latino opportunity districts, including one Texas successfully argued to the Supreme Court it had good reasons to think was required by Section 2 of the Voting Rights Act. While the 2021 map has nine districts in which no single race constitutes a majority of the district's eligible voters, Plan C2308 slashes that number to just four out of thirty-eight districts. Brooks Ex. 258 (Plan C2193

---

[9]    Brooks Ex. 324 (X.com, @AAGHarmeetDhillon, Aug. 9, 2025 3:26 PM, https://x.com/AAGDhillon/status/1954263141019529527).

[10]    Tex. Leg. Council District Viewer, Plan C2308, https://dvr.capitol.texas.gov/Congress/81/PLANC2308.

[11]    Brooks Ex. 309 (Tex. House Redistricting Committee, Aug. 1 2025, https://house.texas.gov/videos/22418).

CVAP Report); Brooks Ex. 259 (Plan C2308 CVAP Report). This is a remarkable feat, given that the entire state has no majority racial group among eligible voters.

***Harris County.*** As DOJ's letter demanded, Plan C2308 dismantled CDs 9, 18, and 29, radically changing their racial composition. Plan C2308 consolidated Black voters who formed a plurality of citizen voting age population ("CVAP") in both CDs 9 and 18 into a single, newly configured CD 18, which was drawn to just surpass a majority Black CVAP, at 50.8%. Brooks Ex. 259 (Plan C2308 CVAP Report). The proposed CD 18 contained 70.7% of the 2021 map's CD 9 and 25.6% of that map's CD 18. Brooks Ex. 260 (Plan C2308 v. C2193 Overlap Report). Notably, Plan C2308 spliced apart the 2021 map's version of CD 9 into seven new districts along racial lines, splitting its non-Black areas among six new districts and joining its Black areas with CD 18's Black areas. *Id.* The same is true of CD 18, which Plan C2308 split into six districts, consolidating its most heavily Black territory with CD 9, and splitting its less concentrated Black populations among the other five. *Id.*

Plan C2308's version of CD 9 contained just 2.9% of the 2021 map's CD 9. *Id.* Instead, the new CD 9 fused 48.6% of the 2021 map's CD 29, 27.7% of the 2021 map's CD 36, and 20.8% of the 2021 map's CD 2. *Id.* The resulting district had a bare-majority Hispanic CVAP of 50.5%, Brooks Ex. 259 (Plan C2308 CVAP Report), but was carried by Republican candidates in recent statewide elections, Brooks Ex. 261 (Plan C2308 2024 Election Report).

Plan C2308 also drastically reduced the Hispanic CVAP of its version of CD 29 compared to the 2021 map, dropping it from 63.5% to 43.0%. *Compare* Brooks Ex. 258 (Plan C2193 CVAP Report) *with* Brooks Ex. 259 (Plan C2308 CVAP Report).

Overall, Plan C2308 collapsed two Black plurality districts that elected Black members of Congress for decades—CDs 9 and 18—into a single Black majority CVAP district. It also

eliminated the sole performing Hispanic opportunity district and replaced it with a sham version with just a bare Hispanic CVAP majority.

**Dallas-Fort Worth**. In the Dallas-Fort Worth metroplex, Plan C2308 likewise did what the DOJ letter demanded. During the 2011 cycle, CD 33 was drawn to remedy an intentionally discriminatory map that splintered Tarrant County minority voters. *Perez v. Abbott*, 274 F. Supp. 3d 624, 653 (W.D. Tex. 2017), *rev'd and remanded on other grounds*, *Abbott v. Perez*, 585 U.S. 579 (2018). In dismantling CD 33, Plan C2308 once again fragmented Tarrant County's minority voting population among several Anglo-dominated districts, *see* Brooks Ex. 269 (Barreto Report), in the same intentionally discriminatory manner as the 2011 map. Plan C2308 placed a newly reconfigured CD 33 in Dallas County, consisting of nearly equal parts of the 2021 map's CDs 30, 32, and 33. Brooks Ex. 260 (Plan C2308 v. Plan C2193 Overlap Report). And it radically reconfigured CD 32, which in the 2021 map was another of the multiracial majority-minority "coalition" districts lacking a single race majority, Brooks Ex. 258 (Plan C2193 CVAP Report). In Plan C2308, CD 32 stretched from Dallas County to Upshur and Camp Counties in east Texas, contained all or part of eight counties, and went from a majority-minority district to one with an Anglo CVAP of 58.7%, Brooks Ex. 259 (Plan C2308 CVAP Report).

Keeping with DOJ and Governor Abbott's demand to eliminate multiracial majority districts, Plan C2308 converted CD 30 from a Black plurality CVAP district to a Black majority CVAP district, with a Black CVAP of 50.2%. *Id.* It accomplished this by retaining the most heavily Black parts of CD 30's core (68.7% of its existing population) and trading its least Black sections (30.9% of the 2021 maps' CD 30) to the newly configured CD 33 in exchange for portions of CDs 6, 25, 32, and 33 that had somewhat higher Black population shares—enough to boost the district to just above majority Black CVAP status. Brooks Ex. 260 (Plan C2308 v. Plan C2193 Overlap

Report). Doing so had no partisan benefit to Republicans, but merely traded population between Democratic districts.

Overall, Plan C2308 reduced from three to two the number of majority-minority districts in the DFW Metroplex. It eliminated one of the three existing multiracial majority districts entirely while converting another to a Black CVAP majority district. The racially diverse DFW Metroplex thus went from three multiracial majority districts to just one.

***Bexar/Travis Counties.*** Plan C2308 dismantled CD 35—a Latino opportunity district represented by Congressman Greg Casar—and split it among seven districts. Brooks Ex. 260 (Plan C2308 v. Plan C2193 Overlap Report). The new version of CD 35 contained just 9.5% of the 2021 map's CD 35. *Id.* Together with that small piece of the former CD 35, Plan C2308 stitched together 39.8% of the former CD 28, 17.4% of the former CD 15, 14.8% of the former CD 20, and 4.5% of the former CD 23. *Id.* Because the portion of CD 20 that Plan C2308 moved into the district is over 80% Hispanic, the new version of CD 35 went from being plurality Hispanic CVAP to 51.6% Hispanic CVAP, while the addition of several rural counties results in Republican victories in recent statewide elections. Brooks Ex. 261 (Plan C2308 2024 Election Report).

Meanwhile, Plan C2308 reconfigured CD 20, the other Hispanic majority district in San Antonio, to contain 60.5% of its 2021 population and take on 30.0% of the 2021 version of CD 35. Brooks Ex. 260 (Plan C2308 v. Plan C2193 Overlap Report). The portion of CD 35 appended to CD 20 was the most highly concentrated Hispanic portion of CD 35, Brooks Ex. 260 (Plan C2308 v. Plan C2193 Overlap Report), and thus the new map packs the Hispanic population from two preexisting performing Hispanic opportunity districts into just one remaining such district.

Notably, the 2021 map's version of CD 35 carried forward last decade's general configuration—a district configuration that Texas defended in the Supreme Court. *See Abbott v.*

*Perez*, 585 U.S. 579 (2018). The Court held that "the 2013 Legislature had 'good reasons' to believe that the district at issue (here CD35) was a viable Latino opportunity district that satisfied the *Gingles* factors," that only the second factor was in dispute in the case, and that there was "ample evidence" that Texas had good reason to believe Section 2 of the VRA required the district. *Id.* at 616. Moreover, the Court observed that the three-judge district court had previously concluded that CD 35 in the 2011 map "was likely not a racial gerrymander and that even it was, it likely satisfied strict scrutiny. In other words, the 2013 Legislature justifiably thought that it had placed a viable opportunity district along the I-35 corridor." *Id.*

**CD27.** CD 27 is another of the 2021 map's multiracial majority districts in which no single race constituted a majority of its CVAP. Under the 2021 map CD 27's Hispanic CVAP was 48.6%, its Black CVAP was 4.5%, and its Anglo CVAP was 44.1%. Brooks Ex. 258 (Plan C2193 CVAP Report). President Trump carried the district in 2024 with 64.3% of the vote. Brooks Ex. 262 (Plan C2193 2024 Election Report). Plan C2308 dismantled CD 27 as a multiracial majority district, leaving only 39.8% of its core population intact, Brooks Ex. 260 (Plan C2308 v. Plan C2193 Overlap Report) and reconfiguring it to be Anglo CVAP majority at 52.8%. Brooks Ex. 259 (Plan C2308 CVAP Report). As a result, CD 27's Republican performance actually decreased, belying any partisan explanation for the change. *Compare* Brooks Ex. 262 (Plan C2193 2024 General Election Report) *with* Brooks Ex. 261 (Plan C2308 2024 General Election Report).

Across Houston, Dallas-Fort Worth, San Antonio, and the coastal region, Plan C2308 set 50%+1 single-race targets for CDs 9, 18, 27, 30, 32, and 35—converting multiracial majority districts to single-race majority districts, rendering CDs 9 and 35 sham Hispanic districts that are unlikely to perform for Hispanic voters, and eliminating one of three multiracial majority "coalition" districts in Dallas-Fort Worth. By targeting these districts *on account of their racial*

*composition*, Plan C2308 cost minority voters three districts in which they have succeeded in electing their preferred candidates. And Plan C2308 substantially reconfigured the Republican-performing CD 27 to meet a single-race majority racial target with no political or traditional redistricting principle purpose.

**Race-Based Justifications by Supporting Legislators.** Laying out Plan C2308 at the August 1, 2025 committee hearing, Chair Hunter cited *Petteway*'s coalition district holding as a basis for undertaking redistricting and said "[i]t is important to note that four of the five new districts are majority minority Hispanic CVAP districts."[12] Describing the districts' racial composition in detail, Chair Hunter explained that "congressional district 9, the new district, has a 50.5% Hispanic CVAP. CD 28, that's the valley south, has an 86.7% Hispanic CVAP. CD 32 is a and remains a nonminority district. CD 34, 71.9%, is now Hispanic CVAP. And CD 35, which is San Antonio, is now at 51.6% Hispanic CVAP." *Id.* at 54:16. 51. He continued: "In [the] 2021 plan, there were nine Hispanic majority voting age districts. In this plan, there are ten Hispanic majority voting age districts. In the 2021 plan, there were seven Hispanic citizen voting age districts, and under this plan there are eight. There were no majority Black CVAP . . . districts under the 2021 plan. In the proposed plan today, CD 18 is now 50.8% Black CVAP. In 2021, it was 38.8. CD 30 is now 50.2% Black CVAP. In 2021, it was 46%." *Id.* at 55:07.

In a colloquy with Republican Rep. David Spiller, Chair Hunter agreed that the 2021 plan contained coalition districts and *Petteway* no longer required the creation of such districts. Rep. Spiller said: "Let's talk about district 18 in Harris County, what is referred to as the Barbara Jordan district. Is it your understanding that district 18 was, or currently is, a coalition district?" *Id.* at

---

[12]    Tex.    House    Redistricting    Committee    Video    at    51:08,    Aug.    1    2025, https://house.texas.gov/videos/22418.

1:14:03. Chair Hunter responded: "I can tell you that under this plan that it becomes a real performing Black CVAP district." *Id.* Rep. Spiller continued, regarding CD 18, "I would submit to you that it is currently a coalition district, under HB 4 it would not be . . . it goes from a coalition district to a majority Black CVAP district, being 50.81% Black." Chair Hunter responded, "That is correct." *Id.* at 1:14:50. Rep. Spiller then asked about CD 9, saying "Let's talk about district 9. My understanding is district 9 was also a coalition district and under HB 4 changes from a coalition district to a majority Hispanic CVAP district, do you know whether that's correct or not?" *Id.* at 1:17:28. Chair Hunter responded, "Well, what we're doing, it moves – district 9 is basically in 2021, the Hispanic CVAP was 25.73. The Black CVAP was 45.06. In this proposal, the Hispanic CVAP is 50.41." *Id.* Rep. Spiller responded, "So previously Hispanics did not hold a majority in that district and under this scenario, HB 4, they now do, correct?" Chair Hunter responded, "Well, according to CVAP." *Id.* at 1:18:25. Discussing CD 29 with Rep. Spiller, Chair Hunter said "It moves from a Hispanic majority CVAP district to what they call a non-Hispanic majority CVAP district. For example, in 29, the Black CVAP goes from 18.31% in 2021 to 32.79% under this proposal." *Id.* at 1:19:03. In a later exchange with Democratic Rep. Chris Turner, Rep. Turner asked: "On CD 29, in that district Hispanic CVAP was actually reduced by 20 percent to be less than 50%, why is that?" Chair Hunter responded, "Okay, on 29, Congressman [sic] Garcia's district, the Black CVAP went from 18.31 to 32.79, a plus 14.48; the Hispanic CVAP went from 63.53 to 43.12, . . . it moves from a Hispanic majority CVAP to a non-Hispanic majority CVAP, increasing Black percentage." *Id.* at 15:06:05.

Republican Rep. Katrina Pierson also had a colloquy with Chair Hunter about the racial composition of the districts. About CD 35, Rep. Pierson asked, "This is one of the coalition districts that is now one of the majority Hispanic CVAP districts, is that correct?" *Id.* at 1:36:30. And Chair

Hunter responded that CD 35 is now majority Hispanic CVAP, with an "increase of 5.71 change" in its Hispanic CVAP. *Id.* Rep. Pierson and Chair Hunter also discussed how the map created 50%+1 targets for Black CVAP. Rep. Pierson started by saying "There was a fear that if the lines were redrawn, that the new map would put in jeopardy the historic Barbara Jordan majority minority district in the Houston area, they felt like that might go away, do you recall that?" *Id.* at 1:38:50. Chair Hunter responded, "That is correct, yes." *Id.* Rep. Pierson continued, "Well there were also stakeholders who testified during those field hearings that felt like the population of Black voters in the state did not have appropriate representation, do you recall that testimony?" *Id.* Chair Hunter responded in the affirmative. *Id.* Next, Rep. Pierson asked, "This current map that you have submitted actually shows there's not just one but two majority Black CVAP districts drawn on this map, is that true?" *Id.* at 1:39:39. Chair Hunter responded, "That is correct, let me give everyone the details. CD 18 is now 50.8% Black CVAP, in 2021 it was only 38.8%. CD 30 is now 50.2% Black, in 2021 it was 46%." *Id.* at 1:39:45. Rep. Pierson summarized, "So overall Black voters go from zero to two majority Black CVAP seats out of the 38 seats in Texas." *Id.* at 1:40:32.

Republican Rep. Terry Wilson also engaged in a colloquy with Chair Hunter, saying: "And, what I also understood, and to just be brass tacks, is that we went from seven to eight Hispanic and from zero to two Black, is that accurate?" *Id.* at 14:45:50. Chair Hunter agreed. *Id.*

Democratic Rep. Christian Manuel noted to Chair Hunter that CDs 9 and 35 were changed to be just above 50% Hispanic CVAP and CDs 18 and 30 were changed to be just above 50% Black CVAP and asked Chair Hunter: "Is that a coincidence?" *Id.* at 1:45:32. Chair Hunter responded: "***Nothing's a coincidence***." *Id.* at 1:46:54 (emphasis added).

Rep. Turner asked a series of questions regarding the justification for the purposeful use of race in redrawing these districts. Rep. Turner said, "Is there any evidence or data you have that would suggest that Black voters in CD 18 or CD 30 are unable to elect the candidates of their choice in the current configuration?" Chair Hunter responded "I don't have any evidence. You said do I have evidence? I don't, I don't have any evidence." *Id.* at 14:55:09. Rep. Turner continued, "Similarly, is there any evidence or data that shows that Latino voters in the existing CD 35 are unable to elect the candidates of their choice?" Chair Hunter responded, "As I told you, I don't have any data or any evidence." *Id.* at 14:55:22. Rep. Turner also asked, "Has Butler Snow conducted a racially polarized voting analysis within the new CD 9 to ascertain who the candidates of choice are with Hispanic voters and also Anglo voters?" Chair Hunter responded, "I don't know." *Id.* at 14:56:22.

Asked by Rep. Thompson whether the map was drawn "race neutral," Chair Hunter responded: "I don't what you mean by race neutral. We're all talking race. We're all talking neutral." *Id.* at 1:30:24.

Chair Hunter denied having any knowledge about the mapdrawer. Asked by Rep. Turner: "Senator King has clearly identified Adam Kincaid as the mapdrawer. Do you have any reason to doubt Senator King on that?" *Id.* at 15:05:15. Chair Hunter responded: "Let me tell you something, I have no idea. I heard that he mentioned it so I'm not here to say that he's right or wrong, I heard that he made that mention, Representative, I don't have any details on his communication with Adam Kincaid." *Id.* Asked by Democratic Rep. Barbara Gervin-Hawkins what the scope of work given to the mapdrawer was, and whether he or Chair Vasut knew the answer, Chair Hunter responded: "I don't know what the chair knows, but I don't think the chair knows much more than me on all of this. So all I can tell you is, when . . . a member is asked to file a Bill presented, and

I agree with it, I did it, but the origin, the specifics, the development involves a lot of privilege a lot of specific information, I'm not part of that discussion, and I can't tell you who is." *Id.* at 14:24:11.

On August 2, 2025 the House Redistricting Committee voted out HB 4 favorably without amendment. But before a vote could occur on the House floor, a large number of representatives left Texas, protesting the intentionally racially discriminatory map, and thereby denied the House a quorum to conduct business. The identical senate version, SB 4, was passed by the Senate on August 12, 2025. With no quorum in the House, the legislature adjourned the First Called Session of the 89th Legislature *sine die* on August 15, 2025.

That same day, the Governor called a second special session of the 89th Legislature, to convene at noon on August 15, 2025. Brooks Ex. 263 (2nd Proclamation). The list of topics again included congressional redistricting.

### B.    Plan C2331

Also on August 15, 2025, Chair Hunter introduced HB 4 again, with just a minor adjustment reflected in Plan C2331. The only difference between Plan C2308 and Plan C2331 is that several precincts were swapped between CD16 and CD23 to place Fort Bliss back into CD16, the same district to which it is assigned in the 2021 map. Brooks Ex. 264 (Plan C2331 v. Plan C2308 Overlap Report).

### C.    Plan C2333

On August 18, 2025, the House Redistricting Committee held a hearing at which Chair Hunter introduced a committee substitute to replace Plan C2331 with Plan C2333. Plan C2333 made mostly minor changes to twelve districts (CDs 2, 6, 7, 8, 9, 14, 17, 18, 22, 29, 36, and 38),

with the most material changes to CD 9.[13] Chair Hunter explained Plan C2333 as justified in part

by *Petteway*.[14] CD 9, which had been wholly contained in Harris County under Plan C2331 and

C2308, was substantially increased in size to include all of Liberty County.[15] The changes to CD

9 from Plan C2331 to C2333 dropped its Hispanic CVAP from 50.5% to just 50.3%. Brooks Ex.

265 (Plan C2333 CVAP Report). Chair Hunter claimed that the change was intended to boost

Republican performance in CD 9.

The remaining changes were minor. *See* Brooks Ex. 266 (Plan C2333 v. Plan C2331

Population Overlap Report).

### D.     Floor Debate

The House held its floor debate on August 20, 2025. Though Chair Hunter at times

suggested that political performance was a factor motivating the map, he never provided any

political data for the members to consider. Instead, he spoke in granular detail—and for hours—

about the racial composition of the districts, trumpeting that the map met various racial targets.

For example, he said early in his presentation, "It is important to note – Please note members. Four

of the five new districts are majority minority Hispanic, what we call CVAP districts. That's the

citizen voting age population. Each of these newly drawn districts now trend Republican in

political performance."[16] He continued, "The five new districts we have. CD 9, 50.15% what we

call Hispanic citizen voting age population. That's HCVAP. CD 28, which is approximately

---

[13]     Tex.   House   Redistricting   Comm.   Hr'g   at   1:35   (Aug.   18,   2025),
https://house.texas.gov/videos/22492; *see also* Tex. Leg. Council District Viewer, Plan C2333
Overlay with Plan C2331, https://dvr.capitol.texas.gov/Congress/83/PLANC2333.

[14] *Id.* at 7:50.

[15]     Tex.     Leg.     Council     District     Viewer,     Plan     C2333,
https://dvr.capitol.texas.gov/Congress/83/PLANC2333.

[16]    Texas   House   of   Representatives   Floor   Debate   Video   at   30:43,   HB   4,
https://house.texas.gov/videos/22491.

86.72% HCVAP. CD 32 remains a nonminority district. CD 34 71.93% HCVAP. CD 35, 51.57%

HCVAP." *Id.* at 31:15.

He then spoke for over two minutes rattling off racial data—unprompted—about specific

districts before claiming that political performance was a motivator. Here's what he said:

> Some data points. In comparison to 2021. In 2021 there were nine Hispanic
> majority age districts. In this plan there are ten Hispanic majority age districts. In
> the 2021 plan, there were seven Hispanic citizen voting age districts and under this
> plan there are eight. There are no Black CVAP districts under the 2021 plan. In the
> proposed plan there are two majority Black CVAP districts. CD 18, 50.71% Black
> CVAP compared to 38.99% in 2021. CD 30, 50.41% Black CVAP 46% in 2021.
> In the Harris County Houston area, there are currently what they call two coalition
> districts and one Hispanic CVAP district. In the proposed plan CD 18 becomes a
> new Black CVAP district. CD 9 becomes a new HCVAP district. And CD 29
> becomes a majority Hispanic VAP district – that's voting age population – which
> should continue their political performance. CD 9 – 50.15% HCVAP, CD 18 –
> 50.71% Black CVAP, CD 29 - 43.45 HCVAP and 32.69% Black CVAP. All
> surrounding Republican districts to continue to perform for the Republicans. This
> is a good plan, I urge its adoption. But Mr. Speaker, Members, you can use political
> performance, and that is what we've done.

*Id.* at 32:10-34:24. So Chair Hutner provided members racial data to consider in how to cast their

votes, with an emphasis on HB 4's dismantling of multiracial majority districts in favor single-

race majority districts.

In a colloquy with Rep. Spiller, Rep. Spiller asked: "We talked about district 18, what we

call the Barbara Jordan historic district, when we went to Houston we heard a lot of testimony

about that. But it was – it's currently one of these coalition districts and under HB 4 changes to a

majority Black CVAP district, is that correct?" *Id.* at 1:28:15. Chair Hunter responded, "That's

correct, it is now 50.71% Black CVAP. In 2021, it was 38.99% Black CVAP." *Id.* Then Rep.

Spiller continued, "And so previously, Black voters in that district did not hold a majority, but

under your bill, under HB 4, they actually do, is that correct?" *Id.* And Chair Hunter responded,

"That is correct." *Id.* Rep. Spiller continued: "And also, relative to Harris County, we talked about

District 9 - which was also second one in Harris County, a coalition district – the district that was addressed in the *Petteway* case – and now under your HB 4, changes from a coalition district to a majority Hispanic CVAP district, is that correct?" *Id.* at 1:29:51. Chair Hunter answered: "Yes for the record the Hispanic CVAP for congressional district 9 under this plan, the Hispanic CVAP is 50.15%. In 2021, it was 25.73%." *Id.*

Spiller summarized, unironically: "This claim, that a lot of this stuff is racially motivated and race negative. Let me ask you, and you've touched on it before, we went under the current map from zero majority Black CVAP districts in the state of Texas and now under your map we added two to that list – there are now two majority Black CVAP districts, is that correct?" *Id.* at 1:32:37. Chair Hunter responded: "Correct. 18 – is one of the ones we talked about, and 30." *Id.*

Later, Chair Hunter acknowledged that there was no partisan purpose or effect to the map's 50%+1 racial target for Black CVAP in CD 30, saying "Congressional 30 to respond to you, the political performance is unchanged. There was no Black CVAP in 2021. Now there is a Black CVAP in 2025. So everybody has the information, the Black CVAP in 30 is 50.41%. The political performance is still Democrat." *Id.* at 7:18:44.

After the House passed HB 4, Speaker Dustin Burrows posted a statement on his X.com account, in which the first sentence reads: "The Texas House today delivered legislation to redistrict certain congressional districts *to address concerns raised by the Department of Justice and to ensure fairness and accuracy in Texans' representation in Congress.*"[17]

The Senate debated HB 4 on August 22, 2025, and it passed early in the morning on August 23, 2025.

---

[17]    X.com,    @Burrows4TX,    Aug.    20,    2025    7:59    PM, https://x.com/Burrows4TX/status/1958318084021801464 (emphasis added)

## ARGUMENT

To succeed on a motion for a preliminary injunction, Plaintiffs must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiffs will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest." *Planned Parenthood v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005). Plaintiffs make that showing here.

## I.    Plaintiffs are likely to succeed on their intentional racial vote dilution claims.

Plaintiffs are likely to succeed on their intentional racial vote dilution claims. A plaintiff alleging intentional racial vote dilution need not show that racial considerations were the predominant motivation for the map to be unconstitutional. *See Alexander v. S. Carolina State Conf. of NAACP*, 602 U.S. 1, 38-39 (2024) (noting that intentional racial vote dilution and racial gerrymandering claims are "analytically distinct" (cleaned up)). Rather, "'racial discrimination need only be one purpose, and not even a primary purpose,' of an official action for a violation to occur." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (*en banc*) (quoting *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009)). This Court has emphasized the same point. *See League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 161-62 (W.D. Tex. 2022) ("*LULAC*") ("Plaintiffs may show intentional vote dilution merely by establishing that race was *part* of Defendants' redistricting calculus, but to show racial gerrymandering they must go further and prove that race *predominated* over other considerations such as partisanship.").

"[D]iscriminatory intent need not be proved by direct evidence." *Rogers v. Lodge*, 458 U.S. 613, 618 (1982). Rather, "direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions may be considered." *Brown*,

561 F.3d at 433. As the *en banc* Fifth Circuit has explained in holding that circumstantial evidence can prove intentional discrimination,

> [i]n this day and age we rarely have legislators announcing an intent to discriminate based upon race, whether in public speeches or private correspondence. To require direct evidence of intent would essentially give legislatures free rein to racially discriminate so long as they do not overtly state discrimination as their purpose and so long as they proffer a seemingly neutral reason for their actions. This approach would ignore the reality that neutral reasons can and do mask racial intent, a fact we have recognized in other contexts that allow for circumstantial evidence.

*Veasey*, 830 F.3d at 230.

Although discriminatory purpose "implies more than intent as volition or intent as awareness of consequences," *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 379 (1979), the Supreme Court has explained that "the inevitability or foreseeability of consequences . . . bear[s] upon the existence of discriminatory intent," *id.* at 379 n.25. Where "the adverse consequences of a law upon an identifiable group" are clear, "a strong inference that the adverse effects were desired can reasonably be drawn." *Id.*; *see LULAC* 601 F. Supp. 3d at 160 ("[T]he decisionmaker need not explicitly spell outs its invidious goals—a court may sometimes infer discriminatory intent where an act has predictable discriminatory consequences.").

As the Supreme Court has explained, "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). The *Arlington Heights* factors are aimed at assessing circumstantial evidence of discriminatory intent. "The impact of the official action[,] whether it 'bears more heavily on one race than another," may provide an important starting point." *Id.* (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). From there, the Court "set out five non-exhaustive factors to determine whether a particular decision was made with a discriminatory

purpose: (1) "the historical background of the decision," (2) "the specific sequence of events leading up to the decision," (3) "departures from the normal procedural sequence," (4) "substantive departures," and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." *Veasey*, 830 F.3d at 231 (quotation marks omitted); *Arlington Heights*, 429 U.S. at 267-68. Plaintiffs claiming intentional discrimination "need not prove race-based hatred or outright racism, or that any particular legislator harbored racial animosity or ill-will toward minorities because of their race." *Perez v. Abbott*, 253 F. Supp. 3d 864, 948 (W.D. Tex. 2017).

In addition to showing that intentional racial vote dilution was *a* purpose, a plaintiff must also show a resulting discriminatory effect. As this Court has explained, the discriminatory effects prong of an intentional discrimination claim differs from the statutory test for discriminatory effects in a Section 2 vote dilution claim. "The intentional-vote-dilution analysis [] is derived from the Constitution, and the *Arlington Heights* framework deployed in that analysis states merely that effects are discriminatory when they 'bear[ ] more heavily on one race than another.'" *LULAC*, 601 F. Supp. 3d at 163 (quoting *Arlington Heights*, 429 U.S. at 266). A plaintiff thus need not show that a particular racial group could constitute the majority of a district. *See id.*; *see also Bartlett v. Strickland*, 556 U.S. 1, 24 (2009) (plurality). ("[I]f there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments.").[18] This Court found a discriminatory effect in the dismantling of SD 10, which previously had a slight Anglo CVAP majority but performed for Black and Latino voters, but which the 2021 state

---

[18] A "crossover" district is one in which Anglo voters are the majority but a sufficient number cross over to vote for the minority voters' preferred candidate to allow that candidate to prevail in the district.

legislative map altered so that minority voters could no longer succeed in electing their preferred candidate. *LULAC*, 601 F. Supp. 3d at 169-70.

A.    **The direct evidence of intentional racial vote dilution is conclusive in this case.**

The direct evidence of intentional racial vote dilution is overwhelming and conclusive in this case. The loudly stated purpose of the 2025 map is to dismantle multiracial majority "coalition" districts. Start with the DOJ letter. DOJ (1) researched the racial composition of Texas's congressional districts, (2) objected, citing *Petteway*, to the inclusion of any multiracial majority "coalition" districts and specifically to CDs 9, 18, 29, and 33,[19] (3) demanded that Texas dismantle these congressional districts, (4) labeled any coalition districts racial gerrymanders, and (5) threatened to file an equal protection challenge if Texas did not comply. Brooks Ex. 253 (DOJ Letter).

This is all **_nonsense_** from start to finish. DOJ's letter came mere weeks after this Court held a four-week trial in which the State's witnesses testified up and down that the congressional map was drawn without *any* consideration of race. And DOJ's conception of *Petteway* is far afield. In *Petteway*, the Fifth Circuit held that "Section 2 of the Voting Rights Act does not authorize separately protected minority groups to aggregate their populations for purposes of a vote dilution claim" under Section 2. *Petteway v. Galveston County*, 111 F.4th 596, 603 (5th Cir. 2024) (en banc). Whether a plaintiff cannot sue to require the deliberate *creation* of a coalition district is wholly a distinct question from whether a State can purposefully seek out and destroy multiracial

---

[19] Among other careless features of DOJ's ill-conceived letter, it varyingly refers to CD 29 as both a coalition and Hispanic majority district. The latter was correct.

majority districts that just *happen to exist*—and do so expressly *on account of* their racial makeup.[20]

The answer to that question is "no." In *Bartlett*, the Supreme Court plurality held that Section 2 does not require the creation of Anglo-majority "crossover" districts that function to elect minority-preferred candidates. 556 U.S. at 24. But the Court was careful to explain that "[o]ur holding recognizes only that there is no support for the claim that § 2 can require the creation of crossover districts in the first instance." *Id.* The Court noted that "States that wish to draw crossover districts are free to do so where no other prohibition exists." *Id.* In particular, the Court noted that in locations where "majority-minority districts would not be required in the first place" because the *Gingles* preconditions are not met, "in the exercise of lawful discretion States could draw crossover districts as they deem appropriate." *Id.* The Court also observed that States should cite their creation of "effective crossover districts" to defend against Section 2 challenges. *Id.* And the Court noted that "if there were a showing that a State intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Id.*

The latter point applies with even greater force to *coalition* districts, where minority voters form the majority of eligible voters. And the application is magnified where, as here, the districts originated from a race-blind mapping process and it is mere happenstance that the districts targeted by DOJ, the Governor, and the legislature for elimination lack a single-race majority.[21] It is not hard to see why the intentional dismantling of districts on account of their multiracial majority

_____

[20] DOJ has no statutory authority to file a lawsuit asserting an equal protection violation, it can only intervene in a preexisting such claim. *See* 42 U.S.C. § 2000h-2.

[21] The point applies with greatest force to the dismantling of CD29, which was a Hispanic CVAP majority district that elected the Latino preferred candidate and yet was still targeted by Texas for elimination in the wake of the DOJ letter.

status violates both the Fourteenth and Fifteenth Amendments. It treats similarly situated eligible voters differently, creating a special rule that applies only to certain groups of voters on account of their race. That violates the plain text of the Fourteenth Amendment's Equal Protection Clause. *See* U.S. Const. amend XIV. And it abridges the right to vote on account of race by preventing voters from electing their preferred candidates on account of the racial composition of the district. That violates the plain text of the Fifteenth Amendment. *See* U.S. Const. amend. XI.

The most significant aspect of the DOJ letter is not its many errors, however, but rather the fact that DOJ researched the racial composition of Texas's congressional districts, reported that racial information to the Governor and Attorney General, demanded that districts be dismantled on account of their racial composition, *and the Governor agreed!*

The first special session Proclamation called for "[l]egislation that provides a revised congressional redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice." Brooks Ex. 254 (1st Proclamation). In other words, the Governor told the Legislature: Draw a new map in light of the U.S. Department of Justice's demand to dismantle districts on account of their racial composition. And that is not just reading between the lines of the Proclamation's text (though it is pretty clear). Governor Abbott went on television programs immediately after issuing the Proclamation and repeatedly for weeks thereafter explaining his purpose to dismantle congressional districts on account of their racial composition so that the voters in those districts could no longer control the electoral outcomes. *See supra* Factual Background, Part III.

The Court can stop its analysis there. The Governor is of singular importance to the enactment of legislation—and especially legislation that is enacted in a special session. Without his call for legislation on a particular topic in a special session, there would not be a new

congressional map. And, absent a veto-proof majority vote by the Legislature, the new map would not be law without his signature. . Both the Fourteenth and Fifteenth Amendments impose a "but for" causation standard. *See Hunter v. Underwood*, 471 U.S. 222, 232 (1985) (holding that Alabama's felony disenfranchisement law was intentionally discriminatory in violation of the Fourteenth Amendment's Equal Protection Clause because discrimination against Blacks was a "'but for' motivation for the enactment"); U.S. Const. amend. XV (prohibiting voting discrimination "on account of" race, color, or previous condition of servitude); *accord Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020) ("As this Court has previously explained, "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.' . . . That form of causation is established whenever a particular outcome would not have happened 'but for' the purported cause.") (internal citations omitted).

*But for* Governor Abbott's intent that multiracial majority districts be dismantled on account of their racial composition and his plan "to take the people who were in those coalition districts, and make sure they're gonna be in districts that really represent the voting preference of those people who live here in Texas,"[22]—in other words, to dilute their voting strength on account of race—the new map could never have been introduced or enacted. His expressly stated intent in that regard alone renders the map constitutionally infirm.

The Legislature, however, has likewise openly stated its intent to dismantle multiracial majority districts on account of their racial composition. The legislative hearings are replete with legislators, including Chair Hunter, describing their purpose of dismantling coalition districts so that the district will no longer perform to elect the candidates of choice of their Black and Latino

---

[22] Governor Abbott Talks Democrat Desperation on the Joe Pags Show, Aug. 7, 2025, https://www.youtube.com/watch?app=desktop&v=kubKVtdGgBA (emphasis added).

voters and applauding the creation of new single-race majority districts. *See supra* Factual Background, Part IV. Though legislators mentioned their partisan preferences at times, it was paired—and indeed overwhelmed—by discussions of *Petteway* and how that decision supposedly empowered them to purposefully eliminate any districts lacking a single-race majority. A partisan goal alongside this substantial race-based intent cannot save the map from invalidation. *See Veasey*, 830 F.3d at 230 ("[R]acial discrimination need only be one purpose, and not even a primary purpose, of an official action for a violation to occur." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016) (*en banc*) (internal quotation marks omitted).

Moreover, even if DOJ, the Governor, and the Legislature all just honestly misunderstood *Petteway* rather than purposefully misunderstanding it for pretextual reasons, legal error cannot excuse race-based decisionmaking that violates the Fourteenth and Fifteenth Amendments. *Cf. Cooper v. Harris*, 581 U.S. 285, 306 (2017) ("But neither will we approve a racial gerrymander whose necessity is supported by no evidence and whose *raison d'être* is a legal mistake.").

The map does exactly what the DOJ letter commands—it dismantles multiracial majority districts across the state, including the districts specified in the letter (and more). This is apparent based upon both the statewide data and a district-by-district analysis. In the 2021 map, nine districts were multiracial majority, with no single race constituting a majority of eligible voters. Brooks Ex. 258 (Plan C2193 CVAP Report) (CDs 7, 9, 18, 22, 27, 30, 32, 33, and 35). In the 2025 map, just *four* districts are multiracial majority. Brooks Ex. 265 (Plan C2333 CVAP Report) (CDs 7, 8, 29, 33). Statewide, the average core retention, *i.e.*, percentage of people who remain together in a district from the 2021 map to the 2025 map, is 67.6%. Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report). That number is 20 points lower among the nine multiracial majority districts in the 2021 map, at just 52.3%. Brooks Ex. 267 (Plan C2333 v. C2193 Overlap Report).

Of the six districts with the lowest core retention, five were multiracial majority under the 2021 map: CD 33 (32.7% core retention); CD 35 (39.8% core retention); CD 27 (39.8% core retention); CD 32 (41.2% core retention); and CD 9 (43.7% core retention). Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report). In four districts, the largest grouping of people in the 2021 version of the district are no longer even in the same numbered district—including three of the four identified in the DOJ letter, with CD 33 missing that metric by just 0.3%. Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report) (CDs 9, 18, 29, and 35). This data unmistakably confirms the direct line between DOJ's letter and the resulting map, given the particular districts that were in fact dismantled.

In the Dallas Fort Worth area, the map purposefully extinguishes the voting power of Tarrant County minorities, fragmenting them across multiple Anglo-dominated districts by dismantling CD 33 and fusing pieces of it with pieces of CD 32 to create a new CD 33 in Dallas County that consolidates two majority-minority districts into just one. *See supra* Factual Background, Part IV.A. This is especially egregious—and gives rise to a powerful inference of intent—in that it repeats the same conduct that the three-judge court in *Perez v. Abbott* found intentionally racially discriminatory as to the 2011 map's configuration of Tarrant County congressional districts. 253 F. Supp. 3d 864, 986 (W.D. Tex. 2017) (Smith, J., dissenting) (agreeing with majority that "[r]elatively little about the 2011 Congressional redistricting passes the smell test as to DFW" and noting the "unusual appendages added [into Tarrant County] from an adjoining, but demographically dissimilar, neighboring county"). The map's race-based line drawing in DFW reduces the number of majority-minority districts from three to two and with it the number of districts minorities have an opportunity to elect their preferred candidates.

Dismantling CD 33 based on race was the express purpose of the new map, as set forth in the DOJ letter, the Governor's Proclamation and interviews, and the legislative hearing statements.

In Harris County, the map likewise does exactly as DOJ's letter demanded. As Governor Abbott said on television, *see supra*, it "consolidate[es]" the two districts (CD 9 and CD 18) that had elected Black members of Congress into a single district and likewise dismantles the sole Hispanic opportunity district in the Houston area (CD 29) and replaces it with a sham bare-majority Hispanic CVAP CD 9. As Dr. Barretto's analysis shows, Latino voters in the new CD 9 cohesively support Democratic candidates, Brooks Ex. 269 (Baretto Report), who are likely to lose in the face of Anglo bloc voting in opposition, Brooks Ex. 268 (Plan C2333 2024 Election Report). The DOJ letter expressly demanded this outcome, and it is precisely what the map does. *See supra* Factual Background, Part IV.A.

In 2006, the Supreme Court held that Texas's creation of a congressional district with a razor thin Latino majority that could not elect the Latino preferred candidate "bears the mark of intentional discrimination that could give rise to an equal protection violation." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) (concluding that Texas violated Section 2 of the Voting Rights Act). The Court noted that the State's purposeful creation of CD23 with a nominal Hispanic voting age majority contributed to the finding of discrimination: "This use of race to create the facade of a Latino district also weighs in favor of appellants' claim." *Id.* at 441. The State has repeated this tactic yet again.

In the San Antonio area, the map dismantles CD 35, leaving just 9.5% of its population in the new CD 35 that replaces it. Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report). Remarkably, it does this despite the fact that Texas successfully defended the district against a racial gerrymandering claim in *Perez v. Abbott*, with the Supreme Court holding that Texas had

good reasons to believe that Section 2 of the Voting Rights Act required a district to protect the voting rights of Latinos along the I-35 corridor between San Antonio and Austin. 585 U.S. at 616. As with the new map's CD 9, Latino voters in the new CD 35 cohesively support Democratic candidates, but the district is configured to allow Anglo voters to defeat those candidates. Ex. 17 (Barreto Report); Brooks Ex. 268 (Plan C2333 2024 Election Report).

In sum, DOJ, the Governor, Chair Hunter, and a host of legislators all expressly demanded the dismantling of multiracial majority districts and the creation of districts they could call "Hispanic majority" on television but that they knew would not actually perform to elect Hispanic preferred candidates. As the *Bartlett* plurality warned, this conduct violates the Fourteenth and Fifteenth Amendment by intentionally diluting the voting strength of minority voters on account of race.

### B. The *Arlington Heights* factors support a finding of intentional racial vote dilution.

It is not necessary to wade too far into the *Arlington Heights* factors in this case because the direct evidence is so overwhelming. When a State *says* it is dismantling districts on account of their racial composition, surveying the circumstantial evidence of that stated intent seems less necessary. But Plaintiffs will nevertheless present testimony and evidence at the preliminary injunction hearing on the *Arlington Heights* factors.

*First*, the 2025 map "bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266 (cleaned up). As discussed above, three performing majority minority districts are eliminated—one each in Dallas Fort Worth, Houston, and San Antonio—and are replaced by districts in which Anglo-preferred candidates prevail.

*Second*, the historical context supports an inference of discriminatory intent, just as this Court found with respect to the preliminary injunction motion regarding SD 10. "In every decade

32

since the statute was passed in 1965, federal courts have held that Texas violated the VRA." *See LULAC*, 601 F. Supp. 3d at 170. "That includes the [2011] redistricting cycle" *Id.*; *see Veasey*, 830 F.3d at 239 (citing the 2012 decision regarding SD 10 in Tarrant County as a "contemporary example[ ] of State-sponsored discrimination"). All three federal judges adjudicating the 2011 congressional map's lawfulness agreed that its configuration of districts in Tarrant County was intentionally discriminatory. *Perez*, 253 F. Supp. 3d at 961; *id.* at 986 (Smith, J., dissenting). Most damningly here, Texas has intentionally dismantled CD 33 (despite assigning that number to an entirely different district in Dallas County), which it was ordered to implement because of a finding of intentional racial discrimination in the cracking of Tarrant County minorities in the 2011 congressional map. It has done *the same thing again.* Moreover, it is remarkable that the State would dismantle a Hispanic opportunity district, CD 35, for which the Supreme Court held—siding with Texas—that the State had good reasons to think was required by Section 2 of the Voting Rights Act. As the Court found regarding SD10, the "historical evidence weighs in favor of an inference of discriminatory intent." *LULAC*, 601 F. Supp. 3d at 171.

     *Third*, the sequence of events, together with the procedural and substantive departures from the norm, support an inference of intentional discrimination. To begin, mid-decade redistricting—unprompted by an unlawful population deviation or a federal or state court order finding a legal violation in the existing map—is exceedingly unusual. Moreover, this process was unusually rushed—just 30 days from start to finish. With respect to the 2021 process—which was significantly more robust—this Court excused its rush in light of the delayed Census data due to COVID. Nothing explains the sprint towards a new map here. Apparently, the only reason they rushed the process was to squeeze it in after this Court held the trial; the key personnel had been discussing it for months. Senator King was in contact with Adam Kincaid months ago, before the

trial in this case, though Senator King asked Mr. Kincaid to keep him ignorant of the details of the mapmaking.[23] This last point is in keeping with his general approach during the legislative process to be willfully ignorant of the mapdrawing process.

The failure to release a map until the public hearings were over was likewise not the normal legislative process and even less excusable given that Adam Kincaid had been working on the map for months. *Id.* at 51:54. And unlike in 2021, neither the House nor Senate involved the Attorney General's office—which has software to conduct Voting Rights Act analyses—in determining the legality of the map. *Id.* at 46:38. That is particularly noteworthy, given that the Attorney General's office had just completed trial in this case and would undoubtedly have had relevant information for the Legislature to consider. Senator King spoke with the "litigation team" at the Attorney General's office only about their letter response to the DOJ's letter. *Id.* at 46:59.

Moreover, the Senate refused to issue subpoenas to the map drawer and DOJ on the argument they were powerless to subpoena out-of-state even though it had been their practice to issue such subpoenas in other contexts. The Senate adopted special Rules that Senator King claimed were the same as 2021 but actually provided for remote hearings for public testimony *before* the map was released, but required in-person attendance at the capitol after the map was introduced. Other than in COVID, the Senate had previously held in-person field hearings, and had been consistent in either holding how it remote or in-person hearings. This time, the field hearings were remote only; then, once there was a map, witnesses were required to come to the capitol, in person. The process was so rushed that the Senate forgot to waive the printing

---

[23]    Senate    Floor    Debate,    Aug.    22,    2025,    Part    II    at    51:54, https://senate.texas.gov/videoplayer.php?vid=22515&lang=en (Senator King explaining his conversation with Mr. Kincaid, saying "I specifically told him don't tell me anything you're doing with regard to mapdrawing").

requirement in committee, as is usual. Instead, they did so by record vote on the floor after staff realized the mistake. For example, when the Senate passed SB 4 the printing requirement was waived in committee. There was also no public testimony taken in the House or Senate on the actual map that was passed. The House took testimony on Plan C2308 at one hearing but neither the House nor Senate took any at all on Plan C2333.

These and other departures will be presented through testimony at the hearing.

*Fourth*, as detailed in the Factual Background section, there is a wealth of contemporary statements revealing a discriminatory purpose to dismantle multiracial majority districts.

The *Arlington Heights* factors support an inference of intentional discrimination, as Plaintiffs will show in greater detail at the evidentiary hearing.

## II.    Plaintiffs are likely to succeed on their racial gerrymandering claims.

Plaintiffs are likely to succeed on their racial gerrymandering claims. The Fourteenth Amendment prohibits a governing body from "separat[ing] its citizens into different voting districts on the basis of race" without sufficient justification. *Miller v. Johnson*, 515 U.S. 900, 911 (1995). Plaintiffs establish a racial gerrymandering violation by showing "either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916; *see also Cooper*, 581 U.S. at 291; *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017). "[R]ace may predominate even when a reapportionment plan respects traditional principles, if '[r]ace was the criterion that, in the State's view, could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189 (2017) (quoting *Shaw v. Hunt*, 517

U.S. 899, 907 (1996)); *see also Miller*, 515 U.S. at 913, 916. While legislatures enjoy a presumption of good faith in redistricting their legislative maps, that presumption is overcome "when there is a showing that a legislature acted with an ulterior racial motive." *LULAC*, 601 F. Supp. 3d at 181. "If a plaintiff can demonstrate that race drove the mapping of district lines, then the burden shifts to the State to prove that the map can overcome the daunting requirements of strict scrutiny." *Alexander*, 602 U.S. at 11. "Under that standard, we begin by asking whether the State's decision to sort voters on the basis of race furthers a compelling governmental interest. We then determine whether the State's use of race is narrowly tailored—*i.e.*, necessary—to achieve that interest. This standard is extraordinarily onerous . . . ." *Id.* (cleaned up).

In *Cooper*, the Court affirmed the district court's finding that two North Carolina congressional districts were impermissible racial gerrymanders. 581 U.S. at 291. There, in District 1, the mapdrawers increased the Black voting age population ("BVAP") percentage from 48.6% to 52.7% and District 12's BVAP from 43.8% to 50.7%. *Id.* at 295-96. With respect to District 1, the Court noted that "[u]ncontested evidence in the record shows that the State's mapmakers, in considering District 1, purposefully established a racial target: African-Americans should make up no less than a majority of the voting-age population." *Id.* at 299. The Court noted that the legislative redistricting leaders "were not coy in expressing that goal." *Id.* This "announced racial target []" subordinated other districting criteria," mandating a finding of racial predominance. *Id.* at 300.

The Court rejected the State's defense that Section 2 of the VRA required this 50%+1 racial target. "[E]lectoral history provided no evidence that a § 2 plaintiff could demonstrate the third *Gingles* prerequisite" because "[f]or more than twenty years prior to the new plan's adoption, African-Americans had made up less than a majority of District 1's voters . . . . [y]et throughout those two decades . . . District 1 was an extraordinarily safe district for African-American preferred

candidates." *Id.* at 302. Because the State's "deliberate measures to augment the district's BVAP" were not supported by a "legislative record" reflecting that the "State carefully evaluate[d] whether a plaintiff could establish the *Gingles* preconditions." *Id.* at 304. The Court likewise rejected the rationale that the legislative leaders cited supporting their racial target:

> Over and over in the legislative record, [the legislative redistricting leaders] cited [*Bartlett*] as mandating a 50%-plus BVAP in District 1. They apparently reasoned that if, as [*Bartlett*] held, § 2 does not *require* crossover districts (for groups insufficiently large under *Gingles*), then § 2 cannot be *satisfied by* crossover districts (for groups in fact meeting *Gingles'* size condition). In effect, they concluded, whenever a legislature *can* draw a majority-minority district, it *must* do so—even if a crossover district would also allow the minority group to elect its favored candidates.

*Id.* at 305. "That idea," the Court explained, "is at war with our § 2 jurisprudence," because in such a circumstance the third *Gingles* precondition would not be satisfied, and thus there would be no basis in evidence to conclude that race-based districting was necessary to avoid Section 2 liability. *Id.* at 306. "Although States enjoy leeway to take race-based actions reasonably judged necessary under a proper interpretation of the VRA," the Court held that it would not "approve a racial gerrymander whose necessity is supported by no evidence and whose *raison d'être* is a legal mistake." *Id.*

With respect to North Carolina's District 12, the State did not raise a VRA defense in the litigation. "Instead, the State altogether denied that racial considerations accounted for (or, indeed, played the slightest role in) District 12's redesign" and instead contended that it was "part of a 'strictly' political gerrymander, without regard to race." *Id.* at 307. The purpose, the State contended, was "to 'pack' District 12 with Democrats, not African-Americans." *Id.* But the Court reasoned that there was substantial record evidence, which the district court credited, of an express goal "to ramp the minority percentage in [District 12] up to over 50 percent to comply with the

Voting Rights [Act]." *Id.* at 312. The Court held that the district court had not clearly erred in rejecting the partisanship explanation.

As in *Cooper*, the express purpose of Texas's 2025 redistricting was the elimination of multiracial majority districts and the creation of racial majority districts using racial targets. The DOJ letter, the Governor's statements, the legislative record, and the map itself reveal that in fixating on creating single-race majority districts, "[r]ace was the criterion that, in the State's view, could not be compromised," *Bethune-Hill*, 5807 U.S. at 189 (quotation marks omitted). This fixation on meeting single-race majority CVAP targets renders several districts unconstitutional racial gerrymanders.

### A.    CDs 18, 30, and 33 are unconstitutional racial gerrymanders.

CD 18 in Houston and CDs 30 and 33 in Dallas are unconstitutional racial gerrymanders because achieving a majority Black CVAP status for CDs 18 and 30 was the predominant consideration in the reconfiguration of those districts. CD 33 is an unconstitutional racial gerrymander because nearly a third of its residents were assigned to it to effectuate the race-based reconfiguration of CD 30. And there is no legitimate state interest, compelling or otherwise, to support this racial target.

This racial target was openly admitted. With respect to CD 18, Governor Abbott said in a television interview with Joe Pags: "Joe, something else that is going to happen in this process and that is the consolidation of what is known as the Barbara Jordan district over in the Houston area. A Black woman who served there for a long time – they've been begging to protect her district and that's exactly what we're doing." *See supra* note 5. Legislators echoed it. *See supra* Part IV.A & D. What Governor Abbott meant, as the map reveals, was that CD 9's Black voters would be combined with CD 18's Black voters to create just one Black majority district in their place.

Indeed, DOJ's letter specifically targeted both expressly on account of their lacking a single-race majority.

With respect to both CD 18 and CD 30, legislators, including Chair Hunter and others, repeatedly spoke about how the 2021 map had zero Black majority CVAP districts and the new map had two. *See supra* Part IV.A & D. Maps showing the Black population and the boundary changes for these districts reveal the race-based shifts that occurred. Brooks Ex. 269 (Barreto Report). Both districts are created by trading population along racial lines between *Democratic* districts—between CD 30 and 33 in Dallas County and CD 18 and 29 in Harris County—a choice that does not benefit Republican performance. Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report).

With respect to the new CD 33, it too is a racial gerrymander because race—in particular the desire to boost CD 30 above 50% Black CVAP—was "the predominant factor motivating the legislature's decision to place a significant number of voters within" CD 33. *Alexander*, 602 U.S. at 42. Fully 30.9% of CD 33's population, 236,797 people, were shifted out of CD 30 and into CD 33 in the 2025 map predominantly on account of their racial composition. Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report). This segment of CD 30's population had its lowest Black CVAP share. Brooks Ex. 267 (Plan C2333 v. Plan C2193 Overlap Report). Removing this population from CD 30 and replacing it with population from other nearby districts with larger Black population shares was the only to achieve a bare-Black CVAP majority in CD 30.

There is no justification for this race-based line drawing. The VRA provides no justification because Black voters had long succeeded in electing their preferred candidates in CDs 18 and 30. Indeed, given the repeated emphasis by the map's supporters that it created two new Black majority districts, it appears that the only motivation was to provide a *talking point* to

provide cover for the fact that the map *reduces* by two the number of districts where Black voters can elect their preferred candidates to Congress. That does not get the State past strict scrutiny.

**B.    CDs 9 and 35 are unconstitutional racial gerrymanders.**

CD 9 in the Houston area and CD 35 in the San Antonio area are likewise unconstitutional racial gerrymanders. Both districts were the product of racial targets—this time to exceed 50% Hispanic CVAP status, which both just barely do. Brooks Ex. 265 (Plan C2333 CVAP Report). This racial gerrymandering of these two districts is all the more egregious because unlike the 2021 map's Latino opportunity districts that they replace, CD 29 and 35, these new configurations will not perform to election Latino voters' candidates of choice in either district. Brooks Ex. 269 (Barreto Report).

Fixating on a 50%+1 Hispanic CVAP target cannot be explained by any partisan motivation. Dr. Barreto generated 332,000 simulated maps in the counties that contain both CDs 9 and 35 and programmed the code to draw districts matching President Trump's vote share in both CD 9 (Houston area) and CD 35 (San Antonio area) to control for the State's purported partisan goals. The code was blind to racial data and revealed that *zero* of the 332,000 maps yielded Republican districts that were Hispanic CVAP majority. Ex. 269 (Barreto Report). Statistically, this means it is impossible that CDs 9 and 35 became Hispanic CVAP majority without the 50%+1 race target being the overriding criterion.

What's more, as Dr. Barreto explains, CD 9 was reconfigured during the legislative process between Plans C2331 and C2333 to improve its Republican performance but only to the extent doing so did not interfere with the "criterion that, in the State's view, could not be compromised," *Bethune-Hill*, 5807 U.S. at 189 (quotation marks omitted)—keeping the district's Hispanic CVAP above 50%. After Liberty County was added, the mapdrawers removed Anglo Republican territory

from the Harris County portion of the district and replaced it with Hispanic Democratic territory—the only way to keep CD 9 above 50% Hispanic CVAP. Brooks Ex. 269 (Barreto Report). Not even a desire to maximize Republican performance could overcome the overriding command to keep the district just barely Hispanic CVAP majority.

The State had no legitimate, let alone compelling, interest in pursuing these racial targets. No Section 2 compliance interest was advanced; indeed the districts extinguish Latino electoral opportunities and violate Section 2. Given the cavalcade of public statements by Governor Abbott and legislators trumpeting that they had created *Hispanic* Republican districts, it appears that generating this talking point was the State's interest. That doesn't cut it for strict scrutiny.

**C.      CD 27 is an unconstitutional racial gerrymander.**

CD 27 is likewise an unconstitutional racial gerrymander. Like many other districts, it was a multiracial majority district in the 2021 map that was converted to a single-race majority district—switching from a combined Latino and Black CVAP majority to Anglo majority. Brooks Ex. 258 (Plan C2193 CVAP Report); Brooks Ex. 265 (Plan C2333 CVAP Report). As discussed above, it is among the districts—like the other multiracial majority districts—that saw the greatest change. Yet the district was strongly Republican performing in the 2021 map and its Republican performance *declines* in the new map. Brooks Ex. 262 (Plan C2193 2024 Election Report); Brooks Ex. 268 (Plan C2333 Election Report). Partisanship cannot explain the radical reconfiguration of CD 27 and its conversion into a single-race majority district consistent with DOJ and Governor Abbott's command.

While overall CD27 sheds Latino population and gains Anglo population, the district carefully excises Latino neighborhoods in the City of Corpus Christi from CD 34. The removal of

Latino voters from CD34, on the basis of their race, further emphasizes the racial gerrymander at work in CD27 and serves to reduce the ability of Latinos in CD34 to elect their preferred candidate.

### III.    Plaintiffs will be irreparably harmed if Plan C2333 is not enjoined.

Plan C2333 causes substantial disenfranchisement—disproportionately affecting Black and Latino voters and those whose viewpoints the State disfavors. Likewise, it intentionally minimizes the ability of minority voters to elect their preferred candidates, at least in part because Governor Abbott and members of the Legislature disagree with the candidates elected by Latino and Black voters. As such, Plaintiffs will suffer irreparable harm absent this Court's intervention. *BST Holdings v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("the loss of constitutional freedoms . . . 'unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns*, 347 U.S. 373 (1976); *see also, e.g.*, *Deerfield Med. Center v. City of Deerfield Beach*, 661 F. 2d 328, 338 (5th Cir. Unit B Nov. 1981) (finding that violations of fundamental rights are always irreparable); *DeLeon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), *aff'd sub nom. DeLeon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law.").

The right to be free from intentional racial discrimination in voting is a core constitutional right. *See* U.S. Const. amend. XIV § 1, U.S. Const. amend. XV § 1; *see also Gomillion v. Lightfoot*, 364 U.S. 339, 346 (1960) ("When a legislature thus singles out a readily isolated segment of a racial minority for special discriminatory treatment, it violates the Fifteenth Amendment."). The State's imposition of Plan C2333 violates that right. This harm cannot be undone through monetary relief. *See Deerfield*, 661 F.2d at 338 (holding that where a fundamental right is "either threatened or in fact being impaired . . . mandates a finding of irreparable injury."); *see also League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election

42

occurs, there can be no do-over and no redress."). As such, the harm to Plaintiffs is irreparable. *Deerfield*, 661 F.2d at 338.

## IV.    The balance of equities weights in favor of an injunction.

The balance of equities favors entry of an injunction. *See Ingebretsen v. Jackson Public School Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (holding that where an enactment is unconstitutional, "the public interest [is] not disserved by an injunction preventing its implementation."). Defendants lack any legitimate interest in enforcing a redistricting plan that violates Plaintiffs' constitutional rights to be free from discrimination. *See BST Holdings*, No. 21-60845 at *19 (finding that any interest that may be asserted in enforcing laws that infringe on constitutional freedoms is "illegitimate."). And the public interest in protecting Plaintiffs' constitutional rights to be free from discrimination outweighs any minimal burden to Defendants. *See De Leon*, 975 F. Supp. 2d at 665 ("[A] preliminary injunction preventing the enforcement of an unconstitutional law serves, rather than contradicts, the public interest."); *see also*, *e.g.*, *G & V Lounge, Inc. v. Michigan Liquor Control Commission*, 23 F.3d 1071 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Charles H. Wesley Educ. Fdn., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) ("[T]he . . . cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest.").

Relying on the evidence offered here and the applicable evidence from the recent trial, the Court should issue a preliminary injunction against HB 4, in full. By doing so, the Court will enjoin its repealer provision and therefore necessarily revive Plan C2193, the plan the State adopted in response to the 2020 Decennial Census. As was proven at trial, Plan C2193 violates the Voting Rights Act, but the State's machinations in this litigation and through this special session allow it to continue harming the voting rights of citizens under Plan C2193. That is well more than this

conduct deserves. The State is able at a moment's notice to implement Plan C2193 having done so twice before. Falling back to this option preserves the status quo, remedies the egregious constitutional violations in Plan C2333, and ensures that the State suffers no prejudice by continuing to utilize the plan it crafted.

As noted in recent filings, these Plaintiffs are prepared to proceed to evidence on this request for preliminary injunction without delay. Any delay caused by the State to the efficient resolution of this request would entitle Plaintiffs to an adjustment of elections deadlines—something that should not be needed as things stand now. It simply cannot be the case that a State can manipulate its conduct so as to prevent the federal courts from ever adjudicating rights under the federal Constitution and laws. The State, in 2021 adopted alternative election deadlines by statute. *See* Tex. Elec. Code § 41.0075(c) (2022). Although these provisions expired after the 2022 elections, they remain State selections of alternative election schedules that can be ordered by this Court in order to provide time to orderly implement the, albeit partial, remedy to the harms Plaintiffs have proven in this litigation.

**CONCLUSION**

For the foregoing reasons, any implementation of Plan C2333 should be preliminarily enjoined.

August 24, 2025                                    Respectfully submitted,

*/s/ Nina Perales*                                */s/ Chad W. Dunn*
Nina Perales                                      Chad W. Dunn (Tex. Bar No. 24036507)
Julia Longoria                                    Brazil & Dunn
Sabrina Rodriguez                                 4407 Bee Caves Road
Mexican American Legal Defense and                Building 1, Ste. 111
Educational Fund (MALDEF)                         Austin, TX 78746
110 Broadway Street, Suite 300                    (512) 717-9822
San Antonio, TX 78205                             chad@brazilanddunn.com
 (210) 224-5476
Fax: (210) 224-5382                               */s/ Mark P. Gaber*

44

nperales@maldef.org
jlongoria@maldef.org
srodriguez@maldef.org

Ernest I. Herrera
Mexican American Legal Defense and
Educational Fund (MALDEF)
634 S. Spring Street, 9th Floor
Los Angeles, CA 90014
 (210) 629-2512
eherrera@maldef.org

Khrystan N. Policarpio*
Mexican American Legal Defense and
Educational Fund (MALDEF)
1512 14th Street
Sacramento, CA 95814
 (916) 444-3031
kpolicarpio@maldef.org

*Admitted *pro hac vice*

*Counsel for LULAC Plaintiffs*

SOMMERMAN, MCCAFFITY, QUESADA
& GEISLER, L.L.P.

*/s/ Sean J. McCaffity*
Sean J. McCaffity
State Bar No. 24013122
George (Tex) Quesada
State Bar No. 16427750
3811 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219-4461
214-720-0720 (Telephone)
214-720-0184 (Facsimile)
SMcCaffity@textrial.com
Quesada@textrial.com

*Attorneys for MALC Plaintiffs*

Mark P. Gaber*
Mark P. Gaber PLLC
P.O. Box 34481
Washington, DC 20043
(715) 482-4066
mark@markgaber.com

Jesse Gaines* (Tex. Bar. No. 07570800)
P.O. Box 50093
Fort Worth, TX 76105
817-714-9988
gainesjesse@ymail.com

Molly E. Danahy*
P.O. Box 51
Helena, MT 59624
(406) 616-3058
danahy.molly@gmail.com

Sonni Waknin*
10300 Venice Blvd. # 204
Culver City, CA 90232
732-610-1283
sonniwaknin@gmail.com

*Admitted *pro hac vice*

*Counsel for Brooks Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that the foregoing was served on all counsel of record on August 24, 2025 via the

Court's CM/ECF system.

*/s/ Mark P. Gaber*