# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS, *et al.* | § § § | |
| *Plaintiffs,* | § | Case No. 3:21-cv-00259 |
| V. | § | [Lead Case] |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § § | |
| TEXAS STATE CONFERENCE OF THE NAACP, | § § § | |
| *Plaintiff,* | § | Case No. 1:21-cv-01006 |
| V. | § § | [Consolidated Case] |
| GREG ABBOTT, *et al.*, | § § | |
| *Defendants.* | § § | |

## PLAINTIFF TEXAS NAACP'S MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 2

I.      The 2021 Redistricting Process ........................................................................... 2

II.     The Consolidated Cases ....................................................................................... 4

III.    The DOJ Letter and Call of the First Special Session ........................................ 4

IV.     The First Special Session ..................................................................................... 6

V.      The Second Special Session and the Enacted Plan .............................................. 9

STANDARDS FOR A PRELIMINARY INJUNCTION ................................................11

ARGUMENT ..................................................................................................................11

I.      Texas NAACP Is Likely to Succeed on Its Intentional Discrimination Claim ................ 12

        A.      The Dismantling of Opportunity Districts in the Dallas-Fort Worth Metro Area, Harris and Fort Bend Counties, and the Austin-San Antonio Area Disproportionately Harms Black and Other Voters of Color. .......................... 13

        B.      Texas's Long and Continued History of Discrimination Supports a Finding of Intentional Discrimination. .............................................................. 15

        C.      The Sequence of Events and Contemporaneous Statements from Decisionmakers  Support an Inference of Intentional Discrimination. ........... 15

        D.      Procedural and Substantive Departures Support a Finding of Intentional Discrimination. ............................................................. 17

II.     Texas NAACP Faces a Substantial Threat of Irreparable Injury Absent Injunctive Relief. .............................................................................................. 18

III.    The Balance of the Equities and Public Interest Weighs in Favor of Texas NAACP ....... 19

CONCLUSION .............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bartlett v. Strickland*,
  556 U.S. 1 (2009) ..................................................................................................9, 18

*BST Holdings, LLC v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) ...................................................................................20

*Byrum v. Landreth*,
  566 F.3d 442 (5th Cir. 2009) ...................................................................................13

*De Leon v. Abbott*,
  791 F.3d 619 (5th Cir. 2015) ...................................................................................21

*De Leon v. Perry*,
  975 F. Supp. 2d 632 (W.D. Tex. 2014)....................................................................21

*Ingebresten on Behalf of Ingebretsen v. Jackson Public School District*,
  88 F.3d 274 (5th Cir. 1996) .....................................................................................21

*Jackson Women's Health Organization v. Currier*,
  760 F.3d 448 (5th Cir. 2014)....................................................................................21

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ...................................................................................21

*McCleskey v. Kemp*,
  481 U.S. 279 (1987)..................................................................................................17

*Nken v. Holder*,
  556 U.S. 418 (2009)..................................................................................................21

*Perez v. Abbott*,
  253 F.Supp.3d 864 (W.D. Tex. 2017)......................................................................16

*Personnel Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979)..................................................................................................19

*Petteway v. Galveston Cnty.*,
  111 F.4th 596 (5th Cir. 2024) ............................................................................ *passim*

*Texas v. United States*,
  887 F. Supp. 2d 133 (D.D.C. 2012).............................................................................5

*U.S. v. Brown*,
   561 F.3d 420 (5th Cir. 2009) ........................................................................14

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) ................................................................3, 14, 15

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252 (1977)......................................................................14, 15, 17

**Statutes**

Texas Constitution Article 3, § 40 ...............................................................5

Texas House Bill 4..................................................................................8, 9

Texas Senate Bill 4 ...........................................................................10, 12, 13

Voting Rights Act Section 2 ................................................................6, 7, 18

U.S. Const. amend. 14 § 1, 15 § 1 ......................................................6, 19, 21

**Other Authorities**

Cong. Redistricting, Select, *Past Committee Schedule* (last accessed Aug. 23,
   2025), https://tinyurl.com/4x5tjk8c ........................................................9

*Governor Abbott Announces Special Session Date, Initial Agenda* (June 23,
   2025), https://tinyurl.com/36jv43r6 ......................................................17

"CNN "'What gives you the right?': Tapper pushes back on Abbott over calls to
   remove Dem lawmaker,", (YouTube, Aug. 11, 2025)
   https://tinyurl.com/yvf9ht6e...........................................................9, 19

Legislative Reference Library, *House Committee on Redistricting, 87th
Legislature* (2021), https://tinyurl.com/56xdwr44................................9

Press Release, *Texas Senate and Texas House Working in Lockstep on
Congressional Redistricting Legislation to Address Concerns* (July 11, 2025),
   available at https://tinyurl.com/57yamfse ...............................................8

Tex. House of Representatives, Comm. on Cong. Redistricting (Aug. 23, 2025),
   available at https://tinyurl.com/bdhfdw3a ...............................................8

Tex. House of Representatives, Comm. on Cong. Redistricting, Select (Aug. 23,
   2025), available at https://tinyurl.com/4x5tjk8c ...................................8

## INTRODUCTION

The Fifth Circuit has recognized that it is the rare case where government officials will announce an intent to discriminate. *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016). This is such a rare case. The U.S. Justice Department ("DOJ"), the Texas Governor, and key legislators announced their intent to excise Congressional districts in which minority groups together formed a majority of voters.

On July 7, 2025, Harmeet Dhillon, Assistant Attorney General of DOJ's Civil Rights Division, sent Texas Governor Abbott and Attorney General Paxton a letter asserting that four districts with a majority of minority voters were "racially gerrymandered." ECF 1114-2 (Exh. A at 2). The letter rested on the spurious claim that *Petteway v. Galveston County* had deemed "coalition districts," which necessarily have a majority of minority voters, unconstitutional. *Petteway,* however, did not address constitutional issues, and in fact, remanded for the district court to consider them. Nevertheless, the letter directed Texas to extinguish these majority minority districts based on their racial composition.

Although DOJ's letter cited no evidence that these districts were based on race, and although the State denied it throughout the proceedings in this action, the Governor included redistricting in the Legislature's special session, citing DOJ's race-based directive in its July 7 letter. ECF 1114-1 (Exh. B) (calling special session "to consider and act upon…[l]egislation that provides a revised congressional redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice."). Governor Abbott emphasized that Texas was no longer "compelled" to have coalition—i.e., majority-minority—districts, could "draw maps to not have coalition districts," and that he would "remove" such districts. Fox 4 Dallas-Fort Worth, *Abbott on THC, redistricting & the special session* at 3:33-39, YouTube (Jul. 22, 2025), https://www.youtube.com/watch?v=PHsYs0NTPTY. Legislators repeatedly echoed the intent to

target these districts based on their racial composition. *See e.g.,* HB 4 Floor Debates Aug. 20, 2025. at 1:25:06-1:26:10. When the respective legislative redistricting committees considered during the second special session the redistricting plan that was ultimately enacted, Senate Chair Phil King and lead bill sponsor Representative Todd Hunter continued to tie redistricting choices to DOJ's gross mischaracterization of the *Petteway* decision as to coalition districts. This shows that whatever the Legislature's partisan aims, their predominant focus, means, and intended effect regarding the adopted plan turned on the racial composition of Congressional districts.

The Legislature's path in executing this discrimination was strewn with markers of exclusion. The Legislature abandoned accepted practices and procedures governing the legislative process in general and redistricting in particular, unnecessarily rushing the proceedings, ignoring the views of minority communities, and suspending longstanding rules, all while proclaiming their intent to dismantle coalition—i.e., majority minority—Congressional districts.

Statistical analysis of the targeted districts demonstrates the Legislature accomplished its objective and drew a map that disadvantaged people of color. Texas NAACP's expert Dr. Moon Duchin, Professor of Data Science and Computer Science at the University of Chicago, finds that the map adopted by the Legislature "is dilutive of minority voting strength. I also find strong evidence that race data was used by the line-drawers in a manner consistent with demographic targets and/or as a proxy for partisanship. In my analysis, the changes are not consistent with the race-neutral pursuit of pure partisan aims." Duchin Declaration, Exh. F at 1.

## FACTUAL BACKGROUND

### I.    The 2021 Redistricting Process

On August 12, 2021, the Census Bureau released the results of the 2020 Census revealing that Texas had gained nearly 4 million residents since 2010. More than 95% of these new Texans

were People of Color ("POC"), with nearly 20% identifying as at least partially Black. Texas gained two seats in the U.S. House and qualified as one of the nation's most diverse states.

On September 7, 2021, Governor Abbott called a special session of the Texas legislature to take up redistricting. Article 3, § 40 of the Texas Constitution limits a special session to 30 days, though the Governor may call as many as he wishes. During this special session, Representative Todd Hunter and Senator Joan Huffman led the redistricting process in their respective chambers. Both Representative Hunter and Senator Huffman had served on their respective redistricting committees in 2011. The redistricting plans adopted then were denied preclearance by a D.C. court because they reflected a discriminatory purpose. *See Texas v. United States*, 887 F. Supp. 2d 133, 178 (D.D.C. 2012).

Representative Hunter and Senator Huffman understood Texas's changing demographics when the special session began in September 2021. Both had access to the 2020 census data and received briefings from the State Demographer's Office. Even so, the 2021 maps did not reflect the increasing diversity of Texas's population. Instead, Representative Hunter and Senator Huffman—supported by attorneys from Butler Snow and Adam Kincaid from the National Republican Redistricting Trust ("NRRT")—crafted maps that intentionally diluted the votes of Black Texans and other Texans of color. Under their congressional map, majority Anglo populations controlled the two new districts Texas had gained when the 2020 Census identified more than three million new Texans of color.

Despite strong opposition from minority communities and civil rights organizations, including Texas NAACP, the Legislature adopted this map in a whirlwind 27-day process marked by serious departures from the ordinary legislative process.

## II.      The Consolidated Cases

Plaintiff Texas NAACP, alongside numerous civil rights organizations and DOJ, filed suit in 2021, alleging that the new maps diluted minority voting strength in violation of Section 2 of the Voting Rights Act and intentionally discriminated against Texas voters of color in violation of Section 2 and the Fourteenth Amendment. The cases were consolidated before this Court. During discovery, Senator Huffman, Representative Hunter, and their staffs testified under oath that the enacted maps were color-blind, but Plaintiffs were stymied in their ability to investigate this implausible claim as the result of the State's invocation of sweeping claims of legislative privilege, shielding hundreds of documents and voluminous testimony that would have illuminated the Legislature's true intent.

On March 5, 2025, DOJ announced on the record that it intended to voluntarily dismiss all of its claims against Defendants in this action. *See* ECF 872. The Court granted that dismissal on March 6, 2025. *Id.*

On March 19, 2025, this Court set the consolidated cases for trial beginning on May 21, 2025. At trial Senator Huffman testified repeatedly under oath that the 2021 U.S. Congressional map was drawn completely blind to race, a claim the State reiterated throughout the proceedings. After three weeks of testimony, the trial concluded on June 11, 2025.

## III.     The DOJ Letter and Call of the First Special Session

Less than a month after the conclusion of the trial, on July 7, 2025, over three years after filing a complaint challenging Texas's 2021 redistricting, and four months after dropping those claims—DOJ raised new charges with Governor Abbott and Attorney General Paxton (the "DOJ Letter"). For the first time, DOJ alleged that districts CD 9, CD 18, CD 29, and CD 33 were unconstitutional racial gerrymanders under *Petteway v. Galveston County*. DOJ demanded a same-day response outlining "the State's intention to bring its current redistricting plans into

4

compliance" with the law. ECF 1114-2. DOJ's characterization of *Petteway* as bearing on the constitutionality of coalition districts was not merely wrong; it was legally indefensible. *Petteway* on its face was an exercise in statutory interpretation as to whether coalition districts could form the basis of a Section 2 claim under the Voting Rights Act. In fact, the Court remanded for consideration of the constitutional issues. *Petteway v. Galveston Cnty.*, 111 F.4th 596, 614 (5th Cir. 2024). Neither the Fifth Circuit in *Petteway*, nor any court in any case, has held that coalition districts are unconstitutional. Nor did *Petteway,* or any other court, suggest that districts with a majority of minority voters are impermissible. DOJ's letter amounted to an instruction to eliminate certain minority majority districts based solely on their racial composition.

Although States have rarely initiated mid-decade redistricting, and Texas has done so only once before, Governor Abbott called a special legislative session (the "first special session") two days after receiving the DOJ Letter. Governor Abbott's agenda for the first special session included, among other matters, "Legislation that provides a revised congressional redistricting plan in light of constitutional concerns raised by the U.S. Department of Justice." Exh. B. In a joint statement on July 11, Lieutenant Governor Patrick and Speaker of the House Burows echoed DOJ's manufactured constitutional concerns, stating: "we have prioritized redistricting in accordance with the governor's special session call," and affirming the common focus of House and Senate committees "to ensure redistricting plans remain in compliance with the U.S. Constitution." *See* Press Release, *Texas Senate and Texas House Working in Lockstep on Congressional Redistricting Legislation to Address Concerns* (July 11, 2025), https://tinyurl.com/57yamfse.

On July 22, Governor Abbott admitted targeting minority opportunity districts: "[*Petteway*] says that coalition districts are no longer required, alright. And so we want to make sure that we have maps that don't impose coalition districts while at the very same time ensuring that we will

maximize the ability of Texans to be able to vote for candidates of their choice." Fox 4 Dallas-Fort Worth, "Abbott on THC, redistricting & the special session," at 3:20-3:47 (YouTube, July 22, 2025), https://www.youtube.com/watch?v=PHsYs0NTPTY. In an August 11 CNN interview, Abbott again cited the DOJ Letter, disclaimed partisan goals, and touted the plan's racial impact, admitting that "***we wanted to remove those coalition districts*** and draw them in ways that, in fact, turned out to provide more seats for Hispanics. For example, four of the districts are predominantly Hispanic. It just coincides [that] there's going to be Hispanic Republicans elected to those seats." CNN, *"'What gives you the right?': Tapper pushes back on Abbott over calls to remove Dem lawmaker"* at 4:00-4:17, YouTube (Aug. 11, 2025), https://tinyurl.com/yvf9ht6e (emphasis added). The interview continued:

> **Jake Tapper**: Well that's not really – I mean, you're doing this to give Trump and Republicans in the House of Representatives five additional seats, right? I mean, that's the motivation is to stave off any midterm election losses.
>
> **Gov. Abbott**: To, again, to be clear Jake, the reason why we're doing this is because of that court decision. Texas is now authorized under law that changed that was different than in 2021, when we last did redistricting under new law.

*Id.* at 4:45-5:10.

## IV.    The First Special Session

The first special session began on July 21, 2025. The Senate Special Committee on Congressional Redistricting handling redistricting was identical to the regular 2025 Senate Redistricting Committee. In the House, however, the Select Committee on Congressional Redistricting handling redistricting in the first special session was not the same as the regular 2025 House Redistricting Committee[1]. Although neither a member of the regular 2025 House

---

[1] Notably, Representative Jolanda Jones, a Black woman representing Harris County, was excluded from the Select Committee and Representative Todd Hunter, a white man representing Aransas and Nueces Counties, was added. *Compare* Tex. House of Representatives, Comm. on Cong.

Redistricting Committee nor chair of the new Select Committee, Representative Hunter largely led the House redistricting process in the first special session. Like the redistricting he led in 2021, this one lacked transparency, unnecessarily compressed the schedule, excluded differing viewpoints, and deviated significantly from normal procedures. For example, the House Select Committee scheduled only four public hearings, three of them before release of any congressional map (Plan C2308). *See* Comm. on Cong. Redistricting, Select, *Past Committee Schedule*, (last accessed Aug. 23, 2025), https://tinyurl.com/4x5tjk8c (Exh. H). This contrasts with the 15 public hearings that were scheduled in the House with respect to the 2021 redistricting plans. *See* Legislative Reference Library, *House Committee on Redistricting, 87th Legislature* (2021), https://tinyurl.com/56xdwr44.

The Committee focused on the Governor's directive to remove coalition districts. At the first pre-map public hearing on July 24, Chair of the House Redistricting, Representative Cody Vasut, stated that the current mid-decade redistricting was "solely to respond to the Governor's call." *See, e.g*., Hrg. Before the Comm. on Cong. Redistricting, Select, July 24, 2025 at 19:30-19:34 (Exh. H). In that same hearing, Representative Spiller, co-author of House Bill 4 ("HB 4") (which would subsequently become the enacted redistricting plan), reaffirmed the linkage to the DOJ Letter, echoing its distortion of *Petteway:* "[Y]ou had the *Bartlett v. Strickland* case which basically said that these coalition districts were not required. But then you had *Petteway* that says they're not authorized." *Id.* at 4:05:00-4:05:19.

The House Committee finally revealed a proposed congressional map publicly on July 30, 2025, when Representative Hunter introduced HB 4, which included congressional plan C2308.

---

Redistricting (Aug. 23, 2025), https://tinyurl.com/bdhfdw3a, *with* Tex. House of Representatives, Comm. on Cong. Redistricting, Select, (Aug. 23, 2025), https://tinyurl.com/4x5tjk8c.

Exh. H. That plan executed DOJ's directive, dismantling CDs 9, 18, 29, and 33 by cracking concentrations of Black and other voters of color in the Dallas-Fort Worth Metro area and Harris and Fort Bend counties, among other areas.

The proposed congressional map also split hundreds of precincts, compared to a few dozen split in the prior map. These splits are a damning signal that the map-drawers relied on race because granular data from the Texas Legislative Council at the sub-precinct level is available only with respect to race, *not* partisanship. Indeed, the only partisanship data available to the Texas Legislative Counsel at the sub-precinct level is based on extrapolated, pro-rated precinct-level data, making it impossible to reliably split precincts to achieve a partisan advantage.

On August 1, 2025, the Committee held its only public hearing following the release of C2308. The testimony was overwhelmingly negative, with demands for transparency, more time for review, and legal critiques of the DOJ Letter. Without the slightest acknowledgement of this testimony and requests for more time to review the proposed map, the House Select Committee voted the map out of committee less than 24 hours later. Given no meaningful opportunity to analyze or debate a proposed map with such profound and discriminatory effects, Democratic representatives left the state, denying the House a quorum.

With no House quorum, the Senate sprung to action—not to hear additional public testimony or provide transparency, but rather to rush through an identical map (C2308) filed as Senate Bill 4 ("SB 4"). The Senate Special Committee heard public testimony on C2308 only once during the first special session, on August 7. As in the House, that testimony was overwhelmingly negative: 117 people signed up to testify against the map while three registered to testify in favor of it. *See* Hearing Before Senate Special Comm. On Cong. Redistricting Aug. 7, 2025 at 1:54:50-1:54:58 (Exh. I). As in the House, the Senate Committee ignored the concerns expressed and voted

SB 4 out of committee less than 24 hours later. The Senators, too, relied on *Petteway* to justify the discriminatory nature of the plan. The full Senate, upon receiving SB 4 from Committee, promptly suspended the regular order of business, suspended its rule requiring legislation to lie before the Senate for three days, and passed SB 4.

As the Legislature engaged in these discriminatory efforts, Assistant Attorney General Dhillon on August 8 posted on X, crediting DOJ's letter for the redistricting in Texas. Exh. C.

The first special session ended on August 15, 2025, before the House was able to achieve a quorum to pass the new map.

### V.    The Second Special Session and the Enacted Plan

Within approximately 20 minutes after the first special session ended, Governor Abbott called a second one to pass "legislation that provides a congressional redistricting plan." Exh. D. Perhaps concerned about the racial focus of his agenda for the first session, the Governor did not mention the DOJ Letter that he featured a month earlier. He gave no reason for the highly unusual mid-decade redistricting.

Nonetheless, the Legislature continued in the second session to focus on dismantling the targeted majority minority districts. Plan C2331, introduced by Representative Hunter in the House Select Committee on August 15, only made a minor change to the previously proposed Congressional map (C2308), maintaining the discriminatory modifications to CD 9, CD 18, CD 29, and CD 33 as demanded by DOJ. In support of Plan C2331, Representative Hunter testified on the record that his understanding of *Petteway* justified the dismantling of coalition districts. *See, e.g.*, HB 4 Floor Debates Aug. 20, 2025 at 37:33-33:41;1:25:52-1:26:21 (Exh. H).

In the hearing the next day on HB 4, Representative Hunter offered committee substitute plan C2333 for the first time, also purportedly "based on *Petteway*." Mtg. of the Comm. on Cong. Redistricting, Select, Aug. 18, 2025 at 7:50-7:57 (Exh. H). The Committee refused to hear public

comment on this plan or its predecessor, swiftly adopted it as the HB 4 plan, and voted HB 4 out of committee, even though the Committee had never reviewed or even seen C2333 prior to the hearing. When asked in the August 20 floor debate on HB 4 whether the existing 2021 congressional plan (C2193)—the one at issue in the trial before this Court—created purposefully race-conscious coalition districts, Hunter answered emphatically that it did, starkly contradicting the sworn testimony this Court heard just months ago. *See* HB 4 Floor Debates Aug. 20, 2025 at 1:25:06-1:25:23 (Exh. H) (Spiller: "under the current congressional maps...there are coalition districts that were created as such in '21...is that fair?" Hunter: "that is correct"). He again repeatedly cited *Petteway* and said the maps took into account the claims in the DOJ Letter. *Id.* at 2:04:26-2:05:05 (Hunter: "there's a letter and the lawyers looked at it took it all into account, and then we came up with this plan"). Representative Hunter showed intimate familiarity with racial data, citing minority CVAP statistics numerous times, referring to CD 18's 50.71% Black CVAP, CD 30's 50.2% Black CVAP, and CD 33's 19.45% Black CVAP. *See, e.g., id.* at 32:44-33:02, 2:19:17-2:19:27, 4:23:04-4:23:36. The co-author of HB 4, Representative Spiller, also confirmed that the bill reflected DOJ's race-based directive, explaining that "one of the reasons that we're doing this now is that we feel compelled to because [of] the *Petteway* case and the ruling in the *Petteway* case as it relates to these coalition districts." *Id.* at 1:25:52-1:26:10. Speaker Burrows' August 20 press release explicitly tied the House's passage of HB 4 to the DOJ Letter, stating that the House "delivered legislation to redistrict certain congressional districts to address concerns raised by the Department of Justice and ensure fairness and accuracy in Texans' representation in Congress." Exh. E.

Once HB 4 crossed over to the Senate, on August 21, Chair King of the Senate Special Committee hearing shifted his justification for the mid-decade redistricting from adhering to the

Governor's call, to a desire for partisan gain. Mtg. of Senate Comm. on Cong. Redistricting, Special Aug. 21, 2025 at 12:10-12:47 (Exh. I). The full Senate considered HB 4 on August 22. At these floor debates, Chair King's prepared statement said the map was motivated by partisanship. Yet once he departed from his prepared statements, he reverted to claiming that the newly drawn districts would be "more competitive than the current map" and that "there are no guarantees it elects more Republicans." *Id*. at 12:10-12:47. Like Representative Hunter, Spiller cited *Petteway* as the basis for redrawing the Congressional districts. *See, e.g.*, *id*. at 1:50:00-1:50:12 ("every district in this map complies with the VRA and complies in light of *Petteway*"). The Senate passed HB 4 shortly after midnight on August 23.

The results reflect the DOJ Letter's discriminatory imperative, which Governor Abbott and the Legislature vigorously carried out: the coalition, majority-minority districts targeted by DOJ are no more and representation of minorities has declined.

## STANDARDS FOR A PRELIMINARY INJUNCTION

A preliminary injunction is warranted if the movant establishes: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). Texas NAACP meets those standards here.

## ARGUMENT

The enacted redistricting plan, C2333, intentionally discriminates based on race. Texas launched its redistricting effort because of DOJ's demand that the State dismantle districts where minority voters held a majority. The Governor reiterated that purpose in urging the Legislature to act in the special sessions. Legislators echoed the objective throughout the process. And then they implemented it.

11

Since enactment of the VRA, Texas has never adopted a Congressional redistricting plan untainted by racial discrimination. The 2021 plan, and the further adulteration of it in C2333, are no exceptions to the discrimination that has plagued the Texas redistricting process for more than half a century. In adopting C2333, the Legislature compounded the unfairness and exclusion at every turn, providing at best token participation by minority objectors and ignoring their concerns.

## I.    Texas NAACP Is Likely to Succeed on Its Intentional Discrimination Claim

In considering whether a defendant acted with discriminatory intent, courts assess direct and circumstantial evidence. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977). The multiple factors set forth in *Arlington Heights* are not individual prerequisites to establishing discriminatory intent, but rather reflect categories of potentially probative evidence, weighed in accord with the particular facts. *See U.S. v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009) ("direct or indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of [the legislature's] actions may be considered."). The factors are: discriminatory effect ("whether [the impact of official action] bears more heavily on one race than another"); historical background of the decision; specific sequence of events leading up to the challenged decision; departures from normal procedures; and statements by members of the decision-making body. *Id.* at 266-68. In assessing intent, "'[r]acial discrimination need only be one purpose, and not even a primary purpose,' of an official action for a violation to occur." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016), citing *Brown*, 561 F.3d at 433.

Consideration of the panoply of circumstantial factors is necessary in most redistricting cases because, as the Fifth Circuit has recognized in, *Veasey* legislators rarely announce an intent to discriminate. *See* 830 F.3d at 230. Here, though, they made precisely such an announcement. They overtly targeted districts where multiple minority groups together constituted a majority of the voters, apparently predicated the legally baseless, pretextual justification theory that such

districts are unconstitutional. Dismantling Congressional districts because of their racial composition is intentional discrimination. The circumstantial evidence of the *Arlington Heights* factors merely corroborates what the direct evidence establishes.

### A. The Dismantling of Opportunity Districts in the Dallas-Fort Worth Metro Area, Harris and Fort Bend Counties, and the Austin-San Antonio Area Disproportionately Harms Black and Other Voters of Color.

Plaintiff Texas NAACP challenges the following districts: CD 32 and CD 33 (Dallas and Tarrant counties); CD 9 (Harris and Fort Bend counties); and CD 35 (Austin-San Antonio Area). In each of these challenged districts, the effects of C2331 disadvantage Black and other voters of color.

First, Dr. Moon Duchin, Plaintiff Texas NAACP's expert in this action, confirms that the Legislature had no need to engage in mid-decade redistricting. None of the Congressional districts violated the one-person, one-vote principle. In fact, C2193 and C2333 both are balanced with respect to 2020 population data. Exh. F at 3. American Community Survey ("ACS") data from 2018-2023 estimates that Black and other people of color comprised 94% of the CVAP growth statewide. *Id.* In the Dallas/Tarrant and Harris/Fort Bend clusters, estimated POC CVAP increased by over 100% in each cluster compared to declines in Anglo CVAP by 8% and 10.8% respectively. *Id.* at 4.

Second, the 291 split precincts in C2333 are "indicative of a focus on race than on partisanship," and are significantly more numerous than the seven (7) precinct splits in C2193. *Id.* at 6. Dr. Duchin's analysis indicates that mapmakers disproportionately and surgically moved Black and other voters of color out of the challenged districts. This level of precision requires sub-precinct information—data at the Census block level, which is more granular than precinct data. The information that the Legislature has used for redistricting has come from the Texas Legislative Council, which provides racial breakdowns down to this level, but not partisan breakdowns. Thus,

the magnitude, nature, and precision of the split precincts show that mapmakers used race data to draw the maps. *Id.* at 7; *see also Perez v. Abbott*, 253 F.Supp.3d 864, 952-53 (W.D. Tex. 2017) ("while accurate racial data is available below the precinct level, accurate political data is not…suggesting that many precinct splits have a racial basis.").

Third, each of the three district clusters loses a district that elects a candidate of choice for Black and other voters of color. Exh. F at 7. POC voters in CD 33 under Plan C2193 were able to elect candidates of choice in both the primary and general elections. Under Plan C2333, even when mapmakers constructed CD 33 as a Democrat-leaning district, they prioritized white voters' interests by drawing a district that ultimately does not elect POC-preferred candidates in general elections—a result that shows racial rather than partisan intent. *Id.* Under Plan C2193, POC voters in CD 9 consistently elected candidates of choice, whereas POC voters in CD 9 under Plan 2333 are shutout from electing a candidate of choice in the general election. *Id.* For CD 35, POC voters under Plan C2193 were able to elect candidates of choice in both primary and general elections. Now under C2333, POC voters are unable to elect candidates of choice in general elections. *Id.*

Fourth, Dr. Duchin's ensemble analysis demonstrates for each district cluster that the challenged districts, are outliers with respect to the treatment of voting age population of Black and other voters of color in comparison to 100,000 neutral alternative maps. *Id.* at 12. This pattern of packing and cracking is even more stark when controlling for partisanship. In other words, partisanship does not explain the racial changes imposed on those districts. *Id.* In district cluster C1, two of the eight districts show that POC CVAP is "outlyingly low" (cracking), while a third district's POC CVAP is "outlyingly high" (packing). *Id.* In district cluster C2, four of the nine districts have "outlyingly low" POC CVAP, while a fifth district is "outlyingly high." *Id.* at 13. In district cluster C3, one district is "outlyingly low" and another district is "outlyingly high." *Id.*

Taken together, this evidence establishes that C2133's discriminatory effect against Black and other voters of color cannot be explained by partisanship.

### B. Texas's Long and Continued History of Discrimination Supports a Finding of Intentional Discrimination.

The second *Arlington Heights* factor is the historical background of the decision. Texas's historical record of discrimination in voting populates much of the caselaw in this area. At trial, Texas NAACP's expert Dr. Monica Munoz Martinez detailed the discriminatory history from as the 1800s to now. Both she and Linda Lewis testified about discrimination "reasonably contemporaneous with the challenged decision." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). Historical evidence, including recent discrimination, supports the direct evidence establishing intentional discrimination and favors an inference of discriminatory intent.

### C. The Sequence of Events and Contemporaneous Statements from Decisionmakers Support an Inference of Intentional Discrimination.

Governor Abbott's initial call on June 23 for the first special session did not include redistricting. Exh. G. The July 7 DOJ Letter advanced a patently apocryphal interpretation of *Petteway v. Galveston County* to require redistricting of CD 9, CD 18, CD 29, and CD 33 as "unconstitutional racially based gerrymandering." Exh. A. The letter identified CDs 9, 18, and 33 as coalition districts and CD 29 as a majority-Hispanic district. *Id.* The Letter demanded the dismantling of opportunity districts for Black and other voters of color due to the districts' racial/ethnic makeup. Race does not merely predominate in this demand but is the basis for it. That is intentional racial discrimination.

Although the DOJ Letter cites no evidence of racial gerrymandering, and Texas has denied it, Governor Abbott acquiesced. He explicitly linked redistricting in the first special session with the letter, calling on July 9 for "[l]egislation that provides a revised congressional redistricting plan

in light of constitutional concerns raised by the U.S. Department of Justice."[2] Exh. B. As noted, the Governor publicly admitted that the object was to "remove those coalition districts and draw them in ways that, in fact, turned out to provide more seats for Hispanics." CNN, *"'What gives you the right?': Tapper pushes back on Abbott over calls to remove Dem lawmaker*" at 3:59-4:10, YouTube (Aug. 11, 2025), https://tinyurl.com/yvf9ht6e.

The Legislature picked up the mantle from Texas's executive officials and purposefully implemented DOJ's and the Governor's demands. As noted, the record of the first legislative session is replete with references to the ability to remove so-called coalition districts. Legislators cited *Petteway* repeatedly as the excuse for the redistricting effort. See e.g. Hearing Before the Comm. on Cong. Redistricting, Select, July 24, 2025 at 4:05:00-4:05:19 (Exh. H); Hearing Before the Comm. on Cong. Redistricting, Select, Aug. 1, 2025 at 1:01:07-1:04:39 (Exh. H).

Although the Governor's call for the second special legislative session did not mention the DOJ letter, it would be implausible to suggest that the approximately 20 minutes between the sessions somehow laundered the intended targeting. Such a claim also would conflict with the legislator's continued statements during the session focusing on *Petteway* and coalition districts. *See e.g.* Meeting of the Comm. on Cong. Redistricting, Select, Aug. 18, 2025 at 7:50-7:57 (Exh. H); HB 4 Floor Debates Aug. 20, 2025 at 2:04:26-2:05:05; 1:25:52-1:26:10 (Exh. H).

In *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009), in disallowing a Section 2 claim based on a coalition of minority and white voters in "crossover districts," the plurality specified constitutional limits on discrimination against such groups: "[I]f there were a showing that a State

---

[2] On July 11, Attorney General Ken Paxton responded to DOJ's letter, noting that after the recent four-week trial in this case, "**[t]he evidence at that trial was clear and unequivocal: the Texas legislature did not pass race-based electoral districts for any of those three political maps.**" Exh. J.

intentionally drew district lines in order to destroy otherwise effective crossover districts, that would raise serious questions under both the Fourteenth and Fifteenth Amendments." This proscription has, if anything, more force for alleged "coalition districts," where the groups include only minorities—more frequent victims of voting discrimination than members of the majority.

From the outset, this mid-decade redistricting cycle targeted Black and other voters of color, homing in on specific districts effective in electing their candidates of choice and redrawing them in accordance with DOJ's directive. Where "the adverse consequences of a law upon an identifiable group" are clear, "a strong inference that the adverse effects were desired can reasonably be drawn." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 379 (1979). The sequence of events and contemporaneous statements support a finding of intentional discrimination.

### D. Procedural and Substantive Departures Support a Finding of Intentional Discrimination.

Legislators engaged in multiple procedural and substantive departures to rush the discriminatory map through. The circumstances of the 2025 mid-decade redistricting cycle and the 2021 redistricting cycle drastically differ. This Court previously found the special session in 2021 necessary to enact redistricting quickly because COVID-19 had delayed release of Census data. Such exigent circumstances do not exist here. The 2025 redistricting is mid-cycle, a rare event absent a court order or some malapportionment. Neither occurred here. This mid-cycle redistricting was purely volitional, at the behest of DOJ and the expense of Black and other voters of color. No extenuating events required any redistricting, let alone at such a breakneck pace.

Once redistricting began, legislators executed the racial directive of the DOJ letter swiftly by suspending or completely ignoring procedural and substantive rules to rush a new Congressional plan into effect. First, both chambers tightly limited public participation in the

process. The Legislature curtailed regional hearings for public comment prior to introducing any proposed maps, compared to multiple regional hearings in 2021. After introduction of proposed maps, they again restricted public participation, either outright in some hearings, or by providing minimal notice before holding other public hearings. In the Senate, legislators suspended notice requirements for the second session.

Second, the Legislature engaged in procedural and substantive gamesmanship throughout the process. Both chambers suspended the "regular order of business," abandoning established legislative procedures such as bill layouts (when sponsors explain a bill and the reasons for it). They also skipped the rule requiring that bills be printed and placed on legislators' desks prior to a vote. Republican committee leadership also imposed restrictive special procedures for legislators to introduce amendments to the bills and rushed votes through committee, including in the middle of the night. Furthermore, unlike in 2021, leadership did not draw the maps, nor did they confer with minority legislators to take into account communities of interest or other relevant redistricting criteria, another departure from longstanding practice. While in 2021, Senator Huffman testified that she held one-on-one meetings with legislators to seek their input, opponents in this round were not consulted even about the contours of their own districts. In fact, no member of the Black Caucus had an opportunity to provide input on the map. *See* HB 4 Floor Debates Aug. 20, 2025 at 2:06:12-2:06:45 (Exh. H). These procedural and substantive departures support an inference of discriminatory intent.

## II.      Texas NAACP Faces a Substantial Threat of Irreparable Injury Absent Injunctive Relief

Mapmakers violated the constitutional rights of Black and other voters of color by intentionally dismantling districts CDs 32, 33, 9, and 35, and diminishing their opportunity to elect their preferred candidates. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("[T]he

18

loss of constitutional freedoms 'for even minimal periods of time … unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also De Leon v. Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014), aff'd sub nom. *De Leon v. Abbott*, 791 F.3d 619 (5th Cir. 2015) ("Federal courts at all levels have recognized that violation of constitutional rights constitutes irreparable harm as a matter of law."). The Constitution guarantees equal protection of the law and freedom from discrimination in voting. *See* U.S. Const. amend. 14 § 1, 15 § 1. Votes, once cast, are virtually irrevocable. Voters can rarely correct constitutional violations. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress."). Absent intervention from this Court, Texas NAACP members thus will be irreparably injured by having to vote in unconstitutional Congressional districts.

### III.    The Balance of the Equities and Public Interest Weighs in Favor of Texas NAACP

Courts assess the balance of the equities and the public interest together because they "overlap considerably." *Nken v. Holder*, 556 U.S. 418, 435 (2009). With interlocutory stays, "[t]hese factors merge when the Government is the opposing party." *Id*. Ridding maps devoid of unconstitutional racial discrimination outweighs any interest that Defendants have or burdens they may face as to the challenged redistricting plan. *See Jackson Women's Health Organization v. Currier*, 760 F.3d 448, 458 n. 9 (5th Cir. 2014). Furthermore, injunctions that prevent constitutional violations are "always in the public interest." *Ingebretsen on Behalf of Ingebretsen v. Jackson Public School District*, 88 F.3d 274, 280 (5th Cir. 1996) (appellants met the public interest requirement for preliminary injunction based on unconstitutionality of school prayer statute). Both the balance of the equities and public interest weigh in favor of a preliminary injunction.

**CONCLUSION**

The Court should enjoin HB 4 for the foregoing reasons.

/s/ Lindsey B. Cohan
Lindsey B. Cohan
Texas Bar No. 24083903
DECHERT LLP
515 Congress Avenue, Suite 1400
Austin, TX 78701
(512) 394-3000
lindsey.cohan@dechert.com

Robert Weiner**
David Rollins-Boyd*
Jennifer Nwachukwu
Jeremy Lewis*
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1500 K Street, Suite 900
Washington, DC 20005
(202) 662-8600
rweiner@lawyerscommittee.org
drollins-boyd@lawyerscommittee.org
jnwachukwu@lawyerscommittee.org
jlewis@lawyerscommittee.org

Neil Steiner*
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
(212) 698-3822
neil.steiner@dechert.com

Robert Notzon
Texas Bar No. 00797934
THE LAW OFFICE OF ROBERT
NOTZON
1502 West Avenue
Austin, Texas 78701
(512) 474-7563
robert@notzonlaw.com

Gary Bledsoe
Texas Bar No. 02476500

THE BLEDSOE LAW FIRM PLLC
6633 Highway 290 East #208
Austin, Texas 78723-1157
(512) 322-9992
*gbledsoe@thebledsoelawfirm.com*
*Attorney only as to Texas NAACP's claims
related to Texas state senate and state house
plans*

Anthony P. Ashton*
NAACP OFFICE OF THE GENERAL
COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
*aashton@naacpnet.org*

Janette M. Louard
NAACP OFFICE OF THE GENERAL
COUNSEL
4805 Mount Hope Drive
Baltimore, MD 21215
(410) 580-577
*jlouard@naacpnet.org*
*Attorneys appearing of counsel*

*Admitted pro hac vice
** Pro hac vice motion forthcoming

*ATTORNEYS FOR THE TEXAS STATE
CONFERENCE OF NAACP*

## CERTIFICATE OF SERVICE

I certify that the foregoing was served on all counsel of record on August 26, 2025 via the

Court's CM/ECF system.

*s/ Lindsey B. Cohan*