UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| LULAC, et. al., <br><br> *Plaintiffs* <br><br> Eddie Bernice Johnson, Sheila Jackson-Lee Alexander Green, and Jasmine Crockett <br><br> *Plaintiff-Intervenors* <br><br> v. <br><br> GREG ABBOTT, in his official capacity As Governor of Texas, et. al. <br><br> *Defendants* | Case No.: 3-21-CV-00259-DCG-JES-JVB [Lead Case] |

**PLAINTIFF-INTERVENORS' MOTION FOR PRELIMINARY INJUNCTION**

TO THE HONORABLE COURT:

Plaintiff-Intervenors Alexander Green and Jasmine Crockett, members of Congress representing the 9th and 30th Congressional districts, respectfully move this Court for a preliminary injunction to enjoin the implementation of Texas Congressional redistricting Plan C2333, recently adopted by the Texas Legislature. Green and Crockett have standing as members of Congress and voters to challenge the map on behalf of voters who were or are currently part of their districts.

Intervenors aver that this Supplemental Complaint is in addition to its Second Amended Complaint and nothing herein constitutes a waiver of previous arguments. Additionally, Plaintiff-Intervenors further adopt the Preliminary Injunction Motion of the Texas NAACP.

**I. LEGAL STANDARD**

To obtain a preliminary injunction, Plaintiff-Intervenors must satisfy the four-part test established in *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008): (1) likelihood of success on the

merits; (2) likelihood of irreparable harm absent the injunction; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023); *Callais v. Landry*, 732 F. Supp. 3d 574 (M.D. La. 2024).

## II. FACTUAL BACKGROUND

### A. Texas's Extensive History of Redistricting Discrimination

Texas has a well-documented and persistent history of discriminating against African American and Latino voters spanning multiple decades under both Democratic and Republican leadership. As this Court previously noted, "Texas has found itself in court every redistricting cycle, and each time it has lost." *Perez v. Abbott*, 253 F. Supp. 3d 864, 957 (W.D. Tex. 2017). This losing streak includes violations found in every redistricting cycle since the adoption of the Voting Rights Act: *LULAC v. Perry*, 548 U.S. 399 (2006); *Bush v. Vera*, 517 U.S. 952 (1996); *Upham v. Seamon*, 456 U.S. 37 (1982); *White v. Weiser*, 412 U.S. 783 (1973); *White v. Regester*, 412 U.S. 755 (1973); *Terrazas v. Slagle*, 789 F. Supp. 828 (W.D. Tex. 1992). Indeed, "a jurisdiction that enacts a plan having a dilutive impact is more likely to have acted with a discriminatory intent to dilute minority voting strength than a jurisdiction whose plan has no such impact." *See generally Johnson v. De Grandy*, 512 U.S. 997, 1017, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) ("One may suspect vote dilution from political famine...."). Texas' sordid history of discrimination therefore makes it more likely, in the minds of the courts, that this new plan C2333 results from intentional discrimination.

The first Latino elected to Congress from Texas was Henry B. Gonzales in 1960, and the first African American was Barbara Jordan, elected in 1972—the first African American from the South elected post-Reconstruction. Despite Texas's growing minority population, which now comprises over 60% of the state, minority voters have consistently been denied proportional representation through systematic vote dilution schemes.

Under the current plan C2193, white voters are able to determine the outcome in 28 of 38 Congressional Districts despite comprising only 40% of the State's population. If Plan C2333 is adopted, this 73 percent will increase to almost 80%, or 30 of 38 districts, demonstrating an escalation rather than remedy of discriminatory practices. *See* Expert Report of Dr. Richard Murray, Exhibit 24; Exhibit B to Plaintiff Intervenors Supplemental Complaint.

**B. The Genesis of the 2025 Mid-Decade Redistricting**

Texas held a regular legislative session in 2025, ending while this case was in the middle of trial. Though there was a redistricting committee during that session, no action was taken on any redistricting bill. Rumors began surfacing in June 2025 about potential mid-decade redistricting, prompting questions from Intervenors and other parties to witnesses about the likelihood of a special session. Governor Abbott was initially quoted as saying he did not want a special session on redistricting.

However, on July 7, 2025, the Trump Administration's Department of Justice sent a letter to Governor Abbott and Attorney General Paxton declaring that Congressional Districts TX-09, TX-18, TX-29, and TX-33 constitute "unconstitutional coalition districts" that must be rectified immediately[1]. The DOJ letter relied primarily on the Fifth Circuit's *Petteway v. Galveston County* decision to argue that coalition districts violate the Voting Rights Act and Fourteenth Amendment, despite the fact that none of the challenged districts actually constitute coalition districts, as they are legacy minority opportunity districts.

The DOJ letter was nothing short of a directive to engage in racial discrimination. It explicitly demanded that Texas eliminate districts where minority voters could elect candidates of their choice, effectively commanding the state to dilute African American and Latino voting strength. Shortly after receiving this directive, Abbott called a special session and redistricting was added to the agenda.

**C. Extraordinary Procedural Irregularities in Plan C2333's Adoption**

The 2025 redistricting process was marked by systematic exclusion of minority legislators and unprecedented procedural departures from normal legislative practice. HB4, which introduced Plan C2333, was first introduced during the first special session and made public just days after limited "field hearings" had taken place. Though a completed map was clearly in hand, the Legislature conducted field hearings where the public testified generally about redistricting preferences, but no hearings were held on the specific proposed map—contrary to customary practice as testified by Senator Royce West during trial.

---

[1] 7-7-2025-DOJ-Letter-re-Unconstitutional-Race-Based-Congressional-Distric.pdf (hereinafter "DOJ Letter").

The bill proceeded through the Legislature with unprecedented speed[2]:

- **August 18**: First unveiled at committee meeting (not hearing) and voted out same day with no hearing

- **August 19**: Sent to Calendars Committee

- **August 20**: House floor consideration with 2nd and 3rd readings same day; Senate first reading same day

- **August 21**: Senate Redistricting Committee passage with no changes

- **August 22**: Senate adoption with 2nd and 3rd readings same day

For comparison, the current C2193 plan was first read on September 30 and adopted approximately three weeks later. Plan C2333 was adopted in less than five days with no real public hearings on the Committee Substitute.

The irregular procedures included but were not limited to:

1. **No public hearings** on the Committee Substitute for HB4

2. **Bill adopted in 5 days** with no substantive review period

3. **Bill adopted as originally constructed** with no meaningful amendments

4. **Same-day Senate first reading** when House adopted the bill

5. **Speaker's failure** to entertain normal parliamentary inquiries

6. **Legislators brought to chambers** who had been held in custody by the Department of Public Safety after quorum was established on August 18

7. **48-hour captivity** of State Representative Nicole Collier after quorum had been established

8. **Special passes required** for minority lawmakers to participate in discussions

9. **Suspension of Senate rules** to defeat minority opposition and expedite passage

As Senator West testified during trial, the Legislature is becoming increasingly hostile to minority lawmakers and minority communities, and this process exemplified that discriminatory behavior.

---

[2] https://capitol.texas.gov/BillLookup/History.aspx?LegSess=892&Bill=HB4

## III. LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff-Intervenors are highly likely to succeed on their claims of intentional racial discrimination, vote dilution under Section 2 of the Voting Rights Act, and racial gerrymandering under the Fourteenth Amendment.

### A. Intentional Racial Discrimination Under Arlington Heights

As courts recognized in *Merrill v. Milligan*, 142 S. Ct. 879 (2022), courts employ the framework established in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), to determine intentional discrimination. This inquiry involves a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Veasey v. Abbott*, 830 F.3d 216, 230 (5th Cir. 2016). The framework includes five non-exhaustive factors: (1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history.

#### 1. Historical Background of Discrimination

Texas's unbroken record of redistricting discrimination provides compelling historical context. As the D.C. Circuit found in *Texas v. United States*, 887 F. Supp. 2d 133, 161 (D.D.C. 2012), "In the last four decades, Texas has found itself in court every redistricting cycle, and each time it has lost." This historical pattern of discrimination is a critical circumstantial factor under Arlington Heights.

Moreover, in prior redistricting cycles, Texas has systematically targeted minority elected officials and their districts. The D.C. Court noted that "the way in which the State had carved apart the Congressional districts being represented by African-American members of Congress could be explained only by an intent to discriminate against minority voters in the districts." *Texas v. United States*, 887 F. Supp. 2d at 160-61.

#### 2. Sequence of Events Demonstrating Discriminatory Purpose

The sequence of events leading to Plan C2333's adoption establishes clear discriminatory intent. The process began with the Trump DOJ's July 7, 2025 letter explicitly demanding that Texas eliminate minority opportunity districts. The letter made no mention of partisan considerations—it

focused solely on race, declaring that districts where minority voters could elect candidates of their choice were "unconstitutional coalition districts" that must be eliminated.

Black and Hispanic members of Congress and the Legislature were systematically excluded from the map-drawing process, while white legislators controlled both the drafting and approval process. Legislators admitted that the map was drawn in secrecy by unnamed parties and provided to committee chairs who could not or would not answer basic questions about its drafting.

**3. Dramatic Departures from Normal Procedural Sequence**

The procedural departures in adopting Plan C2333 were extraordinary and unprecedented:

**Elimination of Normal Notice and Hearing Requirements**: The Legislature eliminated customary public hearings on the proposed map, instead conducting only general "field hearings" before unveiling the final plan. This denied the public and minority communities meaningful opportunity to respond to the specific redistricting proposal.

**Unprecedented Speed of Adoption**: The 5-day adoption timeline was a dramatic departure from normal practice. Even the 2021 redistricting, which Senator West testified went through in "record time," took approximately three weeks. This compressed timeline prevented meaningful analysis or public input.

**Exclusion and Detention of Minority Legislators**: Democratic legislators, including members of the Texas Legislative Black Caucus, were physically detained to prevent them from denying a quorum. State Representative Nicole Collier was held in custody for 48 hours after quorum had already been established, demonstrating that the detention was punitive rather than procedurally necessary.

**Gatekeeping Rules to Prevent Minority Input**: Minority lawmakers were required to obtain special passes to participate in discussions and were excluded from rooms where maps were being reviewed. Amendments had to be pre-approved by designated representatives and white lawyers before they could even be offered for consideration.

**Same-Day Multi-Reading Process**: Both the House and Senate conducted second and third readings on the same day, eliminating normal deliberation periods and amendment opportunities.

**4. Substantive Departures from Neutral Districting Principles**

Plan C2333 represents massive substantive departures from traditional redistricting principles, with these departures correlating directly with race rather than neutral factors:

**Abandonment of District Core Preservation**: Rather than making minimal adjustments to existing districts, Plan C2333 completely reconstruct districts that were optimally sized or close to optimal size. Congressional District 9, which needed virtually no population adjustment, was completely dismantled and reconstructed as an entirely different district.

**Systematic Targeting of Minority Representatives**: Both Congressman Green and Congresswoman Crockett find their residences moved out of their current districts, forcing them to choose between districts and potentially creating contests between minority incumbents. This mirrors the discriminatory targeting found unlawful in prior cases.

**Bizarre District Shapes**: The districts exhibit irregular, non-compact shapes that can only be explained by racial considerations. As Intervenors previously noted in describing similar districts, they resemble "an ailing chicken," "an awkward blob with a uterus shaped hole," and "an amoeba with tentacles," indicating that race predominated over traditional districting concerns.

**5. Legislative History and Contemporary Evidence**

The legislative record provides overwhelming evidence of discriminatory intent:

**Explicit Racial Targeting in DOJ Letter**: The Trump DOJ letter explicitly demanded elimination of districts based on their racial composition, not their partisan performance or compliance with neutral principles. The letter made clear that Texas must dilute the voting strength of minority voters or be sued by the federal government. The Supreme Court has made clear that deference to state legislative policies is permissible only so far as those principles are constitutional. *Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982); *Connor v. Finch,* 431 U.S. 407, 414–415, 97 S.Ct. 1828, 1833–1834, 52 L.Ed.2d 465 (1977). But Texas has chosen to follow the DOJ's lead in an unconstitutional interpretation of the Voting Rights Act. It cannot use this to justify racially discriminatory maps.

**Legislators' Awareness of Discriminatory Impact**: Despite not conducting public hearings on the Committee Substitute, legislators were fully aware of the discriminatory impact from hearings on

the original HB4. Representatives from the Texas NAACP, NAACP Legal Defense Fund, LULAC, Fair Maps, and other organizations detailed the discrimination in the original plan. Minority legislators made these facts known in both chambers, making clear that the Committee Substitute would have severe discriminatory impacts.

**Secret Drafting Process**: Legislative leaders admitted that the map was drawn in secrecy by unnamed parties. Committee chairs acknowledged they could not answer basic questions about the map's drafting, either because the information was privileged or because they simply didn't know.

**B. Dr. Murray's Expert Analysis Demonstrates Severe Discriminatory Impact**

Dr. Richard Murray's comprehensive analysis of Plan C2333 provides compelling evidence of intentional discrimination and severe discriminatory impact:

**Impact on Hispanic Voters**

**Destruction of Houston's Hispanic Opportunity**: Plan C2333 dismantles Congressional District 29, a performing Latino opportunity district since 1992. Dr. Murray notes that existing CD29 is split with Hispanic voters cracked into two districts where they cannot elect their candidate of choice. Heavily Latino precincts like Denver Harbor and East End are moved into Congressional District 9 where they will cast less than 30% of the vote in general elections.

The plan adds Liberty County to the new 9th district, where the county electorate opposes Latino-preferred candidates by a four-to-one ratio (23,983 to 5,699 in the 2024 General Election). This ensures Hispanic voters cannot elect their preferred candidates.

As Dr. Murray concludes, Plan C2333 results in Harris County's Hispanic population of 2,034,700 having "for the first time in three decades, no good opportunity to elect a candidate of their choice to Congress."

**Weakening of Other Hispanic Districts**: In the Bexar-Travis area, Plan C2333 significantly weakens CD35 by replacing Travis, Hays, and Comal areas with counties that have "a recent history of polarized voting against the preferred candidates of Latino voters." In the Lower Rio Grande Valley, Plan C2333 weakens CD34 by deliberately removing heavily Latino portions while including less Latino areas from Nueces County.

### Impact on African American Voters

**Elimination of Black Opportunity Districts**: Plan C2333 reduces Black opportunity districts from three (CD 9, CD 18, and CD 30) to two (CD 18 and CD 30). The Ninth District, which "gave African American voters the opportunity to elect their candidate of choice in eleven consecutive elections," is completely eliminated. As Dr. Murray notes, "99% of the Black voters in the existing CD9 were removed," mostly to the 18th Congressional District.

**Classic Packing and Cracking**: The high-turnout Black precincts from CD9 are moved into CD18, forcing removal of over half of CD18's existing population, including traditional Black areas like Independence Heights and Acres Home. This creates a classic example of packing minority voters into a district they overwhelmingly dominate while reducing African American ability elsewhere to elect candidates of their choice.

**Targeting of Minority Representatives**: Plan C2333 moves Congresswoman Crockett's residence away from CD30, forcing her to choose between districts and potentially creating a "brutal Hispanic-Black faceoff" as the winner of the special election for the vacant 18th seat will likely need to run in the reconfigured 29th District.

### Statewide Discriminatory Impact

Dr. Murray concludes that the Anglo population in Texas is less than 40% of the state total, yet the new map increases Anglo-dominated seats to 79%. Since 2000, Texas has added nine new House seats due to population growth, with over 90% of that growth attributable to minority population increases. Yet Plan C2333 leaves the state "with fewer Black and Hispanic opportunity districts than existed 20 years ago." Dr. Murray concludes the map "is intentionally racially discriminatory against minorities."

### C. Section 2 Voting Rights Act Violations

Plan C2333 violates Section 2 by systematically cracking and concentrating minority communities using classic vote dilution techniques.

### Gingles Preconditions are Satisfied

The three *Thornburg v. Gingles* preconditions are clearly satisfied: (1) African American and Latino populations in the relevant areas are sufficiently large and geographically compact to constitute majorities in reasonably configured districts; (2) these minority communities are politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.

**Totality of Circumstances Demonstrates Inequality**

Under the totality of circumstances, the political processes in Texas are not equally open to African American and Latino voters. The systematic reduction in minority opportunity districts, combined with Texas's documented history of discrimination and ongoing racially polarized voting, demonstrates that minority voters do not have an equal opportunity to participate in the political process.

As this Court previously found in *Perez v. Abbott*:

> "In comparison, minority voters are treated quite differently... Although there are three million African-Americans (12% of the State's population), there are no majority-Black districts in terms of voting age population, and only 21% of the Black voting age population is in a Black-plurality VAP district... Thus, White non-Hispanics, who are 45% of the total population, hold clear majorities in 70% of districts and have opportunities to win 70% of seats, while African-Americans and Hispanics, who are 48% of the State's population, are pluralities or majorities in just 30% of districts."

*Perez v. Abbott*, 253 F. Supp. 3d at 958-59.

Plan C2333 exacerbates this disparity, with Anglo voters potentially controlling up to 30 of 38 districts despite being less than 40% of the population.

**Classic Cracking and Packing Techniques**

Plan C2333 employs the paradigmatic vote dilution techniques of cracking and packing:

**Cracking**: Hispanic voters are systematically cracked by dismantling performing opportunity districts like CD29 and dispersing Latino communities among districts where they cannot elect candidates of their choice.

10

**Packing**: African American voters are packed by concentrating them in fewer districts, as demonstrated by the forced consolidation of CD9's Black voters into CD18, creating what Dr. Murray describes as a "classic example of packing minority voters into a district they will overwhelmingly dominate, while reducing African American ability elsewhere to elect candidates of their choice." *Exhibit A.*

### D. Racial Gerrymandering in Violation of Shaw

Race was the predominant factor in drawing Plan C2333's boundaries, requiring strict scrutiny analysis under the Shaw line of cases.

### Legal Standard for Racial Gerrymandering

As this Court recognized, a Shaw-type racial gerrymandering claim requires showing "that race was improperly used in the drawing of the boundaries of one or more specific electoral districts." *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 265 (2015). The plaintiff's evidentiary burden is "to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Id.* at 267.

### Evidence of Racial Predominance

**Direct Evidence**: The Trump DOJ letter provides direct evidence that race was the predominant motivating factor. The letter explicitly demanded elimination of districts based on their racial composition and minority electoral success, not based on partisan considerations or neutral redistricting principles.

**Circumstantial Evidence**: The systematic movement of minority voters between districts, the bizarre and non-compact shapes of the resulting districts, and the abandonment of traditional redistricting principles all demonstrate racial predominance. As this Court previously found, such evidence establishes that "race predominated over traditional redistricting concerns." *Perez v. Abbott*, 250 F. Supp. 3d at 218.

**Statistical Evidence**: Dr. Murray's analysis demonstrates that the boundary changes correlate with racial rather than partisan data, showing that race, not politics, drove the line-drawing decisions.

**Failure of Strict Scrutiny**

To the extent Defendants might claim compliance with the Voting Rights Act as justification, they cannot satisfy strict scrutiny. The DOJ letter that prompted this redistricting specifically argued that coalition districts are unconstitutional, meaning Defendants had no strong basis in evidence for believing that race-conscious districting was required by federal law. Without a compelling justification backed by strong evidence, the racial gerrymandering cannot survive strict scrutiny.

**E. Violation of Traditional Redistricting Principles**

Plan C2333 systematically abandons traditional redistricting principles that the Supreme Court has recognized as legitimate and nondiscriminatory objectives, including preserving district cores, maintaining communities of interest, and protecting incumbents equally.

**Abandonment of Core Preservation**

The Supreme Court has recognized that preserving the cores of prior districts constitutes a legitimate redistricting principle. *Karcher v. Daggett*, 462 U.S. 725 (1983). Plan C2333 completely abandons this principle for minority districts while preserving it for Anglo-dominated districts. Congressional District 9, which was optimally sized, was completely dismantled and reconstructed as an entirely different district. This dismantling also included the radical restructuring of CD 18, 30, and 33 to the detriment of minorities.

**Destruction of Communities of Interest**

Rather than keeping communities of interest together—including urban character, common media sources, and transportation lines (*Bush v. Vera*, 517 U.S. 952, 977 (1996))—Plan C2333 fractures longstanding minority communities. The plan dismantles CD29's Hispanic community in Houston and splits CD9's African American community between multiple districts. It eliminates downtown Dallas from the 30, removed economic engines and communities of interest, along with two hundred thousand residents accustomed to political cohesion. Congresswoman Crockett's home was removed from her district just as happened before with Eddie Bernece Johnson. Congressional

12

District 30 has existed as a Black opportunity district since 1992, 20 years after Houston had its first African American. The district has elected the African American candidate of choice 17 times since its creation. Though the district was already performing they moved a substantial number of African Americans into the district from Tarrant County. He further noted that related districts in the area, CD32 and CD33 also observed a reduction in African American voting strength.

In CD 33, a court-drawn map to remedy previous racial discrimination, was described by the previous panel as a naturally occurring district, not a coalition district. It was designed as a Tarrant County district but has been moved completely in Dallas County therefore dividing communities of interest. African-American Congressman Marc Veasey was drawn out of his district.

The 18th congressional district lost numerous areas that were longstanding parts of the 18th, such as Independence heights and Acres Homes. This is after the Governor previously refused to set a special election leaving the residents without representation.

The 9th CD had 99 percent of the black population removed from the district. Black voters will have no ability to influence the new 9th district. In the opinion of Dr. Richard Murray, this constitutes intentional racial discrimination. *Exhibit A*. This is likely unprecedented and unjustifiable even in the face of the State's justifications. Congressman Green was also drawn out of his district.

Moreover, Dr. Murray's analysis shows that CD29 in Harris County, a performing Latino opportunity district since 1992, was dismantled. He noted that the existing CD29 was split with Hispanic voters cracked into two districts where they will not have the opportunity to elect their candidate of choice. Heavily Latino precincts like Denver Harbor and East End were moved into Congressional District 9 where they are likely to case less than 30% of the vote in general elections. Heavily polarized voters from Liberty County were moved into CD9. As a result of his analysis, Dr. Murray concluded that C2333 "eliminated the single performing Hispanic opportunity district in the Houston area". He noted that you could preserve the minority opportunity districts in Houston and create a new and deserved Latino opportunity district. *Exhibit A*.

Murray concludes that Texas had 3 African American opportunity districts in C2193 and one of them, CD9, was eliminated. He further noted that the court drawn 33rd District in Tarrant County, a court drawn map that had elected the African American candidate of choice for 7 General Elections starting in 2012, was completely realigned.

Most of the displaced voters from the 18th were moved to the 29th, transforming that district from a long existing Latino opportunity district. He also noted that it seems designed to cause the winner of the special election for the 18th Congressional District to run in the 29th. Murray concludes "the redrawn 18th provides a classic example of packing minority voters into a district they will overwhelmingly dominate, while reducing African American ability elsewhere to elect candidates of their choice."

Murray noted other examples of discrimination such as how the 7th Congressional District, dominated by white voters, was treated favorably in the map compared to Congressional Districts 9, 18 and 29. In Harris County, 9 Congressional Districts are wholly or partly contained in the county, but none will elect the Latino candidate of choice.

The Anglo population in Texas is less than 40 percent Anglo, but the new map will increase the number of Anglo dominated seats to 79%. Importantly, since 2000 the State has added 9 new seats when over 90 percent of its growth has come from the minority population, but this map will leave the State "with fewer Black and Hispanic opportunity districts than existed 20 years ago." He concluded that the map "is intentionally racially discriminatory against minorities." In the last round of redistricting, the courts frowned upon such practices.

**Discriminatory Treatment of Incumbents**

While the Supreme Court has acknowledged that avoiding contests between incumbents is a legitimate objective (*Abbott v. Perez*, 585 U.S. 579, 616 (2018)), Plan C2333 specifically targets minority incumbents while protecting Anglo representatives. Both Congressman Green and Congresswoman Crockett have their residences moved out of their districts, while historical precedent shows Anglo incumbents' preferences were accommodated, including requests for country clubs and grandchildren's schools to be included in their districts. Congressman Veasey was also moved meaning that all three African American Congresspersons were drawn out of our districts.

**IV. IRREPARABLE HARM**

Plaintiff-Intervenors and the minority communities they represent will suffer irreparable harm if Plan C2333 is implemented. Vote dilution constitutes irreparable injury that cannot be remedied by money damages. *Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012).

The harms are immediate and concrete:

**Denial of Fundamental Voting Rights**: The systematic elimination and weakening of minority opportunity districts denies African American and Latino voters their fundamental right to participate equally in the political process. *See generally*, *League of United Latin American Citizens v. Perry*, 548 U.S. 399, 440 (2006). In the foregoing case, that was accomplished by removing opportunity that the minorities were about to exercise. Obviously, history rhymes, as the saying goes.

In *Perez v. Abbott*, the Court held that concentrating minority voters into districts wastes their votes. 253 F. Supp. 3d 864, 958–59 (W.D. Tex. 2017). This is what occurred between CDs 9, 18 and 29 in the Harris and Fort Bend Area, and CDs 30, 32 and 33 in Dallas and Tarrant Counties.

**Targeting of Minority Representatives**: Congresswoman Crockett and Congressman Green face immediate harm as their residences have been moved out of their current districts, forcing them to choose between districts and potentially creating contests between minority incumbents.

**Community Fragmentation**: The cracking and packing of minority communities destroys decades of community building and political organization, harms that cannot be undone even if the redistricting is later found unlawful. Failure to apply such movement of populations in a non discriminatory manner is irreparable harm. *See Karcher v. Daggett*, 462 U.S. 725 (1983); *Bush v. Vera*, 517 U.S. 952.

**Loss of Representation**: For the first time in three decades, Harris County's substantial Hispanic population would have no opportunity to elect a congressional representative of their choice, representing a massive step backward in minority political participation. *See* Exhibit A.

## V. BALANCE OF EQUITIES AND PUBLIC INTEREST

The balance of equities strongly favors granting the injunction. The State's interest in implementing an unconstitutional redistricting plan is minimal compared to the fundamental voting rights at stake.

Any administrative burden from enjoining implementation pales in comparison to the constitutional violations and denial of voting rights that would result from Plan C2333's use.

The public interest strongly supports preventing implementation of a discriminatory redistricting plan. As the Supreme Court recognized in *Allen v. Milligan*, 599 U.S. 1 (2023), the Voting Rights Act embodies Congress's judgment that racial discrimination in voting is fundamentally inconsistent with American democratic values. The public interest is always served by preventing constitutional violations and protecting voting rights.

Moreover, allowing Plan C2333 to take effect would perpetuate and exacerbate the very discrimination this litigation seeks to remedy, undermining the judicial process and the rule of law.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff-Intervenors respectfully request that this Court grant their Motion for Preliminary Injunction and enjoin the implementation of Texas Congressional Plan C2333 pending resolution of this litigation on the merits.

The evidence demonstrates that Plan C2333 was enacted through a discriminatory process designed to eliminate minority electoral opportunity in direct response to a federal directive demanding racial discrimination. The plan systematically reduces minority voting strength through classic cracking and packing techniques while abandoning traditional redistricting principles. These constitutional and statutory violations, combined with the irreparable harm to voting rights, compel immediate injunctive relief.

**Respectfully submitted,**

**/s/ Gary Bledsoe**
Gary Bledsoe
State Bar No. 02476500
The Bledsoe Law Firm PLLC
6633 Highway 290 East, Suite 208
Austin, Texas 78723-1157

Telephone: (512) 322-9992

gbledsoe@thebledsoelawfirm.com

**/s/ Robert S. Notzon**

Robert S. Notzon

Addres1502 West Avenue

**Austin, Texas 78701**

robert@notzonlaw.com

**Attorneys for Plaintiff-Intervenors Alexander Green and Jasmine Crockett**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon all counsel of record in accordance with the Federal Rules of Civil Procedure.

**/s/ Gary Bledsoe**

Gary Bledsoe